1   JOSHUA H. LERNER, SBN 220755
      jlerner@gibsondunn.com
2   GIBSON, DUNN & CRUTCHER LLP
    555 Mission Street Suite 3000
3   San Francisco, CA 94105
      Telephone:      415.393.8200
4     Facsimile: 415.393.8306

5   H. MARK LYON, SBN 162061
      mlyon@gibsondunn.com
6   GIBSON, DUNN & CRUTCHER LLP
    1881 Page Mill Road
7   Palo Alto, CA 94304-1211
    Telephone:  650.849.5300
8   Facsimile:   650.849.5333

9   *Attorneys for Defendant Apple Inc.*

10

11                  **UNITED STATES DISTRICT COURT**
                **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
12                      **SOUTHERN DIVISION**

13  MASIMO CORPORATION,
    CERCACOR LABORATORIES, INC.,          CASE NO. 8:20-cv-00048-DOC-DFM
14
                     Plaintiffs,
15                                         Related Case:
           v.                              Case No. 8:18-cv-02001-JVS-JDE
16
    APPLE INC.,                            **DEFENDANT APPLE INC.'S NOTICE
17                                         OF RELATED CASES**
                     Defendant.
18                                         **[Local Rule 83-1.3]**

19                                         Hon. David O. Carter

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

Pursuant to Local Rule 83-1.3.1, Defendant Apple Inc. ("Apple") hereby provides notice of a related case currently pending in the Central District of California.   The following case arises from the same or a closely related transaction, happening, or event as the 20-00048 case presently before this Court, calls for determination of the same or substantially related or similar questions of law and fact, and would entail substantial duplication of labor if heard by different judges:

- *Masimo Corp. et al. v. True Wearables, Inc. et al.*, Case No. 8:18-cv-02001-JVS-JDE.   A copy of Plaintiffs' First Amended Complaint ("FAC") is attached hereto as Exhibit 1.

Masimo Corporation ("Masimo") and Cercacor Laboratories, Inc. ("Cercacor") (collectively, "Plaintiffs") filed the 18-02001 case against Defendants True Wearables, Inc. ("True Wearables") and Marcelo Lamego ("Lamego") on November 8, 2018, asserting claims for alleged breach of contracts, breach of fiduciary duty, trade secret misappropriation under California's Uniform Trade Secrets Act (Cal. Civ. Code §§ 3426 *et seq*.), trade secret misappropriation under the federal Defend Trade Secrets Act of 2016 (18 U.S.C. §§ 1836 *et seq.*), and patent infringement of five patents (35 U.S.C. § 271(a), (b), and (c)).   Plaintiffs filed their FAC on June 17, 2019.   *See* Ex. 1.   The case is currently at the claim construction stage, with claim construction briefing complete and the *Markman* hearing set for March 25, 2020.   *See* Dkt. 71, *True Wearables*, No. 8:18-cv-02001-JVS-JDE (Scheduling Notice).

The factual allegations giving rise to Plaintiffs' California and federal trade secret misappropriation claims in the 18-02001 case include the same facts alleged to support Plaintiffs' trade secret misappropriation, patent ownership, and correction of inventorship claims pending in the present case.   In particular, Plaintiffs allege in the 18-02001 case that Lamego resigned from Cercacor after learning of "Apple's interest and heavy recruiting of Masimo's technical and clinical team, including soliciting Masimo's key engineers," such as "Masimo's Chief Medical Officer, Michael O'Reilly."   Ex. 1. (FAC ¶ 35).   Plaintiffs also allege that "[s]hortly after joining Apple, Lamego pursued

on behalf of Apple numerous patent applications on some of the same technologies as disclosed in Masimo's patents," and "was listed as an inventor in multiple Apple-filed patent applications that were closely tied to the work he had done [for Masimo]." *Id.* ¶¶ 35, 37. Plaintiffs further allege that "while at Apple, Lamego worked as an engineer on development of non-invasive physiological measurements, including pulse oximetry, for Apple for wearable products." *Id.* ¶ 37. These allegations are nearly identical to the ones Plaintiffs include in their Complaint in the present case. *See, e.g.*, Compl. ¶¶ 20–23, *Masimo Corp. v. Apple Inc.*, No. 8:20-cv-00048-DOC-DFM ("20-00048 Compl."). Moreover, Plaintiffs reference the same or similar confidentiality agreements in both cases (although they did not include copies of the agreements in the present case). *Compare, e.g.*, Ex. 1 (FAC ¶¶ 18, 22, 25, 28, 31), *with* 20-00048 Compl. ¶¶ 18, 184, 186–87.

In addition, on January 8, 2020, Plaintiffs served Apple with a subpoena (attached hereto as Exhibit 2) in the 18-02001 case. The subpoena requests documents and testimony pertaining to Lamego's employment at Apple and his involvement in, and disclosures to Apple about, several topics relating to "physiological parameter monitoring" and "non-invasive measurement of blood parameters"—the very same topics and documents that will be relevant to Plaintiffs' claims in the present case. *See, e.g.*, Ex. 2 (Subpoena Ex. A, at 2; Subpoena Ex. B, at 7–11). This subpoena further illustrates that the two cases are closely related.

Lastly, two of the patents asserted in the present case—U.S. Pat. Nos. 8,457,703 ("the '703 patent") and 10,433,776 ("the '776 patent")—are continuations of U.S. Pat. No. 7,295,866 ("the '866 patent," attached hereto as Exhibit 3) asserted in the 18-02001 case, and all three patents share identical specifications and include similar claims. *Compare, e.g.*, '703 patent, claim 1, *and* '776 patent, claim 1, *with* Ex. 3 ('866 patent), claim 1. The two cases will therefore likely involve the same or substantially related issues and arguments with respect to claim construction, invalidity, and infringement. Litigating these cases separately will thus create a substantial duplication of labor if

1  heard by different judges.  Judge Selna is already familiar with the law and the facts in

2  the 18-02001 case, and has already begun to consider the parties' claim construction

3  arguments.  While additional claim construction arguments may also arise in the present

4  case, requiring another judge to become familiar with the underlying issues, when Judge

5  Selna has already done so, will result in a substantial and expensive duplication of labor.

6  Accordingly, Apple respectfully submits that the present action qualifies for related case

7  transfer under Local Rule 83-1.3.1.

8  Dated:  February 28, 2020

                  Respectfully submitted,

9                    JOSHUA H. LERNER
                  H. MARK LYON

10                   GIBSON, DUNN & CRUTCHER LLP

11

12                   By:  */s/ Joshua H. Lerner*
                          Joshua H. Lerner

13

14                   *Attorneys for Defendant Apple Inc.*

Gibson, Dunn &
Crutcher LLP

# EXHIBIT 1

Exhibit 1
Page 5

Joseph R. Re (Bar No. 134479)
joseph.re@knobbe.com
Stephen C. Jensen (Bar No. 149894)
stephen.jensen@knobbe.com
Irfan A. Lateef (Bar No. 204004)
irfan.lateef@knobbe.com
Brian C. Claassen (Bar No. 253627)
brian.claassen@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, Fourteenth Floor
Irvine, CA  92614
Telephone:  (949)-760-0404
Facsimile:  (949)-760-9502

Attorneys for Plaintiffs,
**Masimo Corporation and**
**Cercacor Laboratories, Inc.**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| MASIMO CORPORATION, a Delaware corporation; and CERCACOR LABORATORIES, INC., a Delaware corporation, <br><br> Plaintiffs, <br><br> v. <br><br> TRUE WEARABLES, INC., a Delaware corporation; and MARCELO LAMEGO, an individual, <br><br> Defendants. | Case No. 8:18-CV-02001 <br><br> **COMPLAINT FOR** <br> **(1) BREACH OF CONTRACT** <br> **(2) TRADE SECRET** <br> **    MISAPPROPRIATION** <br> **(3) BREACH OF FIDUCIARY DUTY** <br> **    AND** <br> **(4) PATENT INFRINGEMENT** <br><br> **AND DEMAND FOR JURY TRIAL** |

Exhibit 1
Page 6

Plaintiffs MASIMO CORPORATION ("Masimo") and CERCACOR LABORATORIES, INC. ("Cercacor") hereby complain of Defendants TRUE WEARABLES, INC. ("True Wearables") and MARCELO LAMEGO ("Lamego") (collectively, "Defendants"), and allege as follows:

## I.  THE PARTIES

1.      Plaintiff Masimo is a Delaware corporation having its principal place of business at 52 Discovery, Irvine, California 92618.

2.      Plaintiff Cercacor is a Delaware corporation having its principal place of business at 40 Parker, Irvine, California 92618.

3.      Plaintiffs Masimo and Cercacor formerly employed Defendant Lamego as a highly-trusted engineer.

4.      Lamego is now the founder, CEO, and Chairman of the Board of Defendant True Wearables.  True Wearables is a relatively new company that recently began selling Oxxiom, a pulse oximeter apparently intended to compete directly with Plaintiffs' products.

5.      On information and belief, Defendant Lamego resides at 18 Lyra Way, Coto de Caza, California 92679 and Defendant True Wearables is a Delaware corporation having a principal place of business at 29826 Avenida de Las Banderas, Suite 300, Rancho Santa Margarita, California 92688.

## II.  JURISDICTION AND VENUE

6.      This civil action includes claims for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 100, *et seq.*, more particularly, 35 U.S.C. §§ 271 and 281.  This action also arises under the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1836(b)-(c).  This Complaint further alleges breach of contract, trade secret misappropriation, and breach of fiduciary duty.

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(a), and 1367(a).

Exhibit 1
Page 7

8.     Defendant Lamego resides in California.   Defendant True
Wearables has its principal place of business in California.  Both Defendants are
subject to personal jurisdiction in California and have committed the acts
complained of in this Judicial District.   The relevant agreements between
Plaintiffs and Lamego also include consent to personal jurisdiction in
California.

9.     Venue is proper in the Southern Division of the Central District of
California pursuant to 28 U.S.C. § 1400(b) with respect to patent infringement
because Lamego resides in, and True Wearables has its regular and established
place of business in, the County of Orange within the Central District of
California.  Defendants also have committed acts of infringement in this Judicial
District.   Venue is also appropriate in this Judicial District under U.S.C.
§ 1391(b) with respect to the DTSA claims.

### III.  <u>STATEMENT OF THE CASE</u>

10.    This action seeks relief for the theft of Plaintiffs' highly
confidential information and trade secrets, and infringement of Masimo's
patents by Lamego and True Wearables.  Lamego betrayed Plaintiffs' trust by
acquiring and wrongfully using their highly confidential and proprietary
technical information, product plans, manufacturing knowledge, and other
highly confidential information.  Lamego also breached his agreements with
Plaintiffs by using and disclosing Plaintiffs' confidential information. This
action also seeks relief for Lamego's breach of his fiduciary duty to Cercacor.

### IV.  <u>STATEMENT OF FACTS</u>

11.    Masimo is a medical technology company that revolutionized pulse
oximetry and is the only company to have succeeded in developing certain other
noninvasive patient monitoring technologies.  Pulse oximetry is a noninvasive
method for monitoring a person's arterial oxygen saturation (also called
"$SpO_2$") and pulse rate from a sensor that is attached to a user.  Before Masimo,

Exhibit 1
Page 8

pulse oximetry was plagued by unreliability, often when the measurement was needed most, due to patient motion and low peripheral blood flow (known as "low perfusion").   The industry had essentially given up on solving this problem, concluding it was largely unsolvable.   Clinicians had to live with the results – patient monitors gave excessive false alarms, froze their measurements for prolonged periods of time despite potential changes in oxygen saturation or pulse rate, delayed notification of alarms due to long averaging times of sensor data, produced inaccurate measurements, or were unable to obtain data on the most critical patients and babies who cannot be instructed to stay still. Masimo's pioneering technology, known as Masimo Signal Extraction Technology ("Masimo SET"), solved this problem and dramatically improved patient safety by accurately monitoring and reporting oxygen saturation and pulse rate even during motion and low perfusion.

12.     Following its success in pulse oximetry, Masimo subsequently invested in developing additional breakthrough measurement technologies, such as non-invasively measuring total hemoglobin, carboxyhemoglobin, and methemoglobin.   Masimo has continued to innovate, succeeding where others have consistently failed.   Masimo was the first, and remains the only, company delivering these game-changing technologies to hospitals in the United States.

13.     From its inception, Masimo has continuously developed cutting-edge noninvasive patient monitoring technologies.   Masimo sought and received numerous U.S. patents for many of its inventions in this area.   Masimo's revolutionary technology was a key to its gaining significant market praise and penetration.   After introduction into the market, many competitors, much larger than Masimo, used Masimo's technology without a license, resulting in patent infringement lawsuits that ultimately confirmed the validity of Masimo's innovations.   But, Masimo does not pursue patents on all its innovations. Masimo maintains some technology as trade secrets.   In addition, Masimo

Exhibit 1
Page 9

guards its future product and market plans. Only select employees have knowledge of and access to these guarded secrets.

14.     Masimo's innovations also include important advances in sensor technologies that complement Masimo's system and algorithms. Masimo's sensors are integral to the success of the revolutionary technologies Masimo has developed. Masimo also pioneered techniques to manufacture sensors with low waste and low cost, while still providing high quality and exacting specifications. These sensor manufacturing techniques have been critical to Masimo's innovation engine and success for many years.

15.     In 1998, Masimo spun certain technology off into a new company, Masimo Laboratories, Inc. or "Masimo Labs," to further research and develop the technologies. The name of the company was later changed to "Cercacor." Cercacor and Masimo have a license agreement between them to facilitate confidential collaboration between the companies.

16.     Like Masimo, Cercacor is an innovator of non-invasive monitoring technologies. Cercacor is on the frontline of understanding how measuring, tracking, and analyzing physiological parameters can impact pre-diabetic and diabetic patients, endurance sports training and performance and overall health and wellness. Cercacor continued the development that started at Masimo on total hemoglobin (SpHb), methemoglobin (SpMet), and carboxyhemoglobin (SpCO®) and other non-invasive parameters.

17.     Leading hospitals around the world use Cercacor technology licensed to Masimo and sold under the name Masimo rainbow SET. Like Masimo, Cercacor does not pursue patents on all its innovations. Cercacor also maintains some technology as trade secrets, and guards its future product and market plans. Only select employees have knowledge of and access to these guarded secrets.

/ / /

Exhibit 1
Page 10

18.     Masimo and Cercacor carefully guard the secrecy of their confidential information and documents.  For example, Masimo and Cercacor have policies regarding labelling confidential information and documents as "CONFIDENTIAL AND PROPRIETARY." They also restrict these documents and information from disclosure to third parties and employees on a need-to-know basis.  Masimo and Cercacor also have policies in place regarding the use of computers and related equipment that govern how their computer systems may be used.  Those policies also govern the protection of Masimo's and Cercacor's confidential information.  Both Masimo and Cercacor have document management systems that restrict access to confidential documents to only those employees with proper security credentials and a need for access. Masimo and Cercacor also require employees to sign agreements precluding the employees from disclosing or making use of any confidential information except as authorized by Masimo and Cercacor and as necessary for the performance of the employees' duties.  Masimo and Cercacor implemented such policies and procedures to maintain the confidentiality of sensitive information. These polices were in place during Lamego's employment and remain in place today.

19.     When Lamego started at Masimo, he was not skilled in physiological monitoring and had no exposure to manufacturing techniques. However, Masimo ultimately came to believe, after some time, that he had the technical capability to excel.  He had exhibited what appeared to be high integrity and qualities of trustworthiness.   Accordingly, Masimo ultimately decided to allow Masimo's key engineers who developed Masimo's revolutionary technology to disclose it to Lamego.  Masimo believed that, by allowing these key engineers to disclose the secrets of Masimo's technologies, Lamego could eventually take over for Masimo's chief scientist.  To accomplish this, Masimo arranged to have Lamego shadow these engineers, and expose him

Exhibit 1
Page 11

to every aspect of Masimo's technology, including top-secret algorithms, proprietary circuit board manufacturing, confidential sensor designs and much more. The engineers disclosed the extensive secrets that underlie Masimo technology and Masimo gave Lamego unfettered access to its most highly confidential technical information. Masimo groomed Lamego to continue this development with the access he had been given to the top engineers at Masimo.

20.    In addition to revealing the secrets of Masimo's technology, Masimo exposed Lamego to Masimo's plans with respect to future products and market plans. Through this exposure, Masimo disclosed to Lamego what technologies Masimo believed would be significant and successful in those markets.

21.    Masimo's founder, Chairman and CEO, also disclosed to Lamego Masimo's know-how and trade secrets regarding his strategic vision of non-invasive monitoring, managing an R&D organization, and strategic product and marketing plans. Indeed, Masimo's founder had regular one-on-one meetings with Lamego to disclose Masimo's know-how and trade secrets to him.

22.    Lamego started with Masimo in 2000 as an Algorithm Engineer, initially staying less than one year. At that time, Lamego agreed to and signed a Masimo Employee Confidentiality Agreement (the "Masimo 2000 Agreement") dated June 26, 2000. A copy of the Masimo 2000 Agreement is attached hereto as Exhibit 1. Among the terms of the Masimo 2000 Agreement are the following:

   a.    "For purposes of this Agreement, the term Confidential Information means any information in any form that Masimo considers confidential, including business plans, customer files, sales and marketing reports, technical data, prices and costs, designs and formulas, software, databases, personnel and payroll records, mailing lists, accounting records, and other business information."

Exhibit 1
Page 12

      b.    "During my employment by Masimo, I will not disclose or make use of any Confidential Information except as authorized by Masimo and as necessary for the performance of my duties as a Masimo employee."

      c.    "After my employment with Masimo has terminated, I will not disclose or make use of any Confidential Information for any purpose, either on my own or on behalf of another business."

      d.    "Upon termination of my employment for any reason, I will immediately assemble all property of Masimo in my possession or under my control and return it unconditionally to Masimo."

      e.    "During my employment, I will devote all of my working time and energy to the business of Masimo, and I will not render services to anyone outside Masimo, accept competing employment, or make preparations to compete with Masimo."

      f.    "During and after my employment, I will not solicit or induce any employee or consultant of Masimo to quit their employment or cease doing business with Masimo…."

      g.    "For purposes of enforcing this Agreement, I hereby consent to jurisdiction in the Superior Court of California for the County of Orange, as well as any other jurisdiction allowed by law."

      h.    "I understand that my obligations under this Agreement remain in effect even after my employment with Masimo terminates."

23.    When he started in 2000, Lamego was not familiar with pulse oximetry product development. Masimo's key engineers began training Lamego on Masimo's pulse oximetry technology, from basic principles to sophisticated Masimo algorithms and approaches.

24.    Lamego left Masimo for a short period from January 2001 to December 2002 to work as a consultant and professor. Lamego returned to

Exhibit 1
Page 13

Masimo in January 2003, as a Research Scientist, and held that position until November 2006.

