Joseph R. Re (Bar No. 134479)
joseph.re@knobbe.com
Stephen C. Jensen (Bar No. 149894)
steve.jensen@knobbe.com
Perry D. Oldham (Bar No. 216016)
perry.oldham@knobbe.com
Stephen W. Larson (Bar No. 240844)
stephen.larson@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, Fourteenth Floor
Irvine, CA 92614
Telephone:  (949)-760-0404
Facsimile:  (949)-760-9502

Attorneys for Plaintiffs,
Masimo Corporation and Cercacor Laboratories, Inc.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| MASIMO CORPORATION, a Delaware corporation; and CERCACOR LABORATORIES, INC., a Delaware corporation<br><br>Plaintiffs,<br><br>v.<br><br>APPLE INC., a California corporation<br><br>Defendant. | ) Case No. 8:20-cv-00048-JVS-JDE<br>)<br>) **DECLARATION OF ADAM B.**<br>) **POWELL IN SUPPORT OF**<br>) **PLAINTIFFS' PORTION OF**<br>) **JOINT STIPULATION**<br>) **REGARDING DEFENDANT**<br>) **APPLE INC.'S MOTION FOR**<br>) **PROTECTIVE ORDER**<br>)<br>) Hrg Date/Time: May 21, 2020 at 10 a.m.<br>) Courtroom:   6A<br>) Discovery Cutoff:   July 5, 2021<br>) Pretrial Conference: March 21, 2022<br>) Trial:              April 5, 20022<br>)<br>) Hon. John D. Early<br>) |

I, Adam B. Powell, hereby declare and state as follows:

1.      I am an attorney with the law firm of Knobbe, Martens, Olson & Bear, LLP, and I am licensed to practice law in the State of California.  I am counsel of record for Plaintiffs Masimo Corporation ("Masimo") and Cercacor Laboratories, Inc. ("Cercacor") in the above-captioned action.  I have personal knowledge of the matters set forth herein, and, if I am called upon to testify, I could and would testify competently thereto.

2.      Attached hereto as **Exhibit 1** is a true and correct copy of U.S. Patent No. 10,470,695.

3.      Attached hereto as **Exhibit 2** is a true and correct copy of U.S. Patent No. 10,433,776.

4.      Attached hereto as **Exhibit 3** is a true and correct copy of a document downloaded from the public docket in *ScaleMP, Inc. v. TidalScale, Inc.*, No. 18-CV-4716 EDL, Dkt. No. 52 (N.D. Cal. Mar. 15, 2019).

5.      Attached hereto as **Exhibit 4** is a true and correct copy of a document downloaded from the public docket in *Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*, No. 10-CV-03428-LHK, Dkt. No. 72 (N.D. Cal. Mar. 24, 2011).

6.      Attached hereto as **Exhibit 5** is a true and correct copy of a document downloaded from the public docket in *General Elec. Co. v. Liang*, 2:13-cv-08670-DDP-CW, Dkt. No. 54 (C.D. Cal. Feb. 20, 2014).

7.      Attached hereto as **Exhibit 6** is a true and correct copy of a letter sent from Joshua Lerner (who is counsel of record for Apple) to Perry Oldham (who is also counsel of record for Plaintiffs) dated March 27, 2020.

8.      The parties' counsel discussed the matters raised in Mr. Lerner's March 27, 2020, letter on April 6, 2020.  During the call, Plaintiffs reieterated their position that Section 2019.210 does not apply in Federal Court under the *Erie* doctrine but, if Section 2019.210 applies, it does not bar patent discovery.

Plaintiffs also asked Apple a series of questions about Apple's March 27, 2020, letter.   For example, Plaintiffs asked Apple which Requests for Production Apple believed were solely related to the Plaintiffs' trade secret claims and unrelated to Plaintiffs' patent claims.   Plaintiffs also asked about Apple's citation to *Advanced Modular Sputtering, Inc. v. Superior Court*, 132 Cal. App. 4th 826, 835 (2005), including whether Apple asserted Plaintiffs' patent infringement claims were "factually dependent" on the misappropriation of trade secrets allegations.  Contrary to Paragraph 13 of Mr. Lerner's Declaration, Apple attempted to ascribe arguments to those questions during the meet-and-confer, and Plaintiffs repeatedly responded they were merely asking questions.

9.     Attached hereto as **Exhibit 7** is a true and correct copy of an email that I sent to Angelique Kaounis (who is counsel of record for Apple) at 12:55pm on April 7, 2020.  Despite this email substantively responding to Ms. Kaounis and being part of the "email exchange" following the parties' meet-and-confer, it was not included in Exhibit J to Mr. Lerner's Declaration.   After the email attached as **Exhibit 7**, the parties exchanged additional emails concerning the briefing schedule for this motion.

10.     Attached hereto as **Exhibit 8** is a true and correct copy of the Joint Rule 26(f) Report (D.I. 33) in this case, which is dated April 14, 2020.

11.     Attached hereto as **Exhibit 9** is the [In Chambers] Order Re Scheduling Dates (D.I. 37) in this case, which is dated April 17, 2020.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on April 29, 2020, in Encinitas, California.


 */s/ Adam B. Powell*
Adam B. Powell

32726075

-2-

US010470695B2

(12) **United States Patent**
Al-Ali

(10) Patent No.: **US 10,470,695 B2**
(45) Date of Patent: ***Nov. 12, 2019**

(54) **ADVANCED PULSE OXIMETRY SENSOR**

(71) Applicant: **MASIMO CORPORATION**, Irvine, CA (US)

(72) Inventor: **Ammar Al-Ali**, San Juan Capistrano, CA (US)

(73) Assignee: **MASIMO CORPORATION**, Irvine, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/226,249**

(22) Filed: **Dec. 19, 2018**

(65) **Prior Publication Data**

US 2019/0117140 A1    Apr. 25, 2019

**Related U.S. Application Data**

(63) Continuation of application No. 15/195,199, filed on Jun. 28, 2016.

(Continued)

(51) **Int. Cl.**
*A61B 5/1455* (2006.01)
*A61B 5/00* (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC ........ *A61B 5/14552* (2013.01); *A61B 5/0002* (2013.01); *A61B 5/02416* (2013.01);
(Continued)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,960,128 A    10/1990  Gordon et al.
4,964,408 A    10/1990  Hink et al.
(Continued)

FOREIGN PATENT DOCUMENTS

EP        0781527 A1    7/1997
EP        2277440 A1    1/2011
WO    WO 02/028274    4/2002

OTHER PUBLICATIONS

US 8,845,543 B2, 09/2014, Diab et al. (withdrawn)
(Continued)

*Primary Examiner* — Eric F Winakur
*Assistant Examiner* — Marjan Fardanesh
(74) *Attorney, Agent, or Firm* — Knobbe, Martens, Olson & Bear, LLP

(57)        **ABSTRACT**

A non-invasive, optical-based physiological monitoring system is disclosed. One embodiment includes an emitter configured to emit light. A diffuser is configured to receive and spread the emitted light, and to emit the spread light at a tissue measurement site. The system further includes a concentrator configured to receive the spread light after it has been attenuated by or reflected from the tissue measurement site. The concentrator is also configured to collect and concentrate the received light and to emit the concentrated light to a detector. The detector is configured to detect the concentrated light and to transmit a signal representative of the detected light. A processor is configured to receive the transmitted signal and to determine a physiological parameter, such as, for example, arterial oxygen saturation, in the tissue measurement site.

**30 Claims, 7 Drawing Sheets**



**Exhibit 1**
-3-

## US 10,470,695 B2

Page 2

### Related U.S. Application Data

(60) Provisional application No. 62/188,430, filed on Jul. 2, 2015.

(51) **Int. Cl.**
    *A61B 5/024*     (2006.01)
    *A61B 5/145*     (2006.01)

(52) **U.S. Cl.**
    CPC ...... *A61B 5/14532* (2013.01); *A61B 5/14546* (2013.01); *A61B 5/4875* (2013.01); *A61B 5/6826* (2013.01); *A61B 5/7278* (2013.01); *A61B 5/742* (2013.01); *A61B 2562/04* (2013.01)

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,041,187 | A | 8/1991 | Hink et al. |
| 5,069,213 | A | 12/1991 | Polczynski |
| 5,099,842 | A | 3/1992 | Mannheimer et al. |
| 5,163,438 | A | 11/1992 | Gordon et al. |
| 5,319,355 | A | 6/1994 | Russek |
| 5,337,744 | A | 8/1994 | Branigan |
| 5,341,805 | A | 8/1994 | Stavridi et al. |
| D353,195 | S | 12/1994 | Savage et al. |
| D353,196 | S | 12/1994 | Savage et al. |
| 5,377,676 | A | 1/1995 | Vari et al. |
| D359,546 | S | 6/1995 | Savage et al. |
| 5,431,170 | A | 7/1995 | Mathews |
| D361,840 | S | 8/1995 | Savage et al. |
| D362,063 | S | 9/1995 | Savage et al. |
| 5,452,717 | A | 9/1995 | Branigan et al. |
| D363,120 | S | 10/1995 | Savage et al. |
| 5,456,252 | A | 10/1995 | Vari et al. |
| 5,479,934 | A | 1/1996 | Imran |
| 5,482,036 | A | 1/1996 | Diab et al. |
| 5,490,505 | A | 2/1996 | Diab et al. |
| 5,494,043 | A | 2/1996 | O'Sullivan et al. |
| 5,497,771 | A | 3/1996 | Rosenheimer |
| 5,533,511 | A | 7/1996 | Kaspari et al. |
| 5,534,851 | A | 7/1996 | Russek |
| 5,561,275 | A | 10/1996 | Savage et al. |
| 5,562,002 | A | 10/1996 | Lalin |
| 5,584,296 | A * | 12/1996 | Cui .................... A61B 5/14552 356/41 |
| 5,590,649 | A | 1/1997 | Caro et al. |
| 5,601,079 | A | 2/1997 | Wong et al. |
| 5,602,924 | A | 2/1997 | Durand et al. |
| 5,623,925 | A * | 4/1997 | Swenson .............. A61B 5/0205 600/301 |
| 5,632,272 | A | 5/1997 | Diab et al. |
| 5,638,816 | A | 6/1997 | Kiani-Azarbayjany et al. |
| 5,638,818 | A | 6/1997 | Diab et al. |
| 5,645,440 | A | 7/1997 | Tobler et al. |
| 5,685,299 | A | 11/1997 | Diab et al. |
| D393,830 | S | 4/1998 | Tobler et al. |
| 5,743,262 | A | 4/1998 | Lepper, Jr. et al. |
| 5,758,644 | A | 6/1998 | Diab et al. |
| 5,760,910 | A | 6/1998 | Lepper, Jr. et al. |
| 5,769,785 | A | 6/1998 | Diab et al. |
| 5,782,757 | A | 7/1998 | Diab et al. |
| 5,785,659 | A | 7/1998 | Caro et al. |
| 5,791,347 | A | 8/1998 | Flaherty et al. |
| 5,810,734 | A | 9/1998 | Caro et al. |
| 5,823,950 | A | 10/1998 | Diab et al. |
| 5,830,131 | A | 11/1998 | Caro et al. |
| 5,830,137 | A | 11/1998 | Scharf |
| 5,833,618 | A | 11/1998 | Caro et al. |
| 5,860,919 | A | 1/1999 | Kiani-Azarbayjany et al. |
| 5,890,929 | A | 4/1999 | Mills et al. |
| 5,904,654 | A | 5/1999 | Wohltmann et al. |
| 5,919,134 | A | 7/1999 | Diab |
| 5,934,925 | A | 8/1999 | Tobler et al. |
| 5,940,182 | A | 8/1999 | Lepper, Jr. et al. |
| 5,987,343 | A | 11/1999 | Kinast |
| 5,995,855 | A | 11/1999 | Kiani et al. |
| 5,997,343 | A | 12/1999 | Mills et al. |
| 6,002,952 | A | 12/1999 | Diab et al. |
| 6,011,986 | A | 1/2000 | Diab et al. |
| 6,027,452 | A | 2/2000 | Flaherty et al. |
| 6,036,642 | A | 3/2000 | Diab et al. |
| 6,045,509 | A | 4/2000 | Caro et al. |
| 6,067,462 | A | 5/2000 | Diab et al. |
| 6,081,735 | A | 6/2000 | Diab et al. |
| 6,088,607 | A | 7/2000 | Diab et al. |
| 6,110,522 | A | 8/2000 | Lepper, Jr. et al. |
| 6,124,597 | A | 9/2000 | Shehada |
| 6,128,521 | A | 10/2000 | Marro et al. |
| 6,129,675 | A | 10/2000 | Jay |
| 6,144,868 | A | 11/2000 | Parker |
| 6,151,516 | A | 11/2000 | Kiani-Azarbayjany et al. |
| 6,152,754 | A | 11/2000 | Gerhardt et al. |
| 6,157,850 | A | 12/2000 | Diab et al. |
| 6,165,005 | A | 12/2000 | Mills et al. |
| 6,184,521 | B1 | 2/2001 | Coffin, IV et al. |
| 6,206,830 | B1 | 3/2001 | Diab et al. |
| 6,223,063 | B1 | 4/2001 | Chaiken et al. |
| 6,229,856 | B1 | 5/2001 | Diab et al. |
| 6,232,609 | B1 | 5/2001 | Snyder et al. |
| 6,236,872 | B1 | 5/2001 | Diab et al. |
| 6,241,683 | B1 | 6/2001 | Macklem et al. |
| 6,253,097 | B1 | 6/2001 | Aronow et al. |
| 6,256,523 | B1 | 7/2001 | Diab et al. |
| 6,263,222 | B1 | 7/2001 | Diab et al. |
| 6,278,522 | B1 | 8/2001 | Lepper, Jr. et al. |
| 6,280,213 | B1 | 8/2001 | Tobler et al. |
| 6,285,896 | B1 | 9/2001 | Tobler et al. |
| 6,301,493 | B1 | 10/2001 | Marro et al. |
| 6,308,089 | B1 | 10/2001 | von der Ruhr et al. |
| 6,317,627 | B1 | 11/2001 | Ennen et al. |
| 6,321,100 | B1 | 11/2001 | Parker |
| 6,325,761 | B1 | 12/2001 | Jay |
| 6,334,065 | B1 | 12/2001 | Al-Ali et al. |
| 6,343,223 | B1 | 1/2002 | Chin et al. |
| 6,343,224 | B1 | 1/2002 | Parker |
| 6,349,228 | B1 | 2/2002 | Kiani et al. |
| 6,360,114 | B1 | 3/2002 | Diab et al. |
| 6,368,283 | B1 | 4/2002 | Xu et al. |
| 6,371,921 | B1 | 4/2002 | Caro et al. |
| 6,377,829 | B1 | 4/2002 | Al-Ali |
| 6,388,240 | B2 | 5/2002 | Schulz et al. |
| 6,397,091 | B2 | 5/2002 | Diab et al. |
| 6,430,437 | B1 | 8/2002 | Marro |
| 6,430,525 | B1 | 8/2002 | Weber et al. |
| 6,463,311 | B1 | 10/2002 | Diab |
| 6,470,199 | B1 | 10/2002 | Kopotic et al. |
| 6,501,975 | B2 | 12/2002 | Diab et al. |
| 6,505,059 | B1 | 1/2003 | Kollias et al. |
| 6,515,273 | B2 | 2/2003 | Al-Ali |
| 6,519,487 | B1 | 2/2003 | Parker |
| 6,525,386 | B1 | 2/2003 | Mills et al. |
| 6,526,300 | B1 | 2/2003 | Kiani et al. |
| 6,541,756 | B2 | 4/2003 | Schulz et al. |
| 6,542,764 | B1 | 4/2003 | Al-Ali et al. |
| 6,580,086 | B1 | 6/2003 | Schulz et al. |
| 6,584,336 | B1 | 6/2003 | Ali et al. |
| 6,595,316 | B2 | 7/2003 | Cybulski et al. |
| 6,597,932 | B2 | 7/2003 | Tian et al. |
| 6,597,933 | B2 | 7/2003 | Kiani et al. |
| 6,606,511 | B1 | 8/2003 | Ali et al. |
| 6,632,181 | B2 | 10/2003 | Flaherty et al. |
| 6,639,668 | B1 | 10/2003 | Trepagnier |
| 6,640,116 | B2 | 10/2003 | Diab |
| 6,643,530 | B2 | 11/2003 | Diab et al. |
| 6,650,917 | B2 | 11/2003 | Diab et al. |
| 6,654,624 | B2 | 11/2003 | Diab et al. |
| 6,658,276 | B2 | 12/2003 | Kiani et al. |
| 6,661,161 | B1 | 12/2003 | Lanzo et al. |
| 6,671,526 | B1 | 12/2003 | Aoyagi et al. |
| 6,671,531 | B2 | 12/2003 | Al-Ali et al. |
| 6,678,543 | B2 | 1/2004 | Diab et al. |
| 6,684,090 | B2 | 1/2004 | Ali et al. |
| 6,684,091 | B2 | 1/2004 | Parker |

Exhibit 1 -4-

## US 10,470,695 B2

Page 3

(56)         **References Cited**

### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 6,697,656 B1 | 2/2004 | Al-Ali |
| 6,697,657 B1 | 2/2004 | Shehada et al. |
| 6,697,658 B2 | 2/2004 | Al-Ali |
| RE38,476 E | 3/2004 | Diab et al. |
| 6,699,194 B1 | 3/2004 | Diab et al. |
| 6,714,804 B2 | 3/2004 | Al-Ali et al. |
| RE38,492 E | 4/2004 | Diab et al. |
| 6,721,582 B2 | 4/2004 | Trepagnier et al. |
| 6,721,585 B1 | 4/2004 | Parker |
| 6,725,075 B2 | 4/2004 | Al-Ali |
| 6,728,560 B2 | 4/2004 | Kollias et al. |
| 6,735,459 B2 | 5/2004 | Parker |
| 6,745,060 B2 | 6/2004 | Diab et al. |
| 6,760,607 B2 | 7/2004 | Al-Ali |
| 6,770,028 B1 | 8/2004 | Ali et al. |
| 6,771,994 B2 | 8/2004 | Kiani et al. |
| 6,792,300 B1 | 9/2004 | Diab et al. |
| 6,813,511 B2 | 11/2004 | Diab et al. |
| 6,816,741 B2 | 11/2004 | Diab |
| 6,822,564 B2 | 11/2004 | Al-Ali |
| 6,826,419 B2 | 11/2004 | Diab et al. |
| 6,830,711 B2 | 12/2004 | Mills et al. |
| 6,850,787 B2 | 2/2005 | Weber et al. |
| 6,850,788 B2 | 2/2005 | Al-Ali |
| 6,852,083 B2 | 2/2005 | Caro et al. |
| 6,861,639 B2 | 3/2005 | Al-Ali |
| 6,898,452 B2 | 5/2005 | Al-Ali et al. |
| 6,920,345 B2 | 7/2005 | Al-Ali et al. |
| 6,931,268 B1 | 8/2005 | Kiani-Azarbayjany et al. |
| 6,934,570 B2 | 8/2005 | Kiani et al. |
| 6,939,305 B2 | 9/2005 | Flaherty et al. |
| 6,943,348 B1 | 9/2005 | Coffin, IV |
| 6,950,687 B2 | 9/2005 | Al-Ali |
| 6,961,598 B2 | 11/2005 | Diab |
| 6,970,792 B1 | 11/2005 | Diab |
| 6,979,812 B2 | 12/2005 | Al-Ali |
| 6,985,764 B2 | 1/2006 | Mason et al. |
| 6,993,371 B2 | 1/2006 | Kiani et al. |
| 6,996,427 B2 | 2/2006 | Ali et al. |
| 6,999,904 B2 | 2/2006 | Weber et al. |
| 7,003,338 B2 | 2/2006 | Weber et al. |
| 7,003,339 B2 | 2/2006 | Diab et al. |
| 7,015,451 B2 | 3/2006 | Dalke et al. |
| 7,024,233 B2 | 4/2006 | Ali et al. |
| 7,027,849 B2 | 4/2006 | Al-Ali |
| 7,030,749 B2 | 4/2006 | Al-Ali |
| 7,039,449 B2 | 5/2006 | Al-Ali |
| 7,041,060 B2 | 5/2006 | Flaherty et al. |
| 7,044,918 B2 | 5/2006 | Diab |
| 7,048,687 B1 | 5/2006 | Reuss et al. |
| 7,067,893 B2 | 6/2006 | Mills et al. |
| 7,096,052 B2 | 8/2006 | Mason et al. |
| 7,096,054 B2 | 8/2006 | Abdul-Hafiz et al. |
| 7,132,641 B2 | 11/2006 | Schulz et al. |
| 7,142,901 B2 | 11/2006 | Kiani et al. |
| 7,149,561 B2 | 12/2006 | Diab |
| 7,186,966 B2 | 3/2007 | Al-Ali |
| 7,190,261 B2 | 3/2007 | Al-Ali |
| 7,215,984 B2 | 5/2007 | Diab |
| 7,215,986 B2 | 5/2007 | Diab |
| 7,221,971 B2 | 5/2007 | Diab |
| 7,225,006 B2 | 5/2007 | Al-Ali et al. |
| 7,225,007 B2 | 5/2007 | Al-Ali |
| RE39,672 E | 6/2007 | Shehada et al. |
| 7,239,905 B2 | 7/2007 | Kiani-Azarbayjany et al. |
| 7,245,953 B1 | 7/2007 | Parker |
| 7,254,429 B2 | 8/2007 | Schurman et al. |
| 7,254,431 B2 | 8/2007 | Al-Ali |
| 7,254,433 B2 | 8/2007 | Diab et al. |
| 7,254,434 B2 | 8/2007 | Schulz et al. |
| 7,272,425 B2 | 9/2007 | Al-Ali |
| 7,274,955 B2 | 9/2007 | Kiani et al. |
| D554,263 S | 10/2007 | Al-Ali |
| 7,280,858 B2 | 10/2007 | Al-Ali et al. |
| 7,289,835 B2 | 10/2007 | Mansfield et al. |
| 7,292,883 B2 | 11/2007 | De Felice et al. |
| 7,295,866 B2 | 11/2007 | Al-Ali |
| 7,328,053 B1 | 2/2008 | Diab et al. |
| 7,332,784 B2 | 2/2008 | Mills et al. |
| 7,340,287 B2 | 3/2008 | Mason et al. |
| 7,341,559 B2 | 3/2008 | Schulz et al. |
| 7,343,186 B2 | 3/2008 | Lamego et al. |
| D566,282 S | 4/2008 | Al-Ali et al. |
| 7,355,512 B1 | 4/2008 | Al-Ali |
| 7,356,365 B2 | 4/2008 | Schurman |
| 7,371,981 B2 | 5/2008 | Abdul-Hafiz |
| 7,373,193 B2 | 5/2008 | Al-Ali et al. |
| 7,373,194 B2 | 5/2008 | Weber et al. |
| 7,376,453 B1 | 5/2008 | Diab et al. |
| 7,377,794 B2 | 5/2008 | Al Ali et al. |
| 7,377,899 B2 | 5/2008 | Weber et al. |
| 7,383,070 B2 | 6/2008 | Diab et al. |
| 7,415,297 B2 | 8/2008 | Al-Ali et al. |
| 7,428,432 B2 | 9/2008 | Ali et al. |
| 7,438,683 B2 | 10/2008 | Al-Ali et al. |
| 7,440,787 B2 | 10/2008 | Diab |
| 7,454,240 B2 | 11/2008 | Diab et al. |
| 7,467,002 B2 | 12/2008 | Weber et al. |
| 7,469,157 B2 | 12/2008 | Diab et al. |
| 7,471,969 B2 | 12/2008 | Diab et al. |
| 7,471,971 B2 | 12/2008 | Diab et al. |
| 7,483,729 B2 | 1/2009 | Al-Ali et al. |
| 7,483,730 B2 | 1/2009 | Diab et al. |
| 7,489,958 B2 | 2/2009 | Diab et al. |
| 7,496,391 B2 | 2/2009 | Diab et al. |
| 7,496,393 B2 | 2/2009 | Diab et al. |
| D587,657 S | 3/2009 | Al-Ali et al. |
| 7,499,741 B2 | 3/2009 | Diab et al. |
| 7,499,835 B2 | 3/2009 | Weber et al. |
| 7,500,950 B2 | 3/2009 | Al-Ali et al. |
| 7,509,154 B2 | 3/2009 | Diab et al. |
| 7,509,494 B2 | 3/2009 | Al-Ali |
| 7,510,849 B2 | 3/2009 | Schurman et al. |
| 7,519,327 B2 | 4/2009 | White |
| 7,526,328 B2 | 4/2009 | Diab et al. |
| 7,530,942 B1 | 5/2009 | Diab |
| 7,530,949 B2 | 5/2009 | Al Ali et al. |
| 7,530,955 B2 | 5/2009 | Diab et al. |
| 7,563,110 B2 | 7/2009 | Al-Ali et al. |
| 7,596,398 B2 | 9/2009 | Al-Ali et al. |
| 7,601,123 B2 | 10/2009 | Tweed et al. |
| 7,618,375 B2 | 11/2009 | Flaherty |
| D606,659 S | 12/2009 | Kiani et al. |
| 7,647,083 B2 | 1/2010 | Al-Ali et al. |
| D609,193 S | 2/2010 | Al-Ali et al. |
| D614,305 S | 4/2010 | Al-Ali et al. |
| RE41,317 E | 5/2010 | Parker |
| 7,726,209 B2 | 6/2010 | Ruotoistenmäki |
| 7,729,733 B2 | 6/2010 | Al-Ali et al. |
| 7,734,320 B2 | 6/2010 | Al-Ali |
| 7,761,127 B2 | 7/2010 | Al-Ali et al. |
| 7,761,128 B2 | 7/2010 | Al-Ali et al. |
| 7,764,982 B2 | 7/2010 | Dalke et al. |
| D621,516 S | 8/2010 | Kiani et al. |
| 7,791,155 B2 | 9/2010 | Diab |
| 7,801,581 B2 | 9/2010 | Diab |
| 7,822,452 B2 | 10/2010 | Schurman et al. |
| RE41,912 E | 11/2010 | Parker |
| 7,844,313 B2 | 11/2010 | Kiani et al. |
| 7,844,314 B2 | 11/2010 | Al-Ali |
| 7,844,315 B2 | 11/2010 | Al-Ali |
| 7,862,523 B2 | 1/2011 | Ruotoistenmaki |
| 7,865,222 B2 | 1/2011 | Weber et al. |
| 7,873,497 B2 | 1/2011 | Weber et al. |
| 7,880,606 B2 | 2/2011 | Al-Ali |
| 7,880,626 B2 | 2/2011 | Al-Ali et al. |
| 7,891,355 B2 | 2/2011 | Al-Ali et al. |
| 7,894,868 B2 | 2/2011 | Al-Ali et al. |
| 7,899,507 B2 | 3/2011 | Al-Ali et al. |
| 7,899,518 B2 | 3/2011 | Trepagnier et al. |
| 7,904,132 B2 | 3/2011 | Weber et al. |
| 7,909,772 B2 | 3/2011 | Popov et al. |
| 7,910,875 B2 | 3/2011 | Al-Ali |
| 7,919,713 B2 | 4/2011 | Al-Ali et al. |

Exhibit 1
-5-

**US 10,470,695 B2**

Page 4

(56)　　　　　**References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,937,128 | B2 | 5/2011 | Al-Ali |
| 7,937,129 | B2 | 5/2011 | Mason et al. |
| 7,937,130 | B2 | 5/2011 | Diab et al. |
| 7,941,199 | B2 | 5/2011 | Kiani |
| 7,951,086 | B2 | 5/2011 | Flaherty et al. |
| 7,957,780 | B2 | 6/2011 | Lamego et al. |
| 7,962,188 | B2 | 6/2011 | Kiani et al. |
| 7,962,190 | B1 | 6/2011 | Diab et al. |
| 7,976,472 | B2 | 7/2011 | Kiani |
| 7,988,637 | B2 | 8/2011 | Diab |
| 7,990,382 | B2 | 8/2011 | Kiani |
| 7,991,446 | B2 | 8/2011 | Al-Ali et al. |
| 8,000,761 | B2 | 8/2011 | Al-Ali |
| 8,008,088 | B2 | 8/2011 | Bellott et al. |
| RE42,753 | E | 9/2011 | Kiani-Azarbayjany et al. |
| 8,019,400 | B2 | 9/2011 | Diab et al. |
| 8,028,701 | B2 | 10/2011 | Al-Ali et al. |
| 8,029,765 | B2 | 10/2011 | Bellott et al. |
| 8,036,727 | B2 | 10/2011 | Schurman et al. |
| 8,036,728 | B2 | 10/2011 | Diab et al. |
| 8,046,040 | B2 | 10/2011 | Ali et al. |
| 8,046,041 | B2 | 10/2011 | Diab et al. |
| 8,046,042 | B2 | 10/2011 | Diab et al. |
| 8,048,040 | B2 | 11/2011 | Kiani |
| 8,050,728 | B2 | 11/2011 | Al-Ali et al. |
| RE43,169 | E | 2/2012 | Parker |
| 8,118,620 | B2 | 2/2012 | Al-Ali et al. |
| 8,126,528 | B2 | 2/2012 | Diab et al. |
| 8,128,572 | B2 | 3/2012 | Diab et al. |
| 8,130,105 | B2 | 3/2012 | Al-Ali et al. |
| 8,145,287 | B2 | 3/2012 | Diab et al. |
| 8,150,487 | B2 | 4/2012 | Diab et al. |
| 8,175,672 | B2 | 5/2012 | Parker |
| 8,180,420 | B2 | 5/2012 | Diab et al. |
| 8,182,443 | B1 | 5/2012 | Kiani |
| 8,185,180 | B2 | 5/2012 | Diab et al. |
| 8,190,223 | B2 | 5/2012 | Al-Ali et al. |
| 8,190,227 | B2 | 5/2012 | Diab et al. |
| 8,203,438 | B2 | 6/2012 | Kiani et al. |
| 8,203,704 | B2 | 6/2012 | Merritt et al. |
| 8,204,566 | B2 | 6/2012 | Schurman et al. |
| 8,219,172 | B2 | 7/2012 | Schurman et al. |
| 8,224,411 | B2 | 7/2012 | Al-Ali et al. |
| 8,228,181 | B2 | 7/2012 | Al-Ali |
| 8,229,533 | B2 | 7/2012 | Diab et al. |
| 8,233,955 | B2 | 7/2012 | Al-Ali et al. |
| 8,244,325 | B2 | 8/2012 | Al-Ali et al. |
| 8,255,026 | B1 | 8/2012 | Al-Ali |
| 8,255,027 | B2 | 8/2012 | Al-Ali et al. |
| 8,255,028 | B2 | 8/2012 | Al-Ali et al. |
| 8,260,577 | B2 | 9/2012 | Weber et al. |
| 8,265,723 | B1 | 9/2012 | McHale et al. |
| 8,274,360 | B2 | 9/2012 | Sampath et al. |
| 8,280,473 | B2 | 10/2012 | Al-Ali |
| 8,289,130 | B2 | 10/2012 | Nakajima et al. |
| 8,301,217 | B2 | 10/2012 | Al-Ali et al. |
| 8,306,596 | B2 | 11/2012 | Schurman et al. |
| 8,310,336 | B2 | 11/2012 | Muhsin et al. |
| 8,315,683 | B2 | 11/2012 | Al-Ali et al. |
| RE43,860 | E | 12/2012 | Parker |
| 8,337,403 | B2 | 12/2012 | Al-Ali et al. |
| 8,346,330 | B2 | 1/2013 | Lamego |
| 8,353,842 | B2 | 1/2013 | Al-Ali et al. |
| 8,355,766 | B2 | 1/2013 | MacNeish, III et al. |
| 8,359,080 | B2 | 1/2013 | Diab et al. |
| 8,364,223 | B2 | 1/2013 | Al-Ali et al. |
| 8,364,226 | B2 | 1/2013 | Diab et al. |
| 8,364,389 | B2 | 1/2013 | Dorogusker et al. |
| 8,374,665 | B2 | 2/2013 | Lamego |
| 8,385,995 | B2 | 2/2013 | Al-ali et al. |
| 8,385,996 | B2 | 2/2013 | Smith et al. |
| 8,388,353 | B2 | 3/2013 | Kiani et al. |
| 8,399,822 | B2 | 3/2013 | Al-Ali |
| 8,401,602 | B2 | 3/2013 | Kiani |
| 8,405,608 | B2 | 3/2013 | Al-Ali et al. |
| 8,414,499 | B2 | 4/2013 | Al-Ali et al. |
| 8,418,524 | B2 | 4/2013 | Al-Ali |
| 8,423,106 | B2 | 4/2013 | Lamego et al. |
| 8,428,967 | B2 | 4/2013 | Olsen et al. |
| 8,430,817 | B1 | 4/2013 | Al-Ali et al. |
| 8,437,825 | B2 | 5/2013 | Dalvi et al. |
| 8,452,364 | B2 * | 5/2013 | Hannula ............ A61B 5/14552 |
| | | | 600/322 |
| 8,455,290 | B2 | 6/2013 | Siskavich |
| 8,457,703 | B2 | 6/2013 | Al-Ali |
| 8,457,707 | B2 | 6/2013 | Kiani |
| 8,463,349 | B2 | 6/2013 | Diab et al. |
| 8,466,286 | B2 | 6/2013 | Bellot et al. |
| 8,471,713 | B2 | 6/2013 | Poeze et al. |
| 8,473,020 | B2 | 6/2013 | Kiani et al. |
| 8,483,787 | B2 | 7/2013 | Al-Ali et al. |
| 8,489,364 | B2 | 7/2013 | Weber et al. |
| 8,498,684 | B2 | 7/2013 | Weber et al. |
| 8,504,128 | B2 | 8/2013 | Blank et al. |
| 8,509,867 | B2 | 8/2013 | Workman et al. |
| 8,515,509 | B2 | 8/2013 | Bruinsma et al. |
| 8,523,781 | B2 | 9/2013 | Al-Ali |
| 8,529,301 | B2 | 9/2013 | Al-Ali et al. |
| 8,532,727 | B2 | 9/2013 | Ali et al. |
| 8,532,728 | B2 | 9/2013 | Diab et al. |
| D692,145 | S | 10/2013 | Al-Ali et al. |
| 8,547,209 | B2 | 10/2013 | Kiani et al. |
| 8,548,548 | B2 | 10/2013 | Al-Ali |
| 8,548,549 | B2 | 10/2013 | Schurman et al. |
| 8,548,550 | B2 | 10/2013 | Al-Ali et al. |
| 8,560,032 | B2 | 10/2013 | Al-Ali et al. |
| 8,560,034 | B1 | 10/2013 | Diab et al. |
| 8,570,167 | B2 | 10/2013 | Al-Ali |
| 8,570,503 | B2 | 10/2013 | Vo et al. |
| 8,571,617 | B2 | 10/2013 | Reichgott et al. |
| 8,571,618 | B1 | 10/2013 | Lamego et al. |
| 8,571,619 | B2 | 10/2013 | Al-Ali et al. |
| 8,577,431 | B2 | 11/2013 | Lamego et al. |
| 8,581,732 | B2 | 11/2013 | Al-Ali et al. |
| 8,584,345 | B2 | 11/2013 | Al-Ali et al. |
| 8,588,880 | B2 | 11/2013 | Abdul-Hafiz et al. |
| 8,600,467 | B2 | 12/2013 | Al-Ali et al. |
| 8,606,342 | B2 | 12/2013 | Diab |
| 8,615,290 | B2 | 12/2013 | Lin et al. |
| 8,626,255 | B2 | 1/2014 | Al-Ali et al. |
| 8,630,691 | B2 | 1/2014 | Lamego et al. |
| 8,634,889 | B2 | 1/2014 | Al-Ali et al. |
| 8,641,631 | B2 | 2/2014 | Sierra et al. |
| 8,652,060 | B2 | 2/2014 | Al-Ali |
| 8,655,004 | B2 | 2/2014 | Prest et al. |
| 8,663,107 | B2 | 3/2014 | Kiani |
| 8,666,468 | B1 | 3/2014 | Al-Ali |
| 8,667,967 | B2 | 3/2014 | Al-Ali et al. |
| 8,670,811 | B2 | 3/2014 | O'Reilly |
| 8,670,814 | B2 | 3/2014 | Diab et al. |
| 8,676,286 | B2 | 3/2014 | Weber et al. |
| 8,682,407 | B2 | 3/2014 | Al-Ali |
| RE44,823 | E | 4/2014 | Parker |
| RE44,875 | E | 4/2014 | Kiani et al. |
| 8,690,799 | B2 | 4/2014 | Telfort et al. |
| 8,700,112 | B2 | 4/2014 | Kiani |
| 8,702,627 | B2 | 4/2014 | Telfort et al. |
| 8,706,179 | B2 | 4/2014 | Parker |
| 8,712,494 | B1 | 4/2014 | MacNeish, III et al. |
| 8,715,206 | B2 | 5/2014 | Telfort et al. |
| 8,718,735 | B2 | 5/2014 | Lamego et al. |
| 8,718,737 | B2 | 5/2014 | Diab et al. |
| 8,718,738 | B2 | 5/2014 | Blank et al. |
| 8,720,249 | B2 | 5/2014 | Al-Ali |
| 8,721,541 | B2 | 5/2014 | Al-Ali et al. |
| 8,721,542 | B2 | 5/2014 | Al-Ali et al. |
| 8,723,677 | B1 | 5/2014 | Kiani |
| 8,740,792 | B1 | 6/2014 | Kiani et al. |
| 8,754,776 | B2 | 6/2014 | Poeze et al. |
| 8,755,535 | B2 | 6/2014 | Telfort et al. |
| 8,755,856 | B2 | 6/2014 | Diab et al. |
| 8,755,872 | B1 | 6/2014 | Marinow |
| 8,760,517 | B2 | 6/2014 | Sarwar et al. |
| 8,761,850 | B2 | 6/2014 | Lamego |

Exhibit 1

-6-

## US 10,470,695 B2

Page 5

(56)                    **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 8,764,671 | B2 | 7/2014 | Kiani |
| 8,768,423 | B2 | 7/2014 | Shakespeare et al. |
| 8,771,204 | B2 | 7/2014 | Telfort et al. |
| 8,777,634 | B2 | 7/2014 | Kiani et al. |
| 8,781,543 | B2 | 7/2014 | Diab et al. |
| 8,781,544 | B2 | 7/2014 | Al-Ali et al. |
| 8,781,549 | B2 | 7/2014 | Al-Ali et al. |
| 8,788,003 | B2 | 7/2014 | Schurman et al. |
| 8,790,268 | B2 | 7/2014 | Al-Ali |
| 8,801,613 | B2 | 8/2014 | Al-Ali et al. |
| 8,821,397 | B2 | 9/2014 | Al-Ali et al. |
| 8,821,415 | B2 | 9/2014 | Al-Ali et al. |
| 8,830,449 | B1 | 9/2014 | Lamego et al. |
| 8,831,700 | B2 | 9/2014 | Schurman et al. |
| 8,840,549 | B2 | 9/2014 | Al-Ali et al. |
| 8,847,740 | B2 | 9/2014 | Kiani et al. |
| 8,849,365 | B2 | 9/2014 | Smith et al. |
| 8,852,094 | B2 | 10/2014 | Al-Ali et al. |
| 8,852,994 | B2 | 10/2014 | Wojtczuk et al. |
| 8,868,147 | B2 | 10/2014 | Stippick et al. |
| 8,868,150 | B2 | 10/2014 | Al-Ali et al. |
| 8,870,792 | B2 | 10/2014 | Al-Ali et al. |
| 8,886,271 | B2 | 11/2014 | Kiani et al. |
| 8,888,539 | B2 | 11/2014 | Al-Ali et al. |
| 8,888,708 | B2 | 11/2014 | Diab et al. |
| 8,892,180 | B2 | 11/2014 | Weber et al. |
| 8,897,847 | B2 | 11/2014 | Al-Ali |
| 8,909,310 | B2 | 12/2014 | Lamego et al. |
| 8,911,377 | B2 | 12/2014 | Al-Ali |
| 8,912,909 | B2 | 12/2014 | Al-Ali et al. |
| 8,920,317 | B2 | 12/2014 | Al-Ali et al. |
| 8,921,699 | B2 | 12/2014 | Al-Ali et al. |
| 8,922,382 | B2 | 12/2014 | Al-Ali et al. |
| 8,929,964 | B2 | 1/2015 | Al-Ali et al. |
| 8,942,777 | B2 | 1/2015 | Diab et al. |
| 8,948,834 | B2 | 2/2015 | Diab et al. |
| 8,948,835 | B2 | 2/2015 | Diab |
| 8,965,471 | B2 | 2/2015 | Lamego |
| 8,983,564 | B2 | 3/2015 | Al-Ali |
| 8,989,831 | B2 | 3/2015 | Al-Ali et al. |
| 8,996,085 | B2 | 3/2015 | Kiani et al. |
| 8,998,809 | B2 | 4/2015 | Kiani |
| 9,028,429 | B2 | 5/2015 | Telfort et al. |
| 9,037,207 | B2 | 5/2015 | Al-Ali et al. |
| 9,060,721 | B2 | 6/2015 | Reichgott et al. |
| 9,066,666 | B2 | 6/2015 | Kiani |
| 9,066,680 | B1 | 6/2015 | Al-Ali et al. |
| 9,072,437 | B2 | 7/2015 | Paalasmaa |
| 9,072,474 | B2 | 7/2015 | Al-Ali et al. |
| 9,078,560 | B2 | 7/2015 | Schurman et al. |
| 9,081,889 | B2 | 7/2015 | Ingrassia, Jr. et al. |
| 9,084,569 | B2 | 7/2015 | Weber et al. |
| 9,095,316 | B2 | 8/2015 | Welch et al. |
| 9,106,038 | B2 | 8/2015 | Telfort et al. |
| 9,107,625 | B2 | 8/2015 | Telfort et al. |
| 9,107,626 | B2 | 8/2015 | Al-Ali et al. |
| 9,113,831 | B2 | 8/2015 | Al-Ali |
| 9,113,832 | B2 | 8/2015 | Al-Ali |
| 9,119,595 | B2 | 9/2015 | Lamego |
| 9,131,881 | B2 | 9/2015 | Diab et al. |
| 9,131,882 | B2 | 9/2015 | Al-Ali et al. |
| 9,131,883 | B2 | 9/2015 | Al-Ali |
| 9,131,917 | B2 | 9/2015 | Telfort et al. |
| 9,138,180 | B1 | 9/2015 | Coverston et al. |
| 9,138,182 | B2 | 9/2015 | Al-Ali et al. |
| 9,138,192 | B2 | 9/2015 | Weber et al. |
| 9,142,117 | B2 | 9/2015 | Muhsin et al. |
| 9,153,112 | B1 | 10/2015 | Kiani et al. |
| 9,153,121 | B2 | 10/2015 | Kiani et al. |
| 9,161,696 | B2 | 10/2015 | Al-Ali et al. |
| 9,161,713 | B2 | 10/2015 | Al-Ali et al. |
| 9,167,995 | B2 | 10/2015 | Lamego et al. |
| 9,176,141 | B2 | 11/2015 | Al-Ali et al. |
| 9,186,102 | B2 | 11/2015 | Bruinsma et al. |
| 9,192,312 | B2 | 11/2015 | Al-Ali |
| 9,192,329 | B2 | 11/2015 | Al-Ali |
| 9,192,351 | B1 | 11/2015 | Telfort et al. |
| 9,195,385 | B2 | 11/2015 | Al-Ali et al. |
| 9,210,566 | B2 | 12/2015 | Ziemianska et al. |
| 9,211,072 | B2 | 12/2015 | Kiani |
| 9,211,095 | B1 | 12/2015 | Al-Ali |
| 9,218,454 | B2 | 12/2015 | Kiani et al. |
| 9,226,696 | B2 | 1/2016 | Kiani |
| 9,241,662 | B2 | 1/2016 | Al-Ali et al. |
| 9,245,668 | B1 | 1/2016 | Vo et al. |
| 9,259,185 | B2 | 2/2016 | Abdul-Hafiz et al. |
| 9,267,572 | B2 | 2/2016 | Barker et al. |
| 9,277,880 | B2 | 3/2016 | Poeze et al. |
| 9,289,167 | B2 | 3/2016 | Diab et al. |
| 9,295,421 | B2 | 3/2016 | Kiani et al. |
| 9,307,928 | B1 | 4/2016 | Al-Ali et al. |
| 9,311,382 | B2 | 4/2016 | Varoglu et al. |
| 9,323,894 | B2 | 4/2016 | Kiani |
| D755,392 | S | 5/2016 | Hwang et al. |
| 9,326,712 | B1 | 5/2016 | Kiani |
| 9,333,316 | B2 | 5/2016 | Kiani |
| 9,339,220 | B2 | 5/2016 | Lamego et al. |
| 9,341,565 | B2 | 5/2016 | Lamego et al. |
| 9,351,673 | B2 | 5/2016 | Diab et al. |
| 9,351,675 | B2 | 5/2016 | Al-Ali et al. |
| 9,357,665 | B2 | 5/2016 | Myers et al. |
| 9,364,181 | B2 | 6/2016 | Kiani et al. |
| 9,368,671 | B2 | 6/2016 | Wojtczuk et al. |
| 9,370,325 | B2 | 6/2016 | Al-Ali et al. |
| 9,370,326 | B2 | 6/2016 | McHale et al. |
| 9,370,335 | B2 | 6/2016 | Al-ali et al. |
| 9,375,185 | B2 | 6/2016 | Ali et al. |
| 9,386,953 | B2 | 7/2016 | Al-Ali |
| 9,386,961 | B2 | 7/2016 | Al-Ali et al. |
| 9,392,945 | B2 | 7/2016 | Al-Ali et al. |
| 9,397,448 | B2 | 7/2016 | Al-Ali et al. |
| 9,408,542 | B1 | 8/2016 | Kinast et al. |
| 9,436,645 | B2 | 9/2016 | Al-Ali et al. |
| 9,445,759 | B1 | 9/2016 | Lamego et al. |
| 9,466,919 | B2 | 10/2016 | Kiani et al. |
| 9,474,474 | B2 | 10/2016 | Lamego et al. |
| 9,480,422 | B2 | 11/2016 | Al-Ali |
| 9,480,435 | B2 | 11/2016 | Olsen |
| 9,489,081 | B2 | 11/2016 | Anzures et al. |
| 9,492,110 | B2 | 11/2016 | Al-Ali et al. |
| 9,497,534 | B2 | 11/2016 | Prest et al. |
| 9,510,779 | B2 | 12/2016 | Poeze et al. |
| 9,517,024 | B2 | 12/2016 | Kiani et al. |
| 9,526,430 | B2 | 12/2016 | Srinivas et al. |
| 9,532,722 | B2 | 1/2017 | Lamego et al. |
| 9,538,949 | B2 | 1/2017 | Al-Ali et al. |
| 9,538,980 | B2 | 1/2017 | Telfort et al. |
| 9,549,696 | B2 | 1/2017 | Lamego et al. |
| 9,553,625 | B2 | 1/2017 | Hatanaka et al. |
| 9,554,737 | B2 | 1/2017 | Schurman et al. |
| 9,560,996 | B2 | 2/2017 | Kiani |
| 9,560,998 | B2 | 2/2017 | Al-Ali et al. |
| 9,566,019 | B2 | 2/2017 | Al-Ali et al. |
| 9,579,039 | B2 | 2/2017 | Jansen et al. |
| 9,591,975 | B2 | 3/2017 | Dalvi et al. |
| 9,593,969 | B2 | 3/2017 | King |
| 9,622,692 | B2 | 4/2017 | Lamego et al. |
| 9,622,693 | B2 | 4/2017 | Diab |
| D788,312 | S | 5/2017 | Al-Ali et al. |
| 9,636,055 | B2 | 5/2017 | Al-Ali et al. |
| 9,636,056 | B2 | 5/2017 | Al-Ali |
| 9,649,054 | B2 | 5/2017 | Lamego et al. |
| 9,651,405 | B1 | 5/2017 | Gowreesunker et al. |
| 9,662,052 | B2 | 5/2017 | Al-Ali et al. |
| 9,668,676 | B2 | 6/2017 | Culbert |
| 9,668,679 | B2 | 6/2017 | Schurman et al. |
| 9,668,680 | B2 | 6/2017 | Bruinsma et al. |
| 9,668,703 | B2 | 6/2017 | Al-Ali |
| 9,675,286 | B2 | 6/2017 | Diab |
| 9,687,160 | B2 | 6/2017 | Kiani |
| 9,693,719 | B2 | 7/2017 | Al-Ali et al. |
| 9,693,737 | B2 | 7/2017 | Al-Ali |
| 9,697,928 | B2 | 7/2017 | Al-Ali et al. |
| 9,699,546 | B2 | 7/2017 | Qian et al. |

**Exhibit 1**

-7-

## US 10,470,695 B2

Page 6

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 9,716,937 B2 | 7/2017 | Qian et al. |
| 9,717,425 B2 | 8/2017 | Kiani et al. |
| 9,717,458 B2 | 8/2017 | Lamego et al. |
| 9,723,997 B1 | 8/2017 | Lamego |
| 9,724,016 B1 | 8/2017 | Al-Ali et al. |
| 9,724,024 B2 | 8/2017 | Al-Ali |
| 9,724,025 B1 | 8/2017 | Kiani et al. |
| 9,730,640 B2 | 8/2017 | Diab et al. |
| 9,743,887 B2 | 8/2017 | Al-Ali et al. |
| 9,749,232 B2 | 8/2017 | Sampath et al. |
| 9,750,442 B2 | 9/2017 | Olsen |
| 9,750,443 B2 | 9/2017 | Smith et al. |
| 9,750,461 B1 | 9/2017 | Telfort |
| 9,775,545 B2 | 10/2017 | Al-Ali et al. |
| 9,775,546 B2 | 10/2017 | Diab et al. |
| 9,775,570 B2 | 10/2017 | Al-Ali |
| 9,778,079 B1 | 10/2017 | Al-Ali et al. |
| 9,781,984 B2 | 10/2017 | Baranski et al. |
| 9,782,077 B2 | 10/2017 | Lamego et al. |
| 9,782,110 B2 | 10/2017 | Kiani |
| 9,787,568 B2 | 10/2017 | Lamego et al. |
| 9,788,735 B2 | 10/2017 | Al-Ali |
| 9,788,768 B2 | 10/2017 | Al-Ali et al. |
| 9,795,300 B2 | 10/2017 | Al-Ali |
| 9,795,310 B2 | 10/2017 | Al-Ali |
| 9,795,358 B2 | 10/2017 | Telfort et al. |
| 9,795,739 B2 | 10/2017 | Al-Ali et al. |
| 9,801,556 B2 | 10/2017 | Kiani |
| 9,801,588 B2 | 10/2017 | Weber et al. |
| 9,808,188 B1 | 11/2017 | Perea et al. |
| 9,814,418 B2 | 11/2017 | Weber et al. |
| 9,820,691 B2 | 11/2017 | Kiani |
| 9,833,152 B2 | 12/2017 | Kiani et al. |
| 9,833,180 B2 | 12/2017 | Shakespeare et al. |
| 9,838,775 B2 | 12/2017 | Qian et al. |
| 9,839,379 B2 | 12/2017 | Al-Ali et al. |
| 9,839,381 B1 | 12/2017 | Weber et al. |
| 9,847,002 B2 | 12/2017 | Kiani et al. |
| 9,847,749 B2 | 12/2017 | Kiani et al. |
| 9,848,800 B1 | 12/2017 | Lee et al. |
| 9,848,806 B2 | 12/2017 | Al-Ali et al. |
| 9,848,807 B2 | 12/2017 | Lamego |
| 9,848,823 B2 | 12/2017 | Raghuram et al. |
| 9,861,298 B2 | 1/2018 | Eckerbom et al. |
| 9,861,304 B2 | 1/2018 | Al-Ali et al. |
| 9,861,305 B1 | 1/2018 | Weber et al. |
| 9,866,671 B1 | 1/2018 | Thompson et al. |
| 9,867,575 B2 | 1/2018 | Maani et al. |
| 9,867,578 B2 | 1/2018 | Al-Ali et al. |
| 9,872,623 B2 | 1/2018 | Al-Ali |
| 9,876,320 B2 | 1/2018 | Coverston et al. |
| 9,877,650 B2 | 1/2018 | Muhsin et al. |
| 9,877,686 B2 | 1/2018 | Al-Ali et al. |
| 9,891,079 B2 | 2/2018 | Dalvi |
| 9,895,107 B2 | 2/2018 | Al-Ali et al. |
| 9,898,049 B2 | 2/2018 | Myers et al. |
| 9,913,617 B2 | 3/2018 | Al-Ali et al. |
| 9,918,646 B2 | 3/2018 | Singh Alvarado et al. |
| 9,924,893 B2 | 3/2018 | Schurman et al. |
| 9,924,897 B1 | 3/2018 | Abdul-Hafiz |
| 9,936,917 B2 | 4/2018 | Poeze et al. |
| 9,943,269 B2 | 4/2018 | Muhsin et al. |
| 9,949,676 B2 | 4/2018 | Al-Ali |
| 9,952,095 B1 | 4/2018 | Hotelling et al. |
| 9,955,937 B2 | 5/2018 | Telfort |
| 9,965,946 B2 | 5/2018 | Al-Ali |
| 9,980,667 B2 | 5/2018 | Kiani et al. |
| D820,865 S | 6/2018 | Muhsin et al. |
| 9,986,919 B2 | 6/2018 | Lamego et al. |
| 9,986,952 B2 | 6/2018 | Dalvi et al. |
| 9,989,560 B2 | 6/2018 | Poeze et al. |
| 9,993,207 B2 | 6/2018 | Al-Ali et al. |
| 10,007,758 B2 | 6/2018 | Al-Ali et al. |
| D822,215 S | 7/2018 | Al-Ali et al. |
| D822,216 S | 7/2018 | Barker et al. |
| 10,010,276 B2 | 7/2018 | Al-Ali et al. |
| 10,032,002 B2 | 7/2018 | Kiani et al. |
| 10,039,080 B2 | 7/2018 | Miller et al. |
| 10,039,482 B2 | 8/2018 | Al-Ali et al. |
| 10,052,037 B2 | 8/2018 | Kinast et al. |
| 10,055,121 B2 | 8/2018 | Chaudhri et al. |
| 10,058,275 B2 | 8/2018 | Al-Ali et al. |
| 10,064,562 B2 | 9/2018 | Al-Ali |
| 10,066,970 B2 | 9/2018 | Gowreesunker et al. |
| 10,076,257 B2 | 9/2018 | Lin et al. |
| 10,078,052 B2 | 9/2018 | Ness et al. |
| 10,086,138 B1 | 10/2018 | Novak, Jr. |
| 10,092,200 B2 | 10/2018 | Al-Ali et al. |
| 10,092,249 B2 | 10/2018 | Kiani et al. |
| 10,098,550 B2 | 10/2018 | Al-Ali et al. |
| 10,098,591 B2 | 10/2018 | Al-Ali et al. |
| 10,098,610 B2 | 10/2018 | Al-Ali et al. |
| D833,624 S | 11/2018 | DeJong et al. |
| 10,123,726 B2 | 11/2018 | Al-Ali et al. |
| 10,130,289 B2 | 11/2018 | Al-Ali et al. |
| 10,130,291 B2 | 11/2018 | Schurman et al. |
| D835,282 S | 12/2018 | Barker et al. |
| D835,283 S | 12/2018 | Barker et al. |
| D835,284 S | 12/2018 | Barker et al. |
| D835,285 S | 12/2018 | Barker et al. |
| 10,149,616 B2 | 12/2018 | Al-Ali et al. |
| 10,154,815 B2 | 12/2018 | Al-Ali et al. |
| 10,159,412 B2 | 12/2018 | Lamego et al. |
| 10,188,296 B2 | 1/2019 | Al-Ali et al. |
| 10,188,331 B1 | 1/2019 | Al-Ali et al. |
| 10,188,348 B2 | 1/2019 | Kiani et al. |
| RE47,218 E | 2/2019 | Al-Ali |
| RE47,244 E | 2/2019 | Kiani et al. |
| RE47,249 E | 2/2019 | Kiani et al. |
| 10,194,847 B2 | 2/2019 | Al-Ali |
| 10,194,848 B1 | 2/2019 | Kiani et al. |
| 10,201,298 B2 | 2/2019 | Al-Ali et al. |
| 10,205,272 B2 | 2/2019 | Kiani et al. |
| 10,205,291 B2 | 2/2019 | Scruggs et al. |
| 10,213,108 B2 | 2/2019 | Al-Ali |
| 10,219,706 B2 | 3/2019 | Al-Ali |
| 10,219,746 B2 | 3/2019 | McHale et al. |
| 10,226,187 B2 | 3/2019 | Al-Ali et al. |
| 10,226,576 B2 | 3/2019 | Kiani |
| 10,231,657 B2 | 3/2019 | Al-Ali et al. |
| 10,231,670 B2 | 3/2019 | Blank et al. |
| 10,231,696 B2 | 3/2019 | Al-Ali et al. |
| RE47,353 E | 4/2019 | Kiani et al. |
| 10,251,585 B2 | 4/2019 | Al-Ali et al. |
| 10,251,586 B2 | 4/2019 | Lamego |
| 10,255,994 B2 | 4/2019 | Sampath et al. |
| 10,258,265 B1 | 4/2019 | Poeze et al. |
| 10,258,266 B1 | 4/2019 | Poeze et al. |
| 10,271,748 B2 | 4/2019 | Al-Ali |
| 10,278,626 B2 | 5/2019 | Schurman et al. |
| 10,278,648 B2 | 5/2019 | Al-Ali et al. |
| 10,279,247 B2 | 5/2019 | Kiani |
| 10,292,628 B1 | 5/2019 | Poeze et al. |
| 10,292,657 B2 | 5/2019 | Abdul-Hafiz et al. |
| 10,292,664 B2 | 5/2019 | Al-Ali |
| 10,299,708 B1 | 5/2019 | Poeze et al. |
| 10,299,709 B2 | 5/2019 | Perea et al. |
| 10,305,775 B2 | 5/2019 | Lamego et al. |
| 10,307,111 B2 | 6/2019 | Muhsin et al. |
| 10,325,681 B2 | 6/2019 | Sampath et al. |
| 10,327,337 B2 | 6/2019 | Triman et al. |
| 2002/0042558 A1 | 4/2002 | Mendelson |
| 2003/0036690 A1 * | 2/2003 | Geddes .............. A61B 5/02233 |
| | | 600/323 |
| 2004/0054290 A1 | 3/2004 | Chance |
| 2004/0114783 A1 | 6/2004 | Spycher et al. |
| 2005/0277819 A1 | 12/2005 | Kiani et al. |
| 2006/0161054 A1 | 7/2006 | Reuss et al. |
| 2007/0282478 A1 | 12/2007 | Al-Ali et al. |
| 2008/0030468 A1 | 2/2008 | Al-Ali et al. |
| 2009/0247984 A1 | 10/2009 | Lamego et al. |
| 2009/0275813 A1 | 11/2009 | Davis |
| 2009/0275844 A1 | 11/2009 | Al-Ali |
| 2010/0004518 A1 | 1/2010 | Vo et al. |

Exhibit 1
-8-

**US 10,470,695 B2**

Page 7

(56)          **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 2010/0030040 A1 | 2/2010 | Poeze et al. |
| 2011/0004106 A1 | 1/2011 | Iwamiya et al. |
| 2011/0082711 A1 | 4/2011 | Poeze et al. |
| 2011/0085721 A1 | 4/2011 | Guyon et al. |
| 2011/0105854 A1 | 5/2011 | Kiani et al. |
| 2011/0125060 A1 | 5/2011 | Telfort et al. |
| 2011/0208015 A1 | 8/2011 | Welch et al. |
| 2011/0213212 A1 | 9/2011 | Al-Ali |
| 2011/0230733 A1 | 9/2011 | Al-Ali |
| 2011/0237969 A1 | 9/2011 | Eckerbom et al. |
| 2011/0288383 A1 | 11/2011 | Diab |
| 2011/0301444 A1 | 12/2011 | Al-Ali |
| 2012/0041316 A1 | 2/2012 | Al-Ali et al. |
| 2012/0046557 A1 | 2/2012 | Kiani |
| 2012/0059267 A1 | 3/2012 | Lamego et al. |
| 2012/0088984 A1 | 4/2012 | Al-Ali et al. |
| 2012/0165629 A1 | 6/2012 | Merritt et al. |
| 2012/0179006 A1 | 7/2012 | Jansen et al. |
| 2012/0209082 A1 | 8/2012 | Al-Ali |
| 2012/0209084 A1 | 8/2012 | Olsen et al. |
| 2012/0283524 A1 | 11/2012 | Kiani et al. |
| 2012/0296178 A1 | 11/2012 | Lamego et al. |
| 2012/0319816 A1 | 12/2012 | Al-Ali |
| 2012/0330112 A1 | 12/2012 | Lamego et al. |
| 2013/0006076 A1 | 1/2013 | McHale |
| 2013/0023775 A1 | 1/2013 | Lamego et al. |
| 2013/0041591 A1 | 2/2013 | Lamego |
| 2013/0046204 A1 | 2/2013 | Lamego et al. |
| 2013/0060147 A1 | 3/2013 | Welch et al. |
| 2013/0096405 A1 | 4/2013 | Garfio |
| 2013/0096936 A1 | 4/2013 | Sampath et al. |
| 2013/0190581 A1 | 7/2013 | Al-Ali et al. |
| 2013/0211214 A1 | 8/2013 | Olsen |
| 2013/0243021 A1 | 9/2013 | Siskavich |
| 2013/0253334 A1 | 9/2013 | Al-Ali et al. |
| 2013/0262730 A1 | 10/2013 | Al-Ali et al. |
| 2013/0267804 A1 | 10/2013 | Al-Ali |
| 2013/0274572 A1 | 10/2013 | Al-Ali et al. |
| 2013/0296672 A1 | 11/2013 | O'Neil et al. |
| 2013/0296713 A1 | 11/2013 | Al-Ali et al. |
| 2013/0317370 A1 | 11/2013 | Dalvi et al. |
| 2013/0324808 A1 | 12/2013 | Al-Ali et al. |
| 2013/0331660 A1 | 12/2013 | Al-Ali et al. |
| 2013/0331670 A1 | 12/2013 | Kiani |
| 2014/0012100 A1 | 1/2014 | Al-Ali et al. |
| 2014/0034353 A1 | 2/2014 | Al-Ali et al. |
| 2014/0051953 A1 | 2/2014 | Lamego et al. |
| 2014/0066783 A1 | 3/2014 | Kiani et al. |
| 2014/0077956 A1 | 3/2014 | Sampath et al. |
| 2014/0081100 A1 | 3/2014 | Muhsin et al. |
| 2014/0081175 A1 | 3/2014 | Telfort |
| 2014/0094667 A1 | 4/2014 | Schurman et al. |
| 2014/0100434 A1 | 4/2014 | Diab et al. |
| 2014/0114199 A1 | 4/2014 | Lamego et al. |
| 2014/0120564 A1 | 5/2014 | Workman et al. |
| 2014/0121482 A1 | 5/2014 | Merritt et al. |
| 2014/0121483 A1 | 5/2014 | Kiani |
| 2014/0127137 A1 | 5/2014 | Bellott et al. |
| 2014/0129702 A1 | 5/2014 | Lamego et al. |
| 2014/0135588 A1 | 5/2014 | Al-Ali et al. |
| 2014/0142401 A1 | 5/2014 | Al-Ali et al. |
| 2014/0163344 A1 | 6/2014 | Al-Ali |
| 2014/0163402 A1 | 6/2014 | Lamego et al. |
| 2014/0166076 A1 | 6/2014 | Kiani et al. |
| 2014/0171146 A1 | 6/2014 | Ma et al. |
| 2014/0171763 A1 | 6/2014 | Diab |
| 2014/0180038 A1 | 6/2014 | Kiani |
| 2014/0180154 A1 | 6/2014 | Sierra et al. |
| 2014/0180160 A1 | 6/2014 | Brown et al. |
| 2014/0187973 A1 | 7/2014 | Brown et al. |
| 2014/0194766 A1 | 7/2014 | Al-Ali et al. |
| 2014/0206963 A1 | 7/2014 | Al-Ali |
| 2014/0213864 A1 | 7/2014 | Abdul-Hafiz et al. |
| 2014/0266790 A1 | 9/2014 | Al-Ali et al. |
| 2014/0275808 A1 | 9/2014 | Poeze et al. |
| 2014/0275835 A1 | 9/2014 | Lamego et al. |
| 2014/0275871 A1 | 9/2014 | Lamego et al. |
| 2014/0275872 A1 | 9/2014 | Merritt et al. |
| 2014/0275881 A1 | 9/2014 | Lamego et al. |
| 2014/0276115 A1 | 9/2014 | Dalvi et al. |
| 2014/0288400 A1 | 9/2014 | Diab et al. |
| 2014/0303520 A1 | 10/2014 | Telfort et al. |
| 2014/0316217 A1 | 10/2014 | Purdon et al. |
| 2014/0316218 A1 | 10/2014 | Purdon et al. |
| 2014/0316228 A1 | 10/2014 | Blank et al. |
| 2014/0323825 A1 | 10/2014 | Al-Ali et al. |
| 2014/0323897 A1 | 10/2014 | Brown et al. |
| 2014/0323898 A1 | 10/2014 | Purdon et al. |
| 2014/0330092 A1 | 11/2014 | Al-Ali et al. |
| 2014/0330098 A1 | 11/2014 | Merritt et al. |
| 2014/0330099 A1 | 11/2014 | Al-Ali et al. |
| 2014/0336481 A1 | 11/2014 | Shakespeare et al. |
| 2014/0357966 A1 | 12/2014 | Al-Ali et al. |
| 2014/0371548 A1 | 12/2014 | Al-Ali et al. |
| 2014/0371632 A1 | 12/2014 | Al-Ali et al. |
| 2014/0378784 A1 | 12/2014 | Kiani et al. |
| 2015/0005600 A1 | 1/2015 | Blank et al. |
| 2015/0011907 A1 | 1/2015 | Purdon et al. |
| 2015/0012231 A1 | 1/2015 | Poeze et al. |
| 2015/0018650 A1 | 1/2015 | Al-Ali et al. |
| 2015/0025406 A1 | 1/2015 | Al-Ali |
| 2015/0032029 A1 | 1/2015 | Al-Ali et al. |
| 2015/0038859 A1 | 2/2015 | Dalvi et al. |
| 2015/0045637 A1 | 2/2015 | Dalvi |
| 2015/0045685 A1 | 2/2015 | Al-Ali et al. |
| 2015/0051462 A1 | 2/2015 | Olsen |
| 2015/0080754 A1 | 3/2015 | Purdon et al. |
| 2015/0087936 A1 | 3/2015 | Al-Ali et al. |
| 2015/0094546 A1 | 4/2015 | Al-Ali |
| 2015/0097701 A1 | 4/2015 | Al-Ali et al. |
| 2015/0099324 A1 | 4/2015 | Wojtczuk et al. |
| 2015/0099950 A1 | 4/2015 | Al-Ali et al. |
| 2015/0099951 A1 | 4/2015 | Al-Ali et al. |
| 2015/0099955 A1 | 4/2015 | Al-Ali et al. |
| 2015/0101844 A1 | 4/2015 | Al-Ali et al. |
| 2015/0106121 A1 | 4/2015 | Muhsin et al. |
| 2015/0112151 A1 | 4/2015 | Muhsin et al. |
| 2015/0116076 A1 | 4/2015 | Al-Ali et al. |
| 2015/0126830 A1 | 5/2015 | Schurman et al. |
| 2015/0133755 A1 | 5/2015 | Smith et al. |
| 2015/0140863 A1 | 5/2015 | Al-Ali et al. |
| 2015/0141781 A1 | 5/2015 | Weber et al. |
| 2015/0165312 A1 | 6/2015 | Kiani |
| 2015/0173671 A1 | 6/2015 | Paalasmaa et al. |
| 2015/0196237 A1 | 7/2015 | Lamego |
| 2015/0201874 A1 | 7/2015 | Diab |
| 2015/0208966 A1 | 7/2015 | Al-Ali |
| 2015/0216459 A1 | 8/2015 | Al-Ali et al. |
| 2015/0230755 A1 | 8/2015 | Al-Ali et al. |
| 2015/0238722 A1 | 8/2015 | Al-Ali |
| 2015/0245773 A1 | 9/2015 | Lamego et al. |
| 2015/0245793 A1 | 9/2015 | Al-Ali et al. |
| 2015/0245794 A1 | 9/2015 | Al-Ali |
| 2015/0255001 A1 | 9/2015 | Haughav et al. |
| 2015/0257689 A1 | 9/2015 | Al-Ali et al. |
| 2015/0272514 A1 | 10/2015 | Kiani et al. |
| 2015/0281424 A1 | 10/2015 | Vock et al. |
| 2015/0318100 A1 | 11/2015 | Rothkopf et al. |
| 2015/0351697 A1 | 12/2015 | Weber et al. |
| 2015/0351704 A1 | 12/2015 | Kiani et al. |
| 2015/0359429 A1 | 12/2015 | Al-Ali et al. |
| 2015/0366472 A1 | 12/2015 | Kiani |
| 2015/0366507 A1 | 12/2015 | Blank |
| 2015/0374298 A1 | 12/2015 | Al-Ali et al. |
| 2015/0380875 A1 | 12/2015 | Coverston et al. |
| 2016/0000362 A1 | 1/2016 | Diab et al. |
| 2016/0007930 A1 | 1/2016 | Weber et al. |
| 2016/0019360 A1 | 1/2016 | Pahwa et al. |
| 2016/0023245 A1 | 1/2016 | Zadesky et al. |
| 2016/0029932 A1 | 2/2016 | Al-Ali |
| 2016/0029933 A1 | 2/2016 | Al-Ali et al. |
| 2016/0038045 A1 | 2/2016 | Shapiro |
| 2016/0045118 A1 | 2/2016 | Kiani |
| 2016/0051157 A1 | 2/2016 | Waydo |

Exhibit 1

-9-

## US 10,470,695 B2

Page 8

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 2016/0051158 A1 | 2/2016 | Silva |
| 2016/0051205 A1 | 2/2016 | Al-Ali et al. |
| 2016/0058302 A1 | 3/2016 | Raghuram et al. |
| 2016/0058309 A1 | 3/2016 | Han |
| 2016/0058312 A1 | 3/2016 | Han et al. |
| 2016/0058338 A1 | 3/2016 | Schurman et al. |
| 2016/0058347 A1 | 3/2016 | Reichgott et al. |
| 2016/0058356 A1 | 3/2016 | Raghuram et al. |
| 2016/0058370 A1 | 3/2016 | Raghuram et al. |
| 2016/0066823 A1 | 3/2016 | Kind et al. |
| 2016/0066824 A1 | 3/2016 | Al-Ali et al. |
| 2016/0066879 A1 | 3/2016 | Telfort et al. |
| 2016/0071392 A1 | 3/2016 | Hankey et al. |
| 2016/0072429 A1 | 3/2016 | Kiani et al. |
| 2016/0073967 A1 | 3/2016 | Lamego et al. |
| 2016/0081552 A1 | 3/2016 | Wojtczuk et al. |
| 2016/0095543 A1 | 4/2016 | Telfort et al. |
| 2016/0095548 A1 | 4/2016 | Al-Ali et al. |
| 2016/0103598 A1 | 4/2016 | Al-Ali et al. |
| 2016/0113527 A1 | 4/2016 | Al-Ali et al. |
| 2016/0143548 A1 | 5/2016 | Al-Ali |
| 2016/0154950 A1 | 6/2016 | Nakajima et al. |
| 2016/0157780 A1 | 6/2016 | Rimminen et al. |
| 2016/0166182 A1 | 6/2016 | Al-Ali et al. |
| 2016/0166183 A1 | 6/2016 | Poeze et al. |
| 2016/0196388 A1 | 7/2016 | Lamego |
| 2016/0197436 A1 | 7/2016 | Barker et al. |
| 2016/0213281 A1 | 7/2016 | Eckerbom et al. |
| 2016/0213309 A1 | 7/2016 | Sannholm et al. |
| 2016/0228043 A1 | 8/2016 | O'Neil et al. |
| 2016/0233632 A1 | 8/2016 | Scruggs et al. |
| 2016/0234944 A1 | 8/2016 | Schmidt et al. |
| 2016/0256058 A1 | 9/2016 | Pham et al. |
| 2016/0256082 A1 | 9/2016 | Ely et al. |
| 2016/0267238 A1 | 9/2016 | Nag |
| 2016/0270735 A1 | 9/2016 | Diab et al. |
| 2016/0283665 A1 | 9/2016 | Sampath et al. |
| 2016/0287090 A1 | 10/2016 | Al-Ali et al. |
| 2016/0287181 A1 | 10/2016 | Han et al. |
| 2016/0287786 A1 | 10/2016 | Kiani |
| 2016/0296169 A1 | 10/2016 | McHale et al. |
| 2016/0296171 A1 | 10/2016 | Culbert |
| 2016/0296174 A1 | 10/2016 | Isikman et al. |
| 2016/0310027 A1 | 10/2016 | Han |
| 2016/0310052 A1 | 10/2016 | Al-Ali et al. |
| 2016/0314260 A1 | 10/2016 | Kiani |
| 2016/0324488 A1 | 11/2016 | Olsen |
| 2016/0327984 A1 | 11/2016 | Al-Ali et al. |
| 2016/0331332 A1 | 11/2016 | Al-Ali |
| 2016/0367173 A1 | 12/2016 | Dalvi et al. |
| 2016/0378069 A1 | 12/2016 | Rothkopf |
| 2016/0378071 A1 | 12/2016 | Rothkopf |
| 2017/0000394 A1 | 1/2017 | Al-Ali et al. |
| 2017/0007134 A1 | 1/2017 | Al-Ali et al. |
| 2017/0007183 A1 | 1/2017 | Dusan et al. |
| 2017/0007198 A1 | 1/2017 | Al-Ali et al. |
| 2017/0010858 A1 | 1/2017 | Prest et al. |
| 2017/0014083 A1 | 1/2017 | Diab et al. |
| 2017/0014084 A1 | 1/2017 | Al-Ali et al. |
| 2017/0024748 A1 | 1/2017 | Haider |
| 2017/0042488 A1 | 2/2017 | Muhsin |
| 2017/0055851 A1 | 3/2017 | Al-Ali |
| 2017/0055882 A1 | 3/2017 | Al-Ali et al. |
| 2017/0055887 A1 | 3/2017 | Al-Ali |
| 2017/0055896 A1 | 3/2017 | Al-Ali et al. |
| 2017/0074897 A1 | 3/2017 | Mermel et al. |
| 2017/0079594 A1 | 3/2017 | Telfort et al. |
| 2017/0084133 A1 | 3/2017 | Cardinali et al. |
| 2017/0086689 A1 | 3/2017 | Shui et al. |
| 2017/0086723 A1 | 3/2017 | Al-Ali et al. |
| 2017/0086742 A1 | 3/2017 | Harrison-Noonan et al. |
| 2017/0086743 A1 | 3/2017 | Bushnell et al. |
| 2017/0094450 A1 | 3/2017 | Tu et al. |
| 2017/0143281 A1 | 5/2017 | Olsen |
| 2017/0147774 A1 | 5/2017 | Kiani |
| 2017/0156620 A1 | 6/2017 | Al-Ali et al. |
| 2017/0164884 A1 | 6/2017 | Culbert et al. |
| 2017/0173632 A1 | 6/2017 | Al-Ali |
| 2017/0187146 A1 | 6/2017 | Kiani et al. |
| 2017/0188919 A1 | 7/2017 | Al-Ali et al. |
| 2017/0196464 A1 | 7/2017 | Jansen et al. |
| 2017/0196470 A1 | 7/2017 | Lamego et al. |
| 2017/0224262 A1 | 8/2017 | Al-Ali |
| 2017/0228516 A1 | 8/2017 | Sampath et al. |
| 2017/0245790 A1 | 8/2017 | Al-Ali et al. |
| 2017/0248446 A1 | 8/2017 | Gowreesunker et al. |
| 2017/0251974 A1 | 9/2017 | Shreim et al. |
| 2017/0251975 A1 | 9/2017 | Shreim et al. |
| 2017/0258403 A1 | 9/2017 | Abdul-Hafiz et al. |
| 2017/0273619 A1 | 9/2017 | Alvarado et al. |
| 2017/0281024 A1 | 10/2017 | Narasimhan et al. |
| 2017/0293727 A1 | 10/2017 | Klaassen et al. |
| 2017/0311851 A1 | 11/2017 | Schurman et al. |
| 2017/0311891 A1 | 11/2017 | Kiani et al. |
| 2017/0325698 A1 | 11/2017 | Allec et al. |
| 2017/0325728 A1 | 11/2017 | Al-Ali et al. |
| 2017/0325744 A1 | 11/2017 | Allec et al. |
| 2017/0332976 A1 | 11/2017 | Al-Ali et al. |
| 2017/0340209 A1 | 11/2017 | Klaassen et al. |
| 2017/0340219 A1 | 11/2017 | Sullivan et al. |
| 2017/0340293 A1 | 11/2017 | Al-Ali et al. |
| 2017/0347885 A1 | 12/2017 | Tan et al. |
| 2017/0354332 A1 | 12/2017 | Lamego |
| 2017/0354795 A1 | 12/2017 | Blahnik et al. |
| 2017/0358239 A1 | 12/2017 | Arney et al. |
| 2017/0358240 A1 | 12/2017 | Blahnik et al. |
| 2017/0358242 A1 | 12/2017 | Thompson et al. |
| 2017/0360306 A1 | 12/2017 | Narasimhan et al. |
| 2017/0360310 A1 | 12/2017 | Kiani et al. |
| 2017/0366657 A1 | 12/2017 | Thompson et al. |
| 2017/0367632 A1 | 12/2017 | Al-Ali et al. |
| 2018/0008146 A1 | 1/2018 | Al-Ali et al. |
| 2018/0013562 A1 | 1/2018 | Haider et al. |
| 2018/0014752 A1 | 1/2018 | Al-Ali et al. |
| 2018/0014781 A1 | 1/2018 | Clavelle et al. |
| 2018/0025287 A1 | 1/2018 | Mathew et al. |
| 2018/0028124 A1 | 2/2018 | Al-Ali et al. |
| 2018/0042556 A1 | 2/2018 | Shahparnia et al. |
| 2018/0049694 A1 | 2/2018 | Singh Alvarado et al. |
| 2018/0050235 A1 | 2/2018 | Tan et al. |
| 2018/0055375 A1 | 3/2018 | Martinez et al. |
| 2018/0055385 A1 | 3/2018 | Al-Ali |
| 2018/0055390 A1 | 3/2018 | Kiani et al. |
| 2018/0055430 A1 | 3/2018 | Diab et al. |
| 2018/0055439 A1 | 3/2018 | Pham et al. |
| 2018/0056129 A1 | 3/2018 | Narasimha Rao et al. |
| 2018/0064381 A1 | 3/2018 | Shakespeare et al. |
| 2018/0069776 A1 | 3/2018 | Lamego et al. |
| 2018/0070867 A1 | 3/2018 | Smith et al. |
| 2018/0078151 A1 | 3/2018 | Allec et al. |
| 2018/0078182 A1 | 3/2018 | Chen et al. |
| 2018/0082767 A1 | 3/2018 | Al-Ali et al. |
| 2018/0085068 A1 | 3/2018 | Telfort |
| 2018/0087937 A1 | 3/2018 | Al-Ali et al. |
| 2018/0103874 A1 | 4/2018 | Lee et al. |
| 2018/0103905 A1 | 4/2018 | Kiani |
| 2018/0110469 A1 | 4/2018 | Maani et al. |
| 2018/0110478 A1 | 4/2018 | Al-Ali |
| 2018/0116575 A1 | 5/2018 | Perea et al. |
| 2018/0125368 A1 | 5/2018 | Lamego et al. |
| 2018/0125430 A1 | 5/2018 | Al-Ali et al. |
| 2018/0125445 A1 | 5/2018 | Telfort et al. |
| 2018/0130325 A1 | 5/2018 | Kiani et al. |
| 2018/0132769 A1 | 5/2018 | Weber et al. |
| 2018/0132770 A1 | 5/2018 | Lamego |
| 2018/0146901 A1 | 5/2018 | Al-Ali et al. |
| 2018/0146902 A1 | 5/2018 | Kiani et al. |
| 2018/0153418 A1 | 6/2018 | Sullivan et al. |
| 2018/0153442 A1 | 6/2018 | Eckerbom et al. |
| 2018/0153446 A1 | 6/2018 | Kiani |
| 2018/0153447 A1 | 6/2018 | Al-Ali et al. |
| 2018/0153448 A1 | 6/2018 | Weber et al. |
| 2018/0161499 A1 | 6/2018 | Al-Ali et al. |
| 2018/0164853 A1 | 6/2018 | Myers et al. |

Exhibit 1
-10-

**US 10,470,695 B2**

Page 9

(56)  **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2018/0168491 | A1 | 6/2018 | Al-Ali et al. |
| 2018/0174679 | A1 | 6/2018 | Sampath et al. |
| 2018/0174680 | A1 | 6/2018 | Sampath et al. |
| 2018/0182484 | A1 | 6/2018 | Sampath et al. |
| 2018/0184917 | A1 | 7/2018 | Kiani |
| 2018/0192924 | A1 | 7/2018 | Al-Ali |
| 2018/0192953 | A1 | 7/2018 | Shreim et al. |
| 2018/0192955 | A1 | 7/2018 | Al-Ali et al. |
| 2018/0196514 | A1 | 7/2018 | Allec et al. |
| 2018/0199871 | A1 | 7/2018 | Pauley et al. |
| 2018/0206795 | A1 | 7/2018 | Al-Ali |
| 2018/0206815 | A1 | 7/2018 | Telfort |
| 2018/0213583 | A1 | 7/2018 | Al-Ali |
| 2018/0214031 | A1 | 8/2018 | Kiani et al. |
| 2018/0214090 | A1 | 8/2018 | Al-Ali et al. |
| 2018/0218792 | A1 | 8/2018 | Muhsin et al. |
| 2018/0225960 | A1 | 8/2018 | Al-Ali et al. |
| 2018/0228414 | A1 | 8/2018 | Shao et al. |
| 2018/0238718 | A1 | 8/2018 | Dalvi |
| 2018/0238734 | A1 | 8/2018 | Hotelling et al. |
| 2018/0242853 | A1 | 8/2018 | Al-Ali |
| 2018/0242921 | A1 | 8/2018 | Muhsin et al. |
| 2018/0242923 | A1 | 8/2018 | Al-Ali et al. |
| 2018/0242924 | A1 | 8/2018 | Barker et al. |
| 2018/0242926 | A1 | 8/2018 | Muhsin et al. |
| 2018/0247353 | A1 | 8/2018 | Al-Ali et al. |
| 2018/0247712 | A1 | 8/2018 | Muhsin et al. |
| 2018/0249933 | A1 | 9/2018 | Schurman et al. |
| 2018/0253947 | A1 | 9/2018 | Muhsin et al. |
| 2018/0256087 | A1 | 9/2018 | Ai-Ali et al. |
| 2018/0256113 | A1 | 9/2018 | Weber et al. |
| 2018/0279956 | A1 | 10/2018 | Waydo et al. |
| 2018/0285094 | A1 | 10/2018 | Housel et al. |
| 2018/0289325 | A1 | 10/2018 | Poeze et al. |
| 2018/0289337 | A1 | 10/2018 | Ai-Ali et al. |
| 2018/0296161 | A1 | 10/2018 | Shreim et al. |
| 2018/0300919 | A1 | 10/2018 | Muhsin et al. |
| 2018/0310822 | A1 | 11/2018 | Indorf et al. |
| 2018/0310823 | A1 | 11/2018 | Ai-Ali et al. |
| 2018/0317826 | A1 | 11/2018 | Muhsin |
| 2018/0317841 | A1 | 11/2018 | Novak, Jr. |
| 2018/0333055 | A1 | 11/2018 | Lamego et al. |
| 2018/0333087 | A1 | 11/2018 | Al-Ali |
| 2019/0000317 | A1 | 1/2019 | Muhsin et al. |
| 2019/0000362 | A1 | 1/2019 | Kiani et al. |
| 2019/0015023 | A1 | 1/2019 | Monfre |
| 2019/0021638 | A1 | 1/2019 | Ai-Ali et al. |
| 2019/0029574 | A1 | 1/2019 | Schurman et al. |
| 2019/0029578 | A1 | 1/2019 | Ai-Ali et al. |
| 2019/0038143 | A1 | 2/2019 | Ai-Ali |
| 2019/0058280 | A1 | 2/2019 | Ai-Ali et al. |
| 2019/0058281 | A1 | 2/2019 | Ai-Ali et al. |
| 2019/0069813 | A1 | 3/2019 | Ai-Ali |
| 2019/0069814 | A1 | 3/2019 | Ai-Ali |
| 2019/0076028 | A1 | 3/2019 | Ai-Ali et al. |
| 2019/0082979 | A1 | 3/2019 | Ai-Ali et al. |
| 2019/0090748 | A1 | 3/2019 | Ai-Ali |
| 2019/0090760 | A1 | 3/2019 | Kinast et al. |
| 2019/0090764 | A1 | 3/2019 | Ai-Ali |
| 2019/0104973 | A1 | 4/2019 | Poeze et al. |
| 2019/0110719 | A1 | 4/2019 | Poeze et al. |
| 2019/0117070 | A1 | 4/2019 | Muhsin et al. |
| 2019/0117139 | A1 | 4/2019 | Al-Ali et al. |
| 2019/0117140 | A1 | 4/2019 | Al-Ali et al. |
| 2019/0117141 | A1 | 4/2019 | Ai-Ali |
| 2019/0117930 | A1 | 4/2019 | Al-Ali |
| 2019/0122763 | A1 | 4/2019 | Sampath et al. |
| 2019/0133525 | A1 | 5/2019 | Al-Ali et al. |
| 2019/0142283 | A1 | 5/2019 | Lamego et al. |
| 2019/0142344 | A1 | 5/2019 | Telfort et al. |
| 2019/0150800 | A1 | 5/2019 | Poeze et al. |
| 2019/0150856 | A1 | 5/2019 | Kiani et al. |
| 2019/0167161 | A1 | 6/2019 | Al-Ali et al. |
| 2019/0175019 | A1 | 6/2019 | Al-Ali et al. |
| 2019/0192076 | A1 | 6/2019 | McHale et al. |

OTHER PUBLICATIONS

Written Opinion received in International Application No. PCT/US2016/040190, dated Jan. 2, 2018.
Konig, V. et al., "Reflectance Pulse Oximetry—Principles and Obstetric Application in the Zurich System," J Clin Monit 1998; 14: 403-412.

* cited by examiner

Exhibit 1
-11-



FIG. 1
(Prior Art)

FIG. 2



FIG. 3

Exhibit 1
-12-

Case 8:20-cv-00048-JVS-JDE   Document 43-4   Filed 04/30/20   Page 14 of 150   Page ID #:3298



FIG. 4A

**Exhibit 1**
**-13-**



FIG. 4B

**Exhibit 1**
**-14-**



FIG. 5

Exhibit 1
-15-



FIG. 7A

FIG. 6
(PRIOR ART)

Exhibit 1
-16-



FIG. 7B

**Exhibit 1**
-17-

U.S. Patent

Nov. 12, 2019

Sheet 7 of 7

US 10,470,695 B2



FIG. 8

Exhibit 1
-18-

US 10,470,695 B2

**1**

**ADVANCED PULSE OXIMETRY SENSOR**

**INCORPORATION BY REFERENCE TO ANY PRIORITY APPLICATIONS**

The present application is a continuation of U.S. patent application Ser. No. 15/195,199 filed Jun. 28, 2016, which claims priority benefit under 35 U.S.C. § 119(e) from U.S. Provisional Application No. 62/188,430, filed Jul. 2, 2015, entitled "Advanced Pulse Oximetry Sensor," which is incorporated by reference herein. Any and all applications for which a foreign or domestic priority claim is identified in the Application Data Sheet as filed with the present application are hereby incorporated by reference under 37 CFR 1.57.

**FIELD OF THE DISCLOSURE**

The present disclosure relates to the field of non-invasive optical-based physiological monitoring sensors, and more particularly to systems, devices and methods for improving the non-invasive measurement accuracy of oxygen saturation, among other physiological parameters.

**BACKGROUND**

Spectroscopy is a common technique for measuring the concentration of organic and some inorganic constituents of a solution. The theoretical basis of this technique is the Beer-Lambert law, which states that the concentration $c_i$ of an absorbent in solution can be determined by the intensity of light transmitted through the solution, knowing the pathlength $d_\lambda$, the intensity of the incident light $I_{0,\lambda}$, and the extinction coefficient $\varepsilon_{i,\lambda}$ at a particular wavelength $\lambda$.

In generalized form, the Beer-Lambert law is expressed as:

$$I_\lambda = I_{0,\lambda} e^{-d_\lambda \cdot \mu_{\alpha,\lambda}} \tag{1}$$

$$\mu_{\alpha,\lambda} = \sum_{i=1}^{n} \varepsilon_{i,\lambda} \cdot c_i \tag{2}$$

where $\mu_{\alpha,\lambda}$ is the bulk absorption coefficient and represents the probability of absorption per unit length. The minimum number of discrete wavelengths that are required to solve equations 1 and 2 is the number of significant absorbers that are present in the solution.

A practical application of this technique is pulse oximetry, which utilizes a noninvasive sensor to measure oxygen saturation and pulse rate, among other physiological parameters. Pulse oximetry relies on a sensor attached externally to the patient to output signals indicative of various physiological parameters, such as a patient's blood constituents and/or analytes, including for example a percent value for arterial oxygen saturation, among other physiological parameters. The sensor has an emitter that transmits optical radiation of one or more wavelengths into a tissue site and a detector that responds to the intensity of the optical radiation after absorption by pulsatile arterial blood flowing within the tissue site. Based upon this response, a processor determines the relative concentrations of oxygenated hemoglobin (HbO$_2$) and deoxygenated hemoglobin (Hb) in the blood so as to derive oxygen saturation, which can provide early detection of potentially hazardous decreases in a patient's oxygen supply.

**2**

A pulse oximetry system generally includes a patient monitor, a communications medium such as a cable, and/or a physiological sensor having one or more light emitters and a detector, such as one or more light-emitting diodes (LEDs) and a photodetector. The sensor is attached to a tissue site, such as a finger, toe, earlobe, nose, hand, foot, or other site having pulsatile blood flow which can be penetrated by light from the one or more emitters. The detector is responsive to the emitted light after attenuation or reflection by pulsatile blood flowing in the tissue site. The detector outputs a detector signal to the monitor over the communication medium. The monitor processes the signal to provide a numerical readout of physiological parameters such as oxygen saturation (SpO2) and/or pulse rate. A pulse oximetry sensor is described in U.S. Pat. No. 6,088,607 entitled Low Noise Optical Probe; pulse oximetry signal processing is described in U.S. Pat. Nos. 6,650,917 and 6,699,194 entitled Signal Processing Apparatus and Signal Processing Apparatus and Method, respectively; a pulse oximeter monitor is described in U.S. Pat. No. 6,584,336 entitled Universal/Upgrading Pulse Oximeter; all of which are assigned to Masimo Corporation, Irvine, Calif., and each is incorporated by reference herein in its entirety.

There are many sources of measurement error introduced to pulse oximetry systems. Some such sources of error include the pulse oximetry system's electronic components, including emitters and detectors, as well as chemical and structural physiological differences between patients. Another source of measurement error is the effect of multiple scattering of photons as the photons pass through the patient's tissue (arterial blood) and arrive at the sensor's light detector.

**SUMMARY**

This disclosure describes embodiments of non-invasive methods, devices, and systems for measuring blood constituents, analytes, and/or substances such as, by way of non-limiting example, oxygen, carboxyhemoglobin, methemoglobin, total hemoglobin, glucose, proteins, lipids, a percentage thereof (e.g., saturation), pulse rate, perfusion index, oxygen content, total hemoglobin, Oxygen Reserve Index™ (ORI™) or for measuring many other physiologically relevant patient characteristics. These characteristics can relate to, for example, pulse rate, hydration, trending information and analysis, and the like.

In an embodiment, an optical physiological measurement system includes an emitter configured to emit light of one or more wavelengths. The system also includes a diffuser configured to receive the emitted light, to spread the received light, and to emit the spread light over a larger tissue area than would otherwise be penetrated by the emitter directly emitting light at a tissue measurement site. The tissue measurement site can include, such as, for example, a finger, a wrist, or the like. The system further includes a concentrator configured to receive the spread light after it has been attenuated by or reflected from the tissue measurement site. The concentrator is also configured to collect and concentrate the received light and to emit the concentrated light to a detector. The detector is configured to detect the concentrated light and to transmit a signal indicative of the detected light. The system also includes a processor configured to receive the transmitted signal indicative of the detected light and to determine, based on an amount of absorption, an analyte of interest, such as, for example, arterial oxygen saturation or other parameter, in the tissue measurement site.

**Exhibit 1**

-19-

US 10,470,695 B2

3

In certain embodiments of the present disclosure, the diffuser comprises glass, ground glass, glass beads, opal glass, or a microlens-based, band-limited, engineered diffuser that can deliver efficient and uniform illumination. In some embodiments the diffuser is further configured to define a surface area shape by which the emitted spread light is distributed onto a surface of the tissue measurement site. The defined surface area shape can include, by way of non-limiting example, a shape that is substantially rectangular, square, circular, oval, or annular, among others.

According to some embodiments, the optical physiological measurement system includes an optical filter having a light-absorbing surface that faces the tissue measurement site. The optical filter also has an opening that is configured to allow the spread light, after being attenuated by the tissue measurement site, to be received by the concentrator. In an embodiment, the opening has dimensions, wherein the dimensions of the opening are similar to the defined surface area shape by which the emitted spread light is distributed onto the surface of the tissue measurement site. In an embodiment, the opening has dimensions that are larger than the defined surface area shape by which the emitted spread light is distributed onto the surface of the tissue measurement site. In other embodiments, the dimensions of the opening in the optical filter are not the same as the diffuser opening, but the dimensions are larger than the detector package.

In other embodiments of the present disclosure, the concentrator comprises glass, ground glass, glass beads, opal glass, or a compound parabolic concentrator. In some embodiments the concentrator comprises a cylindrical structure having a truncated circular conical structure on top. The truncated section is adjacent the detector. The light concentrator is structured to receive the emitted optical radiation, after reflection by the tissue measurement site, and to direct the reflected light to the detector.

In accordance with certain embodiments of the present disclosure, the processor is configured to determine an average level of the light detected by the detector. The average level of light is used to determine a physiological parameter in the tissue measurement site.

According to another embodiment, a method to determine a constituent or analyte in a patient's blood is disclosed. The method includes emitting, from an emitter, light of at least one wavelength; spreading, with a diffuser, the emitted light and emitting the spread light from the diffuser to a tissue measurement site; receiving, by a concentrator, the spread light after the spread light has been attenuated by the tissue measurement site; concentrating, by the concentrator, the received light and emitting the concentrated light from the concentrator to a detector; detecting, with the detector, the emitted concentrated light; transmitting, from the detector, a signal responsive to the detected light; receiving, by a processor, the transmitted signal responsive to the detected light; and processing, by the processor, the received signal responsive to the detected light to determine a physiological parameter.

In some embodiments, the method to determine a constituent or analyte in a patient's blood includes filtering, with a light-absorbing detector filter, scattered portions of the emitted spread light. According to an embodiment, the light-absorbing detector filter is substantially rectangular in shape and has outer dimensions in the range of approximately 1-5 cm in width and approximately 2-8 cm in length, and has an opening through which emitted light may pass, the opening having dimensions in the range of approximately 0.25-3 cm in width and approximately 1-7 cm in

4

length. In another embodiment, the light-absorbing detector filter is substantially square in shape and has outer dimensions in the range of approximately 0.25-10 cm², and has an opening through which emitted light may pass, the opening having dimensions in the range of approximately 0.1-8 cm². In yet another embodiment, the light-absorbing detector filter is substantially rectangular in shape and has outer dimensions of approximately 3 cm in width and approximately 6 cm in length, and has an opening through which emitted light may pass, the opening having dimensions of approximately 1.5 cm in width and approximately 4 cm in length.

In still other embodiments of the method to determine a constituent or analyte in a patient's blood, spreading, with a diffuser, the emitted light and emitting the spread light from the diffuser to a tissue measurement site is performed by at least one of a glass diffuser, a ground glass diffuser, a glass bead diffuser, an opal glass diffuser, and an engineered diffuser. In some embodiments the emitted spread light is emitted with a substantially uniform intensity profile. And in some embodiments, emitting the spread light from the diffuser to the tissue measurement site includes spreading the emitted light so as to define a surface area shape by which the emitted spread light is distributed onto a surface of the tissue measurement site.

According to yet another embodiment, a pulse oximeter is disclosed. The pulse oximeter includes an emitter configured to emit light at one or more wavelengths. The pulse oximeter also includes a diffuser configured to receive the emitted light, to spread the received light, and to emit the spread light directed at a tissue measurement sight. The pulse oximeter also includes a detector configured to detect the emitted spread light after being attenuated by or reflected from the tissue measurement site and to transmit a signal indicative of the detected light. The pulse oximeter also includes a processor configured to receive the transmitted signal and to process the received signal to determine an average absorbance of a blood constituent or analyte in the tissue measurement site over a larger measurement site area than can be performed with a point light source or point detector. In some embodiments, the diffuser is further configured to define a surface area shape by which the emitted spread light is distributed onto a surface of the tissue measurement site, and the detector is further configured to have a detection area corresponding to the defined surface area shape by which the emitted spread light is distributed onto the surface of the tissue measurement site. According to some embodiments, the detector comprises an array of detectors configured to cover the detection area. In still other embodiments, the processor is further configured to determine an average of the detected light.

For purposes of summarizing, certain aspects, advantages and novel features of the disclosure have been described herein. It is to be understood that not necessarily all such advantages can be achieved in accordance with any particular embodiment of the systems, devices and/or methods disclosed herein. Thus, the subject matter of the disclosure herein can be embodied or carried out in a manner that achieves or optimizes one advantage or group of advantages as taught herein without necessarily achieving other advantages as can be taught or suggested herein.

BRIEF DESCRIPTION OF THE DRAWINGS

Throughout the drawings, reference numbers can be reused to indicate correspondence between referenced ele-

Exhibit 1
-20-

US 10,470,695 B2

5

ments. The drawings are provided to illustrate embodiments of the disclosure described herein and not to limit the scope thereof.

FIG. 1 illustrates a conventional approach to two-dimensional pulse oximetry in which the emitter is configured to emit optical radiation as a point optical source.

FIG. 2 illustrates the disclosed three-dimensional approach to pulse oximetry in which the emitted light irradiates a substantially larger volume of tissue as compared to the point source approach described with respect to FIG. 1.

FIG. 3 illustrates schematically a side view of a three-dimensional pulse oximetry sensor according to an embodiment of the present disclosure.

FIG. 4A is a top view of a portion of a three-dimensional pulse oximetry sensor according to an embodiment of the present disclosure.

FIG. 4B illustrates the top view of a portion of the three-dimensional pulse oximetry sensor shown in FIG. 4A, with the addition of a tissue measurement site in operational position.

FIG. 5 illustrates a top view of a three-dimensional pulse oximetry sensor according to an embodiment of the present disclosure.

FIG. 6 illustrates a conventional two-dimensional approach to reflective pulse oximetry in which the emitter is configured to emit optical radiation as a point optical source.

FIG. 7A is a simplified schematic side view illustration of a reflective three-dimensional pulse oximetry sensor according to an embodiment of the present disclosure.

FIG. 7B is a simplified schematic top view illustration of the three-dimensional reflective pulse oximetry sensor of FIG. 7A.

FIG. 8 illustrates a block diagram of an example pulse oximetry system capable of noninvasively measuring one or more blood analytes in a monitored patient, according to an embodiment of the disclosure.

DETAILED DESCRIPTION

FIG. 1 illustrates schematically a conventional pulse oximetry sensor having a two-dimensional (2D) approach to pulse oximetry. As illustrated, the emitter 104 is configured to emit optical radiation as a point optical source, i.e., an optical radiation source that has negligible dimensions such that it may be considered to be a point. This approach is referred to herein as "two-dimensional" pulse oximetry because it applies a two-dimensional analytical model to the three-dimensional space of the tissue measurement site 102 of the patient. Point optical sources feature a defined, freely selectable, and homogeneous light beam area. Light beams emitted from LED point sources often exhibit a strong focus which can produce a usually sharply-defined and evenly-lit illuminated spot often with high intensity dynamics. Illustratively, when looking at the surface of the tissue measurement site 102 (or "sample tissue"), which in this example is a finger, a small point-like surface area of tissue 204 is irradiated by a point optical source. In some embodiments, the irradiated circular area of the point optical source is in the range between 8 and 150 microns. Illustratively, the emitted point optical source of light enters the tissue measurement site 102 as a point of light. As the light penetrates the depth of the tissue 102, it does so as a line or vector, representing a two-dimensional construct within a three-dimensional structure, namely the patient's tissue 102.

Use of a point optical source is believed to reduce variability in light pathlength which would lead to more

6

accurate oximetry measurements. However, in practice, photons do not travel in straight paths. Instead, the light particles scatter, bouncing around between various irregular objects (such as, for example, red blood cells) in the patient's blood. Accordingly, photon pathlengths vary depending on, among other things, their particular journeys through and around the tissue at the measurement site 102. This phenomenon is referred to as "multiple scattering." In a study, the effects of multiple scattering were examined by comparing the results of photon diffusion analysis with those obtained using an analysis based on the Beer-Lambert law, which neglects multiple scattering in the determination of light pathlength. The study found that that the difference between the average lengths of the paths traveled by red and infrared photons makes the oximeter's calibration curve (based on measurements obtained from normal subjects) sensitive to the total attenuation coefficients of the tissue in the two wavelength bands used for pulse oximetry, as well as to absorption by the pulsating arterial blood.

FIG. 2 illustrates schematically the disclosed systems, devices, and methods to implement three-dimensional (3D) pulse oximetry in which the emitted light irradiates a larger volume of tissue at the measurement site 102 as compared to the 2D point optical source approach described with respect to FIG. 1. In an embodiment, again looking at the surface of the tissue measurement site 102, the irradiated surface area 206 of the measurement site 102 is substantially rectangular in shape with dimensions in the range of approximately 0.25-3 cm in width and approximately 1-6 cm in length. In another embodiment, the irradiated surface area 206 of the measurement site 102 is substantially rectangular in shape and has dimensions of approximately 1.5 cm in width and approximately 2 cm in length. In another embodiment, the irradiated surface area 206 of the measurement site 102 is substantially rectangular in shape and has dimensions of approximately 0.5 cm in width and approximately 1 cm in length. In another embodiment, the irradiated surface area 206 of the measurement site 102 is substantially rectangular in shape has dimensions of approximately 1 cm in width and approximately 1.5 cm in length. In yet another embodiment, the irradiated surface area 206 of the measurement site 102 is substantially square in shape and has dimensions in a range of approximately 0.25-9 cm². In certain embodiments, the irradiated surface area 206 of the measurement site 102 is within a range of approximately 0.5-2 cm in width, and approximately 1-4 cm in length. Of course a skilled artisan will appreciate that many other shapes and dimensions of irradiated surface area 206 can be used. Advantageously, by irradiating the tissue measurement site 102 with a surface area 206, the presently disclosed systems, devices, and methods apply a three-dimensional analytical model to the three-dimensional structure being measured, namely, the patient's tissue 102.

According to the Beer-Lambert law, the amount of light absorbed by a substance is proportional to the concentration of the light-absorbing substance in the irradiated solution (i.e., arterial blood). Advantageously, by irradiating a larger volume of tissue 102, a larger sample size of light attenuated (or reflected) by the tissue 102 is measured. The larger, 3D sample provides a data set that is more representative of the complete interaction of the emitted light as it passes through the patient's blood as compared to the 2D point source approach described above with respect to FIG. 1. By taking an average of the detected light, as detected over a surface area substantially larger than a single point, the disclosed pulse oximetry systems, devices, and methods will yield a

Exhibit 1

-21-

US 10,470,695 B2

7

more accurate measurement of the emitted light absorbed by the tissue, which will lead to a more accurate oxygen saturation measurement.

FIG. **3** illustrates schematically a side view of a pulse oximetry 3D sensor **300** according to an embodiment of the present disclosure. In the illustrated embodiment, the 3D sensor **300** irradiates the tissue measurement site **102** and detects the emitted light, after being attenuated by the tissue measurement site **102**. In other embodiments, for example, as describe below with respect to FIGS. **7A** and **7B**, the 3D sensor **300** can be arranged to detect light that is reflected by the tissue measurement site **102**. The 3D sensor **300** includes an emitter **302**, a light diffuser **304**, a light-absorbing detector filter **306**, a light concentrator **308**, and a detector **310**. In some optional embodiments, the 3D sensor **300** further includes a reflector **305**. The reflector **305** can be a metallic reflector or other type of reflector. Reflector **305** can be a coating, film, layer or other type of reflector. The reflector **305** can serve as a reflector to prevent emitted light from emitting out of a top portion of the light diffuser **304** such that light from the emitter **302** is directed in the tissue rather than escaping out of a side or top of the light diffuser **304**. Additionally, the reflector **305** can prevent ambient light from entering the diffuser **304** which might ultimately cause errors within the detected light. The reflector **305** also prevent light piping that might occur if light from the detector **302** is able to escape from the light diffuser **304** and be pipped around a sensor securement mechanism to detector **310** without passing through the patient's tissue **102**.

The emitter **302** can serve as the source of optical radiation transmitted towards the tissue measurement site **102**. The emitter **302** can include one or more sources of optical radiation, such as LEDs, laser diodes, incandescent bulbs with appropriate frequency-selective filters, combinations of the same, or the like. In an embodiment, the emitter **302** includes sets of optical sources that are capable of emitting visible and near-infrared optical radiation. In some embodiments, the emitter **302** transmits optical radiation of red and infrared wavelengths, at approximately 650 nm and approximately 940 nm, respectively. In some embodiments, the emitter **302** includes a single source optical radiation.

The light diffuser **304** receives the optical radiation emitted from the emitter **302** and spreads the optical radiation over an area, such as the area **206** depicted in FIG. **2**. In some embodiments, the light diffuser **304** is a beam shaper that can homogenize the input light beam from the emitter **302**, shape the output intensity profile of the received light, and define the way (e.g., the shape or pattern) the emitted light is distributed to the tissue measurement site **102**. Examples of materials that can be used to realize the light diffuser **304** include, without limitation, a white surface, glass, ground glass, glass beads, polytetrafluoroethylene (also known as Teflon®), opal glass, and greyed glass, to name a few. Additionally, engineered diffusers can be used to realize the diffuser **304** by providing customized light shaping with respect to intensity and distribution. Such diffusers can, for example, deliver substantially uniform illumination over a specified target area (such as, for example, irradiated surface area **206**) in an energy-efficient manner. Examples of engineered diffusers can include molded plastics with specific shapes, patterns or textures designed to diffuse the emitter light across the entirety of the patient's tissue surface.

Advantageously, the diffuser **304** can receive emitted light in the form of a point optical source and spread the light to fit a desired surface area on a plane defined by the surface of the tissue measurement site **102**. In an embodiment, the diffuser **304** is made of ground glass which spreads the

8

emitted light with a Gausian intensity profile. In another embodiment the diffuser **304** includes glass beads. In some embodiments, the diffuser **304** is constructed so as to diffuse the emitted light in a Lambertian pattern. A Lambertian pattern is one in which the radiation intensity is substantially constant throughout the area of dispersion. One such diffuser **304** is made from opal glass. Opal glass is similar to ground glass, but has one surface coated with a milky white coating to diffuse light evenly. In another embodiment, the diffuser **304** is capable of distributing the emitted light on the surface of a plane (e.g., the surface of the tissue measurement site **102**) in a predefined geometry (e.g., a rectangle, square, or circle), and with a substantially uniform intensity profile and energy distribution. In some embodiments, the efficiency, or the amount of light transmitted by the diffuser **304**, is greater than 70% of the light emitted by the emitter **302**. In some embodiments, the efficiency is greater than 90% of the emitted light. Other optical elements known in the art may be used for the diffuser **304**.

In an embodiment, the diffuser **304** has a substantially rectangular shape having dimensions within a range of approximately 0.5-2 cm in width and approximately 1-4 centimeters in length. In another embodiment, the substantially rectangular shape of the diffuser **304** has dimensions of approximately 0.5 cm in width and approximately 1 cm in length. In another embodiment, the diffuser's **304** substantially rectangular shape has dimensions of approximately 1 cm in width and approximately 1.5 cm in length. In yet another embodiment, the diffuser **304** has a substantially square shape with dimensions in the range of approximately 0.25-10 cm$^2$.

The light-absorbing detector filter **306**, which is also depicted in FIG. **4A** in a top view, is a planar surface having an opening **402** through which the emitted light may pass after being attenuated by the tissue measurement site **102**. In the depicted embodiment, the opening **402** is rectangular-shaped, with dimensions substantially similar to the irradiated surface area **206**. According to an embodiment, the light-absorbing detector filter is substantially rectangular in shape and has outer dimensions of 4 cm in width and 8 cm in length, and has an opening through which emitted light may pass, the opening having dimensions of 2 cm in width and 5 cm in length. In another embodiment, the light-absorbing detector filter is substantially rectangular in shape and has outer dimensions in the range of 1-3 cm in width and 2-8 cm in length, and has an opening through which emitted light may pass, the opening having dimensions in the range of 0.25-2 cm in width and 1-4 cm in length. In yet another embodiment, the light-absorbing detector filter is substantially rectangular in shape and has outer dimensions of 3 cm in width and 6 cm in length, and has an opening through which emitted light may pass, the opening having dimensions of 1.5 cm in width and 4 cm in length.

The top surface of the light-absorbing filter **306** (facing the tissue measurement site **102** and the emitter **302**) is coated with a material that absorbs light, such as, for example, black pigment. Many other types of light-absorbing materials are well known in the art and can be used with the detector filter **306**. During operation, light emitted from the emitter **302** can reflect off of the tissue measurement site **102** (or other structures within the 3D sensor **300**) to neighboring portions of the 3D sensor **300**. If those neighboring portions of the 3D sensor **300** possess reflective surfaces, then the light can reflect back to the tissue measurement site **102**, progress through the tissue and arrive at the detector **310**. Such multiple scattering can result in detecting photons whose pathlengths are considerably lon-

Exhibit 1

-22-

US 10,470,695 B2

9

ger than most of the light that is detected, thereby introducing variations in pathlength which will affect the accuracy of the measurements of the pulse oximetry 3D sensor 300. Advantageously, the light-absorbing filter 306 reduces or eliminates the amount of emitted light that is reflected in this manner because it absorbs such reflected light, thereby stopping the chain of scattering events. In certain embodiments, the sensor-facing surfaces of other portions of the 3D sensor 300 are covered in light-absorbing material to further decrease the effect of reflective multiple scattering.

The light concentrator 308 is a structure to receive the emitted optical radiation, after attenuation by the tissue measurement site 102, to collect and concentrate the dispersed optical radiation, and to direct the collected and concentrated optical radiation to the detector 310. In an embodiment, the light concentrator 308 is made of ground glass or glass beads. In some embodiments, the light concentrator 308 includes a compound parabolic concentrator.

As described above with respect to FIG. 1, the detector 310 captures and measures light from the tissue measurement site 102. For example, the detector 310 can capture and measure light transmitted from the emitter 302 that has been attenuated by the tissue in the measurement site 102. The detector 310 can output a detector signal responsive to the light captured or measured. The detector 310 can be implemented using one or more photodiodes, phototransistors, or the like. In addition, a plurality of detectors 310 can be arranged in an array with a spatial configuration corresponding to the irradiated surface area 206 to capture the attenuated or reflected light from the tissue measurement site.

Referring to FIG. 4A, a top view of a portion of the 3D sensor 300 is provided. The light-absorbing detector filter 306 is illustrated having a top surface coated with a light-absorbing material. The light-absorbing material can be a black opaque material or coating or any other dark color or coating configured to absorb light. Additionally, a rectangular opening 402 is positioned relative to the light concentrator 308 (shown in phantom) and the detector 310 such that light may pass through the rectangular opening 402, into the light concentrator 308, and to the detector 310. FIG. 4B illustrates the top view of a portion of the 3D sensor 300 as in FIG. 4A, with the addition of the tissue measurement site 102 in operational position. Accordingly, the rectangular opening 402, the light concentrator 308 and the detector 310 are shown in phantom as being under the tissue measurement site 102. In FIGS. 4A and 4B, the light concentrator 308 is shown to have dimensions significantly larger than the dimensions of the rectangular opening 402. In other embodiments, the dimensions of the light concentrator 308, the rectangular opening 402, and the irradiated surface area 206 are substantially similar.

FIG. 5 illustrates a top view of a 3D pulse oximetry sensor 500 according to an embodiment of the present disclosure. The 3D sensor 500 is configured to be worn on a patient's finger 102. The 3D sensor 500 includes an adhesive substrate 502 having front flaps 504 and rear flaps 506 extending outward from a center portion 508 of the 3D sensor 500. The center portion 508 includes components of the 3D pulse oximetry sensor 300 described with respect to FIGS. 3, 4A and 4B. On the front side of the adhesive substrate 502 the emitter 302 and the light diffuser 304 are positioned. On the rear side of the adhesive substrate 502 the light-absorbent detector filter 306, the light concentrator 308 and the detector 310 are positioned. In use, the patient's finger serving as the tissue measurement site 102 is positioned over the rectangular opening 402 such that when the front portion of the adhesive substrate is folded over on top of the patient's

10

finger 102, the emitter 302 and the light diffuser 304 are aligned with the measurement site 102, the filter 306, the light concentrator 308 and the detector 310. Once alignment is established, the front and rear flaps 504, 506 can be wrapped around the finger measurement site 102 such that the adhesive substrate 502 provides a secure contact between the patient's skin and the 3D sensor 500. FIG. 5 also illustrates an example of a sensor connector cable 510 which is used to connect the 3D sensor 500 to a monitor 809, as described with respect to FIG. 8.

FIG. 6 is a simplified schematic illustration of a conventional, 2D approach to reflective pulse oximetry in which the emitter is configured to emit optical radiation as a point optical source. Reflective pulse oximetry is a method by which the emitter and detector are located on the same side of the tissue measurement site 102. Light is emitted into a tissue measurement site 102 and attenuated. The emitted light passes into the tissue 102 and is then reflected back to the same side of the tissue measurement site 102 as the emitter. As illustrated in FIG. 6, a depicted reflective 2D pulse oximetry sensor 600 includes an emitter 602, a light block 606, and a detector 610. The light block 606 is necessary because the emitter 602 and the detector 610 are located on the same side of the tissue measurement site 102. Accordingly, the light block 606 prevents incident emitter light, which did not enter the tissue measurement site 102, from arriving at the detector 610. The depicted 2D pulse oximetry sensor 600 is configured to emit light as a point source. As depicted in FIG. 6, a simplified illustration of the light path 620 of the emitted light from the emitter 602, through the tissue measurement site 102, and to the detector 610 is provided. Notably, a point source of light is emitted, and a point source of light is detected. As discussed above with respect to FIG. 1, use of a point optical source can result in substantial measurement error due to pathlength variability resulting from the multiple scatter phenomenon. The sample space provided by a 2D point optical emitter source is not large enough to account for pathlength variability, which will skew measurement results.

FIGS. 7A and 7B are simplified schematic side and top views, respectively, of a 3D reflective pulse oximetry sensor 700 according to an embodiment of the present disclosure. In the illustrated embodiment, the 3D sensor 700 irradiates the tissue measurement site 102 and detects the emitted light that is reflected by the tissue measurement site 102. The 3D sensor 700 can be placed on a portion of the patient's body that has relatively flat surface, such as, for example a wrist, because the emitter 702 and detector 710 are on located the same side of the tissue measurement site 102. The 3D sensor 700 includes an emitter 702, a light diffuser 704, a light block 706, a light concentrator 708, and a detector 710.

As previously described, the emitter 702 can serve as the source of optical radiation transmitted towards the tissue measurement site 102. The emitter 702 can include one or more sources of optical radiation. Such sources of optical radiation can include LEDs, laser diodes, incandescent bulbs with appropriate frequency-selective filters, combinations of the same, or the like. In an embodiment, the emitter 702 includes sets of optical sources that are capable of emitting visible and near-infrared optical radiation. In some embodiments, the emitter 702 transmits optical radiation of red and infrared wavelengths, at approximately 650 nm and approximately 940 nm, respectively. In some embodiments, the emitter 702 includes a single source of optical radiation.

The light diffuser 704 receives the optical radiation emitted from the emitter 302 and homogenously spreads the optical radiation over a wide, donut-shaped area, such as the

Exhibit 1

-23-

US 10,470,695 B2

11

12

area outlined by the light diffuser **704** as depicted in FIG. 7B. Advantageously, the diffuser **704** can receive emitted light in the form of a 2D point optical source (or any other form) and spread the light to fit the desired surface area on a plane defined by the surface of the tissue measurement site **102**. In an embodiment, the diffuser **704** is made of ground glass or glass beads. A skilled artisan will understand that may other materials can be used to make the light diffuser **704**.

The light blocker **706** includes an annular ring having a cover portion **707** sized and shaped to form a light isolation chamber for the light concentrator **708** and the detector **710**. (For purposes of illustration, the light block cover **707** is not illustrated in FIG. 7B.) The light blocker **706** and the cover **707** can be made of any material that optically isolates the light concentrator **708** and the detector **710**. The light isolation chamber formed by the light blocker **706** and cover **708** ensures that the only light detected by the detector **710** is light that is reflected from the tissue measurement site.

The light concentrator **708** is a cylindrical structure with a truncated circular conical structure on top, the truncated section of which of which is adjacent the detector **710**. The light concentrator **708** is structured to receive the emitted optical radiation, after reflection by the tissue measurement site **102**, and to direct the reflected light to the detector **710**. In an embodiment, the light concentrator **708** is made of ground glass or glass beads. In some embodiments, the light concentrator **708** includes a compound parabolic concentrator.

As previously described, the detector **710** captures and measures light from the tissue measurement site **102**. For example, the detector **710** can capture and measure light transmitted from the emitter **702** that has been reflected from the tissue in the measurement site **102**. The detector **710** can output a detector signal responsive to the light captured or measured. The detector **710** can be implemented using one or more photodiodes, phototransistors, or the like. In addition, a plurality of detectors **710** can be arranged in an array with a spatial configuration corresponding to the irradiated surface area depicted in FIG. 7B by the light concentrator **708** to capture the reflected light from the tissue measurement site.

Advantageously, the light path **720** illustrated in FIG. 7A depicts a substantial sample of reflected light that enter the light isolation chamber formed by the light blocker **706** and cover **707**. As previously discussed, the large sample of reflected light (as compared to the reflected light collected using the 2D point optical source approach) provides the opportunity to take an average of the detected light, to derive a more accurate measurement of the emitted light absorbed by the tissue, which will lead to a more accurate oxygen saturation measurement.

Referring now to FIG. 7B, a top view of the 3D sensor **700** is illustrated with both the emitter **702** and the light blocker cover **707** removed for ease of illustration. The outer ring illustrates the footprint of the light diffuser **704**. As light is emitted from the emitter **702** (not shown in FIG. 7B), it is diffused homogenously and directed to the tissue measurement site **102**. The light blocker **706** forms the circular wall of a light isolation chamber to keep incident light from being sensed by the detector **710**. The light blocker cover **707** blocks incidental light from entering the light isolation chamber from above. The light concentrator **708** collects the reflected light from the tissue measurement site **102** and funnels it upward toward the detector **710** at the center of the 3D sensor **700**.

FIG. **8** illustrates an example of an optical physiological measurement system **800**, which may also be referred to herein as a pulse oximetry system **800**. In certain embodiments, the pulse oximetry system **800** noninvasively measures a blood analyte, such as oxygen, carboxyhemoglobin, methemoglobin, total hemoglobin, glucose, proteins, lipids, a percentage thereof (e.g., saturation), pulse rate, perfusion index, oxygen content, total hemoglobin, Oxygen Reserve Index™ (ORI™) or many other physiologically relevant patient characteristics. These characteristics can relate to, for example, pulse rate, hydration, trending information and analysis, and the like. The system **800** can also measure additional blood analytes and/or other physiological parameters useful in determining a state or trend of wellness of a patient.

The pulse oximetry system **800** can measure analyte concentrations at least in part by detecting optical radiation attenuated by tissue at a measurement site **102**. The measurement site **102** can be any location on a patient's body, such as a finger, foot, earlobe, wrist, forehead, or the like.

The pulse oximetry system **800** can include a sensor **801** (or multiple sensors) that is coupled to a processing device or physiological monitor **809**. In an embodiment, the sensor **801** and the monitor **809** are integrated together into a single unit. In another embodiment, the sensor **801** and the monitor **809** are separate from each other and communicate with one another in any suitable manner, such as via a wired or wireless connection. The sensor **801** and monitor **809** can be attachable and detachable from each other for the convenience of the user or caregiver, for ease of storage, sterility issues, or the like.

In the depicted embodiment shown in FIG. **8**, the sensor **801** includes an emitter **804**, a detector **806**, and a front-end interface **808**. The emitter **804** can serve as the source of optical radiation transmitted towards measurement site **102**. The emitter **804** can include one or more sources of optical radiation, such as light emitting diodes (LEDs), laser diodes, incandescent bulbs with appropriate frequency-selective filters, combinations of the same, or the like. In an embodiment, the emitter **804** includes sets of optical sources that are capable of emitting visible and near-infrared optical radiation.

The pulse oximetry system **800** also includes a driver **811** that drives the emitter **804**. The driver **111** can be a circuit or the like that is controlled by the monitor **809**. For example, the driver **811** can provide pulses of current to the emitter **804**. In an embodiment, the driver **811** drives the emitter **804** in a progressive fashion, such as in an alternating manner. The driver **811** can drive the emitter **804** with a series of pulses for some wavelengths that can penetrate tissue relatively well and for other wavelengths that tend to be significantly absorbed in tissue. A wide variety of other driving powers and driving methodologies can be used in various embodiments. The driver **811** can be synchronized with other parts of the sensor **801** to minimize or reduce jitter in the timing of pulses of optical radiation emitted from the emitter **804**. In some embodiments, the driver **811** is capable of driving the emitter **804** to emit optical radiation in a pattern that varies by less than about 10 parts-per-million.

The detector **806** captures and measures light from the tissue measurement site **102**. For example, the detector **806** can capture and measure light transmitted from the emitter **804** that has been attenuated or reflected from the tissue at the measurement site **102**. The detector **806** can output a detector signal **107** responsive to the light captured and measured. The detector **806** can be implemented using one

Exhibit 1

-24-

US 10,470,695 B2

13

or more photodiodes, phototransistors, or the like. In some embodiments, a detector **806** is implemented in detector package to capture and measure light from the tissue measurement site **102** of the patient. The detector package can include a photodiode chip mounted to leads and enclosed in an encapsulant. In some embodiments, the dimensions of the detector package are approximately 2 square centimeters. In other embodiments, the dimensions of the detector package are approximately 1.5 centimeters in width and approximately 2 centimeters in length.

The front-end interface **808** provides an interface that adapts the output of the detectors **806**, which is responsive to desired physiological parameters. For example, the front-end interface **808** can adapt the signal **807** received from the detector **806** into a form that can be processed by the monitor **809**, for example, by a signal processor **810** in the monitor **809**. The front-end interface **808** can have its components assembled in the sensor **801**, in the monitor **809**, in a connecting cabling (if used), in combinations of the same, or the like. The location of the front-end interface **808** can be chosen based on various factors including space desired for components, desired noise reductions or limits, desired heat reductions or limits, and the like.

The front-end interface **808** can be coupled to the detector **806** and to the signal processor **810** using a bus, wire, electrical or optical cable, flex circuit, or some other form of signal connection. The front-end interface **808** can also be at least partially integrated with various components, such as the detectors **806**. For example, the front-end interface **808** can include one or more integrated circuits that are on the same circuit board as the detector **806**. Other configurations can also be used.

As shown in FIG. **8**, the monitor **909** can include the signal processor **810** and a user interface, such as a display **812**. The monitor **809** can also include optional outputs alone or in combination with the display **812**, such as a storage device **814** and a network interface **816**. In an embodiment, the signal processor **810** includes processing logic that determines measurements for desired analytes based on the signals received from the detector **806**. The signal processor **810** can be implemented using one or more microprocessors or sub-processors (e.g., cores), digital signal processors, application specific integrated circuits (ASICs), field programmable gate arrays (FPGAs), combinations of the same, and the like.

The signal processor **810** can provide various signals that control the operation of the sensor **801**. For example, the signal processor **810** can provide an emitter control signal to the driver **811**. This control signal can be useful in order to synchronize, minimize, or reduce jitter in the timing of pulses emitted from the emitter **804**. Accordingly, this control signal can be useful in order to cause optical radiation pulses emitted from the emitter **804** to follow a precise timing and consistent pattern. For example, when a transimpedance-based front-end interface **808** is used, the control signal from the signal processor **810** can provide synchronization with an analog-to-digital converter (ADC) in order to avoid aliasing, cross-talk, and the like. As also shown, an optional memory **813** can be included in the front-end interface **808** and/or in the signal processor **810**. This memory **813** can serve as a buffer or storage location for the front-end interface **808** and/or the signal processor **810**, among other uses.

The user interface **812** can provide an output, e.g., on a display, for presentation to a user of the pulse oximetry system **800**. The user interface **812** can be implemented as a touch-screen display, a liquid crystal display (LCD), an organic LED display, or the like. In alternative embodiments, the pulse oximetry system **800** can be provided without a user interface **812** and can simply provide an output signal to a separate display or system.

The storage device **814** and a network interface **816** represent other optional output connections that can be included in the monitor **809**. The storage device **814** can include any computer-readable medium, such as a memory device, hard disk storage, EEPROM, flash drive, or the like. The various software and/or firmware applications can be stored in the storage device **814**, which can be executed by the signal processor **810** or another processor of the monitor **809**. The network interface **816** can be a serial bus port (RS-232/RS-485), a Universal Serial Bus (USB) port, an Ethernet port, a wireless interface (e.g., WiFi such as any 802.1x interface, including an internal wireless card), or other suitable communication device(s) that allows the monitor **809** to communicate and share data with other devices. The monitor **809** can also include various other components not shown, such as a microprocessor, graphics processor, or controller to output the user interface **812**, to control data communications, to compute data trending, or to perform other operations.

Although not shown in the depicted embodiment, the pulse oximetry system **800** can include various other components or can be configured in different ways. For example, the sensor **801** can have both the emitter **804** and detector **806** on the same side of the tissue measurement site **102** and use reflectance to measure analytes.

Although the foregoing disclosure has been described in terms of certain preferred embodiments, many other variations than those described herein will be apparent to those of ordinary skill in the art.

Conditional language used herein, such as, among others, "can," "might," "may," "e.g.," and the like, unless specifically stated otherwise, or otherwise understood within the context as used, is generally intended to convey that certain embodiments include, while other embodiments do not include, certain features, elements and/or states. Thus, such conditional language is not generally intended to imply that features, elements and/or states are in any way required for one or more embodiments or that one or more embodiments necessarily include logic for deciding, with or without author input or prompting, whether these features, elements and/or states are included or are to be performed in any particular embodiment. The terms "comprising," "including," "having," and the like are synonymous and are used inclusively, in an open-ended fashion, and do not exclude additional elements, features, acts, operations, and so forth. Also, the term "or" is used in its inclusive sense (and not in its exclusive sense) so that when used, for example, to connect a list of elements, the term "or" means one, some, or all of the elements in the list. Further, the term "each," as used herein, in addition to having its ordinary meaning, can mean any subset of a set of elements to which the term "each" is applied.

While the above detailed description has shown, described, and pointed out novel features as applied to various embodiments, it will be understood that various omissions, substitutions, and changes in the form and details of the systems, devices or algorithms illustrated can be made without departing from the spirit of the disclosure. As will be recognized, certain embodiments of the disclosure described herein can be embodied within a form that does not provide all of the features and benefits set forth herein, as some features can be used or practiced separately from others.

Exhibit 1
-25-

US 10,470,695 B2

15

The term "and/or" herein has its broadest, least limiting meaning which is the disclosure includes A alone, B alone, both A and B together, or A or B alternatively, but does not require both A and B or require one of A or one of B. As used herein, the phrase "at least one of" A, B, "and" C should be construed to mean a logical A or B or C, using a non-exclusive logical or.

The apparatuses and methods described herein may be implemented by one or more computer programs executed by one or more processors. The computer programs include processor-executable instructions that are stored on a non-transitory tangible computer readable medium. The computer programs may also include stored data. Non-limiting examples of the non-transitory tangible computer readable medium are nonvolatile memory, magnetic storage, and optical storage. Although the foregoing disclosure has been described in terms of certain preferred embodiments, other embodiments will be apparent to those of ordinary skill in the art from the disclosure herein. Additionally, other combinations, omissions, substitutions and modifications will be apparent to the skilled artisan in view of the disclosure herein. Accordingly, the present invention is not intended to be limited by the description of the preferred embodiments, but is to be defined by reference to claims.

Additionally, all publications, patents, and patent applications mentioned in this specification are herein incorporated by reference to the same extent as if each individual publication, patent, or patent application were specifically and individually indicated to be incorporated by reference.

What is claimed is:

**1.** A wrist-worn physiological monitoring device configured for placement on a user at a tissue measurement site, the device comprising:

a light emission source comprising a plurality of emitters configured to irradiate the tissue measurement site by emitting light towards the tissue measurement site, the tissue measurement site being located on a wrist of the user, the plurality of emitters configured to emit one or more wavelengths;

a plurality of detectors configured to detect the light emitted by the plurality of emitters after attenuation by a circular portion of the tissue measurement site, the plurality of detectors further configured to output at least one signal responsive to the detected light;

a processor configured to receive the at least one signal responsive to the output and determine a physiological parameter of the user; and

a light block forming an enclosing wall between the light emission source and the plurality of detectors, the light block defining the circular portion of the tissue measurement site, the light emission source arranged proximate a first side of the enclosing wall and the plurality of detectors arranged proximate a second side of the enclosing wall, the first side being different than the second side,

wherein the enclosing wall prevents at least a portion of light emitted from the light emission source from being detected by the plurality of detectors without attenuation by the tissue, and wherein the plurality of detectors are arranged in an array having a spatial configuration corresponding to the circular portion of the tissue measurement site.

**2.** The physiological monitoring device of claim **1**, further comprising a display configured to present information related to the determined physiological parameter to the user.

16

**3.** The physiological monitoring device of claim **2**, wherein the display is a touch-screen display.

**4.** The physiological monitoring device of claim **1**, wherein the enclosing wall of the light block is a circular wall.

**5.** The physiological monitoring device of claim **1**, wherein, when the physiological monitoring device is worn by the user at the tissue measurement site, the plurality of emitters are arranged in a reflectance measurement configuration on a first side of the tissue measurement site, and wherein the plurality of detectors are arranged in a reflectance measurement configuration on the first side of the tissue measurement site when the physiological monitoring device is worn by the user.

**6.** The physiological monitoring device of claim **1**, further comprising a diffuser which receives, spreads, and emits the spread light, wherein the emitted spread light is directed at the tissue measurement site.

**7.** The physiological monitoring device of claim **1**, wherein the light emission source is positioned outside the enclosing wall when the physiological monitoring device is worn by the user at the tissue measurement site, and wherein the plurality of detectors are positioned inside the enclosing wall when the physiological monitoring device is worn by the user at the tissue measurement site.

**8.** The physiological monitoring device of claim **1**, wherein the physiological parameter is selected from the group consisting of arterial oxygen saturation, glucose, and pulse rate.

**9.** A method of measuring a physiological parameter in a user's blood, the method comprising:

irradiating a tissue measurement site by emitting, from a plurality of emitters of a light emission source of a physiological monitoring device, light of one or more wavelengths toward the tissue measurement site, the tissue measurement site located on a wrist of the user;

detecting, with a plurality of detectors, the light emitted by the plurality of emitters of the light emission source after attenuation through a circular portion of the tissue measurement site; and

providing a cylindrical light block forming an enclosing wall between the light emission source and the plurality of detectors, the light emission source arranged proximate a first side of the enclosing wall and the plurality of detectors arranged proximate a second side of the enclosing wall, the first side being different than the second side, wherein the enclosing wall prevents at least a portion of light emitted from the light emission source from being detected by the plurality of detectors without attenuation by the tissue measurement site, and wherein the plurality of detectors are arranged in an array having a circular spatial configuration, the circular spatial configuration arranged to receive said attenuated light;

outputting, from the plurality of detectors, at least one signal responsive to the detected light;

receiving, by a processor, the outputted at least one signal responsive to the detected light; and processing, by the processor, the received at least one signal responsive to the detected light to determine a physiological parameter.

**10.** The method of claim **9**, wherein the light emission source is positioned outside the enclosing wall when the physiological monitoring device is worn by the user at the tissue measurement site, and wherein the plurality of detec-

**Exhibit 1**

**-26-**

US 10,470,695 B2

17

tors are positioned inside the enclosing wall when the physiological monitoring device is worn by the user at the tissue measurement site.

**11.** The method of claim **9**, further comprising presenting, with a display of the physiological monitoring device, information related to the determined physiological parameter to the user.

**12.** The method of claim **11**, wherein the display is a touch-screen display.

**13.** The method of claim **9**, wherein when the physiological monitoring device is worn by the user at the tissue measurement site, the plurality of emitters are arranged in a reflectance measurement configuration on a first side of the tissue measurement site, and wherein the plurality of detectors are arranged in a reflectance measurement configuration on the first side of the tissue measurement site when the physiological monitoring device is worn by the user.

**14.** The method of claim **9**, further comprising spreading, with a diffuser, the emitted light and emitting the spread light from the diffuser to the tissue measurement site.

**15.** The method of claim **9**, wherein the physiological parameter is indicative of at least one of pulse rate, perfusion index, oxygen saturation, and total hemoglobin.

**16.** The method of claim **9**, wherein the plurality of emitters comprise one or more light emitting diodes (LEDs), and wherein the one or more wavelengths comprises at least an infrared wavelength.

**17.** The method of claim **9**, wherein the plurality of detectors comprise a plurality of photodiodes.

**18.** The method of claim **9**, further comprising, directing, with a light concentrator, the light emitted by the light emission source after attenuation through tissue of the user at the tissue measurement site to the plurality of detectors.

**19.** A wrist-worn physiological monitoring sensor comprising:

a light emission source comprising a plurality of optical sources configured to irradiate a tissue measurement site by emitting light towards the tissue measurement site on a user, the tissue measurement site located on a wrist of the user, the plurality of optical sources configured to emit one or more wavelengths;

a plurality of detectors configured to detect the light emitted by the plurality of emitters after attenuation by a circular portion of the tissue measurement site, the plurality of detectors further configured to output at least one signal responsive to the detected light;

a processor configured to receive the outputted at least one signal responsive to the detected light and determine a physiological parameter indicative of a state or trend of wellness of the user; and

a light block forming an enclosing wall between the light emission source and the plurality of detectors, the light emission source arranged proximate a first side of the enclosing wall and the plurality of detectors arranged proximate a second side of the enclosing wall, the first side being different than the second side, the light block

18

forming a light isolation chamber defined by the enclosing wall, wherein the enclosing wall prevents at least a portion of light emitted from the light emission source from being detected by the plurality of detectors without attenuation by the tissue, and wherein the plurality of detectors are arranged in an array having a circular spatial configuration, the circular spatial configuration arranged to receive said attenuated light.

**20.** The physiological monitoring sensor of claim **19**, wherein the light emission source is located outside the enclosing wall when the physiological monitoring sensor is worn by the user at the tissue measurement site, and wherein the plurality of detectors are arranged inside the enclosing wall when the physiological monitoring sensor is worn by the user at the tissue measurement site.

**21.** The physiological monitoring sensor of claim **19**, further comprising a diffuser which receives, spreads, and emits the spread light, wherein the emitted spread light is directed at the tissue measurement site.

**22.** The physiological monitoring sensor of claim **19**, further comprising a display configured to present information related to the determined physiological parameter to the user.

**23.** The physiological monitoring sensor of claim **22**, wherein the display is a touch-screen display.

**24.** The physiological monitoring sensor of claim **19**, wherein when the physiological monitoring sensor is worn by the user at the tissue measurement site, the plurality of optical sources are arranged in a reflectance measurement configuration on a first side of the tissue measurement site, and wherein the plurality of detectors are arranged in a reflectance measurement configuration on the first side of the tissue measurement site when the physiological monitoring sensor is worn by the user.

**25.** The physiological monitoring device of claim **1**, wherein the plurality of emitters comprise one or more light emitting diodes (LEDs), and wherein the one or more wavelengths comprises at least an infrared wavelength.

**26.** The physiological monitoring device of claim **1**, wherein the plurality of detectors comprise a plurality of photodiodes.

**27.** The physiological monitoring device of claim **1**, further comprising a light concentrator configured to direct the attenuated, reflected light to the plurality of detectors.

**28.** The physiological monitoring sensor of claim **19**, wherein the plurality of optical sources comprise one or more light emitting diodes (LEDs), and wherein the one or more wavelengths comprises at least an infrared wavelength.

**29.** The physiological monitoring sensor of claim **19**, wherein the plurality of detectors comprise a plurality of photodiodes.

**30.** The physiological monitoring sensor of claim **19**, further comprising a light concentrator configured to direct the attenuated, reflected light to the plurality of detectors.

\* \* \* \* \*

Exhibit 1

-27-

US010433776B2

## (12) United States Patent
Al-Ali

(10) Patent No.: **US 10,433,776 B2**

(45) Date of Patent: *Oct. 8, 2019

(54) **LOW POWER PULSE OXIMETER**

(71) Applicant: **Masimo Corporation**, Irvine, CA (US)

(72) Inventor: **Ammar Al-Ali**, Tustin, CA (US)

(73) Assignee: **MASIMO CORPORATION**, Irvine, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/174,144**

(22) Filed: **Oct. 29, 2018**

(65) **Prior Publication Data**

US 2019/0069814 A1    Mar. 7, 2019

**Related U.S. Application Data**

(63) Continuation of application No. 15/820,082, filed on Nov. 21, 2017, which is a continuation of application No. 13/908,957, filed on Jun. 3, 2013, now Pat. No. 9,848,806, which is a continuation of application No. 11/939,519, filed on Nov. 13, 2007, now Pat. No. 8,457,703, which is a continuation of application No. 10/785,573, filed on Feb. 24, 2004, now Pat. No. 7,295,866, which is a continuation of application No.

(Continued)

(51) **Int. Cl.**
*A61B 5/1455*      (2006.01)

(52) **U.S. Cl.**
CPC ........ *A61B 5/1455* (2013.01); *A61B 5/14551* (2013.01); *A61B 2560/0209* (2013.01)

(58) **Field of Classification Search**
CPC .. A61B 5/00; A61B 5/02; A61B 5/021; A61B 5/0205; A61B 5/03; A61B 5/04; A61B 5/0059; A61B 5/08; A61B 5/103; A61B 5/0093; A61B 5/68; A61B 5/145; A61B 5/1455; A61B 5/14551

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| 4,907,183 A | * | 3/1990 | Tanaka | G06F 1/30 |
| | | | | 365/229 |
| 4,960,128 A | | 10/1990 | Gordon et al. | |
| 4,964,408 A | | 10/1990 | Hink et al. | |

(Continued)

FOREIGN PATENT DOCUMENTS

| EP | 0 872 210 A1 | 10/1998 |
| WO | WO 99/63883 | 12/1999 |

OTHER PUBLICATIONS

US 8,845,543 B2, 09/2014, Diab et al. (withdrawn)

(Continued)

*Primary Examiner* — Eric F Winakur
*Assistant Examiner* — Chu Chuan Liu
(74) *Attorney, Agent, or Firm* — Knobbe, Martens, Olson & Bear, LLP

(57)                    **ABSTRACT**

A pulse oximeter may reduce power consumption in the absence of overriding conditions. Various sampling mechanisms may be used individually or in combination. Various parameters may be monitored to trigger or override a reduced power consumption state. In this manner, a pulse oximeter can lower power consumption without sacrificing performance during, for example, high noise conditions or oxygen desaturations.

**16 Claims, 11 Drawing Sheets**



Exhibit 2
-28-

## US 10,433,776 B2

Page 2

### Related U.S. Application Data

10/184,028, filed on Jun. 26, 2002, now Pat. No. 6,697,658.

(60)  Provisional application No. 60/302,564, filed on Jul. 2, 2001.

(56)                    **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,041,187 A | 8/1991 | Hink et al. | |
| 5,069,213 A | 12/1991 | Polczynski | |
| 5,069,214 A * | 12/1991 | Samaras | A61B 5/14551 600/323 |
| 5,163,438 A | 11/1992 | Gordon et al. | |
| 5,238,001 A * | 8/1993 | Gallant | A61B 5/0205 600/513 |
| 5,279,298 A * | 1/1994 | Flower | A61B 3/1241 351/206 |
| 5,319,355 A | 6/1994 | Russek | |
| 5,337,744 A | 8/1994 | Branigan | |
| 5,341,805 A | 8/1994 | Stavridi et al. | |
| D353,195 S | 12/1994 | Savage et al. | |
| D353,196 S | 12/1994 | Savage et al. | |
| 5,377,676 A | 1/1995 | Vari et al. | |
| D359,546 S | 6/1995 | Savage et al. | |
| 5,431,170 A | 7/1995 | Mathews | |
| D361,840 S | 8/1995 | Savage et al. | |
| D362,063 S | 9/1995 | Savage et al. | |
| 5,452,717 A | 9/1995 | Branigan et al. | |
| D363,120 S | 10/1995 | Savage et al. | |
| 5,456,252 A | 10/1995 | Vari et al. | |
| 5,479,934 A | 1/1996 | Imran | |
| 5,482,036 A | 1/1996 | Diab et al. | |
| 5,490,505 A | 2/1996 | Diab et al. | |
| 5,490,523 A | 2/1996 | Isaacson et al. | |
| 5,494,043 A | 2/1996 | O'Sullivan et al. | |
| 5,533,511 A | 7/1996 | Kaspari et al. | |
| 5,534,851 A | 7/1996 | Russek | |
| 5,561,275 A | 10/1996 | Savage et al. | |
| 5,562,002 A | 10/1996 | Lalin | |
| 5,590,649 A | 1/1997 | Caro et al. | |
| 5,602,924 A | 2/1997 | Durand et al. | |
| 5,619,992 A | 4/1997 | Guthrie et al. | |
| 5,632,272 A | 5/1997 | Diab et al. | |
| 5,638,816 A | 6/1997 | Kiani-Azarbayjany et al. | |
| 5,638,818 A | 6/1997 | Diab et al. | |
| 5,645,440 A | 7/1997 | Tobler et al. | |
| 5,685,299 A | 11/1997 | Diab et al. | |
| D393,830 S | 4/1998 | Tobler et al. | |
| 5,743,262 A | 4/1998 | Lepper, Jr. et al. | |
| 5,746,694 A | 5/1998 | Wilk et al. | |
| 5,758,644 A | 6/1998 | Diab et al. | |
| 5,760,910 A | 6/1998 | Lepper, Jr. et al. | |
| 5,769,785 A | 6/1998 | Diab et al. | |
| 5,782,757 A | 7/1998 | Diab et al. | |
| 5,785,659 A | 7/1998 | Caro et al. | |
| 5,791,347 A | 8/1998 | Flaherty et al. | |
| 5,797,841 A | 8/1998 | Delonzor et al. | |
| 5,810,734 A | 9/1998 | Caro et al. | |
| 5,823,950 A | 10/1998 | Diab et al. | |
| 5,827,969 A | 10/1998 | Lee et al. | |
| 5,830,131 A | 11/1998 | Caro et al. | |
| 5,833,618 A | 11/1998 | Caro et al. | |
| 5,860,919 A | 1/1999 | Kiani-Azarbayjany et al. | |
| 5,890,929 A | 4/1999 | Mills et al. | |
| 5,904,654 A | 5/1999 | Wohltmann et al. | |
| 5,919,134 A | 7/1999 | Diab | |
| 5,924,979 A | 7/1999 | Swedlow et al. | |
| 5,934,925 A | 8/1999 | Tobler et al. | |
| 5,940,182 A | 8/1999 | Lepper, Jr. et al. | |
| 5,987,343 A | 11/1999 | Kinast | |
| 5,995,855 A | 11/1999 | Kiani et al. | |
| 5,997,343 A | 12/1999 | Mills et al. | |
| 6,002,952 A | 12/1999 | Diab et al. | |
| 6,011,986 A | 1/2000 | Diab et al. | |
| 6,027,452 A | 2/2000 | Flaherty et al. | |
| 6,036,642 A | 3/2000 | Diab et al. | |
| 6,045,509 A | 4/2000 | Caro et al. | |
| 6,067,462 A | 5/2000 | Diab et al. | |
| 6,081,735 A | 6/2000 | Diab et al. | |
| 6,088,607 A | 7/2000 | Diab et al. | |
| 6,110,522 A | 8/2000 | Lepper, Jr. et al. | |
| 6,115,622 A | 9/2000 | Minoz | |
| 6,124,597 A | 9/2000 | Shehada | |
| 6,128,521 A | 10/2000 | Marro et al. | |
| 6,129,675 A | 10/2000 | Jay | |
| 6,144,868 A | 11/2000 | Parker | |
| 6,151,516 A | 11/2000 | Kiani-Azarbayjany et al. | |
| 6,152,754 A | 11/2000 | Gerhardt et al. | |
| 6,157,850 A | 12/2000 | Diab et al. | |
| 6,165,005 A | 12/2000 | Mills et al. | |
| 6,184,521 B1 | 2/2001 | Coffin, IV et al. | |
| 6,206,830 B1 | 3/2001 | Diab et al. | |
| 6,229,856 B1 | 5/2001 | Diab et al. | |
| 6,232,609 B1 | 5/2001 | Snyder et al. | |
| 6,236,872 B1 | 5/2001 | Diab et al. | |
| 6,241,683 B1 | 6/2001 | Macklem et al. | |
| 6,253,097 B1 | 6/2001 | Aronow et al. | |
| 6,256,523 B1 | 7/2001 | Diab et al. | |
| 6,263,222 B1 | 7/2001 | Diab et al. | |
| 6,270,460 B1 | 8/2001 | McCartan et al. | |
| 6,278,522 B1 | 8/2001 | Lepper, Jr. et al. | |
| 6,280,213 B1 | 8/2001 | Tobler et al. | |
| 6,285,896 B1 | 9/2001 | Tobler et al. | |
| 6,301,493 B1 | 10/2001 | Marro et al. | |
| 6,308,089 B1 | 10/2001 | von der Ruhr et al. | |
| 6,317,627 B1 | 11/2001 | Ennen et al. | |
| 6,321,100 B1 | 11/2001 | Parker | |
| 6,325,761 B1 | 12/2001 | Jay | |
| 6,334,065 B1 | 12/2001 | Al-Ali et al. | |
| 6,343,224 B1 | 1/2002 | Parker | |
| 6,349,228 B1 | 2/2002 | Kiani et al. | |
| 6,360,114 B1 | 3/2002 | Diab et al. | |
| 6,368,283 B1 | 4/2002 | Xu et al. | |
| 6,371,921 B1 | 4/2002 | Caro et al. | |
| 6,377,829 B1 | 4/2002 | Al-Ali | |
| 6,388,240 B2 | 5/2002 | Schulz et al. | |
| 6,396,137 B1 | 5/2002 | Klughart | |
| 6,397,091 B2 | 5/2002 | Diab et al. | |
| 6,402,690 B1 * | 6/2002 | Rhee | A61B 5/0002 600/300 |
| 6,430,437 B1 | 8/2002 | Marro | |
| 6,430,525 B1 | 8/2002 | Weber et al. | |
| 6,463,311 B1 | 10/2002 | Diab | |
| 6,470,199 B1 | 10/2002 | Kopotic et al. | |
| 6,501,975 B2 | 12/2002 | Diab et al. | |
| 6,505,059 B1 | 1/2003 | Kollias et al. | |
| 6,515,273 B2 | 2/2003 | Al-Ali | |
| 6,519,487 B1 | 2/2003 | Parker | |
| 6,525,386 B1 | 2/2003 | Mills et al. | |
| 6,526,300 B1 | 2/2003 | Kiani et al. | |
| 6,527,729 B1 | 3/2003 | Turcott | |
| 6,541,756 B2 | 4/2003 | Schulz et al. | |
| 6,542,764 B1 | 4/2003 | Al-Ali et al. | |
| 6,580,086 B1 | 6/2003 | Schulz et al. | |
| 6,584,336 B1 | 6/2003 | Ali et al. | |
| 6,595,316 B2 | 7/2003 | Cybulski et al. | |
| 6,597,932 B2 | 7/2003 | Tian et al. | |
| 6,597,933 B2 | 7/2003 | Kiani et al. | |
| 6,606,511 B1 | 8/2003 | Ali et al. | |
| 6,632,181 B2 | 10/2003 | Flaherty et al. | |
| 6,639,668 B1 | 10/2003 | Trepagnier | |
| 6,640,116 B2 | 10/2003 | Diab | |
| 6,643,530 B2 | 11/2003 | Diab et al. | |
| 6,650,917 B2 | 11/2003 | Diab et al. | |
| 6,654,624 B2 | 11/2003 | Diab et al. | |
| 6,658,276 B2 | 12/2003 | Kiani et al. | |
| 6,661,161 B1 | 12/2003 | Lanzo et al. | |
| 6,671,531 B2 | 12/2003 | Al-Ali et al. | |
| 6,678,543 B2 | 1/2004 | Diab et al. | |
| 6,684,090 B2 | 1/2004 | Ali et al. | |
| 6,684,091 B2 | 1/2004 | Parker | |
| 6,697,656 B1 | 2/2004 | Al-Ali | |
| 6,697,657 B1 | 2/2004 | Shehada et al. | |

**Exhibit 2**

-29-

**US 10,433,776 B2**

Page 3

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,697,658 | B2 | 2/2004 | Al-Ali |
| RE38,476 | E | 3/2004 | Diab et al. |
| 6,699,194 | B1 | 3/2004 | Diab et al. |
| 6,714,804 | B2 | 3/2004 | Al-Ali et al. |
| RE38,492 | E | 4/2004 | Diab et al. |
| 6,721,582 | B2 | 4/2004 | Trepagnier et al. |
| 6,721,585 | B1 | 4/2004 | Parker |
| 6,725,075 | B2 | 4/2004 | Al-Ali |
| 6,728,560 | B2 | 4/2004 | Kollias et al. |
| 6,735,459 | B2 | 5/2004 | Parker |
| 6,745,060 | B2 | 6/2004 | Diab et al. |
| 6,760,607 | B2 | 7/2004 | Al-Ali |
| 6,770,028 | B1 | 8/2004 | Ali et al. |
| 6,771,994 | B2 | 8/2004 | Kiani et al. |
| 6,792,300 | B1 | 9/2004 | Diab et al. |
| 6,813,511 | B2 | 11/2004 | Diab et al. |
| 6,816,741 | B2 | 11/2004 | Diab |
| 6,822,564 | B2 | 11/2004 | Al-Ali |
| 6,826,419 | B2 | 11/2004 | Diab et al. |
| 6,830,711 | B2 | 12/2004 | Mills et al. |
| 6,850,787 | B2 | 2/2005 | Weber et al. |
| 6,850,788 | B2 | 2/2005 | Al-Ali |
| 6,852,083 | B2 | 2/2005 | Caro et al. |
| 6,861,639 | B2 | 3/2005 | Al-Ali |
| 6,898,452 | B2 | 5/2005 | Al-Ali et al. |
| 6,920,345 | B2 | 7/2005 | Al-Ali et al. |
| 6,931,268 | B1 | 8/2005 | Kiani-Azarbayjany et al. |
| 6,934,570 | B2 | 8/2005 | Kiani et al. |
| 6,939,305 | B2 | 9/2005 | Flaherty et al. |
| 6,943,348 | B1 | 9/2005 | Coffin, IV |
| 6,950,687 | B2 | 9/2005 | Al-Ali |
| 6,961,598 | B2 | 11/2005 | Diab |
| 6,970,792 | B1 | 11/2005 | Diab |
| 6,979,812 | B2 | 12/2005 | Al-Ali |
| 6,985,764 | B2 | 1/2006 | Mason et al. |
| 6,993,371 | B2 | 1/2006 | Kiani et al. |
| 6,996,427 | B2 | 2/2006 | Ali et al. |
| 6,999,904 | B2 | 2/2006 | Weber et al. |
| 7,003,338 | B2 | 2/2006 | Weber et al. |
| 7,003,339 | B2 | 2/2006 | Diab et al. |
| 7,015,451 | B2 | 3/2006 | Dalke et al. |
| 7,024,233 | B2 | 4/2006 | Ali et al. |
| 7,027,849 | B2 | 4/2006 | Al-Ali |
| 7,030,749 | B2 | 4/2006 | Al-Ali |
| 7,039,449 | B2 | 5/2006 | Al-Ali |
| 7,041,060 | B2 | 5/2006 | Flaherty et al. |
| 7,044,918 | B2 | 5/2006 | Diab |
| 7,048,687 | B1 | 5/2006 | Reuss et al. |
| 7,067,893 | B2 | 6/2006 | Mills et al. |
| 7,096,052 | B2 | 8/2006 | Mason et al. |
| 7,096,054 | B2 | 8/2006 | Abdul-Hafiz et al. |
| 7,132,641 | B2 | 11/2006 | Schulz et al. |
| 7,142,901 | B2 | 11/2006 | Kiani et al. |
| 7,149,561 | B2 | 12/2006 | Diab |
| 7,186,966 | B2 | 3/2007 | Al-Ali |
| 7,190,261 | B2 | 3/2007 | Al-Ali |
| 7,190,986 | B1 | 3/2007 | Hannula et al. |
| 7,215,984 | B2 | 5/2007 | Diab |
| 7,215,986 | B2 | 5/2007 | Diab |
| 7,221,971 | B2 | 5/2007 | Diab |
| 7,225,006 | B2 | 5/2007 | Al-Ali et al. |
| 7,225,007 | B2 | 5/2007 | Al-Ali |
| RE39,672 | E | 6/2007 | Shehada et al. |
| 7,239,905 | B2 | 7/2007 | Kiani-Azarbayjany et al. |
| 7,245,953 | B1 | 7/2007 | Parker |
| 7,254,429 | B2 | 8/2007 | Schurman et al. |
| 7,254,431 | B2 | 8/2007 | Al-Ali |
| 7,254,433 | B2 | 8/2007 | Diab et al. |
| 7,254,434 | B2 | 8/2007 | Schulz et al. |
| 7,272,425 | B2 | 9/2007 | Al-Ali |
| 7,274,955 | B2 | 9/2007 | Kiani et al. |
| D554,263 | S | 10/2007 | Al-Ali |
| 7,280,858 | B2 | 10/2007 | Al-Ali et al. |
| 7,289,835 | B2 | 10/2007 | Mansfield et al. |
| 7,292,883 | B2 | 11/2007 | De Felice et al. |

| | | | |
|---|---|---|---|
| 7,295,866 | B2 | 11/2007 | Al-Ali |
| 7,328,053 | B1 | 2/2008 | Diab et al. |
| 7,332,784 | B2 | 2/2008 | Mills et al. |
| 7,340,287 | B2 | 3/2008 | Mason et al. |
| 7,341,559 | B2 | 3/2008 | Schulz et al. |
| 7,343,186 | B2 | 3/2008 | Lamego et al. |
| D566,282 | S | 4/2008 | Al-Ali et al. |
| 7,355,512 | B1 | 4/2008 | Al-Ali |
| 7,356,365 | B2 | 4/2008 | Schurman |
| 7,371,981 | B2 | 5/2008 | Abdul-Hafiz |
| 7,373,193 | B2 | 5/2008 | Al-Ali et al. |
| 7,373,194 | B2 | 5/2008 | Weber et al. |
| 7,376,453 | B1 | 5/2008 | Diab et al. |
| 7,377,794 | B2 | 5/2008 | Al Ali et al. |
| 7,377,899 | B2 | 5/2008 | Weber et al. |
| 7,383,070 | B2 | 6/2008 | Diab et al. |
| 7,415,297 | B2 | 8/2008 | Al-Ali et al. |
| 7,428,432 | B2 | 9/2008 | Ali et al. |
| 7,438,683 | B2 | 10/2008 | Al-Ali et al. |
| 7,440,787 | B2 | 10/2008 | Diab |
| 7,454,240 | B2 | 11/2008 | Diab et al. |
| 7,467,002 | B2 | 12/2008 | Weber et al. |
| 7,469,157 | B2 | 12/2008 | Diab et al. |
| 7,471,969 | B2 | 12/2008 | Diab et al. |
| 7,471,971 | B2 | 12/2008 | Diab et al. |
| 7,483,729 | B2 | 1/2009 | Al-Ali et al. |
| 7,483,730 | B2 | 1/2009 | Diab et al. |
| 7,489,958 | B2 | 2/2009 | Diab et al. |
| 7,496,391 | B2 | 2/2009 | Diab et al. |
| 7,496,393 | B2 | 2/2009 | Diab et al. |
| D587,657 | S | 3/2009 | Al-Ali et al. |
| 7,499,741 | B2 | 3/2009 | Diab et al. |
| 7,499,835 | B2 | 3/2009 | Weber et al. |
| 7,500,950 | B2 | 3/2009 | Al-Ali et al. |
| 7,509,154 | B2 | 3/2009 | Diab et al. |
| 7,509,494 | B2 | 3/2009 | Al-Ali |
| 7,510,849 | B2 | 3/2009 | Schurman et al. |
| 7,526,328 | B2 | 4/2009 | Diab et al. |
| 7,530,942 | B1 | 5/2009 | Diab |
| 7,530,949 | B2 | 5/2009 | Al Ali et al. |
| 7,530,955 | B2 | 5/2009 | Diab et al. |
| 7,563,110 | B2 | 7/2009 | Al-Ali et al. |
| 7,596,398 | B2 | 9/2009 | Al-Ali et al. |
| 7,618,375 | B2 | 11/2009 | Flaherty |
| D606,659 | S | 12/2009 | Kiani et al. |
| 7,647,083 | B2 | 1/2010 | Al-Ali et al. |
| D609,193 | S | 2/2010 | Al-Ali et al. |
| D614,305 | S | 4/2010 | Al-Ali et al. |
| RE41,317 | E | 5/2010 | Parker |
| 7,729,733 | B2 | 6/2010 | Al-Ali et al. |
| 7,734,320 | B2 | 6/2010 | Al-Ali |
| 7,761,127 | B2 | 7/2010 | Al-Ali et al. |
| 7,761,128 | B2 | 7/2010 | Al-Ali et al. |
| 7,764,982 | B2 | 7/2010 | Dalke et al. |
| D621,516 | S | 8/2010 | Kiani et al. |
| 7,791,155 | B2 | 9/2010 | Diab |
| 7,801,581 | B2 | 9/2010 | Diab |
| 7,822,452 | B2 | 10/2010 | Schurman et al. |
| RE41,912 | E | 11/2010 | Parker |
| 7,844,313 | B2 | 11/2010 | Kiani et al. |
| 7,844,314 | B2 | 11/2010 | Al-Ali |
| 7,844,315 | B2 | 11/2010 | Al-Ali |
| 7,865,222 | B2 | 1/2011 | Weber et al. |
| 7,873,497 | B2 | 1/2011 | Weber et al. |
| 7,880,606 | B2 | 2/2011 | Al-Ali |
| 7,880,626 | B2 | 2/2011 | Al-Ali et al. |
| 7,891,355 | B2 | 2/2011 | Al-Ali et al. |
| 7,894,868 | B2 | 2/2011 | Al-Ali et al. |
| 7,899,507 | B2 | 3/2011 | Al-Ali et al. |
| 7,899,518 | B2 | 3/2011 | Trepagnier et al. |
| 7,904,132 | B2 | 3/2011 | Weber et al. |
| 7,909,772 | B2 | 3/2011 | Popov et al. |
| 7,910,875 | B2 | 3/2011 | Al-Ali |
| 7,919,713 | B2 | 4/2011 | Al-Ali et al. |
| 7,937,128 | B2 | 5/2011 | Al-Ali |
| 7,937,129 | B2 | 5/2011 | Mason et al. |
| 7,937,130 | B2 | 5/2011 | Diab et al. |
| 7,941,199 | B2 | 5/2011 | Kiani |
| 7,951,086 | B2 | 5/2011 | Flaherty et al. |

**Exhibit 2**
-30-

**US 10,433,776 B2**

Page 4

(56)　　　　　　References Cited

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,957,780 | B2 | 6/2011 | Lamego et al. |
| 7,962,188 | B2 | 6/2011 | Kiani et al. |
| 7,962,190 | B1 | 6/2011 | Diab et al. |
| 7,976,472 | B2 | 7/2011 | Kiani |
| 7,988,637 | B2 | 8/2011 | Diab |
| 7,990,382 | B2 | 8/2011 | Kiani |
| 7,991,446 | B2 | 8/2011 | Ali et al. |
| 8,000,761 | B2 | 8/2011 | Al-Ali |
| 8,008,088 | B2 | 8/2011 | Bellott et al. |
| RE42,753 | E | 9/2011 | Kiani-Azarbayjany et al. |
| 8,019,400 | B2 | 9/2011 | Diab et al. |
| 8,028,701 | B2 | 10/2011 | Al-Ali et al. |
| 8,029,765 | B2 | 10/2011 | Bellott et al. |
| 8,036,727 | B2 | 10/2011 | Schurman et al. |
| 8,036,728 | B2 | 10/2011 | Diab et al. |
| 8,046,040 | B2 | 10/2011 | Ali et al. |
| 8,046,041 | B2 | 10/2011 | Diab et al. |
| 8,046,042 | B2 | 10/2011 | Diab et al. |
| 8,048,040 | B2 | 11/2011 | Kiani |
| 8,050,728 | B2 | 11/2011 | Al-Ali et al. |
| RE43,169 | E | 2/2012 | Parker |
| 8,118,620 | B2 | 2/2012 | Al-Ali et al. |
| 8,126,528 | B2 | 2/2012 | Diab et al. |
| 8,128,572 | B2 | 3/2012 | Diab et al. |
| 8,130,105 | B2 | 3/2012 | Al-Ali et al. |
| 8,145,287 | B2 | 3/2012 | Diab et al. |
| 8,150,487 | B2 | 4/2012 | Diab et al. |
| 8,175,672 | B2 | 5/2012 | Parker |
| 8,180,420 | B2 | 5/2012 | Diab et al. |
| 8,182,443 | B1 | 5/2012 | Kiani |
| 8,185,180 | B2 | 5/2012 | Diab et al. |
| 8,190,223 | B2 | 5/2012 | Al-Ali et al. |
| 8,190,227 | B2 | 5/2012 | Diab et al. |
| 8,203,438 | B2 | 6/2012 | Kiani et al. |
| 8,203,704 | B2 | 6/2012 | Merritt et al. |
| 8,204,566 | B2 | 6/2012 | Schurman et al. |
| 8,219,172 | B2 | 7/2012 | Schurman et al. |
| 8,224,411 | B2 | 7/2012 | Al-Ali et al. |
| 8,228,181 | B2 | 7/2012 | Al-Ali |
| 8,229,533 | B2 | 7/2012 | Diab et al. |
| 8,233,955 | B2 | 7/2012 | Al-Ali et al. |
| 8,244,325 | B2 | 8/2012 | Al-Ali et al. |
| 8,255,026 | B1 | 8/2012 | Al-Ali |
| 8,255,027 | B2 | 8/2012 | Al-Ali et al. |
| 8,255,028 | B2 | 8/2012 | Al-Ali et al. |
| 8,260,577 | B2 | 9/2012 | Weber et al. |
| 8,265,723 | B1 | 9/2012 | McHale et al. |
| 8,274,360 | B2 | 9/2012 | Sampath et al. |
| 8,280,473 | B2 | 10/2012 | Al-Ali |
| 8,301,217 | B2 | 10/2012 | Al-Ali et al. |
| 8,306,596 | B2 | 11/2012 | Schurman et al. |
| 8,310,336 | B2 | 11/2012 | Muhsin et al. |
| 8,315,683 | B2 | 11/2012 | Al-Ali et al. |
| RE43,860 | E | 12/2012 | Parker |
| 8,337,403 | B2 | 12/2012 | Al-Ali et al. |
| 8,346,330 | B2 | 1/2013 | Lamego |
| 8,353,842 | B2 | 1/2013 | Al-Ali et al. |
| 8,355,766 | B2 | 1/2013 | MacNeish, III et al. |
| 8,359,080 | B2 | 1/2013 | Diab et al. |
| 8,364,223 | B2 | 1/2013 | Al-Ali et al. |
| 8,364,226 | B2 | 1/2013 | Diab et al. |
| 8,374,665 | B2 | 2/2013 | Lamego |
| 8,385,995 | B2 | 2/2013 | Al-ali et al. |
| 8,385,996 | B2 | 2/2013 | Smith et al. |
| 8,388,353 | B2 | 3/2013 | Kiani |
| 8,399,822 | B2 | 3/2013 | Al-Ali |
| 8,401,602 | B2 | 3/2013 | Kiani |
| 8,405,608 | B2 | 3/2013 | Al-Ali et al. |
| 8,414,499 | B2 | 4/2013 | Al-Ali et al. |
| 8,418,524 | B2 | 4/2013 | Al-Ali |
| 8,423,106 | B2 | 4/2013 | Lamego et al. |
| 8,428,967 | B2 | 4/2013 | Olsen et al. |
| 8,430,817 | B1 | 4/2013 | Al-Ali et al. |
| 8,437,825 | B2 | 5/2013 | Dalvi et al. |
| 8,455,290 | B2 | 6/2013 | Siskavich |
| 8,457,703 | B2 | 6/2013 | Al-Ali |
| 8,457,707 | B2 | 6/2013 | Kiani |
| 8,463,349 | B2 | 6/2013 | Diab et al. |
| 8,466,286 | B2 | 6/2013 | Bellot et al. |
| 8,471,713 | B2 | 6/2013 | Poeze et al. |
| 8,473,020 | B2 | 6/2013 | Kiani et al. |
| 8,483,787 | B2 | 7/2013 | Al-Ali et al. |
| 8,489,364 | B2 | 7/2013 | Weber et al. |
| 8,498,684 | B2 | 7/2013 | Weber et al. |
| 8,504,128 | B2 | 8/2013 | Blank et al. |
| 8,509,867 | B2 | 8/2013 | Workman et al. |
| 8,515,509 | B2 | 8/2013 | Bruinsma et al. |
| 8,523,781 | B2 | 9/2013 | Al-Ali |
| 8,529,301 | B2 | 9/2013 | Al-Ali et al. |
| 8,532,727 | B2 | 9/2013 | Ali et al. |
| 8,532,728 | B2 | 9/2013 | Diab et al. |
| D692,145 | S | 10/2013 | Al-Ali et al. |
| 8,547,209 | B2 | 10/2013 | Kiani et al. |
| 8,548,548 | B2 | 10/2013 | Al-Ali |
| 8,548,549 | B2 | 10/2013 | Schurman et al. |
| 8,548,550 | B2 | 10/2013 | Al-Ali et al. |
| 8,560,032 | B2 | 10/2013 | Al-Ali et al. |
| 8,560,034 | B1 | 10/2013 | Diab et al. |
| 8,570,167 | B2 | 10/2013 | Al-Ali |
| 8,570,503 | B2 | 10/2013 | Vo et al. |
| 8,571,617 | B2 | 10/2013 | Reichgott et al. |
| 8,571,618 | B1 | 10/2013 | Lamego et al. |
| 8,571,619 | B2 | 10/2013 | Al-Ali et al. |
| 8,577,431 | B2 | 11/2013 | Lamego et al. |
| 8,581,732 | B2 | 11/2013 | Al-Ali et al. |
| 8,584,345 | B2 | 11/2013 | Al-Ali et al. |
| 8,588,880 | B2 | 11/2013 | Abdul-Hafiz et al. |
| 8,600,467 | B2 | 12/2013 | Al-Ali et al. |
| 8,606,342 | B2 | 12/2013 | Diab |
| 8,626,255 | B2 | 1/2014 | Al-Ali et al. |
| 8,630,691 | B2 | 1/2014 | Lamego et al. |
| 8,634,889 | B2 | 1/2014 | Al-Ali et al. |
| 8,641,631 | B2 | 2/2014 | Sierra et al. |
| 8,652,060 | B2 | 2/2014 | Al-Ali |
| 8,663,107 | B2 | 3/2014 | Kiani |
| 8,666,468 | B1 | 3/2014 | Al-Ali |
| 8,667,967 | B2 | 3/2014 | Al-Ali et al. |
| 8,670,811 | B2 | 3/2014 | O'Reilly |
| 8,670,814 | B2 | 3/2014 | Diab et al. |
| 8,676,286 | B2 | 3/2014 | Weber et al. |
| 8,682,407 | B2 | 3/2014 | Al-Ali |
| RE44,823 | E | 4/2014 | Parker |
| RE44,875 | E | 4/2014 | Kiani et al. |
| 8,690,799 | B2 | 4/2014 | Telfort et al. |
| 8,700,112 | B2 | 4/2014 | Kiani |
| 8,702,627 | B2 | 4/2014 | Telfort et al. |
| 8,706,179 | B2 | 4/2014 | Parker |
| 8,712,494 | B1 | 4/2014 | MacNeish, III et al. |
| 8,715,206 | B2 | 5/2014 | Telfort et al. |
| 8,718,735 | B2 | 5/2014 | Lamego et al. |
| 8,718,737 | B2 | 5/2014 | Diab et al. |
| 8,718,738 | B2 | 5/2014 | Blank et al. |
| 8,720,249 | B2 | 5/2014 | Al-Ali |
| 8,721,541 | B2 | 5/2014 | Al-Ali et al. |
| 8,721,542 | B2 | 5/2014 | Al-Ali et al. |
| 8,723,677 | B1 | 5/2014 | Kiani |
| 8,740,792 | B1 | 6/2014 | Kiani et al. |
| 8,754,776 | B2 | 6/2014 | Poeze et al. |
| 8,755,535 | B2 | 6/2014 | Telfort et al. |
| 8,755,856 | B2 | 6/2014 | Diab et al. |
| 8,755,872 | B1 | 6/2014 | Marinow |
| 8,761,850 | B2 | 6/2014 | Lamego |
| 8,764,671 | B2 | 7/2014 | Kiani |
| 8,768,423 | B2 | 7/2014 | Shakespeare et al. |
| 8,771,204 | B2 | 7/2014 | Telfort et al. |
| 8,777,634 | B2 | 7/2014 | Kiani et al. |
| 8,781,543 | B2 | 7/2014 | Diab et al. |
| 8,781,544 | B2 | 7/2014 | Al-Ali et al. |
| 8,781,549 | B2 | 7/2014 | Al-Ali et al. |
| 8,788,003 | B2 | 7/2014 | Schurman et al. |
| 8,790,268 | B2 | 7/2014 | Al-Ali |
| 8,801,613 | B2 | 8/2014 | Al-Ali et al. |
| 8,821,397 | B2 | 9/2014 | Al-Ali et al. |
| 8,821,415 | B2 | 9/2014 | Al-Ali et al. |

Exhibit 2

-31-

## US 10,433,776 B2
Page 5

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 8,830,449 | B1 | 9/2014 | Lamego et al. |
| 8,831,700 | B2 | 9/2014 | Schurman et al. |
| 8,840,549 | B2 | 9/2014 | Al-Ali et al. |
| 8,847,740 | B2 | 9/2014 | Kiani et al. |
| 8,849,365 | B2 | 9/2014 | Smith et al. |
| 8,852,094 | B2 | 10/2014 | Al-Ali et al. |
| 8,852,994 | B2 | 10/2014 | Wojtczuk et al. |
| 8,868,147 | B2 | 10/2014 | Stippick et al. |
| 8,868,150 | B2 | 10/2014 | Al-Ali et al. |
| 8,870,792 | B2 | 10/2014 | Al-Ali et al. |
| 8,886,271 | B2 | 11/2014 | Kiani et al. |
| 8,888,539 | B2 | 11/2014 | Al-Ali et al. |
| 8,888,708 | B2 | 11/2014 | Diab et al. |
| 8,892,180 | B2 | 11/2014 | Weber et al. |
| 8,897,847 | B2 | 11/2014 | Al-Ali |
| 8,909,310 | B2 | 12/2014 | Lamego et al. |
| 8,911,377 | B2 | 12/2014 | Al-Ali |
| 8,912,909 | B2 | 12/2014 | Al-Ali et al. |
| 8,920,317 | B2 | 12/2014 | Al-Ali et al. |
| 8,921,699 | B2 | 12/2014 | Al-Ali et al. |
| 8,922,382 | B2 | 12/2014 | Al-Ali et al. |
| 8,929,964 | B2 | 1/2015 | Al-Ali et al. |
| 8,942,777 | B2 | 1/2015 | Diab et al. |
| 8,948,834 | B2 | 2/2015 | Diab et al. |
| 8,948,835 | B2 | 2/2015 | Diab |
| 8,965,471 | B2 | 2/2015 | Lamego |
| 8,983,564 | B2 | 3/2015 | Al-Ali |
| 8,989,831 | B2 | 3/2015 | Al-Ali et al. |
| 8,996,085 | B2 | 3/2015 | Kiani et al. |
| 8,998,809 | B2 | 4/2015 | Kiani |
| 9,028,429 | B2 | 5/2015 | Telfort et al. |
| 9,037,207 | B2 | 5/2015 | Al-Ali et al. |
| 9,060,721 | B2 | 6/2015 | Reichgott et al. |
| 9,066,666 | B2 | 6/2015 | Kiani |
| 9,066,680 | B1 | 6/2015 | Al-Ali et al. |
| 9,072,474 | B2 | 7/2015 | Al-Ali et al. |
| 9,078,560 | B2 | 7/2015 | Schurman et al. |
| 9,084,569 | B2 | 7/2015 | Weber et al. |
| 9,095,316 | B2 | 8/2015 | Welch et al. |
| 9,106,038 | B2 | 8/2015 | Telfort et al. |
| 9,107,625 | B2 | 8/2015 | Telfort et al. |
| 9,107,626 | B2 | 8/2015 | Al-Ali et al. |
| 9,113,831 | B2 | 8/2015 | Al-Ali |
| 9,113,832 | B2 | 8/2015 | Al-Ali |
| 9,119,595 | B2 | 9/2015 | Lamego |
| 9,131,881 | B2 | 9/2015 | Diab et al. |
| 9,131,882 | B2 | 9/2015 | Al-Ali et al. |
| 9,131,883 | B2 | 9/2015 | Al-Ali |
| 9,131,917 | B2 | 9/2015 | Telfort et al. |
| 9,138,180 | B1 | 9/2015 | Coverston et al. |
| 9,138,182 | B2 | 9/2015 | Al-Ali et al. |
| 9,138,192 | B2 | 9/2015 | Weber et al. |
| 9,142,117 | B2 | 9/2015 | Muhsin et al. |
| 9,153,112 | B1 | 10/2015 | Kiani et al. |
| 9,153,121 | B2 | 10/2015 | Kiani et al. |
| 9,161,696 | B2 | 10/2015 | Al-Ali et al. |
| 9,161,713 | B2 | 10/2015 | Al-Ali et al. |
| 9,167,995 | B2 | 10/2015 | Lamego et al. |
| 9,176,141 | B2 | 11/2015 | Al-Ali et al. |
| 9,186,102 | B2 | 11/2015 | Bruinsma et al. |
| 9,192,312 | B2 | 11/2015 | Al-Ali |
| 9,192,329 | B2 | 11/2015 | Al-Ali |
| 9,192,351 | B1 | 11/2015 | Telfort et al. |
| 9,195,385 | B2 | 11/2015 | Al-Ali et al. |
| 9,211,072 | B2 | 12/2015 | Kiani |
| 9,211,095 | B1 | 12/2015 | Al-Ali |
| 9,218,454 | B2 | 12/2015 | Kiani et al. |
| 9,226,696 | B2 | 1/2016 | Kiani |
| 9,241,662 | B2 | 1/2016 | Al-Ali et al. |
| 9,245,668 | B1 | 1/2016 | Vo et al. |
| 9,259,185 | B2 | 2/2016 | Abdul-Hafiz et al. |
| 9,267,572 | B2 | 2/2016 | Barker et al. |
| 9,277,880 | B2 | 3/2016 | Poeze et al. |
| 9,289,167 | B2 | 3/2016 | Diab et al. |
| 9,295,421 | B2 | 3/2016 | Kiani et al. |
| 9,307,928 | B1 | 4/2016 | Al-Ali et al. |
| 9,323,894 | B2 | 4/2016 | Kiani |
| D755,392 | S | 5/2016 | Hwang et al. |
| 9,326,712 | B1 | 5/2016 | Kiani |
| 9,333,316 | B2 | 5/2016 | Kiani |
| 9,339,220 | B2 | 5/2016 | Lamego et al. |
| 9,341,565 | B2 | 5/2016 | Lamego et al. |
| 9,351,673 | B2 | 5/2016 | Diab et al. |
| 9,351,675 | B2 | 5/2016 | Al-Ali et al. |
| 9,364,181 | B2 | 6/2016 | Kiani et al. |
| 9,368,671 | B2 | 6/2016 | Wojtczuk et al. |
| 9,370,325 | B2 | 6/2016 | Al-Ali et al. |
| 9,370,326 | B2 | 6/2016 | McHale et al. |
| 9,370,335 | B2 | 6/2016 | Al-ali et al. |
| 9,375,185 | B2 | 6/2016 | Ali et al. |
| 9,386,953 | B2 | 7/2016 | Al-Ali |
| 9,386,961 | B2 | 7/2016 | Al-Ali et al. |
| 9,392,945 | B2 | 7/2016 | Al-Ali et al. |
| 9,397,448 | B2 | 7/2016 | Al-Ali et al. |
| 9,408,542 | B1 | 8/2016 | Kinast et al. |
| 9,436,645 | B2 | 9/2016 | Al-Ali et al. |
| 9,445,759 | B1 | 9/2016 | Lamego et al. |
| 9,466,919 | B2 | 10/2016 | Kiani et al. |
| 9,474,474 | B2 | 10/2016 | Lamego et al. |
| 9,480,422 | B2 | 11/2016 | Al-Ali |
| 9,480,435 | B2 | 11/2016 | Olsen |
| 9,492,110 | B2 | 11/2016 | Al-Ali et al. |
| 9,510,779 | B2 | 12/2016 | Poeze et al. |
| 9,517,024 | B2 | 12/2016 | Kiani et al. |
| 9,532,722 | B2 | 1/2017 | Lamego et al. |
| 9,538,949 | B2 | 1/2017 | Al-Ali et al. |
| 9,538,980 | B2 | 1/2017 | Telfort et al. |
| 9,549,696 | B2 | 1/2017 | Lamego et al. |
| 9,554,737 | B2 | 1/2017 | Schurman et al. |
| 9,560,996 | B2 | 2/2017 | Kiani |
| 9,560,998 | B2 | 2/2017 | Al-Ali et al. |
| 9,566,019 | B2 | 2/2017 | Al-Ali et al. |
| 9,579,039 | B2 | 2/2017 | Jansen et al. |
| 9,591,975 | B2 | 3/2017 | Dalvi et al. |
| 9,622,692 | B2 | 4/2017 | Lamego et al. |
| 9,622,693 | B2 | 4/2017 | Diab |
| D788,312 | S | 5/2017 | Al-Ali et al. |
| 9,636,055 | B2 | 5/2017 | Al-Ali et al. |
| 9,636,056 | B2 | 5/2017 | Al-Ali |
| 9,649,054 | B2 | 5/2017 | Lamego et al. |
| 9,662,052 | B2 | 5/2017 | Al-Ali et al. |
| 9,668,679 | B2 | 6/2017 | Schurman et al. |
| 9,668,680 | B2 | 6/2017 | Bruinsma et al. |
| 9,668,703 | B2 | 6/2017 | Al-Ali |
| 9,675,286 | B2 | 6/2017 | Diab |
| 9,687,160 | B2 | 6/2017 | Kiani |
| 9,693,719 | B2 | 7/2017 | Al-Ali et al. |
| 9,693,737 | B2 | 7/2017 | Al-Ali et al. |
| 9,697,928 | B2 | 7/2017 | Al-Ali et al. |
| 9,717,425 | B2 | 8/2017 | Kiani et al. |
| 9,717,458 | B2 | 8/2017 | Lamego et al. |
| 9,724,016 | B1 | 8/2017 | Al-Ali et al. |
| 9,724,024 | B2 | 8/2017 | Al-Ali |
| 9,724,025 | B1 | 8/2017 | Kiani et al. |
| 9,730,640 | B2 | 8/2017 | Diab et al. |
| 9,743,887 | B2 | 8/2017 | Al-Ali et al. |
| 9,749,232 | B2 | 8/2017 | Sampath et al. |
| 9,750,442 | B2 | 9/2017 | Olsen |
| 9,750,443 | B2 | 9/2017 | Smith et al. |
| 9,750,461 | B1 | 9/2017 | Telfort |
| 9,775,545 | B2 | 10/2017 | Al-Ali et al. |
| 9,775,546 | B2 | 10/2017 | Diab et al. |
| 9,775,570 | B2 | 10/2017 | Al-Ali |
| 9,778,079 | B1 | 10/2017 | Al-Ali et al. |
| 9,782,077 | B2 | 10/2017 | Lamego et al. |
| 9,782,110 | B2 | 10/2017 | Kiani |
| 9,787,568 | B2 | 10/2017 | Lamego et al. |
| 9,788,735 | B2 | 10/2017 | Al-Ali |
| 9,788,768 | B2 | 10/2017 | Al-Ali et al. |
| 9,795,300 | B2 | 10/2017 | Al-Ali |
| 9,795,310 | B2 | 10/2017 | Al-Ali |
| 9,795,358 | B2 | 10/2017 | Telfort et al. |
| 9,795,739 | B2 | 10/2017 | Al-Ali et al. |
| 9,801,556 | B2 | 10/2017 | Kiani |

Exhibit 2
-32-

## US 10,433,776 B2

Page 6

(56)     **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 9,801,588 | B2 | 10/2017 | Weber et al. |
| 9,808,188 | B1 | 11/2017 | Perea et al. |
| 9,814,418 | B2 | 11/2017 | Weber et al. |
| 9,820,691 | B2 | 11/2017 | Kiani |
| 9,833,152 | B2 | 12/2017 | Kiani et al. |
| 9,833,180 | B2 | 12/2017 | Shakespeare et al. |
| 9,839,379 | B2 | 12/2017 | Al-Ali et al. |
| 9,839,381 | B1 | 12/2017 | Weber et al. |
| 9,847,002 | B2 | 12/2017 | Kiani et al. |
| 9,847,749 | B2 | 12/2017 | Kiani et al. |
| 9,848,800 | B1 | 12/2017 | Lee et al. |
| 9,848,806 | B2 | 12/2017 | Al-Ali et al. |
| 9,848,807 | B2 | 12/2017 | Lamego |
| 9,861,298 | B2 | 1/2018 | Eckerbom et al. |
| 9,861,304 | B2 | 1/2018 | Al-Ali et al. |
| 9,861,305 | B1 | 1/2018 | Weber et al. |
| 9,867,578 | B2 | 1/2018 | Al-Ali et al. |
| 9,872,623 | B2 | 1/2018 | Al-Ali |
| 9,876,320 | B2 | 1/2018 | Coverston et al. |
| 9,877,650 | B2 | 1/2018 | Muhsin et al. |
| 9,877,686 | B2 | 1/2018 | Al-Ali et al. |
| 9,891,079 | B2 | 2/2018 | Dalvi |
| 9,895,107 | B2 | 2/2018 | Al-Ali et al. |
| 9,913,617 | B2 | 3/2018 | Al-Ali et al. |
| 9,924,893 | B2 | 3/2018 | Schurman et al. |
| 9,924,897 | B1 | 3/2018 | Abdul-Hafiz |
| 9,936,917 | B2 | 4/2018 | Poeze et al. |
| 9,943,269 | B2 | 4/2018 | Muhsin et al. |
| 9,949,676 | B2 | 4/2018 | Al-Ali |
| 9,955,937 | B2 | 5/2018 | Telfort |
| 9,965,946 | B2 | 5/2018 | Al-Ali |
| 9,980,667 | B2 | 5/2018 | Kiani et al. |
| D820,865 | S | 6/2018 | Muhsin et al. |
| 9,986,919 | B2 | 6/2018 | Lamego et al. |
| 9,986,952 | B2 | 6/2018 | Dalvi et al. |
| 9,989,560 | B2 | 6/2018 | Poeze et al. |
| 9,993,207 | B2 | 6/2018 | Al-Ali et al. |
| 10,007,758 | B2 | 6/2018 | Al-Ali et al. |
| D822,215 | S | 7/2018 | Al-Ali et al. |
| D822,216 | S | 7/2018 | Barker et al. |
| 10,010,276 | B2 | 7/2018 | Al-Ali et al. |
| 10,032,002 | B2 | 7/2018 | Kiani et al. |
| 10,039,482 | B2 | 8/2018 | Al-Ali et al. |
| 10,052,037 | B2 | 8/2018 | Kinast et al. |
| 10,058,275 | B2 | 8/2018 | Al-Ali et al. |
| 10,064,562 | B2 | 9/2018 | Al-Ali |
| 10,086,138 | B1 | 10/2018 | Novak, Jr. |
| 10,092,200 | B2 | 10/2018 | Al-Ali et al. |
| 10,092,249 | B2 | 10/2018 | Kiani et al. |
| 10,098,550 | B2 | 10/2018 | Al-Ali et al. |
| 10,098,591 | B2 | 10/2018 | Al-Ali et al. |
| 10,098,610 | B2 | 10/2018 | Al-Ali et al. |
| D833,624 | S | 11/2018 | DeJong et al. |
| 10,123,726 | B2 | 11/2018 | Al-Ali et al. |
| 10,130,289 | B2 | 11/2018 | Al-Ali et al. |
| 10,130,291 | B2 | 11/2018 | Schurman et al. |
| D835,282 | S | 12/2018 | Barker et al. |
| D835,283 | S | 12/2018 | Barker et al. |
| D835,284 | S | 12/2018 | Barker et al. |
| D835,285 | S | 12/2018 | Barker et al. |
| 10,149,616 | B2 | 12/2018 | Al-Ali et al. |
| 10,154,815 | B2 | 12/2018 | Al-Ali et al. |
| 10,159,412 | B2 | 12/2018 | Lamego et al. |
| 10,188,296 | B2 | 1/2019 | Al-Ali et al. |
| 10,188,331 | B1 | 1/2019 | Kiani et al. |
| 10,188,348 | B2 | 1/2019 | Al-Ali et al. |
| RE47,218 | E | 2/2019 | Ali-Ali |
| RE47,244 | E | 2/2019 | Kiani et al. |
| RE47,249 | E | 2/2019 | Kiani et al. |
| 10,194,847 | B2 | 2/2019 | Al-Ali |
| 10,194,848 | B1 | 2/2019 | Kiani et al. |
| 10,201,298 | B2 | 2/2019 | Al-Ali et al. |
| 10,205,272 | B2 | 2/2019 | Kiani et al. |
| 10,205,291 | B2 | 2/2019 | Scruggs et al. |
| 10,213,108 | B2 | 2/2019 | Al-Ali |

| | | | |
|---|---|---|---|
| 10,219,706 | B2 | 3/2019 | Al-Ali |
| 10,219,746 | B2 | 3/2019 | McHale et al. |
| 10,226,187 | B2 | 3/2019 | Al-Ali et al. |
| 10,226,576 | B2 | 3/2019 | Kiani |
| 10,231,657 | B2 | 3/2019 | Al-Ali et al. |
| 10,231,670 | B2 | 3/2019 | Blank et al. |
| 10,231,676 | B2 | 3/2019 | Al-Ali et al. |
| RE47,353 | E | 4/2019 | Kiani et al. |
| 10,251,585 | B2 | 4/2019 | Al-Ali et al. |
| 10,251,586 | B2 | 4/2019 | Lamego |
| 10,255,994 | B2 | 4/2019 | Sampath et al. |
| 10,258,265 | B1 | 4/2019 | Poeze et al. |
| 10,258,266 | B1 | 4/2019 | Poeze et al. |
| 2003/0218386 | A1 | 11/2003 | Dalke et al. |
| 2005/0234317 | A1 | 10/2005 | Kiani |
| 2006/0094943 | A1 | 5/2006 | Van Slyke |
| 2006/0161054 | A1 | 7/2006 | Reuss et al. |
| 2007/0073121 | A1 | 3/2007 | Hoarau et al. |
| 2007/0282478 | A1 | 12/2007 | Al-Ali et al. |
| 2009/0247984 | A1 | 10/2009 | Lamego et al. |
| 2009/0275813 | A1 | 11/2009 | Davis |
| 2009/0275844 | A1 | 11/2009 | Al-Ali |
| 2010/0004518 | A1 | 1/2010 | Vo et al. |
| 2010/0030040 | A1 | 2/2010 | Poeze et al. |
| 2011/0001605 | A1 | 1/2011 | Kiani et al. |
| 2011/0082711 | A1 | 4/2011 | Poeze et al. |
| 2011/0087083 | A1 | 4/2011 | Poeze et al. |
| 2011/0105854 | A1 | 5/2011 | Kiani et al. |
| 2011/0125060 | A1 | 5/2011 | Telfort et al. |
| 2011/0208015 | A1 | 8/2011 | Welch et al. |
| 2011/0213212 | A1 | 9/2011 | Al-Ali |
| 2011/0230733 | A1 | 9/2011 | Al-Ali |
| 2011/0237911 | A1 | 9/2011 | Lamego et al. |
| 2011/0237969 | A1 | 9/2011 | Eckerbom et al. |
| 2011/0288383 | A1 | 11/2011 | Diab |
| 2012/0041316 | A1 | 2/2012 | Al-Ali et al. |
| 2012/0046557 | A1 | 2/2012 | Kiani |
| 2012/0059267 | A1 | 3/2012 | Lamego et al. |
| 2012/0088984 | A1 | 4/2012 | Al-Ali et al. |
| 2012/0165629 | A1 | 6/2012 | Merritt et al. |
| 2012/0179006 | A1 | 7/2012 | Jansen et al. |
| 2012/0209082 | A1 | 8/2012 | Al-Ali |
| 2012/0209084 | A1 | 8/2012 | Olsen et al. |
| 2012/0227739 | A1 | 9/2012 | Kiani |
| 2012/0283524 | A1 | 11/2012 | Kiani et al. |
| 2012/0296178 | A1 | 11/2012 | Lamego et al. |
| 2012/0319816 | A1 | 12/2012 | Al-Ali |
| 2012/0330112 | A1 | 12/2012 | Lamego et al. |
| 2013/0023775 | A1 | 1/2013 | Lamego et al. |
| 2013/0041591 | A1 | 2/2013 | Lamego |
| 2013/0045685 | A1 | 2/2013 | Kiani |
| 2013/0046204 | A1 | 2/2013 | Lamego et al. |
| 2013/0060147 | A1 | 3/2013 | Welch et al. |
| 2013/0096405 | A1 | 4/2013 | Garfio |
| 2013/0096936 | A1 | 4/2013 | Sampath et al. |
| 2013/0190581 | A1 | 7/2013 | Al-Ali et al. |
| 2013/0197328 | A1 | 8/2013 | Diab et al. |
| 2013/0211214 | A1 | 8/2013 | Olsen |
| 2013/0243021 | A1 | 9/2013 | Siskavich |
| 2013/0253334 | A1 | 9/2013 | Al-Ali et al. |
| 2013/0262730 | A1 | 10/2013 | Al-Ali et al. |
| 2013/0274572 | A1 | 10/2013 | Al-Ali et al. |
| 2013/0296672 | A1 | 11/2013 | O'Neil et al. |
| 2013/0296713 | A1 | 11/2013 | Al-Ali et al. |
| 2013/0317370 | A1 | 11/2013 | Dalvi et al. |
| 2013/0324808 | A1 | 12/2013 | Al-Ali et al. |
| 2013/0331660 | A1 | 12/2013 | Al-Ali et al. |
| 2013/0331670 | A1 | 12/2013 | Kiani |
| 2013/0338461 | A1 | 12/2013 | Lamego et al. |
| 2014/0012100 | A1 | 1/2014 | Al-Ali et al. |
| 2014/0034353 | A1 | 2/2014 | Al-Ali et al. |
| 2014/0051953 | A1 | 2/2014 | Lamego et al. |
| 2014/0058230 | A1 | 2/2014 | Abdul-Hafiz et al. |
| 2014/0066783 | A1 | 3/2014 | Kiani et al. |
| 2014/0077956 | A1 | 3/2014 | Sampath et al. |
| 2014/0081100 | A1 | 3/2014 | Muhsin et al. |
| 2014/0081175 | A1 | 3/2014 | Telfort |
| 2014/0094667 | A1 | 4/2014 | Schurman et al. |
| 2014/0100434 | A1 | 4/2014 | Diab et al. |

**Exhibit 2**

-33-

# US 10,433,776 B2

Page 7

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2014/0114199 | A1 | 4/2014 | Lamego et al. |
| 2014/0120564 | A1 | 5/2014 | Workman et al. |
| 2014/0121482 | A1 | 5/2014 | Merritt et al. |
| 2014/0121483 | A1 | 5/2014 | Kiani |
| 2014/0127137 | A1 | 5/2014 | Bellott et al. |
| 2014/0129702 | A1 | 5/2014 | Lamego et al. |
| 2014/0135588 | A1 | 5/2014 | Al-Ali et al. |
| 2014/0142401 | A1 | 5/2014 | Al-Ali et al. |
| 2014/0163344 | A1 | 6/2014 | Al-Ali |
| 2014/0163402 | A1 | 6/2014 | Lamego et al. |
| 2014/0166076 | A1 | 6/2014 | Kiani et al. |
| 2014/0171763 | A1 | 6/2014 | Diab |
| 2014/0180038 | A1 | 6/2014 | Kiani |
| 2014/0180154 | A1 | 6/2014 | Sierra et al. |
| 2014/0180160 | A1 | 6/2014 | Brown et al. |
| 2014/0187973 | A1 | 7/2014 | Brown et al. |
| 2014/0194709 | A1 | 7/2014 | Al-Ali et al. |
| 2014/0194711 | A1 | 7/2014 | Al-Ali |
| 2014/0194766 | A1 | 7/2014 | Al-Ali et al. |
| 2014/0206963 | A1 | 7/2014 | Al-Ali |
| 2014/0213864 | A1 | 7/2014 | Abdul-Hafiz et al. |
| 2014/0243627 | A1 | 8/2014 | Diab et al. |
| 2014/0266790 | A1 | 9/2014 | Al-Ali et al. |
| 2014/0275808 | A1 | 9/2014 | Poeze et al. |
| 2014/0275835 | A1 | 9/2014 | Lamego et al. |
| 2014/0275871 | A1 | 9/2014 | Lamego et al. |
| 2014/0275872 | A1 | 9/2014 | Merritt et al. |
| 2014/0275881 | A1 | 9/2014 | Lamego et al. |
| 2014/0276115 | A1 | 9/2014 | Dalvi et al. |
| 2014/0288400 | A1 | 9/2014 | Diab et al. |
| 2014/0303520 | A1 | 10/2014 | Telfort et al. |
| 2014/0316217 | A1 | 10/2014 | Purdon et al. |
| 2014/0316218 | A1 | 10/2014 | Purdon et al. |
| 2014/0316228 | A1 | 10/2014 | Blank et al. |
| 2014/0323825 | A1 | 10/2014 | Al-Ali et al. |
| 2014/0323897 | A1 | 10/2014 | Brown et al. |
| 2014/0323898 | A1 | 10/2014 | Purdon et al. |
| 2014/0330092 | A1 | 11/2014 | Al-Ali et al. |
| 2014/0330098 | A1 | 11/2014 | Merritt et al. |
| 2014/0330099 | A1 | 11/2014 | Al-Ali et al. |
| 2014/0333440 | A1 | 11/2014 | Kiani |
| 2014/0336481 | A1 | 11/2014 | Shakespeare et al. |
| 2014/0343436 | A1 | 11/2014 | Kiani |
| 2014/0357966 | A1 | 12/2014 | Al-Ali et al. |
| 2014/0371548 | A1 | 12/2014 | Al-Ali et al. |
| 2014/0378784 | A1 | 12/2014 | Kiani et al. |
| 2015/0005600 | A1 | 1/2015 | Blank et al. |
| 2015/0011907 | A1 | 1/2015 | Purdon et al. |
| 2015/0012231 | A1 | 1/2015 | Poeze et al. |
| 2015/0018650 | A1 | 1/2015 | Al-Ali et al. |
| 2015/0025406 | A1 | 1/2015 | Al-Ali |
| 2015/0032029 | A1 | 1/2015 | Al-Ali et al. |
| 2015/0038859 | A1 | 2/2015 | Dalvi et al. |
| 2015/0045637 | A1 | 2/2015 | Dalvi |
| 2015/0051462 | A1 | 2/2015 | Olsen |
| 2015/0080754 | A1 | 3/2015 | Purdon et al. |
| 2015/0087936 | A1 | 3/2015 | Al-Ali et al. |
| 2015/0094546 | A1 | 4/2015 | Al-Ali |
| 2015/0097701 | A1 | 4/2015 | Al-Ali et al. |
| 2015/0099950 | A1 | 4/2015 | Al-Ali et al. |
| 2015/0099951 | A1 | 4/2015 | Al-Ali et al. |
| 2015/0099955 | A1 | 4/2015 | Al-Ali et al. |
| 2015/0101844 | A1 | 4/2015 | Al-Ali et al. |
| 2015/0106121 | A1 | 4/2015 | Muhsin et al. |
| 2015/0112151 | A1 | 4/2015 | Muhsin et al. |
| 2015/0116076 | A1 | 4/2015 | Al-Ali et al. |
| 2015/0126830 | A1 | 5/2015 | Schurman et al. |
| 2015/0133755 | A1 | 5/2015 | Smith et al. |
| 2015/0141781 | A1 | 5/2015 | Weber et al. |
| 2015/0165312 | A1 | 6/2015 | Kiani |
| 2015/0196237 | A1 | 7/2015 | Lamego |
| 2015/0196249 | A1 | 7/2015 | Brown et al. |
| 2015/0201874 | A1 | 7/2015 | Diab |
| 2015/0208966 | A1 | 7/2015 | Al-Ali et al. |
| 2015/0216459 | A1 | 8/2015 | Al-Ali et al. |
| 2015/0230755 | A1 | 8/2015 | Al-Ali et al. |
| 2015/0238722 | A1 | 8/2015 | Al-Ali |
| 2015/0245773 | A1 | 9/2015 | Lamego et al. |
| 2015/0245794 | A1 | 9/2015 | Al-Ali |
| 2015/0257689 | A1 | 9/2015 | Al-Ali et al. |
| 2015/0272514 | A1 | 10/2015 | Kiani et al. |
| 2015/0351697 | A1 | 12/2015 | Weber et al. |
| 2015/0351704 | A1 | 12/2015 | Kiani et al. |
| 2015/0359429 | A1 | 12/2015 | Al-Ali et al. |
| 2015/0366472 | A1 | 12/2015 | Kiani |
| 2015/0366507 | A1 | 12/2015 | Blank |
| 2015/0374298 | A1 | 12/2015 | Al-Ali et al. |
| 2015/0380875 | A1 | 12/2015 | Coverston et al. |
| 2016/0000362 | A1 | 1/2016 | Diab et al. |
| 2016/0007930 | A1 | 1/2016 | Weber et al. |
| 2016/0029932 | A1 | 2/2016 | Al-Ali |
| 2016/0029933 | A1 | 2/2016 | Al-Ali et al. |
| 2016/0045118 | A1 | 2/2016 | Kiani |
| 2016/0051205 | A1 | 2/2016 | Al-Ali et al. |
| 2016/0058338 | A1 | 3/2016 | Schurman et al. |
| 2016/0058347 | A1 | 3/2016 | Reichgott et al. |
| 2016/0066823 | A1 | 3/2016 | Kind et al. |
| 2016/0066824 | A1 | 3/2016 | Al-Ali et al. |
| 2016/0066879 | A1 | 3/2016 | Telfort et al. |
| 2016/0072429 | A1 | 3/2016 | Kiani et al. |
| 2016/0073967 | A1 | 3/2016 | Lamego et al. |
| 2016/0081552 | A1 | 3/2016 | Wojtczuk et al. |
| 2016/0095543 | A1 | 4/2016 | Telfort et al. |
| 2016/0095548 | A1 | 4/2016 | Al-Ali et al. |
| 2016/0103598 | A1 | 4/2016 | Al-Ali et al. |
| 2016/0113527 | A1 | 4/2016 | Al-Ali et al. |
| 2016/0143548 | A1 | 5/2016 | Al-Ali |
| 2016/0166182 | A1 | 6/2016 | Al-Ali et al. |
| 2016/0166183 | A1 | 6/2016 | Poeze et al. |
| 2016/0166188 | A1 | 6/2016 | Bruinsma et al. |
| 2016/0166210 | A1 | 6/2016 | Al-Ali |
| 2016/0192869 | A1 | 7/2016 | Kiani et al. |
| 2016/0196388 | A1 | 7/2016 | Lamego |
| 2016/0197436 | A1 | 7/2016 | Barker et al. |
| 2016/0213281 | A1 | 7/2016 | Eckerbom et al. |
| 2016/0228043 | A1 | 8/2016 | O'Neil et al. |
| 2016/0233632 | A1 | 8/2016 | Scruggs et al. |
| 2016/0234944 | A1 | 8/2016 | Schmidt et al. |
| 2016/0270735 | A1 | 9/2016 | Diab et al. |
| 2016/0283665 | A1 | 9/2016 | Sampath et al. |
| 2016/0287090 | A1 | 10/2016 | Al-Ali et al. |
| 2016/0287786 | A1 | 10/2016 | Kiani |
| 2016/0296169 | A1 | 10/2016 | McHale et al. |
| 2016/0310052 | A1 | 10/2016 | Al-Ali et al. |
| 2016/0314260 | A1 | 10/2016 | Kiani |
| 2016/0324486 | A1 | 11/2016 | Al-Ali et al. |
| 2016/0324488 | A1 | 11/2016 | Olsen |
| 2016/0327984 | A1 | 11/2016 | Al-Ali et al. |
| 2016/0328528 | A1 | 11/2016 | Al-Ali et al. |
| 2016/0331332 | A1 | 11/2016 | Al-Ali |
| 2016/0367173 | A1 | 12/2016 | Dalvi et al. |
| 2017/0000394 | A1 | 1/2017 | Al-Ali et al. |
| 2017/0007134 | A1 | 1/2017 | Al-Ali et al. |
| 2017/0007190 | A1 | 1/2017 | Al-Ali et al. |
| 2017/0007198 | A1 | 1/2017 | Al-Ali et al. |
| 2017/0014083 | A1 | 1/2017 | Diab et al. |
| 2017/0014084 | A1 | 1/2017 | Al-Ali et al. |
| 2017/0021099 | A1 | 1/2017 | Al-Ali et al. |
| 2017/0024748 | A1 | 1/2017 | Haider |
| 2017/0027456 | A1 | 2/2017 | Kinast et al. |
| 2017/0042488 | A1 | 2/2017 | Muhsin |
| 2017/0055847 | A1 | 3/2017 | Kiani et al. |
| 2017/0055851 | A1 | 3/2017 | Al-Ali |
| 2017/0055882 | A1 | 3/2017 | Al-Ali et al. |
| 2017/0055887 | A1 | 3/2017 | Al-Ali |
| 2017/0055896 | A1 | 3/2017 | Al-Ali et al. |
| 2017/0079594 | A1 | 3/2017 | Telfort et al. |
| 2017/0086723 | A1 | 3/2017 | Al-Ali et al. |
| 2017/0143281 | A1 | 5/2017 | Olsen |
| 2017/0147774 | A1 | 5/2017 | Kiani |
| 2017/0156620 | A1 | 6/2017 | Al-Ali et al. |
| 2017/0173632 | A1 | 6/2017 | Al-Ali |
| 2017/0187146 | A1 | 6/2017 | Kiani et al. |
| 2017/0188919 | A1 | 7/2017 | Al-Ali et al. |

**Exhibit 2**

**-34-**

**US 10,433,776 B2**

Page 8

(56)　　　　　　**References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 2017/0196464 A1 | 7/2017 | Jansen et al. |
| 2017/0196470 A1 | 7/2017 | Lamego et al. |
| 2017/0202490 A1 | 7/2017 | Al-Ali et al. |
| 2017/0224262 A1 | 8/2017 | Al-Ali |
| 2017/0228516 A1 | 8/2017 | Sampath et al. |
| 2017/0245790 A1 | 8/2017 | Al-Ali et al. |
| 2017/0251974 A1 | 9/2017 | Shreim et al. |
| 2017/0251975 A1 | 9/2017 | Shreim et al. |
| 2017/0258403 A1 | 9/2017 | Abdul-Hafiz et al. |
| 2017/0311851 A1 | 11/2017 | Schurman et al. |
| 2017/0311891 A1 | 11/2017 | Kiani et al. |
| 2017/0325728 A1 | 11/2017 | Al-Ali et al. |
| 2017/0332976 A1 | 11/2017 | Al-Ali et al. |
| 2017/0340293 A1 | 11/2017 | Al-Ali et al. |
| 2017/0360310 A1 | 12/2017 | Kiani et al. |
| 2017/0367632 A1 | 12/2017 | Al-Ali et al. |
| 2018/0008146 A1 | 1/2018 | Al-Ali et al. |
| 2018/0013562 A1 | 1/2018 | Haider et al. |
| 2018/0014752 A1 | 1/2018 | Al-Ali et al. |
| 2018/0028124 A1 | 2/2018 | Al-Ali et al. |
| 2018/0055385 A1 | 3/2018 | Al-Ali |
| 2018/0055390 A1 | 3/2018 | Kiani et al. |
| 2018/0055430 A1 | 3/2018 | Diab et al. |
| 2018/0064381 A1 | 3/2018 | Shakespeare et al. |
| 2018/0069776 A1 | 3/2018 | Lamego et al. |
| 2018/0070867 A1 | 3/2018 | Smith et al. |
| 2018/0082767 A1 | 3/2018 | Al-Ali et al. |
| 2018/0085068 A1 | 3/2018 | Telfort |
| 2018/0087937 A1 | 3/2018 | Al-Ali et al. |
| 2018/0103874 A1 | 4/2018 | Lee et al. |
| 2018/0103905 A1 | 4/2018 | Kiani |
| 2018/0110478 A1 | 4/2018 | Al-Ali |
| 2018/0116575 A1 | 5/2018 | Perea et al. |
| 2018/0125368 A1 | 5/2018 | Lamego et al. |
| 2018/0125430 A1 | 5/2018 | Al-Ali et al. |
| 2018/0125445 A1 | 5/2018 | Telfort et al. |
| 2018/0130325 A1 | 5/2018 | Kiani et al. |
| 2018/0132769 A1 | 5/2018 | Weber et al. |
| 2018/0132770 A1 | 5/2018 | Lamego |
| 2018/0146901 A1 | 5/2018 | Al-Ali et al. |
| 2018/0146902 A1 | 5/2018 | Kiani et al. |
| 2018/0153442 A1 | 6/2018 | Eckerbom et al. |
| 2018/0153446 A1 | 6/2018 | Kiani |
| 2018/0153447 A1 | 6/2018 | Al-Ali et al. |
| 2018/0153448 A1 | 6/2018 | Weber et al. |
| 2018/0161499 A1 | 6/2018 | Al-Ali et al. |
| 2018/0168491 A1 | 6/2018 | Al-Ali et al. |
| 2018/0174679 A1 | 6/2018 | Sampath et al. |
| 2018/0174680 A1 | 6/2018 | Sampath et al. |
| 2018/0182484 A1 | 6/2018 | Sampath et al. |
| 2018/0184917 A1 | 7/2018 | Kiani |
| 2018/0192924 A1 | 7/2018 | Al-Ali |
| 2018/0192953 A1 | 7/2018 | Shreim et al. |
| 2018/0192955 A1 | 7/2018 | Al-Ali et al. |
| 2018/0199871 A1 | 7/2018 | Pauley et al. |
| 2018/0206795 A1 | 7/2018 | Al-Ali |
| 2018/0206815 A1 | 7/2018 | Telfort |
| 2018/0213583 A1 | 7/2018 | Al-Ali |
| 2018/0214031 A1 | 8/2018 | Kiani et al. |
| 2018/0214090 A1 | 8/2018 | Al-Ali et al. |
| 2018/0218792 A1 | 8/2018 | Muhsin et al. |
| 2018/0225960 A1 | 8/2018 | Al-Ali et al. |
| 2018/0238718 A1 | 8/2018 | Dalvi |
| 2018/0242853 A1 | 8/2018 | Al-Ali |
| 2018/0242921 A1 | 8/2018 | Muhsin et al. |
| 2018/0242923 A1 | 8/2018 | Al-Ali et al. |
| 2018/0242924 A1 | 8/2018 | Barker et al. |
| 2018/0242926 A1 | 8/2018 | Muhsin et al. |
| 2018/0247353 A1 | 8/2018 | Al-Ali et al. |
| 2018/0247712 A1 | 8/2018 | Muhsin et al. |
| 2018/0249933 A1 | 9/2018 | Schurman et al. |
| 2018/0253947 A1 | 9/2018 | Muhsin et al. |
| 2018/0256087 A1 | 9/2018 | Al-Ali et al. |
| 2018/0256113 A1 | 9/2018 | Weber et al. |
| 2018/0285094 A1 | 10/2018 | Housel et al. |
| 2018/0289325 A1 | 10/2018 | Poeze et al. |
| 2018/0289337 A1 | 10/2018 | Al-Ali et al. |
| 2018/0296161 A1 | 10/2018 | Shreim et al. |
| 2018/0300919 A1 | 10/2018 | Muhsin et al. |
| 2018/0310822 A1 | 11/2018 | Indorf et al. |
| 2018/0310823 A1 | 11/2018 | Al-Ali et al. |
| 2018/0317826 A1 | 11/2018 | Muhsin |
| 2018/0317841 A1 | 11/2018 | Novak, Jr. |
| 2018/0333055 A1 | 11/2018 | Lamego et al. |
| 2018/0333087 A1 | 11/2018 | Al-Ali |
| 2019/0000317 A1 | 1/2019 | Muhsin et al. |
| 2019/0000362 A1 | 1/2019 | Kiani et al. |
| 2019/0015023 A1 | 1/2019 | Monfre |
| 2019/0021638 A1 | 1/2019 | Al-Ali et al. |
| 2019/0029574 A1 | 1/2019 | Schurman et al. |
| 2019/0029578 A1 | 1/2019 | Al-Ali et al. |
| 2019/0058280 A1 | 2/2019 | Al-Ali et al. |
| 2019/0058281 A1 | 2/2019 | Al-Ali et al. |
| 2019/0069813 A1 | 3/2019 | Al-Ali |
| 2019/0076028 A1 | 3/2019 | Al-Ali et al. |
| 2019/0082979 A1 | 3/2019 | Al-Ali et al. |
| 2019/0090748 A1 | 3/2019 | Al-Ali |
| 2019/0090760 A1 | 3/2019 | Kinast et al. |
| 2019/0090764 A1 | 3/2019 | Al-Ali |
| 2019/0117070 A1 | 4/2019 | Muhsin et al. |
| 2019/0117139 A1 | 4/2019 | Al-Ali et al. |
| 2019/0117140 A1 | 4/2019 | Al-Ali et al. |
| 2019/0117141 A1 | 4/2019 | Al-Ali |
| 2019/0117930 A1 | 4/2019 | Al-Ali |

OTHER PUBLICATIONS

US 9,579,050 B2, 02/2017, Al-Ali (withdrawn)
International Search Report dated Jul. 11, 2002, International Application No. PCT/US02/20675 filed Jun. 28, 2002.
U.S. Appl. No. 15/820,082, Low Power Pulse Oximeter, filed Nov. 21, 2017.
U.S. Appl. No. 16/174,130, Low Power Pulse Oximeter, filed Oct. 29, 2018.
Nov. 8, 2018 Complaint for (1) Breach of Contract (2) Trade Secret Misappropriation (3) Breach of Fiduciary Duty and (4) Patent Infringement and Demand for Jury Trial, *Masimo Corporation and Cercacor Laboratories, Inc. v. True Wearables, Inc. and Marcelo Lamego*, Case No. 8:18-cv-2001.
May 15, 2019 Defendants True Wearables, Inc.'s and Marcelo Lamego's Preliminary Invalidity Contentions, *Masimo Corporation and Cercacor Laboratories, Inc. v. True Wearables, Inc. and Marcelo Lamego*, Case No. 8:18-cv-2001-JVS-JDE.
New, William, Jr., "Continuous Non-Invasive Measurement of Arterial Oxygen", Journal of Japan Society for Clinical Anesthesia, vol. 6, No. 6, pp. 460-468 (Dec. 15, 1986).

* cited by examiner

**Exhibit 2**
**-35-**

U.S. Patent

Oct. 8, 2019

Sheet 1 of 11

US 10,433,776 B2



FIG. 1 (Prior Art)

Exhibit 2
-36-

U.S. Patent

Oct. 8, 2019

Sheet 2 of 11

US 10,433,776 B2



FIG. 2 (Prior Art)

Exhibit 2
-37-

U.S. Patent

Oct. 8, 2019

Sheet 3 of 11

US 10,433,776 B2



FIG. 3

Exhibit 2
-38-

U.S. Patent

Oct. 8, 2019

Sheet 4 of 11

US 10,433,776 B2



FIG. 4

Exhibit 2
-39-



FIG. 5

Exhibit 2
-40-



FIG. 6

Exhibit 2
-41-



FIG. 7A

FIG. 7B

Exhibit 2
-42-

U.S. Patent

Oct. 8, 2019

Sheet 8 of 11

US 10,433,776 B2



FIG. 8

Exhibit 2
-43-

U.S. Patent

Oct. 8, 2019

Sheet 9 of 11

US 10,433,776 B2



FIG. 9

E = EVENT
Q = LOW QUALITY
P = ABOVE POWER TARGET FOR A
PARTICULAR TIME PERIOD
T = TIMEOUT

Exhibit 2
-44-



FIG. 10

Exhibit 2
-45-

U.S. Patent

Oct. 8, 2019

Sheet 11 of 11

US 10,433,776 B2



FIG. 11

Exhibit 2
-46-

US 10,433,776 B2

1

# LOW POWER PULSE OXIMETER

## REFERENCE TO RELATED APPLICATIONS

Any and all applications for which a foreign or domestic priority claim is identified in the Application Data Sheet as filed with the present application are incorporated by reference under 37 CFR 1.57 and made a part of this specification.

## BACKGROUND OF THE INVENTION

Pulse oximetry is a widely accepted noninvasive procedure for measuring the oxygen saturation level of a person's arterial blood, an indicator of their oxygen supply. Oxygen saturation monitoring is crucial in critical care and surgical applications, where an insufficient blood supply can quickly lead to injury or death. FIG. 1 illustrates a conventional pulse oximetry system 100, which has a sensor 110 and a monitor 150. The sensor 110, which can be attached to an adult's finger or an infant's foot, has both red and infrared LEDs 112 and a photodiode detector 114. For a finger, the sensor is configured so that the LEDs 112 project light through the fingernail and into the blood vessels and capillaries underneath. The photodiode 114 is positioned at the finger tip opposite the fingernail so as to detect the LED emitted light as it emerges from the finger tissues. A pulse oximetry sensor is described in U.S. Pat. No. 6,088,607 entitled "Low Noise Optical Probe," which is assigned to the assignee of the present invention and incorporated by reference herein.

Also shown in FIG. 1, the monitor 150 has LED drivers 152, a signal conditioning and digitization front-end 154, a signal processor 156, a display driver 158 and a display 159. The LED drivers 152 alternately activate the red and IR LEDs 112 and the front-end 154 conditions and digitizes the resulting current generated by the photodiode 114, which is proportional to the intensity of the detected light. The signal processor 156 inputs the conditioned photodiode signal and determines oxygen saturation based on the differential absorption by arterial blood of the two wavelengths emitted by the LEDs 112. Specifically, a ratio of detected red and infrared intensities is calculated by the signal processor 156, and an arterial oxygen saturation value is empirically determined based on the ratio obtained. The display driver 158 and associated display 159 indicate a patient's oxygen saturation, heart rate and plethysmographic waveform.

## SUMMARY OF THE INVENTION

Increasingly, pulse oximeters are being utilized in portable, battery-operated applications. For example, a pulse oximeter may be attached to a patient during emergency transport and remain with the patient as they are moved between hospital wards. Further, pulse oximeters are often implemented as plug-in modules for multiparameter patient monitors having a restricted power budget. These applications and others create an increasing demand for lower power and higher performance pulse oximeters. A conventional approach for reducing power consumption in portable electronics, typically utilized by devices such as calculators and notebook computers, is to have a "sleep mode" where the circuitry is powered-down when the devices are idle.

FIG. 2 illustrates a sleep-mode pulse oximeter 200 utilizing conventional sleep-mode power reduction. The pulse oximeter 200 has a pulse oximeter processor 210 and a power control 220. The power control 220 monitors the

2

pulse oximeter output parameters 212, such as oxygen saturation and pulse rate, and controls the processor power 214 according to measured activity. For example, if there is no significant change in the oxygen saturation value over a certain time period, the power control 220 will power down the processor 210, except perhaps for a portion of memory. The power control 220 may have a timer that triggers the processor 210 to periodically sample the oxygen saturation value, and the power control 220 determines if any changes in this parameter are occurring. If not, the power control 220 will leave the processor 210 in sleep mode.

There are a number of disadvantages to applying consumer electronic sleep mode techniques to pulse oximetry. By definition, the pulse oximeter is not functioning during sleep mode. Unlike consumer electronics, pulse oximetry cannot afford to miss events, such as patient oxygen desaturation. Further, there is a trade-off between shorter but more frequent sleep periods to avoid a missed event and the increased processing overhead to power-up after each sleep period. Also, sleep mode techniques rely only on the output parameters to determine whether the pulse oximeter should be active or in sleep mode. Finally, the caregiver is given no indication of when the pulse oximeter outputs were last updated.

One aspect of a low power pulse oximeter is a sensor interface adapted to drive a pulse oximetry sensor and receive a corresponding input signal. A processor derives a physiological measurement corresponding to the input signal, and a display driver communicates the measurement to a display. A controller generates a sampling control output to at least one of said sensor interface and said processor so as to reduce the average power consumption of the pulse oximeter consistent with a predetermined power target.

In one embodiment, a calculator derives a signal status output responsive to the input signal. The signal status output is communicated to the controller to override the sampling control output. The signal status output may indicate the occurrence of a low signal quality or the occurrence of a physiological event. In another embodiment, the sensor interface has an emitter driver adapted to provide a current output to an emitter portion of the sensor. Here, the sampling control output determines a duty cycle of the current output. In a particular embodiment, the duty cycle may be in the range of about 3.125% to about 25%.

In another embodiment, the sensor interface has a front-end adapted to receive the input signal from a detector portion of the sensor and to provide a corresponding digitized signal. Here, the sampling control output determines a powered-down period of the front-end. A confidence indicator responsive to a duration of the powered-down period may be provided and displayed.

In yet another embodiment, the pulse oximeter comprises a plurality of data blocks responsive to the input signal, wherein the sampling control output determines a time shift of successive ones of the data blocks. The time shift may vary in the range of about 1.2 seconds to about 4.8 seconds.

An aspect of a low power pulse oximetry method comprises the steps of setting a power target and receiving an input signal from a pulse oximetry sensor. Further steps include calculating a signal status related to the input signal, calculating power status related to the power target, and sampling based upon the result of the calculating signal status and the calculating power status steps.

In one embodiment, the calculating signal status step comprises the substeps of receiving a signal statistic related to the input signal, receiving a physiological measurement related to the input signal, determining a low signal quality

Exhibit 2
-47-

US 10,433,776 B2

3

condition from the signal statistic, determining an event occurrence from the physiological measurement, and indicating an override based upon the low signal quality condition or the event occurrence. The calculating power status step may comprise the substeps of estimating an average power consumption for at least a portion of the pulse oximeter, and indicating an above power target condition when the average power consumption is above the power target. The sampling step may comprise the substep of increasing sampling as the result of the override. The sampling step may also comprise the substep of decreasing sampling as the result of the above power target condition, except during the override.

Another aspect of a low power pulse oximetry method comprises the steps of detecting an override related to a measure of signal quality or a physiological measurement event, increasing the pulse oximeter power to a higher power level when the override exists, and reducing the pulse oximeter power to a lower power level when the override does not exist. The method may comprise the further steps of predetermining a target power level for a pulse oximeter and cycling between the lower power level and the higher power level so that an average pulse oximeter power is consistent with the target power level.

In one embodiment, the reducing step comprises the substep of decreasing the duty cycle of an emitter driver output to the sensor. In another embodiment, the reducing step comprises the substep of powering-down a detector front-end. A further step may comprise displaying a confidence indicator related to the duration of the powering-down substep. In yet another embodiment, the reducing step comprises the substep of increasing the time-shift of post-processor data blocks.

Another aspect of a low power pulse oximeter comprises a sensor interface adapted to receive an input signal from a sensor, a signal processor configured to communicate with the sensor interface and to generate an internal parameter responsive to the input signal, and a sampling controller responsive to the internal parameter so as to generate a sampling control to alter the power consumption of at least one of the sensor interface and the signal processor. The signal processor may be configured to generate an output parameter and the sampling controller may be responsive to a combination of the internal and output parameters so as to generate a sampling control to alter the power consumption of at least one of the sensor interface and the signal processor. The internal parameter may be indicative of the quality of the input signal. The output parameter may be indicative of oxygen saturation.

In another embodiment, the sampling controller is responsive to a predetermined power target in combination with the internal parameter so as to generate a sampling control to alter the power consumption of at least one of the sensor interface and the signal processor. The signal processor may be configured to generate an output parameter and the sampling controller may be responsive to a combination of the internal and output parameters and the power target so as to generate a sampling control to alter the power consumption of at least one of the sensor interface and the signal processor. The sensor interface may comprise an emitter driver and the sampling control may modify a duty cycle of the emitter driver. The sensor interface may comprise a detector front-end and the sampling control may intermittently power-down the detector front-end. The processor may generate a plurality of data blocks corresponding to the input signal, where each of the data blocks have a time shift

4

from a preceding one of the data blocks, and where the sampling control may determine the amount of the time shift.

A further aspect of a low power pulse oximeter comprises an interface means for communicating with a sensor, a processor means for generating an internal parameter and an output parameter, and a controller means for selectively reducing the power consumption of at least one of the interface means and the processor means based upon the parameters. In one embodiment, the interface means comprises a driver means for determining the duty cycle of emitter current to the sensor, the driver means being responsive to the controller means. In another embodiment, the interface means comprises a detector front-end means for receiving an input signal from the sensor, the power for the detector front-end means being responsive to the controller means. In yet another embodiment, the processor means comprises a post-processor means for determining a time shift between data blocks, the post-processor means being responsive to the controller means. In a further embodiment, the controller means comprises a signal status calculator means for generating an indication of a low signal quality or a physiological event based upon at least one of an internal signal statistic and an output physiological measurement, and a control engine means in communications with the signal status calculator means for generating a sampling control responsive to the indication. In yet a further embodiment, the controller means comprises a power status calculator means for generating a power indication of power consumption relative to a power target, and a control engine means in communications with the power status calculator means for generating a sampling control responsive to the power indication.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram of a conventional pulse oximeter sensor and monitor;

FIG. 2 is a block diagram of a pulse oximeter having a conventional sleep mode;

FIG. 3 is a top-level block diagram of a low power pulse oximeter;

FIG. 4 is a detailed block diagram of a low power pulse oximeter illustrating a sensor interface, a signal processor and a sampling controller;

FIG. 5 is a graph of emitter drive current versus time illustrating variable duty cycle processing;

FIG. 6 is a graph of oxygen saturation versus time illustrating intermittent sample processing;

FIGS. 7A-B are graphs of data buffer content versus time illustrating variable data block overlap processing;

FIG. 8 is a graph of power versus time illustrating power dissipation conformance to an average power target using variable duty cycle and intermittent sample processing;

FIG. 9 is a state diagram of the sampling controller for variable duty cycle and intermittent sample processing;

FIG. 10 is a graph of power versus time illustrating power dissipation using variable data block overlap processing; and

FIG. 11 is a state diagram of the sampling controller for variable data block overlap processing.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

FIG. 3 illustrates one embodiment of a low power pulse oximeter. The pulse oximeter 300 has a sensor interface 320, a signal processor 340, a sampling controller 360 and a

Exhibit 2
-48-

US 10,433,776 B2

5

display driver **380**. The pulse oximeter **300** also has a sensor port **302** and a display port **304**. The sensor port **302** connects to an external sensor, e.g. sensor **110** (FIG. **1**). The sensor interface **320** drives the sensor port **302**, receives a corresponding input signal from the sensor port **302**, and provides a conditioned and digitized sensor signal **322** accordingly. Physiological measurements **342** are input to a display driver **380** that outputs to the display port **304**. The display port **304** connects to a display device, such as a CRT or LCD, which a healthcare provider typically uses for monitoring a patient's oxygen saturation, pulse rate and plethysmograph.

As shown in FIG. **3**, the signal processor **340** derives the physiological measurements **342**, including oxygen saturation, pulse rate and plethysmograph, from the input signal **322**. The signal processor **340** also derives signal statistics **344**, such as signal strength, noise and motion artifact. The physiological measurements **342** and signal statistics **344** are input to the sampling controller **360**, which outputs sampling controls **362**, **364**, **366** accordingly. The sampling controls **362**, **364**, **366** regulate pulse oximeter power dissipation by causing the sensor interface **320** to vary the sampling characteristics of the sensor port **302** and by causing the signal processor **340** to vary its sample processing characteristics, as described in further detail with respect to FIG. **4**, below. Advantageously, power dissipation is responsive not only to output parameters, such as the physiological measurements **342**, but also to internal parameters, such as the signal statistics **344**.

FIG. **4** illustrates further detail regarding the sensor interface **320**, the signal processor **340** and the sampling controller **360**. The sensor interface **320** has emitter drivers **480** and a detector front-end **490**. The emitter drivers **480** are responsive to a sampling control **362**, described below, and provide emitter drive outputs **482**. The emitter drive outputs **482** activate the LEDs of a sensor attached to the sensor port **302** (FIG. **3**). The detector front-end **490** receives an input signal **492** from a sensor attached to the sensor port **302** (FIG. **3**) and provides a corresponding conditioned and digitized input signal **322** to the signal processor **340**. A sampling control **364** controls power to the detector front-end **490**, as described below.

As shown in FIG. **4**, the signal processor **340** has a pre-processor **410** and a post processor **430**. The pre-processor **410** demodulates red and IR signals from the digitized signal **322**, performs filtering, and reduces the sample rate. The pre-processor provides a demodulated output, having a red channel **412** and an IR channel **414**, which is input into the post-processor **430**. The post processor **430** calculates the physiological measurements **342** and the signal statistics **344**, which are output to a signal status calculator **450**. The physiological measurements **342** are also output to a display driver **380** (FIG. **3**) as described above. A pulse oximetry signal processor is described in U.S. Pat. No. 6,081,735 entitled "Signal Processing Apparatus," which is assigned to the assignee of the present invention and incorporated by reference herein.

Also shown in FIG. **4**, the sampling controller **360** has a control engine **440**, a signal status calculator **450** and a power status calculator **460**. The control engine **440** outputs sampling controls **362**, **364**, **366** to reduce the power consumption of the pulse oximeter **300**. In one embodiment, the control engine **440** advantageously utilizes multiple sampling mechanisms to alter power consumption. One sampling mechanism is an emitter duty cycle control **362** that is an input to the emitter drivers **480**. The emitter duty cycle control **362** determines the duty cycle of the current supplied

6

by the emitter drive outputs **482** to both red and IR sensor emitters, as described with respect to FIG. **5**, below. Another sampling mechanism is a front-end control **364** that intermittently removes power to the detector front-end **490**, as described with respected to FIG. **6**, below. Yet another sampling mechanism is a data block overlap control **366** that varies the number of data blocks processed by the post processor **430**. These various sampling mechanisms provide the flexibility to reduce power without sacrificing performance during, for example, high noise conditions or oxygen desaturation events, as described below in further detail.

The sampling controls **362**, **364**, **366** modify power consumption by, in effect, increasing or decreasing the number of input samples received and processed. Sampling, including acquiring input signal samples and subsequent sample processing, can be reduced during high signal quality periods and increased during low signal quality periods or when critical measurements are necessary. In this manner, the control engine **440** regulates power consumption to satisfy a predetermined power target, to minimize power consumption, or to simply reduce power consumption, as described with respect to FIGS. **8** and **10**, below. The current state of the control engine is provided as a control state output **442** to the power status calculator **460**. The control engine **440** utilizes the power status output **462** and the signal status output **452** to determine its next control state, as described with respect to FIGS. **9** and **11**, below.

Further shown in FIG. **4**, the signal status calculator **450** receives physiological measurements and signal statistics from the post processor **430** and determines the occurrence of an event or a low signal quality condition. An event determination is based upon the physiological measurements output **342** and may be any physiological-related indication that justifies the processing of more sensor samples and an associated higher power consumption level, such as an oxygen desaturation, a fast or irregular pulse rate or an unusual plethysmograph waveform to name a few. A low signal quality condition is based upon the signal statistics output **344** and may be any signal-related indication that justifies the processing of more sensor samples and an associated higher power consumption level, such as a low signal level, a high noise level or motion artifact to name a few. The signal status calculator **450** provides the signal status output **452** that is input to the control engine **440**.

In addition, FIG. **4** shows that the power status calculator **460** has a control state input **442** and a power status output **462**. The control state input **442** indicates the current state of the control engine **440**. The power status calculator **460** utilizes an internal time base, such as a counter, timer or real-time clock, in conjunction with the control engine state to estimate the average power consumption of at least a portion of the pulse oximeter **300**. The power status calculator **460** also stores a predetermined power target and compares its power consumption estimate to this target. The power status calculator **460** generates the power status output **462** as an indication that the current average power estimate is above or below the power target and provides this output **462** to the control engine **440**.

FIG. **5** illustrates emitter driver output current versus time. The graph **500** depicts the combination of a red LED drive current **510** and an IR drive current **560**. The solid line graph **502** illustrates drive currents having a high duty cycle. The dashed line graph **504** illustrates drive currents having a low duty cycle. In a typical pulse oximeter, the duty cycle of the drive signals is constant and provides sufficient dark bands **508** to demodulate the detector response into red and IR channels. The emitter drivers **480** (FIG. **4**), however,

Exhibit 2

-49-

US 10,433,776 B2

7

8

require a significant portion of the overall pulse oximeter power budget. Intermittently reducing the drive current duty cycle can advantageously reduce power dissipation without compromising signal integrity. As an example, a low power pulse oximeter implementation nominally consuming 500 mw may be able to reduce power consumption on the order of 70 mw by such drive current duty cycle reductions. In a preferred embodiment, the drive current duty cycle is varied within a range from about 25% to about 3.125%. In a more preferred embodiment, the drive current duty cycle is intermittently reduced from about 25% to about 3.125%. In conjunction with an intermittently reduced duty cycle or as an independent sampling mechanism, there may be a "data off" time period longer than one drive current cycle where the emitter drivers **480** (FIG. **4**) are turned off. The detector front-end **490** (FIG. **4**) may also be powered down during such a data off period, as described with respect to FIGS. **8** and **9**, below.

FIG. **6** is a graph **600** of a pre-processor output signal **610** over time depicting the result of intermittent sampling at the detector front-end **490** (FIG. **4**). The output signal **610** is a red channel **412** (FIG. **4**) or an IR channel **414** (FIG. **4**) output from the pre-processor **410** (FIG. **4**), which is input to the post processor **430** (FIG. **4**), as described above. The output signal **610** has "on" periods **612**, during which time the detector front-end **490** (FIG. **4**) is powered-up and "off" periods **614**, during which time the detector front-end **490** (FIG. **4**) is powered-down. The location and duration of the on periods **612** and off periods **614** are determined by the front-end control **364** (FIG. **4**).

Also shown in FIG. **6** is a corresponding timeline **601** of overlapping data blocks **700**, which are "snap-shots" of the pre-processor output signal **610** over specific time intervals. Specifically, the post processor **430** (FIG. **4**) processes a sliding window of samples of the pre-processor output signal **610**, as described with respect to FIGS. **7**A-B, below. Advantageously, the post processor **430** (FIG. **4**) continues to function during off portions **614**, marking as invalid those data blocks **640** that incorporate off portions **614**. A freshness counter can be used to measure the time period **660** between valid data blocks **630**, which can be displayed on a pulse oximeter monitor as an indication of confidence in the current measurements.

FIGS. **7**A-B illustrate data blocks **700**, which are processed by the post processor **430** (FIG. **4**). Each data block **700** has n samples **702** of the pre-processor output and corresponds to a time interval **704** of $n/f_s$, where $f_s$ is the sample frequency. For example, in one embodiment $n=600$ and $f_s=62.5$ Hz. Hence, each data block time interval **704** is nominally 9.6 sec.

As shown in FIG. **7**A, each data block **700** also has a relative time shift **706** from the preceding data block, where is an integral number of sample periods. That is, $=m/f_s$, where m is an integer representing the number of samples dropped from the preceding data block and added to the succeeding data block. In the embodiment described above, $m=75$ and $=1.2$ sec, nominally. The corresponding overlap **708** of two adjacent data blocks **710**, **720** is $(n-m)/f_s$. In the embodiment described above, the overlap **708** is nominally 9.6 sec−1.2 sec=8.4 sec. The greater the overlap **708**, i.e. the smaller the time shift **706**, the more data blocks there are to process in the post-processor **430** (FIG. **4**), with a corresponding greater power consumption. The overlap **708** between successive data blocks **710**, **720** may vary from $n-1$ samples to no samples, i.e. no overlap. Also, as shown in FIG. 7B, there may be a sample gap **756** or negative overlap, i.e. samples between data blocks that are not processed by

the post-processor, allowing further post-processor power savings. Sample gaps **756** may correspond to detector front-end off periods **614** (FIG. **6**).

FIG. **8** illustrates an exemplar power consumption versus time profile **800** for the pulse oximeter **300** (FIG. **3**) during various control engine states. In one embodiment, the control engine **440** (FIG. **4**) has three states related to the sampling control outputs **362**, **364** that affect pulse oximeter power consumption accordingly. One of ordinary skill in the art will recognize that the control engine **440** (FIG. **4**) may have greater or fewer states and associated power consumption levels. The profile **800** shows the three control engine states **810** and the associated power consumption levels **820**. These three states are high duty cycle **812**, low duty cycle **814** and data off **818**.

In the high duty cycle state **812**, the control engine **440** (FIG. **4**) causes the emitter drivers **480** (FIG. **4**) to turn on sensor emitters for a relatively long time period, such as 25% on time for each of the red **510** and IR **560** drive currents. In the low duty cycle state **814**, the control engine **440** (FIG. **4**) causes the emitter drivers **480** (FIG. **4**) to turn on sensor emitters for a relatively short time period, such as 3.125% of the time for each of the red **510** and IR **560** drive currents. In the data off state **818**, the control engine **440** (FIG. **4**) turns off the emitter drivers **480** (FIG. **4**) and powers down the detector front-end **490** (FIG. **4**). Also shown is a predetermined target power consumption level **830**. The control engine **440** (FIG. **4**) alters the sensor sampling of the pulse oximeter **300** (FIG. **3**) so that the average power consumption matches the target level **830**, as indicated by the power status output **462** (FIG. **4**), except when overridden by the signal status output **452** (FIG. **4**).

As shown in FIG. **8**, power consumption changes according to the control states **810** during each of the time intervals **850**. In a first time interval **851**, the pulse oximeter is in a low duty cycle state **814** and transitions to a high duty cycle state **812** during a second time interval **852** due to an event or low quality signal. During a third time interval **853**, the pulse oximeter is able to enter the data off state **818**, during which time no sensor samples are processed. In a forth time interval **854**, sensor samples are again taken, but at a low duty cycle **814**. During the fifth and sixth time intervals **855**, **856**, sensor samples are shut off and turned on again as the pulse oximeter **300** (FIG. **3**) alternates between the data off state **818** and the low duty cycle state **814** so as to maintain an average power consumption at the target level **830**.

FIG. **9** illustrates a state diagram **900** for one embodiment of the control engine **440** (FIG. **4**). In this embodiment, there are three control states, high duty cycle **910**, low duty cycle **940** and data off **970**, as described with respect to FIG. **8**, above. If the control state is data off **970**, an event triggers a data-off to high-duty-cycle transition **972**. If the control state is low duty cycle **940**, an event similarly triggers a low-duty cycle to high-duty-cycle transition **942**. In this manner, the occurrence of an event initiates high duty sensor sampling, allowing high fidelity monitoring of the event. Similarly, if the control state is low duty cycle **940**, low signal quality triggers a low-duty cycle to high-duty-cycle transition **942**. In this manner, low signal quality initiates higher duty sensor sampling, providing, for example, a larger signal-to-noise ratio.

Also shown in FIG. **9**, if the control state is high duty cycle **910** and either an event is occurring or signal quality is low, then a null transition **918** maintains the high duty cycle state **910**. If the pulse oximeter is not above the power target for more than a particular time interval, a null transition **948** maintains the low duty cycle state **940**, so that

**Exhibit 2**

**-50-**

US 10,433,776 B2

9
10

sampling is turned-off only when necessary to track the power target. Further, if the control state is data off **970** and no time-out has occurred, a null transition **978** maintains the data off state **970**, providing a minimum power consumption.

In addition, FIG. **9** shows that when the control state is in a high duty cycle state **910**, if neither an event nor low signal quality are occurring, then a high-duty-cycle to low-duty-cycle transition **912** occurs by default. Also, if the control state is low duty cycle **940**, if neither an event nor low signal quality are occurring and the power consumption is above the target level for longer than a particular time interval, a low-duty-cycle to data-off transition **944** occurs by default, allowing power consumption to come down to the target level. Further, if the control state is data off **970**, if no event occurs and a timeout does occur, a data-off to low-duty-cycle transition **974** occurs by default, preventing excessively long periods of no sensor sampling.

FIG. **10** illustrates an exemplar power consumption versus time profile **1000** for the post processor **430** (FIG. **4**) during various control engine states. In one embodiment, the control engine **440** (FIG. **4**) has three states related to the sampling control output **366** (FIG. **4**) that affect post processor power consumption accordingly. One of ordinary skill in the art will recognize that the control engine may have greater or fewer states and associated power consumption levels. The profile **1000** shows the three control engine states **1010** and the associated post processor power consumption levels **1020**. These three states are large overlap **1012**, medium overlap **1014** and small overlap **1018**.

As shown in FIG. **10**, in the large overlap state **1012**, the control engine **440** (FIG. **4**) causes the post processor to process data blocks that have a comparatively small time shift **706** (FIG. **7**A), and the post processor exhibits relatively high power consumption under these conditions, say 300 mw. In the medium overlap state **1014**, the control engine **440** (FIG. **4**) causes the post processor to process data blocks that have a comparatively larger time shift **706** (FIG. **7**A). For example, the data blocks may be time shifted twice as much as for the large overlap state **1012**, and, as such, the post processor performs only half as many computations and consumes half the nominal power, say 150 mw. In the small overlap state **1018**, the control engine **440** (FIG. **4**) causes the post processor to process data blocks that have a comparatively large time shift. For example, the data blocks may be time shifted twice as much as for the medium overlap state **1014**. As such, the post processor performs only a quarter as many computations and consumes a quarter of the nominal power, say 75 mw, as for the large overlap state **1012**. In one embodiment, the control engine **440** (FIG. **4**) alters the data block overlap of the post processor in conjunction with the duty cycle of the emitter drivers described with respect to FIG. **5**, above, and the front-end sampling described with respect to FIG. **6**, above, so that the average power consumption of the pulse oximeter matches a target level indicated by the power status output **462** (FIG. **4**) or so that the power consumption is otherwise reduced or minimized.

In a preferred embodiment, data blocks are time shifted by either about 0.4 sec or about 1.2 sec, depending on the overlap state of the control engine **440** (FIG. **4**). In a more preferred embodiment, the data blocks are varied between about 1.2 sec and about 4.8 sec. In a most preferred embodiment, the data blocks are time shifted by either about 1.2 sec, about 2.4 sec or about 4.8 sec, depending on the overlap state of the control engine **440** (FIG. **4**). Although the post-processing of data blocks is described above with respect to only a few overlap states and a corresponding number of particular data block time shifts, there may be many overlap states and a corresponding range of data block time shifts.

Further shown in FIG. **10**, power consumption **1020** changes according to the control states **1010** during each of the time intervals **1050**. In a first time interval **1052**, the post processor is in a large overlap state **1012** and transitions to a medium overlap state **1014** during a second time interval **1054**, so as to meet a power target during a high signal quality period, for example. During a third time interval **1055**, the post processor enters a small overlap state **1018**, for example to meet a power target by further reducing power consumption. In a forth time interval **1056**, the post processor transitions back to a large overlap state **1012**, such as during an event or low signal quality conditions.

FIG. **11** illustrates a state diagram **1100** for one embodiment of the control engine **440** (FIG. **4**). These states may function in parallel with, or in combination with, the sampling states described with respect to FIG. **9**, above. In the illustrated embodiment, there are three control states, large overlap **1110**, medium overlap **1140** and small overlap **1170**, as described with respect to FIG. **10**, above. If the control state is small overlap **1170**, an event triggers a small overlap to large overlap transition **1172**. If the control state is medium overlap **1140**, an event triggers a medium overlap to large-overlap transition **1142**. In this manner, the occurrence of an event initiates the processing of more data blocks, allowing more robust signal statistics and higher fidelity monitoring of the event. Similarly, if the control state is medium overlap **1140**, low signal quality triggers a medium overlap to large overlap transition **1142**. In this manner, low signal quality initiates the processing of more data blocks, providing more robust signal statistics during lower signal-to-noise ratio periods.

Also shown in FIG. **11**, if the control state is large overlap **1110** and either an event is occurring or signal quality is low, then a null transition **1118** maintains the large overlap state **1110**. If the pulse oximeter is not above the power target for more than a particular time interval, a null transition **1148** maintains the medium overlap state **1140**, so that reduced data processing occurs only when necessary to track the power target. Further, if the control state is small overlap **1170**, a null transition **1178** maintains this power saving state until the power target is reached or an event or low signal quality condition occurs.

In addition, FIG. **11** shows that when the control state is in a large overlap state **1110**, if neither an event nor low signal quality are occurring, then a large overlap to medium overlap transition **1112** occurs by default. Also, if the control state is medium overlap **1140**, if the power consumption is above the target level for longer than a particular time interval and no low signal quality condition or event is occurring, a medium overlap to small overlap transition **1174** occurs, allowing power consumption to come down to the target level. Further, if the control state is small overlap **1170**, if no event occurs but the power target has been met, a small overlap to medium overlap transition **1174** occurs.

A low power pulse oximeter embodiment is described above as having a power status calculator **460** (FIG. **4**) and an associated power target. Another embodiment of a low power pulse oximeter, however, functions without either a power status calculator or a power target, utilizing the sampling controls **362**, **364**, **366** (FIG. **3**) in response to internal parameters and/or output parameters, such as signal statistics **344** (FIG. **3**) and/or physiological measurements

Exhibit 2
-51-

US 10,433,776 B2

11

342 (FIG. 3) to reduce power consumption except during, say, periods of low signal quality and physiological events.

One of ordinary skill in the art will recognize that various state diagrams are possible representing control of the emitter drivers, the detector front-end and the post-processor. Such state diagrams may have fewer or greater states with differing transitional characteristics and with differing relationships between sampling mechanisms than the particular embodiments described above. In relatively simple embodiments of the control engine **440** (FIG. 4), only a single sampling mechanism is used, such as the sampling mechanism used to vary the duty cycle of the emitter drivers. The single sampling mechanism may be based only upon internal parameters, such as signal quality, only upon output parameters, such as those that indicate the occurrence of physiological events, or upon a combination of internal and output parameters, with or without a power target.

In relatively more complex embodiments of the control engine **440** (FIG. 4), sampling mechanisms are used in combination. These sampling mechanisms may be based only upon internal parameters, only upon output parameters, or upon a combination of internal and output parameters, with or without a power target. In a particular embodiment, the emitter duty-cycle, front-end duty-cycle and data block overlap sampling mechanisms described above are combined. A "reduced overlap" state relating to the post-processing of data blocks is added to the diagram of FIG. **9** between the "low duty cycle" state and the "data off" state. That is, sampling is varied between a high duty cycle state, a low duty cycle state, a reduced overlap state and a data off state in response to signal quality and physiological events, with or without a power target.

The low power pulse oximeter has been disclosed in detail in connection with various embodiments. These embodiments are disclosed by way of examples only and are not to limit the scope of the claims that follow. One of ordinary skill in the art will appreciate many variations and modifications.

What is claimed is:

1. A method of operating a patient monitor configured to monitor at least a pulse rate of a patient by processing signals responsive to light attenuated by body tissue, the method comprising:

operating the patient monitor according to a first control protocol, wherein said operating includes activating a first control protocol light source in accordance with the first control protocol, the first control protocol light source including one or more of a plurality of light sources;

when operating according to the first control protocol, calculating, by the patient monitor, measurement values of the pulse rate, the measurement values responsive to light from the first control protocol light source, detected by a detector of an optical sensor after attenuation by body tissue of the patient using the patient monitor;

generating a trigger signal, wherein generating said trigger signal is responsive to at least one of: a comparison of processing characteristics to a predetermined threshold, a physiological event, or signal quality characteristics of signals received from the detector;

in response to receiving the trigger signal, operating the patient monitor according to a second control protocol different from the first control protocol, wherein said operating includes activating a second control protocol light source in accordance with the second control

12

protocol, the second control protocol light source including one or more of the plurality of light sources; and

when operating the patient monitor according to the second control protocol, calculating the measurement values of the pulse rate, the measurement values responsive to light from the second control protocol light source, detected by the detector after attenuation by the body tissue of the patient using the patient monitor,

wherein said operating of the patient monitor according to the first control protocol operates the first control protocol light source according to a first duty cycle and said operating of the patient monitor according to the second control protocol operates the second control protocol light source according to a second duty cycle, wherein power consumption of the first control protocol light source according to the first duty cycle is different than power consumption of the second control protocol light source according to the second duty cycle.

2. The method of claim **1**, wherein the first control protocol light source operates on the first duty cycle having an active time and an inactive time according to the first control protocol, wherein the second control protocol light source operates on the second duty cycle having an active time and an inactive time according to the second control protocol, the active time of the first duty cycle having a first duration and the active time of the second duty cycle having a second duration, wherein the first duration and the second duration are different.

3. The method of claim **2**, wherein the second duration is longer than the first duration.

4. The method of claim **1**, wherein power consumption during said operating at the second control protocol is greater than power consumption during said operating at the first control protocol.

5. The method of claim **1**, wherein said operating the patient monitor according to the first control protocol consumes a relatively small amount of power, and wherein said operating the patient monitor according to the second control protocol consumes a relatively large amount of power.

6. The method of claim **1**, wherein said operating the patient monitor in accordance with the first control protocol comprises operating the first control protocol light source in a data off state.

7. The method of claim **1**, wherein said signals received from the detector are responsive to the detected light of the first control protocol light source or the second control protocol light source.

8. The method of claim **7**, wherein the signal quality characteristics includes at least one of signal strength, a presence of noise, or a presence of motion induced noise.

9. The method of claim **1**, wherein the physiological event includes at least one of oxygen desaturation, an abnormal pulse rate, or an abnormal plethysmograph waveform.

10. The method of claim **9**, wherein the physiological event includes the abnormal pulse rate and wherein the abnormal pulse rate includes an elevated pulse rate.

11. A patient monitor configured to monitor at least a pulse rate of a patient by processing signals responsive to light attenuated by body tissue, the patient monitor comprising:

a plurality of light sources;

at least one detector of an optical sensor configured to receive light after attenuation by body tissue of the patient using the patient monitor; and

Exhibit 2

-52-

US 10,433,776 B2

13

one or more processors configured to:

operate the patient monitor according to a first control protocol, wherein said operating includes activating a first control protocol light source in accordance with the first control protocol, the first control protocol light source including one or more of said plurality of light sources;

when operating according to the first control protocol, calculate, by the patient monitor, measurement values of the pulse rate, the measurement values responsive to light from the first control protocol light source, detected by said at least one detector after attenuation by the body tissue of the patient using the patient monitor;

generate a trigger signal, wherein generation of said trigger signal is responsive to at least one of: a comparison of processing characteristics to a predetermined threshold, a physiological event, or signal quality characteristics of signals received from the detector;

in response to receiving the trigger signal, operate the patient monitor according to a second control protocol different from the first control protocol, wherein said operation includes activating a second control protocol light source in accordance with the second control protocol, the second control protocol light source including one or more of said plurality of light sources; and

when operating the patient monitor according to the second control protocol, calculate the measurement values of the pulse rate, the measurement values responsive to light from the second control protocol light source, detected by said at least one detector after attenuation by the body tissue of the patient using the patient monitor,

wherein said operation of the patient monitor according to the second control protocol operates the first control

14

protocol light source according to a first duty cycle and said operation of the patient monitor according to the second control protocol operates the second control protocol light source according to a second duty cycle, wherein power consumption of the first control protocol light source according to the first duty cycle is different than power consumption of the second control protocol light source according to the second duty cycle.

12. The patient monitor of claim 11, wherein said operation of the first control protocol light source on the first duty cycle has an active time and an inactive time according to the first control protocol, wherein said operation of the second control protocol light source on the second duty cycle has an active time and an inactive time according to the second control protocol, wherein the active time of the first duty cycle has a first duration and the active time of the second duty cycle has a second duration, wherein the first duration and the second duration are different.

13. The patient monitor of claim 12, wherein the second duration is longer than the first duration.

14. The patient monitor of claim 11, wherein power consumption during said operation at the second control protocol is greater than power consumption during said operation at the first control protocol.

15. The patient monitor of claim 11, wherein said operation of the patient monitor in accordance with the first control protocol comprises operating the first control protocol light source in a data off state.

16. The patient monitor of claim 11, wherein said signals received from the detector are responsive to the detected light of the first control protocol light source or the second control protocol light source.

* * * * *

Exhibit 2

-53-

Case 8:20-cv-00048-JVS-JDE   Document 43-4   Filed 04/30/20   Page 55 of 150   Page ID
#:3373
Case 3:18-cv-04716-EDL   Document 52   Filed 03/15/19   Page 1 of 9

<div style="text-align:center">

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

</div>

| | |
|---|---|
| SCALEMP, INC., | Case No.18-cv-04716-EDL |
| Plaintiff, | |
| v. | **ORDER ON PLAINTIFF'S TRADE SECRET DISCLOSURES** |
| TIDALSCALE, INC., et al., | Re: Dkt. Nos. 48, 50 |
| Defendants. | |

On March 7, 2019, the parties filed a joint discovery letter concerning Defendant TidalScale, Inc.'s objections to Plaintiff ScaleMP, Inc.'s trade secret disclosures under California Civil Procedure Code § 2019.210.  Defendant contends that Plaintiff's disclosures did not identify its trade secrets with "reasonable particularity."  Defendant also argues that its production of core technical documents supporting its invalidity contentions, which is required by Patent Local Rule 3-4(a), should be postponed until ScaleMP further identifies its trade secrets.  For the reasons discussed below, the Court orders Plaintiff to serve revised trade secret disclosures to Defendant within 14 days and orders Defendant to serve the documents it is required to produce pursuant to Patent Local Rule 3-4(a) within 2 days.

## I.    BACKGROUND

This is a patent infringement and trade secret misappropriation case.  Plaintiff is engaged in virtualization for in-memory high-end computing and develops technologies that enable the integration of multiple processors and memories into shared-memory computers.  At issue in this case are three patents that claim and disclose software systems that aggregate processors and memory from multiple physical computers, operating separately and independently, into a single

United States District Court
Northern District of California

Exhibit 3
-54-

Case 8:20-cv-00048-JVS-JDE   Document 43-4   Filed 04/30/20   Page 56 of 150   Page ID
#:3340
Case 3:18-cv-04716-EDL   Document 62   Filed 03/15/19   Page 2 of 9

<div style="float:left">United States District Court<br>Northern District of California</div>

1    virtual machine.  Plaintiff alleges that Defendant Isaac Nassi and non-party David Reed[1] obtained

2    confidential trade secret information from Plaintiff while they previously worked at SAP and then

3    illegally used that trade secret information to when they began working for Defendant TidalScale

4    to develop its allegedly infringing product.  Plaintiff claims that Defendant violated the federal

5    Defend Trade Secrets Act, 18 U.S.C. §§ 1836 et seq., and the California Uniform Trade Secret

6    Act, Cal. Civ. P. Code §§ 3426 et seq.

7          The case management order entered in this case required Plaintiff to disclose its trade

8    secrets by no later than January 22, 2019.  Plaintiff served its Schedule of Disclosed Trade Secrets

9    (the "Schedule") on January 22, 2019.  Roberts Decl., ¶ 3, Ex. A.  The Schedule disclosed five

10   categories of trade secret information (pricing, performance, profiling and event tracing tools,

11   software architecture, and business model) and, for each category, provided one or more example

12   communications that reflected the disclosure.  Id.  Plaintiff included parentheticals after the

13   example communications to explain what the disclosed trade secret was, e.g., the email exchange

14   discloses Plaintiff's "future feature request" or the "business case for use of 2-socket machines to

15   replace 4-socket machines."  Id.  The Schedule did not attach the example communications but

16   stated that Plaintiff would "make available underlying documents upon the entry of a suitable

17   protective order (insofar as the documents include third party SAP confidential information),[2] and

18   reserves the right to update this schedule as additional information is discovered."  Id. at 1.  The

19   Schedule specifically stated that Plaintiff's "disclosures in this document do not constitute a

20   disclosure of any confidential information."  Id. at 4.  On February 28, 2019, Plaintiff produced

21   the documents identified on the Schedule, along with other documents, and highlighted portions or

22   pages in each document it contends to be the trade secret information.  Id., ¶¶ 12, 13, 18, Exs. J &

23   N.  Plaintiff did not amend the Schedule after producing the highlighted documents.

24   _____

25   [1] On March 6, 2019, the Court granted Reed's motion to dismiss the claims against him with
     prejudice for lack of personal jurisdiction.

26   [2] The parties had not entered into a stipulated protective order as of the date Plaintiff served the
27   Schedule, but, as defense counsel pointed out to Plaintiff's counsel in a January 22, 2019 email,
     Patent Local Rule 2-2 provides that "[d]iscovery cannot be withheld on the basis of confidentiality
28   absent Court order.  The Protective Order authorized by the Northern District of California shall
     govern discovery unless the Court enters a different protective order."  Pat. L-R 2-2.

Exhibit 3
-55-

Case 8:20-cv-00048-JVS-JDE   Document 43-4   Filed 04/30/20   Page 57 of 150   Page ID
#:3345
Case 3:18-cv-04716-EDL   Document 52   Filed 03/15/19   Page 3 of 9

Defendant asked Plaintiff to agree that Defendant could defer production of the core

technical documents that it is required to disclose under Patent Local Rule 3-4 with its invalidity

contentions.  See Pat. L-R 3-4(a) ("With the 'Invalidity Contentions,' the party opposing a claim

of patent infringement shall produce or make available for inspection and copying . . . [s]ource

code, specifications, schematics, flow charts, artwork, formulas, or other documentation sufficient

to show the operation of any aspects or elements of an Accused Instrumentality identified by the

patent claimant in its Patent L.R. 3-1(c) chart.").  Roberts Decl., ¶¶ 6, 7, Ex. E.  Plaintiff

responded that it did not believe that "identification of the trade secrets is . . . required for

TidalScale to gather its core technical documents."  Roberts Decl., ¶ 8, Ex. F.  Although Plaintiff

agreed that Defendant could wait to produce the core technical documents until after Plaintiff

produced the confidential SAP documents referenced in the Schedule, Plaintiff stated that it would

move to compel their production if Defendant did not receive them "in a timely fashion after

production of the SAP confidential documents."  Id.

## II.   DISCUSSION

### A.   Trade Secret Disclosures

California law defines a trade secret as:

> [I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and
>
> (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Cal. Civ. Code § 3426.1(d).  As explained in Silvaco Data Sys. V. Intel Corp., 184 Cal. App. 4th

210 (Cal. Ct. App. 2010), trade secret law protects the right to maintain the confidentiality of facts,

not ideas:

> A patent protects an idea, i.e., an invention, against appropriation by others. Trade secret law does not protect ideas as such. Indeed, a trade secret may consist of something we would not ordinarily consider an idea (a conceptual datum) at all, but more a fact (an empirical datum), such as a customer's preferences, or the location of a mineral deposit. In either case, the trade secret is not the idea or fact itself, but information tending to communicate (disclose) the idea or fact to another. Trade secret law, in short, protects only the right to control

3

Exhibit 3
-56-

Case 8:20-cv-00048-JVS-JDE   Document 43-4   Filed 04/30/20   Page 58 of 150   Page ID
#:3343
Case 3:18-cv-04716-EDL   Document 52   Filed 03/15/19   Page 4 of 9

<div style="writing-mode: vertical">United States District Court
Northern District of California</div>

1    the dissemination of information.

2    It is critical to any CUTSA cause of action—and any defense—that
     the information claimed to have been misappropriated be clearly
3    identified.

4    Id. at 220-21 (emphases in original).  Thus, under Section 2019.210,

5    [i]n any action alleging the misappropriation of a trade secret under
     the Uniform Trade Secrets Act . . . , before commencing discovery
6    relating to the trade secret, the party alleging the misappropriation
     shall identify the trade secret with reasonable particularity subject to
7    any orders that may be appropriate under Section 3426.5 of the Civil
     Code.

8    Cal. Civ. P. Code § 2019.210.  There is no dispute over whether Section 2019.210 applies here.

9    The dispute is limited to whether Plaintiff's disclosures "identify the trade secret with reasonable

10   particularity" and whether Defendant may withhold their invalidity contention documents until

11   Plaintiff's trade secret disclosures fulfill this requirement.

12       "[T]here is no bright-line rule governing the level of particularity required by section

13   2019.210."  Loop AI Labs Inc. v. Gatti, 195 F. Supp. 3d 1107, 1111 (N.D. Cal. 2016) (citing

14   Advanced Modular Sputtering, Inc. v. Superior Court, 132 Cal. App. 4th 826, 835 (Cal. Ct. App.

15   2005)).  The party claiming misappropriation "need not 'define every minute detail of its claimed

16   trade secret at the outset of the litigation,' but nevertheless 'must make some showing that is

17   reasonable, i.e., fair, proper, just and rational.'"  Loop AI Labs, 195 F. Supp. 3d at 1111 (quoting

18   Advanced Modular, 132 Cal. App. 4th at 835-36).  "[T]he law" on this standard "is purposely

19   vague in some areas so that there is 'play in the joints.'"  Advanced Modular, 132 Cal. App. 4th at

20   907 (quoting Locke v. Davey, 540 U.S. 712, 718 (2004)).  Identifying what constitutes

21   "reasonable particularity" in any given case is guided by the purpose of Section 2019.210:

22       First, [section 2019.210] promotes well-investigated claims and
         dissuades the filing of meritless trade secret complaints. Second, it
23       prevents plaintiffs from using the discovery process as a means to
         obtain the defendant's trade secrets. Third, the rule assists the court in
24       framing the appropriate scope of discovery and in determining
         whether plaintiff's discovery requests fall within that scope. Fourth,
25       it enables defendants to form complete and well-reasoned defenses,
         ensuring that they need not wait until the eve of trial to effectively
26       defend against charges of trade secret misappropriation.

27   Lilith Games (Shanghai) Co. Ltd. v. uCool, Inc., 2015 WL 4149066, at *4 (N.D. Cal. July 9,

28   2015) (quoting Advanced Modular, 132 Cal. App. 4th at 833-34); see also Loop AI Labs, 195 F.

4

Exhibit 3
-57-

Case 8:20-cv-00048-JVS-JDE   Document 43-4   Filed 04/30/20   Page 59 of 150   Page ID
#:3343
Case 3:18-cv-04716-EDL   Document 82   Filed 03/15/19   Page 5 of 9

1    Supp. 3d at 1112.

2            Defendant contends that Plaintiff's disclosure of the summary Schedule in addition to

3    highlighting specific portions of documents does not identify its trade secrets with reasonable

4    particularity.  The Schedule, standing alone, does not meet that standard.  While not every "minute

5    detail" of the trade secrets being asserted must be disclosed, <u>Advanced Modular</u>, 132 Cal. App.

6    4th at 835-36, the Schedule does not even purport to list all of the alleged trade secrets.  Instead, it

7    merely identifies examples of communications that "embod[y]" the trade secrets.  <u>See</u> <u>Perlan</u>

8    <u>Therapeutics, Inc. v. Superior Court</u>, 178 Cal. App. 4th 1333, 1350 (Cal. Ct. App. 2009)

9    (affirming the trial court's finding that "the Amended Trade Secret Statement continues to be

10   vague because Plaintiff appears to be pursuing a claim for misappropriation of several trade

11   secrets but the Statement has not clearly identified all of the trade secrets at issue").  Moreover, the

12   fact that Plaintiff served the Schedule as a non-confidential document "belies the proposition that

13   it contains information specific enough to be considered 'confidential' trade secrets."  <u>Loop AI</u>

14   <u>Labs</u>, 195 F. Supp. 3d 1107, 1112.

15           However, Plaintiff is not relying upon the Schedule alone, so these issues are not

16   dispositive.  It has also produced a voluminous set of documents and highlighted the portions that

17   it contends are the trade secrets at issue.[3]  Neither side has pointed to any authority that mandates a

18   particular format for the trade secrets disclosures, so this method of disclosure is not categorically

19   prohibited.[4]  Nevertheless, Defendant persuasively argues that this method has failed to meet the

20

21   ─────────────────────

     [3] All of these documents were provided at Exhibit O, a nearly 350-page document, and Exhibit P,
22   an additional 8 pages.  The parties made a joint motion to seal parts of the joint discovery letter
     and exhibits.  The portions they seek to seal are comprised of: (1) Exhibit O, SAP's materials that
23   Plaintiff obtained from SAP pursuant to a nondisclosure agreement, much of which is highly
     technical information; (2) Exhibit P, additional confidential SAP documents; and (3) dropbox
24   links and passwords to enable access to the confidential materials that the parties seek to seal.
     Given the highly sensitive nature of the documents the parties seek to seal, the parties have
25   demonstrated good cause to seal these portions of the joint letter and exhibits and the motion is
     granted.
26
     [4] Both parties agree that Defendant initially "suggested that ScaleMP highlight ***specific***
27   information it alleged as a trade secret as part of addressing" the issue.  Jt. Ltr. at 2 (Defendant's
     position) (emphasis in original); Jt. Ltr. at 3 n.2 (stating that on a March 5, 2019 call "the parties
28   resolved that ScaleMP would either highlight or designate confidential portions in all documents")
     (Plaintiff's position).

                                          5

**Exhibit 3**
-58-

United States District Court
Northern District of California

Case 8:20-cv-00048-JVS-JDE   Document 43-4   Filed 04/30/20   Page 60 of 150   Page ID
#:3344
Case 3:18-cv-04716-EDL   Document 52   Filed 03/15/19   Page 6 of 9

<div style="writing-mode: vertical-rl">United States District Court
Northern District of California</div>

1    reasonable particularity standard as a practical matter.

2          Some of the highlighted designations seem straightforward, as in SCA_00004839 which

3    set forth a specific software configuration.  Other designations, however, are ambiguous and

4    thwart the purposes of the trade secret disclosures.  For example, Plaintiff has highlighted

5    passages across hundreds of pages of documents, including sometimes highlighting several

6    consecutive pages of a single document.  See Roberts Decl., ¶ 1, Ex. O (SCA_00005033, an 18-

7    page document of which 12 pages are completely highlighted).  There is so much information

8    highlighted in some pages, such as this example, that it is impossible to discern by the face of the

9    document whether each sentence is being identified as a trade secret or some combination of

10   sentences or all of it together.  Plaintiff argues that the entire highlighted portion of the document

11   starting at SCA_00005033 is a trade secret because the highlighted portions of the document set

12   forth in detail how Plaintiff analyzes its system's performance.  Without Plaintiff's explanation

13   that it is claiming the entire analysis process as the trade secret, its end goal in highlighting the

14   majority of the document is equivocal.  Plaintiff can resolve the ambiguity by claiming the system

15   performance analysis process, as set forth in SCA_00005033-5050, as a trade secret in an

16   amended Schedule.

17          The same is true of Plaintiff's discussion of the document that begins at SCA_00004819,

18   in which Plaintiff highlighted three sentences about testing a certain driver.  See SCA_00004836-

19   4837.  Plaintiff asserts that these three sentences contain "several items of confidential

20   information" and so its disclosure was adequate, but even in the letter Plaintiff does not identify

21   which portions of the highlighted sentences it considers the "several items of confidential

22   information" and whether each sentence standing alone is a trade secret or whether some

23   combination of the sentences in that highlighted portion are the trade secrets.

24          Finally, Plaintiff points to SCA_00004840, what it characterizes as a "trouble ticket," as

25   another example of an appropriate designation accomplished through highlighting.  Plaintiff

26   contends that the highlighted portion is adequately identified because when the highlighted portion

27   is read with the remainder of the document it is confirmed that the confidential solution of a

28   particular technical problem, which was discussed elsewhere in the document (the whole

<center>6</center>

Exhibit 3
-59-

Case 8:20-cv-00048-JVS-JDE   Document 43-4   Filed 04/30/20   Page 61 of 150   Page ID
#:3345
Case 3:18-cv-04716-EDL   Document 52   Filed 03/15/19   Page 7 of 9

United States District Court
Northern District of California

1  document is at SCA_00004840-4850), was successful based on the additional testing that was

2  discussed in the highlighted portion.  Rather than prove the adequacy of Plaintiff's disclosure

3  method, this explanation exemplifies its problems.  According to Plaintiff, the highlighting itself

4  did not disclose the trade secret; instead, Defendant was obliged to read the highlighted portion in

5  conjunction with other unhighlighted portions in an attempt to deduce the trade secret that Plaintiff

6  intended to disclose through the highlighting.  Requiring Defendant to conduct this type of

7  guesswork does not provide reasonably particular notice.

8          Defendant raised other potential issues that further undermine the sufficiency of the current

9  disclosures.  Plaintiff does not dispute that it has asserted that it may point to combinations of

10  ideas in any of the highlighted materials as being a trade secret, although it has not yet specified

11  what those combinations are.  Plaintiff also does not dispute that it has indicated that it may point

12  to meeting agendas claiming that the trade secrets are comprised of unidentified information

13  discussed in the meeting, which cannot be disclosed by Plaintiff's highlighting method.  As a final

14  example, Defendant points out that Plaintiff highlighted a hyperlink that contains a document that

15  has not been produced and is not accessible to Defendant, making it impossible to know how the

16  unavailable document factors into the disclosed trade secret.  See Ex. O, SCA_00004799.

17          Accordingly, Plaintiff's current disclosures do not identify its asserted trade secrets with

18  reasonable particularity.  Plaintiff must amend its disclosures and serve them on Defendant within

19  14 days of the date of this Order.

20      **B.      Defendant's Production Under Patent Local Rule 3-4(a)**

21          The other issue raised by the joint letter is whether Defendant should be excused from

22  serving its core technical documents as required by Patent L-R 3-4(a) until after Plaintiff serves its

23  amended disclosures.  Section 2019.210 provides that "before commencing *discovery relating to*

24  *the trade secret*, the party alleging the misappropriation shall identify the trade secret with

25  reasonable particularity . . . "  Cal. Civ. P. Code § 2019.210 (emphasis added).  In Advanced

26  Modular, the court held that this provision extends to any claim alleging misappropriation, i.e., if

27  the claim "hinges upon the factual allegation that [the defendant] misappropriated [the plaintiff's]

28  trade secrets."  132 Cal. App. 4th at 907.

**Exhibit 3**
**-60-**

1    While Plaintiff's patent infringement claim is related to its trade secret misappropriation

2  claim in the sense that the alleged misappropriation led to Defendant's development of infringing

3  technology, the patent infringement claim does not "hinge" on the misappropriation allegation.

4  Plaintiff's ability to succeed on the infringement claim is independent of the viability of its

5  misappropriation claim.  Thus, the statutory language does not require a postponement of patent-

6  related disclosures in this case, even while Plaintiff revises its trade secret disclosures.

7    Defendant's only authority for its position that service of its patent-related documents

8  should not move forward is Gabriel Techs. Corp. v. Qualcomm Inc., 2012 WL 849167 (S.D. Cal.

9  Mar. 13, 2012).  In Gabriel, the district court overruled objections to the magistrate judge's order

10  denying the plaintiffs' motion to compel discovery because their trade secrets disclosures under

11  Section 2019.210 were insufficient.  Id. at *1.  Defendant points out that Gabriel was a trade secret

12  misappropriation and patent case.  The operative complaint in Gabriel raised claims of breach of a

13  license agreement, correction of patents to reflect the true inventorship, declaratory judgment for

14  ownership of the patents, and misappropriation of trade secrets, but it did not involve a claim of

15  patent infringement.  Gabriel, Case No. 3:08-cv-01992-AJB-MDD, Dkt. No. 53.  The Gabriel

16  court's March 13, 2012 order did not distinguish between discovery related to the trade secrets

17  claim or discovery related to the patent claims, although the underlying order by the magistrate

18  judge notes that an earlier court order allowed the plaintiffs "to proceed with discovery that was

19  not reliant upon sufficient trade secret designations with respect to Plaintiffs' licensing agreement

20  claims" while the plaintiffs sought to revise their trade secret designations.  Id., Dkt. No. 229 at 4.

21  See also Loop AI Labs Inc. v. Gatti, 2015 WL 9269758, at *4 (N.D. Cal. Dec. 21, 2015) (denying

22  motion to stay all discovery until the plaintiff complied with Section 2019.210 and permitting

23  discovery to move forward on all 16 claims that were not based on trade secret misappropriation

24  claims).  Gabriel recognizes that discovery on claims that are independent of the trade secret

25  misappropriation claim need not be postponed while the plaintiff corrects its trade secret

26  disclosures.

27    Defendant appears concerned that Plaintiff will use its technical documents that it would

28  otherwise need to produce pursuant to Patent L-R 3-4(a) to obtain Defendant's trade secrets, citing

United States District Court
Northern District of California

8

Exhibit 3
-61-

Case 8:20-cv-00048-JVS-JDE   Document 43-4   Filed 04/30/20   Page 63 of 150   Page ID
#:3347
Case 3:18-cv-04716-EDL   Document 152   Filed 03/15/19   Page 9 of 9

1   <u>Loop AI Labs</u>, 195 F. Supp. 3d at 1112 (one purpose of Section 2019.210 is to "prevent[ ]

2   plaintiffs from using the discovery process as a means to obtain the defendant's trade secrets").

3   But Plaintiff is entitled to Defendant's documents under Patent L-R 3-4(a) in order to litigate

4   Defendant's claims of patent invalidity.  The trade secrets statutes and the parties' protective order

5   (dkt. no. 98) prevent Plaintiff from misusing information about Defendant's technology.

6   Defendant has not argued that it is unable to identify and disclose the documents that are required

7   for production under Patent L-R 3-4(a) until Plaintiff serves revised trade secret disclosures.

8   Thus, Defendant must serve its core technical documents and any other documents required by

9   Patent L-R 3-4(a) within 2 days of the date of this order.

10  **III.    CONCLUSION**

11         As discussed above, Plaintiff shall serve revised trade secret disclosures to Defendant

12  within 14 days and Defendant shall serve the documents it is required to produce pursuant to

13  Patent Local Rule 3-4(a) within 2 days.

14

15         **IT IS SO ORDERED.**

16  Dated: March 15, 2019

17

18         *Elizabeth D. Laporte*

19  ELIZABETH D. LAPORTE
    United States Magistrate Judge

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

9

Exhibit 3
-62-

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| BROCADE COMMUNICATIONS SYSTEMS, INC., a Delaware corporation, and FOUNDRY NETWORKS, LLC, a Delaware limited liability company,<br><br>               Plaintiffs,<br><br>   v.<br><br>A10 NETWORKS, INC., a California corporation, LEE CHEN, an individual, RAJKUMAR JALAN, an individual, RON SZETO, an individual, LIANG HAN, an individual, STEVEN HWANG, an individual, and DAVID CHEUNG, an individual,<br><br>               Defendants. | Case No.: 10-CV-03428-LHK<br><br><br><br>CASE MANAGEMENT ORDER |

Based on the Joint Case Management Statement filed by the parties on February 11, 2011, the Court sets the following schedule:

CASE MANAGEMENT CONFERENCE ("CMC") is set for April 28, 2011 at 1:30 p.m.  The Court strongly encourages the parties to resolve their dispute regarding the A10 AX 5200 device in advance of the CMC.  If the parties are unable to do so, the Court will address this issue at the CMC.

DISCOVERY: The Court rejects the phasing of discovery as proposed by Defendants.  However, discovery unique to Plaintiffs' claims of trade secret misappropriation cannot commence until Plaintiff identifies its trade secrets with reasonable particularity as required by Cal. Code Civ. Proc. § 2019.210.  All other discovery shall commence now, including discovery of source code relevant to the copyright and patent infringement claims.

INITIAL DISCLOSURES: In the JCMS, the parties stated that initial disclosures would be exchanged on February 28, 2011.  If this did not occur, the parties shall exchange initial disclosures by no later than April 7, 2011.

DISCOVERY LIMITS:

      Deposition hours: 200, excluding experts

      Interrogatories: 75 per party

Production of documents shall be in TIFF file format.  A party may request that specific documents be produced in native format.  Such requests shall not be unreasonably made or unreasonably denied.

CLAIM CONSTRUCTION: The Court will construe a maximum of ten claim terms.

PROTECTIVE ORDER: The District's Model Stipulated Protective Order for Litigation Involving Patents, Highly Sensitive Confidential Information and/or Trade Secrets shall be the operative Protective Order in this matter unless and until Judge Grewal enters another stipulated Protective Order.  The parties shall submit any such stipulated Protective Order for Court approval by April 22, 2011.

\

Case No.: 10-CV-03428-LHK
MINUTE ORDER AND CASE MANAGEMENT ORDER

United States District Court
For the Northern District of California

Exhibit 4
-63-

| EVENT | Date |
|---|---|
| Disclosure of Asserted Claims/Infringement Contentions | April 7, 2011 |
| Invalidity Contentions | May 23, 2011 |
| Exchange of Proposed Terms and Claim Elements | June 6, 2011 |
| Deadline to Amend Pleadings | 90 days after Defendants Answer |
| Parties Meet and Confer re: list of terms and claim elements | June 13, 2011 |
| Simultaneous Exchange of Preliminary Claim Constructions and Preliminary Identification of Extrinsic Evidence | June 27, 2011 |
| Parties Meet and Confer re: Prelim Claim Constructions and Extrinsic Evidence | June 30, 2011 |
| Simultaneous Exchange of Responsive Claim Constructions | July 7, 2011 |
| Filing of Jt. Claim Construction and Pre-Hearing Statement | July 22, 2011 |
| Completion of Claim Construction Discovery | Aug. 22, 2011 |
| Opening Claim Construction Brief* | Sept. 8, 2011 |
| Responsive Claim Construction Brief | Sept. 22, 2011 |
| Reply Claim Construction Brief | September 29, 2011 |
| 2 Hour Tutorial (1 hour for each party) | Oct. 21, 2011 (Fri. at 2 p.m.) |
| 3 Hour Claim Construction Hearing (1.5 hour for each party) | Oct. 28, 2011 (Fri. at 2 p.m.) |
| Further Case Management Conference | Nov. 30, 2011 at 2 p.m. |

**IT IS SO ORDERED.**

Dated: March 24, 2011

_Lucy H. Koh_
LUCY H. KOH
United States District Judge

Case No.: 10-CV-03428-LHK
MINUTE ORDER AND CASE MANAGEMENT ORDER

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Exhibit 4**
**-64-**

Case 8:20-cv-00048-JVS-JDE   Document 43-4   Filed 04/30/20   Page 66 of 150   Page ID
#:3350
Case 2:13-cv-08670-DDP-CW   Document 54   Filed 02/20/14   Page 1 of 24   Page ID #:1286

1  SCOTT A. EDELMAN, SBN 116927
   sedelman@gibsondunn.com
2  ANGELIQUE KAOUNIS, SBN 209833
   akaounis@gibsondunn.com
3  GIBSON, DUNN & CRUTCHER LLP
   2029 Century Park East, Suite 4000
4  Los Angeles, CA  90067-3026
   Tel.: 310.552.8500 Fax: 310.551.8741
5  Attorneys for Plaintiffs
   GENERAL ELECTRIC COMPANY
6  and GE AVIATION SYSTEMS LLC

7  Abraham Mathew
   abraham@mathewandgeorge.com
8  Mathew & George
   801 S. Grand Ave., Suite 1610
9  Los Angeles, CA 90017
   Tel: 310.478.4349; Fax: 310.478.9580
10 Attorney for Defendant ERWIN W. LIANG

11                 UNITED STATES DISTRICT COURT

12                CENTRAL DISTRICT OF CALIFORNIA

13                      WESTERN DIVISION

14

| General Electric Company, and GE Aviation Systems LLC, | CASE NO.  CV13-08670-DDP (CWx) |
|---|---|
|                     Plaintiffs, | **RULE 26(f) REPORT** |
|             v. | [Proposed Protective Order and ADR Selection Form Filed Concurrently Herewith] |
| Erwin Wenti Liang, Does 1-10, | **Scheduling Conference:** |
|                     Defendants. | Date:      February 27, 2014 |
|  | Time:      3:00 p.m. |
|  | Place:     312 N. Spring St., Courtroom 3 (2nd Flr.) |
|  | Judge:     Hon. Dean D. Pregerson |

Gibson, Dunn &
Crutcher LLP

Exhibit 5
-65-

1       Plaintiffs General Electric Company and GE Aviation Systems LLC

2  (collectively "GE") and Defendant Erwin Wenti Liang ("Liang") submit this Joint

3  Report to the Court regarding the meeting of counsel conducted by telephone

4  conference call on February 6, 2014, pursuant to Federal Rule of Civil Procedure 26(f).

5  The Parties discussed each of the topics covered by the Court's December 18, 2013

6  Order Setting Scheduling Conference.  (Dkt. 28.)  The Parties' respective positions are

7  detailed below.

8  **A.**     **STATEMENT OF THE CASE AND LEGAL ISSUES**

9       **GE's Statement**: This is a case of trade secret theft by Defendant Liang, a

10  former employee of GE subsidiary GE Aviation Systems LLC, who accessed, copied,

11  and downloaded tens of thousands of files from GE's internal network without

12  authorization to do so.  On November 25, 2013, GE filed claims against Liang for:

13  violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030;

14  violation of the Comprehensive Data Access and Fraud Act ("CDAFA"), California

15  Penal Code section 502; trade secret misappropriation under the California Uniform

16  Trade Secrets Act ("CUTSA"), California Civil Code sections 3426 through 3426.11;

17  breach of contract; conversion; and unfair competition under California Business and

18  Professions Code section 17200.[1]  (Dkt. 1.)  On December 3, 2013, the Court entered a

19  Preliminary Injunction requiring Liang (1) to return all GE Intellectual Property[2] in his

20  possession, custody, or control; (2) not to access, use, or disclose any GE Intellectual

21  Property; and (3) to preserve all relevant documents.  (Dkt. 14.)  Plaintiffs seek a

22  permanent injunction preventing Liang from using or disclosing GE Intellectual

23  Property, as well as damages and other relief.

---

[1]  Liang filed his Answer to GE's Complaint on December 17, 2013.  (Dkt. 26.)

[2]  "GE Intellectual Property" is defined as "confidential, proprietary GE materials and GE trade secrets."  *See* Dkt. 14 at 1.

Gibson, Dunn & Crutcher LLP

1

**Exhibit 5**
**-66-**

1    Liang was an employee of GE Aviation Systems LLC until December 2012,

2    when a third party, Woodward HRT, Inc. ("Woodward"), bought the business where

3    he was employed.  To facilitate transition to the new owner, GE allowed Liang and

4    other transitioning employees to have access to GE email, computers, and network

5    resources for a specified period, subject to applicable GE policies, through the use of a

6    GE Single Sign On ("SSO")—a unique ID that allows GE employees to access GE

7    electronic resources when used in combination with a password.

8    GE has discovered that Liang misused his SSO in violation of the Transition

9    Services Agreement ("TSA") between GE and Woodward and numerous policies and

10   agreements restricting Liang's access to and use of GE Intellectual Property to only

11   those materials required to perform his job.  Specifically, despite these clear

12   restrictions, Liang accessed and downloaded tens of thousands of files from numerous

13   GE businesses outside the scope of his employment between March and October 2013.

14   Liang downloaded nearly half of the stolen files in October, just before his SSO

15   password was set to expire, and he had no legitimate business need to access or use the

16   vast majority of the files he took.

17   In an October 23, 2013 interview with GE and Woodward, Liang admitted that

18   what he did was "pretty bad" and "wrong," and that he knew he "didn't have the legal

19   right to obtain" the stolen files.  He also admitted that he used two USB devices to

20   download the files, that he downloaded tens of thousands of them, and that he knew his

21   GE SSO password was set to expire in November 2013.  Additionally, he told

22   investigators that he has two Yahoo! email accounts, a Gmail account, an MIT alumni

23   email account, a Facebook account, and a Google Drive cloud-storage account (to

24   which he admitted uploading some GE files).

25   Despite (a) Liang's admissions of wrongdoing, and this Court's December 3,

26   2013 Preliminary Injunction Order (b) requiring Liang to return all GE Intellectual

27   Property in his possession, custody or control, and (c) recognizing that Liang has

28   access to online accounts that are means of dissemination (Dkt. 14, at 1-2), Liang still

Gibson, Dunn &
Crutcher LLP

**Exhibit 5**
-67-

1  has not returned any of the stolen files.  Liang claims that his computing devices have

2  been confiscated by the FBI, but he has failed to account for the contents of his

3  personal email, Google Drive and Facebook accounts, despite GE's repeated requests.

4  Liang has declined to cooperate with GE because he says that he does not wish to

5  incriminate himself in connection with an ongoing criminal investigation into his

6  conduct.

7      Accordingly, GE still does not know how and to whom Liang distributed the

8  stolen files.  GE is therefore unable to prevent any ongoing and irreparable harm

9  caused by the disclosure and/or use of its trade secrets by Doe Defendants that are not

10  subject to the Court's Preliminary Injunction.

11      GE continues to investigate Liang's forensic trail on GE's internal networks and

12  systems.  Additionally, to attempt to learn the whereabouts of its information as

13  quickly as possible, GE filed a Motion for Expedited Discovery on January 14, 2014,

14  seeking, among other things, forensic inspection of Liang's online accounts and drives,

15  a limited deposition, production of bank records, and permission to subpoena the

16  internet-service providers ("ISPs") of Liang's online accounts.  (Dkt. 29.)  The motion

17  was heard by Judge Carla Woehrle on February 7, 2014—after the parties conducted

18  their Rule 26(f) conference of counsel.  Therefore, Magistrate Judge Woehrle

19  determined that the request for expedited discovery was moot.  Nonetheless,

20  Magistrate Judge Woehrle instructed the parties that discovery should proceed.

21      **Liang's Statement**:

22      As pointed out by GE in its statement above, a parallel criminal investigation is

23  currently pending against Mr. Liang conducted by the Federal Bureau of Investigation

24  and the United States Attorney's Office, National Security Division.  The investigation

25  arises from the same operative facts alleged by GE in this civil action.  To date a

26  charging decision has not been made by the government.  As a result, Mr. Liang filed

27  an Answer to GE's Complaint asserting, among others, the rights afforded under the

28  Fifth Amendment to the United States Constitution.  Within the Answer, Mr. Liang

Gibson, Dunn &
Crutcher LLP

3

**Exhibit 5**
**-68-**

1   reserved the right to withdraw the privilege, and seek leave to amend and/or

2   supplement the Answer and also to object to the use or disclosure of the privilege at

3   trial.

4       **GE's Anticipated Legal Issues**:  GE anticipates that this case will present the

5   following legal issues:

6    &bull;  Whether Liang violated the CFAA, 18 U.S.C. § 1030 by "'intentionally

7       [accessing] a computer without authorization or [in] exce[ss] [of] authorized

8       access, and thereby obtain[ing] information from [a] protected computer,'"

9       when he used GE-provided devices and his SSO password to access GE's

10      internal networks and download and/or copy GE's files without permission and

11      beyond the scope of his employment.  *Ticketmaster LLC v. RMG Techs., Inc.*,

12      507 F. Supp. 2d 1096, 1113 (C.D. Cal. 2007) (quoting 18 U.S.C.

13      § 1030(a)(2)(C)).

14    &bull;  Whether Liang violated the CDAFA, California Penal Code section 502, by

15      knowingly and without authorization accessing GE's computer network and

16      "taking, copying, or us[ing] . . . data," when he used GE-provided devices and

17      his SSO password to access GE's internal networks and download and/or copy

18      GE's files without permission and beyond the scope of his employment.

19      *Facebook, Inc. v. ConnectU LLC*, 489 F. Supp. 2d 1087, 1091 (N.D. Cal. 2007).

20    &bull;  Whether Liang committed trade secret misappropriation under the CUTSA,

21      California Civil Code sections 3426 through 3426.11, by acquiring, using and/or

22      disclosing GE trade secrets without authorization; and thereby damaging GE

23      and/or unjustly enriching himself and/or others.  *See Therapeutic Research*

24      *Facility v. NBTY, Inc.*, 488 F. Supp. 2d 991, 999 (E.D. Cal. 2007).

25    &bull;  Whether Liang is liable for breach of contract, where he downloaded and/or

26      copied files containing GE Intellectual Property in violation of (1) his

27      Proprietary Information & Invention Agreement, which prohibited "disclos[ing]

28      or us[ing] . . . any Propriety Information known to [him] as a result of [his]

Gibson, Dunn &
Crutcher LLP

4

**Exhibit 5
-69-**

1   employment except as required in [his] work" for GE, and/or (2) his Employee

2   Innovation and Proprietary Information Agreement, which prohibited him from

3   "us[ing], publish[ing] or otherwise disclos[ing] (except as [his] Company duties

4   [require]) . . . any secret or confidential information or data." *See Angelica*

5   *Textile Servs. v. Park*, 220 Cal. App. 4th 495, 504-08, 163 Cal. Rptr. 3d 192

6   (2013).

7   • Whether Liang is liable for conversion where he altered, damaged, or deleted

8   GE's files by downloading and/or copying them. *See Kremen v. Cohen*, 337

9   F.3d 1024, 1029-31 (9th Cir. 2003) (under California law, conversion may be

10   based on taking of "'*every species of personal property*,'" not just tangible

11   property).

12   • Whether Liang engaged in unfair competition under California Business and

13   Professions Code section 17200 when he violated the CFAA and CDAFA. *See,*

14   *e.g., Multiven, Inc. v. Cisco Sys., Inc.*, 725 F. Supp. 2d 887, 896-97 (N.D. Cal.

15   2010) (former employer could pursue unfair competition counterclaim based on

16   losses caused by computer fraud).

17   • Whether Liang may refuse to consent to the disclosure of his email and other

18   online communication content held by his ISPs, when the Court has found that

19   his email and cloud-storage accounts are means of disseminating the stolen files

20   and has ordered him to return all GE property. *See, e.g.*, *Doe v. United States*,

21   487 U.S. 201, 217-19 (1988) (upholding court order compelling party to consent

22   to disclosure of bank account records in response to subpoenas despite assertion

23   of Fifth Amendment privilege); *Glazer v. Fireman's Fund Ins. Co.*, 2012 WL

24   1197167, at *2-3 (S.D.N.Y Apr. 5, 2012) (court could order a party to consent to

25   disclosure of chat transcripts held by a third party ISP); *see also Mintz v. Mark*

26   *Bartelstein & Associates, Inc.*, 885 F. Supp. 2d 987 (C.D. Cal. 2012)

27   (recognizing that "although the SCA prohibited the court from ordering

28

Gibson, Dunn &
Crutcher LLP

5

Exhibit 5
-70-

1    Facebook to produce copies of a juror's wall postings, the court could order the

2    juror to request the wall postings from Facebook directly" (citation omitted)).

3   •  Whether Liang can claim that his Fifth Amendment privilege prevents the

4    forensic inspection of his computing and storage devices, and email, Google

5    Drive and Facebook accounts; the production of the passwords to his online

6    accounts; and the production of his bank and safety deposit records, where it is a

7    foregone conclusion that the government knows of Liang's devices and drives,

8    online accounts and financial records, and knows that Liang is the sole user and

9    possessor of them.  *See Fisher v. United States*, 425 U.S. 391, 411, 96 S. Ct.

10    1569, 48 L. Ed. 2d 39 (1976) (foregone conclusion exception to Fifth

11    Amendment privilege); *United States v. Sideman & Bancroft, LLP*, 704 F.3d

12    1197, 1202-05 (9th Cir. 2013) (surrender of documents that government already

13    knows about is not compelled testimony).

14   •  Assuming, *arguendo*, that the Fifth Amendment applies to some of the

15    discovery sought by GE, whether Liang can make a blanket assertion that it

16    prevents all discovery (including his deposition), or whether he is required to

17    assert the privilege in response to particular requests for inspection of property

18    and production of documents, and deposition questions.  *See, e.g., Sallah v.*

19    *Worldwide Clearing LLC*, 855 F. Supp. 2d 1364, 1371 (S.D. Fla. 2012) ("A

20    person may not make a blanket [Fifth Amendment] objection to testifying," but

21    must "invoke the privilege question by question.").

22   •  Whether Liang can satisfy the standard for a civil stay, where he is under

23    investigation but "no criminal charges ha[ve] been filed."  *SEC v. Global*

24    *Express Capital Real Estate Inv. Fund*, 289 F. App'x 183, 191 (9th Cir. 2008).

25    **Liang's Anticipated Legal Issues**:

26    In addition to the issues identified by GE above, Mr. Liang expects the

27   following legal issues:

28

Gibson, Dunn &
Crutcher LLP

6

Exhibit 5
-71-

- Whether this Civil Action should be stayed and/or discovery limited pending resolution of the criminal investigation and potential criminal prosecution.
- Whether the government will intervene in this action and seek a stay after discovery has commenced.
- Whether a civil protective order and discovery secured thereunder will shield Mr. Liang from criminal prosecution and prevent the government from accessing the discovery and using that information in a subsequent grand jury proceeding and/or criminal prosecution.
- Whether or not Mr. Liang's access of GE files was authorized and encouraged and whether GE took adequate precautions to safeguard the confidentiality of its information.
- Whether or not Mr. Liang misappropriated any GE information and what if any resulting damages were incurred.
- Whether or not Mr. Liang can amend his Answer and withdraw the assertion of the Fifth Amendment Privilege and whether an adverse inference can be drawn against Mr. Liang for asserting his Fifth Amendment rights.

**B.    SUBJECT MATTER JURISDICTION**

**GE's Statement**: The Court has subject matter jurisdiction over GE's claims under 18 U.S.C. § 1030(g) and 28 U.S.C. §§ 1331, 1332, 1338 and 1367.

**Liang's Statement**:

Mr. Liang does not currently have sufficient information to determine whether this Court has subject matter of the claims asserted by GE, but expects this may not be an issue.

**C.    PARTIES AND EVIDENCE**

**1.    <u>Current Parties And Whether Additional Parties Will Appear</u>**

The Plaintiffs are General Electric Company and GE Aviation Systems LLC. The Defendants are Erwin Wenti Liang and unidentified Does 1 through 10.

Gibson, Dunn & Crutcher LLP

Exhibit 5
-72-

1  Additional parties may be named as defendants, subject to discovery of the identities

2  of the Doe Defendants.

3  **2.  Witnesses**

4  **GE's List Of Percipient Witnesses**: GE anticipates, at this early stage of the

5  proceedings, and subject to the factual record developed during discovery, that the

6  following persons potentially may be percipient witnesses in this action:

7  • Ignatius B.D. Anandappa, GE CIO, Digital Technologies & Collaboration.

8  • Philip Beauchamp, Information Protection Leader, GE Global Research.

9  • Brenda Britton, Human Resources Manager, GE Aviation Systems LLC.

10  • Orrie Dinstein, Chief Privacy Leader and IP & IT Counsel, GE Capital.

11  • Harvey Dunn, Director, Intellectual Property | Global Legal & Compliance,

12      Woodward, Inc.

13  • Cindy Gao, wife of Defendant Erwin Liang.

14  • Kathleen Gough, Operations & Forensics Leader of the IP Protection Center of

15      Excellence, GE Power & Water, Oil & Gas, and Energy Management.

16  • Chris Graves, GE Cyber Forensics Leader.

17  • Arturo Z. Martinez, Woodward Human Resources Manager.

18  • Brian Neal, Landing Gear and Actuation Engineering Manager, GE Aviation

19      Systems LLC.

20  • James Peterson, GE Corporate Initiatives Director.

21  • Kevin C. Swailes, GE IP Protection Center of Excellence Leader.

22  **Liang's List Of Percipient Witnesses**:

23  In addition to the individuals identified above, Mr. Liang expects Special Agents

24  Sullivan and Yang of the Federal Bureau of Investigation to be percipient witnesses.

25  **3.  Relevant Documents**

26  **GE's List Of Relevant Documents**: GE anticipates, at this early stage of the

27  proceedings, and subject to the factual record developed during discovery, that the

28  following documents may be relevant.  The below listed categories do not include

Gibson, Dunn &
Crutcher LLP

8

**Exhibit 5**
**-73-**

1   documents protected by the attorney-client privilege, the attorney work product

2   doctrine, or any other applicable privilege or protection, and by identifying these

3   categories of documents GE does not waive any such privilege or protection.  The

4   below listed categories also include specific documents containing confidential and

5   proprietary information that, when produced, may be subject to a protective order,

6   redaction and/or sealing.  GE specifically reserves the right to identify or rely upon

7   additional categories of documents as the case proceeds.

8   • Documents related to GE policies and restrictions governing former GE

9     employees' use of GE SSO passwords and access to and use of GE's internal

10    network during the transition of the Duarte Aviation Systems business segment

11    from GE to Woodward, such as the Transition Service Agreement.

12  • Documents that generally define what GE considers to be confidential and/or

13    proprietary information, such as GE's Proprietary Information & Invention

14    Agreement ("PIIA"), GE's Employee Innovation and Proprietary Information

15    Agreement ("EIPIA"), GE's Acceptable Use of GE Information Resources

16    Guidelines ("AUGIR"), and GE's Data Classification Guidelines.

17  • Documents related to GE policies and restrictions governing GE employees' and

18    GE former employees' access to and use of GE Intellectual Property and GE's

19    internal network, including through GE-provided work computers, portable

20    devices and removable media, such as GE's AUGIR and Internet Policies, GE's

21    Data Classification Guidelines and The Spirit And The Letter brochure.

22  • Documents related to GE policies and restrictions governing GE employees'

23    access to, use and/or return of GE Intellectual Property during and after

24    employment, such as GE's PIIA and EIPIA.

25  • Documents that reflect the GE Intellectual Property contained in the GE files

26    that Liang downloaded and copied, including, for example, select exhibits to the

27    Declarations of James Peterson, Orrie Dinstein, and Philip Beauchamp, which

28    were filed with this Court on November 26, 2013.

Gibson, Dunn &
Crutcher LLP

Exhibit 5
-74-

1    • Documents showing Liang's downloading and copying of GE files, including

2        audit trail reports, Data Loss Prevention Reports, forensic data and/or images of

3        all assets seized from Mr. Liang by GE, forensic images of Mr. Liang's personal

4        email, Google Drive and Facebook accounts, and other documents that show

5        data such as the time and date of the downloads, the numbers of files

6        downloaded and their sizes, the internet protocol address and/or addresses

7        associated with the downloads, and/or the identities and/or locations of any third

8        parties to whom Mr. Liang distributed GE's documents.

9        **Liang's List Of Relevant Documents**:

10       Mr. Liang agrees that the information identified by GE above may be relevant to

11   this action, but because Mr. Liang does not have that information in his possession

12   currently, he cannot now positively identify which of those documents are relevant.

13   **D.    DAMAGES AND INJUNCTIVE RELIEF**

14       **GE's Statement**: Because GE does not know the full extent to which

15   Defendants have used and/or disclosed its trade secrets, it is not possible at this early

16   stage of the proceedings to quantify its damages or the amount by which Defendants

17   have been unjustly enriched.  However, given the number of person-hours that have

18   been devoted to certain projects associated with the IP at issue, any use or disclosure of

19   GE's files could cause GE significant damage and/or substantially unjustly enrich third

20   parties, including competitors of GE.  GE has prayed for punitive and exemplary

21   damages. *See, e.g.*, Cal. Penal Code § 502(e)(4); Cal. Civ. Code § 3426.3(c).

22       GE may seek preliminary injunctions against Doe Defendants for the return and

23   preservation of GE's Intellectual Property.

24       GE also seeks a permanent injunction requiring all Defendants to:  (1) return all

25   GE Intellectual Property; and (2) cease further accessing, disclosing, copying, using or

26   otherwise profiting from GE's Intellectual Property.  Additionally, GE seeks an order

27   requiring Defendants to file with the Court and serve on GE a compliance report

28   within thirty days of entry of any permanent injunction.

Gibson, Dunn &
Crutcher LLP

10

**Exhibit 5
-75-**

1     **Liang's Statement**:

2        Mr. Liang agreed not to oppose GE's application for a Temporary Restraining

3 Order and/or its Motion for a Preliminary Injunction and Mr. Liang has no information

4 as to what damages GE may have suffered.

5 **E.**     **INSURANCE**

6     N/A

7 **F.**     **MOTIONS**

8     **GE's Statement**: GE anticipates filing a Motion for Summary Judgment.  As

9 for non-dispositive motions, GE anticipates filing a Motion for Compliance with the

10 Court's Preliminary Injunction Order, should Liang continue to refuse to confirm his

11 compliance with the Preliminary Injunction.  (Dkt. 14.)

12

13     **Liang's Statement**:

14     Mr. Liang filed a motion to stay this civil action and the hearing is set for March

15 10, 2010.  If the motion is denied and due to the ongoing criminal investigation, Mr.

16 Liang expects substantial motion work will follow dealing directly with discovery

17 issues.  It is also likely that continued discovery will lead to the government

18 intervening in this action for a stay.  Mr. Liang also anticipates filing a Motion for

19 Summary Adjudication and/or Judgment and Motions in Limine.

20 **G.**     **COMPLEX DESIGNATION**

21     **GE's Statement**: Because this case does not meet the criteria of Federal Rule of

22 Civil Procedure 16, lacking "difficult or protracted" problems related to "complex

23 issues, multiple parties, difficult legal questions, or unusual proof problems," it is not

24 complex.  Fed. R. Civ. P. 16(c)(2)(L).  Nor is this case the sort of highly technical

25 intellectual property dispute contemplated by the Manual of Complex Litigation.  *See*

26 Manual of Complex Litigation, Fourth § 33 (2004) (discussing complex intellectual

27 property cases).  Therefore, the Manual of Complex Litigation does not need to be

28 used.

Gibson, Dunn &
Crutcher LLP

11

**Exhibit 5**
**-76-**

Case 8:20-cv-00048-JVS-JDE   Document 43-4   Filed 04/30/20   Page 78 of 150   Page ID
#:3362
Case 2:13-cv-08670-DDP-CW   Document 54   Filed 02/20/14   Page 13 of 24   Page ID #:1298

1    **Liang's Statement**:

2       GE claims that Mr. Liang misappropriated hundreds of thousands of files

3    containing GE Intellectual Property.  As a result, Mr. Liang believes that the civil

4    prosecution of this case will be extremely time consuming and potentially complex

5    depending on the information discovered through discovery.  Based upon currently

6    available information, Mr. Liang cannot definitively state that this case should be

7    designated as complex and that this discussion on this issue should be revisited at a

8    later date after discovery is substantially completed.

9    **H.      STATUS OF DISCOVERY**

10      **GE's Statement**:  Regular discovery commenced on February 6, 2014 after the

11   Rule 26(f) meeting of counsel on that same date.  On that date, GE served Liang with a

12   Notice of Deposition and Rule 34 Requests for Inspection of Property and for

13   Production of Documents.  The Rule 34 Request for Inspection sought a forensic

14   inspection of Liang's property, including but not limited to his Google Drive account

15   and any other cloud-based storage applications or services he has used in the last three

16   years (including his Facebook account); all of his personal email accounts (including

17   but not limited to his Gmail, Yahoo and MIT Alumni email accounts); any hardware

18   he possesses, including, but not limited to, PCs, USB drives, smartphones, tablets, and

19   any hardware or accounts being held by any third party on his behalf.  GE also served

20   third party subpoenas on Liang's ISPs, including Google, Yahoo!, and Massachusetts

21   Institute of Technology.  GE is in the process of serving third party subpoenas on

22   Liang's wife (Cindy Gao) and Facebook, his online social network.  Plaintiffs are

23   concurrently serving their initial disclosures under Federal Rule of Civil Procedure

24   26(a)(1)(A).

25      Due to the confidential, proprietary and private nature of the information and

26   documents likely to be produced in discovery, GE has proposed that the parties

27   stipulate to a Protective Order to be entered by the Court.  (*See* Ex. A.)  The Protective

28   Order would limit access to designated information to the parties and/or their attorneys

Gibson, Dunn &
Crutcher LLP

**Exhibit 5**
**-77-**

1  according to the specific designation—*i.e.*, "CONFIDENTIAL" or "HIGHLY

2  CONFIDENTIAL – ATTORNEYS' EYES ONLY".

3      **Liang's Statement**:

4      Liang has not commenced discovery as yet.  If the Court grants Mr. Liang's

5  Motion to Stay, the issue will be moot.  However, if the motion is denied, Liang will

6  commence discovery including written discovery, noticing depositions of percipient

7  and third party witnesses.  As to GE's proposal for a protective order, Mr. Liang

8  cannot stipulate to a protective order as to any testimony and discovery sought from

9  him because that information can be used in a criminal prosecution notwithstanding

10  the civil protective order.  (See, *In re Grand Jury Subpoena Served on Meserve,

11  Mumper & Hughes*, 62 F.3d 1222, 1227 (9th Cir. 1995).)

12  **I.      DISCOVERY PLAN**

13          **1.      Changes To Timing of Discovery**

14      **GE's Position**: Liang has moved to stay this action (Dkt. 44, at 16) and GE has

15  opposed the motion.  (Dkt. 53.)  It is well-established that (1) "[s]imultaneous parallel

16  civil and criminal proceedings are unobjectionable . . . [i]n the absence of substantial

17  prejudice to the rights of the parties involved" (*Keating v. Office of Thrift Supervision*,

18  45 F.3d 322, 324 (9th Cir. 1995) (internal citations and quotation marks omitted)), and

19  (2) "[t]he case for staying civil proceedings is weak when no indictment has been

20  returned."  *SEC v. Global Express Capital Real Estate Inv. Fund*, 289 F. App'x 183,

21  191 (9th Cir. 2008) (denial of stay request was "appropriate" where "no criminal

22  charges had been filed . . . at the time [defendant] moved for a stay").

23      Here, no indictments have been returned against Liang or anyone else in

24  connection with this matter (to GE's knowledge), and thus, his concerns about self-

25  incrimination are entirely speculative.  *See*, *e.g.*, *In re Homestore.com, Inc. Sec. Litig.*,

26  347 F. Supp. 2d 814, 820 (C.D. Cal. 2004) ("The mere possibility that [a civil

27  defendant] will be indicted is insufficient grounds for dragging out" a civil action

28  where there was "no evidence of any timeline for the government's investigation or

Gibson, Dunn &
Crutcher LLP

13

**Exhibit 5**
-78-

1  [the] indictment.").  By contrast, this Court *has already found* that Liang was capable

2  of "disseminat[ing] the confidential, proprietary GE materials and GE trade secrets . . .

3  in his possession, through the use of several personal email accounts, a Google Drive,

4  and/or his Facebook account."  (Dkt. 14, at 1.)  Liang's ability to transmit this

5  information was one of the primary findings underpinning the Court's conclusion that

6  GE was "likely to suffer irreparable harm" if a preliminary injunction was not issued.

7  (*Id.*)[3]  GE needs discovery to determine what happened to the intellectual property that

8  Liang took from it, including (1) the identities of any third parties (including possible

9  Doe Defendants) that received GE IP from Liang, (2) what GE information third

10  parties have access to, and (3) how those disclosures were made.  For these reasons,

11  Liang's asserted Fifth Amendment interest does not outweigh the severe prejudice that

12  GE *will* suffer if it is prevented from obtaining discovery.  *See, e.g., eBay, Inc. v.*

13  *Digital Point Solutions, Inc.*, 2010 U.S. Dist. LEXIS 23253, at *10-13, *17 (N.D. Cal.

14  Feb. 25, 2010) (denying stay and noting that "[t]he potential prejudice to a civil

15  defendant facing a parallel criminal investigation is 'more remote' than it is for an

16  indicted defendant," whereas the plaintiff's "interest in preventing delay, [and]

17  accessing evidence … is substantial") (internal citations and quotation marks omitted).

18        **Liang's Position**:

19        Due to the ongoing criminal investigation, if this Court does not stay this action,

20  Mr. Liang proposes that all discovery be stayed for a period of six months or

21  alternatively that discovery directed to Mr. Liang be stayed for that period of time so

22  as to allow the parties to determine whether or not Mr. Liang will be criminally

23  indicted.

24        **2.    Changes To Initial Disclosures**

25

26  ───────────────

27  [3]  Even if Liang were indicted in the future, "[a] defendant has no absolute right not to be forced to
     choose between testifying in a civil matter and asserting his Fifth Amendment privilege."

28  *Keating*, 45 F. 3d at 326.

Gibson, Dunn &
Crutcher LLP

14

**Exhibit 5
-79-**

1      **GE's Proposed Changes To Initial Disclosures**: GE does not currently expect

2 changes in the timing or content of the Rule 26(a)(1)(A) disclosures.

3      **Liang's Proposed Changes To Initial Disclosures**:

4      Mr. Liang proposes that his initial disclosures be stayed pending the hearing of

5 the stay motion.

6      **3.**    **Anticipated Deponents**

7      **GE's Anticipated Deponents**: At this early stage of the proceedings, and

8 subject to the factual record developed during discovery, GE anticipates deposing the

9 following individuals or entities:

10    • Liang;

11    • Liang's wife Cindy Gao; and

12    • Doe Defendants to be identified through discovery.

13    • Defendants' liability expert(s)

14    • Defendants' damages expert(s)

15      Given the scope of Defendant Liang's conduct, GE anticipates that Liang's

16 deposition will exceed 7 hours and respectfully requests that the Court permit GE to

17 take Liang's deposition for a total of 14 hours (*e.g.*, two days of seven hour sessions).

18 GE does not currently anticipate the need to depose more than 10 witnesses, though it

19 reserves all rights to seek permission of the Court to do so if and when further

20 discovery reveals such a need.

21      **Liang's Anticipated Deponents**:

22      Mr. Liang anticipates deposing each of GE's percipient witnesses identified in

23 Section C.2. above as well as FBI Special agents Yang and Sullivan, other witness

24 revealed through discovery; and experts designated by GE.

25      **4.**    **Anticipated Written Discovery**

26      **GE's Anticipated Written Discovery**:  At this early stage of the proceedings,

27 and subject to the factual record developed during discovery, GE anticipates serving

28

Gibson, Dunn &
Crutcher LLP

15

**Exhibit 5**
**-80-**

1    the following additional written discovery on Liang.  GE anticipates serving similar

2    discovery on Doe Defendants as their identities become known.

3        • Written interrogatories seeking the identities of Doe Defendants to whom Liang

4            disseminated GE's Intellectual Property, the means of dissemination and any

5            associated financial arrangements;

6        • Requests for production of documents on the same aforementioned topics;

7        • Requests for production of documents that reflect all communications about

8            GE's Intellectual Property between Liang and any third parties, including Doe

9            Defendants;

10       • Requests for Admission concerning Liang's access to, downloading, possession,

11           use and/or disclosure of GE Intellectual Property.

12       At this time, GE does not anticipate the need to propound more than 25

13   interrogatories, though it reserves all rights to seek permission of the Court to do so if

14   and when further discovery reveals such a need.  Given the scope of Defendant Liang's

15   conduct, GE currently cannot estimate the number of requests for admission it may be

16   required to propound.

17       **Liang's Anticipated Written Discovery**:

18       Liang expects substantial discovery to be served including written

19   interrogatories, production demands as well as requests for admission.  The scope of

20   discovery required is currently unknown to Mr. Liang but based upon GE's allegations

21   as to the breadth of the alleged misappropriation and the number of files involved,

22   Liang expects to propound more than 25 interrogatories.

23       **5.    Subjects On Which Discovery May Be Needed**

24       **GE's Statement**: At this early stage of the proceedings, and subject to the

25   factual record developed during discovery, GE anticipates seeking discovery on the

26   following topics: what information, including GE Intellectual Proprietary, Liang

27   downloaded and copied from GE; how Liang downloaded or copied that information;

28   where or how Liang stored or saved the information he stole; the means by which

Gibson, Dunn &
Crutcher LLP

16

**Exhibit 5**
**-81-**

1   Liang disseminated or shared that information with others, including Doe Defendants;

2   the identities of Doe Defendants; any financial arrangements between Liang, Doe

3   Defendants, and/or third parties related to Liang's dissemination of that information;

4   and the Defendants' use and/or disclosure of GE's Intellectual Property.

5          **Liang's Statement**:

6          Mr. Liang expects to conduct discovery on the scope of the alleged

7   misrepresentation including how many files are truly GE's Intellectual Property, what

8   measures GE took to safeguard and protect its Intellectual Property, and the damages

9   suffered.

10   **6.   Preservation of Electronically Stored Information**

11          **GE's Proposal**: GE has already taken measures to preserve electronically stored

12   information.  Specifically, GE has preserved forensic images of all assets seized from

13   Liang by GE.  GE also has issued an internal preservation notice to relevant persons

14   covering: documents related to Liang's employment; GE policies related to the

15   security, confidentiality, use, access, disclosure, destruction and/or deletion of GE

16   Intellectual Property; and documents related to GE's claim that Liang improperly

17   accessed, took, copied, deleted and/or altered GE files.  GE has preserved a sample set

18   of files that Liang accessed or copied; Data Loss Prevention Reports showing Liang's

19   downloading and/or copying of GE files to his laptop; and audit trial reports showing

20   Liang's downloading and/or copying of GE files from various GE systems.  Because

21   GE's efforts to investigate Liang's conduct and preserve documents are very costly

22   and time-consuming, GE requested (on January 17, 2014) that Liang notify it

23   immediately if he believed that further efforts were required to preserve such

24   information.  To date, Liang has not done so.

25          Liang has been ordered by the Court to preserve "documents that are relevant to

26   the parties' claims or defenses or likely to lead to the discovery of admissible

27   evidence." (Dkt. 14.)  To show compliance, he should arrange for a third-party

28   forensic analyst to preserve forensic images of all personal devices still in his

Gibson, Dunn &
Crutcher LLP

Exhibit 5
-82-

1  possession, custody or control,[4] including PCs, laptops, USB drives, smartphones and
2  tablets in order to preserve evidence of the GE files that he downloaded and/or copied
3  without authorization.  Further, Liang's email and cloud-storage accounts should be
4  backed up and the contents preserved going back for a period of at least three years.

5        **Liang's Proposal**:

6        On or about October 25, 2013, the FBI executed search and seizure warrants of
7  Mr. Liang's home and automobiles and seized any and all GE information as well as
8  electronic devices (phones, laptops, flash drives and desktop computers) that may
9  potentially contain GE information.  Also, Mr. Liang continues to comply with this
10  Court's December 3, 2013 Order and he has not accessed, used or otherwise disclosed
11  any GE Intellectual Property.

12        **7.**   **Proposed Protective Order**

13        GE has proposed a Protective Order to address the Parties' concerns about the
14  confidential, proprietary and private nature of the information and documents likely to
15  be produced in discovery.  The proposed Protective Order is attached.  (Ex. A.)  Mr.
16  Liang does not generally oppose a protective order for information flowing from GE to
17  Mr. Liang subject to the parties arriving upon mutually agreeable terms.  However to
18  the extent any proposed protective order seeks disclosure of information from Mr.
19  Liang in violation of his Fifth Amendment Rights, Mr. Liang cannot enter into such
20  stipulation.

21        **8.**   **Limitations on Discovery**

22        **GE's Statement**: At the outset, discovery should not be limited.  If specific
23  information sought is subject to some protection or privilege, the responding party
24  should simply assert the legal basis for withholding that information, so that the parties
25  can confer and resolve the issue or, if necessary, move the Court for resolution.  *See*

26
27    [4]  As previously noted, Liang claims that his personal computing devices have been
28       confiscated by the FBI.

Gibson, Dunn &
Crutcher LLP

18

**Exhibit 5**
**-83-**

1    *SEC v. Caramadre*, 717 F. Supp. 2d 217, 224 (D.R.I. 2010) (subpoenaed parties

2    required to assert Fifth Amendment as to particular documents in privilege log); *see*

3    *also Sallah*, 855 F. Supp. 2d at 1371.

4         **Liang's Statement**:

5         In the event the Court does not stay this action, Mr. Liang proposes that

6    discovery be stayed for a period of six months or alternatively that discovery directed

7    to Mr. Liang be stayed for that period of time.

8         **9.    Supplementation of Disclosures Under Rule 26(e)**

9         **GE's Statement**: GE proposes that any supplemental disclosures under Rule

10   26(a) be made on or before May 15, 2014.  Where later supplemental disclosures must

11   be made, the parties should meet and confer in good faith to agree on an appropriate

12   disclosure schedule or seek leave of court in the event they are unable to reach

13   agreement.

14        **Liang's Statement:**

15        Mr. Liang proposes that supplemental disclosures be made May 15, 2015.

16   **J.    PRETRIAL SCHEDULE**

17        **GE's Statement**: GE proposes a Non-Expert Discovery Cut-Off of June 15,

18   2014, by which to complete all depositions and resolve all discovery motions.  GE's

19   proposals for an Expert Discovery, Non-Dispositive Motion and Pretrial Schedule are

20   set forth below.

| Date | Event |
|---|---|
| May 15, 2014 | Last Day to Supplement Disclosures under Rule 26(a) |
| June 15, 2014 | Non-Expert Discovery Cut-Off |
| July 14, 2014 | Parties to identify experts and areas of expert opinion |
| August 11, 2014 | Parties to identify any rebuttal experts and areas of rebuttal expert opinion |
| September 8, 2014 | Parties to exchange expert reports |
| September 29, 2014 | Parties to exchange rebuttal reports |

Gibson, Dunn &
Crutcher LLP

**Exhibit 5
-84-**

| October 21, 2014 | Expert discovery, including expert depositions, completed |
| November 21, 2014 | Dispositive Motions Cut-Off Date |
| December 12, 2014 | Dispositive Motions Opposing Papers Due |
| December 22, 2014 | Dispositive Motions Reply Papers Due |
| January 2, 2015 | Last day for parties to participate in ADR (45 days before Final Pretrial Conference). |
| January 12, 2015 | Latest Hearing Date for Dispositive Motions |
| January 16, 2015 | Last day to submit Rule 26(a)(3) witness lists, and designations of witnesses whose testimony will be presented by deposition. |
| January 27, 2015 | Last day to submit exhibit lists (no later than 21 days before Final Pretrial Conference). |
| February 6, 2015 | Last day to file objections under Rule 26(a)(3) (no later than 11 days before the date set for the Final Pretrial Conference). |
| February 17, 2015 | Requested date for final pretrial conference. |
| March 2, 2015 | Suggested trial date. |

**Liang's Statement**:  GE's proposed pretrial schedule is unrealistic and not grounded in the facts of this case.  As often mentioned by GE in its pleadings, motions and elsewhere, there are in excess of two hundred thousand files GE claims Mr. Liang downloaded and potentially misappropriated.  It will require a tremendous amount of time and resources to review the files, follow up with additional written discovery and deposition testimony; engage in what is certain to be protracted motion work especially involving claims of privilege, and all the while handle the parallel criminal investigation and potential indictment.  It is impossible to complete non expert discovery within 4 months as GE proposes.  Mr. Liang proposes the following pretrial schedule:

Gibson, Dunn & Crutcher LLP

Exhibit 5
-85-

| Date | Event |
|---|---|
| May 15, 2015 | Last Day to Supplement Disclosures under Rule 26(a) |
| May 19, 2016 | Non-Expert Discovery Cut-Off |
| May 23, 2016 | Parties to identify experts and areas of expert opinion |
| June 6, 2016 | Parties to identify any rebuttal experts and areas of rebuttal expert opinion |
| June 27, 2016 | Parties to exchange expert reports |
| July 25, 2016 | Parties to exchange rebuttal reports |
| August 22, 2016 | Expert discovery, including expert depositions, completed |
| September 19, 2016 | Dispositive Motions Cut-Off Date |
| October 31, 2016 | Dispositive Motions Opposing Papers Due |
| November 14, 2016 | Dispositive Motions Reply Papers Due |
| November 14, 2016 | Last day for parties to participate in ADR (45 days before Final Pretrial Conference). |
| December 5, 2016 | Latest Hearing Date for Dispositive Motions |
| December 12, 2016 | Last day to submit Rule 26(a)(3) witness lists, and designations of witnesses whose testimony will be presented by deposition. |
| January 9, 2017 | Last day to submit exhibit lists (no later than 21 days before Final Pretrial Conference). |
| January 16, 2017 | Last day to file objections under Rule 26(a)(3) (no later than 11 days before the date set for the Final Pretrial Conference). |
| January 30, 2017 | Requested date for final pretrial conference. |
| February 14, 2017 | Suggested trial date. |

## K.   TRIAL ESTIMATE

**GE's Estimate**: At this early stage, GE anticipates that trial will last approximately two weeks. However, discovery has commenced only recently, and GE's estimate may be revised, depending on development of the factual record.

Exhibit 5
-86-

Case 8:20-cv-00048-JVS-JDE   Document 43-4   Filed 04/30/20   Page 88 of 150   Page ID
Case 2:13-cv-08670-DDP-CW   Document 54   Filed 02/20/14   Page 23 of 24   Page ID #:1308
#:3372

1    Additionally, the length of trial will depend on the nature and scope of the disclosure

2    and use of GE's trade secrets.  For similar reasons, GE cannot say with certainty how

3    many witnesses will be called.  However, GE expects to call some or all of the 13

4    percipient witness listed above (in section C.2), as well as at least two (2) expert

5    witnesses.

6         **Liang's Estimate**:

7         Mr. Liang estimates that trial will last at least 4 weeks if not more and that this

8    estimate will increase as discovery is conducted.

9    **L.    TRIAL COUNSEL**

10        **GE**:  Scott A. Edelman and Angelique Kaounis of Gibson, Dunn & Crutcher

11   LLP.

12        **Liang**:  Abraham Mathew, Jacob George and Mazyar Mazarei, Mathew &

13   George.

14   **M.    SETTLEMENT STATUS AND ADR SELECTION**

15        **GE's Statement**: The parties have not yet discussed settlement because such

16   discussions would be premature and unlikely to succeed at this stage.  Pursuant to

17   Local Rule 16-15, GE proposes that the parties participate in a private dispute

18   resolution proceeding once discovery has been completed and no later than forty-five

19   (45) days before the Final Pretrial Conference.  The ADR selection form is attached.

20   (Ex. B.)

21        **Liang's Statement**:

22        Mr. Liang agrees with GE's statement above.

23   **N.    OTHER ISSUES**

24        **GE's Statement**: California Code of Civil Procedure section 2019.210 requires

25   that a plaintiff alleging trade secret misappropriation in a state court action identify the

26   trade secrets at issue before discovery may commence.  Assuming, *arguendo*, that

27   2019.210 applies here, the statute has been satisfied by GE's Complaint (Dkt. 1, at

28   ¶ 54) and the declarations filed in support of GE's Motion for Preliminary Injunction,

Gibson, Dunn &
Crutcher LLP

**Exhibit 5**
**-87-**

Case 8:20-cv-00048-JVS-JDE   Document 43-4   Filed 04/30/20   Page 89 of 150   Page ID
Case 2:13-cv-08670-DDP-CW   Document 54   Filed 02/20/14   Page 24 of 24   Page ID #:1309
#:3373

1   which detail the nature of the trade secrets at issue and provide specific examples of

2   those secrets (*see, e.g.*, Dkt. Nos. 7-2, 7-4, and 7-6).  In light of these filings, the Court

3   found on December 3, 2013, that "the documents taken by Liang embody and/or

4   reflect GE trade secrets such as product costs, profit margins, new product initiatives,

5   and strategic planning materials."  (Dkt. 14.)  Thus, GE has sufficiently identified its

6   trade secrets.

7        **Liang's Statement**:

8        Mr. Liang disagrees with GE's position that it has complied with the provisions

9   of California Code of Civil Procedure Section 2019.210 as that section and relevant

10   authority requires specificity in identifying trade secret information as opposed to the

11   general statements GE has set forth to date.

12

13   Dated:  February 19, 2014          Dated:  February 19, 2014

14   SCOTT A. EDELMAN               ABRAHAM MATHEW

15   ANGELIQUE KAOUNIS           MAZYAR MAZAREI
     GIBSON, DUNN & CRUTCHER LLP     MATHEW & GEORGE

16

17   By:_____/s/ Scott A. Edelman_____    By:_____/s/ Abraham Mathew

18            Scott A. Edelman                 Abraham Mathew

19   Attorneys for General Electric           Attorneys for Erwin W. Liang
     Company and GE Aviation

20   Systems LLC

21

22

23   101676151.2

24

25

26

27

28

**Exhibit 5**
**-88-**

# EXHIBIT A

**Exhibit 5**
**-89-**

Case 8:20-cv-00048-JVS-JDE   Document 43-4   Filed 04/30/20   Page 91 of 150   Page ID
#:3375
Case 2:13-cv-08670-DDP-CW   Document 54-1   Filed 02/20/14   Page 2 of 18   Page ID #:1311

SCOTT A. EDELMAN, SBN 116927
sedelman@gibsondunn.com
ANGELIQUE KAOUNIS, SBN 209833
akaounis@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2029 Century Park East, Suite 4000
Los Angeles, CA 90067-3026
Telephone: 310.552.8500
Facsimile: 310.551.8741

Attorneys for Plaintiffs
GENERAL ELECTRIC COMPANY
and GE AVIATION SYSTEMS LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| General Electric Company, and GE Aviation Systems LLC,<br><br>Plaintiffs,<br><br>v.<br><br>Erwin Wenti Liang, Does 1-10,<br><br>Defendants. | CASE NO. 13CV-08670-DDP (CWx)<br>_____<br><br>**STIPULATION AND [PROPOSED] PROTECTIVE ORDER** |

Pursuant to Fed. R. Civ. P. 26(c), the Parties hereby submit this proposed Stipulated Protective Order for the purpose of ensuring that confidential or other non-public information produced by the Parties or any third parties in connection with this proceeding, whether pursuant to compulsory process or voluntarily, is not improperly used or disclosed. Accordingly, the parties, by their undersigned counsel, hereby stipulate, subject to approval and entry by the Court, as follows:

1.  **PURPOSE**

Disclosure and discovery activity in this action are likely to involve production of confidential, proprietary, and/or private information for which a Party may believe special protection from disclosure to the public or a Party warranted.

2.  **DEFINITIONS**

2.1     <u>Challenging Party</u>:  a Party or Non-Party that challenges the designation of information or items under this Order.

2.2     <u>Counsel (without qualifier)</u>:  Outside Counsel of Record and Designated Counsel (as well as their support staff).

2.3     <u>Designated Counsel</u>:  Counsel other than Outside Counsel of Record who may access "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" information in this matter, as agreed by the Parties or ordered by the Court.

2.4     <u>Designating Party</u>:  a Party or Non-Party that designates information or items that it produces in disclosures or in responses to discovery as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY".

2.5     <u>Expert</u>:  a person with specialized knowledge or experience in a matter pertinent to this case who (a) has been retained by a Party or its counsel to serve as an expert witness or as a consultant in this action, (b) is not a current employee of a Party's competitor (which for purposes of this protective order shall mean (i) any company that competes with Plaintiffs General Electric Company or GE Aviation Systems LLC, or (ii) any entity that is owned in whole or in part by such company), and (c) at the time of retention is not anticipated to become an employee of a Party's competitor—*i.e.*, is not in the process of applying for or negotiating employment with such competitor.

2.6     <u>Confidentiality Designations</u>:

(a) "<u>CONFIDENTIAL</u>" Information or Items means information that is not publicly available; and

(b) "<u>HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY</u>" Information or Items means extremely sensitive information or items, including but not limited to any information that GE claims is a trade secret in this action, disclosure of which to another Party or Non-Party would create a substantial risk of serious harm and/or irreparable injury that could not be avoided by less restrictive means.

2.7 <u>Non-Party</u>: any natural person, partnership, corporation, association, or other legal entity not named as a Party.

2.8 <u>Outside Counsel of Record</u>: attorneys who are not employees of a Party but are retained to represent or advise a Party and have appeared in this action on behalf of that Party or are affiliated with a law firm which has appeared on behalf of that Party.

2.9 <u>Party</u>: any party to this action, including all of its officers, directors, employees, consultants, retained experts, and Outside Counsel of Record (and their support staffs).

2.10 <u>Producing Party</u>: a Party or Non-Party that produces Protected Material in this action.

2.11 <u>Professional Vendors</u>: persons or entities that provide litigation support services (*e.g.,* photocopying, videotaping, translating, preparing exhibits or demonstrations, and organizing, storing, or retrieving data in any form or medium) and their employees and subcontractors, including mock jurors.

2.12 <u>Protected Material</u>: all items or information, regardless of the medium or manner in which it is generated, stored, or maintained (including, among other things, testimony, transcripts, and tangible things), that are produced or generated in disclosures or responses to discovery in this matter and are designated as "CONFIDENTIAL" or ""<u>HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY</u>".

2.13 <u>Receiving Party</u>: a Party that receives Protected Material from a Producing Party.

3. **<u>SCOPE</u>**

The protections conferred by this Order cover not only Protected Material (as defined above), but also (1) any information copied or extracted from Protected Material; (2) all copies, excerpts, summaries, or compilations of Protected Material; and (3) any deposition testimony, conversations, or presentations by Parties or their

Gibson, Dunn & Crutcher LLP

3

1  Counsel that might reveal Protected Material.  However, the protections conferred by

2  this Order do not cover the following information:  (a) any information that is in the

3  public domain at the time of disclosure to a Receiving Party or becomes part of the

4  public domain after its disclosure to a Receiving Party as a result of publication not

5  involving a violation of this Order; and (b) any information lawfully known to the

6  Receiving Party prior to the disclosure or obtained by the Receiving Party after the

7  disclosure from a source who obtained the information lawfully and under no

8  obligation of confidentiality to the Designating Party.

9  Nothing in this Protective Order shall prevent disclosure of Protected Material if

10  the Designating Party or its Counsel consents to such disclosure in writing, or if the

11  Court orders or allows such disclosure after noticed motion and upon good cause

12  shown.

13  4.  **DURATION**

14  Even after final disposition of this action, the obligations imposed by this Order

15  shall remain in effect until a Producing Party agrees otherwise in writing or this

16  Court's order otherwise directs.  Final disposition shall be deemed to be final judgment

17  herein after the completion and exhaustion of all writs, appeals, rehearings, remands,

18  trials, or reviews of this action, including the time limits for filing any motions or

19  applications for extension of time pursuant to applicable law.

20  5.  **DESIGNATING PROTECTED MATERIAL**

21  5.1  Exercise of Restraint and Care in Designating Material

22  "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL — ATTORNEYS' EYES

23  ONLY".  Each Party or Non-Party that designates information or items as

24  "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL — ATTORNEYS' EYES

25  ONLY" under this Order must take care to limit any such designations to specific

26  material that qualifies under the appropriate standards.  To the extent practical, the

27  Designating Party must designate for protection only those parts of material,

28  documents, items, or oral or written communications that may reasonably qualify.

Gibson, Dunn &
Crutcher LLP

4

Ex. A
p.27

Exhibit 5
-93-

1       If it comes to a Designating Party's attention that information or items that it

2 designated for protection do not qualify for protection as "CONFIDENTIAL" or

3 "HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY", that Designating

4 Party must promptly notify all other Parties that it is withdrawing the mistaken

5 designation.

6       5.2   Manner and Timing of Designations.  Designation of Protected Material

7 as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL — ATTORNEYS' EYES

8 ONLY" requires:

9       (a) for information in documentary form (*e.g.*, paper or electronic

10 documents, but excluding transcripts of depositions), that the Producing Party affix the

11 legend "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL — ATTORNEYS' EYES

12 ONLY" to each page of the document that contains such material at the time of

13 production.

14       A Party or Non-Party that makes original documents or materials available for

15 inspection need not designate them for protection until after the inspecting Party has

16 indicated which material it would like copied and produced.  During the inspection and

17 before the designation, all of the material made available for inspection shall be

18 deemed "HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY".  After the

19 inspecting Party has identified the documents it wants copied and produced, the

20 Producing Party must determine which documents, or portions thereof, qualify for

21 protection as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL — ATTORNEYS'

22 EYES ONLY".  Then, before producing the specified documents, the Producing Party

23 must affix the legend "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL —

24 ATTORNEYS' EYES ONLY" to all such Protected Material.

25       (b) for information given in response to interrogatories or requests for

26 admission, that the Producing Party designate, at the time the response is served, that

27 part of the response that qualifies as "CONFIDENTIAL" or "HIGHLY

28 CONFIDENTIAL — ATTORNEYS' EYES ONLY".

Gibson, Dunn &
Crutcher LLP

5

1    (c) for testimony given in deposition, that the Designating Party identify

2    on the record, before the close of the deposition, all testimony that is

3    "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL — ATTORNEYS' EYES

4    ONLY".  When it is impractical to identify separately each portion of testimony that is

5    entitled to protection and it appears that substantial portions of the testimony may

6    qualify for protection, the Designating Party may invoke on the record (before the

7    deposition is concluded) a right to have up to 14 days to identify the specific portions

8    of the testimony as to which such protection is sought.  Only those portions of the

9    testimony that are appropriately designated for protection within the 14 days shall be

10   treated as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL — ATTORNEYS'

11   EYES ONLY" under the provisions of this Protective Order.  Alternatively, a

12   Designating Party may specify, at the deposition or up to 14 days afterwards if that

13   period is properly invoked, that the entire transcript shall be treated as

14   "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL — ATTORNEYS' EYES

15   ONLY".

16       Parties shall give the other Parties notice if they reasonably expect a deposition

17   to include "HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY" material so

18   that the other Parties can ensure that only authorized individuals who have signed the

19   "Acknowledgment and Agreement to Be Bound" (Exhibit A) are present at those

20   proceedings.  The use of a document as an exhibit at a deposition shall not in any way

21   affect its designation as "HIGHLY CONFIDENTIAL — ATTORNEYS' EYES

22   ONLY".

23       Deposition transcripts containing "CONFIDENTIAL" or "HIGHLY

24   CONFIDENTIAL — ATTORNEYS' EYES ONLY" material shall have an obvious

25   legend on the title page that the transcript contains such material, and the title page

26   shall be followed by a list of all pages (including line numbers as appropriate) that

27   have been designated as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL —

28   ATTORNEYS' EYES ONLY".  The Designating Party shall inform the court reporter

Gibson, Dunn &
Crutcher LLP

6

1   of these requirements.  Any transcript that is prepared before the expiration of a 14-day

2   period for designation shall be treated during that period as if it had been designated

3   "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL — ATTORNEYS' EYES

4   ONLY" in its entirety unless otherwise agreed.  After the expiration of that period, the

5   transcript shall be treated only as actually designated.

6          (d) for information produced in some form other than documentary and

7   for any other tangible items, that the Producing Party affix in a prominent place on the

8   exterior of the container or containers in which the information or item is stored the

9   legend "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL — ATTORNEYS' EYES

10  ONLY" at the time of production.  If only a portion or portions of the information or

11  item warrant such protection, the Producing Party, to the extent practicable, shall

12  identify the protected portion(s).

13      5.3    Inadvertent Failures to Designate.  If timely corrected, an inadvertent

14  failure to designate qualified information or items does not, standing alone, waive the

15  Designating Party's right to secure protection under this Order for such material.

16  Upon timely correction of a designation, the Receiving Party must make reasonable

17  efforts to assure that the material is treated in accordance with the provisions of this

18  Order.

19  6.      **CHALLENGING CONFIDENTIALITY DESIGNATIONS**

20      6.1    Timing of Challenges.  Any Party or Non-Party may challenge a

21  designation of information as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL —

22  ATTORNEYS' EYES ONLY" at any time.  Unless a prompt challenge to a

23  Designating Party's confidentiality designation is necessary to avoid foreseeable,

24  substantial unfairness, unnecessary economic burdens, or a significant disruption or

25  delay of the proceedings, a Party does not waive its right to challenge a confidentiality

26  designation by electing not to mount a challenge promptly after the original

27  designation is disclosed.

28

Gibson, Dunn &
Crutcher LLP

6.2   <u>Intervention by the Court</u>.  The Parties shall meet and confer in good faith to resolve disputes regarding confidentiality designations.  If the Parties cannot resolve a challenge without intervention by the Court, the Challenging Party shall file a motion for an order de-designating the discovery as confidential under this Protective Order.

The burden of persuasion in any such proceeding shall be on the Designating Party.  Frivolous challenges and those made for an improper purpose (*e.g.*, to harass or impose unnecessary expenses and burdens on other parties) may expose the Challenging Party to sanctions.  All Parties shall continue to afford the material in question the level of protection to which it is entitled under the Producing Party's designation until the Court rules on the Challenging Party's motion.

7.   **ACCESS TO AND USE OF PROTECTED MATERIAL**

7.1   <u>Basic Principles</u>.  A Receiving Party may only use Protected Material that is disclosed or produced by another Party or by a Non-Party in connection with this matter for purposes of prosecuting, defending, or attempting to settle this action.  Such Protected Material may be disclosed only to the categories of persons and under the conditions described in this Order.  When the case has been terminated, a Receiving Party must comply with the provisions of section 14 below (FINAL DISPOSITION).

Protected Material must be stored and maintained by a Receiving Party at a location and in a secure manner that ensures that access is limited to the persons authorized under this Order.

7.2   <u>Disclosure of "CONFIDENTIAL" Protected Material</u>.  Unless otherwise ordered by the Court or permitted in writing by the Designating Party, a Receiving Party may disclose <u>"CONFIDENTIAL"</u> Protected Material only to:

(a) the Receiving Party's Outside Counsel of Record in this action, as well as employees of said Outside Counsel of Record to whom it is reasonably necessary to disclose the information for this action;

(b) the Receiving Party, including officers, directors, and employees (including Designated Counsel) of the Receiving Party or an indemnitor of the

Gibson, Dunn &
Crutcher LLP

8

1  Receiving Party (including Designated Counsel of the indemnitor) to whom disclosure
2  is reasonably necessary for this action and who have signed the "Acknowledgment and
3  Agreement to Be Bound" (Exhibit A);

4        (c) Experts (as defined in this Order) of the Receiving Party to whom
5  disclosure is reasonably necessary for this action and who have signed the
6  "Acknowledgment and Agreement to Be Bound" (Exhibit A);

7        (d) the Court and the Court's staff;

8        (e) court reporters and their staff, professional jury or trial consultants,
9  and Professional Vendors to whom disclosure is reasonably necessary for this action
10  and who have signed the "Acknowledgement and Agreement to Be Bound" (Exhibit
11  A);

12        (f) during their depositions, witnesses in the action to whom disclosure is
13  reasonably necessary and who have signed the "Acknowledgment and Agreement to
14  Be Bound" (Exhibit A), unless otherwise agreed by the Designating Party or ordered
15  by the Court; and

16        (g) the author or recipient of a document containing the information or a
17  custodian or other person who otherwise possessed or knew the information.

18      7.3   Disclosure of "HIGHLY CONFIDENTIAL — ATTORNEYS' EYES
19  ONLY" Material.  Unless otherwise ordered by the Court or permitted in writing by
20  the Designating Party, a Receiving Party may disclose any information or item
21  designated "HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY" only to:

22        (a) the Receiving Party's Outside Counsel of Record in this action, as well
23  as employees of said Outside Counsel of Record to whom it is reasonably necessary to
24  disclose the information for this action;

25        (b) Designated Counsel of General Electric Company and GE Aviation
26  Systems LLC (collectively, "GE");

27
28

Gibson, Dunn &
Crutcher LLP

9

1    (c) Experts (as defined by this Order) of either Party (1) to whom

2    disclosure is reasonably necessary for this action, and (2) who have signed the

3    "Acknowledgment and Agreement to Be Bound" (Exhibit A);

4        (d) the Court and the Court's staff;

5        (e) court reporters and their staff, professional jury or trial consultants,

6    and Professional Vendors to whom disclosure is reasonably necessary for this action

7    and who have signed the "Acknowledgement and Agreement to Be Bound" (Exhibit

8    A);

9        (f) during their depositions, witnesses in the action to whom disclosure is

10   reasonably necessary and who have signed the "Acknowledgment and Agreement to

11   Be Bound" (Exhibit A); Pages of transcribed deposition testimony or exhibits to

12   depositions that reveal <u>"HIGHLY CONFIDENTIAL — ATTORNEYS' EYES</u>

13   <u>ONLY"</u> Information must be separately marked by the court reporter and may not be

14   disclosed to anyone except as permitted under this Protective Order; and

15       (g) the author or recipient of a document containing the information or a

16   custodian or other person who otherwise possessed or knew the information;

17       (h) defendants, but only in the presence of their Outside Counsel, at their

18   Outside Counsel's office, and for no longer than one (1) hour at a time for a given

19   document.  In the event of such limited, supervised disclosure, defendants shall not be

20   permitted to take any notes concerning, or make any reproductions of any kind of any

21   <u>"HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY."</u>

22       7.4    <u>Disclosure to Experts</u>.  Unless otherwise ordered by the Court or agreed to

23   in writing by the Designating Party, a Party that seeks to disclose to an Expert (as

24   defined in this Order) any information or item that has been designated <u>"HIGHLY</u>

25   <u>CONFIDENTIAL — ATTORNEYS' EYES ONLY"</u> pursuant to paragraph 7.3(c) first

26   must make a written request to the Designating Party that (1) sets forth the full name of

27   the Expert and the city and state of his or her primary residence, and (2) attaches a

28   copy of the Expert's current resume, including current employer(s).

Gibson, Dunn &
Crutcher LLP

1        7.5      A Party that makes a request and provides the information specified in the

2    preceding respective paragraphs may disclose the subject Protected Material to the

3    identified Expert unless, within 3 days of delivering the request, the Party receives a

4    written objection from the Designating Party.  Any such objection must set forth in

5    detail the grounds on which it is based.  If an objection is made, the Parties shall meet

6    and confer, and if no agreement is reached, the Designating Party shall file a motion

7    for protective order preventing disclosure of Protected Material to the expert.

8        In any such proceeding, the Party opposing disclosure to the Expert shall bear

9    the burden of proving that the risk of harm that the disclosure would entail (under the

10   safeguards proposed) outweighs the Receiving Party's need to disclose the Protected

11   Material.

12   8.   **PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED**

13        **IN OTHER LITIGATION**

14        If a Party is served with a subpoena or a court order issued in other litigation that

15   compels disclosure of any Protected Material, that Party must:

16        (a) promptly notify in writing the Producing Party.  Such notification shall

17   include a copy of the subpoena or court order;

18        (b) promptly notify in writing the person who caused the subpoena or

19   order to issue in the other litigation that some or all of the material covered by the

20   subpoena or order is subject to this Protective Order.  Such notification shall include a

21   copy of this Protective Order; and

22        (c) cooperate with respect to all reasonable procedures sought to be

23   pursued by the Producing Party whose Protected Material may be affected.

24        If the Producing Party timely seeks a protective order, the Party served with the

25   subpoena or court order shall not produce any Protected Material before a

26   determination by the court from which the subpoena or order issued, unless the Party

27   has obtained the Producing Party's permission.  The Producing Party shall bear the

28   burden and expense of seeking protection in that court of its Protected Material — and

Gibson, Dunn &
Crutcher LLP

11

Case 8:20-cv-00048-JVS-JDE   Document 43-4   Filed 04/30/20   Page 102 of 150   Page ID
#:2386
Case 2:13-cv-08670-DDP-CW   Document 54-1   Filed 02/20/14   Page 13 of 18   Page ID
#:1322

1    nothing in these provisions should be construed as authorizing or encouraging a

2    Receiving Party in this action to disobey a lawful directive from another court.

3    9.    **A NON-PARTY'S PROTECTED MATERIAL SOUGHT TO BE**

4        **PRODUCED IN THIS ACTION**

5        (a) The terms of this Order are applicable to information produced by a

6    Non-Party in this action.  Such information produced by Non-Parties in connection

7    with this matter is protected by the remedies and relief provided by this Order.

8    Nothing in these provisions should be construed as prohibiting a Non-Party from

9    seeking additional protections.

10        (b) In the event that a Party is required, by a valid discovery request, to

11    produce a Non-Party's confidential information in its possession, and the Party is

12    subject to an agreement with the Non-Party not to produce the Non-Party's

13    confidential information, then the Party shall:

14        1.  promptly notify in writing the Requesting Party and the Non-Party

15    that some or all of the information requested is subject to a confidentiality agreement

16    with a Non-Party;

17        2.  promptly provide the Non-Party with a copy of the Protective Order

18    in this action, the relevant discovery request(s), and a reasonably specific description

19    of the information requested; and

20        3.  make the information requested available for inspection by the

21    Non-Party.

22        (c) If the Non-Party fails to object or seek a protective order from the

23    Court within 14 days of receiving the notice and accompanying information, the

24    Receiving Party may produce the Non-Party's confidential information responsive to

25    the discovery request.  If the Non-Party timely seeks a protective order, the Receiving

26    Party shall not produce any information in its possession or control that is subject to

27    the confidentiality agreement with the Non-Party before a determination by the Court.

28

Gibson, Dunn &
Crutcher LLP

1    Absent a court order to the contrary, the Non-Party shall bear the burden and expense

2    of seeking protection from the Court of its Protected Material.

3    10.    **UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL**

4        If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed

5    Protected Material to any person or in any circumstance not authorized under this

6    Protective Order, the Receiving Party must immediately (a) notify in writing the

7    Designating Party of the unauthorized disclosure(s), (b) use its best efforts to retrieve

8    all unauthorized copies of the Protected Material, (c) inform the person or persons to

9    whom unauthorized disclosure(s) was or were made of all the terms of this Order, and

10   (d) request such person or persons to execute the "Acknowledgment and Agreement to

11   Be Bound" that is attached hereto as Exhibit A.

12   11.    **INADVERTENT PRODUCTION OF PRIVILEGED OR OTHERWISE**

13        **PROTECTED MATERIAL**

14        If information is produced in discovery that is subject to a claim of privilege or

15   of protection as attorney work product or otherwise protected from disclosure, the

16   Party making the claim may notify any Party that received the information of the claim

17   and request immediate return of the produced information.  After being notified, a

18   Party must promptly return or destroy the specified information and any copies it has

19   and may not sequester, use or disclose the information until the claim is resolved.

20   Inadvertent production of privileged or work product information shall not be deemed

21   a waiver of the privilege.  If a Receiving Party believes the information should have

22   been produced, the Parties shall meet and confer and bring any dispute to the attention

23   of the Court.  This effort to meet and confer and resolve the dispute shall not justify

24   any delay in the Receiving Party's destruction or return of the material.

25   12.    **FILING PROTECTED MATERIAL**

26        In the event that any documents containing Protected Material (including

27   information copied or extracted from Protected Material; copies, excerpts, summaries,

28   or compilations of Protected Material; and any deposition testimony, conversations, or

Gibson, Dunn &
Crutcher LLP

13

1    presentations by Parties or their Counsel that might reveal Protected Material) are filed

2    with the Court, the Party filing the Protected Material must comply with Central

3    District of California Local Rule 79-5.1, or, where applicable, any Standing Order

4    regarding under-seal filings, and show that sealing of the Protected Material is

5    permitted under the law of this Circuit.

6    13.    **MISCELLANEOUS**

7           13.1    **Right to Further Relief.**  Nothing in this Order abridges the right of any

8    person to seek its modification by the Court in the future.

9           13.2    **Right to Assert Other Objections.**  No Party waives any right it

10   otherwise would have to object to disclosing or producing any information or item on

11   any ground not addressed in this Protective Order.  Similarly, no Party waives any

12   right to object on any ground to use in evidence of any of the material covered by this

13   Protective Order.  Under no circumstances shall a Receiving Party's decision not to

14   challenge a "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL — ATTORNEYS'

15   EYES ONLY" designation be interpreted to mean or used to argue that the Receiving

16   Party admits or agrees such information actually qualifies for the designation.

17   Furthermore, nothing in this Protective Order shall diminish any Designating Party's

18   right to contend in any other proceedings that information produced herein without a

19   designation as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL —

20   ATTORNEYS' EYES ONLY" is nonetheless proprietary and subject to appropriate

21   protection under applicable law.

22   14.    **FINAL DISPOSITION**

23          Within 60 days after the final disposition of this case, as defined in paragraph 4,

24   each Receiving Party must return all Protected Material to the Producing Party or

25   destroy such material.  As used in this subdivision, "all Protected Material" includes all

26   copies, abstracts, compilations, summaries, and any other format reproducing or

27   capturing any of the Protected Material.  Whether the Protected Material is returned or

28   destroyed, the Receiving Party must submit a written certification to the Producing

Gibson, Dunn &
Crutcher LLP

14

1   Party (and, if not the same person or entity, to the Designating Party) by the 60-day

2   deadline that affirms that the Receiving Party has not retained any copies, abstracts,

3   compilations, summaries or any other format reproducing or capturing any of the

4   Protected Material.  Notwithstanding this provision, Counsel are entitled to retain an

5   archival copy of all pleadings, motion papers, trial, deposition, and hearing transcripts,

6   legal memoranda, correspondence, deposition and trial exhibits, expert reports,

7   attorney work product, and consultant and expert work product, even if such materials

8   contain Protected Material.  Any such archival copies that contain or constitute

9   Protected Material remain subject to this Protective Order as set forth in Section 4

10  (DURATION).  Nothing in this section shall prohibit the Parties from maintaining

11  disaster recovery backup tapes or backup servers that contain backup copies of the

12  Protected Material so long as the Protected Material will be destroyed from those

13  backups in the ordinary course of recycling the backup materials, and so long as the

14  Parties do not restore or access the Protected Material from the backup tapes or

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

15

Case 8:20-cv-00048-JVS-JDE   Document 43-4   Filed 04/30/20   Page 106 of 150   Page ID
#:3390
Case 2:13-cv-08670-DDP-CW   Document 54-1   Filed 02/20/14   Page 17 of 18   Page ID
#:1326

1    servers.

2    Respectfully submitted by:

3    Dated:  February __, 2014                    Dated:  February __, 2014

4    SCOTT A. EDELMAN                             ABRAHAM MATHEW
     ANGELIQUE KAOUNIS                            MATHEW & GEORGE
5    GIBSON, DUNN & CRUTCHER LLP

6

7    By:                                          By:

8    Scott A. Edelman                             Abraham Mathew

9    Attorneys for General Electric Company       Attorneys for Erwin W. Liang

10

11

12

13   **IT IS SO ORDERED.**

14   _____

15   HON. DEAN D. PREGERSON

16        DATED:  _____

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

16

<u>EXHIBIT A TO PROTECTIVE ORDER</u>

<u>ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND</u>

I, _____ [print or type full name], of

_____ [print or type full address], declare under penalty of perjury

that I have read in its entirety and understand the Protective Order that was issued in

the case entitled *General Electric Co., et al. v. Liang, et al.*, No. 13CV-08670-DDP

(CWx) (C.D. Cal.).  I agree to comply with and to be bound by all the terms of this

Protective Order and I understand and acknowledge that failure to so comply could

expose me to sanctions and punishment in the nature of contempt.  I solemnly promise

that I will not disclose in any manner any information or item that is subject to this

Protective Order to any person or entity except in strict compliance with the provisions

of this Order.

I further agree to submit to the jurisdiction of the Court for the purpose of

enforcing the terms of this Protective Order, even if such enforcement proceedings

occur after termination of this action.

I hereby appoint _____ [print or type full name] of

_____ [print or type full address and telephone number] as my

California agent for service of process in connection with this action or any

proceedings related to enforcement of this Protective Order.

Date: _____

City and State where sworn and signed:

_____

Printed name: _____
           [printed name]

Signature: _____
         [signature]

GE V. LIANG - PROPOSED PROTECTIVE ORDER.DOCX

Gibson, Dunn &
Crutcher LLP

1

Ex. A
p.40

Exhibit 5
-106-

# EXHIBIT B

Exhibit 5
-107-

Name, Address and Telephone Number of Attorney(s):
SCOTT A. EDELMAN, SBN 116927
ANGELIQUE KAOUNIS, SBN 209833
GIBSON, DUNN & CRUTCHER LLP
2029 Century Park East, Suite 4000
Los Angeles, CA 90067-3026 Tel.: 310.552.8500

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| General Electric Company, and GE Aviation Systems LLC,<br><br><div align="center">v.</div><br><div align="right">Plaintiff(s)</div> | CASE NUMBER<br><br><div align="center">CV13-08670-DDP (CWx)</div> |
| Erwin Wenti Liang, Does 1-10,<br><br><div align="right">Defendant(s).</div> | <div align="center">**REQUEST:**<br>**ADR PROCEDURE SELECTION**</div> |

Pursuant to Civil L.R.16-15, the parties request that the Court approve the following ADR procedure:

☐ **ADR PROCEDURE NO. 1** - The parties shall appear before the ☐ district judge *or* ☐ magistrate judge assigned to the case for such settlement proceedings as the judge may conduct or direct.

☐ **ADR PROCEDURE NO. 2** - The parties shall appear before a neutral selected from the Court's Mediation Panel for mediation.

☑ **ADR PROCEDURE NO. 3** - The parties shall participate in a private dispute resolution proceeding.

Dated: 02/19/14  _____

_____
Attorney for Plaintiff  General Electric Company

Dated: 02/19/14  _____

_____
Attorney for Plaintiff  GE Aviation Systems LLC

Dated: 02/19/14  _____

_____
Attorney for Defendant  Erwin Wenti Liang

Dated:  _____

_____
Attorney for Defendant

NOTE: If additional signatures are required, attach an additional page to this request.

ADR-01 (01/12)            REQUEST: ADR PROCEDURE SELECTION            Page 1 of 1

**Ex. B**
**p. 41**

**Exhibit 5**
**-108-**

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

555 Mission Street
San Francisco, CA 94105-0921
Tel 415.393.8200
www.gibsondunn.com

Joshua H. Lerner
Direct: +1 415.393.8254
Fax: +1 415.374.8499
JLerner@gibsondunn.com

March 27, 2020

**Via E-Mail**

Perry D. Oldham
Knobbe, Martens, Olson & Bear LLP
2040 Main St., 14th Floor.
Irvine, CA 92614
Perry.Oldham@knobbe.com

Re:     *Masimo Corp., et al. v. Apple Inc.,* No. 8:20-cv-00048-JVS-JDE (C.D. Cal.)

Dear Mr. Oldham:

I write to request a conference of counsel pursuant to Local Rule 37-1 to address the continued failure by Plaintiffs Masimo Corporation ("Masimo") and Cercacor Laboratories, Inc. ("Cercacor") (collectively, "Plaintiffs") to comply with California Code of Civil Procedure Section 2019.210.  As we explained in our letter dated March 6, 2020, as well as during our meet-and-confer call on March 10, 2020, Plaintiffs cannot take any discovery "related to" their allegedly misappropriated trade secrets until they have complied with Section 2019.210's requirement that they identify their allegedly misappropriated trade secrets with "reasonable particularity."  Plaintiffs have ignored the clear language of Section 2019 and our express request for Plaintiffs' disclosure.  Instead, Plaintiffs improperly demanded that Apple serve an interrogatory, which is inconsistent with Section 2019.210, and prematurely served on Defendant Apple Inc. ("Apple") their First Set of Requests for Production of Documents ("RFPs"), which seeks extensive discovery related to the alleged trade secrets.  Accordingly, Apple intends to move for a protective order prohibiting Plaintiffs from taking any discovery related to their trade secret misappropriation allegations unless and until they comply with Section 2019.210.

This letter further outlines Apple's position on this issue.  We are available to meet and confer between 2 p.m. and 4 p.m. Pacific on Tuesday, March 31, 2020, or between 10 a.m. and 12 noon Pacific on Wednesday, April 1, 2020.  If you are not available at those times, please contact me as soon as possible and propose an alternative time to meet and confer within the next ten days.  *See* Local Civ. R. 37-1.

During our meet and confer on March 10, 2020, Plaintiffs asserted that Section 2019.210 does not apply in this case because it is a federal case.  This is incorrect.  Federal courts frequently apply Section 2019.210 before permitting Plaintiffs to take trade secret-related discovery.  *See, e.g., Jobscience, Inc. v. CVPartners, Inc.,* No. C 13-04519

**Exhibit 6**
**-109-**

# GIBSON DUNN

Perry D. Oldham
March 27, 2020
Page 2

WHA, 2014 WL 852477, at *5 (N.D. Cal. Feb. 28, 2014).  Federal Courts can and do apply Section 2019 for many reasons, including case management.  *See, e.g.*, *M/A-COM Tech. Sols., Inc. v. Litrinium, Inc.*, No. 819CV00220JVSJDEX, 2019 WL 8108729, at *4 (C.D. Cal. Sept. 3, 2019) (Early, J.) (requiring Plaintiffs to "identif[y] their trade secrets with reasonably particularity as required by Section 2019.210"); *see also Oleumtech Corp. v. Sheriff*, No. SACV1201199JVSANX, 2013 WL 12133908, at *5 (C.D. Cal. Sept. 11, 2013) ("California statute and case law clearly requires identification of a trade secret with reasonable particularity." (citing Civ. Proc. Code § 2019.210 and *Imax Corp. v. Cinema Tech., Inc.*, 152 F.3d 1161, 1164–65 (9th Cir. 1998))).  Plaintiffs' reliance on *SMC Networks, Inc. v. Hitron Techs., Inc.*, No. SACV121293JSTRNBX, 2013 WL 12136372 (C.D. Cal. Mar. 15, 2013), is misplaced.  The *SMC* case is not only outdated, it also is inconsistent with recent cases.  *See, e.g.*, *M/A-COM*, 2019 WL 8108729, at *4; *Alta Devices, Inc. v. LG Elecs., Inc.*, No. 18CV00404LHKVKD, 2019 WL 176261, at *3 (N.D. Cal. Jan. 10, 2019).

Further, the policy reasons underlying Section 2019.210 underscore that the statute applies here.  A prompt and particularized disclosure of Plaintiffs' purportedly misappropriated trade secrets is critical to Apple's ability to prepare its defense, and also to the Court's ability to adjudicate the scope of discovery in this case.  *Comput. Econs., Inc. v. Gartner Grp.*, Inc. 50 F. Supp. 2d 980, 985, 992 (S.D. Cal. 1999) (Section 2019.210 disclosure "assists the court in framing the appropriate scope of discovery and in determining whether [Plaintiffs'] discovery requests fall within that scope.").  District courts throughout California apply Section 2019.210 in trade secrets cases precisely because the statute's required disclosure "assists the court and parties in defining the appropriate scope of discovery." *Soc. Apps, LLC v. Zynga, Inc.*, No. 4:11–CV–04910 YGR, 2012 WL 2203063, at *2 (N.D. Cal. June 14, 2012); *id.* at *1 (granting motion to compel further trade secret disclosure).  Moreover, if you believe that Apple is in possession of Plaintiffs' secrets—which Apple neither believes it possesses nor has any desire to possess—you should immediately identify the secrets.  Doing anything else suggests that you lack a basis for your claims and are engaged in exactly the type of conduct that Section 2019.210 is designed to stop.

Section 2019.210 applies not only to claims alleged directly under California's Uniform Trade Secrets Act, but also to those "claims [that] are factually dependent on the same misappropriation allegations." *CBS Broad. Inc. v. Am. Broad. Companies, Inc.*, No. CV124073GAFJEMX, 2012 WL 13013028, at *2 (C.D. Cal. June 26, 2012) (citing *Advanced Modular Sputtering, Inc. v. Superior Court*, 132 Cal. App. 4th 826, 835 (2005)).  Therefore, discovery may commence as to those claims only "after the misappropriated trade secrets have been identified with reasonable particularity, as required by section 2019.210." *Advanced Modular*, 132 Cal. App. 4th at 835.

**Exhibit 6
-110-**

# GIBSON DUNN

Perry D. Oldham
March 27, 2020
Page 3

For these reasons, Plaintiffs must provide Apple with an adequate Section 2019.210 disclosure before they engage in any discovery related to the alleged trade secrets.

If Plaintiffs refuse to provide a satisfactory Section 2019.210 disclosure identifying with reasonable particularity their alleged trade secrets, Apple will move for a protective order staying all trade secret-related discovery until such time as Plaintiffs fully comply with their statutory obligation.

Please confirm your availability for a telephone call between 2 p.m. and 4 p.m. Pacific on Tuesday, March 31, 2020, or between 10 a.m. and 12 noon Pacific on Wednesday, April 1, 2020, to discuss these issues.

Sincerely,

Joshua H. Lerner

Cc (all by email): H. Mark Lyon
Angelique Kaounis
Joseph R. Re
Stephen C. Jensen
Stephen W. Larson

**Exhibit 6**
**-111-**

| | |
|---|---|
| **From:** | Adam.Powell |
| **To:** | "Kaounis, Angelique" |
| **Cc:** | Perry.Oldham; Buroker, Brian M.; Semendyai, Vladimir J.; Lerner, Joshua H.; Samplin, Ilissa; Lyon, H. Mark; Joe.Re; Stephen.Larson; Steve.Jensen |
| **Subject:** | RE: Masimo et al. v. Apple: meet and confer |
| **Date:** | Tuesday, April 7, 2020 12:55:55 PM |

Angelique,

Nothing in your email contradicts my summary of our conversation. Among other things, Apple confirmed it will not (or cannot) identify any RFPs that relate solely to the trade secret claims and not to the patent claims. Apple also confirmed that it will not (or cannot) identify any claims other than the trade secret claim that are "factually dependent" on the misappropriation allegations. Your assertion that this is irrelevant is belied by Apple's own letter, which expressly relied on this legal standard in citing the *CBS* and *Advanced Modular* cases. We do not understand why you would be surprised or assert it is "not well taken" for us to ask Apple about a legal standard that Apple included in its own letter.

As for the extension, Apple continues to apply extensions in an inappropriate and non-reciprocal manner. As you know, Apple has requested three extensions in this case (responding to the Complaint, serving Initial Disclosures, and responding to the First Amended Complaint), all of which Plaintiffs granted. When Plaintiffs requested a reciprocal extension to respond to Apple's first motion to dismiss, Apple offered a mere 4-day extension in exchange for a 10-day extension on Apple's reply brief. When Plaintiffs requested a reciprocal extension to respond to Apple's anticipated second motion to dismiss, Apple again offered a non-reciprocal extension while simultaneously demanding expedited treatment of Apple's motion for protective order. We pointed out that this appeared to be an improper tactical request for extension and suggested the parties deal with both issues together. Apple responded by accusing us of being unprofessional and conflating two separate issues. Despite our better judgment, we granted Apple the requested extension "based on our understanding that Apple will start agreeing to similar courtesies, including an extension of time on Apple's requested motion for protective order if we believe that is necessary."

Against that backdrop, we requested a reasonable two-week extension of time for a total of three weeks to respond to Apple's anticipated motion for protective order. That is less time than Plaintiffs provided to Apple in all three of Apple's requested extensions. In particular, we provided a 30-day extension on the initial Complaint (more than 7 weeks total), a 3-week extension on the Initial Disclosures (5 weeks total), and a 12-day extension to respond to the First Amended Complaint (26-days total). We also originally agreed to a 14-day extension of time to respond to the First Amended Complaint, but settled on a mutual 12-day extension based on Apple's desire not to prepare its reply brief over memorial day. We agreed to the last extension even though we believed Apple did not need that much time because its second motion to dismiss appeared to be a subset of its first motion to dismiss. Despite those courtesies, Apple now offers only a 1-week extension (2-weeks total), demands we respond in less than one business day, and threatens to serve its portion of the joint stipulation if we do not respond by 2pm even though nothing requires Apple to do so today.

Please confirm Apple will agree to the requested 14-day extension. While we believe the deadline to

**Exhibit 7**
**-112-**

respond to Plaintiffs' RFPs is a separate matter, we will agree Apple may have the same 14-day
extension if Apple needs it.

Best regards,
Adam

**Adam Powell**
Partner

858-707-4245 **Direct**

**Knobbe** Martens

---

**From:** Kaounis, Angelique <AKaounis@gibsondunn.com>
**Sent:** Tuesday, April 7, 2020 7:48 AM
**To:** Adam.Powell <Adam.Powell@knobbe.com>
**Cc:** Perry.Oldham <Perry.Oldham@knobbe.com>; Buroker, Brian M. <BBuroker@gibsondunn.com>;
Semendyai, Vladimir J. <VSemendyai@gibsondunn.com>; Lerner, Joshua H.
<JLerner@gibsondunn.com>; Samplin, Ilissa <ISamplin@gibsondunn.com>; Lyon, H. Mark
<MLyon@gibsondunn.com>; Joe.Re <Joe.Re@knobbe.com>; Stephen.Larson
<Stephen.Larson@knobbe.com>; Steve.Jensen <Steve.Jensen@knobbe.com>
**Subject:** RE: Masimo et al. v. Apple: meet and confer

Adam,

We write in response to your email.  We respond to the substance of the points you raise
below.

First, as threshold matter, you stated that the parties would not agree on the applicability of
Section 2019.210 here.  We therefore are unclear why you seem surprised that we are moving
forward with the motion for protective order.

Second, Section 2019.210 states that in "any action alleging the misappropriation of a trade
secret under [CUTSA], before commencing discovery ***relating*** to the trade secret, the party
alleging misappropriation shall identify the trade secret with reasonable particularity . . . ."  *Id.*
(emph. added).  Thus, Apple's position that Plaintiffs cannot take discovery "relating" to the
alleged secrets until they identify the alleged trade secrets with reasonable particularly is fully
supported by the law, including the plain language of the statute itself.

Third, you are correct that RFPs 5-25 relate to the secrets.  They do not just relate in some
vague "way."  To the contrary, these RFPs seek discovery of documents that the FAC expressly
alleges are trade secrets.  For example, as we mentioned on the call, Request No. 13 seeks "All
documents and things that refer or relate to *technical information, specifications*, and research
*data* for any of the Accused Products" (emphases added).  Plaintiffs' FAC alleges (at para. 211)
that their vastly overbroad trade secrets include "technical information" such as "technical
specifications, [and] technical data."  Similarly, Request No. 12 seeks "All *technical documents*

**Exhibit 7
-113-**

for the Accused Products, including, without limitation, product *specifications*, ... conceptual or *technical drawings*, *design requirements* documents, *design capture documents*, technical requirements documents, *product briefs*, *product plans*, product requirements, document trees, *assembly design documents*, *design review documents*, *system design documents*, fabricating drawings, *manufacturing documents*, and technical meeting minutes" (emphases added). Again, Plaintiffs' FAC alleges (at para. 211) that their trade secrets include "design captures, assembly design requirements," "product briefs, technical drawings," "product plans," "design review documents," "system designs," and "manufacturing techniques and procedures." These few examples make abundantly clear that Plaintiffs' requests seek discovery "related to" their alleged trade secrets.

Fourth, when you asked about RFPs "solely related to the trade secrets," you did not cite any case holding that "solely related" is the appropriate standard. It is not. And when we asked how we should determine the scope of discovery without an adequate trade secret disclosure—given the broad categories alleged in the FAC—you suggested that we should simply ask what discovery is relevant to the patent claims. Given that Plaintiffs have more than once—including on our meet and confer today—suggested that Apple is attempting to delay discovery and refused to provide a trade secret disclosure, we want to be clear that we cannot at this point identify requests that "solely" relate to the trade secrets, and we believe that your request that we do so is needlessly delaying the Court's ruling on the legal issue here, which is *not* whether the discovery is solely related to trade secrets.

Fifth, your suggestion that Apple refused to identify which claims are "factually dependent" on the trade secrets is not well taken. As we explained to you, our letter of March 27, 2020 states six times that the test is whether the discovery ***relates*** to the alleged trade secrets. You asked us about the *CBS* case, which cites *Advanced Modular*, in holding that 2019.210 applies to discovery that is aimed at claims that are dependent or factually dependent on the trade secret allegations. Far from refusing to answer, we told you our answer was the same. Based on the allegations in the FAC, the RFPs we identified seek information that relates to—and is dependent upon—the trade secret allegations. Importantly, with respect to your demands that we identify the RFPs that are solely related to the trade secret allegations or factually dependent on the trade secret allegations, you confirmed that at least some of the patent causes of action are "factually dependent on the same misappropriation allegations." Specifically, we asked you to confirm that Plaintiffs are alleging the Apple Watch (Series 4 and 5 and later) incorporates Plaintiffs' trade secrets, and you responded affirmatively that Plaintiffs were alleging that those products incorporated "some secrets." Given the FAC's broad allegation that the 4 and 5 series "includes technology that tracks technologies to solve some of the performance issues"—and your confirmation that Plaintiffs are alleging the Watch incorporates some (as yet unidentified) secrets—we are not sure why Plaintiffs are claiming to be confused about Apple's position.

Sixth, we are not sure why you asked us about Ninth Circuit cases addressing 2019.210. Judge Early recently found that "the Ninth Circuit has not decided whether Section 2019.210 applies in federal court," and went on to hold that in that case, "the procedural requirements of Section 2019.210 are warranted and appropriate to assist in the orderly and expeditious

**Exhibit 7**
**-114-**

handling of discovery." *M/A-COM Tech. Sols., Inc. v. Litrinium, Inc.*, No. SACV1900220JVSJDEX, 2019 WL 4284523, at \*2 (C.D. Cal. June 11, 2019).

Seventh, turning to the question of an interrogatory, as we have explained multiple times, Plaintiffs' demand that Apple serve an interrogatory is improper. To begin with, Plaintiffs have never agreed—and are not agreeing now—that Plaintiffs will not commence discovery relating to trade secrets until they provide an adequate description of their alleged secrets. That is critical because, as we explained on the call, there is nothing stopping Plaintiffs from cutting and pasting the vague description of the secrets in the FAC into an interrogatory response (served 30 days, if not more, after the interrogatory is propounded) and claiming that they have complied. This will not solve the lack of disclosure problem—it will just invite motion practice, which will further delay the process. Therefore, contrary to Plaintiffs' suggestion that an interrogatory would be faster here, a disclosure pursuant to Section 2019.210 will in fact be faster, as well as more efficient and fair to the parties.

Finally, as for timing, as explained above, Plaintiffs have now argued more than once that Apple is trying to delay discovery. To the contrary, we want to get to the bottom of the trade secret allegations and manage the scope of discovery as quickly as possible. That's why we asked for a disclosure so long ago. It is telling that you conceded that if you can respond to an interrogatory, you should be able to provide a description immediately. In fact, you should have been able to provide one as soon as you filed the original complaint. Regardless, we are not aware of any other information that you have asked us for on this topic, and we understood that you believe there is an unsurmountable issue as to whether Section 2019.210 applies here, even as a case management tool. Therefore, we believe the meet-and-confer process has culminated, and that the parties should move as quickly as possible to seek judicial intervention to resolve this issue. We are not sure why you would need two weeks in addition to the week provided for under the rules, particularly given that the parties have been conferring about these issues for weeks now. Nonetheless, in the interest of mutual courtesy, why don't Plaintiffs take one week in addition to the week provided under the rules, and we will take one additional week to respond to Plaintiffs' first set of RFPs? Please let us know if that works, and we will prepare a stipulation to that effect. If we don't receive your confirmation that you are willing to extend the deadline for the responses by 2 pm Pacific, we will serve Apple's portion of the Joint Stip. by EOD and proceed with the briefing schedule set by the Local Rules.

Thanks very much,
Angelique

**Angelique Kaounis**

## GIBSON DUNN

Gibson, Dunn & Crutcher LLP
2029 Century Park East Suite 4000, Los Angeles, CA 90067-3026
Tel +1 310.552.8546 • Fax +1 310.552.7026
AKaounis@gibsondunn.com • www.gibsondunn.com

**Exhibit 7**
**-115-**

**From:** Adam.Powell <Adam.Powell@knobbe.com>
**Sent:** Monday, April 6, 2020 7:38 PM
**To:** Kaounis, Angelique <AKaounis@gibsondunn.com>; Lerner, Joshua H. <JLerner@gibsondunn.com>; Buroker, Brian M. <BBuroker@gibsondunn.com>; Semendyai, Vladimir J. <VSemendyai@gibsondunn.com>
**Cc:** Lyon, H. Mark <MLyon@gibsondunn.com>; Joe.Re <Joe.Re@knobbe.com>; Stephen.Larson <Stephen.Larson@knobbe.com>; Steve.Jensen <Steve.Jensen@knobbe.com>; Perry.Oldham <Perry.Oldham@knobbe.com>
**Subject:** RE: Masimo et al. v. Apple: meet and confer

[External Email]
Angelique, Josh, Brian, and Vlad,

Thank you for meeting with me today.  During the meeting, Apple maintained that all discovery as to any federal claim that merely "relates" to a California state-law misappropriation claim is barred until the plaintiff complies with California procedural law.  During the call, I asked which RFPs Apple asserts "relate" to the trade secret allegations.  You responded that nearly all of Masimo's RFPS— RFPs 5 to 25—"relate" to the trade secret allegations in some way and are thus barred until Masimo provides a 2019 statement under California law.  I attempted to determine whether Apple would at least acknowledge the RFPs seek discovery relevant to Plaintiffs' patent infringement claims.  When I specifically asked which, if any, RFPs Apple asserts "relate" solely to the trade secret claims (and not to the patent claims), you said the question was irrelevant, but that you would get back to me.

We also discussed Apple's case citation and assertion in its letter that discovery as to non-trade secret claims is barred if the claims are "factually dependent on the same misappropriation allegations."  I asked Apple to identify which claims are "factually dependent" on the misappropriation allegations.  Apple refused, arguing the question is irrelevant because all discovery "relating" in any way to a trade secret claim is barred.  We disagree and would like to understand the assertions in Apple's letter, including Apple's own assertions regarding the legal standard Apple identified.  Please indicate which causes of action are "factually dependent on the same misappropriation allegations."

Apple also indicated it is not aware of any cases from the Ninth Circuit holding that Section 2019.210 should be applied in Federal Court.  I again indicated Plaintiffs would be happy to answer an interrogatory asking them to identify their trade secrets.  Apple refused to serve such an interrogatory unless Plaintiffs agreed in advance to stay all discovery that Apple believes relates in any way to trade secrets (including patent-related discovery) until Apple agreed (or the Court held) that the interrogatory answer satisfies California state law.

Finally, Apple indicated it plans to serve its portion of the joint stipulation tomorrow, which would make Plaintiffs portion due on April 14.  Because the parties are still actively discussing this matter and agreed to get back to each other on various issues, we do not believe it is appropriate to push forward with a joint stipulation tomorrow.  If Apple does serve the joint stipulation tomorrow, however, we request a two week extension of time to respond after receiving Apple's portion.  We will, of course, agree to a reciprocal extension of time if Apple would like more time to prepare its

**Exhibit 7**
**-116-**

portion of the joint stipulation.

Best regards,
Adam

**Adam Powell**
Partner
858-707-4245 **Direct**
**Knobbe Martens**

---

**From:** Kaounis, Angelique <AKaounis@gibsondunn.com>
**Sent:** Thursday, April 2, 2020 9:42 PM
**To:** Adam.Powell <Adam.Powell@knobbe.com>
**Cc:** Lyon, H. Mark <MLyon@gibsondunn.com>; Lerner, Joshua H. <JLerner@gibsondunn.com>; Buroker, Brian M. <BBuroker@gibsondunn.com>; Joe.Re <Joe.Re@knobbe.com>; Stephen.Larson <Stephen.Larson@knobbe.com>; Steve.Jensen <Steve.Jensen@knobbe.com>; Perry.Oldham <Perry.Oldham@knobbe.com>
**Subject:** RE: Masimo et al. v. Apple: meet and confer

Hi Adam,
Yes, Monday at 4 pm will work.  We will circulate a dial in.
Thanks.

**Angelique Kaounis**

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP
2029 Century Park East Suite 4000, Los Angeles, CA 90067-3026
Tel +1 310.552.8546 • Fax +1 310.552.7026
AKaounis@gibsondunn.com • www.gibsondunn.com

---

**From:** Adam.Powell <Adam.Powell@knobbe.com>
**Sent:** Thursday, April 2, 2020 7:17 PM
**To:** Kaounis, Angelique <AKaounis@gibsondunn.com>
**Cc:** Lyon, H. Mark <MLyon@gibsondunn.com>; Lerner, Joshua H. <JLerner@gibsondunn.com>; Buroker, Brian M. <BBuroker@gibsondunn.com>; Joe.Re <Joe.Re@knobbe.com>; Stephen.Larson <Stephen.Larson@knobbe.com>; Steve.Jensen <Steve.Jensen@knobbe.com>; Perry.Oldham <Perry.Oldham@knobbe.com>
**Subject:** Re: Masimo et al. v. Apple: meet and confer

[External Email]
Angelique,

I won't be able to meet tomorrow. Are you available on Monday at 4pm?

Thanks,

**Exhibit 7**
**-117-**

Adam

On Apr 2, 2020, at 5:26 PM, Kaounis, Angelique <AKaounis@gibsondunn.com> wrote:

Hi Adam,
Just following up on the below.  Will you be able to meet and confer with us tomorrow regarding Apple's proposed Protective Order motion?  If so, please let us know what time works.
Thanks very much,
Angelique

**Angelique Kaounis**

### GIBSON DUNN

Gibson, Dunn & Crutcher LLP
2029 Century Park East Suite 4000, Los Angeles, CA 90067-3026
Tel +1 310.552.8546 • Fax +1 310.552.7026
AKaounis@gibsondunn.com • www.gibsondunn.com

---

**From:** Adam.Powell <Adam.Powell@knobbe.com>
**Sent:** Monday, March 30, 2020 6:54 PM
**To:** Kaounis, Angelique <AKaounis@gibsondunn.com>
**Cc:** Lyon, H. Mark <MLyon@gibsondunn.com>; Lerner, Joshua H. <JLerner@gibsondunn.com>; Buroker, Brian M. <BBuroker@gibsondunn.com>; Joe.Re <Joe.Re@knobbe.com>; Stephen.Larson <Stephen.Larson@knobbe.com>; Steve.Jensen <Steve.Jensen@knobbe.com>; Perry.Oldham <Perry.Oldham@knobbe.com>
**Subject:** RE: Masimo et al. v. Apple: meet and confer

[External Email]
Angelique,

We are investigating the issues and cases raised in this letter and doubt we will be prepared to discuss the issues with you on Tuesday or Wednesday.  We will provide our availability for a meet and confer after we have had a chance to complete our review.

Best regards,
Adam

**Adam Powell**
Partner
858-707-4245 **Direct**
**Knobbe Martens**

**Exhibit 7**
**-118-**

**From:** Kaounis, Angelique <AKaounis@gibsondunn.com>
**Sent:** Friday, March 27, 2020 9:18 PM
**To:** Joe.Re <Joe.Re@knobbe.com>; Adam.Powell <Adam.Powell@knobbe.com>; Stephen.Larson <Stephen.Larson@knobbe.com>; Steve.Jensen <Steve.Jensen@knobbe.com>; Perry.Oldham <Perry.Oldham@knobbe.com>
**Cc:** Lyon, H. Mark <MLyon@gibsondunn.com>; Lerner, Joshua H. <JLerner@gibsondunn.com>; Buroker, Brian M. <BBuroker@gibsondunn.com>
**Subject:** Masimo et al. v. Apple: meet and confer

Dear Counsel,
Please see attached.
Thanks very much,
Angelique

**Angelique Kaounis**

## GIBSON DUNN

Gibson, Dunn & Crutcher LLP
2029 Century Park East Suite 4000, Los Angeles, CA 90067-3026
Tel +1 310.552.8546 • Fax +1 310.552.7026
AKaounis@gibsondunn.com • www.gibsondunn.com

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

Exhibit 7
-119-

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

**Exhibit 7**

**-120-**

Case 8:20-cv-00048-JVS-JDE   Document 43-4   Filed 04/30/20   Page 122 of 150   Page ID
#:3406
Case 8:20-cv-00048-JVS-JDE   Document 33   Filed 04/14/20   Page 1 of 28   Page ID #:2558

1   Joseph R. Re (Bar No. 134479)
2   joseph.re@knobbe.com
    Stephen C. Jensen (Bar No. 149894)
3   steve.jensen@knobbe.com
    Perry D. Oldham (Bar No. 216016)
4   perry.oldham@knobbe.com
    Stephen W. Larson (Bar No. 240844)
5   stephen.larson@knobbe.com
6   **KNOBBE, MARTENS, OLSON &**
7   **BEAR, LLP**                           JOSHUA H. LERNER, SBN 220755
8   2040 Main Street, Fourteenth Floor        jlerner@gibsondunn.com
    Irvine, CA  92614                       GIBSON, DUNN & CRUTCHER LLP
9   Telephone:  (949)-760-0404             555 Mission Street Suite 3000
    Facsimile:  (949)-760-9502             San Francisco, CA 94105
10                                          Telephone:  415.393.8200
                                            Facsimile:   415.393.8306
11  *Attorneys for Plaintiffs Masimo*       H. MARK LYON, SBN 162061
12  *Corporation and Cercacor Laboratories,*   mlyon@gibsondunn.com
    *Inc.*                                  GIBSON, DUNN & CRUTCHER LLP
13                                          1881 Page Mill Road
                                            Palo Alto, CA 94304-1211
14                                          Telephone:  650.849.5300
                                            Facsimile:   650.849.5333
15                                          *Attorneys for Defendant Apple Inc.*
16                                          [Additional counsel on following page]

17

18

19                **IN THE UNITED STATES DISTRICT COURT**
                **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
20                         **SOUTHERN DIVISION**

21  MASIMO CORPORATION,                )   Case No. 8:20-cv-00048-JVS-JDE
    a Delaware corporation; and        )
22  CERCACOR LABORATORIES, INC.,       )   **JOINT 26(f) REPORT**
    a Delaware corporation             )
23                                     )
                                       )
24          Plaintiffs,                )
                                       )   Scheduling Conference:
25       v.                            )   Date:    TBD
                                       )   Time:    TBD
26  APPLE INC., a California corporation   )   Ctrm.    TBD
                                       )
27          Defendant.                 )
                                       )
28  _____   )

**Exhibit 8**
**-121-**

Case 8:20-cv-00048-JVS-JDE   Document 43-4   Filed 04/30/20   Page 123 of 150   Page ID
#:3407
Case 8:20-cv-00048-JVS-JDE   Document 33   Filed 04/14/20   Page 2 of 28   Page ID #:2559

1                 BRIAN M. BUROKER, *pro hac vice*
                bburoker@gibsondunn.com

2                 GIBSON, DUNN & CRUTCHER LLP
              1050 Connecticut Avenue, N.W.

3                 Washington, DC 20036
              Telephone:  202.955.8541

4                 Facsimile:    202.467.0539

5                 ILISSA SAMPLIN, SBN 314018
                isamplin@gibsondunn.com

6                 GIBSON, DUNN & CRUTCHER LLP
              333 South Grand Avenue

7                 Los Angeles, CA 90071-3197
              Telephone:  213.229.7000

8                 Facsimile:    213.229.7520

9                 ANGELIQUE KAOUNIS, SBN 209833
                akaounis@gibsondunn.com

10               GIBSON, DUNN & CRUTCHER LLP
             2029 Century Park East Suite 4000

11               Los Angeles, CA 90067
             Telephone:  310.552.8546

12               Facsimile:    310.552.7026

13               *Attorneys for Defendant Apple Inc.*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-1-

**Exhibit 8**
**-122-**

Pursuant to Rule 26(f) of the Federal Rules of Civil Procedure and Local Rule 26-1, Plaintiffs Masimo Corporation ("Masimo") and Cercacor Laboratories, Inc. ("Cercacor") (collectively, "Plaintiffs"), and Defendant Apple Inc. ("Apple") (together with Plaintiffs, the "Parties") hereby submit this Joint Report and [Proposed] Discovery Plan.

On March 10, 2020, counsel for the Parties conducted a telephonic discovery conference to address topics set forth in Fed. R. Civ. P. 26(f) Local Rule 26-1, and this Court's sample Order Setting Rule 26(f) Scheduling Conference. Participating in the conference were Joseph R. Re, Stephen W. Larson, and Adam B. Powell of Knobbe, Martens, Olson & Bear, LLP, counsel for Plaintiffs, and Brian Rosenthal, Angelique Kaounis, and Joshua Lerner of Gibson, Dunn & Crutcher LLP, counsel for Apple.

A.   **Synopsis**

This action involves claims by Plaintiffs against Apple for alleged patent infringement, trade secret misappropriation, correction of inventorship of certain patents assigned to Apple, and declaratory judgment of ownership of certain patents assigned to Apple. On January 9, 2020, Plaintiffs filed the initial Complaint. On March 4, 2020, Apple moved to dismiss the initial Complaint. On March 25, 2020, Plaintiffs filed the First Amended Complaint asserting the following causes of action:

(1)   Infringement of U.S. Patent No. 10,258,265;

(2)   Infringement of U.S. Patent No. 10,258,266;

(3)   Infringement of U.S. Patent No. 10,292,628;

(4)   Infringement of U.S. Patent No. 10,299,708;

(5)   Infringement of U.S. Patent No. 10,376,190;

(6)   Infringement of U.S. Patent No. 10,376,191;

(7)   Infringement of U.S. Patent No. 10,470,695;

(8)   Infringement of U.S. Patent No. 6,771,994;

-1-

Exhibit 8
-123-

1  (9)    Infringement of U.S. Patent No. 8,457,703;

2  (10)   Infringement of U.S. Patent No. 10,433,776;

3  (11)   Infringement of U.S. Patent No. 10,588,553;

4  (12)   Infringement of U.S. Patent No. 10,588,554;

5  (13)   Trade Secret Misappropriation Under California's Uniform Trade

6          Secret Act;

7  (14)   Correction of Inventorship of U.S. Patent No. 10,078,052;

8  (15)   Correction of Inventorship of U.S. Patent No. 10,247,670;

9  (16)   Correction of Inventorship of U.S. Patent No. 9,952,095;

10  (17)  Correction of Inventorship of U.S. Patent No. 10,219,754;

11  (18)  Correction of Inventorship of U.S. Patent No. 10,524,671;

12  (19)  Declaratory  Judgment  of  Ownership  of  U.S.  Patent  No.

13          10,078,052;

14  (20)  Declaratory  Judgment  of  Ownership  of  U.S.  Patent  No.

15          10,247,670;

16  (21)  Declaratory Judgment of Ownership of U.S. Patent No. 9,952,095;

17  (22)  Declaratory  Judgment  of  Ownership  of  U.S.  Patent  No.

18          10,219,754;

19  (23)  Declaratory  Judgment  of  Ownership  of  U.S.  Patent  No.

20          10,524,671; and

21  (24)  Declaratory Judgment of Ownership of U.S. Patent Application No.

22          15/960,507.

23      Apple contends that none of the claims have merit;  Apple will respond to

24  the First Amended Complaint by April 20, 2020, pursuant to the Court's April

25  2, 2020 Order.

26  **B.**    **Legal Issues**

27      The Parties identify the following key disputed issues:

28      1.     Whether  Apple  has  infringed  any  valid  claim  of  the  asserted

-2-

**Exhibit 8**
**-124-**

Case 8:20-cv-00048-JVS-JDE   Document 43-4   Filed 04/30/20   Page 126 of 150   Page ID
#:3410
Case 8:20-cv-00048-JVS-JDE   Document 33   Filed 04/14/20   Page 5 of 28   Page ID #:2562

patents;

2.      The scope and meaning of certain claim terms of Plaintiffs' asserted patents;

3.      Whether Apple improperly acquired, used, or disclosed Plaintiffs' alleged trade secrets;

4.      Whether Plaintiffs were injured by any alleged improper acquisition, use, or disclosure of Plaintiffs' alleged trade secrets by Apple;

5.      Whether inventorship for certain patents assigned to Apple should be corrected;

6.      Whether Plaintiffs are the owner of certain patents and patent applications assigned to Apple;

7.      Whether Plaintiffs are entitled to damages and, if so, in what amount;

8.      Whether Plaintiffs are entitled to an injunction and, if so, the terms of the injunction; and

9.      Whether this case is exceptional and whether any party is entitled to attorneys' fees and costs.

Apple identifies the following additional key disputed issues:

1.      Whether Plaintiffs' trade secret claim is barred by the applicable statute of limitations, *see* Cal. Civ. Code § 3426.6;

2.      Whether Plaintiffs can show that they own protectable trade secrets, including by describing the alleged trade secrets with sufficient particularity to separate them from matters of general knowledge in the trade, and demonstrating reasonable measures to maintain secrecy and value of the alleged trade secrets;

3.      Whether Plaintiffs' misappropriation claim was brought or maintained in bad faith such that the Court should award

-3-

Exhibit 8
-125-

Case 8:20-cv-00048-JVS-JDE   Document 43-4   Filed 04/30/20   Page 127 of 150   Page ID
Case 8:20-cv-00048-JVS-JDE   Document 33   Filed 04/14/20   Page 6 of 28   Page ID #:2563
#:3411

1           reasonable attorney's fees and costs to Apple under Cal. Civ. Code

2           Section 3426.4; and

3     4.     Whether Plaintiffs' patent infringement, correction of inventorship,

4           and patent ownership claims were brought or maintained in bad

5           faith, such that the Court should award reasonable attorney's fees

6           and costs to Apple under 35 U.S.C. § 285.

7     Plaintiffs disagree with Apple's recitation of "additional key issues" as

8 unduly argumentative, addressing questions that are not actually issues in this

9 case, and identifying incorrect legal standards.

10     The Parties reserve all rights to identify additional legal issues that may

11 arise, for example, in connection with possible counterclaims or affirmative

12 defenses, based on the development of evidence in this matter.

13 **C.**     **<u>Damages</u>**

14     <u>Plaintiffs' Statement:</u>

15     Plaintiffs seek damages in an amount to be ascertained through discovery

16 and proven at trial, plus applicable pre-judgment and post-judgment interest.

17 Plaintiffs seek actual damages, lost profits, unjust enrichment, and/or a

18 reasonable royalty.  The final amount of these categories has yet to be

19 ascertained—and Plaintiffs are unable to provide a realistic range of provable

20 damages until they have obtained further information through discovery which

21 can be provided to their damages expert, including revenue and sales

22 information related to the accused products.  Plaintiffs also allege willful patent

23 infringement, as well as willful and malicious trade secret misappropriation.

24 Thus, Plaintiffs seek reasonable attorney's fees and costs in accordance with 35

25 U.S.C. § 285 and Cal. Civil Code § 3426.4.  Plaintiffs will also seek punitive

26 and exemplary damages.  Plaintiffs disagree with Apple's contention below that

27 Plaintiffs' claims lack merit because Plaintiffs have not yet calculated damages,

28 especially when Apple is refusing to provide any discovery in this case.

<div align="center">-4-</div>

**Exhibit 8**
**-126-**

Case 8:20-cv-00048-JVS-JDE   Document 43-4   Filed 04/30/20   Page 128 of 150   Page ID
Case 8:20-cv-00048-JVS-JDE   Document 33   Filed 04/14/20   Page 7 of 28   Page ID #:2564
#:2412

Apple's Statement:

Apple denies that Plaintiffs have been harmed in any way by Apple's conduct, and accordingly Apples denies that any provable damages exist in this case or that Plaintiffs are entitled to any compensatory damages (including lost profits and/or a reasonable royalty), exemplary damages, and/or recovery for unjust enrichment.  The fact that Plaintiffs cannot identify any damages, four months after filing suit, several years after the alleged misappropriation, and over a year after the first accused product was released, is telling.  Apple will respond to any damages theories asserted by Plaintiffs at the appropriate time. Apple reserves the right to assert counterclaims at a later date and may seek damages at that time.  Further, Plaintiffs' misappropriation claim was made, and continues to be maintained, in bad faith such that the Court should award reasonable attorneys' fees and costs to Apple under Cal. Civ. Code Section 3426.4.   Among other things, the misappropriation claim is barred by the applicable statute of limitations, *see* Cal. Civ. Code Section 3426.3, and Plaintiffs have not alleged cognizable trade secrets or any plausible facts supporting any colorable theory of misappropriation.

**D.**     **Insurance**

The Parties are not aware of any insurance coverage related to this matter.

**E.**     **Motions**

While Plaintiffs do not presently contemplate filing any additional amended pleadings or motions to add additional parties or claims, further discovery or issuance of additional patents may result in additional claims or amended pleadings.  Plaintiffs reserve the right to do so, including in response to any Apple counterclaims.

Apple does not, at this time, anticipate filing any motions to add parties or transfer venue.  As noted above, Apple filed a motion to dismiss the original Complaint and intends to file a motion to dismiss some or all of the claims in

**Exhibit 8**
**-127-**

Case 8:20-cv-00048-JVS-JDE   Document 43-4   Filed 04/30/20   Page 129 of 150   Page ID
#:3413
Case 8:20-cv-00048-JVS-JDE   Document 33   Filed 04/14/20   Page 8 of 28   Page ID #:2565

Plaintiffs' First Amended Complaint by April 20, 2020.   Apple has not answered yet and reserves the right to bring counterclaims.

**F.**   **Discovery and Experts**

With respect to expert disclosures, the Parties have proposed deadlines in the Presumptive Schedule of Pretrial Dates attached hereto as Exhibit A.

**1.**   **Initial Disclosures**

The Parties do not believe any changes are necessary in the form or requirement for disclosures under Rule 26(a).   The Court granted the Parties' stipulation to exchange Fed. R. Civ. P. 26(a)(1) initial disclosures on April 14, 2020.

**2.**   **Subjects for Discovery/Discovery Phases/Discovery Cut-Off**

The Parties anticipate that discovery may be needed on at least the topics and disputed issues identified above, as well as any affirmative defenses asserted, and/or counterclaims brought by Apple.   The Parties agree that fact and expert discovery should be conducted in phases.   The proposed timing of expert witness disclosures under Fed. R. Civ. P. 26(a)(2) is set forth below in the proposed schedule attached hereto as Exhibit A.   Although the Parties have served discovery, no discovery has been completed to date.

Plaintiffs' Statement: All discovery should be completed pursuant to the schedule set forth in Exhibit A and in accordance with the Federal Rules of Civil Procedure.   Plaintiffs disagree with Apple's assertion that California Civil Procedure Code Section 2019.210 applies in federal court to bar trade secret discovery until the requirements of the rule are met.   Plaintiffs also disagree with Apple's attempt to use that procedural rule to bar *all* discovery, including patent discovery.   For example, Plaintiffs recently served a narrow set of 25 Requests for Production that concern the asserted patents and technical information about the products accused of patent infringement.   The requested information is necessary for Plaintiffs to provide patent infringement

-6-

**Exhibit 8**
**-128-**

Case 8:20-cv-00048-JVS-JDE   Document 43-4   Filed 04/30/20   Page 130 of 150   Page ID
Case 8:20-cv-00048-JVS-JDE   Document 33   Filed 04/14/20   Page 9 of 28   Page ID #:2566
#:3414

contentions.  Apple has asserted that all discovery is barred, including discovery relating to the products accused of patent infringement because the information is purportedly *also* relevant to Plaintiffs' trade secret claims.

Regardless, Plaintiffs have repeatedly suggested the proper way for Apple to seek this information is through an interrogatory served under the Federal Rules.  Plaintiffs even offered to give Apple an extra interrogatory if that was the issue.  Apple maintained that all discovery that relates in any way to the trade secret claims (including all patent discovery) is barred until Apple agrees that Plaintiffs have complied with a California state procedural rule.  As addressed in more detail in Section K below, that is improper.

<u>Apple's Statement:</u> Apple anticipates patent discovery to be completed pursuant to the schedule set forth in Exhibit A except insofar as Plaintiffs attempt to take trade secret related discovery before providing an adequate description of the alleged trade secrets.  Pursuant to California Code of Civil Procedure Section 2019.210 ("Section 2019.210") and consistent with the principles of orderly case management and discovery, Apple requested that Plaintiffs describe their alleged trade secrets with reasonable particularity before they commence trade secret-related discovery.  Plaintiffs declined, thus far, to do so, and accordingly, Apple is in the process of moving for a protective order preventing Plaintiffs from commencing such discovery.

Apple does not agree that Plaintiffs' set of 25 Requests for Production is "narrow."  While the Requests may "concern the asserted patents and technical information about the products accused of patent infringement," as Plaintiffs contend, a large number of the requests *also* concern Plaintiffs' alleged secrets.  Indeed, the Apple products accused of patent infringement are the Apple products that Plaintiffs allege incorporate their trade secrets.  Section 2019.210 is clear that a trade secret plaintiff must describe its purported secrets with "reasonable particularity" "before commencing discovery *relating to* the trade

-7-

Exhibit 8
-129-

secret." Cal. Civ. Code § 2019.210 (emphasis added).  Plaintiffs have refused to define their purported secrets with the reasonable particularity Section 2019.210 requires, and therefore may not commence discovery that relates to their misappropriation claim even if it *also* relates to their patent claims.

Plaintiffs' conduct threatens the result Section 2019.210 guards against: that Plaintiffs will use their patent infringement claims as an end-run around Section 2019.210, to gain access to Apple's files and claim Apple's confidential information as their own.  Plaintiffs' demand that Apple serve an interrogatory does not sufficiently protect against this result, because, among other things, there is nothing stopping Plaintiffs from cutting and pasting the vague description of the secrets in their First Amended Complaint into an interrogatory response.  Accordingly, Apple intends to move forward with producing responsive discovery that relates solely to Plaintiffs' patent claims, as well as responsive public discovery that pertains to both the patent and trade secret claims.  But as to any non-public discovery that relates to Plaintiffs' trade secret claim or to both the trade secret and patent claims, Apple intends to object to such discovery and await Judge Early's ruling on its protective order motion, which will be filed by joint stipulation of the parties on April 30, 2020.

\*\*\*

The Parties have proposed a Presumptive Schedule of Pretrial Dates attached hereto as Exhibit A.  Plaintiffs present these dates for the completion of all discovery in this case; Apple presents these dates for the completion of non-trade secret related discovery in this case.

### 3.  Written Discovery Requests

Plaintiffs anticipate serving, and have begun serving, written discovery (interrogatories, requests for production, requests for admission) directed to at least the following topics: the structure, function, and operation of Apple's products accused of infringing Plaintiffs' asserted patents; Apple's

-8-

Exhibit 8
-130-

Case 8:20-cv-00048-JVS-JDE   Document 43-4   Filed 04/30/20   Page 132 of 150   Page ID
#:3416
Case 8:20-cv-00048-JVS-JDE   Document 33   Filed 04/14/20   Page 11 of 28   Page ID #:2568

misappropriation of Plaintiffs' trade secrets; the correct inventorship and ownership of the Apple patents at issue; Apple's affirmative defenses; and Apple's revenue, costs, profits pricing, margins, marketing, revenues and profits relating to the accused products.  Plaintiffs also anticipate third-party discovery may be necessary for some or all of the above topics.

Apple anticipates serving written discovery (interrogatories, requests for production, requests for admission), and has already begun serving such discovery, directed to at least the following topics: whether Plaintiffs brought their trade secret claim within the applicable statute of limitations period; the alleged bases for any supposed delayed discovery of Plaintiffs' trade secret claim; the development of the alleged trade secrets; ownership of the alleged trade secrets; the bases for Plaintiffs' claim of misappropriation by Apple; Plaintiffs' purported efforts to maintain the secrecy of their alleged trade secrets; the value, if any, of the alleged trade secrets; the facts on which Plaintiffs claim that Apple knew or should have known (i) that Marcelo Lamego purportedly disclosed Plaintiffs' alleged trade secrets to Apple, and/or (ii) the scope of Plaintiffs' alleged trade secrets; the validity of the asserted patents and related patents; the development that led to the asserted patents; practice by Plaintiffs of the asserted patents; marking of products of Plaintiffs that allegedly practice the asserted patents; contributions of those Plaintiffs allege should be named inventors on the identified Apple patents and patent applications; factual and legal bases for ownership and/or correction of inventorship of the identified Apple patents and patent application; Plaintiffs' bases for their claims of patent infringement; the notice, if any, Plaintiffs gave to Apple of its alleged infringement; Plaintiffs' efforts to enforce their alleged intellectual property rights; Plaintiffs' licensing or assignment of the asserted patents; Plaintiffs' claims that they have been harmed by any conduct committed by Apple; the bases, if any, for Plaintiffs' claims for damages, enhanced damages, attorney's

Exhibit 8
-131-

Case 8:20-cv-00048-JVS-JDE   Document 43-4   Filed 04/30/20   Page 133 of 150   Page ID
#:3417
Case 8:20-cv-00048-JVS-JDE   Document 33   Filed 04/14/20   Page 12 of 28   Page ID #:2569

fees, recovery for unjust enrichment, and reasonable royalties, including Plaintiffs' revenue, costs, profits, pricing, margins, marketing, and licensing agreements relating to the alleged trade secrets and patented technology.  Apple also anticipates third-party discovery may be necessary for some or all of the above topics.

### 4.      Depositions

Plaintiffs anticipate taking the depositions of Apple under Fed. R. Civ. P. 30(b)(6), Apple's employees, non-party witnesses, and expert witnesses concerning the issues identified above.  Plaintiffs also anticipate taking the depositions of third parties.

Apple anticipates taking depositions of Plaintiffs under Fed. R. Civ. P. 30(b)(6); Plaintiffs' employees, including but not limited to those employees and former employees identified in the Complaints as inventors on Plaintiffs' relevant patents, and those employees and former employees identified in the Complaints as inventors or contributors to the Apple patents and patent applications; non-party witnesses; and expert witnesses concerning the issues identified above.   Apple's estimates are based on the claims alleged in Plaintiffs' First Amended Complaint filed on March 25, 2020.   Additional discovery will be needed if counterclaims are brought.

### 5.      Electronic Discovery and Document Production

The Parties are negotiating a protocol governing the preservation and production of Electronically Stored Information ("ESI"), which they will submit separately.

### 6.      Limitations on Discovery

The Parties request the following exceptions to the limitations on discovery set forth in the Federal Rules of Civil Procedure:

(1)      A maximum of 35 interrogatories per side;

(2)      A maximum of 50 requests for admission per side; and

-10-

Exhibit 8
-132-

(3)     Each expert deposition shall be limited to one seven hour day per expert per report.

Additionally, Plaintiffs assert the issues and claims in this case justify 140 hours of fact depositions per side, with each fact deposition counting as having a duration of at least 3.5 hours.  Defendant asserts depositions should be limited to 80 hours of party fact depositions per side, with each party fact deposition counting as having a duration of at least 3.5 hours.

As set forth above, Apple objects to Plaintiffs' commencement of any trade-secret related discovery until Plaintiffs describe their alleged trade secrets with reasonable particularity under Section 2019.210 and will move for a protective order preventing Plaintiffs from taking the same.  Plaintiffs object to Apple's attempt to use a California state procedural rule to bar all discovery, including patent discovery.

**7.     Other Orders**

The Parties intend to request that the Court enter a protective order governing the confidentiality of information in this case.  The Parties will submit to Magistrate Judge Early a proposed protective order under Federal Rule of Civil Procedure 26(c) to govern the exchange and disclosure of confidential documents and information in this case.  Apple will not agree to produce documents unless and until a satisfactory protective order is issued in this case.

The Parties consent to electronic service and agree that such service of papers may be accomplished by electronic mail, with the same result as if such papers had been delivered in person.  If the e-mail serving papers is sent after midnight (Pacific), those papers will be considered to have been received the following day.

At this time, Plaintiffs do not propose that the Court enter any other order under Rule 26(c), Rule 16(b), or Rule 16(c) beyond those normally issued by

-11-

Exhibit 8
-133-

the Court.  However, as set forth herein, Apple will move for a protective order under Rule 26(c) on the basis that Plaintiffs may not commence any trade secret-related discovery until they comply with Section 2019.210.  Plaintiffs object to Apple's attempt to use a California state procedural rule to bar all discovery, including patent discovery.

**G.**   **Dispositive Motions**

Plaintiffs' Statement:

Plaintiffs anticipate that they may file motions for summary judgment regarding patent infringement, validity, trade secret misappropriation, inventorship, and/or ownership.  Plaintiffs anticipate they may also file pretrial motions relating to expert testimony and motions *in limine*.

Apple's Statement:

Apple filed a motion to dismiss Plaintiffs' claims on March 4, 2020.  Plaintiffs voluntarily amended their Complaint on March 25, 2020, and Apple intends to move to dismiss some or all of the claims in the First Amended Complaint on or before April 20, 2020.  Apple reserves the right to move to dismiss any future amended complaint.

If any claims remain after any future motions to dismiss are decided, Apple anticipates that it will move for summary judgment, partial summary judgment, and/or judgment on the pleadings under Rule 15(c) of Plaintiffs' claims of trade secret misappropriation, patent infringement, patent validity, patent eligibility correction of inventorship, and/or declaratory judgment of ownership, and further, that it may seek sanctions (including possibly case or claim-terminating sanctions) against Plaintiffs under Cal. Civ. Code Section 3426.4, among other authorities.  Apple anticipates that it may also file pretrial motions relating to expert testimony and motions *in limine*.  Apple reserves all rights to bring such motions.

-12-

Exhibit 8
-134-

**H.** **Settlement and Settlement Mechanism**

The Parties have met and conferred regarding ADR and settlement procedures pursuant to L.R. 16-15.  The Parties propose participating in a private mediation in accordance with Settlement Procedure No. 3.

The Parties have submitted concurrently herewith an ADR-01 "Request; ADR Procedure Selection" Form.  The Parties appreciate and understand that the case will not proceed to trial unless all parties with full authority to settle the case have appeared personally at a settlement conference.

**I.** **Trial Estimate**

The Parties agree that trial will be by jury on at least all issues for which there is a right to trial by jury.  The Parties estimate a 10-14 day jury trial in which each Party anticipates calling approximately 10-15 witnesses.  Because the Parties' trial estimate exceeds eight days, the Parties will be prepared to discuss the estimate in detail.  The parties reserve the right to request bifurcation of trial.

**J.** **Timetable**

The Parties have submitted the Presumptive Schedule of Pretrial Dates attached as Exhibit A to this report.

**K.** **Other Issues**

Plaintiffs' statement:

Apple's has attempted to block all discovery from the outset by demanding that Plaintiffs follow Cal. Civ. Proc. Code § 2019.210.  Apple's position is misplaced because Section 2019.210 is a California procedural requirement that does not apply in federal court.  *See SMC Networks, Inc. v. Hitron Techs., Inc.*, 2013 WL 12136372, at *3 (C.D. Cal. Mar. 15, 2013) (holding that Cal. Civ. Proc. Code § 2019.210 does not apply in federal courts because it violates Fed. R. Civ. P. 26 and the *Erie* doctrine); *Funcat Leisure Craft, Inc. v. Johnson Outdoors, Inc.*, 2007 WL 273949, at *2 (E.D. Cal. Jan.

-13-

**Exhibit 8**
**-135-**

29, 2007) (same).  As *SMC Networks* explained, Section 2019.210 conflicts with the Federal Rules because "§ 2019.210 sets forth a procedural requirement that must be met before discovery may be initiated, while Rule 26 would permit Plaintiff to proceed."  2013 WL 12136372 at *3.   Thus, Section 2019.210's "automatic stay provision 'serve[s] to prevent application of Rule 26.'"  *Id.* (quoting *Funcat*, 2007 WL 273949, at *2).

Indeed, Apple's own argument shows why Section 2019.210 should not be applied in federal courts.  Apple asserts that it should not have to respond to Plaintiffs' First Set of Requests for Production ("RFPs") because the RFPs seek "extensive trade secret-related discovery."  But even a cursory review of those 25 RFPs show they are standard patent RFPs designed to seek information Plaintiffs need to prepare patent infringement contentions against the "Accused Products."  For example, the requests are narrowly tailored to seek documents concerning the "scope of the Masimo Asserted Patents," the "design and operation of the Accused Products," and the "operation of any heart rate algorithms used in any of the Accused Products."  Some RFPS were even narrowly tailored to particular patent claim limitations.

Plaintiffs asked Apple to identify any requests that it believed sought information not directed to the patent infringement allegations, but Apple admitted it could not identify any such request.  Despite that, Apple has refused to provide any responsive information on the grounds that Apple believes the requests ***also*** relate to the trade secret allegations.  Accordingly, Apple is using a California state procedural rule concerning trade secrets to preclude typical patent discovery.  Apple provides no case law to support that position, which has been rejected by at least one court in this District.  *See Bryant v. Mattel*, 2007 WL 5430888, *3 n.3 (C.D. Cal. May 18, 2007) (refusing to limit discovery of product information under Section 2019.210 because the information was

/ / /

-14-

Exhibit 8
-136-

also "relevant to claims other than the trade secret misappropriation claim, such as Mattel's claim for copyright infringement").

Instead of imposing a state procedural rule to bar patent discovery, Apple should serve an interrogatory under the Federal Rules of Civil Procedure. If Apple had done so immediately after the Rule 26(f) conference on March 10, Plaintiffs would have already responded. This is precisely the procedure the Court already adopted and followed in *Masimo et al. v. True Wearables et al.*, case no. 8:18-cv-2001-JVS-JDEx, which Apple asserts raises allegations that are "nearly identical" to the allegations in this case. *See* D.I. 14 (Apple's Notice of Related Cases) at 1. Apple incorrectly suggests the defendant in *True Wearables* served an interrogatory instead of asking Plaintiffs to identify their trade secrets separate from the interrogatory. The defendant actually requested a formal identification of trade secrets similar to patent infringement contentions. This Court addressed the dispute at the scheduling conference and adopted Plaintiffs' argument that the Federal Rules of Civil Procedure apply and Plaintiffs need only respond to an interrogatory asking for such trade secrets.

Apple's attempt to obtain a contrary ruling by rushing to Magistrate Judge Early is inappropriate. As shown throughout this submission, Apple turned the Section 2019.210 dispute into a scheduling issue by asserting it will not comply with the Court's schedule as to trade secret discovery. Apple's assertion exemplifies the conflict between Section 2019.210 and the Federal Rules, which should be resolved by this Court because it impacts the schedule.

Apple also incorrectly asserts it includes the section below "because Plaintiffs insisted on addressing the merits of the parties' Section 2019.210 dispute in this filing." Plaintiffs initial draft did not include this section or discuss Section 2019.210. Plaintiffs added their position *in response* to Apple's extensive arguments on Section 2019.210. Apple then responded the day before filing by adding additional arguments and citing case law. But most of Apple's

-15-

**Exhibit 8
-137-**

cases did not even discuss the *Erie* conflict. *See M/A-COM Tech. Sols., Inc. v. Litrinium, Inc.*, 2019 WL 8108729, at *4 (C.D. Cal. Sept. 3, 2019); *Swarmify, Inc. v. Cloudflare, Inc.*, 2018 WL 2445515, at *2 (N.D. Cal. May 31, 2018); *Jobscience, Inc. v. CVPartners, Inc.*, 2014 WL 852477, at *4 (N.D. Cal. Feb. 28, 2014). One decision applied Section 2019.210 based on the "circumstances in [that] case," including that plaintiff had initially ***agreed*** to apply Section 2019.210. *E. & J. Gallo Winery v. Instituut Voor Landbouw-En Visserijonderzoek*, 2018 WL 3062160, at *4 (E.D. Cal. June 19, 2018).[1] Plaintiffs request the Court apply the standard Federal Rules for discovery just as it did in the *True Wearables* case, which Apple argued involves "nearly identical" allegations.

Apple's Statement:[2]   Apple wants to move forward with trade secret discovery *as quickly possible*, and therefore has repeatedly requested that Plaintiffs comply with the procedures set out in California Code of Civil Procedure Section 2019.210. Apple informed Plaintiffs that their pleading of the alleged trade secrets was insufficient back on *February 25*, requested Plaintiffs' compliance with Section 2019.210 by letter dated *March 6*, and has repeatedly requested Plaintiffs' compliance with Section 2019.210 ever since. Even though Plaintiffs are alleging secrets that are public, Plaintiffs have steadfastly refused to provide an adequate description of those secrets.

---

[1] Apple also claims it is seeking to move this case forward "as quickly as possible" and faults Plaintiffs for requesting a 14-day extension to respond to Apple's motion for protective order. Apple omits that it has requested and obtained numerous lengthy extensions to respond to the initial Complaint, file this report, and respond to the Amended Complaint. D.I. 12; D.I. 26; D.I. 30.

[2] Apple includes this section because Plaintiffs insisted on addressing the merits of the parties' Section 2019.210 dispute in this filing. Apple notes, however, that this dispute is in the process of being briefed for Judge Early, in a Joint Stipulation to be filed by the parties on April 30, 2020.

-16-

Exhibit 8
-138-

1    Furthermore, Apple has not attempted to "block all discovery from the outset,"
2    as Plaintiffs contend above.  To the contrary, Apple intends to move forward
3    with discovery that pertains solely to Plaintiffs' patent claims.

4         Consistent with its goal to move forward on the trade secret claims as
5    quickly as possible, on March 27, 2020, Apple began the process of moving for
6    a protective order prohibiting Plaintiffs from commencing trade secret-related
7    discovery unless and until they identify their allegedly misappropriated trade
8    secrets with the "reasonable particularity" Section 2019.210 requires.  Apple
9    was prepared to follow the timing for the motion prescribed by the Local Rules
10   and file on April 15, 2020.  *Plaintiffs* requested that Apple delay the filing so
11   that Plaintiffs could have an additional two weeks to prepare their portion, and
12   Apple agreed.  At *Plaintiffs'* request, the filing has been delayed until April 30,
13   2020.

14        District courts throughout California, *including this Court*, recognize that
15   Section 2019.210 serves an essential function in cases like this one—it
16   discourages meritless trade secret claims, prevents plaintiffs from abusing the
17   discovery process to access the defendant's trade secrets, assists the court in
18   framing the appropriate scope of discovery, and enables a defendant to form
19   "complete and well-reasoned defenses" against claims of misappropriation.
20   *M/A-COM Tech. Sols., Inc. v. Litrinium, Inc.*, 2019 WL 8108729, at *2 (C.D.
21   Cal. Sept. 3, 2019) (Early, J.).  A prompt and particularized disclosure of
22   Plaintiffs' purported secrets is critical to each of those functions, as will be
23   described in detail in Apple's forthcoming motion for a protective order.

24        Tellingly, the most recent case Plaintiffs cite in support of their contrary
25   position that Section 2019.210 does not apply to CUTSA cases filed in federal
26   court—*SMC Networks*—is from 2013 and has never been followed by another
27   court.  This Court is far from alone in recently taking a different approach from
28   *SMC*, and managing discovery in trade secret cases by applying Section

-17-

**Exhibit 8
-139-**

1    2019.210.   *See, e.g.*, *E. & J. Gallo Winery v. Instituut Voor Landbouw-En*

2    *Visserijonderzoek*, 2018 WL 3062160, at *4 (E.D. Cal. June 19, 2018);

3    *Swarmify, Inc. v. Cloudflare, Inc.*, 2018 WL 2445515, at *2 (N.D. Cal. May 31,

4    2018); *Jobscience, Inc. v. CVPartners, Inc.*, 2014 WL 852477, at *4 (N.D. Cal.

5    Feb. 28, 2014).

6          Plaintiffs are wrong to suggest that a contrary approach was taken in the

7    *True Wearables* Case.  In that case, the defendant did not move for a protective

8    order pursuant to Section 2019.210.  Here, Apple initiated the meet and confer

9    process in connection with its motion for a protective order pursuant to Section

10   2019.210 on March 27, 2020, Apple sent Plaintiffs its portion of the joint

11   stipulation Judge Early requires for presentation of such a motion on April 8,

12   2020, and, as a result of Plaintiffs' requested two-week extension, the parties'

13   joint stipulation is scheduled to be filed on April 30, 2020.  Moreover, in *True*

14   *Wearables*, the defendant elected to serve an interrogatory for the identification

15   of trade secrets.  Here, by contrast, Apple has not served an interrogatory for the

16   information covered by Section 2019.210 because an interrogatory response

17   does not sufficiently protect Apple from the harm Section 2019.210 guards

18   against: that Plaintiffs will use a vague identification of their trade secrets to

19   gain access to Apple's files and claim Apple's confidential information as their

20   own.  Plaintiffs say they are willing and able to adequately describe their trade

21   secrets in response to an interrogatory, but refuse to do so in a Section 2019.210

22   disclosure.  The clear reason is that Plaintiffs seek to use the discovery process

23   to manufacture a trade secret case.  Indeed, Plaintiffs prefer an interrogatory to a

24   Section 2019.210 disclosure because they are free to amend their interrogatory

25   responses throughout the discovery process, including in response to the *Apple*

26   confidential information they discover in Apple's files.  Plaintiffs should be

27   required to describe the trade secrets that Apple allegedly misappropriated at the

28   outset of this case.  This is information that Plaintiffs must have in their

-18-

Exhibit 8
-140-

possession as the result of the Rule 11 investigation they allegedly conducted prior to filing.  Its prompt disclosure will prevent Plaintiffs from simply manufacturing a trade secret claim that did not exist at the time of filing and it will protect Apple's confidential information – which are the precise reasons why Section 2019.210 was enacted.  Forcing Plaintiffs to specify their alleged trade secrets *before* they commence trade secret-related discovery in Apple's files will prevent unnecessary motion practice later.

Plaintiffs' further argument that their RFPs somehow fall outside the ambit of Section 2019.210 is not persuasive.  To begin with, and to dispel any confusion, Apple is prepared to produce documents responsive to the RFPs pertaining solely to Plaintiffs' patent claims, as well as public documents responsive to the RFPs pertaining to Plaintiffs' patent and trade secret claims. But Plaintiffs are wrong to suggest that all of their RFPs simply seek patent-related information.  Plaintiffs use the term "Accused Products" throughout their RFPs, defined as "Apple Watch Series 4 or later, as well as the combination of Apple Watch Series 4 or later with an Apple iOS Product." These are the *very same Apple Watches that Plaintiffs contend incorporate their trade secrets*.  Accordingly, these overlapping requests are an attempt to end-run the clear requirements of Section 2019.210.  Plaintiffs' discovery of documents pertaining to their purported trade secrets should not commence until Plaintiffs serve an adequate Section 2019.210 disclosure.

This case presents a clear example of the very danger that Section 2019.210 prevents:  Plaintiffs have plead vague trade secrets claims, which they already amended once, and now seek access to *Apple's* confidential information. Absent a reasonable description of Plaintiffs' alleged secrets first, Plaintiffs will be able to sift through Apple's information and claim whatever seems most valuable as their own.  This is particularly troubling because Apple has a long track record of significant investment in groundbreaking technology, including

-19-

Exhibit 8
-141-

1  the Apple Watch.  Plaintiffs should not be permitted to peruse that information

2  *in search* of a valid claim; they need to first provide at least a description of the

3  secrets at issue here.

4        For these and the reasons set forth in detail in Apple's portion of the

5  parties' filing before Judge Early on Apple's motion for a protective order,

6  Apple therefore requests that Plaintiffs be barred from commencing any trade

7  secret-related discovery until Plaintiffs serve on counsel a statement, under seal,

8  that includes (1) a summary of the specific alleged trade secrets; (2) the

9  background of the trade secrets and a description of how each secret has derived

10  independent, actual, or potential economic value by virtue of not being generally

11  known to the public; (3) a description of how each secret has been the subject of

12  reasonable efforts to maintain its secrecy; and (4) each of the precise claimed

13  trade secrets, numbered with a list of the specific elements for each, as claims

14  would appear at the end of a patent.

15        Separately, Apple anticipates a possibly voluminous document production

16  due to the number of patents at issue in this case.  As noted above, the Parties

17  are currently negotiating a protective order.  Apple does not intend to produce

18  documents until an acceptable protective order is issued.

19  **L.**    **Conflicts**

20        The following are subsidiaries of Plaintiff Masimo Corporation:

21        Masimo (China) Medical Technology Co., Ltd; Masimo (Shanghai)

22  Industrial Co., Ltd.; Masimo 17, LLC; Masimo Americas, Inc.; Masimo Asia

23  Pacific Pte. Ltd; Masimo Australia PTY LTD; Masimo Canada ULC; Masimo

24  International SARL - Dubai, U.A.E.; Masimo de Mexico Holdings I LLC;

25  Masimo de Mexico Holdings II LLC; Masimo Europe Limited – French

26  Branch; Masimo Europe Limited; Masimo Europe Limited - Filiale Italiana;

27  Masimo Europe Limited, Sucursal en España; Masimo Europe Ltd

28  Niederlassung Deutschland; Masimo Holdings LLC; Masimo Holdings LP;

-20-

**Exhibit 8**

**-142-**

Masimo Hong Kong Limited; Masimo Importação e Distribuição de Produtos Médicos Ltda.; Masimo International SARL; Masimo International Sarl – Jordan; Masimo International Sarl (filiaal Nederlands); Masimo International Technologies SARL; Masimo Japan Kabushiki Kaisha; Masimo Korea LLC; Masimo Medical Technologies India Private Ltd; Masimo Medikal Ürünler Ticaret Limited Şirketi; Masimo Mexico, S. de R.L. de C.V.; Masimo Oesterreich GmbH; Masimo Peru S.R.L.; Masimo Polska Spola z.o.o.; Masimo International Saudi Arabia; Masimo Semiconductor, Inc.; Masimo Sweden AB; OC Property Shelter, LLC; OC Property Ventures, LLC; Patient Doctor Technologies, Inc.; SEDLine, Inc.; SpO2.com; VCCB Holdings, LLC; 25 Sagamore LLC; 52 Discovery LLC; Alton Office Holdings, LLC; and Alton Office Property, LLC.

Apple filed its Statement of Interested Parties and Corporate Disclosure Statement on March 4, 2020.  Dkt. No. 15.

**M.**   **Patent Cases**

The Presumptive Schedule of Pretrial Dates in Exhibit A identifies the dates and methodology for claim construction and *Markman* hearing.  Plaintiffs do not propose a specific date for the Markman hearing and instead defer to the Court.  Apple proposes that the Markman hearing be held on February 8, 2021, subject to the Court's availability based on its schedule.

**N.**   **Magistrates**

The Parties do not consent to having a Magistrate Judge preside over these proceedings.

/ / /

/ / /

/ / /

/ / /

/ / /

-21-

Exhibit 8
-143-

Case 8:20-cv-00048-JVS-JDE   Document 43-4   Filed 04/30/20   Page 145 of 150   Page ID
#:3429
Case 8:20-cv-00048-JVS-JDE   Document 33   Filed 04/14/20   Page 24 of 28   Page ID #:2581

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  April 14, 2020          By: */s/ Stephen W. Larson*
                                     Joseph R. Re
                                     Stephen C. Jensen
                                     Perry D. Oldham
                                     Stephen W. Larson

                                     Attorneys for Plaintiffs,
                                     Masimo Corporation and
                                     Cercacor Laboratories

                                GIBSON, DUNN & CRUTCHER LLP

Dated:  April 14, 2020          By: */s/ Ilissa Samplin (with permission)*
                                     Joshua H. Lerner
                                     H. Mark Lyon
                                     Brian M. Buroker
                                     Ilissa Samplin
                                     Angelique Kaounis

                                     *Attorneys for Defendant Apple Inc.*

-22-

Exhibit 8
-144-

Case 8:20-cv-00048-JVS-JDE   Document 43-4   Filed 04/30/20   Page 146 of 150   Page ID
#:3430
Case 8:20-cv-00048-JVS-JDE   Document 33   Filed 04/14/20   Page 25 of 28   Page ID #:2582

# EXHIBIT A

### JUDGE JAMES V. SELNA
### PRESUMPTIVE SCHEDULE OF PRETRIAL DATES

| Case No.: | 8:20-cv-00048-JVS (JDEx) |
|---|---|
| Case Name: | Masimo Corporation, et al. v. Apple Inc. |

| Matter | Time | Weeks before trial | Plaintiffs' Request | Defendant's Request | Court Order |
|---|---|---|---|---|---|
| Trial date (jury) Estimated length: 10-14 days | 8:30 am (Tuesday) | | 4/5/2022 | | |
| [Court trial:] File Findings of Fact and Conclusions of Law and Summaries of Direct Testimony | | -1 | N/A | | |
| Final Pretrial Conference: Hearing on Motions in Limine; File Agreed Upon Set of Jury Instructions and Verdict Forms and Joint Statement re Disputed Instructions and Verdict Forms; File Proposed *Voir Dire* Qs and Agreed-to Statement of Case | 11:00 am (Monday) | -2 | 3/21/2022 | | |
| Lodge Pretrial Conf. Order; File Memo of Contentions of Fact and Law; Exhibit List; Witness List; Status Report re Settlement | | -3 | 3/7/2022 | | |
| Last Day for hand-serving Motions in Limine | | -6 | 2/14/2022 | | |
| Last day for hearing motions | 1:30 pm (Monday) | -7 | 2/7/2022 | | |
| Last day to conduct Private ADR | | | 1/24/2022 | | |

-23-

Exhibit 8
-145-

Case 8:20-cv-00048-JVS-JDE   Document 43-4   Filed 04/30/20   Page 147 of 150   Page ID
#:2431
Case 8:20-cv-00048-JVS-JDE   Document 33   Filed 04/14/20   Page 26 of 28   Page ID #:2583

| | | | | |
|---|---|---|---|---|
| Last day for hand-serving motions and filing (other than Motions in Limine) | | -11 | 1/10/2022 | |
| Expert Discovery cut-off | | | 12/6/2021 | |
| Rebuttal Expert Witness Disclosures | | | 10/18/2021 | |
| Opening Expert Witness Disclosures [See F.R. Civ. P. 26(a)(2)]<br><br>Plaintiffs File Final Infringement Contentions,<br><br>Defendant Files Final Invalidity Contentions. | | | 9/6/2021 | |
| Non-expert Discovery cut-off | | -15 | 7/5/2021 | |
| Defendant further reduces the number of asserted prior art references to no more than 6 references per patent and 25 references total.[3] | | | N/A | 14 days after Plaintiffs further reduce number of asserted claims |
| Plaintiffs further reduce number of asserted patents to 6, the number of asserted claims to no more than 3 claims per patent family, and 12 claims total.[4] | | | N/A | 30 days after Markman decision |
| Markman Decision | | | [set by Court] | |

---

[3]     Apple proposes that Plaintiffs and Defendant will narrow their asserted claims and prior art references from the previously narrowed pool of claims and references.

[4]     Plaintiffs believe Defendant's proposal to include deadlines to limit the number of asserted claims and asserted patents is premature and one-sided.

-24-

Exhibit 8
-146-

| | | | | |
|---|---|---|---|---|
| Markman Hearing | | | [set by Court] | 2/8/2021 |
| All Parties File Advice of Counsel Disclosures (Patent L.R. 3-7) | | | 1/25/2021 | 30 days after Markman decision |
| Simultaneously Responding Markman Briefs, Tutorials and Presentation Materials (Patent L.R. 4-5) | | | 1/25/2021 | |
| Last Date to Add Parties / Amend Pleadings | | | 12/23/2020 | |
| Simultaneous Opening Markman Briefs (Patent L.R. 4-5) | | | 12/21/2020 | |
| Complete Claim Construction Discovery (Patent L.R. 4-4) | | | 12/7/2020 | |
| Joint Markman Prehearing Statement Patent L.R. 4-3) | | | 11/9/2020 | |
| Exchange Preliminary Claim Constructions and Extrinsic Evidence Patent L.R. 4-2) | | | 10/12/2020 | |
| Exchange of Proposed Claim Terms for Construction (Patent L.R. 4-1) | | | 9/21/2020 | |
| Invalidity Contentions (Patent L.R 3-3 and 3-4) | | | 9/7/2020 | |
| Defendant reduces the number of asserted prior art references to no more than 12 references per patent and 50 references total.[5] | | | N/A | 8/10/2020 |

---

[5]      Apple proposes that a prior art instrumentality (such as a device or process) and associated references that describe that instrumentality shall count

-25-

Exhibit 8
-147-

| Infringement Contentions (Patent L.R. 3-1 and 3-2) | | | 7/27/2020 | | |
|---|---|---|---|---|---|
| Plaintiffs reduce number of asserted claims to no more than 8 claims per patent and 32 claims total. | | | N/A | 7/27/2020 | |
| Deadline to disclose core technical documents sufficient to show the operation of the accused products.[6] | | | 6/15/2020 | | |
| Initial Disclosures (Rule 26(a)(1)) | | | 4/14/2020 | | |

as one reference, as shall the closely related work of a single prior artist.

[6]     Any discovery-related dates that Apple proposes in this Presumptive Schedule of Pretrial Dates are subject to Plaintiffs providing an adequate identification of their alleged trade secrets in compliance with Section 2019.210 insofar as such an identification is a prerequisite to such discovery.

-26-

Exhibit 8
-148-

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | SACV 20-00048 JVS(JDEx) | Date | April 17, 2020 |
|---|---|---|---|

| Title | Masimo Corporation, et al v Apple, Inc |
|---|---|

Present: The Honorable    **James V. Selna, U.S. District Court Judge**

| Lisa Bredahl | Not Present |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Not Present | Not Present |

**Proceedings:**    **[IN CHAMBERS] ORDER RE SCHEDULING DATES**

The Court has read and considered the parties Rule 26(f) Report and sets the following dates:

| | |
|---|---|
| **Jury Trial** | **April 5, 2022 at 8:30 a.m.** |
| **Final PreTrial Conference** | **March 21, 2022 at 11:00 a.m.** |
| File PreTrial Documents not later than March 7, 2022 | |
| File motions in limine not later than February 14, 2022 | |
| **Discovery Cut-off** | **July 5, 2021** |
| **Expert Discovery Cut-off** | **December 6, 2021** |
| Initial disclosure of Experts not later than September 6, 2021 | |
| Rebuttal disclosure of Experts not later than October 18, 2021 | |
| **Law and Motion Cut-off** | **February 7, 2022 at 1:30 p.m.** |
| Motions to be filed and served not later than January 10, 2022 | |
| **Markman Hearing** | **February 8, 2021 at 3:00 p.m.** |

Counsel inform the Court that their selection for a settlement procedure pursuant to Local Rule 16-15 is ADR #3, private mediation.  The Court orders that any settlement discussions shall be completed not later than November 30, 2021.  Counsel shall file a Joint Report of the parties regarding outcome of settlement discussions, the likelihood of possible further discussions and any help the Court may provide with regard to settlement negotiations not later than seven (7) days after the settlement conference.

The Court adopts discovery limits in Sections 6a-c.  Total hours for depositions 100.  Court will deal with reduction of claims, prior art references at a hearing on **July 10, 2020 at 3:00 p.m.** Parties shall submit joint/separate proposals in one filing by July 3, 2020.  The Court adopts the patent specific dates.  The Court stays the trade secret discovery only pending compliance with 2019.210.  Any dispute over compliance shall be heard before the Magistrate Judge.

| | : | 0 |
|---|---|---|
| Initials of Preparer | lmb | |

**Exhibit 9**
**-149-**