# EXHIBIT 1



History
▾

# Cercacor History

**2019 and Beyond**

Stay tuned for even more exciting introductions!

## 2018

Introduction of  Pulse Rate Variability (PRV)

### 2017

Introduction of two new dyshemoglobins, carboxyhemoglobin (CO) and methemoglobin (MET)

## 2016

Developed and launched Ember,

 cercacor

History ▼

**2016**
Developed and launched Ember, world's first non-invasive Hemoglobin tracker for athletes

**2008**
World's first non-invasive hemoglobin measurement appears in a FDA-cleared device

**2007**
World's first non-invasive methemoglobin measurement appears in a FDA-cleared device

**2005**
World's first non-invasive carboxyhemoglobin measurement appears in a FDA-cleared device

**1998**
Spun off from Masimo

Document title: The History and Timeline of Cercacor | Cercacor
Capture URL: https://www.cercacor.com/pages/history
Capture timestamp (UTC): Tue, 30 Jun 2020 22:59:40 GMT

**Exhibit 1**
**-5-**



History ▼

world's first non-invasive carboxyhemoglobin measurement appears in a FDA-cleared device

## 1998

Spun off from Masimo Corporation



### cercacor

**Products**
BonV
Ember

**Blog**
Blog

**About Us**
About Us
Our Team
History
Newsrooms
Careers
Contact Us
Site Map

**Support**
Support
FAQ
Return Policy
Warranty

**Store**
Health & Wellness
Fitness

**Social**
facebook
twitter
instagram
linkedin
youtube

Terms and Conditions    Regulatory    Legal    Privacy Policy    Patents

Return Policy    Warranty Policy

2020 Cercacor Laboratories, Inc. Apple, the Apple logo, iphone, iPad and iPod touch are trademarks of Apple Inc, registered in the U.S. and other countries. App Store is a service mark of Apple Inc. Masimo and Masimo rainbow SET are registered

Document title: The History and Timeline of Cercacor | Cercacor
Capture URL: https://www.cercacor.com/pages/history
Capture timestamp (UTC): Tue, 30 Jun 2020 22:59:40 GMT

# EXHIBIT 2

## PROPOSED TO BE FILED UNDER SEAL

# EXHIBIT 3



**Linked**in                                    Join now    [ Sign in ]

| Michael O'Reilly |



## Michael O'Reilly

Health Special Projects, Apple; Professor of Anesthesiology, Perioperative and
Pain Care, Stanford University

Cupertino, California · 500+ connections

[ Sign in to Connect ]



 Apple

 The Robert Larner, M.D. College
 of Medicine at The University of...

## Activity



**Inclusion & Diversity**

Liked by **Michael O'Reilly**

## Experience



**Apple**
7 years

**Health Special Projects**
Mar 2016 — Present · 4 years 4 months
Cupertino

**Vice President, Medical Technology**
Jul 2013 — Mar 2016 · 2 years 9 months



**Professor of Anesthesiology**
Stanford University School of Medicine
Dec 2013 — Present · 6 years 7 months

Palo Alto, California

Exhibit 3
-10-

Michael O'Reilly - Health Special Projects - Apple | LinkedIn

 **Linked**in

Join now | Sign in

Michael O'Reilly

 **Professor Anesthesiology and Perioperative Care**
University of California, Irvine
Apr 2008 – Jul 2013 · 5 years 4 months

 **Executive Vice President for Medical Affairs, Chief Medical Officer**
Masimo Corporation
Jan 2008 – Jul 2013 · 5 years 7 months

Irvine, CA

 **Associate Professor**
University of Michigan Health System
Jul 1994 – Jan 2008 · 13 years 7 months

## Education

 **The Robert Larner, M.D. College of Medicine at The University of Vermont**
MD MS · Medicine, Cell Biology

1984 – 1990

 **University of Massachusetts Boston**
BA · Biology

1972 – 1974

 **Wayne Valley**
1966 – 1970

## Groups

 **Anesthesia and Critical Care**

 **Precision Medicine & Digital Health**

View Michael's full profile

👓 See who you know in common

🔲 Get introduced

**Exhibit 3**
**-11-**

6/30/2020                        Michael O'Reilly - Health Special Projects - Apple | LinkedIn

**Linked**in

| Michael O'Reilly |

## People also viewed

 **Samantha Mravca**
Health Special Projects at Apple

 **Alexis Beatty**
Associate Professor at University of California, San Francisco

 **Christine Toruno**
ð Health

 **Anura Patil**
Health at Apple

 **Sonia Vora**
Product Manager at Apple - Health Special Projects

 **Karthik Hariharan**
Health @ Apple

 **Marissa Goodger**
Health at Apple

 **Aurele Taieb, MD**
ð Health • Digital Health & Innovation • MedTech 40 under 40

 **Lauren Cheung**
MD, Health at Apple

 **Divya Nag**
Director of Health, Apple

Show more profiles ⌄

## Others named **Michael O'Reilly**

 **Michael O'Reilly**
Legislative Agent / Lobbyist at Boston Fire Fighters Local 718
Greater Boston Area

 **Michael O'Reilly**
Business Development Team Manager at Jarvis Tech Ltd
Barcelona Area, Spain

 **Michael O'Reilly**
Digital business leader | Chief Digital Officer | CX head

https://www.linkedin.com/in/michael-o-reilly-398503a/                                        3/4

**Exhibit 3**
-12-

6/30/2020                                    Michael O'Reilly - Health Special Projects - Apple | LinkedIn

**Linked**in                                                                        Join now    **Sign in**

Michael O'Reilly

566 others named Michael O'Reilly are on LinkedIn

See others named **Michael O'Reilly**

## Add new skills with these courses

 **Reduce Tension with Breathwork**

 **Strategic Partnerships: Ecosystems and Platforms**

 **IT Service Desk: Monitoring and Metrics Fundamentals**

See all courses

## Michael's public profile badge

Include this LinkedIn profile on other websites

 **Michael O'Reilly**
Health Special Projects, Apple; Professor of Anesthesiology, Perioperative and Pain Care, Stanford University

 Health Special Projects at Apple

 The Robert Larner, M.D. College of Medicine at The University of Vermont

View profile                                                                        **Linked**in

View profile badges

**Linked**in  © 2020                        About

Accessibility                               User Agreement

Privacy Policy                              Cookie Policy

Copyright Policy                            Brand Policy

Guest Controls                              Community Guidelines

Language ⌄

**Exhibit 3**
**-13-**

# EXHIBIT 4



**Linked**in

Join now    Sign in

🔍 Marcelo Lamego

## Marcelo Lamego
Founder and CEO - True Wearables
Rancho Santa Margarita, California · 500+ connections

Sign in to Connect

 True Wearables

 Stanford University

 Company Website ⧉

## About

Marcelo Malini Lamego is currently with True Wearables, Rancho Santa Margarita, CA. Throughout his career, he concentrated his efforts on the development of medical technologies and products. He is an inventor on more than 100 patents related to optimization and signal processing, devices, sensors and patient monitoring technologies, and author on more than 30 peer-reviewed journal and international conference articles in the areas of Automatic Control and Optimization, Adaptive Systems and Neural Networks, Power Electronics, and Mossbauer Spectroscopy applied to environmental control. Marcelo holds a Ph.D. degree in Electrical Engineering from Stanford University, California.

## Articles by Marcelo


### True Wearables is Now Shipping Oxxiom for Sports and Aviation
By Marcelo Lamego
August 28, 2018


### Oxxiom wins iF Design Award 2018
By Marcelo Lamego
January 30, 2018

### Oxxiom Wins 2017 Good Design Award
By Marcelo Lamego
December 17, 2017

Exhibit 4
-14-

6/30/2020                          Marcelo Lamego - Founder and CEO - True Wearables | LinkedIn

**Linked**in

| 🔍 Marcelo Lamego |

Join now   **Sign in**

Activity

https://lnkd.in/g8fVS5v

Liked by **Marcelo Lamego**

https://lnkd.in/g8fVS5v

Liked by **Marcelo Lamego**

https://lnkd.in/g8fVS5v

Shared by **Marcelo Lamego**

Sign in to see all activity

## Experience

**Founder and CEO**
True Wearables
Aug 2014 – Present · 5 years 11 months
29826 Avenida de Las Banderas, Suite 300, Rancho Santa Margarita CA 92688

True Wearables is a medical device company based in Rancho Santa Margarita, California. We aim at creating low cost, reliable, fully disposable, and wireless devices that will disrupt the medical industry and make the world a better place. Our first product is Oxxiom, the world's first wireless (completely cableless), continuous, fully disposable, single-use pulse oximeter, and recipient of:
(1) The 2017 Good Design Award by the Chicago Athenaeum Museum of Architecture and Design, in the...

Show more

**R&D**
Apple
Jan 2014 – Jul 2014 · 7 months
Cupertino, CA

Worked in the Apple Watch project. Activities included:
(1) Produced key intellectual property related to bio-sensing under the form of several issued patents (US9723997, US9952095, US10078052, US10219754, US10247670, US10524671);
(2) Defined required resources for current and future bio-sensing functionalities;

Exhibit 4
-15-

6/30/2020                                    Marcelo Lamego – Founder and CEO - True Wearables | LinkedIn

**Linked**in

| 🔍 Marcelo Lamego |

Join now    **Sign in**

### Chief Technical Officer
Cercacor Laboratories, Inc.

2006 – Jan 2014 · 8 years

189 Technology, Irvine CA 92618

Responsible for the engineering team and Cercacor's research and product development. Developed the Pronto-7, a FDA/CE approved noninvasive hemoglobin meter, currently being sold worldwide by Masimo Corp, and recipient of:
(1) The 2011 Medical Design Excellence Award;
(2) The 2011 iF Product Design Award;
(3) The 2011 TechAmerica High-Tech Innovation Award;
(4) The 2011 World Health Organization Innovative Medical Technology (cost-effectively address global health concerns and...

Show more

### Research Scientist
Masimo

Jan 2003 – Nov 2006 · 3 years 11 months

50 Parker, Irvine, CA 92618

Leading scientist in the development of the Rainbow Technology and of the first FDA/CE approved noninvasive carboxyhemoglobin and methemoglobin meter Rad-57, currently being sold worldwide by Masimo Corp, and recipient of:
(1) The 2006 Medical Design Excellence Award;
(2) The STA 2006 Application of Technology Award;
(3) The 2006 AEA Innovative Medical Technology Award.
This technology required mathematical concepts in several fields, ranging from optimal control theory and...

Show more

### Professor
Universidade de São Paulo

Jan 2002 – Dec 2002 · 1 year

MBA in Management and Product Engineering - PECE program

Taught during two semesters a graduate course entitled "Strategic Consulting for Engineers", wherein students learned and developed a number of business concepts and investment science skills needed to analyze business problems and create visual presentations in order to advise corporate management in the decision making process.

### Management Consultant
The Boston Consulting Group

Jan 2001 – Dec 2002 · 2 years

Sao Paulo, Brazil

Worked in several projects in the areas of energy, technology, banking, new investment opportunities, and pharmaceuticals, mainly helping a pharmaceutical company on market assessment of various highly specialized

**Exhibit 4
-16-**

6/30/2020                                    Marcelo Lamego - Founder and CEO - True Wearables | LinkedIn

**Linked** in

🔍 Marcelo Lamego

Join now   Sign in

Show more

### Algorithm Engineer
Masimo

2000 − 2000 · less than a year

Irvine, CA

Developed estimation algorithms, simulation tools, and experimental clinical data collection setups for the noninvasive measurement of blood constituents.

### Assistant Professor (full tenure)
Universidade Federal do Espírito Santo (Oficial)

Jan 1994 – Aug 1996 · 2 years 8 months

Electrical Engineering Department, Vitoria, ES, Brazil

Taught undergraduate semester courses in Automatic Control (Classic and Modern), Electronics and Electrical Circuits II, with twice a week lectures (2 hours each with 40 to 60 students), and weekly laboratory sections (smaller number of students). Member of the Power Electronics Laboratory (LEFAC), conducting research in Automatic Control and Power Electronics (results published in 20+ papers in international conferences and journals), and supervising senior students on their final graduation...

Show more

### Visiting Researcher
NHL Hogeschool

Feb 1993 – Aug 1993 · 7 months

Leeuwarden, The Netherlands

Developed a fuzzy logic laboratory comprising of laboratory-scale experiments /setups for educational purposes, including an inverted pendulum, an interval fuzzy simulator for differential equations, and a high-performance motion control system using extremity fuzzy PID controllers. The results were published in a number of research-oriented conference papers.

### Co-founder
Hard Sistemas

Jul 1990 – Jan 1993 · 2 years 7 months

Vitoria, ES, Brazil

Projects Developed:
(1) Audio Switching Power Amplifier - developed as a prototype (the first of its kind), delivering over 1kW rms high-quality audio power. Patent was filed in the Brazilian Patent Office (INPI, 22/08/1991, # 103746-8)
(2) Hot Ductility Test Machine - Steel samples were subjected to controlled tension and temperature profiles and immediately frozen upon rupture to reproduce microstructure changes during the cold milling of large steel ingots. This test machine was...

Show more

Exhibit 4
-17-

6/30/2020                              Marcelo Lamego - Founder and CEO - True Wearables | LinkedIn

**Linked**in                                                    Join now    | Sign in |

| 🔍 Marcelo Lamego |

1996 — 2000

**Universidade Federal do Espírito Santo (Oficial)**
Master of Science (MS) • Electrical and Electronics Engineering

1991 — 1993

**Universidade Federal do Espírito Santo (Oficial)**
Bachelor of Engineering (B.E.) • Electrical and Electronics Engineering

1985 — 1990

## Languages

**English**
Native or bilingual proficiency

**Portuguese**
Native or bilingual proficiency

## Recommendations

A preview of what LinkedIn members have to say about Marcelo:

❞  Marcelo hired me on to the team at Cercacor in 2010, generously giving me an even more rewarding position than the
one I had applied for. Marcelo is a brilliant engineer with many inventions to his name. He has the heart of a teacher, and
was eager to help me in my career growth by freely sharing his experience and knowledge with me. Marcelo is a man of
integrity. He cares deeply about both his work and, more importantly, the people he works with.

1 person has recommended Marcelo

| Sign in to view |

## View Marcelo's full profile

  See who you know in common

  Get introduced

  Contact Marcelo directly

Exhibit 4
-18-

6/30/2020                           Marcelo Lamego - Founder and CEO - True Wearables | LinkedIn

**Linked**in                                                   Join now    **Sign in**

🔍 Marcelo Lamego

## Others named **Marcelo Lamego**

 **Marcelo Lamego**
Coordenador de Produção na Techint Engenharia e Construção
Belo Horizonte Area, Brazil

 **Marcelo Nascimento Lamego**
Profissional de Construção e Montagem Industrial - Buscado colocação
Belo Horizonte Area, Brazil

 **Marcelo Lamego**
Sales Coordinator
Curitiba Area, Brazil

 **marcelo lamego**
Aluno na Anhanguera Educacional
Pelotas Area, Brazil

8 others named Marcelo Lamego are on LinkedIn

See others named **Marcelo Lamego**

## Add new skills with these courses

 **IT Service Management: ISO20000**

 **Introducing Blue Prism**

 **Fusion 360: Design for Mechatronics**

See all courses

## Marcelo's public profile badge

Include this LinkedIn profile on other websites

**Marcelo Lamego**
Founder and CEO - True Wearables

Founder and CEO at True Wearables

Stanford University

**Exhibit 4**
**-19-**

6/30/2020                          Marcelo Lamego - Founder and CEO - True Wearables | LinkedIn

**Linked**in

🔍  Marcelo Lamego

Join now     Sign in

---

© 2020                              About

Accessibility                       User Agreement

Privacy Policy                      Cookie Policy

Copyright Policy                    Brand Policy

Guest Controls                      Community Guidelines

Language

**Exhibit 4**

**-20-**

# EXHIBIT 5



INTELLECTUAL PROPERTY LAW

KNOBBE MARTENS OLSON & BEAR LLP

2040 Main St., 14th Fl., Irvine, CA 92614
**T** (949) 760-0404

Stephen C. Jensen
Steve.Jensen@knobbe.com

January 24, 2014

## VIA U.S. MAIL

Timothy D. Cook
Chief Executive Officer
Apple Inc.
1 Infinite Loop
Cupertino, CA  95014

Re:   *Employment Obligations of Marcelo Lamego*
      Our Reference No.:  CERCAL.096L

Dear Mr. Cook:

This firm represents Cercacor Laboratories, Inc.  We understand that Apple recently offered employment to Cercacor's Chief Technology Officer, Marcelo Lamego.  We believe that Apple has hired Mr. Lamego to design and develop products that are likely the same as the products that he was responsible for developing for Cercacor. Apple's design, development, or sales efforts on any such product would compete directly with Cercacor's efforts.

In his capacity as Cercacor's CTO, Mr. Lamego was responsible for *all* of Cercacor's research and development and *all* projects that are underway, or even contemplated, at Cercacor.  These projects include mobile health devices and applications and physiological measurements.  Mr. Lamego has been the key engineer at Cercacor for more than 10 years.  Mr. Lamego learned, and personally conceived, a large number of very valuable trade secrets while he was at Masimo, and he continued to use and improve those trade secrets under license from Masimo when Cercacor was spun off from Masimo.  Mr. Lamego possesses detailed knowledge of trade secrets that only a very few individuals know, pertaining to technologies that other companies have for decades tried and failed to develop.

We note that Apple expressed great interest in the Masimo technology on which Mr. Lamego was trained—the same technology that Mr. Lamego applied at Cercacor.  Apple has been targeting Masimo and Cercacor personnel for some time.  Apple hired Masimo's Chief Medical Officer, Michael O'Reilly.  Thereafter, Apple expressed to Masimo and Cercacor's CEO that Apple had even greater interest in Cercacor.  The CEO responded that Cercacor's owners had no current desire to sell the company.  Shortly thereafter, we understand that Apple increased its efforts to recruit Mr. Lamego.  It is difficult to imagine any reason for this sequence of events other than Apple is attempting to gain access to, or at least the benefit of, Cercacor and Masimo's trade secrets.

Mr. Lamego executed an Employee Confidentiality Agreement (the "Agreement") with Cercacor,[1] a copy of which is enclosed.  The Agreement prohibits Mr. Lamego, for a period of two years after the end of his employment with Cercacor, from competing with Cercacor, and it specifically recites that the purpose of this non-compete provision is to protect Cercacor's trade secrets.  As you may know, California law recognizes the enforceability of a non-compete agreement designed to accomplish that purpose.  The Agreement provides in pertinent part as follows:

---

[1]      The parties to the Agreement are Mr. Lamego and Masimo Laboratories.  Masimo Laboratories subsequently changed its name to Cercacor Laboratories, Inc.

Exhibit 5
-21-

**Knobbe | Martens**

12.     During my employment, . . . I will not render services to anyone outside [Cercacor], accept competing employment, or make preparations to compete with [Cercacor].

13.     During my employment and for a period of five (5) years immediately following termination of my employment with [Cercacor], I will not (a) solicit or induce any employee or consultant of [Cercacor] to quit their employment or cease doing business with [Cercacor], or (b) solicit [Cercacor's] customers or suppliers, unless I am specifically authorized to do (a) or (b) by [Cercacor].

14.     I agree that, during the term of my employment and for a period of two (2) years immediately following my termination of employment with [Cercacor] (voluntary or otherwise), I shall be prohibited from competing with any business, product or service of [Cercacor].

15.     I agree that the activities forbidden in paragraphs 13 and 14 above would necessarily involve the use or disclosure of [Cercacor's] trade secrets and proprietary and confidential information and are necessary to protection of [Cercacor's] trade secrets and proprietary and confidential information.   I understand that none of my activities will be prohibited under paragraphs 13 and 14 to the extent that I can prove that the action was taken without the use or disclosure of any of [Cercacor's] trade secrets or proprietary or confidential information.

As you can see, the Agreement also prohibits Mr. Lamego from soliciting other employees and from soliciting business from any of Cercacor's customers or suppliers.  In view of Mr. Lamego's obligations arising from the Agreement, we trust that Apple will employ Mr. Lamego in an area that does not involve healthcare technology, including mobile health applications and the measurement of physiological information.  We also ask that Apple refrain from inducing Mr. Lamego to take actions that would violate the Agreement while he performs services for Apple and that Apple will direct Mr. Lamego to honor his obligations to all of his prior employers.  Of course, Cercacor reserves any and all rights and remedies that it may have, now and in the future, against Apple and Mr. Lamego relating to this matter.

Very truly yours,

*Steve Jensen* a.h.

Stephen C. Jensen

Enclosure

cc (w/ encl.):
        Adrian Perica, via e-mail (perica@apple.com)
        Marcelo Lamego (via U.S. mail)

17102982

**Exhibit 5**
**-22-**

## MASIMO LABS EMPLOYEE CONFIDENTIALITY AGREEMENT
### (United States)

As an employee of Masimo Laboratories, a Delaware corporation ("Masimo Labs") and in consideration of the compensation and benefits from my employment, I agree as follows:

For purposes of this Agreement, the term Confidential Information means any information in any form that Masimo Labs considers confidential, including without limitation business plans, customer files, customer lists, supplier lists, sales and marketing reports, forecasts, strategies, technical data, prices and costs, designs and formulas, discoveries, processes, manufacturing techniques, know-how, improvements, ideas or copyrightable works, software, databases, personnel and payroll records, mailing lists, accounting records, works of authorship, inventions, trade secrets and other business information. Confidential Information also includes information to which I am exposed during the course of my employment with Masimo Labs that is considered confidential to Masimo Labs' affiliates or any third party.

1.   During my employment by Masimo Labs, I will not disclose or make use of any Confidential Information except as authorized by Masimo Labs and as necessary for the performance of my duties as a Masimo Labs employee.

2.   After my employment with Masimo Labs has terminated, I will not disclose or make use of any Confidential Information for any purpose, either on my own or on behalf of another business.

3.   During my employment with Masimo Labs, I will not disclose or make use of any confidential, proprietary or trade secret information or material belonging to a former employer or other third party without the express approval of Masimo Labs and such former employer or other third party.

4.   I represent that I am not subject to any agreement(s) with any third party that would prevent me from performing all of my assigned duties as a Masimo Labs employee.

5.   Prior to my employment with Masimo Labs, I did not create any inventions, works of authorship, or trade secrets that relate in any way to the business of Masimo Labs, except for those, if any, identified on the list attached to this Agreement as Exhibit A.

6.   I agree that the fruits and products of my labor as a Masimo Labs employee shall belong solely to Masimo Labs.

7.   I agree to assign and hereby assign to Masimo Labs all rights that I may have to any inventions, works of authorship, developments, improvements, or trade secrets that I may develop during the course of my employment, except for inventions which I am allowed to retain under California Labor Code section 2870, a copy of which is attached to this Agreement as Exhibit B.

8.   I agree that all works of authorship to which I contribute during my employment shall be considered "works made for hire" and shall be the sole property of Masimo Labs.

9.   I will keep adequate records of all inventions and works of authorship to which I contribute during my employment, and will make such records available to Masimo Labs on request.

10. I will cooperate with Masimo Labs and do whatever is necessary or appropriate to obtain patents, copyrights, or other legal protection on projects to which I contribute, and, if I am incapacitated for any reason from doing so, I hereby authorize Masimo Labs to act as my agent and to take whatever action is needed on my part to carry out this Agreement.

11. Upon termination of my employment for any reason, I will immediately assemble all property of Masimo Labs, including any proprietary or confidential information, in my possession or under my control and return it unconditionally to Masimo Labs.

**Exhibit 5**
**-23-**

12. During my employment, I will devote all of my working time and energy to the business of Masimo Labs, and I will not render services to anyone outside Masimo Labs, accept competing employment, or make preparations to compete with Masimo Labs.

13. During my employment and for a period of five (5) years immediately following termination of my employment with Masimo Labs, I will not (a) solicit or induce any employee or consultant of Masimo Labs to quit their employment or cease doing business with Masimo Labs, or (b) solicit Masimo Labs' customers or suppliers, unless I am specifically authorized to do (a) or (b) by Masimo Labs.

14. I agree that, during the term of my employment and for a period of two (2) years immediately following my termination of employment with Masimo Labs (voluntary or otherwise), I shall be prohibited from competing with any business, product or service of Masimo Labs.

15. I agree that the activities forbidden in paragraphs 13 and 14 above would necessarily involve the use or disclosure of Masimo Labs' trade secrets and proprietary and confidential information and are necessary to protection of Masimo Labs' trade secrets and proprietary and confidential information. I understand that none of my activities will be prohibited under paragraphs 13 and 14 to the extent that I can prove that the action was taken without the use or disclosure of any of Masimo Labs' trade secrets or proprietary or confidential information.

16. I agree that a violation of this Agreement may cause irreparable harm to Masimo Labs' reputation, customer relationships, and other aspects of its business for which an award of money damages would be inadequate. I therefore agree that Masimo Labs shall be entitled to a court order as appropriate to prevent me from violating this Agreement, in addition to any claims for money damages or other relief.

17. For purposes of enforcing this Agreement, I hereby consent to jurisdiction in the Superior Court of California for the County of Orange, as well as any other jurisdiction allowed by law.

18. This Agreement shall be governed by the law of the state in which I reside, or Delaware if I reside outside the United States.

19. I understand that my obligations under this Agreement remain in effect even after my employment with Masimo Labs terminates.

20. This Agreement does not guarantee me any term of employment or limit my or Masimo Labs' right to terminate my employment at any time, with or without cause.

21. The laws of each state differ. Thus, if any provision of this Agreement is invalid or not permitted in your particular state of residence, all other provisions shall remain in effect.

22. This Agreement is binding on my successors and assigns, and will benefit the successors and assigns of Masimo Labs.

23. This Agreement represents my entire agreement with Masimo Labs with respect to the subject matter herein and in particular with respect to confidential, proprietary and trade secret information and materials and intellectual property rights, superseding any previous oral or written understandings or agreements with Masimo Labs or any of its officers. This Agreement may be amended or modified only in writing signed by all the parties hereto.

MASIMO LABS

By: _Clawejewla_

Name: _KAMILA  MACIEJEWSKA_

Title: _Office Manager_

Signature: _Marcelo Lamego_

Name: _MARCELO LAMEGO_

Date: _5/19/09_

2

Exhibit 5
-24-

EXHIBIT A

LIST OF PRIOR INVENTIONS
AND ORIGINAL WORKS OF AUTHORSHIP*

| Title | Date | Identifying Number or Brief Description |
|-------|------|------------------------------------------|
| NONE  |      |                                          |

Name of Employee: _MARLEW LAMELO_____

* If there are none, so state.

3

**Exhibit 5**
**-25-**

EXHIBIT B

CALIFORNIA LABOR CODE SECTION 2870
EMPLOYMENT AGREEMENTS; ASSIGNMENT OF RIGHTS

"(a) Any provision in an employment agreement which provides that an employee shall assign or offer to assign any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1) Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer.

(2) Result from any work performed by the employee for the employer.

(b) To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable."

**Exhibit 5**
**-26-**

# EXHIBIT 6

# Knobbe Martens

KNOBBE, MARTENS, OLSON & BEAR, LLP

2040 Main St., 14th Fl., Irvine, CA 92614
T (949) 760-0404

Perry D. Oldham
Perry.Oldham@knobbe.com

March 4, 2020

H. Mark Lyon
Gibson, Dunn & Crutcher LLP
1881 Page Mill Road, Palo Alto, CA 94304-1211

Re:     Masimo Corp. and Cercacor Laboratories, Inc. v. Apple Inc.

Dear Mark:

Masimo and Cercacor understand from the February 25, 2020, conference of counsel that Apple disputes whether it had reason to know that Marcelo Lamego and Michael O'Reilly had a duty not to disclose Masimo or Cercacor information to Apple.  Based on this position, Masimo and Cercacor are very concerned that Apple will continue to publish Masimo's and Cercacor's confidential information, particularly in patent applications.  Accordingly, Masimo and Cercacor request that Apple immediately request non-publication for any pending applications concerning physiological monitoring that may contain information from former Masimo or Cercacor employees.  At least the following individuals have left Masimo or Cercacor and subsequently worked for Apple:

| | | | |
|---|---|---|---|
| Cornelius Rath | Yinghui Lu | Shruti Koneru | Haritha Haridas |
| Marcelo Lamego | Joseph Jagenow | Swapnil Harsule | Rich Young |
| Ehsan Masoumi | Vincent Wayne | John Aguilar | Johannes Bruinsma |
| Michael O'Reilly | Will Regan | Boris Oreshkin | Felipe Tonello |
| Ottavia Golfetto | Inje Lee | Pekka Talke | |

Masimo and Cercacor also request that Apple notify them before publishing any such applications so that they can evaluate whether such publication would disclose any of their trade secrets.

Please confirm that Apple will honor the above requests.  Thank you for your attention to this matter.

Best regards,

Perry D. Oldham

32323380

# EXHIBIT 7

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

1881 Page Mill Road
Palo Alto, CA 94304-1211
Tel 650.849.5300
www.gibsondunn.com

H. Mark Lyon
Direct: +1 650.849.5307
Fax: +1 650.849.5007
MLyon@gibsondunn.com

March 6, 2020

**Via E-Mail**

Perry D. Oldham
Knobbe, Martens, Olson & Bear LLP
2040 Main St., 14th Flr.
Irvine, CA 92614
Perry.Oldham@knobbe.com

Re:    *Masimo Corp., et al. v. Apple Inc.,* Case No. 8:20-cv-48 (C.D. Cal.)

Dear Mr. Oldham:

I write in response to your March 4, 2020 letter in the above-titled action (the "Action").

Your letter asserts that during the February 25, 2020 conference of counsel, Apple disputed whether it had reason to know that Marcelo Lamego and Michael O'Reilly had a duty not to disclose Masimo or Cercacor "information" to Apple.  This is a gross oversimplification of the issues at hand.  In fact, as we conveyed on that call, because Masimo and Cercacor have failed to identify their alleged trade secrets with any particularity, and because they have failed to identify any factual basis for Apple to have known that Lamego or O'Reilly had any obligation to maintain secrecy of specific information, Plaintiffs have failed to allege a plausible misappropriation claim against Apple.  Plaintiffs' failure to comply with the basic pleading requirements of Federal Rule of Civil Procedure 8 does not somehow shift the burden to Apple to define what Plaintiffs claim to be confidential information in order to disprove their spurious claim.

Turning to your demands, your sudden expressed concern that "Apple will *continue* to publish Masimo's and Cercacor's confidential information, particularly in patent applications" (emph. added) is belied by the fact that Plaintiffs in this case are asserting that Apple has been misappropriating their trade secrets for roughly *six years*, and yet again, Plaintiffs have never made any effort—before or after filing this lawsuit—to identify any information with sufficient detail for Apple to even identify what was allegedly misappropriated.  Your letter follows the same theme as the Complaint:  without identifying any alleged trade secret information, explaining why Apple would even want or need the information (if it is ever identified), or having a valid basis to question the steps that Apple takes to respect third party rights, you demand that "Apple immediately request non-publication for any pending applications concerning physiological monitoring" that may purportedly contain information from former Masimo or Cercacor (collectively, "Plaintiffs") employees.  Making such a demand without

Exhibit 7
-28-

**GIBSON DUNN**

Perry D. Oldham
March 6, 2020
Page 2

providing any basis for your claims suggests to us that you do not have a basis for the claims, let alone the demand you are making.

In light of Plaintiffs' assertion—both in your letter and in their Complaint (at ¶¶ 185, 187) in the Action—that Apple has supposedly published such information, Plaintiffs should immediately identify (by line and page number) any alleged trade secrets that have been disclosed in any published patent application filed by Apple or in any patent held by Apple. You no doubt already have this information because you must have conducted an investigation before filing a Complaint alleging that Apple disclosed trade secrets in those patent applications and other published patent filings.  If Plaintiffs indeed have a factual basis for these allegations, it is strange that they did not identify this information earlier.

Moreover, because Plaintiffs are required to describe *all* of their allegedly misappropriated secrets pursuant to California Code of Civil Procedure ("CCP") section 2019.210 before they conduct discovery, they should have no issue identifying those secrets now.  In that regard, please provide a full CCP § 2019.210 disclosure immediately.

Additionally, because Plaintiffs assert that other current or former Apple employees previously worked for Masimo or Cercacor, please also identify how any of the alleged trade secret information relates to each of those individuals—*e.g.*, which specific technologies each individual contributed to, what aspects of that technology were advanced by their contributions, etc.  Finally, if Plaintiffs are claiming joint inventorship as to any patent on which these individuals are named inventors, please identify by page and line number (for each patent) which person invented what.

We look forward to Plaintiffs' prompt CCP § 2019.210 disclosure, including the identification of any Masimo and/or Cercacor alleged trade secrets disclosed in any Apple patent application or patent—as well as the identification of the former Masimo or Cercacor employee information requested above.

Sincerely,

H. Mark Lyon

Cc (all by email): Joshua H. Lerner
Joseph R. Re
Stephen C. Jensen
Stephen W. Larson

**Exhibit 7
-29-**

# EXHIBIT 8

# Knobbe Martens

KNOBBE, MARTENS, OLSON & BEAR, LLP

2040 Main St., 14th Fl., Irvine, CA 92614
**T** (949) 760-0404

Perry D. Oldham
Perry.Oldham@knobbe.com

April 17, 2020

H. Mark Lyon
Gibson, Dunn & Crutcher LLP
1881 Page Mill Road, Palo Alto, CA 94304-1211

Re:     Masimo Corp. and Cercacor Laboratories, Inc. v. Apple Inc.

Dear Mark:

We write regarding Plaintiffs' continuing concern that Apple has not confirmed that it will not allow further patent applications to publish or allow other Apple publications that could contain Masimo's and Cercacor's confidential information.  In particular, we seek clarity on two issues, and believe the Court would expect Apple to cooperate because the information sought does not require revealing any confidential information and the information could alleviate any need for a preliminary injunction.

<u>First</u>, does Apple have any pending patent applications that:

       (a)     Concern measurement or tracking of any health-related or physiological information;

       (b)     Name one or more former Masimo or Cercacor employees as an inventor; and

       (c)     Contain information that has not previously published in an Apple patent publication (for example as a related application)?

Continuation applications of applications that previously published (e.g., Application No. 16/700,710) are not within our request.

<u>Second</u>, will Apple agree to seek non-publication under 35 U.S.C. § 122(b)((2)(B)(i) for any new patent application that:

       (a)     Concerns measurement or tracking of any health-related or physiological information;

       (b)     Names one or more former Masimo or Cercacor employees as an inventor; and

       (c)     Contains information that has not previously published in an Apple patent publication?

The answers to these questions will help determine whether the parties have an actual dispute about possible future publication of Plaintiffs' confidential information.

Your recent letter, dated April 2, reiterates assertions Apple made in its prior letter on this subject.  We disagree with Apple's assertions for at least the reasons already explained.

Best regards,

Perry D. Oldham

32603532

Exhibit 8
-30-

# EXHIBIT 9

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

555 Mission Street
San Francisco, CA 94105-0921
Tel 415.393.8200
www.gibsondunn.com

Joshua H. Lerner
Direct: +1 415.393.8254
Fax: +1 415.374.8499
JLerner@gibsondunn.com

03290-00135

April 22, 2020

Perry D. Oldham
Knobbe, Martens, Olson & Bear LLP
2040 Main St., 14th Fl.
Irvine, CA 92614
Perry.Oldham@knobbe.com

Re:     Masimo Corp. and Cercacor Laboratories, Inc. v. Apple Inc.

Dear Mr. Oldham:

Despite Apple's requests, Plaintiffs have not described any of their confidential information yet, let alone provided examples of disclosures of the alleged confidential information in prior applications. Nonetheless, Plaintiffs are seeking yet again to gain access to Apple's confidential information. The Court has now ordered Plaintiffs to comply with Section 2019.210, and Plaintiffs must do so before they may commence any trade secret related discovery.

Your letters also suggest that Plaintiffs' prior employees cannot work within their chosen fields without disclosing Plaintiffs' secrets. That is contrary to California law and Plaintiffs' position is anti-competitive.

Very truly yours,

JHL/akm

Beijing · Brussels · Century City · Dallas · Denver · Dubai · Frankfurt · Hong Kong · Houston · London · Los Angeles · Munich
New York · Orange County · Palo Alto · Paris · San Francisco · São Paulo · Singapore · Washington, D.C.

Exhibit 9
-31-

# EXHIBIT 10

| | |
|---|---|
| **From:** | Mark.Kachner |
| **Sent:** | Thursday, August 6, 2020 7:20 PM |
| **To:** | Lyon, H. Mark |
| **Cc:** | *** Apple-Masimo; Masimo.Apple |
| **Subject:** | Masimo and Cercacor  v. Apple - Apple's patent publications |
| **Attachments:** | 2020-04-17 pdo letter to Lyon.pdf |

Mark,

With the now-entered protective order, will Apple finally answer Plaintiffs' questions (See 2020/04/17 letter from Perry Oldham) regarding whether Apple may allow additional patent applications to publish that list former Masimo or Cercacor employees as inventors, and whether such unpublished applications currently exist?  We will treat Apple's answer as "Highly Confidential – Attorneys' Eyes Only" pursuant to the Protective Order.

Thanks, Mark

**Mark Kachner**
Partner
Mark.Kachner@knobbe.com
310-407-3472 Direct

**Knobbe Martens**
INTELLECTUAL PROPERTY LAW

**five decades. one focus.**
1925 Century Park East, Suite 600
Los Angeles, CA 90067
www.knobbe.com/mark-kachner

**Exhibit 10**
**-32-**

# EXHIBIT 11

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

1881 Page Mill Road
Palo Alto, CA 94304-1211
Tel 650.849.5300
www.gibsondunn.com

H. Mark Lyon
Direct: +1 650.849.5307
Fax: +1 650.849.5007
MLyon@gibsondunn.com

August 13, 2020

**Via E-Mail**

Mark D. Kachner
Knobbe, Martens, Olson & Bear LLP
1925 Century Park East
Suite 600
Los Angeles, CA 90067
Mark.Kachner@knobbe.com

Re:     *Masimo Corp., et al. v. Apple Inc.,* Case No. 8:20-cv-48 (C.D. Cal.)

Dear Mark,

I write in response to your August 6, 2020 email in the above-titled action.

We responded to Plaintiffs' April 17 letter on April 22, 2020.  We remain unaware of any valid basis for your request.  Again, Plaintiffs still (eight months after filing this case) have not identified a single page or line number of an Apple patent filing that allegedly contains Plaintiffs' confidential information.  Instead, Plaintiffs appear to be demanding disclosure of information from Plaintiffs' former employees based on an assumption that Plaintiffs' prior employees will inevitably disclose Plaintiffs' confidential information  (or that Plaintiffs' former employees have some obligation to disclose what they are working on years after their employment with Plaintiffs ended), which is improper.  If you believe there is any basis for your assertion that Plaintiffs' confidential information is allegedly contained in any of Apple's patent filings, please identify by line and page number any subject matter contained in any Apple patent filing that you allege contains Plaintiffs' trade secrets.

Sincerely,

H. Mark Lyon

CC: all counsel of record (by email)

Exhibit 11
-33-

# EXHIBIT 12

# MASIMO CORPORATION
## EMPLOYEE CONFIDENTIALITY AGREEMENT

As an employee of Masimo Corporation, a Delaware corporation ("Masimo") and in consideration of the compensation and benefits from my employment, I agree as follows:

For purposes of this Agreement, the term Confidential Information means any information in any form that Masimo considers confidential, including business plans, customer files, sales and marketing reports, technical data, prices and costs, designs and formulas, software, databases, personnel and payroll records, mailing lists, accounting records, and other business information.

1. During my employment by Masimo, I will not disclose or make use of any Confidential Information except as authorized by Masimo and as necessary for the performance of my duties as a Masimo employee.

2. After my employment with Masimo has terminated, I will not disclose or make use of any Confidential Information for any purpose, either on my own or on behalf of another business.

3. During my employment with Masimo, I will not disclose or make use of any confidential, proprietary or trade secret information or material belonging to a former employer or other third party without the express approval of Masimo and such former employer or other third party.

4. I represent that I am not subject to any agreement(s) with any third party that would prevent me from performing all of my assigned duties as a Masimo employee.

5. Prior to my employment with Masimo, I did not create any inventions, works of authorship, or trade secrets that relate in any way to the business of Masimo, except for those, if any, identified on the list attached to this Agreement as Exhibit A.

6. I agree that the fruits and products of my labor as a Masimo employee shall belong solely to Masimo.

7. I agree to assign and hereby assign to Masimo all rights that I may have to any inventions, works of authorship, developments, improvements, or trade secrets that I may develop during the course of my employment, except for inventions which I am allowed to retain under California Labor Code section 2870, a copy of which is attached to this Agreement as Exhibit B.

8. I agree that all works of authorship to which I contribute during my employment shall be considered "works made for hire" and shall be the sole property of Masimo.

9. I will keep adequate records of all inventions and works of authorship to which I contribute during my employment, and will make such records available to Masimo on request.

10. I will cooperate with Masimo and do whatever is necessary or appropriate to obtain patents, copyrights, or other legal protection on projects to which I contribute, and, if I am incapacitated for any reason from doing so, I hereby authorize Masimo to act as my agent and to take whatever action is needed on my part to carry out this Agreement.

MASA00085602
Exhibit 12
-34-

11. Upon termination of my employment for any reason, I will immediately assemble all property of Masimo in my possession or under my control and return it unconditionally to Masimo.

12. During my employment, I will devote all of my working time and energy to the business of Masimo, and I will not render services to anyone outside Masimo, accept competing employment, or make preparations to compete with Masimo.

13. During and after my employment, I will not solicit or induce any employee or consultant of Masimo to quit their employment or cease doing business with Masimo, unless I am specifically authorized to do so by Masimo.

14. I agree that a violation of this Agreement may cause irreparable harm to Masimo's reputation, customer relationships, and other aspects of its business for which an award of money damages would be inadequate. I therefore agree that Masimo shall be entitled to a court order as appropriate to prevent me from violating this Agreement, in addition to any claims for money damages or other relief.

15. For purposes of enforcing this Agreement, I hereby consent to jurisdiction in the Superior Court of California for the County of Orange, as well as any other jurisdiction allowed by law.

16. This Agreement shall be governed by California law.

17. I understand that my obligations under this Agreement remain in effect even after my employment with Masimo terminates.

18. This Agreement does not guarantee me any term of employment or limit my or Masimo's right to terminate my employment at any time, with or without cause.

19. If any provision of this Agreement is invalid, all other provisions shall remain in effect.

20. This Agreement is binding on my successors and assigns, and will benefit the successors and assigns of Masimo.

21. This Agreement represents my entire agreement with Masimo with respect to the subject matter herein and in particular with respect to confidential, proprietary and trade secret information and materials and intellectual property rights, superseding any previous oral or written understandings or agreements with Masimo or any of its officers. This Agreement may be amended or modified only in writing signed by all the parties hereto.

MASIMO CORPORATION

By: MARCELO M. LAMEGO    Signature: _____

Title: ALGORITHM ENGINEER    Name: NR MGR

Date: 6-26-2000

g:\adm\word\nda's\employee.doc
5/20/98

2

MASA00085603
**Exhibit 12**
-35-

EXHIBIT A

LIST OF PRIOR INVENTIONS
AND ORIGINAL WORKS OF AUTHORSHIP*

| Title | Date | Identifying Number or Brief Description |
|---|---|---|

SEE ENClOSED List.

Name of Employee: MARCELo M. LAMESO

* If there are none, so state.

3

MASA00085604
Exhibit 12
-36-

## EXHIBIT B

### CALIFORNIA LABOR CODE SECTION 2870
### EMPLOYMENT AGREEMENTS; ASSIGNMENT OF RIGHTS

"(a) Any provision in an employment agreement which provides that an employee shall assign or offer to assign any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1) Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer.

(2) Result from any work performed by the employee for the employer.

(b) To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable."

4

MASA00085605

**Exhibit 12**
**-37-**

## Publications

### *Journals*

1. *Modeling and Simulation of Complex Industrial Processes*; Marcos Vescovi, Marcelo M. **Lamego**, Adam Farquhar; IEEE Expert Magazine: Qualitative Reasoning Special Issue, IEEE Computer Society; Vol. 12, Issue 3, pp. 42-6; May-Jun. 1997.
2. *Low Cost HPF Electronic Ballast*; Ricardo O. Brioschi, Marcelo M. **Lamego**, Jose Luiz F. Vieira; Journal of the Brazilian Automation Society (Controle & Automacao - Revista da Sociedade Brasileira de Automatica); Vol. 9, Issue 3, pp. 149-55; Sep./Oct./Nov./Dec. 1998; Brazil. (Portuguese)
3. *Eletronic Ballast with Constant DC Link Voltage*; Ricardo O. Brioschi, Marcelo M. **Lamego**, Jose Luiz F. Vieira; Journal of the Brazilian Power Electronics Society (Revista da Sociedade Brasileira de Eletronica de Potencia); Vol. 3, Issue 1, pp. 16-21; Nov. 1998; Brazil. (Portuguese)
4. *Quantification of Air Pollution Sources*; Marcelo M. **Lamego**, Paulo A. de Souza Jr., Edson P. Ferreira, Vijayendra K. Garg; Journal of the Brazilian Automation Society (Controle & Automacao - Revista da Sociedade Brasileira de Automatica) (to be published)
5. *Adaptive Structures with Algebraic Loops*; Marcelo M. **Lamego**; Transactions on Neural Networks, IEEE, date received: 09/09/1999 (accepted, in review process)
6. *Neurointerfaces*; Bernard Widrow, Marcelo M. **Lamego**, Edson P. Ferreira; Control Engineering Practice, IFAC - International Federation of Automatic Control, date received: 12/08/99 (paper selected from the 14th IFAC World Congress, in review process)

### *Proceedings of International Conferences*

1. *Neurointerfaces: Principles*; Bernard Widrow and Marcelo M. **Lamego**; IEEE International Symposium 2000 on Adaptive Systems for Signal Processing, Communication and Control; Lake Louise, Alberta, Canada, October 2000. (paper submitted)
2. *Neurointerfaces: Applications*; Bernard Widrow and Marcelo M. **Lamego**; IEEE International Symposium 2000 on Adaptive Systems for Signal Processing, Communication and Control; Lake Louise, Alberta, Canada, October 2000. (paper submitted)
3. *Neurointerfaces: Learning by Genetic Algorithms*; Marcelo M. **Lamego**, Edson P. Ferreira, Bernard Widrow; in: Proceedings of the 14th World Congress, IFAC - International Federation of Automatic Control; Beijing, P. R. China; Jul. 1999; published by Elsevier Science Ltd., Oxford, UK.
4. *Neurointerfaces for Semi-autonomous Object Moving Systems*; Edson P. Ferreira, Marcelo M. **Lamego**, Bernard Widrow; in: Proceedings of the 14th World Congress, IFAC - International Federation of Automatic Control; Beijing, P. R. China; Jul. 1999; published by Elsevier Science Ltd., Oxford, UK.
5. *Linear Programming Applied to Identification of Air Pollution Sources: a Case Study*; Marcelo M. **Lamego**, Paulo A. de Souza Jr., Edson P. Ferreira, Vijayendra K. Garg; in: Proceedings of the 14th World Congress, IFAC - International Federation of Automatic Control; Beijing, P. R. China; Jul. 1999; published by Elsevier Science Ltd., Oxford, UK.
6. *Neurointerfaces for Human-machine Real Time Interaction*; Bernard Widrow, Edson P. Ferreira, Marcelo M. **Lamego**; in: Proceedings of the 5th Workshop on Algorithms and Architectures for Real-Time Control - AARTC'98, IFAC - International Federation of Automatic Control; Cancun, Mexico; pp. 131-36; Apr. 1998; published by Elsevier Science Ltd., Oxford, UK.
7. *Adaptive Inverse Control Based on Nonlinear Adaptive Filtering*; Bernard Widrow, Gregory Plett, Edson P.Ferreira, Marcelo M. **Lamego**; in: Proceedings of the 5th Workshop on Algorithms and Architectures for Real Time Control - AARTC'98, IFAC - International

Federation of Automatic Control, Cancun, Mexico, Apr. 1998, pp. 247-52; published by Elsevier Science Ltd., Oxford, UK. (Invited Paper)

8.  *Self Consistent Analysis of Nuclear Gamma Resonant and its Industrial Applications*; Paulo A. De Souza, Marcelo M. **Lamego**, O. D. Rodrigues, Vijayendra K. Garg; in: Proceedings of the 41st Midwest Symposium on Circuits and Systems - IEEE, University of Notre Dame; IN, USA; Aug. 1998.

9.  *A Single Phase Microcontroller Based Energy Meter*; Paulo A. V. Loss, Marcelo M. **Lamego**, Gilberto C. D.Souza, Jose Luiz F. Vieira; in: Proceedings of the Instrumentation and Measurement Technology Conference - IEEE, May 1998, pp. 797-800, Vol. 2.

10. *A Low Cost High Power Factor Electronic Ballast*; Ricardo O. Brioschi, Marcelo M. **Lamego**, Jose L.F. Vieira; in: Proceedings of the 32nd Annual Conference of IEEE Industrial Applications Society; New Orleans, LA, USA; pp. 2360-5, Vol. 3; Oct. 1997.

11. *Constant DC Link Voltage HPF Electronic Ballast*; Ricardo O. Brioschi, Marcelo M. **Lamego**, Jose L.F. Vieira; in: Proceedings of the 32nd Annual Conference of IEEE Industrial Applications Society; New Orleans, LA, USA; pp. 2353-9, Vol. 3; Oct. 1997.

12. *A New Receptor Model in the Analysis of Industrial Pollution Using Fuzzy Set Systems*; Paulo A. Souza Jr., Marcelo M. **Lamego**, Sidney N. Givigi Jr., Vijayendra K. Garg; in: Proceedings of the 40th Midwest Symposium on Circuits and Systems - IEEE; Sacramento, CA, USA; pp. 663-5, Vol. I., Aug. 1997.

13. *Applications of Fuzzy Logic in the Analysis of 57Fe Mossbauer Spectra*; Paulo A. de Souza Junior, Marcelo M. **Lamego**, Vijayendra K. Garg; in: Proceedings of the 39th Midwest Symposium on Circuits and Systems - IEEE; Iowa, USA; pp. 569-72, Vol. 2; Aug. 1996.

14. *The Interval Based Control: A New Approach*; Marcelo Malini **Lamego**, J. Peter Rey; in: Proceedings of the 21st Annual Conference of IEEE Industrial Electronics Society; Orlando, Florida, USA; pp. 1561-5, Vol. 2; Nov. 1995.

15. *Interval Based Control Technique: Controlling Physical Systems Through Imprecise Models*; Marcelo M. **Lamego**, J. Peter Rey; in: Proceedings of the 30th Annual Conference of IEEE Industrial Applications Society; Orlando, Florida, USA; pp. 1822-7, Vol. 2; Oct. 1995.

16. *The Interval Based Control: Working With Imprecise Information*; Marcelo M. **Lamego**, Fransergio L. da Cunha, J. Peter Rey; in: Proceedings of the 38th Midwest Symposium on Circuits and Systems - IEEE; Rio de Janeiro, Brazil; pp. 413-6, Vol. 1; Aug. 1995.

17. *The Interval Based Control Technique*; Marcelo M. **Lamego**, J. Peter Rey; in: Proceedings of the 10th International Conference on Application of Artificial Intelligence in Engineering - AIENG95; Udine, Italy; Jul. 1995.

18. *Extremities PID Controller: A Novel Conception - Robustness and Performance Improving Through Extremities Fuzzy Arithmetics*; Cristiano Dalvi, Marcelo M. **Lamego**, J. Peter Rey, Marcos Regis Vescovi, Edson de Paula Ferreira; in: Proceedings of the 10th Brazilian Automation Conference (Congresso Brasileiro de Automatica); Rio de Janeiro, Brazil; pp. 1072-7; Set. 1994.

19. *Extremities PID Controller - A Numerical Based Fuzzy Approach*; Marcelo M. **Lamego**, Cristiano Dalvi, J.Peter Rey, Marcos Regis Vescovi, Edson de Paula Ferreira; in: Proceedings of the 9th International Conference on Application of Artificial Intelligence in Engineering - AIENG94; Penn State Great Valle, PA, USA; Jul. 1994.

20. *A Numerical Based Fuzzy PID Controller Applied to DC Drive*; Marcelo M. **Lamego**, Cristiano Dalvi, J.Peter Rey, Marcos Regis Vescovi, Edson de Paula Ferreira; in: Proceedings of the IEEE International Symposium on Industrial Electronics; Santiago, Chile; pp. 429-34; May 1994.

21. *Qualitative Fuzzy Simulation of Complex Processes: Application to an Iron Ore Sintering Plant*; Marcos Vescovi,L. Trave-Massuyes, Marcelo M. **Lamego**, Cristiano Dalvi, Edson de Paula Ferreira; in: Proceedings of the IJCAI-93 Workshop - Engineering Problems for Qualitative Reasoning; Chambery, France; Aug. 1993.

22. *Qualitative Interval (or Fuzzy) Simulation of Complex Continuous Processes: Fitting Information Availability and Accuracy Requirements*; Marcos Vescovi, L. Trave-Massuyes, Marcelo M. **Lamego**, Cristiano Dalvi, Edson de Paula Ferreira; in: Proceedings of the 8th International Conference on Application of Artificial Intelligence in Engineering - AIENG93; Toulouse, France; pp. 279-89; May 1993.

23. *Numerical Based Qualitative Fuzzy Simulation: an Extension for Piecewise Linear Systems*; Marcos Regis Vescovi, Marcelo M. **Lamego**, Cristiano Dalvi, Hans Rolf Kulitz; in: proceedings of the 9th Brazilian Automation Conference (Congresso Brasileiro de Automatica); Vitoria, ES, Brazil, pp. 828-33, Set. 1992.
24. *FTD - A Fuzzy Diagnosis Tool*; Marcos Regis Vescovi, Jean-Philippe Robles, Hans Rolf Kulitz, Cristiano Dalvi, Marcelo M. **Lamego**; in: Proceedings of the 9th Brazilian Automation Conference (Congresso Brasileiro de Automatica); Vitoria, ES, Brazil; pp. 834-9; Set. 1992.
25. *Hot Ductility Test and its Applications*; Geraldo Iran S. L. Cardoso, Sergio Leite Lopes, Cristiano Dalvi, Marcelo M. **Lamego**; in: Proceedings of the XLVII Annual Meeting of the Brazilian Metallurgy Society; Rio de Janeiro, Brazil; pp. 345-6; Jul. 1993. (Portuguese)

## Patent Applications

1. *Neurointerfaces for Human Control of Complex Machinery*; Bernard Widrow & Marcelo M. **Lamego**; US Patent Office, Filed on January 2000.
2. *Hot Ductility Test Machine*; Geraldo S. L. Iran, Sergio L. Lopes, Cristiano Dalvi, Marcelo M. **Lamego**; Brazilian Patent Office (INPI - Instituto Nacional da Propriedade Industrial); PI9704161-0, Brazil. (Portuguese)
3. *Switched Amplifier for Audio Applications*; Marcelo M. **Lamego** & Cristiano Dalvi; Brazilian Patent Office (INPI - Instituto Nacional da Propriedade Industrial); PI9103746, 08/22/91, Published on 03/30/93, Intl. Class.: H03F 3/20, Brazil. (Portuguese)

## MASIMO CORPORATION
## EMPLOYEE CONFIDENTIALITY AGREEMENT

As an employee of Masimo Corporation, a Delaware corporation ("Masimo") and in consideration of the compensation and benefits from my employment, I agree as follows:

For purposes of this Agreement, the term Confidential Information means any information in any form that Masimo considers confidential, including business plans, customer files, sales and marketing reports, technical data, prices and costs, designs and formulas, software, databases, personnel and payroll records, mailing lists, accounting records, and other business information.

1. During my employment by Masimo, I will not disclose or make use of any Confidential Information except as authorized by Masimo and as necessary for the performance of my duties as a Masimo employee.

2. After my employment with Masimo has terminated, I will not disclose or make use of any Confidential Information for any purpose, either on my own or on behalf of another business.

3. During my employment with Masimo, I will not disclose or make use of any confidential, proprietary or trade secret information or material belonging to a former employer or other third party without the express approval of Masimo and such former employer or other third party.

4. I represent that I am not subject to any agreement(s) with any third party that would prevent me from performing all of my assigned duties as a Masimo employee.

5. Prior to my employment with Masimo, I did not create any inventions, works of authorship, or trade secrets that relate in any way to the business of Masimo, except for those, if any, identified on the list attached to this Agreement as Exhibit A.

6. I agree that the fruits and products of my labor as a Masimo employee shall belong solely to Masimo.

7. I agree to assign and hereby assign to Masimo all rights that I may have to any inventions, works of authorship, developments, improvements, or trade secrets that I may develop during the course of my employment, except for inventions which I am allowed to retain under California Labor Code section 2870, a copy of which is attached to this Agreement as Exhibit B.

8. I agree that all works of authorship to which I contribute during my employment shall be considered "works made for hire" and shall be the sole property of Masimo.

9. I will keep adequate records of all inventions and works of authorship to which I contribute during my employment, and will make such records available to Masimo on request.

10. I will cooperate with Masimo and do whatever is necessary or appropriate to obtain patents, copyrights, or other legal protection on projects to which I contribute, and, if I am incapacitated for any reason from doing so, I hereby authorize Masimo to act as my agent and to take whatever action is needed on my part to carry out this Agreement.

11. Upon termination of my employment for any reason, I will immediately assemble all property of Masimo in my possession or under my control and return it unconditionally to Masimo.

MASA00085609

**Exhibit 12**
**-41-**

12. During my employment, I will devote all of my working time and energy to the business of Masimo, and I will not render services to anyone outside Masimo, accept competing employment, or make preparations to compete with Masimo.

13. During my employment and for a period of five years after termination of my employment, I will not solicit or induce any employee or consultant of Masimo to quit their employment or cease doing business with Masimo, unless I am specifically authorized to do so by Masimo.

14. I agree that a violation of this Agreement may cause irreparable harm to Masimo's reputation, customer relationships, and other aspects of its business for which an award of money damages would be inadequate. I therefore agree that Masimo shall be entitled to a court order as appropriate to prevent me from violating this Agreement, in addition to any claims for money damages or other relief.

15. For purposes of enforcing this Agreement, I hereby consent to jurisdiction in the Superior Court of California for the County of Orange, as well as any other jurisdiction allowed by law.

16. This Agreement shall be governed by California law.

17. I understand that my obligations under this Agreement remain in effect even after my employment with Masimo terminates.

18. This Agreement does not guarantee me any term of employment or limit my or Masimo's right to terminate my employment at any time, with or without cause.

19. If any provision of this Agreement is invalid, all other provisions shall remain in effect.

20. This Agreement is binding on my successors and assigns, and will benefit the successors and assigns of Masimo.

21. This Agreement represents my entire agreement with Masimo with respect to the subject matter herein and in particular with respect to confidential, proprietary and trade secret information and materials and intellectual property rights, superseding any previous oral or written understandings or agreements with Masimo or any of its officers. This Agreement may be amended or modified only in writing signed by all the parties hereto.


MASIMO CORPORATION

By: _____

Title: _____

Signature: _____

Name: _____

Date: ___01/28/2003___


g:\adm\word\nda's\employee.doc

2

EXHIBIT A

LIST OF PRIOR INVENTIONS
AND ORIGINAL WORKS OF AUTHORSHIP*

| Title | Date | Identifying Number or Brief Description |
|-------|------|------------------------------------------|
|       |      |                                          |

Name of Employee: _____

* If there are none, so state.

3

MASA00085611
**Exhibit 12**
**-43-**

## EXHIBIT B

### CALIFORNIA LABOR CODE SECTION 2870
### EMPLOYMENT AGREEMENTS; ASSIGNMENT OF RIGHTS

"(a) Any provision in an employment agreement which provides that an employee shall assign or offer to assign any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1) Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer.

(2) Result from any work performed by the employee for the employer.

(b) To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable."

4

## MASIMO EMPLOYEE CONFIDENTIALITY AGREEMENT

As an employee of Masimo Corporation, a Delaware corporation ("Masimo"), and in consideration of the compensation and benefits from my employment, I agree as follows:

For purposes of this Agreement, the term Confidential Information means any information in any form that Masimo considers confidential, including without limitation business plans, customer files, sales and marketing reports, technical data, prices and costs, designs and formulas, software, databases, personnel and payroll records, mailing lists, accounting records, and other business information. Confidential Information also includes information to which I am exposed during the course of my employment with Masimo that is considered confidential to Masimo's affiliates or any third party.

1.  During my employment by Masimo, I will not disclose or make use of any Confidential Information except as authorized by Masimo and as necessary for the performance of my duties as a Masimo employee.

2.  After my employment with Masimo has terminated, I will not disclose or make use of any Confidential Information for any purpose, either on my own or on behalf of another business.

3.  During my employment with Masimo, I will not disclose or make use of any confidential, proprietary or trade secret information or material belonging to a former employer or other third party without the express approval of Masimo and such former employer or other third party.

4.  I represent that I am not subject to any agreement(s) with any third party that would prevent me from performing all of my assigned duties as a Masimo employee.

5.  Prior to my employment with Masimo, I did not create any inventions, works of authorship, or trade secrets that relate in any way to the business of Masimo, except for those, if any, identified on the list attached to this Agreement as Exhibit A.

6.  I agree that the fruits and products of my labor as a Masimo employee shall belong solely to Masimo.

7.  I agree to assign and hereby assign to Masimo all rights that I may have to any inventions, works of authorship, developments, improvements, or trade secrets that I may develop during the course of my employment, except for inventions which I am allowed to retain under California Labor Code section 2870, a copy of which is attached to this Agreement as Exhibit B.

8.  I agree that all works of authorship to which I contribute during my employment shall be considered "works made for hire" and shall be the sole property of Masimo.

9.  I will keep adequate records of all inventions and works of authorship to which I contribute during my employment, and will make such records available to Masimo on request.

10. I will cooperate with Masimo and do whatever is necessary or appropriate to obtain patents, copyrights, or other legal protection on projects to which I contribute, and, if I am incapacitated for any reason from doing so, I hereby authorize Masimo to act as my agent and to take whatever action is needed on my part to carry out this Agreement.

11. Upon termination of my employment for any reason, I will immediately assemble all property of Masimo in my possession or under my control and return it unconditionally to Masimo.

12. During my employment, I will devote all of my working time and energy to the business of Masimo, and I will not render services to anyone outside Masimo, accept competing employment, or make preparations to compete with Masimo.

1

13. During my employment and for a period of five (5) years immediately following termination of my employment with Masimo, I will not (a) solicit or induce any employee or consultant of Masimo to quit their employment or cease doing business with Masimo, or (b) solicit Masimo's customers or suppliers, unless I am specifically authorized to do (a) or (b) by Masimo.

14. I agree that, during the term of my employment and for a period of two (2) years immediately following my termination of employment with Masimo (voluntary or otherwise), I shall be prohibited from competing with any business, product or service of Masimo.

15. I agree that the activities forbidden in paragraphs 13 and 14 above would necessarily involve the use or disclosure of Masimo's trade secrets and proprietary and confidential information and are necessary to protection of Masimo's trade secrets and proprietary and confidential information. I understand that none of my activities will be prohibited under paragraphs 13 and 14 to the extent that I can prove that the action was taken without the use or disclosure of any of Masimo's trade secrets or proprietary or confidential information.

16. I agree that a violation of this Agreement may cause irreparable harm to Masimo's reputation, customer relationships, and other aspects of its business for which an award of money damages would be inadequate. I therefore agree that Masimo shall be entitled to a court order as appropriate to prevent me from violating this Agreement, in addition to any claims for money damages or other relief.

17. For purposes of enforcing this Agreement, I hereby consent to jurisdiction in the Superior Court of California for the County of Orange, as well as any other jurisdiction allowed by law.

18. This Agreement shall be governed by the law of the state in which I reside, or Delaware if I reside outside the United States.

19. I understand that my obligations under this Agreement remain in effect even after my employment with Masimo terminates.

20. This Agreement does not guarantee me any term of employment or limit my or Masimo's right to terminate my employment at any time, with or without cause.

21. The laws of each state differ. Thus, if any provision of this Agreement is invalid or not permitted in your particular state of residence, all other provisions shall remain in effect.

22. This Agreement is binding on my successors and assigns, and will benefit the successors and assigns of Masimo.

23. This Agreement represents my entire agreement with Masimo with respect to the subject matter herein and in particular with respect to confidential, proprietary and trade secret information and materials and intellectual property rights, superseding any previous oral or written understandings or agreements with Masimo or any of its officers. This Agreement may be amended or modified only in writing signed by all the parties hereto.

MASIMO

By: _Quinn Davis_

Name: _Quinn Davis_

Title: _HR Admin_

Signature: _[signature]_

Name: _MARCELO LAMEGO_

Date: _01/31/05_

2

MASA00085614

**Exhibit 12**

**-46-**

EXHIBIT A

### LIST OF PRIOR INVENTIONS
### AND ORIGINAL WORKS OF AUTHORSHIP*

| Title | Date | Identifying Number or Brief Description |
|-------|------|------------------------------------------|
|       |      |                                          |

Name of Employee: _____

\* If there are none, so state.

3

MASA00085615
**Exhibit 12**
**-47-**

EXHIBIT B

## CALIFORNIA LABOR CODE SECTION 2870
## EMPLOYMENT AGREEMENTS; ASSIGNMENT OF RIGHTS

"(a) Any provision in an employment agreement which provides that an employee shall assign or offer to assign any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1) Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer.

(2) Result from any work performed by the employee for the employer.

(b) To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable."

4

## MASIMO LABS EMPLOYEE CONFIDENTIALITY AGREEMENT
### (United States)

As an employee of Masimo Laboratories, a Delaware corporation ("Masimo Labs") and in consideration of the compensation and benefits from my employment, I agree as follows:

For purposes of this Agreement, the term Confidential Information means any information in any form that Masimo Labs considers confidential, including without limitation business plans, customer files, customer lists, supplier lists, sales and marketing reports, forecasts, strategies, technical data, prices and costs, designs and formulas, discoveries, processes, manufacturing techniques, know-how, improvements, ideas or copyrightable works, software, databases, personnel and payroll records, mailing lists, accounting records, works of authorship, inventions, trade secrets and other business information. Confidential Information also includes information to which I am exposed during the course of my employment with Masimo Labs that is considered confidential to Masimo Labs' affiliates or any third party.

1.   During my employment by Masimo Labs, I will not disclose or make use of any Confidential Information except as authorized by Masimo Labs and as necessary for the performance of my duties as a Masimo Labs employee.

2.   After my employment with Masimo Labs has terminated, I will not disclose or make use of any Confidential Information for any purpose, either on my own or on behalf of another business.

3.   During my employment with Masimo Labs, I will not disclose or make use of any confidential, proprietary or trade secret information or material belonging to a former employer or other third party without the express approval of Masimo Labs and such former employer or other third party.

4.   I represent that I am not subject to any agreement(s) with any third party that would prevent me from performing all of my assigned duties as a Masimo Labs employee.

5.   Prior to my employment with Masimo Labs, I did not create any inventions, works of authorship, or trade secrets that relate in any way to the business of Masimo Labs, except for those, if any, identified on the list attached to this Agreement as Exhibit A.

6.   I agree that the fruits and products of my labor as a Masimo Labs employee shall belong solely to Masimo Labs.

7.   I agree to assign and hereby assign to Masimo Labs all rights that I may have to any inventions, works of authorship, developments, improvements, or trade secrets that I may develop during the course of my employment, except for inventions which I am allowed to retain under California Labor Code section 2870, a copy of which is attached to this Agreement as Exhibit B.

8.   I agree that all works of authorship to which I contribute during my employment shall be considered "works made for hire" and shall be the sole property of Masimo Labs.

9.   I will keep adequate records of all inventions and works of authorship to which I contribute during my employment, and will make such records available to Masimo Labs on request.

10. I will cooperate with Masimo Labs and do whatever is necessary or appropriate to obtain patents, copyrights, or other legal protection on projects to which I contribute, and, if I am incapacitated for any reason from doing so, I hereby authorize Masimo Labs to act as my agent and to take whatever action is needed on my part to carry out this Agreement.

11. Upon termination of my employment for any reason, I will immediately assemble all property of Masimo Labs, including any proprietary or confidential information, in my possession or under my control and return it unconditionally to Masimo Labs.

1

12. During my employment, I will devote all of my working time and energy to the business of Masimo Labs, and I will not render services to anyone outside Masimo Labs, accept competing employment, or make preparations to compete with Masimo Labs.

13. During my employment and for a period of five (5) years immediately following termination of my employment with Masimo Labs, I will not (a) solicit or induce any employee or consultant of Masimo Labs to quit their employment or cease doing business with Masimo Labs, or (b) solicit Masimo Labs' customers or suppliers, unless I am specifically authorized to do (a) or (b) by Masimo Labs.

14. I agree that, during the term of my employment and for a period of two (2) years immediately following my termination of employment with Masimo Labs (voluntary or otherwise), I shall be prohibited from competing with any business, product or service of Masimo Labs.

15. I agree that the activities forbidden in paragraphs 13 and 14 above would necessarily involve the use or disclosure of Masimo Labs' trade secrets and proprietary and confidential information and are necessary to protection of Masimo Labs' trade secrets and proprietary and confidential information. I understand that none of my activities will be prohibited under paragraphs 13 and 14 to the extent that I can prove that the action was taken without the use or disclosure of any of Masimo Labs' trade secrets or proprietary or confidential information.

16. I agree that a violation of this Agreement may cause irreparable harm to Masimo Labs' reputation, customer relationships, and other aspects of its business for which an award of money damages would be inadequate. I therefore agree that Masimo Labs shall be entitled to a court order as appropriate to prevent me from violating this Agreement, in addition to any claims for money damages or other relief.

17. For purposes of enforcing this Agreement, I hereby consent to jurisdiction in the Superior Court of California for the County of Orange, as well as any other jurisdiction allowed by law.

18. This Agreement shall be governed by the law of the state in which I reside, or Delaware if I reside outside the United States.

19. I understand that my obligations under this Agreement remain in effect even after my employment with Masimo Labs terminates.

20. This Agreement does not guarantee me any term of employment or limit my or Masimo Labs' right to terminate my employment at any time, with or without cause.

21. The laws of each state differ. Thus, if any provision of this Agreement is invalid or not permitted in your particular state of residence, all other provisions shall remain in effect.

22. This Agreement is binding on my successors and assigns, and will benefit the successors and assigns of Masimo Labs.

23. This Agreement represents my entire agreement with Masimo Labs with respect to the subject matter herein and in particular with respect to confidential, proprietary and trade secret information and materials and intellectual property rights, superseding any previous oral or written understandings or agreements with Masimo Labs or any of its officers. This Agreement may be amended or modified only in writing signed by all the parties hereto.

MASIMO LABS

By: _Dawejcule_

Name: _KAMILA MACIEJEWSKA_

Title: _Office Manager_

Signature: _[signature]_

Name: _MARCELO LAMEGO_

Date: _5/19/09_

2

EXHIBIT A

LIST OF PRIOR INVENTIONS
AND ORIGINAL WORKS OF AUTHORSHIP*

| Title | Date | Identifying Number or Brief Description |
|-------|------|------------------------------------------|
| NONE | | |

Name of Employee: _MARLEW LAMELO_

* If there are none, so state.

3

MASA00085619

**Exhibit 12**
-51-

EXHIBIT B

CALIFORNIA LABOR CODE SECTION 2870
EMPLOYMENT AGREEMENTS; ASSIGNMENT OF RIGHTS

"(a) Any provision in an employment agreement which provides that an employee shall assign or offer to assign any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1) Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer.

(2) Result from any work performed by the employee for the employer.

(b) To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable."

4

MASA00085620

**Exhibit 12**
**-52-**

# EXHIBIT 13

U̲NITED S̲TATES P̲ATENT AND T̲RADEMARK̲ O̲FFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | ISSUE DATE | PATENT NO. | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 14/621,268 | 03/05/2019 | 10219754 | P22879US1 | 6317 |

62579      7590      02/13/2019

APPLE INC./BROWNSTEIN
c/o Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, CO 80202

# ISSUE NOTIFICATION

The projected patent number and issue date are specified above.

**Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)**
(application filed on or after May 29, 2000)

The Patent Term Adjustment is 0 day(s). Any patent to issue from the above-identified application will include an indication of the adjustment on the front page.

If a Continued Prosecution Application (CPA) was filed in the above-identified application, the filing date that determines Patent Term Adjustment is the filing date of the most recent CPA.

Applicant will be able to obtain more detailed information by accessing the Patent Application Information Retrieval (PAIR) WEB site (http://pair.uspto.gov).

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Application Assistance Unit (AAU) of the Office of Data Management (ODM) at (571)-272-4200.

APPLICANT(s)  (Please see PAIR WEB site http://pair.uspto.gov for additional applicants):

Marcelo M. Lamego, Cupertino, CA;
Apple Inc., Cupertino, CA;

The United States represents the largest, most dynamic marketplace in the world and is an unparalleled location for business investment, innovation, and commercialization of new technologies. The USA offers tremendous resources and advantages for those who invest and manufacture goods here. Through SelectUSA, our nation works to encourage and facilitate business investment. To learn more about why the USA is the best country in the world to develop technology, manufacture products, and grow your business, visit SelectUSA.gov.

IR103 (Rev. 10/09)

**Exhibit 13**
**-53-**

PTO/SB/47 (03-09)
Approved for use through 05/31/2015. OMB 0651-0016
U.S. Patent and Trademark Office; U. S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## "FEE ADDRESS" INDICATION FORM

Address to:                                                Fax to:
**Mail Stop M Correspondence**                            **571-273-6500**
**Commissioner for Patents**              - OR -
**P.O. Box 1450**
**Alexandria, VA 22313-1450**

**INSTRUCTIONS:** The issue fee must have been paid for application(s) listed on this form.  In addition, only an address represented by a Customer Number can be established as the fee address for maintenance fee purposes (hereafter, fee address).  A fee address should be established when correspondence related to maintenance fees should be mailed to a different address than the correspondence address for the application. **When to check the first box below:** If you have a Customer Number to represent the fee address.  **When to check the second box below:** If you have no Customer Number representing the desired fee address, in which case a completed Request for Customer Number (PTO/SB/125) must be attached to this form.  For more information on Customer Numbers, see the Manual of Patent Examining Procedure (MPEP) § 403.

For the following listed application(s), please recognize as the "Fee Address" under the provisions of 37 CFR 1.363 the address associated with:

[✔] Customer Number:    **000197**

*OR*

[ ] The attached Request for Customer Number (PTO/SB/125) form.

| PATENT NUMBER (if known) | APPLICATION NUMBER |
|---|---|
|  | 14/621,268 |

Completed by (check one):

[ ] Applicant/Inventor

[✔] Attorney or Agent of record  36,232
        (Reg. No.)

[ ] Assignee of record of the entire interest. See 37 CFR 3.71.
Statement under 37 CFR 3.73(b) is enclosed.
(Form PTO/SB/96)

[ ] Assignee recorded at Reel _____ Frame_____

/Gregory W. Osterloth/
        Signature

Gregory W. Osterloth
    Typed or printed name

303-223-1100
  Requester's telephone number

January 17, 2019
      Date

NOTE: Signatures of all the inventors or assignees of record of the entire interest or their representative(s) are required. Submit multiple forms if more that one signature is required, see below*.

[ ]  * Total of _____forms are submitted.

This collection of information is required by 37 CFR 1.363.  The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 5 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA  22313- 1450.  DO NOT SEND COMPLETED FORMS TO THIS ADDRESS.
**SEND TO:  Mail Stop M Correspondence, Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

Exhibit 13
-54-

## Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | 14621268 |
| **Filing Date:** | 12-Feb-2015 |
| **Title of Invention:** | Modulation and Demodulation Techniques for a Health Monitoring System |
| **First Named Inventor/Applicant Name:** | Marcelo M. Lamego |
| **Filer:** | Gregory W. Osterloth/Valerie Brown |
| **Attorney Docket Number:** | P22879US1 |

Filed as Large Entity

**Filing Fees for** Utility under 35 USC 111(a)

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |
| **Post-Allowance-and-Post-Issuance:** | | | | |
| UTILITY APPL ISSUE FEE | 1501 | 1 | 1000 | 1000 |

Exhibit 13
-55-

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Extension-of-Time:** | | | | |
| **Miscellaneous:** | | | | |
| | | | **Total in USD ($)** | **1000** |

Exhibit 13
-56-

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 34893159 |
| **Application Number:** | 14621268 |
| **International Application Number:** | |
| **Confirmation Number:** | 6317 |
| **Title of Invention:** | Modulation and Demodulation Techniques for a Health Monitoring System |
| **First Named Inventor/Applicant Name:** | Marcelo M. Lamego |
| **Customer Number:** | 62579 |
| **Filer:** | Gregory W. Osterloth/Valerie Brown |
| **Filer Authorized By:** | Gregory W. Osterloth |
| **Attorney Docket Number:** | P22879US1 |
| **Receipt Date:** | 17-JAN-2019 |
| **Filing Date:** | 12-FEB-2015 |
| **Time Stamp:** | 22:27:52 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | CARD |
| Payment was successfully received in RAM | $1000 |
| RAM confirmation Number | 011819INTEFSW22282400 |
| Deposit Account | |
| Authorized User | |
| The Director of the USPTO is hereby authorized to charge indicated fees and credit any overpayment as follows: | |

Exhibit 13
-57-

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Issue Fee Payment (PTO-85B) | P22879US1IssueFeeTransmittal .pdf | 598846 <br><br> 1516e35e18cef148477da282a6cca1593a46 482b | no | 1 |
| Warnings: | | | | | |
| Information: | | | | | |
| 2 | Maintenance Fee Address Change | P22879USFeeAddress.pdf | 108346 <br><br> 2073c734d7de8709730e69a1387b5da410 53634a | no | 1 |
| Warnings: | | | | | |
| Information: | | | | | |
| 3 | Fee Worksheet (SB06) | fee-info.pdf | 30582 <br><br> c803681f069f4cb5be62261a3aaa39ac69cf9 52b1 | no | 2 |
| Warnings: | | | | | |
| Information: | | | | | |
| | | **Total Files Size (in bytes):** | 737774 | | |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

Exhibit 13
-58-

PART B - FEE(S) TRANSMITTAL

Complete and send this form, together with applicable fee(s), to: __Mail__

Mail Stop ISSUE FEE
Commissioner for Patents
P.O. Box 1450
Alexandria, Virginia 22313-1450

or __Fax__   (571)-273-2885

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

62579      7590      10/19/2018

APPLE INC./BROWNSTEIN
c/o Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, CO 80202

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

Certificate of Mailing or Transmission
I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being facsimile transmitted to the USPTO (571) 273-2885, on the date indicated below.

_____ (Depositor's name)

_____ (Signature)

_____ (Date)

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 14/621,268 | 02/12/2015 | Marcelo M. Lamego | P22879US1 | 6317 |

TITLE OF INVENTION: Modulation and Demodulation Techniques for a Health Monitoring System

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | UNDISCOUNTED | $1000 | $0 | $0 | $1000 | 01/22/2019 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| NGUYEN, HIEN NGOC | 3793 | 600-476000 |

1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☑ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-02 or more recent) attached. **Use of a Customer Number is required.**

2. For printing on the patent front page, list

(1) The names of up to 3 registered patent attorneys or agents OR, alternatively,

(2) The name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1  Brownstein Hyatt Farber Schreck, LLP

2  _____

3  _____

3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document has been filed for recordation as set forth in 37 CFR 3.11. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE

Apple Inc.

(B) RESIDENCE: (CITY and STATE or COUNTRY)

Cupertino, California

Please check the appropriate assignee category or categories (will not be printed on the patent) :   ☐ Individual   ☑ Corporation or other private group entity   ☐ Government

4a. The following fee(s) are submitted:

☑ Issue Fee

☐ Publication Fee (No small entity discount permitted)

☐ Advance Order - # of Copies _____

4b. Payment of Fee(s): **(Please first reapply any previously paid issue fee shown above)**

☐ A check is enclosed.

☐ Payment by credit card. Form PTO-2038 is attached.

☑ The director is hereby authorized to charge the required fee(s), any deficiency, or credits any overpayment, to Deposit Account Number  50-4621  (enclose an extra copy of this form).

5. **Change in Entity Status** (from status indicated above)

☐ Applicant certifying micro entity status. See 37 CFR 1.29

☐ Applicant asserting small entity status. See 37 CFR 1.27

☐ Applicant changing to regular undiscounted fee status.

NOTE: Absent a valid certification of Micro Entity Status (see forms PTO/SB/15A and 15B), issue fee payment in the micro entity amount will not be accepted at the risk of application abandonment.

NOTE: If the application was previously under micro entity status, checking this box will be taken to be a notification of loss of entitlement to micro entity status.

NOTE: Checking this box will be taken to be a notification of loss of entitlement to small or micro entity status, as applicable.

NOTE: This form must be signed in accordance with 37 CFR 1.31 and 1.33. See 37 CFR 1.4 for signature requirements and certifications.

Authorized Signature  /Gregory W. Osterloth/     Date  January 17, 2019

Typed or printed name  Gregory W. Osterloth     Registration No.  36,232

Page 2 of 3

PTOL-85 Part B (10-13) Approved for use through 10/31/2013.     OMB 0651-0033     U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

**Exhibit 13**

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# NOTICE OF ALLOWANCE AND FEE(S) DUE

62579          7590          10/19/2018

APPLE INC./BROWNSTEIN
c/o Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, CO 80202

| EXAMINER |
| --- |
| NGUYEN, HIEN NGOC |

| ART UNIT | PAPER NUMBER |
| --- | --- |
| 3793 | |

DATE MAILED: 10/19/2018

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
| --- | --- | --- | --- | --- |
| 14/621,268 | 02/12/2015 | Marcelo M. Lamego | P22879US1 | 6317 |

TITLE OF INVENTION: Modulation and Demodulation Techniques for a Health Monitoring System

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
| --- | --- | --- | --- | --- | --- | --- |
| nonprovisional | UNDISCOUNTED | $1000 | $0 | $0 | $1000 | 01/22/2019 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. PROSECUTION ON THE MERITS IS CLOSED.  THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS. THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON PETITION BY THE APPLICANT.  SEE 37 CFR 1.313 AND MPEP 1308.**

**THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN <u>THREE MONTHS</u> FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED.  <u>THIS STATUTORY PERIOD CANNOT BE EXTENDED.</u>  SEE 35 U.S.C. 151.  THE ISSUE FEE DUE INDICATED ABOVE DOES NOT REFLECT A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE IN THIS APPLICATION.  IF AN ISSUE FEE HAS PREVIOUSLY BEEN PAID IN THIS APPLICATION (AS SHOWN ABOVE), THE RETURN OF PART B OF THIS FORM WILL BE CONSIDERED A REQUEST TO REAPPLY THE PREVIOUSLY PAID ISSUE FEE TOWARD THE ISSUE FEE NOW DUE.**

**HOW TO REPLY TO THIS NOTICE:**

I. Review the ENTITY STATUS shown above. If the ENTITY STATUS is shown as SMALL or MICRO, verify whether entitlement to that entity status still applies.

If the ENTITY STATUS is the same as shown above, pay the TOTAL FEE(S) DUE shown above.

If the ENTITY STATUS is changed from that shown above, on PART B - FEE(S) TRANSMITTAL, complete section number 5 titled "Change in Entity Status (from status indicated above)".

For purposes of this notice, small entity fees are 1/2 the amount of undiscounted fees, and micro entity fees are 1/2 the amount of small entity fees.

II. PART B - FEE(S) TRANSMITTAL, or its equivalent, must be completed and returned to the United States Patent and Trademark Office (USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be completed and an extra copy of the form should be submitted. If an equivalent of Part B is filed, a request to reapply a previously paid issue fee must be clearly made, and delays in processing may occur due to the difficulty in recognizing the paper as an equivalent of Part B.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Maintenance fees are due in utility patents issuing on applications filed on or after Dec. 12, 1980. It is patentee's responsibility to ensure timely payment of maintenance fees when due. More information is available at www.uspto.gov/PatentMaintenanceFees.**

Page 1 of 3

PTOL-85 (Rev. 02/11)

**Exhibit 13**
-60-

**PART B - FEE(S) TRANSMITTAL**

**Complete and send this form, together with applicable fee(s), to: <u>Mail</u>**      Mail Stop ISSUE FEE
                                                                  Commissioner for Patents
                                                                  P.O. Box 1450
                                                                  Alexandria, Virginia 22313-1450
**or <u>Fax</u>**   (571)-273-2885

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

| | | |
|---|---|---|
| 62579 | 7590 | 10/19/2018 |

APPLE INC./BROWNSTEIN
c/o Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, CO 80202

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**
I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being facsimile transmitted to the USPTO (571) 273-2885, on the date indicated below.

_____ (Depositor's name)
_____ (Signature)
_____ (Date)

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 14/621,268 | 02/12/2015 | Marcelo M. Lamego | P22879US1 | 6317 |

TITLE OF INVENTION: Modulation and Demodulation Techniques for a Health Monitoring System

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | UNDISCOUNTED | $1000 | $0 | $0 | $1000 | 01/22/2019 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| NGUYEN, HIEN NGOC | 3793 | 600-476000 |

1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).
☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.
☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-02 or more recent) attached. **Use of a Customer Number is required.**

2. For printing on the patent front page, list
(1) The names of up to 3 registered patent attorneys or agents OR, alternatively,
(2) The name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 _____
2 _____
3 _____

3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document has been filed for recordation as set forth in 37 CFR 3.11. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE                        (B) RESIDENCE: (CITY and STATE OR COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent) :   ☐ Individual   ☐ Corporation or other private group entity   ☐ Government

4a. The following fee(s) are submitted:
☐ Issue Fee
☐ Publication Fee (No small entity discount permitted)
☐ Advance Order - # of Copies _____

4b. Payment of Fee(s): **(Please first reapply any previously paid issue fee shown above)**
☐ A check is enclosed.
☐ Payment by credit card. Form PTO-2038 is attached.
☐ The director is hereby authorized to charge the required fee(s), any deficiency, or credits any overpayment, to Deposit Account Number _____ (enclose an extra copy of this form).

5. **Change in Entity Status** (from status indicated above)
☐ Applicant certifying micro entity status. See 37 CFR 1.29
☐ Applicant asserting small entity status. See 37 CFR 1.27
☐ Applicant changing to regular undiscounted fee status.

NOTE: Absent a valid certification of Micro Entity Status (see forms PTO/SB/15A and 15B), issue fee payment in the micro entity amount will not be accepted at the risk of application abandonment.
NOTE: If the application was previously under micro entity status, checking this box will be taken to be a notification of loss of entitlement to micro entity status.
NOTE: Checking this box will be taken to be a notification of loss of entitlement to small or micro entity status, as applicable.

NOTE: This form must be signed in accordance with 37 CFR 1.31 and 1.33. See 37 CFR 1.4 for signature requirements and certifications.

Authorized Signature _____      Date _____

Typed or printed name _____      Registration No. _____

PTOL-85 Part B (10-13) Approved for use through 10/31/2013.        OMB 0651-0033        U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

**Exhibit 13**
**-61-**



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 14/621,268 | 02/12/2015 | Marcelo M. Lamego | P22879US1 | 6317 |

62579        7590        10/19/2018

APPLE INC./BROWNSTEIN
c/o Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, CO 80202

| EXAMINER |
|---|
| NGUYEN, HIEN NGOC |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3793 | |

DATE MAILED: 10/19/2018

## Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
(Applications filed on or after May 29, 2000)

The Office has discontinued providing a Patent Term Adjustment (PTA) calculation with the Notice of Allowance.

Section 1(h)(2) of the AIA Technical Corrections Act amended 35 U.S.C. 154(b)(3)(B)(i) to eliminate the requirement that the Office provide a patent term adjustment determination with the notice of allowance. See Revisions to Patent Term Adjustment, 78 Fed. Reg. 19416, 19417 (Apr. 1, 2013). Therefore, the Office is no longer providing an initial patent term adjustment determination with the notice of allowance. The Office will continue to provide a patent term adjustment determination with the Issue Notification Letter that is mailed to applicant approximately three weeks prior to the issue date of the patent, and will include the patent term adjustment on the patent. Any request for reconsideration of the patent term adjustment determination (or reinstatement of patent term adjustment) should follow the process outlined in 37 CFR 1.705.

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at 1-(888)-786-0101 or (571)-272-4200.

PTOL-85 (Rev. 02/11)

**Exhibit 13**
**-62-**

## OMB Clearance and PRA Burden Statement for PTOL-85 Part B

The Paperwork Reduction Act (PRA) of 1995 requires Federal agencies to obtain Office of Management and Budget approval before requesting most types of information from the public. When OMB approves an agency request to collect information from the public, OMB (i) provides a valid OMB Control Number and expiration date for the agency to display on the instrument that will be used to collect the information and (ii) requires the agency to inform the public about the OMB Control Number's legal significance in accordance with 5 CFR 1320.5(b).

The information collected by PTOL-85 Part B is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450. Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

### Privacy Act Statement

**The Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

**Exhibit 13**

-63-

| ***Examiner-Initiated Interview Summary*** | Application No. | Applicant(s) | | |
|---|---|---|---|---|
| | 14/621,268 | LAMEGO, MARCELO  M. | | |
| | Examiner | Art Unit | AIA (First Inventor to File) Status | Page |
| | HIEN NGUYEN | 3737 | Yes | 1 of 1 |

All participants (applicant, applicant's representative, PTO personnel):

1.   HIEN NGUYEN (Primary Examiner); Telephonic      2.   GREGORY OSTERLOTH  (Attorney of Record)

**Date of Interview:** 02 October 2018

**Claim(s) discussed:** 22

**Brief Description of main topic of discussion:** Examiner suggested to applicant to amend the claims to overcome 112 antecedent basis.

## Issues Discussed:

**Proposed Amendments:**
Examiner suggested to applicant to amend the claims to overcome 112 antecedent basis to put the claims in condition for allowance.

| /HIEN NGUYEN/ Primary Examiner, Art Unit 3793 | |
|---|---|

**Applicant recordation instructions:**  It is not necessary for applicant to provide a separate record of the substance of the interview.

**Examiner recordation instructions:** Examiners must summarize the substance of any interview of record. A complete and proper recordation of the substance of an interview should include the items listed in MPEP 713.04 for complete and proper recordation including the identification of the general thrust of each argument or issue discussed, a general indication of any other pertinent matters discussed regarding patentability and the general results or outcome of the interview, to include an indication as to whether or not agreement was reached on the issues raised.

**Applicant is reminded that a complete written statement as to the substance of the interview must be made of record in the application file. It is the applicant's responsibility to provide the written statement, unless the interview was initiated by the Examiner and the Examiner has indicated that a written summary will be provided.  See MPEP 713.04**

Please further see:

**MPEP 713.04**
**Title 37 Code of Federal Regulations (CFR) § 1.133 Interviews, paragraph (b)**
**37 CFR § 1.2 Business to be transacted in writing**

**Exhibit 13**
**-64-**

| ***Notice of Allowability*** | Application No.<br>14/621,268 | Applicant(s)<br>LAMEGO, MARCELO  M. | |
|---|---|---|---|
| | Examiner<br>HIEN NGUYEN | Art Unit<br>3793 | AIA (First Inventor to File) Status<br>Yes |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application.  If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.**  This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant.  See 37 CFR 1.313 and MPEP 1308.

1. ☒ This communication is responsive to *09/17/18*.
- ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on_____.

2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

3. ☒ The allowed claim(s) is/are *22-25,29 and 31*. As a result of the allowed claim(s), you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp  or send an inquiry to PPHfeedback@uspto.gov.

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   **Certified copies:**
   - a) ☐  All      b) ☐  Some   *c) ☐  None of the:
     - 1. ☐ Certified copies of the priority documents have been received.
     - 2. ☐ Certified copies of the priority documents have been received in Application No. _____ .
     - 3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).
   - * Certified copies not received: _____.

   Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below.  Failure to timely comply will result in ABANDONMENT of this application.
   **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ CORRECTED DRAWINGS ( as "replacement sheets") must be submitted.
   - ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____.
   **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**
1. ☐ Notice of References Cited (PTO-892)
2. ☐ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date _____
3. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material
4. ☒ Interview Summary (PTO-413), Paper No./Mail Date *attach* .

5. ☒ Examiner's Amendment/Comment
6. ☐ Examiner's Statement of Reasons for Allowance
7. ☐ Other _____.

/HIEN NGUYEN/
Primary Examiner, Art Unit 3793

Notice of Allowability                                Part of Paper No./Mail Date

**Exhibit 13**
**-65-**

Application/Control Number: 14/621,268                                                    Page 2
Art Unit: 3793

The present application, filed on or after March 16, 2013, is being examined under the first inventor to file provisions of the AIA.

## EXAMINER'S AMENDMENT

An examiner's amendment to the record appears below. Should the changes and/or additions be unacceptable to applicant, an amendment may be filed as provided by 37 CFR 1.312. To ensure consideration of such an amendment, it MUST be submitted no later than the payment of the issue fee.

Authorization for this examiner's amendment was given in an interview with Mr. Gregory Osterloth on 10/02/18.

The claim have been as followed:

Claim 22, line 31, after "the second", -- "decimation" -- had been inserted.

### *Conclusion*

Any inquiry concerning this communication or earlier communications from the examiner should be directed to HIEN NGUYEN whose telephone number is (571)270-7031.  The examiner can normally be reached on 7:30-5:00.

Exhibit 13
-66-

Application/Control Number: 14/621,268                                    Page 3
Art Unit: 3793

Examiner interviews are available via telephone, in-person, and video

conferencing using a USPTO supplied web-based collaboration tool. To schedule an

interview, applicant is encouraged to use the USPTO Automated Interview Request

(AIR) at http://www.uspto.gov/interviewpractice.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Robert Chen can be reached on (571) 272-3672.  The fax phone number for

the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a

USPTO Customer Service Representative or access to the automated information

system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/HIEN NGUYEN/
Primary Examiner, Art Unit 3793

Exhibit 13
-67-

| *Examiner-Initiated Interview Summary* | Application No. | Applicant(s) | | |
|---|---|---|---|---|
| | 14/621,268 | LAMEGO, MARCELO  M. | | |
| | Examiner | Art Unit | AIA (First Inventor to File) Status | Page |
| | HIEN NGUYEN | 3737 | Yes | 1 of 1 |

All participants (applicant, applicant's representative, PTO personnel):

1.   HIEN NGUYEN (Primary Examiner); Telephonic      2.   GREGORY OSTERLOTH  (Attorney of Record)

**Date of Interview:** 02 October 2018

**Claim(s) discussed:** 22

**Brief Description of main topic of discussion:** Examiner suggested to applicant to amend the claims to overcome 112 antecedent basis.

## Issues Discussed:

**Proposed Amendments:**
Examiner suggested to applicant to amend the claims to overcome 112 antecedent basis to put the claims in condition for allowance.

| /HIEN NGUYEN/<br>Primary Examiner, Art Unit 3793 | |
|---|---|

**Applicant recordation instructions:**  It is not necessary for applicant to provide a separate record of the substance of the interview.

**Examiner recordation instructions:** Examiners must summarize the substance of any interview of record. A complete and proper recordation of the substance of an interview should include the items listed in MPEP 713.04 for complete and proper recordation including the identification of the general thrust of each argument or issue discussed, a general indication of any other pertinent matters discussed regarding patentability and the general results or outcome of the interview, to include an indication as to whether or not agreement was reached on the issues raised.

**Applicant is reminded that a complete written statement as to the substance of the interview must be made of record in the application file. It is the applicant's responsibility to provide the written statement, unless the interview was initiated by the Examiner and the Examiner has indicated that a written summary will be provided.  See MPEP 713.04**

Please further see:

**MPEP 713.04**
**Title 37 Code of Federal Regulations (CFR) § 1.133 Interviews, paragraph (b)**
**37 CFR § 1.2 Business to be transacted in writing**

U.S. Patent and Trademark Office
PTOL-413/413b (Rev. 01/01/2015)                    **Interview Summary**                    Paper No. 20180927

**Exhibit 13**
**-68-**

| *Search Notes* | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 14621268 | LAMEGO, MARCELO M. |
| | **Examiner** | **Art Unit** |
| | HIEN NGUYEN | 3793 |

| CPC- SEARCHED | | |
|---|---|---|
| **Symbol** | **Date** | **Examiner** |
| (A61B5/0059 or A61B5/0084).cpc. | 9/27/2018 | HN |

| CPC COMBINATION SETS  - SEARCHED | | |
|---|---|---|
| **Symbol** | **Date** | **Examiner** |
| | | |

| US CLASSIFICATION SEARCHED | | | |
|---|---|---|---|
| **Class** | **Subclass** | **Date** | **Examiner** |
| | | | |

\* See search history printout included with this form or the SEARCH NOTES box below to determine the scope of the search.

| SEARCH NOTES | | |
|---|---|---|
| **Search Notes** | **Date** | **Examiner** |
| East Search (inventor search) | 1/24/2017 | HN |
| East Search | 10/3/2017 | HN |
| East Search | 11/29/2017 | HN |
| Please see attach search report | | |
| East Search | 4/26/2018 | HN |
| Please see attach search report | | |
| East Search | 9/27/2018 | HN |
| Please see attach search report | | |

| INTERFERENCE SEARCH | | | |
|---|---|---|---|
| **US Class/ CPC Symbol** | **US Subclass / CPC Group** | **Date** | **Examiner** |
| | | | |

| | |
|---|---|
| | |

**Exhibit 13**
**-69-**

| INTERFERENCE SEARCH | | | |
|---|---|---|---|
| **US Class/ CPC Symbol** | **US Subclass / CPC Group** | **Date** | **Examiner** |
| USPAT, PGPUB | (low pass filter$3 decimat$3 demodulat$3 multipl$3 demultiplex$3 physiological).clm. | 9/27/2018 | HN |

| | |
|---|---|
| | |

**Exhibit 13**
**-70-**

| *Issue Classification* | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 14621268 | LAMEGO, MARCELO  M. |
| | **Examiner** | **Art Unit** |
| | HIEN NGUYEN | 3793 |

**CPC**

| Symbol | | | | Type | Version |
|---|---|---|---|---|---|
| A61B | 5 | | 7228 | F | 2013-01-01 |
| A61B | 5 | | 0059 | I | 2013-01-01 |
| A61B | 5 | | 725 | I | 2013-01-01 |
| A61B | 5 | | 7278 | I | 2013-01-01 |
| A61B | 5 | | 7225 | I | 2013-01-01 |
| A61B | 5 | | 7203 | I | 2013-01-01 |
| A61B | 5 | | 681 | I | 2013-01-01 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**CPC Combination Sets**

| Symbol | | | Type | Set | Ranking | Version |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |

| NONE | | Total Claims Allowed: | |
|---|---|---|---|
| (Assistant Examiner) | (Date) | 6 | |
| /HIEN NGUYEN/ Primary Examiner.Art Unit 3793 | 10/01/18 | O.G. Print Claim(s) | O.G. Print Figure |
| (Primary Examiner) | (Date) | 22 | 4 |

U.S. Patent and Trademark Office

Part of Paper No.  20180927

**Exhibit 13**
**-71-**

| *Issue Classification* | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 14621268 | LAMEGO, MARCELO  M. |
| | **Examiner** | **Art Unit** |
| | HIEN NGUYEN | 3793 |

| US ORIGINAL CLASSIFICATION | | INTERNATIONAL CLASSIFICATION | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **CLASS** | **SUBCLASS** | **CLAIMED** | | | | | | **NON-CLAIMED** | | | | | |
| 600 | 476 | A | 6 | 1 | B | 5 / 00 (2006.01.01) | | | | | | | |
| **CROSS REFERENCE(S)** | | | | | | | | | | | | | |
| **CLASS** | **SUBCLASS (ONE SUBCLASS PER BLOCK)** | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |

| NONE | | **Total Claims Allowed:** | |
|---|---|---|---|
| (Assistant Examiner) | (Date) | 6 | |
| /HIEN NGUYEN/<br>Primary Examiner.Art Unit 3793 | 10/01/18 | **O.G. Print Claim(s)** | **O.G. Print Figure** |
| (Primary Examiner) | (Date) | 22 | 4 |

U.S. Patent and Trademark Office

Part of Paper No.  20180927

**Exhibit 13**
**-72-**

| Issue Classification | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 14621268 | LAMEGO, MARCELO  M. |
| | **Examiner** | **Art Unit** |
| | HIEN NGUYEN | 3793 |

| ☐ | Claims renumbered in the same order as presented by applicant | | ☐ CPA | ☐ T.D. | ☐ R.1.47 |

| Final | Original | Final | Original | Final | Original | Final | Original | Final | Original | Final | Original | Final | Original | Final | Original |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | | 17 | | 33 | | | | | | | | | | |
| | 2 | | 18 | | 34 | | | | | | | | | | |
| | 3 | | 19 | | 35 | | | | | | | | | | |
| | 4 | | 20 | | | | | | | | | | | | |
| | 5 | | 21 | | | | | | | | | | | | |
| | 6 | 1 | 22 | | | | | | | | | | | | |
| | 7 | 2 | 23 | | | | | | | | | | | | |
| | 8 | 3 | 24 | | | | | | | | | | | | |
| | 9 | 4 | 25 | | | | | | | | | | | | |
| | 10 | | 26 | | | | | | | | | | | | |
| | 11 | | 27 | | | | | | | | | | | | |
| | 12 | | 28 | | | | | | | | | | | | |
| | 13 | 5 | 29 | | | | | | | | | | | | |
| | 14 | | 30 | | | | | | | | | | | | |
| | 15 | 6 | 31 | | | | | | | | | | | | |
| | 16 | | 32 | | | | | | | | | | | | |

| NONE | | **Total Claims Allowed:** | |
|---|---|---|---|
| (Assistant Examiner) | (Date) | 6 | |
| /HIEN NGUYEN/<br>Primary Examiner.Art Unit 3793 | 10/01/18 | O.G. Print Claim(s) | O.G. Print Figure |
| (Primary Examiner) | (Date) | 22 | 4 |

U.S. Patent and Trademark Office

Part of Paper No.  20180927

**Exhibit 13**
**-73-**

**EAST Search History**

**EAST Search History (Interference)**

| Ref # | Hits | Search Query | DBs | Default Operator | Plurals | Time Stamp |
|---|---|---|---|---|---|---|
| S57 | 0 | (low pass filter$3 decimat$3 demodulat$3 multipl$3 demultiplex$3 physiological).clm. | USPAT | AND | OFF | 2018/09/27 16:25 |

**9/27/2018 6:44:33 PM**
**C:\Users\hnguyen55\Documents\EAST\Workspaces\14621268.wsp**

file:///C/Users/hnguyen55/Documents/e-Red%20Folder/14621268/EASTSearchHistory.14621268_AccessibleVersion.htm[9/27/2018 6:44:35 PM]

Exhibit 13
-74-



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

## BIB DATA SHEET

**CONFIRMATION NO. 6317**

| SERIAL NUMBER | FILING or 371(c) DATE 02/12/2015 RULE | CLASS | GROUP ART UNIT | ATTORNEY DOCKET NO. |
|---|---|---|---|---|
| 14/621,268 | | 600 | 3737 | P22879US1 |

**APPLICANTS**
Apple Inc., Cupertino, CA;

**INVENTORS**
Marcelo M. Lamego, Cupertino, CA;

**\*\* CONTINUING DATA \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***
This appln claims benefit of 62/047,818 09/09/2014

**\*\* FOREIGN APPLICATIONS \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**\*\* IF REQUIRED, FOREIGN FILING LICENSE GRANTED \*\***
02/25/2015

| Foreign Priority claimed ☐ Yes ☑ No | ☐ Met after Allowance | STATE OR COUNTRY | SHEETS DRAWINGS | TOTAL CLAIMS | INDEPENDENT CLAIMS |
|---|---|---|---|---|---|
| 35 USC 119(a-d) conditions met ☐ Yes ☑ No | | CA | 9 | 20 | 3 |
| Verified and Acknowledged /HIEN NGOC NGUYEN/ Examiner's Signature | HN Initials | | | | |

**ADDRESS**

APPLE INC./BROWNSTEIN
c/o Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, CO 80202
UNITED STATES

**TITLE**

Modulation and Demodulation Techniques for a Health Monitoring System

| FILING FEE RECEIVED 1600 | FEES: Authority has been given in Paper No._____ to charge/credit DEPOSIT ACCOUNT No._____ for following: | ☐ All Fees ☐ 1.16 Fees (Filing) ☐ 1.17 Fees (Processing Ext. of time) ☐ 1.18 Fees (Issue) ☐ Other _____ ☐ Credit |
|---|---|---|

**EAST Search History**

**EAST Search History (Prior Art)**

| Ref # | Hits | Search Query | DBs | Default Operator | Plurals | Time Stamp |
|---|---|---|---|---|---|---|
| S1 | 130 | ((Marcelo) near2 (Lamego)).INV. | US-PGPUB; USPAT; USOCR | OR | OFF | 2016/08/02 11:48 |
| S2 | 0 | S1 (light dark demodulat$3).clm. | US-PGPUB; USPAT; USOCR | AND | OFF | 2016/08/02 11:49 |
| S3 | 0 | "14621268" | US-PGPUB; USPAT; USOCR | AND | OFF | 2016/08/02 11:49 |
| S4 | 0 | demodulat$3 fitler$3 decimat$3 light (tissue or sample or skin) physiological | US-PGPUB; USPAT; USOCR | AND | OFF | 2016/08/02 12:00 |
| S5 | 296 | demodulat$3 filter$3 decimat$3 light (tissue or sample or skin) physiological | US-PGPUB; USPAT; USOCR | AND | OFF | 2016/08/02 12:01 |
| S6 | 15 | (demodulat$3 same filter$3 same decimat$3 same light same (tissue or sample or skin)) physiological | US-PGPUB; USPAT; USOCR | AND | OFF | 2016/08/02 12:01 |
| S7 | 0 | (demodulat$3 same filter$3 same decimat$3 same light same (tissue or sample or skin)) physiological wear$4 | US-PGPUB; USPAT; USOCR | AND | OFF | 2016/08/02 12:09 |
| S8 | 1 | (demodulat$3 same filter$3 same decimat$3 same light same (tissue or sample or skin)) wear$4 | US-PGPUB; USPAT; USOCR | AND | OFF | 2016/08/02 12:10 |
| S9 | 7455 | (A61B5/0059 or A61B5/0084).cpc. | US-PGPUB; USPAT | AND | OFF | 2016/08/02 16:38 |
| S10 | 0 | "14621268" | US-PGPUB; USPAT | OR | OFF | 2017/01/24 10:10 |
| S11 | 0 | 14/621268 | US-PGPUB; USPAT | AND | OFF | 2017/01/24 10:11 |
| S12 | 136 | ((("LAMEGO") near3 ("Marcelo")).INV. | US-PGPUB; USPAT; USOCR | OR | OFF | 2017/01/24 10:11 |
| S13 | 0 | ("2012/0253155").URPN. | USPAT | OR | OFF | 2017/01/24 11:24 |
| S14 | 484 | physiological (demultiplex$3 with multipl$4) | US-PGPUB; USPAT | AND | OFF | 2017/01/24 11:25 |
| S15 | 235 | physiological (demultiplex$3 with multipl$4) demodulat$3 | US-PGPUB; USPAT | AND | OFF | 2017/01/24 11:26 |
| S16 | 90 | physiological (demultiplex$3 with multipl$4) demodulat$3 decimat$3 | US-PGPUB; USPAT | AND | OFF | 2017/01/24 11:26 |
| S17 | 1 | physiological (demultiplex$3 with multipl$4 with demodulat$3) decimat$3 | US-PGPUB; USPAT | AND | OFF | 2017/01/24 11:26 |
| S18 | 22 | physiological (demultiplex$3 with | US-PGPUB; | AND | OFF | 2017/01/24 |

file:///C/Users/hnguyen55/Documents/e-Red%20Folder/14621268/EASTSearchHistory.14621268_AccessibleVersion.htm[9/27/2018 6:44:23 PM]

Exhibit 13
-76-

| | | | | | | |
|---|---|---|---|---|---|---|
| | | multipl$4 with demodulat$3) | | | | 11:27 |
| S19 | 4 | (physiological or analyte or blood or (heart adj rate)) (demultiplex$3 with (multiplying or multiply or multiplier) with demodulat$3) | US-PGPUB; USPAT | AND | OFF | 2017/01/24 11:47 |
| S20 | 4 | (physiological or analyte or blood or (heart adj rate) or health) (demultiplex$3 with (multiplying or multiply or multiplier) with demodulat$3) | US-PGPUB; USPAT | AND | OFF | 2017/01/24 11:48 |
| S21 | 5 | (physiological or analyte or blood or (heart adj rate) or health) (demultiplex$3 with (multiplying or multiply or multiplier) same demodulat$3) | US-PGPUB; USPAT | AND | OFF | 2017/01/24 11:49 |
| S22 | 10 | (physiological or analyte or blood or (heart adj rate) or health) (demultiplex$3 with (multiplying or multiply or multiplier) demodulat$3) | US-PGPUB; USPAT | AND | OFF | 2017/01/24 12:05 |
| S23 | 9 | (medical or medicine) (demultiplex$3 with (multiplying or multiply or multiplier) demodulat$3) | US-PGPUB; USPAT | AND | OFF | 2017/01/24 12:26 |
| S24 | 7904 | (A61B5/0059 or A61B5/0084).cpc. | US-PGPUB; USPAT | AND | OFF | 2017/01/24 12:30 |
| S25 | 147 | (("LAMEGO") near3 ("Marcelo")).INV. | US-PGPUB; USPAT; USOCR | OR | OFF | 2017/10/03 10:09 |
| S26 | 0 | S25 (demodulat$3 demultiplex$3 low pass filter$3 decimat$3 multiply$3).clm. | US-PGPUB; USPAT; USOCR | AND | OFF | 2017/10/03 10:25 |
| S27 | 3289970 | demultiplex$3 demodulat$3 decimat$3 filter$3 multiply$3 | US-PGPUB; USPAT | OR | OFF | 2017/10/03 11:04 |
| S28 | 1058 | demultiplex$3 demodulat$3 decimat$3 filter$3 multiply$3 | US-PGPUB; USPAT; DERWENT | AND | OFF | 2017/10/03 11:05 |
| S29 | 1 | demultiplex$3 same demodulat$3 same decimat$3 same filter$3 same multiply$3 | US-PGPUB; USPAT; DERWENT | AND | OFF | 2017/10/03 11:05 |
| S30 | 0 | "14621268" | US-PGPUB; USPAT; DERWENT | AND | OFF | 2017/10/03 11:12 |
| S31 | 0 | ("2012/0253155").URPN. | USPAT | OR | OFF | 2017/10/03 11:19 |
| S32 | 10 | ("20030229276" | "20050197583" | "4258719" | "4989169" | "7890158").PN. OR ("8768424").URPN. | US-PGPUB; USPAT; USOCR | OR | OFF | 2017/10/03 11:19 |
| S33 | 0 | (demultiplex$3 demodulat$3 decimat$3 filter$3 multiply$3) S32 | US-PGPUB; USPAT; DERWENT | AND | OFF | 2017/10/03 11:23 |
| S34 | 197 | (demultiplex$3 demodulat$3 decimat$3 filter$3 multiply$3) sin | US-PGPUB; USPAT; DERWENT | AND | OFF | 2017/10/03 11:23 |
| S35 | 131 | (demultiplex$3 demodulat$3 decimat$3 filter$3 multiply$3) sin cos | US-PGPUB; USPAT; DERWENT | AND | OFF | 2017/10/03 11:23 |
| S36 | 38 | (demultiplex$3 demodulat$3 | US-PGPUB; | AND | OFF | 2017/10/03 |

file:///C/Users/hnguyen55/Documents/e-Red%20Folder/14621268/EASTSearchHistory.14621268_AccessibleVersion.htm[9/27/2018 6:44:23 PM]

Exhibit 13
-77-

| | | | | | | |
|---|---|---|---|---|---|---|
| | | decimat$3 filter$3 multiply$3) sin cos (blood or medic$3 or tissue$1 or analyte$) | USPAT; DERWENT | | | 11:23 |
| S37 | 38 | (demultiplex$3 demodulat$3 decimat$3 (filter$3 or (low adj pass)) multiply$3) sin cos (blood or medic$3 or analyte$) | US-PGPUB; USPAT; DERWENT | AND | OFF | 2017/10/03 11:30 |
| S38 | 4 | (demultiplex$3 (demodulat$3 same decimat$3 same (filter$3 or (low adj pass))) multiply$3) sin cos (blood or medic$3 or analyte$) | US-PGPUB; USPAT; DERWENT | AND | OFF | 2017/10/03 11:31 |
| S39 | 66 | (demultiplex$3 (demodulat$3 same decimat$3 same (filter$3 or (low adj pass))) multiply$3) (blood or medic$3 or analyte$) (light with (on or off)) | US-PGPUB; USPAT; DERWENT | AND | OFF | 2017/10/03 11:54 |
| S40 | 1 | (demultiplex$3 (demodulat$3 same decimat$3 same (filter$3 or (low adj pass))) multiply$3) sin cos (blood or medic$3 or analyte$) (light with (on or off)) | US-PGPUB; USPAT; DERWENT | AND | OFF | 2017/10/03 11:57 |
| S41 | 8388 | (A61B5/0059 or A61B5/0084).cpc. | US-PGPUB; USPAT | AND | OFF | 2017/10/03 17:13 |
| S42 | 149 | ((("LAMEGO") near3 ("Marcelo")).INV. | US-PGPUB; USPAT; USOCR | OR | OFF | 2017/11/28 16:29 |
| S43 | 0 | "14621268" | US-PGPUB; USPAT | AND | OFF | 2017/11/28 16:42 |
| S44 | 8495 | (A61B5/0059 or A61B5/0084).cpc. | US-PGPUB; USPAT | AND | OFF | 2017/11/28 16:43 |
| S45 | 1420 | light sensor demultiplex$3 filter$3 amplifier modulat$3 demodulat$3 multipl$4 | US-PGPUB; USPAT; USOCR | AND | OFF | 2017/11/29 09:23 |
| S46 | 99 | light sensor (demultiplex$3 same filter$3 same amplifier same modulat$3 same demodulat$3 same multipl$4) | US-PGPUB; USPAT; USOCR | AND | OFF | 2017/11/29 09:24 |
| S47 | 0 | (light smae sensor$3) (demultiplex$3 same filter$3 same amplifier same modulat$3 same demodulat$3 same multipl$4) | US-PGPUB; USPAT; USOCR | AND | OFF | 2017/11/29 09:24 |
| S48 | 81 | (light same sensor$3) (demultiplex$3 same filter$3 same amplifier same modulat$3 same demodulat$3 same multipl$4) | US-PGPUB; USPAT; USOCR | AND | OFF | 2017/11/29 09:24 |
| S49 | 0 | "14621268" | US-PGPUB; USPAT | OR | OFF | 2018/07/26 10:08 |
| S50 | 0 | (low pass filter$3 decimat$3 demodulat$3 multipl$3 demultiplex$3 physiological).clm. | US-PGPUB; USPAT | AND | OFF | 2018/09/27 16:24 |
| S51 | 99 | (low with pass with filter$3) decimat$3 demodulat$3 multipl$3 demultiplex$3 physiological | US-PGPUB; USPAT | AND | OFF | 2018/09/27 16:24 |
| S52 | 174 | (((("LAMEGO") near3 ("Marcelo"))).INV. | US-PGPUB; USPAT; USOCR; EPO; JPO; DERWENT | OR | OFF | 2018/09/27 16:48 |

| S53 | 0 | ("2012/0253155").URPN. | USPAT | OR | OFF | 2018/09/27 17:05 |
|------|------|------|------|------|------|------|
| S54 | 138 | ("4653498" \| "4807630" \| "4907876" \| "4942877").PN. OR ("5349952").URPN. | US-PGPUB; USPAT; USOCR | OR | OFF | 2018/09/27 17:11 |
| S55 | 3 | S54 (low pass filter$3 decimat$3 demodulat$3 multipl$3 demultiplex$3 physiological) | US-PGPUB; USPAT; USOCR | AND | OFF | 2018/09/27 17:14 |
| S56 | 9136 | (A61B5/0059 or A61B5/0084).cpc. | US-PGPUB; USPAT | AND | OFF | 2018/09/27 17:19 |

9/27/2018 6:44:20 PM
C:\Users\hnguyen55\Documents\EAST\Workspaces\14621268.wsp

Exhibit 13
-79-

file:///C/Users/hnguyen55/Documents/e-Red%20Folder/14621268/EASTSearchHistory.14621268_AccessibleVersion.htm[9/27/2018 6:44:23 PM]

## Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | 14621268 |
| **Filing Date:** | 12-Feb-2015 |
| **Title of Invention:** | Modulation and Demodulation Techniques for a Health Monitoring System |
| **First Named Inventor/Applicant Name:** | Marcelo M. Lamego |
| **Filer:** | Gregory W. Osterloth/Valerie Brown |
| **Attorney Docket Number:** | P22879US1 |

Filed as Large Entity

**Filing Fees for** Utility under 35 USC 111(a)

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |
| **Post-Allowance-and-Post-Issuance:** | | | | |
| **Extension-of-Time:** | | | | |

Exhibit 13
-80-

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| Extension - 1 month with $0 paid | 1251 | 1 | 200 | 200 |
| **Miscellaneous:** | | | | |
| | | **Total in USD ($)** | | **200** |

Exhibit 13
-81-

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 33746127 |
| **Application Number:** | 14621268 |
| **International Application Number:** | |
| **Confirmation Number:** | 6317 |
| **Title of Invention:** | Modulation and Demodulation Techniques for a Health Monitoring System |
| **First Named Inventor/Applicant Name:** | Marcelo M. Lamego |
| **Customer Number:** | 62579 |
| **Filer:** | Gregory W. Osterloth/Valerie Brown |
| **Filer Authorized By:** | Gregory W. Osterloth |
| **Attorney Docket Number:** | P22879US1 |
| **Receipt Date:** | 17-SEP-2018 |
| **Filing Date:** | 12-FEB-2015 |
| **Time Stamp:** | 18:41:02 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | CARD |
| Payment was successfully received in RAM | $ 200 |
| RAM confirmation Number | 091818INTEFSW18415100 |
| Deposit Account | |
| Authorized User | |
| The Director of the USPTO is hereby authorized to charge indicated fees and credit any overpayment as follows: | |

Exhibit 13
-82-

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Response After Final Action | P22879US1Amendment.pdf | 25876<br><br>a3851f2a920204e0460e1e43a01726c52e17c14b | no | 5 |

**Warnings:**

**Information:**

| 2 | Fee Worksheet (SB06) | fee-info.pdf | 30853<br><br>6fbfed12403729694890ef1619b2bfbde2759925 | no | 2 |

**Warnings:**

**Information:**

| | | **Total Files Size (in bytes):** | 56729 | | |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

New Applications Under 35 U.S.C. 111
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.
National Stage of an International Application under 35 U.S.C. 371
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.
New International Application Filed with the USPTO as a Receiving Office
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

Exhibit 13
-83-

Attorney Docket No. P22879US1

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of:

| | | | |
|---|---|---|---|
| Inventor(s): | Marcelo M. Lamego | | |
| App. No.: | 14/621,268 | Con. No.: | 6317 |
| Filed: | February 12, 2015 | Art Unit: | 3777 |
| Title: | MODULATION AND DEMODULATION TECHNIQUES FOR A HEALTH MONITORING SYSTEM | Examiner: | Nguyen, Hien Ngoc |

**AMENDMENT AND RESPONSE TO FINAL OFFICE ACTION**

Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Sir:

In response to the final Office action dated May 16, 2018, please consider the following remarks and amend the above-identified application as follows:

**Amendments to the Claims** begin on page 2 of this paper.

**Remarks** begin on page 5 of this paper.

Exhibit 13
-84-

**Amendments to the Claims:**

1-21.    (Canceled)

22.    (Previously Presented)  A method for estimating physiological parameters when modulated light from a first light source and a second light source is emitted toward a body part of a user, the method comprising:

determining a first multiplier value by:

turning on the first light source;

generating a first initial signal in response to capturing a first light sample corresponding to the first light source;

demodulating the first initial signal to produce first initial demodulated signals;

filtering and decimating the first initial demodulated signals; and

determining the first multiplier value based on the filtered and decimated first initial demodulated signals;

determining a second multiplier value by:

turning on the second light source;

generating a second initial signal in response to capturing a second light sample corresponding to the second light source;

demodulating the second initial signal to produce second initial demodulated signals;

filtering and decimating the second initial demodulated signals; and

determining the second multiplier value based on the filtered and decimated second initial demodulated signals;

capturing multiple light samples while the first light source and the second light source are turned on to emit modulated light toward the body part of the user and converting the multiple light samples into a captured signal;

demodulating the captured signal to produce multiple demodulated signals;

performing a first decimation stage by:

low pass filtering each demodulated signal; and

decimating each demodulated signal;

performing a second decimation stage after the first decimation stage by:

low pass filtering each demodulated signal; and

decimating each demodulated signal;

2

Exhibit 13
-85-

demultiplexing each demodulated signal after the second stage to produce a first signal associated with the first light source and a second signal associated with the second light source;

multiplying the first signal by the first multiplier value using a first multiplier circuit to obtain a first conditioned signal;

multiplying the second signal by the second multiplier value using a second multiplier circuit to obtain a second conditioned signal; and

analyzing the first conditioned signal and the second conditioned signal to estimate the physiological parameter of the user.

23.    (Previously Presented)  The method as in claim 22, wherein the capturing multiple light samples comprises capturing multiple light samples while:

the first light source is turned on and the second light source is turned off;

the second light source is turned on and the first light source is turned off; and

the first light source and the second light source are turned off after being turned on.

24.    (Previously Presented)  The method as in claim 23, wherein the capturing multiple light samples further comprises capturing one or more light samples after the first light source is turned off and before the second light source is turned on.

25.    (Previously Presented)  The method as in claim 22, wherein the demodulating the captured signal to produce multiple demodulated signals comprises:

applying a first demodulation operation of a sine function to the captured signal; and

applying a second demodulation operation of a cosine function.

26-35.  (Canceled)

29.    (Previously Presented)  The method as in claim 23, wherein the multiple light samples comprise at least five light samples captured when the first light source is turned on and the second light source is turned off.

30.    (Canceled)

Exhibit 13
-86-

Attorney Docket No. P22879US1

31.     (Previously Presented)  The method as in claim 22, wherein:

when the first light source is turned on, the first light source emits infrared light; and

when the second light source is turned on, the second light source emits visible light.


32-35.  (Canceled)

Exhibit 13
-87-

Attorney Docket No. P22879US1

## REMARKS

This paper is submitted in response to the final Office action mailed on May 16, 2018. This paper cancels claims 1, 3-4, 13-14, 30, and 32-35. Accordingly, after entry of this Amendment and Response, claims 22-25, 29, and 31 will be pending.

According to the Office action, claims 22-25, 29, and 31 are allowed. All rejected claims have been canceled herein, rendering the pending rejections moot. The Assignee respectfully submits the present application, as amended, is in condition for allowance and respectfully requests the issuance of a Notice of Allowability as soon as practicable.

This Amendment and Response is submitted contemporaneously with a petition for a one-month extension of time, and a request to charge Deposit Account No. 504621 for the requisite fees.  The Assignee believes no further fees or petitions are required.  However, if any such petitions or fees are necessary, please consider this a request therefor and authorization to charge Deposit Account No. 504621 accordingly.

If the Examiner should require any additional information or amendment, please contact the undersigned attorney.

Dated:  September 17, 2018.

Respectfully submitted,


_____/Gregory W. Osterloth/_____
Gregory W. Osterloth, Registration No. 36,232
Attorney for Assignee
USPTO Customer No. 62579

Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, Colorado  80202
Phone:  303-223-1100
Fax:  303-223-1111

**Exhibit 13**
**-88-**

PTO/SB/06 (09-11)
Approved for use through 1/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| PATENT APPLICATION FEE DETERMINATION RECORD<br>Substitute for Form PTO-875 | Application or Docket Number<br>14/621,268 | Filing Date<br>02/12/2015 | ☐ To be Mailed |
|---|---|---|---|

ENTITY:   ☒ LARGE   ☐ SMALL   ☐ MICRO

## APPLICATION AS FILED – PART I

| | (Column 1) | (Column 2) | | |
|---|---|---|---|---|
| FOR | NUMBER FILED | NUMBER EXTRA | RATE ($) | FEE ($) |
| ☐ BASIC FEE<br>(37 CFR 1.16(a), (b), or (c)) | N/A | N/A | N/A | |
| ☐ SEARCH FEE<br>(37 CFR 1.16(k), (i), or (m)) | N/A | N/A | N/A | |
| ☐ EXAMINATION FEE<br>(37 CFR 1.16(o), (p), or (q)) | N/A | N/A | N/A | |
| TOTAL CLAIMS<br>(37 CFR 1.16(i)) | minus 20 = | * | X $ = | |
| INDEPENDENT CLAIMS<br>(37 CFR 1.16(h)) | minus 3 = | * | X $ = | |
| ☐ APPLICATION SIZE FEE<br>(37 CFR 1.16(s)) | If the specification and drawings exceed 100 sheets of paper, the application size fee due is $310 ($155 for small entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s). | | | |
| ☐ MULTIPLE DEPENDENT CLAIM PRESENT (37 CFR 1.16(j)) | | | | |
| * If the difference in column 1 is less than zero, enter "0" in column 2. | | | TOTAL | |

## APPLICATION AS AMENDED – PART II

| | | (Column 1) | (Column 2) | (Column 3) | | |
|---|---|---|---|---|---|---|
| AMENDMENT | **09/17/2018** | CLAIMS REMAINING AFTER AMENDMENT | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) |
| | Total (37 CFR 1.16(i)) | * 6 | Minus | ** 20 | = 0 | x $100 = | 0 |
| | Independent (37 CFR 1.16(h)) | * 1 | Minus | *** 3 | = 0 | x $460 = | 0 |
| | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | |
| | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | |
| | | | | | TOTAL ADD'L FEE | **0** |

| | | (Column 1) | (Column 2) | (Column 3) | | |
|---|---|---|---|---|---|---|
| AMENDMENT | | CLAIMS REMAINING AFTER AMENDMENT | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) |
| | Total (37 CFR 1.16(i)) | * | Minus | ** | = | x $ = | |
| | Independent (37 CFR 1.16(h)) | * | Minus | *** | = | x $ = | |
| | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | |
| | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | |
| | | | | | TOTAL ADD'L FEE | |

* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.

** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20".

*** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3".

The "Highest Number Previously Paid For" (Total or Independent) is the highest number found in the appropriate box in column 1.

SLIE
KIMBERLY WHITE

This collection of information is required by 37 CFR 1.16. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

Exhibit 13
-89-

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 14/621,268 | 02/12/2015 | Marcelo M. Lamego | P22879US1 | 6317 |

62579          7590          08/16/2018

APPLE INC./BROWNSTEIN
c/o Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, CO 80202

| EXAMINER |
|---|
| NGUYEN, HIEN NGOC |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3737 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 08/16/2018 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

patentdocket@bhfs.com

PTOL-90A (Rev. 04/07)

**Exhibit 13**

| ***Advisory Action***<br>***Before the Filing of an Appeal Brief*** | Application No.<br>14/621,055 | Applicant(s)<br>LAMEGO, MARCELO M. |
|---|---|---|
| | Examiner<br>HIEN NGUYEN | Art Unit<br>3737 | AIA (First Inventor to File) Status<br>Yes |

*--The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

THE REPLY FILED <u>10 August 2018</u> FAILS TO PLACE THIS APPLICATION IN CONDITION FOR ALLOWANCE.

<u>NO NOTICE OF APPEAL FILED</u>

1. ☒ The reply was filed after a final rejection. No Notice of Appeal has been filed. To avoid abandonment of this application, applicant must timely file one of the following replies: (1) an amendment, affidavit, or other evidence, which places the application in condition for allowance; (2) a Notice of Appeal (with appeal fee) in compliance with 37 CFR 41.31; or (3) a Request for Continued Examination (RCE) in compliance with 37 CFR 1.114 if this is a utility or plant application. Note that RCEs are not permitted in design applications. The reply must be filed within one of the following time periods:

   a) ☒ The period for reply expires <u>3</u> months from the mailing date of the final rejection.

   b) ☐ The period for reply expires on: (1) the mailing date of this Advisory Action; or (2) the date set forth in the final rejection, whichever is later. In no event, however, will the statutory period for reply expire later than SIX MONTHS from the mailing date of the final rejection.

   c) ☐ A prior Advisory Action was mailed more than 3 months after the mailing date of the final rejection in response to a first after-final reply filed within 2 months of the mailing date of the final rejection. The current period for reply expires _____ months from the mailing date of *the prior Advisory Action* or SIX MONTHS from the mailing date of the final rejection, whichever is earlier.

   *Examiner Note: If box 1 is checked, check either box (a), (b) or (c). ONLY CHECK BOX (b) WHEN THIS ADVISORY ACTION IS THE <u>FIRST</u> RESPONSE TO APPLICANT'S <u>FIRST</u> AFTER-FINAL REPLY WHICH WAS FILED WITHIN TWO MONTHS OF THE FINAL REJECTION. ONLY CHECK BOX (c) IN THE LIMITED SITUATION SET FORTH UNDER BOX (c). See MPEP 706.07(f).*

Extensions of time may be obtained under 37 CFR 1.136(a). The date on which the petition under 37 CFR 1.136(a) and the appropriate extension fee have been filed is the date for purposes of determining the period of extension and the corresponding amount of the fee. The appropriate extension fee under 37 CFR 1.17(a) is calculated from: (1) the expiration date of the shortened statutory period for reply originally set in the final Office action; or (2) as set forth in (b) or (c) above, if checked. Any reply received by the Office later than three months after the mailing date of the final rejection, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

<u>NOTICE OF APPEAL</u>

2. ☐ The Notice of Appeal was filed on _____. A brief in compliance with 37 CFR 41.37 must be filed within two months of the date of filing the Notice of Appeal (37 CFR 41.37(a)), or any extension thereof (37 CFR 41.37(e)), to avoid dismissal of the appeal. Since a Notice of Appeal has been filed, any reply must be filed within the time period set forth in 37 CFR 41.37(a).

<u>AMENDMENTS</u>

3. ☒ The proposed amendments filed after a final rejection, but prior to the date of filing a brief, will <u>not</u> be entered because

   a) ☒ They raise new issues that would require further consideration and/or search (see NOTE below);

   b) ☐ They raise the issue of new matter (see NOTE below);

   c) ☐ They are not deemed to place the application in better form for appeal by materially reducing or simplifying the issues for appeal; and/or

   d) ☐ They present additional claims without canceling a corresponding number of finally rejected claims.

      NOTE: *See Continuation Sheet.* (See 37 CFR 1.116 and 41.33(a)).

4. ☐ The amendments are not in compliance with 37 CFR 1.121. See attached Notice of Non-Compliant Amendment (PTOL-324).

5. ☐ Applicant's reply has overcome the following rejection(s): _____.

6. ☐ Newly proposed or amended claim(s) _____ would be allowable if submitted in a separate, timely filed amendment canceling the non-allowable claim(s).

7. ☐ For purposes of appeal, the proposed amendment(s): (a) ☐ will not be entered, or (b) ☐ will be entered, and an explanation of how the new or amended claims would be rejected is provided below or appended.

<u>AFFIDAVIT OR OTHER EVIDENCE</u>

8. ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

9. ☐ The affidavit or other evidence filed after a final action, but before or on the date of filing a Notice of Appeal will <u>not</u> be entered because applicant failed to provide a showing of good and sufficient reasons why the affidavit or other evidence is necessary and was not earlier presented. See 37 CFR 1.116(e).

10. ☐ The affidavit or other evidence filed after the date of filing the Notice of Appeal, but prior to the date of filing a brief, will <u>not</u> be entered because the affidavit or other evidence failed to overcome <u>all</u> rejections under appeal and/or appellant fails to provide a showing of good and sufficient reasons why it is necessary and was not earlier presented. See 37 CFR 41.33(d)(1).

11. ☐ The affidavit or other evidence is entered. An explanation of the status of the claims after entry is below or attached.

<u>REQUEST FOR RECONSIDERATION/OTHER</u>

12. ☒ The request for reconsideration has been considered but does NOT place the application in condition for allowance because: <u>The amendment change the scope of the claims therefore require further search and consideration. Time allow after final is not adequate for search and consideration. Since the claims are not entered examiner maintain 112 and 101 rejection.</u>

13. ☐ Note the attached Information *Disclosure Statement*(s). (PTO/SB/08) Paper No(s). _____.

14. ☒ Other: attach PTO 2323 AFCP 2.

<u>STATUS OF CLAIMS</u>

15. The status of the claim(s) is (or will be) as follows:

   Claim(s) allowed: 22-25,29 and 31.

   Claim(s) objected to: .

   Claim(s) rejected: 4,5,13,14,26-28,30,32 and 33.

   Claim(s) withdrawn from consideration: 1,3,34, and 35.

| /HIEN NGUYEN/<br>Primary Examiner, Art Unit 3737 |
|---|

U.S. Patent and Trademark Office<br>PTOL-303 (Rev. 08-2013)      Advisory Action Before the Filing of an Appeal Brief      Part of Paper No. 20180813

Exhibit 13<br>-91-

**Continuation Sheet (PTOL-303)**                                      **Application No. 14/621,268**

Continuation of 3. NOTE:  The amendment change the scope of the claims that require further search and consideration.

**Exhibit 13**
**-92-**

| AFCP 2.0 Decision | Application No. | Applicant(s) |
|---|---|---|
| | 14/621,268 | LAMEGO, MARCELO M. |
| | Examiner | Art Unit |
| | HIEN NGUYEN | 3737 |

This is in response to the After Final Consideration Pilot request filed 10 August 2018.

1. **Improper Request** – The AFCP 2.0 request is improper for the following reason(s) and the after final amendment submitted with the request will be treated under pre-pilot procedure.

☐ An AFCP 2.0 request form PTO/SB/434 (or equivalent document) was not submitted.

☐ A non-broadening amendment to at least one independent claim was not submitted.

☐ A proper AFCP 2.0 request was submitted in response to the most recent final rejection.

☐ Other:

2. **Proper Request**

A. After final amendment submitted with the request will not be treated under AFCP 2.0.
   The after final amendment cannot be reviewed and a search conducted within the guidelines of the pilot program.

   ☒ The after final amendment will be treated under pre-pilot procedure.

B. Updated search and/or completed additional consideration.
   The examiner performed an updated search and/or completed additional consideration of the after final amendment within the time authorized for the pilot program. The result(s) of the updated search and/or completed additional consideration are:

   ☐ 1. All of the rejections in the most recent final Office action are overcome and a Notice of Allowance is issued herewith.

   ☐ 2. The after final amendment would not overcome all of the rejections in the most recent final Office action. See attached interview summary for further details.

   ☐ 3. The after final amendment was reviewed, and it raises a new issue(s). See attached interview summary for further details.

   ☐ 4. The after final amendment raises new issues, but would overcome all of the rejections in the most recent final Office action. A decision on determining allowability could not be made within the guidelines of the pilot. See attached interview summary for further details, including any newly discovered prior art.

   ☐ 5. Other:

   Examiner Note: Please attach an interview summary when necessary as described above.

Doc Code: A.NE.AFCP
Document Description: After Final Consideration Pilot Program Request

PTO/SB/434 (05-13)

| CERTIFICATION AND REQUEST FOR CONSIDERATION UNDER THE AFTER FINAL CONSIDERATION PILOT PROGRAM 2.0 | | |
|---|---|---|
| Practitioner Docket No.:<br>P22879US1 | Application No.:<br>14/621,268 | Filing Date:<br>February 12, 2015 |
| First Named Inventor:<br>Marcelo M. Lamego | Title:<br>Modulation and Demodulation Techniques for a Health Monitoring System | |

APPLICANT HEREBY CERTIFIES THE FOLLOWING AND REQUESTS CONSIDERATION UNDER THE AFTER FINAL CONSIDERATION PILOT PROGRAM 2.0 (AFCP 2.0) OF THE ACCOMPANYING RESPONSE UNDER 37 CFR 1.116.

1.  The above-identified application is (i) an original utility, plant, or design nonprovisional application filed under 35 U.S.C. 111(a) [a continuing application (*e.g.*, a continuation or divisional application) is filed under 35 U.S.C. 111(a) and is eligible under (i)], or (ii) an international application that has entered the national stage in compliance with 35 U.S.C. 371(c).

2.  The above-identified application contains an outstanding final rejection.

3.  Submitted herewith is a response under 37 CFR 1.116 to the outstanding final rejection. The response includes an amendment to at least one independent claim, and the amendment does not broaden the scope of the independent claim in any aspect.

4.  This certification and request for consideration under AFCP 2.0 is the only AFCP 2.0 certification and request filed in response to the outstanding final rejection.

5.  Applicant is willing and available to participate in any interview requested by the examiner concerning the present response.

6.  This certification and request is being filed electronically using the Office's electronic filing system (EFS-Web).

7.  Any fees that would be necessary consistent with current practice concerning responses after final rejection under 37 CFR 1.116, *e.g.*, extension of time fees, are being concurrently filed herewith. [There is no additional fee required to request consideration under AFCP 2.0.]

8.  By filing this certification and request, applicant acknowledges the following:

    •  Reissue applications and reexamination proceedings are not eligible to participate in AFCP 2.0.

    •  The examiner will verify that the AFCP 2.0 submission is compliant, *i.e.*, that the requirements of the program have been met (see items 1 to 7 above). For compliant submissions:

        ○  The examiner will review the response under 37 CFR 1.116 to determine if additional search and/or consideration (i) is necessitated by the amendment and (ii) could be completed within the time allotted under AFCP 2.0. If additional search and/or consideration is required but cannot be completed within the allotted time, the examiner will process the submission consistent with current practice concerning responses after final rejection under 37 CFR 1.116, *e.g.*, by mailing an advisory action.

        ○  If the examiner determines that the amendment does not necessitate additional search and/or consideration, or if the examiner determines that additional search and/or consideration is required and could be completed within the allotted time, then the examiner will consider whether the amendment places the application in condition for allowance (after completing the additional search and/or consideration, if required). If the examiner determines that the amendment does not place the application in condition for allowance, then the examiner will contact the applicant and request an interview.

            ■  The interview will be conducted by the examiner, and if the examiner does not have negotiation authority, a primary examiner and/or supervisory patent examiner will also participate.

            ■  If the applicant declines the interview, or if the interview cannot be scheduled within ten (10) calendar days from the date that the examiner first contacts the applicant, then the examiner will proceed consistent with current practice concerning responses after final rejection under 37 CFR 1.116.

| Signature<br>/Gregory W. Osterloth/ | Date<br>August 10, 2018 |
|---|---|
| Name<br>(Print/Typed) Gregory W. Osterloth | Practitioner<br>Registration No. 36,232 |

*Note: This form must be signed in accordance with 37 CFR 1.33. See 37 CFR 1.4(d) for signature requirements and certifications. Submit multiple forms if more than one signature is required, see below\*.*

☐  \* Total of _____ forms are submitted.

Exhibit 13
-94-

## Privacy Act Statement

The **Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent.  Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent.  If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a).  Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract.  Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906.  Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (*i.e.*, GSA or Commerce) directive.  Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151.  Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

Exhibit 13
-95-

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 33437778 |
| **Application Number:** | 14621268 |
| **International Application Number:** | |
| **Confirmation Number:** | 6317 |
| **Title of Invention:** | Modulation and Demodulation Techniques for a Health Monitoring System |
| **First Named Inventor/Applicant Name:** | Marcelo M. Lamego |
| **Customer Number:** | 62579 |
| **Filer:** | Gregory W. Osterloth/Valerie Brown |
| **Filer Authorized By:** | Gregory W. Osterloth |
| **Attorney Docket Number:** | P22879US1 |
| **Receipt Date:** | 10-AUG-2018 |
| **Filing Date:** | 12-FEB-2015 |
| **Time Stamp:** | 15:54:57 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | no |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Response After Final Action | P22879US1Amendment.pdf | 51485<br>89a33a2c3f9b5265ddo742ccee53766d7c0632ba | no | 10 |

**Warnings:**

Exhibit 13
-96-

**Information:**

| 2 | After Final Consideration Program Request | P22879US1AFCP.pdf | 211809 | no | 2 |
| --- | --- | --- | --- | --- | --- |
| | | | 86b976c2124624679b1d5280074dc4fc6df3844e | | |

**Warnings:**

**Information:**

| **Total Files Size (in bytes):** | 263294 |
| --- | --- |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

Exhibit 13
-97-

PTO/SB/06 (09-11)
Approved for use through 1/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| PATENT APPLICATION FEE DETERMINATION RECORD<br>Substitute for Form PTO-875 | Application or Docket Number<br>14/621,268 | Filing Date<br>02/12/2015 | ☐ To be Mailed |
|---|---|---|---|

**ENTITY:** ☒ LARGE  ☐ SMALL  ☐ MICRO

## APPLICATION AS FILED – PART I

|  | (Column 1) | (Column 2) |  |  |
|---|---|---|---|---|
| FOR | NUMBER FILED | NUMBER EXTRA | RATE ($) | FEE ($) |
| ☐ BASIC FEE<br>(37 CFR 1.16(a), (b), or (c)) | N/A | N/A | N/A | |
| ☐ SEARCH FEE<br>(37 CFR 1.16(k), (i), or (m)) | N/A | N/A | N/A | |
| ☐ EXAMINATION FEE<br>(37 CFR 1.16(o), (p), or (q)) | N/A | N/A | N/A | |
| TOTAL CLAIMS<br>(37 CFR 1.16(i)) | minus 20 = | * | X $ = | |
| INDEPENDENT CLAIMS<br>(37 CFR 1.16(h)) | minus 3 = | * | X $ = | |
| ☐ APPLICATION SIZE FEE<br>(37 CFR 1.16(s)) | If the specification and drawings exceed 100 sheets of paper, the application size fee due is $310 ($155 for small entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s). | | | |
| ☐ MULTIPLE DEPENDENT CLAIM PRESENT (37 CFR 1.16(j)) | | | | |
| * If the difference in column 1 is less than zero, enter "0" in column 2. | | | TOTAL | |

## APPLICATION AS AMENDED – PART II

|  |  | (Column 1) | (Column 2) | (Column 3) |  |  |
|---|---|---|---|---|---|---|
| **AMENDMENT** | **08/10/2018** | CLAIMS REMAINING AFTER AMENDMENT | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) |
| | Total (37 CFR 1.16(i)) | * 16 | Minus | ** 20 | = 0 | x $100 = | 0 |
| | Independent (37 CFR 1.16(h)) | * 3 | Minus | *** 3 | = 0 | x $460 = | 0 |
| | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | |
| | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | |
| | | | | | TOTAL ADD'L FEE | **0** |

|  |  | (Column 1) | (Column 2) | (Column 3) |  |  |
|---|---|---|---|---|---|---|
| **AMENDMENT** | | CLAIMS REMAINING AFTER AMENDMENT | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) |
| | Total (37 CFR 1.16(i)) | * | Minus | ** | = | x $ = | |
| | Independent (37 CFR 1.16(h)) | * | Minus | *** | = | x $ = | |
| | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | |
| | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | |
| | | | | | TOTAL ADD'L FEE | |

* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.
** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20".
*** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3".
The "Highest Number Previously Paid For" (Total or Independent) is the highest number found in the appropriate box in column 1.

LIE
LASHAWN MORGAN

This collection of information is required by 37 CFR 1.16. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

**Exhibit 13**
**-98-**

Attorney Docket No. P22879US1

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of:

| | | | |
|---|---|---|---|
| Inventor(s): | Marcelo M. Lamego | | |
| App. No.: | 14/621,268 | Con. No.: | 6317 |
| Filed: | February 12, 2015 | Art Unit: | 3777 |
| Title: | MODULATION AND DEMODULATION TECHNIQUES FOR A HEALTH MONITORING SYSTEM | Examiner: | Nguyen, Hien Ngoc |

## AMENDMENT AND RESPONSE TO FINAL OFFICE ACTION

Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Sir:

In response to the final Office action dated May 16, 2018, please consider the following remarks and amend the above-identified application as follows:

**Amendments to the Claims** begin on page 2 of this paper.

**Remarks** begin on page 8 of this paper.

1

**Exhibit 13**
-99-

**Amendments to the Claims:**

1.      (Withdrawn – Previously Presented)  An electronic device, comprising:

two or more light sources for emitting light toward a body part of a user;

an optical sensor for obtaining light samples and converting the light samples into a signal;

a processing device operably connected to the optical sensor for demodulating the signal received from the optical sensor into a demodulated signal associated with each light source;

at least one decimation stage for processing each demodulated signal, wherein each decimation stage comprises a low pass filter for receiving the demodulated signals and a decimation circuit operably connected to an output of the low pass filter; and

a demultiplexer and multiplier circuit operably connected to an output of a last decimation stage, wherein the demultiplexer separates the signals by each associated light source and the multiplier multiplies each separated signal by one or more respective multiplier values; wherein

in an initiation stage, the one or more respective multiplier values are determined by:

turning on a respective light source;

generating a respective initial signal in response to the optical sensor capturing a respective light sample corresponding to the respective light source;

processing the respective initial signal by the processing device and the at least one decimation stage to produce respective processed initial signals; and

determining the respective multiplier value based on the respective processed initial signals; and

in an operating stage after the initiation stage:

the optical sensor obtains the light samples and converts the light samples into the signal;

the signal is conditioned by the processing device, the at least one decimation stage, and the demultiplexer and multiplier circuit to obtain conditioned signals; and

the processing device analyzes the conditioned signals to estimate a physiological parameter of the user.

2.      (Canceled)

**Exhibit 13**
**-100-**

Attorney Docket No. P22879US1

3.      (Withdrawn)  The electronic device as in claim 1, wherein the electronic device is a wearable communication device.

4.      (Currently Amended)  A method for <u>estimating a physiological parameter</u> ~~processing a signal obtained by an electronic device when modulated light from multiple light sources of the electronic device is emitted toward a body part~~ of a user <u>using an electronic device</u>, the method comprising:

determining respective values for demultiplexed and demodulated signals by:

capturing, by a light sensor of the electronic device, initial light samples;

processing the initial light samples, by the electronic device, by demodulating, filtering, decimating, or demultiplexing the initial light samples to produce one or more processed signals; and

determining, by the electronic device, the respective values based on the one or more processed signals;

capturing, by the light sensor, a first set of light samples in response to a first of the multiple light sources of the electronic device emitting modulated light toward [[the]] <u>a</u> body part of the user;

capturing, by the light sensor, a second set of light samples in response to a second of the multiple light sources emitting modulated light toward the body part of the user;

converting, within the electronic device, the first set of light samples and the second set of light samples into the signal;

demodulating the signal, by the electronic device, to produce multiple demodulated signals, each associated with one of the multiple light sources;

filtering and decimating each demodulated signal at least once within the electronic device; and

demultiplexing the demodulated signals within the electronic device; and

multiplying each of the demultiplexed and demodulated signals by at least one of the respective values, using a multiplier circuit of the electronic device, to produce a signal associated with each light source; <u>and</u>

<u>analyzing each signal associated with each light source to estimate a physiological parameter of the user;</u> wherein

the at least one of the respective values adjusts each signal associated with each light source for changes over time in at least one of the light sensor, an operational amplifier associated with the light sensor, or a filter.

Exhibit 13
-101-

Attorney Docket No. P22879US1

5-12.   (Canceled)

13.      (Previously Presented)  The method as in claim 4, wherein demodulating the signal to produce multiple demodulated signals comprises applying a first demodulation operation of a sine function to the signal and applying a second demodulation operation of a cosine function to the signal.

14.      (Original)  The method as in claim 4, wherein filtering and decimating each demodulated signal at least once to produce a signal associated with each light source comprises inputting each demodulated signal into one or more low pass filter and decimation stages, wherein each low pass filter and decimation stage comprises a low pass filter for receiving a demodulated signal and a decimation circuit operably connected to an output of the low pass filter.

15-21.  (Canceled)

22.      (Previously Presented)  A method for estimating physiological parameters when modulated light from a first light source and a second light source is emitted toward a body part of a user, the method comprising:
determining a first multiplier value by:
        turning on the first light source;
        generating a first initial signal in response to capturing a first light sample corresponding to the first light source;
        demodulating the first initial signal to produce first initial demodulated signals;
        filtering and decimating the first initial demodulated signals; and
        determining the first multiplier value based on the filtered and decimated first initial demodulated signals;
determining a second multiplier value by:
        turning on the second light source;
        generating a second initial signal in response to capturing a second light sample corresponding to the second light source;
        demodulating the second initial signal to produce second initial demodulated signals;

Exhibit 13
-102-

Attorney Docket No. P22879US1

> filtering and decimating the second initial demodulated signals; and
>
> determining the second multiplier value based on the filtered and decimated

second initial demodulated signals;

capturing multiple light samples while the first light source and the second light source are turned on to emit modulated light toward the body part of the user and converting the multiple light samples into a captured signal;

demodulating the captured signal to produce multiple demodulated signals;

performing a first decimation stage by:

> low pass filtering each demodulated signal; and
>
> decimating each demodulated signal;

performing a second decimation stage after the first decimation stage by:

> low pass filtering each demodulated signal; and
>
> decimating each demodulated signal;

demultiplexing each demodulated signal after the second stage to produce a first signal associated with the first light source and a second signal associated with the second light source;

multiplying the first signal by the first multiplier value using a first multiplier circuit to obtain a first conditioned signal;

multiplying the second signal by the second multiplier value using a second multiplier circuit to obtain a second conditioned signal; and

analyzing the first conditioned signal and the second conditioned signal to estimate the physiological parameter of the user.


23.     (Previously Presented)  The method as in claim 22, wherein the capturing multiple light samples comprises capturing multiple light samples while:

the first light source is turned on and the second light source is turned off;

the second light source is turned on and the first light source is turned off; and

the first light source and the second light source are turned off after being turned on.


24.     (Previously Presented)  The method as in claim 23, wherein the capturing multiple light samples further comprises capturing one or more light samples after the first light source is turned off and before the second light source is turned on.

5

**Exhibit 13**
**-103-**

Attorney Docket No. P22879US1

25.     (Previously Presented)  The method as in claim 22, wherein the demodulating the captured signal to produce multiple demodulated signals comprises:
applying a first demodulation operation of a sine function to the captured signal; and
applying a second demodulation operation of a cosine function.

26-28.  (Canceled)

29.     (Previously Presented)  The method as in claim 23, wherein the multiple light samples comprise at least five light samples captured when the first light source is turned on and the second light source is turned off.

30.     (Currently Amended)  The method as in claim 22, wherein the first multiplier value and the second multiplier value adjust the captured signal for changes over time in at least one of a light an optical sensor, an operational amplifier associated with the light sensor, or a filter.

31.     (Previously Presented)  The method as in claim 22, wherein:
when the first light source is turned on, the first light source emits infrared light; and
when the second light source is turned on, the second light source emits visible light.

32.     (Previously Presented)  The method as in claim 22, further comprising turning on the first light source and the second light source to emit modulated light having a modulation frequency based on the harmonic frequencies of an electrical grid.

33.     (Currently Amended)  The method as in claim 32, wherein the capturing multiple light samples while the first light source and the second light source are turned on to emit modulated light toward the body part of the user comprises capturing light samples at a frequency correlated interrelated with the modulation frequency.

34.     (Previously Presented)  The electronic device as in claim 1, wherein the two or more light sources comprise:
a first light source which emits light within a first wavelength range; and
a second light source which emits light within a second, distinct wavelength range.

**Exhibit 13**
**-104-**

Attorney Docket No. P22879US1

35.    (Previously Presented)  The electronic device as in claim 1, wherein:

the two or more light sources comprise four light sources.

at least a first of the four light sources emits infrared light; and

at least a second of the four light sources emits visible light within a wavelength range associated with the color green.

**Exhibit 13**
**-105-**

## REMARKS

This paper is submitted in response to the final Office action mailed on May 16, 2018. This paper amends claims 4, 28, 30, and 33, and cancels claims 5 and 26-28. Accordingly, after entry of this Amendment and Response, claims 1, 3-4, 13-14, 22-25, and 29-35 will be pending, with claims 1 and 3 being previously withdrawn.

### I. Interview Summary

The Assignee thanks Examiner Nguyen for the courtesy of a telephonic interview on July 26, 2018. In attendance were Examiner Nguyen and the Assignee's representatives Gregory Osterloth and Benjamin Ryan. During the interview, the rejections to the claims under 35 U.S.C. §§ 101 and 112 and proposed amendments for overcoming these rejections were discussed. The Examiner indicated that claim 22 is not subject to a rejection under 35 U.S.C. § 101 because it recites a step of analyzing signals to estimate a physiological parameter of a user. No specific agreement was reached regarding the rejections under 35 U.S.C. § 112.

### II. Claim Rejections Under 35 U.S.C. § 101

The Examiner rejected claims 4-5, 13-14, and 26 under 35 U.S.C. § 101 asserting that the claimed invention is directed to a judicial exception. The amendments to claim 4 render these rejections moot.

Amended claim 4 recites, in part, analyzing signals associated with light sources to estimate a physiological parameter of a user. As discussed in the interview, claim 22 is directed to patentable subject matter because it recites a step of analyzing signals to estimate a physiological parameter of a user. For at least the same reasons, amended claim 4, along with dependent claims 5, 13-14, and 26 are also directed to patentable subject matter.

The Assignee respectfully submits, therefore, that none of the claims in the present application are directed to non-statutory subject matter under 35 U.S.C. § 101. Accordingly, the Assignee respectfully requests that the Examiner withdraw the rejections of claims 4-5, 13-14, and 26 under § 101.

### III. Claim Rejections Under 35 U.S.C. § 112

The Examiner rejected claims 26-28, 30, and 32-33 under 35 U.S.C. § 112(a) as failing to comply with the written description requirement. Regarding claims 28, 30, and 33, the

**Exhibit 13**
-106-

amendments to the claims render the rejections moot. Regarding claim 32, the Assignee respectfully traverses these rejections. Regarding claims 26-28, the claims are canceled, rendering the rejections moot.

Amended claim 30 has adequate support at least in paragraphs [0057]-[0058] of the Specification as filed. Amended claim 30 recites, in part, "wherein the first multiplier value and the second multiplier value adjust the captured signal for changes over time in at least one of an optical sensor, an operational amplifier, or a filter." Paragraphs [0057]-[0058] recite, in part:

> The multiplier circuit then multiplies each signal by respective weights or values. As one example, the values can be stored in a matrix, and each signal is multiplied by the values in a respective row in the matrix.
> …
> The operations of the components such as the optical sensor, the filters (e.g., high pass filters, low pass filters), the operational amplifiers, and the like, change over time due to temperature and other factors. The values in the matrix adjust the signals for these changes.

The foregoing provides adequate support for claim 30. Accordingly, the rejection of claim 30 under 35 U.S.C. § 112 should be withdrawn.

Amended claim 33 has adequate support at least in paragraph [0046] of the Specification as filed. Amended claim 33 recites, in part, "wherein the capturing multiple light samples while the first light source and the second light source are turned on to emit modulated light toward the body part of the user comprises capturing light samples at a frequency interrelated with the modulation frequency." Paragraph [0046] recites, in part, that "the modulation cycle frequency and the sampling frequency may be interrelated, which provides adequate support for claim 33. Accordingly, the rejection of claim 33 under 35 U.S.C. § 112 should be withdrawn.

Claim 32 has adequate support at least in paragraphs [0006], [0046], and [0047] of the Specification as filed. Claim 32 recites, in part, "turning on the first light source and the second light source to emit modulated light having a modulation frequency based on the harmonic frequencies of an electrical grid." Paragraph [0006] recites, in part, "the light sources can be modulated (e.g., turned on and off) according to a particular modulation pattern." Paragraph [0046] recites, in part, "the modulation cycle frequency and the sampling frequency may be interrelated." Paragraph [0047] recites, in part, "other embodiments can obtain a different number of samples and/or operate at a different frequency. The frequency may be determined based on a number of factors, one of which is the harmonics of the electrical network or grid." The foregoing provides adequate support for claim 32. Accordingly, the rejection of claim 32 under 35 U.S.C. § 112 should be withdrawn.

**Exhibit 13**
**-107-**

Attorney Docket No. P22879US1

*III. Allowable Subject Matter*

The Examiner indicated that claims 22-25 are allowed, and that claims 27-28, 30, and 32-33 would be allowable but for the rejection under 35 U.S.C. § 112. Claims 4-5, 13-14, and 26 would be allowable if rewritten to overcome the rejections under 35 U.S.C. § 101.

*IV. Conclusion*

The Assignee thanks the Examiner for the thorough review of the application. The Assignee respectfully submits the present application, as amended, is in condition for allowance and respectfully requests the issuance of a Notice of Allowability as soon as practicable.

This Amendment is filed with a Certification and Request for Consideration Under the After Final Consideration Pilot Program. The Assignee believes no fees or petitions are due with this filing. However, if any such petitions or fees are necessary, please consider this a request therefor and authorization to charge Deposit Account No. 504621 accordingly.

If the Examiner should require any additional information or amendment, please contact the undersigned attorney.

Dated:  August 10, 2018.

Respectfully submitted,

_____/Gregory W. Osterloth/_____
Gregory W. Osterloth, Registration No. 36,232
Attorney for Assignee
USPTO Customer No. 62579

Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, Colorado  80202
Phone:  303-223-1100
Fax:  303-223-1111

**Exhibit 13**
**-108-**

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 14/621,268 | 02/12/2015 | Marcelo M. Lamego | P22879US1 | 6317 |

62579          7590          08/01/2018
APPLE INC./BROWNSTEIN
c/o Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, CO 80202

| EXAMINER |
|---|
| NGUYEN, HIEN NGOC |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3737 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 08/01/2018 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

patentdocket@bhfs.com

Exhibit 13
-109-

| *Applicant-Initiated Interview Summary* | Application No. | Applicant(s) | | |
|---|---|---|---|---|
| | 14/621,268 | LAMEGO, MARCELO M. | | |
| | Examiner | Art Unit | AIA (First Inventor to File) Status | Page |
| | HIEN NGUYEN | 3737 | Yes | 1 of 1 |

All participants (applicant, applicant's representative, PTO personnel):

1.   HIEN NGUYEN (Primary Examiner); Telephonic       2.   GREGORY OSTERLOTH (Attorney of Record); Telephonic

3.   BENJAMIN RYAN (Attorney); Telephonic

**Date of Interview:** 26 July 2018

**Claim(s) discussed:** 4, 28, 30 AND 32-33

**Brief Description of main topic of discussion:** Applicant argues about 101 and 112 written description rejection.

## Issues Discussed:

**Item(s) under 35 U.S.C. 112:**
Applicant argues claims 28, 30 and 32-33 are supported by paragraphs [0054], [0057] and [0045-0046]. Applicant provided the wrong paragraphs. Examiner told applicant examiner need to further review the specification. Examiner also told applicant the claim language need to change because the support in the specification might not be the same as what are being claimed. No agreement has been reach.

**Item(s) under 35 U.S.C. 101:**
Applicant would like to know the different between claim 4 being rejected under 101 and claim 22 indicate allowable. Examiner told applicant claim for only claim process signal to obtain a value. Claim 22 process data to obtain the value then use the value to obtain medical information. Claim 22 has real life application. Claim 4 is just processing signal. No agreement has been reach.

**Attachment(s):** Agenda

| /HIEN NGUYEN/ Primary Examiner, Art Unit 3737 | |
|---|---|
| | |

**Applicant recordation instructions:** The formal written reply to the last Office action must include the substance of the interview. (See MPEP section 713.04). If a reply to the last Office action has already been filed, applicant is given a non-extendable time limit of the longer of one month or thirty days from this interview date, or the mailing date of this interview summary form, whichever is later, to file a statement of the substance of the interview.

**Examiner recordation instructions:** Examiners must summarize the substance of any interview of record. A complete and proper recordation of the substance of an interview should include the items listed in MPEP 713.04 for complete and proper recordation including the identification of the general thrust of each argument or issue discussed, a general indication of any other pertinent matters discussed regarding patentability and the general results or outcome of the interview, to include an indication as to whether or not agreement was reached on the issues raised.

**Applicant is reminded that a complete written statement as to the substance of the interview must be made of record in the application file. It is the applicant's responsibility to provide the written statement, unless the interview was initiated by the Examiner and the Examiner has indicated that a written summary will be provided. See MPEP 713.04**

Please further see:

**MPEP 713.04
Title 37 Code of Federal Regulations (CFR) § 1.133 Interviews, paragraph (b)
37 CFR § 1.2 Business to be transacted in writing**

Attorney Docket No. P22879US1

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of:

| | | | |
|---|---|---|---|
| Inventor(s): Marcelo M. Lamego | | | |
| App. No.: 14/621,268 | | Con. No.: | 6317 |
| Filed: February 12, 2015 | | Art Unit: | 3777 |
| Title: MODULATION AND DEMODULATION TECHNIQUES FOR A HEALTH MONITORING SYSTEM | | Examiner: | Nguyen, Hien Ngoc |

### AGENDA FOR EXAMINER INTERVIEW

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

### FOR DISCUSSION PURPOSES ONLY
### DO NOT ENTER

- Telephone conference to take place on Thursday July 26, 2018 at 11:30 AM ET.

- Attendees  Examiner Hien Ngoc Nguyen and the Assignee's representatives Gregory Osterloth and Benjamin Ryan.

- The Assignee's representatives request the interview to discuss the rejections under 35 U.S.C §§ 101 and 112.

- With respect to the 112 rejections of claims 28, 30, and 32-33, the Assignee's representatives believe claim 28 has support at paragraph [0054] of the specification as filed, claim 30 has support in paragraph [0057], and claims 32 and 33 have support in paragraphs [0045]-[0046].

Exhibit 13
-111-

**UNITED STATES PATENT AND TRADEMARK OFFICE**

# USPTO Automated Interview Request (AIR)

---

Jul 13 2018

---

This paper requesting to schedule and/or conduct an interview is appropriate because:

This submission is requested to be accepted as an authorization for this interview to communicate via the internet.  Recognizing that Internet communications are not secure, I hereby authorize the USPTO to communicate with the undersigned concerning scheduling of the interview via video conference, instant messaging, or electronic mail, and to conduct the interview in accordance with office practice including video conferencing.

Name(s):
Gregory Osterloth

S-signature:
/Gregory Osterloth/

Registration Number:
36232

U.S. Application Number:
14621268

Confirmation Number:
6317

E-mail Address:
gosterloth@bhfs.com

Phone Number:
3032231100

Proposed Time of Interview:
7-19-2018 1:00 PM ET

Alternative Proposed Time(s) of Interview:
  ET
Alternative Proposed Time(s) of Interview:
  ET
Prefered Interview Type:
Telephonic

I am the applicant or applicant's representative for this application.



**UNITED STATES
PATENT AND TRADEMARK OFFICE**

PALM-SILVER

**Exhibit 13
-112-**

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 14/621,268 | 02/12/2015 | Marcelo M. Lamego | P22879US1 | 6317 |

62579          7590          05/16/2018
APPLE INC./BROWNSTEIN
c/o Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, CO 80202

| EXAMINER |
|---|
| NGUYEN, HIEN NGOC |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3777 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 05/16/2018 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

patentdocket@bhfs.com

Exhibit 13
-113-

| **Office Action Summary** | Application No. 14/621,268 | Applicant(s) LAMEGO, MARCELO M. |
|---|---|---|
| | Examiner HIEN NGUYEN | Art Unit 3777 | AIA (First Inventor to File) Status Yes |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

### Period for Reply

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a).  In no event, however, may a reply be timely filed after SIX (6) months from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment.  See 37 CFR 1.704(b).

### Status

1) ☒ Responsive to communication(s) filed on <u>03/28/18</u>.
    ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.
2a) ☒ This action is **FINAL**.    2b) ☐ This action is non-final.
3) ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.
4) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

### Disposition of Claims*

5) ☒ Claim(s) <u>1,3-5,13,14 and 22-35</u> is/are pending in the application.
    5a) Of the above claim(s) <u>1,3,34 and 35</u> is/are withdrawn from consideration.
6) ☒ Claim(s) <u>22-25,29 and 31</u> is/are allowed.
7) ☒ Claim(s) <u>4,5,13,14,26-28,30,32 and 33</u> is/are rejected.
8) ☐ Claim(s) _____ is/are objected to.
9) ☐ Claim(s) _____ are subject to restriction and/or election requirement.
* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov.

### Application Papers

10) ☐ The specification is objected to by the Examiner.
11) ☒ The drawing(s) filed on <u>02/12/15</u> is/are:  a)☒ accepted or b)☐ objected to by the Examiner.
    Applicant may not request that any objection to the drawing(s) be held in abeyance.  See 37 CFR 1.85(a).
    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

### Priority under 35 U.S.C. § 119

12) ☐ Acknowledgement is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
**Certified copies:**
    a)☐ All  b)☐ Some**  c)☐ None of the:
    1. ☐ Certified copies of the priority documents have been received.
    2. ☐ Certified copies of the priority documents have been received in Application No. _____.
    3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).
** See the attached detailed Office action for a list of the certified copies not received.

### Attachment(s)

1) ☐ Notice of References Cited (PTO-892)
2) ☐ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b) Paper No(s)/Mail Date _____.
3) ☐ Interview Summary (PTO-413) Paper No(s)/Mail Date. _____ .
4) ☐ Other: _____.

**Exhibit 13**
-114-

Application/Control Number: 14/621,268                                           Page 2
Art Unit: 3777

The present application, filed on or after March 16, 2013, is being examined

under the first inventor to file provisions of the AIA.


# DETAILED ACTION


## *Claim Rejections - 35 USC § 101*


35 U.S.C. 101 reads as follows:

Whoever invents or discovers any new and useful process, machine, manufacture, or
composition of matter, or any new and useful improvement thereof, may obtain a patent
therefor, subject to the conditions and requirements of this title.

Claims 4-5, 13-14 and 26 are rejected under 35 U.S.C. 101 because the claimed

invention is directed to a judicial exception (i.e., a law of nature, a natural phenomenon,

or an abstract idea) without significantly more.  Claims 4-5, 13-14 and 26 are directed to

a method for processing light signal.  The claim(s) does/do not include additional

elements that are sufficient to amount to significantly more than the judicial exception

because the additional device elements, which are recited at a high level of generality,

provide conventional device functions that do not add meaningful limits to practicing the

abstract idea.


Claim 4 recites, in part, a method for processing light signal. The method involve

mathematical concepts such as mathematical relationships, mathematical formulas, and

calculation (demodulation and decimating involve mathematical algorithm and

Exhibit 13
-115-

Application/Control Number: 14/621,268                                      Page 3
Art Unit: 3777

processing), collecting and processing known information, comparing information

regarding a sample or test subject to a control or target data which correspond to

concepts identified as abstract ideas by the courts. The claims involve processing

signal, but do not claim how this is being performed and it's significant over the current

technology.


        The claim does not include additional elements that are sufficient to amount to

significantly more than the judicial exception because the additional elements when

considered both individually and as an ordered combination do not amount to

significantly more than the abstract idea. The claim recites the additional limitations of a

"capturing light sample", a "filtering" and a "light source". These additional elements are

recited at a high level of generality and are recited as performing generic computer

functions routinely used in computer applications. Generic computer components

recited as performing generic computer functions that are well-understood, routine and

conventional activities amount to no more than implementing the abstract idea with a

computerized system. Thus, taken alone, these additional elements do not amount to

significantly more than the above-identified judicial exception (the abstract idea).

Looking at the limitations as an ordered combination adds nothing that is not already

present when looking at the elements taken individually. There is no indication that the

combination of elements improves the functioning of a computer or improves any other

technology. Their collective functions merely provide conventional computer

implementation.

Exhibit 13
-116-

Application/Control Number: 14/621,268                                    Page 4

Art Unit: 3777

Claims 5, 13-14 and 26 are dependent on claim 4 that includes all the limitations of claim 4. Therefore, claims 5, 13-14 and 26 recites the same abstract idea of "mathematical relationship", "collecting and processing known information" and comparing information regarding a sample or test subject to a control or target data. The claim recites the additional limitations (perform demodulation using sin and cos equations; turn on and off light source and perform detection; filtering and decimation) that also mathematical relationship and collecting and comparing known information. Thus, taken alone, these additional elements do not amount to significantly more than the above-identified judicial exception (the abstract idea). Looking at the limitations as an ordered combination adds nothing that is not already present when looking at the elements taken individually. There is no indication that the combination of elements improves the functioning of a computer or improves any other technology. Their collective functions merely provide conventional computer implementation.

Claims 5, 13-14 and 26 are therefore not drawn to eligible subject matter as they are directed to an abstract idea without significantly more.

### *Claim Rejections - 35 USC § 112*

The following is a quotation of the first paragraph of 35 U.S.C. 112(a):

(a)  IN GENERAL.—The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it

Exhibit 13
-117-

Application/Control Number: 14/621,268                                              Page 5
Art Unit: 3777

> is most nearly connected, to make and use the same,  and shall set forth the best mode
> contemplated by the inventor or joint inventor of carrying out the invention.

### The following is a quotation of the first paragraph of pre-AIA 35 U.S.C. 112:

> The specification shall contain a written description of the invention, and of the
> manner and process of making and using it, in such full, clear, concise, and exact terms as to
> enable any person skilled in the art to which it pertains, or with which it is most nearly
> connected, to make and use the same, and shall set forth the best mode contemplated by the
> inventor of carrying out his invention.

Claims 26-28, 30 and 32-33 are rejected under 35 U.S.C. 112(a) or 35 U.S.C.
112 (pre-AIA), first paragraph, as failing to comply with the written description
requirement.  The claim(s) contains subject matter which was not described in the
specification in such a way as to reasonably convey to one skilled in the relevant art that
the inventor or a joint inventor, or for pre-AIA the inventor(s), at the time the application
was filed, had possession of the claimed invention. These limitations "wherein the
respective values are determined each time the user activates the electronic device;
storing the first multiplier value in the first multiplier circuit; and storing the second
multiplier value in the second multiplier circuit; wherein the demodulating the captured
signal to produce multiple demodulated signals further comprises a first demodulation
stage at a first harmonic frequency of the captured signal and a second demodulation
stage at a second harmonic frequency of the captured signal; wherein the first multiplier
value and the second multiplier value adjust the captured signal for changes over time
in at least one of a light sensor, an operational amplifier associated with the light sensor,
or a filter; turning on the first light source and the second light source to emit modulated
light having a modulation frequency based on the harmonic frequencies of an electrical
grid and wherein the capturing multiple light samples while the first light source and the

**Exhibit 13**
**-118-**

Application/Control Number: 14/621,268                                          Page 6
Art Unit: 3777

~~second light source are turned on to emit modulated light toward the body part of the~~
~~user comprises capturing light samples at a frequency correlated with the modulation~~
~~frequency~~" are not disclose in the specification. Examiner could not find these limitations
in the specification.

### *Allowable Subject Matter*

Claims 22-25 are allowed.

Claims 27-28, 30 and 32-33 would be allowable if rewritten to overcome the
rejection(s) under 35 U.S.C. 112(a) or 35 U.S.C. 112 (pre-AIA), 1st paragraph, set forth
in this Office action and to include all of the limitations of the base claim and any
intervening claims.

Claims 4-5, 13-14 and 26 would be allowable if rewritten to overcome the
rejection(s) under 35 U.S.C. 101, set forth in this Office action and to include all of the
limitations of the base claim and any intervening claims.

### *Response to Arguments*

Applicant's arguments filed 03//28/18 have been fully considered but they are not
persuasive. Applicant argues claim 4 and its dependent claims include several
additional limitations transform the claims, the claim limitations do considerably more
than implement an abstract idea on a generic computer. Applicant's argument is not
persuasive because the claim do not have any real-life practical application. It is just

**Exhibit 13**
**-119-**

Application/Control Number: 14/621,268                                    Page 7
Art Unit: 3777

processing signal from a generic computer. Light sensor for capturing light, filtering by

filter, demultiplexing and using multiplier circuit of the electronic device are conventional

step using conventional device. In previous office action examiner already provide art to

disclose that capturing light by light sensor, filtering by filter, demultiplexing and using

multiplier circuit of the electronic device are well-known. Using well-known electronic

devices to perform well-known steps is not significantly more than an abstract idea.

Sensor, filter, demultiplex and multiplier circuit are generic electronic/computer device.

The claim is an abstract idea (processing signal) perform on a generic

electronic/computer device.

        Applicant argues there are no identification of claim limitations that are not

adequately supported nor any explanation why the claims are not fully supported by the

disclosure. Applicant's argument is not persuasive because examiner explain that

claims 26-28, 30 and 32-33 are not disclose in the specification. All limitations in these

claims are not disclose in the specification. Examiner identify claims 26-28, 30 and 32-

33 lack support by the specification, which mean all limitations in these claims lack

support by the specification. Applicant argues examiner has not met the burden of

presenting evidence or reasons why a person skilled in the art would not recognize the

written description of the invention as providing adequate support for the claim

invention. Applicant's argument is not persuasive because examiner stated in the

rejection that the claim limitations is not in the specification. One of ordinary skill in the

art can not understand the claim limitations when the claim limitations is not in the

Exhibit 13
-120-

Application/Control Number: 14/621,268                                          Page 8
Art Unit: 3777

specification. The written description of the invention is not adequately support when the

claim limitations is not in the specification.

### Conclusion

Applicant's amendment necessitated the new ground(s) of rejection presented in

this Office action.  Accordingly, **THIS ACTION IS MADE FINAL**.  See MPEP

§ 706.07(a).  Applicant is reminded of the extension of time policy as set forth in 37

CFR 1.136(a).

A shortened statutory period for reply to this final action is set to expire THREE

MONTHS from the mailing date of this action.  In the event a first reply is filed within

TWO MONTHS of the mailing date of this final action and the advisory action is not

mailed until after the end of the THREE-MONTH shortened statutory period, then the

shortened statutory period will expire on the date the advisory action is mailed, and any

extension fee pursuant to 37 CFR 1.136(a) will be calculated from the mailing date of

the advisory action.  In no event, however, will the statutory period for reply expire later

than SIX MONTHS from the date of this final action.

Any inquiry concerning this communication or earlier communications from the

examiner should be directed to HIEN NGUYEN whose telephone number is (571)270-

7031.  The examiner can normally be reached on 7:30-5:00.

Examiner interviews are available via telephone, in-person, and video

conferencing using a USPTO supplied web-based collaboration tool. To schedule an

Exhibit 13
-121-

Application/Control Number: 14/621,268                                                   Page 9
Art Unit: 3777

interview, applicant is encouraged to use the USPTO Automated Interview Request

(AIR) at http://www.uspto.gov/interviewpractice.

    If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Robert Chen can be reached on (571) 272-3672.  The fax phone number for

the organization where this application or proceeding is assigned is 571-273-8300.

    Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a

USPTO Customer Service Representative or access to the automated information

system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.


/H. N./
Examiner, Art Unit 3777

/ELMER CHAO/
Primary Examiner, Art Unit 3777

Exhibit 13
-122-

**EAST Search History**

**EAST Search History (Prior Art)**

| Ref # | Hits | Search Query | DBs | Default Operator | Plurals | Time Stamp |
|-------|------|-------------|-----|------------------|---------|-----------|
| S1 | 283 | (("SLAYTON") near3 ("Michael")).INV. | US-PGPUB; USPAT; USOCR | OR | OFF | 2017/09/26 15:46 |
| S2 | 367894 | S1 ((acousto adj mechanical) effect).clm. | US-PGPUB; USPAT; USOCR | OR | OFF | 2017/09/26 15:49 |
| S3 | 4 | S1 ((acousto adj mechanical) effect).clm. | US-PGPUB; USPAT; USOCR | AND | OFF | 2017/09/26 15:49 |
| S4 | 51 | (("JAEGER") near3 ("Paul")).INV. | US-PGPUB; USPAT; USOCR | OR | OFF | 2017/09/26 16:01 |
| S5 | 2 | S4 ((acousto adj mechanical) effect).clm. | US-PGPUB; USPAT; USOCR | AND | OFF | 2017/09/26 16:02 |
| S6 | 3419 | (A61N7/00 or A61H23/0245).cpc. | US-PGPUB; USPAT; USOCR | AND | OFF | 2017/09/26 16:08 |
| S7 | 949 | ((acoust$2 adj mechanical) or (acoust$2 adj elastic)) ultraso$3 | US-PGPUB; USPAT; DERWENT | AND | OFF | 2017/09/26 16:59 |
| S8 | 22 | ((acoust$2 adj mechanical) or (acoust$2 adj elastic)) ultraso$3 pigment | US-PGPUB; USPAT; DERWENT | AND | OFF | 2017/09/26 17:00 |
| S9 | 100 | ((acousto adj mechanical) or (acousto adj elastic)) ultraso$3 | US-PGPUB; USPAT; DERWENT | AND | OFF | 2017/09/26 17:08 |
| S10 | 41 | ((acousto adj mechanical) or (acousto adj elastic)) ultraso$3 (skin or tissue or pigment) | US-PGPUB; USPAT; DERWENT | AND | OFF | 2017/09/26 17:16 |
| S11 | 3 | ((acousto adj mechanical) or (acousto adj elastic)) ultraso$3 (skin or tissue or pigment) hz kw | US-PGPUB; USPAT; DERWENT | AND | OFF | 2017/09/27 09:36 |
| S12 | 3 | ((acousto adj mechanical) or (acousto adj elastic)) ultraso$3 (skin or tissue or pigment) hz (kw or kwatt$1) | US-PGPUB; USPAT; DERWENT | AND | OFF | 2017/09/27 09:37 |
| S13 | 5 | ((acousto adj mechanical) or (acousto adj elastic)) ultraso$3 (skin or tissue or pigment) (khz or mhz) (kw or kwatt$1) | US-PGPUB; USPAT; DERWENT | AND | OFF | 2017/09/27 09:38 |
| S14 | 53 | (ultraso$3 same pigment) (khz or mhz) (kw or kwatt$1) | US-PGPUB; USPAT; DERWENT | AND | OFF | 2017/09/27 09:39 |
| S15 | 6 | (ultraso$3 same pigment) (khz or mhz) (kw or kwatt$1) (pulse adj duration) | US-PGPUB; USPAT; DERWENT | AND | OFF | 2017/09/27 09:39 |
| S16 | 2 | "20120143056" | US-PGPUB; USPAT; | AND | OFF | 2017/09/27 09:58 |

| S17 | 34 | (ultraso$3 same pigment) (khz or mhz) (pulse adj duration) | US-PGPUB; USPAT; DERWENT | AND | OFF | 2017/09/27 09:59 |
|-----|-----|-----|-----|-----|-----|-----|
| S18 | 8 | (ultraso$3 same pigment) (pulse adj duration) kw | US-PGPUB; USPAT; DERWENT | AND | OFF | 2017/09/27 10:23 |
| S19 | 3 | "20110263967" | US-PGPUB; USPAT; DERWENT | AND | OFF | 2017/09/27 10:27 |
| S20 | 264 | (ultraso$3 same pigment) kw | US-PGPUB; USPAT; DERWENT | AND | OFF | 2017/09/27 10:33 |
| S21 | 8 | (ultraso$3 same pigment) kw (pulse$1 adj duration) | US-PGPUB; USPAT; DERWENT | AND | OFF | 2017/09/27 10:34 |
| S22 | 26 | (ultraso$3 same pigment) kw duration | US-PGPUB; USPAT; DERWENT | AND | OFF | 2017/09/27 10:36 |
| S23 | 39 | (ultraso$3 same pigment same (target$3 or treat$4)) kw | US-PGPUB; USPAT; DERWENT | AND | OFF | 2017/09/27 10:37 |
| S24 | 9 | (ultraso$3 same pigment same (skin or tissue)) kw | US-PGPUB; USPAT; DERWENT | AND | OFF | 2017/09/27 10:38 |
| S25 | 132 | (ultraso$3 with (treat$4 or therap$5)) kw (pulse adj duration) | US-PGPUB; USPAT; DERWENT | AND | OFF | 2017/09/27 10:43 |
| S26 | 95 | (ultraso$3 with (treat$4 or therap$5)) kw (pulse adj duration) (skin or tissue) | US-PGPUB; USPAT; DERWENT | AND | OFF | 2017/09/27 10:44 |
| S27 | 84 | (ultraso$3 with (treat$4 or therap$5)) kw (pulse adj duration) (skin or tissue) (cavitation or thermal) | US-PGPUB; USPAT; DERWENT | AND | OFF | 2017/09/27 10:46 |
| S28 | 9 | (ultraso$3 with (treat$4 or therap$5)) (kw same (pulse adj duration) same ultraso$3) (skin or tissue) (cavitation or thermal) | US-PGPUB; USPAT; DERWENT | AND | OFF | 2017/09/27 10:51 |
| S29 | 18 | (ultraso$3 with (treat$4 or therap$5)) (kw same (pulse adj duration)) (skin or tissue) (cavitation or thermal) | US-PGPUB; USPAT; DERWENT | AND | OFF | 2017/09/27 10:52 |
| S30 | 44 | (ultraso$3 with (treat$4 or therap$5)) (kw with power) (pulse adj duration) (skin or tissue) (cavitation or thermal) | US-PGPUB; USPAT; DERWENT | AND | OFF | 2017/09/27 10:54 |
| S31 | 3 | ((acousto adj mechanical) or (acousto adj elastic)) ultraso$3 (pigment) | US-PGPUB; USPAT; DERWENT | AND | OFF | 2017/09/27 10:58 |
| S32 | 635 | (ultraso$3 with (treat$4 or therap$5)) (pulse adj duration) (skin or tissue) (cavitation or thermal) ((kw or watt$1 or w) with power) | US-PGPUB; USPAT; DERWENT | AND | OFF | 2017/09/27 11:12 |
| S33 | 431 | (ultraso$3 with (treat$4 or therap$5)) (pulse adj duration) (skin or tissue) (cavitation or thermal) ((kw or watt$1) with power) | US-PGPUB; USPAT; DERWENT | AND | OFF | 2017/09/27 11:12 |
| S34 | 56 | (ultraso$3 with (treat$4 or therap$5)) (pulse adj duration) (skin or tissue) | US-PGPUB; USPAT; | | OFF | 2017/09/27 11:15 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | (cavitation or thermal) ("50" adj (kw or watt$1)) | DERWENT | | | |
| S35 | 39 | (ultraso$3 with (treat$4 or therap$5)) (pulse adj duration) (skin or cosmetic) (cavitation or thermal) ("50" adj (kw or watt$1)) | US-PGPUB; USPAT; DERWENT | AND | OFF | 2017/09/27 11:16 |
| S36 | 50 | (ultraso$3 with (treat$4 or therap$5)) (pulse adj duration) (skin or cosmetic) (cavitation or thermal) (kw or kilowatt$1) | US-PGPUB; USPAT; DERWENT | AND | OFF | 2017/09/27 11:27 |
| S37 | 2 | "6488626".pn. | US-PGPUB; USPAT; DERWENT | AND | OFF | 2017/09/27 12:42 |
| S38 | 291 | ((("Slayton") near3 ("Michael") near3 ("H"))).INV. | US-PGPUB; USPAT; USOCR | OR | OFF | 2018/04/25 11:01 |
| S39 | 3 | S38 (acousto effect cavitation thermal).clm. | US-PGPUB; USPAT; USOCR | AND | OFF | 2018/04/25 11:02 |
| S40 | 52 | ((("Jaeger") near3 ("Paul"))).INV. | US-PGPUB; USPAT; USOCR | OR | OFF | 2018/04/25 11:22 |
| S41 | 1 | S40 (acousto effect cavitation thermal).clm. | US-PGPUB; USPAT; USOCR | AND | OFF | 2018/04/25 11:22 |
| S42 | 3593 | (A61N7/00 or A61H23/0245).cpc. | US-PGPUB; USPAT; USOCR | AND | OFF | 2018/04/25 12:18 |
| S43 | 61 | ((("Lamego") near3 ("Marcelo") near3 ("M"))).INV. | US-PGPUB; USPAT; USOCR | OR | OFF | 2018/04/26 10:12 |
| S44 | 3597 | (A61N7/00 or A61H23/0245).cpc. | US-PGPUB; USPAT; USOCR | AND | OFF | 2018/04/26 11:21 |

**4/26/2018 1:01:57 PM**
**C:\ Users\ hnguyen55\ Documents\ EAST\ Workspaces\ 14751349.wsp**

| *Search Notes* | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 14621268 | LAMEGO, MARCELO M. |
| | **Examiner** | **Art Unit** |
| | HIEN NGUYEN | 3777 |

### CPC- SEARCHED

| Symbol | Date | Examiner |
|---|---|---|
| (A61B5/0059 or A61B5/0084).cpc. | 4/26/2018 | HN |

### CPC COMBINATION SETS  - SEARCHED

| Symbol | Date | Examiner |
|---|---|---|
| | | |

### US CLASSIFICATION SEARCHED

| Class | Subclass | Date | Examiner |
|---|---|---|---|
| | | | |

* See search history printout included with this form or the SEARCH NOTES box below to determine the scope of the search.

### SEARCH NOTES

| Search Notes | Date | Examiner |
|---|---|---|
| East Search (inventor search) | 1/24/2017 | HN |
| East Search | 10/3/2017 | HN |
| East Search | 11/29/2017 | HN |
| Please see attach search report | | |
| East Search | 4/26/2018 | HN |
| Please see attach search report | | |

### INTERFERENCE SEARCH

| US Class/ CPC Symbol | US Subclass / CPC Group | Date | Examiner |
|---|---|---|---|
| | | | |

| | |
|---|---|
| | |

Part of Paper No. : 20180426

**Exhibit 13**
**-126-**

| *Index of Claims* | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 14621268 | LAMEGO, MARCELO M. |
| | **Examiner** | **Art Unit** |
| | HIEN NGUYEN | 3777 |

| ✓ | **Rejected** | | - | **Cancelled** | | N | **Non-Elected** | | A | **Appeal** |
|---|---|---|---|---|---|---|---|---|---|---|
| = | **Allowed** | | ÷ | **Restricted** | | I | **Interference** | | O | **Objected** |

| ☐ Claims renumbered in the same order as presented by applicant | | ☐ CPA | ☐ T.D. | ☐ R.1.47 |

| CLAIM | | DATE | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Final | Original | 08/02/2016 | 01/24/2017 | 04/26/2018 | | | | | | |
| | 1 | N | N | N | | | | | | |
| | 2 | N | - | - | | | | | | |
| | 3 | N | N | N | | | | | | |
| | 4 | ✓ | ✓ | ✓ | | | | | | |
| | 5 | ✓ | ✓ | ✓ | | | | | | |
| | 6 | ✓ | ✓ | - | | | | | | |
| | 7 | ✓ | ✓ | - | | | | | | |
| | 8 | ✓ | ✓ | - | | | | | | |
| | 9 | ✓ | ✓ | - | | | | | | |
| | 10 | ✓ | ✓ | - | | | | | | |
| | 11 | ✓ | ✓ | - | | | | | | |
| | 12 | ✓ | ✓ | - | | | | | | |
| | 13 | ✓ | ✓ | ✓ | | | | | | |
| | 14 | ✓ | ✓ | ✓ | | | | | | |
| | 15 | N | - | - | | | | | | |
| | 16 | N | - | - | | | | | | |
| | 17 | N | - | - | | | | | | |
| | 18 | N | - | - | | | | | | |
| | 19 | N | - | - | | | | | | |
| | 20 | N | - | - | | | | | | |
| | 21 | | ✓ | - | | | | | | |
| | 22 | | ✓ | = | | | | | | |
| | 23 | | ✓ | = | | | | | | |
| | 24 | | ✓ | = | | | | | | |
| | 25 | | ✓ | = | | | | | | |
| | 26 | | | ✓ | | | | | | |
| | 27 | | | ✓ | | | | | | |
| | 28 | | | ✓ | | | | | | |
| | 29 | | | = | | | | | | |
| | 30 | | | ✓ | | | | | | |
| | 31 | | | = | | | | | | |
| | 32 | | | ✓ | | | | | | |
| | 33 | | | ✓ | | | | | | |
| | 34 | | | N | | | | | | |
| | 35 | | | N | | | | | | |

Part of Paper No. :  20180426

**Exhibit 13**
**-127-**

Attorney Docket No. P22879US1

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of:

| | | | |
|---|---|---|---|
| Inventor(s): | Marcelo M. Lamego | | |
| App. No.: | 14/621,268 | Con. No.: | 6317 |
| Filed: | February 12, 2015 | Art Unit: | 3777 |
| Title: | MODULATION AND DEMODULATION TECHNIQUES FOR A HEALTH MONITORING SYSTEM | Examiner: | Nguyen, Hien Ngoc |

## AMENDMENT AND RESPONSE TO OFFICE ACTION

Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Sir:

In response to the Office action dated December 29, 2017, please consider the following remarks and amend the above-identified application as follows:

**Amendments to the Claims** begin on page 2 of this paper.

**Remarks** begin on page 8 of this paper.

Exhibit 13
-128-

Attorney Docket No. P22879US1

**Amendments to the Claims:**

1.      (Withdrawn – Previously Presented)  An electronic device, comprising:

two or more light sources for emitting light toward a body part of a user;

an optical sensor for obtaining light samples and converting the light samples into a signal;

a processing device operably connected to the optical sensor for demodulating the signal received from the optical sensor into a demodulated signal associated with each light source;

at least one decimation stage for processing each demodulated signal, wherein each decimation stage comprises a low pass filter for receiving the demodulated signals and a decimation circuit operably connected to an output of the low pass filter; and

a demultiplexer and multiplier circuit operably connected to an output of a last decimation stage, wherein the demultiplexer separates the signals by each associated light source and the multiplier multiplies each separated signal by one or more respective multiplier values; wherein

in an initiation stage, the one or more respective multiplier values are determined by:

turning on a respective light source;

generating a respective initial signal in response to the optical sensor capturing a respective light sample corresponding to the respective light source;

processing the respective initial signal by the processing device and the at least one decimation stage to produce respective processed initial signals; and

determining the respective multiplier value based on the respective processed initial signals; and

in an operating stage after the initiation stage:

the optical sensor obtains the light samples and converts the light samples into the signal;

the signal is conditioned by the processing device, the at least one decimation stage, and the demultiplexer and multiplier circuit to obtain conditioned signals; and

the processing device analyzes the conditioned signals to estimate a physiological parameter of the user.

2.      (Canceled)

**Exhibit 13**
**-129-**

Attorney Docket No. P22879US1

3.      (Withdrawn)  The electronic device as in claim 1, wherein the electronic device is a wearable communication device.

4.      (Currently Amended)  A method for processing a signal obtained <u>by an electronic device</u> when modulated light from multiple light sources <u>of the electronic device</u> is emitted toward a body part of a user, the method comprising:

determining respective values for demultiplexed and demodulated signals by:

capturing, by a light sensor <u>of the electronic device</u>, initial light samples;

processing the initial light samples<u>, by the electronic device,</u> by demodulating, filtering, decimating, or demultiplexing the initial light samples to produce one or more processed signals; and

determining<u>, by the electronic device,</u> the respective values based on the one or more processed signals;

capturing, by the light sensor, a first set of light samples in response to a first of the multiple light sources <u>of the electronic device</u> emitting modulated light toward the body part of the user;

capturing, by the light sensor, a second set of light samples in response to a second of the multiple light sources emitting modulated light toward the body part of the user;

converting<u>, within the electronic device,</u> the first set of light samples and the second set of light samples into the signal;

demodulating the signal<u>, by the electronic device,</u> to produce multiple demodulated signals, each associated with one of the multiple light sources;

filtering and decimating each demodulated signal at least once <u>within the electronic device</u>; and

demultiplexing the demodulated signals <u>within the electronic device</u>; and

multiplying each of the demultiplexed and demodulated signals by at least one of the respective values<u>, using a multiplier circuit of the electronic device,</u> to produce a signal associated with each light source; wherein

the at least one of the respective values adjusts each signal associated with each light source for changes over time in at least one of the light sensor, an operational amplifier associated with the light sensor, or a filter.

5.      (Original)  The method as in claim 4, further comprising analyzing each signal associated with each light source to estimate a physiological parameter of the user.

**Exhibit 13**
**-130-**

6-12.   (Canceled)

13.      (Previously Presented)  The method as in claim 4, wherein demodulating the signal to produce multiple demodulated signals comprises applying a first demodulation operation of a sine function to the signal and applying a second demodulation operation of a cosine function to the signal.

14.      (Original)  The method as in claim 4, wherein filtering and decimating each demodulated signal at least once to produce a signal associated with each light source comprises inputting each demodulated signal into one or more low pass filter and decimation stages, wherein each low pass filter and decimation stage comprises a low pass filter for receiving a demodulated signal and a decimation circuit operably connected to an output of the low pass filter.

15-21.  (Canceled)

22.      (Previously Presented)  A method for estimating physiological parameters when modulated light from a first light source and a second light source is emitted toward a body part of a user, the method comprising:
determining a first multiplier value by:
        turning on the first light source;
        generating a first initial signal in response to capturing a first light sample corresponding to the first light source;
        demodulating the first initial signal to produce first initial demodulated signals;
        filtering and decimating the first initial demodulated signals; and
        determining the first multiplier value based on the filtered and decimated first initial demodulated signals;
determining a second multiplier value by:
        turning on the second light source;
        generating a second initial signal in response to capturing a second light sample corresponding to the second light source;
        demodulating the second initial signal to produce second initial demodulated signals;

Exhibit 13
-131-

filtering and decimating the second initial demodulated signals; and

determining the second multiplier value based on the filtered and decimated second initial demodulated signals;

capturing multiple light samples while the first light source and the second light source are turned on to emit modulated light toward the body part of the user and converting the multiple light samples into a captured signal;

demodulating the captured signal to produce multiple demodulated signals;

performing a first decimation stage by:

low pass filtering each demodulated signal; and

decimating each demodulated signal;

performing a second decimation stage after the first decimation stage by:

low pass filtering each demodulated signal; and

decimating each demodulated signal;

demultiplexing each demodulated signal after the second stage to produce a first signal associated with the first light source and a second signal associated with the second light source;

multiplying the first signal by the first multiplier value using a first multiplier circuit to obtain a first conditioned signal;

multiplying the second signal by the second multiplier value using a second multiplier circuit to obtain a second conditioned signal; and

analyzing the first conditioned signal and the second conditioned signal to estimate the physiological parameter of the user.

23.    (Previously Presented)  The method as in claim 22, wherein the capturing multiple light samples comprises capturing multiple light samples while:

the first light source is turned on and the second light source is turned off;

the second light source is turned on and the first light source is turned off; and

the first light source and the second light source are turned off after being turned on.

24.    (Previously Presented)  The method as in claim 23, wherein the capturing multiple light samples further comprises capturing one or more light samples after the first light source is turned off and before the second light source is turned on.

**Exhibit 13**
**-132-**

Attorney Docket No. P22879US1

25.     (Previously Presented)  The method as in claim 22, wherein the demodulating the captured signal to produce multiple demodulated signals comprises:

applying a first demodulation operation of a sine function to the captured signal; and

applying a second demodulation operation of a cosine function.

26.     (Previously Presented)  The method as in claim 4, wherein the respective values are determined each time the user activates the electronic device.

27.     (Previously Presented)  The method as in claim 22, further comprising:

storing the first multiplier value in the first multiplier circuit; and

storing the second multiplier value in the second multiplier circuit.

28.     (Previously Presented)  The method as in claim 25, wherein the demodulating the captured signal to produce multiple demodulated signals further comprises a first demodulation stage at a first harmonic frequency of the captured signal and a second demodulation stage at a second harmonic frequency of the captured signal.

29.     (Previously Presented)  The method as in claim 23, wherein the multiple light samples comprise at least five light samples captured when the first light source is turned on and the second light source is turned off.

30.     (Previously Presented)  The method as in claim 22, wherein the first multiplier value and the second multiplier value adjust the captured signal for changes over time in at least one of a light sensor, an operational amplifier associated with the light sensor, or a filter.

31.     (Previously Presented)  The method as in claim 22, wherein:

when the first light source is turned on, the first light source emits infrared light; and

when the second light source is turned on, the second light source emits visible light.

32.     (Previously Presented)  The method as in claim 22, further comprising turning on the first light source and the second light source to emit modulated light having a modulation frequency based on the harmonic frequencies of an electrical grid.

Exhibit 13
-133-

Attorney Docket No. P22879US1

33.      (Previously Presented)  The method as in claim 32, wherein the capturing multiple light samples while the first light source and the second light source are turned on to emit modulated light toward the body part of the user comprises capturing light samples at a frequency correlated with the modulation frequency.

34.      (Previously Presented)  The electronic device as in claim 1, wherein the two or more light sources comprise:

a first light source which emits light within a first wavelength range; and

a second light source which emits light within a second, distinct wavelength range.

35.      (Previously Presented)  The electronic device as in claim 1, wherein:

the two or more light sources comprise four light sources.

at least a first of the four light sources emits infrared light; and

at least a second of the four light sources emits visible light within a wavelength range associated with the color green.

**Exhibit 13**
**-134-**

## REMARKS

This paper is submitted in response to the Office action mailed on December 29, 2017. This paper amends claim 4.  Accordingly, after entry of this Amendment and Response, claims 1, 3-5, 13, 14, and 22-35 will be pending, with claims 1, 3, 34, and 35 being previously withdrawn.

### I.  Claim Rejections Under 35 U.S.C. § 101

The Examiner rejected claims 4-5, 13-14, and 26 under 35 U.S.C. § 101 asserting that the claimed invention is directed to a judicial exception. For at least the following reasons, the Assignee respectfully traverses these rejections.

The Assignee notes that the rejections for claims 4-5, 13-14, and 26 have been maintained sufficiently identically from the previous Office action. The Assignee points to the Supplemental Amendment and Response filed November 11, 2017 as containing a detailed argument against the rejections repeated in the current office action.

In the interest of advancing prosecution, and without conceding any of the examiner's assertions made in rejection, the Assignee has amended claim 4 herein.

Amended claim 4 recites, in part,

capturing, by a light sensor of the electronic device, initial light samples;
processing the initial light samples, by the electronic device, by demodulating, filtering, decimating, or demultiplexing the initial light samples to produce one or more processed signals; and
determining, by the electronic device, the respective values based on the one or more processed signals;
capturing, by the light sensor, a first set of light samples in response to a first of the multiple light sources of the electronic device emitting modulated light toward the body part of the user;
capturing, by the light sensor, a second set of light samples in response to a second of the multiple light sources emitting modulated light toward the body part of the user;
converting, within the electronic device, the first set of light samples and the second set of light samples into the signal;
demodulating the signal, by the electronic device, to produce multiple demodulated signals, each associated with one of the multiple light sources;
filtering and decimating each demodulated signal at least once within the electronic device; and
demultiplexing the demodulated signals within the electronic device; and
multiplying each of the demultiplexed and demodulated signals by at least one of the respective values, using a multiplier circuit of the electronic device, to produce a signal associated with each light source

Exhibit 13
-135-

Attorney Docket No. P22879US1

As set forth in the arguments presented in the Supplemental Amendment and Response filed November 11, 2017, claim 4 is not directed to, and would not grant any monopoly over, an abstract idea.

Further, under the second step of the *Alice* test, even if the claims were directed to a patent-ineligible concept, several additional limitations transform the claims. For example, claim 4 recites "determining, by the electronic device, respective values for demultiplexed and demodulated signals," "capturing, by a light sensor, a first set of light samples in response to a first of the multiple light sources of the electronic device emitting modulated light toward the body part of the user," "capturing, by the light sensor, a second set of light samples in response to a second of the multiple light sources emitting modulated light toward the body part of the user," "converting, within the electronic device, the multiple light samples into the signal," "demodulating the signal, by the electronic device, to produce multiple demodulated signals, each associated with one of the multiple light sources," "filtering and decimating each demodulated signal at least once within the electronic device," "demultiplexing the demodulated signals within the electronic device," and "multiplying each of the demultiplexed and demodulated signals by at least one of the respective values, using a multiplier circuit of the electronic device."

In *Alice*, the Court stated that "the relevant question is whether the claims do more than simply instruct the practitioner to implement the abstract idea of intermediate settlement on a generic computer." *Alice* at 2359. The above listed limitations, among others, do considerably more than implement an abstract idea on a generic computer.

The Assignee respectfully submits, therefore, that none of the claims in the present application are directed to non-statutory subject matter under 35 U.S.C. § 101. Accordingly, the Assignee respectfully requests that the Examiner withdraw the rejections of claims 4-5, 13-14, and 26 under § 101.

## II.  Claim Rejections Under 35 U.S.C. § 112

The Examiner rejected claims 26-28, 30, and 32-33 under 35 U.S.C. § 112(a) as failing to comply with the enablement requirement. For at least the following reasons, the Assignee respectfully traverses these rejections.

There is a presumption that an adequate written description of the claimed invention is present in the specification as filed. *In re Wertheim*, 541 F.2d at 262, 191 USPQ at 96. Thus, the examiner has the initial burden, after a thorough reading and evaluation of the content of the

application, of presenting evidence or reasons why a person skilled in the art would not recognize the written description of the invention as providing adequate support for the claimed invention. To make a prima facie case, it is necessary to identify the claim limitations that are not adequately supported, and explain why the claim is not fully supported by the disclosure. MPEP § 2163.

The Examiner has not met the burden of presenting evidence or reasons why a person skilled in the art would not recognize the written description of the invention as providing adequate support for the claimed invention. There has been no identification of claim limitations that are not adequately supported nor any explanation why the claims are not fully supported by the disclosure. Accordingly, the rejections under 35 U.S.C. § 112 should be withdrawn.

### III.  Allowable Subject Matter

The Examiner indicated that claims 22-25 are allowed, and that claims 27-28, 30, and 32-33 would be allowable but for the rejection under 35 U.S.C. § 112.

### IV.  Conclusion

The Assignee thanks the Examiner for the thorough review of the application. The Assignee respectfully submits the present application, as amended, is in condition for allowance and respectfully requests the issuance of a Notice of Allowability as soon as practicable.

Exhibit 13
-137-

The Assignee believes no fees or petitions are due with this filing.  However, should any such fees or petitions be required, please consider this a request therefor and authorization to charge Deposit Account No. 504621 as necessary.

If the Examiner should require any additional information or amendment, please contact the undersigned attorney.

Dated:  March 28, 2018.

Respectfully submitted,

_____/Gregory W. Osterloth/_____

Gregory W. Osterloth, Registration No. 36,232
Attorney for Assignee
USPTO Customer No. 62579

Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, Colorado  80202
Phone:  303-223-1100
Fax:  303-223-1111

Exhibit 13
-138-

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 32188379 |
| **Application Number:** | 14621268 |
| **International Application Number:** | |
| **Confirmation Number:** | 6317 |
| **Title of Invention:** | Modulation and Demodulation Techniques for a Health Monitoring System |
| **First Named Inventor/Applicant Name:** | Marcelo M. Lamego |
| **Customer Number:** | 62579 |
| **Filer:** | Gregory W. Osterloth/Valerie Brown |
| **Filer Authorized By:** | Gregory W. Osterloth |
| **Attorney Docket Number:** | P22879US1 |
| **Receipt Date:** | 28-MAR-2018 |
| **Filing Date:** | 12-FEB-2015 |
| **Time Stamp:** | 18:29:35 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | no |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Amendment/Req. Reconsideration-After Non-Final Reject | P22879US1Amendment.pdf | 53755 <br> 78f7b54bfd8a7d23524138bc258154ff3d3f945c | no | 11 |

**Warnings:**

Exhibit 13
-139-

**Information:**

| | |
|---|---|
| **Total Files Size (in bytes):** | 53755 |

**This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.**

**New Applications Under 35 U.S.C. 111**
**If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.**
**National Stage of an International Application under 35 U.S.C. 371**
**If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.**
**New International Application Filed with the USPTO as a Receiving Office**
**If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.**

**Exhibit 13**
**-140-**

PTO/SB/06 (09-11)
Approved for use through 1/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| PATENT APPLICATION FEE DETERMINATION RECORD<br>Substitute for Form PTO-875 | Application or Docket Number<br>14/621,268 | Filing Date<br>02/12/2015 | ☐ To be Mailed |
|---|---|---|---|

**ENTITY:** ☒ LARGE ☐ SMALL ☐ MICRO

## APPLICATION AS FILED – PART I

|  | (Column 1) | (Column 2) |  |  |
|---|---|---|---|---|
| FOR | NUMBER FILED | NUMBER EXTRA | RATE ($) | FEE ($) |
| ☐ BASIC FEE<br>(37 CFR 1.16(a), (b), or (c)) | N/A | N/A | N/A | |
| ☐ SEARCH FEE<br>(37 CFR 1.16(k), (i), or (m)) | N/A | N/A | N/A | |
| ☐ EXAMINATION FEE<br>(37 CFR 1.16(o), (p), or (q)) | N/A | N/A | N/A | |
| TOTAL CLAIMS<br>(37 CFR 1.16(i)) | minus 20 = | * | X $ = | |
| INDEPENDENT CLAIMS<br>(37 CFR 1.16(h)) | minus 3 = | * | X $ = | |
| ☐ APPLICATION SIZE FEE<br>(37 CFR 1.16(s)) | If the specification and drawings exceed 100 sheets of paper, the application size fee due is $310 ($155 for small entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s). | | | |
| ☐ MULTIPLE DEPENDENT CLAIM PRESENT (37 CFR 1.16(j)) | | | | |
| * If the difference in column 1 is less than zero, enter "0" in column 2. | | | TOTAL | |

## APPLICATION AS AMENDED – PART II

|  |  | (Column 1) | (Column 2) | (Column 3) |  |  |
|---|---|---|---|---|---|---|
| **AMENDMENT** | | CLAIMS REMAINING AFTER AMENDMENT | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) |
| | Total (37 CFR 1.16(i)) | * | Minus | ** | = | X $ = | |
| | Independent (37 CFR 1.16(h)) | * | Minus | *** | = | X $ = | |
| | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | |
| | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | |
| | | | | | TOTAL ADD'L FEE | |

|  |  | (Column 1) | (Column 2) | (Column 3) |  |  |
|---|---|---|---|---|---|---|
| **AMENDMENT** | **03/28/2018** | CLAIMS REMAINING AFTER AMENDMENT | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) |
| | Total (37 CFR 1.16(i)) | * 20 | Minus | ** 20 | = 0 | x $100 = | 0 |
| | Independent (37 CFR 1.16(h)) | * 3 | Minus | *** 3 | = 0 | x $460 = | 0 |
| | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | |
| | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | |
| | | | | | TOTAL ADD'L FEE | 0 |

* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.
** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20".
*** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3".
The "Highest Number Previously Paid For" (Total or Independent) is the highest number found in the appropriate box in column 1.

LIE
/RUBY JOHNSON/

This collection of information is required by 37 CFR 1.16. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

**Exhibit 13**
-141-

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 14/621,268 | 02/12/2015 | Marcelo M. Lamego | P22879US1 | 6317 |

62579          7590          12/29/2017
APPLE INC.
c/o Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, CO 80202

| EXAMINER |
|---|
| NGUYEN, HIEN NGOC |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3777 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 12/29/2017 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

patentdocket@bhfs.com

Exhibit 13
-142-

| **Office Action Summary** | Application No.<br>14/621,268 | Applicant(s)<br>LAMEGO, MARCELO M. |
|---|---|---|
| | Examiner<br>HIEN NGUYEN | Art Unit<br>3777 | AIA (First Inventor to File)<br>Status<br>Yes |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

### Period for Reply

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a).  In no event, however, may a reply be timely filed after SIX (6) months from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment.  See 37 CFR 1.704(b).

### Status

1)☒ Responsive to communication(s) filed on <u>11/22/2017</u>.
  ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.
2a)☐ This action is **FINAL**.  2b)☒ This action is non-final.
3)☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.
4)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

### Disposition of Claims*

5)☒ Claim(s) <u>1,3-5,13,14 and 22-35</u> is/are pending in the application.
  5a) Of the above claim(s) <u>1,3,34 and 35</u> is/are withdrawn from consideration.
6)☒ Claim(s) <u>22-25, 29 and 31</u> is/are allowed.
7)☒ Claim(s) <u>4,5,13,14,26-28,30,32 and 33</u> is/are rejected.
8)☐ Claim(s) _____ is/are objected to.
9)☐ Claim(s) _____ are subject to restriction and/or election requirement.
* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov.

### Application Papers

10)☐ The specification is objected to by the Examiner.
11)☒ The drawing(s) filed on <u>02/12/15</u> is/are:  a)☒ accepted or b)☐ objected to by the Examiner.
  Applicant may not request that any objection to the drawing(s) be held in abeyance.  See 37 CFR 1.85(a).
  Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

### Priority under 35 U.S.C. § 119

12)☐ Acknowledgement is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
  **Certified copies:**
  a)☐ All  b)☐ Some**  c)☐ None of the:
  1.☐  Certified copies of the priority documents have been received.
  2.☐  Certified copies of the priority documents have been received in Application No. _____.
  3.☐  Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).
** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**
1) ☐ Notice of References Cited (PTO-892)
2) ☐ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b) Paper No(s)/Mail Date _____.
3) ☐ Interview Summary (PTO-413) Paper No(s)/Mail Date. _____.
4) ☐ Other: _____.

Application/Control Number: 14/621,268                                    Page 2
Art Unit: 3777

The present application, filed on or after March 16, 2013, is being examined

under the first inventor to file provisions of the AIA.


# DETAILED ACTION


## *Claim Rejections - 35 USC § 101*


35 U.S.C. 101 reads as follows:

Whoever invents or discovers any new and useful process, machine, manufacture, or
composition of matter, or any new and useful improvement thereof, may obtain a patent
therefor, subject to the conditions and requirements of this title.

Claims 4-5, 13-14 and 26 are rejected under 35 U.S.C. 101 because the claimed

invention is directed to a judicial exception (i.e., a law of nature, a natural phenomenon,

or an abstract idea) without significantly more.  Claims 4-5, 13-14 and 26 are directed to

a method for processing light signal.  The claim(s) does/do not include additional

elements that are sufficient to amount to significantly more than the judicial exception

because the additional device elements, which are recited at a high level of generality,

provide conventional device functions that do not add meaningful limits to practicing the

abstract idea.


Claim 4 recites, in part, a method for processing light signal. The method involve

mathematical concepts such as mathematical relationships, mathematical formulas, and

calculation (demodulation and decimating involve mathematical algorithm and

Exhibit 13
-144-

Application/Control Number: 14/621,268                                    Page 3
Art Unit: 3777

processing), collecting and processing known information, comparing information regarding a sample or test subject to a control or target data which correspond to concepts identified as abstract ideas by the courts. The claims involve processing signal, but do not claim how this is being performed and it's significant over the current technology.


    The claim does not include additional elements that are sufficient to amount to significantly more than the judicial exception because the additional elements when considered both individually and as an ordered combination do not amount to significantly more than the abstract idea. The claim recites the additional limitations of a "capturing light sample", a "filtering" and a "light source". These additional elements are recited at a high level of generality and are recited as performing generic computer functions routinely used in computer applications. Generic computer components recited as performing generic computer functions that are well-understood, routine and conventional activities amount to no more than implementing the abstract idea with a computerized system. Thus, taken alone, these additional elements do not amount to significantly more than the above-identified judicial exception (the abstract idea). Looking at the limitations as an ordered combination adds nothing that is not already present when looking at the elements taken individually. There is no indication that the combination of elements improves the functioning of a computer or improves any other technology. Their collective functions merely provide conventional computer implementation.

Exhibit 13
-145-

Application/Control Number: 14/621,268                                    Page 4
Art Unit: 3777

Claims 5, 13-14 and 26 are dependent on claim 4 that includes all the limitations of claim 4. Therefore, claims 5, 13-14 and 26 recites the same abstract idea of "mathematical relationship", "collecting and processing known information" and comparing information regarding a sample or test subject to a control or target data. The claim recites the additional limitations (perform demodulation using sin and cos equations; turn on and off light source and perform detection; filtering and decimation) that also mathematical relationship and collecting and comparing known information. Thus, taken alone, these additional elements do not amount to significantly more than the above-identified judicial exception (the abstract idea). Looking at the limitations as an ordered combination adds nothing that is not already present when looking at the elements taken individually. There is no indication that the combination of elements improves the functioning of a computer or improves any other technology. Their collective functions merely provide conventional computer implementation.

Claims 5, 13-14 and 26 are therefore not drawn to eligible subject matter as they are directed to an abstract idea without significantly more.

### *Claim Rejections - 35 USC § 112*

The following is a quotation of the first paragraph of 35 U.S.C. 112(a):

(a) IN GENERAL.—The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it

Exhibit 13
-146-

Application/Control Number: 14/621,268                                    Page 5
Art Unit: 3777

is most nearly connected, to make and use the same,  and shall set forth the best mode
contemplated by the inventor or joint inventor of carrying out the invention.

The following is a quotation of the first paragraph of pre-AIA 35 U.S.C. 112:

The specification shall contain a written description of the invention, and of the
manner and process of making and using it, in such full, clear, concise, and exact terms as to
enable any person skilled in the art to which it pertains, or with which it is most nearly
connected, to make and use the same, and shall set forth the best mode contemplated by the
inventor of carrying out his invention.

Claims 26-28, 30 and 32-33 are rejected under 35 U.S.C. 112(a) or 35 U.S.C.
112 (pre-AIA), first paragraph, as failing to comply with the written description
requirement.  The claim(s) contains subject matter which was not described in the
specification in such a way as to reasonably convey to one skilled in the relevant art that
the inventor or a joint inventor, or for pre-AIA the inventor(s), at the time the application
was filed, had possession of the claimed invention. These limitations are not disclose in
the specification. Examiner could not find these limitations in the specification.

**Allowable Subject Matter**

Claims 22-25 are allowed.

Claims 27-28, 30 and 32-33 would be allowable if rewritten to overcome the
rejection(s) under 35 U.S.C. 112(a) or 35 U.S.C. 112 (pre-AIA), 1st paragraph, set forth
in this Office action and to include all of the limitations of the base claim and any
intervening claims.

Exhibit 13
-147-

Application/Control Number: 14/621,268                                      Page 6
Art Unit: 3777

Claims 4-5, 13-14 and 26 would be allowable if rewritten to overcome the

rejection(s) under 35 U.S.C. 101, set forth in this Office action and to include all of the

limitations of the base claim and any intervening claims.


### *Response to Arguments*


Applicant's arguments filed 11/22/17 have been fully considered but they are not

persuasive. Applicant amend the claims and argue 112 enablement is not valid.

Applicant's argument is persuasive therefore examiner withdraw 112 enablement.

Applicant argues claim 1 and its dependent should be rejoined. Applicant's argument is

not persuasive because these claims are not in condition for allowance. Applicant

argues The Supreme Court has not ruled that patent-ineligible concepts include any

form of "mathematical relationships, mathematical formulas, and calculation . ..,

collecting and processing known information, comparing information regarding a sample

or test subject to a control or target data." Rather, to the extent that such concepts are

not patent-eligible under § 101 it is because they are "laws of nature, natural

phenomena, and abstract ideas". Applicant's argument is not persuasive because base

on interim guideline 2015 "mathematical relationships, mathematical formulas, and

calculation . .., collecting and processing known information, comparing information

regarding a sample or test subject to a control or target data" has been identified by the

court to be an abstract idea. Applicant argues claim 4 cannot be accurately described

as being directed to processing light signal. Applicant's argument is not persuasive

Exhibit 13
-148-

Application/Control Number: 14/621,268                                    Page 7
Art Unit: 3777

because the claim pre-ample clearly claim a method for processing a signal. Further,

consider all the claims limitations as a whole/combination, capturing, demodulating,

filtering, demultiplexing, multiplying, etc. are conventional signal processing steps.

Process and transform signal does not show any practical application. Applicant argues

the claim directed to an improvement to computer-related technology (filter to better

estimate a physiological parameter of a user). Applicant's argument is not persuasive

because the improvement is not in the claim.


### *Conclusion*


Any inquiry concerning this communication or earlier communications from the

examiner should be directed to HIEN NGUYEN whose telephone number is (571)270-

7031.  The examiner can normally be reached on 7:30-5:00.

Examiner interviews are available via telephone, in-person, and video

conferencing using a USPTO supplied web-based collaboration tool. To schedule an

interview, applicant is encouraged to use the USPTO Automated Interview Request

(AIR) at http://www.uspto.gov/interviewpractice.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Robert Chen can be reached on (571) 272-3672.  The fax phone number for

the organization where this application or proceeding is assigned is 571-273-8300.

Exhibit 13
-149-

Application/Control Number: 14/621,268                                    Page 8
Art Unit: 3777

      Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a

USPTO Customer Service Representative or access to the automated information

system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/HIEN NGUYEN/
Examiner, Art Unit 3777

Exhibit 13
-150-

| | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| *Index of Claims* | 14621268 | LAMEGO, MARCELO M. |
| | Examiner | Art Unit |
| | HIEN NGUYEN | 3777 |

| ✓ | Rejected | - | Cancelled | N | Non-Elected | A | Appeal |
|---|---|---|---|---|---|---|---|
| = | Allowed | ÷ | Restricted | I | Interference | O | Objected |

☐ Claims renumbered in the same order as presented by applicant        ☐ CPA   ☐ T.D.   ☐ R.1.47

| CLAIM | | DATE | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Final | Original | 08/02/2016 | 01/24/2017 | 11/28/2017 | | | | | |
| | 1 | N | N | N | | | | | |
| | 2 | N | - | - | | | | | |
| | 3 | N | N | N | | | | | |
| | 4 | ✓ | ✓ | ✓ | | | | | |
| | 5 | ✓ | ✓ | ✓ | | | | | |
| | 6 | ✓ | ✓ | - | | | | | |
| | 7 | ✓ | ✓ | - | | | | | |
| | 8 | ✓ | ✓ | - | | | | | |
| | 9 | ✓ | ✓ | - | | | | | |
| | 10 | ✓ | ✓ | - | | | | | |
| | 11 | ✓ | ✓ | - | | | | | |
| | 12 | ✓ | ✓ | - | | | | | |
| | 13 | ✓ | ✓ | ✓ | | | | | |
| | 14 | ✓ | ✓ | ✓ | | | | | |
| | 15 | N | - | - | | | | | |
| | 16 | N | - | - | | | | | |
| | 17 | N | - | - | | | | | |
| | 18 | N | - | - | | | | | |
| | 19 | N | - | - | | | | | |
| | 20 | N | - | - | | | | | |
| | 21 | | ✓ | - | | | | | |
| | 22 | | ✓ | = | | | | | |
| | 23 | | ✓ | = | | | | | |
| | 24 | | ✓ | = | | | | | |
| | 25 | | ✓ | = | | | | | |
| | 26 | | | ✓ | | | | | |
| | 27 | | | ✓ | | | | | |
| | 28 | | | ✓ | | | | | |
| | 29 | | | = | | | | | |
| | 30 | | | ✓ | | | | | |
| | 31 | | | = | | | | | |
| | 32 | | | ✓ | | | | | |
| | 33 | | | ✓ | | | | | |
| | 34 | | | N | | | | | |
| | 35 | | | N | | | | | |

Exhibit 13
-151-

EAST Search History

**EAST Search History**

**EAST Search History (Prior Art)**

| Ref # | Hits | Search Query | DBs | Default Operator | Plurals | Time Stamp |
|-------|------|--------------|-----|------------------|---------|------------|
| L1 | 1420 | light sensor demultiplex$3 filter$3 amplifier modulat$3 demodulat$3 multipl$4 | US-PGPUB; USPAT; USOCR | AND | OFF | 2017/11/29 09:23 |
| L2 | 99 | light sensor (demultiplex$3 same filter$3 same amplifier same modulat$3 same demodulat$3 same multipl$4) | US-PGPUB; USPAT; USOCR | AND | OFF | 2017/11/29 09:24 |
| L3 | 0 | (light smae sensor$3) (demultiplex$3 same filter$3 same amplifier same modulat$3 same demodulat$3 same multipl$4) | US-PGPUB; USPAT; USOCR | AND | OFF | 2017/11/29 09:24 |
| L4 | 81 | (light same sensor$3) (demultiplex$3 same filter$3 same amplifier same modulat$3 same demodulat$3 same multipl$4) | US-PGPUB; USPAT; USOCR | AND | OFF | 2017/11/29 09:24 |
| S1 | 130 | ((Marcelo) near2 (Lamego)).INV. | US-PGPUB; USPAT; USOCR | OR | OFF | 2016/08/02 11:48 |
| S2 | 0 | S1 (light dark demodulat$3).clm. | US-PGPUB; USPAT; USOCR | AND | OFF | 2016/08/02 11:49 |
| S3 | 0 | "14621268" | US-PGPUB; USPAT; USOCR | AND | OFF | 2016/08/02 11:49 |
| S4 | 0 | demodulat$3 fitler$3 decimat$3 light (tissue or sample or skin) physiological | US-PGPUB; USPAT; USOCR | AND | OFF | 2016/08/02 12:00 |
| S5 | 296 | demodulat$3 filter$3 decimat$3 light (tissue or sample or skin) physiological | US-PGPUB; USPAT; USOCR | AND | OFF | 2016/08/02 12:01 |
| S6 | 15 | (demodulat$3 same filter$3 same decimat$3 same light same (tissue or sample or skin)) physiological | US-PGPUB; USPAT; USOCR | AND | OFF | 2016/08/02 12:01 |
| S7 | 0 | (demodulat$3 same filter$3 same decimat$3 same light same (tissue or sample or skin)) physiological wear$4 | US-PGPUB; USPAT; USOCR | AND | OFF | 2016/08/02 12:09 |
| S8 | 1 | (demodulat$3 same filter$3 same decimat$3 same light same (tissue or sample or skin)) wear$4 | US-PGPUB; USPAT; USOCR | AND | OFF | 2016/08/02 12:10 |

Exhibit 13
-152-

| S9 | 7455 | (A61B5/0059 or A61B5/0084).cpc. | US-PGPUB; USPAT | AND | OFF | 2016/08/02 16:38 |
|---|---|---|---|---|---|---|
| S10 | 0 | "14621268" | US-PGPUB; USPAT | OR | OFF | 2017/01/24 10:10 |
| S11 | 0 | 14/621268 | US-PGPUB; USPAT | AND | OFF | 2017/01/24 10:11 |
| S12 | 136 | (("LAMEGO") near3 ("Marcelo")).INV. | US-PGPUB; USPAT; USOCR | OR | OFF | 2017/01/24 10:11 |
| S13 | 0 | ("2012/0253155").URPN. | USPAT | OR | OFF | 2017/01/24 11:24 |
| S14 | 484 | physiological (demultiplex$3 with multipl$4) | US-PGPUB; USPAT | AND | OFF | 2017/01/24 11:25 |
| S15 | 235 | physiological (demultiplex$3 with multipl$4) demodulat$3 | US-PGPUB; USPAT | AND | OFF | 2017/01/24 11:26 |
| S16 | 90 | physiological (demultiplex$3 with multipl$4) demodulat$3 decimat$3 | US-PGPUB; USPAT | AND | OFF | 2017/01/24 11:26 |
| S17 | 1 | physiological (demultiplex$3 with multipl$4 with demodulat$3) decimat$3 | US-PGPUB; USPAT | AND | OFF | 2017/01/24 11:26 |
| S18 | 22 | physiological (demultiplex$3 with multipl$4 with demodulat$3) | US-PGPUB; USPAT | AND | OFF | 2017/01/24 11:27 |
| S19 | 4 | (physiological or analyte or blood or (heart adj rate)) (demultiplex$3 with (multiplying or multiply or multiplier) with demodulat$3) | US-PGPUB; USPAT | AND | OFF | 2017/01/24 11:47 |
| S20 | 4 | (physiological or analyte or blood or (heart adj rate) or health) (demultiplex$3 with (multiplying or multiply or multiplier) with demodulat$3) | US-PGPUB; USPAT | AND | OFF | 2017/01/24 11:48 |
| S21 | 5 | (physiological or analyte or blood or (heart adj rate) or health) (demultiplex$3 with (multiplying or multiply or multiplier) same demodulat$3) | US-PGPUB; USPAT | AND | OFF | 2017/01/24 11:49 |
| S22 | 10 | (physiological or analyte or blood or (heart adj rate) or health) (demultiplex$3 with (multiplying or multiply or multiplier) demodulat$3) | US-PGPUB; USPAT | AND | OFF | 2017/01/24 12:05 |
| S23 | 9 | (medical or medicine) (demultiplex$3 with (multiplying or multiply or multiplier) demodulat$3) | US-PGPUB; USPAT | AND | OFF | 2017/01/24 12:26 |
| S24 | 7904 | (A61B5/0059 or A61B5/0084).cpc. | US-PGPUB; USPAT | AND | OFF | 2017/01/24 12:30 |
| S25 | 147 | (("LAMEGO") near3 ("Marcelo")).INV. | US-PGPUB; USPAT; USOCR | OR | OFF | 2017/10/03 10:09 |

| S26 | 0 | S25 (demodulat$3 demultiplex$3 low pass filter$3 decimat$3 multiply$3).clm. | US-PGPUB; USPAT; USOCR | AND | OFF | 2017/10/03 10:25 |
| S27 | 3289970 | demultiplex$3 demodulat$3 decimat$3 filter$3 multiply$3 | US-PGPUB; USPAT | OR | OFF | 2017/10/03 11:04 |
| S28 | 1058 | demultiplex$3 demodulat$3 decimat$3 filter$3 multiply$3 | US-PGPUB; USPAT; DERWENT | AND | OFF | 2017/10/03 11:05 |
| S29 | 1 | demultiplex$3 same demodulat$3 same decimat$3 same filter$3 same multiply$3 | US-PGPUB; USPAT; DERWENT | AND | OFF | 2017/10/03 11:05 |
| S30 | 0 | "14621268" | US-PGPUB; USPAT; DERWENT | AND | OFF | 2017/10/03 11:12 |
| S31 | 0 | ("2012/0253155").URPN. | USPAT | OR | OFF | 2017/10/03 11:19 |
| S32 | 10 | ("20030229276" | "20050197583" | "4258719" | "4989169" | "7890158").PN. OR ("8768424").URPN. | US-PGPUB; USPAT; USOCR | OR | OFF | 2017/10/03 11:19 |
| S33 | 0 | (demultiplex$3 demodulat$3 decimat$3 filter$3 multiply$3) S32 | US-PGPUB; USPAT; DERWENT | AND | OFF | 2017/10/03 11:23 |
| S34 | 197 | (demultiplex$3 demodulat$3 decimat$3 filter$3 multiply$3) sin | US-PGPUB; USPAT; DERWENT | AND | OFF | 2017/10/03 11:23 |
| S35 | 131 | (demultiplex$3 demodulat$3 decimat$3 filter$3 multiply$3) sin cos | US-PGPUB; USPAT; DERWENT | AND | OFF | 2017/10/03 11:23 |
| S36 | 38 | (demultiplex$3 demodulat$3 decimat$3 filter$3 multiply$3) sin cos (blood or medic$3 or tissue$1 or analyte$) | US-PGPUB; USPAT; DERWENT | AND | OFF | 2017/10/03 11:23 |
| S37 | 38 | (demultiplex$3 demodulat$3 decimat$3 (filter$3 or (low adj pass)) multiply$3) sin cos (blood or medic$3 or analyte$) | US-PGPUB; USPAT; DERWENT | AND | OFF | 2017/10/03 11:30 |
| S38 | 4 | (demultiplex$3 (demodulat$3 same decimat$3 same (filter$3 or (low adj pass))) multiply$3) sin cos (blood or medic$3 or analyte$) | US-PGPUB; USPAT; DERWENT | AND | OFF | 2017/10/03 11:31 |
| S39 | 66 | (demultiplex$3 (demodulat$3 same decimat$3 same (filter$3 or (low adj pass))) multiply$3) (blood or medic$3 or analyte$) (light with (on or off)) | US-PGPUB; USPAT; DERWENT | AND | OFF | 2017/10/03 11:54 |
| S40 | 1 | (demultiplex$3 (demodulat$3 same decimat$3 same (filter$3 or (low adj pass))) multiply$3) sin cos (blood or medic$3 or analyte$) (light with (on or off)) | US-PGPUB; USPAT; DERWENT | AND | OFF | 2017/10/03 11:57 |

| S41 | 8388 | (A61B5/0059 or A61B5/0084).cpc. | US-PGPUB; USPAT | AND | OFF | 2017/10/03 17:13 |
| S42 | 149 | (("LAMEGO") near3 ("Marcelo")).INV. | US-PGPUB; USPAT; USOCR | OR | OFF | 2017/11/28 16:29 |
| S43 | 0 | "14621268" | US-PGPUB; USPAT | AND | OFF | 2017/11/28 16:42 |
| S44 | 8495 | (A61B5/0059 or A61B5/0084).cpc. | US-PGPUB; USPAT | AND | OFF | 2017/11/28 16:43 |

**11/29/2017 10:05:19 AM**
**C:\ Users\ hnguyen55\ Documents\ EAST\ Workspaces\ 14621268.wsp**

| *Search Notes* | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 14621268 | LAMEGO, MARCELO M. |
| | **Examiner** | **Art Unit** |
| | HIEN NGUYEN | 3777 |

| CPC- SEARCHED | | |
|---|---|---|
| **Symbol** | **Date** | **Examiner** |
| (A61B5/0059 or A61B5/0084).cpc. | 11/28/2017 | HN |

| CPC COMBINATION SETS - SEARCHED | | |
|---|---|---|
| **Symbol** | **Date** | **Examiner** |
| | | |

| US CLASSIFICATION SEARCHED | | | |
|---|---|---|---|
| **Class** | **Subclass** | **Date** | **Examiner** |
| | | | |

\* See search history printout included with this form or the SEARCH NOTES box below to determine the scope of the search.

| SEARCH NOTES | | |
|---|---|---|
| **Search Notes** | **Date** | **Examiner** |
| East Search (inventor search) | 1/24/2017 | HN |
| East Search | 10/3/2017 | HN |
| East Search | 11/29/2017 | HN |
| Please see attach search report | | |

| INTERFERENCE SEARCH | | | |
|---|---|---|---|
| **US Class/ CPC Symbol** | **US Subclass / CPC Group** | **Date** | **Examiner** |
| | | | |

| | |
|---|---|
| | |

Exhibit 13
-156-

Attorney Docket No. P22879US1

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of:

| | | | |
|---|---|---|---|
| Inventor(s): | Marcelo M. Lamego | | |
| App. No.: | 14/621,268 | Con. No.: | 6317 |
| Filed: | February 12, 2015 | Art Unit: | 3777 |
| Title: | MODULATION AND DEMODULATION TECHNIQUES FOR A HEALTH MONITORING SYSTEM | Examiner: | Nguyen, Hien Ngoc |

**SUPPLEMENTAL AMENDMENT AND RESPONSE TO FINAL OFFICE ACTION**

Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Sir:

This Supplemental Amendment and Response supplements and replaces the Amendment and Response to Final Office Action filed July 10, 2017. Please consider the following remarks and amend the above-identified application as follows:

**Amendments to the Claims** begin on page 2 of this paper.

**Remarks** begin on page 8 of this paper.

1

Exhibit 13
-157-

Attorney Docket No. P22879US1

**Amendments to the Claims:**

1.      (Withdrawn – Currently Amended)  An electronic device, comprising:

two or more light sources for emitting light toward a body part of a user;

an optical sensor for obtaining light ~~and dark~~ samples and converting the <u>light</u> samples into a signal;

a processing device operably connected to the optical sensor for demodulating the signal received from the optical sensor into a demodulated signal associated with each light source;

at least one decimation stage for processing each demodulated signal, wherein each decimation stage comprises a low pass filter for receiving the demodulated signals and a decimation circuit operably connected to an output of the low pass filter; and

a demultiplexer and multiplier circuit operably connected to an output of a last decimation stage, wherein the demultiplexer separates the signals by each associated light source and the multiplier multiplies each separated signal by one or more respective ~~weighted multiplier~~ values<u>; wherein</u>

<u>in an initiation stage, the one or more respective multiplier values are determined by:</u>

<u>turning on a respective light source;</u>

<u>generating a respective initial signal in response to the optical sensor capturing a respective light sample corresponding to the respective light source;</u>

<u>processing the respective initial signal by the processing device and the at least one decimation stage to produce respective processed initial signals; and</u>

<u>determining the respective multiplier value based on the respective processed initial signals; and</u>

<u>in an operating stage after the initiation stage:</u>

<u>the optical sensor obtains the light samples and converts the light samples into the signal;</u>

<u>the signal is conditioned by the processing device, the at least one decimation stage, and the demultiplexer and multiplier circuit to obtain conditioned signals; and</u>

<u>the processing device analyzes the conditioned signals to estimate a physiological parameter of the user.</u>

2.      (Canceled)

**Exhibit 13**
-158-

3.      (Withdrawn – Currently Amended)  The electronic device as in claim 1, wherein the electronic device is a wearable communication device.

4.      (Currently Amended)  A method for processing a signal obtained when modulated light from one or more multiple light sources is emitted toward a body part of a user, the method comprising:

determining respective values for demultiplexed and demodulated signals by:

capturing, by a light sensor, initial light samples;

processing the initial light samples by demodulating, filtering, decimating, or demultiplexing the initial light samples to produce one or more processed signals; and

determining the respective values based on the one or more processed signals;

capturing, by the light sensor, a first set of multiple light samples in response to a first of the multiple while each light sources emits emitting modulated light toward the body part of the user; [[and]]

capturing, by the light sensor, a second set of light samples in response to a second of the multiple light sources emitting modulated light toward the body part of the user;

converting the first set of light samples and the second set of multiple light samples into the signal;

demodulating the signal to produce multiple demodulated signals, each associated with one of the multiple light sources;

filtering and decimating each demodulated signal at least once; and

demultiplexing each the demodulated signals; and

multiplying each of the demultiplexed and demodulated signals by at least one of the [[a]] respective values of a matrix of values to produce a signal associated with each light source; wherein

the at least one of the respective values adjusts each signal associated with each light source for changes over time in at least one of the light sensor, an operational amplifier associated with the light sensor, or a filter.

5.      (Original)  The method as in claim 4, further comprising analyzing each signal associated with each light source to estimate a physiological parameter of the user.

6-12.   (Canceled)

Exhibit 13
-159-

Attorney Docket No. P22879US1

13.     (Currently Amended)  The method as in claim 4, wherein demodulating the signal to produce multiple demodulated signals comprises applying a first demodulation operation of a sine function $\sin 2\pi \frac{kt}{N}$ to the signal and applying a second demodulation operation of a cosine function $\cos 2\pi \frac{kt}{N}$ to the signal, where k is defined by $1 \le k \le n/2$, N represents the number of samples obtained by the optical sensor, and t = 0, 1, …, N-1.

14.     (Original)  The method as in claim 4, wherein filtering and decimating each demodulated signal at least once to produce a signal associated with each light source comprises inputting each demodulated signal into one or more low pass filter and decimation stages, wherein each low pass filter and decimation stage comprises a low pass filter for receiving a demodulated signal and a decimation circuit operably connected to an output of the low pass filter.

15-21.  (Canceled)

22.     (Currently Amended)  A method for processing a signal estimating physiological parameters obtained when modulated light from a first light source and a second light source is emitted toward a body part of a user, the method comprising:
     determining a first multiplier value by:
          turning on the first light source;
          generating a first initial signal in response to capturing a first light sample corresponding to the first light source;
          demodulating the first initial signal to produce first initial demodulated signals;
          filtering and decimating the first initial demodulated signals; and
          determining the first multiplier value based on the filtered and decimated first initial demodulated signals;
     determining a second multiplier value by:
          turning on the second light source;
          generating a second initial signal in response to capturing a second light sample corresponding to the second light source;
          demodulating the second initial signal to produce second initial demodulated signals;
          filtering and decimating the second initial demodulated signals; and

4

Exhibit 13
-160-

Attorney Docket No. P22879US1

   <u>determining the second multiplier value based on the filtered and decimated</u> <u>second initial demodulated signals;</u>

  capturing multiple light samples while <u>the first</u> ~~each~~ light source <u>and the second light</u> <u>source are turned on to</u> emit[[s]] <u>modulated</u> light toward the body part of the user and converting the multiple light samples into [[the]] <u>a captured</u> signal;

  demodulating the <u>captured</u> signal to produce multiple demodulated signals;

  performing a first decimation stage by:

   low pass filtering each demodulated signal; and

   decimating each demodulated signal;

  performing a second decimation stage after the first decimation stage by:

   low pass filtering each demodulated signal; and

   decimating each demodulated signal;

  demultiplexing each demodulated signal after the second stage to produce a first signal associated with the first light source and a second signal associated with the second light source;

  multiplying the first signal by [[a]] <u>the</u> first ~~predetermined~~ <u>multiplier</u> value <u>using a first</u> <u>multiplier circuit</u> to obtain a first conditioned signal;

  multiplying the second signal by [[a]] <u>the</u> second ~~predetermine~~ <u>multiplier</u> value <u>using a</u> <u>second multiplier circuit</u> to obtain a second conditioned signal; and

  analyzing the first conditioned signal and the second conditioned signal to estimate <u>the</u> [[a]] physiological parameter of <u>the</u> [[a]] user.


  23. (Currently Amended)  The method as in claim 22, wherein <u>the</u> capturing multiple light samples ~~while each light source emits light toward the body part of the user~~ comprises[[:]] capturing multiple light samples while<u>:</u>

  <u>the first</u> ~~each~~ light source is turned on and the <u>second</u> ~~other~~ light source[[s]] <u>is</u> ~~are~~ turned off;

  <u>the second light source is turned on and the first light source is turned off;</u> and

  ~~capturing multiple dark samples after all four~~ <u>the first</u> light source[[s]] <u>and the second</u> <u>light source are</u> ~~have been turned on and~~ turned off <u>after being turned on</u>.


  24. (Currently Amended)  The method as in claim 23, <u>wherein the capturing multiple</u> <u>light samples</u> further <u>comprises</u> ~~comprising~~ capturing one or more <u>light</u> ~~dark~~ samples after <u>the</u> <u>first</u> ~~one~~ light source is turned off and before the <u>second</u> ~~next~~ light source is turned on.

**Exhibit 13**
**-161-**

Attorney Docket No. P22879US1

25.     (Currently Amended)  The method as in claim 22 [[23]], wherein the demodulating the captured ~~digital~~ signal to produce multiple demodulated signals comprises:

applying a first demodulation operation of a sine function ~~sin $2\pi\frac{kt}{N}$~~ to the captured ~~digital~~ signal; and

applying a second demodulation operation of a cosine function ~~cos $2\pi\frac{kt}{N}$~~ to the captured ~~digital~~ signal~~, where k is defined by 1 ≤ k ≤ n/2, N represents the number of samples obtained by the optical sensor, and t = 0, 1, …, N-1~~.

26.     (New)  The method as in claim 4, wherein the respective values are determined each time the user activates the electronic device.

27.     (New)  The method as in claim 22, further comprising:
storing the first multiplier value in the first multiplier circuit; and
storing the second multiplier value in the second multiplier circuit.

28.     (New)  The method as in claim 25, wherein the demodulating the captured signal to produce multiple demodulated signals further comprises a first demodulation stage at a first harmonic frequency of the captured signal and a second demodulation stage at a second harmonic frequency of the captured signal.

29.     (New)  The method as in claim 23, wherein the multiple light samples comprise at least five light samples captured when the first light source is turned on and the second light source is turned off.

30.     (New)  The method as in claim 22, wherein the first multiplier value and the second multiplier value adjust the captured signal for changes over time in at least one of a light sensor, an operational amplifier associated with the light sensor, or a filter.

31.     (New)  The method as in claim 22, wherein:
when the first light source is turned on, the first light source emits infrared light; and
when the second light source is turned on, the second light source emits visible light.

**Exhibit 13**
**-162-**

Attorney Docket No. P22879US1

32.      (New)  The method as in claim 22, further comprising turning on the first light source and the second light source to emit modulated light having a modulation frequency based on the harmonic frequencies of an electrical grid.

33.      (New)  The method as in claim 32, wherein the capturing multiple light samples while the first light source and the second light source are turned on to emit modulated light toward the body part of the user comprises capturing light samples at a frequency correlated with the modulation frequency.

34.      (New)  The electronic device as in claim 1, wherein the two or more light sources comprise:
a first light source which emits light within a first wavelength range; and
a second light source which emits light within a second, distinct wavelength range.

35.      (New)  The electronic device as in claim 1, wherein:
the two or more light sources comprise four light sources.
at least a first of the four light sources emits infrared light; and
at least a second of the four light sources emits visible light within a wavelength range associated with the color green.

7

Exhibit 13
-163-

## REMARKS

This paper is submitted in response to the final Office action mailed on February 9, 2017. This paper amends claims 4, 13, 22-27; cancels claims 6-12 and 21; and adds claims 26-35. Accordingly, after entry of this Amendment and Response, claims 4, 5, 13, 14, and 22-35 will be pending, with claims 1 and 3 being previously withdrawn.

### *I. Interview*

Examiner Nguyen initiated an interview with Stuart K. Wagner on October 4, 2017 to discuss proposed amendments to place claim 22 and its dependents in condition for allowance. The Assignee's representative, Stuart K. Wagner, initiated a follow-up interview on November 10, 2017 to discuss allowance of the remaining claims. This response presents the agreed upon amendments to claim 22 and its dependents, along with amendments to the remaining claims which the Assignee believes place the claims in condition for allowance.

### *II.  Claim Rejections Under 35 U.S.C. § 101*

The Examiner rejected claims 4-14 and 22-25 under 35 U.S.C. § 101 asserting that the claimed invention is directed to a judicial exception.

First, the Examiner states that the "method involve [sic] mathematical concepts such as mathematical relationships, mathematical formulas, and calculation (demodulation and decimating involve mathematical algorithm and processing), collecting and processing known information, comparing information regarding a sample or test subject to a control or target data which correspond to concepts identified as abstract ideas by the courts" to bolster the idea that the pending claims are drawn to an abstract idea (see Office Action, 2-3). However, this is an irrelevant argument. The Supreme Court has not ruled that patent-ineligible concepts include any form of "mathematical relationships, mathematical formulas, and calculation . . ., collecting and processing known information, comparing information regarding a sample or test subject to a control or target data." Rather, to the extent that such concepts are not patent-eligible under § 101 it is because they are "laws of nature, natural phenomena, and abstract ideas" (*Alice Corp, Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014), citing *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 132 S. Ct. 1289 (2012)). The Examiner is applying a test that does not exist to reach a tautological conclusion.

**Exhibit 13**
**-164-**

Further, the Assignee respectfully submits that the Examiner's assertion that "the claims are directed to a method for processing light signal" (Office Action, 2) runs counter to the Federal Circuit's and the Patent Office's cautions against "describing a claim at a high level of abstraction untethered from the language of the claim when determining the focus of the claimed invention" (Memorandum from Robert W. Bahr, Deputy Comm'r for Patent Examination Policy 1 (May 19, 2016) (citing *Enfish, LLC v. Microsoft Corp.*, No. 2015-1244, slip. op. (Fed. Cir. May 12, 2016), hereinafter "Memorandum"). The Examiner's broad and general description of the claims ignores the claim language. Additionally, the general description of the claims inaccurately describes the claims as being "directed to" "processing light signal."

The claims are not accurately described at this exceptionally high level. For example, independent claim 4 requires at least the following elements and limitations:

1. determining respective values for demultiplexed and demodulated signals by:

    a. capturing, by a light sensor, initial light samples;

    b. processing the initial light samples by demodulating, filtering, decimating, and demultiplexing the initial light samples to produce one or more processed signals; and

    c. determining the respective values based on the one or more processed signals;

2. capturing a first and second sets of light samples by the light sensor while light sources emit modulated light toward the body part of a user;

3. converting the multiple light samples into a signal;

4. demodulating the signal to produce multiple demodulated signals, each assicated with one of the light sources;

5. filtering and decimating each demodulated signal at least once;

6. demultiplexing each demodulated signal; and

7. multiplying each of the demultiplexed and demodulated signals by at least one of the respective values, the at least one of the respective values adjusting each signal for changes over time in at least one of the light sensor, an operational amplifier associated with the light sensor, or a filter.

Thus claim 4 cannot be accurately described as being "directed to" "processing light signal." The claimed device includes multiple electronic components in order to capture, convert, demodulate, filter, decimate, demultiplex, and multiply signals received by an electronic device. Independent claim 1, which is believed to be in condition for rejoinder, contains similar limitations.

Exhibit 13
-165-

Attorney Docket No. P22879US1

In addition, the Patent Office has emphasized that "a claim directed to an improvement to computer-related technology (e.g., computer functionality) is likely not similar to claims that have previously been identified as abstract by the courts" (Memorandum, p. 2). Here, the claims are directed to such an improvement in computer functionality as they provide for an electronic device (or method) which is better able to process light samples into electrical signals through the particular methods and structures claimed. For example, each of the claims employs steps of capturing light samples, converting the light samples into a signal, demodulating the signal, and filtering and decimating each demodulated signal. The claims include multiplying each demultiplexed and demodulated signal by a respective value, and a technique for determining the respective values. This improves functionality by, for example, adjusting for changes over time in at least one of the light sensor, an operational amplifier, or a filter to better estimate a physiological parameter of a user (see, e.g., para. [0018]).

This is entirely in accord with the Supreme Court's test in Alice to determine whether or not a claim is directed to patentable subject matter. With respect to an abstract idea, the United States Supreme Court stated in Alice that a court must determine (1) whether the claim at issue is directed to a patent-ineligible concept, and then (2) determine whether the balance of the claim adds 'significantly more.'" *Alice* at 2355 (citing *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 566 U.S. __ (2012)).

With respect to the first step, the Supreme Court has held that 35 U.S.C. § 101 contains an implicit exception; that laws of nature, natural phenomena, and abstract ideas are not patentable. The concern that drives this implicit exception is pre-emption. The question is whether upholding a patent would pre-empt the use of the abstract idea in all fields, and would effectively grant a monopoly over an abstract idea. See *Alice* at 2354. "Laws of nature, natural phenomena, and abstract ideas are 'the basic tools of scientific and technological work.'" *Id.* (citing *Association for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. __, __ (2013) (slip op., at 11). Here, it is clear that the specific limitations in the claims at issue would not grant any monopoly over any abstract idea.

Further, the Court noted that it must be careful when construing the exception or the exception will swallow all of patent law. The Court stated that "[a]t some level, all inventions … embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas. Thus, an invention is not rendered ineligible for patent simply because it involves an abstract concept." *Alice* at 2354. Accordingly, in applying the § 101 exception, it is important to distinguish between patents that claim the building blocks of human ingenuity and those that integrate the building blocks into something more, thereby transforming it into a patent-eligible

**Exhibit 13 -166-**

invention. See *Mayo* at 1303. The Assignee respectfully submits that the Examiner has read the claim so broadly, and so far beyond its actual limits, that the Examiner has done exactly what the Supreme Court warned against in *Alice*.

With respect to the second step of the *Alice* test, the elements of each claim must be considered both individually and "as an ordered combination" to determine whether the additional elements "transform the nature of the claim" into a patent-eligible application. *Alice* at 2355. Here, even if the claims were directed to a patent-ineligible concept, several additional limitations transform the nature of the claims. For example, claim 4 recites "determining respective values for demultiplexed and demodulated signals," "capturing, by a light sensor, a first set of light samples in response to a first of the multiple light sources emitting modulated light toward the body part of the user," "capturing, by the light sensor, a second set of light samples in response to a second of the multiple light sources emitting modulated light toward the body part of the user," "converting the multiple light samples into the signal," "demodulating the signal to produce multiple demodulated signals, each associated with one of the multiple light sources," "filtering and decimating each demodulated signal at least once," "demultiplexing the demodulated signals," and "multiplying each of the demultiplexed and demodulated signals by at least one of the respective values."

In *Alice*, the Court stated that "the relevant question is whether the claims do more than simply instruct the practitioner to implement the abstract idea of intermediate settlement on a generic computer." *Alice* at 2359. The above listed limitations, among others, do considerably more than implement an abstract idea on a generic computer.

The Assignee respectfully submits, therefore, that none of the claims in the present application are directed to non-statutory subject matter under 35 U.S.C. § 101. Accordingly, the Assignee respectfully requests that the Examiner withdraw the rejections of claims 4-14, and 22-25 under § 101.

### III.  Claim Rejections Under 35 U.S.C. § 112

The Examiner rejected claims 4-14 and 22-25 under 35 U.S.C. § 112(a) as failing to comply with the enablement requirement. For at least the following reasons, the Assignee respectfully traverses these rejections.

The Examiner asserts in the rejection that "[d]etermine [sic] the matrix value is critical or essential to the practice of the invention, but not included in the claim(s) is not enabled by the disclosure."

**Exhibit 13**
-167-

Attorney Docket No. P22879US1

Claim 4, as amended, recites, among other features, "multiplying each of the demultiplexed and demodulated signals by a respective value to produce a signal associated with each light source" wherein "the at least one of the respective values adjusts each signal associated with each light source for changes over time in at least one of the light sensor, an operational amplifier associated with the light sensor, or a filter." Claim 4 additionally recites operations for determining respective values. The respective values are adequately described and enabled in the specification, for example in FIGs. 7 – 10 and paras. [0057] – [0065].

Claim 22, as amended, recites, among other features, operations for "determining a first multiplier value" and "determining a second multiplier value." The process of obtaining first and second multiplier values is adequately supported by the specification, for example in FIGs. 7 – 10 and paras. [0057] – [0065].

### IV.  Claim Rejections Under 35 U.S.C. § 103

The Examiner rejected claims 4-14 and 21-25 under 35 U.S.C. § 103(a) as being obvious over Diab et al. (U.S. Patent Publication No. 2012/0253155; hereinafter "Diab") in view of McCarthy et al. (U.S. Patent No. 5,349,952; hereinafter "McCarthy").

The Examiner rejected claims 6-13 and 23-25 under 35 U.S.C. § 103(a) as being obvious over Diab in view of McCarthy. For at least the following reasons, the Assignee respectfully traverses these rejections.

Claim 4 recites, among other features, "multiplying each of the demultiplexed and demodulated signals by at least one of the respective values to produce a signal associated with each light source" wherein "the at least one of the respective values adjusts each signal associated with each light source for changes over time in at least one of the light sensor, an operational amplifier associated with the light sensor, or a filter." These features are not taught or suggested by the combination of Diab and McCarthy.

Diab describes a method and an apparatus to measure blood oxygenation including two light sources and a detector to detect a composite signal from the two light sources (Diab, Abstract). Diab does not teach or suggest multiplying each of multiple demultiplexed and demodulated signals by a respective value to produce a signal associated with each light source, wherein the respective value adjusts for changes over time.

McCarthy describes filtering a modulated signal that includes to carrier signals to recover underlying signals. McCarthy does not make up for any of the deficiencies of Diab. In particular,

12

**Exhibit 13**
-168-

neither reference is concerned with dynamically adjusting for changes over time in the light sensor, an operational amplifier, a filter, or other processing components.

Accordingly, independent claim 4 is nonobvious in view of Diab and McCarthy and in condition for allowance.

Claim 22 recites, among other features, "determining a first multiplier value by:" "turning on the first light source," "generating a first initial signal in response to capturing a light sample corresponding to the first light source," "demodulating the initial signal to produce first initial demodulated signals," "filtering and decimating the first initial demodulated signals," and "determining the first multiplier value based on the filtered and decimated first initial demodulated signals." A second multiplier value is similarly determined. These features are not taught or suggested by the combination of Diab and McCarthy.

Neither Diab nor McCarthy includes operations of multiplying a first signal and a second signal by respective values, nor of the above operations of determining those respective values. Accordingly, independent claim 22 is nonobvious in view of Diab and McCarthy and in condition for allowance.

The remaining claims depend from independent claims 1 or 22 and are believed to be allowable at least insofar as the claims depend from patentably distinct base claims. Accordingly, the Assignee submits that dependent claims 5-14, 21, and 23-25 are in condition for allowance. The Assignee makes this statement without waiving and without reference to any independent bases of patentability within the claims and thus reserves the right to argue such bases in a future paper if necessary.


*V.  Rejoinder*

Assignee hereby requests rejoinder of the previously withdrawn claims 1 and 3. Per MPEP 821.04, should the elected claim be in condition for allowance, the withdrawn claim should be considered for rejoinder. Assignee submits that in accordance with MPEP 821.04, the withdrawn independent claim 1, as amended, recites allowable limitations similar to independent claims 4 and 22, as amended, which are believed to be in condition for allowance. Accordingly, Assignee respectfully requests that the restriction on withdrawn claims 1 and 3 be withdrawn and that the claims be rejoined and allowed.

**Exhibit 13**
**-169-**

Attorney Docket No. P22879US1

### *VI.  Conclusion*

The Assignee thanks the Examiner for the thorough review of the application. The Assignee respectfully submits the present application, as amended, is in condition for allowance and respectfully requests the issuance of a Notice of Allowability as soon as practicable.

An Amendment and Response was submitted on July 10, 2017 contemporaneously with a Request for Continued Examination (RCE), a petition for a two-month extension of time, and a request to charge Deposit Account No. 504621 for the requisite fees. This Supplemental Amendment and Response supplements and replaces the previously filed Amendment and Response. The Assignee believes no further fees or petitions are required. However, if any such petitions or fees are necessary, please consider this a request therefor and authorization to charge Deposit Account No. 504621 accordingly.

If the Examiner should require any additional information or amendment, please contact the undersigned attorney.

Dated:  November 22, 2017.

Respectfully submitted,

_____/Gregory W. Osterloth/_____
Gregory W. Osterloth, Registration No. 36,232
Attorney for Assignee
USPTO Customer No. 62579

Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, Colorado  80202
Phone:  303-223-1100
Fax:  303-223-1111

14

**Exhibit 13**
**-170-**

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 31034304 |
| **Application Number:** | 14621268 |
| **International Application Number:** | |
| **Confirmation Number:** | 6317 |
| **Title of Invention:** | Modulation and Demodulation Techniques for a Health Monitoring System |
| **First Named Inventor/Applicant Name:** | Marcelo M. Lamego |
| **Customer Number:** | 62579 |
| **Filer:** | Gregory W. Osterloth/Valerie Brown |
| **Filer Authorized By:** | Gregory W. Osterloth |
| **Attorney Docket Number:** | P22879US1 |
| **Receipt Date:** | 22-NOV-2017 |
| **Filing Date:** | 12-FEB-2015 |
| **Time Stamp:** | 17:38:08 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | no |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Supplemental Response or Supplemental Amendment | P22879US1SupplementalAmendment.pdf | 83859<br>88ea8ba4511e8240ee656eaf792db591f75ef3cf | no | 14 |

**Warnings:**

Exhibit 13
-171-

| Information: | | |
|---|---|---|
| **Total Files Size (in bytes):** | | 83859 |

**This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.**

**New Applications Under 35 U.S.C. 111**
**If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.**
**National Stage of an International Application under 35 U.S.C. 371**
**If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.**
**New International Application Filed with the USPTO as a Receiving Office**
**If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.**

**Exhibit 13**
**-172-**

PTO/SB/06 (09-11)
Approved for use through 1/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| PATENT APPLICATION FEE DETERMINATION RECORD<br>Substitute for Form PTO-875 | Application or Docket Number<br>14/621,268 | Filing Date<br>02/12/2015 | ☐ To be Mailed |
|---|---|---|---|

ENTITY:  ☒ LARGE  ☐ SMALL  ☐ MICRO

### APPLICATION AS FILED – PART I

| | (Column 1) | (Column 2) | | |
|---|---|---|---|---|
| FOR | NUMBER FILED | NUMBER EXTRA | RATE ($) | FEE ($) |
| ☐ BASIC FEE<br>(37 CFR 1.16(a), (b), or (c)) | N/A | N/A | N/A | |
| ☐ SEARCH FEE<br>(37 CFR 1.16(k), (i), or (m)) | N/A | N/A | N/A | |
| ☐ EXAMINATION FEE<br>(37 CFR 1.16(o), (p), or (q)) | N/A | N/A | N/A | |
| TOTAL CLAIMS<br>(37 CFR 1.16(i)) | minus 20 = | * | X $ = | |
| INDEPENDENT CLAIMS<br>(37 CFR 1.16(h)) | minus 3 = | * | X $ = | |
| ☐ APPLICATION SIZE FEE<br>(37 CFR 1.16(s)) | If the specification and drawings exceed 100 sheets of paper, the application size fee due is $310 ($155 for small entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s). | | | |
| ☐ MULTIPLE DEPENDENT CLAIM PRESENT (37 CFR 1.16(j)) | | | | |
| * If the difference in column 1 is less than zero, enter "0" in column 2. | | | TOTAL | |

### APPLICATION AS AMENDED – PART II

| | | (Column 1) | (Column 2) | (Column 3) | | |
|---|---|---|---|---|---|---|
| | | CLAIMS REMAINING AFTER AMENDMENT | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) |
| **AMENDMENT** | **11/22/2017** | | | | | |
| | Total (37 CFR 1.16(i)) | * 20 | Minus | ** 20 | = 0 | x $80 = | 0 |
| | Independent (37 CFR 1.16(h)) | * 3 | Minus | *** 3 | = 0 | x $420 = | 0 |
| | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | |
| | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | |
| | | | | | TOTAL ADD'L FEE | **0** |

| | | (Column 1) | (Column 2) | (Column 3) | | |
|---|---|---|---|---|---|---|
| | | CLAIMS REMAINING AFTER AMENDMENT | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) |
| **AMENDMENT** | Total (37 CFR 1.16(i)) | * | Minus | ** | = | x $ = | |
| | Independent (37 CFR 1.16(h)) | * | Minus | *** | = | x $ = | |
| | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | |
| | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | |
| | | | | | TOTAL ADD'L FEE | |

\* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.
\*\* If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20".
\*\*\* If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3".
The "Highest Number Previously Paid For" (Total or Independent) is the highest number found in the appropriate box in column 1.

LIE
TINA M. BELL

This collection of information is required by 37 CFR 1.16. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

Exhibit 13
-173-

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 14/621,268 | 02/12/2015 | Marcelo M. Lamego | P22879US1 | 6317 |

62579          7590          11/20/2017
APPLE INC.
c/o Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, CO 80202

| EXAMINER |
|---|
| NGUYEN, HIEN NGOC |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3777 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 11/20/2017 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

patentdocket@bhfs.com

PTOL-90A (Rev. 04/07)

**Exhibit 13**
**-174-**

| *Applicant-Initiated Interview Summary* | Application No. | Applicant(s) | | |
|---|---|---|---|---|
| | 14/621,268 | LAMEGO, MARCELO M. | | |
| | Examiner | Art Unit | AIA (First Inventor to File) Status | Page |
| | HIEN NGUYEN | 3777 | Yes | 1 of 1 |

All participants (applicant, applicant's representative, PTO personnel):

1.   HIEN NGUYEN (Examiner); Telephonic          2.   STUART WAGNER (Attorney of Record); Telephonic

**Date of Interview:** 13 November 2017

**Claim(s) discussed:** 1, 4 AND 22

**Amendment Proposed:** Applicant proposed to amend "determining respective values for demultiplexed and demodulated signals by:..."

**Brief Description of main topic of discussion:** Applicant proposed claim amendement to overcome 101 and 103 rejection.

## Issues Discussed:

**Item(s) under 35 U.S.C. 101:**
Examiner told applicant the proposed claims does not overcome 101 rejection. The proposed claims do not have practical application. The claims basically just process signal to obtain a multiplier values. No agreement has been reach.

**Attachment(s):** Agenda

| /HIEN NGUYEN/ Examiner, Art Unit 3777 | |
|---|---|

**Applicant recordation instructions:** The formal written reply to the last Office action must include the substance of the interview. (See MPEP section 713.04). If a reply to the last Office action has already been filed, applicant is given a non-extendable time limit of the longer of one month or thirty days from this interview date, or the mailing date of this interview summary form, whichever is later, to file a statement of the substance of the interview.

**Examiner recordation instructions:** Examiners must summarize the substance of any interview of record. A complete and proper recordation of the substance of an interview should include the items listed in MPEP 713.04 for complete and proper recordation including the identification of the general thrust of each argument or issue discussed, a general indication of any other pertinent matters discussed regarding patentability and the general results or outcome of the interview, to include an indication as to whether or not agreement was reached on the issues raised.

**Applicant is reminded that a complete written statement as to the substance of the interview must be made of record in the application file. It is the applicant's responsibility to provide the written statement, unless the interview was initiated by the Examiner and the Examiner has indicated that a written summary will be provided.  See MPEP 713.04**

Please further see:

**MPEP 713.04**
**Title 37 Code of Federal Regulations (CFR) § 1.133 Interviews, paragraph (b)**
**37 CFR § 1.2 Business to be transacted in writing**

Exhibit 13
-175-

# Brownstein Hyatt
# Farber Schreck

## Fax Cover Sheet

**DATE:**    November 8, 2017

|  |  | **PHONE NO.** | **FAX NO.** |
|---|---|---|---|
| **TO:** | Examiner Hien Ngoc Nguyen<br>United States Patent & Trademark Office | 571-270-7031 | 571-270-8031 |
| **FROM:** | Stuart K. Wagner | 303-223-1267 | 303-223-1111 |
| **RE:** | Application No. 14/621,268<br>Our Reference: P22879US1 |  |  |

**No. of Pages With Cover Page:**          9

IF YOU DO NOT RECEIVE ALL OF THE PAGES, OR IF YOU ENCOUNTER ANY DIFFICULTIES WITH THIS TRANSMISSION, PLEASE CALL OUR OFFICE AT **303.223.1100.** THANK YOU.

**Message:**

Attached is the Agenda for Examiner Interview for Discussion Purposes Only for the telephonic interview scheduled for Friday, November 10, 2017 at 10:30 AM Eastern Time.

**Statement of Confidentiality**

The information contained in this fax message is attorney privileged and confidential information, intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to us at the above address via the U.S. Postal Service. Thank you.

410 Seventeenth Street, Suite 2200
Denver, CO 80202-4432
main 303.223.1100

bhfs.com                                                        Brownstein Hyatt Farber Schreck, LLP

PAGE 1/9 * RCVD AT 11/8/2017 6:24:51 PM [Eastern Standard Time] * SVR:W-PTOFAX-002/24 * DNIS:2708031 * CSID:3032231111 * DURATION (mm-ss):02-27

Exhibit 13
-176-

Attorney Docket No. P22879US1

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of:

| | | | | |
|---|---|---|---|---|
| Inventor(s): | Marcelo M. Lamego | | | |
| App. No.: | 14/621,268 | Con. No.: | 6317 | |
| Filed: | February 12, 2015 | Art Unit: | 3777 | |
| Title: | MODULATION AND DEMODULATION TECHNIQUES FOR A HEALTH MONITORING SYSTEM | Examiner: | Nguyen, Hien Ngoc | |

### AGENDA FOR EXAMINER INTERVIEW

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

### FOR DISCUSSION PURPOSES ONLY
### DO NOT ENTER

- Telephone conference to take place on Friday, November 10, 2017 at 10:30 AM Eastern Time.
- Attendees: Examiner Hien Ngoc Nguyen and the Assignee's representative Stuart Wagner.
- The Assignee's representative requests the interview to discuss the proposed amendments included within this agenda.

1

Exhibit 13
-177-

Attorney Docket No. P22879US1

**Amendments to the Claims:**

1.      (Withdrawn – Currently Amended)  An electronic device, comprising:

two or more light sources for emitting light toward a body part of a user;

an optical sensor for obtaining light ~~and dark~~ samples and converting the light samples into a signal;

a processing device operably connected to the optical sensor for demodulating the signal received from the optical sensor into a demodulated signal associated with each light source;

at least one decimation stage for processing each demodulated signal, wherein each decimation stage comprises a low pass filter for receiving the demodulated signals and a decimation circuit operably connected to an output of the low pass filter; and

a demultiplexer and multiplier circuit operably connected to an output of a last decimation stage, wherein the demultiplexer separates the signals by each associated light source and the multiplier multiplies each separated signal by one or more respective ~~weighted multiplier~~ values; wherein

in an initiation stage, the one or more respective multiplier ~~weighted~~ values are ~~dynamically~~ determined by: ~~to adjust each separated signal for changes over time in at least one of the optical sensor, an operational amplifier associated with the light sensor, or a filter~~

turning on a respective light source;

generating a respective initial signal in response to the optical sensor capturing a respective light sample corresponding to the respective light source;

processing the respective initial signal by the processing device and the at least one decimation stage to produce respective processed initial signals; and

determining the respective multiplier value based on the respective processed initial signals.

2.      (Canceled)

3.      (Withdrawn – Currently Amended)  The electronic device as in claim 1, wherein the electronic device is a wearable communication device.

2

Exhibit 13
-178-

4.      (Currently Amended)  A method for processing a signal obtained when modulated light from multiple light sources is emitted toward a body part of a user, the method comprising:

determining respective values for demultiplexed and demodulated signals by:

capturing, by a light sensor, initial light samples;

processing the initial light samples by at least one of demodulating, filtering, decimating, or demultiplexing the initial light samples to produce one or more processed signals; and

determining the respective values based on the one or more processed signals;

capturing, by the [[a]] light sensor, a first set of light samples in response to a first of the multiple light sources emitting modulated light toward the body part of the user;

capturing, by the light sensor, a second set of light samples in response to a second of the multiple light sources emitting modulated light toward the body part of the user;

converting the first set of light samples and the second set of light samples into the signal;

demodulating the signal to produce multiple demodulated signals, each associated with one of the multiple light sources;

filtering and decimating each demodulated signal at least once; and

demultiplexing the demodulated signals; and

multiplying each of the demultiplexed and demodulated signals by at least one of the [[a]] respective ~~dynamically determined~~ value$\underline{s}$ to produce a signal associated with each light source; wherein

the ~~dynamically determined~~ respective value adjusts each signal associated with each light source for changes over time in at least one of the light sensor, an operational amplifier associated with the light sensor, or a filter.


5.      (Original)  The method as in claim 4, further comprising analyzing each signal associated with each light source to estimate a physiological parameter of the user.


6-12.  (Canceled)


13.     (Currently Amended)  The method as in claim 4, wherein demodulating the signal to produce multiple demodulated signals comprises applying a first demodulation operation of a sine function ~~sin 2π$\frac{kt}{N}$~~ to the signal and applying a second demodulation operation of a cosine

3

Exhibit 13
-179-

Attorney Docket No. P22879US1

function ~~cos2π~~ $\frac{kt}{N}$ to the signal~~, where k is defined by 1 ≤ k ≤ n/2, N represents the number of samples obtained by the optical sensor, and t = 0, 1, …, N-1~~.

14.     (Original)  The method as in claim 4, wherein filtering and decimating each demodulated signal at least once to produce a signal associated with each light source comprises inputting each demodulated signal into one or more low pass filter and decimation stages, wherein each low pass filter and decimation stage comprises a low pass filter for receiving a demodulated signal and a decimation circuit operably connected to an output of the low pass filter.

15-21. (Canceled)

22.     (Currently Amended)  A method for ~~processing a signal~~ estimating physiological parameters ~~obtained~~ when modulated light from a first light source and a second light source is emitted toward a body part of a user, the method comprising:
        determining a first multiplier value by:
                turning on the first light source;
                generating a first initial signal in response to capturing a first light sample corresponding to the first light source;
                demodulating the first initial signal to produce first initial demodulated signals;
                filtering and decimating the first initial demodulated signals; and
                determining the first multiplier value based on the filtered and decimated first initial demodulated signals;
        determining a second multiplier value by:
                turning on the second light source;
                generating a second initial signal in response to capturing a second light sample corresponding to the second light source;
                demodulating the second initial signal to produce second initial demodulated signals;
                filtering and decimating the second initial demodulated signals; and
                determining the second multiplier value based on the filtered and decimated second initial demodulated signals;

4

PAGE 5/9 * RCVD AT 11/8/2017 6:24:51 PM [Eastern Standard Time] * SVR:W-PTOFAX-002/24 * DNIS:2708031 * CSID:3032231111 * DURATION (mm-ss):02-27

Exhibit 13
-180-

Attorney Docket No. P22879US1

capturing multiple light samples while the first light source and the second light source are turned on to emit modulated light toward the body part of the user and converting the multiple light samples into [[the]] a captured signal;

demodulating the captured signal to produce multiple demodulated signals;

performing a first decimation stage by:

low pass filtering each demodulated signal; and

decimating each demodulated signal;

performing a second decimation stage after the first decimation stage by:

low pass filtering each demodulated signal; and

decimating each demodulated signal;

demultiplexing each demodulated signal after the second stage to produce a first signal associated with the first light source and a second signal associated with the second light source;

multiplying the first signal by the first predetermined multiplier value using a first multiplier circuit to obtain a first conditioned signal;

multiplying the second signal by the second predetermined multiplier value using a second multiplier circuit to obtain a second conditioned signal; and

analyzing the first conditioned signal and the second conditioned signal to estimate the [[a]] physiological parameter of the [[a]] user.

23.    (Currently Amended)  The method as in claim 22, wherein the capturing multiple light samples while each light source emits light toward the body part of the user comprises[[:]] capturing multiple light samples while:

the first each light source is turned on and the second other light source[[s]] is are turned off;

the second light source is turned on and the first light source is turned off; and

capturing multiple dark samples after all four the first light source[[s]] and the second light source are have been turned on and turned off after being turned on.

24.    (Currently Amended)  The method as in claim 23, wherein the capturing multiple light samples further comprises comprising capturing one or more light dark samples after the first one light source is turned off and before the second next light source is turned on.

5

Exhibit 13
-181-

Attorney Docket No. P22879US1

25.    (Currently Amended)  The method as in claim 22 [[23]], wherein the demodulating the captured digital signal to produce multiple demodulated signals comprises:

applying a first demodulation operation of a sine function $sin\ 2\pi\frac{kt}{N}$ to the captured digital signal; and

applying a second demodulation operation of a cosine function $cos\ 2\pi\frac{kt}{N}$ to the captured digital signal, where k is defined by 1 ≤ k ≤ n/2, N represents the number of samples obtained by the optical sensor, and t = 0, 1, ..., N-1.

26.    (Currently Amended)  The method as in claim 4, wherein the dynamically determined respective values are determined is calculated each time the [[a]] user activates the electronic device health monitoring system.

27.    (Currently Amended)  The method as in claim 22, further comprising wherein:

storing the first multiplier predetermined value is stored in [[a]] the first multiplier circuit; and

storing the second multiplier value in the second multiplier circuit
the first signal is multiplied by the first predetermined value using the multiplier circuit.

28.    (New)  The method as in claim 25, wherein the demodulating the captured signal to produce multiple demodulated signals further comprises a first demodulation stage at a first harmonic frequency of the captured signal and a second demodulation stage at a second harmonic frequency of the captured signal.

29.    (New)  The method as in claim 23, wherein the multiple light samples comprise at least five light samples captured when the first light source is turned on and the second light source is turned off.

30.    (New)  The method as in claim 22, wherein the first multiplier value and the second multiplier value adjust the captured signal for changes over time in at least one of a light sensor, an operational amplifier associated with the light sensor, or a filter.

31.    (New)  The method as in claim 22, wherein:
when the first light source is turned on, the first light source emits infrared light; and

6

Exhibit 13
-182-

Attorney Docket No. P22879US1

when the second light source is turned on, the second light source emits visible light.

32.    (New)  The method as in claim 22, further comprising turning on the first light source and the second light source to emit modulated light having a modulation frequency based on the harmonic frequencies of an electrical grid.

33.    (New)  The method as in claim 32, wherein the capturing multiple light samples while the first light source and the second light source are turned on to emit modulated light toward the body part of the user comprises capturing light samples at a frequency correlated with the modulation frequency.

34.    (New)  The electronic device as in claim 1, wherein the two or more light sources comprise:
a first light source which emits light within a first wavelength range; and
a second light source which emits light within a second, distinct wavelength range.

35.    (New)  The electronic device as in claim 1, wherein:
the two or more light sources comprise four light sources.
at least a first of the four light sources emits infrared light; and
at least a second of the four light sources emits visible light within a wavelength range associated with the color green.

PAGE 8/9 * RCVD AT 11/8/2017 6:24:51 PM [Eastern Standard Time] * SVR:W-PTOFAX-002/24 * DNIS:2708031 * CSID:3032231111 * DURATION (mm-ss):02-27

Exhibit 13
-183-

## REMARKS

If the Examiner should require any additional information or amendment, please contact the undersigned attorney.

Dated:  November 8, 2017

Respectfully submitted,

_____/Stuart K. Wagner/_____
Stuart K. Wagner, Registration No. 74,548
Attorney for Assignee
USPTO Customer No. 62579

Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, Colorado  80202
Phone:  303-223-1100
Fax:  303-223-1111

Exhibit 13
-184-

Attorney Docket No. P22879US1

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of:

| | | | |
|---|---|---|---|
| Inventor(s): Marcelo M. Lamego | | | |
| App. No.: 14/621,268 | | Con. No.: 6317 | |
| Filed: February 12, 2015 | | Art Unit: 3777 | |
| Title: MODULATION AND DEMODULATION TECHNIQUES FOR A HEALTH MONITORING SYSTEM | | Examiner: Nguyen, Hien Ngoc | |

## INTERVIEW SUMMARY

Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Sir:

An interview was conducted on August 24, 2017 with Stuart K. Wagner and Examiner Hien Nguyen participating. The Amendment and Response filed on July 10, 2017 was discussed. No agreement on allowability was reached.

If the Examiner should require any additional information or amendment, please contact the undersigned attorney.

Dated:  October 10, 2017.

Respectfully submitted,


_____/Stuart K. Wagner/_____
Stuart K. Wagner, Registration No. 74,548
Attorney for Assignee
USPTO Customer No. 62579

Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, Colorado  80202
Phone:  303-223-1100
Fax:  303-223-1111

Exhibit 13
-185-

# Electronic Acknowledgement Receipt

| EFS ID: | 30606606 |
|---|---|
| **Application Number:** | 14621268 |
| **International Application Number:** | |
| **Confirmation Number:** | 6317 |
| **Title of Invention:** | Modulation and Demodulation Techniques for a Health Monitoring System |
| **First Named Inventor/Applicant Name:** | Marcelo M. Lamego |
| **Customer Number:** | 62579 |
| **Filer:** | Stephen C. Hemenway/Valerie Brown |
| **Filer Authorized By:** | Stephen C. Hemenway |
| **Attorney Docket Number:** | P22879US1 |
| **Receipt Date:** | 10-OCT-2017 |
| **Filing Date:** | 12-FEB-2015 |
| **Time Stamp:** | 10:55:44 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| Submitted with Payment | no |
|---|---|

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Applicant summary of interview with examiner | P22879US1InteviewSummary.pdf | 14269 <br> f5646a102dbd47510b68adaa54c8ca503999f8f7 | no | 1 |

**Warnings:**

Exhibit 13
-186-

**Information:**

| Total Files Size (in bytes): | 14269 |
|---|---|

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

New Applications Under 35 U.S.C. 111
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.
National Stage of an International Application under 35 U.S.C. 371
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.
New International Application Filed with the USPTO as a Receiving Office
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

Exhibit 13
-187-

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 14/621,268 | 02/12/2015 | Marcelo M. Lamego | P22879US1 | 6317 |

62579          7590          09/08/2017
APPLE INC.
c/o Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, CO 80202

| EXAMINER |
|---|
| NGUYEN, HIEN NGOC |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3777 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 09/08/2017 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

patentdocket@bhfs.com

Exhibit 13
-188-

| ***Applicant-Initiated Interview Summary*** | Application No. | Applicant(s) | | |
|---|---|---|---|---|
| | 14/621,268 | LAMEGO, MARCELO M. | | |
| | Examiner | Art Unit | AIA (First Inventor to File) Status | Page |
| | HIEN NGUYEN | 3777 | Yes | 1 of 2 |

All participants (applicant, applicant's representative, PTO personnel):

1.   HIEN NGUYEN (Examiner); Telephonic        2.   STUART WAGNER (Attorney of Record); Telephonic

**Date of Interview:** 24 August 2017

**Claim(s) discussed:** 4 AND 21-22

**Identification of prior art discussed:** Diab and McCarthy

**Amendment Proposed:** Applicant amend limitation "the dynamically determined value adjusts each signal associated with each light source for changes over time in at least one of the light sensor, an operational amplifier associated with the light sensor, or a filter" and "demodulating the initial signal to produce second initial demodulated signals; filtering and decimating the second initial demodulated signals; and determining the second multiplier value based on the filtered and decimated second initial demodulated signals".

**Brief Description of main topic of discussion:** Applicant discussed the amendment submitted along with the RCE.

## Issues Discussed:

**Other:**
Applicant argues and discusses the file amendment along with the RCE. Examiner proposed to amend some hardware structures into independent claims to overcome 101 rejection. The current independent claims might need additional structures to overcome 101 rejection. Claim 4 might need additionals limitations to put in good condition for allowance. Examiner told applicant examiner would need to do additional search. Examiner told applicant examiner would call and suggest amendment with applicant once examiner perform search to put the claims in condition for allowance. No agree had been reach.

**Attachment(s):** Agenda

| /H. N./ Examiner, Art Unit 3777 | /ELMER CHAO/ Primary Examiner, Art Unit 3777 |
|---|---|

**Applicant recordation instructions:** The formal written reply to the last Office action must include the substance of the interview. (See MPEP section 713.04). If a reply to the last Office action has already been filed, applicant is given a non-extendable time limit of the longer of one month or thirty days from this interview date, or the mailing date of this interview summary form, whichever is later, to file a statement of the substance of the interview.

**Examiner recordation instructions:** Examiners must summarize the substance of any interview of record. A complete and proper recordation of the substance of an interview should include the items listed in MPEP 713.04 for complete and proper recordation including the identification of the general thrust of each argument or issue discussed, a general indication of any other pertinent matters discussed regarding patentability and the general results or outcome of the interview, to include an indication as to whether or not agreement was reached on the issues raised.

**Applicant is reminded that a complete written statement as to the substance of the interview must be made of record in the application file. It is the applicant's responsibility to provide the written statement, unless the interview was initiated by the Examiner and the Examiner has indicated that a written summary will be provided.  See MPEP 713.04**

Please further see:

**MPEP 713.04**
**Title 37 Code of Federal Regulations (CFR) § 1.133 Interviews, paragraph (b)**
**37 CFR § 1.2 Business to be transacted in writing**

Exhibit 13
-189-

Application No.   14/621,268

Page **2** of **2**

U.S. Patent and Trademark Office
PTOL-413/413b (Rev. 01/01/2015)     **Interview Summary**     Paper No. 20170824

**Exhibit 13**
**-190-**

Attorney Docket No. P22879US1

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of:

| | | | |
|---|---|---|---|
| Inventor(s): Marcelo M Lamego | | | |
| App. No.: 14/621,268 | | Con. No.: 6317 | |
| Filed: February 12, 2015 | | Art Unit: 3777 | |
| Title: MODULATION AND DEMODULATION TECHNIQUES FOR A HEALTH MONITORING SYSTEM | | Examiner: Nguyen, Hien Ngoc | |

### AGENDA FOR EXAMINER INTERVIEW

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

### FOR DISCUSSION PURPOSES ONLY
### DO NOT ENTER

- Telephone conference to take place on Thursday, August 23, 2017 at 11:00 AM Eastern Time.
- Attendees: Examiner Hien Ngoc Nguyen and the Assignee's representative Stuart Wagner.
- The Assignee's representative requests the interview to discuss the amendments and arguments submitted on 7/10/2017 in response to a final Office action.

1

Exhibit 13
-191-

Aug-23-17 08:44pm From-BROWNSTEIN HYATT FARBER SCHRECK 3032231111 T-883 P-002/02 F-946

Attorney Docket No. P22879US1

## REMARKS

If the Examiner should require any additional information or amendment, please contact the undersigned attorney.

Dated: <u>August 23, 2017</u>

Respectfully submitted,

<u>  /Stuart K. Wagner/  </u>
Stuart K. Wagner, Registration No. 74,548
Attorney for Assignee
USPTO Customer No. 62579

Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, Colorado 80202
Phone: 303-223-1100
Fax: 303-223-1111

2

PAGE 2/2 * RCVD AT 8/23/2017 8:29:44 PM [Eastern Daylight Time] * SVR:W-PTOFAX-002/16 * DNIS:2708031 * CSID:3032231111 * DURATION (mm-ss):00-32

Exhibit 13
-192-

PTO/SB/30 (07-09)
Approved for use through 07/31/2012. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

# Request for Continued Examination (RCE) Transmittal

Address to:
Mail Stop RCE
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

| | |
|---|---|
| Application Number | 14/621,268 |
| Filing Date | February 12, 2015 |
| First Named Inventor | Marcelo M. Lamego |
| Art Unit | 3777 |
| Examiner Name | Nguyen, Hien Ngoc |
| Attorney Docket Number | P22879US1 |

**This is a Request for Continued Examination (RCE) under 37 CFR 1.114 of the above-identified application.**
Request for Continued Examination (RCE) practice under 37 CFR 1.114 does not apply to any utility or plant application filed prior to June 8, 1995, or to any design application. See Instruction Sheet for RCEs (not to be submitted to the USPTO) on page 2.

1. **Submission required under 37 CFR 1.114** Note: If the RCE is proper, any previously filed unentered amendments and amendments enclosed with the RCE will be entered in the order in which they were filed unless applicant instructs otherwise. If applicant does not wish to have any previously unentered amendment(s) entered, applicant must request non-entry of such amendment(s).

   a. [ ] Previously submitted. If a final Office action is outstanding, any amendments filed after the final Office action may be considered as a submission even if this box is not checked.

      i. [ ] Consider the arguments in the Appeal Brief or Reply Brief previously filed on _____

      ii. [ ] Other _____

   b. [✓] Enclosed

      i. [✓] Amendment/Reply     iii. [ ] Information Disclosure Statement (IDS)

      ii. [ ] Affidavit(s)/ Declaration(s)     iv. [ ] Other _____

2. **Miscellaneous**

   a. [ ] Suspension of action on the above-identified application is requested under 37 CFR 1.103(c) for a period of _____ months. (Period of suspension shall not exceed 3 months; Fee under 37 CFR 1.17(i) required)

   b. [ ] Other _____

3. **Fees** The RCE fee under 37 CFR 1.17(e) is required by 37 CFR 1.114 when the RCE is filed.

   a. [✓] The Director is hereby authorized to charge the following fees, any underpayment of fees, or credit any overpayments, to Deposit Account No. _504621_.

      i. [✓] RCE fee required under 37 CFR 1.17(e)

      ii. [✓] Extension of time fee (37 CFR 1.136 and 1.17)

      iii. [ ] Other _____

   b. [ ] Check in the amount of $ _____ enclosed

   c. [ ] Payment by credit card (Form PTO-2038 enclosed)

   **WARNING: Information on this form may become public. Credit card information should not be included on this form. Provide credit card information and authorization on PTO-2038.**

## SIGNATURE OF APPLICANT, ATTORNEY, OR AGENT REQUIRED

| Signature | /Stuart K. Wagner/ | Date | July 10, 2017 |
|---|---|---|---|
| Name (Print/Type) | Stuart K. Wagner | Registration No. | 74,548 |

## CERTIFICATE OF MAILING OR TRANSMISSION

I hereby certify that this correspondence is being deposited with the United States Postal Service with sufficient postage as first class mail in an envelope addressed to: Mail Stop RCE, Commissioner for Patents, P. O. Box 1450, Alexandria, VA 22313-1450 or facsimile transmitted to the U.S. Patent and Trademark Office on the date shown below.

| Signature | |
|---|---|
| Name (Print/Type) | |
| | Date |

This collection of information is required by 37 CFR 1.114. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Mail Stop RCE, Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

**Exhibit 13**
**-193-**

Attorney Docket No. P22879US1

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of:

| | | | |
|---|---|---|---|
| Inventor(s): | Marcelo M. Lamego | | |
| App. No.: | 14/621,268 | Con. No.: | 6317 |
| Filed: | February 12, 2015 | Art Unit: | 3777 |
| Title: | MODULATION AND DEMODULATION TECHNIQUES FOR A HEALTH MONITORING SYSTEM | Examiner: | Nguyen, Hien Ngoc |

**AMENDMENT AND RESPONSE TO FINAL OFFICE ACTION**

Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Sir:

In response to the final Office action dated February 9, 2017, please consider the following remarks and amend the above-identified application as follows:

**Amendments to the Claims** begin on page 2 of this paper.

**Remarks** begin on page 8 of this paper.

1

Exhibit 13
-194-

Attorney Docket No. P22879US1

**Amendments to the Claims:**

1.      (Withdrawn – Currently Amended)  An electronic device, comprising:

two or more light sources for emitting light toward a body part of a user;

an optical sensor for obtaining light and dark samples and converting the samples into a signal;

a processing device operably connected to the optical sensor for demodulating the signal received from the optical sensor into a demodulated signal associated with each light source;

at least one decimation stage for processing each demodulated signal, wherein each decimation stage comprises a low pass filter for receiving the demodulated signals and a decimation circuit operably connected to an output of the low pass filter; and

a demultiplexer and multiplier circuit operably connected to an output of a last decimation stage, wherein the demultiplexer separates the signals by each associated light source and the multiplier multiplies each separated signal by one or more respective weighted values; wherein

the one or more respective weighted values are dynamically determined to adjust each separated signal for changes over time in at least one of the optical sensor, an operational amplifier associated with the light sensor, or a filter.

2.      (Canceled)

3.      (Withdrawn)  The electronic device as in claim 1, wherein the electronic device is a wearable communication device.

4.      (Currently Amended)  A method for processing a signal obtained when modulated light from one or more multiple light sources is emitted toward a body part of a user, the method comprising:

capturing, by a light sensor, a first set of multiple light samples in response to a first of the multiple while each light sources emits emitting modulated light toward the body part of the user;

capturing, by the light sensor, a second set of light samples in response to a second of the multiple light sources emitting modulated light toward the body part of the user;

Exhibit 13
-195-

Attorney Docket No. P22879US1

[[and]] converting the <u>first set of light samples and the second set of</u> ~~multiple~~ light samples into the signal;

demodulating the signal to produce multiple demodulated signals<u>, each associated with one of the multiple light sources</u>;

filtering and decimating each demodulated signal at least once; and

demultiplexing ~~each~~ <u>the</u> demodulated signal<u>s</u>; and

multiplying each of the <u>demultiplexed and</u> demodulated signals by a respective <u>dynamically determined</u> value ~~of a matrix of values~~ to produce a signal associated with each light source<u>; wherein</u>

<u>the dynamically determined value adjusts each signal associated with each light source for changes over time in at least one of the light sensor, an operational amplifier associated with the light sensor, or a filter.</u>

5.      (Original)  The method as in claim 4, further comprising analyzing each signal associated with each light source to estimate a physiological parameter of the user.

6.      (Currently Amended)  The method as in claim 4, <u>further comprising</u> ~~wherein capturing multiple light samples while each light source emits light toward the body part of the user comprises:~~

~~capturing multiple light samples when a respective light source is turned on and the other light sources are turned off; and~~

capturing multiple dark samples after all ~~four~~ <u>of the multiple</u> light sources have been turned on and turned off.

7.      (Currently Amended)  The method as in claim 6, wherein capturing <u>the first set of</u> ~~multiple~~ light samples <u>in response to the first of the multiple</u> ~~when a respective~~ light source<u>s</u> <u>emitting light toward the body part of the user</u> ~~is turned on and the other light sources are turned off~~ comprises capturing five light samples when <u>the first of the multiple</u> ~~a respective~~ light source<u>s</u> is turned on and ~~the~~ other light sources are turned off.

8.      (Currently Amended)  The method as in claim 7, wherein capturing multiple dark samples after all of the <u>multiple</u> light sources have been turned on and turned off comprises capturing ten dark samples after all of the <u>multiple</u> light sources have been turned on and turned off.

Exhibit 13
-196-

Attorney Docket No. P22879US1

9.      (Currently Amended)  The method as in claim 6, further comprising capturing one or more dark samples after ~~one~~ the first of the multiple light source~~s~~ is turned off and before the ~~next~~ first of the multiple light sources is turned on.

10.      (Currently Amended)  The method as in claim 9, wherein capturing one or more dark samples after ~~one~~ the first of the multiple light source~~s~~ is turned off and before the ~~next~~ first of the multiple light source~~s~~ is turned on comprises capturing one dark sample after ~~one~~ the first of the multiple light source~~s~~ is turned off and before the ~~next~~ first of the multiple light source~~s~~ is turned on.

11.      (Currently Amended)  The method as in claim 10, wherein capturing the first set of ~~multiple~~ light samples in response to the first of the multiple ~~when a respective~~ light source~~s~~ emitting light toward the body part of the user ~~is turned on and the other light sources are turned off~~ comprises capturing five light samples in response to the first of the multiple ~~when a respective~~ light source~~s~~ emitting light toward the body part of the user ~~is turned on~~ and [[the]] other light sources are turned off.

12.      (Original)  The method as in claim 11, wherein capturing multiple dark samples after all of the light sources have been turned on and turned off comprises capturing seven dark samples after all of the light sources have been turned on and turned off.

13.      (Original)  The method as in claim 4, wherein demodulating the signal to produce multiple demodulated signals comprises applying a first demodulation operation of $\sin 2\pi \frac{kt}{N}$ to the signal and applying a second demodulation operation of $\cos 2\pi \frac{kt}{N}$ to the signal, where k is defined by $1 \leq k \leq n/2$, N represents the number of samples obtained by the optical sensor, and t = 0, 1, …, N-1.

14.      (Original)  The method as in claim 4, wherein filtering and decimating each demodulated signal at least once to produce a signal associated with each light source comprises inputting each demodulated signal into one or more low pass filter and decimation stages, wherein each low pass filter and decimation stage comprises a low pass filter for

Exhibit 13
-197-

receiving a demodulated signal and a decimation circuit operably connected to an output of the low pass filter.

      15.     (Canceled)

      16.     (Canceled)

      17.     (Canceled)

      18.     (Canceled)

      19.     (Canceled)

      20.     (Canceled)

      21.     (Currently Amended)  The method as in claim 4, wherein the <u>dynamically determined value</u> ~~matrix of values~~ is determined by:
      turning on a ~~first~~ <u>respective</u> light source;
      capturing a light sample in response to the ~~first~~ <u>respective</u> light source and converting the light sample into an initial signal;
      demodulating the initial signal to produce multiple initial demodulated signals;
      filtering and decimating each initial demodulated signal at least once to determine <u>the dynamically determined value</u> ~~at least a portion of the matrix of values~~.

      22.     (Currently Amended)  A method for processing a signal obtained when <u>modulated</u> light from a first light source and a second light source is emitted toward a body part of a user, the method comprising:
      <u>determining a first multiplier value by:</u>
            <u>turning on the first light source;</u>
            <u>generating a first initial signal in response to capturing a light sample corresponding to the first light source;</u>
            <u>demodulating the initial signal to produce first initial demodulated signals;</u>
            <u>filtering and decimating the first initial demodulated signals; and</u>

**Exhibit 13**
-198-

  determining the first multiplier value based on the filtered and decimated first initial demodulated signals;

  determining a second multiplier value by:

   turning on the second light source;

   generating a second initial signal in response to capturing a light sample corresponding to the second light source;

   demodulating the initial signal to produce second initial demodulated signals;

   filtering and decimating the second initial demodulated signals; and

   determining the second multiplier value based on the filtered and decimated second initial demodulated signals;

  capturing multiple light samples while the first ~~each~~ light source and the second light source emit[[s]] modulated light toward the body part of the user and converting the multiple light samples into the signal;

  demodulating the signal to produce multiple demodulated signals;

  performing a first decimation stage by:

   low pass filtering each demodulated signal; and

   decimating each demodulated signal;

  performing a second decimation stage after the first decimation stage by:

   low pass filtering each demodulated signal; and

   decimating each demodulated signal;

  demultiplexing each demodulated signal after the second stage to produce a first signal associated with the first light source and a second signal associated with the second light source;

  multiplying the first signal by [[a]] the first predetermined value to obtain a first conditioned signal;

  multiplying the second signal by [[a]] the second predetermined value to obtain a second conditioned signal; and

  analyzing the first conditioned signal and the second conditioned signal to estimate a physiological parameter of a user.

  23. (Previously Presented)  The method as in claim 22, wherein capturing multiple light samples while each light source emits light toward the body part of the user comprises:

  capturing multiple light samples while each light source is turned on and the other light sources are turned off; and

6

Exhibit 13
-199-

capturing multiple dark samples after all four light sources have been turned on and turned off.

24.    (Previously Presented)  The method as in claim 23, further comprising capturing one or more dark samples after one light source is turned off and before the next light source is turned on.

25.    (Previously Presented)  The method as in claim 23, wherein demodulating the digital signal to produce multiple demodulated signals comprises applying a first demodulation operation of $\sin 2\pi \frac{kt}{N}$ to the digital signal and applying a second demodulation operation of $\cos 2\pi \frac{kt}{N}$ to the digital signal, where k is defined by $1 \leq k \leq n/2$, N represents the number of samples obtained by the optical sensor, and t = 0, 1, …, N-1.

26.    (New)  The method as in claim 4, wherein the dynamically determined value is calculated each time a user activates the health monitoring system.

27.    (New)  The method as in claim 22, wherein:
the first predetermined value is stored in a multiplier circuit; and
the first signal is multiplied by the first predetermined value using the multiplier circuit.

Exhibit 13
-200-

Attorney Docket No. P22879US1

## REMARKS

This paper is submitted in response to the final Office action mailed on February 9, 2017. This paper amends claims 4, 6-11, 21, and 22; and adds claims 26 and 27. Accordingly, after entry of this Amendment and Response, claims 4-14 and 21-25 will be pending.

### II.  Claim Rejections Under 35 U.S.C. § 101

The Examiner rejected claims 4-14 and 22-25 under 35 U.S.C. § 101 asserting that the claimed invention is directed to a judicial exception.

First, the Examiner states that the "method involve [sic] mathematical concepts such as mathematical relationships, mathematical formulas, and calculation (demodulation and decimating involve mathematical algorithm and processing), collecting and processing known information, comparing information regarding a sample or test subject to a control or target data which correspond to concepts identified as abstract ideas by the courts" to bolster the idea that the pending claims are drawn to an abstract idea (see Office Action, 2-3). However, this is an irrelevant argument. The Supreme Court has not ruled that patent-ineligible concepts include any form of "mathematical relationships, mathematical formulas, and calculation . . ., collecting and processing known information, comparing information regarding a sample or test subject to a control or target data." Rather, to the extent that such concepts are not patent-eligible under § 101 it is because they are "laws of nature, natural phenomena, and abstract ideas" (*Alice Corp, Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014), citing *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 132 S. Ct. 1289 (2012)). The Examiner is applying a test that does not exist to reach a tautological conclusion.

Further, the Assignee respectfully submits that the Examiner's assertion that "the claims are directed to a method for processing light signal" (Office Action, 2) runs counter to the Federal Circuit's and the Patent Office's cautions against "describing a claim at a high level of abstraction untethered from the language of the claim when determining the focus of the claimed invention" (Memorandum from Robert W. Bahr, Deputy Comm'r for Patent Examination Policy 1 (May 19, 2016) (citing *Enfish, LLC v. Microsoft Corp.*, No. 2015-1244, slip. op. (Fed. Cir. May 12, 2016), hereinafter "Memorandum"). The Examiner's broad and general description of the claims ignores the claim language. Additionally, the general description of the claims inaccurately describes the claims as being "directed to" "processing light signal."

The claims are not accurately described at this exceptionally high level. For example, independent claim 4 requires at least the following elements and limitations:

8

**Exhibit 13
-201-**

Attorney Docket No. P22879US1

     1.  capturing a first and second sets of light samples by a light sensor while light sources emit modulated light toward the body part of a user;

     2.  converting the multiple light samples into a signal;

     3.  demodulating the signal to produce multiple demodulated signals, each assicated with one of the light sources;

     4.  filtering and decimating each demodulated signal at least once;

     5.  demultiplexing each demodulated signal; and

     6.  multiplying each of the demultiplexed and demodulated signals by a respective dynamically determined values, the dynamically determined values adjusting each signal for changes over time in at least one of the light sensor, an operational amplifier associated with the light sensor, or a filter.

Thus claim 4 cannot be accurately described as being "directed to" "processing light signal." The claimed device includes multiple electronic components in order to capture, convert, demodulate, filter, decimate, demultiplex, and multiply signals received by an electronic device. Independent claim 22 contains similar limitations.

In addition, the Patent Office has emphasized that "a claim directed to an improvement to computer-related technology (e.g., computer functionality) is likely not similar to claims that have previously been identified as abstract by the courts" (Memorandum, p. 2). Here, the claims are directed to such an improvement in computer functionality as they provide for an electronic device (or method) which is better able to process light samples into electrical signals through the particular methods and structures claimed. For example, each of the claims employs steps of capturing light samples, converting the light samples into a signal, demodulating the signal, and filtering and decimating each demodulated signal. The claims include multiplying each demultiplexed and demodulated signal by a respective value. This improves functionality by, for example, adjusting for changes over time in at least one of the light sensor, an operational amplifier, or a filter to better estimate a physiological parameter of a user (see, e.g., para. [0018]).

This is entirely in accord with the Supreme Court's test in Alice to determine whether or not a claim is directed to patentable subject matter. With respect to an abstract idea, the United States Supreme Court stated in Alice that a court must determine (1) whether the claim at issue is directed to a patent-ineligible concept, and then (2) determine whether the balance of the claim adds 'significantly more.'" *Alice* at 2355 (citing *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 566 U.S. __ (2012)).

**Exhibit 13**
**-202-**

With respect to the first step, the Supreme Court has held that 35 U.S.C. § 101 contains an implicit exception; that laws of nature, natural phenomena, and abstract ideas are not patentable. The concern that drives this implicit exception is pre-emption. The question is whether upholding a patent would pre-empt the use of the abstract idea in all fields, and would effectively grant a monopoly over an abstract idea. See *Alice* at 2354. "Laws of nature, natural phenomena, and abstract ideas are 'the basic tools of scientific and technological work.'" *Id.* (citing *Association for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. __, __ (2013) (slip op., at 11). Here, it is clear that the specific limitations in the claims at issue would not grant any monopoly over any abstract idea.

Further, the Court noted that it must be careful when construing the exception or the exception will swallow all of patent law. The Court stated that "[a]t some level, all inventions … embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas. Thus, an invention is not rendered ineligible for patent simply because it involves an abstract concept." *Alice* at 2354. Accordingly, in applying the § 101 exception, it is important to distinguish between patents that claim the building blocks of human ingenuity and those that integrate the building blocks into something more, thereby transforming it into a patent-eligible invention. See *Mayo* at 1303. The Assignee respectfully submits that the Examiner has read the claim so broadly, and so far beyond its actual limits, that the Examiner has done exactly what the Supreme Court warned against in *Alice*.

With respect to the second step of the *Alice* test, the elements of each claim must be considered both individually and "as an ordered combination" to determine whether the additional elements "transform the nature of the claim" into a patent-eligible application. *Alice* at 2355. Here, even if the claims were directed to a patent-ineligible concept, several additional limitations transform the nature of the claims. For example, claim 4 recites "capturing, by a light sensor, a first set of light samples in response to a first of the multiple light sources emitting modulated light toward the body part of the user," "capturing, by the light sensor, a second set of light samples in response to a second of the multiple light sources emitting modulated light toward the body part of the user," "converting the multiple light samples into the signal," "demodulating the signal to produce multiple demodulated signals, each associated with one of the multiple light sources," "filtering and decimating each demodulated signal at least once," "demultiplexing the demodulated signals," and "multiplying each of the demultiplexed and demodulated signals by a respective dynamically determined value."

In *Alice*, the Court stated that "the relevant question is whether the claims do more than simply instruct the practitioner to implement the abstract idea of intermediate settlement on a

Exhibit 13
-203-

generic computer." *Alice* at 2359. The above listed limitations, among others, do considerably more than implement an abstract idea on a generic computer.

The Assignee respectfully submits, therefore, that none of the claims in the present application are directed to non-statutory subject matter under 35 U.S.C. § 101. Accordingly, the Assignee respectfully requests that the Examiner withdraw the rejections of claims 4-14, and 22-25 under § 101.

## *II.  Claim Rejections Under 35 U.S.C. § 112*

The Examiner rejected claims 4-14 and 22-25 under 35 U.S.C. § 112(a) as failing to comply with the enablement requirement. For at least the following reasons, the Assignee respectfully traverses these rejections.

The Examiner asserts in the rejection that "[d]etermine [sic] the matrix value is critical or essential to the practice of the invention, but not included in the claim(s) is not enabled by the disclosure."

Claim 4, as amended, recites, among other features, "multiplying each of the demultiplexed and demodulated signals by a respective dynamically determined value to produce a signal associated with each light source" wherein "the dynamically determined value adjusts each signal associated with each light source for changes over time in at least one of the light sensor, an operational amplifier associated with the light sensor, or a filter." The dynamically determined value is adequately described and enabled in the specification, for example in FIGs. 7 – 10 and paras. [0057] – [0065].

Claim 22, as amended, recites, among other features, operations for "determining a first multiplier value" and "determining a second multiplier value." The process of obtaining first and second multiplier values is adequately supported by the specification, for example in FIGs. 7 – 10 and paras. [0057] – [0065].

## *III.  Claim Rejections Under 35 U.S.C. § 103*

The Examiner rejected claims 4-14 and 21-25 under 35 U.S.C. § 103(a) as being obvious over Diab et al. (U.S. Patent Publication No. 2012/0253155; hereinafter "Diab") in view of McCarthy et al. (U.S. Patent No. 5,349,952; hereinafter "McCarthy").

The Examiner rejected claims 6-13 and 23-25 under 35 U.S.C. § 103(a) as being obvious over Diab in view of McCarthy.  For at least the following reasons, the Assignee respectfully traverses these rejections.

**Exhibit 13**
-204-

Attorney Docket No. P22879US1

Claim 4 recites, among other features, "multiplying each of the demultiplexed and demodulated signals by a respective dynamically determined value to produce a signal associated with each light source" wherein "the dynamically determined value adjusts each signal associated with each light source for changes over time in at least one of the light sensor, an operational amplifier associated with the light sensor, or a filter." These features are not taught or suggested by the combination of Diab and McCarthy.

Diab describes a method and an apparatus to measure blood oxygenation including two light sources and a detector to detect a composite signal from the two light sources (Diab, Abstract). Diab does not teach or suggest multiplying each of multiple demultiplexed and demodulated signals by a respective dynamically determined value to produce a signal associated with each light source, wherein the dynamically determined value adjusts for changes over time.

McCarthy describes filtering a modulated signal that includes to carrier signals to recover underlying signals. McCarthy does not make up for any of the deficiencies of Diab. In particular, neither reference is concerned with dynamically adjusting for changes over time in the light sensor, an operational amplifier, a filter, or other processing components.

Accordingly, independent claim 4 is nonobvious in view of Diab and McCarthy and in condition for allowance.

Claim 22 recites, among other features, "determining a first multiplier value by:" "turning on the first light source," "generating a first initial signal in response to capturing a light sample corresponding to the first light source," "demodulating the initial signal to produce first initial demodulated signals," "filtering and decimating the first initial demodulated signals," and "determining the first multiplier value based on the filtered and decimated first initial demodulated signals." A second multiplier value is similarly determined. These features are not taught or suggested by the combination of Diab and McCarthy.

Neither Diab nor McCarthy includes operations of multiplying a first signal and a second signal by respective values, nor of the above operations of determining those respective values. Accordingly, independent claim 22 is nonobvious in view of Diab and McCarthy and in condition for allowance.

The remaining claims depend from independent claims 1 or 22 and are believed to be allowable at least insofar as the claims depend from patentably distinct base claims. Accordingly, the Assignee submits that dependent claims 5-14, 21, and 23-25 are in condition for allowance. The Assignee makes this statement without waiving and without reference to any

Exhibit 13
-205-

independent bases of patentability within the claims and thus reserves the right to argue such bases in a future paper if necessary.

### IV.  Rejoinder

Assignee hereby requests rejoinder of the previously withdrawn claims 1 and 3. Per MPEP 821.04, should the elected claim be in condition for allowance, the withdrawn claim should be considered for rejoinder. Assignee submits that in accordance with MPEP 821.04, the withdrawn independent claim 1, as amended, recites the allowable limitations of independent claim 4, as amended, which are believed to be in condition for allowance. Accordingly, Assignee respectfully requests that the restriction on withdrawn claims 1 and 3 be withdrawn and that the claims be rejoined and allowed.

### V.  Conclusion

The Assignee thanks the Examiner for the thorough review of the application. The Assignee respectfully submits the present application, as amended, is in condition for allowance and respectfully requests the issuance of a Notice of Allowability as soon as practicable.

This Amendment and Response is submitted contemporaneously with a Request for Continued Examination (RCE), a petition for a two-month extension of time, and a request to charge Deposit Account No. 504621 for the requisite fees.  The Assignee believes no further fees or petitions are required.  However, if any such petitions or fees are necessary, please consider this a request therefor and authorization to charge Deposit Account No. 504621 accordingly.

Exhibit 13
-206-

Attorney Docket No. P22879US1

If the Examiner should require any additional information or amendment, please contact the undersigned attorney.

Dated:  <u>July 10, 2017</u>.

Respectfully submitted,


<u>          /Stuart K. Wagner/          </u>
Stuart K. Wagner, Registration No. 74,548
Attorney for Assignee
USPTO Customer No. 62579

Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, Colorado  80202
Phone:  303-223-1100
Fax:  303-223-1111

**Exhibit 13**
**-207-**

# Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | 14621268 |
| **Filing Date:** | 12-Feb-2015 |
| **Title of Invention:** | Modulation and Demodulation Techniques for a Health Monitoring System |
| **First Named Inventor/Applicant Name:** | Marcelo M. Lamego |
| **Filer:** | Stuart K. Wagner/Valerie Brown |
| **Attorney Docket Number:** | P22879US1 |

Filed as Large Entity

**Filing Fees for** Utility under 35 USC 111(a)

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |
| **Post-Allowance-and-Post-Issuance:** | | | | |
| **Extension-of-Time:** | | | | |

Exhibit 13
-208-

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| Extension - 2 months with $0 paid | 1252 | 1 | 600 | 600 |
| **Miscellaneous:** | | | | |
| RCE- 1st Request | 1801 | 1 | 1200 | 1200 |
| **Total in USD ($)** | | | | **1800** |

Exhibit 13
-209-

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 29740650 |
| **Application Number:** | 14621268 |
| **International Application Number:** | |
| **Confirmation Number:** | 6317 |
| **Title of Invention:** | Modulation and Demodulation Techniques for a Health Monitoring System |
| **First Named Inventor/Applicant Name:** | Marcelo M. Lamego |
| **Customer Number:** | 62579 |
| **Filer:** | Stuart K. Wagner/Valerie Brown |
| **Filer Authorized By:** | Stuart K. Wagner |
| **Attorney Docket Number:** | P22879US1 |
| **Receipt Date:** | 10-JUL-2017 |
| **Filing Date:** | 12-FEB-2015 |
| **Time Stamp:** | 21:57:01 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | DA |
| Payment was successfully received in RAM | $ 1800 |
| RAM confirmation Number | 071117INTEFSW00008260504621 |
| Deposit Account | |
| Authorized User | |
| The Director of the USPTO is hereby authorized to charge indicated fees and credit any overpayment as follows: | |

Exhibit 13
-210-

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Request for Continued Examination (RCE) | P22879US1RCE.pdf | 147166<br><br>8c6a7789fb8856a5cf1b64a6f4ea391d7c856f94 | no | 1 |

**Warnings:**

This is not a USPTO supplied RCE SB30 form.

**Information:**

| 2 | Amendment Submitted/Entered with Filing of CPA/RCE | P22879US1Amendment.pdf | 79947<br><br>8c93e03a7b10a9c11cd687abd8e7e90ea76b56c2 | no | 14 |

**Warnings:**

**Information:**

| 3 | Fee Worksheet (SB06) | fee-info.pdf | 32517<br><br>e08a9115424 5a29aa442bc9a07bb9f72a982a536 | no | 2 |

**Warnings:**

**Information:**

| | | **Total Files Size (in bytes):** | 259630 | | |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.
**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.
**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

Exhibit 13
-211-

PTO/SB/06 (09-11)
Approved for use through 1/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| PATENT APPLICATION FEE DETERMINATION RECORD Substitute for Form PTO-875 | Application or Docket Number 14/621,268 | Filing Date 02/12/2015 | ☐ To be Mailed |
|---|---|---|---|

**ENTITY:** ☒ LARGE   ☐ SMALL   ☐ MICRO

## APPLICATION AS FILED – PART I

|  | (Column 1) | (Column 2) |  |  |
|---|---|---|---|---|
| FOR | NUMBER FILED | NUMBER EXTRA | RATE ($) | FEE ($) |
| ☐ BASIC FEE (37 CFR 1.16(a), (b), or (c)) | N/A | N/A | N/A |  |
| ☐ SEARCH FEE (37 CFR 1.16(k), (i), or (m)) | N/A | N/A | N/A |  |
| ☐ EXAMINATION FEE (37 CFR 1.16(o), (p), or (q)) | N/A | N/A | N/A |  |
| TOTAL CLAIMS (37 CFR 1.16(i)) | minus 20 = | * | X $ = |  |
| INDEPENDENT CLAIMS (37 CFR 1.16(h)) | minus 3 = | * | X $ = |  |
| ☐ APPLICATION SIZE FEE (37 CFR 1.16(s)) | If the specification and drawings exceed 100 sheets of paper, the application size fee due is $310 ($155 for small entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s). |  |  |  |
| ☐ MULTIPLE DEPENDENT CLAIM PRESENT (37 CFR 1.16(j)) |  |  |  |  |
| * If the difference in column 1 is less than zero, enter "0" in column 2. |  |  | TOTAL |  |

## APPLICATION AS AMENDED – PART II

|  |  | (Column 1) | (Column 2) | (Column 3) |  | RATE ($) | ADDITIONAL FEE ($) |
|---|---|---|---|---|---|---|---|
| AMENDMENT | 07/10/2017 | CLAIMS REMAINING AFTER AMENDMENT | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA |  |  |  |
|  | Total (37 CFR 1.16(i)) | * 18 | Minus | ** 20 | = 0 | x $80 = | 0 |
|  | Independent (37 CFR 1.16(h)) | * 3 | Minus | *** 3 | = 0 | x $420 = | 0 |
|  | ☐ Application Size Fee (37 CFR 1.16(s)) |  |  |  |  |  |  |
|  | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) |  |  |  |  |  |  |
|  |  |  |  |  |  | TOTAL ADD'L FEE | 0 |

|  |  | (Column 1) | (Column 2) | (Column 3) |  | RATE ($) | ADDITIONAL FEE ($) |
|---|---|---|---|---|---|---|---|
| AMENDMENT |  | CLAIMS REMAINING AFTER AMENDMENT | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA |  |  |  |
|  | Total (37 CFR 1.16(i)) | * | Minus | ** | = | x $ = |  |
|  | Independent (37 CFR 1.16(h)) | * | Minus | *** | = | x $ = |  |
|  | ☐ Application Size Fee (37 CFR 1.16(s)) |  |  |  |  |  |  |
|  | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) |  |  |  |  |  |  |
|  |  |  |  |  |  | TOTAL ADD'L FEE |  |

* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.
** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20".
*** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3".
The "Highest Number Previously Paid For" (Total or Independent) is the highest number found in the appropriate box in column 1.

LIE
STELLA LITTLE

This collection of information is required by 37 CFR 1.16. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

**Exhibit 13**
**-212-**

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 14/621,268 | 02/12/2015 | Marcelo M. Lamego | P22879US1 | 6317 |

62579          7590          02/09/2017
APPLE INC.
c/o Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, CO 80202

| EXAMINER |
|---|
| NGUYEN, HIEN NGOC |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3777 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 02/09/2017 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

patentdocket@bhfs.com

PTOL-90A (Rev. 04/07)

Exhibit 13
-213-

| **Office Action Summary** | Application No. 14/621,268 | Applicant(s) LAMEGO, MARCELO M. |
|---|---|---|
| | Examiner HIEN NGUYEN | Art Unit 3777 | AIA (First Inventor to File) Status Yes |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

## Period for Reply

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) months from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

## Status

1)☒ Responsive to communication(s) filed on <u>12/14/16</u>.
  ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.
2a)☒ This action is **FINAL**. 2b)☐ This action is non-final.
3)☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.
4)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

## Disposition of Claims*

5)☒ Claim(s) <u>1,3-14 and 21-25</u> is/are pending in the application.
  5a) Of the above claim(s) <u>1 and 3</u> is/are withdrawn from consideration.
6)☐ Claim(s) _____ is/are allowed.
7)☒ Claim(s) <u>4-14 and 21-25</u> is/are rejected.
8)☐ Claim(s) _____ is/are objected to.
9)☐ Claim(s) _____ are subject to restriction and/or election requirement.
* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov.

## Application Papers

10)☐ The specification is objected to by the Examiner.
11)☐ The drawing(s) filed on _____ is/are: a)☐ accepted or b)☐ objected to by the Examiner.
  Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
  Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

## Priority under 35 U.S.C. § 119

12)☐ Acknowledgement is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
  **Certified copies:**
  a)☐ All b)☐ Some** c)☐ None of the:
    1.☐ Certified copies of the priority documents have been received.
    2.☐ Certified copies of the priority documents have been received in Application No. _____.
    3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).
** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**
1)☒ Notice of References Cited (PTO-892)
2)☐ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b) Paper No(s)/Mail Date _____.
3)☐ Interview Summary (PTO-413) Paper No(s)/Mail Date. _____.
4)☐ Other: _____.

**Exhibit 13**
**-214-**

Application/Control Number: 14/621,268                                      Page 2
Art Unit: 3777

The present application, filed on or after March 16, 2013, is being examined

under the first inventor to file provisions of the AIA.


**DETAILED ACTION**


***Claim Rejections - 35 USC § 101***


35 U.S.C. 101 reads as follows:

Whoever invents or discovers any new and useful process, machine, manufacture, or
composition of matter, or any new and useful improvement thereof, may obtain a patent
therefor, subject to the conditions and requirements of this title.

Claims 4-14 and 22-25 are rejected under 35 U.S.C. 101 because the claimed

invention is directed to a judicial exception (i.e., a law of nature, a natural phenomenon,

or an abstract idea) without significantly more.  Claims 4-14 are directed to a method for

processing light signal.  The claim(s) does/do not include additional elements that are

sufficient to amount to significantly more than the judicial exception because the

additional device elements, which are recited at a high level of generality, provide

conventional device functions that do not add meaningful limits to practicing the abstract

idea.


Claims 4 and 22 recites, in part, a method for processing light signal. The method

involve mathematical concepts such as mathematical relationships, mathematical

formulas, and calculation (demodulation and decimating involve mathematical algorithm

Exhibit 13
-215-

Application/Control Number: 14/621,268                                                    Page 3
Art Unit: 3777

and processing), collecting and processing known information, comparing information

regarding a sample or test subject to a control or target data which correspond to

concepts identified as abstract ideas by the courts. The claims involve processing

signal, but do not claim how this is being performed and it's significant over the current

technology.


    The claim does not include additional elements that are sufficient to amount to

significantly more than the judicial exception because the additional elements when

considered both individually and as an ordered combination do not amount to

significantly more than the abstract idea. The claim recites the additional limitations of a

"capturing light sample", a "filtering" and a "light source". These additional elements are

recited at a high level of generality and are recited as performing generic computer

functions routinely used in computer applications. Generic computer components

recited as performing generic computer functions that are well-understood, routine and

conventional activities amount to no more than implementing the abstract idea with a

computerized system. Thus, taken alone, these additional elements do not amount to

significantly more than the above-identified judicial exception (the abstract idea).

Looking at the limitations as an ordered combination adds nothing that is not already

present when looking at the elements taken individually. There is no indication that the

combination of elements improves the functioning of a computer or improves any other

technology. Their collective functions merely provide conventional computer

implementation.

Exhibit 13
-216-

Application/Control Number: 14/621,268                                      Page 4
Art Unit: 3777

Claims 5-14 and 23-25 are dependent on claims 4 and 22 that includes all
the limitations of claims 4 and 22. Therefore, claims 5-14 and 23-25 recites the same
abstract idea of "mathematical relationship", "collecting and processing known
information" and comparing information regarding a sample or test subject to a control
or target data. The claim recites the additional limitations (perform demodulation using
sin and cos equations; turn on and off light source and perform detection; filtering and
decimation) that also mathematical relationship and collecting and comparing known
information. Thus, taken alone, these additional elements do not amount to significantly
more than the above-identified judicial exception (the abstract idea). Looking at the
limitations as an ordered combination adds nothing that is not already present when
looking at the elements taken individually. There is no indication that the combination of
elements improves the functioning of a computer or improves any other technology.
Their collective functions merely provide conventional computer implementation.

Claims 5-14 and 23-25 are therefore not drawn to eligible subject matter as they
are directed to an abstract idea without significantly more.

### *Claim Rejections - 35 USC § 112*

Claims 4-14 and 22-25 are rejected under 35 U.S.C. 112(a) or 35 U.S.C. 112
(pre-AIA), first paragraph, as based on a disclosure which is not enabling. Determine

Exhibit 13
-217-

Application/Control Number: 14/621,268                                        Page 5
Art Unit: 3777

the matrix value is critical or essential to the practice of the invention, but not included in

the claim(s) is not enabled by the disclosure.  See *In re Mayhew*, 527 F.2d 1229, 188

USPQ 356 (CCPA 1976). Without knowing which value to multiply the signal one of

ordinary skill in the art can not provide an accurate estimate of a physiological

parameter. Examiner suggests amend claim 21 to independent claims 4 and 22 to

overcome the rejection.

### *Claim Rejections - 35 USC § 103*

1.      The following is a quotation of 35 U.S.C. 103 which forms the basis for all

obviousness rejections set forth in this Office action:

> A patent for a claimed invention may not be obtained, notwithstanding that the claimed
> invention is not identically disclosed as set forth in section 102 of this title, if the differences
> between the claimed invention and the prior art are such that the claimed invention as a whole
> would have been obvious before the effective filing date of the claimed invention to a person
> having ordinary skill in the art to which the claimed invention pertains.  Patentability shall not
> be negated by the manner in which the invention was made.

2.      Claims 4-14 and 21-25 are rejected under 35 U.S.C. 103 as being

unpatentable over Diab et al. (US 2012/0253155) and in view of McCarthy et al. (US

5,349,952).

3.      Addressing claims 4 and 22, Diab discloses a method for processing a

signal obtained when light from one or more light sources is emitted toward a body part

of a user, the method comprising: capturing multiple light samples while each light

source emits light toward the body part of the user and converting the multiple light

Exhibit 13
-218-

Application/Control Number: 14/621,268                                           Page 6
Art Unit: 3777

samples into the signal (see abstract and [0007]); demodulating the signal to produce

multiple demodulated signals (see abstract); low-pass filtering and decimating each

demodulated signal at least in two stages (see Fig. 17, [0006], [0008], [0075] and

[0137]; elements 1620 and 1622 is the first stage; elements 1630 and 1632 is the

second stage) and analyzing the first signal and the conditioned signal to estimate a

physiological parameter of the user (see [0002], [0147] and claim 1). However, Diab

does not disclose demultiplexing each demodulated signal and multiplying each of the

demodulated signals by a respective value of a matrix of values to produce a signal

associated with each light source. In the same field of endeavor, McCarthy discloses

demultiplexing each demodulated signal and multiplying each of the

demodulated signals by a respective value of a matrix of values to produce a signal

associated with each light source (see col. 4, lines 15-45). It would have been obvious

to one of ordinary skill in the art before the effective filing date of the claimed invention

to modify Diab to demultiplexing each demodulated signal and multiplying each of the

demodulated signals by a respective value of a matrix of values to produce a signal

associated with each light source as taught by McCarthy because this allow separation

of signal components (see col. 4, lines 35-40).


        4.      Addressing claims 5, 14 and 21, Diab discloses analyzing each signal

associated with each light source to estimate a physiological parameter of the user (see

[0002], [0147] and claim 1); wherein filtering and decimating each demodulated signal at

least once to produce a signal associated with each light source comprises inputting

Exhibit 13
-219-

Application/Control Number: 14/621,268                                    Page 7
Art Unit: 3777

each demodulated signal into one or more low pass filter and decimation stages,

wherein each low pass filter and decimation stage comprises a low pass filter for

receiving a demodulated signal and a decimation circuit operably connected to an

output of the low pass filter (see Figs. 16 and [0099-0106]); wherein the matrix of values

is determined by: turning on a first light source (see abstract and [0007]); capturing a

light sample in response to the first light source and converting the light sample into an

initial signal (see abstract and [0007]); demodulating the initial signal to produce multiple

initial demodulated signals (see abstract and [0007]) and filtering and decimating each

initial demodulated signal at least once to determine at least a portion of the matrix of

values (see [0006], [0008] and [0137]).


        5.      Claims 6-13 and 23-25 are rejected under 35 U.S.C. 103 as being

unpatentable over Diab et al. (US 2012/0253155) and in view of McCarthy et al. (US

5,349,952).


        6.      Addressing claims 6-12, examiner interprets according to applicant

specification. Basically, applicant turns on and off each light source. When applicant

turns on a specific light source and other light sources are off and detector capture

signal applicant calls this capture light sample. When all the light sources are off and

detector capture signal applicant calls this capture dark sample. For claims 6-12,

applicant turns on and off multiple light sources and capture light and dark signal. Diab

discloses turns on and off multiple light sources and capture light and dark signal (see

[0002], [0004], [0042] and Fig. 12). Diab does not disclose capture four, five, ten light or

Exhibit 13
-220-

Application/Control Number: 14/621,268                                    Page 8
Art Unit: 3777

dark sample. However, the amount of light or dark sample is a designer choice and only

requires routine skill in the art. The amount of light or dark sample capture is

conventional, not novelty and does not show any improvement over prior art.


7.     Addressing claims 13 and 25, it would have been obvious to one of

ordinary skill in the art before the effective filing date of the claimed invention that using

sin and cos equation to demodulate signal only require routine skill in the art. Using sin

and cos to demodulate signal is convention and well-known to those skill in the art (see

Diab's paragraph [0056-0059]).


### *Response to Arguments*


Applicant's arguments filed 12/14/16 have been fully considered but they are not

persuasive. Applicant argues the claims involve specific electronic components

performing specific functions that can only be implemented on an electronic device

therefore the claims is not an abstract idea and 101 rejection should be withdrawn.

Applicant argues the claims are directed to such an improvement in computer

functionally as they provide for an electronic device or method which is better able to

process light samples into electrical signals through the particular methods and

structure claimed. Applicant's argument is not persuasive because the electronic device

and components are well-known and conventional. Further, demodulation, multiplying

Exhibit 13
-221-

Application/Control Number: 14/621,268                                      Page 9
Art Unit: 3777

and demultiplexing are discloses by prior art therefore they are not an improvement in

the technological field.

     Applicant's arguments with respect to claims 4-14 and 21 have been considered

but are moot because the arguments do not apply to any of the references being used

in the current rejection.


### *Conclusion*


     Applicant's amendment necessitated the new ground(s) of rejection presented in

this Office action.  Accordingly, **THIS ACTION IS MADE FINAL**.  See MPEP

§ 706.07(a).  Applicant is reminded of the extension of time policy as set forth in 37

CFR 1.136(a).

     A shortened statutory period for reply to this final action is set to expire THREE

MONTHS from the mailing date of this action.  In the event a first reply is filed within

TWO MONTHS of the mailing date of this final action and the advisory action is not

mailed until after the end of the THREE-MONTH shortened statutory period, then the

shortened statutory period will expire on the date the advisory action is mailed, and any

extension fee pursuant to 37 CFR 1.136(a) will be calculated from the mailing date of

the advisory action.  In no event, however, will the statutory period for reply expire later

than SIX MONTHS from the date of this final action.

Exhibit 13
-222-

Application/Control Number: 14/621,268                                    Page 10
Art Unit: 3777

Any inquiry concerning this communication or earlier communications from the examiner should be directed to HIEN NGUYEN whose telephone number is (571)270-7031.  The examiner can normally be reached on 7:30-5:00.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Robert Chen can be reached on (571) 272-3672.  The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system.  Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service Representative or access to the automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/H. N./
Examiner, Art Unit 3777

/ELMER CHAO/
Primary Examiner, Art Unit 3777

Exhibit 13
-223-

| Notice of References Cited | | Application/Control No. 14/621,268 | Applicant(s)/Patent Under Reexamination LAMEGO, MARCELO M. | |
|---|---|---|---|---|
| | | Examiner HIEN NGUYEN | Art Unit 3777 | Page 1 of 1 |

**U.S. PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Name | CPC Classification | US Classification |
|---|---|---|---|---|---|---|
| * | A | US-5,349,952 A | 09-1994 | McCarthy; Rex | A61B5/0059 | 356/41 |
| | B | US- | | | | |
| | C | US- | | | | |
| | D | US- | | | | |
| | E | US- | | | | |
| | F | US- | | | | |
| | G | US- | | | | |
| | H | US- | | | | |
| | I | US- | | | | |
| | J | US- | | | | |
| | K | US- | | | | |
| | L | US- | | | | |
| | M | US- | | | | |

**FOREIGN PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Country | Name | CPC Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

**NON-PATENT DOCUMENTS**

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

| *Search Notes* | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 14621268 | LAMEGO, MARCELO  M. |
| | **Examiner** | **Art Unit** |
| | HIEN NGUYEN | 3777 |

## CPC- SEARCHED

| Symbol | Date | Examiner |
|---|---|---|
| (A61B5/0059 or A61B5/0084).cpc. | 1/24/2017 | HN |

## CPC COMBINATION SETS  - SEARCHED

| Symbol | Date | Examiner |
|---|---|---|
| | | |

## US CLASSIFICATION SEARCHED

| Class | Subclass | Date | Examiner |
|---|---|---|---|
| | | | |

## SEARCH NOTES

| Search Notes | Date | Examiner |
|---|---|---|
| East Search (inventor search) | 1/24/2017 | HN |

## INTERFERENCE SEARCH

| US Class/ CPC Symbol | US Subclass / CPC Group | Date | Examiner |
|---|---|---|---|
| | | | |

| | |
|---|---|
| | |

| *Index of Claims* | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 14621268 | LAMEGO, MARCELO M. |
| | Examiner | Art Unit |
| | HIEN NGUYEN | 3777 |

| ✓ | Rejected | | - | Cancelled | | N | Non-Elected | | A | Appeal |
|---|---|---|---|---|---|---|---|---|---|---|
| = | Allowed | | ÷ | Restricted | | I | Interference | | O | Objected |

☐ Claims renumbered in the same order as presented by applicant    ☐ CPA    ☐ T.D.    ☐ R.1.47

| CLAIM | | DATE | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Final | Original | 08/02/2016 | 01/24/2017 | | | | | | | | |
| | 1 | N | N | | | | | | | | |
| | 2 | N | - | | | | | | | | |
| | 3 | N | N | | | | | | | | |
| | 4 | ✓ | ✓ | | | | | | | | |
| | 5 | ✓ | ✓ | | | | | | | | |
| | 6 | ✓ | ✓ | | | | | | | | |
| | 7 | ✓ | ✓ | | | | | | | | |
| | 8 | ✓ | ✓ | | | | | | | | |
| | 9 | ✓ | ✓ | | | | | | | | |
| | 10 | ✓ | ✓ | | | | | | | | |
| | 11 | ✓ | ✓ | | | | | | | | |
| | 12 | ✓ | ✓ | | | | | | | | |
| | 13 | ✓ | ✓ | | | | | | | | |
| | 14 | ✓ | ✓ | | | | | | | | |
| | 15 | N | - | | | | | | | | |
| | 16 | N | - | | | | | | | | |
| | 17 | N | - | | | | | | | | |
| | 18 | N | - | | | | | | | | |
| | 19 | N | - | | | | | | | | |
| | 20 | N | - | | | | | | | | |
| | 21 | | ✓ | | | | | | | | |
| | 22 | | ✓ | | | | | | | | |
| | 23 | | ✓ | | | | | | | | |
| | 24 | | ✓ | | | | | | | | |
| | 25 | | ✓ | | | | | | | | |

Exhibit 13
-226-

**EAST Search History**

**EAST Search History (Prior Art)**

| Ref # | Hits | Search Query | DBs | Default Operator | Plurals | Time Stamp |
|-------|------|--------------|-----|------------------|---------|------------|
| S1 | 130 | ((Marcelo) near2 (Lamego)).INV. | US-PGPUB; USPAT; USOCR | OR | OFF | 2016/08/02 11:48 |
| S2 | 0 | S1 (light dark demodulat$3).clm. | US-PGPUB; USPAT; USOCR | AND | OFF | 2016/08/02 11:49 |
| S3 | 0 | "14621268" | US-PGPUB; USPAT; USOCR | AND | OFF | 2016/08/02 11:49 |
| S4 | 0 | demodulat$3 fitler$3 decimat$3 light (tissue or sample or skin) physiological | US-PGPUB; USPAT; USOCR | AND | OFF | 2016/08/02 12:00 |
| S5 | 296 | demodulat$3 filter$3 decimat$3 light (tissue or sample or skin) physiological | US-PGPUB; USPAT; USOCR | AND | OFF | 2016/08/02 12:01 |
| S6 | 15 | (demodulat$3 same filter$3 same decimat$3 same light same (tissue or sample or skin)) physiological | US-PGPUB; USPAT; USOCR | AND | OFF | 2016/08/02 12:01 |
| S7 | 0 | (demodulat$3 same filter$3 same decimat$3 same light same (tissue or sample or skin)) physiological wear$4 | US-PGPUB; USPAT; USOCR | AND | OFF | 2016/08/02 12:09 |
| S8 | 1 | (demodulat$3 same filter$3 same decimat$3 same light same (tissue or sample or skin)) wear$4 | US-PGPUB; USPAT; USOCR | AND | OFF | 2016/08/02 12:10 |
| S9 | 7455 | (A61B5/0059 or A61B5/0084).cpc. | US-PGPUB; USPAT | AND | OFF | 2016/08/02 16:38 |
| S10 | 0 | "14621268" | US-PGPUB; USPAT | OR | OFF | 2017/01/24 10:10 |
| S11 | 0 | 14/621268 | US-PGPUB; USPAT | AND | OFF | 2017/01/24 10:11 |
| S12 | 136 | (("LAMEGO") near3 ("Marcelo")).INV. | US-PGPUB; USPAT; USOCR | OR | OFF | 2017/01/24 10:11 |
| S13 | 0 | ("2012/0253155").URPN. | USPAT | OR | OFF | 2017/01/24 11:24 |
| S14 | 484 | physiological (demultiplex$3 with multipl$4) | US- | AND | OFF | 2017/01/24 |

Exhibit 13
-227-

| | | | | | | 11:25 |
|---|---|---|---|---|---|---|
| S15 | 235 | physiological (demultiplex$3 with multipl$4) demodulat$3 | US-PGPUB; USPAT | AND | OFF | 2017/01/24 11:26 |
| S16 | 90 | physiological (demultiplex$3 with multipl$4) demodulat$3 decimat$3 | US-PGPUB; USPAT | AND | OFF | 2017/01/24 11:26 |
| S17 | 1 | physiological (demultiplex$3 with multipl$4 with demodulat$3) decimat$3 | US-PGPUB; USPAT | AND | OFF | 2017/01/24 11:26 |
| S18 | 22 | physiological (demultiplex$3 with multipl$4 with demodulat$3) | US-PGPUB; USPAT | AND | OFF | 2017/01/24 11:27 |
| S19 | 4 | (physiological or analyte or blood or (heart adj rate)) (demultiplex$3 with (multiplying or multiply or multiplier) with demodulat$3) | US-PGPUB; USPAT | AND | OFF | 2017/01/24 11:47 |
| S20 | 4 | (physiological or analyte or blood or (heart adj rate) or health) (demultiplex$3 with (multiplying or multiply or multiplier) with demodulat$3) | US-PGPUB; USPAT | AND | OFF | 2017/01/24 11:48 |
| S21 | 5 | (physiological or analyte or blood or (heart adj rate) or health) (demultiplex$3 with (multiplying or multiply or multiplier) same demodulat$3) | US-PGPUB; USPAT | AND | OFF | 2017/01/24 11:49 |
| S22 | 10 | (physiological or analyte or blood or (heart adj rate) or health) (demultiplex$3 with (multiplying or multiply or multiplier) demodulat$3) | US-PGPUB; USPAT | AND | OFF | 2017/01/24 12:05 |
| S23 | 9 | (medical or medicine) (demultiplex$3 with (multiplying or multiply or multiplier) demodulat$3) | US-PGPUB; USPAT | AND | OFF | 2017/01/24 12:26 |
| S24 | 7904 | (A61B5/0059 or A61B5/0084).cpc. | US-PGPUB; USPAT | AND | OFF | 2017/01/24 12:30 |

1/24/2017 4:32:20 PM
C:\Users\hnguyen55\Documents\EAST\Workspaces\14621268.wsp

Exhibit 13
-228-

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of:

| | | | |
|---|---|---|---|
| Inventor(s): | Marcelo M. Lamego | | |
| App. No.: | 14/621,268 | Con. No.: | 6317 |
| Filed: | February 12, 2015 | Art Unit: | 3777 |
| Title: | MODULATION AND DEMODULATION TECHNIQUES FOR A HEALTH MONITORING SYSTEM | Examiner: | Nguyen, Hien Ngoc |

**AMENDMENT AND RESPONSE TO OFFICE ACTION**

Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Sir:

In response to the Office action dated September 14, 2016, please consider the following remarks and amend the above-identified application as follows:

**Amendments to the Claims** begin on page 2 of this paper.

**Remarks** begin on page 7 of this paper.

Exhibit 13
-229-

Attorney Docket No. P22879US1

**Amendments to the Claims:**

1.      (Withdrawn – Currently Amended)  An electronic device, comprising:

two or more light sources for emitting light toward a body part of a user;

an optical sensor for obtaining light and dark samples and converting the samples into a signal;

a processing device operably connected to the optical sensor for demodulating the signal received from the optical sensor into a demodulated signal associated with each light source; [[and]]

at least one decimation stage for processing each demodulated signal, wherein each decimation stage comprises a low pass filter for receiving the demodulated signals and a decimation circuit operably connected to an output of the low pass filter; and

a demultiplexer and multiplier circuit operably connected to an output of a last decimation stage, wherein the demultiplexer separates the signals by each associated light source and the multiplier multiplies each separated signal by one or more respective weighted values.

2.      (Canceled)

3.      (Withdrawn)  The electronic device as in claim 1, wherein the electronic device is a wearable communication device.

4.      (Currently Amended)  A method for processing a signal obtained when light from one or more light sources is emitted toward a body part of a user, the method comprising:

capturing multiple light samples while each light source emits light toward the body part of the user and converting the multiple light samples into the signal;

demodulating the signal to produce multiple demodulated signals;

filtering and decimating each demodulated signal at least once; and

demultiplexing each demodulated signal and multiplying each of the demodulated signals by a respective value of a matrix of values to produce a signal associated with each light source.

5.      (Original)  The method as in claim 4, further comprising analyzing each signal associated with each light source to estimate a physiological parameter of the user.

Exhibit 13
-230-

6.      (Currently Amended)  The method as in claim 4, wherein capturing multiple light samples while each light source emits light toward the body part of the user comprises:

[[a)]] capturing multiple light samples when <u>a respective</u> <s>each</s> light source is turned on and the other light sources are turned off; and

capturing multiple dark samples after all four light sources have been turned on and turned off.

7.      (Currently Amended)  The method as in claim <u>6</u> [[5]], wherein capturing multiple light samples when a respective light source is turned on and the other light sources are turned off comprises capturing five light samples when a respective light source is turned on and the other light sources are turned off.

8.      (Original)  The method as in claim 7, wherein capturing multiple dark samples after all of the light sources have been turned on and turned off comprises capturing ten dark samples after all of the light sources have been turned on and turned off.

9.      (Original)  The method as in claim 6, further comprising capturing one or more dark samples after one light source is turned off and before the next light source is turned on.

10.      (Original)  The method as in claim 9, wherein capturing one or more dark samples after one light source is turned off and before the next light source is turned on comprises capturing one dark sample after one light source is turned off and before the next light source is turned on.

11.      (Original)  The method as in claim 10, wherein capturing multiple light samples when a respective light source is turned on and the other light sources are turned off comprises capturing five light samples when a respective light source is turned on and the other light sources are turned off.

12.      (Original)  The method as in claim 11, wherein capturing multiple dark samples after all of the light sources have been turned on and turned off comprises capturing seven dark samples after all of the light sources have been turned on and turned off.

Exhibit 13
-231-

Attorney Docket No. P22879US1

13.     (Original)  The method as in claim 4, wherein demodulating the signal to produce multiple demodulated signals comprises applying a first demodulation operation of $\sin 2\pi \frac{kt}{N}$ to the signal and applying a second demodulation operation of $\cos 2\pi \frac{kt}{N}$ to the signal, where k is defined by $1 \le k \le n/2$, N represents the number of samples obtained by the optical sensor, and $t = 0, 1, \ldots, N\text{-}1$.

14.     (Original)  The method as in claim 4, wherein filtering and decimating each demodulated signal at least once to produce a signal associated with each light source comprises inputting each demodulated signal into one or more low pass filter and decimation stages, wherein each low pass filter and decimation stage comprises a low pass filter for receiving a demodulated signal and a decimation circuit operably connected to an output of the low pass filter.

15.     (Canceled)

16.     (Canceled)

17.     (Canceled)

18.     (Canceled)

19.     (Canceled)

20.     (Canceled)

21.     (New)  The method as in claim 4, wherein the matrix of values is determined by:
turning on a first light source;
capturing a light sample in response to the first light source and converting the light sample into an initial signal;
demodulating the initial signal to produce multiple initial demodulated signals;
filtering and decimating each initial demodulated signal at least once to determine at least a portion of the matrix of values.

Exhibit 13
-232-

22.     (New)  A method for processing a signal obtained when light from a first light source and a second light source is emitted toward a body part of a user, the method comprising:

capturing multiple light samples while each light source emits light toward the body part of the user and converting the multiple light samples into the signal;

demodulating the signal to produce multiple demodulated signals;

performing a first decimation stage by:

low pass filtering each demodulated signal; and

decimating each demodulated signal;

performing a second decimation stage after the first decimation stage by:

low pass filtering each demodulated signal; and

decimating each demodulated signal;

demultiplexing each demodulated signal after the second stage to produce a first signal associated with the first light source and a second signal associated with the second light source;

multiplying the first signal by a first predetermined value to obtain a first conditioned signal;

multiplying the second signal by a second predetermine value to obtain a second conditioned signal; and

analyzing the first conditioned signal and the second conditioned signal to estimate a physiological parameter of a user.

23.     (New)  The method as in claim 22, wherein capturing multiple light samples while each light source emits light toward the body part of the user comprises:

capturing multiple light samples while each light source is turned on and the other light sources are turned off; and

capturing multiple dark samples after all four light sources have been turned on and turned off.

24.     (New)  The method as in claim 23, further comprising capturing one or more dark samples after one light source is turned off and before the next light source is turned on.

5

**Exhibit 13**
-233-

25.    (New)  The method as in claim 23, wherein demodulating the digital signal to produce multiple demodulated signals comprises applying a first demodulation operation of $\sin 2\pi \frac{kt}{N}$ to the digital signal and applying a second demodulation operation of $\cos 2\pi \frac{kt}{N}$ to the digital signal, where k is defined by $1 \leq k \leq n/2$, N represents the number of samples obtained by the optical sensor, and t = 0, 1, …, N-1.

Exhibit 13
-234-

## REMARKS

This paper is submitted in response to the Office action mailed on September 14, 2016. This paper amends claims 4, 6, and 7; withdraws claims 1 and 3; cancels claims 2 and 15-20; and adds claims 21-25. Accordingly, after entry of this Amendment and Response, claims 4-14 and 21-25 will be pending.

### I.  Restriction Requirement

In the Restriction Requirement, the Examiner alleges three distinct inventions:

I.        Claims 1-3, drawn to an electronic device, classified in 600/476;

II.       Claims 4-14, drawn to a method for processing a signal obtained when light from one or more light sources is emitted toward body part of a user, classified in 600/476; and

III.      Claims 15-20, drawn to a method for operating an electronic device that includes multiple light sources, classified in 600/476.

The Examiner requires restriction to one of the aforementioned inventions under 35 U.S.C. § 1.21. In response to the Restriction Requirement, Assignee elects Group II, claims 4-14, without traverse. Accordingly, claims 1 and 3 are hereby withdrawn and claims 2 and 15-20 are hereby canceled.

This paper adds new claims 21-25. Claim 21 depends from claim 4, and is therefore included in the elected group II. Claims 22-25 are directed to the elected subject matter of group II.

### II.  Claim Rejections Under 35 U.S.C. § 112

The Examiner rejected claims 4, 6, 8-10 and 12 under 35 U.S.C. § 112(a) as failing to comply with the written description requirement.

The Examiner rejected claims 4, 6, 8-10 and 12 under 35 U.S.C. § 112(a) as failing to comply with the enablement requirement. For at least the following reasons, the Assignee respectfully traverses these rejections.

The Examiner asserts that "[t]he written description does not disclose how applicant performs decimating in the decimation stage" (Office Action, 9). However, the decimation stage is adequately described at least in paragraphs [0018], [0056], [0057], and [0060].

**Exhibit 13**
**-235-**

Further, the Examiner asserts that "the written description does not disclose how to capture dark sample [sic] when all light are off" (Office Action, 9). As described in the specification, an electronic device may include "one or more optical sensors . . . for capturing dark samples while the light source(s) are turned off" (para. [0005]) and "A light sample obtained when all of the light sources are turned off is known as a dark sample" (para. [0049]). One of ordinary skill of the art would understand that a "dark sample," as described in the specification, may include ambient light, noise, or other artifacts which may be captured by an optical sensor. Accordingly, capturing dark samples is adequately described and enabled in the specification. The Assignee respectfully requests the Examiner withdraw these rejections under 35 U.S.C. § 112.

*III  Claim Rejections Under 35 U.S.C. § 101*

The Examiner rejected claims 4-14 under 35 U.S.C. § 101 because the claimed invention is directed to a judicial exception. For at least the following reasons, the Assignee respectfully traverses these rejections.

First, the Examiner states that the "method involve [sic] mathematical concepts such as mathematical relationships, mathematical formulas, and calculation (demodulation and decimating involve mathematical algorithm and processing), collecting and processing known information, comparing information regarding a sample or test subject to a control or target data which correspond to concepts identified as abstract ideas by the courts" to bolster the idea that the pending claims are drawn to an abstract idea (see Office Action, 7). However, this is an irrelevant argument. The Supreme Court has not ruled that patent-ineligible concepts include any form of "mathematical relationships, mathematical formulas, and calculation . . ., collecting and processing known information, comparing information regarding a sample or test subject to a control or target data." Rather, to the extent that such concepts are not patent-eligible under § 101 it is because they are "laws of nature, natural phenomena, and abstract ideas" (*Alice Corp, Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014), citing *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 132 S. Ct. 1289 (2012)). The Examiner is applying a test that does not exist to reach a tautological conclusion.

Further, the Assignee respectfully submits that the Examiner's assertion that "the claims are directed to a method for processing light signal" (Office Action, 6) runs counter to the Federal Circuit's and the Patent Office's cautions against "describing a claim at a high level of abstraction untethered from the language of the claim when determining the focus of the

Exhibit 13
-236-

claimed invention" (Memorandum from Robert W. Bahr, Deputy Comm'r for Patent Examination Policy 1 (May 19, 2016) (citing *Enfish, LLC v. Microsoft Corp.*, No. 2015-1244, slip. op. (Fed. Cir. May 12, 2016), hereinafter "Memorandum"). The Examiner's broad and general description of the claims ignores the claim language. Additionally, the general description of the claims inaccurately describes the claims as being "directed to" "processing light signal."

The claims are not accurately described at this exceptionally high level. For example, independent claim 4 requires at least the following elements and limitations:

   1. capturing multiple light samples while one or more light sources emit light toward the body part of a user

   2. converting the multiple light samples into a signal;

   3. demodulating the signal to produce multiple demodulated signals;

   4. filtering and decimating each demodulated signal at least once;

   5. demultiplexing each demodulated signal; and

   6. multiplying each of the demodulated signals by a respective value of a matrix of values.

Thus claim 4 cannot be accurately described as being "directed to" "processing light signal." The claimed device includes multiple electronic components in order to emit light toward a body part of a user, capture multiple light samples, convert, demodulate, filter, decimate, demultiplex, and multiply signals. Independent claim 22 contains similar limitations. As stated in MPEP § 2106 (II), "[i]n addition to the terms 'laws of nature,' 'natural phenomena,' and 'abstract ideas,' judicially recognized exceptions have been described using various other terms, including 'physical phenomena,' 'scientific principles,' 'systems that depend on human intelligence alone,' 'disembodied concepts,' 'mental processes' and 'disembodied mathematical algorithms and formulas,' for example. The exceptions reflect the courts' view that the basic tools of scientific and technological work are not patentable." As noted above, such basic tools of scientific and technological work, mental processes, or disembodied mathematical algorithms and formulas are not here claimed. Instead the claims involve specific electronic components performing specific functions that can only be implemented on an electronic device.

In addition, the Patent Office has emphasized that "a claim directed to an improvement to computer-related technology (e.g., computer functionality) is likely not similar to claims that have previously been identified as abstract by the courts" (Memorandum, p. 2). Here, the claims are directed to such an improvement in computer functionality as they provide for an electronic device (or method) which is better able to process light samples into electrical signals through the particular methods and structures claimed. For example, each of the claims employs steps

Exhibit 13
-237-

of capturing light samples, converting the light samples into a signal, demodulating the signal, filtering and decimating each demodulated signal, and multiplying each of the demodulated signals by a respective value of a matrix of values. This improves functionality by, for example, reducing or eliminating undesired interferences and producing demodulated signals that can be analyzed to estimate a physiological parameter of a user (see, e.g., para. [0018]).

This is entirely in accord with the Supreme Court's test in *Alice* to determine whether or not a claim is directed to patentable subject matter. With respect to an abstract idea, the United States Supreme Court stated in *Alice* that a court must determine (1) whether the claim at issue is directed to a patent-ineligible concept, and then (2) determine whether the balance of the claim adds 'significantly more.'" *Alice* at 2355 (citing *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 566 U.S. ___ (2012)).

With respect to the first step, the Supreme Court has held that 35 U.S.C. § 101 contains an implicit exception; that laws of nature, natural phenomena, and abstract ideas are not patentable. The concern that drives this implicit exception is pre-emption. The question is whether upholding a patent would pre-empt the use of the abstract idea in all fields, and would effectively grant a monopoly over an abstract idea. *See Alice* at 2354. "Laws of nature, natural phenomena, and abstract ideas are 'the basic tools of scientific and technological work.'" Id. (citing *Association for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. __, __ (2013) (slip op., at 11). Here, it is clear that the specific limitations in the claims at issue would not grant any monopoly over any abstract idea.

Further, the Court noted that it must be careful when construing the exception or the exception will swallow all of patent law. The Court stated that "[a]t some level, all inventions … embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas. Thus, an invention is not rendered ineligible for patent simply because it involves an abstract concept." *Alice* at 2354. Accordingly, in applying the § 101 exception, it is important to distinguish between patents that claim the building blocks of human ingenuity and those that integrate the building blocks into something more, thereby transforming it into a patent-eligible invention. *See Mayo* at 1303. The Assignee respectfully submits that the Examiner has read the claim so broadly, and so far beyond its actual limits, that the Examiner has done exactly what the Supreme Court warned against in *Alice*.

With respect to the second step of the *Alice* test, the elements of each claim must be considered both individually and "as an ordered combination" to determine whether the additional elements "transform the nature of the claim" into a patent-eligible application. *Alice* at 2355. Here, even if the claims were directed to a patent-ineligible concept, several additional

Exhibit 13
-238-

limitations transform the nature of the claims. For example, claim 4 recites "capturing multiple light samples while each light source emits light toward the body part of the user," "converting the multiple light samples into the signal," "demodulating the signal to produce multiple demodulated signals," "filtering and decimating each demodulated signal at least once," "demultiplexing each demodulated signal," and "multiplying each of the demodulated signals by a respective value of a matrix of values."

In *Alice*, the Court stated that "the relevant question is whether the claims do more than simply instruct the practitioner to implement the abstract idea of intermediate settlement on a generic computer." *Alice* at 2359. The above listed limitations, among others, do considerably more than implement an abstract idea on a generic computer.

The Assignee respectfully submits, therefore, that none of the claims in the present application are directed to non-statutory subject matter under 35 U.S.C. § 101. Accordingly, the Assignee respectfully requests that the Examiner withdraw the rejections of claims 4-10, 12-14, and 16-20 under § 101.

### IV.  Claim Rejections Under 35 U.S.C. § 102

The Examiner rejected claims 4-5 and 14 under 35 U.S.C. § 102(a)(1) as being anticipated by Diab et al. (U.S. Patent Publication No. 2012/0253155; hereinafter "Diab"). For at least the following reasons, the Assignee respectfully traverses these rejections.

Claim 4 recites, among other features, "demultiplexing each demodulated signal and multiplying each of the demodulated signals by a respective value of a matrix of values to produce a signal associated with each light source." These features are not taught or suggested by Diab.

Diab describes a method and an apparatus to measure blood oxygenation including two light sources and a detector to detect a composite signal from the two light sources (Diab, Abstract). Diab does not teach or suggest demultiplexing demodulated signals and multiplying each of the demodulated signals by a respective value of a matrix of values to produce a signal associated with each light source.

Accordingly, independent claim 4 is novel and nonobvious over Diab and in condition for allowance. Claims 5 and 14 depend from claim 4 and are allowable at least as depending from an allowable base claim.

Exhibit 13
-239-

### V.  Claim Rejections Under 35 U.S.C. § 103

The Examiner rejected claims 6-13 under 35 U.S.C. § 103(a) as being obvious over
Diab. For at least the following reasons, the Assignee respectfully traverses these rejections.

"If an independent claim is not rendered obvious by prior art, then any claim depending
from the independent claim is not obvious." *In re Fine*, 5 USPQ2d 1596 (Fed. Cir. 1988)(see
also MPEP § 2143.03). Each of claims 6-13 depends from independent claim 4. Accordingly,
the Assignee submits that dependent claims 2-4, 6, 8, 9, 15-25, 27, 28, 30, and 32 are in
condition for allowance.

### VII.  Conclusion

The Assignee thanks the Examiner for the thorough review of the application. The
Assignee respectfully submits the present application, as amended, is in condition for allowance
and respectfully requests the issuance of a Notice of Allowability as soon as practicable.

The Assignee believes no fees or petitions are due with this filing. However, should any
such fees or petitions be required, please consider this a request therefor and authorization to
charge Deposit Account No. 504621 as necessary.

If the Examiner should require any additional information or amendment, please contact
the undersigned attorney.


Dated:  ___December 14, 2016___

                                   Respectfully submitted,


                                   ___/Stuart K. Wagner/_____
                                   Stuart K. Wagner, Registration No. 74,548
                                   Attorney for Assignee
                                   USPTO Customer No. 62579

                                   Brownstein Hyatt Farber Schreck, LLP
                                   410 Seventeenth Street
                                   Suite 2200
                                   Denver, Colorado  80202
                                   Phone:  303-223-1100
                                   Fax:  303-223-1111

**Exhibit 13**
**-240-**

# Electronic Acknowledgement Receipt

| EFS ID: | 27799585 |
|---|---|
| Application Number: | 14621268 |
| International Application Number: | |
| Confirmation Number: | 6317 |
| Title of Invention: | Modulation and Demodulation Techniques for a Health Monitoring System |
| First Named Inventor/Applicant Name: | Marcelo M. Lamego |
| Customer Number: | 62579 |
| Filer: | Stuart K. Wagner/Valerie Brown |
| Filer Authorized By: | Stuart K. Wagner |
| Attorney Docket Number: | P22879US1 |
| Receipt Date: | 14-DEC-2016 |
| Filing Date: | 12-FEB-2015 |
| Time Stamp: | 22:21:04 |
| Application Type: | Utility under 35 USC 111(a) |

## Payment information:

| Submitted with Payment | no |
|---|---|

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Amendment/Req. Reconsideration-After Non-Final Reject | P22879US1Amendment.pdf | 72256<br>2243eb693befd322dba98e10aded335f2b0ed6a4 | no | 12 |

**Warnings:**

Exhibit 13<br>-241-

**Information:**

| | |
|---|---|
| **Total Files Size (in bytes):** | 72256 |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

New Applications Under 35 U.S.C. 111
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

National Stage of an International Application under 35 U.S.C. 371
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

New International Application Filed with the USPTO as a Receiving Office
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

Exhibit 13
-242-

PTO/SB/06 (09-11)
Approved for use through 1/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| PATENT APPLICATION FEE DETERMINATION RECORD<br>Substitute for Form PTO-875 | Application or Docket Number<br>14/621,268 | Filing Date<br>02/12/2015 | ☐ To be Mailed |
|---|---|---|---|

**ENTITY:**   ☒ LARGE   ☐ SMALL   ☐ MICRO

## APPLICATION AS FILED – PART I

|  | (Column 1) | (Column 2) |  |  |
|---|---|---|---|---|
| FOR | NUMBER FILED | NUMBER EXTRA | RATE ($) | FEE ($) |
| ☐ BASIC FEE<br>(37 CFR 1.16(a), (b), or (c)) | N/A | N/A | N/A | |
| ☐ SEARCH FEE<br>(37 CFR 1.16(k), (i), or (m)) | N/A | N/A | N/A | |
| ☐ EXAMINATION FEE<br>(37 CFR 1.16(o), (p), or (q)) | N/A | N/A | N/A | |
| TOTAL CLAIMS<br>(37 CFR 1.16(i)) | minus 20 = | * | X $          = | |
| INDEPENDENT CLAIMS<br>(37 CFR 1.16(h)) | minus 3 = | * | X $          = | |
| ☐APPLICATION SIZE FEE<br>(37 CFR 1.16(s)) | If the specification and drawings exceed 100 sheets of paper, the application size fee due is $310 ($155 for small entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s). | | | |
| ☐ MULTIPLE DEPENDENT CLAIM PRESENT (37 CFR 1.16(j)) | | | | |
| * If the difference in column 1 is less than zero, enter "0" in column 2. | | | TOTAL | |

## APPLICATION AS AMENDED – PART II

|  |  | (Column 1) | (Column 2) | (Column 3) |  |  |
|---|---|---|---|---|---|---|
| **AMENDMENT** | **12/14/2016** | CLAIMS REMAINING AFTER AMENDMENT | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) |
| | Total (37 CFR 1.16(i)) | * 18 | Minus | ** 20 | = 0 | x $80 = | 0 |
| | Independent (37 CFR 1.16(h)) | * 3 | Minus | *** 3 | = 0 | x $420 = | 0 |
| | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | |
| | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | |
| | | | | | TOTAL ADD'L FEE | **0** |

|  |  | (Column 1) | (Column 2) | (Column 3) |  |  |
|---|---|---|---|---|---|---|
| **AMENDMENT** | | CLAIMS REMAINING AFTER AMENDMENT | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) |
| | Total (37 CFR 1.16(i)) | * | Minus | ** | = | x $          = | |
| | Independent (37 CFR 1.16(h)) | * | Minus | *** | = | x $          = | |
| | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | |
| | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | |
| | | | | | TOTAL ADD'L FEE | |

LIE
SHAREILL COLES

* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.
** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20".
*** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3".
The "Highest Number Previously Paid For" (Total or Independent) is the highest number found in the appropriate box in column 1.

This collection of information is required by 37 CFR 1.16. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

**Exhibit 13**
**-243-**

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 14/621,268 | 02/12/2015 | Marcelo M. Lamego | P22879US1 | 6317 |

62579        7590        09/14/2016

APPLE INC. (Brownstein)
c/o Brownstein Hyatt Farber Schreck LLP
410 17th St.
Suite 2200
DENVER, CO 80202

| EXAMINER |
|---|
| NGUYEN, HIEN NGOC |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3777 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 09/14/2016 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

patentdocket@bhfs.com

Exhibit 13
-244-

| *Office Action Summary* | Application No. 14/621,268 | Applicant(s) LAMEGO, MARCELO M. |
|---|---|---|
| | Examiner HIEN NGUYEN | Art Unit 3777 | AIA (First Inventor to File) Status Yes |

| -- The MAILING DATE of this communication appears on the cover sheet with the correspondence address -- |
|---|

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.

- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) months from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1) ☒ Responsive to communication(s) filed on <u>02/12/15</u>.
   ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2a) ☐ This action is **FINAL**.     2b) ☒ This action is non-final.

3) ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

4) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims***

5) ☒ Claim(s) <u>1-20</u> is/are pending in the application.
   5a) Of the above claim(s) <u>1-3 and 15-20</u> is/are withdrawn from consideration.

6) ☐ Claim(s) _____ is/are allowed.

7) ☒ Claim(s) <u>4-14</u> is/are rejected.

8) ☐ Claim(s) _____ is/are objected to.

9) ☐ Claim(s) _____ are subject to restriction and/or election requirement.

* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov.

**Application Papers**

10) ☐ The specification is objected to by the Examiner.

11) ☒ The drawing(s) filed on <u>02/12/15</u> is/are: a) ☒ accepted or b) ☐ objected to by the Examiner.
   Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
   Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

**Priority under 35 U.S.C. § 119**

12) ☐ Acknowledgement is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   **Certified copies:**
      a) ☐ All   b) ☐ Some**  c) ☐ None of the:
      1. ☐ Certified copies of the priority documents have been received.
      2. ☐ Certified copies of the priority documents have been received in Application No. _____.
      3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☒ Notice of References Cited (PTO-892)

2) ☐ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b) Paper No(s)/Mail Date _____.

3) ☐ Interview Summary (PTO-413) Paper No(s)/Mail Date. _____.

4) ☐ Other: _____.

**Exhibit 13**
**-245-**

Application/Control Number: 14/621,268                                              Page 2
Art Unit: 3777

The present application, filed on or after March 16, 2013, is being examined

under the first inventor to file provisions of the AIA.


**DETAILED ACTION**


***Election/Restrictions***


Restriction to one of the following inventions is required under 35 U.S.C. 121:

I. Claims 1-3, drawn to an electronic device, classified in 600/476.

II. Claims 4-14, drawn to a method for processing a signal obtained when light

from one or more light sources is emitted toward body part of a user, classified in

600/476.

III. Claims 15-20, drawn to a method for operating an electronic device that

includes multiple light sources, classified in 600/476.

The inventions are distinct, each from the other because of the following reasons:


Inventions I and II are related as process and apparatus for its practice.  The

inventions are distinct if it can be shown that either: (1) the process as claimed can be

practiced by another and materially different apparatus or by hand, or (2) the apparatus

as claimed can be used to practice another and materially different process.  (MPEP §

806.05(e)). In this case the apparatus as claimed can be used to practice another and

Exhibit 13
-246-

Application/Control Number: 14/621,268                                    Page 3
Art Unit: 3777

materially different process. The apparatus could use a different step and equation of demodulate the signals.

Inventions I and III are related as process and apparatus for its practice.  The inventions are distinct if it can be shown that either: (1) the process as claimed can be practiced by another and materially different apparatus or by hand, or (2) the apparatus as claimed can be used to practice another and materially different process.  (MPEP § 806.05(e)). In this case the apparatus as claimed can be used to practice another and materially different process. The apparatus could use a different step and equation of demodulate the signals and capture signal.

Inventions II and III are directed to related processes. The related inventions are distinct if: (1) the inventions as claimed are either not capable of use together or can have a materially different design, mode of operation, function, or effect; (2) the inventions do not overlap in scope, i.e., are mutually exclusive; and (3) the inventions as claimed are not obvious variants.  See MPEP § 806.05(j). In the instant case, the inventions as claimed have a materially different mode of operation. For example: invention II performs step capturing seven dark samples after all of the light sources have been turned on and turned off and capturing one or more dark samples after one light source is turned off and before the next light source is turned on. Invention III does not perform these steps.

Exhibit 13
-247-

Application/Control Number: 14/621,268                                    Page 4
Art Unit: 3777

Restriction for examination purposes as indicated is proper because all these inventions listed in this action are independent or distinct for the reasons given above and there would be a serious search and/or examination burden if restriction were not required because one or more of the following reasons apply:

The inventions require different search queries and field of search.

**Applicant is advised that the reply to this requirement to be complete must include (i) an election of an invention to be examined** even though the requirement may be traversed (37 CFR 1.143) **and (ii) identification of the claims encompassing the elected invention**.

The election of an invention may be made with or without traverse. To reserve a right to petition, the election must be made with traverse. If the reply does not distinctly and specifically point out supposed errors in the restriction requirement, the election shall be treated as an election without traverse. Traversal must be presented at the time of election in order to be considered timely. Failure to timely traverse the requirement will result in the loss of right to petition under 37 CFR 1.144. If claims are added after the election, applicant must indicate which of these claims are readable upon the elected invention.

Should applicant traverse on the ground that the inventions are not patentably distinct, applicant should submit evidence or identify such evidence now of record showing the inventions to be obvious variants or clearly admit on the record that this is the case. In either instance, if the examiner finds one of the inventions unpatentable

Exhibit 13 -248-

Application/Control Number: 14/621,268                                     Page 5
Art Unit: 3777

over the prior art, the evidence or admission may be used in a rejection under 35 U.S.C.

103 or pre-AIA 35 U.S.C. 103(a) of the other invention.

During a telephone conversation with Nancy Simon on 08/01/16 a provisional

election was made without traverse to prosecute the invention of group II, claims 4-14.

Affirmation of this election must be made by applicant in replying to this Office action.

Claims 1-3 and 15-20 are withdrawn from further consideration by the examiner, 37

CFR 1.142(b), as being drawn to a non-elected invention.

The examiner has required restriction between product or apparatus claims and

process claims. Where applicant elects claims directed to the product/apparatus, and all

product/apparatus claims are subsequently found allowable, withdrawn process claims

that include all the limitations of the allowable product/apparatus claims should be

considered for rejoinder. All claims directed to a nonelected process invention must

include all the limitations of an allowable product/apparatus claim for that process

invention to be rejoined.

In the event of rejoinder, the requirement for restriction between the

product/apparatus claims and the rejoined process claims will be withdrawn, and the

rejoined process claims will be fully examined for patentability in accordance with 37

CFR 1.104. Thus, to be allowable, the rejoined claims must meet all criteria for

patentability including the requirements of 35 U.S.C. 101, 102, 103 and 112. Until all

claims to the elected product/apparatus are found allowable, an otherwise proper

restriction requirement between product/apparatus claims and process claims may be

maintained. Withdrawn process claims that are not commensurate in scope with an

Exhibit 13
-249-

Application/Control Number: 14/621,268                                Page 6
Art Unit: 3777

allowable product/apparatus claim will not be rejoined. See MPEP § 821.04.

Additionally, in order for rejoinder to occur, applicant is advised that the process claims

should be amended during prosecution to require the limitations of the

product/apparatus claims. **Failure to do so may result in no rejoinder.** Further, note

that the prohibition against double patenting rejections of 35 U.S.C. 121 does not apply

where the restriction requirement is withdrawn by the examiner before the patent

issues. See MPEP § 804.01.


### *Claim Rejections - 35 USC § 101*


35 U.S.C. 101 reads as follows:

Whoever invents or discovers any new and useful process, machine, manufacture, or
composition of matter, or any new and useful improvement thereof, may obtain a patent
therefor, subject to the conditions and requirements of this title.

Claims 4-14 are rejected under 35 U.S.C. 101 because the claimed invention is

directed to a judicial exception (i.e., a law of nature, a natural phenomenon, or an

abstract idea) without significantly more.  Claims 4-14 are directed to a method for

processing light signal.  The claim(s) does/do not include additional elements that are

sufficient to amount to significantly more than the judicial exception because the

additional device elements, which are recited at a high level of generality, provide

conventional device functions that do not add meaningful limits to practicing the abstract

idea.

Exhibit 13
-250-

Application/Control Number: 14/621,268                                        Page 7
Art Unit: 3777

      Claim 4 recites, in part, a method for processing light signal. The method involve

mathematical concepts such as mathematical relationships, mathematical formulas, and

calculation (demodulation and decimating involve mathematical algorithm and

processing), collecting and processing known information, comparing information

regarding a sample or test subject to a control or target data which correspond to

concepts identified as abstract ideas by the courts. The claims involve processing

signal, but do not claim how this is being performed and it's significant over the current

technology.


      The claim does not include additional elements that are sufficient to amount to

significantly more than the judicial exception because the additional elements when

considered both individually and as an ordered combination do not amount to

significantly more than the abstract idea. The claim recites the additional limitations of a

"capturing light sample", a "filtering" and a "light source". These additional elements are

recited at a high level of generality and are recited as performing generic computer

functions routinely used in computer applications. Generic computer components

recited as performing generic computer functions that are well-understood, routine and

conventional activities amount to no more than implementing the abstract idea with a

computerized system. Thus, taken alone, these additional elements do not amount to

significantly more than the above-identified judicial exception (the abstract idea).

Looking at the limitations as an ordered combination adds nothing that is not already

present when looking at the elements taken individually. There is no indication that the

Exhibit 13
-251-

Application/Control Number: 14/621,268                                    Page 8
Art Unit: 3777

combination of elements improves the functioning of a computer or improves any other

technology. Their collective functions merely provide conventional computer

implementation.

        Claims 2-14 are dependent on claim 4 that includes all the limitations of

claim 4. Therefore, claims 2-14 recites the same abstract idea of "mathematical

relationship", "collecting and processing known information" and comparing information

regarding a sample or test subject to a control or target data. The claim recites the

additional limitations (perform demodulation using sin and cos equations; turn on and off

light source and perform detection; filtering and decimation) that also mathematical

relationship and collecting and comparing known information. Thus, taken alone, these

additional elements do not amount to significantly more than the above-identified judicial

exception (the abstract idea). Looking at the limitations as an ordered combination adds

nothing that is not already present when looking at the elements taken individually.

There is no indication that the combination of elements improves the functioning of a

computer or improves any other technology. Their collective functions merely provide

conventional computer implementation.

        Claims 4-14 are therefore not drawn to eligible subject matter as they are

directed to an abstract idea without significantly more.

*Claim Rejections - 35 USC § 112*

Exhibit 13
-252-

Application/Control Number: 14/621,268                                        Page 9
Art Unit: 3777

The following is a quotation of the first paragraph of 35 U.S.C. 112(a):

> (a)  IN GENERAL.—The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same,  and shall set forth the best mode contemplated by the inventor or joint inventor of carrying out the invention.

The following is a quotation of the first paragraph of pre-AIA 35 U.S.C. 112:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

Claims 4, 6, 8-10 and 12 are rejected under 35 U.S.C. 112(a) or 35 U.S.C. 112 (pre-AIA), first paragraph, as failing to comply with the written description requirement. The claim(s) contains subject matter which was not described in the specification in such a way as to reasonably convey to one skilled in the relevant art that the inventor or a joint inventor, or for pre-AIA the inventor(s), at the time the application was filed, had possession of the claimed invention.  The written description does not disclose how applicant performs decimating in the decimation stage. The written description discloses capturing dark samples when all light are off. However, the written description does not disclose how to capture dark sample when all light are off. How can detector detect anything when there are no light? Is the dark sample just a black image? Examiner interprets dark sample as black image.

**Exhibit 13**
**-253-**

Application/Control Number: 14/621,268                                          Page 10
Art Unit: 3777

Claims 4, 6, 8-10 and 12 rejected under 35 U.S.C. 112(a) or 35 U.S.C. 112 (pre-

AIA), first paragraph, as failing to comply with the enablement requirement.  The

claim(s) contains subject matter which was not described in the specification in such a

way as to enable one skilled in the art to which it pertains, or with which it is most nearly

connected, to make and/or use the invention. Without knowing how to perform

decimation and capture dark sample one of ordinary skill in the art can not make and

use the invention.

### *Claim Rejections - 35 USC § 102*

1.       The following is a quotation of the appropriate paragraphs of 35 U.S.C.

102 that form the basis for the rejections under this section made in this Office action:

A person shall be entitled to a patent unless –

(a)(1) the claimed invention was patented, described in a printed publication, or in public use,
on sale or otherwise available to the public before the effective filing date of the claimed
invention.

2.       Claims 4-5 and 14 are rejected under 35 U.S.C. 102(a)(1) as being

anticipated by Diab et al. (US 2012/0253155).

3.       Addressing claim 4, Diab discloses a method for processing a signal

obtained when light from one or more light sources is emitted toward a body part of a

user, the method comprising: capturing multiple light samples while each light source

emits light toward the body part of the user and converting the multiple light samples

into the signal (see abstract and [0007]); demodulating the signal to produce multiple

Exhibit 13
-254-

Application/Control Number: 14/621,268                                    Page 11
Art Unit: 3777

demodulated signals (see abstract); filtering and decimating each demodulated signal at

least once to produce a signal associated with each light source (see [0006], [0008] and

[0137]).

4.      Addressing claims 5 and 14, Diab discloses analyzing each signal

associated with each light source to estimate a physiological parameter of the user (see

[0002], [0147] and claim 1); wherein filtering and decimating each demodulated signal at

least once to produce a signal associated with each light source comprises inputting

each demodulated signal into one or more low pass filter and decimation stages,

wherein each low pass filter and decimation stage comprises a low pass filter for

receiving a demodulated signal and a decimation circuit operably connected to an

output of the low pass filter (see Figs. 16 and [0099-0106]).

### *Claim Rejections - 35 USC § 103*

5.      The following is a quotation of 35 U.S.C. 103 which forms the basis for all

obviousness rejections set forth in this Office action:

> A patent for a claimed invention may not be obtained, notwithstanding that the claimed
> invention is not identically disclosed as set forth in section 102 of this title, if the differences
> between the claimed invention and the prior art are such that the claimed invention as a whole
> would have been obvious before the effective filing date of the claimed invention to a person
> having ordinary skill in the art to which the claimed invention pertains.  Patentability shall not
> be negated by the manner in which the invention was made.

6.      Claims 6-13 are rejected under 35 U.S.C. 103 as being unpatentable over

Diab et al. (US 2012/0253155).

Exhibit 13
-255-

Application/Control Number: 14/621,268                                  Page 12
Art Unit: 3777

7.      Addressing claims 6-12, examiner interprets according to applicant specification. Basically, applicant turns on and off each light source. When applicant turns on a specific light source and other light sources are off and detector capture signal applicant calls this capture light sample. When all the light sources are off and detector capture signal applicant calls this capture dark sample. For claims 6-12, applicant turns on and off multiple light sources and capture light and dark signal. Diab discloses turns on and off multiple light sources and capture light and dark signal (see [0002], [0004], [0042] and Fig. 12). Diab does not disclose capture four, five, ten light or dark sample. However, the amount of light or dark sample is a designer choice and only requires routine skill in the art. The amount of light or dark sample capture is conventional, not novelty and does not show any improvement over prior art.

8.      Addressing claim 13, it would have been obvious to one of ordinary skill in the art before the effective filing date of the claimed invention that using sin and cos equation to demodulate signal only require routine skill in the art. Using sin and cos to demodulate signal is convention and well-known to those skill in the art (see Diab's paragraph [0056-0059]).

Exhibit 13
-256-

Application/Control Number: 14/621,268                                      Page 13
Art Unit: 3777

### *Conclusion*

Any inquiry concerning this communication or earlier communications from the examiner should be directed to HIEN NGUYEN whose telephone number is (571)270-7031.  The examiner can normally be reached on 7:30-5:00.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Robert Chen can be reached on (571) 272-3672.  The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system.  Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service Representative or access to the automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/H. N./
Examiner, Art Unit 3777

/ELMER CHAO/
Primary Examiner, Art Unit 3777

Exhibit 13
-257-

| | | | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|---|---|
| ***Notice of References Cited*** | | | 14/621,268 | LAMEGO, MARCELO  M. |
| | | | Examiner | Art Unit | Page 1 of 1 |
| | | | HIEN NGUYEN | 3777 | |

**U.S. PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Name | CPC Classification | US Classification |
|---|---|---|---|---|---|---|
| * | A | US-2012/0253155 A1 | 10-2012 | Diab; Mohamed K. | A61B5/14551 | 600/324 |
| | B | US- | | | | |
| | C | US- | | | | |
| | D | US- | | | | |
| | E | US- | | | | |
| | F | US- | | | | |
| | G | US- | | | | |
| | H | US- | | | | |
| | I | US- | | | | |
| | J | US- | | | | |
| | K | US- | | | | |
| | L | US- | | | | |
| | M | US- | | | | |

**FOREIGN  PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Country | Name | CPC Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

**NON-PATENT DOCUMENTS**

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

| | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| ***Index of Claims*** | 14621268 | LAMEGO, MARCELO M. |
| | **Examiner** | **Art Unit** |
| | HIEN NGUYEN | 3777 |

| ✓ | **Rejected** | - | **Cancelled** | N | **Non-Elected** | A | **Appeal** |
|---|---|---|---|---|---|---|---|
| = | **Allowed** | ÷ | **Restricted** | I | **Interference** | O | **Objected** |

☐ **Claims renumbered in the same order as presented by applicant**    ☐ CPA    ☐ T.D.    ☐ R.1.47

| CLAIM | | DATE | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Final | Original | 08/02/2016 | | | | | | | | |
| | 1 | N | | | | | | | | |
| | 2 | N | | | | | | | | |
| | 3 | N | | | | | | | | |
| | 4 | ✓ | | | | | | | | |
| | 5 | ✓ | | | | | | | | |
| | 6 | ✓ | | | | | | | | |
| | 7 | ✓ | | | | | | | | |
| | 8 | ✓ | | | | | | | | |
| | 9 | ✓ | | | | | | | | |
| | 10 | ✓ | | | | | | | | |
| | 11 | ✓ | | | | | | | | |
| | 12 | ✓ | | | | | | | | |
| | 13 | ✓ | | | | | | | | |
| | 14 | ✓ | | | | | | | | |
| | 15 | N | | | | | | | | |
| | 16 | N | | | | | | | | |
| | 17 | N | | | | | | | | |
| | 18 | N | | | | | | | | |
| | 19 | N | | | | | | | | |
| | 20 | N | | | | | | | | |

**Exhibit 13**
**-259-**

**EAST Search History**

**EAST Search History (Prior Art)**

| Ref # | Hits | Search Query | DBs | Default Operator | Plurals | Time Stamp |
|---|---|---|---|---|---|---|
| L1 | 7455 | (A61B5/0059 or A61B5/0084).cpc. | US-PGPUB; USPAT | AND | OFF | 2016/08/02 16:38 |
| S1 | 130 | ((Marcelo) near2 (Lamego)).INV. | US-PGPUB; USPAT; USOCR | OR | OFF | 2016/08/02 11:48 |
| S2 | 0 | S1 (light dark demodulat$3).clm. | US-PGPUB; USPAT; USOCR | AND | OFF | 2016/08/02 11:49 |
| S3 | 0 | "14621268" | US-PGPUB; USPAT; USOCR | AND | OFF | 2016/08/02 11:49 |
| S4 | 0 | demodulat$3 fitler$3 decimat$3 light (tissue or sample or skin) physiological | US-PGPUB; USPAT; USOCR | AND | OFF | 2016/08/02 12:00 |
| S5 | 296 | demodulat$3 filter$3 decimat$3 light (tissue or sample or skin) physiological | US-PGPUB; USPAT; USOCR | AND | OFF | 2016/08/02 12:01 |
| S6 | 15 | (demodulat$3 same filter$3 same decimat$3 same light same (tissue or sample or skin)) physiological | US-PGPUB; USPAT; USOCR | AND | OFF | 2016/08/02 12:01 |
| S7 | 0 | (demodulat$3 same filter$3 same decimat$3 same light same (tissue or sample or skin)) physiological wear$4 | US-PGPUB; USPAT; USOCR | AND | OFF | 2016/08/02 12:09 |
| S8 | 1 | (demodulat$3 same filter$3 same decimat$3 same light same (tissue or sample or skin)) wear$4 | US-PGPUB; USPAT; USOCR | AND | OFF | 2016/08/02 12:10 |

**8/2/2016 5:26:57 PM**
**C:\ Users\ hnguyen55\ Documents\ EAST\ Workspaces\ 14621268.wsp**

| *Search Notes* | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 14621268 | LAMEGO, MARCELO M. |
| | **Examiner** | **Art Unit** |
| | HIEN NGUYEN | 3777 |

## CPC- SEARCHED

| Symbol | Date | Examiner |
|---|---|---|
| (A61B5/0059 or A61B5/0084).cpc. | 8/2/2016 | HN |

## CPC COMBINATION SETS  - SEARCHED

| Symbol | Date | Examiner |
|---|---|---|
| | | |

## US CLASSIFICATION SEARCHED

| Class | Subclass | Date | Examiner |
|---|---|---|---|
| | | | |

## SEARCH NOTES

| Search Notes | Date | Examiner |
|---|---|---|
| East Search (inventor search) | 8/2/2016 | HN |

## INTERFERENCE SEARCH

| US Class/ CPC Symbol | US Subclass / CPC Group | Date | Examiner |
|---|---|---|---|
| | | | |

| | |
|---|---|
| | |

**Exhibit 13**
**-261-**

## PATENT APPLICATION FEE DETERMINATION RECORD
Substitute for Form PTO-875

| Application or Docket Number |
|---|
| 14/621,268 |

### APPLICATION AS FILED - PART I

| FOR | (Column 1) NUMBER FILED | (Column 2) NUMBER EXTRA | SMALL ENTITY RATE($) | SMALL ENTITY FEE($) | OR | OTHER THAN SMALL ENTITY RATE($) | OTHER THAN SMALL ENTITY FEE($) |
|---|---|---|---|---|---|---|---|
| BASIC FEE (37 CFR 1.16(a), (b), or (c)) | N/A | N/A | N/A | | | N/A | 280 |
| SEARCH FEE (37 CFR 1.16(k), (i), or (m)) | N/A | N/A | N/A | | | N/A | 600 |
| EXAMINATION FEE (37 CFR 1.16(o), (p), or (q)) | N/A | N/A | N/A | | | N/A | 720 |
| TOTAL CLAIMS (37 CFR 1.16(i)) | 20 minus 20 = | * | | | OR | x 80 = | 0.00 |
| INDEPENDENT CLAIMS (37 CFR 1.16(h)) | 3 minus 3 = | | | | | x 420 = | 0.00 |
| APPLICATION SIZE FEE (37 CFR 1.16(s)) | If the specification and drawings exceed 100 sheets of paper, the application size fee due is $310 ($155 for small entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s). | | | | | | 0.00 |
| MULTIPLE DEPENDENT CLAIM PRESENT (37 CFR 1.16(j)) | | | | | | | 0.00 |
| * If the difference in column 1 is less than zero, enter "0" in column 2. | | | TOTAL | | | TOTAL | 1600 |

### APPLICATION AS AMENDED - PART II

**AMENDMENT A**

| | | (Column 1) CLAIMS REMAINING AFTER AMENDMENT | (Column 2) HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3) PRESENT EXTRA | SMALL ENTITY RATE($) | SMALL ENTITY ADDITIONAL FEE($) | OR | OTHER THAN SMALL ENTITY RATE($) | OTHER THAN SMALL ENTITY ADDITIONAL FEE($) |
|---|---|---|---|---|---|---|---|---|---|
| | Total (37 CFR 1.16(i)) | * | Minus ** | = | x = | | OR | x = | |
| | Independent (37 CFR 1.16(h)) | * | Minus *** | = | x = | | OR | x = | |
| | Application Size Fee (37 CFR 1.16(s)) | | | | | | | | |
| | FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | | OR | | |
| | | | | | TOTAL ADD'L FEE | | OR | TOTAL ADD'L FEE | |

**AMENDMENT B**

| | | (Column 1) CLAIMS REMAINING AFTER AMENDMENT | (Column 2) HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3) PRESENT EXTRA | SMALL ENTITY RATE($) | SMALL ENTITY ADDITIONAL FEE($) | OR | OTHER THAN SMALL ENTITY RATE($) | OTHER THAN SMALL ENTITY ADDITIONAL FEE($) |
|---|---|---|---|---|---|---|---|---|---|
| | Total (37 CFR 1.16(i)) | * | Minus ** | = | x = | | OR | x = | |
| | Independent (37 CFR 1.16(h)) | * | Minus *** | = | x = | | OR | x = | |
| | Application Size Fee (37 CFR 1.16(s)) | | | | | | OR | | |
| | FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | | OR | | |
| | | | | | TOTAL ADD'L FEE | | OR | TOTAL ADD'L FEE | |

\* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.
\** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20".
\*** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3".
The "Highest Number Previously Paid For" (Total or Independent) is the highest found in the appropriate box in column 1.

**Exhibit 13**
**-262-**



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING or 371(c) DATE | GRP ART UNIT | FIL FEE REC'D | ATTY.DOCKET.NO | TOT CLAIMS | IND CLAIMS |
|---|---|---|---|---|---|---|
| 14/621,268 | 02/12/2015 | 2875 | 1600 | P22879US1 | 20 | 3 |

**CONFIRMATION NO. 6317**

62579
APPLE INC.
c/o Brownstein Hyatt Farber Schreck
410 17th St.
Suite 2200
DENVER, CO 80202

**FILING RECEIPT**

|||||||||||||||||||||||||
OC000000073615663

Date Mailed: 03/11/2015

Receipt is acknowledged of this non-provisional patent application. The application will be taken up for examination in due course. Applicant will be notified as to the results of the examination. Any correspondence concerning the application must include the following identification information: the U.S. APPLICATION NUMBER, FILING DATE, NAME OF APPLICANT, and TITLE OF INVENTION. Fees transmitted by check or draft are subject to collection. Please verify the accuracy of the data presented on this receipt. **If an error is noted on this Filing Receipt, please submit a written request for a Filing Receipt Correction. Please provide a copy of this Filing Receipt with the changes noted thereon. If you received a "Notice to File Missing Parts" for this application, please submit any corrections to this Filing Receipt with your reply to the Notice. When the USPTO processes the reply to the Notice, the USPTO will generate another Filing Receipt incorporating the requested corrections**

**Inventor(s)**

Marcelo M. Lamego, Cupertino, CA;

**Applicant(s)**

Apple Inc., Cupertino, CA

**Power of Attorney:** The patent practitioners associated with Customer Number 62579

**Domestic Priority data as claimed by applicant**

This appln claims benefit of 62/047,818 09/09/2014

**Foreign Applications** for which priority is claimed (You may be eligible to benefit from the **Patent Prosecution Highway** program at the USPTO. Please see http://www.uspto.gov for more information.) - None.
*Foreign application information must be provided in an Application Data Sheet in order to constitute a claim to foreign priority. See 37 CFR 1.55 and 1.76.*

**If Required, Foreign Filing License Granted:** 02/25/2015

The country code and number of your priority application, to be used for filing abroad under the Paris Convention, is **US 14/621,268**

**Projected Publication Date:** Request for Non-Publication Acknowledged

**Non-Publication Request:** Yes

**Early Publication Request:** No

page 1 of 3

**Exhibit 13**
**-263-**

**Title**

    Modulation and Demodulation Techniques for a Health Monitoring System

**Preliminary Class**

    362

**Statement under 37 CFR 1.55 or 1.78 for AIA (First Inventor to File) Transition Applications:** No

# PROTECTING YOUR INVENTION OUTSIDE THE UNITED STATES

Since the rights granted by a U.S. patent extend only throughout the territory of the United States and have no effect in a foreign country, an inventor who wishes patent protection in another country must apply for a patent in a specific country or in regional patent offices. Applicants may wish to consider the filing of an international application under the Patent Cooperation Treaty (PCT). An international (PCT) application generally has the same effect as a regular national patent application in each PCT-member country. The PCT process **simplifies** the filing of patent applications on the same invention in member countries, but **does not result** in a grant of "an international patent" and does not eliminate the need of applicants to file additional documents and fees in countries where patent protection is desired.

Almost every country has its own patent law, and a person desiring a patent in a particular country must make an application for patent in that country in accordance with its particular laws. Since the laws of many countries differ in various respects from the patent law of the United States, applicants are advised to seek guidance from specific foreign countries to ensure that patent rights are not lost prematurely.

Applicants also are advised that in the case of inventions made in the United States, the Director of the USPTO must issue a license before applicants can apply for a patent in a foreign country. The filing of a U.S. patent application serves as a request for a foreign filing license. The application's filing receipt contains further information and guidance as to the status of applicant's license for foreign filing.

Applicants may wish to consult the USPTO booklet, "General Information Concerning Patents" (specifically, the section entitled "Treaties and Foreign Patents") for more information on timeframes and deadlines for filing foreign patent applications. The guide is available either by contacting the USPTO Contact Center at 800-786-9199, or it can be viewed on the USPTO website at http://www.uspto.gov/web/offices/pac/doc/general/index.html.

For information on preventing theft of your intellectual property (patents, trademarks and copyrights), you may wish to consult the U.S. Government website, http://www.stopfakes.gov. Part of a Department of Commerce initiative, this website includes self-help "toolkits" giving innovators guidance on how to protect intellectual property in specific countries such as China, Korea and Mexico. For questions regarding patent enforcement issues, applicants may call the U.S. Government hotline at 1-866-999-HALT (1-866-999-4258).

**Exhibit 13**
**-264-**

# LICENSE FOR FOREIGN FILING UNDER

## Title 35, United States Code, Section 184

## Title 37, Code of Federal Regulations, 5.11 & 5.15

### GRANTED

The applicant has been granted a license under 35 U.S.C. 184, if the phrase "IF REQUIRED, FOREIGN FILING LICENSE GRANTED" followed by a date appears on this form. Such licenses are issued in all applications where the conditions for issuance of a license have been met, regardless of whether or not a license may be required as set forth in 37 CFR 5.15. The scope and limitations of this license are set forth in 37 CFR 5.15(a) unless an earlier license has been issued under 37 CFR 5.15(b). The license is subject to revocation upon written notification. The date indicated is the effective date of the license, unless an earlier license of similar scope has been granted under 37 CFR 5.13 or 5.14.

This license is to be retained by the licensee and may be used at any time on or after the effective date thereof unless it is revoked. This license is automatically transferred to any related applications(s) filed under 37 CFR 1.53(d). This license is not retroactive.

The grant of a license does not in any way lessen the responsibility of a licensee for the security of the subject matter as imposed by any Government contract or the provisions of existing laws relating to espionage and the national security or the export of technical data. Licensees should apprise themselves of current regulations especially with respect to certain countries, of other agencies, particularly the Office of Defense Trade Controls, Department of State (with respect to Arms, Munitions and Implements of War (22 CFR 121-128)); the Bureau of Industry and Security, Department of Commerce (15 CFR parts 730-774); the Office of Foreign AssetsControl, Department of Treasury (31 CFR Parts 500+) and the Department of Energy.

### NOT GRANTED

No license under 35 U.S.C. 184 has been granted at this time, if the phrase "IF REQUIRED, FOREIGN FILING LICENSE GRANTED" DOES NOT appear on this form. Applicant may still petition for a license under 37 CFR 5.12, if a license is desired before the expiration of 6 months from the filing date of the application. If 6 months has lapsed from the filing date of this application and the licensee has not received any indication of a secrecy order under 35 U.S.C. 181, the licensee may foreign file the application pursuant to 37 CFR 5.15(b).

---

## *SelectUSA*

The United States represents the largest, most dynamic marketplace in the world and is an unparalleled location for business investment, innovation, and commercialization of new technologies. The U.S. offers tremendous resources and advantages for those who invest and manufacture goods here. Through SelectUSA, our nation works to promote and facilitate business investment. SelectUSA provides information assistance to the international investor community; serves as an ombudsman for existing and potential investors; advocates on behalf of U.S. cities, states, and regions competing for global investment; and counsels U.S. economic development organizations on investment attraction best practices. To learn more about why the United States is the best country in the world to develop technology, manufacture products, deliver services, and grow your business, visit http://www.SelectUSA.gov or call +1-202-482-6800.

Exhibit 13
-265-

PTO/AIA/15 (03-13)
Approved for use through 01/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless it displays a valid OMB control number

# UTILITY PATENT APPLICATION TRANSMITTAL

*(Only for new nonprovisional applications under 37 CFR 1.53(b))*

| | |
|---|---|
| Attorney Docket No. | P22879US1 |
| First Named Inventor | Marcelo M. Lamego |
| Title | Modulation and Demodulation Techniques... |
| Express Mail Label No. | Electronic Filing |

## APPLICATION ELEMENTS

*See MPEP chapter 600 concerning utility patent application contents.*

**ADDRESS TO:**  Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

1. [ ] **Fee Transmittal Form** (PTO/SB/17 or equivalent)

2. [ ] **Applicant asserts small entity status.** See 37 CFR 1.27

3. [ ] **Applicant certifies micro entity status.** See 37 CFR 1.29. Applicant must attach form PTO/SB/15A or B or equivalent.

4. [✓] **Specification** [Total Pages 25] Both the claims and abstract must start on a new page. (See MPEP § 608.01(a) for information on the preferred arrangement)

5. [✓] **Drawing(s)** (35 U.S.C. 113) [Total Sheets 9]

6. **Inventor's Oath or Declaration** [Total Pages ___] (including substitute statements under 37 CFR 1.64 and assignments serving as an oath or declaration under 37 CFR 1.63(e))
   a. [ ] Newly executed (original or copy)
   b. [ ] A copy from a prior application (37 CFR 1.63(d))

7. [✓] **Application Data Sheet** * See note below. See 37 CFR 1.76 (PTO/AIA/14 or equivalent)

8. [ ] **CD-ROM or CD-R** in duplicate, large table, or Computer Program (*Appendix*)
   [ ] Landscape Table on CD

9. **Nucleotide and/or Amino Acid Sequence Submission** (*if applicable, items a. – c. are required*)
   a. [ ] Computer Readable Form (CRF)
   b. [ ] Specification Sequence Listing on:
      i. [ ] CD-ROM or CD-R (2 copies); or
      ii. [ ] Paper
   c. [ ] Statements verifying identity of above copies

## ACCOMPANYING APPLICATION PAPERS

10. [ ] **Assignment Papers** (cover sheet & document(s)) Name of Assignee _____

11. [ ] **37 CFR 3.73(c) Statement** (when there is an assignee)      [✓] **Power of Attorney**

12. [ ] **English Translation Document** (if applicable)

13. [ ] **Information Disclosure Statement** (PTO/SB/08 or PTO-1449)
   [ ] Copies of citations attached

14. [ ] **Preliminary Amendment**

15. [ ] **Return Receipt Postcard** (MPEP § 503) (Should be specifically itemized)

16. [ ] **Certified Copy of Priority Document(s)** (if foreign priority is claimed)

17. [✓] **Nonpublication Request** Under 35 U.S.C. 122(b)(2)(B)(i). Applicant must attach form PTO/SB/35 or equivalent.

18. [✓] **Other:** Substitute Statement in Lieu of Declaration
   _____
   _____
   _____
   _____

**\*Note:** (1) Benefit claims under 37 CFR 1.78 and foreign priority claims under 1.55 **must** be included in an Application Data Sheet (ADS).
(2) For applications filed under 35 U.S.C. 111, the application must contain an ADS specifying the applicant if the applicant is an assignee, person to whom the inventor is under an obligation to assign, or person who otherwise shows sufficient proprietary interest in the matter. See 37 CFR 1.46(b).

## 19. CORRESPONDENCE ADDRESS

[✓] The address associated with Customer Number: 62579      OR   [ ] Correspondence address below

| Name | |
|---|---|
| Address | |
| City | | State | | Zip Code | |
| Country | | Telephone | | Email | |

| Signature | /Nancy R. Simon/ | Date | February 12, 2015 |
|---|---|---|---|
| Name (Print/Type) | Nancy R. Simon | Registration No. (Attorney/Agent) | 36,930 |

This collection of information is required by 37 CFR 1.53(b). The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

Exhibit 13
-266-

PTO/AIA/14 (12-13)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | P22879US1 |
|---|---|---|
| | Application Number | |

| Title of Invention | Modulation and Demodulation Techniques for a Health Monitoring System |
|---|---|

The application data sheet is part of the provisional or nonprovisional application for which it is being submitted. The following form contains the bibliographic data arranged in a format specified by the United States Patent and Trademark Office as outlined in 37 CFR 1.76.
This document may be completed electronically and submitted to the Office in electronic format using the Electronic Filing System (EFS) or the document may be printed and included in a paper filed application.

## Secrecy Order 37 CFR 5.2

☐ Portions or all of the application associated with this Application Data Sheet may fall under a Secrecy Order pursuant to 37 CFR 5.2 (Paper filers only. Applications that fall under Secrecy Order may not be filed electronically.)

## Inventor Information:

| Inventor | 1 | | | Remove |
|---|---|---|---|---|

**Legal Name**

| Prefix | Given Name | Middle Name | Family Name | Suffix |
|---|---|---|---|---|
| | Marcelo | M. | Lamego | |

| **Residence Information (Select One)** | ⦿ US Residency | ◯ Non US Residency | ◯ Active US Military Service |
|---|---|---|---|

| City | Cupertino | State/Province | CA | Country of Residence | US |
|---|---|---|---|---|---|

**Mailing Address of Inventor:**

| Address 1 | 10292 Orange Avenue |
|---|---|
| Address 2 | |

| City | Cupertino | | State/Province | CA |
|---|---|---|---|---|
| Postal Code | 95014 | Country i | US | |

All Inventors Must Be Listed - Additional Inventor Information blocks may be generated within this form by selecting the **Add** button.          Add

## Correspondence Information:

Enter either Customer Number or complete the Correspondence Information section below.
For further information see 37 CFR 1.33(a).

☐ An Address is being provided for the correspondence Information of this application.

| Customer Number | 62579 |
|---|---|
| Email Address | Add Email   Remove Email |

## Application Information:

| Title of the Invention | Modulation and Demodulation Techniques for a Health Monitoring System | |
|---|---|---|
| Attorney Docket Number | P22879US1 | Small Entity Status Claimed ☐ |
| Application Type | Nonprovisional | |
| Subject Matter | Utility | |
| Total Number of Drawing Sheets (if any) | 9 | Suggested Figure for Publication (if any) | 4 |

## Filing By Reference :

**Exhibit 13**
**-267-**

PTO/AIA/14 (12-13)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **Application Data Sheet 37 CFR 1.76** | Attorney Docket Number | P22879US1 |
|---|---|---|
| | Application Number | |

| Title of Invention | Modulation and Demodulation Techniques for a Health Monitoring System |
|---|---|

Only complete this section when filing an application by reference under 35 U.S.C. 111(c) and 37 CFR 1.57(a). Do not complete this section if application papers including a specification and any drawings are being filed. Any domestic benefit or foreign priority information must be provided in the appropriate section(s) below (i.e., "Domestic Benefit/National Stage Information" and "Foreign Priority Information").

For the purposes of a filing date under 37 CFR 1.53(b), the description and any drawings of the present application are replaced by this reference to the previously filed application, subject to conditions and requirements of 37 CFR 1.57(a).

| Application number of the previously filed application | Filing date (YYYY-MM-DD) | Intellectual Property Authority or Country |
|---|---|---|
| | | |

## Publication Information:

☐  Request Early Publication (Fee required at time of Request 37 CFR 1.219)

☒  **Request Not to Publish.** I hereby request that the attached application not be published under 35 U.S.C. 122(b) and certify that the invention disclosed in the attached application **has not and will not** be the subject of an application filed in another country, or under a multilateral international agreement, that requires publication at eighteen months after filing.

## Representative Information:

Representative information should be provided for all practitioners having a power of attorney in the application. Providing this information in the Application Data Sheet does not constitute a power of attorney in the application (see 37 CFR 1.32). Either enter Customer Number or complete the Representative Name section below. If both sections are completed the customer Number will be used for the Representative Information during processing.

| Please Select One: | ● Customer Number | ○ US Patent Practitioner | ○ Limited Recognition (37 CFR 11.9) |
|---|---|---|---|
| Customer Number | 62579 | | |

## Domestic Benefit/National Stage Information:

This section allows for the applicant to either claim benefit under 35 U.S.C. 119(e), 120, 121, or 365(c) or indicate National Stage entry from a PCT application. Providing this information in the application data sheet constitutes the specific reference required by 35 U.S.C. 119(e) or 120, and 37 CFR 1.78.
When referring to the current application, please leave the application number blank.

| Prior Application Status | Pending | | Remove |
|---|---|---|---|
| Application Number | Continuity Type | Prior Application Number | Filing Date (YYYY-MM-DD) |
| | Claims benefit of provisional | 62/047818 | 2014-09-09 |

Additional Domestic Benefit/National Stage Data may be generated within this form by selecting the **Add** button.

## Foreign Priority Information:

**Exhibit 13**
**-268-**

PTO/AIA/14 (12-13)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | P22879US1 |
|---|---|---|
| | Application Number | |

| Title of Invention | Modulation and Demodulation Techniques for a Health Monitoring System |
|---|---|

This section allows for the applicant to claim priority to a foreign application. Providing this information in the application data sheet constitutes the claim for priority as required by 35 U.S.C. 119(b) and 37 CFR 1.55(d). When priority is claimed to a foreign application that is eligible for retrieval under the priority document exchange program (PDX)[i] the information will be used by the Office to automatically attempt retrieval pursuant to 37 CFR 1.55(h)(1) and (2). Under the PDX program, applicant bears the ultimate responsibility for ensuring that a copy of the foreign application is received by the Office from the participating foreign intellectual property office, or a certified copy of the foreign priority application is filed, within the time period specified in 37 CFR 1.55(g)(1).

Remove

| Application Number | Country[i] | Filing Date (YYYY-MM-DD) | Access Code[i] (if applicable) |
|---|---|---|---|
| | | | |

Additional Foreign Priority Data may be generated within this form by selecting the **Add** button.

## Statement under 37 CFR 1.55 or 1.78 for AIA (First Inventor to File) Transition Applications

☐ This application (1) claims priority to or the benefit of an application filed before March 16, 2013 and (2) also contains, or contained at any time, a claim to a claimed invention that has an effective filing date on or after March 16, 2013.
NOTE: By providing this statement under 37 CFR 1.55 or 1.78, this application, with a filing date on or after March 16, 2013, will be examined under the first inventor to file provisions of the AIA.

## Authorization to Permit Access:

☐ Authorization to Permit Access to the Instant Application by the Participating Offices

**Exhibit 13**
**-269-**

PTO/AIA/14 (12-13)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | P22879US1 |
|---|---|---|
| | Application Number | |

| Title of Invention | Modulation and Demodulation Techniques for a Health Monitoring System |
|---|---|

If checked, the undersigned hereby grants the USPTO authority to provide the European Patent Office (EPO),
the Japan Patent Office (JPO), the Korean Intellectual Property Office (KIPO), the World Intellectual Property Office (WIPO),
and any other intellectual property offices in which a foreign application claiming priority to the instant patent application
is filed access to the instant patent application. See 37 CFR 1.14(c) and (h). This box should not be checked if the applicant
does not wish the EPO, JPO, KIPO, WIPO, or other intellectual property office in which a foreign application claiming priority
to the instant patent application is filed to have access to the instant patent application.

In accordance with 37 CFR 1.14(h)(3), access will be provided to a copy of the instant patent application with respect
to: 1) the instant patent application-as-filed; 2) any foreign application to which the instant patent application
claims priority under 35 U.S.C. 119(a)-(d) if a copy of the foreign application that satisfies the certified copy requirement of
37 CFR 1.55 has been filed in the instant patent application; and 3) any U.S. application-as-filed from which benefit is
sought in the instant patent application.

In accordance with 37 CFR 1.14(c), access may be provided to information concerning the date o f filing this Authorization.

# Applicant Information:

Providing assignment information in this section does not substitute for compliance with any requirement of part 3 of Title 37 of CFR
to have an assignment recorded by the Office.

**Applicant    1**

If the applicant is the inventor (or the remaining joint inventor or inventors under 37 CFR 1.45), this section should not be completed.
The information to be provided in this section is the name and address of the legal representative who is the applicant under 37 CFR
1.43; or the name and address of the assignee, person to whom the inventor is under an obligation to assign the invention, or person
who otherwise shows sufficient proprietary interest in the matter who is the applicant under 37 CFR 1.46. If the applicant is an
applicant under 37 CFR 1.46 (assignee, person to whom the inventor is obligated to assign, or person who otherwise shows sufficient
proprietary interest) together with one or more joint inventors, then the joint inventor or inventors who are also the applicant should be
identified in this section.

| Clear |
|---|

| ⦿ Assignee | ◯ Legal Representative under  35 U.S.C. 117 | ◯ Joint Inventor |
|---|---|---|
| ◯ Person to whom the inventor is obligated to assign. | | ◯ Person who shows sufficient proprietary interest |

If applicant is the legal representative, indicate the authority to file the patent application, the inventor is:

Name of the Deceased or Legally Incapacitated Inventor :

| If the Applicant is an Organization check here. | ☒ |
|---|---|

| Organization Name | Apple Inc. |
|---|---|

**Mailing Address Information For Applicant:**

| Address 1 | One Infinite Loop | | |
|---|---|---|---|
| Address 2 | | | |
| City | Cupertino | State/Province | CA |
| Country | US | Postal Code | 95014 |
| Phone Number | | Fax Number | |

**Exhibit 13
-270-**

PTO/AIA/14 (12-13)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **Application Data Sheet 37 CFR 1.76** | Attorney Docket Number | P22879US1 |
|---|---|---|
| | Application Number | |

| Title of Invention | Modulation and Demodulation Techniques for a Health Monitoring System |
|---|---|

| Email Address | |
|---|---|

Additional Applicant Data may be generated within this form by selecting the Add button.

# Assignee Information including Non-Applicant Assignee Information:

Providing assignment information in this section does not subsitute for compliance with any requirement of part 3 of Title 37 of CFR to have an assignment recorded by the Office.

| **Assignee    1** |
|---|

Complete this section if assignee information, including non-applicant assignee information, is desired to be included on the patent application publication . An assignee-applicant identified in the "Applicant Information" section will appear on the patent application publication as an applicant. For an assignee-applicant, complete this section only if identification as an assignee is also desired on the patent application publication.

| If the Assignee or Non-Applicant Assignee is an Organization check here. | ☐ |
|---|---|

| Prefix | **Given Name** | Middle Name | **Family Name** | Suffix |
|---|---|---|---|---|
| | | | | |

**Mailing Address Information For Assignee including Non-Applicant Assignee:**

| **Address 1** | |
|---|---|
| Address 2 | |

| **City** | | **State/Province** | |
|---|---|---|---|
| **Country** i | | Postal Code | |
| Phone Number | | Fax Number | |
| Email Address | | | |

Additional Assignee or Non-Applicant Assignee Data may be generated within this form by selecting the Add button.

# Signature:

NOTE:  This form must be signed in accordance with 37 CFR 1.33.  See 37 CFR 1.4 for signature requirements and certifications.

| **Signature** | /Nancy R. Simon/ | | | Date  (YYYY-MM-DD) | 2015-02-12 |
|---|---|---|---|---|---|
| First Name | Nancy R. | Last Name | Simon | Registration Number | 36930 |

Additional Signature may be generated within this form by selecting the Add button.

**Exhibit 13**
**-271-**

PTO/AIA/14 (12-13)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | P22879US1 |
|---|---|---|
| | Application Number | |

| Title of Invention | Modulation and Demodulation Techniques for a Health Monitoring System |
|---|---|

This collection of information is required by 37 CFR 1.76. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 23 minutes to complete, including gathering, preparing, and submitting the completed application data sheet form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

**Exhibit 13**
-272-

# Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1.      The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these records.

2.      A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3.      A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4.      A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5.      A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent C o o p eration Treaty.

6.      A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7.      A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8.      A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9.      A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

**Exhibit 13**
**-273-**

Doc code: Oath
Document Description: Oath or declaration filed

PTO/AIA/02 (07-13)
Approved for use through 01/31/2014.  OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# SUBSTITUTE STATEMENT IN LIEU OF AN OATH OR DECLARATION FOR UTILITY OR DESIGN PATENT APPLICATION (35 U.S.C. 115(d) AND 37 CFR 1.64)

| **Title of Invention** | Modulation and Demodulation Techniques for a Health Monitoring System<br><br>Attorney Docket No. P22879US1 |
|---|---|

This statement is directed to:

☑ The attached application,

OR

☐ United States application or PCT international application number _____ filed on _____.

**LEGAL NAME of inventor to whom this substitute statement applies:**

(*E.g.*, Given Name (first and middle (if any)) and Family Name or Surname)

## Marcelo M. Lamego

Residence (except for a deceased or legally incapacitated inventor):

| City Cupertino | State CA | Country US |
|---|---|---|

Mailing Address (except for a deceased or legally incapacitated inventor):

10292 Orange Avenue

| City Cupertino | State CA | Zip 95014 | Country US |
|---|---|---|---|

I believe the above-named inventor or joint inventor to be the original inventor or an original joint inventor of a claimed invention in the application.

The above-identified application was made or authorized to be made by me.

I hereby acknowledge that any willful false statement made in this statement is punishable under 18 U.S.C. 1001 by fine or imprisonment of not more than five (5) years, or both.

Relationship to the inventor to whom this substitute statement applies:

☐ Legal Representative (for deceased or legally incapacitated inventor only),

☑ Assignee,

☐ Person to whom the inventor is under an obligation to assign,

☐ Person who otherwise shows a sufficient proprietary interest in the matter (petition under 37 CFR 1.46 is required), or

☐ Joint Inventor.

[Page 1 of 2]

This collection of information is required by 35 U.S.C. 115 and 37 CFR 1.63. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 1 minute to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

Exhibit 13
-274-

PTO/SB/AIA02 (07-13)
Approved for use through 01/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## SUBSTITUTE STATEMENT

Circumstances permitting execution of this substitute statement:

☐ Inventor is deceased,

☐ Inventor is under legal incapacity,

☐ Inventor cannot be found or reached after diligent effort, or

☑ Inventor has refused to execute the oath or declaration under 37 CFR 1.63.

If there are joint inventors, please check the appropriate box below:

☑ An application data sheet under 37 CFR 1.76 (PTO/AIA/14 or equivalent) naming the entire inventive entity has been or is currently submitted.

OR

☐ An application data sheet under 37 CFR 1.76 (PTO/AIA/14 or equivalent) has not been submitted. Thus, a Substitute Statement Supplemental Sheet (PTO/AIA/11 or equivalent) naming the entire inventive entity and providing inventor information is attached. See 37 CFR 1.64(b).

### WARNING:

Petitioner/applicant is cautioned to avoid submitting personal information in documents filed in a patent application that may contribute to identity theft. Personal information such as social security numbers, bank account numbers, or credit card numbers (other than a check or credit card authorization form PTO-2038 submitted for payment purposes) is never required by the USPTO to support a petition or an application. If this type of personal information is included in documents submitted to the USPTO, petitioners/applicants should consider redacting such personal information from the documents before submitting them to the USPTO. Petitioner/applicant is advised that the record of a patent application is available to the public after publication of the application (unless a non-publication request in compliance with 37 CFR 1.213(a) is made in the application) or issuance of a patent. Furthermore, the record from an abandoned application may also be available to the public if the application is referenced in a published application or an issued patent (see 37 CFR 1.14). Checks and credit card authorization forms PTO-2038 submitted for payment purposes are not retained in the application file and therefore are not publicly available.

**PERSON EXECUTING THIS SUBSTITUTE STATEMENT:**

| Name: | Nancy R. Simon | Date (Optional): | 2015-02-12 |
|---|---|---|---|

| Signature: | /Nancy R. Simon/ |
|---|---|

**APPLICANT NAME AND TITLE OF PERSON EXECUTING THIS SUBSTITUTE STATEMENT:**

If the applicant is a juristic entity, list the applicant name and the title of the signer:

Applicant Name: Apple Inc.

Title of Person Executing This Substitute Statement: Attorney for Applicant, Registration No. 36,930

The signer, whose title is supplied above, is authorized to act on behalf of the applicant.

**Residence of the signer (unless provided in an application data sheet, PTO/AIA/14 or equivalent):**

| City | Denver | State | CO | Country | US |
|---|---|---|---|---|---|

**Mailing Address of the signer (unless provided in an application data sheet, PTO/AIA/14 or equivalent)**

410 Seventeenth Street
Suite 2200

| City | Denver | State | CO | Zip | 80202 | Country | US |
|---|---|---|---|---|---|---|---|

Note: Use an additional PTO/AIA/02 form for each inventor who is deceased, legally incapacitated, cannot be found or reached after diligent effort, or has refused to execute the oath or declaration under 37 CFR 1.63.

[Page 2 of 2]

**Exhibit 13**

## Privacy Act Statement

The **Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant ( *i.e.*, GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

Exhibit 13
-276-

Doc Code: PA..
Document Description:  Power of Attorney

PTO/AIA/82A (07-13)
Approved for use through 11/30/2014. OMB 0651-0051
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# TRANSMITTAL FOR POWER OF ATTORNEY TO ONE OR MORE REGISTERED PRACTITIONERS

NOTE: This form is to be submitted with the Power of Attorney by Applicant form (PTO/AIA/82B) to identify the application to which the Power of Attorney is directed, in accordance with 37 CFR 1.5, unless the application number and filing date are identified in the Power of Attorney by Applicant form.  If neither form PTO/AIA/82A nor form PTO/AIA82B identifies the application to which the Power of Attorney is directed, the Power of Attorney will not be recognized in the application.

| | |
|---|---|
| Application Number | **Not Yet Assigned** |
| Filing Date | **Herewith** |
| First Named Inventor | Marcelo M. Lamego |
| Title | Modulation and Demodulation Techniques for a Health Monitoring System |
| Art Unit | **Not Yet Assigned** |
| Examiner Name | **Not Yet Assigned** |
| Attorney Docket Number | P22879US1 |

| SIGNATURE of Applicant or Patent Practitioner | | | |
|---|---|---|---|
| Signature | **/Nancy R. Simon/** | Date (Optional) | **February 12, 2015** |
| Name | Nancy R. Simon | Registration Number | 36,930 |
| Title (if Applicant is a juristic entity) | Attorney for Applicant | | |
| Applicant Name (if Applicant is a juristic entity) | **Apple Inc.** | | |

**NOTE:**  This form must be signed in accordance with 37 CFR 1.33.  See 37 CFR 1.4(d) for signature requirements and certifications. If more than one applicant, use multiple forms.

[✓] *Total of 1 forms are submitted.

This collection of information is required by 37 CFR 1.131, 1.32, and 1.33. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application.  Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 3 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

Exhibit 13
-277-

PTO/AIA/82B(07-12)
Approved for use through 11/30/2014. OMB 0651-0035
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# POWER OF ATTORNEY BY APPLICANT

I hereby revoke all previous powers of attorney given in the application identified in the attached transmittal letter.

☑ I hereby appoint Practitioner(s) associated with the following Customer Number as my/our attorney(s) or agent(s), and to transact all business in the United States Patent and Trademark Office connected therewith for the application referenced in the attached transmittal letter (form PTO/AIA/82A or equivalent):

> 62579

**OR**

☐ I hereby appoint Practitioner(s) named below as my/our attorney(s) or agent(s), and to transact all business in the United States Patent and Trademark Office connected therewith for the application referenced in the attached transmittal letter (form PTO/AIA/82A or equivalent):

| Name | Registration Number | Name | Registration Number |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

Please recognize or change the correspondence address for the application identified in the attached transmittal letter to:

☑ The address associated with the above-mentioned Customer Number.
**OR**
☐ The address associated with Customer Number:
**OR**

| ☐ Firm or Individual Name |  |  |  |
|---|---|---|---|
| Address |  |  |  |
| City |  | State | Zip |
| Country |  |  |  |
| Telephone |  | Email |  |

I am the Applicant:

☐ Inventor or Joint Inventor

☐ Legal Representative of a Deceased or Legally Incapacitated Inventor

☑ Assignee or Person to Whom the Inventor is Under an Obligation to Assign

☐ Person Who Otherwise Shows Sufficient Proprietary Interest (e.g., a petition under 37 CFR 1.46(b)(2) was granted in the application or is concurrently being filed with this document)

**SIGNATURE of Applicant for Patent**

| Signature |  | Date | 9/27/12 |
|---|---|---|---|
| Name | BJ Watrous | Telephone | 408 974-0015 |
| Title and Company | Vice President and Chief IP Counsel, Apple Inc. |  |  |

NOTE: Signature - This form must be signed by the applicant in accordance with 37 CFR 1.33. See 37 CFR 1.4 for signature requirements and certifications. Submit multiple forms for more than one signature, see below *.

☐ *Total of _____ forms are submitted.

This collection of information is required by 37 CFR 1.31, 1.32 and 1.33. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 3 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

Exhibit 13
-278-

PTO/SB/35 (07-09)
Approved for use through 07/31/2012. OMB 0651-0031
U.S. Patent and Trademark Office; U. S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# NONPUBLICATION REQUEST UNDER
# 35 U.S.C. 122(b)(2)(B)(i)

| First Named Inventor | Marcelo M. Lamego |
|---|---|
| Title | Modulation and Demodulation Techniques... |
| Attorney Docket Number | P22879US1 |

I hereby certify that the invention disclosed in the attached application **has not and will not be** the subject of an application filed in another country, or under a multilateral international agreement, that requires publication at eighteen months after filing.

I hereby request that the attached application not be published under 35 U.S.C. 122(b).

| /Nancy R. Simon/ | February 12, 2015 |
|---|---|
| Signature | Date |
| Nancy R. Simon | 36,930 |
| Typed or printed name | Registration Number, if applicable |
| 303-223-1100 | |
| Telephone Number | |

This request must be signed in compliance with 37 CFR 1.33(b) and submitted with the application **upon filing.**

Applicant may rescind this nonpublication request at any time. If applicant rescinds a request that an application not be published under 35 U.S.C. 122(b), the application will be scheduled for publication at eighteen months from the earliest claimed filing date for which a benefit is claimed.

If applicant subsequently files an application directed to the invention disclosed in the attached application in another country, or under a multilateral international agreement, that requires publication of applications eighteen months after filing, the applicant **must** notify the United States Patent and Trademark Office of such filing within forty-five (45) days after the date of the filing of such foreign or international application. **Failure to do so will result in abandonment of this application (35 U.S.C. 122(b)(2)(B)(iii)).**

This collection of information is required by 37 CFR 1.213(a). The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application.  Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14.  This collection is estimated to take 6 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO.  Time will vary depending upon the individual case.  Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450.  DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO:  Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

*If you need assistance in completing the form, call 1-800-PTO-9199 (1-800-786-9199) and select option 2.*

Exhibit 13
-279-

Attorney Docket No. P22879US1

# MODULATION AND DEMODULATION TECHNIQUES FOR A HEALTH MONITORING SYSTEM

<u>Cross-Reference to Related Application</u>

**[0001]** This application claims the benefit under 35 U.S.C. § 119(e) of U.S. Provisional Patent Application No. 62/047,818, filed September 9, 2014, entitled "Modulation and Demodulation Techniques for a Health Monitoring System," the entirety of which is incorporated herein by reference.

1

Exhibit 13
-280-

Attorney Docket No. P22879US1

Technical Field

[0002] The present invention relates generally to health monitoring systems, and more particularly to modulation and demodulation techniques for a health monitoring system that includes one or more optical sensors.

2

Exhibit 13
-281-

Background

**[0003]** Health monitoring devices, such as fitness and wellness devices, are capable of measuring a variety of physiological parameters and waveforms non-invasively via optical sensing.  Light is applied to a measurement site, such as a user's wrist, finger, and ear, and the light is absorbed and scattered throughout the skin.  An optical sensor in the health monitoring device captures the light that is reflected from or transmitted through the skin.  The optical sensor, however, is subject to interferences caused by fluorescent bulbs, sun light, the electricity grid or network, and motion artifacts that are caused by the relative motion between the optical sensor and the user's measurement site.  Thus, the light collected by the light sensor contains a component from the measurement site and component from one or more interferences.  To estimate the physiological parameter and waveform, the optical sensor coverts the collected light into electrical signals, and the signal that represents the interference component is typically subtracted from the signal representing the measurement site component.  After subtraction, only the component from the measurement site should remain, which is the component that is used to estimate the physiological parameter.  However, subtraction cannot be performed instantaneously.  A time delay exists between sampling the light and subtracting the interference component.  The time delay can result in the creation of aliases in the signal, and the aliases produce errors in the estimation of the physiological parameter.

3

Exhibit 13
-282-

Attorney Docket No. P22879US1

Summary

[0005]  In one aspect, an electronic device includes one or more light sources for emitting light toward a body part of a user and one or more optical sensors for capturing light samples while each light source is turned on and for capturing dark samples while the light source(s) are turned off.  A signal produced by the one or more optical sensors is demodulated produce multiple demodulated signals.  Each demodulated signal is received by one or more decimation stages to produce a signal associated with each light source.  A demultiplexer and multiplier circuit operably can be connected to an output of the decimation stage.  The demultiplexer separates the signals by each associated light source and the multiplier multiplies each signal by one or more respective weights.  The weights adjust the signals for variations in temperature and operating parameters of various components in the electronic device.  Each signal associated with the light source(s) is analyzed to estimate or determine a physiological parameter of the user.

[0006]  In another aspect, a method for processing the signal received from the light sensor can include capturing multiple light samples while each light source emits light toward the body part of the user and converting the multiple light samples into the signal.  The light sources can be modulated (e.g., turned on and off) according to a particular modulation pattern.  The signal produced by the optical sensor is then demodulated to produce multiple demodulated signals.  Each demodulated signal is associated with a particular light source.  Each demodulated signal is then be processed by at least one decimation stage.  In one embodiment, each decimation stage includes a low pass filter that receives a demodulated signal and a decimation circuit operably connected to an output of the low pass filter.  A demultiplexer and multiplier circuit may then process the signals.  Each signal associated with the light source(s) is analyzed to estimate or determine a physiological parameter of the user.

[0007]  In yet another aspect, a method for operating an electronic device that includes multiple light sources, an optical sensor, and a processing device operably connected to the optical sensor can include turning on each light source one at a time and emitting light toward a body part of a user and capturing multiple light samples while each light source emits light toward the body part of the user and converting the multiple light samples into a signal.  The

4

Exhibit 13
-283-

Attorney Docket No. P22879US1

signal is converted into a digital signal, and the digital signal is demodulated to produce multiple demodulated signals.  Each demodulated signal is then processed by at least one decimation stage.  In one embodiment, each decimation stage includes a low pass filter that receives a demodulated signal and a decimation circuit operably connected to an output of the low pass filter.  Each signal associated with the light source(s) is analyzed to estimate or determine a physiological parameter of the user.

5

Exhibit 13
-284-

Brief Description of the Drawings

[0008]    Embodiments of the invention are better understood with reference to the following drawings. The elements of the drawings are not necessarily to scale relative to each other.  Identical reference numerals have been used, where possible, to designate identical features that are common to the figures.

[0009]    FIG. 1 a perspective front view of one example of an electronic device that provides health-related information;

[0010]    FIG. 2 depicts a back view of the electronic device 100 shown in FIG. 1;

[0011]    FIG. 3 is an illustrative block diagram of the electronic device 100 shown in FIGS. 1 and 2;

[0012]    FIG. 4 is a flowchart of one example method of operating the health monitoring system 312 in FIG. 3;

[0013]    FIGS. 5-6 depict example modulation patterns suitable for use in blocks 400 and 402 in FIG. 4;

[0014]    FIG. 7 is a data flow diagram of a processing channel that performs blocks 408, 410, and 412 in FIG. 4;

[0015]    FIG. 8 is a flowchart of one example method of determining a matrix used in block 718 of FIG. 7;

[0016]    FIG. 9 is a flowchart of one example method of performing block 800 in FIG. 8; and

[0017]    FIG. 10 is a flowchart of one example method of performing block 802 in FIG. 8.

6

Exhibit 13 -285-

Attorney Docket No. P22879US1

Detailed Description

[0018] Embodiments described herein provide modulation and demodulation techniques that reduce or eliminate undesired interferences and produce demodulated signals that can be analyzed to estimate a physiological parameter of a user. A time multiplexed modulation pattern is used to turn the light sources on and off and to cause the optical sensor to capture multiple light and dark samples. Demodulation operations are applied to the signal produced by the optical sensor to produce a signal associated with each light source. In general, the demodulation operation can be $\sin 2\pi \frac{kt}{N}$ or $\cos 2\pi \frac{kt}{N}$. The demodulated signals may then be processed by one or more decimation stages. Each decimation stage can include a low pass filter and a decimation circuit.

[0019] Any suitable type of electronic device can include a health monitoring system. Example electronic devices include, but are not limited to, a smart telephone, a headset, a pulse oximeter, a digital media player, a tablet computing device, and a wearable electronic device. A wearable electronic device can include any type of electronic device that can be worn on a limb of a user. The wearable electronic device can be affixed to a limb or body part of a user, such as a wrist, an arm, a finger, a leg, an ear, or a chest. In some embodiments, the wearable electronic device is worn on a limb of a user with a band that attaches to the body and includes a holder or case to detachably or removably hold the electronic device, such as an armband, an ankle bracelet, a leg band, and/or a wristband. In other embodiments, the wearable electronic device is permanently affixed or attached to a band, and the band attaches to the body of the user.

[0020] As one example, a wearable electronic device can be implemented as a wearable health assistant that provides health-related information (whether real-time or not) to the user, authorized third parties, and/or an associated monitoring device. The wearable health assistant may be configured to provide health-related information or data such as, but not limited to, heart rate data, blood pressure data, temperature data, blood oxygen saturation level data, diet/nutrition information, medical reminders, health-related tips or information, or other health-related data. The associated monitoring device may be, for example, a tablet computing device, phone, personal digital assistant, computer, and so on.

7

Exhibit 13 -286-

[0021] As another example, the electronic device can be configured in the form of a wearable communications device. The wearable communications device may include a processor coupled with or in communication with a memory, one or more sensors, one or more communication interfaces, output devices such as displays and speakers, one or more input devices, and a health monitoring system. The communication interface(s) can provide electronic communications between the communications device and any external communication network, device or platform, such as but not limited to wireless interfaces, Bluetooth interfaces, USB interfaces, Wi-Fi interfaces, TCP/IP interfaces, network communications interfaces, or any conventional communication interfaces. The wearable communications device may provide information regarding time, health, statuses or externally connected or communicating devices and/or software executing on such devices, messages, video, operating commands, and so forth (and may receive any of the foregoing from an external device), in addition to communications.

[0022] Referring now to FIG. 1, there is shown a perspective view of one example of an electronic device that provides health-related information. In the illustrated embodiment, the electronic device 100 is implemented as a wearable communication device. Other embodiments can implement the electronic device differently. As described earlier, the electronic device can be a smart telephone, a gaming device, a digital music player, a device that provides time, a health assistant, and other types of electronic devices that provide health-related information.

[0023] The electronic device 100 includes an enclosure 102 at least partially surrounding a display 104 and one or more buttons 106 or input devices. The enclosure 102 can form an outer surface or partial outer surface and protective case for the internal components of the electronic device 100, and may at least partially surround the display 104. The enclosure 102 can be formed of one or more components operably connected together, such as a front piece and a back piece. Alternatively, the enclosure 102 can be formed of a single piece operably connected to the display 104.

[0024] The display 104 can be implemented with any suitable technology, including, but not limited to, a multi-touch sensing touchscreen that uses liquid crystal display (LCD) technology, light emitting diode (LED) technology, organic light-emitting display (OLED) technology, organic electroluminescence (OEL) technology, or another type of display

8

Exhibit 13
-287-

Attorney Docket No. P22879US1

technology.  A button 106 can take the form of a home button, which may be a mechanical button, a soft button (e.g., a button that does not physically move but still accepts inputs), an icon or image on a display or on an input region, and so on.  Other buttons or mechanisms can be used as input/output devices, such as a speaker, a microphone, an on/off button, a mute button, or a sleep button.  In some embodiments, the button or buttons 106 can be integrated as part of a cover glass of the electronic device.

[0025] The electronic device 100 can be permanently or removably attached to a band 108.  The band 108 can be made of any suitable material, including, but not limited to, leather, metal, rubber or silicon, fabric, and ceramic.  In the illustrated embodiment, the band is a wristband that wraps around the user's wrist.  The wristband can include an attachment mechanism (not shown), such as a bracelet clasp, Velcro, and magnetic connectors.  In other embodiments, the band can be elastic or stretchy such that it fits over the hand of the user and does not include an attachment mechanism.

[0026] FIG. 2 depicts a back view of the electronic device 100 shown in FIG. 1.  As described earlier, the electronic device can include one or more sensors, and at least one of these sensors may provide health-related information.  As one example, the wearable communication device can include an optical sensor, such as a photoplethysmography (PPG) sensor.  A PPG sensor uses light to measure changes in the volume of a part of a user's body.  As the light passes through the user's skin and into the underlying tissue, some light is reflected, some is scattered, and some is absorbed, depending on what the light encounters.  Blood can absorb light more than surrounding tissue, so less reflected light will be sensed by the PPG sensor when more blood is present.  The user's blood volume increases and decreases with each heartbeat.  A PPG sensor detects changes in blood volume based on the reflected light, and one or more physiological parameters of the user can be determined by analyzing the reflected light.  Example physiological parameters include, but are not limited to, heart rate and respiration.

[0027] The electronic device 100 includes one or more apertures 200 in the enclosure 102.  Each aperture is associated with a light source 202.  In one embodiment, each light source is implemented as a light-emitting diode (LED).  Four apertures 200 and four light sources 202

9

Exhibit 13
-288-

are used in the illustrated embodiment.  Other embodiments can include any number of light sources 200.  For example, two light sources can be used in some embodiments.

[0028]  The light sources 202 can operate at the same light wavelength range, or the light sources can operate at different light wavelength ranges.  As one example, with two light sources one light source may transmit light in the visible wavelength range while the other light source can emit light in the infrared wavelength range.  With four light sources, two light sources may transmit light in the visible wavelength range while the other two light sources can emit light in the infrared wavelength range.  For example, in one embodiment, at least one light source can emit light in the wavelength range associated with the color green while another light source transmits light in the infrared wavelength range.  When a physiological parameter of the user will be determined, the light sources emit light toward the user's skin and the optical sensor 204 senses an amount of reflected light.  The optical sensor 204 may sense the reflected light through an aperture (not shown) that is formed in the electronic device.  As will be described in more detail later, a modulation pattern can be used to turn the light sources on and off and sample or sense the reflected light.

[0029]  FIG. 3 is an illustrative block diagram of the electronic device 100 shown in FIG. 1.  The electronic device 100 can include the display 104, one or more processing devices 300, memory 302, one or more input/output (I/O) devices 304, one or more sensors 306, a power source 308, a network communications interface 310, and a health monitoring system 312.  The display 104 may provide an image or video output for the electronic device 100. The display may also provide an input surface for one or more input devices, such as, for example, a touch sensing device and/or a fingerprint sensor.  The display 104 may be substantially any size and may be positioned substantially anywhere on the electronic device 100.

[0030]  The processing device 300 can control some or all of the operations of the electronic device 100.  The processing device 300 can communicate, either directly or indirectly with substantially all of the components of the electronic device 100.  For example, a system bus or signal line 314 or other communication mechanisms can provide communication between the processing device(s) 300, the memory 302, the I/O device(s) 304, the sensor(s) 306, the power source 308, the network communications interface 310, and/or the health monitoring system 312.

10

Exhibit 13
-289-

Attorney Docket No. P22879US1

The one or more processing devices 300 can be implemented as any electronic device capable of processing, receiving, or transmitting data or instructions.  For example, the processing device(s) 200 can each be a microprocessor, a central processing unit (CPU), an application-specific integrated circuit (ASIC), a digital signal processor (DSP), or combinations of such devices.  As described herein, the term "processing device" is meant to encompass a single processor or processing unit, multiple processors, multiple processing units, or other suitably configured computing element or elements.

[0031]  The memory 302 can store electronic data that can be used by the electronic device 100.  For example, a memory can store electrical data or content such as, for example, audio and video files, documents and applications, device settings and user preferences, timing and control signals or data for the health monitoring system 312, data structures or databases, and so on.  The memory 302 can be configured as any type of memory.  By way of example only, the memory can be implemented as random access memory, read-only memory, Flash memory, removable memory, or other types of storage elements, or combinations of such devices.

[0032]  The one or more I/O devices 304 can transmit and/or receive data to and from a user or another electronic device.  One example of an I/O device is button 106 in FIG. 1.  The I/O device(s) 304 can include a display, a touch sensing input surface such as a track pad, one or more buttons, one or more microphones or speakers, one or more ports such as a microphone port, and/or a keyboard.

[0033]  The electronic device 100 may also include one or more sensors 306 positioned substantially anywhere on the electronic device 100.  The sensor or sensors 306 may be configured to sense substantially any type of characteristic, such as but not limited to, images, pressure, light, touch, heat, position, motion, and so on.  For example, the sensor(s) 308 may be an image sensor, a heat sensor, a light or optical sensor, a pressure transducer, a magnet, a gyroscope, an accelerometer, and so on.

[0034]  The power source 308 can be implemented with any device capable of providing energy to the electronic device 100.  For example, the power source 308 can be one or more

11

Exhibit 13
-290-

Attorney Docket No. P22879US1

batteries or rechargeable batteries, or a connection cable that connects the remote control device to another power source such as a wall outlet.

[0035]  The network communication interface 310 can facilitate transmission of data to or from other electronic devices.  For example, a network communication interface can transmit electronic signals via a wireless and/or wired network connection.  Examples of wireless and wired network connections include, but are not limited to, cellular, Wi-Fi, Bluetooth, IR, and Ethernet.

[0036]  The health monitoring system 312 can include the light sources 202, one or more optical sensors 204, and a processing device 316.  The processing device 316 may be any suitable type of processing device.  In one embodiment, the processing device 316 is a digital signal processor.  The processing device 316 may receive signals from the optical sensor(s) 204 and processes the signals to correlate the signal values with a physiological parameter of the user.  As one example, the processing device can apply one or more demodulation operations to the signals received from the optical sensor.  Additionally, the processing device may control the modulation (e.g., turning on and off) of the light sources 202 according to a given modulation pattern.  In one embodiment, one or more modulation patterns may be stored in memory 302 and accessed by the processing device 316 to modulate the light sources 202.

[0037]  As discussed earlier, the light sources can emit light in the visible and/or infrared wavelength ranges.  The optical sensor or sensors 204 is implemented as a photodetector that senses light and converts the light into an electrical signal that represents the amount of light sensed by the photodetector.  In one embodiment, the photodetector can be a photodiode.  Other embodiments can use a different type of photodetector, such as a phototube or photoresistor.

[0038]  In another embodiment, the processing device 316 is not included in the health monitoring system 312 and the processing device 300 receives signals from the optical sensor(s) 204 and processes the signals to correlate the signal values with a physiological parameter of the user.  Additionally or alternatively, the processing device 300 can control the operations of the light sources (e.g., turn on and off).  One or more modulation patterns may be stored in memory 302 and accessed by the processing device 300 to modulate the light sources 202.

12

Exhibit 13
-291-

[0039] It should be noted that FIGS. 1-3 are illustrative only. In other examples, an electronic device may include fewer or more components than those shown in FIG. 3. Additionally or alternatively, the electronic device can be included in a system and one or more components shown in FIG. 3 are separate from the electronic device but in communication with the electronic device. For example, an electronic device may be operatively connected to, or in communication with a separate display. As another example, one or more applications or data can be stored in a memory separate from the electronic device. As another example, a processing device in communication with the electronic device can control various functions in the electronic device and/or process data received from the electronic device. In some embodiments, the separate memory and/or processing device can be in a cloud-based system or in an associated monitoring device.

[0040] Referring now to FIG. 4, there is shown a flowchart of one example method of operating the health monitoring system 312 in FIG. 3. Initially, a light source is turned on to illuminate the user's skin and the optical sensor senses an amount of reflected or transmitted light (blocks 400, 402). A determination can then be made at block 404 as to whether or not another light source is to be turned on. For example, in one embodiment, the light sources are turned on sequentially and the optical sensor senses the light multiple times while each light source is turned on.

[0041] If another light source is to be turned on, the process passes to block 406 where the light source that is currently turned on is turned off. The method then returns to block 400 and repeats until all of the light sources have been turned on and the optical sensor has obtained light samples.

[0042] When a determination is made at block 404 that all of the light sources have been turned on, the process continues at block 408 where the signal received from the optical sensor is digitized by inputting the signal into an analog-to-digital converter. The digitized signal is then demodulated at block 410. Demodulating the signal produces multiple demodulated signals, with a demodulated signal associated with each light source. Each demodulated signal is then received and processed by a low pass filter and a decimation circuit (block 412).

13

Exhibit 13
-292-

[0043] The signals may then be analyzed at block 414 to determine or estimate a physiological parameter of the user. As described earlier, in one embodiment the signals can be analyzed to determine a heart rate of the user. As one example, the processing device 316 can analyze the signals to estimate a physiological parameter of the user. In another example, the processing device 300 can analyze the signals to determine a physiological parameter of the user. And in yet another example, both processing devices 300, 316 can perform various steps in the analysis to estimate a physiological parameter of the user.

[0044] In other embodiments, the light source need not be turned off or on entirely. Instead, certain embodiments may modulate the brightness of the light source in place of or in addition to the turning of lights on and off. In some embodiments, certain light sources may be turned on and off while other light sources are alternately dimmed and brightened.

[0045] FIGS. 5-6 depict example modulation patterns suitable for use in blocks 400 and 402 in FIG. 4. FIGS. 5 and 6 are described with reference to a health monitoring system that includes four light sources. As described earlier, other embodiments can include fewer or more light sources. The embodiments described hereinafter are described with reference to a thirty sample modulation cycle operating at 4096 hertz. This is provided by way of example and is not required. Other modulation cycle frequencies and/or sampling frequencies may be selected. For example, the modulation cycle frequencies may range, as a non-limiting example, from one hundred hertz to several hundred kilohertz.

[0046] In many examples, the modulation cycle frequency and the sampling frequency may be interrelated. For example, certain embodiments may be limited by hardware or software to a particular maximum sampling frequency. In such an example, the modulation cycle frequency may be selected such that the transmitted signal can be adequately reconstructed. In some cases, the modulation cycle may be less than half the sampling rate. Stated another way, if a certain embodiment requires a particular bandwidth, the sampling frequency may be at least twice the selected maximum frequency of the selected bandwidth.

[0047] Other embodiments can obtain a different number of samples and/or operate at a different frequency. The frequency may be determined based on a number of factors, one of

14

Exhibit 13
-293-

which is the harmonics of the electrical network or grid.  For example, when an electrical network produces a signal at 60 Hz, the harmonics are multiples of 60 (e.g., 120 Hz, 180 Hz, 240 Hz, etc.).  Also, some electrical networks produce a signal at 50 Hz, and the harmonics of multiples of 50 Hz (e.g., 100 Hz, 150 Hz, 200 Hz, etc.).

[0048]  Additionally, some electrical networks can be less reliable at generating a signal with a specific frequency, and the frequency may vary by a certain amount or deviation (e.g., a frequency of 60 Hz may operate at 60+/- 1% Hz).  And the deviation increases with each harmonic. Thus, in one embodiment, the frequency of the modulation cycle is selected to be in a harmonic gap that exists between the various harmonics and harmonic deviations of at least one electrical network.

[0049]  The illustrated modulation patterns are time-multiplexed modulation patterns that drive the light sources.  The time periods when the light sources are turned on and off are multiplexed in time.  In FIG. 5, the first light source is turned on for the time period 500.  The other three light sources are turned off during the time period 500.  An optical sensor captures a light sample multiple times 502 during the time period 500.  In the illustrated embodiment, the optical sensor obtains five light samples 502.  The first light source is then turned off and the optical sensor captures the light at time 504.  A light sample obtained when all of the light sources are turned off is known as a dark sample.

[0050]  The second light source is then turned on for the time period 506.  Again, the other three light sources are turned off during the time period 506.  The optical sensor captures multiple light samples 508 during the time period 506.  In the illustrated embodiment, the optical sensor obtains five samples 508.  The second light source is then turned off and the optical sensor captures a dark sample at time 510.

[0051]  Similarly, only the third light source is turned on for the time period 512, and the optical sensor senses an amount of light multiple times 514 (e.g., five times) during the time period 512.  The third light source is then turned off and the optical sensor captures a dark sample at time 516.

15

Exhibit 13
-294-

Attorney Docket No. P22879US1

[0052]  The fourth light source is then turned on for the time period 518, and the optical sensor obtains multiple light samples 520 (e.g., five times) during the time period 518.  The fourth light source is then turned off and the optical sensor captures multiple dark samples 522. In the illustrated embodiment, the optical sensor obtains seven dark samples 522.  Thus, the optical sensor captures thirty samples during one modulation cycle 524.  The modulation cycles can repeat a given number of times when estimating a physiological parameter.   As described earlier, the modulation cycle can have a frequency of 4096 Hz in one embodiment.

[0053]  The modulation pattern in FIG. 6 is similar to the modulation pattern in FIG. 5 except that the optical sensor does not capture dark samples in between the time periods when a light source is turned on.  In other words, the optical sensor does not sense dark samples at times 504, 510, and 516.  The light sensor obtains multiple dark samples 600 after the time period 518 has ended (after the fourth light source is turned off).   In the illustrated embodiment, the light sensor captures ten dark samples 600.  Like the FIG. 5 embodiment, the optical sensor obtains thirty samples during one modulation cycle 602.

[0054]  The analog signal produced by the optical sensor includes information associated with all four light sources.  Thus, in one embodiment, the analog signal is demodulated by a single optical sensor to produce four signals.  In some cases, each signal is associated with a specific light source. In other examples, two optical sensors may be used to generate eight signals associated with the four light sources. In some cases, the two optical sensors may be physically separated so as to measure light associated with the four light sources from different points along the user's skin.  In other embodiments, more than two optical sensors may be used.

[0055]  FIG. 7 is a data flow diagram of an illustrative processing channel that performs blocks 408, 410, and 412 in FIG. 4.  The analog signal received from the optical sensor on signal line 700 is converted to a digital signal by analog-to-digital converter 702 in the processing channel 704.  The digital signal is then received by the mixer circuit 706.  The mixer circuit 706 also receives one or more demodulation operations 708.  In general, the demodulation operation can be $\sin 2\pi \frac{kt}{N}$ or $\cos 2\pi \frac{kt}{N}$, where k is defined by $1 \leq k \leq n/2$, N represents the number of samples obtained by the optical sensor, and t = 0, 1, …, N-1.  The number of demodulation operations input into the mixer circuit 704 may be based on the number of light sources.  In one

16

Exhibit 13
-295-

Attorney Docket No. P22879US1

embodiment, each harmonic of the signal received from the optical sensor has two orthogonal components. Thus, in some cases, the number of harmonics may depend upon the number of channels multiplexed and de-multiplexed. As one example, when the health monitoring system includes two light sources, the demodulation operations can be $\sin 2\pi/N$ or $\cos 2\pi/N$ for the first harmonic frequency. Two signals will be produced after both demodulation operations have been applied to the digital signal by mixer circuit 706. When the health monitoring system has four light sources, the demodulation operation can be $\sin 2\pi/N$ or $\cos 2\pi/N$ for the first harmonic frequency, and $\sin 4\pi/N$ or $\cos 4\pi/N$ for the second harmonic frequency. Four signals will be produced after the four demodulation operations have been applied to the digital signal by mixer circuit 706.

[0056] The signal output by the mixer circuit 706 is received by a low pass filter 710 and a decimation circuit 712. The low pass filter 710 and the decimation circuit 712 form a first decimation stage. Embodiments can include any number of decimation stages K. The number of decimation stages K can be based on the frequency of the sampling cycle of the optical sensor and the frequency of the physiological parameter. For example, in the embodiments shown in FIGS. 5 and 6, thirty samples are obtained by the optical sensor. When the frequency of the physiological parameter is approximately ten hertz and the frequency of the thirty sample cycle is 4096 hertz, six decimation stages are used with each stage reducing the frequency of the signal by two.

[0057] After the signal is processed by the low pass filter 714 and decimation circuit 716 in the last decimation stage K, each signal is received by a demultiplexer and multiplier circuit 718. The demultiplexer separates the signals by associated light source. Thus, the signal associated with the first light source is separated from the signals associated with the other light sources, and so on for each signal. The multiplier circuit then multiplies each signal by respective weights or values. As one example, the values can be stored in a matrix, and each signal is multiplied by the values in a respective row in the matrix.

[0058] The values in the matrix are a function of the dynamics and components of the health monitoring system. The operations of the components such as the optical sensor, the filters (e.g., high pass filters, low pass filters), the operational amplifiers, and the like, change

17

Exhibit 13
-296-

over time due to temperature and other factors.  The values in the matrix adjust the signals for these changes.  One method for determining the values in the matrix is described in conjunction with FIG. 8.

[0059]  The signals output on signal line 720 represent the signals received from the user's tissue, and these signals can be analyzed to determine or measure the physiological parameter.  As one example, these signals can be analyzed to determine the heart rate of the user.

[0060]  FIG. 8 is a flowchart of one example method of determining the values in a matrix used in block 718 of FIG. 7.  Initially, the values in the matrix are determined at block 800.  FIG. 9 is a flowchart of one example method of performing block 800.  In block 900, a single light source is turned on for a given period of time.  The signal produced by the optical sensor is then processed to obtain some of the matrix values.  For example, when the health monitoring system includes four light sources, s signal value or amplitude associated with each light source will be output by the decimation circuit 716.  Thus, four signal values will be output by the decimation circuit 716 based on the single light source emitting light toward the user's skin.  These four signal values are included in one row in the matrix.

[0061]  Returning to FIG. 9, a determination is then made at block 904 as to whether or not all of the light sources have been individually turned on.  If not, the process passes to block 906 where the light source that is currently turned on is turned off.  The method then returns to block 900 where another single light source is turned on and the signal produced by the optical sensor processed to obtain matrix values for another row in the matrix.  The method in FIG. 9 repeats until all of the light sources have been turned on and all of the values determined for the matrix.  For four light sources, the values in the matrix are as follows:

[0062]  Returning to FIG. 8, after the matrix values are determined at block 800 the matrix values can be verified at block 802.  FIG. 10 is a flowchart of one example method of performing block 802.  Initially, all of the light sources except one are turned on for a given period of time (block 1000).  The signal produced by the optical sensor is then processed based on the data flow diagram shown in FIG. 7.  As described earlier, the demultiplexer and multiplier circuit 718 outputs signals that are associated with each light source in the health monitoring

18

Exhibit 13
-297-

system.  The signal value associated with the light source that is turned off should have a value that is substantially zero, while the signal values associated with the light sources that are turned on should be greater than zero.

[0063]  Returning to FIG. 10, a determination is made at block 1004 as to whether or not the signal value associated with the light source that is turned off equals zero.  If not, the method passes to block 1006 where the matrix values in the matrix are recalculated.  Thus, the method shown in FIG. 9 may be repeated and the method shown in FIG. 10 repeated until it is determined at block 1004 that the signal value associated with each light source equals zero when the respective light source is turned off and the other light sources are turned on.

[0064]  If the signal value equals zero, the process continues at block 1008 where a determination is made as to whether or not all of the light sources have been turned off while the other light sources are turned on.  If not, the method passes to block 1010 where the light sources that are currently turned on are turned off.  The method then returns to block 1000 where all light sources except another single light source is turned on.  The method in FIG. 10 repeats until all of the light sources have been turned off while the other light sources are turned on and the signal value output from the demultiplexer and multiplier circuit 718 associated with each light source equals zero when the respective light source is turned off and the other light sources are turned on.

[0065]  Returning to FIG. 8, if the matrix values are not verified at block 804, the method returns to block 800 as described earlier.  If the matrix values are verified at block 804, the process continues at block 806 where the matrix is applied in the demultiplexer and multiplier circuit 718 in FIG. 7.  A determination may then be made at block 808 as to whether or not the matrix values are to be recalculated.  As one example, the matrix values can be recalculated after a given period of time has passed.  Additionally or alternatively, the matrix values may be recalculated each time a user activates the heath monitoring system.  The process waits at block 808 if the matrix values are not recalculated.  If the matrix values are to be recalculated, the method returns to block 800.

19

Exhibit 13
-298-

Attorney Docket No. P22879US1

[0066] Various embodiments have been described in detail with particular reference to certain features thereof, but it will be understood that variations and modifications can be effected within the spirit and scope of the disclosure.  For example, as described earlier, a health monitoring system can include a different number of light sources (e.g., two or six). Additionally or alternatively, a health monitoring system can be included in, or connected to a different type of electronic device.

[0067] Even though specific embodiments have been described herein, it should be noted that the application is not limited to these embodiments. In particular, any features described with respect to one embodiment may also be used in other embodiments, where compatible. Likewise, the features of the different embodiments may be exchanged, where compatible.

Exhibit 13
-299-

## CLAIMS

What is claimed is:

1.      An electronic device, comprising:

two or more light sources for emitting light toward a body part of a user;

an optical sensor for obtaining light and dark samples and converting the samples into a signal;

a processing device operably connected to the optical sensor for demodulating the signal received from the optical sensor into a demodulated signal associated with each light source; and

at least one decimation stage for processing each demodulated signal, wherein each decimation stage comprises a low pass filter for receiving the demodulated signals and a decimation circuit operably connected to an output of the low pass filter.

2.      The electronic device as in claim 1, further comprising a demultiplexer and multiplier circuit operably connected to an output of the last decimation stage, wherein the demultiplexer separates the signals by each associated light source and the multiplier multiplies each signal by one or more respective weights.

3.      The electronic device as in claim 1, wherein the electronic device is a wearable communication device.

4.      A method for processing a signal obtained when light from one or more light sources is emitted toward a body part of a user, the method comprising:

capturing multiple light samples while each light source emits light toward the body part of the user and converting the multiple light samples into the signal;

demodulating the signal to produce multiple demodulated signals;

filtering and decimating each demodulated signal at least once to produce a signal associated with each light source.

5.      The method as in claim 4, further comprising analyzing each signal associated with each light source to estimate a physiological parameter of the user.

21

Exhibit 13
-300-

6.      The method as in claim 4, wherein capturing multiple light samples while each light source emits light toward the body part of the user comprises:

a) capturing multiple light samples when each light source is turned on and the other light sources are turned off; and

capturing multiple dark samples after all four light sources have been turned on and turned off.

7.      The method as in claim 5, wherein capturing multiple light samples when a respective light source is turned on and the other light sources are turned off comprises capturing five light samples when a respective light source is turned on and the other light sources are turned off.

8.      The method as in claim 7, wherein capturing multiple dark samples after all of the light sources have been turned on and turned off comprises capturing ten dark samples after all of the light sources have been turned on and turned off.

9.      The method as in claim 6, further comprising capturing one or more dark samples after one light source is turned off and before the next light source is turned on.

10.      The method as in claim 9, wherein capturing one or more dark samples after one light source is turned off and before the next light source is turned on comprises capturing one dark sample after one light source is turned off and before the next light source is turned on.

11.      The method as in claim 10, wherein capturing multiple light samples when a respective light source is turned on and the other light sources are turned off comprises capturing five light samples when a respective light source is turned on and the other light sources are turned off.

12.      The method as in claim 11, wherein capturing multiple dark samples after all of the light sources have been turned on and turned off comprises capturing seven dark samples after all of the light sources have been turned on and turned off.

22

Exhibit 13
-301-

13.     The method as in claim 4, wherein demodulating the signal to produce multiple demodulated signals comprises applying a first demodulation operation of $\sin 2\pi \frac{kt}{N}$ to the signal and applying a second demodulation operation of $\cos 2\pi \frac{kt}{N}$ to the signal, where k is defined by $1 \leq k \leq n/2$, N represents the number of samples obtained by the optical sensor, and t = 0, 1, …, N-1.

14.     The method as in claim 4, wherein filtering and decimating each demodulated signal at least once to produce a signal associated with each light source comprises inputting each demodulated signal into one or more low pass filter and decimation stages, wherein each low pass filter and decimation stage comprises a low pass filter for receiving a demodulated signal and a decimation circuit operably connected to an output of the low pass filter.

15.     A method for operating an electronic device that includes multiple light sources, an optical sensor, and a processing device operably connected to the optical sensor, the method comprising:

turning on each light source one at a time and emitting light toward a body part of a user;

capturing multiple light samples while each light source emits light toward the body part of the user and converting the multiple light samples into a signal;

converting the signal into a digital signal;

demodulating the digital signal to produce multiple demodulated signals; and

filtering and decimating each demodulated signal at least once to produce a signal associated with each light source.

16.     The method as in claim 15, further comprising analyzing each signal associated with each light source to estimate a physiological parameter of the user.

17.     The method as in claim 15, wherein capturing multiple light samples while each light source emits light toward the body part of the user comprises:

23

Exhibit 13
-302-

                                                                    Attorney Docket No. P22879US1

capturing multiple light samples while each light source is turned on and the other light sources are turned off; and

capturing multiple dark samples after all four light sources have been turned on and turned off.

18.    The method as in claim 17, further comprising capturing one or more dark samples after one light source is turned off and before the next light source is turned on.

19.    The method as in claim 17, wherein demodulating the digital signal to produce multiple demodulated signals comprises applying a first demodulation operation of $\sin 2\pi \frac{kt}{N}$ to the digital signal and applying a second demodulation operation of $\cos 2\pi \frac{kt}{N}$ to the digital signal, where k is defined by $1 \leq k \leq n/2$, N represents the number of samples obtained by the optical sensor, and t = 0, 1, …, N-1.

20.    The method as in claim 17, wherein filtering and decimating each demodulated signal at least once to produce a signal associated with each light source comprises inputting each demodulated signal into one or more low pass filter and decimation stages, wherein each low pass filter and decimation stage comprises a low pass filter for receiving a demodulated signal and a decimation circuit operably connected to an output of the low pass filter.

Exhibit 13
-303-

Attorney Docket No. P22879US1

## ABSTRACT

An electronic device includes one or more light sources for emitting light toward a body part of a user and one or more optical sensors for capturing light samples while each light source is turned on and for capturing dark samples while the light source(s) are turned off. A signal produced by the one or more optical sensors is demodulated produce multiple demodulated signals. Each demodulated signal is received by one or more decimation stages to produce a signal associated with each light source. Each signal associated with the light source(s) is analyzed to estimate or determine a physiological parameter of the user.

**Exhibit 13**
**-304-**

Title: Modulation And Demodulation Techniques For A Health Monitoring System
Application No. Not Yet Assigned; Filed: Herewith
Inventor(s): Lamego
Docket No. P22879US1

*1/9*



**FIG. 1**

Exhibit 13
-305-

Title: Modulation And Demodulation Techniques For A Health Monitoring System
Application No. Not Yet Assigned; Filed: Herewith
Inventor(s): Lamego
Docket No. P22879US1

## 2/9



*FIG. 2*

Exhibit 13
-306-

Title: Modulation And Demodulation Techniques For A Health Monitoring System
Application No. Not Yet Assigned; Filed: Herewith
Inventor(s): Lamego
Docket No. P22879US1

*3/9*



*FIG. 3*

Exhibit 13
-307-

Title: Modulation And Demodulation Techniques For A Health Monitoring System
Application No. Not Yet Assigned; Filed: Herewith
Inventor(s): Lamego
Docket No. P22879US1

*4/9*



*FIG. 4*

Exhibit 13
-308-

Title: Modulation And Demodulation Techniques For A Health Monitoring System
Application No. Not Yet Assigned; Filed: Herewith
Inventor(s): Lamego
Docket No. P22879US1

*5/9*



*FIG. 5*



*FIG. 6*

Exhibit 13
-309-

Title: Modulation And Demodulation Techniques For A Health Monitoring System
Application No. Not Yet Assigned; Filed: Herewith
Inventor(s): Lamego
Docket No. P22879US1

6/9



FIG. 7

Exhibit 13
-310-

*7/9*



*FIG. 8*

Exhibit 13
-311-

Title: Modulation And Demodulation Techniques For A Health Monitoring System
Application No. Not Yet Assigned; Filed: Herewith
Inventor(s): Lamego
Docket No. P22879US1

*8/9*



*FIG. 9*

Exhibit 13
-312-

Title: Modulation And Demodulation Techniques For A Health Monitoring System
Application No. Not Yet Assigned; Filed: Herewith
Inventor(s): Lamego
Docket No. P22879US1

*9/9*



*FIG. 10*

Exhibit 13
-313-

# Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | |
| **Filing Date:** | |
| **Title of Invention:** | Modulation and Demodulation Techniques for a Health Monitoring System |
| **First Named Inventor/Applicant Name:** | Marcelo M. Lamego |
| **Filer:** | Stephen C. Hemenway/Valerie Brown |
| **Attorney Docket Number:** | P22879US1 |

Filed as Large Entity

**Filing Fees for** Utility under 35 USC 111(a)

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| Utility application filing | 1011 | 1 | 280 | 280 |
| Utility Search Fee | 1111 | 1 | 600 | 600 |
| Utility Examination Fee | 1311 | 1 | 720 | 720 |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |

Exhibit 13
-314-

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Post-Allowance-and-Post-Issuance:** | | | | |
| **Extension-of-Time:** | | | | |
| **Miscellaneous:** | | | | |
| | | | **Total in USD ($)** | **1600** |

Exhibit 13
-315-

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 21490561 |
| **Application Number:** | 14621268 |
| **International Application Number:** | |
| **Confirmation Number:** | 6317 |
| **Title of Invention:** | Modulation and Demodulation Techniques for a Health Monitoring System |
| **First Named Inventor/Applicant Name:** | Marcelo M. Lamego |
| **Customer Number:** | 62579 |
| **Filer:** | Stephen C. Hemenway/Valerie Brown |
| **Filer Authorized By:** | Stephen C. Hemenway |
| **Attorney Docket Number:** | P22879US1 |
| **Receipt Date:** | 12-FEB-2015 |
| **Filing Date:** | |
| **Time Stamp:** | 19:45:18 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | Credit Card |
| Payment was successfully received in RAM | $1600 |
| RAM confirmation Number | 5895 |
| Deposit Account | 504621 |
| Authorized User | BROWN, VALERIE |
| The Director of the USPTO is hereby authorized to charge indicated fees and credit any overpayment as follows: | |

Charge any Additional Fees required under 37 C.F.R. Section 1.16 (National application filing, search, and examination fees)

Charge any Additional Fees required under 37 C.F.R. Section 1.17 (Patent application and reexamination processing fees)

Exhibit 13
-316-

Charge any Additional Fees required under 37 C.F.R. Section 1.19 (Document supply fees)

Charge any Additional Fees required under 37 C.F.R. Section 1.20 (Post Issuance fees)

Charge any Additional Fees required under 37 C.F.R. Section 1.21 (Miscellaneous fees and charges)

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Transmittal of New Application | P22879US1ApplicationTransmittal.pdf | 173231 697c9757ff79dd2b439203f6da8b791e041cf566 | no | 1 |
| Warnings: | | | | | |
| Information: | | | | | |
| 2 | Application Data Sheet | P22879US1ApplicationDataSheet.pdf | 95973 7398d6c170192c1f102ffc8b3e74e51c4a788f73 | no | 7 |
| Warnings: | | | | | |
| Information: | | | | | |
| This is not an USPTO supplied ADS fillable form | | | | | |
| 3 | Oath or Declaration filed | P22879US1SubstituteStatement.pdf | 232827 5149ed05f87086d11689d6f9842dfdd12cfc58f | no | 3 |
| Warnings: | | | | | |
| Information: | | | | | |
| 4 | Power of Attorney | P22879US1TransmittalOfPower.pdf | 99488 38e9de489b3e69a00db277ce1c23fa299c08a6b1 | no | 1 |
| Warnings: | | | | | |
| Information: | | | | | |
| 5 | Power of Attorney | P22879US1PowerOfAttorney.pdf | 321013 656db9578932f46dcbfe95cac91a2248a1dae82e | no | 1 |
| Warnings: | | | | | |
| Information: | | | | | |
| 6 | Nonpublication request from applicant. | P22879US1NonpublicationRequest.pdf | 124082 c42d8609b8ac0d3cd61ad836352609cf8018f162 | no | 1 |
| Warnings: | | | | | |
| Information: | | | | | |
| 7 | | P22879US1Specification.pdf | 117248 338ec18c1c2cb7b6eeab68565cbc340256b09187 | yes | 25 |
| | Multipart Description/PDF files in .zip description | | | | |
| | Document Description | | Start | | End |

Exhibit 13 -317-

| | Specification | | 1 | 20 |
|---|---|---|---|---|
| | Claims | | 21 | 24 |
| | Abstract | | 25 | 25 |

| **Warnings:** |
|---|

| **Information:** |
|---|

| 8 | Drawings-only black and white line drawings | P22879US1Drawings.pdf | 94390<br>f6020e8da87981a2db0c832ac78c3395a72a07d0 | no | 9 |
|---|---|---|---|---|---|

| **Warnings:** |
|---|

| **Information:** |
|---|

| 9 | Fee Worksheet (SB06) | fee-info.pdf | 34885<br>b275a91090f027fd7c7a7a1225c4619502b9c410 | no | 2 |
|---|---|---|---|---|---|

| **Warnings:** |
|---|

| **Information:** |
|---|

| **Total Files Size (in bytes):** | 1293137 |
|---|---|

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

**Exhibit 13**
**-318-**

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 21490561 |
| **Application Number:** | 14621268 |
| **International Application Number:** | |
| **Confirmation Number:** | 6317 |
| **Title of Invention:** | Modulation and Demodulation Techniques for a Health Monitoring System |
| **First Named Inventor/Applicant Name:** | Marcelo M. Lamego |
| **Customer Number:** | 62579 |
| **Filer:** | Stephen C. Hemenway/Valerie Brown |
| **Filer Authorized By:** | Stephen C. Hemenway |
| **Attorney Docket Number:** | P22879US1 |
| **Receipt Date:** | 12-FEB-2015 |
| **Filing Date:** | |
| **Time Stamp:** | 19:45:18 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | Credit Card |
| Payment was successfully received in RAM | $1600 |
| RAM confirmation Number | 5895 |
| Deposit Account | 504621 |
| Authorized User | BROWN, VALERIE |
| The Director of the USPTO is hereby authorized to charge indicated fees and credit any overpayment as follows: | |
| Charge any Additional Fees required under 37 C.F.R. Section 1.16 (National application filing, search, and examination fees) | |
| Charge any Additional Fees required under 37 C.F.R. Section 1.17 (Patent application and reexamination processing fees) | |

Exhibit 13
-319-

Charge any Additional Fees required under 37 C.F.R. Section 1.19 (Document supply fees)

Charge any Additional Fees required under 37 C.F.R. Section 1.20 (Post Issuance fees)

Charge any Additional Fees required under 37 C.F.R. Section 1.21 (Miscellaneous fees and charges)

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Transmittal of New Application | P22879US1ApplicationTransmittal.pdf | 173231 <br> 697c9757ff79dd2b439203f6da8b791e041c f566 | no | 1 |
| Warnings: | | | | | |
| Information: | | | | | |
| 2 | Application Data Sheet | P22879US1ApplicationDataSheet.pdf | 95973 <br> 7398d6c170192c1f102ffc8b3e74e51c4a78 8f73 | no | 7 |
| Warnings: | | | | | |
| Information: | | | | | |
| This is not an USPTO supplied ADS fillable form | | | | | |
| 3 | Oath or Declaration filed | P22879US1SubstituteStatement.pdf | 232827 <br> 5149ed05f87086d11689d6f9842dfdd12cf c58f | no | 3 |
| Warnings: | | | | | |
| Information: | | | | | |
| 4 | Power of Attorney | P22879US1TransmittalOfPower.pdf | 99488 <br> 38e9de489b3e69a00db277ce1c23fa299c0 8a6b1 | no | 1 |
| Warnings: | | | | | |
| Information: | | | | | |
| 5 | Power of Attorney | P22879US1PowerOfAttorney.pdf | 321013 <br> 656db9578932f46dcbfe95cac91a2248a1da e82e | no | 1 |
| Warnings: | | | | | |
| Information: | | | | | |
| 6 | Nonpublication request from applicant. | P22879US1NonpublicationRequest.pdf | 124082 <br> c42d8609b8ac0d3cd61ad836352609cf801 8f162 | no | 1 |
| Warnings: | | | | | |
| Information: | | | | | |
| 7 | | P22879US1Specification.pdf | 117248 <br> 338ec18c1c2cb7b6eeab68565cbc340256b 09187 | yes | 25 |
| | Multipart Description/PDF files in .zip description | | | | |
| | Document Description | | Start | | End |

Exhibit 13
-320-

| | Specification | | 1 | 20 |
|---|---|---|---|---|
| | Claims | | 21 | 24 |
| | Abstract | | 25 | 25 |

**Warnings:**

**Information:**

| 8 | Drawings-only black and white line drawings | P22879US1Drawings.pdf | 94390 <br> f6020e8da87981a2dfb0c832ac78c3395a72a07d0 | no | 9 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| 9 | Fee Worksheet (SB06) | fee-info.pdf | 34885 <br> b275a91090f027fd7c7a7a1225c4619502b9c410 | no | 2 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| | | **Total Files Size (in bytes):** | 1293137 |
|---|---|---|---|

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

<u>New Applications Under 35 U.S.C. 111</u>
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

<u>National Stage of an International Application under 35 U.S.C. 371</u>
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

<u>New International Application Filed with the USPTO as a Receiving Office</u>
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

**Exhibit 13**
**-321-**

# EXHIBIT 14

US010219754B1

(12) **United States Patent**
Lamego

(10) **Patent No.: US 10,219,754 B1**
(45) **Date of Patent: Mar. 5, 2019**

(54) **MODULATION AND DEMODULATION TECHNIQUES FOR A HEALTH MONITORING SYSTEM**

(71) Applicant: **Apple Inc.**, Cupertino, CA (US)

(72) Inventor: **Marcelo M. Lamego**, Cupertino, CA (US)

(73) Assignee: **Apple Inc.**, Cupertino, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **14/621,268**

(22) Filed: **Feb. 12, 2015**

**Related U.S. Application Data**

(60) Provisional application No. 62/047,818, filed on Sep. 9, 2014.

(51) **Int. Cl.**
$A61B\ 5/00$ (2006.01)

(52) **U.S. Cl.**
CPC .......... *A61B 5/7228* (2013.01); *A61B 5/0059* (2013.01); *A61B 5/681* (2013.01); *A61B 5/7203* (2013.01); *A61B 5/725* (2013.01); *A61B 5/7225* (2013.01); *A61B 5/7278* (2013.01)

(58) **Field of Classification Search**
CPC ............................. A61B 5/0059; A61B 5/0084
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,349,952 A * 9/1994 McCarthy ............ A61B 5/0059
356/41
2012/0253155 A1* 10/2012 Diab .................. A61B 5/14551
600/324

* cited by examiner

*Primary Examiner* — Hien Nguyen
(74) *Attorney, Agent, or Firm* — Brownstein Hyatt Farber Schreck, LLP

(57) **ABSTRACT**

An electronic device includes one or more light sources for emitting light toward a body part of a user and one or more optical sensors for capturing light samples while each light source is turned on and for capturing dark samples while the light source(s) are turned off. A signal produced by the one or more optical sensors is demodulated produce multiple demodulated signals. Each demodulated signal is received by one or more decimation stages to produce a signal associated with each light source. Each signal associated with the light source(s) is analyzed to estimate or determine a physiological parameter of the user.

**6 Claims, 9 Drawing Sheets**



Exhibit 14
-322-

**U.S. Patent**      **Mar. 5, 2019**      **Sheet 1 of 9**      **US 10,219,754 B1**



**FIG. 1**

Exhibit 14
-323-



*FIG. 2*

Exhibit 14
-324-



*FIG. 3*

Exhibit 14
-325-

Case 8:20-cv-00048-JVS-JDE Document 109-1 Filed 08/17/20 Page 334 of 1129 Page ID #:7291



*FIG. 4*

Exhibit 14
-326-



**FIG. 5**



**FIG. 6**

Exhibit 14
-327-



*FIG. 7*

Exhibit 14
-328-

Case 8:20-cv-00048-JVS-JDE  Document 109-1  Filed 08/17/20  Page 337 of 1129  Page ID #:7294



*FIG. 8*

Exhibit 14
-329-

U.S. Patent        Mar. 5, 2019        Sheet 8 of 9        US 10,219,754 B1



*FIG. 9*

Exhibit 14
-330-



*FIG. 10*

Exhibit 14
-331-

US 10,219,754 B1

**1**

## MODULATION AND DEMODULATION TECHNIQUES FOR A HEALTH MONITORING SYSTEM

### CROSS-REFERENCE TO RELATED APPLICATION

This application claims the benefit under 35 U.S.C. § 119(e) of U.S. Provisional Patent Application No. 62/047,818, filed Sep. 9, 2014, entitled "Modulation and Demodulation Techniques for a Health Monitoring System," the entirety of which is incorporated herein by reference.

### TECHNICAL FIELD

The present invention relates generally to health monitoring systems, and more particularly to modulation and demodulation techniques for a health monitoring system that includes one or more optical sensors.

### BACKGROUND

Health monitoring devices, such as fitness and wellness devices, are capable of measuring a variety of physiological parameters and waveforms non-invasively via optical sensing. Light is applied to a measurement site, such as a user's wrist, finger, and ear, and the light is absorbed and scattered throughout the skin. An optical sensor in the health monitoring device captures the light that is reflected from or transmitted through the skin. The optical sensor, however, is subject to interferences caused by fluorescent bulbs, sun light, the electricity grid or network, and motion artifacts that are caused by the relative motion between the optical sensor and the user's measurement site. Thus, the light collected by the light sensor contains a component from the measurement site and component from one or more interferences. To estimate the physiological parameter and waveform, the optical sensor coverts the collected light into electrical signals, and the signal that represents the interference component is typically subtracted from the signal representing the measurement site component. After subtraction, only the component from the measurement site should remain, which is the component that is used to estimate the physiological parameter. However, subtraction cannot be performed instantaneously. A time delay exists between sampling the light and subtracting the interference component. The time delay can result in the creation of aliases in the signal, and the aliases produce errors in the estimation of the physiological parameter.

### SUMMARY

In one aspect, an electronic device includes one or more light sources for emitting light toward a body part of a user and one or more optical sensors for capturing light samples while each light source is turned on and for capturing dark samples while the light source(s) are turned off. A signal produced by the one or more optical sensors is demodulated produce multiple demodulated signals. Each demodulated signal is received by one or more decimation stages to produce a signal associated with each light source. A demultiplexer and multiplier circuit operably can be connected to an output of the decimation stage. The demultiplexer separates the signals by each associated light source and the multiplier multiplies each signal by one or more respective weights. The weights adjust the signals for variations in temperature and operating parameters of various compo-

**2**

nents in the electronic device. Each signal associated with the light source(s) is analyzed to estimate or determine a physiological parameter of the user.

In another aspect, a method for processing the signal received from the light sensor can include capturing multiple light samples while each light source emits light toward the body part of the user and converting the multiple light samples into the signal. The light sources can be modulated (e.g., turned on and off) according to a particular modulation pattern. The signal produced by the optical sensor is then demodulated to produce multiple demodulated signals. Each demodulated signal is associated with a particular light source. Each demodulated signal is then be processed by at least one decimation stage. In one embodiment, each decimation stage includes a low pass filter that receives a demodulated signal and a decimation circuit operably connected to an output of the low pass filter. A demultiplexer and multiplier circuit may then process the signals. Each signal associated with the light source(s) is analyzed to estimate or determine a physiological parameter of the user.

In yet another aspect, a method for operating an electronic device that includes multiple light sources, an optical sensor, and a processing device operably connected to the optical sensor can include turning on each light source one at a time and emitting light toward a body part of a user and capturing multiple light samples while each light source emits light toward the body part of the user and converting the multiple light samples into a signal. The signal is converted into a digital signal, and the digital signal is demodulated to produce multiple demodulated signals. Each demodulated signal is then processed by at least one decimation stage. In one embodiment, each decimation stage includes a low pass filter that receives a demodulated signal and a decimation circuit operably connected to an output of the low pass filter. Each signal associated with the light source(s) is analyzed to estimate or determine a physiological parameter of the user.

### BRIEF DESCRIPTION OF THE DRAWINGS

Embodiments of the invention are better understood with reference to the following drawings. The elements of the drawings are not necessarily to scale relative to each other. Identical reference numerals have been used, where possible, to designate identical features that are common to the figures.

FIG. **1** a perspective front view of one example of an electronic device that provides health-related information;

FIG. **2** depicts a back view of the electronic device **100** shown in FIG. **1**;

FIG. **3** is an illustrative block diagram of the electronic device **100** shown in FIGS. **1** and **2**;

FIG. **4** is a flowchart of one example method of operating the health monitoring system **312** in FIG. **3**;

FIGS. **5-6** depict example modulation patterns suitable for use in blocks **400** and **402** in FIG. **4**;

FIG. **7** is a data flow diagram of a processing channel that performs blocks **408**, **410**, and **412** in FIG. **4**;

FIG. **8** is a flowchart of one example method of determining a matrix used in block **718** of FIG. **7**;

FIG. **9** is a flowchart of one example method of performing block **800** in FIG. **8**; and

FIG. **10** is a flowchart of one example method of performing block **802** in FIG. **8**.

### DETAILED DESCRIPTION

Embodiments described herein provide modulation and demodulation techniques that reduce or eliminate undesired

**Exhibit 14**
**-332-**

US 10,219,754 B1

**3**

interferences and produce demodulated signals that can be analyzed to estimate a physiological parameter of a user. A time multiplexed modulation pattern is used to turn the light sources on and off and to cause the optical sensor to capture multiple light and dark samples. Demodulation operations are applied to the signal produced by the optical sensor to produce a signal associated with each light source. In general, the demodulation operation can be

$$\sin 2\pi \frac{kt}{N} \text{ or } \cos 2\pi \frac{kt}{N}.$$

The demodulated signals may then be processed by one or more decimation stages. Each decimation stage can include a low pass filter and a decimation circuit.

Any suitable type of electronic device can include a health monitoring system. Example electronic devices include, but are not limited to, a smart telephone, a headset, a pulse oximeter, a digital media player, a tablet computing device, and a wearable electronic device. A wearable electronic device can include any type of electronic device that can be worn on a limb of a user. The wearable electronic device can be affixed to a limb or body part of a user, such as a wrist, an arm, a finger, a leg, an ear, or a chest. In some embodiments, the wearable electronic device is worn on a limb of a user with a band that attaches to the body and includes a holder or case to detachably or removably hold the electronic device, such as an armband, an ankle bracelet, a leg band, and/or a wristband. In other embodiments, the wearable electronic device is permanently affixed or attached to a band, and the band attaches to the body of the user.

As one example, a wearable electronic device can be implemented as a wearable health assistant that provides health-related information (whether real-time or not) to the user, authorized third parties, and/or an associated monitoring device. The wearable health assistant may be configured to provide health-related information or data such as, but not limited to, heart rate data, blood pressure data, temperature data, blood oxygen saturation level data, diet/nutrition information, medical reminders, health-related tips or information, or other health-related data. The associated monitoring device may be, for example, a tablet computing device, phone, personal digital assistant, computer, and so on.

As another example, the electronic device can be configured in the form of a wearable communications device. The wearable communications device may include a processor coupled with or in communication with a memory, one or more sensors, one or more communication interfaces, output devices such as displays and speakers, one or more input devices, and a health monitoring system. The communication interface(s) can provide electronic communications between the communications device and any external communication network, device or platform, such as but not limited to wireless interfaces, Bluetooth interfaces, USB interfaces, Wi-Fi interfaces, TCP/IP interfaces, network communications interfaces, or any conventional communication interfaces. The wearable communications device may provide information regarding time, health, statuses or externally connected or communicating devices and/or software executing on such devices, messages, video, operating commands, and so forth (and may receive any of the foregoing from an external device), in addition to communications.

Referring now to FIG. 1, there is shown a perspective view of one example of an electronic device that provides health-related information. In the illustrated embodiment,

**4**

the electronic device 100 is implemented as a wearable communication device. Other embodiments can implement the electronic device differently. As described earlier, the electronic device can be a smart telephone, a gaming device, a digital music player, a device that provides time, a health assistant, and other types of electronic devices that provide health-related information.

The electronic device 100 includes an enclosure 102 at least partially surrounding a display 104 and one or more buttons 106 or input devices. The enclosure 102 can form an outer surface or partial outer surface and protective case for the internal components of the electronic device 100, and may at least partially surround the display 104. The enclosure 102 can be formed of one or more components operably connected together, such as a front piece and a back piece. Alternatively, the enclosure 102 can be formed of a single piece operably connected to the display 104.

The display 104 can be implemented with any suitable technology, including, but not limited to, a multi-touch sensing touchscreen that uses liquid crystal display (LCD) technology, light emitting diode (LED) technology, organic light-emitting display (OLED) technology, organic electroluminescence (OEL) technology, or another type of display technology. A button 106 can take the form of a home button, which may be a mechanical button, a soft button (e.g., a button that does not physically move but still accepts inputs), an icon or image on a display or on an input region, and so on. Other buttons or mechanisms can be used as input/output devices, such as a speaker, a microphone, an on/off button, a mute button, or a sleep button. In some embodiments, the button or buttons 106 can be integrated as part of a cover glass of the electronic device.

The electronic device 100 can be permanently or removably attached to a band 108. The band 108 can be made of any suitable material, including, but not limited to, leather, metal, rubber or silicon, fabric, and ceramic. In the illustrated embodiment, the band is a wristband that wraps around the user's wrist. The wristband can include an attachment mechanism (not shown), such as a bracelet clasp, Velcro, and magnetic connectors. In other embodiments, the band can be elastic or stretchy such that it fits over the hand of the user and does not include an attachment mechanism.

FIG. 2 depicts a back view of the electronic device 100 shown in FIG. 1. As described earlier, the electronic device can include one or more sensors, and at least one of these sensors may provide health-related information. As one example, the wearable communication device can include an optical sensor, such as a photoplethysmography (PPG) sensor. A PPG sensor uses light to measure changes in the volume of a part of a user's body. As the light passes through the user's skin and into the underlying tissue, some light is reflected, some is scattered, and some light is absorbed, depending on what the light encounters. Blood can absorb light more than surrounding tissue, so less reflected light will be sensed by the PPG sensor when more blood is present. The user's blood volume increases and decreases with each heartbeat. A PPG sensor detects changes in blood volume based on the reflected light, and one or more physiological parameters of the user can be determined by analyzing the reflected light. Example physiological parameters include, but are not limited to, heart rate and respiration.

The electronic device 100 includes one or more apertures 200 in the enclosure 102. Each aperture is associated with a light source 202. In one embodiment, each light source is implemented as a light-emitting diode (LED). Four apertures 200 and four light sources 202 are used in the illustrated embodiment. Other embodiments can include any

Exhibit 14
-333-

US 10,219,754 B1

5

number of light sources 200. For example, two light sources can be used in some embodiments.

The light sources 202 can operate at the same light wavelength range, or the light sources can operate at different light wavelength ranges. As one example, with two light sources one light source may transmit light in the visible wavelength range while the other light source can emit light in the infrared wavelength range. With four light sources, two light sources may transmit light in the visible wavelength range while the other two light sources can emit light in the infrared wavelength range. For example, in one embodiment, at least one light source can emit light in the wavelength range associated with the color green while another light source transmits light in the infrared wavelength range. When a physiological parameter of the user will be determined, the light sources emit light toward the user's skin and the optical sensor 204 senses an amount of reflected light. The optical sensor 204 may sense the reflected light through an aperture (not shown) that is formed in the electronic device. As will be described in more detail later, a modulation pattern can be used to turn the light sources on and off and sample or sense the reflected light.

FIG. 3 is an illustrative block diagram of the electronic device 100 shown in FIG. 1. The electronic device 100 can include the display 104, one or more processing devices 300, memory 302, one or more input/output (I/O) devices 304, one or more sensors 306, a power source 308, a network communications interface 310, and a health monitoring system 312. The display 104 may provide an image or video output for the electronic device 100. The display may also provide an input surface for one or more input devices, such as, for example, a touch sensing device and/or a fingerprint sensor. The display 104 may be substantially any size and may be positioned substantially anywhere on the electronic device 100.

The processing device 300 can control some or all of the operations of the electronic device 100. The processing device 300 can communicate, either directly or indirectly with substantially all of the components of the electronic device 100. For example, a system bus or signal line 314 or other communication mechanisms can provide communication between the processing device(s) 300, the memory 302, the I/O device(s) 304, the sensor(s) 306, the power source 308, the network communications interface 310, and/or the health monitoring system 312. The one or more processing devices 300 can be implemented as any electronic device capable of processing, receiving, or transmitting data or instructions. For example, the processing device(s) 200 can each be a microprocessor, a central processing unit (CPU), an application-specific integrated circuit (ASIC), a digital signal processor (DSP), or combinations of such devices. As described herein, the term "processing device" is meant to encompass a single processor or processing unit, multiple processors, multiple processing units, or other suitably configured computing element or elements.

The memory 302 can store electronic data that can be used by the electronic device 100. For example, a memory can store electrical data or content such as, for example, audio and video files, documents and applications, device settings and user preferences, timing and control signals or data for the health monitoring system 312, data structures or databases, and so on. The memory 302 can be configured as any type of memory. By way of example only, the memory can be implemented as random access memory, read-only memory, Flash memory, removable memory, or other types of storage elements, or combinations of such devices.

6

The one or more I/O devices 304 can transmit and/or receive data to and from a user or another electronic device. One example of an I/O device is button 106 in FIG. 1. The I/O device(s) 304 can include a display, a touch sensing input surface such as a track pad, one or more buttons, one or more microphones or speakers, one or more ports such as a microphone port, and/or a keyboard.

The electronic device 100 may also include one or more sensors 306 positioned substantially anywhere on the electronic device 100. The sensor or sensors 306 may be configured to sense substantially any type of characteristic, such as but not limited to, images, pressure, light, touch, heat, position, motion, and so on. For example, the sensor(s) 308 may be an image sensor, a heat sensor, a light or optical sensor, a pressure transducer, a magnet, a gyroscope, an accelerometer, and so on.

The power source 308 can be implemented with any device capable of providing energy to the electronic device 100. For example, the power source 308 can be one or more batteries or rechargeable batteries, or a connection cable that connects the remote control device to another power source such as a wall outlet.

The network communication interface 310 can facilitate transmission of data to or from other electronic devices. For example, a network communication interface can transmit electronic signals via a wireless and/or wired network connection. Examples of wireless and wired network connections include, but are not limited to, cellular, Wi-Fi, Bluetooth, IR, and Ethernet.

The health monitoring system 312 can include the light sources 202, one or more optical sensors 204, and a processing device 316. The processing device 316 may be any suitable type of processing device. In one embodiment, the processing device 316 is a digital signal processor. The processing device 316 may receive signals from the optical sensor(s) 204 and processes the signals to correlate the signal values with a physiological parameter of the user. As one example, the processing device can apply one or more demodulation operations to the signals received from the optical sensor. Additionally, the processing device may control the modulation (e.g., turning on and off) of the light sources 202 according to a given modulation pattern. In one embodiment, one or more modulation patterns may be stored in memory 302 and accessed by the processing device 316 to modulate the light sources 202.

As discussed earlier, the light sources can emit light in the visible and/or infrared wavelength ranges. The optical sensor or sensors 204 is implemented as a photodetector that senses light and converts the light into an electrical signal that represents the amount of light sensed by the photodetector. In one embodiment, the photodetector can be a photodiode. Other embodiments can use a different type of photodetector, such as a phototube or photoresistor.

In another embodiment, the processing device 316 is not included in the health monitoring system 312 and the processing device 300 receives signals from the optical sensor(s) 204 and processes the signals to correlate the signal values with a physiological parameter of the user. Additionally or alternatively, the processing device 300 can control the operations of the light sources (e.g., turn on and off). One or more modulation patterns may be stored in memory 302 and accessed by the processing device 300 to modulate the light sources 202.

It should be noted that FIGS. 1-3 are illustrative only. In other examples, an electronic device may include fewer or more components than those shown in FIG. 3. Additionally or alternatively, the electronic device can be included in a

Exhibit 14
-334-

US 10,219,754 B1

7

system and one or more components shown in FIG. 3 are separate from the electronic device but in communication with the electronic device. For example, an electronic device may be operatively connected to, or in communication with a separate display. As another example, one or more applications or data can be stored in a memory separate from the electronic device. As another example, a processing device in communication with the electronic device can control various functions in the electronic device and/or process data received from the electronic device. In some embodiments, the separate memory and/or processing device can be in a cloud-based system or in an associated monitoring device.

Referring now to FIG. 4, there is shown a flowchart of one example method of operating the health monitoring system 312 in FIG. 3. Initially, a light source is turned on to illuminate the user's skin and the optical sensor senses an amount of reflected or transmitted light (blocks 400, 402). A determination can then be made at block 404 as to whether or not another light source is to be turned on. For example, in one embodiment, the light sources are turned on sequentially and the optical sensor senses the light multiple times while each light source is turned on.

If another light source is to be turned on, the process passes to block 406 where the light source that is currently turned on is turned off. The method then returns to block 400 and repeats until all of the light sources have been turned on and the optical sensor has obtained light samples.

When a determination is made at block 404 that all of the light sources have been turned on, the process continues at block 408 where the signal received from the optical sensor is digitized by inputting the signal into an analog-to-digital converter. The digitized signal is then demodulated at block 410. Demodulating the signal produces multiple demodulated signals, with a demodulated signal associated with each light source. Each demodulated signal is then received and processed by a low pass filter and a decimation circuit (block 412).

The signals may then be analyzed at block 414 to determine or estimate a physiological parameter of the user. As described earlier, in one embodiment the signals can be analyzed to determine a heart rate of the user. As one example, the processing device 316 can analyze the signals to estimate a physiological parameter of the user. In another example, the processing device 300 can analyze the signals to determine a physiological parameter of the user. And in yet another example, both processing devices 300, 316 can perform various steps in the analysis to estimate a physiological parameter of the user.

In other embodiments, the light source need not be turned off or on entirely. Instead, certain embodiments may modulate the brightness of the light source in place of or in addition to the turning of lights on and off. In some embodiments, certain light sources may be turned on and off while other light sources are alternately dimmed and brightened.

FIGS. 5-6 depict example modulation patterns suitable for use in blocks 400 and 402 in FIG. 4. FIGS. 5 and 6 are described with reference to a health monitoring system that includes four light sources. As described earlier, other embodiments can include fewer or more light sources. The embodiments described hereinafter are described with reference to a thirty sample modulation cycle operating at 4096 hertz. This is provided by way of example and is not required. Other modulation cycle frequencies and/or sampling frequencies may be selected. For example, the modu-

8

lation cycle frequencies may range, as a non-limiting example, from one hundred hertz to several hundred kilohertz.

In many examples, the modulation cycle frequency and the sampling frequency may be interrelated. For example, certain embodiments may be limited by hardware or software to a particular maximum sampling frequency. In such an example, the modulation cycle frequency may be selected such that the transmitted signal can be adequately reconstructed. In some cases, the modulation cycle may be less than half the sampling rate. Stated another way, if a certain embodiment requires a particular bandwidth, the sampling frequency may be at least twice the selected maximum frequency of the selected bandwidth.

Other embodiments can obtain a different number of samples and/or operate at a different frequency. The frequency may be determined based on a number of factors, one of which is the harmonics of the electrical network or grid. For example, when an electrical network produces a signal at 60 Hz, the harmonics are multiples of 60 (e.g., 120 Hz, 180 Hz, 240 Hz, etc.). Also, some electrical networks produce a signal at 50 Hz, and the harmonics of multiples of 50 Hz (e.g., 100 Hz, 150 Hz, 200 Hz, etc.).

Additionally, some electrical networks can be less reliable at generating a signal with a specific frequency, and the frequency may vary by a certain amount or deviation (e.g., a frequency of 60 Hz may operate at 60+/−1% Hz). And the deviation increases with each harmonic. Thus, in one embodiment, the frequency of the modulation cycle is selected to be in a harmonic gap that exists between the various harmonics and harmonic deviations of at least one electrical network.

The illustrated modulation patterns are time-multiplexed modulation patterns that drive the light sources. The time periods when the light sources are turned on and off are multiplexed in time. In FIG. 5, the first light source is turned on for the time period 500. The other three light sources are turned off during the time period 500. An optical sensor captures a light sample multiple times 502 during the time period 500. In the illustrated embodiment, the optical sensor obtains five light samples 502. The first light source is then turned off and the optical sensor captures the light at time 504. A light sample obtained when all of the light sources are turned off is known as a dark sample.

The second light source is then turned on for the time period 506. Again, the other three light sources are turned off during the time period 506. The optical sensor captures multiple light samples 508 during the time period 506. In the illustrated embodiment, the optical sensor obtains five samples 508. The second light source is then turned off and the optical sensor captures a dark sample at time 510.

Similarly, only the third light source is turned on for the time period 512, and the optical sensor senses an amount of light multiple times 514 (e.g., five times) during the time period 512. The third light source is then turned off and the optical sensor captures a dark sample at time 516.

The fourth light source is then turned on for the time period 518, and the optical sensor obtains multiple light samples 520 (e.g., five times) during the time period 518. The fourth light source is then turned off and the optical sensor captures multiple dark samples 522. In the illustrated embodiment, the optical sensor obtains seven dark samples 522. Thus, the optical sensor captures thirty samples during one modulation cycle 524. The modulation cycles can repeat a given number of times when estimating a physiological parameter. As described earlier, the modulation cycle can have a frequency of 4096 Hz in one embodiment.

Exhibit 14
-335-

US 10,219,754 B1

**9**

The modulation pattern in FIG. **6** is similar to the modulation pattern in FIG. **5** except that the optical sensor does not capture dark samples in between the time periods when a light source is turned on. In other words, the optical sensor does not sense dark samples at times **504**, **510**, and **516**. The light sensor obtains multiple dark samples **600** after the time period **518** has ended (after the fourth light source is turned off). In the illustrated embodiment, the light sensor captures ten dark samples **600**. Like the FIG. **5** embodiment, the optical sensor obtains thirty samples during one modulation cycle **602**.

The analog signal produced by the optical sensor includes information associated with all four light sources. Thus, in one embodiment, the analog signal is demodulated by a single optical sensor to produce four signals. In some cases, each signal is associated with a specific light source. In other examples, two optical sensors may be used to generate eight signals associated with the four light sources. In some cases, the two optical sensors may be physically separated so as to measure light associated with the four light sources from different points along the user's skin. In other embodiments, more than two optical sensors may be used.

FIG. **7** is a data flow diagram of an illustrative processing channel that performs blocks **408**, **410**, and **412** in FIG. **4**. The analog signal received from the optical sensor on signal line **700** is converted to a digital signal by analog-to-digital converter **702** in the processing channel **704**. The digital signal is then received by the mixer circuit **706**. The mixer circuit **706** also receives one or more demodulation operations **708**. In general, the demodulation operation can be sin

$$2\pi\frac{kt}{N} \text{ or } \cos 2\pi\frac{kt}{N},$$

where k is defined by 1≤k≤n/2, N represents the number of samples obtained by the optical sensor, and t=0, 1, . . . , N−1. The number of demodulation operations input into the mixer circuit **704** may be based on the number of light sources. In one embodiment, each harmonic of the signal received from the optical sensor has two orthogonal components. Thus, in some cases, the number of harmonics may depend upon the number of channels multiplexed and de-multiplexed. As one example, when the health monitoring system includes two light sources, the demodulation operations can be sin 2π/N or cos 2π/N for the first harmonic frequency. Two signals will be produced after both demodulation operations have been applied to the digital signal by mixer circuit **706**. When the health monitoring system has four light sources, the demodulation operation can be sin 2π/N or cos 2π/N for the first harmonic frequency, and sin 4π/N or cos 4π/N for the second harmonic frequency. Four signals will be produced after the four demodulation operations have been applied to the digital signal by mixer circuit **706**.

The signal output by the mixer circuit **706** is received by a low pass filter **710** and a decimation circuit **712**. The low pass filter **710** and the decimation circuit **712** form a first decimation stage. Embodiments can include any number of decimation stages K. The number of decimation stages K can be based on the frequency of the sampling cycle of the optical sensor and the frequency of the physiological parameter. For example, in the embodiments shown in FIGS. **5** and **6**, thirty samples are obtained by the optical sensor. When the frequency of the physiological parameter is approximately ten hertz and the frequency of the thirty sample cycle

**10**

is 4096 hertz, six decimation stages are used with each stage reducing the frequency of the signal by two.

After the signal is processed by the low pass filter **714** and decimation circuit **716** in the last decimation stage K, each signal is received by a demultiplexer and multiplier circuit **718**. The demultiplexer separates the signals by associated light source. Thus, the signal associated with the first light source is separated from the signals associated with the other light sources, and so on for each signal. The multiplier circuit then multiplies each signal by respective weights or values. As one example, the values can be stored in a matrix, and each signal is multiplied by the values in a respective row in the matrix.

The values in the matrix are a function of the dynamics and components of the health monitoring system. The operations of the components such as the optical sensor, the filters (e.g., high pass filters, low pass filters), the operational amplifiers, and the like, change over time due to temperature and other factors. The values in the matrix adjust the signals for these changes. One method for determining the values in the matrix is described in conjunction with FIG. **8**.

The signals output on signal line **720** represent the signals received from the user's tissue, and these signals can be analyzed to determine or measure the physiological parameter. As one example, these signals can be analyzed to determine the heart rate of the user.

FIG. **8** is a flowchart of one example method of determining the values in a matrix used in block **718** of FIG. **7**. Initially, the values in the matrix are determined at block **800**. FIG. **9** is a flowchart of one example method of performing block **800**. In block **900**, a single light source is turned on for a given period of time. The signal produced by the optical sensor is then processed to obtain some of the matrix values. For example, when the health monitoring system includes four light sources, s signal value or amplitude associated with each light source will be output by the decimation circuit **716**. Thus, four signal values will be output by the decimation circuit **716** based on the single light source emitting light toward the user's skin. These four signal values are included in one row in the matrix.

Returning to FIG. **9**, a determination is then made at block **904** as to whether or not all of the light sources have been individually turned on. If not, the process passes to block **906** where the light source that is currently turned on is turned off. The method then returns to block **900** where another single light source is turned on and the signal produced by the optical sensor processed to obtain matrix values for another row in the matrix. The method in FIG. **9** repeats until all of the light sources have been turned on and all of the values determined for the matrix. For four light sources, the values in the matrix are as follows:

Returning to FIG. **8**, after the matrix values are determined at block **800** the matrix values can be verified at block **802**. FIG. **10** is a flowchart of one example method of performing block **802**. Initially, all of the light sources except one are turned on for a given period of time (block **1000**). The signal produced by the optical sensor is then processed based on the data flow diagram shown in FIG. **7**. As described earlier, the demultiplexer and multiplier circuit **718** outputs signals that are associated with each light source in the health monitoring system. The signal value associated with the light source that is turned off should have a value that is substantially zero, while the signal values associated with the light sources that are turned on should be greater than zero.

Returning to FIG. **10**, a determination is made at block **1004** as to whether or not the signal value associated with

Exhibit 14 -336-

US 10,219,754 B1

**11**

the light source that is turned off equals zero. If not, the method passes to block **1006** where the matrix values in the matrix are recalculated. Thus, the method shown in FIG. **9** may be repeated and the method shown in FIG. **10** repeated until it is determined at block **1004** that the signal value associated with each light source equals zero when the respective light source is turned off and the other light sources are turned on.

If the signal value equals zero, the process continues at block **1008** where a determination is made as to whether or not all of the light sources have been turned off while the other light sources are turned on. If not, the method passes to block **1010** where the light sources that are currently turned on are turned off. The method then returns to block **1000** where all light sources except another single light source is turned on. The method in FIG. **10** repeats until all of the light sources have been turned off while the other light sources are turned on and the signal value output from the demultiplexer and multiplier circuit **718** associated with each light source equals zero when the respective light source is turned off and the other light sources are turned on.

Returning to FIG. **8**, if the matrix values are not verified at block **804**, the method returns to block **800** as described earlier. If the matrix values are verified at block **804**, the process continues at block **806** where the matrix is applied in the demultiplexer and multiplier circuit **718** in FIG. **7**. A determination may then be made at block **808** as to whether or not the matrix values are to be recalculated. As one example, the matrix values can be recalculated after a given period of time has passed. Additionally or alternatively, the matrix values may be recalculated each time a user activates the heath monitoring system. The process waits at block **808** if the matrix values are not recalculated. If the matrix values are to be recalculated, the method returns to block **800**.

Various embodiments have been described in detail with particular reference to certain features thereof, but it will be understood that variations and modifications can be effected within the spirit and scope of the disclosure. For example, as described earlier, a health monitoring system can include a different number of light sources (e.g., two or six). Additionally or alternatively, a health monitoring system can be included in, or connected to a different type of electronic device.

Even though specific embodiments have been described herein, it should be noted that the application is not limited to these embodiments. In particular, any features described with respect to one embodiment may also be used in other embodiments, where compatible. Likewise, the features of the different embodiments may be exchanged, where compatible.

What is claimed is:

**1**. A method for estimating physiological parameters when modulated light from a first light source and a second light source is emitted toward a body part of a user, the method comprising:

determining a first multiplier value by:

turning on the first light source;

generating a first initial signal in response to capturing a first light sample corresponding to the first light source;

demodulating the first initial signal to produce first initial demodulated signals;

filtering and decimating the first initial demodulated signals; and

determining the first multiplier value based on the filtered and decimated first initial demodulated signals;

**12**

determining a second multiplier value by:

turning on the second light source;

generating a second initial signal in response to capturing a second light sample corresponding to the second light source;

demodulating the second initial signal to produce second initial demodulated signals;

filtering and decimating the second initial demodulated signals; and

determining the second multiplier value based on the filtered and decimated second initial demodulated signals;

capturing multiple light samples while the first light source and the second light source are turned on to emit modulated light toward the body part of the user and converting the multiple light samples into a captured signal;

demodulating the captured signal to produce multiple demodulated signals;

performing a first decimation stage by:

low pass filtering each demodulated signal; and

decimating each demodulated signal;

performing a second decimation stage after the first decimation stage by:

low pass filtering each demodulated signal; and

decimating each demodulated signal;

demultiplexing each demodulated signal after the second decimation stage to produce a first signal associated with the first light source and a second signal associated with the second light source;

multiplying the first signal by the first multiplier value using a first multiplier circuit to obtain a first conditioned signal;

multiplying the second signal by the second multiplier value using a second multiplier circuit to obtain a second conditioned signal; and

analyzing the first conditioned signal and the second conditioned signal to estimate the physiological parameter of the user.

**2**. The method as in claim **1**, wherein the capturing multiple light samples comprises capturing multiple light samples while:

the first light source is turned on and the second light source is turned off;

the second light source is turned on and the first light source is turned off; and

the first light source and the second light source are turned off after being turned on.

**3**. The method as in claim **2**, wherein the capturing multiple light samples further comprises capturing one or more light samples after the first light source is turned off and before the second light source is turned on.

**4**. The method as in claim **1**, wherein the demodulating the captured signal to produce multiple demodulated signals comprises:

applying a first demodulation operation of a sine function to the captured signal; and

applying a second demodulation operation of a cosine function.

**5**. The method as in claim **2**, wherein the multiple light samples comprise at least five light samples captured when the first light source is turned on and the second light source is turned off.

**6**. The method as in claim **1**, wherein:

when the first light source is turned on, the first light source emits infrared light; and

Exhibit 14
-337-

US 10,219,754 B1

**13**

**14**

when the second light source is turned on, the second light
source emits visible light.

\* \* \* \* \*

**Exhibit 14**
**-338-**

# EXHIBIT 15

## PROPOSED TO BE FILED UNDER SEAL

# EXHIBIT 16

## PROPOSED TO BE FILED UNDER SEAL

# EXHIBIT 17

## PROPOSED TO BE
## FILED UNDER SEAL

# EXHIBIT 18

US009952095B1

(12) **United States Patent**

Hotelling et al.

(10) Patent No.: **US 9,952,095 B1**

(45) Date of Patent: **Apr. 24, 2018**

(54) **METHODS AND SYSTEMS FOR MODULATION AND DEMODULATION OF OPTICAL SIGNALS**

(71) Applicant: **Apple Inc.**, Cupertino, CA (US)

(72) Inventors: **Steven P. Hotelling**, Cupertino, CA (US); **Marcelo M. Lamego**, Cupertino, CA (US)

(73) Assignee: **Apple Inc.**, Cupertino, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **14/618,664**

(22) Filed: **Feb. 10, 2015**

**Related U.S. Application Data**

(60) Provisional application No. 62/057,089, filed on Sep. 29, 2014.

(51) **Int. Cl.**

| | |
|---|---|
| *G01J 1/44* | (2006.01) |
| *A61B 5/021* | (2006.01) |
| *A61B 5/024* | (2006.01) |
| *A61B 5/08* | (2006.01) |
| *A61B 5/11* | (2006.01) |
| *A61B 5/1455* | (2006.01) |
| *A61B 5/145* | (2006.01) |
| *A61B 5/00* | (2006.01) |
| *A61B 5/01* | (2006.01) |

(52) **U.S. Cl.**
CPC .................. *G01J 1/44* (2013.01); *A61B 5/01* (2013.01); *A61B 5/021* (2013.01); *A61B 5/02427* (2013.01); *A61B 5/0816* (2013.01); *A61B 5/1118* (2013.01); *A61B 5/14532* (2013.01); *A61B 5/14551* (2013.01); *A61B*

*5/4845* (2013.01); *A61B 5/4872* (2013.01); *G01J 2001/444* (2013.01)

(58) **Field of Classification Search**
CPC ..... G01J 1/44; G01J 2001/444; A61B 5/4845; A61B 5/1118; A61B 5/4872; A61B 5/02427
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,729,128 | A | 3/1988 | Grimes |
| 5,162,618 | A | 11/1992 | Knowles |
| 5,381,696 | A | 1/1995 | Ichinose |
| 5,515,298 | A | 5/1996 | Bicz |
| 5,589,636 | A | 12/1996 | Bicz |
| 5,719,950 | A | * 2/1998 | Osten ................... A61B 5/0205 340/5.82 |
| 5,886,452 | A | 3/1999 | Toda |
| 6,091,406 | A | 7/2000 | Kambara |

(Continued)

FOREIGN PATENT DOCUMENTS

WO      WO 94/002911      2/1994

*Primary Examiner* — Tony Ko

(74) *Attorney, Agent, or Firm* — Brownstein Hyatt Farber Schreck, LLP

(57) **ABSTRACT**

An electronic device includes one or more light sources for emitting light toward a body part of a user and one or more optical sensors for capturing light samples while each light source is turned on and for capturing dark samples while the light source(s) are turned off. A signal produced by the one or more optical sensors is filtered and demodulated produce multiple demodulated signals each associated with a light source. Each signal associated with the light source(s) is analyzed to estimate or determine a physiological parameter of the user.

**20 Claims, 7 Drawing Sheets**



100

102
104

102

112

112-2
114b
114a

Exhibit 18
-418-

**US 9,952,095 B1**

Page 2

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,159,149 | A | 12/2000 | Erikson |
| 6,164,135 | A | 12/2000 | Bicz |
| 6,720,712 | B2 | 4/2004 | Scott |
| 7,032,454 | B2 | 4/2006 | Amano |
| 7,400,750 | B2 | 7/2008 | Nam |
| 7,458,268 | B2 | 12/2008 | Schneider et al. |
| 7,497,120 | B2 | 3/2009 | Schneider et al. |
| 7,568,391 | B2 | 8/2009 | Schneider et al. |
| 7,656,932 | B2 * | 2/2010 | Durand .................... H04B 1/30 |
| | | | 375/143 |
| 7,667,374 | B2 | 2/2010 | Aono et al. |
| 7,734,435 | B2 | 6/2010 | Thomas et al. |
| 7,739,912 | B2 | 6/2010 | Schneider et al. |
| 7,770,456 | B2 | 8/2010 | Stevenson et al. |
| 8,047,995 | B2 | 11/2011 | Wakabayashi et al. |
| 8,054,203 | B2 | 11/2011 | Breed et al. |
| 8,085,998 | B2 | 12/2011 | Setlak et al. |
| 8,095,328 | B2 | 1/2012 | Thomas et al. |
| 8,179,678 | B2 | 5/2012 | Yamashita et al. |
| 8,201,739 | B2 | 6/2012 | Schneider et al. |
| 8,335,356 | B2 | 12/2012 | Schmitt |
| 8,345,508 | B2 | 1/2013 | Wodnicki et al. |
| 8,508,103 | B2 | 8/2013 | Schmitt et al. |
| 8,536,465 | B2 | 9/2013 | Hagiwara et al. |
| 8,601,876 | B2 | 12/2013 | Schneider et al. |
| 8,617,078 | B2 | 12/2013 | Machida et al. |
| 8,666,126 | B2 | 3/2014 | Lee et al. |
| 8,724,869 | B2 | 5/2014 | Schneider et al. |
| 8,781,180 | B2 | 7/2014 | Schneider et al. |
| 8,791,792 | B2 * | 7/2014 | Benkley, III ....... G06K 9/00053 |
| | | | 324/658 |
| 8,982,089 | B2 | 3/2015 | Lim |

| | | | |
|---|---|---|---|
| 9,056,082 | B2 | 6/2015 | Liautaud et al. |
| 9,100,034 | B2 | 8/2015 | Oshima |
| 9,132,693 | B2 | 9/2015 | Klootwijk et al. |
| 9,170,668 | B2 | 10/2015 | Schneider et al. |
| 9,276,625 | B2 | 3/2016 | Kim et al. |
| 9,323,393 | B2 | 4/2016 | Djordjev et al. |
| 9,465,972 | B2 | 10/2016 | Chung et al. |
| 9,568,315 | B2 | 2/2017 | Naoka, II et al. |
| 9,607,203 | B1 | 3/2017 | Yazdandoost et al. |
| 9,613,246 | B1 | 4/2017 | Gozzini et al. |
| 2003/0102777 | A1 | 6/2003 | Kuniyasu et al. |
| 2003/0109993 | A1 | 6/2003 | Peat et al. |
| 2004/0140735 | A1 | 7/2004 | Scott et al. |
| 2004/0264746 | A1 | 12/2004 | Polcha |
| 2006/0196271 | A1 | 9/2006 | Jancsik et al. |
| 2008/0142571 | A1 | 6/2008 | Yokozuka et al. |
| 2008/0175450 | A1 | 7/2008 | Scott |
| 2009/0167704 | A1 | 7/2009 | Terlizzi et al. |
| 2012/0092026 | A1 | 4/2012 | Liautaud et al. |
| 2013/0015868 | A1 | 1/2013 | Peng |
| 2013/0278111 | A1 | 10/2013 | Sammoura et al. |
| 2014/0275850 | A1 * | 9/2014 | Venkatraman ....... A61B 5/0002 |
| | | | 600/301 |
| 2014/0333328 | A1 | 11/2014 | Nelson et al. |
| 2014/0352440 | A1 | 12/2014 | Fennell et al. |
| 2014/0355381 | A1 | 12/2014 | Lal et al. |
| 2014/0359757 | A1 | 12/2014 | Sezan et al. |
| 2015/0053006 | A1 | 2/2015 | DeCoux et al. |
| 2015/0185898 | A1 | 7/2015 | Masson et al. |
| 2015/0189136 | A1 | 7/2015 | Chung et al. |
| 2015/0192547 | A1 | 7/2015 | Lee et al. |
| 2015/0358740 | A1 | 12/2015 | Tsai et al. |
| 2016/0063300 | A1 | 3/2016 | Du et al. |
| 2016/0117541 | A1 | 4/2016 | Lu et al. |

* cited by examiner

**Exhibit 18**
**-419-**



*100*

FIG. 1A          FIG. 1B

Exhibit 18
-420-



*FIG. 2A*



*FIG. 2B*

Exhibit 18
-421-



*FIG. 3*

**Exhibit 18**
**-422-**



*FIG. 4*

Exhibit 18
-423-



*FIG. 5*

**Exhibit 18**
**-424-**

**U.S. Patent**     Apr. 24, 2018     Sheet 6 of 7     US 9,952,095 B1



600 — RECEIVE CALIBRATION SIGNAL

602 — DEACTIVATE ALL LIGHT SOURCES FOR A SELECT PERIOD OF TIME

604 — ACTIVE SINGLE LIGHT SOURCE FOR A SELECT PERIOD OF TIME

606 — DEACTIVATE ALL LIGHT SOURCES FOR A SELECT PERIOD OF TIME

608 — SELECT NEXT LIGHT SOURCE

*FIG. 6*

Exhibit 18
-425-



*FIG. 7*

Exhibit 18
-426-

US 9,952,095 B1

**1**

# METHODS AND SYSTEMS FOR MODULATION AND DEMODULATION OF OPTICAL SIGNALS

## CROSS-REFERENCE TO RELATED APPLICATION

This application claims the benefit under 35 U.S.C. § 119(e) of U.S. Provisional Patent Application No. 62/057,089, filed on Sep. 29, 2014, and entitled "Methods and Systems for Modulation and Demodulation of Optical Signals," which is incorporated by reference as if fully disclosed herein.

## TECHNICAL FIELD

The present invention relates generally to health monitoring systems, and more particularly to health monitoring devices that include one or more optical sensors.

## BACKGROUND

Health monitoring devices, such as fitness and wellness devices, may be capable of non-invasively measuring a variety of physiological characteristics of a subject via optical sensing. Such health monitoring devices can include a light source and an optical sensor.

The light source can illuminate a portion of a measurement site or even emit light that penetrates beneath the measurement site, such as into the stratum corneum of the skin or into blood vessels beneath the skin. Light from the light source may be scattered, absorbed, and/or reflected throughout the measurement site or the material forming the measurement site, such as the skin. The amount of scatter, absorption, or reflection can depend directly or indirectly on one or more physiological characteristics of the measurement site.

The optical sensor can collect light exiting the measurement site and generate electrical signals corresponding to the collected light, which may be conveyed (in the form of electrical signals) as information or data to the health monitoring device. The health monitoring device can use the optical sensor data to extrapolate, determine, derive, estimate, or measure physiological parameters of the measurement site.

In many cases, the optical sensor data may include noise associated with ambient light, surface conditions of the measurement site (e.g., cleanliness, hair, perspiration, etc.), proximity of the optical sensor and/or light source to the measurement site, and motion artifacts caused by the relative motion between the health monitoring device and the measurement site.

Furthermore, health monitoring devices often have a small form factor and are wearable by a subject for extended periods of time. The constrained proportions of such devices can limit the maximum physical size of the optical sensor and/or light source, effectively restricting the performance of both. For example, smaller light sources may emit less light and smaller optical sensors may detect less light. In addition, as the size of the optical sensor and/or light source decrease, the effects of noise increase. As a result, the accuracy, precision, and/or reliability of the physiological parameters derived from the optical sensor data can decrease with the size of many current health monitoring devices.

Accordingly, there may be a present need for an improved optical sensing system configured for use with a small form factor health monitoring device.

**2**

## SUMMARY

Embodiments described herein may relate to, include, or take the form of an electronic device adapted to measures the optical characteristics, such as reflection or transmission, of a subject.

Embodiments described herein may relate to, include, or take the form of an electronic device including at least a housing with a surface adapted to be positioned proximate a measurement site of a subject, a biometric sensor positioned at least partially within the surface and including at least a plurality of light sources for emitting light toward the measurement site and an optical sensor for obtaining light exiting the measurement site. The electronic device can also include an input amplifier coupled to the output of the biometric sensor, a high pass filter coupled to the output of the input amplifier, an output amplifier coupled to the output of the high pass filter, and an analog to digital converter coupled to the output of the output amplifier.

Further embodiments described herein may relate to, include, or take the form of a sensor system including at least a plurality of light sources for emitting light toward a measurement site of a subject, an optical sensor for obtaining light exiting the measurement site, an input amplifier coupled to the output of the biometric sensor, a high pass filter coupled to the output of the input amplifier, an output amplifier coupled to the output of the high pass filter, and an analog to digital converter coupled to the output of the output amplifier.

Additional embodiments described herein may relate to, include, or take the form of a method of optical sensing, including at least the operations of emitting light toward a measurement site of a subject, obtaining light exiting the measurement site, converting the obtained light to an electrical signal, amplifying the electrical signal to obtain an amplified signal, filtering low frequency elements from the amplified signal to obtain a filtered signal, and amplifying the filtered signal to obtain an output signal.

Other embodiments may include further including at least sampling the output signal to obtain a matrix of samples, and determining product of the matrix of samples with a demodulation matrix to obtain a demodulated matrix. Sampling the output signal to obtain a matrix of samples can include taking a first sample, taking a second sample, taking a third sample, subtracting the average of the first and third sample from the second sample to obtain an output sample, and inserting the output sample into the matrix of samples.

Other embodiments may include a configuration in which light may be emitted toward the measurement site from a plurality of light sources each with a light emitting diode, and light may be obtained exiting by an optical sensor with one of the group consisting of photodiodes, phototransistors, or optical image sensors.

## BRIEF DESCRIPTION OF THE DRAWINGS

Reference will now be made to representative embodiments illustrated in the accompanying figures. It should be understood that the following descriptions are not intended to limit the disclosure to one preferred embodiment. To the contrary, each is intended to cover alternatives, modifications, and equivalents as may be included within the spirit and scope of the described embodiments as defined by the appended claims.

FIG. 1A depicts a top plan view of an example health monitoring device.

Exhibit 18
-427-

US 9,952,095 B1

3

FIG. **1**B depicts a bottom plan view of the health monitoring device of FIG. **1**A, showing apertures associated with an optical sensing system.

FIG. **2**A depicts a detailed cross-section of FIG. **1**B taken along line **2-2**, showing a simplified view of the optical sensing system of FIG. **1**B.

FIG. **2**B depicts the detailed cross-section of FIG. **2**A, showing a set of example light paths from a light source through a measurement site of a subject to an optical sensor of the optical sensing system.

FIG. **3** depicts a simplified signal flow diagram of an optical sensing system.

FIG. **4** depicts a simplified signal flow diagram of amplification and filtering stages of an optical sensing system.

FIG. **5** depicts a simplified signal flow diagram of a demodulation stage of an optical sensing system.

FIG. **6** depicts example operations of a method of calibrating an optical sensing system performed by a light source controller.

FIG. **7** depicts example operations of a method of calibrating an optical sensing system performed by an optical sensor controller.

The use of the same or similar reference numerals in different drawings indicates similar, related, or identical items where appropriate.

DETAILED DESCRIPTION

Embodiments described herein relate to systems and methods for increasing the signal to noise ratio of an optical sensing system configured for use with a small form factor health monitoring device, although the various systems and methods described herein are not limited to particular form factors and can apply equally to larger embodiments. Further, it should be appreciated that the various embodiments described herein, as well as functionality, operation, components, and capabilities thereof may be combined with other elements as necessary, and so any physical, functional, or operational discussion of any element or feature is not intended to be limited solely to a particular embodiment to the exclusion of others.

Any suitable type of electronic device can include health monitoring functionality. Example electronic devices include, but are not limited to, a smart telephone, a headset, a pulse oximeter, a digital media player, a tablet computing device, a timekeeping device, a peripheral input device (e.g., keyboard, mouse, trackpad), and a wearable device. Electronic devices that include health monitoring functionality are generally referred to herein as "health monitoring devices" or "health devices" and the like. Accordingly, it is understood that a health monitoring device as described herein is not necessarily limited to devices configured to only provide health-related information, rather, a health monitoring device may include other functionality as well.

In one embodiment, one or more sensors may be included within the health monitoring device. Sensors utilized by a health monitoring device can vary from embodiment to embodiment. Suitable sensors can include temperature sensors, electrodermal sensors, blood pressure sensors, heart rate sensors, respiration rate sensors, oxygen saturation sensors, plethysmographic sensors, activity sensors, pedometers, blood glucose sensors, body weight sensors, body fat sensors, blood alcohol sensors, dietary sensors, and so on.

Certain sensors can collect certain health-related information non-invasively. For example, a health monitoring device can include a sensor that is configured to measure changes in light absorption of a measurement site of the

4

subject. Such a sensor can be implemented as an active sensing system including a light emitter and a light detector. In one embodiment the sensing system can include a light source for emitting light into a measurement site of a subject and an optical sensor to detect light exiting the measurement site. Light from the light source may be scattered, absorbed, and/or reflected throughout the measurement sight as a function of various physiological parameters or characteristics of the subject. For example, a subject may be a human user and the measurement site may be the user's wrist. In such an example, the tissue of the user's wrist can scatter, absorb, or reflect light emitted by the light source differently depending on various physiological characteristics of the surface and subsurface of the user's wrist. In other examples, a subject can be an animal.

For example, some embodiments may be configured to detect various subsurface events, such as the user's cardiac cycle. More particularly, during each complete heartbeat, a user's subcutaneous tissue can distend and contract, alternatingly increasing and decreasing the light absorption capacity of the measurement site. In these embodiments, the optical sensor can collect light exiting the measurement site and generate electrical signals corresponding to the collected light. Thereafter, the electrical signals can be conveyed as data to the health monitoring device. One may appreciate that such a sensor is conventionally referred to as a photoplethysmographic sensor (hereinafter "PPG sensor").

As noted above, the performance optical sensors such as PPG sensors can be negatively affected by noise associated with ambient light, surface conditions of the measurement site (e.g., cleanliness, hair, perspiration, etc.), proximity of the optical sensor and/or light source to the measurement site, and motion artifacts caused by the relative motion between the health monitoring device and the measurement site. In other words, "environmental noise" can have a substantial impact on the quality of the data obtained by the optical sensor.

Accordingly, many embodiments described herein modulate the light output from the light source and demodulate the light collected by the optical sensors. In this manner, environmental noise can be at least partially prevented from interfering with the operation of the optical sensor. In many embodiments, modulation and demodulation can be implemented by toggling the light source on and off at a particular frequency. Thereafter, the optical sensor can generate electrical signals corresponding to the light collected from the measurement site. In these embodiments, the electrical signals can be demodulated and processed by the health monitoring device.

In many embodiments, the health monitoring device can implement a time-domain noise attenuation operation such as dark-channel subtraction. For example, in some embodiments, a sample can be taken from the optical sensor when it is known that the light source is not emitting light. This sample can be saved as a "dark" sample. Thereafter, a sample can be taken from the optical sensor when it is known that the light source is emitting light. Next, the dark sample can be subtracted from this "light" sample to remove the effects of noise from the light sample. In other words, a dark sample can represent an approximation of the amount of environmental noise at or near the time the dark sample was taken.

In further embodiments, a second dark sample can be taken after the light sample. In such cases, the first and second dark samples can be averaged. The averaged dark sample may be subtracted from the intervening light sample in order to remove the effects of noise from the light sample.

**Exhibit 18**
**-428-**

US 9,952,095 B1

| 5 | 6 |

Although time-domain noise attenuation operations such as dark-channel subtraction may be suitable in certain embodiments for mitigating the effects of certain environmental noise sources, the delays required between "light" samples (e.g., delays where dark samples are required to be taken) can cause undesirable aliasing. In some examples, using dark-channel subtraction may require a reduction in sampling rate, which in turn can increase the number of aliases present in the data output from the optical sensor. In these examples, low frequency aliases may be particularly undesirable.

For example, many physiological signals measurable by a PPG sensor (e.g., respiration, heart rate) are relatively low frequency signals. For example, a healthy user's heart rate may vary from less than one beat per second to only a few beats per second. In other words, a heart rate may be a physiological signal within the frequency band from 0 Hz to 3-4 Hz. Accordingly, low frequency aliasing (as a result of dark-channel subtraction) can interfere with the detection and extraction of low frequency physiological signals, such as heart rate.

Accordingly, certain embodiments described herein implement a filter prior to time-domain noise attenuation. For example, a high pass or a band pass filter can be implemented to attenuate some or all frequencies except frequencies nearby the modulation frequency. In this manner, certain frequencies of environmental noise can be attenuated prior to time-domain noise attenuation operations such as dark-channel subtraction. As a result, low frequency noise sources are attenuated and, accordingly, the negative effects of low frequency aliasing can be reduced.

Although filtering prior to dark-channel subtraction may be suitable in some embodiments for attenuating certain noise sources, the process of filtering with a dynamic filter (such as a band pass or high pass filter) can increase the complexity of demodulating and/or demultiplexing the signal. For example, the time response of a dynamic filter can mix the time-multiplexed signals sent from the light source in time. In other words, dynamic filtering of a signal $S_0$ received at time $t_0$ can cause the signal $S_0$ to interfere with a signal $S_1$ sent at time $t_1$.

Accordingly, embodiments described herein relate to methods and systems for demodulating and demultiplexing signals output from an optical sensor implementing both dynamic filtering and time-domain noise attenuation.

FIG. 1A depicts a top plan view of an example health monitoring device 100. In the illustrated embodiment, the health monitoring device may be implemented as a portable electronic device that is adapted to be worn by a user. Other embodiments can implement the health monitoring device differently. For example, the health monitoring device can be a smart phone, a gaming device, a digital music player, a sports accessory device, a medical device, a device that provides time and/or weather information, a health assistant, and other types of electronic device suitable for attaching to a user.

The health monitoring device can be implemented as a wearable health assistant that provides health-related information (whether real-time or not) to the user, authorized third parties, and/or an associated monitoring device. The wearable health assistant may be configured to provide health-related information or data such as, but not limited to, heart rate data, blood pressure data, temperature data, blood oxygen saturation level data, diet/nutrition information, medical reminders, health-related tips or information, or other health-related data. The associated monitoring device

may be, for example, a tablet computing device, phone, personal digital assistant, computer, and so on.

As another example, the health monitoring device can be configured in the form of a wearable communications device. The wearable communications device may include a processor coupled with or in communication with a memory, one or more sensors, one or more communication interfaces, output devices such as displays and speakers, one or more input devices, and a health monitoring system. The communication interface(s) can provide electronic communications between the communications device and any external communication network, device or platform, such as but not limited to wireless interfaces, Bluetooth interfaces, USB interfaces, Wi-Fi interfaces, TCP/IP interfaces, network communications interfaces, or any conventional communication interfaces. The wearable communications device may provide information regarding time, health, statuses or externally connected or communicating devices and/or software executing on such devices, messages, video, operating commands, and so forth (and may receive any of the foregoing from an external device), in addition to communications.

The health monitoring device 100 includes a housing 102 at least partially surrounding a display 104. In many examples, the display 104 may incorporate an input device configured to receive touch input, force input, and the like and/or output information to a user, such as various health parameters or health-related suggestions. The health monitoring device 100 may also include one or more buttons or input devices (not shown). The housing 102 can form an outer surface or partial outer surface and protective case for the internal components of the health monitoring device 100. In the illustrated embodiment, the housing 102 is formed into a substantially rectangular shape, although this configuration is not required.

The housing 102 can be formed of one or more components operably connected together, such as a front piece and a back piece or a top clamshell and a bottom clamshell. Alternatively, the housing 102 can be formed of a single piece (e.g., uniform body or unibody) operably connected to the display 104.

The display 104 can be implemented with any suitable technology, including, but not limited to, a multi-touch sensing touchscreen that uses liquid crystal display (LCD) technology, light emitting diode (LED) technology, organic light-emitting display (OLED) technology, organic electroluminescence (OEL) technology, or another type of display technology. A button (not shown) might take the form of a home button, which may be a mechanical button, a soft button (e.g., a button that does not physically move but still accepts inputs), an icon or image on the display 104 or on an input region, and so on. Other buttons or mechanisms can be used as input/output devices, such as a speaker, rotary input, a microphone, an on/off button, a mute button, or a sleep button.

The health monitoring device 100 may include one or more health sensors. In some examples, the health sensors can be disposed on a bottom surface 112 of the housing 102. For example, FIG. 1B depicts a bottom plan view of the health monitoring device of FIG. 1A, showing two apertures 114a, 114b associated with an optical sensing system that can be used to obtain health-related information from a user. As noted above, an optical sensing system can include a light source and an optical sensor (not shown). The light source can be disposed within a first aperture 114a and the optical sensor can be disposed within a second aperture 114b. In some embodiments, the light source may fill the first aperture and/or the optical sensor may fill the second

Exhibit 18
-429-

US 9,952,095 B1

7

8

aperture, while in other embodiments optically-transparent windows or covers may seal the light source and optical sensor in their respective apertures. As used herein, the term "optically transparent" and variants thereof does not necessarily mean that the structure is transparent to visible light but instead to the particular wavelength of light emitted by the light source and/or received by the sensor. Thus, some windows may pass infrared light but block visible light and still be optically transparent.

In some examples, and as illustrated, the apertures 114a, 114b the bottom surface 112 of the housing 102 may take a convex shape, although this configuration is not required. In these examples, the apertures 114a, 114b can be formed symmetrically about the apex of the convex curvature of the bottom surface 112. In this manner, the curvature of the housing itself can provide an optical barrier between the light source and the optical sensor. For example, the apex of the convex curvature of the external surface can physically and optically separate the light source from the optical sensor. In other examples, the bottom surface 112 can be flat, faceted, or concave. In further embodiments, the bottom surface 112 can take an arbitrary shape. In some embodiments, the light source and/or optical sensor may be recessed within the apertures such that there is no direct light path between the two.

The apertures 114a, 114b may be separated by a selected distance. The distance between the apertures 114a, 114b can vary from embodiment to embodiment.

FIG. 2A depicts a detailed cross-section of FIG. 1B taken along line 2-2, showing a simplified view of the optical sensing system of FIG. 1B. The optical sensing system includes a light source 116 and an optical sensor 122. In one embodiment the light source 116 may be light emitting diode configured to emit light at a particular frequency. For example, in certain embodiments the light source 116 can be configured to emit green light. In another example, the light source 116 can emit infrared light. In still further examples, the light source 116 can be configured to emit light in another frequency band.

In many embodiments, more than one independent light source can be implemented as the light source 116. For example, certain embodiments can include four light sources within the space reserved for the light source 116. In other embodiments more or fewer light sources can be used. In these and related embodiments, the multiple individual light sources 116 can be configured to illuminate independently or at once. For example, in certain embodiments, individual light sources 116 can be illuminated in a sequence.

The optical sensor 122 can be a photodiode, phototransistor, and/or an optical image sensor such as a charge-coupled device ("CCD") or complementary metal-oxide semiconductor ("CMOS") array.

The light source 116 can be disposed within a cavity 118 that extends to the aperture 114a. In some embodiments, the cavity 118 may have a shorter width than that of the aperture 114a, although this configuration is not required.

A lens 120 or window may seal the cavity 118; the lens 120 need not focus or scatter light in any particular fashion. The lens 120 may be formed from the same material as the bottom surface 112, although this is not required. In one embodiment, the lens 120 can be configured to diffuse light, while in other embodiments it may focus light or may not affect the directionality of light passing therethrough. In some embodiments, the lens 120 may be optically transparent. In still further embodiments, the lens 120 may be configured to exhibit transparency in a first light frequency band and to be opaque in a second light frequency band. For

one example, the first light frequency band can be infrared light and the second light frequency band can be visible light.

As with the light source 116, the optical sensor 122 can be disposed within a cavity 124 and below another window or lens 126. As with the lens 120, the lens 126 can be configured to diffuse light. In other embodiments, the lens 126 may be optically transparent, or may be shaped to focus light to a particular focal point (or not). In still further embodiments, the lens 126 may be configured to exhibit transparency in a first light frequency band and to be opaque in a second light frequency band. For one example, the first light frequency band can be infrared light and the second light frequency band can be visible light.

FIG. 2B depicts a second cross-section like that of FIG. 2A, now showing a set of example light paths from a light source through a measurement site 110 of a subject to an optical sensor of the optical sensing system. As illustrated, light emitted from the light source 116 passes into an illumination area 130 of the measurement site 110, through an intermediate volume 128 of the measurement site 110, to a collection area 132 of the measurement site 110, and, thereafter, exits the collection area 132 where it may be collected by the optical sensor 122 and conveyed to the health monitoring device 102. In many embodiments, the subject may be a human user.

As illustrated, a portion of the light emitted from the light source 116 may not exit the intermediate volume 128 through the collection area 132. For example, some light may continue transmitting in a direction parallel to the length of the intermediate volume 128. In addition, some light can transmit in directions away from the collection area 132. In addition, some light can be absorbed within the intermediate volume collection area 132, depicted in FIG. 2B as point-terminated lines. Accordingly, the quantity of light received by the optical sensor 122 may be less than the quantity of light emitted by the light source 116.

FIG. 3 depicts a simplified signal flow diagram of an optical sensing system. An optical sensing system can include a light source controller 300 that is coupled to one or more light sources 302. The light source controlled 300 can be implemented as a microprocessor, integrated circuit, with discrete circuitry, or using any other suitable technique. The light source controller 300 can be configured to control the power state, brightness, and/or color of the light emitted by the one or more light sources 302. For example, in some embodiments the light source(s) 302 can include a light configured to emit green light and a second light configured to emit infrared light. In such an embodiment, the light source controller 300 can alternately illuminate the green light and the infrared light. In another example, the light source controller 300 can illuminate the green light and the infrared light at the same time.

The optical sensing system of FIG. 3 can also include an optical sensor controller 306 that is configured to receive output from the one or more optical sensors 308. The optical sensors 308 can receive light from the light source 302 that has reflected or transmitted through a measurement site 310 of a subject. In many embodiments, the subject may be a human user.

The optical sensor controller 306 can be implemented as a microprocessor, integrated circuit, with discrete circuitry, or using any other suitable technique. The optical sensor controller 306 can also be coupled to the light source controller 300. In many examples, the optical sensor controller 306 can use information provided by the light source controller 300. For example, in one embodiment, the light

Exhibit 18
-430-

US 9,952,095 B1

**9**

source controller **300** can inform the optical sensor controller **306** that the light source controller **300** is not illuminating any of the light sources **302**. Alternatively, the light source controller **300** can inform the optical sensor controller **306** that the light source controller **300** is illuminating a particular light source **302**.

In some embodiments described herein, the optical sensor controller **306** can implement one or more operations in an attempt to attenuate environmental noise. In one embodiment, the optical sensor controller **306** can implement a dark-channel subtraction operation. As described above, a dark-channel subtraction operation can take a sample output from an optical sensor **308** when the light source is not illuminated in order to determine the amount of ambient light received by the sensor when the light sources are "dark." Shortly thereafter, a light source **302** can be illuminated and another sample can be taken. Next, the "dark" sample can be subtracted from the "light" sample.

The optical sensor controller **306** can implement the dark-channel subtraction operation with assistance from the light source controller **300**. For example, the light source controller **300** can inform the optical sensor controller **306** when light sources are on or off. In alternate embodiments, the optical sensor controller **306** can direct the light source controller **300** to turn particular light sources **302** on or off.

In further embodiments, the light source controller **300** and/or the optical sensor controller **306** can be implemented as software instructions to be executed by a processor associated with a health monitoring device.

FIG. **4** depicts a simplified signal flow diagram of amplification and filtering stages of an optical sensing system. In the illustrated embodiment, the optical sensor **400** can receive light. In many examples, the light may be transmitted from a light source associated with the optical sensing system, but, as noted above, additional environmental light can be received by the optical sensor as well.

After the light is received by the optical sensor **400**, the optical sensor **400** may convert the light into analog electrical signals. In many examples, the optical sensor **400** can be a photodiode. Next, the analog electrical signal can be received by a transimpedance amplifier at **402**. In many examples, a transimpedance amplifier can be suitable to convert the current output from a photodiode to a usable voltage. In such examples, measuring the current changes through a photodiode may be preferable to measuring the voltage changes across a photodiode because current may vary more linearly with changes in light than voltage. In one embodiment, the photodiode can be zero biased. In other examples the photodiode can be reverse biased.

After the analog electrical signal is amplified by the transimpedance amplifier **402**, the amplified analog electrical signal can be passed through a high pass filter at **404**. As noted with respect to embodiments described above, a high pass filter can be useful to remove low frequency components within the electrical signal that might otherwise interfere with detection of low frequency physiological parameters such as heart rate.

As noted above, the cutoff frequency of the high pass filter **404** can be selected to be below the frequency of modulation of light expected from the light source. For example, if the light source is modulating at 1 KHz, the cutoff frequency of the high pass filter can be 750 Hz. In other embodiments, the cutoff frequency can be closer or father away from the modulation frequency.

In other examples, the filter can be implemented as a band pass filter. For example, if the light source is modulating light at 1 KHz, a band pass filter can have a lower cutoff at

**10**

750*z* and a high cutoff at 1.25 KHz. In other examples, different cutoff frequencies can be used.

In many examples, the filter can also remove direct current biases present within the signal.

After the signal is filtered by the high pass filter **404**, it can be passed to a programmable gain amplifier at **406** and thereafter to an analog to digital converter at **408**. The programmable gain amplifier **406** can increase the dynamic range of the optical sensor. For example, certain users may have darker skin than other users. Accordingly, the amount of light absorbed by the measurement site can vary from person to person. In these embodiments, the programmable gain amplifier **406** can be adjusted on a per-user basis in order to provide the maximum signal to the analog to digital converter **408**.

In other examples, the gain of the programmable gain amplifier **406** can be based, at least in part, on feedback from the analog to digital converter **408**. For example, if the analog to digital converter **408** determines that the average signal output from the programmable gain amplifier **406** is too low, then the analog to digital converter **408** can cause the programmable gain amplifier **406** to increase gain by a certain amount. In other examples, if the analog to digital converter **408** determines that the average signal output from the programmable gain amplifier **406** is too high (e.g., clipping is detected), then the analog to digital converter **408** can cause the programmable gain amplifier **406** to decrease gain by a certain amount.

FIG. **5** depicts a simplified signal flow diagram of a demodulation stage of an optical sensing system. In the illustrated embodiment, a digital signal can be received and sampled into a matrix at **502**. Thereafter at **504**, the matrix can be multiplied by a demodulation matrix in order to obtain a substantially noise-free measurement of the physiological parameters of a measurement site.

A demodulation matrix can be calculated in a number of ways. For example, in certain embodiments, a demodulation matrix can be fixed. In other embodiments, a different demodulation matrix can be selected depending upon particular environmental conditions. In still further embodiments, a plurality of demodulation matrices can be iterated through in order to determine which demodulation matrix obtains the highest quality output signal.

In still further embodiments, a demodulation matrix can be calculated dynamically and/or during a calibration procedure. For example, as with other embodiments described herein, an optical sensing system can have a plurality of light sources, a measurement site, and an optical sensor.

In many embodiments, the light sources can output modulated light. For example, if an embodiment is implemented with four light sources, a single light source can be illuminated at a time. Once all light sources have been illuminated, the cycle can repeat. In other words, the output of light from a light sensor may be periodic with period T, sampled for k periods. The function can be modeled as:

$$x(t)=x(t+kT) \qquad \text{Equation 1}$$

In one example, the function x(t) may be the light as it reaches the measurement site. In other words, light that has been affected by physiological parameters of the measurement site, but that is not yet accompanied or affected by environmental noise. As noted above, the light may pass through the measurement site and may be joined by other noise sources. In other words, the light can pass through a linear time invariant system having an unknown impulse. Such a function can be modeled as H(t). Accordingly, once the light reaches the optical sensor, it may have been affected

Exhibit 18
-431-

US 9,952,095 B1

**11**

by the linear time invariant system. In other words, the light that reaches the sensor y(t) can be modeled as the convolution of x(t)*H(t):

$$y(t) = \int_{-\infty}^{\infty} H(\tau)x(t-\tau)d\tau = y(t+kT) \qquad \text{Equation 2}$$

However, as noted above, in some embodiments, multiple light sources can be used. Accordingly, the original signal x(t) can be represented by a sum of n individual signals, each having a unique scaling factor $\alpha$ associated with it:

$$x(t) = \Sigma_{i=1}{}^{n}\alpha_i(t)x_i(t) \qquad \text{Equation 3}$$

Because light noise may not be modulated at the modulated frequency, the scaling factors may $\alpha$ vary and/or correspond to the physiological parameters of the measurement site.

In many embodiments, it can follow from Equation 3 that the scaling factors can pass through the linear time invariant system H(t), to be directly measured when measuring y(t):

$$y(t) = \Sigma_{i=1}{}^{n}\alpha_i(t)y_i(t) \qquad \text{Equation 4}$$

In other words, the measured signal y(t), may be composed of a number of individual signals $y_i(t)$; once the individual signals $y_i(t)$ can be demultiplexed and demodulated, the individual scaling factors, and thus the physiological parameters of the measurement site, can be determined.

In certain embodiments, various assumptions can assist in demuxing and demodulating the signal y(t). For example, by turning on a single light source and/or turning of all light sources, the signal x(t) can be computationally simplified. Also, in embodiments directed to detecting low frequency physiological signals such as heart rate, it can be assumed that the scaling factors do not change between samples of particularly high sampling rates.

Also as noted above, dark-channel subtraction may be implemented while demodulating to attempt to remove as much noise as possible before further signal processing. For example, a demodulated signal $z_j(k)$ can be formed from synchronous samples of y(t) at individual time instances $\tau_j$. In sync with sampling, the light source can turn on and off at known rate. In this manner, time instances $\tau_j$ can fall immediately between dark periods of a light source. In other words, a dark sample can be taken at $\tau_j - \Delta_j$ and another dark sample can be taken at $\tau_j + \Delta_j$. Between the dark samples, at $\tau_j$, a "light" sample can be taken. The dark channel subtraction can be modeled as:

$$z_j(k) = \qquad \text{Equation 5}$$
$$y(t_0 + kT + \tau_j) - \frac{y(t_0 + kT + \tau_j - \Delta_j) + y(t_o + kT + \tau_j + \Delta_j)}{2}$$

In many embodiments, the demodulated signal $z_j(k)$ can include m samples. In other words, Equation 5 can be defined from j=1 . . . m.

As noted above, individual light sources can be turned on or off. Accordingly, in some embodiments, one light source i may be turned on a time to simplify the calculation of demodulation. More specifically, a demodulated signal $z_j(k)$ that relates specifically to one light source i can be modeled as:

$$z_{j,i}(k) = \alpha_i(t)y_i(t) \qquad \text{Equation 6}$$

Which in turn can be modeled as:

$$z_{j,i}(k) = \alpha_i(t_0 + kT + \tau_j)\omega_{j,i} \qquad \text{Equation 7}$$

**12**

Where:

$$\omega_{j,i} = \qquad \text{Equation 8}$$
$$y(t_0 + kT + \tau_j) - \frac{y(t_0 + kT + \tau_j - \Delta_j) + y(t_0 + kT + \tau_j + \Delta_j)}{2}$$

In order to simplify the calculation, some embodiments can utilize the presumption that because the Equations 1-8 are time invariant, then $t_0$=0. In some embodiments, the simplified calculation can be modeled as:

$$z_{j,i}(k) = \alpha_i(kT + \tau_j)\omega_{j,i} \qquad \text{Equation 9}$$

Where:

$$\omega_{j,i} = y(\tau_j) - \frac{y(\tau_j - \Delta_j) + y(\tau_j + \Delta_j)}{2} \qquad \text{Equation 10}$$

Accordingly, in certain embodiments, the dark-channel subtraction demodulation operation can be accomplished by calculating $\omega_{j,i}$. In other words, because $z_{j,i}(k)$ is measureable, the only unknowns in Equation 9 are, generally speaking, $\omega_{j,i}$ and $\alpha_i(kT + \tau_j)$. However, after the demodulation process, one may appreciate that demultiplexing may still be required.

Accordingly, certain embodiments may attempt to estimate $\omega_{j,i}$. For example, all individual light sources i=1 . . . n can be demultiplexed as described above with respect to the examples of Equations 5-10. In such embodiments, an individual light source can be illuminated while all other light sources are turned off, and the light source can be sampled a certain number of times. As described above, each "sample" can actually constitute three samples; two "dark" samples can be averaged and subtracted from a single "light" sample. Once m samples are taken of the selected light source, the next light source can be selected.

For example, lights sources i=1 . . . n can be sampled with samples j=1 . . . m, and thus all measured results can be modeled as a matrix:

$$Z(k) = \begin{bmatrix} z_{1,1} & \cdots & z_{1,m} \\ \vdots & \ddots & \vdots \\ z_{n,1} & \cdots & z_{n,m} \end{bmatrix} \qquad \text{Equation 11}$$

Correspondingly, the demodulation values can be modeled as a matrix:

$$W = \begin{bmatrix} \omega_{1,1} & \cdots & \omega_{1,m} \\ \vdots & \ddots & \vdots \\ \omega_{n,1} & \cdots & \omega_{n,m} \end{bmatrix} \qquad \text{Equation 12}$$

One may note that the demodulation values does not vary with k. In addition, the scalar coefficients can be modeled as a matrix:

$$A(k) = \begin{bmatrix} \alpha_{1(kT)} & \cdots & 0 \\ \vdots & \ddots & \vdots \\ 0 & \cdots & \alpha_{n(kT)} \end{bmatrix} \qquad \text{Equation 13}$$

Exhibit 18
-432-

US 9,952,095 B1

**13**

Alternatively, some embodiments can model the system as the matrix equation, presuming that W is full rank and that n=m:

$$Z(k)=A(k)W \hspace{2cm} \text{Equation 14}$$

Thus, in order to calculate the scaling factors A(k), given only the measured values from the optical sensor, Z(k), some embodiments utilize the simplification:

$$A(k)=Z(k)W^{-1} \hspace{2cm} \text{Equation 15}$$

In this configuration, the matrix $W^{-1}$ represents demultiplexing constants.

However, in many embodiments, Equation 15 is only useful once and unless the demultiplexing values are known and/or estimated. Accordingly, in some embodiments, an initial matrix of $A_{init}$ can be supplied. For example, an identity matrix may be used in certain embodiments:

$$A_{init} = \begin{bmatrix} 1 & \dots & 0 \\ \vdots & \ddots & \vdots \\ 0 & \dots & 1 \end{bmatrix} \hspace{1cm} \text{Equation 16}$$

In other embodiments, an initial matrix of $A_{init}$ can be supplied from the diagonal of the measured matrix Z(k). For example, an identity matrix may be used in certain embodiments:

$$A_{init} = \begin{bmatrix} z_{1,1} & \dots & 0 \\ \vdots & \ddots & \vdots \\ 0 & \dots & z_{n,m} \end{bmatrix} \hspace{1cm} \text{Equation 17}$$

Thus, in some embodiments, by multiplying the matrix inverse of the measured values $Z(k)^{-1}$ with the initial matrix $A_{init}$, a first estimation of the demultiplexing constants $W^{-1}$ can be calculated. For example:

$$A_{init}Z(k)^{-1}=W^{-1} \hspace{2cm} \text{Equation 18}$$

In some embodiments, the demultiplexing constants can be calculated and averaged with previous demultiplexing constants. After a sufficient number of calculations of the demultiplexing constants, returning to FIG. 5, a sampled signal matrix at 502 can be multiplied by a demultiplexing matrix at 504 to obtain scalar constants corresponding to physiological parameters of the measurement area.

FIG. 6 depicts example operations of a method of calibrating an optical sensing system performed by a light source controller. The method can begin at operation 600 in which a light source controller receives a calibration signal. Next at 602, all lights controlled by the light source controller can be turned off for a selected period of time. In many examples, operation 602 may be a first "dark" sample collection period of a dark-channel subtraction process. Next at 604, one individual light can be turned on for a selected period of time. In many examples, operation 605 may be the "light" sample of a dark-channel subtraction process. Next at 606, all lights controlled by the light source controller can be turned off for another selected period of time. In many embodiments, operation 606 can be a second "dark" sample collection period of a dark-channel subtraction process. Lastly at operation 608, the method can cycle back to operation 602 after selecting the next light source to illuminate individually.

**14**

The order in which lights are illuminated can vary from embodiment to embodiment. For example, certain embodiments may illuminate adjacent lights sequentially. In other examples, a random or pseudorandom illumination pattern can be used.

FIG. 7 depicts example operations of a method of calibrating an optical sensing system performed by an optical sensor controller. The method can begin at operation 700 in which a calibration signal is sent by an optical sensor controller to a light source controller. Next at operation 702, a demultiplexing matrix can be determined and/or estimated. For example, as described with respect to FIG. 5. The method can continue to operation 704 at which a number of calculated demultiplexing matrices are calculated and averaged. The method can conclude at operation 706 during which the average demultiplexing matrix is saved for future use.

For example, a saved demultiplexing matrix can be used in conjunction with Equation 15, modified to account for all light sources being active:

$$[\alpha_1(kT) \dots \alpha_n(kT)]=[z_1(kT) \dots z_n(kT)]W^{-1} \hspace{1cm} \text{Equation 19}$$

Many embodiments of the foregoing disclosure may include or may be described in relation to various methods of operation, use, manufacture, and so on. Notably, the operations of methods presented herein are meant only to be exemplary and, accordingly, are not necessarily exhaustive. For example an alternate operation order, or fewer or additional steps may be required or desired for particular embodiments.

The foregoing description, for purposes of explanation, used specific nomenclature to provide a thorough understanding of the described embodiments. However, it will be apparent to one skilled in the art that the specific details are not required in order to practice the described embodiments. Thus, the foregoing descriptions of the specific embodiments described herein are presented for purposes of illustration and description. They are not meant to be exhaustive or to limit the embodiments to the precise forms disclosed. It will be apparent to one of ordinary skill in the art that many modifications and variations are possible in view of the above teachings. In particular, any features described with respect to one embodiment may also be used in other embodiments, where compatible. Likewise, the features of the different embodiments may be exchanged, substituted, or omitted where compatible and appropriate.

We claim:

1. An electronic device comprising:
   a housing comprising a surface adapted to be positioned proximate a measurement site of a subject;
   a biometric sensor positioned at least partially within the surface and comprising:
      a plurality of light sources for emitting light toward the measurement site at a selected modulation frequency; and
      an optical sensor for obtaining light exiting the measurement site; and
   an input amplifier coupled to the output of the biometric sensor and disposed within the housing;
   a high pass filter coupled to an output of the input amplifier and disposed within the housing, the high pass filter having a cutoff frequency above that of a periodic biometric property of the measurement site;
   an output amplifier coupled to an output of the high pass filter and disposed within the housing; and
   an analog to digital converter coupled to an output of the output amplifier and disposed within the housing.

Exhibit 18
-433-

US 9,952,095 B1

**15**

**2**. The electronic device of claim **1**, wherein:

each light source of the plurality of light sources comprises a light emitting diode; and

the optical sensor comprises one of the group consisting of photodiodes, phototransistors, or optical image sensors.

**3**. The electronic device of claim **1**, wherein the input amplifier comprises a transimpedance amplifier.

**4**. The electronic device of claim **1**, wherein the output amplifier comprises a programmable gain amplifier.

**5**. The electronic device of claim **1**, further comprising a processor coupled to the output of the analog to digital converter.

**6**. The electronic device of claim **1**, wherein the processor is configured to control each of the plurality of light sources of the biometric sensor.

**7**. The electronic device of claim **6**, wherein the biometric sensor further comprises a measurement mode and a calibration mode.

**8**. The electronic device of claim **7**, wherein the calibration mode comprises:

deactivating all light sources for a selected time period;

activating a first light source of the plurality of light sources for a selected time period; and

deactivating all light sources for a selected time period.

**9**. A sensor system for measuring a periodic biometric characteristic of a subject, the sensor system comprising:

a plurality of light sources operative to emit a series light pulses at a selected modulation frequency toward a measurement site of the subject;

an optical sensor operative to receive light exiting a portion of the measurement site, the light originating from the series of light pulses;

a transimpedance input amplifier coupled to the output of the optical sensor;

a high pass filter coupled to the transimpedance input amplifier and configured to filter frequencies lower than the selected modulation frequency;

an output amplifier coupled of the high pass filter and configured to amplify an output of the high pass filter; and

an analog to digital converter coupled to the output amplifier configured to associate a signal amplitude of the output amplifier with a digital value.

**10**. The sensor system of claim **9**, wherein:

each of the light source of the plurality of light sources comprises a light emitting diode configured to emit light at a selected frequency; and

the optical sensor comprises one of the group consisting of photodiodes, phototransistors, and optical image sensors.

**11**. The sensor system of claim **9**, wherein the input amplifier comprises a transimpedance amplifier; and

the output amplifier comprises a programmable gain amplifier.

**16**

**12**. The sensor system of claim **9**, wherein:

a first subset of the plurality of light sources comprises a plurality of light emitting diodes configured to emit light at a first selected frequency; and

a second subset of the plurality of light sources comprises a plurality of light emitting diodes configured to emit light at a second selected frequency;

wherein when the first subset is emitting light the second subset is prevented from emitting light.

**13**. The sensor system of claim **9**, further comprising a processor coupled to the output of the analog to digital converter.

**14**. The sensor system of claim **9**, wherein the processor is configured to control the modulation of at least one of the light sources of the plurality of light sources.

**15**. The sensor system of claim **14**, wherein the biometric sensor further comprises a measurement mode and a calibration mode.

**16**. The electronic device of claim **15**, wherein the calibration mode comprises:

deactivating all light sources for a selected time period;

activating a first light source of the plurality of light sources for a selected time period; and

deactivating all light sources for a selected time period.

**17**. A method of optical sensing, comprising:

emitting light toward a measurement site of a subject at a selected modulation frequency;

obtaining light exiting the measurement site;

converting the obtained light to an electrical signal;

amplifying the electrical signal to obtain an amplified signal;

filtering low frequency components below the selected modulation frequency from the amplified signal to obtain a filtered signal; and

amplifying the filtered signal to obtain an output signal.

**18**. The method of claim **17**, further comprising:

sampling the output signal to obtain a matrix of samples; and

determining product of the matrix of samples with a demodulation matrix to obtain a demodulated matrix.

**19**. The method of claim **18**, wherein sampling the output signal to obtain a matrix of samples comprises:

taking a first sample;

taking a second sample;

taking a third sample;

subtracting the average of the first and third sample from the second sample to obtain an output sample; and

adding the output sample the matrix of samples.

**20**. The method of claim **17**, wherein:

light is emitted toward the measurement site from a plurality of light sources each comprising a light emitting diode; and

light is obtained exiting by an optical sensor comprising one of the group consisting of photodiodes, phototransistors, or optical image sensors.

\*   \*   \*   \*   \*

Exhibit 18
-434-

# EXHIBIT 19

US009723997B1

(12) **United States Patent**
Lamego

(10) Patent No.: **US 9,723,997 B1**
(45) Date of Patent: **Aug. 8, 2017**

(54) **ELECTRONIC DEVICE THAT COMPUTES HEALTH DATA**

(71) Applicant: **Apple Inc.**, Cupertino, CA (US)

(72) Inventor: **Marcelo M. Lamego**, Cupertino, CA (US)

(73) Assignee: **Apple Inc.**, Cupertino, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 44 days.

(21) Appl. No.: **14/617,422**

(22) Filed: **Feb. 9, 2015**

**Related U.S. Application Data**

(60) Provisional application No. 62/056,299, filed on Sep. 26, 2014.

(51) **Int. Cl.**
| | |
|---|---|
| *A61B 5/0205* | (2006.01) |
| *A61B 5/1455* | (2006.01) |
| *A61B 5/0402* | (2006.01) |
| *A61B 5/00* | (2006.01) |
| *A61B 5/021* | (2006.01) |
(Continued)

(52) **U.S. Cl.**
CPC .......... *A61B 5/0205* (2013.01); *A61B 5/0402* (2013.01); *A61B 5/14551* (2013.01); *A61B 5/6898* (2013.01); *A61B 5/70* (2013.01); *A61B 5/7203* (2013.01); *A61B 5/742* (2013.01); *A61B 5/7405* (2013.01); *A61B 5/7455* (2013.01); *A61B 5/021* (2013.01); *A61B 5/0261* (2013.01); *A61B 5/02416* (2013.01); *A61B 5/0537* (2013.01)

(58) **Field of Classification Search**
CPC . A61B 5/0205; A61B 5/0402; A61B 5/14551; A61B 5/6898
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,486,386 B1 * | 2/2009 | Holcombe | G01C 3/08 356/4.01 |
| 7,915,601 B2 | 3/2011 | Setlak et al. | |
(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 2001145607 | 5/2001 |
| WO | WO 2015/030712 | 3/2015 |

OTHER PUBLICATIONS

Ohgi et al., "Stroke phase discrimination in breaststroke swimming using a tri-axial acceleration sensor device," *Sports Engineering*, vol. 6, No. 2, Jun. 1, 2003, pp. 113-123.
(Continued)

*Primary Examiner* — Paula J Stice
(74) *Attorney, Agent, or Firm* — Brownstein Hyatt Farber Schreck, LLP

(57) **ABSTRACT**

An electronic device includes a camera, an ambient light sensor, and a proximity sensor. The electronic device uses one or more of the camera and the proximity sensor to emit light into a body part of a user touching a surface of the electronic device and one or more of the camera, the ambient light sensor, and the proximity sensor to receive at least part of the emitted light reflected by the body part of the user. The electronic device computes health data of the user based upon sensor data regarding the received light. In some implementations, the electronic device may also include one or more electrical contacts that contact one or more body parts of the user. In such implementations, the health data may be further computed based on the an electrical measurement obtained using the electrical contacts.

**21 Claims, 7 Drawing Sheets**



**Exhibit 19**
**-435-**

**US 9,723,997 B1**

Page 2

(51) **Int. Cl.**
*A61B 5/024* (2006.01)
*A61B 5/026* (2006.01)
*A61B 5/053* (2006.01)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 2008/0167834 A1* | 7/2008 | Herz ..................... G06F 1/3203 |
| | | 702/150 |
| 2011/0015496 A1 | 1/2011 | Sherman et al. |
| 2013/0072145 A1 | 3/2013 | Dantu |
| 2013/0215042 A1* | 8/2013 | Messerschmidt ....... G06F 3/041 |
| | | 345/173 |
| 2013/0310656 A1* | 11/2013 | Lim ..................... A61B 5/6898 |
| | | 600/301 |
| 2014/0160314 A1* | 6/2014 | Schatvet ................ H04N 7/142 |
| | | 348/223.1 |
| 2014/0275832 A1* | 9/2014 | Muehlsteff ........... A61B 5/0205 |
| | | 600/301 |

OTHER PUBLICATIONS

Zijlstra et al., "Assessment of spatio-temporal gait parameters from trunk accelerations during human walking," *Gait & Posture,* vol. 18, No. 2, Oct. 1, 2003, pp. 1-10.

* cited by examiner

Exhibit 19
-436-



**FIG. 1**

**Exhibit 19**
**-437-**



*FIG. 2*

Exhibit 19
-438-



**FIG. 3**

Exhibit 19
-439-

**U.S. Patent**     Aug. 8, 2017     Sheet 4 of 7     US 9,723,997 B1



*FIG. 4*

Exhibit 19
-440-



500

| | |
|---|---|
| USE AT LEAST ONE OF CAMERA AND A PROXIMITY SENSOR TO EMIT LIGHT INTO A BODY PART OF A USER TOUCHING A SURFACE OF THE DEVICE | 501 |
| USE AT LEAST ONE OF THE CAMERA, AN AMBIENT LIGHT SENSOR, OR THE PROXIMITY SENSOR TO RECEIVE AT LEAST PART OF THE EMITTED LIGHT REFLECTED BY THE BODY PART OF THE USER | 502 |
| COMPUTE HEALTH DATA OF THE USER BASED AT LEAST UPON SENSOR DATA REGARDING THE RECEIVED LIGHT | 503 |
| PROVIDE THE COMPUTED HEALTH DATA FOR THE USER | 504 |

*FIG. 5*

**Exhibit 19**
-441-

U.S. Patent          Aug. 8, 2017          Sheet 6 of 7          US 9,723,997 B1



600

| DETECT, UTILIZING A CAMERA, A PROFILE OF A BODY PART OF A USER CONTACTING THE CAMERA | 601 |

| USE THE PROFILE, IF THE BODY PART IS MISALIGNED WITH A COMBINATION OF THE CAMERA, AN AMBIENT LIGHT SENSOR, AND A PROXIMITY SENSOR FOR PURPOSES OF OBTAINING HEALTH DATA FOR THE USER | 602 |

| PROVIDE GUIDANCE TO CORRECT THE MISALIGNMENT | 603 |

*FIG. 6*

Exhibit 19
-442-



**FIG. 7**

Exhibit 19
-443-

US 9,723,997 B1

**1**

## ELECTRONIC DEVICE THAT COMPUTES HEALTH DATA

### CROSS-REFERENCE TO RELATED APPLICATION

This application claims the benefit under 35 U.S.C. §119 (e) of U.S. Provisional Patent Application No. 62/056,299, filed on Sep. 26, 2014, and entitled "Electronic Device that Computes Health Data," which is incorporated by reference as if fully disclosed herein.

### TECHNICAL FIELD

This disclosure relates generally to health data, and more specifically to an electronic device that computes health data

### BACKGROUND

It may be beneficial for a user to have information about his or her health data, including fitness data and wellness data. For example, health data may indicate emergency conditions or to enable the user to maximize fitness or wellness activities. Traditionally, health data is provided to users by health care professionals. However, it may be beneficial for users to have more access to health data.

### SUMMARY

The present disclosure discloses systems, apparatuses, and methods related to an electric device that computes health data. An electronic device may include a camera, an ambient light sensor, and a proximity sensor. The electronic device may use one or more of the camera and the proximity sensor to emit light into a body part of a user touching a surface of the electronic device and one or more of the camera, the ambient light sensor, and the proximity sensor to receive at least part of the emitted light reflected by the body part of the user. The electronic device may compute health data of the user based upon sensor data regarding the received light. In some implementations, the electronic device may also include one or more electrical contacts that contact one or more body parts of the user. In such implementations, the health data may be further computed based on the an electrical measurement obtained using the electrical contacts.

In some implementations, the electronic device may utilize the camera to determine the user's body part is misaligned with the camera, the ambient light sensor, and the proximity sensor for purposes of detecting the information about the body part of the user. In such implementations, the electronic device may provide guidance to correct the misalignment.

In various embodiments, a mobile personal computing device may include a camera, an ambient light sensor, a proximity sensor, and a processing unit communicatively coupled to the camera, the ambient light sensor, and the proximity sensor. The processing unit may be configured to: use at least one of camera and a proximity sensor to emit light into a body part of a user touching a surface of the mobile personal computing device; use at least one of the camera, an ambient light sensor, or the proximity sensor to receive at least part of the emitted light reflected by the body part of the user and generate sensor data; and computing health data of the user, utilizing the processing unit, using at least the sensor data regarding the received light.

**2**

In some embodiments, a method for using a mobile personal computing device to obtain health data may include: using at least one of camera and a proximity sensor to emit light into a body part of a user touching a surface of the device; using at least one of the camera, an ambient light sensor, or the proximity sensor to receive at least part of the emitted light reflected by the body part of the user and generate sensor data; and computing health data of the user, utilizing the processing unit, using at least the sensor data regarding the received light.

In one or more embodiments, a method for guiding use of a mobile personal computing device to obtain health data may include: detecting, utilizing a camera, a profile of a body part of a user contacting the camera; determining, using the profile, if the body part is misaligned with a combination of the camera, an ambient light sensor, and a proximity sensor for purposes of obtaining health data for the user; and providing guidance to correct the misalignment.

In various embodiments, a computer program product including a non-transitory storage medium may include a first set of instructions, stored in the non-transitory storage medium, executable by at least one processing unit to use at least one of a camera and a proximity sensor to emit light into a body part of a user touching a surface of a mobile personal computing device; a second set of instructions, stored in the non-transitory storage medium, executable by the least one processing unit to use at least one of the camera, an ambient light sensor, or the proximity sensor to receive at least part of the emitted light reflected by the body part of the user and generate sensor data; and a third set of instructions, stored in the non-transitory storage medium, executable by the least one processing unit to compute health data of the user using at least the sensor data regarding the received light.

It is to be understood that both the foregoing general description and the following detailed description are for purposes of example and explanation and do not necessarily limit the present disclosure. The accompanying drawings, which are incorporated in and constitute a part of the specification, illustrate subject matter of the disclosure. Together, the descriptions and the drawings serve to explain the principles of the disclosure.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is an isometric view an example system for obtaining health data utilizing an electronic device.

FIG. **2** illustrates the view of FIG. **1** while the example system is being utilized to obtain health data.

FIG. **3** illustrates the view of FIG. **2** while the example system is providing guidance to obtain health data.

FIG. **4** illustrates the view of FIG. **2** while the example system is providing the obtained health data.

FIG. **5** is a flow chart illustrating an example method for using an electronic device to obtain health data. This method may be performed by the system of FIG. **1**.

FIG. **6** is a flow chart illustrating an example method for guiding use of an electronic device to obtain health data. This method may be performed by the system of FIG. **1**.

FIG. **7** is a block diagram illustrating functional relationships among components of the example system of FIG. **1**.

### DETAILED DESCRIPTION

The description that follows includes sample systems, apparatuses, and methods that embody various elements of

Exhibit 19
-444-

US 9,723,997 B1

**3**

the present disclosure. However, it should be understood that the described disclosure may be practiced in a variety of forms in addition to those described herein.

The present disclosure details systems, apparatuses, and methods related to an electric device that computes health data. An electronic device (such as a smart phone, tablet computer, mobile computer, digital media player, wearable device, or other electronic device) may include a camera, an ambient light sensor, and a proximity sensor. The electronic device may use one or more of the camera and the proximity sensor to emit light into a body part of a user (such as a finger, and ear, and so on) touching a surface of the electronic device. The electronic device may use one or more of the camera, the ambient light sensor, and the proximity sensor to receive at least part of the emitted light reflected by the body part of the user. The electronic device may compute health data of the user based upon sensor data regarding the received light. In this way, the health data of the user may be detected utilizing an electronic device including a camera, ambient light sensor, and proximity sensor without making the user obtain access to a dedicated fitness and/or wellness device.

In various implementations, the camera, ambient light sensor, and proximity sensor may be positioned such that they are all at least partially covered (and/or contacted) by the user's body part at the same time, such as when the health data is computed. In one or more implementations, the electronic device may also include electrical contacts. The health data of the user may also be computed using an electrical measurement obtained using from the electrical contacts. In some examples of such implementations, the electrical contacts may be positioned to contact the body part of the user and an additional body part such that electrical measurement represents the electrical properties of organs or portions of the body located between the two contacting body parts. In some embodiments, the two body parts are the user's left and right hands and the electrical measurement corresponds to an electrical property that is measured across the user's chest.

In some implementations, the electronic device may utilize the camera to determine the user's body part is misaligned with the camera, the ambient light sensor, and the proximity sensor for purposes of detecting the information about the body part of the user. In such implementations, the electronic device may provide guidance (such as visual, audio, haptic, and/or other guidance) to correct the misalignment. The information from the camera may be utilized to detect this misalignment even in implementations where the camera is configured with a focal distance greater than a distance between the camera and the user's body part when the user's body part is touching the surface of the electronic device.

In various implementations, the proximity sensor may be a multiple light wavelength sensor (such as a sensor that utilizes infrared and visible light, infrared and red light, and so on). In some implementations, the ambient light sensor may be a silicon ambient light sensor, an indium gallium arsenide ambient light sensor, and/or other kind of ambient light sensor. In various implementations, the camera may be both an infrared and visible light camera.

The health data may include one or more of a variety of different wellness, fitness, and/or other parameters relating to the health of a user. For example, in various implementations the health data may include: a blood pressure index, a blood hydration, a body fat content, an oxygen saturation, a pulse rate, a perfusion index, an electrocardiogram, a photoplethysmogram, and/or any other such health data. In

**4**

some implementations, the electronic device may provide the computed health data to the user.

FIG. **1** is an isometric view an example system **100** for obtaining health data utilizing an electronic device. As illustrated, the system may include an electronic device **101**. The electronic device is shown as a smart phone. However, it is understood that this is an example. In various implementations, the electronic device may be any kind of electronic device such as any kind of mobile personal computing device (such as a smart phone, tablet computer, a mobile computer, a digital media player, a cellular telephone, a laptop computer, a wearable device, and so on), a desktop computer, a display, and/or any other electronic device.

As also illustrated, the electronic device **101** may include a housing **102** with a surface **103** where a camera **104**, an ambient light sensor **105**, and a proximity sensor **106** are positioned. As illustrated in FIG. **2**, the camera, ambient light sensor, and proximity sensor may be positioned such that they are partially or entirely covered (and/or contacted) by the body part **202** of a user (illustrated as a finger though such a body part may be an ear, a palm, and/or other body part of the user) at the same time. At such a time, the electronic device may compute health data for the user.

Traditionally, a camera may be capture images using a visible light imaging sensor and a lens focused at a focal distance away from the lens, an ambient light sensor may use a broad range photodiode or similar non-imaging light detector to determine ambient light conditions, and a proximity sensor may use a limited range light source (such as an infrared light emitting diode or "LED") to emit limited range light and a limited range non-imaging light detector to detect if the emitted limited range light is reflected by one or more object to determine whether or not such an object is proximate to the proximity sensor. However, the electronic device **101** may camera **104**, the ambient light sensor **105**, and the proximity sensor **106** in non-traditional ways to detect information about the body part **202**.

The electronic device **101** may use one or more of the camera **104** and the proximity sensor **106** to emit light into a body part of a user **202** touching a surface **103** of the electronic device. The electronic device may use one or more of the camera, the ambient light sensor **105**, and the proximity sensor to receive at least part of the emitted light reflected by the body part of the user. The electronic device may compute health data of the user based upon sensor (such as the camera, the ambient light sensor, and/or the proximity sensor) data regarding the received light.

For example, one or more of the camera **104**, the ambient light sensor **105**, and the proximity sensor **106** may receive light reflected off of the body part **202** of the user. Such light may originate from one or more of the camera (in implementations where the camera includes a light source such as a LED used as a flash), the ambient light sensor (which may be a non-imaging photodiode in some implementations), the proximity sensor (such as in implementations where the proximity sensor is a non-imaging photodiode and one or more LEDs that determine proximity by measuring the time between transmission of light by the LED and receipt of the light by the non-imaging photodiode after reflection off of an object such as the body part **202** of the user), and/or other light source. The electronic device **101** may analyze sensor data regarding the received light and compute information such as the light absorption of the body part. Various health data for the user may be computed from the computed light absorption of the body part.

By way of illustration, sensor data regarding the received light may be used to estimate changes in the volume of the

Exhibit 19
-445-

US 9,723,997 B1

5

body part **202** of the user. In general, as light passes through the user's skin and into the underlying tissue, some light is reflected, some light is scattered, and some light is absorbed, depending on what the light encounters. In some instances, blood may absorb light more than surrounding tissue, so less reflected light may be sensed when more blood is present. the user's blood volume generally increases and decreases with each heartbeat. Thus, analysis of sensor data regarding the reflected light may reflect changes in blood volume and thus allow health data such as oxygen saturation, pulse rate, perfusion index, and such to be computed.

By way of another example, one or more images of the body part **202** of the user captured by the camera **104** may be analyze to compute various health data for the user. In some implementations, the camera may be an infrared camera and/or a combined visible light and infrared camera. In such implementations, infrared data in the image may be analyzed to compute temperature of the body part, changing blood flow in the body part, and so on. In various implementations, the ambient light sensor and/or proximity sensor may be utilized to obtain such infrared data regarding the body part.

In various implementations, various information may be obtained regarding the body part **202** utilizing data from the camera **104**, the ambient light sensor **105**, and the proximity sensor **106**. Such information may be utilized in a variety of different ways. For example, in some implementations each of the camera, the ambient light sensor, and the proximity sensor may capture sensor data regarding light absorption of the body part **202**. However, the light absorption represented by the light received by each may be different based on the particular sensor strengths and/or weaknesses of the respective device. In such an implementation, the sensor data related to light absorption from each may be compared to the others and/or combined in order to obtain a more accurate, single light absorption measurement.

By way of another example, in some implementations sensor data from one or more of the camera **104**, the ambient light sensor **105**, and the proximity sensor **106** may be used to adjust information from one or more others of the camera, the ambient light sensor, and the proximity sensor. For example, in various implementations the proximity sensor may be utilized to obtain sensor data related to light absorption of the body part **202** and the camera may be utilized to determine the specific area of the body part the information relates to. Light absorption may be interpreted differently in computing health data for different areas of the body part (such as where the area of the body part is hairless versus containing hair, where the area is a highly callused area as opposed to a non-callused area, and so on). As such, the sensor data from the camera regarding the specific area of the body part being analyzed may be utilized to adjust the sensor data related to light absorption obtained from the proximity sensor to account for the specific characteristics of the area of the body part that may influence interpretation of light absorption for computing health data for the user.

As also illustrated in FIGS. **1** and **2**, the electronic device **101** may also include electrical contacts such as electrical contacts **107a** and **107b** disposed on an exterior surface of the electronic device. In various implementations, the electronic device **101** may compute health data of the user based upon sensor data obtained from the camera **104**, the ambient light sensor **105**, and the proximity sensor **106** as well as an electrical measurement obtained using the electrical contacts.

As illustrated in FIG. **2**, the electrical contacts **107a** and **107b** may be positioned to contact the body part **202** of the

6

user (such as during the time when the information is being detected) and/or an additional body part **201** of the user. For example, as shown a finger of the user may contact a top electrical contact **107a** while a palm of the user contacts a bottom electrical contact **107b**. However, it is understood that this is an example and the electrical contacts may be configured to contact other body parts of the user (such as an ear, a cheek, and so on) without departing from the scope of the present disclosure.

In some implementations, the electrical contacts **107a** and **107b** may be positioned to contact the body part **202** of the user and an additional body part of the user such that electrical measurement obtained using the electrical contacts corresponds to an electrical characteristic across the user's chest. For example, as shown a finger of the user's left hand may contact a top electrical contact **107a** while a right palm of the user (connected to each other through the user's chest) contacts a bottom electrical contact **107b**. Positioning the electrical contacts to contact user body parts such that the electrical measurement obtained using the electrical contacts corresponds to an electrical property across the user's chest. Such a measurement may enable information related to health data (such as an electrocardiogram) to be obtained that might not otherwise be possible absent such positioning.

By way of illustration, electrical measurements may be taken via the electrical contacts **107a** and **107b** (which may respectively be configured as positive and negative terminals) that may be used to detect electrical activity of the user's body. Such electrical measurements may be used (in some cases along with analysis of the received light) to measure heart function, compute an electrocardiogram, compute a galvanic skin response that may be indicative of emotional state and/or other physiological condition, and/or compute other health data such as body fat, or blood pressure.

Although FIG. **1** illustrates a specific configuration including the camera **104**, the ambient light sensor **105**, the proximity sensor **106**, and the electrical contacts **107a** and **107b**, it is understood that this in an example. In various implementations other configurations are possible and contemplated without departing from the scope of the present disclosure.

For example, the ambient light sensor **105** and the proximity sensor **106** are illustrated and described as separated sensors. However, in some implementations the ambient light sensor and the proximity sensor may be incorporated into a single, unified sensor that may detect both ambient light and proximity without departing from the scope of the present disclosure.

In some implementations, the proximity sensor **106** may operate utilizing a single wavelength of light, such as the infrared portion of the light spectrum. However, in other implementations the proximity sensor (and/or the camera **104** and/or the ambient light sensor **105**) may be a multiple wavelength proximity sensor that operates utilizing multiple wavelengths of light.

For example, in various implementations the proximity sensor **106** may operate utilizing infrared and visible light (such as red light). In some embodiments of such an implementation, the proximity sensor may include an infrared LED for producing infrared light and a red LED for producing red light.

Sensor data obtained utilizing different wavelengths of light may be different based on the particular detection strengths and/or weaknesses of the respective wavelength. By utilizing multiple wavelengths, the information detected

**Exhibit 19**
**-446-**

US 9,723,997 B1

7

utilizing the various wavelengths may be combined and/or utilized to adjust each other in order to obtain greater accuracy.

For example, dark and light hairs may have different light absorption due to their different pigmentation regardless of their other physical characteristics. By averaging light absorption detected utilizing both infrared and red light, a more accurate light absorption that accounts for such color difference may be possible such that detecting light absorption of different colored hairs does not result in inaccurate measurements.

In some implementations, the ambient light sensor 105 may be a silicon ambient light sensor, such as a silicon non-imaging photodiode. In other implementations, the ambient light sensor 105 may be an indium gallium arsenide ambient light sensor, such as an indium gallium arsenide non-imaging photodiode. In various implementations, use of an indium gallium arsenide non-imaging photodiode may allow for detection of a larger spectrum of light than use of a silicon non-imaging photodiode. An indium gallium arsenide non-imaging photodiode may not be typically used as an ambient light sensor as such may be more expensive than a silicon non-imaging photodiode that may adequately be used to determine ambient light conditions by detecting a more limited spectrum of light.

In various implementations, a variety of different health data for the user may be computed based at least thereon. For example, in one or more implementations the health data may include one or more of a variety of different wellness, fitness, and/or other parameters relating to the health of a user such as: a blood pressure index, a blood hydration, a body fat content, an oxygen saturation, a pulse rate, a perfusion index, an electrocardiogram, a photoplethysmogram, and/or any other such health data.

FIG. 7 is a block diagram illustrating functional relationships among components of the example system 100 of FIG. 1. As shown, the electronic device 101 may include one or more processing units 701, one or more non-transitory storage media 702 (which may take the form of, but is not limited to, a magnetic storage medium; optical storage medium; magneto-optical storage medium; read only memory; random access memory; erasable programmable memory; flash memory; and so on), one or more communication components 703 (such as a Wi-Fi or other antenna that may be utilized to transmit computed health data for the user), one or more input/output components 704, a display 108 (which may be utilized to present computed health data for the user), the camera 104, the ambient light sensor 105, the proximity sensor 106, and/or the electrical contacts 107a and 107b. However, it is understood that this is an example. In various implementations, the electronic device 101 may omit one or more of these components and/or utilize one or more additional components not shown.

Returning to FIG. 2, in various implementations the electronic device 101 may provide guidance to the user for aligning the user's body part 202 with the camera 104, the ambient light sensor 105, the proximity sensor 106, and/or the electrical contacts 107a and 107b. Such correct alignment may aid in utilizing camera, the ambient light sensor, the proximity sensor, and/or the electrical contacts in detecting the information regarding the body part of the user. In some implementations, misalignment of the user's body part with the camera, the ambient light sensor, the proximity sensor, and/or the electrical contacts for purposes of obtaining the information may reduce the accuracy of the information and/or prevent detection of the information. As such,

8

the guidance may aid in the detection of the information and/or the computing of the health data.

For example, FIG. 3 illustrates the view of FIG. 2 while the example system 100 is providing guidance to obtain health data. As illustrated in this example, the electronic device 101 provides a current body part position indicator 301 and a goal position indicator 302. A user may compare the visual positions of the current body part position indicator and the goal position indicator to determine how to move the user's body part 202 into correct alignment. As shown, the user may move the user's body part down and to the right, aligning the current body part position indicator with the goal position indicator 302, to move the user's body part into correct alignment.

Further, the electronic device 101 may also provide a status indicator 303 that indicates a progress 304 of obtaining the information. In this way, the user may be alerted to how long the user should stay in position once the user aligns the user's body part so that the information may be detected.

In some implementations, the camera 104 may be utilized to detect the position of the user's body part for purposes of determining alignment/misalignment. The camera may be configured to detect this information even in implementations where the camera is configured with a focal distance greater than the distance from the camera to the user's body part 202 shown as less than full focused image quality may be adequate for determining alignment/misalignment. In other implementations, the ambient light sensor 105, the proximity sensor 106, the electrical contacts 107a and 107b, and/or other components may be utilized instead of and/or in addition to the camera for determining alignment/misalignment of the user's body part.

Although FIG. 3 illustrates the electronic device 101 providing guidance output graphically using a visual output component, it is understood that this is an example. In various implementations, such output may be provided in one or more of a variety of different ways. For example, audio guidance instructions may be provided utilizing an audio output component and/or vibration guidance instructions may be provided utilizing a haptic output component without departing from the scope of the present disclosure.

FIG. 4 illustrates the view of FIG. 2 while the example system 100 is providing the obtained health data. As illustrated, a variety of different health data may be presented. Although FIG. 4 illustrates the electronic device 101 providing the health data graphically using a visual output component, it is understood that this is an example. In various implementations, such health may be provided in one or more of a variety of different ways, such as audibly utilizing an audio output component without departing from the scope of the present disclosure. In other implementations, the health data may be communicated to another electronic device (such as a health data database maintained by a doctor and/or other medical or health provider) utilizing a communication component.

FIG. 5 is a flow chart illustrating an example method 500 for using an electronic device to obtain health data. This method may be performed by the system of FIG. 1.

The flow may begin at block 501 where at least one of camera and a proximity sensor may be used to emit light into a body part of a user touching a surface of the electronic device. The flow may proceed to block 502 where at least one of the camera, an ambient light sensor, or the proximity sensor may be used to receive at least part of the emitted light reflected by the body part of the user to produce sensor output and generate sensor data. The flow may then proceed

Exhibit 19
-447-

US 9,723,997 B1

**9**

to block **503** where health data of the user may be computed using at least the sensor data regarding the received light.

At block **504**, the computed health data for the user may be provided. In some implementations, the computed health data for the user may be provided to the user. Such providing may be performed using one or more visual output components such as a display, audio output components such as a speaker, haptic output components, and so on.

In one example, the proximity sensor may be used to emit light into the user's body part, the ambient light sensor and the camera may be used to receive at least part of the emitted light reflected by the user's body part, and electrical contacts may be used to obtain electrical measurements from the skin of the user's body part. In such an example, a blood pressure index, a body fat content, and an electrocardiogram may be computed using data from the ambient light sensor, the camera, and the electrical contacts.

In another example, the proximity sensor may be a multiple light wavelength proximity sensor that utilizes infrared and visible light and the ambient light sensor may be a indium gallium arsenide ambient light sensor. The proximity sensor may be used to emit light into the user's body part, the ambient light sensor and the camera may be used to receive at least part of the emitted light reflected by the user's body part, and electrical contacts may be used to obtain electrical measurements from the skin of the user's body part. In such an example, a blood hydration may be computed using data from the ambient light sensor, the camera, and the electrical contacts.

In yet another example, the proximity sensor may be used to emit light into the user's body part and the ambient light sensor and the camera receive at least part of the emitted light reflected by the user's body part. In such an example, an oxygen saturation, a pulse rate, a perfusion index and a photoplethysmogram may be computed using data from the ambient light sensor and the camera.

Although the example method **500** is illustrated and described above as including particular operations performed in a particular order, it is understood that this is an example. In various implementations, various orders of the same, similar, and/or different operations may be performed without departing from the scope of the present disclosure.

For example, block **503** is illustrated and described as providing the computed health data for the user. However, in various implementations this operation may be omitted. In some examples of such an implementation, the computed health data for the user may be stored for later use as opposed to being provided to the user.

FIG. **6** is a flow chart illustrating an example method **600** for guiding use of an electronic device to obtain health data. This method may be performed by the system of FIG. **1**.

The flow may begin at block **601** where at least a profile of a body part of a user (such as the outline, location, or orientation) contacting a camera may be detected using a camera. The flow may proceed to block **602** where it is determined based on the detection that the user's body part is misaligned with a combination of the camera, an ambient light sensor, and a proximity sensor for purposes of obtaining health data for the user.

Detection of the user's body part may include comparing the profile to data representing a correct alignment. For example, an image of the profile of the user's body part may be captured and compared to a sample image representing what the image of the profile of the user's body part should look like if the user's body part is correctly aligned. A mismatch may indicate that the user's body part is misaligned.

**10**

At block **603**, guidance to correct the misalignment may be provided. In the example discussed above where a mismatch between the image of the profile of the user's body part and the sample image indicated that the user's body part was misaligned, the differences between the two images may be utilized to determine guidance to provide. By way of illustration, if the image of the profile of the user's body part has the user's body part further to the left than the sample image then it may be determined that the user should move the user's body part to the right. Such guidance may be provided using one or more visual output components such as a display, audio output components such as a speaker, haptic output components such as a vibrator, and so on.

For example, a user may place his finger on the camera. An image may be taken of the profile of the user's finger and compared to a sample image of what the profile of the user's finger should look like if correctly aligned with a combination of the camera, an ambient light sensor, and a proximity sensor for purposes of obtaining health data for the user. Comparison of the two images may indicate that the two images do not match and the user's finger is not correctly aligned. In this example, the image of the profile of the user's finger may be further up and to the right of the sample image. As such, a correct placement indicator and a current placement indicator may be displayed to the user where the current placement indicator is displayed further up and to the right of the correct placement indicator. In this way, the user can see that to correctly align the user's finger the user should move the user's finger down and to the left.

To continue with this example, the user may move the user's finger based on the provided guidance. A new image may be taken of the current profile of the user's finger and compared to the sample image. Comparison of the two images may indicate that the two images, though closer, still do not match and the user's finger is not still correctly aligned. In this example, the image of the profile of the user's finger may be less but still further up and to the right of the sample image. As such, the current placement indicator may be displayed moved closer but still further up and to the right of the correct placement indicator. In this way, the user can see that to correctly align the user's finger the user should move the user's finger still further down and to the left.

The process in this example may be repeated until comparison of an image of profile of the user's finger matches the sample image. The current placement indicator may then be displayed over the correct placement indicator to indicate to the user that the user's finger is correctly aligned and to not move further until health data is obtained.

Although the example method **600** is illustrated and described above as including particular operations performed in a particular order, it is understood that this is an example. In various implementations, various orders of the same, similar, and/or different operations may be performed without departing from the scope of the present disclosure.

For example, though blocks **601-603** are described as a series of linear operations that are performed a single time, it is understood that this is an example. In various implementations, one or more of blocks **601-603** may be repeated until the user's body part is no longer misaligned without departing from the scope of the present disclosure.

As discussed above and illustrated in the accompanying figures, the present disclosure details systems, apparatuses, and methods related to an electric device that computes health data. An electronic device (such as a smart phone, tablet computer, mobile computer, digital media player, wearable device, or other electronic device) may include a

Exhibit 19
-448-

US 9,723,997 B1

**11**

camera, an ambient light sensor, and a proximity sensor. The electronic device use one or more of the camera and the proximity sensor to emit light into a body part of a user (such as a finger, and ear, and so on) touching a surface of the electronic device. The electronic device may use one or more of the camera, the ambient light sensor, and the proximity sensor to receive at least part of the emitted light reflected by the body part of the user. The electronic device may compute health data of the user based upon sensor data regarding the received light. In this way, the health data of the user may be detected utilizing an electronic device including a camera, ambient light sensor, and proximity sensor without making the user obtain access to a dedicated fitness and/or wellness device.

In the present disclosure, the methods disclosed may be implemented as sets of instructions or software readable by a device. Further, it is understood that the specific order or hierarchy of steps in the methods disclosed are examples of sample approaches. In other embodiments, the specific order or hierarchy of steps in the method can be rearranged while remaining within the disclosed subject matter. The accompanying method claims present elements of the various steps in a sample order, and are not necessarily meant to be limited to the specific order or hierarchy presented.

Techniques detailed in the described disclosure may be provided as a computer program product, or software, that may include a non-transitory machine-readable medium having stored thereon instructions, which may be used to program a computer system (or other electronic devices) to perform a process according to the present disclosure. A non-transitory machine-readable medium includes any mechanism for storing information in a form (e.g., software, processing application) readable by a machine (e.g., a computer). The non-transitory machine-readable medium may take the form of, but is not limited to, a magnetic storage medium (e.g., floppy diskette, video cassette, and so on); optical storage medium (e.g., CD-ROM); magneto-optical storage medium; read only memory (ROM); random access memory (RAM); erasable programmable memory (e.g., EPROM and EEPROM); flash memory; and so on.

It is believed that the present disclosure and many of its attendant advantages will be understood by the foregoing description, and it will be apparent that various changes may be made in the form, construction and arrangement of the components without departing from the disclosed subject matter or without sacrificing all of its material advantages. The form described is merely explanatory, and it is the intention of the following claims to encompass and include such changes.

While the present disclosure has been described with reference to various embodiments, it will be understood that these embodiments are illustrative and that the scope of the disclosure is not limited to them. Many variations, modifications, additions, and improvements are possible. More generally, embodiments in accordance with the present disclosure have been described in the context or particular embodiments. Functionality may be separated or combined in blocks differently in various embodiments of the disclosure or described with different terminology. These and other variations, modifications, additions, and improvements may fall within the scope of the disclosure as defined in the claims that follow.

I claim:

**1**. A mobile personal computing device, comprising:
a camera;
an ambient light sensor;
a proximity sensor; and

**12**

a processing unit communicably coupled to the camera, the ambient light sensor, and the proximity sensor;
wherein the processing unit is configured to:
use the camera and the proximity sensor to emit light into a body part of a user touching a surface of the mobile personal computing device;
use at least one of the camera, an ambient light sensor, or the proximity sensor to receive at least part of the emitted light reflected by the body part of the user and generate sensor data; and
compute health data of the user, utilizing the processing unit, using at least the sensor data regarding the received light.

**2**. The mobile personal computing device of claim **1**, wherein the camera, the ambient light sensor, and the proximity sensor are positioned to be at least partially covered by the body part of the user at a same time.

**3**. The mobile personal computing device of claim **1**, wherein the proximity sensor is configured to detect multiple wavelengths of light.

**4**. The mobile personal computing device of claim **3**, wherein multiple light wavelength proximity sensor is configured to emit and receive infrared and visible light.

**5**. The mobile personal computing device of claim **3**, wherein multiple light wavelength proximity sensor is configured to emit and receive infrared and red light.

**6**. The mobile personal computing device of claim **1**, wherein the ambient light sensor is a at least one of a silicon ambient light sensor or an indium gallium arsenide ambient light sensor.

**7**. The mobile personal computing device of claim **1**, wherein the camera is configured to detect infrared light.

**8**. The mobile personal computing device of claim **1**, wherein the device is configured to compute the health-related information when the body part of the user is positioned at least partially over the camera, the ambient light sensor, and the proximity sensor.

**9**. The mobile personal computing device of claim **1**, wherein the processing unit utilizes the camera to determine when the body part of the user is misaligned with the camera, the ambient light sensor, and the proximity sensor for purposes of detecting the information about the body part of the user.

**10**. The mobile personal computing device of claim **9**, wherein the processing unit provides an output that can be used as guidance to correct a misalignment.

**11**. The mobile personal computing device of claim **10**, wherein the processing unit is configure to provide the output to at least one visual output component, audio output component, or haptic output component.

**12**. The mobile personal computing device of claim **1**, wherein the camera is configured with a focal distance greater than a distance between the camera and the body part of the user when the body part is touching the surface of the mobile personal computing device.

**13**. The mobile personal computing device of claim **1**, further comprising
electrical contacts disposed on an exterior surface of the device, wherein the processing unit is further configured to compute additional health-related information regarding the user based on an electrical measurement obtained using the electrical contacts.

**14**. The mobile personal computing device of claim **13**, wherein the electrical contacts are positioned to contact the body part of the user and an additional body part of the user.

**Exhibit 19**
**-449-**

US 9,723,997 B1

**13**

**15**. The mobile personal computing device of claim **14**, wherein the electrical measurement obtained using the electrical contacts corresponds to an electrical property across the user's chest.

**16**. The mobile personal computing device of claim **13**, wherein the processing unit is further configured to:
    use at least the proximity sensor to emit the light;
    use the ambient light sensor and the camera to receive the reflected light; and
    compute a blood pressure index, a body fat content, and an electrocardiogram using data from the ambient light sensor, the camera, and the electrical contacts.

**17**. The mobile personal computing device of claim **13**, wherein the proximity sensor is a multiple light wavelength proximity sensor that utilizes infrared and visible light, the ambient light sensor is a indium gallium arsenide ambient light sensor, and the processing unit is further configured to:
    use at least the proximity sensor to emit the light;
    use the ambient light sensor and the camera receive the reflected light; and
    compute a blood hydration using data from the ambient light sensor, the camera, and the electrical contacts.

**18**. The mobile personal computing device of claim **1**, wherein the processing unit is further configured to:
    use at least the ambient light sensor and the camera receive the reflected light; and
    compute an oxygen saturation, a pulse rate, a perfusion index, or a photoplethysmogram using data from the ambient light sensor and the camera.

**19**. The mobile personal computing device of claim **1**, wherein the processing unit is configured to use data from the camera indicating characteristics of the body part that

**14**

influence light absorption to adjust the sensor data regarding the received light as part of computing the health data.

**20**. A method for using a mobile personal computing device to obtain health data, comprising:
    using a camera and a proximity sensor to emit light into a body part of a user touching a surface of the mobile personal computing device;
    using at least two of the camera, an ambient light sensor, or the proximity sensor to receive at least part of the emitted light reflected by the body part of the user and generate sensor data; and
    computing health data of the user, utilizing the processing unit, using at least the sensor data regarding the received light.

**21**. A computer program product including a non-transitory storage medium, comprising:
    a first set of instructions, stored in the non-transitory storage medium, executable by at least one processing unit to use a camera and a proximity sensor to emit light into a body part of a user touching a surface of a mobile personal computing device;
    a second set of instructions, stored in the non-transitory storage medium, executable by the least one processing unit to use the camera and an ambient light sensor to receive at least part of the emitted light reflected by the body part of the user and generate sensor data; and
    a third set of instructions, stored in the non-transitory storage medium, executable by the least one processing unit to compute health data of the user using at least the sensor data regarding the received light.

\*   \*   \*   \*   \*

Exhibit 19
-450-

# EXHIBIT 20



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING or 371(c) DATE | GRP ART UNIT | FIL FEE REC'D | ATTY.DOCKET.NO | TOT CLAIMS | IND CLAIMS |
|---|---|---|---|---|---|---|
| 62/056,299 | 09/26/2014 | | 260 | P22734USP1 | | |

**CONFIRMATION NO. 1034**

62579
APPLE INC.
c/o Brownstein Hyatt Farber Schreck
410 17th St.
Suite 2200
DENVER, CO 80202

**FILING RECEIPT**

*OC000000071278978*

Date Mailed: 10/10/2014

Receipt is acknowledged of this provisional patent application. It will not be examined for patentability and will become abandoned not later than twelve months after its filing date. Any correspondence concerning the application must include the following identification information: the U.S. APPLICATION NUMBER, FILING DATE, NAME OF APPLICANT, and TITLE OF INVENTION. Fees transmitted by check or draft are subject to collection. Please verify the accuracy of the data presented on this receipt. **If an error is noted on this Filing Receipt, please submit a written request for a Filing Receipt Correction. Please provide a copy of this Filing Receipt with the changes noted thereon. If you received a "Notice to File Missing Parts" for this application, please submit any corrections to this Filing Receipt with your reply to the Notice. When the USPTO processes the reply to the Notice, the USPTO will generate another Filing Receipt incorporating the requested corrections**

**Inventor(s)**
Marcelo M. Lamego, Cupertino, CA;

**Applicant(s)**
Marcelo M. Lamego, Cupertino, CA;

**Power of Attorney:**
S. Hemenway--44759

**If Required, Foreign Filing License Granted:** 10/09/2014
The country code and number of your priority application, to be used for filing abroad under the Paris Convention, is **US 62/056,299**
**Projected Publication Date:** None, application is not eligible for pre-grant publication
**Non-Publication Request:** No
**Early Publication Request:** No
**Title**
Electronic Device that Computes Health Data

**Statement under 37 CFR 1.55 or 1.78 for AIA (First Inventor to File) Transition Applications:** No

## PROTECTING YOUR INVENTION OUTSIDE THE UNITED STATES

Since the rights granted by a U.S. patent extend only throughout the territory of the United States and have no effect in a foreign country, an inventor who wishes patent protection in another country must apply for a patent in a specific country or in regional patent offices. Applicants may wish to consider the filing of an international application under the Patent Cooperation Treaty (PCT). An international (PCT) application generally has the same

Exhibit 20
-451-

effect as a regular national patent application in each PCT-member country. The PCT process **simplifies** the filing of patent applications on the same invention in member countries, but **does not result** in a grant of "an international patent" and does not eliminate the need of applicants to file additional documents and fees in countries where patent protection is desired.

Almost every country has its own patent law, and a person desiring a patent in a particular country must make an application for patent in that country in accordance with its particular laws. Since the laws of many countries differ in various respects from the patent law of the United States, applicants are advised to seek guidance from specific foreign countries to ensure that patent rights are not lost prematurely.

Applicants also are advised that in the case of inventions made in the United States, the Director of the USPTO must issue a license before applicants can apply for a patent in a foreign country. The filing of a U.S. patent application serves as a request for a foreign filing license. The application's filing receipt contains further information and guidance as to the status of applicant's license for foreign filing.

Applicants may wish to consult the USPTO booklet, "General Information Concerning Patents" (specifically, the section entitled "Treaties and Foreign Patents") for more information on timeframes and deadlines for filing foreign patent applications. The guide is available either by contacting the USPTO Contact Center at 800-786-9199, or it can be viewed on the USPTO website at http://www.uspto.gov/web/offices/pac/doc/general/index.html.

For information on preventing theft of your intellectual property (patents, trademarks and copyrights), you may wish to consult the U.S. Government website, http://www.stopfakes.gov. Part of a Department of Commerce initiative, this website includes self-help "toolkits" giving innovators guidance on how to protect intellectual property in specific countries such as China, Korea and Mexico. For questions regarding patent enforcement issues, applicants may call the U.S. Government hotline at 1-866-999-HALT (1-866-999-4258).

# LICENSE FOR FOREIGN FILING UNDER

## Title 35, United States Code, Section 184

## Title 37, Code of Federal Regulations, 5.11 & 5.15

**GRANTED**

The applicant has been granted a license under 35 U.S.C. 184, if the phrase "IF REQUIRED, FOREIGN FILING LICENSE GRANTED" followed by a date appears on this form. Such licenses are issued in all applications where the conditions for issuance of a license have been met, regardless of whether or not a license may be required as set forth in 37 CFR 5.15. The scope and limitations of this license are set forth in 37 CFR 5.15(a) unless an earlier license has been issued under 37 CFR 5.15(b). The license is subject to revocation upon written notification. The date indicated is the effective date of the license, unless an earlier license of similar scope has been granted under 37 CFR 5.13 or 5.14.

This license is to be retained by the licensee and may be used at any time on or after the effective date thereof unless it is revoked. This license is automatically transferred to any related applications(s) filed under 37 CFR 1.53(d). This license is not retroactive.

The grant of a license does not in any way lessen the responsibility of a licensee for the security of the subject matter as imposed by any Government contract or the provisions of existing laws relating to espionage and the national security or the export of technical data. Licensees should apprise themselves of current regulations especially with

page 2 of 3

Exhibit 20
-452-

respect to certain countries, of other agencies, particularly the Office of Defense Trade Controls, Department of State (with respect to Arms, Munitions and Implements of War (22 CFR 121-128)); the Bureau of Industry and Security, Department of Commerce (15 CFR parts 730-774); the Office of Foreign AssetsControl, Department of Treasury (31 CFR Parts 500+) and the Department of Energy.

## NOT GRANTED

No license under 35 U.S.C. 184 has been granted at this time, if the phrase "IF REQUIRED, FOREIGN FILING LICENSE GRANTED" DOES NOT appear on this form. Applicant may still petition for a license under 37 CFR 5.12, if a license is desired before the expiration of 6 months from the filing date of the application. If 6 months has lapsed from the filing date of this application and the licensee has not received any indication of a secrecy order under 35 U.S.C. 181, the licensee may foreign file the application pursuant to 37 CFR 5.15(b).

---

### *SelectUSA*

The United States represents the largest, most dynamic marketplace in the world and is an unparalleled location for business investment, innovation, and commercialization of new technologies. The U.S. offers tremendous resources and advantages for those who invest and manufacture goods here. Through SelectUSA, our nation works to promote and facilitate business investment. SelectUSA provides information assistance to the international investor community; serves as an ombudsman for existing and potential investors; advocates on behalf of U.S. cities, states, and regions competing for global investment; and counsels U.S. economic development organizations on investment attraction best practices. To learn more about why the United States is the best country in the world to develop technology, manufacture products, deliver services, and grow your business, visit http://www.SelectUSA.gov or call +1-202-482-6800.

Exhibit 20
-453-

Attorney Docket No. P22734USP1

# ABSTRACT

An electronic device includes a camera, an ambient light sensor, and a proximity sensor.  The electronic device uses one or more of the camera and the proximity sensor to emit light into a body part of a user touching a surface of the electronic device and one or more of the camera, the ambient light sensor, and the proximity sensor to receive at least part of the emitted light reflected by the body part of the user.  The electronic device computes health data of the user based upon sensor data regarding the received light.  In some implementations, the electronic device may also include one or more electrical contacts that contact one or more body parts of the user.  In such implementations, the health data may be further computed based on the an electrical measurement obtained using the electrical contacts.

013361\1935\11539791.1

**Exhibit 20**
**-454-**

The document Doc u 11 1 Corrected 08/17/20
Application No.:  Not Yet Assigned; Filed:  Herewith
Inventor:  Marcelo M. Lamego
Attorney Docket No. P22734USP1



**FIG. 1**

**Exhibit 20**
-455-

Application No.:  Not Yet Assigned; Filed:  Herewith
Inventor:  Marcelo M. Lamego
Attorney Docket No. P22734USP1



*FIG. 2*

Exhibit 20
-456-

Application No.:  Not Yet Assigned; Filed:  Herewith
Inventor:  Marcelo M. Lamego
Attorney Docket No. P22734USP1



**FIG. 3**

Exhibit 20
-457-

Application No.:  Not Yet Assigned; Filed:  Herewith
Inventor:  Marcelo M. Lamego
Attorney Docket No. P22734USP1



**FIG. 4**

Exhibit 20
-458-

500
USE AT LEAST ONE OF CAMERA AND A PROXIMITY SENSOR TO EMIT LIGHT INTO A BODY PART OF A USER TOUCHING A SURFACE OF THE DEVICE
501
USE AT LEAST ONE OF THE CAMERA, AN AMBIENT LIGHT SENSOR, OR THE PROXIMITY SENSOR TO RECEIVE AT LEAST PART OF THE EMITTED LIGHT REFLECTED BY THE BODY PART OF THE USER
502
COMPUTE HEALTH DATA OF THE USER BASED AT LEAST UPON SENSOR DATA REGARDING THE RECEIVED LIGHT
503
PROVIDE THE COMPUTED HEALTH DATA FOR THE USER
504

***FIG. 5***

Application No.:  Not Yet Assigned; Filed:  Herewith
Inventor:  Marcelo M. Lamego
Attorney Docket No. P22734USP1



Exhibit 20
-460-

The Instrument Product Company IDS 17.3.20
Application No.:  Not Yet Assigned; Filed:  Herewith
Inventor:  Marcelo M. Lamego
Attorney Docket No. P22734USP1



**FIG. 7**

Exhibit 20
-461-

# Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | |
| **Filing Date:** | |
| **Title of Invention:** | Electronic Device that Computes Health Data |
| **First Named Inventor/Applicant Name:** | Marcelo M. Lamego |
| **Filer:** | Stephen C. Hemenway/Valerie Brown |
| **Attorney Docket Number:** | P22734USP1 |

Filed as Large Entity

## Provisional Filing Fees

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| Provisional Application Filing | 1005 | 1 | 260 | 260 |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |
| **Post-Allowance-and-Post-Issuance:** | | | | |
| **Extension-of-Time:** | | | | |

Exhibit 20
-462-

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Miscellaneous:** | | | | |
| | | **Total in USD ($)** | | **260** |

Exhibit 20
-463-

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 20262196 |
| **Application Number:** | 62056299 |
| **International Application Number:** | |
| **Confirmation Number:** | 1034 |
| **Title of Invention:** | Electronic Device that Computes Health Data |
| **First Named Inventor/Applicant Name:** | Marcelo M. Lamego |
| **Customer Number:** | 62579 |
| **Filer:** | Stephen C. Hemenway/Valerie Brown |
| **Filer Authorized By:** | Stephen C. Hemenway |
| **Attorney Docket Number:** | P22734USP1 |
| **Receipt Date:** | 26-SEP-2014 |
| **Filing Date:** | |
| **Time Stamp:** | 18:26:38 |
| **Application Type:** | Provisional |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | Credit Card |
| Payment was successfully received in RAM | $260 |
| RAM confirmation Number | 5131 |
| Deposit Account | 504621 |
| Authorized User | BROWN, VALERIE |
| The Director of the USPTO is hereby authorized to charge indicated fees and credit any overpayment as follows: | |
| Charge any Additional Fees required under 37 C.F.R. Section 1.16 (National application filing, search, and examination fees) | |
| Charge any Additional Fees required under 37 C.F.R. Section 1.17 (Patent application and reexamination processing fees) | |

Exhibit 20
-464-

Charge any Additional Fees required under 37 C.F.R. Section 1.19 (Document supply fees)

Charge any Additional Fees required under 37 C.F.R. Section 1.20 (Post Issuance fees)

Charge any Additional Fees required under 37 C.F.R. Section 1.21 (Miscellaneous fees and charges)

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Provisional Cover Sheet (SB16) | P22734USP1ApplicationTransmittal.pdf | 199177<br>6cb4c135c5fe3d22c0f73a3a4a39bc2cd26a67bd | no | 3 |

| Warnings: |
|---|
| This is not a USPTO supplied Provisional Cover Sheet SB16 form. |
| Information: |

| 2 | | P22734USP1Specification.pdf | 106626<br>d5cc704393 5eeff4e37e4d5c09dad30dfff1e3e8 | yes | 24 |
|---|---|---|---|---|---|

| Multipart Description/PDF files in .zip description | | |
|---|---|---|
| Document Description | Start | End |
| Specification | 1 | 19 |
| Claims | 20 | 23 |
| Any request going to L and R | 24 | 24 |

| Warnings: |
|---|
| Information: |

| 3 | Drawings-only black and white line drawings | P22734USP1Drawings.pdf | 68765<br>78ca761ea765609bab07d1027291cdc8d7178889 | no | 7 |
|---|---|---|---|---|---|

| Warnings: |
|---|
| Information: |

| 4 | Fee Worksheet (SB06) | fee-info.pdf | 29419<br>e8d043d09da7330ce2b3886a1db818b5df6d34c8 | no | 2 |
|---|---|---|---|---|---|

| Warnings: |
|---|
| Information: |

| Total Files Size (in bytes): | 403987 |
|---|---|

Exhibit 20
-465-

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

New Applications Under 35 U.S.C. 111
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

National Stage of an International Application under 35 U.S.C. 371
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

New International Application Filed with the USPTO as a Receiving Office
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

Exhibit 20
-466-

PTO/SB/16 (03-13)
Approved for use through 01/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless it displays a valid OMB control number

**PROVISIONAL APPLICATION FOR PATENT COVER SHEET – Page 1 of 2**
This is a request for filing a PROVISIONAL APPLICATION FOR PATENT under 37 CFR 1.53(c).

Express Mail Label No. ___Electronic Filing___

| INVENTOR(S) | | |
|---|---|---|
| Given Name (first and middle [if any]) | Family Name or Surname | Residence (City and either State or Foreign Country) |
| Marcelo M. | Lamego | Cupertino, California |
| | | |
| | | |
| | | |
| | | |

Additional inventors are being named on the _____ separately numbered sheets attached hereto.

**TITLE OF THE INVENTION (500 characters max):**

Electronic Device that Computes Health Data

Direct all correspondence to:   **CORRESPONDENCE ADDRESS**

[✓] The address corresponding to Customer Number: | 62579

**OR**

[ ] Firm or Individual Name

Address

| City | State | Zip |
|---|---|---|
| Country | Telephone | Email |

**ENCLOSED APPLICATION PARTS (check all that apply)**

[ ] Application Data Sheet. See 37 CFR 1.76.  [ ] CD(s), Number of CDs _____
[✓] Drawing(s)  *Number of Sheets* 7   [ ] Other (specify) _____
[✓] Specification (e.g., description of the invention)  *Number of Pages* 24

**Fees Due:** Filing Fee of $260 ($130 for small entity) ($65 for micro entity). If the specification and drawings exceed 100 sheets of paper, an application size fee is also due, which is $400 ($200 for small entity) ($100 for micro entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s).

**METHOD OF PAYMENT OF THE FILING FEE AND APPLICATION SIZE FEE FOR THIS PROVISIONAL APPLICATION FOR PATENT**

[ ] Applicant asserts small entity status. See 37 CFR 1.27.
[ ] Applicant certifies micro entity status. See 37 CFR 1.29. Applicant must attach form PTO/SB/15A or B or equivalent.
[ ] A check or money order made payable to the *Director of the United States Patent and Trademark Office* is enclosed to cover the filing fee and application size fee (if applicable). | $260
[✓] Payment by credit card. Form PTO-2038 is attached. | **TOTAL FEE AMOUNT ($)**
[✓] The Director is hereby authorized to charge the filing fee and application size fee (if applicable) or credit any overpayment to Deposit Account Number: 50-4621 .

**USE ONLY FOR FILING A PROVISIONAL APPLICATION FOR PATENT**
This collection of information is required by 37 CFR 1.51. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 10 hours to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

**Exhibit 20**
**-467-**

PTO/SB/16 (03-13)
Approved for use through 01/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless it displays a valid OMB control number

## PROVISIONAL APPLICATION FOR PATENT COVER SHEET – Page 2 of 2

The invention was made by an agency of the United States Government or under a contract with an agency of the United States Government.

[✓] No.

[ ] Yes, the invention was made by an agency of the U.S. Government. The U.S. Government agency name is: _____

_____

[ ] Yes, the invention was made under a contract with an agency of the U.S. Government. The name of the U.S. Government agency and Government contract number are: _____

_____

## WARNING:

Petitioner/applicant is cautioned to avoid submitting personal information in documents filed in a patent application that may contribute to identity theft. Personal information such as social security numbers, bank account numbers, or credit card numbers (other than a check or credit card authorization form PTO-2038 submitted for payment purposes) is never required by the USPTO to support a petition or an application. If this type of personal information is included in documents submitted to the USPTO, petitioners/applicants should consider redacting such personal information from the documents before submitting them to the USPTO. Petitioner/applicant is advised that the record of a patent application is available to the public after publication of the application (unless a non-publication request in compliance with 37 CFR 1.213(a) is made in the application) or issuance of a patent. Furthermore, the record from an abandoned application may also be available to the public if the application is referenced in a published application or an issued patent (see 37 CFR 1.14). Checks and credit card authorization forms PTO-2038 submitted for payment purposes are not retained in the application file and therefore are not publicly available.

SIGNATURE /S. Craig Hemenway/                      DATE September 26, 2014

TYPED OR PRINTED NAME S. Craig Hemenway          REGISTRATION NO. 44,759
                                                  (*if appropriate*)

TELEPHONE 303-223-1100                DOCKET NUMBER P22734USP1

Exhibit 20
-468-

## Privacy Act Statement

The **Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (*i.e.*, GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

**Exhibit 20**
**-469-**

Attorney Docket No. P22734USP1

# ELECTRONIC DEVICE THAT COMPUTES HEALTH DATA

<u>Technical Field</u>

[0001] This disclosure relates generally to health data, and more specifically to an electronic device that computes health data.

1

**Exhibit 20**
-470-

Attorney Docket No. P22734USP1

Background

[0002] It may be beneficial for a user to have information about his or her health data, including fitness data and wellness data.  For example, health data may indicate emergency conditions or to enable the user to maximize fitness or wellness activities.  Traditionally, health data is provided to users by health care professionals.  However, it may be beneficial for users to have more access to health data.

2

Exhibit 20
-471-

Attorney Docket No. P22734USP1

Summary

[0003] The present disclosure discloses systems, apparatuses, and methods related to an electric device that computes health data. An electronic device may include a camera, an ambient light sensor, and a proximity sensor. The electronic device may use one or more of the camera and the proximity sensor to emit light into a body part of a user touching a surface of the electronic device and one or more of the camera, the ambient light sensor, and the proximity sensor to receive at least part of the emitted light reflected by the body part of the user. The electronic device may compute health data of the user based upon sensor data regarding the received light. In some implementations, the electronic device may also include one or more electrical contacts that contact one or more body parts of the user. In such implementations, the health data may be further computed based on the an electrical measurement obtained using the electrical contacts.

[0004] In some implementations, the electronic device may utilize the camera to determine the user's body part is misaligned with the camera, the ambient light sensor, and the proximity sensor for purposes of detecting the information about the body part of the user. In such implementations, the electronic device may provide guidance to correct the misalignment.

[0005] In various embodiments, a mobile personal computing device may include a camera, an ambient light sensor, a proximity sensor, and a processing unit communicably coupled to the camera, the ambient light sensor, and the proximity sensor. The processing unit may be configured to: use at least one of camera and a proximity sensor to emit light into a body part of a user touching a surface of the mobile personal computing device; use at least one of the camera, an ambient light sensor, or the proximity sensor to receive at least part of the emitted light reflected by the body part of the user and generate sensor data; and computing health data of the user, utilizing the processing unit, using at least the sensor data regarding the received light.

[0006] In some embodiments, a method for using a mobile personal computing device to obtain health data may include: using at least one of camera and a proximity sensor to emit light into a body part of a user touching a surface of the device; using at least one of the camera, an ambient light sensor, or the proximity sensor to receive at least part of the emitted light reflected

013361\1935\11539791.1

Exhibit 20
-472-

Attorney Docket No. P22734USP1

by the body part of the user and generate sensor data; and computing health data of the user, utilizing the processing unit, using at least the sensor data regarding the received light.

[0007] In one or more embodiments, a method for guiding use of a mobile personal computing device to obtain health data may include: detecting, utilizing  a camera, a profile of a body part of a user contacting the camera; determining, using the profile, if the body part is misaligned with a combination of the camera, an ambient light sensor, and a proximity sensor for purposes of obtaining health data for the user; and providing guidance to correct the misalignment.

[0008] In various embodiments, a computer program product including a non-transitory storage medium may include a first set of instructions, stored in the non-transitory storage medium, executable by at least one processing unit to use at least one of a camera and a proximity sensor to emit light into a body part of a user touching a surface of a mobile personal computing device; a second set of instructions, stored in the non-transitory storage medium, executable by the least one processing unit to use at least one of the camera, an ambient light sensor, or the proximity sensor to receive at least part of the emitted light reflected by the body part of the user and generate sensor data; and a third set of instructions, stored in the non-transitory storage medium, executable by the least one processing unit to compute health data of the user using at least the sensor data regarding the received light.

[0009] It is to be understood that both the foregoing general description and the following detailed description are for purposes of example and explanation and do not necessarily limit the present disclosure.  The accompanying drawings, which are incorporated in and constitute a part of the specification, illustrate subject matter of the disclosure.  Together, the descriptions and the drawings serve to explain the principles of the disclosure.

013361\1935\11539791.1

**Exhibit 20**
**-473-**

Attorney Docket No. P22734USP1

<u>Brief Description of the Drawings</u>

[0010] FIG. 1 is an isometric view an example system for obtaining health data utilizing an electronic device.

[0011] FIG. 2 illustrates the view of FIG. 1 while the example system is being utilized to obtain health data.

[0012] FIG. 3 illustrates the view of FIG. 2 while the example system is providing guidance to obtain health data.

[0013] FIG. 4 illustrates the view of FIG. 2 while the example system is providing the obtained health data.

[0014] FIG. 5 is a flow chart illustrating an example method for using an electronic device to obtain health data.  This method may be performed by the system of FIG. 1.

[0015] FIG. 6 is a flow chart illustrating an example method for guiding use of an electronic device to obtain health data.  This method may be performed by the system of FIG. 1.

[0016] FIG. 7 is a block diagram illustrating functional relationships among components of the example system of FIG. 1.

5

Exhibit 20
-474-

<u>Detailed Description</u>

[0017] The description that follows includes sample systems, apparatuses, and methods that embody various elements of the present disclosure. However, it should be understood that the described disclosure may be practiced in a variety of forms in addition to those described herein.

[0018] The present disclosure details systems, apparatuses, and methods related to an electric device that computes health data. An electronic device (such as a smart phone, tablet computer, mobile computer, digital media player, wearable device, or other electronic device) may include a camera, an ambient light sensor, and a proximity sensor. The electronic device may use one or more of the camera and the proximity sensor to emit light into a body part of a user (such as a finger, and ear, and so on) touching a surface of the electronic device. The electronic device may use one or more of the camera, the ambient light sensor, and the proximity sensor to receive at least part of the emitted light reflected by the body part of the user. The electronic device may compute health data of the user based upon sensor data regarding the received light. In this way, the health data of the user may be detected utilizing an electronic device including a camera, ambient light sensor, and proximity sensor without making the user obtain access to a dedicated fitness and/or wellness device.

[0019] In various implementations, the camera, ambient light sensor, and proximity sensor may be positioned such that they are all at least partially covered (and/or contacted) by the user's body part at the same time, such as when the health data is computed. In one or more implementations, the electronic device may also include electrical contacts. The health data of the user may also be computed using an electrical measurement obtained using from the electrical contacts. In some examples of such implementations, the electrical contacts may be positioned to contact the body part of the user and an additional body part such that electrical measurement represents the electrical properties of organs or portions of the body located between the two contacting body parts. In some embodiments, the two body parts are the user's left and right hands and the electrical measurement corresponds to an electrical property that is measured across the user's chest.

6

Exhibit 20
-475-

Attorney Docket No. P22734USP1

[0020] In some implementations, the electronic device may utilize the camera to determine the user's body part is misaligned with the camera, the ambient light sensor, and the proximity sensor for purposes of detecting the information about the body part of the user.  In such implementations, the electronic device may provide guidance (such as visual, audio, haptic, and/or other guidance) to correct the misalignment.  The information from the camera may be utilized to detect this misalignment even in implementations where the camera is configured with a focal distance greater than a distance between the camera and the user's body part when the user's body part is touching the surface of the electronic device.

[0021] In various implementations, the proximity sensor may be a multiple light wavelength sensor (such as a sensor that utilizes infrared and visible light, infrared and red light, and so on).  In some implementations, the ambient light sensor may be a silicon ambient light sensor, an indium gallium arsenide ambient light sensor, and/or other kind of ambient light sensor.  In various implementations, the camera may be both an infrared and visible light camera.

[0022] The health data may include one or more of a variety of different wellness, fitness, and/or other parameters relating to the health of a user.  For example, in various implementations the health data may include: a blood pressure index, a blood hydration, a body fat content, an oxygen saturation, a pulse rate, a perfusion index, an electrocardiogram, a photoplethysmogram, and/or any other such health data.  In some implementations, the electronic device may provide the computed health data to the user.

[0023] FIG. 1 is an isometric view an example system 100 for obtaining health data utilizing an electronic device.  As illustrated, the system may include an electronic device 101.  The electronic device is shown as a smart phone.  However, it is understood that this is an example.  In various implementations, the electronic device may be any kind of electronic device such as any kind of mobile personal computing device (such as a smart phone, tablet computer, a mobile computer, a digital media player, a cellular telephone, a laptop computer, a wearable device, and so on), a desktop computer, a display, and/or any other electronic device.

[0024] As also illustrated, the electronic device 101 may include a housing 102 with a surface 103 where a camera 104, an ambient light sensor 105, and a proximity sensor 106 are positioned.  As illustrated in FIG. 2, the camera, ambient light sensor, and proximity sensor may

**Exhibit 20
-476-**

be positioned such that they are partially or entirely covered (and/or contacted) by the body part 202 of a user (illustrated as a finger though such a body part may be an ear, a palm, and/or other body part of the user) at the same time.  At such a time, the electronic device may compute health data for the user.

[0025]  Traditionally, a camera may be capture images using a visible light imaging sensor and a lens focused at a focal distance away from the lens, an ambient light sensor may use a broad range photodiode or similar non-imaging light detector to determine ambient light conditions, and a proximity sensor may use a limited range light source (such as an infrared light emitting diode or "LED") to emit limited range light and a limited range non-imaging light detector to detect if the emitted limited range light is reflected by one or more object to determine whether or not such an object is proximate to the proximity sensor.  However, the electronic device 101 may camera 104, the ambient light sensor 105, and the proximity sensor 106 in non-traditional ways to detect information about the body part 202.

[0026]  The electronic device 101 may use one or more of the camera 104 and the proximity sensor 106 to emit light into a body part of a user 202 touching a surface 103 of the electronic device.  The electronic device may use one or more of the camera, the ambient light sensor 105, and the proximity sensor to receive at least part of the emitted light reflected by the body part of the user.  The electronic device may compute health data of the user based upon sensor (such as the camera, the ambient light sensor, and/or the proximity sensor) data regarding the received light.

[0027]  For example, one or more of the camera 104, the ambient light sensor 105, and the proximity sensor 106 may receive light reflected off of the body part 202 of the user.  Such light may originate from one or more of the camera (in implementations where the camera includes a light source such as a LED used as a flash), the ambient light sensor (which may be a non-imaging photodiode in some implementations), the proximity sensor (such as in implementations where the proximity sensor is a non-imaging photodiode and one or more LEDs that determine proximity by measuring the time between transmission of light by the LED and receipt of the light by the non-imaging photodiode after reflection off of an object such as the body part 202 of the user), and/or other light source.  The electronic device 101 may analyze

**Exhibit 20**
**-477-**

Attorney Docket No. P22734USP1

sensor data regarding the received light and compute information such as the light absorption of the body part.  Various health data for the user may be computed from the computed light absorption of the body part.

[0028]  By way of illustration, sensor data regarding the received light may be used to estimate changes in the volume of the body part 202 of the user.  In general, as light passes through the user's skin and into the underlying tissue, some light is reflected, some light is scattered, and some light is absorbed, depending on what the light encounters.  In some instances, blood may absorb light more than surrounding tissue, so less reflected light may be sensed when more blood is present.  the user's blood volume generally increases and decreases with each heartbeat.  Thus, analysis of sensor data regarding the reflected light may reflect changes in blood volume and thus allow health data such as oxygen saturation, pulse rate, perfusion index, and such to be computed.

[0029]  By way of another example, one or more images of the body part 202 of the user captured by the camera 104 may be analyze to compute various health data for the user.  In some implementations, the camera may be an infrared camera and/or a combined visible light and infrared camera. In such implementations, infrared data in the image may be analyzed to compute temperature of the body part, changing blood flow in the body part, and so on.  In various implementations, the ambient light sensor and/or proximity sensor may be utilized to obtain such infrared data regarding the body part.

[0030]  In various implementations, various information may be obtained regarding the body part 202 utilizing data from the camera 104, the ambient light sensor 105, and the proximity sensor 106.  Such information may be utilized in a variety of different ways.  For example, in some implementations each of the camera, the ambient light sensor, and the proximity sensor may capture sensor data regarding light absorption of the body part 202.  However, the light absorption represented by the light received by each may be different based on the particular sensor strengths and/or weaknesses of the respective device.  In such an implementation, the sensor data related to light absorption from each may be compared to the others and/or combined in order to obtain a more accurate, single light absorption measurement.

9

**Exhibit 20**
-478-

[0031] By way of another example, in some implementations sensor data from one or more of the camera 104, the ambient light sensor 105, and the proximity sensor 106 may be used to adjust information from one or more others of the camera, the ambient light sensor, and the proximity sensor. For example, in various implementations the proximity sensor may be utilized to obtain sensor data related to light absorption of the body part 202 and the camera may be utilized to determine the specific area of the body part the information relates to. Light absorption may be interpreted differently in computing health data for different areas of the body part (such as where the area of the body part is hairless versus containing hair, where the area is a highly callused area as opposed to a non-callused area, and so on). As such, the sensor data from the camera regarding the specific area of the body part being analyzed may be utilized to adjust the sensor data related to light absorption obtained from the proximity sensor to account for the specific characteristics of the area of the body part that may influence interpretation of light absorption for computing health data for the user.

[0032] As also illustrated in FIGs. 1 and 2, the electronic device 101 may also include electrical contacts such as electrical contacts 107a and 107b disposed on an exterior surface of the electronic device. In various implementations, the electronic device 101 may compute health data of the user based upon sensor data obtained from the camera 104, the ambient light sensor 105, and the proximity sensor 106 as well as an electrical measurement obtained using the electrical contacts.

[0033] As illustrated in FIG. 2, the electrical contacts 107a and 107b may be positioned to contact the body part 202 of the user (such as during the time when the information is being detected) and/or an additional body part 201 of the user. For example, as shown a finger of the user may contact a top electrical contact 107a while a palm of the user contacts a bottom electrical contact 107b. However, it is understood that this is an example and the electrical contacts may be configured to contact other body parts of the user (such as an ear, a cheek, and so on) without departing from the scope of the present disclosure.

[0034] In some implementations, the electrical contacts 107a and 107b may be positioned to contact the body part 202 of the user and an additional body part of the user such that electrical measurement obtained using the electrical contacts corresponds to an electrical

013361\1935\11539791.1

Exhibit 20
-479-

Attorney Docket No. P22734USP1

characteristic across the user's chest.  For example, as shown a finger of the user's left hand may contact a top electrical contact 107a while a right palm of the user (connected to each other through the user's chest) contacts a bottom electrical contact 107b.  Positioning the electrical contacts to contact user body parts such that the electrical measurement obtained using the electrical contacts corresponds to an electrical property across the user's chest.  Such a measurement may enable information related to health data (such as an electrocardiogram) to be obtained that might not otherwise be possible absent such positioning.

[0035]  By way of illustration, electrical measurements may be taken via the electrical contacts 107a and 107b (which may respectively be configured as positive and negative terminals) that may be used to detect electrical activity of the user's body.  Such electrical measurements may be used (in some cases along with analysis of the received light) to measure heart function, compute an electrocardiogram, compute a galvanic skin response that may be indicative of emotional state and/or other physiological condition, and/or compute other health data such as body fat, or blood pressure.

[0036]  Although FIG. 1 illustrates a specific configuration including the camera 104, the ambient light sensor 105, the proximity sensor 106, and the electrical contacts 107a and 107b, it is understood that this in an example.  In various implementations other configurations are possible and contemplated without departing from the scope of the present disclosure.

[0037]  For example, the ambient light sensor 105 and the proximity sensor 106 are illustrated and described as separated sensors.  However, in some implementations the ambient light sensor and the proximity sensor may be incorporated into a single, unified sensor that may detect both ambient light and proximity without departing from the scope of the present disclosure.

[0038]  In some implementations, the proximity sensor 106 may operate utilizing a single wavelength of light, such as the infrared portion of the light spectrum.  However, in other implementations the proximity sensor (and/or the camera 104 and/or the ambient light sensor 105) may be a multiple wavelength proximity sensor that operates utilizing multiple wavelengths of light.

11

Exhibit 20
-480-

[0039]   For example, in various implementations the proximity sensor 106 may operate utilizing infrared and visible light (such as red light).  In some embodiments of such an implementation, the proximity sensor may include an infrared LED for producing infrared light and a red LED for producing red light.

[0040]   Sensor data obtained utilizing different wavelengths of light may be different based on the particular detection strengths and/or weaknesses of the respective wavelength.  By utilizing multiple wavelengths, the information detected utilizing the various wavelengths may be combined and/or utilized to adjust each other in order to obtain greater accuracy.

[0041]   For example, dark and light hairs may have different light absorption due to their different pigmentation regardless of their other physical characteristics.  By averaging light absorption detected utilizing both infrared and red light, a more accurate light absorption that accounts for such color difference may be possible such that detecting light absorption of different colored hairs does not result in inaccurate measurements.

[0042]   In some implementations, the ambient light sensor 105 may be a silicon ambient light sensor, such as a silicon non-imaging photodiode.  In other implementations, the ambient light sensor 105 may be an indium gallium arsenide ambient light sensor, such as an indium gallium arsenide non-imaging photodiode.  In various implementations, use of an indium gallium arsenide non-imaging photodiode may allow for detection of a larger spectrum of light than use of a silicon non-imaging photodiode.  An indium gallium arsenide non-imaging photodiode may not be typically used as an ambient light sensor as such may be more expensive than a silicon non-imaging photodiode that may adequately be used to determine ambient light conditions by detecting a more limited spectrum of light.

[0043]   In various implementations, a variety of different health data for the user may be computed based at least thereon.  For example, in one or more implementations the health data may include one or more of a variety of different wellness, fitness, and/or other parameters relating to the health of a user such as: a blood pressure index, a blood hydration, a body fat content, an oxygen saturation, a pulse rate, a perfusion index, an electrocardiogram, a photoplethysmogram, and/or any other such health data.

013361\1935\11539791.1

**Exhibit 20**
**-481-**

Attorney Docket No. P22734USP1

[0044] FIG. 7 is a block diagram illustrating functional relationships among components of the example system 100 of FIG. 1. As shown, the electronic device 101 may include one or more processing units 701, one or more non-transitory storage media 702 (which may take the form of, but is not limited to, a magnetic storage medium; optical storage medium; magneto-optical storage medium; read only memory; random access memory; erasable programmable memory; flash memory; and so on), one or more communication components 703 (such as a Wi-Fi or other antenna that may be utilized to transmit computed health data for the user), one or more input/output components 704, a display 108 (which may be utilized to present computed health data for the user), the camera 104, the ambient light sensor 105, the proximity sensor 106, and/or the electrical contacts 107a and 107b. However, it is understood that this is an example. In various implementations, the electronic device 101 may omit one or more of these components and/or utilize one or more additional components not shown.

[0045] Returning to FIG. 2, in various implementations the electronic device 101 may provide guidance to the user for aligning the user's body part 202 with the camera 104, the ambient light sensor 105, the proximity sensor 106, and/or the electrical contacts 107a and 107b. Such correct alignment may aid in utilizing camera, the ambient light sensor, the proximity sensor, and/or the electrical contacts in detecting the information regarding the body part of the user. In some implementations, misalignment of the user's body part with the camera, the ambient light sensor, the proximity sensor, and/or the electrical contacts for purposes of obtaining the information may reduce the accuracy of the information and/or prevent detection of the information. As such, the guidance may aid in the detection of the information and/or the computing of the health data.

[0046] For example, FIG. 3 illustrates the view of FIG. 2 while the example system 100 is providing guidance to obtain health data. As illustrated in this example, the electronic device 101 provides a current body part position indicator 301 and a goal position indicator 302. A user may compare the visual positions of the current body part position indicator and the goal position indicator to determine how to move the user's body part 202 into correct alignment. As shown, the user may move the user's body part down and to the right, aligning the current body part position indicator with the goal position indicator 302, to move the user's body part into correct alignment.

13

Exhibit 20
-482-

[0047] Further, the electronic device 101 may also provide a status indicator 303 that indicates a progress 304 of obtaining the information. In this way, the user may be alerted to how long the user should stay in position once the user aligns the user's body part so that the information may be detected.

[0048] In some implementations, the camera 104 may be utilized to detect the position of the user's body part for purposes of determining alignment/misalignment. The camera may be configured to detect this information even in implementations where the camera is configured with a focal distance greater than the distance from the camera to the user's body part 202 shown as less than full focused image quality may be adequate for determining alignment/misalignment. In other implementations, the ambient light sensor 105, the proximity sensor 106, the electrical contacts 107a and 107b, and/or other components may be utilized instead of and/or in addition to the camera for determining alignment/misalignment of the user's body part.

[0049] Although FIG. 3 illustrates the electronic device 101 providing guidance output graphically using a visual output component, it is understood that this is an example. In various implementations, such output may be provided in one or more of a variety of different ways. For example, audio guidance instructions may be provided utilizing an audio output component and/or vibration guidance instructions may be provided utilizing a haptic output component without departing from the scope of the present disclosure.

[0050] FIG. 4 illustrates the view of FIG. 2 while the example system 100 is providing the obtained health data. As illustrated, a variety of different health data may be presented. Although FIG. 4 illustrates the electronic device 101 providing the health data graphically using a visual output component, it is understood that this is an example. In various implementations, such health may be provided in one or more of a variety of different ways, such as audibly utilizing an audio output component without departing from the scope of the present disclosure. In other implementations, the health data may be communicated to another electronic device (such as a health data database maintained by a doctor and/or other medical or health provider) utilizing a communication component.

[0051] FIG. 5 is a flow chart illustrating an example method 500 for using an electronic device to obtain health data. This method may be performed by the system of FIG. 1.

14

**Exhibit 20**
**-483-**

Attorney Docket No. P22734USP1

[0052] The flow may begin at block 501 where at least one of camera and a proximity sensor may be used to emit light into a body part of a user touching a surface of the electronic device. The flow may proceed to block 502 where at least one of the camera, an ambient light sensor, or the proximity sensor may be used to receive at least part of the emitted light reflected by the body part of the user to produce sensor output and generate sensor data. The flow may then proceed to block 503 where health data of the user may be computed using at least the sensor data regarding the received light.

[0053] At block 504, the computed health data for the user may be provided. In some implementations, the computed health data for the user may be provided to the user. Such providing may be performed using one or more visual output components such as a display, audio output components such as a speaker, haptic output components, and so on.

[0054] In one example, the proximity sensor may be used to emit light into the user's body part, the ambient light sensor and the camera may be used to receive at least part of the emitted light reflected by the user's body part, and electrical contacts may be used to obtain electrical measurements from the skin of the user's body part. In such an example, a blood pressure index, a body fat content, and an electrocardiogram may be computed using data from the ambient light sensor, the camera, and the electrical contacts.

[0055] In another example, the proximity sensor may be a multiple light wavelength proximity sensor that utilizes infrared and visible light and the ambient light sensor may be a indium gallium arsenide ambient light sensor. The proximity sensor may be used to emit light into the user's body part, the ambient light sensor and the camera may be used to receive at least part of the emitted light reflected by the user's body part, and electrical contacts may be used to obtain electrical measurements from the skin of the user's body part. In such an example, a blood hydration may be computed using data from the ambient light sensor, the camera, and the electrical contacts.

[0056] In yet another example, the proximity sensor may be used to emit light into the user's body part and the ambient light sensor and the camera receive at least part of the emitted light reflected by the user's body part. In such an example, an oxygen saturation, a pulse rate, a

013361\1935\11539791.1

**Exhibit 20**
**-484-**

perfusion index and a photoplethysmogram may be computed using data from the ambient light sensor and the camera.

[0057] Although the example method 500 is illustrated and described above as including particular operations performed in a particular order, it is understood that this is an example. In various implementations, various orders of the same, similar, and/or different operations may be performed without departing from the scope of the present disclosure.

[0058] For example, block 503 is illustrated and described as providing the computed health data for the user. However, in various implementations this operation may be omitted. In some examples of such an implementation, the computed health data for the user may be stored for later use as opposed to being provided to the user.

[0059] FIG. 6 is a flow chart illustrating an example method 600 for guiding use of an electronic device to obtain health data. This method may be performed by the system of FIG. 1.

[0060] The flow may begin at block 601 where at least a profile of a body part of a user (such as the outline, location, or orientation) contacting a camera may be detected using a camera. The flow may proceed to block 602 where it is determined based on the detection that the user's body part is misaligned with a combination of the camera, an ambient light sensor, and a proximity sensor for purposes of obtaining health data for the user.

[0061] Detection of the user's body part may include comparing the profile to data representing a correct alignment. For example, an image of the profile of the user's body part may be captured and compared to a sample image representing what the image of the profile of the user's body part should look like if the user's body part is correctly aligned. A mismatch may indicate that the user's body part is misaligned.

[0062] At block 603, guidance to correct the misalignment may be provided. In the example discussed above where a mismatch between the image of the profile of the user's body part and the sample image indicated that the user's body part was misaligned, the differences between the two images may be utilized to determine guidance to provide. By way of illustration, if the image of the profile of the user's body part has the user's body part further to the left than the sample image then it may be determined that the user should more the user's

16

Exhibit 20
-485-

body part to the right. Such guidance may be provided using one or more visual output components such as a display, audio output components such as a speaker, haptic output components such as a vibrator, and so on.

[0063] For example, a user may place his finger on the camera. An image may be taken of the profile of the user's finger and compared to a sample image of what the profile of the user's finger should look like if correctly aligned with a combination of the camera, an ambient light sensor, and a proximity sensor for purposes of obtaining health data for the user. Comparison of the two images may indicate that the two images do not match and the user's finger is not correctly aligned. In this example, the image of the profile of the user's finger may be further up and to the right of the sample image. As such, a correct placement indicator and a current placement indicator may be displayed to the user where the current placement indicator is displayed further up and to the right of the correct placement indicator. In this way, the user can see that to correctly align the user's finger the user should move the user's finger down and to the left.

[0064] To continue with this example, the user may move the user's finger based on the provided guidance. A new image may be taken of the current profile of the user's finger and compared to the sample image. Comparison of the two images may indicate that the two images, though closer, still do not match and the user's finger is not still correctly aligned. In this example, the image of the profile of the user's finger may be less but still further up and to the right of the sample image. As such, the current placement indicator may be displayed moved closer but still further up and to the right of the correct placement indicator. In this way, the user can see that to correctly align the user's finger the user should move the user's finger still further down and to the left.

[0065] The process in this example may be repeated until comparison of an image of profile of the user's finger matches the sample image. The current placement indicator may then be displayed over the correct placement indicator to indicate to the user that the user's finger is correctly aligned and to not move further until health data is obtained.

[0066] Although the example method 600 is illustrated and described above as including particular operations performed in a particular order, it is understood that this is an example. In

17

Exhibit 20
-486-

various implementations, various orders of the same, similar, and/or different operations may be performed without departing from the scope of the present disclosure.

[0067]   For example, though blocks 601-603 are described as a series of linear operations that are performed a single time, it is understood that this is an example.   In various implementations, one or more of blocks 601-603 may be repeated until the user's body part is no longer misaligned without departing from the scope of the present disclosure.

[0068]   As discussed above and illustrated in the accompanying figures, the present disclosure details systems, apparatuses, and methods related to an electric device that computes health data.   An electronic device (such as a smart phone, tablet computer, mobile computer, digital media player, wearable device, or other electronic device) may include a camera, an ambient light sensor, and a proximity sensor.   The electronic device use one or more of the camera and the proximity sensor to emit light into a body part of a user (such as a finger, and ear, and so on) touching a surface of the electronic device.   The electronic device may use one or more of the camera, the ambient light sensor, and the proximity sensor to receive at least part of the emitted light reflected by the body part of the user.   The electronic device may compute health data of the user based upon sensor data regarding the received light.   In this way, the health data of the user may be detected utilizing an electronic device including a camera, ambient light sensor, and proximity sensor without making the user obtain access to a dedicated fitness and/or wellness device.

[0069]   In the present disclosure, the methods disclosed may be implemented as sets of instructions or software readable by a device.   Further, it is understood that the specific order or hierarchy of steps in the methods disclosed are examples of sample approaches.   In other embodiments, the specific order or hierarchy of steps in the method can be rearranged while remaining within the disclosed subject matter.   The accompanying method claims present elements of the various steps in a sample order, and are not necessarily meant to be limited to the specific order or hierarchy presented.

[0070]   Techniques detailed in the described disclosure may be provided as a computer program product, or software, that may include a non-transitory machine-readable medium having stored thereon instructions, which may be used to program a computer system (or other

18

Exhibit 20
-487-

Attorney Docket No. P22734USP1

electronic devices) to perform a process according to the present disclosure.  A non-transitory machine-readable medium includes any mechanism for storing information in a form (e.g., software, processing application) readable by a machine (e.g., a computer).  The non-transitory machine-readable medium may take the form of, but is not limited to, a magnetic storage medium (e.g., floppy diskette, video cassette, and so on); optical storage medium (e.g., CD-ROM); magneto-optical storage medium; read only memory (ROM); random access memory (RAM); erasable programmable memory (e.g., EPROM and EEPROM); flash memory; and so on.

[0071]  It is believed that the present disclosure and many of its attendant advantages will be understood by the foregoing description, and it will be apparent that various changes may be made in the form, construction and arrangement of the components without departing from the disclosed subject matter or without sacrificing all of its material advantages.  The form described is merely explanatory, and it is the intention of the following claims to encompass and include such changes.

[0072]  While the present disclosure has been described with reference to various embodiments, it will be understood that these embodiments are illustrative and that the scope of the disclosure is not limited to them.  Many variations, modifications, additions, and improvements are possible.  More generally, embodiments in accordance with the present disclosure have been described in the context or particular embodiments.  Functionality may be separated or combined in blocks differently in various embodiments of the disclosure or described with different terminology.  These and other variations, modifications, additions, and improvements may fall within the scope of the disclosure as defined in the claims that follow.

19

013361\1935\11539791.1

**Exhibit 20**
**-488-**

Attorney Docket No. P22734USP1

## CLAIMS

We claim:

1.      A mobile personal computing device, comprising:

a camera;

an ambient light sensor;

a proximity sensor; and

a processing unit communicably coupled to the camera, the ambient light sensor, and the proximity sensor;

wherein the processing unit is configured to:

use at least one of a camera or a proximity sensor to emit light into a body part of a user touching a surface of the mobile personal computing device;

use at least one of the camera, an ambient light sensor, or the proximity sensor to receive at least part of the emitted light reflected by the body part of the user and generate sensor data; and

computing health data of the user, utilizing the processing unit, using at least the sensor data regarding the received light.

2.      The mobile personal computing device of claim 1, wherein the camera, the ambient light sensor, and the proximity sensor are positioned to be at least partially covered by the body part of the user at a same time.

3.      The mobile personal computing device of claim 1, wherein the proximity sensor is configured to detect multiple wavelengths of light.

4.      The mobile personal computing device of claim 3, wherein multiple light wavelength proximity sensor is configured to emit and receive infrared and visible light.

5.      The mobile personal computing device of claim 3, wherein multiple light wavelength proximity sensor is configured to emit and receive infrared and red light.

013361\1935\11539791.1

**Exhibit 20**
**-489-**

Attorney Docket No. P22734USP1

6.      The mobile personal computing device of claim 1, wherein the ambient light sensor is a at least one of a silicon ambient light sensor or an indium gallium arsenide ambient light sensor.

7.      The mobile personal computing device of claim 1, wherein the camera is configured to detect infrared light.

8.      The mobile personal computing device of claim 1, wherein the device is configured to compute the health-related information when the body part of the user is positioned at least partially over the camera, the ambient light sensor, and the proximity sensor.

9.      The mobile personal computing device of claim 1, wherein the processing unit utilizes the camera to determine when the body part of the user is misaligned with the camera, the ambient light sensor, and the proximity sensor for purposes of detecting the information about the body part of the user.

10.      The mobile personal computing device of claim 9, wherein the processing unit provides an output that can be used as guidance to correct a misalignment.

11.      The mobile personal computing device of claim 10, wherein the processing unit is configure to provide the output to at least one visual output component, audio output component, or haptic output component.

12.      The mobile personal computing device of claim 1, wherein the camera is configured with a focal distance greater than a distance between the camera and the body part of the user when the body part is touching the surface of the mobile personal computing device.

13.      The mobile personal computing device of claim 1, further comprising
electrical contacts disposed on an exterior surface of the device, wherein the processing unit is further configured to compute additional health-related information regarding the user based on an electrical measurement obtained using the electrical contacts.

21

**Exhibit 20**
**-490-**

14.     The mobile personal computing device of claim 13, wherein the electrical contacts are positioned to contact the body part of the user and an additional body part of the user.

15.     The mobile personal computing device of claim 14, wherein the electrical measurement obtained using the electrical contacts corresponds to an electrical property across the user's chest.

16.     The mobile personal computing device of claim 13, wherein the processing unit is further configured to:

use at least the proximity sensor to emit the light;

use the ambient light sensor and the camera to receive the reflected light; and

compute a blood pressure index, a body fat content, and an electrocardiogram using data from the ambient light sensor, the camera, and the electrical contacts.

17.     The mobile personal computing device of claim 13, wherein the proximity sensor is a multiple light wavelength proximity sensor that utilizes infrared and visible light, the ambient light sensor is a indium gallium arsenide ambient light sensor, and the processing unit is further configured to:

use at least the proximity sensor to emit the light;

use the ambient light sensor and the camera receive the reflected light; and

compute a blood hydration using data from the ambient light sensor, the camera, and the electrical contacts.

18.     The mobile personal computing device of claim 1, wherein the processing unit is further configured to:

use at least the proximity sensor to emit the light;

use at least the ambient light sensor and the camera receive the reflected light; and

compute an oxygen saturation, a pulse rate, a perfusion index, or a photoplethysmogram using data from the ambient light sensor and the camera.

22

**Exhibit 20**
**-491-**

Attorney Docket No. P22734USP1

19.     A method for using a mobile personal computing device to obtain health data, comprising:

using at least one of a camera and a proximity sensor to emit light into a body part of a user touching a surface of the mobile personal computing device;

using at least one of the camera, an ambient light sensor, or the proximity sensor to receive at least part of the emitted light reflected by the body part of the user and generate sensor data; and

computing health data of the user, utilizing the processing unit, using at least the sensor data regarding the received light.

20.     A method for guiding use of a mobile personal computing device to obtain health data, comprising:

detecting, utilizing  a camera, a profile of a body part of a user contacting the camera;

determining, using the profile, if the body part is misaligned with the camera, an ambient light sensor, and a proximity sensor for purposes of obtaining health data for the user; and

providing guidance to correct the misalignment.

21.     A computer program product including a non-transitory storage medium, comprising:

a first set of instructions, stored in the non-transitory storage medium, executable by at least one processing unit to use at least one of a camera and a proximity sensor to emit light into a body part of a user touching a surface of a mobile personal computing device;

a second set of instructions, stored in the non-transitory storage medium, executable by the least one processing unit to use at least one of the camera, an ambient light sensor, or the proximity sensor to receive at least part of the emitted light reflected by the body part of the user and generate sensor data; and

a third set of instructions, stored in the non-transitory storage medium, executable by the least one processing unit to compute health data of the user using at least the sensor data regarding the received light.

013361\1935\11539791.1

Exhibit 20
-492-

# EXHIBIT 21



## UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING or 371(c) DATE | GRP ART UNIT | FIL FEE REC'D | ATTY.DOCKET.NO | TOT CLAIMS | IND CLAIMS |
|---|---|---|---|---|---|---|
| 62/057,089 | 09/29/2014 | | 260 | P22733USP1 | | |

**CONFIRMATION NO. 2901**

62579
APPLE INC.
c/o Brownstein Hyatt Farber Schreck
410 17th St.
Suite 2200
DENVER, CO 80202

**FILING RECEIPT**

*OC000000071284341*

Date Mailed: 10/14/2014

Receipt is acknowledged of this provisional patent application. It will not be examined for patentability and will become abandoned not later than twelve months after its filing date. Any correspondence concerning the application must include the following identification information: the U.S. APPLICATION NUMBER, FILING DATE, NAME OF APPLICANT, and TITLE OF INVENTION. Fees transmitted by check or draft are subject to collection. Please verify the accuracy of the data presented on this receipt. **If an error is noted on this Filing Receipt, please submit a written request for a Filing Receipt Correction. Please provide a copy of this Filing Receipt with the changes noted thereon. If you received a "Notice to File Missing Parts" for this application, please submit any corrections to this Filing Receipt with your reply to the Notice. When the USPTO processes the reply to the Notice, the USPTO will generate another Filing Receipt incorporating the requested corrections**

**Inventor(s)**
> Steven P. Hotelling, Cupertino, CA;
> Marcel M. Lamego, Cupertino, CA;

**Applicant(s)**
> Steven P. Hotelling, Cupertino, CA;
> Marcel M. Lamego, Cupertino, CA;

**Power of Attorney:**
S. Hemenway--44759

**If Required, Foreign Filing License Granted:** 10/09/2014
The country code and number of your priority application, to be used for filing abroad under the Paris Convention, is **US 62/057,089**

**Projected Publication Date:** None, application is not eligible for pre-grant publication

**Non-Publication Request:** No

**Early Publication Request:** No

**Title**

> Methods and Systems for Modulation and Demodulation of Optical Signals

**Statement under 37 CFR 1.55 or 1.78 for AIA (First Inventor to File) Transition Applications:** No

## PROTECTING YOUR INVENTION OUTSIDE THE UNITED STATES

Since the rights granted by a U.S. patent extend only throughout the territory of the United States and have no effect in a foreign country, an inventor who wishes patent protection in another country must apply for a patent

**Exhibit 21**
**-493-**

in a specific country or in regional patent offices. Applicants may wish to consider the filing of an international application under the Patent Cooperation Treaty (PCT). An international (PCT) application generally has the same effect as a regular national patent application in each PCT-member country. The PCT process **simplifies** the filing of patent applications on the same invention in member countries, but **does not result** in a grant of "an international patent" and does not eliminate the need of applicants to file additional documents and fees in countries where patent protection is desired.

Almost every country has its own patent law, and a person desiring a patent in a particular country must make an application for patent in that country in accordance with its particular laws. Since the laws of many countries differ in various respects from the patent law of the United States, applicants are advised to seek guidance from specific foreign countries to ensure that patent rights are not lost prematurely.

Applicants also are advised that in the case of inventions made in the United States, the Director of the USPTO must issue a license before applicants can apply for a patent in a foreign country. The filing of a U.S. patent application serves as a request for a foreign filing license. The application's filing receipt contains further information and guidance as to the status of applicant's license for foreign filing.

Applicants may wish to consult the USPTO booklet, "General Information Concerning Patents" (specifically, the section entitled "Treaties and Foreign Patents") for more information on timeframes and deadlines for filing foreign patent applications. The guide is available either by contacting the USPTO Contact Center at 800-786-9199, or it can be viewed on the USPTO website at http://www.uspto.gov/web/offices/pac/doc/general/index.html.

For information on preventing theft of your intellectual property (patents, trademarks and copyrights), you may wish to consult the U.S. Government website, http://www.stopfakes.gov. Part of a Department of Commerce initiative, this website includes self-help "toolkits" giving innovators guidance on how to protect intellectual property in specific countries such as China, Korea and Mexico. For questions regarding patent enforcement issues, applicants may call the U.S. Government hotline at 1-866-999-HALT (1-866-999-4258).

# LICENSE FOR FOREIGN FILING UNDER

## Title 35, United States Code, Section 184

## Title 37, Code of Federal Regulations, 5.11 & 5.15

**GRANTED**

The applicant has been granted a license under 35 U.S.C. 184, if the phrase "IF REQUIRED, FOREIGN FILING LICENSE GRANTED" followed by a date appears on this form. Such licenses are issued in all applications where the conditions for issuance of a license have been met, regardless of whether or not a license may be required as set forth in 37 CFR 5.15. The scope and limitations of this license are set forth in 37 CFR 5.15(a) unless an earlier license has been issued under 37 CFR 5.15(b). The license is subject to revocation upon written notification. The date indicated is the effective date of the license, unless an earlier license of similar scope has been granted under 37 CFR 5.13 or 5.14.

This license is to be retained by the licensee and may be used at any time on or after the effective date thereof unless it is revoked. This license is automatically transferred to any related applications(s) filed under 37 CFR 1.53(d). This license is not retroactive.

Exhibit 21
-494-

The grant of a license does not in any way lessen the responsibility of a licensee for the security of the subject matter as imposed by any Government contract or the provisions of existing laws relating to espionage and the national security or the export of technical data. Licensees should apprise themselves of current regulations especially with respect to certain countries, of other agencies, particularly the Office of Defense Trade Controls, Department of State (with respect to Arms, Munitions and Implements of War (22 CFR 121-128)); the Bureau of Industry and Security, Department of Commerce (15 CFR parts 730-774); the Office of Foreign AssetsControl, Department of Treasury (31 CFR Parts 500+) and the Department of Energy.

**NOT GRANTED**

No license under 35 U.S.C. 184 has been granted at this time, if the phrase "IF REQUIRED, FOREIGN FILING LICENSE GRANTED" DOES NOT appear on this form. Applicant may still petition for a license under 37 CFR 5.12, if a license is desired before the expiration of 6 months from the filing date of the application. If 6 months has lapsed from the filing date of this application and the licensee has not received any indication of a secrecy order under 35 U.S.C. 181, the licensee may foreign file the application pursuant to 37 CFR 5.15(b).

---

### *SelectUSA*

The United States represents the largest, most dynamic marketplace in the world and is an unparalleled location for business investment, innovation, and commercialization of new technologies. The U.S. offers tremendous resources and advantages for those who invest and manufacture goods here. Through SelectUSA, our nation works to promote and facilitate business investment. SelectUSA provides information assistance to the international investor community; serves as an ombudsman for existing and potential investors; advocates on behalf of U.S. cities, states, and regions competing for global investment; and counsels U.S. economic development organizations on investment attraction best practices. To learn more about why the United States is the best country in the world to develop technology, manufacture products, deliver services, and grow your business, visit http://www.SelectUSA.gov or call +1-202-482-6800.

**Exhibit 21**
**-495-**

PTO/SB/16 (03-13)
Approved for use through 01/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless it displays a valid OMB control number

## PROVISIONAL APPLICATION FOR PATENT COVER SHEET – Page 1 of 2

This is a request for filing a PROVISIONAL APPLICATION FOR PATENT under 37 CFR 1.53(c).

Express Mail Label No. __Electronic Filing__

| INVENTOR(S) | | |
|---|---|---|
| Given Name (first and middle [if any]) | Family Name or Surname | Residence (City and either State or Foreign Country) |
| Steven P. | Hotelling | Cupertino, California |
| Marcel M. | Lamego | Cupertino, California |
| | | |
| | | |
| | | |

Additional inventors are being named on the _____ separately numbered sheets attached hereto.

### TITLE OF THE INVENTION (500 characters max):

Methods and Systems for Modulation and Demodulation of Optical Signals

Direct all correspondence to:       **CORRESPONDENCE ADDRESS**

[✓] The address corresponding to Customer Number:

62579

**OR**

[ ] Firm or Individual Name

Address

| City | State | Zip |
|---|---|---|
| Country | Telephone | Email |

### ENCLOSED APPLICATION PARTS (*check all that apply*)

[ ] Application Data Sheet. See 37 CFR 1.76.        [ ] CD(s), Number of CDs _____

[✓] Drawing(s)   *Number of Sheets* 29        [ ] Other (specify) _____

[✓] Specification (e.g., description of the invention)   *Number of Pages* 7

**Fees Due:** Filing Fee of $260 ($130 for small entity) ($65 for micro entity). If the specification and drawings exceed 100 sheets of paper, an application size fee is also due, which is $400 ($200 for small entity) ($100 for micro entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s).

### METHOD OF PAYMENT OF THE FILING FEE AND APPLICATION SIZE FEE FOR THIS PROVISIONAL APPLICATION FOR PATENT

[ ] Applicant asserts small entity status. See 37 CFR 1.27.

[ ] Applicant certifies micro entity status. See 37 CFR 1.29.
Applicant must attach form PTO/SB/15A or B or equivalent.

[ ] A check or money order made payable to the *Director of the United States Patent and Trademark Office* is enclosed to cover the filing fee and application size fee (if applicable).

[✓] Payment by credit card. Form PTO-2038 is attached.

[✓] The Director is hereby authorized to charge the filing fee and application size fee (if applicable) or credit any overpayment to Deposit Account Number: 50-4621 .

$260

**TOTAL FEE AMOUNT ($)**

### USE ONLY FOR FILING A PROVISIONAL APPLICATION FOR PATENT

This collection of information is required by 37 CFR 1.51. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 10 hours to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

Exhibit 21
-496-

PTO/SB/16 (03-13)
Approved for use through 01/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless it displays a valid OMB control number

## PROVISIONAL APPLICATION FOR PATENT COVER SHEET – Page 2 of 2

The invention was made by an agency of the United States Government or under a contract with an agency of the United States Government.

[✓] No.

[ ] Yes, the invention was made by an agency of the U.S. Government. The U.S. Government agency name is: _____

_____

[ ] Yes, the invention was made under a contract with an agency of the U.S. Government. The name of the U.S. Government agency and Government contract number are: _____

_____

## WARNING:

Petitioner/applicant is cautioned to avoid submitting personal information in documents filed in a patent application that may contribute to identity theft. Personal information such as social security numbers, bank account numbers, or credit card numbers (other than a check or credit card authorization form PTO-2038 submitted for payment purposes) is never required by the USPTO to support a petition or an application. If this type of personal information is included in documents submitted to the USPTO, petitioners/applicants should consider redacting such personal information from the documents before submitting them to the USPTO. Petitioner/applicant is advised that the record of a patent application is available to the public after publication of the application (unless a non-publication request in compliance with 37 CFR 1.213(a) is made in the application) or issuance of a patent. Furthermore, the record from an abandoned application may also be available to the public if the application is referenced in a published application or an issued patent (see 37 CFR 1.14). Checks and credit card authorization forms PTO-2038 submitted for payment purposes are not retained in the application file and therefore are not publicly available.

SIGNATURE  /S. Craig Hemenway/                     DATE September 29, 2014

TYPED OR PRINTED NAME  S. Craig Hemenway          REGISTRATION NO. 44,759
                                                  (*if appropriate*)

TELEPHONE  303-223-1100          DOCKET NUMBER  P22733USP1

Exhibit 21
–497–

## Privacy Act Statement

The **Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent.  Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent.  If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a).  Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract.  Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906.  Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (*i.e.*, GSA or Commerce) directive.  Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151.  Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

**Exhibit 21**
**-498-**

Attorney Docket No. P22733USP1

# Methods and Systems for Modulation And Demodulation of Optical Signals

## Technical Field

[0001] The present invention relates generally to health monitoring systems, and more particularly to health monitoring devices that include one or more optical sensors.

**Exhibit 21**
**-499-**

Attorney Docket No. P22733USP1

Background

[0002] Health monitoring devices, such as fitness and wellness devices, may be capable of non-invasively measuring a variety of physiological characteristics of a subject via optical sensing. Such health monitoring devices can include a light source and an optical sensor.

[0003] The light source can illuminate a portion of a measurement site or even emit light that penetrates beneath the measurement site, such as into the stratum corneum of the skin or into blood vessels beneath the skin. Light from the light source may be scattered, absorbed, and/or reflected throughout the measurement site or the material forming the measurement site, such as the skin. The amount of scatter, absorption, or reflection can depend directly or indirectly on one or more physiological characteristics of the measurement site.

[0004] The optical sensor can collect light exiting the measurement site and generate electrical signals corresponding to the collected light, which may be conveyed (in the form of electrical signals) as information or data to the health monitoring device. The health monitoring device can use the optical sensor data to extrapolate, determine, derive, estimate, or measure physiological parameters of the measurement site.

[0005] In many cases, the optical sensor data may include noise associated with ambient light, surface conditions of the measurement site (e.g., cleanliness, hair, perspiration, etc.), proximity of the optical sensor and/or light source to the measurement site, and motion artifacts caused by the relative motion between the health monitoring device and the measurement site.

[0006] Furthermore, health monitoring devices often have a small form factor and are wearable by a subject for extended periods of time. The constrained proportions of such devices can limit the maximum physical size of the optical sensor and/or light source, effectively restricting the performance of both. For example, smaller light sources may emit less light and smaller optical sensors may detect less light. In addition, as the size of the optical sensor and/or light source decrease, the effects of noise increase. As a result, the accuracy, precision, and/or reliability of the physiological parameters derived from the optical sensor data can decrease with the size of many current health monitoring devices.

- 2 -

Exhibit 21
-500-

Attorney Docket No. P22733USP1

[0007] Accordingly, there may be a present need for an improved optical sensing system configured for use with a small form factor health monitoring device.

**Exhibit 21
-501-**

Attorney Docket No. P22733USP1

Summary

[0008] Embodiments described herein may relate to, include, or take the form of an electronic device adapted to measures the optical characteristics, such as reflection or transmission, of a subject.

[0009] Embodiments described herein may relate to, include, or take the form of an electronic device including at least a housing with a surface adapted to be positioned proximate a measurement site of a subject, a biometric sensor positioned at least partially within the surface and including at least a plurality of light sources for emitting light toward the measurement site and an optical sensor for obtaining light exiting the measurement site. The electronic device can also include an input amplifier coupled to the output of the biometric sensor, a high pass filter coupled to the output of the input amplifier, an output amplifier coupled to the output of the high pass filter, and an analog to digital converter coupled to the output of the output amplifier.

[0010] Further embodiments described herein may relate to, include, or take the form of a sensor system including at least a plurality of light sources for emitting light toward a measurement site of a subject, an optical sensor for obtaining light exiting the measurement site, and an input amplifier coupled to the output of the biometric sensor, a high pass filter coupled to the output of the input amplifier, an output amplifier coupled to the output of the high pass filter, and an analog to digital converter coupled to the output of the output amplifier.

[0011] Additional embodiments described herein may relate to, include, or take the form of a method of optical sensing, including at least the operations of emitting light toward a measurement site of a subject, obtaining light exiting the measurement site, converting the obtained light to an electrical signal, amplifying the electrical signal to obtain an amplified signal, filtering low frequency elements from the amplified signal to obtain a filtered signal, and amplifying the filtered signal to obtain an output signal.

[0012] Other embodiments may include further including at least sampling the output signal to obtain a matrix of samples, and determining product of the matrix of samples with a demodulation matrix to obtain a demodulated matrix. Sampling the output signal to obtain a matrix of samples can include taking a first sample, taking a second sample, taking a third

Exhibit 21
-502-

Attorney Docket No. P22733USP1

sample, subtracting the average of the first and third sample from the second sample to obtain an output sample, and inserting the output sample into the matrix of samples.

[0013] Other embodiments may include a configuration in which light may be emitted toward the measurement site from a plurality of light sources each with a light emitting diode, and light may be obtained exiting by an optical sensor with one of the group consisting of photodiodes, phototransistors, or optical image sensors.

Exhibit 21
-503-

Brief Description of the Drawings

[0014] Reference will now be made to representative embodiments illustrated in the accompanying figures. It should be understood that the following descriptions are not intended to limit the disclosure to one preferred embodiment. To the contrary, each is intended to cover alternatives, modifications, and equivalents as may be included within the spirit and scope of the described embodiments as defined by the appended claims.

[0015] FIG. 1A depicts a top plan view of an example health monitoring device.

[0016] FIG. 1B depicts a bottom plan view of the health monitoring device of FIG. 1A, showing apertures associated with an optical sensing system.

[0017] FIG. 2A depicts a detailed cross-section of FIG. 1B taken along line 2-2, showing a simplified view of the optical sensing system of FIG. 1B.

[0018] FIG. 2B depicts the detailed cross-section of FIG. 2A, showing a set of example light paths from a light source through a measurement site of a subject to an optical sensor of the optical sensing system.

[0019] FIG. 3 depicts a simplified signal flow diagram of an optical sensing system.

[0020] FIG. 4 depicts a simplified signal flow diagram of amplification and filtering stages of an optical sensing system.

[0021] FIG. 5 depicts a simplified signal flow diagram of a demodulation stage of an optical sensing system.

[0022] FIG. 6 depicts example operations of a method of calibrating an optical sensing system performed by a light source controller.

[0023] FIG. 7 depicts example operations of a method of calibrating an optical sensing system performed by an optical sensor controller.

[0024] The use of the same or similar reference numerals in different drawings indicates similar, related, or identical items where appropriate.

- 6 -

Exhibit 21
-504-

<u>Detailed Description</u>

[0025] Embodiments described herein relate to systems and methods for increasing the signal to noise ratio of an optical sensing system configured for use with a small form factor health monitoring device, although the various systems and methods described herein are not limited to particular form factors and can apply equally to larger embodiments. Further, it should be appreciated that the various embodiments described herein, as well as functionality, operation, components, and capabilities thereof may be combined with other elements as necessary, and so any physical, functional, or operational discussion of any element or feature is not intended to be limited solely to a particular embodiment to the exclusion of others.

[0026] Any suitable type of electronic device can include health monitoring functionality. Example electronic devices include, but are not limited to, a smart telephone, a headset, a pulse oximeter, a digital media player, a tablet computing device, a timekeeping device, a peripheral input device (e.g., keyboard, mouse, trackpad), and a wearable device. Electronic devices that include health monitoring functionality are generally referred to herein as "health monitoring devices" or "health devices" and the like. Accordingly, it is understood that a health monitoring device as described herein is not necessarily limited to devices configured to only provide health-related information, rather, a health monitoring device may include other functionality as well.

[0027] In one embodiment, one or more sensors may be included within the health monitoring device. Sensors utilized by a health monitoring device can vary from embodiment to embodiment. Suitable sensors can include temperature sensors, electrodermal sensors, blood pressure sensors, heart rate sensors, respiration rate sensors, oxygen saturation sensors, plethysmographic sensors, activity sensors, pedometers, blood glucose sensors, body weight sensors, body fat sensors, blood alcohol sensors, dietary sensors, and so on.

[0028] Certain sensors can collect certain health-related information non-invasively. For example, a health monitoring device can include a sensor that is configured to measure changes in light absorption of a measurement site of the subject. Such a sensor can be implemented as an active sensing system including a light emitter and a light detector. In one embodiment the sensing system can include a light source for emitting light into a measurement site of a subject and an optical sensor to detect light exiting the measurement site. Light from the light source

- 7 -

Exhibit 21<br>-505-

may be scattered, absorbed, and/or reflected throughout the measurement sight as a function of various physiological parameters or characteristics of the subject. For example, a subject may be a human user and the measurement site may be the user's wrist. In such an example, the tissue of the user's wrist can scatter, absorb, or reflect light emitted by the light source differently depending on various physiological characteristics of the surface and subsurface of the user's wrist. In other examples, a subject can be an animal.

[0029]  For example, some embodiments may be configured to detect various subsurface events, such as the user's cardiac cycle. More particularly, during each complete heartbeat, a user's subcutaneous tissue can distend and contract, alternatingly increasing and decreasing the light absorption capacity of the measurement site. In these embodiments, the optical sensor can collect light exiting the measurement site and generate electrical signals corresponding to the collected light. Thereafter, the electrical signals can be conveyed as data to the health monitoring device. One may appreciate that such a sensor is conventionally referred to as a photoplethysmographic sensor (hereinafter "PPG sensor").

[0030]  As noted above, the performance optical sensors such as PPG sensors can be negatively affected by noise associated with ambient light, surface conditions of the measurement site (e.g., cleanliness, hair, perspiration, etc.), proximity of the optical sensor and/or light source to the measurement site, and motion artifacts caused by the relative motion between the health monitoring device and the measurement site. In other words, "environmental noise" can have a substantial impact on the quality of the data obtained by the optical sensor.

[0031]  Accordingly, many embodiments described herein modulate the light output from the light source and demodulate the light collected by the optical sensors. In this manner, environmental noise can be at least partially prevented from interfering with the operation of the optical sensor. In many embodiments, modulation and demodulation can be implemented by toggling the light source on and off at a particular frequency. Thereafter, the optical sensor can generate electrical signals corresponding to the light collected from the measurement site. In these embodiments, the electrical signals can be demodulated and processed by the health monitoring device.

Exhibit 21
-506-

[0032] In many embodiments, the health monitoring device can implement a time-domain noise attenuation operation such as dark-channel subtraction. For example, in some embodiments, a sample can be taken from the optical sensor when it is known that the light source is not emitting light. This sample can be saved as a "dark" sample. Thereafter, a sample can be taken from the optical sensor when it is known that the light source is emitting light. Next, the dark sample can be subtracted from this "light" sample to remove the effects of noise from the light sample. In other words, a dark sample can represent an approximation of the amount of environmental noise at or near the time the dark sample was taken.

[0033] In further embodiments, a second dark sample can be taken after the light sample. In such cases, the first and second dark samples can be averaged. The averaged dark sample may be subtracted from the intervening light sample in order to remove the effects of noise from the light sample.

[0034] Although time-domain noise attenuation operations such as dark-channel subtraction may be suitable in certain embodiments for mitigating the effects of certain environmental noise sources, the delays required between "light" samples (e.g., delays where dark samples are required to be taken) can cause undesirable aliasing. In some examples, using dark-channel subtraction may require a reduction in sampling rate, which in turn can increase the number of aliases present in the data output from the optical sensor. In these examples, low frequency aliases may be particularly undesirable.

[0035] For example, many physiological signals measurable by a PPG sensor (e.g., respiration, heart rate) are relatively low frequency signals. For example, a heathy user's heart rate may vary from less than one beat per second to only a few beats per second. In other words, a heart rate may be a physiological signal within the frequency band from 0 Hz to 3 – 4 Hz. Accordingly, low frequency aliasing (as a result of dark-channel subtraction) can interfere with the detection and extraction of low frequency physiological signals, such as heart rate.

[0036] Accordingly, certain embodiments described herein implement a filter prior to time-domain noise attenuation. For example, a high pass or a band pass filter can be implemented to attenuate some or all frequencies except frequencies nearby the modulation frequency. In this manner, certain frequencies of environmental noise can be attenuated prior to

Exhibit 21
-507-

time-domain noise attenuation operations such as dark-channel subtraction. As a result, low frequency noise sources are attenuated and, accordingly, the negative effects of low frequency aliasing can be reduced.

[0037] Although filtering prior to dark-channel subtraction may be suitable in some embodiments for attenuating certain noise sources, the process of filtering with a dynamic filter (such as a band pass or high pass filter) can increase the complexity of demodulating and/or demultiplexing the signal. For example, the time response of a dynamic filter can mix the time-multiplexed signals sent from the light source in time. In other words, dynamic filtering of a signal $S_0$ received at time $t_0$ can cause the signal $S_0$ to interfere with a signal $S_1$ sent at time $t_1$.

[0038] Accordingly, embodiments described herein relate to methods and systems for demodulating and demultiplexing signals output from an optical sensor implementing both dynamic filtering and time-domain noise attenuation.

[0039] FIG. 1A depicts a top plan view of an example health monitoring device 100. In the illustrated embodiment, the health monitoring device may be implemented as a portable electronic device that is adapted to be worn by a user. Other embodiments can implement the health monitoring device differently. For example, the health monitoring device can be a smart phone, a gaming device, a digital music player, a sports accessory device, a medical device, a device that provides time and/or weather information, a health assistant, and other types of electronic device suitable for attaching to a user.

[0040] The health monitoring device can be implemented as a wearable health assistant that provides health-related information (whether real-time or not) to the user, authorized third parties, and/or an associated monitoring device. The wearable health assistant may be configured to provide health-related information or data such as, but not limited to, heart rate data, blood pressure data, temperature data, blood oxygen saturation level data, diet/nutrition information, medical reminders, health-related tips or information, or other health-related data. The associated monitoring device may be, for example, a tablet computing device, phone, personal digital assistant, computer, and so on.

Exhibit 21
-508-

[0041] As another example, the health monitoring device can be configured in the form of a wearable communications device. The wearable communications device may include a processor coupled with or in communication with a memory, one or more sensors, one or more communication interfaces, output devices such as displays and speakers, one or more input devices, and a health monitoring system. The communication interface(s) can provide electronic communications between the communications device and any external communication network, device or platform, such as but not limited to wireless interfaces, Bluetooth interfaces, USB interfaces, Wi-Fi interfaces, TCP/IP interfaces, network communications interfaces, or any conventional communication interfaces. The wearable communications device may provide information regarding time, health, statuses or externally connected or communicating devices and/or software executing on such devices, messages, video, operating commands, and so forth (and may receive any of the foregoing from an external device), in addition to communications.

[0042] The health monitoring device 100 includes a housing 102 at least partially surrounding a display 104. In many examples, the display 104 may incorporate an input device configured to receive touch input, force input, and the like and/or output information to a user, such as various health parameters or health-related suggestions. The health monitoring device 100 may also include one or more buttons or input devices (not shown). The housing 102 can form an outer surface or partial outer surface and protective case for the internal components of the health monitoring device 100. In the illustrated embodiment, the housing 102 is formed into a substantially rectangular shape, although this configuration is not required.

[0043] The housing 102 can be formed of one or more components operably connected together, such as a front piece and a back piece or a top clamshell and a bottom clamshell. Alternatively, the housing 102 can be formed of a single piece (e.g., uniform body or unibody) operably connected to the display 104.

[0044] The display 104 can be implemented with any suitable technology, including, but not limited to, a multi-touch sensing touchscreen that uses liquid crystal display (LCD) technology, light emitting diode (LED) technology, organic light-emitting display (OLED) technology, organic electroluminescence (OEL) technology, or another type of display technology. A button (not shown) might take the form of a home button, which may be a

- 11 -

**Exhibit 21**
**-509-**

mechanical button, a soft button (e.g., a button that does not physically move but still accepts inputs), an icon or image on the display 104 or on an input region, and so on. Other buttons or mechanisms can be used as input/output devices, such as a speaker, rotary input, a microphone, an on/off button, a mute button, or a sleep button.

[0045] The health monitoring device 100 may include one or more health sensors. In some examples, the health sensors can be disposed on a bottom surface 112 of the housing 102. For example, FIG. 1B depicts a bottom plan view of the health monitoring device of FIG. 1A, showing two apertures 114a, 114b associated with an optical sensing system that can be used to obtain health-related information from a user. As noted above, an optical sensing system can include a light source and an optical sensor (not shown). The light source can be disposed within a first aperture 114a and the optical sensor can be disposed within a second aperture 114b. In some embodiments, the light source may fill the first aperture and/or the optical sensor may fill the second aperture, while in other embodiments optically-transparent windows or covers may seal the light source and optical sensor in their respective apertures. As used herein, the term "optically transparent" and variants thereof does not necessarily mean that the structure is transparent to visible light but instead to the particular wavelength of light emitted by the light source and/or received by the sensor. Thus, some windows may pass infrared light but block visible light and still be optically transparent.

[0046]  In some examples, and as illustrated, the apertures 114a, 114b the bottom surface 112 of the housing 102 may take a convex shape, although this configuration is not required. In these examples, the apertures 114a, 114b can be formed symmetrically about the apex of the convex curvature of the bottom surface 112. In this manner, the curvature of the housing itself can provide an optical barrier between the light source and the optical sensor. For example, the apex of the convex curvature of the external surface can physically and optically separate the light source from the optical sensor. In other examples, the bottom surface 112 can be flat, faceted, or concave. In further embodiments, the bottom surface 112 can take an arbitrary shape. In some embodiments, the light source and/or optical sensor may be recessed within the apertures such that there is no direct light path between the two.

Exhibit 21
-510-

[0047] The apertures 114a, 114b may be separated by a selected distance. The distance between the apertures 114a, 114b can vary from embodiment to embodiment.

[0048] FIG. 2A depicts a detailed cross-section of FIG. 1B taken along line 2-2, showing a simplified view of the optical sensing system of FIG. 1B. The optical sensing system includes a light source 116 and an optical sensor 122. In one embodiment the light source 116 may be light emitting diode configured to emit light at a particular frequency. For example, in certain embodiments the light source 116 can be configured to emit green light. In another example, the light source 116 can emit infrared light. In still further examples, the light source 116 can be configured to emit light in another frequency band.

[0049] In many embodiments, more than one independent light source can be implemented as the light source 116. For example, certain embodiments can include four light sources within the space reserved for the light source 116. In other embodiments more or fewer light sources can be used. In these and related embodiments, the multiple individual light sources 116 can be configured to illuminate independently or at once. For example, in certain embodiments, individual light sources 116 can be illuminated in a sequence.

[0050] The optical sensor 122 can be a photodiode, phototransistor, and/or an optical image sensor such as a charge-coupled device ("CCD") or complementary metal-oxide semiconductor ("CMOS") array.

[0051] The light source 116 can be disposed within a cavity 118 that extends to the aperture 114a. In some embodiments, the cavity 118 may have a shorter width than that of the aperture 114a, although this configuration is not required.

[0052] A lens 120 or window may seal the cavity 118; the lens 120 need not focus or scatter light in any particular fashion. The lens 120 may be formed from the same material as the bottom surface 112, although this is not required. In one embodiment, the lens 120 can be configured to diffuse light, while in other embodiments it may focus light or may not affect the directionality of light passing therethrough. In some embodiments, the lens 120 may be optically transparent. In still further embodiments, the lens 120 may be configured to exhibit transparency in a first light frequency band and to be opaque in a second light frequency band. For one

- 13 -

Exhibit 21
-511-

example, the first light frequency band can be infrared light and the second light frequency band can be visible light.

[0053] As with the light source 116, the optical sensor 122 can be disposed within a cavity 124 and below another window or lens 126. As with the lens 120, the lens 126 can be configured to diffuse light. In other embodiments, the lens 126 may be optically transparent, or may be shaped to focus light to a particular focal point (or not). In still further embodiments, the lens 126 may be configured to exhibit transparency in a first light frequency band and to be opaque in a second light frequency band. For one example, the first light frequency band can be infrared light and the second light frequency band can be visible light.

[0054] FIG. 2B depicts a second cross-section like that of FIG. 2A, now showing a set of example light paths from a light source through a measurement site 110 of a subject to an optical sensor of the optical sensing system. As illustrated, light emitted from the light source 116 passes into an illumination area 130 of the measurement site 110, through an intermediate volume 128 of the measurement site 110, to a collection area 132 of the measurement site 110, and, thereafter, exits the collection area 132 where it may be collected by the optical sensor 122 and conveyed to the health monitoring device 102. In many embodiments, the subject may be a human user.

[0055] As illustrated, a portion of the light emitted from the light source 116 may not exit the intermediate volume 128 through the collection area 132. For example, some light may continue transmitting in a direction parallel to the length of the intermediate volume 128. In addition, some light can transmit in directions away from the collection area 132. In addition, some light can be absorbed within the intermediate volume collection area 132, depicted in FIG. 2B as point-terminated lines. Accordingly, the quantity of light received by the optical sensor 122 may be less than the quantity of light emitted by the light source 116.

[0056] FIG. 3 depicts a simplified signal flow diagram of an optical sensing system. An optical sensing system can include a light source controller 300 that is coupled to one or more light sources 302. The light source controlled 300 can be implemented as a microprocessor, integrated circuit, with discrete circuitry, or using any other suitable technique. The light source controller 300 can be configured to control the power state, brightness, and/or color of the light

Exhibit 21
-512-

emitted by the one or more light sources 302. For example, in some embodiments the light source(s) 302 can include a light configured to emit green light and a second light configured to emit infrared light. In such an embodiment, the light source controller 300 can alternately illuminate the green light and the infrared light. In another example, the light source controller 300 can illuminate the green light and the infrared light at the same time.

[0057] The optical sensing system of FIG. 3 can also include an optical sensor controller 306 that is configured to receive output from the one or more optical sensors 308. The optical sensors 308 can receive light from the light source 302 that has reflected or transmitted through a measurement site 310 of a subject. In many embodiments, the subject may be a human user.

[0058] The optical sensor controller 306 can be implemented as a microprocessor, integrated circuit, with discrete circuitry, or using any other suitable technique. The optical sensor controller 306 can also be coupled to the light source controller 300. In many examples, the optical sensor controller 306 can use information provided by the light source controller 300. For example, in one embodiment, the light source controller 300 can inform the optical sensor controller 306 that the light source controller 300 is not illuminating any of the light sources 302. Alternatively, the light source controller 300 can inform the optical sensor controller 306 that the light source controller 300 is illuminating a particular light source 302.

[0059] In some embodiments described herein, the optical sensor controller 306 can implement one or more operations in an attempt to attenuate environmental noise. In one embodiment, the optical sensor controller 306 can implement a dark-channel subtraction operation. As described above, a dark-channel subtraction operation can take a sample output from an optical sensor 308 when the light source is not illuminated in order to determine the amount of ambient light received by the sensor when the light sources are "dark." Shortly thereafter, a light source 302 can be illuminated and another sample can be taken. Next, the "dark" sample can be subtracted from the "light" sample.

[0060] The optical sensor controller 306 can implement the dark-channel subtraction operation with assistance from the light source controller 300. For example, the light source controller 300 can inform the optical sensor controller 306 when light sources are on or off. In

Exhibit 21
-513-

alternate embodiments, the optical sensor controller 306 can direct the light source controller 300 to turn particular light sources 302 on or off.

[0061] In further embodiments, the light source controller 300 and/or the optical sensor controller 306 can be implemented as software instructions to be executed by a processor associated with a health monitoring device.

[0062] FIG. 4 depicts a simplified signal flow diagram of amplification and filtering stages of an optical sensing system. In the illustrated embodiment, the optical sensor 400 can receive light. In many examples, the light may be transmitted from a light source associated with the optical sensing system, but, as noted above, additional environmental light can be received by the optical sensor as well.

[0063] After the light is received by the optical sensor 400, the optical sensor 400 may convert the light into analog electrical signals. In many examples, the optical sensor 400 can be a photodiode. Next, the analog electrical signal can be received by a transimpedance amplifier at 402. In many examples, a transimpedance amplifier can be suitable to convert the current output from a photodiode to a usable voltage. In such examples, measuring the current changes through a photodiode may be preferable to measuring the voltage changes across a photodiode because current may vary more linearly with changes in light than voltage. In one embodiment, the photodiode can be zero biased. In other examples the photodiode can be reverse biased.

[0064] After the analog electrical signal is amplified by the transimpedance amplifier 402, the amplified analog electrical signal can be passed through a high pass filter at 404. As noted with respect to embodiments described above, a high pass filter can be useful to remove low frequency components within the electrical signal that might otherwise interfere with detection of low frequency physiological parameters such as heart rate.

[0065] As noted above, the cutoff frequency of the high pass filter 404 can be selected to be below the frequency of modulation of light expected from the light source. For example, if the light source is modulating at 1KHz, the cutoff frequency of the high pass filter can be 750Hz. In other embodiments, the cutoff frequency can be closer or father away from the modulation frequency.

**Exhibit 21**
**-514-**

[0066] In other examples, the filter can be implemented as a band pass filter. For example, if the light source is modulating light at 1KHz, a band pass filter can have a lower cutoff at 750z and a high cutoff at 1.25 KHz. In other examples, different cutoff frequencies can be used.

[0067] In many examples, the filter can also remove direct current biases present within the signal.

[0068] After the signal is filtered by the high pass filter 404, it can be passed to a programmable gain amplifier at 406 and thereafter to an analog to digital converter at 408. The programmable gain amplifier 406 can increase the dynamic range of the optical sensor. For example, certain users may have darker skin than other users. Accordingly, the amount of light absorbed by the measurement site can vary from person to person. In these embodiments, the programmable gain amplifier 406 can be adjusted on a per-user basis in order to provide the maximum signal to the analog to digital converter 408.

[0069] In other examples, the gain of the programmable gain amplifier 406 can be based, at least in part, on feedback from the analog to digital converter 408. For example, if the analog to digital converter 408 determines that the average signal output from the programmable gain amplifier 406 is too low, then the analog to digital converter 408 can cause the programmable gain amplifier 406 to increase gain by a certain amount. In other examples, if the analog to digital converter 408 determines that the average signal output from the programmable gain amplifier 406 is too high (e.g., clipping is detected), then the analog to digital converter 408 can cause the programmable gain amplifier 406 to decrease gain by a certain amount.

[0070] FIG. 5 depicts a simplified signal flow diagram of a demodulation stage of an optical sensing system. In the illustrated embodiment, a digital signal can be received and sampled into a matrix at 502. Thereafter at 504, the matrix can be multiplied by a demodulation matrix in order to obtain a substantially noise-free measurement of the physiological parameters of a measurement site.

[0071] A demodulation matrix can be calculated in a number of ways. For example, in certain embodiments, a demodulation matrix can be fixed. In other embodiments, a different

Exhibit 21
-515-

demodulation matrix can be selected depending upon particular environmental conditions. In still further embodiments, a plurality of demodulation matrices can be iterated through in order to determine which demodulation matrix obtains the highest quality output signal.

[0072] In still further embodiments, a demodulation matrix can be calculated dynamically and/or during a calibration procedure. For example, as with other embodiments described herein, an optical sensing system can have a plurality of light sources, a measurement site, and an optical sensor.

[0073] In many embodiments, the light sources can output modulated light. For example, if an embodiment is implemented with four light sources, a single light source can be illuminated at a time. Once all light sources have been illuminated, the cycle can repeat. In other words, the output of light from a light sensor may be periodic with period $T$, sampled for $k$ periods. The function can be modeled as:

$$x(t) = x(t + kT) \qquad \text{Equation 1}$$

[0074] In one example, the function $x(t)$ may be the light as it reaches the measurement site. In other words, light that has been affected by physiological parameters of the measurement site, but that is not yet accompanied or affected by environmental noise. As noted above, the light may pass through the measurement site and may be joined by other noise sources. In other words, the light can pass through a linear time invariant system having an unknown impulse. Such a function can be modeled as $H(t)$. Accordingly, once the light reaches the optical sensor, it may have been affected by the linear time invariant system. In other words, the light that reaches the sensor $y(t)$ can be modeled as the convolution of $x(t) * H(t)$:

$$y(t) = \int_{-\infty}^{\infty} H(\tau) x(t - \tau) d\tau = y(t + kT) \qquad \text{Equation 2}$$

[0075] However, as noted above, in some embodiments, multiple light sources can be used. Accordingly, the original signal $x(t)$ can be represented by a sum of $n$ individual signals, each having a unique scaling factor $\alpha$ associated with it:

$$x(t) = \sum_{i=1}^{n} \alpha_i(t) x_i(t) \qquad \text{Equation 3}$$

Exhibit 21
-516-

Attorney Docket No. P22733USP1

[0076] Because light noise may not be modulated at the modulated frequency, the scaling factors may $\alpha$ vary and/or correspond to the physiological parameters of the measurement site.

[0077] In many embodiments, it can follow from Equation 3 that the scaling factors can pass through the linear time invariant system **H(t)**, to be directly measured when measuring **y(t)**:

$$y(t) = \sum_{i=1}^{n} \alpha_i(t) y_i(t)$$   Equation 4

[0078] In other words, the measured signal **y(t)**, may be composed of a number of individual signals $y_i(t)$; once the individual signals $y_i(t)$ can be demultiplexed and demodulated, the individual scaling factors, and thus the physiological parameters of the measurement site, can be determined.

[0079] In certain embodiments, various assumptions can assist in demuxing and demodulating the signal **y(t)**. For example, by turning on a single light source and/or turning of all light sources, the signal **x(t)** can be computationally simplified. Also, in embodiments directed to detecting low frequency physiological signals such as heart rate, it can be assumed that the scaling factors do not change between samples of particularly high sampling rates.

[0080] Also as noted above, dark-channel subtraction may be implemented while demodulating to attempt to remove as much noise as possible before further signal processing. For example, a demodulated signal $z_j(k)$ can be formed from synchronous samples of **y(t)** at individual time instances $\tau_j$. In sync with sampling, the light source can turn on and off at known rate. In this manner, time instances $\tau_j$ can fall immediately between dark periods of a light source. In other words, a dark sample can be taken at $\tau_j - \Delta_j$ and another dark sample can be taken at $\tau_j + \Delta_j$. Between the dark samples, at $\tau_j$, a "light" sample can be taken. The dark channel subtraction can be modeled as:

$$z_j(k) = y\left(t_0 + kT + \tau_j\right) - \frac{y(t_0 + kT + \tau_j - \Delta_j) + y(t_0 + kT + \tau_j + \Delta_j)}{2}$$   Equation 5

**Exhibit 21**
**-517-**

Attorney Docket No. P22733USP1

[0081] In many embodiments, the demodulated signal $z_j(k)$ can include $m$ samples. In other words, Equation 5 can be defined from $j = 1 \ldots m$.

[0082] As noted above, individual light sources can be turned on or off. Accordingly, in some embodiments, one light source $i$ may be turned on a time to simplify the calculation of demodulation. More specifically, a demodulated signal $z_j(k)$ that relates specifically to one light source $i$ can be modeled as:

$$z_{j,i}(k) = \alpha_i(t)y_i(t) \qquad\qquad \text{Equation 6}$$

[0083] Which in turn can be modeled as:

$$z_{j,i}(k) = \alpha_i(t_0 + kT + \tau_j)\omega_{j,i} \qquad\qquad \text{Equation 7}$$

[0084] Where:

$$\omega_{j,i} = y(t_0 + kT + \tau_j) - \frac{y(t_0+kT+\tau_j-\Delta_j)+y(t_0+kT+\tau_j+\Delta_j)}{2} \qquad \text{Equation 8}$$

[0085] In order to simplify the calculation, some embodiments can utilize the presumption that because the Equations $1 - 8$ are time invariant, then $t_0 = 0$. In some embodiments, the simplified calculation can be modeled as:

$$z_{j,i}(k) = \alpha_i(kT + \tau_j)\omega_{j,i} \qquad\qquad \text{Equation 9}$$

[0086] Where:

$$\omega_{j,i} = y(\tau_j) - \frac{y(\tau_j-\Delta_j)+y(\tau_j+\Delta_j)}{2} \qquad\qquad \text{Equation 10}$$

[0087] Accordingly, in certain embodiments, the dark-channel subtraction demodulation operation can be accomplished by calculating $\omega_{j,i}$. In other words, because $z_{j,i}(k)$ is measureable, the only unknowns in Equation 9 are, generally speaking, $\omega_{j,i}$ and $\alpha_i(kT + \tau_j)$. However, after the demodulation process, one may appreciate that demultiplexing may still be required.

- 20 -

Exhibit 21
-518-

[0088] Accordingly, certain embodiments may attempt to estimate $\omega_{j,i}$. For example, all individual light sources $i = 1 \ldots n$ can be demultiplexed as described above with respect to the examples of Equations 5 – 10. In such embodiments, an individual light source can be illuminated while all other light sources are turned off, and the light source can be sampled a certain number of times. As described above, each "sample" can actually constitute three samples; two "dark" samples can be averaged and subtracted from a single "light" sample. Once $m$ samples are taken of the selected light source, the next light source can be selected.

[0089] For example, lights sources $i = 1 \ldots n$ can be sampled with samples $j = 1 \ldots m$, and thus all measured results can be modeled as a matrix:

$$Z(k) = \begin{bmatrix} z_{1,1} & \cdots & z_{1,m} \\ \vdots & \ddots & \vdots \\ z_{n,1} & \cdots & z_{n,m} \end{bmatrix} \qquad \text{Equation 11}$$

[0090] Correspondingly, the demodulation values can be modeled as a matrix:

$$W = \begin{bmatrix} \omega_{1,1} & \cdots & \omega_{1,m} \\ \vdots & \ddots & \vdots \\ \omega_{n,1} & \cdots & \omega_{n,m} \end{bmatrix} \qquad \text{Equation 12}$$

[0091] One may note that the demodulation values does not vary with $k$. In addition, the scalar coefficients can be modeled as a matrix:

$$A(k) = \begin{bmatrix} \alpha_{1(kT)} & \cdots & 0 \\ \vdots & \ddots & \vdots \\ 0 & \cdots & \alpha_{n(kT)} \end{bmatrix} \qquad \text{Equation 13}$$

[0092] Alternatively, some embodiments can model the system as the matrix equation, presuming that W is full rank and that $n = m$:

$$Z(k) = A(k)W \qquad \text{Equation 14}$$

[0093] Thus, in order to calculate the scaling factors A(k), given only the measured values from the optical sensor, $Z(k)$, some embodiments utilize the simplification:

$$A(k) = Z(k)\, W^{-1} \qquad \text{Equation 15}$$

- 21 -

Exhibit 21
-519-

Attorney Docket No. P22733USP1

[0094] In this configuration, the matrix $W^{-1}$ represents demultiplexing constants.

[0095] However, in many embodiments, Equation 15 is only useful once and unless the demultiplexing constants are known and/or estimated. Accordingly, in some embodiments, an initial matrix of $A_{init}$ can be supplied. For example, an identity matrix may be used in certain embodiments:

$$A_{init} = \begin{bmatrix} 1 & \cdots & 0 \\ \vdots & \ddots & \vdots \\ 0 & \cdots & 1 \end{bmatrix} \qquad\qquad \text{Equation 16}$$

[0096] In other embodiments, an initial matrix of $A_{init}$ can be supplied from the diagonal of the measured matrix $Z(k)$. For example, an identity matrix may be used in certain embodiments:

$$A_{init} = \begin{bmatrix} z_{1,1} & \cdots & 0 \\ \vdots & \ddots & \vdots \\ 0 & \cdots & z_{n,m} \end{bmatrix} \qquad\qquad \text{Equation 17}$$

[0097] Thus, in some embodiments, by multiplying the matrix inverse of the measured values $Z(k)^{-1}$ with the initial matrix $A_{init}$, a first estimation of the demultiplexing constants $W^{-1}$ can be calculated. For example:

$$A_{init} Z(k)^{-1} = W^{-1} \qquad\qquad \text{Equation 18}$$

[0098] In some embodiments, the demultiplexing constants can be calculated and averaged with previous demultiplexing constants. After a sufficient number of calculations of the demultiplexing constants, returning to FIG. 5, a sampled signal matrix at 502 can be multiplied by a demultiplexing matrix at 504 to obtain scalar constants corresponding to physiological parameters of the measurement area.

[0099] FIG. 6 depicts example operations of a method of calibrating an optical sensing system performed by a light source controller. The method can begin at operation 600 in which a light source controller receives a calibration signal. Next at 602, all lights controlled by the light source controller can be turned off for a selected period of time. In many examples, operation 602 may be a first "dark" sample collection period of a dark-channel subtraction process. Next at

- 22 -

Exhibit 21
-520-

604, one individual light can be turned on for a selected period of time. In many examples, operation 605 may be the "light" sample of a dark-channel subtraction process. Next at 606, all lights controlled by the light source controller can be turned off for another selected period of time. In many embodiments, operation 606 can be a second "dark" sample collection period of a dark-channel subtraction process. Lastly at operation 608, the method can cycle back to operation 602 after selecting the next light source to illuminate individually.

[0100] The order in which lights are illuminated can vary from embodiment to embodiment. For example, certain embodiments may illuminate adjacent lights sequentially. In other examples, a random or pseudorandom illumination pattern can be used.

[0101] FIG. 7 depicts example operations of a method of calibrating an optical sensing system performed by an optical sensor controller. The method can begin at operation 700 in which a calibration signal is sent by an optical sensor controller to a light source controller. Next at operation 702, a demultiplexing matrix can be determined and/or estimated. For example, as described with respect to FIG. 5. The method can continue to operation 704 at which a number of calculated demultiplexing matrices are calculated and averaged. The method can conclude at operation 706 during which the average demultiplexing matrix is saved for future use.

[0102] For example, a saved demultiplexing matrix can be used in conjunction with Equation 15, modified to account for all light sources being active:

$$[\alpha_1(kT) \ldots \alpha_n(kT)] = [z_1(kT) \ldots z_n(kT)]\, W^{-1} \qquad \text{Equation 19}$$

[0103] Many embodiments of the foregoing disclosure may include or may be described in relation to various methods of operation, use, manufacture, and so on. Notably, the operations of methods presented herein are meant only to be exemplary and, accordingly, are not necessarily exhaustive. For example an alternate operation order, or fewer or additional steps may be required or desired for particular embodiments.

[0104] The foregoing description, for purposes of explanation, used specific nomenclature to provide a thorough understanding of the described embodiments. However, it will be apparent to one skilled in the art that the specific details are not required in order to practice the described embodiments. Thus, the foregoing descriptions of the specific

**Exhibit 21 -521-**

Attorney Docket No. P22733USP1

embodiments described herein are presented for purposes of illustration and description. They are not meant to be exhaustive or to limit the embodiments to the precise forms disclosed. It will be apparent to one of ordinary skill in the art that many modifications and variations are possible in view of the above teachings. In particular, any features described with respect to one embodiment may also be used in other embodiments, where compatible. Likewise, the features of the different embodiments may be exchanged, substituted, or omitted where compatible and appropriate.

Exhibit 21
-522-

Attorney Docket No. P22733USP1

## CLAIMS

We claim:

1.      An electronic device comprising:

a housing comprising a surface adapted to be positioned proximate a measurement site of a subject;

a biometric sensor positioned at least partially within the surface and comprising:

a plurality of light sources for emitting light toward the measurement site; and

an optical sensor for obtaining light exiting the measurement site; and

an input amplifier coupled to the output of the biometric sensor and disposed within the housing;

a high pass filter coupled to an output of the input amplifier and disposed within the housing;

an output amplifier coupled to an output of the high pass filter and disposed within the housing; and

an analog to digital converter coupled to an output of the output amplifier and disposed within the housing.

2.      The electronic device of claim 1, wherein:

each light source of the plurality of light sources comprises a light emitting diode; and

the optical sensor comprises one of the group consisting of photodiodes, phototransistors, or optical image sensors.

3.      The electronic device of claim 1, wherein the input amplifier comprises a transimpedance amplifier.

4.      The electronic device of claim 1, wherein the output amplifier comprises a programmable gain amplifier.

5.      The electronic device of claim 1, further comprising a processor coupled to the output of the analog to digital converter.

- 25 -

Exhibit 21
-523-

Attorney Docket No. P22733USP1

6.      The electronic device of claim 1, wherein the processor is configured to control the light source of the optical sensor.

7.      The electronic device of claim 6, wherein the biometric sensor further comprises a measurement mode and a calibration mode.

8.      The electronic device of claim 7, wherein the calibration mode comprises:
deactivating all light sources for a selected time period;
activating a first light source of the plurality of light sources for a selected time period; and
deactivating all light sources for a selected time period.

9.      A sensor system for measuring a periodic biometric characteristic of a subject, the sensor system comprising:
a plurality of light sources operative to emit a series light pulses at a selected modulation frequency toward a measurement site of the subject;
an optical sensor operative to receive light exiting a portion of the measurement site, the light originating from the series of light pulses;
a transimpedance input amplifier coupled to the output of the optical sensor;
a high pass filter coupled to the transimpedance input amplifier and configured to filter frequencies higher than the selected modulation frequency;
an output amplifier coupled of the high pass filter and configured to amplify an output of the high pass filter; and
an analog to digital converter coupled to the output amplifier configured to associate a signal amplitude of the output amplifier with a digital value.

10.     The sensor system of claim 9, wherein:
each of the light source of the plurality of light sources comprises a light emitting diode configured to emit light at a selected frequency; and

- 26 -

Exhibit 21
-524-

the optical sensor comprises one of the group consisting of photodiodes, phototransistors, and optical image sensors.

11.     The sensor system of claim 9, wherein the input amplifier comprises a transimpedance amplifier; and
the output amplifier comprises a programmable gain amplifier.

12.     The sensor system of claim 9, wherein:
a first subset of the plurality of light sources comprises a plurality of light emitting diodes configured to emit light at a first selected frequency; and
a second subset of the plurality of light sources comprises a plurality of light emitting diodes configured to emit light at a second selected frequency;
wherein when the first subset is emitting light the second subset is prevented from emitting light.

13.     The sensor system of claim 9, further comprising a processor coupled to the output of the analog to digital converter.

14.     The sensor system of claim 9, wherein the processor is configured to control the modulation of at least one of the light sources of the plurality of light sources.

15.     The sensor system of claim 14, wherein the biometric sensor further comprises a measurement mode and a calibration mode.

16.     The electronic device of claim 15, wherein the calibration mode comprises:
deactivating all light sources for a selected time period;
activating a first light source of the plurality of light sources for a selected time period; and
deactivating all light sources for a selected time period.

17.     A method of optical sensing, comprising:

- 27 -

**Exhibit 21**
**-525-**

Attorney Docket No. P22733USP1

emitting light toward a measurement site of a subject;

obtaining light exiting the measurement site;

converting the obtained light to an electrical signal;

amplifying the electrical signal to obtain an amplified signal;

filtering low frequency elements from the amplified signal to obtain a filtered signal; and

amplifying the filtered signal to obtain an output signal.

18.     The method of claim 17, further comprising:

sampling the output signal to obtain a matrix of samples; and

determining product of the matrix of samples with a demodulation matrix to obtain a demodulated matrix.

19.     The method of claim 18, wherein sampling the output signal to obtain a matrix of samples comprises:

taking a first sample;

taking a second sample;

taking a third sample;

subtracting the average of the first and third sample from the second sample to obtain an output sample; and

adding the output sample the matrix of samples.

20.     The method of claim 17, wherein:

light is emitted toward the measurement site from a plurality of light sources each comprising a light emitting diode; and

light is obtained exiting by an optical sensor comprising one of the group consisting of photodiodes, phototransistors, or optical image sensors.

**Exhibit 21**
**-526-**

Attorney Docket No. P22733USP1

## **ABSTRACT**

An electronic device includes one or more light sources for emitting light toward a body part of a user and one or more optical sensors for capturing light samples while each light source is turned on and for capturing dark samples while the light source(s) are turned off. A signal produced by the one or more optical sensors is filtered and demodulated produce multiple demodulated signals each associated with a light source. Each signal associated with the light source(s) is analyzed to estimate or determine a physiological parameter of the user.

**Exhibit 21**
**-527-**

Title: Methods and Systems for Modulation And Demodulation of Optical Signals
Application No. Not Yet Assigned; Filed: Herewith
Inventor(s): Lamego et al.
Docket No. P22733USP1

## 1/7

100



FIG. 1A          FIG. 1B

Exhibit 21
-528-

Title: Methods and Systems for Modulation and Demodulation of Optical Signals
Application No. Not Yet Assigned; Filed: Herewith
Inventor(s): Lamego et al.
Docket No. P22733USP1

*2/7*



**FIG. 2A**



**FIG. 2B**

Exhibit 21
-529-

Title: Methods and Systems for Modulation And Demodulation of Optical Signals
Application No. Not Yet Assigned; Filed: Herewith
Inventor(s): Lamego et al.
Docket No. P22733USP1

*3/7*



*FIG. 3*

Exhibit 21
-530-

Title: Methods and Systems for Modulation And Demodulation of Optical Signals
Application No. Not Yet Assigned; Filed: Herewith
Inventor(s): Lamego et al.
Docket No. P22733USP1

*4/7*



*FIG. 4*

Exhibit 21
-531-

Title: Methods and Systems for Modulation And Demodulation of Optical Signals
Application No. Not Yet Assigned; Filed: Herewith
Inventor(s): Lamego et al.
Docket No. P22733USP1

*5/7*



*FIG. 5*

**Exhibit 21**
**-532-**

Title: Methods and Systems for Modulation And Demodulation of Optical Signals
Application No. Not Yet Assigned; Filed: Herewith
Inventor(s): Lamego et al.
Docket No. P22733USP1

*6/7*



*FIG. 6*

Exhibit 21
-533-

Title: Methods and Systems for Modulation And Demodulation of Optical Signals
Application No. Not Yet Assigned; Filed: Herewith
Inventor(s): Lamego et al.
Docket No. P22733USP1

## *7/7*



*FIG. 7*

Exhibit 21
-534-

# Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | |
| **Filing Date:** | |
| **Title of Invention:** | Methods and Systems for Modulation and Demodulation of Optical Signals |
| **First Named Inventor/Applicant Name:** | Steven P. Hotelling |
| **Filer:** | Stephen C. Hemenway/Valerie Brown |
| **Attorney Docket Number:** | P22733USP1 |

Filed as Large Entity

## Provisional Filing Fees

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| Provisional Application Filing | 1005 | 1 | 260 | 260 |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |
| **Post-Allowance-and-Post-Issuance:** | | | | |
| **Extension-of-Time:** | | | | |

Exhibit 21
-535-

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Miscellaneous:** | | | | |
| | | **Total in USD ($)** | | **260** |

Exhibit 21
-536-

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 20276679 |
| **Application Number:** | 62057089 |
| **International Application Number:** | |
| **Confirmation Number:** | 2901 |
| **Title of Invention:** | Methods and Systems for Modulation and Demodulation of Optical Signals |
| **First Named Inventor/Applicant Name:** | Steven P. Hotelling |
| **Customer Number:** | 62579 |
| **Filer:** | Stephen C. Hemenway/Valerie Brown |
| **Filer Authorized By:** | Stephen C. Hemenway |
| **Attorney Docket Number:** | P22733USP1 |
| **Receipt Date:** | 29-SEP-2014 |
| **Filing Date:** | |
| **Time Stamp:** | 18:32:54 |
| **Application Type:** | Provisional |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | Credit Card |
| Payment was successfully received in RAM | $260 |
| RAM confirmation Number | 5838 |
| Deposit Account | 504621 |
| Authorized User | BROWN, VALERIE |
| The Director of the USPTO is hereby authorized to charge indicated fees and credit any overpayment as follows: | |

Charge any Additional Fees required under 37 C.F.R. Section 1.16 (National application filing, search, and examination fees)

Charge any Additional Fees required under 37 C.F.R. Section 1.17 (Patent application and reexamination processing fees)

Exhibit 21
-537-

Charge any Additional Fees required under 37 C.F.R. Section 1.19 (Document supply fees)

Charge any Additional Fees required under 37 C.F.R. Section 1.20 (Post Issuance fees)

Charge any Additional Fees required under 37 C.F.R. Section 1.21 (Miscellaneous fees and charges)

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Transmittal of New Application | P22733USP1ApplicationTransmittal.pdf | 201103<br><br>d937f4e25e253670833fdd89ad03442dfaccbf9c | no | 3 |

**Warnings:**

**Information:**

| 2 | | P22733USP1Specification.pdf | 149278<br><br>170f04e2027c51615f2938ec6ba8eb6e166a242 | yes | 29 |

| Multipart Description/PDF files in .zip description | | |
|---|---|---|
| Document Description | Start | End |
| Specification | 1 | 24 |
| Claims | 25 | 28 |
| Abstract | 29 | 29 |

**Warnings:**

**Information:**

| 3 | Drawings-only black and white line drawings | P22733US1DrawingsFinal.pdf | 94251<br><br>568a6efc6a2a8a6606f63fbf8289f7da69839fd1 | no | 7 |

**Warnings:**

**Information:**

| 4 | Fee Worksheet (SB06) | fee-info.pdf | 29518<br><br>96ffb76b3617287461cd6b6992de01464fb95773 | no | 2 |

**Warnings:**

**Information:**

| | | **Total Files Size (in bytes):** | 474150 | | |

Exhibit 21
-538-

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

New Applications Under 35 U.S.C. 111
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

National Stage of an International Application under 35 U.S.C. 371
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

New International Application Filed with the USPTO as a Receiving Office
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

Exhibit 21
-539-

# EXHIBIT 22



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia  22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING or 371(c) DATE | GRP ART UNIT | FIL FEE REC'D | ATTY.DOCKET.NO | TOT CLAIMS | IND CLAIMS |
|---|---|---|---|---|---|---|
| 62/047,818 | 09/09/2014 | | 260 | P22879USP1 | | |

CONFIRMATION NO. 1519

62579
APPLE INC.
c/o Brownstein Hyatt Farber Schreck
410 17th St.
Suite 2200
DENVER, CO 80202

**FILING RECEIPT**

*OC000000070966478*

Date Mailed: 09/25/2014

Receipt is acknowledged of this provisional patent application. It will not be examined for patentability and will become abandoned not later than twelve months after its filing date. Any correspondence concerning the application must include the following identification information: the U.S. APPLICATION NUMBER, FILING DATE, NAME OF APPLICANT, and TITLE OF INVENTION. Fees transmitted by check or draft are subject to collection. Please verify the accuracy of the data presented on this receipt. **If an error is noted on this Filing Receipt, please submit a written request for a Filing Receipt Correction. Please provide a copy of this Filing Receipt with the changes noted thereon. If you received a "Notice to File Missing Parts" for this application, please submit any corrections to this Filing Receipt with your reply to the Notice. When the USPTO processes the reply to the Notice, the USPTO will generate another Filing Receipt incorporating the requested corrections**

**Inventor(s)**
        Marcelo M. Lamego, Cupertino, CA;
**Applicant(s)**
        Marcelo M. Lamego, Cupertino, CA;
**Power of Attorney:**
S. Hemenway--44759

**If Required, Foreign Filing License Granted:** 09/24/2014
The country code and number of your priority application, to be used for filing abroad under the Paris Convention, is **US 62/047,818**
**Projected Publication Date:**  None, application is not eligible for pre-grant publication
**Non-Publication Request:** No
**Early Publication Request:** No
**Title**
        Modulation and Demodulation Techniques for a Health Monitoring System

**Statement under 37 CFR 1.55 or 1.78 for AIA (First Inventor to File) Transition Applications:** No

## PROTECTING YOUR INVENTION OUTSIDE THE UNITED STATES

Since the rights granted by a U.S. patent extend only throughout the territory of the United States and have no effect in a foreign country, an inventor who wishes patent protection in another country must apply for a patent in a specific country or in regional patent offices. Applicants may wish to consider the filing of an international application under the Patent Cooperation Treaty (PCT). An international (PCT) application generally has the same

page 1 of 3

Exhibit 22
-540-

effect as a regular national patent application in each PCT-member country. The PCT process **simplifies** the filing of patent applications on the same invention in member countries, but **does not result** in a grant of "an international patent" and does not eliminate the need of applicants to file additional documents and fees in countries where patent protection is desired.

Almost every country has its own patent law, and a person desiring a patent in a particular country must make an application for patent in that country in accordance with its particular laws. Since the laws of many countries differ in various respects from the patent law of the United States, applicants are advised to seek guidance from specific foreign countries to ensure that patent rights are not lost prematurely.

Applicants also are advised that in the case of inventions made in the United States, the Director of the USPTO must issue a license before applicants can apply for a patent in a foreign country. The filing of a U.S. patent application serves as a request for a foreign filing license. The application's filing receipt contains further information and guidance as to the status of applicant's license for foreign filing.

Applicants may wish to consult the USPTO booklet, "General Information Concerning Patents" (specifically, the section entitled "Treaties and Foreign Patents") for more information on timeframes and deadlines for filing foreign patent applications. The guide is available either by contacting the USPTO Contact Center at 800-786-9199, or it can be viewed on the USPTO website at http://www.uspto.gov/web/offices/pac/doc/general/index.html.

For information on preventing theft of your intellectual property (patents, trademarks and copyrights), you may wish to consult the U.S. Government website, http://www.stopfakes.gov. Part of a Department of Commerce initiative, this website includes self-help "toolkits" giving innovators guidance on how to protect intellectual property in specific countries such as China, Korea and Mexico. For questions regarding patent enforcement issues, applicants may call the U.S. Government hotline at 1-866-999-HALT (1-866-999-4258).

## LICENSE FOR FOREIGN FILING UNDER

## Title 35, United States Code, Section 184

## Title 37, Code of Federal Regulations, 5.11 & 5.15

### GRANTED

The applicant has been granted a license under 35 U.S.C. 184, if the phrase "IF REQUIRED, FOREIGN FILING LICENSE GRANTED" followed by a date appears on this form. Such licenses are issued in all applications where the conditions for issuance of a license have been met, regardless of whether or not a license may be required as set forth in 37 CFR 5.15. The scope and limitations of this license are set forth in 37 CFR 5.15(a) unless an earlier license has been issued under 37 CFR 5.15(b). The license is subject to revocation upon written notification. The date indicated is the effective date of the license, unless an earlier license of similar scope has been granted under 37 CFR 5.13 or 5.14.

This license is to be retained by the licensee and may be used at any time on or after the effective date thereof unless it is revoked. This license is automatically transferred to any related applications(s) filed under 37 CFR 1.53(d). This license is not retroactive.

The grant of a license does not in any way lessen the responsibility of a licensee for the security of the subject matter as imposed by any Government contract or the provisions of existing laws relating to espionage and the national security or the export of technical data. Licensees should apprise themselves of current regulations especially with

Exhibit 22
-541-

respect to certain countries, of other agencies, particularly the Office of Defense Trade Controls, Department of State (with respect to Arms, Munitions and Implements of War (22 CFR 121-128)); the Bureau of Industry and Security, Department of Commerce (15 CFR parts 730-774); the Office of Foreign AssetsControl, Department of Treasury (31 CFR Parts 500+) and the Department of Energy.

**NOT GRANTED**

No license under 35 U.S.C. 184 has been granted at this time, if the phrase "IF REQUIRED, FOREIGN FILING LICENSE GRANTED" DOES NOT appear on this form. Applicant may still petition for a license under 37 CFR 5.12, if a license is desired before the expiration of 6 months from the filing date of the application. If 6 months has lapsed from the filing date of this application and the licensee has not received any indication of a secrecy order under 35 U.S.C. 181, the licensee may foreign file the application pursuant to 37 CFR 5.15(b).

---

### *SelectUSA*

The United States represents the largest, most dynamic marketplace in the world and is an unparalleled location for business investment, innovation, and commercialization of new technologies. The U.S. offers tremendous resources and advantages for those who invest and manufacture goods here. Through SelectUSA, our nation works to promote and facilitate business investment. SelectUSA provides information assistance to the international investor community; serves as an ombudsman for existing and potential investors; advocates on behalf of U.S. cities, states, and regions competing for global investment; and counsels U.S. economic development organizations on investment attraction best practices. To learn more about why the United States is the best country in the world to develop technology, manufacture products, deliver services, and grow your business, visit http://www.SelectUSA.gov or call +1-202-482-6800.

**Exhibit 22**
**-542-**

PTO/SB/16 (03-13)
Approved for use through 01/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless it displays a valid OMB control number

## PROVISIONAL APPLICATION FOR PATENT COVER SHEET – Page 1 of 2

This is a request for filing a PROVISIONAL APPLICATION FOR PATENT under 37 CFR 1.53(c).

**Express Mail Label No.** _Electronic Filing_

| INVENTOR(S) | | |
|---|---|---|
| Given Name (first and middle [if any]) | Family Name or Surname | Residence (City and either State or Foreign Country) |
| Marcelo M. | Lamego | Cupertino, California |
| | | |
| | | |
| | | |
| | | |

Additional inventors are being named on the _____ separately numbered sheets attached hereto.

### TITLE OF THE INVENTION (500 characters max):

Modulation and Demodulation Techniques for a Health Monitoring System

Direct all correspondence to:     **CORRESPONDENCE ADDRESS**

[✓] The address corresponding to Customer Number:

62579

**OR**

[ ] Firm or Individual Name

Address

| City | State | Zip |
|---|---|---|
| Country | Telephone | Email |

### ENCLOSED APPLICATION PARTS (*check all that apply*)

[ ] Application Data Sheet. See 37 CFR 1.76.      [ ] CD(s), Number of CDs _____

[✓] Drawing(s)   *Number of Sheets* 9      [ ] Other (specify) _____

[✓] Specification (e.g., description of the invention)   *Number of Pages* 24

**Fees Due:** Filing Fee of $260 ($130 for small entity) ($65 for micro entity). If the specification and drawings exceed 100 sheets of paper, an application size fee is also due, which is $400 ($200 for small entity) ($100 for micro entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s).

### METHOD OF PAYMENT OF THE FILING FEE AND APPLICATION SIZE FEE FOR THIS PROVISIONAL APPLICATION FOR PATENT

[ ] Applicant asserts small entity status. See 37 CFR 1.27.

[ ] Applicant certifies micro entity status. See 37 CFR 1.29.
Applicant must attach form PTO/SB/15A or B or equivalent.

[ ] A check or money order made payable to the *Director of the United States Patent and Trademark Office* is enclosed to cover the filing fee and application size fee (if applicable).

$260

**TOTAL FEE AMOUNT ($)**

[✓] Payment by credit card. Form PTO-2038 is attached.

[✓] The Director is hereby authorized to charge the filing fee and application size fee (if applicable) or credit any overpayment to Deposit Account Number: 50-4621 .

### USE ONLY FOR FILING A PROVISIONAL APPLICATION FOR PATENT

This collection of information is required by 37 CFR 1.51. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 10 hours to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

**Exhibit 22**
-543-

PTO/SB/16 (03-13)
Approved for use through 01/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless it displays a valid OMB control number

## PROVISIONAL APPLICATION FOR PATENT COVER SHEET – Page 2 of 2

---

The invention was made by an agency of the United States Government or under a contract with an agency of the United States Government.

[✓] No.

[ ] Yes, the invention was made by an agency of the U.S. Government. The U.S. Government agency name is: _____

_____

[ ] Yes, the invention was made under a contract with an agency of the U.S. Government. The name of the U.S. Government agency and Government contract number are: _____

_____

---

## WARNING:

Petitioner/applicant is cautioned to avoid submitting personal information in documents filed in a patent application that may contribute to identity theft. Personal information such as social security numbers, bank account numbers, or credit card numbers (other than a check or credit card authorization form PTO-2038 submitted for payment purposes) is never required by the USPTO to support a petition or an application. If this type of personal information is included in documents submitted to the USPTO, petitioners/applicants should consider redacting such personal information from the documents before submitting them to the USPTO. Petitioner/applicant is advised that the record of a patent application is available to the public after publication of the application (unless a non-publication request in compliance with 37 CFR 1.213(a) is made in the application) or issuance of a patent. Furthermore, the record from an abandoned application may also be available to the public if the application is referenced in a published application or an issued patent (see 37 CFR 1.14). Checks and credit card authorization forms PTO-2038 submitted for payment purposes are not retained in the application file and therefore are not publicly available.

SIGNATURE /S. Craig Hemenway/                    DATE September 9, 2014

TYPED OR PRINTED NAME S. Craig Hemenway          REGISTRATION NO. 44,759
                                                 (*if appropriate*)

TELEPHONE 303-223-1100                           DOCKET NUMBER P22879USP1

Exhibit 22
-544-

Attorney Docket No. P22879USP1

# MODULATION AND DEMODULATION TECHNIQUES FOR A HEALTH MONITORING SYSTEM

## Technical Field

[0001] The present invention relates generally to health monitoring systems, and more particularly to modulation and demodulation techniques for a health monitoring system that includes one or more optical sensors.

Exhibit 22
-545-

Background

[0002] Health monitoring devices, such as fitness and wellness devices, are capable of measuring a variety of physiological parameters and waveforms non-invasively via optical sensing.  Light is applied to a measurement site, such as a user's wrist, finger, and ear, and the light is absorbed and scattered throughout the skin.  An optical sensor in the health monitoring device captures the light that is reflected from or transmitted through the skin.  The optical sensor, however, is subject to interferences caused by fluorescent bulbs, sun light, the electricity grid or network, and motion artifacts that are caused by the relative motion between the optical sensor and the user's measurement site.  Thus, the light collected by the light sensor contains a component from the measurement site and component from one or more interferences.  To estimate the physiological parameter and waveform, the optical sensor coverts the collected light into electrical signals, and the signal that represents the interference component is typically subtracted from the signal representing the measurement site component.  After subtraction, only the component from the measurement site should remain, which is the component that is used to estimate the physiological parameter.  However, subtraction cannot be performed instantaneously.  A time delay exists between sampling the light and subtracting the interference component.  The time delay can result in the creation of aliases in the signal, and the aliases produce errors in the estimation of the physiological parameter.

Exhibit 22
-546-

Summary

**[0004]** In one aspect, an electronic device includes one or more light sources for emitting light toward a body part of a user and one or more optical sensors for capturing light samples while each light source is turned on and for capturing dark samples while the light source(s) are turned off.  A signal produced by the one or more optical sensors is demodulated produce multiple demodulated signals.  Each demodulated signal is received by one or more decimation stages to produce a signal associated with each light source.  A demultiplexer and multiplier circuit operably can be connected to an output of the decimation stage.  The demultiplexer separates the signals by each associated light source and the multiplier multiplies each signal by one or more respective weights.  The weights adjust the signals for variations in temperature and operating parameters of various components in the electronic device.  Each signal associated with the light source(s) is analyzed to estimate or determine a physiological parameter of the user.

**[0005]** In another aspect, a method for processing the signal received from the light sensor can include capturing multiple light samples while each light source emits light toward the body part of the user and converting the multiple light samples into the signal.  The light sources can be modulated (e.g., turned on and off) according to a particular modulation pattern. The signal produced by the optical sensor is then demodulated to produce multiple demodulated signals.  Each demodulated signal is associated with a particular light source. Each demodulated signal is then be processed by at least one decimation stage.  In one embodiment, each decimation stage includes a low pass filter that receives a demodulated signal and a decimation circuit operably connected to an output of the low pass filter.  A demultiplexer and multiplier circuit may then process the signals.  Each signal associated with the light source(s) is analyzed to estimate or determine a physiological parameter of the user.

**[0006]** In yet another aspect, a method for operating an electronic device that includes multiple light sources, an optical sensor, and a processing device operably connected to the optical sensor can include turning on each light source one at a time and emitting light toward a body part of a user and capturing multiple light samples while each light source emits light toward the body part of the user and converting the multiple light samples into a signal.  The

3

Exhibit 22
-547-

Attorney Docket No. P22879USP1

signal is converted into a digital signal, and the digital signal is demodulated to produce multiple demodulated signals.  Each demodulated signal is then processed by at least one decimation stage.  In one embodiment, each decimation stage includes a low pass filter that receives a demodulated signal and a decimation circuit operably connected to an output of the low pass filter.  Each signal associated with the light source(s) is analyzed to estimate or determine a physiological parameter of the user.

4

Exhibit 22
-548-

Attorney Docket No. P22879USP1

Brief Description of the Drawings

[0007]     Embodiments of the invention are better understood with reference to the following drawings. The elements of the drawings are not necessarily to scale relative to each other.  Identical reference numerals have been used, where possible, to designate identical features that are common to the figures.

[0008]     FIG. 1 a perspective front view of one example of an electronic device that provides health-related information;

[0009]     FIG. 2 depicts a back view of the electronic device 100 shown in FIG. 1;

[0010]     FIG. 3 is an illustrative block diagram of the electronic device 100 shown in FIGS. 1 and 2;

[0011]     FIG. 4 is a flowchart of one example method of operating the health monitoring system 312 in FIG. 3;

[0012]     FIGS. 5-6 depict example modulation patterns suitable for use in blocks 400 and 402 in FIG. 4;

[0013]     FIG. 7 is a data flow diagram of a processing channel that performs blocks 408, 410, and 412 in FIG. 4;

[0014]     FIG. 8 is a flowchart of one example method of determining a matrix used in block 718 of FIG. 7;

[0015]     FIG. 9 is a flowchart of one example method of performing block 800 in FIG. 8; and

[0016]     FIG. 10 is a flowchart of one example method of performing block 802 in FIG. 8.

Exhibit 22
-549-

Attorney Docket No. P22879USP1

Detailed Description

[0017] Embodiments described herein provide modulation and demodulation techniques that reduce or eliminate undesired interferences and produce demodulated signals that can be analyzed to estimate a physiological parameter of a user. A time multiplexed modulation pattern is used to turn the light sources on and off and to cause the optical sensor to capture multiple light and dark samples. Demodulation operations are applied to the signal produced by the optical sensor to produce a signal associated with each light source. In general, the demodulation operation can be $\sin 2\pi \frac{kt}{N}$ or $\cos 2\pi \frac{kt}{N}$. The demodulated signals may then be processed by one or more decimation stages. Each decimation stage can include a low pass filter and a decimation circuit.

[0018] Any suitable type of electronic device can include a health monitoring system. Example electronic devices include, but are not limited to, a smart telephone, a headset, a pulse oximeter, a digital media player, a tablet computing device, and a wearable electronic device. A wearable electronic device can include any type of electronic device that can be worn on a limb of a user. The wearable electronic device can be affixed to a limb or body part of a user, such as a wrist, an arm, a finger, a leg, an ear, or a chest. In some embodiments, the wearable electronic device is worn on a limb of a user with a band that attaches to the body and includes a holder or case to detachably or removably hold the electronic device, such as an armband, an ankle bracelet, a leg band, and/or a wristband. In other embodiments, the wearable electronic device is permanently affixed or attached to a band, and the band attaches to the body of the user.

[0019] As one example, a wearable electronic device can be implemented as a wearable health assistant that provides health-related information (whether real-time or not) to the user, authorized third parties, and/or an associated monitoring device. The wearable health assistant may be configured to provide health-related information or data such as, but not limited to, heart rate data, blood pressure data, temperature data, blood oxygen saturation level data, diet/nutrition information, medical reminders, health-related tips or information, or other health-related data. The associated monitoring device may be, for example, a tablet computing device, phone, personal digital assistant, computer, and so on.

Exhibit 22
-550-

[0020] As another example, the electronic device can be configured in the form of a wearable communications device. The wearable communications device may include a processor coupled with or in communication with a memory, one or more sensors, one or more communication interfaces, output devices such as displays and speakers, one or more input devices, and a health monitoring system. The communication interface(s) can provide electronic communications between the communications device and any external communication network, device or platform, such as but not limited to wireless interfaces, Bluetooth interfaces, USB interfaces, Wi-Fi interfaces, TCP/IP interfaces, network communications interfaces, or any conventional communication interfaces. The wearable communications device may provide information regarding time, health, statuses or externally connected or communicating devices and/or software executing on such devices, messages, video, operating commands, and so forth (and may receive any of the foregoing from an external device), in addition to communications.

[0021] Referring now to FIG. 1, there is shown a perspective view of one example of an electronic device that provides health-related information. In the illustrated embodiment, the electronic device 100 is implemented as a wearable communication device. Other embodiments can implement the electronic device differently. As described earlier, the electronic device can be a smart telephone, a gaming device, a digital music player, a device that provides time, a health assistant, and other types of electronic devices that provide health-related information.

[0022] The electronic device 100 includes an enclosure 102 at least partially surrounding a display 104 and one or more buttons 106 or input devices. The enclosure 102 can form an outer surface or partial outer surface and protective case for the internal components of the electronic device 100, and may at least partially surround the display 104. The enclosure 102 can be formed of one or more components operably connected together, such as a front piece and a back piece. Alternatively, the enclosure 102 can be formed of a single piece operably connected to the display 104.

[0023] The display 104 can be implemented with any suitable technology, including, but not limited to, a multi-touch sensing touchscreen that uses liquid crystal display (LCD) technology, light emitting diode (LED) technology, organic light-emitting display (OLED) technology, organic electroluminescence (OEL) technology, or another type of display

Exhibit 22
-551-

technology.  A button 106 can take the form of a home button, which may be a mechanical button, a soft button (e.g., a button that does not physically move but still accepts inputs), an icon or image on a display or on an input region, and so on.  Other buttons or mechanisms can be used as input/output devices, such as a speaker, a microphone, an on/off button, a mute button, or a sleep button.  In some embodiments, the button or buttons 106 can be integrated as part of a cover glass of the electronic device.

[0024] The electronic device 100 can be permanently or removably attached to a band 108.  The band 108 can be made of any suitable material, including, but not limited to, leather, metal, rubber or silicon, fabric, and ceramic.  In the illustrated embodiment, the band is a wristband that wraps around the user's wrist.  The wristband can include an attachment mechanism (not shown), such as a bracelet clasp, Velcro, and magnetic connectors.  In other embodiments, the band can be elastic or stretchy such that it fits over the hand of the user and does not include an attachment mechanism.

[0025] FIG. 2 depicts a back view of the electronic device 100 shown in FIG. 1.  As described earlier, the electronic device can include one or more sensors, and at least one of these sensors may provide health-related information.  As one example, the wearable communication device can include an optical sensor, such as a photoplethysmography (PPG) sensor.  A PPG sensor uses light to measure changes in the volume of a part of a user's body.  As the light passes through the user's skin and into the underlying tissue, some light is reflected, some is scattered, and some is absorbed, depending on what the light encounters.  Blood can absorb light more than surrounding tissue, so less reflected light will be sensed by the PPG sensor when more blood is present.  The user's blood volume increases and decreases with each heartbeat.  A PPG sensor detects changes in blood volume based on the reflected light, and one or more physiological parameters of the user can be determined by analyzing the reflected light.  Example physiological parameters include, but are not limited to, heart rate and respiration.

[0026] The electronic device 100 includes one or more apertures 200 in the enclosure 102.  Each aperture is associated with a light source 202.  In one embodiment, each light source is implemented as a light-emitting diode (LED).  Four apertures 200 and four light sources 202

8

Exhibit 22
-552-

are used in the illustrated embodiment.  Other embodiments can include any number of light sources 200.  For example, two light sources can be used in some embodiments.

[0027]  The light sources 202 can operate at the same light wavelength range, or the light sources can operate at different light wavelength ranges.  As one example, with two light sources one light source may transmit light in the visible wavelength range while the other light source can emit light in the infrared wavelength range.  With four light sources, two light sources may transmit light in the visible wavelength range while the other two light sources can emit light in the infrared wavelength range.  For example, in one embodiment, at least one light source can emit light in the wavelength range associated with the color green while another light source transmits light in the infrared wavelength range.  When a physiological parameter of the user will be determined, the light sources emit light toward the user's skin and the optical sensor 204 senses an amount of reflected light.  As will be described in more detail later, a modulation pattern can be used to turn the light sources on and off and sample or sense the reflected light.

[0028]  FIG. 3 is an illustrative block diagram of the electronic device 100 shown in FIG. 1.  The electronic device 100 can include the display 104, one or more processing devices 300, memory 302, one or more input/output (I/O) devices 304, one or more sensors 306, a power source 308, a network communications interface 310, and a health monitoring system 312.  The display 104 may provide an image or video output for the electronic device 100. The display may also provide an input surface for one or more input devices, such as, for example, a touch sensing device and/or a fingerprint sensor.  The display 104 may be substantially any size and may be positioned substantially anywhere on the electronic device 100.

[0029]  The processing device 300 can control some or all of the operations of the electronic device 100.  The processing device 300 can communicate, either directly or indirectly with substantially all of the components of the electronic device 100.  For example, a system bus or signal line 314 or other communication mechanisms can provide communication between the processing device(s) 300, the memory 302, the I/O device(s) 304, the sensor(s) 306, the power source 308, the network communications interface 310, and/or the health monitoring system 312.  The one or more processing devices 300 can be implemented as any electronic device capable of processing, receiving, or transmitting data or instructions.  For example, the processing device(s)

9

Exhibit 22 -553-

200 can each be a microprocessor, a central processing unit (CPU), an application-specific integrated circuit (ASIC), a digital signal processor (DSP), or combinations of such devices. As described herein, the term "processing device" is meant to encompass a single processor or processing unit, multiple processors, multiple processing units, or other suitably configured computing element or elements.

[0030] The memory 302 can store electronic data that can be used by the electronic device 100. For example, a memory can store electrical data or content such as, for example, audio and video files, documents and applications, device settings and user preferences, timing and control signals or data for the health monitoring system 312, data structures or databases, and so on. The memory 302 can be configured as any type of memory. By way of example only, the memory can be implemented as random access memory, read-only memory, Flash memory, removable memory, or other types of storage elements, or combinations of such devices.

[0031] The one or more I/O devices 304 can transmit and/or receive data to and from a user or another electronic device. One example of an I/O device is button 106 in FIG. 1. The I/O device(s) 304 can include a display, a touch sensing input surface such as a track pad, one or more buttons, one or more microphones or speakers, one or more ports such as a microphone port, and/or a keyboard.

[0032] The electronic device 100 may also include one or more sensors 306 positioned substantially anywhere on the electronic device 100. The sensor or sensors 306 may be configured to sense substantially any type of characteristic, such as but not limited to, images, pressure, light, touch, heat, position, motion, and so on. For example, the sensor(s) 308 may be an image sensor, a heat sensor, a light or optical sensor, a pressure transducer, a magnet, a gyroscope, an accelerometer, and so on.

[0033] The power source 308 can be implemented with any device capable of providing energy to the electronic device 100. For example, the power source 308 can be one or more batteries or rechargeable batteries, or a connection cable that connects the remote control device to another power source such as a wall outlet.

10

Exhibit 22
-554-

[0034] The network communication interface 310 can facilitate transmission of data to or from other electronic devices.  For example, a network communication interface can transmit electronic signals via a wireless and/or wired network connection.  Examples of wireless and wired network connections include, but are not limited to, cellular, Wi-Fi, Bluetooth, IR, and Ethernet.

[0035] The health monitoring system 312 can include the light sources 202, one or more optical sensors 204, and a processing device 316.  The processing device 316 may be any suitable type of processing device.  In one embodiment, the processing device 316 is a digital signal processor.  The processing device 316 may receive signals from the optical sensor(s) 204 and processes the signals to correlate the signal values with a physiological parameter of the user.  As one example, the processing device can apply one or more demodulation operations to the signals received from the optical sensor.  Additionally, the processing device may control the modulation (e.g., turning on and off) of the light sources 202 according to a given modulation pattern.  In one embodiment, one or more modulation patterns may be stored in memory 302 and accessed by the processing device 316 to modulate the light sources 202.

[0036] As discussed earlier, the light sources can emit light in the visible and/or infrared wavelength ranges.  The optical sensor or sensors 204 is implemented as a photodetector that senses light and converts the light into an electrical signal that represents the amount of light sensed by the photodetector.  In one embodiment, the photodetector can be a photodiode.  Other embodiments can use a different type of photodetector, such as a phototube or photoresistor.

[0037] In another embodiment, the processing device 316 is not included in the health monitoring system 312 and the processing device 300 receives signals from the optical sensor(s) 204 and processes the signals to correlate the signal values with a physiological parameter of the user.  Additionally or alternatively, the processing device 300 can control the operations of the light sources (e.g., turn on and off).  One or more modulation patterns may be stored in memory 302 and accessed by the processing device 300 to modulate the light sources 202.

[0038] It should be noted that FIGS. 1-3 are illustrative only. In other examples, an electronic device may include fewer or more components than those shown in FIG. 3. Additionally or alternatively, the electronic device can be included in a system and one or more

**Exhibit 22**
**-555-**

components shown in FIG. 3 are separate from the electronic device but in communication with the electronic device.  For example, an electronic device may be operatively connected to, or in communication with a separate display.  As another example, one or more applications or data can be stored in a memory separate from the electronic device.  As another example, a processing device in communication with the electronic device can control various functions in the electronic device and/or process data received from the electronic device.  In some embodiments, the separate memory and/or processing device can be in a cloud-based system or in an associated monitoring device.

[0039]  Referring now to FIG. 4, there is shown a flowchart of one example method of operating the health monitoring system 312 in FIG. 3.  Initially, a light source is turned on to illuminate the user's skin and the optical sensor senses an amount of reflected or transmitted light (blocks 400, 402).  A determination can then be made at block 404 as to whether or not another light source is to be turned on.  For example, in one embodiment, the light sources are turned on sequentially and the optical sensor senses the light multiple times while each light source is turned on.

[0040]  If another light source is to be turned on, the process passes to block 406 where the light source that is currently turned on is turned off.  The method then returns to block 400 and repeats until all of the light sources have been turned on and the optical sensor has obtained light samples.

[0041]  When a determination is made at block 404 that all of the light sources have been turned on,  the process continues at block 408 where the signal received from the optical sensor is digitized by inputting the signal into an analog-to-digital converter.  The digitized signal is then demodulated at block 410.  Demodulating the signal produces multiple demodulated signals, with a demodulated signal associated with each light source.  Each demodulated signal is then received and processed by a low pass filter and a decimation circuit (block 412).

[0042]  The signals may then be analyzed at block 414 to determine or estimate a physiological parameter of the user.  As described earlier, in one embodiment the signals can be analyzed to determine a heart rate of the user.  As one example, the processing device 316 can analyze the signals to estimate a physiological parameter of the user.  In another example, the

Exhibit 22
-556-

processing device 300 can analyze the signals to determine a physiological parameter of the user. And in yet another example, both processing devices 300, 316 can perform various steps in the analysis to estimate a physiological parameter of the user.

[0043] In other embodiments, the light source need not be turned off or on entirely. Instead, certain embodiments may modulate the brightness of the light source in place of or in addition to the turning of lights on and off. In some embodiments, certain light sources may be turned on and off while other light sources are alternately dimmed and brightened.

[0044] FIGS. 5-6 depict example modulation patterns suitable for use in blocks 400 and 402 in FIG. 4. FIGS. 5 and 6 are described with reference to a health monitoring system that includes four light sources. As described earlier, other embodiments can include fewer or more light sources. The embodiments described hereinafter are described with reference to a thirty sample modulation cycle operating at 4096 hertz. This is provided by way of example and is not required. Other modulation cycle frequencies and/or sampling frequencies may be selected. For example, the modulation cycle frequencies may range, as a non-limiting example, from one hundred hertz to several hundred kilohertz.

[0045] In many examples, the modulation cycle frequency and the sampling frequency may be interrelated. For example, certain embodiments may be limited by hardware or software to a particular maximum sampling frequency. In such an example, the modulation cycle frequency may be selected such that the transmitted signal can be adequately reconstructed. In some cases, the modulation cycle may be less than half the sampling rate. Stated another way, if a certain embodiment requires a particular bandwidth, the sampling frequency may be at least twice the selected maximum frequency of the selected bandwidth.

[0046] Other embodiments can obtain a different number of samples and/or operate at a different frequency. The frequency may be determined based on a number of factors, one of which is the harmonics of the electrical network or grid. For example, when an electrical network produces a signal at 60 Hz, the harmonics are multiples of 60 (e.g., 120 Hz, 180 Hz, 240 Hz, etc.). Also, some electrical networks produce a signal at 50 Hz, and the harmonics of multiples of 50 Hz (e.g., 100 Hz, 150 Hz, 200 Hz, etc.).

Exhibit 22
-557-

Attorney Docket No. P22879USP1

[0047] Additionally, some electrical networks can be less reliable at generating a signal with a specific frequency, and the frequency may vary by a certain amount or deviation (e.g., a frequency of 60 Hz may operate at 60+/- 1% Hz). And the deviation increases with each harmonic. Thus, in one embodiment, the frequency of the modulation cycle is selected to be in a harmonic gap that exists between the various harmonics and harmonic deviations of at least one electrical network.

[0048] The illustrated modulation patterns are time-multiplexed modulation patterns that drive the light sources. The time periods when the light sources are turned on and off are multiplexed in time. In FIG. 5, the first light source is turned on for the time period 500. The other three light sources are turned off during the time period 500. An optical sensor captures a light sample multiple times 502 during the time period 500. In the illustrated embodiment, the optical sensor obtains five light samples 502. The first light source is then turned off and the optical sensor captures the light at time 504. A light sample obtained when all of the light sources are turned off is known as a dark sample.

[0049] The second light source is then turned on for the time period 506. Again, the other three light sources are turned off during the time period 506. The optical sensor captures multiple light samples 508 during the time period 506. In the illustrated embodiment, the optical sensor obtains five samples 508. The second light source is then turned off and the optical sensor captures a dark sample at time 510.

[0050] Similarly, only the third light source is turned on for the time period 512, and the optical sensor senses an amount of light multiple times 514 (e.g., five times) during the time period 512. The third light source is then turned off and the optical sensor captures a dark sample at time 516.

[0051] The fourth light source is then turned on for the time period 518, and the optical sensor obtains multiple light samples 520 (e.g., five times) during the time period 518. The fourth light source is then turned off and the optical sensor captures multiple dark samples 522. In the illustrated embodiment, the optical sensor obtains seven dark samples 522. Thus, the optical sensor captures thirty samples during one modulation cycle 524. The modulation cycles

Exhibit 22
-558-

can repeat a given number of times when estimating a physiological parameter.  As described earlier, the modulation cycle can have a frequency of 4096 Hz in one embodiment.

[0052]  The modulation pattern in FIG. 6 is similar to the modulation pattern in FIG. 5 except that the optical sensor does not capture dark samples in between the time periods when a light source is turned on.  In other words, the optical sensor does not sense dark samples at times 504, 510, and 516.  The light sensor obtains multiple dark samples 600 after the time period 518 has ended (after the fourth light source is turned off).   In the illustrated embodiment, the light sensor captures ten dark samples 600.  Like the FIG. 5 embodiment, the optical sensor obtains thirty samples during one modulation cycle 602.

[0053]  The analog signal produced by the optical sensor includes information associated with all four light sources.  Thus, in one embodiment, the analog signal is demodulated by a single optical sensor to produce four signals.  In some cases, each signal is associated with a specific light source. In other examples, two optical sensors may be used to generate eight signals associated with the four light sources. In some cases, the two optical sensors may be physically separated so as to measure light associated with the four light sources from different points along the user's skin.  In other embodiments, more than two optical sensors may be used.

[0054]  FIG. 7 is a data flow diagram of an illustrative processing channel that performs blocks 408, 410, and 412 in FIG. 4.  The analog signal received from the optical sensor on signal line 700 is converted to a digital signal by analog-to-digital converter 702 in the processing channel 704.  The digital signal is then received by the mixer circuit 706.  The mixer circuit 706 also receives one or more demodulation operations 708.  In general, the demodulation operation can be $\sin 2\pi \frac{kt}{N}$ or $\cos 2\pi \frac{kt}{N}$, where k is defined by $1 \leq k \leq n/2$, N represents the number of samples obtained by the optical sensor, and t = 0, 1, …, N-1.  The number of demodulation operations input into the mixer circuit 704 may be based on the number of light sources.  In one embodiment, each harmonic of the signal received from the optical sensor has two orthogonal components. Thus, in some cases, the number of harmonics may depend upon the number of channels multiplexed and de-multiplexed. As one example, when the health monitoring system includes two light sources, the demodulation operations can be $\sin 2\pi/N$ or $\cos 2\pi/N$ for the first harmonic frequency.  Two signals will be produced after both demodulation operations have

Exhibit 22
-559-

been applied to the digital signal by mixer circuit 706.  When the health monitoring system has four light sources, the demodulation operation can be $\sin 2\pi/N$ or $\cos 2\pi/N$ for the first harmonic frequency, and $\sin 4\pi/N$ or $\cos 4\pi/N$ for the second harmonic frequency.  Four signals will be produced after the four demodulation operations have been applied to the digital signal by mixer circuit 706.

[0055]  The signal output by the mixer circuit 706 is received by a low pass filter 710 and a decimation circuit 712.  The low pass filter 710 and the decimation circuit 712 form a first decimation stage.  Embodiments can include any number of decimation stages K.  The number of decimation stages K can be based on the frequency of the sampling cycle of the optical sensor and the frequency of the physiological parameter.  For example, in the embodiments shown in FIGS. 5 and 6, thirty samples are obtained by the optical sensor.  When the frequency of the physiological parameter is approximately ten hertz and the frequency of the thirty sample cycle is 4096 hertz, six decimation stages are used with each stage reducing the frequency of the signal by two.

[0056]  After the signal is processed by the low pass filter 714 and decimation circuit 716 in the last decimation stage K, each signal is received by a demultiplexer and multiplier circuit 718.  The demultiplexer separates the signals by associated light source.  Thus, the signal associated with the first light source is separated from the signals associated with the other light sources, and so on for each signal.  The multiplier circuit then multiplies each signal by respective weights or values.  As one example, the values can be stored in a matrix, and each signal is multiplied by the values in a respective row in the matrix.

[0057]  The values in the matrix are a function of the dynamics and components of the health monitoring system.  The operations of the components such as the optical sensor, the filters (e.g., high pass filters, low pass filters), the operational amplifiers, and the like, change over time due to temperature and other factors.  The values in the matrix adjust the signals for these changes.  One method for determining the values in the matrix is described in conjunction with FIG. 8.

16

Exhibit 22
-560-

[0058] The signals output on signal line 720 represent the signals received from the user's tissue, and these signals can be analyzed to determine or measure the physiological parameter.  As one example, these signals can be analyzed to determine the heart rate of the user.

[0059] FIG. 8 is a flowchart of one example method of determining the values in a matrix used in block 718 of FIG. 7.  Initially, the values in the matrix are determined at block 800.  FIG. 9 is a flowchart of one example method of performing block 800.  In block 900, a single light source is turned on for a given period of time.  The signal produced by the optical sensor is then processed to obtain some of the matrix values.  For example, when the health monitoring system includes four light sources, s signal value or amplitude associated with each light source will be output by the decimation circuit 716.  Thus, four signal values will be output by the decimation circuit 716 based on the single light source emitting light toward the user's skin.  These four signal values are included in one row in the matrix.

[0060] Returning to FIG. 9, a determination is then made at block 904 as to whether or not all of the light sources have been individually turned on.  If not, the process passes to block 906 where the light source that is currently turned on is turned off.  The method then returns to block 900 where another single light source is turned on and the signal produced by the optical sensor processed to obtain matrix values for another row in the matrix.  The method in FIG. 9 repeats until all of the light sources have been turned on and all of the values determined for the matrix.  For four light sources, the values in the matrix are as follows:

[0061] Returning to FIG. 8, after the matrix values are determined at block 800 the matrix values can be verified at block 802.  FIG. 10 is a flowchart of one example method of performing block 802.  Initially, all of the light sources except one are turned on for a given period of time (block 1000).  The signal produced by the optical sensor is then processed based on the data flow diagram shown in FIG. 7.  As described earlier, the demultiplexer and multiplier circuit 718 outputs signals that are associated with each light source in the health monitoring system.  The signal value associated with the light source that is turned off should have a value that is substantially zero, while the signal values associated with the light sources that are turned on should be greater than zero.

Exhibit 22
-561-

Attorney Docket No. P22879USP1

[0062] Returning to FIG. 10, a determination is made at block 1004 as to whether or not the signal value associated with the light source that is turned off equals zero. If not, the method passes to block 1006 where the matrix values in the matrix are recalculated. Thus, the method shown in FIG. 9 may be repeated and the method shown in FIG. 10 repeated until it is determined at block 1004 that the signal value associated with each light source equals zero when the respective light source is turned off and the other light sources are turned on.

[0063] If the signal value equals zero, the process continues at block 1008 where a determination is made as to whether or not all of the light sources have been turned off while the other light sources are turned on. If not, the method passes to block 1010 where the light sources that are currently turned on are turned off. The method then returns to block 1000 where all light sources except another single light source is turned on. The method in FIG. 10 repeats until all of the light sources have been turned off while the other light sources are turned on and the signal value output from the demultiplexer and multiplier circuit 718 associated with each light source equals zero when the respective light source is turned off and the other light sources are turned on.

[0064] Returning to FIG. 8, if the matrix values are not verified at block 804, the method returns to block 800 as described earlier. If the matrix values are verified at block 804, the process continues at block 806 where the matrix is applied in the demultiplexer and multiplier circuit 718 in FIG. 7. A determination may then be made at block 808 as to whether or not the matrix values are to be recalculated. As one example, the matrix values can be recalculated after a given period of time has passed. Additionally or alternatively, the matrix values may be recalculated each time a user activates the heath monitoring system. The process waits at block 808 if the matrix values are not recalculated. If the matrix values are to be recalculated, the method returns to block 800.

[0065] Various embodiments have been described in detail with particular reference to certain features thereof, but it will be understood that variations and modifications can be effected within the spirit and scope of the disclosure. For example, as described earlier, a health monitoring system can include a different number of light sources (e.g., two or six).

**Exhibit 22**
**-562-**

Attorney Docket No. P22879USP1

Additionally or alternatively, a health monitoring system can be included in, or connected to a different type of electronic device.

[0066] Even though specific embodiments have been described herein, it should be noted that the application is not limited to these embodiments. In particular, any features described with respect to one embodiment may also be used in other embodiments, where compatible. Likewise, the features of the different embodiments may be exchanged, where compatible.

19

Exhibit 22
-563-

Attorney Docket No. P22879USP1

## CLAIMS

What is claimed is:

1.      An electronic device, comprising:

two or more light sources for emitting light toward a body part of a user;

an optical sensor for obtaining light and dark samples and converting the samples into a signal;

a processing device operably connected to the optical sensor for demodulating the signal received from the optical sensor into a demodulated signal associated with each light source; and

at least one decimation stage for processing each demodulated signal, wherein each decimation stage comprises a low pass filter for receiving the demodulated signals and a decimation circuit operably connected to an output of the low pass filter.

2.      The electronic device as in claim 1, further comprising a demultiplexer and multiplier circuit operably connected to an output of the last decimation stage, wherein the demultiplexer separates the signals by each associated light source and the multiplier multiplies each signal by one or more respective weights.

3.      The electronic device as in claim 1, wherein the electronic device is a wearable communication device.

4.      A method for processing a signal obtained when light from one or more light sources is emitted toward a body part of a user, the method comprising:

capturing multiple light samples while each light source emits light toward the body part of the user and converting the multiple light samples into the signal;

demodulating the signal to produce multiple demodulated signals;

filtering and decimating each demodulated signal at least once to produce a signal associated with each light source.

5.      The method as in claim 4, further comprising analyzing each signal associated with each light source to estimate a physiological parameter of the user.

Exhibit 22
-564-

Attorney Docket No. P22879USP1

6.      The method as in claim 4, wherein capturing multiple light samples while each light source emits light toward the body part of the user comprises:

a) capturing multiple light samples when each light source is turned on and the other light sources are turned off; and

capturing multiple dark samples after all four light sources have been turned on and turned off.

7.      The method as in claim 5, wherein capturing multiple light samples when a respective light source is turned on and the other light sources are turned off comprises capturing five light samples when a respective light source is turned on and the other light sources are turned off.

8.      The method as in claim 7, wherein capturing multiple dark samples after all of the light sources have been turned on and turned off comprises capturing ten dark samples after all of the light sources have been turned on and turned off.

9.      The method as in claim 6, further comprising capturing one or more dark samples after one light source is turned off and before the next light source is turned on.

10.     The method as in claim 9, wherein capturing one or more dark samples after one light source is turned off and before the next light source is turned on comprises capturing one dark sample after one light source is turned off and before the next light source is turned on.

11.     The method as in claim 10, wherein capturing multiple light samples when a respective light source is turned on and the other light sources are turned off comprises capturing five light samples when a respective light source is turned on and the other light sources are turned off.

12.     The method as in claim 11, wherein capturing multiple dark samples after all of the light sources have been turned on and turned off comprises capturing seven dark samples after all of the light sources have been turned on and turned off.

Exhibit 22
-565-

13.     The method as in claim 4, wherein demodulating the signal to produce multiple demodulated signals comprises applying a first demodulation operation of $\sin 2\pi \frac{kt}{N}$ to the signal and applying a second demodulation operation of $\cos 2\pi \frac{kt}{N}$ to the signal, where k is defined by $1 \leq k \leq n/2$, N represents the number of samples obtained by the optical sensor, and t = 0, 1, …, N-1.

14.     The method as in claim 4, wherein filtering and decimating each demodulated signal at least once to produce a signal associated with each light source comprises inputting each demodulated signal into one or more low pass filter and decimation stages, wherein each low pass filter and decimation stage comprises a low pass filter for receiving a demodulated signal and a decimation circuit operably connected to an output of the low pass filter.

15.     A method for operating an electronic device that includes multiple light sources, an optical sensor, and a processing device operably connected to the optical sensor, the method comprising:

turning on each light source one at a time and emitting light toward a body part of a user;

capturing multiple light samples while each light source emits light toward the body part of the user and converting the multiple light samples into a signal;

converting the signal into a digital signal;

demodulating the digital signal to produce multiple demodulated signals; and

filtering and decimating each demodulated signal at least once to produce a signal associated with each light source.

16.     The method as in claim 15, further comprising analyzing each signal associated with each light source to estimate a physiological parameter of the user.

17.     The method as in claim 15, wherein capturing multiple light samples while each light source emits light toward the body part of the user comprises:

Exhibit 22
-566-

Attorney Docket No. P22879USP1

capturing multiple light samples while each light source is turned on and the other light sources are turned off; and

capturing multiple dark samples after all four light sources have been turned on and turned off.

18.     The method as in claim 17, further comprising capturing one or more dark samples after one light source is turned off and before the next light source is turned on.

19.     The method as in claim 17, wherein demodulating the digital signal to produce multiple demodulated signals comprises applying a first demodulation operation of $\sin 2\pi \frac{kt}{N}$ to the digital signal and applying a second demodulation operation of $\cos 2\pi \frac{kt}{N}$ to the digital signal, where k is defined by $1 \leq k \leq n/2$, N represents the number of samples obtained by the optical sensor, and t = 0, 1, …, N-1.

20.     The method as in claim 17, wherein filtering and decimating each demodulated signal at least once to produce a signal associated with each light source comprises inputting each demodulated signal into one or more low pass filter and decimation stages, wherein each low pass filter and decimation stage comprises a low pass filter for receiving a demodulated signal and a decimation circuit operably connected to an output of the low pass filter.

Exhibit 22
-567-

Attorney Docket No. P22879USP1

## ABSTRACT

An electronic device includes one or more light sources for emitting light toward a body part of a user and one or more optical sensors for capturing light samples while each light source is turned on and for capturing dark samples while the light source(s) are turned off. A signal produced by the one or more optical sensors is demodulated produce multiple demodulated signals. Each demodulated signal is received by one or more decimation stages to produce a signal associated with each light source. Each signal associated with the light source(s) is analyzed to estimate or determine a physiological parameter of the user.

**Exhibit 22**
**-568-**

New Sheet
Title: Modulation And Demodulation Techniques For A Health Monitoring System
Application No. Not Yet Assigned; Filed: Herewith
Inventor(s): Lamego
Docket No. P22879US1

## 1/9



**FIG. 1**

Exhibit 22
-569-

New Sheet
Title: Modulation And Demodulation Techniques For A Health Monitoring System
Application No. Not Yet Assigned; Filed: Herewith
Inventor(s): Lamego
Docket No. P22879US1

*2/9*



*FIG. 2*

Exhibit 22
-570-



**FIG. 3**

New Sheet
Title: Modulation And Demodulation Techniques For A Health Monitoring System
Application No.: Not Yet Assigned; Filed: Herewith
Inventor(s): Lamego
Docket No.: P228790US1

3/9

Exhibit 22
-571-

New Sheet

Title: Modulation And Demodulation Techniques For A Health Monitoring System
Application No. Not Yet Assigned; Filed: Herewith
Inventor(s): Lamego
Docket No. P22879US1

*4/9*



*FIG. 4*

Exhibit 22
-572-

Title: Modulation And Demodulation Techniques For A Health Monitoring System
Application No. Not Yet Assigned; Filed: Herewith
Inventor(s): Lamego
Docket No. P22879US1

## 5/9



X = OPTICAL SENSOR
CAPTURES SAMPLE

**FIG. 5**



X = OPTICAL SENSOR
CAPTURES SAMPLE

**FIG. 6**

Exhibit 22
-573-



**FIG. 7**

New Sheet
Title: Modulation And Demodulation Techniques For A Health Monitoring System
Application No. Not Yet Assigned; Filed: Herewith
Inventor(s): Lamego
Docket No. P228760US1

6/9

Exhibit 22
-574-

New Sheet
Title: Modulation And Demodulation Techniques For A Health Monitoring System
Application No. Not Yet Assigned; Filed: Herewith
Inventor(s): Lamego
Docket No. P22879US1

*7/9*



*FIG. 8*

Exhibit 22
-575-

New Sheet
Title: Modulation And Demodulation Techniques For A Health Monitoring System
Application No. Not Yet Assigned; Filed: Herewith
Inventor(s): Lamego
Docket No. P22879US1

*8/9*



*FIG. 9*

Exhibit 22
-576-

New Sheet
Title: Modulation And Demodulation Techniques For A Health Monitoring System
Application No. Not Yet Assigned; Filed: Herewith
Inventor(s): Lamego
Docket No. P22879US1

*9/9*



*FIG. 10*

Exhibit 22
-577-

## Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | |
| **Filing Date:** | |
| **Title of Invention:** | Modulation and Demodulation Techniques for a Health Monitoring System |
| **First Named Inventor/Applicant Name:** | Marcelo M. Lamego |
| **Filer:** | Stephen C. Hemenway/Valerie Brown |
| **Attorney Docket Number:** | P22879USP1 |

Filed as Large Entity

### Provisional Filing Fees

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| Provisional Application Filing | 1005 | 1 | 260 | 260 |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |
| **Post-Allowance-and-Post-Issuance:** | | | | |
| **Extension-of-Time:** | | | | |

Exhibit 22
-578-

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Miscellaneous:** | | | | |
| | | **Total in USD ($)** | | **260** |

Exhibit 22
-579-

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 20085622 |
| **Application Number:** | 62047818 |
| **International Application Number:** | |
| **Confirmation Number:** | 1519 |
| **Title of Invention:** | Modulation and Demodulation Techniques for a Health Monitoring System |
| **First Named Inventor/Applicant Name:** | Marcelo M. Lamego |
| **Customer Number:** | 62579 |
| **Filer:** | Stephen C. Hemenway/Valerie Brown |
| **Filer Authorized By:** | Stephen C. Hemenway |
| **Attorney Docket Number:** | P22879USP1 |
| **Receipt Date:** | 09-SEP-2014 |
| **Filing Date:** | |
| **Time Stamp:** | 13:50:21 |
| **Application Type:** | Provisional |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | Credit Card |
| Payment was successfully received in RAM | $ 260 |
| RAM confirmation Number | 11746 |
| Deposit Account | 504621 |
| Authorized User | BROWN, VALERIE |
| The Director of the USPTO is hereby authorized to charge indicated fees and credit any overpayment as follows: | |
| | Charge any Additional Fees required under 37 C.F.R. Section 1.16 (National application filing, search, and examination fees) |
| | Charge any Additional Fees required under 37 C.F.R. Section 1.17 (Patent application and reexamination processing fees) |

**Exhibit 22**
**-580-**

Charge any Additional Fees required under 37 C.F.R. Section 1.19 (Document supply fees)

Charge any Additional Fees required under 37 C.F.R. Section 1.20 (Post Issuance fees)

Charge any Additional Fees required under 37 C.F.R. Section 1.21 (Miscellaneous fees and charges)

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Provisional Cover Sheet (SB16) | P22879USP1ApplicationTransmittal.pdf | 167207 <br><br> 46e7bbec73bb6addf8f6c82cc37f1e3ca1f7d8f2 | no | 2 |

| Warnings: | | | | | |
|---|---|---|---|---|---|

This is not a USPTO supplied Provisional Cover Sheet SB16 form.

| Information: | | | | | |
|---|---|---|---|---|---|

| 2 | | P22879USP1Specification.pdf | 115040 <br><br> 985d2440cacbd2bc0c3017dc69d4cc1298d21a5a | yes | 24 |
|---|---|---|---|---|---|

| Multipart Description/PDF files in .zip description | | |
|---|---|---|
| **Document Description** | **Start** | **End** |
| Specification | 1 | 19 |
| Claims | 20 | 23 |
| Abstract | 24 | 24 |

| Warnings: | | | | | |
|---|---|---|---|---|---|

| Information: | | | | | |
|---|---|---|---|---|---|

| 3 | Drawings-only black and white line drawings | P22879USP1Drawings.pdf | 92560 <br><br> 29076d29fcd45b98e6594bc8b82bbd8821b51b73 | no | 9 |
|---|---|---|---|---|---|

| Warnings: | | | | | |
|---|---|---|---|---|---|

| Information: | | | | | |
|---|---|---|---|---|---|

| 4 | Fee Worksheet (SB06) | fee-info.pdf | 29724 <br><br> c904a198ddf887718ea8f95ce4485d6a81b317c4 | no | 2 |
|---|---|---|---|---|---|

| Warnings: | | | | | |
|---|---|---|---|---|---|

| Information: | | | | | |
|---|---|---|---|---|---|

| | Total Files Size (in bytes): | 404531 |
|---|---|---|

Exhibit 22 -581-

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

New Applications Under 35 U.S.C. 111
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

National Stage of an International Application under 35 U.S.C. 371
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

New International Application Filed with the USPTO as a Receiving Office
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

Exhibit 22
-582-

# EXHIBIT 23

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | ISSUE DATE | PATENT NO. | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 14/618,664 | 04/24/2018 | 9952095 | P22733US1 | 1097 |

62579          7590          04/04/2018
APPLE INC.
c/o Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, CO 80202

# ISSUE NOTIFICATION

The projected patent number and issue date are specified above.

## Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
### (application filed on or after May 29, 2000)

The Patent Term Adjustment is 0 day(s). Any patent to issue from the above-identified application will include an indication of the adjustment on the front page.

If a Continued Prosecution Application (CPA) was filed in the above-identified application, the filing date that determines Patent Term Adjustment is the filing date of the most recent CPA.

Applicant will be able to obtain more detailed information by accessing the Patent Application Information Retrieval (PAIR) WEB site (http://pair.uspto.gov).

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Application Assistance Unit (AAU) of the Office of Data Management (ODM) at (571)-272-4200.

APPLICANT(s) (Please see PAIR WEB site http://pair.uspto.gov for additional applicants):

Steven P. Hotelling, Cupertino, CA;
APPLE INC., Cupertino, CA;
Marcelo M. Lamego, Cupertino, CA;

The United States represents the largest, most dynamic marketplace in the world and is an unparalleled location for business investment, innovation, and commercialization of new technologies. The USA offers tremendous resources and advantages for those who invest and manufacture goods here. Through SelectUSA, our nation works to encourage and facilitate business investment. To learn more about why the USA is the best country in the world to develop technology, manufacture products, and grow your business, visit <u>SelectUSA.gov</u>.

IR103 (Rev. 10/09)

**Exhibit 23**
**-583-**

PTO/SB/47 (03-09)
Approved for use through 05/31/2015. OMB 0651-0016
U.S. Patent and Trademark Office; U. S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# "FEE ADDRESS" INDICATION FORM

**Address to:**
**Mail Stop M Correspondence**
**Commissioner for Patents**          **- OR -**
**P.O. Box 1450**
**Alexandria, VA 22313-1450**

**Fax to:**
**571-273-6500**

**INSTRUCTIONS:** The issue fee must have been paid for application(s) listed on this form.  In addition, only an address represented by a Customer Number can be established as the fee address for maintenance fee purposes (hereafter, fee address).  A fee address should be established when correspondence related to maintenance fees should be mailed to a different address than the correspondence address for the application. **When to check the first box below:** If you have a Customer Number to represent the fee address.  **When to check the second box below:** If you have no Customer Number representing the desired fee address, in which case a completed Request for Customer Number (PTO/SB/125) must be attached to this form.  For more information on Customer Numbers, see the Manual of Patent Examining Procedure (MPEP) § 403.

For the following listed application(s), please recognize as the "Fee Address" under the provisions of 37 CFR 1.363 the address associated with:

[✔] Customer Number: **000197**

**OR**

[ ] The attached Request for Customer Number (PTO/SB/125) form.

| PATENT NUMBER (if known) | APPLICATION NUMBER |
|---|---|
|  | 14/618,664 |

Completed by (check one):

[ ] Applicant/Inventor

[✔] Attorney or Agent of record   36,232
                    (Reg. No.)

[ ] Assignee of record of the entire interest. See 37 CFR 3.71.
    Statement under 37 CFR 3.73(b) is enclosed.
    (Form PTO/SB/96)

[ ] Assignee recorded at Reel _____ Frame _____

/Gregory W. Osterloth/
Signature

Gregory W. Osterloth
Typed or printed name

303-223-1100
Requester's telephone number

March 12, 2018
Date

NOTE: Signatures of all the inventors or assignees of record of the entire interest or their representative(s) are required. Submit multiple forms if more that one signature is required, see below*.

[ ] * Total of _____ forms are submitted.

This collection of information is required by 37 CFR 1.363.  The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 5 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA  22313- 1450.  DO NOT SEND COMPLETE D FORMS TO THIS A DDRESS. **SEND TO: Mail Stop M Correspondence, Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

**Exhibit 23**
**-584-**

## Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | 14618664 |
| **Filing Date:** | 10-Feb-2015 |
| **Title of Invention:** | Methods and Systems for Modulation and Demodulation of Optical Signals |
| **First Named Inventor/Applicant Name:** | Steven P. Hotelling |
| **Filer:** | Gregory W. Osterloth/Valerie Brown |
| **Attorney Docket Number:** | P22733US1 |

Filed as Large Entity

**Filing Fees for** Utility under 35 USC 111(a)

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |
| **Post-Allowance-and-Post-Issuance:** | | | | |
| UTILITY APPL ISSUE FEE | 1501 | 1 | 960 | 960 |

Exhibit 23
-585-

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Extension-of-Time:** | | | | |
| **Miscellaneous:** | | | | |
| | | | **Total in USD ($)** | **960** |

**Exhibit 23**

**-586-**

# Electronic Acknowledgement Receipt

| EFS ID: | 32018811 |
|---|---|
| Application Number: | 14618664 |
| International Application Number: | |
| Confirmation Number: | 1097 |
| Title of Invention: | Methods and Systems for Modulation and Demodulation of Optical Signals |
| First Named Inventor/Applicant Name: | Steven P. Hotelling |
| Customer Number: | 62579 |
| Filer: | Gregory W. Osterloth/Valerie Brown |
| Filer Authorized By: | Gregory W. Osterloth |
| Attorney Docket Number: | P22733US1 |
| Receipt Date: | 12-MAR-2018 |
| Filing Date: | 10-FEB-2015 |
| Time Stamp: | 11:23:15 |
| Application Type: | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | CARD |
| Payment was successfully received in RAM | $ 960 |
| RAM confirmation Number | 031218INTEFSW11235700 |
| Deposit Account | |
| Authorized User | |
| The Director of the USPTO is hereby authorized to charge indicated fees and credit any overpayment as follows: | |

Exhibit 23
-587-

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Issue Fee Payment (PTO-85B) | P22733US1IssueFeeTransmittal .pdf | 142776 / 43d4131ccbae57f04c084f9384270b390b82a7c1 | no | 1 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 2 | Maintenance Fee Address Change | P22733US1FeeAddress.pdf | 106988 / 8854ab7550c33d13cba71a4e75cceaa038db18fb | no | 1 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 3 | Fee Worksheet (SB06) | fee-info.pdf | 30970 / aebe783d9a0c50bca6db7aeeca393cf78f5f62f9 | no | 2 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| | | **Total Files Size (in bytes):** | 280734 | | |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

Exhibit 23
-588-

**PART B - FEE(S) TRANSMITTAL**

**Complete and send this form, together with applicable fee(s), to:** **Mail**    Mail Stop ISSUE FEE
                                                                        Commissioner for Patents
                                                                        P.O. Box 1450
                                                                        Alexandria, Virginia 22313-1450
                                                                 **or Fax** (571)-273-2885

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

| 62579 | 7590 | 12/13/2017 |
|---|---|---|

APPLE INC.
c/o Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, CO 80202

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**
I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being facsimile transmitted to the USPTO (571) 273-2885, on the date indicated below.

_____ (Depositor's name)

_____ (Signature)

_____ (Date)

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 14/618,664 | 02/10/2015 | Steven P. Hotelling | P22733US1 | 1097 |

TITLE OF INVENTION: Methods and Systems for Modulation and Demodulation of Optical Signals

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | UNDISCOUNTED | $960 | $0 | $0 | $960 | 03/13/2018 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| KO, TONY | 2878 | 250-208200 |

**1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).**

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☑ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-02 or more recent) attached. **Use of a Customer Number is required.**

**2. For printing on the patent front page, list**

(1) The names of up to 3 registered patent attorneys or agents OR, alternatively,

(2) The name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1  Brownstein Hyatt Farber Schreck, LLP

2  _____

3  _____

**3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)**

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document has been filed for recordation as set forth in 37 CFR 3.11. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE

Apple Inc.

(B) RESIDENCE: (CITY and STATE or COUNTRY)

Cupertino, California

Please check the appropriate assignee category or categories (will not be printed on the patent) : ☐ Individual  ☑ Corporation or other private group entity  ☐ Government

**4a. The following fee(s) are submitted:**

☑ Issue Fee

☐ Publication Fee (No small entity discount permitted)

☐ Advance Order - # of Copies _____

**4b. Payment of Fee(s): (Please first reapply any previously paid issue fee shown above)**

☐ A check is enclosed.

☐ Payment by credit card. Form PTO-2038 is attached.

☑ The director is hereby authorized to charge the required fee(s), any deficiency, or credits any overpayment, to Deposit Account Number 50-4621 _____ (enclose an extra copy of this form).

**5. Change in Entity Status (from status indicated above)**

☐ Applicant certifying micro entity status. See 37 CFR 1.29

☐ Applicant asserting small entity status. See 37 CFR 1.27

☐ Applicant changing to regular undiscounted fee status.

NOTE: Absent a valid certification of Micro Entity Status (see forms PTO/SB/15A and 15B), issue fee payment in the micro entity amount will not be accepted at the risk of application abandonment.

NOTE: If the application was previously under micro entity status, checking this box will be taken to be a notification of loss of entitlement to micro entity status.

NOTE: Checking this box will be taken to be a notification of loss of entitlement to small or micro entity status, as applicable.

NOTE: This form must be signed in accordance with 37 CFR 1.31 and 1.33. See 37 CFR 1.4 for signature requirements and certifications.

Authorized Signature  /Gregory W. Osterloth/                Date  March 12, 2018

Typed or printed name  Gregory W. Osterloth             Registration No.  36,232

PTOL-85 Part B (10-13) Approved for use through 10/31/2013.    OMB 0651-0033    U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

**Exhibit 23**

-589-

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 14/618,664 | 02/10/2015 | Steven P. Hotelling | P22733US1 | 1097 |

62579          7590          02/06/2018

APPLE INC.
c/o Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, CO 80202

| EXAMINER |
|---|
| KO, TONY |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2878 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 02/06/2018 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

patentdocket@bhfs.com

PTOL-90A (Rev. 04/07)

Exhibit 23
-590-

UNITED STATES DEPARTMENT OF COMMERCE
**U.S. Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450

| APPLICATION NO./ CONTROL NO. | FILING DATE | FIRST NAMED INVENTOR / PATENT IN REEXAMINATION | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 14/618,664 | 10 February, 2015 | HOTELLING ET AL. | P22733US1 |

| | EXAMINER |
|---|---|
| APPLE INC.<br>c/o Brownstein Hyatt Farber Schreck, LLP<br>410 Seventeenth Street<br>Suite 2200<br>Denver, CO  80202 | TONY KO |

| | ART UNIT | PAPER |
|---|---|---|
| | 2878 | 20180131 |

DATE MAILED:

**Please find below and/or attached an Office communication concerning this application or proceeding.**

Commissioner for Patents

---

IDS filed on 1/24/2018 has been placed in the file wraper and not been considered.

The statement filed by the applicant does not appear to comply with rule 1.97(e)(2) where the MPEP states -

• (e) A statement under this section must state either:
o (1) That each item of information contained in the information disclosure statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement; or
o (2) That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the certification after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in § 1.56(c)  more than three months prior to the filing of the information disclosure statement.

Since the filing of IDS on 1/24/2018 does not meet the requirements, the IDS is not considered.

| | /TONY KO/<br>Primary Examiner, Art Unit 2878 |
|---|---|

PTO-90C (Rev.04-03)

Exhibit 23<br>-591-

Receipt date: 01/24/2018                                                    14/618,664 - GAU: 2878

| PTO/SB/08A and B (08-03) U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE Substitute for Form 1449A/PTO |  | APPLICATION NO.: 14/618,664 | FILING DATE: February 10, 2015 |
|---|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** |  | FIRST NAMED INVENTOR: Steven M. Hotelling | ART UNIT: 2878 |
| *(Use as many sheets as necessary)* |  | EXAMINER NAME: Ko, Tony | ATTY. DOCKET NO.: P22733US1 |

### U.S. PATENT DOCUMENTS

| EXAMINER INITIALS* | Cite No. | PATENT NUMBER Number – Kind Code² (if known) | ISSUE DATE MM-DD-YYYY | Name of Patentee of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
|  | A1. | 8,576,202 | 11/2013 | Tanaka et al. |  |
|  | A2. | 8,692,812 | 04/2014 | Hecht |  |
|  | A3. | 9,201,546 | 12/2015 | Son et al. |  |
|  | A4. | 9,465,972 | 10/2016 | Chung et al. |  |
|  | A5. | 9,778,193 | 10/2017 | Vacca |  |
|  | A6. | 9,824,254 | 11/2017 | Yazdandoost et al. |  |

### U.S. PUBLICATION DOCUMENTS

| EXAMINER INITIALS* | Cite No.¹ | PUBLICATION NUMBER Number – Kind Code² (if known) | PUBLICATION DATE MM-DD-YYYY | Name of Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |

### FOREIGN PATENT DOCUMENTS

| EXAMINER INITIALS* | Cite No.¹ | DOCUMENT NUMBER Country Code³ Number⁴ – Kind Code⁵ (if known) | PUBLICATION DATE MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear | T⁶ |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |

### NONPATENT LITERATURE DOCUMENTS

| EXAMINER INITIALS* | Cite No.¹ | Include name of Author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and/or country where published. | T⁶ |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |

16382202.1

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /T.K/

**Exhibit 23**
**-592-**

| PTO/SB/08A and B (08-03) U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE Substitute for Form 1449A/PTO | APPLICATION NO.: 14/618,664 | FILING DATE: February 10, 2015 |
|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** | FIRST NAMED INVENTOR: Steven M. Hotelling | ART UNIT: 2878 |
| *(Use as many sheets as necessary)* | EXAMINER NAME: Ko, Tony | ATTY. DOCKET NO.: P22733US1 |

| EXAMINER: Initial if citation considered, whether or not citation is in conformance with MPEP 609; Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant. | | | |
|---|---|---|---|
| Examiner Signature | /TONY KO/ | Date Considered | 01/31/2018 |

[1] Applicant's unique citation number (optional). [2] See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04. [3] Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3). [4] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [5] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. [6] Applicant is to place a check mark here if English language Translation is attached.

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /T.K/

**Exhibit 23**
**-593-**

| PTO/SB/08A and B (08-03)<br>U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE<br>Substitute for Form 1449A/PTO | | **APPLICATION NO.:**<br>14/618,664 | **FILING DATE:**<br>February 10, 2015 |
|---|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** | | **FIRST NAMED INVENTOR:**<br>Steven M. Hotelling | **ART UNIT:**<br>2878 |
| ***(Use as many sheets as necessary)*** | | **EXAMINER NAME:**<br>Ko, Tony | **ATTY. DOCKET NO.:**<br>P22733US1 |

**U.S. PATENT DOCUMENTS**

| EXAMINER INITIALS* | Cite No. | PATENT NUMBER<br>Number – Kind Code² (if known) | ISSUE DATE<br>MM-DD-YYYY | Name of Patentee of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | A1. | 8,576,202 | 11/2013 | Tanaka et al. | |
| | A2. | 8,692,812 | 04/2014 | Hecht | |
| | A3. | 9,201,546 | 12/2015 | Son et al. | |
| | A4. | 9,465,972 | 10/2016 | Chung et al. | |
| | A5. | 9,778,193 | 10/2017 | Vacca | |
| | A6. | 9,824,254 | 11/2017 | Yazdandoost et al. | |

**U.S. PUBLICATION DOCUMENTS**

| EXAMINER INITIALS* | Cite No.¹ | PUBLICATION NUMBER<br>Number – Kind Code² (if known) | PUBLICATION DATE<br>MM-DD-YYYY | Name of Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |

**FOREIGN PATENT DOCUMENTS**

| EXAMINER INITIALS* | Cite No.¹ | DOCUMENT NUMBER<br>Country Code³ – Number⁴ – Kind Code⁵ (if known) | PUBLICATION DATE<br>MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear | T⁶ |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |

**NONPATENT LITERATURE DOCUMENTS**

| EXAMINER INITIALS* | Cite No.¹ | Include name of Author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and/or country where published. | T⁶ |
|---|---|---|---|
| | | | |
| | | | |

| PTO/SB/08A and B (08-03)<br>U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE<br>Substitute for Form 1449A/PTO | **APPLICATION NO.:**<br>14/618,664 | **FILING DATE:**<br>February 10, 2015 |
|---|---|---|
| **INFORMATION DISCLOSURE<br>STATEMENT BY APPLICANT** | **FIRST NAMED INVENTOR:**<br>Steven M. Hotelling | **ART UNIT:**<br>2878 |
| ***(Use as many sheets as necessary)*** | **EXAMINER NAME:**<br>Ko, Tony | **ATTY. DOCKET NO.:**<br>P22733US1 |

| **EXAMINER: Initial if citation considered, whether or not citation is in conformance with MPEP 609; Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.** | | | |
|---|---|---|---|
| Examiner Signature | | Date Considered | |

[1] Applicant's unique citation number (optional). [2] See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04. [3] Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3). [4] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [5] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. [6] Applicant is to place a check mark here if English language Translation is attached.

**Exhibit 23**
**-595-**

## Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | 14618664 |
| **Filing Date:** | 10-Feb-2015 |
| **Title of Invention:** | Methods and Systems for Modulation and Demodulation of Optical Signals |
| **First Named Inventor/Applicant Name:** | Steven P. Hotelling |
| **Filer:** | Stephen C. Hemenway/Valerie Brown |
| **Attorney Docket Number:** | P22733US1 |

Filed as Large Entity

**Filing Fees for   Utility under 35 USC 111(a)**

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |
| **Post-Allowance-and-Post-Issuance:** | | | | |
| **Extension-of-Time:** | | | | |

Exhibit 23
-596-

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Miscellaneous:** | | | | |
| Submission- Information Disclosure Stmt | 1806 | 1 | 240 | 240 |
| **Total in USD ($)** | | | | **240** |

Exhibit 23
-597-

# Electronic Acknowledgement Receipt

| EFS ID: | 31592527 |
|---|---|
| Application Number: | 14618664 |
| International Application Number: | |
| Confirmation Number: | 1097 |
| Title of Invention: | Methods and Systems for Modulation and Demodulation of Optical Signals |
| First Named Inventor/Applicant Name: | Steven P. Hotelling |
| Customer Number: | 62579 |
| Filer: | Stephen C. Hemenway/Valerie Brown |
| Filer Authorized By: | Stephen C. Hemenway |
| Attorney Docket Number: | P22733US1 |
| Receipt Date: | 24-JAN-2018 |
| Filing Date: | 10-FEB-2015 |
| Time Stamp: | 14:26:10 |
| Application Type: | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | CARD |
| Payment was successfully received in RAM | $240 |
| RAM confirmation Number | 012518INTEFSW14273300 |
| Deposit Account | |
| Authorized User | |
| The Director of the USPTO is hereby authorized to charge indicated fees and credit any overpayment as follows: |

Exhibit 23
-598-

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Transmittal Letter | P22733US1IDS.pdf | 19164<br><br>226e136fab1f9a3b80ced6b4b8e9a125384a73e3 | no | 2 |

**Warnings:**

**Information:**

| 2 | Information Disclosure Statement (IDS) Form (SB08) | P22733US1PTOSB08.pdf | 30213<br><br>122fa6dfa6f43e6f119d2b07cd8c81190bb2a0d | no | 2 |

**Warnings:**

**Information:**

This is not an USPTO supplied IDS fillable form

| 3 | Fee Worksheet (SB06) | fee-info.pdf | 30459<br><br>1097fcb6415b15aa020a9cc33c4863c0ecc660d8 | no | 2 |

**Warnings:**

**Information:**

| | | **Total Files Size (in bytes):** | 79836 | | |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

Exhibit 23
-599-

Attorney Docket No. P22733US1

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| In re the Application of: | | |
|---|---|---|
| Steven M. Hotelling, et al. | Examiner: | Ko, Tony. |
| Application No. 14/618,664 | Art Unit: | 2878 |
| Filed: February 10, 2015 | Confirmation No. | 1097 |
| For: METHODS AND SYSTEMS FOR MODULATION AND DEMODULATION OF OPTICAL SIGNALS | | |

**INFORMATION DISCLOSURE STATEMENT**
**UNDER 37 C.F.R. §§ 1.97(d), 1.97(e), 1.98 and 1.17(p)**

Mail Stop AMENDMENT
Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Sir:

The Examiner is requested to consider the references noted on the enclosed Form PTO/SB/08a during examination of the above-identified patent application.  These references are submitted for the Examiner's consideration and are submitted pursuant to the duty of disclosure under 37 C.F.R. § 1.56.  In submitting these references, no representation is made or implied that the references are or are not material to the examination of the application.  The Examiner is requested to make his or her own determination of materiality.  Pursuant to the requirements of 37 C.F.R. § 1.98(a)(2)(ii), only copies of the foreign references and non-patent literature documents are provided.  Copies of the U.S. patent and U.S. patent application publication references are not provided, unless required by the Office.

**Statement Under 37 C.F.R. § 1.97(e)(2)**

The undersigned hereby certifies that the references cited in this Information Disclosure Statement were not cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing this certification after making reasonable inquiry, no item of information contain in this Information Disclosure Statement was known to any individual designated in 37 C.F.R. § 1.56(c) more than three months prior to the filing of this Information Disclosure Statement.

1

16382164.1

**Exhibit 23**
**-600-**

Attorney Docket No. P22733US1

This Information Disclosure Statement is being filed under 37 C.F.R. § 1.97(d) after the mailing date of a Notice of Allowance but before the payment of the issue fee.  As such, this Information Disclosure Statement requires a statement under 37 C.F.R. § 1.97(e) and the fee of $180.00 pursuant to 37 C.F.R. § 1.17(p).  A charge to Deposit Account No. 504621 in the amount of $180.00 is authorized herewith.  If any additional fees are deemed necessary, such fees may be charged to Deposit Account No. 504621.

If the Examiner has any questions, please contact the undersigned attorney.

Dated:  January 24, 2018.

Respectfully submitted,

/S. Craig Hemenway/

S. Craig Hemenway, Registration No. 44,759
Attorney for Assignee
USPTO Customer No. 62579

Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, Colorado  80202
Phone: (303) 223-1100
Fax: (303) 223-1111

2

16382164.1

**Exhibit 23**
**-601-**



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# NOTICE OF ALLOWANCE AND FEE(S) DUE

| 62579 | 7590 | 12/13/2017 |
| --- | --- | --- |

APPLE INC.
c/o Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, CO 80202

| EXAMINER |
| --- |
| KO, TONY |

| ART UNIT | PAPER NUMBER |
| --- | --- |
| 2878 | |

DATE MAILED: 12/13/2017

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
| --- | --- | --- | --- | --- |
| 14/618,664 | 02/10/2015 | Steven P. Hotelling | P22733US1 | 1097 |

TITLE OF INVENTION: Methods and Systems for Modulation and Demodulation of Optical Signals

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
| --- | --- | --- | --- | --- | --- | --- |
| nonprovisional | UNDISCOUNTED | $960 | $0 | $0 | $960 | 03/13/2018 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. PROSECUTION ON THE MERITS IS CLOSED.** THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS. THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON PETITION BY THE APPLICANT. SEE 37 CFR 1.313 AND MPEP 1308.

**THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN <u>THREE MONTHS</u> FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. <u>THIS STATUTORY PERIOD CANNOT BE EXTENDED.</u> SEE 35 U.S.C. 151. THE ISSUE FEE DUE INDICATED ABOVE DOES NOT REFLECT A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE IN THIS APPLICATION. IF AN ISSUE FEE HAS PREVIOUSLY BEEN PAID IN THIS APPLICATION (AS SHOWN ABOVE), THE RETURN OF PART B OF THIS FORM WILL BE CONSIDERED A REQUEST TO REAPPLY THE PREVIOUSLY PAID ISSUE FEE TOWARD THE ISSUE FEE NOW DUE.**

**HOW TO REPLY TO THIS NOTICE:**

I. Review the ENTITY STATUS shown above. If the ENTITY STATUS is shown as SMALL or MICRO, verify whether entitlement to that entity status still applies.

If the ENTITY STATUS is the same as shown above, pay the TOTAL FEE(S) DUE shown above.

If the ENTITY STATUS is changed from that shown above, on PART B - FEE(S) TRANSMITTAL, complete section number 5 titled "Change in Entity Status (from status indicated above)".

For purposes of this notice, small entity fees are 1/2 the amount of undiscounted fees, and micro entity fees are 1/2 the amount of small entity fees.

II. PART B - FEE(S) TRANSMITTAL, or its equivalent, must be completed and returned to the United States Patent and Trademark Office (USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be completed and an extra copy of the form should be submitted. If an equivalent of Part B is filed, a request to reapply a previously paid issue fee must be clearly made, and delays in processing may occur due to the difficulty in recognizing the paper as an equivalent of Part B.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Maintenance fees are due in utility patents issuing on applications filed on or after Dec. 12, 1980. It is patentee's responsibility to ensure timely payment of maintenance fees when due. More information is available at www.uspto.gov/PatentMaintenanceFees.**

PTOL-85 (Rev. 02/11)

**Exhibit 23**
**-602-**

# PART B - FEE(S) TRANSMITTAL

**Complete and send this form, together with applicable fee(s), to: <u>Mail</u>**

Mail Stop ISSUE FEE
Commissioner for Patents
P.O. Box 1450
Alexandria, Virginia 22313-1450

**or <u>Fax</u>** (571)-273-2885

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

| 62579 | 7590 | 12/13/2017 |
|---|---|---|

APPLE INC.
c/o Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, CO 80202

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**
I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being facsimile transmitted to the USPTO (571) 273-2885, on the date indicated below.

_____ (Depositor's name)

_____ (Signature)

_____ (Date)

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 14/618,664 | 02/10/2015 | Steven P. Hotelling | P22733US1 | 1097 |

TITLE OF INVENTION: Methods and Systems for Modulation and Demodulation of Optical Signals

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | UNDISCOUNTED | $960 | $0 | $0 | $960 | 03/13/2018 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| KO, TONY | 2878 | 250-208200 |

**1.** Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-02 or more recent) attached. **Use of a Customer Number is required.**

**2.** For printing on the patent front page, list

(1) The names of up to 3 registered patent attorneys or agents OR, alternatively,

(2) The name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 _____

2 _____

3 _____

**3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT** (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document has been filed for recordation as set forth in 37 CFR 3.11. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE

(B) RESIDENCE: (CITY and STATE OR COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent) : ☐ Individual ☐ Corporation or other private group entity ☐ Government

**4a.** The following fee(s) are submitted:

☐ Issue Fee
☐ Publication Fee (No small entity discount permitted)
☐ Advance Order - # of Copies _____

**4b.** Payment of Fee(s): **(Please first reapply any previously paid issue fee shown above)**

☐ A check is enclosed.
☐ Payment by credit card. Form PTO-2038 is attached.
☐ The director is hereby authorized to charge the required fee(s), any deficiency, or credits any overpayment, to Deposit Account Number _____ (enclose an extra copy of this form).

**5. Change in Entity Status** (from status indicated above)

☐ Applicant certifying micro entity status. See 37 CFR 1.29

☐ Applicant asserting small entity status. See 37 CFR 1.27

☐ Applicant changing to regular undiscounted fee status.

NOTE: Absent a valid certification of Micro Entity Status (see forms PTO/SB/15A and 15B), issue fee payment in the micro entity amount will not be accepted at the risk of application abandonment.

NOTE: If the application was previously under micro entity status, checking this box will be taken to be a notification of loss of entitlement to micro entity status.

NOTE: Checking this box will be taken to be a notification of loss of entitlement to small or micro entity status, as applicable.

NOTE: This form must be signed in accordance with 37 CFR 1.31 and 1.33. See 37 CFR 1.4 for signature requirements and certifications.

Authorized Signature _____       Date _____

Typed or printed name _____       Registration No. _____

PTOL-85 Part B (10-13) Approved for use through 10/31/2013.       OMB 0651-0033       U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

**Exhibit 23**
**-603-**

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 14/618,664 | 02/10/2015 | Steven P. Hotelling | P22733US1 | 1097 |

62579      7590      12/13/2017

APPLE INC.
c/o Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, CO 80202

| EXAMINER |
|---|
| KO, TONY |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2878 | |

DATE MAILED: 12/13/2017

## Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
(Applications filed on or after May 29, 2000)

The Office has discontinued providing a Patent Term Adjustment (PTA) calculation with the Notice of Allowance.

Section 1(h)(2) of the AIA Technical Corrections Act amended 35 U.S.C. 154(b)(3)(B)(i) to eliminate the requirement that the Office provide a patent term adjustment determination with the notice of allowance. See Revisions to Patent Term Adjustment, 78 Fed. Reg. 19416, 19417 (Apr. 1, 2013). Therefore, the Office is no longer providing an initial patent term adjustment determination with the notice of allowance. The Office will continue to provide a patent term adjustment determination with the Issue Notification Letter that is mailed to applicant approximately three weeks prior to the issue date of the patent, and will include the patent term adjustment on the patent. Any request for reconsideration of the patent term adjustment determination (or reinstatement of patent term adjustment) should follow the process outlined in 37 CFR 1.705.

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at 1-(888)-786-0101 or (571)-272-4200.

PTOL-85 (Rev. 02/11)

**Exhibit 23**
-604-

## OMB Clearance and PRA Burden Statement for PTOL-85 Part B

The Paperwork Reduction Act (PRA) of 1995 requires Federal agencies to obtain Office of Management and Budget approval before requesting most types of information from the public. When OMB approves an agency request to collect information from the public, OMB (i) provides a valid OMB Control Number and expiration date for the agency to display on the instrument that will be used to collect the information and (ii) requires the agency to inform the public about the OMB Control Number's legal significance in accordance with 5 CFR 1320.5(b).

The information collected by PTOL-85 Part B is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450. Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## Privacy Act Statement

**The Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:
1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

**Exhibit 23**
**-605-**

| *Notice of Allowability* | Application No. 14/618,664 | Applicant(s) HOTELLING ET AL. | |
|---|---|---|---|
| | Examiner TONY KO | Art Unit 2878 | AIA (First Inventor to File) Status Yes |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☒ This communication is responsive to <u>10/02/2017</u>.
    ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on_____.

2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

3. ☒ The allowed claim(s) is/are <u>1-20</u>. As a result of the allowed claim(s), you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp  or send an inquiry to PPHfeedback@uspto.gov.

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
    **Certified copies:**
      a) ☐  All    b) ☐  Some   *c) ☐  None of the:
        1. ☐ Certified copies of the priority documents have been received.
        2. ☐ Certified copies of the priority documents have been received in Application No. _____ .
        3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).
    * Certified copies not received: _____ .

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application. **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ CORRECTED DRAWINGS ( as "replacement sheets") must be submitted.
    ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail No. _____.
    **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**
1. ☐ Notice of References Cited (PTO-892)
2. ☒ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date <u>8/10/2017</u>
3. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material
4. ☐ Interview Summary (PTO-413), Paper No./Mail Date _____ .

5. ☐ Examiner's Amendment/Comment
6. ☐ Examiner's Statement of Reasons for Allowance
7. ☐ Other _____.

/TONY KO/
Primary Examiner, Art Unit 2878

Notice of Allowability

Part of Paper No./Mail Date

**Exhibit 23**
**-606-**

Receipt date: 08/10/2017    14/618,664 - GAU: 2878
Case 8:20-cv-00048-JVS-JDE    Document 109-1    Filed 08/17/20    Page 545 of 1129    Page ID #:7502

Sheet 1 of 1

| PTO/SB/08A and B (08-03) U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE Substitute for Form 1449A/PTO **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** *(Use as many sheets as necessary)* | APPLICATION NO.: 14/618,664 | FILING DATE: February 10, 2015 |
|---|---|---|
| | FIRST NAMED INVENTOR: Steven M. Hotelling | ART UNIT: 2878 |
| | EXAMINER NAME: Ko, Tony | ATTY. DOCKET NO.: P22733US1 |

### U.S. PATENT DOCUMENTS

| EXAMINER INITIALS* | Cite No. | PATENT NUMBER Number – Kind Code² (if known) | ISSUE DATE MM-DD-YYYY | Name of Patentee of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | A1. | 5,886,452 | 03/1999 | Toda | |
| | A2. | 6,164,135 | 12/2000 | Bicz | |

### U.S. PUBLICATION DOCUMENTS

| EXAMINER INITIALS* | Cite No.¹ | PUBLICATION NUMBER Number – Kind Code² (if known) | PUBLICATION DATE MM-DD-YYYY | Name of Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | B1. | 2004/0264746 | 12/2004 | Polcha | |
| | B2. | 2015/0185898 | 07/2015 | Masson et al. | |
| | | | | | |

### FOREIGN PATENT DOCUMENTS

| EXAMINER INITIALS* | Cite No.¹ | DOCUMENT NUMBER Country Code³ – Number⁴ – Kind Code⁵ (if known) | PUBLICATION DATE MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear | T⁶ |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |

### NONPATENT LITERATURE DOCUMENTS

| EXAMINER INITIALS* | Cite No.¹ | Include name of Author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and/or country where published. | T⁶ |
|---|---|---|---|
| | | | |
| | | | |

| EXAMINER: Initial if citation considered, whether or not citation is in conformance with MPEP 609; Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant. | | |
|---|---|---|
| Examiner Signature | /TONY KO/ | Date Considered 12/04/2017 |

¹ Applicant's unique citation number (optional). ² See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04. ³ Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3). ⁴ For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. ⁵ Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. ⁶ Applicant is to place a check mark here if English language Translation is attached.

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /T.K/

**Exhibit 23**
-607-

| ***Search Notes*** | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 14618664 | HOTELLING ET AL. |
| | **Examiner** | **Art Unit** |
| | TONY KO | 2878 |

### CPC- SEARCHED

| Symbol | Date | Examiner |
|---|---|---|
| g01j1/44 | 7/22/2016 | tk |
| a61b5/4845 | 7/22/2016 | tk |
| a61b5/1118 | 7/22/2016 | tk |
| a61b5/4872 | 7/22/2016 | tk |
| a61b5/02427 | 7/22/2016 | tk |
| g01j2001/444 | 7/22/2016 | tk |

### CPC COMBINATION SETS  - SEARCHED

| Symbol | Date | Examiner |
|---|---|---|
| | | |

### US CLASSIFICATION SEARCHED

| Class | Subclass | Date | Examiner |
|---|---|---|---|
| | | | |

* See search history printout included with this form or the SEARCH NOTES box below to determine the scope of the search.

### SEARCH NOTES

| Search Notes | Date | Examiner |
|---|---|---|
| see EAST search history | 7/22/2016 | tk |

### INTERFERENCE SEARCH

| US Class/ CPC Symbol | US Subclass / CPC Group | Date | Examiner |
|---|---|---|---|
| | | | |

| | |
|---|---|
| | |

Part of Paper No. : 20160722

**Exhibit 23**
**-608-**

**EAST Search History**

**EAST Search History (Prior Art)**

| Ref # | Hits | Search Query | DBs | Default Operator | Plurals | Time Stamp |
|---|---|---|---|---|---|---|
| S1 | 98 | ("20030109993" \| "20040140735" \| "20060196271" \| "20090167704" \| "20120092026" \| "20150053006" \| "20150192547" \| "5515298" \| "5589636" \| "6720712" \| "7400750" \| "7458268" \| "7497120" \| "7568391" \| "7734435" \| "7739912" \| "7770456" \| "8085998" \| "8095328" \| "8201739" \| "8335356" \| "8601876" \| "8666126" \| "8724869" \| "8781180" \| "9170668").PN. | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2016/07/21 15:24 |
| S2 | 2148 | g06k9/0002 | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2016/07/21 15:25 |
| S3 | 17 | S2 and (photodiode photo adj diode photosensor photo adj sensor) | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2016/07/21 15:25 |
| S4 | 715 | (finger adj print fingerprint$4) same (photosensor photo adj sensor photodiode photo adj diode) | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2016/07/21 15:30 |
| S5 | 30 | S4 and amplifier and filter and analog with digital | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2016/07/21 15:30 |
| S6 | 36 | S4 and amplifier and filter and analog with digital | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2016/07/21 15:30 |
| S7 | 99 | ("4414684").URPN. | USPAT | OR | OFF | 2016/07/21 15:39 |
| S8 | 4 | S7 and amplifier and filter and analog with digital | USPAT | OR | OFF | 2016/07/21 15:39 |
| S9 | 0 | (finger adj print fingerprint$4) same (photosensor photo adj sensor photodiode photo adj diode) same high adj pass | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2016/07/21 15:59 |
| S10 | 14 | (finger adj print fingerprint$4) same (photosensor photo adj sensor photodiode photo adj diode) and high adj pass | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; | OR | OFF | 2016/07/21 15:59 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | IBM_TDB | | | |
| S11 | 192 | (finger adj print fingerprint$4) same scan$4 and high adj pass and amplifier$1 | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2016/07/21 16:02 |
| S12 | 194 | (finger adj print fingerprint$4) same scan$4 and high adj pass and amplifier$1 | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2016/07/21 16:02 |
| S13 | 20633 | (g01j1/44\|a61b5/4845\|a61b5/1118\|a61b5/4872\|a61b5/02427\|g01j2001/444) | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2016/07/22 10:41 |
| S14 | 7 | S13 and transimpedence | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2016/07/22 10:44 |
| S15 | 216 | S13 and transimpedance | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2016/07/22 10:44 |
| S16 | 14 | (US-20150192547-$ or US-20120092026-$ or US-20150356340-$ or US-20160132712-$ or US-20150340539-$ or US-20050171413-$ or US-20050151065-$ or US-20040252867-$ or US-20150366518-$ or US-20100176823-$).did. or (US-9170668-$ or US-5781651-$ or US-4414684-$ or US-5719950-$).did. | US-PGPUB; USPAT | OR | OFF | 2016/07/22 10:44 |
| S17 | 0 | S15 and S16 | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2016/07/22 10:44 |
| S18 | 0 | S16 and transimpedance | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2016/07/22 10:44 |
| S19 | 200 | S13 and transimpedance adj amplifier | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2016/07/22 10:45 |
| S20 | 204 | S13 and transimpedance adj amplifier | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2016/07/22 10:45 |
| S21 | 42 | S20 and biometric | US-PGPUB; | OR | ON | 2016/07/22 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | | | 10:45 |
| S22 | 423 | biometric same modulation$1 | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2016/07/22 11:58 |
| S23 | 98 | biometric same modulation$1 with frequency | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2016/07/22 11:58 |
| S24 | 10 | S23 and (photodetector photosensor photo adj sensor photo adj detector) | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2016/07/22 11:58 |
| S25 | 2 | ("8954135").PN. | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2016/07/22 12:00 |
| S26 | 2 | ("9044171").PN. | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2016/07/22 12:28 |
| S27 | 2 | ("20140275850").PN. | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2016/07/22 12:31 |
| S28 | 412 | matrix same product same demodulat$4 same matrix | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2016/07/22 15:21 |
| S29 | 514 | matrix same product same demodulat$4 same matrix | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2016/07/22 15:21 |
| S30 | 184 | matrix same product same demodulat$4 same matrix | USPAT | OR | ON | 2016/07/22 15:21 |
| S31 | 15 | (US-20150192547-$ or US-20120092026-$ or US-20150356340-$ or US-20160132712-$ or US-20150340539-$ or US-20050171413-$ or US-20050151065-$ or US-20040252867-$ or US-20150366518-$ or US-20100176823-$).did. or (US-9170668-$ or US-5781651-$ or US-4414684-$ or US-5719950-$ or US-8954135-$).did. | US-PGPUB; USPAT | OR | OFF | 2016/07/22 15:29 |
| S32 | 0 | S31 and programmable near2 amplifier | US-PGPUB; | OR | OFF | 2016/07/22 |

Exhibit 23
-611-

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | | | 15:29 |
| S33 | 0 | S31 and programmable near2 amplifier | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2016/07/22 15:29 |
| S34 | 0 | S31 and programable near2 amplifier | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2016/07/22 15:29 |
| S35 | 2148 | g06k9/0002 | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2016/07/22 15:30 |
| S36 | 8 | S35 and programmable near2 amplifier | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2016/07/22 15:30 |
| S37 | 8 | S35 and programmable near2 amplifier | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2016/07/22 15:30 |
| S38 | 2 | (("5886452") or ("6164135") or ("20040264746") or ("20150185898")).PN. | USPAT; USOCR | OR | OFF | 2017/12/04 09:50 |
| S39 | 4 | (("5886452") or ("6164135") or ("20040264746") or ("20150185898")).PN. | US-PGPUB; USPAT; USOCR | OR | OFF | 2017/12/04 09:50 |
| S40 | 0 | S39 and pass | USPAT | OR | OFF | 2017/12/04 09:51 |
| S41 | 1 | S39 and pass | US-PGPUB; USPAT | OR | ON | 2017/12/04 09:51 |
| S42 | 98 | ("20030109993" \| "20040140735" \| "20060196271" \| "20090167704" \| "20120092026" \| "20150053006" \| "20150192547" \| "5515298" \| "5589636" \| "6720712" \| "7400750" \| "7458268" \| "7497120" \| "7568391" \| "7734435" \| "7739912" \| "7770456" \| "8085998" \| "8095328" \| "8201739" \| "8335356" \| "8601876" \| "8666126" \| "8724869" \| "8781180" \| "9170668").PN. | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2017/12/04 09:51 |
| S43 | 3471 | g06k9/0002 | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2017/12/04 09:51 |
| S44 | 40 | S43 and (photodiode photo adj diode photosensor photo adj sensor) | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; | OR | OFF | 2017/12/04 09:51 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | IBM_TDB | | | |
| S45 | 836 | (finger adj print fingerprint$4) same (photosensor photo adj sensor photodiode photo adj diode) | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2017/12/04 09:51 |
| S46 | 34 | S45 and amplifier and filter and analog with digital | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2017/12/04 09:51 |
| S47 | 41 | S45 and amplifier and filter and analog with digital | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2017/12/04 09:51 |
| S48 | 99 | ("4414684").URPN. | USPAT | OR | OFF | 2017/12/04 09:51 |
| S49 | 4 | S48 and amplifier and filter and analog with digital | USPAT | OR | OFF | 2017/12/04 09:51 |
| S50 | 0 | (finger adj print fingerprint$4) same (photosensor photo adj sensor photodiode photo adj diode) same high adj pass | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2017/12/04 09:51 |
| S51 | 16 | (finger adj print fingerprint$4) same (photosensor photo adj sensor photodiode photo adj diode) and high adj pass | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2017/12/04 09:51 |
| S52 | 228 | (finger adj print fingerprint$4) same scan$4 and high adj pass and amplifier$1 | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2017/12/04 09:51 |
| S53 | 230 | (finger adj print fingerprint$4) same scan$4 and high adj pass and amplifier$1 | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2017/12/04 09:51 |
| S54 | 25936 | (g01j1/44\|a61b5/4845\|a61b5/1118\|a61b5/4872\|a61b5/02427\|g01j2001/444) | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2017/12/04 09:51 |
| S55 | 9 | S54 and transimpedence | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2017/12/04 09:51 |
| S56 | 333 | S54 and transimpedance | US-PGPUB; USPAT; | OR | OFF | 2017/12/04 09:51 |

| | | | | USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | | | |
|---|---|---|---|---|---|---|---|
| S57 | 14 | (US-20150192547-$ or US-20120092026-$ or US-20150356340-$ or US-20160132712-$ or US-20150340539-$ or US-20050171413-$ or US-20050151065-$ or US-20040252867-$ or US-20150366518-$ or US-20100176823-$).did. or (US-9170668-$ or US-5781651-$ or US-4414684-$ or US-5719950-$).did. | US-PGPUB; USPAT | OR | OFF | 2017/12/04 09:51 |
| S58 | 0 | S56 and S57 | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2017/12/04 09:51 |
| S59 | 0 | S57 and transimpedance | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2017/12/04 09:51 |
| S60 | 303 | S54 and transimpedance adj amplifier | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2017/12/04 09:51 |
| S61 | 312 | S54 and transimpedance adj amplifier | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2017/12/04 09:51 |
| S62 | 66 | S61 and biometric | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2017/12/04 09:51 |
| S63 | 561 | biometric same modulation$1 | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2017/12/04 09:51 |
| S64 | 115 | biometric same modulation$1 with frequency | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2017/12/04 09:51 |
| S65 | 12 | S64 and (photodetector photosensor photo adj sensor photo adj detector) | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2017/12/04 09:51 |
| S66 | 2 | ("8954135").PN. | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; | OR | OFF | 2017/12/04 09:51 |

Exhibit 23
-614-

| | | | DERWENT; IBM_TDB | | | |
|---|---|---|---|---|---|---|
| S67 | 2 | ("9044171").PN. | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2017/12/04 09:51 |
| S68 | 2 | ("20140275850").PN. | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2017/12/04 09:51 |
| S69 | 472 | matrix same product same demodulat$4 same matrix | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2017/12/04 09:51 |
| S70 | 581 | matrix same product same demodulat$4 same matrix | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2017/12/04 09:51 |
| S71 | 200 | matrix same product same demodulat$4 same matrix | USPAT | OR | ON | 2017/12/04 09:51 |
| S72 | 15 | (US-20150192547-$ or US-20120092026-$ or US-20150356340-$ or US-20160132712-$ or US-20150340539-$ or US-20050171413-$ or US-20050151065-$ or US-20040252867-$ or US-20150366518-$ or US-20100176823-$).did. or (US-9170668-$ or US-5781651-$ or US-4414684-$ or US-5719950-$ or US-8954135-$).did. | US-PGPUB; USPAT | OR | OFF | 2017/12/04 09:51 |
| S73 | 0 | S72 and programmable near2 amplifier | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2017/12/04 09:51 |
| S74 | 0 | S72 and programmable near2 amplifier | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2017/12/04 09:51 |
| S75 | 0 | S72 and programable near2 amplifier | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2017/12/04 09:51 |
| S76 | 3471 | g06k9/0002 | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2017/12/04 09:51 |
| S77 | 23 | S76 and programmable near2 amplifier | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; | OR | OFF | 2017/12/04 09:51 |

| | | | | DERWENT; IBM_TDB | | | |
|---|---|---|---|---|---|---|---|
| S78 | 23 | S76 and programmable near2 amplifier | | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2017/12/04 09:51 |

**EAST Search History (Interference)**

<This search history is empty>

**12/4/2017 12:34:22 PM**
**C:\Users\tko\Documents\EAST\Workspaces\14618664.wsp**

| *Issue Classification* | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 14618664 | HOTELLING ET AL. |
| | **Examiner** | **Art Unit** |
| | TONY KO | 2878 |

**CPC**

| Symbol | | | Type | Version |
|---|---|---|---|---|
| G01J | 1 | 44 | F | 2013-01-01 |
| A61B | 5 | 021 | I | 2013-01-01 |
| A61B | 5 | 02427 | I | 2013-01-01 |
| A61B | 5 | 0816 | I | 2013-01-01 |
| A61B | 5 | 1118 | I | 2013-01-01 |
| A61B | 5 | 14551 | I | 2013-01-01 |
| A61B | 5 | 14532 | I | 2013-01-01 |
| A61B | 5 | 4845 | I | 2013-01-01 |
| A61B | 5 | 4872 | I | 2013-01-01 |
| A61B | 5 | 01 | I | 2013-01-01 |
| G01J | 2001 | 444 | A | 2013-01-01 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**CPC Combination Sets**

| Symbol | | | Type | Set | Ranking | Version |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |

| NONE | | Total Claims Allowed: |
|---|---|---|
| (Assistant Examiner) | (Date) | 20 |
| /TONY KO/ Primary Examiner.Art Unit 2878 | 12/04/2017 | O.G. Print Claim(s) / O.G. Print Figure |
| (Primary Examiner) | (Date) | 1 / 1 |

**Exhibit 23**
**-617-**

| *Issue Classification* | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 14618664 | HOTELLING ET AL. |
| | **Examiner** | **Art Unit** |
| | TONY KO | 2878 |

| US ORIGINAL CLASSIFICATION | | INTERNATIONAL CLASSIFICATION | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **CLASS** | **SUBCLASS** | **CLAIMED** | | | | | **NON-CLAIMED** | |
| | | G | 0 | 1 | J | 1 / 44 (2006.01.01) | | |
| **CROSS REFERENCE(S)** | | | | | | | | |
| **CLASS** | **SUBCLASS (ONE SUBCLASS PER BLOCK)** | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

| NONE | | **Total Claims Allowed:** | |
|---|---|---|---|
| (Assistant Examiner) | (Date) | 20 | |
| /TONY KO/ Primary Examiner.Art Unit 2878 | 12/04/2017 | O.G. Print Claim(s) | O.G. Print Figure |
| (Primary Examiner) | (Date) | 1 | 1 |

**Exhibit 23**
-618-

| *Issue Classification* | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 14618664 | HOTELLING ET AL. |
| | **Examiner** | **Art Unit** |
| | TONY KO | 2878 |

☒ Claims renumbered in the same order as presented by applicant ☐ CPA ☐ T.D. ☐ R.1.47

| Final | Original | Final | Original | Final | Original | Final | Original | Final | Original | Final | Original | Final | Original | Final | Original |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |

| NONE | | | Total Claims Allowed: | |
|---|---|---|---|---|
| (Assistant Examiner) | (Date) | | 20 | |
| /TONY KO/ Primary Examiner.Art Unit 2878 | 12/04/2017 | O.G. Print Claim(s) | O.G. Print Figure |
| (Primary Examiner) | (Date) | 1 | 1 |

Part of Paper No. 20171204

**Exhibit 23**
**-619-**

Attorney Docket No. P22733US1

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of:

| | | | |
|---|---|---|---|
| Inventor(s): | Steven M. Hotelling, et al. | | |
| App. No.: | 14/618,664 | Con. No.: | 1097 |
| Filed: | February 10, 2015 | Art Unit: | 2878 |
| Title: | METHODS AND SYSTEMS FOR MODULATION AND DEMODULATION OF OPTICAL SIGNALS | Examiner: | Ko, Tony |

**AMENDMENT AND RESPONSE TO OFFICE ACTION**

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Sir:

In response to the Office action dated May 30, 2017, please consider the following remarks and amend the above-identified application as follows:

**Amendments to the Claims** begin on page 2 of this paper.

**Remarks** begin on page 6 of this paper.

Exhibit 23
-620-

Attorney Docket No. P22733US1

**Amendments to the Claims:**

1.      (Currently Amended) An electronic device comprising:

a housing comprising a surface adapted to be positioned proximate a measurement site of a subject;

a biometric sensor positioned at least partially within the surface and comprising:

a plurality of light sources for emitting light toward the measurement site at a selected modulation frequency; and

an optical sensor for obtaining light exiting the measurement site; and

an input amplifier coupled to the output of the biometric sensor and disposed within the housing;

a high pass filter coupled to an output of the input amplifier and disposed within the housing, the high pass filter having a cutoff frequency above that of a periodic biometric property of the measurement site;

an output amplifier coupled to an output of the high pass filter and disposed within the housing; and

an analog to digital converter coupled to an output of the output amplifier and disposed within the housing.

2.      (Original) The electronic device of claim 1, wherein:

each light source of the plurality of light sources comprises a light emitting diode; and

the optical sensor comprises one of the group consisting of photodiodes, phototransistors, or optical image sensors.

3.      (Original) The electronic device of claim 1, wherein the input amplifier comprises a transimpedance amplifier.

4.      (Original) The electronic device of claim 1, wherein the output amplifier comprises a programmable gain amplifier.

5.      (Original) The electronic device of claim 1, further comprising a processor coupled to the output of the analog to digital converter.

**Exhibit 23**
-621-

6.      (Previously Amended) The electronic device of claim 1, wherein the processor is configured to control each of the plurality of light sources of the biometric sensor.

7.      (Original) The electronic device of claim 6, wherein the biometric sensor further comprises a measurement mode and a calibration mode.

8.      (Original) The electronic device of claim 7, wherein the calibration mode comprises:
      deactivating all light sources for a selected time period;
      activating a first light source of the plurality of light sources for a selected time period; and
      deactivating all light sources for a selected time period.

9.      (Previously Presented) A sensor system for measuring a periodic biometric characteristic of a subject, the sensor system comprising:
      a plurality of light sources operative to emit a series light pulses at a selected modulation frequency toward a measurement site of the subject;
      an optical sensor operative to receive light exiting a portion of the measurement site, the light originating from the series of light pulses;
      a transimpedance input amplifier coupled to the output of the optical sensor;
      a high pass filter coupled to the transimpedance input amplifier and configured to filter frequencies lower than the selected modulation frequency;
      an output amplifier coupled of the high pass filter and configured to amplify an output of the high pass filter; and
      an analog to digital converter coupled to the output amplifier configured to associate a signal amplitude of the output amplifier with a digital value.

10.      (Original) The sensor system of claim 9, wherein:
      each of the light source of the plurality of light sources comprises a light emitting diode configured to emit light at a selected frequency; and
      the optical sensor comprises one of the group consisting of photodiodes, phototransistors, and optical image sensors.

Exhibit 23
-622-

11.      (Original) The sensor system of claim 9, wherein the input amplifier comprises a transimpedance amplifier; and

the output amplifier comprises a programmable gain amplifier.

12.      (Original) The sensor system of claim 9, wherein:

a first subset of the plurality of light sources comprises a plurality of light emitting diodes configured to emit light at a first selected frequency; and

a second subset of the plurality of light sources comprises a plurality of light emitting diodes configured to emit light at a second selected frequency;

wherein when the first subset is emitting light the second subset is prevented from emitting light.

13.      (Original) The sensor system of claim 9, further comprising a processor coupled to the output of the analog to digital converter.

14.      (Original) The sensor system of claim 9, wherein the processor is configured to control the modulation of at least one of the light sources of the plurality of light sources.

15.      (Original) The sensor system of claim 14, wherein the biometric sensor further comprises a measurement mode and a calibration mode.

16.      (Original) The electronic device of claim 15, wherein the calibration mode comprises:

deactivating all light sources for a selected time period;

activating a first light source of the plurality of light sources for a selected time period; and

deactivating all light sources for a selected time period.

17.      (Previously Presented) A method of optical sensing, comprising:

emitting light toward a measurement site of a subject at a selected modulation frequency;

obtaining light exiting the measurement site;

converting the obtained light to an electrical signal;

amplifying the electrical signal to obtain an amplified signal;

Exhibit 23
-623-

Attorney Docket No. P22733US1

filtering low frequency components below the selected modulation frequency from the amplified signal to obtain a filtered signal; and

amplifying the filtered signal to obtain an output signal.

18.     (Original) The method of claim 17, further comprising:

sampling the output signal to obtain a matrix of samples; and

determining product of the matrix of samples with a demodulation matrix to obtain a demodulated matrix.

19.     (Original) The method of claim 18, wherein sampling the output signal to obtain a matrix of samples comprises:

taking a first sample;

taking a second sample;

taking a third sample;

subtracting the average of the first and third sample from the second sample to obtain an output sample; and

adding the output sample the matrix of samples.

20.     (Original) The method of claim 17, wherein:

light is emitted toward the measurement site from a plurality of light sources each comprising a light emitting diode; and

light is obtained exiting by an optical sensor comprising one of the group consisting of photodiodes, phototransistors, or optical image sensors.

Exhibit 23
-624-

Attorney Docket No. P22733US1

## REMARKS

This paper is submitted in response to the Office action mailed on May 30, 2017. This paper amends claim 1 for the limited purpose of adding clarity to the claim and for no purpose related to patentability. Accordingly, after entry of this Amendment and Response, claims 1 - 20 will be pending, with claims 1, 9, and 17 being independent.

### I. Claim Rejections Under 35 U.S.C. § 112

The Examiner rejected claims 1-8 under 35 U.S.C. § 112(a) as failing to comply with the written description requirement and, additionally, under 35 U.S.C. § 112(b) as being indefinite for failing to particularly point out and distinctly claim the subject matter which the applicant regards as the invention.

#### A. Rejection Under 35 U.S.C. § 112(a)

The Examiner alleges that the limitation "the high pass filter having a cutoff frequency above that of a biometric property of the measurement site" is not "disclosed in the original disclosure nor was it described in the specification" (*Office Action*, pg. 3).  The Assignee respectfully disagrees and submits that at least paragraph [0065] of the Application provides express support for a high pass filter that has a cutoff frequency larger than a low-frequency biometric property, such as a heartrate. In particular, the paragraph recites: "As noted with respect to embodiments described above, *a high pass filter can be useful to remove low frequency components within the electrical signal that might otherwise interfere with detection of low frequency physiological parameters such as heart rate*." (emphasis added).As such, the Assignee respectfully requests the Examiner withdraw the rejection to claims 1 – 8 under 35 U.S.C. § 112(a).

Despite the foregoing, and for the limited purpose of adding clarity to the claim, the Assignee herein amends claim 1 to specify that the "biometric property" measured is a "*periodic* biometric property." (emphasis added). As noted above, the Assignee submits that at least paragraph [0065] of the application as filed provides support for the amendment.

#### B. Examiner's Cancellation of Claims

The Examiner states that "Claims 2 – 8 are canceled because of their dependency upon [claim 1]." (*Office Action*, pg. 3). The Assignee respectfully submits that the Assignee has not provided any instruction to the Office to cancel claims under MPEP 714. Further, the Assignee

**Exhibit 23**
**-625-**

Attorney Docket No. P22733US1

respectfully submits that the Examiner does not allege or provide a citation to any statutory or non-statutory authority to cancel claims submitted by the Assignee. As such, for clarity of the record, the Assignee respectfully requests the Examiner to withdraw the cancelation of claims 2 – 8.

### C. Rejection Under 35 U.S.C. § 112(b)

Further to the foregoing, the Examiner alleges that the limitation "the high pass filter having a cutoff frequency above that of a biometric property of the measurement site" is not clear (*Office Action*, pg. 3). In particular, the Examiner states that "it is unclear how a cutoff frequency is related to that of biometric property of the measurement site." As noted above, the Assignee herein amends claim 1 for clarity to specify that the biometric property is a periodic biometric property. One example of a periodic biometric property is a heartbeat. The Assignee respectfully requests the Examiner withdraw the rejection to claims 1 – 8 under 35 U.S.C. § 112(b).

### D. Allowability of Claims 1 - 8

The Assignee submits that because the Office Action does not recite an art-based rejection to claims 1 - 8, that in view of the amendment to claim 1 referenced above, claims 1 – 8 should be allowable. Further, the Assignee respectfully points out that any art-based rejection to claim 1 – 8 that follows in a subsequent Office Action would be made for the first time of record, and, as such, such an Office Action cannot be made final per 37 CFR 1.113.

### II. Claim Rejections Under 35 U.S.C. § 102

The Examiner rejected claims 9 and 17 under 35 U.S.C. § 102(a)(2) as being anticipated by Osten et al. (U.S. Patent No. 5,719,950 to Osten et al.).

### A. Unaddressed Arguments Presented with Respect to Osten

The Examiner states that "Applicant's arguments with respect to claims 1 – 20 have been considered but are moot because the arguments to not apply to any of the references being used in the current rejection." (*Office Action*, pg. 7). Respectfully, the Assignee disagrees and directs the Examiner's attention to the previous Office Action Response filed May 2, 2017 in which the Assignee expressly states on pgs. 5 – 8, under a section identified as "Claim

**Exhibit 23**
**-626-**

Attorney Docket No. P22733US1

Rejections under 35 U.S.C. § 102" that "*Osten cannot be used in support of either a novelty or obviousness rejection of claims 1, 9, or 17.*" (*Response*, pg. 8, emphasis added).

The Assignee respectfully submits that the failure to respond to the arguments presented by the Assignee with respect to the disclosure of Osten renders the Office Action incomplete as to all matters (see 37 CFR § 1.104(b)). In addition, MPEP 707.07 expressly states that "[i]n order to provide a complete application file history … an examiner must provide clear explanations of all actions taken by the examiner during prosecution of an application," which necessarily means that "[t]he examiner *must address all arguments which have not already been responded to in the statement of the rejection*." (*id.*, emphasis added). At least in view of the foregoing, the Assignee respectfully submits that the Office Action should be withdrawn.

### B. Osten Expressly Requires a Low-Pass Filter, Which Is Functionally And Structurally Opposite From The Claimed High Pass Filter

As noted in the previous two office action responses, independent claims 1, 9, and 17 all recite, among other limitations, among other limitations, "a high pass filter." As noted in previous response, the Assignee submits one again that high pass filtering is – by definition – mutually exclusive with low pass filtering.

As noted previously, Osten specifically requires low pass filtering *prior to* high pass filtering an output from an amplified signal. This signal processing technique is depicted in FIG. 5, which is reproduced for convenient reference:



*Fig. 5*

**Exhibit 23**
**-627-**

Attorney Docket No. P22733US1

As noted previously, in this figure, light is collected by the photodiode 172. Immediately, that light is sampled and held. By definition, a "sample and hold" operation filters high-frequency noise, functioning as a low-pass filter.

Next, the filtered signal from the photodiode 172 is provided as input to another low-pass filter 192 or 202. Each of these filters *specifically eliminate* frequency components of the signal that are above 10Hz. Next the twice-filtered signal from the photodiode 172 – which does not contain any substantive frequency components greater than 10Hz – is provided as input to a high pass filter 194 or 204 with a cutoff frequency of 0.03 Hz, which is *below the desired heartrate signal*.

As noted previously, the three-times-filtered signal output from the high pass filters 194, 204 do not contain any substantive frequency components lower than 0.03 Hz or greater than 10Hz. The claimed invention is by definition opposite from the signal filtering described in Olsen. FIG. 4 depicts the signal flow associated with claim 1:



*FIG. 4*

In particular, as noted in the previous response, the output of the transimpedance amplifier is filtered by a *high pass filter* "to remove low frequency components within the electrical signal that might otherwise interfere with detection of low frequency physiological parameters such as heart rate." (emphasis added). Quite oppositely, Olsen *specifically retains* – and indeed focuses on – low-frequency components of the input signal greater than 0.03Hz and 10Hz.

The Assignee submits that high pass filtering and low pass filtering, by definition, provide opposite, mutually-exclusive, and non-substitutable functionality. As such, the Assignee submits

**Exhibit 23
-628-**

that Osten cannot be used in support of either a novelty or obviousness rejection of claims 1, 9, or 17.

Similarly, the Assignee submits that Venkatraman does not disclose a high-pass filter coupled to an output of an input amplifier. Like Osten, Venkatraman discloses a "sample and hold" stage which necessarily will filter high-frequency components during the "hold" operation. As such, the Assignee submits that Venkatraman, like Osten, cannot be used in support of either a novelty or obviousness rejection of claims 1, 9, or 17.

### III. Depending Claims

Remaining claims – some of which were rejected under 30 U.S.C. 103 in view of additional art references – all depend from one of the independent claims referenced above and, as such, are believed to be allowable at least insofar as each depends from a patentably distinct base claim. The Assignee makes this statement without reference to and without waiving any independent bases of patentability recited by these claims and, as such, expressly reserves the right to argue such bases in a future paper or filing if necessary.

### IV. Conclusion

The Assignee thanks the Examiner for the thorough review of the application. The Assignee respectfully submits the present application, as amended, is in condition for allowance and respectfully requests the issuance of a Notice of Allowability as soon as practicable.

This Amendment is submitted contemporaneously with a petition for a one-month extension of time in accordance with 37 CFR § 1.136(a) and a request to charge Deposit Account No. 504621 for the requisite fees. The Assignee believes no further fees or petitions are required. However, if any such petitions or fees are necessary, please consider this a request therefor and authorization to charge Deposit Account No. 504621 accordingly.

Exhibit 23
-629-

If the Examiner should require any additional information or amendment, please contact the undersigned attorney.

Dated:  October 2, 2017.

Respectfully submitted,


/Gregory W. Osterloth/
Gregory W. Osterloth, Registration No. 36,232
Attorney for Assignee
USPTO Customer No. 62579

Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, Colorado 80202
Phone: 303-223-1100
Fax: 303-223-1111

Exhibit 23
-630-

## Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | 14618664 |
| **Filing Date:** | 10-Feb-2015 |
| **Title of Invention:** | Methods and Systems for Modulation and Demodulation of Optical Signals |
| **First Named Inventor/Applicant Name:** | Steven P. Hotelling |
| **Filer:** | Gregory W. Osterloth/Valerie Brown |
| **Attorney Docket Number:** | P22733US1 |

Filed as Large Entity

**Filing Fees for** Utility under 35 USC 111(a)

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |
| **Post-Allowance-and-Post-Issuance:** | | | | |
| **Extension-of-Time:** | | | | |

Exhibit 23
-631-

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| Extension - 1 month with $0 paid | 1251 | 1 | 200 | 200 |
| **Miscellaneous:** | | | | |
| | | **Total in USD ($)** | | **200** |

Exhibit 23
-632-

# Electronic Acknowledgement Receipt

| EFS ID: | 30544432 |
|---|---|
| Application Number: | 14618664 |
| International Application Number: | |
| Confirmation Number: | 1097 |
| Title of Invention: | Methods and Systems for Modulation and Demodulation of Optical Signals |
| First Named Inventor/Applicant Name: | Steven P. Hotelling |
| Customer Number: | 62579 |
| Filer: | Gregory W. Osterloth/Valerie Brown |
| Filer Authorized By: | Gregory W. Osterloth |
| Attorney Docket Number: | P22733US1 |
| Receipt Date: | 02-OCT-2017 |
| Filing Date: | 10-FEB-2015 |
| Time Stamp: | 19:18:43 |
| Application Type: | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | DA |
| Payment was successfully received in RAM | $ 200 |
| RAM confirmation Number | 100317INTEFSW00007049504621 |
| Deposit Account | |
| Authorized User | |
| The Director of the USPTO is hereby authorized to charge indicated fees and credit any overpayment as follows: | |

Exhibit 23
-633-

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Amendment/Req. Reconsideration-After Non-Final Reject | P22733US1Amendment.pdf | 243767 / 8ebbbebeedc69490415e8c0a694ba80fb0dd51205 | no | 11 |

**Warnings:**

**Information:**

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 2 | Fee Worksheet (SB06) | fee-info.pdf | 30765 / af95688ab2b919c65ee5a8f5d2b1e7a7878a2347 | no | 2 |

**Warnings:**

**Information:**

| | |
|---|---|
| **Total Files Size (in bytes):** | 274532 |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.
**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.
**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

Exhibit 23
-634-

PTO/SB/06 (09-11)
Approved for use through 1/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| PATENT APPLICATION FEE DETERMINATION RECORD<br>Substitute for Form PTO-875 | Application or Docket Number<br>14/618,664 | Filing Date<br>02/10/2015 | ☐ To be Mailed |
|---|---|---|---|

**ENTITY:** ☒ LARGE   ☐ SMALL   ☐ MICRO

## APPLICATION AS FILED – PART I

|  | (Column 1) | (Column 2) |  |  |
|---|---|---|---|---|
| FOR | NUMBER FILED | NUMBER EXTRA | RATE ($) | FEE ($) |
| ☐ BASIC FEE<br>(37 CFR 1.16(a), (b), or (c)) | N/A | N/A | N/A |  |
| ☐ SEARCH FEE<br>(37 CFR 1.16(k), (i), or (m)) | N/A | N/A | N/A |  |
| ☐ EXAMINATION FEE<br>(37 CFR 1.16(o), (p), or (q)) | N/A | N/A | N/A |  |
| TOTAL CLAIMS<br>(37 CFR 1.16(i)) | minus 20 = | * | X $ = |  |
| INDEPENDENT CLAIMS<br>(37 CFR 1.16(h)) | minus 3 = | * | X $ = |  |
| ☐ APPLICATION SIZE FEE<br>(37 CFR 1.16(s)) | If the specification and drawings exceed 100 sheets of paper, the application size fee due is $310 ($155 for small entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s). |  |  |  |
| ☐ MULTIPLE DEPENDENT CLAIM PRESENT (37 CFR 1.16(j)) |  |  |  |  |
| * If the difference in column 1 is less than zero, enter "0" in column 2. |  |  | TOTAL |  |

## APPLICATION AS AMENDED – PART II

|  |  | (Column 1) | (Column 2) | (Column 3) |  | RATE ($) | ADDITIONAL FEE ($) |
|---|---|---|---|---|---|---|---|
| AMENDMENT | **10/02/2017** | CLAIMS REMAINING AFTER AMENDMENT | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA |  | RATE ($) | ADDITIONAL FEE ($) |
|  | Total (37 CFR 1.16(i)) | * 20 | Minus | ** 20 | = 0 | x $80 = | 0 |
|  | Independent (37 CFR 1.16(h)) | * 3 | Minus | *** 3 | = 0 | x $420 = | 0 |
|  | ☐ Application Size Fee (37 CFR 1.16(s)) |  |  |  |  |  |  |
|  | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) |  |  |  |  |  |  |
|  |  |  |  |  |  | TOTAL ADD'L FEE | **0** |

|  |  | (Column 1) | (Column 2) | (Column 3) |  | RATE ($) | ADDITIONAL FEE ($) |
|---|---|---|---|---|---|---|---|
| AMENDMENT |  | CLAIMS REMAINING AFTER AMENDMENT | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA |  | RATE ($) | ADDITIONAL FEE ($) |
|  | Total (37 CFR 1.16(i)) | * | Minus | ** | = | x $ = |  |
|  | Independent (37 CFR 1.16(h)) | * | Minus | *** | = | x $ = |  |
|  | ☐ Application Size Fee (37 CFR 1.16(s)) |  |  |  |  |  |  |
|  | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) |  |  |  |  |  |  |
|  |  |  |  |  |  | TOTAL ADD'L FEE |  |

* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.
** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20".
*** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3".
The "Highest Number Previously Paid For" (Total or Independent) is the highest number found in the appropriate box in column 1.

LIE
CAROLYN THOMAS

This collection of information is required by 37 CFR 1.16. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

**Exhibit 23**

| PTO/SB/08A and B (08-03)<br>U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE<br>Substitute for Form 1449A/PTO | APPLICATION NO.:<br>14/618,664 | FILING DATE:<br>February 10, 2015 |
|---|---|---|
| **INFORMATION DISCLOSURE<br>STATEMENT BY APPLICANT** | FIRST NAMED INVENTOR:<br>Steven M. Hotelling | ART UNIT:<br>2878 |
| *(Use as many sheets as necessary)* | EXAMINER NAME:<br>Ko, Tony | ATTY. DOCKET NO.:<br>P22733US1 |

### U.S. PATENT DOCUMENTS

| EXAMINER INITIALS* | Cite No. | PATENT NUMBER<br>Number – Kind Code² (if known) | ISSUE DATE<br>MM-DD-YYYY | Name of Patentee of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | A1. | 5,886,452 | 03/1999 | Toda | |
| | A2. | 6,164,135 | 12/2000 | Bicz | |

### U.S. PUBLICATION DOCUMENTS

| EXAMINER INITIALS* | Cite No.[1] | PUBLICATION NUMBER<br>Number – Kind Code² (if known) | PUBLICATION DATE<br>MM-DD-YYYY | Name of Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | B1. | 2004/0264746 | 12/2004 | Polcha | |
| | B2. | 2015/0185898 | 07/2015 | Masson et al. | |
| | | | | | |

### FOREIGN PATENT DOCUMENTS

| EXAMINER INITIALS* | Cite No.[1] | DOCUMENT NUMBER<br>Country Code³ – Number⁴ – Kind Code⁵ (if known) | PUBLICATION DATE<br>MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear | T⁶ |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |

### NONPATENT LITERATURE DOCUMENTS

| EXAMINER INITIALS* | Cite No.[1] | Include name of Author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and/or country where published. | T⁶ |
|---|---|---|---|
| | | | |
| | | | |

| **EXAMINER:** Initial if citation considered, whether or not citation is in conformance with MPEP 609; Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant. |
|---|
| Examiner Signature | | Date Considered | |

---

[1] Applicant's unique citation number (optional).  [2] See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04.  [3] Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3).  [4] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document.  [5] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible.  [6] Applicant is to place a check mark here if English language Translation is attached.

**Exhibit 23**
**-636-**

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 30039778 |
| **Application Number:** | 14618664 |
| **International Application Number:** | |
| **Confirmation Number:** | 1097 |
| **Title of Invention:** | Methods and Systems for Modulation and Demodulation of Optical Signals |
| **First Named Inventor/Applicant Name:** | Steven P. Hotelling |
| **Customer Number:** | 62579 |
| **Filer:** | Stephen C. Hemenway/Valerie Brown |
| **Filer Authorized By:** | Stephen C. Hemenway |
| **Attorney Docket Number:** | P22733US1 |
| **Receipt Date:** | 10-AUG-2017 |
| **Filing Date:** | 10-FEB-2015 |
| **Time Stamp:** | 11:25:00 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | no |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Transmittal Letter | P22733US1IDS.pdf | 19079<br>d11239d25e3b0fcfaf5ed0bc0d2070846f924c9f | no | 2 |

**Warnings:**

Exhibit 23
-637-

**Information:**

| 2 | Information Disclosure Statement (IDS) Form (SB08) | P22733US1PTOSB08.pdf | 27327<br><br>bcb4fe9d78579d2d8b0a9ed687e747abfd5a3b31 | no | 1 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

This is not an USPTO supplied IDS fillable form

| **Total Files Size (in bytes):** | 46406 |
|---|---|

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.
**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.
**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

Exhibit 23
-638-

Attorney Docket No. P22733US1

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re the Application of: | |
| Steven M. Hotelling, et al. | Examiner:      Ko, Tony. |
| Application No. 14/618,664 | Art Unit:      2878 |
| Filed: February 10, 2015 | Confirmation No.    1097 |
| For:   METHODS AND SYSTEMS FOR MODULATION AND DEMODULATION OF OPTICAL SIGNALS | |

**INFORMATION DISCLOSURE STATEMENT**
**UNDER 37 C.F.R. §§ 1.97(c)(1), 1.97(e)(2), and 1.98**

Mail Stop AMENDMENT
Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Sir:

The Examiner is requested to consider the references noted on the enclosed Form PTO/SB/08a during examination of the above-identified patent application.  These references are submitted for the Examiner's consideration and are submitted pursuant to the duty of disclosure under 37 C.F.R. § 1.56.  In submitting these references, no representation is made or implied that the references are or are not material to the examination of the application.  The Examiner is requested to make his or her own determination of materiality.  Pursuant to the requirements of 37 C.F.R. § 1.98(a)(2)(ii), only copies of the foreign references and non-patent literature documents are provided.  Copies of the U.S. patent and U.S. patent application publication references are not provided, unless required by the Office.

This Information Disclosure Statement is filed after the period specified in 37 C.F.R. § 1.97(b), but before the mailing date of either (1) a final Office action or (2) a Notice of Allowance.  Accordingly, this Information Disclosure Statement requires a statement according to 37 C.F.R. § 1.97(e).

15880355

Exhibit 23
-639-

Attorney Docket No. P22733US1

## Statement Under 37 C.F.R. § 1.97(e)(2)

The undersigned hereby certifies that the references cited in this Information Disclosure Statement were not cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing this certification after making reasonable inquiry, no item of information contain in this Information Disclosure Statement was known to any individual designated in 37 C.F.R. § 1.56(c) more than three months prior to the filing of this Information Disclosure Statement.

The Assignee believes no fees or petitions are due with this filing.  However, should any such fees or petitions be required, please consider this a request therefor and authorization to charge Deposit Account No. 504621 as necessary.

If the Examiner has any questions, please contact the undersigned attorney.

Dated:  August 10, 2017.

Respectfully submitted,

_____/S. Craig Hemenway/_____
S. Craig Hemenway, Registration No. 44,759
Attorney for Assignee
USPTO Customer No. 62579

Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, Colorado  80202
Phone: (303) 223-1100
Fax: (303) 223-1111

15880355

**Exhibit 23**
**-640-**

UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 14/618,664 | 02/10/2015 | Steven P. Hotelling | P22733US1 | 1097 |

62579        7590        05/30/2017
APPLE INC.
c/o Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, CO 80202

| EXAMINER |
|---|
| KO, TONY |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2878 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 05/30/2017 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

patentdocket@bhfs.com

PTOL-90A (Rev. 04/07)

**Exhibit 23**
**-641-**

| **Office Action Summary** | Application No.<br>14/618,664 | Applicant(s)<br>HOTELLING ET AL. |
|---|---|---|
| | Examiner<br>TONY KO | Art Unit<br>2878 | AIA (First Inventor to File)<br>Status<br>Yes |

*Note: header has four columns — Office Action Summary spans left; Application No. / Examiner stacked middle; Applicant(s) and Art Unit / AIA Status right.*

-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) months from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☒ Responsive to communication(s) filed on <u>5/02/2017</u>.
  ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2a)☐ This action is **FINAL**.    2b)☒ This action is non-final.

3)☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

4)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims***

5)☒ Claim(s) <u>1-20</u> is/are pending in the application.
  5a) Of the above claim(s) _____ is/are withdrawn from consideration.

6)☐ Claim(s) _____ is/are allowed.

7)☐ Claim(s) _____ is/are rejected.

8)☐ Claim(s) _____ is/are objected to.

9)☐ Claim(s) _____ are subject to restriction and/or election requirement.

* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov.

**Application Papers**

10)☐ The specification is objected to by the Examiner.

11)☐ The drawing(s) filed on _____ is/are: a)☐ accepted or b)☐ objected to by the Examiner.
  Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
  Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgement is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
  **Certified copies:**
  a)☐ All  b)☐ Some**  c)☐ None of the:
    1.☐ Certified copies of the priority documents have been received.
    2.☐ Certified copies of the priority documents have been received in Application No. _____.
    3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1)☐ Notice of References Cited (PTO-892)

2)☒ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b) Paper No(s)/Mail Date <u>5/07/2017</u>.

3)☐ Interview Summary (PTO-413)
  Paper No(s)/Mail Date. _____ .

4)☐ Other: _____.

Exhibit 23
-642-

Application/Control Number: 14/618,664                                    Page 2

Art Unit: 2878

1.      The present application, filed on or after March 16, 2013, is being examined

under the first inventor to file provisions of the AIA.

## DETAILED ACTION

### Continued Examination Under 37 CFR 1.114

2.      A request for continued examination under 37 CFR 1.114, including the fee set

forth in 37 CFR 1.17(e), was filed in this application after final rejection.  Since this

application is eligible for continued examination under 37 CFR 1.114, and the fee set

forth in 37 CFR 1.17(e) has been timely paid, the finality of the previous Office action

has been withdrawn pursuant to 37 CFR 1.114.  Applicant's submission filed on

5/02/2017 has been entered.

### Claim Rejections - 35 USC § 112

3.      The following is a quotation of the first paragraph of 35 U.S.C. 112(a):

> (a)  IN GENERAL.—The specification shall contain a written description of the
> invention, and of the manner and process of making and using it, in such full, clear, concise,
> and exact terms as to enable any person skilled in the art to which it pertains, or with which it
> is most nearly connected, to make and use the same,  and shall set forth the best mode
> contemplated by the inventor or joint inventor of carrying out the invention.

The following is a quotation of the first paragraph of pre-AIA 35 U.S.C. 112:

> The specification shall contain a written description of the invention, and of the
> manner and process of making and using it, in such full, clear, concise, and exact terms as to
> enable any person skilled in the art to which it pertains, or with which it is most nearly
> connected, to make and use the same, and shall set forth the best mode contemplated by the
> inventor of carrying out his invention.

4.      Claims 1-8 are rejected under 35 U.S.C. 112(a) or 35 U.S.C. 112 (pre-AIA), first

paragraph, as failing to comply with the written description requirement.  The claim(s)

contains subject matter which was not described in the specification in such a way as to

Exhibit 23
-643-

Application/Control Number: 14/618,664                                           Page 3
Art Unit: 2878

reasonably convey to one skilled in the relevant art that the inventor or a joint inventor,

or for pre-AIA the inventor(s), at the time the application was filed, had possession of

the claimed invention.

5.      The amended claim 1 includes claim language requires "the high pass filter

having a cutoff frequency above that of a biometric property of the measurement site".

It does not appear such requirement is disclosed in the original disclosure nor was it

described in the specification such that it conveys to one skilled in the relevant art to

one skilled in the relevant art that the inventor or a joint inventor, or for pre-AIA the

inventor(s), at the time the application was filed, had possession of the claimed

invention.  Claims 2-8 are cancelled because their dependency upon rejected claim.

6.      The following is a quotation of 35 U.S.C. 112(b):
        (b)  CONCLUSION.—The specification shall conclude with one or more claims particularly
        pointing out and distinctly claiming the subject matter which the inventor or a joint inventor
        regards as the invention.

        The following is a quotation of 35 U.S.C. 112 (pre-AIA), second paragraph:
        The specification shall conclude with one or more claims particularly pointing out and distinctly
        claiming the subject matter which the applicant regards as his invention.

7.      Claims 1-8 are rejected under 35 U.S.C. 112(b) or 35 U.S.C. 112 (pre-AIA),

second paragraph, as being indefinite for failing to particularly point out and distinctly

claim the subject matter which the inventor or a joint inventor, or for pre-AIA the

applicant regards as the invention.

8.      Regarding claim 1, it is unclear how a cutoff frequency is related to that of a

biometric property of the measurement site.  Such as the case, the cutoff frequency of

the high pass filter appears to be fluid and renders the claim indefinite.  Clarification is

needed.

Exhibit 23
-644-

Application/Control Number: 14/618,664                                          Page 4
Art Unit: 2878

9.      Claims 2-8 are rejected because of their dependency upon rejected claim.

### *Claim Rejections - 35 USC § 102*

10.     The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that

form the basis for the rejections under this section made in this Office action:

> A person shall be entitled to a patent unless –
>
> (a)(2) the claimed invention was described in a patent issued under section 151, or in an
> application for patent published or deemed published under section 122(b), in which the
> patent or application, as the case may be, names another inventor and was effectively filed
> before the effective filing date of the claimed invention.

11.     Claim(s) 9 is/are rejected under 35 U.S.C. 102(a)(2) as being anticipated by

Osten et al (US Patent 5719950).

12.     Regarding claims 9 and 17, Osten et al teach a sensor system for measuring a

periodic biometric characteristic of a subject, the sensor system comprising: a plurality

of light sources (92 and 96) operative to emit a series light pulses at a selected

modulation frequency toward a measurement site of the subject; an optical sensor

operative to receive light exiting a portion of the measurement site, the light originating

from the series of light pulses; a transimpedance input amplifier (174) coupled to the

output of the optical sensor; a high pass filter coupled to the transimpedance input

amplifier (electrically) and configured to filter frequencies lower than the selected

modulation frequency; an output amplifier (196) coupled of the high pass filter and

configured to amplify an output of the high pass filter; and an analog to digital converter

coupled to the output amplifier configured to associate a signal amplitude of the output

amplifier with a digital value (col. 6, line 67).

13.     Regarding claim 10, Osten et al teach each of the light source of the plurality of

light sources comprises a light emitting diode configured to emit light at a selected

Exhibit 23
-645-

Application/Control Number: 14/618,664                                    Page 5
Art Unit: 2878

frequency (visible and/or infrared); and the optical sensor comprises one of the group

consisting of photodiodes, phototransistors, and optical image sensors.

14.     Regarding claim 12, Osten et al teach (Col. 8, lines 45-55) a first subset of the

plurality of light sources comprises a plurality of light emitting diodes configured to emit

light at a first selected frequency; and a second subset of the plurality of light sources

comprises a plurality of light emitting diodes configured to emit light at a second

selected frequency; wherein when the first subset is emitting light the second subset is

prevented from emitting light.

15.     Regarding claim 13, Osten et al teach a processor coupled to the output of the

analog to digital converter.

16.     Regarding claim 14, Osten et al teach et al teach (Col. 8, lines 45-55) the

processor is configured to control the modulation of at least one of the light sources of

the plurality of light sources.

17.     Claims 15 and 16 are rejected because they direct toward method of operating

and do not appear to structurally distinguish from the claim in which they depend upon.

### *Claim Rejections - 35 USC § 103*

18.     The following is a quotation of 35 U.S.C. 103 which forms the basis for all

obviousness rejections set forth in this Office action:

> A patent for a claimed invention may not be obtained, notwithstanding that the claimed
> invention is not identically disclosed as set forth in section 102, if the differences between the
> claimed invention and the prior art are such that the claimed invention as a whole would have
> been obvious before the effective filing date of the claimed invention to a person having
> ordinary skill in the art to which the claimed invention pertains. Patentability shall not be
> negated by the manner in which the invention was made.

19.     Claim 11 is/are rejected under 35 U.S.C. 103 as being unpatentable over Osten

et al in view of Benkely III.

Exhibit 23
-646-

Application/Control Number: 14/618,664                                    Page 6
Art Unit: 2878

20.     Regarding claim 11, Osten et al teach the invention set forth above.  Osten et al

does not specifically teach programmable gain amplifier.  Benkely, III teach a

programmable gain amplifier.  It would have been obvious to one of ordinary skill in the

art at the time of invention to implement a programmable gain control amplifier to

improve dynamic range of the device.

21.     Claim 18-20 is/are rejected under 35 U.S.C. 103 as being unpatentable over

Osten et al in view of Durand et al (US Patent 7656932).

22.     Regarding claim 18, Osten et al teach the invention set forth above.  Osten et al

do not teach sampling the output signal to obtain a matrix of sample; and determining

product of the matrix of samples with a demodulation matrix to obtain a demodulated

matrix.  Durand et al teach (claim 21) obtaining Eigen vector of a product of a matrix

and demodulated and obtain a demodulated signal.  It would have been obvious to one

of ordinary skill in the art at the time of invention to obtaining Eigen vector of a product

of a matrix and demodulated and obtain a demodulated signal because all the claimed

elements were known in the prior art and one skilled in the art could have combined the

elements as claimed by known methods with no change in their respective functions,

and the combination would have yielded predictable results to one of ordinary skill in the

art and such mathematical manipulation of data points are known.

23.     Regarding claim 19, the modified Osten et al teaches the invention set forth

above.  The modified Yuen does not specifically teach add/subtracting of samples to the

matrix of sample.  It is known to add/subtract/multiply and divide samples including

average data points.  It would have been obvious to one of ordinary skill in the art at the

Exhibit 23
-647-

Application/Control Number: 14/618,664                                          Page 7
Art Unit: 2878

time of invention to add/subtract/multiply and divide data because all the claimed

elements were known in the prior art and one skilled in the art could have combined the

elements as claimed by known methods with no change in their respective functions,

and the combination would have yielded predictable results to one of ordinary skill in the

art.

24.     Regarding claim 20, Venkatraman et al further teach light is emitted toward the

measurement site from a plurality of light sources each comprises a light emitting diode;

and light is obtained exiting by an optical sensor comprising one of the group consisting

of photodiodes, phototransistors or optical image sensors.

### *Response to Arguments*

25.     Applicant's arguments with respect to claims 1-20 have been considered but are

moot because the arguments do not apply to any of the references being used in the

current rejection.

### *Conclusion*

Any inquiry concerning this communication or earlier communications from the

examiner should be directed to TONY KO whose telephone number is (571)272-1926.

The examiner can normally be reached on Monday-Friday 7:30 - 4:00.

Examiner interviews are available via telephone, in-person, and video

conferencing using a USPTO supplied web-based collaboration tool. To schedule an

interview, applicant is encouraged to use the USPTO Automated Interview Request

(AIR) at http://www.uspto.gov/interviewpractice.

Exhibit 23
-648-

Application/Control Number: 14/618,664                                    Page 8
Art Unit: 2878

    If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Georgia Epps can be reached on 571-272-2328.  The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

    Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system.  Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service Representative or access to the automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/TONY KO/
Primary Examiner, Art Unit 2878


TK

Exhibit 23
-649-

**EAST Search History**

**EAST Search History (Prior Art)**

| Ref # | Hits | Search Query | DBs | Default Operator | Plurals | Time Stamp |
|---|---|---|---|---|---|---|
| S1 | 98 | ("20030109993" \| "20040140735" \| "20060196271" \| "20090167704" \| "20120092026" \| "20150053006" \| "20150192547" \| "5515298" \| "5589636" \| "6720712" \| "7400750" \| "7458268" \| "7497120" \| "7568391" \| "7734435" \| "7739912" \| "7770456" \| "8085998" \| "8095328" \| "8201739" \| "8335356" \| "8601876" \| "8666126" \| "8724869" \| "8781180" \| "9170668").PN. | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2016/07/21 15:24 |
| S2 | 2148 | g06k9/0002 | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2016/07/21 15:25 |
| S3 | 17 | S2 and (photodiode photo adj diode photosensor photo adj sensor) | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2016/07/21 15:25 |
| S4 | 715 | (finger adj print fingerprint$4) same (photosensor photo adj sensor photodiode photo adj diode) | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2016/07/21 15:30 |
| S5 | 30 | S4 and amplifier and filter and analog with digital | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2016/07/21 15:30 |
| S6 | 36 | S4 and amplifier and filter and analog with digital | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2016/07/21 15:30 |
| S7 | 99 | ("4414684").URPN. | USPAT | OR | OFF | 2016/07/21 15:39 |
| S8 | 4 | S7 and amplifier and filter and analog with digital | USPAT | OR | OFF | 2016/07/21 15:39 |
| S9 | 0 | (finger adj print fingerprint$4) same (photosensor photo adj sensor photodiode photo adj diode) same high adj pass | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2016/07/21 15:59 |
| S10 | 14 | (finger adj print fingerprint$4) same (photosensor photo adj sensor photodiode photo adj diode) and high adj pass | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; | OR | OFF | 2016/07/21 15:59 |

Exhibit 23
-650-

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | IBM_TDB | | | |
| S11 | 192 | (finger adj print fingerprint$4) same scan$4 and high adj pass and amplifier$1 | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2016/07/21 16:02 |
| S12 | 194 | (finger adj print fingerprint$4) same scan$4 and high adj pass and amplifier$1 | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2016/07/21 16:02 |
| S13 | 20633 | (g01j1/44\|a61b5/4845\|a61b5/1118\|a61b5/4872\|a61b5/02427\|g01j2001/444) | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2016/07/22 10:41 |
| S14 | 7 | S13 and transimpedence | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2016/07/22 10:44 |
| S15 | 216 | S13 and transimpedance | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2016/07/22 10:44 |
| S16 | 14 | (US-20150192547-$ or US-20120092026-$ or US-20150356340-$ or US-20160132712-$ or US-20150340539-$ or US-20050171413-$ or US-20050151065-$ or US-20040252867-$ or US-20150366518-$ or US-20100176823-$).did. or (US-9170668-$ or US-5781651-$ or US-4414684-$ or US-5719950-$).did. | US-PGPUB; USPAT | OR | OFF | 2016/07/22 10:44 |
| S17 | 0 | S15 and S16 | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2016/07/22 10:44 |
| S18 | 0 | S16 and transimpedance | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2016/07/22 10:44 |
| S19 | 200 | S13 and transimpedance adj amplifier | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2016/07/22 10:45 |
| S20 | 204 | S13 and transimpedance adj amplifier | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2016/07/22 10:45 |
| S21 | 42 | S20 and biometric | US-PGPUB; | OR | ON | 2016/07/22 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | | | 10:45 |
| S22 | 423 | biometric same modulation$1 | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2016/07/22 11:58 |
| S23 | 98 | biometric same modulation$1 with frequency | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2016/07/22 11:58 |
| S24 | 10 | S23 and (photodetector photosensor photo adj sensor photo adj detector) | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2016/07/22 11:58 |
| S25 | 2 | ("8954135").PN. | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2016/07/22 12:00 |
| S26 | 2 | ("9044171").PN. | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2016/07/22 12:28 |
| S27 | 2 | ("20140275850").PN. | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2016/07/22 12:31 |
| S28 | 412 | matrix same product same demodulat$4 same matrix | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2016/07/22 15:21 |
| S29 | 514 | matrix same product same demodulat$4 same matrix | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2016/07/22 15:21 |
| S30 | 184 | matrix same product same demodulat$4 same matrix | USPAT | OR | ON | 2016/07/22 15:21 |
| S31 | 15 | (US-20150192547-$ or US-20120092026-$ or US-20150356340-$ or US-20160132712-$ or US-20150340539-$ or US-20050171413-$ or US-20050151065-$ or US-20040252867-$ or US-20150366518-$ or US-20100176823-$).did. or (US-9170668-$ or US-5781651-$ or US-4414684-$ or US-5719950-$ or US-8954135-$).did. | US-PGPUB; USPAT | OR | OFF | 2016/07/22 15:29 |
| S32 | 0 | S31 and programmable near2 amplifier | US-PGPUB; | OR | OFF | 2016/07/22 |

| | | | USPAT;<br>USOCR;<br>FPRS;<br>EPO; JPO;<br>DERWENT;<br>IBM_TDB | | | 15:29 |
|---|---|---|---|---|---|---|
| S33 | 0 | S31 and programmable near2 amplifier | US-PGPUB;<br>USPAT;<br>USOCR;<br>FPRS;<br>EPO; JPO;<br>DERWENT;<br>IBM_TDB | OR | ON | 2016/07/22<br>15:29 |
| S34 | 0 | S31 and programable near2 amplifier | US-PGPUB;<br>USPAT;<br>USOCR;<br>FPRS;<br>EPO; JPO;<br>DERWENT;<br>IBM_TDB | OR | ON | 2016/07/22<br>15:29 |
| S35 | 2148 | g06k9/0002 | US-PGPUB;<br>USPAT;<br>USOCR;<br>FPRS;<br>EPO; JPO;<br>DERWENT;<br>IBM_TDB | OR | OFF | 2016/07/22<br>15:30 |
| S36 | 8 | S35 and programmable near2 amplifier | US-PGPUB;<br>USPAT;<br>USOCR;<br>FPRS;<br>EPO; JPO;<br>DERWENT;<br>IBM_TDB | OR | OFF | 2016/07/22<br>15:30 |
| S37 | 8 | S35 and programmable near2 amplifier | US-PGPUB;<br>USPAT;<br>USOCR;<br>FPRS;<br>EPO; JPO;<br>DERWENT;<br>IBM_TDB | OR | ON | 2016/07/22<br>15:30 |

**EAST Search History (Interference)**

< This search history is empty>

**5/19/2017 12:24:43 PM**
**C:\ Users\ tko\ Documents\ EAST\ Workspaces\ 14618664.wsp**

Receipt date: 25/07/2017

Case 8:20-cv-00048-JVS-JDE   Document 109-1   Filed 08/17/20   Page 592 of 1129   Page ID
#:7549

14618664
2878

Sheet 1 of 2

| PTO/SB/08A and B (08-03)<br>U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE<br>Substitute for Form 1449A/PTO<br><br>**INFORMATION DISCLOSURE<br>STATEMENT BY APPLICANT**<br><br>***(Use as many sheets as necessary)*** | **APPLICATION NO.:**<br>14/618,664 | **FILING DATE:**<br>February 10, 2015 |
|---|---|---|
| | **FIRST NAMED INVENTOR:**<br>Steven M. Hotelling | **ART UNIT:**<br>2878 |
| | **EXAMINER NAME:**<br>Ko, Tony | **ATTY. DOCKET NO.:**<br>P22733US1 |

### U.S. PATENT DOCUMENTS

| EXAMINER INITIALS* | Cite No. | PATENT NUMBER<br>Number – Kind Code² (if known) | ISSUE DATE<br>MM-DD-YYYY | Name of Patentee of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | A1. | 9,276,625 | 03/2016 | Kim et al. | |
| | A2. | 9,568,315 | 02/2017 | Naoka II et al. | |
| | A3. | 9,607,203 | 03/2017 | Yazdandoost et al. | |
| | A4. | 9,613,246 | 04/2017 | Gozzini et al. | |

### U.S. PUBLICATION DOCUMENTS

| EXAMINER INITIALS* | Cite No.¹ | PUBLICATION NUMBER<br>Number – Kind Code² (if known) | PUBLICATION DATE<br>MM-DD-YYYY | Name of Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

### FOREIGN PATENT DOCUMENTS

| EXAMINER INITIALS* | Cite No.¹ | DOCUMENT NUMBER<br>Country Code³ – Number⁴ – Kind Code⁵ (if known) | PUBLICATION DATE<br>MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear | T⁶ |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |

### NONPATENT LITERATURE DOCUMENTS

| EXAMINER INITIALS* | Cite No.¹ | Include name of Author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and/or country where published. | T⁶ |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

Receipt date: 25/07/2017    Case 8:20-cv-00048-JVS-JDE   Document 109-1   Filed 08/17/20   Page 593 of 1129   Page ID 14618664 - GAU: 2878
#:7550

Sheet 2 of 2

| PTO/SB/08A and B (08-03)<br>U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE<br>Substitute for Form 1449A/PTO | **APPLICATION NO.:**<br>14/618,664 | **FILING DATE:**<br>February 10, 2015 |
|---|---|---|
| **INFORMATION DISCLOSURE**<br>**STATEMENT BY APPLICANT** | **FIRST NAMED INVENTOR:**<br>Steven M. Hotelling | **ART UNIT:**<br>2878 |
| *(Use as many sheets as necessary)* | **EXAMINER NAME:**<br>Ko, Tony | **ATTY. DOCKET NO.:**<br>P22733US1 |

| **EXAMINER: Initial if citation considered, whether or not citation is in conformance with MPEP 609; Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.** | | |
|---|---|---|
| Examiner Signature | /TONY   KO/ | Date Considered  05/19/2017 |

[1] Applicant's unique citation number (optional).  [2] See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04.  [3] Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3).  [4] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document.  [5] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible.  [6] Applicant is to place a check mark here if English language Translation is attached.

| *Search Notes* | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 14618664 | HOTELLING ET AL. |
| | **Examiner** | **Art Unit** |
| | TONY KO | 2878 |

## CPC- SEARCHED

| Symbol | Date | Examiner |
|---|---|---|
| g01j1/44 | 7/22/2016 | tk |
| a61b5/4845 | 7/22/2016 | tk |
| a61b5/1118 | 7/22/2016 | tk |
| a61b5/4872 | 7/22/2016 | tk |
| a61b5/02427 | 7/22/2016 | tk |
| g01j2001/444 | 7/22/2016 | tk |

## CPC COMBINATION SETS  - SEARCHED

| Symbol | Date | Examiner |
|---|---|---|
| | | |

## US CLASSIFICATION SEARCHED

| Class | Subclass | Date | Examiner |
|---|---|---|---|
| | | | |

## SEARCH NOTES

| Search Notes | Date | Examiner |
|---|---|---|
| see EAST search history | 7/22/2016 | tk |

## INTERFERENCE SEARCH

| US Class/ CPC Symbol | US Subclass / CPC Group | Date | Examiner |
|---|---|---|---|
| | | | |

| | |
|---|---|
| | |

Part of Paper No. :  20160722

**Exhibit 23**
**-656-**

| PTO/SB/08A and B (08-03)<br>U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE<br>Substitute for Form 1449A/PTO | | APPLICATION NO.:<br>14/618,664 | FILING DATE:<br>February 10, 2015 |
|---|---|---|---|
| **INFORMATION DISCLOSURE<br>STATEMENT BY APPLICANT** | | FIRST NAMED INVENTOR:<br>Steven M. Hotelling | ART UNIT:<br>2878 |
| ***(Use as many sheets as necessary)*** | | EXAMINER NAME:<br>Ko, Tony | ATTY. DOCKET NO.:<br>P22733US1 |

### U.S. PATENT DOCUMENTS

| EXAMINER INITIALS* | Cite No. | PATENT NUMBER<br>Number – Kind Code² (if known) | ISSUE DATE<br>MM-DD-YYYY | Name of Patentee of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | A1. | 9,276,625 | 03/2016 | Kim et al. | |
| | A2. | 9,568,315 | 02/2017 | Naoka II et al. | |
| | A3. | 9,607,203 | 03/2017 | Yazdandoost et al. | |
| | A4. | 9,613,246 | 04/2017 | Gozzini et al. | |

### U.S. PUBLICATION DOCUMENTS

| EXAMINER INITIALS* | Cite No.¹ | PUBLICATION NUMBER<br>Number – Kind Code² (if known) | PUBLICATION DATE<br>MM-DD-YYYY | Name of Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

### FOREIGN PATENT DOCUMENTS

| EXAMINER INITIALS* | Cite No.¹ | DOCUMENT NUMBER<br>Country Code³ – Number⁴ – Kind Code⁵ (if known) | PUBLICATION DATE<br>MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear | T⁶ |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |

### NONPATENT LITERATURE DOCUMENTS

| EXAMINER INITIALS* | Cite No.¹ | Include name of Author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and/or country where published. | T⁶ |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

| PTO/SB/08A and B (08-03)<br>U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE<br>Substitute for Form 1449A/PTO | | APPLICATION NO.:<br>14/618,664 | FILING DATE:<br>February 10, 2015 |
|---|---|---|---|
| **INFORMATION DISCLOSURE<br>STATEMENT BY APPLICANT** | | FIRST NAMED INVENTOR:<br>Steven M. Hotelling | ART UNIT:<br>2878 |
| ***(Use as many sheets as necessary)*** | | EXAMINER NAME:<br>Ko, Tony | ATTY. DOCKET NO.:<br>P22733US1 |

| **EXAMINER: Initial if citation considered, whether or not citation is in conformance with MPEP 609; Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.** | | | |
|---|---|---|---|
| Examiner Signature | | Date Considered | |

[1] Applicant's unique citation number (optional).  [2] See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04.  [3] Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3).  [4] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document.  [5] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible.  [6] Applicant is to place a check mark here if English language Translation is attached.

Exhibit 23
-658-

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 29135145 |
| **Application Number:** | 14618664 |
| **International Application Number:** | |
| **Confirmation Number:** | 1097 |
| **Title of Invention:** | Methods and Systems for Modulation and Demodulation of Optical Signals |
| **First Named Inventor/Applicant Name:** | Steven P. Hotelling |
| **Customer Number:** | 62579 |
| **Filer:** | Stephen C. Hemenway/Valerie Brown |
| **Filer Authorized By:** | Stephen C. Hemenway |
| **Attorney Docket Number:** | P22733US1 |
| **Receipt Date:** | 07-MAY-2017 |
| **Filing Date:** | 10-FEB-2015 |
| **Time Stamp:** | 11:12:45 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | no |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Transmittal Letter | P22733US1IDS.pdf | 17561<br>d30bac39b5ab3b4f0e6c48501a8e7460289a7b82 | no | 2 |

**Warnings:**

Exhibit 23
-659-

**Information:**

| 2 | Information Disclosure Statement (IDS) Form (SB08) | P22733US1PTOSB08.pdf | 30674<br><br>45afab64a1ec892f34ea9265abb8866a09bb0805 | no | 2 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

This is not an USPTO supplied IDS fillable form

| **Total Files Size (in bytes):** | 48235 |
|---|---|

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.
**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.
**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

Exhibit 23
-660-

Attorney Docket No. P22733US1

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re the Application of: | |
| Steven M. Hotelling, et al. | Examiner:       Ko, Tony. |
| Application No. 14/618,664 | Art Unit:       2878 |
| Filed: February 10, 2015 | Confirmation No.   1097 |
| For:   METHODS AND SYSTEMS FOR MODULATION AND DEMODULATION OF OPTICAL SIGNALS | |

**INFORMATION DISCLOSURE STATEMENT**
**UNDER 37 C.F.R. §§ 1.97(b)(4) and 1.98**

Mail Stop AMENDMENT
Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Sir:

        The Examiner is requested to consider the references noted on the enclosed Form PTO/SB/08a during examination of the above-identified patent application.  These references are submitted for the Examiner's consideration and are submitted pursuant to the duty of disclosure under 37 C.F.R. § 1.56.  In submitting these references, no representation is made or implied that the references are or are not material to the examination of the application.  The Examiner is requested to make his or her own determination of materiality.  Pursuant to the requirements of 37 C.F.R. § 1.98(a)(2)(ii), only copies of the foreign references and non-patent literature documents are provided.  Copies of the U.S. patent and U.S. patent application publication references are not provided, unless required by the Office.

        This Information Disclosure Statement is being filed before the first Office action following the filing of a Request for Continued Examination.  Accordingly, pursuant to 37 C.F.R. § 1.97(b)(4), no fees are due with respect to this filing.  However, should any such fees or petitions be required, please consider this a request therefor and authorization to charge Deposit Account No. 504621 as necessary.

1

Exhibit 23
-661-

Attorney Docket No. P22733US1

If the Examiner has any questions, please contact the undersigned attorney.

Dated:  May 7, 2017.

Respectfully submitted,


_____/S. Craig Hemenway/_____
S. Craig Hemenway, Registration No. 44,759
Attorney for Assignee
USPTO Customer No. 62579

Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, Colorado  80202
Phone: (303) 223-1100
Fax: (303) 223-1111

013361\2216\15664595.1

**Exhibit 23
-662-**

PTO/SB/30 (07-09)
Approved for use through 07/31/2012. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

**Request
for
Continued Examination (RCE)
Transmittal**

Address to:
Mail Stop RCE
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

| | |
|---|---|
| Application Number | 14/618,664 |
| Filing Date | February 10, 2015 |
| First Named Inventor | Steven M. Hotelling |
| Art Unit | 2878 |
| Examiner Name | Ko, Tony |
| Attorney Docket Number | P22713US1 |

**This is a Request for Continued Examination (RCE) under 37 CFR 1.114 of the above-identified application.**
Request for Continued Examination (RCE) practice under 37 CFR 1.114 does not apply to any utility or plant application filed prior to June 8, 1995, or to any design application. See Instruction Sheet for RCEs (not to be submitted to the USPTO) on page 2.

1. <u>Submission required under 37 CFR 1.114</u> Note: If the RCE is proper, any previously filed unentered amendments and amendments enclosed with the RCE will be entered in the order in which they were filed unless applicant instructs otherwise. If applicant does not wish to have any previously filed unentered amendment(s) entered, applicant must request non-entry of such amendment(s).

   a. ☐ Previously submitted. If a final Office action is outstanding, any amendments filed after the final Office action may be considered as a submission even if this box is not checked.

      i. ☐ Consider the arguments in the Appeal Brief or Reply Brief previously filed on _____

      ii. ☐ Other _____

   b. ☑ Enclosed

      i. ☑ Amendment/Reply          iii. ☐ Information Disclosure Statement (IDS)

      ii. ☐ Affidavit(s)/ Declaration(s)     iv. ☐ Other _____

2. [Miscellaneous]

   a. ☐ Suspension of action on the above-identified application is requested under 37 CFR 1.103(c) for a period of _____ months. (Period of suspension shall not exceed 3 months; Fee under 37 CFR 1.17(i) required)

   b. ☐ Other _____

3. [Fees] The RCE fee under 37 CFR 1.17(e) is required by 37 CFR 1.114 when the RCE is filed.

   a. ☑ The Director is hereby authorized to charge the following fees, any underpayment of fees, or credit any overpayments, to Deposit Account No. 504621 .

      i. ☑ RCE fee required under 37 CFR 1.17(e)

      ii. ☐ Extension of time fee (37 CFR 1.136 and 1.17)

      iii. ☐ Other _____

   b. ☐ Check in the amount of $ _____ enclosed

   c. ☐ Payment by credit card (Form PTO-2038 enclosed)

   **WARNING: Information on this form may become public. Credit card information should not be included on this form. Provide credit card information and authorization on PTO-2038.**

**SIGNATURE OF APPLICANT, ATTORNEY, OR AGENT REQUIRED**

| Signature | /S. Craig Hemenway/ | Date | May 2, 2017 |
|---|---|---|---|
| Name (Print/Type) | S. Craig Hemenway | Registration No. | 44,759 |

**CERTIFICATE OF MAILING OR TRANSMISSION**

I hereby certify that this correspondence is being deposited with the United States Postal Service with sufficient postage as first class mail in an envelope addressed to: Mail Stop RCE, Commissioner for Patents, P. O. Box 1450, Alexandria, VA 22313-1450 or facsimile transmitted to the U.S. Patent and Trademark Office on the date shown below.

| Signature | |
|---|---|
| Name (Print/Type) | Date |

This collection of information is required by 37 CFR 1.114. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Mail Stop RCE, Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

**Exhibit 23
-663-**

Attorney Docket No. P22733US1

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of:

| | | | |
|---|---|---|---|
| Inventor(s): | Steven M. Hotelling, et al. | | |
| App. No.: | 14/618,664 | Con. No.: | 1097 |
| Filed: | February 10, 2015 | Art Unit: | 2878 |
| Title: | METHODS AND SYSTEMS FOR MODULATION AND DEMODULATION OF OPTICAL SIGNALS | Examiner: | Ko, Tony |

## AMENDMENT AND RESPONSE TO FINAL OFFICE ACTION

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Sir:

In response to the final Office action dated February 2, 2017, please consider the following remarks and amend the above-identified application as follows:

**Amendments to the Claims** begin on page 2 of this paper.

**Remarks** begin on page 6 of this paper.

Exhibit 23
-664-

Attorney Docket No. P22733US1

**Amendments to the Claims:**

1.      (Currently Amended) An electronic device comprising:

a housing comprising a surface adapted to be positioned proximate a measurement site of a subject;

a biometric sensor positioned at least partially within the surface and comprising:

a plurality of light sources for emitting light toward the measurement site at a selected modulation frequency; and

an optical sensor for obtaining light exiting the measurement site; and

an input amplifier coupled to the output of the biometric sensor and disposed within the housing;

a high pass filter coupled to an output of the input amplifier and disposed within the housing, the high pass filter having a cutoff frequency above that of a biometric property of the measurement site;

an output amplifier coupled to an output of the high pass filter and disposed within the housing; and

an analog to digital converter coupled to an output of the output amplifier and disposed within the housing.

2.      (Original) The electronic device of claim 1, wherein:

each light source of the plurality of light sources comprises a light emitting diode; and

the optical sensor comprises one of the group consisting of photodiodes, phototransistors, or optical image sensors.

3.      (Original) The electronic device of claim 1, wherein the input amplifier comprises a transimpedance amplifier.

4.      (Original) The electronic device of claim 1, wherein the output amplifier comprises a programmable gain amplifier.

5.      (Original) The electronic device of claim 1, further comprising a processor coupled to the output of the analog to digital converter.

Exhibit 23
-665-

Attorney Docket No. P22733US1

6.        (Previously Amended) The electronic device of claim 1, wherein the processor is configured to control each of the plurality of light sources of the biometric sensor.

7.        (Original) The electronic device of claim 6, wherein the biometric sensor further comprises a measurement mode and a calibration mode.

8.        (Original) The electronic device of claim 7, wherein the calibration mode comprises:

deactivating all light sources for a selected time period;

activating a first light source of the plurality of light sources for a selected time period; and

deactivating all light sources for a selected time period.

9.        (Currently Amended) A sensor system for measuring a periodic biometric characteristic of a subject, the sensor system comprising:

a plurality of light sources operative to emit a series light pulses at a selected modulation frequency toward a measurement site of the subject;

an optical sensor operative to receive light exiting a portion of the measurement site, the light originating from the series of light pulses;

a transimpedance input amplifier coupled to the output of the optical sensor;

a high pass filter coupled to the transimpedance input amplifier and configured to filter frequencies ~~higher~~ lower than the selected modulation frequency;

an output amplifier coupled of the high pass filter and configured to amplify an output of the high pass filter; and

an analog to digital converter coupled to the output amplifier configured to associate a signal amplitude of the output amplifier with a digital value.

10.        (Original) The sensor system of claim 9, wherein:

each of the light source of the plurality of light sources comprises a light emitting diode configured to emit light at a selected frequency; and

the optical sensor comprises one of the group consisting of photodiodes, phototransistors, and optical image sensors.

Exhibit 23
-666-

Attorney Docket No. P22733US1

11.      (Original) The sensor system of claim 9, wherein the input amplifier comprises a transimpedance amplifier; and

the output amplifier comprises a programmable gain amplifier.

12.      (Original) The sensor system of claim 9, wherein:

a first subset of the plurality of light sources comprises a plurality of light emitting diodes configured to emit light at a first selected frequency; and

a second subset of the plurality of light sources comprises a plurality of light emitting diodes configured to emit light at a second selected frequency;

wherein when the first subset is emitting light the second subset is prevented from emitting light.

13.      (Original) The sensor system of claim 9, further comprising a processor coupled to the output of the analog to digital converter.

14.      (Original) The sensor system of claim 9, wherein the processor is configured to control the modulation of at least one of the light sources of the plurality of light sources.

15.      (Original) The sensor system of claim 14, wherein the biometric sensor further comprises a measurement mode and a calibration mode.

16.      (Original) The electronic device of claim 15, wherein the calibration mode comprises:

deactivating all light sources for a selected time period;

activating a first light source of the plurality of light sources for a selected time period; and

deactivating all light sources for a selected time period.

17.      (Currently Amended) A method of optical sensing, comprising:

emitting light toward a measurement site of a subject at a selected modulation frequency;

obtaining light exiting the measurement site;

converting the obtained light to an electrical signal;

amplifying the electrical signal to obtain an amplified signal;

Exhibit 23
-667-

filtering low frequency ~~elements~~ <u>components below the selected modulation frequency</u> from the amplified signal to obtain a filtered signal; and

amplifying the filtered signal to obtain an output signal.

18.      (Original) The method of claim 17, further comprising:

sampling the output signal to obtain a matrix of samples; and

determining product of the matrix of samples with a demodulation matrix to obtain a demodulated matrix.

19.      (Original) The method of claim 18, wherein sampling the output signal to obtain a matrix of samples comprises:

taking a first sample;

taking a second sample;

taking a third sample;

subtracting the average of the first and third sample from the second sample to obtain an output sample; and

adding the output sample the matrix of samples.

20.      (Original) The method of claim 17, wherein:

light is emitted toward the measurement site from a plurality of light sources each comprising a light emitting diode; and

light is obtained exiting by an optical sensor comprising one of the group consisting of photodiodes, phototransistors, or optical image sensors.

Exhibit 23
-668-

### REMARKS

This paper is submitted in response to the Office action mailed on July 29, 2016. This paper amends claims 1, 9, and 17. Accordingly, after entry of this Amendment and Response, claims 1 - 20 will be pending, with claims 1, 9, and 17 being independent.

### *I. Claim Rejections Under 35 U.S.C. § 102*

The Examiner rejected claims 1, 2, 5, 17 and 20 under 35 U.S.C. § 102 as being anticipated by U.S. Patent No. 5,719,950 to Osten et al. (hereinafter "Osten"). In addition or in the alternative, the Examiner rejected claims 1-3, 5-10 and 12-16 under 35 U.S.C. § 102 as being anticipated by U.S. Patent No. 9,044,171 to Venkatraman et al. (hereinafter "Venkatraman").

As noted in the previous office action response, independent claim 1 recites, among other limitations, among other limitations, "a high pass filter coupled to an output of the input amplifier." Independent claims 9 and 17 each recite similar subject matter. In response to the Assignee's arguments, the Examiner stated, "Applicant further argues the exclusive nature of low and high pass filter. However, the exclusion does not appear to be claimed." (*Office Action*, pg. 8).

The Assignee respectfully points out that each of independent claims 1, 9, and 17 specifically recite a high pass filter. As such, the Assignee submits that high pass filtering – mutually exclusive with low pass filtering by definition – is indeed claimed in all independent claims.

In fact, as noted previously, Osten specifically discloses low pass filtration 192, 202 *prior to* high pass filtering (at an even lower frequency) of an output from an amplified signal. This signal processing technique is depicted in FIG. 5, which is reproduced for convenient reference:

**Exhibit 23**
-669-



*Fig. 5*

In this figure, light is collected by the photodiode 172. Immediately, that light is sampled and held. By definition, the Assignee points out, a "sample and hold" operation filters high-frequency noise, operating as a low-pass filter. The stop frequency of the sample-and-hold signal processing stage is defined by the period that Olsen holds the sample before passing to the four pole lowpass filter.

Next, the once-filtered signal from the photodiode 172 is provided as input to a subsequent low-pass filter 192 or 202. Each of these filters specifically eliminate frequency components of the signal that are above 10Hz.

Next the twice-filtered signal from the photodiode 172 – which a person of skill in the art would understand does not contain any substantive frequency components greater than 10Hz – is provided as input to a high pass filter 194 or 204. Each of these filters specifically eliminate frequency components of the twice-filtered signal that are below 0.03 Hz.

A person of skill in the art would understand that the three-times-filtered signal output from the high pass filters 194, 204 do not contain any substantive frequency components lower than 0.03 Hz or greater than 10Hz.

The claimed invention is entirely different, and precisely opposite from the signal filtering described in Olsen. FIG. 4 depicts the signal flow associated with claim 1:

Exhibit 23
-670-

Attorney Docket No. P22733US1



*FIG. 4*

In particular, the Assignee points out that the output of the transimpedance amplifier is filtered by a high pass filter. A high pass filter is, as noted above, specifically opposite and mutually exclusive with a low-pass filter. For example, as noted in paragraph 0065 of the application as filed "…a high pass filter can be useful to remove low frequency components *within the electrical signal that might otherwise interfere with detection of low frequency physiological parameters such as heart rate*." (emphasis added).

As such, a person of ordinary skill in the art that the cutoff frequency of the high pass filter of claim 1 is selected to remove low-frequency noise. Quite oppositely, Olsen *specifically retains* low-frequency components of the input signal.

The Assignee submits that high pass filtering and low pass filtering, by definition, provide opposite, mutually-exclusive, and non-substitutable functionality. As such, the Assignee submits that Osten cannot be used in support of either a novelty or obviousness rejection of claims 1, 9, or 17.

Similarly, the Assignee submits that Venkatraman does not disclose a high-pass filter coupled to an output of an input amplifier. Instead, Venkatraman discloses a "sample and hold" stage which necessarily will filter high-frequency components during the "hold" operation. As such, the Assignee submits that Venkatraman, like Osten, cannot be used in support of either a novelty or obviousness rejection of claims 1, 9, or 17.

In the interests of an expeditious close to prosecution, the Assignee herein amends independent claims 1, 9, and 17 to further clarify a relationship between the cutoff frequency of the high pass filter and biometric properties sought to be measured.

**Exhibit 23**
-671-

Attorney Docket No. P22733US1

## II. Remaining Dependent Claims

The Examiner rejected claims 4 and 11 under 35 U.S.C. § 103(a) as being obvious over Venkatraman in view of Benkley III (U.S. Patent No. 8,791,792). In addition, the Examiner rejected claims 18-20 under 35 U.S.C. § 103(a) as being obvious over Venkatraman in view of Durand et al. (U.S. Patent No. 7,656,932).

The remaining claims depend from an independent claim referenced above. As such, the Assignee submits that such claims should be allowable at least insofar as each depends from a patentably distinct base claim. The Assignee makes this statement without waiving and without reference to any independent bases of patentability recited by these claims and accordingly expressly reserves the right to argue such bases in a future paper if required.

## III. Conclusion

The Assignee thanks the Examiner for the thorough review of the application. The Assignee respectfully submits the present application, as amended, is in condition for allowance and respectfully requests the issuance of a Notice of Allowability as soon as practicable.

**Exhibit 23**
**-672-**

This Amendment and Response is submitted contemporaneously with a Request for Continued Examination (RCE) and a request to charge Deposit Account No. 504621 for the requisite fees.  The Assignee believes no further fees or petitions are required.  However, if any such petitions or fees are necessary, please consider this a request therefor and authorization to charge Deposit Account No. 504621 accordingly.

If the Examiner should require any additional information or amendment, please contact the undersigned attorney.

Dated:  May 2, 2017.

Respectfully submitted,

_____/S. Craig Hemenway/_____
S. Craig Hemenway, Registration No. 44,759
Attorney for Assignee
USPTO Customer No. 62579

Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, Colorado 80202
Phone: 303-223-1100
Fax: 303-223-1111

Exhibit 23
-673-

## Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | 14618664 |
| **Filing Date:** | 10-Feb-2015 |
| **Title of Invention:** | Methods and Systems for Modulation and Demodulation of Optical Signals |
| **First Named Inventor/Applicant Name:** | Steven P. Hotelling |
| **Filer:** | Stephen C. Hemenway/Valerie Brown |
| **Attorney Docket Number:** | P22733US1 |

Filed as Large Entity

**Filing Fees for**   Utility under 35 USC 111(a)

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |
| **Post-Allowance-and-Post-Issuance:** | | | | |
| **Extension-of-Time:** | | | | |

Exhibit 23
-674-

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Miscellaneous:** | | | | |
| RCE- 1st Request | 1801 | 1 | 1200 | 1200 |
| **Total in USD ($)** | | | | **1200** |

Exhibit 23
-675-

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 29092448 |
| **Application Number:** | 14618664 |
| **International Application Number:** | |
| **Confirmation Number:** | 1097 |
| **Title of Invention:** | Methods and Systems for Modulation and Demodulation of Optical Signals |
| **First Named Inventor/Applicant Name:** | Steven P. Hotelling |
| **Customer Number:** | 62579 |
| **Filer:** | Stephen C. Hemenway/Valerie Brown |
| **Filer Authorized By:** | Stephen C. Hemenway |
| **Attorney Docket Number:** | P22733US1 |
| **Receipt Date:** | 02-MAY-2017 |
| **Filing Date:** | 10-FEB-2015 |
| **Time Stamp:** | 14:52:54 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | DA |
| Payment was successfully received in RAM | $ 1200 |
| RAM confirmation Number | 050317INTEFSW00001254504621 |
| Deposit Account | 504621 |
| Authorized User | Valerie Brown |
| The Director of the USPTO is hereby authorized to charge indicated fees and credit any overpayment as follows: | |
| 37 CFR 1.16 (National application filing, search, and examination fees) | |
| 37 CFR 1.17 (Patent application and reexamination processing fees) | |

Exhibit 23
-676-

37 CFR 1.19 (Document supply fees)

37 CFR 1.20 (Post Issuance fees)

37 CFR 1.21 (Miscellaneous fees and charges)

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Request for Continued Examination (RCE) | P22733US1RCE.pdf | 147482 / c7da99a9e29b7bff03227fddc98e96697e8e24f8 | no | 1 |

**Warnings:**

This is not a USPTO supplied RCE SB30 form.

**Information:**

| 2 | Amendment Submitted/Entered with Filing of CPA/RCE | P22733US1Amendment.pdf | 235795 / 00d8eec38b338bfe41c23fc551a13ab9dd12d2ee | no | 10 |

**Warnings:**

**Information:**

| 3 | Fee Worksheet (SB06) | fee-info.pdf | 30553 / 813d9bf4fe5de5dff27862ddc9e1d2f60bfd65e3 | no | 2 |

**Warnings:**

**Information:**

| | | **Total Files Size (in bytes):** | 413830 | | |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.
**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.
**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

Exhibit 23
-677-

PTO/SB/06 (09-11)
Approved for use through 1/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| PATENT APPLICATION FEE DETERMINATION RECORD<br>Substitute for Form PTO-875 | Application or Docket Number<br>14/618,664 | Filing Date<br>02/10/2015 | ☐ To be Mailed |
|---|---|---|---|

**ENTITY:** ☒ LARGE  ☐ SMALL  ☐ MICRO

## APPLICATION AS FILED – PART I

| | (Column 1) | (Column 2) | | |
|---|---|---|---|---|
| FOR | NUMBER FILED | NUMBER EXTRA | RATE ($) | FEE ($) |
| ☐ BASIC FEE<br>(37 CFR 1.16(a), (b), or (c)) | N/A | N/A | N/A | |
| ☐ SEARCH FEE<br>(37 CFR 1.16(k), (i), or (m)) | N/A | N/A | N/A | |
| ☐ EXAMINATION FEE<br>(37 CFR 1.16(o), (p), or (q)) | N/A | N/A | N/A | |
| TOTAL CLAIMS<br>(37 CFR 1.16(i)) | 20 minus 20 = | · 0 | x $80 = | 0 |
| INDEPENDENT CLAIMS<br>(37 CFR 1.16(h)) | 3 minus 3 = | · 0 | x $420 = | 0 |
| ☐ APPLICATION SIZE FEE<br>(37 CFR 1.16(s)) | If the specification and drawings exceed 100 sheets of paper, the application size fee due is $310 ($155 for small entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s). | | | |
| ☐ MULTIPLE DEPENDENT CLAIM PRESENT (37 CFR 1.16(j)) | | | | |
| * If the difference in column 1 is less than zero, enter "0" in column 2. | | | TOTAL | 0 |

## APPLICATION AS AMENDED – PART II

| | | (Column 1) | (Column 2) | (Column 3) | | |
|---|---|---|---|---|---|---|
| AMENDMENT | **05/02/2017** | CLAIMS REMAINING AFTER AMENDMENT | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) |
| | Total (37 CFR 1.16(i)) | · 20 | Minus | ** 20 | = 0 | x $80 = | 0 |
| | Independent (37 CFR 1.16(h)) | · 3 | Minus | *** 3 | = 0 | x $420 = | 0 |
| | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | |
| | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | |
| | | | | | TOTAL ADD'L FEE | 0 |

| | | (Column 1) | (Column 2) | (Column 3) | | |
|---|---|---|---|---|---|---|
| AMENDMENT | | CLAIMS REMAINING AFTER AMENDMENT | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) |
| | Total (37 CFR 1.16(i)) | * | Minus | ** | = | x $ = | |
| | Independent (37 CFR 1.16(h)) | * | Minus | *** | = | x $ = | |
| | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | |
| | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | |
| | | | | | TOTAL ADD'L FEE | |

LIE
GERALDINE STANLEY

* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.
** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20".
*** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3".
The "Highest Number Previously Paid For" (Total or Independent) is the highest number found in the appropriate box in column 1.

This collection of information is required by 37 CFR 1.16. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

**Exhibit 23**
-678-

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 14/618,664 | 02/10/2015 | Steven P. Hotelling | P22733US1 | 1097 |

| | |
|---|---|
| 62579          7590          02/02/2017 | EXAMINER |
| APPLE INC. | KO, TONY |
| c/o Brownstein Hyatt Farber Schreck, LLP | |
| 410 Seventeenth Street | ART UNIT          PAPER NUMBER |
| Suite 2200 | 2878 |
| Denver, CO 80202 | |
| | NOTIFICATION DATE          DELIVERY MODE |
| | 02/02/2017          ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

patentdocket@bhfs.com

PTOL-90A (Rev. 04/07)

**Exhibit 23**
**-679-**

| **Office Action Summary** | Application No. 14/618,664 | Applicant(s) HOTELLING ET AL. |
|---|---|---|
| | Examiner TONY KO | Art Unit 2878 | AIA (First Inventor to File) Status Yes |

*Note: the above header is a four-column layout:*

| | Application No. | Applicant(s) |
|---|---|---|
| **Office Action Summary** | 14/618,664 | HOTELLING ET AL. |
| | **Examiner** TONY KO | **Art Unit** 2878 | **AIA (First Inventor to File) Status** Yes |

-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --

## Period for Reply

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) months from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

## Status

1)☒ Responsive to communication(s) filed on <u>10/31/2016</u>.
  ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.
2a)☒ This action is **FINAL**.   2b)☐ This action is non-final.
3)☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.
4)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

## Disposition of Claims*

5)☒ Claim(s) <u>1-20</u> is/are pending in the application.
  5a) Of the above claim(s) _____ is/are withdrawn from consideration.
6)☐ Claim(s) _____ is/are allowed.
7)☒ Claim(s) <u>1-20</u> is/are rejected.
8)☐ Claim(s) _____ is/are objected to.
9)☐ Claim(s) _____ are subject to restriction and/or election requirement.
* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov.

## Application Papers

10)☐ The specification is objected to by the Examiner.
11)☐ The drawing(s) filed on _____ is/are: a)☐ accepted or b)☐ objected to by the Examiner.
  Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
  Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

## Priority under 35 U.S.C. § 119

12)☐ Acknowledgement is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
  **Certified copies:**
    a)☐ All   b)☐ Some**  c)☐ None of the:
    1.☐  Certified copies of the priority documents have been received.
    2.☐  Certified copies of the priority documents have been received in Application No. _____.
    3.☐  Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).
** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**
1)☐ Notice of References Cited (PTO-892)
2)☒ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b) Paper No(s)/Mail Date <u>10/31/2016, 1/27/2017</u>.
3)☐ Interview Summary (PTO-413) Paper No(s)/Mail Date. _____ .
4)☐ Other: _____ .

**Exhibit 23**
-680-

Application/Control Number: 14/618,664                                     Page 2
Art Unit: 2878

1.      The present application, filed on or after March 16, 2013, is being examined

under the first inventor to file provisions of the AIA.  This office action is in response to

amendment filed on 10/31/2016.  Currently claims 1-20 are pending.

### *Claim Rejections - 35 USC § 102*

2.      The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that

form the basis for the rejections under this section made in this Office action:

> A person shall be entitled to a patent unless –
>
> (a)(1) the claimed invention was patented, described in a printed publication, or in public use, on sale or otherwise available to the public before the effective filing date of the claimed invention.
>
> (a)(2) the claimed invention was described in a patent issued under section 151, or in an application for patent published or deemed published under section 122(b), in which the patent or application, as the case may be, names another inventor and was effectively filed before the effective filing date of the claimed invention.

3.      Claim(s) 1, 2, 5, 17 and 20 is/are rejected under 35 U.S.C. 102(a)(1)(2) as being

anticipated by Osten et al (US Patent 5719950).

4.      Regarding claims 1 and 17, Osten et al teach (Figs. 1-5) an electronic device and

method comprising: a housing (60) comprising a surface (42) adapted to be positioned

proximate a measurement site of a subject; a biometric sensor positioned at least

partially within the surface and comprising: a plurality of light sources (LEDs) for

emitting light toward the measurement site at a selected modulation frequency; and an

optical sensor (26) for obtaining light exiting the measurement site; and an input

amplifier (174) coupled to the output of the biometric sensor and disposed within the

housing; a high pass filter (204) coupled to an output of the input amplifier and disposed

within the housing; an output amplifier (206) coupled to an output of the high pass filter

Exhibit 23
-681-

Application/Control Number: 14/618,664                                     Page 3
Art Unit: 2878

and disposed within the housing; and an analog to digital converter (22) coupled to an

output of the output amplifier and disposed within the housing.

5.      Regarding claims 2 and 20, Osten et al teach each light source of the plurality of

light sources comprises a light emitting diode (92); and the optical sensor comprises

one of the group consisting of photodiodes, phototransistors, or optical image sensors.

6.      Regarding claim 5, Osten et al teach a processor (38) coupled to the output of

the analog to digital converter.

7.      Claim(s) s 1-3, 5-10 and 12-16 are is/are rejected under 35 U.S.C. 102(a)(1) as

being anticipated by Venkatraman et al (US Patent 9044171/US20140275850).

8.      Regarding claims 1 and 17, Venkatraman et al teach (Figs. 1-31) an electronic

device and method comprising a housing comprising a surface adapted to be positioned

proximate a measurement site of a subject; a biometric sensor positioned at least

partially within the surface and comprising: a plurality of light sources (LEDs) for

emitting light toward the measurement site; and an optical sensor (photodetector) for

obtaining light exiting the measurement site; and an input amplifier (Figs. 16G) coupled

to the output of the biometric sensor and disposed within the housing; a high pass filter

(capacitor) coupled to an output of the input amplifier and disposed within the housing;

an output amplifier coupled to an output of the high pass filter and disposed within the

housing; and an analog to digital (A/D) converter coupled to an output of the output

amplifier and disposed within the housing.

9.      Regarding claim 2, Venkatraman et al teach ([0102]) each light source of the

plurality of light sources comprises a light emitting diode; and the optical sensor

Exhibit 23
-682-

Application/Control Number: 14/618,664                                    Page 4
Art Unit: 2878

comprises one of the group consisting of photodiode, phototransistors, or optical image

sensor.

10.     Regarding claim 3, Venkatraman et al teach ([0165]) the input amplifier

comprises a transimpedance amplifier.

11.     Regarding claim 5, Venkatraman et al teach a processor coupled to the output of

the analog to digital converter (ADC).

12.     Regarding claim 6, as understood, Venkatraman et al teach the processor is

configured to control each of the plurality of light sources of the biometric sensor

(figures 11 shows the connection between light source and the controller).

13.     Regarding claim 7, Venkatraman et al teach calibration and measurement mode.

14.     Since claims 7 and 8 lacks structural difference from claim 1, in which claims 7

and 8 depends upon, the rejection made against claim 1 is believed to satisfy the

requirement under 35 U.S.C. 102(a)(1) to properly reject claim 7.

15.     Regarding claim 9, Venkatraman et al teach a sensor system for measuring a

periodic biometric characteristic of a subject, the sensor comprising: a plurality of light

sources (LEDs) operative to emit a series light pulses at a selected modulation

frequency toward a measurement site of the subject; an optical sensor (photodetector)

operative to receive light exiting a portion of the measurement site, the light originating

from the series of light pulses; a transimpedance input amplifier (Fig. 16, ([0165]))

coupled to the output of the optical sensor; a high pass filter ([0326]) coupled to the

transimpedance input amplifier and configured to filter frequencies higher than the

selected modulation frequency; an output amplifier coupled of the high filter and

Exhibit 23
-683-

Application/Control Number: 14/618,664                                   Page 5
Art Unit: 2878

configured to amplify an output of the high pass filter; and an analog to digital converter

coupled to the output amplifier configured to associated a signal amplitude of the output

amplifier with a digital value.  Venkatraman teaches specifically in [0158] that green is

the preferred and teaches the filtering of ambient light (which could include wavelengths

greater or less than in the green spectrum).

16.    Regarding claim 10, Venkatraman et al teach ([0170]) each of the light source of

the plurality of light sources comprises a light emitting diode configured to emit light at a

selected frequency; and the optical sensor comprises one of the group consisting of

photodiode, phototransistors and optical image sensors.

17.    Regarding claim 12, Venkatraman et al teach ([0134]) a first subset of the

plurality of light sources comprises a plurality of light emitting diodes configured to emit

light at a first selected frequency; and a second subset of the plurality of light sources

comprises a plurality of light emitting diodes configured to emit light at a second

selected frequency; wherein when the first subset is emitting light the second subset is

prevented from emitting light.

18.    Regarding claim 13, Venkatraman et al teach a processor coupled to the output

of the analog to digital converter.

19.    Regarding claim 14, Venkatraman et al teach ([0134]) the processor is

configured to control the modulation of at least one of the light sources of the plurality of

light sources.

20.    Regarding claim 15, Venkatraman et al teach ([0115]) the biometric sensor

further comprises a measurement mode and a calibration mode.  That is, figures 21-25

Exhibit 23
-684-

Application/Control Number: 14/618,664                                    Page 6
Art Unit: 2878

teach the calibration where the device determines whether the device is in-door/out-

door and/or in-motion/motionless.

21.     Claim 16 recites method in which the calibration mode to be operated and does

not include further structural limitations.  For this reason, the rejection applied to claim

15 applies to this claim.

### *Claim Rejections - 35 USC § 103*

22.     The following is a quotation of 35 U.S.C. 103 which forms the basis for all

obviousness rejections set forth in this Office action:

> A patent for a claimed invention may not be obtained, notwithstanding that the claimed
> invention is not identically disclosed as set forth in section 102, if the differences between the
> claimed invention and the prior art are such that the claimed invention as a whole would have
> been obvious before the effective filing date of the claimed invention to a person having
> ordinary skill in the art to which the claimed invention pertains. Patentability shall not be
> negated by the manner in which the invention was made.

23.     Claims 4 and 11 is/are rejected under 35 U.S.C. 103 as being unpatentable over

Venkatraman et al in view of Benkely, III (US Patent 8791792).

24.     Regarding claims 4 and 11, Yuen et al teach the invention set forth above.  Yuen

et al do not teach the output amplifier comprises a programmable gain amplifier.

Benkely, III teach a programmable gain amplifier.  It would have been obvious to one of

ordinary skill in the art at the time of invention to implement a programmable gain

control amplifier to improve dynamic range of the device.

25.     Claims 18-20 is/are rejected under 35 U.S.C. 103 as being unpatentable over

Venkatraman et al in view of Durand et al (US patent 7656932).

26.     Regarding claims 18, Venkatraman et al teach the invention set forth above.

Venkatraman et al do not teach sampling the output signal to obtain a matrix of sample;

and determining product of the matrix of samples with a demodulation matrix to obtain a

Exhibit 23
-685-

demodulated matrix.  Durand et al teach (claim 21) obtaining Eigen vector of a product of a matrix and demodulated and obtain a demodulated signal.  It would have been obvious to one of ordinary skill in the art at the time of invention to obtaining Eigen vector of a product of a matrix and demodulated and obtain a demodulated signal because all the claimed elements were known in the prior art and one skilled in the art could have combined the elements as claimed by known methods with no change in their respective functions, and the combination would have yielded predictable results to one of ordinary skill in the art and such mathematical manipulation of data points are known.

27.     Regarding claim 18, the modified Venkatraman teaches the invention set forth above.  The modified Yuen does not specifically teach add/subtracting of samples to the matrix of sample.  It is known to add/subtract/multiply and divide samples including average data points.  It would have been obvious to one of ordinary skill in the art at the time of invention to add/subtract/multiply and divide data because all the claimed elements were known in the prior art and one skilled in the art could have combined the elements as claimed by known methods with no change in their respective functions, and the combination would have yielded predictable results to one of ordinary skill in the art.

28.     Regarding claim 20, Venkatraman et al further teach light is emitted toward the measurement site from a plurality of light sources each comprises a light emitting diode; and light is obtained exiting by an optical sensor comprising one of the group consisting of photodiodes, phototransistors or optical image sensors.

Exhibit 23
-686-

Application/Control Number: 14/618,664                                    Page 8
Art Unit: 2878

### *Response to Arguments*

29.     Applicant's arguments filed 10/31/2016 have been fully considered but they are

not persuasive.  Applicant's representative argues that cited references do not teach "a

selected modulation frequency".  Examiner respectfully disagrees.  Col. 8-9 of Osten et

al teach "the LEDs are timed by clock generator 146 generating intermittent on and off

condition providing two distinct states for the overall light source".  Thus, it is believed

Osten teaches the modulated frequency as claimed.  Applicant further argues the

exclusive nature of low and high pass filter.  However, the exclusion does not appear to

be claimed.  Thus, the arguments are not found persuasive.

### *Conclusion*

30.     **THIS ACTION IS MADE FINAL.**  Applicant is reminded of the extension of time

policy as set forth in 37 CFR 1.136(a).

        A shortened statutory period for reply to this final action is set to expire THREE

MONTHS from the mailing date of this action.  In the event a first reply is filed within

TWO MONTHS of the mailing date of this final action and the advisory action is not

mailed until after the end of the THREE-MONTH shortened statutory period, then the

shortened statutory period will expire on the date the advisory action is mailed, and any

extension fee pursuant to 37 CFR 1.136(a) will be calculated from the mailing date of

the advisory action.  In no event, however, will the statutory period for reply expire later

than SIX MONTHS from the mailing date of this final action.

Exhibit 23
-687-

Application/Control Number: 14/618,664                                     Page 9
Art Unit: 2878

Any inquiry concerning this communication or earlier communications from the
examiner should be directed to TONY KO whose telephone number is (571)272-1926.
The examiner can normally be reached on Monday-Friday 7:30 - 4:00.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's
supervisor, Georgia Epps can be reached on 571-272-2328.  The fax phone number for
the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the
Patent Application Information Retrieval (PAIR) system.  Status information for
published applications may be obtained from either Private PAIR or Public PAIR.
Status information for unpublished applications is available through Private PAIR only.
For more information about the PAIR system, see http://pair-direct.uspto.gov. Should
you have questions on access to the Private PAIR system, contact the Electronic
Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a
USPTO Customer Service Representative or access to the automated information
system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.


/TONY KO/
Primary Examiner, Art Unit 2878

TK

Exhibit 23
-688-

| PTO/SB/08A and B (08-03)<br>U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE<br>Substitute for Form 1449A/PTO<br><br>**INFORMATION DISCLOSURE<br>STATEMENT BY APPLICANT**<br><br>*(Use as many sheets as necessary)* | **APPLICATION NO.:**<br>14/618,664 | **FILING DATE:**<br>February 10, 2015 |
|---|---|---|
| | **FIRST NAMED INVENTOR:**<br>Steven M. Hotelling | **ART UNIT:**<br>2878 |
| | **EXAMINER NAME:**<br>Ko, Tony | **ATTY. DOCKET NO.:**<br>P22733US1 |

### U.S. PATENT DOCUMENTS

| EXAMINER INITIALS* | Cite No. | PATENT NUMBER<br><br>Number – Kind Code[2] (if known) | ISSUE DATE<br><br>MM-DD-YYYY | Name of Patentee of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | A1. | 5,381,696 | 01/1995 | Ichinose | |
| | A2. | 8,508,103 | 08/2013 | Schmitt et al. | |
| | A3. | 8,536,465 | 09/2013 | Hagiwara et al. | |
| | A4. | 9,465,972 | 10/2016 | Chung et al. | |

### U.S. PUBLICATION DOCUMENTS

| EXAMINER INITIALS* | Cite No.[1] | PUBLICATION NUMBER<br><br>Number – Kind Code[2] (if known) | PUBLICATION DATE<br><br>MM-DD-YYYY | Name of Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | B1. | 2008/0175450 | 07/2008 | Scott | |
| | B2. | 2014/0355381 | 12/2014 | Lal et al. | |
| | B3. | 2015/0358740 | 12/2015 | Tsai et al. | |
| | B4. | 2016/0117541 | 04/2016 | Lu et al. | |

### FOREIGN PATENT DOCUMENTS

| EXAMINER INITIALS* | Cite No.[1] | DOCUMENT NUMBER<br><br>Country Code[3] – Number[4] – Kind Code[5] (if known) | PUBLICATION DATE<br><br>MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear | T[6] |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |

### NONPATENT LITERATURE DOCUMENTS

| EXAMINER INITIALS* | Cite No.[1] | Include name of Author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and/or country where published. | T[6] |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

013361\2216\15393311.1

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /T.K/

Exhibit 23
-689-

| PTO/SB/08A and B (08-03)<br>U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE<br>Substitute for Form 1449A/PTO | APPLICATION NO.:<br>14/618,664 | FILING DATE:<br>February 10, 2015 |
|---|---|---|
| **INFORMATION DISCLOSURE<br>STATEMENT BY APPLICANT** | FIRST NAMED INVENTOR:<br>Steven M. Hotelling | ART UNIT:<br>2878 |
| *(Use as many sheets as necessary)* | EXAMINER NAME:<br>Ko, Tony | ATTY. DOCKET NO.:<br>P22733US1 |

| EXAMINER: Initial if citation considered, whether or not citation is in conformance with MPEP 609; Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant. | | |
|---|---|---|
| Examiner Signature | /TONY   KO/ | Date Considered   01/30/2017 |

[1] Applicant's unique citation number (optional).  [2] See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04.  [3] Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3).  [4] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document.  [5] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible.  [6] Applicant is to place a check mark here if English language Translation is attached.

013361\2216\15393311.1

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /T.K/

**Exhibit 23**
**-690-**

| PTO/SB/08A and B (08-03)<br>U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE<br>Substitute for Form 1449A/PTO<br><br>**INFORMATION DISCLOSURE<br>STATEMENT BY APPLICANT**<br><br>*(Use as many sheets as necessary)* | **APPLICATION NO.:**<br>14/618,664 | **FILING DATE:**<br>February 10, 2015 |
|---|---|---|
| | **FIRST NAMED INVENTOR:**<br>Steven M. Hotelling | **ART UNIT:**<br>2878 |
| | **EXAMINER NAME:**<br>Ko, Tony | **ATTY. DOCKET NO.:**<br>P22733US1 |

### U.S. PATENT DOCUMENTS

| EXAMINER INITIALS* | Cite No. | PATENT NUMBER<br>Number – Kind Code² (if known) | ISSUE DATE<br>MM-DD-YYYY | Name of Patentee of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | A1. | 4,729,128 | 03/1988 | Grimes | |
| | A2. | 5,162,618 | 11/1992 | Knowles | |
| | A3. | 6,091,406 | 07/2000 | Kambara | |
| | A4. | 6,159,149 | 12/2000 | Erikson | |
| | A5. | 7,032,454 | 04/2006 | Amano | |
| | A6. | 7,667,374 | 02/2010 | Aono et al. | |
| | A7. | 8,047,995 | 11/2011 | Wakabayashi et al. | |
| | A8. | 8,054,203 | 11/2011 | Breed et al. | |
| | A9. | 8,179,678 | 05/2012 | Yamashita et al. | |
| | A10. | 8,345,508 | 01/2013 | Wodnicki et al. | |
| | A11. | 8,617,078 | 12/2013 | Machida et al. | |
| | A12. | 8,982,089 | 03/2015 | Lim | |
| | A13. | 9,056,082 | 06/2015 | Liautaud et al. | |
| | A14. | 9,100,034 | 08/2015 | Oshima | |
| | A15. | 9,132,693 | 09/2015 | Klootwijk et al. | |
| | A16. | 9,323,393 | 04/2016 | Djordjev et al. | |

### U.S. PUBLICATION DOCUMENTS

| EXAMINER INITIALS* | Cite No.¹ | PUBLICATION NUMBER<br>Number – Kind Code² (if known) | PUBLICATION DATE<br>MM-DD-YYYY | Name of Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | B1. | 2003/0102777 | 06/2003 | Kuniyasu et al. | |
| | B2. | 2008/0142571 | 06/2008 | Yokozuka et al. | |
| | B3. | 2013/0015868 | 01/2013 | Peng | |
| | B4. | 2013/0278111 | 10/2013 | Sammoura et al. | |
| | B5. | 2014/0333328 | 11/2014 | Nelson et al. | |
| | B6. | 2014/0352440 | 12/2014 | Fennell et al. | |
| | B7. | 2014/0359757 | 12/2014 | Sezan et al. | |
| | B8. | 2015/0189136 | 07/2015 | Chung et al. | |
| | B9. | 2016/0063300 | 03/2016 | Du et al. | |

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /T.K/

**Exhibit 23**
**-691-**

| PTO/SB/08A and B (08-03)<br>U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE<br>Substitute for Form 1449A/PTO<br><br>**INFORMATION DISCLOSURE<br>STATEMENT BY APPLICANT**<br><br>***(Use as many sheets as necessary)*** | **APPLICATION NO.:**<br>14/618,664 | **FILING DATE:**<br>February 10, 2015 |
|---|---|---|
| | **FIRST NAMED INVENTOR:**<br>Steven M. Hotelling | **ART UNIT:**<br>2878 |
| | **EXAMINER NAME:**<br>Ko, Tony | **ATTY. DOCKET NO.:**<br>P22733US1 |

### FOREIGN PATENT DOCUMENTS

| EXAMINER INITIALS* | Cite No.[1] | DOCUMENT NUMBER<br>Country Code[2] – Number[4] – Kind Code[5] (if known) | PUBLICATION DATE<br>MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear | T[6] |
|---|---|---|---|---|---|---|
| | C1. | WO 94/002911 | 02/1994 | Toda | | |
| | | | | | | |
| | | | | | | |

### NONPATENT LITERATURE DOCUMENTS

| EXAMINER INITIALS* | Cite No.[1] | Include name of Author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and/or country where published. | T[6] |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

| **EXAMINER:** Initial if citation considered, whether or not citation is in conformance with MPEP 609; Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant. | |
|---|---|
| Examiner Signature    /TONY   KO/ | Date Considered    01/25/2017 |

[1] Applicant's unique citation number (optional). [2] See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04. [3] Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3). [4] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [5] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. [6] Applicant is to place a check mark here if English language Translation is attached.

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /T.K/

**Exhibit 23**
**-692-**

| *Search Notes* | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 14618664 | HOTELLING ET AL. |
| | Examiner | Art Unit |
| | TONY KO | 2878 |

| CPC- SEARCHED | | |
|---|---|---|
| Symbol | Date | Examiner |
| g01j1/44 | 7/22/2016 | tk |
| a61b5/4845 | 7/22/2016 | tk |
| a61b5/1118 | 7/22/2016 | tk |
| a61b5/4872 | 7/22/2016 | tk |
| a61b5/02427 | 7/22/2016 | tk |
| g01j2001/444 | 7/22/2016 | tk |

| CPC COMBINATION SETS  - SEARCHED | | |
|---|---|---|
| Symbol | Date | Examiner |
| | | |

| US CLASSIFICATION SEARCHED | | | |
|---|---|---|---|
| Class | Subclass | Date | Examiner |
| | | | |

| SEARCH NOTES | | |
|---|---|---|
| Search Notes | Date | Examiner |
| see EAST search history | 7/22/2016 | tk |

| INTERFERENCE SEARCH | | | |
|---|---|---|---|
| US Class/ CPC Symbol | US Subclass / CPC Group | Date | Examiner |
| | | | |

| | |
|---|---|
| | |

**Exhibit 23**
**-693-**

| PTO/SB/08A and B (08-03) U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE Substitute for Form 1449A/PTO | | APPLICATION NO.: 14/618,664 | FILING DATE: February 10, 2015 |
|---|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** | | FIRST NAMED INVENTOR: Steven M. Hotelling | ART UNIT: 2878 |
| ***(Use as many sheets as necessary)*** | | EXAMINER NAME: Ko, Tony | ATTY. DOCKET NO.: P22733US1 |

### U.S. PATENT DOCUMENTS

| EXAMINER INITIALS* | Cite No. | PATENT NUMBER | ISSUE DATE | Name of Patentee of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | | Number – Kind Code² (if known) | MM-DD-YYYY | | |
| | A1. | 5,381,696 | 01/1995 | Ichinose | |
| | A2. | 8,508,103 | 08/2013 | Schmitt et al. | |
| | A3. | 8,536,465 | 09/2013 | Hagiwara et al. | |
| | A4. | 9,465,972 | 10/2016 | Chung et al. | |

### U.S. PUBLICATION DOCUMENTS

| EXAMINER INITIALS* | Cite No.¹ | PUBLICATION NUMBER | PUBLICATION DATE | Name of Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | | Number – Kind Code² (if known) | MM-DD-YYYY | | |
| | B1. | 2008/0175450 | 07/2008 | Scott | |
| | B2. | 2014/0355381 | 12/2014 | Lal et al. | |
| | B3. | 2015/0358740 | 12/2015 | Tsai et al. | |
| | B4. | 2016/0117541 | 04/2016 | Lu et al. | |

### FOREIGN PATENT DOCUMENTS

| EXAMINER INITIALS* | Cite No.¹ | DOCUMENT NUMBER | PUBLICATION DATE | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear | T⁶ |
|---|---|---|---|---|---|---|
| | | Country Code² – Number⁴ – Kind Code⁵ (if known) | MM-DD-YYYY | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

### NONPATENT LITERATURE DOCUMENTS

| EXAMINER INITIALS* | Cite No.¹ | Include name of Author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and/or country where published. | T⁶ |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

| PTO/SB/08A and B (08-03) U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE Substitute for Form 1449A/PTO | APPLICATION NO.: 14/618,664 | FILING DATE: February 10, 2015 |
|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** | FIRST NAMED INVENTOR: Steven M. Hotelling | ART UNIT: 2878 |
| *(Use as many sheets as necessary)* | EXAMINER NAME: Ko, Tony | ATTY. DOCKET NO.: P22733US1 |

| EXAMINER: Initial if citation considered, whether or not citation is in conformance with MPEP 609; Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant. | | |
|---|---|---|
| Examiner Signature | | Date Considered | |

[1] Applicant's unique citation number (optional).  [2] See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04.  [3] Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3).  [4] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document.  [5] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible.  [6] Applicant is to place a check mark here if English language Translation is attached.

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 28191545 |
| **Application Number:** | 14618664 |
| **International Application Number:** | |
| **Confirmation Number:** | 1097 |
| **Title of Invention:** | Methods and Systems for Modulation and Demodulation of Optical Signals |
| **First Named Inventor/Applicant Name:** | Steven P. Hotelling |
| **Customer Number:** | 62579 |
| **Filer:** | Stephen C. Hemenway/Valerie Brown |
| **Filer Authorized By:** | Stephen C. Hemenway |
| **Attorney Docket Number:** | P22733US1 |
| **Receipt Date:** | 27-JAN-2017 |
| **Filing Date:** | 10-FEB-2015 |
| **Time Stamp:** | 15:13:09 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | no |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Transmittal Letter | P22733US1IDS.pdf | 19125<br>d191087200eaa99e8c52b524f260d11d1d0<br>444f6 | no | 2 |

**Warnings:**

Exhibit 23
-696-

**Information:**

| 2 | Information Disclosure Statement (IDS) Form (SB08) | P22733US1PTOSB08.pdf | 30721<br><br>d85d19631ca9d8dd7f eac39028f3e5e4cbf 87183 | no | 2 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

This is not an USPTO supplied IDS fillable form

| | | | |
|---|---|---|---|
| | **Total Files Size (in bytes):** | | 49846 |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

**Exhibit 23**
**-697-**

Attorney Docket No. P22733US1

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re the Application of: | |
| Steven M. Hotelling, et al. | Examiner:   Ko, Tony. |
| Application No. 14/618,664 | Art Unit:   2878 |
| Filed:  February 10, 2015 | Confirmation No.   1097 |
| For:   METHODS AND SYSTEMS FOR MODULATION AND DEMODULATION OF OPTICAL SIGNALS | |

**INFORMATION DISCLOSURE STATEMENT**
**UNDER 37 C.F.R. §§ 1.97(c)(1), 1.97(e)(2), and 1.98**

Mail Stop AMENDMENT
Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Sir:

The Examiner is requested to consider the references noted on the enclosed Form PTO/SB/08a during examination of the above-identified patent application.  These references are submitted for the Examiner's consideration and are submitted pursuant to the duty of disclosure under 37 C.F.R. § 1.56.  In submitting these references, no representation is made or implied that the references are or are not material to the examination of the application.  The Examiner is requested to make his or her own determination of materiality.  Pursuant to the requirements of 37 C.F.R. § 1.98(a)(2)(ii), only copies of the foreign references and non-patent literature documents are provided.  Copies of the U.S. patent and U.S. patent application publication references are not provided, unless required by the Office.

This Information Disclosure Statement is filed after the period specified in 37 C.F.R. § 1.97(b), but before the mailing date of either (1) a final Office action or (2) a Notice of Allowance.  Accordingly, this Information Disclosure Statement requires a statement according to 37 C.F.R. § 1.97(e).

1

Exhibit 23
-698-

Attorney Docket No. P22733US1

**Statement Under 37 C.F.R. § 1.97(e)(2)**

No item of information contained in the Information Disclosure Statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to my knowledge after making reasonable inquiry, no item of information contained in the Information Disclosure Statement was known to any individual designated in 37 C.F.R. § 1.56(c) more than three months prior to the filing of the Information Disclosure Statement.

The Assignee believes no fees or petitions are due with this filing.  However, should any such fees or petitions be required, please consider this a request therefor and authorization to charge Deposit Account No. 504621 as necessary.

If the Examiner has any questions, please contact the undersigned attorney.

Dated:  January 27, 2017.

Respectfully submitted,

/S. Craig Hemenway/
S. Craig Hemenway, Registration No. 44,759
Attorney for Assignee
USPTO Customer No. 62579

Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, Colorado  80202
Phone: (303) 223-1100
Fax: (303) 223-1111

013361\2216\15393316.1

**Exhibit 23**
**-699-**

Attorney Docket No. P22733US1

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of:

| | | | |
|---|---|---|---|
| Inventor(s): | Steven M. Hotelling, et al. | | |
| App. No.: | 14/618,664 | Con. No.: | 1097 |
| Filed: | February 10, 2015 | Art Unit: | 2878 |
| Title: | METHODS AND SYSTEMS FOR MODULATION AND DEMODULATION OF OPTICAL SIGNALS | Examiner: | Ko, Tony |

**AMENDMENT AND RESPONSE TO OFFICE ACTION**

Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Sir:

In response to the Office action dated July 29, 2016, please consider the following remarks and amend the above-identified application as follows:

**Amendments to the Claims** begin on page 2 of this paper.

**Remarks** begin on page 6 of this paper.

**Exhibit 23**
**-700-**

Attorney Docket No. P22733US1

**Amendments to the Claims:**

1.       (Currently Amended)  An electronic device comprising:

a housing comprising a surface adapted to be positioned proximate a measurement site of a subject;

a biometric sensor positioned at least partially within the surface and comprising:

a plurality of light sources for emitting light toward the measurement site <u>at a selected modulation frequency</u>; and

an optical sensor for obtaining light exiting the measurement site; and

an input amplifier coupled to the output of the biometric sensor and disposed within the housing;

a high pass filter coupled to an output of the input amplifier and disposed within the housing;

an output amplifier coupled to an output of the high pass filter and disposed within the housing; and

an analog to digital converter coupled to an output of the output amplifier and disposed within the housing.

2.       (Original)  The electronic device of claim 1, wherein:

each light source of the plurality of light sources comprises a light emitting diode; and

the optical sensor comprises one of the group consisting of photodiodes, phototransistors, or optical image sensors.

3.       (Original)  The electronic device of claim 1, wherein the input amplifier comprises a transimpedance amplifier.

4.       (Original)  The electronic device of claim 1, wherein the output amplifier comprises a programmable gain amplifier.

5.       (Original)  The electronic device of claim 1, further comprising a processor coupled to the output of the analog to digital converter.

**Exhibit 23**
**-701-**

Attorney Docket No. P22733US1

6.      (Currently Amended)  The electronic device of claim 1, wherein the processor is configured to control each of the plurality of light sources of the biometric sensor the light source of the optical sensor.

7.      (Original)  The electronic device of claim 6, wherein the biometric sensor further comprises a measurement mode and a calibration mode.

8.      (Original)  The electronic device of claim 7, wherein the calibration mode comprises:
        deactivating all light sources for a selected time period;
        activating a first light source of the plurality of light sources for a selected time period; and
        deactivating all light sources for a selected time period.

9.      (Original)  A sensor system for measuring a periodic biometric characteristic of a subject, the sensor system comprising:
        a plurality of light sources operative to emit a series light pulses at a selected modulation frequency toward a measurement site of the subject;
        an optical sensor operative to receive light exiting a portion of the measurement site, the light originating from the series of light pulses;
        a transimpedance input amplifier coupled to the output of the optical sensor;
        a high pass filter coupled to the transimpedance input amplifier and configured to filter frequencies higher than the selected modulation frequency;
        an output amplifier coupled of the high pass filter and configured to amplify an output of the high pass filter; and
        an analog to digital converter coupled to the output amplifier configured to associate a signal amplitude of the output amplifier with a digital value.

10.     (Original)  The sensor system of claim 9, wherein:
        each of the light source of the plurality of light sources comprises a light emitting diode configured to emit light at a selected frequency; and
        the optical sensor comprises one of the group consisting of photodiodes, phototransistors, and optical image sensors.

Exhibit 23
-702-

Attorney Docket No. P22733US1

11.      (Original)  The sensor system of claim 9, wherein the input amplifier comprises a transimpedance amplifier; and

the output amplifier comprises a programmable gain amplifier.

12.      (Original)  The sensor system of claim 9, wherein:

a first subset of the plurality of light sources comprises a plurality of light emitting diodes configured to emit light at a first selected frequency; and

a second subset of the plurality of light sources comprises a plurality of light emitting diodes configured to emit light at a second selected frequency;

wherein when the first subset is emitting light the second subset is prevented from emitting light.

13.      (Original)  The sensor system of claim 9, further comprising a processor coupled to the output of the analog to digital converter.

14.      (Original)  The sensor system of claim 9, wherein the processor is configured to control the modulation of at least one of the light sources of the plurality of light sources.

15.      (Original)  The sensor system of claim 14, wherein the biometric sensor further comprises a measurement mode and a calibration mode.

16.      (Original)  The electronic device of claim 15, wherein the calibration mode comprises:

deactivating all light sources for a selected time period;

activating a first light source of the plurality of light sources for a selected time period; and

deactivating all light sources for a selected time period.

17.      (Currently Amended)  A method of optical sensing, comprising:

emitting light toward a measurement site of a subject at a selected modulation frequency;

obtaining light exiting the measurement site;

converting the obtained light to an electrical signal;

amplifying the electrical signal to obtain an amplified signal;

**Exhibit 23**
**-703-**

Attorney Docket No. P22733US1

filtering low frequency elements from the amplified signal to obtain a filtered signal; and amplifying the filtered signal to obtain an output signal.

18.     (Original)  The method of claim 17, further comprising:

sampling the output signal to obtain a matrix of samples; and

determining product of the matrix of samples with a demodulation matrix to obtain a demodulated matrix.

19.     (Original)  The method of claim 18, wherein sampling the output signal to obtain a matrix of samples comprises:

taking a first sample;

taking a second sample;

taking a third sample;

subtracting the average of the first and third sample from the second sample to obtain an output sample; and

adding the output sample the matrix of samples.

20.     (Original)  The method of claim 17, wherein:

light is emitted toward the measurement site from a plurality of light sources each comprising a light emitting diode; and

light is obtained exiting by an optical sensor comprising one of the group consisting of photodiodes, phototransistors, or optical image sensors.

**Exhibit 23**
**-704-**

Attorney Docket No. P22733US1

## REMARKS

This paper is submitted in response to the Office action mailed on July 29, 2016.  This paper amends claims 1, 6, and 17.  Accordingly, after entry of this Amendment and Response, claims 1 - 20 will be pending, with claims 1, 9 and 17 being independent.

### I.  Claim Rejections Under 35 U.S.C. § 112

The Examiner rejected claim 6 under 35 U.S.C. § 112(b) as being indefinite. Claim 6 is amended herein. The Assignee submits that the rejection of claim 6 is rendered moot.

### II.  Claim Rejections Under 35 U.S.C. § 102

The Examiner rejected claims 1, 2, 5, 17 and 20 under 35 U.S.C. § 102 as being anticipated by Osten et al. (U.S. Patent No. 5,719,950; hereinafter "Osten").  In addition or in the alternative, the Examiner rejected claims 1-3, 5-10 and 12-16 under 35 U.S.C. § 102 as being anticipated by Venkatraman et al. (U.S. Patent No. 9,044,171; hereinafter "Venkatraman").

Amended independent claim 1 recites, among other limitations, "a biometric sensor … comprising … a plurality of light sources for emitting light toward the measurement site **at a selected modulation frequency**." (emphasis added). Claim 1 also requires, among other limitations, "a high pass filter **coupled to an output of the input amplifier**" (emphasis added). Independent claims 9 and 17 each recite similar subject matter.

The Assignee has reviewed the cited references and submits that none of the cited references, disclose, teach, or suggest a biometric sensor configured to emit light toward a measurement site at a selected modulation frequency and, in addition, filter an output signal of an initial amplifier using a high-pass filter. In fact, Osten specifically discloses loss pass filtration 192, 202 *prior to* high pass filtering of an output from an amplified signal. The Assignee submits that high pass filtering and low pass filtering, by definition, provide opposite, mutually-exclusive, and non-substitutable functionality. As such, the Assignee submits that Osten cannot be used in support of either a novelty or obviousness rejection of claims 1, 9, or 17.

Similarly, the Assignee submits that Venkatraman does not disclose a high-pass filter coupled to an output of an input amplifier. Instead, Venkatraman discloses a "sample and hold" stage which necessarily will filter high-frequency components during the "hold" operation. As such, the Assignee submits that Venkatraman, like Osten, cannot be used in support of either a novelty or obviousness rejection of claims 1, 9, or 17.

**Exhibit 23**
**-705-**

"Claims in dependent form shall be construed to include all the limitations of the claim incorporated by reference into the dependent claim." 37 CFR §1.75.  Claims 2, 3, 5-8, 10, 12-16, and 20 depend directly or indirectly from independent claims 1, 9, or 17.  Accordingly, the Assignee submits that claims 2, 3, 5-8, 10, 12-16, and 20 are not anticipated by Osten or Venkatraman for at least the same reason that claims 1, 9, and 17 are not anticipated by Osten or Venkatraman.

### III.  Remaining Dependent Claims

The Examiner rejected claims 4 and 11 under 35 U.S.C. § 103(a) as being obvious over Venkatraman in view of Benkley III (U.S. Patent No. 8,791,792). In addition, the Examiner rejected claims 18-20 under 35 U.S.C. § 103(a) as being obvious over Venkatraman in view of Durand et al. (U.S. Patent No. 7,656,932).

The remaining claims depend from an independent claim referenced above. As such, the Assignee submits that such claims should be allowable at least insofar as each depends from a patentably distinct base claim. The Assignee makes this statement without waiving and without reference to any independent bases of patentability recited by these claims and accordingly expressly reserves the right to argue such bases in a future paper if required.

### IV.  Conclusion

The Assignee thanks the Examiner for the thorough review of the application.  The Assignee respectfully submits the present application, as amended, is in condition for allowance and respectfully requests the issuance of a Notice of Allowability as soon as practicable.

**Exhibit 23**
**-706-**

Attorney Docket No. P22733US1

The Assignee believes no fees or petitions are due with this filing.  However, should any such fees or petitions be required, please consider this a request therefor and authorization to charge Deposit Account No. 504621 as necessary.

If the Examiner should require any additional information or amendment, please contact the undersigned attorney.

Dated:  October 31, 2016.

Respectfully submitted,


_____/Nancy R. Simon/_____
Nancy R. Simon, Registration No. 36,930
Attorney for Assignee
USPTO Customer No. 62579

Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, Colorado  80202
Phone:  303-223-1100
Fax:  303-223-1111

**Exhibit 23**
**-707-**

# Electronic Acknowledgement Receipt

| EFS ID: | 27376138 |
|---|---|
| Application Number: | 14618664 |
| International Application Number: | |
| Confirmation Number: | 1097 |
| Title of Invention: | Methods and Systems for Modulation and Demodulation of Optical Signals |
| First Named Inventor/Applicant Name: | Steven P. Hotelling |
| Customer Number: | 62579 |
| Filer: | Stephen C. Hemenway/Valerie Brown |
| Filer Authorized By: | Stephen C. Hemenway |
| Attorney Docket Number: | P22733US1 |
| Receipt Date: | 31-OCT-2016 |
| Filing Date: | 10-FEB-2015 |
| Time Stamp: | 18:14:57 |
| Application Type: | Utility under 35 USC 111(a) |

## Payment information:

| Submitted with Payment | no |
|---|---|

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Amendment/Req. Reconsideration-After Non-Final Reject | P22733US1Amendment.pdf | 44747 <br> b0b9da6c4e595708cd2fd1c72687d4eb68b 01dc0 | no | 8 |

**Warnings:**

Exhibit 23
-708-

**Information:**

| | | |
|---|---|---|
| | **Total Files Size (in bytes):** | 44747 |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

<u>New Applications Under 35 U.S.C. 111</u>
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

<u>National Stage of an International Application under 35 U.S.C. 371</u>
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

<u>New International Application Filed with the USPTO as a Receiving Office</u>
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

**Exhibit 23**
**-709-**

| PTO/SB/08A and B (08-03)<br>U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE<br>Substitute for Form 1449A/PTO | APPLICATION NO.:<br>14/618,664 | FILING DATE:<br>February 10, 2015 |
|---|---|---|
| **INFORMATION DISCLOSURE**<br>**STATEMENT BY APPLICANT** | FIRST NAMED INVENTOR:<br>Steven M. Hotelling | ART UNIT:<br>2878 |
| *(Use as many sheets as necessary)* | EXAMINER NAME:<br>Ko, Tony | ATTY. DOCKET NO.:<br>P22733US1 |

### U.S. PATENT DOCUMENTS

| EXAMINER INITIALS* | Cite No. | PATENT NUMBER<br>Number – Kind Code² (if known) | ISSUE DATE<br>MM-DD-YYYY | Name of Patentee of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | A1. | 4,729,128 | 03/1988 | Grimes | |
| | A2. | 5,162,618 | 11/1992 | Knowles | |
| | A3. | 6,091,406 | 07/2000 | Kambara | |
| | A4. | 6,159,149 | 12/2000 | Erikson | |
| | A5. | 7,032,454 | 04/2006 | Amano | |
| | A6. | 7,667,374 | 02/2010 | Aono et al. | |
| | A7. | 8,047,995 | 11/2011 | Wakabayashi et al. | |
| | A8. | 8,054,203 | 11/2011 | Breed et al. | |
| | A9. | 8,179,678 | 05/2012 | Yamashita et al. | |
| | A10. | 8,345,508 | 01/2013 | Wodnicki et al. | |
| | A11. | 8,617,078 | 12/2013 | Machida et al. | |
| | A12. | 8,982,089 | 03/2015 | Lim | |
| | A13. | 9,056,082 | 06/2015 | Liautaud et al. | |
| | A14. | 9,100,034 | 08/2015 | Oshima | |
| | A15. | 9,132,693 | 09/2015 | Klootwijk et al. | |
| | A16. | 9,323,393 | 04/2016 | Djordjev et al. | |

### U.S. PUBLICATION DOCUMENTS

| EXAMINER INITIALS* | Cite No.¹ | PUBLICATION NUMBER<br>Number – Kind Code² (if known) | PUBLICATION DATE<br>MM-DD-YYYY | Name of Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | B1. | 2003/0102777 | 06/2003 | Kuniyasu et al. | |
| | B2. | 2008/0142571 | 06/2008 | Yokozuka et al. | |
| | B3. | 2013/0015868 | 01/2013 | Peng | |
| | B4. | 2013/0278111 | 10/2013 | Sammoura et al. | |
| | B5. | 2014/0333328 | 11/2014 | Nelson et al. | |
| | B6. | 2014/0352440 | 12/2014 | Fennell et al. | |
| | B7. | 2014/0359757 | 12/2014 | Sezan et al. | |
| | B8. | 2015/0189136 | 07/2015 | Chung et al. | |
| | B9. | 2016/0063300 | 03/2016 | Du et al. | |

| PTO/SB/08A and B (08-03)<br>U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE<br>Substitute for Form 1449A/PTO | APPLICATION NO.:<br>14/618,664 | FILING DATE:<br>February 10, 2015 |
|---|---|---|
| **INFORMATION DISCLOSURE<br>STATEMENT BY APPLICANT** | FIRST NAMED INVENTOR:<br>Steven M. Hotelling | ART UNIT:<br>2878 |
| ***(Use as many sheets as necessary)*** | EXAMINER NAME:<br>Ko, Tony | ATTY. DOCKET NO.:<br>P22733US1 |

## FOREIGN PATENT DOCUMENTS

| EXAMINER INITIALS* | Cite No.[1] | DOCUMENT NUMBER<br>Country Code[2] – Number[3] – Kind Code[5] (if known) | PUBLICATION DATE<br>MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear | T[6] |
|---|---|---|---|---|---|---|
| | C1. | WO 94/002911 | 02/1994 | Toda | | |
| | | | | | | |
| | | | | | | |

## NONPATENT LITERATURE DOCUMENTS

| EXAMINER INITIALS* | Cite No.[1] | Include name of Author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and/or country where published. | T[6] |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

| EXAMINER: Initial if citation considered, whether or not citation is in conformance with MPEP 609; Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant. | | |
|---|---|---|
| Examiner Signature | | Date Considered |

[1] Applicant's unique citation number (optional).  [2] See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04.  [3] Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3).  [4] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document.  [5] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible.  [6] Applicant is to place a check mark here if English language Translation is attached.

## PCT

WORLD INTELLECTUAL PROPERTY ORGANIZATION
International Bureau

INTERNATIONAL APPLICATION PUBLISHED UNDER THE PATENT COOPERATION TREATY (PCT)

| (51) International Patent Classification 5 : | | (11) International Publication Number: | WO 94/02911 |
|---|---|---|---|
| G06K 11/14 | A1 | (43) International Publication Date: | 3 February 1994 (03.02.94) |

(21) International Application Number:  PCT/JP93/01028

(22) International Filing Date:  23 July 1993 (23.07.93)

(30) Priority data:
| 4/218335 | 24 July 1992 (24.07.92) | JP |
| 4/218336 | 24 July 1992 (24.07.92) | JP |
| 4/218338 | 24 July 1992 (24.07.92) | JP |
| 4/254151 | 27 August 1992 (27.08.92) | JP |
| 4/254152 | 27 August 1992 (27.08.92) | JP |
| 4/317700 | 2 November 1992 (02.11.92) | JP |
| 5/15533 | 2 February 1993 (02.02.93) | JP |
| 5/160473 | 5 June 1993 (05.06.93) | JP |

(71)(72) Applicant and Inventor: TODA, Kohji [JP/JP]; 49-18, Futaba 1-chome, Yokosuka-shi, Kanagawa-ken 239 (JP).

(74) Agents: ISHIKAWA, Yasuo et al.; Ishida Building 8F, 2-17, Nihombashi-hongokucho 4-chome, Chuo-ku, Tokyo 103 (JP).

(81) Designated States: AU, CA, KR, US, European patent (AT, BE, CH, DE, DK, ES, FR, GB, GR, IE, IT, LU, MC, NL, PT, SE).

Published
*With international search report.*

(54) Title: ULTRASONIC TOUCH SYSTEM



(57) Abstract

An ultrasonic touch system including a substrate and at least an ultrasonic transducing system on one end surface (Z1) of the substrate. The ultrasonic transducing system comprises at least an interdigital transducer (P) and at least an interdigital transducer (Q) corresponding to the interdigital transducer (P). An electric signal having a frequency approximately corresponding to the interdigital periodicity of the interdigital transducer (P) is applied to the interdigital transducer (P), causing the acoustic wave on the end surface (Z1) with a high efficiency, the acoustic wave having a wavelength approximately equal to the interdigital periodicity of the interdigital transducer (P). At this time, an electric signal having a frequency approximately corresponding to the wavelength of the acoustic wave generated on the end surface (Z1) is detected at the interdigital transducer (Q). When touching with a finger or other things on a part of the propagation medium of the acoustic wave on the end surface (Z1), the electric signal detected at the interdigital transducer (Q) is decreased. A touch on the substrate by a finger or other things is accordingly detected with a high sensitivity and a quick response time under operation with low power consumption and low voltage.

Exhibit 23
-712-

7/24/2016, EAST Version: 3.2.1.1

## FOR THE PURPOSES OF INFORMATION ONLY

Codes used to identify States party to the PCT on the front pages of pamphlets publishing international applications under the PCT.

| | | | | | |
|---|---|---|---|---|---|
| AT | Austria | FR | France | MR | Mauritania |
| AU | Australia | GA | Gabon | MW | Malawi |
| BB | Barbados | GB | United Kingdom | NE | Niger |
| BE | Belgium | GN | Guinea | NL | Netherlands |
| BF | Burkina Faso | GR | Greece | NO | Norway |
| BG | Bulgaria | HU | Hungary | NZ | New Zealand |
| BJ | Benin | IE | Ireland | PL | Poland |
| BR | Brazil | IT | Italy | PT | Portugal |
| BY | Belarus | JP | Japan | RO | Romania |
| CA | Canada | KP | Democratic People's Republic | RU | Russian Federation |
| CF | Central African Republic | | of Korea | SD | Sudan |
| CG | Congo | KR | Republic of Korea | SE | Sweden |
| CH | Switzerland | KZ | Kazakhstan | SI | Slovenia |
| CI | Côte d'Ivoire | LI | Liechtenstein | SK | Slovak Republic |
| CM | Cameroon | LK | Sri Lanka | SN | Senegal |
| CN | China | LU | Luxembourg | TD | Chad |
| CS | Czechoslovakia | LV | Latvia | TG | Togo |
| CZ | Czech Republic | MC | Monaco | UA | Ukraine |
| DE | Germany | MG | Madagascar | US | United States of America |
| DK | Denmark | ML | Mali | UZ | Uzbekistan |
| ES | Spain | MN | Mongolia | VN | Viet Nam |
| FI | Finland | | | | |

**Exhibit 23**
-713-

# ULTRASONIC TOUCH SYSTEM

## BACKGROUND OF THE INVENTION

1. Field of the Invention.

The present invention relates to an ultrasonic touch system, having a substrate and an ultrasonic transducing system on one end surface thereof, for sensing a touch on the end surface of the substrate with a finger or other things, the ultrasonic transducing system comprising ultrasonic input and output devices, composed of at least one interdigital transducer, respectively.

2. Description of the Prior Art.

Conventional touch panels are classified into two types, resistance film−type and ultrasonic type. The resistance film−type touch panel has an electrically conductive transparent film, the magnitude of the resistance of the transparent film changing when touching on the transparent film. The resistance film−type touch panel operating under low power consumption has some problems on response time, sensitivity, durability and others. The ultrasonic type touch panel has a nonpiezoelectric plate under acoustic

− 1 −

Exhibit 23
-714-

vibration, which is decreased when touching on the nonpiezoelectric plate.
Conventional means for generating the acoustic vibration on a nonpiezoelectric
plate include a means for vibrating a nonpiezoelectric plate indirectly by a
wedge−shaped transducer with a bulk wave vibrator, a means for vibrating a
nonpiezoelectric plate directly by a piezoelectric thin film transducer and other
means.    The wedge−shaped transducer is used for a non−destruction
evaluation by ultrasound and for others under only a comparative low frequency
operation because of the difficulty on manufacturing accuracy of the wedge
angle and so on.    The piezoelectric thin film transducer, in which a
piezoelectric thin film made from ZnO and others is mounted on a
nonpiezoelectric plate with interdigital transducers generating acoustic
vibration thereon, is used as a high frequency device for the reason that the
interdigital transducer shows various transmission characteristics according to
the structure thereof.    However, the piezoelectric thin film transducer has
operation frequencies limited to the UHF and VHF bands, and has some
problems on manufacturing and mass−producing.  Thus, there are some
problems   on   response   time,   sensitivity,   durability,   manufacturing,
mass−producing and others in conventional touch panels having limited
operation frequencies.

- 2 -

Exhibit 23
-715-

## SUMMARY OF THE INVENTION

An object of the present invention is to provide a touch system capable of generating an acoustic vibration on a substrate with a high efficiency.

Another object of the present invention is to provide a touch system capable of sensing a touch on the substrate with a finger or other things with a high sensitivity and a quick response time.

Another object of the present invention is to provide a touch system excellent in durability, manufacturing, mass−producing and others.

A still other object of the present invention is to provide a touch system operating under low power consumption with low voltage.

A still further object of the present invention is to provide a touch system with a small size which is very light in weight and has a simple structure.

According to one aspect of the present invention there is provided a touch system comprising a substrate and at least an ultrasonic transducing system on one end surface Z1 of the substrate, the ultrasonic transducing system comprising at least one interdigital transducer P and at least one interdigital transducer Q corresponding to the interdigital transducer P.

− 3 −

Exhibit 23
-716-

According to another aspect of the present invention there is provided a means for applying the interdigital transducer P with an electric signal having a frequency approximately corresponding to the interdigital periodicity of the interdigital transducer P, and then generating the acoustic wave, having a wavelength approximately equal to the interdigital periodicity, on the end surface Z1.

According to another aspect of the present invention there is provided a means for delivering an electric signal, having a frequency approximately corresponding to the wavelength of the acoustic wave on the end surface Z1, from the interdigital transducer Q, the interdigital transducers P and Q being arranged face to face each other to make a pair such that the transmitting direction of the acoustic wave by the interdigital transducer P is the same as the receiving direction of the acoustic wave by the interdigital transducer Q.

According to another aspect of the present invention there is provided a means for sensing a touch with a finger or other things on a part of the propagation medium of the acoustic wave on the end surface Z1 by the magnitude of the electric signal detected at the interdigital transducer Q.

According to another aspect of the present invention there is provided a substrate made from an almost transparent piezoelectric ceramic, the direction of the polarization axis thereof being parallel to the direction of

– 4 –

Exhibit 23
-717-

thickness thereof, the interdigital transducers P and Q being mounted on the end surface Z1 directly.

According to another aspect of the present invention there is provided a substrate made from a nonpiezoelectric body, the ultrasonic transducing system comprising an input device A, consisting of a piezoelectric thin plate TA and the interdigital transducer P mounted thereon, and an output device B consisting of a piezoelectric thin plate TB and the interdigital transducer Q mounted thereon, the piezoelectric thin plates TA and TB being mounted on the end surface Z1.

According to another aspect of the present invention there is provided an ultrasonic transducing system comprising N interdigital transducers $P_i$ (i = 1, 2, $\cdots$, N) and N interdigital transducer groups $Q_i$ (i = 1, 2, $\cdots$, N) consisting of at least two interdigital transducers, $Q_{i-1}$ and $Q_{i-2}$.

According to another aspect of the present invention there is provided a connection point $M_1$, each output terminal of the interdigital transducers $Q_{i-1}$ being connected with each other thereat.

According to another aspect of the present invention there is provided a connection point $M_2$, each output terminal of the interdigital transducers $Q_{i-2}$ being connected with each other thereat, a touch with a finger or other things on a part of the propagation medium of the acoustic wave on the end

- 5 -

Exhibit 23
-718-

surface Z1 being detected by the magnitudes of the electric signals delivered from the connection points $M_1$ and $M_2$, respectively.

According to another aspect of the present invention there are provided N switches $S_i$ (i = 1, 2, $\cdots$, N), output terminal thereof being connected with each input terminal of the interdigital transducers $P_i$.

According to another aspect of the present invention there is provided a means for controlling turn on and off of the switches $S_i$ with a fixed period in turn.

According to another aspect of the present invention there is provided a connection point MS, each input terminal of the switches $S_i$ being connected with each other thereat.

According to other aspect of the present invention there is provided an amplifier, the connection point $M_1$ being connected with the connection point MS through the amplifier.

According to a further aspect of the present invention there are provided N oscillators $H_i$ (i = 1, 2, $\cdots$, N) including N corresponding propagation paths $D_i$ (i = 1, 2, $\cdots$, N) as delay elements, the propagation paths $D_i$ comprising the substrate between the interdigital transducers $P_i$ and the interdigital transducers $Q_{i-1}$, the respective signal loops of the oscillators $H_i$ comprising the interdigital transducers $P_i$, the propagation paths $D_i$, the

- 6 -

Exhibit 23
-719-

interdigital transducers $Q_{i-1}$ and the amplifier.


## BRIEF DESCRIPTION OF THE DRAWINGS


Other features and advantages of the invention will be clarified from the following description with reference to the attached drawings.

FIGURE 1 shows a sectional view of the ultrasonic touch system according to a first embodiment of the present invention.

FIGURE 2 shows the relationship between the phase velocity of the acoustic wave of each mode in the piezoelectric thin plate 2 and the kd value or the $d/\lambda$ value.

FIGURE 3 shows the relationship between the phase velocity of the acoustic wave of each mode in the piezoelectric thin plate 2 and the kd value or the $d/\lambda$ value.

FIGURE 4 shows the relationship between the kd value or the $d/\lambda$ value, and the electromechanical coupling constant $k^2$.

FIGURE 5 shows the relationship between the $k^2$ value and the kd value or the $d/\lambda$ value.

FIGURE 6 shows the relationship between the $k^2$ value and the kd

Exhibit 23
-720-

value or the d/$\lambda$ value.

FIGURE 7 shows the relationship between the $k^2$ value and the kd value or the d/$\lambda$ value.

FIGURE 8 shows the relationship between the displacement and the depth under the fd value of 1.0 MHz·mm, corresponding to the nearly maximum $k^2$ value in the first mode acoustic wave.

FIGURE 9 shows the relationship between the displacement and the depth under the fd value of 2.0 MHz·mm, corresponding to the nearly maximum $k^2$ value in the second mode acoustic wave.

FIGURE 10 shows the relationship between the displacement and the depth under the fd value of 3.0 MHz·mm, corresponding to the nearly maximum $k^2$ value in the third mode acoustic wave.

FIGURE 11 shows the relationship between the displacement and the depth under the fd value of 0.7 MHz·mm in the 0−th mode acoustic wave.

FIGURE 12 shows a plan view of the ultrasonic touch system according to a second embodiment of the present invention.

FIGURE 13 shows a perspective view of the input device DT1 seen in FIGURE 12.

FIGURE 14 shows a schematic illustration of the ultrasonic touch system, shown in FIGURE 12, under an rf pulse operation.

− 8 −

Exhibit 23
-721-

FIGURE 15 shows a schematic illustration of the ultrasonic touch system, shown in FIGURE 12, under an operation with a delay line oscillator.

FIGURE 16 shows a plan view of the ultrasonic touch system according to a third embodiment of the present invention.

FIGURE 17 shows a plan view of the input device DTX and the output device DRX in the ultrasonic touch system shown in FIGURE 16.

FIGURE 18 (a) shows a plan view of an interdigital transducer taking the place of that seen in FIGURE 16.

FIGURE 18 (b) shows a plan view of an interdigital transducer taking the place of that seen in FIGURE 16.

FIGURE 19 shows a schematic illustration of the ultrasonic touch system, shown in FIGURE 16, under an rf pulse operation.

FIGURE 20 shows the waveforms corresponding to the respective parts, ①~⑨, seen in FIGURE 19.

FIGURE 21 shows a schematic illustration of the ultrasonic touch system, shown in FIGURE 16, under an operation with a delay line oscillator.

FIGURE 22 shows the frequency dependence of the insertion loss between the interdigital transducers T1 and R11 in case of untouching on the substrate 5.

FIGURE 23 shows the frequency dependence of the insertion loss

Exhibit 23
-722-

between the interdigital transducers T1 and R11 in case of touching on the substrate 5.

FIGURE 24 shows the response between the interdigital transducers T1 and R11 under operation with 3.96 MHz rf pulse in case of untouching on the substrate 5.

FIGURE 25 shows the response between the interdigital transducers T1 and R11 under operation with 3.96 MHz rf pulse in case of touching on the substrate 5.

FIGURE 26 shows the relationship between the relative amplitude and the frequency in the delay line oscillator shown in FIGURE 21.

FIGURE 27 shows a plan view of the ultrasonic touch system according to a fourth embodiment of the present invention.

FIGURE 28 shows a plan view of the interdigital transducers T1, T2, R11, R12, R13, R14, R21, R22, R23 and R24 in the ultrasonic touch system shown in FIGURE 27.

FIGURE 29 shows a circuit diagram of the amplifier A or B under operation with the delay line oscillator in FIGURE 27.

FIGURE 30 shows the frequency dependencies of the insertion loss and the phase of the delay line oscillator employed in the ultrasonic touch system shown in FIGURE 27.

– 10 –

Exhibit 23
-723-

FIGURE 31 shows the relationship between the relative amplitude and the frequency in the delay line oscillator employed in the ultrasonic touch system shown in FIGURE 27.

## DETAILED DESCRIPTION OF THE PRESENTLY PREFERRED EXEMPLARY EMBODIMENTS

FIGURE 1 shows a sectional view of an ultrasonic touch system according to a first embodiment of the present invention. The ultrasonic touch system comprises an input device DT, an output device DR and a substrate 1 made from a borosilicate glass with a dimension of 1.9 mm in thickness. The input device DT has a piezoelectric thin plate 2, of which material is TDK−91A (Brand name), having a dimension of 220 $\mu$m in thickness, and an interdigital transducer T made from aluminium thin film. The output device DR has a piezoelectric thin plate 2 and an interdigital transducer R having the same material and dimensions of the interdigital transducer T. The interdigital transducers T and R, whose types are normal, are mounted on each piezoelectric thin plate 2 which is cemented on the substrate 1 through an epoxy resin with thickness of about 20 $\mu$m. Both the interdigital transducers

– 11 –

Exhibit 23
-724-

T and R, consisting of ten finger pairs, respectively, have an interdigital

periodicity of 640 $\mu$m and a center frequency of 5.1 MHz. If an electric signal

with a frequency approximately equal to the center frequency of the interdigital

transducer T is applied to the input device DT through the interdigital

transducer T, the electric signal is converted to the acoustic wave, which is

transmitted to the piezoelectric thin plate 2 on the substrate 1. At this time, it

is possible to generate the acoustic wave of the first mode or the higher modes

on the substrate 1 effectively under low power consumption with low voltage.

Furthermore, the phase velocity of the acoustic wave in the piezoelectric thin

plate 2 is approximately equal to the propagation velocity of the surface

acoustic wave on the substrate 1 in case which exists as a mono—layer

medium. Therefore, it is possible not only to increase the transducer efficiency

from the input electric signal to the acoustic wave, but also to remove the

reflection and others generated by the miss—matching and others on the

acoustic impedance at the boundary surface between the piezoelectric thin

plate 2 and the substrate 1. The acoustic wave, having a frequency

approximately equal to the center frequency of the interdigital transducer R is

converted to an electric signal, which is detected at the interdigital transducer

R. Thus, the input device DT and the output device DR make an ultrasonic

transducing system with a simple structure, where the interdigital transducers

$-$ 12 $-$

Exhibit 23
-725-

T and R are arranged face to face each other to make a pair such that the transmitting direction of the acoustic wave from the interdigital transducer T is the same as the receiving direction thereof by the interdigital transducer R. When operating the ultrasonic touch system shown in FIGURE 1, the acoustic wave generated on the substrate 1 between the interdigital transducer T and the interdigital transducer R is decreased in response to a touch with a finger or other things on the substrate 1 between the interdigital transducer T and the interdigital transducer R. Thereby, the electric signal detected at the interdigital transducer R is decreased. Accordingly, it is possible to sensing a touch with a finger or other things on the substrate 1 with a high sensitivity and a quick response time.

FIGURE 2 shows the relationship between the phase velocity of the acoustic wave of each mode in the piezoelectric thin plate 2 and the kd value or the d/$\lambda$ value, the kd value being the product of the wave number k of the acoustic wave in the piezoelectric thin plate 2 and the thickness d of the piezoelectric thin plate 2, the d/$\lambda$ value being the thickness d per the wavelength $\lambda$ of the acoustic wave in the piezoelectric thin plate 2. The numbers in FIGURE 2 correspond to the mode order, and the mark $\bigcirc$ shows the observed value. There are two types of the piezoelectric thin plate 2. One type of the piezoelectric thin plate 2 has one surface, being in contact with the

- 13 -

Exhibit 23
-726-

substrate 1 and under an electrically opened condition, and the other surface coated with a metal thin layer, coating with a metal thin layer making an electrically shorted condition. The other type of the piezoelectric thin plate 2 has both surfaces coated with metal thin layers, respectively, causing the both surfaces electrically shorted conditions. The acoustic wave in the piezoelectric thin plate 2 in the ultrasonic touch system shown in FIGURE 1 has various modes. When the kd value is zero, the velocity of the 0−th mode acoustic wave in the piezoelectric thin plate 2 is coincident with the velocity of the acoustic wave on the substrate 1 in case which exists as a mono−layer medium. As the kd value becomes larger, the velocity of the 0−th mode acoustic wave in the piezoelectric thin plate 2 comes near the velocity of the acoustic wave in the piezoelectric thin plate 2 in case which exists as a mono−layer medium. There are the cut−off frequencies in the modes higher than the 0−th mode. Thus, when the kd value is lowest, the velocity of the acoustic wave of the higher mode in the piezoelectric thin plate 2 comes near the velocity of the side wave on the substrate 1 in case which exists as a mono−layer medium.

FIGURE 3 shows the relationship between the phase velocity of the acoustic wave of each mode in the piezoelectric thin plate 2 and the kd value or the d/$\lambda$ value. The numbers in FIGURE 3 correspond to the mode order, and

- 14 -

Exhibit 23
-727-

the mark $\bigcirc$ shows the observed value. There are two types of the piezoelectric thin plate 2. One type of the piezoelectric thin plate 2 has each surface under an electrically opened condition. The other type of the piezoelectric thin plate 2 has one surface, being in contact with the substrate 2 and under an electrically shorted condition, and the other surface, exposed to the air and under an electrically opened condition. When the kd value is zero, the velocity of the 0−th mode acoustic wave in the piezoelectric thin plate 2 is coincident with the velocity of the acoustic wave on the substrate 1 in case which exists as a mono−layer medium. As the kd value becomes larger, the velocity of the 0−th mode acoustic wave in the piezoelectric thin plate 2 comes near the velocity of the acoustic wave in the piezoelectric thin plate 2 in case which exists as a mono−layer medium. There are the cut−off frequencies in the modes higher than the 0−th mode. Thus, when the kd value is lowest, the velocity of the acoustic wave of the higher mode in the piezoelectric thin plate 2 comes near the velocity of the shear wave on the substrate 1 in case which exists as a mono−layer medium.

FIGURE 4 shows the relationship between the kd value or the d/$\lambda$ value, and the electromechanical coupling constant $k^2$ calculated from the difference between the phase velocities for electrically opened and shorted conditions, respectively. The numbers in FIGURE 4 correspond to the mode

– 15 –

Exhibit 23
-728-

order.  The piezoelectric thin plate 2 has one surface, being in contact with the substrate 1 and having the interdigital transducer (IDT) T, and the other surface under an electrically shorted condition. The $k^2$ value of the higher mode acoustic wave is larger than that of the 0-th mode acoustic wave. Particularly, when the kd value of the first mode acoustic wave is 1.8, the $k^2$ value is 17.7 %, showing the maximum value.

FIGURE 5 shows the relationship between the $k^2$ value and the kd value or the d/$\lambda$ value.  The numbers in FIGURE 5 correspond to the mode order.  The piezoelectric thin plate 2 has one surface, being in contact with the substrate 1 and having the interdigital transducer T, and the other surface, exposed to the air and under electrically opened condition.  The $k^2$ value of the higher mode acoustic wave is larger than that of the 0-th mode acoustic wave.

FIGURE 6 shows the relationship between the $k^2$ value and the kd value or the d/$\lambda$ value.  The numbers in FIGURE 6 correspond to the mode order.  The piezoelectric thin plate 2 has one surface, being in contact with the substrate 1 and under an electrically shorted condition, and the other surface having the interdigital transducer T.

FIGURE 7 shows the relationship between the $k^2$ value and the kd value or the d/$\lambda$ value.  The numbers in FIGURE 7 correspond to the mode order.  The piezoelectric thin plate 2 has one surface, being in contact with the

- 16 -

Exhibit 23
-729-

substrate 1 and under an electrically opened condition, and the other surface having the interdigital transducer T.

It is clear from FIGURE 2 to FIGURE 7 that the $k^2$ value is maximum when the phase velocity of the acoustic wave of the first mode or the higher modes in the piezoelectric thin plate 2 is coincident with the velocity of the acoustic wave on the substrate 1 in case which exists as a mono-layer medium.

It is also clear from FIGURE 4 to FIGURE 7 that the transducer efficiency of the electric energy, applied to the interdigital transducer T, to the acoustic wave is increased, when the piezoelectric thin plate 2 has one surface, being in contact with the substrate 1 and having the interdigital transducer T, and the other surface under an electrically shorted condition.

When generating the acoustic wave on the substrate 1 in the ultrasonic touch system shown in FIGURE 1, it is necessary to consider the reflection and others generated by the miss-matching and others on the acoustic impedance at the boundary surface between the piezoelectric thin plate 2 and the substrate 1. In order to make the reflection coefficient minimum, it is necessary to design the ultrasonic touch system such that the phase velocity of the acoustic wave in the piezoelectric thin plate 2 is coincident with the velocity of the surface acoustic wave on the substrate 1 in

– 17 –

Exhibit 23
-730-

case which exists as a mono−layer medium, or such that the $d/\lambda$ value becomes small, and so forth.  If the d value is constant, the acoustic wave of the first mode is available in comparison with the second mode, the second mode being available in comparison with the third mode.  After all, when the d value is less than the interdigital periodicity of the interdigital transducer and the interdigital periodicity is approximately equal to the wavelength of the acoustic wave of the first mode or the higher modes, it is possible not only to increase the transducer efficiency of the electric energy, applied to the interdigital transducer T, to the acoustic wave, but also to remove the reflection and others generated by the miss−matching and others on the acoustic impedance at the boundary surface between the piezoelectric thin plate 2 and the substrate 1.

When the piezoelectric thin plate 2 comprises a piezoelectric ceramic, where the directions of the polarization axis and the thickness run parallel with each other, the acoustic wave of the first mode or the higher modes can be generated on the substrate 1 effectively.

When the piezoelectric thin plate 2 comprises a piezoelectric thin film made from highly polymerized compound such as PVDF and so on, the acoustic wave of the first mode or the higher modes can be generated on the substrate 1 effectively.

– 18 –

Exhibit 23
-731-

When the substrate 1 comprises an acrylate plate or other highly polymerized compound having transparency, the acoustic wave can be generated on the substrate 1 effectively. When the piezoelectric thin plate 2 comprises a single crystal, such as $LiNbO_3$ or $LiTaO_3$, the acoustic wave can be generated on the substrate 1 effectively.

FIGURE 8 shows the relationship between the displacement and the depth under the fd value of 1.0 MHz·mm, corresponding to the nearly maximum $k^2$ value in the first mode acoustic wave. The fd value is the product of the frequency of the acoustic wave in the piezoelectric thin plate 2 and the d value. The piezoelectric thin plate 2 has both surfaces under electrically opened conditions. $U_1$ and $U_3$ in FIGURE 8 show a parallel component and a perpendicular component of the displacement, respectively. The displacement is normalized by the maximum value. The depth of zero shows the boundary face between the piezoelectric thin plate 2 and the substrate 1. Both the displacement $U_1$ and $U_3$ are normalized by the maximum value, $(U_1{}^2 + U_3{}^2)^{1/2}$. The ratio of the displacement component of the first mode acoustic wave on the substrate 1 is 58 %.

FIGURE 9 shows the relationship between the displacement and the depth under the fd value of 2.0 MHz·mm, corresponding to the nearly maximum $k^2$ value in the second mode acoustic wave. The piezoelectric thin plate 2 has

- 19 -

Exhibit 23
-732-

both surfaces under electrically opened conditions. The ratio of the displacement component of the second mode acoustic wave on the substrate 1 is 52 %.

FIGURE 10 shows the relationship between the displacement and the depth under the fd value of 3.0 MHz·mm, corresponding to the nearly maximum $k^2$ value in the third mode acoustic wave. The piezoelectric thin plate 2 has both surfaces under electrically opened conditions. The ratio of the displacement component of the third mode acoustic wave on the substrate 1 is 47 %.

FIGURE 11 shows the relationship between the displacement and the depth under the fd value of 0.7 MHz·mm in the 0−th mode acoustic wave. The piezoelectric thin plate 2 has one surface, being in contact with the substrate 1 and under an electrically opened condition, and the other surface, having the interdigital transducer and under an electrically shorted condition. The 0−th mode acoustic wave, concentrated near the surface of the piezoelectric thin plate 2, comes near the acoustic wave in the piezoelectric thin plate 2 in case which exists as a mono−layer medium.

It is clear from FIGURE 8 to FIGURE 11 that the acoustic wave of the first mode or the higher modes is available in order to generate the acoustic wave on the substrate 1, because the acoustic wave of the mode, where the

Exhibit 23
-733-

ratio of the displacement component of the acoustic wave on the substrate 1 is
large, is available

FIGURE 12 shows a plan view of an ultrasonic touch system according
to a second embodiment of the present invention.  The ultrasonic touch system
comprises seven input devices, DT1, DT2, DT3, DT4, DT5, DT6 and DT7, seven
output devices DR1, DR2, DR3, DR4, DR5, DR6 and DR7, and a substrate 3
made from a pyrex glass with dimensions of 70 mm in length, 55 mm in width
and 1.9 mm in thickness.  Both the seven input devices and the seven output
devices are made from the same piezoelectric materials, and have the same
functions as well as the same construction.  If an electric signal is applied to
each input device, the electric signal is converted to the acoustic wave, which is
transmitted to the substrate 3.  The acoustic wave on the substrate 3 is
converted to an electric signal again, the electric signal being detected at each
output device corresponding to each input device.  For example, an electric
signal applied to the input device DT1 is converted to the acoustic wave, which
is detected at the output device DR1 as an electric signal.  Thus the seven
input devices and the seven output devices make seven ultrasonic transducing
systems classified into two groups, one group including the input devices, DT1,
DT2 and DT3, and the output devices, DR1, DR2 and DR3, the other group
including the input devices, DT4, DT5, DT6 and DT7, and the output devices,

- 21 -

Exhibit 23
-734-

DR4, DR5, DR6 and DR7.  Moreover, the propagation direction of the acoustic wave on the substrate 3 in the one group is perpendicular to that in the other group.

FIGURE 13 shows a perspective view of the input device DT1 seen in FIGURE 12.  The input device DT1 has a piezoelectric thin plate 4, of which material is TDK-91A (Brand name), having dimensions of 10 mm in length, 10 mm in width and 220 $\mu$m in thickness, and an interdigital transducer T made from aluminium thin film.  The interdigital transducer T, whose type is normal, is mounted on the piezoelectric thin plate 4 which is cemented on the substrate 3 through an epoxy resin with thickness of about 20 $\mu$m.  The interdigital transducer T consisting of ten finger pairs has an interdigital periodicity of 640 $\mu$m and an overlap length of 5 mm.  Another input devices and the output devices have the same constructions as the input device DT1.

If an electric signal with a frequency approximately equal to the center frequency of each input interdigital transducer in the ultrasonic touch system shown in FIGURE 12 is applied to each input device through each input interdigital transducer, the electric signal is converted to the acoustic wave, which is transmitted to the piezoelectric thin plate 4 on the substrate 3.  The acoustic wave, having a frequency approximately equal to the center frequency of each output interdigital transducer is converted to an electric signal, which is

– 22 –

Exhibit 23
-735-

detected at the output interdigital transducer. When the thickness of the piezoelectric thin plate 4 is less than the interdigital periodicity of each interdigital transducer, and the interdigital periodicity of each interdigital transducer is approximately equal to the wavelength of the acoustic wave of the first mode or the higher modes, the acoustic wave of the first mode or the higher modes is generated on the substrate 3. At this time, if the phase velocity of the acoustic wave in the piezoelectric thin plate 4 is approximately equal to the propagation velocity of the surface acoustic wave on the substrate 3 in case which exists as a mono—layer medium, it is possible not only to increase the transducer efficiency of the electric energy, applied to the input interdigital transducers, to the acoustic wave, but also to remove the reflection and others generated by the miss—matching and others on the acoustic impedance at the boundary surface between the piezoelectric thin plate 4 and the substrate 3. Thus, it is possible to generate the acoustic wave on the substrate 3 effectively under low power consumption with low voltage.

When the piezoelectric thin plate 4 comprises a piezoelectric ceramic, where the directions of the polarization axis and the thickness run parallel with each other, the acoustic wave of the first mode or the higher modes can be generated on the substrate 3 effectively.

When the piezoelectric thin plate 4 comprises a piezoelectric thin film

- 23 -

Exhibit 23
-736-

made from highly polymerized compound such as PVDF and so on, the acoustic wave of the first mode or the higher modes can be generated on the substrate 3 effectively.

When the substrate 3 comprises an acrylate plate or other highly polymerized compound having transparency, the acoustic wave can be generated on the substrate 3 effectively. When the piezoelectric thin plate 4 comprises a single crystal, such as $LiNbO_3$ or $LiTaO_3$, the acoustic wave can be generated on the substrate 3 effectively.

When operating the ultrasonic touch system shown in FIGURE 12, the acoustic wave propagating the substrate 3 is decreased in response to a touch with a finger or other things thereon. The acoustic wave on the junction of two propagation directions, of which, for example, one is the area between the input device DT1 and the output device DR1 and the other is the area between the input device DT4 and the output device DR4, is decreased in response to a touch with a finger or other things thereon. Therefore, the electric signals detected at the corresponding output interdigital transducers are also decreased. Accordingly, it is possible to sense a touch with a finger or other things on the substrate 3 with a high sensitivity and a quick response time. In addition, the touched position can be specified from the output interdigital transducers, where the electric signal is decreased. At this time, if there are

- 24 -

Exhibit 23
-737-

more ultrasonic transducing systems, of which each comprises a pair of input and output devices such as the input device DT1 and the output device DR1, the touched position can be specified more clearly.

FIGURE 14 shows a schematic illustration of the ultrasonic touch system, shown in FIGURE 12, under an rf pulse operation.  If an rf pulse ① is applied to the input device through the interdigital transducer, an electric signal ② is detected at the output interdigital transducer, and the electric signal ② is amplified via an amplifier.  An electric signal ③ detected at the amplifier is converted to a direct current voltage ④ via a voltage doubling rectifier.  At this time, the direct current voltage ④ in case of touching on the substrate 3 is different from that in case of untouching thereon.  In short, there are two kinds of the direct current voltages ④.  By means of setting the threshold voltage at a proper level, it is possible to set the two direct current voltages ④ at the two fixed values ⑤ in a comparator, respectively.  Thus, the voltage ⑤ in case of touching on the substrate 3 is 0 V, and the voltage ⑤ in case of untouching thereon is 5 V.

FIGURE 15 shows a schematic illustration of the ultrasonic touch system, shown in FIGURE 12, under an operation with a delay line oscillator. If an electric signal is applied to the input device through the interdigital transducer, an electric signal is detected at the output interdigital transducer

- 25 -

Exhibit 23
-738-

and is amplified via an amplifier.  An electric signal ① detected at the amplifier is converted to a direct current voltage ② via a voltage doubling rectifier.  At this time, the direct current voltage ② in case of touching on the substrate 3 is different from that in case of untouching thereon.  In short, there are two kinds of the direct current voltages ②.  By means of setting the threshold voltage at a proper level, it is possible to set the two kinds of the direct current voltages ② at the fixed values, respectively.  The operation with the delay line oscillator does not require pulse generator.  Therefore, it is possible to provide the ultrasonic touch system with a smaller size which is very light in weight and has a simple structure.

FIGURE 16 shows a plan view of an ultrasonic touch system according to a third embodiment of the present invention.  The ultrasonic touch system comprises two input devices DTX and DTY, two output devices DRX and DRY, a substrate 5 made from a pyrex glass with dimensions of 70 mm in length, 55 mm in width and 1.9 mm in thickness, and a display face 6 included in a display device, the display face 6 being not drawn in FIGURE 16.  The input device DTX has a piezoelectric thin plate 7, of which material is TDK−101A (Brand name), having a dimension of 230 $\mu$m in thickness, and two interdigital transducers T1 and T2 made from aluminium thin film, respectively.  The input device DTY has a piezoelectric thin plate 7 and two interdigital transducers T3

– 26 –

Exhibit 23
-739-

and T4 made from aluminium thin film, respectively. The output device DRX has a piezoelectric thin plate  and eight inte  digital transducers, R11, R12, R13, R14, R21, R22, R23 and R24, made from aluminium thin film, respectively.

The output device DRY has a piezoelectric thin plate 7 and eight interdigital transducers, R31, R32, R33, R34, R41, R42, R43 and R44, made from aluminium thin film, respectively. Each interdigital transducer, whose type is normal, is mounted on each piezoelectric thin plate 7 which is cemented on one surface of the substrate 5 through a  epoxy resin with thickness of   ut 20 $\mu$m. The display face 6 is mounted on the other surface, without the input and output devices, of the substrate 5. Each interdigital transducer consisting of 7.5 finger pairs has an interdigital periodicity of 640 $\mu$m.

FIGURE 17 shows a plan view of the input device DTX and the output device DRX in the ultrasonic touch  stem shown in FIGURE 16. The input device DTX and the output device DRX are placed at the opposite ends. In the same way, the input device DTY and the output device DRY are placed at the opposite ends. The interdigital transducers, T1, T2, T3 and T4, have an overlap length of 18 mm, respectively. The interdigital transducers, R11, R12, R13, R14, R21, R22, R23, R24, R31, R32, R33, R34, R41, R42, R43 and R44, have an overlap length of 2.7 mm, respectively. The interdigital transducers, R11, R12, R13 and R14, are corresponding to the interdigital transducer T1. The

- 27 -

**Exhibit 23**
-740-

interdigital transducers, R21, R22, R23 and R24, are corresponding to the interdigital transducer T2. The interdigital transducers, R31, R32, R33 and R34, are corresponding to the interdigital transducer T3. The interdigital transducers, R41, R42, R43 and R44, are corresponding to the interdigital transducer T4.

If an electric signal is applied to the input devices DTX and DTY of the ultrasonic touch system shown in FIGURE 16, the acoustic wave is generated on the substrate 5. The acoustic wave is converted to an electric signal which is detected at the output devices DRX and DRY. Thus, the two input devices and the two output devices make sixteen ultrasonic transducing systems classified into two groups, one group including the input device DTX and the output device DRX, the other group including the input device DTY and the output device DRY. Moreover, the propagation direction of the acoustic wave on the substrate 5 in the one group is perpendicular to that in the other group.

When the thickness of the piezoelectric thin plate 7 seen in FIGURE 16 is less than the interdigital periodicity of each interdigital transducer, and the interdigital periodicity of each interdigital transducer is approximately equal to the wavelength of the acoustic wave of the first mode or the higher modes, the acoustic wave of the first mode or the higher modes is generated on the substrate 5. At this time, if the phase velocity of the acoustic wave in the

- 28 -

Exhibit 23
-741-

piezoelectric thin plate 7 is approximately equal to the propagation velocity of the surface acoustic wave on the substrate 5 in case which exists as a mono–layer medium, it is possible not only to increase the transducer efficiency of the electric energy, applied to the input interdigital transducers, to the acoustic wave, but also to remove the reflection and others generated by the miss–matching and others on the acoustic impedance at the boundary surface between the piezoelectric thin plate 7 and the substrate 5. Thus, it is possible to generate the acoustic wave on the substrate 5 effectively under low power consumption and low voltage.

When the piezoelectric thin plate 7 comprises a piezoelectric ceramic, where the directions of the polarization axis and the thickness run parallel with each other, the acoustic wave of the first mode or the higher modes can be generated on the substrate 5 effectively.

When the piezoelectric thin plate 7 comprises a piezoelectric thin film made from highly polymerized compound such as PVDF and so on, the acoustic wave of the first mode or the higher modes can be generated on the substrate 5 effectively.

When the substrate 5 comprises an acrylate plate or other highly polymerized compound having transparency, the acoustic wave can be generated on the substrate 5 effectively. When the piezoelectric thin plate 7

– 29 –

Exhibit 23
-742-

comprises a single crystal, such as LiNbO$_3$ or LiTaO$_3$, the acoustic wave can be generated on the substrate 5 effectively.

When inserting the ultrasonic touch system according to the present invention into a display in a computer and so on, the substrate of the ultrasonic touch system is set up such that the surface having the input and output devices is faced outside, moreover such that only the area surrounded with the input and output devices on the surface is exposed to outside.

FIGURE 18 (a) shows a plan view of an interdigital transducer taking the place of that seen in FIGURE 16. There are two interdigital periodicities shown in FIGURE 18 (a), the overlap length of the first being different from that of the second. One consists of five finger pairs with an interdigital periodicity of 620 $\mu$m, the other consists of five finger pairs with an interdigital periodicity of 295 $\mu$m. When the interdigital transducers are employed, they are placed such that the part consisting of five finger pairs with the interdigital periodicity of 295 $\mu$m is opposed inside to each other, because the acoustic wave with a higher frequency generated on the substrate 5 in case of the interdigital periodicity smaller is highly decreased on the substrate 5. Thus, the interdigital transducers are placed such that the part with a smaller interdigital periodicity has a smaller propagation distance of the acoustic wave. The arrangement such that the finger pairs with a smaller interdigital

– 30 –

Exhibit 23
-743-

periodicity is placed inside to each other restrains the decrease of the acoustic wave on the substrate 5.

FIGURE 18 (b) shows a plan view of an interdigital transducer taking the place of that seen in FIGURE 16. The interdigital transducer has interdigital periodicities with hyperbolical variation along the direction of the electrode finger located at the central part of the interdigital transducer. The interdigital transducer consists of 26.5 finger pairs with interdigital periodicities of 260 $\mu$m $\sim$ 390 $\mu$m, the overlap length being 23.4 mm. When the interdigital transducers are employed, they take the symmetrical positions each other against the center line between the two interdigital transducers. In the above device configuration, the operation frequency is in the range from 5.4 MHz to 8.2 MHz.

FIGURE 19 shows a schematic illustration of the ultrasonic touch system, shown in FIGURE 16, under an rf pulse operation. FIGURE 20 shows the waveforms corresponding to the respective parts, ①~⑨, seen in FIGURE 19. When operating the ultrasonic touch system shown in FIGURE 16, a continuous wave ① generated by a function generator is modulated to rf pulses ③-1 and ③-2 in the corresponding double balanced mixers (DBMs) 1 and 2 by the corresponding clock pulses ②-1 and ②-2 from a computer. The DBM 1 and the DBM 2 play a role of switching to apply with an rf pulse to the

- 31 -

Exhibit 23
-744-

interdigital transducers T1 and T3 (T1 group of IDTs) or the interdigital transducers T2 and T4 (T2 group of IDTs). If an rf pulse is applied to each of the T1 group of IDTs, the rf pulse with a frequency approximately corresponding to the interdigital periodicity of the T1 group of IDTs is converted to the acoustic wave which is transmitted to the respective piezoelectric thin plate 7 in the input devices DTX and DTY and then transmitted to the substrate 5. The acoustic wave having a wavelength approximately corresponding to each interdigital periodicity of the interdigital transducers, R11, R12, R13, R14, R31, R32, R33 and R34 (R1 group of IDTs), is converted to a delay electric signal, which is detected at the R1 group of IDTs.

If an rf pulse is applied to each of the T2 group of IDTs, the rf pulse with a frequency approximately corresponding to the interdigital periodicity of the T2 group of IDTs is converted to the acoustic wave which is transmitted to the respective piezoelectric thin plate 7 in the input devices DTX and DTY and then transmitted to the substrate 5. The acoustic wave having a wavelength approximately corresponding to each interdigital periodicity of the interdigital transducers, R21, R22, R23, R24, R41, R42, R43 and R44 (R2 group of IDTs), is converted to a delayed electric signal, which is detected at the R2 group of IDTs. If an rf pulse is applied to the T1 and T2 groups of IDTs alternately, a delayed electric signal is detected at the R1 and R2 groups of IDTs alternately.

- 32 -

Exhibit 23
-745-

The connections between the interdigital transducers R11 and R21, R12 and R22, R13 and R23, R14 and R24, R31 and R41, R32 and R42, R33 and R43, and R34 and R44, make the circuit construction simple.  In addition, the delayed electric signal ④ detected at each pair of the interdigital transducers, for example the pair of the interdigital transducers R11 and R21, is received so that they overlap each other.  Therefore, when touching with a material, softer than the substrate 5 and easy to absorb the acoustic wave, on the propagation way, made from the T1 and R1 groups of IDTs, of the acoustic wave on the substrate 5, the acous~ wave on the touched position is decreased ⑤ only in case that an electric signal is applied to each of the T1 group of IDTs.  In the same way, touching with the material on the propagation way, made from the T2 and R2 groups of IDTs, of the acoustic wave on the substrate 5, the acoustic wave on the touched position is decreased ⑥ only in case that an electric signal is applied to each of the T2 group of IDTs. Such the delayed electric signals ④, ⑤ and ⑥ are amplified via an amplifier and rectified via a voltage doubling rectifier, and then become a direct current signals ⑦, ⑧ and ⑨, respectively.  By means of setting the threshold voltage at the proper value between the direct current signals ⑦ and ⑧, or ⑦ and ⑨, the digital signals corresponding to the direct current signals ⑦, ⑧ and ⑨, respectively, are obtained in a comparator.  The digital signals are taken in the computer as the

– 33 –

Exhibit 23
-746-

parallel signals with a proper timing by the computer. Thus, the ultrasonic touch system shown in FIGURE 16 has a short response time, and therefore has a high sensitivity. Accordingly, the touched position on the substrate 5 can be appointed clearly and quickly. If there are more ultrasonic transducing systems consisting of an input interdigital transducer and an output interdigital transducer, respectively, the touched position on the substrate 5 can be more strictly appointed.

FIGURE 21 shows a schematic illustration of the ultrasonic touch system, shown in FIGURE 16, under an operation with a delay line oscillator. The waveforms corresponding to the respective parts, ①～⑨, seen in FIGURE 21 are the same as the FIGURE 20. The delay line oscillator has an 8–shaped signal loop which makes the area between the interdigital transducers T1 and R11, or T2 and R21 on the substrate 5 a first delay element, and the area between the interdigital transducers T3 and R31, or T4 and R41 thereon a second delay element. When operating the ultrasonic touch system shown in FIGURE 21, switches, S1, S2, S3 and S4, are opened and closed by order of a computer. While the switches S1 and S3 ( S1 group of switches) are closed, the switches S2 and S4 ( S2 group of switches) are opened. Thus, an electric signal is applied to the T1 and T2 groups of IDTs, alternately, by opening and closing of the S1 and S2 groups of switches alternately. An electric signal ①

– 34 –

Exhibit 23
-747-

applied to the T1 or T2 groups of IDTs is modulated to rf pulses ③−1 or ③−2, respectively, by the corresponding clock pulses ②−1 or ②−2 from a computer.

If the rf pulse ③−1 is applied to the T1 group of IDTs, then when the S1 group of switches are closed, the rf pulse ③−1 with a frequency approximately corresponding to the interdigital periodicity of the T1 group of IDTs is converted to the acoustic wave which is transmitted to the respective piezoelectric thin plate 7 in the input devices DTX and DTY and then transmitted to the substrate 5.  The acoustic wave having a wavelength approximately corresponding to each interdigital periodicity of the interdigital transducers, R11, R12, R13, R14, R31, R32, R33 and R34 (R1 group of IDTs), is converted to a delayed electric signal, which is detected at the R1 group of IDTs.  If the rf pulse ③−2 is applied to the T2 group of IDTs, then when the S2 group of switches are closed, the rf pulse ③−2 with a frequency approximately corresponding to the interdigital periodicity of the T2 group of IDTs is converted to the acoustic wave which is transmitted to the respective piezoelectric thin plate 7 in the input devices DTX and DTY and then transmitted to the substrate 5.  The acoustic wave having a wavelength approximately corresponding to each interdigital periodicity of the interdigital transducers, R21, R22, R23, R24, R41, R42, R43 and R44 (R2 group of IDTs), is converted to a delayed electric signal, which is detected at the R2 group of

− 35 −

Exhibit 23
-748-

IDTs.  Thus, if an electric signal is applied to the T1 and T2 groups of IDTs alternately, a delayed electric signal is detected at the R1 and R2 groups of IDTs alternately.  The connections between the interdigital transducers R11 and R21, R12 and R22, R13 and R23, R14 and R24, R31 and R41, R32 and R42, R33 and R43, and R34 and R44, make the circuit construction simple.  In addition, the delayed electric signal ④ detected at each pair of the interdigital transducers, for example the pair of the interdigital transducers R11 and R21, is received so that they overlap each other.  A part of the delayed electric signal ④ detected at the pair of the interdigital transducers R11 and R21 and a part of the delayed electric signal ④ detected at the pair of the interdigital transducers R31 and R41 are amplified via the amplifiers A and B, respectively, and each phase thereof is shifted to the fixed value via each phase shifter, the two electric signals with each shifted phase are applied to the T1 and T2 groups of IDTs again, respectively, through the S1 and S2 groups of switches.  In short, the electric signals applied to the interdigital transducers T1 and T2 through the switches S1 and S2 are applied to the interdigital transducers T3 and T4 through the switches S3 and S4, and the electric signals applied to the interdigital transducers T3 and T4 through the switches S3 and S4 are applied to the interdigital transducers T1 and T2 through the switches S1 and S2.  Thus, the delay line oscillator having the 8−shaped signal loop is constructed.

– 36 –

Exhibit 23
-749-

The delayed electric signal ④ detected at each pair of the interdigital transducers is decreased (⑤ or ⑥) in response to a touch on the substrate 5. When touching with a material, softer than the substrate 5 and easy to absorb the acoustic wave, on the propagation way, made from the T1 and R1 groups of IDTs, of the acoustic wave on the substrate 5, the acoustic wave on the touched position is decreased ⑤ only in case that an electric signal is applied to each of the T1 group of IDTs. In the same way, touching with the material on the propagation way, made from the T2 and R2 groups of IDTs, of the acoustic wave on the substrate 5, the acoustic wave on the touched position is decreased ⑥ only in case that an electric signal is applied to each of the T2 group of IDTs. Such the delayed electric signals ④, ⑤ and ⑥ are amplified via an amplifier and rectified via a voltage doubling rectifier, and then become a direct current signals ⑦, ⑧ and ⑨, respectively. By means of setting the threshold voltage at the proper value between the direct current signals ⑦ and ⑧, or ⑦ and ⑨, the digital signals corresponding to the direct current signals ⑦, ⑧ and ⑨, respectively, are obtained via a comparator. The digital signals are taken into the computer in the form of the parallel signals with a proper timing by the computer. The operation with the delay line oscillator has no need for a function generator. Therefore, it is possible to provide the ultrasonic touch system, with a smaller size which is very light in weight and has a simple

– 37 –

Exhibit 23
-750-

structure, capable of an operation under low power consumption with low voltage as compared with the case of the rf pulse operation shown in FIGURE 19.

When operating the ultrasonic touch system shown in FIGURE 16, an information given in a color is appeared on the display face 6 in response to the touched position by order of the computer. At this time, the frequency of the electric signal applied to the T1 or T2 group of IDTs is corresponding to the color. It is possible to look the information on the display face 6 through the substrate 5. When touching on the propagation medium of the acoustic wave on the substrate 5, the acoustic wave decreases and the information given in the color corresponding to the touched position is appeared on the display face 6. It is possible by means of changing the frequency of the input electric signal to indicate each information given in the color corresponding to the frequency of the input electric signal on the identical position of the display face 6. Therefore, when using two kinds of frequencies of the input electric signals, two kinds of the information given in each color on the identical position of the display face 6 are obtained. In addition, the information can be indicated for a fixed period. Thus, when writing, for example, a character with a material, softer than the substrate 5 and easy to absorb the acoustic wave, on the substrate 5, the character is appeared on the display face 6. If the ultrasonic

- 38 -

Exhibit 23
-751-

touch system shown in FIGURE 16 has the interdigital transducers as shown in FIGURE 18 (a), two kinds of input electric signals having the respective frequencies, which are corresponding to the respective interdigital periodicities and different from each other, can be applied to the interdigital transducer. Moreover, it is possible to more increase the number of the input electric signal, because there are many kinds of the frequencies approximately corresponding to each interdigital periodicity. As a result, many kinds of information given in each color can be appeared on the display face 6 by changing the frequency of the input electric signal.

FIGURE 22 shows the frequency dependence of the insertion loss between the interdigital transducers T1 and R11 in case of untouching on the substrate 5. FIGURE 23 shows the frequency dependence of the insertion loss between the interdigital transducers T1 and R11 in case of touching on the substrate 5. The peak around 3.96 MHz corresponds to the first mode acoustic wave. The difference between the insertion loss in case of untouching on the substrate 5 and that in case of touching on the substrate 5 is about 10 dB with regard to the first mode acoustic wave. The difference on the insertion loss is enough to treat the electric signals in the ultrasonic touch system shown in FIGURE 16.

FIGURE 24 shows the response between the interdigital transducers

– 39 –

Exhibit 23
-752-

T1 and R11 under operation with 3.96 MHz rf pulse in case of untouching on

the substrate 5. FIGURE 25 shows the response between the interdigital

transducers T1 and R11 under operation with 3.96 MHz rf pulse in case of

touching on the substrate 5. Since there is the substrate 5 between the

interdigital transducers T1 and R11, the waveforms without spurious signals

are observed with a good response to touch on the substrate 5. Therefore, it is

easy to treat the electric signals in the ultrasonic touch system shown in

FIGURE 16.

FIGURE 26 shows the relationship between the relative amplitude and

the frequency in the delay line oscillator shown in FIGURE 21. Fo in FIGURE

26 corresponds to the fundamental mode wave with the frequency of 3.951

MHz. Because the ultrasonic touch system shown in FIGURE 16 is designed

with the first mode, the stable oscillation without the influence of other modes

is obtained. In addition, the acoustic wave is transmitted on the substrate 5

almost without extension of the acoustic wave, causing easy oscillation without

the influence of other modes.

FIGURE 27 shows a plan view of an ultrasonic touch system according

to a fourth embodiment of the present invention. The ultrasonic touch system

comprises 14 interdigital transducers, having each overlap length of 5 mm, 56

interdigital transducers, made from aluminium thin film, having each overlap

Exhibit 23
-753-

length of 0.8 mm, a piezoelectric substrate 8 being $128°$ rotated Y cut X propagation LiNbO3 with dimensions of 50 mm in length, 40 mm in width and 0.5 mm in thickness, and a display face 9 being not drawn in FIGURE 27. Only the interdigital transducers, T1, T2, T3 and T4, having each overlap length of 5 mm and the interdigital transducers, R11, R12, R13, R14, R21, R22, R23, R24, R31, R32, R33, R34, R41, R42, R43 and R44, having each overlap length of 0.8 mm are drawn in FIGURE 27. The display face 9 included in a display device is mounted on the other surface, without the input and output devices, of the piezoelectric substrate 8.   Each interdigital transducer, whose type is normal, consisting of 7.5 finger pairs, has an interdigital periodicity of 640 $\mu$m.

FIGURE 28 shows a plan view of the interdigital transducers, T1, T2, R11, R12, R13, R14, R21, R22, R23 and R24, in the ultrasonic touch system shown in FIGURE 27.   The interdigital transducers T1 and T2 are placed opposite to the interdigital transducers, R11, R12, R13, R14, R21, R22, R23 and R24.   In the same way, the interdigital transducers T3 and T4 are placed opposite to the interdigital transducers, R31, R32, R33, R34, R41, R42, R43 and R44.   The interdigital transducers, T1, T2, T3 and T4, are used for input.   The interdigital transducers, R11, R12, R13, R14, R21, R22, R23, R24, R31, R32, R33, R34, R41, R42, R43 and R44, are used for output.   The interdigital transducers, R11, R12, R13 and R14, correspond to the interdigital transducer

– 41 –

Exhibit 23
-754-

T1. The interdigital transducers, R21, R22, R23 and R24, correspond to the interdigital transducer T2. The interdigital transducers, R31, R32, R33 and R34, correspond to the interdigital transducer T3. The interdigital transducers, R41, R42, R43 and R44, correspond to the interdigital transducer T4.

If an electric signal is applied to the input interdigital transducer in the ultrasonic touch system shown in FIGURE 27, respectively, the acoustic wave is generated on the piezoelectric substrate 8. The acoustic wave is converted to each electric signal which is detected at the output interdigital transducer. Thus, the 14 input interdigital transducers and the 56 output interdigital transducers make 56 ultrasonic transducing systems classified into two groups, the propagation direction of the acoustic wave on the piezoelectric substrate 8 in the one group being perpendicular to that in the other group. Accordingly, the ultrasonic touch system shown in FIGURE 27 has a simple structure with a small size which is very light in weight, and is operated under a low power consumption with a low voltage.

It is possible to employ interdigital transducers, having at least two kinds of interdigital periodicities as show in FIGURE 18, in the ultrasonic touch system shown in FIGURE 27. For example, the interdigital transducers composed of two parts, respectively, are used, one consisting of five finger pairs with an interdigital periodicity of 178 $\mu$m, the other consisting of five finger

- 42 -

Exhibit 23
-755-

pairs with an interdigital periodicity of 160 $\mu$m. When the interdigital

transducers are employed, they are placed such that each part consisting of five

finger pairs with an interdigital periodicity of 160 $\mu$m is opposed inside to each

other, because the acoustic wave with a higher frequency is generated on the

piezoelectric substrate 8 in case of the interdigital periodicity smaller, and is

easier to be decreased on the piezoelectric substrate 8. Thus, the interdigital

transducers are placed such that the part with a smaller interdigital periodicity

has a smaller propagation distance of the acoustic wave. The arrangement

such that the finger pairs with a smaller interdigital periodicity is placed inside

to each other restrains the decrease of the acoustic wave on the piezoelectric

substrate 8.

In the ultrasonic touch system shown in FIGURE 27 an rf pulse

operation seen in FIGURE 19 can be employed. In this case, the respective

parts, ①〜⑨, corresponds to the waveforms shown in FIGURE 20. When

operating the ultrasonic touch system shown in FIGURE 27, a continuous wave

① generated by a function generator is modulated to rf pulses ③−1 and ③−2

in the corresponding double balanced mixers (DBMs) 1 and 2 by the

corresponding clock pulses ②−1 and ②−2 from a computer. The DBM 1 and

the DBM 2 play a role of switching to apply with an rf pulse to the interdigital

transducers T1 and T3 (T1 group of IDTs) or the interdigital transducers T2 and

Exhibit 23
-756-

T4 (T2 group of IDTs). If an rf pulse is applied to each of the T1 group of IDTs, the rf pulse with a frequency approximately corresponding to the interdigital periodicity of the T1 group of IDTs is converted to the acoustic wave which is transmitted to the piezoelectric substrate 8. The acoustic wave having a wavelength approximately corresponding to each interdigital periodicity of the interdigital transducers, R11, R12, R13, R14, R31, R32, R33 and R34 (R1 group of IDTs), is converted to a delayed electric signal, which is detected at the R1 group of IDTs. If an rf pulse is applied to each of the T2 group of IDTs, the rf pulse with a frequency approximately corresponding to the interdigital periodicity of the T2 group of IDTs is converted to the acoustic wave which is transmitted to the piezoelectric substrate 8. The acoustic wave having a wavelength approximately corresponding to each interdigital periodicity of the interdigital transducers, R21, R22, R23, R24, R41, R42, R43 and R44 (R2 group of IDTs), is converted to a delayed electric signal, which is detected at the R2 group of IDTs. If an rf pulse is applied to the T1 and T2 groups of IDTs alternately, a delayed electric signal is detected at the R1 and R2 groups of IDTs alternately. The connections between the interdigital transducers R11 and R21, R12 and R22, R13 and R23, R14 and R24, R31 and R41, R32 and R42, R33 and R43, and R34 and R44, make a circuit construction simple. In addition, the delayed electric signal ④ detected at each pair of the interdigital transducers,

– 44 –

Exhibit 23
-757-

for example the pair of the interdigital transducers R11 and R21, is received so that they overlap each other. Therefore, when touching with a material, softer than the piezoelectric substrate 8 and easy to absorb the acoustic wave, on the propagation way, made from the T1 and R1 groups of IDTs, of the acoustic wave on the piezoelectric substrate 8, the acoustic wave on the touched position is decreased ⑤ only in case that an electric signal is applied to each of the T1 group of IDTs. In the same way, touching with the material on the propagation way, made from the T2 and R2 groups of IDTs, of the acoustic wave on the piezoelectric substrate 8, the acoustic wave on the touched position is decreased ⑥ only in case that an electric signal is applied to each of the T2 group of IDTs. Such the delayed electric signals ④, ⑤ and ⑥ are amplified via an amplifier and rectified via a voltage doubling rectifier, and then become a direct current signals ⑦, ⑧ and ⑨, respectively. By means of setting the threshold voltage at the proper value between the direct current signals ⑦ and ⑧, or ⑦ and ⑨, the digital signals corresponding to the direct current signals ⑦, ⑧ and ⑨, respectively, are obtained via a comparator. The digital signals are taken into the computer in the form of the parallel signals with a proper timing by the computer. Thus, the ultrasonic touch system shown in FIGURE 27 has a short response time, and therefore has a high sensitivity. Accordingly, the touched position on the piezoelectric substrate 8

– 45 –

Exhibit 23
-758-

can be appointed clearly and quickly.   If there are more ultrasonic transducing

systems consisting of an input interdigital transducer and an output interdigital

transducer, respectively, the touched position on the piezoelectric substrate 8

can be more strictly appointed.

In the ultrasonic touch system shown in FIGURE 27 an operation as a

delay line oscillator seen in FIGURE 21 can be employed.   In this case, the

respective parts, ①~⑨, corresponds to the waveforms shown in FIGURE 20.

FIGURE 29 shows a circuit diagram of the amplifier A or B under operation

with the delay line oscillator in FIGURE 27.   When operating the ultrasonic

touch system shown in FIGURE 27, switches, S1, S2, S3 and S4, are opened

and closed by order of a computer.   While the switches S1 and S3 ( S1 group of

switches) are closed, the switches S2 and S4 ( S2 group of switches) are

opened.   Thus, an electric signal is applied to the T1 and T2 groups of IDTs,

alternately, by opening and closing of the S1 and S2 groups of switches

alternately.   An electric signal ① applied to the T1 or T2 group of IDTs is

modulated to rf pulses ③−1 or ③−2, respectively, by the corresponding clock

pulses ②−1 or ②−2 from a computer.   If the rf pulse ③−1 is applied to the T1

group of IDTs, then when the S1 group of switches are closed, the rf pulse ③

−1 with a frequency approximately corresponding to the interdigital periodicity

of the T1 group of IDTs is converted to the acoustic wave which is transmitted

− 46 −

Exhibit 23
-759-

to the piezoelectric substrate 8. The acoustic wave having a wavelength approximately corresponding to each interdigital periodicity of the interdigital transducers, R11, R12, R13, R14, R31, R32, R33 and R34 (R1 group of IDTs), is converted to a delayed electric signal, which is detected at the R1 group of IDTs. If the rf pulse ③-2 is applied to the T2 group of IDTs, then when the S2 group of switches are closed, the rf pulse ③-2 with a frequency approximately corresponding to the interdigital periodicity of the T2 group of IDTs is converted to the acoustic wave which is transmitted to the piezoelectric substrate 8. The acoustic wave having a wavelength approximately corresponding to each interdigital periodicity of the interdigital transducers, R21, R22, R23, R24, R41, R42, R43 and R44 (R2 group of IDTs), is converted to a delayed electric signal, which is detected at the R2 group of IDTs. Thus, if an electric signal is applied to the T1 and T2 groups of IDTs alternately, a delayed electric signal is detected at the R1 and R2 groups of IDTs alternately. The connections between the interdigital transducers R11 and R21, R12 and R22, R13 and R23, R14 and R24, R31 and R41, R32 and R42, R33 and R43, and R34 and R44, make a circuit construction simple. In addition, the delayed electric signal ④ detected at each pair of the interdigital transducers, for example the pair of the interdigital transducers R11 and R21, is received so that they overlap each other. A part of the delayed electric signal ④ detected

- 47 -

Exhibit 23
-760-

at the pair of the interdigital transducers R11 and R21 and a part of the delayed

electric signal ④ detected at the pair of the interdigital transducers R31 and

R41 are amplified via the amplifiers A and B, respectively, and each phase

thereof is shifted to the fixed value via each phase shifter, the two electric

signals with each shifted phase are applied to the T1 and T2 groups of IDTs

again, respectively, through the S1 and S2 groups of switches.  In short, the

electric signals applied to the interdigital transducers T1 and T2 through the

switches S1 and S2 are applied to the interdigital transducers T3 and T4

through the switches S3 and S4, and the electric signals applied to the

interdigital transducers T3 and T4 through the switches S3 and S4 are applied

to the interdigital transducers T1 and T2 through the switches S1 and S2.

Thus, the delay line oscillator having the 8-shaped signal loop is constructed.

The delayed electric signal ④ detected at each pair of the interdigital

transducers is decreased (⑤ or ⑤) in response to a touch on the piezoelectric

substrate 8.  When touching with a material, softer than the piezoelectric

substrate 8 and easy to absorb the acoustic wave, on the propagation way,

made from the T1 and R1 groups of IDTs, of the acoustic wave on the

piezoelectric substrate 8, the acoustic wave on the touched position is

decreased ⑤ only in case that an electric signal is applied to each of the T1

group of IDTs.  In the same way, touching with the material on the propagation

-- 48 --

Exhibit 23
-761-

way, made from the T2 and R2 groups of IDTs, of the acoustic wave on the
piezoelectric substrate 8, the acoustic wave on the touched position is
decreased ⑥ only in case that an electric signal is applied to each of the T2
group of IDTs. Such the delayed electric signals ④, ⑤ and ⑥ are amplified
via an amplifier and rectified via a voltage doubling rectifier, and then become a
direct current signals ⑦, ⑧ and ⑨, respectively. By means of setting the
threshold voltage at the proper value between the direct current signals ⑦ and
⑧, or ⑦ and ⑨, the digital signals corresponding to the direct current signals
⑦, ⑧ and ⑨, respectively, are obtained via a comparator. The digital signals
are taken into the computer in the form of the parallel signals with a proper
timing by the computer. The operation with the delay line oscillator has no
need for a function generator. Therefore, it is possible to provide the ultrasonic
touch system, with a smaller size which is very light in weight and has a simple
structure, capable of an operation under low power consumption with low
voltage as compared with the case of the rf pulse operation.

When operating the ultrasonic touch system shown in FIGURE 27, an
information given in a color is appeared on the display face 9 in response to the
touched position. At this time, the frequency of the electric signal applied to
the T1 or T2 group of IDTs corresponds to the color. It is possible to look the
information on the display face 9 through the piezoelectric substrate 8. When

– 49 –

Exhibit 23
-762-

touching on the propagation medium of the acoustic wave on the piezoelectric substrate 8, the acoustic wave decreases and the information given in the color corresponding to the touched position appears on the display face 9. It is possible by means of changing the frequency of the input electric signal to indicate each information given in the color corresponding to the frequency of the input electric signal on the identical position of the display face 9. Therefore, when using two kinds of frequencies of the input electric signals, two kinds of the information given in each color on the identical position of the display face 9 are superposed. In addition, the information can be indicated for a fixed period. Thus, when writing, for example, a character with a material, softer than the piezoelectric substrate 8 and easy to absorb the acoustic wave, on the piezoelectric substrate 8, the character appears on the display face 9. If the ultrasonic touch system shown in FIGURE 27 has the interdigital transducers as shown in FIGURE 18 (a), two kinds of input electric signals having different frequencies, which correspond to the respective interdigital periodicities, can be applied to the interdigital transducers. Moreover, it is possible to more increase the number of the input electric signal, because there are many kinds of frequencies approximately corresponding to each interdigital periodicity. As a result, many kinds of information given in each color can be appeared on the display face 9 by changing the frequency of the input electric

– 50 –

Exhibit 23
-763-

signal.

FIGURE 30 shows the frequency dependencies of the insertion loss and the phase of the delay line oscillator employed in the ultrasonic touch system shown in FIGURE 27.

FIGURE 31 shows the relationship between the relative amplitude and the frequency in the delay line oscillator employed in the ultrasonic touch system shown in FIGURE 27, where fo corresponds to the fundamental mode wave with the frequency of 24.3 MHz. The stable oscillation is obtained.

When the piezoelectric substrate 8 comprises a transparent piezoelectric ceramic such as $(Pb \cdot La)(Zr \cdot Ti)O_3$, what is called the PLZT, the directions of the polarization axis and the thickness of the transparent piezoelectric ceramic running parallel with each other, the acoustic wave can be generated on the piezoelectric substrate 8 effectively. Moreover, it is possible to look many kinds of information on the display face 9 through the piezoelectric substrate 8 by using the transparent piezoelectric ceramic as the piezoelectric substrate 8. In order to transmit the acoustic wave to the piezoelectric substrate 8, the thickness of the piezoelectric substrate 8 is requested to be over three times as much as the interdigital periodicity of the input interdigital transducer. In case that the thickness of the piezoelectric substrate 8 is smaller than the interdigital periodicity, the Lamb wave is

– 51 –

Exhibit 23
-764-

transmitted to the piezoelectric substrate 8. However, it is possible to use the Lamb wave mode, if it has the modes capable of fulfilling the sensing function in the ultrasonic touch system shown in FIGURE 27. In place of the transparent piezoelectric ceramic, the single crystal, having transparency and piezoelectricity, such as LiNbO$_3$, LiTaO$_3$ and so on, can be used as the piezoelectric substrate 8. When using the single crystal as the piezoelectric substrate 8, it is necessary to design the ultrasonic touch system in consideration of the electromechanical coupling constant k$^2$ because of the anisotropy of the single crystal. Furthermore, there is the possibility to be in need of an extra complicated circuit. However, the single crystal is promising as the piezoelectric substrate. The PLZT is promising as the piezoelectric ceramic substrate among other things, because of the transparency, manufacturing and durability thereof being excellent. By making use of the transverse isotropy of the piezoelectric substrate 8 made from the PLZT, the electric signal levels of the two groups of the output interdigital transducers become equal, the propagation directions of the acoustic wave on the piezoelectric substrate 8 in the two groups of the output interdigital transducers being perpendicular to each other. Accordingly, the circuit construction becomes so simple that it is possible to provide the ultrasonic touch system not only with a smaller size which is very light in weight and has

– 52 –

Exhibit 23
-765-

a simple structure.  In addition, because of the output signals being always

unified, the signal treatment becomes accuracy and the sensitivity becomes

high.  Furthermore, since the resolution of the electric signal is increased, the

quantity of the information can be increased.

Exhibit 23
-766-

CLAIMS

1. An ultrasonic touch system including a substrate and at least an ultrasonic transducing system on one end surface Z1 of said substrate, said ultrasonic transducing system comprising at least one interdigital transducer P and at least one interdigital transducer Q corresponding to said interdigital transducer P, said ultrasonic touch system further comprising;

means for applying said interdigital transducer P with an electric signal having a frequency approximately corresponding to the interdigital periodicity of said interdigital transducer P, and generating the acoustic wave, having a wavelength approximately equal to said interdigital periodicity, on said end surface Z1;

means for delivering an electric signal, having a frequency approximately corresponding to the wavelength of said acoustic wave generated on said end surface Z1, from said interdigital transducer Q, said interdigital transducers P and Q being arranged face to face each other to make a pair such that the transmitting direction of said acoustic wave by said interdigital transducer P is the same as the receiving direction of said acoustic wave by said interdigital transducer Q; and

- 54 -

Exhibit 23
-767-

means for sensing a touch with a finger or other things on a part of the propagation medium of said acoustic wave on said end surface Z1 by the magnitude of said electric signal detected at said interdigital transducer Q.

2. A system as defined in claim 1, wherein said interdigital transducers P and Q have at least two interdigital periodicities L1 and L2, respectively, along the direction of the electrode finger of said interdigital transducers P or Q, or the direction vertical to said electrode finger.

3. A system as defined in claim 1 or 2, wherein a display face included in a display device and indicating at least two kinds of colors is mounted on the other end surface Z2 of said substrate.

4. A system as defined in claim 1, 2 or 3, wherein said color corresponds to said frequency of said electric signal applied to said interdigital transducer P.

5. A system as defined in claim 1, 2, 3 or 4, wherein said substrate comprises:

an almost transparent piezoelectric ceramic, the direction of the polarization axis thereof being parallel to the thickness direction thereof, said interdigital transducers P and Q being mounted on said end surface Z1 directly.

6. A system as defined in claim 1, 2, 3 or 4, wherein said substrate comprises:

-- 55 --

Exhibit 23
-768-

a nonpiezoelectric body, said ultrasonic transducing system comprising an input device A, consisting of a piezoelectric thin plate TA and said interdigital transducer P mounted thereon, and an output device B consisting of a piezoelectric thin plate TB and said interdigital transducer Q mounted thereon, said piezoelectric thin plates TA and TB being mounted on said end surface Z1.

7. A system as defined in claim 1, 2, 3, 4 or 6, wherein the thickness of said piezoelectric thin plate TA is less than the interdigital periodicity of said interdigital transducer P, and the thickness of said piezoelectric thin plate TB is less than the interdigital periodicity of said interdigital transducer Q, said interdigital periodicities of said interdigital transducers P and Q being approximately equal to the wavelength of the acoustic wave of the first mode or the higher modes, the phase velocity of said acoustic wave of said first mode or said higher modes being approximately equal to the propagation velocity of the acoustic wave generated on said substrate as a mono−layer medium.

8. A system as defined in claim 1, 2, 3, 4, 6 or 7, wherein said piezoelectric thin plates TA and TB are cemented on said end surface Z1 through the end surface with said interdigital transducer P in said piezoelectric thin plate TA and the end surface with said interdigital transducer Q in said piezoelectric thin plate TB.

− 56 −

Exhibit 23
-769-

9. A system as defined in claim 1, 2, 3, 4, 6, 7 or 8, wherein the other end surface without said interdigital transducer P in said piezoelectric thin plate TA and the other end surface without said interdigital transducer Q in said piezoelectric thin plate TB are covered with metal thin layer, respectively.

10. A system as defined in claim 1, 2, 3, 4, 6, 7, 8 or 9, wherein said piezoelectric thin plate TA or TB comprises:

a piezoelectric ceramic, the direction of the polarization axis thereof being parallel to the thickness direction thereof.

11. A system as defined in claim 1, 2, 3, 4, 6, 7, 8 or 9, wherein said piezoelectric thin plate TA or TB comprises:

a piezoelectric thin film made from highly polymerized compound such as PVDF and so on.

12. A system as defined in claim 1, 2, 3, 4, 5, 6, 7, 8, 9, 10 or 11, wherein said ultrasonic transducing system comprises:

N interdigital transducers $P_i$ (i = 1, 2, $\cdots$, N) and N interdigital transducer groups $Q_i$ (i = 1, 2, $\cdots$, N) consisting of at least two interdigital transducers, $Q_{i-1}$ and $Q_{i-2}$, said ultrasonic touch system further comprising;

a connection point $M_1$, each output terminal of said interdigital transducers $Q_{i-1}$ being connected with each other thereat,

a connection point $M_2$, each output terminal of said interdigital

– 57 –

Exhibit 23
-770-

transducers $Q_{i-2}$ being connected with each other thereat, a touch with a finger or other things on a part of the propagation medium of the acoustic wave on said end surface Z1 being detected by the magnitudes of the electric signals detected at said connection points $M_1$ and $M_2$, respectively,

N switches $S_i$ (i = 1, 2, $\cdots$, N), output terminal thereof being connected with each input terminal of said interdigital transducers $P_i$, and

means for controlling turn on and off of said switches $S_i$ with a fixed period in turn.

13. A system as defined in claim 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11 or 12, further comprising:

a connection point MS, each input terminal of said switches $S_i$ being connected with each other thereat,

an amplifier, said connection point $M_1$ being connected with said connection point MS through said amplifier, and

N oscillators $H_i$ (i = 1, 2, $\cdots$, N) including N corresponding propagation paths $D_i$ (i = 1, 2, $\cdots$, N) as delay elements, said propagation paths $D_i$ comprising said substrate between said interdigital transducers $P_i$ and said interdigital transducers $Q_{i-1}$, the respective signal loops of said oscillators $H_i$ comprising said interdigital transducers $P_i$, said propagation paths $D_i$, said interdigital transducers $Q_{i-1}$ and said amplifier.

– 58 –

Exhibit 23
-771-

WO 94/02911

PCT/JP93/01028

FIG. 1



Exhibit 23
-772-

WO 94/02911                                                PCT/JP93/01028

FIG. 2



7/24/2016, EAST Version: 3.2.1.1

Exhibit 23
-773-

# FIG. 3



Exhibit 23
-774-

WO 94/02911
PCT/JP93/01028

FIG. 4



4 / 3 1

Exhibit 23
-775-

WO 94/02911

PCT/JP93/01028

FIG. 5



Exhibit 23
-776-

FIG. 6



Exhibit 23
-777-

7/24/2016, EAST Version: 3.2.1.1

WO 94/02911                                      PCT/JP93/01028

## FIG. 7



Exhibit 23
-778-

WO 94/02911

PCT/JP93/01028

FIG. 8



(1st mode, fd=1.0MHz·mm)

8/31

Exhibit 23
-779-

7/24/2016, EAST Version: 3.2.1.1

FIG. 9



(2nd mode, fd=2.0MHz·mm)

DEPTH

$U_1$      $U_3$

open

open

DISPLACEMENT

9/31

Exhibit 23
-780-

WO 94/02911                                                                    PCT/JP93/01028

FIG. 10



(3rd mode, fd=3.0MHz·mm)

Exhibit 23
-781-

7/24/2016, EAST Version: 3.2.1.1

F I G. 11



11／31

Exhibit 23
-782-

FIG. 12



(UNIT:mm)

12／31

Exhibit 23
-783-

7/24/2016, EAST Version: 3.2.1.1

WO 94/02911                                                        PCT/JP93/01028

F I G. 1 3



(UNIT:mm)

1 3 / 3 1

Exhibit 23
-784-

FIG. 14



Exhibit 23
-785-

7/24/2016, EAST Version: 3.2.1.1

WO 94/02911

PCT/JP93/01028

F I G. 1 5



Exhibit 23
-786-

WO 94/02911

PCT/JP93/01028

FIG. 16



Exhibit 23
-787-

PCT/JP93/01028

F I G. 17



T 1          T 2

DTX                                      7

DRX                                      7



R 11   R 12   R 13   R 14   R 21   R 22   R 23   R 24

7/24/2016, EAST Version: 3.2.1.1

Exhibit 23
-788-

FIG. 18

INTERDIGITAL TRANSDUCER



( a )

INTERDIGITAL TRANSDUCER



( b )

18/31

Exhibit 23
-789-

WO 94/02911

PCT/JP93/01028

FIG. 19



19/31

Exhibit 23
-790-

WO 94/02911                                                                      PCT/JP93/01028

FIG. 20



Exhibit 23
-791-

FIG. 21



21/31

Exhibit 23
-792-

7/24/2016, EAST Version: 3.2.1.1

WO 94/02911                                                         PCT/JP93/01028

FIG. 22



22/31

Exhibit 23
-793-

WO 94/02911                                            PCT/JP93/01028

F I G. 23



Exhibit 23
-794-

7/24/2016, EAST Version: 3.2.1.1

WO 94/02911

PCT/JP93/01028

FIG. 24



0. 5V/div

20mV/div

5μsec/div

24/31

Exhibit 23
-795-

WO 94/02911

PCT/JP93/01028

FIG. 25



0. 5V/div

20mV/div

5μsec/div

25/31

Exhibit 23
-796-

WO 94/02911

PCT/JP93/01028

FIG. 26



Exhibit 23
-797-

PCT/JP93/01028

FIG. 27



Exhibit 23
-798-

7/24/2016, EAST Version: 3.2.1.1

FIG. 28



T1                              T2



R11   R12   R13   R14   R21   R22   R23   R24

Exhibit 23
-799-

7/24/2016, EAST Version: 3.2.1.1

FIG. 29



Exhibit 23
-800-

7/24/2016, EAST Version: 3.2.1.I

WO 94/02911                                                              PCT/JP93/01028

FIG. 30



FREQUENCY (MHz)

30/31

Exhibit 23
-801-

WO 94/02911                                                    PCT/JP93/01028

F I G. 31



Exhibit 23
-802-

INTERNATIONAL SEARCH REPORT

International Application No    PCT/JP 93/01028

| I. CLASSIFICATION OF SUBJECT MATTER (if several classification symbols apply, indicate all)[6] |
|---|
| According to International Patent Classification (IPC) or to both National Classification and IPC |
| Int.Cl. 5 G06K11/14 |

**II. FIELDS SEARCHED**

| Minimum Documentation Searched[7] | |
|---|---|
| Classification System | Classification Symbols |
| Int.Cl. 5 | G06K ;    G06F |

| Documentation Searched other than Minimum Documentation to the Extent that such Documents are Included in the Fields Searched[8] |
|---|
| |

**III. DOCUMENTS CONSIDERED TO BE RELEVANT[9]**

| Category[°] | Citation of Document,[11] with indication, where appropriate, of the relevant passages[12] | Relevant to Claim No.[13] |
|---|---|---|
| Y | EP,A,0 397 539 (ETAT FRANCAIS)<br>14 November 1990 | 1,3,6,13 |
| A | see column 1, line 1 - line 19<br>see column 3, line 8 - column 5, line 25<br>see column 6, line 5 - column 11, line 55;<br>figures<br>--- | 12 |
| Y | PATENT ABSTRACTS OF JAPAN<br>vol. 012, no. 430 (E-682)14 November 1988<br>& JP,A,63 167 507 ( KOJI TODA ET AL. ) 11<br>July 1988 | 1,3,6,13 |
| A | see abstract<br>--- | 7,10 |
| A | FR,A,2 357 865 (THOMSON-CSF)<br>3 February 1978<br>see page 2, line 3 - page 4, line 30<br>see page 5, line 20 - page 9, line 11;<br>figures 1-5<br>--- | 1,2,5 |
| | | --/-- |

° Special categories of cited documents :[10]

"A" document defining the general state of the art which is not considered to be of particular relevance

"E" earlier document but published on or after the international filing date

"L" document which may throw doubts on priority claim(s) or which is cited to establish the publication date of another citation or other special reason (as specified)

"O" document referring to an oral disclosure, use, exhibition or other means

"P" document published prior to the international filing date but later than the priority date claimed

"T" later document published after the international filing date or priority date and not in conflict with the application but cited to understand the principle or theory underlying the invention

"X" document of particular relevance; the claimed invention cannot be considered novel or cannot be considered to involve an inventive step

"Y" document of particular relevance; the claimed invention cannot be considered to involve an inventive step when the document is combined with one or more other such documents, such combination being obvious to a person skilled in the art.

"&" document member of the same patent family

**IV. CERTIFICATION**

| Date of the Actual Completion of the International Search | Date of Mailing of this International Search Report |
|---|---|
| 30 SEPTEMBER 1993 | 1 3. 10. 93 |
| International Searching Authority | Signature of Authorized Officer |
| EUROPEAN PATENT OFFICE | SEMPLE M. |

Form PCT/ISA/210 (second sheet) (January 1985)

Exhibit 23<br>-803-

International Application No
PCT/JP 93/01028

| III. DOCUMENTS CONSIDERED TO BE RELEVANT | (CONTINUED FROM THE SECOND SHEET) | |
|---|---|---|
| Category ° | Citation of Document, with indication, where appropriate, of the relevant passages | Relevant to Claim No. |
| A | US,A,3 673 327 (JOHNSON ET AL.)<br>27 June 1972<br>see column 1, line 32 - line 47<br>see column 2, line 24 - column 3, line 20<br>see column 3, line 63 - column 4, line 6;<br>figures 1-3<br>----- | 1,3,12 |

Exhibit 23
-804-

## ANNEX TO THE INTERNATIONAL SEARCH REPORT
### ON INTERNATIONAL PATENT APPLICATION NO.

JP   9301028
SA      76821

This annex lists the patent family members relating to the patent documents cited in the above-mentioned international search report.
The members are as contained in the European Patent Office EDP file on
The European Patent Office is in no way liable for these particulars which are merely given for the purpose of information.      30/09/93

| Patent document cited in search report | Publication date | Patent family member(s) | Publication date |
|---|---|---|---|
| EP-A-0397539 | 14-11-90 | FR-A-   2644309 | 14-09-90 |
| FR-A-2357865 | 03-02-78 | None | |
| US-A-3673327 | 27-06-72 | None | |

EPO FORM P0479

For more details about this annex : see Official Journal of the European Patent Office, No. 12/82

Exhibit 23
-805-

# Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | 14618664 |
| **Filing Date:** | 10-Feb-2015 |
| **Title of Invention:** | Methods and Systems for Modulation and Demodulation of Optical Signals |
| **First Named Inventor/Applicant Name:** | Steven P. Hotelling |
| **Filer:** | Stephen C. Hemenway/Valerie Brown |
| **Attorney Docket Number:** | P22733US1 |

Filed as Large Entity

**Filing Fees for** Utility under 35 USC 111(a)

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |
| **Post-Allowance-and-Post-Issuance:** | | | | |
| **Extension-of-Time:** | | | | |

Exhibit 23
-806-

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Miscellaneous:** | | | | |
| Submission- Information Disclosure Stmt | 1806 | 1 | 180 | 180 |
| **Total in USD ($)** | | | | **180** |

Exhibit 23
-807-

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 27376575 |
| **Application Number:** | 14618664 |
| **International Application Number:** | |
| **Confirmation Number:** | 1097 |
| **Title of Invention:** | Methods and Systems for Modulation and Demodulation of Optical Signals |
| **First Named Inventor/Applicant Name:** | Steven P. Hotelling |
| **Customer Number:** | 62579 |
| **Filer:** | Stephen C. Hemenway/Valerie Brown |
| **Filer Authorized By:** | Stephen C. Hemenway |
| **Attorney Docket Number:** | P22733US1 |
| **Receipt Date:** | 31-OCT-2016 |
| **Filing Date:** | 10-FEB-2015 |
| **Time Stamp:** | 18:42:28 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | DA |
| Payment was successfully received in RAM | $180 |
| RAM confirmation Number | 110116INTEFSW00005611504621 |
| Deposit Account | |
| Authorized User | |
| The Director of the USPTO is hereby authorized to charge indicated fees and credit any overpayment as follows: | |

Exhibit 23
-808-

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Transmittal Letter | P22733US1IDS.pdf | 16253<br><br>2f0fc79a203daa8d42e186ac777dbb4d83e3a1d4 | no | 2 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 2 | Information Disclosure Statement (IDS) Form (SB08) | P22733US1PTOSB08.pdf | 32975<br><br>fba7e3a8bf8836a7534cadc631b2c553fdd5ac1c | no | 2 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| This is not an USPTO supplied IDS fillable form | | | | | |
| 3 | Foreign Reference | WO1994-002911.PDF | 8186441<br><br>3c5d880e5125968b33af960e9bc6de1d60350e94 | no | 94 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 4 | Fee Worksheet (SB06) | fee-info.pdf | 30463<br><br>a9f6a8af29259731ead0c4905298514573b118bc | no | 2 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| | | **Total Files Size (in bytes):** | 8266132 | | |

**Exhibit 23**
-809-

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

<u>New Applications Under 35 U.S.C. 111</u>
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

<u>National Stage of an International Application under 35 U.S.C. 371</u>
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

<u>New International Application Filed with the USPTO as a Receiving Office</u>
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

**Exhibit 23**
**-810-**

Attorney Docket No. P22733US1

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re the Application of: | |
| Steven M. Hotelling, et al. | Examiner:        Ko, Tony. |
| Application No. 14/618,664 | Art Unit:        2878 |
| Filed:  February 10, 2015 | Confirmation No.    1097 |
| For:    METHODS AND SYSTEMS FOR MODULATION AND DEMODULATION OF OPTICAL SIGNALS | |

**INFORMATION DISCLOSURE STATEMENT**
**UNDER 37 C.F.R. §§ 1.97(c) and 1.98**

Mail Stop AMENDMENT
Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Sir:

The Examiner is requested to consider the references noted on the enclosed Form PTO/SB/08a during examination of the above-identified patent application.  These references are submitted for the Examiner's consideration and are submitted pursuant to the duty of disclosure under 37 C.F.R. § 1.56.  In submitting these references, no representation is made or implied that the references are or are not material to the examination of the application.  The Examiner is requested to make his or her own determination of materiality.  Pursuant to the requirements of 37 C.F.R. § 1.98(a)(2)(ii), only copies of the foreign references and non-patent literature documents are provided.  Copies of the U.S. patent and U.S. patent application publication references are not provided, unless required by the Office.

This Information Disclosure Statement is filed after the period specified in 37 C.F.R. § 1.97(b), but before the mailing date of either (1) a final Office action, or (2) a Notice of Allowance.  A charge to Deposit Account No. 504621 in the amount of $180.00 is authorized herewith.  If any additional fees are deemed necessary, such fees may be charge to Deposit Account No. 504621.

**Exhibit 23**
**-811-**

Attorney Docket No. P22733US1

If the Examiner has any questions, please contact the undersigned attorney.

Dated:  October 31, 2016.

Respectfully submitted,


_____/S. Craig Hemenway/_____
S. Craig Hemenway, Registration No. 44,759
Attorney for Assignee
USPTO Customer No. 62579

Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, Colorado  80202
Phone: (303) 223-1100
Fax: (303) 223-1111

013361\2216\15185688.1

**Exhibit 23**
**-812-**

PTO/SB/06 (09-11)
Approved for use through 1/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| PATENT APPLICATION FEE DETERMINATION RECORD<br>Substitute for Form PTO-875 | Application or Docket Number<br>14/618,664 | Filing Date<br>02/10/2015 | ☐ To be Mailed |
|---|---|---|---|

**ENTITY:**   ☒ LARGE   ☐ SMALL   ☐ MICRO

## APPLICATION AS FILED – PART I

| | (Column 1) | (Column 2) | | |
|---|---|---|---|---|
| FOR | NUMBER FILED | NUMBER EXTRA | RATE ($) | FEE ($) |
| ☐ BASIC FEE<br>(37 CFR 1.16(a), (b), or (c)) | N/A | N/A | N/A | |
| ☐ SEARCH FEE<br>(37 CFR 1.16(k), (i), or (m)) | N/A | N/A | N/A | |
| ☐ EXAMINATION FEE<br>(37 CFR 1.16(o), (p), or (q)) | N/A | N/A | N/A | |
| TOTAL CLAIMS<br>(37 CFR 1.16(i)) | minus 20 = | * | X $ = | |
| INDEPENDENT CLAIMS<br>(37 CFR 1.16(h)) | minus 3 = | * | X $ = | |
| ☐ APPLICATION SIZE FEE<br>(37 CFR 1.16(s)) | If the specification and drawings exceed 100 sheets of paper, the application size fee due is $310 ($155 for small entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s). | | | |
| ☐ MULTIPLE DEPENDENT CLAIM PRESENT (37 CFR 1.16(j)) | | | | |
| * If the difference in column 1 is less than zero, enter "0" in column 2. | | | TOTAL | |

## APPLICATION AS AMENDED – PART II

| | | (Column 1) | (Column 2) | (Column 3) | | |
|---|---|---|---|---|---|---|
| **AMENDMENT** | **10/31/2016** | CLAIMS REMAINING AFTER AMENDMENT | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) |
| | Total (37 CFR 1.16(i)) | * 20 | Minus | ** 20 | = 0 | x $80 = | 0 |
| | Independent (37 CFR 1.16(h)) | * 3 | Minus | *** 3 | = 0 | x $420 = | 0 |
| | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | |
| | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | |
| | | | | | TOTAL ADD'L FEE | **0** |

| | | (Column 1) | (Column 2) | (Column 3) | | |
|---|---|---|---|---|---|---|
| **AMENDMENT** | | CLAIMS REMAINING AFTER AMENDMENT | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) |
| | Total (37 CFR 1.16(i)) | * | Minus | ** | = | x $ = | |
| | Independent (37 CFR 1.16(h)) | * | Minus | *** | = | x $ = | |
| | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | |
| | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | |
| | | | | | TOTAL ADD'L FEE | |

LIE
ANTHONY WILLIAMS

* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.
** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20".
*** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3".
The "Highest Number Previously Paid For" (Total or Independent) is the highest number found in the appropriate box in column 1.

This collection of information is required by 37 CFR 1.16. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

**Exhibit 23**
-813-

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 14/618,664 | 02/10/2015 | Steven P. Hotelling | P22733US1 | 1097 |

62579          7590          07/29/2016
APPLE INC. (Brownstein)
c/o Brownstein Hyatt Farber Schreck LLP
410 17th St.
Suite 2200
DENVER, CO 80202

| EXAMINER |
|---|
| KO, TONY |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2878 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 07/29/2016 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

patentdocket@bhfs.com

PTOL-90A (Rev. 04/07)

Exhibit 23
-814-

| **Office Action Summary** | Application No.<br>14/618,664 | Applicant(s)<br>HOTELLING ET AL. | |
|---|---|---|---|
| | Examiner<br>TONY KO | Art Unit<br>2878 | AIA (First Inventor to File)<br>Status<br>Yes |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

   A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) months from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1) ☐ Responsive to communication(s) filed on _____.
    ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.
2a) ☐ This action is **FINAL**.      2b) ☒ This action is non-final.
3) ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.
4) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims***

5) ☒ Claim(s) <u>1-20</u> is/are pending in the application.
    5a) Of the above claim(s) _____ is/are withdrawn from consideration.
6) ☐ Claim(s) _____ is/are allowed.
7) ☒ Claim(s) <u>1-20</u> is/are rejected.
8) ☐ Claim(s) _____ is/are objected to.
9) ☐ Claim(s) _____ are subject to restriction and/or election requirement.
* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov.

**Application Papers**

10) ☐ The specification is objected to by the Examiner.
11) ☒ The drawing(s) filed on <u>2/10/2015</u> is/are:  a)☒ accepted or b)☐ objected to by the Examiner.
    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

**Priority under 35 U.S.C. § 119**

12) ☐ Acknowledgement is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
    **Certified copies:**
       a)☐ All   b)☐ Some**  c)☐ None of the:
       1. ☐ Certified copies of the priority documents have been received.
       2. ☐ Certified copies of the priority documents have been received in Application No. _____.
       3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).
** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☒ Notice of References Cited (PTO-892)

2) ☒ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b) Paper No(s)/Mail Date <u>1/05/2016</u>.

3) ☐ Interview Summary (PTO-413)
    Paper No(s)/Mail Date. _____ .
4) ☐ Other: _____.

Application/Control Number: 14/618,664                                    Page 2
Art Unit: 2878

1.      The present application, filed on or after March 16, 2013, is being examined

under the first inventor to file provisions of the AIA.

## DETAILED ACTION

### *Claim Rejections - 35 USC § 112*

2.      The following is a quotation of 35 U.S.C. 112(b):
(b)  CONCLUSION.—The specification shall conclude with one or more claims particularly
pointing out and distinctly claiming the subject matter which the inventor or a joint inventor
regards as the invention.

        The following is a quotation of 35 U.S.C. 112 (pre-AIA), second paragraph:
The specification shall conclude with one or more claims particularly pointing out and distinctly
claiming the subject matter which the applicant regards as his invention.

3.      Claim 6 is rejected under 35 U.S.C. 112(b) or 35 U.S.C. 112 (pre-AIA), second

paragraph, as being indefinite for failing to particularly point out and distinctly claim the

subject matter which the inventor or a joint inventor, or for pre-AIA the applicant regards

as the invention.

4.      Claim 6 is rejected because "the light source of the optical sensor" lacks

antecedent basis.  Clarification is needed to determine the scope of the claim.

### *Claim Rejections - 35 USC § 102*

5.      The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that

form the basis for the rejections under this section made in this Office action:

        A person shall be entitled to a patent unless –

        (a)(1) the claimed invention was patented, described in a printed publication, or in public use,
on sale or otherwise available to the public before the effective filing date of the claimed
invention.

        (a)(2) the claimed invention was described in a patent issued under section 151, or in an
application for patent published or deemed published under section 122(b), in which the

Exhibit 23
-816-

Application/Control Number: 14/618,664                                            Page 3
Art Unit: 2878

> patent or application, as the case may be, names another inventor and was effectively filed
> before the effective filing date of the claimed invention.

6.      Claim(s) 1, 2, 5, 17 and 20 is/are rejected under 35 U.S.C. 102(a)(1)(2) as being

anticipated by Osten et al (US Patent 5719950).

7.      Regarding claims 1 and 17, Osten et al teach (Figs. 1-5) an electronic device and

method comprising: a housing (60) comprising a surface (42) adapted to be positioned

proximate a measurement site of a subject; a biometric sensor positioned at least

partially within the surface and comprising: a plurality of light sources (LEDs) for

emitting light toward the measurement site; and an optical sensor (26) for obtaining light

exiting the measurement site; and an input amplifier (174) coupled to the output of the

biometric sensor and disposed within the housing; a high pass filter (204) coupled to an

output of the input amplifier and disposed within the housing; an output amplifier (206)

coupled to an output of the high pass filter and disposed within the housing; and an

analog to digital converter (22) coupled to an output of the output amplifier and disposed

within the housing.

8.      Regarding claims 2 and 20, Osten et al teach each light source of the plurality of

light sources comprises a light emitting diode (92); and the optical sensor comprises

one of the group consisting of photodiodes, phototransistors, or optical image sensors.

9.      Regarding claim 5, Osten et al teach a processor (38) coupled to the output of

the analog to digital converter.

10.     Claim(s) s 1-3, 5-10 and 12-16 are is/are rejected under 35 U.S.C. 102(a)(1) as

being anticipated by Venkatraman et al (US Patent 9044171/US20140275850).

Exhibit 23
-817-

Application/Control Number: 14/618,664                                    Page 4
Art Unit: 2878

11.     Regarding claims 1 and 17, Venkatraman et al teach (Figs. 1-31) an electronic
device and method comprising a housing comprising a surface adapted to be positioned
proximate a measurement site of a subject; a biometric sensor positioned at least
partially within the surface and comprising: a plurality of light sources (LEDs) for
emitting light toward the measurement site; and an optical sensor (photodetector) for
obtaining light exiting the measurement site; and an input amplifier (Figs. 16G) coupled
to the output of the biometric sensor and disposed within the housing; a high pass filter
(capacitor) coupled to an output of the input amplifier and disposed within the housing;
an output amplifier coupled to an output of the high pass filter and disposed within the
housing; and an analog to digital (A/D) converter coupled to an output of the output
amplifier and disposed within the housing.

12.     Regarding claim 2, Venkatraman et al teach ([0102]) each light source of the
plurality of light sources comprises a light emitting diode; and the optical sensor
comprises one of the group consisting of photodiode, phototransistors, or optical image
sensor.

13.     Regarding claim 3, Venkatraman et al teach ([0165]) the input amplifier
comprises a transimpedance amplifier.

14.     Regarding claim 5, Venkatraman et al teach a processor coupled to the output of
the analog to digital converter (ADC).

15.     Regarding claim 6, as understood, Venkatraman et al teach the processor is
configured to control the light source (figures 11 shows the connection between light
source and the controller).

Exhibit 23
-818-

Application/Control Number: 14/618,664                                        Page 5
Art Unit: 2878

16.     Regarding claim 7, Venkatraman et al teach calibration and measurement mode.

17.     Since claims 7 and 8 lacks structural difference from claim 1, in which claims 7 and 8 depends upon, the rejection made against claim 1 is believed to satisfy the requirement under 35 U.S.C. 102(a)(1) to properly reject claim 7.

18.     Regarding claim 9, Venkatraman et al teach a sensor system for measuring a periodic biometric characteristic of a subject, the sensor comprising: a plurality of light sources (LEDs) operative to emit a series light pulses at a selected modulation frequency toward a measurement site of the subject; an optical sensor (photodetector) operative to receive light exiting a portion of the measurement site, the light originating from the series of light pulses; a transimpedance input amplifier (Fig. 16, ([0165])) coupled to the output of the optical sensor; a high pass filter ([0326]) coupled to the transimpedance input amplifier and configured to filter frequencies higher than the selected modulation frequency; an output amplifier coupled of the high filter and configured to amplify an output of the high pass filter; and an analog to digital converter coupled to the output amplifier configured to associated a signal amplitude of the output amplifier with a digital value.  Venkatraman teaches specifically in [0158] that green is the preferred and teaches the filtering of ambient light (which could include wavelengths greater or less than in the green spectrum).

19.     Regarding claim 10, Venkatraman et al teach ([0170]) each of the light source of the plurality of light sources comprises a light emitting diode configured to emit light at a selected frequency; and the optical sensor comprises one of the group consisting of photodiode, phototransistors and optical image sensors.

Exhibit 23
-819-

Application/Control Number: 14/618,664                                              Page 6
Art Unit: 2878

20.      Regarding claim 12, Venkatraman et al teach ([0134]) a first subset of the

plurality of light sources comprises a plurality of light emitting diodes configured to emit

light at a first selected frequency; and a second subset of the plurality of light sources

comprises a plurality of light emitting diodes configured to emit light at a second

selected frequency; wherein when the first subset is emitting light the second subset is

prevented from emitting light.

21.      Regarding claim 13, Venkatraman et al teach a processor coupled to the output

of the analog to digital converter.

22.      Regarding claim 14, Venkatraman et al teach ([0134]) the processor is

configured to control the modulation of at least one of the light sources of the plurality of

light sources.

23.      Regarding claim 15, Venkatraman et al teach ([0115]) the biometric sensor

further comprises a measurement mode and a calibration mode.  That is, figures 21-25

teach the calibration where the device determines whether the device is in-door/out-

door and/or in-motion/motionless.

24.      Claim 16 recites method in which the calibration mode to be operated and does

not include further structural limitations.  For this reason, the rejection applied to claim

15 applies to this claim.

### *Claim Rejections - 35 USC § 103*

25.      The following is a quotation of 35 U.S.C. 103 which forms the basis for all

obviousness rejections set forth in this Office action:

> A patent for a claimed invention may not be obtained, notwithstanding that the claimed
> invention is not identically disclosed as set forth in section 102, if the differences between the
> claimed invention and the prior art are such that the claimed invention as a whole would have

Exhibit 23
-820-

Application/Control Number: 14/618,664                                                      Page 7
Art Unit: 2878

> been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains. Patentability shall not be negated by the manner in which the invention was made.

26.    Claims 4 and 11 is/are rejected under 35 U.S.C. 103 as being unpatentable over Venkatraman et al in view of Benkely, III (US Patent 8791792).

27.    Regarding claims 4 and 11, Yuen et al teach the invention set forth above.  Yuen et al do not teach the output amplifier comprises a programmable gain amplifier. Benkely, III teach a programmable gain amplifier.  It would have been obvious to one of ordinary skill in the art at the time of invention to implement a programmable gain control amplifier to improve dynamic range of the device.

28.    Claims 18-20 is/are rejected under 35 U.S.C. 103 as being unpatentable over Venkatraman et al in view of Durand et al (US patent 7656932).

29.    Regarding claims 18, Venkatraman et al teach the invention set forth above. Venkatraman et al do not teach sampling the output signal to obtain a matrix of sample; and determining product of the matrix of samples with a demodulation matrix to obtain a demodulated matrix.  Durand et al teach (claim 21) obtaining Eigen vector of a product of a matrix and demodulated and obtain a demodulated signal.  It would have been obvious to one of ordinary skill in the art at the time of invention to obtaining Eigen vector of a product of a matrix and demodulated and obtain a demodulated signal because all the claimed elements were known in the prior art and one skilled in the art could have combined the elements as claimed by known methods with no change in their respective functions, and the combination would have yielded predictable results to one of ordinary skill in the art and such mathematical manipulation of data points are known.

Exhibit 23
-821-

Application/Control Number: 14/618,664                                      Page 8
Art Unit: 2878

30.     Regarding claim 18, the modified Venkatraman teaches the invention set forth

above.  The modified Yuen does not specifically teach add/subtracting of samples to the

matrix of sample.  It is known to add/subtract/multiply and divide samples including

average data points.  It would have been obvious to one of ordinary skill in the art at the

time of invention to add/subtract/multiply and divide data because all the claimed

elements were known in the prior art and one skilled in the art could have combined the

elements as claimed by known methods with no change in their respective functions,

and the combination would have yielded predictable results to one of ordinary skill in the

art.

31.     Regarding claim 20, Venkatraman et al further teach light is emitted toward the

measurement site from a plurality of light sources each comprises a light emitting diode;

and light is obtained exiting by an optical sensor comprising one of the group consisting

of photodiodes, phototransistors or optical image sensors.

### *Conclusion*

        Any inquiry concerning this communication or earlier communications from the

examiner should be directed to TONY KO whose telephone number is (571)272-1926.

The examiner can normally be reached on Monday-Friday 7:30 - 4:00.

        If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Georgia Epps can be reached on 571-272-2328.  The fax phone number for

the organization where this application or proceeding is assigned is 571-273-8300.

Exhibit 23
-822-

Application/Control Number: 14/618,664                                        Page 9
Art Unit: 2878

     Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a

USPTO Customer Service Representative or access to the automated information

system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.


/TONY KO/
Primary Examiner, Art Unit 2878


TK

Exhibit 23
-823-

| | Notice of References Cited | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|---|
| | | 14/618,664 | HOTELLING ET AL. |
| | | Examiner | Art Unit | Page 1 of 1 |
| | | TONY KO | 2878 | |

**U.S. PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Name | CPC Classification | US Classification |
|---|---|---|---|---|---|---|
| * | A | US-5,719,950 A | 02-1998 | Osten; David W. | A61B5/0205 | 340/5.82 |
| * | B | US-2014/0275850 A1 | 09-2014 | Venkatraman; Subramaniam | A61B5/0002 | 600/301 |
| * | C | US-8,791,792 B2 | 07-2014 | Benkley, III; Fred G. | G06K9/00053 | 324/658 |
| * | D | US-7,656,932 B2 | 02-2010 | Durand; Beno t | H04B1/30 | 375/143 |
| | E | US- | | | | |
| | F | US- | | | | |
| | G | US- | | | | |
| | H | US- | | | | |
| | I | US- | | | | |
| | J | US- | | | | |
| | K | US- | | | | |
| | L | US- | | | | |
| | M | US- | | | | |

**FOREIGN PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Country | Name | CPC Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

**NON-PATENT DOCUMENTS**

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

**Exhibit 23**
**-824-**

Receipt date: 01/05/2018 Case 8:20-cv-00048-JVS-JDE Document 109-1 Filed 08/17/20 Page 763 of 1129 14/618,664 Page ID #:7720

Sheet 1 of 2

| PTO/SB/08A and B (08-03) U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE Substitute for Form 1449A/PTO | APPLICATION NO.: 14/618,664 | FILING DATE: February 10, 2015 |
|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** | FIRST NAMED INVENTOR: Steven M. Hotelling | ART UNIT: 2878 |
| *(Use as many sheets as necessary)* | EXAMINER NAME: Epps, Georgia Y. | ATTY. DOCKET NO.: P22733US1 |

## U.S. PATENT DOCUMENTS

| EXAMINER INITIALS* | Cite No. | PATENT NUMBER Number – Kind Code² (if known) | ISSUE DATE MM-DD-YYYY | Name of Patentee of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | A1. | 5,515,298 | 05/1996 | Bicz | |
| | A2. | 5,589,636 | 12/1996 | Bicz | |
| | A3. | 6,720,712 | 04/2004 | Scott | |
| | A4. | 7,400,750 | 07/2008 | Nam | |
| | A5. | 7,400,750 | 07/2008 | Nam | |
| | A6. | 7,458,268 | 12/2008 | Schneider et al. | |
| | A7. | 7,497,120 | 03/2009 | Schneider et al. | |
| | A8. | 7,568,391 | 08/2009 | Schneider et al. | |
| | A9. | 7,734,435 | 06/2010 | Thomas et al. | |
| | A10. | 7,739,912 | 06/2010 | Schneider et al. | |
| | A11. | 7,739,912 | 06/2010 | Schneider et al. | |
| | A12. | 7,770,456 | 08/2010 | Stevenson et al. | |
| | A13. | 8,085,998 | 12/2011 | Setlak et al. | |
| | A14. | 8,095,328 | 01/2012 | Thomas et al. | |
| | A15. | 8,201,739 | 06/2012 | Schneider et al. | |
| | A16. | 8,335,356 | 12/2012 | Schmitt | |
| | A17. | 8,601,876 | 12/2013 | Schneider et al. | |
| | A18. | 8,601,876 | 12/2013 | Schneider et al. | |
| | A19. | 8,601,876 | 12/2013 | Schneider et al. | |
| | A20. | 8,666,126 | 03/2014 | Lee et al. | |
| | A21. | 8,724,869 | 05/2014 | Schneider et al. | |
| | A22. | 8,781,180 | 07/2014 | Schneider et al. | |
| | A23. | 9,170,668 | 10/2015 | Schneider et al. | |

## U.S. PUBLICATION DOCUMENTS

| EXAMINER INITIALS* | Cite No.¹ | PUBLICATION NUMBER Number – Kind Code² (if known) | PUBLICATION DATE MM-DD-YYYY | Name of Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | B1. | 2003/0109993 | 06/2003 | Peat et al. | |
| | B2. | 2004/0140735 | 07/2004 | Scott et al. | |
| | B3. | 2006/0196271 | 09/2006 | Jancsik et al. | |
| | B4. | 2009/0167704 | 07/2009 | Terlizzi et al. | |
| | B5. | 2012/0092026 | 04/2012 | Liautaud et al. | |

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /T.K/

**Exhibit 23**
-825-

| PTO/SB/08A and B (08-03)<br>U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE<br>Substitute for Form 1449A/PTO<br><br>**INFORMATION DISCLOSURE<br>STATEMENT BY APPLICANT**<br><br>*(Use as many sheets as necessary)* | **APPLICATION NO.:**<br>14/618,664 | **FILING DATE:**<br>February 10, 2015 |
|---|---|---|
| | **FIRST NAMED INVENTOR:**<br>Steven M. Hotelling | **ART UNIT:**<br>2878 |
| | **EXAMINER NAME:**<br>Epps, Georgia Y. | **ATTY. DOCKET NO.:**<br>P22733US1 |

## U.S. PUBLICATION DOCUMENTS

| EXAMINER INITIALS* | Cite No.[1] | PUBLICATION NUMBER<br>Number – Kind Code[2] (if known) | PUBLICATION DATE<br>MM-DD-YYYY | Name of Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | B6. | 2015/0053006 | 02/2015 | DeCoux et al. | |
| | B7. | 2015/0192547 | 07/2015 | Lee et al. | |

## FOREIGN PATENT DOCUMENTS

| EXAMINER INITIALS* | Cite No.[1] | DOCUMENT NUMBER<br>Country Code[3] – Number[4] – Kind Code[5] (if known) | PUBLICATION DATE<br>MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear | T[6] |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |

## NONPATENT LITERATURE DOCUMENTS

| EXAMINER INITIALS* | Cite No.[1] | Include name of Author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and/or country where published. | T[6] |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

| **EXAMINER:** Initial if citation considered, whether or not citation is in conformance with MPEP 609; Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant. | | | |
|---|---|---|---|
| Examiner Signature | /TONY  KO/ | Date Considered | 07/22/2016 |

[1] Applicant's unique citation number (optional).  [2] See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04.  [3] Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3).  [4] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document.  [5] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible.  [6] Applicant is to place a check mark here if English language Translation is attached.

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /T.K/

**Exhibit 23**
**-826-**

| *Search Notes* | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 14618664 | HOTELLING ET AL. |
| | **Examiner** | **Art Unit** |
| | TONY KO | 2878 |

| CPC- SEARCHED | | |
|---|---|---|
| **Symbol** | **Date** | **Examiner** |
| g01j1/44 | 7/22/2016 | tk |
| a61b5/4845 | 7/22/2016 | tk |
| a61b5/1118 | 7/22/2016 | tk |
| a61b5/4872 | 7/22/2016 | tk |
| a61b5/02427 | 7/22/2016 | tk |
| g01j2001/444 | 7/22/2016 | tk |

| CPC COMBINATION SETS  - SEARCHED | | |
|---|---|---|
| **Symbol** | **Date** | **Examiner** |
| | | |

| US CLASSIFICATION SEARCHED | | | |
|---|---|---|---|
| **Class** | **Subclass** | **Date** | **Examiner** |
| | | | |

| SEARCH NOTES | | |
|---|---|---|
| **Search Notes** | **Date** | **Examiner** |
| see EAST search history | 7/22/2016 | tk |

| INTERFERENCE SEARCH | | | |
|---|---|---|---|
| **US Class/ CPC Symbol** | **US Subclass / CPC Group** | **Date** | **Examiner** |
| | | | |

| | |
|---|---|
| | |

Part of Paper No. :  20160722

**Exhibit 23**
**-827-**

**EAST Search History**

**EAST Search History (Prior Art)**

| Ref # | Hits | Search Query | DBs | Default Operator | Plurals | Time Stamp |
|---|---|---|---|---|---|---|
| S1 | 98 | ("20030109993" \| "20040140735" \| "20060196271" \| "20090167704" \| "20120092026" \| "20150053006" \| "20150192547" \| "5515298" \| "5589636" \| "6720712" \| "7400750" \| "7458268" \| "7497120" \| "7568391" \| "7734435" \| "7739912" \| "7770456" \| "8085998" \| "8095328" \| "8201739" \| "8335356" \| "8601876" \| "8666126" \| "8724869" \| "8781180" \| "9170668").PN. | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2016/07/21 15:24 |
| S2 | 2148 | g06k9/0002 | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2016/07/21 15:25 |
| S3 | 17 | S2 and (photodiode photo adj diode photosensor photo adj sensor) | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2016/07/21 15:25 |
| S4 | 715 | (finger adj print fingerprint$4) same (photosensor photo adj sensor photodiode photo adj diode) | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2016/07/21 15:30 |
| S5 | 30 | S4 and amplifier and filter and analog with digital | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2016/07/21 15:30 |
| S6 | 36 | S4 and amplifier and filter and analog with digital | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2016/07/21 15:30 |
| S7 | 99 | ("4414684").URPN. | USPAT | OR | OFF | 2016/07/21 15:39 |
| S8 | 4 | S7 and amplifier and filter and analog with digital | USPAT | OR | OFF | 2016/07/21 15:39 |
| S9 | 0 | (finger adj print fingerprint$4) same (photosensor photo adj sensor photodiode photo adj diode) same high adj pass | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2016/07/21 15:59 |
| S10 | 14 | (finger adj print fingerprint$4) same (photosensor photo adj sensor photodiode photo adj diode) and high adj pass | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; | OR | OFF | 2016/07/21 15:59 |

**Exhibit 23**
**-828-**

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | IBM_TDB | | | |
| S11 | 192 | (finger adj print fingerprint$4) same scan$4 and high adj pass and amplifier$1 | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2016/07/21 16:02 |
| S12 | 194 | (finger adj print fingerprint$4) same scan$4 and high adj pass and amplifier$1 | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2016/07/21 16:02 |
| S13 | 20633 | (g01j1/44\|a61b5/4845\|a61b5/1118\|a61b5/4872\|a61b5/02427\|g01j2001/444) | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2016/07/22 10:41 |
| S14 | 7 | S13 and transimpedence | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2016/07/22 10:44 |
| S15 | 216 | S13 and transimpedance | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2016/07/22 10:44 |
| S16 | 14 | (US-20150192547-$ or US-20120092026-$ or US-20150356340-$ or US-20160132712-$ or US-20150340539-$ or US-20050171413-$ or US-20050151065-$ or US-20040252867-$ or US-20150366518-$ or US-20100176823-$).did. or (US-9170668-$ or US-5781651-$ or US-4414684-$ or US-5719950-$).did. | US-PGPUB; USPAT | OR | OFF | 2016/07/22 10:44 |
| S17 | 0 | S15 and S16 | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2016/07/22 10:44 |
| S18 | 0 | S16 and transimpedance | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2016/07/22 10:44 |
| S19 | 200 | S13 and transimpedance adj amplifier | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2016/07/22 10:45 |
| S20 | 204 | S13 and transimpedance adj amplifier | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2016/07/22 10:45 |
| S21 | 42 | S20 and biometric | US-PGPUB; | OR | ON | 2016/07/22 |

Exhibit 23
-829-

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | | | 10:45 |
| S22 | 423 | biometric same modulation$1 | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2016/07/22 11:58 |
| S23 | 98 | biometric same modulation$1 with frequency | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2016/07/22 11:58 |
| S24 | 10 | S23 and (photodetector photosensor photo adj sensor photo adj detector) | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2016/07/22 11:58 |
| S25 | 2 | ("8954135").PN. | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2016/07/22 12:00 |
| S26 | 2 | ("9044171").PN. | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2016/07/22 12:28 |
| S27 | 2 | ("20140275850").PN. | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2016/07/22 12:31 |
| S28 | 412 | matrix same product same demodulat$4 same matrix | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2016/07/22 15:21 |
| S29 | 514 | matrix same product same demodulat$4 same matrix | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2016/07/22 15:21 |
| S30 | 184 | matrix same product same demodulat$4 same matrix | USPAT | OR | ON | 2016/07/22 15:21 |
| S31 | 15 | (US-20150192547-$ or US-20120092026-$ or US-20150356340-$ or US-20160132712-$ or US-20150340539-$ or US-20050171413-$ or US-20050151065-$ or US-20040252867-$ or US-20150366518-$ or US-20100176823-$).did. or (US-9170668-$ or US-5781651-$ or US-4414684-$ or US-5719950-$ or US-8954135-$).did. | US-PGPUB; USPAT | OR | OFF | 2016/07/22 15:29 |
| S32 | 0 | S31 and programmable near2 amplifier | US-PGPUB; | OR | OFF | 2016/07/22 |

| | | | USPAT;<br>USOCR;<br>FPRS;<br>EPO; JPO;<br>DERWENT;<br>IBM_TDB | | | 15:29 |
|---|---|---|---|---|---|---|
| S33 | 0 | S31 and programmable near2 amplifier | US-PGPUB;<br>USPAT;<br>USOCR;<br>FPRS;<br>EPO; JPO;<br>DERWENT;<br>IBM_TDB | OR | ON | 2016/07/22<br>15:29 |
| S34 | 0 | S31 and programable near2 amplifier | US-PGPUB;<br>USPAT;<br>USOCR;<br>FPRS;<br>EPO; JPO;<br>DERWENT;<br>IBM_TDB | OR | ON | 2016/07/22<br>15:29 |
| S35 | 2148 | g06k9/0002 | US-PGPUB;<br>USPAT;<br>USOCR;<br>FPRS;<br>EPO; JPO;<br>DERWENT;<br>IBM_TDB | OR | OFF | 2016/07/22<br>15:30 |
| S36 | 8 | S35 and programmable near2 amplifier | US-PGPUB;<br>USPAT;<br>USOCR;<br>FPRS;<br>EPO; JPO;<br>DERWENT;<br>IBM_TDB | OR | OFF | 2016/07/22<br>15:30 |
| S37 | 8 | S35 and programmable near2 amplifier | US-PGPUB;<br>USPAT;<br>USOCR;<br>FPRS;<br>EPO; JPO;<br>DERWENT;<br>IBM_TDB | OR | ON | 2016/07/22<br>15:30 |

**EAST Search History (Interference)**

< This search history is empty>

**7/22/2016 5:28:05 PM**
**C:\ Users\ tko\ Documents\ EAST\ Workspaces\ 14618664.wsp**

## UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

## BIB DATA SHEET

**CONFIRMATION NO. 1097**

| SERIAL NUMBER | FILING or 371(c) DATE | CLASS | GROUP ART UNIT | ATTORNEY DOCKET NO. |
|---|---|---|---|---|
| 14/618,664 | 02/10/2015 **RULE** | 250 | 2878 | P22733US1 |

**APPLICANTS**
APPLE INC., Cupertino, CA;

**INVENTORS**
Steven P. Hotelling, Cupertino, CA;
Marcelo M. Lamego, Cupertino, CA;

**\*\* CONTINUING DATA \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***
This appln claims benefit of 62/057,089 09/29/2014

**\*\* FOREIGN APPLICATIONS \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**\*\* IF REQUIRED, FOREIGN FILING LICENSE GRANTED \*\***
02/25/2015

| Foreign Priority claimed ☐ Yes ☑ No<br>35 USC 119(a-d) conditions met ☐ Yes ☑ No<br>Verified and Acknowledged /TONY KO/ Examiner's Signature | ☐ Met after Allowance Initials | STATE OR COUNTRY CA | SHEETS DRAWINGS 7 | TOTAL CLAIMS 20 | INDEPENDENT CLAIMS 3 |
|---|---|---|---|---|---|

**ADDRESS**

APPLE INC. (Brownstein)
c/o Brownstein Hyatt Farber Schreck LLP
410 17th St.
Suite 2200
DENVER, CO 80202
UNITED STATES

**TITLE**

Methods and Systems for Modulation and Demodulation of Optical Signals

| FILING FEE RECEIVED 1740 | FEES: Authority has been given in Paper No._____ to charge/credit DEPOSIT ACCOUNT No._____ for following: | ☐ All Fees |
|---|---|---|
| | | ☐ 1.16 Fees (Filing) |
| | | ☐ 1.17 Fees (Processing Ext. of time) |
| | | ☐ 1.18 Fees (Issue) |
| | | ☐ Other _____ |
| | | ☐ Credit |

Exhibit 23
-832-

| PTO/SB/08A and B (08-03) U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE Substitute for Form 1449A/PTO | APPLICATION NO.: 14/618,664 | FILING DATE: February 10, 2015 |
|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** | FIRST NAMED INVENTOR: Steven M. Hotelling | ART UNIT: 2878 |
| *(Use as many sheets as necessary)* | EXAMINER NAME: Epps, Georgia Y. | ATTY. DOCKET NO.: P22733US1 |

### U.S. PATENT DOCUMENTS

| EXAMINER INITIALS* | Cite No. | PATENT NUMBER Number – Kind Code² (if known) | ISSUE DATE MM-DD-YYYY | Name of Patentee of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | A1. | 5,515,298 | 05/1996 | Bicz | |
| | A2. | 5,589,636 | 12/1996 | Bicz | |
| | A3. | 6,720,712 | 04/2004 | Scott | |
| | A4. | 7,400,750 | 07/2008 | Nam | |
| | A5. | 7,400,750 | 07/2008 | Nam | |
| | A6. | 7,458,268 | 12/2008 | Schneider et al. | |
| | A7. | 7,497,120 | 03/2009 | Schneider et al. | |
| | A8. | 7,568,391 | 08/2009 | Schneider et al. | |
| | A9. | 7,734,435 | 06/2010 | Thomas et al. | |
| | A10. | 7,739,912 | 06/2010 | Schneider et al. | |
| | A11. | 7,739,912 | 06/2010 | Schneider et al. | |
| | A12. | 7,770,456 | 08/2010 | Stevenson et al. | |
| | A13. | 8,085,998 | 12/2011 | Setlak et al. | |
| | A14. | 8,095,328 | 01/2012 | Thomas et al. | |
| | A15. | 8,201,739 | 06/2012 | Schneider et al. | |
| | A16. | 8,335,356 | 12/2012 | Schmitt | |
| | A17. | 8,601,876 | 12/2013 | Schneider et al. | |
| | A18. | 8,601,876 | 12/2013 | Schneider et al. | |
| | A19. | 8,601,876 | 12/2013 | Schneider et al. | |
| | A20. | 8,666,126 | 03/2014 | Lee et al. | |
| | A21. | 8,724,869 | 05/2014 | Schneider et al. | |
| | A22. | 8,781,180 | 07/2014 | Schneider et al. | |
| | A23. | 9,170,668 | 10/2015 | Schneider et al. | |

### U.S. PUBLICATION DOCUMENTS

| EXAMINER INITIALS* | Cite No.¹ | PUBLICATION NUMBER Number – Kind Code² (if known) | PUBLICATION DATE MM-DD-YYYY | Name of Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | B1. | 2003/0109993 | 06/2003 | Peat et al. | |
| | B2. | 2004/0140735 | 07/2004 | Scott et al. | |
| | B3. | 2006/0196271 | 09/2006 | Jancsik et al. | |
| | B4. | 2009/0167704 | 07/2009 | Terlizzi et al. | |
| | B5. | 2012/0092026 | 04/2012 | Liautaud et al. | |

**Exhibit 23**
-833-

| PTO/SB/08A and B (08-03)<br>U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE<br>Substitute for Form 1449A/PTO | **APPLICATION NO.:**<br>14/618,664 | **FILING DATE:**<br>February 10, 2015 |
|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** | **FIRST NAMED INVENTOR:**<br>Steven M. Hotelling | **ART UNIT:**<br>2878 |
| *(Use as many sheets as necessary)* | **EXAMINER NAME:**<br>Epps, Georgia Y. | **ATTY. DOCKET NO.:**<br>P22733US1 |

### U.S. PUBLICATION DOCUMENTS

| EXAMINER INITIALS* | Cite No.[1] | PUBLICATION NUMBER<br>Number – Kind Code[2] (if known) | PUBLICATION DATE<br>MM-DD-YYYY | Name of Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | B6. | 2015/0053006 | 02/2015 | DeCoux et al. | |
| | B7. | 2015/0192547 | 07/2015 | Lee et al. | |

### FOREIGN PATENT DOCUMENTS

| EXAMINER INITIALS* | Cite No.[1] | DOCUMENT NUMBER<br>Country Code[3] – Number[4] – Kind Code[5] (if known) | PUBLICATION DATE<br>MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear | T[6] |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |

### NONPATENT LITERATURE DOCUMENTS

| EXAMINER INITIALS* | Cite No.[1] | Include name of Author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and/or country where published. | T[6] |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

| EXAMINER: Initial if citation considered, whether or not citation is in conformance with MPEP 609; Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant. |
|---|

| Examiner Signature | | Date Considered | |
|---|---|---|---|

[1] Applicant's unique citation number (optional).  [2] See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04.  [3] Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3).  [4] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document.  [5] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible.  [6] Applicant is to place a check mark here if English language Translation is attached.

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 24527696 |
| **Application Number:** | 14618664 |
| **International Application Number:** | |
| **Confirmation Number:** | 1097 |
| **Title of Invention:** | Methods and Systems for Modulation and Demodulation of Optical Signals |
| **First Named Inventor/Applicant Name:** | Steven P. Hotelling |
| **Customer Number:** | 62579 |
| **Filer:** | Stephen C. Hemenway/Valerie Brown |
| **Filer Authorized By:** | Stephen C. Hemenway |
| **Attorney Docket Number:** | P22733US1 |
| **Receipt Date:** | 05-JAN-2016 |
| **Filing Date:** | 10-FEB-2015 |
| **Time Stamp:** | 13:34:59 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | no |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Transmittal Letter | P22733US1IDS.pdf | 16130 <br> fcf728902d1f23953dfc1a8a2e04516cd0d27bcd | no | 2 |

| Warnings: |
|---|
| Information: |

Exhibit 23
-835-

| 2 | Information Disclosure Statement (IDS) Form (SB08) | P22733US1PTOSB08.pdf | 34826<br><br>379927a35591734f5063a35234f2d6166280e-d5caa | no | 2 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

This is not an USPTO supplied IDS fillable form

| **Total Files Size (in bytes):** | 50956 |
|---|---|

**This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.**

**New Applications Under 35 U.S.C. 111**
**If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.**

**National Stage of an International Application under 35 U.S.C. 371**
**If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.**

**New International Application Filed with the USPTO as a Receiving Office**
**If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.**

**Exhibit 23**
**-836-**

Attorney Docket No. P22733US1

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re the Application of: | |
| Steven M. Hotelling, et al. | Examiner:   Epps, Georgia Y. |
| Application No. 14/618,664 | Art Unit:   2878 |
| Filed: February 10, 2015 | Confirmation No.   1097 |
| For:   METHODS AND SYSTEMS FOR MODULATION AND DEMODULATION OF OPTICAL SIGNALS | |

## INFORMATION DISCLOSURE STATEMENT
## UNDER 37 C.F.R. §§ 1.97(b)(3) and 1.98

Mail Stop AMENDMENT
Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Sir:

The Examiner is requested to consider the references noted on the enclosed Form PTO/SB/08a during examination of the above-identified patent application.  These references are submitted for the Examiner's consideration and are submitted pursuant to the duty of disclosure under 37 C.F.R. § 1.56.  In submitting these references, no representation is made or implied that the references are or are not material to the examination of the application.  The Examiner is requested to make his or her own determination of materiality.  Pursuant to the requirements of 37 C.F.R. § 1.98(a)(2)(ii), only copies of the foreign references and non-patent literature documents are provided.  Copies of the U.S. patent and U.S. patent application publication references are not provided, unless required by the Office.

This Information Disclosure Statement is being filed before the mailing date of a first Office action.  Therefore, pursuant  to 37 C.F.R. 1.97(b)(3), no fees are due with respect to this filing.  However, should any such fees or petitions be required, please consider this a request therefor and authorization to charge Deposit Account No. 504621 as necessary.

013361\2216\14362220.1

Exhibit 23
-837-

Attorney Docket No. P22733US1

If the Examiner has any questions, please contact the undersigned attorney.

Dated:  January 5, 2016.

Respectfully submitted,


_____/S. Craig Hemenway/_____
S. Craig Hemenway, Registration No. 44,759
Attorney for Assignee
USPTO Customer No. 62579

Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, Colorado  80202
Phone: (303) 223-1100
Fax: (303) 223-1111

2

Exhibit 23
-838-

PTO/AIA/01 (06-12)
Approved for use through 01/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## DECLARATION (37 CFR 1.63) FOR UTILITY OR DESIGN APPLICATION USING AN APPLICATION DATA SHEET (37 CFR 1.76)

| Title of Invention | Methods and Systems for Modulation and Demodulation of Optical Signals |
|---|---|
| | Attorney Docket No. P22733US1 |

As the below named inventor, I hereby declare that:

This declaration is directed to:
☐ The attached application, or
☑ United States application or PCT international application number 14/618,664
filed on February 10, 2015

The above-identified application was made or authorized to be made by me.

I believe that I am the original inventor or an original joint inventor of a claimed invention in the application.

I hereby acknowledge that any willful false statement made in this declaration is punishable under 18 U.S.C. 1001 by fine or imprisonment of not more than five (5) years, or both.

### WARNING:

Petitioner/applicant is cautioned to avoid submitting personal information in documents filed in a patent application that may contribute to identity theft. Personal information such as social security numbers, bank account numbers, or credit card numbers (other than a check or credit card authorization form PTO-2038 submitted for payment purposes) is never required by the USPTO to support a petition or an application. If this type of personal information is included in documents submitted to the USPTO, petitioners/applicants should consider redacting such personal information from the documents before submitting them to the USPTO. Petitioner/applicant is advised that the record of a patent application is available to the public after publication of the application (unless a non-publication request in compliance with 37 CFR 1.213(a) is made in the application) or issuance of a patent. Furthermore, the record from an abandoned application may also be available to the public if the application is referenced in a published application or an issued patent (see 37 CFR 1.14). Checks and credit card authorization forms PTO-2038 submitted for payment purposes are not retained in the application file and therefore are not publicly available.

LEGAL NAME OF INVENTOR

Inventor: Steven P. Hotelling        Date (Optional): 7/14/15
Signature:

Note: An application data sheet (PTO/SB/14 or equivalent), including naming the entire inventive entity, must accompany this form or must have been previously filed. Use an additional PTO/AIA/01 form for each additional inventor.

This collection of information is required by 35 U.S.C. 115 and 37 CFR 1.63. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 1 minute to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.
If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.

Exhibit 23
-839-

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 22981010 |
| **Application Number:** | 14618664 |
| **International Application Number:** | |
| **Confirmation Number:** | 1097 |
| **Title of Invention:** | Methods and Systems for Modulation and Demodulation of Optical Signals |
| **First Named Inventor/Applicant Name:** | Steven P. Hotelling |
| **Customer Number:** | 62579 |
| **Filer:** | Stephen C. Hemenway/Valerie Brown |
| **Filer Authorized By:** | Stephen C. Hemenway |
| **Attorney Docket Number:** | P22733US1 |
| **Receipt Date:** | 21-JUL-2015 |
| **Filing Date:** | 10-FEB-2015 |
| **Time Stamp:** | 17:38:28 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | no |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Oath or Declaration filed | P22733US1DecHotelling.pdf | 864835<br>844d61ac5497713e31baa35de446eb0512e70e93 | no | 1 |

Warnings:

Information:

Exhibit 23
-840-

**Total Files Size (in bytes):** 864835

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

<u>New Applications Under 35 U.S.C. 111</u>
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

<u>National Stage of an International Application under 35 U.S.C. 371</u>
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

<u>New International Application Filed with the USPTO as a Receiving Office</u>
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

**Exhibit 23**
**-841-**

 United States Patent and Trademark Office

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING OR 371(C) DATE | FIRST NAMED APPLICANT | ATTY. DOCKET NO./TITLE |
|---|---|---|---|
| 14/618,664 | 02/10/2015 | Steven P. Hotelling | P22733US1 |

**CONFIRMATION NO. 1097**

62579
APPLE INC.
c/o Brownstein Hyatt Farber Schreck
410 17th St.
Suite 2200
DENVER, CO 80202

**NOTICE**

*OC000000073619717*

Date Mailed: 02/27/2015

## INFORMATIONAL NOTICE TO APPLICANT

Applicant is notified that the above-identified application contains the deficiencies noted below. No period for reply is set forth in this notice for correction of these deficiencies. However, if a deficiency relates to the inventor's oath or declaration, the applicant must file an oath or declaration in compliance with 37 CFR 1.63, or a substitute statement in compliance with 37 CFR 1.64, executed by or with respect to each actual inventor no later than the expiration of the time period set in the "Notice of Allowability" to avoid abandonment. See 37 CFR 1.53(f).

The item(s) indicated below are also required and should be submitted with any reply to this notice to avoid further processing delays.

- A properly executed inventor's oath or declaration has not been received for the following inventor(s):
  Steven P. Hotelling

**Exhibit 23**
**-842-**



### UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING or 371(c) DATE | GRP ART UNIT | FIL FEE REC'D | ATTY.DOCKET.NO | TOT CLAIMS | IND CLAIMS |
|---|---|---|---|---|---|---|
| 14/618,664 | 02/10/2015 | 2875 | 1740 | P22733US1 | 20 | 3 |

**CONFIRMATION NO. 1097**

62579
APPLE INC.
c/o Brownstein Hyatt Farber Schreck
410 17th St.
Suite 2200
DENVER, CO 80202

**FILING RECEIPT**

*OC000000073619716*

Date Mailed: 02/27/2015

Receipt is acknowledged of this non-provisional patent application. The application will be taken up for examination in due course. Applicant will be notified as to the results of the examination. Any correspondence concerning the application must include the following identification information: the U.S. APPLICATION NUMBER, FILING DATE, NAME OF APPLICANT, and TITLE OF INVENTION. Fees transmitted by check or draft are subject to collection. Please verify the accuracy of the data presented on this receipt. **If an error is noted on this Filing Receipt, please submit a written request for a Filing Receipt Correction. Please provide a copy of this Filing Receipt with the changes noted thereon. If you received a "Notice to File Missing Parts" for this application, please submit any corrections to this Filing Receipt with your reply to the Notice. When the USPTO processes the reply to the Notice, the USPTO will generate another Filing Receipt incorporating the requested corrections**

**Inventor(s)**

Steven P. Hotelling, Cupertino, CA;
Marcelo M. Lamego, Cupertino, CA;

**Applicant(s)**

APPLE INC., Cupertino, CA

**Power of Attorney:** The patent practitioners associated with Customer Number 62579

**Domestic Priority data as claimed by applicant**
This appln claims benefit of 62/057,089 09/29/2014

**Foreign Applications** for which priority is claimed (You may be eligible to benefit from the **Patent Prosecution Highway** program at the USPTO. Please see http://www.uspto.gov for more information.) - None.
*Foreign application information must be provided in an Application Data Sheet in order to constitute a claim to foreign priority. See 37 CFR 1.55 and 1.76.*

**If Required, Foreign Filing License Granted:** 02/25/2015

The country code and number of your priority application, to be used for filing abroad under the Paris Convention, is **US 14/618,664**

**Projected Publication Date:** Request for Non-Publication Acknowledged

**Non-Publication Request:** Yes

**Early Publication Request:** No

**Exhibit 23**
-843-

**Title**

    Methods and Systems for Modulation and Demodulation of Optical Signals

**Preliminary Class**

    362

**Statement under 37 CFR 1.55 or 1.78 for AIA (First Inventor to File) Transition Applications:** No

# PROTECTING YOUR INVENTION OUTSIDE THE UNITED STATES

Since the rights granted by a U.S. patent extend only throughout the territory of the United States and have no effect in a foreign country, an inventor who wishes patent protection in another country must apply for a patent in a specific country or in regional patent offices. Applicants may wish to consider the filing of an international application under the Patent Cooperation Treaty (PCT). An international (PCT) application generally has the same effect as a regular national patent application in each PCT-member country. The PCT process **simplifies** the filing of patent applications on the same invention in member countries, but **does not result** in a grant of "an international patent" and does not eliminate the need of applicants to file additional documents and fees in countries where patent protection is desired.

Almost every country has its own patent law, and a person desiring a patent in a particular country must make an application for patent in that country in accordance with its particular laws. Since the laws of many countries differ in various respects from the patent law of the United States, applicants are advised to seek guidance from specific foreign countries to ensure that patent rights are not lost prematurely.

Applicants also are advised that in the case of inventions made in the United States, the Director of the USPTO must issue a license before applicants can apply for a patent in a foreign country. The filing of a U.S. patent application serves as a request for a foreign filing license. The application's filing receipt contains further information and guidance as to the status of applicant's license for foreign filing.

Applicants may wish to consult the USPTO booklet, "General Information Concerning Patents" (specifically, the section entitled "Treaties and Foreign Patents") for more information on timeframes and deadlines for filing foreign patent applications. The guide is available either by contacting the USPTO Contact Center at 800-786-9199, or it can be viewed on the USPTO website at http://www.uspto.gov/web/offices/pac/doc/general/index.html.

For information on preventing theft of your intellectual property (patents, trademarks and copyrights), you may wish to consult the U.S. Government website, http://www.stopfakes.gov. Part of a Department of Commerce initiative, this website includes self-help "toolkits" giving innovators guidance on how to protect intellectual property in specific countries such as China, Korea and Mexico. For questions regarding patent enforcement issues, applicants may call the U.S. Government hotline at 1-866-999-HALT (1-866-999-4258).

**Exhibit 23**
**-844-**

# LICENSE FOR FOREIGN FILING UNDER

## Title 35, United States Code, Section 184

## Title 37, Code of Federal Regulations, 5.11 & 5.15

**GRANTED**

The applicant has been granted a license under 35 U.S.C. 184, if the phrase "IF REQUIRED, FOREIGN FILING LICENSE GRANTED" followed by a date appears on this form. Such licenses are issued in all applications where the conditions for issuance of a license have been met, regardless of whether or not a license may be required as set forth in 37 CFR 5.15. The scope and limitations of this license are set forth in 37 CFR 5.15(a) unless an earlier license has been issued under 37 CFR 5.15(b). The license is subject to revocation upon written notification. The date indicated is the effective date of the license, unless an earlier license of similar scope has been granted under 37 CFR 5.13 or 5.14.

This license is to be retained by the licensee and may be used at any time on or after the effective date thereof unless it is revoked. This license is automatically transferred to any related applications(s) filed under 37 CFR 1.53(d). This license is not retroactive.

The grant of a license does not in any way lessen the responsibility of a licensee for the security of the subject matter as imposed by any Government contract or the provisions of existing laws relating to espionage and the national security or the export of technical data. Licensees should apprise themselves of current regulations especially with respect to certain countries, of other agencies, particularly the Office of Defense Trade Controls, Department of State (with respect to Arms, Munitions and Implements of War (22 CFR 121-128)); the Bureau of Industry and Security, Department of Commerce (15 CFR parts 730-774); the Office of Foreign AssetsControl, Department of Treasury (31 CFR Parts 500+) and the Department of Energy.

**NOT GRANTED**

No license under 35 U.S.C. 184 has been granted at this time, if the phrase "IF REQUIRED, FOREIGN FILING LICENSE GRANTED" DOES NOT appear on this form. Applicant may still petition for a license under 37 CFR 5.12, if a license is desired before the expiration of 6 months from the filing date of the application. If 6 months has lapsed from the filing date of this application and the licensee has not received any indication of a secrecy order under 35 U.S.C. 181, the licensee may foreign file the application pursuant to 37 CFR 5.15(b).

---

## *SelectUSA*

The United States represents the largest, most dynamic marketplace in the world and is an unparalleled location for business investment, innovation, and commercialization of new technologies. The U.S. offers tremendous resources and advantages for those who invest and manufacture goods here. Through SelectUSA, our nation works to promote and facilitate business investment. SelectUSA provides information assistance to the international investor community; serves as an ombudsman for existing and potential investors; advocates on behalf of U.S. cities, states, and regions competing for global investment; and counsels U.S. economic development organizations on investment attraction best practices. To learn more about why the United States is the best country in the world to develop technology, manufacture products, deliver services, and grow your business, visit http://www.SelectUSA.gov or call +1-202-482-6800.

**Exhibit 23**
**-845-**

## PATENT APPLICATION FEE DETERMINATION RECORD
Substitute for Form PTO-875

| | |
|---|---|
| Application or Docket Number | 14/618,664 |

### APPLICATION AS FILED - PART I

| FOR | NUMBER FILED (Column 1) | NUMBER EXTRA (Column 2) | SMALL ENTITY RATE($) | FEE($) | OR | OTHER THAN SMALL ENTITY RATE($) | FEE($) |
|---|---|---|---|---|---|---|---|
| BASIC FEE (37 CFR 1.16(a), (b), or (c)) | N/A | N/A | N/A | | | N/A | 280 |
| SEARCH FEE (37 CFR 1.16(k), (i), or (m)) | N/A | N/A | N/A | | | N/A | 600 |
| EXAMINATION FEE (37 CFR 1.16(o), (p), or (q)) | N/A | N/A | N/A | | | N/A | 720 |
| TOTAL CLAIMS (37 CFR 1.16(i)) | 20 | minus 20 = * | | | OR | x 80 = | 0.00 |
| INDEPENDENT CLAIMS (37 CFR 1.16(h)) | 3 | minus 3 = * | | | | x 420 = | 0.00 |
| APPLICATION SIZE FEE (37 CFR 1.16(s)) | If the specification and drawings exceed 100 sheets of paper, the application size fee due is $310 ($155 for small entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s). | | | | | | 0.00 |
| MULTIPLE DEPENDENT CLAIM PRESENT (37 CFR 1.16(j)) | | | | | | | 0.00 |
| * If the difference in column 1 is less than zero, enter "0" in column 2. | | | TOTAL | | | TOTAL | 1600 |

### APPLICATION AS AMENDED - PART II

**AMENDMENT A**

| | CLAIMS REMAINING AFTER AMENDMENT (Column 1) | HIGHEST NUMBER PREVIOUSLY PAID FOR (Column 2) | PRESENT EXTRA (Column 3) | SMALL ENTITY RATE($) | ADDITIONAL FEE($) | OR | OTHER THAN SMALL ENTITY RATE($) | ADDITIONAL FEE($) |
|---|---|---|---|---|---|---|---|---|
| Total (37 CFR 1.16(i)) | * | Minus ** | = | x = | | OR | x = | |
| Independent (37 CFR 1.16(h)) | * | Minus *** | = | x = | | OR | x = | |
| Application Size Fee (37 CFR 1.16(s)) | | | | | | | | |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | | OR | | |
| | | | | TOTAL ADD'L FEE | | OR | TOTAL ADD'L FEE | |

**AMENDMENT B**

| | CLAIMS REMAINING AFTER AMENDMENT (Column 1) | HIGHEST NUMBER PREVIOUSLY PAID FOR (Column 2) | PRESENT EXTRA (Column 3) | SMALL ENTITY RATE($) | ADDITIONAL FEE($) | OR | OTHER THAN SMALL ENTITY RATE($) | ADDITIONAL FEE($) |
|---|---|---|---|---|---|---|---|---|
| Total (37 CFR 1.16(i)) | * | Minus ** | = | x = | | OR | x = | |
| Independent (37 CFR 1.16(h)) | * | Minus *** | = | x = | | OR | x = | |
| Application Size Fee (37 CFR 1.16(s)) | | | | | | | | |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | | OR | | |
| | | | | TOTAL ADD'L FEE | | OR | TOTAL ADD'L FEE | |

* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.
** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20".
*** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3".
The "Highest Number Previously Paid For" (Total or Independent) is the highest found in the appropriate box in column 1.

**Exhibit 23**
**-846-**

PTO/AIA/82B(07-12)
Approved for use through 11/30/2014. OMB 0651-0035
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# POWER OF ATTORNEY BY APPLICANT

I hereby revoke all previous powers of attorney given in the application identified in the attached transmittal letter.

☑ I hereby appoint Practitioner(s) associated with the following Customer Number as my/our attorney(s) or agent(s), and to transact all business in the United States Patent and Trademark Office connected therewith for the application referenced in the attached transmittal letter (form PTO/AIA/82A or equivalent):

| 62579 |

OR

☐ I hereby appoint Practitioner(s) named below as my/our attorney(s) or agent(s), and to transact all business in the United States Patent and Trademark Office connected therewith for the application referenced in the attached transmittal letter (form PTO/AIA/82A or equivalent):

| Name | Registration Number | Name | Registration Number |
|------|---------------------|------|---------------------|
|      |                     |      |                     |
|      |                     |      |                     |
|      |                     |      |                     |
|      |                     |      |                     |

Please recognize or change the correspondence address for the application identified in the attached transmittal letter to:

☑ The address associated with the above-mentioned Customer Number.
OR
☐ The address associated with Customer Number:
OR

| ☐ Firm or Individual Name | |
|---|---|
| Address | |
| City | State | Zip |
| Country | |
| Telephone | Email |

I am the Applicant:

☐ Inventor or Joint Inventor
☐ Legal Representative of a Deceased or Legally Incapacitated Inventor
☑ Assignee or Person to Whom the Inventor is Under an Obligation to Assign
☐ Person Who Otherwise Shows Sufficient Proprietary Interest (e.g., a petition under 37 CFR 1.46(b)(2) was granted in the application or is concurrently being filed with this document)

SIGNATURE of Applicant for Patent

| Signature | | Date | 9/27/16 |
|---|---|---|---|
| Name | BJ Watrous, | Telephone | 408 974-0015 |
| Title and Company | Vice President and Chief IP Counsel, Apple Inc. | | |

NOTE: Signature - This form must be signed by the applicant in accordance with 37 CFR 1.33. See 37 CFR 1.4 for signature requirements and certifications. Submit multiple forms for more than one signature, see below *.

☐ *Total of _____ forms are submitted.

This collection of information is required by 37 CFR 1.31, 1.32 and 1.33. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 3 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

Exhibit 23
-847-

PTO/SB/35 (07-09)
Approved for use through 07/31/2012. OMB 0651-0031
U.S. Patent and Trademark Office; U. S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# NONPUBLICATION REQUEST UNDER 35 U.S.C. 122(b)(2)(B)(i)

| First Named Inventor | P22733US1 |
|---|---|
| Title | Methods and Systems for Modulation... |
| Attorney Docket Number | P22733US1 |

I hereby certify that the invention disclosed in the attached application **has not and will not be** the subject of an application filed in another country, or under a multilateral international agreement, that requires publication at eighteen months after filing.

I hereby request that the attached application not be published under 35 U.S.C. 122(b).

/S. Craig Hemenway/

**Signature**

February 10, 2015

**Date**

S. Craig Hemenway

**Typed or printed name**

44,759

**Registration Number, if applicable**

303-223-1100

**Telephone Number**

This request must be signed in compliance with 37 CFR 1.33(b) and submitted with the application **upon filing.**

Applicant may rescind this nonpublication request at any time. If applicant rescinds a request that an application not be published under 35 U.S.C. 122(b), the application will be scheduled for publication at eighteen months from the earliest claimed filing date for which a benefit is claimed.

If applicant subsequently files an application directed to the invention disclosed in the attached application in another country, or under a multilateral international agreement, that requires publication of applications eighteen months after filing, the applicant **must** notify the United States Patent and Trademark Office of such filing within forty-five (45) days after the date of the filing of such foreign or international application. **Failure to do so will result in abandonment of this application (35 U.S.C. 122(b)(2)(B)(iii)).**

This collection of information is required by 37 CFR 1.213(a). The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 USC 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 6 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 (1-800-786-9199) and select option 2.*

**Exhibit 23**
**-848-**

Attorney Docket No. P22733US1

# Methods and Systems for Modulation And Demodulation of Optical Signals

Cross-Reference to Related Application

[0001] This application claims the benefit under 35 U.S.C. § 119(e) of U.S. Provisional Patent Application No. 62/057,089, filed on September 29, 2014, and entitled "Methods and Systems for Modulation and Demodulation of Optical Signals," which is incorporated by reference as if fully disclosed herein.

**Exhibit 23**
**-849-**

Attorney Docket No. P22733US1

Technical Field

**[0002]** The present invention relates generally to health monitoring systems, and more particularly to health monitoring devices that include one or more optical sensors.

**Exhibit 23**
**-850-**

Background

**[0003]** Health monitoring devices, such as fitness and wellness devices, may be capable of non-invasively measuring a variety of physiological characteristics of a subject via optical sensing. Such health monitoring devices can include a light source and an optical sensor.

**[0004]** The light source can illuminate a portion of a measurement site or even emit light that penetrates beneath the measurement site, such as into the stratum corneum of the skin or into blood vessels beneath the skin. Light from the light source may be scattered, absorbed, and/or reflected throughout the measurement site or the material forming the measurement site, such as the skin. The amount of scatter, absorption, or reflection can depend directly or indirectly on one or more physiological characteristics of the measurement site.

**[0005]** The optical sensor can collect light exiting the measurement site and generate electrical signals corresponding to the collected light, which may be conveyed (in the form of electrical signals) as information or data to the health monitoring device. The health monitoring device can use the optical sensor data to extrapolate, determine, derive, estimate, or measure physiological parameters of the measurement site.

**[0006]** In many cases, the optical sensor data may include noise associated with ambient light, surface conditions of the measurement site (e.g., cleanliness, hair, perspiration, etc.), proximity of the optical sensor and/or light source to the measurement site, and motion artifacts caused by the relative motion between the health monitoring device and the measurement site.

**[0007]** Furthermore, health monitoring devices often have a small form factor and are wearable by a subject for extended periods of time. The constrained proportions of such devices can limit the maximum physical size of the optical sensor and/or light source, effectively restricting the performance of both. For example, smaller light sources may emit less light and smaller optical sensors may detect less light. In addition, as the size of the optical sensor and/or light source decrease, the effects of noise increase. As a result, the accuracy, precision, and/or reliability of the physiological parameters derived from the optical sensor data can decrease with the size of many current health monitoring devices.

Exhibit 23
-851-

[0008] Accordingly, there may be a present need for an improved optical sensing system configured for use with a small form factor health monitoring device.

Exhibit 23
-852-

Attorney Docket No. P22733US1

Summary

[0009] Embodiments described herein may relate to, include, or take the form of an electronic device adapted to measures the optical characteristics, such as reflection or transmission, of a subject.

[0010] Embodiments described herein may relate to, include, or take the form of an electronic device including at least a housing with a surface adapted to be positioned proximate a measurement site of a subject, a biometric sensor positioned at least partially within the surface and including at least a plurality of light sources for emitting light toward the measurement site and an optical sensor for obtaining light exiting the measurement site. The electronic device can also include an input amplifier coupled to the output of the biometric sensor, a high pass filter coupled to the output of the input amplifier, an output amplifier coupled to the output of the high pass filter, and an analog to digital converter coupled to the output of the output amplifier.

[0011] Further embodiments described herein may relate to, include, or take the form of a sensor system including at least a plurality of light sources for emitting light toward a measurement site of a subject, an optical sensor for obtaining light exiting the measurement site, and an input amplifier coupled to the output of the biometric sensor, a high pass filter coupled to the output of the input amplifier, an output amplifier coupled to the output of the high pass filter, and an analog to digital converter coupled to the output of the output amplifier.

[0012] Additional embodiments described herein may relate to, include, or take the form of a method of optical sensing, including at least the operations of emitting light toward a measurement site of a subject, obtaining light exiting the measurement site, converting the obtained light to an electrical signal, amplifying the electrical signal to obtain an amplified signal, filtering low frequency elements from the amplified signal to obtain a filtered signal, and amplifying the filtered signal to obtain an output signal.

[0013] Other embodiments may include further including at least sampling the output signal to obtain a matrix of samples, and determining product of the matrix of samples with a demodulation matrix to obtain a demodulated matrix. Sampling the output signal to obtain a matrix of samples can include taking a first sample, taking a second sample, taking a third

- 5 -

Exhibit 23
-853-

Attorney Docket No. P22733US1

sample, subtracting the average of the first and third sample from the second sample to obtain an output sample, and inserting the output sample into the matrix of samples.

[0014] Other embodiments may include a configuration in which light may be emitted toward the measurement site from a plurality of light sources each with a light emitting diode, and light may be obtained exiting by an optical sensor with one of the group consisting of photodiodes, phototransistors, or optical image sensors.

Exhibit 23
-854-

Brief Description of the Drawings

[0015] Reference will now be made to representative embodiments illustrated in the accompanying figures. It should be understood that the following descriptions are not intended to limit the disclosure to one preferred embodiment. To the contrary, each is intended to cover alternatives, modifications, and equivalents as may be included within the spirit and scope of the described embodiments as defined by the appended claims.

[0016] FIG. 1A depicts a top plan view of an example health monitoring device.

[0017] FIG. 1B depicts a bottom plan view of the health monitoring device of FIG. 1A, showing apertures associated with an optical sensing system.

[0018] FIG. 2A depicts a detailed cross-section of FIG. 1B taken along line 2-2, showing a simplified view of the optical sensing system of FIG. 1B.

[0019] FIG. 2B depicts the detailed cross-section of FIG. 2A, showing a set of example light paths from a light source through a measurement site of a subject to an optical sensor of the optical sensing system.

[0020] FIG. 3 depicts a simplified signal flow diagram of an optical sensing system.

[0021] FIG. 4 depicts a simplified signal flow diagram of amplification and filtering stages of an optical sensing system.

[0022] FIG. 5 depicts a simplified signal flow diagram of a demodulation stage of an optical sensing system.

[0023] FIG. 6 depicts example operations of a method of calibrating an optical sensing system performed by a light source controller.

[0024] FIG. 7 depicts example operations of a method of calibrating an optical sensing system performed by an optical sensor controller.

[0025] The use of the same or similar reference numerals in different drawings indicates similar, related, or identical items where appropriate.

Exhibit 23
-855-

<u>Detailed Description</u>

[0026] Embodiments described herein relate to systems and methods for increasing the signal to noise ratio of an optical sensing system configured for use with a small form factor health monitoring device, although the various systems and methods described herein are not limited to particular form factors and can apply equally to larger embodiments. Further, it should be appreciated that the various embodiments described herein, as well as functionality, operation, components, and capabilities thereof may be combined with other elements as necessary, and so any physical, functional, or operational discussion of any element or feature is not intended to be limited solely to a particular embodiment to the exclusion of others.

[0027] Any suitable type of electronic device can include health monitoring functionality. Example electronic devices include, but are not limited to, a smart telephone, a headset, a pulse oximeter, a digital media player, a tablet computing device, a timekeeping device, a peripheral input device (e.g., keyboard, mouse, trackpad), and a wearable device. Electronic devices that include health monitoring functionality are generally referred to herein as "health monitoring devices" or "health devices" and the like. Accordingly, it is understood that a health monitoring device as described herein is not necessarily limited to devices configured to only provide health-related information, rather, a health monitoring device may include other functionality as well.

[0028] In one embodiment, one or more sensors may be included within the health monitoring device. Sensors utilized by a health monitoring device can vary from embodiment to embodiment. Suitable sensors can include temperature sensors, electrodermal sensors, blood pressure sensors, heart rate sensors, respiration rate sensors, oxygen saturation sensors, plethysmographic sensors, activity sensors, pedometers, blood glucose sensors, body weight sensors, body fat sensors, blood alcohol sensors, dietary sensors, and so on.

[0029] Certain sensors can collect certain health-related information non-invasively. For example, a health monitoring device can include a sensor that is configured to measure changes in light absorption of a measurement site of the subject. Such a sensor can be implemented as an active sensing system including a light emitter and a light detector. In one embodiment the sensing system can include a light source for emitting light into a measurement site of a subject and an optical sensor to detect light exiting the measurement site. Light from the light source

Exhibit 23
-856-

may be scattered, absorbed, and/or reflected throughout the measurement sight as a function of various physiological parameters or characteristics of the subject. For example, a subject may be a human user and the measurement site may be the user's wrist. In such an example, the tissue of the user's wrist can scatter, absorb, or reflect light emitted by the light source differently depending on various physiological characteristics of the surface and subsurface of the user's wrist. In other examples, a subject can be an animal.

[0030] For example, some embodiments may be configured to detect various subsurface events, such as the user's cardiac cycle. More particularly, during each complete heartbeat, a user's subcutaneous tissue can distend and contract, alternatingly increasing and decreasing the light absorption capacity of the measurement site. In these embodiments, the optical sensor can collect light exiting the measurement site and generate electrical signals corresponding to the collected light. Thereafter, the electrical signals can be conveyed as data to the health monitoring device. One may appreciate that such a sensor is conventionally referred to as a photoplethysmographic sensor (hereinafter "PPG sensor").

[0031] As noted above, the performance optical sensors such as PPG sensors can be negatively affected by noise associated with ambient light, surface conditions of the measurement site (e.g., cleanliness, hair, perspiration, etc.), proximity of the optical sensor and/or light source to the measurement site, and motion artifacts caused by the relative motion between the health monitoring device and the measurement site. In other words, "environmental noise" can have a substantial impact on the quality of the data obtained by the optical sensor.

[0032] Accordingly, many embodiments described herein modulate the light output from the light source and demodulate the light collected by the optical sensors. In this manner, environmental noise can be at least partially prevented from interfering with the operation of the optical sensor. In many embodiments, modulation and demodulation can be implemented by toggling the light source on and off at a particular frequency. Thereafter, the optical sensor can generate electrical signals corresponding to the light collected from the measurement site. In these embodiments, the electrical signals can be demodulated and processed by the health monitoring device.

Exhibit 23
-857-

Attorney Docket No. P22733US1

[0033] In many embodiments, the health monitoring device can implement a time-domain noise attenuation operation such as dark-channel subtraction. For example, in some embodiments, a sample can be taken from the optical sensor when it is known that the light source is not emitting light. This sample can be saved as a "dark" sample. Thereafter, a sample can be taken from the optical sensor when it is known that the light source is emitting light. Next, the dark sample can be subtracted from this "light" sample to remove the effects of noise from the light sample. In other words, a dark sample can represent an approximation of the amount of environmental noise at or near the time the dark sample was taken.

[0034] In further embodiments, a second dark sample can be taken after the light sample. In such cases, the first and second dark samples can be averaged. The averaged dark sample may be subtracted from the intervening light sample in order to remove the effects of noise from the light sample.

[0035] Although time-domain noise attenuation operations such as dark-channel subtraction may be suitable in certain embodiments for mitigating the effects of certain environmental noise sources, the delays required between "light" samples (e.g., delays where dark samples are required to be taken) can cause undesirable aliasing. In some examples, using dark-channel subtraction may require a reduction in sampling rate, which in turn can increase the number of aliases present in the data output from the optical sensor. In these examples, low frequency aliases may be particularly undesirable.

[0036] For example, many physiological signals measurable by a PPG sensor (e.g., respiration, heart rate) are relatively low frequency signals. For example, a heathy user's heart rate may vary from less than one beat per second to only a few beats per second. In other words, a heart rate may be a physiological signal within the frequency band from 0 Hz to 3 – 4 Hz. Accordingly, low frequency aliasing (as a result of dark-channel subtraction) can interfere with the detection and extraction of low frequency physiological signals, such as heart rate.

[0037] Accordingly, certain embodiments described herein implement a filter prior to time-domain noise attenuation. For example, a high pass or a band pass filter can be implemented to attenuate some or all frequencies except frequencies nearby the modulation frequency. In this manner, certain frequencies of environmental noise can be attenuated prior to

Exhibit 23
-858-

time-domain noise attenuation operations such as dark-channel subtraction. As a result, low frequency noise sources are attenuated and, accordingly, the negative effects of low frequency aliasing can be reduced.

[0038] Although filtering prior to dark-channel subtraction may be suitable in some embodiments for attenuating certain noise sources, the process of filtering with a dynamic filter (such as a band pass or high pass filter) can increase the complexity of demodulating and/or demultiplexing the signal. For example, the time response of a dynamic filter can mix the time-multiplexed signals sent from the light source in time. In other words, dynamic filtering of a signal $S_0$ received at time $t_0$ can cause the signal $S_0$ to interfere with a signal $S_1$ sent at time $t_1$.

[0039] Accordingly, embodiments described herein relate to methods and systems for demodulating and demultiplexing signals output from an optical sensor implementing both dynamic filtering and time-domain noise attenuation.

[0040] FIG. 1A depicts a top plan view of an example health monitoring device 100. In the illustrated embodiment, the health monitoring device may be implemented as a portable electronic device that is adapted to be worn by a user. Other embodiments can implement the health monitoring device differently. For example, the health monitoring device can be a smart phone, a gaming device, a digital music player, a sports accessory device, a medical device, a device that provides time and/or weather information, a health assistant, and other types of electronic device suitable for attaching to a user.

[0041] The health monitoring device can be implemented as a wearable health assistant that provides health-related information (whether real-time or not) to the user, authorized third parties, and/or an associated monitoring device. The wearable health assistant may be configured to provide health-related information or data such as, but not limited to, heart rate data, blood pressure data, temperature data, blood oxygen saturation level data, diet/nutrition information, medical reminders, health-related tips or information, or other health-related data. The associated monitoring device may be, for example, a tablet computing device, phone, personal digital assistant, computer, and so on.

Exhibit 23
-859-

Attorney Docket No. P22733US1

[0042] As another example, the health monitoring device can be configured in the form of a wearable communications device. The wearable communications device may include a processor coupled with or in communication with a memory, one or more sensors, one or more communication interfaces, output devices such as displays and speakers, one or more input devices, and a health monitoring system. The communication interface(s) can provide electronic communications between the communications device and any external communication network, device or platform, such as but not limited to wireless interfaces, Bluetooth interfaces, USB interfaces, Wi-Fi interfaces, TCP/IP interfaces, network communications interfaces, or any conventional communication interfaces. The wearable communications device may provide information regarding time, health, statuses or externally connected or communicating devices and/or software executing on such devices, messages, video, operating commands, and so forth (and may receive any of the foregoing from an external device), in addition to communications.

[0043] The health monitoring device 100 includes a housing 102 at least partially surrounding a display 104. In many examples, the display 104 may incorporate an input device configured to receive touch input, force input, and the like and/or output information to a user, such as various health parameters or health-related suggestions. The health monitoring device 100 may also include one or more buttons or input devices (not shown). The housing 102 can form an outer surface or partial outer surface and protective case for the internal components of the health monitoring device 100. In the illustrated embodiment, the housing 102 is formed into a substantially rectangular shape, although this configuration is not required.

[0044] The housing 102 can be formed of one or more components operably connected together, such as a front piece and a back piece or a top clamshell and a bottom clamshell. Alternatively, the housing 102 can be formed of a single piece (e.g., uniform body or unibody) operably connected to the display 104.

[0045] The display 104 can be implemented with any suitable technology, including, but not limited to, a multi-touch sensing touchscreen that uses liquid crystal display (LCD) technology, light emitting diode (LED) technology, organic light-emitting display (OLED) technology, organic electroluminescence (OEL) technology, or another type of display technology. A button (not shown) might take the form of a home button, which may be a

- 12 -

Exhibit 23
-860-

mechanical button, a soft button (e.g., a button that does not physically move but still accepts inputs), an icon or image on the display 104 or on an input region, and so on. Other buttons or mechanisms can be used as input/output devices, such as a speaker, rotary input, a microphone, an on/off button, a mute button, or a sleep button.

[0046] The health monitoring device 100 may include one or more health sensors. In some examples, the health sensors can be disposed on a bottom surface 112 of the housing 102. For example, FIG. 1B depicts a bottom plan view of the health monitoring device of FIG. 1A, showing two apertures 114a, 114b associated with an optical sensing system that can be used to obtain health-related information from a user. As noted above, an optical sensing system can include a light source and an optical sensor (not shown). The light source can be disposed within a first aperture 114a and the optical sensor can be disposed within a second aperture 114b. In some embodiments, the light source may fill the first aperture and/or the optical sensor may fill the second aperture, while in other embodiments optically-transparent windows or covers may seal the light source and optical sensor in their respective apertures. As used herein, the term "optically transparent" and variants thereof does not necessarily mean that the structure is transparent to visible light but instead to the particular wavelength of light emitted by the light source and/or received by the sensor. Thus, some windows may pass infrared light but block visible light and still be optically transparent.

[0047] In some examples, and as illustrated, the apertures 114a, 114b the bottom surface 112 of the housing 102 may take a convex shape, although this configuration is not required. In these examples, the apertures 114a, 114b can be formed symmetrically about the apex of the convex curvature of the bottom surface 112. In this manner, the curvature of the housing itself can provide an optical barrier between the light source and the optical sensor. For example, the apex of the convex curvature of the external surface can physically and optically separate the light source from the optical sensor. In other examples, the bottom surface 112 can be flat, faceted, or concave. In further embodiments, the bottom surface 112 can take an arbitrary shape. In some embodiments, the light source and/or optical sensor may be recessed within the apertures such that there is no direct light path between the two.

- 13 -

Exhibit 23
-861-

[0048] The apertures 114a, 114b may be separated by a selected distance. The distance between the apertures 114a, 114b can vary from embodiment to embodiment.

[0049] FIG. 2A depicts a detailed cross-section of FIG. 1B taken along line 2-2, showing a simplified view of the optical sensing system of FIG. 1B. The optical sensing system includes a light source 116 and an optical sensor 122. In one embodiment the light source 116 may be light emitting diode configured to emit light at a particular frequency. For example, in certain embodiments the light source 116 can be configured to emit green light. In another example, the light source 116 can emit infrared light. In still further examples, the light source 116 can be configured to emit light in another frequency band.

[0050] In many embodiments, more than one independent light source can be implemented as the light source 116. For example, certain embodiments can include four light sources within the space reserved for the light source 116. In other embodiments more or fewer light sources can be used. In these and related embodiments, the multiple individual light sources 116 can be configured to illuminate independently or at once. For example, in certain embodiments, individual light sources 116 can be illuminated in a sequence.

[0051] The optical sensor 122 can be a photodiode, phototransistor, and/or an optical image sensor such as a charge-coupled device ("CCD") or complementary metal-oxide semiconductor ("CMOS") array.

[0052] The light source 116 can be disposed within a cavity 118 that extends to the aperture 114a. In some embodiments, the cavity 118 may have a shorter width than that of the aperture 114a, although this configuration is not required.

[0053] A lens 120 or window may seal the cavity 118; the lens 120 need not focus or scatter light in any particular fashion. The lens 120 may be formed from the same material as the bottom surface 112, although this is not required. In one embodiment, the lens 120 can be configured to diffuse light, while in other embodiments it may focus light or may not affect the directionality of light passing therethrough. In some embodiments, the lens 120 may be optically transparent. In still further embodiments, the lens 120 may be configured to exhibit transparency in a first light frequency band and to be opaque in a second light frequency band. For one

- 14 -

Exhibit 23
-862-

example, the first light frequency band can be infrared light and the second light frequency band can be visible light.

[0054] As with the light source 116, the optical sensor 122 can be disposed within a cavity 124 and below another window or lens 126. As with the lens 120, the lens 126 can be configured to diffuse light. In other embodiments, the lens 126 may be optically transparent, or may be shaped to focus light to a particular focal point (or not). In still further embodiments, the lens 126 may be configured to exhibit transparency in a first light frequency band and to be opaque in a second light frequency band. For one example, the first light frequency band can be infrared light and the second light frequency band can be visible light.

[0055] FIG. 2B depicts a second cross-section like that of FIG. 2A, now showing a set of example light paths from a light source through a measurement site 110 of a subject to an optical sensor of the optical sensing system. As illustrated, light emitted from the light source 116 passes into an illumination area 130 of the measurement site 110, through an intermediate volume 128 of the measurement site 110, to a collection area 132 of the measurement site 110, and, thereafter, exits the collection area 132 where it may be collected by the optical sensor 122 and conveyed to the health monitoring device 102. In many embodiments, the subject may be a human user.

[0056] As illustrated, a portion of the light emitted from the light source 116 may not exit the intermediate volume 128 through the collection area 132. For example, some light may continue transmitting in a direction parallel to the length of the intermediate volume 128. In addition, some light can transmit in directions away from the collection area 132. In addition, some light can be absorbed within the intermediate volume collection area 132, depicted in FIG. 2B as point-terminated lines. Accordingly, the quantity of light received by the optical sensor 122 may be less than the quantity of light emitted by the light source 116.

[0057] FIG. 3 depicts a simplified signal flow diagram of an optical sensing system. An optical sensing system can include a light source controller 300 that is coupled to one or more light sources 302. The light source controlled 300 can be implemented as a microprocessor, integrated circuit, with discrete circuitry, or using any other suitable technique. The light source controller 300 can be configured to control the power state, brightness, and/or color of the light

**Exhibit 23**
**-863-**

Attorney Docket No. P22733US1

emitted by the one or more light sources 302. For example, in some embodiments the light source(s) 302 can include a light configured to emit green light and a second light configured to emit infrared light. In such an embodiment, the light source controller 300 can alternately illuminate the green light and the infrared light. In another example, the light source controller 300 can illuminate the green light and the infrared light at the same time.

[0058] The optical sensing system of FIG. 3 can also include an optical sensor controller 306 that is configured to receive output from the one or more optical sensors 308. The optical sensors 308 can receive light from the light source 302 that has reflected or transmitted through a measurement site 310 of a subject. In many embodiments, the subject may be a human user.

[0059] The optical sensor controller 306 can be implemented as a microprocessor, integrated circuit, with discrete circuitry, or using any other suitable technique. The optical sensor controller 306 can also be coupled to the light source controller 300. In many examples, the optical sensor controller 306 can use information provided by the light source controller 300. For example, in one embodiment, the light source controller 300 can inform the optical sensor controller 306 that the light source controller 300 is not illuminating any of the light sources 302. Alternatively, the light source controller 300 can inform the optical sensor controller 306 that the light source controller 300 is illuminating a particular light source 302.

[0060] In some embodiments described herein, the optical sensor controller 306 can implement one or more operations in an attempt to attenuate environmental noise. In one embodiment, the optical sensor controller 306 can implement a dark-channel subtraction operation. As described above, a dark-channel subtraction operation can take a sample output from an optical sensor 308 when the light source is not illuminated in order to determine the amount of ambient light received by the sensor when the light sources are "dark." Shortly thereafter, a light source 302 can be illuminated and another sample can be taken. Next, the "dark" sample can be subtracted from the "light" sample.

[0061] The optical sensor controller 306 can implement the dark-channel subtraction operation with assistance from the light source controller 300. For example, the light source controller 300 can inform the optical sensor controller 306 when light sources are on or off. In

**Exhibit 23**
-864-

Attorney Docket No. P22733US1

alternate embodiments, the optical sensor controller 306 can direct the light source controller 300 to turn particular light sources 302 on or off.

[0062] In further embodiments, the light source controller 300 and/or the optical sensor controller 306 can be implemented as software instructions to be executed by a processor associated with a health monitoring device.

[0063] FIG. 4 depicts a simplified signal flow diagram of amplification and filtering stages of an optical sensing system. In the illustrated embodiment, the optical sensor 400 can receive light. In many examples, the light may be transmitted from a light source associated with the optical sensing system, but, as noted above, additional environmental light can be received by the optical sensor as well.

[0064] After the light is received by the optical sensor 400, the optical sensor 400 may convert the light into analog electrical signals. In many examples, the optical sensor 400 can be a photodiode. Next, the analog electrical signal can be received by a transimpedance amplifier at 402. In many examples, a transimpedance amplifier can be suitable to convert the current output from a photodiode to a usable voltage. In such examples, measuring the current changes through a photodiode may be preferable to measuring the voltage changes across a photodiode because current may vary more linearly with changes in light than voltage. In one embodiment, the photodiode can be zero biased. In other examples the photodiode can be reverse biased.

[0065] After the analog electrical signal is amplified by the transimpedance amplifier 402, the amplified analog electrical signal can be passed through a high pass filter at 404. As noted with respect to embodiments described above, a high pass filter can be useful to remove low frequency components within the electrical signal that might otherwise interfere with detection of low frequency physiological parameters such as heart rate.

[0066] As noted above, the cutoff frequency of the high pass filter 404 can be selected to be below the frequency of modulation of light expected from the light source. For example, if the light source is modulating at 1KHz, the cutoff frequency of the high pass filter can be 750Hz. In other embodiments, the cutoff frequency can be closer or father away from the modulation frequency.

**Exhibit 23**
**-865-**

Attorney Docket No. P22733US1

[0067] In other examples, the filter can be implemented as a band pass filter. For example, if the light source is modulating light at 1KHz, a band pass filter can have a lower cutoff at 750z and a high cutoff at 1.25 KHz. In other examples, different cutoff frequencies can be used.

[0068] In many examples, the filter can also remove direct current biases present within the signal.

[0069] After the signal is filtered by the high pass filter 404, it can be passed to a programmable gain amplifier at 406 and thereafter to an analog to digital converter at 408. The programmable gain amplifier 406 can increase the dynamic range of the optical sensor. For example, certain users may have darker skin than other users. Accordingly, the amount of light absorbed by the measurement site can vary from person to person. In these embodiments, the programmable gain amplifier 406 can be adjusted on a per-user basis in order to provide the maximum signal to the analog to digital converter 408.

[0070] In other examples, the gain of the programmable gain amplifier 406 can be based, at least in part, on feedback from the analog to digital converter 408. For example, if the analog to digital converter 408 determines that the average signal output from the programmable gain amplifier 406 is too low, then the analog to digital converter 408 can cause the programmable gain amplifier 406 to increase gain by a certain amount. In other examples, if the analog to digital converter 408 determines that the average signal output from the programmable gain amplifier 406 is too high (e.g., clipping is detected), then the analog to digital converter 408 can cause the programmable gain amplifier 406 to decrease gain by a certain amount.

[0071] FIG. 5 depicts a simplified signal flow diagram of a demodulation stage of an optical sensing system. In the illustrated embodiment, a digital signal can be received and sampled into a matrix at 502. Thereafter at 504, the matrix can be multiplied by a demodulation matrix in order to obtain a substantially noise-free measurement of the physiological parameters of a measurement site.

[0072] A demodulation matrix can be calculated in a number of ways. For example, in certain embodiments, a demodulation matrix can be fixed. In other embodiments, a different

- 18 -

**Exhibit 23**
**-866-**

Attorney Docket No. P22733US1

demodulation matrix can be selected depending upon particular environmental conditions. In still further embodiments, a plurality of demodulation matrices can be iterated through in order to determine which demodulation matrix obtains the highest quality output signal.

[0073] In still further embodiments, a demodulation matrix can be calculated dynamically and/or during a calibration procedure. For example, as with other embodiments described herein, an optical sensing system can have a plurality of light sources, a measurement site, and an optical sensor.

[0074] In many embodiments, the light sources can output modulated light. For example, if an embodiment is implemented with four light sources, a single light source can be illuminated at a time. Once all light sources have been illuminated, the cycle can repeat. In other words, the output of light from a light sensor may be periodic with period $T$, sampled for $k$ periods. The function can be modeled as:

$$x(t) = x(t + kT) \qquad\qquad \text{Equation 1}$$

[0075] In one example, the function $x(t)$ may be the light as it reaches the measurement site. In other words, light that has been affected by physiological parameters of the measurement site, but that is not yet accompanied or affected by environmental noise. As noted above, the light may pass through the measurement site and may be joined by other noise sources. In other words, the light can pass through a linear time invariant system having an unknown impulse. Such a function  can be modeled as $H(t)$. Accordingly, once the light reaches the optical sensor, it may have been affected by the linear time invariant system. In other words, the light that reaches the sensor $y(t)$ can be modeled as the convolution of $x(t) * H(t)$:

$$y(t) = \int_{-\infty}^{\infty} H(\tau)x(t - \tau)d\tau = y(t + kT) \qquad\qquad \text{Equation 2}$$

[0076] However, as noted above, in some embodiments, multiple light sources can be used. Accordingly, the original signal $x(t)$ can be represented by a sum of $n$ individual signals, each having a unique scaling factor $\alpha$ associated with it:

$$x(t) = \sum_{i=1}^{n} \alpha_i(t)x_i(t) \qquad\qquad \text{Equation 3}$$

Exhibit 23
-867-

Attorney Docket No. P22733US1

[0077] Because light noise may not be modulated at the modulated frequency, the scaling factors may *α* vary and/or correspond to the physiological parameters of the measurement site.

[0078] In many embodiments, it can follow from Equation 3 that the scaling factors can pass through the linear time invariant system *H(t)*, to be directly measured when measuring *y(t)*:

$$y(t) = \sum_{i=1}^{n} \alpha_i(t) y_i(t) \qquad \text{Equation 4}$$

[0079] In other words, the measured signal *y(t)*, may be composed of a number of individual signals $y_i(t)$; once the individual signals $y_i(t)$ can be demultiplexed and demodulated, the individual scaling factors, and thus the physiological parameters of the measurement site, can be determined.

[0080] In certain embodiments, various assumptions can assist in demuxing and demodulating the signal *y(t)*. For example, by turning on a single light source and/or turning of all light sources, the signal *x(t)* can be computationally simplified. Also, in embodiments directed to detecting low frequency physiological signals such as heart rate, it can be assumed that the scaling factors do not change between samples of particularly high sampling rates.

[0081] Also as noted above, dark-channel subtraction may be implemented while demodulating to attempt to remove as much noise as possible before further signal processing. For example, a demodulated signal $z_j(k)$ can be formed from synchronous samples of *y(t)* at individual time instances $\tau_j$. In sync with sampling, the light source can turn on and off at known rate. In this manner, time instances $\tau_j$ can fall immediately between dark periods of a light source. In other words, a dark sample can be taken at $\tau_j - \Delta_j$ and another dark sample can be taken at $\tau_j + \Delta_j$. Between the dark samples, at $\tau_j$, a "light" sample can be taken. The dark channel subtraction can be modeled as:

$$z_j(k) = y\left(t_0 + kT + \tau_j\right) - \frac{y(t_0 + kT + \tau_j - \Delta_j) + y(t_0 + kT + \tau_j + \Delta_j)}{2} \qquad \text{Equation 5}$$

Exhibit 23
-868-

Attorney Docket No. P22733US1

[0082] In many embodiments, the demodulated signal $z_j(k)$ can include $m$ samples. In other words, Equation 5 can be defined from $j = 1 \ldots m$.

[0083] As noted above, individual light sources can be turned on or off. Accordingly, in some embodiments, one light source $i$ may be turned on a time to simplify the calculation of demodulation. More specifically, a demodulated signal $z_j(k)$ that relates specifically to one light source $i$ can be modeled as:

$$z_{j,i}(k) = \alpha_i(t)y_i(t) \qquad\qquad \text{Equation 6}$$

[0084] Which in turn can be modeled as:

$$z_{j,i}(k) = \alpha_i(t_0 + kT + \tau_j)\omega_{j,i} \qquad\qquad \text{Equation 7}$$

[0085] Where:

$$\omega_{j,i} = y(t_0 + kT + \tau_j) - \frac{y(t_0 + kT + \tau_j - \Delta_j) + y(t_0 + kT + \tau_j + \Delta_j)}{2} \qquad\qquad \text{Equation 8}$$

[0086] In order to simplify the calculation, some embodiments can utilize the presumption that because the Equations $1 - 8$ are time invariant, then $t_0 = 0$. In some embodiments, the simplified calculation can be modeled as:

$$z_{j,i}(k) = \alpha_i(kT + \tau_j)\omega_{j,i} \qquad\qquad \text{Equation 9}$$

[0087] Where:

$$\omega_{j,i} = y(\tau_j) - \frac{y(\tau_j - \Delta_j) + y(\tau_j + \Delta_j)}{2} \qquad\qquad \text{Equation 10}$$

[0088] Accordingly, in certain embodiments, the dark-channel subtraction demodulation operation can be accomplished by calculating $\omega_{j,i}$. In other words, because $z_{j,i}(k)$ is measureable, the only unknowns in Equation 9 are, generally speaking, $\omega_{j,i}$ and $\alpha_i(kT + \tau_j)$. However, after the demodulation process, one may appreciate that demultiplexing may still be required.

- 21 -

Exhibit 23
-869-

Attorney Docket No. P22733US1

[0089] Accordingly, certain embodiments may attempt to estimate $\omega_{j,i}$. For example, all individual light sources $i = 1 \ldots n$ can be demultiplexed as described above with respect to the examples of Equations 5 – 10. In such embodiments, an individual light source can be illuminated while all other light sources are turned off, and the light source can be sampled a certain number of times. As described above, each "sample" can actually constitute three samples; two "dark" samples can be averaged and subtracted from a single "light" sample. Once $m$ samples are taken of the selected light source, the next light source can be selected.

[0090] For example, lights sources $i = 1 \ldots n$ can be sampled with samples $j = 1 \ldots m$, and thus all measured results can be modeled as a matrix:

$$Z(k) = \begin{bmatrix} z_{1,1} & \cdots & z_{1,m} \\ \vdots & \ddots & \vdots \\ z_{n,1} & \cdots & z_{n,m} \end{bmatrix} \qquad \text{Equation 11}$$

[0091] Correspondingly, the demodulation values can be modeled as a matrix:

$$W = \begin{bmatrix} \omega_{1,1} & \cdots & \omega_{1,m} \\ \vdots & \ddots & \vdots \\ \omega_{n,1} & \cdots & \omega_{n,m} \end{bmatrix} \qquad \text{Equation 12}$$

[0092] One may note that the demodulation values does not vary with $k$. In addition, the scalar coefficients can be modeled as a matrix:

$$A(k) = \begin{bmatrix} \alpha_{1(kT)} & \cdots & 0 \\ \vdots & \ddots & \vdots \\ 0 & \cdots & \alpha_{n(kT)} \end{bmatrix} \qquad \text{Equation 13}$$

[0093] Alternatively, some embodiments can model the system as the matrix equation, presuming that W is full rank and that $n = m$:

$$Z(k) = A(k)W \qquad \text{Equation 14}$$

[0094] Thus, in order to calculate the scaling factors A(k), given only the measured values from the optical sensor, $Z(k)$, some embodiments utilize the simplification:

$$A(k) = Z(k)\,W^{-1} \qquad \text{Equation 15}$$

- 22 -

Exhibit 23
-870-

Attorney Docket No. P22733US1

[0095] In this configuration, the matrix $W^{-1}$ represents demultiplexing constants.

[0096] However, in many embodiments, Equation 15 is only useful once and unless the demultiplexing constants are known and/or estimated. Accordingly, in some embodiments, an initial matrix of $A_{init}$ can be supplied. For example, an identity matrix may be used in certain embodiments:

$$A_{init} = \begin{bmatrix} 1 & \cdots & 0 \\ \vdots & \ddots & \vdots \\ 0 & \cdots & 1 \end{bmatrix} \hspace{3cm} \text{Equation 16}$$

[0097] In other embodiments, an initial matrix of $A_{init}$ can be supplied from the diagonal of the measured matrix $Z(k)$. For example, an identity matrix may be used in certain embodiments:

$$A_{init} = \begin{bmatrix} z_{1,1} & \cdots & 0 \\ \vdots & \ddots & \vdots \\ 0 & \cdots & z_{n,m} \end{bmatrix} \hspace{2cm} \text{Equation 17}$$

[0098] Thus, in some embodiments, by multiplying the matrix inverse of the measured values $Z(k)^{-1}$ with the initial matrix $A_{init}$, a first estimation of the demultiplexing constants $W^{-1}$ can be calculated. For example:

$$A_{init} Z(k)^{-1} = W^{-1} \hspace{3cm} \text{Equation 18}$$

[0099] In some embodiments, the demultiplexing constants can be calculated and averaged with previous demultiplexing constants. After a sufficient number of calculations of the demultiplexing constants, returning to FIG. 5, a sampled signal matrix at 502 can be multiplied by a demultiplexing matrix at 504 to obtain scalar constants corresponding to physiological parameters of the measurement area.

[0100] FIG. 6 depicts example operations of a method of calibrating an optical sensing system performed by a light source controller. The method can begin at operation 600 in which a light source controller receives a calibration signal. Next at 602, all lights controlled by the light source controller can be turned off for a selected period of time. In many examples, operation 602 may be a first "dark" sample collection period of a dark-channel subtraction process. Next at

- 23 -

Exhibit 23
-871-

604, one individual light can be turned on for a selected period of time. In many examples, operation 605 may be the "light" sample of a dark-channel subtraction process. Next at 606, all lights controlled by the light source controller can be turned off for another selected period of time. In many embodiments, operation 606 can be a second "dark" sample collection period of a dark-channel subtraction process. Lastly at operation 608, the method can cycle back to operation 602 after selecting the next light source to illuminate individually.

[0101] The order in which lights are illuminated can vary from embodiment to embodiment. For example, certain embodiments may illuminate adjacent lights sequentially. In other examples, a random or pseudorandom illumination pattern can be used.

[0102] FIG. 7 depicts example operations of a method of calibrating an optical sensing system performed by an optical sensor controller. The method can begin at operation 700 in which a calibration signal is sent by an optical sensor controller to a light source controller. Next at operation 702, a demultiplexing matrix can be determined and/or estimated. For example, as described with respect to FIG. 5. The method can continue to operation 704 at which a number of calculated demultiplexing matrices are calculated and averaged. The method can conclude at operation 706 during which the average demultiplexing matrix is saved for future use.

[0103] For example, a saved demultiplexing matrix can be used in conjunction with Equation 15, modified to account for all light sources being active:

$$[\alpha_1(kT) \dots \alpha_n(kT)] = [z_1(kT) \dots z_n(kT)] \, W^{-1} \qquad \text{Equation 19}$$

[0104] Many embodiments of the foregoing disclosure may include or may be described in relation to various methods of operation, use, manufacture, and so on. Notably, the operations of methods presented herein are meant only to be exemplary and, accordingly, are not necessarily exhaustive. For example an alternate operation order, or fewer or additional steps may be required or desired for particular embodiments.

[0105] The foregoing description, for purposes of explanation, used specific nomenclature to provide a thorough understanding of the described embodiments. However, it will be apparent to one skilled in the art that the specific details are not required in order to practice the described embodiments. Thus, the foregoing descriptions of the specific

Exhibit 23
-872-

Attorney Docket No. P22733US1

embodiments described herein are presented for purposes of illustration and description. They are not meant to be exhaustive or to limit the embodiments to the precise forms disclosed. It will be apparent to one of ordinary skill in the art that many modifications and variations are possible in view of the above teachings. In particular, any features described with respect to one embodiment may also be used in other embodiments, where compatible. Likewise, the features of the different embodiments may be exchanged, substituted, or omitted where compatible and appropriate.

**Exhibit 23**
**-873-**

## CLAIMS

We claim:

1.      An electronic device comprising:

a housing comprising a surface adapted to be positioned proximate a measurement site of a subject;

a biometric sensor positioned at least partially within the surface and comprising:

a plurality of light sources for emitting light toward the measurement site; and

an optical sensor for obtaining light exiting the measurement site; and

an input amplifier coupled to the output of the biometric sensor and disposed within the housing;

a high pass filter coupled to an output of the input amplifier and disposed within the housing;

an output amplifier coupled to an output of the high pass filter and disposed within the housing; and

an analog to digital converter coupled to an output of the output amplifier and disposed within the housing.

2.      The electronic device of claim 1, wherein:

each light source of the plurality of light sources comprises a light emitting diode; and

the optical sensor comprises one of the group consisting of photodiodes, phototransistors, or optical image sensors.

3.      The electronic device of claim 1, wherein the input amplifier comprises a transimpedance amplifier.

4.      The electronic device of claim 1, wherein the output amplifier comprises a programmable gain amplifier.

5.      The electronic device of claim 1, further comprising a processor coupled to the output of the analog to digital converter.

- 26 -

Exhibit 23
-874-

Attorney Docket No. P22733US1

6.      The electronic device of claim 1, wherein the processor is configured to control the light source of the optical sensor.

7.      The electronic device of claim 6, wherein the biometric sensor further comprises a measurement mode and a calibration mode.

8.      The electronic device of claim 7, wherein the calibration mode comprises:

deactivating all light sources for a selected time period;

activating a first light source of the plurality of light sources for a selected time period; and

deactivating all light sources for a selected time period.

9.      A sensor system for measuring a periodic biometric characteristic of a subject, the sensor system comprising:

a plurality of light sources operative to emit a series light pulses at a selected modulation frequency toward a measurement site of the subject;

an optical sensor operative to receive light exiting a portion of the measurement site, the light originating from the series of light pulses;

a transimpedance input amplifier coupled to the output of the optical sensor;

a high pass filter coupled to the transimpedance input amplifier and configured to filter frequencies higher than the selected modulation frequency;

an output amplifier coupled of the high pass filter and configured to amplify an output of the high pass filter; and

an analog to digital converter coupled to the output amplifier configured to associate a signal amplitude of the output amplifier with a digital value.

10.      The sensor system of claim 9, wherein:

each of the light source of the plurality of light sources comprises a light emitting diode configured to emit light at a selected frequency; and

**Exhibit 23**
**-875-**

the optical sensor comprises one of the group consisting of photodiodes, phototransistors, and optical image sensors.

11.      The sensor system of claim 9, wherein the input amplifier comprises a transimpedance amplifier; and

the output amplifier comprises a programmable gain amplifier.

12.      The sensor system of claim 9, wherein:

a first subset of the plurality of light sources comprises a plurality of light emitting diodes configured to emit light at a first selected frequency; and

a second subset of the plurality of light sources comprises a plurality of light emitting diodes configured to emit light at a second selected frequency;

wherein when the first subset is emitting light the second subset is prevented from emitting light.

13.      The sensor system of claim 9, further comprising a processor coupled to the output of the analog to digital converter.

14.      The sensor system of claim 9, wherein the processor is configured to control the modulation of at least one of the light sources of the plurality of light sources.

15.      The sensor system of claim 14, wherein the biometric sensor further comprises a measurement mode and a calibration mode.

16.      The electronic device of claim 15, wherein the calibration mode comprises:

deactivating all light sources for a selected time period;

activating a first light source of the plurality of light sources for a selected time period; and

deactivating all light sources for a selected time period.

17.      A method of optical sensing, comprising:

- 28 -

**Exhibit 23**
**-876-**

emitting light toward a measurement site of a subject;

obtaining light exiting the measurement site;

converting the obtained light to an electrical signal;

amplifying the electrical signal to obtain an amplified signal;

filtering low frequency elements from the amplified signal to obtain a filtered signal; and

amplifying the filtered signal to obtain an output signal.

18.     The method of claim 17, further comprising:

sampling the output signal to obtain a matrix of samples; and

determining product of the matrix of samples with a demodulation matrix to obtain a demodulated matrix.

19.     The method of claim 18, wherein sampling the output signal to obtain a matrix of samples comprises:

taking a first sample;

taking a second sample;

taking a third sample;

subtracting the average of the first and third sample from the second sample to obtain an output sample; and

adding the output sample the matrix of samples.

20.     The method of claim 17, wherein:

light is emitted toward the measurement site from a plurality of light sources each comprising a light emitting diode; and

light is obtained exiting by an optical sensor comprising one of the group consisting of photodiodes, phototransistors, or optical image sensors.

Exhibit 23
-877-

Attorney Docket No. P22733US1

## **ABSTRACT**

An electronic device includes one or more light sources for emitting light toward a body part of a user and one or more optical sensors for capturing light samples while each light source is turned on and for capturing dark samples while the light source(s) are turned off. A signal produced by the one or more optical sensors is filtered and demodulated produce multiple demodulated signals each associated with a light source. Each signal associated with the light source(s) is analyzed to estimate or determine a physiological parameter of the user.

**Exhibit 23**
**-878-**

Title: Methods and Systems for Modulation And Demodulation of Optical Signals
Application No. Not Yet Assigned; Filed: Herewith
Inventor(s): Lamego et al.
Docket No. P22733US1

*1/7*



*FIG. 1A*          *FIG. 1B*

Exhibit 23
-879-

Title: Methods and Systems for Modulation And Demodulation of Optical Signals
Application No. Not Yet Assigned; Filed: Herewith
Inventor(s): Lamego et al. .
Docket No. P22733US1

*2/7*



**FIG. 2A**



**FIG. 2B**

Exhibit 23
-880-

Title: Methods and Systems for Modulation And Demodulation of Optical Signals
Application No. Not Yet Assigned; Filed: Herewith
Inventor(s): Lamego et al. .
Docket No. P22733US1

*3/7*



*FIG. 3*

Exhibit 23
-881-

Title: Methods and Systems for Modulation And Demodulation of Optical Signals
Application No. Not Yet Assigned; Filed: Herewith
Inventor(s): Lamego et al. .
Docket No. P22733US1

*4/7*



*FIG. 4*

Exhibit 23
-882-

Title: Methods and Systems for Modulation And Demodulation of Optical Signals
Application No. Not Yet Assigned; Filed: Herewith
Inventor(s): Lamego et al. .
Docket No. P22733US1

*5/7*



502

504

SAMPLE SIGNAL AS MATRIX

MULTIPLY MATRIX BY DEMULTIPLEXING MATRIX

*FIG. 5*

Exhibit 23
-883-

Title: Methods and Systems for Modulation And Demodulation of Optical Signals
Application No. Not Yet Assigned; Filed: Herewith
Inventor(s): Lamego et al. .
Docket No. P22733US1

*6/7*



*FIG. 6*

Exhibit 23
-884-

Title: Methods and Systems for Modulation And Demodulation of Optical Signals
Application No. Not Yet Assigned; Filed: Herewith
Inventor(s): Lamego et al. .
Docket No. P22733US1

*7/7*



*FIG. 7*

Exhibit 23
-885-

PTO/AIA/14 (12-13)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | P22733US1 |
|---|---|---|
| | Application Number | |

| Title of Invention | Methods and Systems for Modulation and Demodulation of Optical Signals |
|---|---|

The application data sheet is part of the provisional or nonprovisional application for which it is being submitted. The following form contains the bibliographic data arranged in a format specified by the United States Patent and Trademark Office as outlined in 37 CFR 1.76.
This document may be completed electronically and submitted to the Office in electronic format using the Electronic Filing System (EFS) or the document may be printed and included in a paper filed application.

## Secrecy Order 37 CFR 5.2

☐ Portions or all of the application associated with this Application Data Sheet may fall under a Secrecy Order pursuant to 37 CFR 5.2 (Paper filers only. Applications that fall under Secrecy Order may not be filed electronically.)

## Inventor Information:

**Inventor 1** [Remove]
**Legal Name**

| Prefix | Given Name | Middle Name | Family Name | Suffix |
|---|---|---|---|---|
| | Steven | P. | Hotelling | |

**Residence Information (Select One)** ◉ US Residency ○ Non US Residency ○ Active US Military Service

| City | Cupertino | State/Province | CA | Country of Residence | US |
|---|---|---|---|---|---|

**Mailing Address of Inventor:**

| Address 1 | One Infinite Loop, MS: 83-T |
|---|---|
| Address 2 | |
| City | Cupertino | State/Province | CA |
| Postal Code | 95014 | Country i | US |

**Inventor 2** [Remove]
**Legal Name**

| Prefix | Given Name | Middle Name | Family Name | Suffix |
|---|---|---|---|---|
| | Marcelo | M. | Lamego | |

**Residence Information (Select One)** ◉ US Residency ○ Non US Residency ○ Active US Military Service

| City | Cupertino | State/Province | CA | Country of Residence | US |
|---|---|---|---|---|---|

**Mailing Address of Inventor:**

| Address 1 | 10292 Orange Avenue |
|---|---|
| Address 2 | |
| City | Cupertino | State/Province | CA |
| Postal Code | 95014 | Country i | US |

All Inventors Must Be Listed - Additional Inventor Information blocks may be generated within this form by selecting the **Add** button. [Add]

## Correspondence Information:

Enter either Customer Number or complete the Correspondence Information section below.
For further information see 37 CFR 1.33(a).

PTO/AIA/14 (12-13)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | P22733US1 |
|---|---|---|
| | Application Number | |

| Title of Invention | Methods and Systems for Modulation and Demodulation of Optical Signals |
|---|---|

☐ **An Address is being provided for the correspondence Information of this application.**

| Customer Number | 62579 | | |
|---|---|---|---|
| Email Address | | [Add Email] | [Remove Email] |

## Application Information:

| Title of the Invention | Methods and Systems for Modulation and Demodulation of Optical Signals | |
|---|---|---|
| Attorney Docket Number | P22733US1 | **Small Entity Status Claimed** ☐ |
| Application Type | Nonprovisional | |
| Subject Matter | Utility | |
| **Total Number of Drawing Sheets (if any)** | 7 | **Suggested Figure for Publication (if any)** | 4 |

### Filing By Reference :

Only complete this section when filing an application by reference under 35 U.S.C. 111(c) and 37 CFR 1.57(a).  Do not complete this section if application papers including a specification and any drawings are being filed.  Any domestic benefit or foreign priority information must be provided in the appropriate section(s) below (i.e., "Domestic Benefit/National Stage Information" and "Foreign Priority Information").

For the purposes of a filing date under 37 CFR 1.53(b), the description and any drawings of the present application are replaced by this reference to the previously filed application, subject to conditions and requirements of 37 CFR 1.57(a).

| Application number of the previously filed application | Filing date (YYYY-MM-DD) | Intellectual Property Authority or Country |
|---|---|---|
| | | |

## Publication Information:

☐    Request Early Publication (Fee required at time of Request 37 CFR 1.219)

☒    **Request Not to Publish.**  I hereby request that the attached application not be published under 35 U.S.C. 122(b) and certify  that the invention disclosed in the attached application **has not and will not** be the subject of an application filed in another country, or under a  multilateral international agreement, that requires publication at eighteen months after filing.

## Representative Information:

Representative information should be provided for all practitioners having a power of attorney in the application. Providing this information in the Application Data Sheet does not constitute a power of attorney in the application (see 37 CFR 1.32).
Either enter Customer Number or complete the Representative Name section below. If both sections are completed the customer Number will be used for the Representative Information during processing.

| Please Select One : | ⦿ Customer Number | ◯ US Patent Practitioner | ◯ Limited Recognition (37 CFR 11.9) |
|---|---|---|---|
| Customer Number | 62579 | | |

**Exhibit 23**
-887-

PTO/AIA/14 (12-13)
Approved for use through 01/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | P22733US1 |
|---|---|---|
| | Application Number | |

| Title of Invention | Methods and Systems for Modulation and Demodulation of Optical Signals |
|---|---|

## Domestic Benefit/National Stage Information:

This section allows for the applicant to either claim benefit under 35 U.S.C. 119(e), 120, 121, or 365(c) or indicate National Stage entry from a PCT application. Providing this information in the application data sheet constitutes the specific reference required by 35 U.S.C. 119(e) or 120, and 37 CFR 1.78.
When referring to the current application, please leave the application number blank.

| Prior Application Status | Pending | | Remove |
|---|---|---|---|
| Application Number | Continuity Type | Prior Application Number | Filing Date (YYYY-MM-DD) |
| | Claims benefit of provisional | 62/057089 | 2014-09-29 |

Additional Domestic Benefit/National Stage Data may be generated within this form by selecting the **Add** button.

## Foreign Priority Information:

This section allows for the applicant to claim priority to a foreign application. Providing this information in the application data sheet constitutes the claim for priority as required by 35 U.S.C. 119(b) and 37 CFR 1.55(d). When priority is claimed to a foreign application that is eligible for retrieval under the priority document exchange program (PDX)[i] the information will be used by the Office to automatically attempt retrieval pursuant to 37 CFR 1.55(h)(1) and (2). Under the PDX program, applicant bears the ultimate responsibility for ensuring that a copy of the foreign application is received by the Office from the participating foreign intellectual property office, or a certified copy of the foreign priority application is filed, within the time period specified in 37 CFR 1.55(g)(1).

| | | | Remove |
|---|---|---|---|
| Application Number | Country[i] | Filing Date (YYYY-MM-DD) | Access Code[i] (if applicable) |
| | | | |

Additional Foreign Priority Data may be generated within this form by selecting the **Add** button.

## Statement under 37 CFR 1.55 or 1.78 for AIA (First Inventor to File) Transition Applications

☐ This application (1) claims priority to or the benefit of an application filed before March 16, 2013 and (2) also contains, or contained at any time, a claim to a claimed invention that has an effective filing date on or after March 16, 2013.
NOTE: By providing this statement under 37 CFR 1.55 or 1.78, this application, with a filing date on or after March 16, 2013, will be examined under the first inventor to file provisions of the AIA.

Exhibit 23
-888-

PTO/AIA/14 (12-13)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | P22733US1 |
|---|---|---|
| | Application Number | |

| Title of Invention | Methods and Systems for Modulation and Demodulation of Optical Signals |
|---|---|

# Authorization to Permit Access:

☐ Authorization to Permit Access to the Instant Application by the Participating Offices

If checked, the undersigned hereby grants the USPTO authority to provide the European Patent Office (EPO), the Japan Patent Office (JPO), the Korean Intellectual Property Office (KIPO), the World Intellectual Property Office (WIPO), and any other intellectual property offices in which a foreign application claiming priority to the instant patent application is filed access to the instant patent application. See 37 CFR 1.14(c) and (h). This box should not be checked if the applicant does not wish the EPO, JPO, KIPO, WIPO, or other intellectual property office in which a foreign application claiming priority to the instant patent application is filed to have access to the instant patent application.

In accordance with 37 CFR 1.14(h)(3), access will be provided to a copy of the instant patent application with respect to: 1) the instant patent application-as-filed; 2) any foreign application to which the instant patent application claims priority under 35 U.S.C. 119(a)-(d) if a copy of the foreign application that satisfies the certified copy requirement of 37 CFR 1.55 has been filed in the instant patent application; and 3) any U.S. application-as-filed from which benefit is sought in the instant patent application.

In accordance with 37 CFR 1.14(c), access may be provided to information concerning the date o f filing this Authorization.

# Applicant Information:

Providing assignment information in this section does not substitute for compliance with any requirement of part 3 of Title 37 of CFR to have an assignment recorded by the Office.

**Applicant    1**

If the applicant is the inventor (or the remaining joint inventor or inventors under 37 CFR 1.45), this section should not be completed. The information to be provided in this section is the name and address of the legal representative who is the applicant under 37 CFR 1.43; or the name and address of the assignee, person to whom the inventor is under an obligation to assign the invention, or person who otherwise shows sufficient proprietary interest in the matter who is the applicant under 37 CFR 1.46. If the applicant is an applicant under 37 CFR 1.46 (assignee, person to whom the inventor is obligated to assign, or person who otherwise shows sufficient proprietary interest) together with one or more joint inventors, then the joint inventor or inventors who are also the applicant should be identified in this section.

[ Clear ]

| ◉ Assignee | ◯ Legal Representative under  35 U.S.C. 117 | ◯ Joint Inventor |
|---|---|---|

| ◯ Person to whom the inventor is obligated to assign. | ◯ Person who shows sufficient proprietary interest |
|---|---|

If applicant is the legal representative, indicate the authority to file the patent application, the inventor is:

| Name of the Deceased or Legally Incapacitated Inventor : | |
|---|---|

If the Applicant is an Organization check here.     ☒

| Organization Name | Apple Inc. |
|---|---|

Exhibit 23
-889-

PTO/AIA/14 (12-13)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | P22733US1 |
|---|---|---|
| | Application Number | |

| Title of Invention | Methods and Systems for Modulation and Demodulation of Optical Signals |
|---|---|

**Mailing Address Information For Applicant:**

| **Address 1** | One Infinite Loop | | | |
|---|---|---|---|---|
| Address 2 | | | | |
| **City** | Cupertino | **State/Province** | CA | |
| **Country** | US | Postal Code | 95014 | |
| Phone Number | | Fax Number | | |
| Email Address | | | | |

Additional Applicant Data may be generated within this form by selecting the Add button.

# Assignee Information including Non-Applicant Assignee Information:

Providing assignment information in this section does not subsitute for compliance with any requirement of part 3 of Title 37 of CFR to have an assignment recorded by the Office.

**Assignee   1**

Complete this section if assignee information, including non-applicant assignee information, is desired to be included on the patent application publication . An assignee-applicant identified in the "Applicant Information" section will appear on the patent application publication as an applicant. For an assignee-applicant, complete this section only if identification as an assignee is also desired on the patent application publication.

| If the Assignee or Non-Applicant Assignee is an Organization check here. | ☐ |
|---|---|

| Prefix | **Given Name** | Middle Name | **Family Name** | Suffix |
|---|---|---|---|---|
| | | | | |

**Mailing Address Information For Assignee including Non-Applicant Assignee:**

| **Address 1** | | | |
|---|---|---|---|
| Address 2 | | | |
| **City** | | **State/Province** | |
| **Country** | | Postal Code | |
| Phone Number | | Fax Number | |
| Email Address | | | |

Additional Assignee or Non-Applicant Assignee Data may be generated within this form by selecting the Add button.

Exhibit 23
-890-

PTO/AIA/14 (12-13)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | P22733US1 |
|---|---|---|
| | Application Number | |

| Title of Invention | Methods and Systems for Modulation and Demodulation of Optical Signals |
|---|---|

## Signature:

NOTE:  This form must be signed in accordance with 37 CFR 1.33.  See 37 CFR 1.4 for signature requirements and certifications.

| **Signature** | /S. Craig Hemenway/ | | | Date  (YYYY-MM-DD) | 2015-02-10 |
|---|---|---|---|---|---|
| First Name | S. Craig | Last Name | Hemenway | Registration Number | 44759 |

Additional Signature may be generated within this form by selecting the Add button.

This collection of information is required by 37 CFR 1.76.  The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application.  Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14.  This collection is estimated to take 23 minutes to complete, including gathering, preparing, and submitting the completed application data sheet form to the USPTO.  Time will vary depending upon the individual case.  Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450.  DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS.  **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

Exhibit 23
-891-

# Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1.    The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these records.

2.   A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3.    A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4.    A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5.    A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent C o o p eration Treaty.

6.    A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7.    A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8.    A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9.    A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

**Exhibit 23**
**-892-**

Doc code: Oath
Document Description: Oath or declaration filed

PTO/AIA/02 (07-13)
Approved for use through 01/31/2014.  OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# SUBSTITUTE STATEMENT IN LIEU OF AN OATH OR DECLARATION FOR UTILITY OR DESIGN PATENT APPLICATION (35 U.S.C. 115(d) AND 37 CFR 1.64)

| Title of Invention | Methods and Systems for Modulation and Demodulation of Optical Signals |
|---|---|
| | Attorney Docket No. P22733US1 |

This statement is directed to:

☑ The attached application,

OR

☐ United States application or PCT international application number _____ filed on _____.

**LEGAL NAME of inventor to whom this substitute statement applies:**

(*E.g.*, Given Name (first and middle (if any)) and Family Name or Surname)

## Marcelo M. Lamego

Residence (except for a deceased or legally incapacitated inventor):

| City | Cupertino | State | CA | Country | US |
|---|---|---|---|---|---|

Mailing Address (except for a deceased or legally incapacitated inventor):

10292 Orange Avenue

| City | Cupertino | State | CA | Zip | 95014 | Country | US |
|---|---|---|---|---|---|---|---|

I believe the above-named inventor or joint inventor to be the original inventor or an original joint inventor of a claimed invention in the application.

The above-identified application was made or authorized to be made by me.

I hereby acknowledge that any willful false statement made in this statement is punishable under 18 U.S.C. 1001 by fine or imprisonment of not more than five (5) years, or both.

Relationship to the inventor to whom this substitute statement applies:

☐ Legal Representative (for deceased or legally incapacitated inventor only),

☑ Assignee,

☐ Person to whom the inventor is under an obligation to assign,

☐ Person who otherwise shows a sufficient proprietary interest in the matter (petition under 37 CFR 1.46 is required), or

☐ Joint Inventor.

[Page 1 of 2]

This collection of information is required by 35 U.S.C. 115 and 37 CFR 1.63. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 1 minute to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

Exhibit 23
-893-

PTO/SB/AIA02 (07-13)
Approved for use through 01/31/2014.  OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# SUBSTITUTE STATEMENT

Circumstances permitting execution of this substitute statement:

☐ Inventor is deceased,

☐ Inventor is under legal incapacity,

☐ Inventor cannot be found or reached after diligent effort, or

☑ Inventor has refused to execute the oath or declaration under 37 CFR 1.63.

If there are joint inventors, please check the appropriate box below:

☑ An application data sheet under 37 CFR 1.76 (PTO/AIA/14 or equivalent) naming the entire inventive entity has been or is currently submitted.

OR

☐ An application data sheet under 37 CFR 1.76 (PTO/AIA/14 or equivalent) has not been submitted. Thus, a Substitute Statement Supplemental Sheet (PTO/AIA/11 or equivalent) naming the entire inventive entity and providing inventor information is attached. See 37 CFR 1.64(b).

## WARNING:

Petitioner/applicant is cautioned to avoid submitting personal information in documents filed in a patent application that may contribute to identity theft. Personal information such as social security numbers, bank account numbers, or credit card numbers (other than a check or credit card authorization form PTO-2038 submitted for payment purposes) is never required by the USPTO to support a petition or an application. If this type of personal information is included in documents submitted to the USPTO, petitioners/applicants should consider redacting such personal information from the documents before submitting them to the USPTO. Petitioner/applicant is advised that the record of a patent application is available to the public after publication of the application (unless a non-publication request in compliance with 37 CFR 1.213(a) is made in the application) or issuance of a patent. Furthermore, the record from an abandoned application may also be available to the public if the application is referenced in a published application or an issued patent (see 37 CFR 1.14). Checks and credit card authorization forms PTO-2038 submitted for payment purposes are not retained in the application file and therefore are not publicly available.

**PERSON EXECUTING THIS SUBSTITUTE STATEMENT:**

| Name: | S. Craig Hemenway | Date (Optional): | 2015-02-10 |
|---|---|---|---|

Signature: /S. Craig Hemenway/

**APPLICANT NAME AND TITLE OF PERSON EXECUTING THIS SUBSTITUTE STATEMENT:**

If the applicant is a juristic entity, list the applicant name and the title of the signer:

Applicant Name: Apple Inc.

Title of Person Executing This Substitute Statement: Attorney for Applicant, Registration No. 44,759

The signer, whose title is supplied above, is authorized to act on behalf of the applicant.

**Residence of the signer (unless provided in an application data sheet, PTO/AIA/14 or equivalent):**

| City Denver | State CO | Country US |
|---|---|---|

**Mailing Address of the signer (unless provided in an application data sheet, PTO/AIA/14 or equivalent)**

410 Seventeenth Street
Suite 2200

| City Denver | State CO | Zip 80202 | Country US |
|---|---|---|---|

Note: Use an additional PTO/AIA/02 form for each inventor who is deceased, legally incapacitated, cannot be found or reached after diligent effort, or has refused to execute the oath or declaration under 37 CFR 1.63.

Exhibit 23
-894-

## Privacy Act Statement

The **Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant ( *i.e.*, GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

Exhibit 23
-895-

# Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | |
| **Filing Date:** | |
| **Title of Invention:** | Methods and Systems for Modulation and Demodulation of Optical Signals |
| **First Named Inventor/Applicant Name:** | Steven P. Hotelling |
| **Filer:** | Stephen C. Hemenway/Valerie Brown |
| **Attorney Docket Number:** | P22733US1 |

Filed as Large Entity

**Filing Fees for  Utility under 35 USC 111(a)**

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| Utility application filing | 1011 | 1 | 280 | 280 |
| Utility Search Fee | 1111 | 1 | 600 | 600 |
| Utility Examination Fee | 1311 | 1 | 720 | 720 |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| Late Filing Fee for Oath or Declaration | 1051 | 1 | 140 | 140 |
| **Petition:** | | | | |

Exhibit 23
-896-

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Patent-Appeals-and-Interference:** | | | | |
| **Post-Allowance-and-Post-Issuance:** | | | | |
| **Extension-of-Time:** | | | | |
| **Miscellaneous:** | | | | |
| | | **Total in USD ($)** | | **1740** |

**Exhibit 23**
-897-

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 21448351 |
| **Application Number:** | 14618664 |
| **International Application Number:** | |
| **Confirmation Number:** | 1097 |
| **Title of Invention:** | Methods and Systems for Modulation and Demodulation of Optical Signals |
| **First Named Inventor/Applicant Name:** | Steven P. Hotelling |
| **Customer Number:** | 62579 |
| **Filer:** | Stephen C. Hemenway/Valerie Brown |
| **Filer Authorized By:** | Stephen C. Hemenway |
| **Attorney Docket Number:** | P22733US1 |
| **Receipt Date:** | 10-FEB-2015 |
| **Filing Date:** | |
| **Time Stamp:** | 16:54:00 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | Credit Card |
| Payment was successfully received in RAM | $1740 |
| RAM confirmation Number | 3350 |
| Deposit Account | 504621 |
| Authorized User | BROWN, VALERIE |
| The Director of the USPTO is hereby authorized to charge indicated fees and credit any overpayment as follows: ||
| Charge any Additional Fees required under 37 C.F.R. Section 1.16 (National application filing, search, and examination fees) ||
| Charge any Additional Fees required under 37 C.F.R. Section 1.17 (Patent application and reexamination processing fees) ||

Exhibit 23
-898-

Charge any Additional Fees required under 37 C.F.R. Section 1.19 (Document supply fees)

Charge any Additional Fees required under 37 C.F.R. Section 1.20 (Post Issuance fees)

Charge any Additional Fees required under 37 C.F.R. Section 1.21 (Miscellaneous fees and charges)

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Transmittal of New Application | P22733US1ApplicationTransmittal.pdf | 168978 <br> dc749aec5f353813a63f8ddd03957ede4fd1e3f36 | no | 1 |
| Warnings: | | | | | |
| Information: | | | | | |
| 2 | Power of Attorney | P22733US1TransmittalOfPower.pdf | 100311 <br> f59f812ffd7e6dc95fd28fc7e19c6cd867ee18ac | no | 1 |
| Warnings: | | | | | |
| Information: | | | | | |
| 3 | Power of Attorney | P22733US1PowerOfAttorney.pdf | 206999 <br> ee30dfc789fa2a0b8384a4896ae2afd2cf9f150b | no | 1 |
| Warnings: | | | | | |
| Information: | | | | | |
| 4 | Nonpublication request from applicant. | P22733US1NonpublicationRequest.pdf | 122931 <br> 4dcb9763e579f2cdbd9b5521ca91cc0d63f14077 | no | 1 |
| Warnings: | | | | | |
| Information: | | | | | |
| 5 | | P22733US1Specification.pdf | 150863 <br> 193ee4ecefb237d7c0f5d5ae39d85be5417c888a | yes | 30 |
| Multipart Description/PDF files in .zip description | | | | | |
| | Document Description | | Start | End | |
| | Specification | | 1 | 25 | |
| | Claims | | 26 | 29 | |
| | Abstract | | 30 | 30 | |
| Warnings: | | | | | |
| Information: | | | | | |
| 6 | Drawings-only black and white line drawings | P22733US1Drawings.pdf | 87136 <br> c6426ecf73c9f8667aad4a5a703a1b294f079172 | no | 7 |

Exhibit 23
-899-

| | | | | | |
|---|---|---|---|---|---|
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 7 | Application Data Sheet | P22733US1ApplicationDataSheet.pdf | 97841<br><br>f6646231a0b56573033acee13d6937df3859182d | no | 7 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| This is not an USPTO supplied ADS fillable form | | | | | |
| 8 | Oath or Declaration filed | P22733US1SubstituteStatement.pdf | 233234<br><br>263e7c98cdc197623edc100f6f23295782ee5fac | no | 3 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 9 | Fee Worksheet (SB06) | fee-info.pdf | 36588<br><br>3267fe199b4bf5c447feafb3fc4f47cc302c84b2 | no | 2 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| | | | **Total Files Size (in bytes):** | 1204881 | |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

**Exhibit 23**
**-900-**

Doc Code: PA..
Document Description:  Power of Attorney

PTO/AIA/82A (07-13)
Approved for use through 11/30/2014. OMB 0651-0051
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# TRANSMITTAL FOR POWER OF ATTORNEY TO ONE OR MORE REGISTERED PRACTITIONERS

NOTE: This form is to be submitted with the Power of Attorney by Applicant form (PTO/AIA/82B) to identify the application to which the Power of Attorney is directed, in accordance with 37 CFR 1.5, unless the application number and filing date are identified in the Power of Attorney by Applicant form.  If neither form PTO/AIA/82A nor form PTO/AIA82B identifies the application to which the Power of Attorney is directed, the Power of Attorney will not be recognized in the application.

| | |
|---|---|
| Application Number | **Not Yet Assigned** |
| Filing Date | **Herewith** |
| First Named Inventor | Steven P. Hotelling |
| Title | Methods and Systems for Modulation and Demodulation of Optical Signals |
| Art Unit | **Not Yet Assigned** |
| Examiner Name | **Not Yet Assigned** |
| Attorney Docket Number | P22733US1 |

## SIGNATURE of Applicant or Patent Practitioner

| | | | |
|---|---|---|---|
| Signature | **/S. Craig Hemenway/** | Date (Optional) | **February 10, 2015** |
| Name | S. Craig Hemenway | Registration Number | 44,759 |
| Title (if Applicant is a juristic entity) | Attorney for Applicant | | |
| Applicant Name (if Applicant is a juristic entity) | **Apple Inc.** | | |

**NOTE:**  This form must be signed in accordance with 37 CFR 1.33.  See 37 CFR 1.4(d) for signature requirements and certifications. If more than one applicant, use multiple forms.

☑ *Total of  1  forms are submitted.

This collection of information is required by 37 CFR 1.131, 1.32, and 1.33. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application.  Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 3 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

Exhibit 23
-901-

PTO/AIA/15 (03-13)
Approved for use through 01/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless it displays a valid OMB control number

# UTILITY PATENT APPLICATION TRANSMITTAL

*(Only for new nonprovisional applications under 37 CFR 1.53(b))*

| | |
|---|---|
| Attorney Docket No. | P22733US1 |
| First Named Inventor | Steven P. Hotelling |
| Title | Methods and Systems for Modulation... |
| Express Mail Label No. | Electronic Filing |

## APPLICATION ELEMENTS
*See MPEP chapter 600 concerning utility patent application contents.*

**ADDRESS TO:**   Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

1. [ ] **Fee Transmittal Form** (PTO/SB/17 or equivalent)
2. [ ] **Applicant asserts small entity status.** See 37 CFR 1.27
3. [ ] **Applicant certifies micro entity status.** See 37 CFR 1.29. Applicant must attach form PTO/SB/15A or B or equivalent.
4. [✓] **Specification** [Total Pages 30] Both the claims and abstract must start on a new page. *(See MPEP § 608.01(a) for information on the preferred arrangement)*
5. [✓] **Drawing(s)** (35 U.S.C. 113) [Total Sheets 7]
6. **Inventor's Oath or Declaration** [Total Pages 1] *(including substitute statements under 37 CFR 1.64 and assignments serving as an oath or declaration under 37 CFR 1.63(e))*
   a. [✓] Newly executed (original or copy)
   b. [ ] A copy from a prior application (37 CFR 1.63(d))
7. [✓] **Application Data Sheet** *See note below.* See 37 CFR 1.76 (PTO/AIA/14 or equivalent)
8. [ ] **CD-ROM or CD-R** in duplicate, large table, or Computer Program (*Appendix*)
   [ ] Landscape Table on CD
9. **Nucleotide and/or Amino Acid Sequence Submission** (*if applicable, items a. – c. are required*)
   a. [ ] Computer Readable Form (CRF)
   b. [ ] Specification Sequence Listing on:
      i. [ ] CD-ROM or CD-R (2 copies); or
      ii. [ ] Paper
   c. [ ] Statements verifying identity of above copies

### ACCOMPANYING APPLICATION PAPERS

10. [ ] **Assignment Papers** (cover sheet & document(s)) Name of Assignee _____
11. [ ] **37 CFR 3.73(c) Statement** (*when there is an assignee*)   [✓] **Power of Attorney**
12. [ ] **English Translation Document** (*if applicable*)
13. [ ] **Information Disclosure Statement** (PTO/SB/08 or PTO-1449)
   [ ] Copies of citations attached
14. [ ] **Preliminary Amendment**
15. [ ] **Return Receipt Postcard** (*MPEP § 503*) (*Should be specifically itemized*)
16. [ ] **Certified Copy of Priority Document(s)** (*if foreign priority is claimed*)
17. [✓] **Nonpublication Request** Under 35 U.S.C. 122(b)(2)(B)(i). Applicant must attach form PTO/SB/35 or equivalent.
18. [ ] **Other:** _____

**\*Note:** (1) Benefit claims under 37 CFR 1.78 and foreign priority claims under 1.55 **must** be included in an Application Data Sheet (ADS).
(2) For applications filed under 35 U.S.C. 111, the application must contain an ADS specifying the applicant if the applicant is an assignee, person to whom the inventor is under an obligation to assign, or person who otherwise shows sufficient proprietary interest in the matter. See 37 CFR 1.46(b).

## 19. CORRESPONDENCE ADDRESS

[✓] The address associated with Customer Number: 62579    OR   [ ] Correspondence address below

| Name | |
|---|---|
| Address | |
| City | | State | | Zip Code | |
| Country | | Telephone | | Email | |

| Signature | /S. Craig Hemenway/ | Date | February 10, 2015 |
|---|---|---|---|
| Name (Print/Type) | S. Craig Hemenway | Registration No. (Attorney/Agent) | 44,759 |

This collection of information is required by 37 CFR 1.53(b). The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

Exhibit 23
-902-

# EXHIBIT 24

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | ISSUE DATE | PATENT NO. | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 14/617,422 | 08/08/2017 | 9723997 | P22734US1 | 5106 |

62579        7590        07/19/2017
APPLE INC.
c/o Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, CO 80202

# ISSUE NOTIFICATION

The projected patent number and issue date are specified above.

## Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
(application filed on or after May 29, 2000)

The Patent Term Adjustment is 44 day(s). Any patent to issue from the above-identified application will include an indication of the adjustment on the front page.

If a Continued Prosecution Application (CPA) was filed in the above-identified application, the filing date that determines Patent Term Adjustment is the filing date of the most recent CPA.

Applicant will be able to obtain more detailed information by accessing the Patent Application Information Retrieval (PAIR) WEB site (http://pair.uspto.gov).

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Application Assistance Unit (AAU) of the Office of Data Management (ODM) at (571)-272-4200.

APPLICANT(s) (Please see PAIR WEB site http://pair.uspto.gov for additional applicants):

Marcelo M. Lamego, Cupertino, CA;
Apple Inc., Cupertino, CA;

The United States represents the largest, most dynamic marketplace in the world and is an unparalleled location for business investment, innovation, and commercialization of new technologies. The USA offers tremendous resources and advantages for those who invest and manufacture goods here. Through SelectUSA, our nation works to encourage and facilitate business investment. To learn more about why the USA is the best country in the world to develop technology, manufacture products, and grow your business, visit SelectUSA.gov.

IR103 (Rev. 10/09)

**Exhibit 24**
**-903-**

**PART B - FEE(S) TRANSMITTAL**

**Complete and send this form, together with applicable fee(s), to:** <u>Mail</u>   Mail Stop ISSUE FEE
Commissioner for Patents
P.O. Box 1450
Alexandria, Virginia 22313-1450
or <u>Fax</u>   (571)-273-2885

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

| | | |
|---|---|---|
| 62579 | 7590 | 04/04/2017 |

APPLE INC.
c/o Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, CO 80202

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**
I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being facsimile transmitted to the USPTO (571) 273-2885, on the date indicated below.

| |
|---|
| (Depositor's name) |
| (Signature) |
| (Date) |

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 14/617,422 | 02/09/2015 | Marcelo M. Lamego | P22734US1 | 5106 |

TITLE OF INVENTION: Electronic Device that Computes Health Data

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | UNDISCOUNTED | $960 | $0 | $0 | $960 | 07/05/2017 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| STICE, PAULA J | 3766 | 600-301000 |

1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☒ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-02 or more recent) attached. **Use of a Customer Number is required.**

2. For printing on the patent front page, list

(1) The names of up to 3 registered patent attorneys or agents OR, alternatively,

(2) The name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1  Brownstein Hyatt Farber
2  Schreck, LLP
3  _____

3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document has been filed for recordation as set forth in 37 CFR 3.11. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE                     (B) RESIDENCE: (CITY and STATE OR COUNTRY)

Apple Inc.                               Cupertino, California

Please check the appropriate assignee category or categories (will not be printed on the patent) :  ☐ Individual  ☒ Corporation or other private group entity  ☐ Government

4a. The following fee(s) are submitted:
☒ Issue Fee
☐ Publication Fee (No small entity discount permitted)
☐ Advance Order - # of Copies _____

4b. Payment of Fee(s): (**Please first reapply any previously paid issue fee shown above**)
☐ A check is enclosed.
☐ Payment by credit card. Form PTO-2038 is attached.
☒ The director is hereby authorized to charge the required fee(s), any deficiency, or credits any overpayment, to Deposit Account Number  504621  (enclose an extra copy of this form).

5. Change in Entity Status (from status indicated above)

☐ Applicant certifying micro entity status. See 37 CFR 1.29

☐ Applicant asserting small entity status. See 37 CFR 1.27

☐ Applicant changing to regular undiscounted fee status.

NOTE: Absent a valid certification of Micro Entity Status (see forms PTO/SB/15A and 15B), issue fee payment in the micro entity amount will not be accepted at the risk of application abandonment.

NOTE: If the application was previously under micro entity status, checking this box will be taken to be a notification of loss of entitlement to micro entity status.

NOTE: Checking this box will be taken to be a notification of loss of entitlement to small or micro entity status, as applicable.

NOTE: This form must be signed in accordance with 37 CFR 1.31 and 1.33. See 37 CFR 1.4 for signature requirements and certifications.

| | | | |
|---|---|---|---|
| Authorized Signature | /S. Craig Hemenway/ | Date | July 4, 2017 |
| Typed or printed name | S. Craig Hemenway | Registration No. | 44,759 |

Page 2 of 3

PTOL-85 Part B (10-13) Approved for use through 10/31/2013.          OMB 0651-0033          U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

**Exhibit 24**

-904-

PTO/SB/47 (03-09)
Approved for use through 05/31/2015. OMB 0651-0016
U.S. Patent and Trademark Office; U. S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# "FEE ADDRESS" INDICATION FORM

| Address to: | Fax to: |
|---|---|
| Mail Stop M Correspondence | 571-273-6500 |
| Commissioner for Patents     - OR - | |
| P.O. Box 1450 | |
| Alexandria, VA 22313-1450 | |

> INSTRUCTIONS: The issue fee must have been paid for application(s) listed on this form.  In addition, only an address represented by a Customer Number can be established as the fee address for maintenance fee purposes (hereafter, fee address).  A fee address should be established when correspondence related to maintenance fees should be mailed to a different address than the correspondence address for the application. **When to check the first box below**: If you have a Customer Number to represent the fee address.  **When to check the second box below**: If you have no Customer Number representing the desired fee address, in which case a completed Request for Customer Number (PTO/SB/125) must be attached to this form.  For more information on Customer Numbers, see the Manual of Patent Examining Procedure (MPEP) § 403.

For the following listed application(s), please recognize as the "Fee Address" under the provisions of 37 CFR 1.363 the address associated with:

[✓]  Customer Number: **000197**

*OR*

[ ]  The attached Request for Customer Number (PTO/SB/125) form.

| PATENT NUMBER (if known) | APPLICATION NUMBER |
|---|---|
| | 14/617,422 |

Completed by (check one):

[ ] Applicant/Inventor

/S. Craig Hemenway/
Signature

[✓] Attorney or Agent of record  44,759
(Reg. No.)

S. Craig Hemenway
Typed or printed name

[ ] Assignee of record of the entire interest. See 37 CFR 3.71. Statement under 37 CFR 3.73(b) is enclosed. (Form PTO/SB/96)

303-223-1100
Requester's telephone number

[ ] Assignee recorded at Reel_____ Frame_____

July 4, 2017
Date

NOTE: Signatures of all the inventors or assignees of record of the entire interest or their representative(s) are required. Submit multiple forms if more that one signature is required, see below*.

[✓] * Total of _____ forms are submitted.

This collection of information is required by 37 CFR 1.363.  The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 5 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Mail Stop M Correspondence, Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

**Exhibit 24**
**-905-**

## Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | 14617422 |
| **Filing Date:** | 09-Feb-2015 |
| **Title of Invention:** | Electronic Device that Computes Health Data |
| **First Named Inventor/Applicant Name:** | Marcelo M. Lamego |
| **Filer:** | Stephen C. Hemenway/Valerie Brown |
| **Attorney Docket Number:** | P22734US1 |

Filed as Large Entity

**Filing Fees for** Utility under 35 USC 111(a)

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |
| **Post-Allowance-and-Post-Issuance:** | | | | |
| UTILITY APPL ISSUE FEE | 1501 | 1 | 960 | 960 |

Exhibit 24
-906-

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Extension-of-Time:** | | | | |
| **Miscellaneous:** | | | | |
| | | **Total in USD ($)** | | **960** |

Exhibit 24
-907-

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 29683275 |
| **Application Number:** | 14617422 |
| **International Application Number:** | |
| **Confirmation Number:** | 5106 |
| **Title of Invention:** | Electronic Device that Computes Health Data |
| **First Named Inventor/Applicant Name:** | Marcelo M. Lamego |
| **Customer Number:** | 62579 |
| **Filer:** | Stephen C. Hemenway/Valerie Brown |
| **Filer Authorized By:** | Stephen C. Hemenway |
| **Attorney Docket Number:** | P22734US1 |
| **Receipt Date:** | 04-JUL-2017 |
| **Filing Date:** | 09-FEB-2015 |
| **Time Stamp:** | 17:52:31 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | DA |
| Payment was successfully received in RAM | $ 960 |
| RAM confirmation Number | 070517INTEFSW00005975504621 |
| Deposit Account | |
| Authorized User | |
| The Director of the USPTO is hereby authorized to charge indicated fees and credit any overpayment as follows: | |

Exhibit 24
-908-

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Issue Fee Payment (PTO-85B) | P22734US1IssueFeeTransmittal.pdf | 1600575<br>2f8e776b3ae79ff02062e5f6ac2f423f95163b85 | no | 1 |

**Warnings:**

**Information:**

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 2 | Maintenance Fee Address Change | P22734US1FeeAddress.pdf | 107577<br>32b2b6a90c40523c83321af014f8deb512c48af5 | no | 1 |

**Warnings:**

**Information:**

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 3 | Fee Worksheet (SB06) | fee-info.pdf | 30551<br>3beec170190bc83060158a2e4a7f772f9f741a9b | no | 2 |

**Warnings:**

**Information:**

| | Total Files Size (in bytes): | 1738703 |
|---|---|---|

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

Exhibit 24
-909-



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# NOTICE OF ALLOWANCE AND FEE(S) DUE

62579          7590          04/04/2017

APPLE INC.
c/o Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, CO 80202

| EXAMINER |
|---|
| STICE, PAULA J |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3766 | |

DATE MAILED: 04/04/2017

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 14/617,422 | 02/09/2015 | Marcelo M. Lamego | P22734US1 | 5106 |

TITLE OF INVENTION: Electronic Device that Computes Health Data

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | UNDISCOUNTED | $960 | $0 | $0 | $960 | 07/05/2017 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. PROSECUTION ON THE MERITS IS CLOSED. THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS. THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON PETITION BY THE APPLICANT. SEE 37 CFR 1.313 AND MPEP 1308.**

**THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN <u>THREE MONTHS</u> FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. <u>THIS STATUTORY PERIOD CANNOT BE EXTENDED.</u> SEE 35 U.S.C. 151. THE ISSUE FEE DUE INDICATED ABOVE DOES NOT REFLECT A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE IN THIS APPLICATION. IF AN ISSUE FEE HAS PREVIOUSLY BEEN PAID IN THIS APPLICATION (AS SHOWN ABOVE), THE RETURN OF PART B OF THIS FORM WILL BE CONSIDERED A REQUEST TO REAPPLY THE PREVIOUSLY PAID ISSUE FEE TOWARD THE ISSUE FEE NOW DUE.**

**HOW TO REPLY TO THIS NOTICE:**

I. Review the ENTITY STATUS shown above. If the ENTITY STATUS is shown as SMALL or MICRO, verify whether entitlement to that entity status still applies.

If the ENTITY STATUS is the same as shown above, pay the TOTAL FEE(S) DUE shown above.

If the ENTITY STATUS is changed from that shown above, on PART B - FEE(S) TRANSMITTAL, complete section number 5 titled "Change in Entity Status (from status indicated above)".

For purposes of this notice, small entity fees are 1/2 the amount of undiscounted fees, and micro entity fees are 1/2 the amount of small entity fees.

II. PART B - FEE(S) TRANSMITTAL, or its equivalent, must be completed and returned to the United States Patent and Trademark Office (USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be completed and an extra copy of the form should be submitted. If an equivalent of Part B is filed, a request to reapply a previously paid issue fee must be clearly made, and delays in processing may occur due to the difficulty in recognizing the paper as an equivalent of Part B.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Utility patents issuing on applications filed on or after Dec. 12, 1980 may require payment of maintenance fees. It is patentee's responsibility to ensure timely payment of maintenance fees when due.**

Page 1 of 3

PTOL-85 (Rev. 02/11)

**Exhibit 24**
**-910-**

<div align="center">

**PART B - FEE(S) TRANSMITTAL**

</div>

**Complete and send this form, together with applicable fee(s), to:** <u>**Mail**</u>    **Mail Stop ISSUE FEE**
**Commissioner for Patents**
**P.O. Box 1450**
**Alexandria, Virginia 22313-1450**
**or** <u>**Fax**</u>   **(571)-273-2885**

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

| 62579 | 7590 | 04/04/2017 |
|---|---|---|

APPLE INC.
c/o Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, CO 80202

**Certificate of Mailing or Transmission**
I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being facsimile transmitted to the USPTO (571) 273-2885, on the date indicated below.

_____ (Depositor's name)

_____ (Signature)

_____ (Date)

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 14/617,422 | 02/09/2015 | Marcelo M. Lamego | P22734US1 | 5106 |

TITLE OF INVENTION: Electronic Device that Computes Health Data

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | UNDISCOUNTED | $960 | $0 | $0 | $960 | 07/05/2017 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| STICE, PAULA J | 3766 | 600-301000 |

**1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).**

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-02 or more recent) attached. **Use of a Customer Number is required.**

**2. For printing on the patent front page, list**

(1) The names of up to 3 registered patent attorneys or agents OR, alternatively,

(2) The name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 _____

2 _____

3 _____

**3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT** (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document has been filed for recordation as set forth in 37 CFR 3.11. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE                    (B) RESIDENCE: (CITY and STATE OR COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent) :   ☐ Individual  ☐ Corporation or other private group entity  ☐ Government

**4a. The following fee(s) are submitted:**
☐ Issue Fee
☐ Publication Fee (No small entity discount permitted)
☐ Advance Order - # of Copies _____

**4b. Payment of Fee(s): (Please first reapply any previously paid issue fee shown above)**
☐ A check is enclosed.
☐ Payment by credit card. Form PTO-2038 is attached.
☐ The director is hereby authorized to charge the required fee(s), any deficiency, or credits any overpayment, to Deposit Account Number _____ (enclose an extra copy of this form).

**5. Change in Entity Status** (from status indicated above)

☐ Applicant certifying micro entity status. See 37 CFR 1.29

☐ Applicant asserting small entity status. See 37 CFR 1.27

☐ Applicant changing to regular undiscounted fee status.

NOTE: Absent a valid certification of Micro Entity Status (see forms PTO/SB/15A and 15B), issue fee payment in the micro entity amount will not be accepted at the risk of application abandonment.

NOTE: If the application was previously under micro entity status, checking this box will be taken to be a notification of loss of entitlement to micro entity status.

NOTE: Checking this box will be taken to be a notification of loss of entitlement to small or micro entity status, as applicable.

NOTE: This form must be signed in accordance with 37 CFR 1.31 and 1.33. See 37 CFR 1.4 for signature requirements and certifications.

Authorized Signature _____    Date _____

Typed or printed name _____    Registration No. _____

<div align="center">

Page 2 of 3

</div>

PTOL-85 Part B (10-13) Approved for use through 10/31/2013.    OMB 0651-0033    U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

**Exhibit 24**



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 14/617,422 | 02/09/2015 | Marcelo M. Lamego | P22734US1 | 5106 |

62579        7590        04/04/2017

APPLE INC.
c/o Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, CO 80202

| EXAMINER |
|---|
| STICE, PAULA J |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3766 | |

DATE MAILED: 04/04/2017

**Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)**
(Applications filed on or after May 29, 2000)

The Office has discontinued providing a Patent Term Adjustment (PTA) calculation with the Notice of Allowance.

Section 1(h)(2) of the AIA Technical Corrections Act amended 35 U.S.C. 154(b)(3)(B)(i) to eliminate the requirement that the Office provide a patent term adjustment determination with the notice of allowance. See Revisions to Patent Term Adjustment, 78 Fed. Reg. 19416, 19417 (Apr. 1, 2013). Therefore, the Office is no longer providing an initial patent term adjustment determination with the notice of allowance. The Office will continue to provide a patent term adjustment determination with the Issue Notification Letter that is mailed to applicant approximately three weeks prior to the issue date of the patent, and will include the patent term adjustment on the patent. Any request for reconsideration of the patent term adjustment determination (or reinstatement of patent term adjustment) should follow the process outlined in 37 CFR 1.705.

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at 1-(888)-786-0101 or (571)-272-4200.

PTOL-85 (Rev. 02/11)

**Exhibit 24**
-912-

## OMB Clearance and PRA Burden Statement for PTOL-85 Part B

The Paperwork Reduction Act (PRA) of 1995 requires Federal agencies to obtain Office of Management and Budget approval before requesting most types of information from the public. When OMB approves an agency request to collect information from the public, OMB (i) provides a valid OMB Control Number and expiration date for the agency to display on the instrument that will be used to collect the information and (ii) requires the agency to inform the public about the OMB Control Number's legal significance in accordance with 5 CFR 1320.5(b).

The information collected by PTOL-85 Part B is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450. Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

### Privacy Act Statement

**The Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

Exhibit 24
-913-

| *Notice of Allowability* | Application No. 14/617,422 | | Applicant(s) LAMEGO, MARCELO M. | |
|---|---|---|---|---|
| | Examiner Paula J. Stice | | Art Unit 3766 | AIA (First Inventor to File) Status Yes |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☒ This communication is responsive to *AFCP 3/21/2017*.

    ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on_____.

2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

3. ☒ The allowed claim(s) is/are *1-19,21 and 22*. As a result of the allowed claim(s), you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov.

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    **Certified copies:**

      a) ☐ All    b) ☐ Some    *c) ☐ None of the:

        1. ☐ Certified copies of the priority documents have been received.

        2. ☐ Certified copies of the priority documents have been received in Application No. _____ .

        3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

    * Certified copies not received: _____.

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application. **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ CORRECTED DRAWINGS ( as "replacement sheets") must be submitted.

    ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____.

    **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**

1. ☐ Notice of References Cited (PTO-892)

2. ☐ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date _____

3. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material

4. ☐ Interview Summary (PTO-413), Paper No./Mail Date _____ .

5. ☐ Examiner's Amendment/Comment

6. ☒ Examiner's Statement of Reasons for Allowance

7. ☒ Other *PTO 2323 IS ATTACHED*.

/Paula J. Stice/
Primary Examiner, Art Unit 3766

Exhibit 24
-914-

Application/Control Number: 14/617,422                                              Page 2
Art Unit: 3766

## DETAILED ACTION

### *Notice of Pre-AIA or AIA Status*

1.      The present application, filed on or after March 16, 2013, is being examined under the first inventor to file provisions of the AIA.

### *Election/Restrictions*

2.      Claims 1-8, 12, 18, 19 and 21-22 are allowable. The restriction requirement of claims 9-11 and 13-17 , as set forth in the Office action mailed on 06/14/2016, has been reconsidered in view of the allowability of claims to the elected invention pursuant to MPEP § 821.04(a). **The restriction requirement is hereby withdrawn as to any claim that requires all the limitations of an allowable claim.** Claims 9-11 and 13-17 are no longer withdrawn and have been rejoined because the claims requires all the limitations of an allowable claim.

### *Allowable Subject Matter*

3.      Claims 1-19 and 21-22 are allowed.

4.      The following is an examiner's statement of reasons for allowance: the invention is directed towards a personal mobile device and associated method and computer readable media.  The invention includes a camera, ambient light sensor, proximity sensor and processing unit.  The prior art fails to disclose or render obvious all of the limitations of the independent claims in combination with both the camera and proximity sensor emitting light into a body part and using the received light reflected by the body part to compute user health data.

**Exhibit 24**
**-915-**

Application/Control Number: 14/617,422                                    Page 3
Art Unit: 3766

 Any comments considered necessary by applicant must be submitted no later

than the payment of the issue fee and, to avoid processing delays, should preferably

accompany the issue fee.  Such submissions should be clearly labeled "Comments on

Statement of Reasons for Allowance."

### *Conclusion*

 Any inquiry concerning this communication or earlier communications from the

examiner should be directed to Paula J. Stice whose telephone number is (571)270-

1478.  The examiner can normally be reached on Monday - Friday 9AM-5PM.

 If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Carl Layno can be reached on (571) 272-4949.  The fax phone number for

the organization where this application or proceeding is assigned is 571-273-8300.

 Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a

USPTO Customer Service Representative or access to the automated information

system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.


/Paula J. Stice/
Primary Examiner, Art Unit 3766

**Exhibit 24
-916-**

| **AFCP 2.0 Decision** | Application No. | Applicant(s) |
|---|---|---|
| | 14/617,422 | LAMEGO, MARCELO M. |
| | Examiner | Art Unit |
| | Paula J. Stice | 3766 |

This is in response to the After Final Consideration Pilot request filed 21 March 2017.

1. **Improper Request** – The AFCP 2.0 request is improper for the following reason(s) and the after final amendment submitted with the request will be treated under pre-pilot procedure.

    ☐ An AFCP 2.0 request form PTO/SB/434 (or equivalent document) was not submitted.

    ☐ A non-broadening amendment to at least one independent claim was not submitted.

    ☐ A proper AFCP 2.0 request was submitted in response to the most recent final rejection.

    ☐ Other:

2. **Proper Request**

    **A.** After final amendment submitted with the request will not be treated under AFCP 2.0.
    The after final amendment cannot be reviewed and a search conducted within the guidelines of the pilot program.

    ☐ The after final amendment will be treated under pre-pilot procedure.

    **B.** Updated search and/or completed additional consideration.
    The examiner performed an updated search and/or completed additional consideration of the after final amendment within the time authorized for the pilot program. The result(s) of the updated search and/or completed additional consideration are:

    ☒ 1. All of the rejections in the most recent final Office action are overcome and a Notice of Allowance is issued herewith.

    ☐ 2. The after final amendment would not overcome all of the rejections in the most recent final Office action. See attached interview summary for further details.

    ☐ 3. The after final amendment was reviewed, and it raises a new issue(s). See attached interview summary for further details.

    ☐ 4. The after final amendment raises new issues, but would overcome all of the rejections in the most recent final Office action. A decision on determining allowability could not be made within the guidelines of the pilot. See attached interview summary for further details, including any newly discovered prior art.

    ☐ 5. Other:

    Examiner Note: Please attach an interview summary when necessary as described above.

**Exhibit 24
-917-**

| *Search Notes* | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| [barcode] | 14617422 | LAMEGO, MARCELO M. |
| | **Examiner** | **Art Unit** |
| | PAULA J STICE | 3766 |

| CPC- SEARCHED | | |
|---|---|---|
| **Symbol** | **Date** | **Examiner** |
| A61B5/0205, 5/0402, 5/14551, 5/6898 | 9/2/2016 | PJS |
| update | 1/11/2017 | PJS |

| CPC COMBINATION SETS  - SEARCHED | | |
|---|---|---|
| **Symbol** | **Date** | **Examiner** |
| | | |

| US CLASSIFICATION SEARCHED | | | |
|---|---|---|---|
| **Class** | **Subclass** | **Date** | **Examiner** |
| | east searches - broad for specific sensors | 9/2/2016 | pjs |
| | updated | 1/11/2017 | pjs |

| SEARCH NOTES | | |
|---|---|---|
| **Search Notes** | **Date** | **Examiner** |
| A61B5/0205, 5/0402, 5/14551, 5/6898 | 9/2/2016 | pjs |
| east searches | 9/2/2016 | pjs |
| forward and back searches | 9/2/2016 | pjs |
| updated | 1/11/2017 | pjs |

| INTERFERENCE SEARCH | | | |
|---|---|---|---|
| **US Class/ CPC Symbol** | **US Subclass / CPC Group** | **Date** | **Examiner** |
| | A61B5/0205, 5/0402, 5/14551, 5/6898 | 3/27/2017 | pjs |

| | |
|---|---|
| | |

Part of Paper No. : 20170327

**Exhibit 24**
**-918-**

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

## BIB DATA SHEET

**CONFIRMATION NO. 5106**

| SERIAL NUMBER | FILING or 371(c) DATE | CLASS | GROUP ART UNIT | ATTORNEY DOCKET NO. |
|---|---|---|---|---|
| 14/617,422 | 02/09/2015 **RULE** | 600 | 3766 | P22734US1 |

**APPLICANTS**
  Apple Inc., Cupertino, CA;

**INVENTORS**
  Marcelo M. Lamego, Cupertino, CA;

**\*\* CONTINUING DATA \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***
  This appln claims benefit of 62/056,299 09/26/2014

**\*\* FOREIGN APPLICATIONS \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**\*\* IF REQUIRED, FOREIGN FILING LICENSE GRANTED \*\***
  02/20/2015

| | | STATE OR COUNTRY | SHEETS DRAWINGS | TOTAL CLAIMS | INDEPENDENT CLAIMS |
|---|---|---|---|---|---|
| Foreign Priority claimed ☐ Yes ☑ No<br>35 USC 119(a-d) conditions met ☐ Yes ☑ No<br>Verified and Acknowledged /PAULA J STICE/ Examiner's Signature | ☐ Met after Allowance<br>Initials | CA | 7 | 21 | 4 |

**ADDRESS**

  APPLE INC.
  c/o Brownstein Hyatt Farber Schreck, LLP
  410 Seventeenth Street
  Suite 2200
  Denver, CO 80202
  UNITED STATES

**TITLE**

  Electronic Device that Computes Health Data

| FILING FEE RECEIVED | FEES: Authority has been given in Paper No._____ to charge/credit DEPOSIT ACCOUNT No._____ for following: | |
|---|---|---|
| 2240 | | ☐ All Fees |
| | | ☐ 1.16 Fees (Filing) |
| | | ☐ 1.17 Fees (Processing Ext. of time) |
| | | ☐ 1.18 Fees (Issue) |
| | | ☐ Other _____ |
| | | ☐ Credit |

BIB (Rev. 05/07).

**Exhibit 24**
**-919-**

**EAST Search History**

**EAST Search History (Prior Art)**

| Ref # | Hits | Search Query | DBs | Default Operator | Plurals | Time Stamp |
|---|---|---|---|---|---|---|
| L1 | 4433 | ((A61B5/0205.CPC.SUBCLASS.) and @ad <= "20140926" | US-PGPUB; USPAT | OR | OFF | 2017/03/27 10:18 |
| L2 | 2894 | (A61B5/0402.CPC.SUBCLASS.) and @ad <= "20140926" | US-PGPUB; USPAT | OR | OFF | 2017/03/27 10:18 |
| L3 | 805 | (A61B5/6898.CPC.SUBCLASS.) and @ad <= "20140926" | US-PGPUB; USPAT | OR | OFF | 2017/03/27 10:18 |
| L4 | 2 | (L1 L2 L3) and (camera same (proximity with sensor)) same ((emitt$4 and reflect$4) with light) | US-PGPUB; USPAT | OR | | 2017/03/27 10:18 |
| S1 | 5261 | (ambient near3 light near3 sensor) and (proximity near3 sensor) | US-PGPUB; USPAT | OR | | 2016/09/02 10:27 |
| S2 | 3474 | (ambient near3 light near3 sensor) same (proximity near3 sensor) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 10:27 |
| S3 | 2363 | ((ambient near3 light near3 sensor) same (proximity near3 sensor)) and phone | US-PGPUB; USPAT | OR | OFF | 2016/09/02 10:27 |
| S4 | 354 | ((ambient near3 light near3 sensor) same (proximity near3 sensor)) and Iphone | US-PGPUB; USPAT | OR | OFF | 2016/09/02 10:27 |
| S5 | 28 | ((ambient near3 light near3 sensor) same (proximity near3 sensor)) and Iphone and (heart near3 rate) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 10:29 |
| S6 | 43 | ((ambient near3 light near3 sensor) same (proximity near3 sensor)) same (heart near3 rate near4 sensor) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 10:35 |
| S7 | 4856 | (A61B5/0205.CPC.SUBCLASS.) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 10:52 |
| S8 | 4221 | (A61B5/0205.CPC.SUBCLASS.) and @ad <= "20140926" | US-PGPUB; USPAT | OR | OFF | 2016/09/02 10:52 |
| S9 | 2701 | (A61B5/0402.CPC.SUBCLASS.) and @ad <= "20140926" | US-PGPUB; USPAT | OR | OFF | 2016/09/02 10:52 |
| S10 | 727 | (A61B5/6898.CPC.SUBCLASS.) and @ad <= "20140926" | US-PGPUB; USPAT | OR | OFF | 2016/09/02 10:52 |
| S11 | 6812 | (S8 S9 S10) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 10:53 |
| S12 | 58 | (S8 S9 S10) and (camera or (proximity with sensor)) same ((emitt$4 and reflect$4) with | US-PGPUB; | OR | OFF | 2016/09/02 10:54 |

Exhibit 24
-920-

| | | light) | USPAT | | | |
|---|---|---|---|---|---|---|
| S13 | 49 | (S8 S9 S10) and (camera or (proximity with sensor)) same ((emitt$4 and reflect$4) with light) and ((heart near3 rate) or (health with data)) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 10:54 |
| S14 | 4221 | (A61B5/0205.CPC.SUBCLASS.) and @ad <= "20140926" | US-PGPUB; USPAT | OR | OFF | 2016/09/02 13:13 |
| S15 | 2701 | (A61B5/0402.CPC.SUBCLASS.) and @ad <= "20140926" | US-PGPUB; USPAT | OR | OFF | 2016/09/02 13:13 |
| S16 | 727 | (A61B5/6898.CPC.SUBCLASS.) and @ad <= "20140926" | US-PGPUB; USPAT | OR | OFF | 2016/09/02 13:13 |
| S17 | 1 | (S14 S15 S16) and (camera and (proximity with sensor)) same ((emitt$4 and reflect$4) with light) and ((heart near3 rate) or (health with data)) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 13:13 |
| S18 | 116 | (S14 S15 S16) and (camera and (proximity with sensor)) and ((emitt$4 and reflect$4) with light) and ((heart near3 rate) or (health with data)) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 13:13 |
| S19 | 118 | (S14 S15 S16) and (camera and (proximity with sensor)) and ((emitt$4 and reflect$4) with light) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 13:13 |
| S20 | 111 | (S14 S15 S16) and (camera and (proximity with sensor) and (light with sensor) and ((emitt$4 and reflect$4) with light) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 13:14 |
| S21 | 51 | (S14 S15 S16) and (camera and (proximity near3 sensor) and (light near3 sensor) and ((emitt$4 and reflect$4) with light) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 13:14 |
| S22 | 2647 | (camera and (proximity near3 sensor) and (light near3 sensor) and ((emitt$4 and reflect$4) with light) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 13:42 |
| S23 | 115 | (camera and (proximity near3 sensor) and (light near3 sensor) and ((emitt$4 and reflect$4) with light) and (physiological near3 data) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 13:43 |
| S24 | 170 | (S14 S15 S16) and ((sense or determine) near3 contact) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 14:27 |
| S25 | 0 | (S14 S15 S16) and ((sense or determine) near3 contact) and messerschmidt | US-PGPUB; USPAT | OR | OFF | 2016/09/02 14:27 |
| S26 | 4 | (S14 S15 S16) and ((sense or determine) with contact) and messerschmidt | US-PGPUB; USPAT | OR | OFF | 2016/09/02 14:27 |
| S27 | 1 | "20130310656" | US-PGPUB; USPAT | OR | OFF | 2016/09/02 14:29 |
| S28 | 221 | (multiple near3 wavelength with light) with sensor | US-PGPUB; USPAT | OR | OFF | 2016/09/02 15:12 |
| S29 | 0 | (multiple near3 wavelength with light) with (proximity near3 sensor) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 15:13 |
| S30 | 0 | (multiple near3 wavelength with light) same | US- | OR | OFF | 2016/09/02 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | (proximity near3 sensor) | | | | 15:13 |
| S31 | 2 | (multiple near3 wavelength ) same (proximity near3 sensor) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 15:13 |
| S32 | 77 | (visible and infrared and red) same (proximity near3 sensor) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 15:14 |
| S33 | 45 | (visible with light) same infrared same red same (proximity near3 sensor) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 15:20 |
| S34 | 0 | (S14 S15 S16) and ((ambient with light) same (indigum or silicone)) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 15:27 |
| S35 | 67 | ((ambient with light with sensor) same (indigum or silicone)) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 15:27 |
| S36 | 50 | ((ambient near3 light near3 sensor) same (indigum or silicone)) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 15:27 |
| S37 | 4 | (silicone with ambient with light with sensor) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 15:28 |
| S38 | 2551 | (S14 S15 S16) and (camera with detect wtih infrared) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 15:33 |
| S39 | 0 | (S14 S15 S16) and (camera adj detect adj infrared) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 15:33 |
| S40 | 2 | (S14 S15 S16) and (camera with detect with infrared) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 15:33 |
| S41 | 37 | (S14 S15 S16) and (camera with detect$5 with infrared) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 15:34 |
| S42 | 63 | (vital near3 sign) and (camera with detect$5 with infrared) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 15:36 |
| S43 | 2 | (S14 S15 S16) and (camera with configured with detect$5 with infrared) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 15:41 |
| S44 | 37 | (S14 S15 S16) and (camera with detect$5 with infrared) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 15:42 |
| S45 | 431 | (S14 S15 S16) and (ambient with light with sensor) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 15:54 |
| S46 | 11 | (S14 S15 S16) and ((ambient with light with sensor) same camera) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 15:54 |
| S47 | 4559 | ((ambient with light with sensor) same camera) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 15:57 |
| S48 | 4 | ((ambient with light with sensor) same camera) and (Vital near3 sign) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 15:57 |
| S49 | 6065 | @ad <= "20140926" and (proximity near3 | US- | OR | OFF | 2017/01/10 |

Exhibit 24
-922-

| | | | PGPUB; USPAT | | | 14:11 |
|---|---|---|---|---|---|---|
| S50 | 75 | @ad <= "20140926" and (proximity near3 sensor near3 emit near3 light) | US-PGPUB; USPAT | OR | OFF | 2017/01/10 14:12 |

**EAST Search History (Interference)**

| Ref # | Hits | Search Query | DBs | Default Operator | Plurals | Time Stamp |
|---|---|---|---|---|---|---|
| L5 | 1674 | (A61B5/0205.CPC.SUBCLASS.) and @ad <= "20140926" | USPAT | OR | OFF | 2017/03/27 10:23 |
| L6 | 1072 | (A61B5/0402.CPC.SUBCLASS.) and @ad <= "20140926" | USPAT | OR | OFF | 2017/03/27 10:23 |
| L7 | 237 | (A61B5/6898.CPC.SUBCLASS.) and @ad <= "20140926" | USPAT | OR | OFF | 2017/03/27 10:23 |
| L8 | 1 | (l6 l7 "l8") and (camera same (proximity with sensor) same ((emit$4 and reflect$4) with light) | USPAT | OR | OFF | 2017/03/27 10:24 |
| L9 | 1 | (l5 l6 l7) and (camera same (proximity with sensor) same ((emit$4 and reflect$4) with light) | USPAT | OR | OFF | 2017/03/27 10:24 |
| L10 | 6 | (l5 l6 l7) and ((ambient with light with sensor) same camera) | USPAT | OR | OFF | 2017/03/27 10:27 |
| L11 | 15 | (l5 l6 l7) and (camera and (proximity near3 sensor) and (light near3 sensor)) and ((emit$4 and reflect$4) with light) and (physiological near3 data) | USPAT | OR | OFF | 2017/03/27 10:28 |
| L12 | 23 | (l5 l6 l7) and (camera or (proximity with sensor) same ((emit$4 and reflect$4) with light) and ((heart near3 rate) or (health with data)) | USPAT | OR | OFF | 2017/03/27 10:32 |
| L13 | 0 | (l5 l6 l7) and (multiple near3 wavelength with light) with (proximity near3 sensor) | USPAT | OR | OFF | 2017/03/27 10:32 |
| L14 | 0 | (l5 l6 l7) and (ambient with light with sensor) same camera) and (Vital near3 sign) | USPAT | OR | OFF | 2017/03/27 10:32 |
| L15 | 0 | (l5 l6 l7) and (visible and infrared and red) same (proximity near3 sensor) | USPAT | OR | OFF | 2017/03/27 10:32 |

**3/27/2017 10:33:03 AM**
**C:\Users\pstice\Documents\EAST\Workspaces\14617422.wsp**

| *Issue Classification* | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 14617422 | LAMEGO, MARCELO  M. |
| | Examiner | Art Unit |
| | PAULA J STICE | 3766 |

**CPC**

| Symbol | | | | Type | Version |
|---|---|---|---|---|---|
| A61B | 5 | | 0205 | F | 2013-01-01 |
| A61B | 5 | | 14551 | I | 2013-01-01 |
| A61B | 5 | | 0402 | I | 2013-01-01 |
| A61B | 5 | | 70 | I | 2013-01-01 |
| A61B | 5 | | 7203 | I | 2013-01-01 |
| A61B | 5 | | 742 | I | 2013-01-01 |
| A61B | 5 | | 7405 | I | 2013-01-01 |
| A61B | 5 | | 7455 | I | 2013-01-01 |
| A61B | 5 | | 6898 | I | 2013-01-01 |
| A61B | 5 | | 021 | A | 2013-01-01 |
| A61B | 5 | | 02416 | A | 2013-01-01 |
| A61B | 5 | | 0261 | A | 2013-01-01 |
| A61B | 5 | | 0537 | A | 2013-01-01 |
| | | | | | |
| | | | | | |

**CPC Combination Sets**

| Symbol | | | Type | Set | Ranking | Version |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |

| | | Total Claims Allowed: |
|---|---|---|
| NONE | | |
| (Assistant Examiner) | (Date) | 20 |
| /PAULA J STICE/ Primary Examiner.Art Unit 3766 | 03/27/2017 | O.G. Print Claim(s) / O.G. Print Figure |
| (Primary Examiner) | (Date) | 1 / 1 |

Exhibit 24
-924-

| *Issue Classification* | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 14617422 | LAMEGO, MARCELO M. |
| | **Examiner** | **Art Unit** |
| | PAULA J STICE | 3766 |

| US ORIGINAL CLASSIFICATION | | INTERNATIONAL CLASSIFICATION | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **CLASS** | **SUBCLASS** | **CLAIMED** | | | | | | | **NON-CLAIMED** | | | | |
| | | A | 6 | 1 | B | 5 / 0205 (2006.01.01) | | | | | | | |
| **CROSS REFERENCE(S)** | | | | | | | | | | | | | |
| **CLASS** | **SUBCLASS (ONE SUBCLASS PER BLOCK)** | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |

| NONE | | Total Claims Allowed: | |
|---|---|---|---|
| (Assistant Examiner) | (Date) | 20 | |
| /PAULA J STICE/ Primary Examiner.Art Unit 3766 | 03/27/2017 | O.G. Print Claim(s) | O.G. Print Figure |
| (Primary Examiner) | (Date) | 1 | 1 |

U.S. Patent and Trademark Office

Part of Paper No. 20170327

Exhibit 24
-925-

| *Issue Classification* | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 14617422 | LAMEGO, MARCELO M. |
| | **Examiner** | **Art Unit** |
| | PAULA J STICE | 3766 |

☐ Claims renumbered in the same order as presented by applicant ☐ CPA ☐ T.D. ☐ R.1.47

| Final | Original | Final | Original | Final | Original | Final | Original | Final | Original | Final | Original | Final | Original | Final | Original |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1 | 17 | 17 | | | | | | | | | | | | |
| 2 | 2 | 18 | 18 | | | | | | | | | | | | |
| 3 | 3 | 20 | 19 | | | | | | | | | | | | |
| 4 | 4 | | 20 | | | | | | | | | | | | |
| 5 | 5 | 21 | 21 | | | | | | | | | | | | |
| 6 | 6 | 19 | 22 | | | | | | | | | | | | |
| 7 | 7 | | | | | | | | | | | | | | |
| 8 | 8 | | | | | | | | | | | | | | |
| 9 | 9 | | | | | | | | | | | | | | |
| 10 | 10 | | | | | | | | | | | | | | |
| 11 | 11 | | | | | | | | | | | | | | |
| 12 | 12 | | | | | | | | | | | | | | |
| 13 | 13 | | | | | | | | | | | | | | |
| 14 | 14 | | | | | | | | | | | | | | |
| 15 | 15 | | | | | | | | | | | | | | |
| 16 | 16 | | | | | | | | | | | | | | |

| NONE | | | **Total Claims Allowed:** | |
|---|---|---|---|---|
| (Assistant Examiner) | | (Date) | 20 | |
| /PAULA J STICE/ Primary Examiner.Art Unit 3766 | | 03/27/2017 | O.G. Print Claim(s) | O.G. Print Figure |
| (Primary Examiner) | | (Date) | 1 | 1 |

U.S. Patent and Trademark Office

Part of Paper No. 20170327

**Exhibit 24**
**-926-**

Attorney Docket No. P22734US1

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of:

| | | | |
|---|---|---|---|
| Inventor(s): | Marcelo M. Lamego | | |
| App. No.: | 14/617,422 | Con. No.: | 5106 |
| Filed: | February 9, 2015 | Art Unit: | 3766 |
| Title: | ELECTRONIC DEVICE THAT COMPUTES HEALTH DATA | Examiner: | Stice, Paula J. |

## AMENDMENT AND RESPONSE TO FINAL OFFICE ACTION

Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Sir:

In response to the final Office action dated January 23, 2017, please consider the following remarks and amend the above-identified application as follows:

**Amendments to the Claims** begin on page 2 of this paper.

**Remarks** begin on page 6 of this paper.

1

Exhibit 24
-927-

Attorney Docket No. P22734US1

**Amendments to the Claims:**

1.      (Currently Amended)  A mobile personal computing device, comprising:
a camera;
an ambient light sensor;
a proximity sensor; and
a processing unit communicably coupled to the camera, the ambient light sensor, and the proximity sensor;
wherein the processing unit is configured to:
        use the camera and the proximity sensor to emit light into a body part of a user touching a surface of the mobile personal computing device;
        use at least one of the camera, an ambient light sensor, or the proximity sensor to receive at least part of the emitted light reflected by the body part of the user and generate sensor data; and
        compute health data of the user, utilizing the processing unit, using at least the sensor data regarding the received light.

2.      (Original)  The mobile personal computing device of claim 1, wherein the camera, the ambient light sensor, and the proximity sensor are positioned to be at least partially covered by the body part of the user at a same time.

3.      (Original)  The mobile personal computing device of claim 1, wherein the proximity sensor is configured to detect multiple wavelengths of light.

4.      (Original)  The mobile personal computing device of claim 3, wherein multiple light wavelength proximity sensor is configured to emit and receive infrared and visible light.

5.      (Original)  The mobile personal computing device of claim 3, wherein multiple light wavelength proximity sensor is configured to emit and receive infrared and red light.

6.      (Original)  The mobile personal computing device of claim 1, wherein the ambient light sensor is a at least one of a silicon ambient light sensor or an indium gallium arsenide ambient light sensor.

**Exhibit 24**
**-928-**

Attorney Docket No. P22734US1

7.      (Original)  The mobile personal computing device of claim 1, wherein the camera is configured to detect infrared light.

8.      (Original)  The mobile personal computing device of claim 1, wherein the device is configured to compute the health-related information when the body part of the user is positioned at least partially over the camera, the ambient light sensor, and the proximity sensor.

9.      (Withdrawn)  The mobile personal computing device of claim 1, wherein the processing unit utilizes the camera to determine when the body part of the user is misaligned with the camera, the ambient light sensor, and the proximity sensor for purposes of detecting the information about the body part of the user.

10.      (Withdrawn)  The mobile personal computing device of claim 9, wherein the processing unit provides an output that can be used as guidance to correct a misalignment.

11.      (Withdrawn)  The mobile personal computing device of claim 10, wherein the processing unit is configure to provide the output to at least one visual output component, audio output component, or haptic output component.

12.      (Original)  The mobile personal computing device of claim 1, wherein the camera is configured with a focal distance greater than a distance between the camera and the body part of the user when the body part is touching the surface of the mobile personal computing device.

13.      (Withdrawn)  The mobile personal computing device of claim 1, further comprising
        electrical contacts disposed on an exterior surface of the device, wherein the processing unit is further configured to compute additional health-related information regarding the user based on an electrical measurement obtained using the electrical contacts.

14.      (Withdrawn)  The mobile personal computing device of claim 13, wherein the electrical contacts are positioned to contact the body part of the user and an additional body part of the user.

**Exhibit 24
-929-**

Attorney Docket No. P22734US1

15.      (Withdrawn)  The mobile personal computing device of claim 14, wherein the electrical measurement obtained using the electrical contacts corresponds to an electrical property across the user's chest.

16.      (Withdrawn)  The mobile personal computing device of claim 13, wherein the processing unit is further configured to:
     use at least the proximity sensor to emit the light;
     use the ambient light sensor and the camera to receive the reflected light; and
     compute a blood pressure index, a body fat content, and an electrocardiogram using data from the ambient light sensor, the camera, and the electrical contacts.

17.      (Withdrawn)  The mobile personal computing device of claim 13, wherein the proximity sensor is a multiple light wavelength proximity sensor that utilizes infrared and visible light, the ambient light sensor is a indium gallium arsenide ambient light sensor, and the processing unit is further configured to:
     use at least the proximity sensor to emit the light;
     use the ambient light sensor and the camera receive the reflected light; and
     compute a blood hydration using data from the ambient light sensor, the camera, and the electrical contacts.

18.      (Currently Amended)  The mobile personal computing device of claim 1, wherein the processing unit is further configured to:
     ~~use at least the proximity sensor to emit the light;~~
     use at least the ambient light sensor and the camera receive the reflected light; and
     compute an oxygen saturation, a pulse rate, a perfusion index, or a photoplethysmogram using data from the ambient light sensor and the camera.

19.      (Currently Amended)  A method for using a mobile personal computing device to obtain health data, comprising:
     using ~~at least one of~~ a camera and a proximity sensor to emit light into a body part of a user touching a surface of the mobile personal computing device;
     using at least two of the camera, an ambient light sensor, or the proximity sensor to receive at least part of the emitted light reflected by the body part of the user and generate sensor data; and

**Exhibit 24**
**-930-**

Attorney Docket No. P22734US1

computing health data of the user, utilizing the processing unit, using at least the sensor data regarding the received light.

20.      (Cancelled)

21.      (Currently Amended)  A computer program product including a non-transitory storage medium, comprising:

a first set of instructions, stored in the non-transitory storage medium, executable by at least one processing unit to use ~~at least one of~~ a camera and a proximity sensor to emit light into a body part of a user touching a surface of a mobile personal computing device;

a second set of instructions, stored in the non-transitory storage medium, executable by the least one processing unit to use the camera and an ambient light sensor to receive at least part of the emitted light reflected by the body part of the user and generate sensor data; and

a third set of instructions, stored in the non-transitory storage medium, executable by the least one processing unit to compute health data of the user using at least the sensor data regarding the received light.

22.      (Previously Presented) The mobile personal computing device of claim 1, wherein the processing unit is configured to use data from the camera indicating characteristics of the body part that influence light absorption to adjust the sensor data regarding the received light as part of computing the health data.

**Exhibit 24
-931-**

Attorney Docket No. P22734US1

## REMARKS

This paper is submitted in response to the Office action mailed on September 8, 2016. This paper 1, 18-19 and 21.  Support for these amendments can be found at least in paragraphs 0027 and 0056 of the application as filed and no new matter is added.  Accordingly, after entry of this Amendment and Response, claims 1-19 and 21-22 will be pending with claims 9-11 and 13-17 being withdrawn.

### I.  Interview Summary

**I.**      An interview was conducted January 31, 2017 with David S. Atkinson and Examiner Paula J. Stice participating.  The rejections in view of U.S. 2013/0215042 to Messerschmidt et al. (hereinafter "Messerschmidt"), U.S. Pub. No. 2008/0167834 to Herz et al. (hereinafter "Herz"), U.S. Patent No. 7,486,386 to Holcombe et al. (hereinafter "Holcombe"), U.S. Pub. No. 2014/0160314 to Schatevet et al. (hereinafter "Schatevet"), and U.S. Pub. No. 2014/0275832 to Muehlsteff et al. (hereinafter "Muehlsteff") were discussed.  Proposed amendments were discussed and agreed upon.  This response presents those amendments.

### II.  Claim Rejections Under 35 U.S.C. § 103

**A. Claims 1, 2, 8, 12, 19, and 21**

The Examiner rejected claims 1, 2, 8, 12, 19, and 21 under 35 U.S.C. § 103(a) as being obvious over Messerschmidt in view of Herz.  For at least the following reasons, the Assignee respectfully traverses these rejections.

Independent claim 1 recites that "the processing unit is configured to…use the camera and the proximity sensor to emit light into a body part of a user touching a surface of the mobile personal computing device;" "use at least one of the camera, an ambient light sensor, or the proximity sensor to receive at least part of the emitted light reflected by the body part of the user and generate sensor data;" and compute health data of the user, utilizing the processing unit, using at least the sensor data regarding the received light."  Independent claims 19 and 21 recite similar limitations.  Support for these amendments can be found at least in paragraphs 0027 and 0056 of the application as filed and no new matter is added.  As agreed in the January 31, 2017 interview, different light sources transmit different light and would yield different data than using a single light source.  Thus, as agreed in the January 31, 2017 interview, independent claims 1, 19, and 21 are patentable over the combination of Messerschmidt and Herz.

**Exhibit 24**
**-932-**

Claims 2, 8, and 12 depend from independent claim 1 and the Assignee respectfully submits that dependent claims 2, 8, and 12 are patentable at least due to their dependence on an allowable base claim.  The Assignee makes this statement without reference to, or waiving, the independent bases for patentability in any dependent claim.  The Assignee reserves the right to separately argue the patentability of dependent claims 2, 8, and 12 in a subsequently filed response, if necessary.

**B. Claims 3-5, 6, 7, 18, and 22**

The Examiner rejected claims 3-5, 18, and 22 under 35 U.S.C. § 103(a) as being obvious over Messerschmidt and  Herz in view of Holcombe; claim 6 under 35 U.S.C. § 103(a) as being obvious over Messerschmidt and Herz in view of Schatevet; and claim 7 under 35 U.S.C. § 103(a) as being obvious over Messerschmidt and Herz in view of Muehlsteff.  For at least the following reasons, the Assignee respectfully traverses these rejections.  Claims 3-7, 18, and 22 depend from independent claims 1 and 21, respectively, and the Assignee respectfully submits that dependent claims 3-7, 18, and 22 are patentable at least due to their dependence on an allowable base claim.  The Assignee makes this statement without reference to, or waiving, the independent bases for patentability in any dependent claim.  The Assignee reserves the right to separately argue the patentability of dependent claims 3-7, 18, and 22 in a subsequently filed response, if necessary.

_III.  Conclusion_

The Assignee thanks the Examiner for the thorough review of the application.  The Assignee respectfully submits the present application, as amended, is in condition for allowance and respectfully requests the issuance of a Notice of Allowability as soon as practicable.

This Amendment and Response is being filed within two months of the mailing date of the current Office Action and an Advisory Action is requested.  This Amendment is filed with a Certification and Request for Consideration Under the After Final Consideration Pilot Program.  The Assignee believes no fees or petitions are due with this filing.  However, if any such petitions or fees are necessary, please consider this a request therefor and authorization to charge Deposit Account No. 504621 accordingly.

**Exhibit 24
-933-**

Attorney Docket No. P22734US1

If the Examiner should require any additional information or amendment, please contact the undersigned attorney.

Dated:  March 21, 2017.

Respectfully submitted,


_____/David S. Atkinson/_____
David S. Atkinson, Registration No. 56,655
Attorney for Assignee
USPTO Customer No. 62579

Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, Colorado  80202
Phone:  303-223-1100
Fax:  303-223-1111

**Exhibit 24**
**-934-**

Doc Code: A.NE.AFCP
Document Description: After Final Consideration Pilot Program Request

PTO/SB/434 (05-13)

| CERTIFICATION AND REQUEST FOR CONSIDERATION UNDER THE AFTER FINAL CONSIDERATION PILOT PROGRAM 2.0 | | |
|---|---|---|
| Practitioner Docket No.:<br>P22734US1 | Application No.:<br>14/617,422 | Filing Date:<br>February 9, 2015 |
| First Named Inventor:<br>Marcelo M. Lamego | Title:<br>Electronic Device that Computes Health Data | |

APPLICANT HEREBY CERTIFIES THE FOLLOWING AND REQUESTS CONSIDERATION UNDER THE AFTER FINAL CONSIDERATION PILOT PROGRAM 2.0 (AFCP 2.0) OF THE ACCOMPANYING RESPONSE UNDER 37 CFR 1.116.

1.  The above-identified application is (i) an original utility, plant, or design nonprovisional application filed under 35 U.S.C. 111(a) [a continuing application (e.g., a continuation or divisional application) is filed under 35 U.S.C. 111(a) and is eligible under (i)], or (ii) an international application that has entered the national stage in compliance with 35 U.S.C. 371(c).

2.  The above-identified application contains an outstanding final rejection.

3.  Submitted herewith is a response under 37 CFR 1.116 to the outstanding final rejection. The response includes an amendment to at least one independent claim, and the amendment does not broaden the scope of the independent claim in any aspect.

4.  This certification and request for consideration under AFCP 2.0 is the only AFCP 2.0 certification and request filed in response to the outstanding final rejection.

5.  Applicant is willing and available to participate in any interview requested by the examiner concerning the present response.

6.  This certification and request is being filed electronically using the Office's electronic filing system (EFS-Web).

7.  Any fees that would be necessary consistent with current practice concerning responses after final rejection under 37 CFR 1.116, e.g., extension of time fees, are being concurrently filed herewith. [There is no additional fee required to request consideration under AFCP 2.0.]

8.  By filing this certification and request, applicant acknowledges the following:

    • Reissue applications and reexamination proceedings are not eligible to participate in AFCP 2.0.
    • The examiner will verify that the AFCP 2.0 submission is compliant, i.e., that the requirements of the program have been met (see items 1 to 7 above). For compliant submissions:
        ○ The examiner will review the response under 37 CFR 1.116 to determine if additional search and/or consideration (i) is necessitated by the amendment and (ii) could be completed within the time allotted under AFCP 2.0. If additional search and/or consideration is required but cannot be completed within the allotted time, the examiner will process the submission consistent with current practice concerning responses after final rejection under 37 CFR 1.116, e.g., by mailing an advisory action.
        ○ If the examiner determines that the amendment does not necessitate additional search and/or consideration, or if the examiner determines that additional search and/or consideration is required and could be completed within the allotted time, then the examiner will consider whether the amendment places the application in condition for allowance (after completing the additional search and/or consideration, if required). If the examiner determines that the amendment does not place the application in condition for allowance, then the examiner will contact the applicant and request an interview.
            ▪ The interview will be conducted by the examiner, and if the examiner does not have negotiation authority, a primary examiner and/or supervisory patent examiner will also participate.
            ▪ If the applicant declines the interview, or if the interview cannot be scheduled within ten (10) calendar days from the date that the examiner first contacts the applicant, then the examiner will proceed consistent with current practice concerning responses after final rejection under 37 CFR 1.116.

| Signature<br>/David S. Atkinson/ | Date<br>March 21, 2017 |
|---|---|
| Name (Print/Typed)<br>David S. Atkinson | Practitioner Registration No.<br>56,655 |

Note: This form must be signed in accordance with 37 CFR 1.33. See 37 CFR 1.4(d) for signature requirements and certifications. Submit multiple forms if more than one signature is required, see below*.

☐ * Total of _____ forms are submitted.

Exhibit 24
-935-

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 28687624 |
| **Application Number:** | 14617422 |
| **International Application Number:** | |
| **Confirmation Number:** | 5106 |
| **Title of Invention:** | Electronic Device that Computes Health Data |
| **First Named Inventor/Applicant Name:** | Marcelo M. Lamego |
| **Customer Number:** | 62579 |
| **Filer:** | Stephen C. Hemenway/Valerie Brown |
| **Filer Authorized By:** | Stephen C. Hemenway |
| **Attorney Docket Number:** | P22734US1 |
| **Receipt Date:** | 21-MAR-2017 |
| **Filing Date:** | 09-FEB-2015 |
| **Time Stamp:** | 10:40:47 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | no |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Response After Final Action | P22734US1Amendment.pdf | 44461<br>5019288821e19b7e5bcdc867dc58b1ad69<br>18d5b3 | no | 8 |

**Warnings:**

Exhibit 24
-936-

**Information:**

| 2 | After Final Consideration Program Request | P22734US1AfterFinalPilotProgram.pdf | 98948 | no | 1 |
|---|---|---|---|---|---|
| | | | 9586332c3edd482681811262ca228e8fdff6933f | | |

**Warnings:**

**Information:**

| Total Files Size (in bytes): | 143409 |
|---|---|

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

Exhibit 24
-937-

PTO/SB/06 (09-11)
Approved for use through 1/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| PATENT APPLICATION FEE DETERMINATION RECORD<br>Substitute for Form PTO-875 | Application or Docket Number<br>14/617,422 | Filing Date<br>02/09/2015 | ☐ To be Mailed |
|---|---|---|---|

**ENTITY:** ☒ LARGE ☐ SMALL ☐ MICRO

## APPLICATION AS FILED – PART I

|  | (Column 1) | (Column 2) |  |  |
|---|---|---|---|---|
| FOR | NUMBER FILED | NUMBER EXTRA | RATE ($) | FEE ($) |
| ☐ BASIC FEE<br>(37 CFR 1.16(a), (b), or (c)) | N/A | N/A | N/A |  |
| ☐ SEARCH FEE<br>(37 CFR 1.16(k), (i), or (m)) | N/A | N/A | N/A |  |
| ☐ EXAMINATION FEE<br>(37 CFR 1.16(o), (p), or (q)) | N/A | N/A | N/A |  |
| TOTAL CLAIMS<br>(37 CFR 1.16(i)) | minus 20 = | * | X $ = |  |
| INDEPENDENT CLAIMS<br>(37 CFR 1.16(h)) | minus 3 = | * | X $ = |  |
| ☐ APPLICATION SIZE FEE<br>(37 CFR 1.16(s)) | If the specification and drawings exceed 100 sheets of paper, the application size fee due is $310 ($155 for small entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s). |  |  |  |
| ☐ MULTIPLE DEPENDENT CLAIM PRESENT (37 CFR 1.16(j)) |  |  |  |  |
| * If the difference in column 1 is less than zero, enter "0" in column 2. |  |  | TOTAL |  |

## APPLICATION AS AMENDED – PART II

|  |  | (Column 1) | (Column 2) | (Column 3) |  |  |
|---|---|---|---|---|---|---|
| **AMENDMENT** | **03/21/2017** | CLAIMS REMAINING AFTER AMENDMENT | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) |
|  | Total (37 CFR 1.16(i)) | * 21 | Minus | ** 21 | = 0 | x $80 = | 0 |
|  | Independent (37 CFR 1.16(h)) | * 3 | Minus | *** 4 | = 0 | x $420 = | 0 |
|  | ☐ Application Size Fee (37 CFR 1.16(s)) |  |  |  |  |  |
|  | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) |  |  |  |  |  |
|  |  |  |  |  | TOTAL ADD'L FEE | **0** |

|  |  | (Column 1) | (Column 2) | (Column 3) |  |  |
|---|---|---|---|---|---|---|
| **AMENDMENT** |  | CLAIMS REMAINING AFTER AMENDMENT | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) |
|  | Total (37 CFR 1.16(i)) | * | Minus | ** | = | x $ = |  |
|  | Independent (37 CFR 1.16(h)) | * | Minus | *** | = | x $ = |  |
|  | ☐ Application Size Fee (37 CFR 1.16(s)) |  |  |  |  |  |
|  | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) |  |  |  |  |  |
|  |  |  |  |  | TOTAL ADD'L FEE |  |

LIE
RUTH LLOYD

\* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.
\** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20".
\*** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3".
The "Highest Number Previously Paid For" (Total or Independent) is the highest number found in the appropriate box in column 1.

This collection of information is required by 37 CFR 1.16. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

**Exhibit 24**
**-938-**

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 14/617,422 | 02/09/2015 | Marcelo M. Lamego | P22734US1 | 5106 |

62579        7590        02/07/2017

APPLE INC.
c/o Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, CO 80202

| EXAMINER |
|---|
| STICE, PAULA J |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3766 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 02/07/2017 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

patentdocket@bhfs.com

PTOL-90A (Rev. 04/07)

Exhibit 24
-939-

| *Applicant-Initiated Interview Summary* | Application No. | Applicant(s) | | |
|---|---|---|---|---|
| | 14/617,422 | LAMEGO, MARCELO M. | | |
| | Examiner | Art Unit | AIA (First Inventor to File) Status | Page |
| | Paula J. Stice | 3766 | Yes | 1 of 1 |

All participants (applicant, applicant's representative, PTO personnel):

1.  Paula J. Stice (Primary Examiner); Telephonic        2.  David Atkinson (Attorney of Record); Telephonic

**Date of Interview:** 31 January 2017

**Claim(s) discussed:** 1

**Amendment Proposed:** Applicant provided an agenda with proposed claim amendments.  The amendment would likely include language narrowing the independent claims to include that both the camera and proximity sensors emit light into the users body.  This yields more acurate data.

## Issues Discussed:

**Attachment(s):** Agenda

| /Paula J. Stice/ Primary Examiner, Art Unit 3766 | |
|---|---|

**Applicant recordation instructions:** The formal written reply to the last Office action must include the substance of the interview. (See MPEP section 713.04). If a reply to the last Office action has already been filed, applicant is given a non-extendable time limit of the longer of one month or thirty days from this interview date, or the mailing date of this interview summary form, whichever is later, to file a statement of the substance of the interview.

**Examiner recordation instructions:** Examiners must summarize the substance of any interview of record. A complete and proper recordation of the substance of an interview should include the items listed in MPEP 713.04 for complete and proper recordation including the identification of the general thrust of each argument or issue discussed, a general indication of any other pertinent matters discussed regarding patentability and the general results or outcome of the interview, to include an indication as to whether or not agreement was reached on the issues raised.

**Applicant is reminded that a complete written statement as to the substance of the interview must be made of record in the application file. It is the applicant's responsibility to provide the written statement, unless the interview was initiated by the Examiner and the Examiner has indicated that a written summary will be provided.  See MPEP 713.04**

Please further see:

**MPEP 713.04**
**Title 37 Code of Federal Regulations (CFR) § 1.133 Interviews, paragraph (b)**
**37 CFR § 1.2 Business to be transacted in writing**

U.S. Patent and Trademark Office
PTOL-413/413b (Rev. 01/01/2015)                 Interview Summary                 Paper No. 20170131

**Exhibit 24**
**-940-**

Attorney Docket No. P22734US1

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re the Application of:

| Inventor(s): | Marcelo M. Lamego | | |
|---|---|---|---|
| App. No.: | 14/617,422 | Con. No.: | 5106 |
| Filed: | February 9, 2015 | Art Unit: | 3766 |
| Title: | ELECTRONIC DEVICE THAT COMPUTES HEALTH DATA | Examiner: | Stice, Paula J. |

**AGENDA FOR TELECONFERENCE: FOR PURPOSES OF DISCUSSION ONLY**

- Teleconference to take place Tuesday January 31, 2017 at 9:30 am Mountain and Arizona time (David S. Atkinson to call Examiner Paula J. Stice at 571-270-1478)
- Discuss rejections over U.S. Pub. No. 2013/0215042 to Messerschmidt et al. (hereinafter Messerschmidt), U.S. Pub. No. 2008/0167834 to Herz et al. (hereinafter "Herz"), U.S. Patent No. 7,486,386 to Holcombe et al. (hereinafter "Holcombe"), U.S. Pub. No. 2014/0160314 to Schatevet et al. (hereinafter "Schatevet"), and U.S. Pub. No. 2014/0275832 to Muehlsteff et al. (hereinafter "Muehlsteff").
- With respect to independent claim 1, the Examiner brings in Herz as teaching a proximity sensor that emits light and essentially states it would be obvious to use that instead of the camera of Messerschmidt. Discuss amending to clarify that the camera and the proximity sensor emit the light into the body part of the user. The present application discusses how use of multiple different light emitters with different properties yields more accurate data, which is not in any of the references. The justification to swap the proximity sensor for the camera in light transmission could potentially be there, but not use of both.
  - Alternatively and/or additionally, discuss amending to clarify that at least two of the camera, ambient light sensor, and proximity sensor receive the reflected light. The present application discusses how use of multiple different light receivers with different properties yields more accurate data, which is not in any of the references.
- With respect to independent claim 19, the claim requires that at least two of the camera, ambient light sensor, and proximity sensor receive the reflected light. The Examiner does not address this limitation and the references do not teach or suggest such.
  - Alternatively and/or additionally, discuss amending to clarify that the camera and the proximity sensor emit the light into the body part of the user. The present application discusses how use of multiple different light emitters with different properties yields more accurate data, which is not in any of the references. The justification to swap the proximity sensor for the camera in light transmission could potentially be there, but not use of both.
- With respect to independent claim 21, the claim requires that the camera and the ambient light sensor receive the reflected light. The Examiner does not address this limitation and the references do not teach or suggest such.
  - Alternatively and/or additionally, discuss amending to clarify that the camera and the proximity sensor emit the light into the body part of the user. The present application discusses how use of multiple different light emitters with different properties yields more

1

Exhibit 24
-941-

Attorney Docket No. P22734US1

accurate data, which is not in any of the references.  The justification to swap the
proximity sensor for the camera in light transmission could potentially be there, but not
use of both.

- With respect to dependent claims 18 and 22, the Examiner states that use of the data to
compute oxygen saturation, pulse rate, perfusion index, or a photoplethysmogram (18)
and adjusting sensor data based on detected characteristics of the body part that
influence light absorption (22) is only intended use and is not structure.  However, the
claims recite that the processing unit is configured to perform these functions.  A
processing unit that is configured to perform a particular function is structurally different
from a processing unit that is not configured to perform such functions.
- Discuss any Examiner suggestions for amendment to move the case forward.

**Exhibit 24
-942-**

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 14/617,422 | 02/09/2015 | Marcelo M. Lamego | P22734US1 | 5106 |

62579        7590        01/23/2017
APPLE INC.
c/o Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, CO 80202

| EXAMINER |
|---|
| STICE, PAULA J |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3766 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 01/23/2017 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

patentdocket@bhfs.com

PTOL-90A (Rev. 04/07)

**Exhibit 24**
**-943-**

| **Office Action Summary** | Application No. 14/617,422 | Applicant(s) LAMEGO, MARCELO  M. |
|---|---|---|
| | Examiner Paula J. Stice | Art Unit 3766 | AIA (First Inventor to File) Status Yes |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a).  In no event, however, may a reply be timely filed after SIX (6) months from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment.  See 37 CFR 1.704(b).

**Status**

1) ☒ Responsive to communication(s) filed on <u>12/6/2016</u>.
    ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.
2a) ☒ This action is **FINAL**.    2b) ☐ This action is non-final.
3) ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.
4) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims***

5) ☒ Claim(s) <u>1-19,21 and 22</u> is/are pending in the application.
    5a) Of the above claim(s) <u>9-11 and 13-17</u> is/are withdrawn from consideration.
6) ☐ Claim(s) _____ is/are allowed.
7) ☒ Claim(s) <u>1-8, 12, 18-19 and 21-22</u> is/are rejected.
8) ☐ Claim(s) _____ is/are objected to.
9) ☐ Claim(s) _____ are subject to restriction and/or election requirement.
* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov.

**Application Papers**

10) ☐ The specification is objected to by the Examiner.
11) ☐ The drawing(s) filed on _____ is/are:  a) ☐ accepted or b) ☐ objected to by the Examiner.
    Applicant may not request that any objection to the drawing(s) be held in abeyance.  See 37 CFR 1.85(a).
    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

**Priority under 35 U.S.C. § 119**

12) ☐ Acknowledgement is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
    **Certified copies:**
    a) ☐ All   b) ☐ Some**  c) ☐ None of the:
        1. ☐ Certified copies of the priority documents have been received.
        2. ☐ Certified copies of the priority documents have been received in Application No. _____.
        3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).
** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☒ Notice of References Cited (PTO-892)

2) ☐ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b) Paper No(s)/Mail Date _____.

3) ☐ Interview Summary (PTO-413)
    Paper No(s)/Mail Date. _____ .

4) ☐ Other: _____.

**Exhibit 24**
**-944-**

Application/Control Number: 14/617,422                                           Page 2
Art Unit: 3766

## DETAILED ACTION

### *Notice of Pre-AIA or AIA Status*

The present application, filed on or after March 16, 2013, is being examined under the first inventor to file provisions of the AIA.

### *Response to Arguments*

1.      Applicant's arguments, see Applicants Response, filed 12/6/2016, with respect to the rejection of the claims under Messerschmidt in view of Herz have been fully considered and are persuasive.  Therefore, the rejection has been withdrawn. However, upon further consideration, a new ground(s) of rejection is made in view of Herz et al. US 2008/0167834.

2.      All previous rejections and objections have been withdrawn in favor of the below rejections.

### *Claim Rejections - 35 USC § 103*

3.      The following is a quotation of 35 U.S.C. 103 which forms the basis for all obviousness rejections set forth in this Office action:

> A patent for a claimed invention may not be obtained, notwithstanding that the claimed invention is not identically disclosed as set forth in section 102, if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains. Patentability shall not be negated by the manner in which the invention was made.

4.      The factual inquiries set forth in *Graham v. John Deere Co.*, 383 U.S. 1, 148 USPQ 459 (1966), that are applied for establishing a background for determining obviousness under 35 U.S.C. 103 are summarized as follows:

    1. Determining the scope and contents of the prior art.

    2. Ascertaining the differences between the prior art and the claims at issue.

    3. Resolving the level of ordinary skill in the pertinent art.

**Exhibit 24**
-945-

Application/Control Number: 14/617,422                                    Page 3
Art Unit: 3766

    4. Considering objective evidence present in the application indicating obviousness or nonobviousness.


5.    Claims 1, 2, 8, 12, 19 and 21 are rejected under 35 U.S.C. 103 as being unpatentable over Messerschmidt et al. US 2013/0215042 in view of Herz et al. US 2008/0167834.

6.    Regarding claims 1 and 21:  Messerschmidt discloses a camera (paragraph 0039); a light sensor (paragraph 0039, "light sensor") and a processing unit 104 (figure 2, and paragraphs 0020, 0023) coupled to the camera, ambient light sensor and proximity sensor; the processing unit is configured to use the camera to emit light (paragraphs 0039-40) into a body part of a user touching the surface of the mobile computing device (figures 4a-f and 5a-d); the processor then uses the light emitted from the camera reflected by the body part to generate data (paragraphs 0039-40) and compute health data of the user from the light received (paragraphs 0025-0027); the body part is at least partially over the camera and ambient light sensor.   However, Messerschmidt does not specifically disclose a proximity sensor which is used by the processor to emit light into the users body which is touching the sensor.  Herz however teaches of a similar cellular phone device (figure 2) which has a proximity sensor to emit IR light and then detect the reflected light.  It therefore would have been obvious to one of ordinary skill in the art at the time the invention was made to modify Messerschmidt to include a proximity sensor to emit IR light, as taught by Herz, in order to utilize a proximity sensor to detect appropriate signals.

Exhibit 24
-946-

Application/Control Number: 14/617,422                                      Page 4
Art Unit: 3766

7.      Regarding claims 2, 8 and 19:  Messerschmidt/Herz discloses the claimed

invention.  Messerschmidt teaches that the camera and light sensor are to be positioned

in the same general area (figure 6A, paragraph 0040), Herz further teaches that the

proximity sensor is positioned near the surface to be sensed (paragraph 0076).  It

therefore would have been obvious to one of ordinary skill in the art at the time the

invention was made to modify Messerschmidt/Herz of claim 1 to include all three

components near each other in order to determine the appropriate parameter.

8.      Regarding claim 12:  Messerschmidt discloses that the camera is covered by the

finger of the user in figure 6A, this camera is clearly configured with a focal distance

greater than a distance between the body part and the camera.  The camera emits the

light and the sensor takes images of the reflected light not the image of the finger itself.


9.      Claims 3-5, 18 and 22 are rejected under 35 U.S.C. 103 as being unpatentable

over Messerschmidt et al. US 2013/0215042 in view of Herz et al. US 2008/0167834

and further in view of Holcombe et al. US 7,486,386.

10.     Regarding claims 3-5:  Messerschmidt/Herz discloses the claimed invention,

however Messerschmidt/Herz discloses the claimed invention of claim 1 does not

specifically disclose that the proximity sensor is configured to detect multiple

wavelengths of light, emit and/or emit and receive infrared, red and visible light. Herz,

however, further teaches that the proximity sensor can comprise "*a transmissive type*

*photoelectric sensor, a direct reflective type photoelectric sensor, a mirror reflective type*

*photoelectric sensor, a high-frequency oscillation proximity sensor, a capacitance type*

Exhibit 24
-947-

Application/Control Number: 14/617,422                                    Page 5
Art Unit: 3766

*proximity sensor, a magnetic type proximity sensor, an infrared rays proximity sensor, and so on (paragraph 0076).*"  However it is unclear if these proximity sensors detect multiple wavelengths of light and emit and receive infrared, visible and red light. Holcombe however teaches of a proximity sensor which uses several LED's 103, 104, 105 (figures 1) which emit actual light which is visible or not visible, red light and infrared light (column 6, lines 36-67).  It therefore would have been obvious to one of ordinary skill in the art at the time the invention was filed to modify Messerschmidt/Herz in order to include multiple LED's and the use of multiple wavelengths in order to detect an object with a proximity sensor.

11.    Regarding claims 18 and 22:  Messerschmidt/Herz discloses the structure claimed including the camera, proximity sensor, ambient light sensor and the computing device.  Health data is also disclosed (paragraph 0025-0026), and the computing devices uses the data from the camera and other components to process and determine health data.  The remainder of the claim language is considered to be intended use and/or functional language. The structure of Messerschmidt/Herz is certainly capable of performing this function.  It makes no difference if the devices of the prior art are used in a different way since a recitation of the intended use of the claimed invention must result in a structural difference between the claimed invention and the prior art in order to patentably distinguish the claimed invention from the prior art. If the prior art structure is capable of performing the intended use. In this instance, the prior art is capable of meeting the claimed intended use recitations.

Exhibit 24
-948-

Application/Control Number: 14/617,422                                        Page 6
Art Unit: 3766

12.     Claim 6 is rejected under 35 U.S.C. 103 as being unpatentable over
Messerschmidt et al. US 2013/0215042 in view of Herz et al. US 2008/0167834 and
further in view of Schatevet et al. US 2014/0160314.

13.     Regarding claim 6: Messerschmidt/Herz discloses the claimed invention,
however Messerschmidt/Herz discloses the claimed invention of claim 1 does not
specifically disclose a silicone ambient light sensor.  Schatevet however teaches of a
silicon photo-diode ambient light sensor (paragraph 0017).  It therefore would have
been obvious to one of ordinary skill in the art at the time the invention was filed to
modify Messerschmidt/Herz to include a silicone ambient light sensor, as taught by
Schatevet, in order to utilize a semiconductor photo-detector responsive to the
appropriate range of color intensities in ambient light.


14.     Claim 7 is rejected under 35 U.S.C. 103 as being unpatentable over
Messerschmidt et al. US 2013/0215042 in view of  Herz et al. US 2008/0167834 and
further in view of Muehlsteff et al. US 2014/0275832

15.     Regarding claim 7: Messerschmidt/Herz discloses the claimed invention,
however Messerschmidt/Herz discloses the claimed invention of claim 1 does not
specifically disclose a camera configured to detect infrared light. Muehlsteff however
teaches of a camera for detecting visible and infrared spectral ranges (paragraph 0036).
It therefore would have been obvious to one of ordinary skill in the art at the time the
invention was made to modify   Messerschmidt/Herz to include a camera capable of
detect infrared light, as taught by Muehlstef, in order to detect vital signs.

Exhibit 24
-949-

Application/Control Number: 14/617,422                                    Page 7
Art Unit: 3766

### *Conclusion*

Applicant's amendment necessitated the new ground(s) of rejection presented in this Office action.  Accordingly, **THIS ACTION IS MADE FINAL**.  See MPEP § 706.07(a). Applicant is reminded of the extension of time policy as set forth in 37 CFR 1.136(a).

A shortened statutory period for reply to this final action is set to expire THREE MONTHS from the mailing date of this action.  In the event a first reply is filed within TWO MONTHS of the mailing date of this final action and the advisory action is not mailed until after the end of the THREE-MONTH shortened statutory period, then the shortened statutory period will expire on the date the advisory action is mailed, and any extension fee pursuant to 37 CFR 1.136(a) will be calculated from the mailing date of the advisory action.  In no event, however, will the statutory period for reply expire later than SIX MONTHS from the date of this final action.

Any inquiry concerning this communication or earlier communications from the examiner should be directed to Paula J. Stice whose telephone number is (571)270-1478.  The examiner can normally be reached on Monday - Friday 9AM-5PM.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Carl Layno can be reached on (571) 272-4949.  The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

**Exhibit 24**
**-950-**

Application/Control Number: 14/617,422                                    Page 8
Art Unit: 3766

  Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a

USPTO Customer Service Representative or access to the automated information

system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.


/Paula J. Stice/
Primary Examiner, Art Unit 3766

Exhibit 24
-951-

| *Notice of References Cited* | Application/Control No. 14/617,422 | Applicant(s)/Patent Under Reexamination LAMEGO, MARCELO M. | |
|---|---|---|---|
| | Examiner Paula J. Stice | Art Unit 3766 | Page 1 of 1 |

### U.S. PATENT DOCUMENTS

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Name | CPC Classification | US Classification |
|---|---|---|---|---|---|---|
| * | A | US-2008/0167834 A1 | 07-2008 | Herz; Scott M. | G06F1/3203 | 702/150 |
| | B | US- | | | | |
| | C | US- | | | | |
| | D | US- | | | | |
| | E | US- | | | | |
| | F | US- | | | | |
| | G | US- | | | | |
| | H | US- | | | | |
| | I | US- | | | | |
| | J | US- | | | | |
| | K | US- | | | | |
| | L | US- | | | | |
| | M | US- | | | | |

### FOREIGN PATENT DOCUMENTS

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Country | Name | CPC Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

### NON-PATENT DOCUMENTS

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages |
|---|---|---|
| | U | |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

**Exhibit 24**
-952-

**EAST Search History**

**EAST Search History (Prior Art)**

| Ref # | Hits | Search Query | DBs | Default Operator | Plurals | Time Stamp |
|---|---|---|---|---|---|---|
| S1 | 5261 | ((ambient near3 light near3 sensor) and (proximity near3 sensor) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 10:27 |
| S2 | 3474 | (ambient near3 light near3 sensor) same (proximity near3 sensor) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 10:27 |
| S3 | 2363 | ((ambient near3 light near3 sensor) same (proximity near3 sensor)) and phone | US-PGPUB; USPAT | OR | OFF | 2016/09/02 10:27 |
| S4 | 354 | ((ambient near3 light near3 sensor) same (proximity near3 sensor)) and Iphone | US-PGPUB; USPAT | OR | OFF | 2016/09/02 10:27 |
| S5 | 28 | ((ambient near3 light near3 sensor) same (proximity near3 sensor)) and Iphone and (heart near3 rate) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 10:29 |
| S6 | 43 | ((ambient near3 light near3 sensor) same (proximity near3 sensor)) same (heart near3 rate near4 sensor) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 10:35 |
| S7 | 4856 | (A61B5/0205.CPC.SUBCLASS.) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 10:52 |
| S8 | 4221 | (A61B5/0205.CPC.SUBCLASS.) and @ad <= "20140926" | US-PGPUB; USPAT | OR | OFF | 2016/09/02 10:52 |
| S9 | 2701 | (A61B5/0402.CPC.SUBCLASS.) and @ad <= "20140926" | US-PGPUB; USPAT | OR | OFF | 2016/09/02 10:52 |
| S10 | 727 | (A61B5/6898.CPC.SUBCLASS.) and @ad <= "20140926" | US-PGPUB; USPAT | OR | OFF | 2016/09/02 10:52 |
| S11 | 6812 | (S8 S9 S10) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 10:53 |
| S12 | 58 | (S8 S9 S10) and (camera or (proximity with sensor)) same ((emitt$4 and reflect$4) with light) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 10:54 |
| S13 | 49 | (S8 S9 S10) and (camera or (proximity with sensor)) same ((emitt$4 and reflect$4) with light) and ((heart near3 rate) or (health with data)) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 10:54 |
| S14 | 4221 | (A61B5/0205.CPC.SUBCLASS.) and @ad <= "20140926" | US-PGPUB; USPAT | OR | OFF | 2016/09/02 13:13 |
| S15 | 2701 | (A61B5/0402.CPC.SUBCLASS.) and @ad <= "20140926" | US-PGPUB; USPAT | OR | OFF | 2016/09/02 13:13 |
| S16 | 727 | (A61B5/6898.CPC.SUBCLASS.) and @ad <= | US- | | OFF | 2016/09/02 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | "20140926" | PGPUB; USPAT | | | 13:13 |
| S17 | 1 | (S14 S15 S16) and (camera and (proximity with sensor)) same ((emitt$4 and reflect$4) with light) and ((heart near3 rate) or (health with data)) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 13:13 |
| S18 | 116 | (S14 S15 S16) and (camera and (proximity with sensor)) and ((emitt$4 and reflect$4) with light) and ((heart near3 rate) or (health with data)) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 13:13 |
| S19 | 118 | (S14 S15 S16) and (camera and (proximity with sensor)) and ((emitt$4 and reflect$4) with light) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 13:13 |
| S20 | 111 | (S14 S15 S16) and (camera and (proximity with sensor) and (light with sensor)) and ((emitt$4 and reflect$4) with light) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 13:14 |
| S21 | 51 | (S14 S15 S16) and (camera and (proximity near3 sensor) and (light near3 sensor)) and ((emitt$4 and reflect$4) with light) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 13:14 |
| S22 | 2647 | (camera and (proximity near3 sensor) and (light near3 sensor)) and ((emitt$4 and reflect$4) with light) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 13:42 |
| S23 | 115 | (camera and (proximity near3 sensor) and (light near3 sensor)) and ((emitt$4 and reflect$4) with light) and (physiological near3 data) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 13:43 |
| S24 | 170 | (S14 S15 S16) and ((sense or determine) near3 contact) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 14:27 |
| S25 | 0 | (S14 S15 S16) and ((sense or determine) near3 contact) and messerschmidt | US-PGPUB; USPAT | OR | OFF | 2016/09/02 14:27 |
| S26 | 4 | (S14 S15 S16) and ((sense or determine) with contact) and messerschmidt | US-PGPUB; USPAT | OR | OFF | 2016/09/02 14:27 |
| S27 | 1 | "20130310656" | US-PGPUB; USPAT | OR | OFF | 2016/09/02 14:29 |
| S28 | 221 | (multiple near3 wavelength with light) with sensor | US-PGPUB; USPAT | OR | OFF | 2016/09/02 15:12 |
| S29 | 0 | (multiple near3 wavelength with light) with (proximity near3 sensor) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 15:13 |
| S30 | 0 | (multiple near3 wavelength with light) same (proximity near3 sensor) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 15:13 |
| S31 | 2 | (multiple near3 wavelength ) same (proximity near3 sensor) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 15:13 |
| S32 | 77 | (visible and infrared and red) same (proximity near3 sensor) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 15:14 |
| S33 | 45 | (visible with light) same infrared same red same (proximity near3 sensor) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 15:20 |
| S34 | 0 | (S14 S15 S16) and ((ambient with light) same | US- | OR | OFF | 2016/09/02 |

Exhibit 24
-954-

| | | | | | | |
|---|---|---|---|---|---|---|
| | | (indigum or silicone)) | US-PGPUB; USPAT | | | 15:27 |
| S35 | 67 | ((ambient with light with sensor) same (indigum or silicone)) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 15:27 |
| S36 | 50 | ((ambient near3 light near3 sensor) same (indigum or silicone)) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 15:27 |
| S37 | 4 | (silicone with ambient with light with sensor) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 15:28 |
| S38 | 2551 | (S14 S15 S16) and (camera with detect wtih infrared) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 15:33 |
| S39 | 0 | (S14 S15 S16) and (camera adj detect adj infrared) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 15:33 |
| S40 | 2 | (S14 S15 S16) and (camera with detect with infrared) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 15:33 |
| S41 | 37 | (S14 S15 S16) and (camera with detect$5 with infrared) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 15:34 |
| S42 | 63 | (vital near3 sign) and (camera with detect$5 with infrared) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 15:36 |
| S43 | 2 | (S14 S15 S16) and (camera with configured with detect$5 with infrared) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 15:41 |
| S44 | 37 | (S14 S15 S16) and (camera with detect$5 with infrared) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 15:42 |
| S45 | 431 | (S14 S15 S16) and (ambient with light with sensor) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 15:54 |
| S46 | 11 | (S14 S15 S16) and ((ambient with light with sensor) same camera) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 15:54 |
| S47 | 4559 | ((ambient with light with sensor) same camera) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 15:57 |
| S48 | 4 | ((ambient with light with sensor) same camera) and (Vital near3 sign) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 15:57 |
| S49 | 6065 | @ad <= "20140926" and (proximity near3 sensor near3 light) | US-PGPUB; USPAT | OR | OFF | 2017/01/10 14:11 |
| S50 | 75 | @ad <= "20140926" and (proximity near3 sensor near3 emit near3 light) | US-PGPUB; USPAT | OR | OFF | 2017/01/10 14:12 |

1/11/2017 8:53:03 AM
C:\Users\pstice\Documents\EAST\Workspaces\14617422.wsp

**Exhibit 24**
**-955-**

| *Search Notes* | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 14617422 | LAMEGO, MARCELO M. |
| | **Examiner** | **Art Unit** |
| | PAULA J STICE | 3766 |

| CPC- SEARCHED | | |
|---|---|---|
| **Symbol** | **Date** | **Examiner** |
| A61B5/0205, 5/0402, 5/14551, 5/6898 | 9/2/2016 | PJS |
| update | 1/11/2017 | PJS |

| CPC COMBINATION SETS  - SEARCHED | | |
|---|---|---|
| **Symbol** | **Date** | **Examiner** |
| | | |

| US CLASSIFICATION SEARCHED | | | |
|---|---|---|---|
| **Class** | **Subclass** | **Date** | **Examiner** |
| | east searches - broad for specific sensors | 9/2/2016 | pjs |
| | updated | 1/11/2017 | pjs |

| SEARCH NOTES | | |
|---|---|---|
| **Search Notes** | **Date** | **Examiner** |
| A61B5/0205, 5/0402, 5/14551, 5/6898 | 9/2/2016 | pjs |
| east searches | 9/2/2016 | pjs |
| forward and back searches | 9/2/2016 | pjs |
| updated | 1/11/2017 | pjs |

| INTERFERENCE SEARCH | | | |
|---|---|---|---|
| **US Class/ CPC Symbol** | **US Subclass / CPC Group** | **Date** | **Examiner** |
| | | | |

| | |
|---|---|
| | |

U.S. Patent and Trademark Office

Part of Paper No. : 20170111

**Exhibit 24**
**-956-**

| | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| **Index of Claims** | 14617422 | LAMEGO, MARCELO M. |
| | **Examiner** | **Art Unit** |
| | PAULA J STICE | 3766 |

| ✔ | Rejected | | - | Cancelled | | N | Non-Elected | | A | Appeal |
|---|---|---|---|---|---|---|---|---|---|---|
| = | Allowed | | ÷ | Restricted | | I | Interference | | O | Objected |

| ☐ Claims renumbered in the same order as presented by applicant | | ☐ CPA | ☐ T.D. | ☐ R.1.47 |
|---|---|---|---|---|

| CLAIM | | DATE | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Final | Original | 06/07/2016 | 09/03/2016 | 01/11/2017 | | | | | | |
| | 1 | ÷ | ✔ | ✔ | | | | | | |
| | 2 | ÷ | ✔ | ✔ | | | | | | |
| | 3 | ÷ | ✔ | ✔ | | | | | | |
| | 4 | ÷ | ✔ | ✔ | | | | | | |
| | 5 | ÷ | ✔ | ✔ | | | | | | |
| | 6 | ÷ | ✔ | ✔ | | | | | | |
| | 7 | ÷ | ✔ | ✔ | | | | | | |
| | 8 | ÷ | ✔ | ✔ | | | | | | |
| | 9 | ÷ | N | N | | | | | | |
| | 10 | ÷ | N | N | | | | | | |
| | 11 | ÷ | N | N | | | | | | |
| | 12 | ÷ | ✔ | ✔ | | | | | | |
| | 13 | ÷ | N | N | | | | | | |
| | 14 | ÷ | N | N | | | | | | |
| | 15 | ÷ | N | N | | | | | | |
| | 16 | ÷ | N | N | | | | | | |
| | 17 | ÷ | N | N | | | | | | |
| | 18 | ÷ | ✔ | ✔ | | | | | | |
| | 19 | ÷ | ✔ | ✔ | | | | | | |
| | 20 | ÷ | - | - | | | | | | |
| | 21 | ÷ | ✔ | ✔ | | | | | | |
| | 22 | | ✔ | ✔ | | | | | | |

Part of Paper No. : 20170111

**Exhibit 24**
**-957-**

Attorney Docket No. P22734US1

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of:

| | | | |
|---|---|---|---|
| Inventor(s): | Marcelo M. Lamego | | |
| App. No.: | 14/617,422 | Con. No.: | 5106 |
| Filed: | February 9, 2015 | Art Unit: | 3766 |
| Title: | ELECTRONIC DEVICE THAT COMPUTES HEALTH DATA | Examiner: | Stice, Paula J. |

## AMENDMENT AND RESPONSE TO OFFICE ACTION

Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Sir:

 In response to the Office action dated September 8, 2016, please consider the following remarks and amend the above-identified application as follows:

 **Amendments to the Claims** begin on page 2 of this paper.

 **Remarks** begin on page 6 of this paper.

1

Exhibit 24
-958-

Attorney Docket No. P22734US1

**Amendments to the Claims:**

1.      (Currently Amended)  A mobile personal computing device, comprising:

a camera;

an ambient light sensor;

a proximity sensor; and

a processing unit communicably coupled to the camera, the ambient light sensor, and the proximity sensor;

wherein the processing unit is configured to:

use ~~at least one of a camera or a~~ the proximity sensor to emit light into a body part of a user touching a surface of the mobile personal computing device;

use at least one of the camera, an ambient light sensor, or the proximity sensor to receive at least part of the emitted light reflected by the body part of the user and generate sensor data; and

compute health data of the user, utilizing the processing unit, using at least the sensor data regarding the received light.

2.      (Original)  The mobile personal computing device of claim 1, wherein the camera, the ambient light sensor, and the proximity sensor are positioned to be at least partially covered by the body part of the user at a same time.

3.      (Original)  The mobile personal computing device of claim 1, wherein the proximity sensor is configured to detect multiple wavelengths of light.

4.      (Original)  The mobile personal computing device of claim 3, wherein multiple light wavelength proximity sensor is configured to emit and receive infrared and visible light.

5.      (Original)  The mobile personal computing device of claim 3, wherein multiple light wavelength proximity sensor is configured to emit and receive infrared and red light.

6.      (Original)  The mobile personal computing device of claim 1, wherein the ambient light sensor is a at least one of a silicon ambient light sensor or an indium gallium arsenide ambient light sensor.

Exhibit 24
-959-

Attorney Docket No. P22734US1

7.      (Original)  The mobile personal computing device of claim 1, wherein the camera is configured to detect infrared light.

8.      (Original)  The mobile personal computing device of claim 1, wherein the device is configured to compute the health-related information when the body part of the user is positioned at least partially over the camera, the ambient light sensor, and the proximity sensor.

9.      (Withdrawn)  The mobile personal computing device of claim 1, wherein the processing unit utilizes the camera to determine when the body part of the user is misaligned with the camera, the ambient light sensor, and the proximity sensor for purposes of detecting the information about the body part of the user.

10.     (Withdrawn)  The mobile personal computing device of claim 9, wherein the processing unit provides an output that can be used as guidance to correct a misalignment.

11.     (Withdrawn)  The mobile personal computing device of claim 10, wherein the processing unit is configure to provide the output to at least one visual output component, audio output component, or haptic output component.

12.     (Original)  The mobile personal computing device of claim 1, wherein the camera is configured with a focal distance greater than a distance between the camera and the body part of the user when the body part is touching the surface of the mobile personal computing device.

13.     (Withdrawn)  The mobile personal computing device of claim 1, further comprising
        electrical contacts disposed on an exterior surface of the device, wherein the processing unit is further configured to compute additional health-related information regarding the user based on an electrical measurement obtained using the electrical contacts.

14.     (Withdrawn)  The mobile personal computing device of claim 13, wherein the electrical contacts are positioned to contact the body part of the user and an additional body part of the user.

Exhibit 24
-960-

Attorney Docket No. P22734US1

15.    (Withdrawn)  The mobile personal computing device of claim 14, wherein the electrical measurement obtained using the electrical contacts corresponds to an electrical property across the user's chest.

16.    (Withdrawn)  The mobile personal computing device of claim 13, wherein the processing unit is further configured to:

use at least the proximity sensor to emit the light;

use the ambient light sensor and the camera to receive the reflected light; and

compute a blood pressure index, a body fat content, and an electrocardiogram using data from the ambient light sensor, the camera, and the electrical contacts.

17.    (Withdrawn)  The mobile personal computing device of claim 13, wherein the proximity sensor is a multiple light wavelength proximity sensor that utilizes infrared and visible light, the ambient light sensor is a indium gallium arsenide ambient light sensor, and the processing unit is further configured to:

use at least the proximity sensor to emit the light;

use the ambient light sensor and the camera receive the reflected light; and

compute a blood hydration using data from the ambient light sensor, the camera, and the electrical contacts.

18.    (Original)  The mobile personal computing device of claim 1, wherein the processing unit is further configured to:

use at least the proximity sensor to emit the light;

use at least the ambient light sensor and the camera receive the reflected light; and

compute an oxygen saturation, a pulse rate, a perfusion index, or a photoplethysmogram using data from the ambient light sensor and the camera.

19.    (Currently Amended)  A method for using a mobile personal computing device to obtain health data, comprising:

using at least one of a camera and a proximity sensor to emit light into a body part of a user touching a surface of the mobile personal computing device;

using at least [[one]] two of the camera, an ambient light sensor, or the proximity sensor to receive at least part of the emitted light reflected by the body part of the user and generate sensor data; and

**Exhibit 24**
**-961-**

computing health data of the user, utilizing the processing unit, using at least the sensor data regarding the received light.

20.    (Cancelled)

21.    (Currently Amended)  A computer program product including a non-transitory storage medium, comprising:

a first set of instructions, stored in the non-transitory storage medium, executable by at least one processing unit to use at least one of a camera and a proximity sensor to emit light into a body part of a user touching a surface of a mobile personal computing device;

a second set of instructions, stored in the non-transitory storage medium, executable by the least one processing unit to use ~~at least one of~~ the camera[[,]] and an ambient light sensor~~, or the proximity sensor~~ to receive at least part of the emitted light reflected by the body part of the user and generate sensor data; and

a third set of instructions, stored in the non-transitory storage medium, executable by the least one processing unit to compute health data of the user using at least the sensor data regarding the received light.

22.    (Currently Amended) The mobile personal computing device of claim 1, wherein the processing unit is configured to use[[s]] data from the camera indicating characteristics of the body part that influence light absorption to adjust the sensor data regarding the received light as part of computing the health data.

Exhibit 24
-962-

# REMARKS

This paper is submitted in response to the Office action mailed on September 8, 2016. This paper amends claims 1, 19, and 21-22.  Support for these amendments can be found at least in paragraphs 0027 and 0056 of the application as filed and no new matter is added. Accordingly, after entry of this Amendment and Response, claims 1-19 and 21-22 will be pending with claims 9-11 and 13-17 being withdrawn.

## I.  Interview Summary

An interview was conducted November 16, 2016 with David S. Atkinson and Examiner Paula J. Stice participating.  The rejections in view of U.S. 2013/0215042 to Messerschmidt et al. (hereinafter "Messerschmidt"), U.S. Pub. No. 2013/0310656 to Lim et al. (hereinafter "Lim"), U.S. Patent No. 7,486,386 to Holcombe et al. (hereinafter "Holcombe"), U.S. Pub. No. 2014/0160314 to Schatevet et al. (hereinafter "Schatevet"), and U.S. Pub. No. 2014/0275832 to Muehlsteff et al. (hereinafter "Muehlsteff") were discussed.  Agreements were discussed and agreed upon.  This response presents those amendments.

## II.  Claim Rejections Under 35 U.S.C. § 112

### A. 112(b)

The Examiner rejected claims 1-8, 12, 18-19, and 22 under 35 U.S.C. § 112(b) as being indefinite due to informalities in claim 1.  This response corrects the informalities and the assignee respectfully submits that claims 1-8, 12, 18-19, and 22 are definite.

### B. 112(f)

The Examiner stated that the term "configured to" in the claims would be interpreted as means plus function as it uses a generic placeholder combined with functional language not preceded by a structural modifier. However, the term in each case follows a structural component (the processing unit, the proximity sensor, camera, and device).  As such, the term is a limitation of the structural component rather than a generic placeholder combined with functional language not preceded by a structural modifier and should not be interpreted as means plus function.

**Exhibit 24**
**-963-**

## V.  Claim Rejections Under 35 U.S.C. § 103

### A. Claims 1, 2, 8, 12, 19, and 21

The Examiner rejected claims 1, 2, 8, 12, 19, and 21 under 35 U.S.C. § 103(a) as being obvious over Messerschmidt in view of Lim.  For at least the following reasons, the Assignee respectfully traverses these rejections.

Independent claim 1 recites that "the processing unit is configured to: use the proximity sensor to emit light into a body part of a user touching a surface of the mobile personal computing device."  Support for these amendments can be found at least in paragraphs 0027 and 0056 of the application as filed and no new matter is added.  The Examiner relied upon Messerschmidt for these limitations.  However, as agreed in the November 16, 2016 interview, Messerschmidt only uses a camera LED for this or other LED, not light from a proximity sensor. Different light sources transmit different light and thus this would yield different data than if the proximity sensor did not transmit the light.  Thus, as agreed in the November 16, 2016 interview, this feature is missing from the combination of Messerschmidt and Lim and independent claim 1 is patentable over the combination of Messerschmidt and Lim.

Independent claim 19 recites "using at least two of the camera, an ambient light sensor, or the proximity sensor to receive at least part of the emitted light reflected by the body part of the user and generate sensor data."  Support for these amendments can be found at least in paragraphs 0027 and 0056 of the application as filed and no new matter is added.  The Examiner relied upon Messerschmidt for these limitations.  However, as agreed in the November 16, 2016 interview, Messerschmidt does not use multiple light sensors to perform this function.  Different light sensors receive light differently and thus the combination would yield different data than a single light sensor.  Thus, as agreed in the November 16, 2016 interview, this feature is missing from the combination of Messerschmidt and Lim and independent claim 1 is patentable over the combination of Messerschmidt and Lim.

Independent claim 21 recites that the "processing unit to" uses "the camera and an ambient light sensor to receive at least part of the emitted light reflected by the body part of the user and generate sensor data."  Support for these amendments can be found at least in paragraphs 0027 and 0056 of the application as filed and no new matter is added.  The Examiner relied upon Messerschmidt for these limitations.  However, as agreed in the November 16, 2016 interview, Messerschmidt does not use multiple light sensors to perform this function.  Different light sensors receive light differently and thus the combination would yield different data than a single light sensor.  Thus, as agreed in the November 16, 2016

Exhibit 24
-964-

Attorney Docket No. P22734US1

interview, this feature is missing from the combination of Messerschmidt and Lim and independent claim 1 is patentable over the combination of Messerschmidt and Lim.

Claims 2, 8, and 12 depend from independent claim 1 and the Assignee respectfully submits that dependent claims 2, 8, and 12 are patentable at least due to their dependence on an allowable base claim. The Assignee makes this statement without reference to, or waiving, the independent bases for patentability in any dependent claim. The Assignee reserves the right to separately argue the patentability of dependent claims 2, 8, and 12 in a subsequently filed response, if necessary.

### B. Claims 3-7, 18, and 22

The Examiner rejected claims 3-5, 18, and 22 under 35 U.S.C. § 103(a) as being obvious over Messerschmidt and Lim in view of Holcombe; claim 6 under 35 U.S.C. § 103(a) as being obvious over Messerschmidt and Lim in view of Schatevet; and claim 7 under 35 U.S.C. § 103(a) as being obvious over Messerschmidt and Lim in view of Muehlsteff. For at least the following reasons, the Assignee respectfully traverses these rejections. Claims 3-7, 18, and 22 depend from independent claims 1 and 21, respectively, and the Assignee respectfully submits that dependent claims 3-7, 18, and 22 are patentable at least due to their dependence on an allowable base claim. The Assignee makes this statement without reference to, or waiving, the independent bases for patentability in any dependent claim. The Assignee reserves the right to separately argue the patentability of dependent claims 3-7, 18, and 22 in a subsequently filed response, if necessary.

### VII. Conclusion

The Assignee thanks the Examiner for the thorough review of the application. The Assignee respectfully submits the present application, as amended, is in condition for allowance and respectfully requests the issuance of a Notice of Allowability as soon as practicable.

The Assignee believes no fees or petitions are due with this filing. However, should any such fees or petitions be required, please consider this a request therefor and authorization to charge Deposit Account No. 504621 as necessary.

**Exhibit 24**
**-965-**

Attorney Docket No. P22734US1

If the Examiner should require any additional information or amendment, please contact the undersigned attorney.

Dated:  December 6, 2016.

Respectfully submitted,

_____/David S. Atkinson/_____
David S. Atkinson, Registration No. 56,655
Attorney for Assignee
USPTO Customer No. 62579

Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, Colorado  80202
Phone:  303-223-1100
Fax:  303-223-1111

**Exhibit 24**
**-966-**

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 27705175 |
| **Application Number:** | 14617422 |
| **International Application Number:** | |
| **Confirmation Number:** | 5106 |
| **Title of Invention:** | Electronic Device that Computes Health Data |
| **First Named Inventor/Applicant Name:** | Marcelo M. Lamego |
| **Customer Number:** | 62579 |
| **Filer:** | David S. Atkinson/Valerie Brown |
| **Filer Authorized By:** | David S. Atkinson |
| **Attorney Docket Number:** | P22734US1 |
| **Receipt Date:** | 06-DEC-2016 |
| **Filing Date:** | 09-FEB-2015 |
| **Time Stamp:** | 12:30:24 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | no |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Amendment/Req. Reconsideration-After Non-Final Reject | P22734US1Amendment.pdf | 48169 <br> 0f4a0ddaafd7577255fadb2c86a1f12c0582da430 | no | 9 |

**Warnings:**

Exhibit 24
-967-

**Information:**

| | |
|---|---|
| **Total Files Size (in bytes):** | 48169 |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

<u>New Applications Under 35 U.S.C. 111</u>
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

<u>National Stage of an International Application under 35 U.S.C. 371</u>
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

<u>New International Application Filed with the USPTO as a Receiving Office</u>
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

Exhibit 24
-968-

PTO/SB/06 (09-11)
Approved for use through 1/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| PATENT APPLICATION FEE DETERMINATION RECORD<br>Substitute for Form PTO-875 | Application or Docket Number<br>14/617,422 | Filing Date<br>02/09/2015 | ☐ To be Mailed |
|---|---|---|---|

**ENTITY:**  ☒ LARGE  ☐ SMALL  ☐ MICRO

## APPLICATION AS FILED – PART I

| | (Column 1) | (Column 2) | | |
|---|---|---|---|---|
| FOR | NUMBER FILED | NUMBER EXTRA | RATE ($) | FEE ($) |
| ☐ BASIC FEE<br>(37 CFR 1.16(a), (b), or (c)) | N/A | N/A | N/A | |
| ☐ SEARCH FEE<br>(37 CFR 1.16(k), (i), or (m)) | N/A | N/A | N/A | |
| ☐ EXAMINATION FEE<br>(37 CFR 1.16(o), (p), or (q)) | N/A | N/A | N/A | |
| TOTAL CLAIMS<br>(37 CFR 1.16(i)) | minus 20 = | * | X $ = | |
| INDEPENDENT CLAIMS<br>(37 CFR 1.16(h)) | minus 3 = | * | X $ = | |
| ☐ APPLICATION SIZE FEE<br>(37 CFR 1.16(s)) | If the specification and drawings exceed 100 sheets of paper, the application size fee due is $310 ($155 for small entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s). | | | |
| ☐ MULTIPLE DEPENDENT CLAIM PRESENT (37 CFR 1.16(j)) | | | | |
| * If the difference in column 1 is less than zero, enter "0" in column 2. | | | TOTAL | |

## APPLICATION AS AMENDED – PART II

| | | (Column 1) | (Column 2) | (Column 3) | | |
|---|---|---|---|---|---|---|
| **AMENDMENT** | **12/06/2016** | CLAIMS REMAINING AFTER AMENDMENT | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) |
| | Total (37 CFR 1.16(i)) | * 21 | Minus | ** 21 | = 0 | x $80 = | 0 |
| | Independent (37 CFR 1.16(h)) | * 3 | Minus | *** 4 | = 0 | x $420 = | 0 |
| | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | |
| | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | |
| | | | | | TOTAL ADD'L FEE | **0** |

| | | (Column 1) | (Column 2) | (Column 3) | | |
|---|---|---|---|---|---|---|
| **AMENDMENT** | | CLAIMS REMAINING AFTER AMENDMENT | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) |
| | Total (37 CFR 1.16(i)) | * | Minus | ** | = | x $ = | |
| | Independent (37 CFR 1.16(h)) | * | Minus | *** | = | x $ = | |
| | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | |
| | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | |
| | | | | | TOTAL ADD'L FEE | |

LIE
MARCIA GORDON

* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.
** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20".
*** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3".
The "Highest Number Previously Paid For" (Total or Independent) is the highest number found in the appropriate box in column 1.

This collection of information is required by 37 CFR 1.16. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

**Exhibit 24**
**-969-**

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 14/617,422 | 02/09/2015 | Marcelo M. Lamego | P22734US1 | 5106 |

62579          7590          12/05/2016

APPLE INC.
c/o Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, CO 80202

| EXAMINER |
|---|
| STICE, PAULA J |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3766 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 12/05/2016 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

patentdocket@bhfs.com

PTOL-90A (Rev. 04/07)

**Exhibit 24**
**-970-**

| ***Applicant-Initiated Interview Summary*** | Application No. | Applicant(s) |
|---|---|---|
| | 14/617,422 | LAMEGO, MARCELO M. |
| | Examiner | Art Unit | |
| | Paula J. Stice | 3766 | |

All participants (applicant, applicant's representative, PTO personnel):

(1) _Paula J. Stice_.          (3) _____.

(2) _David Atkinson_.          (4) _____.

Date of Interview: _16 November 2016_.

Type:  ☒ Telephonic  ☐ Video Conference
       ☐ Personal [copy given to:  ☐ applicant   ☐ applicant's representative]

Exhibit shown or demonstration conducted:   ☐ Yes     ☐ No.
   If Yes, brief description: _____.

Issues Discussed  ☐101  ☐112  ☐102  ☐103  ☒Others
(For each of the checked box(es) above, please describe below the issue and detailed description of the discussion)

Claim(s) discussed: _1_.

Identification of prior art discussed: _____.

Substance of Interview
(For each issue discussed, provide a detailed description and indicate if agreement was reached. Some topics may include: identification or clarification of a reference or a portion thereof, claim interpretation, proposed amendments, arguments of any applied references etc...)

_Claim 1 was discussed in light of the interview summary provided.  It as agreed that the prior art of reference did not include both the camera and proximity sensor transmitting light_.

**Applicant recordation instructions:** The formal written reply to the last Office action must include the substance of the interview. (See MPEP section 713.04). If a reply to the last Office action has already been filed, applicant is given a non-extendable period of the longer of one month or thirty days from this interview date, or the mailing date of this interview summary form, whichever is later, to file a statement of the substance of the interview

**Examiner recordation instructions:** Examiners must summarize the substance of any interview of record. A complete and proper recordation of the substance of an interview should include the items listed in MPEP 713.04 for complete and proper recordation including the identification of the general thrust of each argument or issue discussed, a general indication of any other pertinent matters discussed regarding patentability and the general results or outcome of the interview, to include an indication as to whether or not agreement was reached on the issues raised.

☒ Attachment

| /Paula J. Stice/<br>Primary Examiner, Art Unit 3766 | |
|---|---|

**Exhibit 24**
**-971-**

# Summary of Record of Interview Requirements

**Manual of Patent Examining Procedure (MPEP), Section 713.04, Substance of Interview Must be Made of Record**
A complete written statement as to the substance of any face-to-face, video conference, or telephone interview with regard to an application must be made of record in the application whether or not an agreement with the examiner was reached at the interview.

**Title 37 Code of Federal Regulations (CFR) § 1.133 Interviews**
Paragraph (b)

In every instance where reconsideration is requested in view of an interview with an examiner, a complete written statement of the reasons presented at the interview as warranting favorable action must be filed by the applicant.  An interview does not remove the necessity for reply to Office action as specified in §§ 1.111, 1.135. (35 U.S.C. 132)

37 CFR §1.2  Business to be transacted in writing.
All business with the Patent or Trademark Office should be transacted in writing.  The personal attendance of applicants or their attorneys or agents at the Patent and Trademark Office is unnecessary.  The action of the Patent and Trademark Office will be based exclusively on the written record in the Office.  No attention will be paid to any alleged oral promise, stipulation, or understanding in relation to which there is disagreement or doubt.

———

The action of the Patent and Trademark Office cannot be based exclusively on the written record in the Office if that record is itself incomplete through the failure to record the substance of interviews.
It is the responsibility of the applicant or the attorney or agent to make the substance of an interview of record in the application file, unless the examiner indicates he or she will do so.  It is the examiner's responsibility to see that such a record is made and to correct material inaccuracies which bear directly on the question of patentability.

Examiners must complete an Interview Summary Form for each interview held where a matter of substance has been discussed during the interview by checking the appropriate boxes and filling in the blanks.  Discussions regarding only procedural matters, directed solely to restriction requirements for which interview recordation is otherwise provided for in Section 812.01 of the Manual of Patent Examining Procedure, or pointing out typographical errors or unreadable script in Office actions or the like, are excluded from the interview recordation procedures below.  Where the substance of an interview is completely recorded in an Examiners Amendment, no separate Interview Summary Record is required.

The Interview Summary Form shall be given an appropriate Paper No., placed in the right hand portion of the file, and listed on the "Contents" section of the file wrapper.  In a personal interview, a duplicate of the Form is given to the applicant (or attorney or agent) at the conclusion of the interview.  In the case of a telephone or video-conference interview, the copy is mailed to the applicant's correspondence address either with or prior to the next official communication. If additional correspondence from the examiner is not likely before an allowance or if other circumstances dictate, the Form should be mailed promptly after the interview rather than with the next official communication.

The Form provides for recordation of the following information:
– Application Number (Series Code and Serial Number)
– Name of applicant
– Name of examiner
– Date of interview
– Type of interview (telephonic, video-conference, or personal)
– Name of participant(s) (applicant, attorney or agent, examiner, other PTO personnel, etc.)
– An indication whether or not an exhibit was shown or a demonstration conducted
– An identification of the specific prior art discussed
– An indication whether an agreement was reached and if so, a description of the general nature of the agreement (may be by attachment of a copy of amendments or claims agreed as being allowable).  Note: Agreement as to allowability is tentative and does not restrict further action by the examiner to the contrary.
– The signature of the examiner who conducted the interview (if Form is not an attachment to a signed Office action)

It is desirable that the examiner orally remind the applicant of his or her obligation to record the substance of the interview of each case. It should be noted, however, that the Interview Summary Form will not normally be considered a complete and proper recordation of the interview unless it includes, or is supplemented by the applicant or the examiner to include, all of the applicable items required below concerning the substance of the interview.
A complete and proper recordation of the substance of any interview should include at least the following applicable items:
1) A brief description of the nature of any exhibit shown or any demonstration conducted,
2) an identification of the claims discussed,
3) an identification of the specific prior art discussed,
4) an identification of the principal proposed amendments of a substantive nature discussed, unless these are already described on the Interview Summary Form completed by the Examiner,
5) a brief identification of the general thrust of the principal arguments presented to the examiner,
(The identification of arguments need not be lengthy or elaborate.  A verbatim or highly detailed description of the arguments is not required.  The identification of the arguments is sufficient if the general nature or thrust of the principal arguments made to the examiner can be understood in the context of the application file.  Of course, the applicant may desire to emphasize and fully describe those arguments which he or she feels were or might be persuasive to the examiner.)
6) a general indication of any other pertinent matters discussed, and
7) if appropriate, the general results or outcome of the interview unless already described in the Interview Summary Form completed by the examiner.
Examiners are expected to carefully review the applicant's record of the substance of an interview.  If the record is not complete and accurate, the examiner will give the applicant an extendable one month time period to correct the record.

## Examiner to Check for Accuracy

If the claims are allowable for other reasons of record, the examiner should send a letter setting forth the examiner's version of the statement attributed to him or her.  If the record is complete and accurate, the examiner should place the indication, "Interview Record OK" on the paper recording the substance of the interview along with the date and the examiner's initials.

**Exhibit 24**
-972-

Attorney Docket No. P22734US1

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re the Application of:

| | | | |
|---|---|---|---|
| Inventor(s): | Marcelo M. Lamego | | |
| App. No.: | 14/617,422 | Con. No.: | 5106 |
| Filed: | February 9, 2015 | Art Unit: | 3766 |
| Title: | ELECTRONIC DEVICE THAT COMPUTES HEALTH DATA | Examiner: | Stice, Paula J. |

### AGENDA FOR TELECONFERENCE: FOR PURPOSES OF DISCUSSION ONLY

- Teleconference Wednesday November 16, 2016 10:30am Mountain Time (David S. Atkinson to call Examiner Paula J. Stice at 571-270-1478).
- Discuss rejections over U.S. 2013/0215042 to Messerschmidt et al. (hereinafter "Messerschmidt"), U.S. Pub. No. 2013/0310656 to Lim et al. (hereinafter "Lim"), U.S. Patent No. 7,486,386 to Holcombe et al. (hereinafter "Holcombe"), U.S. Pub. No. 2014/0160314 to Schatevet et al. (hereinafter "Schatevet"), and U.S. Pub. No. 2014/0275832 to Muehlsteff et al. (hereinafter "Muehlsteff").
- Discuss amending the independent claims to recite:
  - The proximity sensor transmits the light (disclosed at least in paragraph 0056 of the application as filed). Messerschmidt only uses a camera LED for this or other LED, not light from a proximity sensor. Different light sources transmit different light and thus this would yield different data than if the proximity sensor did not transmit the light.
  - The ambient light sensor and the camera are used to receive the light used to compute the health data (disclosed at least in paragraph 0056 of the application as filed). Messerschmidt does not use multiple light sensors to perform this function. Different light sensors receive light differently and thus the combination would yield different data than a single light sensor.
  - Both the camera and the proximity sensor transmit the light (disclosed at least in paragraph 0027 of the application as filed). Messerschmidt does not use multiple light emitters to perform this function. Different light emitters transmit different light and thus the combination would yield different data than a single light emitter.
  - At least two of the camera, proximity sensor, and ambient light sensor receive the light used to compute the health data (disclosed at least in paragraph 0027 of the application as filed). Messerschmidt does not use multiple light sensors to perform this function. Different light sensors receive light differently and thus the combination would yield different data than a single light sensor.
- Further, claim 22 recites that the processing unit uses data from the camera indicating characteristics of the body part that influence light absorption to adjust the sensor data regarding the received light as part of computing the health data. The Examiner states that this is just intended use and it makes no difference if the prior art performs this because the claims must be structurally different. However, the fact that a processing unit is programmed to perform a function is a structural difference. To interpret to the contrary would be to hold that no processing unit would ever be patentable over the original concept of a processing unit no matter how different the functionality the new

1

Exhibit 24
-973-

PAGE 1/2 * RCVD AT 11/14/2016 12:40:21 PM [Eastern Standard Time] * SVR:W-PTOFAX-002/38 * DNIS:2702478 * CSID:3032231111 * DURATION (mm-ss):00-45

Attorney Docket No. P22734US1

processor performed, which would not comply established case law such as Altiris, Inc. v. Symantec Corp., Aloft Media, LLC v. Adobe Systems Inc.

- Discuss any Examiner suggestions for amendment to move the case forward.

PAGE 2/2 * RCVD AT 11/14/2016 12:40:21 PM [Eastern Standard Time] * SVR:W-PTOFAX-002/38 * DNIS:2702478 * CSID:3032231111 * DURATION (mm-ss):00-45

**Exhibit 24**

**-974-**

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 14/617,422 | 02/09/2015 | Marcelo M. Lamego | P22734US1 | 5106 |

62579          7590          09/08/2016
APPLE INC. (Brownstein)
c/o Brownstein Hyatt Farber Schreck LLP
410 17th St.
Suite 2200
DENVER, CO 80202

| EXAMINER |
|---|
| STICE, PAULA J |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3766 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 09/08/2016 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

patentdocket@bhfs.com

PTOL-90A (Rev. 04/07)

**Exhibit 24**
**-975-**

| **Office Action Summary** | Application No. 14/617,422 | Applicant(s) LAMEGO, MARCELO M. |
|---|---|---|
| | Examiner Paula J. Stice | Art Unit 3766 | AIA (First Inventor to File) Status Yes |

-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --

## Period for Reply

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) months from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

## Status

1) ☒ Responsive to communication(s) filed on <u>7/26/2016</u>.
   ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.
2a) ☐ This action is **FINAL**.   2b) ☒ This action is non-final.
3) ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.
4) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

## Disposition of Claims*

5) ☒ Claim(s) <u>1-19,21 and 22</u> is/are pending in the application.
   5a) Of the above claim(s) <u>9-11 and 13-17</u> is/are withdrawn from consideration.
6) ☐ Claim(s) _____ is/are allowed.
7) ☒ Claim(s) <u>1-8, 12, 18-19 and 21-22</u> is/are rejected.
8) ☐ Claim(s) _____ is/are objected to.
9) ☐ Claim(s) _____ are subject to restriction and/or election requirement.

* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov.

## Application Papers

10) ☐ The specification is objected to by the Examiner.
11) ☒ The drawing(s) filed on <u>2/9/2015</u> is/are: a)☒ accepted or b)☐ objected to by the Examiner.
   Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
   Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

## Priority under 35 U.S.C. § 119

12) ☐ Acknowledgement is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   **Certified copies:**
   a)☐ All   b)☐ Some**   c)☐ None of the:
   1. ☐ Certified copies of the priority documents have been received.
   2. ☐ Certified copies of the priority documents have been received in Application No. _____.
   3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).
** See the attached detailed Office action for a list of the certified copies not received.

### Attachment(s)

1) ☒ Notice of References Cited (PTO-892)
2) ☒ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b) Paper No(s)/Mail Date _____.
3) ☐ Interview Summary (PTO-413) Paper No(s)/Mail Date. _____ .
4) ☐ Other: _____.

**Exhibit 24**
**-976-**

Application/Control Number: 14/617,422                                    Page 2
Art Unit: 3766

## DETAILED ACTION

### *Notice of Pre-AIA or AIA Status*

1.      The present application, filed on or after March 16, 2013, is being examined under the first inventor to file provisions of the AIA.

### *Claim Rejections - 35 USC § 112*

1.      Claims 1-8, 12, 18-19 and 22 are rejected under 35 U.S.C. 112(b) or 35 U.S.C. 112 (pre-AIA), second paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject matter which the inventor or a joint inventor, or for pre-AIA the applicant regards as the invention.

2.      Regarding claim 1:  the claim recites "a camera" and "a proximity sensor" in lines 2 and 4, then in line 8 the claim recites "a camera or a proximity sensor", based on the antecedent basis in this claim language it is unclear if these are additional cameras/proximity sensors or if they are the same camera/proximity sensor.  If this is the same camera and proximity sensor then the antecedent basis should be amended to read "the camera or the proximity sensor" in line 8.  If these are different, separate and distinct a camera" and "a proximity sensor" then the invention is indefinite in that this particular arrangement does not appear in the drawings and is therefore not understood.  For the purpose of examination it will be assumed that these are the same and the antecedent basis should be corrected.

3.      The remainder of the claims are also rejected in that they depend from previously rejected claims.

Exhibit 24
-977-

Application/Control Number: 14/617,422                                   Page 3
Art Unit: 3766

4.      The following is a quotation of 35 U.S.C. 112(f):

> (f) Element in Claim for a Combination. – An element in a claim for a combination may be
> expressed as a means or step for performing a specified function without the recital of
> structure, material, or acts in support thereof, and such claim shall be construed to cover the
> corresponding structure, material, or acts described in the specification and equivalents
> thereof.

The following is a quotation of pre-AIA 35 U.S.C. 112, sixth paragraph:

> An element in a claim for a combination may be expressed as a means or step for performing
> a specified function without the recital of structure, material, or acts in support thereof, and
> such claim shall be construed to cover the corresponding structure, material, or acts
> described in the specification and equivalents thereof.

Use of the word "means" (or "step for" or "configured to") in a claim with

functional language creates a rebuttable presumption that the claim element is to be

treated in accordance with 35 U.S.C. 112(f) (pre-AIA 35 U.S.C. 112, sixth paragraph).

The presumption that 35 U.S.C. 112(f) (pre-AIA 35 U.S.C. 112, sixth paragraph) is

invoked is rebutted when the function is recited with sufficient structure, material, or acts

within the claim itself to entirely perform the recited function.


Absence of the word "means" (or "step for" or "configured to") in a claim creates a

rebuttable presumption that the claim element **is not** to be treated in accordance with

35 U.S.C. 112(f) (pre-AIA 35 U.S.C. 112, sixth paragraph).  The presumption that 35

U.S.C. 112(f) (pre-AIA 35 U.S.C. 112, sixth paragraph) is not invoked is rebutted when

the claim element recites function but fails to recite sufficiently definite structure,

material or acts to perform that function.


Claim elements in this application that use the word "means" (or "step for") are

presumed to invoke 35 U.S.C. 112(f) except as otherwise indicated in an Office action.

Exhibit 24
-978-

Application/Control Number: 14/617,422                                           Page 4
Art Unit: 3766

Similarly, claim elements that do not use the word "means" (or "step for") are presumed

not to invoke 35 U.S.C. 112(f) except as otherwise indicated in an Office action.

Claim limitation "the processor configured to" in claims 1 and 8 has been

interpreted under 35 U.S.C. 112(f) or pre-AIA 35 U.S.C. 112, sixth paragraph, because

it uses/they use a generic placeholder "configured to" coupled with functional language

"use at least one camera or proximity sensor to emit light; use at least the camera or

proximity sensor to receive part of the emitted light reflected and compute health data"

without reciting sufficient structure to achieve the function.  Furthermore, the generic

placeholder is not preceded by a structural modifier.

Since the claim limitation(s) invokes 35 U.S.C. 112(f) or pre-AIA 35 U.S.C. 112,

sixth paragraph, claims 1 and 8 has been interpreted to cover the corresponding

structure described in the specification that achieves the claimed function, and

equivalents thereof.

A review of the specification shows that the following appears to be the

corresponding structure described in the specification for the 35 U.S.C. 112(f) or pre-

AIA 35 U.S.C. 112, sixth paragraph limitation: the processor and/or microprocessor

itself operably connected to the camera, proximity sensor and ambient light sensor.

Claim limitations "configured to detect multiple wavelengths of light", "configured

to emit and receive infrared and visible light", configured to emit and receive infrared

and red light", "configured to detect infrared light", and "configured with a focal distance

greater than a distance between the camera and the body part" have been interpreted

under 35 U.S.C. 112(f) or pre-AIA 35 U.S.C. 112, sixth paragraph, because it uses/they

Exhibit 24
-979-

Application/Control Number: 14/617,422                                             Page 5
Art Unit: 3766

use a generic placeholder "configured to" coupled with functional language "detect

multiple wavelengths of light", "emit and receive infrared and visible light", "emit and

receive infrared and red light", "detect infrared light", and "with a focal distance greater

than a distance between the camera and the body part" without reciting sufficient

structure to achieve the function.  Furthermore, the generic placeholder is not preceded

by a structural modifier.

      Since the claim limitation(s) invokes 35 U.S.C. 112(f) or pre-AIA 35 U.S.C. 112,

sixth paragraph, claims 3-5, 7 and 12 have been interpreted to cover the corresponding

structure described in the specification that achieves the claimed function, and

equivalents thereof.

      A review of the specification shows that the following appears to be the

corresponding structure described in the specification for the 35 U.S.C. 112(f) or pre-

AIA 35 U.S.C. 112, sixth paragraph limitation: the specification gives no clear guidance

as to the specific configuration of the proximity sensor and the camera therefore it is

assumed by the examiner that the configured to language in this setting would be

directed towards any and all proximity sensors and cameras capable of performing this

task.

      If applicant wishes to provide further explanation or dispute the examiner's

interpretation of the corresponding structure, applicant must identify the corresponding

structure with reference to the specification by page and line number, and to the

drawing, if any, by reference characters in response to this Office action.

Exhibit 24
-980-

Application/Control Number: 14/617,422                                          Page 6
Art Unit: 3766

    If applicant does not intend to have the claim limitation(s) treated under 35

U.S.C. 112(f) or pre-AIA 35 U.S.C. 112 , sixth paragraph, applicant may amend the

claim(s) so that it/they will clearly not invoke 35 U.S.C. 112(f) or pre-AIA 35 U.S.C. 112,

sixth paragraph, or present a sufficient showing that the claim recites/recite sufficient

structure, material, or acts for performing the claimed function to preclude application of

35 U.S.C. 112(f) or pre-AIA 35 U.S.C. 112, sixth paragraph.

    For more information, see MPEP § 2173 *et seq.* and *Supplementary Examination*

*Guidelines for Determining Compliance With 35 U.S.C. 112 and for Treatment of*

*Related Issues in Patent Applications*, 76 FR 7162, 7167 (Feb. 9, 2011).


### *Claim Rejections - 35 USC § 103*

2.    The following is a quotation of 35 U.S.C. 103 which forms the basis for all

obviousness rejections set forth in this Office action:

> A patent for a claimed invention may not be obtained, notwithstanding that the claimed
> invention is not identically disclosed as set forth in section 102, if the differences between the
> claimed invention and the prior art are such that the claimed invention as a whole would have
> been obvious before the effective filing date of the claimed invention to a person having
> ordinary skill in the art to which the claimed invention pertains. Patentability shall not be
> negated by the manner in which the invention was made.

3.    The factual inquiries set forth in *Graham v. John Deere Co.*, 383 U.S. 1, 148

USPQ 459 (1966), that are applied for establishing a background for determining

obviousness under 35 U.S.C. 103 are summarized as follows:

    1. Determining the scope and contents of the prior art.

    2. Ascertaining the differences between the prior art and the claims at issue.

    3. Resolving the level of ordinary skill in the pertinent art.

    4. Considering objective evidence present in the application indicating

obviousness or nonobviousness.

Exhibit 24
-981-

Application/Control Number: 14/617,422                                    Page 7
Art Unit: 3766

4.       Claims 1, 2, 8, 12, 19 and 21 are rejected under 35 U.S.C. 103 as being

unpatentable over Messerschmidt et al. US 2013/0215042 in view of Lim et al. US

2013/0310656.

5.       Regarding claims 1 and 21:  Messerschmidt discloses a camera (paragraph

0039); a light sensor (paragraph 0039, "light sensor") and a processing unit 104 (figure

2, and paragraphs 0020, 0023) coupled to the camera, ambient light sensor and

proximity sensor; the processing unit is configured to use the camera to emit light

(paragraphs 0039-40) into a body part of a user touching the surface of the mobile

computing device (figures 4a-f and 5a-d); the processor then uses the light emitted from

the camera reflected by the body part to generate data (paragraphs 0039-40) and

compute health data of the user from the light received (paragraphs 0025-0027); the

body part is at least partially over the camera and ambient light sensor.   However,

Messerschmidt does not specifically disclose a proximity sensor.  Lim however teaches

of a proximity sensor 141 (figure 2) in a similar device (figures 2A-B).  It therefore would

have been obvious to one of ordinary skill in the art at the time the invention was filed to

modify Masserschmidt to include a proximity in order to determine if the user is touching

the device appropriately.

6.       Regarding claims 2, 8 and 19:  Messerschmidt/Lim discloses the claimed

invention.  Messerschmidt teaches that the camera and light sensor are to be positioned

in the same general area (figure 6A, paragraph 0040), Lim further teaches that the

proximity sensor is positioned near the surface to be sensed (paragraph 0076).  It

therefore would have been obvious to one of ordinary skill in the art at the time the

Exhibit 24
-982-

Application/Control Number: 14/617,422                                          Page 8
Art Unit: 3766

invention was made to modify Messerschmidt/Lim of claim 1 to include all three

components near each other in order to determine the appropriate parameter.

7.      Regarding claim 12:  Messerschmidt discloses that the camera is covered by the

finger of the user in figure 6A, this camera is clearly configured with a focal distance

greater than a distance between the body part and the camera.  The camera emits the

light and the sensor takes images of the reflected light not the image of the finger itself.


8.      Claims 3-5, 18 and 22 are rejected under 35 U.S.C. 103 as being unpatentable

over Messerschmidt et al. US 2013/0215042 in view of Lim et al. US 2013/0310656 and

further in view of Holcombe et al. US 7,486,386.

9.      Regarding claims 3-5:  Messerschmidt/Lim discloses the claimed invention,

however Messerschmidt/Lim discloses the claimed invention of claim 1 does not

specifically disclose that the proximity sensor is configured to detect multiple

wavelengths of light, emit and/or emit and receive infrared, red and visible light. Lim,

however, further teaches that the proximity sensor can comprise "*a transmissive type*

*photoelectric sensor, a direct reflective type photoelectric sensor, a mirror reflective type*

*photoelectric sensor, a high-frequency oscillation proximity sensor, a capacitance type*

*proximity sensor, a magnetic type proximity sensor, an infrared rays proximity sensor,*

*and so on (paragraph 0076).*"  However it is unclear if these proximity sensors detect

multiple wavelengths of light and emit and receive infrared, visible and red light.

Holcombe however teaches of a proximity sensor which uses several LED's 103, 104,

105 (figures 1) which emit actual light which is visible or not visible, red light and

Exhibit 24
-983-

Application/Control Number: 14/617,422                                    Page 9
Art Unit: 3766

infrared light (column 6, lines 36-67).  It therefore would have been obvious to one of

ordinary skill in the art at the time the invention was filed to modify Messerschmidt/Lim

in order to include multiple LED's and the use of multiple wavelengths in order to detect

an object with a proximity sensor.

10.     Regarding claims 18 and 22:  Messerschmidt/Lim discloses the structure claimed

including the camera, proximity sensor, ambient light sensor and the computing device.

Health data is also disclosed (paragraph 0025-0026), and the computing devices uses

the data from the camera and other components to process and determine health data.

The remainder of the claim language is considered to be intended use and/or functional

language. The structure of Messerschmidt/Lim is certainly capable of performing this

function.  It makes no difference if the devices of the prior art are used in a different way

since a recitation of the intended use of the claimed invention must result in a structural

difference between the claimed invention and the prior art in order to patentably

distinguish the claimed invention from the prior art. If the prior art structure is capable of

performing the intended use. In this instance, the prior art is capable of meeting the

claimed intended use recitations.


11.     Claim 6 is rejected under 35 U.S.C. 103 as being unpatentable over

Messerschmidt et al. US 2013/0215042 in view of Lim et al. US 2013/0310656 and

further in view of Schatevet et al. US 2014/0160314.

12.     Regarding claim 6: Messerschmidt/Lim discloses the claimed invention, however

Messerschmidt/Lim discloses the claimed invention of claim 1 does not specifically

Exhibit 24
-984-

Application/Control Number: 14/617,422                                         Page 10
Art Unit: 3766

disclose a silicone ambient light sensor.  Schatevet however teaches of a silicon photo-

diode ambient light sensor (paragraph 0017).  It therefore would have been obvious to

one of ordinary skill in the art at the time the invention was filed to modify

Messerschmidt/Lim to include a silicone ambient light sensor, as taught by Schatevet, in

order to utilize a semiconductor photo-detector responsive to the appropriate range of

color intensities in ambient light.

13.     Claim 7 is rejected under 35 U.S.C. 103 as being unpatentable over

Messerschmidt et al. US 2013/0215042 in view of Lim et al. US 2013/0310656 and

further in view of Muehlsteff et al. US 2014/0275832

14.     Regarding claim 7: Messerschmidt/Lim discloses the claimed invention, however

Messerschmidt/Lim discloses the claimed invention of claim 1 does not specifically

disclose a camera configured to detect infrared light. Muehlsteff however teaches of a

camera for detecting visible and infrared spectral ranges (paragraph 0036).  It therefore

would have been obvious to one of ordinary skill in the art at the time the invention was

made to modify   Messerschmidt/Lim to include a camera capable of detect infrared

light, as taught by Muehlstef, in order to detect vital signs.

### *Conclusion*

Any inquiry concerning this communication or earlier communications from the

examiner should be directed to Paula J. Stice whose telephone number is (571)270-

1478.  The examiner can normally be reached on Monday - Friday 9AM-5PM.

Exhibit 24
-985-

Application/Control Number: 14/617,422                                      Page 11
Art Unit: 3766

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Carl Layno can be reached on (571) 272-4949.  The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system.  Status information for published applications may be obtained from either Private PAIR or Public PAIR.  Status information for unpublished applications is available through Private PAIR only.  For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service Representative or access to the automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/Paula J. Stice/
Primary Examiner, Art Unit 3766

Exhibit 24
-986-

| | Notice of References Cited | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|---|
| | | 14/617,422 | LAMEGO, MARCELO M. |
| | | Examiner | Art Unit | Page 1 of 1 |
| | | Paula J. Stice | 3766 | |

**U.S. PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Name | CPC Classification | US Classification |
|---|---|---|---|---|---|---|
| * | A | US-7,486,386 B1 | 02-2009 | Holcombe; Wayne Thomas | G01C3/08 | 356/4.01 |
| * | B | US-2014/0160314 A1 | 06-2014 | SCHATVET; Petter | H04N7/142 | 348/223.1 |
| * | C | US-2014/0275832 A1 | 09-2014 | MUEHLSTEFF; Jens | A61B5/0205 | 600/301 |
| * | D | US-2013/0215042 A1 | 08-2013 | Messerschmidt; Robert G. | G06F3/041 | 345/173 |
| * | E | US-2013/0310656 A1 | 11-2013 | Lim; Gukchan | A61B5/6898 | 600/301 |
| | F | US- | | | | |
| | G | US- | | | | |
| | H | US- | | | | |
| | I | US- | | | | |
| | J | US- | | | | |
| | K | US- | | | | |
| | L | US- | | | | |
| | M | US- | | | | |

**FOREIGN PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Country | Name | CPC Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

**NON-PATENT DOCUMENTS**

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

**Exhibit 24**
**-987-**

| PTO/SB/08A and B (08-03)<br>U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE<br>Substitute for Form 1449A/PTO | | APPLICATION NO.:<br>Not Yet Assigned | FILING DATE:<br>Herewith |
|---|---|---|---|
| **INFORMATION DISCLOSURE**<br>**STATEMENT BY APPLICANT**<br><br>***(Use as many sheets as necessary)*** | | FIRST NAMED INVENTOR:<br>Marcelo M. Lamego | ART UNIT:<br>Not Yet Assigned |
| | | EXAMINER NAME:<br>Not Yet Assigned | ATTY. DOCKET NO.:<br>P22734US1 |

### U.S. PATENT DOCUMENTS

| EXAMINER INITIALS* | Cite No. | PATENT NUMBER<br>Number – Kind Code² (if known) | ISSUE DATE<br>MM-DD-YYYY | Name of Patentee of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | A1. | 7,915,601 | 03/2011 | Setlak et al. | |
| | | | | | |

### U.S. PUBLICATION DOCUMENTS

| EXAMINER INITIALS* | Cite No.[1] | PUBLICATION NUMBER<br>Number – Kind Code² (if known) | PUBLICATION DATE<br>MM-DD-YYYY | Name of Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | B1. | 2011/0015496 | 01/2011 | Sherman et al. | |
| | B2. | 2013/0072145 | 03/2013 | Dantu | |
| | | | | | |

### FOREIGN PATENT DOCUMENTS

| EXAMINER INITIALS* | Cite No.[1] | DOCUMENT NUMBER<br>Country Code³ – Number⁴ – Kind Code⁵ (if known) | PUBLICATION DATE<br>MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear | T⁶ |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |

### NONPATENT LITERATURE DOCUMENTS

| EXAMINER INITIALS* | Cite No.[1] | Include name of Author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and/or country where published. | T⁶ |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

013361\2087\11892687.1

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /P.J.S/

**Exhibit 24**
**-988-**

| PTO/SB/08A and B (08-03)<br>U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE<br>Substitute for Form 1449A/PTO | APPLICATION NO.:<br>Not Yet Assigned | FILING DATE:<br>Herewith |
|---|---|---|
| **INFORMATION DISCLOSURE**<br>**STATEMENT BY APPLICANT** | FIRST NAMED INVENTOR:<br>Marcelo M. Lamego | ART UNIT:<br>Not Yet Assigned |
| ***(Use as many sheets as necessary)*** | EXAMINER NAME:<br>Not Yet Assigned | ATTY. DOCKET NO.:<br>P22734US1 |

| EXAMINER: Initial if citation considered, whether or not citation is in conformance with MPEP 609; Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant. | | |
|---|---|---|
| Examiner Signature | /PAULA J STICE/ | Date Considered | 09/03/2016 |

[1] Applicant's unique citation number (optional).  [2] See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04.  [3] Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3).  [4] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document.  [5] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible.  [6] Applicant is to place a check mark here if English language Translation is attached.

013361\2087\11892687.1

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /P.J.S/

**Exhibit 24**
**-989-**

**EAST Search History**

**EAST Search History (Prior Art)**

| Ref # | Hits | Search Query | DBs | Default Operator | Plurals | Time Stamp |
|---|---|---|---|---|---|---|
| S1 | 5261 | ((ambient near3 light near3 sensor) and (proximity near3 sensor) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 10:27 |
| S2 | 3474 | (ambient near3 light near3 sensor) same (proximity near3 sensor) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 10:27 |
| S3 | 2363 | ((ambient near3 light near3 sensor) same (proximity near3 sensor)) and phone | US-PGPUB; USPAT | OR | OFF | 2016/09/02 10:27 |
| S4 | 354 | ((ambient near3 light near3 sensor) same (proximity near3 sensor)) and Iphone | US-PGPUB; USPAT | OR | OFF | 2016/09/02 10:27 |
| S5 | 28 | ((ambient near3 light near3 sensor) same (proximity near3 sensor)) and Iphone and (heart near3 rate) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 10:29 |
| S6 | 43 | ((ambient near3 light near3 sensor) same (proximity near3 sensor)) same (heart near3 rate near4 sensor) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 10:35 |
| S7 | 4856 | (A61B5/0205.CPC.SUBCLASS.) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 10:52 |
| S8 | 4221 | (A61B5/0205.CPC.SUBCLASS.) and @ad <= "20140926" | US-PGPUB; USPAT | OR | OFF | 2016/09/02 10:52 |
| S9 | 2701 | (A61B5/0402.CPC.SUBCLASS.) and @ad <= "20140926" | US-PGPUB; USPAT | OR | OFF | 2016/09/02 10:52 |
| S10 | 727 | (A61B5/6898.CPC.SUBCLASS.) and @ad <= "20140926" | US-PGPUB; USPAT | OR | OFF | 2016/09/02 10:52 |
| S11 | 6812 | (S8 S9 S10) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 10:53 |
| S12 | 58 | (S8 S9 S10) and (camera or (proximity with sensor)) same ((emitt$4 and reflect$4) with light) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 10:54 |
| S13 | 49 | (S8 S9 S10) and (camera or (proximity with sensor)) same ((emitt$4 and reflect$4) with light) and ((heart near3 rate) or (health with data)) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 10:54 |
| S14 | 4221 | (A61B5/0205.CPC.SUBCLASS.) and @ad <= "20140926" | US-PGPUB; USPAT | OR | OFF | 2016/09/02 13:13 |
| S15 | 2701 | (A61B5/0402.CPC.SUBCLASS.) and @ad <= "20140926" | US-PGPUB; USPAT | OR | OFF | 2016/09/02 13:13 |
| S16 | 727 | (A61B5/6898.CPC.SUBCLASS.) and @ad <= | US- | | OFF | 2016/09/02 |

Exhibit 24
-990-

| | | "20140926" | | | | | 13:13 |
|---|---|---|---|---|---|---|---|
| | | | PGPUB; USPAT | | | | |
| S17 | 1 | (S14 S15 S16) and (camera and (proximity with sensor)) same ((emitt$4 and reflect$4) with light) and ((heart near3 rate) or (health with data)) | US-PGPUB; USPAT | OR | OFF | | 2016/09/02 13:13 |
| S18 | 116 | (S14 S15 S16) and (camera and (proximity with sensor)) and ((emitt$4 and reflect$4) with light) and ((heart near3 rate) or (health with data)) | US-PGPUB; USPAT | OR | OFF | | 2016/09/02 13:13 |
| S19 | 118 | (S14 S15 S16) and (camera and (proximity with sensor)) and ((emitt$4 and reflect$4) with light) | US-PGPUB; USPAT | OR | OFF | | 2016/09/02 13:13 |
| S20 | 111 | (S14 S15 S16) and (camera and (proximity with sensor) and (light with sensor)) and ((emitt$4 and reflect$4) with light) | US-PGPUB; USPAT | OR | OFF | | 2016/09/02 13:14 |
| S21 | 51 | (S14 S15 S16) and (camera and (proximity near3 sensor) and (light near3 sensor)) and ((emitt$4 and reflect$4) with light) | US-PGPUB; USPAT | OR | OFF | | 2016/09/02 13:14 |
| S22 | 2647 | (camera and (proximity near3 sensor) and (light near3 sensor)) and ((emitt$4 and reflect$4) with light) | US-PGPUB; USPAT | OR | OFF | | 2016/09/02 13:42 |
| S23 | 115 | (camera and (proximity near3 sensor) and (light near3 sensor)) and ((emitt$4 and reflect$4) with light) and (physiological near3 data) | US-PGPUB; USPAT | OR | OFF | | 2016/09/02 13:43 |
| S24 | 170 | (S14 S15 S16) and ((sense or determine) near3 contact) | US-PGPUB; USPAT | OR | OFF | | 2016/09/02 14:27 |
| S25 | 0 | (S14 S15 S16) and ((sense or determine) near3 contact) and messerschmidt | US-PGPUB; USPAT | OR | OFF | | 2016/09/02 14:27 |
| S26 | 4 | (S14 S15 S16) and ((sense or determine) with contact) and messerschmidt | US-PGPUB; USPAT | OR | OFF | | 2016/09/02 14:27 |
| S27 | 1 | "20130310656" | US-PGPUB; USPAT | OR | OFF | | 2016/09/02 14:29 |
| S28 | 221 | (multiple near3 wavelength with light) with sensor | US-PGPUB; USPAT | OR | OFF | | 2016/09/02 15:12 |
| S29 | 0 | (multiple near3 wavelength with light) with (proximity near3 sensor) | US-PGPUB; USPAT | OR | OFF | | 2016/09/02 15:13 |
| S30 | 0 | (multiple near3 wavelength with light) same (proximity near3 sensor) | US-PGPUB; USPAT | OR | OFF | | 2016/09/02 15:13 |
| S31 | 2 | (multiple near3 wavelength ) same (proximity near3 sensor) | US-PGPUB; USPAT | OR | OFF | | 2016/09/02 15:13 |
| S32 | 77 | (visible and infrared and red) same (proximity near3 sensor) | US-PGPUB; USPAT | OR | OFF | | 2016/09/02 15:14 |
| S33 | 45 | (visible with light) same infrared same red same (proximity near3 sensor) | US-PGPUB; USPAT | OR | OFF | | 2016/09/02 15:20 |
| S34 | 0 | (S14 S15 S16) and ((ambient with light) same | US- | OR | OFF | | 2016/09/02 |

Exhibit 24
-991-

| | | (indigum or silicone)) | | | | 15:27 |
|---|---|---|---|---|---|---|
| S35 | 67 | ((ambient with light with sensor) same (indigum or silicone)) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 15:27 |
| S36 | 50 | ((ambient near3 light near3 sensor) same (indigum or silicone)) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 15:27 |
| S37 | 4 | (silicone with ambient with light with sensor) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 15:28 |
| S38 | 2551 | (S14 S15 S16) and (camera with detect wtih infrared) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 15:33 |
| S39 | 0 | (S14 S15 S16) and (camera adj detect adj infrared) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 15:33 |
| S40 | 2 | (S14 S15 S16) and (camera with detect with infrared) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 15:33 |
| S41 | 37 | (S14 S15 S16) and (camera with detect$5 with infrared) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 15:34 |
| S42 | 63 | (vital near3 sign) and (camera with detect$5 with infrared) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 15:36 |
| S43 | 2 | (S14 S15 S16) and (camera with configured with detect$5 with infrared) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 15:41 |
| S44 | 37 | (S14 S15 S16) and (camera with detect$5 with infrared) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 15:42 |
| S45 | 431 | (S14 S15 S16) and (ambient with light with sensor) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 15:54 |
| S46 | 11 | (S14 S15 S16) and ((ambient with light with sensor) same camera) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 15:54 |
| S47 | 4559 | ((ambient with light with sensor) same camera) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 15:57 |
| S48 | 4 | ((ambient with light with sensor) same camera) and (Vital near3 sign) | US-PGPUB; USPAT | OR | OFF | 2016/09/02 15:57 |

**9/3/2016 10:31:49 AM**
**C:\ Users\ pstice\ Documents\ EAST\ Workspaces\ 14617422.wsp**

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

## BIB DATA SHEET

CONFIRMATION NO. 5106

| SERIAL NUMBER 14/617,422 | FILING or 371(c) DATE 02/09/2015 RULE | CLASS 600 | GROUP ART UNIT 3766 | ATTORNEY DOCKET NO. P22734US1 |
|---|---|---|---|---|

**APPLICANTS**
  Apple Inc., Cupertino, CA;

**INVENTORS**
  Marcelo M. Lamego, Cupertino, CA;

** CONTINUING DATA *************************
  This appln claims benefit of 62/056,299 09/26/2014

** FOREIGN APPLICATIONS *************************

** IF REQUIRED, FOREIGN FILING LICENSE GRANTED **
  02/20/2015

| Foreign Priority claimed ☐ Yes ☑ No | ☐ Met after Allowance | STATE OR COUNTRY | SHEETS DRAWINGS | TOTAL CLAIMS | INDEPENDENT CLAIMS |
|---|---|---|---|---|---|
| 35 USC 119(a-d) conditions met ☐ Yes ☑ No | | | | | |
| Verified and Acknowledged  /PAULA J STICE/ Examiner's Signature | Initials | CA | 7 | 21 | 4 |

**ADDRESS**

APPLE INC. (Brownstein)
c/o Brownstein Hyatt Farber Schreck LLP
410 17th St.
Suite 2200
DENVER, CO 80202
UNITED STATES

**TITLE**

  Electronic Device that Computes Health Data

| FILING FEE RECEIVED 2240 | FEES: Authority has been given in Paper No._____ to charge/credit DEPOSIT ACCOUNT No._____ for following: | ☐ All Fees |
|---|---|---|
| | | ☐ 1.16 Fees (Filing) |
| | | ☐ 1.17 Fees (Processing Ext. of time) |
| | | ☐ 1.18 Fees (Issue) |
| | | ☐ Other _____ |
| | | ☐ Credit |

BIB (Rev. 05/07).

Exhibit 24
-993-

| PTO/SB/08A and B (08-03) U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE Substitute for Form 1449A/PTO | APPLICATION NO.: 14/617,422 | FILING DATE: February 9, 2015 |
|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** | FIRST NAMED INVENTOR: Marcelo M. Lamego | ART UNIT: 3766 |
| *(Use as many sheets as necessary)* | EXAMINER NAME: Stice, Paula J. | ATTY. DOCKET NO.: P22734US1 |

### U.S. PATENT DOCUMENTS

| EXAMINER INITIALS* | Cite No. | PATENT NUMBER Number – Kind Code² (if known) | ISSUE DATE MM-DD-YYYY | Name of Patentee of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | | | | | |

### U.S. PUBLICATION DOCUMENTS

| EXAMINER INITIALS* | Cite No.¹ | PUBLICATION NUMBER Number – Kind Code² (if known) | PUBLICATION DATE MM-DD-YYYY | Name of Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |

### FOREIGN PATENT DOCUMENTS

| EXAMINER INITIALS* | Cite No.¹ | DOCUMENT NUMBER Country Code³ – Number⁴ – Kind Code⁵ (if known) | PUBLICATION DATE MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear | T⁶ |
|---|---|---|---|---|---|---|
| | C1. | JP 2001145607 | 05/2001 | Casio Computer Co. Ltd. | | T |
| | | | | | | |
| | | | | | | |

### NONPATENT LITERATURE DOCUMENTS

| EXAMINER INITIALS* | Cite No.¹ | Include name of Author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and/or country where published. | T⁶ |
|---|---|---|---|
| | D1. | OHGI et al., "Stroke phase discrimination in breaststroke swimming using a tri-axial acceleration sensor device," *Sports Engineering*, Vol. 6, No. 2, June 1, 2003, pp. 113-123 | |
| | D2. | ZIJLSTRA et al., "Assessment of spatio-temporal gait parameters from trunk accelerations during human walking," *Gait & Posture*, Vol. 18, No. 2, October 1, 2003, pp. 1-10 | |
| | | | |

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /P.J.S/

**Exhibit 24**
-994-

Receipt date: 03/19/2048   Case 3:20-cv-00048-JVS-JDE   Document 109-1   Filed 08/17/20   Page 934 of 1129 PageID #:7891   14/617422

Sheet 2 of 2

| PTO/SB/08A and B (08-03)<br>U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE<br>Substitute for Form 1449A/PTO | APPLICATION NO.:<br>14/617,422 | FILING DATE:<br>February 9, 2015 |
|---|---|---|
| **INFORMATION DISCLOSURE**<br>**STATEMENT BY APPLICANT** | FIRST NAMED INVENTOR:<br>Marcelo M. Lamego | ART UNIT:<br>3766 |
| *(Use as many sheets as necessary)* | EXAMINER NAME:<br>Stice, Paula J. | ATTY. DOCKET NO.:<br>P22734US1 |

| **EXAMINER: Initial if citation considered, whether or not citation is in conformance with MPEP 609; Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.** | | | |
|---|---|---|---|
| Examiner Signature | /PAULA J STICE/ | Date Considered | 09/03/2016 |

[1] Applicant's unique citation number (optional).  [2] See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04.  [3] Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3).  [4] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document.  [5] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible.  [6] Applicant is to place a check mark here if English language Translation is attached.

013361\2087\14960117.1

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /P.J.S/

**Exhibit 24**
**-995-**

| *Search Notes* | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 14617422 | LAMEGO, MARCELO M. |
| | **Examiner** | **Art Unit** |
| | PAULA J STICE | 3766 |

| CPC- SEARCHED | | |
|---|---|---|
| **Symbol** | **Date** | **Examiner** |
| A61B5/0205, 5/0402, 5/14551, 5/6898 | 9/2/2016 | PJS |

| CPC COMBINATION SETS  - SEARCHED | | |
|---|---|---|
| **Symbol** | **Date** | **Examiner** |
| | | |

| US CLASSIFICATION SEARCHED | | | |
|---|---|---|---|
| **Class** | **Subclass** | **Date** | **Examiner** |
| | east searches - broad for specific sensors | 9/2/2016 | pjs |

| SEARCH NOTES | | |
|---|---|---|
| **Search Notes** | **Date** | **Examiner** |
| A61B5/0205, 5/0402, 5/14551, 5/6898 | 9/2/2016 | pjs |
| east searches | 9/2/2016 | pjs |
| forward and back searches | 9/2/2016 | pjs |

| INTERFERENCE SEARCH | | | |
|---|---|---|---|
| **US Class/ CPC Symbol** | **US Subclass / CPC Group** | **Date** | **Examiner** |
| | | | |

| | |
|---|---|
| | |

| *Index of Claims* | Application/Control No. 14617422 | Applicant(s)/Patent Under Reexamination LAMEGO, MARCELO M. |
|---|---|---|
| | Examiner PAULA J STICE | Art Unit 3766 |

| ✓ | Rejected | - | Cancelled | N | Non-Elected | A | Appeal |
|---|---|---|---|---|---|---|---|
| = | Allowed | ÷ | Restricted | I | Interference | O | Objected |

☐ Claims renumbered in the same order as presented by applicant    ☐ CPA    ☐ T.D.    ☐ R.1.47

| CLAIM | | DATE | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Final | Original | 06/07/2016 | 09/03/2016 | | | | | | | |
| | 1 | ÷ | ✓ | | | | | | | |
| | 2 | ÷ | ✓ | | | | | | | |
| | 3 | ÷ | ✓ | | | | | | | |
| | 4 | ÷ | ✓ | | | | | | | |
| | 5 | ÷ | ✓ | | | | | | | |
| | 6 | ÷ | ✓ | | | | | | | |
| | 7 | ÷ | ✓ | | | | | | | |
| | 8 | ÷ | ✓ | | | | | | | |
| | 9 | ÷ | N | | | | | | | |
| | 10 | ÷ | N | | | | | | | |
| | 11 | ÷ | N | | | | | | | |
| | 12 | ÷ | ✓ | | | | | | | |
| | 13 | ÷ | N | | | | | | | |
| | 14 | ÷ | N | | | | | | | |
| | 15 | ÷ | N | | | | | | | |
| | 16 | ÷ | N | | | | | | | |
| | 17 | ÷ | N | | | | | | | |
| | 18 | ÷ | ✓ | | | | | | | |
| | 19 | ÷ | ✓ | | | | | | | |
| | 20 | ÷ | - | | | | | | | |
| | 21 | ÷ | ✓ | | | | | | | |
| | 22 | | ✓ | | | | | | | |

Exhibit 24
-997-

Receipt date: 01/70/2018    Case 8:20-cv-00048-JVS-JDE    Document 109-1    Filed 08/17/20    Page 937 of 1122 Page ID 14617422 3766
#:7894

Sheet 1 of 2

| PTO/SB/08A and B (08-03)<br>U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE<br>Substitute for Form 1449A/PTO<br><br>**INFORMATION DISCLOSURE<br>STATEMENT BY APPLICANT**<br><br>*(Use as many sheets as necessary)* | **APPLICATION NO.:**<br>14/617,422 | **FILING DATE:**<br>February 9, 2015 |
|---|---|---|
| | **FIRST NAMED INVENTOR:**<br>Marcelo M. Lamego | **ART UNIT:**<br>3766 |
| | **EXAMINER NAME:**<br>Stice, Paula J. | **ATTY. DOCKET NO.:**<br>P22734US1 |

### U.S. PATENT DOCUMENTS

| EXAMINER INITIALS* | Cite No. | PATENT NUMBER<br>Number – Kind Code² (if known) | ISSUE DATE<br>MM-DD-YYYY | Name of Patentee of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | | | | | |

### U.S. PUBLICATION DOCUMENTS

| EXAMINER INITIALS* | Cite No.¹ | PUBLICATION NUMBER<br>Number – Kind Code² (if known) | PUBLICATION DATE<br>MM-DD-YYYY | Name of Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |

### FOREIGN PATENT DOCUMENTS

| EXAMINER INITIALS* | Cite No.¹ | DOCUMENT NUMBER<br>Country Code³ – Number⁴ – Kind Code⁵ (if known) | PUBLICATION DATE<br>MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear | T⁶ |
|---|---|---|---|---|---|---|
| | C1. | WO 15/030712 | 03/2015 | Bodhi Technology Ventures LLC | | |
| | | | | | | |
| | | | | | | |

### NONPATENT LITERATURE DOCUMENTS

| EXAMINER INITIALS* | Cite No.¹ | Include name of Author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and/or country where published. | T⁶ |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

013361\2087\14960117.1

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /P.J.S/

**Exhibit 24**
-998-

Receipt date: 03/17/2016    Case 8:20-cv-01048-JVS-JDE    Document 109-1    Filed 08/17/20    Page 938 of 1129   Page ID 14617422
#:7895

Sheet 2 of 2

| PTO/SB/08A and B (08-03)<br>U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE<br>Substitute for Form 1449A/PTO | **APPLICATION NO.:**<br>14/617,422 | **FILING DATE:**<br>February 9, 2015 |
|---|---|---|
| **INFORMATION DISCLOSURE<br>STATEMENT BY APPLICANT** | **FIRST NAMED INVENTOR:**<br>Marcelo M. Lamego | **ART UNIT:**<br>3766 |
| ***(Use as many sheets as necessary)*** | **EXAMINER NAME:**<br>Stice, Paula J. | **ATTY. DOCKET NO.:**<br>P22734US1 |

| **EXAMINER:** Initial if citation considered, whether or not citation is in conformance with MPEP 609; Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant. | | | |
|---|---|---|---|
| Examiner Signature | /PAULA J STICE/ | Date Considered | 09/03/2016 |

[1] Applicant's unique citation number (optional). [2] See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04. [3] Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3). [4] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [5] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. [6] Applicant is to place a check mark here if English language Translation is attached.

013361\2087\14960117.1

**ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /P.J.S/**

Exhibit 24
-999-

| PTO/SB/08A and B (08-03)<br>U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE<br>Substitute for Form 1449A/PTO | APPLICATION NO.:<br>14/617,422 | FILING DATE:<br>February 9, 2015 |
|---|---|---|
| **INFORMATION DISCLOSURE**<br>**STATEMENT BY APPLICANT**<br><br>*(Use as many sheets as necessary)* | FIRST NAMED INVENTOR:<br>Marcelo M. Lamego | ART UNIT:<br>3766 |
| | EXAMINER NAME:<br>Stice, Paula J. | ATTY. DOCKET NO.:<br>P22734US1 |

### U.S. PATENT DOCUMENTS

| EXAMINER INITIALS* | Cite No. | PATENT NUMBER<br>Number – Kind Code² (if known) | ISSUE DATE<br>MM-DD-YYYY | Name of Patentee of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |

### U.S. PUBLICATION DOCUMENTS

| EXAMINER INITIALS* | Cite No.¹ | PUBLICATION NUMBER<br>Number – Kind Code² (if known) | PUBLICATION DATE<br>MM-DD-YYYY | Name of Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |

### FOREIGN PATENT DOCUMENTS

| EXAMINER INITIALS* | Cite No.¹ | DOCUMENT NUMBER<br>Country Code³ – Number⁴ – Kind Code⁵ (if known) | PUBLICATION DATE<br>MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear | T⁶ |
|---|---|---|---|---|---|---|
| | C1. | WO 15/030712 | 03/2015 | Bodhi Technology Ventures LLC | | |
| | | | | | | |
| | | | | | | |

### NONPATENT LITERATURE DOCUMENTS

| EXAMINER INITIALS* | Cite No.¹ | Include name of Author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and/or country where published. | T⁶ |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

Exhibit 24
-1000-

| PTO/SB/08A and B (08-03)<br>U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE<br>Substitute for Form 1449A/PTO | APPLICATION NO.:<br>14/617,422 | FILING DATE:<br>February 9, 2015 |
|---|---|---|
| **INFORMATION DISCLOSURE**<br>**STATEMENT BY APPLICANT** | FIRST NAMED INVENTOR:<br>Marcelo M. Lamego | ART UNIT:<br>3766 |
| *(Use as many sheets as necessary)* | EXAMINER NAME:<br>Stice, Paula J. | ATTY. DOCKET NO.:<br>P22734US1 |

| EXAMINER: Initial if citation considered, whether or not citation is in conformance with MPEP 609; Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant. | |
|---|---|
| Examiner Signature | Date Considered |

[1] Applicant's unique citation number (optional).  [2] See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04.  [3] Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3).  [4] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document.  [5] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible.  [6] Applicant is to place a check mark here if English language Translation is attached.

(12) INTERNATIONAL APPLICATION PUBLISHED UNDER THE PATENT COOPERATION TREATY (PCT)

(19) World Intellectual Property Organization
International Bureau

(43) International Publication Date
5 March 2015 (05.03.2015)



WIPO | PCT



(10) International Publication Number
**WO 2015/030712 A1**

(51) International Patent Classification:
A61B 5/0404 (2006.01)   G06F 19/00 (2011.01)
A61B 5/00 (2006.01)   G06K 9/00 (2006.01)

(21) International Application Number:
PCT/US2013/056681

(22) International Filing Date:
26 August 2013 (26.08.2013)

(25) Filing Language: English

(26) Publication Language: English

(71) Applicant: BODHI TECHNOLOGY VENTURES LLC
[US/US]; Corporation Trust Center, 1209 Orange Street,
Wilmington, DE 19801 (US).

(74) Agents: BISWAS, Shouvik et al.; Morrison & Foerster
LLP, 707 Wilshire Boulevard, Los Angeles, CA 90017
(US).

(81) Designated States (unless otherwise indicated, for every
kind of national protection available): AE, AG, AL, AM,

AO, AT, AU, AZ, BA, BB, BG, BH, BN, BR, BW, BY,
BZ, CA, CH, CL, CN, CO, CR, CU, CZ, DE, DK, DM,
DO, DZ, EC, EE, EG, ES, FI, GB, GD, GE, GH, GM, GT,
HN, HR, HU, ID, IL, IN, IS, JP, KE, KG, KN, KP, KR,
KZ, LA, LC, LK, LR, LS, LT, LU, LY, MA, MD, ME,
MG, MK, MN, MW, MX, MY, MZ, NA, NG, NI, NO, NZ,
OM, PA, PE, PG, PH, PL, PT, QA, RO, RS, RU, RW, SA,
SC, SD, SE, SG, SK, SL, SM, ST, SV, SY, TH, TJ, TM,
TN, TR, TT, TZ, UA, UG, US, UZ, VC, VN, ZA, ZM,
ZW.

(84) Designated States (unless otherwise indicated, for every
kind of regional protection available): ARIPO (BW, GH,
GM, KE, LR, LS, MW, MZ, NA, RW, SD, SL, SZ, TZ,
UG, ZM, ZW), Eurasian (AM, AZ, BY, KG, KZ, RU, TJ,
TM), European (AL, AT, BE, BG, CH, CY, CZ, DE, DK,
EE, ES, FI, FR, GB, GR, HR, HU, IE, IS, IT, LT, LU, LV,
MC, MK, MT, NL, NO, PL, PT, RO, RS, SE, SI, SK, SM,
TR), OAPI (BF, BJ, CF, CG, CI, CM, GA, GN, GQ, GW,
KM, ML, MR, NE, SN, TD, TG).

[Continued on next page]

(54) Title: METHOD OF DETECTING THE WEARING LIMB OF A WEARABLE ELECTRONIC DEVICE

(57) Abstract: A wearable device configured to acquire and process electro-
cardiographic measurements, detect lead inversion and correct the acquired
measurements for lead inversion is provided. In one example, the wearable
device can detect lead inversion by first assessing whether the P-wave of a
given electrocardiographic measurement has a negative amplitude, and if the
P-wave is found to be negative, the device can determine if the magnitude of
the R-wave is smaller than the maximum of the magnitudes of the S-wave
and the Q-wave. In another example, the device can be put through an enroll-
ment procedure in which electrocardiographic measurements are taken with
the device being worn at known locations on the body. Once the enrollment
procedure is completed, when the device is being used, any electrocardio-
graphic results obtained can be compared against the measurements taken
during the enrollment phase, and the location of the device on the body can
be determined.



FIG. 6

WO 2015/030712 A1

Exhibit 24
-1002-

WO 2015/030712 A1 |IIIII III IIIII IIII IIIII IIII IIII IIIIII III IIII III IIII IIIII IIIIII IIII IIII IIII

**Published:**

----   *with international search report (Art. 21(3))*

**Exhibit 24**
**-1003–**

# METHOD OF DETECTING THE WEARING LIMB OF A WEARABLE ELECTRONIC DEVICE

## Field of the Disclosure

[0001]      This relates generally to wearable electrical devices that have the capability of recording electrocardiographic signals, and more particularly to detecting and correcting for inversions in electrocardiographic measurements caused by wearing the device on varying locations on the human body.

## Background of the Disclosure

[0002]      Computing devices such as desktop computers, laptop computers, mobile phones, smartphones, watches, tablet devices and portable multimedia players are popular. These computing devices can be used for performing a wide variety of tasks, from the simple to the most complex.  As an example, some portable computing devices can have electrocardiographic functionality with various kinds or types of electrodes configured to be worn or attached to identified locations on the human body for the purpose of making measurements of the electrical activity of the human heart.

[0003]      A portable computing device can be fashioned into a wearable accessory that can be worn on the body.  Examples of a wearable device can include a watch, a ring, a pendant, a brooch, a wrist-band or wrist band, a pendant, a bracelet, etc.  A wearable device can be affixed to a limb of the human body such as a wrist or ankle, as an example.  The wearable device can be worn on the left or right wrist, or even on the right or left ankle. Since electrocardiographic measurements can depend on the electrode's relative position to the heart being measured, and since the electrodes can be affixed to the wearable device, changing the device's location from right to left, or wrist to ankle, can have an impact on the acquired electrocardiographic measurements.  As an example, wearing the device on the left wrist vs. wearing the device on the right wrist can produce electrocardiographic measurements that are inverted relative to one another.

Exhibit 24
-1004-

## Summary

[0004]       This relates to a wearable device that can determine the wearing limb of the device, and if the device is being worn in such a way as to produce inverted electrocardiographic readings, can then correct the inverted readings in order to produce electrocardiographic measurements that are consistent for a given pair of limbs of the user. In one example, the wearable device can detect lead inversion by first assessing whether the P-wave of a given electrocardiographic measurement has a negative amplitude, and if the P-wave is found to be negative, the device can determine if the magnitude of the R-wave is smaller than the maximum of the magnitudes of the S-wave and the Q-wave.  If both of the conditions are true, the device can determine that the electrocardiographic reading is inverted and correct for the inversion.  In another example, the device can be put through an enrollment procedure in which electrocardiographic measurements are taken with the device being worn at known locations on the body.  Once the enrollment procedure is completed, when the device is being used, any electrocardiographic results obtained can be compared against the measurements taken during the enrollment phase, and the location of the device on the body can be determined.

## Brief Description of the Drawings

[0005]       FIG. 1 illustrates various electrocardiographic lead configurations according to examples of the disclosure.

[0006]       FIG. 2 illustrates an exemplary electrocardiographic measurement according to examples of the disclosure.

[0007]       FIG. 3a-3c illustrate exemplary electrocardiographic measurements resulting from lead inversion according to examples of the disclosure.

[0008]       FIG. 4 illustrates an exemplary wearable device capable of recording an electrocardiographic measurement according to examples of the disclosures.

[0009]       FIG. 5 illustrates an exemplary placement of a wearable device on the user according to examples of the disclosure.

Exhibit 24
-1005-

[0010]        FIG. 6 illustrates another exemplary placement of a wearable device on the user according to examples of the disclosure.

[0011]        FIG. 7 illustrates an exemplary method for detecting lead inversion and correcting the acquired electrocardiographic measurement according to examples of the disclosure.

[0012]        FIG. 8 illustrates additional electrocardiographic lead configurations according to examples of the disclosure.

[0013]        FIG. 9 illustrates another exemplary method for detecting lead inversion of an electrocardiographic measurement according to examples of the disclosure.

[0014]        FIG. 10 illustrates various enrollment phase lead configurations according to examples of the disclosure.

[0015]        FIG. 11 illustrates an exemplary method for determining lead configuration and inversion according to examples of the disclosure.

## Detailed Description

[0016]        In the following description of examples, reference is made to the accompanying drawings which form a part hereof, and in which it is shown by way of illustration specific examples of the disclosure that can be practiced.  It is to be understood that other examples can be used and structural changes can be made without departing from the scope of the examples of this disclosure.

[0017]        This relates to a method of detecting lead inversion and the location of the wearing limb in an electrocardiographic measurement taken by a wearable device, and correcting the acquired measurement if it is determined that lead inversion has occurred.

[0018]        Although examples disclosed herein may be described and illustrated herein in terms of the wearable devices, it should be understood that the examples are not so limited, but are additionally applicable to electrocardiographic measurements taken by non-wearable heart monitors in which electrodes are placed on the body.  Furthermore, although examples may be described and illustrated herein in terms of wearable devices that can be worn on the wrists and ankles, it should be understood that the examples are also applicable

3

Exhibit 24

-1006-

to wearable devices that can be worn on the hands, wrists, legs, feet or any other part of the body.

[0019]      FIG. 1 illustrates various electrocardiographic lead configurations according to examples of the disclosure. In some examples, electrocardiographic electrodes (i.e., sensors that measure electrical potential at a particular location on the body) can be placed on a human body in various locations. As illustrated in FIG. 1, electrocardiographic electrodes can be placed on the right wrist (from the perspective of the patient) 102, the left wrist 104, or on the left leg 106. Placing the electrodes in this manner can form what is known in the art as Einthoven's triangle. Einthoven's triangle can have sides, 108, 110, and 112. Each side of the triangle can represent a lead configuration for taking an electrocardiographic measurement. For instance, side 108 of the triangle, known in the art as the Lead I configuration, can represent measuring the potential difference between the left wrist and the right wrist. Side 110 of the triangle, known in the art as the Lead II configuration, can represent measuring the potential difference between the left leg and the right wrist. Side 112 of the triangle, known in the art as the Lead III configuration, can represent measuring the potential difference between the left leg and the left wrist. By measuring the potential difference between any two electrodes of the three electrodes, an electrocardiographic measurement can be taken. Each lead configuration can also have two possible ways to produce measurements. For instance, the Lead I configuration 108 can measure the potential difference between the left wrist ($V_L$) and the right wrist ($V_R$). This potential difference can be expressed as the difference between the voltages measured at the right wrist and the left wrist, for example, as expressed in equation 1:

$$V_I = V_L - V_R \qquad\qquad (1)$$

The $V_L$ and $V_R$ potentials can be measured with respect to a ground electrode, for example, placed on the right leg. The potential difference between the right wrist and the left wrist can also be expressed as:

$$-V_I = V_R - V_L \qquad\qquad (2)$$

Equations 1 and 2 thus can be inversions of one another. This can mean that depending on which electrode is the positive electrode (i.e., the number being subtracted from) and which

4

Exhibit 24
-1007-

electrode is the negative electrode (i.e., the number being subtracted), the results can be inverted with respect to one another.

[0020]       The Lead II configuration can measure the potential difference between the left leg 106 and the right wrist 102. This potential difference can be expressed as the difference between the voltages measured at the right wrist and left ankle, for example, as expressed in equation 3:

$$V_{II} = V_F - V_R \qquad\qquad\qquad (3)$$

The potential difference between the right wrist and the left ankle can also be expressed as:

$$-V_{II} = V_R - V_F \qquad\qquad\qquad (4)$$

Equations 3 and 4 thus can be inversions of one another. This can mean that depending on which electrode is the positive electrode and which electrode is the negative electrode, the results can be inverted with respect to one another.

[0021]       The Lead III configuration can measure the potential difference between the left leg 106 and the left wrist 104. This potential difference can be expressed as the difference between the voltages measured at the left leg and the left wrist, for example, as expressed in equation 5:

$$V_{III} = V_F - V_L \qquad\qquad\qquad (5)$$

$$-V_{III} = V_L - V_F \qquad\qquad\qquad (6)$$

Equations 5 and 6 thus can be inversions of one another. This can mean that depending on which electrodes is the positive electrode and which electrode is the negative electrode, the results can be inverted with respect to one another.

[0022]       FIG. 2 illustrates an exemplary electrocardiographic measurement according to examples of the disclosure. In this example, the measurement can be made when the electrodes are placed in the Lead I configuration, with the positive electrode on the left wrist and the negative electrode on the right wrist. The potential difference between the two electrodes can vary based on electrical signals being produced by the heart as part of its normal function. Measurement 200 can represent the varying potential between the two electrodes over one cycle of a heartbeat. For instance, initially at 202, the potential difference can rise and then fall for a brief duration. This initial rise and fall can correspond

Exhibit 24
-1008-

to atrial depolarization of the heart muscle and is known in the art as a P-wave. At 204, the potential between the two electrodes can fall for a brief period of time. The fall can correspond to septal depolarization and is known in the art as a Q-wave. At 206, the potential difference can have a sharp rise. The rise can correspond to apical depolarization (i.e., when the majority of the ventricle tissue depolarizes) and is known in the art as an R-wave. At 208, the potential difference can fall. The fall can correspond to left ventricular depolarization and is known in the art as an S-wave. Finally at 210, the potential difference can rise and fall for a brief duration. This final rise and fall can correspond to ventricular repolarization and is known in the art as a T-wave.

[0023]       FIGs. 3a-3c illustrate exemplary electrocardiographic measurements resulting from lead inversion according to examples of the disclosure. In these examples, the measurement can be made when the electrodes are placed in the Lead I configuration, with the positive electrode on the right wrist and the negative electrode on the left wrist. By placing the electrodes in this configuration, the resulting electrocardiographic measurement can be inverted relative to a measurement taken with the electrodes oriented as in the example of FIG. 2. Referring to FIG. 3a, measurement 300 can represent the varying potential between the electrodes over one cycle of a heartbeat. Since the electrodes are reversed in reference to the example of FIG. 2, the electrocardiographic measurement will be inverted with respect to the measurement illustrated in FIG. 2. As an example, the P-wave 202 of FIG. 2 can appear as a decrease in potential difference illustrated at 302 in FIG. 3a. The P-wave can also appear to be insignificant (i.e., have a small amplitude) as shown at 312 of FIG. 3b. In another example, the P-wave can appear to be bi-phasic as illustrated at 314 of FIG. 3c. The R-wave 206 of FIG. 2 can appear as a sharp decrease in potential difference, illustrated at 306 in FIG. 3. Similar results can occur for the Q, S, and T waves.

[0024]       Lead inversion can create identification issues in the processing of electrocardiographic measurements. For instance, referring to FIG. 2, when the electrocardiographic measurement is processed to identify the P, Q, R, S and T waves, an example algorithm can search for the first sharp increase in potential such as what occurs at 206, and classify that sharp increase as the R-wave that can correspond to apical depolarization and left ventricular depolarization. In the example of FIG. 2, this classification would most likely be correct. However, using this same principle to search

6

Exhibit 24
-1009-

for the R-wave in the example of FIG. 3a, the algorithm may attribute the R-wave to either the potential increase which occurs at 304, or the potential increase that occurs at 308. As discussed above, however, the potential increases at 304 and 306 can correspond to the Q-wave and S-wave of the heart cycle and only appear as potential increases due to the fact that the positions of the positive electrode and the negative electrode have been reversed.

[0025]     Because of this fact, medical practitioners often have to take care as to the placement of the positive electrode and the negative electrode to ensure accurate processing of an electrocardiographic measurement. However, in some contexts, ensuring that the leads are placed in the correct position in order to prevent lead inversion errors may not be feasible.

[0026]     FIG. 4 illustrates an exemplary wearable device capable of recording an electrocardiographic measurement according to examples of the disclosures. Wearable device 400 can be worn by a user on the wrist (as pictured) or the ankle/leg of the user, or any other part of the human body. Wearable device 400 can be configured to have three electrocardiographic electrodes 401, 402, and 403. In the example of FIG. 4, electrode 402 can act as the positive electrode for the purpose of measuring the potential difference from electrode 401, which can act as the negative electrode. The potentials at electrode 401 and 402 can be measured with respect to the ground electrode 403. Also, in the example of FIG. 4, the positive electrode 402 and the ground electrode 403 can be positioned such that they are in direct contact with the wrist (i.e., on the underside of the wearable device 400), while electrode 401 can be positioned such that it is not in contact with any portion of the user's body as illustrated. In order to take an electrocardiographic measurement, the user can place a part of his or her body, such as a finger, on the open electrode (i.e., electrode 401) that is not already in contact with the user's body. For instance, the user can place his or her finger on electrode 401, or can place electrode 401 in contact with either ankle. Once electrode 401 has made contact with a portion of the user's body, an electrocardiographic measurement that measures the potential difference between the portion of the body in contact with electrode 402 and the portion of the body in contact with electrode 401 can be acquired.

[0027]     FIG. 5 illustrates an exemplary placement of a wearable device on the user according to examples of the disclosure. In the example of FIG. 5, the wearable device 502

7

Exhibit 24
-1010-

is shown as being worn on the left wrist of the user 500. In this placement, the positive electrode 504 can be on the underside of the wearable device 502, with the positive electrode touching the left wrist of the user. In order to record an electrocardiographic measurement, the user 500 can place one of the right hand fingers 508 on the negative electrode 506. The device can measure the potential difference between the left wrist of the user and one of the right hand fingers of the user. An electrocardiographic measurement obtained in this manner can correspond to the Lead I configuration illustrated in FIG. 1 at side 108 of Einthoven's triangle. Since the positive electrode 504 is placed at the left wrist, while the negative electrode 506 is being touched by a right hand finger 508, equation 1 above can be used to characterize the electrocardiographic measurement.

[0028]        FIG. 6 illustrates another exemplary placement of a wearable device on the user according to examples of the disclosure. In the example of FIG. 6, the wearable device 502 is shown as being worn on the right wrist of the user 600. In this placement, the positive electrode 604 can be on the underside of the wearable device 602 with the electrode touching the right wrist of the user. In order to record an electrocardiographic measurement, the user 600 can place one of the left hand fingers 608 on the negative electrode 606. The device can measure the potential difference between the right wrist of the user and the left hand finger of the user. An electrocardiographic measurement obtained in this manner can correspond to an inverted Lead I configuration illustrated in FIG. 1 at side 108 of Einthoven's triangle. Since the positive electrode 604 is placed at the right wrist while the negative electrode 606 is being touched by the left hand finger 608, equation 2 above can be used to characterize the electrocardiographic measurement.

[0029]        As discussed above, equations 1 and 2 can be inversions of one another. This can mean that if the user wears the device on their left wrist, the electrocardiographic measurement can be taken with the P, Q, R, S and T waves detected correctly. However, if the user wears the device on the right wrist, the measurement may be inverted and the waves may not be classified correctly, leading to a deficient measurement. In order to maintain flexibility as to where on the body the user can wear the device, a method of detecting the wearing limb and correcting for lead inversion can be employed in order to correct electrocardiographic measurements that have been inverted as discussed above.

Exhibit 24
-1011-

[0030]        FIG. 7 illustrates an exemplary method for detecting lead inversion and
correcting the acquired electrocardiographic measurement according to examples of the
disclosure.  In addition to detecting lead inversion, the method depicted in FIG. 7 can also
be used to detect the wearing limb of the device.  Such knowledge may be useful in other
biomedical applications such as diagnosing peripheral arterial occlusion disease, peripheral
venous disease, and blood pressure as examples.  The example of FIG. 7 is illustrated using
the right and left wrists as an example, but could apply to other portions of the body.  At
step 702 the P-wave (as classified by the electrocardiographic processing method described
above) is analyzed.  If the amplitude of the P-wave is negative (as depicted at 302 in FIG.
3a) or insignificant (as depicted at 312 in FIG. 3b), or biphasic and the first deflection is
negative (as depicted at 314 in FIG. 3c), the method can move on to step 706.  As illustrated
in FIG. 3, which illustrates an electrocardiographic measurement that has been inverted due
to lead inversion, the P-wave 302 can have a negative amplitude.  In contrast, as illustrated
in FIG. 2 (which illustrates a non-inverted electrocardiographic measurement), the P-wave
can have a positive amplitude.  If a positive P-wave is detected (in other words, the P-wave
amplitude is above a pre-determined threshold), then the method can move to step 704 and a
determination can be made that the device is being worn on the left wrist.  Detecting a
negative, or insignificant, or biphasic P-wave with the first deflection negative may not in
and of itself be determinative of an inverted electrocardiographic measurement.  This can be
due to various cardiovascular pathologies wherein a certain portion of the human population
can have negative or insignificant P-waves as part of their normal cardiac function.
Therefore, if a negative or insignificant or a biphasic P-wave with first deflection negative is
detected, the method can move on to step 706.

[0031]        At step 706, the magnitude of the R-wave can be compared with the
magnitude of the Q-wave and the S-wave.  If the magnitude of the R-wave is less than the
maximum among the magnitudes of the Q-wave and S-wave, the method can determine that
the leads have been inverted.  As illustrated in FIGs. 3a-3c and as discussed above, when
lead inversion occurs, a processing algorithm can inaccurately identify the Q, R, and S
waves.  As discussed above in reference to FIG. 3, the algorithm may characterize the
potential change at 304 as the R-wave and the potential change at 306 as the S-wave.  If
such a misclassification were to occur, the magnitude of the R-wave will be less than the
magnitude of the misclassified S-wave.  Under such a scenario, the method can determine

Exhibit 24
-1012-

that the leads have been inverted.  Alternatively, in the measurement of FIG. 3, the potential
change at 306 can be misclassified as the Q-wave, while the potential change at 308 can be
misclassified as the R-wave.  In such a scenario, the magnitude of the R-wave will be less
than the magnitude of the Q-wave, and the method can determine that lead inversion has
occurred and that the device is being worn on the right wrist at 708.  If the magnitude of the
R-wave is greater than the maximum of the magnitudes of the Q-wave and the S-wave then
the method can move to 704 and can determine that the device is being worn on the left
wrist and that no lead inversion has occurred.

[0032]      The method illustrated in FIG. 7 can distinguish an inverted
electrocardiographic measurement from a non-inverted electrocardiogram measurement.  It
may not, however, be able to determine which limb of the user the device is being worn.  It
also may not be able to determine which limb of the user is touching the negative electrode
in order to acquire the measurement.  In a scenario in which the wearable device is
restricted to being worn on the wrist, the method described in FIG. 7 may be adequate since
it is known a priori that the device is being worn on the wrist, and based on the
determination of whether electrocardiographic reading is inverted or not, the wrist the
device is being worn on (left v. right) can also be known.  Knowing the wrist or limb on
which the device is worn may also be useful for other biological measurements performed
by the device, for example blood pressure, temperature or pulse transition time. However in
a scenario in which the wearable device is not restricted to being worn on a particular limb,
the method of FIG. 7 may be prone to errors since the electrocardiographic measurement
shape and features depends on which pair of limbs the measurement is being taken from.

[0033]      FIG. 8 illustrates additional electrocardiographic lead configurations
according to examples of the disclosure.  If the wearable device could be worn on any wrist
or any leg of the user's body, then non-standard electrocardiographic leads can be defined
between the right leg and other limbs, thereby expanding Einthoven's triangle illustrated in
FIG. 1 and explained above.  As illustrated, Leads I, II, and III (108, 110, and 112) from
FIG. 1 and discussed above can represent different scenarios in which the device is worn on
either the left wrist, right wrist, or the left ankle.  If the device can also be worn on the right
ankle, then a second triangle can be formed with sides 802, 804 and 108.

10

Exhibit 24
-1013-

[0034]        Side 802 can represent a non-standard Lead IV configuration and can represent the potential difference between the right ankle and the right wrist. The potential difference could be measured, for instance, if the user was to wear the device on their right ankle and touch with one of the right hand fingers the negative electrode. This potential difference can be expressed as the difference between the voltages measured at the right ankle and the right wrist, for example, as expressed in equation 7:

$$V_{IV} = V_{RF} - V_{RA} \tag{7}$$

The potential difference between the right wrist and the left ankle can also be expressed as:

$$-V_{IV} = V_{RA} - V_{RF} \tag{8}$$

if the device is worn on the right wrist and the right ankle is touching the negative electrode of the device. Equations 7 and 8 thus can be inversions of one another. This can mean that depending on which limb is wearing the device (right wrist or right leg) or which electrode is the positive electrode and which electrode is the negative electrode, the results can be inverted with respect to one another.

[0035]        The non-standard Lead V configuration (side 804) can measure the potential difference between the right ankle 812 and the left wrist 810. This potential difference can be expressed as the difference between the voltages measured at the right ankle and the left wrist, for example, as expressed in equation 9:

$$V_V = V_{RF} - V_{LA} \tag{9}$$

The potential difference between the left wrist and the right ankle can also be expressed as:

$$-V_V = V_{LA} - V_{RF} \tag{10}$$

Equations 9 and 10 thus can be inversions of one another. This can mean that depending on which electrode is the positive electrode and which electrode is the negative electrode, the results can be inverted with respect to one another.

[0036]        The non-standard Lead VI configuration can measure the potential difference between the left ankle and the right ankle, for example, as expressed in equation 11:

$$V_{VI} = V_{LF} - V_{RF} \tag{11}$$

The potential difference between the right ankle and the left ankle can also be expressed as:

Exhibit 24
-1014-

$$-V_{VI} = V_{RF} - V_{LF} \tag{12}$$

Equations 11 and 12 thus can be inversions of one another. This can mean that depending on which electrode is the positive electrode and which electrode is the negative electrode, the results can be inverted with respect to one another. The six Lead configurations as described for the purpose of this disclosure can be summarized below in Table 1.

| Lead | Positive Limb (wearing limb) | Negative Limb | Representative Equation |
|------|------------------------------|---------------|-------------------------|
| I | Left wrist | Right wrist | $V_I = V_{LA} - V_{RA}$ |
| II | Left ankle | Right wrist | $V_{II} = V_{LF} - V_{RA}$ |
| III | Left ankle | Left wrist | $V_{III} = V_{LF} - V_{LA}$ |
| IV | Right ankle | Right wrist | $V_{IV} = V_{RF} - V_{RA}$ |
| V | Right ankle | Left wrist | $V_V = V_{RF} - V_{LA}$ |
| VI | Left ankle | Right ankle | $V_{VI} = V_{LF} - V_{RF}$ |

[0037]    Based on the mathematical relationships expressed above in Table 1, it may not be necessary to record all six lead configurations in order to ascertain the potential differences expressed in the equations pertaining to each lead. For examples Leads, I, II and V can be measured as described above. With these three measurements, and using Kirchhoff's rule, the potential differences for the Lead III, IV, and VI configurations can be derived using the equations below:

$$V_{III} = V_{II} - V_I \tag{13}$$

$$V_{IV} = V_I + V_V \tag{14}$$

$$V_{VI} = V_{II} - V_I - V_V \tag{15}$$

12

Exhibit 24
-1015-

[0038]        As an example, the potential difference that can be obtained in the Lead III configuration can be derived by obtaining measurements in the Lead II configuration and the Lead I configuration and then subtracting the results from each other.  Equations 13, 14 and 15 illustrate that in order to measure the potential difference in all six of the lead configurations discussed above; one may only have to measure the potential difference in three of the lead configurations and can then derive the remaining potential differences for the remaining lead configurations.

[0039]        FIG. 9 illustrates another exemplary method for detecting and correcting for lead inversion of an electrocardiographic measurement according to examples of the disclosure.  The method illustrated in FIG. 9 can contain two phases, an enrollment phase and a test phase.  At step 902, the device can determine if the enrollment phase (described below) has been completed.  If it is determined that the enrollment phase has been completed, the method can move to the beginning of the test phase which can begin at step 906.  If the user has not been enrolled, then the method can move to step 904 in order to enroll the user.

[0040]        Enrolling the user can include taking a series of electrocardiographic measurements in various lead configurations when the user first uses the wearable device, in order to create a database for the device to compare future acquired electrocardiographic measurements against the measurements stored in the database.  The enrollment phase may only need to be performed once per user of the device in order to create the database that future acquired measurements can be compared against.

[0041]        FIG. 10 illustrates various enrollment phase lead configurations according to examples of the disclosure.  As illustrated at 1002, as part of the enrollment phase, the device can be worn in the Lead I configuration with the device on the left wrist and the negative electrode making contact with a finger of the right wrist.  After the measurement has been obtained in the Lead I configuration, the device can prompt the user to wear the device in the Lead II configuration with the device being worn on the left leg and a finger of the right arm making contact with the negative electrode of the device, as illustrated at 1004.  After the measurement has been obtained in the Lead II configuration, the device can prompt the user to wear the device in the Lead V configuration with the device being worn

Exhibit 24
-1016-

on the right leg and one of the fingers of the left arm making contact with the negative electrode, as illustrated at 1006.

[0042]       With these three measurements stored in the device, the measurements for Lead III, IV, and VI can be derived as described above.  Therefore at the end of the enrollment phase, the device can have stored six different measurements, one for each lead.  A processor in the device can then calculate the positions of the QRS complexes (or R waves) and can compute an average template for each of the 6 leads by overlapping and averaging the recorded beats in synchrony with the R waves.  A time scaling can be applied to normalize each template lead to a given heart rate such as 60 bpm (beats per minute) using the same principles used in QT interval correction known in the art.  A normalization in amplitude can also be applied. The 6 templates are stored for use in the subsequent test (detection) phases.

[0043]       Returning to the method illustrated at FIG. 9, once the enrollment phase has been completed, the method can then move to step 906 where an electrocardiographic measurement can be acquired.  Acquiring the electrocardiographic measurement can include calculating the position of the QRS complexes (or R waves) and computing an average template for the recorded measurement by overlapping the recorded beats in synchrony with the R waves.  As in the enrollment phase, a time scaling can be applied to normalize the template for fluctuations in heart rate and amplitude normalization can also be performed.

[0044]       Once the electrocardiographic measurement has been acquired at step 906, the method can move to step 908.  At step 908, the acquired electrocardiogram reading can be compared to the six template readings acquired during the enrollment phase.  The comparison can include computing the cross-correlations between the acquired and normalized measurement acquired at step 906 and each of the six stored templates acquired in the enrollment phase.  In one example, a cross-correlation factor ranging from -1 to +1 can be computed for each of the six lead templates.  The cross-correlation factor can thus represent a measure of the correlation between the acquired measurement and each of the six lead templates.  A correlation factor of -1 can mean the two signals are inversely correlated with each other (i.e., one is the inversion of the other), while a correlation factor close to +1 can mean that the two signals are nearly identical.

14

Exhibit 24
-1017-

[0045]        FIG. 11 illustrates an exemplary method for determining lead configuration and inversion according to examples. The method illustrated in FIG. 11 can correspond to step 908 and 910 of FIG. 9. At step 1102, correlation factors between the acquired ECG signal and the six templates acquired during the enrollment phase can be computed. At step 1104 the maximum of the absolute values (max abs) of the six computed correlation factors can be calculated. Once the max abs correlation factor is determined, the method can then move to step 1106 where a determination can be made as to whether the max abs correlation factor was originally positive or negative. At step 1108, the method can determine that the device is in the Lead configuration that produced the max abs correlation factor, and based on the polarity of the correlation factor can determine if the leads have been inverted. As an example, if the acquired data produces the following set of correlation factors corresponding to the Lead I-VI templates:

$$[+0.2, -0.5, -0.6, -0.9, +0.3, +0.1]$$

then the max abs of the set of correlations factors can be +.9 which corresponds to the Lead IV template (i.e., the fourth element of the matrix above). Thus, the method can determine that the device is in the Lead IV configuration. Since the Lead IV template produced a correlation factor of -0.9, the device can determine that the leads are inverted. Referring to Table I, an inverted Lead IV configuration can mean that the device is being worn on the right wrist and the right ankle is touching the negative electrode. If the device determines that the leads are inverted, it can process the acquired data to correct for the inversion.

[0046]        One way the device can correct for a detected inversion is to "flip" the data around the x-axis. In one example, lead inversion can mean that the data is flipped about the x-axis; in other words, when data is inverted, the negative values appear as positive and the positive values appear as negative. Thus, correction can simply mean multiplying a measured result by -1 in order to correct for the inversion.

[0047]        Therefore, according to the above, some examples of the disclosure are directed to A device capable of measuring electrocardiographic signals, the device comprising: a first electrode configured to come into contact with a first portion of the user's body and configured to measure an electrical potential at the first portion of the user's body; a second electrode configured to come into contact with a second portion of the user's body and configured to measure an electrical potential at the second portion of the user's

Exhibit 24
-1018-

body; and a processor capable of: measuring a potential difference between the first electrode and the second electrode; determining whether the first electrode and second electrode have been inverted based on the measured potential difference between the first electrode and the second electrode, wherein determining whether the first electrode and second electrode have been inverted includes identifying a P-wave, an R-wave, a Q-wave, and an S-wave from the measured potential difference; and compensating the measured potential difference if the first and second electrodes are determined to be inverted. Additionally or alternatively to one or more of the examples disclosed above, in some examples, determining whether the first electrode and the second electrode have been inverted further includes determining if the P-wave exhibits a characteristic indicative of inversion of the first and second electrodes. Additionally or alternatively to one or more of the examples disclosed above, in some examples, determining whether the first electrode and the second electrode have been inverted further includes comparing an amplitude of the R-wave to the maximum of the absolute values of the amplitudes of the Q-wave and the S-wave, if the amplitude of the P-wave is lower than a pre-determined threshold. Additionally or alternatively to one or more of the examples disclosed above, in some examples, the processor is further capable of determining a location on the user's body of the first electrode and a location on the user's body of the second electrode based on the determination of whether the first electrode and the second electrode have been inverted.

[0048]     Some examples of the disclosure are directed to a method of detecting and correcting lead inversion in an electrocardiographic measurement, the method comprising: measuring a potential difference between a first electrode and a second electrode, the first electrode and second electrode being in contact with a first portion and a second portion respectively of a user's body; determining whether the first electrode and second electrode have been inverted based on the measured potential difference between the first electrode and the second electrode, wherein determining whether the first electrode and second electrode have been inverted includes identifying a P-wave, an R-wave, a Q-wave, and an S-wave from the measured potential difference; and compensating the measured potential difference if the first and second electrodes are determined to be inverted. Additionally or alternatively to one or more of the examples disclosed above, in some examples, determining whether the first electrode and the second electrode have been inverted further includes determining if the P-wave exhibits a characteristic indicative of inversion of the

16

Exhibit 24
-1019-

WO 2015/030712                                                          PCT/US2013/056681

first and second electrodes.  Additionally or alternatively to one or more of the examples
disclosed above, in some examples, determining whether the first electrode and the second
electrode have been inverted further includes comparing an amplitude of the R-wave to the
maximum of the absolute values of the amplitudes of the  Q-wave and the S-wave, if the
amplitude of the P-wave is lower than a pre-determined threshold.  Additionally or
alternatively to one or more of the examples disclosed above, in some examples, the method
further comprising determining a location on the user's body of the first electrode and a
location on the user's body of the second electrode based on the determination of whether
the first electrode and the second electrode have been inverted.

[0049]        Some examples of the disclosure are directed to A non-transitory computer
readable storage medium having stored thereon a set of instructions for detecting and
correcting lead inversion in an electrocardiographic measurement, that when executed by a
processor causes the processor to:  measure a potential difference between a first electrode
and a second electrode, the first electrode and second electrode being in contact with a first
portion and a second portion respectively of a user's body; determine whether the first
electrode and second electrode have been inverted based on the measured potential
difference between the first electrode and the second electrode, wherein determining
whether the first electrode and second electrode have been inverted includes identifying a P-
wave, an R-wave, a Q-wave, and an S-wave from the measured potential difference; and
compensate the measured potential difference if the first and second electrodes are
determined to be inverted.  Additionally or alternatively to one or more of the examples
disclosed above, in some examples, determining whether the first electrode and the second
electrode have been inverted further includes determining if the P-wave exhibits a
characteristic indicative of inversion of the first and second electrodes.  Additionally or
alternatively to one or more of the examples disclosed above, in some examples,
determining whether the first electrode and the second electrode have been inverted further
includes comparing an amplitude of the R-wave to the maximum of the absolute values of
the amplitudes of the Q-wave and the S-wave, if the amplitude of the P-wave is lower than a
pre-determined threshold.  Additionally or alternatively to one or more of the examples
disclosed above, in some examples, the method further comprising determining a location
on the user's body of the first electrode and a location on the user's body of the second

17

Exhibit 24
-1020-

electrode based on the determination of whether the first electrode and the second electrode have been inverted.

[0050]     Some examples of the disclosure are directed to a device capable of measuring electrocardiographic signals, the device comprising: a first electrode configured to come into contact with a first portion of the user's body and configured to measure an electrical potential at the first portion of the user's body; a second electrode configured to come into contact with a second portion of the user's body and configured to measure an electrical potential at the second portion of the user's body; and a processor capable of: measuring a potential difference between the first electrode and the second electrode; determining whether the first electrode and the second electrode have been inverted based on the measured potential difference between the first electrode and the second electrode, wherein determining whether the first electrode and the second electrode have been inverted includes comparing the measured potential difference to a plurality of electrocardiographic measurements stored in a memory of the device. Additionally or alternatively to one or more of the examples disclosed above, in some examples, the plurality of electrocardiographic measurements are obtained in an enrollment phase of the device, wherein during the enrollment phase the first electrode and the second electrode are placed in a plurality of known locations on the user's body to generate the plurality of electrocardiographic measurements. Additionally or alternatively to one or more of the examples disclosed above, in some examples, comparing the measured potential difference to a plurality of electrocardiographic measurements stored in a memory of the device includes generating a cross-correlation factor between the measured potential difference and each of the electrocardiographic measurements stored in the memory of the device. Additionally or alternatively to one or more of the examples disclosed above, in some examples, the processor is further capable of determining a location on the user's body of the first electrode and a location on the user's body of the second electrode based on the plurality of correlation factors generated.

[0051]     Some examples of the disclosure are directed to a method of detecting and correcting lead inversion in an electrocardiographic measurement, the method comprising: measuring a potential difference between a first electrode and a second electrode, the first electrode and second electrode being in contact with a first portion and a second portion

18

Exhibit 24
-1021-

respectively of a user's body; determining whether the first electrode and the second electrode have been inverted based on the measured potential difference between the first electrode and the second electrode, wherein determining whether the first electrode and the second electrode have been inverted includes comparing the measured potential difference to a plurality of stored electrocardiographic measurements; compensating the measured potential difference if the first and second electrodes are determined to be inverted. Additionally or alternatively to one or more of the examples disclosed above, in some examples, the plurality of electrocardiographic measurements are obtained by placing the first electrode and the second electrode in a plurality of known locations on the user's body to generate the plurality of stored electrocardiographic measurements. Additionally or alternatively to one or more of the examples disclosed above, in some examples, comparing the measured potential difference to a plurality of electrocardiographic measurements includes generating a cross-correlation factor between the measured potential difference and each of the stored electrocardiographic measurements of the plurality of stored electrocardiographic measurements. Additionally or alternatively to one or more of the examples disclosed above, in some examples, the method further comprises determining a location on the user's body of the first electrode and a location on the user's body of the second electrode based on the plurality of correlation factors generated.

[0052]     Some examples of the disclosure are directed to A non-transitory computer readable storage medium having stored thereon a set of instructions for detecting and correcting lead inversion in an electrocardiographic measurement, that when executed by a processor causes the processor to:  measure a potential difference between a first electrode and a second electrode, the first electrode and second electrode being in contact with a first portion and a second portion respectively of a user's body; determine whether the first electrode and the second electrode have been inverted based on the measured potential difference between the first electrode and the second electrode, wherein determining whether the first electrode and the second electrode have been inverted includes comparing the measured potential difference to a plurality of electrocardiographic measurements stored in a memory; compensate the measured potential difference if the first and second electrodes are determined to be inverted. Additionally or alternatively to one or more of the examples disclosed above, in some examples, the plurality of electrocardiographic measurements are obtained by placing the first electrode and the second electrode in a

Exhibit 24
-1022-

plurality of known locations on the user's body to generate the plurality of stored electrocardiographic measurements. Additionally or alternatively to one or more of the examples disclosed above, in some examples, comparing the measured potential difference to a plurality of electrocardiographic measurements includes generating a cross-correlation factor between the measured potential difference and each of the stored electrocardiographic measurements of the plurality of stored electrocardiographic measurements. Additionally or alternatively to one or more of the examples disclosed above, in some examples, the method further comprises determining a location on the user's body of the first electrode and a location on the user's body of the second electrode based on the plurality of correlation factors generated.

[0053]     Although examples of this disclosure have been fully described with reference to the accompanying drawings, it is to be noted that various changes and modifications including, but not limited to, combining features of different examples, omitting a feature or features, etc., as will be apparent to those skilled in the art in light of the present description and figures.

Exhibit 24
-1023-

WHAT IS CLAIMED IS:

1.      A device capable of measuring electrocardiographic signals, the device comprising:

        a first electrode configured to come into contact with a first portion of the user's body and configured to measure an electrical potential at the first portion of the user's body;

        a second electrode configured to come into contact with a second portion of the user's body and configured to measure an electrical potential at the second portion of the user's body; and

        a processor capable of:

                measuring a potential difference between the first electrode and the second electrode;

                determining whether the first electrode and second electrode have been inverted based on the measured potential difference between the first electrode and the second electrode, wherein determining whether the first electrode and second electrode have been inverted includes identifying a P-wave, an R-wave, a Q-wave, and an S-wave from the measured potential difference; and

                compensating the measured potential difference if the first and second electrodes are determined to be inverted.


2.      The device of claim 1, wherein determining whether the first electrode and the second electrode have been inverted further includes determining if the P-wave exhibits a characteristic indicative of inversion of the first and second electrodes.


3.      The device of claim 2, wherein determining whether the first electrode and the second electrode have been inverted further includes comparing an amplitude of the R-wave to the maximum of the absolute values of the amplitudes of the Q-wave and the S-wave, if the amplitude of the P-wave is lower than a pre-determined threshold.

Exhibit 24
-1024-

4.      The device of claim 1, wherein the processor is further capable of determining a location on the user's body of the first electrode and a location on the user's body of the second electrode based on the determination of whether the first electrode and the second electrode have been inverted.

5.      A method of detecting and correcting lead inversion in an electrocardiographic measurement, the method comprising:

        measuring a potential difference between a first electrode and a second electrode, the first electrode and second electrode being in contact with a first portion and a second portion respectively of a user's body;

        determining whether the first electrode and second electrode have been inverted based on the measured potential difference between the first electrode and the second electrode, wherein determining whether the first electrode and second electrode have been inverted includes identifying a P-wave, an R-wave, a Q-wave, and an S-wave from the measured potential difference; and

        compensating the measured potential difference if the first and second electrodes are determined to be inverted.

6.      The method of claim 5, wherein determining whether the first electrode and the second electrode have been inverted further includes determining if the P-wave exhibits a characteristic indicative of inversion of the first and second electrodes.

7.      The method of claim 6, wherein determining whether the first electrode and the second electrode have been inverted further includes comparing an amplitude of the R-wave to the maximum of the absolute values of the amplitudes of the  Q-wave and the S-wave, if the amplitude of the P-wave is lower than a pre-determined threshold.

8.      The method of claim 5, the method further comprising determining a location on the user's body of the first electrode and a location on the user's body of the second electrode

Exhibit 24
-1025-

based on the determination of whether the first electrode and the second electrode have been inverted.

9.      A non-transitory computer readable storage medium having stored thereon a set of instructions for detecting and correcting lead inversion in an electrocardiographic measurement, that when executed by a processor causes the processor to:

        measure a potential difference between a first electrode and a second electrode, the first electrode and second electrode being in contact with a first portion and a second portion respectively of a user's body;

        determine whether the first electrode and second electrode have been inverted based on the measured potential difference between the first electrode and the second electrode, wherein determining whether the first electrode and second electrode have been inverted includes identifying a P-wave, an R-wave, a Q-wave, and an S-wave from the measured potential difference; and

        compensate the measured potential difference if the first and second electrodes are determined to be inverted.

10.     The non-transitory computer readable storage medium of claim 9, wherein determining whether the first electrode and the second electrode have been inverted further includes determining if the P-wave exhibits a characteristic indicative of inversion of the first and second electrodes.

11.     The non-transitory computer readable storage medium of claim 10, wherein determining whether the first electrode and the second electrode have been inverted further includes comparing an amplitude of the R-wave to the maximum of the absolute values of the amplitudes of the Q-wave and the S-wave, if the amplitude of the P-wave is lower than a pre-determined threshold.

Exhibit 24
-1026-

12.     The non-transitory computer readable storage medium of claim 9, the processor being further caused to determine a location on the user's body of the first electrode and a location on the user's body of the second electrode based on the determination of whether the first electrode and the second electrode have been inverted.

13.     A device capable of measuring electrocardiographic signals, the device comprising:

        a first electrode configured to come into contact with a first portion of the user's body and configured to measure an electrical potential at the first portion of the user's body;

        a second electrode configured to come into contact with a second portion of the user's body and configured to measure an electrical potential at the second portion of the user's body; and

        a processor capable of:

                measuring a potential difference between the first electrode and the second electrode;

                determining whether the first electrode and the second electrode have been inverted based on the measured potential difference between the first electrode and the second electrode, wherein determining whether the first electrode and the second electrode have been inverted includes comparing the measured potential difference to a plurality of electrocardiographic measurements stored in a memory of the device.

14.     The device of claim 13, wherein the plurality of electrocardiographic measurements are obtained in an enrollment phase of the device, wherein during the enrollment phase the first electrode and the second electrode are placed in a plurality of known locations on the user's body to generate the plurality of electrocardiographic measurements.

15.     The device of claim 13, wherein comparing the measured potential difference to a plurality of electrocardiographic measurements stored in a memory of the device includes

Exhibit 24
-1027-

generating a cross-correlation factor between the measured potential difference and each of the electrocardiographic measurements stored in the memory of the device.

16.     The device of claim 15, wherein the processor is further capable of determining a location on the user's body of the first electrode and a location on the user's body of the second electrode based on the plurality of correlation factors generated.

17.     A method of detecting and correcting lead inversion in an electrocardiographic measurement, the method comprising:

        measuring a potential difference between a first electrode and a second electrode, the first electrode and second electrode being in contact with a first portion and a second portion respectively of a user's body;

        determining whether the first electrode and the second electrode have been inverted based on the measured potential difference between the first electrode and the second electrode, wherein determining whether the first electrode and the second electrode have been inverted includes comparing the measured potential difference to a plurality of stored electrocardiographic measurements;

        compensating the measured potential difference if the first and second electrodes are determined to be inverted.

18.     The method of claim 17, wherein the plurality of electrocardiographic measurements are obtained by placing the first electrode and the second electrode in a plurality of known locations on the user's body to generate the plurality of stored electrocardiographic measurements.

19.     The method of claim 17, wherein comparing the measured potential difference to a plurality of electrocardiographic measurements includes generating a cross-correlation factor between the measured potential difference and each of the stored electrocardiographic measurements of the plurality of stored electrocardiographic measurements.

Exhibit 24
-1028-

20.     The method of claim 19, wherein the method further comprises determining a location on the user's body of the first electrode and a location on the user's body of the second electrode based on the plurality of correlation factors generated.


21.     A non-transitory computer readable storage medium having stored thereon a set of instructions for detecting and correcting lead inversion in an electrocardiographic measurement, that when executed by a processor causes the processor to:

        measure a potential difference between a first electrode and a second electrode, the first electrode and second electrode being in contact with a first portion and a second portion respectively of a user's body;

        determine whether the first electrode and the second electrode have been inverted based on the measured potential difference between the first electrode and the second electrode, wherein determining whether the first electrode and the second electrode have been inverted includes comparing the measured potential difference to a plurality of electrocardiographic measurements stored in a memory;

        compensate the measured potential difference if the first and second electrodes are determined to be inverted.


22.     The non-transitory computer readable storage medium of claim 21, wherein the plurality of electrocardiographic measurements are obtained by placing the first electrode and the second electrode in a plurality of known locations on the user's body to generate the plurality of stored electrocardiographic measurements.


23.     The non-transitory computer readable storage medium of claim 21, wherein comparing the measured potential difference to a plurality of electrocardiographic measurements includes generating a cross-correlation factor between the measured potential difference and each of the stored electrocardiographic measurements of the plurality of stored electrocardiographic measurements.

Exhibit 24
-1029-

24.     The non-transitory computer readable storage medium of claim 23, wherein the method further comprises determining a location on the user's body of the first electrode and a location on the user's body of the second electrode based on the plurality of correlation factors generated.

Exhibit 24
-1030-

1/11



**FIG. 1**

Exhibit 24
-1031-





**FIG. 2**



**FIG. 3A**

Exhibit 24
-1032-

WO 2015/030712                                                    PCT/US2013/056681

3/11



FIG. 3B



FIG. 3C

Exhibit 24
-1033-



FIG. 4

Exhibit 24
-1034-

5/11



FIG. 5

Exhibit 24
-1035-

WO 2015/030712                                                    PCT/US2013/056681

6/11



FIG. 6

Exhibit 24
-1036-

Case 8:20-cv-00048-JVS-JDE   Document 109-1   Filed 08/17/20   Page 976 of 1129   Page ID #:7933

7/11



FIG. 7

Exhibit 24
-1037-

WO 2015/030712                                                    PCT/US2013/056681

8/11



FIG. 8

Exhibit 24
-1038-

WO 2015/030712                                                                    PCT/US2013/056681

9/11



FIG. 9

Exhibit 24
-1039-

WO 2015/030712                                                        PCT/US2013/056681

10/11



FIG. 10

Exhibit 24
-1040-

WO 2015/030712                                      PCT/US2013/056681

11/11



FIG. 11

Exhibit 24
-1041-

INTERNATIONAL SEARCH REPORT

| | International application No |
|---|---|
| | PCT/US2013/056681 |

**A. CLASSIFICATION OF SUBJECT MATTER**

INV. A61B5/0404   A61B5/00
ADD. G06F19/00   G06K9/00

According to International Patent Classification (IPC) or to both national classification and IPC

**B. FIELDS SEARCHED**

Minimum documentation searched (classification system followed by classification symbols)

A61B   G06F   G06K

Documentation searched other than minimum documentation to the extent that such documents are included in the fields searched

Electronic data base consulted during the international search (name of data base and, where practicable, search terms used)

EPO-Internal, WPI Data

**C. DOCUMENTS CONSIDERED TO BE RELEVANT**

| Category* | Citation of document, with indication, where appropriate, of the relevant passages | Relevant to claim No. |
|---|---|---|
| X | EP 0 712 605 A1 (SIEMENS ELEMA AB [SE]) 22 May 1996 (1996-05-22) column 6, lines 33, 38, 40, 41, 52, 53, 57 column 4, lines 19-23 column 5, line 42 column 7, lines 6, 7 figures 1, 2, 4 ----- | 1-12 |
| X | DE 10 2009 012352 A1 (PERSONAL MEDSYSTEMS GMBH [DE]) 16 September 2010 (2010-09-16) | 13,14, 17,18, 21,22 |
| Y | paragraphs [0012], [0013], [0026], [0045], [0051], [0052], [0060] - [0076], [0075] figures 1, 10 ----- -/-- | 15,16, 19,20, 23,24 |

[X] Further documents are listed in the continuation of Box C.      [X] See patent family annex.

* Special categories of cited documents :

"A" document defining the general state of the art which is not considered to be of particular relevance

"E" earlier application or patent but published on or after the international filing date

"L" document which may throw doubts on priority claim(s) or which is cited to establish the publication date of another citation or other special reason (as specified)

"O" document referring to an oral disclosure, use, exhibition or other means

"P" document published prior to the international filing date but later than the priority date claimed

"T" later document published after the international filing date or priority date and not in conflict with the application but cited to understand the principle or theory underlying the invention

"X" document of particular relevance; the claimed invention cannot be considered novel or cannot be considered to involve an inventive step when the document is taken alone

"Y" document of particular relevance; the claimed invention cannot be considered to involve an inventive step when the document is combined with one or more other such documents, such combination being obvious to a person skilled in the art

"&" document member of the same patent family

| Date of the actual completion of the international search | Date of mailing of the international search report |
|---|---|
| 30 April 2014 | 12/05/2014 |

| Name and mailing address of the ISA/ | Authorized officer |
|---|---|
| European Patent Office, P.B. 5818 Patentlaan 2 NL - 2280 HV Rijswijk Tel. (+31-70) 340-2040, Fax: (+31-70) 340-3016 | Meyer, Wolfgang |

Form PCT/ISA/210 (second sheet) (April 2005)

2

Exhibit 24
-1042-

**INTERNATIONAL SEARCH REPORT**

| | International application No |
|---|---|
| | PCT/US2013/056681 |

C(Continuation).   DOCUMENTS CONSIDERED TO BE RELEVANT

| Category* | Citation of document, with indication, where appropriate, of the relevant passages | Relevant to claim No. |
|---|---|---|
| Y | BALAZS G ET AL: "Intelligent cardiac telemonitoring system", COMPUTERS IN CARDIOLOGY, 2004 CHICAGO, IL, USA SEPT. 19-22, 2004, PISCATAWAY, NJ, USA,IEEE, 19 September 2004 (2004-09-19), pages 745-748, XP010814133, DOI: 10.1109/CIC.2004.1443047 ISBN: 978-0-7803-8927-4 page 745, right-hand column, paragraph "Electrode reversal detection and correction" | 15,16, 19,20, 23,24 |
| | ----- | |
| A | US 2007/232946 A1 (FEILD DIRK Q [US] ET AL) 4 October 2007 (2007-10-04) the whole document | 1-24 |
| | ----- | |
| A | GB 2 438 589 A (BIO MEDICAL RES LTD [IE]) 5 December 2007 (2007-12-05) the whole document | 1-24 |
| | ----- | |
| A | HYUNG WOOK NOH ET AL: "A preliminary study of the effect of electrode placement in order to define a suitable location for two electrodes and obtain sufficiently reliable ECG signals when monitoring with wireless system", THE EFFECT OF APPLIED COMPRESSIVE LOADING ON TISSUE-ENGINEERED CARTILAGE CONSTRUCTS CULTURED WITH TGF-BETA3, IEEE, 28 August 2012 (2012-08-28), pages 2124-2127, XP032463359, ISSN: 1557-170X, DOI: 10.1109/EMBC.2012.6346380 the whole document | 1-24 |
| | ----- | |
| A | US 6 282 440 B1 (BRODNICK DONALD E [US] ET AL) 28 August 2001 (2001-08-28) the whole document | 1-24 |
| | ----- | |
| A | WO 91/00052 A1 (KUNIG HORST E [US]) 10 January 1991 (1991-01-10) the whole document | 1-24 |
| | ----- | |

2

Exhibit 24
-1043-

**INTERNATIONAL SEARCH REPORT**

Information on patent family members

| | International application No |
|---|---|
| | PCT/US2013/056681 |

| Patent document cited in search report | | Publication date | Patent family member(s) | | Publication date |
|---|---|---|---|---|---|
| EP 0712605 | A1 | 22-05-1996 | DE | 69528806 D1 | 19-12-2002 |
| | | | DE | 69528806 T2 | 04-09-2003 |
| | | | EP | 0712605 A1 | 22-05-1996 |
| | | | FI | 955480 A | 17-05-1996 |
| | | | JP | H08206088 A | 13-08-1996 |
| | | | US | 5640966 A | 24-06-1997 |
| DE 102009012352 | A1 | 16-09-2010 | DE | 102009012352 A1 | 16-09-2010 |
| | | | EP | 2405808 A1 | 18-01-2012 |
| | | | JP | 2012519561 A | 30-08-2012 |
| | | | SG | 174305 A1 | 28-10-2011 |
| | | | US | 2011319781 A1 | 29-12-2011 |
| | | | WO | 2010102695 A1 | 16-09-2010 |
| US 2007232946 | A1 | 04-10-2007 | NONE | | |
| GB 2438589 | A | 05-12-2007 | CN | 101460217 A | 17-06-2009 |
| | | | EP | 2024020 A1 | 18-02-2009 |
| | | | GB | 2438589 A | 05-12-2007 |
| | | | JP | 2009538654 A | 12-11-2009 |
| | | | KR | 20090031860 A | 30-03-2009 |
| | | | US | 2009105795 A1 | 23-04-2009 |
| | | | WO | 2007138071 A1 | 06-12-2007 |
| US 6282440 | B1 | 28-08-2001 | DE | 10065578 A1 | 30-08-2001 |
| | | | JP | 4733262 B2 | 27-07-2011 |
| | | | JP | 2001204701 A | 31-07-2001 |
| | | | US | 6282440 B1 | 28-08-2001 |
| WO 9100052 | A1 | 10-01-1991 | US | 4987901 A | 29-01-1991 |
| | | | WO | 9100052 A1 | 10-01-1991 |

Form PCT/ISA/210 (patent family annex) (April 2005)

Exhibit 24
-1044-

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 26666852 |
| **Application Number:** | 14617422 |
| **International Application Number:** | |
| **Confirmation Number:** | 5106 |
| **Title of Invention:** | Electronic Device that Computes Health Data |
| **First Named Inventor/Applicant Name:** | Marcelo M. Lamego |
| **Customer Number:** | 62579 |
| **Filer:** | Stephen C. Hemenway/Valerie Brown |
| **Filer Authorized By:** | Stephen C. Hemenway |
| **Attorney Docket Number:** | P22734US1 |
| **Receipt Date:** | 17-AUG-2016 |
| **Filing Date:** | 09-FEB-2015 |
| **Time Stamp:** | 14:13:53 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | no |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Transmittal Letter | P22734US1IDS.pdf | 14939<br><br>c666b1ca43a45561c805fa5259845cc2564a65dd | no | 2 |

**Warnings:**

Exhibit 24<br>-1045-

**Information:**

| 2 | Information Disclosure Statement (IDS) Form (SB08) | P22734US1PTOSB08.pdf | 33250 | no | 2 |
|---|---|---|---|---|---|
| | | | c702c4e1a922b152270aef345bfbf60df3bc73f9 | | |

**Warnings:**

**Information:**

This is not an USPTO supplied IDS fillable form

| 3 | Foreign Reference | WO2015030712A1.pdf | 4125641 | no | 43 |
|---|---|---|---|---|---|
| | | | 8538ccfe3349ee6811a6694958e20c455416aa6d | | |

**Warnings:**

**Information:**

| | Total Files Size (in bytes): | 4173830 |
|---|---|---|

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

Exhibit 24
-1046-

Attorney Docket No. P22734US1

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re the Application of: | |
| Marcelo M. Lamego | Examiner:       Stice, Paula J. |
| Application No. 14/617,422 | Art Unit:        3766 |
| Filed: February 9, 2015 | Confirmation No.    5106 |
| For:    ELECTRONIC DEVICE THAT COMPUTERS HEALTH DATA | |

**INFORMATION DISCLOSURE STATEMENT**
**UNDER 37 C.F.R. §§1.97(b)(3) and 1.98**

Mail Stop AMENDMENT
Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Sir:

        The Examiner is requested to consider the references noted on the enclosed Form PTO/SB/08A and B during examination of the above-identified patent application.  These references are submitted for the Examiner's consideration and are submitted pursuant to the duty of disclosure under 37 C.F.R. § 1.56.  In submitting these references, no representation is made or implied that the references are or are not material to the examination of the application. The Examiner is requested to make his or her own determination of materiality.  Pursuant to the requirements of 37 C.F.R. § 1.98(a)(2)(ii), only copies of the foreign references and non-patent literature documents are provided.  Copies of the U.S. patent and U.S. patent application publication references are not provided, unless required by the Office.

        This Information Disclosure Statement is being filed before the mailing date of a first Office action.  Therefore, pursuant  to 37 C.F.R. 1.97(b)(3), no fees are due with respect to this filing.  However, should any such fees or petitions be required, please consider this a request therefor and authorization to charge Deposit Account No. 504621 as necessary.

1

Exhibit 24
-1047-

Attorney Docket No. P22734US1

If the Examiner has any questions, please contact the undersigned attorney.

Dated:  August 17, 2015.

Respectfully submitted,


_____/David S. Atkinson/_____
David S. Atkinson, Registration No. 55,655
Attorney for Assignee
USPTO Customer No. 62579

Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, Colorado  80202
Phone: (303) 223-1100
Fax: (303) 223-1111

2

Exhibit 24
-1048-

| PTO/SB/08A and B (08-03)<br>U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE<br>Substitute for Form 1449A/PTO | APPLICATION NO.:<br>14/617,422 | FILING DATE:<br>February 9, 2015 |
|---|---|---|
| INFORMATION DISCLOSURE<br>STATEMENT BY APPLICANT | FIRST NAMED INVENTOR:<br>Marcelo M. Lamego | ART UNIT:<br>3766 |
| *(Use as many sheets as necessary)* | EXAMINER NAME:<br>Stice, Paula J. | ATTY. DOCKET NO.:<br>P22734US1 |

## U.S. PATENT DOCUMENTS

| EXAMINER INITIALS* | Cite No. | PATENT NUMBER<br>Number – Kind Code² (if known) | ISSUE DATE<br>MM-DD-YYYY | Name of Patentee of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |

## U.S. PUBLICATION DOCUMENTS

| EXAMINER INITIALS* | Cite No.[1] | PUBLICATION NUMBER<br>Number – Kind Code² (if known) | PUBLICATION DATE<br>MM-DD-YYYY | Name of Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |

## FOREIGN PATENT DOCUMENTS

| EXAMINER INITIALS* | Cite No.[1] | DOCUMENT NUMBER<br>Country Code³ – Number⁴ – Kind Code⁵ (if known) | PUBLICATION DATE<br>MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear | T⁶ |
|---|---|---|---|---|---|---|
|  | C1. | JP 2001145607 | 05/2001 | Casio Computer Co. Ltd. |  | T |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |

## NONPATENT LITERATURE DOCUMENTS

| EXAMINER INITIALS* | Cite No.[1] | Include name of Author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and/or country where published. | T⁶ |
|---|---|---|---|
|  | D1. | OHGI et al., "Stroke phase discrimination in breaststroke swimming using a tri-axial acceleration sensor device," *Sports Engineering*, Vol. 6, No. 2, June 1, 2003, pp. 113-123 |  |
|  | D2. | ZIJLSTRA et al., "Assessment of spatio-temporal gait parameters from trunk accelerations during human walking," *Gait & Posture*, Vol. 18, No. 2, October 1, 2003, pp. 1-10 |  |
|  |  |  |  |

| **PTO/SB/08A and B (08-03)**<br>**U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE**<br>Substitute for Form 1449A/PTO | **APPLICATION NO.:**<br>14/617,422 | **FILING DATE:**<br>February 9, 2015 |
|---|---|---|
| **INFORMATION DISCLOSURE**<br>**STATEMENT BY APPLICANT** | **FIRST NAMED INVENTOR:**<br>Marcelo M. Lamego | **ART UNIT:**<br>3766 |
| ***(Use as many sheets as necessary)*** | **EXAMINER NAME:**<br>Stice, Paula J. | **ATTY. DOCKET NO.:**<br>P22734US1 |

| **EXAMINER: Initial if citation considered, whether or not citation is in conformance with MPEP 609; Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.** | | |
|---|---|---|
| Examiner Signature | | Date Considered |

[1] Applicant's unique citation number (optional). [2] See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04. [3] Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3). [4] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [5] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. [6] Applicant is to place a check mark here if English language Translation is attached.

# EUROPEAN PATENT OFFICE

**Patent Abstracts of Japan**

| | | |
|---|---|---|
| PUBLICATION NUMBER | : | 2001145607 |
| PUBLICATION DATE | : | 29-05-01 |
| | | |
| APPLICATION DATE | : | 15-10-99 |
| APPLICATION NUMBER | : | 11294441 |

APPLICANT : CASIO COMPUT CO LTD;

INVENTOR : KANZAKI TAKASHI;

INT.CL. : A61B 5/05

TITLE : PORTABLE BODY FAT MEASURING INSTRUMENT



ABSTRACT : PROBLEM TO BE SOLVED: To provide a portable body fat percentage measuring instrument capable of easily and speedily measuring a body fat percentage anytime.

SOLUTION: This body fat measuring instrument consists of a case 1 and a pair of belts 16 and 17 engaged with the mutually opposed side parts of this case 1. Key input parts 51 to 54 are provided at the other both mutually-opposed side parts of the case 1. On the front surface side of the case 1, a display part 4 consisting of an LCD is arranged at a center part and a pair of electrodes 2 and 3 is arranged at a place closer to the belt 17. Concerning this pair of electrodes 2 and 3, one electrode 2 which is for high-frequency current output and the other electrode 3 which is for detecting voltage are arranged at a proper interval to be insulated from each other. Further, on the rear surface side of the case 1, a pair of electrodes 6 and 7 is arranged. Concerning this pair of electrodes 6 and 7, one electrode 6 which is for high-frequency current output and the other electrode 7 which is for detecting voltage are arranged at a proper interval to be insulated from each other.

COPYRIGHT: (C)2001,JPO

BNSDOCID: <JP____2001145607A_AJ_>

Exhibit 24
-1051-

(19)日本国特許庁（ＪＰ）　　　(12) 公 開 特 許 公 報 (A)　　　(11)特許出願公開番号

特開2001−145607

（P2001−145607A）

(43)公開日　平成13年5月29日(2001.5.29)

| (51)Int.Cl.⁷ | 識別記号 | FI | テーマコード゛(参考) |
|---|---|---|---|
| A61B 5/05 | | A61B 5/05 | B 4C027 |

審査請求　未請求　請求項の数17　ＯＬ　（全 27 頁）

| | |
|---|---|
| (21)出願番号　特願平11−294441 | (71)出願人　000001443 |
| | カシオ計算機株式会社 |
| (22)出願日　平成11年10月15日(1999.10.15) | 東京都渋谷区本町1丁目6番2号 |
| | (72)発明者　鈴木　健夫 |
| (31)優先権主張番号　特願平11−257922 | 東京都羽村市栄町3丁目2番1号　カシオ |
| (32)優先日　平成11年9月10日(1999.9.10) | 計算機株式会社羽村技術センター内 |
| (33)優先権主張国　日本（ＪＰ） | (72)発明者　神崎　隆司 |
| | 東京都羽村市栄町3丁目2番1号　カシオ |
| | 計算機株式会社羽村技術センター内 |
| | (74)代理人　100058100 |
| | 弁理士　三好　千明 |
| | Ｆターム(参考)　4C027 AA07 BB03 CC00 EE00 HH01 |

(54)【発明の名称】　携帯型体脂肪率測定装置

(57)【要約】

【課題】　体脂肪率の測定を随時に容易かつ迅速に行うことのできる携帯型体脂肪率測定装置を提供する。

【解決手段】　体脂肪測定装置は、ケース1とこのケース1の相対向する側部に係止された一対のベルト16、17とで構成されている。ケース1の相対向する他の両側部には、キー入力部51〜54が設けられている。ケース1の表面側には、中央部にＬＣＤからなる表示部4が配置され、ベルト17寄りに一対の電極2、3が配置されている。この一対の電極2、3は、一方の電極2が高周波電流出力用であって、他方の電極3電圧検出用であり、適宜の間隔をもって配置されることにより相互に絶縁されている。また、ケース1の裏面側には、一対の電極6、7が配設されている。この一対の電極6、7は、電極6は高周波電流出力用であって、他方の電極7が電圧検出用であり、適宜の間隔をもって配置されることにより相互に絶縁されている。



Exhibit 24
-1052-

：（２）００１−１４５６０７（Ｐ２００１−１４５６０７Ａ）

【特許請求の範囲】
【請求項１】　高周波電流を出力するための一対の出力用電極と、電圧を検出するための一対の検出用電極とを備え、前記一対の出力用電極で形成される人体を経由するループが、前記一対の検出用電極で形成される前記人体を経由するループより大きくなるように前記一対の出力用電極を前記人体の皮膚に接触させて、前記検出用電極から検出される電圧に基づき体脂肪を測定する体脂肪測定装置であって、
前記人体の腕に装着可能な装着者の腕と接触する裏面側に、前記一対の出力用電極の一方、及び前記一対の検出用電極の一方を配置し、
前記装着本体の表面側に前記一対の出力用電極の他方、及び前記一対の検出用電極の他方を配置することを特徴とする携帯型体脂肪測定装置。
【請求項２】　前記装着本体は、装置本体と、この装置本体の両端部に係着され前記人体の腕に巻き付け可能な帯状体とで構成され、前記電極を前記装置本体に配置したことを特徴とする請求項１記載の携帯型体脂肪測定装置。
【請求項３】　前記装着本体は、装置本体と、この装置本体の両端部に係着され前記人体の腕に巻き付け可能な帯状体とで構成され、前記電極を前記帯状体に配置したことを特徴とする請求項１記載の携帯型体脂肪測定装置。
【請求項４】　前記装着本体は、前記人体の左右いずれの腕に装着されたかを検出する検出手段と、この検出手段の検出結果に基づき前記電極を前記出力用電極と前記検出用電極とに切り換える制御手段とをさらに備えることを特徴とする請求項１記載の携帯型体脂肪測定装置。
【請求項５】　前記検出手段は、心電波を検出する心電波検出手段であって、この検出した心電波に基づき、前記人体の左右いずれの腕に装着されたかを検出することを特徴とする請求項４記載の携帯型体脂肪測定装置。
【請求項６】　前記装着本体の表面側に前記一対の出力用電極の他方、及び前記一対の検出用電極の他方をそれぞれ２つ配置し、前記検出手段は、これらの電極のうちいずれに人体が接触したかに基づき、前記人体の左右いずれの腕に装着されたかを検出することを特徴とする請求項４記載の携帯型体脂肪測定装置。
【請求項７】　前記装着本体は、回動可能なベゼルを前記表面側に備え、前記検出手段は、このベゼルの回動方向に基づいて、前記人体の左右いずれの腕に装着されたかを検出することを特徴とする請求項４記載の携帯型体脂肪測定装置。
【請求項８】　測定者の個人データと対応付けて当該測定者が前記装着本体を左右いずれの腕に装着するかを記憶する記憶手段と、この記憶手段の記憶内容に基づいて前記電極を前記出力用電極と前記検出用電極とに切り換える制御手段とをさらに備えることを特徴とする請求項１記載の携帯型体脂肪測定装置。

【請求項９】　前記装置本体の表面側に、測定結果を表示する表示手段をさらに備えたことを特徴とする請求項１から８のいずれかに記載の携帯型体脂肪測定装置。
【請求項１０】　前記装置本体の表面側に、前記一対の出力用電極及び検出用電極を配置するとともに、前記装置本体の表面を開閉自在に覆う蓋体を設けたことを特徴とする請求項２記載の携帯型体脂肪測定装置。
【請求項１１】　前記蓋体に、前記体脂肪の測定結果を表示する表示手段を設けたことを特徴とする請求項１０記載の携帯型体脂肪測定装置。
【請求項１２】　前記蓋体の前記装置本体の表面を覆う一面側に、前記体脂肪の測定結果を表示する第１の表示手段を設けるとともに、他面側に時刻を表示する第２の表示手段を設けたことを特徴とする請求項１０記載の携帯型体脂肪測定装置。
【請求項１３】　前記表示手段は、前記体脂肪の測定結果をレベル表示する表示部を有することを特徴とする請求項９、１１又は１２記載の携帯型体脂肪測定装置。
【請求項１４】　前記蓋体の開を検出して、前記測定を開始させる制御手段を備えたことを特徴とする請求項１０、１１、又は１２記載の携帯型体脂肪測定装置。
【請求項１５】　高周波電流を出力するための一対の出力用電極と、電圧を検出するための一対の検出用電極とを備え、前記一対の出力用電極で形成される人体を経由するループが、前記一対の検出用電極で形成される前記人体を経由するループより大きくなるように前記一対の出力用電極を前記人体の皮膚に接触させて、前記検出用電極から検出される電圧に基づき体脂肪を測定する体脂肪測定装置であって、
装置本体と、
この装置本体に設けられ、押圧されてオン動作するスイッチ機能と前記各電極としての機能とを併有する複数の操作手段と、
を備えたことを特徴とする携帯型体脂肪測定装置。
【請求項１６】　前記装置本体を腕に装着するための装着手段をさらに備えたことを特徴とする請求項１５記載の携帯型体脂肪測定装置。
【請求項１７】　前記複数のスイッチのオン動作を検出して、前記測定を開始させる制御手段をさらに備えたことを特徴とする請求項１５記載の携帯型体脂肪測定装置。

【発明の詳細な説明】
【０００１】
【発明の属する技術分野】本発明は、体脂肪測定装置に関し、詳細には、所謂４端子電極法により、人体の体脂肪を測定する携帯型体脂肪測定装置に関する。
【０００２】
【従来の技術】従来、４端子電極法を用いた携帯型体脂肪測定装置として、登録実用新案　第３０２８９８６号公報に開示されたものが知られている。この携帯型体

Exhibit 24
-1053-

(3) 001-145607 (P2001-145607A)

肪測定装置は、装置本体とこの装置本体の両側に折り畳み可能に取り付けられた一対の把持部とで構成され、各把持部に各々2つの電極が配置されている。したがって、非測定時には把持部を折り畳むことにより小型化してポケット等においても持ち運ぶことができる。また、測定時には把持部を展開して把持することにより、把持部の電極に手のひらが密着して、体脂肪を測定することができる。

【0003】
【発明が解決しようとする課題】しかしながら、このような従来の携帯型体脂肪測定装置にあっては、測定に際しては装置をポケット等から取り出し、把持部を展開してからこれを各把持部を把持しなければならない。したがって、測定時の操作が煩雑であり、体脂肪率の測定を容易かつ迅速に行うことができない。

【0004】本発明は、このような従来の課題に鑑みてなされたものであり、体脂肪率の測定を随時に容易かつ迅速、そして正確に行うことのできる携帯型体脂肪率測定装置を提供することを目的とするものである。

【0005】
【課題を解決するための手段】前記課題を解決するために請求項1記載の発明にあっては、高周波電流を出力するための一対の出力用電極と、電圧を検出するための一対の検出用電極とを備え、前記一対の検出用電極で形成される人体を経由するループが、前記一対の検出用電極で形成される前記人体を経由するループより大きくなるように前記一対の出力用電極を前記人体の皮膚に接触させて、前記検出用電極から検出される電圧に基づき体脂肪を測定する体脂肪測定装置であって、前記人体の腕に装着可能な装着体の腕と接触する裏面側に、前記一対の出力用電極の一方、及び前記一対の検出用電極の一方を配置し、前記装着体の表面側に前記一対の出力用電極の他方、及び前記一対の検出用電極の他方を配置することを特徴としている。したがって、装着体を腕に装着すると、一方の前記出力用電極及び前記検出用電極とが腕に接触する。よって、一方の手指を他方の前記出力用電極及び前記検出用電極とに接触させれば、体脂肪の測定が可能となり、体脂肪率の測定を随時に容易かつ迅速に行うことができる。

【0006】また、請求項2記載の発明にあっては、前記装着体は、装置本体と、この装置本体の両端部に係着され前記人体の腕に巻き付け可能な帯状体とで構成され、前記電極を前記装置本体に配置してある。したがって、電極への電力を直接装置本体から俫給でき、回路が簡略化する。

【0007】また、請求項3記載の発明にあっては、前記装着体は、装置本体と、この装置本体の両端部に係着され前記人体の腕に巻き付け可能な帯状体とで構成され、前記電極を前記帯状体に配置してある。したがって、帯状体を腕に巻き付けると、電極が腕の皮膚に密着

し、エラーなく測定が可能となる。

【0008】また、請求項4記載の発明にあっては、前記装着体は、前記人体の左右いずれの腕に装着されたかを検出する検出手段と、この検出手段の検出結果に基づき前記電極を前記出力用電極と前記検出用電極とに切り換える制御手段とをさらに備える。したがって、この装着体を人体の左右いずれの腕に装着した場合であっても、電極が出力用電極と検出用電極とに切り換えられることにより、一対の出力用電極で形成される人体を経由するループと、一対の検出用電極で形成される人体を経由するループとより大きくなるようにすることができる。よって、装着体を左右いずれの腕に装着した場合であっても、4端子電極法を用いて体脂肪を正確に測定することができる。

【0009】また、請求項5記載の発明にあっては、前記検出手段は、心電波を検出する心電波検出手段であり、この検出した心電波に基づき、前記人体の左右いずれの腕に装着されたかを検出する。すなわち、左右両腕から誘導される心電図第一誘導の特徴的なQRST波形の特にR波の極性を判定することにより、装着体の装着腕を検出する。

【0010】また、請求項6記載の発明にあっては、前記装着体の表面側に前記一対の出力用電極の他方、及び前記一対の検出用電極の他方をそれぞれ2つ配置し、前記検出手段は、これらの電極のうちいずれに人体が接触したかに基づき、前記人体の左右いずれの腕に装着されたかを検出する。つまり、測定に際しては、装着体を一方の腕に装着し、他方の手指を2つずつ配置された出力用電極のいずれか1つと、検出用電極のいずれか1つとに接触させることとなる。このとき、それぞれ2つずつ配置された出力用電極と検出用電極のうち、例えば右手の指で接触し易い1つの出力用電極と検出用電極電極とに手指が接触されたならば装着体は左手に装着されており、左手の指で接触し易い1つの出力用電極と検出用電極電極とに手指が接触されたならば装着体は左手に装着されていると検出することができる。

【0011】また、請求項7記載の発明にあっては、前記装着体は、回動可能なベゼルを前記表面側に備え、前記検出手段は、このベゼルの回転方向に基づいて、前記人体の左右いずれの腕に装着されたかを検出する。つまり、測定に際しては、装着体を一方の腕に装着し、他方の手でベゼルを回転させる。このとき、当該他方の手でベゼルを回転させやすい方向があるから、その方向を検出することにより、装着体が装着されている腕が左右いずれであるかを検出し得る。

【0012】また、請求項8記載の発明にあっては、測定者の個人データと対応付けて当該測定者が前記装着体を左右いずれの腕に装着するかを記憶する記憶手段と、この記憶手段の記憶内容に基づいて前記電極を前記出力用電極と前記検出用電極とに切り換える制御手段とをさ

Exhibit 24
-1054-

!(4) 001-145607 (P2001-145607A)

らに備える。したがって、前述と同様に、この装置体を人体の左右いずれの腕に装着した場合であっても、電極を出力用電極と検出用電極とに切り換えられることにより、一対の出力用電極で形成される人体を経由するループが、一対の検出用電極で形成される人体を経由するループより大きくなるようにすることができる。

【0013】また、請求項9記載の発明にあっては、前記装置本体の表面側に、測定結果を表示する表示手段をさらに備える。したがって、測定結果を容易かつ迅速に視認することができる。

【0014】また、請求項10記載の発明にあっては、前記装置本体の表面側に、前記他方の出力用電極及び検出用電極を配置するとともに、前記装置本体の表面を開閉自在に覆う蓋体を設けてある。したがって、非測定時には蓋体により電極が覆われて汚れが防止され、測定時に接触不良によるエラーの発生を未然に防止し得る。

【0015】また、請求項11記載の発明にあっては、前記蓋体に、前記体脂肪の測定結果を表示する表示手段を設けてある。したがって、蓋体を任意の角度に開くことにより、表示手段を見易い角度で視認することができる。

【0016】また、請求項12記載の発明にあっては、前記蓋体の前記装置本体の表面に covered する一面側に、前記体脂肪の測定結果を表示する第1の表示手段を設けるとともに、他面側に時刻を表示する第2の表示手段を設けてある。したがって、非測定時には蓋を閉めておけば、腕時計として機能する。

【0017】また、請求項13記載の発明にあっては、前記表示手段は、前記体脂肪の測定結果をレベル表示する表示部を有する。したがって、このレベル表示により、測定結果に対する評価をする事ができる。

【0018】また、請求項14記載の発明にあっては、前記蓋体の開を検出して、前記測定を開始させる制御手段を備えている。したがって、蓋体により電極を保護しつつ、測定をスムーズに開始させることができる。

【0019】また、請求項15記載の発明にあっては、高周波電流を出力するための一対の出力用電極と、電圧を検出するための一対の検出用電極とを備え、前記一対の出力用電極で形成される人体を経由するループが、前記一対の検出用電極で形成される前記人体を経由するループより大きくなるように前記一対の出力用電極を前記人体の皮膚に接触させて、前記検出用電極から検出される電圧に基づいて人体の体脂肪を測定する測定装置であって、装置本体と、この装置本体に設けられ、押圧されてオン動作するスイッチ機能と前記各電極としての機能とを併有する複数の操作手段とを備える。したがって、スイッチを操作するように各操作手段を同時に操作することにより、体脂肪の測定に必要な電極と人体との接触状態が形成される。

【0020】また、請求項16記載の発明にあっては、

前記装置本体を腕に装着するための装着手段をさらに備え、よって、携帯にも便利となる。

【0021】また、請求項17記載の発明にあっては、前記複数のスイッチのオン動作を検出して、前記測定を開始させる制御手段をさらに備える。よって、スイッチを操作するように各操作手段を同時に操作することにより、体脂肪の測定に必要な電極と人体との接触状態が形成されるとともに、スムーズに測定が開始される。

【0022】
【発明の実施の形態】（第1の実施の形態）以下、本発明の実施の形態を図に従って説明する。図1は、本発明の第1の実施の形態を示すものであって、この体脂肪測定装置は腕時計と同様の外部構成であって、ケース1とこのケース1の相対向する側端に係止された一対のベルト16、17とで構成されている。ケース1の相対向する他の両側部には、キー入力部51、52、53、54が設けられている。ケース1の表面側には、同図（a）に示すように、中央部にLCDからなる表示部4が配置され、ベルト17寄りに一対の電極2、3が配置されている。

【0023】この一対の電極2、3は、一方の電極2が高周波電流出力用、他方の電極3が電圧検出用であり、適宜の間隔をもって配置されることにより相互に絶縁されている。また、ケース1の裏面側には、同図（b）に示すように、一対の電極6、7が配設されている。この一対の電極6、7は、一方の電極6が高周波電流出力用、他方の電極7が電圧検出用であり、適宜の間隔をもって配置されることにより相互に絶縁されている。

【0024】前記表示部4には、図2に拡大して示したように、「やせ」「普通」「軽肥満」「肥満」の文字が印刷されているとともに、これら各文字に対応してセグメント4aが設けられている。また、表示部4には、後述する処理により図示のように「FAT」及び「BMI」が表示される。「FAT」は体脂肪率（%）であるが、キー入力部51、52、53、54の何れかの所定操作を検出することにより脂肪量（kg）に表示切り替えることもできる（図7（a）参照）。また、「BMI」は、肥満度をチェックする方法として広く知られているBMI（Body Mass Index）によって算出される指数であり、例えば、RAM8に予め記憶された被測定者の体重/（身長）²の値が表示される。

【0025】図3は、ケース1内に配置されている本実施の形態にかかる体脂肪測定装置の回路の構成を示すブロック図である。このブロック図において、発振回路15とV／I回路は高周波電流発生回路である（詳細には、15は発振回路であり、V／I回路14は発振回路で発振された交流電圧から高周波電流を生成する回路である）。 V／I回路14は高周波電流出力用電極2、6に接続されている。また、電圧検出用電極3、7は、フィルタを含む信号増幅器11、演算積算器12、A／

:(5) 001-145607 (P2001-145607A)

D変換器13を介してCPU10に接続されている。C
PU10には、前記キー入力部51～54及び表示部4
が接続されているとともに、RAM8とROM9とが接
続されている。CPU10は、ROM9に格納されてい
るプログラムに従って、時刻情報表示処理、及び後述の
体脂肪測定処理を実行することにより、時刻情報の表
示、及びモード切替による体脂肪測定を制御するもので
ある。RAM8はCPU10のワーク用（時刻情報用レ
ジスタ）として使用されるとともに、キー操作とともに
予め入力された被測定者の身長、体重、年齢、性別等のデ
ータを格納するメモリとして使用される。

【0026】以上の構成にかかる本実施の形態におい
て、被測定者はこのベルト16、17にて左腕に装着し
ておく。これにより、裏面側の電極6、7が被測定者の
左腕の皮膚に接触する。そして、体脂肪測定を行うに際
しては、所定のキー操作を行って、モード切替を行なっ
て測定モードを設定した後、右手の手指をそれぞれ表面
側の電極2、3に接触させる。これにより、図3に示し
たように、高周波電流出力用電極2、6と電圧検出用電
極3、7と被測定者の人体とでループを形成して導通し
た状態となる。

【0027】一方、CPU10はROM9に格納されて
いるプログラムに基づき、図4に示すフローチャートに
従って動作し、測定モードの設定を待機する（ステップS1）。そして、測定モードが検出される
と、ワークエリアにおける前回の測定データを初期化す
る（ステップS2）。次に、RAM8より当該ユーザの
身長、体重、年齢、性別等の各データを順次読み出し
（ステップS3）、この読み出した体重と身長に基づ
き、BMI指数を算出する（ステップS4）。

【0028】しかる後に、測定を開始して、電圧検出用
電極3、7間の電位を取り出し（ステップS5）、その
際、電極、電位2、3、6、7における接触不良による測定
エラーの有無を検出する（ステップS6）。測定エラー
が検出された場合には、表示部4にエラー表示を行うと
ともに（ステップS9）、このエラー表示を一定時間経
過するまで継続する（ステップS10）。

【0029】測定エラーが検出されない場合には、前述
のステップS5で取り出した電圧検出用電極3、7間の
電位から身体インピーダンスを求め、この身体インピー
ダンスと前記ステップS3で読み出した身長及び体重に
基づき、周知の演算を行って体脂肪率を算出する（ステ
ップS7）。しかる後に、前記ステップS4で算出した
BMIとこのステップS7で算出した体脂肪率とを表示
部4に表示させる（ステップS8）。

【0030】このとき、算出した体脂肪率に応じて、
「やせ」「普通」「軽肥満」「肥満」の順に対応するセグ
メント4aを点灯させる。したがって、このステップ
S8での処理により表示部4には、図2に例示したよう
に、「FAT 23.5%」「BMI 21」の表示が

なされるとともに、算出された体脂肪率、及びBMI指
数に応じて、セグメント4aが順次点灯する。よって、
この体脂肪測定装置を腕に装着しておけば、測定モード
の設定して他方の手指を表面側の電極2、3に接触させ
ることにより、体脂肪率を随時に容易かつ迅速に
行うことができる。また、点灯したセグメント4aに対
応する印刷文字を視認することにより、被測定者自身の
体脂肪率がどのレベルであるかを認識することができ
る。なお、前述のように所定のキー操作による表示切り
替えにより、FATに代えて被測定者人体に対する脂肪
量の割合（％）を表示することもできる。

【0031】図5は、本発明の第1の実施の形態におい
て表面側に配置される電極2、3の配置例を示すもので
ある。すなわち、同図（a）はケース1において表示部
4の両側に電極2、3を配置した例である。（b）は右
上隅部と左下隅部とに配置した例であり、（c）は左上
隅部と右下隅部とに配置した例である。（d）はベルト
17に配置した例であり、（e）はベルト16とベルト
17とに、電極2、3の一方をそれぞれ配置した例であ
る。これら変形例に示すように、電極2、3はこの体脂
肪測定装置をベルト16、17にて腕に装着した状態に
おいて当該腕には接触せず、他方の手指により接触可能
であり、測定時に被測定者の左腕に当該体脂肪測定装置
を装着した際に、被測定者の人体を基準に電極2が電極
3よりも外側になるような位置にあれば、いかなる位置
であってもよい。但し、電極2、3をケース1側に配置
した場合には、電極2、3への電流供給及び電圧検出が
容易となり、回路が簡単化する利点がある。

【0032】また、図6は、本発明の第1の実施の形態
において裏面側に配置される電極6、7の配置例を示す
ものである。すなわち、同図（a）はケース1の裏面に
おいて横方向に電極6、7を配置した例である。（b）
は右斜め方向に配置した例であり、（c）は左斜め方向
に配置した例である。（d）は一方のベルト17に配置
した例であり、（e）は他方のベルト16に配置した例
であり、（f）はベルト16とベルト17とに、電極
6、7の一方をそれぞれ配置した例である。この変形例
に示すように、電極6、7はこの体脂肪測定装置をベル
ト16、17にて腕に装着した状態において当該腕の皮
膚に接触可能であり、測定時に被測定者の左腕に当該体
脂肪測定装置を装着した際に、被測定者の人体を基準に
電極6が電極7よりも外側になるような位置にあれば、
いかなる位置であってもよい。

【0033】無論、図5（a）～（d）に示した配置例
と図6（a）～（f）に示した配置例を適宜組み合わせ
て用いることができる。

【0034】尚、本実施の形態においては、算出した体
脂肪率、及びBMI指数に応じて、「やせ」「普通」
「軽肥満」「肥満」に対応するセグメント4a順次点灯
させるようにしたが、「やせ」「普通」「軽肥満」「肥

！(6) 001-145607 (P2001-145607A)

潟」の何れかに対応するセグメント4aを点灯させるようにしてもよく、これらの測定結果の表示については、ドットマトリクスによるキャラクター表示や、アニメーション表示等、適宜変更可能である。

【0035】（第2の実施の形態）図7は、本発明の第2の実施の形態を示すものである。同図（a）に示すように、この体脂肪測定装置はケース1がケース本体1aと蓋1bとで構成されている。ケース本体1aには、前記実施の形態と同様に、一対のベルト16、17が係止され、キー入力部51、52、53、54が設けられるとともに、表面に前記電極2、3が配置されている。蓋1bは、ケース本体1aの一側端に任意の角度に開閉自在に枢支されており、ケース本体1aには所定角度以上ケース本体1aと蓋1bとが開いたことを検出するためのセンサー55が配設されている。このセンサー55は、蓋1bが開くことにより変化するケース本体1aの照度により所定角度以上ケース本体1aと蓋1bとが開いたことを検出する光量検出センサーであるが、接点スイッチであっても良い。また、この蓋1bには、これを閉じた状態で前記ケース本体1aに接面する裏面側に、前記実施の形態と同様の表示部4が配置され、表面側に図示しない時刻表示部が設けられている。また、ケース本体1aの裏面側に前記電極6、7が配置されている。

【0036】なお、この実施の形態においては、ケース本体1a内に図3に示した回路を備えると共に、図示しないが、蓋1b側には前記時刻表示部に時刻を表示させるための時計回路部が内蔵されている。

【0037】以上の構成にかかる本実施の形態において、被測定者は普段（時刻情報等を見る場合）はこのベルト16、17にて一方の腕に装着しておき、その際蓋1bを閉じた状態にしておく。これにより、蓋1bの表面に配置されている時刻表示部が上面に位置し、通常の腕時計として使用することができる。そして、体脂肪測定を行うに際しては、図7（a）に示したように、蓋1bを所定角度以上開いて起立させる。すると、蓋1bが所定角度以上開となったことをセンサー55が検出してこの検出信号をCPU10に出力し、CPU10は自動的に時刻表示モードから測定モードに切り換える。したがって、図4に示したフローチャートにおいてステップS2以降の処理が実行されて、BMI及び体脂肪率が表示される。

【0038】また、本実施の形態によれば、ケース本体1aの表面全体を利用して電極2、3を配置することができることから、電極2、3を大型にして測定精度を高めることができる。また、非測定時には蓋1bを閉じておくことにより、電極2、3の汚れを防止して、測定時におけるエラーの発生を抑制することができるとともに、電極2、3が隠蔽されデザイン的にも有利となる。さらに、蓋1bを開いた際に、自動的に測定モードに移

行させることができ、これによりスムーズに測定を開始して脂肪率の測定をより容易かつ迅速に行うことができる。

【0039】さらに、ケース本体1b側には図3に示した回路、蓋1b側には時計回路部（不図示）をそれぞれ備えさせることで、例えば電流発生回路（発振回路15、及びV／I回路14）において発生する高周波電圧もしくは高周波電流による、時計回路部へのノイズの影響を受けにくくする、所謂、シールド効果を期待することもできる。

【0040】又、上記第1の実施の形態、及び第2の実施の形態によれば、被測定者は体脂肪測定の為に、わざわざ測定装置を出す準備をしたり、両手をフリーの状態にしなくてはならないという煩わしさを解消することができるので、何時でも手軽に体脂肪測定が可能となる。

【0041】（第3の実施の形態）図8は、本発明の第3の実施の形態を示すものであり、この体脂肪測定装置は第1の実施の形態と同様に、ケース110とこのケース110の相対向する側面に係止された一対のベルト16、17とで構成され、ケース110の表面側に表示部4が配置されている。しかし、第1の実施の形態とは異なり、ケース110の一側部に設けられたキー入力部53、54が高周波電流出力用電極2、6を兼ねており、他側部に設けられたキー入力部51、52が電圧検出用電極3、7を兼ねている。

【0042】以上の構成にかかる本実施の形態において、通常、現在時刻を表示する際は図8（a）に図示するように、12-6時方向を縦方向として表示すると共に、体脂肪測定を行うに際しては、この体脂肪測定装置を腕から取り外し、例えば図8（b）に図示するように、左の親指601と人差し指602で挟むようにしてキー入力部51、53を押圧し、右の親指701と人差し指702で挟むようにしてキー入力部52、54を押圧する。これにより、左手が高周波電流出力用電極2と電圧検出用電極3とに接触し、かつ、右手が高周波電流出力用電極6と電圧検出用電極7とに接触する。その結果、図3に示したように、高周波電流出力用電極2、6が人体を介して電圧検出用電極3、7と導通した状態となる。

【0043】また、このようにして両手でキー入力部51〜54を押圧すると、これら4個のキー入力部51〜54が同時押しの状態となる。すると、CPU10がキー入力部51〜54の全同時押しを検出して、表示部4を3−9時方向を縦方向（3時方向が上）表示に設定し、自動的に測定モードに切り換える。したがって、図4に示したフローチャートにおいてステップS2以降の処理が実行されて、BMI及び体脂肪率が表示される。

【0044】この場合、表示部4はドットマトリクス液晶で構成され、上記第1、第2の実施の形態において、表示部4に印刷されていた、「やせ」「普通」「軽肥

**Exhibit 24**
-1057-

:(7)001-145607(P2001-145607A)

満」「肥満」の文字の代わりとして、これら4段階の中で、測定結果に対応した内容を選択して、表示部4に表示させるようにする。

【0045】また、本実施の形態によれば、ケース110自体に複数の電極2、3、6、7を別途配置する必要がないことから、デザイン的、スペース的に有利であるとともに、キー入力部51～54と兼用しているので、全同時押し時に、自動的に測定モードに移行して、かつ、そのまま体脂肪率の測定を開始することができより一層、容易かつ迅速に体脂肪率の測定を行うことができる。

【0046】又この第3の実施の形態の場合、キー入力部51、52、53、54の夫々に対応して、電極2、3、6、7を配置しても良い。

【0047】（第4の実施の形態）図9～図13は、本発明の第4の実施の形態を示すものであり、腕時計型の体脂肪測定装置において、その測定原理に反することなく正確な測定を容易に行えるようにしたものである。すなわち、4端子電極法を用いた体脂肪測定においては、高周波電流を出力するための一対の出力用電極で形成される人体を経由するループが、電圧を検出するための一対の検出用電極で形成される人体を経由するループより大きくなるように、各電極を人体の皮膚に接触させることが必要である。しかし、例えば図1（b）に示した電極6、7の配置構成において、左手首に装着した場合には電極6が手先側、電極7がこれよりも胴体に近い手元側となり、右手に装着した場合には逆に電極6が手元側、電極7が手先側となる。したがって、電極6が高周波出力用であるとすると、左手に装着した場合には、高周波電流を出力するための一対の出力用電極で形成される人体を経由するループが、電圧を検出するための一対の検出用電極で形成される人体を経由するループより大きくなるが、右手に装着した場合にはそうはならず、正確な測定が困難となる。

【0048】したがって、当該装置が左右どちらの腕に装着されているかにより、正確な測定を可能するための重要な要件となる。そこで、本実施の形態においては、左右両腕から誘導される心電図第一誘導の特徴的なQRST波形の特にR波の極性を判定することにより、当該装置の装着腕を特定して、この特定結果に応じて4つの電極の役割、つまりいずれの電極を高周波電流を出力するための一対の出力用電極とし、電圧を検出するための一対の検出用電極とするかを決定するようにしたものである。

【0049】以下、本発明の実施の形態を図に従って説明する。図9に示すように、本実施の形態にかかる体脂肪測定装置は前述した第1の実施の形態と同様の外部構成であって、ケース120とこのケース120の相対向する電極に係止された一対のベルト16、17とで構成されている。ケース120の相対向する他の両側端には、キー入力部51、52、53、54が設けられてい

る。ケース120の表面側には、同図（a）に示すように、中央部にLCDからなる表示部4が配置され、ベルト17寄りに一対の電極2、3が左右に配置されており、この一対の電極2、3は、適宜の間隔をもって配置されることにより相互に絶縁されている。また、ケース120の裏面側には、同図（b）に示すように、一対の電極6、7が左右に配設されており、この一対の電極6、7も、適宜の間隔をもって配置されることにより相互に絶縁されている。

【0050】図10は、ケース120内に配置されている本実施の形態にかかる体脂肪測定装置の回路における電極近辺の詳細を示す回路図である。すなわち、図3に示したCPU10の入力ポートに差動増幅回路18（詳細は後述の図11に示す）と前記V／I回路14とが接続されており、CPU10の出力ポートにスイッチ制御回路19、20が接続されている。スイッチ制御回路19は、スイッチSW1、SW2、SW5、SW6を制御するものであり、スイッチ制御回路20はスイッチSW3、SW4、SW7、SW8を制御するものである。

【0051】そして、スイッチSW1とSW3の可動端子、及びSW2とSW4の可動端子とが接続されているとともに、SW5の可動端子は電極3に、SW6の可動端子は電極7に接続され、SW7とSW8の可動端子は前記信号増幅器11の入力部に、各々接続されている。なお、信号増幅器11は図3に示したように、進行積算器12に接続されている。

【0052】また、スイッチSW1は、V／I回路14に接続された固定端子C1と、差動増幅回路18、及び、スイッチSW5の固定端子C9に接続された固定端子C2とを有しており、スイッチSW2は、V／I回路14に接続された固定端子C3と、差動増幅回路18に接続された固定端子C4とを有している。スイッチSW3は、電極3とスイッチSW5間に接続された固定端子C5と、電極2に接続した固定端子C6とを有しており、スイッチSW4は、電極6に接続された固定端子C7と、電極7とスイッチSW6間に接続された固定端子C8とを有している。スイッチSW5は、前記スイッチSW1の固定端子C2に接続された固定端子C9と、スイッチSW7の固定端子C14に接続された固定端子C10とを有しており、スイッチSW6は、スイッチSW8の固定端子C15に接続された固定端子C11と、差動増幅回路18に接続された固定端子C12とを有している。スイッチSW7は、前記スイッチSW1の固定端子C6と電極2間に接続された固定端子C13と、スイッチSW5の固定端子C10に接続された固定端子C14とを有しており、スイッチSW8は、スイッチSW6の固定端子C11に接続された固定端子C15と、前記スイッチSW4の固定端子C7と電極6間に接続された固定端子C16とを有している。

【0053】図11は、前記差動増幅回路18の詳細を

**Exhibit 24**
**-1058-**

!(8)００１−１４５６０７（Ｐ２００１−１４５６０７Ａ）

示す回路図であり、差動増幅器１８１、１８２、１８
３、及び信号増幅器１８４で構成されている。差動増幅
器１８１の一方の入力端には、前記スイッチＳＷ１、Ｓ
Ｗ３、ＳＷ５の状態に応じて電極２又は電極３が接続さ
れ、差動増幅器１８２の一方の入力端には、前記スイッ
チＳＷ６の状態に応じて電極７が接続される。差動増幅
器１８１、１８２の他方の入力端には、スイッチＳＷ及
びＳＷ４の状態に応じて電極６が接続される。また、差
動増幅器１８１、１８２の出力端は差動増幅器１８３の
入力端に接続されているともに、差動増幅器１８３の出
力端は信号増幅器１８４の入力端に接続され、この信号
増幅器１８４の出力がＣＰＵ１０に与えられるよう
に構成されている。

【００５４】以上の構成にかかる本実施の形態におい
て、被測定者はこのベルト１６、１７にて一方の腕に装
着してえる。また、裏面側の電極６、７が被測定
者の一方の腕の皮膚に接触する。そして、体脂肪測定を
行うに際しては、所定のキー操作を行って、体脂肪測定
モードを設定した後、他方の手指を表面側の電極２、３
に接触させる。これにより、図１０に示したように、電
極２、６が人体を介して電極３、７と導通した状態とな
る。

【００５５】一方、体脂肪測定モードが設定されるとＣ
ＰＵ１０はＲＯＭ９に格納されているプログラムに基づ
き、図１２に示すフローチャートに従って動作を開始
し、ワークエリアにおける前回の測定データを初期化す
る（ステップＳ１１）。次に、ＲＡＭ８より当該ユーザ
の身長、体重、年齢、性別等の各データを順次読み出し
（ステップＳ１２）、この読み出した体重と身長とに基
づき、ＢＭＩ指数を算出する（ステップＳ１３）。

【００５６】しかる後に、スイッチＳＷ１、ＳＷ２、Ｓ
Ｗ５、ＳＷ６の可動接点が各々固定接点Ｃ２、Ｃ４、Ｃ
９、Ｃ１２と接続した状態となるように、スイッチ制御
回路１９を制御するとともに（ステップＳ１４）、スイ
ッチＳＷ３、ＳＷ４の可動接点が各々固定接点Ｃ６、Ｃ
７と接続した状態となるように、スイッチ制御回路２０
を制御する（ステップＳ１５）。これにより、表面側に
配置されている電極２、３が一時的に短絡し、裏面側に
配置されている電極６、７のうち電極７が心電波検出用
の誘導電極として作用し、電極６が当該装置の心電波検
出用の共通電極としてそれぞれ作用する。

【００５７】このような電極配置で第一誘導心電波を得
るには、図１１に示したような差動増幅回路１８により、
電極６を信号の共通レベル若しくは基準と見なし
て、電極２（３）の電位を得る。同時に、電極７の電位
を得るとともに、電極２（３）と電極７との電位差を得
る。このようにして得られる電位差は数ミリボルト程度
の強さであるため、検出し易くするために信号増幅器１
８４により増幅してＣＰＵ１０に供給する。

【００５８】これにより、ＣＰＵ１０は図１３（ａ）又

は（ｂ）に示すように特徴的なＱＲＳＴ波形が含まれる
第一誘導心電波を得ることができる。そこで、次のステ
ップＳ１６では、電極２、３より心電波を検出し得たか否
か、特に次のステップＳ１８で判断するＲ波を検出し得
たか否かを判断する（ステップＳ１６）。そして、検出
し得ない場合には、表示部４にエラー表示を行って（ス
テップＳ１７）、図４のステップＳ１０に進みこのエラ
ー表示を一定時間経過するまで継続する。

【００５９】また心電波、特にＲ波を検出し得たなら
ば、Ｒ波の極性を判断し（ステップＳ１８）、Ｒ波の棘
状信号が正負いずれの方向であるかを識別する（ステッ
プＳ１９）。すなわち、このＲ波の棘状信号は、当該装
置装着した腕が左右いずれかによって、その極性が逆転
し、当該装置を左手首に装着して右手指を電極２（３）
に接触させながら信号を検出したときには、図１３
（ａ）に示すように、Ｒ波は負の棘状信号となる。ま
た、逆に当該装置を右手首に装着して左手指を電極２
（３）に接触させながら信号を検出したときには、同図
（ｂ）に示すように、Ｒ波は正の棘状信号となる。

【００６０】したがって、ステップＳ１９での判別の結
果、Ｒ波の棘状信号が負方向であれば、本実施の形態に
かかる体脂肪測定装置を左手首に装着して、右手指で電
極２、３に触れた場合である。この場合には、スイッチ
ＳＷ１、ＳＷ２、ＳＷ５、ＳＷ６の可動接点が各々固定
接点Ｃ１、Ｃ３、Ｃ１０、Ｃ１１と接続した状態となる
ように、スイッチ制御回路１９を制御する（ステップＳ
２０）。さらに、スイッチＳＷ３、ＳＷ４、ＳＷ７、Ｓ
Ｗ８の可動接点が各々固定接点Ｃ６、Ｃ７、Ｃ１４、Ｃ
１５と接続した状態となるように、スイッチ制御回路２
０を制御する（ステップＳ２１）。これにより、電極２
と電極６とを高周波電流出力用電極として設定し、か
つ、電極３と電極７とを電圧検出用電極として設定する
（ステップＳ２２）。

【００６１】このとき、前述のようにこの体脂肪測定装
置を左手首に装着した状態においては、電極６（高周波
電流出力用とした電極）が胴体から遠い手先側、電極７
（電圧検出用とした電極）がこれよりも胴体に近い手元
側となる。また、右手第２指で電極３に触れ、かつ、第
２指よりも長い第３指で電極２に触れると、電極２（高
周波電流出力用とした電極）が胴体から遠く、電極３
（電圧検出用とした電極）がこれよりも胴体に近い側と
なる。したがって、高周波電流を出力するための一対の
電極２、６で形成される人体を経由するループより、電圧
を検出するための一対の電極３、７で形成される人体を
経由するループより大きくなる。よって、この状態で測
定を開始することにより（ステップＳ２３）、正確に体
脂肪を測定することができる。

【００６２】他方、ステップＳ１９での判別の結果、Ｒ
波の棘状信号が正方向であれば、本実施の形態にかかる
体脂肪測定装置を右手首に装着して、左手指で電極２、

Exhibit 24
-1059-

!(9) 001－145607 (P2001－145607A)

3に触れた場合である。この場合には、前述のステップS20と同様に、スイッチSW1、SW2、SW5、SW6の可動接点が各々固定接点C1、C3、C10、C11と接続した状態となるように、スイッチ制御回路19を制御する（ステップS24）。さらに、スイッチSW3、SW4、SW7、SW8の可動接点が各々固定接点C5、C8、C13、C16と接続した状態となるように、スイッチ制御回路20を制御する（ステップS25）。これにより、電極3と電極7とを高周波電流出力用電極とし、かつ、電極2と電極6とを電圧検出用電極として設定する（ステップS26）。

【0063】このとき、前述のようにこの体脂肪測定装置を右手首に装着した状態においては、電極7（高周波電流出力用とした電極）が胴体から遠い手先側、電極6（電圧検出用とした電極）がこれよりも胴体に近い手元側となる。また、右手第2指で電極2に触れ、かつ、第2指よりも長い第3指で電極3に触れると、電極3（高周波電流出力用とした電極）が胴体から遠く、電極2（電圧検出用とした電極）がこれよりも胴体に近い側となる。したがって、高周波電流を出力するための一対の電極3、7で形成される人体を経由するループが、電圧を検出するための一対の電極2、6で形成される人体を経由するループより大きくなる。よって、この状態で測定を開始することにより（ステップS23）、正確に体脂肪を測定することができる。

【0064】（第5の実施の形態）図14～図17は、本発明の第5の実施の形態を示すものである。図14に示すように、本実施の形態にかかる体脂肪測定装置は腕時計と同様の外部構成であって、ケース130とこのケース130の相対向する側面に係止された一対のベルト16、17とで構成されている。ケース130の相対向する他の側面部には、キー入力部51、52、53、54が設けられている。ケース130の表面側には、中央部にLCDからなる表示部4が配置され、ベルト16寄りの両隅部に表面部から側面部に亙って各々電極22、1が配置され、ベルト17寄りの両隅部に表面部から側面部に亙って各々電極31、32が配置されている。これら電極21、22、31、32は、相互に絶縁されている。また、ケース130の裏面側には、一対の電極61、71が左右に配置されており、この一対の電極61、71も、適宜の間隔をもって配置されることにより相互に絶縁されている。

【0065】図15は、ケース130内に配置されている本実施の形態にかかる体脂肪測定装置の回路の構成を示すブロック図である。このブロック図に示すように、V／I回路14はスイッチ切換制御回路30を介して前記電極6、21、22に接続されている。前記電極7、31、32は、スイッチ切換制御回路34を介してフィルタを含む信号増幅器11に接続されており、両スイッチ切換制御回路30、34は相互に接続されている。

のスイッチ切換制御回路30、34は、ゲート等あるいはソフト制御されるLSIチップ等で構成され、CPU10からの制御信号により後述するフローチャートに示すように切換動作するものである。また、電極31、32での検出電圧がスイッチ切換制御回路34からCPU10に入力されるように構成されている。なお、他の回路構成すなわち発振回路15、計時積算器12、A／D変換器13、RAM8、ROM9及び表示部4、キー入力部51～54を備えることは、前述した図3に示した実施の形態と同様である。

【0066】以上の構成にかかる本実施の形態において、被測定者はこのベルト16、17にて一方の腕に装着することにより、これにより、裏面側の電極61、71が被測定者の一方の腕の皮膚に接触する。そして、体脂肪測定を行うに際しては、所定のキー操作を行って、体脂肪測定モードを設定する。すると、CPU10はROM9に格納されているプログラムに基づき、図16に示すフローチャートに従って動作を開始し、ワークエリアにおける前回の測定データを初期化する（ステップS11）。次に、RAM8より当該ユーザの身長、体重、年齢、性別等の各データを順次読み出し（ステップS12）、この読み出した体重と身長とに基づき、BMI指数を算出する（ステップS13）。

【0067】しかる後に、両スイッチ切換制御回路30、34を制御して電極6、7をV／I回路14に接続し、この電極6、7において高周波電流を出力する（ステップS35）。次に、切換制御回路34を制御して電極31、32を信号増幅器11に接続し、この電極31、32のいずれかにおいて電圧が検出されたか否かを判断する（ステップS35）。そして、電極31、32のいずれにおいても電圧が検出されなかった場合には、表示部4にエラー表示を行って（ステップS36）、図4のステップS10に進みこのエラー表示を一定時間経過するまで継続する。

【0068】また、ステップS35で電極31、32のいずれかにおいて電圧が検出された場合には、正常な信号が検出されたのは電極31と電極32のいずれであるかを判断する（ステップS37）。すなわち、前述のように本実施の形態にかかる体脂肪測定装置においては、ケース130のベルト16寄りの両隅部に各々電極22、21が配置され、ベルト17寄りの両隅部に各々電極31、32が配置されている。したがって、図17（a）に示すように、当該装置を左手首61に装着して、右手70を一対の電極に接触させる場合、図示のように右手第1指701を電極31に接触させるとともに、右手第2指702を対角線上の電極21に接触させ、右手第1指701と右手第2指702とで、電極31、21を挟み込むようにすることが、自然な接触形態である。

【0069】したがって、ステップS37での判断の結

（１０）０１−１４５６０７（Ｐ２００１−１４５６０７Ａ）

果、正常な信号が検出されたのが電極３１であったなら
ば、図１７（ａ）に示したように、当該装置を左手首６
１に装着して、右手第１指７０１を電極３１に接触させ
るとともに、右手第２指７０２を対角線上の電極２１に
接触させた、自然かつ適正な接触形態が形成されている
と見なすことができる。そして、この場合には両スイッ
チ切換制御回路３０、３４を制御して、電極２１と電極
６とを高周波電流出力用電極とし、かつ、電極３１と電
極７とを電圧検出用電極として、体脂肪の測定演算を実
行する（ステップＳ３８）。

【００７０】このとき、この体脂肪測定装置を左手首６
１に装着した状態においては、前述と同様に高周波電流
出力用とした電極６が胴体から遠い手先側、電圧検出用
とした電極７がこれよりも胴体に近い手元側となる。ま
た、右手第１指７０１で電極３１に触れ、かつ、第１指
よりも長い第２指７０２で電極２１に触れると、高周波
電流出力用とした電極２１が胴体から遠く、電圧検出用
とした電極３１がこれよりも胴体に近い側となる。した
がって、高周波電流を出力するための一対の電極２１、
６で形成される人体を経由するループが、電圧を検出す
るための一対の電極３１、７で形成される人体を経由す
るループより大きくなる。よって、この状態で測定演算
を実行することにより、正確に体脂肪を測定することが
できる。

【００７１】他方、ステップＳ３７での判別の結果、正
常な信号が検出されたのが電極３２であったならば、図
１７（ｂ）に示したように、当該装置を右手首７１に装
着して、左手６０の第１指６０１を電極３２に接触させ
るとともに、第２指６０２を対角線上の電極２２に接触
させた、自然かつ適正な接触形態が形成されていると見
なすことができる。この場合には両スイッチ切
換制御回路３０、３４を制御して、電極２２と電極７と
を高周波電流出力用電極とし、かつ、電極３２と電極６
とを電圧検出用電極として、体脂肪の測定演算を実行す
る（ステップＳ３９）。

【００７２】このとき、この体脂肪測定装置を右手首に
装着した状態においては、前述と同様に高周波電流出力
用とした電極７が胴体から遠い手先側、電圧検出用とし
た電極６がこれよりも胴体に近い手元側となる。また、
左手第１指６０１で電極３２に触れ、かつ、第１指より
も長い第２指６０２で電極２２に触れると、高周波電流
出力用とした電極２２が胴体から遠く、電圧検出用とし
た電極３２がこれよりも胴体に近い側となる。したがっ
て、高周波電流を出力するための一対の電極２２、７で
形成される人体を経由するループが、電圧を検出するた
めの一対の電極３２、６で形成される人体を経由するル
ープより大きくなる。よって、この状態で測定演算を実
行することにより、正確に体脂肪を測定することができ
る。

【００７３】（第５の実施の形態の変形例）図１８及び

図１９は、本発明の第５の実施の形態の変形例を示すも
のであり、被測定者がベルト１６、１７にて一方の腕に
装着して、体脂肪測定モードを設定すると、ＣＰＵ１０
はＲＯＭ９に格納されているプログラムに基づき、図１
８に示すフローチャートに従って動作を開始する。この
フローチャートにおいて、ステップＳ１１〜Ｓ１３、ス
テップＳ３４及びステップＳ３６の処理は、図１６に示
したフローチャートと同様である。そして、ステップＳ
３４に続くステップＳ４５では、切換制御回路３４を制
御して電極２１、２２を信号増幅器１１に接続し、この
電極２１、２２のいずれかにおいて電圧が検出されたか
否かを判断する（ステップＳ４５）。そして、電極２
１、２２のいずれにおいても電圧が検出されなかった場
合には、表示部４にエラー表示を行って（ステップＳ３
６）、図４のステップＳ１０に進みこのエラー表示を一
定時間経過するまで継続する。

【００７４】また、ステップＳ４５で電極２１、２２の
いずれかにおいて電圧が検出された場合には、正常な信
号が検出されたのは電極２１と電極２２のいずれである
かを判断する（ステップＳ４７）。すなわち、本実施の
形態においては、図１９（ａ）に示すように、当該装置
を左手首６１に装着した場合、右手第２指７２を電極２
２に接触させるとともに、右手第３指７３を対角線上の
電極３２に接触させることが、適正な接触形態であると
する。

【００７５】したがって、ステップＳ４７での判断の結
果、正常な信号が検出されたのが電極２２であったなら
ば、図１９（ａ）に示したように、当該装置を左手首６
１に装着して、右手第２指７２を電極２２に接触させる
とともに、右手第３指７３を対角線上の電極３２に接触
させ、適正な接触形態が形成されていると見なすことが
できる。そして、この場合には両スイッチ切換制御回路
３０、３４を制御して、電極３２と電極６とを高周波電
流出力用電極とし、かつ、電極２２と電極７とを電圧検
出用電極として、体脂肪の測定演算を実行する（ステッ
プＳ４８）。

【００７６】このとき、この体脂肪測定装置を左手首６
１に装着した状態においては、前述と同様に高周波電流
出力用とした電極６が胴体から遠い手先側、電圧検出用
とした電極７がこれよりも胴体に近い手元側となる。ま
た、右手第２指７２で電極２２に触れ、かつ、第２指よ
りも長い第３指７３で電極３２に触れると、高周波電流
出力用とした電極３２が胴体から遠く、電圧検出用とし
た電極２２がこれよりも胴体に近い側となる。したがっ
て、高周波電流を出力するための一対の電極３２、６で
形成される人体を経由するループが、電圧を検出するた
めの一対の電極２２、７で形成される人体を経由するル
ープより大きくなる。よって、この状態で測定演算を実
行することにより、正確に体脂肪を測定することができ
る。

Exhibit 24
-1061-

(11)特開2001−145607（P2001−145607A）

【００７７】また、本実施の形態においては、図１９
（ｂ）に示すように、当該装置を右手首７１に装着した
場合、左手第２指６２を電極２１に接触させるととも
に、左手第３指６３を対角線上の電極３１に接触させる
ことが、適正な接触形態であるとする。したがって、ス
テップＳ４７での判別の結果、正常な信号が検出された
のが電極２１であったならば、図１９（ｂ）に示した適
正な接触形態が形成されていると見なすことができる。
そして、この場合には両スイッチ切換制御回路３０、３
４を制御して、電極３１と電極７とを高周波電流出力用
電極とし、かつ、電極２１と電極６とを電圧検出用電極
として、体脂肪の測定演算を実行する（ステップＳ４
９）。
【００７８】このとき、この体脂肪測定装置を左手首６
１に装着した状態においては、前述と同様に高周波電流
出力用とした電極６が胴体から遠い手先側、電圧検出用
とした電極７がこれよりも近い手元側となる。また、左手第２指６２で電極２１に触れ、かつ、第２指よ
りも長い第３指６３で電極３１に触れると、高周波電流
出力用とした電極３１が胴体から遠く、電圧検出用とし
た電極２１がこれよりも胴体に近い側となる。したがっ
て、高周波電流を出力するための一対の電極３１、７で
形成される人体を経由するループが、電圧を検出するた
めの一対の電極２１、６で形成される人体を経由するル
ープより大きくなる。よって、この状態で測定演算を実
行することにより、正確に体脂肪を測定することができ
る。
【００７９】（第６の実施の形態）図２０～図２３は、
本発明の第６の実施の形態を示すものである。図２０に
示すように、本実施の形態にかかる体脂肪測定装置も腕
時計と同様の外部構成であって、ケース１４０とこのケ
ース１４０の相対向する側部に係止された一対のベルト
１６、１７とで構成されている。ケース１４０の相対向
する他の両側部には、キー入力部５１、５２、５３、５
４が設けられている。ケース１４０の表面側には、中央
部にＬＣＤからなる表示部４が配置され、周囲にベゼル
４０が回動可能に装着されている。ベゼル４０の相対向
するベルト１６側端部とベルト１７側端部には、電極２
３と電極３３とが設けられており、これら電極２３、３
３は、相互に絶縁されている。また、ケース１４０の裏
面側には、図９に示した実施の形態と同様の、一対の電
極６、７が左右に配設されており、この一対の電極６、
７も、適宜の間隔をもって配置されることにより相互に
絶縁されている。
【００８０】図２１は、ケース１４０内に配置されてい
る本実施の形態にかかる体脂肪測定装置の回路の構成を
示すブロック図である。このブロック図に示すように、
Ｖ／Ｉ切換制御回路９０はスイッチ切換制御回路９０を介して前
記電極６、２３に接続されている。前記電極７、３３
は、スイッチ切換制御回路９１を介してフィルタを含む

信号増幅器１１に接続されており、両スイッチ切換制御
回路９０、９１は相互に接続されている。このスイッチ
切換制御回路９０、９１は、図１５に示したスイッチ切
換制御回路３０、３４と同様にゲート等あるいはソフト
制御されるチップで構成され、ＣＰＵ１０からの制御信
号により後述するフローチャートに示すように切換動作
するものである。ベゼル回転方向検出部９２は、ベゼル
４０の回転方向を検出してＣＰＵ１０に出力するもので
あり、ここでベゼル４０の回転方向は図２２（ａ）に示
すように、時計方向を負（−α）方向とし、同図（ｂ）
に示すように、反時計方向を正（＋α）方向としている。
なお、他の回路構成すなわち発振回路１５、進行預算器
１２、Ａ／Ｄ変換器１３、ＲＡＭ８、ＲＯＭ９及び表示
部４、キー入力部５１～５４を備えることは、前述した
図３に示した実施の形態と同様である。
【００８１】以上の構成にかかる本実施の形態におい
て、被測定者はこのベルト１６、１７にて一方の腕に装
着しておく。これにより、裏面側の電極６、７が被測定
者の一方の腕の皮膚に接触する。そして、体脂肪測定を
行うに際しては、所定のキー操作を行って、体脂肪測定
モードを設定する。すると、ＣＰＵ１０はＲＯＭ９に格
納されているプログラムに基づき、図２３に示すフロー
チャートに従って動作を開始し、ワークエリアにおける
前回の測定データを初期化する（ステップＳ１１）。次
に、ＲＡＭ８より当該ユーザの身長、体重、年齢、性別
等の各データを順次読み出し（ステップＳ１２）、この
読み出した体重と身長とに基づき、ＢＭＩ指数を算出す
る（ステップＳ１３）。
【００８２】次に、内部のタイマーをスタートさせ（ス
テップＳ５４）、しかる後にベゼル４０の回転が検出さ
れたか否かを判断する（ステップＳ５５）。ベゼル４０
の回転が検出されない場合には、タイムアップとなっ
たか否かを判断し（ステップＳ５６）、タイムアップとな
った場合には表示部４にエラー表示を行って（ステップ
Ｓ５７）、図４のステップＳ１０に進みこのエラー表示
を一定時間経過するまで継続する。
【００８３】このとき、被測定者がこの体脂肪測定装置
を左腕に装着し、図１７（ａ）に示したと同様に、右手
第１指７０１を本実施の形態におけるベゼル４０の一方
の電極３３に接触させるとともに、右手第２指７０２を
他方の電極２３に接触させ、右手第１指７０１と右手第
２指７０２とで、電極３３、２３を挟み込むようにする
ことが、適正な接触形態であるとする。そして、この状
態で両腕を伸ばすと、胸の角度が変化し、第１指７０１
と右手第２指７０２とで電極３３、２３を挟み込んだ右
手は、図２２（ａ）に示すように、ベゼル４０を負方向
（−α）に回動させるように自然に動作する。
【００８４】したがって、ステップＳ５５でベゼル４０
の回転が検出され、ステップＳ５８でその回転方向が負
（−α）方向であることが判明すれば、当該装置を左手

Exhibit 24
-1062-

（12）01-145607（P2001-145607A）

首に装着して、右手第1指701を電極33に接触させるとともに、右手第2指702を電極23に接触させた、適正な接触形態で腕を伸ばしたものと見なすことができる。そして、この場合には両スイッチ切換制御回路90、91を制御して、電極23と電極6とを高周波電流出力用電極とし、かつ、電極33と電極7とを電圧検出用電極として、体脂肪の測定演算を実行する（ステップS59）。

【0085】このとき、この体脂肪測定装置を左手首に装着した状態においては、前述と同様に高周波電流出力用とした電極6が胴体から遠い手先側、電圧検出用とした電極7がこれよりも胴体に近い手元側となる。また、右手第1指701で電極33に触れ、かつ、第1指よりも長い第2指702で電極23に触れると、高周波電流出力用とした電極23が胴体から遠く、電圧検出用とした電極33がこれよりも胴体に近い側となる。よって、高周波電流を出力するための一対の電極23、6で形成される人体を経由するループが、電圧を検出するための一対の電極33、7で形成される人体を経由するループより大きくなる。よって、この状態で測定演算を実行することにより、正確に体脂肪を測定することができ、しかも両腕を伸ばした状態で測定がなされることから、測定値をより正確なものにすることができる。

【0086】他方、ステップS58での判別の結果、図22（b）に示すようにベゼル40の回転方向が正（α）方向であったならば、当該装置を右手首に装着して、図17（b）に示したと同様に、左手第1指601を本実施の形態におけるベゼル40の一方の電極33に接触させるとともに、左手第2指702を電極23に接触させた、適正な接触形態で腕を伸ばしたものと見なすことができる。そして、この場合には両スイッチ切換制御回路90、91を制御して、電極23と電極7とを高周波電流出力用電極とし、かつ、電極33と電極6とを電圧検出用電極として、体脂肪の測定演算を実行する（ステップS60）。

【0087】このとき、この体脂肪測定装置を右手首に装着した状態においては、前述と同様に高周波電流出力用とした電極7が胴体から遠い手先側、電圧検出用とした電極6がこれよりも胴体に近い手元側となる。また、左手第1指601で電極33に触れ、かつ、第1指よりも長い第2指602で電極23に触れると、高周波電流出力用とした電極23が胴体から遠く、電圧検出用とした電極33がこれよりも胴体に近い側となる。よって、高周波電流を出力するための一対の電極23、7で形成される人体を経由するループが、電圧を検出するための一対の電極33、6で形成される人体を経由するループより大きくなる。よって、この状態で測定演算を実行することにより、正確に体脂肪を測定することができ、しかも両腕を伸ばした状態で測定がなされることから、測定値をより正確なものにすることができる。

【0088】（第7の実施の形態）図24～図26は、本発明の第7の実施の形態を示すものである。図24に示すように、ベゼル40のベルト17側に、相互に絶縁された電極23と電極33とが近設されていて、これ以外の構成は前述した第6の実施の形態と同様である。また、ベゼル40は図24に示した状態が初期状態であって、図25（a）に示す反時計方向である正（β）方向と、同図（b）に示す時計方向である負（-β）方向とに各々±90°回転可能である。そして、前記ベゼル回転方向検出部40は、ベゼル40が45≦β≦90°、及び-45≦-β≦-90である場合に、ベゼル40の回転を検出するように構成されている。

【0089】以上の構成にかかる本実施の形態において、被測定者はこのベルト16、17にて一方の腕に装着しておく。これにより、裏面側の電極6、7が被測定者の一方の腕の皮膚に接触する。そして、体脂肪測定を行うに際しては、所定のキー操作を行って、体脂肪測定モードを設定する。すると、CPU10はROM9に格納されているプログラムに基づき、図26に示すフローチャートに従って動作を開始し、ワークエリアにおける前回の測定データを初期化する（ステップS51）。次に、RAM8より当該ユーザの身長、体重、年齢、性別等の各データを順次読み出し（ステップS52）、この読み出した体重と身長とに基づく、BMI指数を算出する（ステップS53）。

【0090】次に、内部のタイマーをスタートさせ（ステップS54）、しかる後にベゼル40の回転が検出されたか否かを判断する（ステップS55）。ベゼル40の回転が検出されない場合には、タイムアップとなったか否かを判断し（ステップS56）、タイムアップとなった場合には表示部にエラー表示を行って（ステップS57）、図4のステップS50に進みこのエラー表示を一定時間経過するまで継続する。

【0091】このとき、被測定者がこの体脂肪測定装置を左腕に装着し、図19（a）に示したと同様に、右手第2指72を本実施の形態におけるベゼル40の一方の電極32に接触させるとともに、右手第3指73を他方の電極33に接触させ、この状態でベゼル40を回転させようとすると、ベゼル40を負（-β）方向に回転させることは困難であり、正（β）方向に回転させることのみが容易となる。

【0092】したがって、ステップS55でベゼル40の回転（45≦β≦90°又は-45≦-β≦-90）が検出され、ステップS58でその回転方向が正（β）方向であることが判明すれば、当該装置を左手首に装着して、右手第2指72を電極32に接触させるとともに、電極33に右手第3指73を接触させた状態にあると見なすことができる。そして、この場合には両スイッチ切換制御回路90、91を制御して、電極33と電極6とを高周波電流出力用電極とし、かつ、電極23と電

Exhibit 24
-1063-

(113) 301-145607（P2001-145607A）

極7とを電圧検出用電極として、体脂肪の測定演算を実行する（ステップS61）。

【0093】このとき、この体脂肪測定装置を左手首に装着した状態においては、前述と同様に高周波電流出力用とした電極6が胴体から遠い手先側、電圧検出用とした電極7がこれよりも胴体に近い手元側となる。また、右手第2指72で電極23に触れ、かつ、第2指よりも長い第3指73で電極33に触れると、高周波電流出力用とした電極33が胴体から遠く、電圧検出用とした電極23がこれよりも胴体に近い側となる。したがって、高周波電流を出力するための一対の電極33、6で形成される人体を経由するループが、電圧を検出するための一対の電極23、7で形成される人体を経由するループより大きくなる。よって、この状態で測定演算を実行することにより、正確に体脂肪を測定することができ、しかも両腕を伸ばした状態で測定がなされることから、測定値をより正確なものにすることができる。

【0094】他方、被測定者がこの体脂肪測定装置を右腕に装着し、図19（b）に示したと同様に、左手第2指62を本実施の形態におけるベゼル40の一方の電極33に接触させるとともに、左手第3指62を他方の電極23に接触させ、この状態でベゼル40を回転させようとすると、ベゼル40を正（β）方向に回転させることは困難であり、負（−β）方向に回転させることのみが容易となる。

【0095】したがって、ステップS55でベゼル40の回転（45≦β≦90°又は−45≦−β≦−90）が検出され、ステップS58でその回転方向が負（−β）方向であることが判明すれば、当該装置を右手首に装着して、左手第2指62を電極33に接触させるとともに、電極23に左手第3指63を接触させた状態にあると推定することができる。そして、この場合には両スイッチ切換制御回路90、91を制御して、電極23と電極7を高周波電流出力用電極とし、かつ、電極33と電極6とを電圧検出用電極として、体脂肪の測定演算を実行する（ステップS62）。

【0096】このとき、この体脂肪測定装置を左手首に装着した状態においては、前述と同様に高周波電流出力用とした電極6が胴体から遠い手先側、電圧検出用とした電極7がこれよりも胴体に近い手元側となる。また、左手第2指62で電極33に触れ、かつ、第2指よりも長い第3指63で電極23に触れると、高周波電流出力用とした電極23が胴体から遠く、電圧検出用とした電極33がこれよりも胴体に近い側となる。したがって、高周波電流を出力するための一対の電極23、7で形成される人体を経由するループが、電圧を検出するための一対の電極33、6で形成される人体を経由するループより大きくなる。よって、この状態で測定演算を実行することにより、正確に体脂肪を測定することができ、しかも両腕を伸ばした状態で測定がなされることから、測

定値をより正確なものにすることができる。

【0097】（第8の実施の形態）図27、28は、本発明の第8の実施の形態を示すものである。図24に示すように、前記RAM8には、時刻データ記憶エリア81、個人データ記憶エリア82、及び測定値記憶エリア83が設けられている。時刻データ記憶エリア81は、時計モードにおいて使用されるエリアであって、現在時刻等をカウントするカウンタ、及びバッファが含まれる。測定値記憶エリア83には、前述した各フローに従った処理により測定された体脂肪の測定値が記憶される。

【0098】個人データ記憶エリア82には、「身長」「体重」「生年月日」及び「装着する腕」の各データが記憶され、「装着する腕」は対応する「右腕」又は「左腕」に「1」で装着することを示すフラグデータを書き込むことにより行われる。これらの各データは、ユーザがキー入力部51～54を操作することにより予め記憶されたものである。

【0099】かかる実施の形態によれば、当該装置が左右どちらの腕に装着されているかを検出することなく、記憶されている「装着する腕」のデータに基づき、一対の出力用電極で形成される人体を経由するループが、一対の検出用電極で形成される人体を経由するループより大きくなるように、各電極を高周波電流出力用あるいは電圧検出用として、適正に設定することができる。また、「生年月日」のデータから測定時における測定者の現在年齢を算出して、体脂肪の演算に加味することができ、これによって、より正確な測定結果を得ることができる。

【0100】なお、この実施の形態においては、当該装置を装着する腕を示すデータを記憶させておくようにしたが、4個の電極のうちいずれの電極を高周波電流出力用あるいは電圧検出用とするかを記憶させておき、これに基づき各電極を切換制御するようにしてもよい。

【0101】

【発明の効果】以上説明したように本発明は、高周波電流を出力するための一対の出力用電極出力用電極で形成される人体を経由するループが、電圧を検出するための一対の検出用電極で形成される人体を経由するループより大きくなるようにして、体脂肪を測定する体脂肪測定装置であって、人体の腕に装着可能な装着体の腕と接触する裏面側に、前記一対の出力用電極の一方、及び前記一対の検出用電極の一方を配置し、前記装着体の表面側に前記一対の出力用電極の他方、及び前記一対の検出用電極の他方を配置するようにしたことから、他方の手指を他方の出力用電極及び検出用電極とに接触させれば、体脂肪の測定が可能となり、体脂肪率の測定を随時に容易かつ迅速に行うことができる。

【0102】また、電極を装置本体に配置することにより、電極への電力を直接装置本体から供給可能にして回

BNSDOCID: <JP____2001145607A__I_>

Exhibit 24
-1064-

（１４）ＪＯ１－１４５６０７（Ｐ２００１－１４５６０７Ａ）

路が簡略化を図ることができ、帯状体に配置することにより、電極と腕の皮膚との密着性を確保して、エラーなく測定が可能となる。

【０１０３】また、装置本体の表面側に、測定結果を表示する表示手段を設けるようにしたことから、測定結果を容易かつ迅速に視認することができる。

【０１０４】また、装置が人体の左右いずれの腕に装着されたかを検出し、あるいは左右いずれの腕に装着するかを記憶しておき、これに基づき電極を出力用電極と検出用電極とに切り換えるようにしたことから、装置を人体の左右いずれの腕に装着した場合であっても、一対の出力用電極で形成される人体を経由するループが、一対の検出用電極で形成される人体を経由するループより大きくなるようにすることができる。よって、装着体を左右いずれの腕に装着した場合であっても、４端子電極法を用いて体脂肪を正確に測定することができる。

【０１０５】また、心電波を検出してこれに基づき人体の左右いずれの腕に装着されたかを検出することにより、外観に影響を与えることなく人体の左右いずれの腕に装着されたかを検出することができる。

【０１０６】また、装着体の表面側に一対の出力用電極の他方、及び一対の検出用電極の他方をそれぞれ２つ配置しておくことにより、簡単な構成によって、人体の左右いずれの腕に装着されたかを検出することができる。

【０１０７】また、回動可能なベゼルの回転方向に基づいて、人体の左右いずれの腕に装着されたかを検出するようにしたことから、ベゼルを有する腕時計においてベゼルを有効利用して、検出手段を達成することができる。

【０１０８】また、装置本体の表面側に電極を配置し、これを開閉自在な蓋体で覆うようにしたことから、非測定時には蓋体により電極の汚れが防止でき、測定に接触不良によるエラーの発生を未然に防止することができるとともに、電極が隠蔽されることにより、デザイン的にも有利となる。

【０１０９】また、蓋体に測定結果を表示する表示手段を設けることにより、蓋体を任意の角度に開いて見易い角度で測定結果を視認することが可能となる。

【０１１０】また、蓋体の装置本体の表面を覆う一面側に、体脂肪の測定結果を表示する第１の表示手段を設け、他面側に時刻を表示する第２の表示手段を設けることにより、外観上は腕時計と同様となり、違和感なく携帯することができる。

【０１１１】また、体脂肪の測定結果をレベル表示するようにしたことから、このレベル表示により、一見して測定結果に対する評価を認識することが可能となる。

【０１１２】また、前記蓋体の開きを検出して、前記測定を開始させるようにしたことから、蓋体により電極を保護しつつ、測定をスムーズに開始させることができる。

【０１１３】また、押圧されてオン動作するスイッチ機

能と前記各電極としての機能とを併有する複数の操作手段を設けるようにしたことから、スイッチを操作するように各操作手段を同時に操作することにより、体脂肪の測定に必要な電極と人体との接触状態が形成され、エラーなく測定を行うことができる。加えて、これら複数のスイッチのオン動作を検出して、測定を開始させるようにしたことから、さらにスムーズに測定を開始することができる。

【図面の簡単な説明】

【図１】（ａ）は本発明の第１の実施の形態にかかる体脂肪測定装置の平面図、（ｂ）は同背面図である。

【図２】表示部の拡大図である。

【図３】同実施の形態にかかる体脂肪測定装置の回路図である。

【図４】同実施の形態における体脂肪測定時の処理手順を示すフローチャートである。

【図５】同実施の形態にかかる体脂肪測定装置の表面側の変形例を示す平面図である。

【図６】同実施の形態にかかる体脂肪測定装置の裏面側の変形例を示す背面図である。

【図７】（ａ）は本発明の第２の実施の形態にかかる体脂肪測定装置の斜視図、（ｂ）は同背面図である。

【図８】（ａ）は、本発明の第３の実施の形態にかかる体脂肪測定装置の通常（現在時刻表示）モードの平面図、（ｂ）は、測定モードの平面図である。

【図９】（ａ）は本発明の第４の実施の形態にかかる体脂肪測定装置の平面図、（ｂ）は同背面図である。

【図１０】同実施の形態にかかる体脂肪測定装置の電極近辺の詳細を示す要部回路図である。

【図１１】同実施の形態における差動増幅回路の詳細を示す回路図である。

【図１２】同実施の形態における処理手順の要部を示すフローチャートである。

【図１３】（ａ）は左手に装着した場合のＱＲＳＴ波形を示す波形図、（ｂ）は右手に装着した場合のＱＲＳＴ波形を示す波形図である。

【図１４】（ａ）は本発明の第５の実施の形態にかかる体脂肪測定装置の平面図、（ｂ）は左側面図、（ｃ）は右側面図である。

【図１５】同実施の形態にかかる体脂肪測定装置の回路図である。

【図１６】同実施の形態における処理手順の要部を示すフローチャートである。

【図１７】（ａ）は同実施の形態にかかる体脂肪測定装置を左手首に装着した場合の測定イメージ図、（ｂ）は右手手首に装着した場合の測定イメージ図である。

【図１８】同実施の形態にかかる変形例の処理手順の要部を示すフローチャートである。

【図１９】（ａ）は同変形例にかかる体脂肪測定装置を左手手首に装着した場合の測定イメージ図、（ｂ）は右

BNSDOCID: <JP____2001145607A__I_>

**Exhibit 24**
-1065-

（15）01-145607（P2001-145607A）

手手首に装着した場合の測定イメージ図である。

【図20】（a）は本発明の第6の実施の形態にかかる体脂肪測定装置の平面図、（b）は左側面図、（c）は右側面図である。

【図21】同実施の形態にかかる体脂肪測定装置の回路図である。

【図22】（a）は同実施の形態にかかる体脂肪測定装置を左手手首に装着した場合のベゼル回動方向説明図、（b）は右手手首に装着した場合のベゼル回動方向説明図である。

【図23】同実施の形態における処理手順の要部を示すフローチャートである。

【図24】（a）は本発明の第7の実施の形態にかかる体脂肪測定装置の平面図、（b）は左側面図、（c）は右側面図である。

【図25】（a）は同実施の形態にかかる体脂肪測定装置を左手手首に装着した場合のベゼル回動方向説明図、（b）は右手手首に装着した場合のベゼル回動方向説明図である。

【図26】同実施の形態における処理手順の要部を示すフローチャートである。

【図27】本発明の第8の実施の形態におけるRAMの

メモリ構成図である。

【図28】同実施の形態における個人データ記憶エリアのメモリ構成図である。

【符号の説明】
1　ケース
1a　ケース本体
1b　蓋
16、17　ベルト
2、3　電極
4　表示部
4a　セグメント
6、7　電極
10　CPU
19、20　スイッチ制御回路
21、22、23　電極
31、32、33　電極
40　ベゼル
92　ベゼル回転方向検出部
51、52、53、54　キー入力部
82　個人データ記憶エリア
120　ケース

【図1】　　　　　　　【図2】　　　　　　　【図28】



【図13】

(19)J01-145607(P2001-145607A)



BNSDOCID: <JP_____2001145607A__I_>

Exhibit 24
-1067-

(17) 301-145607（P2001-145607A）

【図4】



【図11】



【図27】



BNSDOCID: <JP_____2001145607A__I_>

Exhibit 24
-1068-

(19)01-145607(P2001-145607A)





Exhibit 24
-1069-

(19))01-145607(P2001-145607A)

【図12】



(20))01-145607(P2001-145607A)

【図14】



【図15】



BNSDOCID: <JP_____2001145607A__I_>

Exhibit 24
-1071-

(21))01-145607(P2001-145607A)

【図16】



(22))01-145607(P2001-145607A)

【図17】



【図19】



【図20】



Exhibit 24
-1073-

(23) )01-145607 (P2001-145607A)

【図18】



Exhibit 24
-1074-

（24）)01-145607（P2001-145607A）

【図21】



【図22】



【図24】



BNSDOCID: <JP____2001145607A__I_>

Exhibit 24
-1075-

(25))01-145607(P2001-145607A)

【図23】



BNSDOCID: <JP_____2001145607A___I_>

Exhibit 24
-1076-

(26))01-145607(P2001-145607A)

【図25】



BNSDOCID: <JP_____2001145607A___I_>

Exhibit 24
-1077-

(27))01-145607(P2001-145607A)

【図26】



BNSDOCID: <JP_____2001145607A__I_>

Exhibit 24
-1078-

Portable body fat measuring apparatus, JP PAT APP 2001145607 A (MAT) (1999)

## PORTABLE BODY FAT MEASURING APPARATUS
JP PAT APP 2001145607 A (MAT)


Original Image of JP PAT APP 2001145607 A (MAT) (PDF)

**Abstract**

**SUBJECT of the Invention**

The portable body fat ratio measuring apparatus which can measure a body fat ratio easily and quickly to at any time is provided.

**PROBLEM to be solved**

The body fat measuring apparatus is comprised by a pair of belts 16 and 17 latched by the side part which the case 1 and this case 1 mutually oppose. The key input parts 51-54 are provided in the other both sides which the case 1 mutually opposes. The display part 4 which turns into a center part from LCD is arrange|positioned, and a pair of electrodes 2 and 3 are arrange|positioned at belt 17 side|approaching at the surface side of the case 1. One electrode 2 of this pair of electrodes 2 and 3 is an object for high frequency current outputs, Comprising: It is the other object for electrode 3 voltage detection, and insulates mutually by arrange|positioning with an appropriate space|interval. Moreover, a pair of electrodes 6 and 7 are arrange|positioned by the back surface side of the case 1. The electrode 6 of this pair of electrodes 6 and 7 is an object for high frequency current outputs, Comprising: The other electrode 7 is an object for voltage detection, and it insulates mutually by arrange|positioning with an appropriate space|interval. [MAT_IMAGE 000002]

**Patent**

**Title:** PORTABLE BODY FAT MEASURING APPARATUS

**Published Application Number:** JP 2001145607 A
**Published Application Date:** 2001-05-29

**Application Number:** JP 1999294441
**Application Date:** 1999-10-15

**Inventor(s):**
SUZUKI TAKEO
KANZAKI TAKASHI

**Assignee(s):**
CASIO COMPUT CO LTD

**Classification Information**

**International Classes (IPC [8]):** A61B-5/05
**International Classes (IPC [1-7]):** A61B-5/05

**Language:** Japanese

**Claims**

**Number of Claims:** 17

1. A pair of electrode for an output for outputting the high frequency current and a pair of electrode for a detection for detecting a voltage are provided, The loop which goes through via the human body formed with a pair of said electrode for an output makes a pair of said electrode for an output contact the skin of the said human body so that it may become larger than the loop which goes through via the said human body formed with a pair of said electrode for a detection. It is a body fat measuring apparatus which measures body fat based on the voltage detected from the said electrode for a detection, Comprising: To the back surface side which contacts the arm of the mounting body with which the arm of the said human body can be mounted|worn, one of a pair of said electrode for an output and one side of a pair of said electrode for a detection are arrange|positioned, The other of a pair of said electrode for an output and the other of a pair of said electrode for a detection are arrange|positioned to the surface side of the said mounting body. The portable body fat measuring apparatus characterized by the above-mentioned.

2. The said mounting body was latchingly attached by the both ends of an apparatus main body and this apparatus main body, was comprised by the arm of the said human body with the strip|belt-shaped body in which winding is possible, and has arrange|positioned the said electrode to the said apparatus main body. The portable body fat measuring apparatus of Claim 1 characterized by the above-mentioned.

3. The said mounting body was latchingly attached by the both ends of an apparatus main body and this apparatus main body, was comprised by the arm of the said human body with the strip|belt-shaped body in which winding is possible, and has arrange|positioned the said electrode to the said strip|belt-shaped body. The portable body fat measuring apparatus of Claim 1 characterized by the above-mentioned.

4. The said mounting body is a detection means to detect whether the either right or left arm of the said human body was mounted|worn, The control means which switches the said electrode to the said electrode for an output, and the said electrode for a detection based on the detection result of this detection means These are provided further. The portable body fat measuring apparatus of Claim 1 characterized by the above-mentioned.

5. The said detection means is an electrocardio wave detection means to detect an electrocardio wave, Based on this detected electrocardio wave, it is detected whether the either right or left arm of the said human body was mounted|worn. The portable body fat measuring apparatus of Claim 4 characterized by the above-mentioned.

6. The other of a pair of said electrode for an output and the two others of a pair of said electrode for a detection are arrange|positioned to the surface side of the said mounting body, respectively, The said detection means detects any the human body contacted among these electrodes, and whether the either right or left arm of companion group and the said human body was mounted|worn. The portable body fat measuring apparatus of Claim 4 characterized by the above-mentioned.

7. The said mounting body equips the said surface side with the bezel which can be rotated, and the said detection means detects whether the either right or left arm of the said human body was mounted|worn based on the rotation direction of this bezel. The portable body fat measuring apparatus of Claim 4 characterized by the above-mentioned.

8. A memory|storage means to memorize|store whether it matches with a measurement person's individual data, and the said measurement person mounts| wears an either right or left arm with the said mounting body, The control means which switches the said electrode to the said electrode for an output, and the said electrode for a detection based on the memory content of this memory|storage means These are provided further. The portable body fat measuring apparatus of Claim 1 characterized by the above-mentioned.

9. The display means which displays a measurement result on the surface side of the said apparatus main body was provided further. The portable body fat

Exhibit 24
-1080-

Portable body fat measuring apparatus, JP PAT APP 2001145022 A (MAT) (1999)

measuring apparatus in any one of Claim 1 to 8 characterized by the above-mentioned.

10. While having arrange¦positioned said other electrode for an output, and the electrode for a detection to the surface side of the said apparatus main body, the cover body which openably-closably covers the surface of the said apparatus main body was provided in it. The portable body fat measuring apparatus of Claim 2 characterized by the above-mentioned.

11. The display means which displays the measurement result of the said body fat on the said cover body was provided. The portable body fat measuring apparatus of Claim 10 characterized by the above-mentioned.

12. While providing the 1st display means which displays the measurement result of the said body fat on the one surface side which covers the surface of the said apparatus main body of the said cover body, the 2nd display means which displays time was provided in the other surface side. The portable body fat measuring apparatus of Claim 10 characterized by the above-mentioned.

13. The said display means has a display part which carries out the level indication of the measurement result of the said body fat. The portable body fat measuring apparatus of Claim 9, 11 or 12 characterized by the above-mentioned.

14. Open of the said cover body was detected and the control means which starts the said measurement was provided. The portable body fat measuring apparatus of Claim 10, 11 or 12 characterized by the above-mentioned.

15. A pair of electrode for an output for outputting the high frequency current and a pair of electrode for a detection for detecting a voltage are provided, The loop which goes through via the human body formed with a pair of said electrode for an output makes a pair of said electrode for an output contact the skin of the said human body so that it may become larger than the loop which goes through via the said human body formed with a pair of said electrode for a detection. It is a body fat measuring apparatus which measures body fat based on the voltage detected from the said electrode for a detection, Comprising: Apparatus main body, Several operation means to jointly possess the switch function which is provided in this apparatus main body, is pressed, and is ON-operated, and the function as each said electrode, These were provided. The portable body fat measuring apparatus characterized by the above-mentioned.

16. The mounting¦wearing means for mounting¦wearing an arm with the said apparatus main body was provided further. The portable body fat measuring apparatus of Claim 15 characterized by the above-mentioned.

17. The ON operation of these switches was detected and the control means which starts the said measurement was provided further. The portable body fat measuring apparatus of Claim 15 characterized by the above-mentioned.

**Specification**

**TECHNICAL FIELD of the Invention**

[0001] This invention relates to a body fat measuring apparatus. Specifically, By what is called a 4 terminal electrodes method, it is related with the portable body fat measuring apparatus which measures the body fat of a human body.

**PRIOR ART**

[0002] Conventionally, what was indicated by registered utility model No. 3028986 gazette is known as a portable body fat measuring apparatus using 4 terminal electrodes method. This portable body fat measuring apparatus is comprised by a pair of holding part attached to the both sides of an apparatus main body and this apparatus main body so that folding was possible, and two electrodes are arrange¦positioned respectively at each holding part. Therefore, it can reduce in size by folding a holding part at the time of non-measuring, and can put in and carry in a pocket etc. Moreover, by expand¦deploying and gripping

Exhibit 24
-1081-

a holding part at the time of a measurement, a palm can contact|adhere to the electrode of a holding part and body fat can be measured.

## PROBLEM to be solved by the Invention

[0003] However, in such a conventional portable body fat measuring apparatus, in the case of a measurement, an apparatus is taken out from a pocket etc., and after expand|deploying a holding part, you have to grip each holding part for this. Therefore, operation at the time of a measurement is complicated, and cannot measure a body fat ratio easily and quickly.

[0004] This invention is made|formed in view of such a conventional subject, It aims at providing the portable body fat ratio measuring apparatus which can measure a body fat ratio easily and quickly and correctly to at any time.

## MEANS to solve the Problem

[0005] In order to solve the said subject, in invention of Claim 1, a pair of electrode for an output for outputting the high frequency current and a pair of electrode for a detection for detecting a voltage are provided, The loop which goes through via the human body formed with a pair of said electrode for an output makes a pair of said electrode for an output contact the skin of the said human body so that it may become larger than the loop which goes through via the said human body formed with a pair of said electrode for a detection. It is a body fat measuring apparatus which measures body fat based on the voltage detected from the said electrode for a detection, Comprising: To the back surface side which contacts the arm of the mounting body with which the arm of the said human body can be mounted|worn, one of a pair of said electrode for an output and one side of a pair of said electrode for a detection are arrange|positioned, The other of a pair of said electrode for an output and the other of a pair of said electrode for a detection are arrange|positioned to the surface side of the said mounting body, It is characterized by the above-mentioned. Therefore, when an arm is mounted|worn with a mounting body, one said electrode for an output and said electrode for a detection will contact with an arm. Therefore, if the other fingers are made to contact the other said electrode for an output, and the said electrode for a detection, the measurement of body fat is attained and a body fat ratio can be measured easily and quickly to at any time.

[0006] Moreover, in invention of Claim 2, the said mounting body is latchingly attached by the both ends of an apparatus main body and this apparatus main body, is comprised by the arm of the said human body with the strip|belt-shaped body in which winding is possible, and arrange|positions the said electrode to the said apparatus main body. Therefore, the electric power to an electrode can be directly supplied from an apparatus main body, and a circuit is simplified.

[0007] Moreover, in invention of Claim 3, the said mounting body is latchingly attached by the both ends of an apparatus main body and this apparatus main body, is comprised by the arm of the said human body with the strip|belt-shaped body in which winding is possible, and arrange|positions the said electrode to the said strip|belt-shaped body. Therefore, when a strip|belt-shaped body is wound around an arm, an electrode will contact|adhere to the skin of an arm, it will be errorless and the measurement of it will be attained.

[0008] Moreover, in invention of Claim 4, the said mounting body is a detection means to detect whether the either right or left arm of the said human body was mounted|worn, The control means which switches the said electrode to the said electrode for an output, and the said electrode for a detection based on the detection result of this detection means These are provided further. Therefore,

Exhibit 24
-1082-

even if it is a case where the either right or left arm of a human body is mounted| worn with this mounting body, By switching an electrode to the electrode for an output, and the electrode for a detection, the loop which goes through via the human body formed with a pair of electrode for an output can become larger than the loop which goes through via the human body formed with a pair of electrode for a detection. Therefore, even if it is a case where an either right or left arm is mounted|worn with a mounting body, body fat can be correctly measured using 4 terminal electrodes method.

[0009] Moreover, in invention of Claim 5, the said detection means is an electrocardio wave detection means to detect an electrocardio wave, Based on this detected electrocardio wave, it is detected whether the either right or left arm of the said human body was mounted|worn. That is, the mounting|wearing arm of a mounting body is detected by [ of the electrocardiogram 1st induction| guidance|derivation induced|guided|derived from right-and-left both arms / characteristic / of a QRST waveform ] determining especially the polarity of the R wave.

[0010] Moreover, in invention of Claim 6, the other of a pair of said electrode for an output and the two others of a pair of said electrode for a detection are arrange|positioned to the surface side of the said mounting body, respectively, The said detection means detects any the human body contacted among these electrodes, and whether the either right or left arm of companion group and the said human body was mounted|worn. That is, one arm is mounted|worn with a mounting body in the case of a measurement, and it is made to contact any one of the electrodes for an output which had every two fingers of the other arrange|positioned, and any one of the electrodes for a detection. The left hand will be mounted|worn with the mounting body if one electrode for an output and the electrode electrode for a detection which contact easily with a right finger|toe among the electrode for an output arrange|positioned two [ at a time ], respectively and the electrode for a detection at this time are contacted in fingers, If one electrode for an output and the electrode electrode for a detection which contact easily with a left finger|toe are contacted in fingers, a mounting body is detectable when the left hand is mounted|worn.

[0011] Moreover, in invention of Claim 7, the said mounting body equips the said surface side with the bezel which can be rotated, and the said detection means detects whether the either right or left arm of the said human body was mounted| worn based on the rotation direction of this bezel. That is, one arm is mounted| worn with a mounting body in the case of a measurement, and it rotates a bezel by the other hand. Since there exists a direction which is easy to rotate a bezel by the said the other hand at this time, it can be detected by detecting that direction whether the arm with which it mounts|wears with the mounting body is either right or left.

[0012] Moreover, a memory|storage means to memorize|store whether it matches with a measurement person's individual data, and the said measurement person mounts|wears an either right or left arm with the said mounting body in invention of Claim 8, The control means which switches the said electrode to the said electrode for an output, and the said electrode for a detection based on the memory content of this memory|storage means These are provided further. Therefore, like the above, even if it is a case where the either right or left arm of a human body is mounted|worn with this mounting body, By switching an electrode to the electrode for an output, and the electrode for a detection, the loop which goes through via the human body formed with a pair of electrode for an output can become larger than the loop which goes through via the human body formed with a pair of electrode for a detection.

Exhibit 24
-1083-

Portable body fat measuring apparatus, JP PAT APP ABFA13682 A (MAT) (1999)

[0013] Moreover, in invention of Claim 9, the display means which displays a measurement result on the surface side of the said apparatus main body is provided further. Therefore, a measurement result can be visually recognized easily and quickly.

[0014] Moreover, in invention of Claim 10, while arrange|positioning said other electrode for an output, and the electrode for a detection to the surface side of the said apparatus main body, the cover body which openably-closably covers the surface of the said apparatus main body is provided in it. Therefore, an electrode is covered with a cover body at the time of non-measuring, stain|pollution| contamination are prevented, and generation|occurence|production of the error by a contact failure can be beforehand prevented at the time of a measurement.

[0015] Moreover, in invention of Claim 11, the display means which displays the measurement result of the said body fat on the said cover body is provided. Therefore, a display means can be visually recognized at a legible angle by opening a cover body to an arbitrary angle.

[0016] Moreover, in invention of Claim 12, while providing the 1st display means which displays the measurement result of the said body fat on the one surface side which covers the surface of the said apparatus main body of the said cover body, the 2nd display means which displays time is provided in the other surface side. Therefore, if the lid|cover is closed at the time of non-measuring, it will function as a wristwatch.

[0017] Moreover, in invention of Claim 13, the said display means has a display part which carries out the level indication of the measurement result of the said body fat. Therefore, the evaluation with respect to a measurement result can be shown by this level indication.

[0018] Moreover, in invention of Claim 14, open of the said cover body was detected and the control means which starts the said measurement is provided. Therefore, a measurement can be started smoothly, protecting an electrode by a cover body.

[0019] Moreover, in invention of Claim 15, a pair of electrode for an output for outputting the high frequency current and a pair of electrode for a detection for detecting a voltage are provided, The loop which goes through via the human body formed with a pair of said electrode for an output makes a pair of said electrode for an output contact the skin of the said human body so that it may become larger than the loop which goes through via the said human body formed with a pair of said electrode for a detection. It is a body fat measuring apparatus which measures body fat based on the voltage detected from the said electrode for a detection, Comprising: Several operation means to jointly possess an apparatus main body, and the switch function which is provided in this apparatus main body, is pressed, and is ON-operated and the function as each said electrode These are provided. Therefore, the contact state of an electrode and a human body required for the measurement of body fat is formed by operating each operation means simultaneously so that a switch may be operated.

[0020] Moreover, in invention of Claim 16, the mounting|wearing means for mounting|wearing an arm with the said apparatus main body is provided further, and, therefore, it becomes convenient to carry.

[0021] Moreover, in invention of Claim 17, an ON operation of these switches is detected and the control means which starts the said measurement is provided further. Therefore, while the contact state of an electrode and a human body required for the measurement of body fat is formed by operating each operation

Exhibit 24
-1084-

Portable body fat measuring apparatus, JP PAT APP 09112496 A (MAT) (1999)

means simultaneously so that a switch may be operated, a measurement is started smoothly.

**EMBODIMENT of the Invention**

[0022] (1st Embodiment) Hereafter, embodiment of this invention is described according to figures. FIG. 1 shows the 1st Embodiment of this invention, This body fat measuring apparatus is the same external structure as a wristwatch, Comprising: It is comprised by a pair of belts 16 and 17 latched by the side part which the case 1 and this case 1 mutually oppose. The other both sides which the case 1 mutually opposes are provided with key input part 51, 52, 53, 54. As shown to the figure (a), the display part 4 which turns into a center part from LCD is arrange|positioned, and a pair of electrodes 2 and 3 are arrange|positioned at belt 17 side|approaching at the surface side of the case 1.

[0023] This pair of electrodes 2 and 3 are mutually insulated by the object for high frequency current outputs and the other electrode 3 being the objects for voltage detection, and arrange|positioning one electrode 2 with an appropriate space|interval. Moreover, as shown to the figure (b), a pair of electrodes 6 and 7 are arrange|positioned by the back surface side of the case 1. This pair of electrodes 6 and 7 are mutually insulated by the object for high frequency current outputs and the other electrode 7 being the objects for voltage detection, and arrange|positioning one electrode 6 with an appropriate space|interval.

[0024] As it expands to FIG. 2 and being shown [ display part / 4 / said ], while the character of "thinness|emaciation" "normal" "the light obesity" and "obesity" is printed, the segment 4a is provided corresponding to each of these character. Moreover, "FAT" and "BMI" are displayed on the display part 4 like illustration by the process mentioned later. Although "FAT" is body fat ratio (%), display switching can also be carried out to fat (kg) by detecting predetermined operation any of the key input parts 51, 52, 53, and 54 (refer Fig.7 (a)). Moreover, it is an index|exponent computed by "BMI (Body Mass Index) widely known as a method BMI" checks a corpulence degree", For example, the value of the body weight/ (body height) $^2$ of a to-be-measured person stored beforehand by RAM8 is displayed.

[0025] FIG. 3 is a block diagram which shows the structure of the circuit of the body fat measuring apparatus concerning this Embodiment arrange|positioned in the case 1. In this block diagram, the oscillation circuit 15 and a V/I circuit are high-frequency-current generator circuits (In detail, 15 is an oscillation circuit and the V/I circuit 14 is a circuit which produces|generates the high frequency current from the alternating voltage oscillated in the oscillation circuit.). The V/I circuit 14 is connected to the electrodes 2 and 6 for high frequency current outputs. Moreover, the electrodes 3 and 7 for voltage detection are connected to CPU10 through the signal amplifier 11, the advancing integrator 12, and A/D converter 13 including a filter. While the said key input parts 51-54 and the display part 4 are connected, RAM8 and ROM9 are connected to CPU10. CPU10 controls presenting of time information, and the body fat measurement by mode switch according to the program stored in ROM9 by performing a time information display process and the below-mentioned body fat measurement process. RAM8 is used as memory which stores the data of the body height of the to-be-measured person previously inputted by key operation, a body weight, age, sex, etc. while being used as an object for the workpiece|works of CPU10 (register|resistor for time information).

[0026] In this Embodiment concerning the above structure, the to-be-measured person mounts|wears the left arm by these belts 16 and 17. Thereby, the electrodes 6 and 7 of a back surface side contact the skin of a to-be-measured person's

left arm. And when performing a body fat measurement, after performing predetermined key operation, performing mode switch and setting measurement mode, right fingers are made to contact the electrodes 2 and 3 of surface side, respectively. As shown in FIG. 3, this will be in the state which formed and conduct|electrically_connected the loop in the electrodes 2 and 6 for high frequency current outputs, the electrodes 3 and 7 for voltage detection, and the to-be-measured person's human body.

[0027] On the other hand, based on the program stored in ROM9, CPU10 operate|moves according to the flowchart shown in FIG. 4, and it waits until it detects the setting in measurement mode (step S1). And a detection of measurement mode will initialize the last measurement data in a work area (step S2). Next, from RAM8, each data of the said user's body height, a body weight, age, sex, etc. is read one by one (step S3), and a BMI index|exponent is computed based on this body weight and body height that were read (step S4).

[0028] After an appropriate time, a measurement is started, the electric potential between the electrodes 3 and 7 for voltage detection is taken out (step S5), and the presence or absence of the measurement error by the electrode and the contact failure in 2, 3, 6, 7 is detected in that case (step S6). When a measurement error is detected, while performing an error display to the display part 4 (step S9), it continues until it goes through this error display for a fixed time (step S10).

[0029] When a measurement error is not detected, a body impedance is calculated|required from the electric potential between the electrodes 3 and 7 for voltage detection taken out by above-mentioned step S5, Based on the body height and body weight which were read by this body impedance and said step S3, a body fat ratio is computed by performing a known calculation (step S7). The display part 4 is made to display BMI computed by the said step S4, and the body fat ratio computed by this step S7 on after an appropriate time (step S8).

[0030] The segment 4a corresponding to the order of "thinness|emaciation" "normal" "the light obesity" and "obesity" is made to light according to the computed body fat ratio at this time. Therefore, by this step S8, as illustrated to the display part 4 by process at FIG. 2, while the display of "FAT 23.5%" and "BMI 21" is made|formed, according to the computed body fat ratio and a BMI index| exponent, the segment 4a lights one by one. Therefore, if the arm is mounted| worn with this body fat measuring apparatus, a body fat ratio can be measured easily and quickly to at any time by measurement mode's setting and making the other fingers contact the electrodes 2 and 3 of surface side. Moreover, it can be recognized which level a to-be-measured person's own body fat ratio is by visually recognizing the printer graphic corresponding to the lighted segment 4a. In addition, as mentioned above, by the display switching by predetermined key operation, it can replace with FAT and ratio (%) of the fat with respect to a to-be-measured person human body can also be displayed.

[0031] FIG. 5 shows the example of arrangement|positioning of the electrodes 2 and 3 arrange|positioned in the 1st Embodiment of this invention at surface side. That is, the figure (a) is an example which has arrange|positioned the electrodes 2 and 3 on both sides of the display part 4 in the case 1. (b) is an example arrange| positioned to the upper right corner and the lower left corner, (c) is an example arrange|positioned to the upper left corner and the lower right corner. (d) is an example arrange|positioned to the belt 17, (e) is to the belt 16 and the belt 17, It is an example which has arrange|positioned one side of the electrodes 2 and 3, respectively. As shown in these modifications, in the state which mounted| wore the arm with this body fat measuring apparatus by the belts 16 and 17, the electrodes 2 and 3 cannot contact the said arm, but can contact with the other fingers, When a to-be-measured person's left arm is mounted|worn with the said

Exhibit 24
-1086-

body fat measuring apparatus at the time of a measurement, as long as it exists in the position where the electrode 2 becomes outside the electrode 3 on the basis of a to-be-measured person's human body, what kind of position may be used. However, when the electrodes 2 and 3 have been arrange|positioned to the case 1 side, the electric current supply and voltage detection to the electrodes 2 and 3 become easy, and there exists an advantage which a circuit simplifies.

[0032] Moreover, FIG. 6 shows the example of arrangement|positioning of the electrodes 6 and 7 arrange|positioned in the 1st Embodiment of this invention at a back surface side. That is, the figure (a) is an example which has arrange| positioned the electrodes 6 and 7 transversely in the back surface of the case 1. (b) is an example arrange|positioned to the right diagonal direction, (c) is an example arrange|positioned to the left diagonal direction. (d) is an example arrange| positioned to one belt 17, (e) is an example arrange|positioned to the other belt 16, (f) is an example which has arrange|positioned one side of the electrodes 6 and 7 to the belt 16 and the belt 17, respectively. As shown in this modification, in the state which mounted|wore the arm with this body fat measuring apparatus by the belts 16 and 17, the electrodes 6 and 7 can contact the skin of the said arm, When a to-be-measured person's left arm is mounted|worn with the said body fat measuring apparatus at the time of a measurement, as long as it exists in the position where the electrode 6 becomes outside the electrode 7 on the basis of a to-be-measured person's human body, what kind of position may be used.

[0033] Of course, it can use, combining suitably the example of arrangement| positioning shown to Fig.5(a)-(d), and the example of arrangement|positioning shown to Fig.6 (a) - (f).

[0034] in addition, the segment 4a corresponding to "thinness|emaciation" "normal" "the light obesity" and "obesity" according to the body fat ratio computed in this Embodiment, and a BMI index|exponent -- it was made to make the light light one by one However, You may make it make the segment 4a corresponding to either "thinness|emaciation" "normal" "the light obesity" or "obesity" light. About the display of these measurement results, the character display by a dot matrix, an animation display, etc. can be changed suitably.

[0035] (2nd Embodiment) FIG. 7 shows the 2nd Embodiment of this invention. As shown to the figure (a), as for this body fat measuring apparatus, the case 1 is comprised with the case main body 1a and the lid|cover 1b. While a pair of belts 16 and 17 are latched by the case main body 1a and it is provided with key input part 51, 52, 53, 54 like the said embodiment, the said electrodes 2 and 3 are arrange|positioned on the surface. The lid|cover 1b is openably-closably supported by the one side edge of the case main body 1a at the arbitrary angle, The sensor 55 for detecting what the case main body 1a and the lid|cover 1b opened above by predetermined angle is arrange|positioned by the case main body 1a. It is a light quantity detection sensor which detects what the case main body 1a and the lid|cover 1b opened this sensor 55 for above by predetermined angle with the illumination intensity on the case main body 1a which changes when the lid| cover 1b opens, However, A contact switch may be used. Moreover, the same display part 4 as the said embodiment is arrange|positioned at the back surface side contacted to the said case main body 1a in the state which closed this, and this lid|cover 1b is provided with the time display part which is not illustrated to surface side. Moreover, the said electrodes 6 and 7 are arrange|positioned at the back surface side of the case main body 1a.

[0036] In addition, in this embodiment, while providing the circuit shown in the case main body 1a at FIG. 3, it does not illustrate, but the timepiece circuit unit for displaying time on the said time display part is incorporated in the lid|cover 1b side.

Portable body fat measuring apparatus, JP PAT APP 2001438 [ A (MA1) ( 1999)

[0037] In this Embodiment concerning the above structure, the to-be-measured person mounts|wears one arm by these belts 16 and 17 usually (when seeing time information etc.), and makes it the state which closed the lid|cover 1b at that time. Thereby, the time display part arrange|positioned on the surface of the lid| cover 1b is located in an upper surface, and can use it as a normal wristwatch. And when performing a body fat measurement, the lid|cover 1b is opened above by predetermined angle, and it is made to stand up, as shown to Fig.7 (a). Then, the sensor 55 detects that the lid|cover 1b became open above by predetermined angle, this detection signal is output to CPU10, and CPU10 is automatically switched to measurement mode from a time display mode. Therefore, the process after step S2 is performed in the flowchart shown in FIG. 4, and BMI and a body fat ratio are displayed.

[0038] Moreover, according to this Embodiment, since the electrodes 2 and 3 can be arrange|positioned using the whole surface of the case main body 1a, the electrodes 2 and 3 can be made large sized and a measurement precision can be raised. Moreover, while being able to prevent the stain|pollution|contamination of the electrodes 2 and 3 and being able to suppress generation|occurence| production of the error in the time of a measurement by closing the lid|cover 1b at the time of non-measuring, the electrodes 2 and 3 are concealed and it becomes advantageous also in design. Furthermore, when the lid|cover 1b is opened, it can be made to be able to transfer to measurement mode automatically, a measurement can be started smoothly by this, and a fat rate can be measured more easily and quickly.

[0039] To the case main body 1b side, by furthermore, the thing made to equip with the timepiece circuit unit (not shown) the circuit [ which was shown in FIG. 3 ], and lid|cover 1b side, respectively, For example, the so-called and shielding effect which make hard to receive influence of the noise to the timepiece circuit unit by the high frequency voltage or the high frequency current generate|occur| produced in an electric current generator circuit (the oscillation circuit 15 and the V/I circuit 14) are also expectable.

[0040] Moreover, according to the said 1st Embodiment and 2nd Embodiment, the troublesomeness that the to-be-measured person has to make the preparations which take out a measuring apparatus specially for a body fat measurement, or both hands must be made into a free state can be eliminated, Therefore A body fat measurement is attained easily [ always ].

[0041] (3rd Embodiment) FIG. 8 shows the 3rd Embodiment of this invention, This body fat measuring apparatus is comprised by a pair of belts 16 and 17 latched like 1st Embodiment by the side part which the case 110 and this case 110 mutually oppose, and the display part 4 is arrange|positioned at the surface side of the case 110. However, Unlike 1st Embodiment, the key input parts 53 and 54 provided in the one side part of the case 110 serve as the electrodes 2 and 6 for high frequency current outputs, The key input parts 51 and 52 provided in the other side part serve as the electrodes 3 and 7 for voltage detection.

[0042] In this Embodiment concerning the above structure, when performing a body fat measurement while displaying a direction as the vertical direction at 6 [ 12 to ]:00 so that it may illustrate to Fig.8 (a), when displaying the present time normally, this body fat measuring apparatus is removed from an arm, For example, as it pinches|interposes by the left thumb|big_toe 601 and the index finger 602, the key input parts 51 and 53 are pressed so that it may illustrate in FIG.8(b), As it pinches|interposes by the right thumb|big_toe 701 and the index finger 702, the key input parts 52 and 54 are pressed. Thereby, a left hand contacts the electrode 2 for high frequency current outputs, and the electrode 3

for voltage detection, and a right hand contacts the electrode 6 for high frequency current outputs, and the electrode 7 for voltage detection. As a result, as shown in FIG. 3, the electrodes 2 and 6 for high frequency current outputs will be in the electrodes 3 and 7 for voltage detection, and the conduct|electrically_connected state through a human body.

[0043] Moreover, when it does in this way and the key input parts 51-54 are pressed with both hands, these four key input parts 51-54 will be in the state of a simultaneous pushing. Then, the full-simultaneous pushing of the key input parts 51-54 is detected, and CPU10 sets a direction to a vertical direction (direction at 3:00. on) display at 9 [ three to ]:00, and switches the display part 4 to measurement mode automatically. Therefore, the process after step S2 is performed in the flowchart shown in FIG. 4, and BMI and a body fat ratio are displayed.

[0044] In this case, the display part 4 is comprised by a dot matrix liquid crystal, In the said 1st, 2nd embodiment, the content corresponding to a measurement result is selected in [ four steps of ] these as a substitute of the character of "thinness|emaciation" "normal" "the light obesity" currently printed on the display part 4, and "obesity", It is made to make it display on the display part 4.

[0045] Moreover, according to this Embodiment, it is not necessary to arrange| position several electrode 2, 3, 6, 7 separately to case 110 itself, From this, while it is design-wise and spatially advantageous, it is combining with the key input parts 51-54, Therefore At the time of a full-simultaneous pushing, it transfers to measurement mode automatically, And the measurement of a body fat ratio can be started as it is, and a body fat ratio can be measured much more easily and quickly.

[0046] Moreover, in the case of this 3rd Embodiment, you may arrange|position electrode 2, 3, 6, 7 corresponding to the each of key input part 51, 52, 53, 54.

[0047] (4th Embodiment) FIGS. 9-13 shows the 4th Embodiment of this invention, and is a wristwatch-type body fat measuring apparatus. WHEREIN: It enables it to perform an exact measurement easily, without being contrary to the measurement principle. Namely, in the body fat measurement using 4 terminal electrodes method, It is required to make each electrode contact the skin of a human body so that the loop which goes through via the human body formed with a pair of electrode for an output for outputting the high frequency current may become larger than the loop which goes through via the human body formed with a pair of electrode for a detection for detecting a voltage. However, For example, in the arrangement configuration of the electrodes 6 and 7 shown in FIG.1(b), when a left wrist is mounted|worn, in a hand side, the electrode 6 becomes a hand side with the electrode 7 near [ this ] a fuselage|body, When a right hand is mounted|worn, conversely, the electrode 6 becomes a hand side and the electrode 7 is on a hand side. Therefore, supposing the electrode 6 is an object for a high frequency output, when a left hand is mounted|worn, the loop which goes through via the human body formed with a pair of electrode for an output for outputting the high frequency current becomes larger than the loop which goes through via the human body formed with a pair of electrode for a detection for detecting a voltage, However, When a right hand is mounted|worn, it does not become so, but an exact measurement becomes difficult.

[0048] Therefore, it becomes the important requirements for carrying out possible [ of the exact measurement ] whether the arm of either right or left is mounted|worn with said apparatus. Then, in this Embodiment, the mounting| wearing arm of said apparatus is identified by [ of the electrocardiogram 1st induction|guidance|derivation induced|guided|derived from right-and-left both

Exhibit 24
-1089-

arms / characteristic / of a QRST waveform ] determining especially the polarity of the R wave, Let the role of four electrodes, i.e., any electrode, be a pair of electrode for an output for outputting the high frequency current according to this specific result, It is determined whether it is set as a pair of electrode for a detection for detecting a voltage.

[0049] Hereafter, embodiment of this invention is described according to figures. As shown in FIG. 9, the body fat measuring apparatus concerning this Embodiment is the same external structure as 1st Embodiment mentioned above, Comprising: It is comprised by a pair of belts 16 and 17 latched by the side part which the case 120 and this case 120 mutually oppose. The other both sides which the case 120 mutually opposes are provided with key input part 51, 52, 53, 54. As shown in the surface side of the case 120 in the figure (a), the display part 4 which turns into a center part from LCD is arrange|positioned, and a pair of electrodes 2 and 3 are arrange|positioned right and left at belt 17 side|approaching, This pair of electrodes 2 and 3 are mutually insulated by having an appropriate space|interval and arrange|positioning. Moreover, as shown to the back surface side of the case 120 in the figure (b), a pair of electrodes 6 and 7 are arrange|positioned by right and left, It insulates mutually by this pair of electrodes 6 and 7 also having an appropriate space|interval, and arrange|positioning them.

[0050] FIG. 10 is a circuit diagram which shows the detail of the electrode vicinity in the circuit of the body fat measuring apparatus concerning this Embodiment arrange|positioned in the case 120. That is, the differential amplifier circuit 18 (it shows in below-mentioned FIG. 11 for details), and the said V / I circuit 14 are connected to the input port of CPU10 shown in FIG. 3, The switch control circuits 19 and 20 are connected to the output port of CPU10. The switch control circuit 19 controls switch SW1, SW2, SW5 and SW6, and the switch control circuit 20 controls switch SW3, SW4, SW7, and SW8.

[0051] And while the movable terminal of the switches SW1 and SW3 and the movable terminal of SW2 and SW4 are connected, the movable terminal of SW5 is connected to the electrode 3, the movable terminal of SW6 is connected to the electrode 7, and the movable terminal of SW7 and SW8 is respectively connected to the input part of the said signal amplifier 11. In addition, as shown in FIG. 3, the signal amplifier 11 is connected to the advancing integrator 12.

[0052] Moreover, switch SW1 has the fix terminal C1 connected to the V/I circuit 14, and the differential amplifier circuit 18 and the fix terminal C2 connected to the fix terminal C9 of switch SW5, Switch SW2 has the fix terminal C3 connected to the V/I circuit 14, and the fix terminal C4 connected to the differential amplifier circuit 18. Switch SW3 has the fix terminal C5 connected with the electrode 3 between the switches SW5, and the fix terminal C6 connected to the electrode 2, Switch SW4 has the fix terminal C7 connected to the electrode 6, and the fix terminal C8 connected with the electrode 7 between the switches SW6. Switch SW5 has the fix terminal C9 connected to the fix terminal C2 of said switch SW1, and the fix terminal C10 connected to the fix terminal C14 of switch SW7, Switch SW6 has the fix terminal C11 connected to the fix terminal C15 of switch SW8, and the fix terminal C12 connected to the differential amplifier circuit 18. Switch SW7 has the fix terminal C6 of said switch SW1, the fix terminal C13 connected between the electrodes 2, and the fix terminal C14 connected to the fix terminal C10 of switch SW5, Switch SW8 is with the fix terminal C15 connected to the fix terminal C11 of switch SW6, It has the fix terminal 7 of said switch SW4, and the fix terminal C16 connected between the electrodes 6.

[0053] FIG. 11 is a circuit diagram which shows the detail of the said differential amplifier circuit 18, and is comprised with the differential amplifiers 181, 182, and 183 and the signal amplifier 184. The electrode 2 or the electrode 3 is connected

to one input terminal of the differential amplifier 181 according to the state of said switch SW1, SW3, and SW5, and the electrode 7 is connected to one input terminal of the differential amplifier 182 at it according to the state of said switch SW6. The electrode 6 is connected to the other input terminal of the differential amplifiers 181 and 182 according to the state of the switches SW and SW4. Moreover, while the output terminal of the differential amplifiers 181 and 182 is connected to the input terminal of the differential amplifier 183, the output terminal of the differential amplifier 183 is connected to the input terminal of the signal amplifier 184, It is comprised so that the output from this signal amplifier 184 may be given to CPU10.

[0054] In this Embodiment concerning the above structure, the to-be-measured person mounts|wears one arm by these belts 16 and 17. Thereby, the electrodes 6 and 7 of a back surface side contact the skin of one arm of a to-be-measured person. And when performing a body fat measurement, after performing predetermined key operation and setting body fat measurement mode, the other fingers are made to contact the electrodes 2 and 3 of surface side. Thereby, as shown in FIG. 10, the electrodes 2 and 6 will be in the electrodes 3 and 7 and the conduct|electrically_connected state through a human body.

[0055] On the other hand, when body fat measurement mode is set, CPU10 will start an operation|movement according to the flowchart shown in FIG. 12 based on the program stored in ROM9, The last measurement data in a work area is initialized (step S11). Next, from RAM8, each data of the said user's body height, a body weight, age, sex, etc. is read one by one (step S12), and a BMI index| exponent is computed based on this body weight and body height that were read (step S13).

[0056] So that it may be in switch SW1, SW2, SW5 and the state which the movable contact of SW6 connected with the stationary contact C2, C4, C9, and C12 respectively after an appropriate time. While controlling the switch control circuit 19 (step S14), the switch control circuit 20 is controlled so that the movable contact of switch SW3 and SW4 will be in the stationary contact C6 and the state linked to C7 respectively (step S15). Thereby, the electrodes 2 and 3 arrange| positioned at surface side short-circuit temporarily, The electrode 7 acts as an induction|dielectric electrode for an electrocardio wave detection among the electrodes 6 and 7 arrange|positioned at the back surface side, The electrode 6 acts as a common electrode for the electrocardio wave detection of said apparatus, respectively.

[0057] In order to obtain a 1st induction|guidance|derivation electrocardio wave by such electrode arrangement|positioning, as shown in FIG. 11, by the differential amplifier circuit 18, it considers that the electrode 6 is the common level or reference|standard of a signal, and the electric potential of the electrode 2 (3) is obtained. Simultaneously, while obtaining the electric potential of the electrode 7, the electrical potential difference of the electrode 2 (3) and the electrode 7 is obtained. Thus, since the obtained electrical potential difference is about several millivolts strength, in order to make it easy to detect, it is amplified with the signal amplifier 184 and supplied to CPU10.

[0058] Thereby, CPU10 can obtain the 1st induction|guidance|derivation electrocardio wave in which a characteristic QRST waveform is included as shown to Fig.13 (a) or (b). So, in following step S16, it is judged whether the R wave judged [ whether the electrode 2 and 3 ↓ electrocardio wave could be detected and ] especially by following step S18 could be detected (step S16). And when it cannot detect, an error display is performed to the display part 4 (step S17), and it continues until it progresses to step S10 of FIG.4 and goes through this error display for a fixed time.

Exhibit 24
-1091-

Portable body fat measuring apparatus, JP PAT APP 2001142602 A (MA1) (1999)

[0059] Moreover, if an electrocardio wave, especially the R wave can be detected, the polarity of the R wave will be judged (step S18) and it will be identified whether the thorn-like signal of the R wave is which a positive/negative direction (step S19). That is, in the arm which carried out said apparatus mounting|wearing, that polarity reverse|inverts the thorn-like signal of this R wave by either right or left, When a signal is detected mounting|wearing a left wrist with said apparatus and making a right-hand finger|toe contact the electrode 2 (3), as shown to Fig.13 (a), the R wave becomes a negative thorn-like signal. Moreover, when a signal is detected mounting|wearing a right wrist with said apparatus conversely, and making a left-hand finger|toe contact the electrode 2 (3), as shown to the figure (b), the R wave becomes a positive thorn-like signal.

[0060] Therefore, when the thorn-like signal of the R wave is a negative direction as a result of discrimination|determination by step S19, it is a case where the left wrist was mounted|worn with the body fat measuring apparatus concerning this Embodiment, and a right-hand finger|toe describes the electrodes 2 and 3. In this case, the switch control circuit 19 is controlled to be in switch SW1, SW2, SW5 and the state which the movable contact of SW6 connected with the stationary contact C1, C3, C10, and C11 respectively (step S20). Furthermore, the switch control circuit 20 is controlled to be in switch SW3, SW4, SW7 and the state which the movable contact of SW8 connected with the stationary contact C6, C7, C14, and C15 respectively (step S21). Thereby, the electrode 2 and the electrode 6 are set as an electrode for high frequency current outputs, and the electrode 3 and the electrode 7 are set as an electrode for voltage detection (step S22).

[0061] In a hand side with the electrode 6 (electrode made into high frequency current outputs) far from a fuselage|body, at this time, the electrode 7 (electrode made into voltage detection) becomes a hand side near [ this ] a fuselage|body in the state which mounted|wore the left wrist with this body fat measuring apparatus as mentioned above. Moreover, a right-hand 2nd finger|toe describes the electrode 3, And when a 3rd finger|toe longer than a 2nd finger|toe describes the electrode 2, the electrode 2 (electrode made into high frequency current outputs) will consist of fuselage|bodies a side with the long distance and the electrode 3 (electrode made into voltage detection) near [ this ] a fuselage|body. Therefore, the loop which goes through via the human body formed with a pair of electrodes 2 and 6 for outputting the high frequency current becomes larger than the loop which goes through via the human body formed with a pair of electrodes 3 and 7 for detecting a voltage. therefore, the thing for which a measurement is started in this state --- (step S23) --- body fat can be measured correctly.

[0062] On the other hand, when the thorn-like signal of the R wave is the normal| positive direction as a result of discrimination|determination by step S19, it is a case where the right wrist was mounted|worn with the body fat measuring apparatus concerning this Embodiment, and a left-hand finger|toe describes the electrodes 2 and 3. In this case, the switch control circuit 19 is controlled to be in switch SW1, SW2, SW5 and the state which the movable contact of SW6 connected with the stationary contact C1, C3, C10, and C11 respectively like above-mentioned step S20 (step S24). Furthermore, the switch control circuit 20 is controlled to be in switch SW3, SW4, SW7 and the state which the movable contact of SW8 connected with the stationary contact C5, C8, C13, and C16 respectively (step S25). Thereby, the electrode 3 and the electrode 7 are used as the electrode for high frequency current outputs, and the electrode 2 and the electrode 6 are set as an electrode for voltage detection (step S26).

[0063] In a hand side with the electrode 7 (electrode made into high frequency current outputs) far from a fuselage|body, at this time, the electrode 6 (electrode made into voltage detection) becomes a hand side near [ this ] a fuselage|body

Exhibit 24
-1092-

Portable body fat measuring apparatus, JP PAT APP 2001/189202 A (MA??) (1999)

in the state which mounted|wore the right wrist with this body fat measuring apparatus as mentioned above. Moreover, a right-hand 2nd finger|toe describes the electrode 2, And when a 3rd finger|toe longer than a 2nd finger|toe describes the electrode 3, the electrode 3 (electrode made into high frequency current outputs) will consist of fuselage|bodies a side with the long distance and the electrode 2 (electrode made into voltage detection) near [ this ] a fuselage|body. Therefore, the loop which goes through via the human body formed with a pair of electrodes 3 and 7 for outputting the high frequency current becomes larger than the loop which goes through via the human body formed with a pair of electrodes 2 and 6 for detecting a voltage. therefore, the thing for which a measurement is started in this state -- (step S23) -- body fat can be measured correctly.

[0064] (5th Embodiment) FIGS. 14-17 shows the 5th Embodiment of this invention. As shown in FIG. 14, the body fat measuring apparatus concerning this Embodiment is also the same external structure as a wristwatch, Comprising: It is comprised by a pair of belts 16 and 17 latched by the side part which the case 130 and this case 130 mutually oppose. The other both sides which the case 130 mutually opposes are provided with key input part 51, 52, 53, 54. The display part 4 which becomes the surface side of the case 130 from LCD in the center part is arrange|positioned, the electrodes 22 and 1 are respectively arrange|positioned at both the corners of belt 16 side|approaching ranging from the surface part to a side part, and the electrodes 31 and 32 are respectively arrange|positioned at both the corners of belt 17 side|approaching ranging from the surface part to a side part. These electrodes 21, 22, 31, 32 is insulated mutually. Moreover, a pair of electrodes 61 and 71 are arrange|positioned by the back surface side of the case 130 at right and left, It insulates mutually by this pair of electrodes 61 and 71 also having an appropriate space|interval, and arrange|positioning them.

[0065] FIG. 15 is a block diagram which shows the structure of the circuit of the body fat measuring apparatus concerning this Embodiment arrange|positioned in the case 130. As shown in this block diagram, the V/I circuit 14 is connected to the said electrodes 6, 21, and 22 through the switch switching control circuit 30. The said electrodes 7, 31, and 32 are connected to the signal amplifier 11 which includes a filter through the switch switching control circuit 34, and both the switch switching control circuits 30 and 34 are connected mutually. These switch switching control circuits 30 and 34 are comprised by LSI chips etc. by which soft control is carried out, such as a gate, and as shown to the flowchart later mentioned with the control signal from CPU10, they carry out a switching operation|movement. Moreover, it is comprised so that the detection voltage in the electrodes 31 and 32 may be inputted into CPU10 from the switch switching control circuit 34. In addition, it is the same as that of embodiment shown in FIG. 3 mentioned above to provide the other circuit structure 15, i.e., an oscillation circuit, the advancing integrator 12, A/D converter 13, RAM8, ROM9 and the display part 4, and the key input parts 51-54.

[0066] In this Embodiment concerning the above structure, the to-be-measured person mounts|wears one arm by these belts 16 and 17. Thereby, the electrodes 61 and 71 of a back surface side contact the skin of one arm of a to-be-measured person. And when performing a body fat measurement, predetermined key operation is performed and body fat measurement mode is set. Then, based on the program stored in ROM9, CPU10 starts an operation|movement according to the flowchart shown in FIG. 16, and initializes the last measurement data in a work area (step S11). Next, from RAM8, each data of the said user's body height, a body weight, age, sex, etc. is read one by one (step S12), and a BMI index| exponent is computed based on this body weight and body height that were read (step S13).

Exhibit 24
-1093-

[0067] After an appropriate time, both the switch switching control circuits 30 and 34 are controlled, the electrodes 6 and 7 are connected to the V/I circuit 14, and the high frequency current is output in these electrodes 6 and 7 (step S35). Next, the switching control circuit 34 is controlled, the electrodes 31 and 32 are connected to the signal amplifier 11, and it is judged whether the voltage was detected in any one of these electrodes 31 and 32 (step S35). And when a voltage is not detected in any of the electrodes 31 and 32, an error display is performed to the display part 4 (step S36), and it continues until it progresses to step S10 of FIG.4 and goes through this error display for a fixed time.

[0068] Moreover, when a voltage is detected in any one of the electrodes 31 and 32 by step S35, it is judged any of the electrode 31 and the electrode 32 it is that the normal signal was detected (step S37). That is, in the body fat measuring apparatus applied to this Embodiment as mentioned above, the electrodes 22 and 21 are arrange|positioned respectively at both the corners of belt 16 side| approaching of the case 130, and the electrodes 31 and 32 are arrange|positioned respectively at both the corners of belt 17 side|approaching. Therefore, as shown to Fig.17 (a), the left wrist 61 is mounted|worn with said apparatus, When making the right hand 70 contact a pair of electrode, while making the right-hand 1st finger|toe 701 contact the electrode 31 like illustration, the right-hand 2nd finger| toe 702 is made to contact the electrode 21 on a diagonal. It is with the right-hand 1st finger|toe 701 and the right-hand 2nd finger|toe 702, and it is a natural contact form to insert|pinch the electrodes 31 and 21.

[0069] Therefore, if it is the electrode 31 that the normal signal was detected as a result of judgment by step S37, as shown to Fig.17 (a), the left wrist 61 will be mounted|worn with said apparatus, While making the right-hand 1st finger|toe 701 contact the electrode 31, the right-hand 2nd finger|toe 702 can be regarded as the natural and appropriate contact form made to contact the electrode 21 on a diagonal being formed. And both the switch switching control circuits 30 and 34 are controlled in this case, Let the electrode 21 and the electrode 6 be the electrodes for high frequency current outputs, And the measurement calculation of body fat is performed by using the electrode 31 and the electrode 7 as the electrode for voltage detection (step S38).

[0070] In a hand side with the electrode 6 far from a fuselage|body which made this body fat measuring apparatus high frequency current outputs like the above in the state with which the left wrist 61 was mounted|worn, at this time, the electrode 7 made into voltage detection becomes a hand side near [ this ] a fuselage|body. Moreover, the right-hand 1st finger|toe 701 describes the electrode 31, And when the 2nd finger|toe 702 longer than a 1st finger|toe describes the electrode 21, the electrode 31 which the electrode 21 made into high frequency current outputs made a long distance and voltage detection from the fuselage| body will become the side near [ this ] a fuselage|body. Therefore, the loop which goes through via the human body formed with a pair of electrodes 21 and 6 for outputting the high frequency current becomes larger than the loop which goes through via the human body formed with a pair of electrodes 31 and 7 for detecting a voltage. Therefore, body fat can be correctly measured by performing a measurement calculation in this state.

[0071] On the other hand, if it is the electrode 32 that the normal signal was detected as a result of discrimination|determination by step S37, as shown in FIG.17(b), the right wrist 71 will be mounted|worn with said apparatus, While making the 1st finger|toe 601 of the left hand 60 contact the electrode 32, the 2nd finger|toe 602 can be regarded as the natural and appropriate contact form made to contact the electrode 22 on a diagonal being formed. And both the switch switching control circuits 30 and 34 are controlled in this case, Let the electrode 22 and the electrode 7 be the electrodes for high frequency current outputs, And

the measurement calculation of body fat is performed by using the electrode 32 and the electrode 6 as the electrode for voltage detection (step S39).

[0072] In a hand side with the electrode 7 far from a fuselage|body which made this body fat measuring apparatus high frequency current outputs like the above in the state with which the right wrist was mounted|worn, at this time, the electrode 6 made into voltage detection becomes a hand side near [ this ] a fuselage|body. Moreover, the left-hand 1st finger|toe 601 describes the electrode 32, And when the 2nd finger|toe 602 longer than a 1st finger|toe describes the electrode 22, the electrode 32 which the electrode 32 made into high frequency current outputs made a long distance and voltage detection from the fuselage|body will become the side near [ this ] a fuselage|body. Therefore, the loop which goes through via the human body formed with a pair of electrodes 22 and 7 for outputting the high frequency current becomes larger than the loop which goes through via the human body formed with a pair of electrodes 32 and 6 for detecting a voltage. Therefore, body fat can be correctly measured by performing a measurement calculation in this state.

[0073] (Modification of 5th Embodiment) FIG.18 and FIG.19 shows the modification of the 5th Embodiment of this invention, A to-be-measured person mounts one arm by the belts 16 and 17, When body fat measurement mode is set, CPU10 will start an operation|movement according to the flowchart shown in FIG. 18 based on the program stored in ROM9. This flowchart WHEREIN: The process of step S11 - S13, step S34, and step S36 is the same as that of the flowchart shown in FIG. 16. And the switching control circuit 34 is controlled by step S45 following step S34, and the electrodes 21 and 22 are connected to the signal amplifier 11 by it, It is judged whether the voltage was detected in any one of these electrodes 21 and 22 (step S45). And when a voltage is not detected in any of the electrodes 21 and 22, an error display is performed to the display part 4 (step S36), and it continues until it progresses to step S10 of FIG.4 and goes through this error display for a fixed time.

[0074] Moreover, when a voltage is detected in any one of the electrodes 21 and 22 by step S45, it is judged any of the electrode 21 and the electrode 22 it is that the normal signal was detected (step S47). That is, in this Embodiment, when the left wrist 61 is mounted|worn with said apparatus, while making the right-hand 2nd finger|toe 72 contact the electrode 22 as shown to Fig.19 (a), making the right-hand 3rd finger|toe 73 contact the electrode 32 on a diagonal presupposes that it is an appropriate contact form.

[0075] Therefore, if it is the electrode 22 that the normal signal was detected as a result of judgment by step S47, as shown to Fig.19 (a), the left wrist 61 will be mounted|worn with said apparatus, While making the right-hand 2nd finger|toe 72 contact the electrode 22, the right-hand 3rd finger|toe 73 is made to contact the electrode 32 on a diagonal. It can be considered that the appropriate contact form is formed. And both the switch switching control circuits 30 and 34 are controlled in this case, Let the electrodes 32 and the electrode 6 be the electrodes for high frequency current outputs, And the measurement calculation of body fat is performed by using the electrode 22 and the electrode 7 as the electrode for voltage detection (step S48).

[0076] In a hand side with the electrode 6 far from a fuselage|body which made this body fat measuring apparatus high frequency current outputs like the above in the state with which the left wrist 61 was mounted|worn, at this time, the electrode 7 made into voltage detection becomes a hand side near [ this ] a fuselage|body. Moreover, the right-hand 2nd finger|toe 72 describes the electrode 22, And when the 3rd finger|toe 73 longer than a 2nd finger|toe describes the electrode 32, the electrode 22 which the electrode 32 made into high frequency

Exhibit 24
-1095-

Portable body fat measuring apparatus, JP PAT APP 2001142607 A (MAT) (1999)

current outputs made a long distance and voltage detection from the fuselage| body will become the side near [ this ] a fuselage|body. Therefore, the loop which goes through via the human body formed with a pair of electrodes 32 and 6 for outputting the high frequency current becomes larger than the loop which goes through via the human body formed with a pair of electrodes 22 and 7 for detecting a voltage. Therefore, body fat can be correctly measured by performing a measurement calculation in this state.

[0077] Moreover, in this Embodiment, when the right wrist 71 is mounted|worn with said apparatus, while making the left-hand 2nd finger|toe 62 contact the electrode 21 as shown in FIG.19(b), making the left-hand 3rd finger|toe 63 contact the electrode 31 on a diagonal presupposes that it is an appropriate contact form. Therefore, if it is the electrode 21 that the normal signal was detected as a result of discrimination|determination by step S47, it can be considered that the appropriate contact form shown in FIG.19(b) is formed. And both the switch switching control circuits 30 and 34 are controlled in this case, Let the electrode 31 and the electrode 7 be the electrodes for high frequency current outputs, And the measurement calculation of body fat is performed by using the electrode 21 and the electrode 6 as the electrode for voltage detection (step S49).

[0078] In a hand side with the electrode 6 far from a fuselage|body which made this body fat measuring apparatus high frequency current outputs like the above in the state with which the left wrist 61 was mounted|worn, at this time, the electrode 7 made into voltage detection becomes a hand side near [ this ] a fuselage|body. Moreover, the left-hand 2nd finger|toe 62 describes the electrode 21, And when the 3rd finger|toe 63 longer than a 2nd finger|toe describes the electrode 31, the electrode 21 which the electrode 31 made into high frequency current outputs made a long distance and voltage detection from the fuselage| body will become the side near [ this ] a fuselage|body. Therefore, the loop which goes through via the human body formed with a pair of electrodes 31 and 7 for outputting the high frequency current becomes larger than the loop which goes through via the human body formed with a pair of electrodes 21 and 6 for detecting a voltage. Therefore, body fat can be correctly measured by performing a measurement calculation in this state.

[0079] (6th Embodiment) FIGS. 20-23 shows the 6th Embodiment of this invention. As shown in FIG. 20, the body fat measuring apparatus concerning this Embodiment is also the same external structure as a wristwatch, Comprising: It is comprised by a pair of belts 16 and 17 latched by the side part which the case 140 and this case 140 mutually oppose. The other both sides which the case 140 mutually opposes are provided with key input part 51, 52, 53, 54. At the surface side of the case 140, the display part 4 which consists of LCDs is arrange|positioned, and the center part is mounted|worn with the bezel 40 at the circumference so that rotation is possible. The electrode 23 and the electrode 33 are provided in belt 16 edge part and belt 17 edge part which the bezel 40 mutually opposes, These electrodes 23 and 33 are insulated mutually. Moreover, the same electrodes 6 and 7 of a pair of as embodiment shown to the back surface side of the case 140 at FIG. 9 are arrange|positioned by right and left, It insulates mutually by this pair of electrodes 6 and 7 also having an appropriate space| interval, and arrange|positioning them.

[0080] FIG. 21 is a block diagram which shows the structure of the circuit of the body fat measuring apparatus concerning this Embodiment arrange|positioned in the case 140. As shown in this block diagram, the V/I circuit 14 is connected to the said electrodes 6 and 23 through the switch switching control circuit 90. The said electrodes 7 and 33 are connected to the signal amplifier 11 which includes a filter through the switch switching control circuit 91, and both the switch switching control circuits 90 and 91 are connected mutually. These switch

Exhibit 24
-1096-

switching control circuits 90 and 91 are comprised with chip|tips by which soft control is carried out, such as a gate, like the switch switching control circuits 30 and 34 shown in FIG. 15, and as shown to the flowchart later mentioned with the control signal from CPU10, they carry out a switching operation|movement. The bezel rotation direction detection part 92 detects the rotation direction of the bezel 40, and outputs it to CPU10, The rotation direction of the bezel 40 makes a clockwise rotation a negative (- (alpha)) direction here, as shown to Fig.22 (a), Anti-clockwise is made into the right ((alpha)) direction as shown to the figure (b). In addition, it is the same as that of embodiment shown in FIG. 3 mentioned above to provide the other circuit structure 15, i.e., an oscillation circuit, the advancing integrator 12, A/D converter 13, RAM8, ROM9 and the display part 4, and the key input parts 51-54.

[0081] In this Embodiment concerning the above structure, the to-be-measured person mounts|wears one arm by these belts 16 and 17. Thereby, the electrodes 6 and 7 of a back surface side contact the skin of one arm of a to-be-measured person. And when performing a body fat measurement, predetermined key operation is performed and body fat measurement mode is set. Then, based on the program stored in ROM9, CPU10 starts an operation|movement according to the flowchart shown in FIG. 23, and initializes the last measurement data in a work area (step S11). Next, from RAM8, each data of the said user's body height, a body weight, age, sex, etc. is read one by one (step S12), and a BMI index| exponent is computed based on this body weight and body height that were read (step S13).

[0082] Next, an internal timer is started (step S54) and it is judged whether rotation of the bezel 40 was detected by after an appropriate time (step S55). It continues until it performs an error display to the display part 4 (step S57), it progresses to step S10 of FIG.4 and it goes through this error display for a fixed time, when it judges whether it was that the deadline of is passed when rotation of the bezel 40 was not detected (step S56) and is that the deadline of is passed.

[0083] At this time, a to-be-measured person mounts|wears a left arm with this body fat measuring apparatus, While making the right-hand 1st finger|toe 701 contact one electrode 33 of the bezel 40 in this Embodiment similarly with having shown to Fig.17 (a), the right-hand 2nd finger|toe 702 is made to contact the other electrode 23. With the right-hand 1st finger|toe 701 and the right-hand 2nd finger|toe 702, inserting|pinching the electrodes 33 and 23 presupposes that it is an appropriate contact form. And when both arms are extend|stretched in this state, the angle of an arm will change, As shown to Fig.22 (a), the right hand which inserted|pinched the electrodes 33 and 23 with the 1st finger|toe 701 and the right-hand 2nd finger|toe 702 operate|moves naturally so that a negative direction (-(alpha)) may be made to rotate the bezel 40.

[0084] Therefore, a left wrist will be mounted|worn with said apparatus, if rotation of the bezel 40 is detected by step S55 and it becomes clear that the rotation direction is a negative (- (alpha)) direction in step S58. While making the right-hand 1st finger|toe 701 contact the electrode 33, it can be regarded as the thing which made the right-hand 2nd finger|toe 702 contact the electrode 23 and which extend|stretched the arm with the appropriate contact form. And both the switch switching control circuits 90 and 91 are controlled in this case, Let the electrode 23 and the electrode 6 be the electrodes for high frequency current outputs, And the measurement calculation of body fat is performed by using the electrode 33 and the electrode 7 as the electrode for voltage detection (step S59).

[0085] In a hand side with the electrode 6 far from a fuselage|body which made this body fat measuring apparatus high frequency current outputs like the above in the state with which the left wrist was mounted|worn, at this time, the electrode

Exhibit 24
-1097-

Portable body fat measuring apparatus, JP PAT APP 09141480, A (MAT) (1995)

7 made into voltage detection becomes a hand side near [ this ] a fuselage|body. Moreover, the right-hand 1st finger|toe 701 describes the electrode 33, And when the 2nd finger|toe 702 longer than a 1st finger|toe describes the electrode 23, the electrode 33 which the electrode 23 made into high frequency current outputs made a long distance and voltage detection from the fuselage|body will become the side near [ this ] a fuselage|body. Therefore, the loop which goes through via the human body formed with a pair of electrodes 23 and 6 for outputting the high frequency current becomes larger than the loop which goes through via the human body formed with a pair of electrodes 33 and 7 for detecting a voltage. Therefore, since a measurement is made|formed in the state which could measure body fat correctly and also extend|stretched both arms by performing a measurement calculation in this state, a measured value can be made more exact.

[0086] On the other hand, a right wrist will be mounted|worn with said apparatus, if the rotation direction of the bezel 40 is a right ((alpha)) direction as a result of discrimination|determination by step S58 as shown in FIG.22(b), While making the left-hand 1st finger|toe 601 contact one electrode 33 of the bezel 40 in this Embodiment similarly with having shown in FIG.17(b), it can be regarded as the thing which made the left-hand 2nd finger|toe 702 contact the electrode 23 and which extend|stretched the arm with the appropriate contact form. And both the switch switching control circuits 90 and 91 are controlled in this case, Let the electrode 23 and the electrode 7 be the electrodes for high frequency current outputs, And the measurement calculation of body fat is performed by using the electrode 33 and the electrode 6 as the electrode for voltage detection (step S60).

[0087] In a hand side with the electrode 7 far from a fuselage|body which made this body fat measuring apparatus high frequency current outputs like the above in the state with which the right wrist was mounted|worn, at this time, the electrode 6 made into voltage detection becomes a hand side near [ this ] a fuselage|body. Moreover, the left-hand 1st finger|toe 601 describes the electrode 33, And when the 2nd finger|toe 602 longer than a 1st finger|toe describes the electrode 23, the electrode 33 which the electrode 23 made into high frequency current outputs made a long distance and voltage detection from the fuselage| body will become the side near [ this ] a fuselage|body. Therefore, the loop which goes through via the human body formed with a pair of electrodes 23 and 7 for outputting the high frequency current becomes larger than the loop which goes through via the human body formed with a pair of electrodes 33 and 6 for detecting a voltage. Therefore, since a measurement is made|formed in the state which could measure body fat correctly and also extend|stretched both arms by performing a measurement calculation in this state, a measured value can be made more exact.

[0088] (7th Embodiment) FIGS. 24-26 shows the 7th Embodiment of this invention. As shown in FIG. 24, the electrode 23 and the electrode 33 which were insulated mutually are arranged in parallel at the belt 17 side of the bezel 40, and the structure of those other than this is the same as that of 6th Embodiment mentioned above. Moreover, the state which the bezel 40 showed in FIG. 24 is an initial state, Comprising: +/-90degree rotation is respectively possible in the right ((beta)) direction which is shown to Fig.25 (a) and which is anti-clockwise, and the negative (- (beta)) direction which is clockwise rotations shown to the figure (b). And when the bezels 40 are 45<=(beta)<=90 degrees and -45 <=-(beta)<=-90, the said bezel rotation direction detection part 40 is comprised so that rotation of the bezel 40 may be detected.

[0089] In this Embodiment concerning the above structure, the to-be-measured person mounts|wears one arm by these belts 16 and 17. Thereby, the electrodes 6 and 7 of a back surface side contact the skin of one arm of a to-be-measured

Portable body fat measuring apparatus, JP PAT APP 2003211242 A (MAT) (1999)

person. And when performing a body fat measurement, predetermined key operation is performed and body fat measurement mode is set. Then, based on the program stored in ROM9, CPU10 starts an operation|movement according to the flowchart shown in FIG. 26, and initializes the last measurement data in a work area (step S51). Next, from RAM8, each data of the said user's body height, a body weight, age, sex, etc. is read one by one (step S52), and a BMI index| exponent is computed based on this body weight and body height that were read (step S53).

[0090] Next, an internal timer is started (step S54) and it is judged whether rotation of the bezel 40 was detected by after an appropriate time (step S55). It continues until it performs an error display to the display part 4 (step S57), it progresses to step S50 of FIG.4 and it goes through this error display for a fixed time, when it judges whether it was that the deadline of is passed when rotation of the bezel 40 was not detected (step S56) and is that the deadline of is passed.

[0091] At this time, a to-be-measured person mounts|wears a left arm with this body fat measuring apparatus, While making the right-hand 2nd finger|toe 72 contact one electrode 32 of the bezel 40 in this Embodiment similarly with having shown to Fig.19 (a), the right-hand 3rd finger|toe 73 is made to contact the other electrode 33. When it is going to rotate the bezel 40 in this state, it is difficult to make a negative (- (beta)) direction rotate the bezel 40, It only becomes easy to rotate a right ((beta)) direction.

[0092] Therefore, a left wrist will be mounted|worn with said apparatus, if the rotation (45<=(beta)<=90 degrees or -45 <=-(beta)<=-90) of the bezel 40 is detected by step S55 and it becomes clear that the rotation direction is a right ((beta)) direction in step S58, While making the right-hand 2nd finger|toe 72 contact the electrode 32, it can be considered that it exists in the state which made the right-hand 3rd finger|toe 73 contact the electrode 33. And both the switch switching control circuits 90 and 91 are controlled in this case, Let the electrode 33 and the electrode 6 be the electrodes for high frequency current outputs, And the measurement calculation of body fat is performed by using the electrode 23 and the electrode 7 as the electrode for voltage detection (step S61).

[0093] In a hand side with the electrode 6 far from a fuselage|body which made this body fat measuring apparatus high frequency current outputs like the above in the state with which the left wrist was mounted|worn, at this time, the electrode 7 made into voltage detection becomes a hand side near [ this ] a fuselage|body. Moreover, the right-hand 2nd finger|toe 72 describes the electrode 23, And when the 3rd finger|toe 73 longer than a 2nd finger|toe describes the electrode 33, the electrode 23 which the electrode 33 made into high frequency current outputs made a long distance and voltage detection from the fuselage|body will become the side near [ this ] a fuselage|body. Therefore, the loop which goes through via the human body formed with a pair of electrodes 33 and 6 for outputting the high frequency current becomes larger than the loop which goes through via the human body formed with a pair of electrodes 23 and 7 for detecting a voltage. Therefore, since a measurement is made|formed in the state which could measure body fat correctly and also extend|stretched both arms by performing a measurement calculation in this state, a measured value can be made more exact.

[0094] On the other hand, a to-be-measured person mounts|wears a right arm with this body fat measuring apparatus, While making the left-hand 3rd finger| toe 62 contact one electrode 33 of the bezel 40 in this Embodiment similarly with having shown in FIG.19(b), the left-hand 3rd finger|toe 62 is made to contact the other electrode 23. When it is going to rotate the bezel 40 in this state, it is difficult to make a right ((beta)) direction rotate the bezel 40, It only becomes easy to rotate a negative (-(beta)) direction.

Exhibit 24
-1099-

[0095] Therefore, a right wrist will be mounted|worn with said apparatus, if the rotation (45<=(beta)<=90 degrees or -45 <=-(beta)<=-90) of the bezel 40 is detected by step S55 and it becomes clear that the rotation direction is a negative (- (beta)) direction in step S58, While making the left-hand 2nd finger|toe 62 contact the electrode 33, it can be estimated that it exists in the state which made the left-hand 3rd finger|toe 63 contact the electrode 23, And both the switch switching control circuits 90 and 91 are controlled in this case, Let the electrode 23 and the electrode 7 be the electrodes for high frequency current outputs, And the measurement calculation of body fat is performed by using the electrode 33 and the electrode 6 as the electrode for voltage detection (step S62).

[0096] In a hand side with the electrode 6 far from a fuselage|body which made this body fat measuring apparatus high frequency current outputs like the above in the state with which the left wrist was mounted|worn, at this time, the electrode 7 made into voltage detection becomes a hand side near [ this ] a fuselage|body. Moreover, the left-hand 2nd finger|toe 62 describes the electrode 33, And when the 3rd finger|toe 63 longer than a 2nd finger|toe describes the electrode 23, the electrode 33 which the electrode 23 made into high frequency current outputs made a long distance and voltage detection from the fuselage|body will become the side near [ this ] a fuselage|body. Therefore, the loop which goes through via the human body formed with a pair of electrodes 23 and 7 for outputting the high frequency current becomes larger than the loop which goes through via the human body formed with a pair of electrodes 33 and 6 for detecting a voltage. Therefore, since a measurement is made|formed in the state which could measure body fat correctly and also extend|stretched both arms by performing a measurement calculation in this state, a measured value can be made more exact.

[0097] (8th Embodiment) FIG. 27, 28 shows the 8th Embodiment of this invention. As shown in FIG. 24, the time data storage area 81, the individual data storage area 82, and the measured value memory|storage area 83 are provided in RAM8 [ said ]. The time data storage area 81 is an area used in timepiece mode, Comprising: The counter which counts the present time etc., and a buffer are included. The measured value of the body fat measured by the process according to each flow mentioned above is memorize|stored in the measured value memory| storage area 83.

[0098] Each data of a "body height", a "body weight", a "birth date", and "the arm with which it mounts|wears" is memorize|stored in the individual data storage area 82, and "the arm with which it mounts|wears" is performed in it by writing in the flag data which show mounting|wearing corresponding "right arm" or "left arm" by "1". Each of these data are stored beforehand when a user operates the key input parts 51-54.

[0099] Without detecting whether the arm of either right or left is mounted|worn with said apparatus according to this embodiment, Each electrode can be made into the object for high frequency current outputs, or voltage detection, and can be appropriately set so that the loop which goes through via the human body formed with a pair of electrode for an output may become larger than the loop which goes through via the human body formed with a pair of electrode for a detection based on the data of "the arm with which it mounts|wears" memorize|stored. Moreover, the present age of the measurement person in the time of a measurement can be computed from the data of a "birth date", the calculation of body fat can be seasoned, and a more exact measurement result can be obtained by this.

[0100] In addition, in this embodiment, the data which show the arm equipped with said apparatus were memorize|stored, However, It memorize|stores whether which electrode is made into the object for high frequency current outputs, or

Exhibit 24
-1100-

Portable body fat measuring apparatus, JP PAT APP 09141202 A (MAT) (1998)

voltage detection among four electrodes, and may be made to carry out switching control of each electrode based on this.

## ADVANTAGE of the Invention

[0101] It is made for this invention to become larger than the loop which goes through via the human body formed with a pair of electrode for a detection for the loop which goes through via the human body formed with a pair of electrode for an electrode output for an output for outputting the high frequency current to detect a voltage as explained above. It is a body fat measuring apparatus which measures body fat, Comprising: To the back surface side which contacts the arm of the mounting body with which the arm of a human body can be mounted|worn, one of a pair of said electrode for an output and one side of a pair of said electrode for a detection are arrange|positioned, The other of a pair of said electrode for an output and the other of a pair of said electrode for a detection were arrange| positioned to the surface side of the said mounting body, If the other fingers are made to contact the other electrode for an output, and the electrode for a detection from this, The measurement of body fat is attained and a body fat ratio can be measured easily and quickly to at any time.

[0102] Moreover, by arrange|positioning an electrode to an apparatus main body, supply of the electric power to an electrode is enabled from a direct apparatus main body, and a circuit can attain a simplification and ensures the adhesiveness of an electrode and the skin of an arm from arrange|positioning to a strip|belt-shaped body, A measurement becomes it is errorless and possible.

[0103] Moreover, since the display means which displays a measurement result on the surface side of an apparatus main body was provided, a measurement result can be visually recognized easily and quickly.

[0104] Moreover, it memorize|stores whether it detects whether the either right or left arm of the human body was mounted|worn with the apparatus, or an either right or left arm is mounted|worn, and the electrode was switched to the electrode for an output, and the electrode for a detection based on this, Even if it is a case where the either right or left arm of a human body is mounted|worn with an apparatus from this, the loop which goes through via the human body formed with a pair of electrode for an output can become larger than the loop which goes through via the human body formed with a pair of electrode for a detection. Therefore, even if it is a case where an either right or left arm is mounted|worn with a mounting body, body fat can be correctly measured using 4 terminal electrodes method.

[0105] Moreover, it can be detected by detecting whether the electrocardio wave was detected and the either right or left arm of the human body was mounted| worn based on this whether the either right or left arm of the human body was mounted|worn, without affecting an external appearance.

[0106] Moreover, it is detectable by arrange|positioning the other of a pair of electrode for an output, and the two others of a pair of electrode for a detection to the surface side of the mounting body, respectively whether the either right or left arm of the human body was mounted|worn by simple structure.

[0107] Moreover, based on the rotation direction of a bezel which can be rotated, it was detected whether the either right or left arm of the human body was mounted|worn, From this, a bezel is used effectively in the wristwatch which has a bezel, A detection means can be achieved.

Portable body fat measuring apparatus, JP PAT APP 09141892 A (MA1) (1999)

[0108] Moreover, an electrode is arrange|positioned to the surface side of an apparatus main body, This was covered by the openable-closable cover body, While being able to prevent the stain|pollution|contamination of an electrode by a cover body at the time of non-measuring and being able to prevent generation| occurence|production of the error by a contact failure from this beforehand to a measurement, it becomes advantageous also in design by concealing an electrode.

[0109] Moreover, it becomes possible to open a cover body to an arbitrary angle and to visually recognize a measurement result at a legible angle by providing the display means which displays a measurement result on a cover body.

[0110] Moreover, an external appearance top becomes being the same as that of a wristwatch by providing the 1st display means which displays the measurement result of body fat on the one surface side which covers the surface of the apparatus main body of a cover body, and providing the 2nd display means which displays time in an other surface side, It is comfortably portable.

[0111] Moreover, since it was made to carry out the level indication of the measurement result of body fat, it becomes possible to recognize the evaluation with respect to a measurement result at a glance by this level indication.

[0112] Moreover, a measurement can be started smoothly, protecting an electrode by a cover body, since open of the said cover body is detected and the said measurement was started.

[0113] Moreover, several operation means to jointly possess the switch function which is pressed and is ON-operated, and the function as each said electrode were provided, From this, by operating each operation means simultaneously so that a switch may be operated, the contact state of an electrode and a human body required for the measurement of body fat is formed, and it can measure errorless. A measurement can be smoothly started from detecting an ON operation of the switch of these some and in addition, having started the measurement.

**BRIEF DESCRIPTION OF THE DRAWINGS**
[FIG. 1] (a) is a top view of the body fat measuring apparatus concerning the 1st Embodiment of this invention, (b) is the rear view. [FIG. 2] It is an enlarged view of a display part. [FIG. 3] It is a circuit diagram of the body fat measuring apparatus concerning the embodiment. [FIG. 4] It is a flowchart which shows the process procedure at the time of the body fat measurement in the embodiment. [FIG. 5] It is a top view which shows the modification of the surface side of the body fat measuring apparatus concerning the embodiment. [FIG. 6] It is a rear view which shows the modification of the back surface side of the body fat measuring apparatus concerning the embodiment. [FIG. 7] (a) is a perspective view of the body fat measuring apparatus concerning the 2nd Embodiment of this invention, (b) is the rear view. [FIG. 8] As for (a), the body fat measuring apparatus concerning the 3rd Embodiment of this invention is a top view in a mode normally (the present time display), (b) is a top view in measurement mode. [FIG. 9] (a) is a top view of the body fat measuring apparatus concerning the 4th Embodiment of this invention, (b) is the rear view. [FIG. 10] It is a principal part circuit diagram which shows the detail of the electrode vicinity of the body fat measuring apparatus concerning the embodiment. [FIG. 11] It is a circuit diagram which shows the detail of the differential amplifier circuit in the embodiment. [FIG. 12] It is a flowchart which shows the principal part of the process procedure in the embodiment. [FIG. 13] (a) is a wave form diagram which shows the QRST waveform at the time of mounting|wearing a left hand, (b) is a wave form diagram which shows the QRST waveform at the time of mounting|wearing a right hand.

Exhibit 24
-1102-

[FIG. 14] (a) is a top view of the body fat measuring apparatus concerning the 5th Embodiment of this invention, (b) is a left view, (c) is a right view. [FIG. 15] It is a circuit diagram of the body fat measuring apparatus concerning the embodiment. [FIG. 16] It is a flowchart which shows the principal part of the process procedure in the embodiment. [FIG. 17] (a) is a measurement image figure at the time of mounting|wearing a left-hand wrist with the body fat measuring apparatus concerning the embodiment, (b) is a measurement image figure at the time of mounting|wearing a right-hand wrist. [FIG. 18] It is a flowchart which shows the principal part of the process procedure of the modification in the embodiment. [FIG. 19] (a) is a measurement image figure at the time of mounting|wearing a left-hand wrist with the body fat measuring apparatus concerning the modification, (b) is a measurement image figure at the time of mounting|wearing a right-hand wrist. [FIG. 20] (a) is a top view of the body fat measuring apparatus concerning the 6th Embodiment of this invention, (b) is a left view, (c) is a right view. [FIG. 21] It is a circuit diagram of the body fat measuring apparatus concerning the embodiment. [FIG. 22] (a) is bezel rotation direction explanatory drawing at the time of mounting|wearing a left-hand wrist with the body fat measuring apparatus concerning the embodiment, (b) is bezel rotation direction explanatory drawing at the time of mounting|wearing a right-hand wrist. [FIG. 23] It is a flowchart which shows the principal part of the process procedure in the embodiment. [FIG. 24] (a) is a top view of the body fat measuring apparatus concerning the 7th Embodiment of this invention, (b) is a left view, (c) is a right view. [FIG. 25] (a) is bezel rotation direction explanatory drawing at the time of mounting|wearing a left-hand wrist with the body fat measuring apparatus concerning the embodiment, (b) is bezel rotation direction explanatory drawing at the time of mounting|wearing a right-hand wrist. [FIG. 26] It is a flowchart which shows the principal part of the process procedure in the embodiment. [FIG. 27] It is a memory block diagram of RAM in the 8th Embodiment of this invention. [FIG. 28] It is a memory block diagram of the individual data storage area in the embodiment.

**Description of Symbols**
1 Case 1a Case main body 1b Lid|cover 16, 17 Belt 2, 3 Electrode 4 Display part 4a Segment 6, 7 Electrode 10 CPU 19, 20 Switch control circuit 21, 22, 23 Electrode 31, 32, 33 Electrode 40 Bezel 92 Bezel rotation direction detection part 51, 52, 53, 54 Key input part 82 Individual data storage area 120 Case [FIG. 1] [MAT_IMAGE 000003] [FIG. 2] [MAT_IMAGE 000004] [FIG. 13] [MAT_IMAGE 000015] [FIG. 28] [MAT_IMAGE 000030] [FIG. 3] [MAT_IMAGE 000005] [FIG. 5] [MAT_IMAGE 000007] [FIG. 6] [MAT_IMAGE 000008] [FIG. 9] [MAT_IMAGE 000011] [FIG. 4] [MAT_IMAGE 000006] [FIG. 11] [MAT_IMAGE 000013] [FIG. 27] [MAT_IMAGE 000029] [FIG. 7] [MAT_IMAGE 000009] [FIG. 8] [MAT_IMAGE 000010] [FIG. 10] [MAT_IMAGE 000012] [FIG. 12] [MAT_IMAGE 000014] [FIG. 14] [MAT_IMAGE 000016] [FIG. 15] [MAT_IMAGE 000017] [FIG. 16] [MAT_IMAGE 000018] [FIG. 17] [MAT_IMAGE 000019] [FIG. 19] [MAT_IMAGE 000021] [FIG. 20] [MAT_IMAGE 000022] [FIG. 18] [MAT_IMAGE 000020] [FIG. 21] [MAT_IMAGE 000023] [FIG. 22] [MAT_IMAGE 000024] [FIG. 24] [MAT_IMAGE 000026] [FIG. 23] [MAT_IMAGE 000025] [FIG. 25] [MAT_IMAGE 000027] [FIG. 26] [MAT_IMAGE 000028]

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 24
-1103-

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 26609069 |
| **Application Number:** | 14617422 |
| **International Application Number:** | |
| **Confirmation Number:** | 5106 |
| **Title of Invention:** | Electronic Device that Computes Health Data |
| **First Named Inventor/Applicant Name:** | Marcelo M. Lamego |
| **Customer Number:** | 62579 |
| **Filer:** | Stephen C. Hemenway/Valerie Brown |
| **Filer Authorized By:** | Stephen C. Hemenway |
| **Attorney Docket Number:** | P22734US1 |
| **Receipt Date:** | 10-AUG-2016 |
| **Filing Date:** | 09-FEB-2015 |
| **Time Stamp:** | 20:18:05 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | no |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Transmittal Letter | P22734US1IDS.pdf | 20614<br>a6dced654f14b5bb935761d804863d50c854aa01 | no | 3 |

**Warnings:**

Exhibit 24
-1104-

Information:

| 2 | Information Disclosure Statement (IDS) Form (SB08) | P22734US1PTOSB08.pdf | 37513<br><br>2f6c9efdb4f79c735a9304ac0dfce6014bb05811 | no | 2 |

Warnings:

Information:

This is not an USPTO supplied IDS fillable form

| 3 | Foreign Reference | JP2001145607.pdf | 6433051<br><br>0466d29dd6d4096f6341b94bb9c1a39cd761d59e | no | 53 |

Warnings:

Information:

| 4 | Non Patent Literature | Ohgi.pdf | 830669<br><br>4d15980dc72e2fcdc4d76a2d68f1ab871f5f3d7c | no | 11 |

Warnings:

Information:

| 5 | Non Patent Literature | Zijlstra.pdf | 2700602<br><br>8a1b03e7b4618dbdbdfdd5bf9a9c534b26881ef0 | no | 10 |

Warnings:

Information:

| | | **Total Files Size (in bytes):** | 10022449 |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

**Exhibit 24**
-1105-

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re the Application of: | |
| Marcelo M. Lamego | Examiner:        Stice, Paula J. |
| Application No. 14/617,422 | Art Unit:          3766 |
| Filed: February 9, 2015 | Confirmation No.    5106 |
| For:    ELECTRONIC DEVICE THAT COMPUTERS HEALTH DATA | |

**INFORMATION DISCLOSURE STATEMENT**
**UNDER 37 C.F.R. §§1.97(b)(3) and 1.98**
**and STATEMENT OF RELATEDNESS UNDER M.P.E.P. § 2001.06(b)**

Mail Stop AMENDMENT
Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Sir:

The Examiner is requested to consider the references noted on the enclosed Form PTO/SB/08A and B during examination of the above-identified patent application.  These references are submitted for the Examiner's consideration and are submitted pursuant to the duty of disclosure under 37 C.F.R. § 1.56.  In submitting these references, no representation is made or implied that the references are or are not material to the examination of the application.  The Examiner is requested to make his or her own determination of materiality.  Pursuant to the requirements of 37 C.F.R. § 1.98(a)(2)(ii), only copies of the foreign references and non-patent literature documents are provided.  Copies of the U.S. patent and U.S. patent application publication references are not provided, unless required by the Office.

In satisfaction of the duty of disclosure under 37 C.F.R. § 1.56, and as required by M.P.E.P. § 2001.06(b), the Examiner is requested to consider the pending application listed on "Attachment A," which is owned by the Assignee of the present application.  The pending application may include subject matter similar to that of the present application.

This Information Disclosure Statement is being filed before the mailing date of a first Office action.  Therefore, pursuant  to 37 C.F.R. 1.97(b)(3), no fees are due with respect to this

Exhibit 24
-1106-

filing.  However, should any such fees or petitions be required, please consider this a request therefor and authorization to charge Deposit Account No. 504621 as necessary.

If the Examiner has any questions, please contact the undersigned attorney.

Dated:  August 10, 2015.

Respectfully submitted,


_____/David S. Atkinson/_____
David S. Atkinson, Registration No. 55,655
Attorney for Assignee
USPTO Customer No. 62579

Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, Colorado  80202
Phone: (303) 223-1100
Fax: (303) 223-1111

Exhibit 24
-1107-

Attorney Docket No. P22734US1

# ATTACHMENT A

**INFORMATION DISCLOSURE STATEMENT**
**AND**
**STATEMENT OF RELATEDNESS (Under M.P.E.P. § 2001.06(b))**

| Examiner Initials | Application Number | Filing Date | Name of Inventor | Docket No. |
|---|---|---|---|---|
| | 15/118,053 | 08/10/2016 | Dusan | P20822US1 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

3

013361\2087\14960120.1

Exhibit 24
-1108-

Attorney Docket No. P22734US1

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of:

| | | | |
|---|---|---|---|
| Inventor(s): | Marcelo M. Lamego | | |
| App. No.: | 14/617,422 | Con. No.: | 5106 |
| Filed: | February 9, 2015 | Art Unit: | 3766 |
| Title: | ELECTRONIC DEVICE THAT COMPUTES HEALTH DATA | Examiner: | Stice, Paula J. |

**AMENDMENT AND RESPONSE TO RESTRICTION REQUIREMENT**

MAIL STOP AMENDMENT
Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Sir:

In response to the Restriction Requirement dated June 14, 2016, please consider the following remarks and amend the above-identified application as follows:

**Amendments to the Claims** begin on page 2 of this paper.

**Remarks** begin on page 6 of this paper.

Exhibit 24
-1109-

Attorney Docket No. P22734US1

**Amendments to the Claims:**

1.       (Original)  A mobile personal computing device, comprising:

a camera;

an ambient light sensor;

a proximity sensor; and

a processing unit communicably coupled to the camera, the ambient light sensor, and the proximity sensor;

wherein the processing unit is configured to:

use at least one of a camera or a proximity sensor to emit light into a body part of a user touching a surface of the mobile personal computing device;

use at least one of the camera, an ambient light sensor, or the proximity sensor to receive at least part of the emitted light reflected by the body part of the user and generate sensor data; and

compute health data of the user, utilizing the processing unit, using at least the sensor data regarding the received light.

2.       (Original)  The mobile personal computing device of claim 1, wherein the camera, the ambient light sensor, and the proximity sensor are positioned to be at least partially covered by the body part of the user at a same time.

3.       (Original)  The mobile personal computing device of claim 1, wherein the proximity sensor is configured to detect multiple wavelengths of light.

4.       (Original)  The mobile personal computing device of claim 3, wherein multiple light wavelength proximity sensor is configured to emit and receive infrared and visible light.

5.       (Original)  The mobile personal computing device of claim 3, wherein multiple light wavelength proximity sensor is configured to emit and receive infrared and red light.

6.       (Original)  The mobile personal computing device of claim 1, wherein the ambient light sensor is a at least one of a silicon ambient light sensor or an indium gallium arsenide ambient light sensor.

**Exhibit 24**
**-1110-**

7.      (Original)  The mobile personal computing device of claim 1, wherein the camera is configured to detect infrared light.

8.      (Original)  The mobile personal computing device of claim 1, wherein the device is configured to compute the health-related information when the body part of the user is positioned at least partially over the camera, the ambient light sensor, and the proximity sensor.

9.      (Withdrawn)  The mobile personal computing device of claim 1, wherein the processing unit utilizes the camera to determine when the body part of the user is misaligned with the camera, the ambient light sensor, and the proximity sensor for purposes of detecting the information about the body part of the user.

10.      (Withdrawn)  The mobile personal computing device of claim 9, wherein the processing unit provides an output that can be used as guidance to correct a misalignment.

11.      (Withdrawn)  The mobile personal computing device of claim 10, wherein the processing unit is configure to provide the output to at least one visual output component, audio output component, or haptic output component.

12.      (Original)  The mobile personal computing device of claim 1, wherein the camera is configured with a focal distance greater than a distance between the camera and the body part of the user when the body part is touching the surface of the mobile personal computing device.

13.      (Withdrawn)  The mobile personal computing device of claim 1, further comprising
electrical contacts disposed on an exterior surface of the device, wherein the processing unit is further configured to compute additional health-related information regarding the user based on an electrical measurement obtained using the electrical contacts.

14.      (Withdrawn)  The mobile personal computing device of claim 13, wherein the electrical contacts are positioned to contact the body part of the user and an additional body part of the user.

Exhibit 24
-1111-

Attorney Docket No. P22734US1

15.      (Withdrawn)  The mobile personal computing device of claim 14, wherein the electrical measurement obtained using the electrical contacts corresponds to an electrical property across the user's chest.

16.      (Withdrawn)  The mobile personal computing device of claim 13, wherein the processing unit is further configured to:
use at least the proximity sensor to emit the light;
use the ambient light sensor and the camera to receive the reflected light; and
compute a blood pressure index, a body fat content, and an electrocardiogram using data from the ambient light sensor, the camera, and the electrical contacts.

17.      (Withdrawn)  The mobile personal computing device of claim 13, wherein the proximity sensor is a multiple light wavelength proximity sensor that utilizes infrared and visible light, the ambient light sensor is a indium gallium arsenide ambient light sensor, and the processing unit is further configured to:
use at least the proximity sensor to emit the light;
use the ambient light sensor and the camera receive the reflected light; and
compute a blood hydration using data from the ambient light sensor, the camera, and the electrical contacts.

18.      (Original)  The mobile personal computing device of claim 1, wherein the processing unit is further configured to:
use at least the proximity sensor to emit the light;
use at least the ambient light sensor and the camera receive the reflected light; and
compute an oxygen saturation, a pulse rate, a perfusion index, or a photoplethysmogram using data from the ambient light sensor and the camera.

19.      (Original)  A method for using a mobile personal computing device to obtain health data, comprising:
using at least one of a camera and a proximity sensor to emit light into a body part of a user touching a surface of the mobile personal computing device;
using at least one of the camera, an ambient light sensor, or the proximity sensor to receive at least part of the emitted light reflected by the body part of the user and generate sensor data; and

Exhibit 24
-1112-

computing health data of the user, utilizing the processing unit, using at least the sensor data regarding the received light.

20.      (Cancelled)

21.      (Original)  A computer program product including a non-transitory storage medium, comprising:

a first set of instructions, stored in the non-transitory storage medium, executable by at least one processing unit to use at least one of a camera and a proximity sensor to emit light into a body part of a user touching a surface of a mobile personal computing device;

a second set of instructions, stored in the non-transitory storage medium, executable by the least one processing unit to use at least one of the camera, an ambient light sensor, or the proximity sensor to receive at least part of the emitted light reflected by the body part of the user and generate sensor data; and

a third set of instructions, stored in the non-transitory storage medium, executable by the least one processing unit to compute health data of the user using at least the sensor data regarding the received light.

22.      (New) The mobile personal computing device of claim 1, wherein the processing unit uses data from the camera indicating characteristics of the body part that influence light absorption to adjust the sensor data regarding the received light as part of computing the health data.

Exhibit 24
-1113-

Attorney Docket No. P22734US1

# REMARKS

This paper is submitted in response to the Office action mailed on June 14, 2016. This paper cancels claim 20, withdraws claims 9-11 and 13-17, and adds new claim 22. Support for new claim 22 can be found at least in paragraphs 0031-0032 of the application as filed and no new matter is added. Accordingly, after entry of this Amendment and Response, claims 1-19 and 21-22 will be pending with claims 9-11 and 13-17 being withdrawn.

In the Restriction Requirement, the Examiner alleges two distinct inventions:

I.      Claims 1-19 and 21[1], drawn to a mobile computing device, classified in A61B 5/6898;

> Species A:  directed towards a proximity sensor
>
> Species B:  directed towards a misalignment sensor
>
> Species C:  directed towards electrode/electrical contacts

II.     Claim 20, drawn to a method for guiding use of a mobile device, classified in A61B 5/0261.

The Examiner requires restriction to one of the aforementioned inventions under 35 U.S.C. § 1.21. In response to the Restriction Requirement, Assignee elects Group I, claims 1-19 and 21, without traverse. Accordingly, claim 20 is hereby cancelled.

Upon election of group I, the Examiner also requires restriction to one of the aforementioned species under 35 U.S.C. § 1.21. In response to the Restriction Requirement, Assignee elects Species A without traverse. Accordingly, claims 9-11 and 13-17, which read upon unelected Species B and C, are hereby withdrawn.

The Assignee believes no fees or petitions are due with this filing. However, should any such fees or petitions be required, please consider this a request therefor and authorization to charge Deposit Account No. 504621 as necessary.

---

[1] The Restriction Requirement dated June 14, 2016 states claims 1-9 and 21 on page 2. However, the Assignee believes this is a typographical error and should read claims 1-19 and 21 as there are only two groups identified and the other group, group II, only includes claim 20. Further, page 4 of Restriction Requirement dated June 14, 2016 references other claims of 1-19 and 21 as included in group I. Page 4 of Restriction Requirement dated June 14, 2016 states that claims 1-2, 6-8, 12, and 18-20 are generic to species A, B, and C of group I. However, since claim 20 is identified as the only claim in group II, the Assignee believes that this is a typographical error and 4 of Restriction Requirement dated June 14, 2016 should state that claims 1-2, 6-8, 12, 18-19, and 21 are generic to species A, B, and C of group I.

**Exhibit 24**
**-1114-**

If the Examiner should require any additional information or amendment, please contact the undersigned attorney.

Dated:  July 26, 2016.

Respectfully submitted,

_____/David S. Atkinson/_____
David S. Atkinson, Registration No. 56,655
Attorney for Assignee
USPTO Customer No. 62579

Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, Colorado  80202
Phone:  303-223-1100
Fax:  303-223-1111

Exhibit 24
-1115-

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 26456062 |
| **Application Number:** | 14617422 |
| **International Application Number:** | |
| **Confirmation Number:** | 5106 |
| **Title of Invention:** | Electronic Device that Computes Health Data |
| **First Named Inventor/Applicant Name:** | Marcelo M. Lamego |
| **Customer Number:** | 62579 |
| **Filer:** | Stephen C. Hemenway/Valerie Brown |
| **Filer Authorized By:** | Stephen C. Hemenway |
| **Attorney Docket Number:** | P22734US1 |
| **Receipt Date:** | 26-JUL-2016 |
| **Filing Date:** | 09-FEB-2015 |
| **Time Stamp:** | 13:14:40 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | no |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Response to Election / Restriction Filed | P22734US1Amendment.pdf | 37873<br>b27283d5f86a144c0daff9b1bfcd963dff521fff | no | 7 |

**Warnings:**

Exhibit 24<br>-1116-

**Information:**

| | |
|---|---|
| **Total Files Size (in bytes):** | 37873 |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

**Exhibit 24**
**-1117-**

PTO/SB/06 (09-11)
Approved for use through 1/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| PATENT APPLICATION FEE DETERMINATION RECORD<br>Substitute for Form PTO-875 | Application or Docket Number<br>14/617,422 | Filing Date<br>02/09/2015 | ☐ To be Mailed |
|---|---|---|---|

**ENTITY:**  ☒ LARGE  ☐ SMALL  ☐ MICRO

## APPLICATION AS FILED – PART I

| | (Column 1) | (Column 2) | | |
|---|---|---|---|---|
| FOR | NUMBER FILED | NUMBER EXTRA | RATE ($) | FEE ($) |
| ☐ BASIC FEE (37 CFR 1.16(a), (b), or (c)) | N/A | N/A | N/A | |
| ☐ SEARCH FEE (37 CFR 1.16(k), (i), or (m)) | N/A | N/A | N/A | |
| ☐ EXAMINATION FEE (37 CFR 1.16(o), (p), or (q)) | N/A | N/A | N/A | |
| TOTAL CLAIMS (37 CFR 1.16(i)) | minus 20 = | * | X $   = | |
| INDEPENDENT CLAIMS (37 CFR 1.16(h)) | minus 3 = | * | X $   = | |
| ☐ APPLICATION SIZE FEE (37 CFR 1.16(s)) | If the specification and drawings exceed 100 sheets of paper, the application size fee due is $310 ($155 for small entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s). | | | |
| ☐ MULTIPLE DEPENDENT CLAIM PRESENT (37 CFR 1.16(j)) | | | | |
| * If the difference in column 1 is less than zero, enter "0" in column 2. | | | TOTAL | |

## APPLICATION AS AMENDED – PART II

| | | (Column 1) | (Column 2) | (Column 3) | | |
|---|---|---|---|---|---|---|
| AMENDMENT | **07/26/2016** | CLAIMS REMAINING AFTER AMENDMENT | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) |
| | Total (37 CFR 1.16(i)) | * 21 | Minus | ** 21 | = 0 | x $80 = | 0 |
| | Independent (37 CFR 1.16(h)) | * 3 | Minus | *** 4 | = 0 | x $420 = | 0 |
| | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | |
| | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | |
| | | | | | TOTAL ADD'L FEE | **0** |

| | | (Column 1) | (Column 2) | (Column 3) | | |
|---|---|---|---|---|---|---|
| AMENDMENT | | CLAIMS REMAINING AFTER AMENDMENT | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) |
| | Total (37 CFR 1.16(i)) | * | Minus | ** | = | x $   = | |
| | Independent (37 CFR 1.16(h)) | * | Minus | *** | = | x $   = | |
| | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | |
| | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | |
| | | | | | TOTAL ADD'L FEE | |

LIE
ALA HUNTER

* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.
** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20".
*** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3".
The "Highest Number Previously Paid For" (Total or Independent) is the highest number found in the appropriate box in column 1.

This collection of information is required by 37 CFR 1.16. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

**Exhibit 24**
-1118-

UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 14/617,422 | 02/09/2015 | Marcelo M. Lamego | P22734US1 | 5106 |

62579          7590          06/14/2016
APPLE INC. (Brownstein)
c/o Brownstein Hyatt Farber Schreck LLP
410 17th St.
Suite 2200
DENVER, CO 80202

| EXAMINER |
|---|
| STICE, PAULA J |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3766 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 06/14/2016 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

patentdocket@bhfs.com

PTOL-90A (Rev. 04/07)

Exhibit 24
-1119-

| **Office Action Summary** | Application No. | Applicant(s) |
| | 14/617,422 | LAMEGO, MARCELO M. |
| | Examiner | Art Unit | AIA (First Inventor to File) Status |
| | Paula J. Stice | 3766 | Yes |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

## Period for Reply

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) months from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

## Status

1)☒ Responsive to communication(s) filed on <u>2/9/2015</u>.
  ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.
2a)☐ This action is **FINAL**.     2b)☐ This action is non-final.
3)☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.
4)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

## Disposition of Claims*

5)☒ Claim(s) <u>1-21</u> is/are pending in the application.
  5a) Of the above claim(s) _____ is/are withdrawn from consideration.
6)☐ Claim(s) _____ is/are allowed.
7)☐ Claim(s) _____ is/are rejected.
8)☐ Claim(s) _____ is/are objected to.
9)☒ Claim(s) <u>1-21</u> are subject to restriction and/or election requirement.
* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov.

## Application Papers

10)☐ The specification is objected to by the Examiner.
11)☐ The drawing(s) filed on _____ is/are: a)☐ accepted or b)☐ objected to by the Examiner.
  Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
  Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

## Priority under 35 U.S.C. § 119

12)☐ Acknowledgement is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
  **Certified copies:**
    a)☐ All   b)☐ Some**  c)☐ None of the:
    1.☐ Certified copies of the priority documents have been received.
    2.☐ Certified copies of the priority documents have been received in Application No. _____.
    3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).
** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**
1)☐ Notice of References Cited (PTO-892)
2)☐ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b) Paper No(s)/Mail Date _____.
3)☐ Interview Summary (PTO-413)
  Paper No(s)/Mail Date. _____ .
4)☐ Other: _____.

Application/Control Number: 14/617,422                                      Page 2
Art Unit: 3766

## DETAILED ACTION

### *Notice of Pre-AIA or AIA Status*

1.      The present application, filed on or after March 16, 2013, is being examined under the first inventor to file provisions of the AIA.

### *Election/Restrictions*

2.      Restriction to one of the following inventions is required under 35 U.S.C. 121:

       I. Claims 1-9 and 21, drawn to a mobile computing device, classified in A61B 5/6898.

              Species A: directed towards a proximity sensor

              Species B: directed towards a misalignment sensor

              Species C: directed towards electrode/electrical contacts

       II. Claim 20, drawn to method for guiding use of a mobile device, classified in A61B 5/0261.

The inventions are distinct, each from the other because of the following reasons:

3.      Inventions I and II are related as product and process of use.  The inventions can be shown to be distinct if either or both of the following can be shown: (1) the process for using the product as claimed can be practiced with another materially different product or (2) the product as claimed can be used in a materially different process of using that product. See MPEP § 806.05(h).  In the instant case the process for using the product could be used with a materially different product.

4.      Restriction for examination purposes as indicated is proper because all these inventions listed in this action are independent or distinct for the reasons given above

Exhibit 24
-1121-

Application/Control Number: 14/617,422                                      Page 3
Art Unit: 3766

and there would be a serious search and/or examination burden if restriction were not

required because one or more of the following reasons apply:

There would be a serious search and examination burden in that the inventions

are independent and distinct.

**Applicant is advised that the reply to this requirement to be complete must**

**include (i) an election of an invention to be examined** even though the requirement

may be traversed (37 CFR 1.143) **and (ii) identification of the claims encompassing**

**the elected invention**.

The election of an invention may be made with or without traverse. To reserve a

right to petition, the election must be made with traverse. If the reply does not distinctly

and specifically point out supposed errors in the restriction requirement, the election

shall be treated as an election without traverse. Traversal must be presented at the time

of election in order to be considered timely. Failure to timely traverse the requirement

will result in the loss of right to petition under 37 CFR 1.144. If claims are added after

the election, applicant must indicate which of these claims are readable upon the

elected invention.

Should applicant traverse on the ground that the inventions are not patentably

distinct, applicant should submit evidence or identify such evidence now of record

showing the inventions to be obvious variants or clearly admit on the record that this is

the case. In either instance, if the examiner finds one of the inventions unpatentable

over the prior art, the evidence or admission may be used in a rejection under 35 U.S.C.

103 or pre-AIA 35 U.S.C. 103(a) of the other invention.

**Exhibit 24**
**-1122-**

Application/Control Number: 14/617,422                                    Page 4
Art Unit: 3766

5.      This application contains claims directed to the following patentably distinct species A, B and C of group 1 as shown above. The species are independent or distinct because each group recites mutually exclusive characteristics. In addition, these species are not obvious variants of each other based on the current record.

Applicant is required under 35 U.S.C. 121 to elect a single disclosed species, or a single grouping of patentably indistinct species, for prosecution on the merits to which the claims shall be restricted if no generic claim is finally held to be allowable. Currently, claims 1-2, 6-8, 12 and 18-20 are generic.

There is a search and/or examination burden for the patentably distinct species as set forth above because at least the following reason(s) apply:  each species recites mutually exclusive characteristics.

**Applicant is advised that the reply to this requirement to be complete must include (i) an election of a species to be examined** even though the requirement may be traversed (37 CFR 1.143) **and (ii) identification of the claims encompassing the elected species or grouping of patentably indistinct species**, including any claims subsequently added. An argument that a claim is allowable or that all claims are generic is considered nonresponsive unless accompanied by an election.

The election may be made with or without traverse. To preserve a right to petition, the election must be made with traverse. If the reply does not distinctly and specifically point out supposed errors in the election of species requirement, the election shall be treated as an election without traverse. Traversal must be presented at the time of election in order to be considered timely. Failure to timely traverse the requirement

Exhibit 24
-1123-

Application/Control Number: 14/617,422                                    Page 5
Art Unit: 3766

will result in the loss of right to petition under 37 CFR 1.144. If claims are added after

the election, applicant must indicate which of these claims are readable on the elected

species or grouping of patentably indistinct species.

Should applicant traverse on the ground that the species, or groupings of

patentably indistinct species from which election is required, are not patentably distinct,

applicant should submit evidence or identify such evidence now of record showing them

to be obvious variants or clearly admit on the record that this is the case. In either

instance, if the examiner finds one of the species unpatentable over the prior art, the

evidence or admission may be used in a rejection under 35 U.S.C. 103 or pre-AIA 35

U.S.C. 103(a) of the other species.

Upon the allowance of a generic claim, applicant will be entitled to consideration

of claims to additional species which depend from or otherwise require all the limitations

of an allowable generic claim as provided by 37 CFR 1.141.

6.      The examiner has required restriction between product or apparatus claims and

process claims. Where applicant elects claims directed to the product/apparatus, and all

product/apparatus claims are subsequently found allowable, withdrawn process claims

that include all the limitations of the allowable product/apparatus claims should be

considered for rejoinder. All claims directed to a nonelected process invention must

include all the limitations of an allowable product/apparatus claim for that process

invention to be rejoined.

In the event of rejoinder, the requirement for restriction between the

product/apparatus claims and the rejoined process claims will be withdrawn, and the

Exhibit 24
-1124-

Application/Control Number: 14/617,422                                     Page 6
Art Unit: 3766

rejoined process claims will be fully examined for patentability in accordance with 37

CFR 1.104. Thus, to be allowable, the rejoined claims must meet all criteria for

patentability including the requirements of 35 U.S.C. 101, 102, 103 and 112. Until all

claims to the elected product/apparatus are found allowable, an otherwise proper

restriction requirement between product/apparatus claims and process claims may be

maintained. Withdrawn process claims that are not commensurate in scope with an

allowable product/apparatus claim will not be rejoined. See MPEP § 821.04.

Additionally, in order for rejoinder to occur, applicant is advised that the process claims

should be amended during prosecution to require the limitations of the

product/apparatus claims. **Failure to do so may result in no rejoinder.** Further, note

that the prohibition against double patenting rejections of 35 U.S.C. 121 does not apply

where the restriction requirement is withdrawn by the examiner before the patent

issues. See MPEP § 804.01.

      Any inquiry concerning this communication or earlier communications from the

examiner should be directed to Paula J. Stice whose telephone number is (571)270-

1478.  The examiner can normally be reached on Monday - Friday 9AM-5PM.

      If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Carl Layno can be reached on (571) 272-4949.  The fax phone number for

the organization where this application or proceeding is assigned is 571-273-8300.

**Exhibit 24
-1125-**

Application/Control Number: 14/617,422                                    Page 7
Art Unit: 3766

Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a

USPTO Customer Service Representative or access to the automated information

system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.


/Paula J. Stice/
Primary Examiner, Art Unit 3766

Exhibit 24
-1126-

| *Index of Claims* | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 14617422 | LAMEGO, MARCELO M. |
| | Examiner | Art Unit |
| | PAULA J STICE | 3766 |

| ✓ | Rejected | - | Cancelled | N | Non-Elected | A | Appeal |
|---|---|---|---|---|---|---|---|
| = | Allowed | ÷ | Restricted | I | Interference | O | Objected |

☐ **Claims renumbered in the same order as presented by applicant**   ☐ CPA   ☐ T.D.   ☐ R.1.47

| CLAIM | | DATE | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Final | Original | 06/07/2016 | | | | | | | |
| | 1 | ÷ | | | | | | | |
| | 2 | ÷ | | | | | | | |
| | 3 | ÷ | | | | | | | |
| | 4 | ÷ | | | | | | | |
| | 5 | ÷ | | | | | | | |
| | 6 | ÷ | | | | | | | |
| | 7 | ÷ | | | | | | | |
| | 8 | ÷ | | | | | | | |
| | 9 | ÷ | | | | | | | |
| | 10 | ÷ | | | | | | | |
| | 11 | ÷ | | | | | | | |
| | 12 | ÷ | | | | | | | |
| | 13 | ÷ | | | | | | | |
| | 14 | ÷ | | | | | | | |
| | 15 | ÷ | | | | | | | |
| | 16 | ÷ | | | | | | | |
| | 17 | ÷ | | | | | | | |
| | 18 | ÷ | | | | | | | |
| | 19 | ÷ | | | | | | | |
| | 20 | ÷ | | | | | | | |
| | 21 | ÷ | | | | | | | |

**Exhibit 24
-1127-**

Doc code: Oath
Document Description: Oath or declaration filed

PTO/AIA/02 (07-13)
Approved for use through 01/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## SUBSTITUTE STATEMENT IN LIEU OF AN OATH OR DECLARATION FOR UTILITY OR DESIGN PATENT APPLICATION (35 U.S.C. 115(d) AND 37 CFR 1.64)

| **Title of Invention** | Electronic Device that Computes Health Data |
|---|---|
| | Attorney Docket No. P22734US1 |

This statement is directed to:

☐ The attached application,

OR

☒ United States application or PCT international application number **14/617,422** filed on February 9, 2015.

**LEGAL NAME of inventor to whom this substitute statement applies:**

(*E.g.,* Given Name (first and middle (if any)) and Family Name or Surname)

**Marcelo M. Lamego**

Residence (except for a deceased or legally incapacitated inventor):

| City **Cupertino** | State **CA** | Country **US** |
|---|---|---|

Mailing Address (except for a deceased or legally incapacitated inventor):

10292 Orange Avenue

| City **Cupertino** | State **CA** | Zip **95014** | Country **US** |
|---|---|---|---|

I believe the above-named inventor or joint inventor to be the original inventor or an original joint inventor of a claimed invention in the application.

The above-identified application was made or authorized to be made by me.

I hereby acknowledge that any willful false statement made in this statement is punishable under 18 U.S.C. 1001 by fine or imprisonment of not more than five (5) years, or both.

Relationship to the inventor to whom this substitute statement applies:

☐ Legal Representative (for deceased or legally incapacitated inventor only),

☒ Assignee,

☐ Person to whom the inventor is under an obligation to assign,

☐ Person who otherwise shows a sufficient proprietary interest in the matter (petition under 37 CFR 1.46 is required), or

☐ Joint Inventor.

[Page 1 of 2]

This collection of information is required by 35 U.S.C. 115 and 37 CFR 1.63. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 1 minute to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

Exhibit 24
-1128-

PTO/SB/AIA02 (07-13)
Approved for use through 01/31/2014.  OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# SUBSTITUTE STATEMENT

Circumstances permitting execution of this substitute statement:

☐ Inventor is deceased,

☐ Inventor is under legal incapacity,

☐ Inventor cannot be found or reached after diligent effort, or

☑ Inventor has refused to execute the oath or declaration under 37 CFR 1.63.

If there are joint inventors, please check the appropriate box below:

☑ An application data sheet under 37 CFR 1.76 (PTO/AIA/14 or equivalent) naming the entire inventive entity has been or is currently submitted.

OR

☐ An application data sheet under 37 CFR 1.76 (PTO/AIA/14 or equivalent) has not been submitted. Thus, a Substitute Statement Supplemental Sheet (PTO/AIA/11 or equivalent) naming the entire inventive entity and providing inventor information is attached. See 37 CFR 1.64(b).

## WARNING:

Petitioner/applicant is cautioned to avoid submitting personal information in documents filed in a patent application that may contribute to identity theft.  Personal information such as social security numbers, bank account numbers, or credit card numbers (other than a check or credit card authorization form PTO-2038 submitted for payment purposes) is never required by the USPTO to support a petition or an application.  If this type of personal information is included in documents submitted to the USPTO, petitioners/applicants should consider redacting such personal information from the documents before submitting them to the USPTO.  Petitioner/applicant is advised that the record of a patent application is available to the public after publication of the application (unless a non-publication request in compliance with 37 CFR 1.213(a) is made in the application) or issuance of a patent.  Furthermore, the record from an abandoned application may also be available to the public if the application is referenced in a published application or an issued patent (see 37 CFR 1.14).  Checks and credit card authorization forms PTO-2038 submitted for payment purposes are not retained in the application file and therefore are not publicly available.

**PERSON EXECUTING THIS SUBSTITUTE STATEMENT:**

Name: **David S. Atkinson**      Date (Optional): 2015-02-27

Signature: **/David S. Atkinson/**

**APPLICANT NAME AND TITLE OF PERSON EXECUTING THIS SUBSTITUTE STATEMENT:**

If the applicant is a juristic entity, list the applicant name and the title of the signer:

Applicant Name: **Apple Inc.**

Title of Person Executing This Substitute Statement: **Attorney for Applicant, Registration No. 56,655**

The signer, whose title is supplied above, is authorized to act on behalf of the applicant.

**Residence of the signer (unless provided in an application data sheet, PTO/AIA/14 or equivalent):**

City **Denver**   State **CO**   Country **US**

**Mailing Address of the signer (unless provided in an application data sheet, PTO/AIA/14 or equivalent)**

410 Seventeenth Street
Suite 2200

City **Denver**   State **CO**   Zip **80202**   Country **US**

Note: Use an additional PTO/AIA/02 form for each inventor who is deceased, legally incapacitated, cannot be found or reached after diligent effort, or has refused to execute the oath or declaration under 37 CFR 1.63.

## Privacy Act Statement

The **Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1.  The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2.  A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3.  A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4.  A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5.  A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6.  A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7.  A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant ( *i.e.*, GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8.  A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9.  A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

**Exhibit 24
-1130-**

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 21624226 |
| **Application Number:** | 14617422 |
| **International Application Number:** | |
| **Confirmation Number:** | 5106 |
| **Title of Invention:** | Electronic Device that Computes Health Data |
| **First Named Inventor/Applicant Name:** | Marcelo M. Lamego |
| **Customer Number:** | 62579 |
| **Filer:** | Stephen C. Hemenway/Valerie Brown |
| **Filer Authorized By:** | Stephen C. Hemenway |
| **Attorney Docket Number:** | P22734US1 |
| **Receipt Date:** | 27-FEB-2015 |
| **Filing Date:** | 09-FEB-2015 |
| **Time Stamp:** | 15:14:34 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | no |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Oath or Declaration filed | P22734US1SubstituteDeclaration.pdf | 238067<br>abebe84c732ae22d7fc4302d6b35e6329c5fc75f | no | 3 |

| | |
|---|---|
| **Warnings:** | |
| **Information:** | |

Exhibit 24
-1131-

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

<u>New Applications Under 35 U.S.C. 111</u>
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

<u>National Stage of an International Application under 35 U.S.C. 371</u>
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

<u>New International Application Filed with the USPTO as a Receiving Office</u>
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

**Exhibit 24**
**-1132-**

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING OR 371(C) DATE | FIRST NAMED APPLICANT | ATTY. DOCKET NO./TITLE |
|---|---|---|---|
| 14/617,422 | 02/09/2015 | Marcelo M. Lamego | P22734US1 |

**CONFIRMATION NO. 5106**

62579
APPLE INC.
c/o Brownstein Hyatt Farber Schreck
410 17th St.
Suite 2200
DENVER, CO 80202

**NOTICE**

*OC000000073525628*

Date Mailed: 02/24/2015

## INFORMATIONAL NOTICE TO APPLICANT

Applicant is notified that the above-identified application contains the deficiencies noted below. No period for reply is set forth in this notice for correction of these deficiencies. However, if a deficiency relates to the inventor's oath or declaration, the applicant must file an oath or declaration in compliance with 37 CFR 1.63, or a substitute statement in compliance with 37 CFR 1.64, executed by or with respect to each actual inventor no later than the expiration of the time period set in the "Notice of Allowability" to avoid abandonment. See 37 CFR 1.53(f).

The item(s) indicated below are also required and should be submitted with any reply to this notice to avoid further processing delays.

• A properly executed inventor's oath or declaration has not been received for the following inventor(s):
  Marcelo M. Lamego

**Exhibit 24**
**-1133-**

| PATENT APPLICATION FEE DETERMINATION RECORD<br>Substitute for Form PTO-875 | Application or Docket Number<br>14/617,422 |
|---|---|

## APPLICATION AS FILED - PART I

| FOR | (Column 1)<br>NUMBER FILED | (Column 2)<br>NUMBER EXTRA | SMALL ENTITY<br>RATE($) | FEE($) | OR | OTHER THAN<br>SMALL ENTITY<br>RATE($) | FEE($) |
|---|---|---|---|---|---|---|---|
| BASIC FEE<br>(37 CFR 1.16(a), (b), or (c)) | N/A | N/A | N/A | | | N/A | 280 |
| SEARCH FEE<br>(37 CFR 1.16(k), (i), or (m)) | N/A | N/A | N/A | | | N/A | 600 |
| EXAMINATION FEE<br>(37 CFR 1.16(o), (p), or (q)) | N/A | N/A | N/A | | | N/A | 720 |
| TOTAL CLAIMS<br>(37 CFR 1.16(i)) | 21 minus 20 = | * 1 | | | OR | x 80 = | 80 |
| INDEPENDENT CLAIMS<br>(37 CFR 1.16(h)) | 4 minus 3 = | * 1 | | | | x 420 = | 420 |
| APPLICATION SIZE FEE<br>(37 CFR 1.16(s)) | If the specification and drawings exceed 100 sheets of paper, the application size fee due is $310 ($155 for small entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s). | | | | | | 0.00 |
| MULTIPLE DEPENDENT CLAIM PRESENT (37 CFR 1.16(j)) | | | | | | | 0.00 |
| * If the difference in column 1 is less than zero, enter "0" in column 2. | | | TOTAL | | | TOTAL | 2100 |

## APPLICATION AS AMENDED - PART II

| AMENDMENT A | | (Column 1)<br>CLAIMS REMAINING AFTER AMENDMENT | (Column 2)<br>HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3)<br>PRESENT EXTRA | SMALL ENTITY<br>RATE($) | ADDITIONAL FEE($) | OR | OTHER THAN<br>SMALL ENTITY<br>RATE($) | ADDITIONAL FEE($) |
|---|---|---|---|---|---|---|---|---|---|
| | Total<br>(37 CFR 1.16(i)) | * | Minus ** | = | x = | | OR | x = | |
| | Independent<br>(37 CFR 1.16(h)) | * | Minus *** | = | x = | | OR | x = | |
| | Application Size Fee (37 CFR 1.16(s)) | | | | | | | | |
| | FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | | OR | | |
| | | | | | TOTAL ADD'L FEE | | OR | TOTAL ADD'L FEE | |

| AMENDMENT B | | (Column 1)<br>CLAIMS REMAINING AFTER AMENDMENT | (Column 2)<br>HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3)<br>PRESENT EXTRA | SMALL ENTITY<br>RATE($) | ADDITIONAL FEE($) | OR | OTHER THAN<br>SMALL ENTITY<br>RATE($) | ADDITIONAL FEE($) |
|---|---|---|---|---|---|---|---|---|---|
| | Total<br>(37 CFR 1.16(i)) | * | Minus ** | = | x = | | OR | x = | |
| | Independent<br>(37 CFR 1.16(h)) | * | Minus *** | = | x = | | OR | x = | |
| | Application Size Fee (37 CFR 1.16(s)) | | | | | | | | |
| | FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | | OR | | |
| | | | | | TOTAL ADD'L FEE | | OR | TOTAL ADD'L FEE | |

* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.
** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20".
*** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3".
The "Highest Number Previously Paid For" (Total or Independent) is the highest found in the appropriate box in column 1.

Exhibit 24
-1134-



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING or 371(c) DATE | GRP ART UNIT | FIL FEE REC'D | ATTY.DOCKET.NO | TOT CLAIMS | IND CLAIMS |
|---|---|---|---|---|---|---|
| 14/617,422 | 02/09/2015 | 3769 | 2240 | P22734US1 | 21 | 4 |

**CONFIRMATION NO. 5106**

62579
APPLE INC.
c/o Brownstein Hyatt Farber Schreck
410 17th St.
Suite 2200
DENVER, CO 80202

**FILING RECEIPT**

*OC000000073525627*

Date Mailed: 02/24/2015

Receipt is acknowledged of this non-provisional patent application. The application will be taken up for examination in due course. Applicant will be notified as to the results of the examination. Any correspondence concerning the application must include the following identification information: the U.S. APPLICATION NUMBER, FILING DATE, NAME OF APPLICANT, and TITLE OF INVENTION. Fees transmitted by check or draft are subject to collection. Please verify the accuracy of the data presented on this receipt. **If an error is noted on this Filing Receipt, please submit a written request for a Filing Receipt Correction. Please provide a copy of this Filing Receipt with the changes noted thereon. If you received a "Notice to File Missing Parts" for this application, please submit any corrections to this Filing Receipt with your reply to the Notice. When the USPTO processes the reply to the Notice, the USPTO will generate another Filing Receipt incorporating the requested corrections**

**Inventor(s)**
 Marcelo M. Lamego, Cupertino, CA;

**Applicant(s)**
 Apple Inc., Cupertino, CA

**Power of Attorney:** The patent practitioners associated with Customer Number 62579

**Domestic Priority data as claimed by applicant**
 This appln claims benefit of 62/056,299 09/26/2014

**Foreign Applications** for which priority is claimed (You may be eligible to benefit from the **Patent Prosecution Highway** program at the USPTO. Please see http://www.uspto.gov for more information.) - None.
*Foreign application information must be provided in an Application Data Sheet in order to constitute a claim to foreign priority. See 37 CFR 1.55 and 1.76.*

**If Required, Foreign Filing License Granted:** 02/20/2015

The country code and number of your priority application, to be used for filing abroad under the Paris Convention, is **US 14/617,422**

**Projected Publication Date:** Request for Non-Publication Acknowledged

**Non-Publication Request:** Yes

**Early Publication Request:** No

**Exhibit 24**
**-1135-**

**Title**

      Electronic Device that Computes Health Data

**Preliminary Class**

      600

**Statement under 37 CFR 1.55 or 1.78 for AIA (First Inventor to File) Transition Applications:** No

## PROTECTING YOUR INVENTION OUTSIDE THE UNITED STATES

Since the rights granted by a U.S. patent extend only throughout the territory of the United States and have no effect in a foreign country, an inventor who wishes patent protection in another country must apply for a patent in a specific country or in regional patent offices. Applicants may wish to consider the filing of an international application under the Patent Cooperation Treaty (PCT). An international (PCT) application generally has the same effect as a regular national patent application in each PCT-member country. The PCT process **simplifies** the filing of patent applications on the same invention in member countries, but **does not result** in a grant of "an international patent" and does not eliminate the need of applicants to file additional documents and fees in countries where patent protection is desired.

Almost every country has its own patent law, and a person desiring a patent in a particular country must make an application for patent in that country in accordance with its particular laws. Since the laws of many countries differ in various respects from the patent law of the United States, applicants are advised to seek guidance from specific foreign countries to ensure that patent rights are not lost prematurely.

Applicants also are advised that in the case of inventions made in the United States, the Director of the USPTO must issue a license before applicants can apply for a patent in a foreign country. The filing of a U.S. patent application serves as a request for a foreign filing license. The application's filing receipt contains further information and guidance as to the status of applicant's license for foreign filing.

Applicants may wish to consult the USPTO booklet, "General Information Concerning Patents" (specifically, the section entitled "Treaties and Foreign Patents") for more information on timeframes and deadlines for filing foreign patent applications. The guide is available either by contacting the USPTO Contact Center at 800-786-9199, or it can be viewed on the USPTO website at http://www.uspto.gov/web/offices/pac/doc/general/index.html.

For information on preventing theft of your intellectual property (patents, trademarks and copyrights), you may wish to consult the U.S. Government website, http://www.stopfakes.gov. Part of a Department of Commerce initiative, this website includes self-help "toolkits" giving innovators guidance on how to protect intellectual property in specific countries such as China, Korea and Mexico. For questions regarding patent enforcement issues, applicants may call the U.S. Government hotline at 1-866-999-HALT (1-866-999-4258).

**Exhibit 24**

**-1136-**

# LICENSE FOR FOREIGN FILING UNDER

## Title 35, United States Code, Section 184

## Title 37, Code of Federal Regulations, 5.11 & 5.15

**GRANTED**

The applicant has been granted a license under 35 U.S.C. 184, if the phrase "IF REQUIRED, FOREIGN FILING LICENSE GRANTED" followed by a date appears on this form. Such licenses are issued in all applications where the conditions for issuance of a license have been met, regardless of whether or not a license may be required as set forth in 37 CFR 5.15. The scope and limitations of this license are set forth in 37 CFR 5.15(a) unless an earlier license has been issued under 37 CFR 5.15(b). The license is subject to revocation upon written notification. The date indicated is the effective date of the license, unless an earlier license of similar scope has been granted under 37 CFR 5.13 or 5.14.

This license is to be retained by the licensee and may be used at any time on or after the effective date thereof unless it is revoked. This license is automatically transferred to any related applications(s) filed under 37 CFR 1.53(d). This license is not retroactive.

The grant of a license does not in any way lessen the responsibility of a licensee for the security of the subject matter as imposed by any Government contract or the provisions of existing laws relating to espionage and the national security or the export of technical data. Licensees should apprise themselves of current regulations especially with respect to certain countries, of other agencies, particularly the Office of Defense Trade Controls, Department of State (with respect to Arms, Munitions and Implements of War (22 CFR 121-128)); the Bureau of Industry and Security, Department of Commerce (15 CFR parts 730-774); the Office of Foreign AssetsControl, Department of Treasury (31 CFR Parts 500+) and the Department of Energy.

**NOT GRANTED**

No license under 35 U.S.C. 184 has been granted at this time, if the phrase "IF REQUIRED, FOREIGN FILING LICENSE GRANTED" DOES NOT appear on this form. Applicant may still petition for a license under 37 CFR 5.12, if a license is desired before the expiration of 6 months from the filing date of the application. If 6 months has lapsed from the filing date of this application and the licensee has not received any indication of a secrecy order under 35 U.S.C. 181, the licensee may foreign file the application pursuant to 37 CFR 5.15(b).

---

## *SelectUSA*

The United States represents the largest, most dynamic marketplace in the world and is an unparalleled location for business investment, innovation, and commercialization of new technologies. The U.S. offers tremendous resources and advantages for those who invest and manufacture goods here. Through SelectUSA, our nation works to promote and facilitate business investment. SelectUSA provides information assistance to the international investor community; serves as an ombudsman for existing and potential investors; advocates on behalf of U.S. cities, states, and regions competing for global investment; and counsels U.S. economic development organizations on investment attraction best practices. To learn more about why the United States is the best country in the world to develop technology, manufacture products, deliver services, and grow your business, visit http://www.SelectUSA.gov or call +1-202-482-6800.

**Exhibit 24**
**-1137-**

PTO/AIA/15 (03-13)
Approved for use through 01/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless it displays a valid OMB control number

# UTILITY PATENT APPLICATION TRANSMITTAL

*(Only for new nonprovisional applications under 37 CFR 1.53(b))*

| | |
|---|---|
| Attorney Docket No. | **P22734US1** |
| First Named Inventor | **Marcelo M. Lamego** |
| Title | Electronic Device that Computes Health Data |
| Express Mail Label No. | **Electronic Filing** |

## APPLICATION ELEMENTS
*See MPEP chapter 600 concerning utility patent application contents.*

**ADDRESS TO:**
**Commissioner for Patents**
**P.O. Box 1450**
**Alexandria, VA 22313-1450**

1. [ ] **Fee Transmittal Form**
(PTO/SB/17 or equivalent)

2. [ ] **Applicant asserts small entity status.**
See 37 CFR 1.27

3. [ ] **Applicant certifies micro entity status.** See 37 CFR 1.29.
Applicant must attach form PTO/SB/15A or B or equivalent.

4. [✓] **Specification** *[Total Pages* 25 *]*
Both the claims and abstract must start on a new page.
*(See MPEP § 608.01(a) for information on the preferred arrangement)*

5. [✓] **Drawing(s)** (35 U.S.C. 113) *[Total Sheets* 7 *]*

6. **Inventor's Oath or Declaration** *[Total Pages _____ ]*
*(including substitute statements under 37 CFR 1.64 and assignments serving as an oath or declaration under 37 CFR 1.63(e))*
  a. [ ] Newly executed (original or copy)
  b. [ ] A copy from a prior application (37 CFR 1.63(d))

7. [✓] **Application Data Sheet** *See note below.*
See 37 CFR 1.76 (PTO/AIA/14 or equivalent)

8. [ ] **CD-ROM or CD-R**
in duplicate, large table, or Computer Program (*Appendix*)
  [ ] Landscape Table on CD

9. **Nucleotide and/or Amino Acid Sequence Submission**
*(if applicable, items a. – c. are required)*
  a. [ ] Computer Readable Form (CRF)
  b. [ ] Specification Sequence Listing on:
    i. [ ] CD-ROM or CD-R (2 copies); or
    ii. [ ] Paper
  c. [ ] Statements verifying identity of above copies

## ACCOMPANYING APPLICATION PAPERS

10. [ ] **Assignment Papers**
(cover sheet & document(s))
Name of Assignee _____

11. [ ] **37 CFR 3.73(c) Statement**
(*when there is an assignee*)      [✓] **Power of Attorney**

12. [ ] **English Translation Document**
(*if applicable*)

13. [ ] **Information Disclosure Statement**
(PTO/SB/08 or PTO-1449)
  [ ] Copies of citations attached

14. [ ] **Preliminary Amendment**

15. [ ] **Return Receipt Postcard**
(MPEP § 503) (Should be specifically itemized)

16. [ ] **Certified Copy of Priority Document(s)**
(*if foreign priority is claimed*)

17. [✓] **Nonpublication Request**
Under 35 U.S.C. 122(b)(2)(B)(i). Applicant must attach form PTO/SB/35 or equivalent.

18. [ ] **Other:** _____
_____
_____
_____
_____
_____

**\*Note:** (1) Benefit claims under 37 CFR 1.78 and foreign priority claims under 1.55 **must** be included in an Application Data Sheet (ADS).
(2) For applications filed under 35 U.S.C. 111, the application must contain an ADS specifying the applicant if the applicant is an assignee, person to whom the inventor is under an obligation to assign, or person who otherwise shows sufficient proprietary interest in the matter. See 37 CFR 1.46(b).

## 19. CORRESPONDENCE ADDRESS

[✓] The address associated with Customer Number: 62579      OR   [ ] Correspondence address below

| | |
|---|---|
| Name | |
| Address | |
| City | State | Zip Code |
| Country | Telephone | Email |

| Signature | /David S. Atkinson/ | Date | February 9, 2015 |
|---|---|---|---|
| Name (Print/Type) | David S. Atkinson | Registration No. (Attorney/Agent) | 56,655 |

This collection of information is required by 37 CFR 1.53(b). The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

Exhibit 24
-1138-

## Privacy Act Statement

The **Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (*i.e.*, GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

**Exhibit 24**
**-1139-**

PTO/AIA/14 (12-13)
Approved for use through 01/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | P22734US1 |
|---|---|---|
| | Application Number | |

| Title of Invention | Electronic Device that Computes Health Data |
|---|---|

The application data sheet is part of the provisional or nonprovisional application for which it is being submitted. The following form contains the bibliographic data arranged in a format specified by the United States Patent and Trademark Office as outlined in 37 CFR 1.76.
This document may be completed electronically and submitted to the Office in electronic format using the Electronic Filing System (EFS) or the document may be printed and included in a paper filed application.

## Secrecy Order 37 CFR 5.2

☐ Portions or all of the application associated with this Application Data Sheet may fall under a Secrecy Order pursuant to 37 CFR 5.2  (Paper filers only. Applications that fall under Secrecy Order may not be filed electronically.)

## Inventor Information:

| Inventor | 1 | | | Remove |
|---|---|---|---|---|

**Legal Name**

| Prefix | Given Name | Middle Name | Family Name | Suffix |
|---|---|---|---|---|
| | Marcelo | M. | Lamego | |

| **Residence Information (Select One)** | ◉ US Residency | ○ Non US Residency | ○ Active US Military Service |
|---|---|---|---|

| City | Cupertino | State/Province | CA | Country of Residence | US |
|---|---|---|---|---|---|

**Mailing Address of Inventor:**

| Address 1 | 10292 Orange Avenue |
|---|---|
| Address 2 | |

| City | Cupertino | State/Province | CA |
|---|---|---|---|
| Postal Code | 95014 | Country i | US |

All Inventors Must Be Listed - Additional Inventor Information blocks may be generated within this form by selecting the **Add** button.   [Add]

## Correspondence Information:

Enter either Customer Number or complete the Correspondence Information section below.
For further information see 37 CFR 1.33(a).

☐ **An Address is being provided for the correspondence Information of this application.**

| Customer Number | 62579 |
|---|---|
| Email Address | | [Add Email] [Remove Email] |

## Application Information:

| Title of the Invention | Electronic Device that Computes Health Data | |
|---|---|---|
| Attorney Docket Number | P22734US1 | Small Entity Status Claimed ☐ |
| Application Type | Nonprovisional | |
| Subject Matter | Utility | |
| Total Number of Drawing Sheets (if any) | 7 | Suggested Figure for Publication (if any) 4 |

## Filing By Reference :

**Exhibit 24**
**-1140-**

PTO/AIA/14 (12-13)
Approved for use through 01/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | P22734US1 |
|---|---|---|
| | Application Number | |

| Title of Invention | Electronic Device that Computes Health Data |
|---|---|

Only complete this section when filing an application by reference under 35 U.S.C. 111(c) and 37 CFR 1.57(a).  Do not complete this section if application papers including a specification and any drawings are being filed.  Any domestic benefit or foreign priority information must be provided in the appropriate section(s) below (i.e., "Domestic Benefit/National Stage Information" and "Foreign Priority Information").

For the purposes of a filing date under 37 CFR 1.53(b), the description and any drawings of the present application are replaced by this reference to the previously filed application, subject to conditions and requirements of 37 CFR 1.57(a).

| Application number of the previously filed application | Filing date (YYYY-MM-DD) | Intellectual Property Authority or Country |
|---|---|---|
| | | |

## Publication Information:

☐  Request Early Publication (Fee required at time of Request 37 CFR 1.219)

☒  **Request Not to Publish.**  I hereby request that the attached application not be published under 35 U.S.C. 122(b) and certify  that the invention disclosed in the attached application **has not and will not** be the subject of an application filed in another country, or under a  multilateral international agreement, that requires publication at eighteen months after filing.

## Representative Information:

Representative information should be provided for all practitioners having a power of attorney in the application. Providing this information in the Application Data Sheet does not constitute a power of attorney in the application (see 37 CFR 1.32). Either enter Customer Number or complete the Representative Name section below. If both sections are completed the customer Number will be used for the Representative Information during processing.

| Please Select One: | ⦿ Customer Number | ◯ US Patent Practitioner | ◯ Limited Recognition (37 CFR 11.9) |
|---|---|---|---|
| Customer Number | 62579 | | |

## Domestic Benefit/National Stage Information:

This section allows for the applicant to either claim benefit under 35 U.S.C. 119(e), 120, 121, or 365(c) or indicate National Stage entry from a PCT application.  Providing this information in the application data sheet constitutes the specific reference required by 35 U.S.C. 119(e) or 120, and 37 CFR 1.78.
When referring to the current application, please leave the application number blank.

| Prior Application Status | Pending | | Remove |
|---|---|---|---|
| Application Number | Continuity Type | Prior Application Number | Filing Date (YYYY-MM-DD) |
| | Claims benefit of provisional | 62/056299 | 2014-09-26 |

Additional Domestic Benefit/National Stage Data may be generated within this form by selecting the **Add** button.

## Foreign Priority Information:

Exhibit 24
-1141-

PTO/AIA/14 (12-13)
Approved for use through 01/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | P22734US1 |
|---|---|---|
| | Application Number | |

| Title of Invention | Electronic Device that Computes Health Data |
|---|---|

This section allows for the applicant to claim priority to a foreign application. Providing this information in the application data sheet constitutes the claim for priority as required by 35 U.S.C. 119(b) and 37 CFR 1.55(d). When priority is claimed to a foreign application that is eligible for retrieval under the priority document exchange program (PDX)[i] the information will be used by the Office to automatically attempt retrieval pursuant to 37 CFR 1.55(h)(1) and (2). Under the PDX program, applicant bears the ultimate responsibility for ensuring that a copy of the foreign application is received by the Office from the participating foreign intellectual property office, or a certified copy of the foreign priority application is filed, within the time period specified in 37 CFR 1.55(g)(1).

| | | | Remove |
|---|---|---|---|
| Application Number | Country[i] | Filing Date (YYYY-MM-DD) | Access Code[i] (if applicable) |
| | | | |

Additional Foreign Priority Data may be generated within this form by selecting the **Add** button.

## Statement under 37 CFR 1.55 or 1.78 for AIA (First Inventor to File) Transition Applications

☐ This application (1) claims priority to or the benefit of an application filed before March 16, 2013 and (2) also contains, or contained at any time, a claim to a claimed invention that has an effective filing date on or after March 16, 2013.
NOTE: By providing this statement under 37 CFR 1.55 or 1.78, this application, with a filing date on or after March 16, 2013, will be examined under the first inventor to file provisions of the AIA.

## Authorization to Permit Access:

☐ Authorization to Permit Access to the Instant Application by the Participating Offices

Exhibit 24
-1142-

PTO/AIA/14 (12-13)
Approved for use through 01/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | P22734US1 |
|---|---|---|
| | Application Number | |

| Title of Invention | Electronic Device that Computes Health Data |
|---|---|

If checked, the undersigned hereby grants the USPTO authority to provide the European Patent Office (EPO),
the Japan Patent Office (JPO), the Korean Intellectual Property Office (KIPO), the World Intellectual Property Office (WIPO),
and any other intellectual property offices in which a foreign application claiming priority to the instant patent application
is filed access to the instant patent application. See 37 CFR 1.14(c) and (h). This box should not be checked if the applicant
does not wish the EPO, JPO, KIPO, WIPO, or other intellectual property office in which a foreign application claiming priority
to the instant patent application is filed to have access to the instant patent application.

In accordance with 37 CFR 1.14(h)(3), access will be provided to a copy of the instant patent application with respect
to: 1) the instant patent application-as-filed; 2) any foreign application to which the instant patent application
claims priority under 35 U.S.C. 119(a)-(d) if a copy of the foreign application that satisfies the certified copy requirement of
37 CFR 1.55 has been filed in the instant patent application; and 3) any U.S. application-as-filed from which benefit is
sought in the instant patent application.

In accordance with 37 CFR 1.14(c), access may be provided to information concerning the date o f filing this Authorization.

# Applicant Information:

Providing assignment information in this section does not substitute for compliance with any requirement of part 3 of Title 37 of CFR
to have an assignment recorded by the Office.

## Applicant   1

If the applicant is the inventor (or the remaining joint inventor or inventors under 37 CFR 1.45), this section should not be completed.
The information to be provided in this section is the name and address of the legal representative who is the applicant under 37 CFR
1.43; or the name and address of the assignee, person to whom the inventor is under an obligation to assign the invention, or person
who otherwise shows sufficient proprietary interest in the matter who is the applicant under 37 CFR 1.46. If the applicant is an
applicant under 37 CFR 1.46 (assignee, person to whom the inventor is obligated to assign, or person who otherwise shows sufficient
proprietary interest) together with one or more joint inventors, then the joint inventor or inventors who are also the applicant should be
identified in this section.

| Clear |
|---|

| ◉ Assignee | ○ Legal Representative under  35 U.S.C. 117 | ○ Joint Inventor |
|---|---|---|
| ○ Person to whom the inventor is obligated to assign. | ○ Person who shows sufficient proprietary interest | |

If applicant is the legal representative, indicate the authority to file the patent application, the inventor is:

| | |
|---|---|

| Name of the Deceased or Legally Incapacitated Inventor : | |
|---|---|

| If the Applicant is an Organization check here. | ☒ |
|---|---|

| Organization Name | Apple Inc. |
|---|---|

### Mailing Address Information For Applicant:

| Address 1 | One Infinite Loop | | |
|---|---|---|---|
| Address 2 | | | |
| City | Cupertino | State/Province | CA |
| Country | US | Postal Code | 95014 |
| Phone Number | | Fax Number | |

Exhibit 24
-1143-

PTO/AIA/14 (12-13)
Approved for use through 01/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | P22734US1 |
|---|---|---|
| | Application Number | |

| Title of Invention | Electronic Device that Computes Health Data |
|---|---|

| Email Address | |
|---|---|

Additional Applicant Data may be generated within this form by selecting the Add button.

# Assignee Information including Non-Applicant Assignee Information:

Providing assignment information in this section does not subsitute for compliance with any requirement of part 3 of Title 37 of CFR to have an assignment recorded by the Office.

**Assignee    1**

Complete this section if assignee information, including non-applicant assignee information, is desired to be included on the patent application publication . An assignee-applicant identified in the "Applicant Information" section will appear on the patent application publication as an applicant. For an assignee-applicant, complete this section only if identification as an assignee is also desired on the patent application publication.

| If the Assignee or Non-Applicant Assignee is an Organization check here. | ☐ |
|---|---|

| Prefix | Given Name | Middle Name | Family Name | Suffix |
|---|---|---|---|---|
| | | | | |

**Mailing Address Information For Assignee including Non-Applicant Assignee:**

| Address 1 | |
|---|---|
| Address 2 | |

| City | | State/Province | |
|---|---|---|---|
| Country i | | Postal Code | |
| Phone Number | | Fax Number | |
| Email Address | | | |

Additional Assignee or Non-Applicant Assignee Data may be generated within this form by selecting the Add button.

## Signature:

NOTE:  This form must be signed in accordance with 37 CFR 1.33.  See 37 CFR 1.4 for signature requirements and certifications.

| Signature | /David S. Atkinson/ | | | Date  (YYYY-MM-DD) | 2015-02-09 |
|---|---|---|---|---|---|
| First Name | David S. | Last Name | Atkinson | Registration Number | 56655 |

Additional Signature may be generated within this form by selecting the Add button.

Exhibit 24
-1144-

PTO/AIA/14 (12-13)
Case 8:20-cv-00048-JVS-JDE   Document 109-1   Filed 08/17/20   Page 1084 of 1129   Page
ID #:8041
Approved for use through 01/31/2014.  OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | P22734US1 |
|---|---|---|
| | Application Number | |

| Title of Invention | Electronic Device that Computes Health Data |
|---|---|

This collection of information is required by 37 CFR 1.76.  The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application.  Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14.  This collection is estimated to take 23 minutes to complete, including gathering, preparing, and submitting the completed application data sheet form to the USPTO.  Time will vary depending upon the individual case.  Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450.  DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS.  **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

**Exhibit 24**
**-1145-**

# Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent.  Accordingly, pursuant to the requirements of the Act, please be advised that:  (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent.  If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a).  Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these records.

2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract.  Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent C o o p eration Treaty.

6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906.  Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive.  Such disclosure shall not be used to make determinations about individuals.

8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151.  Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

**Exhibit 24**
**-1146-**

PTO/AIA/82A (07-13)
Approved for use through 11/30/2014. OMB 0651-0051
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# TRANSMITTAL FOR POWER OF ATTORNEY TO ONE OR MORE REGISTERED PRACTITIONERS

NOTE: This form is to be submitted with the Power of Attorney by Applicant form (PTO/AIA/82B) to identify the application to which the Power of Attorney is directed, in accordance with 37 CFR 1.5, unless the application number and filing date are identified in the Power of Attorney by Applicant form.  If neither form PTO/AIA/82A nor form PTO/AIA82B identifies the application to which the Power of Attorney is directed, the Power of Attorney will not be recognized in the application.

| | |
|---|---|
| Application Number | **Not Yet Assigned** |
| Filing Date | **Herewith** |
| First Named Inventor | Marcelo M. Lamego |
| Title | Electronic Device that Computes Health Data |
| Art Unit | **Not Yet Assigned** |
| Examiner Name | **Not Yet Assigned** |
| Attorney Docket Number | P22734US1 |

| SIGNATURE of Applicant or Patent Practitioner | | | |
|---|---|---|---|
| Signature | /David S. Atkinson/ | Date (Optional) | February 9, 2015 |
| Name | David S. Atkinson | Registration Number | 56,655 |
| Title (if Applicant is a juristic entity) | Attorney for Applicant | | |
| Applicant Name (if Applicant is a juristic entity) | Apple Inc. | | |

**NOTE:**  This form must be signed in accordance with 37 CFR 1.33.  See 37 CFR 1.4(d) for signature requirements and certifications. If more than one applicant, use multiple forms.

[✓] *Total of   1   forms are submitted.

This collection of information is required by 37 CFR 1.131, 1.32, and 1.33. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application.  Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 3 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

Exhibit 24
-1147-

| PTO/SB/08A and B (08-03)<br>U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE<br>Substitute for Form 1449A/PTO | APPLICATION NO.:<br>Not Yet Assigned | FILING DATE:<br>Herewith |
|---|---|---|
| **INFORMATION DISCLOSURE<br>STATEMENT BY APPLICANT** | FIRST NAMED INVENTOR:<br>Marcelo M. Lamego | ART UNIT:<br>Not Yet Assigned |
| ***(Use as many sheets as necessary)*** | EXAMINER NAME:<br>Not Yet Assigned | ATTY. DOCKET NO.:<br>P22734US1 |

### U.S. PATENT DOCUMENTS

| EXAMINER INITIALS* | Cite No. | PATENT NUMBER<br>Number – Kind Code² (if known) | ISSUE DATE<br>MM-DD-YYYY | Name of Patentee of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | A1. | 7,915,601 | 03/2011 | Setlak et al. | |
| | | | | | |

### U.S. PUBLICATION DOCUMENTS

| EXAMINER INITIALS* | Cite No.¹ | PUBLICATION NUMBER<br>Number – Kind Code² (if known) | PUBLICATION DATE<br>MM-DD-YYYY | Name of Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | B1. | 2011/0015496 | 01/2011 | Sherman et al. | |
| | B2. | 2013/0072145 | 03/2013 | Dantu | |
| | | | | | |

### FOREIGN PATENT DOCUMENTS

| EXAMINER INITIALS* | Cite No.¹ | DOCUMENT NUMBER<br>Country Code⁷ – Number⁵ – Kind Code⁵ (if known) | PUBLICATION DATE<br>MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear | T⁶ |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |

### NONPATENT LITERATURE DOCUMENTS

| EXAMINER INITIALS* | Cite No.¹ | Include name of Author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and/or country where published. | T⁶ |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

| PTO/SB/08A and B (08-03)<br>U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE<br>Substitute for Form 1449A/PTO | **APPLICATION NO.:**<br>Not Yet Assigned | **FILING DATE:**<br>Herewith |
|---|---|---|
| **INFORMATION DISCLOSURE**<br>**STATEMENT BY APPLICANT** | **FIRST NAMED INVENTOR:**<br>Marcelo M. Lamego | **ART UNIT:**<br>Not Yet Assigned |
| ***(Use as many sheets as necessary)*** | **EXAMINER NAME:**<br>Not Yet Assigned | **ATTY. DOCKET NO.:**<br>P22734US1 |

| **EXAMINER: Initial if citation considered, whether or not citation is in conformance with MPEP 609; Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.** | | |
|---|---|---|
| Examiner Signature | | Date Considered | |

[1] Applicant's unique citation number (optional).  [2] See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04.  [3] Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3).  [4] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document.  [5] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible.  [6] Applicant is to place a check mark here if English language Translation is attached.

# Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | |
| **Filing Date:** | |
| **Title of Invention:** | Electronic Device that Computes Health Data |
| **First Named Inventor/Applicant Name:** | Marcelo M. Lamego |
| **Filer:** | Stephen C. Hemenway/Valerie Brown |
| **Attorney Docket Number:** | P22734US1 |

Filed as Large Entity

**Filing Fees for  Utility under 35 USC 111(a)**

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| Utility application filing | 1011 | 1 | 280 | 280 |
| Utility Search Fee | 1111 | 1 | 600 | 600 |
| Utility Examination Fee | 1311 | 1 | 720 | 720 |
| **Pages:** | | | | |
| **Claims:** | | | | |
| Claims in Excess of 20 | 1202 | 1 | 80 | 80 |
| Independent claims in excess of 3 | 1201 | 1 | 420 | 420 |
| **Miscellaneous-Filing:** | | | | |

Exhibit 24
-1150-

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| Late Filing Fee for Oath or Declaration | 1051 | 1 | 140 | 140 |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |
| **Post-Allowance-and-Post-Issuance:** | | | | |
| **Extension-of-Time:** | | | | |
| **Miscellaneous:** | | | | |
| | **Total in USD ($)** | | | **2240** |

Exhibit 24
-1151-

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 21441891 |
| **Application Number:** | 14617422 |
| **International Application Number:** | |
| **Confirmation Number:** | 5106 |
| **Title of Invention:** | Electronic Device that Computes Health Data |
| **First Named Inventor/Applicant Name:** | Marcelo M. Lamego |
| **Customer Number:** | 62579 |
| **Filer:** | Stephen C. Hemenway/Valerie Brown |
| **Filer Authorized By:** | Stephen C. Hemenway |
| **Attorney Docket Number:** | P22734US1 |
| **Receipt Date:** | 09-FEB-2015 |
| **Filing Date:** | |
| **Time Stamp:** | 16:42:06 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | Credit Card |
| Payment was successfully received in RAM | $ 2240 |
| RAM confirmation Number | 3363 |
| Deposit Account | 504621 |
| Authorized User | BROWN, VALERIE |

The Director of the USPTO is hereby authorized to charge indicated fees and credit any overpayment as follows:

Charge any Additional Fees required under 37 C.F.R. Section 1.16 (National application filing, search, and examination fees)

Charge any Additional Fees required under 37 C.F.R. Section 1.17 (Patent application and reexamination processing fees)

Exhibit 24
-1152-

Charge any Additional Fees required under 37 C.F.R. Section 1.19 (Document supply fees)

Charge any Additional Fees required under 37 C.F.R. Section 1.20 (Post Issuance fees)

Charge any Additional Fees required under 37 C.F.R. Section 1.21 (Miscellaneous fees and charges)

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Transmittal of New Application | P22734US1ApplicationTransmittal.pdf | 202601<br>bbca8371ef44c57ed7fa91a472bad0bbef58fc50 | no | 2 |
| Warnings: | | | | | |
| Information: | | | | | |
| 2 | Application Data Sheet | P22734US1ApplicationDataSheet.pdf | 95912<br>cae9e8a7dd271134f7b118eb0b26a562e8b9c345 | no | 7 |
| Warnings: | | | | | |
| Information: | | | | | |
| This is not an USPTO supplied ADS fillable form | | | | | |
| 3 | Power of Attorney | P22734US1TransmittalOfPower.pdf | 98856<br>724016f365e36df1406e84ade91f34e21164b707 | no | 1 |
| Warnings: | | | | | |
| Information: | | | | | |
| 4 | Power of Attorney | P22734US1PowerOfAttorney.PDF | 206999<br>ee30dfc789fa2a0b8384a4896ae2afd2cf9f150b | no | 1 |
| Warnings: | | | | | |
| Information: | | | | | |
| 5 | Nonpublication request from applicant. | P22734US1NonpublicationRequest.pdf | 124866<br>a19d9bc0c24edd10a4c4d79d4cff36756d5bcc84 | no | 1 |
| Warnings: | | | | | |
| Information: | | | | | |
| 6 | | P22734US1SpecificationFinal.pdf | 105642<br>67e25f529a688a28a53cb49eae394b8087743648 | yes | 25 |

| | Multipart Description/PDF files in .zip description | | |
|---|---|---|---|
| | Document Description | Start | End |
| | Specification | 1 | 20 |
| | Claims | 21 | 24 |

**Exhibit 24**
-1153-

| | Abstract | | | 25 | 25 |
|---|---|---|---|---|---|
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 7 | Drawings-only black and white line drawings | P22734US1Drawings.pdf | 74476<br><br>71a565e13876d00c24125069b47034d09246b5d6 | no | 7 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 8 | Transmittal Letter | P22734US1IDS.pdf | 15808<br><br>e2e68ad64b24a9ce8834544a348cf3b17ce2665b | no | 2 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 9 | Information Disclosure Statement (IDS) Form (SB08) | P22734US1PTOSB08.pdf | 33201<br><br>81d512d2b49ae3ea624960eee46c2f4a74f647f7 | no | 2 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| This is not an USPTO supplied IDS fillable form | | | | | |
| 10 | Fee Worksheet (SB06) | fee-info.pdf | 39710<br><br>b2fec03e7060b9ae4c092e6c39ae87ac8c28f017 | no | 2 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| | | **Total Files Size (in bytes):** | | 998071 | |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

Exhibit 24
-1154-

PTO/AIA/82B(07-12)
Approved for use through 11/30/2014. OMB 0651-0035
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# POWER OF ATTORNEY BY APPLICANT

I hereby revoke all previous powers of attorney given in the application identified in the attached transmittal letter.

☑ I hereby appoint Practitioner(s) associated with the following Customer Number as my/our attorney(s) or agent(s), and to transact all business in the United States Patent and Trademark Office connected therewith for the application referenced in the attached transmittal letter (form PTO/AIA/82A or equivalent):

> 62579

OR

☐ I hereby appoint Practitioner(s) named below as my/our attorney(s) or agent(s), and to transact all business in the United States Patent and Trademark Office connected therewith for the application referenced in the attached transmittal letter (form PTO/AIA/82A or equivalent):

| Name | Registration Number | Name | Registration Number |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

Please recognize or change the correspondence address for the application identified in the attached transmittal letter to:

☑ The address associated with the above-mentioned Customer Number.

OR

☐ The address associated with Customer Number:

OR

☐ Firm or Individual Name

| Address | |
|---|---|
| City | State  Zip |
| Country | |
| Telephone | Email |

I am the Applicant:

☐ Inventor or Joint Inventor

☐ Legal Representative of a Deceased or Legally Incapacitated Inventor

☑ Assignee or Person to Whom the Inventor is Under an Obligation to Assign

☐ Person Who Otherwise Shows Sufficient Proprietary Interest (e.g., a petition under 37 CFR 1.46(b)(2) was granted in the application or is concurrently being filed with this document)

SIGNATURE of Applicant for Patent

| Signature | | Date | 9/27/16 |
|---|---|---|---|
| Name | BJ Watrous, | Telephone | 408 974-0015 |
| Title and Company | Vice President and Chief IP Counsel, Apple Inc. | | |

NOTE: Signature - This form must be signed by the applicant in accordance with 37 CFR 1.33. See 37 CFR 1.4 for signature requirements and certifications. Submit multiple forms for more than one signature, see below *.

* Total of _____ forms are submitted.

This collection of information is required by 37 CFR 1.31, 1.32 and 1.33. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 3 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

Exhibit 24
-1155-

PTO/SB/35 (07-09)
Approved for use through 07/31/2012. OMB 0651-0031
U.S. Patent and Trademark Office; U. S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# NONPUBLICATION REQUEST UNDER 35 U.S.C. 122(b)(2)(B)(i)

| First Named Inventor | Marcelo M. Lamego |
|---|---|
| Title | Electronic Device that Computes Health Data |
| Attorney Docket Number | P22734US1 |

I hereby certify that the invention disclosed in the attached application **has not and will not be** the subject of an application filed in another country, or under a multilateral international agreement, that requires publication at eighteen months after filing.

I hereby request that the attached application not be published under 35 U.S.C. 122(b).

/David S. Atkinson/                                February 9, 2015

_____          _____
Signature                                                            Date

David S. Atkinson                                       56,655

_____          _____
Typed or printed name                        Registration Number, if applicable

303-223-1100

_____
Telephone Number

This request must be signed in compliance with 37 CFR 1.33(b) and submitted with the application **upon filing.**

Applicant may rescind this nonpublication request at any time. If applicant rescinds a request that an application not be published under 35 U.S.C. 122(b), the application will be scheduled for publication at eighteen months from the earliest claimed filing date for which a benefit is claimed.

If applicant subsequently files an application directed to the invention disclosed in the attached application in another country, or under a multilateral international agreement, that requires publication of applications eighteen months after filing, the applicant **must** notify the United States Patent and Trademark Office of such filing within forty-five (45) days after the date of the filing of such foreign or international application. **Failure to do so will result in abandonment of this application (35 U.S.C. 122(b)(2)(B)(iii)).**

This collection of information is required by 37 CFR 1.213(a). The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application.  Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14.  This collection is estimated to take 6 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO.  Time will vary depending upon the individual case.  Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450.  DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO:  Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 (1-800-786-9199) and select option 2.*

Exhibit 24
-1156-

Attorney Docket No. P22734US1

# ELECTRONIC DEVICE THAT COMPUTES HEALTH DATA

Cross-Reference to Related Application

[0001] This application claims the benefit under 35 U.S.C. § 119(e) of U.S. Provisional Patent Application No. 62/056,299, filed on September 26, 2014, and entitled "Electronic Device that Computes Health Data," which is incorporated by reference as if fully disclosed herein.

Exhibit 24
-1157-

Attorney Docket No. P22734US1

Technical Field

   **[0002]** This disclosure relates generally to health data, and more specifically to an electronic device that computes health data

Exhibit 24
-1158-

Attorney Docket No. P22734US1

<u>Background</u>

**[0003]** It may be beneficial for a user to have information about his or her health data, including fitness data and wellness data.  For example, health data may indicate emergency conditions or to enable the user to maximize fitness or wellness activities.  Traditionally, health data is provided to users by health care professionals.  However, it may be beneficial for users to have more access to health data.

**Exhibit 24**
**-1159-**

Attorney Docket No. P22734US1

<u>Summary</u>

[0004]  The present disclosure discloses systems, apparatuses, and methods related to an electric device that computes health data.  An electronic device may include a camera, an ambient light sensor, and a proximity sensor.  The electronic device may use one or more of the camera and the proximity sensor to emit light into a body part of a user touching a surface of the electronic device and one or more of the camera, the ambient light sensor, and the proximity sensor to receive at least part of the emitted light reflected by the body part of the user.  The electronic device may compute health data of the user based upon sensor data regarding the received light.  In some implementations, the electronic device may also include one or more electrical contacts that contact one or more body parts of the user.  In such implementations, the health data may be further computed based on the an electrical measurement obtained using the electrical contacts.

[0005]  In some implementations, the electronic device may utilize the camera to determine the user's body part is misaligned with the camera, the ambient light sensor, and the proximity sensor for purposes of detecting the information about the body part of the user.  In such implementations, the electronic device may provide guidance to correct the misalignment.

[0006]  In various embodiments, a mobile personal computing device may include a camera, an ambient light sensor, a proximity sensor, and a processing unit communicably coupled to the camera, the ambient light sensor, and the proximity sensor.  The processing unit may be configured to: use at least one of camera and a proximity sensor to emit light into a body part of a user touching a surface of the mobile personal computing device; use at least one of the camera, an ambient light sensor, or the proximity sensor to receive at least part of the emitted light reflected by the body part of the user and generate sensor data; and computing health data of the user, utilizing the processing unit, using at least the sensor data regarding the received light.

[0007]  In some embodiments, a method for using a mobile personal computing device to obtain health data may include: using at least one of camera and a proximity sensor to emit light into a body part of a user touching a surface of the device; using at least one of the camera, an ambient light sensor, or the proximity sensor to receive at least part of the emitted light reflected

Exhibit 24
-1160-

by the body part of the user and generate sensor data; and computing health data of the user, utilizing the processing unit, using at least the sensor data regarding the received light.

[0008]   In one or more embodiments, a method for guiding use of a mobile personal computing device to obtain health data may include: detecting, utilizing  a camera, a profile of a body part of a user contacting the camera; determining, using the profile, if the body part is misaligned with a combination of the camera, an ambient light sensor, and a proximity sensor for purposes of obtaining health data for the user; and providing guidance to correct the misalignment.

[0009]   In various embodiments, a computer program product including a non-transitory storage medium may include a first set of instructions, stored in the non-transitory storage medium, executable by at least one processing unit to use at least one of a camera and a proximity sensor to emit light into a body part of a user touching a surface of a mobile personal computing device; a second set of instructions, stored in the non-transitory storage medium, executable by the least one processing unit to use at least one of the camera, an ambient light sensor, or the proximity sensor to receive at least part of the emitted light reflected by the body part of the user and generate sensor data; and a third set of instructions, stored in the non-transitory storage medium, executable by the least one processing unit to compute health data of the user using at least the sensor data regarding the received light.

[0010]   It is to be understood that both the foregoing general description and the following detailed description are for purposes of example and explanation and do not necessarily limit the present disclosure.  The accompanying drawings, which are incorporated in and constitute a part of the specification, illustrate subject matter of the disclosure.  Together, the descriptions and the drawings serve to explain the principles of the disclosure.

Exhibit 24
-1161-

Attorney Docket No. P22734US1

Brief Description of the Drawings

[0011] FIG. 1 is an isometric view an example system for obtaining health data utilizing an electronic device.

[0012] FIG. 2 illustrates the view of FIG. 1 while the example system is being utilized to obtain health data.

[0013] FIG. 3 illustrates the view of FIG. 2 while the example system is providing guidance to obtain health data.

[0014] FIG. 4 illustrates the view of FIG. 2 while the example system is providing the obtained health data.

[0015] FIG. 5 is a flow chart illustrating an example method for using an electronic device to obtain health data.  This method may be performed by the system of FIG. 1.

[0016] FIG. 6 is a flow chart illustrating an example method for guiding use of an electronic device to obtain health data.  This method may be performed by the system of FIG. 1.

[0017] FIG. 7 is a block diagram illustrating functional relationships among components of the example system of FIG. 1.

Exhibit 24
-1162-

Detailed Description

[0018]   The description that follows includes sample systems, apparatuses, and methods that embody various elements of the present disclosure.  However, it should be understood that the described disclosure may be practiced in a variety of forms in addition to those described herein.

[0019]   The present disclosure details systems, apparatuses, and methods related to an electric device that computes health data.  An electronic device (such as a smart phone, tablet computer, mobile computer, digital media player, wearable device, or other electronic device) may include a camera, an ambient light sensor, and a proximity sensor.  The electronic device may use one or more of the camera and the proximity sensor to emit light into a body part of a user (such as a finger, and ear, and so on) touching a surface of the electronic device.  The electronic device may use one or more of the camera, the ambient light sensor, and the proximity sensor to receive at least part of the emitted light reflected by the body part of the user.  The electronic device may compute health data of the user based upon sensor data regarding the received light.  In this way, the health data of the user may be detected utilizing an electronic device including a camera, ambient light sensor, and proximity sensor without making the user obtain access to a dedicated fitness and/or wellness device.

[0020]   In various implementations, the camera, ambient light sensor, and proximity sensor may be positioned such that they are all at least partially covered (and/or contacted) by the user's body part at the same time, such as when the health data is computed.  In one or more implementations, the electronic device may also include electrical contacts.  The health data of the user may also be computed using an electrical measurement obtained using from the electrical contacts.  In some examples of such implementations, the electrical contacts may be positioned to contact the body part of the user and an additional body part such that electrical measurement represents the electrical properties of organs or portions of the body located between the two contacting body parts.  In some embodiments, the two body parts are the user's left and right hands and the electrical measurement corresponds to an electrical property that is measured across the user's chest.

Exhibit 24
-1163-

[0021] In some implementations, the electronic device may utilize the camera to determine the user's body part is misaligned with the camera, the ambient light sensor, and the proximity sensor for purposes of detecting the information about the body part of the user. In such implementations, the electronic device may provide guidance (such as visual, audio, haptic, and/or other guidance) to correct the misalignment. The information from the camera may be utilized to detect this misalignment even in implementations where the camera is configured with a focal distance greater than a distance between the camera and the user's body part when the user's body part is touching the surface of the electronic device.

[0022] In various implementations, the proximity sensor may be a multiple light wavelength sensor (such as a sensor that utilizes infrared and visible light, infrared and red light, and so on). In some implementations, the ambient light sensor may be a silicon ambient light sensor, an indium gallium arsenide ambient light sensor, and/or other kind of ambient light sensor. In various implementations, the camera may be both an infrared and visible light camera.

[0023] The health data may include one or more of a variety of different wellness, fitness, and/or other parameters relating to the health of a user. For example, in various implementations the health data may include: a blood pressure index, a blood hydration, a body fat content, an oxygen saturation, a pulse rate, a perfusion index, an electrocardiogram, a photoplethysmogram, and/or any other such health data. In some implementations, the electronic device may provide the computed health data to the user.

[0024] FIG. 1 is an isometric view an example system 100 for obtaining health data utilizing an electronic device. As illustrated, the system may include an electronic device 101. The electronic device is shown as a smart phone. However, it is understood that this is an example. In various implementations, the electronic device may be any kind of electronic device such as any kind of mobile personal computing device (such as a smart phone, tablet computer, a mobile computer, a digital media player, a cellular telephone, a laptop computer, a wearable device, and so on), a desktop computer, a display, and/or any other electronic device.

[0025] As also illustrated, the electronic device 101 may include a housing 102 with a surface 103 where a camera 104, an ambient light sensor 105, and a proximity sensor 106 are positioned. As illustrated in FIG. 2, the camera, ambient light sensor, and proximity sensor may

Exhibit 24
-1164-

be positioned such that they are partially or entirely covered (and/or contacted) by the body part 202 of a user (illustrated as a finger though such a body part may be an ear, a palm, and/or other body part of the user) at the same time.  At such a time, the electronic device may compute health data for the user.

[0026]  Traditionally, a camera may be capture images using a visible light imaging sensor and a lens focused at a focal distance away from the lens, an ambient light sensor may use a broad range photodiode or similar non-imaging light detector to determine ambient light conditions, and a proximity sensor may use a limited range light source (such as an infrared light emitting diode or "LED") to emit limited range light and a limited range non-imaging light detector to detect if the emitted limited range light is reflected by one or more object to determine whether or not such an object is proximate to the proximity sensor.  However, the electronic device 101 may camera 104, the ambient light sensor 105, and the proximity sensor 106 in non-traditional ways to detect information about the body part 202.

[0027]  The electronic device 101 may use one or more of the camera 104 and the proximity sensor 106 to emit light into a body part of a user 202 touching a surface 103 of the electronic device.  The electronic device may use one or more of the camera, the ambient light sensor 105, and the proximity sensor to receive at least part of the emitted light reflected by the body part of the user.  The electronic device may compute health data of the user based upon sensor (such as the camera, the ambient light sensor, and/or the proximity sensor) data regarding the received light.

[0028]  For example, one or more of the camera 104, the ambient light sensor 105, and the proximity sensor 106 may receive light reflected off of the body part 202 of the user.  Such light may originate from one or more of the camera (in implementations where the camera includes a light source such as a LED used as a flash), the ambient light sensor (which may be a non-imaging photodiode in some implementations), the proximity sensor (such as in implementations where the proximity sensor is a non-imaging photodiode and one or more LEDs that determine proximity by measuring the time between transmission of light by the LED and receipt of the light by the non-imaging photodiode after reflection off of an object such as the body part 202 of the user), and/or other light source.  The electronic device 101 may analyze

9

Exhibit 24
-1165-

Attorney Docket No. P22734US1

sensor data regarding the received light and compute information such as the light absorption of the body part.  Various health data for the user may be computed from the computed light absorption of the body part.

[0029] By way of illustration, sensor data regarding the received light may be used to estimate changes in the volume of the body part 202 of the user.  In general, as light passes through the user's skin and into the underlying tissue, some light is reflected, some light is scattered, and some light is absorbed, depending on what the light encounters.  In some instances, blood may absorb light more than surrounding tissue, so less reflected light may be sensed when more blood is present.  the user's blood volume generally increases and decreases with each heartbeat.  Thus, analysis of sensor data regarding the reflected light may reflect changes in blood volume and thus allow health data such as oxygen saturation, pulse rate, perfusion index, and such to be computed.

[0030] By way of another example, one or more images of the body part 202 of the user captured by the camera 104 may be analyze to compute various health data for the user.  In some implementations, the camera may be an infrared camera and/or a combined visible light and infrared camera. In such implementations, infrared data in the image may be analyzed to compute temperature of the body part, changing blood flow in the body part, and so on.  In various implementations, the ambient light sensor and/or proximity sensor may be utilized to obtain such infrared data regarding the body part.

[0031] In various implementations, various information may be obtained regarding the body part 202 utilizing data from the camera 104, the ambient light sensor 105, and the proximity sensor 106.  Such information may be utilized in a variety of different ways.  For example, in some implementations each of the camera, the ambient light sensor, and the proximity sensor may capture sensor data regarding light absorption of the body part 202.  However, the light absorption represented by the light received by each may be different based on the particular sensor strengths and/or weaknesses of the respective device.  In such an implementation, the sensor data related to light absorption from each may be compared to the others and/or combined in order to obtain a more accurate, single light absorption measurement.

Exhibit 24
-1166-

[0032] By way of another example, in some implementations sensor data from one or more of the camera 104, the ambient light sensor 105, and the proximity sensor 106 may be used to adjust information from one or more others of the camera, the ambient light sensor, and the proximity sensor. For example, in various implementations the proximity sensor may be utilized to obtain sensor data related to light absorption of the body part 202 and the camera may be utilized to determine the specific area of the body part the information relates to. Light absorption may be interpreted differently in computing health data for different areas of the body part (such as where the area of the body part is hairless versus containing hair, where the area is a highly callused area as opposed to a non-callused area, and so on). As such, the sensor data from the camera regarding the specific area of the body part being analyzed may be utilized to adjust the sensor data related to light absorption obtained from the proximity sensor to account for the specific characteristics of the area of the body part that may influence interpretation of light absorption for computing health data for the user.

[0033] As also illustrated in FIGs. 1 and 2, the electronic device 101 may also include electrical contacts  such as electrical contacts 107a and 107b disposed on an exterior surface of the electronic device. In various implementations, the electronic device 101 may compute health data of the user based upon sensor data obtained from the camera 104, the ambient light sensor 105, and the proximity sensor 106 as well as an electrical measurement obtained using the electrical contacts.

[0034] As illustrated in FIG. 2, the electrical contacts 107a and 107b may be positioned to contact the body part 202 of the user (such as during the time when the information is being detected) and/or an additional body part 201 of the user. For example, as shown a finger of the user may contact a top electrical contact 107a while a palm of the user contacts a bottom electrical contact 107b. However, it is understood that this is an example and the electrical contacts may be configured to contact other body parts of the user (such as an ear, a cheek, and so on) without departing from the scope of the present disclosure.

[0035] In some implementations, the electrical contacts 107a and 107b may be positioned to contact the body part 202 of the user and an additional body part of the user such that electrical measurement obtained using the electrical contacts corresponds to an electrical

Exhibit 24
-1167-

characteristic across the user's chest.  For example, as shown a finger of the user's left hand may contact a top electrical contact 107a while a right palm of the user (connected to each other through the user's chest) contacts a bottom electrical contact 107b.  Positioning the electrical contacts to contact user body parts such that the electrical measurement obtained using the electrical contacts corresponds to an electrical property across the user's chest.  Such a measurement may enable information related to health data (such as an electrocardiogram) to be obtained that might not otherwise be possible absent such positioning.

[0036]  By way of illustration, electrical measurements may be taken via the electrical contacts 107a and 107b (which may respectively be configured as positive and negative terminals) that may be used to detect electrical activity of the user's body.  Such electrical measurements may be used (in some cases along with analysis of the received light) to measure heart function, compute an electrocardiogram, compute a galvanic skin response that may be indicative of emotional state and/or other physiological condition, and/or compute other health data such as body fat, or blood pressure.

[0037]  Although FIG. 1 illustrates a specific configuration including the camera 104, the ambient light sensor 105, the proximity sensor 106, and the electrical contacts 107a and 107b, it is understood that this in an example.  In various implementations other configurations are possible and contemplated without departing from the scope of the present disclosure.

[0038]  For example, the ambient light sensor 105 and the proximity sensor 106 are illustrated and described as separated sensors.  However, in some implementations the ambient light sensor and the proximity sensor may be incorporated into a single, unified sensor that may detect both ambient light and proximity without departing from the scope of the present disclosure.

[0039]  In some implementations, the proximity sensor 106 may operate utilizing a single wavelength of light, such as the infrared portion of the light spectrum.  However, in other implementations the proximity sensor (and/or the camera 104 and/or the ambient light sensor 105) may be a multiple wavelength proximity sensor that operates utilizing multiple wavelengths of light.

Exhibit 24
-1168-

Attorney Docket No. P22734US1

[0040] For example, in various implementations the proximity sensor 106 may operate utilizing infrared and visible light (such as red light). In some embodiments of such an implementation, the proximity sensor may include an infrared LED for producing infrared light and a red LED for producing red light.

[0041] Sensor data obtained utilizing different wavelengths of light may be different based on the particular detection strengths and/or weaknesses of the respective wavelength. By utilizing multiple wavelengths, the information detected utilizing the various wavelengths may be combined and/or utilized to adjust each other in order to obtain greater accuracy.

[0042] For example, dark and light hairs may have different light absorption due to their different pigmentation regardless of their other physical characteristics. By averaging light absorption detected utilizing both infrared and red light, a more accurate light absorption that accounts for such color difference may be possible such that detecting light absorption of different colored hairs does not result in inaccurate measurements.

[0043] In some implementations, the ambient light sensor 105 may be a silicon ambient light sensor, such as a silicon non-imaging photodiode. In other implementations, the ambient light sensor 105 may be an indium gallium arsenide ambient light sensor, such as an indium gallium arsenide non-imaging photodiode. In various implementations, use of an indium gallium arsenide non-imaging photodiode may allow for detection of a larger spectrum of light than use of a silicon non-imaging photodiode. An indium gallium arsenide non-imaging photodiode may not be typically used as an ambient light sensor as such may be more expensive than a silicon non-imaging photodiode that may adequately be used to determine ambient light conditions by detecting a more limited spectrum of light.

[0044] In various implementations, a variety of different health data for the user may be computed based at least thereon. For example, in one or more implementations the health data may include one or more of a variety of different wellness, fitness, and/or other parameters relating to the health of a user such as: a blood pressure index, a blood hydration, a body fat content, an oxygen saturation, a pulse rate, a perfusion index, an electrocardiogram, a photoplethysmogram, and/or any other such health data.

Exhibit 24
-1169-

[0045] FIG. 7 is a block diagram illustrating functional relationships among components of the example system 100 of FIG. 1.  As shown, the electronic device 101 may include one or more processing units 701, one or more non-transitory storage media 702 (which may take the form of, but is not limited to, a magnetic storage medium; optical storage medium; magneto-optical storage medium; read only memory; random access memory; erasable programmable memory; flash memory; and so on), one or more communication components 703 (such as a Wi-Fi or other antenna that may be utilized to transmit computed health data for the user), one or more input/output components 704, a display 108 (which may be utilized to present computed health data for the user), the camera 104, the ambient light sensor 105, the proximity sensor 106, and/or the electrical contacts 107a and 107b.  However, it is understood that this is an example. In various implementations, the electronic device 101 may omit one or more of these components and/or utilize one or more additional components not shown.

[0046] Returning to FIG. 2, in various implementations the electronic device 101 may provide guidance to the user for aligning the user's body part 202 with the camera 104, the ambient light sensor 105, the proximity sensor 106, and/or the electrical contacts 107a and 107b. Such correct alignment may aid in utilizing camera, the ambient light sensor, the proximity sensor, and/or the electrical contacts in detecting the information regarding the body part of the user.  In some implementations, misalignment of the user's body part with the camera, the ambient light sensor, the proximity sensor, and/or the electrical contacts for purposes of obtaining the information may reduce the accuracy of the information and/or prevent detection of the information.  As such, the guidance may aid in the detection of the information and/or the computing of the health data.

[0047] For example, FIG. 3 illustrates the view of FIG. 2 while the example system 100 is providing guidance to obtain health data.  As illustrated in this example, the electronic device 101 provides a current body part position indicator 301 and a goal position indicator 302.  A user may compare the visual positions of the current body part position indicator and the goal position indicator to determine how to move the user's body part 202 into correct alignment.  As shown, the user may move the user's body part down and to the right, aligning the current body part position indicator with the goal position indicator 302, to move the user's body part into correct alignment.

14

Exhibit 24
-1170-

[0048] Further, the electronic device 101 may also provide a status indicator 303 that indicates a progress 304 of obtaining the information.  In this way, the user may be alerted to how long the user should stay in position once the user aligns the user's body part so that the information may be detected.

[0049] In some implementations, the camera 104 may be utilized to detect the position of the user's body part for purposes of determining alignment/misalignment.  The camera may be configured to detect this information even in implementations where the camera is configured with a focal distance greater than the distance from the camera to the user's body part 202 shown as less than full focused image quality may be adequate for determining alignment/misalignment. In other implementations, the ambient light sensor 105, the proximity sensor 106, the electrical contacts 107a and 107b, and/or other components may be utilized instead of and/or in addition to the camera for determining alignment/misalignment of the user's body part.

[0050] Although FIG. 3 illustrates the electronic device 101 providing guidance output graphically using a visual output component, it is understood that this is an example.  In various implementations, such output may be provided in one or more of a variety of different ways.  For example, audio guidance instructions may be provided utilizing an audio output component and/or vibration guidance instructions may be provided utilizing a haptic output component without departing from the scope of the present disclosure.

[0051] FIG. 4 illustrates the view of FIG. 2 while the example system 100 is providing the obtained health data.  As illustrated, a variety of different health data may be presented. Although FIG. 4 illustrates the electronic device 101 providing the health data graphically using a visual output component, it is understood that this is an example.  In various implementations, such health may be provided in one or more of a variety of different ways, such as audibly utilizing an audio output component without departing from the scope of the present disclosure. In other implementations, the health data may be communicated to another electronic device (such as a health data database maintained by a doctor and/or other medical or health provider) utilizing a communication component.

[0052] FIG. 5 is a flow chart illustrating an example method 500 for using an electronic device to obtain health data.  This method may be performed by the system of FIG. 1.

15

Exhibit 24
-1171-

[0053] The flow may begin at block 501 where at least one of camera and a proximity sensor may be used to emit light into a body part of a user touching a surface of the electronic device.  The flow may proceed to block 502 where at least one of the camera, an ambient light sensor, or the proximity sensor may be used to receive at least part of the emitted light reflected by the body part of the user to produce sensor output and generate sensor data.  The flow may then proceed to block 503 where health data of the user may be computed using at least the sensor data regarding the received light.

[0054] At block 504, the computed health data for the user may be provided.  In some implementations, the computed health data for the user may be provided to the user.  Such providing may be performed using one or more visual output components such as a display, audio output components such as a speaker, haptic output components, and so on.

[0055] In one example, the proximity sensor may be used to emit light into the user's body part, the ambient light sensor and the camera may be used to receive at least part of the emitted light reflected by the user's body part, and electrical contacts may be used to obtain electrical measurements from the skin of the user's body part.  In such an example, a blood pressure index, a body fat content, and an electrocardiogram may be computed using data from the ambient light sensor, the camera, and the electrical contacts.

[0056] In another example, the proximity sensor may be a multiple light wavelength proximity sensor that utilizes infrared and visible light and the ambient light sensor may be a indium gallium arsenide ambient light sensor.  The proximity sensor may be used to emit light into the user's body part, the ambient light sensor and the camera may be used to receive at least part of the emitted light reflected by the user's body part, and electrical contacts may be used to obtain electrical measurements from the skin of the user's body part.  In such an example, a blood hydration may be computed using data from the ambient light sensor, the camera, and the electrical contacts.

[0057] In yet another example, the proximity sensor may be used to emit light into the user's body part and the ambient light sensor and the camera receive at least part of the emitted light reflected by the user's body part.  In such an example, an oxygen saturation, a pulse rate, a

16

Exhibit 24
-1172-

perfusion index and a photoplethysmogram may be computed using data from the ambient light sensor and the camera.

[0058] Although the example method 500 is illustrated and described above as including particular operations performed in a particular order, it is understood that this is an example. In various implementations, various orders of the same, similar, and/or different operations may be performed without departing from the scope of the present disclosure.

[0059] For example, block 503 is illustrated and described as providing the computed health data for the user. However, in various implementations this operation may be omitted. In some examples of such an implementation, the computed health data for the user may be stored for later use as opposed to being provided to the user.

[0060] FIG. 6 is a flow chart illustrating an example method 600 for guiding use of an electronic device to obtain health data. This method may be performed by the system of FIG. 1.

[0061] The flow may begin at block 601 where at least a profile of a body part of a user (such as the outline, location, or orientation) contacting a camera may be detected using a camera. The flow may proceed to block 602 where it is determined based on the detection that the user's body part is misaligned with a combination of the camera, an ambient light sensor, and a proximity sensor for purposes of obtaining health data for the user.

[0062] Detection of the user's body part may include comparing the profile to data representing a correct alignment. For example, an image of the profile of the user's body part may be captured and compared to a sample image representing what the image of the profile of the user's body part should look like if the user's body part is correctly aligned. A mismatch may indicate that the user's body part is misaligned.

[0063] At block 603, guidance to correct the misalignment may be provided. In the example discussed above where a mismatch between the image of the profile of the user's body part and the sample image indicated that the user's body part was misaligned, the differences between the two images may be utilized to determine guidance to provide. By way of illustration, if the image of the profile of the user's body part has the user's body part further to the left than the sample image then it may be determined that the user should more the user's

Exhibit 24
-1173-

Attorney Docket No. P22734US1

body part to the right.  Such guidance may be provided using one or more visual output components such as a display, audio output components such as a speaker, haptic output components such as a vibrator, and so on.

[0064] For example, a user may place his finger on the camera.  An image may be taken of the profile of the user's finger and compared to a sample image of what the profile of the user's finger should look like if correctly aligned with a combination of the camera, an ambient light sensor, and a proximity sensor for purposes of obtaining health data for the user.  Comparison of the two images may indicate that the two images do not match and the user's finger is not correctly aligned.  In this example, the image of the profile of the user's finger may be further up and to the right of the sample image.  As such, a correct placement indicator and a current placement indicator may be displayed to the user where the current placement indicator is displayed further up and to the right of the correct placement indicator.  In this way, the user can see that to correctly align the user's finger the user should move the user's finger down and to the left.

[0065] To continue with this example, the user may move the user's finger based on the provided guidance.  A new image may be taken of the current profile of the user's finger and compared to the sample image.  Comparison of the two images may indicate that the two images, though closer, still do not match and the user's finger is not still correctly aligned.  In this example, the image of the profile of the user's finger may be less but still further up and to the right of the sample image.  As such, the current placement indicator may be displayed moved closer but still further up and to the right of the correct placement indicator.  In this way, the user can see that to correctly align the user's finger the user should move the user's finger still further down and to the left.

[0066] The process in this example may be repeated until comparison of an image of profile of the user's finger matches the sample image.  The current placement indicator may then be displayed over the correct placement indicator to indicate to the user that the user's finger is correctly aligned and to not move further until health data is obtained.

[0067] Although the example method 600 is illustrated and described above as including particular operations performed in a particular order, it is understood that this is an example. In

18

Exhibit 24
-1174-

Attorney Docket No. P22734US1

various implementations, various orders of the same, similar, and/or different operations may be
performed without departing from the scope of the present disclosure.

[0068]  For example, though blocks 601-603 are described as a series of linear operations
that are performed a single time, it is understood that this is an example.  In various
implementations, one or more of blocks 601-603 may be repeated until the user's body part is no
longer misaligned without departing from the scope of the present disclosure.

[0069]  As discussed above and illustrated in the accompanying figures, the present
disclosure details systems, apparatuses, and methods related to an electric device that computes
health data.  An electronic device (such as a smart phone, tablet computer, mobile computer,
digital media player, wearable device, or other electronic device) may include a camera, an
ambient light sensor, and a proximity sensor.  The electronic device use one or more of the
camera and the proximity sensor to emit light into a body part of a user (such as a finger, and ear,
and so on) touching a surface of the electronic device.  The electronic device may use one or
more of the camera, the ambient light sensor, and the proximity sensor to receive at least part of
the emitted light reflected by the body part of the user.  The electronic device may compute
health data of the user based upon sensor data regarding the received light.  In this way, the
health data of the user may be detected utilizing an electronic device including a camera, ambient
light sensor, and proximity sensor without making the user obtain access to a dedicated fitness
and/or wellness device.

[0070]  In the present disclosure, the methods disclosed may be implemented as sets of
instructions or software readable by a device.  Further, it is understood that the specific order or
hierarchy of steps in the methods disclosed are examples of sample approaches.  In other
embodiments, the specific order or hierarchy of steps in the method can be rearranged while
remaining within the disclosed subject matter.  The accompanying method claims present
elements of the various steps in a sample order, and are not necessarily meant to be limited to the
specific order or hierarchy presented.

[0071]  Techniques detailed in the described disclosure may be provided as a computer
program product, or software, that may include a non-transitory machine-readable medium
having stored thereon instructions, which may be used to program a computer system (or other

Exhibit 24
-1175-

Attorney Docket No. P22734US1

electronic devices) to perform a process according to the present disclosure.  A non-transitory machine-readable medium includes any mechanism for storing information in a form (e.g., software, processing application) readable by a machine (e.g., a computer).  The non-transitory machine-readable medium may take the form of, but is not limited to, a magnetic storage medium (e.g., floppy diskette, video cassette, and so on); optical storage medium (e.g., CD-ROM); magneto-optical storage medium; read only memory (ROM); random access memory (RAM); erasable programmable memory (e.g., EPROM and EEPROM); flash memory; and so on.

[0072]  It is believed that the present disclosure and many of its attendant advantages will be understood by the foregoing description, and it will be apparent that various changes may be made in the form, construction and arrangement of the components without departing from the disclosed subject matter or without sacrificing all of its material advantages.  The form described is merely explanatory, and it is the intention of the following claims to encompass and include such changes.

[0073]  While the present disclosure has been described with reference to various embodiments, it will be understood that these embodiments are illustrative and that the scope of the disclosure is not limited to them.  Many variations, modifications, additions, and improvements are possible.  More generally, embodiments in accordance with the present disclosure have been described in the context or particular embodiments.  Functionality may be separated or combined in blocks differently in various embodiments of the disclosure or described with different terminology.  These and other variations, modifications, additions, and improvements may fall within the scope of the disclosure as defined in the claims that follow.

**Exhibit 24**
**-1176-**

Attorney Docket No. P22734US1

## CLAIMS

We claim:

1.    A mobile personal computing device, comprising:

a camera;

an ambient light sensor;

a proximity sensor; and

a processing unit communicably coupled to the camera, the ambient light sensor, and the proximity sensor;

wherein the processing unit is configured to:

use at least one of a camera or a proximity sensor to emit light into a body part of a user touching a surface of the mobile personal computing device;

use at least one of the camera, an ambient light sensor, or the proximity sensor to receive at least part of the emitted light reflected by the body part of the user and generate sensor data; and

compute health data of the user, utilizing the processing unit, using at least the sensor data regarding the received light.

2.    The mobile personal computing device of claim 1, wherein the camera, the ambient light sensor, and the proximity sensor are positioned to be at least partially covered by the body part of the user at a same time.

3.    The mobile personal computing device of claim 1, wherein the proximity sensor is configured to detect multiple wavelengths of light.

4.    The mobile personal computing device of claim 3, wherein multiple light wavelength proximity sensor is configured to emit and receive infrared and visible light.

5.    The mobile personal computing device of claim 3, wherein multiple light wavelength proximity sensor is configured to emit and receive infrared and red light.

**Exhibit 24**
**-1177-**

Attorney Docket No. P22734US1

6.     The mobile personal computing device of claim 1, wherein the ambient light sensor is a at least one of a silicon ambient light sensor or an indium gallium arsenide ambient light sensor.

7.     The mobile personal computing device of claim 1, wherein the camera is configured to detect infrared light.

8.     The mobile personal computing device of claim 1, wherein the device is configured to compute the health-related information when the body part of the user is positioned at least partially over the camera, the ambient light sensor, and the proximity sensor.

9.     The mobile personal computing device of claim 1, wherein the processing unit utilizes the camera to determine when the body part of the user is misaligned with the camera, the ambient light sensor, and the proximity sensor for purposes of detecting the information about the body part of the user.

10.     The mobile personal computing device of claim 9, wherein the processing unit provides an output that can be used as guidance to correct a misalignment.

11.     The mobile personal computing device of claim 10, wherein the processing unit is configure to provide the output to at least one visual output component, audio output component, or haptic output component.

12.     The mobile personal computing device of claim 1, wherein the camera is configured with a focal distance greater than a distance between the camera and the body part of the user when the body part is touching the surface of the mobile personal computing device.

13.     The mobile personal computing device of claim 1, further comprising
electrical contacts disposed on an exterior surface of the device, wherein the processing unit is further configured to compute additional health-related information regarding the user based on an electrical measurement obtained using the electrical contacts.

Exhibit 24
-1178-

Attorney Docket No. P22734US1

14.     The mobile personal computing device of claim 13, wherein the electrical contacts are positioned to contact the body part of the user and an additional body part of the user.

15.     The mobile personal computing device of claim 14, wherein the electrical measurement obtained using the electrical contacts corresponds to an electrical property across the user's chest.

16.     The mobile personal computing device of claim 13, wherein the processing unit is further configured to:

use at least the proximity sensor to emit the light;

use the ambient light sensor and the camera to receive the reflected light; and

compute a blood pressure index, a body fat content, and an electrocardiogram using data from the ambient light sensor, the camera, and the electrical contacts.

17.     The mobile personal computing device of claim 13, wherein the proximity sensor is a multiple light wavelength proximity sensor that utilizes infrared and visible light, the ambient light sensor is a indium gallium arsenide ambient light sensor, and the processing unit is further configured to:

use at least the proximity sensor to emit the light;

use the ambient light sensor and the camera receive the reflected light; and

compute a blood hydration using data from the ambient light sensor, the camera, and the electrical contacts.

18.     The mobile personal computing device of claim 1, wherein the processing unit is further configured to:

use at least the proximity sensor to emit the light;

use at least the ambient light sensor and the camera receive the reflected light; and

compute an oxygen saturation, a pulse rate, a perfusion index, or a photoplethysmogram using data from the ambient light sensor and the camera.

Exhibit 24
-1179-

Attorney Docket No. P22734US1

19.     A method for using a mobile personal computing device to obtain health data, comprising:

using at least one of a camera and a proximity sensor to emit light into a body part of a user touching a surface of the mobile personal computing device;

using at least one of the camera, an ambient light sensor, or the proximity sensor to receive at least part of the emitted light reflected by the body part of the user and generate sensor data; and

computing health data of the user, utilizing the processing unit, using at least the sensor data regarding the received light.

20.     A method for guiding use of a mobile personal computing device to obtain health data, comprising:

detecting, utilizing  a camera, a profile of a body part of a user contacting the camera;

determining, using the profile, if the body part is misaligned with the camera, an ambient light sensor, and a proximity sensor for purposes of obtaining health data for the user; and

providing guidance to correct the misalignment.

21.     A computer program product including a non-transitory storage medium, comprising:

a first set of instructions, stored in the non-transitory storage medium, executable by at least one processing unit to use at least one of a camera and a proximity sensor to emit light into a body part of a user touching a surface of a mobile personal computing device;

a second set of instructions, stored in the non-transitory storage medium, executable by the least one processing unit to use at least one of the camera, an ambient light sensor, or the proximity sensor to receive at least part of the emitted light reflected by the body part of the user and generate sensor data; and

a third set of instructions, stored in the non-transitory storage medium, executable by the least one processing unit to compute health data of the user using at least the sensor data regarding the received light.

Exhibit 24
-1180-

Attorney Docket No. P22734US1

# **ABSTRACT**

An electronic device includes a camera, an ambient light sensor, and a proximity sensor.  The electronic device uses one or more of the camera and the proximity sensor to emit light into a body part of a user touching a surface of the electronic device and one or more of the camera, the ambient light sensor, and the proximity sensor to receive at least part of the emitted light reflected by the body part of the user.  The electronic device computes health data of the user based upon sensor data regarding the received light.  In some implementations, the electronic device may also include one or more electrical contacts that contact one or more body parts of the user.  In such implementations, the health data may be further computed based on the an electrical measurement obtained using the electrical contacts.

**Exhibit 24**
**-1181-**

Title: Electronic Device That Communicates With a Companion Device
Application No.: Not Yet Assigned; Filed: Herewith
Inventor:  Marcelo Lamego
Attorney Docket No. P22734US1

1/7



**FIG. 1**

Exhibit 24
-1182-

Title: Electronic Device That Computes Health Data
Application No.: Not Yet Assigned; Filed: Herewith
Inventor:  Marcelo Lamego
Attorney Docket No. P22734US1

2/7



*FIG. 2*

Exhibit 24
-1183-

Title: Electronic Device and Computer Program
Application No.: Not Yet Assigned; Filed: Herewith
Inventor: Marcelo Lamego
Attorney Docket No. P22734US1

3/7



**FIG. 3**

Exhibit 24
-1184-

Title: Electronic Device that Computes Health Data
Application No.: Not Yet Assigned; Filed: Herewith
Inventor: Marcelo Lamego
Attorney Docket No. P22734US1

4/7



**FIG. 4**

Exhibit 24
-1185-

Case 8:20-cv-00048-JVS-JDE   Document 109-1   Filed 08/27/20   Page 1125 of 1129   Page ID #:8082

Title: Electronic Device Having a Computer... 1
Application No.: Not Yet Assigned; Filed: Herewith
Inventor: Marcelo Lamego
Attorney Docket No. P22734US1

5/7



**FIG. 5**

Exhibit 24
-1186-

Title: Electronic Device with Computer-Vision ...
Application No.: Not Yet Assigned; Filed: Herewith
Inventor: Marcelo Lamego
Attorney Docket No. P22734US1

6/7



FIG. 6

Exhibit 24
-1187-

Title: Electronic Device and Computer Program
Application No.: Not Yet Assigned; Filed: Herewith
Inventor:  Marcelo Lamego
Attorney Docket No. P22734US1

7/7



**FIG. 7**

Exhibit 24
-1188-

Attorney Docket No. P22734US1

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re the Application of: | |
| Marcelo M. Lamego | Examiner:  Not Yet Assigned |
| Application No. Not Yet Assigned | Art Unit:  Not Yet Assigned |
| Filed:  Herewith | Confirmation No.  Not Yet Assigned |
| For:   ELECTRONIC DEVICE THAT COMPUTERS HEALTH DATA | |

**INFORMATION DISCLOSURE STATEMENT
UNDER 37 C.F.R. §§1.97(b)(3) and 1.98**

Mail Stop AMENDMENT
Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Sir:

The Examiner is requested to consider the references noted on the enclosed Form PTO/SB/08A and B during examination of the above-identified patent application.  These references are submitted for the Examiner's consideration and are submitted pursuant to the duty of disclosure under 37 C.F.R. § 1.56.  In submitting these references, no representation is made or implied that the references are or are not material to the examination of the application.  The Examiner is requested to make his or her own determination of materiality.  Pursuant to the requirements of 37 C.F.R. § 1.98(a)(2)(ii), only copies of the foreign references and non-patent literature documents are provided.  Copies of the U.S. patent and U.S. patent application publication references are not provided, unless required by the Office.

This Information Disclosure Statement is being filed before the mailing date of a first Office action.  Therefore, pursuant  to 37 C.F.R. 1.97(b)(3), no fees are due with respect to this filing.  However, should any such fees or petitions be required, please consider this a request therefor and authorization to charge Deposit Account No. 504621 as necessary.

1

Exhibit 24
-1189-

Attorney Docket No. P22734US1

If the Examiner has any questions, please contact the undersigned attorney.

Dated:  February 9, 2015.

Respectfully submitted,


　　　　　/David S. Atkinson/
David S. Atkinson, Registration No. 55,655
Attorney for Assignee
USPTO Customer No. 62579

Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, Colorado  80202
Phone: (303) 223-1100
Fax: (303) 223-1111

2

013361\2087\11892679.1

**Exhibit 24**
**-1190-**