Joseph R. Re (Bar No. 134479)
joseph.re@knobbe.com
Stephen C. Jensen (Bar No. 149894)
steve.jensen@knobbe.com
Perry D. Oldham (Bar No. 216016)
perry.oldham@knobbe.com
Stephen W. Larson (Bar No. 240844)
stephen.larson@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, Fourteenth Floor
Irvine, CA 92614
Telephone:  (949) 760-0404 Facsimile:  (949) 760-9502

Adam B. Powell (Bar No. 272725)
adam.powell@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
12790 El Camino Real
San Diego, CA 92130
Telephone: (858) 707-4000 Facsimile: (858) 707-4001

Attorneys for Plaintiffs,
Masimo Corporation and Cercacor Laboratories, Inc.

# IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| MASIMO CORPORATION, a Delaware corporation; and CERCACOR LABORATORIES, INC., a Delaware corporation<br><br>Plaintiffs,<br><br>v.<br><br>APPLE INC., a California corporation<br><br>Defendant. | ) Case No. 8:20-cv-00048-JVS-JDE<br>)<br>) Hon. James V. Selna<br>) Magistrate Judge John D. Early<br>)<br>) **DECLARATION OF PERRY D. OLDHAM IN SUPPORT OF PLAINTIFFS' *EX PARTE* APPLICATION TO ENFORCE THE COURT'S ORDER**<br>)<br>)<br>) Discovery Cut-Off:      7/5/2021<br>) Pre-Trial Conference:  3/21/2022<br>) Trial:                        4/5/2022 |

**REDACTED VERSION OF DOCUMENT
PROPOSED TO BE FILED UNDER SEAL**

1    I, Perry D. Oldham, hereby declare:

2         1.      I am a partner in the law firm of Knobbe, Martens, Olson & Bear,

3    LLP, and Counsel for Plaintiffs Masimo Corporation and Cercacor

4    Laboratories, Inc. in this action.  I have personal knowledge of the matters set

5    forth in this Declaration and, if called upon as a witness, would testify

6    competently thereto.

7         2.      I submit this Declaration in support of *Ex Parte* Application to

8    Enforce the Court's Order.

9         3.      Pursuant to L.R. 7-19, on August 20, 2020, at approximately

10   3:45pm, I left voicemails for Brian Andrea, Joshua Lerner, and Ilissa Samplin

11   (who are all counsel of record for Apple) describing Plaintiffs' anticipated *ex

12   parte* application and asking them to call me back and inform me whether Apple

13   would oppose.  I spoke to Brian Rosenthal and Brian Andrea at approximately

14   5:00pm.  During the conference, Apple's counsel stated Apple would provide

15   some of the requested information for some of the specific exemplary

16   deficiencies identified by Plaintiffs.  Apple's counsel maintained that Apple

17   would produce documents relating to functionality it understood was accused of

18   infringing, and that it need only provide information for features that Apple

19   asserts are at issue in this case.  Apple's counsel claims that it is collecting and

20   will eventually produce additional documents, but failed to identify with

21   specificity the documents it plans to produce or when it plans to produce them.

22   The parties were unable to resolve their dispute and Apple indicated it would

23   oppose Plaintiffs' application.

24        4.      To date, Apple has produced two sets of documents in this case.

25   Apple's first set of documents contained approximately eight-hundred pages of

26   non-technical   documents,   including   the   "user   guide"   available   on

27   www.apple.com, product packaging, and end-user license agreements.

28

5.     Apple's second set of documents contained thirty-seven documents (approximately three-hundred and fifty pages).  I reviewed the documents and identified several documents that appear to be versions of the same document.  I also identified several documents that were redacted on pages bearing bates numbers    APL-MAS_00001000,    APL-MAS_00001006,    and    APL-MAS_00001010.

6.     Apple also made certain source code available for inspection.  I conducted an initial inspection of Apple's source code the week of August 3.

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████

7.     Attached hereto as **Exhibit 1** is a true and correct copy of a transcript of the July 10, 2020, hearing in this matter.

8.     Attached hereto as **Exhibit 2** is a true and correct copy of an email sent from Ms. Samplin to Adam Powell (counsel of record for Plaintiffs) at 11:37 a.m. on July 17, 2020.

9.      Attached hereto as **Exhibit 3** is a true and correct copy of an email sent from Ms. Samplin to Mr. Powell at 5:12 p.m. on July 21, 2020.

10.      Attached hereto as **Exhibit 4** are true and correct copies of excerpts of U.S. Patent Nos. 10,588,553; 10,588,554; 10,258,265; 10,624,564; 10,631,765; 10,702,194; 10,702,195; 10,292,628; 10,709,366.

11.      Attached hereto as **Exhibit 5 [filed under seal]** are true and correct copy of documents Apple produced in discovery bearing bates numbers APL-MAS_00000842-1192.

12.      Attached hereto as **Exhibit 6** is a true and correct copy of a document obtained from the public docket in *Contour IP Holding, LLC v. GoPro*, No. 15-cv-01108, Dkt. 65 (D. Del. July 6, 2016).

13.      Attached hereto as **Exhibit 7** is a true and correct copy of a document obtained from the public docket in *Tessera, Inc. v. Broadcom Corp.*, 16-cv-00380 (D. Del. Oct. 19, 2016).

14.      Attached hereto as **Exhibit 8** is a true and correct copy of a printout from https://www.businessinsider.com/tim-cook-full-interview-with-charlie-rose-with-transcript-2014-9.

15.      Attached hereto as **Exhibit 9** is a true and correct copy of an email from Karina Villanueva (who is a litigation paralegal at my firm) to Apple's counsel at 11:38pm on August 17, 2020.

16.      Attached hereto as **Exhibit 10** is a true and correct copy of an email from Mr. Andrea to an email distribution list that includes myself at 7:00am on August 11, 2020.

17.      Attached hereto as **Exhibit 11 [filed under seal]** is a true and correct copy of an email sent from Mr. Andrea to myself at 6:53am on August 20, 2020.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on August 20, 2020, at Irvine, California.


*/s/ Perry D. Oldham*
Perry D. Oldham

33270522

# EXHIBIT 1

**Page 1**

1
2
3
4  UNITED STATES DISTRICT COURT
5  CENTRAL DISTRICT OF CALIFORNIA
6  SOUTHERN DIVISION
7  - - -
8  THE HONORABLE JAMES V. SELNA, JUDGE PRESIDING
9
10  MASIMO CORPORATION, et al., )
       Plaintiffs, )
11         vs.          )
                        ) SACV-20-00048-JVS
12  APPLE, INC.,        )
          Defendant.   )
13  ------------------------------)
14
15  REPORTER'S TRANSCRIPT OF PROCEEDINGS
16  Santa Ana, California
17  July 10, 2020
18
19  SHARON A. SEFFENS, RPR
       United States Courthouse
20     411 West 4th Street, Suite 1-1053
       Santa Ana, CA  92701
21     (714) 543-0870
22
23
24
25                                            11:46

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**Page 2**

1  APPEARANCES OF COUNSEL:
2  For the Plaintiffs:
3  JOSEPH R. RE
4  STEPHEN JENSEN
   KNOBBE MARTENS
5  2040 Main Street, 14th Floor
   Irvine, CA  92614
6  (949) 760-0404
7  For the Defendant:
8  H. MARK LYON
   JOSHUA LERNER
9  BRIAN ROSENTHAL
   GIBSON DUNN & CRUTCHER, LLP
10  1881 Page Mill Road
    Palo Alto, CA  93403-1211
11  (650) 849-5307
12  JOSHUA LERNER
    GIBSON DUNN & CRUTCHER, LLP
13  555 Mission Street, Suite 3000
    San Francisco, CA  94105-0921
14  (415) 393-8254
15  BRIAN ROSENTHAL
    GIBSON DUNN & CRUTCHER, LLP
16  200 Park Avenue
    New York, NY  10166-0193
17  (212) 351-2339
18
19
20
21
22
23
24
25

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**Page 3**

1  SANTA ANA, CALIFORNIA; FRIDAY, JULY 10, 2020; 2:58 P.M.
2  (Per telephonic conference)
3         THE CLERK:   Calling Item No. 1, SACV-20-00048-JVS,
4  Masimo Corporation versus Apple, Inc.
5         Appearances on behalf of the plaintiff, please.
6         MR. RE:   Thank you.  Good afternoon, Your Honor,
7  this is Joseph Re of Knobbe Martens on behalf of Masimo
8  Corporation, and with me is my partner Stephen Jensen.
9         THE CLERK:   And on behalf of the defendants,
10  please.
11        MR. LYON:   Good afternoon, Your Honor.  It's Mark
12  Lyon on behalf of Apple, and with me is Joshua Lerner, and
13  Brian Rosenthal.
14        THE COURT:   Good afternoon.
15        Thank you for your joint report that you filed
16  last week.  Let me share my thoughts with you, and then I'd
17  be happy to hear you.
18        I believe it's fundamentally unfair to the parties
19  and inefficient to require reduction of the number of claims
20  for prior art references prior to the full disclosure of the
21  infringement contentions and the invalidity contentions.
22  Let me give you an example of the poker world.  Suppose
23  Masimo has a claim that it would evaluate as a for basis,
24  but when Apple makes its invalidity disclosures, it comes up
25  with prior art that would amount to Royal Fresh.  It's

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**Page 4**

1  better for Masimo to designate a claim in light of prior art
2  demonstrating it wasn't viable.
3         So my thought is that the initial round of
4  disclosures ought to come after the parties have made their
5  invalidity disclosures and their prior art disclosures.  The
6  date for invalidity contentions is 9/7.  What I would
7  propose is that within two weeks of that date, the parties
8  present me with a proposal for an initial reduction of
9  claims and prior art references that would contemplate
10  actual disclosure of those reductions within 30 days of the
11  Court adopting a specific proposal.  I would then
12  contemplate that there would be a further reduction after
13  the Markman hearing, and I would leave to your discretion
14  the time for final disclosure as to what we go to trial on.
15        I think that may require some adjustments to
16  events leading to the Markman hearing.  If the invalidity
17  contentions come in 9/7, the parties' exchange of
18  proposed claim terms is 9/21.  I don't think that gives you
19  enough time to reflect on both sides' disclosures, come up
20  with your proposal, and then for narrowing selections of
21  claims and prior art references.
22        So I think that the dates between the exchange of
23  claim terms and the Markman hearing need to be adjusted to
24  accommodate the disclosures pursuant to whatever proposal I
25  adopt for the disclosures following the invalidity and the

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

Exhibit 1
-4-

5

```
03:01  1   infringement contentions and the Markman hearing.  I'm not
03:02  2   adverse to slipping the Markman hearing a month or six weeks
03:02  3   if that makes sense.  That's in February, and we don't have
03:02  4   a trial date in 2021.
03:02  5           So those are my general thoughts.  I'll be happy
03:02  6   to hear you.
03:02  7           Let's begin with you, Mr. Re.
03:02  8           MR. RE:   Thank you, Your Honor.
03:02  9           I think we're in complete agreement with
03:02 10   everything you said.  I do think there needs to be an
03:02 11   exchange of information.  I do want to alert the Court that
03:02 12   we are planning on amending our pleading that's set forth in
03:02 13   the Court's order regarding the Motion to Dismiss.  In fact,
03:02 14   we will be substituting out some patents, so there needs to
03:02 15   be some more time for the parties to fully evaluate the
03:02 16   claims.
03:03 17           And, yes, we have not yet received the other
03:03 18   party's technical documents which were due back in June, and
03:03 19   that we of course need before we do our contentions.  But we
03:03 20   agree with everything you said, and I think the parties will
03:03 21   work it out and will come up with a proposal for this by
03:03 22   September 21 as you indicated.
03:03 23           THE COURT:   Mr. Lyon.
03:03 24           MR. LYON:   Thank you, Your Honor.
03:03 25           Just a couple points.  Let me just raise a
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

6

```
03:03  1   concern, and you may have already considered this, but let
03:03  2   me at least just throw it out there so that we can have a
03:03  3   discussion if it's helpful.  The one thing I would say with
03:03  4   not putting in some kind of target limits at this point is
03:03  5   that you end up with potentially hundreds of claims that
03:03  6   both parties are going to be charting, that they're going to
03:03  7   be discussing and potentially arguing over as far as what
03:03  8   claim terms might be involved.
03:03  9           That is not a trivial aspect.  I mean, that's
03:03 10   something when some of these -- I'm sure you've seen them.
03:03 11   Some of these claim charts can wind up being hundreds or
03:03 12   thousands of pages long, which is a very significant effort
03:03 13   to create, even if it is copying and pasting some of the
03:03 14   information because these claims are so related, which still
03:04 15   winds up that somebody has to sit down and analyze each
03:04 16   individual claim to decide whether or not you can simply
03:04 17   copy a paragraph from a different claim or not.  You have to
03:04 18   do that, and then that has to go through whatever levels of
03:04 19   review with the client and with the firm to make sure that
03:04 20   that's okay.
03:04 21           Then to the extent that there's any dispute about
03:04 22   that, instead of having a single claim that the Court is
03:04 23   worrying about, it may end up being 15 or 16 claims, which
03:04 24   the Court would then have to do a similar review to make
03:04 25   sure it all makes sense, and the same argument applies
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

7

```
03:04  1   equally to each of those 15 or 16 claims.
03:04  2           So our view of this would be if we set some
03:04  3   number, and it could be -- we don't think the numbers we
03:04  4   picked are terrible, but if there's a higher number, we
03:04  5   could talk about.  But pick some target numbers now so
03:04  6   that we can get a bit more reign in on the case before we
03:04  7   get into charting everything with the idea that if there's
03:04  8   reasons to change these things down the road, that's
03:04  9   something that can always be done in good cause.
03:05 10           But it really needs to be done at the stage of
03:05 11   preparing it for Markman, and then have that kind of a
03:05 12   target, sort of like page limits in the brief in a lot of
03:05 13   ways.  If you put these claims and limits on people, they'll
03:05 14   make some hard choices that they otherwise wouldn't make or
03:05 15   -- and that they probably should make, but because of the
03:05 16   fact that they don't have to, everything just gets thrown in
03:05 17   with the kitchen sink.
03:05 18           That's why we were suggesting trying to do
03:05 19   something now.  Then if we need to have some discussions
03:05 20   about whether, you know, it's 50, 40, claims, whatever it is
03:05 21   we pick -- maybe the plaintiffs need a little bit more than
03:05 22   that, maybe another ten or so -- we could have those kinds
03:05 23   of discussions and maybe stipulate to that at the beginning.
03:05 24           This is the first we've heard that they're
03:05 25   planning on changing the patents again, so that's a little
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

8

```
03:05  1   troubling because we are already very far into the case, and
03:06  2   we're already trying to start gearing up for discovery on
03:06  3   the patents that we have.  But that may also throw a monkey
03:06  4   wrench into not just this but to more parts of the case
03:06  5   schedule if it changes substantially.
03:06  6           THE COURT:   I appreciate the fact that at some
03:06  7   point the parties will have to make hard choices.  I believe
03:06  8   they ought to be able to make fair hard choices.  But if you
03:06  9   want to have further discussions among yourselves and come
03:06 10   to a consensus as to how to do some limits at this time,
03:06 11   that's fine, but I'm not going to impose it.
03:06 12           What I'm going to order is that no later than 9/21
03:06 13   the parties will submit a joint proposal for the initial
03:06 14   round of productions and the number of infringement
03:06 15   contentions and prior art references, and a final proposal
03:06 16   as to what we ought to do following the Markman hearing, and
03:06 17   then what we ought to do as a final third stage in terms of
03:06 18   what we're actually going to go to trial on.
03:06 19           MR. RE:   T?hank you, Your Honor.
03:07 20           May I ask one more question about this, though,
03:07 21   Your Honor?  If we have currently set up infringement
03:07 22   contentions due on July 27, which then triggers our
03:07 23   invalidity contentions on September 7 to trigger off of
03:07 24   those -- if the patents are going to be changing because of
03:07 25   the new pleading, I guess I would want to know when is that
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

Exhibit 1
-5-

9

```
03:07  1   going to happen, and are those target changes going to be
03:07  2   reflected in the infringement contentions we are going to
03:07  3   see in July, or is that going to be a completely separate
03:07  4   ball of wax that we have to deal with?
03:07  5          THE COURT:   Well, if Masimo changes the line of
03:07  6   both patents, I would reevaluate the dates for infringement
03:07  7   and invalidity contentions in light of that on a fairly
03:07  8   short ex-parte basis.
03:07  9          Let me circle back to one thing Mr. Re said.  I
03:07  10  don't think that Masimo should be required to make its
03:07  11  infringement contentions until you produce the core
03:08  12  technical information.  I understand that there is presently
03:08  13  in place a protective order to permit that, but to the
03:08  14  extent that production is made, these dates are just going
03:08  15  to drift out there and out there and out there.  And I would
03:08  16  be likely to entertain a motion made to me, not the
03:08  17  magistrate judge, with regard to patent production on the
03:08  18  core confidential information.
03:08  19         MR. LYON:   Your Honor, on that point -- this is
03:08  20  Mark Lyon again, Your Honor.  On that point, we did produce
03:08  21  nonconfidential technical documentation as part of the
03:08  22  schedule, and we're waiting on the protective order which
03:08  23  now is in place.  But as you may know, we filed an objection
03:08  24  to certain orders of Magistrate Early on the staging of
03:08  25  that, which we do hope to have -- because the issue, as you
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

10

```
03:08  1   may know, is that there needs to be a 2019 trade secret
03:08  2   statement in place before we can proceed on the trade secret
03:09  3   discovery.
03:09  4          The whole basis for that rule is to really avoid
03:09  5   the situation where plaintiffs get ahold of all these
03:09  6   technical documents and then can hunt and peck and kind of
03:09  7   try to come up with a list of trade secrets that they
03:09  8   otherwise really don't have but that they are trying to
03:09  9   create that way.  That is the whole purpose of being able to
03:09  10  have those trade secrets in before all that technical
03:09  11  information is out.
03:09  12         If that information is provided ahead of getting
03:09  13  those trade secrets, that bell can't be unrung.  That's one
03:09  14  concern, and we actually have that motion in place.  We
03:09  15  understood from yesterday that Masimo was asking us to
03:09  16  produce that information.  The first that they had come back
03:09  17  and talked to us was in an email yesterday asking for that
03:09  18  information immediately, knowing that we had these
03:09  19  objections out there.  We may need to actually file some
03:09  20  type of an ex-parte application, if necessary, to seek
03:09  21  relief on that so we can get that issue decided first, if
03:09  22  possible.
03:10  23         I don't know, Mr. Lerner, if you want to say
03:10  24  anything more on that.  Please feel free.
03:10  25         MR. LERNER:   First of all, thank you for having
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

11

```
03:10  1   this hearing by telephone, Your Honor.  We know during these
03:10  2   times it's busy, and we appreciate the opportunity to be
03:10  3   heard.
03:10  4          Second, I do not believe that anybody can dispute
03:10  5   the point that once these documents are out then you have
03:10  6   the issue that is raised by every case on point, which is,
03:10  7   one can make vague trade secret allegations and then claim
03:10  8   Apple's valuable confidential information based on years of
03:10  9   hard work on this product as their own.  That simply cannot
03:10  10  be undone once these documents are produced, and it leads to
03:10  11  all kinds of issues.
03:10  12         I think the two most relevant here are that what,
03:10  13  for example, do you do with the people that are going to
03:10  14  work on the trade secret disclosure when first Your Honor
03:11  15  did order compliance with Section 2019.210 many months ago?
03:11  16  What do you do with the lawyers who have seen our
03:11  17  confidential information, but also might want to work on
03:11  18  that disclosure, which does at some point obviously need to
03:11  19  be provided?  Our view, as we briefed, is that it should
03:11  20  have been provided a long time ago.
03:11  21         The other key policy matter here, I think, is that
03:11  22  we would not be having these discussions or these problems
03:11  23  if that disclosure had been provided, because I think the
03:11  24  most basic policy guidance behind the rule is it enables the
03:11  25  Court to determine the proper scope of discovery and whether
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

12

```
03:11  1   or not discovery requests fall within it.  That just can't
03:11  2   be done until they provide this document, which the parties
03:11  3   briefed before the scheduling order, which Your Honor then
03:12  4   ruled on.
03:12  5          So as Mr. Lyon says, if necessary -- in fact,
03:12  6   we're planning on it if necessary to raise it as quickly as
03:12  7   possible now, so that we don't run into this waterfall of
03:12  8   problems that will follow if there's not compliance with
03:12  9   this basic rule.
03:12  10         THE COURT:   I guess I analyze things differently.
03:12  11  If core confidential documents are relevant to the patents,
03:12  12  they should be disclosed now, notwithstanding the fact that
03:12  13  they may overlap the trade secrets case.  We need to go
03:12  14  forward with the patent case.  And if and when there is
03:12  15  adequate disclosure for trade secrets, all other materials
03:12  16  should be produced.  But to the extent the core confidential
03:12  17  technical documents are relevant to the patent case, they
03:12  18  should be disclosed now and in advance of Masimo having to
03:12  19  identify which claims it wants to proceed on.
03:12  20         MR. LERNER:   If I may just very briefly respond to
03:12  21  that, Your Honor.  I understand that Masimo has raised that
03:12  22  argument, but it does render the statute a nullity.
03:13  23  2019.210 expressly states:  "Discovery related to the trade
03:13  24  secrets" -- indeed, in cases before Judge Early before, he
03:13  25  said just because discovery relates to a non-trade secret
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

Exhibit 1
-6-

13

03:13 1 claim it doesn't mean it also doesn't relate to the trade
03:13 2 secret.  Here, there's no dispute -- there can't be any
03:13 3 dispute that discovery on the patent side relates to the
03:13 4 trade secrets.  So if we're going to do that, it does render the
03:13 5 statute in this instance a nullity, and we will have, I
03:13 6 think, all the problems that follow and are the very basis
03:13 7 for the rule there.  So I think that it is important to
03:13 8 consider both the express language of that statute and then
03:14 9 what's behind it.
03:14 10
03:14 11         The only other thing I will mention is that every
03:14 12 case that Masimo has cited on this point that involved
03:14 13 parallel claims -- every single one there was a prior trade
03:14 14 secret disclosure.  It's possible that it could have been
03:14 15 amended at some later time, but there was at the very least
03:14 16 some disclosure.
03:14 17
03:14 18         The only exception I can think of was one where
03:14 19 there was a date certain order, and the plaintiff would have
03:14 20 had to show good cause if they ever wanted to change it
03:14 21 later.  Because without either the disclosure or that date
03:14 22 certain and an order that it can't be changed without good
03:15 23 cause, then we have the very real situation that Masimo can
03:15 24 just look through our confidential information in a case
03:15 25 with a patent thicket and use our confidential information
03:15  to try and craft their purported secrets in a way that (a)

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

14

03:15 1 is allegedly theirs, even though it's based on our
03:15 2 confidential information, (b) tries to weave around
03:15 3 their many patents so they don't run into the problem that
03:15 4 it's been disclosed.
03:15 5         For those reasons, I think it's in some ways of
03:15 6 critical importance here that we do it.  It's even more
03:15 7 important than I would say in a normal case where there
03:15 8 might not be quite so many patents in the space or so many
03:15 9 allegations that the secrets were allegedly disclosed in the
03:15 10 patents.
03:15 11         THE COURT:   Let's assume Masimo never asserted a
03:15 12 trade secret claim.  The confidential information which
03:15 13 involves the patent claims would be subject to production
03:16 14 whether it was a trade secret or not.  That's what
03:16 15 protective orders are for.
03:16 16         MR. LERNER:   We completely agree with that, Your
03:16 17 Honor.  If there were no trade secret claims in this case,
03:16 18 this would not be a problem.  But every case where there is
03:16 19 a trade secret, given the express language of the statute,
03:16 20 has found that you can't avoid that language.  I'm not aware
03:16 21 of any finding that ignores the language on point.
03:16 22         That's why in all of the cases there was a trade
03:16 23 secret disclosure before you had a ruling that patent
03:16 24 discovery could go forward, or at least as I said, an order
03:16 25 that the trade secret disclosure be produced by a date

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

15

03:16 1 certain along with admonition that the list couldn't change
03:16 2 without good cause.
03:17 3         So, yes, if there were no trade secret claim, then
03:17 4 2019.210 by and large would not come into play.  There are
03:17 5 some cases holding that if it's kind of, you know, a wolf in
03:17 6 sheep's clothing and it's obvious it's coming, then the
03:17 7 Court would say you still have to do the 2019.210
03:17 8 disclosure.
03:17 9         But here we don't have that situation.  This is a
03:17 10 case where they've suggested they have a serious trade
03:17 11 secret claim.  They've never described it with any
03:17 12 specificity whatsoever, even though they allege it has been
03:17 13 disclosed in public patent filings.  One could just say
03:17 14 here's the page and line number.
03:17 15         Not withstanding all of those things, there's no
03:17 16 description in a case that's, you know, roughly seven months
03:17 17 old, and they want this confidential information.  Again,
03:18 18 once that's done, we just cannot undo it, and we'll have I
03:18 19 think unfortunately a lot of unnecessary disputes both about
03:18 20 the scope of discovery, but also what to do about the fact
03:18 21 that you then have lawyers who have seen our secrets
03:18 22 drafting what their alleged secrets are.
03:18 23         THE COURT:   Mr. Re.
03:18 24         MR. RE:   Well, Your Honor, this is at least the
03:18 25 second or third time they've made this argument.  You are

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

16

03:18 1 correct.  Our patent case is independent of the trade secret
03:18 2 case.  The case law that we already cited and briefed to
03:18 3 Judge Early on these other motions were breach of contract
03:18 4 cases that were factually dependent on the trade secret
03:18 5 claims.  Our case is not dependent on our trade secret case.
03:18 6 And currently the trade secret case has been dismissed on
03:18 7 their Motion to Dismiss.  It's not even pending before the
03:18 8 Court, and obviously the patent case gets to go forward.
03:18 9         I've never seen such strenuous objections to
03:19 10 producing just the core technical documents in a case.  They
03:19 11 are fighting tooth and nail, and they will keep fighting and
03:19 12 fighting no matter what.  They're going to file more motions
03:19 13 I understand today to prevent the disclosures that were due
03:19 14 back in June.  I think the time has come we move forward now
03:19 15 as the Court has indicated.
03:19 16         THE COURT:   Are you going to replead your trade
03:19 17 secret claim?
03:19 18         MR. RE:   Yes, we are.  We plan on complying with
03:19 19 the 30-day leave to amend date at the end of the month.
03:19 20         THE COURT:   Okay.  Well, I think you have my
03:19 21 general views.  Let's see what motion practice that results
03:19 22 in.
03:19 23         Anything else we should take up today?
03:19 24         MR. RE:   No.  Thank you, Your Honor.
03:20 25         MR. LYON:   Thank you, Your Honor.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

Exhibit 1
-7-



03:20  1       MR. LERNER:   Thank you very much, Your Honor.

03:20  2       THE COURT:   Okay.  Thank you very much.

03:20  3       (Whereupon, the proceedings were concluded.)

03:20  4              *   *   *

CERTIFICATE

I hereby certify that pursuant to Section 753,
Title 28, United States Code, the foregoing is a true and
correct transcript of the stenographically reported
proceedings held in the above-entitled matter and that the
transcript page format is in conformance with the
regulations of the Judicial Conference of the United States.

Date:  July 20, 2020

/s/   Sharon A. Seffens  7/20/20
SHARON A. SEFFENS, U.S. COURT REPORTER

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

Exhibit 1
-8-

**/**
/s [1]  18/15

**0**
**0193 [1]**  2/16
**0404 [1]**  2/5
**0870 [1]**  1/21
**0921 [1]**  2/13

**1**
**1-1053 [1]**  1/20
**10 [2]**  1/17 3/1
**10166-0193 [1]**  2/16
**1053 [1]**  1/20
**1211 [1]**  2/10
**14th [1]**  2/4
**15 [2]**  6/23 7/1
**16 [2]**  4/4 4/12
**1881 [1]**  2/9

**2**
**20 [2]**  18/13 18/15
**200 [1]**  2/15
**2019 [1]**  10/1
**2019.210 [4]**  11/15 12/23 15/4 15/7
**2020 [3]**  1/17 3/1 18/13
**2021 [1]**  5/4
**2040 [1]**  2/4
**21 [3]**  4/18 5/22 8/12
**212 [1]**  2/16
**2339 [1]**  2/16
**27 [1]**  8/22
**28 [1]**  18/7
**2:58 [1]**  3/1

**3**
**30 [1]**  4/10
**30-day [1]**  16/19
**3000 [1]**  2/12
**351-2339 [1]**  2/16
**393-8254 [1]**  2/13

**4**
**40 [1]**  7/20
**411 [1]**  1/20
**415 [1]**  2/13
**4th [1]**  1/20

**5**
**50 [1]**  7/20
**5307 [1]**  2/10
**543-0870 [1]**  1/21
**555 [1]**  2/12

**6**
**650 [1]**  2/10

**7**
**7/20/20 [1]**  18/15
**714 [1]**  1/21
**753 [1]**  18/6
**760-0404 [1]**  2/5

**8**
**8254 [1]**  2/13
**849-5307 [1]**  2/10

**9**
**9/21 [2]**  4/18 8/12
**9/7 [2]**  4/6 4/17
**92614 [1]**  2/5
**92701 [1]**  1/20
**93403-1211 [1]**  2/10
**94105-0921 [1]**  2/13
**949 [1]**  2/5

**A**
**able [2]**  8/8 10/9
**about [7]**  6/21 6/23 7/5 7/20 8/20 15/19 15/20
**above [1]**  18/9
**above-entitled [1]**  18/9
**accommodate [1]**  4/24
**actual [1]**  4/10
**actually [3]**  8/18 10/14 10/19
**adequate [1]**  12/15
**adjusted [1]**  4/23
**adjustments [1]**  4/15
**admonition [1]**  15/1
**adopt [1]**  4/25
**adopting [1]**  4/11
**advance [1]**  12/18
**adverse [1]**  5/2
**after [2]**  4/4 4/12
**afternoon [3]**  3/6 3/11 3/14
**again [3]**  7/25 9/20 15/17
**ago [2]**  11/15 11/20
**agree [2]**  5/20 14/16
**agreement [1]**  5/9
**ahead [1]**  10/12
**ahold [1]**  10/5
**al [1]**  1/9
**alert [1]**  5/11
**all [9]**  6/25 10/5 10/10 10/25 11/11 12/15 13/7 14/22 15/15
**allegations [2]**  11/7 14/9
**allege [1]**  15/12
**alleged [1]**  15/22
**allegedly [2]**  14/1 14/9
**along [1]**  15/1
**already [4]**  6/1 8/1 8/2 16/2
**also [4]**  8/3 11/17 13/1 15/20
**Alto [2]**  2/10
**always [1]**  7/9
**amend [1]**  16/19
**amended [1]**  13/15
**amending [1]**  5/12
**among [1]**  8/9
**amount [1]**  3/25
**Ana [3]**  1/16 1/20 3/1
**analyze [2]**  6/15 12/10
**another [1]**  7/22
**any [4]**  6/21 13/2 14/21 15/11
**anybody [1]**  11/4
**anything [2]**  10/24 16/23
**APPEARANCES [2]**  2/1 3/5
**APPLE [4]**  1/11 3/4 3/12 3/24
**Apple's [1]**  11/8
**application [1]**  10/20
**applies [1]**  6/25
**appreciate [2]**  8/6 11/2
**are [25]**
**arguing [1]**  6/7
**argument [3]**  6/25 12/22 15/25
**around [1]**  14/2
**art [7]**  3/20 3/25 4/1 4/5 4/9 4/21 8/15
**as [18]**  3/23 4/14 5/22 6/7 8/10 8/16 8/17 9/21 9/23 9/25 11/9 11/19 12/5 12/6 12/6 14/24 16/15
**ask [1]**  8/20
**asking [2]**  10/15 10/17
**aspect [1]**  6/9
**asserted [1]**  14/11
**assume [1]**  14/11
**Avenue [1]**  2/15
**avoid [1]**  14/20
**aware [1]**  14/20

**B**
**back [4]**  5/18 9/9 10/16 16/14
**ball [1]**  9/4

**based [2]**  11/8 14/1
**basis [2]**  1/24 12/2
**basis [4]**  3/23 9/8 10/4 13/7
**be [36]**
**because [8]**  6/14 7/15 8/1 8/24 9/25 11/23 12/25 13/20
**been [6]**  11/20 11/23 13/14 14/4 15/12 16/6
**before [9]**  5/19 7/6 10/2 10/10 12/3 12/24 12/24 14/23 16/7
**begin [1]**  5/7
**beginning [1]**  7/23
**behalf [4]**  3/5 3/7 3/9 3/12
**behind [2]**  11/24 13/10
**being [3]**  6/11 6/23 10/9
**believe [3]**  3/18 8/7 11/4
**bell [1]**  10/13
**better [1]**  4/1
**between [1]**  4/22
**bit [2]**  7/6 7/21
**both [5]**  4/19 6/6 9/6 13/9 15/19
**breach [1]**  16/3
**BRIAN [3]**  2/8 2/14 3/13
**brief [1]**  7/12
**briefed [3]**  11/19 12/3 16/2
**briefly [1]**  12/20
**busy [1]**  11/2

**C**
**CA [4]**  1/20 2/5 2/10 2/13
**CALIFORNIA [3]**  1/5 1/16 3/1
**Calling [1]**  3/3
**can [12]**  6/2 6/11 6/16 7/6 7/9 10/2 10/6 10/21 11/4 11/7 13/17 13/22
**can't [5]**  10/13 12/1 13/2 13/21 14/20
**cannot [2]**  11/9 15/18
**case [22]**
**cases [4]**  12/24 14/22 15/5 16/4
**cause [4]**  7/9 13/19 13/22 15/2
**CENTRAL [1]**  1/5
**certain [4]**  9/24 13/18 13/21 15/1
**CERTIFICATE [1]**  18/4
**certify [1]**  18/6
**change [3]**  7/8 13/19 15/1
**changed [1]**  13/21
**changes [3]**  8/5 9/1 9/5
**changing [2]**  7/25 8/24
**charting [2]**  6/6 7/7
**charts [1]**  6/11
**choices [3]**  7/14 8/7 8/8
**circle [1]**  9/9
**cited [2]**  13/12 16/2
**claim [15]**  3/23 4/1 4/18 4/23 6/8 6/11 6/16 6/17 6/22 11/7 13/1 14/12 15/3 15/11 16/17
**claims [15]**  3/19 4/9 4/21 5/16 6/5 6/14 6/23 7/1 7/13 7/20 12/19 13/13 14/13 14/17 16/5
**client [1]**  6/19
**clothing [1]**  15/6
**Code [1]**  18/7
**come [9]**  4/4 4/17 4/19 5/21 8/9 10/7 10/16 15/4 16/14
**comes [1]**  3/24
**coming [1]**  15/6
**complete [1]**  5/9
**completely [2]**  9/3 14/16
**compliance [2]**  11/15 12/8
**complying [1]**  16/18
**concern [2]**  6/1 10/14
**concluded [1]**  17/3
**conference [2]**  3/2 18/11
**confidential [10]**  9/18 11/8 11/17 12/11 12/16 13/23 13/24 14/2 14/12 15/17
**conformance [1]**  18/10
**consensus [1]**  8/10

Exhibit 1
-9-

**C**

consider [1]  13/9
considered [1]  6/1
contemplate [2]  4/9 4/12
contentions [12]  3/21 3/21 4/6 4/17 5/1
 5/19 8/15 8/22 8/23 9/2 9/7 9/11
contract [1]  16/3
copy [1]  6/17
copying [1]  6/13
core [5]  9/11 9/18 12/11 12/16 16/10
CORPORATION [3]  1/9 3/4 3/8
correct [2]  16/1 18/8
could [6]  7/3 7/5 7/22 13/14 14/24 15/13
couldn't [1]  15/1
COUNSEL [1]  2/1
couple [1]  5/25
course [1]  5/19
COURT [10]  1/4 4/11 5/11 6/22 6/24
 11/25 15/7 16/8 16/15 18/16
Court's [1]  5/13
Courthouse [1]  1/19
craft [1]  13/25
create [2]  6/13 10/9
critical [1]  14/6
CRUTCHER [3]  2/9 2/12 2/15
currently [2]  8/21 16/6

**D**

date [8]  4/6 4/7 5/4 13/18 13/20 14/25
 16/19 18/13
dates [3]  4/22 9/6 9/14
day [1]  16/19
days [1]  4/10
deal [1]  9/4
decide [1]  6/16
decided [1]  10/21
Defendant [2]  1/12 2/6
defendants [1]  3/9
demonstrating [1]  4/2
dependent [2]  16/4 16/5
described [1]  15/11
description [1]  15/16
designate [1]  4/1
determine [1]  11/25
did [2]  9/20 11/15
different [1]  6/17
differently [1]  12/10
disclosed [5]  12/12 12/18 14/4 14/9
 15/13
disclosure [13]  3/20 4/10 4/14 11/14
 11/18 11/23 12/15 13/14 13/16 13/20
 14/23 14/25 15/8
disclosures [8]  3/24 4/4 4/5 4/5 4/19
 4/24 4/25 16/13
discovery [9]  8/2 10/3 11/25 12/1 12/23
 12/25 13/3 14/24 15/20
discretion [1]  4/13
discussing [1]  6/7
discussion [1]  6/3
discussions [4]  7/19 7/23 8/9 11/22
Dismiss [2]  5/13 16/7
dismissed [1]  16/6
dispute [4]  6/21 11/4 13/2 13/3
disputes [1]  15/19
DISTRICT [2]  1/4 1/5
DIVISION [1]  1/6
do [19]
document [1]  12/2
documentation [1]  9/21
documents [7]  5/18 10/6 11/5 11/10
 12/11 12/17 16/10
does [3]  11/8 12/3 13/5
doesn't [2]  13/1 13/1
don't [10]  4/18 5/3 7/3 7/16 9/10 10/8
 10/23 12/7 14/3 15/9

