# EXHIBIT 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALTERG, INC., | Case No. 18-cv-07568-EMC |
| Plaintiff, | |
| v. | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS** |
| BOOST TREADMILLS LLC, et al., | Docket No. 37 |
| Defendants. | |

Plaintiff AlterG, Inc. ("AlterG") brings this action against three of its former employees, Sean Whalen, Thomas Allen, and Michael James Bean (the "Individual Defendants"), and the company they founded, Boost Treadmills LLC ("Boost," and together with the Individual Defendants, "Defendants"). AlterG alleges that Defendants infringed its patents and misused its trade secret information to create Boost products. AlterG's complaint pleads nine causes of action: (1) patent infringement; (2) breach of contract; (3) trade secret misappropriation; (4) breach of fiduciary duty; (5) interference with contract; (6) interference with prospective economic advantage; (7) false advertisement; (8) trade libel; and (9) unfair competition.

Upon Defendants' motion, the Court previously dismissed all nine causes of action as insufficiently pleaded, with leave to amend. Docket No. 29 ("Order"). AlterG subsequently filed a First Amended Complaint. Docket No. 33 ("FAC"). Defendant then filed a motion to dismiss the FAC. Docket No. 37 ("Mot.").

///

///

///

**Exhibit 1**
-3-

# I.   BACKGROUND

A.   Factual Background

The core allegations in the FAC remain unchanged from AlterG's original complaint. AlterG is a medical device company that is the "leading provider of impact reduction treadmills," also known as "Anti-Gravity Treadmills," that are used for orthopedic rehabilitation and training.  FAC ¶ 14.  "One of the keys [sic] drivers of AlterG's success is its patented Differential Air Pressure ('DAP') technology," which "use[s] a pressurized bag to provide a counterforce to the subject's body weight, reducing their effective weight on the treadmill surface."  *Id.* ¶ 15. From 2012 to 2015, AlterG devoted substantial resources to develop "a lower cost, bare bones AlterG machine" in response to "potential competitors who wanted to develop anti-gravity training and rehab machines using mechanical unweighting and other options, and at a lower price point than AlterG."  *Id.* ¶ 33.  AlterG calls this project the "Low-Cost Platform Project," or "LCPP."  *Id.*  AlterG ultimately decided not to "immediately commercialize" or sell any products developed as part of the LCPP.  *Id.* ¶ 34.

The Individual Defendants are three former employees of AlterG.  Whalen was a co-founder of AlterG as well as "the initial and primary inventor . . . principally involved in developing the technology and products of the company."  *Id.* ¶ 19.  In 2012, Whalen relinquished his former positions at AlterG but continued working for the company as a consultant until he stopped working for AlterG altogether on March 31, 2015.  *Id.* ¶¶ 21, 35.  During this consultancy period, "Whalen was the principal consultant and engineer" on the LCPP.  *Id.* ¶ 33.

Allen joined AlterG in 2007 and has "held numerous jobs at AlterG in sales, business development, and in international sales."  *Id.* ¶ 37.  Like Whalen, Allen worked closely with the LCPP team from 2012 through 2015.  *Id.* ¶ 40.  Allen was also AlterG's "principal liaison" to Woodway USA ("Woodway"), a longtime supplier of treadmills for AlterG.  *Id.* ¶¶ 41, 43.  He resigned from AlterG on April 28, 2015.  *Id.* ¶ 42.

Bean joined AlterG in 2008 and worked in various sales roles at the company.  *Id.* ¶ 47. He resigned from AlterG in April 2017.  *Id.* ¶ 50.  "Since Bean's departure from AlterG in April 2017, AlterG has discovered communications between Bean and Allen about Allen's work on a

2

Exhibit 1
-4-

Case 8:20-cv-00048-JVS-JDE   Document 181-1   Filed 09/04/20   Page 4 of 33   Page ID
#:12591
Case 3:18-cv-07568-EMC   Document 41   Filed 09/05/19   Page 3 of 32

1    competing anti-gravity unit while Bean was still an employee of AlterG." *Id.*

2         Each of the Individual Defendants signed various confidentiality and non-disclosure

3    agreements with AlterG during their employment with the company.  Those agreements provided

4    that signatories would "not use or disclose AlterG's proprietary and confidential information in

5    any way contrary to the benefit of AlterG." *Id.* ¶¶ 20, 37, 47.  AlterG and Woodway also "entered

6    into various confidentiality agreements whereby AlterG would provide to Woodway proprietary

7    and confidential information to assist Woodway to build and supply AlterG with anti-gravity

8    units." *Id.* ¶ 44.

9         Boost was formed at the end of 2016 and registered in April 2017.  *Id.* ¶ 51.  Allen and

10   Bean are founders of Boost, and Whalen worked for the company in product development.  *Id.* ¶¶

11   51–52.  AlterG believes that "Defendants conspired almost immediately [upon leaving AlterG] to

12   create a competing machine incorporating AlterG intellectual property," and that "Boost was

13   developing an unweighting treadmill well prior to the company's registration." *Id.* ¶¶ 51, 55.  As

14   part of this process, Whalen and Allen started "secretly" working with Woodway and "utilized

15   confidential, proprietary, and trade secret information from the [LCPP], and other AlterG

16   intellectual property, to shortcut the research and development time to come to market with a

17   lower cost unweighting treadmill." *Id.* ¶ 46.  "At the end of 2017, Boost introduced its first

18   product—the Boost One," which "infringes AlterG patents" and "incorporates numerous

19   unpatented technology features developed by AlterG in connection with the [LCPP]." *Id.* ¶ 54.

20        AlterG further alleges that Defendants "falsely claim that the problematic Boost One is a

21   superior product over the AlterG DAP systems 'at a fraction of the cost.'" *Id.* ¶ 60.  Defendants

22   have also "told customers and prospects false statements to denigrate AlterG and its superior

23   technology, falsely claiming that AlterG was going out of business, is in poor financial health and

24   will not be able to get Woodway treadmills anymore." *Id.* ¶ 61.  The upshot of Defendants'

25   allegations is that Defendants have been able to "sell over 20 units [of Boost products] to date to

26   customers considering an AlterG unit." *Id.* ¶ 62.

27   B.    Procedural Background

28        After Defendants moved to dismiss the original complaint, the Court dismissed AlterG's

United States District Court
Northern District of California

3

Exhibit 1
-5-

Case 8:20-cv-00048-JVS-JDE   Document 181-1   Filed 09/04/20   Page 5 of 33   Page ID
#:12592
Case 3:18-cv-07568-EMC   Document 41   Filed 09/05/19   Page 4 of 32

claims with leave to amend.  *See* Order at 27–28.  The FAC presents two principal changes.  First, while the original complaint asserted that Defendants infringed five of AlterG's patents, the FAC alleges infringement of just one—U.S. Patent Number 7,591,795 (the "'795 patent").  FAC ¶ 64.  Second, AlterG alleges that it has had to withdraw its infringement claims with respect to one patent, U.S. Patent Number 10,004,656 ("the '656 patent"), because Defendants argued in their first motion to dismiss that the '656 patent was invalid in light of its public disclosure before the patent application was filed.  *Id.* ¶ 27.  According to Defendants, Whalen gave a journalist a demo of AlterG's P200/G-Trainer treadmill, the subject of the '656 patent, and the journalist then featured the machine in an online article on August 18, 2006, more than a year before AlterG filed the application for the patent.  *Id.*  AlterG now alleges that "Allen and Whalen kept the information about the online article quiet and as an insurance policy so they could use the information later to invalidate the '656 patent . . . , just in case the patent was asserted against them for developing and selling an infringing product through Boost."  *Id.*  AlterG's breach of fiduciary duty claim against Whalen is based in part on these allegations.  *Id.* ¶ 78.

## II.      LEGAL STANDARD

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief."  A complaint that fails to meet this standard may be dismissed pursuant to Rule 12(b)(6).  Fed. R. Civ. P. 12(b)(6).  To overcome a Rule 12(b)(6) motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (internal quotation marks omitted).  The Supreme Court has noted that, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Id.* (internal quotation marks omitted).

Exhibit 1
-6-

Case 8:20-cv-00048-JVS-JDE   Document 181-1   Filed 09/04/20   Page 6 of 33   Page ID
#:12593
Case 3:18-cv-07568-EMC   Document 41   Filed 09/05/19   Page 5 of 32

1    On a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the complaint as true

2    and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St.*

3    *Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). The Court need not, however,

4    "assume the truth of legal conclusions merely because they are cast in the form of factual

5    allegations." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (per curiam) (internal

6    quotation marks omitted). Thus, "a Plaintiff's obligation to provide the 'grounds' of his

7    'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the

8    elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*,

9    478 U.S. 265, 286 (1986)). The Court also "need not . . . accept as true allegations that contradict

10   matters properly subject to judicial notice or by exhibit." *Sprewell v. Golden State Warriors*, 266

11   F.3d 979, 988 (9th Cir. 2001).

12   Claims sounding in fraud or mistake are subject to the heightened pleading requirements of

13   Federal Rule of Civil Procedure 9(b), pursuant to which a plaintiff alleging fraud "must state with

14   particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To comply with this

15   heightened pleading standard, the plaintiff must allege the "who, what, when, where, and how" of

16   the alleged fraud. *Vess v. Ciba-Geigy Corp. USA,* 317 F.3d 1097, 1106 (9th Cir. 2003).

