# EXHIBIT 28



Wirecutter is reader-supported. When you buy through links on our site, we may earn an affiliate commission. **Learn more**

---

**Real Talk**

Advice, staff picks, mythbusting, and more. Let us help you.

**Exhibit 28**
**-138-**



Photo: David Dow/Getty Images

# I Spent 54 Days in the NBA Bubble. Here's the Gear I Couldn't Live Without.

**PUBLISHED SEPTEMBER 17, 2020**

___

**Marc Stein**



I spent nearly two months this summer living in a bubble within a bubble.

Exhibit 28
-139-

The New York Times sent me to Walt Disney World in July, but not for a vacation. I was The Times's first of two representatives in the media corner of the NBA bubble, assigned to cover everything happening on the league's restricted-access, highly surveilled Disney campus, where 22 teams were summoned to play out the rest of the 2019–20 season for up to three months. The league's goal was twofold: It wanted to crown a champion, as it had in each of the NBA's first 73 seasons, but it also wanted to keep the coronavirus from infiltrating this first-of-its-kind village and forcing a permanent cancellation of its 74th season. As such, in the name of safety, rules kept reporters to a 1-square-mile section of the broader bubble, which housed hundreds of players in three off-limits team hotels.

Reporters like me, fresh off four months with nowhere to go in the wake of the NBA's March 11 shutdown in response to the coronavirus pandemic, were naturally eager to be close to the game again—whatever the restrictions. Yet I spent much of my 54 days in Central Florida, apart from game venues and practice gyms, in the same 314-square-foot hotel room. This routine required a fierce focus and some technical assistance—even for a seasoned traveler like me, and even when I was housed at a place that bills itself as the most magical on Earth.

Here are the devices, some modern and some simple, that kept me at peak functionality, and without which I surely would have been lost.

## 1. **BlackBerry KEY2 smartphone**

Exhibit 28
-140-



Photo: BlackBerry

I'm not trying to be morbid, but there is a decent chance I will die with a BlackBerry device of some sort in my hand. I also carry an iPhone with me at all times for the music, apps, and camera goodness, but I cannot live without my BlackBerry's physical keyboard. The portability of the device and the way it helps me laser in on one screen when I'm trying to put words together are priceless boosts to my writing process. I still write the first draft of pretty much every article, including this one, on my **KEY2**.

## 2. AmazonBasics Microwave

**Exhibit 28**
**-141-**



Photo: Amazon

It's not that I'm a fan of this particular brand of microwave. (After I left the bubble, in fact, CNN reported that a design flaw may cause the AmazonBasics Microwave to catch fire.) But player rooms at the three hotels that housed the 22 teams invited to the NBA restart were all outfitted with microwaves, and media hotel rooms were not. I quickly discovered that a microwave was one item, in these conditions, that I couldn't live without, so The Times authorized me to shell out $60 to order this AmazonBasics model. Cold food, on top of the limited food options we had on this restricted-access campus, would have been difficult to stomach.

### 3. AmazonBasics Electric Kettle

Exhibit 28
-142-



Photo: Amazon

Bubble life is rough on coffee snobs like me. I am great at buying coffee and terrible at making it, which meant I had to figure out something fast, because the only options available to reporters (weak drip coffee in the media meal room and an in-room Keurig) were, to put it charitably, less than optimal. So I ordered an **AeroPress** and this **electric hot water kettle** from Amazon, studied some YouTube videos for AeroPress tricks, and made my own coffee every morning. I am proud of this achievement because—I repeat—I can barely make toast.

## **4. Kinexon SafeTag**

Exhibit 28
-143-



Photo: Kinexon

This was not elective technology. All bubble inhabitants—except for players—
were required to affix a **Kinexon SafeTag** proximity alarm to their campus credential. The alarms are designed to promote social distancing but also to assist with contract tracing in the event someone on campus tests positive for the coronavirus. The alarms beeped any time two people wearing them were less than 6 feet apart for 10 seconds—provided the alarms were charged overnight. In interview situations, when reporters were unable to maintain 6 feet of distance as we got as close to players as we could manage, the alarms often produced a symphony of chirping.

**5. Kinsa smart thermometer**
**6. Masimo MightySat pulse oximeter**

Exhibit 28
-144-



Photo: Masimo

Likewise required to maintain bubble citizenship was the daily use of a **Kinsa smart thermometer** and a **Masimo MightySat fingertip pulse oximeter**. Via the magic of Bluetooth and the league's own health app, I began every day the same way for the entirety of my stay: I recorded my temperature and oxygen-saturation readings and filled out a brief questionnaire regarding potential COVID-19 symptoms before heading out of my room to get my daily coronavirus test.

## 7. **MagicBand**

Exhibit 28
-145-



Photo: Disney

Veteran Disney World–goers know that a plastic **MagicBand**, which you wear on your wrist like a watch, serves as a room-entry device that also has credit card capabilities. In the NBA bubble, MagicBands doubled as a device people were required to scan against a sensor for entry at the coronavirus testing suites and for access to practice sites and game venues. (There were team-specific designs, such as the Lakers version pictured, while mine, for members of the media, was a mostly gray issue adorned with multiple NBA logos.) If you left your room without recording your temperature and oxygen saturation, or without filling out the questionnaire, those subsequent MagicBand scans would be rejected. The MagicBand, in the NBA bubble, was as essential an accessory as the face coverings that were mandatory at virtually all times—and I must say it made for a nice (and unique) Disney collectible to bring home.

Exhibit 28
-146-

## Further reading

 **Peloton Review: What to Know Before You Buy**

 **The Best Meditation Apps**

 **All of Wirecutter's Coronavirus Coverage**

 **How to Choose the Best Cloth Face Mask for You**

Exhibit 28
-147-

**Wirecutter Comment Policy**

Be kind. Ask questions. Discriminatory language, personal attacks, promotion, and spam will be removed.

Please read our **Comment Policy** before commenting.



| 8 Comments | Wirecutter 🔒 Privacy Policy | 1 Login |

♡ **Recommend** 5          🐦 Tweet          f Share                    Sort by Newest ▾

Join the discussion…

LOG IN WITH                    OR SIGN UP WITH DISQUS ?

Name

**Joeybagofdougnuts** • 8 hours ago

Opens post, sees blackberry as first item, closes post

3 ∧  |  ∨  •  Reply  •  Share ›

**Adam** • 6 days ago

What a worthless post.

Exhibit 28
-148-

# EXHIBIT 29

TECH

# How next Apple Watch could help save coronavirus patients

By Chris Smith, BGR

April 14, 2020  |  1:57pm



An employee demonstrate the new Apple watch.

AFP via Getty Images

ORIGINALLY PUBLISHED BY:

**BGR**

**The wild reason why coronavirus stimulus money is being delayed**

**How to make DIY coronavirus face masks without even having to sew**

**CDC: Coronavirus might travel up to 13 feet in the air**

We've updated our Terms of Use and by continuing, you are agreeing to comply with them.

Exhibit 29
-149-

The novel coronavirus disease is seemingly at or near its peak in many countries. After that, life will return to some degree of normalcy, although we'll have to keep our defenses up at least until a vaccine is widely available. Social distancing measures might ease, but we'll still have to keep washing our hands often, wearing masks, and avoiding crowds. The coronavirus can't be eradicated just yet, and outbreaks are still possible.

Some expect a second big coronavirus wave in the fall, but the next time around, authorities won't be caught by surprise. And by the time the next major COVID-19 epidemic happens or any new illness caused by cousins of these coronaviruses arises, we may have a new weapon at our disposal: The Apple Watch Series 6.

The most common COVID-19 symptoms include fever, fatigue, cough, and shortness of breath. Right now, the mild-to-moderate cases are to be treated at home, as hospitals are overwhelmed with severe cases that need immediate attention. And while some patients might not experience any symptoms, others could face a tough battle. This particular passage attracted my attention a few weeks ago when The New York Times deputy editor Jessica Lustig detailed her stressful and tiring experience treating her husband at home (emphasis mine):

Now there is too much rushing back and forth, making sure T has a little dinner — just a tiny bowl of soup, just an appetizer, really, that he is unable to smell, that he fights nausea to choke down — taking his temperature, monitoring his oxygen-saturation levels with the fingertip pulse oximeter brought by a friend from the drugstore on the doctor's advice, taking him tea, dispensing his meds, washing my hands over and over, texting the doctor to say T is worse again, standing next to him while he coughs into the covers, rubbing his knees through the blankets.

I told you that I started recording my temperature readings a few weeks ago, even if I don't have any symptoms. My thinking is that if I got the disease without showing any signs, these readings might help. If I do get it, the spike in temperature that I measure should inform me that something isn't right. But you can't measure cough or fatigue objectively, and you need a pulse oximeter to measure your blood-oxygen levels.

That parameter is even more important than your temperature readings when it comes to saving your life. The oxygen-saturation level is what will convince your doctor to move you to oxygen therapy in the hospital and then to a ventilator. That's because patients who suffer from severe cases of COVID-19 are literally fighting to get that oxygen in. The virus buries itself in the lungs, where it takes over individual cells to replicate itself, destroying the lung tissue in the process.

A leak in early March claimed the Apple Watch Series 6 would come with a sensor that could measure blood-oxygen levels. In other words, the most popular wearable in the world could feature exactly the life-saving feature that many coronavirus patients could use.

COVID-19 isn't the only disease that will affect blood-oxygen levels, and the Apple Watch could catch other illnesses that affect your breathing as well. But in the very near future, the next Apple Watch could detect oxygen saturation changes as they happen and sound the alarm. In the case of future outbreaks where hospitals might be overrun, a device like the Apple Watch Series 6 could mean the difference between life or death for some patients.

A similar concept is already in testing in Cleveland, Ohio, where a team of researchers created a pilot program meant to catch changes in blood oxygen levels. Some of the patients who aren't sick enough to be admitted are sent home with a device that looks like this:



**SEE ALSO**

Tech giants can h
us from coronavi
should we let the

We've updated our Terms of Use and by continuing, you are agreeing to comply with them.

Exhibit 29
-150-

It's cumbersome, and it's not exactly fashionable, but the wrist monitor sends signals to the cell phone, and that data is then sent to a monitoring station operated by doctors and nurses. "Ultimately, they go home and know somebody is watching their breathing and their oxygen levels, which are the early signs that someone is going to get sick, and it gives them peace of mind," Dr. Peter Pronovost told CNN.

The report details the experience of a 54-year-old patient who was sent home wearing the device on March 27th. On April 1st, they called him so he could come to the ER immediately. The sensor sent data that included lower blood-oxygen readings and may have saved his life. The patient spent seven days in the hospital, where he was given oxygen therapy.

The tiny device helped saved his life. That's what the Apple Watch Series 6 could do. The Apple Watch already monitors pulse readings and can perform quick EKGs. Combine that with fall alerts and the blood-oxygen sensor, and the Apple Watch might become an invaluable tool during the novel coronavirus pandemic. The next Apple Watch will be more expensive than the Masimo SafetyNet device in the images above, bu the pulse oximeter in the image above also serves only one purpose.

That said, the Apple Watch Series 6's blood-oxygen sensor has yet to be confirmed by Apple. The gadget is expected to be unveiled this September alongside the iPhone 12.

FILED UNDER   **APPLE WATCH**, **CORONAVIRUS**, **VACCINES**, **4/14/20**

We've updated our Terms of Use and by continuing, you are agreeing to comply with them.

**Exhibit 29**
**-151-**

# EXHIBIT 30

# The Washington Post

*Democracy Dies in Darkness*

# The new Apple Watch says my lungs may be sick. Or perfect. It can't decide.

Both the Apple Watch Series 6 and Fitbit Sense have new blood-oxygen apps. They're mostly useless.

By **Geoffrey A. Fowler**

September 23, 2020 at 4:00 a.m. PDT

Sometimes the new Apple Watch Series 6 reports my lungs and heart are the picture of health, pumping blood that's 100 percent saturated with oxygen.

At other times, it reports my blood oxygen is so low I might be suffering from emphysema. (I am not.)

The watch can't decide. This much is clear: Don't buy one of these $400 devices in the hopes of monitoring your lung health.

An Apple oxygen check a day will not keep the doctor away, at least not yet. The way consumer tech companies are marketing health capabilities is getting ahead of what their gadgets can actually, reliably do. That's a dangerous trend, and it jeopardizes the potential positive effect that collecting body data could have on our health.

It's particularly deceptive at a time when many people are looking to health monitors for any clue that they may have covid-19, the illness caused by the novel coronavirus.

For the past week, I've been wearing a smartwatch on each wrist, all day and all night long. On the right I have the Apple Watch Series 6, and on the left I wear the new $330 Fitbit Sense, which went on sale this week.

There are many reasons people buy wearable gadgets. I wear an Apple Watch for fitness motivation and to receive phone notifications, and an Oura Ring to track my sleep. But this fall's smartwatch upgrades from Apple and Fitbit are all about health. Apple's slogan reads: "The future of health is on your wrist."

These watches also read heart rate and rhythm, but I'm focusing this review on the headline addition to the Apple watch and the Fitbit: an oximeter, which measures the oxygen in your blood. Doctors are increasingly treating oxygenation as a vital sign (alongside pulse and temperature) because it can help reveal aspects of conditions including sleep apnea, pulmonary embolism and covid-19. That certainly sounds helpful to have on your wrist.

That's what Apple Vice President for Health Sumbul Ahmad Desai implied at Apple's prerecorded launch event. "Adding blood oxygen brings another valuable health measurement to users. Blood oxygen and pulse oximetry are terms that we've heard a lot about during the covid pandemic," she said.

But you start to get a different picture when you read what both companies say in their disclaimers. Neither device is approved by the Food and Drug Administration.

**Exhibit 30**
**-152-**

The tiny type at the bottom of Apple's website says its blood-oxygen app is "not intended for medical use" and is "only designed for general fitness and wellness purposes." Fitbit's small print says its blood-oxygen app is "not intended to diagnose or treat any medical condition" and is useful to "help you manage your well-being and keep track of your information."

There are important differences in the blood oxygen data that Apple and Fitbit report. But in my experience, neither company's measurement serves much purpose at all. You should know what you're buying, because it might do more harm than good.

# Measuring blood: Finger vs. wrist

To understand my frustrating Apple Watch readings, I called pulmonologists who haven't had a chance to test the watches but understand the science. When doctors test blood oxygen, they often use sensors on fingers called pulse oximeters. These devices shine light through the skin and nail to detect the color of the blood as a measure of how much oxygen is there. They produce a measure called SpO2; most healthy people range between 95 percent and 100 percent.

The finger oximeters used by doctors are approved by the Food and Drug Administration. To compare my smartwatch results, I bought a finger oximeter for $60 from Medline Industries that is FDA approved and reports an error rate of plus or minus two percentage points.

Unlike finger pulse oximeters, these two smartwatches try to read your blood oxygen from your wrist. And they're conspicuously silent about accuracy.

Apple's new watch has lights on the bottom to generate signals that are reflected back from the blood in your wrist and read by sensors. An app lets you do spot checks anytime and also runs on its own while you sleep. You have to hold really, really still for 15 seconds to get a reading.

The first time I tried this on the Apple Watch 6, it said my oxygen level was 88 percent — shockingly low, given that I am in good health and wasn't wheezing. Five minutes later, I tested again and it said my SpO2 was 95 percent. I kept trying it and kept getting different readings — and, frequently, an "unsuccessful measurement" error message.

I told Apple about my experience, and it sent me a new watch. My first measurement on my second Apple Watch 6 reported my SpO2 as 100 percent. If these readings were accurate, my lungs were having a really wild Wednesday.

Over several days of comparing my second Apple Watch's measurements to my FDA-approved finger oximeter, Apple's readings most often differ by two or three percentage points — though they've also sometimes exactly matched, and sometimes have been as much as seven percentage points lower.

Is it just me? Skin, fat and blood vessels do vary. Apple would not comment on the error rate of its sensor, but spokeswoman Amy Bessette said it "has been rigorously tested across a wide spectrum of users and across all skin tones." (When I tested the Apple Watch on a colleague whose skin is darker than mine, the results were also off from the finger pulse oximeter, but less wildly so.)

Bessette also said, "For a small percentage of users, various factors may make it difficult to get a blood oxygen measurement including motion, watch placement on the wrist, skin temperature and skin perfusion, and the blood

Exhibit 30
-153-

oxygen app provides dynamic feedback to help users get the best reading possible.

The company sent me additional Apple watch straps — eight in total — to wear while testing its second watch. This year, Apple is selling a new kind of stretchy band that is called the Solo Loop and comes in a variety of sizes. Going down one size (to a model that leaves a slight imprint on my wrist) did eliminate some but not all of the "unsuccessful measurement" error messages.

With the Fitbit, I've had less-erratic results, but the device also provides a lot less information. You can't ask the Sense to run spot checks. Instead, it measures your SpO2 while you sleep and provides a nightly average.

My oxygen level, Fitbit reports, is typically in the range of 95 percent to 97 percent. That sounds believable, though I can't compare it to results from my finger pulse oximeter because I'm not awake to turn it on.

In an interview, Fitbit's director of research, Conor Heneghan, said the company decided the overnight view was a more reliable piece of information. "It's a pretty hard technical problem to measure SpO2 on the wrist," he said. Unlike fingers, which have many blood vessels near the surface that offer a strong signal, the wrist is prone to obstructions and poor readings.

"You move a little bit, or even just you are a little bit colder than normal, you can get a very weak signal," Heneghan said. "We've gone after long-term averaging, so that way, when we take overnight measurements, we can comfortably exclude the periods when we feel that signal is too noisy or weak to be reliable."

Heneghan still wouldn't disclose the Fitbit's exact error rate. But he said it beats the range set by an international standards organization. That's not much to brag about: It would allow someone with a true SpO2 reading of 95 percent to be told they're at 91 percent.

He was forthcoming on the testing Fitbit did, such as working with a lab at the University of California at San Francisco to test the device on volunteers, including people with different skin tones. "We tried to overrepresent darker-skin-toned people in our testing to make sure that it's not skewed toward a particular tone," he said.

# Marketing vs. medicine

Let's be clear: These companies are marketing a device with medical functions while winking and insisting they're not medical functions. Okay, so then what else, exactly, are we supposed to use oxygen apps for?

Fitness? You can't use these sensors while you work out. Just the slightest bit of movement — even breathing too heavily — sends my Apple Watch into error mode. Neither Apple nor Fitbit makes any effort to explain how your SpO2 levels might be linked to your workouts. (SpO2 is different from another oxygen indicator called VO2 Max, which measures how your body uses oxygen while you exercise.)

That leaves us with the industry's term "wellness." So, are we supposed to get together with friends over drinks and talk about O2 stats? "Hey, bud, my hemoglobin works better than yours!"

Whatever the fine print might say, some people are going to treat these as medical devices — and that's a concern.

"Pulse oximeters can tell you in a trending situation if your oxygen is in the normal range," said Albert Rizzo, the chief medical officer for the American Lung Association. But it's not necessarily a leading indicator of problems, including covid-19. "Nobody should be waiting for their pulse-ox to go down before calling their doctor," he said.

Exhibit 30
-154-

There could be consequences if consumers actually believe the hype about these devices. "I agree with you that it is a dangerous trend for technology companies to release medical devices that don't meet FDA standards and claim that they are not medical devices," said Brian Clark, a pulmonologist and professor at the Yale University School of Medicine.

The most common negative consequence is likely to be people calling their doctors too often because of false low readings. "But the more concerning and potentially dangerous scenario is when the devices provide false reassurance and people don't seek health care when they really need it," Clark said.

Apple was more upfront in 2018 when it added an electrocardiogram, or ECG, app to its watch. It did get FDA clearance (not quite the same as "approval") for its app, and worked with researchers to publish studies on its accuracy. But still, there's fine print: the Apple Watch's irregular-rhythm notification is not intended for use by "those who have been previously diagnosed with atrial fibrillation (AFib)."

Fitbit said an ECG app it added to the Sense this year also received FDA clearance. Why not do the same for the oximeter? "If we were to make a claim, like we could detect sleep apnea, we would definitely go through the regulatory process and be very clear on our messaging and very clear on the limitations," said Fitbit's Heneghan.

A release-with-disclaimers approach could leave consumers without guardrails as more body sensors come to market. To the Sense, Fitbit also added a skin temperature sensor and an electrodermal activity sensor — similar to what's in a polygraph — that it says "may indicate your body's response to stress." Neither of those sensors has been cleared by the FDA.

Questions about accuracy also interfere with the work of academics combing through the body data from smartwatches to see if it can be used to detect disease. This summer, I wrote about promising early results from academics using heart rate and temperature data from the Oura Ring and Fitbit to predict the onset of covid-19 symptoms.

Several of those researchers told me they were excited by the addition of blood-oxygen data — but there's not enough information about its validity. "We have toys, and we have things that are used for clinical purposes. And it really needs to be a clear distinction," said Duke University's Jessilyn Dunn, an assistant professor of biomedical engineering who is helping to lead a study called Covidentify.

It should not be acceptable for giant tech companies to market devices that take readings of our bodies without disclosing how those devices were tested and what their error ranges might be.

I believe collecting accurate data about our bodies can help advance our health. But the key word here is "accurate."

Sign in to join the conversation

Exhibit 30
-155-

# EXHIBIT 31

# RECOGNITION FOR EXCELLENCE



Masimo Rad-97® Named a Gold Edison Award Winner for 2020



Masimo Rad-97® Wins 2020 BIG Innovation Award



Masimo Rad-97™ Wins 2019 BIG Innovation Award

MASA00019923
**Exhibit 31**
**-156-**



Masimo Founder and CEO Joe Kiani Honored with First IP Champion Award by the Intellectual Property Owners Education Foundation



Masimo Wins Participation in the FDA Innovation Challenge to Develop Devices that Prevent and Treat Opioid Use Disorder



Masimo Awarded Best Patient Monitoring Technology Manufacturer 2018 by Global Health & Pharma



Masimo CEO Joe Kiani Selected Person of the Year – SafeCare Magazine

MASA00019924
**Exhibit 31**
**-157-**



Masimo Root Wins the GOLD 2015 Medical Design Excellence Award



Newborn Foundation Bestows Masimo CEO Joe Kiani with the Hubert H. Humphrey 'Dawn of Life'
Award

Hospital Review

50 Experts Leading the Field of Patient Safety (2014), includes Masimo CEO and Patient Safety
Movement Foundation founder Joe Kiani



Masimo Receives 2013 Zenith Award at the American Association of Respiratory Care Congress



MASA00019925
Exhibit 31
-158-

EMMA™ Palm Size Capnograph Earns 2013 EMS World Top Innovation Award



Masimo CEO Joe Kiani Receives Argyros Medal for Visionary Leadership & Commitment to
Patient Safety



iSpO2, EMMA Earn Hot Products Awards at EMS Today 2013



Ernst & Young National Entrepreneur Of The Year – 2012 Life Sciences Award Winner



MASA00019926
**Exhibit 31**
**-159-**

Masimo Pronto-7® Wins GOLD "Stevie®" Award for Best New Health Product



2012 Ernst & Young Entrepreneur of the Year



2011 TechAmerica High-Tech Innovation Award for the Masimo Pronto-7



2011 Medical Design Excellence Award - Gold for the Masimo Pronto-7



2011 iF Product Design Award

MASA00019927
**Exhibit 31**
**-160-**



2010 AARC Zenith Award



Masimo Wins GHX 2010 Respiratory Product Best-in-Class Award



2009 North American Patient Monitoring CEO of the Year Award



2009 AARC Zenith Award



Masimo Patient SafetyNet Helps Dartmouth-Hitchcock Medical Center Win 4th Annual Health
Devices Achievement Award from ECRI Institute

MASA00019928
**Exhibit 31**
**-161-**



Masimo Wins GHX 2009 Best in Class Award



2008 AARC Zenith Award



2008 MTAA Masimo Honored for Excellence in Medical Technology



2008 ACG Honors Masimo with Outstanding Growth Award



2008 AEA Outstanding Medical Device Company Award

MASA00019929
**Exhibit 31**
**-162-**



Better Health for Your Bottom Line.

Masimo Wins GHX 2008 Best in Class Award



Intellectual Property.
Intelligence Quotient.

2008 Masimo Ranks #1 in Industry Current Impact and Innovation Cycle Time on the Patent
Scorecard™



2007 Frost & Sullivan Recognizes Masimo as an Outstanding Company for Excellence in
Healthcare Opportunities



2007 Frost & Sullivan North American Patient Monitoring Technology Leadership of the Year
Award

MASA00019930
**Exhibit 31**
**-163-**

Masimo - Awards



2007 Frost & Sullivan North American Brand Development Strategy Leadership Award



2007 Texas Society for Respiratory Care (TSRC) LoneStar Award



2007 STA Excellence in Technology Innovation Award



2006 Orange County Business Journal Excellence in Entrepreneurship Award



2006 Medical Design Excellence Award for the Masimo Rad-57

MASA00019931
**Exhibit 31**
**-164-**



AEA 2006 High Tech Award Winner - Medical Technology Award



2006 Application of Technology Award



Masimo Tops the 2006 Patent Scorecard's Top 10 List of Innovators in Medical Devices for
Current-Impact Index™ and Technology Cycle Time™



2005 San Diego State University - Monty Award



MASA00019932
**Exhibit 31**
**-165-**

2005 Deloitte & Touche - Technology Fast 50, Orange County



2004 MD & DI 100 Notable People in Medical Device Industry awarded to Joe Kiani



2004 The Forum for Corporate Directors -- Director of the Year for Corporate Growth



2004 Deloitte & Touche 2004 Technology Fast 50, Orange County



2003 Frost & Sullivan New Standard of Care in Patient Monitoring Award

MASA00019933
**Exhibit 31**
**-166-**



2003 Frost & Sullivan Patient Monitoring Technology of The Year Award



2003 Platinum "ABBY" Award --Adaptive Business Leaders Innovations in Healthcare Award



2002 Frost & Sullivan Product Quality Leadership Award



2001 Medical Design Excellence Award for Radical™ Signal Extraction Pulse Oximeter



MASA00019934
**Exhibit 31**
**-167-**

2001 Audie Lewis Mark of Excellence Award



2001 AEA Innovative Product/Technology Award



2001 The Huntington's Disease Society of America Distinguished Leadership Award



2001 March of Dimes Excellence in Leadership Award



2000 SCCM Technology Excellence Award

MASA00019935
**Exhibit 31**
**-168-**

2000 Frost & Sullivan Market Engineering Competitive Strategy Award



2000 AEA High Tech Award Winner- Outstanding Medical Device Company



1995 STA Excellence in Technology Innovation Award

### Masimo Rad-97® Named a Gold Edison Award Winner for 2020

**Irvine, California – March 18, 2020** - Masimo announced that
the Rad-97® Pulse CO-Oximeter® has won the gold Edison
Award for 2020 in the category *Medical Communications and*



*Connectivity.* Among the nomination entries comprising the best products, services, and
businesses in innovation for the year 2020, Rad-97 was chosen as a winner by a panel of over
3,000 leading business executives from around the world. "After a thorough review, the Edison
Awards Judges recognize the Rad-97 from Masimo as a game-changing innovation standing out
among the best new products and services launched in their category," said Frank Bonafilia,
Executive Director of the Edison Awards.

MASA00019936
**Exhibit 31**
**-169-**

GO TO TOP

### Masimo Rad-97® Wins 2020 BIG Innovation Award



**Philadelphia, Pennsylvania – January 22, 2020** - Masimo announced that its Rad-97® Pulse CO-Oximeter® is among the winners of the Business Intelligence Group's 2020 BIG Innovation Award, an annual business award that recognizes the organizations, products and people that are bringing new ideas to life. Masimo was also a BIG Innovation Award recipient in 2019. "Innovation has become a major theme for organizations across virtually all industries and this year's winners are a testament to the creativity, passion and perseverance of individuals worldwide," said Maria Jimenez, chief operating officer of the Business Intelligence Group. "We are thrilled to be honoring Masimo as they are leading by example and making real progress on improving the daily lives of so many."

GO TO TOP

### Masimo Rad-97™ Wins 2019 BIG Innovation Award



**Philadelphia, Pennsylvania – February 5, 2019** - Masimo announced that its Rad-97™ Pulse CO-Oximeter® is among the winners of the Business Intelligence Group's 2019 BIG Innovation Award, an annual business award that recognizes the organizations, products and people that are bringing new ideas to life. "Innovation and the use of technology to advance commerce and improve lives is permeating nearly every organization across the globe," said Maria Jimenez, chief operating officer of the Business Intelligence Group. "We are thrilled to be honoring this year's winning executives, companies and products as they work to improve our experiences and lives." The Business Intelligence Group was founded with the mission of recognizing true talent and superior performance in the business world. The organization's proprietary and unique scoring system selectively measures performance across multiple business domains and then rewards those companies whose achievements stand above those of their peers.

MASA00019937
**Exhibit 31**
**-170-**

GO TO TOP

**Masimo Founder and CEO Joe Kiani Honored with First IP Champion Award by the Intellectual Property Owners Education Foundation**

Intellectual
Property
Owners
Education
Foundation

**Washington, DC – December 12, 2018** - Masimo Founder and CEO Joe
Kiani was honored last night at the 2018 IPO Education Foundation Awards Dinner with the first ever IP Champion Award. The Intellectual Property Owners Education Foundation, a non-profit organization devoted to educating the public on the importance of IP to society, has been awarding an Inventor of the Year for 45 years and Distinguished IP Professional for 10 years. 2018 marks the creation of a new award, IP Champion, bestowed upon Mr. Kiani for showing "extraordinary leadership in advocating for the value of intellectual property to the progress of innovation."

Retired Chief Judge Paul Michel, formerly U.S. Circuit Judge of the U.S. Court of Appeals for the Federal Circuit and Chief Judge of that court, commented, "Serial inventor Joe Kiani built a major patient health improving company, starting from scratch at age 23, obtaining VC funding based on his patent applications when patents were strong. Later Congressional and Supreme Court interventions so sapped patent strength that he could not repeat his feat today. Reviving patents is essential to America's future since most major inventions, new jobs, and personal welfare gains and economic growth result from start-ups and small and mid-sized technology companies like Masimo. It actually saves many lives each day with its patient monitoring devices. Isn't that what we need as much today as before?"

GO TO TOP

**Masimo Wins Participation in the FDA Innovation Challenge to Develop Devices that Prevent and Treat Opioid Use Disorder**

**Irvine, California – December 3, 2018** – Masimo is one of eight U.S.
companies to be selected for the FDA Innovation Challenge: Devices

MASA00019938
**Exhibit 31
-171-**

to Prevent and Treat Opioid Use Disorder. Initially announced in May, this Innovation Challenge is designed to spur the development of medical devices to help combat the opioid crisis and achieve the goal of preventing and treating opioid use disorder. From over 250 applications, 8 medical device developers were selected to participate, including Masimo.

In a statement, the FDA noted that "Through this effort, the FDA seeks to provide device developers an opportunity to work directly with the FDA to accelerate the development of innovative products, such as diagnostics to identify patients at increased risk for addiction, non-opioid pain therapies for acute or chronic pain, treatments for opioid use disorder or symptoms of opioid withdrawal, as well as devices that monitor the use and prevent diversion of prescription opioids." Masimo and the other winners will work directly with the FDA to accelerate the development and review of innovative products, which will be eligible for "Breakthrough Device" designation.

**GO TO TOP**

## Masimo Awarded Best Patient Monitoring Technology Manufacturer 2018 by Global Health & Pharma

**Irvine, California – September 14, 2018 –** Masimo announced that it has received this year's

Healthcare & Pharmaceutical Award for "Best Patient Monitoring Technology Manufacturer 2018," as determined by Global Health & Pharma (GHP). GHP is a UK-based, global information sharing platform of



approximately 4,900 users dedicated to enhancing communication and collaboration across a variety of healthcare themes. The Healthcare & Pharmaceutical Awards celebrate those companies which demonstrate dedication to furthering advancements within healthcare, and are given based solely on merit.

**GO TO TOP**

MASA00019939
**Exhibit 31**
**-172-**

**SafeCare Magazine Selects Joe Kiani as Person of the Year**

(/siteassets/us/documents/pdf/cover-story-safe-care.pdf)

**Lexington, Kentucky – October 5, 2015 –** SafeCare
Magazine announced today that Joe Kiani, Founder of the
Patient Safety Movement Foundation and CEO of Masimo,
was awarded Person of the Year for 2015. This award
recognizes and applauds the one individual who contributed
significantly towards improving patient safety and
healthcare quality across the globe.



The 64 nominees and finalists included Dr. Victor Dzau,
President, Institute of Medicine of the National Academy of
Sciences, Dr. James Bagian, former astronaut, Director,
Center for Healthcare Engineering, University of Michigan,
Dr. Atul Gawande, Surgeon and public health researcher, Dr.

Peter Pronovost, SVP for Patient Safety and Quality, Johns Hopkins University of Medicine, Dr.
Mark Chassin, President of the Joint Commission, Dr. Ala Alwan, World Health Organization, Dr.
Patrick Conway, Chief Medical Officer for Medicare, Dr. Cynthia Deyling, Chief Quality Officer,
Cleveland Clinic Health Systems, Dr. David Bates, Chief Innovation Officer, Brigham and Women's
Hospital, Dr. Robert M. Wachter, Professor and Interim Chairman, Department of Medicine at
University of California San Francisco, and Dr. Hardeep Singh, Chief, Health Policy, Quality and
Informatics Program, Houston Veteran Affairs Health Services Research Center for Innovation.

"We congratulate this year's 2015 SafeCare Person of the Year - Mr. Kiani," said Dr. Yisrael M.
Safeek, Founder of SafeCare Magazine. "We are incredibly impressed with what he has been able
to accomplish in the area of patient safety. Most of our nominees were internationally
recognized physicians so the very fact that this year's award is going to someone without a
medical background makes him even more remarkable. For over 25 years, his innovations have
revolutionized surgery and critical care medicine. His work with his non-profit Patient Safety
Movement Foundation has taken the topic of patient safety and put it at the forefront of those
that can impact change. If anyone can achieve zero preventable deaths by 2020, it will be Mr. Joe
Kiani."

SafeCare Magazine's mission is to deliver information on the people, ideas, organizations and
novel technologies affecting safe, efficient and quality healthcare to the sector's most influential
leaders. The publication's 100 SafeCare Hospital ranking is firmly rooted in the evidence-based

MASA00019940
**Exhibit 31**
**-173-**

framework of the Affordable Care Act, evaluating hospitals in HVBP, HRRP, and HACRP metrics.
For more information, please visit www.safecaremagazine.com
(http://www.safecaremagazine.com).

**GO TO TOP**

## Masimo Root Wins the GOLD 2015 Medical Design Excellence Award

**IRVINE, California – June 10, 2015 –** Masimo (NASDAQ: MASI) announced that its Root® patient
monitoring and connectivity platform has received the GOLD 2015 Medical Design Excellence
Award—the highest award given in the general hospital devices and therapeutic products
category. The 2015 Medical Design Excellence Award winners were honored today at a
presentation ceremony in New York City's Jacob K. Javits Convention Center, in conjunction with
the Medical Design & Manufacturing (MD&M) East Conference and Exposition
(www.MDMEast.com (http://trk.cp20.com/Tracking/t.c?8d5pm-odo2z-lent0i9&_v=2)).

Root comes with a dock for the Radical-7® handheld monitor or Radius-7® wearable monitor, an
intuitive display, and multiple networking/connectivity options. Root integrates multiple streams
of data on an easy-to-read, touch-screen.

Root innovations include:

- MOC-9™ – Flexible measurement expansion through Masimo Open Connect™ (MOC-9™) with MOC-9
  modules from Masimo or third-party measurement by other companies to expand the platform's
  measurements and capabilities. New MOC-9 modules in the U.S. will require new 510(k) clearances
- ISA™ Capnography – $CO_2$ sidestream module featuring fast warm-up time and the innovative and cost-
  effective Nomoline™ sampling line
- SedLine® brain function monitoring module, which provides four channels of EEG to help clinicians
  better understand the effects of anesthesia on the brain<
- Iris™ connectivity gateway designed to provide integration for standalone devices such as IV pumps,
  ventilators, hospital beds, and other patient monitors. Iris enables Root to intake data from all devices
  connected to the patient, acting as an in-room patient monitor and connectivity hub. Alarms and alerts
  for all devices are seamlessly forwarded to the patient's clinician and all device data are effortlessly
  documented in the patient's electronic medical record
- Wireless functionality – Capable of transmitting information through Bluetooth and WiFi.

MASA00019941
**Exhibit 31**
**-174-**

Root (/products/continuous/root/) can accommodate Radical-7 or Raidus-7 (/products/continuous/radius7/), the first and only wearable, wireless monitor with Masimo's breakthrough rainbow® SET® technology, to measure blood oxygenation, pulse rate, and rainbow® acoustic monitoring (RAM™) through acoustic respiration rate (RRa®). Radius-7 offers patients continuous monitoring while providing freedom of movement, allowing hospitals to



*Masimo Root® patient monitoring and connectivity hub with the Radius-7™ patient-worn, wireless monitor.*

optimize capacity by getting patients out of bed faster. Studies have shown that patient mobility is a key factor in more rapid patient recovery.[1]

The Medical Design Excellence Awards competition (www.MDEAwards.com (http://trk.cp20.com/Tracking/t.c?8d5pm-odo32-lent0i8&_v=2)) is organized and presented by UBM Canon and is the only awards program that exclusively recognizes contributions and advances in the design of medical products. Entries are evaluated on the basis of their design and engineering features, including innovative use of materials, user-related functions that improve healthcare delivery and change traditional medical attitudes or practices, features that provide enhanced benefits to the patient, and the ability of the product development team to overcome design and engineering challenges so that the product meets its clinical objectives. A comprehensive review of the entries was performed by an impartial, multidisciplinary panel of third-party jurors with expertise in biomedical engineering, human factors, industrial design, medicine, and diagnostics.

"We are honored to have Root receive the GOLD MDEA-winning product," said Joe Kiani, Founder and CEO of Masimo. "We hope Root will eliminate barriers to entry for innovative products and barriers to interoperability and help automate patient care with its open and scalable architecture."

@MasimoInnovates (http://trk.cp20.com/Tracking/t.c?8d5pm-odo33-lent0i9&_v=2) || #Masimo

[1] Needham D, Korupolu R, Zanni J, Pradhan P, Colantuoni E, Palmer J, Brower R, Fan E. "Early Physical Medicine and Rehabilitation for Patients With Acute Respiratory Failure: A Quality Improvement Project." Archives of Physical Medicine and Rehabilitation Vol 91, Issue 4, PP 536–542, April 2010

**About Masimo**

Masimo (NASDAQ: MASI) is the global leader in innovative noninvasive monitoring technologies that significantly improve patient care-helping solve "unsolvable" problems. In 1995, the company debuted Measure-through Motion and Low Perfusion pulse oximetry, known as Masimo SET®, which virtually eliminated false alarms and increased pulse oximetry's ability to detect life-threatening events. More than 100 independent and objective studies have shown that Masimo SET® outperforms other pulse oximetry technologies, even under the most challenging clinical conditions, including patient motion and low peripheral perfusion. In 2005, Masimo introduced rainbow

MASA00019942
**Exhibit 31**
**-175-**

Pulse CO-Oximetry technology, allowing noninvasive and continuous monitoring of blood constituents that previously could only be measured invasively, including total hemoglobin (SpHb®), oxygen content (SpOC™), carboxyhemoglobin (SpCO®), methemoglobin (SpMet®), and Pleth Variability Index (PVi®), in addition to SpO2, pulse rate, and perfusion index (PI). Additional information about Masimo and its products may be found at www.masimo.com (http://www.masimo.com).

**Forward-Looking Statements**

This press release includes forward-looking statements as defined in Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934, in connection with the Private Securities Litigation Reform Act of 1995. These forward-looking statements are based on current expectations about future events affecting us and are subject to risks and uncertainties, all of which are difficult to predict and many of which are beyond our control and could cause our actual results to differ materially and adversely from those expressed in our forward-looking statements as a result of various risk factors discussed in the "Risk Factors" section of our most recent reports filed with the Securities and Exchange Commission ("SEC"), which may be obtained for free at the SEC's website at www.sec.gov (http://trk.cp20.com/Tracking/t.c?8d5pm-odo35-lent0i1&_v=2). Although we believe that the expectations reflected in our forward-looking statements are reasonable, we do not know whether our expectations will prove correct. All forward-looking statements included in this press release are expressly qualified in their entirety by the foregoing cautionary statements. You are cautioned not to place undue reliance on these forward-looking statements, which speak only as of today's date. We do not undertake any obligation to update, amend or clarify these statements or the "Risk Factors" contained in our most recent reports filed with the SEC, whether as a result of new information, future events or otherwise, except as may be required under the applicable securities laws.

**GO TO TOP**

## Newborn Foundation Bestows Masimo CEO Joe Kiani with the Hubert H. Humphrey 'Dawn of Life' Award

*Awards Gala Marked Largest Fundraiser of its Kind to Raise Awareness to Combat Newborn Mortality*

**Irvine, California – Oct. 13, 2014 –**The Newborn Foundation presented Joe Kiani, founder, CEO and Chairman of the Board of Masimo (NASDAQ: MASI), with the Hubert H. Humphrey "Dawn of Life" Award at its gala Friday night in Minneapolis, Minn., an honor previously reserved for members of Congress.

Billed as the largest fundraiser of its kind to raise awareness for combatting newborn mortality, all proceeds from the awards gala will go to the continued efforts of the Newborn Foundation | Coalition to leverage technologies that improve early detection of health conditions and access to care for newborns.

Hubert "Buck" Humphrey IV, the former Vice President's grandson, presented the Dawn of Life award to Kiani as a "visionary leader who has been dedicated to increasing the role of technology and innovation in improving health" of newborns around the world.

MASA00019943
Exhibit 31
-176-

Kiani received the "Dawn of Life" Award the same day Masimo announced CE Mark of Eve™ Newborn Screening Software Application* for Radical-7® Pulse CO-Oximeters, designed to help clinicians more effectively and efficiently screen newborns for critical congenital heart disease (CCHD).

"Joe's work has been truly outstanding," said Annamarie Saarinen, co-founder and CEO of the Newborn Foundation. "It's been a privilege to have his wisdom and support in pursuit of improving newborn health and patient safety."

The Newborn Foundation (http://www.newbornfoundation.org/) was launched after Saarinen's daughter, Eve, was diagnosed and treated for critical congenital heart defects as a newborn. She was only able to survive because of early detection and access to life-saving intervention. In just a few short years, the Newborn Foundation's advocacy and policy leadership have impacted the landscape of newborn health – and helped save lives. Today, nearly all 4 million babies born each year in the U.S. are being screened with pulse oximetry (http://cchdscreeningmap.org/) for heart defects and other serious health conditions and the Newborn Foundation's projects are impacting the hardest to reach and most underserved babies across the nation.

The Foundation's work has also expanded internationally, with vital screening, telehealth and infrastructure programs in Morocco, the Philippines and rural China. A partner of the United Nations' Every Newborn Action Plan (http://www.everynewborn.org/Documents/ENAP_committments-RA.pdf)– Masimo and the Newborn Foundation's BORN Project (http://www.newbornfoundation.org/born-project)were highlighted at a global meeting of delegates in Johannesburg this year as being among a handful of programs that are saving newborn lives.

Stated Kiani: "I am truly humbled and honored to receive the Newborn Foundation's 'Dawn of Life' Award. The Newborn Foundation is a tireless advocate for those who can't yet speak for themselves – babies born with heart and other conditions, who can be saved with early detection and intervention. I, and all of us at Masimo, look forward to continue working alongside the Newborn Foundation, with the goal of eliminating preventable deaths of newborns."

Eve™ is not available in the United States.

*Referred to as "CCHD Mode" in Radical-7*

**About the Newborn Foundation**
The Newborn Foundation is an international non-profit working specifically to leverage health IT and medical technologies to improve access and outcomes while reducing disparities for newborns. The organization has been integral in the policy development, adoption and implementation of technologies for early detection, intervention and care of the youngest patients, including the landmark addition

MASA00019944
Exhibit 31
-177-

of universal newborn screening with pulse oximetry as a public health initiative. The work has now moved international, with vital newborn health projects in the UK, Morocco, the Philippines and rural China. Visit www.newbornfoundation.org (http://www.newbornfoundation.org)

### About Masimo

Masimo (NASDAQ: MASI) is the global leader in innovative noninvasive monitoring technologies that significantly improve patient care-helping solve "unsolvable" problems. In 1995, the company debuted Measure-Through Motion and Low Perfusion pulse oximetry, known as Masimo SET®, which virtually eliminated false alarms and increased pulse oximetry's ability to detect life-threatening events. More than 100 independent and objective studies have shown that Masimo SET® outperforms other pulse oximetry technologies, even under the most challenging clinical conditions, including patient motion and low peripheral perfusion. In 2005, Masimo introduced rainbow SET® Pulse CO-Oximetry technology, allowing noninvasive and continuous monitoring of blood constituents that previously could only be measured invasively, including total hemoglobin (SpHb®), oxygen content (SpOC™), carboxyhemoglobin (SpCO®), methemoglobin (SpMet®), and Pleth Variability Index (PVi®), in addition to SpO2, pulse rate, and perfusion index (PI). Additional information about Masimo and its products may be found at www.masimo.com.

### Forward Looking Statements

This press release includes forward-looking statements as defined in Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934, in connection with the Private Securities Litigation Reform Act of 1995. These forward-looking statements are based on current expectations about future events affecting us and are subject to risks and uncertainties, all of which are difficult to predict and many of which are beyond our control and could cause our actual results to differ materially and adversely from those expressed in our forward-looking statements as a result of various risk factors, including, but not limited to: whether Mr. Kiani's receipt of the Dawn of Life award will have any material effect on our business, as well as other factors discussed in the Risk Factors" section of our most recent reports filed with the Securities and Exchange Commission ("SEC"), which may be obtained for free at the SEC's website at www.sec.gov. Although we believe that the expectations reflected in our forward-looking statements are reasonable, we do not know whether our expectations will prove correct. All forward-looking statements included in this press release are expressly qualified in their entirety by the foregoing cautionary statements. You are cautioned not to place undue reliance on these forward-looking statements, which speak only as of today's date. We do not undertake any obligation to update, amend or clarify these forward-looking statements or the "Risk Factors" contained in our most recent reports filed with the SEC, whether as a result of new information, future events or otherwise, except as may be required under the applicable securities laws.

**GO TO TOP**

---

### Becker's Hospital Review Names 50 Experts Leading the Field of Patient Safety, including Patient Safety Movement Foundation Founder Joe Kiani

**Irvine, California – April 7, 2014 –** Becker's Hospital Review has published its list of "50 Experts Leading the Field of Patient Safety," recognizing healthcare organizations, nonprofits, universities and other institutions devoted to improving patient safety and quality of care. The leaders include healthcare providers, advocates, administrators, researchers and professors who have demonstrated a commitment to patient safety through their body of work, personal accomplishments and organizational leadership.

MASA00019945
**Exhibit 31**
**-178-**

The Becker's Hospital Review editorial team evaluated experts based on local and national impact on patient safety through participating in or heading patient safety initiatives, educating others, publicly speaking about patient safety and publishing articles and research.

The 2014 roster of "50 Experts Leading the Field of Patient Safety" includes:

James P. Bagian, MD, PE. Director for the Center for Health Engineering and Patient Safety, University of Michigan

David W. Bates, MD, MSc. Senior Vice President for Quality and Safety and Chief Quality Officer at Brigham and Women's Hospital and Brigham and Women's Physicians Organization

Donald M. Berwick, MD, MPP. Former CMS Administrator

Karl Bilimoria, MD, MS. Director of Surgical Outcomes and Quality Improvement Center at Northwestern Memorial Hospital

Leah F. Binder, MA, MGA. CEO of The Leapfrog Group

Maureen Bisognano, RN. President and CEO of the Institute for Healthcare Improvement

Doug Bonacum. Vice President of Quality, Safety and Resource Management at Kaiser Permanente

Richard Boothman, JD. Chief Risk Officer of University of Michigan Health System

Helga Brake, PharmD, CPHQ. Patient Safety Leader at Northwestern Memorial Hospital

Mark R. Chassin, MD, FACP, MPP, MPH. President of The Joint Commission and President and CEO of the Joint Commission Center for Transforming Healthcare

Michael R. Cohen, RPh, MS, ScD. President of the Institute for Safe Medication Practices

Molly Coye, MD, MPH. Chief Innovation Officer at UCLA Health

Katrina Crist, MBA. CEO of the Association for Professionals in Infection Control and Prevention

James DeFontes, MD. Patient Safety Officer for Kaiser Permanente Southern California

Sir Liam Donaldson, Patient Safety Envoy for the World Health Organization

Ethan Freid, MD, FACP. Founder of the NYACP Near-Miss Registry

Tom Frieden, MD, MPH. Director of the Centers for Disease Control and Prevention

Karen Frush, MD. Chief Patient Safety Officer at Duke University Health System

Chu Foxlin. Associate at Tsoi/Kobus & Associates

Tejal K. Gandhi, MD, MPH, CPPS. President of the National Patient Safety Foundation

Atul Gawande, MD, PhD. Professor of Public Health at Harvard School of Public Health

Michael Henderson, MD. Chief Quality Officer of Cleveland Clinic

Gordon C. Hunt Jr., MD, MBA. Senior Vice President and CMO for Sutter Health

Donald Kennerly, MD, PhD. Chief Quality Officer at Baylor Health Care System and Chief Patient Safety Officer for Baylor Scott & White Health

**Joe Kiani. Founder of the Patient Safety Movement Foundation**

Richard Kronick, PhD, Director for the Agency for Healthcare Research and Quality

Lucian Leape, MD. Chairman of the Lucian Leape Institute at the National Patient Safety Foundation

MASA00019946
**Exhibit 31**
**-179-**

Jeffrey C. Lerner, PhD. President and CEO of ECRI

Tammi Minnier, RN, MSN, FACHE. Chief Quality Officer for UPMC

Elizabeth Mort, MD. Senior Vice President for Quality and Safety at Massachusetts General Hospital

Frank Overdyk, MD, MSEE. Executive Director for Research at North American Partners in Anesthesia

Peter Pronovost, MD. Senior Vice President for Patient Safety and Quality at Johns Hopkins Medicine

Eric Schneider, MD, Editor of the International Journal of Quality in Healthcare

Kaveh G. Shojania, MD. Editor-in-Chief of BMJ Quality & Safety

Robert K. Stoelting, MD. President of the Anesthesia Patient Safety Foundation

Janet Woodcock, MD. Director of the Center for Drug Evaluation and Research

Joan Wynn, PhD. Chief Quality and Safety Officer for Vidant Health

The entire list can be found here: 50 Experts Leading the Field of Patient Safety – 2014 (http://www.beckershospitalreview.com/lists/50-experts-leading-the-field-of-patient-safety-2014.html)

For more information about the Patient Safety Movement Foundation and its mission to eliminate preventable patient deaths by 2020, please visit http://patientsafetymovement.org (http://patientsafetymovement.org).

### About Masimo

Masimo (NASDAQ: MASI) is the global leader in innovative noninvasive monitoring technologies that significantly improve patient care-helping solve "unsolvable" problems. In 1995, the company debuted Measure-Through Motion and Low Perfusion pulse oximetry, known as Masimo SET®, which virtually eliminated false alarms and increased pulse oximetry's ability to detect life-threatening events. More than 100 independent and objective studies have shown that Masimo SET® outperforms other pulse oximetry technologies, even under the most challenging clinical conditions, including patient motion and low peripheral perfusion. In 2005, Masimo introduced rainbow Pulse CO-Oximetry technology, allowing noninvasive and continuous monitoring of blood constituents that previously could only be measured invasively, including total hemoglobin (SpHb®), oxygen content (SpOC™), carboxyhemoglobin (SpCO®), methemoglobin (SpMet®), and Pleth Variability Index (PVi®), in addition to SpO2, pulse rate, and perfusion index (PI). Additional information about Masimo and its products may be found at www.masimo.com.

**GO TO TOP**

**Masimo Receives 2013 Zenith Award at the American Association of Respiratory Care Congress**

MASA00019947
Exhibit 31
-180-

**Irvine, California – November 18, 2013** – Masimo (NASDAQ: MASI), the inventor of Pulse CO-Oximetry™ and Measure-through Motion and Low Perfusion™ pulse oximetry, announced today that it has received the prestigious Zenith Award for equipment and service excellence from the American Association of Respiratory Care (AARC) at the 59th Annual AARC Congress in Anaheim, Calif.



With the 2013 Zenith Award, Masimo has achieved AARC's top industry recognition honoring respiratory care equipment and pharmaceutical manufacturers for quality and service excellence. More than 400 companies were eligible for only one of six Zenith Award honors. Award winners are chosen by the association's membership—more than 52,000 respiratory care professionals—based upon the quality of equipment and/or supplies, accessibility and helpfulness of sales personnel, as well as the company's responsiveness, service record, truth in advertising, and overall support of the respiratory care profession.

"Masimo typifies the qualities represented in the criteria and, because of this, we salute you and your employees," said AARC Executive Director/CEO Thomas J. Kallstrom.

"We are honored by the appreciation of so many AARC members who have once again recognized us with the Zenith Award," said Joe Kiani, founder & CEO of Masimo. "This recognition is especially meaningful and gratifying because it comes from the clinicians who use our products every day."

### About Masimo

Masimo (NASDAQ: MASI) is the global leader in innovative noninvasive monitoring technologies that significantly improve patient care—helping solve "unsolvable" problems. In 1995, the company debuted Measure-Through Motion and Low Perfusion pulse oximetry, known as Masimo SET®, which virtually eliminated false alarms and increased pulse oximetry's ability to help clinicians detect life-threatening events. More than 100 independent and objective studies have shown that Masimo SET® outperforms other pulse oximetry technologies, even under the most challenging clinical conditions, including patient motion and low peripheral perfusion. In 2005, Masimo introduced rainbow ® Pulse CO-Oximetry™ technology, allowing noninvasive and continuous monitoring of blood constituents that previously required invasive procedures; total hemoglobin (SpHb®), oxygen content (SpOC™), carboxyhemoglobin (SpCO®), methemoglobin (SpMet®), PVi®, and perfusion index (PI), in addition to measure-through motion SpO2, and pulse rate. In 2008, Masimo introduced Patient SafetyNet™, a remote monitoring and wireless clinician notification system designed to help hospitals avoid preventable deaths and injuries associated with failure to rescue events. In 2009, Masimo introduced rainbow® Acoustic Monitoring™, the first-ever commercially available noninvasive and continuous monitoring of acoustic respiration rate (RRa™). Masimo SET® and Masimo rainbow® technologies also can be found in over 100 multiparameter patient monitors from over 50 medical device manufacturers around the world. Founded in 1989, Masimo has the mission of "Improving Patient Outcome and Reducing Cost of Care by Taking Noninvasive Monitoring to New Sites and Applications®." Additional information about Masimo and its products may be found at www.masimo.com.

### Forward-Looking Statements

This press release includes forward-looking statements as defined in Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934, in connection with the Private Securities Litigation Reform Act of 1995. These forward-looking statements are based on current expectations about future events affecting us and are subject to risks and uncertainties, all of which are difficult to predict and many of which are beyond our control and could cause our actual results to differ materially and adversely from those expressed in our forward-looking statements as a result of various risk factors discussed in the "Risk Factors" section of our

MASA00019948
Exhibit 31
-181-

Masimo - Awards

most recent reports filed with the Securities and Exchange Commission ("SEC"), which may be obtained for free at the SEC's website at www.sec.gov. Although we believe that the expectations reflected in our forward-looking statements are reasonable, we do not know whether our expectations will prove correct. All forward-looking statements included in this press release are expressly qualified in their entirety by the foregoing cautionary statements. You are cautioned not to place undue reliance on these forward-looking statements, which speak only as of today's date. We do not undertake any obligation to update, amend or clarify these statements or the "Risk Factors" contained in our most recent reports filed with the SEC, whether as a result of new information, future events or otherwise, except as may be required under the applicable securities laws.

**GO TO TOP**

## EMMA™ Palm Size Capnograph Earns 2013 EMS World Top Innovation Award

**Irvine, California – October 4, 2013** – Masimo(NASDAQ: MASI) announced today that its EMMA (/products/ventilator/capnography/emma-capnograph/)™ Capnograph with waveform display earned a prestigious EMS World Top Innovation Award, another accolade for a powerful, portable device, that offers immediate waveform capnography, end-tidal carbon dioxide and respiration rate at your fingertips.

EMMA was one of 65 products entered as a new, innovative product in emergency medical services. A committee narrowed the field to finalists, which were selected for in-depth evaluation at the recent EMS World Expo (http://trk.cp20.com/Tracking/t.c?5yo7y-a8u99-me8qtn0&_v=2).Of those, 20 were selected as Top New Product Innovations to be featured in the December 2013 issue of *EMSWorld Magazine* (http://trk.cp20.com/Tracking/t.c?5yo7y-a8u9a-me8qtn0&_v=2), as well as on EMSWorld.com (http://trk.cp20.com/Tracking/t.c?5yo7y-a8u9b-me8qtn1&_v=2), and profiled in the January 2014 print issue.



*Masimo EMMA™ Capnograph.*

Launched in July 2013, EMMA Capnograph offers clinicians assessment of end-tidal carbon dioxide (EtCO2) and respiration rate, as well as assisting in recognition of return to spontaneous circulation, for a variety of clinical settings, including emergency medicine and transport, ORs, ICUs, patient rooms, and clinics. Rugged, water-resistant and operational in first-responder and other

MASA00019949
**Exhibit 31**
**-182-**

clinically challenging conditions, EMMA Capnograph displays and monitors respiratory rate and EtCO2 continuously with full accuracy within 15 seconds when connected to a patient's breathing circuit. Powered by two standard AAA batteries, EMMA's portability allows for easy use during cardiopulmonary resuscitation (CPR) and intubation in multiple points of care.

Previously, sister product EMMA Capnometer won a JEMS Hot Products Award (http://trk.cp20.com/Tracking/t.c?5yo7y-a8u9c-me8qtn2&_v=2) from the *Journal of Emergency Medical Services* (http://trk.cp20.com/Tracking/t.c?5yo7y-a8u9d-me8qtn3&_v=2) at the EMS Today Conference and Exposition.

"We are honored that our EMMA Capnograph continues to earn high praise from all corners of the EMS industry," said Jon Coleman, Masimo President, Masimo Worldwide Sales, Professional Services and Medical Affairs. "The EMS World Top Innovation Award is particularly uplifting given the intensely competitive field of EMS devices."

### About Masimo

Masimo (NASDAQ: MASI) is the global leader in innovative noninvasive monitoring technologies that significantly improve patient care—helping solve "unsolvable" problems. In 1995, the company debuted Measure-Through Motion and Low Perfusion pulse oximetry, known as Masimo SET®, which virtually eliminated false alarms and increased pulse oximetry's ability to help clinicians detect life-threatening events. More than 100 independent and objective studies have shown that Masimo SET® outperforms other pulse oximetry technologies, even under the most challenging clinical conditions, including patient motion and low peripheral perfusion. In 2005, Masimo introduced rainbow ® Pulse CO-Oximetry™ technology, allowing noninvasive and continuous monitoring of blood constituents that previously required invasive procedures; total hemoglobin (SpHb®), oxygen content (SpOC™), carboxyhemoglobin (SpCO®), methemoglobin (SpMet®), PVi®, and perfusion index (PI), in addition to measure-through motion SpO2, and pulse rate. In 2008, Masimo introduced Patient SafetyNet™, a remote monitoring and wireless clinician notification system designed to help hospitals avoid preventable deaths and injuries associated with failure to rescue events. In 2009, Masimo introduced rainbow® Acoustic Monitoring™, the first-ever commercially available noninvasive and continuous monitoring of acoustic respiration rate (RRa™). Masimo SET® and Masimo rainbow® technologies also can be found in over 100 multiparameter patient monitors from over 50 medical device manufacturers around the world. Founded in 1989, Masimo has the mission of "Improving Patient Outcome and Reducing Cost of Care by Taking Noninvasive Monitoring to New Sites and Applications®." Additional information about Masimo and its products may be found at www.masimo.com (http://trk.cp20.com/Tracking/t.c?5yo7y-a8u9e-me8qtn4&_v=2).

### Forward-Looking Statements

This press release includes forward-looking statements as defined in Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934, in connection with the Private Securities Litigation Reform Act of 1995. These forward-looking statements are based on current expectations about future events affecting us and are subject to risks and uncertainties, all of which are difficult to predict and many of which are beyond our control and could cause our actual results to differ materially and adversely from those expressed in our forward-looking statements as a result of various risk factors, including, but not limited to: risks related to the performance of EMMA and its ability to provide end-tidal CO2 assessment during cardiopulmonary resuscitation (CPR) and intubation for all patients in all clinical settings in just a few seconds; as well as other factors discussed in the "Risk Factors" section of our most recent reports filed with the Securities and Exchange Commission ("SEC"), which may be obtained for free at the SEC's website at www.sec.gov (http://trk.cp20.com/Tracking/t.c?5yo7y-a8u9f-me8qtn5&_v=2). Although we believe that the expectations reflected in our forward-looking statements are reasonable, we do not know whether our expectations will prove correct. All forward-looking statements included in this press release are expressly qualified in their entirety by the foregoing cautionary statements. You are cautioned not to place undue reliance on these forward-looking statements, which speak only as of today's date. We do not undertake

MASA00019950
Exhibit 31
-183-

any obligation to update, amend or clarify these forward-looking statements or the "Risk Factors" contained in our most recent reports filed with the SEC, whether as a result of new information, future events or otherwise, except as may be required under the applicable securities laws.

**GO TO TOP**

## Masimo CEO Joe Kiani Receives Argyros Medal for Visionary Leadership & Commitment to Patient Safety

*Chapman University's George L. Argyros School of Business and Economics Bestows Award at Commencement Address to Class of 2013*

**Irvine, California – May 20, 2013** – Chapman University's George L. Argyros School of Business and Economics awarded Joe Kiani, founder, CEO and Chairman of the Board of Masimo (NASDAQ: MASI), the Argyros Medal for his entrepreneurship, outstanding business accomplishments, service on behalf of patient safety, and dedication and support of Chapman University.



(/siteassets/us/images/company/awards/c941d6cabc774062ac4afd90d00240f2.jpg)

James L. Doti, President of Chapman University, and Reginald H. Gilyard, Dean of the Argyros School of Business and Economics, presented Kiani with the Argyros Medal before Joe Kiani delivered the Commencement Address to the Class of 2013.

MASA00019951
**Exhibit 31**
**-184-**

Chapman officials noted that while English is his second language, Kiani graduated high school at the age of 15, and earned his Bachelor of Science and Master of Science degrees in electrical engineering at the age of 22.

"Joe demonstrates the meaning of hard work and resilience," said Gilyard, and added that with the knowledge gained through education, he founded Masimo, which "has grown exponentially through Joe's visionary leadership and is now a trailblazer in the medical technology field."

Gilyard also cited Kiani's passion and commitment for patient safety through his founding of the Patient Safety, Science & Technology Movement (http://trk.cp20.com/Tracking/t.c?5hl46-8acvt-me8qtn2&_v=2), with a goal to reduce preventable hospital deaths to zero by 2020, and his dedication to the Clinton Global Initiative to help alleviate maternal mortality and anemia in Sub-Sarah Africa starting with villages in Liberia and Uganda.

"Joe considers it his company's responsibility to make patient safety a top priority," Gilyard said. "And Masimo is working tirelessly to get medical decision-makers on board with this charge."

Stated Kiani: "I am truly humbled and honored to receive the Argyros Medal from Chapman University's George L. Argyros School of Business and Economics. As I noted in my Commencement Address to the Class of 2013, success should be defined in terms of happiness. This award represents a happy occasion, as well as a solemn reminder that ethical business practices and financial profits are not mutually exclusive."

###

#### About the George L. Argyros Award

The George L. Argyros Award is given every year on behalf of the Honorable George L. Argyros '59. This award is given at the annual Argyros School of Business and Economics' Commencement ceremony. The award is given to a member of the community who exemplifies entrepreneurship and service. The Argyros Medal honors the outstanding accomplishments of the Honorable George L. Argyros as an entrepreneur and leader in the business community, as well as his dedication and support for Chapman University. Please visit www.chapman.edu/asbe/about-george-argyros.aspx (http://trk.cp20.com/Tracking/t.c?5hl46-8acvu-me8qtn3&_v=2)

#### About Masimo

Masimo (NASDAQ: MASI) is the global leader in innovative noninvasive monitoring technologies that significantly improve patient care—helping solve "unsolvable" problems. In 1995, the company debuted Measure-Through Motion and Low Perfusion pulse oximetry, known as Masimo SET®, which virtually eliminated false alarms and increased pulse oximetry's ability to help clinicians detect life-threatening events. More than 100 independent and objective studies have shown that Masimo SET® outperforms other pulse oximetry technologies, even under the most challenging clinical conditions, including patient motion and low peripheral perfusion. In 2005, Masimo introduced rainbow SET® Pulse CO-Oximetry technology, allowing noninvasive and continuous monitoring of blood constituents that previously required invasive procedures; total hemoglobin (SpHb®), oxygen content (SpOCTM), carboxyhemoglobin (SpCO®), methemoglobin (SpMet®), PVi®, and perfusion index (PI), in addition to measure-through motion SpO2, and pulse rate.

MASA00019952
Exhibit 31
-185-

In 2008, Masimo introduced Patient SafetyNet™, a remote monitoring and wireless clinician notification system designed to help hospitals avoid preventable deaths and injuries associated with failure to rescue events. In 2009, Masimo introduced rainbow® Acoustic Monitoring™, the first-ever commercially available noninvasive and continuous monitoring of acoustic respiration rate (RRa™). Masimo SET® and Masimo rainbow® technologies also can be found in over 100 multiparameter patient monitors from over 50 medical device manufacturers around the world. Founded in 1989, Masimo has the mission of "Improving Patient Outcome and Reducing Cost of Care by Taking Noninvasive Monitoring to New Sites and Applications®." Additional information about Masimo and its products may be found at www.masimo.com (http://trk.cp20.com/Tracking/t.c?5hl46-8acvv-me8qtn4&_v=2).

**Forward Looking Statements**

This press release includes forward-looking statements as defined in Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934, in connection with the Private Securities Litigation Reform Act of 1995. These forward-looking statements are based on current expectations about future events affecting us and are subject to risks and uncertainties, all of which are difficult to predict and many of which are beyond our control and could cause our actual results to differ materially and adversely from those expressed in our forward-looking statements as a result of various risk factors, including, but not limited to: whether Mr. Kiani's receipt of the Argyros Medal will have any material effect on our business, as well as other factors discussed in the "Risk Factors" section of our most recent reports filed with the Securities and Exchange Commission ("SEC"), which may be obtained for free at the SEC's website at www.sec.gov. Although we believe that the expectations reflected in our forward-looking statements are reasonable, we do not know whether our expectations will prove correct. All forward-looking statements included in this press release are expressly qualified in their entirety by the foregoing cautionary statements. You are cautioned not to place undue reliance on these forward-looking statements, which speak only as of today's date. We do not undertake any obligation to update, amend or clarify these forward-looking statements or the "Risk Factors" contained in our most recent reports filed with the SEC, whether as a result of new information, future events or otherwise, except as may be required under the applicable securities laws.

**GO TO TOP**

Masimo iSpO2 Pulse Oximeter & EMMA Emergency Capnometer Earn JEMS Hot Products Awards at EMS Today 2013 Conference & Exposition

(/siteassets/us/images/company/awards/jems-hot-products-2013.jpg)

*Masimo One of Two Companies (out of 300) to Win Two Awards at 31st Annual Industry-Leading Emergency Medical Services Event*

**IRVINE, California – April 29, 2013** – Masimo (NASDAQ: MASI) announced today that its iSpO2™ pulse oximeter for iPad, iPhone, and iPod touch and EMMA™ Emergency Capnometer earned JEMS Hot Product awards. Only two companies received dual Hot Product award honors at the

MASA00019953
**Exhibit 31**
**-186-**

EMS Today 2013 Conference & Exposition, the industry's leading emergency medical services (EMS) event held recently in Washington, D.C.

A dozen judges reviewed and evaluated products that had recently been introduced into the emergency service industry by the more than 300 exhibitors at the EMS Today 2013 Conference & Exhibition and rated each of them on originality, functionality, ease of use, and need in the EMS setting. The top 25 products were then selected as the hottest new products shown at EMS Today 2013.



EMMA Mainstream Capnometer™ continuously measures, displays, and monitors respiratory rate and end-tidal carbon dioxide (EtCO2).

"This year just two companies got two products selected in the top 25 – quite an achievement," said AJ Heightman, editor-in-chief of JEMS. "We have had very few double winners in the past."

The EMMA Mainstream Capnometer measures, displays, and monitors respiratory rate and end-tidal carbon dioxide (EtCO2) continuously when connected to a patient's breathing circuit. EMMA's portability allows for use during cardiopulmonary resuscitation (CPR) and intubation in multiple points of care



Masimo iSpO2™ pulse oximetry cable and sensor (available at iSpO2.com) is compatible with the iPhone, iPad, or iPod touch.

including pre-hospital, rapid response, emergency medicine, operating room, intensive care unit, and long-term acute care. Because EMMA is integrated into the breathing circuit for easy viewing during CPR and endotracheal tube placement, it is highly accessible during transport and/or emergency ventilation scenarios—allowing quick assessment in just a few seconds.

The Masimo iSpO2™ is a consumer pulse oximeter utilizing Masimo SET® technology – the same technology used in leading hospitals worldwide, providing accurate measurements even during the challenging conditions of motion and low perfusion – for use with iPhone, iPad or iPod touch with 30-pin connector to noninvasively measure blood oxygenation, pulse rate and perfusion index. iSpO2 is for short-term sports and aviation use and is not intended for medical use.

"We are honored that our iSpO2 pulse oximeter and EMMA capnometer received two prestigious JEMS Hot Products Awards at EMS Today, the preeminent conference and exhibition for the emergency services industry," said Jon Coleman, Masimo President of Worldwide Sales and Marketing and Clinical Research. "Masimo has always been committed to taking monitoring technologies to new sites and applications, and we're equally committed to launching more award-winning products."

###

MASA00019954
Exhibit 31
-187-

## About Masimo

Masimo (NASDAQ: MASI) is the global leader in innovative noninvasive monitoring technologies that significantly improve patient care—helping solve "unsolvable" problems. In 1995, the company debuted Measure-Through Motion and Low Perfusion pulse oximetry, known as Masimo SET®, which virtually eliminated false alarms and increased pulse oximetry's ability to help clinicians detect life-threatening events. More than 100 independent and objective studies have shown that Masimo SET® outperforms other pulse oximetry technologies, even under the most challenging clinical conditions, including patient motion and low peripheral perfusion. In 2005, Masimo introduced rainbow ® Pulse CO-Oximetry™ technology, allowing noninvasive and continuous monitoring of blood constituents that previously required invasive procedures; total hemoglobin (SpHb®), oxygen content (SpOC˜), carboxyhemoglobin (SpCO®), methemoglobin (SpMet®), PVi®, and perfusion index (PI), in addition to measure-through motion SpO2, and pulse rate. In 2008, Masimo introduced Patient SafetyNet˜, a remote monitoring and wireless clinician notification system designed to help hospitals avoid preventable deaths and injuries associated with failure to rescue events. In 2009, Masimo introduced rainbow® Acoustic Monitoring™, the first-ever commercially available noninvasive and continuous monitoring of acoustic respiration rate (RRa˜). Masimo SET® and Masimo rainbow® technologies also can be found in over 100 multiparameter patient monitors from over 50 medical device manufacturers around the world. Founded in 1989, Masimo has the mission of "Improving Patient Outcome and Reducing Cost of Care ... by Taking Noninvasive Monitoring to New Sites and Applications®." Additional information about Masimo and its products may be found at www.masimo.com (http://www.masimo.com).

## Forward-Looking Statements

This press release includes forward-looking statements as defined in Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934, in connection with the Private Securities Litigation Reform Act of 1995. These forward-looking statements are based on current expectations about future events affecting us and are subject to risks and uncertainties, all of which are difficult to predict and many of which are beyond our control and could cause our actual results to differ materially and adversely from those expressed in our forward-looking statements as a result of various risk factors, including, but not limited to: risks related to the performance of iSpO2 with Masimo SET technology and its ability to provide accurate measurements even during the challenging conditions of motion and low perfusion; risks related to the performance of EMMA and its ability to provide quick assessment in just a few seconds in all cases, as well as other factors discussed in the "Risk Factors" section of our most recent reports filed with the Securities and Exchange Commission ("SEC"), which may be obtained for free at the SEC's website at www.sec.gov. Although we believe that the expectations reflected in our forward-looking statements are reasonable, we do not know whether our expectations will prove correct. All forward-looking statements included in this press release are expressly qualified in their entirety by the foregoing cautionary statements. You are cautioned not to place undue reliance on these forward-looking statements, which speak only as of today's date. We do not undertake any obligation to update, amend or clarify these statements or the "Risk Factors" contained in our most recent reports filed with the SEC, whether as a result of new information, future events or otherwise, except as may be required under the applicable securities laws.

**GO TO TOP**

Masimo Corporation Founder and CEO Joe Kiani Named Ernst & Young National Entrepreneur Of The Year – 2012 Life Sciences Award Winner

MASA00019955
**Exhibit 31**
**-188-**

*Joe Kiani honored for revolutionizing today's health care
technologies with the invention and commercialization of
noninvasive patient monitoring devices*

**IRVINE, California, November 20, 2012** – Joe Kiani, founder,
CEO and Chairman of the Board of Masimo Corporation, has
been named the Ernst & Young National Entrepreneur Of The
Year – 2012 Life Sciences Award Winner. The Ernst & Young
Entrepreneur Of The Year Award is the country's most
prestigious business award for entrepreneurs. The award
encourages entrepreneurial activity and recognizes leaders and
visionaries who demonstrate innovation, financial success and
personal commitment as they create and build world-class businesses.



Kiani was recognized for revolutionizing the health care industry by taking risks to create and
commercialize noninvasive patient monitoring devices, which include a wide array of sensors
that lead to improved accuracy, a reduction in the overall number of false readings, and
ultimately, reduced cost of care. Kiani was honored at the Entrepreneur Of The Year Awards gala,
the culminating event of the Ernst & Young Strategic Growth Forum in Palm Springs, Calif. The
Forum is the nation's premier gathering of high-growth, market-leading companies. Awards were
given in nine additional categories. The Ernst & Young Entrepreneur Of The Year Award winners
were selected by an independent panel of judges from 244 regional award recipients.

"We are pleased to honor Joe Kiani with this esteemed award and recognize him for his
perseverance, passion, and innovative mind – all of which continue to make a positive impact on
health care and patient monitoring technologies," said Bryan Pearce, Americas Director,
Entrepreneur Of The Year, Ernst & Young LLP. "Joe's innovative approach, discipline and triumph
over the years truly demonstrate the meaning of the entrepreneurial spirit we've come to
celebrate over the last 26 years."

### The early rise and collapse

By training, Kiani is an electrical engineer, graduating from high school at the mere age of 15.
Kiani's entrepreneurial spirit sprouted early on at his first job, a smaller company with pulse
oximeter technology, where he worked in exchange for stock – not cash. Kiani's aptitude and
contributions led to his swift rise to the top as president of the company, after its upcoming
merger, at an early age. But as hasty as the rise, Kiani quickly learned an important aspect of
ethics and integrity. As a result of his efforts in honesty, Kiani was blamed for the collapse of the
company's pending merger. This decision and outcome ultimately led to Masimo Corporation.

MASA00019956
**Exhibit 31**
**-189-**

## Passion & discipline: never settle for less

With Kiani's developed passion for adaptive signal processing for noninvasive monitoring, he took the money he had saved and a $40,000 bank loan and began to develop noninvasive patient monitoring technology from his garage. Within three short years of maintaining a strong financial discipline, Kiani had raised substantial capital and was well on his way to creating medical technology that has transformed the health care industry today – technology that would not exist were it not for Masimo Corporation. Despite hospital administrators and clinicians embracing Masimo's superior technology, Kiani still faced barriers. Larger, more established companies and group purchasing organizations (GPOs) were reluctant to let Masimo Corporation succeed in the market. Kiani stuck by his belief of always doing what is right for patient care and emerged victorious after Senate investigations into anticompetitive practices of GPOs and established companies, including his main rival, where Kiani testified twice in front of the U.S. Senate Judiciary Committee, and a seven-year patent infringement legal battle – a battle that threatened to bankrupt Masimo.

## Giving back and thriving

As Masimo emerged as a success story in the medical industry, many advised Kiani to buy out his existing shareholders. But instead, he distributed much of his profit in a special dividend and offered a substantial appreciation bonus to employees. Soon after, Kiani knew Masimo could achieve bigger and better things, and in order to do so, he took the company public. In its first five years as a public company, Masimo Corporation product revenues increased by more than 100 percent, and net income increased by more than 175 percent. Throughout it all, Kiani never stopped taking risks to grow what is now a multi-million dollar public company with more than 2,700 employees.

#### About Ernst & Young's Entrepreneur Of The Year Ernst & Young's Entrepreneur Of The Year

is the world's most prestigious business award for entrepreneurs. The unique award makes a difference through the way it encourages entrepreneurial activity among those with potential and recognizes the contribution of people who inspire others with their vision, leadership and achievement. As the first and only truly global award of its kind, Entrepreneur Of The Year celebrates those who are building and leading successful, growing and dynamic businesses, recognizing them through regional, national and global awards programs in more than 140 cities in 50 countries.

#### About Ernst & Young

Ernst & Young is a global leader in assurance, tax, transaction and advisory services. Worldwide, our 167,000 people are united by our shared values and an unwavering commitment to quality. We make a difference by helping our people, our clients and our wider communities achieve their potential.

MASA00019957
**Exhibit 31**
**-190-**

Masimo - Awards

For more information, please visit ey.com.

SOURCE Ernst & Young

**GO TO TOP**

Masimo Pronto-7® Wins GOLD "Stevie®" Award for Best New Health Product

**Irvine, California – September 20, 2012** – Masimo Corporation (NASDAQ: MASI) announced today that its Pronto-7® handheld noninvasive hemoglobin, arterial oxygen saturation (SpO2), pulse rate, and perfusion index spot-check testing device earned a 2012 GOLD Stevie® American 

Business Award for the Best New Product or Service in the Health & Pharmaceuticals category.

This marks the fourth industry award the innovative Pronto-7 has won since its commercialization last year. The 2012 Stevie Award winners were honored recently at a presentation ceremony at the Julia Morgan Ballroom, Merchants Exchange in San Francisco.

The Pronto-7 is a palm-sized device designed for quick-and-easy noninvasive total hemoglobin (SpHb®) spot-check testing, along with SpO2, pulse rate, and perfusion index. Extremely lightweight at approximately 296g, the Pronto-7 delivers total hemoglobin measurement results —a physiological parameter that previously required an invasive blood draw and time-consuming lab analysis—in under one minute. Offering needle-less and pain-free hemoglobin testing, the Pronto-7 is a cost-effective solution for immediate, on-the-spot hemoglobin testing that is raising the expectations of patients and clinicians alike to more advanced healthcare at the earliest moment of care.

"We are honored the Pronto-7 has earned a GOLD Stevie award, emerging atop an extremely competitive field this year," said Joe Kiani, Founder and CEO of Masimo. "The Pronto-7 incorporates some of Masimo's most advanced technology to help overcome many of the challenges and risks associated with invasive hemoglobin sampling for both clinicians and patients – enabling fast, accurate, painless, needle-free total hemoglobin measurements."

The Stevie Awards were created to honor and generate public recognition of the achievements and positive contributions of organizations and business people worldwide. Beginning with The American Business Awards in 2002, The International Business Awards in 2003, The Stevie

MASA00019958
**Exhibit 31**
**-191-**

Awards for Women in Business in 2004, and the Stevie Awards for Sales & Customer Service in
2006, the program's mission is to raise the profile of exemplary organizations and individuals
among the press, the business community, and the general public. The Stevie has become one
of the world's most coveted awards.

The American Business Awards are judged each year by more than 200 executives nationwide.
Sponsors include several of the top business publishers and marketers.

**About Masimo Masimo**

(NASDAQ: MASI) is the global leader in innovative noninvasive monitoring technologies that significantly improve patient
care—helping solve "unsolvable" problems. In 1995, the company debuted Measure-Through Motion and Low Perfusion
pulse oximetry, known as Masimo SET®, which virtually eliminated false alarms and increased pulse oximetry's ability to
detect life-threatening events. More than 100 independent and objective studies demonstrate Masimo SET provides the
most reliable SpO2 and pulse rate measurements even under the most challenging clinical conditions, including patient
motion and low peripheral perfusion. In 2005, Masimo introduced rainbow SET® Pulse CO-Oximetry™ technology, allowing
noninvasive and continuous monitoring of blood constituents that previously required invasive procedures, including
total hemoglobin (SpHb®), oxygen content (SpOC™), carboxyhemoglobin (SpCO®), methemoglobin (SpMet®), and Pleth
Variability Index (PVi®), in addition to SpO2, pulse rate, and perfusion index (PI). In 2008, the company introduced Masimo
SafetyNet™, a remote monitoring and wireless clinician notification system designed to help hospitals avoid preventable
deaths and injuries associated with failure to rescue events. In 2009, Masimo introduced rainbow Acoustic Monitoring™,
the first-ever noninvasive and continuous monitoring of acoustic respiration rate (RRa™). Masimo's rainbow SET
technology platform offers a breakthrough in patient safety by helping clinicians detect life-threatening conditions and
helping guide treatment options. In 2010, Masimo acquired SedLine®, a pioneer in the development of innovative brain
function monitoring technology and devices. Masimo SET and Masimo rainbow SET technologies can also be found in
over 100 multiparameter patient monitors from over 50 medical device manufacturers around the world. Founded in
1989, Masimo has the mission of "Improving Patient Outcome and Reducing Cost of Care ... by Taking Noninvasive
Monitoring to New Sites and Applications®." Additional information about Masimo and its products may be found at
www.masimo.com (/).

**Forward-Looking Statements**

This press release includes forward-looking statements as defined in Section 27A of the Securities Act of 1933 and
Section 21E of the Securities Exchange Act of 1934, in connection with the Private Securities Litigation Reform Act of
1995. These forward-looking statements are based on current expectations about future events affecting us and are
subject to risks and uncertainties, all of which are difficult to predict and many of which are beyond our control and could
cause our actual results to differ materially and adversely from those expressed in our forward-looking statements as a
result of various risk factors, including, but not limited to: risks related to our assumptions of the repeatability of clinical
results obtained using the new Masimo Pronto-7 and noninvasive sensor sizes, risks related to our belief that the Pronto-
7 enables quick and easy noninvasive spot-checking of hemoglobin (SpHb®), SpO2, pulse rate, and perfusion index at the
point-of-care for all patients, as well as other factors discussed in the "Risk Factors" section of our most recent reports
filed with the Securities and Exchange Commission ("**SEC**"), which may be obtained for free at the SEC's website at
www.sec.gov (https://www.sec.gov/). Although we believe that the expectations reflected in our forward-looking
statements are reasonable, we do not know whether our expectations will prove correct. All forward-looking statements
included in this press release are expressly qualified in their entirety by the foregoing cautionary statements. You are
cautioned not to place undue reliance on these forward-looking statements, which speak only as of today's date. We do

MASA00019959
**Exhibit 31**
**-192-**

not undertake any obligation to update, amend or clarify these statements or the "Risk Factors" contained in our most recent reports filed with the SEC, whether as a result of new information, future events or otherwise, except as may be required under the applicable securities laws.

**GO TO TOP**

Masimo CEO Joe Kiani Named Ernst & Young Entrepreneur of the Year

**Irvine, California − June 8, 2012** − Masimo (NASDAQ: MASI) CEO and founder Joe Kiani received the Ernst & Young (Orange County) Entrepreneur of the Year® Award during a gala at the St. Regis Monarch Beach Resort in Dana Point, Calif., Thursday evening.

*⧎ ERNST & YOUNG*

Kiani is an inventor of pioneering noninvasive patient-monitoring devices, a trusted voice for patient safety and care, and a convention-breaking maverick.

Founded in 1989, Masimo has grown from a garage startup into a successful publicly traded company, employing more than 2,500 people worldwide. The company makes and markets Measure-through-Motion and Low Perfusion (blood flow) pulse oximetry technology such as Masimo rainbow® SET Pulse CO-Oximetry˜ − a breakthrough platform that allows noninvasive, continuous monitoring of blood constituents and physiological parameters that previously required invasive procedures, including: total hemoglobin (SpHb®), oxygen content (SpOC˜), carboxyhemoglobin (SpCO®), methemoglobin (SpMet®), Pleth Variability Index (PVi®), and acoustic respiration rate (RRa˜), in addition to the Measure-through Motion and Low Perfusion performance of Masimo SET® oxyhemoglobin (SpO2), perfusion index (PI), and pulse rate (PR).

In 2006, Kiani and Masimo emerged victorious after a seven-year patent-infringement battle against a larger competitor. His underdog story is a testament to the power of the American Dream. The company filed for a successful initial public offering in 2007. *Forbes* named Masimo one of the best small public companies in the United States (November 2011). The company also has earned dozens of industry honors, including the 2011 TechAmerica High-Tech Innovation Award; the 2011 Gold Medal Medical Design Excellence Award; the 2011 iF Product Design Award; and multiple Zenith awards, among others.

MASA00019960
**Exhibit 31**
**-193-**

In 2010, Kiani created the Masimo Foundation for Ethics, Innovation and Competition in Healthcare to encourage and promote activities, programs, and research opportunities that improve patient safety and deliver advanced healthcare to people worldwide who may not otherwise have access to lifesaving technologies.

"This is an honor and one that's made possible by the incredible, passionate and hard-working people at Masimo, who are motivated to help improve patient care and reduce healthcare costs," Kiani said of the Entrepreneur of the Year award. "We look forward to continuing to innovate, while taking noninvasive monitoring to new sites and applications."

### About Ernst & Young Entrepreneur of the Year

Ernst & Young Entrepreneur of the Year is the world's most prestigious business award for entrepreneurs. The unique award makes a difference through the way it encourages entrepreneurial activity among those with potential, and recognizes the contribution of people who inspire others with their vision, leadership and achievement. As the first and only truly global award of its kind, Entrepreneur of the Year celebrates those who are building and leading successful, growing and dynamic businesses, recognizing them through regional, national and global awards programs in more than 140 cities in more than 50 countries.

### About Masimo

(NASDAQ: MASI) is the global leader in innovative noninvasive monitoring technologies that significantly improve patient care—helping solve "unsolvable" problems. In 1995, the company debuted Measure-Through Motion and Low Perfusion pulse oximetry, known as Masimo SET®, which virtually eliminated false alarms and increased pulse oximetry's ability to detect life-threatening events. More than 100 independent and objective studies demonstrate Masimo SET provides the most reliable $SpO_2$ and pulse rate measurements even under the most challenging clinical conditions, including patient motion and low peripheral perfusion. In 2005, Masimo introduced rainbow SET® Pulse CO-Oximetry® technology, allowing noninvasive and continuous monitoring of blood constituents that previously required invasive procedures, including total hemoglobin (SpHb®), oxygen content (SpOC®), carboxyhemoglobin (SpCO®), methemoglobin (SpMet®), and Pleth Variability Index (PVi®), in addition to $SpO_2$, pulse rate, and perfusion index (PI). In 2008, the company introduced Masimo SafetyNet®, a remote monitoring and wireless clinician notification system designed to help hospitals avoid preventable deaths and injuries associated with failure to rescue events. In 2009, Masimo introduced rainbow Acoustic Monitoring®, the first-ever noninvasive and continuous monitoring of acoustic respiration rate (RRa™). Masimo's rainbow SET technology platform offers a breakthrough in patient safety by helping clinicians detect life-threatening conditions and helping guide treatment options. In 2010, Masimo acquired SedLine®, a pioneer in the development of innovative brain function monitoring technology and devices. Masimo SET and Masimo rainbow SET technologies can also be found in over 100 multiparameter patient monitors from over 50 medical device manufacturers around the world. Founded in 1989, Masimo has the mission of "Improving Patient Outcome and Reducing Cost of Care ... by Taking Noninvasive Monitoring to New Sites and Applications®." Additional information about Masimo and its products may be found at www.masimo.com.

### Forward-Looking Statements

This press release includes forward-looking statements as defined in Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934, in connection with the Private Securities Litigation Reform Act of 1995. These forward-looking statements are based on current expectations about future events affecting us and are

MASA00019961
**Exhibit 31**
**-194-**

subject to risks and uncertainties, all of which are difficult to predict and many of which are beyond our control and could cause our actual results to differ materially and adversely from those expressed in our forward-looking statements as a result of various risk factors, including, but not limited to: risks related to our assumptions of the repeatability of clinical results obtained using the new Masimo Pronto-7 and noninvasive sensor sizes, risks related to our belief that the Pronto-7 enables quick and easy noninvasive spot-checking of hemoglobin (SpHb®), SpO2, pulse rate, and perfusion index at the point-of-care for all patients, as well as other factors discussed in the "Risk Factors" section of our most recent reports filed with the Securities and Exchange Commission ("**SEC**"), which may be obtained for free at the SEC's website at www.sec.gov (https://www.sec.gov/). Although we believe that the expectations reflected in our forward-looking statements are reasonable, we do not know whether our expectations will prove correct. All forward-looking statements included in this press release are expressly qualified in their entirety by the foregoing cautionary statements. You are cautioned not to place undue reliance on these forward-looking statements, which speak only as of today's date. We do not undertake any obligation to update, amend or clarify these statements or the "Risk Factors" contained in our most recent reports filed with the SEC, whether as a result of new information, future events or otherwise, except as may be required under the applicable securities laws.

**GO TO TOP**

Masimo Pronto-7 Receives 2011 TechAmerica High-Tech Innovation Award — One of OC's Largest and Longest Running Technology Celebrations

**June 9, 2011** – The Masimo Pronto-7˝ handheld noninvasive hemoglobin, arterial oxygen saturation (SpO2), pulse rate, and perfusion index spot-check testing device has been named the 2011 TechAmerica High-Tech Innovation Award winner in the medical devices category. The premier high-tech innovation event in the OC (California), TechAmerica celebrates excellence and achievement in the region's technology industry—honoring



local companies, individuals, and products that drive innovation in Orange County and Inland Empire. This year's High-Tech Innovation Award winners were recognized during a special awards ceremony at the Hyatt Regency in Irvine, Calif. on June 9, 2011, which drew nearly 400 luminaries from local high-tech companies, financial and government institutions, as well as academic leaders, students, and investors.

Honored as a breakthrough in hemoglobin spot-check testing for its ability to quickly and easily measure hemoglobin, arterial oxygen saturation (SpO2), pulse rate, and perfusion index noninvasively without the pain and wait associated with invasive blood tests, Pronto-7 represents a cost-effective solution for immediate, on-the-spot testing that has the potential to advance the quality and delivery of healthcare around the world.

MASA00019962
**Exhibit 31**
**-195-**

"This region (Orange County, California) boasts many noteworthy individuals, companies, and products that help advance the business of technology not only in Orange County but also throughout the world," said Bob Brunson, director, TechAmerica Orange County. "This year we saw a record number of 100 nominations, including many from companies new to the competition. We congratulate all of this year's finalists, and look forward to celebrating their achievements with them and the local business community."

TechAmerica—formed by the merger of AeA (formerly the American Electronics Association), the Cyber Security Industry Alliance (CSIA), the Information Technology Association of America (ITAA) and the Government Electronics & Information Technology Association (GEIA)—is the leading voice for the U.S. technology industry and the driving force behind productivity growth and jobs creation in the United States and the foundation of the global innovation economy. Representing nearly 1,200 member companies of all sizes from the public and commercial sectors of the economy, TechAmerica is the industry's largest advocacy organization and the technology industry's only grassroots-to-global advocacy network, with offices and partnerships in state capitals across the country, Washington DC, Europe (Brussels), Asia (Beijing), and around the world.

The new Pronto-7 with small, medium, and large size finger sensors will soon be launched internationally and is pending FDA 510(k) Clearance in the U.S.

**GO TO TOP**

Masimo Pronto-7 Wins GOLD in the 2011 Medical Design Excellence Award Competition—the Premier Awards Program for the Medical Technology Community

**Irvine, California – June 8, 2011** – Masimo Corporation (NASDAQ: MASI) announced today that its Pronto-7" handheld noninvasive hemoglobin, arterial oxygen saturation (SpO2), pulse rate, and perfusion index spot-check testing device has received the GOLD 2011 Medical Design Excellence Award—the highest award given in



the general hospital devices and therapeutic products category. The 2011 Medical Design Excellence Award winners were honored today at a presentation ceremony in New York City's Jacob K. Javits Convention Center, in conjunction with the Medical Design & Manufacturing (MD&M) East Conference and Exposition (www.MDMEast.com (http://www.MDMEast.com)).

MASA00019963
**Exhibit 31**
**-196-**

The Medical Design Excellence Awards competition
(www.MDEAwards.com (http://www.MDEAwards.com)) is
organized and presented by UBM Canon (Los Angeles) and is the
only awards program that exclusively recognizes contributions and
advances in the design of medical products. Entries are evaluated
on the basis of their design and engineering features, including
innovative use of materials, user related functions that improve
healthcare delivery and change traditional medical attitudes or
practices, features that provide enhanced benefits to the patient,
and the ability of the product development team to overcome
design and engineering challenges so that the product meets its
clinical objectives. A comprehensive review of the entries was
performed by an impartial, multidisciplinary panel of third-party
jurors with expertise in biomedical engineering, human factors,
industrial design, medicine, and diagnostics.



The palm-sized Masimo Pronto-7¨
offers noninvasive hemoglobin, SpO2,
pulse rate, and PI spot-check results.

The Pronto-7 is truly an incredible breakthrough for clinical users. The palm-sized device was
designed for quick-and-easy noninvasive hemoglobin (SpHb®) spot-check testing, along with
SpO2, pulse rate, and perfusion index. Extremely lightweight at approximately 296g, the Pronto-7
delivers total hemoglobin measurement results—a physiological parameter that previously
required an invasive blood draw. Offering needle-less and pain-free hemoglobin blood testing, the
Pronto-7 is a cost-effective solution for immediate, on-the-spot hemoglobin testing that is raising
the expectations of patients and clinicians alike to more advanced healthcare at the earliest
moment of care.

"We are honored that the judges have selected Pronto-7 as a GOLD MDEA winning product," said
Joe Kiani, Founder and CEO of Masimo. "Pronto-7 was designed to help overcome many of the
challenges and risks associated with invasive hemoglobin sampling for both clinicians and
patients—enabling fast, accurate, painless, needle- and risk-free total hemoglobin
measurements."

The new Pronto-7 with small, medium, and large size finger sensors will soon be launched
internationally and is pending FDA 510(k) Clearance in the U.S.

**GO TO TOP**

MASA00019964
**Exhibit 31**
**-197-**

**Masimo Pronto-7 Honored with the International Seal of Product Design Excellence as a 2011 iF Product Design Award Winner**

Irvine, California – March, 2011 – The Masimo Pronto-7 has been named as one of the prestigious 2011 iF Product Design Award winners in medicine / health+care. Since 1953, the iF product design award has been internationally known as the most important award for innovative product design—honoring designers and



manufacturers with a label of excellence that reflects current trends in outstanding design. iF product award winners are selected by a jury of international experts who convene over two days to evaluate first-hand the design quality, finish, choice of materials, degree of innovation, environmental impact, functionality, ergonomics, visualization of intended use, safety, brand value + branding, and aspects of universal design. 993 products, out of 2,756 product entries from 1,121 participants in 43 countries, received the renowned iF product design award seal of excellence across 16 categories.

According to the jury, "Many well-known companies, and especially those with longstanding traditions, are increasingly refocusing on their own brand values and know-how that made them the successful manufacturers they are today. This year there were several extremely good examples of designs in which the brand philosophy of a company was communicated in a particularly successful fashion. Particularly in times of economic upheaval, design represents a crucial factor with regards to value creation and market success. In many of the submitted products, design clearly was the benchmark aspect."

Pronto-7 is a palm-sized noninvasive total hemoglobin (SpHb), arterial oxygen saturation (SpO2), pulse rate, and perfusion index spot-check testing device (weighing just 10.5 ounces) that offers a breakthrough new solution for noninvasively measuring hemoglobin in less than one minute—without the needles, time-consuming laboratory analysis, risk of blood contamination, hazardous medical waste, and patient discomfort associated with traditional blood tests. It puts the power of a blood lab into any clinician's hands, in virtually any environment—allowing more patients to be assessed more easily.

**GO TO TOP**

MASA00019965
**Exhibit 31**
**-198-**

## Masimo Awarded Prestigious 2010 Zenith Award for Third Straight Year

Irvine, California – December 13, 2010 – Underscoring the Company's
commitment, dedication, and industry leadership in providing best-in-breed,
innovative patient care solutions, Masimo (NASDAQ: MASI) received its third



consecutive Zenith Award. As the AARC's top industry honor for quality and service excellence,
more than 400 companies were eligible for one of five Zenith Award honors. Award winners are
chosen by the association's membership—more than 44,000 respiratory care professionals—
based upon the quality of the company's equipment and/or supplies, responsiveness, service
record, truth in advertising, accessibility and helpfulness of sales personnel, and overall support
of the respiratory care profession.

**GO TO TOP**

Masimo Wins GHX 2010 Respiratory Product Best-in-Class Award



Better Health for Your Bottom Line.

*Annual Awards Honor Medical Manufacturers for Greatest Market Share Growth*

Irvine, California – March 25, 2010 - Masimo has received the 2010 Global Healthcare Exchange
(GHX) Best-in-Class Award for achieving the nation's highest year-over-year market share growth
for distributed products in the Respiratory product category for the third straight year. Best-in-
Class status is determined through a combination of year-over-year market share growth and
total market share through the end of 2009. The winners were honored at the 10th Annual GHX
Supply Chain Summit in Orlando, Florida, March 29-31, 2010.

"We are extremely pleased to honor Masimo for its leadership position in the Respiratory product
category," said Ed McCauley, vice president, E-Sourcing and Business Intelligence, GHX. "Their
performance proves that despite the down economy there continues to be market opportunities
for manufacturers if they know where to target their sales efforts."

Masimo was among 31 leading medical-surgical product manufacturers recognized by GHX in
six market segments and 35 product categories, ranging from electrosurgical products to
microbiology reagents. Winners were determined using GHX Market Intelligence reports that
analyze national distributed sales transaction data. With information provided by 27 of the
nation's leading distributors, GHX Market Intelligence tracks and reports on more than $35.5

MASA00019966
**Exhibit 31**
**-199-**

billion of distributed sales for medical-surgical and clinical laboratory supplies and devices. It is
the only comprehensive source for accurate, detailed and timely data for the acute and alternate
site healthcare markets, containing geographically relevant and competitive market share, size
and average selling price reporting down to the three-digit ZIP code level.

GO TO TOP

## 2009 North American Patient Monitoring CEO of the Year Award - Joe E. Kiani

The 2009 Frost & Sullivan CEO of the Year Award in the North
American Patient Monitoring market is presented to Mr. Joe E.
Kiani (Mr. Kiani), the founder, Chairman of the Board of Directors,
and CEO of Masimo, a global medical technology company. The
Award is presented in recognition of Mr. Kiani's laudable
accomplishments in launching Masimo as a platform to



conceptualize and develop novel noninvasive patient monitoring technologies. As the CEO of
Masimo, Mr. Kiani has demonstrated unprecedented ability in understanding customer
requirements, developing new technologies, delivering relevant products, and thereby exploiting
new market opportunities. In leading Masimo, he has not only made technology innovation the
core of the company's philosophy but also equally emphasized protection of that innovation
through patent licensing and OEM contracts with established patient monitoring manufacturing
companies such as GE Medical, Philips, Zoll, Atom, Draeger, and Medtronic. While accomplishing
all of these things, Masimo and Mr. Kiani have also been recognized for their integrity in
conducting business and truthfulness in advertising.

An Industry Icon

Mr. Kiani enjoys an iconic status in the industry by virtue of his pioneering contributions and
proven capabilities in transforming a humble start-up venture into a leading publicly-traded
company. After earning his B.S.E.E. and M.S.E.E. degrees from San Diego State University, Mr.
Kiani served as Regional Technical Manager for Anthem Electronics, Inc, and as Field
Applications Engineer for Bell industries, Inc. Moreover, he had also served Unisys Corporation as
a Product Engineer. Finally, in 1989 Mr. Kiani laid the foundation of Masimo with the explicit goal
to improve the precision of pulse oximetry monitoring equipment. Mr. Kiani also carries other

MASA00019967
**Exhibit 31**
**-200-**

responsibilities as a Board member of Saba Software, Inc; a software company specialized in human capital development and management solutions and as chairman of the Medical Device Manufacturers Association.

A True Innovation Leader

As a technology innovator, Mr. Kiani has always been intrigued by complex technical challenges. In his early career, he identified the inadequacies of conventional pulse oximetry monitoring equipment. Simultaneously, he also recognized the opportunity to apply adaptive filters and innovative signal processing technologies, named Signal Extraction Technology® in measuring physiological parameters. This technology application could potentially address the issue of motion artifact and low signal to noise problem that afflicted pulse oximetry. With the assistance of his friend, Mohamed Diab, an engineer, Mr. Kiani embarked on achieving the impossible goal of developing a pulse oximetry technology that provides precise, reliable measurements during low peripheral profusion and patient motion. The outcome of this endeavor was the invention of a breakthrough technology in pulse oximetry, Masimo SET, which considerably reduced false alarms and increased the instrument's capability of detecting critical conditions.

This revolutionary discovery marked the beginning of Masimo's legacy as pulse oximetry technology innovator developing and manufacturing advanced, unique equipment each year. Under Mr. Kiani's leadership, in 2005 Masimo unveiled its second ground-breaking innovation, Masimo Rainbow SET Pulse CO-Oximetry with the advanced ability to measure several blood constituents that traditionally necessitated invasive methods. Considerable enhancements were made in this product line with the capacity to measure carboxyhemoglobin (SpCO®) in 2005, methemoglobin (SpMet®) in 2006, and pleth variability index (PVi®)in 2007. The latest Rainbow innovation from Masimo launched in 2008 is the noninvasive total hemoglobin (SpHb"). Additionally, this novel equipment also measures pulse rate, perfusion index, and oxyhemoglobin and plays a critical role in early detection and treatment of life-threatening conditions.

Unequaled Entrepreneurial Capabilities

The key to Mr. Kiani's success as the CEO of Masimo lies in directing his technological inventions to strategically address the unmet needs of the market. With adequate customer insights, identification of the shortcomings to the available pulse oximetry monitoring equipment, ideation and subsequent development of an exclusive class of medical instrumentation procedures, Mr. Kiani has redefined patient monitoring systems. Under Mr.

MASA00019968
Exhibit 31
-201-

Kiani's leadership, Masimo has successfully penetrated a market that poses significant entrance barriers. Masimo as a leading market participant not only innovates but also manufactures, licenses, and markets sophisticated medical signal processing technologies to gain maximum profits from a billion-dollar market growing at 8 percent annually.

As a dynamic entrepreneur, he has accepted technological and business challenges successfully, resolved them, and created new industry benchmarks during this process. In this context, it is relevant to mention that in 2006, Mr. Kiani's relentless efforts enabled Masimo to attain a historic victory against Nellcor division of Tyco Healthcare in one of the biggest patent infringement violation lawsuits. Despite Tyco Healthcare's stature and market dominance, Mr. Kiani won his company more than $300 million in damages setting a dramatic precedent that has changed the very face of the healthcare industry. In addition, his testimony before the U.S. Senate in 2002 led to Group Purchasing Organization (GPO) reforms that help ensure clinicians have access to the best technology and that every company making effective products, competitively priced, is given a chance to compete and sell to hospitals through a GPO, not just the dominant suppliers.

Persistently Driving Company Growth

Guided by Mr. Kiani, Masimo has consistently delivered phenomenal financial results. At the end of the 2007 Masimo's product revenue stood at a record $199.7 million. Masimo's financial results at the end of third quarter of 2008 were equally impressive, depicting 21st consecutive quarter of revenue growth. Some of the noteworthy achievements are: record $66 million revenues, increase by 48 percent in direct business revenues, and a staggering number of 30,700 new pulse oximeters and Pulse CO-Oximeter shipments. It is also pertinent to mention in this context that in 2006, Masimo was one of the two leading participants in the market with 40 percent of the market share. Furthermore, the market for all its products together is estimated as $2 to $3 billion.

Setting Industry Trends

The strategies adopted by Mr. Kiani as the CEO of Masimo have persistently created new industry standards. The novel product portfolio of Masimo has added a new dimension to noninvasive patient monitoring equipment that has considerably facilitated early detection of

MASA00019969
Exhibit 31
-202-

challenging patient conditions. As a technology innovator, Mr. Kiani has more than 50 patents to
his credit in sensors, signal processing, and patient monitoring that include patents for the
innovation of read-through motion and low-perfusion pulse oximetry.

His technology licensing strategy has successfully demonstrated the infallibility of patenting as a
critical growth propeller for emerging medical device companies. Masimo's victory against Tyco
Healthcare buttresses the importance of patenting in guarding the innovations of the emerging
companies against established market participants. Furthermore, this victory also indicates the
capability of emerging companies to compete with the market leaders that control the market.

Committed to Customer Value Enhancement

Under Mr. Kiani's able leadership, Masimo products have proved their value to their customers.
More than 100 clinical studies have corroborated the fact that Masimo SET is the world's most
effective pulse oximeter. Measuring hemoglobin, oxygenation status, and pulse rate
simultaneously, Masimo Rainbow SET is noninvasive, continuous, and immediate unlike
conventional laboratory measurements that are invasive, intermittent, and produce delayed
results. It is worth mentioning that in a recent study, Masimo SET pulse oximetry technology has
been acknowledged as most valuable in neonatal care. To quote Mr. Kiani, "We are very happy to
see that researchers around the world continue to use our technology to improve process of
care, positively impacting the lives of the most vulnerable patients in the most difficult clinical
conditions."

Integrity and Truthfulness

While leading innovation and industry change, Masimo and Mr. Kiani have also been guided by
the highest principles and ethics, resulting in recognition by customers and partners alike for
their integrity in conducting business. Masimo has also received high rankings by industry
publications and professional societies for truthfulness in advertising.

Significant Accolades

MASA00019970
**Exhibit 31**
**-203-**

Mr. Kiani in 2005 was honored with the prestigious Monty Award from San Diego State University for his ingenious efforts in addressing the pressing need of pulse oximetry market by applying his scientific knowledge and inventing novel pulse oximeters that leverage on signal extraction technology. His impeccable leadership has earned Masimo a host of industry accolades. Some of the recent awards include AARC Zenith Award (2009, 2008), ACG Outstanding Growth Award (2008), AeA Outstanding Medical Device Company Award (2008), GHX Best-in-Class Award (2008), and FDNY Flag of Heroes (2008).

Conclusion

In successfully augmenting his scientific acumen, his formal university training, his business foresight, and the highest integrity, Mr. Kiani has demonstrated the characteristic virtues of a true entrepreneur. As the CEO, he has constantly assisted Masimo in taking confident, progressive strides in the highly monopolized patient monitoring equipment market. In strategically balancing product innovation, manufacturing, licensing, and marketing, Mr. Kiani has carefully delineated the cardinal elements of an effective business model. Fostering healthy competition and transforming challenges to drivers, Mr. Kiani has emerged as the ideal choice for the 2009 Frost & Sullivan CEO of the Year Award in the North American Patient Monitoring market.

Award Description

The Frost & Sullivan CEO of the Year Award is bestowed each year upon the CEO or executive who has demonstrated leadership excellence within his or her industry. Gains in market share and decisions that improve earnings and grow the company, as well as leadership that affects observable changes in the industry, are common CEO performance measurement criteria and are important metrics Frost & Sullivan utilizes in its CEO of the Year Award selection process. A CEO's vision, risk-taking, and leadership also can have a profound effect on performance. Frost & Sullivan seeks to identify a highly successful CEO whose leadership, vision, and successful risk-taking stand out among his or her peers. The Award recipient also has distinguished himself or herself from competitors by pursuing a unique restructuring, organizational management reengineering, or competitive roadmap that has resulted in propelling or sustaining the company's market position.

MASA00019971
Exhibit 31
-204-

Research Methodology

To choose the Award recipient, the Frost & Sullivan tracks market developments and measurements in the industry. The selection process utilizes market participant interviews and extensive primary and extensive secondary research. After evaluating the research, the analyst team considers market share, market growth, market penetration, profit margins, stock price, and overall industry impact in relation to CEO corporate organizational and strategic business actions.

Measurement Criteria

In addition to the methodology described above, there are specific criteria used in determining the final ranking and Award recipient. The recipient of this Award has excelled based on several of the following criteria:

- History of serving the industry
- Impact on organization and contribution to company financial results, restructuring, or business strategy to grow market share (e.g. effective development and implementation of a new business model)
- Leadership, risk-taking, vision, or decision that has served as the catalyst for market growth, sustaining market share, and/or company image
- Leadership that created industry standards in operations, product quality, processes, or other notable benchmarks
- Leadership that increased value as perceived by the stakeholders (e.g. consumers, suppliers, shareholders, etc.)
- Degree of industry participation and influence on the market as a result of CEO actions
- Degree of CEO leadership and employee participation in community service programs
- Operational excellence

About Best Practices (www.awards.frost.com (http://www.awards.frost.com))

Frost & Sullivan Best Practices Awards recognize companies in a variety of regional and global markets for demonstrating outstanding achievement and superior performance in areas such as leadership, technological innovation, customer service, and strategic product development. Industry analysts compare market participants and measure performance through in-depth interviews, analysis, and extensive secondary research in order to identify best practices in the industry.

MASA00019972
Exhibit 31
-205-

About Frost & Sullivan

Frost & Sullivan, the Growth Consulting Company, partners with clients to accelerate their growth. The company's Growth Partnership Services, Growth Consulting and Career Best Practices empower clients to create a growth focused culture that generates, evaluates and implements effective growth strategies. Frost & Sullivan employs over 45 years of experience in partnering with Global 1000 companies, emerging businesses and the investment community from more than 30 offices on six continents. For more information about Frost & Sullivan's Growth Partnerships, visit www.frost.com (http://www.frost.com).

**GO TO TOP**

## Masimo Receives 2009 Zenith Award at the American Association of Respiratory Care Congress

*Masimo Rainbow SET® Acoustic Respiration Rate Monitoring Generates Significant Interest*

Irvine, California – December 9, 2009 – Masimo (NASDAQ: MASI), the inventor of Pulse CO-Oximetry and Measure-Through Motion and Low Perfusion pulse oximetry, announced today that it has received the prestigious Zenith Award for equipment and service excellence from the American Association of Respiratory Care (AARC) at their 55th Annual AARC International Congress in San Antonio, Texas. Masimo Rainbow SET Acoustic Monitoring was also featured in live demonstrations at the Masimo commercial exhibit and received very favorable reviews from respiratory therapists.

For the second year in a row, Masimo has achieved AARC's top industry recognition honoring respiratory care equipment and pharmaceutical manufacturers for quality and service excellence. More than 400 companies were eligible for one of five Zenith Award honors. Award winners are chosen by the association's membership—more than 44,000 respiratory care professionals—based upon the quality of equipment and/or supplies, accessibility and helpfulness of sales personnel, as well as the company's responsiveness, service record, truth in advertising, and overall support of the respiratory care profession.

In addition, hundreds of respiratory care professionals from all over the world were among the first to see live demonstrations of Masimo Rainbow SET Acoustic Monitoring—providing noninvasive and continuous respiration rate (RRa") that is accurate, easy-to-use, and enhances

MASA00019973
Exhibit 31
-206-

patient compliance. Masimo Rainbow SET Acoustic Monitoring may enable earlier detection of respiratory compromise and patient distress—offering a breakthrough in patient safety for post-surgical patients on the general floor. Comments received from respiratory therapists at the AARC Congress included the following:

- David Gibson, RRT, Supervisor, Medical City Dallas Hospital in Dallas, Texas, stated: "As a caregiver, I appreciate Masimo's commitment to innovation—they have done it again with their new Acoustic Respiration Rate Monitoring technology. Finally, there is a reliable, easy, comfortable, and cost-effective way to monitor breathing sounds on my patients on the general floor."
- Jenni Raake, MBA, RRT, Respiratory Care Coordinator, Cincinnati Children's Hospital Medical Center, stated: "I see so many uses for Masimo's Rainbow Acoustic Monitoring, across so many care areas. With the wireless Masimo Rad-87 monitor, I believe it will be a great technology for patients needing ambulation. It should also be perfect for conscious sedation procedures."
- Abbie Rosenberg, RRT, RCP in Santa Cruz, California, added: "I believe that Masimo Acoustic Respiration Rate will help hospitals effectively monitor and avoid sentinel events in post-surgical patients using patient controlled analgesic pumps."
- Joe Kiani, Founder & CEO of Masimo, stated: "We are honored to receive the Zenith Award. This recognition is especially gratifying because it comes from the clinicians who use our products every day. It's also exciting to see the reactions and hear the positive reviews from respiratory therapists who saw first-hand demonstrations of Rainbow Acoustic Monitoring."
- Michael O'Reilly, MD, Masimo's EVP of Medical Affairs, stated: "Respiratory care professionals attending the AARC Congress were truly excited by the introduction of Rainbow SET Acoustic Monitoring with its ability to monitor the breathing status of patients, 24/7. Respiratory care professionals are not alone in their excitement, as all clinicians who care for patients receiving patient-controlled analgesia for pain management know that sedation can slow breathing and place patients at considerable risk. For these patients, early intervention and appropriate treatment could mean the difference between life and death."

About Masimo

Masimo (NASDAQ: MASI) develops innovative monitoring technologies that significantly improve patient care—helping solve 'unsolvable' problems. In 1995, the company debuted Measure-Through Motion and Low Perfusion pulse oximetry, known as Masimo SET®, which virtually eliminated false alarms and increased pulse oximetry's ability to detect life-threatening events. More than 100 independent and objective studies demonstrate Masimo SET provides the most reliable SpO2 and pulse rate measurements even under the most challenging clinical conditions, including patient motion and low peripheral perfusion. In 2005, Masimo introduced Masimo Rainbow SET® Pulse CO-Oximetry™, a breakthrough noninvasive blood constituent monitoring platform that can measure many blood constituents that previously required invasive procedures. Masimo Rainbow SET continuously and noninvasively measures total hemoglobin (SpHb™), oxygen content (SpOC™), carboxyhemoglobin (SpCO®), methemoglobin (SpMet®), PVi®, and acoustic respiration rate (RRa), in addition to oxyhemoglobin (SpO2), pulse rate (PR), and perfusion index (PI), allowing early detection and treatment of potentially life-threatening conditions. Founded in 1989, Masimo has the mission of 'Improving Patient Outcomes and Reducing Cost of Care by Taking Noninvasive Monitoring to New Sites and Applications.' Additional information about Masimo and its products may be found at www.masimo.com (/).

Forward Looking Statements

This press release includes forward-looking statements as defined in Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934, in connection with the Private Securities Litigation Reform Act of 1995. These forward-looking statements are based on current expectations about future events affecting us and are subject to risks and uncertainties, all of which are difficult to predict and many of which are beyond our control and could cause our actual results to differ materially and adversely from those expressed in our forward-looking statements as a result of various risk factors,

MASA00019974
Exhibit 31
-207-

including, but not limited to: risks related to our belief that the breakthrough respiration rate monitoring capabilities of Masimo Rainbow SET Acoustic Monitoring technology will allow clinicians to detect and treat respiratory compromise and patient distress earlier, risks related to our belief that Masimo Rainbow SET Acoustic Monitoring technology will provide sufficient sensitivity and specificity to measure respiratory rate in a variety of patients and monitoring conditions, risks related to our assumptions regarding the commercial timing and availability of the technology, as well as other factors discussed in the 'Risk Factors' section of our most recent reports filed with the Securities and Exchange Commission ('SEC'), which may be obtained for free at the SEC's website at www.sec.gov. Although we believe that the expectations reflected in our forward-looking statements are reasonable, we do not know whether our expectations will prove correct. All forward-looking statements included in this press release are expressly qualified in their entirety by the foregoing cautionary statements. You are cautioned not to place undue reliance on these forward-looking statements, which speak only as of today's date. We do not undertake any obligation to update, amend or clarify these forward-looking statements or the 'Risk Factors' contained in our most recent reports filed with the SEC, whether as a result of new information, future events or otherwise, except as may be required under the applicable securities laws.

Media Contacts:
Dana Banks
Masimo Corporation
+1 (949) 297-7348

Masimo, SET, Signal Extraction Technology, Improving Outcomes and Reducing Cost of Care by Taking Noninvasive Monitoring to New Sites and Applications, Rainbow, SpHb, SpOC, SpCO, SpMet, PVi, RRa, Radical-7, Rad-87, Rad-57,Rad-9, Rad-8, Rad-5,Pulse CO-Oximetry and Pulse CO-Oximeter are trademarks or registered trademarks of Masimo Corporation.

**GO TO TOP**

**ECRI Institute Announces Winner of 4th Annual Health Devices Achievement Award**
Dartmouth-Hitchcock Medical Center recognized for excellence in health technology management



**PLYMOUTH MEETING, PA - 9/30/2009** - ECRI Institute, an independent nonprofit that researches the best approaches to improving patient care, is pleased to announce Dartmouth-Hitchcock Medical Center of Lebanon, New Hampshire, as the winner of the fourth annual Health Devices Achievement Award for excellence in health technology management. The Health Devices Achievement Award recognizes an outstanding initiative undertaken by an ECRI Institute member healthcare facility that improves patient safety, reduces costs, or otherwise facilitates better strategic management of health technology.

MASA00019975
**Exhibit 31**
**-208-**

Dartmouth-Hitchcock's winning submission, "A Multidisciplinary Approach to Improving Patient Safety in the Adult Medical/Surgical Population through Earlier Detection of Patient Deterioration Using Surveillance Monitoring," describes an initiative designed to decrease failure to rescue (FTR) events—instances of severe patient harm (such as death or disability) that occur because a serious deterioration in the patient's condition is not detected in time.

The project was designed to reduce FTR events through a new application of pulse-oximetry monitoring: using it continuously from admission to discharge. The primary goal was to enhance nurse surveillance in the postoperative setting. A secondary goal was to reduce the number of "nuisance alarms," which tend to desensitize nurses to alarms. Nurse satisfaction with the new surveillance tool was reported to be very high, and preliminary analysis indicates that the initiative has contributed to decreases in annual rescue calls and transfers to critical care.

"ECRI Institute identified clinical alarm hazards as the number one device-related risk on its 2009 list of Top 10 Health Technology Hazards," says James P. Keller, Jr., vice president, health technology evaluation and safety, ECRI Institute. "Any effort to improve this problem can have a huge impact on patient safety. Dartmouth-Hitchcock should be commended for recognizing the problems that alarm 'overload' can cause and taking on a project to improve the way clinicians monitor for and respond to serious changes in patient conditions."

"The award from ECRI Institute is a tremendous honor and a great recognition for the many people who have played a role in the deployment of this new technology," says George Blike, M.D., quality and patient safety officer for Dartmouth-Hitchcock Medical Center. "Creating excellence in patient care is a matter of finding and training the right people, enabling them with the right tools, and doing it all within the right environment of care. This tremendous group effort and innovative technology have combined to save lives, which is incredibly rewarding for everyone involved."

Dartmouth-Hitchcock's award-winning entry will be featured in ECRI Institute's Health Devices journal and on the ECRI Institute Web site. A formal award presentation will be made by ECRI Institute's Jim Keller later this year.

For information about becoming a member of ECRI Institute's Health Devices System or for submitting an application for the 5th Annual Health Devices Award, contact ECRI Institute at (610) 825-6000, ext. 5377, visit www.ecri.org (http://www.ecri.org), e-mail communications@ecri.org, or mail ECRI Institute, 5200 Butler Pike, Plymouth Meeting, PA 19462-1298, USA.

MASA00019976
**Exhibit 31**
**-209-**

About ECRI Institute

ECRI Institute, a nonprofit organization, dedicates itself to bringing the discipline of applied
scientific research to healthcare to discover which medical procedures, devices, drugs, and
processes are best to enable improved patient care. As pioneers in this science for 40 years,
ECRI Institute marries experience and independence with the objectivity of evidence-based
research. ECRI Institute is designated a Collaborating Center of the World Health Organization
and an Evidence-based Practice by the U.S. Agency for Healthcare Research and Quality. ECRI
Institute PSO is listed as a federally certified Patient Safety Organization by the U.S. Department
of Health and Human Resources. For more information, visit https://www.ecri.org
(https://www.ecri.org).

About Dartmouth Hitchcock

Dartmouth-Hitchcock Medical Center (DHMC) is New Hampshire's only academic medical
center. Internationally renowned and nationally ranked, DHMC serves a population of 1.5 million
in Vermont and New Hampshire. DHMC integrates high-quality patient care, advanced medical
education, and translational research to provide a full spectrum of health care. Dartmouth-
Hitchcock Medical Center includes Norris Cotton Cancer Center, a National Cancer Institute
designated Comprehensive Care Center, and is home to the Children's Hospital at Dartmouth.
The center also includes Mary Hitchcock Memorial Hospital (396-bed teaching hospital), the
Dartmouth-Hitchcock Clinic, Veterans Affairs Regional Medical and Office Center, and Dartmouth
Medical School. For more information on Dartmouth-Hitchcock Medical Center, visit
www.dhmc.org (http://www.dhmc.org).

GO TO TOP

**Masimo Recognized as a Medical-Surgical Market Leader with the 2009 GHX Best in Class
Award**

**June 4, 2009**

Masimo received the 2009 Global Healthcare Exchange (GHX) Best in
Class Award for achieving the nation's highest year-over-year market
share growth for distributed products in the Respiratory product category for the 2008 calendar
year.

"We are extremely pleased to honor Masimo for its leadership position in the Respiratory product

MASA00019977
**Exhibit 31**
**-210-**

category," said Ed McCauley, general manager, GHX Market Intelligence. "Despite the down economy, Masimo grew 41.81 percent in 2008 while the overall market segment grew 9.76 percent."

Masimo was among 30 leading medical-surgical product manufacturers recognized by GHX in five market segments and 35 product categories. Winners were determined using GHX Market Intelligence reports that analyze national distributed sales transaction data. With information provided by 27 of the nation's leading distributors, GHX Market Intelligence tracks and reports on more than $34 billion of distributed sales for medical-surgical and clinical laboratory supplies and devices. It is the only comprehensive source for accurate, detailed and timely data for the acute and alternate site healthcare markets, containing geographically relevant and competitive market share, size and average selling price reporting down to the three-digit ZIP code level.

Rick Fishel, President of Masimo Americas, stated: "We are pleased to receive GHX's Best in Class Award for market share growth for the second year in a row. This achievement recognizes the power of clinical preference and demand for advanced medical technology and best-in-class products to drive national sales. It is an honor to be a market leader among the industry's best."

**GO TO TOP**

**AARC Presentation Cites Masimo Patient Safety Net as Key Factor in "Improving Patient Outcomes and Reducing Costs" in Post-Acute Care Facilities**

*Masimo also receives the AARC Zenith Award for Equipment and Service Excellence at the 54th Annual International Respiratory Congress in Anaheim*

Irvine, California – December 16, 2008 – Masimo (NASDAQ: MASI), the inventor of Pulse CO-Oximetry and Measure-Through-Motion and Low-Perfusion pulse oximetry, announced that the clinical benefit of its remote monitoring and clinician notification system, Masimo Patient SafetyNet, was featured in a presentation titled *Global Perspectives of Facility-Prolonged Mechanical Ventilation Care* at the American Association of Respiratory Care (AARC) 54th Annual International Congress in Anaheim, California, on December 15, 2008.

MASA00019978
**Exhibit 31**
**-211-**

Gene Gantt, RRT and Manager of Business Development for Linde Respiratory Support Services (RSS), a leader in post-acute respiratory care, presented how weaning patients off ventilator care in a post-acute care setting provides improved outcomes and reduced costs. According to Mr. Gantt, a major challenge to weaning patients off ventilator care in the post-acute environment was a safe and easy-to-use patient surveillance system that could help clinicians preempt adverse events. Mr. Gantt reported that the integration of the Masimo Patient SafetyNet system into Linde's Knoxville, TN facility protocol has been a significant factor in successfully implementing their weaning protocol and achieving a 75% wean rate with an average length-of-stay of only 40 days. The initiative has been so successful at improving the quality of life for patients and reducing the overall cost of care that Linde-RSS has decided to expand use of the Patient SafetyNet system to both their Memphis and Chattanooga facilities, as well.

"Using the Masimo Patient SafetyNet System not only raised the bar in terms of the quality of care that could be delivered in a post-acute setting—proving to be the right thing to do for patient safety—it is also paying for itself through clinical efficiency," Mr. Gantt explained. "Since our clinicians are no longer wasting their time chasing false oximetry alarms, they are freed up to focus on patient care."

In addition to the Patient SafetyNet presentation and the continued excitement generated by Masimo's noninvasive and continuous hemoglobin monitoring technology (SpHb), the company announced that it received the AARC's prestigious Zenith Award. More than 400 companies were eligible for one of five 2008 Zenith Award honors presented. The Zenith Award is AARC's top industry recognition honoring respiratory care equipment and pharmaceutical manufacturers for quality and service excellence. Award recipients are chosen via special ballot by the association's membership of more than 44,000 respiratory care professionals based upon the quality of its equipment and/or supplies, the accessibility and helpfulness of its sales personnel, as well as the company's responsiveness, service record, truth in advertising, and overall support of the respiratory care profession.

Masimo Founder and CEO, Joe E. Kiani, stated, "We are delighted to see the results of Linde RSS's use of Masimo SET and Patient SafetyNet and are honored that AARC members have chosen to recognize Masimo for the superior performance, service, and integrity that Masimo provides to the clinical community. Respiratory clinicians were among the first to embrace the performance of Masimo SET pulse oximeters 10 years ago, but they often faced challenges in gaining access to Masimo's pulse oximetry technology. It is gratifying to see that despite the challenges, so many hospitals and clinicians now have access to Masimo SET and the benefits that our technology brings to their day-to-day patient care. It is our pleasure to serve the respiratory care profession in their mission in caring for the critically ill."

MASA00019979
Exhibit 31
-212-

### About Masimo

Masimo (NASDAQ: MASI) develops innovative monitoring technologies that significantly improve patient care—helping solve "unsolvable" problems. In 1995, the company debuted Measure-Through-Motion-and-Low-Perfusion pulse oximetry, known as Masimo SET, which virtually eliminated false alarms and increased pulse oximetry's ability to detect life-threatening events. More than 100 independent and objective studies demonstrate Masimo SET provides the most reliable $SpO_2$ and pulse rate measurements even under the most challenging clinical conditions, including patient motion and low peripheral perfusion. In 2005, Masimo introduced Masimo Rainbow SET Pulse CO-Oximetry, a breakthrough noninvasive blood constituent monitoring platform that can measure many blood constituents that previously required invasive procedures. Masimo Rainbow SET Pulse CO-Oximetry continuously and noninvasively measures total hemoglobin (SpHb™), oxygen content (SpOC™), carboxyhemoglobin (SpCO®), methemoglobin (SpMet®), and PVi®, in addition to oxyhemoglobin ($SpO_2$), pulse rate (PR), and perfusion index (PI), allowing early detection and treatment of potentially life-threatening conditions. Founded in 1989, Masimo has the mission of 'Improving Patient Outcomes and Reducing Cost of Care by Taking Noninvasive Monitoring to New Sites and Applications.' Additional information about Masimo and its products may be found at www.masimo.com (http://www.masimo.com/).

### About the AARC

The American Association for Respiratory Care, headquartered in Dallas, Texas, is a professional association of respiratory therapists that focuses primarily on respiratory therapy education and research. The organization's goals are to ensure that respiratory patients receive safe and effective care from qualified professionals as well as supporting respiratory health care providers. The association continues to advocate on behalf of pulmonary patients for appropriate access to respiratory services provided by qualified professionals. Further information about the AARC may be found at www.AARC.org (http://www.aarc.org/).

### Forward Looking Statements

This press release includes forward-looking statements as defined in Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934, in connection with the Private Securities Litigation Reform Act of 1995. These forward-looking statements are based on current expectations about future events affecting us and are subject to risks and uncertainties, all of which are difficult to predict and many of which are beyond our control and could cause our actual results to differ materially and adversely from those expressed in our forward-looking statements as a result of various risk factors, including, but not limited to: risks related to our assumption that this award will serve to increase market acceptance and adoption of Masimo technologies and products or substantially increase revenues, as well as other factors discussed in the 'Risk Factors' section of our Quarterly Report on Form 10-Q for the fiscal quarter ended September 27, 2008, filed with the Securities and Exchange Commission ('**SEC**') on October 29, 2008, which may be obtained for free at the SEC's website at www.sec.gov (http://www.sec.gov/). Although we believe that the expectations reflected in our forward-looking statements are reasonable, we do not know whether our expectations will prove correct. All forward-looking statements included in this press release are expressly qualified in their entirety by the foregoing cautionary statements. You are cautioned not to place undue reliance on these forward-looking statements, which speak only as of today's date. We do not undertake any obligation to update, amend or clarify these forward-looking statements or the 'Risk Factors' contained in our Quarterly Report on Form 10-Q for the fiscal quarter ended September 27, 2008, whether as a result of new information, future events or otherwise, except as may be required under the applicable securities laws.

### Contact:

Dana Banks
Masimo Corporation
949-297-7348

Masimo, SET, Signal Extraction Technology, Improving Outcomes and Reducing Cost of Care by Taking Noninvasive Monitoring to New Sites and Applications, Rainbow, SpHb, SpOC, SpCO, SpMet, PVi, Radical-7, Rad-87, Rad-57,Rad-9, Rad-8, Rad-5,Pulse CO-Oximetry and Pulse CO-Oximeter are trademarks or registered trademarks of Masimo Corporation.

MASA00019980
**Exhibit 31**
**-213-**

GO TO TOP

**Masimo Honored for Excellence in Medical Technology by the Medical Technology Association of Australia**

**Sydney, Australia (September 25, 2008) -** Masimo has  received the Medical Technology Association of Australia's (MTAA) highest award, the Kerrin Rennie Award for Excellence in Medical Technology-Improving Quality of Life, for the innovative and extraordinary contributions of the Masimo Radical-7 Pulse CO-Oximeter in improving health outcomes of Australian patients.

Anne Trimmer, MTAA CEO, said: "Masimo's Oximeter is an excellent example of innovation in the medical technology sector. It benefits the patient, the clinician and the health system." In selecting Masimo as its 2008 Kerrin Rennie Award winner, MTAA highlighted both technical and clinical innovations demonstrated by the Radical-7, commenting:

The Radical-7 Pulse CO-Oximeter from Masimo Corporation continuously and noninvasively measures blood constituents in patients without having to draw blood. The device uses multiple wavelengths of light in a single, simple to apply sensor. It can be used reliably in different care settings, for example at the patient's bedside or during transport. In addition to its unique use of algorithms to ensure accurate patient monitoring, the Radical-7 includes a unique technology platform that allows for additional features to be added as simple software upgrades.

MTAA is Australia's national industry organization representing companies in the medical technology industry. Aiming to ensure the benefits of modern, innovative and reliable medical technology are delivered to the community for a healthier Australia, MTAA honors innovative medical products used in the diagnosis, prevention, treatment or management of disease and disability that deliver significant patient and healthcare contributions.

GO TO TOP

MASA00019981
**Exhibit 31**
**-214-**

### Association for Corporate Growth Honors Masimo with Outstanding Growth Award

**Newport Beach, CA (May 8th, 2008)** – The Association for Corporate Growth (ACG) honors Masimo with the 2008 Outstanding Growth Award

at the ACG Annual Growth Awards ceremony held on May 8, 2008, at the Hyatt Regency Hotel in Newport Beach, California.

Every year the ACG honors select companies that have demonstrated outstanding growth in one of three award categories: Outstanding Growth, Emerging Growth and Spotlight Deal. In selecting Masimo as the winner of the Outstanding Growth Award, ACG judges remarked that they were impressed with Masimo's "innovative monitoring technologies that significantly improve patient care, helping to solve 'unsolvable' problems." The Association for Corporate Growth has 10,000 members worldwide who are involved in corporate development, mergers and acquisitions.

GO TO TOP

### American Electronics Association (AeA) Names Masimo Outstanding Medical Device Company for 2008

*Awards recognize the top contributors to local innovation and global competition*

**Newport Beach, CA (April 30, 2008)** - The AeA Orange County and Inland Empire Council honored Masimo as the Outstanding Medical Device Company of the Year at the 15th Annual High-Tech Innovation Awards. The 2008 winners were honored on April 29, 2008 at a sold-out dinner and awards ceremony at the Hyatt Regency in Irvine that drew luminaries from local high-tech companies, financial and government institutions, as well as academic leaders, educators, students, investors and media affiliates.

This is the fourth time AeA has named Masimo as an award winner and the second time Masimo has been honored as the Outstanding Medical Device Company. In 2006, AeA named Masimo as a High-Tech Award winner for Medical Technology, in 2001 Masimo received the

MASA00019982
**Exhibit 31
-215-**

Innovative Product/Technology Award, and in 2000 Masimo was honored with the Outstanding Medical Device Company Award.

"Now companies must work harder than ever to stand out from the competition," said Don Hicks, executive director, AeA Orange County/Inland Empire. "Masimo is truly a winner this year and the 15th annual High-Tech Innovation Awards recognizes Masimo for providing outstanding innovation."

AeA is the largest high-tech trade association in the U.S. and represents all segments of the technology industry. Internationally, AeA represents 2,500 companies with 1.8 million employees. In Orange County & the Inland Empire, AeA represents 140 member companies with worldwide revenue of more than $8 billion and more than 160,000 employees in the United States and globally. Information on the Orange County & Inland Empire Council can be found at www.aeanet.org/orangecounty (http://www.aeanet.org/orangecounty)

**GO TO TOP**

### Masimo Wins GHX 2008 Best in Class Award



**April 21, 2008** - Masimo (NASDAQ: MASI), the inventor of Pulse CO-Oximetry and Measure-Through-Motion-and-Low-Perfusion pulse oximetry, today announced that it received the 2008 Global Healthcare Exchange (GHX) Best in Class Award for achieving the nation's highest year-over-year market share growth in electromedical products through the end of 2007.

"We are extremely pleased to honor Masimo for its leadership," said Ed McCauley, general manager, GHX Market Intelligence. "They have successfully navigated the complexities of this market through a combination of innovative technologies, educated market insights and competitive business strategies."

Masimo was among 29 leading medical/surgical and clinical laboratory manufacturers recognized by GHX in five market segments and 35 product categories. Winners were determined using GHX Market Intelligence reports that analyze national distributed sales transaction data. With information provided by 23 of the nation's leading distributors, GHX Market Intelligence tracks and reports on over $30 billion of distributed sales for medical/surgical and clinical laboratory supplies and devices.

MASA00019983
**Exhibit 31**
**-216-**

Rick Fishel, President of Masimo Americas, stated, "We are honored to receive the 2008 Best in Class Award for achieving the top market position and highest year-over-year market share growth in our category. This award is an important industry benchmark because it uses national sales data and in-depth market intelligence to provide an accurate representation of the state of the market."

**GO TO TOP**

## Masimo Ranks #1 in Industry Current Impact and Innovation Cycle Time on the 2008 Patent Scorecard⁻ List of Top 10 Innovators in Medical Devices

**January 2008** – Masimo Corporation ranked highest among all medical device innovators in two categories on the 2008 Patent Scorecard. Leading the Industry Current Impact⁻ category with a score of 12.054, Masimo scored highest of all medtech companies, including Abbott with 2.490, Covidien with 1.782 and Medtronic with 1.704, indicating the extent to which others are building upon Masimo's portfolio of issued U.S. utility patents as compared to a total set of patents. In the Innovation Cycle Time⁻ category, Masimo again out-scored all other medtech companies with a score of 6.9, a score that indicates whether a patent or patent portfolio is building off newer (the lower the score) or older inventions (the higher the score).

The Patent Scorecard is an industry-by-industry ranking of corporate innovation and combines a series of indicators to arrive at patent quality, technological strength and breadth of impact. It has historically been published in MIT's Technology Review and tracks the U.S. patent portfolio of more than 2,500 of the world's top technology firms.

**GO TO TOP**

## Frost & Sullivan Recognizes Masimo as an Outstanding Company for Excellence in Healthcare Opportunities

MASA00019984
**Exhibit 31**
**-217-**

**December 10, 2007** – Frost & Sullivan honored companies for demonstrating industry excellence at last week's annual Excellence in Healthcare Opportunities Awards Banquet and Networking Sessions held in Orlando, Florida at the Disney Boardwalk Inn. The Awards recognize companies that are predicted to encourage significant growth in their industries, have identified emerging trends before they became the standard in the marketplace, and have created advanced technologies that will catalyze industries in the near future. Masimo Corporation received the 2007 North American Patient Monitoring Technology Leadership of the Year Award, as well as the 2007 North American Brand Development Strategy Leadership Award.

GO TO TOP

## Masimo Corporation Receives a Frost & Sullivan 2007 Industry Best Practices Award for Pulse Oximetry Leadership



FROST & SULLIVAN

North American Brand Development
Strategy Leadership Award

**IRVINE, Calif., Nov. 20** - Masimo (Nasdaq:MASI), the inventor of Pulse CO-Oximetry and Read-Through

Motion and Low Perfusion pulse oximetry, announced it has received a Frost & Sullivan 2007 Industry Best Practices Award, for Pulse Oximetry Leadership -- "ranking number one in the pulse oximetry industry." Frost & Sullivan further recognized "the impressive progression of Signal Extraction Technology (Masimo SET) to the 'gold standard' for reliable pulse oximetry monitoring" in honoring the company.

Superior Technology

Historically, the performance of conventional pulse oximetry, as well as its usefulness in a variety of clinical settings, has been plagued by interfering noise due to patient motion and low peripheral perfusion, which often results in false $SpO_2$ readings and frequent alarms. "Masimo Signal Extraction Technology (SET) eliminates the issues caused by motion artifact and low peripheral perfusion through proprietary signal processing algorithms and sensor technologies," said Frost & Sullivan analyst Mike Arani in his report.

Clinical Preference

Leading clinicians around the world have put the efficacy and reliability of Masimo SET to the test in more than 100 independent and objective peer-reviewed studies that prove Masimo's revolutionary Signal Extraction Technology outperforms all others, even under the most

MASA00019985
**Exhibit 31**
**-218-**

demanding of clinical conditions. "These clinical trials have not only proved the performance superiority of Masimo SET, but time after time, they have also left a lasting impression on the participating clinicians," the report said.

Brand Recognition

Also, according to the Frost & Sullivan report, "Masimo's strong brand recognition has even driven major patient monitoring companies with in-house proprietary SpO2 technologies to offer their multiparameter monitors with the choice of Masimo SET SpO2 module." Today, Masimo SET technology is widely integrated into more than 100 multiparameter monitors and over 40 monitoring brands. "After all, performance superiority is the chief reason Masimo pulse oximetry is the only vital sign module clinicians ask for by brand when purchasing a patient-monitoring product," they added.

Market Achievements

Masimo's rapid market acceptance and market share gains were cited by Frost & Sullivan as visible examples of this combination of superior technology, clinical preference, brand recognition and exceptional brand development success.

In selecting Masimo for the 2007 pulse oximetry brand development strategy leadership award, Frost & Sullivan's analyst team tracked all the major participants in the pulse oximetry industry. The process included in-depth interviews with all market participants, customers and suppliers, along with extensive secondary and technology research to identify best practices within the industry. To determine the final ranking of competitors, Frost & Sullivan measured each on the basis of: development of unique brand strategies, competitor recognition and brand value, participation in industry trade groups, establishment of programs that allow the brand's customers to grow, and increases in customer loyalty. As a result of this ranking, Masimo topped the list of industry competitors.

According to Frost & Sullivan manager Antonio Garcia, "The key to Masimo's strong image lies in its vision of giving caregivers more options and capabilities than they expect. After all, Masimo simply takes the guess work out of pulse oximetry, so clinicians never have to guess what brand is the most reliable."

Joe E. Kiani, Chairman and CEO of Masimo, said, "We are honored to receive this award from Frost & Sullivan. This recognition is especially meaningful because Frost & Sullivan has surveyed the market and responded with research findings that validate what we have heard clinicians saying all along and what our increasing marketshare momentum is a testament to-that clinicians recognize Masimo SET is the best pulse oximetry technology for their patients."

MASA00019986
Exhibit 31
-219-

GO TO TOP

## 2007 Frost & Sullivan North American Brand Development Strategy Leadership Award



GO TO TOP

## 2007 Texas Society for Respiratory Care (TSRC) LoneStar Award



**Irvine, California June 28, 2007** - Masimo, the inventor of Pulse CO-
Oximetry and Read-Through Motion and Low Perfusion pulse oximetry, today received the first ever Texas Society for Respiratory Care (TSRC) LoneStar Award for Innovation and Support "for the groundbreaking innovation of Rainbow SET Technology, and the continued unwavering support of the TSRC and the Respiratory Care profession." Masimo Chairman and CEO, Joe Kiani, accepted the award on behalf of Masimo employees worldwide at the TSRC's 36th Annual Meeting and Exhibition in Austin, Texas.

"Masimo has advanced patient care with its read-through motion pulse oximetry technology, Masimo SET, making pulse oximeters a clinically useful tool," said TSRC President-Elect Terry Gilmore, MA, and RRT. "With their introduction of Masimo Rainbow SET and with it the noninvasive measurement of carboxyhemoglobin and methemoglobin, they are again advancing patient care by allowing respiratory care professionals to have a better understanding of the true oxygenation status of their patients' blood." Gary Herrin, MBA, Executive Director of the TSRC added that "we greatly appreciate Masimo's long standing support of the Respiratory Care profession and the TSRC, and we welcome the opportunity to enhance this partnership in patient care. We encourage their development and implementation of further groundbreaking technology"

MASA00019987
**Exhibit 31**
**-220-**

"We are honored to receive this award from TSRC for the advances in patient care made possible by Masimo technologies, and are happy that respiratory care professionals continue to look to Masimo to help them provide cost-effective quality cardiopulmonary patient care." Mr. Kiani explained. "For nearly 20 years, we have been privileged to work alongside so many dedicated respiratory care professionals who shared our vision of always doing what is best for patient care. This award is very meaningful to us because it comes from an organization and a group of professionals we greatly admire."

GO TO TOP

## STA 2007 Excellence in Technology Innovation Award

2007, The Society for Technology in Anesthesia (STA) an international organization of physicians, engineers, students and others with an interest in anesthesia-related technologies, has chosen M. R. Macknet, MD and a team of researchers at Loma Linda University's Department of Anesthesiology as the recipients of this year's STA Excellence in Technology Innovation Award for their study showing that a preliminary Masimo engineering prototype can accurately measure total hemoglobin continuously and noninvasively. This award recognizes excellence in technologies that benefit patients and caregivers in the area anesthesiology especially technologies that address high priority needs of the practice of anesthesia. This is the third time Masimo technology has won such a prestigious award from the Society of Technology in Anesthesia. In 1995, the company won the Excellence in Technology Innovation award for the foundational technology of Masimo SET, the first pulse oximetry technology to provide accurate and reliable SpO2 measurements during motion and low peripheral perfusion. In 2006, Masimo Rainbow SET won the Application of Technology award for creating the first technology to provide noninvasive measurement of carboxyhemoglobin and methemoglobin levels in the blood.

GO TO TOP

Masimo's Kiani: Stared Down Tyco

ORANGE COUNTY BUSINESS JOURNAL

MASA00019988
Exhibit 31
-221-

Posted date: 3/20/2006

By Vita Reed
ORANGE COUNTY BUSINESS JOURNAL STAFF

Joe Kiani started and built up a medical device company. Then he stared
down Tyco International Ltd. So excuse him for being in Bora Bora last week.



Kiani, chief executive of Irvine-based Masimo Corp., was honored at last
week's Excellence in Entrepreneurship Awards luncheon put on by the
Business Journal. The awards luncheon was held at the Hyatt Regency in
Irvine.

Kiani: started company in
Mission Viejo garage

Earlier this year, Masimo collected some $330 million from Tyco, after a long fight over
technology patents.

Masimo makes a device called a pulse oximeter, which attaches to a finger or toe and measures
oxygen in critically ill adults or newborns.

Kiani and partner Mohammed Diab, a Masimo director, started Masimo in 1989 in classic
entrepreneurial fashion-in a garage.

Nine years later, Masimo received Food and Drug Administration approval for its pulse oximeter.
Masimo's device cuts down on false alarms and other misreadings caused by patient motion or
low blood flow, according to the company.

Masimo licenses its signal extraction technology to more than 35 medical equipment
companies, including GE Medical Systems, Medtronic Inc. and Zoll Medical Corp.

The company counts yearly sales of about $110 million and some 900 workers.

Scrappiness and a willingness to take on larger rivals are part of the Masimo story.

Masimo fought hard to get its oximeters and sensors into hospitals. It wasn't easy, even with
clinical studies and testimonies showing Masimo's device was superior to ones from larger
rivals.

**Hospital Fight**

MASA00019989
**Exhibit 31**
**-222-**

The company became something of a media darling a few years
back. Masimo was featured in the New York Times for its efforts to
get its device into larger hospitals.

The effort paid off.

Masimo now has contracts with Premier Inc., a large, San Diego-
based nonprofit that helps its member hospitals buy supplies and equipment, and Novation LLC,
a rival buying group out of Irving, Texas.

The company's first deal with Premier, signed in 2002, came in the wake of heavy criticism of
Premier's awarding of buying pacts to larger device makers.

A U.S. Senate subcommittee criticized Premier and Novation for not signing deals with smaller
makers such as Masimo.

Then there's Tyco.

Masimo recently wrapped up a long-running patent fight with Nellcor Puritan Bennett Inc., a Tyco
unit.

Last fall, the U.S. Court of Appeals in Washington, D.C., upheld a $164.5 million jury award to
Masimo from Nellcor.

The verdict was based on a 2004 finding by a Los Angeles federal jury that Nellcor's Oximax and
Oxismart pulse oximeters violated Masimo's patents.

Back in 1999, Masimo sued Nellcor for allegedly violating patents on its motion-tolerant pulse
oximetry technology. Nellcor then went on the offensive, filing lawsuits of its own against
Masimo's signal processing technology.

There's a warmer, fuzzier side to Masimo.

At last week's awards lunch, Travis Trask, head of the Orange County office of San Diego-based
insurance brokerage Barney & Barney LLC, related his own experience with Masimo's pulse
oximeter.

Trask said his son was born 10 weeks early and spent 30 days in the hospital.

"Every hour, every second even" he said he and his wife watched a Masimo oximeter attached to
the finger of his 2-pound baby.

MASA00019990
Exhibit 31
-223-

The accuracy of the device was critical, he said. Administering oxygen after a false alarm can cause blindness in babies.

Trask said his son has grown into a healthy boy.

**Iranian Immigrant**

Kiani came to the U.S. at age 9 from Iran with his family.

The son of an engineer and a nurse, he graduated high school at 15 and received bachelor's and master's degrees from San Diego State University by 22.

A married father of two, Kiani's early career included working as regional technical manager for electronics distributor Anthem Electronics Inc., now part of Arrow Electronics Inc., as a field engineer for Bell Industries Inc. and as a product engineer at Unisys Corp.

Kiani, who lives in Laguna Beach, holds more than 50 patents relating to signal processing, sensors and patient monitoring.

**GO TO TOP**

---

**2006 Medical Design Excellence Award for the Masimo Rad-57**



Masimo, the inventor of Pulse CO-Oximetry and Read-Through Motion and Low Perfusion pulse oximetry, received the prestigious Medical Design Excellence Gold Award in 2006 for its innovative new Masimo Rainbow SET Rad-57 Pulse CO-Oximeter.

The Masimo Rad-57 Pulse CO-Oximeter is the first and only device that allows clinicians to detect and continuously monitor carbon monoxide levels in the bloodstream non-invasively. In clinical studies and in the field, Masimo Rainbow SET is already proving itself effective in detecting carbon monoxide poisoning in seconds, allowing accurate diagnosis and early treatment of a life-threatening problem that is frequently misdiagnosed as flu or migraine. Masimo has also recently received FDA clearance for the noninvasive measurement of methemoglobin levels in the blood. A recent Johns Hopkins study found that methemoglobinemia, a potentially lethal condition that starves the tissues of oxygen, is much

MASA00019991
**Exhibit 31**
**-224-**

more common in hospitalized patients than previously realized.

Joe E. Kiani, Chairman & CEO of Masimo stated, "We are honored to receive this Medical Design Excellence Gold Award. We received a similar award years ago when we introduced the Radical Signal Extraction Pulse Oximeter, which was the first technology to measure oxygen saturation and pulse rate during motion and low perfusion. We take much pride that the second breakthrough in oximetry is once again developed by our engineering team. With our new Masimo Rainbow SET platform, we are collecting a much more rich data stream separated from interference, enabling us to distinguish additional blood constituents. Our clinical and engineering teams are currently working to identify and qualify additional Rainbow parameters. We thank the organizers of the MDEA program for this award and their recognition of this innovative platform, and I thank our engineering team for their brilliant efforts and tireless progress."

The Medical Design Excellence Awards competition is organized and presented by Canon Communications LLC (Los Angeles) and is the only awards program that exclusively recognizes contributions and advances in the design of medical products. Entries are evaluated on the basis of their design and engineering features, including innovative use of materials, user-related functions that improve healthcare delivery and change traditional medical attitudes or practices, features that provide enhanced benefits to the patient, and the ability of the product development team to overcome design and engineering challenges so the product meets its clinical objectives. A comprehensive review of the entries was performed by an impartial, multidisciplinary panel of third-party jurors with expertise in biomedical engineering, human factors, industrial design, medicine, and diagnostics.

GO TO TOP

### AEA Honors Masimo with Innovative Medical Technology Award

**Irvine, California May 23, 2006** - Masimo Corporation, the inventor of Pulse CO-Oximetry™ and Read-Through Motion and Low Perfusion Pulse Oximetry, was honored by the American Electronics Association's (AEA) Orange County Council at its Thirteenth Annual High Tech Awards ceremony. The AEA recognized the Masimo Rainbow SET Rad-57™ Pulse CO-Oximeter™, as the Innovative Product winner in the Medical Technology category.

MASA00019992
**Exhibit 31**
**-225-**

Masimo is the inventor of read-through motion and low-perfusion pulse oximetry, a technology called Masimo SET®, which has been proven more accurate and reliable in the most challenging clinical settings by over 70 peer reviewed published clinical studies. Building on this technology platform, Masimo has recently introduced Masimo Rainbow SET", a new technology that uses eight wavelengths of light to allow clinicians to capture and monitor an unprecedented array of patient physiological data, such as oxygen, carbon monoxide and methemoglobin, noninvasively. Masimo Rainbow SET capabilities will be available in Masimo monitors and in multi-parameter patient monitors produced by leading manufacturers.

The Rad-57 Pulse CO-Oximeter, the first FDA cleared Rainbow SET product from Masimo, is the first device that allows clinicians to detect and monitor carbon monoxide levels in the bloodstream non-invasively. In clinical studies and in the field, Masimo Rainbow SET is already proving itself effective in detecting carbon monoxide poisoning in seconds, allowing accurate diagnosis and early treatment of a life-threatening problem that is frequently misdiagnosed as flu or migraine. Masimo has also recently received FDA clearance for the noninvasive measurement of methemoglobin levels in the blood. A recent Johns Hopkins study found that methemoglobinemia, a potentially lethal condition that starves the tissues of oxygen, is much more common in hospitalized patients than previously realized.

Joe E. Kiani, Chief Executive Officer of Masimo stated "We are honored that the AEA has recognized Masimo with this award. From the very beginning, we always believed that our breakthrough signal extraction technologies would be widely applicable. Our first application, Masimo SET Signal Extraction Pulse Oximetry, has rapidly created a new performance standard for this critical vital sign. With our Masimo Rainbow SET platform, we are collecting a much more rich data stream separated from interference, enabling us to distinguish additional blood constituents. Our clinical and engineering teams are currently working to identify and qualify additional Rainbow parameters. We thank the AEA for this award and it's recognition of this innovative platform, and I thank my team for their brilliant efforts and tireless progress."

**About AeA**
AeA, founded in 1943, is a nationwide trade association that represents all segments of the technology industry and is dedicated solely to helping our members' top line and bottom line. We do this in partnership with our small, medium, and large member companies by lobbying governments at the state, federal, and international levels, providing access to capital and business opportunities, and offering select business services and networking programs. For more information, please visit www.aeanet.org.

**GO TO TOP**

MASA00019993
**Exhibit 31**
**-226-**

## STA 2006 Application of Technology Award

**IRVINE CA—January 20, 2006** - A new study of the Masimo Rainbow SET Rad-57 Pulse CO-Oximeter™, conducted by Steven J. Barker, PhD, MD of the University of Arizona, has received the 2006 Application of Technology award from the Society for Technology in Anesthesia.

The winning study, "New Pulse Oximeter Measures Carboxyhemoglobin Levels in Human Volunteers" evaluated the ability of the Rad-57 to directly measure the effects of carbon monoxide inhalation in humans. The lethal effects of carbon monoxide are caused by the conversion of normal hemoglobin in the blood to an abnormal form called carboxyhemoglobin, or "COHb." Levels of COHb higher than 50% are potentially fatal, and caused the recent deaths of the coal miners in West Virginia. This study compared the COHb readings from the Rad-57 with blood sample measurements made by CO-oximeters, which are currently used to determine COHb levels in hospital laboratories. The CO-oximeter is a large, expensive machine that requires a blood sample, whereas the Rad-57 is small, portable, and measures COHb with a simple finger-clip sensor. The Arizona researchers found that the Rad-57™ performed within its specifications, accurately measuring the changing COHb levels in the volunteers' blood. The study concluded that this new technology represents a major advance in the monitoring of oxygenation. This is the second time technology pioneered by Masimo is being honored by the STA with such an award.

### Unmasking a silent killer—carbon monoxide—with light waves

"We believe that this device represents a major advance in patient monitoring," said Dr. Barker, the lead author and Head of the Department of Anesthesiology at University of Arizona. "Carbon monoxide poisoning can be a life-threatening problem in the Operating Room, as well as in many settings outside of the hospital. This new technology allows diagnosis in seconds, even in field conditions by first responders. By allowing earlier diagnosis and treatment, this will have a significant effect on patient care."

"We are delighted to hear of the award given to the University of Arizona research team," said Joe E. Kiani, Masimo Chairman and CEO. "Ten years ago, Dr. Barker and Masimo won a similar STA award for Masimo SET®, or Signal Extraction Technology. At that time, our achievement was to monitor oxygen saturation levels accurately for the first time during conditions such as patient

MASA00019994
**Exhibit 31**
-227-

motion and low perfusion. Now, building on SET, we are able to monitor carboxyhemoglobin and methemoglobin levels, and soon, we hope, additional vital physiologic parameters, noninvasively. This is history repeating itself in the most encouraging way."

"We are especially pleased that Dr. Barker and his colleagues on the University of Arizona research team have received this recognition," Kiani added. "Dr. Barker is the author of over 150 scholarly works, and one of the leading researchers in oxygen monitoring. To provide Masimo with the scientific advice we need and a strong connection to the medical community, we have invited Dr. Barker to work with us as the Chairman of our Scientific Advisory Board and as a member of the Masimo Board of Directors. I am delighted to say that he has accepted, and we will be able to lead Masimo better with his guidance."

GO TO TOP

## Masimo Tops the 2006 Patent Scorecard's Top 10 List of Innovators in Medical Devices for Current-Impact Index˜ and Technology Cycle Time˜

**May 10, 2006** – Masimo Corporation receives the highest value in the Current-Impact Index of the ipIQ Medical Devices Patent Scorecard˜ for 2006. The Current-Impact Index showcases the broader significance of a company's patents by examining how often its U.S. patents are used as the basis for other innovation in the current year. A value of 140 indicates a company's patents were referenced 40% more often than the industry average. Masimo achieved a score of 1,294 for the year 2005. In addition, the company also topped the Technology Cycle Time˜ category, which indicates a firm's speed in turning proprietary research and innovations into Intellectual Property.

The Patent Scorecard is an industry-by-industry ranking of corporate innovation and combines a series of indicators to arrive at patent quality, technological strength and breadth of impact. It has historically been published in MIT's Technology Review and tracks the U.S. patent portfolio of more than 2,500 of the world's top technology firms.

To view the full award, please click here (/siteassets/us/documents/pdf/ipiq_advance_2006_medical_devices_scorecard.pdf).

MASA00019995
**Exhibit 31**
**-228-**

**GO TO TOP**

## Masimo CEO Joe Kiani Receives Monty Award

**IRVINE, California – March 7, 2005** – Masimo®, the inventor of Read-Through SAN DIEGO STATE
Motion & Low Perfusion Pulse Oximetry, is proud to announce that its CEO UNIVERSITY
and Founder, Joe E. Kiani, has received the prestigious 2005 Monty award from San Diego State
University. This annual honor recognizes the outstanding achievements and success of
prominent SDSU alumni from each of the school's academic colleges, and Mr. Kiani received the
College of Engineering 2005 Monty Award. This year's award ceremonies were held Saturday,
March 5th.



Mr. Kiani received both his undergraduate and graduate degrees in
electrical engineering from San Diego State University in the 1980's,
and founded Masimo in 1989 shortly after completing his formal
education. He has served as CEO and chairman since that time, and
co-invented Masimo SET® Pulse Oximetry with friend and engineer,
Mohamed Diab, applying system theory and adaptive signal
processing to dramatically improve the monitoring of pulse rate and
oxygen saturation in the blood. This month Masimo announced its second major advance in
patient monitoring with Masimo Rainbow˜ SET® Pulse CO-Oximetry˜, a new technology that
allows caregivers to noninvasively measure carbon monoxide concentration of the blood, for the
first time. The Masimo Rainbow˜ SET® platform is designed to allow for the monitoring of
additional parameters like methemoglobin (SpMet˜), as well as arterial oxygen saturation
completely noninvasively.

"When we consider candidates, we look not only for success and innovation, but also for
evidence that the university played some role in that success," reported Professor David T.
Hayhurst, Dean of Engineering at SDSU. "Joe Kiani did stellar work here in electrical and
computer engineering, and that has clearly been applied brilliantly in the development of Masimo
SET® Pulse Oximetry, which has gone on to become an international standard. We are equally
impressed with his perseverance in doing what was necessary to overcome numerous
significant obstacles in turning his scientific breakthrough into a real product, and then
successfully penetrating a market that is very difficult to enter. We are extremely proud to
recognize Joe for all his accomplishments."

MASA00019996
**Exhibit 31**
**-229-**

"As an educator I persistently address the questions: 'Am I getting through to them? Am I making a difference in their lives? How do I measure if I am?'" says Professor Fredric Harris, Cubic Signal Processing Chair of the Department of Electrical and Computer Engineering at SDSU. "One way is by reviewing the accomplishments of my former students. Joe Kiani is an example of a former student that every teacher wishes he had by the room-full. Joe is a creative individual who directed his native intelligence and SDSU-acquired education to a class of medical instrumentation problems. He recognized them as an opportunity to apply advanced signal processing techniques. As founder of Masimo Corp., in the best tradition of entrepreneurship, he guided development of a novel class of high performance medical instrumentation methods that have revolutionized patient monitoring systems. The Monty award Joe received at the 33rd Alumni Association Awards Gala is SDSU's public recognition of the success of one our distinguished alumni. His award is much deserved and I am proud to know Joe as a faculty member, as an advisor, and as a friend."

Masimo, founded in 1989, is the inventor and leader of Signal Extraction Technology for the non-invasive monitoring of vital signs. Masimo develops, licenses, and markets advanced medical signal processing technologies and product. Masimo Signal Extraction Technology, or Masimo SET®, represents the standard of care for pulse oximeters. With its introduction in 1996, Masimo SET® overcame data dropouts, false alarms and inaccurate measurements due to patient motion, low perfusion and other challenging conditions. Over 100 clinical studies support the conclusion that Masimo SET® is the most effective pulse oximeter in the world.

With the advent of Rainbow™ Technology, Masimo ushers a new era for noninvasive monitoring, where patients at risk of respiratory and cardiac complications, carbon monoxide poisoning and other life threatening diseases can be safely, noninvasively and accurately monitored with Pulse CO-Oximetry. Masimo is headquartered in Irvine, California. Additional information about Masimo and its products can be found at www.masimo.com (/).

Masimo, Signal Extraction Technology and SET® are registered trademarks of Masimo Corporation. Signal Extraction is a trademark of Masimo Corporation. Rainbow, Pulse CO-Oximetry, SpCO, and SpMet are trademarks of Masimo Laboratories.

Contact: Brad Langdale
Masimo Corporation
blangdale@masimo.com (mailto:blangdale@masimo.com) (949) 297-7009

**GO TO TOP**

MASA00019997
**Exhibit 31**
**-230-**

**Acacia Research Tops Deloitte's Orange County Technology Fast 50 Ranking of Fastest-Growing Technology Companies**

**Deloitte.** 2005
**Technology Fast 50**
Orange County

Published: 10/11/05

Contact: Yi-Fang Kryger (mailto:ykryger@deloitte.com)
Deloitte & Touche LLP
213 553 1944

**COSTA MESA, Calif., October 11, 2005** — Acacia Research Corporation, a Newport Beach-based company that develops, acquires, and licenses patented technologies, tops the list of the fastest growing technology companies in Orange County as recognized by Deloitte & Touche LLP at an award event held October 11 at the Hyatt Regency in Irvine. Called the "Orange County Technology Fast 50," the annual award program ranks technology companies located in Orange County by revenue growth.

"The past five years have been a rollercoaster ride for technology companies," said Fred Poska, Partner in the Technology, Media & Telecommunications (TMT) Group at Deloitte based in Costa Mesa. "The companies on the Deloitte Orange County Technology Fast 50 have shown they can prosper in challenging economies and marketplaces. Deloitte is pleased to recognize their achievements."

Winners are selected based on percentage revenue growth over five years from 2000 to 2004. To be considered, Technology Fast 50 entrants must: have operating revenues of at least $50,000 in 2000 and at least $1,000,000 in 2004; be headquartered in Orange County; be a "technology company," defined as a company that owns proprietary technology that contributes to a significant portion of its operating revenues or devotes a significant proportion of revenues to the research and development of technology. Using other companies' technology in a unique way does not qualify. Subsidiaries and divisions are not eligible, unless they have some public ownership and are separately traded.

**2005 Rank**
**Company Name**
**City**
**5yr % Growth**
**Ticker**

MASA00019998
**Exhibit 31**
**-231-**

12
Masimo Corporation
Irvine
390%
Private

The Orange County Technology Fast 50 sponsors include Deloitte & Touche LLP, Focus Creative Group, Comerica, CRESA Partners, D.L.D. Insurance Brokers, Merrill Corporation, McDermott & Bull and Strading Yocca Carlson & Rauth, in association with AEA, Software Council of Southern California and Promotions by Design.

## About Deloitte

Deloitte refers to one or more of Deloitte Touche Tohmatsu, a Swiss Verein, its member firms and their respective subsidiaries and affiliates. As a Swiss Verein (association), neither Deloitte Touche Tohmatsu nor any of its member firms has any liability for each other's acts or omissions. Each of the member firms is a separate and independent legal entity operating under the names "Deloitte," "Deloitte & Touche," "Deloitte Touche Tohmatsu" or other related names. Services are provided by the member firms or their subsidiaries or affiliates and not by the Deloitte Touche Tohmatsu Verein.

Deloitte & Touche USA LLP is the U.S. member firm of Deloitte Touche Tohmatsu. In the U.S., services are provided by the subsidiaries of Deloitte & Touche USA LLP (Deloitte & Touche LLP, Deloitte Consulting LLP, Deloitte Financial Advisory Services LLP, Deloitte Tax LLP and their subsidiaries), and not by Deloitte & Touche USA LLP.

**GO TO TOP**

### MD&DI 100 Notable People in Medical Device Industry awarded to Joe Kiani

MD&DI Names Joe E. Kiani as one of its 100 notable people in the medical device industry.



Joe E. Kiani, the company's co-founder and CEO has been recognized for his contributions to the medical device industry by the editors of Medical Device & Diagnostic Industry(MD&DI) , a Canon Communications LLC publication. Mr. Kiani was selected as the one of the magazine's 100 notable people and featured in the June 2004 issue of MD&DI. "We selected our 100 notable people on the basis of their contributions to the medical device and healthcare industries," said

MASA00019999
**Exhibit 31**
**-232-**

Canon Communications Editorial Director John Bethune. "The individuals chosen reflect the outstanding achievements of the people behind today's medical technology." The medical device industry is well known for its technology, a central aspect that MD&DI covers in each and every issue. Less often noted are the many outstanding people without whom that technology would not exist. The June issue marks the first time MD&DI pays special tribute to 100 of these individuals.

Joe Kiani
Chairman and CEO
Masimo Corp.

A named inventor on more than 30 patents for signal processing, sensors, and patient monitoring... helped start-up company grow to have 300 employees, a global technology-license, and product-distribution agreements.

**GO TO TOP**

## The Forum for Corporate Directors -- Director of the Year for Corporate Growth

**Laguna Niguel, CA (February 25, 2004)** - Joe Kiani, CEO, Masimo Corporation, took home the Forum for Corporate Directors' (FCD) Director of the Year Award. Mr. Kiani built Masimo Corporation from a tiny start-up to a 450+ employee, multi-national company that



dramatically changed pulse oximetry with their innovation of Masimo SET®, a proprietary method of picking up difficult-to-read signals. His leadership also built bridges to Group Purchasing Organizations, paving the way for other small companies to gain access to previously unavailable market segments.

### About Forum for Corporate Directors

The Forum for Corporate Director's mission is to promote the highest standards of corporate ethics and best governance practices, create forums for director peer interactions, and enhance director effectiveness through high-quality and timely education and development programs.

Forum for Corporate Directors membership includes 200 of Orange County's most prominent business and community leaders, corporations and professional services organizations. Forum members are committed to creating value for their organizations, promoting the highest standards of corporate ethics and sharing their experiences with their fellow members and directors.

MASA00020000
**Exhibit 31**
**-233-**

**About Masimo**

Masimo, founded in 1989, is the innovator and leader of motion and low perfusion tolerant pulse oximetry. Masimo develops, licenses and markets advanced medical signal processing technologies and products for the noninvasive monitoring of vital signs. Masimo Signal Extraction Technology represents a fundamental departure from conventional pulse oximetry technologies. Over 70 independent and objective published studies have demonstrated that Masimo SET® is the safest and most effective pulse oximetry technology in the world. To date, Masimo has licensed its Signal Extraction Pulse Oximetry technology to over 35 international patient monitoring system providers, which make up over 70 percent of the world's pulse oximeter shipments. Masimo is headquartered in Irvine, Calif. Additional information about Masimo and its products can be found on www.masimo.com.

**GO TO TOP**

## Deloitte & Touche Technology Fast 50, Orange County



WHAT: Deloitte & Touche LLP, one of the nation's leading professional services firms, is pleased to announce an alphabetical listing of its 2004 Orange County Technology Fast 50 winners. The Fast 50 ranks the 50 fastest-growing technology companies in Orange County over five years (1999-2003). A special category called "Rising Stars" recognizes the five fastest-growing technology companies based on revenue growth over three years (2001-2003).

HOW: Technology Fast 50 winners are selected based on the percentage of growth in fiscal year revenues from 1999 to 2003. To be considered, entrants must be based in Orange County and must be a technology company defined as owning proprietary technology that contributes to a significant portion of the company's operating revenues (using other companies' technology in a unique way does not qualify); and/or devoting a significant proportion of revenues to research and development of technology.

WHEN:
Announcement of the Orange County Technology Fast 50 winners ranked by growth percentage and the Rising Star winners is scheduled for October 4, 2004.

WHERE:
Visit www.fast50.com (https://www2.deloitte.com/us/en.html) for more information on the Technology Fast 50 program.

WHO:
Acacia Research Corporation, Accenx Technologies, Inc., Aircept.com LLC(a), Allergan, Inc., Artemis International Solutions Corporation, Autobytel Inc., BIOLASE Technology, Inc., Broadcom

MASA00020001
**Exhibit 31**
**-234-**

Corporation, Callipso Corporation, Cardiac Science, Inc., Ceradyne, Inc., ChromaVision Medical Systems, Inc., Cortex Pharmaceuticals, Inc., DPAC Technologies Corp., Dynatem, Inc, eEye Digital Security, Electropure, Inc., Emulex Corporation, Endocare, Inc., Envision Financial Systems, Inc., Exult Inc., Foundstone, Inc.(a), HireRight, Inc., I/OMagic Corporation, ICU Medical, Inc., I-Flow Corporation, Infokall, Inc.(a), Interpore Cross International, Inc., Island Pacific, Inc., KOR Electronics, Lantronix, Inc., Lifemasters Supported Self Care, Inc., Masimo Corporation, Meade Instruments Corp., MenuLink Computer Solutions, Inc., Micro Therapeutics, Inc., MSC.Software Corporation, netGuru, Inc., Oakley, Inc., Paciolan, Inc., QLogic Corporation, Quality Systems, Inc., Quest Software, Inc., Raining Data Corporation, Ritz Interactive, Inc., Syagen Technology, Inc., Sybron Dental Specialties, Inc., TCI Solutions, Inc., Telogis(a), The TriZetto Group, Inc., TransDimension, Inc., TTM Technologies, Inc., U-Nav Microelectronics Corporation(a), Universal Space Network, Inc., US LABS, Inc.

#### About Deloitte

Deloitte, one of the nation's leading professional services firms, provides audit, tax, financial advisory services and consulting through nearly 30,000 people in more than 80 U.S. cities. Known as an employer of choice for innovative human resources programs, the firm is dedicated to helping its clients and its people excel. "Deloitte" refers to the associated partnerships of Deloitte & Touche USA LLP (Deloitte & Touche LLP and Deloitte Consulting LLP) and subsidiaries. Deloitte is the US member firm of Deloitte Touche Tohmatsu. For more information, please visit Deloitte's web site at www.deloitte.com/us (http://www.deloitte.com/us).

Deloitte Touche Tohmatsu is an organization of member firms devoted to excellence in providing professional services and advice. We are focused on client service through a global strategy executed locally in nearly 150 countries. With access to the deep intellectual capital of 120,000 people worldwide, our member firms, including their affiliates, deliver services in four professional areas: audit, tax, financial advisory services and consulting. Our member firms serve more than one-half of the world's largest companies, as well as large national enterprises, public institutions, locally important clients, and successful, fast-growing global growth companies.

Deloitte Touche Tohmatsu is a Swiss Verein (association), and, as such, neither Deloitte Touche Tohmatsu nor any of its member firms has any liability for each other's acts or omissions. Each of the member firms is a separate and independent legal entity operating under the names "Deloitte," "Deloitte & Touche," "Deloitte Touche Tohmatsu" or other related names. The services described herein are provided by the member firms and not by the Deloitte Touche Tohmatsu Verein. For regulatory and other reasons certain member firms do not provide services in all four professional areas listed above.

**GO TO TOP**

### Frost & Sullivan New Standard of Care in Patient Monitoring Award

**San Jose, Calif. - June 16, 2003** - Frost & Sullivan today presented the first the 2003 New Standard of Care in Patient Monitoring Award to Masimo Corporation, a developer of



MASA00020002
**Exhibit 31**
**-235-**

advanced medical signal processing technologies instrumental in state-of-the-art noninvasive monitoring of patient vital signs, at the AMMI Conference in Long Beach, California.

Aroop Zutshi, Frost & Sullivan senior partner, presented the award to Joe E. Kiani, Chairman and CEO of Masimo Corporation, in recognition of its commitment to patient care, its successful pioneering and introduction of next-generation pulse oximetry technology, and its demonstrated improvement of patient monitoring.

In 1996,1997, and 1998, Masimo introduced in Europe, Japan and the US respectively, its pioneering Signal Extraction Technology (Masimo SET®) solution, the first motion-tolerant and low-perfusion monitoring device, into the pulse oximetry and patient monitoring markets. Initially blocked from selling its product to the US hospitals through group purchasing organizations (GPOs), Masimo went directly to leading medical professionals and had its product assessed and compared against the leading pulse oximeters of the day.

These independent studies highly favored the Masimo SET® solution, raising the awareness of improvements in the medical community and creating strong demand for this motion-tolerant technology among healthcare workers. Prior to Masimo SET® pulse oximetry, pulse oximeters were fraught with false alarms. In fact, approximately 90% of the pulse oximeter alarms were false with conventional pulse oximetry. The dramatic reduction in the number of false alarms, and the improvement in detection of true alarms, was felt to significantly improve the caregiver's productivity as well as provide reliable continuous patient pulse oximetry data.

Masimo's low-perfusion technology also enables doctors and healthcare workers to measure oxygenation levels in patients which were previously unable to be measured and regulated. Clinical studies had shown that over 10% of the time pulse oximeters failed to provide any measurement during surgery in the OR. Masimo SET® changed all of that. As a result, new standards of care are now being offered to patients from infants to geriatrics.

"The rapid adoption of Masimo SET® technology, by both hospitals and major patient monitoring equipment manufacturers demonstrates the value that the market has placed on this significant technological advancement," says Katherine Shariq, Frost & Sullivan industry analyst.
The Frost & Sullivan New Standard of Care in Patient Monitoring Award is given to a company that has successfully developed or introduced a new or advanced version of a patient monitoring component or device, which could potentially revolutionize or reinvigorate the market. Multiple advantages over existing monitoring components clearly establish that the technology used in the field has evolved into a next-generation device. Masimo is the first company to receive such an honor over the past 15 years.

About Masimo Corporation

MASA00020003
**Exhibit 31**
**-236-**

Founded in 1989, Masimo Corporation, the innovator of motion and low perfusion tolerant pulse oximetry, is a privately held medical technology company that develops, licenses and markets advanced medical signal processing technologies and products for the noninvasive monitoring of patient vital signs. Masimo Corporation is headquartered in Irvine, California.

About Frost & Sullivan

Founded in 1961, Frost & Sullivan, a global leader in growth consulting, presents Market Engineering Awards to companies that demonstrate excellence in their industry, commending the diligence and innovative business strategies required to advance in the global marketplace. Frost & Sullivan rigorously analyzes specific criteria to determine Market Engineering Award recipients in a vast variety of market industries and landscapes. For further information, visit www.frost.com (http://www.nacersano.org)

**GO TO TOP**

## Frost & Sullivan Patient Monitoring Technology of The Year Award

**SAN DIEGO, Nov 6, 2003** - At last night's 2003 Global Excellence in Healthcare & Life Sciences Awards Banquet, Frost & Sullivan named Masimo Corporation as the recipient of the 2003 Patient Monitoring Technology of the Year Award.



Masimo Corporation's innovative Signal Extraction Technology (Masimo SET®) modernized the pulse oximetry and patient monitoring markets with its ease of use and breakthrough performance.

Its ability to noninvasively measure oxygen saturation levels in high-risk and difficult patients, such as people with very low levels of perfusion and those actively in motion, has created widespread demand by physicians.

"Masimo's engineering design and skilled development of highly specific algorithms have made its technology highly sought after," states Katherine Shariq, industry analyst with Frost & Sullivan. "Due to the company's innovations, the pulse oximetry market has been reenergized and the use of pulse oximetry solutions for continuous measurements among high-risk patients has expanded."

This award recognizes Masimo's contribution to medicine and patient care through its innovation, engineering expertise, and diligence in getting its Masimo SET® technology accepted and used in the patient monitoring market. Masimo currently maintains licensing agreements

MASA00020004
**Exhibit 31**
**-237-**

with more than 35 international patient monitoring equipment providers and operates a growing
stand-alone pulse oximeter business.

With Masimo SET® acknowledged as a new technology standard most hospitals and caregivers
are making the shift to "next-generation" pulse oximetry solutions to monitor their patients.
Masimo deserves this award for its commitment to patient care, reliability, and the ease of use of
its products.

Joe E. Kiani, Chairman & CEO of Masimo stated, "On behalf of the Masimo team, both those
inside and outside the company, I would like to thank Frost and Sullivan for bestowing upon us
this award. This award not only encourages us to do more, but hopefully it encourages other
people to dedicate themselves to the advancement of patient care."

Every year, Frost & Sullivan honors the company that introduces a technology with the ability to
influence and impact R&D focus and competitive posture in several market segments. The
technology also shows potential to become an industry standard or achieve a high degree of
market acceptance.

Held in San Diego, Calif., the Frost & Sullivan banquet honored world-class companies for
outstanding performance and achievements in the healthcare industry. An annual event, the
banquet recognizes the quality and merit of these distinguished companies.

About Masimo

Masimo, founded in 1989, is the innovator and leader of motion and low perfusion tolerant pulse oximetry. Masimo develops, licenses
and markets advanced medical signal processing technologies and products for the noninvasive monitoring of vital signs. Masimo
Signal Extraction Technology represents a fundamental departure from conventional pulse oximetry technologies. Over 70 independent
and objective published studies have demonstrated that Masimo SET® is the safest and most effective pulse oximetry technology in the
world. To date, Masimo has licensed its Signal Extraction Pulse Oximetry technology to over 35 international patient monitoring system
providers, which make up over 70 percent of the world's pulse oximeter shipments. Masimo is headquartered in Irvine, Calif. Additional
information about Masimo and its products can be found on www.masimo.com (/).

About Frost & Sullivan

Founded in 1961, Frost & Sullivan is recognized as a global leader in growth consulting. Frost & Sullivan Awards are presented to
companies that demonstrate excellence in their industry, commending the diligence, commitment, and innovative business strategies
required to advance in the global marketplace. Frost & Sullivan rigorously analyzes specific criteria to determine award recipients in a
vast variety of market industries and landscapes. For further information, visit www.frost.com (http://www.frost.com).

**GO TO TOP**

MASA00020005
**Exhibit 31**
**-238-**

**Platinum "ABBY" Award --Adaptive Business Leaders Innovations in Healthcare Award**

**Orange, CA (June 20, 2003)** - Joe Kiani, CEO of Masimo
Corporation (in Irvine), Jay Short, Ph.D., CEO of Diversa



Corporation (in San Diego) and Adam Singer, M.D., CEO of IPC-The Hospitalist Company (in
North Hollywood), respectively took home the Platinum, Gold and Silver "ABBY" Awards at the
Adaptive Business Leaders (ABL) Organization's Fifth Annual Innovations in Healthcare℠ Awards
and Event, held Wednesday, June 18, at the Hyatt Regency, Irvine.

The three innovators were selected to receive the gold statuette from among a group of nine
Innovations in Healthcare℠ finalists for their outstanding advancements to the field of
healthcare in medical technology, bio technology and information technology-enhanced
healthcare services. According to Mimi Grant, President of ABL, the 60-plus judges, primarily ABL
Members and other healthcare industry CEO's and Division heads attending the Event, found
their greatest challenge of the day was selecting just three companies to win the ABBY among
the nine finalists, each of whom presented a compelling case as to why and how their product or
service significantly advanced the quality of patient life or enabled the business of healthcare to
be conducted more cost effectively.

Joe Kiani, CEO of Masimo Corporation, took home the Platinum "ABBY." Masimo has developed
proprietary signal processing and sensor technologies for cost-effective, noninvasive patient
monitoring, improving patient outcomes and reducing the cost of care through its Masimo SET®
Pulse Oximetry technology. Joe has also brought leadership to the medical technology industry
by breaking through the often bureaucratic hurdles established by some large healthcare
systems and Group Purchasing Organizations.

Jay Short, Ph.D., CEO of Diversa Corporation received the Gold Innovations in Healthcare℠
Award. Diversa is a leader in the discovery, evolution, and production of commercially valuable
molecules with pharmaceutical applications, such as optimized monoclonal antibodies and
orally active drugs. The company also developed a cutting edge technology that allows ultra
high-throughput, resulting in faster new drug discovery, enabling the fast-tracking of the next
cancer or autoimmune disease treatment development.

Adam Singer, M.D. and CEO of IPC - The Hospitalist Company was awarded the Silver "ABBY." In
1991, IPC pioneered hospitalist care: full-time, acute primary care specialists who focus
exclusively on patients receiving inpatient care. IPC-LINK® is the company's proprietary clinical
repository of best practices (and much more) that each of IPC's 400 physicians can easily
access on their wireless hand-held computers, thus increasing economic efficiency while
enhancing quality of care.

MASA00020006
**Exhibit 31**
**-239-**

The other finalists included:

David Adamson, M.D., is Chairman and CEO of Advanced Reproductive Care, Inc, which is the only national organization of physician specialists in fertility care, who also have developed innovative payment plans.

Eleanor Levin, M.D., is the Clinical Lead of Kaiser Permanente's Comprehensive Coronary Artery Disease Program, which has dramatically reduced the number of Kaiser patients suffering and dieing from coronary artery disease

Bob Watson is President and CEO of Concuity, Inc., which provides an enterprise-wide information system that helps providers create and negotiate better contracts with payers and collect what's owed them.

John O'Shaughnessy is President of Government Management Services, Inc., which created and operates FACIS®, the Fraud and Abuse Control Information System, for verifying the credentials of, and reports sanctions against, physicians and other clinicians.

Ed Fotsch, M.D. is CEO of Medem, Inc., which, backed by the AMA, developed this physician-patient communications network to facilitate online access to information and care for more than 90,000 physicians and their patients.

Richard Brumley, M.D. is the Physician in Charge of Kaiser Permanente's TriCentral Palliative Care Program, which cares for those with serious, advanced, life-limiting illnesses and is focused on their quality of life.

About the ABL Organization

From its inception, 20 years ago, the purpose of the Adaptive Business Leaders Organization (ABL; originally named SO/CAL/TEN) has been the sharing of best practices and innovative approaches that propel business growth. Today the Organization facilitates nine monthly Round Tables (from San Diego to San Francisco) and holds special forums throughout the year -- like Innovations in Healthcare℠ -- that enable its healthcare and technology Members to learn from each other. Further, for ABL's healthcare Members there is a particular focus on how to cost-effectively apply innovative approaches to delivering high quality healthcare.

**GO TO TOP**

MASA00020007
**Exhibit 31**
**-240-**

**Frost & Sullivan Product Equability Leadership Award**



Frost & Sullivan bestows the Market Engineering Award for
Quality Control Leadership upon the company that has

demonstrated superior quality control÷over their existing competitors÷in product manufacturing.
Quality control is an essential element of satisfying customers, increasing repeat buying
behavior, and assuring long-term market survival.

Research Methods:
To choose the award recipient, the analyst team tracks all products and research and
development projects within the industry. This is accomplished through interviews with all
market participants, end-users, distributors, and extensive secondary and technology research.

Measurement Criteria:
In addition to the methodology described above, there is specific criteria used to determine final
competitor rankings in this industry. The award recipient has excelled based on one or more of
the following criteria:

- Lowest defect percentage per batch of units produced by suppliers in current base year
- Product ability to fulfill customer needs, in terms of functionality and user friendliness
- Number of breakdowns or services required per year
- Degree of connectivity
- Level of product support end-users receive from their vendors or suppliers

Product Quality Leadership Award: Masimo Corporation:

The recipient of the 2002 Frost & Sullivan Product Quality Leadership Award for the U.S. fetal and
neonatal market is Masimo Corporation.

Masimo is a leading supplier of advanced medical signal processing technologies and products
for the noninvasive monitoring of patient vital signs. Masimo Corporation is a privately held
medical technology company, and is responsible for developing innovative motion and low
perfusion tolerant pulse oximetry. The Masimo Signal Extraction Technology (Masimo SET®) is a
breakthrough technology to access, process and register arterial oxygen saturation and pulse
rate. Masimo SET® enhances the accuracy of SpO2 monitoring, particularly in complex patient
conditions such as motion and low peripheral perfusion. Masimo SET® utilizes five algorithms
(as opposed to the traditional two) to ensure continuous, accurate SpO2 measurement, even
under the most challenging conditions.

MASA00020008
**Exhibit 31**
**-241-**

Over 50 clinical studies have proved that the Masimo SET® considerably reduces costs, improves patient outcomes, and reduces medical errors in the presence of patient movement and low perfusion. Masimo has licensed its Signal Extraction pulse oximetry technology to over 35 international patient monitoring systems providers, accountable for 60 percent of the world's pulse oximeter shipments. Moreover, over 35 patient monitoring equipment manufacturers market Masimo SET® pulse oximetry. Some of the most notorious companies competing in the fetal and neonatal monitoring equipment market that offer Masimo's SET® pulse oximetry are: Datascope, GE Medical Systems, Invivo Research Inc., Ivy Biomedical Systems, Inc., Medical Data Electronics (MDE), a subsidiary of Viasys Healthcare, Respironics, and Welch Allyn.

For its commitment to the highest standards of excellence in its product offerings, Frost & Sullivan is proud to present the 2002 Product Quality Leadership Award to Masimo Corporation.

GO TO TOP

## Medical Design Excellence Award for Radical™ Signal Extraction Pulse Oximeter

Masimo Corporation, the innovator of Signal Extraction Pulse Oximetry, has been selected as winner in the 2001 Medical Design Excellence Awards (MDEA) competition for Masimo's recently released Signal



Extraction Technology™ Pulse Oximeter, Radical™. The MDEA is the only awards program devoted exclusively to recognizing contributions and advancements in the design of medical products. MDEA-winning products excel in the areas of product innovation, design and engineering excellence, end-user benefit, and cost-effectiveness in manufacturing and healthcare delivery. An impartial, multi-disciplinary panel of third-party jurors reviews all products submitted. These jurors have expertise in biomedical engineering, human factors, industrial design, medicine, nursing, diagnostics, and medical packaging. Winners are selected in ten medical product categories. Radical was selected as a winner in the division of Critical Care and Emergency Products.

Radical Signal Extraction Pulse Oximeter is three pulse oximeters in one: a standalone device for bedside monitoring, a detachable handheld pulse oximeter for portable monitoring or spot check, and with its rich interface options, including SatShare™, provides an upgrade path for the conventional pulse oximetry technologies found in hospital patient monitors to Masimo SET® performance.

MASA00020009
**Exhibit 31**
**-242-**

Radical incorporates a new version of Masimo SET® software, V3", which not only delivers the breakthrough motion and low perfusion performance of Masimo SET®, but debuts FastSat", which allows pulse oximeters to accurately track rapid saturation changes with unprecedented fidelity. Radical also debuts Signal IQ", a unique visual indication that identifies the arterial pulse and quality of the acquired signal even under conditions of motion and low perfusion.

"Radical, is the most advanced pulse oximeter in the world, yet it is simple to use," said Joe E. Kiani, President and Chief Executive Officer of Masimo Corporation. "Clinicians from around the world contributed to the design of Radical by challenging our engineers to take the Masimo SET® engine and design a pulse oximeter body around it that would make it available to all of their patients in all of the environments they were currently using conventional pulse oximetry or couldn't due to the limitations of conventional pulse oximeters. They also wanted one intuitive user interface for all of their applications, whether they were doing spot-check hand-held pulse oximetry measurement or continuous bedside monitoring in the OR, ICU or Ward."

Mr. Kiani continued, "Due to the requirements and feedback by our clinical advisory group, and the ingenuity and hard work of our engineers, clinicians around the world can now benefit from Masimo SET®'s unprecedented sensitivity and specificity for all their patients in all of the environments they choose; all with one intuitive user interface. We thank MDEA for this recognition, as well as, the many clinician advisors, our engineering team and the industrial design team of I.N. for creating Radical."

**GO TO TOP**

## Masimo Becomes only Pulse Oximetry Company to Receive the Audie Lewis Mark of Excellence˜ Award

**November 2001** – Audie Lewis Consulting, Inc, a consulting organization serving hospitals, published an audit report in November 2001 on masimo Signal Extraction Technology (Masimo SET). In this audit report, Masimo received the Audie Lewis Mark of Excellence ˜, the only pulse oximetry company receive this distinction. This Mark was given to Masimo after an extensive audit, a large majority of which was conducted prior to Masimo being made aware that it was taking place. The audit report concluded that none of the other pulse oximetry technologies matched the quality and clinical benefits of Masimo SET, and provided an overall assessment of

MASA00020010
**Exhibit 31**
**-243-**

"Outstanding." Masimo also received high grades for Masimo SET's cost reduction impact to hospitals, and Audie Lewis' highest rating for ever for customer satisfaction following direct interviews 21 Masimo clients throughout the USA.

To view the full award, please click here (/siteassets/us/documents/pdf/alewis.pdf).

**GO TO TOP**

## AEA Innovative Product/Technology Award

Masimo Corporation, the innovator of Signal Extraction Pulse Oximetry, was honored by the American Electronics Association's (AEA) Orange County Council at its Eighth Annual High Tech Awards ceremony last night. The AEA recognized the Masimo Radical Signal Extraction pulse oximeter, as the Innovative Product/Technology in the medical area.

The Radical has quickly become recognized as the most advanced and versatile pulse oximeter ever conceived. In addition to providing the unsurpassed accuracy and reliability of Masimo SET® pulse oximetry, Radical possesses several other features that set it apart. Its removable, battery operated module allows it to be quickly converted from a standalone bedside monitor to a handheld device, which can be used for transport or spot checks. Masimo's SatShare interface cable may also be used with the Radical pulse oximeter to upgrade existing monitors to Masimo SET® performance. Many hospitals have found the SatShare interface to be most economical means of upgrading their existing monitors.

The versatility and multi-functionality of the Radical pulse oximeter make it the best solution for a hospital looking to replace all of its pulse oximetry technology with the newly recognized motion and low perfusion tolerance standards set by Masimo. A facility can replace its standalone and handheld devices with Radical pulse oximeters, and upgrade its integrated monitoring systems with SatShare. Then, all patients in the facility benefit from the improved performance of Masimo SET® and clinicians do not need to decide which patients get the new technology and which can risk the old. And, with sensor standardization achieved, the hospital can keep a long lasting Masimo single patient adhesive sensor on the patient throughout their stay. Many hospitals, including Massachusetts General, are standardizing their entire facility on Masimo SET®.

MASA00020011
**Exhibit 31**
**-244-**

"We are honored that the AEA has recognized Masimo with this award," said Joe E. Kiani, President and Chief Executive Officer of Masimo Corporation. "Radical is the result of input from clinicians around the world who were looking for a pulse oximetry solution that met all of their needs. Our talented and dedicated team went beyond the call of duty in designing and building a product that meets these needs. I'm proud to say, based on the clinical and market response to Radical so far, that we achieved our goal and have delivered a product to the market that can allow clinicians to improve the level of care while saving money in the process. We thank the AEA, and I thank my team for their valiant effort."

**GO TO TOP**

### The Huntington's Disease Society of America Distinguished Leadership Award

Irvine, California November 19, 2001 - Joe E. Kiani, President & CEO of Masimo Corporation, was presented with the Huntington's Disease Society of America's (HDSA) Distinguished Leadership Award at the First Annual HDSA Orange County Celebration of Hope Dinner last week. The HDSA Distinguished Leadership Award is a nationally recognized award associated with the Celebration of Hope Dinners, which benefit HDSA Centers of Excellence in cities around the country. The award is presented to individuals who have had a positive impact in their communities, and for the significant contributions they have made in their chosen fields.

Mr. Kiani was recognized for his accomplishments in founding Masimo Corporation, the innovator of Masimo SET® - Signal Extraction Technology - which is used in the healthcare field as the premier noninvasive patient monitoring technology. Since its worldwide market release in 1998, Masimo SET® has emerged as the preeminent pulse oximetry (measuring a patient's arterial blood oxygen saturation) technology, particularly under the most challenging conditions of patient motion and low perfusion (low blood flow). Other recipients of the Distinguished Leadership Award included:

Ralph Cygan, M.D. - CEO of and Clinical Professor at UC Irvine Medical Center

John Hagestad - Chairman, Orangewood Children's Foundation; Executive

Committee Member, Sares Regis Group

MASA00020012
**Exhibit 31**
**-245-**

Arthur B. Birtcher - Co-Chair, Birtcher Real Estate Group

"Huntington's Disease is a degenerative, fatal genetic disorder that can absolutely devastate families who are affected by it," said Joe E. Kiani, President and Chief Executive Officer of Masimo Corporation. "I am honored to receive the Distinguished Leadership Award, but, more importantly, I am hopeful that events such as the Celebration of Hope dinners, will serve to bring awareness and support in the fight to end Huntington's Disease."

Masimo Corporation, founded in 1989, is a privately held medical technology company that develops, licenses and markets advanced medical signal processing technologies and products for the noninvasive monitoring of vital signs. Masimo Signal Extraction Technology represents a fundamental departure from conventional pulse oximetry technologies. Over 50 independent, published studies have demonstrated that Masimo Signal Extraction Technology substantially overcomes the limitations of conventional pulse oximeters in accurately measuring arterial blood oxygen saturation levels and pulse rates in the presence of patient movement and low perfusion. To date, Masimo has licensed its Signal Extraction pulse oximetry OEM MS Boards and proprietary LNOP single patient adhesive and reusable sensors to over 35 international patient monitoring system providers which make up over 60% of the world's pulse oximeter shipments. AmeriNet, the leading group purchasing organization and HealthTrust Columbia, the largest hospital system in America are offering their member hospitals the ability to gain access to Masimo SET® technology at group purchasing discounted prices. Masimo is headquartered in Irvine, California. Additional information about Masimo and its products can be found on the company's web site www.masimo.com (/).

Huntington's Disease (HD), named for Dr. George Huntington who first discovered the disease in 1872, is a fatal and degenerative brain disorder for which there is, at present, no effective treatment or cure. HD, which is passed down to 50% of the children of a parent having the disorder, slowly diminishes the affected individual's ability to walk, talk and reason. The Huntington's Disease Society of America is dedicated to providing support and education to the families affected by this life-altering illness, and to ultimately finding a cure. HDSA Centers of Excellence provide clinical care, counseling, referrals and education for individuals with HD and their families. HDSA Centers of Excellence are supported through Celebration of Hope events and through the generosity of the community and HD family and friends.

**GO TO TOP**

MASA00020013
**Exhibit 31**
**-246-**

## March of Dimes Excellence in Leadership Award



The Orange County Division of the March of Dimes held its 7th Annual
Excellence in Leadership Gala on Thursday, October 18, 2001, at 6:00

p.m. at the Hyatt Newporter in Newport Beach. The non-profit that saves babies' lives recognized
four Orange County individuals for their contribution to the March of Dimes mission, and for their
significant achievements and outstanding leadership in their fields. The black tie dinner was
attended by over 352 participants and raised $140,000 in support of the March of Dimes.

The Jonas Salk Excellence in Medicine Award was awarded to M. Douglas Cunningham, M.D.,
Vice President, Special Projects, Pediatrix Medical Group, Inc. An accomplished physician,
teacher and researcher, Dr. Cunningham was honored for his contributions to the field of
neonatal-perinatal medicine.

The Excellence in Leadership Awards were presented to: Joe E. Kiani, president and CEO,
Masimo Corporation, for his outstanding contributions in the biomedical technology field; Tim
Smith, CEO and president, Fountain Valley Regional Hospital & Medical Center, for his ongoing
effort and achievements in the medical field; and Alex Stenzler, vice president, Advanced
Technologies, Sensor Medics Corporation, for his extraordinary endeavors in the biomedical
technology field.

Heading the Honorary Committee were Bill Ross, honorary event chair and chief operating officer
for Viasys Healthcare, along with Deborah Harrington, chair, Orange County Division Board of
Directors and manager, Investment Management Services for Harrington Capital. Serving along
with Ross and Harrington were Jeffrey C. Barbakow, Tenet HealthSystem; Valerie Begnoche,
Masimo Corporation; Steve Bredehoft, Sensor Medics Corporation; Thomas J. Burnham, The
Allergan Foundation; Michele Finney, Los Alamitos Medical Center; Lynn Hayes, Pediatrix Medical
Group; Jannie Herchuk, Deloitte & Touche; Chris Kilpatrick, Arter & Hadden; Roger J. Medel, M.D.,
Pediatrix Medical Group, Kathleen O'Brien, Fountain Valley Regional Hospital & Medical Center;
Meredith Rattay, Grossman Burn Center; LeAnn Spaide, Glendale Adventist Medical Center; and
Mike Stephens of Hoag Hospital.

The annual gala helped increase awareness of the March of Dimes and its accomplishments in
serving the mothers and babies of Orange County. Funds raised helped provide continuing
support for research, community programs, public education and advocacy in the fight against
birth defects, prematurity, and infant mortality.

MASA00020014
**Exhibit 31**
**-247-**

The black tie evening began with a cocktail reception at 6:00 p.m., followed by dinner and the awards presentation at 7:15 p.m. Tickets were $250.00. For additional event information, contact Hanna Koh at (949) 263-1100 or email Hkoh@modimes.org.

The March of Dimes is a national voluntary health agency whose mission is to improve the health of babies by preventing birth defects, prematurity, and infant mortality. Founded in 1938, the March of Dimes funds programs of research, community service, education, and advocacy to save babies. The Southern California Chapter serves a population of more than 20 million people and has divisions in Los Angeles, San Diego, Orange County and the Inland Empire. More information is available on the March of Dimes web sites at www.modimes.org (http://www.modimes.org) and www.nacersano.org (http://www.nacersano.org).

## THE ORANGE COUNTY DIVISION OF THE MARCH OF DIMES 7TH ANNUAL EXCELLENCE IN LEADERSHIP GALA 2001 HONOREES

### JONAS SALK EXCELLENCE IN MEDICINE AWARD

M. Douglas Cunningham, M.D., joined Pediatrix as Chief Medical Officer in 1996 and has served on the Board of Directors for Pediatrix Medical Group since that time. Currently he serves as vice president of Special Projects at Pediatrix Medical Group. Dr. Cunningham has dedicated 32 years to research and clinical interests in pediatrics. He has co-authored a book that has been translated in four languages, 16 chapters have been utilized in medical textbooks, 34 articles have been published in medical journals and in 57 scientific presentations.

### EXCELLENCE IN LEADERSHIP AWARD

Joe E. Kiani is the co-founder of Masimo Corporation. He has served as its president, CEO and Chairman of the Board of Directors since Masimo's inception in 1989. Kiani is an inventor on more than 30 patents related to signal processing, sensors and patient monitoring. Masimo licenses its technology to more than half of the world's patient monitoring suppliers, making Masimo SET® technology available to customers in a wide array of product configurations.

Tim Smith has served in the healthcare management field for 20 years and currently serves as president and CEO at Fountain Valley Regional Hospital and Regional Center. Smith is a Diplomate of the American College of Healthcare Executives and participates in the University of California, Los Angeles Mentoring Program. He is the recipient of the 2000 Ethics in America Award from Chapman University.

MASA00020015
**Exhibit 31**
**-248-**

Alex Stenzler currently serves as vice president of Advanced Technologies for Sensor Medics Corporation and the Critical Care Division of Viasys Healthcare Corporation where he has worked for 10 years. Sensor Medics designs, manufactures, markets and services advanced diagnostic and therapeutic products for the respiratory care market. Stenzler, always concerned about the respiratory health of babies and adults alike, has done extensive research on the passive measurement system for respiratory mechanics.

GO TO TOP

### SCCM Technology Excellence Award

Society of
Critical Care Medicine

The Society for Critical Care Medicine (SCCM) has chosen Masimo Corporation as the recipient of this year's SCCM Technology Excellence Award. This award, which recognizes outstanding strides in technology which benefit critical care medicine, will be formally given to Joe E. Kiani, Founder and President of Masimo Corporation, at the SCCM Conference to be held in Orlando, Florida from February 11 through February 15.

This is the first year such an award is being given to someone in the industry. The SCCM Awards had previously been given only to clinicians and non-industry researchers. According to the SCCM, "Masimo's design convinced intensivists that pulse oximetry could work on the toughest patients and be useful during motion and low perfusion, thus raising the bar in the standards critical care medicine can now apply to future technology."

"It is important that true technological innovators be recognized and rewarded for their efforts," commented Max H. Weil, MD, PhD, FCCM, Distinguished University Professor and founder of the SCCM. "Prior to Masimo's contributions, the false alarms and unreliability of pulse oximeters were assumed to be inherent and insurmountable limitations of the measurement. Masimo did not accept this and made an intuitive leap to create what is now the new standard of performance for pulse oximeters. Having dedicated my career to advancing the care of critically ill patients, I am happy to see that better care will result and the standards are being raised as a result of Masimo's technological breakthrough. Masimo has truly earned this award."

GO TO TOP

MASA00020016
**Exhibit 31**
**-249-**

### Frost & Sullivan Market Engineering Competitive Strategy Award



Masimo Corporation announced that it is the recipient of one of Frost
& Sullivan's highest honors for Market Engineering: the 2000 Competitive Strategy Award. This
award, based on independent research and analysis of companies in the health care industry,
recognizes Masimo for its positive contribution to the blood gas monitoring equipment market.

According to Frost & Sullivan analyst, Minal Vasanawada, "Masimo has made a significant
impact on the industry with its successful marketing of its proprietary Signal Extraction pulse
oximetry technology, Masimo SET®. False alarms and erroneous readings due to patient and
environmental factors have for long plagued pulse oximetry technology. By addressing this
pressing need to have more accurate data from pulse oximeters in varied clinical settings
including motion and low perfusion, Masimo has displayed a clear understanding of the primary
competitive factors in this industry. Frost & Sullivan recognizes this outstanding achievement
and awards Masimo with its Competitive Strategy Award."

"Masimo is honored to be recognized by Frost & Sullivan for the advancement and contribution
Masimo has made in the field of pulse oximetry," said Joe E. Kiani, President and CEO of Masimo
Corporation. "Our goal was to solve what other companies thought was unsolvable - to make
pulse oximetry accurate during motion and low perfusion. We then set out to educate the
industry and health care professionals with independent clinical studies by leading clinicians
around the world and true side-by-side demonstrations. Today, over 25 clinical studies by
independent researchers have proven Masimo Signal Extraction Technology to be the only pulse
oximetry technology accurate under the most challenging conditions of motion and low
perfusion and when it's needed the most. We wish to thank the dedicated clinicians who, without
any personal monetary reward, have spent their valuable time and resources to study Masimo
SET®'s performance compared to conventional pulse oximetry and Masimo SET's effect on
improving patient care as well as reducing cost of care."

Mr. Kiani continued, "By proving the breakthrough accuracy and reliability of Masimo SET®
technology clearly and honestly, we have been able to attract over 30 leading patient monitoring
companies, who make up over 50% of the world's pulse oximeter suppliers - to adopt Masimo
SET® as their standard pulse oximetry technology. These companies have spent significant
resources to upgrade their products to Masimo SET® for the benefit of their customers; they
should also be honored. Receiving honors such as this Frost & Sullivan Award and the

MASA00020017
**Exhibit 31**
**-250-**

appreciation from clinicians and patients who have been helped by our technology, renews our commitment to continue to advance signal processing and sensor technology for the benefit of patients and to be driven by a sense of fascination and accomplishment."

Recently Masimo announced Radical, a product that is accelerating the standardization of Masimo SET® pulse oximetry throughout hospitals. The Radical Signal Extraction pulse oximeter allows clinicians to get access to Masimo SET®. It is three pulse oximeters in one: a standalone device for bedside monitoring, a detachable handheld pulse oximeter for ultra-portable monitoring and a monitor interface, called SatShare, which allows Radical to upgrade multi-parameter patient monitors to Masimo SET® technology. Radical can provide continuous and reliable arterial oxygen saturation monitoring anywhere throughout the continuum of care. With help from some of our partners, particularly Allegiance and Datex-Ohmeda, who have vast distribution resources and flexible acquisition programs, Masimo is making it easy for clinicians to get access to Radical to standardize their hospitals to Masimo SET® pulse oximetry.

GO TO TOP

## AEA 2000 High Tech Award Winner- Outstanding Medical Device Company

Masimo Corporation announced that it is the recipient of the 2000 American Electronics Association (AEA) award for Outstanding Medical Device Company. This award, presented as part of the Seventh Annual High-Tech Awards event of the Orange County Council, is presented to the company demonstrating excellence in technological innovation and leadership in the medical device industry.

The High-Tech Awards honor a wide range of high-technology categories including Outstanding Medical Device Company, Outstanding Public Company, Outstanding Software Company, Outstanding Internet Company, Outstanding Executive (public and private company), Mentor/Angel, and Innovative Product/Technology.

According to Phil Beaudoin, executive director, Orange County Council, AEA, "These companies and executives serve as outstanding examples of the innovative technology that continues to be developed and enhanced at the local level. They have set the precedent for technology growth in Orange County for the new century."

MASA00020018
Exhibit 31
-251-

"Masimo is honored to be recognized by the American Electronics Association," said Joe E. Kiani, President and CEO of Masimo Corporation. "Masimo is a classic Orange County start-up. Eleven years ago, we started in a garage and our goal was, and still is, to make a contribution by developing better technology for patient care. In our pursuit of this goal, we have been fortunate to develop a technology that today, is not only saving lives and improving patient care, but is also reducing the cost of care. Over 25 clinical studies by independent researchers have proven Masimo Signal Extraction Technology to be the only pulse oximetry technology accurate under the most challenging conditions of motion and low perfusion and when it's needed most."

Mr. Kiani continued, "This award belongs to everyone on the Masimo Team, our employees, advisors, investors, clinical researchers, and the business community in Orange County, who believed in us, encouraged and supported us."

**GO TO TOP**

### STA Excellence in Technology Innovation Award

1995, The Society for Technology in Anesthesia (STA) an international organization of physicians, engineers, students and others with an interest in anesthesia-related technologies, has chosen Dr. Steven Barker and Masimo Corporation researchers Ebrahim Elfadel and Walt Weber as the recipients of this year's STA Excellence in Technology Innovation Award. This award recognizes excellence in technologies that benefit patients and caregivers in the area anesthesiology especially technologies that address high priority needs of the practice of anesthesia. Dr. Barker and coauthors are being recognized for their abstract "Motion-Resistant Pulse Oximetry" which showed the superior performance of Masimo SET® Pulse Oximetry compared conventional pulse oximetry.

**GO TO TOP**

PLCO-003672/PLMM-10956D-0320

MASA00020019
**Exhibit 31**
**-252-**



(/)

**Improving Patient Outcomes and Reducing the Cost of Care®**

## PRIVACY ∨

Privacy Notice (/company/masimo/privacy/)

Cookie Preferences

Cookie Notice (/company/cookie-notice/)

## COMPANY ∨

About (/company/masimo/about/)

Guiding Principles (/company/masimo/guiding-principles/)

Executive Management (/company/masimo/executive-management/)

Careers (/company/opportunities/careers/)

Contact Us (/company/contact/contact-us/)

## LEGAL NOTICES ∨

Compliance (/company/masimo/codes-of-conduct/)

Patents (/company/masimo/patents/)

Terms (/company/terms-of-use/)

SITEMAP

## FOLLOW US

**y**                          **in**                          ▶

(https://twitter.com/masimolinkedin(https://www.youtube.com/c/masimo)

corporation)

MASA00020020
**Exhibit 31**
**-253-**

Masimo - Awards

© 2020 Masimo. All Rights Reserved.

MASA00020021
**Exhibit 31**
**-254-**

# EXHIBIT 32

1   MARK D. SELWYN (CA SBN 244180)        DANIEL T. SHVODIAN (CA SBN 184576)
2   mark.selwyn@wilmerhale.com            DShvodian@perkinscoie.com
    WILMER CUTLER PICKERING               PERKINS COIE LLP
3       HALE AND DORR LLP                 3150 Porter Drive
    950 Page Mill Road                    Palo Alto, CA 94304
4   Palo Alto, California 94304           Telephone: (650) 838-4300
    Telephone: (650) 858-6000             Facsimile: (650) 737-5461
5   Facsimile: (650) 858-6100
6                                         *Attorney for Plaintiff Google LLC*
    CATHERINE M.A. CARROLL*
7   catherine.carroll@wilmerhale.com
    WILMER CUTLER PICKERING
8       HALE AND DORR LLP
    1875 Pennsylvania Avenue NW
9   Washington, DC 20006
    Telephone: (202) 663-6000
10  Facsimile: (202) 663-6363
11
    *Attorneys for Plaintiffs Apple Inc., Cisco*
12  *Systems, Inc., and Intel Corporation*
13  *Pro hac vice application forthcoming*     *A complete list of parties and counsel appears*
14                                             *on the signature page per Local Rule 3-4(a)(1)*
15

16                    **UNITED STATES DISTRICT COURT**

17              **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

18                          **SAN JOSE DIVISION**

19

20   APPLE INC., CISCO SYSTEMS, INC.,     Case No.:   5:20-cv-6128
     GOOGLE LLC, and INTEL CORPORATION,
21                                        **COMPLAINT FOR DECLARATORY**
                  Plaintiffs,             **AND INJUNCTIVE RELIEF**
22
          v.                              Administrative Procedure Act Case
23
     ANDREI IANCU, in his official capacity as
24   Under Secretary of Commerce for Intellectual
     Property and Director, United States Patent and
25   Trademark Office,
26                  Defendant.
27

28

─────────────────────────────────────────────

**Exhibit 32
-255-**

Case 8:20-cv-00048-JVS-JDE   Document 207-2   Filed 09/28/20   Page 124 of 287   Page ID
#:14850
Case 5:20-cv-06128   Document 1   Filed 08/31/20   Page 2 of 23

**INTRODUCTION**

1.      This action under the Administrative Procedure Act ("APA") challenges a rule adopted by the Director of the U.S. Patent and Trademark Office ("PTO") governing that agency's consideration of petitions to institute inter partes review ("IPR")—an administrative proceeding for determining the patentability of previously issued patent claims.

2.      A strong patent system is vital to protecting the massive research and development investments that fuel Plaintiffs' innovative products and services.  And a crucial element of any strong patent system is a mechanism for "weeding out" weak patents that never should have been granted because the claimed invention was not novel or would have been obvious in light of prior art. *Thryv, Inc. v. Click-To-Call Techs., LP*, 140 S. Ct. 1367, 1374 (2020).  Such patents threaten innovation—particularly in the hands of non-practicing entities that use the patent system not to spur their own inventions, but to extract monetary returns by asserting weak patents in infringement suits. As frequent targets of such tactics, Plaintiffs have a strong interest in having an efficient and accessible means for challenging weak patents that should never have issued to ensure that such patents cannot hamper innovation.

3.      IPR was a centerpiece of Congress's efforts to strengthen the U.S. patent system in the Leahy-Smith America Invents Act ("AIA").  In enacting the AIA in 2011, Congress recognized that innovation is inhibited when invalid patents are issued and then deployed in litigation against technology inventors and developers.  And Congress found existing procedures for challenging already-issued patents, including litigation, to be insufficient to protect the patent system.  Congress accordingly created IPR to provide a more efficient and streamlined administrative alternative to litigation for determining patentability before specialized patent judges.  IPR has served to enhance the U.S. patent system and strengthen U.S. technology and innovation by weeding out thousands of invalid patent claims.

4.      To ensure that IPR fulfills its purpose as a superior alternative to litigation over patent validity, the AIA specifically contemplates that IPR will be available to determine the patentability of patent claims that are also the subject of pending patent infringement litigation.

**Exhibit 32
-256-**

Case 8:20-cv-00048-JVS-JDE   Document 207-2   Filed 09/28/20   Page 125 of 287   Page ID
#:14851
Case 5:20-cv-06128   Document 1   Filed 08/31/20   Page 3 of 23

1      5.     In the agency action challenged in this suit (referred to here as the "*NHK-Fintiv* rule"),

2 however, the Director determined that the PTO could deny a petition for IPR based on a balancing of

3 discretionary factors relating to the pendency of parallel patent infringement litigation—factors that

4 appear nowhere in the AIA.  The agency's application of that rule has dramatically reduced the

5 availability of IPR, regardless of the weakness of the patent claims being challenged, thereby

6 undermining IPR's central role in protecting a strong patent system.

7      6.     The *NHK-Fintiv* rule violates the AIA, which allows IPR to proceed in tandem with

8 infringement litigation involving the same patent claims so long as the IPR petition is filed within one

9 year after the petitioner was served with the complaint in the infringement suit.  Congress dictated in

10 the AIA exactly when litigation should take precedence over IPR and vice versa, and the *NHK-Fintiv*

11 rule contravenes Congress's judgment.  Indeed, the *NHK-Fintiv* rule defeats the purpose of IPR,

12 which is to provide a streamlined and specialized mechanism for clearing away invalid patents that

13 never should have issued, and to do so without the substantial costs, burdens, and delays of litigation.

14      7.     The *NHK-Fintiv* rule is also arbitrary and capricious because its vague factors lead to

15 speculative, unpredictable, and unfair outcomes and will not advance the agency's stated goal of

16 promoting administrative efficiency.

17      8.     Finally, even if it were not contrary to law, the *NHK-Fintiv* rule is procedurally invalid

18 because it was not adopted through notice-and-comment rulemaking.  Both the APA and the AIA

19 obligated the Director to follow that procedure, yet the Director instead propounded the *NHK-Fintiv*

20 rule through an internal process within the PTO for establishing binding rules by designating select

21 decisions of the Patent Trial and Appeal Board as "precedential"—a process that provides for no

22 opportunity for or consideration of public input.

23      9.     The Court should therefore declare the *NHK-Fintiv* rule unlawful and set it aside under

24 the APA.  The Court should further permanently enjoin the Director from applying the rule or the

25 non-statutory factors it incorporates to deny institution of IPR.

26

27

28

**Exhibit 32
-257-**

**JURISDICTION AND VENUE**

10.     This case arises under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*  This Court has subject matter jurisdiction under 28 U.S.C. § 1331.

11.     Pursuant to 5 U.S.C. § 702, Defendant has waived sovereign immunity for purposes of this suit.

12.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by 5 U.S.C. §§ 702-706, by Federal Rules of Civil Procedure 57 and 65, and by the inherent equitable powers of this Court.

13.     Venue is proper in this District under 28 U.S.C. § 1391(e) and 5 U.S.C. § 703 because at least one Plaintiff maintains its headquarters in this District.

14.     The *NHK-Fintiv* rule is final agency action subject to judicial review under 5 U.S.C. § 704.

**INTRADISTRICT ASSIGNMENT**

15.     This action arises in the San Jose Division because a substantial part of the events giving rise to Plaintiffs' claims occurred in Santa Clara County, California, where all Plaintiffs maintain their headquarters.

**PARTIES**

16.     Plaintiff Apple Inc. ("Apple") is a California corporation having its principal place of business at One Apple Park Way, Cupertino, California, 95014.

17.     Plaintiff Cisco Systems, Inc. ("Cisco") is a California corporation having its principal place of business at 170 West Tasman Drive, San Jose, California, 95134.

18.     Plaintiff Google LLC ("Google") is a Delaware limited liability company having its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California, 94043.

19.     Plaintiff Intel Corporation ("Intel") is a Delaware corporation having its principal place of business at 2200 Mission College Boulevard, Santa Clara, California, 95054.

20.     Defendant Andrei Iancu is the Under Secretary of Commerce for Intellectual Property and Director of the PTO.  The Director oversees the operations of the PTO and is statutorily vested

Exhibit 32
-258-

1    with the authority to decide whether to institute IPR of a patent claim.  35 U.S.C. § 314.  Defendant

2    Iancu is being sued in his official capacity.  His principal place of business is in Alexandria, Virginia.

3                                    **FACTUAL ALLEGATIONS**

4                                    **<u>The Patent System</u>**

5         21.    "To promote the progress of science and useful arts," the Constitution empowers

6    Congress to "secur[e] for limited times to … inventors the exclusive right to their … discoveries."

7    U.S. Const., art. I, § 8, cl. 8.  The U.S. patent system has long fueled American economic growth and

8    innovation.  Plaintiffs each strongly support and rely on a strong patent system that lends robust legal

9    protection to meritorious patent claims.

10        22.    Apple is an American success story and developer of iconic consumer devices and

11   software that have transformed the American economy.  With more than 90,000 employees in the

12   United States, Apple is one of the country's largest employers in the high-technology business sector.

13   Overall, Apple supports 2.4 million jobs in all 50 states.  Last year, Apple spent over $60 billion with

14   more than 9,000 domestic suppliers across the country, including at manufacturing locations in 36

15   states.  Apple invests billions of dollars annually in U.S. research and development, and it owns more

16   than 22,000 U.S. patents that protect that investment.

17        23.    Cisco is an American and worldwide leader in information technology, networking,

18   communications, and cybersecurity solutions.  Cisco is a strong supporter of the U.S. patent system,

19   owning more than 16,000 U.S. patents, which protect more than $6 billion in annual spending on

20   research and development.  Cisco's 20,000 worldwide engineers constantly invent new ways to better

21   connect the world.  As a result of its commitment to innovation and intellectual property, Cisco files

22   more than 700 patent applications each year seeking protection for those inventions.

23        24.    Google is a diversified American technology company whose mission is to organize

24   the world's information and make it universally accessible and useful.  Google offers leading web-

25   based products and services that are used daily around the world.  With over 100,000 employees,

26   Google invests over $20 billion annually to invent and develop its products and services, and it relies

27   on a strong and balanced patent system to protect them—owning more than 25,000 U.S. patents.

28

**Exhibit 32**
**-259-**

1    25.    Intel is a global leader in the design and manufacture of semiconductor products,

2  including hardware and software products for networking, telecommunications, cloud computing,

3  artificial intelligence, autonomous driving, and other applications.  Intel's chips power a large

4  percentage of the world's computers, from home-office desktops and laptops to the servers that

5  support the digital economy.  To develop and improve these products, Intel makes significant

6  investments.  Intel currently has more than 42,000 employees actively engaged in research and

7  development worldwide; in the United States, Intel employs more than 52,000 workers.  In 2019

8  alone, Intel spent more than $13 billion on research and development and more than $16 billion on

9  manufacturing.  These investments are protected by more than 25,000 U.S. patents, with more than

10  10,000 U.S. patent applications pending.

11    26.    Each Plaintiff's success in developing transformative, cutting-edge technologies

12  depends on a patent system that provides strong legal protections for meritorious patents while

13  ensuring that weak patents cannot be exploited in litigation to inhibit innovation.

14                              **Inter Partes Review**

15    27.    The U.S. patent laws have long provided both administrative and judicial paths for

16  challenging the validity of patent claims after a patent has been issued.  By 2011, however, Congress

17  rightly perceived a "growing sense that questionable patents [we]re too easily obtained" and "too

18  difficult to challenge" through existing procedures.  H.R. Rep. No. 98, at 39-40, 112th Cong., 1st

19  Sess. (2011) ("House Report").  Congress responded by creating IPR in the AIA to strengthen the

20  patent system.  Pub. L. No. 112-29, § 6(a), 125 Stat. 284, 299 (2011).

21    28.    As a centerpiece of the AIA, IPR provides "an administrative process in which a

22  patent challenger may ask the [PTO] to reconsider the validity of earlier granted patent claims."

23  *Thryv*, 140 S. Ct. at 1370; *see* 35 U.S.C. § 311 *et seq.*  Congress intended IPR to provide an improved

24  alternative to litigation over the validity of previously granted patents by "establish[ing] a more

25  efficient and streamlined patent system that will improve patent quality and limit unnecessary and

26  counterproductive litigation costs."  House Report at 39-40.

27

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

5

**Exhibit 32
-260-**

Case 8:20-cv-00048-JVS-JDE   Document 207-2   Filed 09/28/20   Page 129 of 287   Page ID
#:14855
Case 5:20-cv-06128   Document 1   Filed 08/31/20   Page 7 of 23

29.     Several features of IPR make it advantageous compared to litigation for determining whether an issued patent's claims are patentable.  IPR is conducted by the expert patent judges of the Patent Trial and Appeal Board ("Board"), who are appointed by the Secretary of Commerce and must be "persons of competent legal knowledge and scientific ability."  35 U.S.C. § 6(a), (c).  In contrast, patent validity disputes in court are resolved by lay jurors who need not have—and often lack—any specialized technical experience relevant to the patent claims at issue.  Moreover, unlike jury trials, which typically end in general verdicts, IPR ends with the Board's "final written decision," *id.* § 318(a), which enables more informed appellate review.  And while bad patents can be held unpatentable in IPR by a preponderance of the evidence, *id.* § 316(e), those same patents will survive litigation unless the challenger proves invalidity by clear and convincing evidence, *see Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91 (2011).

30.     IPR is also more streamlined and efficient than litigation.  An IPR petitioner may challenge a claim's patentability only on limited grounds.  35 U.S.C. § 311(b).  The scope of discovery in IPR proceedings is more limited than in civil litigation.  *See id.* § 316(a)(5); 37 C.F.R. § 42.51.  The AIA also limits how long the Director may take to decide whether to institute IPR, 35 U.S.C. § 314(b), and, if IPR is instituted, how long the Board may take to issue its final decision on patentability, *id.* § 316(a)(11).  As a result, the life-span of an IPR from the filing of a petition to a final written decision is typically only 18 months.  *See id.* § 316(a)(11); 37 C.F.R. § 42.107.

<u>**The Availability Of IPR In Parallel With Infringement Actions**</u>

31.     Given its purpose to provide an efficient alternative to litigation, Congress expected that IPR would often proceed in parallel with litigation in which the validity of the same patent claims is at issue—particularly in cases where a defendant accused of patent infringement in a lawsuit seeks to challenge the asserted patent claims through IPR.  Several provisions of the AIA reflect that expectation and govern the interaction between IPR and litigation.

32.     The AIA permits a party accused of infringement to file a petition for IPR with regard to the same patent claims that are being asserted in the pending infringement suit, so long as the petition is filed within "1 year after the date on which the petitioner … is served with a complaint

**Exhibit 32
-261-**

Case 8:20-cv-00048-JVS-JDE   Document 207-2   Filed 09/28/20   Page 130 of 287   Page ID
#:14856
Case 5:20-cv-06128   Document 1   Filed 08/31/20   Page 8 of 23

1   alleging infringement of the patent." 35 U.S.C. § 315(b).  And although the AIA forecloses IPR if

2   the petitioner has previously "filed a civil action challenging the validity of a claim of the patent," *id.*

3   § 315(a)(1), it expressly permits a petitioner to assert invalidity arguments in a counterclaim in

4   litigation without forgoing IPR, *id.* § 315(a)(3).

5        33.     The AIA also removed statutory provisions that previously restricted the PTO's

6   review of patent claims that had been the subject of a challenge to the patent's validity in district

7   court.  Before the creation of IPR, parties could challenge issued patents pursuant to an administrative

8   procedure known as inter partes reexamination, but no such review could be maintained if a court

9   entered "a final decision" concluding that the petitioner "ha[d] not sustained its burden of proving the

10  invalidity" of the patent.  35 U.S.C. § 317(b) (2006).  The AIA eliminated that rule and imposed no

11  similar limitation on IPR, which replaced inter partes reexamination.

12       34.     Apart from the one-year deadline in § 315(b), and the prohibition in § 315(a)(1) on

13  filing an IPR petition after filing a suit challenging patent validity, no provision in the AIA expressly

14  requires or even permits the Director (or the Board as his delegee) to deny IPR petitions based on

15  pending litigation involving the same patent claims.

16                    **The *NHK* And *Fintiv* Decisions**

17       35.     The AIA specifies several requirements that must be met for the Director of the PTO

18  to grant a petition for, or "institute," IPR, and enumerates discretionary grounds on which the

19  Director may decline to institute IPR even if those preconditions are met.  *E.g.*, 35 U.S.C.

20  §§ 311(c)(1)-(2), 312(a)(1)-(5), 315(a)(1)-(2).  For example, the Director "may not" institute IPR

21  "unless" he determines, based on the IPR petition, that "there is a reasonable likelihood that the

22  petitioner would prevail with respect to at least 1 of the claims challenged in the petition."  *Id.*

23  § 314(a).  And the Director "may take into account whether, and reject the petition or request

24  because, the same or substantially the same prior art or arguments previously were presented to the

25  [Patent] Office."  *Id.* § 325(d).

26       36.     The Director has delegated to the Board the authority to decide whether to institute

27  IPR.  37 C.F.R. § 42.4(a); *see id.* §§ 42.2, 42.108.

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
7

**Exhibit 32
-262-**

37.    In two recent decisions, the Board articulated an additional standard, found nowhere in the AIA, under which the Board may decline to institute IPR based on the pendency of litigation over the validity of the same patent claims—even if the petition was timely filed within the one-year deadline set by 35 U.S.C. § 315(b).

38.    In *NHK Spring Co. v. Intri-Plex Technologies, Inc.*, the Board declared that "the advanced state of [a parallel] district court proceeding … weighs in favor of denying the [IPR] Petition under § 314(a)." No. IPR2018-00752, Paper 8, at 20 (P.T.A.B. Sept. 12, 2018) (attached hereto as Ex. A; also available at 2018 WL 4373643).

39.    The Board explained in *NHK* that because a pending infringement lawsuit involving "the same prior art and arguments" as the IPR petition was "nearing its final stages," with trial "set to begin" about six months before the IPR would end, IPR "would not be consistent with an objective of the AIA … to provide an effective and efficient alternative to district court litigation." *NHK*, Paper 8 at 20 (internal quotation marks omitted).

40.    In *Apple Inc. v. Fintiv, Inc.*, the Board elaborated on *NHK*, explaining how it would consider the pendency of a parallel infringement lawsuit when deciding whether to institute IPR.  No. IPR2020-00019, Paper 11 (P.T.A.B. Mar. 20, 2020) (attached hereto as Ex. B; also available at 2020 WL 2126495).  The Board declared it would "weigh[]" various "non-dispositive factors" to decide whether to institute IPR when parallel litigation is pending "as part of a balanced assessment of all relevant circumstances of the case, including the merits," to promote "system efficiency, fairness, and patent quality." *Id.* at 5 (internal quotation marks omitted).

41.    Accordingly, the Board enumerated six such "factors," none of which appears in the AIA:

        1.    whether the court granted a stay or evidence exists that one may be granted if [an IPR] proceeding is instituted;

        2.    proximity of the court's trial date to the Board's projected statutory deadline for a final written decision;

        3.    investment in the parallel proceeding by the court and the parties;

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
8

Exhibit 32
-263-

1           4.     overlap between issues raised in the petition and in the parallel

2                   proceeding;

3           5.     whether the petitioner and the defendant in the parallel proceeding are

4                   the same party; and

5           6.     other circumstances that impact the Board's exercise of discretion,

6                   including the merits.

7 *Fintiv*, Paper 11 at 5-6.

8       42.     Although the Board offered general guidance on how it might apply some of these

9 factors, the *Fintiv* decision did not clearly "instruct [the Board] how to weigh the factors."  *Cisco*

10 *Sys., Inc. v. Ramot at Tel Aviv Univ. Ltd.*, No. IPR2020-00122, 2020 WL 2511246, at *5 (P.T.A.B.

11 May 15, 2020) (Crumbley, APJ, dissenting).

12                 **Designation Of The Board's Decisions As Precedential**

13       43.     "[B]y default," the Board's decisions in IPR proceedings have no precedential force in

14 future cases.  Patent Trial and Appeal Board, Standard Operating Procedure 2 (Rev. 10) ("SOP-2"), at

15 3, 8-9 (Sept. 20, 2018).

16       44.     The PTO, however, has established a procedure for designating select Board decisions

17 as "precedential."  SOP-2 at 1-2, 8-12.  Decisions designated as precedential are "binding" on the

18 Board "in subsequent matters involving similar factors or issues."  SOP-2 at 11.

19       45.     Under this procedure, the Director decides whether to designate a Board decision as

20 precedential.  SOP-2 at 11.

21       46.     Although members of the public (in addition to members of the Board) may nominate

22 a Board decision for designation as precedential, SOP-2 at 9, the designation procedure otherwise

23 does not allow for public notice of, or any opportunity for public comment on, whether a Board

24 decision should be designated as precedential.  SOP-2 at 8-11.

25       47.     The Director designated *NHK* as precedential on May 7, 2019.

26       48.     The Director designated *Fintiv* as precedential on May 5, 2020.

27

28

**Exhibit 32
-264-**

Case 8:20-cv-00048-JVS-JDE   Document 207-2   Filed 09/28/20   Page 133 of 287   Page ID
#:14859
Case 5:20-cv-06128   Document 1   Filed 08/31/20   Page 11 of 23

49.     By designating these decisions as precedential, the Director propounded a rule (the

"*NHK-Fintiv* rule") that the Board is legally bound to apply in all its institution decisions.

50.     The Director adopted the *NHK-Fintiv* rule without notice-and-comment rulemaking.

51.     Having been established as a binding rule through the designation of the *NHK* and

*Fintiv* decisions as precedential, the *NHK-Fintiv* rule constitutes final agency action.

### The Board's Application Of The *NHK-Fintiv* Rule

52.     The Board has applied the *NHK-Fintiv* rule to deny institution of numerous IPR

proceedings, including many petitions brought by Plaintiffs.

53.     Following *NHK*, the Board relied on that decision to deny several IPR petitions.  *See*

*Edwards Lifesciences Corp. v. Evalve, Inc.*, No. IPR2019-01546, 2020 WL 1486766 (P.T.A.B. Mar.

19, 2020); *Edwards Lifesciences Corp. v. Evalve, Inc.*, No. IPR2019-01479, 2020 WL 927867

(P.T.A.B. Feb. 26, 2020); *Magellan Midstream Partners L.P. v. Sunoco Partners Marketing &*

*Terminals L.P.*, No. IPR2019-01445, 2020 WL 373335 (P.T.A.B. Jan. 22, 2020); *Next Caller Inc. v.*

*TRUSTID, Inc.*, No. IPR2019-00962, 2019 WL 5232627 (P.T.A.B. Oct. 16, 2019); *Next Caller Inc. v.*

*TRUSTID, Inc.*, No. IPR2019-00961, 2019 WL 5232627 (P.T.A.B. Oct. 16, 2019).

54.     For example, on March 27, 2020, the Board denied institution in *Google LLC v.*

*Uniloc 2017, LLC*, No. IPR2020-00115, 2020 WL 1523248 (Mar. 27, 2020).  Although Google

timely filed the IPR petition in that proceeding less than nine months after being served with a related

infringement complaint, the Board denied the petition under *NHK* based on the trial date set in the

district court's scheduling order.  *Id.* at *1, *4.  Google requested rehearing, but its request was

denied.  Soon thereafter, the district court action was ordered to be transferred, and the trial date was

vacated.  *Uniloc 2017, LLC v. Google LLC*, No. 18-cv-00504, 2020 WL 3064460, at *6 (E.D. Tex.

June 8, 2020).

55.     On the same day that *Fintiv* was designated as precedential, the Board applied the

*NHK-Fintiv* rule to deny Intel's IPR petition in *Intel Corp. v. VLSI Technology LLC*, No. IPR2020-

00106, 2020 WL 2201828 (P.T.A.B. May 5, 2020).  The petition had been timely filed, but the Board

concluded that the "advanced stage" of related district court litigation, overlap in the issues, and the

Exhibit 32
-265-

Case 8:20-cv-00048-JVS-JDE   Document 207-2   Filed 09/28/20   Page 134 of 287   Page ID
#:14860
Case 5:20-cv-06128   Document 1   Filed 08/31/20   Page 12 of 23

1    timing of trial—which was scheduled to begin approximately seven months before IPR would have

2    ended, but which was subsequently rescheduled—meant that IPR would have been "an inefficient use

3    of Board, party, and judicial resources." *Id.* at *6.

4         56.    Eight days later, the Board applied the *NHK-Fintiv* rule to deny Apple's IPR petition

5    in *Fintiv*.  *Apple Inc. v. Fintiv, Inc.*, No. IPR2020-00019, 2020 WL 2486683, at *3-4, *7 (P.T.A.B.

6    May 13, 2020) (Paper 15).  In *Fintiv*, Apple had filed an IPR petition challenging the patentability of

7    certain patent claims that had been asserted against Apple in a patent infringement suit.  Apple timely

8    filed the IPR petition less than ten months after the infringement suit began.  After Apple filed its IPR

9    petition, the district court in the infringement lawsuit held a *Markman* hearing (to consider evidence

10   relevant to the interpretation of the patent claims) and then set a trial date, which it later rescheduled.

11   *Id.* at *3-4, *7.  In declining to institute IPR, the Board explained that

12            the District Court case is ongoing, trial is scheduled to begin two months before
             we would reach a final decision in this proceeding, the District Court has
13            expended effort resolving substantive issues in the case, the identical claims are
             challenged based on the same prior art in both the Petition and in the District
14            Court, and the defendant in District Court and the Petitioner here are the same
             party.
15

16   *Id.* at *7.

17        57.    The Board subsequently applied the *NHK-Fintiv* rule to deny IPR petitions filed five

18   months after service of the complaint in the pending infringement action in *Cisco Systems, Inc. v.*

19   *Ramot at Tel Aviv University Ltd.*  No. IPR2020-00122, 2020 WL 2511246 (P.T.A.B. May 15, 2020);

20   No. IPR2020-00123, 2020 WL 2511247 (P.T.A.B. May 15, 2020).  Based on the scheduled trial date

21   in pending infringement litigation, overlap in substantive issues, and the absence of a stay in the

22   district court, the Board assumed that proceeding with IPR would "duplicate effort" in the litigation,

23   *Ramot*, No. IPR2020-00122, 2020 WL 2511246, at *4—even though the district court had denied a

24   stay "without prejudice" in light of its "established practice" to entertain stay requests only *after* the

25   Board institutes IPR, *id.* at *3—and denied Cisco's IPR petitions to avoid "an inefficient use of

26   Board, party, and judicial resources," *id.* at *5; *see also Ramot*, No. IPR2020-00123, 2020 WL

27   2511247, at *5.

28

---

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
11

**Exhibit 32
-266-**

Case 8:20-cv-00048-JVS-JDE   Document 207-2   Filed 09/28/20   Page 135 of 287   Page ID
#:14861
Case 5:20-cv-06128   Document 1   Filed 08/31/20   Page 13 of 23

58.     Indeed, since the *NHK* and *Fintiv* decisions' designation as precedential, the Board has

applied the *NHK-Fintiv* rule to deny IPR petitions filed by Plaintiffs and others on numerous

occasions.  *See, e.g.*, *Apple Inc. v. Maxell, Ltd.*, No. IPR2020-00407, 2020 WL 4680039 (P.T.A.B.

Aug. 11, 2020); *Apple Inc. v. Maxell, Ltd.*, No. IPR2020-00408, 2020 WL 4680042 (P.T.A.B. Aug.

11, 2020); *Apple Inc. v. Maxell, Ltd.*, No. IPR2020-00409, 2020 WL 4680047 (P.T.A.B. Aug. 11,

2020); *Apple Inc. v. Maxell, Ltd.*, No. IPR2020-00203, 2020 WL 3662522 (P.T.A.B. July 6, 2020);

*Cisco Sys., Inc. v. Ramot at Tel Aviv Univ. Ltd.*, No. IPR2020-00484, 2020 WL 4820592 (P.T.A.B.

Aug. 18, 2020); *Cisco Sys., Inc. v. Ramot at Tel Aviv Univ. Ltd.*, No. IPR2020-00122, 2020 WL

2511246 (P.T.A.B. May 15, 2020); *Cisco Sys., Inc. v. Ramot at Tel Aviv Univ. Ltd.*, No. IPR2020-

00123, 2020 WL 2511247 (P.T.A.B. May 15, 2020); *Ethicon, Inc. v. Bd. of Regents, Univ. of Tex.

Sys.*, No. IPR2019-00406, 2020 WL 3088846 (P.T.A.B. June 10, 2020); *Google LLC v. Uniloc 2017,

LLC*, No. IPR2020-00115, 2020 WL 1523248 (P.T.A.B. Mar. 27, 2020); *Intel Corp. v. VLSI Tech.

LLC*, No. IPR2020-00498, 2020 WL 4820595 (P.T.A.B. Aug. 19, 2020); *Intel Corp. v. VLSI Tech.

LLC*, No. IPR2020-00526, 2020 WL 4820610 (P.T.A.B. Aug. 18, 2020); *Intel Corp. v. VLSI Tech.

LLC*, No. IPR2020-00527, 2020 WL 4820610 (P.T.A.B. Aug. 18, 2020); *Intel Corp. v. VLSI Tech.

LLC*, No. IPR2020-00141, 2020 WL 3033208 (P.T.A.B. June 4, 2020); *Intel Corp. v. VLSI Tech.

LLC*, No. IPR2020-00142, 2020 WL 3033209 (P.T.A.B. June 4, 2020); *Intel Corp. v. VLSI Tech.

LLC*, No. IPR2020-00158, 2020 WL 2563448 (P.T.A.B. May 20, 2020); *Intel Corp. v. VLSI Tech.

LLC*, No. IPR2020-00112, 2020 WL 2544910 (P.T.A.B. May 19, 2020); *Intel Corp. v. VLSI Tech.

LLC*, No. IPR2020-00113, 2020 WL 2544912 (P.T.A.B. May 19, 2020); *Intel Corp. v. VLSI Tech.

LLC*, No. IPR2020-00114, 2020 WL 2544917 (P.T.A.B. May 19, 2020).

59.     Plaintiffs are currently awaiting institution decisions on IPR petitions that relate to

pending infringement litigation, in which the Board will be bound to apply the *NHK-Fintiv* rule to

decide whether to institute IPR.  Additionally, Plaintiffs regularly file IPR petitions and expect that

the Board will apply the *NHK-Fintiv* rule to decide whether to grant their future petitions when

parallel litigation is pending.  The Board is likely to deny at least some of Plaintiffs' pending or

future IPR petitions under the *NHK-Fintiv* rule based on the pendency of litigation.

**Exhibit 32
-267-**

1       60.    Even where the Board has decided to institute IPR under the *NHK-Fintiv* rule, its

2   decisions have been inconsistent and unpredictable, making it difficult for Plaintiffs to anticipate how

3   the Board will weigh and apply each factor.  The rule also forces petitioners to file IPR petitions at

4   earlier stages of litigation when there is less certainty over the patent claims at issue and their scope.

5       **The *NHK-Fintiv* Rule Exceeds The Director's Authority And Violates The AIA**

6       61.    Nothing in the AIA authorizes the Director to deny IPR petitions based on perceived

7   overlap with pending infringement litigation involving the same patent claims.  To the contrary, the

8   text and structure of the AIA make clear that IPR can and should proceed even where related

9   litigation is pending.

10       62.    Most notably, the AIA permits IPR if the petition is filed within "1 year after the date

11   on which the petitioner … is served with a complaint alleging infringement of the patent."  35 U.S.C.

12   § 315(b).  Congress thus explicitly determined that, so long as the IPR petition is filed within a year

13   after a lawsuit against the petitioner starts, IPR is appropriate.

14       63.    Congress's decision to allow IPR where a parallel infringement lawsuit has been

15   pending for less than one year reflects its considered policy judgment.  In enacting the AIA, Congress

16   was aware that IPR and litigation concerning the same patent claim would often proceed in parallel,

17   and it carefully calibrated § 315(b)'s one-year limit to ensure that IPR is not used for purposes of

18   delay while also giving infringement defendants an adequate opportunity to investigate the claims

19   asserted against them in litigation.  Similarly, while Congress prohibited IPR where a petitioner had

20   previously filed its own action challenging patent validity, *see* 35 U.S.C. § 315(a)(1), Congress

21   expressly declined to extend that prohibition to petitions where the petitioner challenged the patent's

22   validity through a counterclaim, *see id.* § 315(a)(3).

23       64.    By authorizing the Board to deny institution of IPR based on the pendency of a

24   parallel proceeding, the *NHK-Fintiv* rule overrides the congressional judgments embodied in

25   §§ 315(a) and (b).

26       65.    The *NHK-Fintiv* rule also undermines the purpose of IPR as a streamlined and

27   specialized alternative to litigation over patent validity.  Congress sought in the AIA to encourage

28

**Exhibit 32
-268-**

1  defendants accused of patent infringement in litigation to assert their potentially meritorious

2  challenges to patentability in an IPR petition—thereby *inviting* overlap between IPR and litigation in

3  which the petitioner would assert those same challenges as defenses against an infringement claim.

4  Yet the *NHK-Fintiv* rule threatens to make IPR unavailable in precisely the circumstances where

5  Congress intended it to operate, defeating IPR's role as a more efficient mechanism for clearing away

6  invalid patents and ultimately weakening the patent system.

7        66.     Where Congress wanted to give the Director discretion to deny IPR based on parallel

8  proceedings, it knew how to say so explicitly.  For example, as noted, the AIA provides that if the

9  *IPR petitioner* has previously filed suit challenging the validity of a patent claim, IPR may not be

10  instituted at all—regardless of how much time has passed between the suit and the IPR petition.  35

11  U.S.C. § 315(a)(1).  Similarly, Congress expressly granted the Director discretion to decide how to

12  manage IPR when there is a parallel proceeding *before the PTO*, including by terminating the IPR

13  proceeding, *id.* § 315(d), and by "reject[ing] the petition or request because[] the same or

14  substantially the same prior art or arguments previously were presented to the [Patent] Office," *id.*

15  § 325(d).  But Congress nowhere authorized denial of a timely IPR petition based on overlap with

16  parallel litigation brought by the patent owner.  To the contrary, Congress expressly provided that a

17  petitioner's counterclaim challenging the validity of a patent claim would not bar IPR.  *Id.*

18  § 315(a)(3).

19        67.     Although the statute accords the Director some discretion in the context of evaluating

20  the merits of IPR petitions or promulgating rules governing IPR institution, that discretion is limited.

21  *See* 35 U.S.C. §§ 314(a), 316(b).  It certainly is not unbounded and cannot be exercised in a manner

22  that is contrary to the statute's text, structure, and purpose.

23        **The *NHK-Fintiv* Rule Is Arbitrary And Capricious**

24        68.     The Board's application of the *NHK-Fintiv* rule has already led to unjustifiable and

25  unpredictable disparities among similarly-situated IPR petitioners, reflecting the uncertainty and

26  malleability of the rule's factors.

27

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
14

**Exhibit 32**
**-269-**

Case 8:20-cv-00048-JVS-JDE   Document 207-2   Filed 09/28/20   Page 138 of 287   Page ID
#:14864
Case 5:20-cv-06128   Document 1   Filed 08/31/20   Page 16 of 23

69.     The *NHK-Fintiv* rule requires the Board to make institution decisions based on its speculation about the likely course of parallel litigation, producing irrational and inconsistent outcomes.  For example, if no stay has been entered in the district court, the Board must guess whether "one may be granted" if IPR is instituted.  *Fintiv*, Paper 11 at 6.

70.     The Board inconsistently applies the second factor, which concerns the proximity of a district court trial date to the Board's projected statutory deadline for a final written decision.  For example, after denying Apple's petition in *Fintiv* (where trial was scheduled to begin only two months before the Board would have been required to issue a final written decision in an IPR), the Board *instituted* IPR in other cases where the scheduled trial dates fell much earlier relative to the IPR decision deadline.  *See, e.g., Apple Inc. v. Maxell, Ltd.*, No. IPR2020-00204, 2020 WL 3401274, at *6 (P.T.A.B. June 19, 2020) (trial scheduled for nine months before Board's decision deadline); *Apple Inc. v. SEVEN Networks, LLC*, No. IPR2020-00156, 2020 WL 3249313, at *4 (P.T.A.B. June 15, 2020) (trial scheduled for 7.5 months before Board's decision deadline).  In another case, the Board declined to institute IPR based on the expected time of trial, even though the trial date had been continued indefinitely.  *Ethicon, Inc. v. Bd. of Regents, Univ. of Tex. Sys.*, No. IPR2019-00406, 2020 WL 3088846 (P.T.A.B. June 10, 2020).

71.     The date of trial is an inherently unpredictable factor, given the frequency with which trial dates are rescheduled.  The Board even had to grant rehearing of one non-institution decision after the district court rescheduled the trial date following the Board's decision.  *Sand Revolution II, LLC v. Continental Intermodal Group – Trucking LLC*, No. IPR2019-01393, 2020 WL 581790 (P.T.A.B. June 16, 2020).  Rehearing is not an option in most cases, however, because IPR petitioners are allowed only 30 days to seek it, 37 C.F.R. § 42.71(d)(2), and a district court might reschedule trial long after that period has passed.  That is precisely what occurred in *Uniloc 2017*, where the Board denied Google's IPR petition based on a trial date that was subsequently vacated—too late for Google to obtain rehearing of the Board's denial of the IPR petition.  *See* 2020 WL 3064460, at *6.

**Exhibit 32
-270-**

72.     Similarly, the Board has sometimes concluded that overlap in issues favored institution, while in other cases, the Board has treated overlap as disfavoring institution.  For example, in one case, the Board stated that overlap favored institution when the Board thought trial was relatively distant, but in another case decided that overlap disfavored institution when the Board thought trial was near.  *Compare Medtronic, Inc., & Medtronic Vascular, Inc. v. Teleflex Innovations S.à.r.l.*, No. IPR2020-00135, 2020 WL 3053201 (P.T.A.B. June 8, 2020), *with Cisco Sys., Inc. v. Ramot at Tel Aviv Univ. Ltd.*, No. IPR2020-00122, 2020 WL 2511246 (P.T.A.B. May 15, 2020).  As a result, some petitioners will succeed in obtaining review of claims that overlap with those in the parallel litigation while others will not, all based on trial schedules that are inherently uncertain and subject to speculative forecasting by the Board.

73.     The *NHK-Fintiv* rule thus promotes uncertainty and unpredictability—not administrative efficiency—in the IPR process.  The rule also forces infringement defendants to file IPR petitions earlier in litigation, when there is less clarity regarding the patent claims at issue and their scope—further undermining an efficient IPR process.

74.     Any inefficiency that might result from overlap between litigation and IPR proceedings would be better addressed by a stay of the litigation pending the outcome of the IPR. *See, e.g.*, *Bell N. Res., LLC v. Coolpad Techs., Inc.*, No. 18-cv-1783-CAB-BLM, ECF No. 148 (S.D. Cal. Feb. 18, 2020) (after previously denying stay without prejudice while IPR petition was pending, granting stay of litigation after Board decided to institute IPR).  Unlike denial of IPR, a stay of the litigation does not risk irreversibly depriving the petitioner of Congress's preferred forum for resolving an unpatentability dispute.

75.     The Board's attempt to justify the *NHK-Fintiv* rule on the ground that it avoids "duplicative costs" by denying IPR when "the court and the parties have invested" substantially in the lawsuit, *Fintiv*, Paper 11 at 9, makes no sense.  By focusing on the past investment that has been made in the litigation already, the Board's explanation is irrational and rests on the fallacy of sunk costs—*i.e.*, "the equivalent of throwing good money after bad, both for the court and for the parties." *Stryker Spine v. Spine Grp. of Wis., LLC*, 320 F. Supp. 3d 985, 991 (E.D. Wis. 2018).  To the extent

**Exhibit 32**
**-271-**

1   that promoting efficiency is relevant to the institution decision at all, the analysis should instead

2   compare the *future* investment needed to complete the lawsuit to the *future* investment needed to

3   conduct IPR—a comparison that will usually favor IPR.

4                    **The *NHK-Fintiv* Rule Is Procedurally Invalid**

5          76.     The *NHK-Fintiv* rule is a substantive rule that alters the rights and interests of IPR

6   petitioners by permitting the Board to deny institution of IPR based on parallel litigation.  In adopting

7   such a rule, the Director was required by both the APA and the AIA to act through notice-and-

8   comment rulemaking.  *See* 5 U.S.C. § 553(b), (c); 35 U.S.C. §§ 2(b)(2), 316(a).

9          77.     The Director, however, adopted the *NHK-Fintiv* rule without notice-and-comment

10  rulemaking, instead propounding it as a binding rule by designating the *NHK* and *Fintiv* decisions as

11  precedential through a unilateral, internal process that involved no opportunity for public comment

12  and no consideration by the Director of any public input.

13                                  **COUNT 1**

14              **(Final Agency Action In Violation Of 5 U.S.C. § 706(2)(C))**

15         78.     Under the APA, the Court "shall … hold unlawful and set aside" final agency action

16  found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5

17  U.S.C. § 706(2)(C).

18         79.     The *NHK-Fintiv* rule is final agency action "in excess of statutory jurisdiction,

19  authority, or limitations, or short of statutory right" because it violates the AIA and the Director

20  exceeded his statutory authority in adopting it.

21         80.     The AIA's text and structure make clear that Congress withheld from the Director the

22  authority to deny IPR petitions based on a parallel infringement lawsuit against the IPR petitioner that

23  was served less than one year before the IPR petition was filed.  By allowing IPR petitions to be filed

24  at any time within one year after the start of an infringement lawsuit involving the same patent, by

25  allowing IPR to proceed even where the petitioner has filed a counterclaim challenging the patent's

26  validity, and by designing IPR to serve as an efficient alternative to litigation for eliminating invalid

27

28

**Exhibit 32
-272-**

1  patent claims, Congress left no room for the Director to otherwise deny a timely IPR petition based

2  on parallel infringement litigation.

3          81.     The AIA expressly contemplates that IPR and litigation can proceed simultaneously

4  and specifies how administrative efficiency should be accounted for and best served in that

5  circumstance.  The Director has no authority to alter that judgment.

6          82.     By authorizing the Board to deny institution of a timely IPR petition based on overlap

7  with pending litigation, the *NHK-Fintiv* rule contravenes the text and structure of the AIA and

8  undermines its purpose and the strength of the patent system.

9                                    **COUNT 2**

10                  **(Final Agency Action In Violation Of 5 U.S.C. § 706(2)(A))**

11         83.     Under the APA, the Court "shall … hold unlawful and set aside" final agency action

12  that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5

13  U.S.C. § 706(2)(A).

14         84.     The *NHK-Fintiv* rule is final agency action that is "arbitrary, capricious, an abuse of

15  discretion, or otherwise not in accordance with law."

16         85.     For the reasons alleged in Count 1, the *NHK-Fintiv* rule is arbitrary, capricious, and

17  not in accordance with law because it violates the AIA.

18         86.     Additionally, the *NHK-Fintiv* rule is arbitrary, capricious, and an abuse of discretion

19  because it requires the Board to engage in substantial speculation as to the likely course of the parallel

20  district court proceeding and because its factors are vague and malleable.  As a result, the rule

21  produces irrational, unpredictable, and unfair outcomes, treating similarly situated IPR petitioners

22  differently and depriving some patent infringement defendants of a speedy, efficient, and specialized

23  forum for invalidating the patent at issue.

24         87.     The *NHK-Fintiv* rule is also arbitrary, capricious, and an abuse of discretion because it

25  will not achieve its stated purpose of promoting administrative efficiency, and the Board's contrary

26  explanations are unreasoned and not rationally connected to the facts.

27

28

**Exhibit 32
-273-**

**COUNT 3**

**(Final Agency Action In Violation Of 5 U.S.C. § 706(2)(D))**

88.    Under the APA, the Court "shall … hold unlawful and set aside" final agency action that is undertaken "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

89.    The *NHK-Fintiv* rule is final agency action undertaken "without observance of procedure required by law."

90.    Even if the *NHK-Fintiv* rule were not contrary to law, the Director could not adopt such a rule without notice-and-comment rulemaking.  *See* 5 U.S.C. § 553; 35 U.S.C. §§ 2(b)(2), 316(a).

91.    The Director propounded the *NHK-Fintiv* rule as a binding substantive rule without notice and comment in violation of the APA.

**RELIEF REQUESTED**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and:

1.    Declare that the *NHK-Fintiv* rule is unlawful;

2.    Set aside the *NHK-Fintiv* rule;

3.    Permanently enjoin Defendant, and his officers, agents, employees, assigns, and all persons acting in concert or participating with him, from relying on the *NHK-Fintiv* rule or the non-statutory factors it incorporates to deny institution of IPR;

4.    Award Plaintiffs their costs and attorney's fees and expenses as allowed by law; and

5.    Provide such other and further relief as the Court deems appropriate.


DATED: August 31, 2020                              Respectfully submitted,



By: */s/ Mark D. Selwyn*

MARK D. SELWYN (CA SBN 244180)
mark.selwyn@wilmerhale.com
WILMER CUTLER PICKERING

**Exhibit 32
-274-**

1
       HALE AND DORR LLP
    950 Page Mill Road

2
    Palo Alto, California 94304
    Telephone: (650) 858-6000

3
    Facsimile: (650) 858-6100

4

5
    CATHERINE M.A. CARROLL*
    DAVID M. LEHN*

6
    REBECCA LEE*
    catherine.carroll@wilmerhale.com

7
    david.lehn@wilmerhale.com
    rebecca.lee@wilmerhale.com

8
    WILMER CUTLER PICKERING

9
       HALE AND DORR LLP
    1875 Pennsylvania Avenue NW

10
    Washington, DC 20006
    Telephone: (202) 663-6000

11
    Facsimile: (202) 663-6363

12
    ALYSON ZUREICK*

13
    alyson.zureick@wilmerhale.com
    WILMER CUTLER PICKERING

14
       HALE AND DORR LLP
    7 World Trade Center

15
    250 Greenwich Street
    New York, NY 10007

16
    Telephone: (212) 230-8800
    Facsimile: (212) 230-8888

17

18
    *Attorneys for Plaintiffs Apple Inc., Cisco
    Systems, Inc., and Intel Corporation*

19
    DANIEL T. SHVODIAN (CA SBN 184576)

20
    DShvodian@perkinscoie.com
    PERKINS COIE LLP

21
    3150 Porter Drive
    Palo Alto, CA 94304-1212

22
    Telephone: (650) 838-4300
    Facsimile: (650) 737-5461

23

24
    THERESA NGUYEN (CA SBN 284581)
    RNguyen@perkinscoie.com

25
    PERKINS COIE LLP
    1201 Third Avenue, Suite 4900

26
    Seattle, WA 98101-3099
    Telephone: (206) 359-6068

27
    Facsimile: (206) 359-9000

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
20

**Exhibit 32**
**-275-**

Case 8:20-cv-00048-JVS-JDE   Document 207-2   Filed 09/28/20   Page 144 of 287   Page ID
#:14870
Case 5:20-cv-06128   Document 1   Filed 08/31/20   Page 22 of 23

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ANDREW T. DUFRESNE*
ADufresne@perkinscoie.com
PERKINS COIE LLP
33 East Main Street, Suite 201
Madison, WI 53703-3095
Telephone: (608) 663-7492
Facsimile: (608) 663-7499

*Attorneys for Plaintiff Google LLC*

*\* Pro hac vice application forthcoming*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
21

**Exhibit 32
-276-**

Case 8:20-cv-00048-JVS-JDE   Document 207-2   Filed 09/28/20   Page 145 of 287   Page ID
#:14871
Case 5:20-cv-06128   Document 1   Filed 08/31/20   Page 23 of 23

1

## ATTORNEY ATTESTATION

2

3        I, Mark D. Selwyn, am the ECF User whose ID and password are being used to file this
document. In compliance with N.D. Cal. Civil L.R. 5- 1(i)(3), I hereby attest that concurrence in the
filing of the document has been obtained from each of the other signatories.

4

5                              By: /s/ *Mark D. Selwyn*
                                   Mark D. Selwyn

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Exhibit 32**
**-277-**

# EXHIBIT A

**Exhibit 32**
**-278-**

Trials@uspto.gov
571-272-7822



Patent Trial and Appeal Board
PRECEDENTIAL
Standard Operating Procedure 2
Designated: 05/07/2019

Paper No. 8
Entered: September 12, 2018

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

NHK SPRING CO., LTD.,
Petitioner,

v.

INTRI-PLEX TECHNOLOGIES, INC.,
Patent Owner.

_____

Case IPR2018-00752
Patent 6,183,841 B1

_____

Before CHRISTOPHER M. KAISER, ELIZABETH M. ROESEL, and
MICHELLE N. ANKENBRAND, *Administrative Patent Judges*.

ANKENBRAND, *Administrative Patent Judge*.

DECISION
Denying Institution of *Inter Partes* Review
*35 U.S.C. § 314(a)*

Exhibit 32
-279-

IPR2018-00752
Patent 6,183,841 B1

# I.     INTRODUCTION

NHK Spring Co., Ltd. ("Petitioner") requests an *inter partes* review of claims 1, 4, 7, and 10 of U.S. Patent No. 6,183,841 B1 ("the '841 patent," Ex. 1001).  Paper 1 ("Pet.").  Intri-Plex Technologies, Inc. ("Patent Owner") timely filed a Preliminary Response.  Paper 7 ("Prelim. Resp.").

Based upon the particular circumstances of this case, we exercise our discretion under 35 U.S.C. §§ 314(a) and 325(d) and do not institute an *inter partes* review of the challenged claims.

## II.     BACKGROUND

### A. Related Matters

The parties identify *Intri-Plex Technologies, Inc. v. NHK International Corp.*, 3:17-cv-01097-EMC (N.D. Cal.) as a related matter under 37 C.F.R. § 42.8(b)(2).  Pet. 2; Paper 4, 2.

### B. The '841 patent

The '841 patent, titled "Optimized Low Profile Swage Mount Base Plate Attachment of Suspension Assembly for Hard Disk Drive," issued on February 6, 2001, based on an application filed April 21, 1998.  Ex. 1001, [22], [45], [54].  The '841 patent relates to a base plate for attaching a suspension assembly to an actuator arm in a hard disk drive.  *Id.* at Abstract. The base plate includes a flat flange portion and a cylindrical hub portion. *Id.* at 3:41–42.  The base plate has several parameters, including a base plate thickness ($T_{BP}$), hub overall height ($H_H$), hub inner diameter ($D_{ID}$), base plate length ($L_{BP}$), base plate width ($W_{BP}$), hub outer diameter ($D_{OD}$), hub inner surface depth ($H_{IS}$), base plate opening diameter ($D_{BP}$), hub radial width ($W_H$, which is ($D_{OD}$ - $D_{ID}$)/2), and a hub counter bore depth ($H_{CB}$).  *Id.* at

**Exhibit 32**
**-280-**

Case 8:20-cv-00048-JVS-JDE   Document 207-2   Filed 09/28/20   Page 149 of 287   Page ID
#:14875
Case 5:20-cv-06128   Document 1-1   Filed 08/31/20   Page 4 of 23

IPR2018-00752
Patent 6,183,841 B1

3:48–55, 4:3–18.  The '841 patent states that "[t]he optimum parameters . . .
are such as to satisfy the following equation:"

$$\frac{W_H}{T_{BP}} \cdot \frac{W_H}{(H_{IS} + H_H - H_{CB})/2} \geq 5$$

*Id.* at 3:56–63.  The calculation on the left-hand side results in a Geometry
Metric Value (*id.* at 4:18), and the equation is satisfied when the Geometry
Metric Value is less than or equal to five (*id.* at 3:60).

The '841 patent provides a table, reproduced below, that compares an
exemplary inventive base plate to a prior art base plate.

| SYMBOL | NAME | TYP. PRIOR ART DIMEN-SION(MM) PN: 15120-09 | TYP. IN-VENTION DIMEN-SION(MM) PN: 15120-05 |
|---|---|---|---|
| $L_{BP}$ | Base Plate Length | 5.080 | 5.080 |
| $W_{BP}$ | Base Plate Width | 5.080 | 5.080 |
| $T_{BP}$ | Base Plate Thickness | 0.150 | 0.150 |
| $D_{BP}$ | Base Plate Opening Diameter | 2.375 | 2.510 |
| $D_{ID}$ | Hub Inner Diameter | 2.145 | 1.956 |
| $D_{OD}$ | Hub Outer Diameter | 2.731 | 2.731 |
| $H_H$ | Hub Overall Height | 0.270 | 0.269 |
| $H_{IS}$ | Hub Inner Surface Depth | 0.114 | 0.115 |
| $H_{CD}$ | Hub Counterbore Height | 0.038 | 0.127 |
| $W_H$ | Hub Radial Width | 0.293 | 0.3875 |
| | Geometry Metric Value | 3.308 | 7.810 |

*Id.* at 4:3–18.  The table above sets forth the dimensions of the parameters
that form the prior art and inventive base plates, and the Geometry Metric
Value that results for each after applying the values for $W_H$, $T_{BP}$, $H_{IS}$, $H_H$,
and $H_{CB}$ to the equation.  According to the table, the dimensions of the prior

3

**Exhibit 32**
**-281-**

Case 8:20-cv-00048-JVS-JDE   Document 207-2   Filed 09/28/20   Page 150 of 287   Page ID
#:14876
Case 5:20-cv-06128   Document 1-1   Filed 08/31/20   Page 5 of 23

IPR2018-00752
Patent 6,183,841 B1

art base plate result in a Geometry Metric value of 3.308, which does not satisfy the equation, whereas the dimensions of the exemplary inventive base plate result in a Geometry Metric Value of 7.810, which satisfies the equation. *Id.*

According to the '841 patent, a base plate with parameters that satisfy the equation has several advantages, including that it reduces gram load change inherent in swaging and allows a large retention torque in "low hub height configurations that offer limited retention torque in a standard hub geometry." *Id.* at 2:27–30. The '841 patent also states that such a base plate eliminates the neck region associated with prior art base plates that was known to result in bending moment decoupling of the hub and flange. *Id.* at 4:23–65, Figs. 3, 4.

### C. Illustrative Claim

Claim 1 is independent and illustrative of the claimed subject matter. Claim 1 recites:

1. An optimized low profile base plate for attachment of a suspension assembly to an actuator arm in a hard disk drive comprising:

a flange having a flange thickness ($T_{BP}$); and,

a hub having, a hub height ($H_H$), a hub radial width $W_H$, a land height hub inner surface depth ($H_{IS}$), and a lead in shoulder hub counter bore height ($H_{CB}$);

wherein:

$$\frac{W_H}{T_{BP}} \cdot \frac{W_H}{(H_{IS} + H_H - H_{CB})/2} \geq 5$$

Ex. 1001, 5:41–53.

4

**Exhibit 32**
-282-

IPR2018-00752
Patent 6,183,841 B1

### D. The Asserted Grounds of Unpatentability

Petitioner challenges the patentability of claims 1, 4, 7, and 10 of the '841 patent based on the following grounds:

| Reference(s) | Statutory Basis | Claims Challenged |
|---|---|---|
| Braunheim[1] | § 102(e) | 1, 4, 7, 10 |
| Braunheim | § 103 | 1, 4, 7, 10 |
| Braunheim and Applicant Admitted Prior Art (AAPA)[2] | § 103 | 1, 4, 7, 10 |

Pet. 4. Petitioner relies on the Declaration of David B. Bogy, Ph.D. (Ex. 1002) to support its asserted grounds of unpatentability. Patent Owner disputes that Petitioner's asserted grounds renders any of the challenged claims unpatentable. *See generally* Prelim. Resp.

### III.    ANALYSIS

#### A. Level of Ordinary Skill in the Art

Petitioner, citing Dr. Bogy's testimony, asserts that a person of ordinary skill in the art at the time of the invention of the '841 patent "would have had at least a Bachelor's degree in mechanical engineering, with at least two years of work and/or academic experience in the design and/or study of disk drive components." Pet. 4 (citing Ex. 1002 ¶ 13).

At this stage of the proceeding, Patent Owner does not dispute Petitioner's assertion regarding the level of ordinary skill in the art, which

---

[1] U.S. Patent No. 5,689,389, filed Jan. 22, 1996, and issued Nov. 18, 1997 (Ex. 1003).

[2] Petitioner relies on the dimensional values set forth for the parameters of the base plate in the '841 patent's table that are described as typical prior art dimensions. *See, e.g.*, Pet. 15 ("Ground 3 (Braunheim in view of AAPA) is non-cumulative [to Grounds 1 and 2] because AAPA expressly specifies a 'typical' prior art value for the flange thickness ($T_{BP}$).").

5

Exhibit 32
-283-

Case 8:20-cv-00048-JVS-JDE  Document 207-2  Filed 09/28/20  Page 152 of 287  Page ID
#:14878
Case 5:20-cv-06128  Document 1-1  Filed 08/31/20  Page 7 of 23

IPR2018-00752
Patent 6,183,841 B1

we adopt for purposes of this decision.  Further, based on the information
presented at this stage of the proceeding, we consider Petitioner's declarant,
Dr. Bogy, qualified to opine from the perspective of an ordinary artisan at
the time of the invention.  *See* Ex. 1002 ¶¶ 3–11 (Dr. Bogy's background
and qualifications), Attachment A (Dr. Bogy's curriculum vitae).

### B. Claim Construction

For an unexpired patent, the Board interprets claims using the
"broadest reasonable construction in light of the specification of the patent."
37 C.F.R. § 42.100(b); *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131,
2144–46 (2016).  In this proceeding, however, Patent Owner filed a Motion
for District Court-Type Claim Construction (Paper 6), in which it certified
under 37 C.F.R. § 42.100(b) that the '841 patent would expire within 18
months of March 13, 2018 (i.e., the entry of the Notice of Filing Date
Accorded to Petition).  Paper 6, 2.  Petitioner agrees that the claims of the
'841 patent should be interpreted "similar to that of a District Court's
review."  Pet. 11–12.  Because the '841 patent will expire before we would
enter a final written decision, we find that district court-type claim
construction, rather than broadest reasonable construction, applies to this
proceeding.  *See In re CSB-Sys. Int'l, Inc.*, 832 F.3d 1335, 1340–42 (Fed.
Cir. 2016) ("[C]onsistent with our prior precedent and customary practice,
we reaffirm that once a patent expires, the PTO should apply the *Phillips*
standard for claim construction."); *Black & Decker, Inc. v. Positec USA,
Inc.*, 646 Fed. App'x 1019, 1024 (Fed. Cir. 2016); *see also* Amendments to
the Rules of Practice for Trials before the Patent Trial and Appeal Board, 81
Fed. Reg. 18,750, 18,750 (Apr. 1, 2016) (amending 37 C.F.R. § 42.100(b) to
allow a district court-style claim construction approach "for claims of

**Exhibit 32
-284-**

IPR2018-00752
Patent 6,183,841 B1

patents that will expire before entry of a final written decision"). Under the district court standard, claim terms "are generally given their ordinary and customary meaning," which is the "meaning that the term would have to a person of ordinary skill in the art . . . at the time of the invention" when read "in the context of" the specification and prosecution history of the patent. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–14 (Fed. Cir. 2005) (en banc) (internal quotation marks and citation omitted).

For purposes of this proceeding, Petitioner adopts the parties' agreed-upon constructions from the related district court litigation. Pet. 13–14. Patent Owner does not dispute the agreed-upon constructions, which Patent Owner notes the district court has adopted. Prelim. Resp. 21. Patent Owner contends, however, that claim construction is not necessary to resolve the parties' dispute at this stage of the proceeding. *Id.* at 22. We determine that no claim term requires express construction to resolve any controversy at this stage of the proceeding. *See Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) ("[O]nly those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy.").

### C. Asserted References

Before turning to the parties' arguments, we provide a brief summary of the asserted references.

#### 1. Braunheim (Ex. 1003)

Braunheim discloses a low profile swage mount for connecting a disk drive actuator arm to the load beam of a head suspension assembly. Ex. 1003, Abstract. The swage mount includes a base plate formed on one side with an opening and a hollow hub disposed on the opposite side. *Id.*

7

**Exhibit 32**
**-285-**

Case 8:20-cv-00048-JVS-JDE   Document 207-2   Filed 09/28/20   Page 154 of 287   Page ID
#:14880
Case 5:20-cv-06128   Document 1-1   Filed 08/31/20   Page 9 of 23

IPR2018-00752
Patent 6,183,841 B1

"The hub is formed with an inner swaging surface having a diameter approximating the diameter of the base plate opening to give the swage mount torq[u]e retention characteristics comparable to conventional swage mounts much larger in size." *Id.*

Braunheim discloses a number of parameters for the swage mount, including a base plate thickness ($T_{BP}$), hub overall height ($H_H$), hub inner diameter ($D_{ID}$), base plate length ($L_{BP}$), base plate width ($W_{BP}$), hub outer diameter ($D_{OD}$), hub inner surface depth ($H_{IS}$), base plate opening diameter ($D_{BP}$), and hub radial width ($W_H$). *Id.* at 6:34–49 (Table 1). Table 1 of Braunheim, which is reproduced below, provides approximate dimensions for all of the parameters of a preferred embodiment of the swage mount.

**TABLE 1**

| SYMBOL | NAME | DIMENSION (MM) |
|---|---|---|
| $L_{BP}$ | Base Plate Length | 5.080 |
| $W_{BP}$ | Base Plate Width | 5.080 |
| $T_{BP}$ | Base Plate Thickness | 0.203 |
| $D_{BP}$ | Base Plate Opening Diameter | 2.312 |
| $D_{ID}$ | Hub Inner Diameter | 2.083 |
| $D_{OD}$ | Hub Outer Diameter | 2.731 |
| $H_H$ | Hub Overall Height | 0.145 |
| $H_{IS}$ | Hub Inner Surface Depth | 0.094 |
| $W_H$ | Hub Radial Width | 0.648 |

*Id.* at 6:37–49. According to Braunheim, "by adhering to particular dimensional relationships" between the parameters, the swage mount "may be reduced in size to exhibit a vertical profile nowhere anticipated in the art while maintaining torque retention of magnitudes comparable to much larger swage mount profiles." *Id.* at 6:4–10. In particular, Braunheim describes the relationship between the base plate opening diameter ($D_{BP}$) and the hub inner diameter ($D_{ID}$) and the relationship between hub height ($H_H$) and hub

8

**Exhibit 32
-286-**

IPR2018-00752
Patent 6,183,841 B1

inner surface depth ($H_{IS}$) as providing the advantages to its disclosed swage mount. *Id.* at 6:11–33, 7:29–34.

Braunheim further explains that although the base plate thickness ($T_{BP}$) "is on the order of 0.20 millimeters," it "may be reduced further in accordance with the present invention." *Id.* at 5:28–31. Braunheim describes the relationship that exists between the hub wall radial thickness and the base plate thickness, *id.* at 3:15–18, 30–31, and states that the invention overcomes the conventional assumption that "the hub can be no thicker than the base plate thickness" by maintaining the relationships between $D_{BP}$ and $D_{ID}$, and $H_H$ and $H_{IS}$, *id.* at 7:41–52.

### 2. *Applicant Admitted Prior Art ("AAPA")*

Petitioner relies on the dimensional values set forth for the parameters of the base plate in the '841 patent's table that are described as typical prior art dimensions. Ex. 1001, 4:3–18. In particular, for its first ground— anticipation based on Braunheim—Petitioner points to the "typical" known hub counter bore height ($H_{CB}$) of 0.038 mm from the '841 patent's table. *See, e.g.*, Pet. 22. For its second ground—obviousness over Braunheim— Petitioner, in an alternative application of Braunheim, relies on the 0.038 value for $H_{CB}$ from the '841 patent's table. *See id.* at 43–45. Also for its second ground, and for its third ground (obviousness over Braunheim in view of the AAPA), Petitioner directs us to the "typical" prior art base plate thickness ($T_{BP}$) of 0.150 mm from the '841 patent's table. *See, e.g.*, *id.* at 40–41 (obviousness over Braunheim in view of the knowledge of the person of ordinary skill in the art), *id.* at 46 (obviousness over Braunheim in view of the AAPA).

**Exhibit 32**
**-287-**

IPR2018-00752
Patent 6,183,841 B1

### D. Petitioner's Challenges to the '841 Patent

Petitioner contends that claims 1, 4, 7, and 10 of the '841 patent are unpatentable as anticipated by Braunheim, obvious over Braunheim alone, and obvious over Braunheim in view of the AAPA. *See* Pet. 15–50. In brief, Petitioner argues that Braunheim anticipates the challenged claims because, once supplemented to include a typical AAPA value for $H_{CB}$, or pursuant to Braunheim's own suggestions (for $T_{BP}$), Braunheim discloses a base plate having dimensions that satisfy the equation recited in the challenged claims. *See, e.g.*, Pet. 15–26 (claim 1). In addition, Petitioner argues that the challenged claims would have been obvious over Braunheim because reducing $H_{CB}$ or $T_{BP}$ would have been within the knowledge of the ordinary artisan. *See id.* at 37 (relying on anticipation analysis for reduction of $T_{BP}$), *id.* at 42–46 (asserting that the AAPA as background knowledge would have led the skilled artisan to reduce $H_{CB}$ with a reasonable expectation of success in achieving a Geometry Metric Value of $\geq 5$). In addition, Petitioner contends that the challenged claims would have been obvious over Braunheim in view of the AAPA because the AAPA expressly specifies a "typical" prior art value for $T_{BP}$. *See id.* at 46–49. In all three grounds, Petitioner relies on the parameters set forth in Braunheim's Table 1 and directs us to the typical prior art dimensions for $H_{CB}$ and $T_{BP}$ set forth in the '841 patent's table. *See supra* § II.B.2.

Patent Owner contends that Braunheim does not anticipate the challenged claims and that the challenged claims would not have been obvious over Braunheim or the combination of Braunheim and the AAPA. Prelim. Resp. 39–54. First, however, Patent Owner contends that we should exercise our discretion under 35 U.S.C. § 325(d) to deny institution. *Id.* at

10

Exhibit 32
-288-

IPR2018-00752
Patent 6,183,841 B1

22–36.  Patent Owner argues that we should deny institution under § 325(d) because "the Petition simply repackages and restyles arguments made by the Examiner and overcome by [Patent Owner] during prosecution of the application that led to the grant of the '841 patent and that are being simultaneously asserted by Petitioner in the District Court case."  *Id.* at 4. Patent Owner also argues that we should deny institution under § 314(a) because Petitioner filed the Petition shortly before the time-bar under § 315(b) expired and because proceeding in parallel with the district court litigation is an inefficient use of our time and resources.  *Id.* at 36–39.  For the reasons explained below, we agree with Patent Owner and exercise our discretion under 35 U.S.C. §§ 314(a), 325(d) to deny institution.

### 1. *Discretion Under 35 U.S.C. § 325(d)*

Institution of *inter partes* review is discretionary.  *See Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1367 (Fed. Cir. 2016) ("the PTO is permitted, but never compelled, to institute an IPR proceeding").  Section 325(d) gives us express discretion to deny a petition when "the same or substantially the same prior art or arguments previously were presented to the Office."  35 U.S.C. § 325(d).  In evaluating whether to exercise our discretion under Section 325(d), we weigh the following non-exclusive factors:  "(a) the similarities and material differences between the asserted art and the prior art involved during examination; (b) the cumulative nature of the asserted art and the prior art evaluated during examination; (c) the extent to which the asserted art was evaluated during examination, including whether the prior art was the basis for rejection; (d) the extent of the overlap between the arguments made during examination and the manner in which Petitioner relies on the prior art or Patent Owner distinguishes the prior art;

11

**Exhibit 32**
**-289-**

Case 8:20-cv-00048-JVS-JDE   Document 207-2   Filed 09/28/20   Page 158 of 287   Page ID
#:14884
Case 5:20-cv-06128   Document 1-1   Filed 08/31/20   Page 13 of 23

IPR2018-00752
Patent 6,183,841 B1

(e) whether Petitioner has pointed out sufficiently how the Examiner erred in
its evaluation of the asserted prior art; and (f) the extent to which additional
evidence and facts presented in the Petition warrant reconsideration of prior
art or arguments." *Becton, Dickinson & Co. v. B. Braun Melsungen AG*,
IPR2017-01586, slip op. at 17–18 (Paper 8) (PTAB Dec. 15, 2017)
(informative).

We analyze these factors below as they apply to the record in this
proceeding, and find that, on balance, the factors weigh in favor of
exercising our discretion under 35 U.S.C. § 325(d).  We also decide, for
reasons explained below, that an additional factor supports denying
institution under § 314(a).

### (a) The similarities and material differences between the asserted art and the prior art involved during examination

As explained above, Petitioner relies on Braunheim as anticipating
claims 1, 4, 7, and 10, and Braunheim, as well as Braunheim and the AAPA
for its arguments that claims 1, 4, 7, and 10 would have been obvious.  Pet.
4.  As Petitioner acknowledges, the Examiner considered Braunheim and the
AAPA during prosecution of the '841 patent.  *Id.* at 7 ("The primary
reference (Braunheim) in the proposed grounds of this Petition was applied
by the Examiner during prosecution of the '841 patent."), 8–9 (explaining
that the Examiner relied on "a side-by-side comparison of a 'typical'
embodiment's dimensions versus 'typical' prior art dimensions admitted by
the '841 [p]atent"); *see also* Ex. 1001, [56] (listing Braunheim among the
References Cited); Ex. 1004, 47, 67 (rejecting all pending claims for
obviousness over "applicant's admission of the state of the prior art in the
table [in the '841 patent specification] . . . in view of Brooks . . . (U.S.

12

**Exhibit 32**
**-290-**

IPR2018-00752
Patent 6,183,841 B1

5,717,545) and Braunheim (U.S. 5,689,389)").  Thus, the Examiner
considered the prior art that Petitioner asserts here.

### (b) The cumulative nature of the asserted art and the prior art evaluated during examination

As explained above, Petitioner relies on the same prior art that the
Examiner considered during prosecution of the '841 patent.  Because it is the
same, we need not address whether the AAPA and Braunheim are
cumulative of the art that the Examiner considered.

### (c) The extent to which the asserted art was evaluated during examination, including whether the prior art was the basis for rejection

As Patent Owner points out, the Examiner cited Braunheim and the
AAPA, along with Brooks, during examination to reject all pending claims
for obviousness in the initial Office Action and the Final Office Action.  *See*
Prelim. Resp. 25–26; Ex. 1004, 47 (initial Office Action), 67 (Final Office
Action).  In those rejections, the Examiner relied on the AAPA dimensions
for each of the parameters listed in the '841 patent's table.  *See, e.g.*,
Ex. 1004, 47–48.  The Examiner explained that the AAPA dimensions for
$H_{CB}$ and $W_H$ were the only AAPA dimensions that differed from the
dimensions recited in the claims.  *Id.* at 49.  The Examiner concluded that a
person of ordinary skill in the art would have increased $H_{CB}$ based on the
teachings in Brooks and would have increased slightly $W_H$ based on
Braunheim's disclosure.  *Id.* at 48–49.

In other words, the Examiner (1) started with the AAPA dimensions
for the base plate parameters, and (2) increased or decreased dimensions for
certain parameters (i.e., $H_{CB}$ and $W_H$) in the equation recited in the claims
based on the prior art teachings in Brooks and Braunheim in order to arrive

**Exhibit 32**
**-291-**

Case 8:20-cv-00048-JVS-JDE   Document 207-2   Filed 09/28/20   Page 160 of 287   Page ID
#:14886
Case 5:20-cv-06128   Document 1-1   Filed 08/31/20   Page 15 of 23

IPR2018-00752
Patent 6,183,841 B1

at the optimized relationship recited in the claims, i.e., a Geometry Metric
Value of $\geq 5$.  *See id.* at 47–49.  Accordingly, we find that the Examiner
evaluated Braunheim and the AAPA during examination and substantively
applied their teachings to reject the '841 patent's claims.

> *(d)The extent of the overlap between the arguments made during*
> *examination and the manner in which Petitioner relies on the prior*
> *art or Patent Owner distinguishes the prior art*

Although Petitioner argues to the contrary, we determine that the
findings the Examiner made during prosecution and the arguments Petitioner
makes here are substantially the same.  As discussed above, Petitioner
contends Braunheim anticipates the challenged claims by pointing to the
dimensions Braunheim discloses for most of the base plate parameters and
by relying on the value for $H_{CB}$ that the AAPA discloses.  For its
obviousness grounds, Petitioner relies on Braunheim's dimensions, as well
as the typical values for $H_{CB}$ and $T_{BP}$ that the AAPA discloses.

Petitioner, anticipating Patent Owner's argument under § 325(d),
contends that it relies on Braunheim "***in an entirely different manner***" than
the Examiner relied on Braunheim during prosecution.  *Id.* at 7–8.  In
particular, Petitioner contends that the asserted grounds "rely ***primarily*** on a
base plate exemplified in Braunheim (Table 1) and using the metric formula
of the challenged claims to '***calculate a metric value***' from its dimensions,"
whereas the Examiner omitted a metric value calculation "and instead
rel[ied] on a side-by-side comparison of a 'typical' embodiment's
dimensions versus 'typical'" AAPA dimensions set forth in the '841 patent.
*Id.* at 8–9; *see also* Ex. 1002 ¶¶ 39, 41 (Dr. Bogy's testimony to the same
effect).

14

**Exhibit 32**
**-292-**

IPR2018-00752
Patent 6,183,841 B1

We disagree.  Patent Owner argues persuasively that the Petition "simply applies the same references in the opposite order."  Prelim. Resp. 33–34.  As explained above, in rejecting the claims, the Examiner started with the AAPA base plate dimensions from the '841 patent's table and modified two of them (including $W_H$) based on Braunheim to arrive at a value for the metric equation of $\geq 5$.  Ex. 1004, 47–48.  Here, Petitioner starts with Braunheim's base plate dimensions, including $W_H$, and either supplements those dimensions with $H_{CB}$ as disclosed by the AAPA or modifies the value for $T_{BP}$ based on the AAPA.  For example, in arguing that Braunheim anticipates the challenged claims, Petitioner directs us to the parameters Braunheim's Table 1 discloses for a base plate (e.g., $T_{BP}$, $W_H$, $H_{IS}$, and $H_H$).  Pet. 21.  Because Braunheim does not disclose $H_{CB}$, Petitioner uses the "'typical' known $H_{CB}$ admitted by the '841 Patent"—0.038 mm.  *Id.* at 22.  Similarly, in arguing that Braunheim and Braunheim in view of the AAPA would have rendered the challenged claims obvious, Petitioner relies on the values in Braunheim's Table 1 for all of the parameters in the metric equation except $T_{BP}$.  *See, e.g., id.* at 37 (referring back to anticipation argument).  Petitioner then directs us to the "'typical prior art" $T_{BP}$ of 0.150 mm set forth in the '841 patent's table.  *Id.* at 40, 47.

Thus, Petitioner's analysis here is substantially the same as the Examiner's during prosecution:  both rely upon prior art values for base plate parameters and conclude that the ordinary artisan would have modified certain of the values for parameters in the metric equation to achieve the relationship of $\geq 5$ that is recited in the claims.

15

**Exhibit 32**
**-293-**

IPR2018-00752
Patent 6,183,841 B1

### *(e) Whether Petitioner has pointed out sufficiently how the Examiner erred in its evaluation of the asserted prior art*

Petitioner contends that the Examiner "overlooked" Braunheim's Table 1 and that "[h]ad the Examiner considered the Braunheim base plate and applied its dimensions to the claimed metric formula, the claims would not have been allowed." Pet. 8, 11. The flaw in Petitioner's argument, however, is that none of Petitioner's asserted grounds relies solely on Braunheim's Table 1 values. Rather, as previously explained, Petitioner relies on Braunheim's Table 1 for some of the parameters of the metric equation recited in the challenged claims and relies on the AAPA for other parameters. *See, e.g.*, Pet. 22, 40, 47. Petitioner, therefore, does not point out sufficiently how the Examiner erred in evaluating the asserted prior art.

### *(f) The extent to which additional evidence and facts presented in the Petition warrant reconsideration of prior art or arguments*

For the reasons discussed in subsection (d) above, we find that Petitioner's arguments substantially overlap the Examiner's findings during examination. Petitioner explains that the Petition presents declaratory evidence—Dr. Bogy's declaration—that the Office did not consider during examination. Pet. 7. Although Dr. Bogy's declaration was not before the Examiner, the declaration does not persuade us that we should reconsider Braunheim, the AAPA, or Petitioner's arguments because the declaration is substantially similar to the Petition (i.e., contains the same arguments that we find substantially overlap the Examiner's findings)[3] and Dr. Bogy fails to

---

[3] Although Dr. Bogy's declaration is substantially similar to the Petition in most respects, Dr. Bogy's testimony differs from the Petition with regard to $H_{CB}$. For Ground 1, Petitioner contends that Braunheim anticipates an $H_{CB}$ value that satisfies the metric equation recited in the claims. Pet. 15–23.

**Exhibit 32**
**-294-**

IPR2018-00752
Patent 6,183,841 B1

support his testimony with objective evidence.  For example, Dr. Bogy testifies that one of ordinary skill in the art would have changed certain values of Braunheim's base plate parameters based on the AAPA and suggestions in Braunheim.  *See, e.g.*, Ex. 1002 ¶¶ 54–61, 62–65.  But Dr. Bogy fails to explain why a change in the value of one parameter would not have affected the other parameters of Braunheim's base plate, including $D_{BP}$, $D_{ID}$, $H_H$, and $H_{IS}$, which Braunheim identifies as having "unexpected relationship[s] deemed critical to the successful operation of the swage mount."  Ex. 1003, 6:11–33; *see also id.* at 7:29–31 ("Important advantages result from constructing the swage mount . . . with the aforedescribed relationships between $D_{BP}$ and $D_{ID}$, and between $H_H$ and $H_{IS}$."); *id.* at 7:49–52 ("[B]y maintaining the aforedescribed relationships between $D_{BP}$ and $D_{ID}$, and $H_H$ and $H_{IS}$, the profile of the swage mount . . . may be greatly reduced while still maintaining sufficient torque retention for fastening the actuator arm to the load beam.").

Further, as support for adjusting the value of $T_{BP}$ from that disclosed in Braunheim's Table 1 to something less than 0.145 mm, Petitioner argues that "[t]he only lower limit to [$T_{BP}$] suggested by Braunheim is the hub height ($H_H$)."  Pet. 25 (citing Ex. 1003, 2:59–60, 7:41–43 ("[T]he hub can be no thicker than base plate thickness.")).  Dr. Bogy offers similar testimony in that regard.  Ex. 1002 ¶¶ 63, 65.  Absent from Petitioner's analysis and Dr. Bogy's testimony, however, is a persuasive reason why the skilled artisan would have understood Braunheim's disclosure of $T_{BP}$ as the upper

---

But Dr. Bogy testifies that "one of ordinary skill in the art would have found it obvious to include an $H_{CB}$ of 0.038 mm [the AAPA $H_{CB}$] in Braunheim's base plate."  Ex. 1002 ¶ 58; *see id.* ¶ 61.

**Exhibit 32**
**-295-**

Case 8:20-cv-00048-JVS-JDE   Document 207-2   Filed 09/28/20   Page 164 of 287   Page ID
#:14890
Case 5:20-cv-06128   Document 1-1   Filed 08/31/20   Page 19 of 23

IPR2018-00752
Patent 6,183,841 B1

limit for hub thickness to necessarily disclose the converse—i.e., that hub thickness is the upper limit for $T_{BP}$.  Moreover, Petitioner and Dr. Bogy do not explain why Braunheim's disclosure of an upper limit for *hub thickness* means hub height, $H_H$, as opposed to hub radial thickness, $W_H$, in view of Braunheim's disclosure that a relationship exists between $W_H$ and $T_{BP}$.  *See* Ex. 1003, 3:30–31 (disclosing relationship between $W_H$ and $T_{BP}$).  Rather, Petitioner and Dr. Bogy simply presume that Braunheim's disclosure that "the hub can be no thicker" than $T_{BP}$ refers to $H_H$ not $W_H$.  Pet. 25; Ex. 1002 ¶ 63 ("Specifically, because 'the hub can be no thicker than the [base plate] thickness,' the lower limit for the [base plate] thickness ($T_{BP}$) is the hub height ($H_H$).").

Given the foregoing, we are not persuaded that we should reconsider Braunheim or the arguments Petitioner presents in the Petition.

### 2. Weighing the 325(d) Factors

Taking into account the above factors, we find that the factors weigh in favor of exercising our discretion and denying institution under § 325(d). Importantly, the asserted art is a subset of the same prior art that the Examiner applied in rejecting the claims during prosecution.  Further, the arguments Petitioner advances in its Petition are substantially similar to the findings the Examiner made to reject the claims, and that Patent Owner overcame.  Thus, we deny institution under § 325(d).  Although a weighing of the § 325(d) factors alone is sufficient to support an exercise of our discretion to deny institution, we also consider Patent Owner's additional arguments under § 314(a).

18

**Exhibit 32**
**-296-**

Case 8:20-cv-00048-JVS-JDE   Document 207-2   Filed 09/28/20   Page 165 of 287   Page ID
#:14891
Case 5:20-cv-06128   Document 1-1   Filed 08/31/20   Page 20 of 23

IPR2018-00752
Patent 6,183,841 B1

### 3. Discretion under § 314(a)

Patent Owner contends that two additional factors weigh in favor of denying institution under § 314(a).  First, Patent Owner argues that Petitioner knew about the '841 patent for more than 10 years, yet provides no explanation for why it waited so long to file the Petition.  Prelim. Resp. 37–38.  We are not persuaded that this lapse in time favors denying review.  As Patent Owner acknowledges, Petitioner filed the Petition shortly before the one-year bar in 35 U.S.C. § 315(b) expired.  The Petition, therefore, was timely, and Patent Owner does not apprise us of any tactical advantage, or opportunity for tactical advantage, that Petitioner gained by waiting to file the Petition.  Thus, we find this proceeding distinguishable from the facts in *General Plastic Industrial Co., Ltd. v. Canon Kabushiki Kaisha*, Case IPR2016-01357 (Paper 19) (PTAB Sept. 6, 2017) (precedential as to § II.B.4.i) ("*General Plastic*")—the decision on which Patent Owner relies to support its argument regarding the timing of the Petition.

Second, Patent Owner argues that instituting an *inter partes* review "ultimately would be inefficient," given the status of the district court proceeding between the parties.  Prelim. Resp. 38–39.  In particular, Patent Owner directs us to the Scheduling Order in the district court proceeding, which sets a trial date of March 25, 2019.  *Id.* at 39.  Patent Owner further notes that because the '841 patent has expired, we will apply the same standard for claim construction as the district court (which already has construed the '841 patent claim terms).  *Id.* at 38.  Patent Owner also represents that Petitioner relies on the same prior art (Braunheim and the AAPA) and arguments in its district court invalidity contentions as asserted in the Petition.  *Id.* at 1.  Thus, Patent Owner argues, the district court

19

**Exhibit 32**
**-297-**

IPR2018-00752
Patent 6,183,841 B1

proceeding will analyze the same issues and will be resolved before any trial on the Petition concludes. *Id.* at 39. Patent Owner asserts that such inefficiency supports denying the Petition.

We agree. First, we note that there is no "intent to limit discretion under § 314(a), such that it is . . . encompassed by § 325(d)." *Gen. Plastic*, Paper 19, 18–19. Thus, simply because we exercise our discretion to deny the Petition under § 325(d) does not mean that we cannot consider and weigh additional factors that favor denying institution under § 314(a).[4] Second, Patent Owner argues persuasively that instituting a trial under the facts and circumstances here would be an inefficient use of Board resources. The district court proceeding, in which Petitioner asserts the same prior art and arguments, is nearing its final stages, with expert discovery ending on November 1, 2018, and a 5-day jury trial set to begin on March 25, 2019. Ex. 2004, 1. A trial before us on the same asserted prior art will not conclude until September 2019. Institution of an *inter partes* review under these circumstances would not be consistent with "an objective of the AIA . . . to provide an effective and efficient alternative to district court litigation." *Gen. Plastic*, Paper 19, 16–17. Accordingly, we find that the advanced state of the district court proceeding is an additional factor that weighs in favor of denying the Petition under § 314(a).

---

[4] Indeed, the August 2018 Update to the Office Patent Trial Practice Guide, 83 Fed. Reg. 39,989 (Aug. 13, 2018) ("Trial Practice Guide Update"), invites parties to address additional factors that may bear on the Board's discretionary decision to institute or not institute under §§ 314(a) and 325(d). Trial Practice Guide Update 11, 13.

20

**Exhibit 32**
**-298-**

IPR2018-00752
Patent 6,183,841 B1

## IV.   CONCLUSION

Taking account of the information presented in the Petition and the Preliminary Response, and the evidence of record, we exercise our discretion under §§ 314(a) and 325(d) and deny institution.  Accordingly, the Petition is *denied*, and no trial is instituted.

## V.   ORDER

In consideration of the foregoing, it is hereby:

ORDERED that the Petition is *denied*, and no trial is instituted.

**Exhibit 32**
**-299-**

Case 8:20-cv-00048-JVS-JDE   Document 207-2   Filed 09/28/20   Page 168 of 287   Page ID
#:14894
Case 5:20-cv-06128   Document 1-1   Filed 08/31/20   Page 23 of 23

IPR2018-00752
Patent 6,183,841 B1

PETITIONER:

William Mandir
wmandir@sughrue.com

John Rabena
jrabena@sughrue.com

Yoshinari Kishimoto
ykishimoto@sughrue.com

Fadi Kiblawi
fkiblawi@sughrue.com

PATENT OWNER:

James Haley
james.haley@hglaw.com

Joshua Van Hoven
joshua.vanhoven@hglaw.com

Exhibit 32
-300-

Case 8:20-cv-00048-JVS-JDE   Document 207-2   Filed 09/28/20   Page 169 of 287   Page ID
#:14895
Case 5:20-cv-06128   Document 1-2   Filed 08/31/20   Page 1 of 19

# EXHIBIT B

**Exhibit 32**
**-301-**

Trials@uspto.gov
571-272-7822



Patent Trial and Appeal Board
PRECEDENTIAL
Standard Operating Procedure 2
Designated: 5/5/20

Paper No. 11
Entered: March 20, 2020

## UNITED STATES PATENT AND TRADEMARK OFFICE

_____

## BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

APPLE INC.,
Petitioner,

v.

FINTIV, INC.,
Patent Owner.

_____

Case IPR2020-00019
Patent 8,843,125 B2

_____

Before WILLIAM M. FINK, *Vice Chief Administrative Patent Judge*, and
LINDA E. HORNER and LYNNE E. PETTIGREW, *Administrative Patent
Judges*.


FINK, *Vice Chief Administrative Patent Judge*.


ORDER
Conduct of the Proceeding
*Supplemental Briefing on Discretionary Denial*
*35 U.S.C. § 314(a) and 37 C.F.R. § 42.5(a)*

**Exhibit 32**
**-302-**

Case 8:20-cv-00048-JVS-JDE   Document 207-2   Filed 09/28/20   Page 171 of 287   Page ID
#:14897
Case 5:20-cv-06128   Document 1-2   Filed 08/31/20   Page 3 of 19

IPR2020-00019
Patent 8,843,125 B2

## I.     INTRODUCTION

Petitioner, Apple, Inc., filed a Petition in this case on October 28,
2019, challenging certain claims of U.S. Patent No. 8,843,125 B2 (Ex. 1001,
"the '125 patent") owned by Patent Owner, Fintiv, Inc.  Paper 1 ("Pet.").
Patent Owner filed a Preliminary Response on February 15, 2020.  Paper 10
("Prelim. Resp.").  In its Preliminary Response, Patent Owner requests that
the Board apply its discretion under 35 U.S.C. § 314(a) to deny institution of
the requested proceeding due to the advanced state of a parallel district court
litigation in which the same issues have been presented and trial has been set
for November 16, 2020.  Prelim. Resp. 22–26 (citing *NHK Spring Co. v.
Intri-Plex Techs., Inc.*, IPR2018-00752, Paper 8 (PTAB Sept. 12, 2018)
(precedential, designated May 7, 2019)).  Although Petitioner addressed the
issue briefly in the Petition, at that time no trial date had been set.  *See*
Pet. 7.  In light of the apparent change in status of the parallel proceeding,
the panel has determined that supplemental briefing on the issue of
discretionary denial is necessary in this case to give Petitioner an
opportunity to respond.  This Order discusses the factors relevant to the
Board's decision on whether to apply its discretion under 35 U.S.C. § 314(a)
to deny institution.  This Order authorizes the parties to file supplemental
briefing addressing facts in this case relevant to these factors.

## II.     DISCRETIONARY DENIAL UNDER *NHK*

In *NHK*, the patent owner argued the Board should deny institution
under 35 U.S.C. § 314(a) because institution of a trial at the PTAB would be
an inefficient use of Board resources in light of the "advanced state" of the
parallel district court litigation in which the petitioner had raised the same
invalidity challenges.  IPR2018-00752, Paper 8.  The Board denied

2

**Exhibit 32**
**-303-**

Case 8:20-cv-00048-JVS-JDE   Document 207-2   Filed 09/28/20   Page 172 of 287   Page ID
#:14898
Case 5:20-cv-06128   Document 1-2   Filed 08/31/20   Page 4 of 19

IPR2020-00019
Patent 8,843,125 B2

institution, relying in part on § 314(a).  Specifically, under § 314(a) the
Board considered the fact that the parallel district court proceeding was
scheduled to finish before the Board reached a final decision as a factor
favoring denial.[1]  The Board found that the earlier district court trial date
presented efficiency considerations that provided an additional basis,
separate from the independent concerns under 35 U.S.C. § 325(d),[2] for
denying institution.  Thus, *NHK* applies to the situation where the district
court has set a trial date to occur earlier than the Board's deadline to issue a
final written decision in an instituted proceeding.  In a case where, in
contrast to the facts present in *NHK*, the district court has set a trial date
*after* the Board's deadline to issue a final written decision in an instituted
proceeding, the Board may be less likely to deny institution under 35 U.S.C.
§ 314(a) based on district court trial timing depending on other factors as set
forth below.[3]

---

[1] *See* 35 U.S.C. § 316(a)(11) (2018) (requiring issuance of a final written
decision within one year of institution, absent extension up to six months for
good cause).

[2] Section 325(d) provides that the Director may elect not to institute a
proceeding if the challenge to the patent is based on the same or
substantially the same prior art or arguments previously presented to the
Office.

[3] *See Polycom, Inc. v. directPacket Research, Inc.,* IPR2019-01233, Paper
21 at 13 (PTAB Jan. 13, 2020) (declining to apply discretion to deny
institution when district court trial is scheduled to occur months after the
statutory deadline for completion of the IPR); *Iconex, LLC v. MAXStick
Products Ltd.*, IPR2019-01119, Paper 9 at 10 (PTAB Dec. 6, 2019) (same).

**Exhibit 32**
**-304-**

IPR2020-00019
Patent 8,843,125 B2

> A.      *The Parties' Arguments*

In the Petition, Petitioner argues that although a parallel district court proceeding is ongoing involving the challenged patent, the Board should not exercise authority to deny institution under *NHK* because, at the time of the Petition filing, "no preliminary injunction motion has been filed, the district court has not been presented with or invested any time in the analysis of prior art invalidity issues, and no trial date has been set." Pet. 7. Petitioner also argues that it timely filed its petition within the statutorily prescribed one-year window, and that declining to institute IPR here would "essentially render nugatory" the one-year filing period of § 315(b). *Id.* Petitioner also argues that declining to institute an IPR based on a parallel district court litigation "ignores the common scenario, contemplated by Congress, of obtaining a district court stay based on institution." *Id.*

In its Preliminary Response, Patent Owner has raised several factors that it contends weigh in favor of exercising authority to deny institution under *NHK*, including an earlier trial date (six months prior to the projected deadline for a final written decision if the Board institutes a proceeding),[4] significant overlap between issues raised in the Petition and in the district court proceeding (identical claims and arguments), and investment in the district court trial (claim construction already issued). *See* Prelim. Resp. 23–27.

---

[4] After the filing of the Petition, the district court entered a scheduling order setting a trial date to occur prior to projected deadline for a final written decision in this matter. Ex. 2009 (setting trial date of November 16, 2020).

**Exhibit 32**
**-305-**

IPR2020-00019
Patent 8,843,125 B2

> B.    *Factors Related to a Parallel, Co-Pending Proceeding in Determining Whether to Exercise Discretionary Institution or Denial*

As with other non-dispositive factors considered for institution under 35 U.S.C. § 314(a), an early trial date should be weighed as part of a "balanced assessment of all relevant circumstances of the case, including the merits."[5] Consolidated Trial Practice Guide November 2019 ("TPG")[6] at 58. Indeed, the Board's cases addressing earlier trial dates as a basis for denial under *NHK* have sought to balance considerations such as system efficiency, fairness, and patent quality.[7] When the patent owner raises an argument for discretionary denial under *NHK* due to an earlier trial date,[8] the Board's decisions have balanced the following factors:

---

[5] *See Abbott Vascular, Inc. v. FlexStent, LLC*, IPR2019-00882, Paper 11 at 31 (PTAB Oct. 7, 2019) (declining to adopt a bright-line rule that an early trial date alone requires denial in every case).

[6] *Available at* https://www.uspto.gov/TrialPracticeGuideConsolidated.

[7] *See Magellan Midstream Partners L.P. v. Sunoco Partners Marketing & Terminals L.P.*, IPR2019-01445, Paper 12 at 10 (PTAB Jan. 22, 2020) (citing "unnecessary and counterproductive litigation costs" where district court would most likely have issued a decision before the Board issues a final decision); *Intel Corp. v. VLSI Tech. LLC*, IPR2019-01192, Paper 15 at 11 (PTAB Jan. 9, 2020) ("When considering the impact of parallel litigation in a decision to institute, the Board seeks, among other things, to minimize the duplication of work by two tribunals to resolve the same issue."); *Illumina, Inc. v. Natera, Inc.*, IPR2019-01201, Paper 19 at 6 (PTAB Dec. 18, 2019) ("We have considered the positions of the parties and find that, on this record, considerations of efficiency, fairness, and the merits of the grounds in the Petition do not weigh in favor of denying the Petition.").

[8] To the extent we refer to such a denial of institution as a "denial under *NHK*," we refer to *NHK*'s § 314(a) denial due to the earlier trial date in the district court and not the independent basis for denial under § 325(d).

**Exhibit 32**
**-306-**

Case 8:20-cv-00048-JVS-JDE   Document 207-2   Filed 09/28/20   Page 175 of 287   Page ID
#:14901
Case 5:20-cv-06128   Document 1-2   Filed 08/31/20   Page 7 of 19

IPR2020-00019
Patent 8,843,125 B2

1. whether the court granted a stay or evidence exists that one may be granted if a proceeding is instituted;

2. proximity of the court's trial date to the Board's projected statutory deadline for a final written decision;

3. investment in the parallel proceeding by the court and the parties;

4. overlap between issues raised in the petition and in the parallel proceeding;

5. whether the petitioner and the defendant in the parallel proceeding are the same party; and

6. other circumstances that impact the Board's exercise of discretion, including the merits.

These factors relate to whether efficiency, fairness, and the merits support the exercise of authority to deny institution in view of an earlier trial date in the parallel proceeding. As explained below, there is some overlap among these factors. Some facts may be relevant to more than one factor. Therefore, in evaluating the factors, the Board takes a holistic view of whether efficiency and integrity of the system are best served by denying or instituting review. *See* TPG at 58 (quoting 35 U.S.C. § 316(b)).

> 1. *whether a stay exists or is likely to be granted if a proceeding is instituted*

A district court stay of the litigation pending resolution of the PTAB trial allays concerns about inefficiency and duplication of efforts. This fact has strongly weighed against exercising the authority to deny institution under *NHK*.[9] In some cases, there is no stay, but the district court has denied

---

[9] *See Precision Planting, LLC v. Deere & Co.*, IPR2019-01052, Paper 19 at 10 (PTAB Jan. 7, 2020) (finding that the district court stay of the parallel district court case rendered moot the patent owner's argument for discretionary denial of the petition); *Apotex Inc. v. UCB Biopharma Sprl*,

**Exhibit 32**
**-307-**

Case 8:20-cv-00048-JVS-JDE   Document 207-2   Filed 09/28/20   Page 176 of 287   Page ID
#:14902
Case 5:20-cv-06128   Document 1-2   Filed 08/31/20   Page 8 of 19

IPR2020-00019
Patent 8,843,125 B2

a motion for stay without prejudice and indicated to the parties that it will

consider a renewed motion or reconsider a motion to stay if a PTAB trial is

instituted.  Such guidance from the district court, if made of record, suggests

the district court may be willing to avoid duplicative efforts and await the

PTAB's final resolution of the patentability issues raised in the petition

before proceeding with the parallel litigation.  This fact has usually weighed

against exercising authority to deny institution under *NHK*,[10] but, for reasons

discussed below, proximity of the court's trial date and investment of time

are relevant to how much weight to give to the court's willingness to

reconsider a stay.[11, 12]  If a court has denied a defendant's motion for a stay

---

IPR2019-00400, Paper 17 at 31–32 (PTAB July 15, 2019) (finding that the
district court stay of the parallel district court case predicated on the *inter
partes* review means that the trial will not occur before the Board renders a
final decision).

[10] *See Abbott Vascular*, IPR2019-00882, Paper 11 at 30–31 (noting district
court's willingness to revisit request for stay if Board institutes an *inter
partes* review proceeding).

[11] *See DMF, Inc. v. AMP Plus, Inc.*, Case No. 2-18-cv-07090 (C.D. Cal. July
12, 2019) (denying defendants' initial motion to stay without prejudice to
their renewing the motion should PTAB grant their IPR petition); *id.* (Dec.
13, 2019) (denying renewed motion to stay after PTAB instituted, in part,
because in the interim claim construction order had issued, trial date was fast
approaching, and discovery was in an advanced stage).

[12] It is worth noting that the district court, in considering a motion for stay,
may consider similar factors related to the amount of time already invested
by the district court and proximity of the trial date to the Board's deadline
for a final written decision.  *See Space Data Corp. v. Alphabet Inc.*, Case
No. 16-cv-03260, slip op. at 3 (N.D. Cal. Mar. 12, 2019) (denying motion to
stay where the court had ruled on a motion for partial summary judgment
and issued a *Markman* order, and fact and expert discovery are closed, and
thus "much work has been completed"); *Intellectual Ventures I LLC v. T-*

**Exhibit 32**
**-308-**

Case 8:20-cv-00048-JVS-JDE   Document 207-2   Filed 09/28/20   Page 177 of 287   Page ID
#:14903
Case 5:20-cv-06128   Document 1-2   Filed 08/31/20   Page 9 of 19

IPR2020-00019
Patent 8,843,125 B2

pending resolution of a PTAB proceeding, and has not indicated to the

parties that it will consider a renewed motion or reconsider a motion to stay

if a PTAB trial is instituted, this fact has sometimes weighed in favor of

exercising authority to deny institution under *NHK*.

One particular situation in which stays arise frequently is during a

parallel district court *and* ITC investigation involving the challenged patent.

In such cases, the district court litigation is often stayed under 28 U.S.C.

§ 1659 pending the resolution of the ITC investigation.  Regardless, even

though the Office and the district court would not be bound by the ITC's

decision, an earlier ITC trial date may favor exercising authority to deny

institution under *NHK* if the ITC is going to decide the same or substantially

similar issues to those presented in the petition.  The parties should indicate

whether there is a parallel district court case that is ongoing or stayed under

28 U.S.C. § 1659 pending the resolution of the ITC investigation.  We

---

*Mobile USA, Inc.*, Case No. 2-17-cv-00577 (E. D. Tex. Dec. 13, 2018)
(denying motion to stay after dispositive and *Daubert* motions had been filed
and the court had expended material judicial resources to prepare for the
pretrial in three weeks); *Plastic Omnium Advanced Innovation and Research
v. Donghee Am., Inc.*, Case No. 1-16-cv-00187 (D. Del. Mar. 9, 2018)
(denying motion for stay after PTAB's institution of *inter partes* reviews
because the court "has construed the parties' disputed claim terms, handled
additional discovery-related disputes, begun reviewing the parties' summary
judgment and *Daubert* motions . . . and generally proceeded toward trial"
and "[d]elaying the progress of this litigation . . .  would risk wasting the
Court's resources"); *Dentsply Int'l, Inc. v. US Endodontics, LLC*, Case
No. 2-14-cv-00196, slip op. at 5 (E.D. Tenn. Dec. 1, 2015) (denying motion
for stay pending *inter partes* review because a stay at this point in the
proceedings "would waste a significant amount of the time and resources
already committed to this case by the parties and the Court").

**Exhibit 32**
**-309-**

IPR2020-00019
Patent 8,843,125 B2

recognize that ITC final invalidity determinations do not have preclusive effect,[13] but, as a practical matter, it is difficult to maintain a district court proceeding on patent claims determined to be invalid at the ITC. Accordingly, the parties should also indicate whether the patentability disputes before the ITC will resolve all or substantially all of the patentability disputes between the parties, regardless of the stay.[14]

2. *proximity of the court's trial date to the Board's projected statutory deadline*

If the court's trial date is earlier than the projected statutory deadline, the Board generally has weighed this fact in favor of exercising authority to deny institution under *NHK*. If the court's trial date is at or around the same time as the projected statutory deadline or even significantly after the projected statutory deadline, the decision whether to institute will likely implicate other factors discussed herein, such as the resources that have been invested in the parallel proceeding.[15]

3. *investment in the parallel proceeding by the court and parties*

The Board also has considered the amount and type of work already completed in the parallel litigation by the court and the parties at the time of the institution decision. Specifically, if, at the time of the institution decision, the district court has issued substantive orders related to the patent

---

[13] *See Texas Instruments v. Cypress Semiconductor Corp.*, 90 F.3d 1558 (Fed. Cir. 1996) (holding that an invalidity determination in an ITC section 337 action does not have preclusive effect).

[14] *See infra* § II.A.4.

[15] *See, e.g.*, *infra* § II.A.3, § II.A.4.

9

**Exhibit 32**
**-310-**

IPR2020-00019
Patent 8,843,125 B2

at issue in the petition, this fact favors denial.[16]  Likewise, district court claim construction orders may indicate that the court and parties have invested sufficient time in the parallel proceeding to favor denial.[17]  If, at the time of the institution decision, the district court has not issued orders related to the patent at issue in the petition, this fact weighs against exercising discretion to deny institution under *NHK*.[18]  This investment factor is related to the trial date factor, in that more work completed by the parties and court in the parallel proceeding tends to support the arguments that the parallel proceeding is more advanced, a stay may be less likely, and instituting would lead to duplicative costs.

_____

[16] *See E-One, Inc. v. Oshkosh Corp.*, IPR2019-00162, Paper 16 at 8, 13, 20 (PTAB June 5, 2019) (district court issued preliminary injunction order after finding petitioner's invalidity contentions unlikely to succeed on the merits).

[17] *See Next Caller, Inc. v. TRUSTID, Inc.*, IPR2019-00963, Paper 8 at 13 (PTAB Oct. 28, 2019) (district court issued claim construction order); *Thermo Fisher Scientific, Inc. v. Regents of the Univ. of Cal.*, IPR2018-01370, Paper 11 at 26 (PTAB Feb. 7, 2019) (district court issued claim construction order).  We note that the weight to give claim construction orders may vary depending upon a particular district court's practices.  For example, some district courts may postpone significant discovery until after it issues a claim construction order, while others may not.

[18] *See Facebook, Inc. v. Search and Social Media Partners, LLC*, IPR2018-01620, Paper 8 at 24 (PTAB Mar. 1, 2019) (district court proceeding in its early stages, with no claim constructions having been determined); *Amazon.com, Inc. v. CustomPlay, LLC*, IPR2018-01496, Paper 12 at 8–9 (PTAB Mar. 7, 2019) (district court proceeding in its early stages, with no claim construction hearing held and district court having granted extensions of various deadlines in the schedule).

**Exhibit 32**
**-311-**

IPR2020-00019
Patent 8,843,125 B2

As a matter of petition timing, notwithstanding that a defendant has one year to file a petition,[19] it may impose unfair costs to a patent owner if the petitioner, faced with the prospect of a looming trial date, waits until the district court trial has progressed significantly before filing a petition at the Office. The Board recognizes, however, that it is often reasonable for a petitioner to wait to file its petition until it learns which claims are being asserted against it in the parallel proceeding.[20] Thus, the parties should explain facts relevant to timing. If the evidence shows that the petitioner filed the petition expeditiously, such as promptly after becoming aware of the claims being asserted, this fact has weighed against exercising the authority to deny institution under *NHK*.[21] If, however, the evidence shows

---

[19] *See* 35 U.S.C. § 315(b) (2018) (setting a one-year window from the date on which the petitioner, real party in interest, or privy of the petitioner is served with a complaint alleging infringement of the patent in which to file a petition).

[20] *See* 157 Cong. Rec. S5429 (Sept. 8, 2011) (S. Kyl) (explaining that in light of the House bill's enhanced estoppels, it is important to extend the deadline for allowing an accused infringer to seek *inter partes* review from 6 months, as proposed in the Senate bill, to one year to afford defendants a reasonable opportunity to identify and understand the patent claims that are relevant to the litigation). Our discussion of this factor focuses on the situation where the petitioner also is a defendant in the parallel litigation. If the parallel litigation involves a party different than the petitioner, this fact weighs against exercising authority to deny institution under *NHK*. *See infra* § II.A.5.

[21] *See Intel Corp.*, IPR2019-01192, Paper 15 at 12–13 (finding petitioner was diligent in filing the petition within two months of patent owner narrowing the asserted claims in the district court proceeding); *Illumina*, IPR2019-01201, Paper 19 at 8 (finding petitioner was diligent in filing the

**Exhibit 32**
-312-

Case 8:20-cv-00048-JVS-JDE   Document 207-2   Filed 09/28/20   Page 181 of 287   Page ID
#:14907
Case 5:20-cv-06128   Document 1-2   Filed 08/31/20   Page 13 of 19

IPR2020-00019
Patent 8,843,125 B2

that the petitioner did not file the petition expeditiously, such as at or around
the same time that the patent owner responds to the petitioner's invalidity
contentions, or even if the petitioner cannot explain the delay in filing its
petition, these facts have favored denial.[22]

    4.    *overlap between issues raised in the petition and in the
parallel proceeding*

In *NHK*, the Board was presented with substantially identical prior art
arguments that were at issue in the district court (as well as those previously
addressed by the Office under § 325(d)).  IPR2018-00752, Paper 8 at 20.
Thus, concerns of inefficiency and the possibility of conflicting decisions
were particularly strong.  Accordingly, if the petition includes the same or
substantially the same claims, grounds, arguments, and evidence as
presented in the parallel proceeding, this fact has favored denial.[23]
Conversely, if the petition includes materially different grounds, arguments,

---

petition several months before the statutory deadline and in response to the
patent being added to the litigation in an amended complaint).

[22] *See Next Caller, Inc. v. TRUSTID, Inc.*, IPR2019-00961, Paper 10 at 16
(PTAB Oct. 16, 2019) (weighing the petitioner's unexplained delay in filing
the petition in favor of denial of the petition and noting that had the
petitioner filed the petition around the same time as the service of its initial
invalidity contentions, the PTAB proceeding may have resolved the issues
prior to the district court).

[23] *See Next Caller*, IPR2019-00963, Paper 8 at 11–12 (same grounds
asserted in both cases); *ZTE (USA) Inc. v. Fractus, S.A.*, IPR2018-01451,
Paper 12 at 20 (PTAB Feb. 19, 2019) (same prior art and identical evidence
and arguments in both cases).

**Exhibit 32**
**-313-**

Case 8:20-cv-00048-JVS-JDE   Document 207-2   Filed 09/28/20   Page 182 of 287   Page ID
#:14908
Case 5:20-cv-06128   Document 1-2   Filed 08/31/20   Page 14 of 19

IPR2020-00019
Patent 8,843,125 B2

and/or evidence than those presented in the district court, this fact has tended to weigh against exercising discretion to deny institution under *NHK*.[24]

In many cases, weighing the degree of overlap is highly fact dependent.  For example, if a petition involves the same prior art challenges but challenges claims in addition to those that are challenged in the district court, it may still be inefficient to proceed because the district court may resolve validity of enough overlapping claims to resolve key issues in the petition.  The parties should indicate whether all or some of the claims challenged in the petition are also at issue in district court.  The existence of non-overlapping claim challenges will weigh for or against exercising discretion to deny institution under *NHK* depending on the similarity of the claims challenged in the petition to those at issue in the district court.[25]

> 5. *whether the petitioner and the defendant in the parallel proceeding are the same party*

If a petitioner is unrelated to a defendant in an earlier court proceeding, the Board has weighed this fact against exercising discretion to

———————————

[24] *See Facebook, Inc. v. BlackBerry Limited*, IPR2019-00899, Paper 15 at 12 (PTAB Oct. 8, 2019) (different prior art relied on in the petition than in the district court); *Chegg, Inc. v. NetSoc, LLC*, IPR2019-01165, Paper 14 at 11– 12 (PTAB Dec. 5, 2019) (different statutory grounds of unpatentability relied on in the petition and in the district court).

[25] *See Next Caller*, IPR2019-00961, Paper 10 at 14 (denying institution even though two petitions jointly involve all claims of patent and district court involves only a subset of claims because the claims all are directed to the same subject matter and petitioner does not argue that the non-overlapping claims differ significantly in some way or argue that it would be harmed if institution of the non-overlapping claims is denied).

**Exhibit 32
-314-**

IPR2020-00019
Patent 8,843,125 B2

deny institution under *NHK*.[26]  Even when a petitioner is unrelated to a defendant, however, if the issues are the same as, or substantially similar to, those already or about to be litigated, or other circumstances weigh against redoing the work of another tribunal, the Board may, nonetheless, exercise the authority to deny institution.[27]  An unrelated petitioner should, therefore, address any other district court or Federal Circuit proceedings involving the challenged patent to discuss why addressing the same or substantially the same issues would not be duplicative of the prior case even if the petition is brought by a different party.

> 6.  *other circumstances that impact the Board's exercise of discretion, including the merits*

As noted above, the factors considered in the exercise of discretion are part of a balanced assessment of all the relevant circumstances in the case, including the merits.[28]  For example, if the merits of a ground raised in the petition seem particularly strong on the preliminary record, this fact has

---

[26] *See Nalox-1 Pharms., LLC. v. Opiant Pharms., Inc.*, IPR2019-00685, Paper 11 at 6 (PTAB Aug. 27, 2019) (distinguishing *NHK* because in *NHK*, "the Board considered 'the status of the district court proceeding *between* the parties'" and, in the *Nalox-1* case, the petitioner was not a party to the parallel district court litigations).

[27] *See Stryker Corp. v. KFx Medical, LLC*, IPR2019-00817, Paper 10 at 27–28 (PTAB Sept. 16, 2019) (considering a jury verdict of no invalidity, based in part on evidence of secondary considerations, weighed in favor of denying institution where the unrelated petitioner failed to address this evidence in the petition).

[28] TPG at 58.

**Exhibit 32**
-315-

Case 8:20-cv-00048-JVS-JDE   Document 207-2   Filed 09/28/20   Page 184 of 287   Page ID
#:14910
Case 5:20-cv-06128   Document 1-2   Filed 08/31/20   Page 16 of 19

IPR2020-00019
Patent 8,843,125 B2

favored institution.[29]  In such cases, the institution of a trial may serve the interest of overall system efficiency and integrity because it allows the proceeding to continue in the event that the parallel proceeding settles or fails to resolve the patentability question presented in the PTAB proceeding.[30]  By contrast, if the merits of the grounds raised in the petition are a closer call, then that fact has favored denying institution when other factors favoring denial are present.[31]  This is not to suggest that a full merits analysis is necessary to evaluate this factor.[32]  Rather, there may be strengths

---

[29] *Illumina*, IPR2019-01201, Paper 19 at 8 (PTAB Dec. 18, 2019) (instituting when "the strength of the merits outweigh relatively weaker countervailing considerations of efficiency"); *Facebook, Inc. v. BlackBerry Ltd.*, IPR2019-00925, Paper 15 at 27 (PTAB Oct. 16, 2019) (same); *Abbott Vascular*, IPR2019-00882, Paper 11 at 29–30 (same); *Comcast Cable Commnc'ns., LLC v. Rovi Guides, Inc.*, IPR2019-00231, Paper 14 at 11 (PTAB May 20, 2019) (instituting because the proposed grounds are "sufficiently strong to weigh in favor of not denying institution based on § 314(a)").

[30] Were a final judgment entered on the patentability issues in the parallel proceeding, the parties may jointly request to terminate the PTAB proceeding in light of the fully resolved parallel proceeding.  *See* 37 C.F.R. § 42.72.

[31] *E-One*, IPR2019-00162, Paper 16 at 8, 13, 20 (denying institution based on earlier district court trial date, weakness on the merits, and the district court's substantial investment of resources considering the invalidity of the challenged patent).

[32] Of course, if a petitioner fails to present a reasonable likelihood of prevailing as to unpatentability of at least one challenged claim, then the Board may deny the petition on the merits and may choose not to reach a patent owner's discretionary denial arguments.

**Exhibit 32**
**-316-**

IPR2020-00019
Patent 8,843,125 B2

or weaknesses regarding the merits that the Board considers as part of its balanced assessment.[33]

### C.    Other Considerations

Other facts and circumstances may also impact the Board's discretion to deny institution.  For example, factors unrelated to parallel proceedings that bear on discretion to deny institution include the filing of serial petitions,[34] parallel petitions challenging the same patent,[35] and considerations implicated by 35 U.S.C. § 325(d).[36]  The parties should explain whether these or other facts and circumstances exist in their proceeding and the impact of those facts and circumstances on efficiency and integrity of the patent system.

### III.    ORDER

The panel requests that the parties submit supplemental briefing, as set forth below, to present on the record facts in this case relevant to the factors discussed above.  The supplemental briefing may be accompanied by

_____

[33] *See id.* at 13–20 (finding weaknesses in aspects of petitioner's challenges).

[34] *See Valve Corp. v. Elec. Scripting Prods., Inc.*, IPR2019-00064, Paper 10 (PTAB May 1, 2019) (precedential); *Valve Corp. v. Elec. Scripting Prods., Inc.*, IPR2018-00752, Paper 8 (PTAB Sept. 12, 2018); *Gen. Plastic Indus. Co. v. Canon Kabushiki Kaisha*, IPR2016-01357, Paper 19 (PTAB Sept. 6, 2017) (precedential as to § II.B.4.i).

[35] TPG at 59–61.

[36] *See Advanced Bionics, LLC v. MED-EL Elektromedizinische Geräte GmbH*, IPR2019-01469, Paper 6 (PTAB Feb. 13, 2020) (discussing two-part framework for applying discretion to deny institution under 35 U.S.C. § 325(d)).

**Exhibit 32**
**-317-**

IPR2020-00019
Patent 8,843,125 B2

documentary evidence in support of any facts asserted in the supplemental briefing, but may not be accompanied by declaratory evidence.

Accordingly, it is

ORDERED that Petitioner is authorized to file a reply to the Preliminary Response, no more than ten (10) pages and limited to addressing the issue of discretionary denial under 35 U.S.C. § 314(a), by March 27, 2020; and it is

FURTHER ORDERED that Patent Owner is authorized to file a sur-reply to Petitioner's reply, no more than ten (10) pages and limited to the issue of discretionary denial under 35 U.S.C. § 314(a), by April 3, 2020.

Exhibit 32
-318-

IPR2020-00019
Patent 8,843,125 B2

For PETITIONER:

Travis Jensen
K. Patrick Herman
ORRICK, HERRINGTON & SUTCLIFFE LLP
T61PTABDocket@orrick.com
P52PTABDocket@orrick.com
Apple-Fintiv_OHS@orrick.com

For PATENT OWNER:

Jonathan K. Waldrop
Rodney R. Miller
John W. Downing
KASOWITZ BENSON TORRES LLP
jwaldrop@kasowitz.com
rmiller@kasowitz.com
jdowning@kasowitz.com

**Exhibit 32**
**-319-**

JS-CAND 44 (Rev. 07/19)

# CIVIL COVER SHEET

The JS-CAND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Apple Inc., Cisco Systems, Inc., Google LLC, Intel Corporation | Andrei Iancu, in his official capacity as Under Secretary of Commerce for Intellectual Property and Director, U.S. Patent and Trademark Office |
| **(b)** County of Residence of First Listed Plaintiff   Santa Clara County, CA *(EXCEPT IN U.S. PLAINTIFF CASES)* | County of Residence of First Listed Defendant *(IN U.S. PLAINTIFF CASES ONLY)* NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |
| **(c)** Attorneys *(Firm Name, Address, and Telephone Number)* See attachment | Attorneys *(If Known)* |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [X] 2 U.S. Government Defendant
- [ ] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | 1 | 1 | Incorporated *or* Principal Place of Business In This State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated *and* Principal Place of Business In Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 6 | 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | 625 Drug Related Seizure of Property 21 USC § 881 | 422 Appeal 28 USC § 158 | 375 False Claims Act |
| 120 Marine | 310 Airplane | 365 Personal Injury – Product Liability | 690 Other | 423 Withdrawal 28 USC § 157 | 376 Qui Tam (31 USC § 3729(a)) |
| 130 Miller Act | 315 Airplane Product Liability | 367 Health Care/ Pharmaceutical Personal Injury Product Liability | **LABOR** | **PROPERTY RIGHTS** | 400 State Reapportionment |
| 140 Negotiable Instrument | 320 Assault, Libel & Slander | | 710 Fair Labor Standards Act | 820 Copyrights | 410 Antitrust |
| 150 Recovery of Overpayment Of Veteran's Benefits | 330 Federal Employers' Liability | 368 Asbestos Personal Injury Product Liability | 720 Labor/Management Relations | 830 Patent | 430 Banks and Banking |
| | 340 Marine | | 740 Railway Labor Act | 835 Patent—Abbreviated New Drug Application | 450 Commerce |
| 151 Medicare Act | 345 Marine Product Liability | **PERSONAL PROPERTY** | 751 Family and Medical Leave Act | 840 Trademark | 460 Deportation |
| 152 Recovery of Defaulted Student Loans (Excludes Veterans) | 350 Motor Vehicle | 370 Other Fraud | 790 Other Labor Litigation | **SOCIAL SECURITY** | 470 Racketeer Influenced & Corrupt Organizations |
| | 355 Motor Vehicle Product Liability | 371 Truth in Lending | 791 Employee Retirement Income Security Act | 861 HIA (1395ff) | 480 Consumer Credit |
| 153 Recovery of Overpayment of Veteran's Benefits | 360 Other Personal Injury | 380 Other Personal Property Damage | **IMMIGRATION** | 862 Black Lung (923) | 485 Telephone Consumer Protection Act |
| | 362 Personal Injury -Medical Malpractice | 385 Property Damage Product Liability | 462 Naturalization Application | 863 DIWC/DIWW (405(g)) | 490 Cable/Sat TV |
| 160 Stockholders' Suits | | | | 864 SSID Title XVI | 850 Securities/Commodities/ Exchange |
| 190 Other Contract | **CIVIL RIGHTS** | **PRISONER PETITIONS** | 465 Other Immigration Actions | 865 RSI (405(g)) | 890 Other Statutory Actions |
| 195 Contract Product Liability | 440 Other Civil Rights | **HABEAS CORPUS** | | **FEDERAL TAX SUITS** | 891 Agricultural Acts |
| 196 Franchise | 441 Voting | 463 Alien Detainee | | 870 Taxes (U.S. Plaintiff or Defendant) | 893 Environmental Matters |
| **REAL PROPERTY** | 442 Employment | 510 Motions to Vacate Sentence | | 871 IRS–Third Party 26 USC § 7609 | 895 Freedom of Information Act |
| 210 Land Condemnation | 443 Housing/ Accommodations | 530 General | | | 896 Arbitration |
| 220 Foreclosure | 445 Amer. w/Disabilities– Employment | 535 Death Penalty | | | [X] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| 230 Rent Lease & Ejectment | 446 Amer. w/Disabilities–Other | **OTHER** | | | 950 Constitutionality of State Statutes |
| 240 Torts to Land | 448 Education | 540 Mandamus & Other | | | |
| 245 Tort Product Liability | | 550 Civil Rights | | | |
| 290 All Other Real Property | | 555 Prison Condition | | | |
| | | 560 Civil Detainee– Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation–Transfer
- [ ] 8 Multidistrict Litigation–Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
5 U.S.C. s 701-706

Brief description of cause:
Challenge to USPTO rule as violating the Administrative Procedure Act and the America Invents Act

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, Fed. R. Civ. P.

DEMAND $

CHECK YES only if demanded in complaint:
**JURY DEMAND:** [ ] Yes [X] No

## VIII. RELATED CASE(S), IF ANY *(See instructions)*:

JUDGE

DOCKET NUMBER

## IX. DIVISIONAL ASSIGNMENT (Civil Local Rule 3-2)
*(Place an "X" in One Box Only)*

- [ ] SAN FRANCISCO/OAKLAND
- [X] SAN JOSE
- [ ] EUREKA-MCKINLEYVILLE

| DATE | 08/31/2020 | SIGNATURE OF ATTORNEY OF RECORD | /s/ Mark D. Selwyn |
|---|---|---|---|

**Exhibit 32**
**-320-**

Case 8:20-cv-00048-JVS-JDE   Document 207-2   Filed 09/28/20   Page 189 of 287   Page ID
#:14915
Case 5:20-cv-06128   Document 1-3   Filed 08/31/20   Page 2 of 4

JS-CAND 44 (rev. 07/19)

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-CAND 44

**Authority For Civil Cover Sheet.** The JS-CAND 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I. a) **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

b) **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

c) **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)."

II. **Jurisdiction.** The basis of jurisdiction is set forth under Federal Rule of Civil Procedure 8(a), which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

(1) <u>United States plaintiff.</u> Jurisdiction based on 28 USC §§ 1345 and 1348. Suits by agencies and officers of the United States are included here.

(2) <u>United States defendant.</u> When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

(3) <u>Federal question.</u> This refers to suits under 28 USC § 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

(4) <u>Diversity of citizenship.</u> This refers to suits under 28 USC § 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

III. **Residence (citizenship) of Principal Parties.** This section of the JS-CAND 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV. **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

V. **Origin.** Place an "X" in one of the six boxes.

(1) <u>Original Proceedings.</u> Cases originating in the United States district courts.

(2) <u>Removed from State Court.</u> Proceedings initiated in state courts may be removed to the district courts under Title 28 USC § 1441. When the petition for removal is granted, check this box.

(3) <u>Remanded from Appellate Court.</u> Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

(4) <u>Reinstated or Reopened.</u> Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

(5) <u>Transferred from Another District.</u> For cases transferred under Title 28 USC § 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

(6) <u>Multidistrict Litigation Transfer.</u> Check this box when a multidistrict case is transferred into the district under authority of Title 28 USC § 1407. When this box is checked, do not check (5) above.

(8) <u>Multidistrict Litigation Direct File.</u> Check this box when a multidistrict litigation case is filed in the same district as the Master MDL docket.

<u>Please note that there is no Origin Code 7.</u> Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

VI. **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** <u>Example:</u> U.S. Civil Statute: 47 USC § 553. <u>Brief Description:</u> Unauthorized reception of cable service.

VII. **Requested in Complaint.** <u>Class Action.</u> Place an "X" in this box if you are filing a class action under Federal Rule of Civil Procedure 23.

<u>Demand.</u> In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.

<u>Jury Demand.</u> Check the appropriate box to indicate whether or not a jury is being demanded.

VIII. **Related Cases.** This section of the JS-CAND 44 is used to identify related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

IX. **Divisional Assignment.** If the Nature of Suit is under Property Rights or Prisoner Petitions or the matter is a Securities Class Action, leave this section blank. For all other cases, identify the divisional venue according to Civil Local Rule 3-2: "the county in which a substantial part of the events or omissions which give rise to the claim occurred or in which a substantial part of the property that is the subject of the action is situated."

**Date and Attorney Signature.** Date and sign the civil cover sheet.

**Exhibit 32**
**-321-**

**Attachment to Civil Cover Sheet for**

***Apple Inc., et. al. v. Andrei Iancu***

**I. (c)**   The following attorneys are designated as attorneys of record for Apple Inc., Cisco Systems, Inc., and Intel Corporation:

1. Mark D. Selwyn

   Wilmer Cutler Pickering Hale and Dorr LLP
   950 Page Mill Road
   Palo Alto, California 94304
   (650) 858-6000

2. Catherine M.A. Carroll

   Wilmer Cutler Pickering Hale and Dorr LLP
   1875 Pennsylvania Avenue NW
   Washington, DC 20006
   (202) 663-6000

3. David M. Lehn

   Wilmer Cutler Pickering Hale and Dorr LLP
   1875 Pennsylvania Avenue NW
   Washington, DC 20006
   (202) 663-6000

4. Alyson Zureick

   Wilmer Cutler Pickering Hale and Dorr LLP
   7 World Trade Center
   250 Greenwich Street
   New York, NY 10007
   (212) 230-8800

5. Rebecca Lee

   Wilmer Cutler Pickering Hale and Dorr LLP
   1875 Pennsylvania Avenue NW
   Washington, DC 20006
   (202) 663-6000

**Exhibit 32**
**-322-**

The following attorneys are designated as attorneys of record for Google LLC:

1.  Daniel T. Shvodian

    Perkins Coie LLP
    3150 Porter Drive
    Palo Alto, CA 94304
    (650) 838-4300

2.  Theresa Nguyen

    Perkins Coie LLP
    1201 Third Avenue, Suite 4900
    Seattle, WA  98101
    (206) 359-6068

3.  Andrew T. Dufresne

    Perkins Coie LLP
    33 East Main Street, Suite 201
    Madison, WI  53703
    (608) 663-7499

**Exhibit 32**
**-323-**

# EXHIBIT 33

SKIP NAVIGATION

▶ YouTube **Premium**



Live chat replay was turned off for this video.

## Apple Event — September 15

13,541,715 views • Streamed live on Sep 15, 2020          👍 450K      👎 42K      ➦ SHARE      SAVE      •••

**Apple** ✓
12.5M subscribers                                                                      SUBSCRIBE

Watch the Apple Special Event and learn about the latest updates for Apple Watch, iPad Air, and
more.

SHOW MORE

Up next                                                                      AUTOPLAY  ◯

WWDC 2020 Special Event Keynote — Apple
Apple ✓
11M views • Streamed 3 months ago

SKIP NAVIGATION

Exhibit 33
-324-

9/26/2020                                    Apple Event — September 15 - YouTube

   Premium

    



**Apple - September Event 2015**

Apple ✓

2.8M views • 5 years ago



**Introducing Apple Watch Series 6 — It Already Does That**

Apple ✓

25M views • 1 week ago



**Apple - WWDC 2015**

Apple ✓

2M views • 5 years ago



**Introducing iPad Air — Apple**

Apple ✓

11M views • 1 week ago



**iPad Pro — How to correctly use a computer — Apple**

Apple ✓

5.5M views • 6 months ago



**Apple Music – Taylor vs. Treadmill**

Apple ✓

12M views • 3 years ago



**Apple - WWDC 2014**

Apple ✓

2.3M views • 6 years ago



**Mix - Apple**

YouTube



**Introducing the new MacBook Air — Apple**

Apple ✓

8.8M views • 1 year ago

Apple — September Event 2016

Exhibit 33
-325-

# EXHIBIT 34

9TO5Mac

Apple Health OVERVIEW  •  UPDATED SEPTEMBER 14, 2020

# Apple Health
Apple's next big thing

310 'Apple Health' stories
July 2011 - September 2020

[ See All Stories ]



When the Apple Watch was originally released in 2015, it was pitched as a great watch, an intimate way to communicate, and a comprehensive fitness device. While the original Apple Watch (later renamed Series 0) lacked GPS and was generally a slow device, it has shown dramatic improvements year over year particularly for Apple's health initiatives.

When Apple released the Series 1 and Series 2 Apple Watches, it added heart rate monitoring for Apple Health. When you enable heart rate monitoring, you  can also turn on heart rate notifications, so you know if your heart rate remains above or below a chosen beats per minute (BPM), or to occasionally check for an irregular heart rhythm. Irregular rhythm notifications are available only with watchOS 5.1.2 or later in certain countries.



With Apple Watch Series 4, Apple added a electrocardiogram monitoring (also known as ECG and EKG). The ECG app on Apple Watch (Series 4 or newer) can record your heartbeat and rhythm using the electrical heart sensor and then check the reading for atrial fibrillation (AFib). It then records that information into the Apple Health app.

Since the release of Apple Watch, there have been countless stories of people's lives being saved by the health advancements in Apple Watch and Apple's Health initiatives.



Exhibit 34
-326-

If you have an Apple Watch Series 4 or newer, here's a how-to guide on how to take an ECG.

Apple also includes a Health app on the iPhone where it's easy to learn about your health and start reaching your goals. It consolidates data from iPhone, Apple Watch, and third-party apps in one place.

Top Stories on Apple Health

- Apple Watch user discovers A-fib heart issue with new ECG app, 'this probably saved you,' says doctor
- How Apple Watch saved one man's life — and how it's empowering him after his heart attack
- Apple Watch again credited with saving a life as it leads New York man to discover erupted ulcer
- Apple Watch skeptic discovers Afib days after ECG app reaches Europe
- How to share ECG results with your doctor
- Apple Watch customer identifies Afib heart condition after dismissing symptoms as 'holiday anxiety'
- Apple Watch credited with alerting Seattle man his A-fib had returned, potentially preventing stroke
- Reddit user says Apple Watch saved his life helping detect supraventricular tachycardia
- Tim Cook shares story of user who discovered A-fib and other health issues with Apple Watch
- Apple Watch fall detection sent emergency services to the aid of an 80-year-old woman

Apple Health STORIES • SEPTEMBER 14

## [Update: September 2020] Working out with Apple Watch? These smart scales sync weight with iPhone

Zac Hall - Sep. 14th 2020 2:05 am PT ▼ @apollozac

APPLE WATCH    APPLE HEALTH    HEALTHKIT



28 Comments    Facebook    Twitter    Pinterest    LinkedIn    Reddit

Apple Watch can help you stay motivated to exercise and improve your health, and smart scales that sync data to the iPhone can be a fun and useful way to track your progress. If you want to easily collect your weight and other measurement data in the Health app on iPhone, the trick is to find a scale that works with HealthKit. Here are some of the current options on the market:

EXPAND FULL STORY +

Apple Health STORIES • AUGUST 7

## Apple Watch Fall Detection could send your health data to emergency services

Ben Lovejoy - Aug. 7th 2020 6:46 am PT ▼ @benlovejoy

APPLE WATCH    APPLE HEALTH    PATENTS



3 Comments    Facebook    Twitter    Pinterest    LinkedIn    Reddit

Apple Watch Fall Detection has been credited with saving a number of lives, thanks to its ability to automatically call emergency services if it detects you falling and you don't confirm that you're ok.

But the feature could get even more sophisticated in future, with the ability to send comprehensive

Exhibit 34
-327-


FitTech Pep Fitness Tracker with...
$79.99 $229.99
This sleek, stylish, and affordable blood pressure watch is the perfect daily...
FitTech

Apple Health STORIES • AUGUST 4

## Apple teams up with UCLA on mental health study using Apple Watch, iPhone, and Beddit sleep tracker

Chance Miller - Aug. 4th 2020 12:08 pm PT · @ChanceHMiller

APPLE WATCH    APPLE HEALTH



Apple and UCLA are teaming up on a new three-year study to understand how factors including sleep, physical activity, heart rate, and daily routines can play a role in depression and anxiety. As first reported by CNBC, UCLA will use data collected by iPhone, Apple Watch, and the Beddit sleep tracker. The study begins this week.

EXPAND FULL STORY +



Polestar is going to bring this cool electric car concept to production

Tesla Model 3 with 100,000 miles shows extreme low cost and minimal battery degradation

Climate Week NYC: Prince Charles: We must take 'swift action'

Apple Health STORIES • JULY 30

## Feature Request: Make it easier to see your key Health app data at a glance

Ben Lovejoy - Jul. 30th 2020 5:40 am PT · @benlovejoy

APPLE HEALTH    FEATURE REQUEST



Thanks to technology, there's never been an easier time to work on your health, fitness, or weight. Instead of the old days, when you had to make an effort to time your exercises, keep your own records of your weight, calculate your own BMI, and so on, a combination of hardware and software means that almost all of it can be done automatically. And even better, your Health app data pulls together almost all of it in one place.

Exhibit 34
-328-

The app offers a vast array of stats, and helpfully allows you to favorite the metrics that are most relevant to your chosen activity, which then appear at the summit of your workout screen.

**EXPAND FULL STORY +**

Apple Health STORIES • JULY 1

## Doctor says Apple Watch diagnosed his critical heart disease, saved his life

Ben Lovejoy · Jul. 1st 2020 5:37 am PT  🐦 @benlovejoy

APPLE WATCH    APPLE HEALTH



| 5 Comments | f Facebook | 🐦 Twitter | 📌 Pinterest | in LinkedIn | Reddit |

The Apple Watch's ECG feature can officially only indicate atrial fibrillation, but an anesthesiologist working at a California hospital says that it picked up on a critical heart disease so serious that he requires a bypass operation.

Dr. Donald W Milne from Antelope Valley Hospital shared the story with us and has also written to Tim Cook ...

**EXPAND FULL STORY +**

Apple Health STORIES • JUNE 23

## iOS 14: HealthKit expands ECGs with new API, new symptom tracking and mobility types

Michael Potuck · Jun. 23rd 2020 3:27 pm PT  🐦 @michaelpotuck

APPLE HEALTH    HEALTHKIT

| 1 Comment | f Facebook | 🐦 Twitter | 📌 Pinterest | in LinkedIn | Reddit |

Health and fitness is a big focus for Apple and with iOS 14 and watchOS 7, HealthKit is seeing improvements for developers to do even more with health-related apps. Updates include a new ECG API that offers read access to third-parties, 13 new symptoms that can be tracked, as well as four new mobility data types.

**EXPAND FULL STORY +**

9TO5TOYS  f  🐦  ▶

Today's Amazon Gold Box tackles muscle pain with Naipo massagers from $37

Add blood pressure to Apple Health using Withings BPM Connect: $83 (Reg. $100)

Ditch keys with Kwikset's $44.50 Powerbolt 2 Passcode Deadbolt (Reg. $55)

Apple's Lightning to SD Card Adapter hits new low of $24, more up to 31% off

Powered by WordPress VIP

Exhibit 34
-329-

# EXHIBIT 35



HEALTHCARE & PHARMA    JULY 23, 2020 / 9:09 AM / UPDATED 2 MONTHS AGO

## Could your Fitbit or Apple Watch detect early COVID-19 symptoms?

By Aleksandra Michalska                              4 MIN READ    f  𝕏

NEW YORK (Reuters) - Fitbit and other wearable devices typically linked to exercise are being studied as ways to identify people who are potentially infected with COVID-19 before symptoms appear, when they can unknowingly spread the disease.



Tour to distribute whoop to every player caddy.

Changes in heart rate, respiratory rate, and other biometrics measured constantly by the devices may flag the early stages of virus infection, so an otherwise healthy-looking person knows to self-isolate and seek a COVID-19 diagnostic test, researchers say.

"When you get ill, even before you know it, your body starts changing, your heart rate goes up," said Professor Michael Snyder of Stanford University School of Medicine.

Stanford researchers are among several groups examining whether wearable fitness devices such as the Fitbit or Apple Watch can provide an early warning. Snyder's team enrolled 5,000 people in the study and studied historical smartwatch data from 31 users who tested positive for COVID-19.

Of those 31, 80 percent had data on their wearable devices that indicated infection at the time or before symptoms appeared. Wearable devices picked up the signals of infection early - at the time or before symptoms appeared - in an average of three days.

ADVERTISEMENT

In one case, Snyder's team found that a smartwatch was able to spot the first signal of potential COVID-19 infection nine days before more obvious symptoms were reported.

"We can tell when someone's getting ill before symptoms. That's super powerful," Snyder said. "You can tell people to stay at home. Don't go out, infect other people."

The new coronavirus has infected more than 15 million people, and killed more than 600,000 worldwide since it was first identified in January. Early tell-tale symptoms include cough, fever, and loss of smell.

Large tech companies hope smartwatches can replace slowing sales of their main offerings, with a pitch to consumers that the wearable gadgets can improve their lifestyles. Apple Watch has been regarded as the industry's top success, with

ADVERTISEMENT

TRENDING STORIES

PROUD BOYS RALLY DRAWS FEWER
THAN EXPECTED IN PORTLAND

SPECIAL REPORT: WILL YOUR MAIL
BALLOT COUNT IN THE U.S.
PRESIDENTIAL ELECTION? IT MAY
DEPEND ON WHO'S COUNTING AND
WHERE

TOP U.S. REPUBLICANS PLEDGE
PEACEFUL TRANSITION AS TRUMP SOWS
ELECTION DOUBTS

PUTIN SAYS RUSSIA AND U.S. SHOULD
AGREE NOT TO MEDDLE IN EACH
OTHER'S ELECTIONS

TRUMP PICKS BARRETT AS HE MOVES
TO TILT U.S. SUPREME COURT
RIGHTWARD

Exhibit 35
-330-

Google agreeing to buy Fitbit last year for $2.1 billion in hopes of catching up.



Fitbit is conducting its own research into how its devices can help with COVID-19 early detection, involving 100,000 people in the U.S. and Canada, including 900 diagnosed with the virus.

"We've seen the changes in breathing rates and heart rates that we suspected would happen," said Fitbit's lead research scientist Conor Heneghan.

Slideshow ( 4 images )

Device makers also are studying possible early signs of COVID-19 infection among professional athletes who wear personalized fitness trackers, like Whoop, a wristband, and Oura, a ring worn on your finger.

Promising results from separate university studies of the Oura ring, produced by Oura Health, prompted the National Basketball League to purchase 2,000 devices to be worn by players and staff to keep a close eye on heart rate and temperature. The PGA Tour bought 1,000 Whoop bands for players, caddies, and media covering the golf tournament, said Whoop founder Will Ahmed.

ADVERTISEMENT

"They're using the technology to measure everything about their bodies, but especially respiratory rate, which we've found is a very important statistic for understanding COVID-19," Ahmed said.

(This story corrects 5th graf to show 80 percent of 31 confirmed cases indicated infection at the time or before symptoms appeared; Corrects 10th graf to show study involves 900 people diagnosed with the virus)

Writing by Barbara Goldberg; Editing by Alistair Bell

*Our Standards: The Thomson Reuters Trust Principles.*

MORE FROM REUTERS

REUTERS NEWS NOW

Subscribe to our daily curated newsletter to receive the latest exclusive Reuters coverage delivered to your inbox.

Enter email address

Submit

PAID PROMOTIONAL LINKS

Promoted by Dianomi





The Worst Way to Withdraw From Retirement Accounts
smartasset

Motley Fool Issues Rare "All In" Buy Alert
The Motley Fool



Learning From Your Trade Losers
Charles Schwab

Why This Man is Warning Americans About the Pump in the Stock Market
Weiss Ratings

Exhibit 35
-331-

MORE FROM REUTERS

REUTERS

Proud Boys rally has Portland in state of emergency
26 Sept

REUTERS

Australia says world needs to know origins of COVID-19
26 Sept

REUTERS

Factbox: Notable legal opinions of U.S. Supreme Court nominee Amy...
25 Sept

REUTERS

Minnesota, Montana and South Dakota report record rises in COVID cases
26 Sept

REUTERS

FAA chief set to conduct 737 MAX evaluation flight next week
25 Sept

MORE FROM REUTERS

REUTERS

Some 3,500 U.S. companies sue over Trump-imposed Chinese tariffs
25 Sept

REUTERS

Putin calls for reset in cyber ties with U.S., no election meddling...
25 Sept

REUTERS
REUTERS

Instant View: Reaction to Trump plan to pick Amy Coney Barrett for...
26 Sept

REUTERS
Johnson&Johnson
EST. 1886 | LISTED 1944

Johnson & Johnson COVID-19 vaccine produces strong immune...
25 Sept

REUTERS
NETFLIX

Netflix says it does not agree with Chinese author's views on...
26 Sept

Apps   Newsletters   Advertise with Us   Advertising Guidelines   Cookies   Terms of Use   Privacy
Do Not Sell My Personal Information

All quotes delayed a minimum of 15 minutes. See here for a complete list of exchanges and delays.
© 2020 Reuters. All Rights Reserved.

**Exhibit 35**
**-333-**

# EXHIBIT 36

1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**
9                   **SOUTHERN DISTRICT OF CALIFORNIA**
10

11   WHALEN FURNITURE MFG., INC.,          CONSOLIDATED CASE NO. 11-
                                           CV-2958-H (DHB)
12              Plaintiff-Counterdefendant,
                                           **ORDER DENYING**
13        vs.                              **DEFENDANTS' MOTION TO**
                                           **STAY PENDING REEXAM**
14                                         **WITHOUT PREJUDICE**
     Z-LINE DESIGNS, INC., et al.,
15                                         [Doc. Nos. 92, 93]
                Defendants-Counterclaimants.
16

17
18        On June 14, 2013, Defendants Z-Line Designs, Inc. ("Z-Line") and Bell'O
19   International ("Bell'O") (collectively "Defendants") filed a motion to stay the action
20   pending reexamination of the asserted patents. (Doc. Nos. 92, 93.) On June 28, 2013,
21   Whalen Furniture Mfg., Inc. ("Whalen") filed a response in opposition to Defendants'
22   motion to stay. (Doc. No. 100.) On July 3, 2013, Defendant Bell'O filed its reply.
23   (Doc. No. 101.) On July 17, 2013, the Court held a telephonic hearing on Defendants'
24   motions. Paul Hayes and Kevin Gannon appeared for Whalen. Megan Chung appeared
25   for Z-Line.   Gregory Gerwitz, Keir Loiacono, Russell Faegenburg, and Peter
26   Stockburger appeared for Bell'O. For the reasons below, the Court denies Defendants'
27   motion to stay.
     ///
28

                                   - 1 -                        11cv2958

**Exhibit 36**
**-334-**

Case 8:20-cv-00048-JVS-JDE   Document 207-2   Filed 09/28/20   Page 207 of 287   Page ID
Case 3:11-cv-02958-H-DHB   Document 108   Filed 06/12/13   PageID.4034   Page 2 of 8
#:14983

**Background**

I.      **The Federal Action**

This is a patent infringement action brought by Whalen accusing Defendants Z-Line, Bell'O, TechCraft Manufacturing, Inc. ("TechCraft"), and Walker Edison Furniture Co., Inc. ("Walker") of infringing U.S. Patent Nos. 8,079,311 ("the '311 Patent") and 8,191,485 ("the '485 Patent") (collectively, the "patents-in-suit"). The invention claimed in the patents-in-suit relates to a universal TV support and mounting kit that allows the consumer to employ at least three different modes of support for a flat panel television: stand mount, console mount, and wall mount. See U.S. Patent No. 8,079,311 (filed Sept. 24, 2007); U.S. Patent No. 8,191,485 (filed Dec. 12, 2011).

In December 2011, Whalen filed separate actions against each Defendant alleging infringement of the '311 Patent. (Doc. No. 1; [11-cv-2988] Doc. No. 1; [11-cv-2998] Doc. No. 1; [11-cv-3001] Doc. No. 1.) On June 5, 2012, Whalen filed an additional action against each Defendant alleging infringement of the '485 Patent. (Doc. No. 25; [11-cv-2988] Doc. No. 30; [11-cv-2998] Doc. No. 23; [11-cv-3001] Doc. No. 24.) In July 2012, the Court consolidated the two actions against each Defendant into a single action against each Defendant. (Id.)

On December 21, 2012, the Court issued a consolidated claim construction order, construing the disputed terms of the '311 Patent and the '485 Patent. (Doc No. 45.) On February 20, 2013, the Court consolidated the four actions against each Defendant into a single action. (Doc. No. 59.) On February 27, 2013, the Court dismissed Defendant Walker. (Doc. No. 64.) On May 20, 2013, the Court dismissed Defendant TechCraft. (Doc. No. 80.)

II.     **The Reexam Proceedings**

On September 10, 2012, Bell'O filed requests for inter partes reexamination of the patents-in-suit. (Doc. No. 92-2, Declaration of Keir Loiancono ("Loiancono Decl.") Exs. 3-4.) Specifically, Bell'O sought reexamination of all the claims from the patent-in-suit that Whalen is asserting against Bell'O in the present action. (Compare

**Exhibit 36
-335-**

Case 8:20-cv-00048-JVS-JDE   Document 207-2   Filed 09/28/20   Page 208 of 287   Page ID
Case 3:11-cv-02958-H-DHB   Document 108   Filed 06/12/13   PageID.4035   Page 3 of 8
#:14994

1   id. (reexamination requests) <u>with</u> Doc. No. 92-2, Loiancono Decl. Ex. 1-2 (Whalen's

2   infringement contentions against Bell'O).)

3        On November 9, 2012, the PTO granted Bell'O's requests to institute inter partes

4   reexamination of all of the requested claims-claims 1-16 of the '311 Patent and claims

5   1-8 of the '485 Patent. (Doc. No. 92-2, Loiancono Decl. Exs. 5-6.) On November 9,

6   2012, the PTO also issued office actions rejecting claims 1-16 of the '311 Patent and

7   claims 1-8 of the '485 Patent. (<u>Id.</u> Exs. 7-8.) By January 9, 2013, Whalen filed

8   responses to the office action rejections. (<u>Id.</u> Exs. 9-10.)

9        On May 29 and 31, 2013, the PTO issued Actions Closing Prosecution ("ACP")

10   for the '311 Patent and the '485 Patent. (Doc. No. 92-2, Loiancono Decl. Exs. 11, 12.)

11   In the ACPs, the PTO affirmed its rejections of claims 1-16 of the '311 Patent and

12   claims 1-8 of the '485 Patent as both anticipated and obvious under 35 U.S.C. §§ 102

13   and 103 in light of several prior art references. (<u>See</u> <u>id.</u>)

14                             **Discussion**

15   **I.**     **Legal Standards**

16        "A patent is presumed to be valid, and this presumption only can be overcome

17   by clear and convincing evidence to the contrary." <u>Enzo Biochem, Inc. Gen-Probe Inc.</u>,

18   424 F.3d 1276, 1281 (Fed. Cir. 2005) (citation omitted). However, "[a]ny person at any

19   time may file a request for reexamination by the Office of any claim of a patent on the

20   basis of any prior art . . . ." 35 U.S.C. § 302.

21        "Courts have inherent power to manage their dockets and stay proceedings,

22   including the authority to order a stay pending conclusion of a PTO reexamination."

23   <u>Ethicon, Inc. v. Quigg</u>, 849 F.2d 1422, 1426-27 (Fed. Cir. 1988) (citation omitted); <u>see</u>

24   <u>also</u> <u>Landis v. N. Am. Co.</u>, 299 U.S. 248, 254 (1936) (stating that a district court is

25   vested with the discretion to stay an action based on its inherent power to control its

26   own docket). District courts in the Ninth Circuit consider three factors in determining

27   whether to stay an action pending reexamination of a patent: "'(1) whether a stay will

28   simplify the issues in question and trial of the case; (2) whether discovery is complete

**Exhibit 36**
**-336-**

1   and whether a trial date has been set; and (3) whether a stay would unduly prejudice or

2   present a clear tactical disadvantage to the nonmoving party.'" Tierravision, Inc. v.

3   Google, Inc., 2012 U.S. Dist. LEXIS 21463, at *3 (S.D. Cal. Feb. 21, 2012); accord

4   Medicis Pharmaceutical Corp. v. Upsher-Smith Labs., Inc., 486 F. Supp. 2d 990, 993-94

5   (D. Ariz. 2007); In re Cygnus Telecomms. Tech., LLC, 385 F. Supp. 2d 1022, 1023

6   (N.D. Cal. 2005).  The determination of whether to stay a case is within the district

7   court's discretion, Patlex Corp. v. Mossinghoff, 758 F.2d 594, 602-03 (Fed. Cir. 1985),

8   and a district court is not required to stay an action in light of a reexamination

9   proceeding. Viskase Corp. v. American Nat'l Can Co., 261 F.3d 1316, 1328 (Fed. Cir.

10  2001).

11  **II.    Analysis**

12           A.    The Simplification of Issues

13           "[W]aiting for the outcome of the reexamination could eliminate the need for trial

14  if the claims are cancelled or, if the claims survive, facilitate trial by providing the court

15  with expert opinion of the PTO and clarifying the scope of the claims." Target

16  Therapeutics, Inc. v. SciMed Life Sys., Inc., 1995 U.S. Dist. LEXIS 22517, at *4-5

17  (N.D. Cal. Jan. 13, 1995).  In the ACPs, the PTO has rejected all of the claims in the

18  patents-in-suit that Whalen is asserting against Bell'O in this action.  (Compare Doc.

19  No. 92-2, Loiancono Decl. Exs. 3-4 with id. Exs. 1-2.)  Therefore, if the PTO maintains

20  its rejections, the reexamination will likely resolve the action between Whalen and

21  Bell'O.  This weighs toward granting a stay.  See Pragmatus AV, LLC v. Facebook,

22  Inc., 2011 U.S. Dist. LEXIS 117147, at *7-8 (N.D. Cal. Oct. 11, 2011) (finding this

23  factor weighs towards a stay where the reexamination proceedings involve all the

24  asserted claims).  But, the reexamination proceedings would not completely resolve the

25  action between Whalen and Z-Line.  Dependent Claim 17 of the '311 Patent is asserted

26  against Z-Line, but is not subject to the reexamination proceedings.  (See Doc. No.

27  92-2, Loiancono Decl. Exs. 3-4.)  Defendants argue this should not affect the stay

28  analysis because if the other claims are invalidated through reexamination, Claim

- 4 -

11cv2958

**Exhibit 36
-337-**

1   17–which is directed to a minor feature–would also be invalid.  (Doc. No. 93 at 2-6;

2   Doc. No. 92-1 at 10 n.3.)  Even assuming this is true, some further proceedings before

3   this Court would still be required to invalidate Claim 17, either through a motion for

4   summary judgment or a trial.  Therefore, this factors weighs towards granting a stay,

5   but only slightly.

6           **B.**    <u>The Stage of the Proceedings</u>

7         This factor primarily focuses on "whether discovery is complete and whether a

8   trial date has been set."  <u>Tierravision</u>, 2012 U.S. Dist. LEXIS 21463, at *3.  The Court

9   has completed claim construction.  (Doc. No. 45.)  Fact discovery is almost complete

10   with the deadline in a few weeks–July 26, 2013.  (Doc. No. 89.)  The deadline for the

11   completion of expert discovery is in two months–September 19, 2013.  (<u>Id.</u>)  Finally,

12   a trial date has been set for November 5, 2013–four months away.  (Doc. No. 60.)

13   Accordingly, this factor weighs against a stay.  <u>See</u> <u>SenoRx, Inc. v. Hologic, Inc.</u>, 2013

14   U.S. Dist. LEXIS 8044, at *16 (D. Del. Jan. 11, 2013) ("[W]hen a request for

15   reexamination comes after discovery is complete or nearly complete, and a trial is

16   imminent, a stay is less likely to be granted." (citing cases)); <u>Interwoven. Inc. v.</u>

17   <u>Vertical Computer Sys., Inc.</u>, 2012 U.S. Dist. LEXIS 30946, at *4 (N.D. Cal. Mar. 8,

18   2012) (denying stay, noting that discovery was well underway and "[m]ore importantly,

19   the parties have fully briefed the issue of claim construction, attended a Markman

20   hearing, and received a claim construction order.").

21           **C.**    <u>Prejudice to the Nonmoving Party</u>

22         Whalen and Defendants are direct competitors in the TV stand and mount kit

23   industry.  When the parties are direct competitors, courts presume that a stay will

24   prejudice the non-movant.  <u>ADA Solutions, Inc. v. Engineered Plastics, Inc.</u>, 826 F.

25   Supp. 2d 348, 351 (D. Mass. 2011); <u>see also</u> <u>Boston Sci. Corp. v. Cordis Corp.</u>, 777 F.

26   Supp. 2d 783, 789 (D. Del. 2011) ("Courts are generally reluctant to stay proceedings

27   where the parties are direct competitors.").  "In such cases, 'there is a reasonable chance

28   that delay in adjudicating the alleged infringement will have outsized consequences to

**Exhibit 36
-338-**

1    the party asserting infringement has occurred, including the potential for loss of market

2    share and an erosion of goodwill.'"  Neste Oil Oyj v. Dynamic Fuels, LLC, 2013 U.S.

3    Dist. LEXIS 13081, at *7 (D. Del. Jan. 31, 2013); see also Avago Techs. Fiber IP

4    (Singapore) Pte. Ltd. v. IPtronics Inc., 2011 U.S. Dist. LEXIS 82665, at *16 (N.D. Cal.

5    July 28, 2011) ("[I]nfringement among competitors can cause harm in the marketplace

6    that is not compensable by readily calculable money damages.  Staying a case while

7    such harm is ongoing usually prejudices the patentee that seeks timely enforcement of

8    its right to exclude." (citation omitted)).  Defendants argue that Whalen's claim of

9    prejudice is belied by its failure to seek a preliminary injunction in this action.  (Doc.

10   No. 92-1 at 15.)  However, courts have noted this contention is flawed because there

11   may be other reasons why a patentee may decide not to seek a preliminary

12   injunction–for example, the difficulty of showing a likelihood of success.  See Avago

13   Techs., 2011 U.S. Dist. LEXIS 82665, at *17; Biomet Biologics, LLC v. Bio Rich

14   Med., Inc., 2011 U.S. Dist. LEXIS 109282, at *6 (C.D. Cal. Sept. 26, 2011).  Therefore,

15   Whalen's decision not to seek a preliminary injunction does not weigh against a finding

16   of prejudice.  Accordingly, this factor weighs against a stay.

17          Other considerations related to this factor include the timing of the reexamination

18   request, the timing of the stay request, and the status of the reexamination proceedings.

19   Neste Oil Oyj, 2013 U.S. Dist. LEXIS 13081, at *5.  "[R]equests for reexamination

20   made later in the litigation are more likely to represent a tactical move for delay."

21   Smart Modular Techs., Inc. v. Netlist, Inc., 2013 U.S. Dist. LEXIS 76636, at *10 (E.D.

22   Cal. May 30, 2013).  Bell'O did not request reexamination until September 10,

23   2012-nine months after Whalen filed its first set of actions against the Defendants and

24   three months after Whalen filed the second set of actions.  (See Doc. No. 1; Doc. No.

25   92-2 Loiancono Decl. Exs. 3-4.)  Defendants then waited another nine months until

26   June 2013 to file their motions to stay.  (Doc. Nos. 92, 93.)  These facts weigh against

27   staying the action.  See Affinity Labs of Tex., LLC v. Nike, Inc., 2011 U.S. Dist. LEXIS

28   51665, at *6-7 (N.D. Cal. May 13, 2011) (denying motion to stay in part where

- 6 -

**Exhibit 36**
**-339-**

1    defendant waited nine months after the action was filed to request reexamination and

2    another four months to request a stay).

3            The reexamination proceedings have reached the stage where the PTO has issued

4    ACPs rejecting the requested claims.  (Doc. No. 92-2, Loiancono Decl. Exs. 11, 12.)

5    But, an ACP is not final in the sense that it may be appealed.  <u>Spectros Corp. v. Thermo</u>

6    <u>Fisher Sci.</u>, Inc., 2010 U.S. Dist. LEXIS 12131, at *9 n.1 (N.D. Cal. Jan. 20, 2010).

7    With appeals, it is likely that the reexamination proceedings will take at least another

8    two years before they reach completion.  <u>See</u> USPTO, Reexaminations - FY 2012[1]

9    (PTO statistics showing that the average pendency of an inter partes reexamination from

10   the time of filing to the issuance of a certificate in the year 2012 was 38.4 months); <u>see</u>

11   <u>also</u> <u>Boston Sci. Corp. v. Cordis Corp.</u>, 777 F. Supp. 2d 783, 789 (D. Del. 2011)

12   ("Reexamination is an arduous process fraught with the potential for multiple

13   appeals.").  Accordingly, based on the stage of this action compared to the stage of the

14   reexamination proceedings, the Court concludes that this factor also weighs against a

15   stay.  <u>See, e.g.</u>, <u>Walker Digital, LLC v. Google, Inc.</u>, 2013 U.S. Dist. LEXIS 52176, at

16   *7-8 (D. Del. Apr. 11, 2013) (denying motion to stay in action where the PTO had

17   issued an ACP).

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25

26

27   ――――――――――――――

28        [1] Available at http://www.uspto.gov/patents/stats/Reexamination_operational_
     statistic_13_Q2.pdf

**Exhibit 36
-340-**

## Conclusion

After considering the parties' arguments and weighing the above factors, the Court declines to stay the action pending the resolution of the reexamination proceedings. Although the PTO has issued Actions Closing Prosecution rejecting the majority of the claims at issue in this action, it is likely that the reexamination proceedings will take at least two years to be completed. This action is scheduled to go to trial in four months. In addition, the parties are direct competitors, and this factor strongly weighs against a stay. Accordingly, exercising its discretion and considering the competing interests, the Court denies Defendants' motion to stay without prejudice.

**IT IS SO ORDERED.**

DATED: July 12, 2013

MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT

11cv2958

Exhibit 36
-341-

# EXHIBIT 37

9/26/2020                                    Tim Cook: Apple's greatest contribution will be 'about health'





Monday - Friday, 6:00 - 7:00 PM ET

VIDEO | FULL EPISODES | PODCAST | CRAMER'S COVID-19 INDEX | CRAMER'S SOUND

**MAD MONEY**

# Tim Cook: Apple's greatest contribution will be 'about health'

PUBLISHED TUE, JAN 8 2019•6:35 PM EST   UPDATED FRI, AUG 9 2019•10:52 AM EDT

**Lizzy Gurdus**
@LIZZYGURDUS

SHARE    

## KEY POINTS

Apple CEO Tim Cook says his company will "announce new services" in 2019 in an interview with CNBC's Jim Cramer.

"If you zoom out into the future, and you look back, and you ask the question, 'What was Apple's greatest contribution to mankind?' It will be about health," Cook tells the "Mad Money" host.




MARKETS


WATCHLIST


CNBC TV


MENU

Exhibit 37
-342-

9/26/2020                        Tim Cook: Apple's greatest contribution will be 'about health'

                                                                          

**VIDEO**  01:08

**Tim Cook teases new Apple services to come in 2019**

[Apple](#) will announce "material" new additions to its growing roster of services in 2019,
CEO [Tim Cook](#) told CNBC on Tuesday.



"You will see us announce new services this year. There will more things coming," Cook
said in an exclusive ["Mad Money"](#) interview with [Jim Cramer](#). "I believe it'll be material
over time."

The new services will be ones that Apple has "been working on for multiple years,"
Cook said. Apple has been [investing in health and wellness](#) in recent years as it
capitalized on the [success of its Watch](#) and [hired dozens of doctors](#) to bolster its health
technology segment.

                              

MARKETS                   WATCHLIST                    CNBC TV                      MENU

**Exhibit 37**
**-343-**

9/26/2020                                Tim Cook: Apple's greatest contribution will be 'about health'



color and context - right in your ears



LISTEN NOW

"I believe, if you zoom out into the future, and you look back, and you ask the question, 'What was Apple's greatest contribution to mankind?' it will be about health," Cook told Cramer.

With products like its electrocardiogram-equipped Apple Watch, the iPhone maker is bent on "democratizing" health care, Cook said.

"We are taking what has been with the institution and empowering the individual to manage their health. And we're just at the front end of this," he said. "But I do think, looking back, in the future, you will answer that question: Apple's most important contribution to mankind has been in health."

Apple shares climbed 1.91 percent Tuesday, settling at $150.75 a share. In the "Mad Money" interview, Cook also addressed the success of his company's wearable products like the Watch and the AirPods.

## Watch Tim Cook's full interview with Cramer here:



MARKETS



WATCHLIST



CNBC TV



MENU

Exhibit 37
-344-

Tim Cook: Apple's greatest contribution will be 'about health'



**VIDEO** 22:13

**Apple CEO Tim Cook talks China, Wall Street negativity and innovation with CNBC's Jim Cramer**

*Disclosure: Cramer's charitable trust owns shares of Apple.*

---

Questions for Cramer?

Call Cramer: 1-800-743-CNBC

Want to take a deep dive into Cramer's world? Hit him up!

[Mad Money Twitter](#) - Jim C

Questions, comments, sugg                                        :ap@cnbc.com

---

**TRENDING NOW**



**Google CEO Sundar Pichai tells employees 'we are not going back' after sexual misconduct settlement**

 MARKETS       WATCHLIST       CNBC TV       MENU

Exhibit 37
-345-

9/26/2020                                          Tim Cook: Apple's greatest contribution will be 'about health'









### Dr. Fauci says to take vitamin D if you're deficient — here's how to know



### U.S. has 'long way to go' before herd immunity with less than 10% showing coronavirus antibodies



### 'Dumb money' is fueling one of the biggest lies on Wall Street, researcher says



Subscribe to CNBC PRO                     Licensing & Reprints

CNBC Councils                             Supply Chain Values

CNBC on Peacock                           Advertise With Us

Join the CNBC Panel                       Digital Products

News Releases                             Closed Captioning

Corrections                               About CNBC

Internships                               Site Map

Podcasts                                  Ad Choices

Careers                                   Help

Contact



News Tips

**Exhibit 37
-346-**

Tim Cook: Apple's greatest contribution will be 'about health'



GET IN TOUCH

 **CNBC Newsletters**

Sign up for free newsletters and get more CNBC delivered to your inbox

SIGN UP NOW

Get this delivered to your inbox, and more info about our products and services.

Privacy Policy

Do Not Sell My Personal Information

Terms of Service

© 2020 CNBC LLC. All Rights Reserved. A Division of NBCUniversal

Data is a real-time snapshot *Data is delayed at least 15 minutes. Global Business and Financial News, Stock Quotes, and Market Data and Analysis.

Market Data Terms of Use and Disclaimers

Data also provided by


MARKETS


WATCHLIST


CNBC TV


MENU

**Exhibit 37
-347-**

# EXHIBIT 38

EDITORS' PICK  |  2,413 views  |  Jul 31, 2020, 12:39pm EDT                                    **BETA**

# How Apple Watch 6 Could Help Detect Covid-19 And Monitor Its Symptoms



**John Koetsier** Senior Contributor ⓘ

[Consumer Tech](#)

*John Koetsier is a journalist, analyst, author, and speaker.*

 **Listen to this article now**

02:51        🌐  Powered by  **Trinity Audio**



The current Apple Watch series 5, not the next Apple Watch series 6   APPLE

A report that Apple Watch 6 could contain a blood oxygen sensor creates the very real possibility that the next version of Apple's best-selling wearable could be an important ally in the fight against Covid-19.

Supporting code for the feature was [found](#) in iOS 14 in the spring.

Cookies on Forbes

**Exhibit 38**
-348-

And Apple received a patent for hardware that would detect blood oxygen
levels in June.

BETA

Recommended For You                                                              ⌃

**Apple Just Crippled IDFA, Sending An $80 Billion Industry Into Upheaval**

**Malicious Chinese SDK In 1,200 iOS Apps With Billions Of Installs Causing 'Major Privacy
Concerns To Hundreds Of Millions Of Consumers'**

**Amazon's New Flying Security Drone Will Be $249, Has Night Vision, Does Not Have A
Microphone**

The latest news is from Taiwan electronics new site DigiTimes, which
indicates that ASE Technology has reported won a new contract from Apple
for manufacturing the hardware. That hardware is likely slated for the next
version of the Apple Watch, which will probably ship late this year.
Competing products like the Fitbit, owned by Google, already offer the
functionality.

Currently, doctors use pulse oximeters to measure blood oxygen levels.
Health levels of oxygen are clearly critical for health in general, but more
specifically, low blood oxygen is a fairly common impact of COVID-19
infection.

Cookies on Forbes

**Exhibit 38
-349-**

BETA



A typical pulse oximeter   AFP VIA GETTY IMAGES

"Many doctors in emergency rooms are noticing a very concerning finding: Some COVID-19 patients have dangerously low levels of oxygen," WebMD said in April. "Some are recommending that COVID-19 patients monitor their oxygen levels at home with a pulse oximeter."

Pulse oximeters are cheap: under $50 in many cases. But they're only used when someone suspects a problem, and deliberately undergoes a test. Continuous monitoring of blood oxygen levels via an always-worn Apple Watch could detect not only dangerous levels of low oxygen in the blood, but also blood oxygen levels that are trending down. That could make them useful in both monitoring known COVID-19 patients as well as potentially detecting emerging cases.

Of course, Apple is not announcing any Apple Watch Series 6 capabilities, so all of this is speculation until the product actually launches.

However, health is a major focus for the company.

Cookies on Forbes

MORE FROM FORBES

Exhibit 38
-350-

## Apple's App Store Report Ignores Two Massive Elephants in The Room

BETA

By **John Koetsier**

"If you zoom out into the future, and you look back, and you ask the question: 'What was Apple's greatest contribution to mankind?' it will be about health," Apple CEO Tim Cook told CNBC in 2019. "We're democratizing it. We're ... empowering the individual to manage their health."

That's why the Apple Watch routinely saves lives with fall detection. That's why the Apple Watch monitors ambient sound, notifies you if you're experiencing high levels, and provides data on how long you were in dangerously loud environments in the past week. And, of course, why it monitors your heartbeat, can perform an ECG, detect atrial fibrillation, monitors exercise levels, and reminds you to move regularly.

Adding blood oxygen monitoring would make perfect sense, and it certainly won't be the last health feature Apple will add to a wearable device. And it could help if Coronavirus going to be with us for years to come.

But we'll have to wait until the Apple Watch 6's official launch to be sure.

## Expert Led Reviews, Recommendations And Roundups

The best shopping content across tech, home, fashion and more delivered to you twice a week.

Cookies on Forbes

Enter e-mail address                              Sign up

You may opt out any time. Terms and Conditions and Privacy Policy

*Follow me on Twitter or LinkedIn. Check out my website or some of my other work here.*

 **John Koetsier**

**Exhibit 38
-351-**

 Follow

I forecast and analyze trends affecting the mobile ecosystem. I've been a journalist, analyst, and corporate executive, and have chronicled the rise of the mobile...

**Read More**

Reprints & Permissions

ADVERTISEMENT

**BETA**

Cookies on Forbes

Exhibit 38
-352-

# EXHIBIT 39

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**<u>CIVIL MINUTES – GENERAL</u>**

Case No. SA CV 18-2043-DOC (ADSx)                    Date:  January 13, 2020

Title: ELLISON EDUCATIONAL EQUIPMENT, INC. v. STEPHANIE BARNARD
       DESIGNS, INC. ET AL.

PRESENT:

<u>THE HONORABLE DAVID O. CARTER, JUDGE</u>

| <u>Deborah Lewman</u> | <u>Not Present</u> |
|---|---|
| Courtroom Clerk | Court Reporter |

| ATTORNEYS PRESENT FOR PLAINTIFF: | ATTORNEYS PRESENT FOR DEFENDANT: |
|---|---|
| None Present | None Present |

PROCEEDINGS (IN CHAMBERS):   **ORDER DENYING DEFENDANTS'**
**MOTION TO STAY LITIGATION**
**PENDING *INTER PARTES* REVIEW**
**[40]**

Before the Court is Defendants Stephanie Barnard Designs, doing business as The Stamps of Life, and Stephanie Barnard's ("Defendants") Motion Motion to Stay Litigation Pending Inter Partes Review ("Motion") (Dkt. 40), accompanied by a Memorandum in support thereof ("Memorandum") (Dkt. 40-1). The Court finds this matter appropriate for resolution without oral argument. *See* Fed. R. Civ. P. 78; L.R. 7-15. Having reviewed the parties' moving papers, the Court DENIES Defendants' Motion to Stay Litigation Pending *Inter Partes* Review.

**I.     Background**

This case arises out of a patent dispute between Plaintiff Ellison Educational Equipment, Inc. ("Plaintiff") and Defendants. Plaintiff alleges infringement of Claim 1 of U.S. Patent No. 9,079,325 (the " '325 Patent"). Meanwhile, Defendants have petitioned for *inter partes* review ("IPR") of the '325 Patent, asserting that its Claims 1 and 2 are invalid. Defendants now request that this Court stay the instant action pending IPR, or,

**Exhibit 39**
**-353-**

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 18-2043-DOC (ADSx)                                    Date: January 13, 2020
                                                                                              Page 2

alternatively, pending the Patent Trial and Appeal Board's ("PTAB") decision to institute IPR.

## II.      Legal Standard

        "Courts have inherent power to manage their dockets and stay proceedings, including the authority to order a stay pending conclusion of a PTO reexamination." *Ethicon, Inc. v. Quigg*, 849 F.2d 1422, 1426-27 (Fed. Cir. 1988) (citations omitted). "To be sure, a court is under no obligation to delay its own proceedings by yielding to ongoing PTAB patent reexaminations—even if the reexaminations are relevant to the infringement claims before the Court." *Robert Bosch Healthcare Sys., Inc. v. Cardiocom, LLC*, No. C-14-1575 EMC, 2014 WL 3107447, at *3 (N.D. Cal. July 3, 2014); *see also Viskase Corp. v. Am. Nat'l Can Co.*, 261 F.3d 1316, 1328 (Fed. Cir. 2001).

        To determine whether to stay a case pending IPR, courts in this district typically consider three factors: "(1) whether discovery is complete and whether a trial date has been set; (2) whether a stay will simplify the issues in question and trial of the case; and (3) whether a stay would unduly prejudice or present a clear tactical disadvantage to the nonmoving party." *Universal Elecs., Inc. v. Universal Remote Control, Inc.*, 943 F. Supp. 2d 1028, 1030-31 (C.D. Cal. 2013). The three factors "are not exhaustive, however, as the decision whether to order a stay must be based on the totality of the circumstances." *Polaris Innovations Ltd. v. Kingston Tech. Co., Inc.*, No. 8:16-cv-00300-CJC-RAO, 2016 WL 7496740, at *1 (C.D. Cal. Nov. 17, 2016) (citing *Universal Elecs., Inc.*, 943 F. Supp. 2d at 1030-31).

## III.      Discussion

        In support of the instant Motion, Defendants argue that a stay is appropriate because discovery is still in relatively early stages, IPR will potentially dispose of or simplify the issues in this action, and a stay will not unduly disadvantage Plaintiffs. *See generally* Mem. Plaintiff disagrees, pointing to the quantity of discovery undertaken so far (three sets of requests for production and interrogatories, one set of requests for admissions, notices of depositions, and issuance of subpoenas), the fact that a trial date has been set, the fact that IPR has not yet been instituted, and the timing of the requests for IPR and a stay. *See generally* Opp'n.

        *First factor: discovery and trial date.* At a scheduling conference on February 25, 2019, the parties agreed upon and accepted a March 3, 2020 discovery cut-off, an April 27, 2020 motion cut-off, an August 3, 2020 final pretrial conference, and a September 1,

**Exhibit 39**
**-354-**

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 18-2043-DOC (ADSx)                    Date: January 13, 2020
                                                                                     Page 3

2020 trial date. Roughly nine months later, on November 14, 2019, Defendants filed their petition for IPR, knowing full well that these dates had already been chosen and scheduled. Moreover, while more discovery remains, the parties have already undertaken some discovery and expended resources to do so. This factor thus counsels against a stay.

    *Second factor: simplification of issues.* While the single claim in the '325 patent at issue in this action would also be reexamined in the IPR, the PTAB has not decided whether to institute IPR, and need not do so until May 14, 2020—almost two full months after the close of discovery set by this Court's scheduling order. Thus, while the IPR *might* simplify this proceeding *if* it were instituted, there is also a significant chance that the PTAB will decide not to institute IPR, and this Court will have thrown off the entire scheduling of this case for no benefit. This factor also weighs against granting a stay.

    *Third factor: undue prejudice.* The timing of the request for review—eleven months after the parties and the Court set dates for this action—and the fact that IPR has not yet been instituted both strongly suggest that a stay should not be granted. As such, the Court is unwilling to disturb its own calendar or subject Plaintiff to additional, perhaps extensive delays by staying this case.

    Considering the totality of the circumstances, then, guided by the factors established in our case law, the Court finds that a stay of the case pending IPR is not warranted.

**IV.   Disposition**

    For the reasons set forth above, the Court DENIES Defendants' Motion to Stay Litigation Pending *Inter Partes* Review.

    The Clerk shall serve this minute order on the parties.

MINUTES FORM 11
CIVIL-GEN                                                    Initials of Deputy Clerk: djl

**Exhibit 39**
**-355-**

# EXHIBIT 40

**Exhibit 40**

**-356-**

| *Notice of Allowability* | Application No. 16/261,326 | Applicant(s) Poeze et al. | |
|---|---|---|---|
| | Examiner CHU CHUAN LIU | Art Unit 3791 | AIA (FITF) Status No |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☑ This communication is responsive to the preliminary amendments filed on 01/30/2019.
   ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

3. ☑ The allowed claim(s) is/are 2-31 . As a result of the allowed claim(s), you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov.

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   **Certified copies:**
   a) ☐All     b) ☐ Some     *c) ☐ None of the:
      1. ☐ Certified copies of the priority documents have been received.
      2. ☐ Certified copies of the priority documents have been received in Application No. _____ .
      3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).
   * Certified copies not received: _____ .

   Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file areply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application. **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ CORRECTED DRAWINGS (as "replacement sheets") must be submitted.
   ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____ .
   **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**
1. ☑ Notice of References Cited (PTO-892)
2. ☑ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date 02/01/2019.
3. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material _____ .
4. ☐ Interview Summary (PTO-413), Paper No./Mail Date. _____ .
5. ☑ Examiner's Amendment/Comment
6. ☑ Examiner's Statement of Reasons for Allowance
7. ☐ Other _____ .

| /CHU CHUAN LIU/ Examiner, Art Unit 3791 | /ERIC F WINAKUR/ Primary Examiner, Art Unit 3791 |
|---|---|

Application/Control Number: 16/261,326                                        Page 2
Art Unit: 3791

## EXAMINER'S AMENDMENT

1.      An examiner's amendment to the record appears below. Should the changes and/or additions be unacceptable to applicant, an amendment may be filed as provided by 37 CFR 1.312. To ensure consideration of such an amendment, it MUST be submitted no later than the payment of the issue fee.

        Authorization for this examiner's amendment was given in an interview with Scott Cromar on 02/21/2019 and 02/26/2019. During the interview, proposed claim amendments were discussed with respect to Chaiken (USPN 6,223,063). Amendments were made to better define over the art.

        The application has been amended as follows:

Claim 2.        A noninvasive optical physiological sensor comprising:
        a plurality of emitters configured to emit light into tissue of a user;
        a plurality of detectors configured to detect light that has been attenuated by tissue of the user, wherein the plurality of detectors comprise at least four detectors;
        a housing configured to house at least the plurality of detectors; and
        a light permeable cover configured to be located between tissue of the user and the plurality of detectors when the noninvasive optical physiological sensor is worn by the user, wherein the cover comprises an outwardly protruding convex surface configured to cause tissue of the user to conform to at least a portion of the outwardly protruding convex surface when the noninvasive optical

Exhibit 40
-358-

Application/Control Number: 16/261,326                                        Page 3
Art Unit: 3791

physiological sensor is worn by the user and during operation of the noninvasive

optical physiological sensor, and wherein ~~the light permeable cover covers~~ the

plurality of detectors are configured to receive light passed through the outwardly

protruding convex surface after attenuation by tissue of the user.


Claim 8.       An optical physiological measurement device comprising:

          a plurality of emitters configured to emit light into tissue of a user;

          a circular housing including a planar surface;

          at least four detectors arranged on the planar surface of the circular

housing, wherein the four detectors are arranged in a[[n]] ~~offset~~ grid pattern; and

          a light permeable cover of the circular housing, ~~wherein the light~~

~~permeable cover covers the at least four detectors, and~~ wherein at least a portion

of the cover ~~protrudes from the housing~~ comprises a protruding surface that is

arranged to allow passage of light to the at least four detectors after attenuation

by tissue of the user.


Claim 9.       The optical physiological measurement device of Claim 8, wherein

the cover is configured to cause tissue of the user to conform to at least a portion

of [[a]] the protruding surface of the cover when the optical physiological

measurement device is worn by the user.


Claim 10.      The optical physiological measurement device of Claim 9, wherein

the four detectors are arranged in [[a]] the grid pattern such that a first detector

256

**Exhibit 40**
**-359-**

and a second detector are arranged across from each other on opposite sides of a central point along a first axis, and a third detector and a fourth detector are arranged across from each other on opposite sides of the central point along a second axis which is perpendicular to the first axis.

Claim 15.      The optical physiological measurement device of Claim 14, wherein the protruding surface of the cover comprises a single surface of the cover that covers the at least four detectors.

Claim 21.      A noninvasive optical physiological sensor comprising:

a plurality of emitters configured to emit light into tissue of a user;

a plurality of detectors configured to detect light that has been attenuated by tissue of the user, wherein the plurality of detectors comprise at least four detectors;

a housing configured to house at least the plurality of detectors; and

a light permeable cover configured to be located between tissue of the user and the plurality of detectors, and cover the plurality of detectors, when the noninvasive optical physiological sensor is worn by the user, wherein the cover comprises an outwardly protruding surface configured to cause tissue of the user to conform to at least a portion of the outwardly protruding surface when the noninvasive optical physiological sensor is worn by the user and during operation of the noninvasive optical physiological sensor, and wherein the outwardly

Exhibit 40
-360-

protruding surface is further configured to allow passage of light to the plurality of

detectors after attenuation by tissue of the user.


2.       The following is an examiner's statement of reasons for allowance: The Terminal

Disclaimers of USPN 8,437,825 and copending applications Nos. 16/212,537 and

16/212440 are approved on 02/26/2019 to resolve the double patenting issues. Wong et

al. (USPN 5,601,079) teaches a noninvasive optical physiological measurement device

(Figs. 4-8 and associated descriptions) comprises a plurality of emitters of different

wavelengths; a housing having a surface and a circular wall protruding from the surface;

a plurality of detectors arranged on the surface and spaced apart from each other (see

Figs. 4-8 and associated descriptions). Schulz et al. (USPN 7,341,559 - applicant cited)

teaches an pulse oximeter (Fig. 19B and associated descriptions) comprises a plurality

of emitters of different wavelengths; a detector; a housing having a surface and a

circular wall protruding from the surface; a light permeable cover arranged above at

least a portion of the housing, the light permeable cover comprising a protrusion

arranged to cover the detector (see Fig. 19B and associated descriptions). Chaiken et

al. (USPN 6,223,063 - applicant cited) teaches an optical physiological measurement

device (Figs. 1-3 and associated descriptions) comprises a plurality of emitters of

different wavelengths; four detectors arranged on the surface and spaced apart from

each other; a plurality of lenses each covers/ in optical communication with a respective

detector (see Figs. 1 -3 and associated descriptions). The prior art of record does not

teach or suggest "a light permeable cover configured to be located between tissue of

the user and the plurality of detectors... wherein the cover comprises an outwardly

**Exhibit 40
-361-**

Application/Control Number: 16/261,326                                             Page 6
Art Unit: 3791

protruding surface… and wherein the outwardly protruding surface is further configured

to allow passage of light to the plurality of detectors/ at least four detectors after

attenuation by tissue of the user" and "the plurality of detectors are configured to receive

light passed through the outwardly protruding convex surface after attenuation by tissue

of the user", in combination with the other claimed elements/ steps.


     Any comments considered necessary by applicant must be submitted no later

than the payment of the issue fee and, to avoid processing delays, should preferably

accompany the issue fee.  Such submissions should be clearly labeled "Comments on

Statement of Reasons for Allowance."

     Any inquiry concerning this communication or earlier communications from the

examiner should be directed to CHU CHUAN LIU whose telephone number is (571)270-

5507.  The examiner can normally be reached on M-Th (8am-6pm).

     Examiner interviews are available via telephone, in-person, and video

conferencing using a USPTO supplied web-based collaboration tool. To schedule an

interview, applicant is encouraged to use the USPTO Automated Interview Request

(AIR) at http://www.uspto.gov/interviewpractice.

     If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Jacqueline Cheng can be reached on (571) 272-5596.  The fax phone

number for the organization where this application or proceeding is assigned is 571-

273-8300.

     Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

Exhibit 40
-362-

Application/Control Number: 16/261,326                                    Page 7
Art Unit: 3791

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a

USPTO Customer Service Representative or access to the automated information

system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.


/ERIC F WINAKUR/
Primary Examiner, Art Unit 3791


/CHU CHUAN LIU/
Examiner, Art Unit 3791

Exhibit 40
-363-

# EXHIBIT 41

```
 1                  UNITED STATES DISTRICT COURT

 2            FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3                      SOUTHERN DIVISION

 4   MASIMO CORPORATION, a Delaware      )
     corporation; and CERCACOR          )
 5   LABORATORIES, INC., a Delaware      )
     corporation,                        )
 6                                       )
             Plaintiffs,                 )
 7                                       )
              VS.                        )CASE NO:8:20-cv-00048-JVS
 8                                       )
     APPLE, INC.,                        )
 9                                       )
             Defendant.                  )
10                                       )

11   _____

12                      CONFERENCE CALL

13               WEDNESDAY, SEPTEMBER 9, 2020

14                        10:00 A.M.

15

16

17

18

19

20

21   REPORTED BY:

22   DAVID A. SALYER, RMR, CRR

23   CSR NO. 4410

24   JOB NO. 4251588

25
```

1

**Exhibit 41
-364-**

```
 1    APPEARANCES: (All participants appearing remotely.)

 2   FOR THE PLAINTIFF:

 3           KNOBBE MARTENS OLSON & BEAR
             BY:  STEPHEN M. JENSEN, ESQ.
 4                ADAM POWELL, ESQ.
                  PERRY OLDHAM, ESQ.
 5           2040 Main Street
             14th Floor
 6           Irvine, California  92614
             (949)760-0404
 7           stephen.jensen@knobbe.com

 8   FOR THE DEFENDANTS:

 9           GIBSON, DUNN & CRUTCHER, LLP
             BY:  JOSHUA H. LERNER, ESQ.
10                MARK LYON, ESQ.
                  BRIAN ROSENTHAL, ESQ.
11                BRIAN ANDREA, ESQ.
             555 Mission Street
12           Suite 3000
             San Francisco, California  94105
13           (415)393-8200
             jlerner@gibsondunn.com
14

15

16

17

18

19

20

21

22

23

24

25
```

2

**Exhibit 41**
**-365-**

1                              I   N   D   E   X

2      PROCEEDINGS                                              PAGE

3
       Conference Call                                          1
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Exhibit 41**
**-366-**

```
              1              LOS ANGELES, CALIFORNIA;

              2         WEDNESDAY, SEPTEMBER 9, 2020

              3                 10:11 A.M.

              4                   -OOO-

              5         (All parties appearing remotely.)

10:11:22      6         MR. LERNER:  All right.  So at least on our end

              7    I think where things left off yesterday is obviously we

              8    were going to follow-up now.

10:11:33      9         Apologies for being a little bit late.

10:11:37     10         I think we're kind of ready to, again,

             11    follow-up and move forward on the proposal we discussed

             12    yesterday.

10:11:46     13         Brian Rosenthal, if you want to add any detail,

             14    please jump in.

10:11:52     15         I think obviously, Stephen, you wanted to talk

             16    to folks on your side as well, but, Brian, if you want

             17    to jump in.  Then we can hear any additional updates

             18    Steven has.  Maybe we can take it from there.

10:12:07     19         MR. ROSENTHAL:  This is Brian Rosenthal.

10:12:09     20         Yes, Steve, sorry for not being able to get

             21    back to you yesterday.

10:12:12     22         Actually, the reason we were late is because

             23    that's when we were able to speak with Apple.

10:12:17     24         So a couple things that will work for us.  The

             25    25th of September will work for us.
```

<p style="text-align:right">4</p>

Exhibit 41
-367-

10:12:28   1            The idea of when the new version of the Apple

           2    Watch is released shortly thereafter producing the sort

           3    of non-source code but other, you know, core technical

           4    documents so that you can very quickly determine whether

           5    you're going to assert the patents in suit against that

           6    product.  If you do assert it, then we will provide the

           7    source code shortly thereafter.

10:12:58   8            That plan was also approved, that part of the

           9    compromise proposal after some -- reluctantly approved,

          10    let me put it that way.  We got that.

10:13:10  11            So I think those were the outstanding questions

          12    that we were going to get back to you on.  So those are

          13    our answers.  And we're eager to hear where you guys

          14    stand.

10:13:23  15            MR. JENSEN:  So we were able to talk internally

          16    as well.  This is Steve Jensen.

10:13:28  17            I have a couple of thoughts and a counter

          18    proposal, so to speak that hopefully will work that I

          19    think addresses each party's stated concerns from

          20    yesterday with some small adjustments to some of the

          21    things we were discussing.

10:13:47  22            As I was able to talk with Perry and the team

          23    about the remaining outstanding issues, I guess we still

          24    have concerns, but that's not going to stop us from

          25    doing something here that we aren't really going to know

                                                                    5

Exhibit 41
-368-

```
         1   whether we've resolved our motion until we see your

         2   production and decide -- determine whether, hey, is it

         3   really now something that's a motion to compel issue or

         4   something we're still really missing in order to provide

         5   meaningfully updated contentions.

10:14:19 6           So, you know, I think we do have an

         7   agreement -- disagreement, for example, on what you were

         8   talking about providing the iPhone, but I don't know yet

         9   whether that dispute is going to drive anything, right?

        10   I think you know what I mean by that.  It might not

        11   matter.

10:14:39 12          I looked at some of the claims.  I looked at

        13   the iPhones mentioned in the complaint.  There are

        14   certainly some communication, some things that happened.

        15   So I don't know until we see the actual production

        16   whether or not it resolves it.

10:14:55 17          But I'm happy to commit, number 1, that we will

        18   start our clock running when we get your is subsequent

        19   production, right, and we will provide updated

        20   infringement protections based on upon that production

        21   at some period after that.

10:15:09 22          I'll get to that in a minute.

10:15:11 23          Did that all make sense, Brian?

10:15:13 24          MR. ROSENTHAL:  This is Brian.  It did.

10:15:16 25          MR. JENSEN:  Okay.  So that takes me to a
```

6

Exhibit 41
-369-

```
         1   couple things that I would like to deal with from what

         2   our proposal would look like.

10:15:26 3          We do think it makes sense that -- and as I

         4   explained yesterday that in terms of timing that we

         5   are -- that we have the benefit of, if months -- now,

         6   Judge Selna may move hearings.  I'm willing to commit to

         7   dates even if that happens, but I think it makes sense

         8   to have the planning be such that we would have the

         9   potential of having his guidance.  If we don't, we

        10   don't.  We'll move forward.

10:15:53 11         So what I'm proposing the date would be would

        12   be the 9th as we discussed yesterday.  But in order to

        13   deal with the issue of the case, you know, continuing,

        14   I'm willing to shorten my time for contentions by a week

        15   so it doesn't continue to string that out.

10:16:13 16         That way I have to move quicker on that, but we

        17   have the benefit of, you know, that motion to dismiss

        18   practice potential I have a tentative or something from

        19   him on that that might guide the parties with respect to

        20   the tried secret piece that you're challenging.

10:16:32 21         So I'm proposing to do that the 9th.

10:16:37 22         And the documents would be the same date which

        23   would give you a little extra time on that and we then

        24   shorten our time on the contentions.

10:16:43 25         I think we still are going to have to -- but I
```

                                                              7

**Exhibit 41**
**-370-**

```
            1   don't think we have to resolve it today, Brian.  I think

            2   we're going to have to look at the rest of the schedule

            3   as you mentioned yesterday and just sigh what else, what

            4   other pressures that brings.

10:16:57    5            I'm willing to shorten my contention time in

            6   order to have that exchange occur on the 9th.

10:17:05    7            MR. ROSENTHAL:  This is Brian Rosenthal.  Sorry

            8   to interrupt your train of thought, Steve.

10:17:09    9            But just to understand that, what I'm

           10   understanding is the 9th would be our trigger date.

           11   These the date on which 2019 disclosures are made, the

           12   date on which we complete what we've agreed to complete.

10:17:23   13            MR. JENSEN:  Right.

10:17:23   14            MR. ROSENTHAL:  But your infringement

           15   contentions, the preliminary infringement contentions,

           16   would be due on November 13th, which is 35 days

           17   thereafter, right?

10:17:34   18            MR. JENSEN:  This is Steve.  Can Adam or

           19   somebody just look at that?  It sounds right.  It would

           20   be, what, five weeks later, Brian?

10:17:43   21            MR. ROSENTHAL:  Five weeks, yes.

10:17:44   22            MR. POWELL:  Yeah, that's fine.  That timing is

           23   correct.

10:17:53   24            MR. JENSEN:  Okay.  If Adam says it, it's

           25   correct.
```

8

Exhibit 41
-371-

10:17:58   1              So that would be our proposal.  The way I would

           2      deal with the motions, I think you're getting full

           3      relief, although the sufficiency may still be an issue.

           4      I guess you'll see when you get it.

10:18:12   5              You'll be getting a date certain from us on

           6      that.  It would be the date we would do that exchange.

10:18:18   7              The way I would propose we deal with the

           8      motions is that we each send a notice and we withdraw

           9      those motions without prejudice.  That way, you know, we

          10      decide where the appropriate forum is to deal with those

          11      in the future in case something is supposed to go to

          12      sell that or Judge Early.

10:18:37  13              I know Judge Selna ruled the sufficiency of any

          14      2019 is dealt with by Early.

10:18:43  15              He also said if there is a core technical

          16      document, he's supposed to deal with it, but I don't

          17      know until we get your production really whether there

          18      is going to be anything remaining there or not.

10:18:57  19              So I suggest we withdraw them and then we deal

          20      with it when we see what each other has done on the

          21      ninth.

10:19:05  22              MR. ROSENTHAL:  It's Brian Rosenthal again and

          23      Josh and some others may have comments, as well.  But

          24      let me give you my reaction.

10:19:15  25              First, I appreciate, you know, I genuinely

                                                                      9

Exhibit 41
-372-

1    appreciate how this call and yesterday's call has gone.

2    Thank you for that.  I think it's been very productive

3    and continues to be.  I think we are both trying to

4    resolve the issue and sort of move on in this case, so

5    that's great.

10:19:33    6         Second, I am not going to comment on the

7    timing.  I'm going to leave that to Josh because, from

8    the patent perspective I think I can live with that

9    timing, because basically that pushes the infringement

10   contentions back a week from what we were proposing.

11   Rather than being November 6th it would be November 13th

10:20:00    12        We had put together a schedule adjustment based

13   on a November 6th infringement contention.  It's going

14   to be very easy for us to adjust that for a November 13

15   infringement contention.

10:20:12    16        So the timing, if it's a problem, will be a

17   problem from the trade secret perspective not from the

18   patent perspective.  So I'll let Josh address that in

19   just a moment.

10:20:22    20        The concern I have with your proposal is it

21   sounds like we may be in exactly the same situation on

22   October 9th, where, by that time, we produce everything

23   that we believe is called for, all the bits and other

24   things.  We produce what we're going to produce.

10:20:47    25        Then we get back into this infinite loop where

                                                                10

Exhibit 41
-373-

1   you all look at it and say I don't think this is all the

2   core technical documents so now we're going to refile

3   our ex parte application and now we're back in the same

4   boat.

10:21:01   5           That aspect of the proposal I think is not

6   productive because it just kicks the can down the road.

10:21:07   7           I fully understand, Steve, what you're saying.

8   We don't know what you're going to produce until you

9   produce it.  I get that.

10:21:14   10           I will say I think that from a practical

11   standpoint, not a theoretical or academic standpoint but

12   from a practical standpoint when you look at what we've

13   produced, I mean, we've long passed of what core

14   technical documents would require.  We're well into what

15   other documents might we need in this litigation.

10:21:37   16           I know you may not and probably do not agree

17   with that, but I'm just concerned that we end up in

18   exactly the same situation.

10:21:46   19           I think for that proposal to work for us, we

20   would all have to agree to the extent that there is any

21   disagreements, and there may well be, to the extent

22   there is any disagreements about the sufficiency of the

23   production, whether it's the sufficiency of the 2019.210

24   disclosure or the sufficiency of the documents we

25   produced, that that ought to be raised as a motion to

11

Exhibit 41
-374-

```
           1   compel with Judge Early.
10:22:11   2            I think we've heard loud and clear from the
           3   Court that ex partes motions on this stuff is not
           4   appreciated by the Court.
10:22:20   5            We also heard from Judge Early that at least he
           6   wants to try to take these disputes as much as possible
           7   out of the hands or off the table or off the plate of
           8   Judge Selna.
10:22:32   9            So from our perspective for that proposal to
          10   work, I think we ought to agree that to the extent there
          11   are any sufficiency issues that we can resolve amongst
          12   ourselves.  And I actually think there will be.  I think
          13   there are issues that you all have.  We will be able to
          14   resolve them unless you want everything that has to do
          15   with the iPhone, then that will be a dispute.
10:22:57  16            It seems to me that the right way to handle
          17   that is to go through the regular discovery process.  We
          18   can expedite it as much as possible.  We can do whatever
          19   week to get stipulations done and get them on file.
10:23:11  20            That's the only aspect I have a problem with
          21   your proposal.
10:23:21  22            MR. JENSEN:  Okay.  Thank you, Brian.  I have
          23   some more thoughts on that unless there is something
          24   more from Josh.
10:23:28  25            MR. LERNER:  There is not other than -- I'm
```

<div align="center">12</div>

Exhibit 41
-375-

```
           1   still thinking about it.
10:23:33   2          As I indicated yesterday, that is, just in the
           3   interest of openness, kind of later than we wanted, but
           4   as I also said yesterday, nobody is going to get
           5   everything they want.
10:23:47   6          The one thing that I would not want to hide the
           7   ball about or have-kind of play it close to my
           8   investigate and then have you be surprised or feel like
           9   we misled you, we, as you know from the hearing with
          10   Judge Early, do not believe that the motion to dismiss
          11   is relevant to 2019.210.
10:24:18  12          We think that Judge Early, again to be
          13   straightforward, agrees with us.  We think it's a
          14   different standard.
10:24:27  15          We would pushback, to put it mildly, on the
          16   idea that a ruling on the motion to dismiss has a
          17   bearing on the sufficiency of the description of the
          18   secrets in a 2019.210 disclosure.
10:24:45  19          I think you all know that, but I didn't -- to
          20   the extent we reach an agreement on a date after the
          21   motion to dismiss briefing is wrapped up, I didn't want
          22   to suggest that we were thereby agreeing that the ruling
          23   on the motion to dismiss would have some bearing.
10:25:09  24          I obviously get you all think otherwise, but
          25   what I don't want to have is you all feeling like we've
```

                                                             13

Exhibit 41
-376-

```
          1   agreed that you're right and on the flip side if you all

          2   were to argue that we had agreed to that, I would

          3   strongly disagree with that.

10:25:30  4        So as long as kind of nobody is walking away

          5   with that from that date with the impression it means

          6   we've agreed the motion to dismiss could resolve the

          7   2019.210 issues, I think that part of it is probably

          8   fine as long as we're all on the same page.

10:25:48  9        As far as the specific date goes, I'm still

         10   thinking through it, but I don't disagree with what you

         11   said in terms.  Current schedule in terms of briefing

         12   and kind of how it unfolds.

10:26:03 13        With that, I'll kind of pause and let you

         14   respond with the additional points you wanted to make,

         15   Steve.

10:26:11 16        MR. JENSEN:  Sure.

10:26:11 17        I'll start with the date.

10:26:14 18        I didn't take anything from that discussion.

         19   This is Steve Jensen if the court reporter doesn't

         20   recognize my voice yet.

10:26:24 21        I didn't take anything from that as an intent

         22   to try to bind you to any agreement that any ruling

         23   would resolve any dispute we have over 2019.  And that

         24   was not my intent.

10:26:38 25        So I'm not -- that wasn't going to walk away
```

14

Exhibit 41
-377-

```
          1    with that, but thanks for clarifying and making clear

          2    your position.

10:26:47  3           By the way, the date we're proposing is earlier

          4    than I would have proposed which was after we had an

          5    answer from you which would be who knows when, right?

10:26:58  6           So I'm giving you a date.  Even if Judge Selna

          7    has moved that, I think it might provide some guidance

          8    for us.  But if it moves, it moves.  We'll give it to

          9    you on the 9th.

10:27:11 10           With respect to what you raised, Brian, on the

         11    exchange, I thought I had probably dealt with that and

         12    you may have missed it by stating -- because I assumed

         13    that would be a concern -- by stating that we would --

         14    which basically means I'm committing not to do what you

         15    suggested but not pre-dispose the process we use.

10:27:36 16           That is, I'm going to provide you with updated

         17    infringement contentions on whatever that date was you

         18    mentioned.  Because I'm going to assume you're going to

         19    produce more stuff to us and we're going to -- we may

         20    still have disputes over that and then hopefully they

         21    will come within the realm of stuff that we -- you know.

10:27:57 22           I committed to provide the contentions even if

         23    I believe it wasn't sufficient core technical

         24    documentation.

10:28:06 25           So I wouldn't be saying in any motion, even if
```

                                                                15

Exhibit 41
-378-

1    it was an ex parte motion that, hey, our infringement

2    contentions should be moved again and continue in that

3    loop.

10:28:21    4         I'm going to take you at your word that there

5    are going to be some things there that Perry is going to

6    find useful, and I'm just going to take that on your

7    word a bit.

10:28:32    8         But I still have the issue of until I see it, I

9    don't know whether we're dealing with something we

10   believe is a core technical document failure that Judge

11   Selna has ordered us to go to him with an ex parte

12   processor whether it's something that is going to be a

13   motion to compel.

10:28:48    14        So I was just trying to not pre-dispose the

15   process, but I am happy to commit providing those

16   contentions based upon that trigger date that we're

17   going to do the exchange.

10:28:59    18        Does that help?

10:29:05    19        MR. ROSENTHAL:  Your explanation is -- this is

20   Brian Rosenthal.

10:29:08    21        Your explanation is consistent with how I

22   understood the proposal, so it doesn't really help.

10:29:15    23        I understood that.

10:29:18    24        My concern is not that we -- you're right that

25   the fact that you're willing to commit to provide the

16

Exhibit 41
-379-

1    infringement contentions on a date certain which is

2    certainly a requirement of anything that we would agree

3    to does avoid the issue of us getting back into this

4    loop where we have, you know, complaints that we're not

5    sufficient and complaints that we're not sufficient and

6    that date keeps pushing out.  That does solve that

7    problem and we appreciate that aspect of the proposal.

10:29:48    8        It does not solve the problem that I see which

9    is the sort of -- the use of the ex parte process in a

10   manner that we don't think is necessary or productive

11   with respect to the core technical documents.

10:30:12   12        And to be candid, I think my view of that is

13   colored by the fact that, you know, I've produced core

14   technical documents in many, many cases as you all have.

15   You know, I have a sense of what core technical

16   documents means.

10:30:31   17        I think we've gone above and beyond what

18   anybody would consider core technical documents and

19   we're now into what other documents might be necessary

20   to prove a case.  These a very different question.

10:30:42   21        I'm very, very happy to continue to respond to

22   those requests and go back and find more documents.  And

23   when we do our more full document production, a lot of

24   that stuff is going to be covered as well.

10:30:53   25        What I'm concerned about is that we do this

17

Exhibit 41
-380-

1   24-hour response dance over and over again about the

2   sufficiency of our document production.

10:31:08   3          I think you all have a pretty good sense of, A,

4   what we've already produced and, B, what we will

5   produce.

10:31:15   6          We've committed to producing documents

7   responsive to each one of those categories that are

8   identified by the letter this week.

10:31:26   9          I do feel that if that's what we do which we

10   will, I'm not envisioning a scenario where an ex parte

11   request at that moment would be something that's

12   necessary.

10:31:39   13          If there are additional documents that you need

14   to have produced, you know, we can talk about that.

10:31:45   15          If we're unable to come to agreement, I don't

16   see why the conventional motion to compel process would

17   be insufficient.

10:31:53   18          So what I fear is that by agreeing to this we

19   are essentially agreeing that on October 10th we're

20   going to be facing another ex parte request in which

21   you're going to say, well, this is all, you know,

22   insufficient.  We don't think it's sufficient and we

23   want them to produce everything under the sun.  And

24   we're go to be right back to where we are today.  That's

25   what I'm concerned about.

                                                                18

Exhibit 41
-381-

```
10:32:21   1              MR. JENSEN:  Okay.  This is Steve Jensen.  Let

           2    me address a couple of those things.

10:32:28   3              I don't think we will be back where we are

           4    because we won't be in the loop of when our are

           5    contentions due, so we understand each other on that.

10:32:36   6              I also don't have an issue.  Judge Selna

           7    ordered us as to raise the core technical documents

           8    issue.  I don't personally have a problem with not

           9    having that briefing object a 24-hour schedule, okay?

10:32:57  10              You know, I think I'd want to talk to my team,

          11    but I think I would feel comfortable a just tinge some

          12    kind of maybe expedited schedule or some kind of regular

          13    motion, but I'm still concerned that I shouldn't

          14    pre-dispose where that motion should go if we believe --

          15    if we still strongly believe there's been a failure on

          16    the core technical documents side, that that might be --

          17    that that should be going to Judge Selna because that's

          18    what he's ordered us to do.

10:33:29  19              So I'm very reluctant to have the parties come

          20    to an agreement where the judge has ordered a particular

          21    process.  And I'm not looking for some way to put your

          22    feet to the fire on a 24-hour briefing.  That's not the

          23    goal.

10:33:48  24              Pre-disposing, pre-deciding before that where

          25    that motion should go, I just think it's not consistent
```

                                                                  19

Exhibit 41
-382-

```
            1    with what the Court's orders have already said.
10:34:00    2          I do think we could agree amongst ourselves.
            3    Maybe my team will disagree with me, but I do think we
            4    could agree amongst ourselves that that briefing would
            5    not have to be on a 24-hour basis.
10:34:15    6          MR. ROSENTHAL:  I might be reading too much
            7    between the lines, but if I read between the lines, what
            8    I'm hearing is that-this is Brian Rosenthal.
10:34:22    9          What I'm hearing is that because Judge Selna
           10    indicated that disputes about core technical documents
           11    should be brought to his attention, you would not feel
           12    comfortable in a situation where you agree with us to
           13    bring them to Judge Early.  That I understand.
10:34:38   14          So I don't have a problem, subject to
           15    discussions with our team -- I don't have a problem with
           16    the notion that if you do have a problem with the core
           17    technical documents, that we find a way to bring that
           18    dispute to Judge Selna's attention as opposed to Judge
           19    Early's attention.  I don't have a problem with that.
10:35:00   20          I'm also that the briefing schedule that you're
           21    looking for is sort of the audience that you've been
           22    directed to.
10:35:15   23          If we could agree that we find a way to either
           24    remember reply date or close to remember reply date the
           25    normal motion to compel process, I'm not married to that
```

                                                               20

Exhibit 41
-383-

```
             1   particular schedule, something more akin to a regular

             2   briefing process, you would want to bring that to Judge

             3   Selna's attention.  That I don't think we have a problem

             4   with.

10:35:38     5          So if we can agree to something like that, I'm

             6   not sure how we can frame it.  But if we can agree to

             7   that general idea that any issue that you have that you

             8   believe require court resolution as to the sufficiency

             9   of the core technical document production, would be

            10   brought to Judge Selna's attention but on a briefing

            11   schedule that approximates a regular briefing schedule

            12   for a motion.  And we can figure out the details of how

            13   we do that.

10:36:04    14          That, to me, would be a workable solution

            15   subject to the comments of the rest of the team.

10:36:11    16          MR. JENSEN:  This is Steve Jensen.

10:36:13    17          I appreciate that.  I think we are

            18   communicating.

10:36:20    19          You're catching exactly my concern which is

            20   having been ordered to deal with it in a certain way,

            21   I'm reluctant, as you explained.

10:36:30    22          So I think that's the solution.

10:36:32    23          Look, I may not want to bring it to Judge Selna

            24   because I'm not sure he's going to want to see further

            25   briefing on this, but I think we need to leave that
```

21

Exhibit 41
-384-

1    avenue open and we can agree to the briefing schedule,

2    you know, whatever makes sense.

10:36:47   3         I'm not -- you know, I'm not going to be trying

4    to push some rapid emergency briefing schedule on the

5    situation and I'm happy to have it look like a regular

6    motion.

10:36:58   7         MR. ROSENTHAL:  I think, subject to a final

8    confirmation from our team, that would work for us.

10:37:02   9         It sounds like, as a general matter, we have a

10   landing spot here as far as the date and as far as what

11   we would do in respect to deficiencies that we perceive.

10:37:17   12        Keep in mind we should all communicate about

13   those deficiencies and try to resolve them towards

14   resolution if we can.  I really think we can.

10:37:26   15        I don't know if it's been clear to you, Steve,

16   I've certainly stressed it to others on your team, but

17   we don't, with the exception of some actual disputes

18   like the watch OS 7 that we talked about, we don't have

19   any desire to not give you stuff.

10:37:41   20        Our desire is to give you what you need and

21   move on.  I mean that.  You've known me for a while.  I

22   really do mean that.

10:37:50   23        We want to give you what you want.  We don't

24   have a hide the ball mentality here.

10:37:55   25        I think this would be helpful for us to move

22

Exhibit 41
-385-

```
             1   forward.
10:38:00     2           I didn't hear from you yet on the watch -- the
             3   new watch and the OS 7 proposal that we talked about
             4   yesterday.  It is okay with us.  Is that okay with you
             5   proceeding in that way?
10:38:14     6           MR. JENSEN:  Yes.  That works for us.  I think
             7   that's the most streamlined.
10:38:17     8           I appreciate you getting that done.  I think
             9   that will streamline the situation.  Maybe it will be
            10   very different or maybe it will be very the same and
            11   we'll both learn.
10:38:29    12           MR. ROSENTHAL:  You'll be waiting with bated
            13   breath.
10:38:35    14           Okay.  Let me open it up.  Are there other
            15   issues that we need to resolve?
10:38:40    16           MR. JENSEN:  There is not on my plate.
10:38:43    17           Adam, did I miss something, Perry?
10:38:48    18           Assuming we didn't, I think we'll file a
            19   one-sentence thing that would say something -- I'm not
            20   going to try to put it -- it was supposed to be one
            21   sentence you resolved or didn't resolve.
10:39:00    22           I think I would say we resolved it in a manner
            23   that we will each withdraw our motions with prejudice.
            24   Something like that, period.
10:39:11    25           That's what I submit to the Court today.
```

                                                                    23

**Exhibit 41
-386-**

10:39:14   1           MR. ROSENTHAL:  This is Brian Rosenthal.

10:39:15   2           I'm sure Josh is going to want to weigh in.

10:39:17   3           The other thing I would say is, look, I don't

           4   think we need to recount or should we recount any of the

           5   details of the agreements that we've reached.  That is

           6   the whole purpose of having this reported or

           7   transcribed.  We know what we've reached.

10:39:32   8           As a matter with respect to what we say to the

           9   Court, I certainly agree, but I will now pass it over to

          10   Josh.

10:39:39  11           MR. LERNER:  And this is just thinking out loud

          12   in terms of the motions.  But with respect to -- and

          13   this is getting in the weeds.

10:39:46  14           Given everything we've discussed about, you

          15   know, a different schedule and how much things will have

          16   changed, I'm not sure what the parties mean is kind of

          17   without prejudice such that the same motions would go

          18   back on for hearing if something went south in the

          19   future, because to state the obvious, both your motion

          20   and ours would be significantly --

10:40:28  21           MR. JENSEN:  It would look different.

10:40:31  22           MR. LERNER:  Look.  If you want to refile your

          23   motion for a date certain for me to give you one, I

          24   won't stop you from doing that, but I don't think either

          25   of us has to worry about the same exact motion being

                                                              24

**Exhibit 41**
**-387-**

```
              1  refiled, assuming we follow through on what we agree to

              2  be file.

10:40:49      3        If I didn't give you my 2019 on the 9th, but I

              4  expect they would look different.

10:40:57      5        It's just that we have a -- it's without

              6  prejudice to the relief we're seeking.

10:41:07      7        We get what we're going to get.  You get my

              8  2019 and I suspect any relief would look differently at

              9  that point.

10:41:16     10        MR. JENSEN:  Understood.  Okay.

10:41:21     11        Mark, anything else on your end?  I know Brian

             12  and I have been speaking.

10:41:25     13        Anything else you have?

10:41:29     14        MR. LYON:  No, nothing from me at this point.

             15  I think.

10:41:37     16        MR. JENSEN:  Adam, Perry, anything anybody had

             17  on their list?  I think I covered everything that we've

             18  done.

10:41:47     19        We have a transcript.

10:42:02     20        MR. LERNER:  Steve, this is Josh.

10:42:04     21        So one detail thing which would be just be

             22  incredibly helpful, if you don't mind sending over

             23  before -- if possible before you file it, the one

             24  sentence you're planning to say just so that we can try

             25  and communicate with our folks both where we landed on
```

25

**Exhibit 41**
**-388-**

```
             1   this call and what's being said.  That will make it a

             2   lot easier to not have a crunch here and ideally also to

             3   not respond which I think, even though it's a sentence,

             4   will make everybody happier.

10:42:38     5          So if it's at all possible as a courtesy, just

             6   shoot us what you're planning to say once you've got it,

             7   that would be super helpful.

10:42:49     8          MR. JENSEN:  I'm fine with that.

10:42:50     9          Presuming I get it to you -- I'm on mountain

            10   time.  I'm saying we only have 15 minutes, but we have

            11   an hour and 15 minutes.

10:42:58    12          I'll try to get that to you as soon as we have

            13   it finalized.

10:43:04    14          MR. LERNER:  Okay.

10:43:06    15          MR. OLDHAM:  This is Perry Oldham.  I just

            16   wanted to confirm that we've covered between yesterday

            17   and today the things that we needed to cover.

10:43:19    18          I understand from today that neither side wants

            19   surprise owes October 9th and hopefully we can work

            20   together to make sure that everybody's expectations are

            21   appropriately set for whatever gets exchanged on the

            22   9th.

10:43:41    23          MR. JENSEN:  Thanks, Perry.

10:43:42    24          I don't think there is anything else from our

            25   side.
```

Exhibit 41
-389-

```
10:43:49    1              Anything else from you guys, Gibson?

10:43:51    2              MR. LERNER:  This is Josh.  Nothing else from

            3    me.

10:43:57    4              MR. ROSENTHAL:  No.

10:44:02    5              MR. LERNER:  It was a good conversation.  We'll

            6    see you.

10:44:05    7              (Proceedings concluded at 10:44 a.m.)

            8

            9

           10

           11

           12

           13

           14

           15

           16

           17

           18

           19

           20

           21

           22

           23

           24

           25
```

27

**Exhibit 41
-390-**

# EXHIBIT 42





**Exhibit 42 -391-**

# EXHIBIT 43

**Page 1**

```
 1
 2
 3
 4              UNITED STATES DISTRICT COURT
 5             CENTRAL DISTRICT OF CALIFORNIA
 6                   SOUTHERN DIVISION
 7                       - - -
 8     THE HONORABLE JAMES V. SELNA, JUDGE PRESIDING
 9
10    MASIMO CORPORATION, et al.,  )
          Plaintiffs, )
11              vs.          )
                            )  SACV-20-00048-JVS
12    APPLE, INC.,          )
          Defendant.  )
13    ------------------------------)
14
15         REPORTER'S TRANSCRIPT OF PROCEEDINGS
16              Santa Ana, California
17              July 10, 2020
18
19           SHARON A. SEFFENS, RPR
                United States Courthouse
20             411 West 4th Street, Suite 1-1053
               Santa Ana, CA  92701
21             (714) 543-0870
22
23
24
25                                      11:46
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**Page 2**

```
 1    APPEARANCES OF COUNSEL:
 2    For the Plaintiffs:
 3    JOSEPH R. RE
      STEPHEN JENSEN
 4    KNOBBE MARTENS
      2040 Main Street, 14th Floor
 5    Irvine, CA  92614
      (949) 760-0404
 6
      For the Defendant:
 7
      H. MARK LYON
 8    JOSHUA LERNER
      BRIAN ROSENTHAL
 9    GIBSON DUNN & CRUTCHER, LLP
      1881 Page Mill Road
10    Palo Alto, CA  93403-1211
      (650) 849-5307
11
      JOSHUA LERNER
12    GIBSON DUNN & CRUTCHER, LLP
      555 Mission Street, Suite 3000
13    San Francisco, CA  94105-0921
      (415) 393-8254
14
      BRIAN ROSENTHAL
15    GIBSON DUNN & CRUTCHER, LLP
      200 Park Avenue
16    New York, NY  10166-0193
      (212) 351-2339
17
18
19
20
21
22
23
24
25
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**Page 3**

```
 1        SANTA ANA, CALIFORNIA; FRIDAY, JULY 10, 2020; 2:58 P.M.    02:59
 2        (Per telephonic conference)
 3            THE CLERK:   Calling Item No. 1, SACV-20-00048-JVS,    03:00
 4    Masimo Corporation versus Apple, Inc.                          03:00
 5        Appearances on behalf of the plaintiff, please.            03:00
 6        MR. RE:   Thank you.  Good afternoon, Your Honor,          03:00
 7    this is Joseph Re of Knobbe Martens on behalf of Masimo        03:00
 8    Corporation, and with me is my partner Stephen Jensen.         03:00
 9            THE CLERK:   And on behalf of the defendants,          03:00
10    please.                                                        03:00
11            MR. LYON:   Good afternoon, Your Honor.  It's Mark     03:00
12    Lyon on behalf of Apple, and with me is Joshua Lerner, and     03:00
13    Brian Rosenthal.                                               03:00
14            THE COURT:   Good afternoon.                           03:00
15        Thank you for your joint report that you filed             03:01
16    last week.  Let me share my thoughts with you, and then I'd    03:01
17    be happy to hear you.                                          03:01
18        I believe it's fundamentally unfair to the parties        03:01
19    and inefficient to require reduction of the number of claims   03:01
20    for prior art references prior to the full disclosure of the   03:01
21    infringement contentions and the invalidity contentions.      03:01
22    Let me give you an example of the poker world.  Suppose        03:01
23    Masimo has a claim that it would evaluate as a for basis,      03:01
24    but when Apple makes its invalidity disclosures, it comes up   03:01
25    with prior art that would amount to Royal Fresh.  It's         03:01
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**Page 4**

```
 1    better for Masimo to designate a claim in light of prior art
 2    demonstrating it wasn't viable.
 3        So my thought is that the initial round of
 4    disclosures ought to come after the parties have made their
 5    invalidity disclosures and their prior art disclosures.  The
 6    date for invalidity contentions is 9/7.  What I would
 7    propose is that within two weeks of that date, the parties
 8    present me with a proposal for an initial reduction of
 9    claims and prior art references that would contemplate
10    actual disclosure of those reductions within 30 days of the
11    Court adopting a specific proposal.  I would then
12    contemplate that there would be a further reduction after
13    the Markman hearing, and I would leave to your discretion
14    the time for final disclosure as to what we go to trial on.
15        I think that that may require some adjustments to
16    events leading to the Markman hearing.  If the invalidity
17    contentions come in 9/7, the parties' exchange of
18    proposed claim terms is 9/21.  I don't think that gives you
19    enough time to reflect on both sides' disclosures, come up
20    with your proposal, and then for narrowing selections of
21    claims and prior art references.
22        I think that the dates between the exchange of
23    claim terms and the Markman hearing need to be adjusted to
24    accommodate the disclosures pursuant to whatever proposal I
25    adopt for the disclosures following the invalidity and the
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

Exhibit 43
-392-

5

1  infringement contentions and the Markman hearing. I'm not
2  adverse to slipping the Markman hearing a month or six weeks
3  if that makes sense. That's in February, and we don't have
4  a trial date in 2021.
5       So those are my general thoughts. I'll be happy
6  to hear you.
7       Let's begin with you, Mr. Re.
8       MR. RE:    Thank you, Your Honor.
9       I think we're in complete agreement with
10  everything you said. I do think there needs to be an
11  exchange of information. I do want to alert the Court that
12  we are planning on amending our pleading that's set forth in
13  the Court's order regarding the Motion to Dismiss. In fact,
14  we will be substituting out some patents, so there needs to
15  be some more time for the parties to fully evaluate the
16  claims.
17       And, yes, we have not yet received the other
18  party's technical documents which were due back in June, and
19  that we of course need before we do our contentions. But we
20  agree with everything you said, and I think the parties will
21  work it out and will come up with a proposal for this by
22  September 21 as you indicated.
23       THE COURT:    Mr. Lyon.
24       MR. LYON:    Thank you, Your Honor.
25       Just a couple points. Let me just raise a

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

6

1  concern, and you may have already considered this, but let
2  me at least just throw it out there so that we can have a
3  discussion if it's helpful. The one thing I would say with
4  not putting in some kind of target limits at this point is
5  that you end up with potentially hundreds of claims that
6  both parties are going to be charting, that they're going to
7  be discussing and potentially arguing over as far as what
8  claim terms might be involved.
9       That is not a trivial aspect. I mean, that's
10  something when some of these -- I'm sure you've seen them.
11  Some of these claim charts can wind up being hundreds or
12  thousands of pages long, which is a very significant effort
13  to create, even if it is copying and pasting some of the
14  information because these claims are so related, which still
15  winds up that somebody has to sit down and analyze each
16  individual claim to decide whether or not you can simply
17  copy a paragraph from a different claim or not. You have to
18  do that, and then that has to go through whatever levels of
19  review with the client and with the firm to make sure that
20  that's okay.
21       Then to the extent that there's any dispute about
22  that, instead of having a single claim that the Court is
23  worrying about, it may end up being 15 or 16 claims, which
24  the Court would then have to do a similar review to make
25  sure it all makes sense, and the same argument applies

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

7

1  equally to each of those 15 or 16 claims.
2       So our view of this would be if we set some
3  number, and it could be -- we don't think the numbers we
4  picked are terrible, but if there's a higher number, we
5  could talk about it. But pick some target numbers now so
6  that we can get a bit more reign in on the case before we
7  get into charting everything with the idea that if there's
8  reasons to change these things down the road, that's
9  something that can always be done in good cause.
10       But it really needs to be done at the stage of
11  preparing it for Markman, and then have that kind of a
12  target, sort of like page limits in the brief in a lot of
13  ways. If you put these claims and limits on people, they'll
14  make some hard choices that they otherwise wouldn't make or
15  -- and that they probably should make, but because of the
16  fact that they don't have to, everything just gets thrown in
17  with the kitchen sink.
18       That's why we were suggesting trying to do
19  something now. Then if we need to have some discussions
20  about whether, you know, it's 50, 40, claims, whatever it is
21  we pick -- maybe the plaintiffs need a little bit more than
22  that, maybe another ten or so -- we could have those kinds
23  of discussions and maybe stipulate to that at the beginning.
24       This is the first we've heard that they're
25  planning on changing the patents again, so that's a little

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

8

1  troubling because we are already very far into the case, and
2  we're already trying to start gearing up for discovery on
3  the patents that we have. But that may also throw a monkey
4  wrench into not just this but to more parts of the case
5  schedule if it changes substantially.
6       THE COURT:    I appreciate the fact that at some
7  point the parties will have to make hard choices. I believe
8  they ought to be able to make fair hard choices. But if you
9  want to have further discussions among yourselves and come
10  to a consensus as to how to do some limits at this time,
11  that's fine, but I'm not going to impose it.
12       What I'm going to order is that no later than 9/21
13  the parties will submit a joint proposal for the initial
14  round of productions and the number of infringement
15  contentions and prior art references, and a final proposal
16  as to what we ought to do following the Markman hearing, and
17  then what we ought to do as a final third stage in terms of
18  what we're actually going to go to trial on.
19       MR. RE:    T?hank you, Your Honor.
20       May I ask one more question about this, though,
21  Your Honor? If we have currently set up infringement
22  contentions due on July 27, which then triggers our
23  invalidity contentions on September 7 to trigger off of
24  those -- if the patents are going to be changing because of
25  the new pleading, I guess I would want to know when is that

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

Exhibit 43
-393-

9

```
03:07  1   going to happen, and are those target changes going to be
03:07  2   reflected in the infringement contentions we are going to
03:07  3   see in July, or is that going to be a completely separate
03:07  4   ball of wax that we have to deal with?
03:07  5         THE COURT:   Well, if Masimo changes the line of
03:07  6   both patents, I would reevaluate the dates for infringement
03:07  7   and invalidity contentions in light of that on a fairly
03:07  8   short ex-parte basis.
03:07  9         Let me circle back to one thing Mr. Re said.  I
03:07  10  don't think that Masimo should be required to make its
03:07  11  infringement contentions until you produce the core
03:08  12  technical information.  I understand that there is presently
03:08  13  in place a protective order to permit that, but to the
03:08  14  extent that production is made, these dates are just going
03:08  15  to drift out there and out there and out there.  And I would
03:08  16  be likely to entertain a motion made to me, not the
03:08  17  magistrate judge, with regard to patent production on the
03:08  18  core confidential information.
03:08  19         MR. LYON:   Your Honor, on that point -- this is
03:08  20  Mark Lyon again, Your Honor.  On that point, we did produce
03:08  21  nonconfidential technical documentation as part of the
03:08  22  schedule, and we're waiting on the protective order which
03:08  23  now is in place.  But as you may know, we filed an objection
03:08  24  to certain orders of Magistrate Early on the staging of
03:08  25  that, which we do hope to have -- because the issue, as you
```

10

```
03:08  1   may know, is that there needs to be a 2019 trade secret
03:08  2   statement in place before we can proceed on the trade secret
03:09  3   discovery.
03:09  4         The whole basis for that rule is to really avoid
03:09  5   the situation where plaintiffs get ahold of all these
03:09  6   technical documents and then can hunt and peck and kind of
03:09  7   try to come up with a list of trade secrets that they
03:09  8   otherwise really don't have but that they are trying to
03:09  9   create that way.  That is the whole purpose of being able to
03:09  10  have those trade secrets in before all that technical
03:09  11  information is out.
03:09  12         If that information is provided ahead of getting
03:09  13  those trade secrets, that bell can't be unrung.  That's one
03:09  14  concern, and we actually have that motion in place.  We
03:09  15  understood from yesterday that Masimo was asking us to
03:09  16  produce that information.  The first that they had come back
03:09  17  and talked to us was in an email yesterday asking for that
03:09  18  information immediately, knowing that we had these
03:09  19  objections out there.  We may need to actually file some
03:09  20  type of an ex-parte application, if necessary, to seek
03:09  21  relief on that so we can get that issue decided first, if
03:09  22  possible.
03:10  23         I don't know, Mr. Lerner, if you want to say
03:10  24  anything more on that.  Please feel free.
03:10  25         MR. LERNER:   First of all, thank you for having
```

11

```
03:10  1   this hearing by telephone, Your Honor.  We know during these
03:10  2   times it's busy, and we appreciate the opportunity to be
03:10  3   heard.
03:10  4         Second, I do not believe that anybody can dispute
03:10  5   the point that once these documents are out then you have
03:10  6   the issue that is raised by every case on point, which is,
03:10  7   one can make vague trade secret allegations and then claim
03:10  8   Apple's valuable confidential information based on years of
03:10  9   hard work on this product as their own.  That simply cannot
03:10  10  be undone once these documents are produced, and it leads to
03:10  11  all kinds of issues.
03:10  12         I think the two most relevant here are that what,
03:10  13  for example, do you do with the people that are going to
03:10  14  work on the trade secret disclosure when first Your Honor
03:11  15  did order compliance with Section 2019.210 many months ago?
03:11  16  What do you do with the lawyers who have seen our
03:11  17  confidential information, but also might want to work on
03:11  18  that disclosure, which does at some point obviously need to
03:11  19  be provided?  Our view, as we briefed, is that it should
03:11  20  have been provided a long time ago.
03:11  21         The other key policy matter here, I think, is that
03:11  22  we would not be having these discussions or these problems
03:11  23  if that disclosure had been provided, because I think the
03:11  24  most basic policy guidance behind the rule is it enables the
03:11  25  Court to determine the proper scope of discovery and whether
```

12

```
03:11  1   or not discovery requests fall within it.  That just can't
03:11  2   be done until they provide this document, which the parties
03:12  3   briefed before the scheduling order, which Your Honor then
03:12  4   ruled on.
03:12  5         So as Mr. Lyon says, if necessary -- in fact,
03:12  6   we're planning on it if necessary to raise it as quickly as
03:12  7   possible now, so that we don't run into this waterfall of
03:12  8   problems that will follow if there's not compliance with
03:12  9   this basic rule.
03:12  10         THE COURT:   I guess I analyze things differently.
03:12  11  If core confidential documents are relevant to the patents,
03:12  12  they should be disclosed now, notwithstanding the fact that
03:12  13  they may overlap the trade secrets case.  We need to go
03:12  14  forward with the patent case.  And if and when there is
03:12  15  adequate disclosure for trade secrets, all other materials
03:12  16  should be produced.  But to the extent the core confidential
03:12  17  technical documents are relevant to the patent case, they
03:12  18  should be disclosed now and in advance of Masimo having to
03:12  19  identify which claims it wants to proceed on.
03:12  20         MR. LERNER:   If I may just very briefly respond to
03:12  21  that, Your Honor.  I understand that Masimo has raised that
03:13  22  argument, but it does render the statute a nullity.
03:13  23  2019.210 expressly states:  "Discovery related to the trade
03:13  24  secrets" -- indeed, in cases before Judge Early before, he
03:13  25  said just because discovery relates to a non-trade secret
```

**Exhibit 43**
**-394-**

13

1  claim it doesn't mean it also doesn't relate to the trade
2  secret.  Here, there's no dispute -- there can't be any
3  dispute that discovery on the patent side relates to the
4  trade secrets.
5          So if we're going to do that, it does render the
6  statute in this instance a nullity, and we will have, I
7  think, all the problems that follow and are the very basis
8  for the rule there.  So I think that it is important to
9  consider both the express language of that statute and then
10 what's behind it.
11         The only other thing I will mention is that every
12 case that Masimo has cited on this point that involved
13 parallel claims -- every single one there was a prior trade
14 secret disclosure.  It's possible that it could have been
15 amended at some later time, but there was at the very least
16 some disclosure.
17         The only exception I can think of was one where
18 there was a date certain order, and the plaintiff would have
19 had to show good cause if they ever wanted to change it
20 later.  Because without either the disclosure or that date
21 certain and an order that it can't be changed without good
22 cause, then we have the very real situation that Masimo can
23 just look through our confidential information in a case
24 with a patent thicket and use our confidential information
25 to try and craft their purported secrets in a way that (a)

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

14

1  is allegedly theirs, even though it's based on our
2  confidential information, but (b) tries to weave around
3  their many patents so they don't run into the problem that
4  it's been disclosed.
5          For those reasons, I think it's in some ways of
6  critical importance here that we do it.  It's even more
7  important than I would say in a normal case where there
8  might not be quite so many patents in the space or so many
9  allegations that the secrets were allegedly disclosed in the
10 patents.
11         THE COURT:   Let's assume Masimo never asserted a
12 trade secret claim.  The confidential information which
13 involves the patent claims would be subject to production
14 whether it was a trade secret or not.  That's what
15 protective orders are for.
16         MR. LERNER:   We completely agree with that, Your
17 Honor.  If there were no trade secret claims in this case,
18 this would not be a problem.  But every case where there is
19 a trade secret, given the express language of the statute,
20 has found that you can't avoid that language.  I'm not aware
21 of any finding that ignores the language on point.
22         That's why in all of the cases there was a trade
23 secret disclosure before you had a ruling that patent
24 discovery could go forward, or at least as I said, an order
25 that the trade secret disclosure be produced by a date

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

15

1  certain along with admonition that the list couldn't change
2  without good cause.
3          So, yes, if there were no trade secret claim, then
4  2019.210 by large would not come into play.  There are
5  some cases holding that if it's kind of, you know, a wolf in
6  sheep's clothing and it's obvious it's coming, then the
7  Court would say you still have to do the 2019.210
8  disclosure.
9          But here we don't have that situation.  This is a
10 case where they've suggested they have a serious trade
11 secret claim.  They've never described it with any
12 specificity whatsoever, even though they allege it has been
13 disclosed in public patent filings.  One could just say
14 here's the page and line number.
15         Not withstanding all of those things, there's no
16 description in a case that's, you know, roughly seven months
17 old, and they want this confidential information.  Again,
18 once that's done, we just cannot undo it, and we'll have I
19 think unfortunately a lot of unnecessary disputes both about
20 the scope of discovery, but also what to do about the fact
21 that you then have lawyers who have seen our secrets
22 drafting what their alleged secrets are.
23         THE COURT:   Mr. Re.
24         MR. RE:   Well, Your Honor, this is at least the
25 second or third time they've made this argument.  You are

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

16

1  correct.  Our patent case is independent of the trade secret
2  case.  The case law that we already cited and briefed to
3  Judge Early on these other motions were breach of contract
4  cases that were factually dependent on the trade secret
5  claims.  Our case is not dependent on our trade secret case.
6  And currently the trade secret case has been dismissed on
7  their Motion to Dismiss.  It's not even pending before the
8  Court, and obviously the patent case gets to go forward.
9          I've never seen such strenuous objections to
10 producing just the core technical documents in a case.  They
11 are fighting tooth and nail, and they will keep fighting and
12 fighting no matter what.  They're going to file more motions
13 I understand today to prevent the disclosures that were due
14 back in June.  I think the time has come we move forward now
15 as the Court has indicated.
16         THE COURT:   Are you going to replead your trade
17 secret claim?
18         MR. RE:   Yes, we are.  We plan on complying with
19 the 30-day leave to amend date at the end of the month.
20         THE COURT:   Okay.  Well, I think you have my
21 general views.  Let's see what motion practice that results
22 in.
23         Anything else we should take up today?
24         MR. RE:   No.  Thank you, Your Honor.
25         MR. LYON:   Thank you, Your Honor.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

Exhibit 43
-395-



03:20   1     MR. LERNER:    Thank you very much, Your Honor.

03:20   2     THE COURT:    Okay.  Thank you very much.

03:20   3     (Whereupon, the proceedings were concluded.)

03:20   4                      *   *   *

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**CERTIFICATE**

I hereby certify that pursuant to Section 753,
Title 28, United States Code, the foregoing is a true and
correct transcript of the stenographically reported
proceedings held in the above-entitled matter and that the
transcript page format is in conformance with the
regulations of the Judicial Conference of the United States.

Date:  July 20, 2020

/s/   Sharon A. Seffens  7/20/20
SHARON A. SEFFENS, U.S. COURT REPORTER

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

Exhibit 43
-396-

## /

**/s [1]** 18/15

## 0

**0193 [1]** 2/16
**0404 [1]** 2/5
**0870 [1]** 1/21
**0921 [1]** 2/13

## 1

**1-1053 [1]** 1/20
**10 [2]** 1/17 3/1
**10166-0193 [1]** 2/16
**1053 [1]** 1/20
**1211 [1]** 2/10
**14th [1]** 2/4
**15 [2]** 6/23 7/1
**16 [2]** 4/24 4/12
**1881 [1]** 2/9

## 2

**20 [2]** 18/13 18/15
**200 [1]** 2/15
**2019 [1]** 10/1
**2019.210 [4]** 11/15 12/23 15/4 15/7
**2020 [3]** 1/17 3/1 18/13
**2021 [1]** 5/4
**2040 [1]** 2/9
**21 [3]** 4/18 5/22 8/12
**212 [1]** 2/16
**2339 [1]** 2/16
**27 [1]** 8/22
**28 [1]** 18/7
**2:58 [1]** 3/1

## 3

**30 [1]** 4/10
**30-day [1]** 16/19
**3000 [1]** 2/12
**351-2339 [1]** 2/16
**393-8254 [1]** 2/13

## 4

**40 [1]** 7/20
**411 [1]** 1/20
**415 [1]** 2/13
**4th [1]** 1/20

## 5

**50 [1]** 7/20
**5307 [1]** 2/10
**543-0870 [1]** 1/21
**555 [1]** 2/12

## 6

**650 [1]** 2/10

## 7

**7/20/20 [1]** 18/15
**714 [1]** 1/21
**753 [1]** 1/20
**760-0404 [1]** 2/5

## 8

**8254 [1]** 2/13
**849-5307 [1]** 2/10

## 9

**9/21 [2]** 4/18 8/12
**9/7 [2]** 4/6 4/17
**92614 [1]** 2/5
**92701 [1]** 2/10
**93403-1211 [1]** 2/10
**94105-0921 [1]** 2/13
**949 [1]** 2/5

## A

**able [2]** 8/8 10/8
**about [7]** 6/21 6/23 7/5 7/20 8/20 15/19
 15/20
**above [1]** 18/9
**above-entitled [1]** 18/9
**accommodate [1]** 4/24
**actual [1]** 4/10
**actually [3]** 8/18 10/14 10/19
**adequate [1]** 12/15
**adjusted [1]** 4/23
**adjustments [1]** 4/15
**admonition [1]** 15/1
**adopt [1]** 4/25
**adopting [1]** 4/11
**advance [1]** 12/18
**adverse [1]** 5/2
**after [2]** 4/4 4/12
**afternoon [3]** 3/6 3/11 3/14
**again [3]** 7/25 9/20 15/17
**ago [2]** 11/15 11/20
**agree [2]** 5/20 14/16
**agreement [1]** 5/9
**ahead [1]** 10/12
**ahold [1]** 10/5
**al [1]** 1/9
**alert [1]** 5/11
**all [9]** 6/25 10/5 10/10 10/25 11/11
 12/15 13/7 14/22 15/15
**allegations [2]** 11/7 14/9
**allege [1]** 15/12
**alleged [1]** 15/22
**allegedly [2]** 14/1 14/9
**along [1]** 15/1
**already [4]** 6/1 8/1 8/2 16/2
**also [4]** 8/3 11/17 13/1 15/20
**Alto [2]** 2/10
**always [1]** 7/9
**amend [1]** 16/19
**amended [1]** 13/15
**amending [1]** 5/12
**among [1]** 8/9
**amount [1]** 3/25
**Ana [3]** 1/16 1/20 3/1
**analyze [2]** 6/15 12/10
**another [1]** 7/22
**any [4]** 6/21 13/2 14/21 15/11
**anybody [1]** 11/4
**anything [2]** 10/24 16/23
**APPEARANCES [2]** 2/1 3/5
**APPLE [4]** 1/11 3/4 3/12 3/24
**Apple's [1]** 11/8
**application [1]** 10/20
**applies [1]** 6/25
**appreciate [2]** 8/6 11/2
**are [25]**
**arguing [1]** 6/7
**argument [3]** 6/25 12/22 15/25
**around [1]** 14/2
**art [7]** 3/20 3/25 4/1 4/5 4/9 4/21 8/15
**as [18]** 3/23 4/14 5/22 6/7 6/7 8/10 8/16
 8/17 9/21 9/23 9/25 11/9 11/19 12/5
 12/6 12/6 14/24 16/15
**ask [1]** 8/20
**asking [2]** 10/15 10/17
**aspect [1]** 6/9
**asserted [1]** 14/11
**assume [1]** 14/11
**Avenue [1]** 2/15
**avoid [1]** 14/20
**aware [1]** 14/20

## B

**back [4]** 5/18 9/9 10/16 16/14
**ball [1]** 9/4

**based [2]** 11/8 14/1
**basic [2]** 7/12 12/7
**basis [4]** 3/23 9/8 10/4 13/7
**be [36]**
**because [8]** 6/14 7/15 8/1 8/24 9/25
 11/23 12/25 13/20
**been [6]** 11/20 11/23 13/14 14/4 15/12
 16/6
**before [9]** 5/19 7/6 10/2 10/10 12/3
 12/24 12/24 14/23 16/7
**begin [1]** 5/7
**beginning [1]** 7/23
**behalf [4]** 3/5 3/7 3/9 3/12
**behind [2]** 11/24 13/10
**being [3]** 6/11 6/23 10/9
**believe [3]** 3/18 8/7 11/4
**bell [1]** 10/13
**better [1]** 4/1
**between [2]** 4/22
**bit [2]** 7/6 7/21
**both [5]** 4/19 6/6 9/6 13/9 15/19
**breach [1]** 16/3
**BRIAN [3]** 2/8 2/14 3/13
**brief [1]** 7/12
**briefed [3]** 11/19 12/3 16/2
**briefly [1]** 12/20
**busy [1]** 11/2

## C

**CA [4]** 1/20 2/5 2/10 2/13
**CALIFORNIA [3]** 1/5 1/16 3/1
**Calling [1]** 3/3
**can [12]** 6/2 6/11 6/16 7/6 7/9 10/2 10/6
 10/21 11/4 11/7 13/17 13/22
**can't [5]** 10/13 12/1 13/2 13/21 14/20
**cannot [2]** 11/9 15/18
**case [22]**
**cases [4]** 12/24 14/22 15/5 16/4
**cause [4]** 7/9 13/19 13/22 15/2
**CENTRAL [1]** 1/5
**certain [4]** 9/24 13/18 13/21 15/1
**CERTIFICATE [1]** 18/4
**certify [1]** 18/6
**change [3]** 7/8 13/19 15/1
**changed [1]** 13/21
**changes [3]** 8/5 9/1 9/5
**changing [2]** 7/25 8/24
**charting [2]** 6/6 7/7
**charts [1]** 6/11
**choices [3]** 7/14 8/7 8/8
**circle [1]** 9/9
**cited [2]** 13/12 16/2
**claim [15]** 3/23 4/1 4/18 4/23 6/8 6/11
 6/16 6/17 6/22 11/7 13/1 14/12 15/3
 15/11 16/17
**claims [15]** 3/19 4/9 4/21 5/16 6/5 6/14
 6/23 7/1 7/13 7/20 12/19 13/13 14/13
 14/17 16/5
**client [1]** 6/19
**clothing [1]** 15/6
**Code [1]** 18/7
**come [9]** 4/4 4/17 4/19 5/21 8/9 10/7
 10/16 15/4 16/14
**comes [1]** 3/24
**coming [1]** 15/6
**complete [1]** 5/9
**completely [2]** 9/3 14/16
**compliance [2]** 11/15 12/8
**complying [1]** 16/18
**concern [2]** 6/1 10/14
**concluded [1]** 17/3
**conference [2]** 3/2 18/11
**confidential [10]** 9/18 11/8 11/17 12/11
 12/16 13/23 13/24 14/2 14/12 15/17
**conformance [1]** 18/10
**consensus [1]** 8/10

Exhibit 43
-397-

**C**

consider [1] 13/9
considered [1] 6/1
contemplate [2] 4/9 4/12
contentions [12] 3/21 3/21 4/6 4/17 5/1 5/19 8/15 8/22 8/23 9/2 9/7 9/11
contract [1] 16/3
copy [1] 6/17
copying [1] 6/13
core [5] 9/11 9/18 12/11 12/16 16/10
CORPORATION [3] 1/9 3/4 3/8
correct [2] 16/1 18/8
could [6] 7/3 7/5 7/22 13/14 14/24 15/13
couldn't [1] 15/1
COUNSEL [1] 2/1
couple [1] 5/25
course [1] 5/19
COURT [10] 1/4 4/11 5/11 6/22 6/24 11/25 15/7 16/8 16/15 18/16
Court's [1] 5/13
Courthouse [1] 1/19
craft [1] 13/25
create [2] 6/13 10/9
critical [1] 14/6
CRUTCHER [3] 2/9 2/12 2/15
currently [2] 8/21 16/6

**D**

date [8] 4/6 4/7 5/4 13/18 13/20 14/25 16/19 18/13
dates [3] 4/22 9/6 9/14
day [1] 16/19
days [1] 4/10
deal [1] 9/4
decide [1] 6/16
decided [1] 10/21
Defendant [1] 1/12 2/6
defendants [1] 3/9
demonstrating [1] 4/2
dependent [2] 16/4 16/5
described [1] 15/11
description [1] 15/16
designate [1] 4/1
determine [1] 11/25
did [2] 9/20 11/15
different [1] 6/17
differently [1] 12/10
disclosed [5] 12/12 12/18 14/4 14/9 15/13
disclosure [13] 3/20 4/10 4/14 11/14 11/18 11/23 12/15 13/14 13/16 13/20 14/23 14/25 15/8
disclosures [8] 3/24 4/4 4/5 4/5 4/19 4/24 4/25 16/13
discovery [9] 8/2 10/3 11/25 12/1 12/23 12/25 13/3 14/24 15/20
discretion [1] 4/13
discussing [1] 6/7
discussion [1] 6/3
discussions [4] 7/19 7/23 8/9 11/22
Dismiss [2] 5/13 16/7
dismissed [1] 16/6
dispute [4] 6/21 11/4 13/2 13/3
disputes [1] 15/19
DISTRICT [2] 1/4 1/5
DIVISION [1] 1/6
do [19]
document [1] 12/2
documentation [1] 9/21
documents [7] 5/18 10/6 11/5 11/10 12/11 12/17 16/10
does [3] 11/8 13/22 13/5
doesn't [2] 13/1 13/1
don't [10] 4/18 5/3 7/3 7/16 9/10 10/8 12/23 12/7 14/3 15/9
done [4] 7/9 7/10 12/2 15/18
down [2] 6/2 6/2
drafting [1] 15/22
drift [1] 9/15
due [3] 5/18 8/22 16/13
DUNN [2] 2/9 2/12 2/15
during [1] 11/1

**E**

each [2] 6/15 7/1
Early [3] 9/24 12/24 16/3
effort [1] 4/2
either [1] 13/20
else [1] 16/23
email [1] 10/17
enables [1] 11/24
end [3] 6/5 6/23 16/19
enough [1] 4/19
entertain [1] 9/16
entitled [1] 18/9
equally [1] 7/1
et [1] 1/9
evaluate [2] 3/23 5/15
even [5] 6/13 14/1 14/6 15/12 16/7
events [1] 13/19
ever [1] 13/19
every [4] 11/6 13/11 13/13 14/18
everything [4] 5/10 5/20 7/7 7/16
ex [2] 9/8 10/20
ex-parte [1] 9/8 10/20
example [2] 3/22 11/13
exception [1] 13/17
exchange [3] 4/17 4/22 5/11
express [2] 13/9 14/19
expressly [1] 12/23
extent [3] 6/21 9/14 12/16

**F**

fact [6] 5/13 7/16 8/6 12/5 12/12 15/20
factually [1] 16/4
fair [1] 8/8
fairly [1] 9/7
fall [1] 12/1
far [2] 6/7 8/1
February [1] 5/3
feel [1] 10/24
fighting [3] 16/11 16/11 16/12
file [2] 10/19 16/12
filed [2] 3/15 9/23
filings [1] 15/13
final [3] 4/14 8/15 8/17
finding [1] 14/21
fine [1] 8/11
firm [1] 6/19
first [5] 7/24 10/16 10/21 10/25 11/14
Floor [1] 2/4
follow [2] 12/8 13/7
following [4] 4/25 8/16
foregoing [1] 18/7
format [1] 18/10
forth [1] 5/12
forward [4] 12/14 14/24 16/8 16/14
found [1] 14/20
Francisco [2] 2/13
free [1] 10/24
Fresh [1] 3/25
FRIDAY [1] 3/1
full [1] 3/20
fully [1] 5/15
fundamentally [1] 3/18
further [2] 4/12 8/9

**G**

gearing [1] 8/2
general [2] 5/5 16/21
get [4] 7/6 7/7 10/5 10/21
gets [2] 7/16 16/8
getting [1] 16/8
GIBSON [3] 2/9 2/12 2/15
give [1] 3/22
given [1] 14/19
gives [1] 4/18
go [6] 4/14 6/18 8/18 12/13 14/24 16/8
going [15] 6/6 6/6 8/11 8/12 8/18 8/24 9/1 9/1 9/2 9/3 9/14 11/13 13/5 16/12 16/16
good [7] 3/6 3/11 3/14 7/9 13/19 13/21 15/2
guess [2] 8/25 12/10
guidance [1] 11/24

**H**

had [5] 10/16 10/18 11/23 13/19 14/23
hank [1] 8/19
happen [1] 9/1
happy [2] 3/17 5/5
hard [4] 7/14 8/7 8/8 11/9
has [10] 3/23 6/15 6/18 12/21 13/12 14/20 15/12 16/6 16/14 16/15
have [34]
having [4] 6/22 10/25 11/22 12/18
he [1] 12/24
hear [2] 3/17 5/6
heard [2] 7/24 11/3
hearing [7] 4/13 4/16 4/23 5/1 5/2 8/16 11/1
held [1] 18/9
helpful [1] 6/3
here [5] 11/12 11/21 13/2 14/6 15/9
here's [1] 15/14
hereby [1] 18/6
higher [1] 7/4
holding [1] 15/5
Honor [17] 3/6 3/11 5/8 5/24 8/19 8/21 9/19 9/20 11/1 11/14 12/3 12/21 14/17 15/24 16/24 16/25 17/1
HONORABLE [1] 1/8
hope [1] 9/25
how [1] 8/10
hundreds [2] 6/5 6/11
hunt [1] 10/6

**I**

I'd [1] 3/16
I'll [1] 5/5
I'm [5] 5/1 6/10 8/11 8/12 14/20
I've [1] 16/9
idea [1] 7/7
identify [1] 12/19
ignores [1] 14/21
immediately [1] 10/18
importance [1] 14/6
important [2] 13/8 14/7
impose [1] 8/11
INC [2] 1/11 3/4
indeed [1] 12/24
independent [1] 16/1
indicated [2] 5/22 16/15
individual [1] 6/16
inefficient [1] 3/19
information [15] 5/11 6/14 9/12 9/18 10/11 10/12 10/16 10/18 11/8 11/17 13/23 13/24 14/2 14/12 15/17
infringement [7] 3/21 5/1 8/14 8/21 9/2 9/6 9/11
initial [3] 4/3 4/8 8/13
instance [1] 13/6
instead [1] 6/22
invalidity [8] 3/21 3/24 4/5 4/6 4/16 4/25 8/23 9/7
involved [2] 6/8 13/12
involves [1] 14/13

Exhibit 43
-398-

## I

**Irvine [1]** 2/5
**is [42]**
**issue [3]** 9/25 10/21 11/6
**issues [1]** 11/11
**it [35]**
**it's [15]** 3/11 3/18 3/25 6/3 7/20 11/2 13/14 14/1 14/4 14/5 14/6 15/5 15/6 15/6 16/7
**Item [1]** 3/3
**its [2]** 3/24 9/10

## J

**JAMES [1]** 1/8
**JENSEN [2]** 2/3 3/8
**joint [2]** 3/15 8/13
**JOSEPH [2]** 2/3 3/7
**JOSHUA [3]** 2/8 2/11 3/12
**judge [4]** 1/8 9/17 12/24 16/3
**Judicial [1]** 18/11
**July [5]** 1/17 3/1 8/22 9/3 18/13
**July 27 [1]** 8/22
**June [2]** 5/18 16/14
**just [13]** 5/25 5/25 6/2 7/16 8/4 9/14 12/1 12/20 12/25 13/23 15/13 15/18 16/10
**JVS [2]** 1/11 3/3

## K

**keep [1]** 16/11
**key [1]** 11/21
**kind [4]** 6/4 7/11 10/6 15/5
**kinds [2]** 7/22 11/11
**kitchen [1]** 7/17
**KNOBBE [2]** 2/4 3/7
**know [8]** 7/20 8/25 9/23 10/1 10/23 11/1 15/5 15/16
**knowing [1]** 10/18

## L

**language [4]** 13/9 14/19 14/20 14/21
**large [1]** 15/4
**last [1]** 3/16
**later [3]** 8/12 13/15 13/20
**law [1]** 16/2
**lawyers [2]** 11/16 15/21
**leading [1]** 4/16
**leads [1]** 11/10
**least [4]** 6/2 13/15 14/24 15/24
**leave [2]** 4/13 16/19
**LERNER [4]** 2/8 2/11 3/12 10/23
**let [5]** 3/16 3/22 5/25 5/25 6/1 9/9
**Let's [3]** 5/7 14/11 16/21
**levels [1]** 6/18
**light [2]** 4/1 9/7
**like [1]** 7/12
**likely [1]** 9/16
**limits [4]** 6/4 7/12 7/13 8/10
**line [2]** 9/5 15/14
**list [2]** 10/7 15/1
**little [2]** 7/21 7/25
**LLP [3]** 2/9 2/12 2/15
**long [2]** 6/12 11/20
**look [1]** 13/23
**lot [2]** 7/12 15/19
**LYON [5]** 2/7 3/12 5/23 9/20 12/5

## M

**made [4]** 4/4 9/14 9/16 15/25
**magistrate [2]** 9/17 9/24
**Main [1]** 2/4
**make [9]** 6/19 6/24 7/14 7/14 7/15 8/7 8/8 9/10 11/7
**makes [3]** 3/24 5/3 6/25
**many [4]** 11/15 14/3 14/8 14/8

## MARK [3]** 2/7 3/11 9/20
**Markman [2]** 7/24 18/9
**MARTENS [2]** 2/4 3/7
**MASIMO [13]** 1/9 3/4 3/7 3/23 4/1 9/5 9/10 10/15 12/18 12/21 13/12 13/22 14/11
**materials [1]** 12/15
**matter [3]** 11/21 16/12 18/9
**may [4]** 4/15 6/1 6/23 8/3 8/20 9/23 10/1 10/19 12/13 12/20
**maybe [3]** 7/21 7/22 7/22
**me [9]** 3/8 3/12 3/16 3/22 4/8 5/25 6/2 9/9 9/16
**mean [2]** 6/9 13/1
**mention [1]** 13/11
**might [3]** 6/8 11/17 14/8
**Mill [1]** 2/9
**Mission [1]** 2/12
**monkey [1]** 8/3
**month [2]** 12/6 16/19
**months [2]** 11/15 15/16
**more [8]** 5/15 7/6 7/21 8/4 8/20 10/24 14/6 16/12
**most [2]** 11/12 11/24
**motion [5]** 5/13 9/16 10/14 16/7 16/21
**motions [2]** 16/3 16/12
**move [1]** 16/14
**Mr [1]** 12/5
**Mr. [5]** 5/7 5/23 9/9 10/23 15/23
**Mr. Lerner [1]** 10/23
**Mr. Lyon [1]** 5/23
**Mr. Re [3]** 5/7 9/9 15/23
**much [2]** 17/1 17/2
**my [5]** 3/8 3/16 4/3 5/5 16/20

## N

**nail [1]** 16/11
**narrowing [1]** 4/20
**necessary [3]** 10/20 12/5 12/6
**need [7]** 4/23 5/19 7/19 7/21 10/19 11/18 12/13
**needs [4]** 5/10 5/14 7/10 10/1
**never [3]** 14/11 15/11 16/9
**new [2]** 2/16 8/25
**no [8]** 3/3 8/12 13/2 14/17 15/3 15/15 16/12 16/24
**non [1]** 12/25
**non-trade [1]** 12/25
**nonconfidential [1]** 9/21
**normal [1]** 14/7
**not [21]**
**notwithstanding [1]** 12/12
**now [7]** 7/5 7/19 9/23 12/7 12/12 12/18 16/14
**nullity [2]** 12/22 13/6
**number [5]** 3/19 7/3 7/4 8/14 15/14
**numbers [2]** 7/3 7/5
**NY [1]** 2/16

## O

**objection [1]** 9/23
**objections [2]** 10/19 16/9
**obvious [1]** 15/6
**obviously [2]** 11/18 16/8
**off [1]** 8/23
**okay [3]** 6/20 16/20 17/2
**old [1]** 15/17
**once [3]** 11/5 11/10 15/18
**one [8]** 6/3 8/20 9/9 10/13 11/7 13/13 13/17 15/13
**only [2]** 13/11 13/17
**opportunity [1]** 7/11
**order [9]** 5/13 8/12 9/13 9/22 11/15 12/3 13/18 13/21 14/24
**orders [2]** 9/24 14/15

## other [5]** 5/17 11/21 12/15 13/11 16/3
**otherwise [2]** 6/1 8/8
**ought [4]** 4/4 8/8 8/16 8/17
**our [13]** 5/12 5/19 7/2 8/22 11/6 11/19 13/23 13/24 14/1 15/21 16/1 16/5 16/5
**out [9]** 5/14 5/21 6/2 9/15 9/15 9/15 10/11 10/19 11/5
**over [1]** 6/7
**overlap [1]** 12/13
**own [1]** 11/9

## P

**P.M [1]** 3/1
**page [4]** 2/9 7/12 15/14 18/10
**pages [1]** 6/12
**Palo [1]** 2/10
**paragraph [1]** 6/17
**parallel [1]** 13/13
**Park [1]** 2/15
**part [1]** 9/21
**parte [2]** 9/8 10/20
**parties [9]** 3/18 4/4 4/7 5/15 5/20 6/6 8/7 8/13 12/2
**parties' [1]** 4/17
**partner [1]** 3/8
**parts [1]** 8/4
**party's [1]** 5/18
**pasting [1]** 6/13
**patent [10]** 9/17 12/14 12/17 13/3 13/24 14/13 14/23 15/13 16/1 16/8
**patents [9]** 5/14 7/25 8/3 8/24 9/6 12/11 14/3 14/8 14/10
**peck [1]** 10/6
**pending [1]** 16/7
**people [2]** 7/13 11/13
**Per [1]** 3/2
**permit [1]** 9/13
**pick [2]** 7/5 7/21
**picked [1]** 7/4
**place [4]** 9/13 9/23 10/2 10/14
**plaintiff [2]** 3/5 13/18
**plaintiffs [4]** 1/10 2/2 7/21 10/5
**plan [1]** 16/18
**planning [3]** 5/12 7/25 12/6
**play [1]** 15/4
**pleading [2]** 5/12 8/25
**please [3]** 3/5 3/10 10/24
**point [9]** 6/4 8/7 9/19 9/20 11/5 11/6 11/18 13/12 14/21
**points [1]** 5/25
**poker [1]** 3/22
**policy [2]** 11/21 11/24
**possible [3]** 10/22 12/7 13/14
**potentially [2]** 6/5 6/7
**practice [1]** 16/21
**preparing [1]** 7/11
**present [1]** 4/8
**presently [1]** 9/12
**PRESIDING [1]** 1/8
**prevent [1]** 16/13
**prior [9]** 3/20 3/20 3/25 4/1 4/5 4/9 4/21 8/15 13/13
**probably [1]** 7/15
**problem [2]** 14/3 14/18
**problems [3]** 11/22 12/8 13/7
**proceed [2]** 10/2 12/19
**proceedings [3]** 1/15 17/3 18/9
**produce [3]** 9/11 9/20 10/16
**produced [3]** 11/10 12/16 14/25
**producing [1]** 16/10
**product [1]** 11/9
**production [3]** 9/14 9/17 14/13
**productions [1]** 8/14
**proper [1]** 11/25
**proposal [7]** 4/8 4/11 4/20 4/24 5/21 8/13 8/15

Exhibit 43
-399-

**P**

propose [1]  4/7
proposed [1]  4/18
protective [3]  9/13 9/22 14/15
provide [1]  2/2
provided [4]  10/12 11/19 11/20 11/23
public [1]  15/13
purported [1]  13/25
purpose [1]  10/9
pursuant [2]  4/24 18/6
put [1]  7/13
putting [1]  6/4

**Q**

question [1]  8/20
quickly [1]  12/6
quite [1]  14/8

**R**

raise [2]  5/25 12/6
raised [2]  11/6 12/21
RE [5]  2/3 3/7 5/7 9/9 15/23
real [1]  13/22
really [7]  7/10 10/4 10/8
reasons [2]  7/8 14/5
received [1]  5/17
reduction [3]  3/19 4/8 4/12
reductions [1]  4/10
reevaluate [1]  9/6
references [4]  3/20 4/9 4/21 8/15
reflect [1]  4/19
reflected [1]  9/2
regard [1]  9/17
regarding [1]  5/13
regulations [1]  18/11
reign [1]  7/6
relate [1]  13/1
related [2]  6/14 12/23
relates [2]  12/25 13/3
relevant [3]  11/12 12/11 12/17
relief [1]  10/21
render [2]  12/22 13/5
replead [1]  16/16
report [1]  3/15
reported [1]  18/8
REPORTER [1]  18/16
REPORTER'S [1]  1/15
requests [1]  12/1
require [2]  3/19 4/1
required [1]  9/10
respond [1]  12/20
results [1]  16/21
review [2]  6/19 6/24
road [2]  2/9 7/8
ROSENTHAL [3]  2/8 2/14 3/13
roughly [1]  15/16
round [2]  4/3 8/14
Royal [1]  3/25
RPR [1]  1/19
rule [4]  10/4 11/24 12/9 13/8
ruled [1]  12/4
ruling [1]  14/23
run [2]  12/7 14/3

**S**

SACV [1]  1/11 3/3
SACV-20-00048-JVS [2]  1/11 3/3
said [5]  5/10 5/20 9/9 12/25 14/24
same [1]  6/25
San [1]  2/13
Santa [3]  1/16 1/20 3/1
say [5]  6/3 10/23 14/7 15/7 15/13
says [1]  12/5
schedule [2]  8/5 9/22
scheduling [1]  12/3

scope [2]  11/25 15/20
second [2]  7/5 12/5
secret [20]
secrets [11]  10/7 10/10 10/13 12/13
 12/15 12/24 13/4 13/25 14/9 15/21
 15/22
Section [2]  11/15 18/6
see [2]  9/3 16/21
seek [1]  10/20
seen [4]  6/10 11/16 15/21 16/9
SEFFENS [3]  1/19 18/15 18/16
selections [1]  4/20
SELNA [1]  1/8
sense [2]  5/3 6/25
separate [1]  9/3
September [2]  5/22 8/23
September 21 [1]  5/22
serious [1]  15/10
set [3]  5/12 7/2 8/21
seven [1]  15/16
share [1]  3/16
SHARON [3]  1/19 18/15 18/16
sheep's [1]  15/6
short [1]  9/8
should [7]  7/15 9/10 11/19 12/12 12/16
 12/18 16/23
show [1]  13/19
side [1]  13/3
sides' [1]  4/19
significant [1]  6/12
similar [1]  6/24
simply [2]  6/16 11/9
single [2]  6/22 13/13
sink [1]  7/17
sit [1]  6/15
situation [3]  10/5 13/22 15/9
six [1]  5/2
slipping [1]  5/2
so [19]
some [19]
somebody [1]  6/15
something [3]  6/10 7/9 7/19
sort [1]  7/12
SOUTHERN [1]  1/6
space [1]  16/1
specific [1]  4/11
specificity [1]  15/12
stage [2]  7/10 8/17
staging [1]  9/24
start [1]  8/2
statement [1]  10/2
states [5]  1/4 1/19 12/23 18/7 18/11
statute [4]  12/22 13/6 13/9 14/19
stenographically [1]  18/8
STEPHEN [2]  2/3 3/8
still [2]  6/14 15/7
stipulate [1]  7/23
Street [3]  1/20 2/4 2/12
strenuous [1]  16/9
subject [1]  14/13
submit [1]  8/13
substantially [1]  8/5
substituting [1]  5/14
such [1]  16/9
suggested [1]  15/10
suggesting [1]  7/18
Suite [2]  1/20 2/12
Suppose [1]  3/22
sure [5]  6/10 6/19 6/25

**T**

take [1]  16/23
talk [1]  7/5
talked [1]  10/17
target [4]  6/4 7/5 7/12 9/1
technical [7]  5/18 9/12 9/21 10/6 10/10

12/17 16/10
telephone [1]  3/2
telephonic [1]  3/2
ten [1]  7/22
terms [4]  4/18 4/23 6/8 8/17
terrible [1]  7/4
than [3]  7/21 8/12 14/7
thank [9]  3/6 3/15 5/8 5/24 10/25 16/24
 16/25 17/1 17/2
that [119]
that's [13]  5/3 5/12 6/9 6/20 7/8 7/18
 7/25 8/11 10/13 14/14 14/22 15/16
 15/18
their [7]  4/4 4/5 11/9 13/25 14/3 15/22
 16/7
theirs [1]  14/1
them [1]  6/10
then [19]
there [22]
there's [6]  6/21 7/4 7/7 12/8 13/2 15/15
these [14]  6/10 6/11 6/14 7/8 7/13 9/14
 10/5 10/18 11/1 11/5 11/10 11/22 11/22
 16/3
they [18]  7/14 7/15 7/16 8/8 10/7 10/8
 10/16 12/2 12/12 12/13 12/17 13/19
 14/3 15/10 15/12 15/17 16/10 16/11
they'll [1]  7/13
they're [3]  6/6 7/24 16/12
they've [3]  15/10 15/11 15/25
thicket [1]  13/24
thing [3]  6/3 9/9 13/11
things [3]  7/8 12/10 15/15
think [18]  4/15 4/18 4/22 5/9 5/10 5/20
 7/3 9/10 11/12 11/21 11/23 13/7 13/8
 13/17 14/5 15/19 16/14 16/20
third [2]  8/17 15/25
this [23]
those [10]  4/10 5/5 7/1 7/22 8/24 9/1
 10/10 10/13 14/5 15/15
though [3]  8/20 14/1 15/12
thought [2]  4/3
thoughts [2]  3/16 5/5
thousands [1]  6/12
through [2]  6/18 13/23
throw [2]  6/2 8/3
thrown [2]  7/16
time [8]  4/14 4/19 5/15 8/10 11/20 13/15
 15/25 16/14
times [1]  11/2
Title [1]  18/7
today [2]  16/13 16/23
tooth [1]  16/11
trade [27]
transcript [3]  1/15 18/8 18/10
trial [3]  4/14 5/4 8/18
tries [1]  14/2
trigger [1]  8/23
triggers [1]  8/22
trivial [1]  6/9
troubling [1]  8/1
true [1]  18/7
try [2]  10/7 13/25
trying [3]  7/18 8/2 10/8
two [2]  4/7 11/12
type [1]  10/20

**U**

U.S [1]  18/16
understand [3]  9/12 12/21 16/13
understood [1]  10/15
undo [1]  15/18
undone [1]  11/10
unfair [1]  3/18
unfortunately [1]  15/19
UNITED [4]  1/4 1/19 18/7 18/11
unnecessary [1]  15/19

Exhibit 43
-400-

## U

unrung [1]  10/13
until [2]  9/11 12/2
up [11]  3/24 4/19 5/21 6/5 6/11 6/15
 6/23 8/2 8/21 10/7 16/23
us [2]  10/15 10/17
use [1]  13/24

## V

vague [1]  11/7
valuable [1]  11/8
versus [1]  3/4
very [8]  6/12 8/1 12/20 13/7 13/15 13/22
 17/1 17/2
viable [1]  4/2
view [2]  7/2 11/19
views [1]  16/21

## W

waiting [1]  9/22
want [6]  5/11 8/9 8/25 10/23 11/17
 15/17
wanted [1]  13/19
wants [1]  12/19
was [8]  10/15 10/17 13/13 13/15 13/17
 13/18 14/14 14/22
wasn't [1]  4/2
waterfall [1]  12/7
wax [1]  9/4
way [2]  10/9 13/25
ways [2]  7/13 14/5
we [52]
we'll [1]  15/18
we're [6]  5/9 8/2 8/18 9/22 12/6 13/5
we've [1]  7/24
weave [1]  14/2
week [1]  3/16
weeks [2]  4/7 5/2
Well [3]  9/5 15/24 16/20
were [9]  5/18 7/18 14/9 14/17 15/3 16/3
 16/4 16/13 17/3
West [1]  1/20
what [14]  4/6 4/14 6/7 8/12 8/16 8/17
 8/18 11/12 11/16 14/14 15/20 15/22
 16/12 16/21
what's [1]  13/10
whatever [3]  4/24 6/18 7/20
whatsoever [1]  15/12
when [4]  3/24 8/25 11/14 12/14
where [6]  6/10 10/5 13/17 14/7 14/18
 15/10
Whereupon [1]  17/3
whether [4]  6/16 7/20 11/25 14/14
which [13]  5/18 6/12 6/14 6/23 8/22 9/22
 9/25 11/6 11/18 12/2 12/3 12/19 14/12
who [2]  11/16 15/21
whole [2]  10/4 10/9
why [2]  7/18 14/22
will [9]  5/14 5/20 5/21 8/7 8/13 12/8 13/6
 13/11 16/11
wind [1]  6/11
winds [1]  6/15
within [3]  4/7 4/10 12/1
without [3]  13/20 13/21 15/2
withstanding [1]  15/15
wolf [1]  15/5
work [4]  5/21 11/9 11/14 11/17
world [1]  3/22
worrying [1]  6/23
would [20]
wouldn't [1]  7/14
wrench [1]  8/4

## Y

years [1]  11/8

yes [3]  5/17 15/3 16/18
yesterday [2]  7/25 11/17
yet [1]  5/17
York [1]  2/16
you [43]
you've [1]  6/10
your [21]
yourselves [1]  8/9

Exhibit 43
-401-

# EXHIBIT 44



**Exhibit 44**

**-402-**



*Alivecor's KardiaBand*

A third-party app on the Apple Watch has also been shown to detect AF reasonably well; compared with the gold standard diagnostic method, 12-lead ECG, Cardiogram showed sensitivity of 98.0% and specificity of 90.2%. Cardiogram is not cleared by the FDA, and is separate from the newly cleared Apple programme, for which no accuracy data seem to be available. Neither this nor the official Apple app have been shown to prevent stroke or other hard endpoints.

Even so, Apple has pretty much destroyed the market for KardiaBand; no one will buy a $200 Apple Watch accessory to do something the Watch itself does.

**Non-invasive**

Just as well Alivecor is moving on to something else, then. The FDA has designated the group's KardiaK software a breakthrough device for the detection of high potassium levels in the blood. If approved, it would be the first means of diagnosing hyperkalaemia without requiring a blood draw.

Instead, the company says, KardiaK uses a deep neural network to analyse the patient's ECG. Patients with hyperkalaemia can have slow heartbeat and weak pulse.

In March Alivecor released data from a study that used more than two million ECGs linked with four million serum potassium values collected between 1994 and 2017. The results showed that its algorithm was able to detect hyperkalaemia from heart traces with sensitivity of 90-94%.

The FDA will now fast-track KardiaK. If it is approved, patients with chronic kidney disease will be able to use it to monitor their potassium levels and seek treatment if these are dangerously high.

The question for Alivecor is whether its ECG analysis technology is more resistant to copying by Apple than the ECG itself.



## Related Companies

🏷️AliveCor | Apple

## Related Topics

🏷️Cardiovascular | Diagnostic | Full Approval | Medtech

**DOWNLOAD PDF**

## Share This Article

🐦 💼 ✉️



Evaluate Vantage
with Covid-19 antibody tests

Evaluate Vantage | March 16, 2020
FDA authorises Covid-19 tests from Roche and Thermo Fisher

Evaluate Vantage | August 19, 2019
Shock approval for CVRx

**Editor's Picks**

Evaluate Vantage | September 11, 2020
Esmo 2020 preview – late-breaking immunotherapy

Evaluate Vantage | September 11, 2020
Esmo 2020 preview – a kidney cancer showdown gets star billing

Evaluate Vantage | September 07, 2020
Big pharma spinouts grow up

Evaluate Vantage | September 09, 2020
Covid vaccine developers face nervous wait

Evaluate Vantage | September 03, 2020
Medtechs that book the most sales per employee face the greatest losses

Evaluate HQ          Terms and Conditions

Exhibit 44
-403-

Case 8:20-cv-00048-JVS-JDE   Document 207-2   Filed 09/28/20   Page 283 of 287   Page ID #:15009

**Evaluate**

44-(0)20-7377-0800

Evaluate Americas
+1-617-573-9450

Evaluate APAC
+81-(0)80-1164-4754

Privacy Policies

Cookie Policy

© Copyright 2020 Evaluate Ltd.

**Exhibit 44**
**-404-**

# EXHIBIT 45

| From: | Andrea, Brian |
|---|---|
| To: | Stephen.Larson |
| Cc: | *** Apple-Masimo; Masimo.Apple |
| Subject: | Masimo v. Apple - Briefing on Stay Motion |
| Date: | Thursday, September 10, 2020 6:06:54 AM |

Steve,

As a follow up to our meet and confer regarding Apple's motion to stay the patent case, and specifically your request for extended briefing, Apple cannot agree.  As with Plaintiffs' preliminary injunction motion, Apple's motion is time sensitive, as the litigation costs Apple significant resources each day that goes by, and thus we would like it to be heard by the Court as early as possible.  If Plaintiffs are willing to agree to stay the patent case pending resolution of Apple's motion (and push all of the deadlines in the case in the event the stay is not granted), however, Apple would be willing to grant Plaintiff's request for an extended briefing schedule.

Thanks,

**Brian Andrea**

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W., Washington, DC 20036-5306
Tel +1 202.887.3624 • Fax +1 202.530.4220
BAndrea@gibsondunn.com • www.gibsondunn.com

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

**Exhibit 45**
**-405-**

# EXHIBIT 46

| | |
|---|---|
| **From:** | Perry.Oldham |
| **To:** | Rosenthal, Brian A. |
| **Cc:** | Apple-Masimo; Masimo.Apple |
| **Subject:** | Masimo v. Apple |
| **Date:** | Monday, September 28, 2020 5:03:46 PM |

Brian,

Plaintiffs write regarding Apple's release of the Series 6 Watch.   On September 9, Apple stated:

> The idea of when the new version of the Apple Watch is released shortly thereafter producing the sort of non-source code but other, you know, core technical documents so that you can very quickly determine whether you're going to assert the patents in suit against that product. If you do assert it, then we will provide the source code shortly thereafter.

As you know, Apple announced the Series 6 on September 15 and began selling it on September 18. To date, Apple has removed redactions to three documents but has not produced its promised core technical documents on the Series 6.  Please confirm Apple will produce its core technical documents for Series 6 in the next few days, including documents regarding pulse oximetry. Regardless, Plaintiffs have confirmed based on public information that the Series 6 is an accused product in this case.  Accordingly, please confirm when Apple will make its source code for Series 6 available for inspection based on its commitment to do so "shortly" after Plaintiffs confirmed Series 6 was an accused product.  Plaintiffs have also confirmed that the Series SE is also an accused product in this case.  Please let us know when Apple will provide the same information for the Series SE.

Separately, we expect Apple will produce additional information and source code about all accused products by October 9 pursuant to our agreement.  However, Apple should not wait until October 9 to produce the type of information for Series 6 and Series SE that Apple previously produced for the earlier versions of the watch.

Best regards,

Perry


**Perry Oldham**
Partner
949-721-2961
**Knobbe Martens**

Exhibit 46
-406-