Joseph R. Re (Bar No. 134479)
joseph.re@knobbe.com
Stephen C. Jensen (Bar No. 149894)
steve.jensen@knobbe.com
Perry D. Oldham (Bar No. 216016)
perry.oldham@knobbe.com
Stephen W. Larson (Bar No. 240844)
stephen.larson@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, Fourteenth Floor
Irvine, CA 92614
Telephone: (949) 760-0404 Facsimile: (949) 760-9502

Adam B. Powell (Bar No. 272725)
adam.powell@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
12790 El Camino Real
San Diego, CA 92130
Telephone: (858) 707-4000 Facsimile: (858) 707-4001

Attorneys for Plaintiffs,
Masimo Corporation and Cercacor Laboratories, Inc.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
## SOUTHERN DIVISION

| | |
|---|---|
| MASIMO CORPORATION, a Delaware corporation; and CERCACOR LABORATORIES, INC., a Delaware corporation<br><br>Plaintiffs,<br><br>v.<br><br>APPLE INC., a California corporation<br><br>Defendant. | Case No. 8:20-cv-00048-JVS-JDE<br><br>**PLAINTIFFS' OPPOSITION TO APPLE'S MOTION TO STAY THE PATENT INFRINGEMENT CASE PENDING *INTER PARTES* REVIEW PROCEEDINGS**<br><br>Date:     October 19, 2020<br>Time:     1:30 p.m.<br>Ctrm:     10C<br>Judge:    Hon. James V. Selna |

**REDACTED VERSION OF DOCUMENT**
**PROPOSED TO BE FILED UNDER SEAL**

# TABLE OF CONTENTS

**Page No.**

I.  INTRODUCTION ..................................................................................... 1

II.  STATEMENT OF FACTS ...................................................................... 2

    A.  Plaintiffs Masimo and Cercacor ................................................ 2

    B.  Apple's Efforts To Expand Into Healthcare ............................... 4

    C.  Apple's Efforts To Take Plaintiffs' Technologies ..................... 6

    D.  Apple Announces Series 6 The Same Day It Files This Motion ........................................................................................ 7

III.  ARGUMENT ......................................................................................... 8

    A.  A Stay Would Prejudice And Tactically Disadvantage Plaintiffs .................................................................................... 9

        1.  The Parties Are Direct Competitors .................................. 9

        2.  Plaintiffs Will Lose Market Share and Business Opportunities ................................................................. 11

        3.  The Timing Of The Series 6 Release Will Cause Further Harm ................................................................. 12

        4.  Delay Will Prejudice Plaintiffs In Other Ways ............. 15

        5.  Apple's Remaining Prejudice Arguments Lack Merit ............................................................................. 17

    B.  The Stage Of This Litigation Weighs Against A Stay ............. 18

        1.  The Parties and the Court Have Moved This Case Forward ......................................................................... 18

        2.  Apple Seeks To Exploit Delays That It Caused ............. 20

    C.  Staying The Patent Case Will Not Narrow The Issues ............ 20

        1.  Apple's Pre-Institution Arguments Are Highly Speculative .................................................................... 20

        2.  Apple's Statistics Do Not Show Simplification Is Likely ............................................................................. 22

-i-

# TABLE OF CONTENTS
### (*Cont'd*)

**Page No.**

3. Apple Fails To Show IPR Proceedings Will Simplify The Case ............................................................... 23

D. The Court Should Not Stay The Trade Secret Case ..................... 24

IV. CONCLUSION ......................................................................... 25

**TABLE OF AUTHORITIES**

**Page No(s).**

*Allure Energy, Inc. v. Nest Labs, Inc.*,
  2015 WL 11110606 (E.D. Tex. Apr. 2, 2015) ..............................................16

*Apple Inc. v. Samsung Elecs. Co.*,
  809 F.3d 633 (Fed. Cir. 2015) .....................................................................11

*Avago Techs. Fiber IP (Singapore) Pte. Ltd. v. IPtronics Inc.*,
  2011 WL 3267768 (N.D. Cal. July 28, 2011) ..............................................10

*Aylus Networks, Inc. v. Apple Inc.*,
  856 F.3d 1353 (Fed. Cir. 2017) ...................................................................24

*Bal Seal Eng'g, Inc. v. Nelson Prods., Inc.*,
  2014 WL 12854129 (C.D. Cal. May 20, 2014)............................................25

*Bell N. Research, LLC v. Coolpad Tech., Inc.*,
  2019 WL 3782183 (S.D. Cal. Aug. 12, 2019) ..............................................21

*Biomet Biologics, LLC v. Bio Rich Med., Inc.*,
  2011 WL 4448972 (C.D. Cal. Sept. 26, 2011)......................10, 18, 20, 22

*Carl Zeiss A.G. v. Nikon Corp.*,
  2018 WL 5081479 (C.D. Cal. Oct. 16, 2018) ..............................................16

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*,
  664 F.3d 922 (Fed. Cir. 2012) .....................................................................12

*Core Optical Techs., LLC v. Fujitsu Network Commc'ns, Inc.*,
  2016 WL 7507760 (C.D. Cal. Sept. 12, 2016)............................9, 12, 20, 23

*Douglas Dynamics, LLC v. Buyers Prod. Co.*,
  717 F.3d 1336 (Fed. Cir. 2013) ...................................................................15

*Ellison Educ. Equip., Inc. v. Stephanie Barnard Designs, Inc.*,
  Case No. 18-cv-2043-DOC (C.D. Cal. January 13, 2020)...........................19

*Evolutionary Intelligence LLC v. Yelp Inc.*,
  2013 WL 6672451 (N.D. Cal. Dec. 18, 2013) ..............................................12

*Fulfillium, Inc. v. ReShape Med., LLC*,
  2018 WL 9848044 (C.D. Cal. Jun 4, 2018), vacated on other
  grounds, 2018 WL 7286379 (C.D. Cal. Sep. 28, 2018)..............................25

*Hologram USA, Inc v. Vntana, 3D, LLC*,
  2015 WL 12791513 (C.D. Cal. Dec. 7, 2015) ........................................17, 21

**TABLE OF AUTHORITIES**
(*Cont'd*)

**Page No(s).**

*Illumina, Inc. v. Qiagen, N.V.*,
207 F. Supp. 3d 1081 (N.D. Cal. 2016) ......................................15

*Karl Storz Endoscopy-Am., Inc. v. Stryker Corp.*,
2015 WL 13727876 (N.D. Cal. Mar. 30, 2015) .....................17, 22

*KFx Med., LLC v. Stryker Corp.*,
2019 WL 2008998 (S.D. Cal. May 7, 2019) ...............................21

*Lancaster Composite, Inc. v. Hardcore Composites
Operations LLC*,
2005 WL 121794 (D. Del. Jan. 14, 2005) ...................................14

*LG Elecs., Inc. v. Eastman Kodak Co.*,
2009 WL 1468703 (S.D. Cal. May 26, 2009) ..............................16

*Lodge Mfg. Co. v. Gibson Overseas, Inc.*,
2019 WL 9443180 (C.D. Cal. Sept. 24, 2019) ............................25

*Mallinckrodt, Inc. v. Masimo Corp.*,
147 Fed. App'x 158 (Fed. Cir. 2005) ...........................................3

*Masimo Corp. v. Philips Elec. N. Am. Corp.*,
2015 WL 2379485 (D. Del. May 18, 2015) ..................................3

*Metalcraft of Mayville, Inc. v. The Toro Co.*,
848 F.3d 1358 (Fed. Cir. 2017) ..................................................11

*Nichia Corp. v. Vizio, Inc.*,
2017 WL 3485767 (C.D. Cal. Feb. 2, 2017) ...............................17

*Otto Bock HealthCare LP v. Ossur*
2013 WL 12313020, at *3 (C.D. Cal. Dec. 16, 2013) ......8, 10, 19, 21

*PersonalWeb Techs., LLC v. Facebook, Inc.*,
2014 WL 116340 (N.D. Cal. Jan. 13, 2014) ..........................12, 24

*Pi-Net Int'l, Inc. v. The Hertz Corp.*,
2013 WL 7158011 (C.D. Cal. June 5, 2013) ...............................18

*Polaris Innovations Ltd. v. Kingston Tech. Co., Inc.*,
2016 WL 7496740 (C.D. Cal. Nov. 17, 2016) .......................21, 24

*Polymer Techs., Inc. v. Bridwell*,
103 F.3d 970 (Fed. Cir. 1996) ....................................................11

**TABLE OF AUTHORITIES**
(*Cont'd*)

Page No(s).