25.    Upon re-joining Masimo, Lamego signed a second agreement with Masimo dated January 28, 2003 with provisions similar to his first agreement. A copy of the 2003 Agreement is attached hereto as Exhibit 2.  The 2003 Agreement further confirmed, "I agree to assign and hereby assign to Masimo all rights that I may have to any inventions, works of authorship, developments, improvements, or trade secrets that I may develop during the course of my employment, except for inventions which I am allowed to retain under California Labor Code section 2870, a copy of which is attached to this Agreement as Exhibit B."

26.    Masimo's most trusted and skilled engineers continued to expose Lamego to Masimo's technology.  As Lamego became more immersed in Masimo's technology, Masimo gave Lamego access to the most confidential of information that was restricted to only a very small number of Masimo's trusted engineers.  Masimo's chief scientist spent significant time over the years disclosing to Lamego Masimo's technical know-how and trade secrets.  To accelerate this process, Masimo's chief scientist shared an office with Lamego for years, disclosing everything he could about Masimo technology.  Masimo expected Lamego would eventually succeed Masimo's chief scientist.

27.    In his trusted position, Masimo exposed Lamego to Masimo's future product and market plans.  Lamego was a senior member of a team that was developing SpHb, SpMet, SpCO, and other non-invasive parameters.  He was also part of a team developing a plan to pursue un-tethered, wearable monitoring solutions and wireless sensors, whereby the patient or user would no longer be connected by a wire to a monitor.  Masimo had begun its strategic plans for wireless sensors and wearable monitors, and Lamego was privy to those discussions and plans.  Those plans also included developing wearable

Exhibit 1
Page 14

devices, including wireless sensors and wearable monitors, and marketing those products outside of the medical field, for example, to athletes and health conscious consumers.  Lamego was personally involved in strategic discussions on both the marketing and product plans for wireless sensors and wearable monitors and the planned target markets.   These plans were not generally known.

28.    Lamego signed a third agreement with Masimo dated January 31, 2005.  A copy of the 2005 Agreement is attached hereto as Exhibit 3.  The 2005 Agreement also added:

a.    "For purposes of this Agreement, the term Confidential Information means any information in any form that Masimo considers confidential, including without limitation business plans, customer files, sales and marketing reports, technical data, prices and costs, designs and formulas, software, databases, personnel and payroll records, mailing lists, accounting records, and other business information.  Confidential Information also includes information to which I am exposed during the course of my employment with Masimo that is considered confidential to Masimo's affiliates or any third party."

b.    "Upon termination of my employment for any reason, I will immediately assemble all property of Masimo in my possession or under my control and return it unconditionally to Masimo.

c.    "I agree that the fruits and products of my labor as a Masimo employee shall belong solely to Masimo."

d.    "I agree that the activities forbidden in paragraphs 13 and 14 above would necessarily involve the use or disclosure of Masimo's trade secrets and proprietary and confidential information . . . and are necessary to protection of Masimo's trade secrets and proprietary and confidential information.  I understand that none of my activities will be prohibited

Exhibit 1
Page 15

under paragraphs 13 and 14 to the extent that I can prove that the action was taken without the use or disclosure of any of Masimo's trade secrets or proprietary or confidential information.

29.    In 2006, Lamego, having received extensive exposure to Masimo's confidential information from Masimo's key engineers, moved from Masimo to Masimo Labs.  Lamego was promoted to Chief Technical Officer of Masimo Labs.  With this promotion, he became the most senior ranking executive engineer of Masimo Labs.  Masimo Labs' mission was to continue developing non-invasive technologies using the technology originally developed at Masimo, which was licensed to Masimo Labs.  Masimo Labs focused on the market outside of the professional medical caregiver market with these new innovative technologies.

30.    Masimo Labs was also working to measure glucose levels in the blood non-invasively.  As CTO, Lamego led all Masimo Labs' technology development.  He was also involved in, exposed to, and responsible for carrying out strategic plans for products and markets, including for wearable monitors and wireless sensors, and target markets for those products.

31.  While at Masimo Labs, Lamego signed an Employee Confidentiality Agreement (the "Cercacor Agreement") dated May 19, 2009.  A copy of the Cercacor Agreement is attached hereto as Exhibit 4.  Among the terms of the Cercacor Agreement are the following:

a.    "For purposes of this Agreement, the term Confidential Information means any information in any form that Masimo Labs considers confidential, including without limitation business plans, customer files, customer lists, supplier lists, sales and marketing reports, forecasts, strategies, technical data, prices and costs, designs and formulas, discoveries, processes, manufacturing techniques, know-how, improvements, ideas or copyrightable works, software, databases,

Exhibit 1
Page 16

personnel and payroll records, mailing lists, accounting records, works of authorship, inventions, trade secrets and other business information. Confidential Information also includes information to which I am exposed during the course of my employment with Masimo Labs that is considered confidential to Masimo Labs' affiliates or any third party."

b.    "During my employment by Masimo Labs, I will not disclose or make use of any Confidential Information except as authorized by Masimo Labs and as necessary for the performance of my duties as a Masimo Labs employee."

c.    "After my employment with Masimo Labs has terminated, I will not disclose or make use of any Confidential Information for any purpose, either on my own or on behalf of another business."

d.    "Upon termination of my employment for any reason, I will immediately assemble all property of Masimo Labs, including any proprietary or confidential information, in my possession or under by control and return it unconditionally to Masimo Labs."

e.    "During my employment, I will devote all of my working time and energy to the business of Masimo Labs, and I will not render services to anyone outside Masimo Labs, accept competing employment, or make preparations to compete with Masimo Labs."

f.    "I agree that the activities forbidden in paragraphs 13 and 14 above would necessarily involve the use or disclosure of Masimo Labs' trade secrets and proprietary and confidential information and are necessary to protection of Masimo Labs' trade secrets or activities."

g.    "For purposes of enforcing this Agreement, I hereby consent to jurisdiction in the Superior Court of California for the County of Orange, as well as any other jurisdiction allowed by law."

/ / /

Exhibit 1
Page 17

      h.    "I understand that my obligations under this Agreement remain in effect even after my employment with Masimo Labs terminates."

32.    The Masimo 2000 Agreement, 2003 Agreement, 2005 Agreement, and the Cercacor 2009 Agreement are collectively referred to herein as the "Lamego Agreements."

33.    At Masimo Labs, later renamed Cercacor, Lamego's understanding of Plaintiffs' confidential information continued to develop regarding, among other things, the construction of physiological sensors, how to manufacture high-quality sensors to exacting specifications at a reasonable cost, how to process signals based on light transport through physiological tissue, and photon diffusion. He continued to be Cercacor's most-trusted engineer with unrestricted access to Masimo's and Cercacor's confidential information. In his executive role at Cercacor, he was further closely involved in the strategic future plans of Masimo and Cercacor on many topics, including Masimo plans to enter certain markets and particular technologies that would likely be successful. He was also introduced to potential suppliers relating to components for wireless sensors and untethered monitors.

34.    In his role at Cercacor, Lamego led the engineering team and Cercacor's research and product development. With regular guidance provided by the CEO, Lamego managed and directed all technical activities, including developing product roadmaps, project management, intellectual property strategy, recruitment of employees, negotiation of supplier agreements and non-disclosure agreements, modeling, hardware development, algorithm design, software implementation, biosensor development, and industrial design. Lamego also participated in many discussions about the development of a wireless sensor and other wireless configurations for Plaintiffs. Masimo and Cercacor disclosed their vast pulse oximetry sensor technology, including

Exhibit 1
Page 18

processing of signals based on light transport through physiological tissue, and photon diffusion while he worked.  Masimo also disclosed manufacturing techniques for producing pulse oximetry sensors with reasonable cost constraints.  As former Chief Technical Officer of Cercacor and a Research Scientist at Masimo, he had unfettered access to and responsibility for maintaining Plaintiffs' highly confidential technical information.

35.    Lamego resigned from Cercacor in January 2014, after having sought, and obtained, a position at Apple, Inc.  Lamego learned of Apple's interest and heavy recruiting of Masimo's technical and clinical team, including soliciting Masimo's key engineers.  Apple's recruitment included the key engineers that Lamego knew intimately understood Masimo's technology.  Apple also solicited and succeeded in hiring Masimo's Chief Medical Officer, Michael O'Reilly, who as a Masimo executive, was also intimately familiar with Masimo's strategic product and marketing plans.  Lamego was aware of Masimo's and Cercacor's concerns about Apple pursuing key team members.  On information and belief, Lamego then sought and obtained a position from Apple.  Shortly after joining Apple, Lamego pursued on behalf of Apple numerous patent applications on some of the same technologies as disclosed in Masimo's patents.

36.    When Lamego informed Masimo and Cercacor that he was leaving for Apple, Lamego proactively volunteered to Masimo and Cercacor that he would not work on pulse oximetry and other technologies he had worked on while with Masimo or Cercacor.  He assured Plaintiffs that if Apple asked him to do so, he would quit.  Yet, he continued such work on his own after leaving Apple.

37.    Although only at Apple for seven months, Lamego was listed as an inventor in multiple Apple-filed patent applications that were closely tied to the work he had done and the technology he had been taught by Masimo's key

Exhibit 1
Page 19

scientists.   Based on those now-published patent applications, Masimo and Cercacor now understand that while at Apple, Lamego worked as an engineer on development of non-invasive physiological measurements, including pulse oximetry, for Apple for wearable products, directly in conflict with his assurances to Masimo and Cercacor.

38.    After seven months, Lamego's employment at Apple ended.  He then founded True Wearables.  In late 2016, Plaintiffs cautioned Lamego that his activity raised significant concerns about his obligations to Plaintiffs. Lamego contended that the products he was developing for True Wearables did not rely on Plaintiffs' confidential information.  But, Lamego refused to share with Plaintiffs' outside counsel the Oxxiom hardware or software. On information and belief, Lamego later released his Oxxiom device with its software fully encrypted.

39.    Lamego also was aware of Masimo's and Cercacor's ongoing projects for wearable wireless devices, and indeed, Lamego oversaw such projects at Cercacor.  Plaintiffs' plans, known to Lamego, were not generally known outside of Plaintiffs.

40.    After True Wearables introduced its Oxxiom product to market, Plaintiffs unfortunately confirmed the concerns raised by Lamego and True Wearables that were identified in the Plaintiffs' letters.

41.    Lamego never sought any type of permission or rights from Plaintiffs to use their confidential information, trade secrets or other intellectual property.

42.    Before Lamego left Cercacor, he claimed to have proven the feasibility of measuring glucose and multiple other blood constituents non-invasively.  He assured Cercacor's CEO that he had transferred all know-how for these measuring these blood constituents to others at Cercacor.  Because of the unexpected departure of Lamego, Cercacor revisited the feasibility studies

Exhibit 1
Page 20

and could not demonstrate feasibility of any of the measurements.  Accordingly, either Lamego withheld from Cercacor information critical to the development of the technology for these parameters or misrepresented their feasibility.

43.    Lamego also recruited onto Defendant True Wearables' Board another former Masimo executive, Anthony Allan, previously Chief Operating Officer at Masimo.  Allan was in charge of manufacturing at Masimo, and had access to extensive know-how regarding Masimo's manufacturing, such as how to manufacture disposable and reusable pulse oximetry sensors, to exacting specifications, at a reasonable cost with low waste.

## V.  FIRST CAUSE OF ACTION
### (BREACH OF CONTRACT WITH MASIMO BY LAMEGO)

44.    Masimo hereby realleges and incorporates by reference the allegations set forth in paragraphs 1 through 43.

45.    The covenants in the Masimo 2000 Agreement, 2003 Agreement, and 2005 Agreement (collectively, "Masimo Agreements") were intended and necessary to protect Plaintiffs' legitimate business interests in its goodwill and confidential information.

46.    The Masimo Agreements are valid and enforceable contracts between Masimo and Lamego.

47.    Because of the Masimo Agreements, Lamego had an obligation to keep confidential and not to disclose or to make use of any of Masimo's confidential information, except as authorized by Masimo and as necessary for the performance of his duties as an employee of Masimo.

48.    Because of the Masimo Agreements, Lamego also had an obligation not to disclose or to make use of any Masimo confidential information, for any purpose, either on his own or on behalf of another business after his employment with Masimo had terminated.

/ / /

Exhibit 1
Page 21

49.     Masimo breached the Masimo Agreements by taking and using Masimo's confidential information for his own benefit and for the benefit of True Wearables.  On information and belief, Lamego continues to breach the Masimo Agreements by wrongfully utilizing Masimo's confidential information to the benefit of others and in the course of his employment with True Wearables.

50.     Because of the Masimo Agreements, Lamego also had an obligation to cooperate with Masimo to do whatever necessary or appropriate to obtain patents.

51.     Lamego breached the Masimo Agreements by failing to cooperate with Masimo by failing to pursue the patenting of certain subject matter he was instructed to pursue, as well as by refusing to review and sign inventor declarations and assignments for continuing patent applications on which he was a named inventor.  Masimo suffered harm as a result, including attorneys' fees and expenses.

52.     Masimo has fully performed all its obligations and has satisfied all conditions for performance under the Masimo Agreement.

53.     Lamego has willfully, and with conscious disregard for the contractual obligations owed to Masimo, breached the Masimo Agreements.

54.     Unless restrained and enjoined by the Court, Lamego will continue to breach the Masimo Agreements.

55.     As a foreseeable, direct, and proximate result of Lamego's breach of contract, Masimo has suffered irreparable injury to their rights and pecuniary damages.  Masimo will continue to suffer such injury, loss, and damage unless and until Lamego is enjoined from further use or disclosure of Masimo's confidential information.

56.     Lamego has derived and received and will continue to derive and to receive from the aforementioned breach of contract, gains, profits, and

Exhibit 1
Page 22

advantages, many of which are not presently known to Masimo. As a result, Lamego should be required to disgorge these gains, profits, and advantages in restitution for his breach.

57.     Masimo is therefore entitled to injunctive relief or specific performance of the Masimo Agreements.

## VI.  <u>SECOND CAUSE OF ACTION</u>
## <u>(BREACH OF CONTRACT WITH CERCACOR BY LAMEGO)</u>

58.     Plaintiffs hereby reallege and incorporate by reference the allegations set forth in paragraphs 1 through 57.

59.     The covenants in the Cercacor Agreement were intended and necessary to protect Cercacor's legitimate business interests in its goodwill and confidential information.

60.     The Cercacor Agreement is a valid and enforceable contract between Cercacor and Lamego.

61.     Because of the Cercacor Agreement, Lamego had an obligation to keep confidential and not to disclose or to make use of any of Cercacor's confidential information, except as authorized by Cercacor and as necessary for the performance of his duties as an employee of Cercacor.

62.     Because of the Cercacor Agreement, Lamego also had an obligation not to disclose or to make use of any Plaintiffs' confidential information, for any purpose, either on his own or on behalf of another business after his employment with Cercacor had terminated.

63.     Lamego breached the Cercacor Agreement by taking and using Cercacor's confidential information for his own benefit and for the benefit of True Wearables. On information and belief, Lamego continues to breach the Cercacor Agreements by wrongfully utilizing Plaintiffs' confidential information to the benefit of others and in the course of his employment with True Wearables.

Exhibit 1
Page 23

64.     Lamego also breached the Cercacor Agreement by taking and using Cercacor's trade secrets to compete directly with Cercacor.  Cal. Bus. & Prof. Code § 16600 generally prohibits agreements forbidding former employees from engaging in work for a competitor.  However, courts in California have recognized a trade secrets exception to Section 16600.  *See Asset Mktg. Sys. v. Gagnon*, 542 F.3d 748, 758 (9th Cir. 2008).  Lamego agreed with Cercacor "for a period of two (2) years immediately following my termination of employment with Masimo Labs (voluntary or otherwise), I shall be prohibited from competing with any business, product or service of Masimo Labs."  Ex. 4 at ¶14.  Lamego also agreed that this was necessary to protect trade secrets. *See* Ex. 4 at ¶15.  Lamego and True Wearables compete directly with Cercacor, using Cercacor trade secrets, in violation of the terms of the Cercacor Agreement.

65.     Because of the Cercacor Agreement, Lamego also had an obligation to cooperate with Cercacor to do whatever necessary or appropriate to obtain patents.

66.     Lamego breached the Cercacor Agreement by failing to cooperate with Cercacor by failing to pursue the patenting of certain subject matter he was instructed to pursue, as well as by refusing to review and sign inventor declarations and assignments for continuing patent applications on which he was a named inventor.  Cercacor suffered harm as a result, including attorneys' fees and expenses.

67.     Lamego also breached the Cercacor Agreement by not disclosing sufficient information regarding glucose and the other non-invasive parameters he claimed to have proven feasibility of at Cercacor, or in the alternative, not accurately presenting the status of their development.

68.     Cercacor has fully performed all its obligations and have satisfied all conditions for performance under the Cercacor Agreement.

Exhibit 1
Page 24

69.     Lamego has willfully, and with conscious disregard for the contractual obligations owed to Plaintiffs, breached the Cercacor Agreement.

70.     Unless restrained and enjoined by the Court, Lamego will continue to breach the Cercacor Agreement.

71.     As a foreseeable, direct, and proximate result of Lamego's breach of contract, Cercacor has suffered irreparable injury to their rights and pecuniary damages.  Cercacor will continue to suffer such injury, loss, and damage unless and until Lamego is enjoined from further use or disclosure of Cercacor's confidential information.

72.     Lamego has derived and received and will continue to derive and to receive from the aforementioned breach of contract, gains, profits, and advantages, many of which are not presently known to Cercacor.  As a result, Lamego should be required to disgorge these gains, profits, and advantages in restitution for his breach.

73.     Cercacor is therefore entitled to injunctive relief or specific performance of the Cercacor Agreement.

## VII.  <u>THIRD CAUSE OF ACTION</u>
### <u>(TRADE SECRET MISAPPROPRIATION UNDER</u>
### <u>CALIFORNIA'S UNIFORM TRADE SECRET LAW)</u>

74.     Plaintiffs hereby reallege and incorporate by reference the allegations set forth in paragraphs 1 through 73.

75.     This is a cause of action for Misappropriation of Trade Secrets under California's Uniform Trade Secrets Act, Cal. Civ. Code §§ 3426 *et seq*., based upon Defendants' wrongful and improper use and disclosure of confidential and proprietary trade secret information of Plaintiffs.

76.     Plaintiffs own the trade secrets including, but not limited to, Plaintiffs' business plans, know-how, technical information, technical data, designs, manufacturing techniques and other business information ("Confidential

Exhibit 1
Page 25

Information").