**done** [4]  7/9 7/10 12/2 15/18
down [1]  8/7
drafting [1]  15/22
drift [1]  9/15
due [3]  5/18 8/22 16/13
DUNN [3]  2/9 2/12 2/15
during [1]  11/1

**E**

each [2]  6/15 7/1
Early [3]  9/24 12/24 16/3
effort [1]  4/12
either [1]  13/20
else [1]  16/23
email [1]  10/17
enables [1]  11/24
end [3]  6/5 6/23 16/19
enough [1]  4/19
entertain [1]  9/16
entitled [1]  18/9
equally [1]  7/1
et [1]  1/9
evaluate [2]  3/23 5/15
even [5]  6/13 14/1 14/6 15/12 16/7
events [1]  13/19
ever [1]  13/19
every [4]  11/6 13/11 13/13 14/18
everything [4]  5/10 5/20 7/7 7/16
ex [2]  9/8 10/20
ex-parte [1]  9/8 10/20
example [2]  3/22 11/13
exception [1]  13/17
exchange [3]  4/17 4/22 5/11
express [2]  13/9 14/19
expressly [1]  12/23
extent [3]  6/21 9/14 12/16

**F**

fact [6]  5/13 7/16 8/6 12/5 12/12 15/20
factually [1]  16/4
fair [1]  8/8
fairly [1]  9/7
fall [1]  12/1
far [2]  6/7 8/1
February [1]  5/3
feel [1]  10/24
fighting [3]  16/11 16/11 16/12
file [2]  10/19 16/12
filed [2]  3/15 9/23
filings [1]  15/13
final [3]  4/14 8/15 8/17
finding [1]  14/21
fine [1]  8/11
firm [1]  6/19
first [5]  7/24 10/16 10/21 10/25 11/14
Floor [1]  2/4
follow [2]  12/8 13/7
following [4]  4/25 8/16
foregoing [1]  18/7
format [1]  18/10
forth [1]  5/12
forward [4]  12/14 14/24 16/8 16/14
found [1]  14/20
Francisco [2]  2/13
free [1]  10/24
Fresh [1]  3/25
FRIDAY [1]  3/1
full [1]  3/20
fully [1]  5/15
fundamentally [1]  3/18
further [2]  4/12 8/9

**G**

gearing [1]  8/2
general [2]  5/5 16/21
get [4]  7/6 7/7 10/5 10/21

**gets** [2]  7/16 16/8
getting [1]  13/12
GIBSON [3]  2/9 2/12 2/15
give [1]  3/22
given [1]  14/19
gives [1]  4/18
go [6]  4/14 6/18 8/18 12/13 14/24 16/8
going [15]  6/6 6/6 8/11 8/12 8/18 8/24
 9/1 9/1 9/2 9/3 9/14 11/13 13/5 16/12
 16/16
good [7]  3/6 3/11 3/14 7/9 13/19 13/21
 15/2
guess [2]  8/25 12/10
guidance [1]  11/24

**H**

had [5]  10/16 10/18 11/23 13/19 14/23
hank [1]  8/19
happen [1]  9/1
happy [2]  3/17 5/5
hard [4]  7/14 8/7 8/8 11/9
has [10]  3/23 6/15 6/18 12/21 13/12
 14/20 15/12 16/6 16/14 16/15
have [34]
having [4]  6/22 10/25 11/22 12/18
he [1]  12/24
hear [2]  3/17 5/6
heard [2]  7/24 11/3
hearing [7]  4/13 4/16 4/23 5/1 5/2 8/16
 11/1
held [1]  18/9
helpful [1]  6/3
here [5]  11/12 11/21 13/2 14/6 15/9
here's [1]  15/14
hereby [1]  18/6
higher [1]  7/4
holding [1]  15/5
Honor [17]  3/6 3/11 5/8 5/24 8/19 8/21
 9/19 9/20 11/1 11/14 12/3 12/21 14/17
 15/24 16/24 16/25 17/1
HONORABLE [1]  1/8
hope [1]  9/25
how [1]  8/10
hundreds [2]  6/5 6/11
hunt [1]  10/6

**I**

I'd [1]  3/16
I'll [1]  5/5
I'm [5]  5/1 6/10 8/11 8/12 14/20
I've [1]  16/9
idea [1]  7/7
identify [1]  12/19
ignores [1]  14/21
immediately [1]  10/18
importance [1]  14/6
important [2]  13/8 14/7
impose [1]  8/11
INC [2]  1/11 3/4
indeed [1]  12/24
independent [1]  16/1
indicated [2]  5/22 16/15
individual [1]  6/16
inefficient [1]  3/19
information [15]  5/11 6/14 9/12 9/18
 10/11 10/12 10/16 10/18 11/8 11/17
 13/23 13/24 14/2 14/12 15/17
infringement [7]  3/21 5/1 8/14 8/21 9/2
 9/6 9/11
initial [3]  4/3 4/8 8/13
instance [1]  13/6
instead [1]  6/22
invalidity [8]  3/21 3/24 4/5 4/6 4/16 4/25
 8/23 9/7
involved [2]  6/8 13/12
involves [1]  14/13

Exhibit 1
-10-

**I**
irvine [1]  2/5
is [42]
issue [3]  9/25 10/21 11/6
issues [1]  11/11
it [35]
it's [15]  3/11 3/18 3/25 6/3 7/20 11/2 13/14 14/1 14/4 14/5 14/6 15/5 15/6 15/6 16/7
Item [1]  3/3
its [2]  3/24 9/10

**J**
JAMES [1]  1/8
JENSEN [2]  2/3 3/8
joint [2]  3/15 8/13
JOSEPH [2]  2/3 3/7
JOSHUA [3]  2/8 2/11 3/12
judge [4]  1/8 9/17 12/24 16/3
Judicial [1]  18/11
July [5]  1/17 3/1 8/22 9/3 18/13
July 27 [1]  8/22
June [2]  5/18 16/14
just [13]  5/25 5/25 6/2 7/16 8/4 9/14 12/1 12/20 12/25 13/23 15/13 15/18 16/10
JVS [2]  1/11 3/3

**K**
keep [1]  16/11
key [1]  11/21
kind [4]  6/4 7/11 10/6 15/5
kinds [2]  7/22 11/11
kitchen [1]  7/17
KNOBBE [2]  2/4 3/7
know [8]  7/20 8/25 9/23 10/1 10/23 11/1 15/5 15/16
knowing [1]  10/18

**L**
language [4]  13/9 14/19 14/20 14/21
large [1]  15/4
last [1]  3/16
later [3]  8/12 13/15 13/20
law [1]  16/2
lawyers [2]  11/16 15/21
leading [1]  4/16
leads [1]  11/10
least [4]  6/2 13/15 14/24 15/14
leave [2]  4/13 16/19
LERNER [4]  2/8 2/11 3/12 10/23
let [5]  3/16 3/22 5/25 6/1 9/9
Let's [3]  5/7 14/11 16/21
levels [1]  6/18
light [2]  4/1 9/7
like [1]  7/12
likely [1]  9/16
limits [4]  6/4 7/12 7/13 8/10
line [2]  9/5 15/14
list [2]  10/7 15/1
little [2]  7/21 7/25
LLP [3]  2/9 2/12 2/15
long [2]  6/12 11/20
look [1]  13/23
lot [2]  7/12 15/19
LYON [5]  2/7 3/12 5/23 9/20 12/5

**M**
made [4]  4/4 9/14 9/16 15/25
magistrate [2]  9/17 9/24
Main [1]  2/4
make [9]  6/19 6/24 7/14 7/14 7/15 8/7 8/8 9/10 11/7
makes [3]  3/24 5/3 6/25
many [4]  11/15 14/3 14/8 14/8

**MARK [3]**  2/7 3/11 9/20
Markman [7]  1/3 3/4 13/24 13/25 15/2 8/16
MARTENS [2]  2/4 3/7
MASIMO [13]  1/9 3/4 3/7 3/23 4/1 9/5 9/10 10/15 12/18 12/21 13/12 13/22 14/11
materials [1]  12/15
matter [3]  11/21 16/12 18/9
may [4]  4/15 6/1 6/23 8/3 8/20 9/23 10/1 10/19 12/13 12/20
maybe [3]  7/21 7/22 7/22
me [9]  3/8 3/12 3/16 3/22 4/8 5/25 6/2 9/9 9/16
mean [2]  6/9 13/1
mention [1]  11/21
might [3]  6/8 11/17 14/8
Mill [1]  2/9
Mission [1]  2/12
monkey [1]  8/3
month [2]  5/2 16/19
months [2]  11/15 15/16
more [8]  5/15 7/6 7/21 8/4 8/20 10/24 14/6 16/12
most [2]  11/12 11/24
motion [5]  5/13 9/16 10/14 16/7 16/21
motions [2]  16/3 16/12
move [1]  16/14
Mr [1]  12/5
Mr. [5]  5/7 5/23 9/9 10/23 15/23
Mr. Lerner [1]  10/23
Mr. Lyon [1]  5/23
Mr. Re [3]  5/7 9/9 15/23
much [2]  17/1 17/2
my [5]  3/8 3/16 4/3 5/5 16/20

**N**
nail [1]  16/11
narrowing [1]  4/20
necessary [3]  10/20 12/5 12/6
need [7]  4/23 5/19 7/19 7/21 10/19 11/18 12/13
needs [4]  5/10 5/14 7/10 10/1
never [3]  14/11 15/11 16/9
new [2]  2/16 8/25
no [8]  3/3 8/12 13/2 14/17 15/3 15/15 16/12 16/24
non [1]  12/25
non-trade [1]  12/25
nonconfidential [1]  9/21
normal [1]  14/7
not [21]
notwithstanding [1]  12/12
now [7]  7/5 7/19 9/23 12/7 12/12 12/18 16/14
nullity [2]  12/22 13/6
number [5]  3/19 7/3 7/4 8/14 15/14
numbers [2]  7/3 7/5
NY [1]  2/16

**O**
objection [1]  9/23
objections [2]  10/19 16/9
obvious [1]  15/6
obviously [1]  11/18 16/8
off [1]  8/23
okay [3]  6/20 16/20 17/2
old [1]  15/17
once [3]  11/5 11/10 15/18
one [8]  6/3 8/20 9/9 10/13 11/7 13/13 13/17 15/13
only [2]  13/11 13/17
opportunity [1]  7/11
order [9]  5/13 8/12 9/13 9/22 11/15 12/3 13/18 13/21 14/24
orders [2]  9/24 14/15

**other [5]**  5/17 11/21 12/15 13/11 16/23
otherwise [2]  7/11 12/8
ought [4]  4/4 8/8 8/16 8/17
our [13]  5/12 5/19 7/2 8/22 11/16 11/19 13/23 13/24 14/1 15/21 16/1 16/5 16/5
out [9]  5/14 5/21 6/2 9/15 9/15 9/15 10/11 10/19 11/5
over [1]  6/7
overlap [1]  12/13
own [1]  11/9

**P**
P.M [1]  3/1
page [4]  2/9 7/12 12/15 15/14 18/10
pages [1]  6/12
Palo [1]  2/10
paragraph [1]  6/17
parallel [1]  13/13
Park [1]  2/15
part [1]  9/21
parte [2]  9/8 10/20
parties [9]  3/18 4/4 4/7 5/15 5/20 6/6 8/7 8/13 12/2
parties' [1]  4/17
partner [1]  3/8
parts [1]  8/4
party's [1]  5/18
pasting [1]  6/13
patent [10]  9/17 12/14 12/17 13/3 13/24 14/13 14/23 15/13 16/1 16/8
patents [9]  5/14 7/25 8/3 8/24 9/6 12/11 14/3 14/8 14/10
peck [1]  10/6
pending [1]  16/7
people [2]  7/13 11/13
Per [1]  3/2
permit [1]  9/13
pick [2]  7/5 7/21
picked [1]  7/4
place [4]  9/13 9/23 10/2 10/14
plaintiff [2]  3/5 13/18
plaintiffs [4]  1/10 2/2 7/21 10/5
plan [1]  16/18
planning [3]  5/12 7/25 12/6
play [1]  15/4
pleading [5]  5/12 8/25
please [3]  3/5 3/10 10/24
point [9]  6/4 8/7 9/19 9/20 11/5 11/6 11/18 13/12 14/2 15/16
points [1]  5/25
poker [1]  3/22
policy [2]  11/21 11/24
possible [3]  10/22 12/7 13/14
potentially [2]  6/5 6/7
practice [1]  16/21
preparing [1]  7/11
present [1]  4/8
presently [1]  9/12
PRESIDING [1]  1/8
prevent [1]  16/13
prior [9]  3/20 3/20 3/25 4/1 4/5 4/9 4/21 8/15 13/13
probably [1]  7/15
problem [2]  14/3 14/18
problems [3]  11/22 12/8 13/7
proceed [2]  10/2 12/19
proceedings [3]  1/15 17/3 18/9
produce [3]  9/11 9/20 10/16
produced [3]  11/10 12/16 14/25
producing [1]  16/10
product [1]  11/9
production [3]  9/14 9/17 14/13
productions [1]  8/14
proper [1]  11/25
proposal [7]  4/8 4/11 4/20 4/24 5/21 8/13 8/15

Exhibit 1
-11-

**P**

propose [1]  4/7
proposed [1]  4/18
protective [3]  9/13 9/22 14/15
provide [1]  12/2
provided [4]  10/12 11/19 11/20 11/23
public [1]  15/13
purported [1]  13/25
purpose [1]  10/9
pursuant [2]  4/24 18/6
put [1]  7/13
putting [1]  6/4

**Q**

question [1]  8/20
quickly [1]  12/6
quite [1]  14/8

**R**

raise [2]  5/25 12/6
raised [2]  11/6 12/21
RE [5]  2/3 3/7 5/7 9/9 15/23
real [1]  13/22
really [3]  7/10 10/4 10/8
reasons [2]  7/8 14/5
received [1]  5/17
reduction [3]  3/19 4/8 4/12
reductions [1]  4/10
reevaluate [1]  9/6
references [4]  3/20 4/9 4/21 8/15
reflect [1]  4/19
reflected [1]  9/2
regard [1]  9/17
regarding [1]  5/13
regulations [1]  18/11
reign [1]  7/6
relate [1]  13/1
related [2]  6/14 12/23
relates [2]  12/25 13/3
relevant [3]  11/12 12/11 12/17
relief [1]  10/21
render [2]  12/22 13/5
replead [1]  16/16
report [1]  3/15
reported [1]  18/8
REPORTER [1]  18/16
REPORTER'S [1]  1/15
requests [1]  12/1
require [2]  3/19 4/15
required [1]  9/10
respond [1]  12/20
results [1]  16/21
review [2]  6/19 6/24
road [2]  2/9 7/8
ROSENTHAL [3]  2/8 2/14 3/13
roughly [1]  15/16
round [2]  4/3 8/14
Royal [1]  3/25
RPR [1]  1/19
rule [4]  10/4 11/24 12/9 13/8
ruled [1]  12/4
ruling [1]  14/23
run [2]  12/7 14/3

**S**

SACV [1]  1/11 3/3
SACV-20-00048-JVS [2]  1/11 3/3
said [5]  5/10 5/20 9/9 12/25 14/24
same [1]  6/25
San [1]  2/13
Santa [3]  1/16 1/20 3/1
say [5]  6/3 10/23 14/7 15/7 15/13
says [1]  12/5
schedule [2]  8/5 9/22
scheduling [1]  12/3

scope [2]  11/25 15/20
second [2]  11/22 13/25
secret [20]
secrets [11]  10/7 10/10 10/13 12/13
 12/15 12/24 13/4 13/25 14/9 15/21
 15/22
Section [2]  11/15 18/6
see [2]  9/3 16/21
seek [1]  10/20
seen [4]  6/10 11/16 15/21 16/9
SEFFENS [3]  1/19 18/15 18/16
selections [1]  4/20
SELNA [1]  1/8
sense [2]  5/3 6/25
separate [1]  9/3
September [2]  5/22 8/23
September 21 [1]  5/22
serious [1]  15/10
set [3]  5/12 7/2 8/21
seven [1]  15/16
share [1]  8/16
SHARON [3]  1/19 18/15 18/16
sheep's [1]  15/6
short [1]  9/8
should [7]  7/15 9/10 11/19 12/12 12/16
 12/18 16/23
show [1]  13/19
side [1]  13/3
sides' [1]  4/19
significant [1]  6/12
similar [1]  6/24
simply [2]  6/16 11/9
single [2]  6/22 13/13
sink [1]  7/17
sit [1]  6/15
situation [3]  10/5 13/22 15/9
six [1]  5/2
slipping [1]  5/2
so [19]
some [19]
somebody [1]  6/15
something [3]  6/10 7/9 7/19
sort [1]  7/12
SOUTHERN [1]  1/6
space [1]  3/15
specific [1]  4/11
specificity [1]  15/12
stage [2]  7/10 8/17
staging [1]  9/24
start [1]  8/2
statement [1]  11/15
states [5]  1/4 1/19 12/23 18/7 18/11
statute [2]  12/22 13/6 13/9 14/19
stenographically [1]  18/8
STEPHEN [2]  2/3 3/8
still [2]  6/14 15/7
stipulate [1]  7/23
Street [3]  1/20 2/4 2/12
strenuous [1]  16/9
subject [1]  14/13
submit [1]  8/13
substantially [1]  8/5
substituting [1]  5/14
such [1]  16/9
suggested [1]  15/10
suggesting [1]  7/18
Suite [2]  1/20 2/12
Suppose [1]  3/22
sure [3]  6/10 6/19 6/25

**T**

take [1]  16/23
talk [1]  7/5
talked [1]  10/17
target [4]  6/4 7/5 7/12 9/1
technical [7]  5/18 9/12 9/21 10/6 10/10

12/17 16/10
telephone [1]  16/12
telephonic [1]  3/2
ten [1]  7/22
terms [4]  4/18 4/23 6/8 8/17
terrible [1]  7/4
than [3]  7/21 8/12 14/7
thank [9]  3/6 3/15 5/8 5/24 10/25 16/24
 16/25 17/1 17/2
that [119]
that's [13]  5/3 5/12 6/9 6/20 7/8 7/18
 7/25 8/11 10/13 14/14 14/22 15/16
 15/18
their [7]  4/4 4/5 11/9 13/25 14/3 15/22
 16/7
theirs [1]  14/1
them [1]  6/10
then [19]
there [22]
there's [6]  6/21 7/4 7/7 12/8 13/2 15/15
these [14]  6/10 6/11 6/14 7/8 7/13 9/14
 10/5 10/18 11/1 11/5 11/10 11/22 11/22
 16/3
they [18]  7/14 7/15 7/16 8/8 10/7 10/8
 10/16 12/2 12/12 12/13 12/17 13/19
 14/3 15/10 15/12 15/17 16/10 16/11
they'll [1]  7/13
they're [3]  6/6 7/24 16/12
they've [3]  15/10 15/11 15/25
thicket [1]  13/24
thing [3]  6/3 9/9 13/11
things [3]  7/8 12/10 15/15
think [18]  4/15 4/18 4/22 5/9 5/10 5/20
 7/3 9/10 11/12 11/21 11/23 13/7 13/8
 13/17 14/5 15/19 16/14 16/20
third [2]  8/17 15/25
this [23]
those [10]  4/10 5/5 7/1 7/22 8/24 9/1
 10/10 10/13 14/5 15/15
though [3]  8/20 14/1 15/12
thought [2]  4/3
thoughts [2]  3/16 5/5
thousands [1]  6/12
through [2]  6/18 13/23
throw [2]  6/2 8/3
thrown [1]  7/16
time [8]  4/14 4/19 5/15 8/10 11/20 13/15
 15/25 16/14
times [1]  11/2
Title [1]  18/7
today [2]  16/13 16/23
tooth [1]  16/11
trade [27]
transcript [3]  1/15 18/8 18/10
trial [3]  4/14 5/4 8/18
tries [1]  14/2
trigger [1]  8/23
triggers [1]  8/22
trivial [1]  6/9
troubling [1]  8/1
true [1]  18/7
try [2]  10/7 13/25
trying [3]  7/18 8/2 10/8
two [2]  4/7 11/12
type [1]  10/20

**U**

U.S [1]  18/16
understand [3]  9/12 12/21 16/13
understood [1]  10/15
undo [1]  15/18
undone [1]  11/10
unfair [1]  3/18
unfortunately [1]  15/19
UNITED [4]  1/4 1/19 18/7 18/11
unnecessary [1]  15/19

**Exhibit 1**
**-12-**

# U

**unrung [1]**  10/13
**until [2]**  9/11 12/2
**up [11]**  3/24 4/19 5/21 6/5 6/11 6/15
 6/23 8/2 8/21 10/7 16/23
**us [2]**  10/15 10/17
**use [1]**  13/24

# V

**vague [1]**  11/7
**valuable [1]**  11/8
**versus [1]**  3/4
**very [8]**  6/12 8/1 12/20 13/7 13/15 13/22
 17/1 17/2
**viable [1]**  4/2
**view [2]**  7/2 11/19
**views [1]**  16/21

# W

**waiting [1]**  9/22
**want [6]**  5/11 8/9 8/25 10/23 11/17
 15/17
**wanted [1]**  13/19
**wants [1]**  12/19
**was [8]**  10/15 10/17 13/13 13/15 13/17
 13/18 14/14 14/22
**wasn't [1]**  4/2
**waterfall [1]**  12/7
**wax [1]**  9/4
**way [2]**  10/9 13/25
**ways [2]**  7/13 14/5
**we [52]**
**we'll [1]**  15/18
**we're [6]**  5/9 8/2 8/18 9/22 12/6 13/5
**we've [1]**  7/24
**weave [1]**  14/2
**week [1]**  3/16
**weeks [2]**  4/7 5/2
**Well [3]**  9/5 15/24 16/20
**were [9]**  5/18 7/18 14/9 14/17 15/3 16/3
 16/4 16/13 17/3
**West [1]**  1/20
**what [14]**  4/6 4/14 6/7 8/12 8/16 8/17
 8/18 11/12 11/16 14/14 15/20 15/22
 16/12 16/21
**what's [1]**  13/10
**whatever [3]**  4/24 6/18 7/20
**whatsoever [1]**  15/12
**when [4]**  3/24 8/25 11/14 12/14
**where [6]**  6/10 10/5 13/17 14/7 14/18
 15/10
**Whereupon [1]**  17/3
**whether [4]**  6/16 7/20 11/25 14/14
**which [13]**  5/18 6/12 6/14 6/23 8/22 9/22
 9/25 11/6 11/18 12/2 12/3 12/19 14/12
**who [2]**  11/16 15/21
**whole [2]**  10/4 10/9
**why [2]**  7/18 14/22
**will [9]**  5/14 5/20 5/21 8/7 8/13 12/8 13/6
 13/11 16/11
**wind [1]**  6/11
**winds [1]**  6/15
**within [3]**  4/7 4/10 12/1
**without [3]**  13/20 13/21 15/2
**withstanding [1]**  15/15
**wolf [1]**  15/5
**work [4]**  5/21 11/9 11/14 11/17
**world [1]**  3/22
**worrying [1]**  6/23
**would [20]**
**wouldn't [1]**  7/14
**wrench [1]**  8/4

# Y

**years [1]**  11/8

**yes [3]**  5/17 15/3 16/18
**yesterday [2]**  12/14 16/17
**yet [1]**  5/17
**York [1]**  2/16
**you [43]**
**you've [1]**  6/10
**your [21]**
**yourselves [1]**  8/9

**Exhibit 1**
-13-

# EXHIBIT 2

| From: | Samplin, Ilissa |
|---|---|
| To: | Adam.Powell; Mark.Kachner; Masimo.Apple |
| Cc: | Lerner, Joshua H.; Lyon, H. Mark; *** Apple-Masimo |
| Subject: | RE: Masimo v. Apple - Section 2019.210 disclosure and amended interrogatory responses |
| Date: | Friday, July 17, 2020 11:37:33 AM |

Adam,

We obviously disagree with your gross mischaracterization of Apple's position, set forth in the first paragraph of your email below—which is demonstrably wrong based on Apple's production of technical documents to your team less than two hours later.

We also continue to disagree with your incorrect positions on Section 2019.210 and trade secret-related interrogatories.  Plaintiffs should not need to prepare their amended complaint *before* serving a Section 2019.210 disclosure or amended interrogatory responses pertaining to their purported trade secrets because Plaintiffs presumably had a Rule 11 basis for their trade secret allegations when they first asserted them back in January 2020.  In other words, Plaintiffs knew (or should have known) what their alleged trade secrets were back when they first filed this case and therefore should not need to file an amended complaint before they can describe those trade secrets to Apple—in a Section 2019.210 disclosure and amended interrogatory responses that Plaintiffs previously, and repeatedly, agreed to provide once a protective order was entered, and did not make contingent on the earlier-in-time filing of an amended pleading.  Your suggestion that Apple's Motion to Dismiss created this problem is factually incorrect.  Plaintiffs' failure to describe their trade secrets even under Federal Rule of Civil Procedure 8 is, and continues to be, the problem here.  Your two week offer for amended interrogatory responses is *not* "more than diligent" as you contend below, and you have again failed to even commit to a date certain by which you will serve a Section 2019.210-compliant trade secret disclosure.  Please provide a date by which Plaintiffs will serve their Section 2019.210 disclosure; we have been asking for a date for so many months now.

With respect to the ethical wall, are you saying that Plaintiffs intend to review the material Apple produced yesterday without first putting a temporary ethical wall in place?

Apple likewise reserves all rights.

Regards.
Ilissa

**Ilissa Samplin**

## GIBSON DUNN

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7354 • Fax +1 213.229.6354
ISamplin@gibsondunn.com • www.gibsondunn.com

**From:** Adam.Powell <Adam.Powell@knobbe.com>

**Exhibit 2**
**-14-**

**Sent:** Thursday, July 16, 2020 5:02 PM
**To:** Samplin, Ilissa <ISamplin@gibsondunn.com>; Mark.Kachner <Mark.Kachner@knobbe.com>;
Masimo.Apple <Masimo.Apple@knobbe.com>
**Cc:** Lerner, Joshua H. <JLerner@gibsondunn.com>; Lyon, H. Mark <MLyon@gibsondunn.com>; ***
Apple-Masimo <Apple-Masimo@gibsondunn.com>
**Subject:** RE: Masimo v. Apple - Section 2019.210 disclosure and amended interrogatory responses

[External Email]
Ilissa,

Your attempt to tie Apple's technical document production to Masimo possibly substituting patents
is inconsistent with the facts.  I asked you about the timing of Apple's document production on July 8
and July 9.  You refused to answer.  Masimo did not mention it was considering substituting patents
until July 10.  Regardless, as a courtesy, we responded yesterday concerning the possible patent
family reduction to focus this case.  Apple's statement that it is now "preparing" its core technical
document production demonstrates the extent to which Apple has flouted—and continues to flout
—the Court's Scheduling Order.  Apple's statement that it needs more information "before" it
produces documents confirms Apple's open contempt for the Court's Order and numerous rulings
confirming that Order, which required Apple to produce documents weeks ago.

We disagree with your assertions regarding Section 2019.210 and Plaintiffs' interrogatory
responses.  Plaintiffs are in the process of preparing an amended complaint, which will describe
Plaintiffs' asserted trade secrets in more detail.  Plaintiffs' amended complaint will be relevant to the
scope of trade secret discovery in this case and the Section 2019.210 statement.  Apple's Motion to
Dismiss obviously drove that timing.  Moreover, Apple apparently already plans to continue
prolonging the pleading stage by filing another motion to dismiss, even though it has not yet seen
the amended complaint.  Apple's demand that we provide discovery now, before we amend the
complaint, puts the cart before the horse.  It is reasonable for us to amend the complaint first and
then update our interrogatories as they relate to the amended complaint.  Our agreement to
provide discovery just two weeks after amending the complaint is more than diligent.

As for your request that we enact a temporary "ethical wall," that is another baseless attempt to tie
Apple's disclosure of technical documents to Section 2019.210—a procedural ploy the Court has
now rejected at least *four times*.  We are aware of no case imposing such a requirement.  The *Jardin*
case you cited is irrelevant because it affirmed an order creating a temporary ethical wall for lawyers
involved in a separate case.  Apple's ongoing defiance and contempt of this Court's numerous orders
is prejudicial.  Plaintiffs reserve all rights.

Best regards,
Adam

**Adam Powell**
Partner
**858-707-4245 Direct**
**Knobbe Martens**

**Exhibit 2**
**-15-**

**From:** Samplin, Ilissa <ISamplin@gibsondunn.com>
**Sent:** Wednesday, July 15, 2020 4:46 PM
**To:** Adam.Powell <Adam.Powell@knobbe.com>; Mark.Kachner <Mark.Kachner@knobbe.com>;
Masimo.Apple <Masimo.Apple@knobbe.com>
**Cc:** Lerner, Joshua H. <JLerner@gibsondunn.com>; Lyon, H. Mark <MLyon@gibsondunn.com>; ***
Apple-Masimo <Apple-Masimo@gibsondunn.com>
**Subject:** RE: Masimo v. Apple - Section 2019.210 disclosure and amended interrogatory responses

Adam,

We have not answered your question about the timing of technical documents because you still
have not answered our question about whether you are dropping a patent family.  We are preparing
our core technical document production.  Before we produce, we need to know if you are
contemplating dropping a patent family, and if so, which one(s).  This has an impact on what we
produce.  If you are not contemplating dropping a patent family, we can make our production
shortly.

With respect to your second question, no, we do not agree that we will rely on only public materials
to defend our client in this case.

With respect to our request for amended interrogatory responses, please explain why your team
feels it needs six weeks from the date the protective order was entered to serve the amended
interrogatory responses Mark previously represented that your team was working on, and would be
able to serve after entry of a protective order?  We don't understand why your team needs 2 weeks
from the date of amendment to provide the amendments we've been waiting on for weeks.

Notably, you omitted from your email below any reference to the Section 2019.210 disclosure we've
been asking about for many months now.  There is no reason why you cannot provide the Section
2019.210 disclosure now—indeed, your team has repeatedly represented that the absence of a
protective order was the only cause for delay on the Section 2019.210 disclosure front.  A protective
order has now been entered.  Plaintiffs should be in a position to provide the disclosure now,
without any further delay.  Please confirm that Plaintiffs will produce a Section 2019.210-compliant
disclosure this week.

Finally, please confirm that you will maintain an ethical wall to keep Plaintiffs' attorneys who will
have actual access to Apple's confidential information from participating in drafting or revising
Plaintiffs' Section 2019.210 statement.  As I am sure you can understand and appreciate, this
temporary ethical wall is necessary because Plaintiffs' counsel who review Apple's core technical
production will be unable to "divorce themselves from their knowledge of [Apple's] confidential
material when identifying the information [Apple] allegedly misappropriated." *Jardin v. DATAllegro,
Inc.*, 2011 WL 3299395, at *5 (S.D. Cal. July 29, 2011) (affirming magistrate judge's order creating a
temporary ethical wall because plaintiff's counsel that learns defendant's confidential information
"simply cannot unring the bell").

**Exhibit 2**
**-16-**

Thank you,
Ilissa

**Ilissa Samplin**

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7354 • Fax +1 213.229.6354
ISamplin@gibsondunn.com • www.gibsondunn.com

---

**From:** Adam.Powell <Adam.Powell@knobbe.com>
**Sent:** Wednesday, July 15, 2020 10:59 AM
**To:** Samplin, Ilissa <ISamplin@gibsondunn.com>; Mark.Kachner <Mark.Kachner@knobbe.com>; Masimo.Apple <Masimo.Apple@knobbe.com>
**Cc:** Lerner, Joshua H. <JLerner@gibsondunn.com>; Lyon, H. Mark <MLyon@gibsondunn.com>; *** Apple-Masimo <Apple-Masimo@knobbe.com>
**Subject:** RE: Masimo v. Apple - Section 2019.210 disclosure and amended interrogatory responses

[External Email]
Ilissa,

You still have not answered the questions I asked last week. You cannot expect us to drop everything and respond in a single business day to your requests while ignoring our questions for a week. Please provide an answer to the following questions as soon as possible.

1. What is Apple's basis for continuing to refuse to provide technical documents?
2. Will Apple confirm it will rely solely on public information for its non-infringement positions in this case?

As you know, Plaintiffs' amended complaint is due July 25. Plaintiffs will agree to supplement their interrogatory answers within two weeks of filing the amended complaint.

Best regards,
Adam

**Adam Powell**
Partner
858-707-4245 **Direct**
**Knobbe Martens**

---

**From:** Samplin, Ilissa <ISamplin@gibsondunn.com>
**Sent:** Tuesday, July 14, 2020 9:40 PM

Exhibit 2
-17-

**To:** Adam.Powell <Adam.Powell@knobbe.com>; Mark.Kachner <Mark.Kachner@knobbe.com>;
Masimo.Apple <Masimo.Apple@knobbe.com>
**Cc:** Lerner, Joshua H. <JLerner@gibsondunn.com>; Lyon, H. Mark <MLyon@gibsondunn.com>; ***
Apple-Masimo <Apple-Masimo@gibsondunn.com>
**Subject:** RE: Masimo v. Apple - Section 2019.210 disclosure and amended interrogatory responses

Counsel:

We did not receive a response to the email below.  Please confirm, by **10 am PT tomorrow**, whether
Plaintiffs will in fact serve their Section 2019.210 disclosure and amended responses to Apple's
Interrogatory Nos. 5 through 13, and 17, by June 22, 2020.  We need to know where things stand on
these matters as soon as possible, given that the parties have been meeting and conferring about all
of them for months now—and Plaintiffs' only purported impediment to production was the absence
of a protective order, which has now been entered.

We look forward to your prompt response.

Thank you,
Ilissa
**Ilissa Samplin**

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7354 • Fax +1 213.229.6354
ISamplin@gibsondunn.com • www.gibsondunn.com

---

**From:** Samplin, Ilissa
**Sent:** Monday, July 13, 2020 11:22 PM
**To:** Adam.Powell <Adam.Powell@knobbe.com>; Mark.Kachner <Mark.Kachner@knobbe.com>;
Masimo.Apple <Masimo.Apple@knobbe.com>
**Cc:** Lerner, Joshua H. <JLerner@gibsondunn.com>; Lyon, H. Mark <MLyon@gibsondunn.com>; ***
Apple-Masimo <Apple-Masimo@gibsondunn.com>
**Subject:** Masimo v. Apple - Section 2019.210 disclosure and amended interrogatory responses

Counsel:

You have repeatedly represented that "despite the stay" pertaining to trade secret discovery that
you mistakenly contend applies to all parties, "Plaintiffs were not withholding discovery, even for
requests related solely to trade secrets"—but rather, that "Plaintiffs will provide their 2019.210
statement and confidential documents after entry of a protective order."  (5/22/20 Kachner Ltr.;
6/2/20 Kachner Ltr.)  You likewise have represented that Plaintiffs would produce responsive
documents, and amend numerous deficient interrogatory responses, upon entry of a protective
order.  (*See, e.g.*, 6/6/20 Samplin Ltr. confirming parties' 6/3/20 meet and confer.)  As you know, the
Protective Order was entered two weeks ago.  Plaintiffs nonetheless are still withholding their

**Exhibit 2**
**-18-**

Section 2109.210 disclosure, as well as documents and information responsive to Apple's trade secret-related and other discovery requests.  There is no justification for Plaintiffs' continued withholding of this relevant and responsive information.

For starters, please confirm that by no later than July 22, 2020, Plaintiffs will produce a Section 2019.210-compliant disclosure, as well as amended responses to Interrogatory Nos. 5 through 13, and 17.  Plaintiffs have now had *ample* time to prepare their Section 2019.210 disclosure and the amended responses to these Interrogatories.  There is no reason for Plaintiffs to continue to delay their production.

Please provide confirmation by 5 pm PT tomorrow, July 14.

Regards,
Ilissa
**Ilissa Samplin**

## GIBSON DUNN

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7354 • Fax +1 213.229.6354
ISamplin@gibsondunn.com • www.gibsondunn.com

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

Exhibit 2
-19-

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

**Exhibit 2**
**-20-**

# EXHIBIT 3

| From: | Samplin, Ilissa |
| --- | --- |
| To: | Adam.Powell |
| Cc: | *** Apple-Masimo; Morgan, Tracy A.; Joe.Re; Steve.Jensen; Perry.Oldham; Stephen.Larson; Masimo.Apple |
| Subject: | RE: Masimo v. Apple - Apple Production (APLPROD002) |
| Date: | Tuesday, July 21, 2020 5:12:17 PM |

Adam,

There is no "ongoing contempt" by Apple as you complain of below.  And frankly, we are confused about what you are even asking of us in your email below.  You have Apple's production of core technical documents and are free to review them.  We've made our position on the need for a temporary ethical wall clear.  We understand that you disagree with our position.  If you choose not to enact the temporary ethical wall we've requested prior to review, and instead use the same team to review and draft Plaintiffs' Section 2019.210 disclosure, you of course do so with full knowledge of Apple's position on this issue.  I'm not sure what more you need from us on the topic at this point.