17                              **III.    DISCUSSION**

18   Defendants again move to dismiss all of AlterG's claims.

19   A.    Patent Infringement

20          1.    Direct Infringement

21   AlterG alleges that Defendants directly, indirectly, and willfully infringed the '795 patent,

22   which is titled "System, Method and Apparatus for Applying Air Pressure on a Portion of the

23   Body of an Individual." FAC, Exh. N ('795 patent). Defendants argue that the infringement

24   claim should be dismissed because AlterG has failed to allege how Boost's accused products

25   infringe on a claim-by-claim, element-by-element basis. *See* Mot. at 4. As the Court explained in

26   its prior Order, a direct infringement claim "does not satisfy the standards of *Twombly* and *Iqbal*

27   where it does not at least contain factual allegations that the accused product practices every

28   element of at least one exemplary claim." *Novitaz, Inc. v. inMarket Media, LLC*, No. 16-CV-

United States District Court
Northern District of California

5

**Exhibit 1**
**-7-**

Case 8:20-cv-00048-JVS-JDE   Document 181-1   Filed 09/04/20   Page 7 of 33   Page ID
#:12594
Case 3:18-cv-07568-EMC   Document 41   Filed 09/05/19   Page 6 of 32

1    06795-EJD, 2017 WL 2311407, at *3 (N.D. Cal. May 26, 2017).  Here, AlterG has appended to

2    the FAC a "preliminary infringement claim chart" comparing the accused products to the

3    limitations of claims 1-6, 8-10, 20-22, 27, 30-34, 36-38, 46, 48, and 51 of the '795 patent.  FAC ¶

4    68; *see* FAC, Exh. O (claim chart).

5         Defendants contend that AlterG has not plausibly alleged that the accused products

6    practice one particular element of Claim 1—a method for "generating a relationship between

7    pressure [inside the treadmill chamber] and actual weight of the individual" treadmill user.  '795

8    patent, 8:43–44.  This argument is unpersuasive.

9         As an initial matter, Defendants are incorrect to assert that infringement *allegations* must

10   meet the standard of specificity applied to infringement *contentions* under this district's Patent

11   Local Rules simply because the complaint references a claim chart that conforms to Patent Local

12   Rule 3-1(c).  Rule 3-1(c) requires a plaintiff to provide a chart "identifying specifically where and

13   how each limitation of each asserted claim is found within each Accused Instrumentality[.]"  The

14   purpose of Rule 3-1 is "to require a plaintiff to crystalize its theory of the case and patent

15   claims."  *Finjan, Inc. v. Check Point Software Techs., Inc.*, No. 18-CV-02621-WHO, 2019 WL

16   955000, at *5 (N.D. Cal. Feb. 27, 2019) (citation omitted).  It therefore "requires exacting

17   identification of the accused instrumentalities and how those instrumentalities read on the alleged

18   claim limitations."  *Grecia v. Apple Inc.*, No. C-14-0775 EMC, 2014 WL 4685195, at *1 (N.D.

19   Cal. Sept. 19, 2014).  Accordingly, courts have held that "[a]t the Patent Local Rule 3-1

20   Disclosure stage, a plaintiff must put forth information so specific that either reverse engineering

21   or its equivalent is required."  *Finjan*, 2019 WL 955000, at *5.  But at present, Defendants are not

22   challenging AlterG's infringement contentions.  They are attacking the sufficiency of AlterG's

23   *pleadings* under Rule 12(b)(6), which requires a complaint to allege "sufficient factual matter . . .

24   to state a claim to relief that is *plausible* on its face."  *Iqbal*, 556 U.S. at 678 (emphasis added); *see*

25   *Novitaz*, 2017 WL 2311407, at *2 (explaining that under Rule 12(b)(6), courts "assess[] the

26   sufficiency of claims for direct patent infringement under the standard set forth

27

28

United States District Court
Northern District of California

6

Exhibit 1
-8-

in *Twombly* and *Iqbal*").  Infringement contentions generally follow the pleading stage.[1]  In any event, the FAC incorporates the infringement contentions already exchanged in this case.

In the FAC, which incorporates the claims chart, AlterG has plausibly alleged that the accused products "generat[e] a relationship between pressure and actual weight of the individual." '795 patent, 8:43–44.  The claim chart cites a section from the Boost One training manual describing that product's "calibrated" mode:



FAC, Exh. O at 6 (highlights in original).  The claim chart also quotes a Boost video touting the Boost One's "incremental off-weighting" capabilities, which "create[] a bespoke workout or rehab session for your personal goals and objectives."  *Id.*  These materials indicate that the Boost One features a "weight control function" that gives the user "the ability fine tune air pressure" inside the treadmill chamber based on the user's "body weight," "in 1% increments."  In other words, they plausibly describe a system that "generat[es] a relationship between pressure" inside the treadmill and the "actual weight of the individual," as the '795 patent claims.

Defendants next protest that AlterG cannot now allege that the accused products adjust air pressure in relation to user weight after alleging in its original complaint that "the Boost One [does] not calibrate to specific user's actual weight and volume dimensions like the AlterG DAP systems."  Docket No. 1 ¶ 44.  Defendants believe this earlier allegation is a "judicial admission" that is binding on AlterG.  Mot. at 5.  Judicial admissions are "formal admissions in the pleadings

---

[1] It would make little sense to subject a complaint to the Rule 3-1 standard since courts have rejected the contention that "a formal charting of patent claim elements against each accused product is always necessary" at the pleading stage.  *Novitaz*, 2017 WL 2311407, at *3.

United States District Court
Northern District of California

Exhibit 1
-9-

1    which have the effect of withdrawing a fact from issue and dispensing wholly with the need for

2    proof of the fact." *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988) (citation

3    omitted).  The principle applies only to "factual allegations in a complaint, and not legal

4    conclusions." *Nat'l Abortion Fed'n v. Ctr. for Med. Progress*, 134 F. Supp. 3d 1199, 1205 (N.D.

5    Cal. 2015).

6           AlterG claims that its earlier statement that the Boost One does *not* calibrate to a user's

7    actual weight merely expressed AlterG's belief that "as tested, Boost One failed to accurately

8    calibrate to a specific user's actual weight."  Opp. at 7.  Put differently, AlterG was not alleging

9    that the Boost One does not operate by generating a relationship between pressure and user

10    weight, but rather that it does a poor job of generating the relationship.  Because

11    "[a] judicial admission must be deliberate, clear, and unambiguous," *Lam Research Corp. v.*

12    *Schunk Semiconductor*, 65 F. Supp. 3d 863, 870 (N.D. Cal. 2014) (citation omitted), and the Court

13    finds the allegation at issue to be ambiguous, it accepts AlterG's explanation for the apparent

14    inconsistency between its two complaints.  *See Nat'l Abortion Fed'n*, 134 F. Supp. 3d at 1206

15    ("Trial courts have discretion to accept or reject a judicial admission." (citing *Singer v. State Farm*

16    *Mut. Auto. Ins. Co.*, 116 F.3d 373, 376 (9th Cir. 1997)).  Of course, AlterG has a duty under Rule

17    11 to make factual contentions with evidentiary support, and if it is later determined that AlterG

18    knowingly mischaracterized the functioning of the Boost One, it can be subject to sanctions.

19           Defendants' remaining arguments for dismissal of the infringement claim raise factual

20    disputes about how Boost products actually work.  *See, e.g.*, Mot. at 5 ("[T]here is no weight scale

21    of any kind (e.g. a load cell) that measures the actual weight of the individual [in the accused

22    products].");  Docket No. 39 ("Reply") at 3 n.6 ("Boost uses an assumed or designated weight

23    based only on short size and the rack height adjustment.").  Defendants strongly emphasized these

24    points during the hearing on the motion.  However, such disputes are inappropriate for resolution

25    at the pleading stage, where the Court must accept AlterG's well-pleaded factual allegations as

26    true.  *See Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).[2]

27

28      [2] The Court also notes that the '795 Patent's reference to "actual weight" and whether that feature
is found in Boost One's products raise a matter that is likely subject to claims construction, a

United States District Court
Northern District of California

**Exhibit 1**
**-10-**

### 2.    Indirect and Willful Infringement

Defendants ask the Court to dismiss AlterG's indirect and willful infringement claims on the sole ground that the predicate direct infringement claim fails.  *See* Mot. at 8.  Because AlterG's direct infringement claim is adequately pleaded, its indirect and willful infringement claims also survive.

In sum, the Court finds that AlterG's direct, indirect, and willful infringement claims were sufficiently alleged.  Thus, the motion to dismiss is **DENIED** as to those claims, and any further refinement of the infringement claims will require claim construction.

### B.    Trade Secret Misappropriation

The FAC alleges that Defendants violated the Defend Trade Secrets Act ("DTSA") by misappropriating eight of AlterG's trade secrets.  *See* FAC ¶ 90.  Defendants argue that two of the eight trade secrets were not identified with sufficient particularity: the second, which is "the concept of retrofitting an existing commercial treadmill with an air based unweighting system," and the eighth, which is "AlterG's pricing and market strategy, especially with respect to price-sensitive accounts."  *Id.*

To state a claim for trade secret misappropriation under the DTSA, a plaintiff must allege that: "(1) the plaintiff owned a trade secret; (2) the defendant misappropriated the trade secret; and (3) the defendant's actions damaged the plaintiff."  *Alta Devices, Inc. v. LG Elecs., Inc.*, 343 F. Supp. 3d 868, 877 (N.D. Cal. 2018) (citation omitted).  As set forth in the Order, at the pleading stage, "[a] plaintiff need not spell out the details of the trade secret," but must "describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies."  *Id.* at 881 (citations, internal quotation marks, and alterations omitted).