*Power Survey, LLC v. Premier Util. Servs., LLC*,
    61 F. Supp. 3d 477 (D.N.J. 2014)................................................................14

*Power-One, Inc. v. Artesyn Tech., Inc.*,
    2008 WL 1746636 (E.D. Tex. Apr. 11, 2008) .............................................12

*Purecircle USA Inc. v. SweeGen, Inc.*,
    2019 WL 3220021 (C.D. Cal. June 3, 2019).........................................12, 23

*Select Comfort Corp., v. Tempur Sealy Int'l, Inc.*,
    2014 WL 12600114 (D. Minn. Oct. 10, 2014)............................................23

*Semiconductor Energy Lab. Co. v. Chimei Innolux Corp.*,
    2012 WL 7170593 (C.D. Cal. Dec. 19, 2012) .......................................17, 20

*SoftView LLC v. Apple Inc.*,
    2012 WL 3061027 (D. Del. July 26, 2012).............................................16, 19

*Speakware Inc. v. Microsoft Corp.*,
    2019 WL 1878350 (C.D. Cal. Feb. 21, 2019)..........................9, 18, 19, 21

*SZ DJI Tech. Co. v. Yuneec Int'l Co.*,
    2016 WL 9114148 (C.D. Cal. Dec. 1, 2016) ..................................18, 21, 22

*TAS Energy, Inc. v. San Diego Gas & Elec. Co.*,
    2014 WL 794215 (S.D. Cal. Feb. 26, 2014) ................................................12

*Toshiba Tec Corp. v. Katun Corp.*,
    2016 WL 9137646 (C.D. Cal. Sept. 21, 2016).........................10, 17, 21, 22

*TPK Touch Sols., Inc v. Wintek Electro-Optics Corp.*,
    2013 WL 6021324 (N.D. Cal. Nov. 13, 2013)............................................21

*Transocean Offshore Deepwater Drilling, Inc. v.
GlobalSantaFe Corp.*,
    2006 WL 3813778 (S.D. Tex. Dec. 27, 2006) ............................................12

*Universal Elecs., Inc. v. Universal Remote Control, Inc.*,
    943 F. Supp. 2d 1028 (C.D. Cal. 2013)...................................9, 10, 17

*Walker Digital, LLC v. Google, Inc.*,
    2014 WL 2880474 (D. Del. Jun. 24, 2014)................................................16

*Whalen Furniture Mfg., Inc. v. Z-Line Designs, Inc.*,
    No. 3:11-cv-02958-H-DHB, Slip. Op. (S.D. Cal. July 12, 2013)...............11

**TABLE OF AUTHORITIES**
*(Cont'd)*

**Page No(s).**

*Wonderland Nursery Goods Co. v. Baby Trend, Inc.*,
  2015 WL 1809309 (C.D. Cal. Apr. 20, 2015)...............................................23

**OTHER AUTHORITIES**

35 U.S.C. § 112............................................................................................24

35 U.S.C. § 314............................................................................................18

35 U.S.C. § 316............................................................................................18

35 U.S.C. § 325............................................................................................22

# I. **INTRODUCTION**

Masimo formed its business and built its reputation on pioneering pulse oximetry technology, which measures blood oxygen saturation. Although Masimo has added additional technologies over the years, pulse oximetry remains at the core of Masimo's business.

Less than two weeks ago, Apple announced, with much fanfare, the "Series 6" Watch and heavily promoted that it calculates oxygen saturation. Apple extensively touted the feature as a "remarkable new sensor" and "a breath of fresh innovation." Apple claims it is a "valuable health measurement" added to Apple's "powerful health tool" and announced three new medical research studies using the Series 6 pulse oximetry feature. Apple also released a dramatic advertisement that ends by highlighting the pulse oximetry feature and stating: "The future of health is on your wrist."

Apple filed this Motion six hours after the event. Yet, Apple still argues the parties are ***not*** competitors because Plaintiffs' "core business" is "pulse oximetry" and "target[s] the healthcare market," whereas Apple is supposedly just a "consumer electronics" company that sells some consumer products that calculate ***other*** parameters. Mot. at 15-16. Apple never even ***mentions*** the Series 6, that Apple is selling pulse oximetry, or Apple's heavy promotion of that ***very feature*** in healthcare.

Apple's requested relief is prejudicial and the timing appears to be anything but coincidental. Apple seeks to stay the case just as Apple strikes at what Apple itself acknowledges is Plaintiffs' "core business." *Id.* at 15. In attempting to obtain discovery, Plaintiffs specifically raised that the Series 6 would contain pulse oximetry, but Apple dismissed Plaintiffs' information as "Internet rumors." Apple blocked all Series 6 discovery. Apple thereby delayed discovery long enough for Apple to seek a stay while it targets Plaintiffs' core business. Granting Apple's stay would allow Apple to seize on

-1-

a critical window of opportunity to capture an emerging field.  Because of Apple's "ecosystem" of interconnected products, customers that purchase Series 6 are unlikely to purchase competitive products later.  Just as it has done in numerous other markets, Apple seeks to use its considerable resources and ecosystem to capture the market without regard for Plaintiffs' patents.

Apple's Motion is also premature because the Patent Office has not instituted any of Apple's IPRs.  At a minimum, this Court should decline to stay this case until after the institution decisions.  Moreover, Apple rushed to file its Motion before even *filing* IPR petitions on all of Plaintiffs' patents.  Apple has not cited, nor have Plaintiffs identified, any case granting a stay in such circumstances.  Thus, Apple's premature Motion is unprecedented.  Apple promises it *will* file additional petitions, but has not done so as of the filing of this opposition.  Even if Apple eventually does so, it will have deprived Plaintiffs of the information needed to argue why Apple's petitions as a whole will not simplify this case.  That alone justifies denial at this point.

Apple argues this case has not advanced significantly, but that is because Apple repeatedly violated the Court's orders and failed to provide patent discovery.  If Apple had complied with its obligations, the parties would have exchanged infringement contentions, exchanged invalidity contentions, and begun the *Markman* process.  Even with Apple's delays, the Court has issued a scheduling order and ruled on more than a dozen motions and *ex parte* applications.  The parties exchanged approximately 150,000 pages of discovery and spent 40-45 hours inspecting each other's source code.  Courts decline to stay cases in such circumstances.  The Court should do the same here.