77.     Plaintiffs' Confidential Information is currently, and was at the time of Defendants' misappropriation, not generally known. All individuals with access to Plaintiffs' Confidential Information were instructed to keep it confidential, and they were subject to obligations to keep Plaintiffs' Confidential Information secret.  Additionally, Plaintiffs' Confidential Information is not generally known to the public or to other persons who can obtain economic value from its disclosure or use.

78.     Plaintiffs' Confidential Information has actual and potential independent economic value because it is not generally known.  The actual and potential independent economic value of Plaintiffs' Confidential Information is derived from not being generally known because it gives Plaintiffs an actual and potential business advantage over others who do not know the information and who could obtain economic value from its disclosure or use.

79.     Plaintiffs made reasonable efforts under the circumstances to keep Plaintiffs' Confidential Information from becoming generally known.   For example, Plaintiffs' efforts included marking documents confidential, instructing those individuals with access to the information to treat it as confidential, restricting access to the information, and requiring individuals to sign confidentiality agreements.

80.     Plaintiffs are informed and believe, and thereon alleges, that Lamego misappropriated Plaintiffs' Confidential Information by disclosure.   On information and belief, Lamego disclosed Plaintiffs' Confidential Information, without Plaintiffs' consent, to True Wearables, True Wearables' employees, and True Wearables' contractors in order for them improperly develop the Oxxiom product.  Additionally, at the time of disclosure, Lamego knew or had reason to know that his knowledge of Plaintiffs' Confidential Information was acquired by an employer-employee and fiduciary relationship and Lamego's employment

Exhibit 1
Page 26

agreements, which created a duty for Lamego to keep Plaintiffs' Confidential Information secret.

81.     Plaintiffs are informed and believe, and thereon allege, that Defendants also misappropriated Plaintiffs' Confidential Information by use.  On information and belief, Lamego used Plaintiffs' Confidential Information in deciding to form True Wearables, in identifying the target market, the products to pursue, and during Lamego's employment at True Wearables, without Plaintiffs' express or implied consent, for True Wearables to identify the target market, target product, and to develop and manufacture pulse oximetry product.

82.     Plaintiffs are informed and believe, and thereon allege, that True Wearables also misappropriated Plaintiffs' Confidential Information by disclosure.   On information and belief, True Wearables disclosed Plaintiffs' Confidential Information, without Plaintiffs' consent, in order to improperly develop and manufacture the pulse oximetry devices.  True Wearables knew or had reason to know that his knowledge of Plaintiffs Confidential Information came from Plaintiffs, and that Lamego had previously acquired Plaintiff's Confidential Information by virtue of an employer-employee and fiduciary relationship and the Lamego agreements, all of which created a duty for Lamego to keep Plaintiffs' Confidential Information secret.

83.     Plaintiffs are informed and believe, and thereon allege, that Defendants misappropriated Plaintiffs' Confidential Information by acquisition because True Wearables obtained possession of Plaintiffs' Confidential Information from Lamego, when True Wearables knew or had reason to know that Lamego used improper means to acquire it.  Additionally, True Wearables used improper means to acquire Lamego's Confidential Information from Lamego because True Wearables relied on Lamego's breach of his duty not to use Plaintiffs' Trade Secrets.  Lamego acquired the trade secrets by improper means. Additionally, at the time of acquisition, Lamego knew or had reason to know that

Exhibit 1
Page 27

his knowledge of Plaintiffs' Confidential Information came from Plaintiffs and that Lamego had previously acquired Plaintiffs' Confidential Information by virtue of an employer-employee and fiduciary relationship and the Lamego agreements, all of which created a duty for Lamego to protect and not use Plaintiffs' Confidential Information.

84.     Plaintiffs were harmed by Defendants' acquisition, use, and disclosure of Plaintiffs' Confidential Information, and Defendants' actions were substantial factors in causing Plaintiffs' harm.  As a direct and proximate result of Defendants' willful, improper, and unlawful acquisition, use, and disclosure of Plaintiffs' trade secrets, Plaintiffs have suffered, and will continue to suffer, great harm and damage.  Plaintiffs will continue to be irreparably damaged unless Defendants are enjoined from further use and disclosure of Plaintiffs Confidential Information.

85.     Defendants were unjustly enriched by Defendants' acquisition, use, and disclosure of Plaintiffs' Confidential Information, and Defendants' actions were substantial factors in causing Defendants to be unjustly enriched. Defendants were unjustly enriched because their misappropriation of Plaintiffs' Confidential Information caused Defendants to receive a benefit that they otherwise would not have achieved.

86.     If neither damages nor unjust enrichment caused by Defendants' misappropriation of Plaintiffs' Confidential Information is provable at trial, Plaintiffs are entitled to a reasonable royalty for the period of time that Defendants' use of Plaintiffs' Confidential Information could have been prohibited.

87.     The aforementioned acts of Defendants in wrongfully misappropriating Plaintiffs trade secrets were, and continue to be, willful and malicious, warranting an award of reasonable attorneys' fees, as provided by Cal. Civ. Code § 3426.4, and exemplary damages, as provided by Cal. Civ. Code

Exhibit 1
Page 28

§§ 3294 and 3426.3(c).

### VIII.  FOURTH CAUSE OF ACTION
### (TRADE SECRET MISAPPROPRIATION UNDER THE FEDERAL
### DEFENSE OF TRADE SECRETS ACT)

88.   Plaintiffs hereby reallege and incorporate by reference the allegations set forth in paragraphs 1 through 87.

89.   This is a cause of action for Misappropriation of Trade Secrets under the Federal Defense of Trade Secrets Act of 2016, 18 U.S.C. §§ 1836 *et seq.*, based upon Defendants' wrongful and improper use of confidential and proprietary trade secret information of Plaintiffs.

90.   Plaintiffs own the trade secrets including, but not limited to, the Confidential Information previously described.

91.   Plaintiffs' Confidential Information is currently, and was at the time of Defendants' misappropriation, secret.  All individuals with access to Plaintiffs' Confidential Information were instructed to protect it, and they were subject to obligations to keep Plaintiffs' Confidential Information secret.  Additionally, Plaintiffs' Confidential Information is not generally known to the public or to other persons who can obtain economic value from its disclosure or use. Plaintiffs' Confidential Information is not readily ascertainable by the public or to other persons.

92.   Plaintiffs' Confidential Information has actual and potential independent economic value because it is not generally known.  The actual and potential independent economic value of Plaintiffs' Confidential Information is derived from not being generally known because it gives Plaintiffs an actual and potential business advantage over others who do not know the information and who could obtain economic value from its disclosure or use.

/ / /

/ / /

Exhibit 1
Page 29

93.   Plaintiffs made reasonable efforts under the circumstances to keep Plaintiffs' Confidential Information secret.   For example, Plaintiffs' efforts included marking documents confidential, instructing those individuals with access to the information to treat it as confidential, restricting access to the information, and requiring individuals with access to the information to sign confidentiality agreements.

94.   Plaintiffs are informed and believe, and thereon allege, that True Wearables misappropriated Plaintiffs' Confidential Information by use.   True Wearables' unauthorized use of Plaintiff's Confidential Information has occurred after the enactment of the DTSA in May 2016, and such unauthorized and improper use is ongoing and continues to this day.

95.   On information and belief, Lamego disclosed Plaintiffs' Confidential Information, without Plaintiffs' consent, to True Wearables and to True Wearables' employees for them improperly develop the Oxxiom product.   True Wearables used Plaintiffs' Confidential Information, without Plaintiffs' express or implied consent, improperly to pursue the concept, and to identify the target market, identify the target product and develop and manufacture the Oxxiom device.   On information and belief, True Wearables used Plaintiffs' Confidential Information, without Plaintiffs' consent, by choosing the target market, choosing the target product, and advertising and releasing True Wearables Oxxiom product. Additionally, at the time of disclosure, True Wearables knew or had reason to know that Lamego's knowledge of Plaintiffs' Confidential Information was acquired by virtue of an employer-employee and fiduciary relationship and Lamego's employment agreements, which created a duty for Lamego to protect Plaintiffs' Confidential Information.

96.   On information and belief, Defendants also used Plaintiffs' Confidential Information during Lamego's employment at True Wearables, without Plaintiffs' express or implied consent, in order for True Wearables to

Exhibit 1
Page 30

identify the target market, the target product, and develop and manufacture the Oxxiom product.

97.   Plaintiffs' are informed and believe, and thereon allege, that Defendants misappropriated Plaintiffs' Confidential Information by acquisition because True Wearables obtained possession of Plaintiffs' Confidential Information from Lamego, when True Wearables knew or had reason to know that Lamego used improper means to acquire it.   Additionally, True Wearables used improper means to acquire Lamego's Confidential Information from Lamego because True Wearables relied on Lamego's breach of his duty not to use Plaintiffs' Trade Secrets.

98.   Plaintiffs were harmed by Defendants' acquisition, use, and disclosure of Plaintiffs' Trade Secrets, and Defendants' actions were substantial factors in causing Plaintiffs' harm.   As a direct and proximate result of Defendants' willful, improper, and unlawful acquisition, use, and disclosure of Plaintiffs' trade secrets, Plaintiffs have suffered, and will continue to suffer, great harm and damage.   Plaintiffs will continue to be irreparably damaged unless Defendants are enjoined from further use and disclosure of Plaintiffs' Trade Secrets.

99.   Defendants were unjustly enriched by Defendants' acquisition, use, and disclosure of Plaintiffs' Trade Secrets, and Defendants' actions were substantial factors in causing Defendants to be unjustly enriched.   Defendants were unjustly enriched because their misappropriation of Plaintiffs' Trade Secrets caused Defendants to receive a benefit that they otherwise would not have achieved.

100.   In the event that neither damages nor unjust enrichment caused by Defendants' misappropriation of Plaintiffs' Trade Secrets is provable at trial, Plaintiffs are entitled to a reasonable royalty for the period of time that Defendants' use of Plaintiffs' trade secrets could have been prohibited.

Exhibit 1
Page 31

101.   The aforementioned acts of Defendants in wrongfully misappropriating Plaintiffs trade secrets were, and continue to be, willful and malicious, warranting an award of reasonable attorneys' fees, as provided by 18 U.S.C. § 1836(b)(3)(D), and exemplary damages, as provided by 18 U.S.C. § 1836(b)(3)(C).

## IX.  FIFTH CAUSE OF ACTION
### (BREACH OF FIDUCIARY DUTY OF UNDIVIDED LOYALTY AGAINST LAMEGO)

102.   Cercacor hereby realleges and incorporates by reference the allegations set forth in paragraphs 1 through 101.

103.   As an officer of Cercacor, Lamego owed duties of loyalty and other fiduciary duties to Cercacor, including the duty not to exploit his position within Cercacor's corporate structure for his own benefit and the duty not to hinder or usurp Cercacor's corporate opportunities.

104.   While serving as Cercacor's Chief Technical Officer, Lamego oversaw research and development into technology for the noninvasive measurement of over twenty additional blood parameters.

105.   Lamego failed to pursue patent subject matter he was instructed to pursue.  Although filing patents that appeared to relate to the subject matter, Lamego excluded certain subject matter for which he was instructed to seek patent protection.

106.   In 2013, Lamego represented to the Cercacor Board of Directors that many non-invasive parameters were feasible and available for license to Masimo.

107.   Cercacor revisited the feasibility studies for these parameters after Lamego's unexpected departure, but could not confirm their feasibility.  Either Lamego failed to fully disclose information critical to their feasibility, in breach of his fiduciary duty or he did not accurately represent the status, also in breach of his fiduciary duty.  To the extent that Lamego did not accurately present to Cercacor

Exhibit 1
Page 32

and its Board of Directors the status of his research and development into the technology for non-invasively measuring those blood parameters, or failed to fully disclose the developed technology, Lamego breached his duty of undivided loyalty.

108.   Based on Lamego's representations, in December 2013, Masimo licensed the Lamego-developed technology to noninvasively measure five of those blood parameters and paid Cercacor a license fee of $2,500,000.

109.   Lamego acted against Cercacor's interests by either not accurately presenting the status of at least the five parameters ultimately licensed by Masimo, or by failing to disclose sufficient information to Cercacor regarding feasibility of the technology for the parameters before his departure from Cercacor at the end of 2013.   Indeed, Lamego did not maintain notebooks or sufficient records at Cercacor.

110.   Following Lamego's departure from Cercacor, Cercacor was unable to transfer the technology to Masimo in a manner that allowed successful development of a product.   Cercacor revisited the testing of the Lamego-developed technology and ultimately determined it could not show feasibility sufficient to maintain the license to Masimo.

111.   Cercacor suffered financial harm as a result, refunding the $2,500,000 license fee to Masimo and the expense of substantial resources to develop the technology Lamego oversaw.   Lamego's failure in his duties to Cercacor was a substantial factor in causing Cercacor's harm.

## X.  THE PATENTS-IN-SUIT

112.   Masimo is the owner by assignment of U.S. Patent No. 8,983,564 entitled "Perfusion Index Smoother" ("the '564 patent"), which the United States Patent and Trademark Office lawfully and duly issued on March 17, 2015.  A true and correct copy of the '564 patent is attached hereto as Exhibit 5.

/ / /

Exhibit 1
Page 33

113.   Masimo is the owner by assignment of U.S. Patent No. 8,886,271 entitled "Non-Invasive Physiological Sensor Cover" ("the '271 patent"), which the United States Patent and Trademark Office lawfully and duly issued on November 11, 2014.  A true and correct copy of the '271 patent is attached hereto as Exhibit 6.

114.   Masimo is the owner by assignment of U.S. Patent No. 7,295,866 entitled "Low Power Pulse Oximeter" ("the '866 patent"), which the United States Patent and Trademark Office lawfully and duly issued on November 13, 2007.  A true and correct copy of the '866 patent is attached hereto as Exhibit 7.

115.   Masimo is the owner by assignment of U.S. Patent No. 7,186,966 entitled "Amount of Use Tracking Device and Method for Medical Product" ("the '966 patent"), which the United States Patent and Trademark Office lawfully and duly issued on March 6, 2007.  A true and correct copy of the '966 patent is attached hereto as Exhibit 8.

116.   Masimo is the owner by assignment of U.S. Patent No. 10,194,847 entitled "Perfusion Index Smoother" ("the '847 patent"), which the United States Patent and Trademark Office lawfully and duly issued on February 5, 2019.  A true and correct copy of the '847 patent is attached hereto as Exhibit 10.

117.   Masimo is the owner by assignment of U.S. Patent No. 10,194,848 entitled "Non-Invasive Physiological Sensor Cover" ("the '848 patent"), which the United States Patent and Trademark Office lawfully and duly issued on February 5, 2019.  A true and correct copy of the '848 patent is attached hereto as Exhibit 11.

## XI.  SIXTH CAUSE OF ACTION
### (INFRINGEMENT OF U.S. PATENT NO. 8,983,564)

118.  Plaintiffs hereby reallege and incorporate by reference the allegations set forth in paragraphs 1 through 117.

Exhibit 1
Page 34

119.   Upon information and belief, True Wearables' products, including at least the Oxxiom pulse oximeter, infringe at least Claims 1-3 of the '564 patent under at least 35 U.S.C. § 271(a), (b), and (c).

120.   Upon information and belief, True Wearables has directly infringed one or more claims of the '564 patent through manufacture, use, sale, offer for sale, and/or importation into the United States of pulse oximeters, including the Oxxiom device.

121.   For example, upon information and belief, in operation, the Oxxiom device and its corresponding Oxxiom application perform all of the limitations of Claim 2 of the '564 patent.  The Oxxiom device and application determine an indication of perfusion index, displayed on the Oxxiom application and labeled as "PI" as shown in the image below found on True Wearables website at https://www.truewearables.com/:



122.   The Oxxiom device receives plethysmograph ("pleth") data based on a signal received from a detector contained in an Osram SFH7050, a component within the Oxxiom device.  On information and belief, the Oxxiom device and application use pleth data to determine $SpO_2$, pulse rate, and perfusion index.  Lamego further describes the Oxxiom device and application

Exhibit 1
Page 35

in a patent application he filed that published as U.S. Patent Application Publication 2018/0110450 on April 26, 2018.  A copy of the publication is attached as Exhibit 9.  That publication describes that the Oxxiom device receives pleth data and processes it, for example in Fig. 24 and the corresponding text.

123.   The Oxxiom device and/or application determine an indication of perfusion index by utilizing at least one of a first calculation technique and a second calculation technique to determine a resulting indication of perfusion index.  As shown above in the image, the Oxxiom application displays a resulting indication of perfusion index.  On information and belief, when the Oxxiom device is tapped or rubbed while attached to a user, the perfusion index readings demonstrate the use of at least two different perfusion index calculation techniques.

124.   On information and belief, the Oxxiom device also determines the indication of perfusion index by choosing a calculation technique that will result in a lower perfusion index value.  For example, when the Oxxiom device is tapped or rubbed, the perfusion index readings demonstrate the choice of a calculation technique resulting in the lowest perfusion index value.

125.   Upon information and belief, Lamego and True Wearables have knowledge of Masimo's patents, including the '564 patent at least based on Lamego's former positions with Masimo and Cercacor.  Masimo filed the patent application that led to the '564 patent on September 26, 2012 and it published on March 28, 2014, both while Lamego was employed by Cercacor as Chief Technical Officer and oversaw Cercacor's IP strategy.   Upon further information and belief, through the knowledge of the '564 patent gained by monitoring Masimo's patents, Lamego and True Wearables knew or should have known that these activities would infringe.  True Wearables also had knowledge of the '564 patent no later than the filing of this Complaint.

Exhibit 1
Page 36

126.   Upon information and belief, True Wearables has actively induced others to infringe the '564 patent by marketing and selling the above Oxxiom device, knowing and intending that such systems would be used by customers and end users in a manner that infringes the '564 patent.  To that end, True Wearables provides instructions and teachings to its customers and end users that such Oxxiom devices be used to infringe the '564 patent.  True Wearables' acts constitute infringement of the '564 patent in violation of 35 U.S.C. § 271(b).

127.   Upon information and belief, True Wearables actively induces users to directly infringe the asserted claims of the '564 patent.  By way of example only, upon information and belief, Oxxiom actively induces direct infringement of the '564 patent by providing directions, demonstrations, guides, manuals, training for use, and/or other materials necessary for the use of the Oxxiom device.  Upon information and belief, True Wearables knew or should have known that these activities would cause direct infringement.

128.   Upon information and belief, True Wearables' acts constitute contributory infringement of the '564 patent in violation of 35 U.S.C. § 271(c).  Upon information and belief, True Wearables contributorily infringes because, among other things, True Wearables offers to sell and/or sells within the United States, and/or imports into the United States, components of the Oxxiom device that constitute material parts of the invention of the asserted claims of the '564 patent, are not staple articles or commodities of commerce suitable for substantial non-infringing use, and are known by True Wearables to be especially made or especially adapted for use in an infringement of the '564 patent.