Regards,
Ilissa
**Ilissa Samplin**

## GIBSON DUNN

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7354 • Fax +1 213.229.6354
ISamplin@gibsondunn.com • www.gibsondunn.com

**From:** Adam.Powell <Adam.Powell@knobbe.com>
**Sent:** Friday, July 17, 2020 2:10 PM
**To:** Samplin, Ilissa <ISamplin@gibsondunn.com>
**Cc:** *** Apple-Masimo <Apple-Masimo@gibsondunn.com>; Morgan, Tracy A. <TMorgan2@gibsondunn.com>; Joe.Re <Joe.Re@knobbe.com>; Steve.Jensen <Steve.Jensen@knobbe.com>; Perry.Oldham <Perry.Oldham@knobbe.com>; Stephen.Larson <Stephen.Larson@knobbe.com>; Masimo.Apple <Masimo.Apple@knobbe.com>
**Subject:** RE: Masimo v. Apple - Apple Production (APLPROD002)

[External Email]
Ilissa,

We write in response to Apple's purported document production last night.  Along with the production, Apple stated "[t]hese documents should be treated as subject to the ethical wall referenced in my colleague Ilissa Samplin's July 15, 2020 email."

Apple cannot unilaterally impose restrictions on its document production.  As we explained in our email yesterday, there is no wall in this case and nothing would support imposing Apple's proposed wall.  The parties briefed over twenty protective order disputes to Judge Early, and no such wall

**Exhibit 3**
**-21-**

exists.  Apple has asked the Court at least four times to condition production of technical documents on Section 2019.210 and the Court rejected every single one of Apple's requests.  Apple's attempt to impose a unilateral wall is baseless and demonstrates Apple's continued contempt of the Court's numerous orders on this subject.  Apple's ongoing contempt is prejudicial to Plaintiffs.

Because we do not agree to Apple's unilateral attempt to impose a wall, we have not downloaded Apple's purported document production and do not consider the documents produced.  Please immediately confirm Apple withdraws its unilateral attempt to impose a wall.

Best regards,
Adam

**Adam Powell**
Partner
858-707-4245 **Direct**
**Knobbe Martens**

---

**From:** Morgan, Tracy A. <TMorgan2@gibsondunn.com>
**Sent:** Thursday, July 16, 2020 6:51 PM
**To:** Joe.Re <Joe.Re@knobbe.com>; Steve.Jensen <Steve.Jensen@knobbe.com>; Perry.Oldham <Perry.Oldham@knobbe.com>; Adam.Powell <Adam.Powell@knobbe.com>; Stephen.Larson <Stephen.Larson@knobbe.com>; Masimo.Apple <Masimo.Apple@knobbe.com>
**Cc:** *** Apple-Masimo <Apple-Masimo@gibsondunn.com>
**Subject:** Masimo v. Apple - Apple Production (APLPROD002)

Counsel,

Documents bearing production numbers APL-MAS_00000842 - APL-MAS_00001192 are available for download.  The credentials to access the SFTP site are below.  The SFTP password and production .RAR file password will be sent separately.  Please note these files will only remain available on the SFTP site for seven days.  These documents should be treated as subject to the ethical wall referenced in my colleague Ilissa Samplin's July 15, 2020 email.

Production Volume: APLPROD002
Bates Range: APL-MAS_00000842 - APL-MAS_00001192
Password: Sent separately

| Host | sftp.gibsondunn.com |
|---|---|
| Connection type | SFTP/SSH (we recommend using the software FileZilla to connect) |
| Port | 22 |
| Username | 03290-00135_Apple_Productions |
| Password to SFTP | Sent separately |

Exhibit 3
-22-

Sincerely,

**Tracy A. Morgan, CP**
Certified Paralegal

## GIBSON DUNN

Gibson, Dunn & Crutcher LLP
3161 Michelson Drive, Irvine, CA 92612-4412
Tel +1 949.451.4186 • Fax +1 949.475.4686
TMorgan2@gibsondunn.com • www.gibsondunn.com

---

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

---

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

---

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

---

**Exhibit 3**
**-23-**

# EXHIBIT 4

US010588553B2

(12) **United States Patent**　　　　　　　(10) **Patent No.:　　US 10,588,553 B2**

Poeze et al.　　　　　　　　　　　　　　(45) **Date of Patent:　*Mar. 17, 2020**

(54) **MULTI-STREAM DATA COLLECTION SYSTEM FOR NONINVASIVE MEASUREMENT OF BLOOD CONSTITUENTS**

(71) Applicant: **Masimo Corporation**, Irvine, CA (US)

(72) Inventors: **Jeroen Poeze**, Rancho Santa Margarita, CA (US); **Marcelo Lamego**, Cupertino, CA (US); **Sean Merritt**, Lake Forest, CA (US); **Cristiano Dalvi**, Lake Forest, CA (US); **Hung Vo**, Fountain Valley, CA (US); **Johannes Bruinsma**, Opeinde (NL); **Ferdyan Lesmana**, Irvine, CA (US); **Massi Joe E. Kiani**, Laguna Niguel, CA (US); **Greg Olsen**, Lake Forest, CA (US)

(73) Assignee: **Masimo Corporation**, Irvine, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/534,949**

(22) Filed: **Aug. 7, 2019**

(65) **Prior Publication Data**

US 2019/0357812 A1　　　Nov. 28, 2019

**Related U.S. Application Data**

(63) Continuation of application No. 16/409,515, filed on May 10, 2019, now Pat. No. 10,376,191, which is a (Continued)

(51) **Int. Cl.**
　　*A61B 5/1455*　　　(2006.01)
　　*A61B 5/145*　　　(2006.01)
　　*A61B 5/00*　　　(2006.01)

(52) **U.S. Cl.**
　　CPC ........ *A61B 5/1455* (2013.01); *A61B 5/14532* (2013.01); *A61B 5/14546* (2013.01); (Continued)

(58) **Field of Classification Search**
　　CPC .............. A61B 5/1455; A61B 5/14551; A61B 5/14552; A61B 5/14532; A61B 5/14546; (Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,910,701 A　　10/1975　Henderson et al.
4,114,604 A　　9/1978　Shaw et al.

FOREIGN PATENT DOCUMENTS

CN　　　1270793 A　　10/2000
CN　　101484065 B　　11/2011
　　　　　　　　(Continued)

OTHER PUBLICATIONS

US 8,845,543 B2, 09/2014, Diab et al. (withdrawn)

*Primary Examiner* — Eric F Winakur
*Assistant Examiner* — Chu Chuan Liu
(74) *Attorney, Agent, or Firm* — Knobbe Martens Olson & Bear LLP

(57) **ABSTRACT**

The present disclosure relates to noninvasive methods, devices, and systems for measuring various blood constituents or analytes, such as glucose. In an embodiment, a light source comprises LEDs and super-luminescent LEDs. The light source emits light at at least wavelengths of about 1610 nm, about 1640 nm, and about 1665 nm. In an embodiment, the detector comprises a plurality of photodetectors arranged in a special geometry comprising one of a substantially (Continued)



Exhibit 4
-24-

US 10,588,553 B2

43

drical housing **1480/1580** (not shown) attached to an emitter submount **1702**, which is attached to a circuit board **1719**.

A spring **1787** attaches to a detector shell **1706** via pins **1783**, **1785**, which hold the emitter and detector shells **1704**, **1706** together. A support structure **1791** attaches to the detector shell **1706**, which provides support for a shielding enclosure **1790**. A noise shield **1713** attaches to the shielding enclosure **1790**. A detector submount **1700** is disposed inside the shielding enclosure **1790**. A finger bed **1710** provides a surface for placement of the patient's finger. Finger bed **1710** may comprise a gripping surface or gripping features, which may assist in placing and stabilizing a patient's finger in the sensor. A partially cylindrical protrusion **1705** may also be disposed in the finger bed **1710**. As shown, finger bed **1710** attaches to the noise shield **1703**. The noise shield **1703** may be configured to reduce noise, such as from ambient light and electromagnetic noise. For example, the noise shield **1703** may be constructed from materials having an opaque color, such as black or a dark blue, to prevent light piping.

Noise shield **1703** may also comprise a thermistor **1712**. The thermistor **1712** may be helpful in measuring the temperature of a patient's finger. For example, the thermistor **1712** may be useful in detecting when the patient's finger is reaching an unsafe temperature that is too hot or too cold. In addition, the temperature of the patient's finger may be useful in indicating to the sensor the presence of low perfusion as the temperature drops. In addition, the thermistor **1712** may be useful in detecting a shift in the characteristics of the water spectrum in the patient's finger, which can be temperature dependent.

Moreover, a flex circuit cover **1706** attaches to the pins **1783**, **1785**. Although not shown, a flex circuit can also be provided that connects the circuit board **1719** with the submount **1700** (or a circuit board to which the submount **1700** is connected). A flex circuit protector **1760** may be provided to provide a barrier or shield to the flex circuit (not shown). In particular, the flex circuit protector **1760** may also prevent any electrostatic discharge to or from the flex circuit. The flex circuit protector **1760** may be constructed from well known materials, such as a plastic or rubber materials.

FIG. **18** shows the results obtained by an exemplary sensor **101** of the present disclosure that was configured for measuring glucose. This sensor **101** was tested using a pure water ex-vivo sample. In particular, ten samples were prepared that ranged from 0-55 mg/dL. Two samples were used as a training set and eight samples were then used as a test population. As shown, embodiments of the sensor **101** were able to obtain at least a standard deviation of 13 mg/dL in the training set and 11 mg/dL in the test population.

FIG. **19** shows the results obtained by an exemplary sensor **101** of the present disclosure that was configured for measuring glucose. This sensor **101** was tested using a turbid ex-vivo sample. In particular, 25 samples of water/glucose/ Liposyn were prepared that ranged from 0-55 mg/dL. Five samples were used as a training set and 20 samples were then used as a test population. As shown, embodiments of sensor **101** were able to obtain at least a standard deviation of 37 mg/dL in the training set and 32 mg/dL in the test population.

FIGS. **20** through **22** shows other results that can be obtained by an embodiment of system **100**. In FIG. **20**, 150 blood samples from two diabetic adult volunteers were collected over a 10-day period. Invasive measurements were taken with a YSI glucometer to serve as a reference measurement. Noninvasive measurements were then taken with

44

an embodiment of system **100** that comprised four LEDs and four independent detector streams. As shown, the system **100** obtained a correlation of about 85% and Arms of about 31 mg/dL.

In FIG. **21**, 34 blood samples were taken from a diabetic adult volunteer collected over a 2-day period. Invasive measurements were also taken with a glucometer for comparison. Noninvasive measurements were then taken with an embodiment of system **100** that comprised four LEDs in emitter **104** and four independent detector streams from detectors **106**. As shown, the system **100** was able to attain a correlation of about 90% and Arms of about 22 mg/dL.

The results shown in FIG. **22** relate to total hemoglobin testing with an exemplary sensor **101** of the present disclosure. In particular, 47 blood samples were collected from nine adult volunteers. Invasive measurements were then taken with a CO-oximeter for comparison. Noninvasive measurements were taken with an embodiment of system **100** that comprised four LEDs in emitter **104** and four independent detector channels from detectors **106**. Measurements were averaged over 1 minute. As shown, the testing resulted in a correlation of about 93% and Arms of about 0.8 mg/dL.

Conditional language used herein, such as, among others, "can," "could," "might," "may," "e.g.," and the like, unless specifically stated otherwise, or otherwise understood within the context as used, is generally intended to convey that certain embodiments include, while other embodiments do not include, certain features, elements and/or states. Thus, such conditional language is not generally intended to imply that features, elements and/or states are in any way required for one or more embodiments or that one or more embodiments necessarily include logic for deciding, with or without author input or prompting, whether these features, elements and/or states are included or are to be performed in any particular embodiment.

While certain embodiments of the inventions disclosed herein have been described, these embodiments have been presented by way of example only, and are not intended to limit the scope of the inventions disclosed herein. Indeed, the novel methods and systems described herein can be embodied in a variety of other forms; furthermore, various omissions, substitutions and changes in the form of the methods and systems described herein can be made without departing from the spirit of the inventions disclosed herein. The claims and their equivalents are intended to cover such forms or modifications as would fall within the scope and spirit of certain of the inventions disclosed herein.

What is claimed is:

**1**. A noninvasive optical physiological sensor comprising:
a plurality of emitters configured to emit light into tissue of a user;
at least four detectors, wherein at least one of the at least four detectors is configured to detect light that has been attenuated by tissue of the user, and wherein the at least four detectors are arranged on a substrate;
a wall configured to circumscribe at least the at least four detectors; and
a cover configured to be located between tissue of the user and the at least four detectors when the noninvasive optical physiological sensor is worn by the user, wherein the cover comprises a single protruding convex surface operable to conform tissue of the user to at least a portion of the single protruding convex surface when the noninvasive optical physiological sensor is worn by the user, and wherein the wall operably connects to the substrate and the cover.

Exhibit 4
-25-

US 10,588,553 B2

45

**2**. The noninvasive optical physiological sensor of claim **1**, wherein the wall operably connects to the substrate on one side and operably connects to the cover on an opposite side.

**3**. The noninvasive optical physiological sensor of claim **1** wherein the at least four detectors are arranged evenly spaced from one another.

**4**. The noninvasive optical physiological sensor of claim **3** further comprising:

an opaque layer blocking light other than at one or more openings that allow light to pass through to at least one of the at least four detectors.

**5**. The noninvasive optical physiological sensor of claim **1**, wherein at least part of the cover is light permeable.

**6**. The noninvasive optical physiological sensor of claim **5**, wherein the cover is configured to allow light to reach at least one of the at least four detectors.

**7**. A physiological monitoring device comprising:

the noninvasive optical physiological sensor of claim **1**;

a touch-screen display;

one or more processors configured to receive data or one or more signals from at least one of the at least four detectors and cause communication of physiological measurement information to at least one of: the touch-screen display or a mobile phone; and

a strap configured to facilitate attachment of at least part of the physiological monitoring device to an arm of a user of the physiological monitoring device.

**8**. The physiological monitoring device of claim **7** further comprising:

a magnet configured to be used as a connecting mechanism.

**9**. The noninvasive optical physiological sensor of claim **1**, wherein the attenuated light is reflected by the tissue.

**10**. An optical physiological measurement sensor comprising:

a plurality of emitters configured to emit light into tissue of a user;

a substrate including a planar surface;

at least four detectors operably arranged on the planar surface of the substrate in a pattern;

a cover comprising a single protruding convex surface; and

a wall that surrounds the at least four detectors, wherein the wall operably connects to the substrate and the cover.

**11**. The optical physiological measurement sensor of claim **10**, wherein the cover is operable to conform tissue of the user to at least a portion of the single protruding convex surface when the optical physiological measurement sensor is worn by the user.

**12**. The optical physiological measurement sensor of claim **10**, wherein at least a portion of the cover is sufficiently rigid to be operable to conform tissue of the user to at least a portion of a shape of the cover.

**13**. The optical physiological measurement sensor of claim **10**, wherein the cover is configured to be positioned between the at least four detectors and tissue of a user when the optical physiological measurement sensor is worn by the user.

**14**. The optical physiological measurement sensor of claim **10**, wherein the wall comprises an opaque surface.

**15**. The optical physiological measurement sensor of claim **10**, wherein the wall operably connects to the substrate on one side and operably connects to the cover on the other side.

46

**16**. The optical physiological measurement sensor of claim **10**, wherein at least a portion of the cover is light permeable.

**17**. The optical physiological measurement sensor of claim **16**, wherein the cover is configured to allow light to reach at least one of the at least four detectors.

**18**. The optical physiological measurement sensor of claim **10** further comprising:

one or more openings that allow light to pass through to the at least four detectors.

**19**. The optical physiological measurement sensor of claim **18** further comprising:

one or more processors configured to:

receive one or more signals from at least one of the at least four detectors, the one or more signals indicative of a physiological parameter of the user of the optical physiological measurement sensor; and

cause output of information indicative of measurements of the physiological parameter to at least one of: a touch-screen display or a mobile phone.

**20**. A noninvasive optical physiological measurement device comprising:

a plurality of emitters configured to emit light into tissue of a user;

at least four detectors, wherein at least one of the at least four detectors is configured to detect light that has been attenuated by tissue of the user;

a cover configured to be located between tissue of the user and the at least four detectors when the noninvasive optical physiological measurement device is worn by the user, wherein the cover comprises a protruding surface operable to conform tissue of the user to at least a portion of the protruding surface when the noninvasive optical physiological measurement device is worn by the user, and wherein at least one of the at least four detectors is configured to receive light passed through the protruding surface after attenuation by tissue of the user;

a wall surrounding the at least four detectors; and

a substrate on which at least the at least four detectors are positioned,

wherein the wall operably connects to the substrate and the cover, thereby positioning the at least four detectors within one or more spaces formed by at least the substrate, the wall, and the cover.

**21**. The noninvasive optical physiological measurement device of claim **20**, wherein the cover is further configured to allow passage of light to at least one of the at least four detectors after attenuation by tissue of the user via at least one or more light permeable portions of the cover.

**22**. The noninvasive optical physiological measurement device of claim **21**, wherein at least a portion of the cover is comprised of a sufficiently rigid material so as to cause the tissue of the user to conform to at least the portion of the protruding surface.

**23**. The noninvasive optical physiological measurement device of claim **22**, wherein the at least four detectors are evenly spaced from one another.

**24**. The noninvasive optical physiological measurement device of claim **23** further comprising:

one or more openings that allow light to pass through to the at least four detectors.

**25**. The noninvasive optical physiological measurement device of claim **24** further comprising:

a magnet configured to be used as a connecting mechanism.

Exhibit 4
-26-

US 10,588,553 B2

47

48

26. The noninvasive optical physiological measurement device of claim **25** further comprising:

one or more processors configured to:

receive data or one or more signals from at least one of the at least four detectors, the data or one or more signals indicative of a physiological parameter of the user of the noninvasive optical physiological measurement device; and

cause output of information indicative of measurements of the physiological parameter to at least one of: a touch-screen display or a mobile phone.

27. The noninvasive optical physiological measurement device of claim **26**, further comprising a touch-screen display.

28. The noninvasive optical physiological measurement device of claim **27**, wherein the physiological parameter comprises at least one of: pulse rate, glucose, oxygen, oxygen saturation, methemoglobin, total hemoglobin, carboxyhemoglobin, or carbon monoxide.

29. The noninvasive optical physiological measurement device of claim **20**, wherein the attenuated light is reflected by the tissue.

\* \* \* \* \*

Exhibit 4
-27-

US010588554B2

## (12) United States Patent
### Poeze et al.

(10) Patent No.: **US 10,588,554 B2**

(45) Date of Patent: *Mar. 17, 2020

---

(54) **MULTI-STREAM DATA COLLECTION SYSTEM FOR NONINVASIVE MEASUREMENT OF BLOOD CONSTITUENTS**

(71) Applicant: **Masimo Corporation**, Irvine, CA (US)

(72) Inventors: **Jeroen Poeze**, Rancho Santa Margarita, CA (US); **Marcelo Lamego**, Cupertino, CA (US); **Sean Merritt**, Lake Forest, CA (US); **Cristiano Dalvi**, Lake Forest, CA (US); **Hung Vo**, Fountain Valley, CA (US); **Johannes Bruinsma**, Opeinde (NL); **Ferdyan Lesmana**, Irvine, CA (US); **Massi Joe E. Kiani**, Laguna Niguel, CA (US); **Greg Olsen**, Lake Forest, CA (US)

(73) Assignee: **Masimo Corporation**, Irvine, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/544,713**

(22) Filed: **Aug. 19, 2019**

(65) **Prior Publication Data**

US 2019/0365295 A1 Dec. 5, 2019

### Related U.S. Application Data

(63) Continuation of application No. 16/534,949, filed on Aug. 7, 2019, which is a continuation of application
(Continued)

(51) **Int. Cl.**
| | |
|---|---|
| *A61B 5/1455* | (2006.01) |
| *A61B 5/145* | (2006.01) |
| *A61B 5/00* | (2006.01) |

(52) **U.S. Cl.**
CPC ........ *A61B 5/1455* (2013.01); *A61B 5/14532* (2013.01); *A61B 5/14546* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC .............. A61B 5/1455; A61B 5/14551; A61B 5/14552; A61B 5/14532; A61B 5/6829;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,910,701 A | 10/1975 | Henderson et al. | |
| 4,114,604 A | 9/1978 | Shaw et al. | |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| CN | 1270793 A | 10/2000 | |
| CN | 101484065 B | 11/2011 | |
| | (Continued) | | |

OTHER PUBLICATIONS

US 8,845,543 B2, 09/2014, Diab et al. (withdrawn)
(Continued)

*Primary Examiner* — Eric F Winakur

*Assistant Examiner* — Chu Chuan Liu

(74) *Attorney, Agent, or Firm* — Knobbe Martens Olson & Bear LLP

(57) **ABSTRACT**

The present disclosure relates to noninvasive methods, devices, and systems for measuring various blood constituents or analytes, such as glucose. In an embodiment, a light source comprises LEDs and super-luminescent LEDs. The light source emits light at at least wavelengths of about 1610 nm, about 1640 nm, and about 1665 nm. In an embodiment, the detector comprises a plurality of photodetectors arranged in a special geometry comprising one of a substantially
(Continued)



Exhibit 4
-28-

US 10,588,554 B2

43

drical housing **1480/1580** (not shown) attached to an emitter submount **1702**, which is attached to a circuit board **1719**.

A spring **1787** attaches to a detector shell **1706** via pins **1783**, **1785**, which hold the emitter and detector shells **1704**, **1706** together. A support structure **1791** attaches to the detector shell **1706**, which provides support for a shielding enclosure **1790**. A noise shield **1713** attaches to the shielding enclosure **1790**. A detector submount **1700** is disposed inside the shielding enclosure **1790**. A finger bed **1710** provides a surface for placement of the patient's finger. Finger bed **1710** may comprise a gripping surface or gripping features, which may assist in placing and stabilizing a patient's finger in the sensor. A partially cylindrical protrusion **1705** may also be disposed in the finger bed **1710**. As shown, finger bed **1710** attaches to the noise shield **1703**. The noise shield **1703** may be configured to reduce noise, such as from ambient light and electromagnetic noise. For example, the noise shield **1703** may be constructed from materials having an opaque color, such as black or a dark blue, to prevent light piping.

Noise shield **1703** may also comprise a thermistor **1712**. The thermistor **1712** may be helpful in measuring the temperature of a patient's finger. For example, the thermistor **1712** may be useful in detecting when the patient's finger is reaching an unsafe temperature that is too hot or too cold. In addition, the temperature of the patient's finger may be useful in indicating to the sensor the presence of low perfusion as the temperature drops. In addition, the thermistor **1712** may be useful in detecting a shift in the characteristics of the water spectrum in the patient's finger, which can be temperature dependent.

Moreover, a flex circuit cover **1706** attaches to the pins **1783**, **1785**. Although not shown, a flex circuit can also be provided that connects the circuit board **1719** with the submount **1700** (or a circuit board to which the submount **1700** is connected). A flex circuit protector **1760** may be provided to provide a barrier or shield to the flex circuit (not shown). In particular, the flex circuit protector **1760** may also prevent any electrostatic discharge to or from the flex circuit. The flex circuit protector **1760** may be constructed from well known materials, such as a plastic or rubber materials.

FIG. **18** shows the results obtained by an exemplary sensor **101** of the present disclosure that was configured for measuring glucose. This sensor **101** was tested using a pure water ex-vivo sample. In particular, ten samples were prepared that ranged from 0-55 mg/dL. Two samples were used as a training set and eight samples were then used as a test population. As shown, embodiments of the sensor **101** were able to obtain at least a standard deviation of 13 mg/dL in the training set and 11 mg/dL in the test population.

FIG. **19** shows the results obtained by an exemplary sensor **101** of the present disclosure that was configured for measuring glucose. This sensor **101** was tested using a turbid ex-vivo sample. In particular, 25 samples of water/glucose/Liposyn were prepared that ranged from 0-55 mg/dL. Five samples were used as a training set and 20 samples were then used as a test population. As shown, embodiments of sensor **101** were able to obtain at least a standard deviation of 37 mg/dL in the training set and 32 mg/dL in the test population.

FIGS. **20** through **22** shows other results that can be obtained by an embodiment of system **100**. In FIG. **20**, 150 blood samples from two diabetic adult volunteers were collected over a 10-day period. Invasive measurements were taken with a YSI glucometer to serve as a reference measurement. Noninvasive measurements were then taken with

44

an embodiment of system **100** that comprised four LEDs and four independent detector streams. As shown, the system **100** obtained a correlation of about 85% and Arms of about 31 mg/dL.

In FIG. **21**, 34 blood samples were taken from a diabetic adult volunteer collected over a 2-day period. Invasive measurements were also taken with a glucometer for comparison. Noninvasive measurements were then taken with an embodiment of system **100** that comprised four LEDs in emitter **104** and four independent detector streams from detectors **106**. As shown, the system **100** was able to attain a correlation of about 90% and Arms of about 22 mg/dL.

The results shown in FIG. **22** relate to total hemoglobin testing with an exemplary sensor **101** of the present disclosure. In particular, 47 blood samples were collected from nine adult volunteers. Invasive measurements were then taken with a CO-oximeter for comparison. Noninvasive measurements were taken with an embodiment of system **100** that comprised four LEDs in emitter **104** and four independent detector channels from detectors **106**. Measurements were averaged over 1 minute. As shown, the testing resulted in a correlation of about 93% and Arms of about 0.8 mg/dL.

Conditional language used herein, such as, among others, "can," "could," "might," "may," "e.g.," and the like, unless specifically stated otherwise, or otherwise understood within the context as used, is generally intended to convey that certain embodiments include, while other embodiments do not include, certain features, elements and/or states. Thus, such conditional language is not generally intended to imply that features, elements and/or states are in any way required for one or more embodiments or that one or more embodiments necessarily include logic for deciding, with or without author input or prompting, whether these features, elements and/or states are included or are to be performed in any particular embodiment.

While certain embodiments of the inventions disclosed herein have been described, these embodiments have been presented by way of example only, and are not intended to limit the scope of the inventions disclosed herein. Indeed, the novel methods and systems described herein can be embodied in a variety of other forms; furthermore, various omissions, substitutions and changes in the form of the methods and systems described herein can be made without departing from the spirit of the inventions disclosed herein. The claims and their equivalents are intended to cover such forms or modifications as would fall within the scope and spirit of certain of the inventions disclosed herein.

What is claimed is:

1. A physiological measurement system comprising:
   a physiological sensor device comprising:
   a plurality of emitters configured to emit light into tissue of a user;
   at least four detectors, wherein each of the at least four detectors has a corresponding window that allows light to pass through to the detector;
   a wall that surrounds at least the at least four detectors; and
   a cover that operably connects to the wall and that is configured to be located between tissue of the user and the at least four detectors when the physiological sensor device is worn by the user, wherein:
   the cover comprises a single protruding convex surface, and
   at least a portion of the cover is sufficiently rigid to cause tissue of the user to conform to at least a

Exhibit 4

-29-

US 10,588,554 B2

portion of a shape of the single protruding convex surface when the physiological sensor device is worn by the user; and

a handheld computing device in wireless communication with the physiological sensor device, wherein the handheld computing device comprises:

one or more processors configured to wirelessly receive one or more signals from the physiological sensor device, the one or more signals responsive to at least a physiological parameter of the user;

a touch-screen display configured to provide a user interface,

wherein:

the user interface is configured to display indicia responsive to measurements of the physiological parameter, and

an orientation of the user interface is configurable responsive to a user input; and

a storage device configured to at least temporarily store at least the measurements of the physiological parameter.

2. The physiological measurement system of claim 1, wherein the at least four detectors comprise at least eight detectors.

3. The physiological measurement system of claim 2, wherein at least part of the single protruding convex surface is light permeable to provide at least one optical path to at least one of the at least four detectors.

4. The physiological measurement system of claim 3, wherein the physiological sensor device further comprises:

an at least partially opaque layer blocking one or more optical paths to at least one of the at least four detectors, wherein the at least partially opaque layer comprises the windows that allow light to pass through to the corresponding detectors.

5. The physiological measurement system of claim 4, wherein the physiological sensor device further comprises:

a substrate having a first surface, wherein the at least four detectors are arranged on the first surface.

6. The physiological measurement system of claim 5, wherein:

the wall surrounds at least the at least four detectors on the first surface,

the wall operably connects to the substrate on one side of the wall, and

the wall operably connects to the cover on an opposing side of the wall.

7. The physiological measurement system of claim 6, wherein the wall creates one or more gaps between the first surface of the substrate and a surface of the cover that is interior to the physiological sensor device, and wherein the at least four detectors are positioned on the first surface of the substrate within the one or more gaps.

8. The physiological measurement system of claim 6, wherein the substrate, the wall, and the cover together hermetically seal the at least four detectors.

9. The physiological measurement system of claim 8, wherein a surface of the handheld computing device positions the touch-screen display.

10. The physiological measurement system of claim 9, wherein the physiological parameter comprises at least one of: pulse rate, glucose, oxygen, oxygen saturation, methemoglobin, total hemoglobin, carboxyhemoglobin, or carbon monoxide.

11. The physiological measurement system of claim 10, wherein the single protruding convex surface protrudes a height between 1 millimeter and 3 millimeters.

12. The physiological measurement system of claim 11, wherein at least one of the detectors is configured to detect light that has been attenuated by tissue of the user.

13. The physiological measurement system of claim 12, wherein the displayed indicia are further responsive to temperature.

14. The physiological measurement system of claim 13, wherein a portion of the physiological sensor device comprises one of at least two sizes, the two sizes intended to be appropriate for larger users and smaller users.

15. The physiological measurement system of claim 14, wherein the at least four detectors are arranged such that a first detector and a second detector of the least four detectors are arranged across from each other on opposite sides of a central point along a first axis, and a third detector and a fourth detector of the least four detectors are arranged across from each other on opposite sides of the central point along a second axis which is different from the first axis.

16. The physiological measurement system of claim 15, wherein the first axis is perpendicular to the second axis, and wherein the first, second, third and fourth detectors form a cross pattern about the central point.

17. The physiological measurement system of claim 16, wherein the single protruding convex surface protrudes a height greater than 2 millimeters and less than 3 millimeters.

18. The physiological measurement system of claim 17, wherein the attenuated light is reflected by the tissue.

19. The physiological measurement system of claim 9, wherein the physiological parameter comprises a state or trend of wellness of the user.

20. A physiological measurement system comprising:

a physiological sensor device comprising:

a plurality of emitters configured to emit light into tissue of a user;

at least four detectors, wherein each of the at least four detectors has a corresponding window that allows light to pass through to the detector;

a wall that surrounds at least the at least four detectors; and

a cover comprising a single protruding convex surface, wherein the single protruding convex surface is configured to be located between tissue of the user and the at least four detectors when the physiological sensor device is worn by the user, wherein at least a portion of the single protruding convex surface is sufficiently rigid to cause tissue of the user to conform to at least a portion of a shape of the single protruding convex surface when the physiological sensor device is worn by the user, and wherein the cover operably connects to the wall; and

a handheld computing device in wireless communication with the physiological sensor device.

21. The physiological measurement system of claim 20, wherein the handheld computing device comprises:

one or more processors configured to wirelessly receive one or more signals from the physiological sensor device, the one or more signals responsive to at least a physiological parameter of the user;

a touch-screen display configured to provide a user interface, wherein:

the user interface is configured to display indicia responsive to measurements of the physiological parameter, and

an orientation of the user interface is configurable responsive to a user input; and

a storage device configured to at least temporarily store at least the measurements of the physiological parameter.

Exhibit 4
-30-

US 10,588,554 B2

47

**22**. The physiological measurement system of claim **21**, wherein the at least four detectors comprise at least eight detectors.

**23**. The physiological measurement system of claim **22**, wherein at least part of the single protruding convex surface is light permeable to allow light to reach at least one of the at least four detectors.

**24**. The physiological measurement system of claim **23**, wherein the physiological sensor device further comprises:

an at least partially opaque layer blocking one or more optical paths to at least one of the at least four detectors, wherein the at least partially opaque layer comprises the windows that allow light to pass through to the corresponding detectors.

**25**. The physiological measurement system of claim **24**, wherein the physiological sensor device further comprises:

a substrate having a first surface, wherein the at least four detectors are arranged on the first surface, and wherein the wall surrounds at least the at least four detectors on the first surface,

48

wherein:

the wall operably connects to the substrate on one side of the wall, and

the wall operably connects to the cover on an opposing side of the wall.

**26**. The physiological measurement system of claim **25**, wherein a surface of the handheld computing device positions the touch-screen display.

**27**. The physiological measurement system of claim **26**, wherein the physiological parameter comprises at least one of: pulse rate, glucose, oxygen, oxygen saturation, methemoglobin, total hemoglobin, carboxyhemoglobin, carbon monoxide, or a state or trend of wellness of the user.

**28**. The physiological measurement system of claim **27**, wherein the single protruding convex surface protrudes a height greater than 2 millimeters and less than 3 millimeters.

\* \* \* \* \*

Exhibit 4
-31-

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.          : 10,588,554 B2                                    Page 1 of 1
APPLICATION NO.  : 16/544713
DATED                  : March 17, 2020
INVENTOR(S)        : Jeroen Poeze et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the Title Page

Item (63), Page 2, Column 1 at Lines 14-15, Related U.S. Application Data, Change "and a continuation-in-part" to --which is a continuation-in-part--.

Item (63), Page 2, Column 1 at Line 21, Related U.S. Application Data, Change "and a continuation-in-part" to --which is a continuation-in-part--.

In the Specification

In Column 29 at Line 14, After "thermistors" delete "(not shown)".

In Column 38 at Line 22, Change "15008" to --1500B--.

Signed and Sealed this
Second Day of June, 2020

Andrei Iancu

Andrei Iancu
*Director of the United States Patent and Trademark Office*

**Exhibit 4**
**-32-**

US010258265B1

(12) **United States Patent**
Poeze et al.

(10) Patent No.: **US 10,258,265 B1**
(45) Date of Patent: **\*Apr. 16, 2019**

(54) **MULTI-STREAM DATA COLLECTION SYSTEM FOR NONINVASIVE MEASUREMENT OF BLOOD CONSTITUENTS**

(71) Applicant: **MASIMO CORPORATION**, Irvine, CA (US)

(72) Inventors: **Jeroen Poeze**, Rancho Santa Margarita, CA (US); **Marcelo Lamego**, Cupertino, CA (US); **Sean Merritt**, Lake Forest, CA (US); **Cristiano Dalvi**, Lake Forest, CA (US); **Hung Vo**, Fountain Valley, CA (US); **Johannes Bruinsma**, Opeinde (NL); **Ferdyan Lesmana**, Irvine, CA (US); **Massi Joe E. Kiani**, Laguna Niguel, CA (US); **Greg Olsen**, Trabuco Canyon, CA (US)

(73) Assignee: **MASIMO CORPORATION**, Irvine, CA (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/212,440**

(22) Filed: **Dec. 6, 2018**

**Related U.S. Application Data**

(63) Continuation of application No. 14/981,290, filed on Dec. 28, 2015, which is a continuation of application
(Continued)

(51) **Int. Cl.**
| | | |
|---|---|---|
| *A61B 5/1455* | (2006.01) | |
| *A61B 5/00* | (2006.01) | |
| *A61B 5/145* | (2006.01) | |

(52) **U.S. Cl.**
CPC ........ *A61B 5/1455* (2013.01); *A61B 5/14532* (2013.01); *A61B 5/14546* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC . A61B 5/0205; A61B 5/1455; A61B 5/14551; A61B 5/14552; A61B 5/14532;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,910,701 | A | 10/1975 | Henderson et al. |
| 4,114,604 | A | 9/1978 | Shaw et al. |
| | | (Continued) | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 419223 | 3/1991 |
| EP | 1 518 494 | 3/2005 |
| | (Continued) | |

OTHER PUBLICATIONS

US 8,845,543 B2, 09/2014, Diab et al. (withdrawn)
(Continued)

*Primary Examiner* — Eric F Winakur
*Assistant Examiner* — Chu Chuan Liu
(74) *Attorney, Agent, or Firm* — Knobbe Martens Olson & Bear LLP

(57) **ABSTRACT**

The present disclosure relates to noninvasive methods, devices, and systems for measuring various blood constituents or analytes, such as glucose. In an embodiment, a light source comprises LEDs and super-luminescent LEDs. The light source emits light at least wavelengths of about 1610 nm, about 1640 nm, and about 1665 nm. In an embodiment, the detector comprises a plurality of photodetectors arranged in a special geometry comprising one of a substantially
(Continued)



Exhibit 4
-33-

US 10,258,265 B1

43

a sensor signal responsive to the light after tissue absorption, such as absorption by pulsatile arterial blood flow within the tissue site.