### 1.    Second Trade Secret

Defendants' argument with respect to the second trade secret is not a challenge to the

---

matter not yet ripe in this litigation.

United States District Court
Northern District of California

Exhibit 1
-11-

United States District Court
Northern District of California

1    particularity of the pleading at all.  Rather, it is a challenge to the validity of the trade secret:

2    Defendants claim that "the concept of retrofitting an existing commercial treadmill with an air

3    based unweighting system . . . falls squarely within the prior art and therefore does not qualify as a

4    trade secret."  Mot. at 10.

5           ""[I]t is well established that disclosure of a trade secret in a patent places the information

6    comprising the secret into the public domain.  Once the information is in the public domain and

7    the element of secrecy is gone, the trade secret is extinguished."  *Ultimax Cement Mfg. Corp. v.*

8    *CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1355 (Fed. Cir. 2009) (citation and internal quotation

9    marks omitted).  Defendants contend that AlterG made its purported trade secret public on June

10   18, 2015, when it filed a patent application titled "Pressure Chamber and Lift for Differential Air

11   Pressure System with Medical Data Collection Capabilities."  Docket No. 37-1, Exh. 5.[3]  In the

12   background section of the application, AlterG wrote that "Differential Air Pressure (DAP) partial

13   unweighting systems have typically comprised an OEM ['original equipment manufacturer']

14   treadmill enclosed in a flexible bag that applies air pressure to the lower portion of the user's

15   body."  *Id.* ¶ 0007.  According to Defendants, this sentence concedes that "DAP treadmill systems

16   typically employ 'the concept of retrofitting an existing commercial treadmill with an air based

17   unweighting system,' and what AlterG alleges as its trade secret is indisputably in the public

18   domain."  Mot. at 10.  AlterG counters that "'retrofitting an existing commercial treadmill' is an

19   entirely different concept than incorporating an OEM treadmill in an unweighting system.  The

20   latter requires the OEM treadmill to be a necessary component of a fully functioning and specified

21   system (like the Woodway OEM treadmill incorporated in Boost One); whereas the former refers

22   to additions and improvements to a user's existing exercise equipment."  Opp. at 9.  AlterG thus

23   argues its trade secret was not publicly disclosed through the 2015 patent application.

24          The Court finds that as alleged in the FAC, constructing an air-based unweighting system

25   such as Boost One may involve methods and technology similar to prior art which addresses

26

27   [3] Defendants asked the Court to take judicial notice of this exhibit.  AlterG did not oppose the request.  The Court can and does take judicial notice of the "patent application because [it is a] publicly available . . . government record[]."  *GeoVector Corp. v. Samsung Elecs. Co.*, 234 F.

28   Supp. 3d 1009, 1016 n.2 (N.D. Cal. 2017) (citation and internal quotation marks omitted).

Exhibit 1
-12-

retrofitting such a system.  It is not readily apparent what material differences there are between retrofitting and use of an OEM treadmill.  Accordingly, AlterG's misappropriation of trade secrets claim as it pertains to the second trade secret demands a greater degree of specificity than was presented in the FAC.

        2.    <u>Eighth Trade Secret</u>

Defendants also argue that AlterG's eighth trade secret, described as "AlterG's pricing and market strategy, especially with respect to price-sensitive accounts," is not alleged with sufficient particularity.  Mot. at 11.

The Court dismissed AlterG's trade secret allegations from the original complaint regarding "its marketing and product strategy, cost strategies, [and] customer needs" for lacking sufficient specificity.  Order at 9–10 (quoting Docket No. 1 ¶ 102).  In doing so, the Court relied on *Vendavo, Inc. v. Price f(x) AG*, No. 17-CV-06930-RS, 2018 WL 1456697 (N.D. Cal. Mar. 23, 2018).  In *Vendavo*, the court dismissed claims regarding trade secrets characterized as "pricing information, vendor lists and related information, [and] marketing plans" because the claims were only "set out . . . in broad, categorical terms."  *Id.* at *3–4.  The Court's prior concern about AlterG's original allegations arose from their vagueness as to technical matters, which are more complex to begin with and therefore warrant greater specificity.  *See* Order at 10 (noting that the purported trade secrets "are not tethered to a specific technology; it cannot be discerned which aspects of AlterG's 'anti-gravity rehabilitation and training units' the information pertains to").  Pricing and marketing strategy, by contrast, are less technical, and their description does not demand the same level of specificity that applies to technical matters.  *Alta Devices*, 343 F. Supp. 3d at 877.  Pricing and marketing strategies tied to specific products are typical trade secrets.  The Court finds that the claim for misappropriation of the eighth trade secret is adequately pleaded.

Accordingly, the motion to dismiss is **GRANTED** as to AlterG's second trade secret claim and **DENIED** as to AlterG's eighth trade secret misappropriation claim.

C.    <u>Breach of Contract</u>

AlterG's alleges that Defendants breached several of their contracts with AlterG.  The Court dismissed the breach of contract claims from the original complaint because AlterG merely

United States District Court
Northern District of California

11

Exhibit 1
-13-

Case 8:20-cv-00048-JVS-JDE   Document 181-1   Filed 09/04/20   Page 13 of 33   Page ID
#:12600
Case 3:18-cv-07568-EMC   Document 41   Filed 09/05/19   Page 12 of 32

alluded to the underlying contracts without attaching them or identifying their essential terms.  *See* Order at 11–19.  AlterG has now attached the contracts to the FAC: five agreements between Whalen and AlterG (FAC, Exhs. A–E), four between Allen and AlterG (FAC, Exhs. F–I), and three between Bean and AlterG (FAC, Exhs. J–L).

Defendants argue that many of these contracts are no longer valid or enforceable because they have been superseded due to integration clauses in more recent agreements, as summarized in the chart below:

|  | Superseded | Superseded By or Latest |
|---|---|---|
| Whalen Agreements | July 11, 2005 (FAC Exh. A)<br>Dec. 27, 2007 (FAC Exh. B)<br>August 7, 2008 (FAC Exh. C)<br>June 30, 2010 (FAC Exh. D) | April 1, 2012.  (FAC Exh. E) |
| Allen Agreements | January 26, 2007 (FAC Exh. F)<br>August 7, 2008 (FAC Exh. G)<br>April 16, 2012 (FAC Exh. H) | July 28, 2013 (FAC Exh. I) |
| Bean Agreements | June 15, 2009 (FAC Exh. J)<br>June 18, 2009 (FAC Exh. K) | August 10, 2016 (FAC Exh. L) |

Mot. at 12.

1.  Breach of Confidentiality

AlterG alleges that Whalen, Allen, and Bean all breached confidentiality provisions in their contracts with AlterG.  *See* FAC ¶ 82.  Defendants argue that the confidentiality provision in each Individual Defendant's most recent agreement superseded the confidentiality provisions in their earlier agreements, so AG's claims based on the earlier agreements must be dismissed.

a.  Whalen's Agreements

Under California law, "[t]he crucial issue in determining whether there has been an integration [that supersedes prior contracts] is whether the parties intended their writing to serve as the exclusive embodiment of their agreement."  *Grey v. Am. Mgmt. Servs.*, 204 Cal. App. 4th 803, 807 (2012) (citation omitted).  "The existence of an integration clause is a key factor in divining that intent."  *Id.*  The integration clause in the 2012 Whalen agreement provides:

> This Agreement constitutes the entire agreement of the parties with respect to its subject matter, superseding all prior oral and written communications, proposals, negotiations, representations,

12

Exhibit 1
-14-

United States District Court
Northern District of California

Case 8:20-cv-00048-JVS-JDE   Document 181-1   Filed 09/04/20   Page 14 of 33   Page ID
#:12601
Case 3:18-cv-07568-EMC   Document 41   Filed 09/05/19   Page 13 of 32

1    understandings, courses of dealing, agreements, contracts, and the
     like between the parties in such respect.

2    FAC, Exh. E § 7(e).

3         AlterG contends that the "with respect to its subject matter" language in this clause is key,

4    because the 2012 Whalen agreement covers different subject matter than his earlier agreements,

5    and thus does not supersede the earlier agreements. Opp. at 13. Specifically, the 2012 agreement

6    governed Whalen's relationship with AlterG during the time he was a consultant, whereas the

7    2005 and 2008 agreements governed the period when Whalen was AlterG's employee.