## II.  STATEMENT OF FACTS

### A.  Plaintiffs Masimo and Cercacor

Masimo is a medical technology pioneer that revolutionized noninvasive monitoring of physiological parameters, such as oxygen saturation, pulse rate,

respiratory rate, and more.  *See Mallinckrodt, Inc. v. Masimo Corp.*, 147 Fed. App'x 158, 176-77 (Fed. Cir. 2005) (confirming infringement and validity of Masimo pulse oximetry patents, and reversing district court's denial of permanent injunction); *Masimo Corp. v. Philips Elec. N. Am. Corp.*, 2015 WL 2379485, at *19 (D. Del. May 18, 2015) ("an entire industry—other than Philips and one Chinese company—took licenses from Masimo for innovative technology that saved thousands of lives and billions of dollars in healthcare costs.").  In 1998, Masimo spun off certain technologies into a company now known as Cercacor. Ex. 1.[1] Cercacor and Masimo cross-license technologies to each other and confidentially collaborate on development.  Kiani Decl. ¶ 3.

Plaintiffs sell a variety of patient monitors, including Masimo Root (left) and Radius-7 wearable monitor (middle and right) for clinical use.  Exs. 2, 3.





---

[1] All exhibits are attached to the Declaration of Stephen W. Larson unless noted otherwise.  All emphasis is added unless noted otherwise.

1  ██████████████████████  Plaintiffs market several clinical grade products to

2  consumers, including the MightySAT (left) and iSpO2 (right).  Exs. 4, 5.



7  Plaintiffs also market Radius PPG (below), which is a wrist-worn clinical grade

8  Masimo SET pulse oximeter.  Ex. 6.



12  Radius PPG works with a variety of clinical grade monitors, as well as some

13  consumer products: (1) "Masimo Sleep" improves consumer sleep patterns, (2)

14  "Masimo SafetyNet-Open" helps organizations monitor employees during

15  COVID-19, and (3) "Masimo SafetyNet" allows doctors to remotely monitor

16  patients, including while they are recovering at home.  Exs. 7-9.   Masimo

17  SafetyNet is the only clinical grade wearable pulse oximeter available for home

18  monitoring that transmits data to the clinicians.  Kiani Decl. ¶¶ 5-6.  ████

19  ████████████████████████████████████████████

20  ████████████████████████████████████████████

21  ████████████

22  ██████████████████████████████████████████

23  ███████████████████████████████████

24

25

## B.   Apple's Efforts To Expand Into Healthcare

27  Apple is the most valuable company in the world.  Ex. 10.   While

28  ostensibly a consumer electronics company, Apple uses its resources and

platform of interconnected products to target and dominate other industries. Lawton Decl. ¶¶ 27-65.   Lacking expertise in these industries, Apple takes technology from others.   Ex. 11 (identifying famous products that Apple "stole"); Ex. 12 (explaining how Apple incorporated everything from flashlights to health applications into the iPhone); *see also* Lawton Decl. ¶¶ 58-65, 81. Having an idea "copied by Apple" is so common it has an industry term: "Getting Sherlocked." Ex. 12 at 84.   Apple identifies the correct "window of opportunity" to incorporate technology into its products.   After incorporating that technology, Apple enjoys the enormous advantage of an "ecosystem"—a platform of interconnected products that consumers are unlikely to leave to buy competitive products. Lawton Decl. ¶¶ 31-35, 104, 109.  The inevitable result is the displacement of formerly successful companies in the relevant field. Ex. 12.

As Plaintiffs' expert, Cathy Lawton, explains, Apple is now employing this same strategy in healthcare, including with the Apple Watch.  Lawton Decl. ¶¶ 73-81.  Apple introduced the original Apple Watch in late 2015 with a "built-in heart rate sensor" and "comprehensive health and fitness apps."  Ex. 13 at 1, 4.   Apple even maintains a website directed to healthcare providers entitled: "Apple Watch.  Helping your **patients** identify early warning signs."  Ex. 14. Apple's CEO, Tim Cook, recently stated: "I believe, if you zoom out into the future, and you look back, and you ask the question, 'What was Apple's greatest contribution to mankind?' it will be about **health**."  Ex. 37 at 1.

As it has done in the past, Apple is already displacing healthcare competitors.  For example, AliveCor worked with Apple to sell KardiaBand, an ECG device mounted on an Apple Watch strap.  Ex. 15.  In September 2018, Apple announced—with much fanfare—that it was incorporating ECG directly into the Apple Watch Series 4.  Apple falsely claimed it was the "first over-the-counter ECG device offered to consumers . . .."  Ex. 16 at 3.  Just eight months

1  later, AliveCor stopped selling KardiaBand.  Ex. 15.  As commentators noted,

2  "Apple ha[d] pretty much destroyed the market for KardiaBand . . .."  Ex. 44.

3       Apple moves into new markets without regard to patent infringement.

4  Apple's former "patent chief" stated that "efficient infringement, where the

5  benefits outweigh the legal costs of defending against a suit, could almost be

6  viewed as a 'fiduciary responsibility,' at least for cash-rich firms that can afford

7  to litigate without end."  Ex. 17 at 1.  Others also believe Apple's business

8  model includes so-called "efficient infringement."  Ex. 18 at 2-3 (Apple is

9  engaging in "efficient infringement," where "companies like Apple really think

10  they can just get away with infringing others' patent rights because they have

11  the resources to outlast patent owners in these legal challenges"); Ex. 19 at 1

12  ("Apple has adopted a legal strategy of stringing the case out for as long as

13  humanly possible . . . presumably in the hope that [Patent Owner] goes out of

14  business before it gets any money out of the computing giant.").

15  **C.     Apple's Efforts To Take Plaintiffs' Technologies**

16       Because Apple wanted to enter the healthcare field but lacked necessary

17  expertise, Apple contacted Plaintiffs in 2013 to discuss integrating Plaintiffs'

18  technologies into Apple's products.  Kiani Decl. ¶ 8.  Apple indicated it wanted

19  to "dig deep" into Plaintiffs' technology because Apple wanted to include

20  Plaintiffs' technology in the Apple Watch.  Ex. 20.  After those meetings, Apple

21  began systematically hiring Plaintiffs' employees.  Kiani Decl. ¶ 9.

22       Apple first hired Masimo's Chief Medical Officer and Executive VP for

23  Medical Affairs, Michael O'Reilly.  *Id.*  Apple then hired Cercacor's Chief

24  Technical Officer, Marcelo Lamego.  *Id.*  Despite Plaintiffs warnings that

25  Lamego possessed Plaintiffs' trade secrets, Apple immediately obtained patent

26  disclosures from Lamego and, within a few months, began filing applications on

27  the very technology Lamego spent years helping Plaintiffs develop.  Exs. 21-23.

28  Apple also hired at least fifteen other individuals from Plaintiffs.  Ex. 24.

Plaintiffs learned of Apple's patent infringement and trade secret misappropriation and filed suit on January 9, 2020. Dkt. 1. Plaintiffs attempted to determine the full scope of Apple's infringement by seeking discovery regarding the Apple Watch, including all versions and relevant source code. Apple repeatedly resisted providing such discovery. Dkt. 37; Dkt. 54 at 8; Dkt. 76; Dkt. 79; Ex. 43 at 12:10-19. Eventually, this Court admonished Apple and threatened sanctions: "This issue has been litigated multiple times, and Apple has not prevailed. *Now* is the time for Apple to act: The Court expects prompt and full compliance." Dkt. 92 at 2.