129.   Upon information and belief, True Wearables' infringement of the '564 patent has been, and continues to be, willful, deliberate, and intentional by continuing its acts of infringement after becoming aware of the '564 patent and

Exhibit 1
Page 37

its infringement thereof, thus acting in reckless disregard of Masimo's patent rights.

130.   Because of True Wearables' infringement of the '564 patent, Masimo has suffered and will continue to suffer irreparable harm and injury, including monetary damages in an amount to be determined at trial.

131.   Upon information and belief, unless enjoined, True Wearables, and/or others acting on behalf of True Wearables, will continue their infringing acts, thereby causing additional irreparable injury to Masimo for which there is no adequate remedy at law.

## XII.  SEVENTH CAUSE OF ACTION
## (INFRINGEMENT OF U.S. PATENT NO. 8,886,271)

132.   Plaintiffs hereby reallege and incorporate by reference the allegations set forth in paragraphs 1 through 131.

133.   Upon information and belief, True Wearables' products, including at least the Oxxiom pulse oximeter, infringe at least Claims 1-2, 6-11, and 15-18 of the '271 patent under at least 35 U.S.C. § 271(a), (b), and (c).

134.   Upon information and belief, True Wearables has directly infringed one or more claims of the '271 patent through manufacture, use, sale, offer for sale, and/or importation into the United States of pulse oximeters, including the Oxxiom device.

135.   For example, upon information and belief, the Oxxiom includes all of the limitations of Claim 10 of the '271 patent.  The Oxxiom device has a sensor cover, including "tab 2," for use with a noninvasive optical physiological sensor, the Oxxiom.  The sensor cover comprises all the limitations of Claim 10. It includes an opaque portion attachable to the sensor and configured to block optical readings by the sensor, as shown in the instructions from the True Wearables website (https://www.truewearables.com/), reproduced below:

/ / /

Exhibit 1
Page 38



"Tab 2" also includes a non-adhesive portion that protrudes from the sensor to facilitate removal of the sensor cover, as showing in the depiction above. Furthermore, the Oxxiom device is a sensor that includes a light source configured to emit light from one or more emitters of the sensor and a detector configured to receive at least a portion of the light emitted by the one or more emitters after the light has passed through a tissue site. The Oxxiom device includes a light source that has multiple emitters, the multiple LEDs contained in an Osram SFH7050. That same Osram SFH7050 includes a detector that is configured to receive at least a portion of the light emitted by the one or more emitters after the light has passed through a tissue site. The opaque portion of "Tab 2" is configured to prevent the detector from receiving light during sensor activation, as shown in the instructions above.

136.  Upon information and belief, Lamego and True Wearables have knowledge of Masimo's patents, including the '271 patent at least based on Lamego's former position with Cercacor.  The inventors filed the patent application that led to the '271 patent on June 17, 2013, while Lamego was employed by Cercacor as Chief Technical Officer and oversaw IP strategy. Upon further information and belief, through the knowledge of the '271 patent gained by monitoring Masimo's patents, True Wearables knew or should have known that these activities would cause direct infringement.  True Wearables

Exhibit 1
Page 39

also had knowledge of the '271 patent no later than the filing of this Complaint.

137. Upon information and belief, True Wearables has actively induced others to infringe the '271 patent by marketing and selling the above Oxxiom devices, knowing and intending that such systems would be used by customers and end users in a manner that infringes the '271 patent. To that end, True Wearables provides instructions and teachings to its customers and end users that such Oxxiom devices be used to infringe the '271 patent. True Wearables' acts constitute infringement of the '271 patent in violation of 35 U.S.C. § 271(b).

138. Upon information and belief, True Wearables actively induces users to directly infringe the asserted claims of the '271 patent. By way of example only, upon information and belief, Oxxiom actively induces direct infringement of the '271 patent by providing directions, demonstrations, guides, manuals, training for use, and/or other materials necessary for the use of the Oxxiom device. Upon information and belief, True Wearables knew or should have known that these activities would cause direct infringement.

139. Upon information and belief, True Wearables' acts constitute contributory infringement of the '271 patent in violation of 35 U.S.C. § 271(c). Upon information and belief, True Wearables contributorily infringes because, among other things, True Wearables offers to sell and/or sells within the United States, and/or imports into the United States, components of the Oxxiom that constitute material parts of the invention of the asserted claims of the '271 patent, are not staple articles or commodities of commerce suitable for substantial non-infringing use, and are known by True Wearables to be especially made or especially adapted for use in an infringement of the '271 patent.

140. Upon information and belief, True Wearables' infringement of the '271 patent has been, and continues to be, willful, deliberate, and intentional by

Exhibit 1
Page 40

continuing its acts of infringement after becoming aware of the '271 patent and its infringement thereof, thus acting in reckless disregard of Masimo's patent rights.

141.   As a consequence of True Wearables' infringement of the '271 patent, Masimo has suffered and will continue to suffer irreparable harm and injury, including monetary damages in an amount to be determined at trial.

142.   Upon information and belief, unless enjoined, True Wearables, and/or others acting on behalf of True Wearables, will continue their infringing acts, thereby causing additional irreparable injury to Masimo for which there is no adequate remedy at law.

## XIII.  EIGHTH CAUSE OF ACTION
## (INFRINGEMENT OF U.S. PATENT NO. 7,295,866)

143.   Plaintiffs hereby reallege and incorporate by reference the allegations set forth in paragraphs 1 through 142.

144.   Upon information and belief, True Wearables' products, including at least the Oxxiom pulse oximeter, infringe at least Claims 10-12 of the '866 patent under at least 35 U.S.C. § 271(a), (b), and (c).

145.   Upon information and belief, True Wearables has directly infringed one or more claims of the '866 patent through manufacture, use, sale, offer for sale, and/or importation into the United States of pulse oximeters, including the Oxxiom device.

146.   For example, upon information and belief, the Oxxiom device includes all of the limitations of Claim 10 of the '866 patent.  The Oxxiom device is a pulse oximeter capable of varying its power consumption, comprising all of the elements of Claim 10.  The Oxxiom device includes an emitter driver, a Texas Instruments AFE4403.  The Texas Instruments AFE4403 contains an integrated dual LED driver.  The emitter driver of the Oxxiom device outputs a drive signal capable of driving at least one emitter of a sensor,

Exhibit 1
Page 41

contained in an Osram SFH7050, that detects energy attenuated by tissue of a measurement site of a patient.

147. The Oxxiom also includes a controller, a Nordic Semiconductor nRF51422 system on a chip device with a Bluetooth transceiver, input/output interfaces, memory, and a processor. The Nordic chip, as configured in the Oxxiom device, uses at least a first duty cycle of the drive signal corresponding to a first power consumption and a second duty cycle of the drive signal corresponding to a second power consumption different than the first power consumption. For example, the data sheet for the Texas Instruments AFE4403 explains that the device contains a configurable timing controller, controllable through a serial interface (SPI) to the Nordic Semiconductor nRF51422. On information and belief, through the serial interface, the Nordic Semiconductor nRF51422 configures the Texas Instruments AFE4403 to switch between duty cycles corresponding to two different power consumptions.

148. Further description of the Oxxiom device is found in Exhibit 9, the patent application filed by Lamego that published on April 26, 2018. That publication describes many aspects of the Oxxiom device. For example, at paragraph 71, the publication states "FIG. 37 shows the typical workflow, advantages, and technical specifications of a wireless, fully disposable, single-use continuous clinical-grade oximeter (OXXIOM™) according to an embodiment of these inventions." The publication specifically identifies the Osram SFH7050 at paragraph 95, the Nordic nRF51422 at paragraph 101, and the Texas Instruments AFE4403 at paragraph 88. The publication at paragraph 88 further confirms that "If the preferred low-cost low-power pulse oximeter front[-]end from Texas Instruments, AFE4403 is used as the instrumentation electronics [], then it can be programmed to generate and control directly the required LED modulation scheme without additional resources from the sensor processor []." Figures 34A-C and paragraph 89 explain that "Modulations as

Exhibit 1
Page 42

shown in FIG. 34A can also be adopted in the case of measurement sites with low perfusion and/or subject to excessive motion." This description is consistent with the operation of the Oxxiom device.

149. Upon information and belief, Lamego and True Wearables have knowledge of Masimo's patents, including the '866 patent at least based on Lamego's former positions with Masimo and Cercacor. The '866 patent issued in November 2007, while Lamego was employed by Cercacor as Chief Technical Officer and supervised IP strategy. Upon further information and belief, through the knowledge of the '866 patent gained by monitoring Masimo's patents, True Wearables knew or should have known that these activities would cause direct infringement. True Wearables also had knowledge of the '866 patent no later than the filing of this Complaint.

150. Upon information and belief, True Wearables has actively induced others to infringe the '866 patent by marketing and selling the above Oxxiom devices, knowing and intending that such systems would be used by customers and end users in a manner that infringes the '866 patent. To that end, True Wearables provides instructions and teachings to its customers and end users that such Oxxiom devices be used to infringe the '866 patent. True Wearables' acts constitute infringement of the '866 patent in violation of 35 U.S.C. § 271(b).

151. Upon information and belief, True Wearables actively induces users to directly infringe the asserted claims of the '866 patent. By way of example only, upon information and belief, Oxxiom actively induces direct infringement of the '866 patent by providing directions, demonstrations, guides, manuals, training for use, and/or other materials necessary for the use of the Oxxiom device. Upon information and belief, True Wearables knew or should have known that these activities would cause direct infringement.

/ / /

Exhibit 1
Page 43

152.   Upon information and belief, True Wearables' acts constitute contributory infringement of the '866 patent in violation of 35 U.S.C. § 271(c). Upon information and belief, True Wearables contributorily infringes because, among other things, True Wearables offers to sell and/or sells within the United States, and/or imports into the United States, components of the Oxxiom device that constitute material parts of the invention of the asserted claims of the '866 patent, are not staple articles or commodities of commerce suitable for substantial non-infringing use, and are known by True Wearables to be especially made or especially adapted for use in an infringement of the '866 patent.

153.   Upon information and belief, True Wearables' infringement of the '866 patent has been, and continues to be, willful, deliberate, and intentional by continuing its acts of infringement after becoming aware of the '866 patent and its infringement thereof, thus acting in reckless disregard of Masimo's patent rights.

154.   Because of True Wearables' infringement of the '866 patent, Masimo has suffered and will continue to suffer irreparable harm and injury, including monetary damages in an amount to be determined at trial.

155.   Upon information and belief, unless enjoined, True Wearables, and/or others acting on behalf of True Wearables, will continue their infringing acts, thereby causing additional irreparable injury to Masimo for which there is no adequate remedy at law.

## XIV.  NINTH CAUSE OF ACTION
## (INFRINGEMENT OF U.S. PATENT NO. 7,186,966)

156.   Plaintiffs hereby reallege and incorporate by reference the allegations set forth in paragraphs 1 through 155.

157.   Upon information and belief, True Wearables' products, including at least the Oxxiom pulse oximeter, infringe at least Claims 1, 4, 15, and 19 of

Exhibit 1
Page 44

the '966 patent under at least 35 U.S.C. § 271(a), (b), and (c).

158.   Upon information and belief, True Wearables has directly infringed one or more claims of the '966 patent through manufacture, use, sale, offer for sale, and/or importation into the United States of pulse oximeters, including the Oxxiom device.

159.   For example, upon information and belief, the Oxxiom device and its application perform all of the limitations of Claim 1.  The Oxxiom device is a noninvasive probe, and the Oxxiom and its application track the amount of use of the electronics of the Oxxiom device.  The application alerts a caregiver when the electronics have expired.

160.   The Oxxiom device and its application determine a cumulative amount of use of the noninvasive probe, the Oxxiom device.  The Oxxiom device includes a plurality of emitters, including the red and infrared LEDs located in an Osram SFH7050 on the Oxxiom device.  The same Osram SFH7050 also contains a detector capable of detecting light attenuated by tissue. These features are further described in Lamego's published patent application regarding the Oxxiom, Ex. 9 at paragraph 106.

161.   On information and belief, when the cumulative amount of use exceeds a predetermined amount of time, twenty-four hours, the Oxxiom application activates one or more indications, including a red "X" displayed on the battery icon in the application, conveying that the noninvasive optical probe has expired.

162.   Upon information and belief, Lamego and True Wearables have knowledge Masimo's patents, including the '966 patent at least based on Lamego's former positions with Masimo and Cercacor.  The '966 patent issued in March 2007, while Lamego was employed by Cercacor as Chief Technical Officer and supervised IP strategy.  Upon further information and belief, through the knowledge of the '966 patent gained by monitoring Masimo's

Exhibit 1
Page 45

patents, True Wearables knew or should have known that these activities would cause direct infringement.   True Wearables also had knowledge of the '966 patent no later than the filing of this Complaint.

163.   Upon information and belief, True Wearables has actively induced others to infringe the '966 patent by marketing and selling the above Oxxiom devices, knowing and intending that such systems would be used by customers and end users in a manner that infringes the '966 patent.   To that end, True Wearables provides instructions and teachings to its customers and end users that such Oxxiom devices be used to infringe the '966 patent.   True Wearables' acts constitute infringement of the '966 patent in violation of 35 U.S.C. § 271(b).

164.   Upon information and belief, True Wearables actively induces users to directly infringe the asserted claims of the '966 patent.   By way of example only, upon information and belief, Oxxiom actively induces direct infringement of the '966 patent by providing directions, demonstrations, guides, manuals, training for use, and/or other materials necessary for the use of the Oxxiom device.   Upon information and belief, True Wearables knew or should have known that these activities would cause direct infringement.

165.   Upon information and belief, True Wearables' acts constitute contributory infringement of the '966 patent in violation of 35 U.S.C. § 271(c). Upon information and belief, True Wearables contributorily infringes because, among other things, True Wearables offers to sell and/or sells within the United States, and/or imports into the United States, components of the Oxxiom device that constitute material parts of the invention of the asserted claims of the '966 patent, are not staple articles or commodities of commerce suitable for substantial non-infringing use, and are known by True Wearables to be especially made or especially adapted for use in an infringement of the '966 patent.

Exhibit 1
Page 46

166.   Upon information and belief, True Wearables' infringement of the '966 patent has been, and continues to be, willful, deliberate, and intentional by continuing its acts of infringement after becoming aware of the '966 patent and its infringement thereof, thus acting in reckless disregard of Masimo's patent rights.

167.   Because of True Wearables' infringement of the '966 patent, Masimo has suffered and will continue to suffer irreparable harm and injury, including monetary damages in an amount to be determined at trial.

168.   Upon information and belief, unless enjoined, True Wearables, and/or others acting on behalf of True Wearables, will continue their infringing acts, thereby causing additional irreparable injury to Masimo for which there is no adequate remedy at law.

## XV.   TENTH CAUSE OF ACTION
## (INFRINGEMENT OF U.S. PATENT NO. 10,194,847)

169.   Plaintiffs hereby reallege and incorporate by reference the allegations set forth in paragraphs 1 through 168.

170.   Upon information and belief, True Wearables' products, including at least the Oxxiom pulse oximeter, infringe at least Claims 1-4 of the '847 patent under at least 35 U.S.C. § 271(a), (b), and (c).

171.   Upon information and belief, True Wearables has directly infringed one or more claims of the '847 patent through manufacture, use, sale, offer for sale, and/or importation into the United States of pulse oximeters, including the Oxxiom device.

172.   For example, upon information and belief, in operation, the Oxxiom device and its corresponding Oxxiom application perform all of the limitations of Claim 4 of the '847 patent.   In use, the Oxxiom device and application determine an indication of a physiological condition (e.g., perfusion index), which is displayed on the Oxxiom application and labeled "PI," as

Exhibit 1
Page 47

shown in the image below found on True Wearables website at https://www.truewearables.com/:



After approximately 15 seconds, SpO2, PR, and PI measurements are displayed continuously

173.   The Oxxiom device determines an indication of pulse information based on intensity signals acquired from a detector (e.g., pleth data) contained in an Osram SFH7050, a component within the Oxxiom device.  On information and belief, the Oxxiom device and application use pleth data to determine $SpO_2$, pulse rate, and perfusion index.  Lamego further describes the Oxxiom device and application in a patent application he filed that published as U.S. Patent Application Publication 2018/0110450 on April 26, 2018.  A copy of the publication is attached as Exhibit 9.  That publication describes that the Oxxiom device receives pleth data and processes it, for example in Fig. 24 and the corresponding text.

174.   The Oxxiom device and/or application software determines first and second indications of amplitude from the pleth data, which it uses to determine a final indication of amplitude based on a signal quality indication and a statistical analysis of the first and second indications of amplitude.  The Oxxiom application then outputs the final indication of amplitude as an indication of perfusion index, as shown in the image above.

/ / /

Exhibit 1
Page 48

175.   Upon information and belief, True Wearables has actively induced others to infringe the '847 patent by marketing and selling the above Oxxiom device, knowing and intending that such systems would be used by customers and end users in a manner that infringes the '847 patent.  To that end, True Wearables provides instructions and teachings to its customers and end users that such Oxxiom devices be used to infringe the '847 patent.  True Wearables' acts constitute infringement of the '847 patent in violation of 35 U.S.C. § 271(b).

176.   Upon information and belief, True Wearables actively induces users to directly infringe the asserted claims of the '847 patent.  By way of example only, upon information and belief, Oxxiom actively induces direct infringement of the '847 patent by providing directions, demonstrations, guides, manuals, training for use, and/or other materials necessary for the use of the Oxxiom device.  Upon information and belief, True Wearables knew or should have known that these activities would cause direct infringement.

177.   Upon information and belief, True Wearables' acts constitute contributory infringement of the '847 patent in violation of 35 U.S.C. § 271(c).  Upon information and belief, True Wearables contributorily infringes because, among other things, True Wearables offers to sell and/or sells within the United States, and/or imports into the United States, components of the Oxxiom device that constitute material parts of the invention of the asserted claims of the '847 patent, are not staple articles or commodities of commerce suitable for substantial non-infringing use, and are known by True Wearables to be especially made or especially adapted for use in an infringement of the '847 patent.

178.   Upon information and belief, True Wearables' infringement of the '847 patent has been, and continues to be, willful, deliberate, and intentional by continuing its acts of infringement after becoming aware of the '847 patent and

Exhibit 1
Page 49

its infringement thereof, thus acting in reckless disregard of Masimo's patent rights.

179.   Because of True Wearables' infringement of the '847 patent, Masimo has suffered and will continue to suffer irreparable harm and injury, including monetary damages in an amount to be determined at trial.

180.   Upon information and belief, unless enjoined, True Wearables, and/or others acting on behalf of True Wearables, will continue their infringing acts, thereby causing additional irreparable injury to Masimo for which there is no adequate remedy at law.