The sensor signal is communicated via the flexible coupling **1630** to the connector end **1620**. The connector end **1620** can mate with a cable (not shown) that communicates the sensor signal to a monitor (not shown), such as any of the cables or monitors shown above with respect to FIGS. **2A** through **2D**. Alternatively, the connector end **1620** can mate directly with the monitor.

FIG. **17** illustrates an exploded view of certain of the components of the sensor **301** described above. A heat sink **1751** and a cable **1781** attach to an emitter shell **1704**. The emitter shell attaches to a flap housing **1707**. The flap housing **1707** includes a receptacle **1709** to receive a cylindrical housing **1480/1580** (not shown) attached to an emitter submount **1702**, which is attached to a circuit board **1719**.

A spring **1787** attaches to a detector shell **1706** via pins **1783**, **1785**, which hold the emitter and detector shells **1704**, **1706** together. A support structure **1791** attaches to the detector shell **1706**, which provides support for a shielding enclosure **1790**. A noise shield **1713** attaches to the shielding enclosure **1790**. A detector submount **1700** is disposed inside the shielding enclosure **1790**. A finger bed **1710** provides a surface for placement of the patient's finger. Finger bed **1710** may comprise a gripping surface or gripping features, which may assist in placing and stabilizing a patient's finger in the sensor. A partially cylindrical protrusion **1705** may also be disposed in the finger bed **1710**. As shown, finger bed **1710** attaches to the noise shield **1703**. The noise shield **1703** may be configured to reduce noise, such as from ambient light and electromagnetic noise. For example, the noise shield **1703** may be constructed from materials having an opaque color, such as black or a dark blue, to prevent light piping.

Noise shield **1703** may also comprise a thermistor **1712**. The thermistor **1712** may be helpful in measuring the temperature of a patient's finger. For example, the thermistor **1712** may be useful in detecting when the patient's finger is reaching an unsafe temperature that is too hot or too cold. In addition, the temperature of the patient's finger may be useful in indicating to the sensor the presence of low perfusion as the temperature drops. In addition, the thermistor **1712** may be useful in detecting a shift in the characteristics of the water spectrum in the patient's finger, which can be temperature dependent.

Moreover, a flex circuit cover **1706** attaches to the pins **1783**, **1785**. Although not shown, a flex circuit can also be provided that connects the circuit board **1719** with the submount **1700** (or a circuit board to which the submount **1700** is connected). A flex circuit protector **1760** may be provided to provide a barrier or shield to the flex circuit (not shown). In particular, the flex circuit protector **1760** may also prevent any electrostatic discharge to or from the flex circuit. The flex circuit protector **1760** may be constructed from well known materials, such as a plastic or rubber materials.

FIG. **18** shows the results obtained by an exemplary sensor **101** of the present disclosure that was configured for measuring glucose. This sensor **101** was tested using a pure water ex-vivo sample. In particular, ten samples were prepared that ranged from 0-55 mg/dL. Two samples were used as a training set and eight samples were then used as a test population. As shown, embodiments of the sensor **101** were able to obtain at least a standard deviation of 13 mg/dL in the training set and 11 mg/dL in the test population.

44

FIG. **19** shows the results obtained by an exemplary sensor **101** of the present disclosure that was configured for measuring glucose. This sensor **101** was tested using a turbid ex-vivo sample. In particular, 25 samples of water/glucose/Lyposin were prepared that ranged from 0-55 mg/dL. Five samples were used as a training set and 20 samples were then used as a test population. As shown, embodiments of sensor **101** were able to obtain at least a standard deviation of 37 mg/dL in the training set and 32 mg/dL in the test population.

FIGS. **20** through **22** shows other results that can be obtained by an embodiment of system **100**. In FIG. **20**, 150 blood samples from two diabetic adult volunteers were collected over a 10-day period. Invasive measurements were taken with a YSI glucometer to serve as a reference measurement. Noninvasive measurements were then taken with an embodiment of system **100** that comprised four LEDs and four independent detector streams. As shown, the system **100** obtained a correlation of about 85% and Arms of about 31 mg/dL.

In FIG. **21**, 34 blood samples were taken from a diabetic adult volunteer collected over a 2-day period. Invasive measurements were also taken with a glucometer for comparison. Noninvasive measurements were then taken with an embodiment of system **100** that comprised four LEDs in emitter **104** and four independent detector streams from detectors **106**. As shown, the system **100** was able to attain a correlation of about 90% and Arms of about 22 mg/dL.

The results shown in FIG. **22** relate to total hemoglobin testing with an exemplary sensor **101** of the present disclosure. In particular, 47 blood samples were collected from nine adult volunteers. Invasive measurements were then taken with a CO-oximeter for comparison. Noninvasive measurements were taken with an embodiment of system **100** that comprised four LEDs in emitter **104** and four independent detector channels from detectors **106**. Measurements were averaged over 1 minute. As shown, the testing resulted in a correlation of about 93% and Arms of about 0.8 mg/dL.

Conditional language used herein, such as, among others, "can," "could," "might," "may," "e.g.," and the like, unless specifically stated otherwise, or otherwise understood within the context as used, is generally intended to convey that certain embodiments include, while other embodiments do not include, certain features, elements and/or states. Thus, such conditional language is not generally intended to imply that features, elements and/or states are in any way required for one or more embodiments or that one or more embodiments necessarily include logic for deciding, with or without author input or prompting, whether these features, elements and/or states are included or are to be performed in any particular embodiment.

While certain embodiments of the inventions disclosed herein have been described, these embodiments have been presented by way of example only, and are not intended to limit the scope of the inventions disclosed herein. Indeed, the novel methods and systems described herein can be embodied in a variety of other forms; furthermore, various omissions, substitutions and changes in the form of the methods and systems described herein can be made without departing from the spirit of the inventions disclosed herein. The claims and their equivalents are intended to cover such forms or modifications as would fall within the scope and spirit of certain of the inventions disclosed herein.

What is claimed is:

1. A noninvasive optical physiological measurement device adapted to be worn by a wearer, the noninvasive

Exhibit 4
-34-

US 10,258,265 B1

45

optical physiological measurement device providing an indication of a physiological parameter of the wearer comprising:

a plurality of emitters of different wavelengths;

a housing having a surface and a circular wall protruding from the surface;

at least four detectors arranged on the surface and spaced apart from each other, the at least four detectors configured to output one or more signals responsive to light from the one or more light emitters attenuated by body tissue, the one or more signals indicative of a physiological parameter of the wearer; and

a light permeable cover arranged above at least a portion of the housing, the light permeable cover comprising a protrusion arranged to cover the at least four detectors.

2. The noninvasive optical physiological measurement device of claim 1, wherein the light permeable cover is attached to the housing and forms an airtight or substantially airtight seal enclosing the at least four detectors.

3. The noninvasive optical physiological measurement device of claim 2, wherein the circular wall creates a gap between the surface and the light permeable cove.

4. The noninvasive optical physiological measurement device of claim 2, wherein the housing provides noise shielding for the at least four detectors.

5. The noninvasive optical physiological measurement device of claim 4, wherein the light permeable cover comprises a conductive layer configured to shield the at least four detectors from noise.

6. The noninvasive optical physiological measurement device of claim 3, wherein the protrusion comprises a continuous protrusion.

7. The noninvasive optical physiological measurement device of claim 6, wherein the continuous protrusion comprises a convex protrusion.

8. The noninvasive optical physiological measurement device of claim 6, wherein the light permeable cover is comprised of a rigid material.

9. The noninvasive optical physiological measurement device of claim 8, wherein the light permeable cover is configured to be positioned between the at least four detectors and tissue of a user when the noninvasive optical physiological measurement device is worn by the user.

10. The noninvasive optical physiological measurement device of claim 9, wherein the light permeable cover is configured to press against and at least partially deform tissue of the user when the noninvasive optical physiological measurement device is worn by the user.

11. The noninvasive optical physiological measurement device of claim 10, wherein the light permeable cover is configured to act as a tissue shaper and conform tissue of the user to at least a portion of an external surface shape of the light permeable cover when the noninvasive optical physiological measurement device is worn by the user.

12. The noninvasive optical physiological measurement device of claim 11, wherein the light permeable cover is configured to reduce a mean path length of light traveling to the at least four detectors.

13. The noninvasive optical physiological measurement device of claim 11, wherein the at least four detectors are evenly spaced from one another.

14. The noninvasive optical physiological measurement device of claim 1, wherein the light permeable cover is configured to reduce a mean path length of light traveling to the at least four detectors.

15. The noninvasive optical physiological measurement device of claim 13, wherein the light permeable cover

46

concentration window is configured to increase a signal to noise ratio of the noninvasive optical physiological measurement device.

16. The noninvasive optical physiological measurement device of claim 13, wherein the light permeable cover is configured to increase a signal strength per area of the at least four detectors.

17. The noninvasive optical physiological measurement device of claim 1, wherein the physiological parameter is pulse rate.

18. The noninvasive optical physiological measurement device of claim 1, wherein the physiological parameter is at least one of: glucose, oxygen, oxygen saturation, methemoglobin, total hemoglobin, carboxyhemoglobin, or carbon monoxide.

19. The noninvasive optical physiological measurement device of claim 1, wherein the noninvasive optical physiological measurement device is a disposable or a reusable device.

20. The noninvasive optical physiological measurement device of claim 1, wherein a first detector is arranged spaced apart from a second detector, and a third detector arranged spaced apart from a fourth detector.

21. The noninvasive optical physiological measurement device of claim 20, wherein the first detector is arranged across a central axis from the second detector and the third detector is arranged across the central axis from the fourth detector, wherein the first, second, third and fourth detectors form a cross pattern about the central axis.

22. The noninvasive optical physiological measurement device of claim 20, wherein the noninvasive optical physiological measurement device provides a variation in optical path length to the at least four detectors.

23. The noninvasive optical physiological measurement device of claim 1, wherein the noninvasive optical physiological measurement device is comprised as part of a mobile monitoring device.

24. The noninvasive optical physiological measurement device of claim 23, wherein the mobile monitoring device includes a touch-screen display.

25. A physiological monitoring system comprising:

the noninvasive optical physiological measurement device of claim 1; and

a processor configured to receive the one or more signals and communicate physiological measurement information to a mobile phone.

26. A noninvasive optical physiological measurement device adapted to be worn by a wearer providing an indication of a physiological parameter of the wearer comprising:

a plurality of emitters of different wavelengths;

a circular housing comprising a surface with a raised edge;

at least four detectors arranged on the surface, wherein a first detector is arranged spaced apart from a second detector, and a third detector arranged spaced apart from a fourth detector; and

a cover of the circular housing comprising a lens portion, the lens portion comprising a protrusion in optical communication with the at least four detectors, wherein the at least four detectors are configured to output one or more signals responsive to light from the one or more light emitters attenuated by body tissue, the one or more signals indicative of a physiological parameter of the wearer.

27. The noninvasive optical physiological measurement device of claim 26, wherein the first detector is arranged

Exhibit 4
-35-

US 10,258,265 B1

47

48

across a central axis from the second detector and the third detector is arranged across the central axis from the fourth detector, wherein the first, second, third and fourth detectors form a cross pattern about the central axis.

**28**. The noninvasive optical physiological measurement device of claim **26**, wherein the at least four detectors are arranged in a grid pattern such that the first detector and the second detector are arranged across from each other on opposite sides of a central point along a first axis, and the third detector and the fourth detector are arranged across from each other on opposite sides of the central point along a second axis which is perpendicular to the first axis.

**29**. The noninvasive optical physiological measurement device of claim **27**, wherein the physiological parameter is pulse rate.

**30**. The noninvasive optical physiological measurement device of claim **27**, wherein the physiological parameter is at least one of: glucose, oxygen, oxygen saturation, methemoglobin, total hemoglobin, carboxyhemoglobin, or carbon monoxide.

\* \* \* \* \*

Exhibit 4
-36-

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.        : 10,258,265 B1                                   Page 1 of 1
APPLICATION NO. : 16/212440
DATED             : April 16, 2019
INVENTOR(S)       : Jeroen Poeze et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In the Specification

In Column 25 at Line 18, After "where" insert --R--.

In Column 40 at Line 39 (approx.), After "$Noise = \sqrt{aR + bR^2}$ , " insert --where:--.

In Column 41 at Line 35, Change "MO" to --M$\Omega$--.

In Column 41 at Line 38, Change "MO" to --M$\Omega$--.

In Column 41 at Line 47, Change "MO" to --M$\Omega$--.

In Column 41 at Line 49, Change "MO" to --M$\Omega$--.

In the Claims

In Column 45 at Line 22, In Claim 3, change "cove." to --cover.--.

In Column 45 at Line 63, In Claim 14, change "claim 1," to --claim 13,--.

In Column 46 at Line 1, In Claim 15, before "is" delete "concentration window".

Signed and Sealed this
Twenty-second Day of October, 2019

*Andrei Iancu*

Andrei Iancu
*Director of the United States Patent and Trademark Office*

**Exhibit 4**
**-37-**

US010624564B1

## (12) United States Patent
### Poeze et al.

(10) Patent No.: **US 10,624,564 B1**

(45) Date of Patent: **\*Apr. 21, 2020**

(54) **MULTI-STREAM DATA COLLECTION SYSTEM FOR NONINVASIVE MEASUREMENT OF BLOOD CONSTITUENTS**

(71) Applicant: **Masimo Corporation**, Irvine, CA (US)

(72) Inventors: **Jeroen Poeze**, Rancho Santa Margarita, CA (US); **Marcelo Lamego**, Cupertino, CA (US); **Sean Merritt**, Lake Forest, CA (US); **Cristiano Dalvi**, Lake Forest, CA (US); **Hung Vo**, Fountain Valley, CA (US); **Johannes Bruinsma**, Opeinde (NL); **Ferdyan Lesmana**, Irvine, CA (US); **Massi Joe E. Kiani**, Laguna Niguel, CA (US); **Greg Olsen**, Lake Forest, CA (US)

(73) Assignee: **Masimo Corporation**, Irvine, CA (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/725,292**

(22) Filed: **Dec. 23, 2019**

### Related U.S. Application Data

(63) Continuation of application No. 16/534,949, filed on Aug. 7, 2019, which is a continuation of application
(Continued)

(51) **Int. Cl.**
| | |
|---|---|
| *A61B 5/1455* | (2006.01) |
| *A61B 5/00* | (2006.01) |
| *A61B 5/145* | (2006.01) |

(52) **U.S. Cl.**
CPC ........ *A61B 5/1455* (2013.01); *A61B 5/14532* (2013.01); *A61B 5/14546* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC .............. A61B 5/1455; A61B 5/14551; A61B 5/14552; A61B 5/14532; A61B 5/14546;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,910,701 A | 10/1975 | Henderson et al. | |
| 4,114,604 A | 9/1978 | Shaw et al. | |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| CN | 1270793 A | 10/2000 | |
| CN | 101484065 B | 11/2011 | |

OTHER PUBLICATIONS

US 8,845,543 B2, 09/2014, Diab et al. (withdrawn)
(Continued)

*Primary Examiner* — Eric F Winakur
*Assistant Examiner* — Chu Chuan Liu
(74) *Attorney, Agent, or Firm* — Knobbe Martens Olson & Bear LLP

(57) **ABSTRACT**

The present disclosure relates to noninvasive methods, devices, and systems for measuring various blood constituents or analytes, such as glucose. In an embodiment, a light source comprises LEDs and super-luminescent LEDs. The light source emits light at at least wavelengths of about 1610 nm, about 1640 nm, and about 1665 nm. In an embodiment, the detector comprises a plurality of photodetectors arranged in a special geometry comprising one of a substantially linear substantially equal spaced geometry, a substantially linear substantially non-equal spaced geometry, and a substantially grid geometry.

**30 Claims, 65 Drawing Sheets**



**Exhibit 4**
**-38-**

US 10,624,564 B1

43

The sensor signal is communicated via the flexible coupling **1630** to the connector end **1620**. The connector end **1620** can mate with a cable (not shown) that communicates the sensor signal to a monitor (not shown), such as any of the cables or monitors shown above with respect to FIGS. 2A through 2D. Alternatively, the connector end **1620** can mate directly with the monitor.

FIG. **17** illustrates an exploded view of certain of the components of the sensor **301**' described above. A heat sink **1751** and a cable **1781** attach to an emitter shell **1704**. The emitter shell attaches to a flap housing **1707**. The flap housing **1707** includes a receptacle **1709** to receive a cylindrical housing **1480/1580** (not shown) attached to an emitter submount **1702**, which is attached to a circuit board **1719**.

A spring **1787** attaches to a detector shell **1706** via pins **1783**, **1785**, which hold the emitter and detector shells **1704**, **1706** together. A support structure **1791** attaches to the detector shell **1706**, which provides support for a shielding enclosure **1790**. A noise shield **1713** attaches to the shielding enclosure **1790**. A detector submount **1700** is disposed inside the shielding enclosure **1790**. A finger bed **1710** provides a surface for placement of the patient's finger. Finger bed **1710** may comprise a gripping surface or gripping features, which may assist in placing and stabilizing a patient's finger in the sensor. A partially cylindrical protrusion **1705** may also be disposed in the finger bed **1710**. As shown, finger bed **1710** attaches to the noise shield **1703**. The noise shield **1703** may be configured to reduce noise, such as from ambient light and electromagnetic noise. For example, the noise shield **1703** may be constructed from materials having an opaque color, such as black or a dark blue, to prevent light piping.

Noise shield **1703** may also comprise a thermistor **1712**. The thermistor **1712** may be helpful in measuring the temperature of a patient's finger. For example, the thermistor **1712** may be useful in detecting when the patient's finger is reaching an unsafe temperature that is too hot or too cold. In addition, the temperature of the patient's finger may be useful in indicating to the sensor the presence of low perfusion as the temperature drops. In addition, the thermistor **1712** may be useful in detecting a shift in the characteristics of the water spectrum in the patient's finger, which can be temperature dependent.

Moreover, a flex circuit cover **1706** attaches to the pins **1783**, **1785**. Although not shown, a flex circuit can also be provided that connects the circuit board **1719** with the submount **1700** (or a circuit board to which the submount **1700** is connected). A flex circuit protector **1760** may be provided to provide a barrier or shield to the flex circuit (not shown). In particular, the flex circuit protector **1760** may also prevent any electrostatic discharge to or from the flex circuit. The flex circuit protector **1760** may be constructed from well known materials, such as a plastic or rubber materials.

FIG. **18** shows the results obtained by an exemplary sensor **101** of the present disclosure that was configured for measuring glucose. This sensor **101** was tested using a pure water ex-vivo sample. In particular, ten samples were prepared that ranged from 0-55 mg/dL. Two samples were used as a training set and eight samples were then used as a test population. As shown, embodiments of the sensor **101** were able to obtain at least a standard deviation of 13 mg/dL in the training set and 11 mg/dL in the test population.

FIG. **19** shows the results obtained by an exemplary sensor **101** of the present disclosure that was configured for measuring glucose. This sensor **101** was tested using a turbid ex-vivo sample. In particular, 25 samples of water/glucose/

44

Liposyn were prepared that ranged from 0-55 mg/dL. Five samples were used as a training set and 20 samples were then used as a test population. As shown, embodiments of sensor **101** were able to obtain at least a standard deviation of 37 mg/dL in the training set and 32 mg/dL in the test population.

FIGS. **20** through **22** shows other results that can be obtained by an embodiment of system **100**. In FIG. **20**, 150 blood samples from two diabetic adult volunteers were collected over a 10-day period. Invasive measurements were taken with a YSI glucometer to serve as a reference measurement. Noninvasive measurements were then taken with an embodiment of system **100** that comprised four LEDs and four independent detector streams. As shown, the system **100** obtained a correlation of about 85% and Arms of about 31 mg/dL.

In FIG. **21**, 34 blood samples were taken from a diabetic adult volunteer collected over a 2-day period. Invasive measurements were also taken with a glucometer for comparison. Noninvasive measurements were then taken with an embodiment of system **100** that comprised four LEDs in emitter **104** and four independent detector streams from detectors **106**. As shown, the system **100** was able to attain a correlation of about 90% and Arms of about 22 mg/dL.

The results shown in FIG. **22** relate to total hemoglobin testing with an exemplary sensor **101** of the present disclosure. In particular, 47 blood samples were collected from nine adult volunteers. Invasive measurements were then taken with a CO-oximeter for comparison. Noninvasive measurements were taken with an embodiment of system **100** that comprised four LEDs in emitter **104** and four independent detector channels from detectors **106**. Measurements were averaged over 1 minute. As shown, the testing resulted in a correlation of about 93% and Arms of about 0.8 mg/dL.

Conditional language used herein, such as, among others, "can," "could," "might," "may," "e.g.," and the like, unless specifically stated otherwise, or otherwise understood within the context as used, is generally intended to convey that certain embodiments include, while other embodiments do not include, certain features, elements and/or states. Thus, such conditional language is not generally intended to imply that features, elements and/or states are in any way required for one or more embodiments or that one or more embodiments necessarily include logic for deciding, with or without author input or prompting, whether these features, elements and/or states are included or are to be performed in any particular embodiment.

While certain embodiments of the inventions disclosed herein have been described, these embodiments have been presented by way of example only, and are not intended to limit the scope of the inventions disclosed herein. Indeed, the novel methods and systems described herein can be embodied in a variety of other forms; furthermore, various omissions, substitutions and changes in the form of the methods and systems described herein can be made without departing from the spirit of the inventions disclosed herein. The claims and their equivalents are intended to cover such forms or modifications as would fall within the scope and spirit of certain of the inventions disclosed herein.

What is claimed is:

1. A user-worn physiological measurement device comprising:

    one or more emitters configured to emit light into tissue of a user;

    at least four detectors arranged on a substrate;

Exhibit 4
-39-

US 10,624,564 B1

45

a cover comprising a protruding convex surface, wherein the protruding convex surface extends over all of the at least four detectors arranged on the substrate, wherein at least a portion of the protruding convex surface is rigid;

one or more processors configured to:

receive one or more signals from at least one of the at least four detectors, the one or more signals responsive to at least a physiological parameter of the user; and

process the one or more signals to determine measurements of the physiological parameter;

a network interface configured to communicate with a mobile phone;

a touch-screen display configured to provide a user interface, wherein:

the user interface is configured to display indicia responsive to the measurements of the physiological parameter, and

an orientation of the user interface is configurable responsive to a user input;

a wall that surrounds at least the at least four detectors, wherein the wall operably connects to the substrate and the cover;

a storage device configured to at least temporarily store at least the measurements of the physiological parameter; and

a strap configured to position the physiological measurement device on the user.

2. The user-worn physiological measurement device of claim 1, wherein the protruding convex surface is configured to be located between tissue of the user and the at least four detectors when the physiological measurement device is worn by the user.

3. The user-worn physiological measurement device of claim 2, wherein at least part of the protruding convex surface is light permeable to allow light to reach at least one of the at least four detectors.

4. The user-worn physiological measurement device of claim 2, wherein the at least four detectors are arranged on a first surface of the substrate.

5. The user-worn physiological measurement device of claim 4, wherein:

the wall operably connects to the substrate on one side of the wall,

the wall operably connects to the cover on an opposing side of the wall, and

the wall surrounds at least the at least four detectors on the first surface.

6. The user-worn physiological measurement device of claim 5, further comprising a single unit wearable by the user, the single unit encompassing the one or more emitters, the at least four detectors, the wall, the cover, the one or more processors, the network interface, and the storage device.

7. The user-worn physiological measurement device of claim 6, wherein a surface of the single unit positions the touch-screen display, and wherein the strap is attached to the single unit.

8. The user-worn physiological measurement device of claim 7, wherein the network interface is configured to communicate at least the measurements of the physiological parameter to the mobile phone.

9. The user-worn physiological measurement device of claim 7, wherein the network interface is further configured to wirelessly communicate with the mobile phone or with a computer network.

46

10. The user-worn physiological measurement device of claim 7, wherein the physiological parameter comprises at least one of: pulse rate, glucose, oxygen, oxygen saturation, methemoglobin, total hemoglobin, carboxyhemoglobin, or carbon monoxide.

11. The user-worn physiological measurement device of claim 10 further comprising:

a magnet configured to be used as a connecting mechanism.

12. The user-worn physiological measurement device of claim 10, wherein the one or more processors are further configured to modulate a duty cycle of one or more of the one or more emitters, and wherein the modulation includes pulse width time slots and off time slots.

13. The user-worn physiological measurement device of claim 10, wherein the displayed indicia are further responsive to temperature.

14. The user-worn physiological measurement device of claim 10, wherein the physiological parameter comprises a state or trend of wellness of the user.

15. The user-worn physiological measurement device of claim 10, wherein a portion of the physiological measurement device comprises one of at least two sizes, the two sizes intended to be appropriate for larger users and smaller users.

16. The user-worn physiological measurement device of claim 10, wherein the protruding convex surface protrudes a height between 1 millimeter and 3 millimeters.

17. The user-worn physiological measurement device of claim 16, wherein the protruding convex surface protrudes a height greater than 2 millimeters and less than 3 millimeters.

18. The user-worn physiological measurement device of claim 10, wherein each of the at least four detectors has a corresponding window that allows light to pass through to the detector.

19. The user-worn physiological measurement device of claim 18 further comprising:

an at least partially opaque layer blocking one or more optical paths to at least one of the at least four detectors, wherein the at least partially opaque layer comprises the windows that allow light to pass through to the corresponding detectors.

20. The user-worn physiological measurement device of claim 10, wherein the at least four detectors are arranged such that a first detector and a second detector of the at least four detectors are arranged across from each other on opposite sides of a central point along a first axis, and a third detector and a fourth detector of the at least four detectors are arranged across from each other on opposite sides of the central point along a second axis which is different from the first axis.

21. The user-worn physiological measurement device of claim 20, wherein the first axis is perpendicular to the second axis.

22. The user-worn physiological measurement device of claim 20, wherein the first, second, third and fourth detectors form a cross pattern about the central point.

23. The user-worn physiological measurement device of claim 10, wherein the wall creates one or more gaps between the first surface of the substrate and a surface of the cover that is interior to the physiological measurement device, and wherein the at least four detectors are positioned on the first surface of the substrate within the one or more gaps.

24. The user-worn physiological measurement device of claim 10, wherein the at least four detectors comprise at least eight detectors.

Exhibit 4
-40-

US 10,624,564 B1

47

48

**25**. The user-worn physiological measurement device of claim **10**, wherein at least one of the detectors is configured to detect light that has been attenuated by tissue of the user.

**26**. The user-worn physiological measurement device of claim **25**, wherein the attenuated light is reflected by the tissue.

**27**. A physiological measurement system comprising:
the user-worn physiological measurement device according to claim **1**; and
the mobile phone in communication with the physiological measurement device.

**28**. The physiological measurement system of claim **27**, wherein the network interface of the physiological measurement device is configured to wirelessly communicate, and wherein the mobile phone wirelessly communicates with the network interface.

**29**. A physiological measurement system comprising:
the user-worn physiological measurement device according to claim **24**; and
the mobile phone in communication with the physiological measurement device.

**30**. The physiological measurement system of claim **29**, wherein the network interface of the physiological measurement device is configured to wirelessly communicate, and wherein the mobile phone wirelessly communicates with the network interface.

\* \* \* \* \*

Exhibit 4
-41-

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.        : 10,624,564 B1                              Page 1 of 1
APPLICATION NO.   : 16/725292
DATED             : April 21, 2020
INVENTOR(S)       : Jeroen Poeze

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the Title Page

Item (63), Page 2, Column 1 at Lines 21-22, Related U.S. Application Data, Change "and a continuation-in-part" to --which is a continuation-in-part--.

Item (63), Page 2, Column 1 at Lines 22-23, Related U.S. Application Data, Change "Aug. 25, 2009," to --"Aug. 25, 2008,--.

In the Specification

In Column 38 at Line 34, Change "15008" to --1500B--.

Signed and Sealed this
Second Day of June, 2020

Andrei Iancu

Andrei Iancu
*Director of the United States Patent and Trademark Office*

Exhibit 4
-42-

US010631765B1

(12) **United States Patent**
Poeze et al.

(10) Patent No.: **US 10,631,765 B1**

(45) Date of Patent: **\*Apr. 28, 2020**

(54) **MULTI-STREAM DATA COLLECTION SYSTEM FOR NONINVASIVE MEASUREMENT OF BLOOD CONSTITUENTS**

(71) Applicant: **Masimo Corporation**, Irvine, CA (US)

(72) Inventors: **Jeroen Poeze**, Rancho Santa Margarita, CA (US); **Marcelo Lamego**, Cupertino, CA (US); **Sean Merritt**, Lake Forest, CA (US); **Cristiano Dalvi**, Lake Forest, CA (US); **Hung Vo**, Fountain Valley, CA (US); **Johannes Bruinsma**, Opeinde (NL); **Ferdyan Lesmana**, Irvine, CA (US); **Massi Joe E. Kiani**, Laguna Niguel, CA (US); **Greg Olsen**, Lake Forest, CA (US)

(73) Assignee: **Masimo Corporation**, Irvine, CA (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/725,478**

(22) Filed: **Dec. 23, 2019**

**Related U.S. Application Data**

(63) Continuation of application No. 16/534,949, filed on Aug. 7, 2019, which is a continuation of application
(Continued)

(51) **Int. Cl.**
*A61B 5/1455* (2006.01)
*A61B 5/00* (2006.01)
*A61B 5/145* (2006.01)

(52) **U.S. Cl.**
CPC ........ *A61B 5/1455* (2013.01); *A61B 5/14532* (2013.01); *A61B 5/14546* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC .............. A61B 5/1455; A61B 5/14551; A61B 5/14552; A61B 5/14532; A61B 5/14546;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,910,701 A   10/1975   Henderson et al.
4,114,604 A    9/1978   Shaw et al.
(Continued)

FOREIGN PATENT DOCUMENTS

CN        1270793 A    10/2000
CN     101484065 B    11/2011

OTHER PUBLICATIONS

US 8,845,543 B2, 09/2014, Diab et al. (withdrawn)
(Continued)

*Primary Examiner* — Eric F Winakur
*Assistant Examiner* — Chu Chuan Liu
(74) *Attorney, Agent, or Firm* — Knobbe Martens Olson & Bear LLP

(57) **ABSTRACT**

The present disclosure relates to noninvasive methods, devices, and systems for measuring various blood constituents or analytes, such as glucose. In an embodiment, a light source comprises LEDs and super-luminescent LEDs. The light source emits light at at least wavelengths of about 1610 nm, about 1640 nm, and about 1665 nm. In an embodiment, the detector comprises a plurality of photodetectors arranged in a special geometry comprising one of a substantially linear substantially equal spaced geometry, a substantially linear substantially non-equal spaced geometry, and a substantially grid geometry.

**29 Claims, 65 Drawing Sheets**



Exhibit 4
-43-

US 10,631,765 B1

43

drical housing **1480/1580** (not shown) attached to an emitter submount **1702**, which is attached to a circuit board **1719**.

A spring **1787** attaches to a detector shell **1706** via pins **1783**, **1785**, which hold the emitter and detector shells **1704**, **1706** together. A support structure **1791** attaches to the detector shell **1706**, which provides support for a shielding enclosure **1790**. A noise shield **1713** attaches to the shielding enclosure **1790**. A detector submount **1700** is disposed inside the shielding enclosure **1790**. A finger bed **1710** provides a surface for placement of the patient's finger. Finger bed **1710** may comprise a gripping surface or gripping features, which may assist in placing and stabilizing a patient's finger in the sensor. A partially cylindrical protrusion **1705** may also be disposed in the finger bed **1710**. As shown, finger bed **1710** attaches to the noise shield **1703**. The noise shield **1703** may be configured to reduce noise, such as from ambient light and electromagnetic noise. For example, the noise shield **1703** may be constructed from materials having an opaque color, such as black or a dark blue, to prevent light piping.

Noise shield **1703** may also comprise a thermistor **1712**. The thermistor **1712** may be helpful in measuring the temperature of a patient's finger. For example, the thermistor **1712** may be useful in detecting when the patient's finger is reaching an unsafe temperature that is too hot or too cold. In addition, the temperature of the patient's finger may be useful in indicating to the sensor the presence of low perfusion as the temperature drops. In addition, the thermistor **1712** may be useful in detecting a shift in the characteristics of the water spectrum in the patient's finger, which can be temperature dependent.

Moreover, a flex circuit cover **1706** attaches to the pins **1783**, **1785**. Although not shown, a flex circuit can also be provided that connects the circuit board **1719** with the submount **1700** (or a circuit board to which the submount **1700** is connected). A flex circuit protector **1760** may be provided to provide a barrier or shield to the flex circuit (not shown). In particular, the flex circuit protector **1760** may also prevent any electrostatic discharge to or from the flex circuit. The flex circuit protector **1760** may be constructed from well known materials, such as a plastic or rubber materials.

FIG. **18** shows the results obtained by an exemplary sensor **101** of the present disclosure that was configured for measuring glucose. This sensor **101** was tested using a pure water ex-vivo sample. In particular, ten samples were prepared that ranged from 0-55 mg/dL. Two samples were used as a training set and eight samples were then used as a test population. As shown, embodiments of the sensor **101** were able to obtain at least a standard deviation of 13 mg/dL in the training set and 11 mg/dL in the test population.

FIG. **19** shows the results obtained by an exemplary sensor **101** of the present disclosure that was configured for measuring glucose. This sensor **101** was tested using a turbid ex-vivo sample. In particular, 25 samples of water/glucose/Liposyn were prepared that ranged from 0-55 mg/dL. Five samples were used as a training set and 20 samples were then used as a test population. As shown, embodiments of sensor **101** were able to obtain at least a standard deviation of 37 mg/dL in the training set and 32 mg/dL in the test population.

FIGS. **20** through **22** shows other results that can be obtained by an embodiment of system **100**. In FIG. **20**, 150 blood samples from two diabetic adult volunteers were collected over a 10-day period. Invasive measurements were taken with a YSI glucometer to serve as a reference measurement. Noninvasive measurements were then taken with

44

an embodiment of system **100** that comprised four LEDs and four independent detector streams. As shown, the system **100** obtained a correlation of about 85% and Arms of about 31 mg/dL.

In FIG. **21**, 34 blood samples were taken from a diabetic adult volunteer collected over a 2-day period. Invasive measurements were also taken with a glucometer for comparison. Noninvasive measurements were then taken with an embodiment of system **100** that comprised four LEDs in emitter **104** and four independent detector streams from detectors **106**. As shown, the system **100** was able to attain a correlation of about 90% and Arms of about 22 mg/dL.

The results shown in FIG. **22** relate to total hemoglobin testing with an exemplary sensor **101** of the present disclosure. In particular, 47 blood samples were collected from nine adult volunteers. Invasive measurements were then taken with a CO-oximeter for comparison. Noninvasive measurements were taken with an embodiment of system **100** that comprised four LEDs in emitter **104** and four independent detector channels from detectors **106**. Measurements were averaged over 1 minute. As shown, the testing resulted in a correlation of about 93% and Arms of about 0.8 mg/dL.

Conditional language used herein, such as, among others, "can," "could," "might," "may," "e.g.," and the like, unless specifically stated otherwise, or otherwise understood within the context as used, is generally intended to convey that certain embodiments include, while other embodiments do not include, certain features, elements and/or states. Thus, such conditional language is not generally intended to imply that features, elements and/or states are in any way required for one or more embodiments or that one or more embodiments necessarily include logic for deciding, with or without author input or prompting, whether these features, elements and/or states are included or are to be performed in any particular embodiment.

While certain embodiments of the inventions disclosed herein have been described, these embodiments have been presented by way of example only, and are not intended to limit the scope of the inventions disclosed herein. Indeed, the novel methods and systems described herein can be embodied in a variety of other forms; furthermore, various omissions, substitutions and changes in the form of the methods and systems described herein can be made without departing from the spirit of the inventions disclosed herein. The claims and their equivalents are intended to cover such forms or modifications as would fall within the scope and spirit of certain of the inventions disclosed herein.

What is claimed is:

1. A physiological measurement system comprising:
a physiological sensor device comprising:
  one or more emitters configured to emit light into tissue of a user;
  at least four detectors, wherein each of the at least four detectors has a corresponding window that allows light to pass through to the detector;
  a wall that surrounds at least the at least four detectors; and
  a cover comprising a protruding convex surface, wherein the protruding convex surface is above all of the at least four detectors, wherein at least a portion of the protruding convex surface is rigid, and wherein the cover operably connects to the wall; and
a handheld computing device in wireless communication with the physiological sensor device, wherein the handheld computing device comprises:

Exhibit 4
-44-

US 10,631,765 B1

45

one or more processors configured to wirelessly receive one or more signals from the physiological sensor device, the one or more signals responsive to at least a physiological parameter of the user;

a touch-screen display configured to provide a user interface, wherein:

the user interface is configured to display indicia responsive to measurements of the physiological parameter, and

an orientation of the user interface is configurable responsive to a user input; and

a storage device configured to at least temporarily store at least the measurements of the physiological parameter.

**2.** The physiological measurement system of claim **1**, wherein the protruding convex surface is configured to be located between tissue of the user and the at least four detectors when the physiological measurement device is worn by the user.

**3.** The physiological measurement system of claim **2**, wherein the at least four detectors comprise at least eight detectors.

**4.** The physiological measurement system of claim **3**, wherein at least part of the protruding convex surface is light permeable to allow light to reach at least one of the at least four detectors.