8         The 2012 agreement is explicitly titled "Consultant Agreement," and it governed "the

9    services of [Whalen] as a consultant to [AlterG]." FAC, Exh. E at 1. The confidentiality

10   provision therein requires Whalen to "agree that he will not, *during the Consultation Period* or at

11   any time thereafter, disclose . . . any Proprietary Information or Inventions." *Id.* § 4(a) (emphasis

12   added). "Proprietary Information or Inventions" is in turn defined as "[a]ll inventions . . . made,

13   conceived, written, designed or developed by the Consultant in the course of the performance of

14   services hereunder." *Id.* § 5(a). Accordingly, the subject matter of the 2012 agreement is

15   Whalen's duty of confidentiality in connection with his work as a *consultant* to AlterG. In

16   contrast, the 2005 and 2008 agreements provide that "[Whalen's] *employment* creates a

17   relationship of confidence and trust between [him] and the Company with respect to Proprietary

18   Information." FAC, Exh. A § 1 (emphasis added); *see* FAC, Exh. C. Under those agreements,

19   Whalen is bound not to disclose any of AlterG's proprietary information "during [his] *employment*

20   by the company." FAC, Exh. A § 3.a. (emphasis added). The subject matter of the 2005 and 2008

21   agreements is thus Whalen's duty of confidentiality in connection with his work as an *employee* of

22   AlterG. The 2012 Agreement therefore does not pertain to the same "subject matter."

23        Defendants disagree, arguing that because all three agreements address confidentiality,

24   they cover the same "subject matter." Reply at 8. In contesting the scope of the term "subject

25   matter," the parties cite *Cione v. Foresters Equity Servs., Inc.*, 58 Cal. App. 4th 625 (1997), and

26   *Jenks v. DLA Piper Rudnick Gray Cary US LLP*, 243 Cal. App. 4th 1 (2015). In *Cione*, a

27   securities industry employee (Cione) entered into an agreement with the National Association of

28   Securities Dealers ("NASD") in which he agreed to arbitrate any disputes with his employer. 58

United States District Court
Northern District of California

13

Exhibit 1
-15-

Case 8:20-cv-00048-JVS-JDE   Document 181-1   Filed 09/04/20   Page 15 of 33   Page ID
#:12602
Case 3:18-cv-07568-EMC   Document 41   Filed 09/05/19   Page 14 of 32

United States District Court
Northern District of California

1   Cal. App. 4th at 630.  Subsequently, Cione and his employer (FESCO) entered into an

2   employment agreement that did not contain an arbitration clause.  *Id.* at 630–31.  FESCO, as a

3   third-party beneficiary of the arbitration clause in the NASD agreement, sought to arbitrate a

4   dispute with Cione.  Cione opposed, arguing that his employment contract with FESCO included

5   an integration clause and thus superseded the NASD arbitration clause.  The court rejected Cione's

6   position because "the scope of the integration clause was 'limited' to the 'subject matter

7   contained' in the written employment agreement," and the employment agreement did not "refer

8   to Cione's . . . arbitration agreement with NASD or otherwise make any mention of arbitration."

9   *Id.* at 637–38.  The subject matter of the two contracts was therefore not the same.

10          In *Jenks*, the defendant (DLA Piper) moved to compel arbitration of a dispute with a

11   former employee (Jenks) pursuant to an arbitration clause contained in the offer letter Jenks signed

12   when he started the job.  243 Cal. App. 4th at 5.  Jenks opposed, arguing that the termination

13   agreement he signed when he left DLA Piper superseded the offer letter.  *Id.* at 15.  The court held

14   that the termination agreement did not supersede the offer letter because, as in *Cione*, the

15   integration clause in the termination agreement was "explicitly limited to 'the subject matter

16   hereof,'" and the termination agreement "d[id] not mention arbitration at all" or dispute resolution

17   generally.  *Id.* at 15–16 (citing *Cione*, 58 Cal. App. 4th at 639).

18          Defendants read *Cione* and *Jenks* to mean that "subject matter" refers to the type of

19   provision in a contract, *i.e.*, if one contract contains an arbitration provision and another does not,

20   they do not concern the same subject matter.  Accordingly, Defendants reason, Whalen's 2005,

21   2008, and 2012 agreements all contain confidentiality provisions and thus have the same "subject

22   matter."  *Cione* and *Jenks* are inapposite.  In those cases, the plaintiff was an employee of the

23   defendant throughout their relationship; neither court addressed the precise question that is

24   relevant here: whether a confidentiality provision in a *consultant* contract supersedes a

25   confidentiality provision in an *employment* contract.

26          A more recent decision sheds light on that question.  In *Oxford Preparatory Academy v.

27   Edlighten Learning Solutions*, 34 Cal. App. 5th 605 (2019), the parties entered into a termination

28   agreement on June 17, 2016 that ended a preexisting management services agreement between

14

Exhibit 1
-16-

Case 8:20-cv-00048-JVS-JDE   Document 181-1   Filed 09/04/20   Page 16 of 33   Page ID
#:12603
Case 3:18-cv-07568-EMC   Document 41   Filed 09/05/19   Page 15 of 32

1  them. *Id.* at 607. The court held that the termination agreement did not supersede the

2  management services agreement because they concerned different subject matters: the former

3  prescribed the parties' "rights and obligations . . . after June 17, 2016" whereas the latter

4  prescribed their "rights and obligations . . . before June 17, 2016." *Id.* at 610. *Oxford Preparatory*

5  instructs that "the 'subject matter' of [an] agreement" refers to the "rights and obligations" of the

6  parties to the agreement. *Id.* at 611.

7        The 2012 Whalen agreement set forth his rights and obligations during the period he

8  worked as a consultant. In contrast, the 2005 and 2008 agreements set forth his rights and

9  obligations during the time he was AlterG's employee. Thus, the 2012 Agreement involves a

10  different 'subject matter' from the 2005 and 2008 agreements, and it does not "waive, extinguish,

11  excuse, or release any right or obligation of either party arising prior to" Whalen's work as a

12  consultant. Accordingly, the 2012 agreement did not supersede the 2005 and 2008 agreements,

13  and—as a result—the Court rejects Defendants' contention that any claims based on the earlier

14  agreements must be dismissed.

15               b.    <u>Allen's and Bean's Agreements</u>

16        The 2013 Allen agreement and the 2016 Bean agreement contain identical integration

17  clauses, which provide:

18             This Agreement together with the Exhibits herein and any executed
19             written offer letter between me and the Company, to the extent such
           materials are not in conflict with this Agreement, sets forth the
20             entire agreement and understanding between the Company and me
           with respect to the subject matter herein and supersedes all prior
21             written and oral agreements, discussions, or representations between
           us, including, but not limited to, any representations made during
22             my interview(s) or relocation negotiations.

23  FAC, Exh. I § 16(C); FAC, Exh. L § 16(C).

24        AlterG maintains that these agreements did not supersede Allen's and Bean's earlier

25  agreements, although not on the ground that the subject matter differed (there is no dispute that all

26  of their agreements were employment agreements). Instead, AlterG contends that "[t]here is

27  nothing inconsistent between the various agreements with respect to Defendants' non-disclosure

28  obligations, and therefore nothing to supersede." Opp. at 14. However, AlterG does not elaborate

15

Exhibit 1
-17-

United States District Court
Northern District of California

Case 8:20-cv-00048-JVS-JDE   Document 181-1   Filed 09/04/20   Page 17 of 33   Page ID
#:12604
Case 3:18-cv-07568-EMC   Document 41   Filed 09/05/19   Page 16 of 32

further on this argument, and cites no legal authority for the proposition that an integration clause has no effect on a consistent contract. Perhaps AlterG is attempting to invoke the principle that "[e]vidence would be properly admissible 'to prove the existence of a separate . . . agreement as to any matter on which [a contract] is silent and is not inconsistent with its terms' . . . even though the [contract] appeared to state a complete agreement." *Cione*, 58 Cal. App. 4th at 639 (quoting *Masterson v. Sine*, 68 Cal. 2d 222, 226 (1968). But the most recent Allen and Bean agreements are not silent on the matter of confidentiality, *Cione* is distinguishable.

AlterG offered no persuasive explanation as to why the integration clause does not apply to Allen's and Bean's earlier agreements. The Court finds those agreements superseded, and therefore directs AlterG to plead their breach-of-confidentiality claims with reference to the superseding agreements.

2.  <u>Breach and Damages</u>

Defendants argue that AlterG's breach of confidentiality claims fail for the independent reason that the FAC does not sufficiently plead how Defendants breached their duty of confidentiality and what damage it caused to AlterG. Mot. at 15.

Defendants first claim that AlterG failed to plead "what specific confidential information [disclosed by Defendants] in fact was integrated into the Boost One." *Id.* Contrary to Defendants' contention, the FAC explicitly alleges that Defendants "have taken and used" the following AlterG trade secrets "in developing, making, and marketing . . . the Boost One treadmills": "(1) the concept of optional calibration and the use of parameters such as height and waist/shorts size as a proxy for DAP control in an air based unweighting system; (2) the concept of retrofitting an existing commercial treadmill with an air based unweighting system; (3) the vendor and model of the blower used in AG4 prototypes; (4) the control algorithm, at least at the block diagram level, for the blower used in AG4 prototypes; (5) the layout and build of the electronic packages on the circuit boards for the blower used in AG4 prototypes for DAP control; [and] (6) AlterG DAP bag design and construction/assembly, including the selection of the panel design, selection of the materials for the panels, construction and assembly techniques, and the selection of the designer and manufacturer for the bag." FAC ¶ 90.

16

Exhibit 1
-18-

Case 8:20-cv-00048-JVS-JDE   Document 181-1   Filed 09/04/20   Page 18 of 33   Page ID
#:12605
Case 3:18-cv-07568-EMC   Document 41   Filed 09/05/19   Page 17 of 32

United States District Court
Northern District of California

1    Defendants next claim that AlterG failed to explain how the alleged disclosure of

2    confidential information from the LCPP caused damages, given that AlterG admits the LCPP was

3    "not commercialized." FAC ¶ 59. The Court already considered and rejected this argument when

4    Defendants made it on their first motion to dismiss. AlterG's damages theory does not hinge on

5    the commercialization of the LCPP. Rather, the FAC alleges that AlterG suffered monetary

6    damages because Defendants used confidential information from the LCPP to develop and sell

7    over 20 units of the Boost One "to customers considering an AlterG unit." FAC ¶ 62; *see* Order at

8    13–14. AlterG has thus adequately pleaded damages.