When Apple failed to produce a single additional document on the Court's deadline, Plaintiffs filed an application to enforce the Court's order. Dkt. 123-1. Apple opposed by arguing most of the discovery at issue pertained to Series 6, which had not been released. Dkt. 130-1. Plaintiffs argued they were entitled to discovery regarding Series 6 and raised that Series 6 was set to measure oxygen saturation, which is a core part of Plaintiffs' business. Apple dismissed Plaintiffs' concerns about pulse oximetry as "unconfirmed Internet rumors." *Id.* at 10. In an attempt to resolve two disputes without burdening the Court, Plaintiffs agreed to withdraw their application without prejudice based on Apple's agreement to produce additional technical documents and also provide information about Series 6 right after announcing the product. Dkt. 183.

**D.** **Apple Announces Series 6 The Same Day It Files This Motion**

On September 15—less than one week after Plaintiffs' withdrew their application—Apple conducted a major media event and publicly announced the Series 6. Ex. 25. The YouTube version of Apple's announcement alone has been viewed more than 13 million times. Ex. 33. Apple touted that the Series 6 includes a pulse oximeter to calculate "Blood Oxygen," characterizing the feature as "[a] breath of fresh innovation." Ex. 26 at 4. Apple also issued a press release touting its "revolutionary Blood Oxygen feature." Ex. 25. Apple

touted three partnerships with medical research hospitals that use "Apple Watch to explore how blood oxygen levels can be used in future health applications." *Id.* The event also discussed the COVID-19 pandemic and how consumers are using Apple Watch for medical purposes.

Apple featured an advertisement discussing various features added to the Apple Watch over the years and stating, "It Already Does That." Larson Decl. ¶ 2. The advertisement builds up to a final climactic scene in space with the narrator stating, "Imagine a future, one day, a tiny device . . . uses red and infrared light to measure your blood oxygen level." *Id.* As the narrator speaks, the advertisement zooms in on a space station and reveals an astronaut holding a sign stating, "It Already Does That." *Id.* The advertisement closes with the tagline: "The future of health is on your wrist." *Id.*

Apple has not produced its technical documents regarding Series 6. Larson Decl. ¶ 44.[2] Instead, less than six hours after its announcement, Apple filed this Motion to Stay. Apple did not mention Series 6, pulse oximetry, or Apple's focus on healthcare. Instead, Apple argued the parties do not compete because Plaintiffs are "medical technology" companies that focus on "pulse oximetry," whereas Apple is supposedly just a "consumer electronics" company that sells some consumer products that calculate ***other*** physiological parameters. Mot. at 15-16.

## III.  <u>ARGUMENT</u>

"The party seeking a stay bears the burden of showing that a stay is warranted." *Otto Bock HealthCare LP v. Ossur hf*, 2013 WL 12313020, at *3

---

[2] Even though Apple has not produced its technical information, Plaintiffs have confirmed that the Series 6 is an accused product based on public information. *See* Ex. 46 (email to Apple); Dkt. 89-1 (operative complaint alleging infringement of "Series 4 and later" devices).

1    (C.D. Cal. Dec. 16, 2013) (denying motion to stay).  The Court is "under no

2    obligation to delay its own proceedings by yielding to ongoing PTAB patent

3    reexaminations—even if the reexaminations are relevant to the infringement

4    claims before the Court."  *Speakware Inc. v. Microsoft Corp.*, 2019 WL

5    1878350, at *2 (C.D. Cal. Feb. 21, 2019) (internal quotations omitted).

6    "[C]ourts in this district typically consider three factors: '(1) whether discovery

7    is complete and whether a trial date has been set; (2) whether a stay will

8    simplify the issues in question and trial of the case; and (3) whether a stay

9    would unduly prejudice or present a clear tactical disadvantage to the

10   nonmoving party.'"  *Id.* (quoting *Universal Elecs., Inc. v. Universal Remote

11   Control, Inc.*, 943 F. Supp. 2d 1028, 1030-31 (C.D. Cal. 2013)).   These factors

12   are "not exhaustive" as the decision "must be based on the totality of

13   circumstances."  *Id.* (internal quotations omitted).

14   **A.    A Stay Would Prejudice And Tactically Disadvantage Plaintiffs**

15       Contrary to Apple's argument, Plaintiffs will be prejudiced and tactically

16   disadvantaged by a multi-year delay for many reasons.

17       **1.    The Parties Are Direct Competitors**

18       Apple cites case law to assert that a "primary issue in an undue prejudice

19   analysis is whether the parties are competitors such that a stay would cause

20   irreparable harm to the patentee in the market."  Mot. at 15 (quoting *Core

21   Optical Techs., LLC v. Fujitsu Network Commc'ns, Inc.*, 2016 WL 7507760, at

22   *2 (C.D. Cal. Sept. 12, 2016)).   Apple claims the parties "are not direct

23   competitors" because Plaintiffs are "medical technology" companies that focus

24   on "pulse oximetry," whereas Apple is just a "consumer electronics" company

25   selling products that calculate ***other*** parameters.  *Id.* at 15-16.

26       Apple is correct that the law focuses heavily on whether the parties are

27   competitors, but incorrect that the parties here are not competitors.  Indeed,

28   Apple ignores that its announcement of the Series 6 Watch—just ***hours*** before it

1    filed its Motion—focuses almost entirely on **oxygen saturation**.  Ex. 25.  Apple

2    also ignores that Plaintiffs offer numerous patented consumer products that

3    calculate oxygen saturation, including MightySAT, iSpO2, and Masimo Sleep.

4    Exs. 4, 5 and 7.  Even before the Series 6, the parties competed with respect to

5    pulse rate monitoring in such consumer products.  *Id.*; *see also* Kiani Decl. ¶ 10.

6         Apple is also touting its products for clinical use.  Apple announced

7    "health studies" with universities and hospitals to use "Apple Watch to explore

8    how blood oxygen levels can be used in future health applications."  Ex. 25.

9    Apple's website directed to clinicians states: "Apple Watch.  Helping your

10   **patients** identify early warning signs."  Ex. 14.  Apple's marketing has already

11   convinced third parties that Series 6 can be used for medical monitoring.  *See,*

12   *e.g.*, Exs. 29, 34, 38.  As Lawton explains, Apple's move reflects its recent push

13   into healthcare, where Apple hopes to employ its usual playbook to displace a

14   successful competitor.  Lawton Decl. ¶¶ 66-81.

15        This Court has recognized that, "when parties to litigation are direct

16   competitors" courts "presume that a stay will prejudice the non-movant[.]"  *Otto*

17   *Bock*, 2013 WL 12313020, at *3.  Thus, this Court routinely denies motions to

18   stay in such circumstances.  *Id.*; *Universal Elecs.*, 943 F. Supp. 2d at 1034

19   ("infringement among competitors can cause harm in the marketplace that is not

20   compensable by readily calculable money damages"); *Toshiba Tec Corp. v.*

21   *Katun Corp.*, 2016 WL 9137646, at *4 (C.D. Cal. Sept. 21, 2016) (courts

22   "regularly find this factor weighs strongly against granting a stay where the

23   parties are direct competitors"); *Biomet Biologics, LLC v. Bio Rich Med., Inc.*,

24   2011 WL 4448972, at *2 (C.D. Cal. Sept. 26, 2011).  Other courts reach the

25   same conclusion.  *See, e.g.*, A*vago Techs. Fiber IP (Singapore) Pte. Ltd. v.*

26   *IPtronics Inc.*, 2011 WL 3267768, at *5 (N.D. Cal. July 28, 2011) ("Unlike

27   patent infringement actions involving non-practicing entities, infringement

28   among competitors can cause harm in the marketplace that is not compensable

-10-

1  by readily calculable money damages."); *Whalen Furniture Mfg., Inc. v. Z-Line*
2  *Designs, Inc.*, No. 3:11-cv-02958-H-DHB, Slip. Op. at 5 (S.D. Cal. July 12,
3  2013) (attached as Ex. 36) (citing cases and concluding courts presume stays
4  will prejudice competitors).  This Could should do the same here.