## XVI.  ELEVENTH CAUSE OF ACTION
## (INFRINGEMENT OF U.S. PATENT NO. 10,194,848)

181.   Plaintiffs hereby reallege and incorporate by reference the allegations set forth in paragraphs 1 through 180.

182.   Upon information and belief, True Wearables' products, including at least the Oxxiom pulse oximeter, infringe all of the claims of the '848 patent (Claims 1-29) under at least 35 U.S.C. § 271(a), (b), and (c).

183.   Upon information and belief, True Wearables has directly infringed one or more claims of the '848 patent through manufacture, use, sale, offer for sale, and/or importation into the United States of pulse oximeters, including the Oxxiom device.

184.   For example, upon information and belief, the Oxxiom includes all of the limitations of Claim 9 of the '848 patent.  The Oxxiom device includes both a cover portion configured to be adhered to a pulse oximeter sensor and removed before use, and a protruding portion (Tab "2") that facilitates removal of the sensor cover, as shown in the Oxxiom User Guide available on the True Wearables website (https://www.truewearables.com/), reproduced and annotated below:

/ / /

Exhibit 1
Page 50



The cover portion of the sensor cover on the Oxxiom device covers the sensing components of the pulse oximeter sensor, as shown above.  The Oxxiom device includes a sensor that includes a light source configured to emit light from one or more emitters of the sensor and a detector configured to receive at least a portion of the light emitted by the one or more emitters after the light has passed through a tissue site.  The Oxxiom device includes a light source that has multiple emitters, the multiple LEDs contained in an Osram SFH7050.  That same Osram SFH7050 includes a detector that is configured to receive at least a portion of the light emitted by the one or more emitters after the light has passed through a tissue site.  The cover portion of the sensor cover blocks at least a portion of light from the emitters from being received by the detector.

185.   Upon information and belief, True Wearables has actively induced others to infringe the '848 patent by marketing and selling the above Oxxiom devices, knowing and intending that such systems would be used by customers and end users in a manner that infringes the '848 patent.  To that end, True Wearables provides instructions and teachings to its customers and end users

Exhibit 1
Page 51

that such Oxxiom devices be used to infringe the '848 patent.  True Wearables' acts constitute infringement of the '848 patent in violation of 35 U.S.C. § 271(b).

186.  Upon information and belief, True Wearables actively induces users to directly infringe the asserted claims of the '848 patent.  By way of example only, upon information and belief, Oxxiom actively induces direct infringement of the '848 patent by providing directions, demonstrations, guides, manuals, training for use, and/or other materials necessary for the use of the Oxxiom device.  Upon information and belief, True Wearables knew or should have known that these activities would cause direct infringement.

187.  Upon information and belief, True Wearables' acts constitute contributory infringement of the '848 patent in violation of 35 U.S.C. § 271(c).  Upon information and belief, True Wearables contributorily infringes because, among other things, True Wearables offers to sell and/or sells within the United States, and/or imports into the United States, components of the Oxxiom that constitute material parts of the invention of the asserted claims of the '848 patent, are not staple articles or commodities of commerce suitable for substantial non-infringing use, and are known by True Wearables to be especially made or especially adapted for use in an infringement of the '848 patent.

188.  Upon information and belief, True Wearables' infringement of the '848 patent has been, and continues to be, willful, deliberate, and intentional by continuing its acts of infringement after becoming aware of the '848 patent and its infringement thereof, thus acting in reckless disregard of Masimo's patent rights.

189.  As a consequence of True Wearables' infringement of the '848 patent, Masimo has suffered and will continue to suffer irreparable harm and injury, including monetary damages in an amount to be determined at trial.

Exhibit 1
Page 52

190. Upon information and belief, unless enjoined, True Wearables, and/or others acting on behalf of True Wearables, will continue their infringing acts, thereby causing additional irreparable injury to Masimo for which there is no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment in its favor against Defendants for the following relief:

A.    Pursuant to 35 U.S.C. § 271, a determination that True Wearables and its officers, agents, servants, employees, attorneys and all others in active concert and/or participation with them have infringed each of the '564, '271, '866, '966, '847, and '848 patents through the manufacture, use, importation, offer for sale, and/or sale of infringing products and/or any of the other acts prohibited by 35 U.S.C. § 271;

B.    Pursuant to 35 U.S.C. § 283, an injunction enjoining True Wearables and its officers, agents, servants, employees, attorneys and all others in active concert and/or participation with them from infringing the '564, '271, '866, '966, '847, and '848 patents through the manufacture, use, importation, offer for sale, and/or sale of infringing products and/or any of the other acts prohibited by 35 U.S.C. § 271, including preliminary and permanent injunctive relief;

C.    Pursuant to 35 U.S.C. § 284, an award compensating Masimo for True Wearables' infringement of the '564, '271, '866, '966, '847, and '848 patents through payment of not less than a reasonable royalty on True Wearables' sales of infringing products;

D.    Pursuant to 35 U.S.C. § 284, an award increasing damages up to three times the amount found or assessed by the jury for True Wearables' infringement of each of the '564, '271, '866, '966, '847, and '848 patents in view of the willful and deliberate nature of the infringement;

Exhibit 1
Page 53

E.      Pursuant to 35 U.S.C. § 285, a finding that this is an exceptional case, and an award of reasonable attorneys' fees and non-taxable costs;

F.      An assessment of prejudgment and post-judgment interest and costs against True Wearables, together with an award of such interest and costs, pursuant to 35 U.S.C. § 284;

G.      That Defendants, and each of them, be adjudged to have misappropriated Plaintiffs' trade secrets in violation of the United States Defense of Trade Secrets Act of 2016, 18 U.S.C. §§ 1836 *et seq.*, and that True Wearables acts in doing so be adjudged willful, malicious, and done knowingly;

H.      That Defendants, and each of them, be adjudged to have misappropriated Plaintiffs' trade secrets in violation of the California Uniform Trade Secrets Act, Cal. Civ. Code § 3426 *et seq.*, and that Lamego's acts in doing so be adjudged willful, malicious, oppressive, and done knowingly

I.      That Lamego be adjudged to have breached the Masimo Agreements, and that Lamego's acts in doing so be adjudged willful, malicious, oppressive, and done knowingly;

J.      For an order that Lamego specifically perform the Masimo Agreements;

K.      For preliminary and permanent injunctions enjoining Lamego from breaching the Masimo Agreements;

L.      That Lamego be adjudged to have breached the Cercacor Agreement, and that Lamego's acts in doing so be adjudged willful, malicious, oppressive, and done knowingly;

M.      For an order that Lamego specifically perform the Cercacor Agreement;

N.      For preliminary and permanent injunctions enjoining Lamego from breaching the Cercacor Agreement;

/ / /

Exhibit 1
Page 54

O.    That the Court award Cercacor its actual damages caused by Lamego's breach of his fiduciary duty to Cercacor;

P.    That Defendants, and each of them, be adjudged to have been unjustly enriched;

Q.    That Defendants and each of them, their respective agents, servants, employees, and attorneys, and all those persons in active concert or participation with each of them, be forthwith temporarily, preliminarily, and thereafter permanently required to return all of Plaintiffs' trade secrets and confidential information and enjoined from further using and disclosing to any third parties any of Plaintiffs' trade secrets and confidential information;

R.    That Defendants, their respective agents, servants, employees, and attorneys, and all those persons in active concert or participation with Defendants, be forthwith temporarily, preliminarily, and thereafter permanently required to return all of Plaintiffs' trade secrets and enjoined from further using and disclosing to any third parties any of Plaintiffs' trade secrets;

S.    That Defendants be enjoined from selling or offering to sell any product, including True Wearables Oxxiom product, that includes or uses any of Plaintiffs' trade secrets;

T.    That Defendants, and each of them, be directed to file with this Court and to serve on Plaintiffs within thirty (30) days after the service of the injunction, a report in writing, under oath, setting forth in detail the manner and form in which Defendants, and each of them, have complied with the injunction;

U.    That Defendants, and each of them, be required to account to Plaintiffs for any and all gains, profits, and advantages derived by each of them, and all damages sustained by Plaintiffs, by reason of Defendants' acts complained herein;

V.    That Plaintiffs be awarded exemplary damages from Defendants, and each of them, pursuant to Cal. Civ. Code §§ 3294 and 3426.3(c);

Exhibit 1
Page 55

W. An award of taxable costs; and

X. That this Court award such other and further relief as this Court may deem just.

        Respectfully submitted,

        KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: June 17, 2019   By: */s/ Brian C. Claassen*
           Joseph R. Re
           Stephen C. Jensen
           Irfan A. Lateef
           Brian C. Claassen

           Attorneys for Plaintiffs,
           Masimo Corporation and
           Cercacor Laboratories, Inc.

Exhibit 1
Page 56

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs Masimo Corporation and Cercacor Laboratories, Inc., hereby demand a trial by jury on all issues so triable.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: __June 17, 2019__        By: _/s/ Brian C. Claassen_
Joseph R. Re
Stephen C. Jensen
Irfan A. Lateef
Brian C. Claassen

Attorneys for Plaintiffs,
Masimo Corporation and
Cercacor Laboratories, Inc.

Exhibit 1
Page 57

# EXHIBIT 2

Exhibit 2
Page 58

1|8|20
9:20 Am

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Central District of California

| | |
|---|---|
| Masimo Corporation and Cercacor Laboratories, Inc. | ) |
| *Plaintiffs* | ) |
| v. | )    Civil Action No.   8:18-cv-02001-JVS-JDE |
| True Wearables, Inc. and Marcelo Lamego | ) |
| *Defendants* | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:                                       Apple Inc.
One Apple Park Way, Cupertino CA 95014
*(Name of person to whom this subpoena is directed)*

☑ *Testimony:*  **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:
Please see Exhibit A Attached for Topics.

| Place: Knobbe, Martens, Olson & Bear LLP<br>333 Bush Street, Suite 2100<br>San Francisco, CA 94104 | Date and Time:<br>02/10/2020 10:00 am |
|---|---|

The deposition will be recorded by this method:    stenographic, audio, video and/or real-time computer means

☑ *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material: Please see Exhibit B attached.  You are instructed to produce the documents by January 28, 2020 to the attention of Nicholas Belair at KNOBBE, MARTENS, OLSON & BEAR LLP, 333 Bush Street, Suite 2100, San Francisco, CA 94104.

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    01/07/2020

CLERK OF COURT

                                   OR

                                                            /s/ Brian C. Claassen

_____                _____
   *Signature of Clerk or Deputy Clerk*                       *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*    **Plaintiffs**
Masimo Corporation and Cercacor Laboratories, Inc.             , who issues or requests this subpoena, are:
Brian C. Claassen, Knobbe, Martens, Olson & Bear LLP, 2040 Main St., 14th Floor, Irvine CA 92614 (949) 760-0404

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Exhibit 2
Page 59

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.  8:18-cv-02001-JVS-JDE

### PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

     ☐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

     ☐ I returned the subpoena unexecuted because: _____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

Exhibit 2
Page 60

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

(1) *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
    (i) is a party or a party's officer; or
    (ii) is commanded to attend a trial and would not incur substantial expense.

(2) *For Other Discovery.* A subpoena may command:
  (A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  (B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction— which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*
  (A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  (B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    (i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena.*
  (A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

    (i) fails to allow a reasonable time to comply;
    (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
    (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    (iv) subjects a person to undue burden.
  (B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    (i) disclosing a trade secret or other confidential research, development, or commercial information; or
    (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  (C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    (ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

(1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  (A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  (B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  (C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  (D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) *Claiming Privilege or Protection.*
  (A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    (i) expressly make the claim; and
    (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  (B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

Exhibit 2
Page 61

# EXHIBIT A

Exhibit 2
Page 62

**EXHIBIT A**

A.    The term "Masimo" shall mean Masimo Corporation and shall include any predecessor in interest, successor, subsidiary, affiliate, and/or division.

B.    The term "Cercacor" shall mean Cercacor Laboratories, Inc. and shall include any predecessor in interest, successor, subsidiary, affiliate, and/or division.

C.    The term "Plaintiffs" shall mean Masimo and Cercacor, collectively and/or individually.

D.    The term "Lamego," shall mean and include the following individual, Marcelo Lamego, and any present or former principal, officer, director, employee, former employee, servant, agent, attorney, or other representative acting on behalf of Defendant Marcelo Lamego.

E.    The term "True Wearables" shall mean True Wearables, Inc. and any present or former principal, officer, director, employee, former employee, servant, agent, attorney, or other representative acting on its behalf, and shall include any parent, subsidiary, division, predecessor, successor, or affiliate.

F.    The terms "Defendants," "You," and "Your" shall mean Lamego and True Wearables, collectively and/or individually.

G.    The terms "Oxxiom" or "Accused Product" shall mean True Wearables, Inc.'s hardware and/or iOS software application pulse oximeter product that, among other things, tracks oxygen saturation ($SpO_2$), pulse rate (PR) and perfusion index (PI).

H.    The term "Masimo Asserted Patents" shall mean, individually and collectively: U.S. Patent Nos. 7,186,966 ("the '966 patent"), 7,295,866 ("the '866 patent"), 8,886,271 ("the '271 patent"), 8,983,564 ("the '564 patent"), 10,194,847 ("the '847 patent"), and 10,194,848 ("the '848 patent"), and any other patents that Masimo asserts in this litigation.

Exhibit 2
Page 63

**DEPOSITION TOPICS**

**TOPIC NO. 1:**

Marcelo Lamego's involvement in, and technical disclosures to Apple regarding, physiological parameter monitoring, such as pulse oximetry and pulse rate monitoring.

**TOPIC NO. 2:**

Marcelo Lamego's contributions to Apple's marketing strategies for physiological parameter monitoring, such as pulse oximetry and pulse rate monitoring.

**TOPIC NO. 3:**

Marcelo Lamego's disclosures to Apple relating to light piping reduction in physiological parameter monitoring, such as pulse oximetry and pulse rate monitoring.

**TOPIC NO. 4:**

Marcelo Lamego's disclosures to Apple relating to the weighting and relative importance of separate calculation techniques for non-invasive measurement of blood parameters

**TOPIC NO. 5:**

Marcelo Lamego's disclosures to Apple relating to physiological parameter buffers during measurements in physiological parameter monitoring, such as pulse oximetry and pulse rate monitoring.

**TOPIC NO. 6:**

Marcelo Lamego's involvement in and disclosures to Apple regarding technical aspects of light emission and detection.

**TOPIC NO. 7:**

Apple's communications with Marcelo Lamego concerning Mr. Lamego's employment with Apple and termination thereof.

-2-

Exhibit 2
Page 64

# EXHIBIT B

Exhibit 2
Page 65

**EXHIBIT B**

Pursuant to Rules 34 and 45 of the Federal Rules of Civil Procedure, and in accordance with the following definitions and instructions, Plaintiffs request that Apple Inc. produce the documents and things identified in the requests for production below.

**DEFINITIONS**

1.     The term "documents" is used in the broadest sense possible under Rule 34 of the Federal Rules of Civil Procedure, and includes all written or graphic matter, however produced or reproduced, including, but not limited to, originals (or copies where originals are unavailable) of correspondence, electronic mail, computer storage media (including, but not limited to, all active, inactive, and archived data files stored on hard drives, operating systems, software, floppy disks, magnetic tapes, zip drives, CD-ROMS, mainframe computers, desktop computers, home computers, laptops, mobile handheld devices, retired computer systems or any other storage medium), computer software needed to produce in human-readable form data from said computer storage media, instructions for using said computer software, telegrams, notes or sound recordings of any type of personal or telephone conversations, or of meetings or conferences, minutes of directors or committee meetings, memoranda, inter-office communications, studies, analyses, reports, engineering drawings, results of investigations, catalogs, contracts, licenses, agreements, working papers, statistical records, ledgers, books of account, vouchers, invoices, charge slips, freight bills, time sheets or logs, stenographers' notebooks, diaries, or papers similar to any of the foregoing, however denominated.

2.     The terms "communication" or "communications" mean any communication regardless of the manner in which the communication(s) took place, including, but not limited to, face-to-face conversations, correspondence,

Exhibit 2
Page 66

1  electronic or computer mail, telephone calls, facsimile communications, or
2  telegrams.

3      3.     The terms "describe," "described" or "description" when used with
4  respect to any act, action, accounting, activity, audit, practice, process, occurrence,
5  course of conduct, happening, negotiation, relationship, scheme, communication,
6  conference, discussion, development, service, transaction, instance, incident or
7  event, means provide any or all of the following information (to the extent it is
8  available to you): its general nature; the time and place thereof; a chronological
9  account setting forth each element thereof, what such element consisted of, and
10 what transpired as a part thereof; the identity of each person who performed any
11 function or had any role in connection therewith (e.g., speaker, participant,
12 contributor of information, witness) or who has any knowledge thereof together
13 with a description of each person's function, role, or knowledge; the identity of
14 each document which refers thereto or which was used, referred to, or prepared in
15 the course or as a result thereof; and identification of each communication which
16 was a part thereof or referred thereto.   When used in connection with any
17 evaluation, calculation, or computation, the terms "describe," "described" or
18 "description" mean provide any or all the following information: an explanation of
19 its meaning; an explanation of the manner in which it was derived; the identity of
20 each person who performed any function with respect thereto and a description of
21 his or her function; the identity of each document which refers thereto or which
22 was used, referred to, or prepared in the course of or as a result thereof; and the
23 identity of each communication which occurred in the course of the preparation
24 thereof or which referred thereto.
25     4.     The term "you," "your," and "Apple" means Apple Inc., and its
26 associated entities (including subsidiaries and affiliates), companies acquired by
27 Apple Inc. or, employees, agents, partners, attorneys, and representatives.
28

-4-

Exhibit 2
Page 67

5.    The terms "person," "individual," and "entity" shall include natural persons, corporations, and other legal or business entities, whether or not in your employ, and the acts and knowledge of a person, individual or entity are defined to include the acts and knowledge of that person's, individual's, or entity's directors, officers, members, employees, representatives, agents, and attorneys.

6.    The singular form of any noun or pronoun used herein includes within its meaning the plural form thereof and vice versa; the neuter, masculine or feminine form of any pronoun used herein includes within its meaning the neuter, masculine and feminine forms; and the use herein of any tense of any verb includes within its meaning all other tenses of the verb.  In every such instance, the specific request shall be construed in the broadest sense so as to call for the most complete and inclusive answer.

7.    The terms "and" and "or" shall be construed both conjunctively and disjunctively, and the plural shall be construed as the singular, and vice versa, as necessary and in order to bring within the scope of these requests for production all documents that might otherwise be construed to be outside their scope.

## INSTRUCTIONS

1.    You are to produce every document and thing requested that is in your possession, custody, or control, or within the possession, custody, or control of any employees, agents, consultants, attorneys, and/or any other persons acting or purporting to act on your behalf.