**5.** The physiological measurement system of claim **4**, wherein the physiological sensor device further comprises:

an at least partially opaque layer blocking one or more optical paths to at least one of the at least four detectors, wherein the at least partially opaque layer comprises the windows that allow light to pass through to the corresponding detectors.

**6.** The physiological measurement system of claim **2**, wherein the physiological sensor device further comprises:

a substrate having a first surface, wherein the at least four detectors are arranged on the first surface.

**7.** The physiological measurement system of claim **6**, wherein:

the wall surrounds at least the at least four detectors on the first surface,

the wall operably connects to the substrate on one side of the wall, and

the wall operably connects to the cover on an opposing side of the wall.

**8.** The physiological measurement system of claim **7**, wherein the wall creates one or more gaps between the first surface of the substrate and a surface of the cover that is interior to the physiological sensor device, and wherein the at least four detectors are positioned on the first surface of the substrate within the one or more gaps.

**9.** The physiological measurement system of claim **7**, wherein the substrate, the wall, and the cover together hermetically seal the at least four detectors.

**10.** The physiological measurement system of claim **7**, wherein a surface of the handheld computing device positions the touch-screen display.

**11.** The physiological measurement system of claim **10**, wherein the physiological parameter comprises at least one of: pulse rate, glucose, oxygen, oxygen saturation, methemoglobin, total hemoglobin, carboxyhemoglobin, or carbon monoxide.

**12.** The physiological measurement system of claim **11**, wherein the protruding convex surface protrudes a height between 1 millimeter and 3 millimeters.

46

**13.** The physiological measurement system of claim **11**, wherein at least one of the detectors is configured to detect light that has been attenuated by tissue of the user.

**14.** The physiological measurement system of claim **13**, wherein the displayed indicia are further responsive to temperature.

**15.** The physiological measurement system of claim **13**, wherein a portion of the physiological sensor device comprises one of at least two sizes, the two sizes intended to be appropriate for larger users and smaller users.

**16.** The physiological measurement system of claim **13**, wherein the at least four detectors are arranged such that a first detector and a second detector of the least four detectors are arranged across from each other on opposite sides of a central point along a first axis, and a third detector and a fourth detector of the least four detectors are arranged across from each other on opposite sides of the central point along a second axis which is different from the first axis.

**17.** The physiological measurement system of claim **16**, wherein the first axis is perpendicular to the second axis, and wherein the first, second, third and fourth detectors form a cross pattern about the central point.

**18.** The physiological measurement system of claim **17**, wherein the protruding convex surface protrudes a height greater than 2 millimeters and less than 3 millimeters.

**19.** The physiological measurement system of claim **18**, wherein the attenuated light is reflected by the tissue.

**20.** The physiological measurement system of claim **13**, wherein the physiological parameter comprises a state or trend of wellness of the user.

**21.** A physiological measurement system comprising:

a physiological sensor device comprising:

one or more emitters configured to emit light into tissue of a user;

at least four detectors, wherein each of the at least four detectors has a corresponding window that allows light to pass through to the detector;

a wall that surrounds at least the at least four detectors; and

a cover comprising a protruding convex surface, wherein the protruding convex surface is positioned such that the protruding convex surface is located between tissue of the user and all of the at least four detectors when the physiological sensor device is worn by the user, wherein at least a portion of the protruding convex surface is rigid, and wherein the cover operably connects to the wall; and

a handheld computing device in wireless communication with the physiological sensor device.

**22.** The physiological measurement system of claim **21**, wherein the handheld computing device comprises:

one or more processors configured to wirelessly receive one or more signals from the physiological sensor device, the one or more signals responsive to at least a physiological parameter of the user;

a touch-screen display configured to provide a user interface, wherein:

the user interface is configured to display indicia responsive to measurements of the physiological parameter, and

an orientation of the user interface is configurable responsive to a user input; and

a storage device configured to at least temporarily store at least the measurements of the physiological parameter.

**23.** The physiological measurement system of claim **22**, wherein the at least four detectors comprise at least eight detectors.

Exhibit 4
-45-

US 10,631,765 B1

47

48

**24**. The physiological measurement system of claim **23**, wherein at least part of the protruding convex surface is light permeable to allow light to reach at least one of the at least four detectors.

**25**. The physiological measurement system of claim **23**, wherein the physiological sensor device further comprises:

an at least partially opaque layer blocking one or more optical paths to at least one of the at least four detectors, wherein the at least partially opaque layer comprises the windows that allow light to pass through to the corresponding detectors.

**26**. The physiological measurement system of claim **25**, wherein the physiological sensor device further comprises:

a substrate having a first surface, wherein the at least four detectors are arranged on the first surface, and wherein the wall surrounds at least the at least four detectors on the first surface,

wherein:

the wall operably connects to the substrate on one side of the wall, and

the wall operably connects to the cover on an opposing side of the wall.

**27**. The physiological measurement system of claim **26**, wherein a surface of the handheld computing device positions the touch-screen display.

**28**. The physiological measurement system of claim **27**, wherein the physiological parameter comprises at least one of: pulse rate, glucose, oxygen, oxygen saturation, methemoglobin, total hemoglobin, carboxyhemoglobin, carbon monoxide, or a state or trend of wellness of the user.

**29**. The physiological measurement system of claim **28**, wherein the protruding convex surface protrudes a height greater than 2 millimeters and less than 3 millimeters.

\* \* \* \* \*

Exhibit 4
-46-

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.          : 10,631,765 B1                                    Page 1 of 1
APPLICATION NO.     : 16/725478
DATED               : April 28, 2020
INVENTOR(S)         : Jeroen Poeze

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the Title Page

Item (63), Page 2, Column 1 at Line 12, Related U.S. Application Data, Change "and a continuation-in-part" to --said application No. 12/829,352 is a continuation-in-part--.

In the Specification

In Column 38 at Line 22, Change "15008" to --1500B--.

In Column 41 at Line 33, Change "40 MO" to --40 MΩ--.

In Column 41 at Line 35, Change "40 MO" to --40 MΩ--.

In the Claims

In Column 46 at Line 16, In Claim 16, change "the least" to --the at least--.

Signed and Sealed this
Second Day of June, 2020

Andrei Iancu

Andrei Iancu
*Director of the United States Patent and Trademark Office*

**Exhibit 4
-47-**

US010702194B1

(12) **United States Patent** (10) **Patent No.:** **US 10,702,194 B1**
Poeze et al. (45) **Date of Patent:** *Jul. 7, 2020

(54) **MULTI-STREAM DATA COLLECTION SYSTEM FOR NONINVASIVE MEASUREMENT OF BLOOD CONSTITUENTS**

(71) Applicant: **Masimo Corporation**, Irvine, CA (US)

(72) Inventors: **Jeroen Poeze**, Rancho Santa Margarita, CA (US); **Marcelo Lamego**, Cupertino, CA (US); **Sean Merritt**, Lake Forest, CA (US); **Cristiano Dalvi**, Lake Forest, CA (US); **Hung Vo**, Fountain Valley, CA (US); **Johannes Bruinsma**, Opeinde (NL); **Ferdyan Lesmana**, Irvine, CA (US); **Massi Joe E. Kiani**, Laguna Niguel, CA (US); **Greg Olsen**, Lake Forest, CA (US)

(73) Assignee: **Masimo Corporation**, Irvine, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/829,536**

(22) Filed: **Mar. 25, 2020**

**Related U.S. Application Data**

(63) Continuation of application No. 16/725,292, filed on Dec. 23, 2019, now Pat. No. 10,624,564, which is a (Continued)

(51) **Int. Cl.**
    *A61B 5/1455* (2006.01)
    *A61B 5/145* (2006.01)
    *A61B 5/00* (2006.01)

(52) **U.S. Cl.**
    CPC ........ *A61B 5/1455* (2013.01); *A61B 5/14532* (2013.01); *A61B 5/14546* (2013.01);
    (Continued)

(58) **Field of Classification Search**
    CPC .............. A61B 5/1455; A61B 5/14551; A61B 5/14552; A61B 5/14532; A61B 5/14546;
    (Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,910,701 A    10/1975  Henderson et al.
4,114,604 A     9/1978  Shaw et al.
(Continued)

FOREIGN PATENT DOCUMENTS

CN         1270793 A    10/2000
CN      101564290 B    10/2009

OTHER PUBLICATIONS

US 8,845,543 B2, 09/2014, Diab et al. (withdrawn)
(Continued)

*Primary Examiner* — Eric F Winakur
*Assistant Examiner* — Chu Chuan Liu
(74) *Attorney, Agent, or Firm* — Knobbe Martens Olson & Bear LLP

(57) **ABSTRACT**

The present disclosure relates to noninvasive methods, devices, and systems for measuring various blood constituents or analytes, such as glucose. In an embodiment, a light source comprises LEDs and super-luminescent LEDs. The light source emits light at at least wavelengths of about 1610 nm, about 1640 nm, and about 1665 nm. In an embodiment, the detector comprises a plurality of photodetectors arranged in a special geometry comprising one of a substantially linear substantially equal spaced geometry, a substantially linear substantially non-equal spaced geometry, and a substantially grid geometry.

**30 Claims, 65 Drawing Sheets**



DETECTOR₁
DETECTOR₂
DETECTOR₄
DETECTOR₃
DETECTOR SUBMOUNT 1200

**Exhibit 4**
**-48-**

US 10,702,194 B1

45

46

What is claimed is:

1. A physiological measurement system comprising:

a physiological sensor device comprising:

one or more emitters configured to emit light into tissue of a user;

a first set of photodiodes, wherein:

the first set of photodiodes comprises at least four photodiodes,

the photodiodes of the first set of photodiodes are connected to one another in parallel to provide a first signal stream, and

each of the photodiodes of the first set of photodiodes has a corresponding window that allows light to pass through to the photodiode;

a second set of photodiodes, wherein:

the second set of photodiodes comprises at least four photodiodes,

the photodiodes of the second set of photodiodes are connected to one another in parallel to provide a second signal stream, and

each of the photodiodes of the second set of photodiodes has a corresponding window that allows light to pass through to the photodiode;

a wall that surrounds at least the first and second sets of photodiodes; and

a cover comprising a protruding convex surface, wherein the protruding convex surface is above all of the photodiodes of the first and second sets of photodiodes, wherein at least a portion of the protruding convex surface is rigid, and wherein the cover is above the wall; and

a handheld computing device in wireless communication with the physiological sensor device, wherein the handheld computing device comprises:

one or more processors configured to wirelessly receive one or more signals from the physiological sensor device, the one or more signals responsive to at least a physiological parameter of the user;

a touch-screen display configured to provide a user interface, wherein:

the user interface is configured to display indicia responsive to measurements of the physiological parameter, and

an orientation of the user interface is configurable responsive to a user input; and

a storage device configured to at least temporarily store at least the measurements of the physiological parameter.

2. The physiological measurement system of claim 1, wherein the physiological sensor device further comprises: preprocessing electronics configured to preprocess at least one of the first signal stream or the second signal stream.

3. The physiological measurement system of claim 2, wherein the preprocessing comprises adapting the at least one of the first signal stream or the second signal stream.

4. The physiological measurement system of claim 3, wherein the preprocessing further comprises amplifying the at least one of the first signal stream or the second signal stream.

5. The physiological measurement system of claim 4, wherein the preprocessing further comprises converting the at least one of the first signal stream or the second signal stream from analog to digital.

6. The physiological measurement system of claim 2, wherein the preprocessing electronics comprise at least:

a first amplifier configured to receive the first signal stream from the first set of photodiodes at an input of the first amplifier and at least amplify the first signal stream, and

a second amplifier configured to receive the second signal stream from the second set of photodiodes at an input of the second amplifier and at least amplify the second signal stream.

7. The physiological measurement system of claim 6, wherein the protruding convex surface is configured to be located between tissue of the user and the photodiodes of the first and second sets of photodiodes when the physiological measurement device is worn by the user, and wherein at least part of the protruding convex surface is light permeable to allow light to reach at least one of the photodiodes of the first or second sets of photodiodes.

8. The physiological measurement system of claim 7, wherein the physiological sensor device further comprises:

an at least partially opaque layer blocking one or more optical paths to at least one of the photodiodes of the first set of photodiodes or the second set of photodiodes, wherein the at least partially opaque layer comprises the windows that allow light to pass through to the corresponding photodiodes.

9. The physiological measurement system of claim 8, wherein the physiological sensor device further comprises:

a substrate having a first surface, wherein the photodiodes of the first set of photodiodes and the photodiodes of the second set of photodiodes are arranged on the first surface.

10. The physiological measurement system of claim 9, wherein:

the wall surrounds at least the first set of photodiodes and the second set of photodiodes on the first surface,

the wall operably connects to the substrate on one side of the wall, and

the wall operably connects to the cover on an opposing side of the wall.

11. The physiological measurement system of claim 10, wherein a surface of the handheld computing device positions the touch-screen display.

12. The physiological measurement system of claim 11, wherein the physiological parameter comprises at least one of: pulse rate, glucose, oxygen, oxygen saturation, methemoglobin, total hemoglobin, carboxyhemoglobin, or carbon monoxide.

13. The physiological measurement system of claim 12, wherein the protruding convex surface protrudes a height between 1 millimeter and 3 millimeters.

14. The physiological measurement system of claim 12, wherein at least one of the photodiodes is configured to receive light that has been attenuated by tissue of the user.

15. The physiological measurement system of claim 14, wherein a portion of the physiological sensor device comprises one of at least two sizes, the two sizes intended to be appropriate for larger users and smaller users.

16. The physiological measurement system of claim 14, wherein at least the photodiodes of the first set of photodiodes are arranged such that a first photodiode and a second photodiode of the first set of photodiodes are arranged across from each other on opposite sides of a central point along a first axis, and a third photodiode and a fourth photodiode of the first set of photodiodes are arranged across from each other on opposite sides of the central point along a second axis which is different from the first axis.

Exhibit 4
-49-

US 10,702,194 B1

47

**17**. The physiological measurement system of claim **14**, wherein the protruding convex surface protrudes a height greater than 2 millimeters and less than 3 millimeters.

**18**. The physiological measurement system of claim **17**, wherein the attenuated light is reflected by the tissue.

**19**. The physiological measurement system of claim **1**, wherein the handheld computing device comprises a mobile phone.

**20**. A physiological measurement system comprising:

a physiological sensor device comprising:

one or more emitters configured to emit light into tissue of a user;

a first set of photodiodes, the first set of photodiodes comprising at least four photodiodes, the photodiodes of the first set of photodiodes connected to one another in parallel to provide a first signal stream; wherein each of the photodiodes of the first set of photodiodes has a corresponding window that allows light to pass through to the photodiode;

a second set of photodiodes, the second set of photodiodes comprising at least four photodiodes, the photodiodes of the second set of photodiodes connected to one another in parallel to provide a second signal stream, wherein each of the photodiodes of the second set of photodiodes has a corresponding window that allows light to pass through to the photodiode; and

a protruding convex surface, wherein the protruding convex surface is positioned such that the protruding convex surface is located between tissue of the user and the photodiodes of the first and second sets of photodiodes when the physiological sensor device is worn by the user; and

a handheld computing device in wireless communication with the physiological sensor device.

**21**. The physiological measurement system of claim **20**, wherein the handheld computing device comprises a mobile phone.

**22**. The physiological measurement system of claim **20** further comprising:

preprocessing electronics comprising at least:

a first amplifier configured to receive the first signal stream at an input of the first amplifier and at least amplify the first signal stream, and

a second amplifier configured to receive the second signal stream at an input of the second amplifier and at least amplify the second signal stream.

**23**. The physiological measurement system of claim **22**, wherein the preprocessing electronics are further configured to convert at least one of the first signal stream or the second signal stream from analog to digital.

**24**. The physiological measurement system of claim **23**, wherein the handheld computing device comprises:

one or more processors configured to wirelessly receive one or more signals from the physiological sensor device, the one or more signals responsive to at least a physiological parameter of the user;

a touch-screen display configured to provide a user interface, wherein the user interface is configured to display indicia responsive to measurements of the physiological parameter; and

a storage device configured to at least temporarily store at least the measurements of the physiological parameter.

**25**. The physiological measurement system of claim **24**, wherein at least part of the protruding convex surface is light permeable to allow light to reach at least one of the photo-

48

diodes of the first or second sets of photodiodes, and wherein the physiological sensor device further comprises:

an at least partially opaque layer blocking one or more optical paths to at least one of the photodiodes of the first set of photodiodes and at least one of the photodiodes of the second set of photodiodes, wherein the at least partially opaque layer comprises the windows that allow light to pass through to the corresponding photodiodes.

**26**. The physiological measurement system of claim **25**, wherein the physiological sensor device further comprises:

a wall that surrounds at least the first and second sets of photodiodes; and

a substrate having a first surface, wherein the photodiodes of the first set of photodiodes and the photodiodes of the second set of photodiodes are arranged on the first surface, wherein the wall surrounds at least the first set of photodiodes and the second set of photodiodes on the first surface; and

a cover comprising the protruding convex surface, wherein:

the wall operably connects to the substrate on one side of the wall, and

the wall operably connects to the cover on an opposing side of the wall.

**27**. The physiological measurement system of claim **26**, wherein a surface of the handheld computing device positions the touch-screen display.

**28**. The physiological measurement system of claim **27**, wherein the physiological parameter comprises at least one of: pulse rate, glucose, oxygen, oxygen saturation, methemoglobin, total hemoglobin, carboxyhemoglobin, carbon monoxide, or a state or trend of wellness of the user.

**29**. The physiological measurement system of claim **28**, wherein the protruding convex surface protrudes a height greater than 2 millimeters and less than 3 millimeters.

**30**. A physiological measurement system comprising:

a physiological sensor device comprising:

one or more emitters configured to emit light into tissue of a user;

a substrate having a first surface;

a first set of photodiodes arranged on the first surface, wherein:

the first set of photodiodes comprises at least four photodiodes,

the photodiodes of the first set of photodiodes are connected to one another in parallel to provide a first signal stream, and

each of the photodiodes of the first set of photodiodes has a corresponding window that allows light to pass through to the photodiode;

a second set of photodiodes arranged on the first surface, wherein:

the second set of photodiodes comprises at least four photodiodes,

the photodiodes of the second set of photodiodes are connected to one another in parallel to provide a second signal stream, and

each of the photodiodes of the second set of photodiodes has a corresponding window that allows light to pass through to the photodiode;

a cover comprising a protruding convex surface, wherein:

the protruding convex surface is above all of the photodiodes of the first and second sets of photodiodes,

**Exhibit 4**
-50-

US 10,702,194 B1

49

at least a portion of the protruding convex surface is rigid,

the cover is above the wall, and

the protruding convex surface is configured to be located between tissue of the user and the photodiodes of the first and second sets of photodiodes when the physiological measurement device is worn by the user;

a wall that surrounds at least the first and second sets of photodiodes on the first surface, wherein:

the wall operably connects to the substrate on one side of the wall, and

the wall operably connects to the cover on an opposing side of the wall; and

preprocessing electronics configured to preprocess at least one of the first signal stream or the second signal stream, wherein the preprocessing electronics comprise at least:

a first amplifier configured to receive the first signal stream from the first set of photodiodes at an input of the first amplifier and at least amplify the first signal stream, and

50

a second amplifier configured to receive the second signal stream from the second set of photodiodes at an input of the second amplifier and at least amplify the second signal stream; and

a handheld computing device in wireless communication with the physiological sensor device, wherein the handheld computing device comprises:

one or more processors configured to wirelessly receive one or more signals from the physiological sensor device, the one or more signals responsive to at least a physiological parameter of the user, wherein the physiological parameter comprises at least one of: pulse rate, glucose, oxygen, oxygen saturation, methemoglobin, total hemoglobin, carboxyhemoglobin, or carbon monoxide;

a touch-screen display configured to provide a user interface, wherein the user interface is configured to display indicia responsive to measurements of the physiological parameter; and

a storage device configured to at least temporarily store at least the measurements of the physiological parameter.

\* \* \* \* \*

Exhibit 4
-51-

US010702195B1

(12) **United States Patent**     (10) **Patent No.:**     **US 10,702,195 B1**
Poeze et al.                      (45) **Date of Patent:**     *Jul. 7, 2020

(54) **MULTI-STREAM DATA COLLECTION SYSTEM FOR NONINVASIVE MEASUREMENT OF BLOOD CONSTITUENTS**

(71) Applicant: **Masimo Corporation**, Irvine, CA (US)

(72) Inventors: **Jeroen Poeze**, Rancho Santa Margarita, CA (US); **Marcelo Lamego**, Cupertino, CA (US); **Sean Merritt**, Lake Forest, CA (US); **Cristiano Dalvi**, Lake Forest, CA (US); **Hung Vo**, Fountain Valley, CA (US); **Johannes Bruinsma**, Opeinde (NL); **Ferdyan Lesmana**, Irvine, CA (US); **Massi Joe E. Kiani**, Laguna Niguel, CA (US); **Greg Olsen**, Lake Forest, CA (US)

(73) Assignee: **Masimo Corporation**, Irvine, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/834,467**

(22) Filed: **Mar. 30, 2020**

**Related U.S. Application Data**

(63) Continuation of application No. 16/725,292, filed on Dec. 23, 2019, now Pat. No. 10,624,564, which is a (Continued)

(51) **Int. Cl.**
*A61B 5/1455* (2006.01)
*A61B 5/145* (2006.01)
*A61B 5/00* (2006.01)

(52) **U.S. Cl.**
CPC ........ *A61B 5/1455* (2013.01); *A61B 5/14532* (2013.01); *A61B 5/14546* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC .............. A61B 5/1455; A61B 5/14551; A61B 5/14552; A61B 5/14532; A61B 5/14546;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,910,701 A    10/1975  Henderson et al.
4,114,604 A    9/1978  Shaw et al.
(Continued)

FOREIGN PATENT DOCUMENTS

CN    1270793 A      10/2000
CN    101564290 B    10/2009

OTHER PUBLICATIONS

US 8,845,543 B2, 09/2014, Diab et al. (withdrawn)
(Continued)

*Primary Examiner* — Eric F Winakur
*Assistant Examiner* — Chu Chuan Liu
(74) *Attorney, Agent, or Firm* — Knobbe Martens Olson & Bear LLP

(57)                    **ABSTRACT**

The present disclosure relates to noninvasive methods, devices, and systems for measuring various blood constituents or analytes, such as glucose. In an embodiment, a light source comprises LEDs and super-luminescent LEDs. The light source emits light at at least wavelengths of about 1610 nm, about 1640 nm, and about 1665 nm. In an embodiment, the detector comprises a plurality of photodetectors arranged in a special geometry comprising one of a substantially linear substantially equal spaced geometry, a substantially linear substantially non-equal spaced geometry, and a substantially grid geometry.

**17 Claims, 65 Drawing Sheets**



DETECTOR₁
DETECTOR₂
DETECTOR₄
DETECTOR₃
DETECTOR SUBMOUNT 1200

**Exhibit 4**
**-52-**

US 10,702,195 B1

43

The sensor signal is communicated via the flexible coupling **1630** to the connector end **1620**. The connector end **1620** can mate with a cable (not shown) that communicates the sensor signal to a monitor (not shown), such as any of the cables or monitors shown above with respect to FIGS. 2A through 2D. Alternatively, the connector end **1620** can mate directly with the monitor.

FIG. **17** illustrates an exploded view of certain of the components of the sensor **301**′ described above. A heat sink **1751** and a cable **1781** attach to an emitter shell **1704**. The emitter shell attaches to a flap housing **1707**. The flap housing **1707** includes a receptacle **1709** to receive a cylindrical housing **1480/1580** (not shown) attached to an emitter submount **1702**, which is attached to a circuit board **1719**.

A spring **1787** attaches to a detector shell **1706** via pins **1783**, **1785**, which hold the emitter and detector shells **1704**, **1706** together. A support structure **1791** attaches to the detector shell **1706**, which provides support for a shielding enclosure **1790**. A noise shield **1713** attaches to the shielding enclosure **1790**. A detector submount **1700** is disposed inside the shielding enclosure **1790**. A finger bed **1710** provides a surface for placement of the patient's finger. Finger bed **1710** may comprise a gripping surface or gripping features, which may assist in placing and stabilizing a patient's finger in the sensor. A partially cylindrical protrusion **1705** may also be disposed in the finger bed **1710**. As shown, finger bed **1710** attaches to the noise shield **1703**. The noise shield **1703** may be configured to reduce noise, such as from ambient light and electromagnetic noise. For example, the noise shield **1703** may be constructed from materials having an opaque color, such as black or a dark blue, to prevent light piping.

Noise shield **1703** may also comprise a thermistor **1712**. The thermistor **1712** may be helpful in measuring the temperature of a patient's finger. For example, the thermistor **1712** may be useful in detecting when the patient's finger is reaching an unsafe temperature that is too hot or too cold. In addition, the temperature of the patient's finger may be useful in indicating to the sensor the presence of low perfusion as the temperature drops. In addition, the thermistor **1712** may be useful in detecting a shift in the characteristics of the water spectrum in the patient's finger, which can be temperature dependent.

Moreover, a flex circuit cover **1706** attaches to the pins **1783**, **1785**. Although not shown, a flex circuit can also be provided that connects the circuit board **1719** with the submount **1700** (or a circuit board to which the submount **1700** is connected). A flex circuit protector **1760** may be provided to provide a barrier or shield to the flex circuit (not shown). In particular, the flex circuit protector **1760** may also prevent any electrostatic discharge to or from the flex circuit. The flex circuit protector **1760** may be constructed from well known materials, such as a plastic or rubber materials.

FIG. **18** shows the results obtained by an exemplary sensor **101** of the present disclosure that was configured for measuring glucose. This sensor **101** was tested using a pure water ex-vivo sample. In particular, ten samples were prepared that ranged from 0-55 mg/dL. Two samples were used as a training set and eight samples were then used as a test population. As shown, embodiments of the sensor **101** were able to obtain at least a standard deviation of 13 mg/dL in the training set and 11 mg/dL in the test population.

FIG. **19** shows the results obtained by an exemplary sensor **101** of the present disclosure that was configured for measuring glucose. This sensor **101** was tested using a turbid ex-vivo sample. In particular, 25 samples of water/glucose/

44

Liposyn were prepared that ranged from 0-55 mg/dL. Five samples were used as a training set and 20 samples were then used as a test population. As shown, embodiments of sensor **101** were able to obtain at least a standard deviation of 37 mg/dL in the training set and 32 mg/dL in the test population.

FIGS. **20** through **22** shows other results that can be obtained by an embodiment of system **100**. In FIG. **20**, 150 blood samples from two diabetic adult volunteers were collected over a 10-day period. Invasive measurements were taken with a YSI glucometer to serve as a reference measurement. Noninvasive measurements were then taken with an embodiment of system **100** that comprised four LEDs and four independent detector streams. As shown, the system **100** obtained a correlation of about 85% and Arms of about 31 mg/dL.

In FIG. **21**, 34 blood samples were taken from a diabetic adult volunteer collected over a 2-day period. Invasive measurements were also taken with a glucometer for comparison. Noninvasive measurements were then taken with an embodiment of system **100** that comprised four LEDs in emitter **104** and four independent detector streams from detectors **106**. As shown, the system **100** was able to obtain a correlation of about 90% and Arms of about 22 mg/dL.

The results shown in FIG. **22** relate to total hemoglobin testing with an exemplary sensor **101** of the present disclosure. In particular, 47 blood samples were collected from nine adult volunteers. Invasive measurements were then taken with a CO-oximeter for comparison. Noninvasive measurements were taken with an embodiment of system **100** that comprised four LEDs in emitter **104** and four independent detector channels from detectors **106**. Measurements were averaged over 1 minute. As shown, the testing resulted in a correlation of about 93% and Arms of about 0.8 mg/dL.

Conditional language used herein, such as, among others, "can," "could," "might," "may," "e.g.," and the like, unless specifically stated otherwise, or otherwise understood within the context as used, is generally intended to convey that certain embodiments include, while other embodiments do not include, certain features, elements and/or states. Thus, such conditional language is not generally intended to imply that features, elements and/or states are in any way required for one or more embodiments or that one or more embodiments necessarily include logic for deciding, with or without author input or prompting, whether these features, elements and/or states are included or are to be performed in any particular embodiment.

While certain embodiments of the inventions disclosed herein have been described, these embodiments have been presented by way of example only, and are not intended to limit the scope of the inventions disclosed herein. Indeed, the novel methods and systems described herein can be embodied in a variety of other forms; furthermore, various omissions, substitutions and changes in the form of the methods and systems described herein can be made without departing from the spirit of the inventions disclosed herein. The claims and their equivalents are intended to cover such forms or modifications as would fall within the scope and spirit of certain of the inventions disclosed herein.

What is claimed is:

1. A user-worn physiological measurement device that defines a plurality of optical paths, the physiological measurement device comprising:
   one or more emitters configured to emit light into tissue of a user;

Exhibit 4
-53-

US 10,702,195 B1

45

a first set of photodiodes positioned on a first surface and surrounded by a wall that is operably connected to the first surface, wherein:

the first set of photodiodes comprises at least four photodiodes, and

the photodiodes of the first set of photodiodes are connected to one another in parallel to provide a first signal stream;

a second set of photodiodes positioned on the first surface and surrounded by the wall, wherein:

the second set of photodiodes comprises at least four photodiodes, and

the photodiodes of the second set of photodiodes are connected to one another in parallel to provide a second signal stream; and

a cover located above the wall and comprising a single protruding convex surface configured to be located between tissue of the user and the first and second sets of photodiodes when the physiological measurement device is worn by the user,

wherein the physiological measurement device provides a plurality of optical paths, wherein each of the optical paths:

exits an emitter of the one or more emitters,

passes through tissue of the user,

passes through the single protruding convex surface, and

arrives at a corresponding photodiode of the at least one of the first or second sets of photodiodes, the corresponding photodiode configured to receive light emitted by the emitter after traversal by the light of a corresponding optical path of the plurality of optical paths and after attenuation of the light by tissue of the user.

2. The user-worn physiological measurement device of claim 1 further comprising:

preprocessing electronics configured to preprocess at least one of the first signal stream or the second signal stream.

3. The user-worn physiological measurement device of claim 2, wherein the preprocessing comprises adapting the at least one of the first signal stream or the second signal stream.

4. The user-worn physiological measurement device of claim 3, wherein the preprocessing further comprises amplifying the at least one of the first signal stream or the second signal stream.

5. The user-worn physiological measurement device of claim 4, wherein the preprocessing further comprises converting the at least one of the first signal stream or the second signal stream from analog to digital.

6. The user-worn physiological measurement device of claim 2, wherein the preprocessing electronics comprise at least:

a first common amplifier configured to receive the first signal stream from the first set of photodiodes at an input of the first common amplifier and at least amplify the first signal stream, and

a second common amplifier configured to receive the second signal stream from the second set of photodiodes at an input of the second common amplifier and at least amplify the second signal stream.

7. The user-worn physiological measurement device of claim 6, wherein at least the photodiodes of the first set of photodiodes are arranged such that a first photodiode and a second photodiode are arranged across from each other on opposite sides of a central point along a first axis, and a third

46

photodiode and a fourth photodiode are arranged across from each other on opposite sides of the central point along a second axis which is different from the first axis.

8. The user-worn physiological measurement device of claim 6 further comprising:

a plurality of windows, wherein each of the photodiodes of the first set of photodiodes and the second set of photodiodes has a corresponding window of the plurality of windows that allows light to pass through to the photodiode,

wherein each of the optical paths further:

passes through a corresponding window of the plurality of windows.

9. The user-worn physiological measurement device of claim 8, wherein the single protruding convex surface protrudes a height between 1 millimeter and 3 millimeters.

10. The user-worn physiological measurement device of claim 9 further comprising:

one or more processors configured to:

receive a signal stream responsive to at least one of the first signal stream or the second signal stream, wherein the signal stream is responsive to at least a physiological parameter of the user; and

process the signal stream to determine measurements of the physiological parameter;

a network interface configured to communicate with a handheld computing device;

a touch-screen display configured to provide a user interface, wherein:

the user interface is configured to display indicia responsive to the measurements of the physiological parameter, and

an orientation of the user interface is configurable responsive to a user input; and

a storage device configured to at least temporarily store at least the measurements of the physiological parameter.

11. The user-worn physiological measurement device of claim 10, wherein the physiological parameter comprises at least one of: pulse rate, glucose, oxygen, oxygen saturation, methemoglobin, total hemoglobin, carboxyhemoglobin, or carbon monoxide.

12. The user-worn physiological measurement device of claim 11, wherein the attenuated light is reflected by the tissue.

13. The user-worn physiological measurement device of claim 12 further comprising:

a strap configured to position the physiological measurement device on the user, wherein the physiological measurement device comprises a single unit wearable by the user, the single unit encompassing at least: the one or more emitters, the first and second sets of photodiodes, the wall, the cover, the plurality of windows, the one or more processors, the network interface, and the storage device.

14. The user-worn physiological measurement device of claim 13, wherein the network interface is configured to communicate at least the measurements of the physiological parameter to the handheld computing device.

15. The user-worn physiological measurement device of claim 14, wherein the single protruding convex surface protrudes a height greater than 2 millimeters and less than 3 millimeters.

16. A user-worn physiological measurement device that defines a plurality of optical paths, the physiological measurement device comprising:

one or more emitters configured to emit light into tissue of a user;

Exhibit 4
-54-

US 10,702,195 B1

47

a first set of photodiodes positioned on a first surface and surrounded by a wall that is operably connected to the first surface, wherein:

the first set of photodiodes comprises at least four photodiodes, and

the photodiodes of the first set of photodiodes are connected to one another in parallel to provide a first signal stream;

a second set of photodiodes positioned on the first surface and surrounded by the wall, wherein:

the second set of photodiodes comprises at least four photodiodes, and

the photodiodes of the second set of photodiodes are connected to one another in parallel to provide a second signal stream;

a cover located above the wall and comprising a single protruding convex surface configured to be located between tissue of the user and the first and second sets of photodiodes when the physiological measurement device is worn by the user;

a plurality of windows, wherein each of the photodiodes of the first set of photodiodes and the second set of photodiodes has a corresponding window of the plurality of windows that allows light to pass through to the photodiode;

preprocessing electronics configured to preprocess at least one of the first signal stream or the second signal stream, wherein the preprocessing electronics comprise at least:

a first common amplifier configured to receive the first signal stream from the first set of photodiodes at an input of the first common amplifier and at least amplify the first signal stream, and

a second common amplifier configured to receive the second signal stream from the second set of photodiodes at an input of the second common amplifier and at least amplify the second signal stream;

one or more processors configured to:

receive a signal stream responsive to at least one of the first signal stream or the second signal stream after preprocessing of the at least one of the first signal stream and the second signal stream, wherein the signal stream is responsive to at least a physiological parameter of the user, and wherein the physiological parameter comprises at least one of: pulse rate,

48

glucose, oxygen, oxygen saturation, methemoglobin, total hemoglobin, carboxyhemoglobin, or carbon monoxide; and

process the signal stream to determine measurements of the physiological parameter;

a network interface configured to communicate at least the measurements of the physiological parameter to a handheld computing device;

a touch-screen display configured to provide a user interface, wherein the user interface is configured to display indicia responsive to the measurements of the physiological parameter;

a storage device configured to at least temporarily store at least the measurements of the physiological parameter; and

a strap configured to position the physiological measurement device on the user, wherein the physiological measurement device comprises a single unit wearable by the user, the single unit encompassing at least: the one or more emitters, the first and second sets of photodiodes, the wall, the cover, the plurality of windows, the one or more processors, the network interface, and the storage device,

wherein the physiological measurement device provides a plurality of optical paths, wherein each of the optical paths:

exits an emitter of the one or more emitters,

passes through tissue of the user,

passes through the single protruding convex surface and the corresponding window of the plurality of windows, and

arrives at a corresponding photodiode of the at least one of the first or second sets of photodiodes, the corresponding photodiode configured to receive light emitted by the emitter after traversal by the light of a corresponding optical path of the plurality of optical paths and after attenuation of the light by tissue of the user, and

wherein the attenuated light is reflected by the tissue.

17. A physiological measurement system comprising:

a user-worn physiological measurement device according to claim 16; and

a handheld computing device in communication with the user-worn physiological measurement device.

* * * * *

Exhibit 4
-55-

US010292628B1

(12) **United States Patent**
Poeze et al.