9         3.    Whalen's Breach of Obligation to Obtain and Maintain AlterG's Patents

10   AlterG also alleges that under his 2005 and 2008 employee agreements, "Whalen agreed to

11   perform, during and after his employment, all acts necessary to permit and assist AlterG in

12   obtaining and maintaining valid and enforceable patents and other rights on the inventions that he

13   developed during his employment with AlterG." FAC ¶ 78. AlterG believes Whalen breached

14   this obligation "by not disclosing crucial information relating to the patentability of the '656

15   patent and related patent applications" (*i.e.*, by not alerting AlterG that a journalist had written

16   publicly about the '656 patent before the patent application was submitted). *Id.* ¶ 82. Defendants

17   ask the Court to dismiss the claim on the ground that Whalen's 2005 and 2008 agreements were

18   superseded by his 2012 agreement. Mot. at 14. Defendants' argument is unavailing because, as

19   discussed above, the subject matter of Whalen's 2012 consultant agreement was not the same as

20   that of his 2005 and 2008 employment agreements. Whalen was bound under his 2005 and 2008

21   agreements "to perform, *during and after [his] employment*, all acts deemed necessary or desirable

22   by the Company to permit and assist it . . . in obtaining, maintaining, defending and enforcing

23   patents." FAC, Exh. A (emphasis added). AlterG adequately alleges a breach of the 2005 and

24   2008 employee agreements.

25        4.    Allen's and Bean's Breach of Non-Compete Provisions

26   Under Allen's and Bean's employment agreements, each agreed that "during his

27   employment with AlterG, he would not engage in any activity that was competitive with AlterG's

28   business or proposed business." FAC ¶¶ 79, 80. AlterG alleges that they breached this non-

17

**Exhibit 1**
**-19-**

Case 8:20-cv-00048-JVS-JDE   Document 181-1   Filed 09/04/20   Page 19 of 33   Page ID
#:12606
Case 3:18-cv-07568-EMC   Document 41   Filed 09/05/19   Page 18 of 32

1   compete agreement.  *Id.* ¶ 82.  Defendants argue that any attempt "to enforce a non-compete

2   provision post-employment" is presumptively unenforceable in California.  Mot. at 15.

3        Defendants are correct that *post*-employment non-compete provisions are generally

4   unenforceable under California law.  In *Muggill v. Reuben H. Donnelley Corp.*, 62 Cal. 2d 239

5   (1965), the California Supreme Court held that California Business & Professions Code § 16600

6   "invalidates provisions in employment contracts prohibiting an employee from working for a

7   competitor *after* completion of his employment." *Id.* at 242 (emphasis added).  But that rule has

8   no relevance here, because AlterG alleges only that the employment agreements barred Allen and

9   Bean from competing with AlterG "*during* [their] employment with AlterG," and that they

10   breached the agreements "by directly competing with or engaging in activities that were

11   competitive with AlterG's business or proposed business *during* their employment with AlterG."

12   FAC ¶¶ 79, 80, 82 (emphases added).

13        Moreover, "[c]ourts have found an exception to section 16600 . . . where the agreement is

14   'necessary to protect the employer's trade secrets' or confidential information." *E.D.C. Techs.,*

15   *Inc. v. Seidel*, 216 F. Supp. 3d 1012, 1015 (N.D. Cal. 2016) (quoting *Muggill*, 62 Cal. 2d at 242).

16   AlterG's allegations in this case center around Allen's and Bean's unauthorized disclosure of

17   AlterG's trade secrets and proprietary information, so California's general prohibition against non-

18   compete agreements would not bar the existence of the specific agreement here. *See id.* at 1015–

19   16 (plaintiff adequately pled the existence of a contract, notwithstanding a non-compete provision,

20   where "[m]any of the facts alleged in the amended complaint center around [defendant's]

21   unauthorized use of [plaintiff's] 'intellectual property and confidential information'").

22        In sum, the Court **GRANTS** the motion to dismiss AlterG's breach of contract claim to the

23   extent it arises from Allen's superseded contracts (from 2007, 2008, and 2012) and Bean's

24   superseded contracts (from June 15, 2009 and June 18, 2009), but **DENIES** the motion otherwise.

25   D.    <u>Breach of Fiduciary Duty</u>

26        The FAC alleges that Whalen, as a co-founder and director of AlterG, owed a fiduciary

27   duty to AlterG and breached it by disclosing AlterG's proprietary information to Boost and by

28   undermining AlterG's efforts to secure and maintain its '656 patent.  FAC ¶¶ 110, 113.

United States District Court<br>Northern District of California

18

Exhibit 1
-20-

United States District Court
Northern District of California

1   Defendants first argue that Whalen's 2012 consultant agreement superseded all of his

2   earlier agreements—out of which his fiduciary duties to AlterG arose—and therefore his breach of

3   fiduciary duty claim has no contractual basis.  Mot. at 16–17.  This argument fails because, as

4   discussed in the previous section, Whalen's 2012 agreement did not supersede his earlier

5   agreements with AlterG.  To the extent that Defendants argue that Whalen's fiduciary duty is

6   abrogated by the superseding of his confidentiality agreements, Defendants' argument fails

7   because, as discussed in the previous section, Whalen's 2012 agreement did not supersede his

8   earlier agreements with AlterG.

9   Defendants next challenge the factual plausibility of AlterG's account of Whalen's actions

10   in connection with the '656 patent.  According to the FAC:

11   24. On August 2, 2007, prior to filing the provisional applications on
12   October 15, 2007 that resulted in the issuance of [the '656 patent],
     AlterG's patent counsel asked Whalen "when you started to sell
13   machines with the current support bar and saddle bar shape," and
     advised Whalen that "[w]e can only file patents on what is not
14   disclosed to the public and on what was disclosed to the public
     within one year."

15   25. In response, Whalen did not answer the question directly or
16   advise the patent counsel of any public disclosure of the invention,
     but asked: "if we sold our first unit 11 months ago, will a
17   provisional still lock our invention date? What date will that be?"
     Based on Whalen's response, patent prosecution that resulted in the
18   issuance of the '656 patent proceeded under the assumption that
     there was no prior public use of the inventions. . . .

19   26. The '656 patent issued on June 26, 2018. On information and
20   belief, during the pendency of the patent application that issued as
     the '656 patent or its parent patent applications, Whalen never
21   advised AlterG or its patent counsel of any public disclosure by
     Whalen that could have rendered the '656 patent invalid.

22   27. Only after AlterG filed its original complaint against
23   Defendants, in which AlterG alleged infringement of the '656 patent
     by Defendant Boost, did Whalen and other Defendants claim for the
24   first time in their motion to dismiss that the '656 patent was invalid
     in view of a demo of AlterG's P200/G-Trainer treadmill, the subject
25   of the '656 patent, to a journalist, who then featured the machine in
     an online article on August 18, 2006. On information and belief,
26   Allen and Whalen kept the information about the online article quiet
     and as an insurance policy so they could use the information later to
27   invalidate the '656 patent . . . , just in case the patent was asserted
     against them for developing and selling an infringing product
28   through Boost.

19

Exhibit 1
-21-

28. As it turned out, unbeknownst to anyone currently employed at AlterG, at the invitation of and/or arranged by Whalen, a trail running blogger visited AlterG and tried the P200/G-Trainer on or about August 10, 2006, and published a blog post featuring the P200/G-Trainer a week later.

FAC ¶¶ 24–28.  Defendants call this account "entirely contrived."  Mot. at 17.  Seizing on AlterG's allegation that Whalen arranged the journalist's visit "unbeknownst to anyone currently employed at AlterG," Defendants question how AlterG could have "conjure[d] up [the] fantastic chain of events" described in the FAC.  *Id.*  But the contradiction between current employees lacking information about the visit and AlterG offering a detailed description of what allegedly occurred does not necessarily discredit AlterG's allegations; it is entirely possible, for example, that once AlterG was alerted to the journalist's 2006 visit by Defendants' first motion to dismiss, AlterG reached out to former employees to ascertain more facts about the visit.

There is more merit in Defendants' challenge to the allegation that "Allen and Whalen kept the information about the online article quiet and as an insurance policy so they could use the information later to invalidate the '656 patent . . . , just in case the patent was asserted against them for developing and selling an infringing product through Boost."  FAC ¶ 27.  As Defendants point out, it seems highly improbable that in 2007—when Whalen was still a director and board member of AlterG, and Boost's formation was still almost a decade away—Whalen harbored the intent to sabotage AlterG's patent application process in case he later joined a competing company.  Defendants believe that such an allegation about Whalen's state of mind is an "unwarranted deduction[] of fact" or "unreasonable inference[]" that the Court is not required to accept as true.  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).  The Court agrees.  The alleged sequence is farfetched and implausible.  *Cf. Starr v. Baca*, 652 F.3d 1202, 1216–17 (9th Cir. 2011) ("Plaintiff's complaint may be dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is *im*plausible.") (emphasis in original).