5  ## 2.   Plaintiffs Will Lose Market Share and Business Opportunities

6  The Federal Circuit has explained that "[c]ompetitors change the
7  marketplace.  Years after infringement has begun, it may be impossible to
8  restore a patentee's (or an exclusive licensee's) exclusive position by an award
9  of damages and a permanent injunction.  Customers may have established
10 relationships with infringers." *Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970,
11 975-76 (Fed. Cir. 1996).  The Federal Circuit's observation is particularly apt
12 here.  As Apple has done in other industries, Apple is employing its
13 considerable resources and platform of interconnected products to seek a
14 position of dominance in the healthcare industry.  Lawton Decl. ¶¶ 66-81.  As
15 Lawton explains, Apple's strategy will result in Plaintiffs losing market share
16 and business opportunities.  *Id.*  Once consumers invest in Apple's ecosystem,
17 they rarely leave to purchase competing products.  *Id.*  Thus, Plaintiffs are likely
18 to lose market share and sales to Apple.  *Id.*; Kiani Decl. ¶ 10.

19 The Federal Circuit recognizes that the loss of a customer "may have far-
20 reaching, long-term impact on its future revenues, and the sales lost by
21 [Plaintiff] are difficult to quantify due to 'ecosystem' effects, where one
22 company's customers will continue to buy that company's products and
23 recommend them to others." *Metalcraft of Mayville, Inc. v. The Toro Co.*, 848
24 F.3d 1358, 1368 (Fed. Cir. 2017) (quoting *Apple Inc. v. Samsung Elecs. Co.*,
25 809 F.3d 633, 641, 645 (Fed. Cir. 2015)).  This is not controversial—Apple
26 itself successfully argued to the Federal Circuit that the "ecosystem" effect,
27 where a lost sale impacts other future sales, supports the higher standard of
28 ***irreparable harm***.  *Apple*, 809 F.3d at 645.

-11-

Apple's citations are inapposite because they addressed cases where the parties were not competitors.  *See Core Optical*, 2016 WL 7507760, at *2 (plaintiff's "status as a non-practicing entity weighs in favor of a stay"); *TAS Energy, Inc. v. San Diego Gas & Elec. Co.*, 2014 WL 794215, at *5 (S.D. Cal. Feb. 26, 2014) (the parties were not competitors ***and*** "there is no continuing sale of infringing products"); *PersonalWeb Techs., LLC v. Facebook, Inc.*, 2014 WL 116340, at *5 (N.D. Cal. Jan. 13, 2014) (the parties are "not competitors"); *Evolutionary Intelligence LLC v. Yelp Inc.*, 2013 WL 6672451, at *8 (N.D. Cal. Dec. 18, 2013) (rejecting conclusory assertion that plaintiff may eventually release competing products).  Apple does cite a case where the parties were competitors, but that case found that prejudice weighed ***against*** a stay for precisely that reason.  *Purecircle USA Inc. v. SweeGen, Inc.*, 2019 WL 3220021, at *3 (C.D. Cal. June 3, 2019).

### 3. The Timing Of The Series 6 Release Will Cause Further Harm

The risk of harm is particularly significant here because, as it has done in other markets, Apple is again releasing a product at a critical "window of opportunity" to exploit an emerging field.  Lawton Decl. ¶¶ 105, 108, 111.  As the Federal Circuit explained, "[d]uring the growth stage of a product[,] it is particularly crucial to be able to distinguish oneself from competitors.  This includes building the brand, expanding the customer base, and establishing one's reputation and leadership in the market."  *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 931 (Fed. Cir. 2012).  Courts find such facts satisfy the higher standard of irreparable harm.  *See Transocean Offshore Deepwater Drilling, Inc. v. GlobalSantaFe Corp.*, 2006 WL 3813778, at *4 (S.D. Tex. Dec. 27, 2006) (the infringer would steal market share in a "developing market"); *Power-One, Inc. v. Artesyn Tech., Inc.*, 2008 WL 1746636, at *1 n.1 (E.D. Tex. Apr. 11, 2008) (the parties were competitors in a "recently created" market).

-12-

Here, Plaintiffs are racing to develop the emerging field of wearable home monitoring. Kiani Decl. ¶¶ 4-6. The timing has become particularly critical due to the global pandemic. ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████ When COVID-19 hit, an urgent need arose to monitor COVID-19 patients from home. ████████████████████████

████████████████████████████████████████████████████████

████████████████ Masimo SafetyNet quickly made national news as the only clinical grade remote wearable pulse oximeter available to monitor COVID-19 patients from their home. Ex. 27. Demand was immediate. Kiani Decl. ¶ 6. MightySat, a clinical grade pulse oximeter available to consumers, is also recognized as a critical tool for early detection of COVID-19 symptoms. Ex. 28 at 7-8. ████████████████████████████████████████

████████████████████████████████████████████████████████

If the Court grants Apple's requested stay, Apple will attempt to satisfy the surging demand for at-home health monitoring solutions, and harm Plaintiffs' ability to grow their own share of this emerging field. Lawton Decl. ¶¶ 104-14; Kiani Decl. ¶ 10. Reports have already surfaced suggesting Series 6 can be used to monitor COVID-19 patients at home. Exs. 29, 38. At least one consumer acknowledged Plaintiffs' products are "the best American medical device engineering has to offer" from "a leader in hospital grade equipment," but complained about the cost of this clinical product and concluded: "Thank god Apple Watch is going to have O2 monitoring." Ex. 42. Apple will attempt to flood consumers with its pulse oximetry product during a stay. The resulting prejudice is significant. As Lawton explains, because of Apple's ecosystem, consumers that purchase Series 6 during this window of opportunity are

-13-

1  unlikely to switch.  Lawton Decl. ¶¶ 15, 16, 18, 31, 50, 104-111; Kiani Decl.
2  ¶ 10.

3      Apple's unfettered sale of pulse oximetry products is particularly
4  concerning because Plaintiffs' initial testing indicates that Series 6 does not
5  reliably measure oxygen saturation.  Kiani Decl. ¶ 11.  Particularly in an
6  emerging field, a defendant's poorly performing product can harm a plaintiff
7  because customers may assume *all* products in that field perform poorly.
8  *Lancaster Composite, Inc. v. Hardcore Composites Operations LLC*, 2005 WL
9  121794, at *5 (D. Del. Jan. 14, 2005) (finding a "risk of irreparable injury to
10 plaintiff" because the defendant may produce products that "could be of
11 substandard quality or could be delivered in an untimely fashion, jeopardizing
12 acceptance of this relatively new [technology]"); *Power Survey, LLC v. Premier
13 Util. Servs., LLC*, 61 F. Supp. 3d 477, 487 (D.N.J. 2014) (finding irreparable
14 harm was "exacerbated by the fact that this is a new field" and customers "may
15 assume that all of these products have false negative rates regardless of which
16 product they are utilizing").