2.    If you have any good faith objection to any request or any part thereof, the specific nature of the objection and whether it applies to the entire request or to a part of the request shall be stated.  If there is an objection to any part of a request, then the part objected to should be identified and documents responsive to the remaining unobjectionable part should be produced.

3.    Each request shall be answered separately.

4.    Each request shall be answered on the basis of your entire

-5-

Exhibit 2
Page 68

knowledge, from all sources.

5.    For each document and thing requested herein that you withhold or redact under a claim of attorney-client privilege, work product immunity, or any other privilege or immunity, you shall provide an explanation of the basis for the claim, including:

    a.  the date of the document;

    b.  the type of document (e.g., letter, memorandum, etc.);

    c.  the name and title of any and all authors or senders and any and all addressees and copy recipients of the document and any and all persons to whom the document was shown or to whom its subject matter was disclosed;

    d.  the name of each person or persons (other than stenographic or clerical assistants) participating in the preparation of the document or in whose name the document was prepared;

    e.  the subject matter of the document;

    f.  the REQUEST FOR PRODUCTION to which the document is responsive; and

    g.  a statement of the basis upon which the document has been redacted or withheld, including the specific nature of the privilege or exemption claimed and the detailed grounds for claiming such

6.    For any document requested herein that has been destroyed or misplaced, you shall provide the information described in paragraphs 5(a)-(e) above, as well as a brief explanation of the circumstances (when, how, by whom, and why) surrounding the document's destruction or loss, and any and all records pertaining to its destruction or loss.

7.    If you or your attorneys know of the existence, past or present, of any document described in a request, but such document is not presently in your possession, custody, or control or in the possession, custody, or control of its

-6-

Exhibit 2
Page 69

1  agents, representatives, or attorneys, you shall so state in response to the request,
2  identify such document in response to the request, and identify the individual in
3  whose possession, custody, or control the document was last known to reside.
4      8.    Documents shall be produced as they are maintained in the normal
5  course of business, including:
6        a. all associated file labels, file headings, and file folders shall be
7          produced together with the responsive documents from each file, and
8          each file shall be identified as to its owner or custodian;
9        b. all documents that cannot be legibly copied shall be produced in their
10          original form; otherwise, you may produce photocopies; and
11        c. each page shall be given a discrete production number.
12
13  **REQUESTS FOR PRODUCTION**
14  **REQUEST FOR PRODUCTION NO. 1:**
15      Documents sufficient to show Marcelo Lamego's involvement in any Apple
16  program or project relating to physiological parameter monitoring, including but
17  not limited to pulse oximetry and pulse rate monitoring.
18  **REQUEST FOR PRODUCTION NO. 2:**
19      All documents constituting, referring, or relating to Marcelo Lamego's
20  technical disclosures to Apple relating to physiological parameter monitoring,
21  including but not limited to pulse oximetry and pulse rate monitoring.
22  **REQUEST FOR PRODUCTION NO. 3:**
23      All documents generated in whole or in part by Marcelo Lamego while
24  employed at Apple and relating to physiological parameter monitoring, including
25  but not limited to pulse oximetry and pulse rate monitoring.
26  **REQUEST FOR PRODUCTION NO. 4:**
27      Documents sufficient to show Marcelo Lamego's contributions to Apple's
28  marketing strategies relating to physiological parameter monitoring, including but

Exhibit 2
Page 70

1  not limited to pulse oximetry and pulse rate monitoring.

2  **REQUEST FOR PRODUCTION NO. 5:**

3      All documents constituting, referring, or relating to Marcelo Lamego's

4  disclosures to Apple regarding light piping reduction in physiological parameter

5  monitoring, including but not limited to pulse oximetry and pulse rate monitoring.

6  **REQUEST FOR PRODUCTION NO. 6:**

7      All documents constituting, referring, or relating to Marcelo Lamego's

8  disclosures to Apple regarding the weighting and relative importance of separate

9  calculation techniques for non-invasive measurement of blood parameters.

10  **REQUEST FOR PRODUCTION NO. 7:**

11      All documents constituting, referring, or relating to Marcelo Lamego's

12  disclosures to Apple regarding physiological parameter buffers during

13  measurements of physiological parameters in physiological parameter monitoring,

14  including but not limited to pulse oximetry and pulse rate monitoring.

15  **REQUEST FOR PRODUCTION NO. 8:**

16      Documents sufficient to show Marcelo Lamego's involvement in any Apple

17  program or project relating to the technical aspects of light emission and detection

18  **REQUEST FOR PRODUCTION NO. 9:**

19      All documents constituting, referring, or relating to Marcelo Lamego's

20  disclosures to Apple regarding the technical aspects of light emission and

21  detection.

22  **REQUEST FOR PRODUCTION NO. 10:**

23      All communications with Marcelo Lamego regarding his employment at

24  Apple, including his recruitment and termination.

25

26  / / /

27  / / /

28  / / /

-8-

Exhibit 2
Page 71

**REQUEST FOR PRODUCTION NO. 11:**

All agreements between Marcelo Lamego and Apple concerning his employment by Apple, including but not limited to employment agreements, assignment agreements, confidentiality agreements, separation or termination agreements.

-9-

Exhibit 2
Page 72

# EXHIBIT 3

Exhibit 3
Page 73



US007295866B2

(12) **United States Patent**     (10) Patent No.:     **US 7,295,866 B2**

Al-Ali     (45) Date of Patent:     **Nov. 13, 2007**

(54) **LOW POWER PULSE OXIMETER**

(75) Inventor: **Ammar Al-Ali**, Tustin, CA (US)

(73) Assignee: **Masimo Corporation**, Irvine, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 527 days.

(21) Appl. No.: **10/785,573**

(22) Filed: **Feb. 24, 2004**

(65) **Prior Publication Data**

US 2004/0181133 A1     Sep. 16, 2004

**Related U.S. Application Data**

(63) Continuation of application No. 10/184,028, filed on Jun. 26, 2002, now Pat. No. 6,697,658.

(60) Provisional application No. 60/302,564, filed on Jul. 2, 2001.

(51) **Int. Cl.**
*A61B 5/00*     (2006.01)
(52) **U.S. Cl.** ...................................... **600/323**; 600/310
(58) **Field of Classification Search** ................ 600/310, 600/322, 323, 333, 336
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,960,128 | A | 10/1990 | Gordon et al. |
| 4,964,408 | A | 10/1990 | Hink et al. |
| 5,041,187 | A | 8/1991 | Hink et al. |
| 5,069,213 | A | 12/1991 | Polczynski |
| 5,163,438 | A | 11/1992 | Gordon et al. |
| 5,337,744 | A | 8/1994 | Branigan |
| D353,195 | S | 12/1994 | Savage et al. |
| D353,196 | S | 12/1994 | Savage et al. |
| 5,431,170 | A | 7/1995 | Mathews |
| D361,840 | S | 8/1995 | Savage et al. |
| D362,063 | S | 9/1995 | Savage et al. |

| | | | |
|---|---|---|---|
| 5,452,717 | A | 9/1995 | Branigan et al. |
| D363,120 | S | 10/1995 | Savage et al. |
| 5,482,036 | A | 1/1996 | Diab et al. |
| 5,490,505 | A | 2/1996 | Diab et al. |
| 5,494,043 | A | 2/1996 | O'Sullivan et al. |
| 5,533,511 | A | 7/1996 | Kaspari et al. |
| 5,562,002 | A | 10/1996 | Lalin |
| 5,590,649 | A | 1/1997 | Caro et al. |
| 5,602,924 | A | 2/1997 | Durand et al. |
| 5,632,272 | A | 5/1997 | Diab et al. |
| 5,638,816 | A | 6/1997 | Kiani-Azarbayjany et al. |
| 5,638,818 | A | 6/1997 | Diab et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

EP     0 872 210 A1     10/1998

(Continued)

*Primary Examiner*—Eric F. Winakur
(74) *Attorney, Agent, or Firm*—Knobbe, Martens, Olson & Bear LLP

(57)     **ABSTRACT**

A pulse oximeter adaptively samples an input signal from a sensor in order to reduce power consumption in the absence of overriding conditions. Various sampling mechanisms may be used individually or in combination, including reducing the duty cycle of a drive current to a sensor emitter, intermittently powering-down a front-end interface to a sensor detector, or increasing the time shift between processed data blocks. Both internal parameters and output parameters may be monitored to trigger or override a reduced power consumption state. In this manner, a pulse oximeter can lower power consumption without sacrificing performance during, for example, high noise conditions or oxygen desaturations.

**33 Claims, 11 Drawing Sheets**



Exhibit 3
Page 74

US 7,295,866 B2

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,645,440 | A | 7/1997 | Tobler et al. |
| 5,685,299 | A | 11/1997 | Diab et al. |
| D393,830 | S | 4/1998 | Tobler et al. |
| 5,743,262 | A | 4/1998 | Lepper, Jr. et al. |
| 5,758,644 | A | 6/1998 | Diab et al. |
| 5,760,910 | A | 6/1998 | Lepper, Jr. et al. |
| 5,769,785 | A | 6/1998 | Diab et al. |
| 5,782,757 | A | 7/1998 | Diab et al. |
| 5,785,659 | A | 7/1998 | Caro et al. |
| 5,791,347 | A | 8/1998 | Flaherty et al. |
| 5,810,734 | A | 9/1998 | Caro et al. |
| 5,823,950 | A | 10/1998 | Diab et al. |
| 5,830,131 | A | 11/1998 | Caro et al. |
| 5,833,618 | A | 11/1998 | Caro et al. |
| 5,860,919 | A | 1/1999 | Kiani-Azarbayjany et al. |
| 5,890,929 | A | 4/1999 | Mills et al. |
| 5,904,654 | A | 5/1999 | Wohltmann et al. |
| 5,919,134 | A | 7/1999 | Diab |
| 5,924,979 | A | 7/1999 | Swedlow et al. |
| 5,934,925 | A | 8/1999 | Tobler et al. |
| 5,940,182 | A | 8/1999 | Lepper, Jr. et al. |
| 5,995,855 | A | 11/1999 | Kiani et al. |
| 5,997,343 | A | 12/1999 | Mills et al. |
| 6,002,952 | A | 12/1999 | Diab et al. |
| 6,011,986 | A | 1/2000 | Diab et al. |
| 6,027,452 | A | 2/2000 | Flaherty et al. |
| 6,036,642 | A | 3/2000 | Diab et al. |
| 6,045,509 | A | 4/2000 | Caro et al. |
| 6,067,462 | A | 5/2000 | Diab et al. |
| 6,081,735 | A | 6/2000 | Diab et al. |
| 6,088,607 | A | 7/2000 | Diab et al. |
| 6,110,522 | A | 8/2000 | Lepper, Jr. et al. |
| 6,144,868 | A | 11/2000 | Parker |
| 6,151,516 | A | 11/2000 | Kiani-Azarbayjany et al. |
| 6,152,754 | A | 11/2000 | Gerhardt et al. |
| 6,157,850 | A | 12/2000 | Diab et al. |
| 6,165,005 | A | 12/2000 | Mills et al. |
| 6,184,521 | B1 | 2/2001 | Coffin, IV et al. |
| 6,206,830 | B1 | 3/2001 | Diab et al. |
| 6,229,856 | B1 | 5/2001 | Diab et al. |
| 6,236,872 | B1 | 5/2001 | Diab et al. |
| 6,256,523 | B1 | 7/2001 | Diab et al. |
| 6,263,222 | B1 | 7/2001 | Diab et al. |
| 6,278,522 | B1 | 8/2001 | Lepper, Jr. et al. |
| 6,280,213 | B1 | 8/2001 | Tobler et al. |
| 6,285,896 | B1 | 9/2001 | Tobler et al. |
| 6,321,100 | B1 | 11/2001 | Parker |
| 6,334,065 | B1 | 12/2001 | Al-Ali et al. |
| 6,343,224 | B1 | 1/2002 | Parker |
| 6,349,228 | B1 | 2/2002 | Kiani et al. |
| 6,360,114 | B1 | 3/2002 | Diab et al. |
| 6,371,921 | B1 | 4/2002 | Caro et al. |
| 6,377,829 | B1 | 4/2002 | Al-Ali |
| 6,388,240 | B2 | 5/2002 | Schulz et al. |
| 6,397,091 | B2 | 5/2002 | Diab et al. |
| 6,430,525 | B1 | 8/2002 | Weber et al. |
| 6,463,311 | B1 | 10/2002 | Diab |
| 6,470,199 | B1 | 10/2002 | Kopotic et al. |
| 6,501,975 | B2 | 12/2002 | Diab et al. |
| 6,515,273 | B2 | 2/2003 | Al-Ali |
| 6,519,487 | B1 | 2/2003 | Parker |
| 6,525,386 | B1 | 2/2003 | Mills et al. |
| 6,526,300 | B1 | 2/2003 | Kiani et al. |
| 6,541,756 | B2 | 4/2003 | Schulz et al. |
| 6,542,764 | B1 | 4/2003 | Al-Ali et al. |
| 6,580,086 | B1 | 6/2003 | Schulz et al. |
| 6,584,336 | B1 | 6/2003 | Ali et al. |
| 6,595,316 | B2 | 7/2003 | Cybulski et al. |
| 6,597,933 | B2 | 7/2003 | Kiani et al. |
| 6,606,511 | B1 | 8/2003 | Ali et al. |

| | | | |
|---|---|---|---|
| 6,632,181 | B2 | 10/2003 | Flaherty et al. |
| 6,640,116 | B2 | 10/2003 | Diab |
| 6,643,530 | B2 | 11/2003 | Diab et al. |
| 6,650,917 | B2 | 11/2003 | Diab et al. |
| 6,654,624 | B2 | 11/2003 | Diab et al. |
| 6,658,276 | B2 | 12/2003 | Kianl et al. |
| 6,661,161 | B1 | 12/2003 | Lanzo et al. |
| 6,671,531 | B2 | 12/2003 | Al-Ali et al. |
| 6,678,543 | B2 | 1/2004 | Diab et al. |
| 6,684,090 | B2 | 1/2004 | Ali et al. |
| 6,684,091 | B2 | 1/2004 | Parker |
| 6,697,656 | B1 | 2/2004 | Al-Ali |
| 6,697,658 | B2 * | 2/2004 | Al-Ali .......................... 600/323 |
| RE38,476 | E | 3/2004 | Diab et al. |
| 6,699,194 | B1 | 3/2004 | Diab et al. |
| 6,714,804 | B2 | 3/2004 | Al-Ali et al. |
| RE38,492 | E | 4/2004 | Diab et al. |
| 6,721,585 | B1 | 4/2004 | Parker |
| 6,725,075 | B2 | 4/2004 | Al-Ali |
| 6,735,459 | B2 | 5/2004 | Parker |
| 6,745,060 | B2 | 6/2004 | Diab et al. |
| 6,760,607 | B2 | 7/2004 | Al-Ali |
| 6,770,028 | B1 | 8/2004 | Ali et al. |
| 6,771,994 | B2 | 8/2004 | Kiani et al. |
| 6,792,300 | B1 | 9/2004 | Diab et al. |
| 6,813,511 | B2 | 11/2004 | Diab et al. |
| 6,816,741 | B2 | 11/2004 | Diab |
| 6,822,564 | B2 | 11/2004 | Al-Ali |
| 6,826,419 | B2 | 11/2004 | Diab et al. |
| 6,830,711 | B2 | 12/2004 | Mills et al. |
| 6,850,787 | B2 | 2/2005 | Weber et al. |
| 6,850,788 | B2 | 2/2005 | Al-Ali |
| 6,852,083 | B2 | 2/2005 | Caro et al. |
| 6,861,639 | B2 | 3/2005 | Al-Ali |
| 6,898,452 | B2 | 5/2005 | Al-Ali et al. |
| 6,920,345 | B2 | 7/2005 | Al-Ali et al. |
| 6,931,268 | B1 | 8/2005 | Kiani-Azarbayjany et al. |
| 6,934,570 | B2 | 8/2005 | Kiani et al. |
| 6,939,305 | B2 | 9/2005 | Flaherty et al. |
| 6,943,348 | B1 | 9/2005 | Coffin IV |
| 6,950,687 | B2 | 9/2005 | Al-Ali |
| 6,961,598 | B2 | 11/2005 | Diab |
| 6,970,792 | B1 | 11/2005 | Diab |
| 6,979,812 | B2 | 12/2005 | Al-Ali |
| 6,985,764 | B2 | 1/2006 | Mason et al. |
| 6,993,371 | B2 | 1/2006 | Kiani et al. |
| 6,996,427 | B2 | 2/2006 | Ali et al. |
| 6,999,904 | B2 | 2/2006 | Weber et al. |
| 7,003,338 | B2 | 2/2006 | Weber et al. |
| 7,003,339 | B2 | 2/2006 | Diab et al. |
| 7,015,451 | B2 | 3/2006 | Dalke et al. |
| 7,024,233 | B2 | 4/2006 | Al et al. |
| 7,027,849 | B2 | 4/2006 | Al-Ali |
| 7,030,749 | B2 | 4/2006 | Al-Ali |
| 7,039,449 | B2 | 5/2006 | Al-Ali |
| 7,041,060 | B2 | 5/2006 | Flaherty et al. |
| 7,044,918 | B2 | 5/2006 | Diab |
| 7,067,893 | B2 | 6/2006 | Mills et al. |
| 7,096,052 | B2 | 8/2006 | Mason et al. |
| 7,096,054 | B2 | 8/2006 | Abdul-Hafiz et al. |
| 7,132,641 | B2 | 11/2006 | Schulz et al. |
| 7,142,901 | B2 | 11/2006 | Kiani et al. |
| 7,149,561 | B2 | 12/2006 | Diab |
| 7,186,966 | B2 | 3/2007 | Al-Ali |
| 7,190,261 | B2 | 3/2007 | Al-Ali |
| 2003/0218386 | A1 | 11/2003 | Dalke et al. |
| 2005/0234317 | A1 | 10/2005 | Kiani |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | WO99/63883 | 12/1999 |

* cited by examiner

Exhibit 3
Page 75



FIG. 1 (Prior Art)

Exhibit 3
Page 76



FIG. 2 (Prior Art)

Exhibit 3
Page 77



FIG. 3

Exhibit 3
Page 78



FIG. 4

Exhibit 3
Page 79



FIG. 5

Exhibit 3
Page 80



FIG. 6

Exhibit 3
Page 81



FIG. 7A

FIG. 7B

Exhibit 3
Page 82



FIG. 8

Exhibit 3
Page 83



FIG. 9

E = EVENT
Q = LOW QUALITY
P = ABOVE POWER TARGET FOR A
   PARTICULAR TIME PERIOD
T = TIMEOUT

Exhibit 3
Page 84



FIG. 10

Exhibit 3
Page 85



FIG. 11

E = EVENT
Q = LOW QUALITY
P = ABOVE POWER TARGET FOR A
    PARTICULAR TIME PERIOD

Exhibit 3
Page 86

US 7,295,866 B2

**1**

## LOW POWER PULSE OXIMETER

### REFERENCE TO RELATED APPLICATIONS

The present application claims priority benefit under 35 U.S.C. § 120 to, and is a continuation of application Ser. No. 10/184,028, entitled "Low Power Pulse Oximeter," filed Jun. 26, 2002, now U.S. Pat. No. 6,697,658, which claims priority benefit under 35 U.S.C. § 119(e) from U.S. Provisional Application No. 60/302,564, entitled "Low Power Pulse Oximeter," filed Jul. 2, 2001. The present application incorporates each of the foregoing disclosures herein by reference.