(10) Patent No.: **US 10,292,628 B1**
(45) Date of Patent: **\*May 21, 2019**

(54) **MULTI-STREAM DATA COLLECTION SYSTEM FOR NONINVASIVE MEASUREMENT OF BLOOD CONSTITUENTS**

(71) Applicant: **MASIMO CORPORATION**, Irvine, CA (US)

(72) Inventors: **Jeroen Poeze**, Rancho Santa Margarita, CA (US); **Marcelo Lamego**, Cupertino, CA (US); **Sean Merritt**, Lake Forest, CA (US); **Cristiano Dalvi**, Lake Forest, CA (US); **Hung Vo**, Fountain Valley, CA (US); **Johannes Bruinsma**, Opeinde (NL); **Ferdyan Lesmana**, Irvine, CA (US); **Massi Joe E. Kiani**, Laguna Niguel, CA (US); **Greg Olsen**, Trabuco Canyon, CA (US)

(73) Assignee: **MASIMO CORPORATION**, Irvine, CA (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/261,326**

(22) Filed: **Jan. 29, 2019**

**Related U.S. Application Data**

(63) Continuation of application No. 16/212,537, filed on Dec. 6, 2018, which is a continuation of application
(Continued)

(51) **Int. Cl.**
*A61B 5/1455* (2006.01)
*A61B 5/00* (2006.01)
*A61B 5/145* (2006.01)

(52) **U.S. Cl.**
CPC ........ *A61B 5/1455* (2013.01); *A61B 5/14532* (2013.01); *A61B 5/14546* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC . A61B 5/0205; A61B 5/1455; A61B 5/14551; A61B 5/14552; A61B 5/14532;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,910,701 A   10/1975   Henderson et al.
4,114,604 A   9/1978   Shaw et al.
(Continued)

FOREIGN PATENT DOCUMENTS

EP   419223   3/1991
EP   1 518 494   3/2005
(Continued)

OTHER PUBLICATIONS

US 8,845,543 B2, 09/2014, Diab et al. (withdrawn)
(Continued)

*Primary Examiner* — Eric F Winakur
*Assistant Examiner* — Chu Chuan Liu
(74) *Attorney, Agent, or Firm* — Knobbe Martens Olson & Bear LLP

(57) **ABSTRACT**

The present disclosure relates to noninvasive methods, devices, and systems for measuring various blood constituents or analytes, such as glucose. In an embodiment, a light source comprises LEDs and super-luminescent LEDs. The light source emits light at least wavelengths of about 1610 nm, about 1640 nm, and about 1665 nm. In an embodiment, the detector comprises a plurality of photodetectors arranged in a special geometry comprising one of a substantially linear substantially equal spaced geometry, a substantially linear substantially non-equal spaced geometry, and a substantially grid geometry.

**30 Claims, 65 Drawing Sheets**



**Exhibit 4**
**-56-**

US 10,292,628 B1

43

shown, finger bed **1710** attaches to the noise shield **1703**. The noise shield **1703** may be configured to reduce noise, such as from ambient light and electromagnetic noise. For example, the noise shield **1703** may be constructed from materials having an opaque color, such as black or a dark blue, to prevent light piping.

Noise shield **1703** may also comprise a thermistor **1712**. The thermistor **1712** may be helpful in measuring the temperature of a patient's finger. For example, the thermistor **1712** may be useful in detecting when the patient's finger is reaching an unsafe temperature that is too hot or too cold. In addition, the temperature of the patient's finger may be useful in indicating to the sensor the presence of low perfusion as the temperature drops. In addition, the thermistor **1712** may be useful in detecting a shift in the characteristics of the water spectrum in the patient's finger, which can be temperature dependent.

Moreover, a flex circuit cover **1706** attaches to the pins **1783**, **1785**. Although not shown, a flex circuit can also be provided that connects the circuit board **1719** with the submount **1700** (or a circuit board to which the submount **1700** is connected). A flex circuit protector **1760** may be provided to provide a barrier or shield to the flex circuit (not shown). In particular, the flex circuit protector **1760** may also prevent any electrostatic discharge to or from the flex circuit. The flex circuit protector **1760** may be constructed from well known materials, such as a plastic or rubber materials.

FIG. **18** shows the results obtained by an exemplary sensor **101** of the present disclosure that was configured for measuring glucose. This sensor **101** was tested using a pure water ex-vivo sample. In particular, ten samples were prepared that ranged from 0-55 mg/dL. Two samples were used as a training set and eight samples were then used as a test population. As shown, embodiments of the sensor **101** were able to obtain at least a standard deviation of 13 mg/dL in the training set and 11 mg/dL in the test population.

FIG. **19** shows the results obtained by an exemplary sensor **101** of the present disclosure that was configured for measuring glucose. This sensor **101** was tested using a turbid ex-vivo sample. In particular, 25 samples of water/glucose/Lyposin were prepared that ranged from 0-55 mg/dL. Five samples were used as a training set and 20 samples were then used as a test population. As shown, embodiments of sensor **101** were able to obtain at least a standard deviation of 37 mg/dL in the training set and 32 mg/dL in the test population.

FIGS. **20** through **22** shows other results that can be obtained by an embodiment of system **100**. In FIG. **20**, 150 blood samples from two diabetic adult volunteers were collected over a 10-day period. Invasive measurements were taken with a YSI glucometer to serve as a reference measurement. Noninvasive measurements were then taken with an embodiment of system **100** that comprised four LEDs and four independent detector streams. As shown, the system **100** obtained a correlation of about 85% and Arms of about 31 mg/dL.

In FIG. **21**, 34 blood samples were taken from a diabetic adult volunteer collected over a 2-day period. Invasive measurements were also taken with a glucometer for comparison. Noninvasive measurements were then taken with an embodiment of system **100** that comprised four LEDs in emitter **104** and four independent detector streams from detectors **106**. As shown, the system **100** was able to attain a correlation of about 90% and Arms of about 22 mg/dL.

The results shown in FIG. **22** relate to total hemoglobin testing with an exemplary sensor **101** of the present disclo-

44

sure. In particular, 47 blood samples were collected from nine adult volunteers. Invasive measurements were then taken with a CO-oximeter for comparison. Noninvasive measurements were taken with an embodiment of system **100** that comprised four LEDs in emitter **104** and four independent detector channels from detectors **106**. Measurements were averaged over 1 minute. As shown, the testing resulted in a correlation of about 93% and Arms of about 0.8 mg/dL.

Conditional language used herein, such as, among others, "can," "could," "might," "may," "e.g.," and the like, unless specifically stated otherwise, or otherwise understood within the context as used, is generally intended to convey that certain embodiments include, while other embodiments do not include, certain features, elements and/or states. Thus, such conditional language is not generally intended to imply that features, elements and/or states are in any way required for one or more embodiments or that one or more embodiments necessarily include logic for deciding, with or without author input or prompting, whether these features, elements and/or states are included or are to be performed in any particular embodiment.

While certain embodiments of the inventions disclosed herein have been described, these embodiments have been presented by way of example only, and are not intended to limit the scope of the inventions disclosed herein. Indeed, the novel methods and systems described herein can be embodied in a variety of other forms; furthermore, various omissions, substitutions and changes in the form of the methods and systems described herein can be made without departing from the spirit of the inventions disclosed herein. The claims and their equivalents are intended to cover such forms or modifications as would fall within the scope and spirit of certain of the inventions disclosed herein.

What is claimed is:

**1**. A noninvasive optical physiological sensor comprising:

a plurality of emitters configured to emit light into tissue of a user;

a plurality of detectors configured to detect light that has been attenuated by tissue of the user, wherein the plurality of detectors comprise at least four detectors;

a housing configured to house at least the plurality of detectors; and

a light permeable cover configured to be located between tissue of the user and the plurality of detectors when the noninvasive optical physiological sensor is worn by the user, wherein the cover comprises an outwardly protruding convex surface configured to cause tissue of the user to conform to at least a portion of the outwardly protruding convex surface when the noninvasive optical physiological sensor is worn by the user and during operation of the noninvasive optical physiological sensor, and wherein the plurality of detectors are configured to receive light passed through the outwardly protruding convex surface after attenuation by tissue of the user.

**2**. The noninvasive optical physiological sensor of claim **1**, wherein the plurality of detectors are arranged on a two-dimensional surface of the housing.

**3**. The noninvasive optical physiological sensor of claim **2**, wherein a first detector and a second detector of the plurality of detectors are arranged across from each other on opposite sides of a central point along a first axis, and a third detector and a fourth detector of the plurality of detectors are arranged across from each other on opposite sides of the central point along a second axis which is perpendicular to the first axis.

Exhibit 4
-57-

US 10,292,628 B1

45

**4.** The noninvasive optical physiological sensor of claim 3, wherein the cover is comprised of a rigid material.

**5.** The noninvasive optical physiological sensor of claim 4, wherein the at least four detectors are evenly spaced from one another.

**6.** The noninvasive optical physiological sensor of claim 5, wherein the outwardly protruding convex surface is a single outwardly protruding convex surface.

**7.** An optical physiological measurement device comprising:

a plurality of emitters configured to emit light into tissue of a user;

a circular housing including a planar surface;

at least four detectors arranged on the planar surface of the circular housing, wherein the four detectors are arranged in a grid pattern; and

a light permeable cover of the circular housing, and wherein at least a portion of the cover comprises a protruding surface that is arranged to allow passage of light to the at least four detectors after attenuation by tissue of the user.

**8.** The optical physiological measurement device of claim 7, wherein the cover is configured to cause tissue of the user to conform to at least a portion of the protruding surface of the cover when the optical physiological measurement device is worn by the user.

**9.** The optical physiological measurement device of claim 8, wherein the four detectors are arranged in the grid pattern such that a first detector and a second detector are arranged across from each other on opposite sides of a central point along a first axis, and a third detector and a fourth detector are arranged across from each other on opposite sides of the central point along a second axis which is perpendicular to the first axis.

**10.** The optical physiological measurement device of claim 9, wherein the cover is comprised of a rigid material.

**11.** The optical physiological measurement device of claim 10, wherein the cover is configured to be positioned between the at least four detectors and tissue of a user when the optical physiological measurement device is worn by the user.

**12.** The optical physiological measurement device of claim 11, wherein the cover is configured to press against and at least partially deform tissue of the user when the optical physiological measurement device is worn by the user.

**13.** The optical physiological measurement device of claim 12, wherein the at least four detectors are evenly spaced from one another.

**14.** The optical physiological measurement device of claim 13, wherein the protruding surface of the cover comprises a single surface of the cover that covers the at least four detectors.

**15.** The optical physiological measurement device of claim 14, wherein the single surface of the cover comprises a convex surface.

**16.** The optical physiological measurement device of claim 15, wherein the optical physiological measurement device is configured to provide data useable for determining measurements of at least one of: glucose, oxygen, oxygen saturation, methemoglobin, total hemoglobin, carboxyhemoglobin, or carbon monoxide.

**17.** The optical physiological measurement device of claim 15, wherein the optical physiological measurement device is configured to provide data useable for determining measurements of pulse rate.

46

**18.** The optical physiological measurement device of claim 7 further comprising:

a processor configured to:

receive one or more signals from the at least four detectors, the one or more signals indicative of a physiological parameter of a wearer of the optical physiological measurement device; and

output information indicative of measurements of the physiological parameter to a mobile phone.

**19.** The optical physiological measurement device of claim 18, further comprising a touch-screen display.

**20.** A noninvasive optical physiological sensor comprising:

a plurality of emitters configured to emit light into tissue of a user;

a plurality of detectors configured to detect light that has been attenuated by tissue of the user, wherein the plurality of detectors comprise at least four detectors;

a housing configured to house at least the plurality of detectors; and

a light permeable cover configured to be located between tissue of the user and the plurality of detectors when the noninvasive optical physiological sensor is worn by the user, wherein the cover comprises an outwardly protruding surface configured to cause tissue of the user to conform to at least a portion of the outwardly protruding surface when the noninvasive optical physiological sensor is worn by the user and during operation of the noninvasive optical physiological sensor, and wherein the outwardly protruding surface is further configured to allow passage of light to the plurality of detectors after attenuation by tissue of the user.

**21.** The noninvasive optical physiological sensor of claim 20, wherein the plurality of detectors are arranged on a two-dimensional surface of the housing.

**22.** The noninvasive optical physiological sensor of claim 21, wherein a first detector and a second detector of the plurality of detectors are arranged across from each other on opposite sides of a central point along a first axis, and a third detector and a fourth detector of the plurality of detectors are arranged across from each other on opposite sides of the central point along a second axis which is perpendicular to the first axis.

**23.** The noninvasive optical physiological sensor of claim 22, wherein the cover is comprised of a rigid material.

**24.** The noninvasive optical physiological sensor of claim 23, wherein the at least four detectors are evenly spaced from one another.

**25.** The noninvasive optical physiological sensor of claim 24, wherein the outwardly protruding surface comprises a single outwardly protruding surface configured to cover the plurality of detectors.

**26.** The noninvasive optical physiological sensor of claim 25, wherein the single outwardly protruding surface comprises is convex.

**27.** The noninvasive optical physiological sensor of claim 26, wherein the noninvasive optical physiological sensor is configured to provide data useable for determining measurements of at least one of: glucose, oxygen, oxygen saturation, methemoglobin, total hemoglobin, carboxyhemoglobin, or carbon monoxide.

**28.** The noninvasive optical physiological sensor of claim 26, wherein the noninvasive optical physiological sensor is configured to provide data useable for determining measurements of pulse rate.

Exhibit 4
-58-

US 10,292,628 B1

47

48

**29**. A physiological monitoring device comprising:
   the invasive optical physiological sensor of claim **20**; and
   a processor configured to receive one or more signals from the plurality of detectors and communicate physiological measurement information to a mobile phone.

**30**. The physiological monitoring device of claim **29** further comprising a touch-screen display.

\*    \*    \*    \*    \*

Exhibit 4
-59-

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.            : 10,292,628 B1                              Page 1 of 1
APPLICATION NO.   : 16/261326
DATED                   : May 21, 2019
INVENTOR(S)         : Jeroen Poeze et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In the Specification

In Column 34 at Line 64, Change "$I_1/I_n = e^{-(b_1 - b_n)c}$," to --$I_1/I_n = e^{-m(b_1 - b_n)c}$--.

In Column 41 at Line 20, Change "MO" to --M$\Omega$--.

In the Claims

In Column 45 at Line 18 (approx.), In Claim 7, after "housing," delete "and".

In Column 47 at Line 2, In Claim 29, change "invasive" to --noninvasive--.

Signed and Sealed this
Twenty-seventh Day of August, 2019

*Andrei Iancu*

Andrei Iancu
*Director of the United States Patent and Trademark Office*

**Exhibit 4**
**-60-**

US010709366B1

(12) **United States Patent** (10) **Patent No.: US 10,709,366 B1**
Poeze et al. (45) **Date of Patent: \*Jul. 14, 2020**

(54) **MULTI-STREAM DATA COLLECTION SYSTEM FOR NONINVASIVE MEASUREMENT OF BLOOD CONSTITUENTS**

(71) Applicant: **Masimo Corporation**, Irvine, CA (US)

(72) Inventors: **Jeroen Poeze**, Rancho Santa Margarita, CA (US); **Marcelo Lamego**, Cupertino, CA (US); **Sean Merritt**, Lake Forest, CA (US); **Cristiano Dalvi**, Lake Forest, CA (US); **Hung Vo**, Fountain Valley, CA (US); **Johannes Bruinsma**, Opeinde (NL); **Ferdyan Lesmana**, Irvine, CA (US); **Massi Joe E. Kiani**, Laguna Niguel, CA (US); **Greg Olsen**, Lake Forest, CA (US)

(73) Assignee: **Masimo Corporation**, Irvine, CA (US)

(\*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/829,510**

(22) Filed: **Mar. 25, 2020**

**Related U.S. Application Data**

(63) Continuation of application No. 16/725,292, filed on Dec. 23, 2019, now Pat. No. 10,624,564, which is a
(Continued)

(51) **Int. Cl.**
    *A61B 5/1455* (2006.01)
    *A61B 5/00* (2006.01)
    *A61B 5/145* (2006.01)

(52) **U.S. Cl.**
    CPC ........ *A61B 5/1455* (2013.01); *A61B 5/14532* (2013.01); *A61B 5/14546* (2013.01);
(Continued)

(58) **Field of Classification Search**
    CPC .............. A61B 5/1455; A61B 5/14551; A61B 5/14552; A61B 5/14532; A61B 5/14546;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,910,701 A 10/1975 Henderson et al.
4,114,604 A 9/1978 Shaw et al.
(Continued)

FOREIGN PATENT DOCUMENTS

CN 1270793 A 10/2000
CN 101564290 B 10/2009

OTHER PUBLICATIONS

US 8,845,543 B2, 09/2014, Diab et al. (withdrawn)
(Continued)

*Primary Examiner* — Eric F Winakur
*Assistant Examiner* — Chu Chuan Liu
(74) *Attorney, Agent, or Firm* — Knobbe Martens Olson & Bear LLP

(57) **ABSTRACT**

The present disclosure relates to noninvasive methods, devices, and systems for measuring various blood constituents or analytes, such as glucose. In an embodiment, a light source comprises LEDs and super-luminescent LEDs. The light source emits light at at least wavelengths of about 1610 nm, about 1640 nm, and about 1665 nm. In an embodiment, the detector comprises a plurality of photodetectors arranged in a special geometry comprising one of a substantially linear substantially equal spaced geometry, a substantially linear substantially non-equal spaced geometry, and a substantially grid geometry.

**27 Claims, 65 Drawing Sheets**



DETECTOR₁
DETECTOR₂
DETECTOR₄
DETECTOR₃
DETECTOR SUBMOUNT 1200

Exhibit 4
-61-

US 10,709,366 B1

43

FIG. **17** illustrates an exploded view of certain of the components of the sensor **301***f* described above. A heat sink **1751** and a cable **1781** attach to an emitter shell **1704**. The emitter shell attaches to a flap housing **1707**. The flap housing **1707** includes a receptacle **1709** to receive a cylindrical housing **1480/1580** (not shown) attached to an emitter submount **1702**, which is attached to a circuit board **1719**.

A spring **1787** attaches to a detector shell **1706** via pins **1783, 1785**, which hold the emitter and detector shells **1704, 1706** together. A support structure **1791** attaches to the detector shell **1706**, which provides support for a shielding enclosure **1790**. A noise shield **1713** attaches to the shielding enclosure **1790**. A detector submount **1700** is disposed inside the shielding enclosure **1790**. A finger bed **1710** provides a surface for placement of the patient's finger. Finger bed **1710** may comprise a gripping surface or gripping features, which may assist in placing and stabilizing a patient's finger in the sensor. A partially cylindrical protrusion **1705** may also be disposed in the finger bed **1710**. As shown, finger bed **1710** attaches to the noise shield **1703**. The noise shield **1703** may be configured to reduce noise, such as from ambient light and electromagnetic noise. For example, the noise shield **1703** may be constructed from materials having an opaque color, such as black or a dark blue, to prevent light piping.

Noise shield **1703** may also comprise a thermistor **1712**. The thermistor **1712** may be helpful in measuring the temperature of a patient's finger. For example, the thermistor **1712** may be useful in detecting when the patient's finger is reaching an unsafe temperature that is too hot or too cold. In addition, the temperature of the patient's finger may be useful in indicating to the sensor the presence of low perfusion as the temperature drops. In addition, the thermistor **1712** may be useful in detecting a shift in the characteristics of the water spectrum in the patient's finger, which can be temperature dependent.

Moreover, a flex circuit cover **1706** attaches to the pins **1783, 1785**. Although not shown, a flex circuit can also be provided that connects the circuit board **1719** with the submount **1700** (or a circuit board to which the submount **1700** is connected). A flex circuit protector **1760** may be provided to provide a barrier or shield to the flex circuit (not shown). In particular, the flex circuit protector **1760** may also prevent any electrostatic discharge to or from the flex circuit. The flex circuit protector **1760** may be constructed from well known materials, such as a plastic or rubber materials.

FIG. **18** shows the results obtained by an exemplary sensor **101** of the present disclosure that was configured for measuring glucose. This sensor **101** was tested using a pure water ex-vivo sample. In particular, ten samples were prepared that ranged from 0-55 mg/dL. Two samples were used as a training set and eight samples were then used as a test population. As shown, embodiments of the sensor **101** were able to obtain at least a standard deviation of 13 mg/dL in the training set and 11 mg/dL in the test population.

FIG. **19** shows the results obtained by an exemplary sensor **101** of the present disclosure that was configured for measuring glucose. This sensor **101** was tested using a turbid ex-vivo sample. In particular, 25 samples of water/glucose/Liposyn were prepared that ranged from 0-55 mg/dL. Five samples were used as a training set and 20 samples were then used as a test population. As shown, embodiments of sensor **101** were able to obtain at least a standard deviation of 37 mg/dL in the training set and 32 mg/dL in the test population.

44

FIGS. **20** through **22** shows other results that can be obtained by an embodiment of system **100**. In FIG. **20**, 150 blood samples from two diabetic adult volunteers were collected over a 10-day period. Invasive measurements were taken with a YSI glucometer to serve as a reference measurement. Noninvasive measurements were then taken with an embodiment of system **100** that comprised four LEDs and four independent detector streams. As shown, the system **100** obtained a correlation of about 85% and Arms of about 31 mg/dL.

In FIG. **21**, 34 blood samples were taken from a diabetic adult volunteer collected over a 2-day period. Invasive measurements were also taken with a glucometer for comparison. Noninvasive measurements were then taken with an embodiment of system **100** that comprised four LEDs in emitter **104** and four independent detector streams from detectors **106**. As shown, the system **100** was able to attain a correlation of about 90% and Arms of about 22 mg/dL.

The results shown in FIG. **22** relate to total hemoglobin testing with an exemplary sensor **101** of the present disclosure. In particular, 47 blood samples were collected from nine adult volunteers. Invasive measurements were then taken with a CO-oximeter for comparison. Noninvasive measurements were taken with an embodiment of system **100** that comprised four LEDs in emitter **104** and four independent detector channels from detectors **106**. Measurements were averaged over 1 minute. As shown, the testing resulted in a correlation of about 93% and Arms of about 0.8 mg/dL.

Conditional language used herein, such as, among others, "can," "could," "might," "may," "e.g.," and the like, unless specifically stated otherwise, or otherwise understood within the context as used, is generally intended to convey that certain embodiments include, while other embodiments do not include, certain features, elements and/or states. Thus, such conditional language is not generally intended to imply that features, elements and/or states are in any way required for one or more embodiments or that one or more embodiments necessarily include logic for deciding, with or without author input or prompting, whether these features, elements and/or states are included or are to be performed in any particular embodiment.

While certain embodiments of the inventions disclosed herein have been described, these embodiments have been presented by way of example only, and are not intended to limit the scope of the inventions disclosed herein. Indeed, the novel methods and systems described herein can be embodied in a variety of other forms; furthermore, various omissions, substitutions and changes in the form of the methods and systems described herein can be made without departing from the spirit of the inventions disclosed herein. The claims and their equivalents are intended to cover such forms or modifications as would fall within the scope and spirit of certain of the inventions disclosed herein.

What is claimed is:

1. A noninvasive physiological parameter measurement device adapted to be worn by a wearer, the noninvasive physiological parameter measurement device comprising:

one or more light emitters;
a substrate having a surface;
a first set of photodiodes arranged on the surface and spaced apart from each other, wherein:
the first set of photodiodes comprises at least four photodiodes, and
the photodiodes of the first set of photodiodes are connected to one another in parallel to provide a first

Exhibit 4
-62-

US 10,709,366 B1

45

signal stream responsive to light from at least one of the one or more light emitters attenuated by body tissue;

a second set of photodiodes arranged on the surface and spaced apart from each other, wherein:

the second set of photodiodes comprises at least four photodiodes,

the photodiodes of the second set of photodiodes are connected to one another in parallel to provide a second signal stream responsive to light from at least one of the one or more light emitters attenuated by body tissue, and

at least one of the first signal stream or the second signal stream includes information usable to determine a physiological parameter of a wearer of the noninvasive physiological parameter measurement device;

a wall extending from the surface and configured to surround at least the first and second sets of photodiodes; and

a cover arranged to cover at least a portion of the surface of the substrate, wherein the cover comprises a protrusion that extends over all of the photodiodes of the first and second sets of photodiodes arranged on the surface, and wherein the cover is further configured to cover the wall.

2. The noninvasive physiological parameter measurement device of claim 1 further comprising preprocessing electronics including at least:

first preprocessing electronics configured to preprocess the first signal stream; and

second preprocessing electronics configured to preprocess the second signal stream.

3. The noninvasive physiological parameter measurement device of claim 2, wherein:

the first preprocessing electronics comprise at least a first amplifier configured to receive the first signal stream and at least amplify the first signal stream, and

the second preprocessing electronics comprise at least a second amplifier configured to receive the second signal stream and at least amplify the second signal stream.

4. The noninvasive physiological parameter measurement device of claim 3, wherein the preprocessing further comprises converting at least one of the first signal stream or the second signal stream from analog to digital.

5. The noninvasive physiological parameter measurement device of claim 3, wherein the protrusion comprises a convex protrusion, and wherein at least a portion the cover is comprised of a sufficiently rigid material to cause tissue of the wearer to conform to at least a portion of a shape of the cover.

6. The noninvasive physiological parameter measurement device of claim 5, wherein the physiological parameter comprises at least one of: pulse rate, glucose, oxygen, oxygen saturation, methemoglobin, total hemoglobin, carboxyhemoglobin, or carbon monoxide.

7. The noninvasive physiological parameter measurement device of claim 6, wherein at least part of the cover is light permeable.

8. The noninvasive physiological parameter measurement device of claim 6 further comprising:

one or more openings that allow light to pass through to the photodiodes of the first and second sets of photodiodes.

46

9. The noninvasive physiological parameter measurement device of claim 8, wherein the wall operably connects to the substrate on one side and operably connects to the cover on an opposite side.

10. The noninvasive physiological parameter measurement device of claim 9 further comprising:

a touch-screen display;

a strap configured to facilitate attachment of at least part of the noninvasive physiological parameter measurement device to an arm of the wearer; and

one or more processors configured to:

receive information responsive to at least one of the first signal stream or the second signal stream;

process the information to determine physiological parameter measurement information; and

cause communication of the physiological parameter measurement information to a user interface displayed on the touch-screen display.

11. The noninvasive physiological parameter measurement device of claim 10, wherein the attenuated light is reflected by the tissue.

12. The noninvasive physiological parameter measurement device of claim 11, wherein the one or more processors are further configured to:

cause transmission of the physiological parameter measurement information to at least one of: a mobile phone, or a computer network.

13. The noninvasive physiological parameter measurement device of claim 12 further comprising:

a magnet configured to be used as a connecting mechanism.

14. A noninvasive physiological parameter measurement device comprising:

one or more light emitters;

a first set of photodiodes, the first set of photodiodes comprising at least four photodiodes, the photodiodes of the first set of photodiodes connected to one another in parallel to provide a first signal stream responsive to light from at least one of the one or more light emitters attenuated by body tissue;

a second set of photodiodes, the second set of photodiodes comprising at least four photodiodes, the photodiodes of the second set of photodiodes connected to one another in parallel to provide a second signal stream responsive to light from at least one of the one or more light emitters attenuated by body tissue;

a wall configured to surround at least the first and second sets of photodiodes;

a protrusion that extends over the wall and the photodiodes of the first and second sets of photodiodes; and

one or more processors configured to:

receive information responsive to at least one of the first signal stream or the second signal stream; and

process the information to determine physiological parameter measurement information.

15. The noninvasive physiological parameter measurement device of claim 14, wherein the first and second sets of photodiodes are arranged on a substrate, and wherein the protrusion extends over at least a part of the substrate.

16. The noninvasive physiological parameter measurement device of claim 15 further comprising preprocessing electronics including at least:

first preprocessing electronics configured to preprocess the first signal stream; and

second preprocessing electronics configured to preprocess the second signal stream,

Exhibit 4
-63-

US 10,709,366 B1

47

wherein the information responsive to the at least one of the first signal stream or the second signal stream is received by the one or more processors after preprocessing of the at least one of the first signal stream or the second signal stream.

**17.** The noninvasive physiological parameter measurement device of claim **16**, wherein:

the first preprocessing electronics comprise at least a first amplifier configured to receive the first signal stream and at least amplify the first signal stream, and

the second preprocessing electronics comprise at least a second amplifier configured to receive the second signal stream and at least amplify the second signal stream.

**18.** The noninvasive physiological parameter measurement device of claim **17**, wherein the preprocessing further comprises converting at least one of the first signal stream or the second signal stream from analog to digital.

**19.** The noninvasive physiological parameter measurement device of claim **17**, wherein the protrusion comprises a convex protrusion, and wherein at least a portion the convex protrusion is comprised of a sufficiently rigid material to cause tissue of a wearer of the noninvasive physiological parameter measurement device to conform to at least a portion of a shape of the convex protrusion when the noninvasive physiological parameter measurement device is worn by the wearer.

**20.** The noninvasive physiological parameter measurement device of claim **19**, wherein the physiological parameter comprises at least one of: pulse rate, glucose, oxygen, oxygen saturation, total hemoglobin, carboxyhemoglobin, or carbon monoxide.

**21.** The noninvasive physiological parameter measurement device of claim **20**, wherein at least part of the protrusion is light permeable.

**22.** The noninvasive physiological parameter measurement device of claim **20** further comprising:

one or more openings that allow light to pass through to the photodiodes of the first and second sets of photodiodes.

**23.** The noninvasive physiological parameter measurement device of claim **22** further comprising:

a strap configured to facilitate attachment of at least part of the noninvasive physiological parameter measurement device to an arm of the wearer; and

a touch-screen display,

wherein the one or more processors are further configured to cause communication of the physiological parameter measurement information to a user interface displayed on the touch-screen display.

**24.** The noninvasive physiological parameter measurement device of claim **23**, wherein the attenuated light is reflected by the tissue.

**25.** The noninvasive physiological parameter measurement device of claim **24**, wherein the one or more processors are further configured to:

cause transmission of the physiological parameter measurement information to at least one of: a mobile phone, or a computer network.

**26.** A physiological measurement system comprising:

a noninvasive physiological parameter measurement device according to claim **25**; and

a mobile phone configured to wirelessly communicate with the noninvasive physiological parameter measurement device.

48

**27.** A noninvasive physiological parameter measurement device adapted to be worn by a wearer, the noninvasive physiological parameter measurement device comprising:

one or more light emitters;

a substrate having a surface;

a first set of photodiodes arranged on the surface and spaced apart from each other, wherein:

the first set of photodiodes comprises at least four photodiodes, and

the photodiodes of the first set of photodiodes are connected to one another in parallel to provide a first signal stream responsive to light from at least one of the one or more light emitters attenuated by body tissue;

a second set of photodiodes arranged on the surface and spaced apart from each other, wherein:

the second set of photodiodes comprises at least four photodiodes,

the photodiodes of the second set of photodiodes are connected to one another in parallel to provide a second signal stream responsive to light from at least one of the one or more light emitters attenuated by body tissue,

at least one of the first signal stream or the second signal stream includes information usable to determine a physiological parameter of a wearer of the noninvasive physiological parameter measurement device, and

the physiological parameter comprises at least one of: pulse rate, glucose, oxygen, oxygen saturation, methemoglobin, total hemoglobin, carboxyhemoglobin, or carbon monoxide;

first preprocessing electronics configured to preprocess the first signal stream, the first preprocessing electronics comprising at least a first amplifier configured to receive the first signal stream and at least amplify the first signal stream;

second preprocessing electronics configured to preprocess the second signal stream, the second preprocessing electronics comprising at least a second amplifier configured to receive the second signal stream and at least amplify the second signal stream;

a wall extending from the surface and configured to surround at least the first and second sets of photodiodes;

a cover arranged to cover at least a portion of the surface of the substrate, wherein:

the cover comprises a protrusion that extends over all of the photodiodes of the first and second sets of photodiodes arranged on the surface,

the protrusion comprises a convex protrusion,

at least a portion the cover is comprised of a sufficiently rigid material to cause tissue of the wearer to conform to at least a portion of a shape of the cover,

the cover is further configured to cover the wall, and

the wall operably connects to the substrate on one side and operably connects to the cover on an opposite side;

one or more openings that allow light to pass through to the photodiodes of the first and second sets of photodiodes;

a touch-screen display;

a strap configured to facilitate attachment of at least part of the noninvasive physiological parameter measurement device to an arm of the wearer; and

one or more processors configured to:

Exhibit 4
-64-

US 10,709,366 B1

49                                                                 50

receive information responsive to at least one of the first signal stream or the second signal stream;

process the information to determine physiological parameter measurement information;

cause communication of the physiological parameter measurement information to a user interface displayed on the touch-screen display; and

cause transmission of the physiological parameter measurement information to at least one of: a mobile phone, or a computer network.

* * * * *

Exhibit 4
-65-

# EXHIBIT 5

## PROPOSED TO BE FILED UNDER SEAL

# EXHIBIT 6

# U.S. District Court
## District of Delaware (Wilmington)
## CIVIL DOCKET FOR CASE #: 1:15–cv–01108–LPS

Contour IP Holding, LLC v. GoPro, Inc.
Assigned to: Judge Leonard P. Stark
Cause: 35:271 Patent Infringement

Date Filed: 11/30/2015
Date Terminated: 08/15/2017
Jury Demand: Plaintiff
Nature of Suit: 830 Patent
Jurisdiction: Federal Question

| Date Filed | # | Docket Text |
|---|---|---|
| 07/06/2016 | 65 | ORAL ORDER by Judge Leonard P. Stark: Having reviewed the parties letters and associated materials relating to protective order and discovery disputes (D.I. 61 – 64 ), IT IS HEREBY ORDERED that: (1) Defendants proposal with respect to experts copying portions of source code into their notes (see D.I. 62 Ex. A at 6.4(d)) is ADOPTED, as this provision will adequately protect Defendants highly valuable source code while still permitting Plaintiffs experts to adequately advise and assist their client (see generally D.I. 62 at 1) (GoPro is willing to allow CIPHs expert to review and take notes to summarize the functionalities implemented by the source code files based on the names of functions and comments embedded in the functions without copying the source code from the source code files.); and (2) Plaintiffs request to compel production of core technical documents sufficient to show how the accused products work is GRANTED, as such information must be produced pursuant to the scheduling order (D.I. 37 at 3), is required by Plaintiff in order for this case to proceed efficiently, and because Defendants decision not to produce any non–publicly available documentation and to limit its production only to documents directed to users is more unreasonable than Plaintiffs refusal to identify accused functionalities. IT IS FURTHER ORDERED that the parties shall submit a proposed protective order, consistent with todays Order, no later than July 8 and that Defendant shall produce the documentation ordered here no later than July 18. The teleconference scheduled for July 8 is CANCELLED. (rpg) (Entered: 07/06/2016) |

**Exhibit 6**
**-370-**

# EXHIBIT 7

CLOSED,CASREF,DISCOVERY–CJB,MEDIATION–CJB,PATENT

**U.S. District Court**
**District of Delaware (Wilmington)**
**CIVIL DOCKET FOR CASE #: 1:16–cv–00380–LPS–CJB**

Tessera, Inc. et al v. Broadcom Corporation
Assigned to: Judge Leonard P. Stark
Referred to: Judge Christopher J. Burke
Related Case:  1:16–cv–00379–LPS–CJB
Cause: 35:271 Patent Infringement

Date Filed: 05/23/2016
Date Terminated: 12/21/2017
Jury Demand: Plaintiff
Nature of Suit: 830 Patent
Jurisdiction: Federal Question

| Date Filed | # | Docket Text |
|---|---|---|
| 10/19/2016 | | ORAL ORDER: The Court, having reviewed the parties' joint letter regarding disputes as to identification of accused products and core technical documents, (D.I. 40), hereby ORDERS as follows: With regard to the dispute as to the '215 and '605 patents: (a) Plaintiffs shall identify for Defendant any specific compositions/materials that Plaintiffs have already determined are "thixotropic materials" by no later than October 26, 2016; (b) The Court is also inclined to require Defendant to produce bills of materials regarding a "representative number" of potentially accused products (and not as to "every" potentially accused flip chip and BGA product), so that Plaintiff can review those bills of materials and identify the "thixotropic materials" it contends are used in the products referenced therein. The Court's hope is that this process will help enable the parties to obtain a shared understanding of the entire span of accused products containing "thixotropic materials," without putting Defendant to the burden of producing bills of materials for every flip chip and BGA product. However, the Court does not have enough information to identify what would constitute a helpful, "representative sample." Therefore, the parties shall meet and confer to identify an appropriate subset of potentially accused products for which Defendant shall produce a bill of materials, and shall inform the Court of their proposal(s) (and the reasons supporting them) in a joint letter. With regard to the '563 patent, the parties shall provide additional information to the Court in the above–referenced letter, regarding the dispute over the terms "compliant layer" and "bonding ribbons." More specifically, the Court has not yet been persuaded that Plaintiffs' position–––which is that it is appropriate at this stage to have identified the "compliant layer" at issue simply by noting the substance that it is made of (rather than by articulating what feature of the accused products is said to constitute that "complaint layer")–––is appropriate. Similarly, the Court has not yet been persuaded that Plaintiffs' current identification of what component in the accused products constitutes "bonding ribbons" (which appears to be limited to simply reciting language used in the relevant claims) is a sufficient identification, at this stage, of products containing that feature. In the above–referenced letter, Plaintiffs may provide further explanation as to why its articulation of what accused products contain a "compliant layer" and "bonding ribbons" is sufficient, and Defendants may provide more information as to why it is not. The joint letter referenced herein shall be no longer than 5 single–spaced pages and shall be submitted by 3:00 p.m. on October 28, 2016. Additionally, IT IS HEREBY ORDERED that a teleconference with the Court has been scheduled for October 31, 2016, at 1:00 p.m., for the Court to further discuss these issues with the parties. Ordered by Judge Christopher J. Burke on 10/19/2016. (dlk) (Entered: 10/19/2016) |

# EXHIBIT 8

☰   🔍   BUSINESS INSIDER                                               Subscribe

◥ DOW +0.15%    ◥ S&P 500 +0.31%    ◥ NASDAQ 100 +0.89%

🌲 lendingtree                                                      ⓘ Ad
Today's Refinance Rate        15-Year Fixed    2.25%    2.42% APR    ➜
**2.42%**                     30-Year Fixed    2.25%    2.46% APR    ➜
APR                           5/1 ARM          3.00%    2.96% APR    ➜
[ Calculate Payment › ]       $225,000 (5/1 ARM)  $944/mo   2.96% APR  ➜
Terms & Conditions apply. NMLS#1136   $350,000 (5/1 ARM)  $1,409/mo  2.74% APR  ➜

HOME › TECH

# Tim Cook Gave His Most In-Depth Interview To Date — Here's What He Said

Sam Colt  Sep 20, 2014, 2:39 PM                                    f  ✉  ⋯



**Cook covered a wide range of topics in his two-part interview with Charlie Rose.**  YouTube/The Charlie Rose Show





Ad ⓘ
NEW
Oh snap!
We're giving out **FREE***
domains with hosting.