Nonetheless, this allegation may not be critical to AlterG's breach of fiduciary duty claim.  Whalen was bound under his employment agreements "to perform, during and after [his] employment, all acts deemed necessary or desirable by the Company to permit and assist it . . .  in

20

United States District Court
Northern District of California

Exhibit 1
-22-

1    obtaining, maintaining, defending and enforcing patents." FAC, Exh. A. Whalen's failure to

2    inform AlterG's patent counsel about the journalist's article on the P200/G-Trainer treadmill on its

3    own may have violated the duty he owed to AlterG, regardless of his motivations for doing so.

4    Notably, when Whalen spoke to AlterG's patent counsel on August 2, 2007, it was still less than

5    one year after the publication of the demo in the online article and the blog post.

6        Accordingly, the Court **DENIES** the motion to dismiss AlterG's breach of fiduciary duty

7    claim.

8    E.    Interference with Contract

9        AlterG alleges that Defendants interfered with three sets of AlterG's contracts: (1) its

10   confidentiality agreements with each Individual Defendant; (2) its confidentiality agreements with

11   Woodway; and (3) its contract with the University of Tennessee, a customer. FAC ¶¶ 116–22.

12   "The elements which a plaintiff must plead to state the cause of action for intentional interference

13   with contractual relations are (1) a valid contract between plaintiff and a third party; (2)

14   defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a

15   breach or disruption of the contractual relationship; (4) actual breach or disruption of the

16   contractual relationship; and (5) resulting damage." *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*,

17   50 Cal. 3d 1118, 1126 (1990). Defendants argue that AlterG's allegations are deficient as to the

18   Woodway and University of Tennessee contracts. Mot. at 18.

19       1.    Pleading Standard

20       The parties first dispute the pleading standard that governs the interference of contract

21   claim. Defendants urge the Court to apply the heightened standard for pleading fraud under Rule

22   9(b). Mot. at 19. Rule 9(b) requires that, "[i]n alleging fraud or mistake, a party must state with

23   particularity the circumstances constituting fraud or mistake." Defendants point out that AlterG is

24   seeking punitive damages for its interference with contract claim based on the allegation that

25   "Defendants committed the [interference] maliciously, fraudulently, and oppressively, with the

26   wrongful intention of injuring AlterG." FAC ¶ 123.

27       Fraud and malice are not essential elements of an interference with contract claim under

28   California law. *See Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 55–56 (1998)

21

Exhibit 1
-23-

Case 8:20-cv-00048-JVS-JDE   Document 181-1   Filed 09/04/20   Page 23 of 33   Page ID
#:12610
Case 3:18-cv-07568-EMC   Document 41   Filed 09/05/19   Page 22 of 32

1    (holding that "it is not necessary that the defendant's conduct be wrongful apart from the

2    interference with the contract itself," so "[i]ntentionally inducing or causing a breach of

3    an existing contract" is "not an element of the tort").  Thus, "the heightened pleading standard

4    under Rule 9(b) generally does not apply to claims of intentional interference with contracts."

5    *Fabian v. Seto*, No. SACV15856JLSDFMX, 2015 WL 12683812, at *6 n.3 (C.D. Cal. Oct. 6,

6    2015).  But Rule 9(b) can apply even "[i]n cases where fraud is not a necessary element of a

7    claim."  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003).  For example, if a

8    plaintiff "allege[s] some fraudulent and some non-fraudulent conduct . . . . , only the allegations of

9    fraud are subject to Rule 9(b)'s heightened pleading requirements."  *Id.* at 1104.  And if a plaintiff

10   "allege[s] a unified course of fraudulent conduct and rel[ies] entirely on that course of conduct as

11   the basis of a claim . . . . [,] the pleading of that claim as a whole must satisfy the particularity

12   requirement of Rule 9(b)."  *Id.* at 1103–04.

13          Here, the FAC alleges that Defendants' interference with AlterG's contracts formed a

14   unified course of fraudulent conduct.  *See* FAC ¶ 123 ("Defendants committed the aforementioned

15   acts maliciously, fraudulently, and oppressively, with the wrongful intention of injuring AlterG . .

16   . ."), ¶ 142 (alleging that Boost representatives made false statements about AlterG to the

17   University of Tennessee).  Courts have evaluated interference with contract claims premised on

18   similar allegations under the Rule 9(b) standard.  *See, e.g.*, *United States v. Agbayani Constr.*

19   *Corp.*, No. 14-CV-02503-MEJ, 2014 WL 3866095, at *3 (N.D. Cal. Aug. 5, 2014) (plaintiff

20   sought punitive damages in connection with interference with contract claim based on allegations

21   of defendant's "willful, oppressive, and fraudulent" conduct).

22          AlterG cites two cases in which courts applied the regular Rule 8(a) pleading standard to

23   interference with contract claims.  Those cases are distinguishable because the acts of interference

24   there were not alleged to be fraudulent.  *See Seaman v. Valley Health Care Med. Grp., Inc.*, No.

25   CV098532DOCRNBX, 2011 WL 13213625, at *3 (C.D. Cal. Apr. 25, 2011); *Ordonez v. Saxon*

26   *Mortgages Servs., Inc.*, No. CVF 08-1148 LJO GSA, 2009 WL 395488, at *4 (E.D. Cal. Feb. 17,

27   2009).  The Court finds the Rule 9(b) standard to be appropriate here.  This means that AlterG's

28   allegations "must be accompanied by 'the who, what, when, where, and how' of the misconduct

United States District Court
Northern District of California

22

**Exhibit 1**
**-24-**

1    charged." *Vess*, 317 F.3d at 1106.

2         2.    <u>Woodway</u>

3         AlterG entered into a May 2007 confidentiality agreement with Woodway, under which

4    Woodway agreed that it "shall not use in any way, for [its] own account or the account of any third

5    party, nor disclose to any third party, any such confidential information which is revealed to it by

6    [AlterG]." FAC ¶ 199.  AlterG alleges that "Defendants, Whalen and Allen especially," knew of

7    this agreement and induced Woodway to breach it "to produce a competitive product based on the

8    confidential information it obtained from AlterG." *Id.*  Defendants contend this allegation is

9    deficient in three ways.

10        Defendants first argue that AlterG failed to allege the "who, what, when, where, and how"

11   of the interference with Woodway's confidentiality agreement.  Contrary to Defendants' claim,

12   AlterG has alleged the who, what and how: "Defendants, Whalen and Allen especially, induced

13   Woodway to breach the confidentiality agreement with AlterG" by "utilizing a Woodway

14   treadmill" to "create[] an anti-gravity unit that derived directly from the technology Whalen and

15   other AlterG engineers developed for AlterG in the Low Cost Platform Project." FAC ¶¶ 119, 46.

16   However, Defendants are correct that AlterG failed to specify when and where Whalen and Allen

17   induced Woodway to give up AlterG's proprietary technology.  The FAC only alleges in vague

18   fashion that "[u]nbeknownst to AlterG, Whalen and Allen started secretly working with Woodway

19   on developing a low-cost anti-gravity unit." FAC ¶ 46.  While Plaintiff may not yet have

20   information to know precise facts, it is not unreasonable to ask Plaintiff to allege the "when" and

21   "where" in as much detail as they can reasonably muster, based on at least some broader

22   parameters.

23        Defendants next contend that it is implausible for AlterG to allege that Defendants knew

24   about a confidentiality agreement with Woodway that dated all the way back to 2007.  Mot. at 19.

25   This is a strange argument to make, given that Whalen was with AlterG from its founding until

26   2015, and Allen was with the company from 2007 until 2015—and indeed was AlterG's "principal

27   liaison" to Woodway.  *See* FAC ¶¶ 19, 37, 40–43.  It is eminently plausible that they both would

28   have known about AlterG's 2007 contract with Woodway.

United States District Court
Northern District of California

23

Exhibit 1
-25-

1          Finally, Defendants argue that AlterG failed to allege the "actual . . . disruption of the

2   contractual relationship" and "resulting damage" elements of the interference with contract claim.

3   *Pac. Gas*, 50 Cal. 3d at 1126.  But this is not so.  AlterG alleged that "Whalen and Allen . . .

4   induced Woodway to breach the confidentiality agreement with AlterG to produce a competitive

5   product based on the confidential information it obtained from AlterG."  FAC ¶ 119.  AlterG has

6   also stated that Defendants have used the confidential information from Woodway to develop and

7   "sell over 20 [Boost] units to date to customers considering an AlterG unit."  *Id.* ¶ 62.  These

8   allegations are sufficient to establish actual disruption and resulting damages.

9          3.     University of Tennessee

10          AlterG alleges that in May 2018, AlterG won a bid to supply the University of Tennessee

11   with two anti-gravity treadmills.  FAC ¶ 120.  "However, in June 2018, after a person well

12   acquainted with Boost (and [who] later joined Boost) became involved in the University of

13   Tennessee's purchasing decision, and on information and belief, after Boost representatives made

14   contact with the University and made false representations about Boost capabilities and negative

15   libelous comments about AlterG, the University of Tennessee retracted the contract award to

16   AlterG and purchased two Boost One treadmills instead."  *Id.*

17          Defendants assert that AlterG merely won a bid with the University of Tennessee, which is

18   not a "valid contract" that is required for an interference with contract claim.[4]  *Pac. Gas*, 50 Cal.

19   3d at 1126.  It is true that AlterG did not explicitly allege it had entered into a complete contract

20   with the University of Tennessee.  But if inferences are drawn in AlterG's favor, it is plausible that

21   the University of Tennessee had a contractual obligation to purchase treadmills from whichever

22   vendor won the bidding process.  AlterG's claim thus will not be dismissed at this juncture.