17     The Washington Post also reported accuracy problems with the Series 6.
18 Ex. 30 at 152.  The articles states that Apple's marketing of the Series 6 is
19 "dangerous" and "deceptive at a time when many people are looking to health
20 monitors for any clue that they may have covid-19, the illness caused by the
21 novel coronavirus."  *Id.*  Apple is "marketing a device with medical functions
22 while winking and insisting they're not medical functions."  *Id.* at 154.
23 "Whatever the fine print might say, some people are going to treat these as
24 medical devices – and that's a concern."  *Id.*

1  ████████████████████████████████████████

2  ██████████████████████████████

3       The facts of *Illumina, Inc. v. Qiagen, N.V.*, 207 F. Supp. 3d 1081, 1093

4  (N.D. Cal. 2016) are very similar to this case.  There, the court found the market

5  was "expected to grow substantially in the near future" and "as the doors to the

6  market have swung open, [defendant] seeks to usurp Illumina's position in that

7  market with pirated technology."  *Id.*  The court found the plaintiff "would

8  suffer irreparable harm if [defendant] were allowed to capture and define the

9  market with pirated technology alongside its preexisting relationships and

10  disruptive business model."  *Id.*  Further, the harm "could be compounded if

11  [defendant's] products perform poorly—a serious prospect supported by the

12  evidence herein."

13       Similarly, here, Apple should not be permitted to "capture and define the

14  market" using Plaintiffs' patented technology and Apple's "disruptive business

15  model."  *See id.*  Despite accuracy problems, and contrary to its fine print,

16  Apple is marketing Series 6 as having a medical function and some third parties

17  seem to believe the Series 6 is the panacea of healthcare, including to monitor

18  patients with COVID-19.  Ex. 29.  Apple's marketing of the Series 6 creates a

19  need for Plaintiffs to move forward with this case.

20       **4.    Delay Will Prejudice Plaintiffs In Other Ways**

21       Plaintiffs will suffer prejudice in additional ways.  First, Plaintiffs will

22  suffer harm to their reputation as an innovator.  As the Federal Circuit

23  explained, a plaintiff's "reputation as an innovator will certainly be damaged if

24  customers found the same 'innovations' appearing in competitors' [products]."

25  *Douglas Dynamics, LLC v. Buyers Prod. Co.*, 717 F.3d 1336, 1344-45 (Fed.

26  Cir. 2013).  Here, Plaintiffs have obtained more than one hundred awards for

27  innovations in non-invasive monitoring.  Ex. 31.  Despite Apple being a

28  consumer electronics company with little experience in non-invasive

monitoring, Apple is already claiming that *it* is the true innovator of wearable pulse oximetry technology.   Apple's website describes the pulse oximeter feature of the Series 6 as "a breath of fresh innovation" and a "remarkable new sensor."   Ex. 26 at 4, 5.   Apple's press release claimed Apple introduced a "revolutionary Blood Oxygen feature" and "completely redefines what a watch can do."  Ex. 25 at 126.

Second, the '776 Patent will expire in June of 2022.   As this Court explained, "[p]lacing an asserted patent 'in limbo for the majority of its remaining life would create a clear tactical disadvantage for [p]laintiffs.'"  *See Carl Zeiss A.G. v. Nikon Corp.*, 2018 WL 5081479, at *4 (C.D. Cal. Oct. 16, 2018) (quoting *Biomet Biologics*, 2011 WL 4448972, at *2); *see also Walker Digital, LLC v. Google, Inc*., 2014 WL 2880474 (D. Del. Jun. 24, 2014) (finding prejudice because the patents would expire soon).

Third, delay may result in loss of evidence or the inability of witnesses to recall specific facts.   That is particularly relevant here because this case involves misconduct Apple successfully concealed for years.   *See* Dkt. 60 (this Court rejecting Apple's statute of limitations defense where "Apple requested non-publication of various patent applications containing Plaintiffs' trade secrets").   Courts routinely find prejudice in such circumstances.   *LG Elecs., Inc. v. Eastman Kodak Co.*, 2009 WL 1468703, at *2 (S.D. Cal. May 26, 2009) ("[D]elaying a trial increases 'the danger of prejudice resulting from the loss of evidence, including the inability of witnesses to recall specific facts.'"); *Allure Energy, Inc. v. Nest Labs, Inc.*, 2015 WL 11110606, at *1 (E.D. Tex. Apr. 2, 2015) ("The stay also tactically disadvantages Plaintiff, as the longer this matter persists, the more likely it is that evidence and witnesses' memories will disappear or deteriorate."); *SoftView LLC v. Apple Inc.*, 2012 WL 3061027, at *4 (D. Del. July 26, 2012) ("[R]esuming litigation after a protracted stay could raise issues with stale evidence, faded memories, and lost documents.").

Fourth, courts consider whether the timing of defendant's IPR petition and motion to stay indicates defendant seeks a tactical advantage. *See Toshiba*, 2016 WL 9137646, at *3 (denying stay where defendant knew of the importance of filing IPR petitions early but waited until months after the scheduling order and after the court denied a motion to compel mediation). Here, Apple took *eight months* to file its first petition for IPR, during which Apple repeatedly argued that patent discovery should be stayed pending compliance with Section 2019.210. After the Court repeatedly rejected Apple's request to stay discovery, Apple filed the IPRs. Apple then waited until the very day it announced pulse oximetry to seek a stay of all of Plaintiffs' patent claims. Apple also filed its motion even though it has not even *filed* IPRs on all of the patents. The timing of Apple's actions provides another reason to deny this Motion.

### 5. **Apple's Remaining Prejudice Arguments Lack Merit**

Apple argues money damages are sufficient because Plaintiffs failed to seek a preliminary injunction against products that did not purport to calculate oxygen saturation. Mot. at 17. As support, Apple again cites cases where the Court relied on the parties *not* competing. *See Nichia Corp. v. Vizio, Inc.*, 2017 WL 3485767, at *6 (C.D. Cal. Feb. 2, 2017); *Semiconductor Energy Lab. Co. v. Chimei Innolux Corp.*, 2012 WL 7170593, at *4 (C.D. Cal. Dec. 19, 2012).[3] This Court rejects the argument that failing to seek a preliminary injunction is significant where, as here, the parties are competitors. *See Universal Elecs.*, 943 F. Supp. 2d at 1034 ("The fact that Plaintiff did not seek a preliminary injunction does not mean that it would not suffer prejudicial harm from its competitor's market activity during a lengthy delay in the case."); *Hologram*

---

[3] Apple's other cited case is from another District and considered the failure to seek a preliminary injunction as only one factor. *See Karl Storz Endoscopy-Am., Inc. v. Stryker Corp.*, 2015 WL 13727876, at *4 (N.D. Cal. Mar. 30, 2015).

*USA, Inc v. Vntana, 3D, LLC*, 2015 WL 12791513, at *3 (C.D. Cal. Dec. 7, 2015) (same); *SZ DJI Tech. Co. v. Yuneec Int'l Co.*, 2016 WL 9114148, at *3 (C.D. Cal. Dec. 1, 2016) ("[T]he Court will not hold against [plaintiff] its decision to spare the parties more litigation"); *Biomet Biologics*, 2011 WL 4448972, at *2.

Apple also argues money damages are sufficient because "[t]he shortened timeline of IPR proceedings also ensures that any stay granted by the Court will be relatively short . . .." Mot. at 17.  That is incorrect.[4]  By statute, Plaintiffs' response to those IPR requests is due in three months, the PTAB takes three months to decide whether to institute the IPR, and then the PTAB takes between twelve and eighteen months to issue a final written decision.   35 U.S.C. § 314(b); 35 U.S.C. § 316(a)(11).  Thus, if the PTAB institutes any of Apple's IPRs, it will not issue a final decision until at least **March of 2022** and potentially as late as **September of 2022**.  The parties would then need to continue this litigation where it left off.  Because this case is currently set for trial in April of 2022, Apple's stay would likely push trial until **late 2023 or early 2024**.  Staying this case will indisputably result in a lengthy delay that gives Apple years to build market share with impunity in an emerging market.