### BACKGROUND OF THE INVENTION

Pulse oximetry is a widely accepted noninvasive procedure for measuring the oxygen saturation level of a person's arterial blood, an indicator of their oxygen supply. Oxygen saturation monitoring is crucial in critical care and surgical applications, where an insufficient blood supply can quickly lead to injury or death. FIG. 1 illustrates a conventional pulse oximetry system 100, which has a sensor 110 and a monitor 150. The sensor 110, which can be attached to an adult's finger or an infant's foot, has both red and infrared LEDs 112 and a photodiode detector 114. For a finger, the sensor is configured so that the LEDs 112 project light through the fingernail and into the blood vessels and capillaries underneath. The photodiode 114 is positioned at the finger tip opposite the fingernail so as to detect the LED emitted light as it emerges from the finger tissues. A pulse oximetry sensor is described in U.S. Pat. No. 6,088,607 entitled "Low Noise Optical Probe," which is assigned to the assignee of the present invention and incorporated by reference herein.

Also shown in FIG. 1, the monitor 150 has LED drivers 152, a signal conditioning and digitization front-end 154, a signal processor 156, a display driver 158 and a display 159. The LED drivers 152 alternately activate the red and IR LEDs 112 and the front-end 154 conditions and digitizes the resulting current generated by the photodiode 114, which is proportional to the intensity of the detected light. The signal processor 156 inputs the conditioned photodiode signal and determines oxygen saturation based on the differential absorption by arterial blood of the two wavelengths emitted by the LEDs 112. Specifically, a ratio of detected red and infrared intensities is calculated by the signal processor 156, and an arterial oxygen saturation value is empirically determined based on the ratio obtained. The display driver 158 and associated display 159 indicate a patient's oxygen saturation, heart rate and plethysmographic waveform.

### SUMMARY OF THE INVENTION

Increasingly, pulse oximeters are being utilized in portable, battery-operated applications. For example, a pulse oximeter may be attached to a patient during emergency transport and remain with the patient as they are moved between hospital wards. Further, pulse oximeters are often implemented as plug-in modules for multiparameter patient monitors having a restricted power budget. These applications and others create an increasing demand for lower power and higher performance pulse oximeters. A conventional approach for reducing power consumption in portable electronics, typically utilized by devices such as calculators and notebook computers, is to have a "sleep mode" where the circuitry is powered-down when the devices are idle.

**2**

FIG. 2 illustrates a sleep-mode pulse oximeter 200 utilizing conventional sleep-mode power reduction. The pulse oximeter 200 has a pulse oximeter processor 210 and a power control 220. The power control 220 monitors the pulse oximeter output parameters 212, such as oxygen saturation and pulse rate, and controls the processor power 214 according to measured activity. For example, if there is no significant change in the oxygen saturation value over a certain time period, the power control 220 will power down the processor 210, except perhaps for a portion of memory. The power control 220 may have a timer that triggers the processor 210 to periodically sample the oxygen saturation value, and the power control 220 determines if any changes in this parameter are occurring. If not, the power control 220 will leave the processor 210 in sleep mode.

There are a number of disadvantages to applying consumer electronic sleep mode techniques to pulse oximetry. By definition, the pulse oximeter is not functioning during sleep mode. Unlike consumer electronics, pulse oximetry cannot afford to miss events, such as patient oxygen desaturation. Further, there is a trade-off between shorter but more frequent sleep periods to avoid a missed event and the increased processing overhead to power-up after each sleep period. Also, sleep mode techniques rely only on the output parameters to determine whether the pulse oximeter should be active or in sleep mode. Finally, the caregiver is given no indication of when the pulse oximeter outputs were last updated.

One aspect of a low power pulse oximeter is a sensor interface adapted to drive a pulse oximetry sensor and receive a corresponding input signal. A processor derives a physiological measurement corresponding to the input signal, and a display driver communicates the measurement to a display. A controller generates a sampling control output to at least one of said sensor interface and said processor so as to reduce the average power consumption of the pulse oximeter consistent with a predetermined power target.

In one embodiment, a calculator derives a signal status output responsive to the input signal. The signal status output is communicated to the controller to override the sampling control output. The signal status output may indicate the occurrence of a low signal quality or the occurrence of a physiological event. In another embodiment, the sensor interface has an emitter driver adapted to provide a current output to an emitter portion of the sensor. Here, the sampling control output determines a duty cycle of the current output. In a particular embodiment, the duty cycle may be in the range of about 3.125% to about 25%.

In another embodiment, the sensor interface has a front-end adapted to receive the input signal from a detector portion of the sensor and to provide a corresponding digitized signal. Here, the sampling control output determines a powered-down period of the front-end. A confidence indicator responsive to a duration of the powered-down period may be provided and displayed.

In yet another embodiment, the pulse oximeter comprises a plurality of data blocks responsive to the input signal, wherein the sampling control output determines a time shift of successive ones of the data blocks. The time shift may vary in the range of about 1.2 seconds to about 4.8 seconds.

An aspect of a low power pulse oximetry method comprises the steps of setting a power target and receiving an input signal from a pulse oximetry sensor. Further steps include calculating signal status related to the input signal, calculating power status related to the power target, and sampling based upon the result of the calculating signal status and the calculating power status steps.

Exhibit 3
Page 87

US 7,295,866 B2

**3**

In one embodiment, the calculating signal status step comprises the substeps of receiving a signal statistic related to the input signal, receiving a physiological measurement related to the input signal, determining a low signal quality condition from the signal statistic, determining an event occurrence from the physiological measurement, and indicating an override based upon the low signal quality condition or the event occurrence. The calculating power status step may comprise the substeps of estimating an average power consumption for at least a portion of the pulse oximeter, and indicating an above power target condition when the average power consumption is above the power target. The sampling step may comprise the substep of increasing sampling as the result of the override. The sampling step may also comprise the substep of decreasing sampling as the result of the above power target condition, except during the override.

Another aspect of a low power pulse oximetry method comprises the steps of detecting an override related to a measure of signal quality or a physiological measurement event, increasing the pulse oximeter power to a higher power level when the override exists, and reducing the pulse oximeter power to a lower power level when the override does not exist. The method may comprise the further steps of predetermining a target power level for a pulse oximeter and cycling between the lower power level and the higher power level so that an average pulse oximeter power is consistent with the target power level.

In one embodiment, the reducing step comprises the substep of decreasing the duty cycle of an emitter driver output to the sensor. In another embodiment, the reducing step comprises the substep of powering-down a detector front-end. A further step may comprise displaying a confidence indicator related to the duration of the powering-down substep. In yet another embodiment, the reducing step comprises the substep of increasing the time-shift of post-processor data blocks.

Another aspect of a low power pulse oximeter comprises a sensor interface adapted to receive an input signal from a sensor, a signal processor configured to communicate with the sensor interface and to generate an internal parameter responsive to the input signal, and a sampling controller responsive to the internal parameter so as to generate a sampling control to alter the power consumption of at least one of the sensor interface and the signal processor. The signal processor may be configured to generate an output parameter and the sampling controller may be responsive to a combination of the internal and output parameters so as to generate a sampling control to alter the power consumption of at least one of the sensor interface and the signal processor. The internal parameter may be indicative of the quality of the input signal. The output parameter may be indicative of oxygen saturation.

In another embodiment, the sampling controller is responsive to a predetermined power target in combination with the internal parameter so as to generate a sampling control to alter the power consumption of at least one of the sensor interface and the signal processor. The signal processor may be configured to generate an output parameter and the sampling controller may be responsive to a combination of the internal and output parameters and the power target so as to generate a sampling control to alter the power consumption of at least one of the sensor interface and the signal processor. The sensor interface may comprise an emitter driver and the sampling control may modify a duty cycle of the emitter driver. The sensor interface may comprise a detector front-end and the sampling control may intermit-

**4**

tently power-down the detector front-end. The processor may generate a plurality of data blocks corresponding to the input signal, where each of the data blocks have a time shift from a preceding one of the data blocks, and where the sampling control may determine the amount of the time shift.

A further aspect of a low power pulse oximeter comprises an interface means for communicating with a sensor, a processor means for generating an internal parameter and an output parameter, and a controller means for selectively reducing the power consumption of at least one of the interface means and the processor means based upon the parameters. In one embodiment, the interface means comprises a driver means for determining the duty cycle of emitter current to the sensor, the driver means being responsive to the controller means. In another embodiment, the interface means comprises a detector front-end means for receiving an input signal from the sensor, the power for the detector front-end means being responsive to the controller means. In yet another embodiment, the processor means comprises a post-processor means for determining a time shift between data blocks, the post-processor means being responsive to the controller means. In a further embodiment, the controller means comprises a signal status calculator means for generating an indication of a low signal quality or a physiological event based upon at least one of an internal signal statistic and an output physiological measurement, and a control engine means in communications with the signal status calculator means for generating a sampling control responsive to the indication. In yet a further embodiment, the controller means comprises a power status calculator means for generating a power indication of power consumption relative to a power target, and a control engine means in communications with the power status calculator means for generating a sampling control responsive to the power indication.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a block diagram of a conventional pulse oximeter sensor and monitor;

FIG. **2** is a block diagram of a pulse oximeter having a conventional sleep mode;

FIG. **3** is a top-level block diagram of a low power pulse oximeter;

FIG. **4** is a detailed block diagram of a low power pulse oximeter illustrating a sensor interface, a signal processor and a sampling controller;

FIG. **5** is a graph of emitter drive current versus time illustrating variable duty cycle processing;

FIG. **6** is a graph of oxygen saturation versus time illustrating intermittent sample processing;

FIGS. **7**A–B are graphs of data buffer content versus time illustrating variable data block overlap processing;

FIG. **8** is a graph of power versus time illustrating power dissipation conformance to an average power target using variable duty cycle and intermittent sample processing;

FIG. **9** is a state diagram of the sampling controller for variable duty cycle and intermittent sample processing;

FIG. **10** is a graph of power versus time illustrating power dissipation using variable data block overlap processing; and

FIG. **11** is a state diagram of the sampling controller for variable data block overlap processing.

Exhibit 3
Page 88

US 7,295,866 B2

**5**

DETAILED DESCRIPTION OF THE
PREFERRED EMBODIMENT

FIG. **3** illustrates one embodiment of a low power pulse oximeter. The pulse oximeter **300** has a sensor interface **320**, a signal processor **340**, a sampling controller **360** and a display driver **380**. The pulse oximeter **300** also has a sensor port **302** and a display port **304**. The sensor port **302** connects to an external sensor, e.g. sensor **110** (FIG. **1**). The sensor interface **320** drives the sensor port **302**, receives a corresponding input signal from the sensor port **302**, and provides a conditioned and digitized sensor signal **322** accordingly. Physiological measurements **342** are input to a display driver **380** that outputs to the display port **304**. The display port **304** connects to a display device, such as a CRT or LCD, which a healthcare provider typically uses for monitoring a patient's oxygen saturation, pulse rate and plethysmograph.

As shown in FIG. **3**, the signal processor **340** derives the physiological measurements **342**, including oxygen saturation, pulse rate and plethysmograph, from the input signal **322**. The signal processor **340** also derives signal statistics **344**, such as signal strength, noise and motion artifact. The physiological measurements **342** and signal statistics **344** are input to the sampling controller **360**, which outputs sampling controls **362**, **364**, **366** accordingly. The sampling controls **362**, **364**, **366** regulate pulse oximeter power dissipation by causing the sensor interface **320** to vary the sampling characteristics of the sensor port **302** and by causing the signal processor **340** to vary its sample processing characteristics, as described in further detail with respect to FIG. **4**, below. Advantageously, power dissipation is responsive not only to output parameters, such as the physiological measurements **342**, but also to internal parameters, such as the signal statistics **344**.

FIG. **4** illustrates further detail regarding the sensor interface **320**, the signal processor **340** and the sampling controller **360**. The sensor interface **320** has emitter drivers **480** and a detector front-end **490**. The emitter drivers **480** are responsive to a sampling control **362**, described below, and provide emitter drive outputs **482**. The emitter drive outputs **482** activate the LEDs of a sensor attached to the sensor port **302** (FIG. **3**). The detector front-end **490** receives an input signal **492** from a sensor attached to the sensor port **302** (FIG. **3**) and provides a corresponding conditioned and digitized input signal **322** to the signal processor **340**. A sampling control **364** controls power to the detector front-end **490**, as described below.

As shown in FIG. **4**, the signal processor **340** has a pre-processor **410** and a post processor **430**. The pre-processor **410** demodulates red and IR signals from the digitized signal **322**, performs filtering, and reduces the sample rate. The pre-processor provides a demodulated output, having a red channel **412** and an IR channel **414**, which is input into the post-processor **430**. The post processor **430** calculates the physiological measurements **342** and the signal statistics **344**, which are output to a signal status calculator **450**. The physiological measurements **342** are also output to a display driver **380** (FIG. **3**) as described above. A pulse oximetry signal processor is described in U.S. Pat. No. 6,081,735 entitled "Signal Processing Apparatus," which is assigned to the assignee of the present invention and incorporated by reference herein.

Also shown in FIG. **4**, the sampling controller **360** has a control engine **440**, a signal status calculator **450** and a power status calculator **460**. The control engine **440** outputs sampling controls **362**, **364**, **366** to reduce the power consumption of the pulse oximeter **300**. In one embodiment, the control engine **440** advantageously utilizes multiple sampling mechanisms to alter power consumption. One sampling mechanism is an emitter duty cycle control **362** that is an input to the emitter drivers **480**. The emitter duty cycle control **362** determines the duty cycle of the current supplied by the emitter drive outputs **482** to both red and IR sensor emitters, as described with respect to FIG. **5**, below. Another sampling mechanism is a front-end control **364** that intermittently removes power to the detector front-end **490**, as described with respected to FIG. **6**, below. Yet another sampling mechanism is a data block overlap control **366** that varies the number of data blocks processed by the post processor **430**. These various sampling mechanisms provide the flexibility to reduce power without sacrificing performance during, for example, high noise conditions or oxygen desaturation events, as described below in further detail.

The sampling controls **362**, **364**, **366** modify power consumption by, in effect, increasing or decreasing the number of input samples received and processed. Sampling, including acquiring input signal samples and subsequent sample processing, can be reduced during high signal quality periods and increased during low signal quality periods or when critical measurements are necessary. In this manner, the control engine **440** regulates power consumption to satisfy a predetermined power target, to minimize power consumption, or to simply reduce power consumption, as described with respect to FIGS. **8** and **10**, below. The current state of the control engine is provided as a control state output **442** to the power status calculator **460**. The control engine **440** utilizes the power status output **462** and the signal status output **452** to determine its next control state, as described with respect to FIGS. **9** and **11**, below.

Further shown in FIG. **4**, the signal status calculator **450** receives physiological measurements and signal statistics from the post processor **430** and determines the occurrence of an event or a low signal quality condition. An event determination is based upon the physiological measurements output **342** and may be any physiological-related indication that justifies the processing of more sensor samples and an associated higher power consumption level, such as an oxygen desaturation, a fast or irregular pulse rate or an unusual plethysmograph waveform to name a few. A low signal quality condition is based upon the signal statistics output **344** and may be any signal-related indication that justifies the processing of more sensor samples, such as a low signal level, a high noise level or motion artifact to name a few. The signal status calculator **450** provides the signal status output **452** that is input to the control engine **440**.

In addition, FIG. **4** shows that the power status calculator **460** has a control state input **442** and a power status output **462**. The control state input **442** indicates the current state of the control engine **440**. The power status calculator **460** utilizes an internal time base, such as a counter, timer or real-time clock, in conjunction with the control engine state to estimate the average power consumption of at least a portion of the pulse oximeter **300**. The power status calculator **460** also stores a predetermined power target and compares its power consumption estimate to this target. The power status calculator **460** generates the power status output **462** as an indication that the current average power estimate is above or below the power target and provides this output **462** to the control engine **440**.

FIG. **5** illustrates emitter driver output current versus time. The graph **500** depicts the combination of a red LED drive current **510** and an IR drive current **560**. The solid line

Exhibit 3
Page 89

US 7,295,866 B2

7

graph 502 illustrates drive currents having a high duty cycle. The dashed line graph 504 illustrates drive currents having a low duty cycle. In a typical pulse oximeter, the duty cycle of the drive signals is constant and provides sufficient dark bands 508 to demodulate the detector response into red and IR channels. The emitter drivers 480 (FIG. 4), however, require a significant portion of the overall pulse oximeter power budget. Intermittently reducing the drive current duty cycle can advantageously reduce power dissipation without compromising signal integrity. As an example, a low power pulse oximeter implementation nominally consuming 500 mw may be able to reduce power consumption on the order of 70 mw by such drive current duty cycle reductions. In a preferred embodiment, the drive current duty cycle is varied within a range from about 25% to about 3.125%. In a more preferred embodiment, the drive current duty cycle is intermittently reduced from about 25% to about 3.125%. In conjunction with an intermittently reduced duty cycle or as an independent sampling mechanism, there may be a "data off" time period longer than one drive current cycle where the emitter drivers 480 (FIG. 4) are turned off. The detector front-end 490 (FIG. 4) may also be powered down during such a data off period, as described with respect to FIGS. 8 and 9, below.

FIG. 6 is a graph 600 of a pre-processor output signal 610 over time depicting the result of intermittent sampling at the detector front-end 490 (FIG. 4). The output signal 610 is a red channel 412 (FIG. 4) or an IR channel 414 (FIG. 4) output from the pre-processor 410 (FIG. 4), which is input to the post processor 430 (FIG. 4), as described above. The output signal 610 has "on" periods 612, during which time the detector front-end 490 (FIG. 4) is powered-up and "off" periods 614, during which time the detector front-end 490 (FIG. 4) is powered-down. The location and duration of the on periods 612 and off periods 614 are determined by the front-end control 364 (FIG. 4).

Also shown in FIG. 6 is a corresponding timeline 601 of overlapping data blocks 700, which are "snap-shots" of the pre-processor output signal 610 over specific time intervals. Specifically, the post processor 430 (FIG. 4) processes a sliding window of samples of the pre-processor output signal 610, as described with respect to FIGS. 7A–B, below. Advantageously, the post processor 430 (FIG. 4) continues to function during off portions 614, marking as invalid those data blocks 640 that incorporate off portions 614. A freshness counter can be used to measure the time period 660 between valid data blocks 630, which can be displayed on a pulse oximeter monitor as an indication of confidence in the current measurements.