[ Peep this deal ]

* Restrictions apply


HostGator

Last week, Apple CEO Tim Cook sat down with PBS News' Charlie
Rose in what amounts to Cook's most effusive and forthright public
appearance to date.

VIDEOS YOU MAY LIKE                by Taboola

Document title: Tim Cook Full Interview With Charlie Rose With Transcript - Business Insider
Capture URL: https://www.businessinsider.com/tim-cook-full-interview-with-charlie-rose-with-transcript-2014-9
Capture timestamp (UTC): Thu, 20 Aug 2020 19:01:48 GMT

Page 1 of 42

**Exhibit 8
-372-**

BUSINESS
INSIDER



Why we haven't had supersonic commercial jets since the Concorde

Here's what we know about Russia's coronavirus vaccine, which has experts questioni...



Why US's NASA, China, and UAE are all going to Mars at the same time - Business Insider

How Kamala Harris compares with Joe Biden on Medicare for All, gun control, marijuana legalization, and 7...



FROM THE WEB                by Taboola


N95 Respirator Mask Reusable (FDA Registered), 10% Off

Last week, Apple CEO Tim Cook sat down with PBS News' Charlie Rose in what amounts to Cook's most effusive and forthright public appearance to date.

The two-part interview covers a wide range of topics. Privacy, Steve Jobs' legacy at Apple, and what's next for the tech Goliath are all on the table.

We watched the whole interview and broke it down for your reading pleasure. The Charlie Rose Show was kind enough to allow us to publish the (lightly-edited) transcript of their conversation, which follows below:

## Cook on the Apple Watch

**Cook:** The Apple watch is the most personal device we've ever created. I think it takes us into a whole different area. We had an intense team working on this for three years.  We explored many different things and as the product came to fruition, it became not only the timepiece that you would expect, but a device that can do many different things, include really a whole new way of communicating and connecting with people.  And also, it has a health and fitness component that we think could really be profound.

**Rose:** Could [it] take your blood pressure and lots of other things?

> *The Apple watch is the most personal device we've ever created.*

**Cook:** Well it'll start with the heart. And it will be a sort of a personal trainer for you.  You can set goals and it will reward you for achieving certain things.  You can choose [for it] to interact with your doctor.  You can choose to combine it with other apps on the phone and get a full view of your health and so it's a whole new area for Apple. We're all about making great products and enriching people's lives and we see it as allowing us to do that at a whole different level. The Apple watch is the most personal device we've ever created.

**Rose:** So what's interesting is that outside the entrepreneurs can design apps for this watch.

Document title: Tim Cook Full Interview With Charlie Rose With Transcript - Business Insider
Capture URL: https://www.businessinsider.com/tim-cook-full-interview-with-charlie-rose-with-transcript-2014-9
Capture timestamp (UTC): Thu, 20 Aug 2020 19:01:48 GMT

**Exhibit 8
-373-**




**N95 Respirator Mask Reusable (FDA Registered), 10% Off**
Sponsored by Canopus Group



**This Is Where the Majority of Singles Over 50 Are Finding Love in Naperville**
Sponsored by SilverSingles

**Rose:** So what's interesting is that outside the entrepreneurs can design apps for this watch.

**Cook:** Yes. We've opened it up to developers, and one of the reasons we wanted to announce it before we shipped it is so that the developers will have time to develop software for it. Based on the first few days, I would say there's going to be a lot of stuff available for it.

**Rose:** It makes the computer personal?

**Cook:** It makes it very personal. Now, that doesn't take away from the function of it. The function of it is killer. There is a computer on a chip in here. You know, it's the first one we've ever done. There's four or 500 components wrapped in one. It has everything from the GPU to the CPU to memory and all the rest.


The Apple Watch will focus heavily on health and fitness.   Apple

**SPONSORED FINANCIAL CONTENT**

**6 Credit Cards You Should Not Ignore If You Have Excellent Credit**
NerdWallet

**Why This Man is Warning Americans About the Pump in the Stock Market**
Weiss Ratings

**Motley Fool issues our top cannabis stock for the 2020 election**
The Motley Fool

**Earn a $700 welcome bonus with required activities. Learn More.**
Citi Priority

**How do I invest? Turn to the Nerds to get started.**
NerdWallet

Dianomi

**Rose:** But you have to have an iPhone for it to work.

**Cook:** Yeah, it requires an iPhone. Because they've been designed to work together. [For] things like messages, it's using the cellular system to pull down your messages. However, if you go for a run and you don't want to carry your iPhone, music is also in your watch. And so, with the Bluetooth headset, you can run and listen to your music without your iPhone.

**Rose:** There's a fashion item aspect of this, too.

**Cook:** There is.

**Rose:** Johnny [Ive] brought in his friend Marc Newson.

**Cook:** He did. He did, and Marc is unbelievable. He's another great addition to the Apple team. But Johnny and team recognized that to wear something it had to be incredibly personal. It had to reflect your taste and and express what you wanted to express about yourself. It's sort of like your clothes and your shoes. You're not



Document title: Tim Cook Full Interview With Charlie Rose With Transcript - Business Insider
Capture URL: https://www.businessinsider.com/tim-cook-full-interview-with-charlie-rose-with-transcript-2014-9
Capture timestamp (UTC): Thu, 20 Aug 2020 19:01:48 GMT

Page 3 of 42

**Exhibit 8**
**-374-**



to wear something it had to be incredibly personal. It had to reflect your taste and and express what you wanted to express about yourself. It's sort of like your clothes and your shoes. You're not going to wear the same thing everybody else does. And so, most tech companies, I think, look at this as only technology. We recognize that technology itself isn't sufficient, that it had to have a style element. It had to be something that you're proud of wearing. I mean, this is connected to your body.

## Cook on the iPhone 6



The iPhone 6 is so thin that the camera is thicker than the phone itself. *Apple*

**Cook:** It's the thinnest we've ever done. The screen is just to die for. It's super fast; it's lightning fast. It has a whole new round of wireless technology and so it's streaming fast on the wireless networks. It's really unbelievable and it feels unbelievable in your hand. Hold it. I mean, it's something -- it's really unbelievable. The design -- Johnny and his team did such an incredible job here. It's really seamless between the glass. It's like a singular form.

**Rose:** Back to what's next. I mean, is this -- this represents a continuation of the iPhone.

**Cook:** Well, a leapfrog, I would say. But, yes. It's not the first iPhone. But it's the biggest advancement ever in iPhone history, and so we think that the upgrade cycle here and the number of people that will switch from other smartphones -- it will be enormous.

## Cook on Apple's philosophy

**Rose:** Were you challenged by what Samsung does and what it has in the development of this size personal smartphone?


*The philosophy's*

**Cook:** Honestly, Charlie, we could have done a larger

**POPULAR WITH SUBSCRIBERS**



**The definitive story of how a controversial Florida businessman blew up MoviePass and burned hundreds of millions**



Document title: Tim Cook Full Interview With Charlie Rose With Transcript - Business Insider
Capture URL: https://www.businessinsider.com/tim-cook-full-interview-with-charlie-rose-with-transcript-2014-9
Capture timestamp (UTC): Thu, 20 Aug 2020 19:01:48 GMT

Page 4 of 42

**Exhibit 8**
**-375-**





> *The philosophy's always been to be the best, not the first.*

**Cook:** Honestly, Charlie, we could have done a larger iPhone years ago. It's never been about just making a larger phone. It's been about making a better phone in every single way. And so we ship things when they're ready. You can still use this phone one-handed because you can tap it twice and the screen will come down. And so the ingenuity here and the fact that we've integrated software, hardware, and services which I think only Apple can do -- this phone -- now is the time for it.

**Rose:** Is the philosophy of Apple, "We don't have to be first; we want to be prepared to be the best."?

**Cook:** The philosophy's always been to be the best, not the first. If you look back in time at Apple, the iPod. The iPod was not the first MP3 player. It was arguably the best, and arguably it was the first modern one, but not the first. The iPhone was not the first smartphone. Blackberry was shipping phones, Palm was shipping phones. iPhone was the first modern smartphone. And then if you look at iPad, tablets were shipping a decade before. And yet, iPad arguably was the first modern tablet and the first one that met commercial -- any level of commercial success.

## Cook on Apple's push into health and fitness

**Rose:** The health care business is a huge sector of our economy. Is [the Apple Watch] your entree into into that in some way?

**Cook:** Yeah. I see this is huge, Charlie.

**Rose:** Trillions of dollars.



**Cook:** I'm not looking at it just from the monetary piece of it -- we do want to enrich people's lives. We want to do both. With health care, there is a wide open field to make some really



Document title: Tim Cook Full Interview With Charlie Rose With Transcript - Business Insider
Capture URL: https://www.businessinsider.com/tim-cook-full-interview-with-charlie-rose-with-transcript-2014-9
Capture timestamp (UTC): Thu, 20 Aug 2020 19:01:48 GMT

Page 5 of 42

Exhibit 8
-376-



**The Apple Watch's fitness apps are designed to reward users for completing goals.** Business Insider

lives. We want to do both. With health care, there is a wide open field to make some really profound contributions. And so, our entry into this is we announced HealthKit in June. [With] HealthKit you can begin to take all of the data that's in all of your health apps and aggregate those. You might elect just to use that yourself. You might elect to interact with your doctor on them. Now, all of a sudden, we've also got a device that gathers certain fitness data about you.

This is yet another way to begin to build a comprehensive view of your life, which should empower you to take care of yourself over time. And when you need help, it empowers you to take certain data to your doctor to get help from them. All while guarding your privacy so that nobody getting the data -- if you don't want them to have the data, nobody sharing the data, if you don't want them to share the data. And no, we're not keeping it.

## Cook on Steve Jobs

**Rose:** The arena where you had it is where Steve introduced 30 years ago Macintosh. When you introduced the watch, you famously said, One more thing. Words that Steve had used. Where is Steve in all this?

**Cook:** He's in my heart. And he is deep in Apple's DNA. His spirit will always be the foundation of the company. I literally think about him every day. His office is still left as it was.

**Rose:** On the fourth floor?

**Cook:** On the fourth floor. His name is still on the door. If you think about the things that Steve stood for, at a macro level, he stood for innovation. He stood for the simple, not the complex. He knew that Apple should only enter areas where we can control the primary technology. All of these things are still deep in our company. They're still things that we very much believe. The strive for perfection, for being the best, for only doing the best products, for staying focused -- the fact that -- despite this table being so small, that you and I are sitting at, you could put every Apple product on it



Document title: Tim Cook Full Interview With Charlie Rose With Transcript - Business Insider
Capture URL: https://www.businessinsider.com/tim-cook-full-interview-with-charlie-rose-with-transcript-2014-9
Capture timestamp (UTC): Thu, 20 Aug 2020 19:01:48 GMT

Page 6 of 42

Exhibit 8
-377-

They're still things that we very much believe. The strive for perfection, for being the best, for only doing the best products, for staying focused -- the fact that -- despite this table being so small, that you and I are sitting at, you could put every Apple product on it. Every single one that we ship today.

> **His spirit will always be the foundation of the company.**

And yet, this year our revenues will be, you know, approximately 180 billion. There's probably no other company on the face of the earth that could say that. Most companies begin to do larger and larger and larger portfolios because it's so easy to add [products]. It's hard to edit. It's hard to stay focused. And yet, we know we'll only do our best work if we stay focused. And so, you know, the hardest decisions we made are all the things not to work on, frankly.

## Cook on Apple making a TV

**Cook:** A TV is one [product] that we continue to have great interest in.

**Rose:** [laughs]

**Cook:** I choose my words carefully there. TV is one of those things that, if we're really honest, it's stuck back in the '70s. Think about how much your life has changed and all the things around you that have changed. And yet, TV -- when



**Apple's set-top box is the closest the company has come to making a TV -- so far.** AP

you go in your living room to watch the TV or wherever it might be, it almost feels like you're rewinding the clock and you've entered a time capsule, and you're going backwards. The interface is terrible.

**Rose:** Yes.

**Cook:** I mean, it's awful. And you watch things when they come on unless you remember to record them.

**Rose:** So, why don't you fix that?



Document title: Tim Cook Full Interview With Charlie Rose With Transcript - Business Insider
Capture URL: https://www.businessinsider.com/tim-cook-full-interview-with-charlie-rose-with-transcript-2014-9
Capture timestamp (UTC): Thu, 20 Aug 2020 19:01:48 GMT

Page 7 of 42

**Exhibit 8
-378-**

BUSINESS INSIDER

unless you remember to record them.

**Rose:** So, why don't you fix that?

**Cook:** Well, you know, I don't want to get into what we're doing in the future.  But we've taken steps with Apple TV.  And Apple TV now has over 20 million users.  It has far exceeded the hobby label that we that we placed on it.  And we've added more content to it this year.  There's increasingly more things that you can do on there.  But this is an area that we continue to look at.

## Cook on becoming Apple's CEO



**Tim Cook and Steve Jobs**
Flickr/Thetaxhaven

**Rose:** Steve was a visionary.  Can Tim continue the Apple tradition of creating new products every four years or less?  Can he reach into the future?  Does he have that kind of makeup?  Did that concern you?  Did you think about that?  Were you committed to prove that Apple had a future beyond the groundwork that Steve Jobs had laid?

**Cook:** He called me one weekend in August of '11.  And he said, "I'd like to talk." And I said, "Oh, okay." And I go "When?" And he goes, "Now." I go -- "Yeah, I'll be right over." And he told me, "I've been thinking a lot.  Apple has never had a professional transition at CEO.  I'm determined that we will have one now.  I want you to be the CEO." And honestly, I didn't see it coming.

**Rose:** You did not see it coming?

> *Can Tim continue the Apple tradition of creating new products every four years or less?*

**Cook:** I know you could look at me with disbelief, but--

**Rose:** Yes.

**Cook:** You can say I was in denial or whatever, but I thought Steve was getting better.  He was still at home, but I felt he

POPULAR WITH SUBSCRIBERS

**MORGAN STANLEY: Buy these 22 stocks that are slashing costs as sales take a hit from COVID-19 — putting them in position to smash the market as the economic recovery continues**

Document title: Tim Cook Full Interview With Charlie Rose With Transcript - Business Insider
Capture URL: https://www.businessinsider.com/tim-cook-full-interview-with-charlie-rose-with-transcript-2014-9
Capture timestamp (UTC): Thu, 20 Aug 2020 19:01:48 GMT

Page 8 of 42

Exhibit 8
-379-

BUSINESS
INSIDER

Subscribe

POPULAR WITH SUBSCRIBERS

**MORGAN STANLEY: Buy these
22 stocks that are slashing
costs as sales take a hit from
COVID-19 — putting them in
position to smash the market as
the economic recovery
continues**

*years or less?*

**Cook:** You can say I was in denial or whatever, but I thought Steve was getting better.  He was still at home, but I felt he was getting better.  I was seeing him regularly.  At the end of the day, I always thought he would bounce.  He always had.  He had some incredible lows in his health, and it had always bounced.  And I always believed he would. And so, it took me a little by surprise. He had talked to me about being CEO before. I always knew it was his long-term thinking.

**Rose:** That you would become the CEO.

**Cook:** That I would become the CEO.

**Rose:** But not then.

*I wanted desperately
to continue his
legacy.*

**Cook:** But not that specific moment.  And so, he and I had a discussion back and forth.  I said, "You know, well, what kind of things do you want to do as chairman versus he did?" Just sort of having a good banter with him. I said, for example, "Ads.  Do you want me to just do the ones that I think are right, or do you want to be involved in it?" And he said, well I hope you'll ask my opinion on some things.  But he, I thought Charlie, on that day, that he would be chairman for a long time, that I'd be CEO for a long time, and that we would continue to work together.

And he knew, when he chose me, that I wasn't't like him, that I'm not a carbon copy of him.  And so he obviously thought through that deeply, about who he wanted to lead Apple.  So that, I have always felt the responsibility of.  And I wanted desperately to continue his legacy.  And the Apple I deeply loved, so from the onset, I wanted to pour every ounce that I had in myself, into the company.  But, in terms of being everything he was, I've never had that objective.  I've never had the objective of being like him, because I knew, the only person I can be is the person I am.

*I've tried to be the
best Tim Cook I can
be.*

**Rose:** Right.

**Cook:** Right?  And I'm not an actor.  I'd be terrible in

Document title: Tim Cook Full Interview With Charlie Rose With Transcript - Business Insider
Capture URL: https://www.businessinsider.com/tim-cook-full-interview-with-charlie-rose-with-transcript-2014-9
Capture timestamp (UTC): Thu, 20 Aug 2020 19:01:48 GMT

Page 9 of 42

**Exhibit 8
-380-**

BUSINESS INSIDER

POPULAR WITH SUBSCRIBERS

**MORGAN STANLEY: Buy these 22 stocks that are slashing costs as sales take a hit from COVID-19 — putting them in position to smash the market as the economic recovery continues**

> *I've tried to be the best Tim Cook I can be.*

**Rose:** Right.

**Cook:** Right? And I'm not an actor. I'd be terrible in Hollywood. And that's what I've done. I've tried to be the best Tim Cook I can be. And I think the reality is, that Apple has always had incredible contributors at very high levels. Johnny's been there forever and contributing at an incredible level. As has Craig and Jeff and Dan, and you just go around the table. We have a new CFO now. There's, this group of people, and we've recruited Angela. Angela now runs retail, Angela Ahrendts, she is fantastic. This level of people are capable of doing incredible things and you know, it's a privilege of a lifetime to work with them.



**Cook said Apple promotes debate and discussion among executives.** YouTube/The Charlie Rose Show

## Cook on Apple's corporate culture

**Rose:** And you have a picture in your office of Martin Luther King, and a picture of Robert F. Kennedy. Robert F. Kennedy, after his brother's assassination, someone said, the difficulty for him well, he'll have no RFK, as he was to his brother Jack. So, I might ask the question, do you have a Tim, as you were Tim to Steve?

> *I believe in diversity.*

**Cook:** I think each person, if

Document title: Tim Cook Full Interview With Charlie Rose With Transcript - Business Insider
Capture URL: https://www.businessinsider.com/tim-cook-full-interview-with-charlie-rose-with-transcript-2014-9
Capture timestamp (UTC): Thu, 20 Aug 2020 19:01:48 GMT

Page 10 of 42

Exhibit 8
-381-



*I believe in diversity with a capital D.*

**Cook:** I think each person, if you're a CEO, the most important thing is to have, to me, is to pick people around you that aren't like you, that complement you.  Because you want to build a puzzle, you don't want to stack chiclets up and have everyone be the same.  And so I believe in diversity with a capital D.  And that's diversity in thought and diversity any way you want to measure it.  And so the people that surrounding me are not like me.  They have skills that I don't have.  I may have some that they don't have.  What we do as a team collectively are able to do some incredible things.  And it's because we collaborate, and I see one of my key things in life is to make sure that we collaborate as an incredible level.  Because we run the company functionally.

*We have great respect for one another and we trust one another and we complement one another.*

We're not like the typical big company that has n number of divisions and n number of [profits and losses].  Everybody is a functional expert.  And then we collectively, to get things done, work together as a team. Because the work really happens horizontally in our company, not vertically.  Products are horizontal.  It takes hardware plus software plus services to make a killer product.  So, all of these people, if you were to line us up and talk to everyone, you know several of them, we're all different.  And that's the power of it.  Is that we're not trying to put everyone through a car wash so they look alike, talk alike, think alike at the end of the day.  We argue and debate.  If you were to come in to our executive team meetings on Mondays, you'd hear a lot of discussion and debate about something.  We don't always agree on everything.  But we have great respect for one another and we trust one another and we complement one another.  And that makes it all work.

**Rose:** Did the team, you leading the team, have any question that you could accomplish what you did, knowing those questions were out there, about the future of Apple?

**Cook:** I think for me, I can't talk about what everybody else thinks, but for me, I'm, one great skill I have is blocking noise.  And so I -- I

Document title: Tim Cook Full Interview With Charlie Rose With Transcript - Business Insider
Capture URL: https://www.businessinsider.com/tim-cook-full-interview-with-charlie-rose-with-transcript-2014-9
Capture timestamp (UTC): Thu, 20 Aug 2020 19:01:48 GMT

**Exhibit 8
-382-**

**Cook:** I think for me, I can't talk about what everybody else thinks, but for me, I'm, one great skill I have is blocking noise. And so I -- I typically read and listen to things that are deep and challenging and intellectual in nature. Not the -- just the noise. I think if you get caught up in the noise as a CEO, you're going to be a terrible CEO. Because there's so much noise out there in the world that everybody's on the sidelines saying what you should do, shouldn't do, et cetera. It's sort of like the old Roosevelt quote in the arena.

**Rose:** Right.

**Cook:** Right?

*Steve said to you, "Don't ever ask yourself, 'What would Steve do?'" Correct?*

**Rose:** Teddy Roosevelt.

**Cook:** Yes.

**Rose:** The credit belonged to the man in the arena who gets dirty and all of those things.

**Cook:** Yes. Well, I'm the dirty one. And you have to block the noise and so the question I think is did I have doubts? The answer's no. And did the executive team have doubts. I think you can see in our products that we were all betting on each other in a big way.

**Rose:** If Apple is becoming -- it's building on its tradition, but it's doing things different. Steve said to you, "Don't ever ask yourself, 'What would Steve do?'" Correct?

**Cook:** He did.

**Rose:** Don't ask that. Do what you think you need to do based on the circumstances that you face. So, is Apple becoming more open? I've mentioned the fact that people who have apps -- great apps can do it for the watch. You're now engaged in partnerships with people like IBM. You've made an acquisition. Tell me where is Apple going.

## Cook on the the Apple-IBM partnership



Document title: Tim Cook Full Interview With Charlie Rose With Transcript - Business Insider
Capture URL: https://www.businessinsider.com/tim-cook-full-interview-with-charlie-rose-with-transcript-2014-9
Capture timestamp (UTC): Thu, 20 Aug 2020 19:01:48 GMT

Page 12 of 42

Exhibit 8
-383-

BUSINESS INSIDER    Subscribe

## Cook on the the Apple-IBM partnership



**Tim Cook and IBM CEO Ginni Rommety.**
Courtesy of Apple/Paul Sakuma

**Rose:** Are we interested in enterprise because we can partner with IBM?

**Cook:** IBM is a great one to talk about because I think it will give you an insight into how we look at things [now]. We look at these products and the iPads that aren't here and we think we can change the way people work. We've changed the consumers' lives. We've changed the way students learn and teachers teach. But when you get to the working environment, the change that we've made to us isn't significant enough. And so we begin to ask ourselves why. Why haven't we done more? And the real answer is in the applications. There's not enough apps that have been written for very deep verticals like what the airline pilot does. What the bank teller does. Down at the level of the job. And so we begin to ask ourselves should we do this or should we partner or should we just forget it?

> *Why haven't we done more? And the real answer is in the applications.*

And I didn't want to forget it because this is the way to enrich people's lives in a big way, to change the way people work. I mean, most of our life is spent working. And certainly our apps are changing the way I work, but I'm not seeing it as much in other places. And so we begin looking out and thinking about, "Well, who could we partner with?" And Ginni and I have been talking about some other things for a while. I have great respect for her, great trust of her.

**Rose:** She's the CEO of IBM.

> *To me, this is the perfect marriage.*

**Cook:** As the CEO of IBM. She's fantastic. And we began to talk about this area. You know, this is an area where they've got things that we don't have. They have deep, vertical knowledge of many different verticals, right? They have a huge sales force, and so IBM brings significant enterprise knowledge

Document title: Tim Cook Full Interview With Charlie Rose With Transcript - Business Insider
Capture URL: https://www.businessinsider.com/tim-cook-full-interview-with-charlie-rose-with-transcript-2014-9
Capture timestamp (UTC): Thu, 20 Aug 2020 19:01:48 GMT

**Exhibit 8**
**-384-**

where they've got things that we don't have.  They have deep, vertical knowledge of many different verticals, right?  They have a huge sales force, and so IBM brings significant enterprise knowledge to the table.  We bring the products that enterprise want, and so we have something they don't have.  Well, we also don't compete on anything.  To me, this is the perfect marriage.  There's no friction.  There's just, we have what they need; they have what we need.  And so IBM is in the process with our help of designing many different apps for many different verticals.  From banking to all the different financial services to pharmaceutical to aerospace and manufacturing and so on and so forth.  And they have to go to market that we don't have.  And so this is an area where I think that everybody's going to win.  We're going to win, IBM's going to win, and more importantly than both of us, the customer's going to win.

POPULAR WITH SUBSCRIBERS

**The inside story of how a historic $3.2 billion deal between rival solar giants Sunrun and Vivint Solar came together — and why it could transform the future of power generation**



From left: Beats executives Jimmy Iovine and Dr. Dre.  AP

## Cook on buying Beats

**Rose:** Why did you think you had to buy a headphone manufacturer?

**Cook:** In Beats, what we saw is several things.  We saw --

**Rose:** Talent.

**Cook:** -- a talent that I'm super impressed with.  Jimmy and Dre -- off the charts.  Creative geniuses.  They also had teams under Newson that I've really liked.  Jimmy has a deep knowledge of the musical industry.  Dre knows artists.  Dre is an artist.  And they had started a subscription service.  And this subscription service -- some people think they're all alike.  Well, let me tell you -- I went into the [deal] skeptically.

**Rose:** As to the acquisition?  Yeah.

**Cook:** Not to the acquisition.  Into their service.

**Rose:** Right.

**Cook:** Because Jimmy had told me how great it was.  And so, one

Document title: Tim Cook Full Interview With Charlie Rose With Transcript - Business Insider
Capture URL: https://www.businessinsider.com/tim-cook-full-interview-with-charlie-rose-with-transcript-2014-9
Capture timestamp (UTC): Thu, 20 Aug 2020 19:01:48 GMT

Page 14 of 42

**Exhibit 8
-385-**

POPULAR WITH SUBSCRIBERS

**The inside story of how a historic $3.2 billion deal between rival solar giants Sunrun and Vivint Solar came together — and why it could transform the future of power generation**

**Rose:** Right.

**Cook:** Because Jimmy had told me how great it was. And so, one night, I'm sitting playing with theirs versus some others. And all of a sudden, it dawns on me that when I listened to theirs for a while, I feel completely different. And the reason is that they recognized that human curation was important in the subscription service, that the sequencing of songs that you listen to affects how you feel.

> *I think they've done a fabulous job with their brand.*

It's hard to describe. But you know it when you feel it. And so, that night, I couldn't sleep that night. And so, I was thinking, "We've -- we need to do this." I think they've done a fabulous job with their brand. And -- in the headphone business. It's a fast-growing business. They went into [it] not too long ago, and, you know, have done really well. However, they needed a global footprint. We have a global footprint. They had been primarily U.S., not solely U.S., but primarily U.S.. And so, I felt we could get a subscription service. We could get incredible talent that I think we can all put our heads together and do some things that are beyond what either of us are currently doing. And we could get a fast-growing business.

And, you know -- financially, it's not the only element of looking at it at all. But next year, in our fiscal year, which is about to start, it's a creditive [spelled phonetically]. When is the last time you heard of a technology CEO saying that they were doing an acquisition that was a [unintelligible]? And it just doesn't happen. And so, I think it's wonderful to get the influx of talent, the different perspectives. It's this idea -- diversity -- that I use in a big way. I think it's really going to help us. And I [am] -- 100 percent sold on the subscription -- music subscription service. And of course, we can scale it, where Beats would have had a more difficult time, because they're a small company.



Document title: Tim Cook Full Interview With Charlie Rose With Transcript - Business Insider
Capture URL: https://www.businessinsider.com/tim-cook-full-interview-with-charlie-rose-with-transcript-2014-9
Capture timestamp (UTC): Thu, 20 Aug 2020 19:01:48 GMT

Page 15 of 42

Exhibit 8
-386-



Subscribe



YouTube/The Charlie Rose Show

POPULAR WITH SUBSCRIBERS

**The inside story of how a historic $3.2 billion deal between rival solar giants Sunrun and Vivint Solar came together — and why it could transform the future of power generation**

## Cook on Apple's future

**Rose:** Is the new chapter in Apple also defined by the fact that you're moving away from just being essentially a hardware company?

**Cook:** You know, I wouldn't say that we were ever just a hardware company. The significant part of the iPhone is the software and the services. It's just that we don't split out the price between the hardware and the software and the services.

**Rose:** It's all part of your own ecosystem.



*I wouldn't say that we were ever just a hardware company.*

**Cook:** It's part of our own ecosystem.  And we do that because it all works together.  It just works when you do it that way.  When you split the two, you wind up with -- I mean, think about what happened in the PC area. When you had a Windows and a separate OEN that was doing hardware, and then somebody else that was doing apps.  And you have a problem.  You're pulling your hair out.  You call the help desk.  And the help desk tells you to call another help desk.  And that help desk tells you to call somebody else.  And the other guy doesn't even have a help desk.  So, we recognized early on that these kind of devices, you really need to have a womb-to-tomb view of them for the customers' sake.  And so, if somebody calls us, it's our problem.  We're not passing the buck.  And so, I think you get a much better customer experience.

**Rose:** But do you miss opportunities to take advantage of a whole group of people?

Document title: Tim Cook Full Interview With Charlie Rose With Transcript - Business Insider
Capture URL: https://www.businessinsider.com/tim-cook-full-interview-with-charlie-rose-with-transcript-2014-9
Capture timestamp (UTC): Thu, 20 Aug 2020 19:01:48 GMT

Page 16 of 42

**Exhibit 8
-387-**

BUSINESS
INSIDER

Subscribe

**Rose:** But do you miss opportunities to take advantage of a whole group of people?



*It's a privilege to work with the developers we do.*

**Cook:** Well, look at our ecosystem, Charlie. I mean, we've got nine million registered developers. And so, we're not having a problem getting people to develop our platform. If you were at our conference in June, in San Francisco, there's developers there from almost every country in the world.

We have incredible access to innovation. And we also view it and treat it -- it's a privilege to work with the developers we do. And so, we treat them like it's a privilege. And from their point of view, they get to design something from a company that has over 90 percent of their customers on one version of the operating system. So, we're not fragmented like Android is, right? We've got -- we'll release iOS 8 next week. And right now, iOS 7, the one that we just released a year ago 92 percent of our customers are running iOS 7. If you looked at a comparable number for Android, it's very low. It's extremely low. If you looked at a comparable number for Windows, on the PC side, very low. And so, you can really write software to the latest, or write your app to the latest software versus spending your time on all of these versions and iterations and so forth.

So, it's great from their point of view. And they get to sell their product worldwide. Think about how it used to be if you were a developer. You had to go negotiate with every retailer. And there's no global retailers. And so, you were negotiating in every country in the world,



**Tim Cook at WWDC last June.**   WWDC

trying to get your product on the shelf. Here, you can push a button -- we review it. And it quickly gets in the App store. And it's in the App Store in 155 countries. I mean, it's really shocking -- the jobs that this thing has created is unbelievable. We're now, between the people that we employ directly and the -- the developers -- the developers are a big piece of this -- we're responsible for a million jobs in the United States. And a lot of that are people that had

Document title: Tim Cook Full Interview With Charlie Rose With Transcript - Business Insider
Capture URL: https://www.businessinsider.com/tim-cook-full-interview-with-charlie-rose-with-transcript-2014-9
Capture timestamp (UTC): Thu, 20 Aug 2020 19:01:48 GMT

Page 17 of 42

**Exhibit 8**
**-388-**

people that we employ directly and the -- the developers -- the developers are a big piece of this -- we're responsible for a million jobs in the United States. And a lot of that are people that had concluded to write apps.

## Cook on Apple's competition

**Rose:** Who is your competition?

**Cook:** Well, Google.

**Rose:** People would say --

**Cook:** Google.

**Rose:** -- Samsung instantly, because of the products. They make smartphones like this. Not like this, but they make smartphones. They have the Android operating system, which is the largest operating system in the world.

**Cook:** But Google supplies that to them. And so, I think I would say --

**Rose:** Google is your competition.

> *I don't consider Facebook a competitor. I consider Facebook a partner.*

**Cook:** Google is the top [competitor]. And then they enable many people in the hardware business -- like Samsung. And Samsung is the best of the hardware companies in the Android sphere.

**Rose:** Google is competition. Who else?

**Cook:** You know? Who else?

**Rose:** In terms of most people's considerations, Amazon, Apple, Facebook.

**Cook:** Yeah. I don't consider Facebook a competitor. I consider

Document title: Tim Cook Full Interview With Charlie Rose With Transcript - Business Insider
Capture URL: https://www.businessinsider.com/tim-cook-full-interview-with-charlie-rose-with-transcript-2014-9
Capture timestamp (UTC): Thu, 20 Aug 2020 19:01:48 GMT

Exhibit 8
-389-

Apple, Facebook.

**Cook:** Yeah.  I don't consider Facebook a competitor.  I consider Facebook a partner.  We're not in the social networking business.

**Rose:** And will not be?

**Cook:** We have no plans to be in the social networking area.  We partner with both Facebook and Twitter.  And we had integrated both of them into the operating system.  And so [we] worked closely with both of them so that our customers can get access in a different and unique way to their services.  And we like both companies.

**Rose:** Amazon?

**Cook:** Amazon -- we don't work with that much.  We have little relationship there.  They've come up with a phone.  You don't see it in a lot of places.  They have some tablets.  But they're not a product company.  Apple is a product company.  And so, in the long term, will they become a bigger product company? I don't know.  You would have to ask Jeff what his plans are.  But when I think of competitor, I would think of Google much above everyone else.



**Rose mentioned Apple Maps as an example of a company blunder.**  YouTube/The Charlie Rose Show

## Cook on Apple Maps

> *Oh, we screwed up.*

**Rose:** When you do something that's not as much of a success, and I'm obviously thinking of maps, and you look at it, what did you

Document title: Tim Cook Full Interview With Charlie Rose With Transcript - Business Insider
Capture URL: https://www.businessinsider.com/tim-cook-full-interview-with-charlie-rose-with-transcript-2014-9
Capture timestamp (UTC): Thu, 20 Aug 2020 19:01:48 GMT

Page 19 of 42

**Exhibit 8
-390-**

POPULAR WITH SUBSCRIBERS

**Seattle tech salaries revealed: The region's 21 highest-paid jobs at companies like Amazon, Microsoft, and Facebook, paying as much as $1.6 million**

> *Oh, we screwed up.*

**Rose:** When you do something that's not as much of a success, and I'm obviously thinking of maps, and you look at it, what did you do wrong?

**Cook:** Oh, we screwed up. There are many screw ups in that one. There's just not one. There's many. And we've learned and corrected and are continuing to invest in maps, because our fundamental premise that maps were really key to Apple is the same. But we did screw up on the release. It should not have happened like it did. It shouldn't have come out. And you know, sometimes, when you're running fast, you slip and you fall. And I think the best thing you can do is get back up and say, "I'm sorry." And you try to remedy the situation, and you work like hell to make the product right. If you're probably never making a mistake, you're probably not doing enough.

## Cook on joining Apple



Mike Nudelman/Business Insider

**Rose:** I mentioned at the beginning of the interview, when you made a decision in 1998 about Apple. You had some reservations. But at the same time, during your interview with Steve, you said, something like this, I was prepared within five minutes to throw caution to the wind. What did he say that made you believe this company is the place for Tim Cook?

**Cook:** It was an interesting meeting. I had gotten a call several times from the search people that he had employed. And I said no, I was at Compaq, I was happy, or thought I was. And they were persistent. And so I finally thought, I'm going to go out and take the meeting. Steve created the whole industry that I'm in, I'd love to meet him. And so I'm honestly going into the meeting.