23          Next, Defendants argue that AlterG failed to specify who made the false representations to

24   the University of Tennessee and what the false representations consisted of.  But the FAC alleges

25   that "sales representatives of the Boost One treadmill falsely told the University of Tennessee that

26   Woodway would stop selling treadmill[s] to AlterG."  FAC ¶ 142.  This specifies the "who"

27   ─────────────────────────

28   [4] Defendants did not make this argument in their motion, but raised it for the first time on reply.
    *See* Reply at 12.

United States District Court
Northern District of California

Exhibit 1
-26-

Case 8:20-cv-00048-JVS-JDE   Document 181-1   Filed 09/04/20   Page 26 of 33   Page ID
#:12613
Case 3:18-cv-07568-EMC   Document 41   Filed 09/05/19   Page 25 of 32

United States District Court
Northern District of California

1   (Boost sales representatives) and the "what" (the false statement that Woodway would stop

2   supplying AlterG with treadmills).  Defendants complain that the FAC is vague regarding the

3   identity of the "person well acquainted with Boost (and later joined Boost) [who] became involved

4   in the University of Tennessee's purchasing decision." FAC ¶ 120.  However, the identity of this

5   person does not appear to be material to AlterG's claim; it is the Boost sales representatives that

6   made the false representations at issue.

7          Accordingly, the Court **GRANTS** the motion to dismiss the interference with contract

8   claim with respect to Woodway **with leave to amend** with details of when and where Defendants

9   induced Woodway to breach its confidentiality agreement.  It **DENIES** the motion with respect to

10  the University of Tennessee.

11  F.     Interference with Prospective Economic Advantage

12         AlterG alleges that Defendants interfered with AlterG's prospective economic

13  relationships with Northwestern University and Woodway.[5]  *See* FAC ¶¶ 125–132.  The elements

14  of a claim for intentional interference with prospective economic advantage are: "(1) an economic

15  relationship between the plaintiff and some third person containing the probability of future

16  economic benefit to the plaintiff; (2) knowledge by the defendant of the existence of the

17  relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship;

18  (4) actual disruption of the relationship; and (5) damages to the plaintiff proximately caused by the

19  acts of the defendant." *Blank v. Kirwan*, 39 Cal. 3d 311, 330 (1985).

20         As with its interference with contract claim, AlterG's interference with prospective

21  economic advantage claim seeks punitive damages because AlterG alleges that "Defendants

22  committed the [interference] maliciously, fraudulently, and oppressively, with the wrongful

23  intention of injuring AlterG." FAC ¶ 133.  The claim therefore must also meet the pleading

24  requirements of Rule 9(b).

25

26

27  [5] The FAC also contains allegations that Defendants interfered with AlterG's relationship with
    Bear Fitness, a service vendor. *See* FAC ¶ 128.  However, AlterG clarifies in its opposition that
28  this allegation is "relevant to show Defendants' pattern of behavior," but is not a standalone claim
    for interference.  Opp. at 20 n.16.

25

Exhibit 1
-27-

Case 8:20-cv-00048-JVS-JDE   Document 181-1   Filed 09/04/20   Page 27 of 33   Page ID
#:12614
Case 3:18-cv-07568-EMC   Document 41   Filed 09/05/19   Page 26 of 32

1.    <u>Northwestern University</u>

The FAC alleges that:

> Defendants, especially Bean, knew that Northwestern University
> was a sales target of AlterG's. In or around late March 2017, shortly
> before his resignation from AlterG, Bean was involved in
> developing a pricing strategy for potentially obtaining the
> Northwestern University account. On information and belief,
> Defendants used the information Bean obtained and developed
> while at AlterG to formulate Boost's sales pitch to Northwestern
> University, resulting in Boost's very first sale of the Boost One
> treadmill.

FAC ¶ 126.

This claim fails because a mere "sales target" does not constitute "an economic

relationship . . . containing the probability of future economic benefit." *Blank*, 39 Cal. 3d at 330.

Courts have made clear that "[t]he law precludes recovery for overly speculative expectancies by

initially requiring proof" that it is "reasonably probable that the prospective economic advantage

would have been realized but for defendant's interference." *Westside Ctr. Assocs. v. Safeway

Stores 23, Inc.*, 42 Cal. App. 4th 507, 522 (1996).  The allegation that Northwestern University

was a "sales target" indicates only that AlterG wished to acquire the university as a customer, not

that a sale would probably have been realized.  In *Silicon Knights, Inc. v. Crystal Dynamics, Inc.*,

983 F. Supp. 1303 (N.D. Cal. 1997), the court dismissed an interference with prospective

economic advantage claim in similar circumstances.  The plaintiff there alleged interference with

its "reasonable expectation of trade and business relationships with . . . prospective customers."

*Id.* at 1312.  But because the complaint did "not allege that [plaintiff] was in the midst of

negotiations" with the prospective customers or give any other indication that the prospective

relationships would likely have been realized as actual sales, the court found that the claim

"assert[ed] the type of speculative economic relationship [the court had previously] disapproved of

. . . ."  *Id.*; *see also A-Mark Coin Co. v. General Mills, Inc.*, 148 Cal. App. 3d 312, 324 (1983)

("[I]t is no tort to beat a business rival to prospective customers.").

Based on AlterG's allegations here, any relationship it had with Northwestern University

was speculative and not probable.  The Court therefore **GRANTS** the motion to dismiss this claim

and allows AlterG one more opportunity to amend if it indicates it can plead additional facts to

United States District Court
Northern District of California

**Exhibit 1**
-28-

1    take its claim out of the speculative realm.

2        2.    Woodway

3        AlterG alleges that "while Woodway currently supplies treadmills to AlterG, due to

4    Defendants' interference alleged herein, it is highly uncertain whether Woodway will continue to

5    supply treadmills to AlterG." FAC ¶ 127. According to AlterG, "[o]n at least one occasion, sales

6    representatives of the Boost One treadmill told the University of Tennessee . . . that Woodway

7    would stop selling treadmills to AlterG." *Id.*

8        Defendants correctly point out that the FAC has not alleged "actual disruption of the

9    relationship" between AlterG and Woodway, nor has it alleged "damages . . . proximately caused

10   by the acts of the defendant." *Blank*, 39 Cal. 3d at 330. By AlterG's own admission, Woodway is

11   still supplying treadmills to AlterG, so there has been no actual disruption of the supplier

12   relationship. Moreover, AlterG's claim that "it is highly uncertain whether Woodway will

13   continue to supply treadmills to AlterG" is undermined by its statement, in the same paragraph,

14   that "Woodway has also notified AlterG that it will raise the price of the treadmills supplied to

15   AlterG." FAC ¶ 127. The latter suggests Woodway intends to continue to make its treadmills

16   available to AlterG, albeit at a higher price. Cessation of business with Woodway is not probable.

17       Because AlterG's own allegations indicate that there has been no actual or probable

18   disruption of its supplier relationship with Woodway, the Court **GRANTS** the motion to dismiss

19   the interference with prospective economic advantage claim as to Woodway **without leave to**

20   **amend**.

21   G.   False Advertisement

22       AlterG alleges that Defendants engaged in false advertising in violation of the Lanham Act

23   by "falsely claim[ing] that the Boost One is a superior product over the AlterG DAP systems 'at a

24   fraction of the cost.'" FAC ¶ 135. A false advertising claim under the Lanham Act has five

25   elements: "(1) a false statement of fact by the defendant in a commercial advertisement about its

26   own or another's product; (2) the statement actually deceived or has the tendency to deceive a

27   substantial segment of its audience; (3) the deception is material, in that it is likely to influence the

28   purchasing decision; (4) the defendant caused the false statement to enter interstate commerce; and

27

**Exhibit 1
-29-**

1    (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct

2    diversion of sales from itself to defendant or by a lessening of the goodwill associated with its

3    products." *Skydive Arizona, Inc. v. Quattrocchi,* 673 F.3d 1105, 1110 (9th Cir. 2012).  AlterG's

4    false advertising claim is subject to the Rule 9(b) pleading standard.  *See* Order at 19; *TransFresh*

5    *Corp. v. Ganzerla & Assoc., Inc.*, 862 F. Supp. 2d 1009, 1017–18 (N.D. Cal. 2012).  As noted

6    above, that means that the FAC must therefore allege "'the who, what, when, where, and how' of

7    the fraud." *TransFresh Corp.*, 862 F. Supp. 2d at 1017 (quoting *Vess*, 317 F.3d at 1106).

8         Defendants fault AlterG for failing to establish the second and third elements of a Lanham

9    Act claim; they challenge whether the false statements at issue actually deceived or have the

10   tendency to deceive a substantial segment of its audience and whether the statements were likely

11   to influence consumers' purchasing decisions.  Mot. at 24.  These challenges fail.  The FAC

12   alleges that by falsely representing the capabilities of the Boost One treadmill relative to AlterG

13   products, Defendants have succeeded in selling "over 20 [Boost] units to date to customers

14   considering an AlterG unit."  FAC ¶ 62.  These allegations suggest that Defendants' false

15   advertising may have, in fact, deceived customers and influenced their decisions to opt for the

16   Boost One over AlterG treadmills.

17        Defendants next claim that AlterG failed to specify the "where" and "when" of the false

18   advertising as required by Rule 9(b).  Again, Defendants are incorrect.  AlterG alleged that

19   Defendants made deceptive statements on Boost's own website and on Woodway's website, and it

20   specified when those statements were first posted to the websites.  *See* FAC ¶ 135.  Defendants

21   protest that the advertising on Woodway's website is not "necessarily attributable" to Boost.  Mot.