**B.** **The Stage Of This Litigation Weighs Against A Stay**

   **1.** **The Parties and the Court Have Moved This Case Forward**

The stage of litigation "counsel[s] against a stay of the action" where a scheduling order has issued, a trial is set, and the parties have engaged in motion practice.  *SpeakWare*, 2019 WL 1878350, at *2 (C.D. Cal. Feb. 21, 2019).  In *SpeakWare*, the defendant filed an IPR four months after the complaint was

---

[4] Apple cites a single case to support its position, but that case involved parties that were not competitors.  *See Pi-Net Int'l, Inc. v. The Hertz Corp.*, 2013 WL 7158011, at *4 (C.D. Cal. June 5, 2013).

1  filed.  *Id.* at \*1-2.  In that time, the parties had "expended non-trivial resources
2  into this litigation," because "a scheduling order has been issued, a motion to
3  consolidate has been decided, and a trial date has been set in the instant action."
4  *Id.*    Similarly, in *Ellison*, the Court denied a motion to stay because
5  "[d]efendants filed their petition for IPR, knowing full well that dates had
6  already been chosen and scheduled," and "while more discovery remains, the
7  parties have already undertaken some discovery and expended resources to do
8  so."  *Ellison Educ. Equip., Inc. v. Stephanie Barnard Designs, Inc.*, Case No.
9  18-cv-2043-DOC (C.D. Cal. January 13, 2020) (attached as Ex. 39) at 2-3.

10        This case is much further along than *SpeakWare* or *Ellison*.  Indeed, this
11  case already has more than two-hundred docket entries.  The Court issued a
12  scheduling order, set a trial date, and decided **fourteen** motions and *ex parte*
13  applications, including a motion to dismiss and a motion for preliminary
14  injunction.  Dkt. 17, 36, 37, 54, 59, 60, 67, 76, 79, 92, 93, 96, 135, 147, 159,
15  175, 206.  The Court will also address another motion to dismiss before hearing
16  this Motion.  *See* Dkt. 104.  The Court has addressed substantive issues,
17  including rejecting Apple's statute of limitations defense and finding Plaintiffs
18  were likely to succeed in proving Apple misappropriated trade secrets.   Dkt. 60
19  at 5-6; Dkt. 206.  Apple brought the majority of the disputes, and the Court
20  denied all but one of Apple's requests.  *Id.*

21        Courts deny motions to stay in similar circumstances.  *See Otto Bock*,
22  2013 WL 12313020, at \*3 ("Although it is true that discovery has only just
23  commenced in this case, this factor is less weighty here" where the parties asked
24  the Court to resolve substantive issues.)  In another Apple litigation, the court
25  denied a motion to stay because "the economies that might otherwise flow from
26  granting a stay early in a case are somewhat offset by the substantial resources
27  already incurred by both the parties and the Court."  *SoftView,* 2012 WL
28  3061027 at \*4.  *SoftView* also recognized the need to balance the stage of

-19-

litigation against the stage of Patent Office proceedings. *Id.* Here, this case is well under way, while Apple has not even filed all of its IPR petitions.

### 2. Apple Seeks To Exploit Delays That It Caused

Apple argues this case is in the early stages and that little discovery has taken place. Mot. at 8. As this Court has explained, that argument is "significantly diminished by the fact that Defendants themselves have caused substantial delays in the progress of this case." *Biomet Biologics*, 2011 WL 4448972, at *1. Here, Apple not only caused delay, but did so by repeatedly disregarding the Court's orders, including failing to produce technical documents. *See* Dkt. 37; Dkt. 54 at 8; Dkt. 76; Dkt. 79; Ex. 43 at 12:10-19; Dkt. 92 at 2. Apple also asked for, and received, several courtesy extensions from Plaintiffs. Dkt. 12; Dkt. 30.[5] Apple's assertion that "fact discovery has barely begun," Mot. at 9, ignores that the parties have produced approximately 150,000 pages of discovery and spent 40-45 hours inspecting each other's source code. Larson Decl. ¶ 50. This case is thus distinguishable from Apple's cited cases (*Polaris PowerLED*, *PureCircle USA*, *Core Optical*, *Aten Int'l Co.*, and *Semiconductor Energy Lab*), which did not address litigation delays by the moving party or the protracted motion practice Apple has engaged in here.

### C. Staying The Patent Case Will Not Narrow The Issues

### 1. Apple's Pre-Institution Arguments Are Highly Speculative

Apple argues a pre-institution, pre-petition stay is appropriate because IPR proceedings will simplify the case. Mot. at 10. But Apple cannot show such efficiencies because it has not even ***filed*** all of its petitions, much less received an institution decision from the PTAB. This Court routinely declines to grant pre-institution stays even after IPRs are filed because any purported

---

[5] Apple refused to extend the same courtesy by declining to give Plaintiffs more time to respond to this Motion because "the litigation costs Apple significant

efficiencies are speculative.  *See, e.g.*, *SZ DJI*, 2016 WL 9114148, at *3 (pre-institution "makes it more difficult to predict whether the issues are likely to be simplified"); *Toshiba*, 2016 WL 9137646, at *3 ("[a]ny prospect of simplification is, thus, speculative at best"); *SpeakWare*, 2019 WL 1878350, at *2 (C.D. Cal. Feb. 21, 2019) (simplification was "inherently speculative"); *Hologram*, 2015 WL 12791513, at *3 ("the undecided status of the IPR petition clouds the simplification inquiry"); *Polaris Innovations Ltd. v. Kingston Tech. Co., Inc.*, 2016 WL 7496740 (C.D. Cal. Nov. 17, 2016) (stay was "based on nothing more than the fact that a petition for *inter partes* review was filed"); *Otto Bock*, 2013 WL 12313020, at *3 (same).

Other courts reach the same conclusion.  *TPK Touch Sols., Inc v. Wintek Electro-Optics Corp.*, 2013 WL 6021324, at *4 (N.D. Cal. Nov. 13, 2013); *Bell N. Research, LLC v. Coolpad Tech., Inc.*, 2019 WL 3782183 (S.D. Cal. Aug. 12, 2019).  "Indeed, the majority of district courts have postponed ruling on stay requests or have denied stay requests when the PTAB has not yet acted on the petition for review."  *KFx Med., LLC v. Stryker Corp.*, 2019 WL 2008998 (S.D. Cal. May 7, 2019).  At a minimum, this Court should decline to stay this case until after the institution decisions.

Apple's pre-institution arguments are also speculative because Apple is reusing references already submitted to the PTO.[6]  Even when Apple relies on different art, the teachings in many references are no different than the teachings in art the PTAB already considered.  *See, e.g.*, Ex. 40 at 5-6 (noting deficiencies

---

resources each day that goes by."  Ex. 45.

[6] Dkt. 197 at 147, 153 (re-using U.S. Patent No. 6,527,729, which is cited on the face of the '776 patent); 305, 316 (re-using U.S. Patent No. 6,801,799, which is cited on the face of the '553 patent); 534, 538 (re-using U.S. Patent No. 6,801,799, which is cited on the face of the '554 patent), 865, 869 (re-using U.S. Patent No. 5,632,272, which is cited on the face of the '703 patent).

in art of record).  The PTAB can deny institution of an IPR where the same or substantially the same art was presented to the PTO.  35 U.S.C. § 325(d).

Apple's arguments are particularly speculative because Apple has not even filed all of its IPRs.  Apple's timing deprived Plaintiffs of the ability to make any arguments about those IPRs, which may contain even more deficiencies.  Apple fails to cite—and Plaintiffs have not found—a single case granting a motion to stay based on IPR filings made *after* the motion was filed.