FIGS. 7A–B illustrate data blocks 700, which are processed by the post processor 430 (FIG. 4). Each data block 700 has n samples 702 of the pre-processor output and corresponds to a time interval 704 of n/$f_s$, where $f_s$ is the sample frequency. For example, in one embodiment n=600 and $f_s$=62.5 Hz. Hence, each data block time interval 704 is nominally 9.6 sec.

As shown in FIG. 7A, each data block 700 also has a relative time shift 706 from the preceding data block, where is an integral number of sample periods. That is, =m/$f_s$, where m is an integer representing the number of samples dropped from the preceding data block and added to the succeeding data block. In the embodiment described above, m=75 and =1.2 sec, nominally. The corresponding overlap 708 of two adjacent data blocks 710, 720 is (n−m)/$f_s$. In the embodiment described above, the overlap 708 is nominally 9.6 sec-1.2 sec=8.4 sec. The greater the overlap 708, i.e. the smaller the time shift 706, the more data blocks there are to

8

process in the post-processor 430 (FIG. 4), with a corresponding greater power consumption. The overlap 708 between successive data blocks 710, 720 may vary from n−1 samples to no samples, i.e. no overlap. Also, as shown in FIG. 7B, there may be a sample gap 756 or negative overlap, i.e. samples between data blocks that are not processed by the post-processor, allowing further post-processor power savings. Sample gaps 756 may correspond to detector front-end off periods 614 (FIG. 6).

FIG. 8 illustrates an exemplar power consumption versus time profile 800 for the pulse oximeter 300 (FIG. 3) during various control engine states. In one embodiment, the control engine 440 (FIG. 4) has three states related to the sampling control outputs 362, 364 that affect pulse oximeter power consumption accordingly. One of ordinary skill in the art will recognize that the control engine 440 (FIG. 4) may have greater or fewer states and associated power consumption levels. The profile 800 shows the three control engine states 810 and the associated power consumption levels 820. These three states are high duty cycle 812, low duty cycle 814 and data off 818.

In the high duty cycle state 812, the control engine 440 (FIG. 4) causes the emitter drivers 480 (FIG. 4) to turn on sensor emitters for a relatively long time period, such as 25% on time for each of the red 510 and IR 560 drive currents. In the low duty cycle state 814, the control engine 440 (FIG. 4) causes the emitter drivers 480 (FIG. 4) to turn on sensor emitters for a relatively short time period, such as 3.125% of the time for each of the red 510 and IR 560 drive currents. In the data off state 818, the control engine 440 (FIG. 4) turns off the emitter drivers 480 (FIG. 4) and powers down the detector front-end 490 (FIG. 4). Also shown is a predetermined target power consumption level 830. The control engine 440 (FIG. 4) alters the sensor sampling of the pulse oximeter 300 (FIG. 3) so that the average power consumption matches the target level 830, as indicated by the power status output 462 (FIG. 4), except when overridden by the signal status output 452 (FIG. 4).

As shown in FIG. 8, power consumption changes according to the control states 810 during each of the time intervals 850. In a first time interval 851, the pulse oximeter is in a low duty cycle state 814 and transitions to a high duty cycle state 812 during a second time interval 852 due to an event or low quality signal. During a third time interval 853, the pulse oximeter is able to enter the data off state 818, during which time no sensor samples are processed. In a forth time interval 854, sensor samples are again taken, but at a low duty cycle 814. During the fifth and sixth time intervals 855, 856, sensor samples are shut off and turned on again as the pulse oximeter 300 (FIG. 3) alternates between the data off state 818 and the low duty cycle state 814 so as to maintain an average power consumption at the target level 830.

FIG. 9 illustrates a state diagram 900 for one embodiment of the control engine 440 (FIG. 4). In this embodiment, there are three control states, high duty cycle 910, low duty cycle 940 and data off 970, as described with respect to FIG. 8, above. If the control state is data off 970, an event triggers a data-off to high-duty-cycle transition 972. If the control state is low duty cycle 940, an event similarly triggers a low-duty cycle to high-duty-cycle transition 942. In this manner, the occurrence of an event initiates high duty sensor sampling, allowing high fidelity monitoring of the event. Similarly, if the control state is low duty cycle 940, low signal quality triggers a low-duty cycle to high-duty-cycle transition 942. In this manner, low signal quality initiates higher duty sensor sampling, providing, for example, a larger signal-to-noise ratio.

Exhibit 3
Page 90

US 7,295,866 B2

9

Also shown in FIG. 9, if the control state is high duty cycle 910 and either an event is occurring or signal quality is low, then a null transition 918 maintains the high duty cycle state 910. If the pulse oximeter is not above the power target for more than a particular time interval, a null transition 948 maintains the low duty cycle state 940, so that sampling is turned-off only when necessary to track the power target. Further, if the control state is data off 970 and no time-out has occurred, a null transition 978 maintains the data off state 970, providing a minimum power consumption.

In addition, FIG. 9 shows that when the control state is in a high duty cycle state 910, if neither an event nor low signal quality are occurring, then a high-duty-cycle to low-duty-cycle transition 912 occurs by default. Also, if the control state is low duty cycle 940, if neither an event nor low signal quality are occurring and the power consumption is above the target level for longer than a particular time interval, a low-duty-cycle to data-off transition 944 occurs by default, allowing power consumption to come down to the target level. Further, if the control state is data off 970, if no event occurs and a timeout does occur, a data-off to low-duty-cycle transition 974 occurs by default, preventing excessively long periods of no sensor sampling.

FIG. 10 illustrates an exemplar power consumption versus time profile 1000 for the post processor 430 (FIG. 4) during various control engine states. In one embodiment, the control engine 440 (FIG. 4) has three states related to the sampling control output 366 (FIG. 4) that affect post processor power consumption accordingly. One of ordinary skill in the art will recognize that the control engine may have greater or fewer states and associated power consumption levels. The profile 1000 shows the three control engine states 1010 and the associated post processor power consumption levels 1020. These three states are large overlap 1012, medium overlap 1014 and small overlap 1018.

As shown in FIG. 10, in the large overlap state 1012, the control engine 440 (FIG. 4) causes the post processor to process data blocks that have a comparatively small time shift 706 (FIG. 7A), and the post processor exhibits relatively high power consumption under these conditions, say 300 mw. In the medium overlap state 1014, the control engine 440 (FIG. 4) causes the post processor to process data blocks that have a comparatively larger time shift 706 (FIG. 7A). For example, the data blocks may be time shifted twice as much as for the large overlap state 1012, and, as such, the post processor performs only half as many computations and consumes half the nominal power, say 150 mw. In the small overlap state 1018, the control engine 440 (FIG. 4) causes the post processor to process data blocks that have a comparatively large time shift. For example, the data blocks may be time shifted twice as much as for the medium overlap state 1014. As such, the post processor performs only a quarter as many computations and consumes a quarter of the nominal power, say 75 mw, as for the large overlap state 1012. In one embodiment, the control engine 440 (FIG. 4) alters the data block overlap of the post processor in conjunction with the duty cycle of the emitter drivers described with respect to FIG. 5, above, and the front-end sampling described with respect to FIG. 6, above, so that the average power consumption of the pulse oximeter matches a target level indicated by the power status output 462 (FIG. 4) or so that the power consumption is otherwise reduced or minimized.

In a preferred embodiment, data blocks are time shifted by either about 0.4 sec or about 1.2 sec, depending on the overlap state of the control engine 440 (FIG. 4). In a more

10

preferred embodiment, the data blocks are varied between about 1.2 sec and about 4.8 sec. In a most preferred embodiment, the data blocks are time shifted by either about 1.2 sec, about 2.4 sec or about 4.8 sec, depending on the overlap state of the control engine 440 (FIG. 4). Although the post-processing of data blocks is described above with respect to only a few overlap states and a corresponding number of particular data block time shifts, there may be many overlap states and a corresponding range of data block time shifts.

Further shown in FIG. 10, power consumption 1020 changes according to the control states 1010 during each of the time intervals 1050. In a first time interval 1052, the post processor is in a large overlap state 1012 and transitions to a medium overlap state 1014 during a second time interval 1054, so as to meet a power target during a high signal quality period, for example. During a third time interval 1055, the post processor enters a small overlap state 1018, for example to meet a power target by further reducing power consumption. In a forth time interval 1056, the post processor transitions back to a large overlap state 1012, such as during an event or low signal quality conditions.

FIG. 11 illustrates a state diagram 1100 for one embodiment of the control engine 440 (FIG. 4). These states may function in parallel with, or in combination with, the sampling states described with respect to FIG. 9, above. In the illustrated embodiment, there are three control states, large overlap 1110, medium overlap 1140 and small overlap 1170, as described with respect to FIG. 10, above. If the control state is small overlap 1170, an event triggers a small overlap to large overlap transition 1172. If the control state is medium overlap 1140, an event similarly triggers a medium overlap to large-overlap transition 1142. In this manner, the occurrence of an event initiates the processing of more data blocks, allowing more robust signal statistics and higher fidelity monitoring of the event. Similarly, if the control state is medium overlap 1140, low signal quality triggers a medium overlap to large overlap transition 1142. In this manner, low signal quality initiates the processing of more data blocks, providing more robust signal statistics during lower signal-to-noise ratio periods.

Also shown in FIG. 11, if the control state is large overlap 1110 and either an event is occurring or signal quality is low, then a null transition 1118 maintains the large overlap state 1110. If the pulse oximeter is not above the power target for more than a particular time interval, a null transition 1148 maintains the medium overlap state 1140, so that reduced data processing occurs only when necessary to track the power target. Further, if the control state is small overlap 1170, a null transition 1178 maintains this power saving state until the power target is reached or an event or low signal quality condition occurs.

In addition, FIG. 11 shows that when the control state is in a large overlap state 1110, if neither an event nor low signal quality are occurring, then a large overlap to medium overlap transition 1112 occurs by default. Also, if the control state is medium overlap 1140, if the power consumption is above the target level for longer than a particular time interval and no low signal quality condition or event is occurring, a medium overlap to small overlap transition 1174 occurs, allowing power consumption to come down to the target level. Further, if the control state is small overlap 1170, if no event occurs but the power target has been met, a small overlap to medium overlap transition 1174 occurs.

A low power pulse oximeter embodiment is described above as having a power status calculator 460 (FIG. 4) and an associated power target. Another embodiment of a low

Exhibit 3
Page 91

US 7,295,866 B2

11

power pulse oximeter, however, functions without either a power status calculator or a power target, utilizing the sampling controls **362**, **364**, **366** (FIG. **3**) in response to internal parameters and/or output parameters, such as signal statistics **344** (FIG. **3**) and/or physiological measurements **342** (FIG. **3**) to reduce power consumption except during, say, periods of low signal quality and physiological events.

One of ordinary skill in the art will recognize that various state diagrams are possible representing control of the emitter drivers, the detector front-end and the post-processor. Such state diagrams may have fewer or greater states with differing transitional characteristics and with differing relationships between sampling mechanisms than the particular embodiments described above. In relatively simple embodiments of the control engine **440** (FIG. **4**), only a single sampling mechanism is used, such as the sampling mechanism used to vary the duty cycle of the emitter drivers. The single sampling mechanism may be based only upon internal parameters, such as signal quality, only upon output parameters, such as those that indicate the occurrence of physiological events, or upon a combination of internal and output parameters, with or without a power target.

In relatively more complex embodiments of the control engine **440** (FIG. **4**), sampling mechanisms are used in combination. These sampling mechanisms may be based only upon internal parameters, only upon output parameters, or upon a combination of internal and output parameters, with or without a power target. In a particular embodiment, the emitter duty-cycle, front-end duty-cycle and data block overlap sampling mechanisms described above are combined. A "reduced overlap" state relating to the post-processing of data blocks is added to the diagram of FIG. **9** between the "low duty cycle" state and the "data off" state. That is, sampling is varied between a high duty cycle state, a low duty cycle state, a reduced overlap state and a data off state in response to signal quality and physiological events, with or without a power target.

The low power pulse oximeter has been disclosed in detail in connection with various embodiments. These embodiments are disclosed by way of examples only and are not to limit the scope of the claims that follow. One of ordinary skill in the art will appreciate many variations and modifications.

What is claimed is:

**1**. A method of managing power consumption in a pulse oximeter, the method comprising:

    operating a pulse oximeter at a first approximate power consumption during a first signal condition representative of a condition of a signal received from a sensor capable of detecting energy attenuated by tissue of a measurement site of a patient;

    determining a second signal condition of the signal; and

    operating the pulse oximeter at a second approximate power consumption different than the first approximate power consumption based on the second signal condition, wherein the step of operating the pulse oximeter at the first approximate power consumption comprises generating a drive signal for the sensor at a first duty cycle, and wherein the step of operating the pulse oximeter at the second approximate power consumption comprises generating the drive signal for the sensor at a second duty cycle different from the first duty cycle.

**2**. The method of claim **1**, wherein the first signal condition corresponds to a high signal quality condition and the first approximate power consumption corresponds to a low power consumption.

12

**3**. The method of claim **1**, wherein the second signal condition corresponds to a low signal quality condition and the second approximate power consumption corresponds to a high power consumption.

**4**. The method of claim **1**, wherein the first duty cycle comprises approximately three percent (3%) and the second duty cycle comprises approximately twenty-five percent (25%).

**5**. The method of claim **1**, wherein the steps of operating the pulse oximeter at a first approximate power consumption and operating the pulse oximeter at a second approximate power consumption comprises varying a duty cycle of a drive signal for the sensor.

**6**. The method of claim **5**, wherein the varying the duty cycle comprises varying the duty cycle between approximately three percent (3%) and approximately twenty-five percent (25%).

**7**. The method of claim **1** wherein the steps of operating the pulse oximeter at the first approximate power consumption and of operating the pulse oximeter at the second approximate power consumption comprises varying an amount of data blocks processed.

**8**. The method of claim **1**, wherein the steps of operating the pulse oximeter at the first approximate power consumption and of operating the pulse oximeter at the second approximate power consumption comprises varying power to a detector front end.

**9**. The method of claim **1**, comprising:

    determining a override condition exists; and

    returning to operating the pulse oximeter at the first approximate power consumption.

**10**. A pulse oximeter capable of varying its power consumption, comprising:

    an emitter driver which outputs a drive signal capable of driving at least one emitter of a sensor that detects energy attenuated by tissue of a measurement site of a patient; and

    a controller which selects between at least a first duty cycle of the drive signal corresponding to a first power consumption and a second duty cycle of the drive signal corresponding to a second power consumption different than the first power consumption.

**11**. The pulse oximeter of claim **10**, wherein the first power consumption corresponds to a low power consumption and is associated with a high signal quality of at least one signal received from the sensor.

**12**. The pulse oximeter of claim **10**, wherein second power consumption corresponds to a high power consumption and is associated with a low signal quality of at least one signal received from the sensor.

**13**. The pulse oximeter of claim **10**, wherein the first duty cycle is substantially lower than the second duty cycle.

**14**. The pulse oximeter of claim **13**, wherein the first duty cycle comprises approximately three percent (3%) and the second duty cycle comprises approximately twenty-five percent (25%).

**15**. The pulse oximeter of claim **10**, wherein the controller varies an amount of data blocks processed.

**16**. The pulse oximeter of claim **10**, wherein the controller varies power to a detector front end.

**17**. The pulse oximeter of claim **10**, wherein the controller selects based on at least an estimate of power consumption as compared to a target power consumption.

**18**. The pulse oximeter of claim **10**, wherein the controller selects based on a quality of a signal responsive to the detected energy from said sensor.

Exhibit 3
Page 92

US 7,295,866 B2

13

**19**. The pulse oximeter of claim **10**, wherein the controller selects based on one or more determined values of a physiological parameter responsive to the detected energy from said sensor.

**20**. A method of modifying power consumption of an oximeter, the method comprising:

operating said oximeter at a lower power consumption by at least one of activating emitters of a noninvasive optical sensor at a decreased duty cycle or reducing overlap in data blocks being processed;

determining a transition event should occur; and

operating said oximeter at a higher power consumption based at least in part on said determination of said transition event by at least one of activating said emitters of said sensor at an increased duty cycle or increasing overlap in said data blocks being processed.

**21**. The method of claim **20**, wherein the operating said oximeter at said lower power consumption comprises activating said emitters at said decreased duty cycle, and wherein the operating said oximeter at said higher power consumption comprises activating said emitters at said increased duty cycle.

**22**. The method of claim **21**, wherein said decreased duty cycle can range as low as about 3.125% and said increased duty cycle can range as high as about 25%.

**23**. The method of claim **20**, wherein the operating said oximeter at said lower power consumption comprises decreasing said overlap, and wherein the operating said oximeter at said higher power consumption comprises increasing said overlap.

**24**. The method of claim **23**, wherein said decreased overlap is associated with a time shift ranging as high as about 4.8 seconds and said increased overlap is associated with a time shift ranging as low as about 1.2 seconds.

14

**25**. The method of claim **20**, wherein the operating said oximeter at said lower power consumption additionally comprises intermittently removing power from a processing front end, and wherein the operating said oximeter at said higher power consumption additionally comprises powering said processing front end.

**26**. The method of claim **20**, wherein said determining said transition event should occur comprises evaluating one or more characteristics of one or more signals from one or more light sensitive detectors.

**27**. The method of claim **26**, wherein said one or more characteristics comprises signal strength.

**28**. The method of claim **26**, wherein said one or more characteristics comprises a presence of noise.

**29**. The method of claim **26**, wherein said one or more characteristics comprises a presence of motion induced noise.

**30**. The method of claim **20**, wherein said determining said transition event should occur comprises determining an estimate of current power consumption and comparing said estimate with a target power consumption.

**31**. The method of claim **20**, wherein said determining said transition event should occur comprises determining an override condition exists.

**32**. The method of claim **31**, wherein said override condition comprises a need for measurements during a critical care environment.

**33**. The method of claim **31**, wherein said override condition comprises one or more monitored physiological parameters exhibiting predefined behavior.

*   *   *   *   *

Exhibit 3
Page 93

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.        : 7,295,866 B2                          Page 1 of 1
APPLICATION NO. : 10/785573
DATED              : November 13, 2007
INVENTOR(S)      : Ammar Al-Ali

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

At column 12, line 14, in claim 6, after "wherein", please delete "the".

At column 12, line 18, in claim 7, after "claim 1", please insert -- , --.

Signed and Sealed this

Eighteenth Day of November, 2008

JON W. DUDAS
*Director of the United States Patent and Trademark Office*

Exhibit 3
Page 94