**Rose:** There's no downside of this.

> *What did [Jobs] say that made you believe*

**Cook:** Well I'm just thinking I'm going to meet him and all of a sudden he's talking

Document title: Tim Cook Full Interview With Charlie Rose With Transcript - Business Insider
Capture URL: https://www.businessinsider.com/tim-cook-full-interview-with-charlie-rose-with-transcript-2014-9
Capture timestamp (UTC): Thu, 20 Aug 2020 19:01:48 GMT

Page 20 of 42

**Exhibit 8
-391-**

BUSINESS INSIDER

POPULAR WITH SUBSCRIBERS

**Seattle tech salaries revealed: The region's 21 highest-paid jobs at companies like Amazon, Microsoft, and Facebook, paying as much as $1.6 million**

> *What did [Jobs] say that made you believe this company is the place for Tim Cook?*

**Cook:** Well I'm just thinking I'm going to meet him and all of a sudden he's talking about his strategy and his vision, and what he was doing was going 100 percent into consumer. When everybody else in the industry had decided you couldn't make any money on consumers so they were headed to services and storage and enterprise. And I thought, I'd always thought that following the herd was not a good thing, that it was a terrible thing to do right? You're either going to lose big, or lose, but those are the two options. He was doing something totally different. And he told me a little about the design, enough to get me really interested. And he was describing what later would be called the iMac. And the way that he talked, and the way the chemistry was in the room, it was just he and I. And I could tell, I can work with him. And I looked at the problems Apple had, and I thought you know, I can make a contribution here. And working with him, and this is a privilege of a lifetime. And so all of a sudden I thought, I 'm doing it. I'm going for it. And you have this voice in your ear that says go west young man, go west. I was young at the time. But you know, you come back and you try to do the things that people do with spreadsheets and stuff, and none of it makes sense. It didn't make sense. And yet, my gut said, go for it. And I listened to my gut. There was literally no one around me that was inviting doing it.

> *I looked at the problems Apple had, and I thought you know, I can make a contribution here*

**Rose:** But in your speech at Auburn, your commencement speech, you spoke to intuition.

**Cook:** Yes. And that's what I mean by gut. My intuition was telling me loudly to go. And it wasn't based on, you know as an engineer you want to write down pros and cons, and the financial part you want to look at, and you want it to say go. You want it to sort of validate the decision that your guts come. And it never did. Because, you know Michael Dell had made a comment weeks earlier that if he were the CEO, and he was a very, is and was a very respected CEO, that if he were the CEO of Apple, he would close it down and give the money back to shareholders. That it had no future.

Document title: Tim Cook Full Interview With Charlie Rose With Transcript - Business Insider
Capture URL: https://www.businessinsider.com/tim-cook-full-interview-with-charlie-rose-with-transcript-2014-9
Capture timestamp (UTC): Thu, 20 Aug 2020 19:01:48 GMT

Page 21 of 42

**Exhibit 8**
**-392-**

POPULAR WITH SUBSCRIBERS

**Seattle tech salaries revealed: The region's 21 highest-paid jobs at companies like Amazon, Microsoft, and Facebook, paying as much as $1.6 million**

respected CEO, that if he were the CEO of Apple, he would close it down and give the money back to shareholders. That it had no future.

**Rose:** I remember he said that.

**Cook:** He was just saying what everybody thought.

**Rose:** They didn't know Steve Jobs.

**Cook:** They didn't know Steve. And so in that meeting, I concluded all of those guys are wrong. They don't know him and they don't know his vision. They see things in the traditional way, which Steve never did. He was always looking well beyond the norm.


**Tim Cook claimed Michael Dell didn't understand Jobs' vision for Apple.**  AP

**Rose:** And [unintelligible] the beginner's eye.

**Cook:** Yes, he had a gift for that. He clearly had a gift for that. And he took that gift and embedded it in the company. It wasn't a gift that he kept to himself. I loved many things about him, as a dear friend. But he also was a mentor. He was a great teacher. This is something that's never written about him. But what he left in not just me, but many of us, is what he taught us. He was one of the best mentors in the world.

**Rose:** This is more than perfectionist.

**Cook:** Oh, it's much more than that. No, it's much more than that because that's just holding the bar so high that it's very hard to hit. It's teaching and making sure people are learning and him taking such an interest he's going out of his way to do this. And I saw him do that over many years -- well, not just [with] me but [also with] many people. And I think it's a huge, huge part of what he did that's missed in most of the things that I've read.

**Rose:** The misconception misses that. The teaching aspect of it.

**Cook:** It does. That and the human aspect of it. He was an

Document title: Tim Cook Full Interview With Charlie Rose With Transcript - Business Insider
Capture URL: https://www.businessinsider.com/tim-cook-full-interview-with-charlie-rose-with-transcript-2014-9
Capture timestamp (UTC): Thu, 20 Aug 2020 19:01:48 GMT

Page 22 of 42

**Exhibit 8
-393-**

**Rose:** The misconception misses that. The teaching aspect of it.

**Cook:** It does. That and the human aspect of it. He was an incredible human being and I've never read anything that really captured him. Or captured the Steve I knew.



**Cook introduced Apple Pay to a captive audience in Cupertino on September 9.**
Apple

## Cook on Apple Pay

**Rose:** One of the products you introduced is ApplePay. Now, do you have a relationship with credit cards in creating ApplePay?

**Cook:** We do.

**Rose:** Some say, "Why not just go around them? You know, be disruptive."

**Cook:** Well, as it turns out, people love their credit cards. And so I don't know what credit cards you have.

**Rose:** Too many.

**Cook:** But many people love their credit cards because they might love that you collect airline points.

**Rose:** Right.

**Cook:** So we looked at the industry and we said, "You know, people like that part." And so we're about making the user's life better. Making the experience better. We saw all the mobile payment stuff that had been done as none of it was making anybody's life better. It was more about creating a business model for someone else to make money. We started with the user and we said, "What do they really want?" Well, nobody wants to carry a wallet. You don't want another thing that you have to remember to put in your pants when you walk out the door. You don't want another thing to lose. You don't really want this card with exposed numbers on it that has a huge security risk on it, and so we've fixed the security issue.

*Nobody wants to*                    Our system is much more
*secure than the traditional*

Document title: Tim Cook Full Interview With Charlie Rose With Transcript - Business Insider
Capture URL: https://www.businessinsider.com/tim-cook-full-interview-with-charlie-rose-with-transcript-2014-9
Capture timestamp (UTC): Thu, 20 Aug 2020 19:01:48 GMT

huge security risk on it, and so we've fixed the security issue.

> *Nobody wants to carry a wallet.*

Our system is much more secure than the traditional credit card system is. We kept the thing that people liked, which is they do love their card. And we said, "We don't want any of this data, so we're not doing what other companies are doing. We don't want to know what you're buying. We don't want to know where you're buying it. We don't want to collect all this stuff on Charlie. I don't want to know where you're spending your nights." And so we've firewalled all the stuff where we don't keep it. It's not on our servers. And so we kept what's great and fixed what wasn't. The retailers love it because it's a far more efficient way for people to check out.

> *We don't want to know what you're buying. We don't want to know where you're buying it.*

**Rose:** Tell us how it works.

**Cook:** It's very simple. Literally, all you have to do -- this phone's not wired, but if it were, all I would have to do is touch the iTouch or the Touch ID rather. And hold it within a proximity of the terminal and that's it. It's done. The transaction is finished because you've authenticated with your fingerprint. It's hard to steal a fingerprint. And you've not pulled out a card, you've not jostled through your wallet for something you may have lost. You haven't had to run your credit card through a machine several times and for it to reject your card. None of that is done. It's as simple as boom, boom. It's done.



Document title: Tim Cook Full Interview With Charlie Rose With Transcript - Business Insider
Capture URL: https://www.businessinsider.com/tim-cook-full-interview-with-charlie-rose-with-transcript-2014-9
Capture timestamp (UTC): Thu, 20 Aug 2020 19:01:48 GMT

Page 24 of 42

Exhibit 8
-395-




Getty Images

## Cook on Apple's emerging markets

**Rose:** Technology is a very global thing, as you well know, as well as anyone. Emerging markets are where a lot of people are coming to the middle class and they have buying power.

**Cook:** Absolutely.

**Rose:** China, Brazil, lots of other places. How do you see that market and how does Apple do well in that market?

**Cook:** Well, in China, if you look back at the last year, our business in greater China is about 30 billion. And to my knowledge that's larger than any American company, certainly in technology and maybe the largest of any period. We put a lot of energy in there for years. We've had very fast growth, but you're exactly right. Ultimately what's causing that is you have a significant number of people moving into the middle class. Large numbers -- unprecedented numbers. This is also happening in Brazil. It's happening in Turkey. It's happening in Thailand, it's happening in Malaysia. It's happening in many different places. Indonesia's beginning. It's at a different place in that curve.

> *Emerging markets are where a lot of people are coming to the middle class and they have buying power.*

**Rose:** Does price point become an issue?

**Cook:** Yeah. Income is a gating factor. But there's a lot of retailers that will allow smart phones to be paid for over time. In China, there's a subsidy on smart phones if you sign a contract, much like the United States. And so, there are ways to make it more affordable. Also, this is iPhone 6 and 6 Plus. But we also sell iPhone 5S.

Document title: Tim Cook Full Interview With Charlie Rose With Transcript - Business Insider
Capture URL: https://www.businessinsider.com/tim-cook-full-interview-with-charlie-rose-with-transcript-2014-9
Capture timestamp (UTC): Thu, 20 Aug 2020 19:01:48 GMT

Page 25 of 42

**Exhibit 8**
**-396-**

BUSINESS
INSIDER

Subscribe

over time.  In China, there's a subsidy on smart phones if you sign a contract, much like the United States. And so, there are ways to make it more affordable.  Also, this is iPhone 6 and 6-Plus. But we also sell iPhone 5S.

**Rose:** Yes.

**Cook:** And iPhone 5C.  And all of these just got lower prices on Tuesday because of the entry of the new products.  And so, you will find in emerging markets -- the mix of product sales are sometimes different in those markets versus other markets.

## Cook on how Apple develops products

**Rose:** You spend a lot of money on research.

> *There's obviously other things that we're working on, that right now, isn't apparent.*

**Cook:** We spend a lot of money in R&D. And that number has ramped dramatically.  That's true.  Some of that is spent for things that aren't shipping yet. The Apple Watch is an example of that.  I've announced it now so everybody can see it.  But we've been spending money for three years on it.  Because we started development about three years ago.  And there's obviously other things that we're working on, that right now, isn't apparent.

**Rose:** Here's what's interesting about you and about Steve Jobs --

**Cook:** We're both secretive.

**Rose:** Yeah. [laughs] Exactly.  Exactly! It's hard to get something -- there's also this, though.  You guys have ideas for products that might be part of the future, which no one knows about.

> *There are products that we're working on … that haven't been rumored about yet.*

**Cook:** There are products that we're working on that no one knows about, yes.  That haven't been rumored about yet.  Yes. And part of some of those are going to come out and be blow-away, probably.  And some of those we'll probably

POPULAR WITH SUBSCRIBERS

**EXCLUSIVE: The head of Operation Warp Speed shares his best timeline on the race for a COVID-19 vaccine and predicts a return to normal in the 2nd half of 2021**

Document title: Tim Cook Full Interview With Charlie Rose With Transcript - Business Insider
Capture URL: https://www.businessinsider.com/tim-cook-full-interview-with-charlie-rose-with-transcript-2014-9
Capture timestamp (UTC): Thu, 20 Aug 2020 19:01:48 GMT

Page 26 of 42

Exhibit 8
-397-

*rumored about yet.* "

yet. Yes. And part of some of those are going to come out and be blow-away, probably. And some of those we'll probably decide, "You know, that one we're going to stop." And so, we kick around a lot of things internally. And we might start something and get down the road a little bit, and have a different idea. I mean, Steve told a story on about the iPad. You know, iPad was started way in advance of when it came out. Many years before.

**Rose:** Tablets was not a new idea.

**Cook:** It was not a new idea. It was shelved because of the idea to make iPhone. And the team was relocated to work on iPhone. And then the iPhone came out. And after iPhone got up and running, [we] brought



Steve Jobs unveiled the first iPad in 2010.
AP

the iPad out. And so, you may find something along the route to doing something that you want to do that you wouldn't have imagined or gotten there unless you started on that road.

A lot of what leads to innovation is curiosity. It's curiosity to begin pulling a string, and you see where it takes you. And a lot of what we do isn't apparent to the public in the beginning, where it's going to lead. Touch ID is an example. We did touch ID a year ago. A lot of people just thought Touch ID was a way to get into your phone. And it's very cool at doing that. But then we also said, "Well, you can buy stuff from Apple with it." Obviously, we, the entire time, were planning to do a much broader roll out for mobile payments with Touch ID. But we invest in a lot of things that have long tentacles.



Cook sought to draw distinction between hacking and password phishing.
YouTube/The Charlie Rose Show

## Cook on the iCloud hacking scandal

**Rose:** Hacking of iCloud, caused a lot of people --

**Cook:** It wasn't hacked. There's

POPULAR WITH SUBSCRIBERS

**EXCLUSIVE: The head of Operation Warp Speed shares his best timeline on the race for a COVID-19 vaccine and predicts a return to normal in the 2nd half of 2021**

Document title: Tim Cook Full Interview With Charlie Rose With Transcript - Business Insider
Capture URL: https://www.businessinsider.com/tim-cook-full-interview-with-charlie-rose-with-transcript-2014-9
Capture timestamp (UTC): Thu, 20 Aug 2020 19:01:48 GMT

Page 27 of 42

**Exhibit 8
-398-**




Cook sought to draw distinction between hacking and password phishing.
YouTube/The Charlie Rose Show

**POPULAR WITH SUBSCRIBERS**

**EXCLUSIVE: The head of Operation Warp Speed shares his best timeline on the race for a COVID-19 vaccine and predicts a return to normal in the 2nd half of 2021**

**Rose:** Hacking of iCloud, caused a lot of people --

**Cook:** It wasn't hacked. There's a misunderstanding about this. If you think about what hacking iCloud would mean, it means somebody would get into the cloud and could go fish around in people's accounts. That didn't happen. What happened was that -- like, let's take you. It didn't happen to you, I hope. But let's take you as an example. Somebody could say, "Oh, you know, I mean, I know Charlie's ID from -- somehow."

**Rose:** "I know his e-mail perhaps, or" --

> *It's not an Apple issue. This is an internet issue.*

**Cook:** Maybe it's his e-mail. And they may guess your password -- or that's not as likely. They might phish it.

**Rose:** Right.

**Cook:** How do you phish it? I could pretend to be somebody else. And you could unknowingly give me your password. And that happens on the Internet too many times today. That's the number one issue, by far. And it's not an Apple issue. This is an internet issue. You just saw that this happened to millions of Gmail users.

**Rose:** Right.

**Cook:** They were phished. My understanding is it wasn't a breach there, either, of the infrastructure. It was a phishing expedition. There are lots of bad people that do this. And what we said was, instead of just saying, "Hey, if there's a lot people to do this," we need to figure out, "Well, how can we try to protect our customers on this?" That's our top goal. And so, we're working internally about how to bring more awareness to these schemes and trying to do things to do --

**Rose:** Public information process.

**Cook:** Well, some of it is that.

**Rose:** Yeah.

Document title: Tim Cook Full Interview With Charlie Rose With Transcript - Business Insider
Capture URL: https://www.businessinsider.com/tim-cook-full-interview-with-charlie-rose-with-transcript-2014-9
Capture timestamp (UTC): Thu, 20 Aug 2020 19:01:48 GMT

**Exhibit 8**
**-399-**

**Cook:** Well, some of it is that.

**Rose:** Yeah.

**Cook:** Some of it is like an old public service announcement used to be.

**Rose:** Right.

**Cook:** In addition, we have to do things where it notifies the customer quickly if it does happen. That's reactive. And you know, we don't want it to happen at all, but if it does, you probably want to know instantly.  There are some other things that I can't describe right now, where we think we can make a contribution beyond just making sure the cloud's not hacked --

**Rose:** Yeah.  This is different than the hacking of Home Depot or the hacking of --

**Cook:** Very different.

**Rose:** -- of Target.

**Cook:** Yeah.  It's totally different.



**Cook was critical of the federal governments surveillance programs.**   Screenshot / Hulu

## Cook on secrecy and surveillance

**Rose:** A couple of bigger questions beyond Apple.

Document title: Tim Cook Full Interview With Charlie Rose With Transcript - Business Insider
Capture URL: https://www.businessinsider.com/tim-cook-full-interview-with-charlie-rose-with-transcript-2014-9
Capture timestamp (UTC): Thu, 20 Aug 2020 19:01:48 GMT

Page 29 of 42

Exhibit 8
-400-

## Cook on secrecy and surveillance

**Rose:** A couple of bigger questions beyond Apple.

**Cook:** Yeah.

**Rose:** You once said to me, at a conference, and I was about ready to go in and interview someone, [inaudible]. I said, "What do you think I should ask?" And you said -- either facetiously or not -- "Ask him what comes after the Internet."

**Cook:** I remember telling you that.  And I remember your reaction.  You were like this.

**Rose:** Yes.

**Cook:** I wanted you to ask him because I wanted to hear what they were going to say.

**Rose:** Exactly. [laughter]

**Cook:** I think you have to think about things like that.

**Rose:** Yeah.

**Cook:** And sometimes, in the Valley, everybody can get so fixated on one thing.  And lots of companies pop up and do those things.  And you're not thinking enough about the next next next thing.  And so, it's something that we think about. And I don't know what the answer is.  We always had some ideas here and there.

> *I don't think that the country, or the government's found the right balance.*

**Rose:** Well, give me one.

**Cook:** Well, I don't want to give you one. [laughter] I don't want anybody else to copy it.  I mean, you have people out there that copy us --

**Rose:** Okay.

**Cook:** -- and so, I don't want to help them do that.

Document title: Tim Cook Full Interview With Charlie Rose With Transcript - Business Insider
Capture URL: https://www.businessinsider.com/tim-cook-full-interview-with-charlie-rose-with-transcript-2014-9
Capture timestamp (UTC): Thu, 20 Aug 2020 19:01:48 GMT

**Exhibit 8
-401-**

**Rose:** Okay.

**Cook:** -- and so, I don't want to help them do that.

**Rose:** In this country, we've had to, because of Edward Snowden and other [unintelligible]. Try to come to grips with the idea of freedom, privacy, and national security. Where is that debate?

**Cook:** I think it's a tough balance. And I don't think that the country, or the government's found the right balance. I think they erred too much on the collect everything side. And I think the president and the administration is committed to kind of moving that pendulum back. However, you don't want, it's probably not right to not do anything. And so I think it's a careful line to walk. You want to make sure you're protecting American people. But you don't want to take, there's no reason to collect information on you. But people, are 99.99 percent of other people.



Cook emphasized Apple's disinterest in collecting user records. YouTube/The Charlie Rose Show

**Rose:** A lot of people say, you know, have said to me, there's a whole ton of information already out there, that are in the possession of companies like Google, like so many other companies, that that information is there and they worry about that. Too much personal information is out there and who has access to it, that kind of thing, which is different from than the national security implications of what you do to listen in on people's phone conversations or what technology companies do to provide a list of whatever might happen.



*I think it's a careful line to walk.*

**Cook:** We take a very different view of this than a lot of other companies have. Our view is, when we design a new service, we try not to collect data. So we're not reading your email. We're not reading your iMessage. If the government laid a subpoena to get iMessages, we can't provide it. It's encrypted and we don't have a key. And so it's sort of, the door is closed.

Document title: Tim Cook Full Interview With Charlie Rose With Transcript - Business Insider
Capture URL: https://www.businessinsider.com/tim-cook-full-interview-with-charlie-rose-with-transcript-2014-9
Capture timestamp (UTC): Thu, 20 Aug 2020 19:01:48 GMT

Page 31 of 42

Exhibit 8
-402-

subpoena to get iMessages, we can't provide it. It's encrypted and we don't have a key. And so it's sort of, the door is closed.

But our business Charlie, is based on selling these. Our business is not based on having information about you. You're not our product. Our product are these, and this watch, and Macs and so forth. And so we run a very different company.


> *You're not our product.*

I think everyone has to ask, how do companies make their money? Follow the money. And if they're making money mainly by collecting gobs of personal data, I think you have a right to be worried. And you should really understand what's happening to that data.

And companies I think should be very transparent about it. From our point of view, you can see what we're doing on the credit card thing. We don't want it. We're not in that business. I'm offended by lots of it. And so, I think people have a right to privacy. And I think that's going to be a very key topic over the next year or so. And we'll reach higher and higher levels of urgency as more and more incidents happen.

> *Follow the money. And if they're making money mainly by collecting gobs of personal data, I think you have a right to be worried.*

I think that the, for us, in the Snowden thing, just to go long on that for just a moment. We wanted instantly to be totally transparent because there were rumors and things being written in the press that people had backdoors to our servers. None of that is true, zero. We would never allow that to happen. They would have to cart us out in a box before we would do that. If we ever get information, and we finally got an agreement from the administration to release how many times we had national security orders on Apple. And in a six month period, and we had to release a range, because they won't let us say the exact number, it's between zero and 250. That's the lowest number you can quote. Zero to 250.

**Rose:** It could have been one or it could have been 249.

Document title: Tim Cook Full Interview With Charlie Rose With Transcript - Business Insider
Capture URL: https://www.businessinsider.com/tim-cook-full-interview-with-charlie-rose-with-transcript-2014-9
Capture timestamp (UTC): Thu, 20 Aug 2020 19:01:48 GMT

Page 32 of 42

Exhibit 8
-403-

BUSINESS INSIDER

 Subscribe

**Rose:** It could have been one or it could have been 249.

**Cook:** Correct. But, so you can tell, we have hundreds and millions of customers. So it's a very rare instance that there's been any data asked. And one of the reasons is, we don't keep a lot. We're not the treasure trove of places to come to.

## Cook on his personal values

**Rose:** I mentioned Robert Kennedy and Martin Luther King in your office. Tell me the values you consider most important beyond the culture and the values of Apple. To Tim Cook, the man.

> *Everyone deserves respect. I'll fight for it until my toes point out.*

**Cook:** Treating people with dignity. Treating people the same. That everyone deserves a basic level of human rights, regardless of their color, regardless of their religion, regardless of their sexual orientation, regardless of their gender. That everyone deserves respect. I'll fight for it until my toes point out. I think those two guys, if you look back in history, I think -- they're not the only two. But they laid their lives on the line. And they knew they were doing it. And I had the -- just tremendous respect for both of them, and so I do.



**Cook keeps a portrait of Kennedy in his office.** AP

I look at them every day because I think for people -- there's still too many cases in the world and in the United States where there's a class kind of structure or where voting or people are trying to convince each other that this other group of people don't deserve the same rights. And I think it's crazy, I think it's un-American. I think it doesn't belong. And I also see as a businessman in Apple, I can see the value in diversity. I see a tremendous company that because we don't judge each other, because we don't have different rights and so forth because we allow anyone in the front door. I see a company that where -- that this inclusion really inspires innovation.

Document title: Tim Cook Full Interview With Charlie Rose With Transcript - Business Insider
Capture URL: https://www.businessinsider.com/tim-cook-full-interview-with-charlie-rose-with-transcript-2014-9
Capture timestamp (UTC): Thu, 20 Aug 2020 19:01:48 GMT

Page 33 of 42

**Exhibit 8
-404-**

can see the value in diversity. I see a tremendous company that because we don't judge each other, because we don't have different rights and so forth because we allow anyone in the front door. I see a company that where -- that this inclusion really inspires innovation. And so I see the value of it from that point of view as well. But from a human point of view, I feel it's just and right. And I've seen it not occur. And I've seen the devastation of it not occurring, and so I want to do everything I can do to not only not profit from it --



*We have a lot further to go.*

**Rose:** What offends me most about discrimination is that you're not being able to not access the full range of not only of humanity, but also you're doing a huge disservice to yourself because [of] the human potential.

**Cook:** I agree.

**Rose:** Anything that restricts the human potential is doing a disservice to you and to everybody around you.

**Cook:** I agree. And it's not what the country was based on. You know, I get back to that. There's some basic level of rights that our forefathers had the insight to think about. And we're still fighting 250 years, a little less than that I guess, afterwards to see that vision. That it's worth the fight and we've certainly come a long way since Dr. King's speech on the Mall, but we have a lot further to go. We have a lot further to go.

## Cook on labor and the environment

**Rose:** And finally there's the threat to the planet.

**Cook:** There is. And this is one that we're putting a lot of energy in. You know, we want to leave the world better than we found it. What does that mean for us? It means that we take toxins out of all of our products. We've done that. Well, I think we're still the only consumer electronics company that's done that. It means that we focus on renewable energy, and so we have a data center that people tell us we could never get to 100 percent renewable energy there. We'd never get there. Well, we're there. We have it in Maiden, North Carolina. You should go see it. Working with both the state and working with our -- the talent without Apple, we were able to pull that off. We've got other data centers; [on] 100 percent renewable

Document title: Tim Cook Full Interview With Charlie Rose With Transcript - Business Insider
Capture URL: https://www.businessinsider.com/tim-cook-full-interview-with-charlie-rose-with-transcript-2014-9
Capture timestamp (UTC): Thu, 20 Aug 2020 19:01:48 GMT

Page 34 of 42

**Exhibit 8**
**-405-**

Carolina. You should go see it. Working with both the state and working with our -- the talent without Apple, we were able to pull that off. We've got other data centers; [on] 100 percent renewable [energy].

> *We want to leave the world better than we found it.*

We're building the headquarters, our new headquarters. It will be 100 percent renewable. And we're working on our supply chain and we're digging deep within the supply chain and we've got initiatives going on there as well. I know some people have issues with this, but to me it's all about leaving the world better than you found it. And I don't know about you, but when I spend my spare time -- when I have any -- I like to be out in the national parks.

**Rose:** Yeah, I do.

**Cook:** And reminding myself of the land and the beauty of it. And you can go to different places and see that slipping away. And it's not right. And we owe it to the generation, to the younger generation, to solve this and not to keep turning and looking at away.


**Tim Cook visited Foxconn -- one of Apple's manufacturing partners -- in 2012.** AP

**Rose:** Those same values, also, ought to be applied to the people who make --

**Cook:** Yes.

**Rose:** -- Apple products, wherever they live and wherever they work.

**Cook:** Absolutely. And you can see what we've done there. We have trained now well over a million, probably two million people in their rights, and where you and I have a good view of what our rights are -- that's not the same in every country in the world. One of the best ways you can make sure that things are happening well is if people stand up and say, "Something's happening that's not right here." We've audited so deep in our supply chain. We do it constantly.

Document title: Tim Cook Full Interview With Charlie Rose With Transcript - Business Insider
Capture URL: https://www.businessinsider.com/tim-cook-full-interview-with-charlie-rose-with-transcript-2014-9
Capture timestamp (UTC): Thu, 20 Aug 2020 19:01:48 GMT

Page 35 of 42

**Exhibit 8**
**-406-**

Subscribe

that's not the same in every country in the world. One of the best ways you can make sure that things are happening well is if people stand up and say, "Something's happening that's not right here." We've audited so deep in our supply chain. We do it constantly, looking for anything that's wrong, whether it's down to the -- there's a safety exit blocked. We have gone beyond the auditing and are now essentially holding university-style classes on the manufacturing campuses with our partners, because you don't start in life at here. You start in life at the bottom and you crawl up.

*We have trained now well over a million, probably two million people in their rights*

We're trying to provide education, which to me, is the great equalizer among people, to people on the factory floor who want and aspire to do more. And so, we worked with local Chinese universities to employ classes right on campus, to make it super convenient for people. I really feel that we've done a tremendous amount in this -- in this -- in this area. And plus, we've been incredibly transparent, because this is an area unlike me being secretive about the future -- I want everybody to copy, and I'd love that everybody takes exactly what we're doing and do it. And if they've got any better ideas, I want them. Because I think we all ought to be, you know, just like with the environment and human rights, this is an area we ought to all share, we could all improve the world on. It's not building a new product, where we want to keep it secretive.

## Cook on Apple's responsibility

**Rose:** And the Apple of your future stands, as Steve once said, at the junction of tech and humanities?

*We may change other things. We may become more open.*

**Cook:** Yes. It does. And you can see it in these products -- in this incredible watch. You can feel it. You can see that in everything we do, we have this focus on, "How am I changing the world? How am I enriching somebody's life? How am I making things easier for people?" And we're just not making products to sell, you know? That doesn't get me up in the morning. I get up in the morning, and many other people get in the morning, to change things. I mean, that's -- that's

Exhibit 8
-407-

we're just not making products to sell, you know? That doesn't get me up in the morning. I get up in the morning, and many other people get in the morning, to change things. I mean, that's -- that's who we are as a company. That hasn't changed. We may change other things. We may become more open. We may participate in these things that we haven't done before. But what drives us are making great products that enrich people's lives. It's the same thing that has driven Apple forever.

**Rose:** But it's been a good business. Are you now not the largest company in the world, in terms of market count?

**Cook:** We are. But we don't fixate on it, Charlie. I don't get up in the morning thinking, "Wow, we're the largest."

**Rose:** Do you think of that in terms of the opportunities it provides you to do all the things that I've just -- we've been talking about?

**Cook:** I do.

> *I'm proud that we're out in front on environment. I'm proud that we're pushing like crazy in human rights.*

**Rose:** Whether it's technology, whether it's humanity -- it's whether it is being a good citizen.

**Cook:** I do. And I see it as a responsibility. I don't see it as a burden. I see it as a responsibility and I feel that this gives us even a greater ability to contribute more -- not just in the monetary sense. We'll always contribute the most to humanity through our products, because these products will change people's lives and enable them to do things they couldn't do before. And we could reach more people doing that. But I'm proud to be working on Product Red with Bono. And eliminating AIDS in Africa. I'm proud that we're out in front on environment. I'm proud that we're pushing like crazy in human rights. I'm proud that we're working on education and trying to change the way teachers teach and students learn. These things excite me. These things move the dial in the world. And I'm not just talking about the U.S. I'm talking about, you know, worldwide. I think these are the things that make our hearts sing. These are the things that get us up in the morning. And it drives us to do unbelievable things and work unbelievably hard. It's not the largest

Document title: Tim Cook Full Interview With Charlie Rose With Transcript - Business Insider
Capture URL: https://www.businessinsider.com/tim-cook-full-interview-with-charlie-rose-with-transcript-2014-9
Capture timestamp (UTC): Thu, 20 Aug 2020 19:01:48 GMT

Page 37 of 42

**Exhibit 8
-408-**

think these are the things that make our hearts sing. These are the things that get us up in the morning. And it drives us to do unbelievable things and work unbelievably hard. It's not the largest market cap in the world. This is not an objective that we're -- people will work the extra hour, will go the extra mile. Those things aren't things that push people. I mean, I don't know. They don't push me, anyway. I'm not saying that I don't -- just to all the shareholders out there, I'm not saying I'm not focusing on you. I am very focused on them.

> *I'm proud that we're working on education and trying to change the way teachers teach and students learn*

But I'm talking about what drives people. And what we've learned is something simple -- is it's very simple in a way -- is if we focus on great products that enrich people's lives, and we do that well, really well, the financial returns will follow, and our shareholders will be happy. And it's a continuous circle. And so, I like that because it's simple. Too many companies focus on the -- let's try to get the largest market cap. And that's doesn't drive people. You know, I was at Compaq at a time where the objective was to become a $40 billion company. Well, employees don't get excited about that. This isn't something you wake up and you go, "I'm going to take the hill today to do 40" -- I mean, you know? It's just not that. But changing the world -- these are the things that people work for. And this pushes people. And so, this is who we are as people. It's the values of our company. It's been the values of our company forever. And it's to Steve's credit. He put these values in the company. It wasn't just his values. It was his mentoring and teaching that instilled these deep in the company. And so, if I step off the curb this afternoon -- I hope I don't -- but if I do, those will be the values of the company tomorrow. And the next day and the next day. It's that deep. I know I probably said it too many times, but it's a privilege of a lifetime to be there, because I think there's no place like it on earth.

## Cook on partnering with U2



**Rose:** What was it that Bono said to you – [laughter]

Document title: Tim Cook Full Interview With Charlie Rose With Transcript - Business Insider
Capture URL: https://www.businessinsider.com/tim-cook-full-interview-with-charlie-rose-with-transcript-2014-9
Capture timestamp (UTC): Thu, 20 Aug 2020 19:01:48 GMT

Exhibit 8
-409-





**Rose:** What was it that Bono said to you – [laughter]

**Cook:** ... that got me to buy his free album?

Cook and Bono bonded on stage at the iPhone launch event.  Apple

**Rose:** Yes. [laughs] What did Bono say to get you to buy free albums?  And what did he say to you when he walked over to you at the presentation?  It was something [unintelligible] Zen Meister [spelled phonetically] -- I'm not sure what it was.

**Cook:** [laughs] He called me the Zen Master -- he can't shake me.  You can't shake me up.  You know, from our point of view, it's kind of simple, is we love music.  We were thrilled with the album.  We think the album is killer.  I don't know if you've listened to it yet.  I really encourage you to do it. And so, what we wanted to do was we wanted to give something to our customers.  And I think the vast majority of them are going to love the music. Some may not love it.  I hope they all do.  But it was more about our customers.  And so, it felt great to participate in something that's music history -- one of the largest album releases ever.  But the real thing was giving something to our users.

**Rose:** But you can get the album free.

**Cook:** Yeah. I hope you listen to it.  They had done a killer job.  They worked on it for five years.  The band has done incredible work here.  And I think you're really going to like it.  They performed one song at our event.

**Rose:** Right.

**Cook:** And I think the crowd really, really liked it.

**Rose:** Thank you for coming.

**Cook:** It's been a pleasure.

**Rose:** A pleasure.

**Cook:** It's been a pleasure.  I will never forget this.

Document title: Tim Cook Full Interview With Charlie Rose With Transcript - Business Insider
Capture URL: https://www.businessinsider.com/tim-cook-full-interview-with-charlie-rose-with-transcript-2014-9
Capture timestamp (UTC): Thu, 20 Aug 2020 19:01:48 GMT

Page 39 of 42

**Exhibit 8**
**-410-**

BUSINESS
INSIDER

**Cook:** It's been a pleasure.  I will never forget this.

**Rose:** Thank you.

**Cook:** Thanks, Charlie.

**Rose:** Tim Cook, CEO of Apple.  Thank you for joining us.  See you next time.



*Get the latest Google stock price* *here*.

NEWSLETTER

**Get a daily round up of our most popular tech stories. Sign up for our Tech newsletter.**

| Email address | **SIGN UP** |
|---|---|

By clicking 'Sign up', you agree to receive marketing emails from Business Insider as well as other partner offers and accept our Terms of Service and Privacy Policy.

More:   Apple   Tim Cook   Charlie Rose   Interview ⌄

Taboola Feed 







**N95 Masks Now Available To General Public [Buy Here]**
Sponsored by Moller Health

**FDA Registered N95 Respirator Mask, Ships sa...**
Sponsored by Canopus Group

**Our $5 Wines Are Better Than Most $50 Wines**
Sponsored by Firstleaf





Document title: Tim Cook Full Interview With Charlie Rose With Transcript - Business Insider
Capture URL: https://www.businessinsider.com/tim-cook-full-interview-with-charlie-rose-with-transcript-2014-9
Capture timestamp (UTC): Thu, 20 Aug 2020 19:01:48 GMT

# EXHIBIT 9

| From: | Karina.Villanueva |
|---|---|
| To: | *** Apple-Masimo; Lerner, Joshua H.; Lyon, H. Mark; Buroker, Brian M.; Samplin, Ilissa; Kaounis, Angelique; BAndrea@gibsondunn.com; BRosenthal@gibsondunn.com |
| Cc: | Masimo.Apple |
| Subject: | Masimo Corp. et al. v. Apple Inc. | 20-cv-00048 - Document Production |
| Date: | Monday, August 17, 2020 11:38:11 PM |

Counsel,

Documents bearing production numbers MASA00085602 - MASA00086972 are available for download at https://knobbe.sharefile.com/d-sb43039f9db04a889.  The password to the zip file is the same as the prior productions. Please note, some of the documents have been designated Highly Confidential – Attorneys' Eyes Only pursuant to the Protective Order.

Best,

**Karina Villanueva**
Litigation Paralegal
Karina.Villanueva@knobbe.com

949-721-2928 **Direct**

**Knobbe Martens**

2040 Main St., 14th Fl.
Irvine, CA 92614
www.knobbe.com

**Exhibit 9
-412-**

# EXHIBIT 10

| | |
|---|---|
| **From:** | Andrea, Brian |
| **To:** | Masimo.Apple |
| **Cc:** | *** Apple-Masimo |
| **Subject:** | Masimo v. Apple - Plaintiffs" Source Code |
| **Date:** | Tuesday, August 11, 2020 7:02:16 AM |

Counsel,

Please let us know when we will be able to inspect Plaintiffs' source code.  We expect that Plaintiffs will make available for review all source code, including all prior versions, revisions, comments, and related source code files, for every product that practices or has ever practiced any asserted claim of any asserted patent, including but not limited to the Monitors, OEM Boards, and Pronto-7 identified in Plaintiffs' infringement contentions.  *See, e.g.,* Infringement Contentions at 6, 8.  We expect that the source code available for review will include all source code, including all prior versions, revisions, comments, and related source code files, for every product Plaintiffs sold or offered for sale before July 2, 2001 that includes or relates to any low power feature including, but not limited to changing or altering the duty cycle, measurement mode, drive current, processing, and/or sampling frequency.

Lastly, we expect that Plaintiffs will also make available for review all source code, including all prior versions, revisions, comments, and related source code files, that Plaintiffs identified in their Second Amended Complaint. *See, e.g.,* Second Amended Complaint, paras. 42 and 44.

Thanks,
Brian

**Brian Andrea**

## GIBSON DUNN

Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W., Washington, DC 20036-5306
Tel +1 202.887.3624 • Fax +1 202.530.4220
BAndrea@gibsondunn.com • www.gibsondunn.com

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

**Exhibit 10**
**-413-**

# EXHIBIT 11

## PROPOSED TO BE FILED UNDER SEAL