22   at 23–24.  However, as AlterG notes, at the pleading stage it needs only show that the false

23   advertising is plausibly attributable, not "necessarily attributable," to Defendants.  Opp. at 22.  The

24   FAC describes Woodway as an "affiliate and sales partner" of Boost, FAC ¶ 135, from which it

25   can be reasonably inferred that Boost is responsible for the statements about Boost products on the

26   website.

27        Defendants' argument that AlterG failed to identify "who" made the false statements is

28   more meritorious.  *See* Mot. at 23.  Under Rule 9(b), "there is no absolute requirement that where

United States District Court
Northern District of California

28

**Exhibit 1
-30-**

several defendants are sued in connection with an alleged fraudulent scheme, the complaint must identify false statements made by each and every defendant," but a plaintiff must "at a minimum, identify the role of each defendant in the alleged fraudulent scheme." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (emphasis and brackets removed).  Accordingly, the Court previously found lacking AlterG's "completely undifferentiated" allegations in the original complaint "asserting that 'Defendants' are responsible for the statements."  Order at 21.  AlterG has now amended the complaint to allege that "Defendants, either individually or collectively" made the false statements.  FAC ¶ 135.  This is no clearer than the original allegation, and still fails to identify the role of each Defendant in the alleged fraudulent scheme.  Again, even in the absence of precise information, Plaintiff can allege with more detail even within broad parameters.  *See Swartz*, 476 F.3d at 764.  AlterG maintains it has "made specific allegations as to the role of each Defendant," but the FAC paragraphs it cites to merely detail the role of each Defendant within Boost generally, not their role in the false advertising.  Opp. at 23 (citing FAC ¶¶ 3–5, 51, 60).  Perhaps recognizing that its pleading lacks particularity, AlterG requests leave to amend its FAC "to allege the false advertising claim only against Boost."  Opp. at 23 n.17.

The Court accordingly **GRANTS** Defendant's Motion to Dismiss as to AlterG's Lanham Act claim, but permits AlterG leave to amend the claim to bring it into compliance with Rule 9(b) by specifying that only Boost was responsible for the false advertising.  The Court finds the claim adequately pleaded in all other respects.

H.    Trade Libel

AlterG asserts Defendants engaged in trade libel by making "false, disparaging, and defamatory statements regarding AlterG's business and products to several AlterG customers and potential AlterG customers."  FAC ¶ 140.  "Trade libel is defined as 'an intentional disparagement of the quality of property, which results in pecuniary damage.'"  *Aetna Cas. & Sur. Co. v. Centennial Ins. Co.*, 838 F.2d 346, 351 (9th Cir. 1988) (quoting *Erlich v. Etner*, 224 Cal. App. 2d 69, 73 (1964)).  A trade libel claim requires: (1) a publication, (2) which induces others not to deal with plaintiff, and (3) special damages."  *Id.* (citing *Polygram Records, Inc. v. Superior Court*, 170 Cal. App. 3d 543, 548–49 (1985)).  Moreover, "a plaintiff must allege: (1) who made the

29

Exhibit 1
-31-

United States District Court
Northern District of California

1   statements, (2) to whom the statements were made, (3) the time and place of publication, and (4)

2   the substance of the statements."  *NPK Indus. v. Hunter*, No. 15-CV-00811-SI, 2015 WL 5461667,

3   at *4 (N.D. Cal. Sept. 16, 2015) (citations omitted).

4          Defendants contend AlterG's trade libel claim is deficient because "[n]ot a single definitive

5   statement made to a specific AlterG customer or potential customer by a specific Defendant has

6   been identified."  Mot. at 24.  Defendants are incorrect.  The FAC details one particular instance

7   of trade libel: "[I]n or around May 2018, sales representatives of the Boost One treadmill falsely

8   told the University of Tennessee that Woodway would stop selling treadmill [sic] to AlterG."[6]

9   FAC ¶ 142.  This specifies who made the statements, to whom the statements were made, the time

10  and place of publication, and the substance of the statements.  *See NPK Indus.*, 2015 WL 5461667,

11  at *4.  Defendants fairly point out that there is some ambiguity as to whether the "sales

12  representatives" mentioned above actually refer to Defendants, but given that the same paragraph

13  describes the statements made to the University of Tennessee as "Defendants' misrepresentation,"

14  FAC ¶ 142, a reasonable inference in Plaintiff's favor requires that the ambiguity be resolved in

15  AlterG's favor.

16         Defendants also question the allegation that "AlterG lost the sales of two Pro200 treadmills

17  to the University of Tennessee at least *in part* due to Defendants' misrepresentation."  FAC ¶ 142

18  (emphasis added).  But to plead a trade libel claim, a plaintiff need only show that the

19  misrepresentation "played a material and substantial part in inducing others not to deal with [the

20  plaintiff]," not that it was the sole cause of the decision not to deal.  *Erlich v. Etner*, 224 Cal. App.

21  2d 69, 73 (1964).  That AlterG's loss of sales may have been attributable only "in part" to

22  Defendants' disparagement is not fatal to its trade libel claim.

23         Finally, Defendants also argue that AlterG's allegations are "based only on non-public and

24  non-published statements made to University of Tennessee."[7]  Reply at 15.  But Defendants

25

26  [6] The FAC also describes an alleged instance of trade libel directed at Bear Fitness, a service
    vendor for AlterG.  *See* FAC ¶ 143.  However, AlterG clarifies in its opposition that this allegation
27  is "relevant to show Defendants' pattern of behavior," but is not a standalone trade libel claim.
    Opp. at 20 n.16.

28  [7] Again, this is an argument Defendants raise for the first time on reply.  It was not made in the

                                                    30

Exhibit 1
-32-

Case 8:20-cv-00048-JVS-JDE   Document 181-1   Filed 09/04/20   Page 32 of 33   Page ID
#:12619
Case 3:18-cv-07568-EMC   Document 41   Filed 09/05/19   Page 31 of 32

1  misconstrue the "publication" element of a trade libel claim.  In the context of trade libel and

2  defamation, "publication" is simply "defined as a communication to some third person." *Ringler*

3  *Assocs. Inc. v. Maryland Cas. Co.*, 80 Cal. App. 4th 1165, 1179 (2000).  "Publication need not be

4  to the public or a large group; communication to a single individual is sufficient." *Id.* (citing

5  *Cunningham v. Simpson*, 1 Cal. 3d 301, 306 (1969)).

6      Accordingly, the Court **DENIES** the motion to dismiss AlterG's trade libel claim.

7  I.    Unfair Competition

8      AlterG brings a claim under the "unlawful" prong of California's Unfair Competition Law

9  ("UCL").  Under the "unlawful" prong, "[t]he UCL 'borrows violations of other laws and treats

10  them as unlawful practices that the unfair competition law makes independently actionable.'"

11  *Wilson v. Hewlett–Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012) (quoting *Cel-Tech*

12  *Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999)).  AlterG identifies its trade

13  secret misappropriation and breach of fiduciary claims as the predicates for its UCL claim.  *See*

14  FAC ¶¶ 147–48.  Because those two predicate claims are adequately pleaded (at least in part), the

15  Court **DENIES** the motion to dismiss the UCL claim.

16              **IV.    CONCLUSION**

17      For the foregoing reasons,

18      • The Court **DENIES** the motion to dismiss AlterG's direct, indirect, and willful

19        infringement claims.

20      • The Court **GRANTS** the motion to dismiss as to AlterG's second trade secret claim

21        and **DENIES** the motion as to AlterG's eighth trade secret misappropriation claim.

22      • The Court **GRANTS** the motion to dismiss AlterG's breach of contract claim to the

23        extent it arises from Allen's superseded contracts (from 2007, 2008, and 2012) and

24        Bean's superseded contracts (from June 15, 2009 and June 18, 2009), but **DENIES**

25        the motion otherwise.

26      • The Court **DENIES** the motion to dismiss AlterG's breach of fiduciary duty claim.

27

28  _____

   motion to dismiss.

   *United States District Court*
   *Northern District of California*

   31

**Exhibit 1**
**-33-**

- The Court **GRANTS** the motion to dismiss the interference with contract claim with respect to Woodway **with leave to amend** with details of when and where Defendants induced Woodway to breach its confidentiality agreement.  The Court **DENIES** the motion with respect to the University of Tennessee.

- The Court **GRANTS** the motion to dismiss AlterG's claim that Defendants interfered with AlterG's prospective economic relationship with Northwestern University and allows AlterG one more opportunity to amend, if it indicates it can plead additional facts to take its claim out of the speculative realm.  The Court **GRANTS** the motion to dismiss the interference with prospective economic advantage claim as to Woodway **without leave to amend**.

- The Court **GRANTS** Defendant's Motion to Dismiss as to AlterG's Lanham Act claim, but permits AlterG leave to amend the claim to bring it into compliance with Rule 9(b) by specifying that only Boost was responsible for the false advertising.

- The Court **DENIES** the motion to dismiss AlterG's trade libel claim.

- The Court **DENIES** the motion to dismiss the UCL claim.

This order disposes of Docket No. 37.

**IT IS SO ORDERED**.

Dated: September 5, 2019

_____
EDWARD M. CHEN
United States District Judge

United States District Court
Northern District of California

32

**Exhibit 1
-34-**