### 2. Apple's Statistics Do Not Show Simplification Is Likely

Apple contends that high institution and invalidation rates make it likely the PTAB will institute IPR proceedings and invalidate Plaintiffs' claims.  Mot. at 12.   The Court has rejected such arguments.  *See SZ DJI*, 2016 WL 9114148, at *3 ("Defendants' reliance on statistics is also insufficient support to warrant a stay."); *Biomet Biologics*, 2011 WL 4448972, at *3 (same); *Toshiba*, 2016 WL 9137646, at *3 (finding statistics "regarding the percentage of claims invalidated as a result of inter partes reexaminations largely inapplicable" and concluding "[a]ny prospect of simplification is, thus, speculative at best.").

Apple's statistics also do not support its position.  Apple relies on cumulative institution rates since 2012, but ignores that institution rates are far lower today.  Dkt. 197 (Ex. S) at 980 (reporting 31% decline in institution rates from 2012 through July 2020 and a 56% institution rate for IPRs filed in 2020).  Apple's cited cases (*Comfort Corp.*, *Blast Motion*, and *Karl Storz*) are inapplicable because they also rely on outdated statistics from years ago.

Apple's statistics are also inaccurate.  Since 2012, only 28% of IPR petitions reached a final written decision.  Dkt. 197 (Ex. S) at 984.  Of the IPRs that have not settled, 64.6% have resulted in decisions *favorable* to the patent owner by either denying institution or confirming the patentability of one or more claims.  Dkt. 197 at 985.  Apple's reliance on its own "track record" is also misplaced because Apple obtained a finding of unpatentability of all claims

in only 34% of its petitions.  Dkt. 197 at 988 (Ex. T).  After the vast majority of Apple's IPRs, the patentee still had claims to assert.  Thus, it is highly ***unlikely*** that Apple's petitions will fully resolve Plaintiffs' claims.

Moreover, while proclaiming that institution is likely, Mot. at 12, Apple admits to other courts that the PTAB often declines to hear Apple's petitions due to ongoing litigation.  Apple recently sued the PTO over the PTO's ability to "deny a petition for IPR based on a balancing of discretionary factors relating to the pendency of parallel patent infringement litigation . . .."  Ex. 32 (complaint) at ¶ 5.  Apple argued "[t]he agency's application of that rule has ***dramatically reduced*** the availability of IPR" and "[t]he Board is likely to deny at least some of [Apple's] pending or future IPR petitio*n*s under the *NHK-Fintiv* rule based on the pendency of litigation."  *Id.* ¶¶ 5, 59.  The complaint identifies numerous IPR proceedings, including many filed by Apple, in which the PTAB denied institution.  *Id.* ¶¶ 53-58.  Apple's admissions undermine its arguments about the likelihood of institution.

### 3.     Apple Fails To Show IPR Proceedings Will Simplify The Case

Because Apple infringes numerous patents across three families, and because Apple has already filed several IPR petitions and plans to file more, the PTAB will likely assign the petitions to different panels.  Indeed, 102 different PTAB judges have been assigned to IPRs previously filed by Apple.  *See* Dkt 197 at 989 (Ex. T).  Far from streamlining this litigation, the IPRs could add more complexity with inconsistent decisions.  Apple's cited cases are thus inapplicable because they found simplification where the litigation involved only a ***single*** patent.  *See Purecircle*, 2019 WL 3220021; *Core Optical*, 2016 WL 7507760; *Wonderland Nursery Goods Co. v. Baby Trend, Inc.*, 2015 WL 1809309 (C.D. Cal. Apr. 20, 2015); *Select Comfort Corp., v. Tempur Sealy Int'l, Inc.*, 2014 WL 12600114, at *2 (D. Minn. Oct. 10, 2014).

1  Apple also speculates that a stay would allow the Court to benefit from

2  the PTAB proceedings due to hypothetical future statements by Plaintiffs that

3  may purportedly inform claim construction.  Mot. at 11.  Apple cites *Aylus*

4  *Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1362 (Fed. Cir. 2017), which

5  discussed whether prosecution disclaimer occurred during an IPR.  It did not

6  address a stay based upon the theoretical possibility of such statements

7  occurring in the future.

8  Apple also argues that its stipulation will simplify the case.  Mot. at 11-

9  12.  But Apple's carefully-worded stipulations shows the opposite.  Apple states

10  that, if the PTAB institutes IPR on a specific ground, Apple will not assert that

11  **specific ground** in this litigation.  Dkt. 197 at 947, 951, 955, 959, 963, 967, 971.

12  Apple's stipulations erroneously "reserves its rights to continue to assert **all**

13  **grounds other than Instituted Grounds**."  Dkt. 197 at 948 (Ex. L), 952 (Ex. M),

14  956 (Ex. N), 960 (Ex. O), 964 (Ex. P), 968 (Ex. Q), 972 (Ex. R).  Apple's

15  reservation distinguishes this matter from Apple's cited cases (*Limestone*,

16  *PersonalWeb*, *Wonderland*, *Purecircle*, and *Polaris*) where IPR estoppel was a

17  factor in the Court's decision.   Additionally, Apple is raising other invalidity

18  defenses not at issue in the IPRs, including defenses based on 35 U.S.C. § 112.

19  Accordingly, Apple is not using the IPRs as a mechanism to streamline this

20  case.  Instead, Apple hopes to exploit a stay from current and prospective IPRs

21  to capture the nascent market and assert further validity challenges later.

22  **D.**     **The Court Should Not Stay The Trade Secret Case**

23  Apple briefly argues the Court may "opt to stay the entire action."  Mot.

24  at 21.  During the conference of counsel, however, Apple unequivocally stated it

25  would ***not*** ask the Court to stay claims other than patent infringement.  Larson

26  Decl. ¶ 3.  Regardless, staying the trade secret case would prejudice Plaintiffs

27  for the reasons discussed above.  This Court already found Plaintiffs are likely

28  to prove Apple misappropriated Plaintiffs' trade secrets.  Dkt. 206.  There is no

reason to delay Plaintiffs' ability to seek relief for such misappropriation. *See Fulfillium, Inc. v. ReShape Med., LLC*, 2018 WL 9848044, at *3 (C.D. Cal. Jun 4, 2018) ("even if the PTAB eventually institutes IPR, it would have no chance of effecting Fulfillium's misappropriation of trade secrets claim"), vacated on other grounds, 2018 WL 7286379 (C.D. Cal. Sep. 28, 2018).

Apple cites *Lodge Mfg. Co. v. Gibson Overseas, Inc.*, 2019 WL 9443180, at *2-3 (C.D. Cal. Sept. 24, 2019), but that case addressed counterclaims raised by *defendant* in response to patent infringement claims.  Apple also cites *Bal Seal Eng'g, Inc. v. Nelson Prods., Inc.*, 2014 WL 12854129, at *2–3 (C.D. Cal. May 20, 2014), but that case specifically found the presence of trade secret claims "counsels *against* a stay."  *Bal Seal* granted a stay because there was little potential for ongoing infringement.  *Id.*  Here, Apple is aggressively marketing a new product that targets Plaintiffs' primary business.

## IV.  <u>CONCLUSION</u>

For all the reasons discussed above, Plaintiffs respectfully request the Court deny Apple's Motion to Stay.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  September 28, 2020     By: */s/ Stephen W. Larson*
Joseph R. Re
Stephen C. Jensen
Perry D. Oldham
Stephen W. Larson
Adam B. Powell

Attorneys for Plaintiffs,
Masimo Corporation and
Cercacor Laboratories

33482384

33599378

-25-