JOSHUA H. LERNER, SBN 220755
  jlerner@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street Suite 3000
San Francisco, CA 94105
Tel.: 415.393.8200 / Fax: 415.393.8306

H. MARK LYON, SBN 162061
  mlyon@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA 94304-1211
Tel.: 650.849.5300 / Fax: 650.849.5333

BRIAN M. BUROKER, *pro hac vice*
  bburoker@gibsondunn.com
BRIAN K. ANDREA, *pro hac vice*
  bandrea@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Tel.: 202.955.8500 / Fax: 202.467.0539

BRIAN A. ROSENTHAL, *pro hac vice*
  brosenthal@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Tel.: 212.351.2339 / Fax: 212.817.9539

ILISSA SAMPLIN, SBN 314018
  isamplin@gibsondunn.com
GIBSON, DUNN & CRUTCER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Tel.: 213.229.7000 / Fax: 213.229.7520

ANGELIQUE KAOUNIS, SBN 209833
  akaounis@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2029 Century Park East Suite 4000
Los Angeles, CA 90067
Tel.: 310.552.8546 / Fax: 310.552.7026

Attorneys for Defendant Apple Inc.

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| MASIMO CORPORATION, CERCACOR LABORATORIES, INC., <br><br> Plaintiffs, <br><br> v. <br><br> APPLE INC., <br><br> Defendant. | CASE NO. 8:20-cv-00048-JVS (JDEx) <br><br> **DECLARATION OF ILISSA SAMPLIN IN SUPPORT OF DEFENDANT APPLE INC.'S MOTION TO COMPEL PLAINTIFFS TO COMPLY WITH SECTION 2019.210** <br><br> Judge:   Magistrate Judge John D. Early <br> Date/Time:   January 7, 2021 / 10:00 AM <br> Courtroom:   6A <br><br> Discovery Cutoff:   7/5/2021 <br> Pre-trial Conference:   3/21/2022 <br> Trial:   4/5/2022 |

I, Ilissa Samplin, declare and state as follows:

1.      I am an attorney duly licensed to practice law before this Court and all courts of the State of California.  I am a partner with the law firm of Gibson, Dunn & Crutcher LLP ("Gibson Dunn") and counsel of record for Apple Inc. ("Apple") in the above-captioned action.

2.      I have personal, firsthand knowledge of the facts stated herein and, if called upon to do so, could and would competently testify thereto.

3.      I make this declaration in support of Apple's Motion to Compel Plaintiffs to Comply with Section 2019.210 (the "Motion").

4.      On October 9, 2020, after ten months' delay, Plaintiffs finally provided Apple with what purported to be a trade secret disclosure pursuant to California Code of Civil Procedure Section 2019.210 ("Section 2019.210").  A true and correct copy of Plaintiffs' October 9 disclosure is attached hereto as **Exhibit A [filed under seal]**.

5.      On October 16, I wrote a letter to Stephen Larson (counsel of record for Plaintiffs) outlining the many deficiencies in Plaintiffs' October 9 disclosure and requesting a conference of counsel pursuant to Local Rule 37-1.  A true and correct copy of my October 16 letter to Mr. Larson is attached hereto as **Exhibit B [filed under seal]**.

6.      The parties met and conferred pursuant to Local Rule 37-1 on October 26, 2020.  During the meet and confer, Plaintiffs declined to take a position on any of the problems Apple identified with Plaintiffs' disclosure, and the parties therefore were unable to resolve any of their disputes.

7.      On October 28, 2020, Adam Powell (counsel of record for Plaintiffs), followed up on the parties' October 26 conference of counsel with a letter to me defending the sufficiency of Plaintiffs' October 9 disclosure, but promising to amend it by removing "some or all" of the catch-all phrases that Apple identified and which Judge Selna previously found problematic.  A true and correct copy of Mr. Powell's October 28 letter addressed to me is attached hereto as **Exhibit C**.

8.      On October 30, 2020, I replied to Mr. Powell's October 28 letter, further explaining why Apple deems Plaintiffs' October 9 disclosure inadequate under Section 2019.210.  A true and correct copy of my October 30 letter to Mr. Powell is attached hereto as **Exhibit D**.

9.      On November 6, 2020, Plaintiffs served an amended disclosure.  A true and correct copy of Plaintiffs' November 6 amended disclosure is attached hereto as **Exhibit E [filed under seal]**.

10.     On November 12, 2020, I wrote a letter to Mr. Powell explaining why Apple deems Plaintiffs' November 6 amended disclosure inadequate under Section 2019.210.  A true and correct copy of my November 12 letter to Mr. Powell is attached hereto as **Exhibit F [filed under seal]**.

11.     A true and correct copy of Plaintiffs' First Amended Complaint, ECF No. 28, filed on March 25, 2020, is attached hereto as **Exhibit G**.

12.     A true and correct copy of Plaintiffs' Second Amended Complaint, ECF No. 89-1, filed on July 24, 2020, is attached hereto as **Exhibit H [filed under seal]**.

13.     A true and correct copy of Plaintiffs' Third Amended Complaint, ECF No. 231-1, filed on November 12, 2020, is attached hereto as **Exhibit I [filed under seal]**.

14.     A true and correct copy of Plaintiffs' Request for Oral Argument on Apple's Motion to Dismiss the Thirteenth Cause of Action in Plaintiffs' Second Amended Complaint, ECF No. 214, filed on October 6, 2020, is attached hereto as **Exhibit J**.

15.     A true and correct copy of the Court's Order Regarding Motion to Dismiss, ECF No. 60, filed on June 25, 2020, is attached hereto as **Exhibit K**.

16.     A true and correct copy of the Court's sealed Order Regarding Motion to Dismiss, ECF No. 219, filed on October 13, 2020, is attached hereto as **Exhibit L [filed under seal]**.

17.     A true and correct copy of the parties' Joint 26(f) Report, ECF No. 33, filed on April 14, 2020, is attached hereto as **Exhibit M**.

18.     A true and correct copy of the Court's Order Re Scheduling Dates, ECF No. 37, filed on April 17, 2020, is attached hereto as **Exhibit N**.

19.     A true and correct copy of Plaintiffs' Opposition to Apple's Motion to Stay the Patent Infringement Case Pending *Inter Partes* Review Proceedings, ECF No. 209-1, filed on September 28, 2020, is attached hereto as **Exhibit O [filed under seal]**.

20.     A true and correct copy of the parties' Joint Stipulation Regarding Defendant Apple Inc.'s Motion to Compel Plaintiffs to Provide a Section 2019.210 Disclosure, ECF No. 169-1, filed on September 1, 2020, is attached hereto as **Exhibit P**.

21.     A true and correct transcript of the parties' September 2, 2020 telephonic conference with the Court regarding Defendant's September 1 motion to compel is attached hereto as **Exhibit Q**.

22.     A true and correct transcript of the parties' September 9, 2020 conference call is attached hereto as **Exhibit R**.

23.     A true and correct copy of Patent No. 10,219,754, published on March 5, 2019, is attached hereto as **Exhibit S**.

24.     A true and correct copy of Patent No. 9,723,997, published on August 8, 2017, attached hereto as **Exhibit T**.

25.     A true and correct copy of Plaintiffs' Memorandum in Support of Their Motion for Preliminary Injunction, ECF No. 111-1, filed on August 17, 2020, is attached hereto as **Exhibit U [filed under seal]**.

26.     A true and correct copy of Plaintiffs' Reply in Support of Their Motion for Preliminary Injunction, ECF No. 161-1, filed on August 31, 2020, is attached hereto as **Exhibit V [filed under seal]**.

27.    A true and correct copy of Plaintiffs' First Set of Requests for Production of Documents, served on March 16, 2020, is attached hereto as **Exhibit W**.

28.    A true and correct copy of the parties' Joint Stipulation Regarding Defendant Apple Inc's Motion for Protective Order Barring Trade Secret-Related Discovery Absent Trade Secret Identification, ECF No. 43-1, filed on April 30, 2020, is attached hereto as **Exhibit X**.

29.    A true and correct copy of a letter written by Stephen Larson on November 16, 2020, and addressed to my colleague, Brian Andrea, is attached hereto as **Exhibit Y**.

Executed this 2nd day of December, 2020, in Los Angeles, California.

By:  /s/ *Ilissa Samplin*
Ilissa Samplin

# Exhibit C

# Knobbe Martens

KNOBBE, MARTENS, OLSON & BEAR, LLP

12790 El Camino Real, Suite 100, San Diego, CA 92130
**T** (858) 707-4000

Adam Powell
Adam.Powell@knobbe.com

October 28, 2020

**VIA EMAIL**

Ilissa Samplin
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue,
Los Angeles, CA 90071-3197

Re:     Masimo Corp. and Cercacor Laboratories, Inc. v. Apple Inc.

Dear Ilissa:

We write in response to your October 16 letter and our October 26 meet and confer regarding Plaintiffs' Section 2019.210 Disclosure (the "Disclosure"). Although Apple's letter recites high-level arguments, it lacks specific criticisms of Plaintiffs' identification of each of its trade secrets. During the parties' meet and confer, we asked Apple to discuss each trade secret and why Apple contends it is unclear, but Apple refused. We address each of Apple's general arguments below in turn.

First, Apple's letter argues the Disclosure is "untethered to the trade secrets that were allegedly misappropriated through disclosure or use." We disagree. Plaintiffs' Section 2019.210 Disclosure identifies the trade secrets that Plaintiffs allege Apple misappropriated. During the meet and confer, Apple confirmed the Disclosure need not explain *how* Apple misappropriated Plaintiffs' trade secrets, but argued the Disclosure must describe *where* Apple published Plaintiffs' trade secrets. Plaintiffs do not understand the distinction that Apple is making, but have provided their contentions on this matter in response to interrogatories and will supplement as Plaintiffs discover more facts. We are aware of no authority holding that Plaintiffs must include such information in the 2019.210 Disclosure itself. We asked Apple for authority supporting its position and Apple pointed only to the cases on page 2 of its letter, none of which are relevant to this issue.

Second, Apple's letter argues the Disclosure "must distinguish Plaintiffs' alleged trade secrets from publicly available information, including patent applications and patents." The letter further asserts the Disclosure renders it "impossible for [Apple] to conduct public domain or other research to challenge the alleged secrecy of the information at issue." Apple's letter does not explain this assertion or provide any analysis as to why any portion of the Disclosure is unclear. Likewise, Apple does not identify any "patent applications and patents" that it believes shows the information in the Disclosure is generally known. During the meet and confer, we asked Apple to identify any specific patents or other publications that Apple asserts show the information described in the Disclosure was generally known. Apple identified no such patents or publications. Instead, Apple took the position that Plaintiffs must affirmatively distinguish their trade secrets over *all* patent publications. We disagree with Apple's unreasonable position that Plaintiffs' 2019.210 Disclosure must affirmatively distinguish Plaintiffs' trade secrets from all patent publications.

Third, Apple's letter argues the changes that Plaintiffs made compared to the Second Amended Complaint ("SAC") somehow "exacerbate the problems identified by the Court in dismissing Plaintiffs' SAC" and that Plaintiffs "double down on their use of vague language and catch-all phrases . . .." We disagree. The Court found that Paragraph 39 of the SAC, and the word "including" before each bullet point list of specific trade secrets, rendered the bullet points mere "examples." The Disclosure does not include Paragraph 39 from the SAC, and Plaintiffs further amended each section to refer to "the following" specific trade secrets, without using the word "including."

Fourth, Apple's letter argues the phrases "information regarding," "and/or," and "including" within bullet points are "catchall" phrases that should be removed. During the meet and confer, Plaintiffs explained that they disagree with Apple's position, but would remove some or all of those phrases to avoid this dispute. Plaintiffs asked Apple to identify any other phrases that Apple believed rendered the Disclosure unclear so that Plaintiffs could address all of Apple's objections at once. Apple pointed to the separate reservation of rights paragraph discussed below, but did not identify any additional phrases in the Disclosure that it objected to. Apple committed to doing so in writing, but has not yet done so.

Fifth, Apple's letter argues that Plaintiffs' reservation of the right to amend is "an end run around the very purpose of Section 2019.210." We disagree. Apple's own authority makes clear that Plaintiffs may amend their Section 2019.210 disclosure as discovery progresses. *See Perlan Therapeutics, Inc. v. Superior Court*, 178 Cal.App.4th 1333, 1350 (2009) ("If, through discovery, Perlan uncovers information suggesting defendants misappropriated additional trade secrets, it may have good cause to amend its trade secret statement under appropriate circumstances."). During the meet and confer, Apple also argued this paragraph somehow rendered the remainder of the Disclosure unclear. However, other than arguing amendment was improper, Apple did not explain how this paragraph rendered any portion of the Disclosure unclear. We asked if Apple was taking the position that a Section 2019.210 statement could never include a reservation of rights, but Apple did not take a position. Apple cites no authority to support its proposition that merely including a reservation of rights somehow renders a disclosure unclear. If you are aware of any supporting authority, please provide it.

Sixth, Apple's letter argues the Disclosure must follow a specific format and include four additional requirements. Apple correctly notes that it has "requested" those requirements multiple times, but omits that the Court denied Apple's request. As the California Court of Appeals explained, Section 2019.210 can be satisfied by any showing that is "reasonable, i.e. fair, proper, just, and rational, under all of the circumstances . . .." *Advanced Modular Sputtering, Inc. v. Superior Court*, 132 Cal. App. 4th 826, 836 (2005) (internal quotations and citation omitted). No specific format is required.

Finally, during the meet and confer, we asked Apple which specific bullet points in the Disclosure Apple contends are unclear. Apple responded it was "not going to go bullet point by bullet point." We asked if Apple could point to any specific bullet point as being unclear, but Apple declined. Given Apple's refusal to engage in any discussion of the actual substance of Plaintiffs' trade secrets, we asked if Apple had any basis for objecting to the Disclosure other than the objections set forth in Apple's October 16 letter. Apple confirmed it has no additional basis for objecting to the Disclosure.

At the end of our call, Plaintiffs indicated that they would consider Apple's position and expected to respond within two or three days at most. You again accused Plaintiffs' counsel of intentionally "delaying" resolution and stringing you along. We disagree with your attempt to cast aspersions on counsel. Plaintiffs met and conferred within the time permitted by the Local Rules, considered Apple's

position, have continued to express a good faith intent to try to address any specific concerns raised by Apple, and have now responded in just two days.  Moreover, Apple recently took far longer to respond to Plaintiffs' Local Rule 37-1 letter dated October 1, 2020.  Despite Apple taking much longer to respond, Plaintiffs did not ascribe any motive to Apple's counsel.

As discussed, Plaintiffs intend to make changes to their Section 2019.210 disclosure to narrow or eliminate the parties' dispute.  However, we are still waiting for Apple to identify any additional alleged phrases that render the Disclosure insufficient.  To avoid the need for multiple amendments, please provide Apple's position on that issue at your earliest opportunity.  After we have Apple's position, we will endeavor to provide an amended disclosure in one week or less.

Best regards,

Adam B. Powell

32641686

# Exhibit D

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP

333 South Grand Avenue
Los Angeles, CA 90071-3197
Tel 213.229.7000
www.gibsondunn.com

Ilissa Samplin
Direct: +1 213.229.7354
Fax: +1 213.229.6354
ISamplin@gibsondunn.com

HIGHLY CONFIDENTIAL
PURSUANT TO PROTECTIVE ORDER


October 30, 2020


VIA E-MAIL

Adam B. Powell
Knobbe, Martens, Olson & Bear, LLP
12790 El Camino Real, Suite 100
San Diego, CA 92130
Adam.Powell@knobbe.com

Re:     *Masimo Corp. et al. v. Apple, Inc.*, C.A. 8:20-cv-00048 (C.D. Cal.)

Dear Adam,

We write in response to your October 28, 2020 letter purporting to defend Plaintiffs'
2019.210 Disclosure (the "Disclosure").  You are wrong to argue that Apple failed to make
specific criticisms of Plaintiffs' Disclosure.  In fact, Apple carefully detailed such criticisms
in our October 16 letter and reiterated them during the parties' October 26 meet and confer
call.  Nonetheless, we respond to the points raised in your October 28 letter below.

Plaintiffs feign confusion over the distinction between litigating the merits and providing an
identification of the specific trade secrets at issue in this case, but Apple has been clear that it
is not asking Plaintiffs to describe *how* Apple allegedly misappropriated their trade secrets.
Apple is asking Plaintiffs to identify their purported trade secrets *alleged in this case*, i.e., as
they exist in the accused patents and Apple Watch, so that Apple can discern the specific
information Plaintiffs allege to be trade secrets that Apple misappropriated.  We repeat the
law on this point:  a plaintiff must "identify with 'reasonable particularity' the purported
trade secrets *which allegedly have been misappropriated*" before trade secret-related
discovery can commence.  *Perlan Therapeutics, Inc. v. Superior Court*, 178 Cal. App. 4th
1333, 1336 (2009) (emphasis added).  Apple cited several cases directly relevant to this
issue, all of which found Section 2019.210 disclosures to be inadequate where a plaintiff
"ha[d] the ability (but not the inclination) to provide clearer, more specific information
about . . . its alleged trade secrets."  *Id.* at 1345; *see also, e.g.*, *Space Data Corp. v. X*, 2017
WL 5013363, at *2 (N.D. Cal. Feb. 16, 2017) ("Moreover, Space Data has not made clear
which aspects of its technology and other information are 'part of patents and pending patent
applications,' if any, and which are secret.");  *Loop AI Labs Inc. v. Gatti*, 195 F. Supp. 3d
1107, 1116 (N.D. Cal. 2016) (2019.210 disclosure deficient where "Plaintiff d[id] not specify
which contracts and agreements contain[ed] the alleged trade secrets" and "assert[ed] that its

**GIBSON DUNN**

HIGHLY CONFIDENTIAL
PURSUANT TO PROTECTIVE ORDER

Page 2

patent application is a trade secret," but "d[id] not specify which portion of the application describes the claimed secret").

Plaintiffs' assertion that they "have provided their contentions on this matter in response to interrogatories" is incorrect, and we previously explained that Plaintiffs' reservation to "supplement" their responses as they "discover more facts" represents a bald-faced attempt to make tactical use of discovery so Plaintiffs can later "change [their] claims to conform to the information defendant revealed in discovery." *Social Apps, LLC v. Zynga, Inc.*, 2012 WL 2203063, at *2 (N.D. Cal. June 14, 2012).  Furthermore, if Plaintiffs believe that they have described key information in their discovery responses, it is troubling that they are not including that in the Disclosure.  Plaintiffs' trade secrets should not be a moving target.  That defeats the very purpose of Section 2019.2100—which requires that the purportedly misappropriated trade secrets be identified with particularity *before* the party alleging misappropriation commences discovery.  From the beginning of this case, Plaintiffs have alleged that Apple disclosed Plaintiffs' trade secrets in patent applications and incorporated them in the Apple Watch.  *See* Compl. ¶¶ 23–28, 185, 187; FAC ¶¶ 24–25, 218; SAC ¶¶ 24–25, 236–38.  If this is true, Plaintiffs have at their disposal the information they need to identify those secrets.  Plaintiffs have no excuse for their continued refusal to identify the specific secrets that they allege Apple misappropriated.

Plaintiffs further misconstrue Apple's position regarding Plaintiffs' duty to distinguish their trade secrets from public information.  Apple's position, as buttressed by the case law, is that Plaintiffs must "clearly explain how [their] secrets (or secret combinations of publicly available processes) differ[] from publicly available knowledge." *Perlan*, 178 Cal. App. 4th at 1352; *see also Advanced Modular Sputtering, Inc. v. Superior Court*, 132 Cal. App. 4th 826, 835 (2005).  As Apple explained in its letter and again on the parties' meet and confer call, Plaintiffs' Disclosure makes no attempt to distinguish between information generally known to those employed in the field and the proprietary information allegedly misappropriated by Apple.  This problem is manifest throughout the Disclosure.

Apple appreciates Plaintiffs' willingness to remove "some or all" of the open-ended phrases that the Judge Selna found rendered Plaintiffs' trade secret claim indefinite; however, Plaintiffs' "use of the word 'including' alone was never sufficient on its own for the court to find dismissal warranted."  Order at 4.  For the same reason, Plaintiffs' willingness to remove "information regarding" and "and/or" also is not sufficient.  The deeper problem remains: Plaintiffs still have not identified the purported trade secrets *which allegedly have been misappropriated* with sufficient particularity to separate them from matters of public knowledge.

**GIBSON DUNN**

HIGHLY CONFIDENTIAL
PURSUANT TO PROTECTIVE ORDER

As to your suggestion that we made some commitment on the meet and confer call to point out any additional objectionable language in the Disclosure, that is wrong.  We said we would look back at the Disclosure and discuss with our team whether there were additional specific terms to raise.  But we specifically noted that to the extent the Disclosure is meant to be non-exhaustive, it is deficient regardless of any specific terms used.  We also specifically noted that even if the "catch-all" phrases in the Disclosure are limited to those identified in Apple's October 16 letter, the Disclosure remains deficient to the extent it does not specifically limit Plaintiffs' alleged trade secrets to the descriptions contained therein.  *See Gatan, Inc. v. Nion Co.*, 2018 WL 2117379, at *3 (N.D. Cal. May 8, 2018) ("If the trade secrets discussed in Nion's SBIR application are in fact the only trade secrets at issue, then Gatan's trade secrets designation should say so.").

Plaintiffs' reservations of right are a clear indicator that their trade secrets are not limited to the descriptions in the Disclosure.  *See, e.g.*, *Perlan*, 178 Cal. App. 4th at 1338 ("boilerplate reservations of right . . . make[] no attempt to comply with section 2019.210").  That is the problem with Plaintiffs' reservations that we again articulated during the October 26 meet-and-confer call.

Plaintiffs must amend their Disclosure in light of the deficiencies identified above.  Apple asks only for what is "reasonable, i.e., fair, proper, just and rational"—a Disclosure containing enough particularity to allow Apple to distinguish publicly available information and determine what it is it is accused of taking.  *Advanced Modular*, 132 Cal. App. 4th at 836.  Plaintiffs have had eight months or more to identify the trade secrets they publicly accused Apple of misappropriating.  The Disclosure Plaintiffs served on the parties' agreed upon deadline is inadequate.  Apple expected to receive an amended Disclosure along with Plaintiffs' October 28 letter.  Notwithstanding Plaintiffs' delay, Apple will wait until Friday, November 6 for Plaintiffs to address the defects in the Disclosure.  We trust that you actually need a week for substantive changes, not merely stripping the Disclosure of the terms "information regarding," "and/or," and "including," which would take little time and should already have been done.  After that date, Apple will move to compel Plaintiffs to provide a more definite statement that cannot be changed absent good cause.

Sincerely,

Ilissa Samplin

# Exhibit G

Joseph R. Re (Bar No. 134479)
joseph.re@knobbe.com
Stephen C. Jensen (Bar No. 149894)
steve.jensen@knobbe.com
Perry D. Oldham (Bar No. 216016)
perry.oldham@knobbe.com
Stephen W. Larson (Bar No. 240844)
stephen.larson@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, Fourteenth Floor
Irvine, CA  92614
Telephone:  (949) 760-0404
Facsimile:  (949) 760-9502

Attorneys for Plaintiff,
**Masimo Corporation**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| MASIMO CORPORATION, a Delaware corporation; and CERCACOR LABORATORIES, INC., a Delaware corporation<br><br>Plaintiffs,<br><br>v.<br><br>APPLE INC., a California corporation<br><br>Defendant. | Case No. 8:20-cv-00048-JVS-JDE<br><br>**FIRST AMENDED COMPLAINT FOR**<br>**(1) PATENT INFRINGEMENT**<br>**(2) TRADE SECRET MISAPPROPRIATION**<br>**(3) CORRECTION OF INVENTORSHIP AND**<br>**(4) OWNERSHIP OF PATENTS**<br><br>**AND DEMAND FOR JURY TRIAL**<br><br>Hon. James V. Selna |

Plaintiffs MASIMO CORPORATION ("Masimo") and CERCACOR LABORATIES, INC. ("Cercacor") hereby complain of Defendant APPLE INC. ("Apple"), and allege as follows:

## I.  THE PARTIES

1.      Plaintiff Masimo is a Delaware corporation having its principal place of business at 52 Discovery, Irvine, California 92618.

2.      Plaintiff Cercacor is a Delaware corporation having its principal place of business at 15750 Alton Pkwy, Irvine, California 92618.

3.      Upon information and belief, Defendant Apple is a California corporation having a principal place of business at One Apple Park Way, Cupertino, California, 95014.

## II.  JURISDICTION AND VENUE

4.      This civil action includes claims for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 100, *et seq*., more particularly, 35 U.S.C. §§ 271 and 281.  This civil action includes claims for correction of inventorship of certain United States patents arising under the patent law of the United States, more particularly 35 U.S.C. § 256.  This Complaint further alleges trade secret misappropriation and seeks a declaration of ownership of certain patents and patent applications.

5.      This Court has subject matter jurisdiction over claims 1-12 and 14-18 pursuant to at least 28 U.S.C. §§ 1331 and 1338(a), and has at least supplemental jurisdiction over claims 13 and 19-24 pursuant to at least 28 U.S.C. §§ 1367(a), including because, as alleged in more detail below, they are sufficiently related to the claims over which this Court has original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

6.      Apple has its principal place of business in California.  Apple is subject to personal jurisdiction in California and has committed the acts complained of in this Judicial District.

7.      Venue is proper in the Southern Division of the Central District of California pursuant to 28 U.S.C. § 1400(b) with respect to patent infringement because Defendant has a regular and established place of business in the County of Orange within the Central District of California and committed acts of infringement in this Judicial District.  Defendant also committed acts of misappropriation in this Judicial District.  Inventive contributions to the patents and patent application as to which Plaintiffs seek correction of inventorship and/or declarations of ownership also took place in this Judicial District.  Thus, venue is proper pursuant to 28 U.S.C. §§ 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this Judicial District.

### III.  **STATEMENT OF THE CASE**

8.      This action seeks relief for the theft of Plaintiffs' highly confidential information and trade secrets, and infringement of Masimo's patents by Defendant, correction of inventorship, and ownership of patents assigned to or filed by Apple on subject matter that belongs to Plaintiffs.

### IV.  **STATEMENT OF FACTS**

9.      Masimo is a medical technology company that revolutionized non-invasive monitoring of physiological parameters, such as pulse rate, arterial oxygen saturation and many others.

10.     Most of these parameters are measured using light that is transmitted through the body tissue.  The received light, that has been attenuated by the various components of the body tissue, including the blood, is known in the industry as a photoplethysmograph or "PPG."  The transmission and receipt

of this light is typically accomplished through a sensor that is applied to a body part such as a finger, arm, toe, forehead or ear.

11.     Before Masimo, non-invasive measurements from the PPG were plagued by unreliability, often when the measurement was needed most, due to the person moving or having low peripheral blood flow (known as "low perfusion").  The industry had essentially given up on solving these problems, concluding they were largely unsolvable.  In the medical context, clinicians had to live with the results – patient monitors gave excessive false alarms, froze their measurements for prolonged periods of time despite potential changes in the physiological parameter (e.g., oxygen saturation or pulse rate), delayed notification of alarms due to long averaging times of sensor data, produced inaccurate measurements, or were unable to obtain data on the most critical patients and babies who cannot be instructed to stay still.  Masimo's pioneering technology, known as Masimo Signal Extraction Technology ("Masimo SET"), solved this problem and dramatically improved the reliability of monitoring and reporting physiological signals derived from the PPG.

12.     Following its initial success with Masimo SET, Masimo invested heavily in developing additional breakthrough measurement technologies, such as non-invasively measuring total hemoglobin, carboxyhemoglobin, and methemoglobin.  Masimo has continued to innovate, succeeding where others have consistently failed.  Masimo was the first, and remains the only, company delivering these game-changing technologies to hospitals in the United States. Use of Masimo's technology in the clinical setting has been proven to reduce blindness in premature infants, detect congenital heart disease in infants, save lives on the general care floor and post-surgery, and improve transfusion management, while saving money.

13.     From its inception, Masimo has continuously developed cutting-edge noninvasive patient monitoring technologies.  Masimo sought and received

Case 8:20-cv-00048-JVS-JDE   Document 260-2   Filed 12/30/20   Page 18 of 353   Page ID #:19857
Case 8:20-cv-00048-JVS-JDE   Document 261   Filed 03/25/20   Page 306 of 353   Page ID #:19850
#:19850

numerous U.S. patents for many of its inventions.  Masimo's revolutionary technology was a key to its gaining significant market praise and penetration.  After introduction into the market, many competitors, much larger than Masimo, used Masimo's technology without a license, resulting in patent infringement lawsuits that ultimately confirmed the validity of Masimo's innovations.  Masimo also maintains some technology as trade secrets.  Masimo also closely guards its future product and market plans.  Only select employees have knowledge of and access to these guarded secrets.

14.    Masimo's innovations also include important advances in sensor technologies that work together as part of Masimo's system and algorithms.  Masimo's sensors are integral to the success of the revolutionary technologies Masimo has developed.

15.    In 1998, Masimo spun certain technologies off into a new company, Masimo Laboratories, Inc. or "Masimo Labs," to further research and develop the technologies. The name of the company was later changed to Cercacor Laboratories Inc. or "Cercacor."  Cercacor and Masimo have a cross-license agreement to facilitate confidential collaboration between the companies.  Cercacor is not owned by Masimo.

16.    Like Masimo, Cercacor is an innovator of non-invasive monitoring technologies.  Cercacor is on the frontline of understanding how measuring, tracking, and analyzing physiological parameters can impact pre-diabetic and diabetic patients, sports training and performance and overall health and wellness principally in the consumer market.  Cercacor continued the development that started at Masimo on non-invasive total hemoglobin (SpHb®), methemoglobin (SpMet®), and carboxyhemoglobin (SpCO®) and other non-invasive physiological parameters.

17.    Leading hospitals around the world use Cercacor technology licensed to Masimo and sold under the name Masimo rainbow SET.  Like

-4-

Masimo, Cercacor also maintains some technology as trade secrets, and Cercacor closely guards its future product and market plans. Only select employees have knowledge of and access to these guarded secrets.

18. Plaintiffs carefully guard the secrecy of their confidential information and documents. For example, Plaintiffs have policies regarding labeling confidential information and documents as "CONFIDENTIAL AND PROPRIETARY." They also restrict these documents and information from disclosure to third parties and employees on a need-to-know basis. Plaintiffs also have policies in place regarding the use of computers and related equipment that govern how their computer systems may be used. Those policies also govern the protection of Plaintiffs' confidential information. Plaintiffs have document management systems that restrict access to confidential documents to only those employees with proper security credentials and a need for access. Plaintiffs also require employees to sign agreements precluding the employees from disclosing or making use of any confidential information except as authorized by Plaintiffs and as necessary for the performance of the employees' duties. Plaintiffs also require third parties, including customers, to execute confidential non-disclosure agreements. Plaintiffs implemented such policies and procedures to maintain the confidentiality of sensitive information. These policies remain in place today.

19. In 2013, Apple contacted Masimo and asked to meet regarding a potential collaboration. Apple told Masimo that Apple would like to understand more about Masimo's technology to potentially integrate that technology into Apple's products. Apple and Masimo later entered into a confidentiality agreement, and Masimo's management met with Apple. The meetings included confidential discussions of Masimo's technology. After what seemed to Masimo to have been productive meetings, Apple quickly began trying to hire Masimo employees, including engineers and key management.

20.     Masimo employed Michael O'Reilly as its Chief Medical Officer and Executive Vice President for Medical Affairs beginning in January 2008. As part of the Masimo executive team, O'Reilly was privy to extremely sensitive information, including information about mobile medical products and applications, wellness applications, clinical data gathering and analytics, and other technology of Masimo.  Upon information and belief, Apple employed O'Reilly in July 2013, shortly after the meetings with Masimo, to assist in wellness and mobile applications that include non-invasive measurement of physiological parameters.  Not long after, by December of 2013, O'Reilly was already meeting with the FDA on behalf of Apple to discuss medical applications and discuss medical products that non-invasively measures blood constituents.

21.     Apple systematically recruited other key Masimo personnel, such as Marcelo Lamego, who was the former Chief Technical Officer of Cercacor and a former Research Scientist at Masimo.  Lamego was a Masimo employee during 2000-2001 and 2003-2006, and the Cercacor Chief Technical Officer during 2006-2014.

22.     Lamego had unfettered access to Plaintiffs' highly confidential technical information.  He was trained and mentored at Masimo by the most skilled engineers and scientists, and was taught about the keys to effective non-invasive monitoring, something he was not involved in prior to Masimo. Masimo engineers and scientists taught Lamego about non-invasive monitoring, including, among others, Ammar Al-Ali, Mohamed Diab, and Walter Weber. The Masimo engineers, including Al-Ali, Diab, and Weber, were Masimo employees at all relevant times.   Lamego also had access to and learned guarded secrets regarding Plaintiffs' mobile medical products, including key technology and advance plans for future products.

23.     When Lamego left Cercacor, he assured Plaintiffs that he would not violate his agreements with Plaintiffs and volunteered that he would not work on technology similar to Plaintiffs' technology.  On January 24, 2014, Plaintiffs sent a letter to Defendant explaining that Lamego possessed Plaintiffs' confidential proprietary information and warning Apple to respect Plaintiffs' rights in such information.  The letter stated "we trust that Apple will employ Mr. Lamego in an area that does not involve healthcare technology, including mobile health applications and the measurement of physiological information." The letter also asked that "Apple refrain from inducing Mr. Lamego to take actions that would violate the Agreement while he performs services for Apple" and asked Apple to "direct Mr. Lamego to honor his obligations to all of his prior employers."  Based on Plaintiffs' conversations with Lamego, Plaintiffs' letter to Apple, and Plaintiffs' confidentiality agreement with Apple, Plaintiffs reasonably believed that Lamego would not use or disclose Plaintiffs' confidential information and that Defendant would not induce Lamego to do so or itself use Plaintiffs' confidential information.

24.     Unbeknownst to Plaintiffs at the time, it now appears that, shortly after joining Apple in January 2014, Lamego began pursuing on behalf of Apple numerous patent applications directed toward technologies he worked on at Plaintiffs, and with which he had no prior experience or knowledge.

25.     Upon information and belief, Apple announced the first version of its watch in September 2014, and began shipping its watch in April 2015.  The Apple Watch Series 3 was released on September 22, 2017, and upon information and belief had significant performance issues with the non-invasive physiological measurements.  Apple announced the Apple Watch Series 4 on September 12, 2018, and upon information and belief, that watch includes technology that tracks Plaintiffs' technologies to solve some of the performance issues.  The Apple Watch Series 5 was announced on September 10, 2019 and

released on September 20, 2019.  Upon information and belief, the Apple Watch Series 5 also includes Plaintiffs' technologies to solve some of the prior performance issues, including technology as to which Lamego was an inventor while at Plaintiffs.

26.     As set forth in detail below, and on information and belief, each portion of evidence cited by Plaintiffs, such as the selected portions of Apple patent applications and Apple websites, accurately portrays, in relevant part, the structure, design, function and/or operation of the Apple Watch Series 4 and later devices.

## V.  **THE PATENTS-IN-SUIT**

27.     Masimo is the owner by assignment of U.S. Patent No. 10,258,265 entitled "Multi-stream data collection system for noninvasive measurement of blood constituents" ("the '265 patent"), which the United States Patent and Trademark Office lawfully and duly issued on April 16, 2019.  A true and correct copy of the '265 patent is attached hereto as Exhibit 1.

28.     Masimo is the owner by assignment of U.S. Patent No. 10,258,266 entitled "Multi-stream data collection system for noninvasive measurement of blood constituents" ("the '266 patent"), which the United States Patent and Trademark Office lawfully and duly issued on April 16, 2019.  A true and correct copy of the '266 patent is attached hereto as Exhibit 2.

29.     Masimo is the owner by assignment of U.S. Patent No. 10,292,628 entitled "Multi-stream data collection system for noninvasive measurement of blood constituents" ("the '628 patent"), which the United States Patent and Trademark Office lawfully and duly issued on May 21, 2019.  A true and correct copy of the '628 patent is attached hereto as Exhibit 3.

30.     Masimo is the owner by assignment of U.S. Patent No. 10,299,708 entitled "Multi-stream data collection system for noninvasive measurement of blood constituents" ("the '708 patent"), which the United States Patent and

Trademark Office lawfully and duly issued on May 21, 2019.   A true and correct copy of the '708 patent is attached hereto as Exhibit 4.

31.   Masimo is the owner by assignment of U.S. Patent No. 10,376,190 entitled "Multi-stream data collection system for noninvasive measurement of blood constituents" ("the '190 patent"), which the United States Patent and Trademark Office lawfully and duly issued on August 13, 2019.   A true and correct copy of the '190 patent is attached hereto as Exhibit 5.

32.   Masimo is the owner by assignment of U.S. Patent No. 10,376,191 entitled "Multi-stream data collection system for noninvasive measurement of blood constituents" ("the '191 patent"), which the United States Patent and Trademark Office lawfully and duly issued on August 13, 2019.   A true and correct copy of the '191 patent is attached hereto as Exhibit 6.

33.   Masimo is the owner by assignment of U.S. Patent No. 10,470,695 entitled "Advanced pulse oximetry sensor" ("the '695 patent"), which the United States Patent and Trademark Office lawfully and duly issued on November 12, 2019.   A true and correct copy of the '695 patent is attached hereto as Exhibit 7.

34.   Masimo is the owner by assignment of U.S. Patent No. 6,771,994 entitled "Pulse oximeter probe-off detection system" ("the '994 patent"), which the United States Patent and Trademark Office lawfully and duly issued on August 3, 2004.  A true and correct copy of the '994 patent is attached hereto as Exhibit 8.

35.   Masimo is the owner by assignment of U.S. Patent No. 8,457,703 entitled "Low power pulse oximeter" ("the '703 patent"), which the United States Patent and Trademark Office lawfully and duly issued on June 4, 2013. A true and correct copy of the '703 patent is attached hereto as Exhibit 9.

36.   Masimo is the owner by assignment of U.S. Patent No. 10,433,776 entitled "Low power pulse oximeter" ("the '776 patent"), which the United

States Patent and Trademark Office lawfully and duly issued on October 8, 2019. A true and correct copy of the '776 patent is attached hereto as Exhibit 10.

37.     Masimo is the owner by assignment of U.S. Patent No. 10,588,553 entitled "Multi-Stream Data Collection System For Noninvasive Measurement of Blood Constituents" ("the '553 patent"), which the United States Patent and Trademark Office lawfully and duly issued on March 17, 2020. A true and correct copy of the '553 patent is attached hereto as Exhibit 11.

38.     Masimo is the owner by assignment of U.S. Patent No. 10,588,554 entitled "Multi-Stream Data Collection System For Noninvasive Measurement of Blood Constituents" ("the '554 patent"), which the United States Patent and Trademark Office lawfully and duly issued on March 17, 2020. A true and correct copy of the '554 patent is attached hereto as Exhibit 12.

## VI.   THE DISPUTED LAMEGO PATENTS

39.     Lamego is named as an inventor on U.S. Provisional Patent Application No. 62/043,294, filed Aug. 28, 2014 and titled "Reflective Surface Treatments for Optical Sensors." Related applications that also name Lamego as an inventor include U.S Patent Application Nos. 14/740,196 and 16/114,003, which issued as U.S. Patent Nos. 10,078,052 and 10,247,670.

40.     Lamego is also named as an inventor on U.S. Provisional Patent Application No. 62/047,818, filed Sep. 9, 2014, entitled "Modulation and Demodulation Techniques for a Health Monitoring System." A related application that names Lamego as the sole inventor includes U.S Patent Application No. 14/621,268, which issued as U.S. Patent No. 10,219,754.

41.     Lamego is also named as an inventor on U.S. Provisional Patent Application No. 62/056,299, filed on Sep. 26, 2014, and entitled "Electronic Device that Computes Health Data." Related applications that also name Lamego as the sole inventor include U.S Patent Application Nos. 14/617,422,

15/667,832, and 16/700,710. The '422 Application issued as U.S. Patent No. 9,723,997 and the '832 Application issued as U.S. Patent No. 10,524,671.

42. Lamego is also named as an inventor on U.S. Provisional Patent Application No. 62/057,089, filed on Sep. 29, 2014, and entitled "Methods and Systems for Modulation and Demodulation of Optical Signals." Related applications that also name Lamego as an inventor include U.S Patent Application Nos. 14/618,664 and 15/960,507. The '664 Application issued as U.S. Patent No. 9,952,095.

## VII. FIRST CAUSE OF ACTION
## (INFRINGEMENT OF U.S. PATENT NO. 10,258,265)

43. Plaintiff Masimo hereby realleges and incorporates by reference the allegations set forth in paragraphs 1 through 42.

44. Upon information and belief, Defendant's products, including at least the Apple Watch Series 4 and later devices, infringe at least Claims 1-3, 6-11, 13, 17, and 17-25 of the '265 patent under at least 35 U.S.C. § 271(a), (b), and (c).

45. Upon information and belief, Defendant has directly infringed one or more claims of the '265 patent through manufacture, use, sale, offer for sale, and/or importation into the United States of physiological monitors, including the Apple Watch Series 4 and later devices.

46. For example, upon information and belief, in operation, the Apple Watch Series 4 and later devices include all of the limitations of Claim 1 of the '265 patent as set forth herein and further illustrated in the claim chart shown in Exhibit 13. The Apple Watch Series 4 and later devices are adapted to be worn by a wearer and provide an indication of a physiological parameter (for example, heart rate) of the wearer as shown in the image below found on the Apple website at https://www.apple.com/apple-watch-series-4/health/:



47.     The Apple Watch Series 4 and later devices include a plurality of emitters of different wavelengths (for example, green and infrared LEDs) and at least four detectors (for example, photodiode sensors) spaced apart from each other as shown in the image below found on the Apple website at https://support.apple.com/en-us/HT204666:



48.     The detectors output signals responsive to light from the light emitters attenuated by body tissue.  Upon information and belief, the signals are indicative of a physiological parameter (for example, heart rate) of the wearer.

Case 8:20-cv-00048-JVS-JDE  Document 28-1  Filed 06/25/20  Page 140 of 95  Page ID #:1826

49.     Upon information and belief, the relevant technology in the Apple Watch Series 4 and later devices is described in the below citations to U.S. Patent Application Publication 2019/0072912 (the '912 publication).  A copy of the publication is attached as Exhibit 25.  The Apple Watch Series 4 and later devices include a housing having a surface and a circular wall protruding from the surface, and a light permeable cover arranged above a portion of the housing and covering the detectors.  Fig. 4C and the corresponding text of the '912 publication show, for example, such housing:



FIG. 4C

50.     Upon information and belief, Defendant has knowledge of Masimo's patents, including the '265 patent, at least based on O'Reilly and Lamego's former positions with Plaintiffs.  Masimo filed provisional patent applications that led to the '265 patent in August 2008, while O'Reilly and Lamego were with Masimo and/or Cercacor.  Lamego is a named inventor of

the '265 patent. Defendant had knowledge of the '265 patent no later than the filing of the original Complaint.

51. Upon information and belief, Defendant has actively induced others to infringe the '265 patent by marketing and selling the above Apple Watch Series 4 and later devices, knowing and intending that such systems would be used by customers and end users in a manner that infringes the '265 patent. To that end, Defendant provides instructions and teachings to its customers and end users that such Apple Watch Series 4 and later devices be used to infringe the '265 patent. Defendant's acts constitute infringement of the '265 patent in violation of 35 U.S.C. § 271(b).

52. Upon information and belief, Defendant actively induces users to directly infringe the asserted claims of the '265 patent. By way of example only, upon information and belief, Defendant actively induces direct infringement of the '265 patent by providing directions, demonstrations, guides, manuals, training for use, and/or other materials necessary for the use of the Apple Watch Series 4 and later devices, including use with Apple iPhones. Upon information and belief, Defendant knew or should have known that these activities would cause direct infringement.

53. Upon information and belief, Defendant's acts constitute contributory infringement of the '265 patent in violation of 35 U.S.C. § 271(c). Upon information and belief, Defendant contributorily infringes because, among other things, Defendant offers to sell and/or sells within the United States, and/or imports into the United States, components of the Apple Watch Series 4 and later devices and Apple iPhones that constitute material parts of the invention of the asserted claims of the '265 patent, are not staple articles or commodities of commerce suitable for substantial non-infringing use and are known by Defendant to be especially made or especially adapted for use in an infringement of the '265 patent.

-14-

54.     Defendant's infringement of the '265 patent is willful, deliberate, and intentional by continuing its acts of infringement after becoming aware of the '265 patent and its infringement thereof, thus acting in reckless disregard of Masimo's patent rights.

55.     Because of Defendant's infringement of the '265 patent, Masimo has suffered and will continue to suffer irreparable harm and injury, including monetary damages in an amount to be determined at trial.

56.     Upon information and belief, unless enjoined, Defendant, and/or others acting on behalf of Defendant, will continue their infringing acts, thereby causing additional irreparable injury to Masimo for which there is no adequate remedy at law.

## VIII.  SECOND CAUSE OF ACTION
## (INFRINGEMENT OF U.S. PATENT NO. 10,258,266)

57.     Plaintiff Masimo hereby realleges and incorporates by reference the allegations set forth in paragraphs 1 through 42.

58.     Upon information and belief, Defendant's products, including at least the Apple Watch Series 4 and later devices, infringe at least Claims 1-19 of the '266 patent under at least 35 U.S.C. § 271(a), (b), and (c).

59.     Upon information and belief, Defendant has directly infringed one or more claims of the '266 patent through manufacture, use, sale, offer for sale, and/or importation into the United States of physiological monitors, including the Apple Watch Series 4 and later devices.

60.     For example, upon information and belief, in operation, the Apple Watch Series 4 and later devices 4 and 5 devices include all of the limitations of Claim 1 of the '266 patent as set forth herein and further illustrated in the claim chart shown in Exhibit 14.  The Apple Watch Series 4 and later devices provide an indication of a physiological parameter (for example, heart rate) of the

Case 8:20-cv-00048-JVS-JDE Document 28 Filed 03/25/20 Page 16 of 35 Page ID #:1529

wearer as shown in the image below found on the Apple website at https://www.apple.com/apple-watch-series-4/health/:



61.    The Apple Watch Series 4 and later devices include a plurality of emitters that emit light into tissue of a user and a plurality of detectors (for example, photodiode sensors) that detect light that has been attenuated by tissue of the user as shown in the image below found on the Apple website at https://support.apple.com/en-us/HT204666:



62.    The Apple Watch Series 4 and later devices include a housing configured to house the detectors and a lens located between the tissue of the

Case 8:20-cv-00048-JVS-JDE Document 260-2 Filed 12/30/20 Page 32 of 353 Page ID
Case 8:20-cv-00048-JVS-JDE Document 28-1 Filed 08/25/20 Page 180 of 95 Page ID #:1830
#:19863

user and the detectors. Fig. 4C and the corresponding text of the '912 publication show, for example, such housing:



**FIG. 4C**

63.     Upon information and belief, the lens has a single outwardly protruding convex surface configured to cause tissue of the user to conform to the protruding convex surface during operation of the noninvasive optical physiological sensor.

64.     Upon information and belief, Defendant has knowledge of Masimo's patents, including the '266 patent, at least based on O'Reilly and Lamego's former positions with Plaintiffs. Masimo filed provisional patent applications that led to the '266 patent in August 2008, while O'Reilly and Lamego were with Masimo and/or Cercacor. Lamego is a named inventor of the '266 patent. Defendant had knowledge of the '266 patent no later than the filing of the original Complaint.

65. Upon information and belief, Defendant has actively induced others to infringe the '266 patent by marketing and selling the above Apple Watch Series 4 and later devices, knowing and intending that such systems would be used by customers and end users in a manner that infringes the '266 patent. To that end, Defendant provides instructions and teachings to its customers and end users that such Apple Watch Series 4 and later devices be used to infringe the '266 patent. Defendant's acts constitute infringement of the '266 patent in violation of 35 U.S.C. § 271(b).

66. Upon information and belief, Defendant actively induces users to directly infringe the asserted claims of the '266 patent. By way of example only, upon information and belief, Defendant actively induces direct infringement of the '266 patent by providing directions, demonstrations, guides, manuals, training for use, and/or other materials necessary for the use of the Apple Watch Series 4 and later devices. Upon information and belief, Defendant knew or should have known that these activities would cause direct infringement.

67. Upon information and belief, Defendant's acts constitute contributory infringement of the '266 patent in violation of 35 U.S.C. § 271(c). Upon information and belief, Defendant contributorily infringes because, among other things, Defendant offers to sell and/or sells within the United States, and/or imports into the United States, components of the Apple Watch Series 4 and later devices that constitute material parts of the invention of the asserted claims of the '266 patent, are not staple articles or commodities of commerce suitable for substantial non-infringing use and are known by Defendant to be especially made or especially adapted for use in an infringement of the '266 patent.

68. Defendant's infringement of the '266 patent is willful, deliberate, and intentional by continuing its acts of infringement after becoming aware of

the '266 patent and its infringement thereof, thus acting in reckless disregard of Masimo's patent rights.

69.     Because of Defendant's infringement of the '266 patent, Masimo has suffered and will continue to suffer irreparable harm and injury, including monetary damages in an amount to be determined at trial.

70.     Upon information and belief, unless enjoined, Defendant, and/or others acting on behalf of Defendant, will continue their infringing acts, thereby causing additional irreparable injury to Masimo for which there is no adequate remedy at law.

## IX.  THIRD CAUSE OF ACTION
### (INFRINGEMENT OF U.S. PATENT NO. 10,292,628)

71.     Plaintiff Masimo hereby realleges and incorporates by reference the allegations set forth in paragraphs 1 through 42.

72.     Upon information and belief, Defendant's products, including at least the Apple Watch Series 4 and later devices, infringe at least Claim 1 of the '628 patent under at least 35 U.S.C. § 271(a), (b), and (c).

73.     Upon information and belief, Defendant has directly infringed one or more claims of the '628 patent through manufacture, use, sale, offer for sale, and/or importation into the United States of physiological monitors, including the Apple Watch Series 4 and later devices.

74.     For example, upon information and belief, in operation, the Apple Watch Series 4 and later devices include all of the limitations of Claim 1 of the '628 patent as set forth herein and further illustrated in the claim chart shown in Exhibit 15.

75.     The Apple Watch Series 4 and later devices include a housing configured to house a plurality of detectors. Fig. 4C and the corresponding text of the '912 publication show, for example, such housing:

Case 8:20-cv-00048-JVS-JDE  Document 260-2  Filed 12/30/20  Page 35 of 353  Page ID
Case 8:20-cv-00048-JVS-JDE  Document 28-19  Filed 03/23/20  Page 20 of 35  Page ID #:1533
#:19866



FIG. 4C

76.     The Apple Watch Series 4 and later devices include a plurality of emitters that emit light into tissue of a user and a plurality of detectors that detect light that has been attenuated by tissue of the user as shown in the image below found on the Apple website at https://support.apple.com/en-us/HT204666:



77.    The Apple Watch Series 4 and later devices include a light permeable cover configured to be located between tissue of the user and the plurality of detectors when the noninvasive optical physiological sensor is worn by the user, wherein the cover comprises an outwardly protruding convex surface configured to cause tissue of the user to conform to at least a portion of the outwardly protruding convex surface when the noninvasive optical physiological sensor is worn by the user and during operation of the noninvasive optical physiological sensor, and wherein the plurality of detectors are configured to receive light passed through the outwardly protruding convex surface after attenuation by tissue of the user.  Fig. 4C and the corresponding text of the '912 publication show, for example, such cover:

FIG. 4C

78.     Upon information and belief, Defendant has knowledge of Masimo's patents, including the '628 patent, at least based on O'Reilly and Lamego's former positions with Plaintiffs.  Masimo filed provisional patent applications that led to the '628 patent in August 2008, while O'Reilly and Lamego were with Masimo and/or Cercacor.  Lamego is a named inventor of the '628 patent.  Defendant had knowledge of the '628 patent no later than the filing of the original Complaint.

79.     Upon information and belief, Defendant has actively induced others to infringe the '628 patent by marketing and selling the above Apple Watch Series 4 and later devices, knowing and intending that such systems would be used by customers and end users in a manner that infringes the '628 patent.  To that end, Defendant provides instructions and teachings to its customers and end users that such Apple Watch Series 4 and later devices be

used to infringe the '628 patent.  Defendant's acts constitute infringement of the '628 patent in violation of 35 U.S.C. § 271(b).

80.    Upon information and belief, Defendant actively induces users to directly infringe the asserted claims of the '628 patent.  By way of example only, upon information and belief, Defendant actively induces direct infringement of the '628 patent by providing directions, demonstrations, guides, manuals, training for use, and/or other materials necessary for the use of the Apple Watch Series 4 and later devices, including use with Apple iPhones. Upon information and belief, Defendant knew or should have known that these activities would cause direct infringement.

81.    Upon information and belief, Defendant's acts constitute contributory infringement of the '628 patent in violation of 35 U.S.C. § 271(c). Upon information and belief, Defendant contributorily infringes because, among other things, Defendant offers to sell and/or sells within the United States, and/or imports into the United States, components of the Apple Watch Series 4 and later devices and Apple iPhones that constitute material parts of the invention of the asserted claims of the '628 patent, are not staple articles or commodities of commerce suitable for substantial non-infringing use, and are known by Defendant to be especially made or especially adapted for use in an infringement of the '628 patent.

82.    Defendant's infringement of the '628 patent is willful, deliberate, and intentional by continuing its acts of infringement after becoming aware of the '628 patent and its infringement thereof, thus acting in reckless disregard of Masimo's patent rights.

83.    Because of Defendant's infringement of the '628 patent, Masimo has suffered and will continue to suffer irreparable harm and injury, including monetary damages in an amount to be determined at trial.

84.     Upon information and belief, unless enjoined, Defendant, and/or others acting on behalf of Defendant, will continue their infringing acts, thereby causing additional irreparable injury to Masimo for which there is no adequate remedy at law.

## X.  FOURTH CAUSE OF ACTION
## (INFRINGEMENT OF U.S. PATENT NO. 10,299,708)

85.     Plaintiff Masimo hereby realleges and incorporates by reference the allegations set forth in paragraphs 1 through 42.

86.     Upon information and belief, Defendant's products, including at least the Apple Watch Series 4 and later devices, infringe at least Claim 1 of the '708 patent under at least 35 U.S.C. § 271(a), (b), and (c).

87.     Upon information and belief, Defendant has directly infringed one or more claims of the '708 patent through manufacture, use, sale, offer for sale, and/or importation into the United States of physiological monitors, including the Apple Watch Series 4 and later devices.

88.     For example, upon information and belief, in operation, the Apple Watch Series 4 and later devices include all of the limitations of Claim 1 of the '708 patent as set forth herein and further illustrated in the claim chart shown in Exhibit 16.  The Apple Watch Series 4 and later devices are adapted to be worn by a wearer and provide an indication of a physiological parameter (for example, heart rate) of the wearer as shown in the image below found on the Apple website at https://www.apple.com/apple-watch-series-4/health/:



89.    The Apple Watch Series 4 and later devices include a platform including a planar surface, a housing including a raised edge portion extending from and enclosing at least a portion of the planar surface, and the housing including a protruding light permeable cover. Fig. 4C and the corresponding text of the '912 publication show, for example, such platform and housing:



FIG. 4C

90.     Upon information and belief, the Apple Watch Series 4 and later devices include at least four detectors (for example, photodiode sensors) arranged on the planar surface of the platform and within the housing, wherein the at least four detectors are arranged in a grid pattern such that a first detector and a second detector are arranged across from each other on opposite sides of a central point along a first axis, and a third detector and a fourth detector are arranged across from each other on opposite sides of the central point along a second axis which is perpendicular to the first axis as shown in the image below found on the Apple website at https://support.apple.com/en-us/HT204666:



91.     Upon information and belief, Defendant has knowledge of Masimo's patents, including the '708 patent, at least based on O'Reilly and Lamego's former positions with Plaintiffs.  Masimo filed provisional patent applications that led to the '708 patent in August 2008, while O'Reilly and Lamego were with Masimo and/or Cercacor.  Lamego is a named inventor of the '708 patent.  Defendant had knowledge of the '708 patent no later than the filing of the original Complaint.

92.     Upon information and belief, Defendant has actively induced others to infringe the '708 patent by marketing and selling the above Apple

Watch Series 4 and later devices, knowing and intending that such systems would be used by customers and end users in a manner that infringes the '708 patent. To that end, Defendant provides instructions and teachings to its customers and end users that such Apple Watch Series 4 and later devices be used to infringe the '708 patent. Defendant's acts constitute infringement of the '708 patent in violation of 35 U.S.C. § 271(b).

93. Upon information and belief, Defendant actively induces users to directly infringe the asserted claims of the '708 patent. By way of example only, upon information and belief, Defendant actively induces direct infringement of the '708 patent by providing directions, demonstrations, guides, manuals, training for use, and/or other materials necessary for the use of the Apple Watch Series 4 and later devices, including use with Apple iPhones. Upon information and belief, Defendant knew or should have known that these activities would cause direct infringement.

94. Upon information and belief, Defendant's acts constitute contributory infringement of the '708 patent in violation of 35 U.S.C. § 271(c). Upon information and belief, Defendant contributorily infringes because, among other things, Defendant offers to sell and/or sells within the United States, and/or imports into the United States, components of the Apple Watch Series 4 and later devices and Apple iPhones that constitute material parts of the invention of the asserted claims of the '708 patent, are not staple articles or commodities of commerce suitable for substantial non-infringing use, and are known by Defendant to be especially made or especially adapted for use in an infringement of the '708 patent.

95. Defendant's infringement of the '708 patent is willful, deliberate, and intentional by continuing its acts of infringement after becoming aware of the '708 patent and its infringement thereof, thus acting in reckless disregard of Masimo's patent rights.

96.     Because of Defendant's infringement of the '708 patent, Masimo has suffered and will continue to suffer irreparable harm and injury, including monetary damages in an amount to be determined at trial.

97.     Upon information and belief, unless enjoined, Defendant, and/or others acting on behalf of Defendant, will continue their infringing acts, thereby causing additional irreparable injury to Masimo for which there is no adequate remedy at law.

## XI.  FIFTH CAUSE OF ACTION
## (INFRINGEMENT OF U.S. PATENT NO. 10,376,190)

98.     Plaintiff Masimo hereby realleges and incorporates by reference the allegations set forth in paragraphs 1 through 42.

99.     Upon information and belief, Defendant's products, including at least the Apple Watch Series 4 and later devices, infringe at least Claim 1 of the '190 patent under at least 35 U.S.C. § 271(a), (b), and (c).

100.    Upon information and belief, Defendant has directly infringed one or more claims of the '190 patent through manufacture, use, sale, offer for sale, and/or importation into the United States of physiological monitors, including the Apple Watch Series 4 and later devices.

101.    For example, upon information and belief, in operation, the Apple Watch Series 4 and later devices include all of the limitations of Claim 1 of the '190 patent as set forth herein and further illustrated in the claim chart shown in Exhibit 17.  The Apple Watch Series 4 and later devices are noninvasive optical physiological measurement devices adapted to be worn by a wearer, the noninvasive optical physiological measurement device providing an indication of a physiological parameter (for example, heart rate) of the wearer as shown in the image below found on the Apple website at https://www.apple.com/apple-watch-series-4/health/:

Case 8:20-cv-00048-JVS-JDE Document 28-1 Filed 03/23/20 Page 30 of 95 Page ID #:1342



102.   Upon information and belief, the Apple Watch Series 4 and later devices include light emitters and at least four detectors spaced apart from each other and configured to output one or more signals responsive to light from the one or more light emitters attenuated by body tissue, the one or more signals indicative of a physiological parameter of the wearer as shown in the image below found on the Apple website at https://support.apple.com/en-us/HT204666:



103.   The Apple Watch Series 4 and later devices include a housing having a surface and a circular raised edge extending from the surface, and a

light permeable cover arranged above at least a portion of the housing, the light permeable cover comprising a protrusion arranged to cover the at least four detectors.  Fig. 4C and the corresponding text of the '912 publication show, for example, such housing:



FIG. 4C

104.  Upon information and belief, Defendant has knowledge of Masimo's patents, including the '190 patent, at least based on O'Reilly and Lamego's former positions with Plaintiffs.  Masimo filed provisional patent applications that led to the '190 patent in August 2008, while O'Reilly and Lamego were with Masimo and/or Cercacor.  Lamego is a named inventor of the '190 patent.  Defendant had knowledge of the '190 patent no later than the filing of the original Complaint.

105.  Upon information and belief, Defendant has actively induced others to infringe the '190 patent by marketing and selling the above Apple

Watch Series 4 and later devices, knowing and intending that such systems would be used by customers and end users in a manner that infringes the '190 patent. To that end, Defendant provides instructions and teachings to its customers and end users that such Apple Watch Series 4 and later devices be used to infringe the '190 patent. Defendant's acts constitute infringement of the '190 patent in violation of 35 U.S.C. § 271(b).

106. Upon information and belief, Defendant actively induces users to directly infringe the asserted claims of the '190 patent. By way of example only, upon information and belief, Defendant actively induces direct infringement of the '190 patent by providing directions, demonstrations, guides, manuals, training for use, and/or other materials necessary for the use of the Apple Watch Series 4 and later devices, including use with Apple iPhones. Upon information and belief, Defendant knew or should have known that these activities would cause direct infringement.

107. Upon information and belief, Defendant's acts constitute contributory infringement of the '190 patent in violation of 35 U.S.C. § 271(c). Upon information and belief, Defendant contributorily infringes because, among other things, Defendant offers to sell and/or sells within the United States, and/or imports into the United States, components of the Apple Watch Series 4 and later devices and Apple iPhones that constitute material parts of the invention of the asserted claims of the '190 patent, are not staple articles or commodities of commerce suitable for substantial non-infringing use, and are known by Defendant to be especially made or especially adapted for use in an infringement of the '190 patent.

108. Defendant's infringement of the '190 patent is willful, deliberate, and intentional by continuing its acts of infringement after becoming aware of the '190 patent and its infringement thereof, thus acting in reckless disregard of Masimo's patent rights.

109.   Because of Defendant's infringement of the '190 patent, Masimo has suffered and will continue to suffer irreparable harm and injury, including monetary damages in an amount to be determined at trial.

110.   Upon information and belief, unless enjoined, Defendant, and/or others acting on behalf of Defendant, will continue their infringing acts, thereby causing additional irreparable injury to Masimo for which there is no adequate remedy at law.

## XII.  SIXTH CAUSE OF ACTION
## (INFRINGEMENT OF U.S. PATENT NO. 10,376,191)

111.   Plaintiff Masimo hereby realleges and incorporates by reference the allegations set forth in paragraphs 1 through 42.

112.   Upon information and belief, Defendant's products, including at least the Apple Watch Series 4 and later devices, infringe at least Claim 1 of the '191 patent under at least 35 U.S.C. § 271(a), (b), and (c).

113.   Upon information and belief, Defendant has directly infringed one or more claims of the '191 patent through manufacture, use, sale, offer for sale, and/or importation into the United States of physiological monitors, including the Apple Watch Series 4 and later devices.

114.   For example, upon information and belief, in operation, the Apple Watch Series 4 and later devices include all of the limitations of Claim 1 of the '191 patent as set forth herein and further illustrated in the claim chart shown in Exhibit 18.   The Apple Watch Series 4 and later devices are a noninvasive optical physiological sensor as shown in the image below found on the Apple website at https://www.apple.com/apple-watch-series-4/health/:



115.   The Apple Watch Series 4 and later devices include a plurality of emitters configured to emit light into tissue of a user and a plurality of detectors configured to detect light that has been attenuated by tissue of the user, wherein the plurality of detectors comprise at least four detectors as shown in the image below found on the Apple website at https://support.apple.com/en-us/HT204666:



116.   The Apple Watch Series 4 and later devices include a housing configured to house at least the plurality of detectors in a circular portion of the housing, and a lens configured to be located between tissue of the user and the

-33-

Case 8:20-cv-00048-JVS-JDE Document 28 Filed 06/25/20 Page 36 of 95 Page ID #:1847

plurality of detectors when the noninvasive optical physiological sensor is worn by the user, wherein the lens comprises a single outwardly protruding convex surface configured to cause tissue of the user to conform to at least a portion of the single outwardly protruding convex surface when the noninvasive optical physiological sensor is worn by the user and during operation of the noninvasive optical physiological sensor. Fig. 4C and the corresponding text of the '912 publication show, for example, such housing and lens:



FIG. 4C

117. Upon information and belief, Defendant has knowledge of Masimo's patents, including the '191 patent, at least based on O'Reilly and Lamego's former positions with Plaintiffs. Masimo filed provisional patent applications that led to the '191 patent in August 2008, while O'Reilly and Lamego were with Masimo and/or Cercacor. Lamego is a named inventor of

the '191 patent. Defendant had knowledge of the '191 patent no later than the filing of the original Complaint.

118. Upon information and belief, Defendant has actively induced others to infringe the '191 patent by marketing and selling the above Apple Watch Series 4 and later devices, knowing and intending that such systems would be used by customers and end users in a manner that infringes the '191 patent. To that end, Defendant provides instructions and teachings to its customers and end users that such Apple Watch Series 4 and later devices be used to infringe the '191 patent. Defendant's acts constitute infringement of the '191 patent in violation of 35 U.S.C. § 271(b).

119. Upon information and belief, Defendant actively induces users to directly infringe the asserted claims of the '191 patent. By way of example only, upon information and belief, Defendant actively induces direct infringement of the '191 patent by providing directions, demonstrations, guides, manuals, training for use, and/or other materials necessary for the use of the Apple Watch Series 4 and later devices. Upon information and belief, Defendant knew or should have known that these activities would cause direct infringement.

120. Upon information and belief, Defendant's acts constitute contributory infringement of the '191 patent in violation of 35 U.S.C. § 271(c). Upon information and belief, Defendant contributorily infringes because, among other things, Defendant offers to sell and/or sells within the United States, and/or imports into the United States, components of the Apple Watch Series 4 and later devices that constitute material parts of the invention of the asserted claims of the '191 patent, are not staple articles or commodities of commerce suitable for substantial non-infringing use, and are known by Defendant to be especially made or especially adapted for use in an infringement of the '191 patent.

121.   Defendant's infringement of the '191 patent is willful, deliberate, and intentional by continuing its acts of infringement after becoming aware of the '191 patent and its infringement thereof, thus acting in reckless disregard of Masimo's patent rights.

122.   Because of Defendant's infringement of the '191 patent, Masimo has suffered and will continue to suffer irreparable harm and injury, including monetary damages in an amount to be determined at trial.

123.   Upon information and belief, unless enjoined, Defendant, and/or others acting on behalf of Defendant, will continue their infringing acts, thereby causing additional irreparable injury to Masimo for which there is no adequate remedy at law.

## XIII.  SEVENTH CAUSE OF ACTION
## (INFRINGEMENT OF U.S. PATENT NO. 10,470,695)

124.   Plaintiff Masimo hereby realleges and incorporates by reference the allegations set forth in paragraphs 1 through 42.

125.   Upon information and belief, Defendant's products, including at least the Apple Watch Series 4 and later devices, infringe at least Claim 1 of the '695 patent under at least 35 U.S.C. § 271(a), (b), and (c).

126.   Upon information and belief, Defendant has directly infringed one or more claims of the '695 patent through manufacture, use, sale, offer for sale, and/or importation into the United States of physiological monitors, including the Apple Watch Series 4 and later devices.

127.   For example, upon information and belief, in operation, the Apple Watch Series 4 and later devices include all of the limitations of Claim 1 of the '695 patent as set forth herein and further illustrated in the claim chart shown in Exhibit 19.   The Apple Watch Series 4 and later devices are a wrist-worn physiological monitoring device configured for placement on a user at a tissue

measurement site as shown in the image below found on the Apple website at https://www.apple.com/apple-watch-series-4/health/:



128. The Apple Watch Series 4 and later devices include a light emission source comprising a plurality of emitters configured to irradiate the tissue measurement site by emitting light towards the tissue measurement site, the tissue measurement site being located on a wrist of the user, the plurality of emitters configured to emit one or more wavelengths and a plurality of detectors configured to detect the light emitted by the plurality of emitters after attenuation by a circular portion of the tissue measurement site, the plurality of detectors further configured to output at least one signal responsive to the detected light as shown in the image below found on the Apple website at https://support.apple.com/en-us/HT204666:



129.   The Apple Watch Series 4 and later devices include a processor configured to receive the at least one signal responsive to the output and determine a physiological parameter of the user and a light block forming an enclosing wall between the light emission source and the plurality of detectors, the light block defining the circular portion of the tissue measurement site, the light emission source arranged proximate a first side of the enclosing wall and the plurality of detectors arranged proximate a second side of the enclosing wall, the first side being different than the second side, wherein the enclosing wall prevents at least a portion of light emitted from the light emission source from being detected by the plurality of detectors without attenuation by the tissue, and wherein the plurality of detectors are arranged in an array having a spatial configuration corresponding to the portion of the tissue measurement site.  Fig. 4C and the corresponding text of the '912 publication show, for example, such light block:



FIG. 4C

130.  Upon information and belief, Defendant has knowledge of Masimo's patents, including the '695 patent, at least based on O'Reilly and Lamego's former positions with Plaintiffs.  Masimo filed provisional patent applications that led to the '695 patent in August 2008, while O'Reilly and Lamego were with Masimo and/or Cercacor.  Lamego is a named inventor of the '695 patent.  Defendant had knowledge of the '695 patent no later than the filing of the original Complaint.

131.  Upon information and belief, Defendant has actively induced others to infringe the '695 patent by marketing and selling the above Apple Watch Series 4 and later devices, knowing and intending that such systems would be used by customers and end users in a manner that infringes the '695 patent.  To that end, Defendant provides instructions and teachings to its customers and end users that such Apple Watch Series 4 and later devices be used to infringe the '695 patent.  Defendant's acts constitute infringement of the '695 patent in violation of 35 U.S.C. § 271(b).

132.   Upon information and belief, Defendant actively induces users to directly infringe the asserted claims of the '695 patent.  By way of example only, upon information and belief, Defendant actively induces direct infringement of the '695 patent by providing directions, demonstrations, guides, manuals, training for use, and/or other materials necessary for the use of the Apple Watch Series 4 and later devices.  Upon information and belief, Defendant knew or should have known that these activities would cause direct infringement.

133.   Upon information and belief, Defendant's acts constitute contributory infringement of the '695 patent in violation of 35 U.S.C. § 271(c). Upon information and belief, Defendant contributorily infringes because, among other things, Defendant offers to sell and/or sells within the United States, and/or imports into the United States, components of the Apple Watch Series 4 and later devices that constitute material parts of the invention of the asserted claims of the '695 patent, are not staple articles or commodities of commerce suitable for substantial non-infringing use, and are known by Defendant to be especially made or especially adapted for use in an infringement of the '695 patent.

134.   Defendant's infringement of the '695 patent is willful, deliberate, and intentional by continuing its acts of infringement after becoming aware of the '695 patent and its infringement thereof, thus acting in reckless disregard of Masimo's patent rights.

135.   Because of Defendant's infringement of the '695 patent, Masimo has suffered and will continue to suffer irreparable harm and injury, including monetary damages in an amount to be determined at trial.

136.   Upon information and belief, unless enjoined, Defendant, and/or others acting on behalf of Defendant, will continue their infringing acts, thereby

Case 8:20-cv-00048-JVS-JDE   Document 260-2   Filed 12/30/20   Page 56 of 353   Page ID
Case 8:20-cv-00048-JVS-JDE   Document 1-6   Filed 06/25/20   Page 42 of 95   Page ID #:134
#:19887

causing additional irreparable injury to Masimo for which there is no adequate remedy at law.

## XIV.  EIGHTH CAUSE OF ACTION
## (INFRINGEMENT OF U.S. PATENT NO. 6,771,994)

137.  Plaintiff Masimo hereby realleges and incorporates by reference the allegations set forth in paragraphs 1 through 42.

138.  Upon information and belief, Defendant's products, including at least the Apple Watch Series 4 and later devices, infringe at least Claim 15 of the '994 patent under at least 35 U.S.C. § 271(a), (b), and (c).

139.  Upon information and belief, Defendant has directly infringed one or more claims of the '994 patent through manufacture, use, sale, offer for sale, and/or importation into the United States of physiological monitors, including the Apple Watch Series 4 and later devices.

140.  For example, upon information and belief, in operation, the Apple Watch Series 4 and later devices include all of the limitations of Claim 15 of the '994 patent as set forth herein and further illustrated in the claim chart shown in Exhibit 20.  Upon information and belief, the Apple Watch Series 4 and later devices detects light transmitted through body tissue carrying pulsing blood to determine heart rate as shown in the image below found on the Apple website at https://www.apple.com/apple-watch-series-4/health/:

Case 8:20-cv-00048-JVS-JDE   Document 260-2   Filed 12/30/20   Page 57 of 353   Page ID
#:19888
Case 8:20-cv-00048-JVS-JDE   Document 23-10   Filed 06/23/20   Page 49 of 75   Page ID #:1535



141.   The Apple Watch Series 4 and later devices include at least one light emission device and a light sensitive detector as shown in the image below found on the Apple website at https://support.apple.com/en-us/HT204666:



142.   The detectors output signals responsive to light from the light emitters attenuated by body tissue.  Upon information and belief, the signals are indicative of a physiological parameter (for example, heart rate) of the wearer.

143.   Upon information and belief, the relevant technology in the Apple Watch Series 4 and later devices is described in the below citations to U.S. Patent Application Publication 2019/0090806 (the '806 publication).  A copy of

the publication is attached as Exhibit 26.  The Apple Watch Series 4 and later devices include a plurality of louvers positioned over the light sensitive detector to accept light from the at least one light emission device originating from a general direction of the at least one light emission device and then transmitting through body tissue carrying pulsing blood, wherein the louvers accept the light when the sensor is properly applied to tissue of a patient.  Upon information and belief, this technology is described, for example, in Fig. 7 and the corresponding text of the '806 publication:



FIG. 7

144.  Upon information and belief, Defendant has knowledge of Masimo's patents, including the '994 patent, at least based on O'Reilly and Lamego's former positions with Plaintiffs.  Masimo filed a patent application that led to the '994 patent on June 16, 2000.  The '994 patent issued on August 3, 2004, and Masimo has maintained the patent while O'Reilly and Lamego were with Masimo and/or Cercacor.  Defendant had knowledge of the '994 patent no later than the filing of the original Complaint.

145.  Upon information and belief, Defendant has actively induced others to infringe the '994 patent by marketing and selling the above Apple Watch Series 4 and later devices, knowing and intending that such systems would be used by customers and end users in a manner that infringes the '994 patent.  To that end, Defendant provides instructions and teachings to its customers and end users that such Apple Watch Series 4 and later devices be used to infringe the '994 patent.  Defendant's acts constitute infringement of the '994 patent in violation of 35 U.S.C. § 271(b).

146.  Upon information and belief, Defendant actively induces users to directly infringe the asserted claims of the '994 patent.  By way of example

-43-

only, upon information and belief, Defendant actively induces direct infringement of the '994 patent by providing directions, demonstrations, guides, manuals, training for use, and/or other materials necessary for the use of the Apple Watch Series 4 and later devices. Upon information and belief, Defendant knew or should have known that these activities would cause direct infringement.

147. Upon information and belief, Defendant's acts constitute contributory infringement of the '994 patent in violation of 35 U.S.C. § 271(c). Upon information and belief, Defendant contributorily infringes because, among other things, Defendant offers to sell and/or sells within the United States, and/or imports into the United States, components of the Apple Watch Series 4 and later devices that constitute material parts of the invention of the asserted claims of the '994 patent, are not staple articles or commodities of commerce suitable for substantial non-infringing use, and are known by Defendant to be especially made or especially adapted for use in an infringement of the '994 patent.

148. Defendant's infringement of the '994 patent is willful, deliberate, and intentional by continuing its acts of infringement after becoming aware of the '994 patent and its infringement thereof, thus acting in reckless disregard of Masimo's patent rights.

149. Because of Defendant's infringement of the '994 patent, Masimo has suffered and will continue to suffer irreparable harm and injury, including monetary damages in an amount to be determined at trial.

150. Upon information and belief, unless enjoined, Defendant, and/or others acting on behalf of Defendant, will continue their infringing acts, thereby causing additional irreparable injury to Masimo for which there is no adequate remedy at law.

Case 8:20-cv-00048-JVS-JDE  Document 260-2  Filed 12/30/20  Page 60 of 353  Page ID
Case 8:20-cv-00048-JVS-JDE  Document 23-1  Filed 03/23/20  Page 46 of 95  Page ID #:1588
#:19891

## XV.  NINTH CAUSE OF ACTION

### (INFRINGEMENT OF U.S. PATENT NO. 8,457,703)

151.  Plaintiff Masimo hereby realleges and incorporates by reference the allegations set forth in paragraphs 1 through 42.

152.  Upon information and belief, Defendant's products, including at least the Apple Watch Series 4 and later devices, infringe at least Claim 1 of the '703 patent under at least 35 U.S.C. § 271(a), (b), and (c).

153.  Upon information and belief, Defendant has directly infringed one or more claims of the '703 patent through manufacture, use, sale, offer for sale, and/or importation into the United States of physiological monitors, including the Apple Watch Series 4 and later devices.

154.  For example, upon information and belief, in operation, the Apple Watch Series 4 and later devices include all of the limitations of Claim 1 of the '703 patent as set forth herein and further illustrated in the claim chart shown in Exhibit 21.  The Apple Watch Series 4 and later devices provide an indication of a physiological parameter (for example, heart rate) of the wearer as shown in the image below found on the Apple website at https://www.apple.com/apple-watch-series-4/health/:



155.   The Apple Watch Series 4 and later devices drive one or more light sources configured to emit light into tissue and receives one or more signals from one or more detectors configured to detect light after attenuation by tissue as shown in the image below found on the Apple website at https://support.apple.com/en-us/HT204666:



156.   The detectors output signals responsive to light from the light emitters attenuated by body tissue.  Upon information and belief, the signals are indicative of a physiological parameter (for example, heart rate) of the wearer.

157.   Upon information and belief, the Apple Watch Series 4 and later devices continuously operate at a lower power consumption level to determine measurement values for heart rate, as described at https://support.apple.com/en-us/HT204666:

> The optical heart sensor in Apple Watch uses what is known as photoplethysmography. This technology, while difficult to pronounce, is based on a very simple fact: Blood is red because it reflects red light and absorbs green light. Apple Watch uses green LED lights paired with light-sensitive photodiodes to detect the amount of blood flowing through your wrist at any given moment.

When your heart beats, the blood flow in your wrist — and the green light absorption — is greater. Between beats, it's less. By flashing its LED lights hundreds of times per second, Apple Watch can calculate the number of times the heart beats each minute — your heart rate. The optical heart sensor supports a range of 30–210 beats per minute. In addition, the optical heart sensor is designed to compensate for low signal levels by increasing both LED brightness and sampling rate.

158.   Upon information and belief, the Apple Watch Series 4 and later devices as described above compare processing characteristics to a predetermined threshold, and when the processing characteristics pass the threshold, the Apple Watch Series 4 and later devices transition to continuously operating at a higher power consumption level, wherein the continuously operating at the lower power consumption level comprises reducing activation of an attached sensor, the sensor positioning the light sources and the detectors proximate to the tissue.

159.   Upon information and belief, Defendant has knowledge of Masimo's patents, including the '703 patent, at least based on O'Reilly and Lamego's former positions with Plaintiffs.  Masimo filed a provisional patent application that led to the '703 patent on July 2, 2001.  The '703 patent issued on June 4, 2013, while O'Reilly and Lamego were with Masimo and/or Cercacor.  Defendant had knowledge of the '703 patent no later than the filing of the original Complaint.

160.   Upon information and belief, Defendant has actively induced others to infringe the '703 patent by marketing and selling the above Apple Watch Series 4 and later devices, knowing and intending that such systems would be used by customers and end users in a manner that infringes the '703 patent.  To that end, Defendant provides instructions and teachings to its

Case 8:20-cv-00048-JVS-JDE Document 260-2 Filed 12/30/20 Page 63 of 353 Page ID
#:19894
Case 8:20-cv-00048-JVS-JDE Document 1-8 Filed 03/23/20 Page 49 of 95 Page ID #:181

customers and end users that such Apple Watch Series 4 and later devices be used to infringe the '703 patent. Defendant's acts constitute infringement of the '703 patent in violation of 35 U.S.C. § 271(b).

161. Upon information and belief, Defendant actively induces users to directly infringe the asserted claims of the '703 patent. By way of example only, upon information and belief, Defendant actively induces direct infringement of the '703 patent by providing directions, demonstrations, guides, manuals, training for use, and/or other materials necessary for the use of the Apple Watch Series 4 and later devices. Upon information and belief, Defendant knew or should have known that these activities would cause direct infringement.

162. Upon information and belief, Defendant's acts constitute contributory infringement of the '703 patent in violation of 35 U.S.C. § 271(c). Upon information and belief, Defendant contributorily infringes because, among other things, Defendant offers to sell and/or sells within the United States, and/or imports into the United States, components of the Apple Watch Series 4 and later devices that constitute material parts of the invention of the asserted claims of the '703 patent, are not staple articles or commodities of commerce suitable for substantial non-infringing use, and are known by Defendant to be especially made or especially adapted for use in an infringement of the '703 patent.

163. Defendant's infringement of the '703 patent is willful, deliberate, and intentional by continuing its acts of infringement after becoming aware of the '703 patent and its infringement thereof, thus acting in reckless disregard of Masimo's patent rights.

164. Because of Defendant's infringement of the '703 patent, Masimo has suffered and will continue to suffer irreparable harm and injury, including monetary damages in an amount to be determined at trial.

165.  Upon information and belief, unless enjoined, Defendant, and/or others acting on behalf of Defendant, will continue their infringing acts, thereby causing additional irreparable injury to Masimo for which there is no adequate remedy at law.

## XVI.  TENTH CAUSE OF ACTION
## (INFRINGEMENT OF U.S. PATENT NO. 10,433,776)

166.  Plaintiff Masimo hereby realleges and incorporates by reference the allegations set forth in paragraphs 1 through 42.

167.  Upon information and belief, Defendant's products, including at least the Apple Watch Series 4 and later devices, infringe at least Claim 1 of the '776 patent under at least 35 U.S.C. § 271(a), (b), and (c).

168.  Upon information and belief, Defendant has directly infringed one or more claims of the '776 patent through manufacture, use, sale, offer for sale, and/or importation into the United States of physiological monitors, including the Apple Watch Series 4 and later devices.

169.  For example, upon information and belief, in operation, the Apple Watch Series 4 and later devices include all of the limitations of Claim 1 of the '776 patent as set forth herein and further illustrated in the claim chart shown in Exhibit 22.  The Apple Watch Series 4 and later devices are configured to monitor at least a pulse rate of a patient by processing signals responsive to light attenuated by body tissue of the wearer as shown in the image below found on the Apple website at https://www.apple.com/apple-watch-series-4/health/:



170.    The Apple Watch Series 4 and later devices drive one or more light sources configured to emit light into tissue and receives one or more signals from one or more detectors configured to detect light after attenuation by tissue as shown in the image below found on the Apple website at https://support.apple.com/en-us/HT204666:



171.    Upon information and belief, the Apple Watch Series 4 and later devices operate according to a first control protocol, wherein said operating includes activating a first control protocol light source in accordance with the

first control protocol, the first control protocol light source including one or more of a plurality of light sources, and when operating according to the first control protocol, calculating, by the patient monitor, measurement values of the pulse rate, the measurement values responsive to light from the first control protocol light source, detected by a detector of an optical sensor after attenuation by body tissue of the patient using the patient monitor as explained, for example, on the Apple website at https://support.apple.com/en-us/HT204666. That webpage explains the optical heart sensor uses photoplethysmography. "Apple Watch uses green LED lights paired with light-sensitive photodiodes to detect the amount of blood flowing through your wrist at any given moment. When your heart beats, the blood flow in your wrist — and the green light absorption — is greater. Between beats, it's less. By flashing its LED lights hundreds of times per second, Apple Watch can calculate the number of times the heart beats each minute — your heart rate. The optical heart sensor supports a range of 30–210 beats per minute. In addition, the optical heart sensor is designed to compensate for low signal levels by increasing both LED brightness and sampling rate." That webpage further explains that the "optical heart sensor can also use infrared light. This mode is what Apple Watch uses when it measures your heart rate in the background, and for heart rate notifications. Apple Watch uses green LED lights to measure your heart rate during workouts and Breathe sessions, and to calculate walking average and Heart Rate Variability (HRV)."

172. Upon information and belief, the Apple Watch Series 4 and later devices generate a trigger signal, wherein generating said trigger signal is responsive to at least one of: a comparison of processing characteristics to a predetermined threshold, a physiological event, or signal quality characteristics of signals received from the detector, and in response to receiving the trigger signal, operating the patient monitor according to a second control protocol

different from the first control protocol, wherein said operating includes activating a second control protocol light source in accordance with the second control protocol, the second control protocol light source including one or more of the plurality of light sources, and when operating the patient monitor according to the second control protocol, calculating the measurement values of the pulse rate, the measurement values responsive to light from the second control protocol light source, detected by the detector after attenuation by the body tissue of the patient using the patient monitor, wherein said operating of the patient monitor according to the first control protocol operates the first control protocol light source according to a first duty cycle and said operating of the patient monitor according to the second control protocol operates the second control protocol light source according to a second duty cycle, wherein power consumption of the first control protocol light source according to the first duty cycle is different than power consumption of the second control protocol light source according to the second duty cycle.

173. Upon information and belief, Defendant has knowledge of Masimo's patents, including the '776 patent, at least based on O'Reilly and Lamego's former positions with Plaintiffs. Masimo filed a provisional patent application that led to the '776 patent on July 2, 2001. The '776 patent issued on June 4, 2013, while O'Reilly and Lamego were with Masimo and/or Cercacor. Defendant had knowledge of the '776 patent no later than the filing of the original Complaint.

174. Upon information and belief, Defendant has actively induced others to infringe the '776 patent by marketing and selling the above Apple Watch Series 4 and later devices, knowing and intending that such systems would be used by customers and end users in a manner that infringes the '776 patent. To that end, Defendant provides instructions and teachings to its customers and end users that such Apple Watch Series 4 and later devices be

1  used to infringe the '776 patent.  Defendant's acts constitute infringement of the
2  '776 patent in violation of 35 U.S.C. § 271(b).

3    175.   Upon information and belief, Defendant actively induces users to
4  directly infringe the asserted claims of the '776 patent.  By way of example
5  only, upon information and belief, Defendant actively induces direct
6  infringement of the '776 patent by providing directions, demonstrations, guides,
7  manuals, training for use, and/or other materials necessary for the use of the
8  Apple Watch Series 4 and later devices.   Upon information and belief,
9  Defendant knew or should have known that these activities would cause direct
10  infringement.

11    176. Upon information and belief, Defendant's acts constitute
12  contributory infringement of the '776 patent in violation of 35 U.S.C. § 271(c).
13  Upon information and belief, Defendant contributorily infringes because, among
14  other things, Defendant offers to sell and/or sells within the United States,
15  and/or imports into the United States, components of the Apple Watch Series 4
16  and later devices that constitute material parts of the invention of the asserted
17  claims of the '776 patent, are not staple articles or commodities of commerce
18  suitable for substantial non-infringing use, and are known by Defendant to be
19  especially made or especially adapted for use in an infringement of the
20  '776 patent.

21    177.   Defendant's infringement of the '776 patent is willful, deliberate,
22  and intentional by continuing its acts of infringement after becoming aware of
23  the '776 patent and its infringement thereof, thus acting in reckless disregard of
24  Masimo's patent rights.

25    178.  Because of Defendant's infringement of the '776 patent, Masimo
26  has suffered and will continue to suffer irreparable harm and injury, including
27  monetary damages in an amount to be determined at trial.

28

Case 8:20-cv-00048-JVS-JDE   Document 260-2   Filed 12/30/20   Page 69 of 353   Page ID
Case 8:20-cv-00048-JVS-JDE   Document 1-6   Filed 03/23/20   Page 55 of 95   Page ID #:367
#:19900

179.  Upon information and belief, unless enjoined, Defendant, and/or others acting on behalf of Defendant, will continue their infringing acts, thereby causing additional irreparable injury to Masimo for which there is no adequate remedy at law.

## XVII.  ELEVENTH CAUSE OF ACTION
## (INFRINGEMENT OF U.S. PATENT NO. 10,588,553)

180.  Plaintiff Masimo hereby realleges and incorporates by reference the allegations set forth in paragraphs 1 through 42.

181.  Upon information and belief, Defendant's products, including at least the Apple Watch Series 4 and later devices, infringe at least Claim 1 of the '553 patent under at least 35 U.S.C. § 271(a), (b), and (c).

182.  Upon information and belief, Defendant has directly infringed one or more claims of the '553 patent through manufacture, use, sale, offer for sale, and/or importation into the United States of physiological monitors, including the Apple Watch Series 4 and later devices.

183.  For example, upon information and belief, in operation, the Apple Watch Series 4 and later devices include all of the limitations of Claim 1 of the '553 patent as set forth herein and further illustrated in the claim chart shown in Exhibit 23.  The Apple Watch Series 4 and later devices are noninvasive optical physiological sensor devices as shown in the image below found on the Apple website at https://www.apple.com/apple-watch-series-4/health/:



184. The Apple Watch Series 4 and later devices include a plurality of emitters configured to emit light into tissue of a user, and at least four detectors, wherein at least one of the at least four detectors is configured to detect light that has been attenuated by tissue of the user, and wherein the at least four detectors are arranged on a substrate as shown in the image below found on the Apple website at https://support.apple.com/en-us/HT204666:



185. The detectors output signals responsive to light from the light emitters attenuated by body tissue. Upon information and belief, the signals are indicative of a physiological parameter (for example, heart rate) of the wearer.

186.   Upon information and belief, the relevant technology in the Apple Watch Series 4 and later devices is described in the below citations to U.S. Patent Application Publication 2019/0072912 (the '912 publication).  A copy of the publication is attached as Exhibit 25.  The Apple Watch Series 4 and later devices include a wall configured to circumscribe at least the at least four detectors and a cover configured to be located between tissue of the user and the at least four detectors when the noninvasive optical physiological sensor is worn by the user, wherein the cover comprises a single protruding convex surface operable to conform tissue of the user to at least a portion of the single protruding convex surface when the noninvasive optical physiological sensor is worn by the user, and wherein the wall operably connects to the substrate and the cover.  Fig. 4C and the corresponding text of the '912 publication show, for example, such wall and cover:



FIG. 4C

187. Upon information and belief, Defendant has knowledge of Masimo's patents, including the '553 patent, at least based on O'Reilly and Lamego's former positions with Plaintiffs. Masimo filed provisional patent applications that led to the '553 patent in August 2008, while O'Reilly and Lamego were with Masimo and/or Cercacor. Lamego is a named inventor of the '553 patent. Defendant had knowledge of the '553 patent no later than the filing of this First Amended Complaint.

188. Upon information and belief, Defendant has actively induced others to infringe the '553 patent by marketing and selling the above Apple Watch Series 4 and later devices, knowing and intending that such systems would be used by customers and end users in a manner that infringes the '553 patent. To that end, Defendant provides instructions and teachings to its customers and end users that such Apple Watch Series 4 and later devices be used to infringe the '553 patent. Defendant's acts constitute infringement of the '553 patent in violation of 35 U.S.C. § 271(b).

189. Upon information and belief, Defendant actively induces users to directly infringe the asserted claims of the '553 patent. By way of example only, upon information and belief, Defendant actively induces direct infringement of the '553 patent by providing directions, demonstrations, guides, manuals, training for use, and/or other materials necessary for the use of the Apple Watch Series 4 and later devices, including use with Apple iPhones. Upon information and belief, Defendant knew or should have known that these activities would cause direct infringement.

190. Upon information and belief, Defendant's acts constitute contributory infringement of the '553 patent in violation of 35 U.S.C. § 271(c). Upon information and belief, Defendant contributorily infringes because, among other things, Defendant offers to sell and/or sells within the United States, and/or imports into the United States, components of the Apple Watch Series 4

and later devices and Apple iPhones that constitute material parts of the invention of the asserted claims of the '553 patent, are not staple articles or commodities of commerce suitable for substantial non-infringing use and are known by Defendant to be especially made or especially adapted for use in an infringement of the '553 patent.

191.  Defendant's infringement of the '553 patent is willful, deliberate, and intentional by continuing its acts of infringement after becoming aware of the '553 patent and its infringement thereof, thus acting in reckless disregard of Masimo's patent rights.

192.  Because of Defendant's infringement of the '553 patent, Masimo has suffered and will continue to suffer irreparable harm and injury, including monetary damages in an amount to be determined at trial.

193.  Upon information and belief, unless enjoined, Defendant, and/or others acting on behalf of Defendant, will continue their infringing acts, thereby causing additional irreparable injury to Masimo for which there is no adequate remedy at law.

## XVIII.  TWELFTH CAUSE OF ACTION
## (INFRINGEMENT OF U.S. PATENT NO. 10,588,554)

194.  Plaintiff Masimo hereby realleges and incorporates by reference the allegations set forth in paragraphs 1 through 42.

195.  Upon information and belief, Defendant's products, including at least the Apple Watch Series 4 and later devices, infringe at least Claim 21 of the '554 patent under at least 35 U.S.C. § 271(a), (b), and (c).

196.  Upon information and belief, Defendant has directly infringed one or more claims of the '554 patent through manufacture, use, sale, offer for sale, and/or importation into the United States of physiological monitors, including the Apple Watch Series 4 and later devices.

197.   For example, upon information and belief, in operation, the Apple Watch Series 4 and later devices in combination with iPhone devices include all of the limitations of Claim 21 of the '554 patent as set forth herein and further illustrated in the claim chart shown in Exhibit 24.   The Apple Watch Series 4 and later devices are physiological measurement systems with physiological sensors as shown in the image below found on the Apple website at https://www.apple.com/apple-watch-series-4/health/:



198.   The Apple Watch Series 4 and later devices include a plurality of emitters configured to emit light into tissue of a user, and at least four detectors, wherein each of the at least four detectors has a corresponding window that allows light to pass through to the detector as shown in the image below found on the Apple website at https://support.apple.com/en-us/HT204666:



199.    The detectors output signals responsive to light from the light emitters attenuated by body tissue.  Upon information and belief, the signals are indicative of a physiological parameter (for example, heart rate) of the wearer.

200.    Upon information and belief, the relevant technology in the Apple Watch Series 4 and later devices is described in the below citations to U.S. Patent Application Publication 2019/0072912 (the '912 publication).  A copy of the publication is attached as Exhibit 25.  The Apple Watch Series 4 and later devices include a wall that surrounds at least the at least four detectors, a cover comprising a single protruding convex surface, wherein the single protruding convex surface is configured to be located between tissue of the user and the at least four detectors when the physiological sensor device is worn by the user, wherein at least a portion of the single protruding convex surface is sufficiently rigid to cause tissue of the user to conform to at least a portion of a shape of the single protruding convex surface when the physiological sensor device is worn by the user, and wherein the cover operably connects to the wall.  Fig. 4C and the corresponding text of the '912 publication show, for example, such wall and cover:



201. The Apple Watch Series 4 and later devices communicate wirelessly with handheld computing devices as shown in the image below found on the Apple website at https://support.apple.com/en-us/HT204666 and as further described at https://support.apple.com/en-us/HT204505:

202.  Upon information and belief, Defendant has knowledge of Masimo's patents, including the '554 patent, at least based on O'Reilly and Lamego's former positions with Plaintiffs.  Masimo filed provisional patent applications that led to the '554 patent in August 2008, while O'Reilly and Lamego were with Masimo and/or Cercacor.  Lamego is a named inventor of the '554 patent.  Defendant had knowledge of the '554 patent no later than the filing of this First Amended Complaint.

203.  Upon information and belief, Defendant has actively induced others to infringe the '554 patent by marketing and selling the above Apple Watch Series 4 and later devices, knowing and intending that such systems would be used by customers and end users in a manner that infringes the '554 patent.  To that end, Defendant provides instructions and teachings to its customers and end users that such Apple Watch Series 4 and later devices be used to infringe the '554 patent.  Defendant's acts constitute infringement of the '554 patent in violation of 35 U.S.C. § 271(b).

204.  Upon information and belief, Defendant actively induces users to directly infringe the asserted claims of the '554 patent.  By way of example only, upon information and belief, Defendant actively induces direct infringement of the '554 patent by providing directions, demonstrations, guides, manuals, training for use, and/or other materials necessary for the use of the Apple Watch Series 4 and later devices, including use with Apple iPhones.  Upon information and belief, Defendant knew or should have known that these activities would cause direct infringement.

205.  Upon information and belief, Defendant's acts constitute contributory infringement of the '554 patent in violation of 35 U.S.C. § 271(c).  Upon information and belief, Defendant contributorily infringes because, among other things, Defendant offers to sell and/or sells within the United States, and/or imports into the United States, components of the Apple Watch Series 4

and later devices and Apple iPhones that constitute material parts of the invention of the asserted claims of the '554 patent, are not staple articles or commodities of commerce suitable for substantial non-infringing use and are known by Defendant to be especially made or especially adapted for use in an infringement of the '554 patent.

206.   Defendant's infringement of the '554 patent is willful, deliberate, and intentional by continuing its acts of infringement after becoming aware of the '554 patent and its infringement thereof, thus acting in reckless disregard of Masimo's patent rights.

207.   Because of Defendant's infringement of the '554 patent, Masimo has suffered and will continue to suffer irreparable harm and injury, including monetary damages in an amount to be determined at trial.

208.   Upon information and belief, unless enjoined, Defendant, and/or others acting on behalf of Defendant, will continue their infringing acts, thereby causing additional irreparable injury to Masimo for which there is no adequate remedy at law.

## XIX.  THIRTEENTH CAUSE OF ACTION
## (TRADE SECRET MISAPPROPRIATION UNDER
## CALIFORNIA'S UNIFORM TRADE SECRET ACT)

209.   Plaintiffs hereby reallege and incorporate by reference the allegations set forth in paragraphs 1 through 42.

210.   This is a cause of action for Misappropriation of Trade Secrets under California's Uniform Trade Secrets Act, Cal. Civ. Code §§ 3426 *et seq.*, based upon Defendant's wrongful and improper acquisition, use, and disclosure of confidential and proprietary trade secret information of Plaintiffs.

211.   Plaintiffs own trade secrets that include, but are not limited to, Plaintiffs' technical information, sales and marketing information, and other business information relating to non-invasive monitoring of physiological

parameters and products to perform such monitoring. Plaintiffs' technical information includes product plans, engineering plans, product briefs, technical drawings, technical specifications, technical data, product designs, system designs, design captures, assembly design requirements, risk analysis, test procedures and results, test data, design review documents, software requirement specifications, technical know-how, manufacturing techniques and procedures, installation techniques and procedures, and invention disclosures. Plaintiffs' sales and marketing information includes product plans, business plans, customer information, sales pipelines, proposal and quote generation tools, pricing models, pricing schedules, sales training materials, product training materials, marketing and launch plans, marketing analysis, and competitive analysis. Plaintiffs' other business information includes information for successfully operating a non-invasive patient monitoring company, including personnel information, supplier information, and other business spreadsheets and analysis. Plaintiffs trade secrets also include combinations and selections of the above information, and knowledge of the varying importance of the information. Plaintiffs trade secrets also include knowledge for selecting which information and technology are important for improving reliability, improving measurements, and how to successfully combine and implement them to achieve the desired functionality. Plaintiffs' trade secrets also include negative information, what works well under certain conditions, and trade-offs of selecting certain techniques. The aforementioned information is referred to herein as Plaintiffs' "Confidential Information."

212. Plaintiffs' Confidential Information is currently or was, at least at the time of Defendant's misappropriation, not generally known to the public or to other persons who can obtain economic value from its disclosure or use. All individuals with access to Plaintiffs' Confidential Information were instructed to keep it confidential, and they were subject to obligations to keep Plaintiffs' Confidential Information secret. For example, Plaintiffs marked documents

confidential, and instructed those individuals with access to the information to treat it as confidential, restricted access to the information, and required individuals and companies to enter into confidentiality agreements with Plaintiffs in order to receive Plaintiffs' Confidential Information.

213. Plaintiffs' Confidential Information derives independent economic value, actual and potential, because it is, or was at the time of Defendant's misappropriation, not generally known to the public or to other persons who can obtain economic value from its disclosure or use. The actual and potential independent economic value of Plaintiffs' Confidential Information is derived from not being generally known because it gives or gave Plaintiffs an actual and potential business advantage over others who do not know the information and who could obtain economic value from its disclosure or use. If others obtained access to Plaintiffs' Confidential Information, they could use the information to deprive Plaintiffs of the business advantage it has over others, as well as to themselves obtain a business advantage over others.

214. Plaintiffs made reasonable efforts under the circumstances to keep Plaintiffs' Confidential Information from becoming generally known. For example, Plaintiffs' efforts included marking documents confidential, instructing individuals with access to the information to treat it as confidential, restricting access to the information, and requiring individuals and companies to enter into confidentiality agreements with Plaintiffs in order to receive Plaintiffs' Confidential Information. Accordingly, Plaintiffs' Confidential Information constitutes a "trade secret" pursuant to Cal. Civ. Code § 3426.1.

215. Plaintiffs are informed and believe, and thereon allege, that Defendant misappropriated Plaintiffs' Confidential Information by acquisition at least from Plaintiffs' former employees who left Plaintiffs to work for Defendant. For example, upon information and belief, Lamego disclosed Plaintiffs' Confidential Information, without Plaintiffs' consent, to Defendant. At the time of

Case 8:20-cv-00048-JVS-JDE   Document 260-2   Filed 12/30/20   Page 81 of 353   Page ID
Case 8:20-cv-00048-JVS-JDE   Document 1-8   Filed 08/23/20   Page 67 of 95   Page ID #:179
#:19912

disclosure, Lamego knew, or had reason to know, that his knowledge of Plaintiffs' Confidential Information was acquired by an employer-employee relationship, fiduciary relationship, and Lamego's employment agreements, which created a duty for Lamego to keep Plaintiffs' Confidential Information secret. Lamego also knew, or had reason to know, that disclosing Plaintiffs' Confidential Information to Defendant constituted a breach of those obligations.

216. At the time of acquisition, Defendant also knew, or had reason to know, that Lamego obtained Plaintiffs' Confidential information pursuant to a duty or obligation to keep Plaintiffs' Confidential information secret. This duty or obligation arose from an employer-employee relationship, fiduciary relationship, and Lamego's employment agreements. Among other things, Defendant knew Lamego was the Chief Technical Officer of Cercacor and a Research Scientist at Masimo. Defendant knew Lamego was under a duty to maintain the secrecy of the information he obtained from Plaintiffs. Defendant knew Plaintiffs considered the information confidential by virtue of its prior relationship with Plaintiffs. Defendant had also received a letter dated January 24, 2014, from Plaintiffs explaining that Lamego possessed Plaintiffs' Confidential Information, asking Defendant not to use such information, and attaching a copy of Lamego's Employee Confidentiality Agreement with Cercacor. Nevertheless, Defendant induced Lamego to disclose Plaintiffs' Confidential Information and Lamego disclosed Plaintiffs' Confidential Information for the benefit of Defendant while employed by Defendant. Thus, Defendant acquired Plaintiffs' trade secrets through the improper means of its employees breaching a duty to maintain secrecy owed to Plaintiffs, as well as inducing its employees to breach a duty to maintain secrecy owed to Plaintiffs.

217. Upon information and belief, Defendant used and disclosed Plaintiffs' Confidential Information it obtained from Plaintiffs and their former employees without Plaintiffs' express or implied consent. For example, Lamego

used and disclosed Plaintiffs' Confidential Information for the benefit of Defendant while employed by Defendant. As discussed above, Lamego knew or had reason to know that his knowledge of Plaintiffs' Confidential Information was acquired under circumstances giving rise to a duty to maintain its secrecy and limit its use.

218. Defendant further used and disclosed Plaintiffs' Confidential Information at least by incorporating it into Defendant's products and by filing patent applications containing Plaintiffs' Confidential Information, without Plaintiffs' express or implied consent. As discussed above, Defendant knew or had reason to know that its knowledge of Plaintiffs' Confidential Information came from Plaintiffs, Lamego's knowledge of Plaintiffs' Confidential Information came from Plaintiffs, and that Lamego had previously acquired Plaintiffs' Confidential Information by virtue of employer-employee and fiduciary relationships and the Lamego employment agreements, all of which created a duty for Lamego to keep Plaintiffs' Confidential Information secret.

219. Plaintiffs had no way of knowing, or learning, of Defendant's improper acquisition, use, or disclosure prior to January 10, 2017. Defendant did not publish Plaintiffs' Confidential Information in patent applications until after January 10, 2017, and the first product at issue was not announced until 2018. Additionally, based at least on Plaintiffs' conversations with Lamego, Plaintiffs' letter to Apple, and Plaintiffs' confidentiality agreement with Apple, Plaintiffs had no reason to suspect or believe that Defendant had ignored Plaintiffs' letter and improperly acquired, used, and disclosed Plaintiffs' Confidential Information until after Plaintiffs discovered patent applications published after January 10, 2017, and accused products announced in 2018.

220. Defendant and Lamego also led Plaintiffs to believe they intended to respect Plaintiffs' intellectual property rights and concealed Defendant's acquisition, use, and disclosure of Plaintiffs' Confidential Information. Plaintiffs

Case 8:20-cv-00048-JVS-JDE   Document 260-2   Filed 12/30/20   Page 83 of 353   Page ID
Case 8:20-cv-00048-JVS-JDE   Document 231   Filed 03/23/20   Page 69 of 95   Page ID #:1581
#:19914

notified Defendant that Lamego possessed the Confidential Information on January 24, 2014. Defendant never informed Plaintiffs that Lamego had used or disclosed the Confidential Information. Defendant also requested non-publication of patent applications, which prevented Plaintiffs from learning of the contents of those applications until much later. For example, Defendant requested non-publication of the '268 Application (which issued as the '754 Patent), the '422 Application (which issued as the '997 Patent), and the '664 Application (which issued as the '095 Patent). On information and belief, Defendant requested non-publication of those applications to prevent Plaintiffs from learning those applications contained Plaintiffs' Confidential Information, and from learning the Defendant had acquired, used and disclosed Plaintiffs' Confidential Information.

221. Plaintiffs were harmed by Defendant's acquisition, use, and disclosure of Plaintiffs' Confidential Information, and Defendant's actions were substantial factors in causing Plaintiffs' harm. As a direct and proximate result of Defendant's willful, improper, and unlawful acquisition, use, and disclosure of Plaintiffs' trade secrets, Plaintiffs have suffered, and will continue to suffer, great harm and damage. Plaintiffs will continue to be irreparably damaged unless Defendant is enjoined from further use and disclosure of Plaintiffs' Confidential Information.

222. Defendant was unjustly enriched by Defendant's acquisition, use, and disclosure of Plaintiffs' Confidential Information, and Defendant's actions were substantial factors in causing Defendant to be unjustly enriched. Defendant was unjustly enriched because its misappropriation of Plaintiffs' Confidential Information caused Defendant to receive a benefit that it otherwise would not have achieved.

223. If neither damages nor unjust enrichment caused by Defendant's misappropriation of Plaintiffs' Confidential Information is provable at trial,

Plaintiffs are entitled to a reasonable royalty for the period of time that Defendant's use of Plaintiffs' Confidential Information could have been prohibited.

224.   The aforementioned acts of Defendant wrongfully misappropriating Plaintiffs' trade secrets were, and continue to be, willful and malicious, warranting an award of reasonable attorneys' fees, as provided by Cal. Civ. Code § 3426.4, and exemplary damages, as provided by Cal. Civ. Code §§ 3294 and 3426.3(c).

## XX.  FOURTEENTH CAUSE OF ACTION
## (CORRECTION OF INVENTORSHIP OF U.S. PATENT NO. 10,078,052)

225.   Plaintiffs hereby reallege and incorporate by reference the allegations set forth in paragraphs 1 through 42.

226.   Lamego is a named inventor of U.S. Patent 10,078,052 presently recorded as owned by Apple.  A true and correct copy of the '052 Patent is attached hereto as Exhibit 27.

227.   The '052 Patent claims subject matter that Lamego obtained from discussions with, or jointly conceived with, Masimo employees.  For example, Claim 1 of the '052 Patent recites an electronic device comprising a housing defining an aperture; an optical sensing system comprising a light emitter for emitting light through the aperture, the light emitter positioned adjacent the aperture; and a light detector for obtaining a first portion of the light after the first portion of the light reflects from an object; and a reflector disposed about the aperture and adapted to reflect a second portion of the light back into the object after the second portion of the light reflects from the object.  Lamego obtained this subject matter from discussions with, or jointly conceived it with, Diab.  Accordingly, Diab is a joint inventor of any patentable subject matter claimed in the '052 Patent, and should have been named as an inventor on the '052 Patent.

228. In written assignments, Lamego, as well as Diab, agreed to assign and assigned to Masimo all patentable subject matter (as well as all works of authorship, developments, improvements, or trade secrets) conceived during their employment at Masimo, including ownership of all patents and patent applications claiming such subject matter.

229. Those assignments vested in Masimo all legal and equitable title to all patents and patent applications reciting inventions made during their employment, such that Masimo is at least a joint owner of the '052 Patent and Masimo has standing to seek correction of inventorship to perfect Masimo's ownership interest in the '052 Patent.

230. In at least one written assignment, Lamego agreed to assign and assigned to Cercacor all patentable subject matter (as well as all works of authorship, developments, improvements, or trade secrets) conceived during his employment at Cercacor, including ownership of all patents and patent applications claiming such subject matter. An exemplary agreement conveying such rights was attached as Exhibit A to Apple's Motion to Dismiss (Doc. No. 16-3). Accordingly, to the extent the evidence establishes that Lamego obtained patentable subject matter claimed in the '052 Patent from, or jointly conceived such subject matter with, Masimo employees while Lamego was an employee of Cercacor, Cercacor would be a joint owner of the '052 Patent and has standing to seek correction of inventorship to perfect Cercacor's ownership interest in the '052 Patent.

231. Pursuant to 28 U.S.C. § 2201 and 35 U.S.C. § 256, Plaintiffs seek an order directing the U.S. Patent and Trademark Office to correct the inventorship of the '052 Patent by adding inventor Diab as a named inventor.

# XXI.  FIFTEENTH CAUSE OF ACTION
## (CORRECTION OF INVENTORSHIP OF U.S. PATENT NO. 10,247,670)

232.  Plaintiffs hereby reallege and incorporate by reference the allegations set forth in paragraphs 1 through 42.

233.  Lamego is a named inventor of U.S. Patent 10,247,670 presently recorded as owned by Apple.  A true and correct copy of the '670 Patent is attached hereto as Exhibit 28.

234.  The '670 Patent claims subject matter that Lamego obtained from discussions with, or jointly conceived with, Masimo employees.  For example, Claim 1 of the '670 Patent recites an electronic device comprising a housing with a surface; a reflective layer that is formed on the surface, wherein the reflective layer has first and second openings; a light emitter that emits light through the first opening; and a light detector that receives the light emitted by the light emitter through the second opening.  Lamego obtained this subject matter from discussions with, or jointly conceived it with, Diab.  Accordingly, Diab is a joint inventor of any patentable subject matter claimed in the '670 Patent, and should have been named as an inventor on the '670 Patent.

235.  In written assignments, Lamego, as well as Diab, agreed to assign and assigned to Masimo all patentable subject matter (as well as all works of authorship, developments, improvements, or trade secrets) conceived during their employment at Masimo, including ownership of all patents and patent applications claiming such subject matter.

236.  Those assignments vested in Masimo all legal and equitable title to all patents and patent applications reciting inventions made during their employment, such that Masimo is at least a joint owner of the '670 Patent and Masimo has standing to seek correction of inventorship to perfect Masimo's ownership interest in the '670 Patent.

237.   In at least one written assignment, Lamego agreed to assign and assigned to Cercacor all patentable subject matter (as well as all works of authorship, developments, improvements, or trade secrets) conceived during his employment at Cercacor, including ownership of all patents and patent applications claiming such subject matter.  An exemplary agreement conveying such rights was attached as Exhibit A to Apple's Motion to Dismiss (Doc. No. 16-3).  Accordingly, to the extent the evidence establishes that Lamego obtained patentable subject matter claimed in the '670 Patent from, or jointly conceived such subject matter with, Masimo employees while Lamego was an employee of Cercacor, Cercacor would be a joint owner of the '670 Patent and has standing to seek correction of inventorship to perfect Cercacor's ownership interest in the '670 Patent.

238.   Pursuant to 28 U.S.C. § 2201 and 35 U.S.C. § 256, Plaintiffs seek an order directing the U.S. Patent and Trademark Office to correct the inventorship of the '670 Patent by adding inventor Diab as a named inventors.

## XXII.  SIXTEENTH CAUSE OF ACTION
## (CORRECTION OF INVENTORSHIP OF U.S. PATENT NO. 9,952,095)

239.  Plaintiffs hereby reallege and incorporate by reference the allegations set forth in paragraphs 1 through 42.

240.  Lamego is a named inventor of U.S. Patent 9,952,095 presently recorded as owned by Apple.  A true and correct copy of the '095 Patent is attached hereto as Exhibit 29.

241.  The '095 Patent claims subject matter that Lamego obtained from discussions with, or jointly conceived with, Masimo employees.  For example, Claim 1 of the '095 Patent recites an electronic device comprising a housing comprising a surface adapted to be positioned proximate a measurement site of a subject; a biometric sensor positioned at least partially within the surface and comprising: a plurality of light sources for emitting light toward the

measurement site at a selected modulation frequency; and an optical sensor for obtaining light exiting the measurement site; and an input amplifier coupled to the output of the biometric sensor and disposed within the housing; a high pass filter coupled to an output of the input amplifier and disposed within the housing, the high pass filter having a cutoff frequency above that of a periodic biometric property of the measurement site; an output amplifier coupled to an output of the high pass filter and disposed within the housing; and an analog to digital converter coupled to an output of the output amplifier and disposed within the housing. Lamego obtained this subject matter from discussions with, or jointly conceived it with, Diab. Accordingly, Diab is a joint inventor of any patentable subject matter claimed in the '095 Patent, and should have been named as an inventor on the '095 Patent.

242. In written assignments, Lamego, as well as Diab, agreed to assign and assigned to Masimo all patentable subject matter (as well as all works of authorship, developments, improvements, or trade secrets) conceived during their employment at Masimo, including ownership of all patents and patent applications claiming such subject matter.

243. Those assignments vested in Masimo all legal and equitable title to all patents and patent applications reciting inventions made during their employment, such that Masimo is at least a joint owner of the '095 Patent and Masimo has standing to seek correction of inventorship to perfect Masimo's ownership interest in the '095 Patent.

244. In at least one written assignment, Lamego agreed to assign and assigned to Cercacor all patentable subject matter (as well as all works of authorship, developments, improvements, or trade secrets) conceived during his employment at Cercacor, including ownership of all patents and patent applications claiming such subject matter. An exemplary agreement conveying such rights was attached as Exhibit A to Apple's Motion to Dismiss (Doc. No.

16-3).  Accordingly, to the extent the evidence establishes that Lamego obtained patentable subject matter claimed in the '095 Patent from, or jointly conceived such subject matter with, Masimo employees while Lamego was an employee of Cercacor, Cercacor would be a joint owner of the '095 Patent and has standing to seek correction of inventorship to perfect Cercacor's ownership interest in the '095 Patent.

245.   Pursuant to 28 U.S.C. § 2201 and 35 U.S.C. § 256, Plaintiffs seek an order directing the U.S. Patent and Trademark Office to correct the inventorship of the '095 Patent by adding inventor Diab as a named inventor.

## XXIII.  SEVENTEENTH CAUSE OF ACTION
## (CORRECTION OF INVENTORSHIP OF U.S. PATENT NO. 10,219,754)

246.  Plaintiffs hereby reallege and incorporate by reference the allegations set forth in paragraphs 1 through 42.

247.  Lamego is a named inventor of U.S. Patent 10,219,754 presently recorded as owned by Apple.  A true and correct copy of the '754 Patent is attached hereto as Exhibit 30.

248.  The '754 Patent claims subject matter that Lamego obtained from discussions with, or jointly conceived with, Masimo employees.  For example, Claim 1 of the '754 Patent recites a method for estimating physiological parameters when modulated light from a first light source and a second light source is emitted toward a body part of a user, the method comprising determining a first multiplier value by: turning on the first light source; generating a first initial signal in response to capturing a first light sample corresponding to the first light source; demodulating the first initial signal to produce first initial demodulated signals; filtering and decimating the first initial demodulated signals; and determining the first multiplier value based on the filtered and decimated first initial demodulated signals; determining a second multiplier value by: turning on the second light source; generating a second

-74-

initial signal in response to capturing a second light sample corresponding to the second light source; demodulating the second initial signal to produce second initial demodulated signals; filtering and decimating the second initial demodulated signals; and determining the second multiplier value based on the filtered and decimated second initial demodulated signals; capturing multiple light samples while the first light source and the second light source are turned on to emit modulated light toward the body part of the user and converting the multiple light samples into a captured signal; demodulating the captured signal to produce multiple demodulated signals; performing a first decimation stage by: low pass filtering each demodulated signal; and decimating each demodulated signal; performing a second decimation stage after the first decimation stage by: low pass filtering each demodulated signal; and decimating each demodulated signal; demultiplexing each demodulated signal after the second decimation stage to produce a first signal associated with the first light source and a second signal associated with the second light source; multiplying the first signal by the first multiplier value using a first multiplier circuit to obtain a first conditioned signal; multiplying the second signal by the second multiplier value using a second multiplier circuit to obtain a second conditioned signal; and analyzing the first conditioned signal and the second conditioned signal to estimate the physiological parameter of the user.  Lamego obtained this subject matter from discussions with, or jointly conceived it with, Al-Ali, Diab, and Weber.  Accordingly, Al-Ali, Diab, and Weber are joint inventors of any patentable subject matter claimed in the '754 Patent, and should have been named as inventors on the '754 Patent.

249.  In written assignments, Lamego, as well as Al-Ali, Diab, and Weber, agreed to assign and assigned to Masimo all patentable subject matter (as well as all works of authorship, developments, improvements, or trade

secrets) conceived during their employment at Masimo, including ownership of all patents and patent applications claiming such subject matter.

250.   Those assignments vested in Masimo all legal and equitable title to all patents and patent applications reciting inventions made during their employment, such that Masimo is at least a joint owner of the '754 Patent and Masimo has standing to seek correction of inventorship to perfect Masimo's ownership interest in the '754 Patent.

251.   In at least one written assignment, Lamego agreed to assign and assigned to Cercacor all patentable subject matter (as well as all works of authorship, developments, improvements, or trade secrets) conceived during his employment at Cercacor, including ownership of all patents and patent applications claiming such subject matter.   An exemplary agreement conveying such rights was attached as Exhibit A to Apple's Motion to Dismiss (Doc. No. 16-3).   Accordingly, to the extent the evidence establishes that Lamego obtained patentable subject matter claimed in the '754 Patent from, or jointly conceived such subject matter with, Masimo employees while Lamego was an employee of Cercacor, Cercacor would be a joint owner of the '754 Patent and has standing to seek correction of inventorship to perfect Cercacor's ownership interest in the '754 Patent.

252.   Pursuant to 28 U.S.C. § 2201 and 35 U.S.C. § 256, Plaintiffs seek an order directing the U.S. Patent and Trademark Office to correct the inventorship of the '754 Patent by adding inventors Al-Ali, Diab, and Weber as named inventors.

## XXIV.  <u>EIGHTEENTH CAUSE OF ACTION</u>
## <u>(CORRECTION OF INVENTORSHIP OF U.S. PATENT NO. 10,524,671)</u>

253.   Plaintiffs hereby reallege and incorporate by reference the allegations set forth in paragraphs 1 through 42.

Case 8:20-cv-00048-JVS-JDE Document 260-2 Filed 12/30/20 Page 92 of 353 Page ID
Case 8:20-cv-00048-JVS-JDE Document 23-0 Filed 08/25/20 Page 78 of 95 Page ID #:1590
#:19923

254.   Lamego is a named inventor of U.S. Patent 10,524,671 presently recorded as owned by Apple.   A true and correct copy of the '671 Patent is attached hereto as Exhibit 31.

255.   The '671 Patent claims subject matter that Lamego obtained from discussions with, or jointly conceived with, Masimo employees.   For example, Claim 1 of the '671 Patent recites a wearable device, comprising a first light source; a second light source, the second light source operating at a different wavelength than the first light source; at least one light receiver; and a processing unit communicably coupled to the first light source, the second light source, and the at least one light receiver; wherein the processing unit is configured to: use the first light source and the second light source to emit light into a body part of a user; and dependent on the light emitted by the first light source and received by the at least one light receiver, compute a pulse rate of the user using the light emitted by the second light source and received by the at least one light receiver.   Lamego obtained this subject matter from discussions with, or jointly conceived it with, Diab.   Accordingly, Diab is a joint inventor of any patentable subject matter claimed in the '671 Patent, and should have been named as an inventor on the '671 Patent.

256.   In written assignments, Lamego, as well as Diab, agreed to assign and assigned to Masimo all patentable subject matter (as well as all works of authorship, developments, improvements, or trade secrets) conceived during their employment at Masimo, including ownership of all patents and patent applications claiming such subject matter.

257.   Those assignments vested in Masimo all legal and equitable title to all patents and patent applications reciting inventions made during their employment, such that Masimo is at least a joint owner of the '671 Patent and Masimo has standing to seek correction of inventorship to perfect Masimo's ownership interest in the '671 Patent.

258.   In at least one written assignment, Lamego agreed to assign and assigned to Cercacor all patentable subject matter (as well as all works of authorship, developments, improvements, or trade secrets) conceived during his employment at Cercacor, including ownership of all patents and patent applications claiming such subject matter.  An exemplary agreement conveying such rights was attached as Exhibit A to Apple's Motion to Dismiss (Doc. No. 16-3).  Accordingly, to the extent the evidence establishes that Lamego obtained patentable subject matter claimed in the '671 Patent from, or jointly conceived such subject matter with, Masimo employees while Lamego was an employee of Cercacor, Cercacor would be a joint owner of the '671 Patent and has standing to seek correction of inventorship to perfect Cercacor's ownership interest in the '671 Patent.

259.   Pursuant to 28 U.S.C. § 2201 and 35 U.S.C. § 256, Plaintiffs seek an order directing the U.S. Patent and Trademark Office to correct the inventorship of the '671 Patent by adding inventor Diab as a named inventor.

## XXV.  NINETEENTH CAUSE OF ACTION
## (DECLARATORY JUDGMENT OF OWNERSHIP OF
## U.S. PATENT NO. 10,078,052)

260.   Plaintiffs hereby reallege and incorporate by reference the allegations set forth in paragraphs 1 through 42.

261.   U.S. Patent 10,078,052 is recorded as owned by Apple.

262.   The '052 Patent claims subject matter that Lamego obtained from discussions with, or jointly conceived with, Masimo employees.  For example, Claim 1 of the '052 Patent recites an electronic device comprising a housing defining an aperture; an optical sensing system comprising a light emitter for emitting light through the aperture, the light emitter positioned adjacent the aperture; and a light detector for obtaining a first portion of the light after the first portion of the light reflects from an object; and a reflector disposed about

the aperture and adapted to reflect a second portion of the light back into the object after the second portion of the light reflects from the object. Lamego obtained this subject matter from discussions with, or jointly conceived it with Diab. Accordingly, Diab is a joint inventor of any patentable subject matter claimed in the '052 Patent, and should have been named as an inventor on the '052 Patent

263. Lamego and Diab made any inventive contributions to at least Claim 1 while they were employees of Masimo.

264. In written assignments, Lamego, as well as Diab, agreed to assign and assigned to Masimo all patentable subject matter (as well as all works of authorship, developments, improvements, or trade secrets) conceived during their employment at Masimo, including ownership of all patents and patent applications claiming such subject matter.

265. Those assignments vested in Masimo all legal and equitable title to patents and patent applications reciting inventions made during their employment, such that Masimo is at least a joint owner of the '052 Patent and all applications, patents, continuations, divisionals, and reissues that claim priority to the '052 Patent, including foreign counterparts.

266. In at least one written assignment, Lamego agreed to assign and assigned to Cercacor all patentable subject matter (as well as all works of authorship, developments, improvements, or trade secrets) conceived during his employment at Cercacor, including ownership of all patents and patent applications claiming such subject matter. An exemplary agreement conveying such rights was attached as Exhibit A to Apple's Motion to Dismiss (Doc. No. 16-3). That assignment vested in Cercacor all legal and equitable title to patents and patent applications reciting inventions made during his employment, such that, to the extent the evidence establishes that Lamego obtained patentable subject matter claimed in the '052 Patent from, or jointly conceived such subject

-79-

matter with, Cercacor employees while Lamego was an employee of Cercacor, Cercacor would be a joint owner of the '052 Patent and all applications, patents, continuations, divisionals, and reissues that claim priority to the '052 Patent, including foreign counterparts.

267.   Based on the forgoing, Plaintiffs seek declaratory relief under at least 28 U.S.C. §§ 2201 & 2202, as well as applicable state contract law and federal patent law, declaring that Masimo is at least a joint owner of the '052 Patent (or, to the extent it is determined that Masimo employees invented all of the patentable subject matter claimed in the '052 Patent, that Masimo is the exclusive owner), and, in the alternative, that Cercacor is a joint owner of the '052 Patent.  Plaintiffs also seek an order from the Court directing the Patent Office to amend the Patent Office records to reflect the ownership interest of Masimo and/or Cercacor.

## XXVI.  TWENTIETH CAUSE OF ACTION
## (DECLARATORY JUDGMENT OF OWNERSHIP OF
## U.S. PATENT NO. 10,247,670)

268.   Plaintiffs hereby reallege and incorporate by reference the allegations set forth in paragraphs 1 through 42.

269.   U.S. Patent 10,247,670 is recorded as owned by Apple.

270.   The '670 Patent claims subject matter that Lamego obtained from discussions with, or jointly conceived with, Masimo employees.  For example, Claim 1 of the '670 Patent recites an electronic device comprising a housing with a surface; a reflective layer that is formed on the surface, wherein the reflective layer has first and second openings; a light emitter that emits light through the first opening; and a light detector that receives the light emitted by the light emitter through the second opening.  Lamego obtained this subject matter from discussions with, or jointly conceived it with, Diab.  Accordingly,

Diab is a joint inventor of any patentable subject matter claimed in the '670 Patent, and should have been named as an inventor on the '670 Patent.

271.   Lamego and Diab made any inventive contributions to at least Claim 1 while they were employees of Masimo.

272.   In written assignments, Lamego, as well as Diab, agreed to assign and assigned to Masimo all patentable subject matter (as well as all works of authorship, developments, improvements, or trade secrets) conceived during their employment at Masimo, including ownership of all patents and patent applications claiming such subject matter.

273.   Those assignments vested in Masimo all legal and equitable title to patents and patent applications reciting inventions made during their employment, such that Masimo is at least a joint owner of the '670 Patent and all applications, patents, continuations, divisionals, and reissues that claim priority to the '670 Patent, including foreign counterparts.

274.   In at least one written assignment, Lamego agreed to assign and assigned to Cercacor all patentable subject matter (as well as all works of authorship, developments, improvements, or trade secrets) conceived during his employment at Cercacor, including ownership of all patents and patent applications claiming such subject matter.  An exemplary agreement conveying such rights was attached as Exhibit A to Apple's Motion to Dismiss (Doc. No. 16-3).  That assignment vested in Cercacor all legal and equitable title to patents and patent applications reciting inventions made during his employment, such that, to the extent the evidence establishes that Lamego obtained patentable subject matter claimed in the '670 Patent from, or jointly conceived such subject matter with, Cercacor employees while Lamego was an employee of Cercacor, Cercacor would be a joint owner of the '670 Patent and all applications, patents, continuations, divisionals, and reissues that claim priority to the '670 Patent, including foreign counterparts.

Case 8:20-cv-00048-JVS-JDE Document 260-2 Filed 12/30/20 Page 97 of 353 Page ID
#:19928
Case 8:20-cv-00048-JVS-JDE Document 1-3 Filed 08/25/20 Page 80 of 95 Page ID #:1395

275.   Based on the forgoing, Plaintiffs seek declaratory relief under at least 28 U.S.C. §§ 2201 & 2202, as well as applicable state contract law and federal patent law, declaring that Masimo is at least a joint owner of the '670 Patent (or, to the extent it is determined that Masimo employees invented all of the patentable subject matter claimed in the '670 Patent, that Masimo is the exclusive owner), and, in the alternative, that Cercacor is a joint owner of the '670 Patent.  Plaintiffs also seek an order from the Court directing the Patent Office to amend the Patent Office records to reflect the ownership interest of Masimo and/or Cercacor.

## XXVII.  TWENTY-FIRST CAUSE OF ACTION
## (DECLARATORY JUDGMENT OF OWNERSHIP OF
## U.S. PATENT NO. 9,952,095)

276.  Plaintiffs hereby reallege and incorporate by reference the allegations set forth in paragraphs 1 through 42.

277.   U.S. Patent 9,952,095 is recorded as owned by Apple.

278.   The '095 Patent claims subject matter that Lamego obtained from discussions with, or jointly conceived with, Masimo employees.  For example, Claim 1 of the '095 Patent recites an electronic device comprising a housing comprising a surface adapted to be positioned proximate a measurement site of a subject; a biometric sensor positioned at least partially within the surface and comprising: a plurality of light sources for emitting light toward the measurement site at a selected modulation frequency; and an optical sensor for obtaining light exiting the measurement site; and an input amplifier coupled to the output of the biometric sensor and disposed within the housing; a high pass filter coupled to an output of the input amplifier and disposed within the housing, the high pass filter having a cutoff frequency above that of a periodic biometric property of the measurement site; an output amplifier coupled to an output of the high pass filter and disposed within the housing; and an analog to

digital converter coupled to an output of the output amplifier and disposed within the housing. Lamego obtained this subject matter from discussions with, or jointly conceived it with, Diab. Accordingly, Diab is a joint inventor of any patentable subject matter claimed in the '095 Patent, and should have been named as an inventor on the '095 Patent.

279. Lamego and Diab made any inventive contributions to at least Claim 1 while they were employees of Masimo.

280. In written assignments, Lamego, as well as Diab, agreed to assign and assigned to Masimo all patentable subject matter (as well as all works of authorship, developments, improvements, or trade secrets) conceived during their employment at Masimo, including ownership of all patents and patent applications claiming such subject matter.

281. Those assignments vested in Masimo all legal and equitable title to patents and patent applications reciting inventions made during their employment, such that Masimo is at least a joint owner of the '095 Patent and all applications, patents, continuations, divisionals, and reissues that claim priority to the '095 Patent, including foreign counterparts.

282. In at least one written assignment, Lamego agreed to assign and assigned to Cercacor all patentable subject matter (as well as all works of authorship, developments, improvements, or trade secrets) conceived during his employment at Cercacor, including ownership of all patents and patent applications claiming such subject matter. An exemplary agreement conveying such rights was attached as Exhibit A to Apple's Motion to Dismiss (Doc. No. 16-3). That assignment vested in Cercacor all legal and equitable title to patents and patent applications reciting inventions made during his employment, such that, to the extent the evidence establishes that Lamego obtained patentable subject matter claimed in the '095 Patent from, or jointly conceived such subject matter with, Cercacor employees while Lamego was an employee of Cercacor,

Cercacor would be a joint owner of the '095 Patent and all applications, patents, continuations, divisionals, and reissues that claim priority to the '095 Patent, including foreign counterparts.

283. Based on the forgoing, Plaintiffs seek declaratory relief under at least 28 U.S.C. §§ 2201 & 2202, as well as applicable state contract law and federal patent law, declaring that Masimo is at least a joint owner of the '095 Patent (or, to the extent it is determined that Masimo employees invented all of the patentable subject matter claimed in the '095 Patent, that Masimo is the exclusive owner), and, in the alternative, that Cercacor is a joint owner of the '095 Patent. Plaintiffs also seek an order from the Court directing the Patent Office to amend the Patent Office records to reflect the ownership interest of Masimo and/or Cercacor.

## XXVIII.  TWENTY-SECOND CAUSE OF ACTION (DECLARATORY JUDGMENT OF OWNERSHIP OF U.S. PATENT NO. 10,219,754)

284. Plaintiffs hereby reallege and incorporate by reference the allegations set forth in paragraphs 1 through 42.

285. U.S. Patent 10,219,754 is recorded as owned by Apple.

286. The '754 Patent claims subject matter that Lamego obtained from discussions with, or jointly conceived with, Masimo employees. For example, Claim 1 of the '754 Patent recites a method for estimating physiological parameters when modulated light from a first light source and a second light source is emitted toward a body part of a user, the method comprising determining a first multiplier value by: turning on the first light source; generating a first initial signal in response to capturing a first light sample corresponding to the first light source; demodulating the first initial signal to produce first initial demodulated signals; filtering and decimating the first initial demodulated signals; and determining the first multiplier value based on the

Case 8:20-cv-00048-JVS-JDE Document 260-2 Filed 12/30/20 Page 100 of 353 Page ID
Case 8:20-cv-00048-JVS-JDE Document 280 Filed 03/25/20 Page 86 of 98 Page ID #:1358
#:19931

filtered and decimated first initial demodulated signals; determining a second multiplier value by: turning on the second light source; generating a second initial signal in response to capturing a second light sample corresponding to the second light source; demodulating the second initial signal to produce second initial demodulated signals; filtering and decimating the second initial demodulated signals; and determining the second multiplier value based on the filtered and decimated second initial demodulated signals; capturing multiple light samples while the first light source and the second light source are turned on to emit modulated light toward the body part of the user and converting the multiple light samples into a captured signal; demodulating the captured signal to produce multiple demodulated signals; performing a first decimation stage by: low pass filtering each demodulated signal; and decimating each demodulated signal; performing a second decimation stage after the first decimation stage by: low pass filtering each demodulated signal; and decimating each demodulated signal; demultiplexing each demodulated signal after the second decimation stage to produce a first signal associated with the first light source and a second signal associated with the second light source; multiplying the first signal by the first multiplier value using a first multiplier circuit to obtain a first conditioned signal; multiplying the second signal by the second multiplier value using a second multiplier circuit to obtain a second conditioned signal; and analyzing the first conditioned signal and the second conditioned signal to estimate the physiological parameter of the user. Lamego obtained this subject matter from discussions with, or jointly conceived it with, Al-Ali, Diab, and Weber. Accordingly, Al-Ali, Diab, and Weber are joint inventors of any patentable subject matter claimed in the '754 Patent, and should have been named as inventors on the '754 Patent.

287. Lamego, Al-Ali, Diab, and Weber made any inventive contributions to at least Claim 1 while they were employees of Masimo.

288.   In written assignments, Lamego, Al-Ali, Diab, and Weber, agreed to assign and assigned to Masimo all patentable subject matter (as well as all works of authorship, developments, improvements, or trade secrets) conceived during their employment at Masimo, including ownership of all patents and patent applications claiming such subject matter.

289.   Those assignments vested in Masimo all legal and equitable title to patents and patent applications reciting inventions made during their employment, such that Masimo is at least a joint owner of the '754 Patent and all applications, patents, continuations, divisionals, and reissues that claim priority to the '754 Patent, including foreign counterparts.

290.   In at least one written assignment, Lamego agreed to assign and assigned to Cercacor all patentable subject matter (as well as all works of authorship, developments, improvements, or trade secrets) conceived during his employment at Cercacor, including ownership of all patents and patent applications claiming such subject matter.   An exemplary agreement conveying such rights was attached as Exhibit A to Apple's Motion to Dismiss (Doc. No. 16-3).   That assignment vested in Cercacor all legal and equitable title to patents and patent applications reciting inventions made during his employment, such that, to the extent the evidence establishes that Lamego obtained patentable subject matter claimed in the '754 Patent from, or jointly conceived such subject matter with, Cercacor employees while Lamego was an employee of Cercacor, Cercacor would be a joint owner of the '754 Patent and all applications, patents, continuations, divisionals, and reissues that claim priority to the '754 Patent, including foreign counterparts.

291.   Based on the forgoing, Plaintiffs seek declaratory relief under at least 28 U.S.C. §§ 2201 & 2202, as well as applicable state contract law and federal patent law, declaring that Masimo is at least a joint owner of the '754 Patent (or, to the extent it is determined that Masimo employees invented all of

the patentable subject matter claimed in the '754 Patent, that Masimo is the exclusive owner), and, in the alternative, that Cercacor is a joint owner of the '754 Patent. Plaintiffs also seek an order from the Court directing the Patent Office to amend the Patent Office records to reflect the ownership interest of Masimo and/or Cercacor.

## XXIX.  TWENTY-THIRD CAUSE OF ACTION
## (DECLARATORY JUDGMENT OF OWNERSHIP OF
## U.S. PATENT NO. 10,524,671)

292.   Plaintiffs hereby reallege and incorporate by reference the allegations set forth in paragraphs 1 through 42.

293.   U.S. Patent 10,524,671 is recorded as owned by Apple.

294.   The '671 Patent claims subject matter that Lamego obtained from discussions with, or jointly conceived with, Masimo employees. For example, Claim 1 of the '671 Patent recites a wearable device, comprising a first light source; a second light source, the second light source operating at a different wavelength than the first light source; at least one light receiver; and a processing unit communicably coupled to the first light source, the second light source, and the at least one light receiver; wherein the processing unit is configured to: use the first light source and the second light source to emit light into a body part of a user; and dependent on the light emitted by the first light source and received by the at least one light receiver, compute a pulse rate of the user using the light emitted by the second light source and received by the at least one light receiver. Lamego obtained this subject matter from discussions with, or jointly conceived it with, Diab. Accordingly, Diab is a joint inventor of any patentable subject matter claimed in the '671 Patent, and should have been named as an inventor on the '671 Patent.

295.   Lamego and Diab made any inventive contributions to at least Claim 1 while they were employees of Masimo.

296.   In written assignments, Lamego, as well as Diab, agreed to assign and assigned to Masimo all patentable subject matter (as well as all works of authorship, developments, improvements, or trade secrets) conceived during their employment at Masimo, including ownership of all patents and patent applications claiming such subject matter.

297.   Those assignments vested in Masimo all legal and equitable title to patents and patent applications reciting inventions made during their employment, such that Masimo is at least a joint owner of the '671 Patent and all applications, patents, continuations, divisionals, and reissues that claim priority to the '671 Patent, including foreign counterparts.

298.   In at least one written assignment, Lamego agreed to assign and assigned to Cercacor all patentable subject matter (as well as all works of authorship, developments, improvements, or trade secrets) conceived during his employment at Cercacor, including ownership of all patents and patent applications claiming such subject matter.  An exemplary agreement conveying such rights was attached as Exhibit A to Apple's Motion to Dismiss (Doc. No. 16-3).  That assignment vested in Cercacor all legal and equitable title to patents and patent applications reciting inventions made during his employment, such that, to the extent the evidence establishes that Lamego obtained patentable subject matter claimed in the '671 Patent from, or jointly conceived such subject matter with, Cercacor employees while Lamego was an employee of Cercacor, Cercacor would be a joint owner of the '671 Patent and all applications, patents, continuations, divisionals, and reissues that claim priority to the '671 Patent, including foreign counterparts.

299.   Based on the forgoing, Plaintiffs seek declaratory relief under at least 28 U.S.C. §§ 2201 & 2202, as well as applicable state contract law and federal patent law, declaring that Masimo is at least a joint owner of the '671 Patent (or, to the extent it is determined that Masimo employees invented all of

the patentable subject matter claimed in the '671 Patent, that Masimo is the exclusive owner), and, in the alternative, that Cercacor is a joint owner of the '671 Patent. Plaintiffs also seek an order from the Court directing the Patent Office to amend the Patent Office records to reflect the ownership interest of Masimo and/or Cercacor.

### XXX.  TWENTY-FOURTH CAUSE OF ACTION
### (DECLARATORY JUDGMENT OF OWNERSHIP OF
### U.S. PATENT APPLICATION NO. 15/960,507)

300.  Plaintiffs hereby reallege and incorporate by reference the allegations set forth in paragraphs 1 through 42.

301.  U.S. Patent Application 15/960,507 is recorded as owned by Apple.

302.  Any inventive contribution that Lamego could have made to the alleged invention of the subject matter claimed in the '507 application was made while he was a Masimo employee during 2000-2001 and 2003-2006, or a Cercacor employee during 2006-2014. This includes, for example, Claim 21 of the '507 Application recites a biometric sensor within a housing of a wearable electronic device, the biometric sensor comprising: an emitter for transmitting modulated light toward a measurement site of a subject through a first aperture in the housing; an optical sensor for receiving modulated light through a second aperture in the housing, the modulated light at least partially exiting the measurement site; a high pass filter to receive an output of the optical sensor, the high pass filter having a cutoff frequency above a frequency of a periodic optical property of the measurement site; and an analog to digital converter to receive an output of the high pass filter."

303.  In written assignments, Lamego agreed to assign and assigned to Masimo all patentable subject matter (as well as all works of authorship, developments, improvements, or trade secrets) conceived during their

Case 8:20-cv-00048-JVS-JDE   Document 260-2   Filed 12/30/20   Page 105 of 353   Page ID
Case 8:20-cv-00048-JVS-JDE   Document 280   Filed 03/25/20   Page 99 of 95   Page ID #:4403
#:19936

employment at Masimo, including ownership of all patents and patent applications claiming such subject matter.

304.   Those assignments vested in Masimo all legal and equitable title to patents and patent applications reciting inventions made during their employment, such that Masimo is at least a joint owner of the '507 Application and all applications, patents, continuations, divisionals, and reissues that claim priority to the '507 Application, including foreign counterparts.

305.   In at least one written assignment, Lamego agreed to assign and assigned to Cercacor all patentable subject matter (as well as all works of authorship, developments, improvements, or trade secrets) conceived during his employment at Cercacor, including ownership of all patents and patent applications claiming such subject matter.  An exemplary agreement conveying such rights was attached as Exhibit A to Apple's Motion to Dismiss (Doc. No. 16-3).  That assignment vested in Cercacor all legal and equitable title to patents and patent applications reciting inventions made during his employment, such that, to the extent the evidence establishes that Lamego obtained patentable subject matter claimed in the '507 Application from, or jointly conceived such subject matter with, Cercacor employees while Lamego was an employee of Cercacor, Cercacor would be a joint owner of the '507 Application and all applications, patents, continuations, divisionals, and reissues that claim priority to the '507 Application, including foreign counterparts.

306.   Based on the forgoing, Plaintiffs seek declaratory relief under at least 28 U.S.C. §§ 2201 & 2202, as well as applicable state contract law and federal patent law, declaring that Masimo is at least a joint owner of the '507 Application (or, to the extent it is determined that Masimo employees invented all of the patentable subject matter claimed in the '507 Application, that Masimo is the exclusive owner), and, in the alternative, that Cercacor is a joint owner of the '507 Application.  Plaintiffs also seek an order from the Court directing the

Patent Office to amend the Patent Office records to reflect the ownership interest of Masimo and/or Cercacor.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for judgment in their favor against Defendant for the following relief:

A.     Pursuant to 35 U.S.C. § 271, a determination that Defendant and its officers, agents, servants, employees, attorneys and all others in active concert and/or participation with them have infringed each of the '265, '266, '628, '708, '190, '191, '994, '695, '703, '776, '553, and '554 patents through the manufacture, use, importation, offer for sale, and/or sale of infringing products and/or any of the other acts prohibited by 35 U.S.C. § 271;

B.     Pursuant to 35 U.S.C. § 283, an injunction enjoining Defendant and its officers, agents, servants, employees, attorneys and all others in active concert and/or participation with them from infringing the '265, '266, '628, '708, '190, '191, '994, '695, '703, '776, '553, and '554 patents through the manufacture, use, importation, offer for sale, and/or sale of infringing products and/or any of the other acts prohibited by 35 U.S.C. § 271, including preliminary and permanent injunctive relief;

C.     Pursuant to 35 U.S.C. § 284, an award compensating Masimo for Defendant's infringement of the '265, '266, '628, '708, '190, '191, '994, '695, '703, '776, '553, and '554 patents through payment of not less than a reasonable royalty on Defendant's sales of infringing products;

D.     Pursuant to 35 U.S.C. § 284, an award increasing damages up to three times the amount found or assessed by the jury for Defendant's infringement of each of the '265, '266, '628, '708, '190, '191, '994, '695, '703, '776, '553, and '554 patents in view of the willful and deliberate nature of the infringement;

E.     Pursuant to 35 U.S.C. § 285, a finding that this is an exceptional

case, and an award of reasonable attorneys' fees and non-taxable costs;

F.    An assessment of prejudgment and post-judgment interest and costs against Defendant, together with an award of such interest and costs, pursuant to 35 U.S.C. § 284;

G.    That Defendant be adjudged to have misappropriated Plaintiffs' trade secrets in violation of the California Uniform Trade Secrets Act, Cal. Civ. Code § 3426 *et seq.*, and that Defendant's acts in doing so be adjudged willful, malicious, oppressive, and done knowingly;

H.    That Defendant be adjudged to have been unjustly enriched;

I.    That Plaintiffs be awarded damages for actual losses, unjust enrichment, and/or a reasonable royalty pursuant to Cal. Civ. Code § 3426.3.

J.    That Defendant, its agents, servants, employees, and attorneys, and all those persons in active concert or participation with Defendant, be forthwith temporarily, preliminarily, and thereafter permanently required to return all of Plaintiffs' trade secrets and confidential information and enjoined from further using and disclosing to any third parties any of Plaintiffs' trade secrets and confidential information;

K.    That Defendant be enjoined from selling or offering to sell any product, including Defendant's Apple Watch Series 4 and later devices, that includes or uses any of Plaintiffs' trade secrets;

L.    That Defendant be directed to file with this Court and to serve on Plaintiffs within thirty (30) days after the service of the injunction, a report in writing, under oath, setting forth in detail the manner and form in which Defendant has complied with the injunction;

M.    That Defendant be required to account to Plaintiffs for any and all gains, profits, and advantages derived by it, and all damages sustained by Plaintiffs, by reason of Defendant's acts complained herein;

N.      That Plaintiffs be awarded exemplary damages and reasonable attorneys' fees pursuant to Cal. Civ. Code § 3426.3(c) and 3426.4;

O.      That the U.S. Patent and Trademark Office be directed to correct the inventorship of the '052, '670, '095, '754 and '671 patents to add the correct inventors;

P.      An order imposing a constructive trust for the benefit of Plaintiffs over: (1) any trade secrets Defendants obtained from Plaintiffs; (2) any profits, revenues, or other benefits obtained by Defendants as a result of any disclosure or use of trade secrets obtained from Plaintiffs; and (3) the Lamego Patents and the Lamego Patent Applications;

Q.      That Plaintiffs be declared exclusive owners, or at least joint owners, of the patents and patent applications that are based on Plaintiffs' developments, including the '052, '670, '095, '754 and '671 patents, and the '507 application, and all applications, patents, continuations, divisionals, and reissues that claim priority to those patents and that patent application, including foreign counterparts;

R.      An award of taxable costs; and

S.      That this Court award such other and further relief as this Court may deem just.


                                        Respectfully submitted,

                                        KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: __March 25, 2020__        By: _/s/ Perry D. Oldham_
                                        Joseph R. Re
                                        Stephen C. Jensen
                                        Perry D. Oldham
                                        Stephen W. Larson

                                        Attorneys for Plaintiffs,
                                        Masimo Corporation and
                                        Cercacor Laboratories, Inc.

# **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs Masimo Corporation and Cercacor Laboratories, Inc. hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: March 25, 2020          By: */s/ Perry D. Oldham*

Joseph R. Re
Stephen C. Jensen
Perry D. Oldham
Stephen W. Larson

Attorneys for Plaintiffs,
Masimo Corporation and
Cercacor Laboratories, Inc.

32313943

Exhibit J

1  Joseph R. Re (Bar No. 134479)
2  joseph.re@knobbe.com
   Stephen C. Jensen (Bar No. 149894)
3  steve.jensen@knobbe.com
   Perry D. Oldham (Bar No. 216016)
4  perry.oldham@knobbe.com
   Stephen W. Larson (Bar No. 240844)
5  stephen.larson@knobbe.com
6  **KNOBBE, MARTENS, OLSON & BEAR, LLP**
   2040 Main Street, Fourteenth Floor
7  Irvine, CA 92614
   Telephone: (949) 760-0404 Facsimile: (949) 760-9502
8
   Adam B. Powell (Bar No. 272725)
9  adam.powell@knobbe.com
   **KNOBBE, MARTENS, OLSON & BEAR, LLP**
10 12790 El Camino Real
   San Diego, CA 92130
11 Telephone: (858) 707-4000 Facsimile: (858) 707-4001
12
   Attorneys for Plaintiffs,
13 Masimo Corporation and Cercacor Laboratories, Inc.
14
15          **IN THE UNITED STATES DISTRICT COURT**
16         **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
17                  **SOUTHERN DIVISION**
18
19 MASIMO CORPORATION,              ) Case No. 8:20-cv-00048-JVS-JDE
   a Delaware corporation; and      )
20 CERCACOR LABORATORIES, INC.,     ) Hon. James V. Selna
   a Delaware corporation           ) Magistrate Judge John D. Early
21                                   )
            Plaintiffs,              ) **PLAINTIFFS' REQUEST FOR**
22                                   ) **ORAL ARGUMENT ON APPLE'S**
        v.                           ) **MOTION TO DISMISS THE**
23                                   ) **THIRTEENTH CAUSE OF**
   APPLE INC., a California corporation ) **ACTION IN PLAINTIFFS'**
24                                   ) **SECOND AMENDED**
            Defendant.              ) **COMPLAINT (DKT. 104)**
25                                   )
26                                   )
27
28

Plaintiffs hereby request oral argument or modification of the Tentative on Apple's Motion to Dismiss the Thirteenth Cause of Action in Plaintiffs' Second Amended Complaint ("SAC") (Dkt. 104). The Tentative concludes the SAC fails to plead a plausible claim of misappropriation based on certain allegedly vague language. As discussed below, Plaintiffs respectfully submit the Tentative is incorrect. If necessary to avoid ambiguity, however, Plaintiffs consent to the Court *sua sponte* striking the allegedly vague language to resolve this Motion. To the extent doing so would not fully address the Court's concerns, Plaintiffs submit that oral argument is important for Plaintiffs to understand the Court's concerns and correct any additional deficiencies.

## A.    The SAC Pleads Misappropriation Of At Least One Trade Secret

Plaintiffs respectfully submit the Tentative errs by dismissing Plaintiffs claims even though the SAC plausibly alleges misappropriation of at least one trade secret. The Tentative appears to acknowledge the SAC alleges misappropriation of at least some "specific trade secrets." Tentative at 5-6. Indeed, this Court recently determined that Plaintiffs met a higher standard and established they are likely to succeed on the merits. Dkt. 206 at 7-9 (denying motion for preliminary injunction on other grounds). This Court determined Plaintiffs are likely to prove "the existence of the trade secret that they allege" and are likely to prove that "Apple misappropriated Plaintiffs' trade secrets" through acquisition, use, and disclosure. *Id.* The Court also found "Plaintiffs have defined their trade secret with sufficient particularity" for Apple to provide "more than twenty pages of detailed analysis" and for "the Court to discern with particularity what is in fact secret." *Id.* at 10.

The SAC describes and alleges misappropriation of the same trade secret at issue in the Motion for Preliminary Injunction, using the same description. Dkt. 89-1 at 12:13-13:7. Because Plaintiffs describe ***at least one*** trade secret in sufficient detail, Plaintiffs' claim survives a motion to dismiss. *See Hill*

*Phoenix, Inc. v. Classic Refrigeration SoCal, Inc.*, 2019 WL 7172977, at *6 (C.D. Cal. Sept. 6, 2019) (denying motion to dismiss where "Plaintiff has pled that it owned **at least one** trade secret" and that "Defendants used Plaintiff's trade secret" (emphasis added)); *Patrick v. Turner*, 2008 WL 4650403 at *17 (Cal. Ct. App. Oct. 22, 2008) (unpublished) (noting some of the trade secret descriptions were "woefully vague," but rejecting challenge to pleadings because "plaintiff sufficiently described **at least one** misappropriated trade secret" (emphasis added)); *see also Consolidated Container Company LP v. Ecoplast Corporation*, 2017 WL 3047894, at *4 (C.D. Cal. 2017) (noting the complaint "advances four theories of misrepresentation" and "[i]f any of these theories is viable, [plaintiff's] fraud claim survives").[1]  Any disagreement about the scope of Plaintiffs' other trade secrets will be addressed in connection with Plaintiffs' Section 2019.210 statement.  The parties agreed Plaintiffs will serve that statement on October 9 and this Court directed that Judge Early will resolve any disputes regarding that statement.  *See* Dkt. 37.

B.     <u>The SAC Pleads Misappropriation As To All Asserted Trade Secrets</u>

Even if the Court were to determine that it needs to evaluate whether the SAC states a claim with respect to each and every asserted trade secret individually, the SAC does so.  Plaintiffs respectfully submit that the analysis in the Tentative that reaches a contrary conclusion is incorrect for two reasons.  First, Plaintiffs amended the SAC to make clear that paragraph 39 describes trade secrets that Plaintiffs own, not trade secrets that Plaintiffs assert Apple misappropriated.  Second, the phrases "at least" and "including" in paragraphs 40-50 do not render the SAC impermissibly vague.

---

[1] Plaintiffs could not have raised this argument in their Opposition because the Court issued the Order on Plaintiffs' Motion for Preliminary Injunction after Plaintiffs filed their Opposition.  *See* Dkt. 179-2; Dkt. 206.

### 1.    Paragraph 39 Is Irrelevant To The Issue Before This Court

The Tentative proposes to hold the SAC is insufficient because paragraphs 41-50 are mere examples of the trade secrets described in paragraph 39.  In particular, the Tentative finds paragraph 39 describes information that "Plaintiffs allege Apple misappropriated . . .."  Tentative at 1 (citing Dkt. 89-1 ¶ 39).  It then finds the "specific trade secrets" in paragraphs 41-50 cannot be considered because they "come[] under the umbrella of ¶ 39, which the Court has already found insufficient . . .."'"  *Id.* at 5; *see also id.* ("the 'specific trade secrets' merely provide some examples of what is within the broad allegations of ¶ 39.").  Paragraphs 41-50 do "not serve to remedy the problems with SAC ¶ 39 if they merely state what is 'at least' included within it."  *Id.* at 5-6.

Plaintiffs respectfully submit the Tentative's conclusion is incorrect because the SAC specifically states that Paragraph 39 describes only the trade secrets that Plaintiffs "own"—not the trade secrets that Plaintiffs allege Apple misappropriated.  *See* Dkt. 89-1 (SAC) ¶ 39 ("Plaintiffs **own** trade secrets that include" (emphasis added)).  The SAC never alleges Apple misappropriated the trade secrets described in Paragraph 39.

Plaintiffs recognize the Court previously held that paragraph 211 of the First Amended Complaint ("FAC"), which is similar to paragraph 39 of the SAC, was insufficient to describe the trade secrets that Apple misappropriated.  Dkt. 60.  In response to the Court's prior ruling, Plaintiffs amended the SAC so that paragraph 39 no longer defined the information described therein as the "Confidential Information" that Apple misappropriated.  *Compare* Dkt. 28 (FAC) ¶ 211 (ending with "[t]he aforementioned information is referred to herein as Plaintiffs' 'Confidential Information'") *with* Dkt. 89-1 (SAC) ¶ 39 (including no such definition).  Plaintiffs included the background material in paragraph 39 to avoid any inference that removing it constituted an admission that Plaintiffs do not own such trade secrets.  Plaintiffs thought they made this

clear, and did not intend any ambiguity that appears to have resulted from including paragraph 39. However, that paragraph no longer purports to identify the trade secrets that Plaintiffs allege were misappropriated.

Instead, it is paragraph 40 that expressly introduces the specific trade secrets Plaintiffs allege Apple misappropriated: "Plaintiffs allege Apple misappropriated at least the following specific trade secrets discussed in **Paragraphs 41-50** below." *Id.* ¶ 40 (emphasis added). Paragraph 40 thus establishes that paragraphs 41-50, **not paragraph 39**, describe the trade secrets that Apple misappropriated. Plaintiffs' Opposition presented this point. *See* Dkt. 187 at 17, n.3 ("Paragraph 39 describes the type of trade secrets that Plaintiffs own. At issue here are Paragraphs 41-50, which described trade secrets Plaintiffs currently allege Apple misappropriated.").

Accordingly, the SAC alleges Apple misappropriated the specific trade secrets described in paragraphs 41-50, not the broader description in paragraph 39 concerning trade secrets Plaintiffs own. While Plaintiffs maintain they own the trade secrets described in paragraph 39, **Plaintiffs consent to the Court sua sponte striking paragraph 39** if necessary or helpful to avoid ambiguity as to the trade secrets that Plaintiffs allege Apple misappropriated.

## 2. The Phrases "At Least" And "Including" Do Not Render Paragraphs 40-50 Impermissibly Vague

The Tentative states the specific trade secrets described in paragraphs 41-50 come under the "umbrella" of "¶ 40, which states that Apple misappropriated 'at least' the 'specific trade secrets.'" Tentative at 5. The phrase "at least" in paragraph 40 does not refer to the broader description in paragraph 39. *See* Dkt. 89-1 ¶ 40. Instead, it merely acknowledges the misappropriated trade secrets of which Plaintiffs are currently aware and described in the SAC may not be the full extent of Apple's misappropriation. Like any other claim, discovery may reveal additional acts of misappropriation. *See id.* ("The full extent of Apple's

misappropriation will be revealed through discovery. However, **_based on the information currently available to Plaintiffs_**, Plaintiffs allege Apple misappropriated **_at least_** the following specific trade secrets discussed in Paragraphs 41-50 below." (emphasis added)). This language does not render the identified trade secrets vague. If discovery shows Apple misappropriated additional trade secrets, the Court can address at that time whether Plaintiffs are required to and may amend their Section 2019.210 statement.

The Tentative found the word "including" at the end of the first sentence of paragraphs 41, 43, 45, 47, and 49 "suggests that the lists that follow each of these broad headings is not exhaustive either." *Id.* at 6. Plaintiffs used that word as a transition, not to broaden the descriptions to include paragraph 39.

The Tentative also found paragraphs 42, 44, 46, 48, and 50 do not provide "further clarity." *Id.* Plaintiffs understand the Tentative as holding those paragraphs do not cure other deficiencies, not that those paragraphs render other portions of the SAC vague. Plaintiffs included those paragraphs identifying specific documents to comply with the Court's prior Order (Dkt. 60).

Nonetheless, if necessary or helpful to avoid ambiguity, Plaintiffs would have no objection to the Court *sua sponte* striking one or more of the following:

- The phrase "at least" in paragraph 40;
- The word "including" from the first sentence in paragraphs 41, 43, 45, 47, and 49; or
- The entirety of paragraphs 42, 44, 46, 48, and 50.

**C.** **Conclusion**

Plaintiffs request the Court deny Apple's motion. Alternatively, Plaintiffs consent to the Court striking the material discussed above to allow this case to move forward without the need for additional pleadings and yet another motion to dismiss. If striking the material does not resolve the Court's concerns, Plaintiffs request oral argument to better understand the Court's ruling.

1    Respectfully submitted,

2    KNOBBE, MARTENS, OLSON & BEAR, LLP

3

Dated: October 6, 2020        By: /s/ Adam B. Powell

4            Joseph R. Re
             Stephen C. Jensen
5            Perry D. Oldham
             Stephen W. Larson
6            Adam B. Powell

7            Attorneys for Plaintiffs,
             Masimo Corporation and
8            Cercacor Laboratories

33634003

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-6-

Exhibit K

Case 8:20-cv-00048-JVS-JDE   Document 60-2   Filed 06/25/20   Page 1 of 8   Page ID #:417

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | SACV 20-48 JVS (JDEx) | Date | June 25, 2020 |
|---|---|---|---|

| Title | **Masimo Corporation et al v. Apple Inc.** |
|---|---|

| Present: The Honorable | **James V. Selna, U.S. District Court Judge** |
|---|---|

| Lisa Bredahl | Not Present |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Not Present | Not Present |

**Proceedings:**   **[IN CHAMBERS] <u>Order Regarding Motion to Dismiss</u>**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendant Apple Inc. ("Apple") moved to dismiss the Thirteenth Cause of Action for trade secret misappropriation under the California Uniform Trade Secret Act ("CUTSA") asserted by Plaintiffs Masimo Corporation ("Masimo") and Cercacor Laboratories,   Inc. ("Cercacor") (together, "Plaintiffs").  Mot., Dkt. No. 38.  Plaintiffs opposed.  Opp'n, Dkt. No. 48.  Apple replied.  Reply, Dkt. No. 49.

For the following reasons, the Court **GRANTS** the motion.

### I. BACKGROUND

The background is drawn entirely from Plaintiffs' First Amended Complaint ("FAC") and is therefore based solely on allegations.  See Dkt. No. 28.

This case concerns technology for monitoring physiological parameters, such as pulse rate.  See <u>generally</u>, FAC ¶¶ 9-18.  Plaintiffs filed the FAC on January 9, 2020.

In 2013, Apple contacted Masimo and asked to discuss a potential collaboration. <u>Id</u>. ¶ 19.  The two companies entered into a confidentiality agreement, and held meetings about Masimo's technology.  <u>Id</u>.  Apple then began attempting to hire Masimo employees.  <u>Id</u>.

Relevant to this motion, Apple recruited Marcelo Lamego, who was the Chief Technical Officer of Cercacor and a Research Scientist at Masimo.  <u>Id</u>. ¶ 21.  Lamego had access to "highly confidential technical information," "was taught about the keys to

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   SACV 20-48 JVS (JDEx)                                    Date   June 25, 2020

Title   **Masimo Corporation et al v. Apple Inc.**

effective non-invasive monitoring," and "learned guarded secrets regarding Plaintiffs' mobile medical products."  Id. ¶ 22.

On January 24, 2014, Plaintiffs sent a letter to Apple explaining that Lamego possessed Plaintiffs' confidential proprietary information and warning Apple to respect Plaintiffs' rights in such information.  Id. ¶ 23.  Based on Plaintiffs' conversations with Lamego, Plaintiffs' letter to Apple, and Plaintiffs' confidentiality agreement with Apple, Plaintiffs believed that Lamego would not use or disclose Plaintiffs' confidential information and that Apple would not induce Lamego to do so or itself use Plaintiffs' confidential information.  Id.

Shortly after joining Apple in January 2014, but "[u]nbeknownst to Plaintiffs at the time," Lamego began pursuing patent applications directed towards technologies he worked on at Plaintiffs' companies.  Id. ¶ 24.

The Apple Watch includes Plaintiffs' technologies.  Id. ¶ 25.  The Series 4 was announced on September 12, 2018; that watch includes technology that tracks Plaintiffs' technologies to solve performance issues with non-invasive physiological measurements evident in the Series 3.  Id.

Plaintiffs' Thirteenth Cause of Action, for Trade Secret Misappropriation under CUTSA, alleges that Apple misappropriated Plaintiffs' confidential information from former employees who left Plaintiffs to work for Apple, including Lamego.  Id. ¶ 215. Apple used and disclosed Plaintiffs' confidential information by incorporating it into Apple's products and by filing patent applications containing the confidential information, without Plaintiffs' express or implied consent.  Id. ¶ 218.

Plaintiffs had no way of knowing, or learning, of Apple's improper acquisition, use, or disclosure prior to January 10, 2017.  Id. ¶ 219.  Apple did not publish Plaintiffs' confidential information in patent applications until after January 10, 2017, and the first product at issue was not announced until 2018.  Id.

Apple also requested nonpublication of patent applications, which prevented Plaintiffs from learning of the contents of those applications until much later.  For example, Apple  requested non-publication of the '268 Application (which issued as the '754 Patent), the '422 Application (which issued as the '997 Patent), and the '664

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SACV 20-48 JVS (JDEx) | Date | June 25, 2020 |
|---|---|---|---|

| Title | Masimo Corporation et al v. Apple Inc. |
|---|---|

Application (which issued as the '095 Patent).  Id. ¶ 220.  Apple requested non-publication of those applications to prevent Plaintiffs from learning those applications contained confidential information, and from learning the Apple had acquired, used and disclosed this information.  Id.

## II. LEGAL STANDARD

Under Rule 12(b)(6), a defendant may move to dismiss for failure to state a claim upon which relief can be granted.  A plaintiff must state "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  A claim has "facial plausibility" if the plaintiff pleads facts that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

In resolving a 12(b)(6) motion under Twombly, the Court must follow a two-pronged approach.  First, the Court must accept all well-pleaded factual allegations as true, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Iqbal, 556 U.S. at 678. Nor must the Court "'accept as true a legal conclusion couched as a factual allegation.'"  Id. at 678-80 (quoting Twombly, 550 U.S. at 555).  Second, assuming the veracity of well-pleaded factual allegations, the Court must "determine whether they plausibly give rise to an entitlement to relief."  Id. at 679.  This determination is context-specific, requiring the Court to draw on its experience and common sense, but there is no plausibility "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct."  Id.

## III. DISCUSSION

### A. Request for Judicial Notice

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SACV 20-48 JVS (JDEx) | Date | June 25, 2020 |
|---|---|---|---|

| Title | **Masimo Corporation et al v. Apple Inc.** |
|---|---|

Apple requests that the Court take judicial notice of Exhibits A through D to the Declaration of Ilissa Samplin ("RJN Decl."). See RJN, Dkt. No. 38-2; RJN Decl., Dkt. No. 38-4.

Exhibit A is the January 24, 2014 letter Masimo sent to Apple regarding the latter's offer of employment to Lamego. Exhibit B is United States Patent Application Publication No. 2016/0061726 ("the '726 Application"), published by the U.S. Patent & Trademark Office ("USPTO") on March 3, 2016, listing Lamego as one of the inventors. Exhibit C is Masimo's Form 10-K for the fiscal year ended January 3, 2015, filed with the U.S. Securities and Exchange Commission ("SEC"). Finally, Exhibit D is Masimo's FAC in the related matter of Masimo Corp. v. True Wearables, Inc., SACV 18-2001, filed on June 17, 2019.

Because factual challenges have no bearing under Rule 12(b)(6), generally, the Court may not consider material beyond the pleadings in ruling on a motion to dismiss. Lee v. City of Los Angeles, 250 F.3d 668, 688 (9th Cir. 2001), overruled on other grounds, Galbraith v. Cnty. of Santa Clara, 307 F. 3d 1119, 1125 (9th Cir. 2002). There are, however, three exceptions to this rule that do not demand converting the motion to dismiss into one for summary judgment. Lee, 250 F.3d at 688. First, pursuant to Federal Rule of Evidence 201, the Court may take judicial notice of matters of public record, but it "cannot take judicial notice of disputed facts contained in such public records." Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988, 999 (9th Cir. 2018), cert. denied sub nom. Hagan v. Khoja, 139 S. Ct. 2615, 204 L. Ed. 2d 264 (2019) (citing Lee, 250 F.3d at 689); see Fed. R. Evid. 201(b). Second, the Court also may take judicial notice of documents attached to or "properly submitted as part of the complaint." Lee, 250 F.3d at 688. Third, if the documents are "not physically attached to the complaint," they may still be considered if the documents' "authenticity . . . is not contested" and the documents are necessarily relied upon by the complaint. Id.; United States v. Corinthian Colleges, 655 F.3d 984, 998–99 (9th Cir. 2011). "However, if the document merely creates a defense to the well-pled allegations in the complaint, then that document did not necessarily form the basis of the complaint" and cannot be incorporated by reference. Khoja, 899 F.3d at 1002.

The Court **grants** Apple's request for judicial notice, as the documents are either relied upon in the FAC (Ex. A) or matters of public record, not subject to reasonable dispute (Exs. B-D).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | SACV 20-48 JVS (JDEx) | Date | June 25, 2020 |

| | |
|---|---|
| Title | **Masimo Corporation et al v. Apple Inc.** |

## B.   Motion to Dismiss

### 1.    Plaintiffs' CUTSA Claim is Not Time-Barred

"An action for misappropriation must be brought within three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered."  Cal. Civ. Code § 3426.6.  "Under the 'discovery rule,' the statute of limitations begins to run when a plaintiff discovers, or has reason to discover, the cause of action."  See Klang v. Pflueger, 2014 WL 4922401, at *6 (C.D. Cal. July 10, 2014) (Selna, J.).  "A plaintiff whose complaint shows on its face that its claim would be barred without the benefit of the discovery rule must specifically plead facts to show (1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence."  Id. (internal citation and quotation marks removed).

"[W]hen there is reason to suspect that a trade secret has been misappropriated, and a reasonable investigation would produce facts sufficient to confirm this suspicion (and justify bringing suit), the limitations period begins, even though the plaintiff has not conducted such an investigation."  Hays v. VDF Futureceuticals, Inc., 2016 WL 5660395, at *3 (D. Haw. Sept. 28, 2016) ((internal citation and quotation marks removed).

"Dismissal at the pleading stage on statute-of-limitations grounds *ordinarily is improper* unless it is 'apparent from the face of the complaint that the claim is time-barred.'"  ABB Turbo Sys. AG v. Turbousa, Inc., 774 F.3d 979, 985 (Fed. Cir. 2014) (citations omitted) (emphasis added).

Apple proposes two dates for when the statutory limitations period was triggered. First, Apple notes that Plaintiffs sent a warning letter on January 24, 2014, regarding Apple's interest in Plaintiffs' technology and subsequent offer of employment to Lamego.  Mot. at 6-7; see FAC ¶¶ 23-24.  The letter stated that "[i]t is difficult to imagine *any reason* for this sequence of events *other than Apple is attempting to gain access to, or at least the benefit of, Cercacor and Masimo's trade secrets*."  RJN Decl., Ex. A at 4 (emphasis added).  The letter cited Lamego's Employee Confidentiality Agreement, stating "we trust that Apple will employ Mr. Lamego in an area that does not involve healthcare technology, including mobile health applications and the measurement of physiological information," as such employment would violate his obligations under that agreement.  Id. at 5.  Competing with Plaintiffs would "necessarily involve the use or

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | SACV 20-48 JVS (JDEx) | Date | June 25, 2020 |

| | |
|---|---|
| Title | **Masimo Corporation et al v. Apple Inc.** |

disclosure of" trade secrets.  Id.

The Court does not find that the statute of limitations period was triggered on January 24, 2014.  Although this letter certainly suggests that Plaintiffs had a *suspicion* Lamego would be in a position to compete with his former employer by drawing upon Plaintiffs' trade secrets, he had not yet begun his employment.  Thus, Plaintiffs would not have reason to suspect that a trade secret had already been misappropriated, as is required.

Apple's second proposed date for the start of the statute of limitations period is March 3, 2016.   The '196 application, which named Lamego as an inventor, was published on this date as the '726 publication.  RJN Decl., Ex. B.

Plaintiffs "had no way of knowing, or learning, of [Apple's] improper acquisition, use, or disclosure prior to January 10, 2017."  FAC ¶ 219.  This is because Apple "did not publish Plaintiffs' Confidential Information in patent applications until after January 10, 2017, and the first product at issue was not announced until 2018."  Id.  Apple requested non-publication of various patent applications containing Plaintiffs' trade secrets.  Id. ¶ 220.  The first Apple Watch Plaintiffs identify as resolving performance issues with non-invasive physiological measurements, with "technology that tracks Plaintiffs' technologies," was the Series 4, which was announced in September 2018.  Id. ¶ 25.

Construing these allegations as true, the Court agrees with Plaintiffs that the '726 publication did not give them constructive notice of the possible misappropriation of their trade secrets.  See Javo Beverage Co. v. Cal. Extration Ventures, 2019 WL 6467802 at *3 (S.D. Cal. Dec. 2, 2019) (reasoning that the publication of the patent application did not cause the statute of limitations period to begin because "[t]he majority of cases relying on the issuance of a patent as constructive notice were either at the summary judgment stage or later in the proceedings with sufficient evidence on the record to decide this issue.").  It is not apparent, on the face of the FAC, that the claim is time-barred.  Accordingly, the Court finds that the CUTSA statute of limitations is not a ground upon which to grant Apple's motion.

## 2.     Sufficiency of Plaintiffs' Trade Secret Allegations

To state a claim for misappropriation of trade secrets, the plaintiff must allege: "(1) the plaintiff owned a trade secret, (2) the defendant acquired, disclosed, or used the

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SACV 20-48 JVS (JDEx) | Date | June 25, 2020 |
|---|---|---|---|

| Title | **Masimo Corporation et al v. Apple Inc.** |
|---|---|

plaintiff's trade secret through improper means, and (3) the defendant's actions damaged the plaintiff." Cytodyn, Inc. v. Amerimmune Pharm., Inc., 160 Cal. App. 4th 288, 297 (2008) (quoting Sargeant Fletcher, Inc. v. Able Corp., 110 Cal. App. 4th 1658, 1665 (2003)).

Apple contends that Plaintiffs have failed to allege any protectable trade secrets because the FAC does not describe Plaintiffs' confidential information with sufficient particularity under Federal Rule of Civil Procedure 8. Mot. at 14-19. Plaintiffs argue that they need not disclose any specific trade secrets and that the broad categories of information they assert are sufficient at the pleading stage. Opp'n at 4-8; see, e.g., Strategic Partners Inc. v. Vestagen Protective Techs., Inc., 2016 WL 10611186, at *4 (C.D. Cal. Nov. 23, 2016).

"To adequately allege the existence of a trade secret, the plaintiff must describe the trade secret with *sufficient particularity* to separate it from matters of general knowledge in the trade or of special knowledge of those persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies." Acrisure of Cal., LLC v. SoCal Commercial Ins. Servs., 2019 WL 4137618, at *3 (C.D. Cal. Mar. 27, 2019) (emphasis added) (internal citation and quotation marks omitted). Although the plaintiff need not define every minute detail, "[t]he Ninth Circuit has rejected the use of 'catchall' language, holding that such language is insufficiently specific 'because it does not clearly refer to tangible trade secret material." Id. (internal citation and quotation marks omitted). The pleadings "must have enough specificity to provide both the Court and defendants with notice of the boundaries of this case." Citcon USA, LLC v. RiverPay Inc., 2018 WL 6813211, at *4 (N.D. Cal. Dec. 27, 2018) (internal citation omitted). A "laundry list of items . . . does not meaningfully define the trade secrets at issue." Invisible Dot, Inc. v. DeDecker, 2019 WL 1718621, at *5 (C.D. Cal. Feb. 6, 2019).

The Court agrees that Plaintiffs have not adequately pled a trade secret. Plaintiffs allege that they "own trade secrets that include, but are not limited to, Plaintiffs' technical information, sales and marketing information, and other business information relating to non-invasive monitoring of physiological parameters and products to perform such monitoring." FAC ¶ 211. The categories (technical, sales and marketing, and other business information) consist of a long list of different types of information. See id. Plaintiffs' broad references to types of information like "product plans," "personnel

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SACV 20-48 JVS (JDEx) | Date | June 25, 2020 |
|---|---|---|---|

| Title | **Masimo Corporation et al v. Apple Inc.** |
|---|---|

information," "product briefs," and "technical drawings," without reference to specific plans, briefs, or drawings, fails to plead a trade secret in a manner that gives Apple fair notice of the claim.  See Acrisure, 2019 WL 4137618, at *3; see also Human Longevity, Inc. v. J. Craig Venter Inst., Inc., 2018 WL 6617633, at *4 (S.D. Cal. Dec. 18, 2018) ("allegations of broad categories relating to business or technology are not adequate to support a trade secrets claim . . . .").  Accordingly, the Court **grants** Apple's motion to dismiss this cause of action.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** the motion.  Plaintiffs have 30 days to amend.  To the extent that the amended pleading itself discloses Plaintiffs' trade secrets, the Court would entertain a sealed filing accompanied with a public redacted version.

The Court finds that oral argument would not be helpful in this matter and **vacates** the June 29, 2020 hearing.  Fed. R. Civ. P. 78; L.R. 7-15.

**IT IS SO ORDERED.**

| | : | 0 |
|---|---|---|
| Initials of Preparer | lmb | |

# Exhibit M

Joseph R. Re (Bar No. 134479)
joseph.re@knobbe.com
Stephen C. Jensen (Bar No. 149894)
steve.jensen@knobbe.com
Perry D. Oldham (Bar No. 216016)
perry.oldham@knobbe.com
Stephen W. Larson (Bar No. 240844)
stephen.larson@knobbe.com
**KNOBBE, MARTENS, OLSON &
BEAR, LLP**
2040 Main Street, Fourteenth Floor
Irvine, CA  92614
Telephone:  (949)-760-0404
Facsimile:  (949)-760-9502

*Attorneys for Plaintiffs Masimo
Corporation and Cercacor Laboratories,
Inc.*

JOSHUA H. LERNER, SBN 220755
  jlerner@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street Suite 3000
San Francisco, CA 94105
Telephone:  415.393.8200
Facsimile:   415.393.8306

H. MARK LYON, SBN 162061
  mlyon@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA 94304-1211
Telephone:  650.849.5300
Facsimile:   650.849.5333

*Attorneys for Defendant Apple Inc.*
[Additional counsel on following page]

# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
### SOUTHERN DIVISION

| | |
|---|---|
| MASIMO CORPORATION, a Delaware corporation; and CERCACOR LABORATORIES, INC., a Delaware corporation<br><br>Plaintiffs,<br><br>v.<br><br>APPLE INC., a California corporation<br><br>Defendant. | Case No. 8:20-cv-00048-JVS-JDE<br><br>**JOINT 26(f) REPORT**<br><br>Scheduling Conference:<br>Date:    TBD<br>Time:    TBD<br>Ctrm.    TBD |

BRIAN M. BUROKER, *pro hac vice*
 bburoker@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Telephone:  202.955.8541
Facsimile:   202.467.0539

ILISSA SAMPLIN, SBN 314018
 isamplin@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:   213.229.7520

ANGELIQUE KAOUNIS, SBN 209833
 akaounis@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2029 Century Park East Suite 4000
Los Angeles, CA 90067
Telephone:  310.552.8546
Facsimile:   310.552.7026

*Attorneys for Defendant Apple Inc.*

Pursuant to Rule 26(f) of the Federal Rules of Civil Procedure and Local Rule 26-1, Plaintiffs Masimo Corporation ("Masimo") and Cercacor Laboratories, Inc. ("Cercacor") (collectively, "Plaintiffs"), and Defendant Apple Inc. ("Apple") (together with Plaintiffs, the "Parties") hereby submit this Joint Report and [Proposed] Discovery Plan.

On March 10, 2020, counsel for the Parties conducted a telephonic discovery conference to address topics set forth in Fed. R. Civ. P. 26(f) Local Rule 26-1, and this Court's sample Order Setting Rule 26(f) Scheduling Conference. Participating in the conference were Joseph R. Re, Stephen W. Larson, and Adam B. Powell of Knobbe, Martens, Olson & Bear, LLP, counsel for Plaintiffs, and Brian Rosenthal, Angelique Kaounis, and Joshua Lerner of Gibson, Dunn & Crutcher LLP, counsel for Apple.

## A. **Synopsis**

This action involves claims by Plaintiffs against Apple for alleged patent infringement, trade secret misappropriation, correction of inventorship of certain patents assigned to Apple, and declaratory judgment of ownership of certain patents assigned to Apple. On January 9, 2020, Plaintiffs filed the initial Complaint. On March 4, 2020, Apple moved to dismiss the initial Complaint. On March 25, 2020, Plaintiffs filed the First Amended Complaint asserting the following causes of action:

(1)     Infringement of U.S. Patent No. 10,258,265;

(2)     Infringement of U.S. Patent No. 10,258,266;

(3)     Infringement of U.S. Patent No. 10,292,628;

(4)     Infringement of U.S. Patent No. 10,299,708;

(5)     Infringement of U.S. Patent No. 10,376,190;

(6)     Infringement of U.S. Patent No. 10,376,191;

(7)     Infringement of U.S. Patent No. 10,470,695;

(8)     Infringement of U.S. Patent No. 6,771,994;

(9)    Infringement of U.S. Patent No. 8,457,703;

(10)   Infringement of U.S. Patent No. 10,433,776;

(11)   Infringement of U.S. Patent No. 10,588,553;

(12)   Infringement of U.S. Patent No. 10,588,554;

(13)   Trade Secret Misappropriation Under California's Uniform Trade Secret Act;

(14)   Correction of Inventorship of U.S. Patent No. 10,078,052;

(15)   Correction of Inventorship of U.S. Patent No. 10,247,670;

(16)   Correction of Inventorship of U.S. Patent No. 9,952,095;

(17)   Correction of Inventorship of U.S. Patent No. 10,219,754;

(18)   Correction of Inventorship of U.S. Patent No. 10,524,671;

(19)   Declaratory Judgment of Ownership of U.S. Patent No. 10,078,052;

(20)   Declaratory Judgment of Ownership of U.S. Patent No. 10,247,670;

(21)   Declaratory Judgment of Ownership of U.S. Patent No. 9,952,095;

(22)   Declaratory Judgment of Ownership of U.S. Patent No. 10,219,754;

(23)   Declaratory Judgment of Ownership of U.S. Patent No. 10,524,671; and

(24)   Declaratory Judgment of Ownership of U.S. Patent Application No. 15/960,507.

Apple contends that none of the claims have merit;  Apple will respond to the First Amended Complaint by April 20, 2020, pursuant to the Court's April 2, 2020 Order.

**B.**   **Legal Issues**

The Parties identify the following key disputed issues:

1.     Whether Apple has infringed any valid claim of the asserted

patents;

2.     The scope and meaning of certain claim terms of Plaintiffs' asserted patents;

3.     Whether Apple improperly acquired, used, or disclosed Plaintiffs' alleged trade secrets;

4.     Whether Plaintiffs were injured by any alleged improper acquisition, use, or disclosure of Plaintiffs' alleged trade secrets by Apple;

5.     Whether inventorship for certain patents assigned to Apple should be corrected;

6.     Whether Plaintiffs are the owner of certain patents and patent applications assigned to Apple;

7.     Whether Plaintiffs are entitled to damages and, if so, in what amount;

8.     Whether Plaintiffs are entitled to an injunction and, if so, the terms of the injunction; and

9.     Whether this case is exceptional and whether any party is entitled to attorneys' fees and costs.

Apple identifies the following additional key disputed issues:

1.     Whether Plaintiffs' trade secret claim is barred by the applicable statute of limitations, *see* Cal. Civ. Code § 3426.6;

2.     Whether Plaintiffs can show that they own protectable trade secrets, including by describing the alleged trade secrets with sufficient particularity to separate them from matters of general knowledge in the trade, and demonstrating reasonable measures to maintain secrecy and value of the alleged trade secrets;

3.     Whether Plaintiffs' misappropriation claim was brought or maintained in bad faith such that the Court should award

reasonable attorney's fees and costs to Apple under Cal. Civ. Code Section 3426.4; and

4.  Whether Plaintiffs' patent infringement, correction of inventorship, and patent ownership claims were brought or maintained in bad faith, such that the Court should award reasonable attorney's fees and costs to Apple under 35 U.S.C. § 285.

Plaintiffs disagree with Apple's recitation of "additional key issues" as unduly argumentative, addressing questions that are not actually issues in this case, and identifying incorrect legal standards.

The Parties reserve all rights to identify additional legal issues that may arise, for example, in connection with possible counterclaims or affirmative defenses, based on the development of evidence in this matter.

**C.**  **Damages**

Plaintiffs' Statement:

Plaintiffs seek damages in an amount to be ascertained through discovery and proven at trial, plus applicable pre-judgment and post-judgment interest. Plaintiffs seek actual damages, lost profits, unjust enrichment, and/or a reasonable royalty.  The final amount of these categories has yet to be ascertained—and Plaintiffs are unable to provide a realistic range of provable damages until they have obtained further information through discovery which can be provided to their damages expert, including revenue and sales information related to the accused products.  Plaintiffs also allege willful patent infringement, as well as willful and malicious trade secret misappropriation. Thus, Plaintiffs seek reasonable attorney's fees and costs in accordance with 35 U.S.C. § 285 and Cal. Civil Code § 3426.4.  Plaintiffs will also seek punitive and exemplary damages.  Plaintiffs disagree with Apple's contention below that Plaintiffs' claims lack merit because Plaintiffs have not yet calculated damages, especially when Apple is refusing to provide any discovery in this case.

**Apple's Statement:**

Apple denies that Plaintiffs have been harmed in any way by Apple's conduct, and accordingly Apples denies that any provable damages exist in this case or that Plaintiffs are entitled to any compensatory damages (including lost profits and/or a reasonable royalty), exemplary damages, and/or recovery for unjust enrichment. The fact that Plaintiffs cannot identify any damages, four months after filing suit, several years after the alleged misappropriation, and over a year after the first accused product was released, is telling. Apple will respond to any damages theories asserted by Plaintiffs at the appropriate time. Apple reserves the right to assert counterclaims at a later date and may seek damages at that time. Further, Plaintiffs' misappropriation claim was made, and continues to be maintained, in bad faith such that the Court should award reasonable attorneys' fees and costs to Apple under Cal. Civ. Code Section 3426.4. Among other things, the misappropriation claim is barred by the applicable statute of limitations, *see* Cal. Civ. Code Section 3426.3, and Plaintiffs have not alleged cognizable trade secrets or any plausible facts supporting any colorable theory of misappropriation.

**D.   Insurance**

The Parties are not aware of any insurance coverage related to this matter.

**E.   Motions**

While Plaintiffs do not presently contemplate filing any additional amended pleadings or motions to add additional parties or claims, further discovery or issuance of additional patents may result in additional claims or amended pleadings. Plaintiffs reserve the right to do so, including in response to any Apple counterclaims.

Apple does not, at this time, anticipate filing any motions to add parties or transfer venue. As noted above, Apple filed a motion to dismiss the original Complaint and intends to file a motion to dismiss some or all of the claims in

Plaintiffs' First Amended Complaint by April 20, 2020.   Apple has not answered yet and reserves the right to bring counterclaims.

**F.    Discovery and Experts**

With respect to expert disclosures, the Parties have proposed deadlines in the Presumptive Schedule of Pretrial Dates attached hereto as Exhibit A.

**1.    Initial Disclosures**

The Parties do not believe any changes are necessary in the form or requirement for disclosures under Rule 26(a).  The Court granted the Parties' stipulation to exchange Fed. R. Civ. P. 26(a)(1) initial disclosures on April 14, 2020.

**2.    Subjects for Discovery/Discovery Phases/Discovery Cut-Off**

The Parties anticipate that discovery may be needed on at least the topics and disputed issues identified above, as well as any affirmative defenses asserted, and/or counterclaims brought by Apple.  The Parties agree that fact and expert discovery should be conducted in phases.  The proposed timing of expert witness disclosures under Fed. R. Civ. P. 26(a)(2) is set forth below in the proposed schedule attached hereto as Exhibit A.  Although the Parties have served discovery, no discovery has been completed to date.

Plaintiffs' Statement: All discovery should be completed pursuant to the schedule set forth in Exhibit A and in accordance with the Federal Rules of Civil Procedure.  Plaintiffs disagree with Apple's assertion that California Civil Procedure Code Section 2019.210 applies in federal court to bar trade secret discovery until the requirements of the rule are met.  Plaintiffs also disagree with Apple's attempt to use that procedural rule to bar *all* discovery, including patent discovery.  For example, Plaintiffs recently served a narrow set of 25 Requests for Production that concern the asserted patents and technical information about the products accused of patent infringement.  The requested information is necessary for Plaintiffs to provide patent infringement

contentions.  Apple has asserted that all discovery is barred, including discovery relating to the products accused of patent infringement because the information is purportedly *also* relevant to Plaintiffs' trade secret claims.

Regardless, Plaintiffs have repeatedly suggested the proper way for Apple to seek this information is through an interrogatory served under the Federal Rules.  Plaintiffs even offered to give Apple an extra interrogatory if that was the issue.  Apple maintained that all discovery that relates in any way to the trade secret claims (including all patent discovery) is barred until Apple agrees that Plaintiffs have complied with a California state procedural rule.  As addressed in more detail in Section K below, that is improper.

Apple's Statement: Apple anticipates patent discovery to be completed pursuant to the schedule set forth in Exhibit A except insofar as Plaintiffs attempt to take trade secret related discovery before providing an adequate description of the alleged trade secrets.  Pursuant to California Code of Civil Procedure Section 2019.210 ("Section 2019.210") and consistent with the principles of orderly case management and discovery, Apple requested that Plaintiffs describe their alleged trade secrets with reasonable particularity before they commence trade secret-related discovery.  Plaintiffs declined, thus far, to do so, and accordingly, Apple is in the process of moving for a protective order preventing Plaintiffs from commencing such discovery.

Apple does not agree that Plaintiffs' set of 25 Requests for Production is "narrow."  While the Requests may "concern the asserted patents and technical information about the products accused of patent infringement," as Plaintiffs contend, a large number of the requests *also* concern Plaintiffs' alleged secrets.  Indeed, the Apple products accused of patent infringement are the Apple products that Plaintiffs allege incorporate their trade secrets.  Section 2019.210 is clear that a trade secret plaintiff must describe its purported secrets with "reasonable particularity" "before commencing discovery *relating to* the trade

secret." Cal. Civ. Code § 2019.210 (emphasis added). Plaintiffs have refused to define their purported secrets with the reasonable particularity Section 2019.210 requires, and therefore may not commence discovery that relates to their misappropriation claim even if it *also* relates to their patent claims.

Plaintiffs' conduct threatens the result Section 2019.210 guards against: that Plaintiffs will use their patent infringement claims as an end-run around Section 2019.210, to gain access to Apple's files and claim Apple's confidential information as their own. Plaintiffs' demand that Apple serve an interrogatory does not sufficiently protect against this result, because, among other things, there is nothing stopping Plaintiffs from cutting and pasting the vague description of the secrets in their First Amended Complaint into an interrogatory response. Accordingly, Apple intends to move forward with producing responsive discovery that relates solely to Plaintiffs' patent claims, as well as responsive public discovery that pertains to both the patent and trade secret claims. But as to any non-public discovery that relates to Plaintiffs' trade secret claim or to both the trade secret and patent claims, Apple intends to object to such discovery and await Judge Early's ruling on its protective order motion, which will be filed by joint stipulation of the parties on April 30, 2020.

*\*\*\**

The Parties have proposed a Presumptive Schedule of Pretrial Dates attached hereto as Exhibit A. Plaintiffs present these dates for the completion of all discovery in this case; Apple presents these dates for the completion of non-trade secret related discovery in this case.

### 3. <u>Written Discovery Requests</u>

Plaintiffs anticipate serving, and have begun serving, written discovery (interrogatories, requests for production, requests for admission) directed to at least the following topics: the structure, function, and operation of Apple's products accused of infringing Plaintiffs' asserted patents; Apple's

misappropriation of Plaintiffs' trade secrets; the correct inventorship and ownership of the Apple patents at issue; Apple's affirmative defenses; and Apple's revenue, costs, profits pricing, margins, marketing, revenues and profits relating to the accused products.  Plaintiffs also anticipate third-party discovery may be necessary for some or all of the above topics.

Apple anticipates serving written discovery (interrogatories, requests for production, requests for admission), and has already begun serving such discovery, directed to at least the following topics: whether Plaintiffs brought their trade secret claim within the applicable statute of limitations period; the alleged bases for any supposed delayed discovery of Plaintiffs' trade secret claim; the development of the alleged trade secrets; ownership of the alleged trade secrets; the bases for Plaintiffs' claim of misappropriation by Apple; Plaintiffs' purported efforts to maintain the secrecy of their alleged trade secrets; the value, if any, of the alleged trade secrets; the facts on which Plaintiffs claim that Apple knew or should have known (i) that Marcelo Lamego purportedly disclosed Plaintiffs' alleged trade secrets to Apple, and/or (ii) the scope of Plaintiffs' alleged trade secrets; the validity of the asserted patents and related patents; the development that led to the asserted patents; practice by Plaintiffs of the asserted patents; marking of products of Plaintiffs that allegedly practice the asserted patents; contributions of those Plaintiffs allege should be named inventors on the identified Apple patents and patent applications; factual and legal bases for ownership and/or correction of inventorship of the identified Apple patents and patent application; Plaintiffs' bases for their claims of patent infringement; the notice, if any, Plaintiffs gave to Apple of its alleged infringement; Plaintiffs' efforts to enforce their alleged intellectual property rights; Plaintiffs' licensing or assignment of the asserted patents; Plaintiffs' claims that they have been harmed by any conduct committed by Apple; the bases, if any, for Plaintiffs' claims for damages, enhanced damages, attorney's

fees, recovery for unjust enrichment, and reasonable royalties, including Plaintiffs' revenue, costs, profits, pricing, margins, marketing, and licensing agreements relating to the alleged trade secrets and patented technology. Apple also anticipates third-party discovery may be necessary for some or all of the above topics.

### 4.   Depositions

Plaintiffs anticipate taking the depositions of Apple under Fed. R. Civ. P. 30(b)(6), Apple's employees, non-party witnesses, and expert witnesses concerning the issues identified above. Plaintiffs also anticipate taking the depositions of third parties.

Apple anticipates taking depositions of Plaintiffs under Fed. R. Civ. P. 30(b)(6); Plaintiffs' employees, including but not limited to those employees and former employees identified in the Complaints as inventors on Plaintiffs' relevant patents, and those employees and former employees identified in the Complaints as inventors or contributors to the Apple patents and patent applications; non-party witnesses; and expert witnesses concerning the issues identified above. Apple's estimates are based on the claims alleged in Plaintiffs' First Amended Complaint filed on March 25, 2020. Additional discovery will be needed if counterclaims are brought.

### 5.   Electronic Discovery and Document Production

The Parties are negotiating a protocol governing the preservation and production of Electronically Stored Information ("ESI"), which they will submit separately.

### 6.   Limitations on Discovery

The Parties request the following exceptions to the limitations on discovery set forth in the Federal Rules of Civil Procedure:

(1)   A maximum of 35 interrogatories per side;

(2)   A maximum of 50 requests for admission per side; and

(3)    Each expert deposition shall be limited to one seven hour day per expert per report.

Additionally, Plaintiffs assert the issues and claims in this case justify 140 hours of fact depositions per side, with each fact deposition counting as having a duration of at least 3.5 hours.  Defendant asserts depositions should be limited to 80 hours of party fact depositions per side, with each party fact deposition counting as having a duration of at least 3.5 hours.

As set forth above, Apple objects to Plaintiffs' commencement of any trade-secret related discovery until Plaintiffs describe their alleged trade secrets with reasonable particularity under Section 2019.210 and will move for a protective order preventing Plaintiffs from taking the same.  Plaintiffs object to Apple's attempt to use a California state procedural rule to bar all discovery, including patent discovery.

## 7.    Other Orders

The Parties intend to request that the Court enter a protective order governing the confidentiality of information in this case.  The Parties will submit to Magistrate Judge Early a proposed protective order under Federal Rule of Civil Procedure 26(c) to govern the exchange and disclosure of confidential documents and information in this case.  Apple will not agree to produce documents unless and until a satisfactory protective order is issued in this case.

The Parties consent to electronic service and agree that such service of papers may be accomplished by electronic mail, with the same result as if such papers had been delivered in person.  If the e-mail serving papers is sent after midnight (Pacific), those papers will be considered to have been received the following day.

At this time, Plaintiffs do not propose that the Court enter any other order under Rule 26(c), Rule 16(b), or Rule 16(c) beyond those normally issued by

the Court. However, as set forth herein, Apple will move for a protective order under Rule 26(c) on the basis that Plaintiffs may not commence any trade secret-related discovery until they comply with Section 2019.210. Plaintiffs object to Apple's attempt to use a California state procedural rule to bar all discovery, including patent discovery.

## G. **Dispositive Motions**

Plaintiffs' Statement:

Plaintiffs anticipate that they may file motions for summary judgment regarding patent infringement, validity, trade secret misappropriation, inventorship, and/or ownership. Plaintiffs anticipate they may also file pretrial motions relating to expert testimony and motions *in limine*.

Apple's Statement:

Apple filed a motion to dismiss Plaintiffs' claims on March 4, 2020. Plaintiffs voluntarily amended their Complaint on March 25, 2020, and Apple intends to move to dismiss some or all of the claims in the First Amended Complaint on or before April 20, 2020. Apple reserves the right to move to dismiss any future amended complaint.

If any claims remain after any future motions to dismiss are decided, Apple anticipates that it will move for summary judgment, partial summary judgment, and/or judgment on the pleadings under Rule 15(c) of Plaintiffs' claims of trade secret misappropriation, patent infringement, patent validity, patent eligibility correction of inventorship, and/or declaratory judgment of ownership, and further, that it may seek sanctions (including possibly case or claim-terminating sanctions) against Plaintiffs under Cal. Civ. Code Section 3426.4, among other authorities. Apple anticipates that it may also file pretrial motions relating to expert testimony and motions *in limine*. Apple reserves all rights to bring such motions.

**H.      Settlement and Settlement Mechanism**

The Parties have met and conferred regarding ADR and settlement procedures pursuant to L.R. 16-15. The Parties propose participating in a private mediation in accordance with Settlement Procedure No. 3.

The Parties have submitted concurrently herewith an ADR-01 "Request; ADR Procedure Selection" Form. The Parties appreciate and understand that the case will not proceed to trial unless all parties with full authority to settle the case have appeared personally at a settlement conference.

**I.      Trial Estimate**

The Parties agree that trial will be by jury on at least all issues for which there is a right to trial by jury. The Parties estimate a 10-14 day jury trial in which each Party anticipates calling approximately 10-15 witnesses. Because the Parties' trial estimate exceeds eight days, the Parties will be prepared to discuss the estimate in detail. The parties reserve the right to request bifurcation of trial.

**J.      Timetable**

The Parties have submitted the Presumptive Schedule of Pretrial Dates attached as Exhibit A to this report.

**K.      Other Issues**

Plaintiffs' statement:

Apple's has attempted to block all discovery from the outset by demanding that Plaintiffs follow Cal. Civ. Proc. Code § 2019.210. Apple's position is misplaced because Section 2019.210 is a California procedural requirement that does not apply in federal court. *See SMC Networks, Inc. v. Hitron Techs., Inc.*, 2013 WL 12136372, at *3 (C.D. Cal. Mar. 15, 2013) (holding that Cal. Civ. Proc. Code § 2019.210 does not apply in federal courts because it violates Fed. R. Civ. P. 26 and the *Erie* doctrine); *Funcat Leisure Craft, Inc. v. Johnson Outdoors, Inc.*, 2007 WL 273949, at *2 (E.D. Cal. Jan.

29, 2007) (same). As *SMC Networks* explained, Section 2019.210 conflicts with the Federal Rules because "§ 2019.210 sets forth a procedural requirement that must be met before discovery may be initiated, while Rule 26 would permit Plaintiff to proceed." 2013 WL 12136372 at *3. Thus, Section 2019.210's "automatic stay provision 'serve[s] to prevent application of Rule 26.'" *Id.* (quoting *Funcat*, 2007 WL 273949, at *2).

Indeed, Apple's own argument shows why Section 2019.210 should not be applied in federal courts. Apple asserts that it should not have to respond to Plaintiffs' First Set of Requests for Production ("RFPs") because the RFPs seek "extensive trade secret-related discovery." But even a cursory review of those 25 RFPs show they are standard patent RFPs designed to seek information Plaintiffs need to prepare patent infringement contentions against the "Accused Products." For example, the requests are narrowly tailored to seek documents concerning the "scope of the Masimo Asserted Patents," the "design and operation of the Accused Products," and the "operation of any heart rate algorithms used in any of the Accused Products." Some RFPS were even narrowly tailored to particular patent claim limitations.

Plaintiffs asked Apple to identify any requests that it believed sought information not directed to the patent infringement allegations, but Apple admitted it could not identify any such request. Despite that, Apple has refused to provide any responsive information on the grounds that Apple believes the requests *also* relate to the trade secret allegations. Accordingly, Apple is using a California state procedural rule concerning trade secrets to preclude typical patent discovery. Apple provides no case law to support that position, which has been rejected by at least one court in this District. *See Bryant v. Mattel*, 2007 WL 5430888, *3 n.3 (C.D. Cal. May 18, 2007) (refusing to limit discovery of product information under Section 2019.210 because the information was

/ / /

-14-

also "relevant to claims other than the trade secret misappropriation claim, such as Mattel's claim for copyright infringement").

Instead of imposing a state procedural rule to bar patent discovery, Apple should serve an interrogatory under the Federal Rules of Civil Procedure. If Apple had done so immediately after the Rule 26(f) conference on March 10, Plaintiffs would have already responded. This is precisely the procedure the Court already adopted and followed in *Masimo et al. v. True Wearables et al.*, case no. 8:18-cv-2001-JVS-JDEx, which Apple asserts raises allegations that are "nearly identical" to the allegations in this case. *See* D.I. 14 (Apple's Notice of Related Cases) at 1. Apple incorrectly suggests the defendant in *True Wearables* served an interrogatory instead of asking Plaintiffs to identify their trade secrets separate from the interrogatory. The defendant actually requested a formal identification of trade secrets similar to patent infringement contentions. This Court addressed the dispute at the scheduling conference and adopted Plaintiffs' argument that the Federal Rules of Civil Procedure apply and Plaintiffs need only respond to an interrogatory asking for such trade secrets.

Apple's attempt to obtain a contrary ruling by rushing to Magistrate Judge Early is inappropriate. As shown throughout this submission, Apple turned the Section 2019.210 dispute into a scheduling issue by asserting it will not comply with the Court's schedule as to trade secret discovery. Apple's assertion exemplifies the conflict between Section 2019.210 and the Federal Rules, which should be resolved by this Court because it impacts the schedule.

Apple also incorrectly asserts it includes the section below "because Plaintiffs insisted on addressing the merits of the parties' Section 2019.210 dispute in this filing." Plaintiffs initial draft did not include this section or discuss Section 2019.210. Plaintiffs added their position *in response* to Apple's extensive arguments on Section 2019.210. Apple then responded the day before filing by adding additional arguments and citing case law. But most of Apple's

-15-

cases did not even discuss the *Erie* conflict. *See M/A-COM Tech. Sols., Inc. v. Litrinium, Inc.*, 2019 WL 8108729, at *4 (C.D. Cal. Sept. 3, 2019); *Swarmify, Inc. v. Cloudflare, Inc.*, 2018 WL 2445515, at *2 (N.D. Cal. May 31, 2018); *Jobscience, Inc. v. CVPartners, Inc.*, 2014 WL 852477, at *4 (N.D. Cal. Feb. 28, 2014). One decision applied Section 2019.210 based on the "circumstances in [that] case," including that plaintiff had initially **agreed** to apply Section 2019.210. *E. & J. Gallo Winery v. Instituut Voor Landbouw-En Visserijonderzoek*, 2018 WL 3062160, at *4 (E.D. Cal. June 19, 2018).[1] Plaintiffs request the Court apply the standard Federal Rules for discovery just as it did in the *True Wearables* case, which Apple argued involves "nearly identical" allegations.

Apple's Statement:[2]  Apple wants to move forward with trade secret discovery *as quickly possible*, and therefore has repeatedly requested that Plaintiffs comply with the procedures set out in California Code of Civil Procedure Section 2019.210. Apple informed Plaintiffs that their pleading of the alleged trade secrets was insufficient back on *February 25*, requested Plaintiffs' compliance with Section 2019.210 by letter dated *March 6*, and has repeatedly requested Plaintiffs' compliance with Section 2019.210 ever since. Even though Plaintiffs are alleging secrets that are public, Plaintiffs have steadfastly refused to provide an adequate description of those secrets.

---

[1] Apple also claims it is seeking to move this case forward "as quickly as possible" and faults Plaintiffs for requesting a 14-day extension to respond to Apple's motion for protective order. Apple omits that it has requested and obtained numerous lengthy extensions to respond to the initial Complaint, file this report, and respond to the Amended Complaint. D.I. 12; D.I. 26; D.I. 30.

[2] Apple includes this section because Plaintiffs insisted on addressing the merits of the parties' Section 2019.210 dispute in this filing. Apple notes, however, that this dispute is in the process of being briefed for Judge Early, in a Joint Stipulation to be filed by the parties on April 30, 2020.

Furthermore, Apple has not attempted to "block all discovery from the outset," as Plaintiffs contend above. To the contrary, Apple intends to move forward with discovery that pertains solely to Plaintiffs' patent claims.

Consistent with its goal to move forward on the trade secret claims as quickly as possible, on March 27, 2020, Apple began the process of moving for a protective order prohibiting Plaintiffs from commencing trade secret-related discovery unless and until they identify their allegedly misappropriated trade secrets with the "reasonable particularity" Section 2019.210 requires. Apple was prepared to follow the timing for the motion prescribed by the Local Rules and file on April 15, 2020. *Plaintiffs* requested that Apple delay the filing so that Plaintiffs could have an additional two weeks to prepare their portion, and Apple agreed. At *Plaintiffs'* request, the filing has been delayed until April 30, 2020.

District courts throughout California, *including this Court*, recognize that Section 2019.210 serves an essential function in cases like this one—it discourages meritless trade secret claims, prevents plaintiffs from abusing the discovery process to access the defendant's trade secrets, assists the court in framing the appropriate scope of discovery, and enables a defendant to form "complete and well-reasoned defenses" against claims of misappropriation. *M/A-COM Tech. Sols., Inc. v. Litrinium, Inc.*, 2019 WL 8108729, at *2 (C.D. Cal. Sept. 3, 2019) (Early, J.). A prompt and particularized disclosure of Plaintiffs' purported secrets is critical to each of those functions, as will be described in detail in Apple's forthcoming motion for a protective order.

Tellingly, the most recent case Plaintiffs cite in support of their contrary position that Section 2019.210 does not apply to CUTSA cases filed in federal court—*SMC Networks*—is from 2013 and has never been followed by another court. This Court is far from alone in recently taking a different approach from *SMC*, and managing discovery in trade secret cases by applying Section

-17-

2019.210.  *See, e.g.*, *E. & J. Gallo Winery v. Instituut Voor Landbouw-En Visserijonderzoek*, 2018 WL 3062160, at *4 (E.D. Cal. June 19, 2018); *Swarmify, Inc. v. Cloudflare, Inc.*, 2018 WL 2445515, at *2 (N.D. Cal. May 31, 2018); *Jobscience, Inc. v. CVPartners, Inc.*, 2014 WL 852477, at *4 (N.D. Cal. Feb. 28, 2014).

Plaintiffs are wrong to suggest that a contrary approach was taken in the *True Wearables* Case.  In that case, the defendant did not move for a protective order pursuant to Section 2019.210.  Here, Apple initiated the meet and confer process in connection with its motion for a protective order pursuant to Section 2019.210 on March 27, 2020, Apple sent Plaintiffs its portion of the joint stipulation Judge Early requires for presentation of such a motion on April 8, 2020, and, as a result of Plaintiffs' requested two-week extension, the parties' joint stipulation is scheduled to be filed on April 30, 2020.  Moreover, in *True Wearables*, the defendant elected to serve an interrogatory for the identification of trade secrets.  Here, by contrast, Apple has not served an interrogatory for the information covered by Section 2019.210 because an interrogatory response does not sufficiently protect Apple from the harm Section 2019.210 guards against: that Plaintiffs will use a vague identification of their trade secrets to gain access to Apple's files and claim Apple's confidential information as their own.  Plaintiffs say they are willing and able to adequately describe their trade secrets in response to an interrogatory, but refuse to do so in a Section 2019.210 disclosure.  The clear reason is that Plaintiffs seek to use the discovery process to manufacture a trade secret case.  Indeed, Plaintiffs prefer an interrogatory to a Section 2019.210 disclosure because they are free to amend their interrogatory responses throughout the discovery process, including in response to the *Apple* confidential information they discover in Apple's files.  Plaintiffs should be required to describe the trade secrets that Apple allegedly misappropriated at the outset of this case.  This is information that Plaintiffs must have in their

-18-

possession as the result of the Rule 11 investigation they allegedly conducted prior to filing. Its prompt disclosure will prevent Plaintiffs from simply manufacturing a trade secret claim that did not exist at the time of filing and it will protect Apple's confidential information – which are the precise reasons why Section 2019.210 was enacted. Forcing Plaintiffs to specify their alleged trade secrets *before* they commence trade secret-related discovery in Apple's files will prevent unnecessary motion practice later.

Plaintiffs' further argument that their RFPs somehow fall outside the ambit of Section 2019.210 is not persuasive. To begin with, and to dispel any confusion, Apple is prepared to produce documents responsive to the RFPs pertaining solely to Plaintiffs' patent claims, as well as public documents responsive to the RFPs pertaining to Plaintiffs' patent and trade secret claims. But Plaintiffs are wrong to suggest that all of their RFPs simply seek patent-related information. Plaintiffs use the term "Accused Products" throughout their RFPs, defined as "Apple Watch Series 4 or later, as well as the combination of Apple Watch Series 4 or later with an Apple iOS Product." These are the *very same Apple Watches that Plaintiffs contend incorporate their trade secrets*. Accordingly, these overlapping requests are an attempt to end-run the clear requirements of Section 2019.210. Plaintiffs' discovery of documents pertaining to their purported trade secrets should not commence until Plaintiffs serve an adequate Section 2019.210 disclosure.

This case presents a clear example of the very danger that Section 2019.210 prevents: Plaintiffs have plead vague trade secrets claims, which they already amended once, and now seek access to *Apple's* confidential information. Absent a reasonable description of Plaintiffs' alleged secrets first, Plaintiffs will be able to sift through Apple's information and claim whatever seems most valuable as their own. This is particularly troubling because Apple has a long track record of significant investment in groundbreaking technology, including

-19-

the Apple Watch. Plaintiffs should not be permitted to peruse that information *in search* of a valid claim; they need to first provide at least a description of the secrets at issue here.

For these and the reasons set forth in detail in Apple's portion of the parties' filing before Judge Early on Apple's motion for a protective order, Apple therefore requests that Plaintiffs be barred from commencing any trade secret-related discovery until Plaintiffs serve on counsel a statement, under seal, that includes (1) a summary of the specific alleged trade secrets; (2) the background of the trade secrets and a description of how each secret has derived independent, actual, or potential economic value by virtue of not being generally known to the public; (3) a description of how each secret has been the subject of reasonable efforts to maintain its secrecy; and (4) each of the precise claimed trade secrets, numbered with a list of the specific elements for each, as claims would appear at the end of a patent.

Separately, Apple anticipates a possibly voluminous document production due to the number of patents at issue in this case. As noted above, the Parties are currently negotiating a protective order. Apple does not intend to produce documents until an acceptable protective order is issued.

## L.    **Conflicts**

The following are subsidiaries of Plaintiff Masimo Corporation:

Masimo (China) Medical Technology Co., Ltd; Masimo (Shanghai) Industrial Co., Ltd.; Masimo 17, LLC; Masimo Americas, Inc.; Masimo Asia Pacific Pte. Ltd; Masimo Australia PTY LTD; Masimo Canada ULC; Masimo International SARL - Dubai, U.A.E.; Masimo de Mexico Holdings I LLC; Masimo de Mexico Holdings II LLC; Masimo Europe Limited – French Branch; Masimo Europe Limited; Masimo Europe Limited - Filiale Italiana; Masimo Europe Limited, Sucursal en España; Masimo Europe Ltd Niederlassung Deutschland; Masimo Holdings LLC; Masimo Holdings LP;

Case 8:20-cv-00048-JVS-JDE   Document 260-2   Filed 12/30/20   Page 150 of 353   Page ID
Case 8:20-cv-00048-JVS-JDE   Document 30   Filed 04/14/20   Page 20 of 26   Page ID #:1350
#:19981

Masimo Hong Kong Limited; Masimo Importação e Distribuição de Produtos Médicos Ltda.; Masimo International SARL; Masimo International Sarl – Jordan; Masimo International Sarl (filiaal Nederlands); Masimo International Technologies SARL; Masimo Japan Kabushiki Kaisha; Masimo Korea LLC; Masimo Medical Technologies India Private Ltd; Masimo Medikal Ürünler Ticaret Limited Şirketi; Masimo Mexico, S. de R.L. de C.V.; Masimo Oesterreich GmbH; Masimo Peru S.R.L.; Masimo Polska Spola z.o.o.; Masimo International Saudi Arabia; Masimo Semiconductor, Inc.; Masimo Sweden AB; OC Property Shelter, LLC; OC Property Ventures, LLC; Patient Doctor Technologies, Inc.; SEDLine, Inc.; SpO2.com; VCCB Holdings, LLC; 25 Sagamore LLC; 52 Discovery LLC; Alton Office Holdings, LLC; and Alton Office Property, LLC.

Apple filed its Statement of Interested Parties and Corporate Disclosure Statement on March 4, 2020.  Dkt. No. 15.

**M.    Patent Cases**

The Presumptive Schedule of Pretrial Dates in Exhibit A identifies the dates and methodology for claim construction and *Markman* hearing.  Plaintiffs do not propose a specific date for the Markman hearing and instead defer to the Court.  Apple proposes that the Markman hearing be held on February 8, 2021, subject to the Court's availability based on its schedule.

**N.    Magistrates**

The Parties do not consent to having a Magistrate Judge preside over these proceedings.

/ / /

/ / /

/ / /

/ / /

/ / /

Case 8:20-cv-00048-JVS-JDE Document 260-2 Filed 12/30/20 Page 151 of 353 Page ID
Case 8:20-cv-00048-JVS-JDE Document 260 Filed 04/14/20 Page 22 of 23 Page ID
#:19982

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  April 14, 2020        By: */s/ Stephen W. Larson*
                                     Joseph R. Re
                                     Stephen C. Jensen
                                     Perry D. Oldham
                                     Stephen W. Larson

                                     Attorneys for Plaintiffs,
                                     Masimo Corporation and
                                     Cercacor Laboratories

GIBSON, DUNN & CRUTCHER LLP

Dated:  April 14, 2020        By: */s/ Ilissa Samplin (with permission)*
                                     Joshua H. Lerner
                                     H. Mark Lyon
                                     Brian M. Buroker
                                     Ilissa Samplin
                                     Angelique Kaounis

                                     *Attorneys for Defendant Apple Inc.*

# EXHIBIT A

## JUDGE JAMES V. SELNA
### PRESUMPTIVE SCHEDULE OF PRETRIAL DATES

| Case No.: | 8:20-cv-00048-JVS (JDEx) |
|---|---|
| Case Name: | Masimo Corporation, et al. v. Apple Inc. |

| Matter | Time | Weeks before trial | Plaintiffs' Request | Defendant's Request | Court Order |
|---|---|---|---|---|---|
| Trial date (jury) Estimated length: 10-14 days | 8:30 am (Tuesday) | | 4/5/2022 | | |
| [Court trial:] File Findings of Fact and Conclusions of Law and Summaries of Direct Testimony | | -1 | N/A | | |
| Final Pretrial Conference: Hearing on Motions in Limine; File Agreed Upon Set of Jury Instructions and Verdict Forms and Joint Statement re Disputed Instructions and Verdict Forms; File Proposed *Voir Dire* Qs and Agreed-to Statement of Case | 11:00 am (Monday) | -2 | 3/21/2022 | | |
| Lodge Pretrial Conf. Order; File Memo of Contentions of Fact and Law; Exhibit List; Witness List; Status Report re Settlement | | -3 | 3/7/2022 | | |
| Last Day for hand-serving Motions in Limine | | -6 | 2/14/2022 | | |
| Last day for hearing motions | 1:30 pm (Monday) | -7 | 2/7/2022 | | |
| Last day to conduct Private ADR | | | 1/24/2022 | | |

-23-

| | | | | |
|---|---|---|---|---|
| Last day for hand-serving motions and filing (other than Motions in Limine) | | -11 | 1/10/2022 | |
| Expert Discovery cut-off | | | 12/6/2021 | |
| Rebuttal Expert Witness Disclosures | | | 10/18/2021 | |
| Opening Expert Witness Disclosures [See F.R. Civ. P. 26(a)(2)]<br><br>Plaintiffs File Final Infringement Contentions,<br><br>Defendant Files Final Invalidity Contentions. | | | 9/6/2021 | |
| Non-expert Discovery cut-off | | -15 | 7/5/2021 | |
| Defendant further reduces the number of asserted prior art references to no more than 6 references per patent and 25 references total.[3] | | | N/A | 14 days after Plaintiffs further reduce number of asserted claims |
| Plaintiffs further reduce number of asserted patents to 6, the number of asserted claims to no more than 3 claims per patent family, and 12 claims total.[4] | | | N/A | 30 days after Markman decision |
| Markman Decision | | | [set by Court] | |

[3]   Apple proposes that Plaintiffs and Defendant will narrow their asserted claims and prior art references from the previously narrowed pool of claims and references.

[4]   Plaintiffs believe Defendant's proposal to include deadlines to limit the number of asserted claims and asserted patents is premature and one-sided.

-24-

| Markman Hearing | | | [set by Court] | 2/8/2021 | |
|---|---|---|---|---|---|
| All Parties File Advice of Counsel Disclosures (Patent L.R. 3-7) | | | 1/25/2021 | 30 days after Markman decision | |
| Simultaneously Responding Markman Briefs, Tutorials and Presentation Materials (Patent L.R. 4-5) | | | 1/25/2021 | | |
| Last Date to Add Parties / Amend Pleadings | | | 12/23/2020 | | |
| Simultaneous Opening Markman Briefs (Patent L.R. 4-5) | | | 12/21/2020 | | |
| Complete Claim Construction Discovery (Patent L.R. 4-4) | | | 12/7/2020 | | |
| Joint Markman Prehearing Statement Patent L.R. 4-3) | | | 11/9/2020 | | |
| Exchange Preliminary Claim Constructions and Extrinsic Evidence Patent L.R. 4-2) | | | 10/12/2020 | | |
| Exchange of Proposed Claim Terms for Construction (Patent L.R. 4-1) | | | 9/21/2020 | | |
| Invalidity Contentions (Patent L.R 3-3 and 3-4) | | | 9/7/2020 | | |
| Defendant reduces the number of asserted prior art references to no more than 12 references per patent and 50 references total.[5] | | | N/A | 8/10/2020 | |

---

[5]    Apple proposes that a prior art instrumentality (such as a device or process) and associated references that describe that instrumentality shall count

| | Infringement Contentions (Patent L.R. 3-1 and 3-2) | | | 7/27/2020 | | |
|---|---|---|---|---|---|---|
| | Plaintiffs reduce number of asserted claims to no more than 8 claims per patent and 32 claims total. | | | N/A | 7/27/2020 | |
| | Deadline to disclose core technical documents sufficient to show the operation of the accused products.[6] | | | 6/15/2020 | | |
| | Initial Disclosures (Rule 26(a)(1)) | | | 4/14/2020 | | |

as one reference, as shall the closely related work of a single prior artist.

[6]     Any discovery-related dates that Apple proposes in this Presumptive Schedule of Pretrial Dates are subject to Plaintiffs providing an adequate identification of their alleged trade secrets in compliance with Section 2019.210 insofar as such an identification is a prerequisite to such discovery.

# Exhibit N

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.  SACV 20-00048JVS(JDEx)                    Date    April 17, 2020

Title    Masimo Corporation, et al v Apple, Inc

---

Present: The Honorable       **James V. Selna, U.S. District Court Judge**

| Lisa Bredahl | Not Present |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Not Present | Not Present |

**Proceedings:    [IN CHAMBERS] ORDER RE SCHEDULING DATES**

The Court has read and considered the parties Rule 26(f) Report and sets the following dates:

| | |
|---|---|
| **Jury Trial** | **April 5, 2022 at 8:30 a.m.** |
| **Final PreTrial Conference** | **March 21, 2022 at 11:00 a.m.** |
| File PreTrial Documents not later than March 7, 2022 | |
| File motions in limine not later than February 14, 2022 | |
| **Discovery Cut-off** | **July 5, 2021** |
| **Expert Discovery Cut-off** | **December 6, 2021** |
| Initial disclosure of Experts not later than September 6, 2021 | |
| Rebuttal disclosure of Experts not later than October 18, 2021 | |
| **Law and Motion Cut-off** | **February 7, 2022 at 1:30 p.m.** |
| Motions to be filed and served not later than January 10, 2022 | |
| **Markman Hearing** | **February 8, 2021 at 3:00 p.m.** |

Counsel inform the Court that their selection for a settlement procedure pursuant to Local Rule 16-15 is ADR #3, private mediation.  The Court orders that any settlement discussions shall be completed not later than November 30, 2021.  Counsel shall file a Joint Report of the parties regarding outcome of settlement discussions, the likelihood of possible further discussions and any help the Court may provide with regard to settlement negotiations not later than seven (7) days after the settlement conference.

The Court adopts discvoery limits in Sections 6a-c.  Total hours for depositions 100.  Court will deal with reduction of claims, prior art references at a hearing on **July 10, 2020 at 3:00 p.m.** Parties shall submit joint/separate proposals in one filing by July 3, 2020.  The Court adopts the patent specific dates.  The Court stays the trade secret discovery only pending compliance with 2019.210.  Any dispute over compliance shall be heard before the Magistrate Judge.

| | : | 0 |
|---|---|---|
| Initials of Preparer | lmb | |

Exhibit P

Joseph R. Re (Bar No. 134479)
joseph.re@knobbe.com
Stephen C. Jensen (Bar No. 149894)
steve.jensen@knobbe.com
Perry D. Oldham (Bar No. 216016)
perry.oldham@knobbe.com
Stephen W. Larson (Bar No. 240844)
stephen.larson@knobbe.com
KNOBBE, MARTENS, OLSON &
BEAR, LLP
2040 Main Street, Fourteenth Floor
Irvine, CA 92614
Telephone: (949)-760-0404
Facsimile: (949)-760-9502

Adam B. Powell (Bar. No. 272725)
adam.powell@knobbe.com
KNOBBE, MARTENS, OLSON &
BEAR, LLP
12790 El Camino Real
San Diego, CA 92130
Telephone: (858) 707-4000;
Facsimile: (858) 707-4001

*Attorneys for Plaintiffs Masimo
Corporation and Cercacor Laboratories,
Inc.*

JOSHUA H. LERNER, SBN 220755
  jlerner@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street Suite 3000
San Francisco, CA 94105
Tel.: 415.393.8200 / Fax: 415.393.8306

H. MARK LYON, SBN 162061
  mlyon@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA 94304-1211
Tel.: 650.849.5300 / Fax: 650.849.5333

BRIAN M. BUROKER, *pro hac vice*
  bburoker@gibsondunn.com
BRIAN K. ANDREA, *pro hac vice*
  bandrea@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Tel.: 202.955.8500 / Fax: 202.467.0539

BRIAN A. ROSENTHAL, *pro hac vice*
  brosenthal@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Tel.: 212.351.2339 / Fax: 212.817.9539

*Attorneys for Defendant Apple Inc.
[Additional counsel listed on next page]*

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| MASIMO CORPORATION, CERCACOR LABORATORIES, INC., | CASE NO. 8:20-cv-00048-JVS (JDEx) |
| Plaintiffs, | **JOINT STIPULATION REGARDING DEFENDANT APPLE INC.'S MOTION TO COMPEL PLAINTIFFS TO PROVIDE A SECTION §2019.210 DISCLOSURE** |
| v. | |
| APPLE INC., | |
| Defendant. | Judge: Magistrate Judge John D. Early |
| | Date/Time: September 24, 2020, at 10 a.m. |
| | Courtroom: 6A |
| | Discovery Cutoff: 7/5/2021 |
| | Pre-trial Conference: 3/21/2022 |
| | Trial: 4/5/2022 |

Case 8:20-cv-00048-JVS-JDE Document 169-1 Filed 09/04/20 Page 2 of 35 Page ID #:11945

ILISSA SAMPLIN, SBN 314018
  isamplin@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Tel.: 213.229.7000 / Fax: 213.229.7520

ANGELIQUE KAOUNIS, SBN 209833
  akaounis@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2029 Century Park East Suite 4000
Los Angeles, CA 90067
Tel.: 310.552.8546 / Fax: 310.552.7026

*Attorneys for Defendant Apple Inc.*

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTORY STATEMENTS ................................................. 1

    A.   Apple's Introductory Statement .................................... 1

    B.   Plaintiffs' Introductory Statement .............................. 3

II.  APPLE'S POSITION ........................................................... 6

    A.   Factual Background ..................................................... 6

    B.   Legal Standard............................................................. 8

    C.   Plaintiffs Should Provide A Disclosure Promptly ................. 10

        1. The Four Purposes of Section 2019.210 Are Served by a Prompt Disclosure ............................................................ 10

        2. None of Plaintiffs' Excuses for Delay Are Proper ............ 12

        3. The Lack of a Disclosure Prejudices Apple....................... 15

        4. The Court's Denial of Apple's Motion for a Protective Order Does Not Mean that Plaintiffs Can Delay Forever ............ 16

    D.   Conclusion.................................................................. 16

III. PLAINTIFFS' POSITION ..................................................... 17

    A.   Factual Background ................................................... 17

    B.   Argument .................................................................. 19

        1. This Court and Judge Selna Have Denied Apple's Request Numerous Times ........................................................ 19

        2. Plaintiffs Are Not Required To Serve A Section 2019.210 Statement By A Date Certain..................................... 20

        3. None of Apple's Policy Arguments Justify Apple's Attempt To Relitigate These Issues............................................ 22

        4. Apple's Requested Relief Again Far Exceeds The Requirements Of Section 2019.210 ................................................ 25

Gibson, Dunn & Crutcher LLP

Case 8:20-cv-00048-JVS-JDE Document 169-1 Filed 08/04/20 Page 4 of 35 Page ID #:19847

Pursuant to Federal Rule of Civil Procedure 37 and Local Rule 37-2, Defendant Apple Inc. ("Apple"), as movant, and Plaintiffs Masimo Corporation ("Masimo") and Cercacor Laboratories, Inc. ("Cercacor") (collectively, "Plaintiffs"), as respondents, respectfully submit the following Joint Stipulation regarding Apple's Motion to Compel Plaintiffs to Provide a Section 2019.210 Disclosure. Pursuant to Local Rule 37-1, the parties met and conferred in good faith following a letter from Apple laying out the grounds for this Motion, but were unable to resolve the disputes presented here. *See* Declaration of Ilissa Samplin ("Samplin Decl.") ¶¶ 9, 14.

# I. <u>INTRODUCTORY STATEMENTS</u>

## A. Apple's Introductory Statement

This *whole* case needs to move forward, not just the portion that Plaintiffs deem advantageous. To that end, Apple brings this Motion to Compel to require Plaintiffs to finally—after more than seven months—describe their alleged trade secrets with reasonable particularity consistent with California Code of Civil Procedure Section 2019.210 ("Section 2019.210").[1] Plaintiffs should provide a Disclosure within five days of the Court's order if Apple prevails.

A prompt Disclosure is consistent with *all* the purposes of Section 2019.210: If Plaintiffs have a valid trade secret claim, they should have been able to describe their trade secrets with reasonable particularity months ago, and certainly now; a Disclosure will assist the Court in determining the appropriate scope of discovery—indeed, that is impossible without a Disclosure; and Apple finally will be able to investigate this case and prepare its defenses. Plaintiffs' recent Motion for Preliminary injunction highlights all of these issues. Apple has been asking Plaintiffs to identify by page and line number any patent that allegedly discloses Plaintiffs' purported trade secrets for *five months*. Plaintiffs repeatedly refused to provide the information. Then, after gaining access to Apple's confidential information, Plaintiffs suddenly filed a Motion for Preliminary

---

[1] Hereinafter referred to as "Disclosure."

Gibson, Dunn & Crutcher LLP

Injunction, with a five-day opposition period, identifying a single patent that names Marcelo Lamego—a former employee who worked for Apple for six months six years ago—and that published in 2019. In other words, Plaintiffs are selectively, and strategically, advancing small portions of their ever-shifting trade secret case to maximum advantage, giving Apple mere days to address the gamesmanship. Absent a Disclosure, this imbalance will continue.

None of Plaintiffs' reasons for delay are appropriate. First, Plaintiffs refused to provide a Disclosure on the basis that Section 2019.210 does not apply in this case. This Court rejected that position. Then Plaintiffs insisted on waiting for the Protective Order. When the Protective Order was entered, they insisted on waiting until they filed the Second Amended Complaint ("SAC"). But now that they have filed the SAC, which is *not* an adequate description of Plaintiffs' purported secrets under Section 2019.210, Plaintiffs *still* refuse to provide a Disclosure. Plaintiffs continue to repeat that they will provide a disclosure at some unidentified "reasonable time" in "due course." The problem is that the reasonable time for producing a Disclosure passed long ago—Plaintiffs have had more than *six months* to back up the trade secret claim they filed at the beginning of the year.

Plaintiffs now claim that there will never be any date by which they must produce their Disclosure—and that Apple should not file this Motion—because the Court already ruled that there is no deadline for the Disclosure. Not so. Apple previously sought a stay—a Protective Order—until Plaintiffs provided a Disclosure. Plaintiffs argued that they did not need to provide a Disclosure before commencing discovery relating to trade secrets because Judge Selna's Scheduling Order stayed *only* trade secret discovery. The Court denied Apple's motion, and therefore Plaintiffs' counsel is reviewing Apple's core technical documents and source code. Apple is not re-litigating its previous argument or the Court's orders. Apple is raising an obvious problem that neither it nor the Court addressed: Plaintiffs' contention that they do not need to provide a Disclosure *until some unidentified time that they deem maximally advantageous to their case*. That new

Case 8:20-cv-00048-JVS-JDE Document 163-1 Filed 09/01/20 Page 6 of 35 Page ID #:11945

issue—separate from the question of whether Plaintiffs needed to provide a Disclosure *before* commencing discovery—is the subject of this Motion. Importantly, as far as Apple knows, the position in which it finds itself is unprecedented: Plaintiffs are alleging trade secret misappropriation, Plaintiffs have served discovery that this Court already has found relates to the alleged trade secrets, Plaintiffs are pursuing a preliminary injunction based on alleged secrets that are slowly trickling out whenever it suits Plaintiffs' interests, and Apple still has no Disclosure.

Apple is being prejudiced by Plaintiffs' delay in producing a Disclosure. Plaintiffs are moving forward with the portions of the case that they want to advance while preventing Apple from attacking the trade secrets allegations. The five days Apple has to oppose Plaintiffs' Motion for Preliminary Injunction is a perfect example—if Apple had a Disclosure, it would have begun preparing its defense long ago, and it should not be prevented from doing so forever. Delaying a description of alleged trade secrets is a common problem—it is the very reason why Section 2019.210 was enacted—and the Court should put a stop to it so Apple can begin defending itself against Plaintiffs' allegations of trade secret misappropriation.

## B. Plaintiffs' Introductory Statement

Apple's motion is long on rhetoric and void of support. It is a baseless attempt to reargue an issue on which it already lost many times. Apple has ***repeatedly*** asked this Court and Judge Selna to order Plaintiffs to provide a Section 2019.210 statement by a date certain. This Court and Judge Selna have repeatedly rejected that request. Apple's feigned desire to move this case forward contradicts its repeated motions and defiance of multiple court orders.

First, Apple moved for a protective order and requested the Court order Plaintiffs to "serve on Apple no later than seven (7) days of the date of this Order a Section

2019.210-compliant disclosure of their alleged trade secrets." Ex. 1 (Dkt. 43-5);[2] *see also* Ex. 2 (Dkt. 46) at 5.  This Court denied the request.  Ex. 3 (Dkt. 54) at 8-9.

Second, Apple objected to this Court's ruling under Rule 72 and asked Judge Selna to require Plaintiffs to provide a Section 2019.210 statement by a date certain.  Ex. 4 (Dkt. 57-1) at 1; Ex. 5 (Dkt. 57-17).  Apple even moved *ex parte* to stay this Court's order until Judge Selna decided the issue.  Dkt. 73.  Judge Selna denied Apple's *ex parte* application and then denied Apple's objections.  Dkt. 76; Ex. 6 (Dkt. 79).

Third, Apple specifically raised the issue with Judge Selna at a hearing on July 10 and again asked him to order Plaintiffs to produce a Section 2019.210 statement by a date certain.  Ex. 7 at 13:17-14:4.  Judge Selna rejected Apple's request.  *Id.* at 12:10-19; 14:11-15, 16:20-22.

As Judge Selna very recently found, Apple's arguments on Section 2019.210 have been litigated "multiple times" and "Apple has not prevailed."  Ex. 8 (Dkt. 92) at 2. Judge Selna threatened to sanction Apple and its counsel for stubbornly refusing to accept the Court's decisions:

> ***This issue has been litigated multiple times, and Apple has not prevailed***. Now is the time for Apple to act: The Court expects prompt and full compliance.  Any further recalcitrance on Apple's part will likely draw an application for contempt or sanctions under 28 U.S.C. § 1927 or an invitation from the Court to seek such relief.

*Id*.[3]

Apple attempts to evade the Court's clear orders by arguing its prior motions merely asserted Plaintiffs should not start ***discovery*** before they serve a Section 2019.210 statement.  Not so.  Apple unequivocally sought orders requiring Plaintiffs to provide a Section 2019.210 statement by a date certain.  This Court and Judge Selna repeatedly denied that relief.

---

[2] All citations to exhibits in Plaintiffs' sections are to the exhibits attached to the Declaration of Adam Powell, filed herewith.

[3] All emphasis in Plaintiffs' sections is added unless otherwise noted.

Apple even makes the identical arguments that this Court and Judge Selna already rejected. For example, Apple argues a Section 2019.210 disclosure is required because Plaintiffs will supposedly only provide a disclosure at "some unidentified time that they deem maximally advantageous to their case." But Apple already argued that identical speculation to this Court and Judge Selna. *See, e.g.,* Ex. 4 (Dkt. 57-1) at 2; Ex. 9 (Dkt. 71) at 10. This Court and Judge Selna both rejected that argument. *See* Ex. 3 (Dkt. 54); Ex. 6 (Dkt. 79). Similarly, Apple complains that "Plaintiffs have served discovery" that Apple contends relates to trade secrets but "Apple still has no [2019.210] Disclosure." Apple repeatedly made that same argument to this Court and Judge Selna. *See, e.g.*, Ex. 10 (Dkt. 43-1) at 3; Ex, 2 (Dkt. 46) at 1; Ex. 4 (Dkt. 57-1) at 5. This Court and Judge Selna both rejected that argument. *See* Ex. 3 (Dkt. 54); Ex. 6 (Dkt. 79).

Apple's continued unsupported complaints about the timing of Plaintiffs' Section 2019.210 statement also ignore the facts. Specifically, Apple's repeated claims that it desires to move the case forward are contradicted by the fact that it repeatedly refused to comply with the Scheduling Order requiring production of Apple's technical documents and recently ***moved to dismiss*** Plaintiffs' Second Amended Complaint ("SAC"). In its motion to dismiss, Apple argues Plaintiffs' ***pleading*** did not identify Plaintiffs' trade secrets with "sufficient particularity"—a similar standard to Section 2019.210. There is no reason for Plaintiffs to provide a Section 2019.210 statement when Apple is litigating the same issue right now before Judge Selna. Indeed, Apple fails to cite a single case that ever required a Section 2019.210 statement ***before*** the pleadings were closed. To the contrary, the only cases Apple cites requiring a date certain did so ***after*** the pleadings closed. It is far more efficient for the Court to resolve Apple's pleading challenge and Apple to answer the SAC ***before*** Plaintiffs provide a Section 2019.210 statement relating to those trade secrets.

Apple also claims Plaintiffs purportedly suggested they may provide a Section 2019.210 statement earlier. But Plaintiffs never agreed to provide a Section 2019.210 statement by any particular date. Moreover, all of the statements on which Apple relies

Case 8:20-cv-00048-JVS-JDE Document 169-1 Filed 08/04/20 Page 7 of 353 Page ID #:11992

were ***before*** Plaintiffs knew that Apple was going to continue challenging the pleadings. After Plaintiffs filed the SAC describing their trade secrets in substantial detail, Apple should have answered and moved this case forward. When Apple implied it may file another motion to dismiss, Plaintiffs explained that they should not have to provide a Section 2019.210 statement while the pleadings remained open. Apple then moved to dismiss the SAC on a similar standard as Section 2019.210.

Simply put, Apple has no basis for bringing yet another motion raising the same issue that it has repeatedly lost. Apple's attempt to reargue issues on which it lost has become a disturbing pattern in this case. The Court should deny Apple's Motion.

## II.  **APPLE'S POSITION**

### A.  **Factual Background**

Plaintiffs filed this case on January 9, 2020. Since then, Apple repeatedly has asked Plaintiffs to provide a Disclosure. Despite the seriousness of their allegations, Plaintiffs have not provided a Disclosure or even a date by which they will do so.

At first, Plaintiffs refused to comply with Section 2019.210 on the basis that it does not apply in federal court at all. Dkt. 33 at 14-15. Plaintiffs insisted that Apple serve an interrogatory seeking the same information (*id*.), undoubtedly because they wanted the flexibility to amend an interrogatory response throughout the discovery process based on what they find in Apple' files—which is one of the reasons why Section 2019.210 disclosures are necessary in trade secret cases. If Plaintiffs could respond to an interrogatory, they could and should have been able to provide a Disclosure. It is now clear that Plaintiffs never intended to provide a detailed description of their alleged secrets. Indeed, Plaintiffs objected to the application of Section 2019.210 in the parties' Rule 26(f) Report, but on April 17, 2020, the Court stayed trade secret discovery only pending compliance with Section 2019.210. Dkt. 37. Plaintiffs *still* did not provide a Disclosure.

In the intervening four months, Plaintiffs steadfastly refused to provide a Disclosure or to commit to a date by which they will do so. Plaintiffs continue to respond

to Apple's request with rote statements that they will provide a Disclosure in "due course" or at a "reasonable time." Below are just a few examples from the last four months.

April 21: "We will provide a Section 2019.210 disclosure *in due course*, but will need a Protective Order in place before doing so." Samplin Decl. ¶ 4 & Ex. A.

June 9: "Plaintiffs expect to provide a 2019.210 statement and other confidential information *within a reasonable time* period after entry of a protective order." *Id.* ¶ 6 & Ex. C.

June 12: "Nothing supports Apple's demand that Plaintiffs provide a date certain by which they will serve any 2019.210 statement. As we have repeatedly explained, Judge Selna's order did not require a 2019.210 statement at all, much less by a date certain." *Id.* ¶ 6 & Ex. C.

July 9: "Plaintiffs' Section 2019.210 statement is a different issue with no due date. Nonetheless, Plaintiffs will provide that statement *in due course*." *Id.* Ex. D.

July 16: "Plaintiffs are in the process of preparing an amended complaint, which will describe Plaintiffs' asserted trade secrets in more detail. Plaintiffs' amended complaint will be relevant to the scope of trade secret discovery in this case and the Section 2019.210 statement." *Id.* ¶ 8 & Ex. E.

July 30: Plaintiffs refused to provide a Disclosure or a deadline on the basis that Apple asked for a prompt Disclosure when Apple sought a stay of discovery. *Id.* ¶ 10 & Ex. E.

August 14: Plaintiffs serve belated amended responses to Apple's First Set of Interrogatories, identifying—for the very first time—a non-exhaustive list of patents that published in 2017, 2018, and 2019, that allegedly disclosed Plaintiffs' unspecified trade secrets, but not identifying by page and line number where the alleged trade secrets appear. *Id.* ¶ 11 & Ex. G. Plaintiffs could and should have disclosed this information at the beginning of the case—Apple began asking for it in March 2020 and repeatedly

followed up on the request. *Id.* ¶ 12 & Ex. H. Instead, Plaintiffs withheld the information.

<u>August 17</u>: Plaintiffs filed their Motion for Preliminary Injunction alleging that a patent that published in 2019 disclosed Plaintiffs' alleged trade secrets.

The problem, as set forth in more detail below, is that while the Court did not grant Apple's motion for a stay, it also did not rule that Plaintiffs can avoid providing a Disclosure forever. Furthermore, the Court recognized that at least some of the discovery that Plaintiffs already served is trade secret-related even if the discovery is not "solely" related to trade secrets. Dkt. 54 at 8. Thus, a Disclosure is required.

**B.  Legal Standard**

"[T]he California Legislature enacted [California Code of Civil Procedure] § 2019[.210] contemporaneously with, and as an integral part of, the Uniform Trade Secrets Act." *Computer Econ., Inc. v. Gartner Grp., Inc.*, 50 F. Supp. 2d 980, 991-92 (S.D. Cal. 1999). Section 2019.210 provides that in any action alleging misappropriation of trade secrets under CUTSA, "before commencing discovery relating to the trade secret, the party alleging the misappropriation shall identify the trade secret with reasonable particularity subject to any orders that may be appropriate under Section 3426.5 of the Civil Code." Cal. Civ. Proc. Code § 2019.210.

The early identification of trade secrets serves four purposes that are relevant here:

> First, it promotes well-investigated claims and dissuades the filing of meritless trade secret complaints. Second, it prevents plaintiffs from using the discovery process as a means to obtain the defendant's trade secrets. Third, the rule assists the court in framing the appropriate scope of discovery and in determining whether plaintiff's discovery requests fall within that scope. Fourth, it enables defendants to form complete and well-reasoned defenses, ensuring that they need not wait until the eve of trial to effectively defend against charges of trade secret misappropriation.

*Computer Econ.*, 50 F. Supp. 2d at 988-92.

Under Section 2019.210, a plaintiff is required "to identify or designate the trade secrets at issue with 'sufficient particularity' to limit the permissible scope of discovery by distinguishing the trade secrets 'from matters of general knowledge in the trade or of

special knowledge of those persons . . . skilled in the trade.'" *Advanced Modular Sputtering, Inc. v. Superior Court*, 132 Cal. App. 4th 826, 835 (2005) (quoting *IMAX Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164-65 (9th Cir. 1998)) (citation omitted).

Where "alleged trade secrets consist of incremental variations on, or advances in the state of the art in a highly specialized technical field, a more exacting level of particularity may be required to distinguish the alleged trade secrets from matters already known to persons skilled in that field." *Loop AI Labs Inc. v. Gatti*, 195 F. Supp. 3d 1107, 1112 (N.D. Cal. 2016) (citation and internal quotation marks omitted). "Catchall descriptions, lists of categories of alleged trade secrets in broad terms, or a listing of concepts that the plaintiff asserts constitute its trade secret information are all insufficient under Section 2019.210," as are "designations that are not sufficiently concrete, leaving room for the designating party to change the meaning of the trade secret after the completion of discovery." *M/A-COM Tech. Sols., Inc. v. Litrinium, Inc.*, 2019 WL 8108729, at *2 (C.D. Cal. Sept. 3, 2019) (Early, J.) (citation, internal alterations, and quotation marks omitted).

Even if discovery begins without a Disclosure, trade secret plaintiffs are not exempted from compliance with Section 2019.210. To the contrary, courts order plaintiffs in trade secret cases to comply with Section 2019.210 where, as here, there is no stay on discovery. In *Loop AI Labs Inc v. Gatti*, 2015 WL 9269758, at *4 (N.D. Cal. Dec. 21, 2015), for example, the court did not stay discovery on the non-trade secret claims, but ordered plaintiff to file and serve a Disclosure within 21 days.

Finally, a party should not be able to use a preliminary injunction to learn more about a defendant's information and defenses without a fixed Disclosure. Otherwise, the plaintiff can "reboot its alleged trade secrets lineup and try again when the opening skirmish illuminates glaring flaws in [plaintiff's] case. *Swarmify, Inc. v. Cloudflare, Inc.*, 2018 WL 2445515, at *3 (N.D. Cal. May 31, 2018) (permitting a new Disclosure after discovery commenced and after a motion for preliminary injunction was filed on

the condition that "the new disclosure would be the final definition of Swarmify's alleged trade secrets for this case").

### C.   Plaintiffs Should Provide A Disclosure Promptly

#### 1.   The Four Purposes of Section 2019.210 Are Served by a Prompt Disclosure

Plaintiffs' strategy of do little and delay in providing a Disclosure is a common one. "Trade secret plaintiffs rarely provide a precise and complete identification of the alleged trade secrets at issue without a court order requiring them to do so. This is a strategy, not an accident. The tactical advantages a plaintiff gains from non-identification are too tempting for a plaintiff to voluntarily provide such identification." *Perlan Therapeutics, Inc. v. Super. Ct.*, 178 Cal. App. 4th 1333, 1344 (2009) (internal quotations and citations omitted). Unless forced to identify its trade secrets with particularity as required by Section 2019.210, a plaintiff can make tactical use of discovery to "change its claims to conform to the information defendant revealed in discovery." *Social Apps, LLC v. Zynga, Inc.*, 2012 WL 2203063, at *2 (N.D. Cal. June 14, 2012). To state the obvious, "to prepare a defense against claims that it has misappropriated trade secrets, [the defendant] will need to know the substance of the secrets it has allegedly stolen," and the defendant cannot do so without that substance. *Via Techs., Inc. v. Asus Computer Int'l*, 2016 WL 5930280 at *3 (N.D. Cal. Oct. 12, 2016) (emphasis in original).

Plaintiffs' gamesmanship should not be allowed to continue. It frustrates all of the purposes of Section 2019.210 and prejudices Apple:

*First*, if Plaintiffs have a valid trade secret claim, they should have provided a Disclosure as early as possible. With every day that passes, it becomes more difficult to determine if Plaintiffs could have described a single valid trade secret without reviewing Apple's confidential information. The fact that the Court allowed Plaintiffs to access Apple's confidential information so that the patent case could move forward does not change this urgent need for the trade secret side of the case to also move forward:

"Experience has shown that it is easy to allege theft of trade secrets with vagueness, then take discovery into the defendants' files, and then cleverly specify whatever happens to be there as having been trade secrets stolen from plaintiff. *A true trade secret plaintiff ought to be able to identify, up front, and with specificity the particulars of the trade secrets without any discovery.*" *Jobscience, Inc. v. CVPartners, Inc.*, 2014 WL 852477, at *5 (N.D. Cal. Feb. 28, 2014) (emphasis added).

*Second*, a Disclosure will make it easy for the parties, and, if necessary, the Court, to determine if Plaintiffs are using discovery to obtain Apple's trade secrets. Right now, Plaintiffs can simply claim that discovery is not "solely" trade secret-related. The Disclosure will make it possible to determine if Plaintiffs' positions are legitimate. *Computer Econ.*, 50 F. Supp. 2d at 989 ("Only until a plaintiff identifies its allegedly misappropriated trade secrets can the court determine the relevance, and therefore the scope, of discovery.").

*Third*, a Disclosure will make it possible for the Court to frame the scope of discovery. Right now, neither Apple nor the Court have any way to frame discovery—there are no boundaries on Plaintiffs' trade secret misappropriation claim because the purported trade secrets have not been described with reasonable particularity. *Loop AI Labs Inc.*, 2015 WL 9269758, at *2–3 (rule requiring pre-discovery identification of trade secrets "assists the court in framing the appropriate scope of discovery and in determining whether plaintiff's discovery requests fall within that scope").

*Fourth*, without a Disclosure, Apple is in the dark as to how to prepare its defense in this case. *Jobscience, Inc.*, 2014 WL 1724763, at *2 ("Defendants cannot reasonably prepare [their] defenses and search for art in the field if the boundaries of the trade secret are … undetermined"). Plaintiffs accuse the Apple Watch of incorporating Plaintiffs' confidential information, but without a Disclosure, Apple has no idea what part of the Apple Watch incorporates any confidential information. Likewise, Plaintiffs accuse Apple of disclosing Plaintiffs' confidential information in patent filings, but Apple does not have a complete list of such patent filings (Plaintiffs' interrogatory response lists

examples) or any indication of where in those filings the alleged secrets appear (Plaintiffs have not pointed to line or page numbers for any patent filing). Apple has been repeatedly asking for identification of the patent filings, including line and page numbers, for *five months*. Plaintiffs withheld information about any patents that allegedly disclose their trade secrets until Friday, August 14, 2020, when they could spring those allegations to maximum advantage in their Motion for Preliminary Injunction filed the following Monday, on August 17, 2020. Samplin Decl. ¶ 11 & Ex. G.

### 2. None of Plaintiffs' Excuses for Delay Are Proper

The Court rejected Plaintiffs' arguments that (a) Section 2019.210 does not apply to this case, and (b) that Apple should serve an interrogatory instead of seeking a Disclosure. *See* Dkt. 33 (Joint 26(f) Report); Dkt. 37 (staying trade secret discovery "only pending compliance with 2019.210").

Plaintiffs' delay pending entry of the Protective Order was also improper. *Soc. Apps, LLC v. Zynga, Inc.*, 2012 WL 2203063, at *5 (N.D. Cal. June 14, 2012) (finding trade secret disclosure insufficient and ordering plaintiff to serve an amended disclosure, noting "[t]he Court is mindful that an identification of the trade secrets at issue might require a protective order or sealing order . . . [h]owever, the need to seek further protective or sealing orders does not excuse [plaintiff's] failure to identify the trade secrets."). Furthermore, Apple offered to treat the disclosure as Attorneys' Eyes Only— which, under the Protective Order in this case, permits the Disclosure to be shared only with Apple's outside counsel, and does not permit even Apple's in-house litigation counsel to view it—yet Plaintiffs still refused to produce it.

Plaintiffs' delay pending the filing of the SAC was also improper. It is well-established that the standard for pleading a trade secret claim is different from the standard for providing a reasonably particular description under Section 2019.210. *M/A-COM Tech. Sols., Inc.*, 2019 WL 4284523, at *3 ("A finding that allegations are sufficient to survive a motion to dismiss does not mean the trade secret allegations are

1   sufficient under Section 2019.210."); *Gatan, Inc.*, 2018 WL 2117379, at *2 (noting the

2   district court's finding that trade secret allegations were sufficient to survive a motion

3   to dismiss "did not prejudge whether plaintiff's trade secret allegations satisfied

4   § 2019.210," and concluding the disclosures were insufficient under Section 2019.210).

5       The Court should reject any suggestion that the SAC is a sufficient Disclosure.

6   An adequate Disclosure under Section 2019.210 at a minimum first "must clearly

7   identify what the 'thing' is that is alleged to be a trade secret, and second, [Plaintiffs]

8   must be able to clearly articulate why that 'thing' belongs in the legal category of trade

9   secret." *Agency Solutions.Com, LLC v. TriZetto Grp., Inc.*, 819 F. Supp. 2d 1001, 1015

10   (E.D. Cal. 2011). The SAC, however, is rife with language that courts have held

11   improper in a Disclosure under Section 2019.210. As this Court held in another case,

12   "catchall" descriptions, a "lists [of] categories of alleged trade secrets in broad terms,"

13   or "a listing of concepts that [the plaintiff] asserts constitute its trade secret information"

14   are all insufficient under Section 2019.210. *M/A-COM Tech. Sols., Inc*, 2019 WL

15   4284523, at *2 (citing *Loop AI Labs Inc.*, 195 F. Supp. 3d at 1113-114); *see also Gatan,*

16   *Inc.*, 2018 WL 2117379, at *3 (noting the "use of catchall words such as 'including'

17   weighs against a finding that the designation satisfies § 2019.210"). Designations that

18   are not sufficiently concrete, leaving room for the designating party to change the

19   meaning of the trade secret after the completion of discovery, are inadequate. *M/A-COM*

20   *Tech. Sols., Inc.*, 2019 WL 4284523, at *2 (noting the words "details of" a process or

21   product, without specifying those details, are inadequate under § 2019.210); *see also*

22   *Jobscience, Inc.*, 2014 WL 852477, at *5 (applying § 2019.210, noting "it is easy to

23   allege theft of trade secrets with vagueness, then take discovery into the defendants'

24   files, and then cleverly specify whatever happens to be there as having been trade secrets

25   stolen from plaintiff," and requiring the plaintiff to "identify, up front, and with

26   specificity the particulars of the trade secrets without discovery").

27       The SAC's introductory paragraph setting out Plaintiffs' alleged secrets already

28   was found to be too vague to pass even the pleading standard. Dkt. 60 at 7. The next

nine paragraphs describe five broad categories of techniques and strategies. Each category runs afoul of the cases prohibiting catchall phrases and high-level descriptions that enable the plaintiff to keep shifting the purported secrets. Each category in the SAC lists a "technique" or "strategy," the "value and importance of such" technique or strategy, followed by the catchall word "including," and then various sub-categories. *See, e.g.*, SAC ¶¶ 41, 43, 45, 47. Then, rather than identifying a specific document or code, Plaintiffs claim that "Plaintiffs' documents that relate to the trade secrets in the preceding paragraph include [documents by bates number]." *Id*. ¶¶ 42, 44, 46, 48. These paragraphs fail to identify any alleged trade secrets with "'sufficient particularity' to limit the permissible scope of discovery by distinguishing the trade secrets 'from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade.'" *Advanced Modular Sputtering*, 132 Cal. App. 4th at 835 (quoting *IMAX Corp.*, 152 F.3d at 1164-65) (citation omitted). Indeed, the SAC does nothing to distinguish the purported secrets alleged therein from public information. *See, e.g.*, *Perlan Therapeutics*, 178 Cal. App. 4th at 1352 (Section 2019.210 disclosure inadequate where plaintiff "did not clearly explain how its secrets (or secret combinations of publicly available processes) differed from publicly available knowledge"); *Bladeroom Grp. Ltd. v. Facebook, Inc.*, 2015 WL 8028294 at *4 (N.D. Cal. Dec. 7, 2015) (trade secret disclosures inadequate where it unclear "which aspects are publicly known and which are not"); *Top Agent Network, Inc. v. Zillow, Inc.*, 2015 WL 7709655, at *5 (N.D. Cal. Apr. 13, 2015) ("failure to distinguish the allegedly shared trade secrets from non-trade secret information renders [misappropriation] claim defective").

In sum, the SAC is not sufficiently particular, leaves Plaintiffs ample room to shift their trade secret allegations during the life of the case, and therefore cannot serve as a Disclosure under Section 2019.210. Lest there be any doubt about this, Plaintiffs' Motion for Preliminary Injunction shifts the sands again: Plaintiffs allege disclosure in a patent that appears nowhere in the SAC. Dkt. 111-1. Thus, there can be no dispute that the SAC does not even include, let alone describe, the alleged trade secrets.

And while Plaintiffs' belated amended responses to Apple's trade secret-related interrogatories—served on the Friday before Plaintiffs filed their Motion for Preliminary Injunction the following Monday—identify the patent referenced in the Motion for Preliminary Injunction, they in all other respects suffer from the exact same deficiencies as the SAC. The interrogatory responses provide merely the same broad overview of the alleged trade secrets as that contained in the SAC, without the more particularized information requested by the interrogatories (e.g., the identity of each person involved in the conception, design, development, and/or use of each alleged trade secrets, and the specific efforts taken to maintain the secrecy of each specific alleged secret). *See* Samplin Decl. Ex. G. Thus, the interrogatory responses are on their face deficient—and certainly do not satisfy Plaintiffs' Disclosure requirement in any event.

### 3.    The Lack of a Disclosure Prejudices Apple

Apple cannot defend against trade secrets that have not been identified with reasonable particularity. To give but a few examples, by refusing to describe the alleged trade secrets with specificity, Plaintiffs make it impossible for Apple to investigate if any part of the Apple Watch or Apple's patents incorporate any of Plaintiffs' confidential information. Furthermore, if there are valid trade secrets here—and there is nothing to suggest that there are—Apple has no ability to identify those secrets and remove them from the Apple Watch or Apple patent filings or otherwise remedy any alleged misappropriation. It not only defies common sense that a true trade secret plaintiff would not want identify its alleged secrets quickly (to stop a defendant from continuing to use or disclose the secrets), it also is unfair to allow Plaintiffs to run up alleged damages by keeping Apple from curing any alleged misappropriation. The recent Motion for Preliminary Injunction is a prime example: Apple should not be left with just a few days to analyze trade secrets that trickle out in motions with short opposition periods; that does not give Apple a fair opportunity to defend itself. If Plaintiffs are permitted to stay the course, Apple will be forced to "wait until the eve of

trial to effectively defend against charges of trade secret misappropriation." *Computer Econ.*, 50 F. Supp. 2d at 988-92.

Again, this whole case should move forward, not just the portions that Plaintiffs deem most advantageous at the moment. Plaintiffs made weighty trade secret allegations, and now they need to back them up.

### 4. The Court's Denial of Apple's Motion for a Protective Order Does Not Mean that Plaintiffs Can Delay Forever

Plaintiffs' latest excuse for delay is that "Apple asked for a date certain in both its motion for protective order and objections to Judge Early's ruling. Dkt. 43-5, Dkt. 57-17. Both Judge Early and Judge Selna denied Apple's request." Samplin Decl. ¶ 10 & Ex. E. The problem with this excuse is that Apple previously asked for production of a Disclosure *before* discovery commenced. Dkt. 43. Apple did not brief—and the Court did not decide—the unprecedented suggestion by Plaintiffs that they should be able to delay production of a Disclosure until some unspecified, future date that is best for their case (and harmful to Apple's case).

Thus, contrary to Plaintiffs' contention, Apple is not asking to re-litigate old issues or revisit a prior ruling. Apple lost its Motion for a Protective Order and Plaintiffs' lawyers are reviewing Apple's core technical documents and source code. Apple believes that this is improper, but it is moving forward. To begin to prepare a defense to Plaintiffs' trade secret misappropriation claim, however, Apple needs a Disclosure (even if Plaintiffs have the benefit of Apple's confidential information in drafting the Disclosure). Apple should not be forced to wait any longer, let alone until trial, to finally learn the details of the allegations against it.

### D. Conclusion

Within five days of an order from this Court, Plaintiffs should serve on Apple a Disclosure that includes: (1) a summary of the specific, alleged trade secrets; (2) the background of the alleged trade secrets and a description of how each alleged secret has derived independent, actual or potential economic value by virtue of not being generally

known to the public; (3) a description of how each alleged secret has been the subject of reasonable efforts to maintain its secrecy; and finally (4) each of the precise claimed trade secrets, numbered, with a list of the specific elements for each, as claims would appear at the end of a patent.

## III.   **PLAINTIFFS' POSITION**

Plaintiffs would like nothing more than to move this case forward. However, the Apple's refusal to comply with the Scheduling Order and repeated arguments regarding Section 2019.210 have taken months to resolve. Judge Selna eventually threatened Apple with sanctions for failure to comply. Apple has repeatedly proclaimed that it intends to litigate the sufficiency of Plaintiffs' identification of trade secret as long as it possibly can, regardless of how specific Plaintiffs' disclosure is. Plaintiffs have long suggested to Apple a willingness to agree to mutual exchange dates for a Section 2019.210 statement and Apple's full production of documents. Apple was never willing to even discuss such an exchange. Apparently, Apple's idea of "moving the case forward" is to delay its own discovery obligations and prolong the pleadings as long as possible.

### A.   **Factual Background**

Both this Court and Judge Selna have already rejected the relief sought by Apple many times. First, Apple argued that Judge Selna should bar patent discovery until Plaintiffs provided an "adequate" Section 2019.210 statement. Ex. 11 (Dkt. 33) at 26, n.6. Judge Selna rejected that argument and stayed "trade secret discovery only . . .." Ex. 12 (Dkt. 37). Notably, Judge Selna entered a Scheduling Order that did ***not*** set a deadline for Plaintiffs to serve a Section 2019.210 statement.

Second, despite Judge Selna's clear decision, Apple sought a contrary ruling from this Court. Apple requested an order halting all discovery and requiring Plaintiffs to produce a Section 2019.210 disclosure within seven days. Ex. 1 (Dkt. 43-5). Apple argued that "Plaintiffs are wrong to contend that they can provide a Section 2019.210 disclosure whenever *they* decide that discovery is trade secret-related" and that "[t]he

Gibson, Dunn & Crutcher LLP

Court should order Plaintiffs to serve their [Section 2019.210] disclosure by May 28, 2020." Ex. 2 (Dkt. 46) at 1, 5 (emphasis in original); *see also* Ex. 1 (Dkt. 43-5). This Court rejected Apple's argument and denied Apple's Motion. Ex. 3 (Dkt. 54) at 8-9.

Third, unsatisfied with this Court's Order, Apple objected under Rule 72 and filed an *ex parte* application to stay this Court's Order. Ex. 4 (Dkt. 57-1); Dkt. 73. Again, Apple requested that Judge Selna "promptly require a Section 2019.210 disclosure," arguing Judge Selna had previously "ordered Section 2019.210 compliance." Ex. 4 (Dkt. 57-1) at 13; Ex. 9 (Dkt. 71) at 11. Judge Selna rejected Apple's request by denying both the application to stay and Apple's objections. *See* Dkt. 76; Ex. 6 (Dkt. 79).

Fourth, while Apple's objections were pending, Apple raised the issue again at a hearing before Judge Selna. Apple argued that Judge Selna should require "the [Section 2019] disclosure or that **date certain** and an order that it can't be changed without good cause." Ex. 7 at 13:17-14:4. Judge Selna rejected that request. *Id.* at 12:10-13; 14:11-15, 16:20-22.

Fifth, undeterred by Judge Selna and this Court's repeated orders, Apple unilaterally conditioned patent discovery on Section 2019.210. Apple attempted to impose an "ethical wall" prohibiting counsel who have access to Apple's confidential information from drafting or revising Plaintiffs' Section 2019.210 statement. Ex. 13 at 158. Apple thus attempted to impose its own condition requiring Plaintiffs to either (1) provide a Section 2019.210 statement immediately or (2) segregate its counsel into two separate teams that could not coordinate. Judge Selna ordered Apple to remove its unilateral "wall" and proceed with patent discovery. Ex. 8 at 1 (Dkt. 92). Judge Selna admonished Apple:

> ***This issue has been litigated multiple times, and Apple has not prevailed***. Now is the time for Apple to act: The Court expects prompt and full compliance. Any further recalcitrance on Apple's part will likely draw an application for contempt or sanctions under 28 U.S.C. § 1927 or an invitation from the Court to seek such relief.

*Id.* at 2. In continued defiance of this Court and Judge Selna's numerous orders, Apple now brings yet another motion seeking an order requiring Plaintiffs' to serve a Section 2019.210 statement by a date certain.

### B. Argument

#### 1. This Court and Judge Selna Have Denied Apple's Request Numerous Times

This Court and Judge Selna have collectively denied Apple's requests for a date certain at least ***three separate times***—once in this Court's order denying Apple's motion for a protective order (Ex. 3 (Dkt. 54)), once in Judge Selna's order denying Apple's objections (Ex. 6 (Dkt. 79)), and once at a hearing before Judge Selna (Ex. 7 at 12:10-13; 14:11-15, 16:20-22). Judge Selna also rejected Apple's many attempts at self-help in refusing to participate in patent discovery pending an "adequate" Section 2019.210 statement. Those decisions are now law of the case. *SAS v. Sawabeh Information Services Co.*, No. CV 11-04147 MMM (MANx),2015 WL 12763541, at *6 (C.D. Cal., June 22, 2015) ("Under the law of the case doctrine, a court is generally precluded from reconsidering an issue that has already been decided by the same court.") (quoting *United States v. Almazan–Becerra*, 537 F.3d 1094, 1096–97 (9th Cir. 2008)). Apple cannot circumvent these decisions by filing yet another motion seeking ***identical*** relief. Apple's Motion should be denied.

Apple attempts to sidestep these prior orders by claiming its prior motions merely argued Plaintiffs should not start ***discovery*** before they serve a Section 2019.210 statement. Not so. Apple unequivocally sought an order requiring Plaintiffs to provide a Section 2019.210 statement by a date certain. Indeed, Apple's proposed order stated: "Plaintiffs shall serve on Apple no later than seven (7) days of the date of this Order a Section 2019.210-compliant disclosure of their alleged trade secrets." Ex. 1 (Dkt. 43-5). This Court ***denied*** that relief. Ex. 3 (Dkt. 54). Judge Selna similarly overruled Apple's objections and denied Plaintiffs' ongoing attempts to require a Section 2019.210 disclosure by a particular date. Ex. 9 (Dkt. 71) at 13-15 (Apple requesting the same

Gibson, Dunn & Crutcher LLP

relief again); Ex. 6 (Dkt. 79) (Judge Selna denying the same relief again.); Ex. 7 at 13:17-14:4 (Apple requesting the same relief at a hearing); *Id.* at 12:10-13, 14:11-15, 16:20-22 (Judge Selna rejecting the relief).

Apple's present Motion seeks the identical relief it sought in its prior motions. Joint Stipulation at 1 (requesting "[d]isclosure within five days of the Court's order"). But Apple's arguments are essentially unchanged. Indeed, large swaths of Apple's arguments above track Apple's previous arguments. *Compare* Joint Stipulation Section II.C.1, *supra* ("The Four Purposes of Section 2019.210 Are Served by a Prompt Disclosure") *with* Ex. 10 (Dkt. 43-1) at 21-28 (section entitled "Plaintiffs' Refusal To Comply With Section 2019.210 Frustrates Each Of The **Four Purposes** Of The Statute") *and* Ex. 4 (Dkt. 57-1) at 8-13 (section entitled "Magistrate Judge Early's Order Is Inconsistent with the Purpose of Section 2019.210"). Apple even seeks to relitigate the issue of whether Plaintiffs served patent discovery, claiming that "Plaintiffs have served discovery that this Court already has found relates to the alleged trade secrets." Joint Stipulation at 3. In reality, this Court and Judge Selna found that Plaintiffs served *patent* discovery that "at most" only "arguably seek some of the same categories of information relevant to Plaintiffs' trade secrets." Ex. 6 (Dkt. 79) at 4 (internal quotations omitted). This Court should reject Apple's fourth attempt to litigate this issue.

## 2. Plaintiffs Are Not Required To Serve A Section 2019.210 Statement By A Date Certain

Apple's arguments have not improved since this Court and Judge Selna previously rejected them. Nothing requires Plaintiffs to provide a Section 2019.210 statement at this stage. Indeed, the California legislature specifically *rejected* including a date certain requirement in Section 2019.210. *See* Ex. 14 at 168, 172-73. The initial legislative proposal required disclosure within 60 days of filing suit. *Id* at 172-73. The final statute contains no such requirement. *See* Cal. Civ. Code § 2019.210. Thus, the legislature necessarily determined that a date certain was not required.

Apple likewise cites no case law supporting its position. Apple's cases requiring a Section 2019.210 statement by a date certain required such a disclosure **after** the defendant **answered** the complaint. *See Loop AI Labs Inc v. Gatti*, No. 15-cv-00798-HSG-DMR, 2015 WL 9269758, at *4 (N.D. Cal. Dec. 21, 2015) (Order requiring a Section 2019.210 statement by January 11, 2016); Ex. 15 (Answer filed September 16, 2015); *Jobscience, Inc. v. CVPartners*, Inc., No. C-13-04519-WHA, 2014 WL 852477, at *5 (N.D. Cal. Feb. 28, 2014) (ordering plaintiff to produce a Section 2019.210 statement after defendant answers). Nothing requires Plaintiffs to serve a Section 2019.210 statement before even seeing Apple's answer, including any defenses.

None of Apple's other arguments have merit. First, Apple complains that if "Plaintiffs are permitted to stay the course, Apple will be forced to 'wait until the eve of trial to effectively defend against charges of trade secret misappropriation.'" Joint Stipulation at 15-16 (*citing Computer Econ., Inc. c. Gartner Group, Inc*, 50 F. Supp. 2d 980, 988-92 (S.D. Cal. 1999). That argument must be intended as hyperbole, because this is clearly not the "eve of trial." Apple has not even answered the Complaint, and trial is not scheduled until April **2022**.

Second, Apple points to Plaintiffs' prior statements that a Protective Order would be necessary before Plaintiffs provided a Section 2019.210 statement. But as Apple pointed out, with a string of quotes, Plaintiffs never agreed to a specific deadline. Moreover, all of those statements were **before** Apple told Plaintiffs they planned to move to dismiss the SAC. After Plaintiffs filed the SAC describing their trade secrets in more detail, Apple should have answered and allowed this case to move forward. When Apple implied it may file another motion to dismiss, Plaintiffs explained that they should not have to provide a Section 2019.210 statement while the pleadings remained open. Powell Decl. ¶ 2. It is not appropriate for Apple to demand a Section 2019.210 statement while Apple continues to challenge the trade secret pleadings.

Third, Apple argues Plaintiffs are not entitled to rely on the recently filed SAC because "the standard for pleading a trade secret claim is different from the standard for

Gibson, Dunn & Crutcher LLP

Joint Stip. Re Apple's Mot. to Compel 21 Case No. 8:20-cv-00048-JVS (JDEx)

providing a reasonably particular description under Section 2019.210."[4]  But that hardly supports Apple's argument.  This Court should not require Plaintiffs to serve a Section 2019.210 statement while the parties are addressing the adequacy of Plaintiffs' SAC in motion practice before Judge Selna.  Apple puts the cart before the horse by demanding that Plaintiffs simultaneously provide two separate trade secret disclosures that will be addressed by two separate Judges.

Indeed, in its motion to dismiss, Apple makes arguments nearly identical to the arguments Apple will undoubtedly make when, as it has promised, it challenges Plaintiffs' Section 2019.210 statement regardless of the detail provided.  No law or logic requires Plaintiffs to serve a Section 2019.210 statement inviting Apple to bring the *same* challenges and make the *same* arguments before this Court.

### 3. None of Apple's Policy Arguments Justify Apple's Attempt To Relitigate These Issues

Rather than identify any authority supporting its position, Apple resorts to speculation and policy arguments.  But none of Apple's policy arguments support Apple's attempt to relitigate issues it already lost.  Indeed, Apple made matching arguments in its unsuccessful motions to this Court and Judge Selna.  Ex. 10 (Dkt. 43-1) at 21-28; Ex. 4 (Dkt. 57-1) at 8-13.  The Court may wish to review Apple's arguments in its objections to this Court's previous order, which closely track its arguments above. *See, e.g.*, Ex. 4 (Dkt. 57-1) at 8-13 ("Magistrate Judge Early's Order Is Inconsistent with the Purpose of Section 2019.210").  Judge Selna rejected those arguments.  Ex. 6 (Dkt. 79).  Nothing justifies Apple's attempt to obtain a different ruling from this Court.

Regardless, Apple's policy arguments are just as unpersuasive as they were the last time Apple asserted them.  First, Apple argues that Plaintiffs "should have provided a disclosure as early as possible" because "[w]ith every day that passes, it becomes more

---

[4] Apple also argues that the SAC does not satisfy Section 2019.210.  Apple's argument is irrelevant because Apple acknowledges Section 2019.210 does not apply to pleadings.

Gibson, Dunn &
Crutcher LLP

difficult to determine if Plaintiffs could have described a single valid trade secret without reviewing Apple's confidential information." Joint Stipulation at 10. But Plaintiffs already identified numerous trade secrets in the SAC before Apple produced *any* confidential discovery. Dkt. 89-1 ¶¶ 41-50. Plaintiffs have also now provided strong evidence of Apple's misappropriation in their pending Motion for Preliminary Injunction. *See, e.g.*, Dkt. 116 at 7-10.

Moreover, Apple's argument makes no sense because Plaintiffs will still have to prove ownership and misappropriation at trial. Indeed, despite Apple's desire to cast a Section 2019.210 statement in stone, its *own* cited authority acknowledges that plaintiffs are *permitted* to amend trade secret disclosures based on evidence uncovered in discovery. *Perlan Therapeutics, Inc. v. Superior Court*, 178 Cal.App.4th 1333, 1350 (Cal.App. 4 Dist., 2009) ("If, through discovery, Perlan uncovers information suggesting defendants misappropriated additional trade secrets, it may have good cause to amend its trade secret statement under appropriate circumstances."); *see also Swarmfly, Inc. v. Cloudfare, Inc.*, No. 17-06957-WHA, 2018 WL 2445515 at *3 (N.D. Cal. May 31, 2018) (allowing plaintiffs to amend its Section 2019.210 statement after receiving discovery). Apple's cited case, *Jobscience*, does not hold otherwise and even allowed the plaintiffs to review the defendant's source code *before* serving a Section 2019.210 statement. Ex. 16 at 22:7-23:24, 30:19- 31:7; *see also Jobscience,* 2014 WL 852477 at *6 ("This order need not address the inspection and discovery problems concerning the source code ordered at the hearing orally.").

Second, Apple argues that a Section 2019.210 statement would make it possible to determine "if Plaintiffs are using discovery to obtain Apple's trade secrets" by serving discovery that is "solely" trade secret-related. Joint Statement at 11. But the Court can already make this determination—discovery is not "solely" related to trade secrets if it is relevant to Plaintiffs' patent case. Whether the discovery is *also* relevant in some way to trade secrets is irrelevant. Apples cited case does not show otherwise. *See Computer Econ.*, 50 F.Supp.2d at 989. Instead, it explained that a trade secret disclosure allows

courts to determine what discovery was relevant to those **trade secrets**. Plaintiffs have not yet served trade secret discovery.

Third, Apple argues a Section 2019.210 statement would "make it possible for the Court to frame the scope of discovery." Joint Stipulation at 11. But a Section 2019.210 statement is irrelevant to the patent discovery that Plaintiffs served. The Court has no need to frame the scope of trade secret discovery because Plaintiffs have not served trade secret discovery. Apple's cited case again addressed the scope of **trade secret** discovery and is not relevant here. *See Loop AI Labs Inc.*, 2015 WL 9269758, at *2–3.

Fourth, Apple argues that "it is in the dark as to how to prepare its defense in this case" without a Section 2019.210 statement. Joint Stipulation at 11. But trial is not until April **2022,** and Apple is still challenging the pleadings. Apple complains that Plaintiffs' Motion for Preliminary Injunction demonstrates Apple's inability to prepare defenses. Joint Stipulation at 9. But the Motion for Preliminary Injunction concerns the **precise trade secret** that Plaintiffs identified in the SAC nearly **one month** earlier. *Compare* Dkt. 89-1, ¶ 41 *with* Dkt. 116 at 7-9. Apple cannot ignore Plaintiffs' disclosures and feign ignorance.[5]

Apple's cited case, *Jobscience*, is distinguishable. There, the court faulted plaintiffs for not defining trade secrets with the requisite specificity almost two months **after** defendant had answered the complaint. *See* Ex. 17 (answer filed on March 14, 2014). Here, Apple has not answered the SAC and has made it clear it will not do so anytime soon. There is no prejudice to Apple in maintaining a stay on trade secret discovery until the pleadings close. Indeed, Apple requested that stay. Apple's incessant

---

[5] Apple also claims the confidential documents it produced somehow guided the trade secrets in Plaintiffs' Motion for Preliminary Injunction, but provides no factual support. The motion addresses an Apple patent **publication** that disclosed Plaintiffs' trade secrets, completely unrelated to any confidential documents Apple produced. Further, Plaintiffs described the exact same trade secrets in the SAC before reviewing any Apple confidential information.

requests for an early Section 2019.210 statement is obviously not about "moving the case forward."

Moreover, Plaintiffs' actions are entirely consistent with the true purpose of Section 2019.210. As Apple's own cited case explains, the purpose of Section 2019.210 is to prevent plaintiffs from "driving a competitor out of business" by serving "extensive discovery which the new business is ill equipped to afford." *Computer Econ.*, 50 F. Supp. 2d at 985 n.6. As Apple itself explained, it "is one of the largest technology companies in the world." Dkt. 61-1 at 5. There is no risk that Plaintiffs could drive *Apple* out of business by serving discovery requests, especially when trade secret discovery is stayed.

### 4. Apple's Requested Relief Again Far Exceeds The Requirements Of Section 2019.210

Finally, Apple again seeks relief that far exceeds the "reasonable particularity" requirement of Section 2019.210. *See* Joint Statement at 16-17. Specifically, Apple demands that Plaintiffs also provide background information about the trade secret, contentions regarding economic value, contentions regarding efforts to maintain secrecy, and format the trade secrets as a list of specific elements "as claims would appear at the end of a patent." *Id.* Judge Selna and this Court already rejected the *identical* request. *See* Ex. 11 (Dkt. 33) at 20 (Apple requesting *identical* relief in the Rule 26(f)); Ex. 12 (Dkt. 37) (Court order requiring only "compliance with 2019.210"); Ex. 10 (Dkt. 43-1) at 28 (Apple requesting this relief in front of this Court); Ex. 3 (Dkt. 54) (this Court denying the requested relief); Ex. 9 (Dkt. 71) at 13-15 (Apple requesting the same relief again in front of Judge Selna); Ex. 6 (Dkt. 79) (Judge Selna denying the same relief again.). This Court should reject Apple's fourth attempt at a do-over.

Apple cites *no authority* for these additional requirements. Indeed, Apple previously acknowledged it was asking for *more* than mere compliance with Section 2019.210. Ex. 10 (Dkt. 43-1) at 28 (Apple's prior request for an order requiring Plaintiffs to "[1] identify their alleged trade secrets with the reasonable particularity

Section 2019.210 requires; *and* [2] order Plaintiffs to serve on counsel a statement, under seal, that includes [the additional requirements]").

In prior briefing, Plaintiffs argued Apple had cited *no authority* for its request. *Id.* at 39-40; Ex. 18 (Dkt. 64) at 18-19. Apple's reply brief on its Rule 72 objections identified three cases for the first time when Plaintiffs had no opportunity to respond. Ex. 9 (Dkt. 71) at 13-15. Apple's decision to again not cite any support for its request indicates that Apple apparently intends to sandbag Plaintiffs again by citing new cases when Plaintiffs again have no opportunity to respond. That is, of course, improper.

To the extent Apple cites the same cases in a supplemental memorandum, none of those cases support its position. Three cases were from the Northern District of California and merely cited to each other and imposed these requirements without discussion. Dkt. 71 at 13-15 (citing *Jobscience,* 2014 WL 852477, at *5; *Openwave Messaging, Inc. v. Open-Xchange, Inc.*, No. 16-cv-00253-WHO, 2018 WL 2117424 (N.D. Cal. May 8, 2018) (citing *Jobscience*); *Gatan, Inc. v. Nion Co.*, No. 15-cv-01862-PJH, 2018 WL 2117379 (N.D. Cal. May 8, 2018) (same)). Apple's fourth case, which is from this District, found a Section 2019.210 disclosure sufficient even though it did *not* contain the additional requirements that Apple asks this Court to impose. *See Bal Seal Eng'g, Inc. v. Nelson Prod., Inc.*, No. 13-cv-01880-JLS-KES, 2017 WL 10543565, at *3, *6 (C.D. Cal. Mar. 13, 2017).

As the California Court of Appeals explained, Section 2019.210 may be satisfied by any showing that is "reasonable, i.e. fair, proper, just, and rational, under all of the circumstances . . .." *Advanced Modular Sputtering, Inc. v. Superior Court*, 132 Cal. App. 4th 826, 836 (2005) (internal quotations and citation omitted). Apple's suggested additions are nowhere to be found in the statue and inconsistent with the cases interpreting the statute. Nothing justifies Apple's baseless attempt to relitigate these issues. The Court should deny Apple's motion.

Gibson, Dunn &
Crutcher LLP

Case 8:20-cv-00048-JVS-JDE Document 260-1 Filed 12/30/20 Page 188 of 353 Page ID
#:20073
Case 8:20-cv-00048-JVS-JDE Document 99-1 Filed 09/04/20 Page 90 of 353 Page ID
#:11073

Dated: September 1, 2020        GIBSON, DUNN & CRUTCHER LLP

By:    /s/ *Joshua H. Lerner*
      Joshua H. Lerner
      H. Mark Lyon
      Brian M. Buroker
      Brian A. Rosenthal
      Ilissa Samplin
      Brian K. Andrea
      Angelique Kaounis

*Attorneys for Defendant Apple Inc.*

Dated: September 1, 2020       KNOBBE, MARTENS, OLSON & BEAR LLP

By:    /s/ *Adam B. Powell*
      Joseph R. Re
      Stephen C Jensen
      Perry D. Oldham
      Stephen W Larson
      Adam B. Powell

*Attorneys for Plaintiffs Masimo Corporation and Cercacor Laboratories, Inc.*

33386406

# Exhibit Q

```
                  UNITED STATES DISTRICT COURT
                  CENTRAL DISTRICT OF CALIFORNIA
                  (SOUTHERN DIVISION - SANTA ANA)




MASIMO CORPORATION, ET AL,    ) CASE NO: 8:20-CV-00048-JVS-JDEx
                              )
              Plaintiffs,     )            CIVIL
                              )
     vs.                      )      Santa Ana, California
                              )
APPLE, INC,                   )  Wednesday, September 2, 2020
                              )
              Defendant.      )    (3:01 p.m. to 3:45 p.m.)


   TELEPHONIC CONFERENCE RE DEFENDANT'S MOTION TO COMPEL [169]

             BEFORE THE HONORABLE JOHN D. EARLY,
                UNITED STATES MAGISTRATE JUDGE




APPEARANCES:              SEE PAGE 2



Court Reporter:          Recorded; CourtSmart

Courtroom Deputy:        Maria Barr

Transcribed by:          Exceptional Reporting Services, Inc.
                         P.O. Box 8365
                         Corpus Christi, TX 78468
                         361 949-2988
```

**Proceedings recorded by electronic sound recording; transcript produced by transcription service.**

2

**APPEARANCES:**


For Plaintiffs:            STEPHEN C. JENSEN, ESQ.
                           Knobbe Martens Olson & Bear, LLP
                           2040 Main Street
                           14th Floor
                           Irvine, CA 92614


                           ADAM POWELL, ESQ.
                           Knobbe Martens Olson & Bear, LLP
                           12790 El Camino Real
                           San Diego, CA 92130

For Defendant:             JOSHUA H. LERNER, ESQ.
                           Gibson Dunn & Crutcher, LLP
                           555 Mission Street
                           Suite 3000
                           San Francisco, CA 94105


                           ILISSA S. SAMPLIN, ESQ.
                           Gibson Dunn & Crutcher, LLP
                           2029 Century Park East
                           Suite 4000
                           Los Angeles, CA 90067


                           NATALIE POUS, ESQ.
                           Apple in-house counsel

1        **Santa Ana, California; Wednesday, September 2, 2020; 3:01 p.m.**

2            **(Appearances via Zoom Web Video Conference)**

3                        **Call to Order**

4            **THE COURT:**  We're here on the record in *Masimo*

5   *Corporation, et al versus Apple Inc.*, Case Number Central

6   District SA-cv-20-00048-JVS-JDE.

7            We are here because -- I'll take appearances in a

8   moment, but we are here because I requested, this is Magistrate

9   Judge Early, I requested a telephonic conference regarding a

10  Motion that was filed and a Joint Stipulation and supporting

11  evidence filed yesterday regarding a request for a Section

12  2019.210 Disclosure.

13           As I understand it on the call we have on behalf of

14  Plaintiff we have Mr. Stephen Jensen, Mr. Adam Powell.

15           And on behalf of Defendant we have Ms. Ilissa Samplin

16  and Mr. Joshua Lerner, and a representative from Apple whose

17  name we weren't able to catch.

18           Before I get that name could I find out, and don't

19  say anything, but is there anyone else on the call whose name I

20  didn't call other than the representative of Apple?

21       **(No audible response)**

22           **THE COURT:**  All right, if I could get the name of the

23  Apple in house counsel representative who is on the call?

24           **MS. POUS:**  Yes, your Honor, this is Natalie Pous.

25           **THE COURT:**  And I'm sorry, it's a little hard to hear

4

1    you, could you give me your first and last name slowly, please?

2           **MS. POUS:**  My apologies Natalie and the last name

3    Pous, P-O-U-S.

4           **THE COURT:**  P-O-E-S?

5           **MS. POUS:**  P-O-U-S.

6           **THE COURT:**  U-S.  Thank you.

7           All right, I appreciate Counsel making themselves

8    available on short notice.  Here I want to tell you what I want

9    to do, I want to make your lives easier, that's what I'm here

10   for, not entirely, but maybe partly.  I want to make your lives

11   easier.

12          We issued an Order yesterday on an ex parte

13   application that had some language that I hope Counsel have

14   looked at.

15          There's a lot of Motions being filed, mostly

16   surrounding, not the substance of any issue in the case, but

17   the order in which discovery is going to take place.  It seems

18   like a lot of time, money and effort and on matters that I

19   would expect and anticipate Counsel can work out amongst

20   themselves.

21          I haven't read all of the cases cited in the Joint

22   Stipulation, but I will.

23          I have looked at all of the briefing and I have

24   looked at all of the supporting documentation and have some

25   concerns.  What I don't want to do is go off the cuff and make

5

1   allegations without backing those up and making findings about

2   how the case is being litigated without backing those up with

3   the record, but we're reaching a point where we're probably

4   going to need to start doing that.  And -- but before I do

5   something like that I always like to give a heads up that it's

6   potentially coming.

7          One thing I'll tell you that I've noticed is that

8   both Counsel do agree on something and it's great that you

9   agree on something; it's bad that you agree on this.

10          You both agree that the other side's engaging in

11   gamesmanship.  It's a word you both used referring to the

12   other.  I'm not going to make a finding right now, but I

13   certainly probably could go through the record and find

14   instances where counsel for both sides have engaged in conduct

15   that could meet that definition.  I'm not going to do that yet,

16   I want to give you an opportunity to try to work some of these

17   things out.  And I'll tell you I think it's both Counsel

18   represent clients who's going to take this case very seriously

19   and that's important, that's what we're here for, we do serious

20   work.  I'm sitting in a chair right now where we had a request

21   for detention on a man facing a life sentence for an alleged

22   bombing that resulted in a killing where the victim was

23   literally blown to bits, pieces of her found in a parking lot,

24   on a wall, all other nearby places, two other victims injured.

25          Earlier, not too many days ago, and I thought about

6

1   this when I was working on the ex parte, I think it was the

2   fourth one in this case that involved the issues we talked

3   about, not the fourth one for me, I think Judge Selna had the

4   pleasure on the earlier three, but the fourth one seeking

5   expedited resolution.  And I'm going to describe to you a

6   situation we had just a few days ago where someone asked for

7   expedited resolution.  It was a series of search and arrest

8   warrants for a person who had previously been convicted of

9   terrorism and at this time was facing additional charges, and

10  as part of the request for an estimate for when the warrants

11  would be approved one of the -- it was noted that a

12  neighborhood was surrounded by SWAT officers and a law

13  enforcement helicopter was in the air and needed to know

14  whether it needed to refuel before the warrants would be signed

15  off, approved so that the tactical team could make entry safely

16  and without incident, and I'm happy to report that that did

17  happen, it occurred without incident and we completed our

18  hearing this morning regarding the allegations of murder and a

19  request for continued detention.

20          I want you to really think about that when you folks

21  think about whether you're going to re-institute, this is now

22  the ninth Motion regarding the Order in which disclosures will

23  be made in this case.  I know the case is very important to

24  you.

25          I also want you to think about what Judge Selna's

7

1    going through with his calendar with criminal cases circling

2    waiting for trials where the Sixth Amendment mandates trials or

3    the Constitution and the Speedy Trial Act mandate speedy trials

4    where a Court's calendar is not an excuse for delaying a

5    criminal defendant's right to a trial, and the fact that we're

6    under an emergency declaration, and we're under an emergency

7    declaration in this District for the District Courts for being

8    so far down in what they should have in terms of Judges meaning

9    that each Judge in the Central District does about, at this

10   point, getting close to two times the case load of what is

11   expected of District Judges.

12          And I gave you some numbers about if you plotted out

13   if every civil case litigated these issues like you are what it

14   would be like, and obviously not every case is litigated this

15   way, but this one is reaching a point that you folks really

16   need to think about that.

17          And part of this you may be playing tiny violins for

18   your concern about the Courts and the Court's calendar and the

19   fact that we have reduced staffing here, but part of it should

20   also be of concern because what I'm seeing doesn't reflect well

21   on Counsel, and when things don't reflect well on Counsel what

22   happens is things get more complicated at every stage of the

23   proceeding where the Court would like to rely on Counsel as

24   officers of the court to ensure that their complying with Rule

25   Number 1, and it's Rule Number 1 for a reason of the Federal

8

1   Rules of Civil Procedure to ensure the just timely and

2   inexpensive determination and resolution of disputes.  I want

3   you really to think about that and really focus on that as we

4   move forward.  And I don't necessarily expect us to resolve

5   this Motion today, but I want to give you some things to think

6   about.

7            You're going to have Supplemental Memoranda due in

8   about eight days and we may or may not have a hearing on the

9   Motion, but I'll be writing something up and I want you to have

10  an idea of some of the things that I'm thinking about including

11  in the Order and then ultimately you'll do what you'll do and

12  Judge Selna will have a chance to look at it, and you've seen

13  him express his views on some things in this case already and

14  some Orders, so I want you really to think about what's

15  happening in this case, what's happening with how the Court is

16  perceiving Counsel, and how that may affect how the case goes

17  forward.  And, obviously, we don't tie Counsel to their clients

18  and every client is entitled to a day in court and a fair day

19  in court, but I hope that the clients understand that how

20  things are being done may reflect on their representatives as

21  they make further appearances down the road.

22           I'm a lowly Magistrate Judge, though.  I am really

23  here to help you, I'm really here to maybe give you a sense of

24  what things look from this side and what things may look like

25  to Judge Selna, and how things may ultimately appear to a jury.

1          I have tried many cases in this building, I have

2  tried cases with Judge Selna.  I'm in front of Orange County --

3  or was in front of Orange County juries as a lawyer quite a

4  bit, and am still in front of them on consent cases and often

5  -- well, I'm going to leave that aside.

6          But juries don't necessarily like lawyers that snip

7  at each other and fight at each other and can't agree on what

8  even a juror can see is a relatively basic and simple process.

9  I'm not here to point a finger directly at one side or another,

10  but what I can tell you is it appears that this is happening

11  and coming from both sides, and when each side refers to the

12  other as "engaging in gamesmanship" I see support for both of

13  those -- each of those accusations.

14          Turning to the particular Motion that brings us here,

15  and that's Docket Number 169 filed yesterday, I think I heard

16  Mr. Powell had mentioned he's on the call -- Mr. Powell, are

17  you on the call?

18          **MR. POWELL:**  Yes, your Honor.

19          **THE COURT:**  All right.  I want to ask you about some

20  emails that you sent.

21          I'm looking at an email and I'll do it -- the Docket

22  Number, it's Docket Number 169-3, it's Page 7.  These are

23  otherwise referred to as, I think these are exhibits to

24  Ms. Samplin's Declaration, but it's easier for my record to

25  refer to them by their Docket Entry Number and their Page

10

1   Number, and it's a April 21st, 2020 email sent at 7:09 p.m., it

2   looks like Mountain Daylight Time, and you wrote to

3   Ms. Samplin:

4           "We will provide a Section 2019.210 disclosure in due

5           course, but will need a Protective Order in place

6           before doing so."

7           When you wrote that on February 21 of this year,

8   Mr. Powell, what date did you have in mind?

9           **MR. POWELL:**  I'm not sure we had a specific date in

10  mind, your Honor, and things have changed throughout this case.

11  I completely agree with you --

12          **THE COURT:**  Well, let's just focus on my question,

13  you answered it.  I asked what date you had in mind, although

14  you left some wiggle room, you said you're not sure you had a

15  date in mind, and that's -- I understand, it's been what,

16  counting with my fingers May, June, July, August, four and a

17  half months that you might not remember what you thought four

18  and a half months ago and that's fair.

19          I mean, did you have a general sense about a

20  particular event?  You mentioned a Protective Order, so you

21  named that.  Was there any other event you had in mind back in

22  April when you said that you'd make the Section 2019.210

23  disclosure in due course?

24          **MR. POWELL:**  Your Honor, to be honest, it's hard for

25  me to remember exactly what I was thinking on April 21st.

11

```
1         THE COURT:  Well, I want you -- I understand -- I
2    recognize, I want you to think, and if you say -- it's one
3    thing to say it's hard for you to remember, I acknowledge that,
4    but if you then follow it up by saying "and sitting here today
5    I can't remember" that's okay, tell me that.
6         MR. POWELL:  I don't think -- yeah, no, I can't
7    remember any specific thing.  I can tell you that at the time
8    the issue that we were dealing with with Apple concerned
9    primarily the Protective Order, and the reason is that both
10   parties had said "We won't provide confidential information
11   without a Protective Order."
12        THE COURT:  Okay.
13        MR. POWELL:  I think we just said we would provide
14   the information based on a mutual agreement to exchange it,
15   both parties would agree to (indiscernible) and Apple hadn't,
16   at the time, agreed to that agreement.  So we were and remain
17   to this day, always have been willing to provide confidential
18   information before entry of a Protective Order if both parties
19   did it.
20        THE COURT:  Right.
21        MR. POWELL:  That's all we were asking.
22        THE COURT:  Well, let's continue on.  So that was
23   April.
24        Let's look at Docket Entry -- the same Docket Entry
25   Number 169-3, and this is Page Number 14, this is an email you
```

12

1   wrote on June 9th so now we're getting a little closer in time,

2   maybe your memory is a little bit better.  We're talking about

3   three months -- a little less than three months ago, email June

4   9th, 2020 at 12:48 p.m. and, again, I'll quote:

5           "Plaintiffs expect to provide a 2019.210 statement

6           and other confidential information within a

7           reasonable period after entry of a Protective Order."

8           What was the reasonable time period you had in your

9   mind when you wrote that --

10          Oh, I'm sorry, that was actually not written by you,

11  that was written by Mr. Kachner.  I wonder, though, since it

12  looks like, Mr. Powell, you were copied on that, and if you had

13  an understanding about what Mr. Kachner meant by that?

14          **MR. POWELL:**  Yeah, I don't know exactly what

15  Mr. Kachner meant, but I think we were assuming that Apple

16  would answer the Amended Complaint after we filed it, and that

17  they would answer and we would provide a 2019 statement.

18          **THE COURT:**  But you don't know what he meant by that?

19          **MR. POWELL:**  I would be guessing if I told you

20  exactly what he meant, your Honor, I'm sorry.

21          **THE COURT:**  All right.  Let's jump ahead now to July

22  9th, so a month after Mr. Kachner's statement by email.  This

23  is Docket Entry Number 169-3 at Page 21, and this is from you,

24  Mr. Powell, once again referring to the 2019 statement.  You

25  write that, and I'm quoting in part:

13

1          "Nonetheless Plaintiffs will provide that statement

2          in due course."

3          What did you mean -- so now we're only talking about,

4     oh, a month and a half ago, what did you mean by "due course,"

5     what date did you have in mind?

6          MR. POWELL:  So, your Honor, at that time, and I'm

7     trying to make sure I get my timeline right, I want to be

8     accurate, but I believe we had filed the Second Amended

9     Complaint at that time and we had provided what we believe was

10    an extraordinary amount of detail in the Second Amended

11    Complaint, and we assumed Apple would answer the Second Amended

12    Complaint, and it was not until I think -- I'll have to get the

13    exact date of the meet and confer, right around when Apple

14    indicated to us that they intended to still move to dismiss,

15    and that's when things really changed here is that we thought

16    this was going to move forward, Apple would answer, we would

17    provide the 2019, and when Apple indicated they would still

18    move to dismiss that's when we realized that it didn't make

19    sense to litigate this, some of this similar and/or identical

20    issues both before your Honor and before Judge Selna at the

21    exact same time, in two separate forums, before two separate

22    Judges.

23          THE COURT:  Well, you indicated that, in your view,

24    there was an "extraordinary amount of disclosure in the Second

25    Amended Complaint," is that -- am I quoting you correctly?

14

1          **MR. POWELL:**  I think I said "extraordinary," I'm not

2   sure.  I think we certainly complied with Judge Selna's Order

3   and I think we actually complied with the reasonable

4   particularity requirement of 2019.

5          **THE COURT:**  All right.  So why not tell Defendant

6   that, why not tell Apple that?  That "Our Second Amended

7   Complaint, we stand on that" and then if Judge Selna finds that

8   to be insufficient so be it.

9          **MR. POWELL:**  I'm not sure --

10         **MR. JENSEN:**  I'm sorry, were you trying to say

11   something else?  I didn't mean to interrupt you.

12         I was trying to ask -- Judge Early, this is Steve

13   Jensen, whether that was a question to Mr. Powell or whether

14   you would like me to address that as our argument?

15         **THE COURT:**  I guess I'm happy to listen to whomever

16   wants to speak, but ultimately you're each making

17   representations, or it's primarily Mr. Powell making

18   representations in the record before me so I want to understand

19   the bases for the recommendations.

20         You know, here's ultimately -- I don't really mean to

21   make Mr. Powell uncomfortable, if that's what happening, and I

22   hope it's not, but when an officer of the court is making

23   representations to another officer of the court about how the

24   case is proceeding I expect them to live up to the things that

25   they say, and so when they say four months ago that they're

15

 1    going to be making a disclosure in due course after the entry

 2    of a Protective Order, and when that Protective Order is

 3    entered on June 30th, and they say in a separate email that

 4    they will be making that 2019.210 disclosure in a reasonable

 5    time after the entry of the Protective Order the shifting of

 6    sands to say "Oh, no, I'm going to not do it because Apple is

 7    challenging our Second Amended Complaint."

 8           Hey, both sides agree on something, that the Second

 9    Amended Complaint, the standard for under Rule 12(b)(6) and

10    Rule 8 for what's sufficient to state a claim is not the same

11    as the standard under 2019.210 for what's stating a trade

12    secret with reasonable particularity.  So a challenge to one

13    doesn't mean a challenge to the other.

14           If Judge Selna denies the Motion to Dismiss that

15    doesn't mean the language contained in the Second Amended

16    Complaint is sufficient under 2019.210.

17           If he grants it, well, since the standard is lower it

18    would, but it doesn't show a lot of faith in the adequacy of

19    the disclosure.

20           I'm troubled by that.  I'm troubled by the

21    argumentativeness of the contention that the issue has been

22    decided multiple times before about the 2019.210 disclosure.

23           The case isn't frozen in time.  What happened in

24    April, May, June in terms of what needs to be disclosed and

25    whether patent-related claims and trademark-related claims are

16

1    stayed or not stayed, or discovery is stayed or not stayed as

2    to Plaintiff's discovery under 2019.210 are -- that's one whole

3    set of issues and that changes over time.

4           But there's another big, big issue and that is

5    leaving aside 2019.210, Rule 26 gives Federal District Courts

6    broad discretion in controlling and scheduling discovery, and

7    you have read Judge Selna's Orders and I have read Judge

8    Selna's Orders and he certainly made it clear what he felt

9    about the issue of Apple not producing core technical data in,

10   what, Judge Selna found to be a timely or untimely fashion.

11          But the -- a corollary of that is Judge Selna wants

12   to get things moving, wants to get this case moving, you can

13   see it from his Orders.  And I'm concerned that Plaintiffs read

14   into that maybe more than they should have, and that Judge

15   Selna didn't say that there would never be a time for the

16   2019.210 disclosures, and he never said that there not be a

17   separate basis, whether it was in an interrogatory response or

18   a general controlling of the discovery process, that we didn't

19   need to get things going on the trade secret disclosure issue.

20          Your hearing in front of Judge Selna on the Motion to

21   Dismiss is, correct me if I'm wrong, it's September -- is it

22   14th?  Somebody tell me, what's the hearing on the Motion to

23   Dismiss?

24          **MR. POWELL:**  Just one moment, your Honor, I'll get

25   it.

1           **MR. LERNER:**  Yeah, your Honor, this is Josh Lerner

2     for Apple.  Sorry to jump in.  I think the date you had on the

3     14th is the date for the hearing on the Preliminary Injunction

4     which probably comes from the fact that we mentioned that in

5     our papers because obviously we feel like dealing with that

6     Motion without the disclosure is one of the issues here.  But

7     that's the hearing that's on the 14th, and I believe if

8     Mr. Powell doesn't have it yet, I'll have the date on the

9     Motion to Dismiss here in just one second, I'm just pulling it

10    up --

11          **MR. POWELL:**  Oh, I have it, your Honor, it's October

12    5th.

13          **THE COURT:**  All right.  And why don't I turn -- I'll

14    let Plaintiffs think about some of the things that I've said

15    and I'll turn to Apple.

16          If we just let this Motion that you filed go and let

17    it be heard in a regular hearing, which is probably what we're

18    going to wind up doing today short of giving you some things to

19    think about, if I do exactly what you asked me to do we have a

20    hearing on September 24th, I ordered disclosure in five days,

21    that would be September 29th.  What's the significance of that

22    date?

23          **MR. LERNER:**  The significance of that date, your

24    Honor, is that is the soonest we could find a way to get this

25    disclosure without, again, moving ex parte.  And to your

1    Honor's point we did see the language in your Order and we do

2    take it seriously.

3           I have practiced criminal law and I hear you and I

4    definitely get the importance of the matters you are describing

5    kind of as the relative importance of speed, and so the really

6    straightforward answer to your question is we really would like

7    to and I don't think it's overstating it to say we need a

8    disclosure earlier, but we also are aware of the burden on the

9    Court right now and we saw the Order and we didn't think it was

10   prudent to file another ex parte Motion notwithstanding the

11   fact that we are, as I mentioned, litigating it beyond.

12           **THE COURT:**  Well, I'm going out on a limb and saying

13   you had circulated the Joint Stipulation seven days before it

14   was filed so we were already going down that route by the time

15   my Order hit the Docket, right?

16           **MR. LERNER:**  Yes.  And even before that, though, your

17   Honor, I think this goes to your point, it was, I think,

18   evident to everybody that, you know, there are a lot of papers

19   in this case and we're trying to be mindful of that.

20           That said, if we can get this disclosure sooner

21   rather than later, even if it is on the regularly scheduled

22   hearing, that is a huge step forward for us because right now

23   we are litigating the case.  And I do think it's fair to say

24   this isn't disputed, I don't think opposing Counsel would

25   dispute it, they, of course, may, but the information, for

19

1 example, in the Motion for Preliminary Injunction and the

2 information in the Second Amended Complaint are not even close

3 to the same, and so we, Apple, are facing a situation where we

4 will take the disclosure identifying the secrets in this case

5 as soon as we can get it, and if that is after that hearing on

6 the regularly scheduled Motion and that's the best we can do we

7 absolutely will do that.

8          Now in terms of moving --

9          **THE COURT:**  Has Apple produced all of the core

10 technical data that was the subject of Judge Selna's Order last

11 month?  That's to Apple.

12          **MR. LERNER:**  Not only now, and this is kind of

13 ongoing and there's another Motion that you're probably aware

14 of before Judge Selna right now that's, I believe, also an ex

15 parte Motion from the Plaintiff and so I assume they may

16 disagree with us, but the answer to your Honor's question is we

17 do believe we have complied with that Order.

18          The Complaint was amended for new patents and there

19 is information that we believe is due requests which we have

20 been working very hard to gather with our clients, and I think

21 we can demonstrate well that since that Order came down we not

22 only have produced a ton of information including source code,

23 but also regularly updated that in follow-up requests for

24 anything missing we have responded as quickly as we could and

25 worked with the people on our end.  And Judge Selna's Order was

 1   not and is not something that we were not taking seriously, so

 2   I think, yes, we're in compliance with that part of it.

 3            THE COURT:  Let me cut to the chase and make sure I'm

 4   clear, that's great that you have produced a ton of

 5   information, but if it calls for two tons of information I

 6   don't necessarily know.

 7            Here's what I want to hear from Apple:

 8            Has Apple produced everything that Judge Selna

 9   ordered relating to the core technical data?

10            MR. LERNER:  Our view, yes, we have produced the

11   documents that he ordered.  And I don't want to not answer your

12   question, but I do think it's relevant.  I think there is a

13   piece here which is there have been follow-up requests and --

14   yes --

15            THE COURT:  I understand -- let me say this, let me

16   stop you for a second.  I understand the Second Amended

17   Complaint and the parties can dispute how much it changed or

18   didn't change things referring to different patents and whether

19   that's subsumed in the prior Order.  I'm not concerned about

20   that.

21            I just want to know if based -- at the time Judge

22   Selna entered the Order has Apple produced everything that

23   Judge Selna ordered to be produced?

24            MR. LERNER:  Our position is yes, your Honor.

25            THE COURT:  All right.  Let me hear from Plaintiffs

1    on that question.

2            Has Apple produced everything that Judge Selna

3    ordered as of the date of that Order, leaving aside whether

4    things have changed in light of the Second Amended Complaint?

5    Has Apple produced everything that Judge Selna ordered as of

6    the date of that Order?

7            **MR. SPEAKER:**  Our position is absolutely not, your

8    Honor, not even close.

9            **THE COURT:**  What have they not -- if you're able to

10   be that definitive tell me specifically and if we need to --

11           **MR. SPEAKER:**  Yes.  There are --

12           **THE COURT:**  -- let me just -- hold on a second.  If

13   we need to --

14           **MR. SPEAKER:**  Okay.

15           **THE COURT:**  -- go with a confidential portion of this

16   proceeding alert me ahead of time and we'll designate the

17   transcript confidential.

18           **MR. SPEAKER:**  Yeah, and I don't have those kinds of

19   details in front of me, and if you want to know exactly if

20   there is a Motion that is --

21           **THE COURT:**  If I could interrupt you again, since

22   we're not here in court I need you to state your name when you

23   speak.

24           **MR. JENSEN:**  Right.  Oh, okay, sorry, this is Steve

25   Jensen.

22

1          There is a subsequent Motion which briefs the

2    deficiencies that we believe were in a place when Apple did not

3    comply with the Judge's Order to provide those core technical

4    documents in five days.  In fact, there were about 30 documents

5    which were produced and there was some source code.  We

6    immediately identified the deficiencies that were on the list.

7    Apple said they would look into it.  Two weeks later they were

8    still looking into it.

9          We did try to work through those things.  Judge Selna

10   had invited us to re-weigh the issue if the production was

11   insufficient.  That Motion, unfortunately, it's another Motion,

12   is briefed before Judge Selna asking that he, again, order them

13   to produce those documents.

14         Now they have subsequently agreed to looking into and

15   produce, there's a long list and it's very specific, of the

16   things we're asking for.  That correspondence has been from my

17   partner, Perry Oldham, and I think Brian Andrea who, I think,

18   have been dealing with the patent side of this case.  But we

19   strongly believe they have not complied with that, and we are

20   seeking those and trying to get those documents from them.

21         Once we filed the subsequent Motion we started

22   getting some additional documents from them.

23         **THE COURT:**  All right, so you strongly, "you" meaning

24   the Plaintiffs, strongly believe that Apple is --

25         **MR. JENSEN:**  Yes.

23

1          THE COURT:  -- has not produced the documents

2    required by Judge Selna.

3          You just heard Apple say they -- and Apple disagrees,

4    they think they have complied.

5          MR. JENSEN:  Yes.

6          THE COURT:  The flip side is, totally different

7    issue, one before -- that one before Judge Selna, now a Motion

8    before me where Apple strongly believes that Plaintiffs have

9    been "playing games," Apple's words, with the 2019 disclosure

10   or lack thereof, and has pointed me to a series of emails

11   which, for lack of a better term, look like a process of

12   stringing along, and Plaintiffs disagree that they have any

13   obligation to make a 2019 disclosure right now.  So you're at

14   loggerheads on the Motion before me; you're at loggerheads on

15   the ex parte application before Judge Selna, each side taking a

16   different view of the other side's recalcitrance.

17          Can you folks step back for a minute and see whether

18   there's a way to pick a date where Apple finishes its review

19   and produces whatever technical data that Plaintiffs claim

20   hasn't been produced in the matter that's sitting on Judge

21   Selna's desk, along with scores of other matters sitting on

22   Judge Selna's desk.  And I'm not kidding, I go up there

23   sometimes and he's got stuff stacked on the floor; he's got

24   stuff all over the place.  He's not in right now, but was in

25   earlier today, and we have got a Motion before me, thankfully

24

1    not anywhere near as difficult, I don't have the burdens that

2    he does of working criminal trials and finding a way to do this

3    and, frankly, I think this Motion before me, I'll be able to

4    get out a ruling on it, neither side is probably going to like

5    what the ruling says, but I'll be able to get a ruling out on

6    it.  But we've got loggerheads on production of information,

7    confidential, sensitive trade secret technical information, and

8    they both have been thrown into court for the Court to

9    determine.

10          By the way, probably the worst group of people to

11   make these determinations, Judge Selna is much smarter than I

12   am, but neither one of us knows the technology like your two

13   firms and your two clients know.  Neither one of us know what

14   you really need to prepare your case for Motions, for trial.

15          What both Judge Selna and I can do is smell out

16   gamesmanship and can make findings on that.

17          But what I think, again, I'm here to help, I'm not

18   going to order anything, but what I think you two sides really

19   ought to do is see whether you can take a break for a moment,

20   take a deep breath --

21          I know you've got a Motion for Preliminary

22   Injunction, a very important Motion pending, and you've got

23   another Motion to Dismiss pending.  Even if I order everything

24   that Apple wants it's not going to come until weeks after the

25   Motion for Preliminary Injunction is heard.

1          Why don't you two hold off on throwing stuff into

2   court for a while, try a little harder to work stuff out.  Try

3   a little harder to figure out what you really need and what's

4   really being withheld, and if you can't come back, but maybe

5   you can.  I actually think you can.  I look at this and I --

6   although I see a lot of difficulty I think you both know what's

7   going on.  Both of your firms have been on both sides of patent

8   cases, you know what's happening, you know what each side's

9   reasoning behind different things is, take some time, talk

10  amongst yourselves to see whether you can resolve these two

11  things working together in tandem at the same time.

12          Tell me what you think about that, and I'm going to

13  start with Plaintiff, even though they're not the moving party

14  on the Motion in front of me, I'm going to start with

15  Mr. Jensen.

16          **MR. JENSEN:**  Thank you, your Honor.  And, look, we

17  take your workload and what you're saying here very seriously

18  as we did in the Order that you issued the other day.

19          I think what you're suggesting is a fantastic

20  suggestion and we welcome it.  I was not on the phone, but I

21  understand that when they were asking for the 2019 earlier we

22  made a suggestion that we agreed to a mutual exchange date of

23  that.  So I think that, you know, when we get --

24  (indiscernible) for these cases the parties should be able to

25  negotiate, work things out, do a little horse trading and get

26

1   the case moving.  I couldn't agree with you more, your Honor,

2   and so we are more than happy to try to engage in that process

3   the best we can and still represent our clients as well, and I

4   welcome it.  I think it's -- and I know that at least I wasn't

5   on the call, but I know we tried something similar to those

6   before this 2019 thing got out of hand.

7           **THE COURT:**  I'm going to ask you not to point fingers

8   here, all right?

9           **MR. JENSEN:**  Okay.

10          **THE COURT:**  I'm going to turn to -- is it going to be

11  Mr. Lerner or Ms. Samplin to make their response on behalf of

12  Apple?

13          **MR. LERNER:**  Thank you, your Honor, Joshua Lerner and

14  Ilissa will definitely correct me if I get it wrong in speaking

15  for both of us.

16          But I obviously hear your guidance and it makes sense

17  and we obviously will follow up with the Plaintiff here and

18  appreciate the Court's thinking on it and suggestions.

19          **THE COURT:**  Well, I want to know, can we do something

20  right now?  You don't need to stroke my ego, whatever ego I get

21  gets knocked off my shoulder the moment I cross the threshold

22  of my own front door.  Let's try to work something out right

23  now, something procedurally where we've got two pending

24  Motions, one ex parte, one in front of Judge Selna, this one in

25  front of me.  Can we come up with a procedural mechanism where

1    you let Judge Selna know "Hey, Judge, let's give that a break.

2    We talked about it with Judge Early, there's a separate Motion,

3    we're going to try to work this out for a week and see what we

4    can do."

5              Tell me if that's something you can agree to right

6    now.

7              **MR. LERNER:**  And I apologize for being dense, your

8    Honor.  You just mean communicating to both Judge Selna and

9    obviously yourself that we should put those Motions on hold

10   while the parties meet and confer on it and try and reach an

11   agreement as you discussed?

12             **THE COURT:**  Yes.  Yes.

13             **MR. LERNER:**  And, again, apologies for being dense.

14             **THE COURT:**  No, you're not being dense.  What I'm

15   trying to avoid is turning Judge Selna into Andrew Jackson and

16   have him fight the battle of New Orleans after the war is over.

17   If we can --

18             I don't know where he stands.  It might actually be

19   in for docketing right now or a ruling on the ex parte, I don't

20   know.  But if I say "Okay, you two see if you can talk about it

21   for a little bit," and it takes you -- we're now Wednesday and

22   you can't figure anything out until, you know, we've got a

23   three-day weekend coming up, there's a good chance Judge

24   Selna's going to rule on it and so you'll -- one side will be

25   very unhappy and kicking themselves and the other side who

28

1    winds up winning that is going to be glad that they didn't work

2    it out, but my suggestion is let's see if we can do something

3    right now where we put something on the docket and I try to get

4    ahold of Judge Selna or his chambers and let them know that

5    we're going to put a hold on that and see if you folks can work

6    it out.  Tell me what you think.

7            **MR. LERNER:**  Yes, that makes sense and apologies

8    again for being slow on that.

9            **THE COURT:**  So on behalf of Apple do you agree that I

10   can issue a Minute Order based on today's call that the parties

11   agree that this Motion that I referred to, it's Docket Number

12   169, and the ex parte that Plaintiff filed that's in front of

13   Judge Selna relating to the alleged failure to comply with his

14   July Order, that from Apple's standpoint I can issue an Order

15   and advise Judge Selna the parties agree to, for seven days,

16   hold those Motions in abeyance while the parties attempt to

17   resolve the issues therein.

18           Is that agreeable on behalf of Apple, Mr. Lerner?

19           **MR. LERNER:**  Yes.  Yes.

20           **THE COURT:**  And, Mr. Jensen, do you need me to repeat

21   that or can I just ask is that agreeable on behalf of

22   Plaintiffs?

23           **MR. JENSEN:**  No.  That's agreeable to Plaintiff.

24   (indiscernible)

25           **THE COURT:**  All right.  So what I'm going to do is

1    I'm going to go back into my chambers and write something up

2    very quickly and try to get ahold of Judge Selna's chambers.

3    And what's going to happen from you is you're going to be

4    required on September 9th, by noon, to advise the Court by way

5    of -- I'm going to ask Plaintiff to do it, but maybe I'm

6    expecting too much that I won't then get a counter-response

7    from Defendant, simply advising whether the Motions have been

8    resolved, the ex parte application and the Motions have been

9    resolved, or advising that they haven't been resolved.  No

10   argumentation, I don't need anything else, I just need a one

11   sentence statement that the Motions have been resolved and are

12   no longer needed to be determined by the Courts, or they

13   haven't been resolved.  Is that agreeable, Mr. Jensen?

14           **MR. JENSEN:**  That's agreeable.

15           **THE COURT:**  All right.  So I'm not going to waste any

16   more time, I'm going to go back and write something up and try

17   to get ahold of Judge Selna.

18           In the meantime I'm hoping that you folks can try to

19   work through these things.  I think it's going to be in your

20   best long term interests to do that.

21           But is there anything further?  Since I called it I

22   don't have anything further.  Is there anything further from --

23   on behalf of Plaintiffs with respect to what we've talked about

24   today?

25           **MR. JENSEN:**  Nothing from Plaintiffs, your Honor.

1              **THE COURT:**  And from the Defense?

2              **MR. LERNER:**  Nothing else from me, your Honor, except

3     one (indiscernible), what you mentioned, and hopefully it would

4     be avoided anyways, but should this submission on the 9th be

5     joint?  Just do the parties need to agree on it?  If not back

6     and forth or anything else?

7              **THE COURT:**  The only reason why I didn't want it to

8     be joint is I don't want you spending five hours going back and

9     forth on a one sentence submission.  So, listen, Plaintiffs

10    are --

11             **MR. LERNER:**  Okay.

12             **THE COURT:**  -- directed to file that one sentence

13    submission by noon on September 9th.

14             Defendants, should they desire, are permitted to file

15    a one sentence response to that by 1:00 p.m. on September 9th.

16             I don't want to add anymore because the more I add

17    the longer my Order gets and the greater the likelihood that

18    something from Judge Selna on the earlier ex parte hits the

19    docket, all right?

20             **MR. JENSEN:**  And my goal, your Honor -- this is

21    Mr. Jensen, my goal would be that our filing will not elicit a

22    response from Apple.  How's that?

23             **THE COURT:**  All right, I've got it and we, obviously,

24    can't make any promises so that's going to be --

25             **MR. JENSEN:**  Correct.  Correct.

31

1          **THE COURT:**  -- my Order and I'm going to let you

2    folks go so you have plenty of time to work on it.  And it

3    doesn't --

4          With respect to Judge Selna, what's in front of him

5    it doesn't change anything, you'll just let him know that he

6    can issue an Order.

7          With respect to me your Supplemental Memoranda are

8    due the following day on the 10th so you'll know by noon on the

9    9th whether you need to file a Supplemental Memoranda on the

10   pending Motion before me.

11         All right?

12         **MR. JENSEN:**  And just a clarification on that just so

13   I'm clear, we're not doing anything with Judge Selna now,

14   you're going to take care of that, right?  We're just doing the

15   thing a week from now to let us -- right?

16         **THE COURT:**  I'm going to issue an Order and I'm going

17   to try to reach him to let him know.

18         **MR. JENSEN:**  Okay.

19         **THE COURT:**  All right?

20         **MR. JENSEN:**  All right, sounds great.

21         **THE COURT:**  All right.

22         **MR. JENSEN:**  Thank you.

23         **THE COURT:**  Thank you.  We're adjourned.

24         **MR. LERNER:**  Thank you, your Honor.

25         **MS. SAMPLIN:**  Thank you, your Honor.

(This proceeding was adjourned at 3:45 p.m.)


CERTIFICATION


I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.



_____                    September 9, 2020
              Signed                                       Dated


                    *TONI HUDSON, TRANSCRIBER*

Exhibit R

```
 1              UNITED STATES DISTRICT COURT

 2         FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3                  SOUTHERN DIVISION

 4

 5   MASIMO CORPORATION, a Delaware    )
     corporation; and CERCACOR        )
 6   LABORATORIES, INC.,              )
     a Delaware corporation,          )
 7                                    )
              Plaintiffs,             )
 8                                    )
              VS.                     ) 8:20-CV-00048-JVS
 9                                    )
     APPLE, INC.,                     )
10                                    )
              Defendant.              )
11                                    )

12

13                  CONFERENCE CALL

14          WEDNESDAY, SEPTEMBER 9, 2020

15                   10:11 A.M.

16

17

18

19

20

21   REPORTED BY:

22   DAVID A. SALYER, RMR, CRR

23   CSR NO. 4410

24   JOB NO. 4251588

25   PAGES 1-27
```

                                              Page  1

```
1    APPEARANCES: (All participants appearing remotely.)
2    FOR THE PLAINTIFF:
3            KNOBBE MARTENS OLSON & BEAR
             BY:  STEPHEN M. JENSEN, ESQ.
4                 ADAM POWELL, ESQ.
                  PERRY OLDHAM, ESQ.
5            2040 Main Street
             14th Floor
6            Irvine, California  92614
             (949)760-0404
7            stephen.jensen@knobbe.com
8
9    FOR THE DEFENDANTS:
             GIBSON, DUNN & CRUTCHER, LLP
10           BY:  JOSHUA H. LERNER, ESQ.
                  MARK LYON, ESQ.
11                BRIAN ROSENTHAL, ESQ.
                  BRIAN ANDREA, ESQ.
12           555 Mission Street
             Suite 3000
13           San Francisco, California  94105
             (415)393-8200
14           jlerner@gibsondunn.com
15
16
17
18
19
20
21
22
23
24
25
```

Page  2

```
1                     I   N   D   E   X

2    PROCEEDINGS                                    PAGE

3    Conference Call                                  1

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page  3

```
 1                   LOS ANGELES, CALIFORNIA;

 2              WEDNESDAY, SEPTEMBER 9, 2020

 3                       10:11 a.m.

 4                         -OOO-

 5              (All parties appearing remotely.)

 6              MR. LERNER:  All right.  So at least on our end

 7     I think where we left off yesterday is obviously we were

 8     going to follow up now.

 9              Apologies for being a little bit late.

10              I think we're kind of ready to, again, follow

11     up and move forward on the proposal we discussed

12     yesterday.

13              Brian Rosenthal, if you want to add any detail,

14     please jump in.

15              I think obviously, Stephen, you wanted to talk

16     to folks on your side as well, but, Brian, if you want

17     to jump in.  Then we can hear any additional updates

18     Stephen has.  Maybe we can take it from there.

19              MR. ROSENTHAL:  This is Brian Rosenthal.

20              Yes, Steve, sorry for not being able to get

21     back to you yesterday.

22              The reason we were late is because that's when

23     we were able to speak with Apple.

24              A couple things that will work for us.  The

25     25th of September will work for us.
```

Page  4

```
 1              The idea of when the new version of the Apple

 2    Watch is released shortly thereafter producing the sort

 3    of non-source code but other, you know, core technical

 4    documents so that you can very quickly determine whether

 5    you're going to assert the patents in suit against that

 6    product.  If you do assert it, then we will provide the

 7    source code shortly thereafter.

 8              That plan was also approved, that part of the

 9    compromise proposal, after some -- reluctantly approved,

10    let me put it that way.  We got that.

11              So I think those were the outstanding questions

12    that we were going to get back to you on.  So those are

13    our answers.  And we're eager to hear where you guys

14    stand.

15              MR. JENSEN:  So we were able to talk internally

16    as well.  This is Steve Jensen.

17              I have a couple of thoughts and a

18    counter-proposal, so to speak, that hopefully will work

19    that I think addresses each party's stated concerns from

20    yesterday with some small adjustments to some of the

21    things we were discussing.

22              As I was able to talk with Perry and the team

23    about the remaining outstanding issues, I guess we still

24    have concerns, but that's not going to stop us from

25    doing something here that we aren't really going to know
```

Veritext Legal Solutions
866 299-5127

```
 1    whether we've resolved our motion until we see your
 2    production and decide -- determine whether, hey, is it
 3    really now something that's a motion to compel issue or
 4    something we're still really missing in order to provide
 5    meaningfully updated contentions.
 6              So, you know, I think we do have an
 7    agreement -- disagreement, for example, on what you were
 8    talking about providing on the iPhone, but I don't know
 9    yet whether that dispute is going to drive anything,
10    right?  I think you know what I mean by that.  It might
11    not matter.
12              I looked at some of the claims.  I looked at
13    the iPhones mentioned in the complaint.  There are
14    certainly some communication, some things that happened.
15    So I just don't know until we see the actual production
16    whether or not it resolves it.
17              But I'm happy to commit, number 1, that we will
18    start our clock running when we get your subsequent
19    production, right, and we will provide updated
20    infringement protections based on upon that production
21    at some period after that.
22              I'll get to that in a minute.
23              Did that all make sense, Brian?
24              MR. ROSENTHAL:  This is Brian.  It did.
25              MR. JENSEN:  Okay.  So that takes me to a
```

Page 6

1    couple things that I would then like to deal with from

2    what our proposal would look like.

3         We do think it makes sense that -- and as I

4    explained yesterday that in terms of timing that we

5    are -- that we have the benefit of, if possible -- now,

6    Judge Selna may move the hearings.  I'm willing to

7    commit to dates even if that happens.  But I think it

8    makes sense to have the planning be such that we would

9    have the potential of having his guidance.  If we don't,

10   we don't.  We'll move forward.

11        So what I'm proposing the date would be would

12   be the 9th as we discussed yesterday.  But in order to

13   deal with the issue of the case, you know, continuing,

14   I'm willing to shorten my time for contentions by a week

15   so it doesn't continue to string that out.

16        That way I have to move quicker on that, but we

17   have the benefit of, you know, that motion to dismiss

18   practice, potentially have a tentative or something from

19   him on that that might guide the parties with respect to

20   the trade secret piece that you're challenging.  So I'm

21   proposing to do that the 9th.

22        And the documents would be the same date which

23   would give you a little extra time on that and we then

24   shorten our time on the contentions.

25        I think we still are going to have to -- but I

Page  7

```
1    don't think we have to resolve it today, Brian.  I think
2    we're going to have to look at the rest of the schedule
3    as you mentioned yesterday and just see what else, what
4    other pressures that brings.
5            I'm willing to shorten my contention time in
6    order to have that exchange occur on the 9th.
7            MR. ROSENTHAL:  This is Brian Rosenthal.  Sorry
8    to interrupt your train of thought, Steve.
9            But just to understand that, what I'm
10   understanding is the 9th would be our trigger date.
11   That's the date on which 2019 disclosures are made, the
12   date on which we complete what we've agreed to complete.
13           MR. JENSEN:  Right.
14           MR. ROSENTHAL:  But your infringement
15   contentions, the preliminary infringement contentions
16   would be due on November 13, which is 35 days
17   thereafter, right?
18           MR. JENSEN:  This is Steve.
19           Can Adam or somebody just look at that?  It
20   sounds right.  It would be, what, five weeks later,
21   Brian?
22           MR. ROSENTHAL:  Five weeks, yes.
23           MR. POWELL:  Yeah, that's fine.  The timing is
24   correct.  Okay.
25           MR. JENSEN:  If Adam says it, it's correct.
```

Page 8

```
 1            So that would be our proposal.  The way I would
 2    deal with the motions, I think you're getting full
 3    relief, although the sufficiency may still be an issue.
 4    I guess you'll see when you get it.
 5            You'll be getting a date certain from us on
 6    that.  It would be the date we would do that exchange.
 7            The way I would propose we deal with the
 8    motions is that we each send a notice and we withdraw
 9    those motions without prejudice.  That way, you know, we
10    decide where the appropriate forum is to deal with those
11    in the future in case something is supposed to go to
12    Judge Selna or Judge Early.
13            I know Judge Selna ruled the sufficiency of any
14    2019 is dealt with by Early.
15            He also said if there is a core technical
16    document, he's supposed to deal with it, but I don't
17    know until we get your production really whether there
18    is going to be anything remaining there or not.
19            So I suggest we withdraw them and then we deal
20    with it when we see what each other has done on the 9th.
21            MR. ROSENTHAL:  It's Brian Rosenthal again, and
22    Josh and some others may have comments, as well.  But
23    let me give you my reaction.
24            First, I appreciate -- you know, I genuinely
25    appreciate how this call and yesterday's call has gone.
```

Page 9

1    Thank you for that.  I think it's been very productive

2    and continues to be.  I think we are both trying to

3    resolve the issue and sort of move on in this case, so

4    that's great.

5            Second, I am not going to comment on the

6    timing.  I'm going to leave that to Josh because from

7    the patent perspective I think I can live with that

8    timing because basically that pushes the infringement

9    contentions back a week from what we were proposing.

10   Rather than being November 6th, it would be

11   November 13th.

12           We had put together a schedule adjustment based

13   on a November 6th infringement contention.  It's going

14   to be very easy for us to adjust that for a November 13

15   infringement contention.

16           So the timing, if it's a problem, is going to

17   be a problem from the trade secret perspective not from

18   the patent perspective.  So I'll let Josh address that

19   in just a moment.

20           The concern I have with your proposal is it

21   sounds like we may be in exactly the same situation on

22   October 9th, where, by that time, we produce everything

23   that we believe is called for, all the bits and other

24   things.  We produce what we're going to produce.

25           Then we get back into this infinite loop where

Page 10

1    you all look at it and say I don't think this is all the

2    core technical documents, so now we're going to refile

3    our ex parte application and now we're back in the same

4    boat.

5          That aspect of the proposal I think is not

6    productive because it just kicks the can down the road.

7          I fully understand, Steve, what you're saying.

8    We don't know what you're going to produce until you

9    produce it.  I get that.

10         I will say I think that from a practical

11   standpoint, not a theoretical or academic standpoint but

12   from a practical standpoint, when you look at what we've

13   produced, I mean, we've long passed what core technical

14   documents would require.  We're well into what other

15   documents might we need in this litigation.

16         I know you may not and probably do not agree

17   with that, but I'm just concerned that we end up in

18   exactly the same situation.

19         I think for that proposal to work for us, we

20   would all have to agree to the extent that there is any

21   disagreements, and there may well be, to the extent

22   there is any disagreements about the sufficiency of the

23   production, whether it's the sufficiency of the 2019.210

24   disclosure or the sufficiency of the documents we

25   produced, that that ought to be raised as a motion to

                                                  Page 11

 1    compel with Judge Early.

 2            I think we've heard loud and clear from the

 3    Court that ex parte motions on this stuff is not

 4    appreciated by the Court.

 5            We also heard from Judge Early that at least he

 6    wants to try to take these disputes as much as possible

 7    out of the hands or off the table or off the plate of

 8    Judge Selna.

 9            So from our perspective for that proposal to

10    work, I think we ought to agree that to the extent there

11    are any sufficiency issues that we can resolve amongst

12    ourselves -- and I actually think there will be -- I

13    think there are issues that you all have.  We will be

14    able to resolve them unless you want everything that has

15    to do with the iPhone, then that will be a dispute.

16            It seems to me that the right way to handle

17    that is to go through the regular discovery process.  We

18    can expedite it as much as possible.  We can do whatever

19    we can to get stipulations done and get them on file.

20            That's the only aspect I have a problem with

21    with your proposal.

22            MR. JENSEN:  Okay.  Thank you, Brian.

23            I have some more thoughts on that unless there

24    is something more from Josh.

25            MR. LERNER:  There is not other than -- I'm

                                                Page 12

1    still thinking about it.

2         As I indicated yesterday, that is, just in the

3    interest of openness, kind of later than we wanted, but

4    as I also said yesterday, nobody is going to get

5    everything they want.

6         The one thing that I would not want to hide the

7    ball about or have -- kind of play it close to my chest

8    and then have you be surprised or feel like we misled

9    you, we, as you know from the hearing with Judge Early,

10   do not believe that the motion to dismiss is relevant to

11   2019.210.

12        We think that Judge Early, again to be

13   straightforward, agrees with us.  We think it's a

14   different standard.

15        We would push back, to put it mildly, on the

16   idea that a ruling on the motion to dismiss has a

17   bearing on the sufficiency of the description of the

18   secrets in a 2019.210 disclosure.

19        I think you all know that, but I didn't -- to

20   the extent we reach an agreement on a date after the

21   motion to dismiss briefing is wrapped up, I didn't want

22   to suggest that we were thereby agreeing that the ruling

23   on the motion to dismiss would have some bearing.

24        I obviously get you all think otherwise, but

25   what I don't want to have is you all feeling like we've

Page 13

```
 1    agreed that you're right and on the flipside if you all
 2    were to argue that we had agreed to that, I would
 3    strongly disagree with that.
 4           So as long as kind of nobody is walking away
 5    with that from that date with the impression it means
 6    we've agreed the motion to dismiss could resolve the
 7    2019.210 issues, I think that part of it is probably
 8    fine as long as we're all on the same page.
 9           As far as the specific date goes, I'm still
10    thinking through it, but I don't disagree with what you
11    said in terms of the current schedule in terms of
12    briefing and kind of how it unfolds.
13           With that, I'll kind of pause and let you
14    respond with the additional points you wanted to make,
15    Steve.
16           MR. JENSEN:  Sure.
17           I'll start with the date.
18           I didn't take anything from that discussion.
19    This is Steve Jensen, if the court reporter doesn't
20    recognize my voice yet.
21           I didn't take anything from that as an intent
22    to try to bind you to any agreement that any ruling
23    would resolve any dispute we have over 2019.  And that
24    was not my intent.
25           So I'm not -- that wasn't going to walk away
```

Page 14

```
 1    with that, but thanks for clarifying and making clear

 2    your position.

 3            By the way, the date we're proposing is earlier

 4    than I would have proposed which was after we had an

 5    answer from you which would be who knows when, right?

 6            So I'm giving you a date even if Judge Selna

 7    has moved that.  I think it might provide some guidance

 8    for us.  But if it moves, it moves.  We'll give it to

 9    you on the 9th.

10            With respect to what you raised, Brian, on the

11    exchange, I thought I had probably dealt with that and

12    you may have missed it by stating -- because I assumed

13    that would be a concern -- by stating that we would --

14    which basically means I'm committing to not do what you

15    suggested but not pre-dispose the process we use.

16            That is, I'm going to provide you with updated

17    infringement contentions on whatever that date was you

18    mentioned.  Because I'm going to assume you're going to

19    produce more stuff to us and we're going to -- we may

20    still have disputes over that and then hopefully they

21    will come within the realm of stuff that we -- you know.

22            I committed to provide the contentions even if

23    I believe it wasn't sufficient core technical

24    documentation.

25            So I wouldn't be saying in any motion, even if
```

Page 15

```
 1    it was an ex parte motion that, hey, our infringement
 2    contentions should be moved again and continue in that
 3    loop.
 4             I'm going to take you at your word that there
 5    are going to be some things that are there that Perry is
 6    going to find useful, and I'm just going to take that on
 7    your word a bit.
 8             But I still have the issue of until I see it, I
 9    don't know whether we're dealing with something we
10    believe is a core technical document failure, that Judge
11    Selna has ordered us to go to him with an ex parte
12    process or whether it's something that is going to be a
13    motion to compel.
14             So I was just trying to not pre-dispose the
15    process, but I am happy to commit providing those
16    contentions based upon that trigger date that we're
17    going to do the exchange.
18             Does that help?
19             MR. ROSENTHAL:  Your explanation is -- this is
20    Brian Rosenthal.  Your explanation is consistent with
21    how I understood the proposal, so it doesn't really
22    help.
23             I understood that.
24             My concern is not that we -- you're right that
25    the fact that you're willing to commit to provide the
```

Page 16

```
 1    infringement contentions on a date certain which is
 2    certainly a requirement of anything that we would agree
 3    to does avoid the issue of us getting back into this
 4    loop where we have, you know, complaints that we're not
 5    sufficient and complaints that we're not sufficient and
 6    that date keeps pushing out.  That does solve that
 7    problem and we appreciate that aspect of the proposal.
 8          It does not solve the problem that I see which
 9    is the sort of -- the use of the ex parte process in a
10    manner that we don't think is necessary or productive
11    with respect to the core technical documents.
12          And to be candid, I think my view of that is
13    colored by the fact that, you know, I've produced core
14    technical documents in many, many cases as you all have.
15    You know, I have a sense of what core technical
16    documents means.
17          I think we've gone above and beyond what
18    anybody would consider core technical documents, and
19    we're now into what other documents might be necessary
20    to prove a case.  That's a very different question.
21          I'm very, very happy to continue to respond to
22    those requests and go back and find more documents.  And
23    when we do our more full document production, a lot of
24    that stuff is going to be covered, as well.
25          What I'm concerned about is that when we do
```

Page 17

```
 1    this 24-hour response dance over and over again about

 2    the sufficiency of our document production.  I think you

 3    all have a pretty good sense of, A, what we've already

 4    produced and, B, what we will produce.

 5            We've committed to producing documents

 6    responsive to each one of those categories that are

 7    identified by the letter this week.  I do feel that if

 8    that's what we do which we will, I'm not envisioning a

 9    scenario where an ex parte request at that moment would

10    be something that's necessary.

11            If there are additional documents that you need

12    to have produced, you know, we can talk about that.

13            If we're unable to come to agreement, I don't

14    see why the conventional motion to compel process would

15    be insufficient.

16            So what I fear is that by agreeing to this, we

17    are essentially agreeing that on October 10th we're

18    going to be facing another ex parte request in which

19    you're going to say, well, this is all, you know,

20    insufficient.  We don't think it's sufficient and we

21    want them to produce everything under the sun.  And

22    we're going to be right back to where we are today.

23    That's what I'm concerned about.

24            MR. JENSEN:  Okay.  This is Steve Jensen.  Let

25    me address a couple of those things.
```

Page 18

1          I don't think we will be back where we are

2     because we won't be in the loop of when are our

3     contentions due, so we understand each other on that.

4          I also don't have an issue.  Judge Selna

5     ordered us to raise the core technical documents issue.

6     I don't personally have a problem with not having that

7     briefing be on a 24-hour schedule, okay?

8          You know, I think I'd want to talk to my team,

9     but I think I would feel comfortable adjusting some kind

10    of maybe expedited schedule or some kind of regular

11    motion, but I'm still concerned that I shouldn't

12    predispose where that motion should go if we believe --

13    if we still strongly believe there's been a failure on

14    the core technical documents side, that that might be --

15    that that should be going to Judge Selna because that's

16    what he's ordered us to do.

17         So I'm very reluctant to have the parties come

18    to an agreement where the judge has ordered a particular

19    process.  And I'm not looking for some way to put your

20    feet to the fire on a 24-hour briefing.  That's not the

21    goal.

22         But predeciding before that where that motion

23    should go, I just think it's not consistent with what

24    the Court's orders have already said.

25         I do think we could agree amongst ourselves.

```
 1    Maybe my team will disagree with me, but I do think we
 2    could agree amongst ourselves that that briefing would
 3    not have to be on a 24-hour basis.
 4            MR. ROSENTHAL:  So I might be reading too much
 5    between the lines, but if I read between the lines, what
 6    I'm hearing is that -- this is Brian Rosenthal.  What
 7    I'm hearing is that because Judge Selna indicated that
 8    disputes about core technical documents should be
 9    brought to his attention, you would not feel comfortable
10    in a situation where you agree with us to bring them to
11    Judge Early.  That I understand.
12            So I don't have a problem -- subject to
13    discussions with our team, I don't have a problem with
14    the notion that if you do have a problem with the core
15    technical documents, that we find a way to bring that
16    dispute to Judge Selna's attention as opposed to Judge
17    Early's attention.  I don't have a problem with that.
18            I'm also hearing that it's not the briefing
19    schedule that you're looking for is sort of the audience
20    that you've been directed to.
21            If we could agree that we find a way to either
22    replicate or close to replicate the normal motion to
23    compel process, I'm not married to that particular
24    schedule, something more akin to a regular briefing
25    process, you would want to bring that to Judge Selna's
```

Page 20

```
 1    attention.  That I don't think we have a problem with.
 2            So if we can agree to something like that, I'm
 3    not sure how we can frame it.  But if we can agree to
 4    that general idea that any issues that you have that you
 5    believe require court resolution as to the sufficiency
 6    of the core technical document production, would be
 7    brought to Judge Selna's attention but on a briefing
 8    schedule that approximates a regular briefing schedule
 9    for a motion, and we can figure out the details of how
10    we do that.
11            That, to me, would be a workable solution
12    subject to the comments of the rest of the team.
13            MR. JENSEN:  This is Steve Jensen.
14            I appreciate that.  I think we are
15    communicating.
16            You're catching exactly my concern which is
17    having been ordered to deal with it in a certain way,
18    I'm reluctant, as you explained.
19            So I think that's the solution.
20            Look, I may not want to bring it to Judge Selna
21    because I'm not sure he's going to want to see further
22    briefing on this, but I think we need to leave that
23    avenue open and we can agree to the briefing schedule,
24    you know, whatever makes sense.
25            I'm not -- you know, I'm not going to be trying
```

Page 21

1   to push some rapid emergency briefing schedule on the

2   situation and I'm happy to have it look like a regular

3   motion.

4           MR. ROSENTHAL:  I think, subject to a final

5   confirmation from our team, that would work for us.

6           It sounds like, as a general matter, we have a

7   landing spot here as far as the date and as far as what

8   we would do in respect to deficiencies that we perceive.

9           Keep in mind we should all communicate about

10  those deficiencies and try to resolve them towards

11  resolution if we can.  I really think we can.

12          I don't know if it's been clear to you, Steve,

13  I've certainly stressed it to others on your team, but

14  we don't, with the exception of some actual disputes

15  like the watch OS 7 that we talked about, we don't have

16  any desire to not give you stuff.

17          Our desire is to give you what you need and

18  move on.  I mean that.  You've known me for a while.  I

19  really do mean that.  We want to give you what you want.

20  We don't have a hide-the-ball mentality here.  I think

21  that would be helpful for us to move forward.

22          I didn't hear from you yet on the watch -- the

23  new watch and the OS 7 proposal we talked about

24  yesterday.

25          It is okay with us.  Is that okay with you in

Page 22

1    that way proceeding?

2          MR. JENSEN:  Yes, I think that's the most

3    streamlined.

4          I appreciate you getting that done.  I think

5    that will streamline the situation and maybe it will be

6    very different or maybe it will be very much the same

7    and we'll both learn.

8          MR. ROSENTHAL:  You'll be waiting with bated

9    breath.

10         Okay.  Let me open it up.  Are there other

11   issues we need to resolve?

12         MR. JENSEN:  There is not on my plate.

13         Adam, did I miss something?  Perry?

14         Assuming we didn't, I think we'll file our one

15   sentence things that would say something -- I'm not

16   going to try to put it -- it was supposed to be one

17   sentence you resolved or didn't resolve.

18         I think I would say we resolved it in a manner

19   that we will each withdraw our motions with prejudice.

20   Something like that, period.

21         That's what I'll submit to the Court today.

22         MR. ROSENTHAL:  This is Brian Rosenthal.  I'm

23   sure Josh is going to want to weigh in.

24         The other thing I would say is, look, I don't

25   think we need to recount or should we recount any of the

```
1    details of the agreements that we've reached.  That is

2    the whole purpose of having this reported or

3    transcribed.  We know what we've reached.

4             As to that aspect of what we say to the Court,

5    I certainly agree, but I will now pass it over to Josh.

6             MR. LERNER:  And this is just thinking out loud

7    in terms of the motions.  But with respect to -- and

8    this is getting in the weeds.

9             Given everything we've discussed about, you

10   know, a different schedule and how much things will have

11   changed, I'm not sure what the parties mean is kind of

12   without prejudice such that the same motions would go

13   back on for hearing if something went south in the

14   future, because to state the obvious, both your motion

15   and ours would be significantly --

16            MR. JENSEN:  It would look different.

17            MR. LERNER:  Look.  If you want to refile your

18   motion for a date certain for me to give you one, I

19   won't stop you from doing that.  But I don't think

20   either of us has to worry about the same exact motion

21   being refiled, assuming we follow through on what we

22   agree to be filed.

23            If I didn't give you my 2019 on the 9th, but I

24   expect they would look different.

25            It's just that we have a -- it's without
```

Page 24

```
 1    prejudice to the relief we're seeking.

 2             We get what we're going to get.  You get my

 3    2019 and I suspect any relief would look differently at

 4    that point.

 5             MR. JENSEN:  Understood.  Okay.

 6             Mark, anything else on your end?  I know Brian

 7    and I have been speaking.  Anything else you have?

 8             MR. LYON:  No, nothing from me at this point.

 9    I think.

10             MR. JENSEN:  Adam, Perry, anything anybody had

11    on their list?  I think I covered everything that we've

12    done.

13             We have a transcript.

14             MR. LERNER:  Steve, this is Josh.

15             So one detail thing which would be just be

16    incredibly helpful, if you don't mind sending over

17    before -- if possible before you file it, the one

18    sentence you're planning to say just so that we can try

19    and communicate with our folks both where we landed on

20    this call and what's being said.  That will make it a

21    lot easier to not have a crunch here and ideally also to

22    not respond which I think, even though it's only a

23    sentence, will make everybody happier.

24             So if it's at all possible as a courtesy, just

25    shoot us what you're planning to say once you've got it,
```

Page 25

1    that would be super helpful.

2          MR. JENSEN:  I'm fine with that.

3          Presuming I get it to you -- I'm on mountain

4    time.  I'm saying we only have 15 minutes, but we have

5    an hour and 15 minutes.  So I will try to get that to

6    you as soon as we have it finalized.

7          MR. LERNER:  Okay.

8          MR. OLDHAM:  This is Perry Oldham.  I just

9    wanted to confirm that we've covered between yesterday

10   and today the things that we needed to cover.

11         I understand from today that neither side wants

12   surprises October 9th, and hopefully we can work

13   together to make sure that everybody's expectations are

14   appropriately set for whatever gets exchanged on the

15   9th.

16         MR. LERNER:  Thanks, Perry.

17         MR. JENSEN:  I don't think there is anything

18   else from our side.  This is Steve Jensen

19         Anything else from you guys?  Gibson?

20         MR. LERNER:  This is Josh.  Nothing else from

21   me.

22         MR. ROSENTHAL:  No.

23         MR. LERNER:  It was a good conversation.  We'll

24   see you.

25         (Proceedings concluded at 10:42 a.m.)

                                          Page 26

```
1    STATE OF CALIFORNIA         )

                                 ) ss

2    COUNTY OF LOS ANGELES       )

3

4

5              I, David A. Salyer, a Certified Shorthand

6    Reporter, do hereby certify:

7              That said telephonic conference was taken

8    down by me in shorthand at the time and place therein

9    named and thereafter transcribed under my direction;

10             I further certify that I am neither counsel

11   for, nor related to, any party to said proceedings, nor

12   in any way interested in the  outcome thereof.

13             I declare under penalty of perjury

14   under the laws of the State of California that the

15   foregoing is true and correct.

16

17   Dated: October 20, 2020

18

19

20                    DAVID A. SALYER, CMR,CRR

21                    CSR No. 4410

22

23

24

25

                                              Page 27
```

**[& - brings]**

| & | 5 | | |
|---|---|---|---|
| **&**  2:3,9 | **555**  2:12 | 21:23 24:5,22 | **audience**  20:19 |
| | | **agreed**  8:12 14:1,2 | **avenue**  21:23 |
| **0** | **6** | 14:6 | **avoid**  17:3 |
| **00048**  1:8 | **6th**  10:10,13 | **agreeing**  13:22 | **b** |
| **1** | **7** | 18:16,17 | |
| | | **agreement**  6:7 | **b**  18:4 |
| **1**  3:3 6:17 | **7**  22:15,23 | 13:20 14:22 18:13 | **back**  4:21 5:12 |
| **1-27**  1:25 | **760-0404**  2:6 | 19:18 | 10:9,25 11:3 |
| **10:11**  1:15 4:3 | **8** | **agreements**  24:1 | 13:15 17:3,22 |
| **10:42**  26:25 | | **agrees**  13:13 | 18:22 19:1 24:13 |
| **10th**  18:17 | **8:20**  1:8 | **akin**  20:24 | **ball**  13:7 22:20 |
| **13**  8:16 10:14 | **9** | **andrea**  2:11 | **based**  6:20 10:12 |
| **13th**  10:11 | | **angeles**  4:1 27:2 | 16:16 |
| **14th**  2:5 | **9**  1:14 4:2 | **answer**  15:5 | **basically**  10:8 |
| **15**  26:4,5 | **92614**  2:6 | **answers**  5:13 | 15:14 |
| | **94105**  2:13 | **anybody**  17:18 | **basis**  20:3 |
| **2** | **949**  2:6 | 25:10 | **bated**  23:8 |
| **20**  27:17 | **9th**  7:12,21 8:6,10 | **apologies**  4:9 | **bear**  2:3 |
| **2019**  8:11 9:14 | 9:20 10:22 15:9 | **appearances**  2:1 | **bearing**  13:17,23 |
| 14:23 24:23 25:3 | 24:23 26:12,15 | **appearing**  2:1 4:5 | **believe**  10:23 |
| **2019.210**  11:23 | **a** | **apple**  1:9 4:23 5:1 | 13:10 15:23 16:10 |
| 13:18 14:7 | | **application**  11:3 | 19:12,13 21:5 |
| **2019.210.**  13:11 | **a.m.**  1:15 4:3 | **appreciate**  9:24,25 | **benefit**  7:5,17 |
| **2020**  1:14 4:2 | 26:25 | 17:7 21:14 23:4 | **beyond**  17:17 |
| 27:17 | **able**  4:20,23 5:15 | **appreciated**  12:4 | **bind**  14:22 |
| **2040**  2:5 | 5:22 12:14 | **appropriate**  9:10 | **bit**  4:9 16:7 |
| **21302**  27:19 | **academic**  11:11 | **appropriately** | **bits**  10:23 |
| **24**  18:1 19:7,20 | **actual**  6:15 22:14 | 26:14 | **boat**  11:4 |
| 20:3 | **adam**  2:4 8:19,25 | **approved**  5:8,9 | **breath**  23:9 |
| **25th**  4:25 | 23:13 25:10 | **approximates** | **brian**  2:11,11 4:13 |
| **3** | **add**  4:13 | 21:8 | 4:16,19 6:23,24 |
| | **additional**  4:17 | **argue**  14:2 | 8:1,7,21 9:21 |
| **3000**  2:12 | 14:14 18:11 | **aspect**  11:5 12:20 | 12:22 15:10 16:20 |
| **35**  8:16 | **address**  10:18 | 17:7 24:4 | 20:6 23:22 25:6 |
| **393-8200**  2:13 | 18:25 | **assert**  5:5,6 | **briefing**  13:21 |
| **4** | **addresses**  5:19 | **assume**  15:18 | 14:12 19:7,20 |
| | **adjust**  10:14 | **assumed**  15:12 | 20:2,18,24 21:7,8 |
| **415**  2:13 | **adjusting**  19:9 | **assuming**  23:14 | 21:22,23 22:1 |
| **4251588**  1:24 | **adjustment**  10:12 | 24:21 | **bring**  20:10,15,25 |
| **4410**  1:23 27:21 | **adjustments**  5:20 | **attention**  20:9,16 | 21:20 |
| | **agree**  11:16,20 | 20:17 21:1,7 | **brings**  8:4 |
| | 12:10 17:2 19:25 | | |
| | 20:2,10,21 21:2,3 | | |

Page 1

| | | | |
|---|---|---|---|
| **brought** 20:9 21:7 | **commit** 6:17 7:7 16:15,25 | **conventional** 18:14 | **dated** 27:17 |
| **c** | **committed** 15:22 18:5 | **conversation** 26:23 | **dates** 7:7 |
| **california** 1:2 2:6 2:13 4:1 27:1,14 | **committing** 15:14 | **core** 5:3 9:15 11:2 11:13 15:23 16:10 17:11,13,15,18 19:5,14 20:8,14 21:6 | **david** 1:22 27:5,20 |
| **call** 1:13 3:3 9:25 9:25 25:20 | **communicate** 22:9 25:19 | | **days** 8:16 |
| **called** 10:23 | **communicating** 21:15 | | **deal** 7:1,13 9:2,7 9:10,16,19 21:17 |
| **candid** 17:12 | **communication** 6:14 | **corporation** 1:5,5 1:6 | **dealing** 16:9 |
| **case** 7:13 9:11 10:3 17:20 | **compel** 6:3 12:1 16:13 18:14 20:23 | **correct** 8:24,25 27:15 | **dealt** 9:14 15:11 |
| **cases** 17:14 | **complaint** 6:13 | **counsel** 27:10 | **decide** 6:2 9:10 |
| **catching** 21:16 | **complaints** 17:4,5 | **counter** 5:18 | **declare** 27:13 |
| **categories** 18:6 | **complete** 8:12,12 | **county** 27:2 | **defendant** 1:10 |
| **central** 1:2 | **compromise** 5:9 | **couple** 4:24 5:17 7:1 18:25 | **defendants** 2:9 |
| **cercacor** 1:5 | **concern** 10:20 15:13 16:24 21:16 | | **deficiencies** 22:8 22:10 |
| **certain** 9:5 17:1 21:17 24:18 | | **court** 1:1 12:3,4 14:19 21:5 23:21 24:4 | **delaware** 1:5,6 |
| **certainly** 6:14 17:2 22:13 24:5 | **concerned** 11:17 17:25 18:23 19:11 | | **description** 13:17 |
| **certified** 27:5 | **concerns** 5:19,24 | **court's** 19:24 | **desire** 22:16,17 |
| **certify** 27:6,10 | **concluded** 26:25 | **courtesy** 25:24 | **detail** 4:13 25:15 |
| **challenging** 7:20 | **conference** 1:13 3:3 27:7 | **cover** 26:10 | **details** 21:9 24:1 |
| **changed** 24:11 | **confirm** 26:9 | **covered** 17:24 25:11 26:9 | **determine** 5:4 6:2 |
| **chest** 13:7 | **confirmation** 22:5 | **crr** 1:22 27:20 | **different** 13:14 17:20 23:6 24:10 24:16,24 |
| **claims** 6:12 | **consider** 17:18 | **crunch** 25:21 | |
| **clarifying** 15:1 | **consistent** 16:20 19:23 | **crutcher** 2:9 | **differently** 25:3 |
| **clear** 12:2 15:1 22:12 | **contention** 8:5 10:13,15 | **csr** 1:23 27:21 | **directed** 20:20 |
| **clock** 6:18 | **contentions** 6:5 7:14,24 8:15,15 10:9 15:17,22 16:2,16 17:1 19:3 | **current** 14:11 | **direction** 27:9 |
| **close** 13:7 20:22 | | **cv** 1:8 | **disagree** 14:3,10 20:1 |
| **cmr** 27:20 | | **d** | |
| **code** 5:3,7 | **continue** 7:15 16:2 17:21 | **d** 3:1 | **disagreement** 6:7 |
| **colored** 17:13 | | **dance** 18:1 | **disagreements** 11:21,22 |
| **come** 15:21 18:13 19:17 | **continues** 10:2 | **date** 7:11,22 8:10 8:11,12 9:5,6 13:20 14:5,9,17 15:3,6,17 16:16 17:1,6 22:7 24:18 | **disclosure** 11:24 13:18 |
| **comfortable** 19:9 20:9 | **continuing** 7:13 | | **disclosures** 8:11 |
| **comment** 10:5 | | | **discovery** 12:17 |
| **comments** 9:22 21:12 | | | **discussed** 4:11 7:12 24:9 |
| | | | **discussing** 5:21 |
| | | | **discussion** 14:18 |
| | | | **discussions** 20:13 |

Page 2

**[dismiss - hopefully]**

**dismiss** 7:17 13:10 13:16,21,23 14:6
**dispose** 15:15 16:14
**dispute** 6:9 12:15 14:23 20:16
**disputes** 12:6 15:20 20:8 22:14
**district** 1:1,2
**division** 1:3
**document** 9:16 16:10 17:23 18:2 21:6
**documentation** 15:24
**documents** 5:4 7:22 11:2,14,15,24 17:11,14,16,18,19 17:22 18:5,11 19:5,14 20:8,15
**doing** 5:25 24:19
**drive** 6:9
**due** 8:16 19:3
**dunn** 2:9

**e**

**e** 3:1
**eager** 5:13
**earlier** 15:3
**early** 9:12,14 12:1 12:5 13:9,12 20:11
**early's** 20:17
**easier** 25:21
**easy** 10:14
**either** 20:21 24:20
**emergency** 22:1
**envisioning** 18:8
**esq** 2:3,4,4,10,10 2:11,11
**essentially** 18:17

**everybody** 25:23
**everybody's** 26:13
**ex** 11:3 12:3 16:1 16:11 17:9 18:9 18:18
**exact** 24:20
**exactly** 10:21 11:18 21:16
**example** 6:7
**exception** 22:14
**exchange** 8:6 9:6 15:11 16:17
**exchanged** 26:14
**expect** 24:24
**expectations** 26:13
**expedite** 12:18
**expedited** 19:10
**explained** 7:4 21:18
**explanation** 16:19 16:20
**extent** 11:20,21 12:10 13:20
**extra** 7:23

**f**

**facing** 18:18
**fact** 16:25 17:13
**failure** 16:10 19:13
**far** 14:9 22:7,7
**fear** 18:16
**feel** 13:8 18:7 19:9 20:9
**feeling** 13:25
**feet** 19:20
**figure** 21:9
**file** 12:19 23:14 25:17
**filed** 24:22

**final** 22:4
**finalized** 26:6
**find** 16:6 17:22 20:15,21
**fine** 8:23 14:8 26:2
**fire** 19:20
**first** 9:24
**five** 8:20,22
**flipside** 14:1
**floor** 2:5
**folks** 4:16 25:19
**follow** 4:8,10 24:21
**foregoing** 27:15
**forum** 9:10
**forward** 4:11 7:10 22:21
**frame** 21:3
**francisco** 2:13
**full** 9:2 17:23
**fully** 11:7
**further** 21:21 27:10
**future** 9:11 24:14

**g**

**general** 21:4 22:6
**genuinely** 9:24
**getting** 9:2,5 17:3 23:4 24:8
**gibson** 2:9 26:19
**gibsondunn.com** 2:14
**give** 7:23 9:23 15:8 22:16,17,19 24:18 24:23
**given** 24:9
**giving** 15:6
**go** 9:11 12:17 16:11 17:22 19:12 19:23 24:12

**goal** 19:21
**goes** 14:9
**going** 4:8 5:5,12 5:24,25 6:9 7:25 8:2 9:18 10:5,6,13 10:16,24 11:2,8 13:4 14:25 15:16 15:18,18,19 16:4,5 16:6,6,12,17 17:24 18:18,19,22 19:15 21:21,25 23:16,23 25:2
**good** 18:3 26:23
**great** 10:4
**guess** 5:23 9:4
**guidance** 7:9 15:7
**guide** 7:19
**guys** 5:13 26:19

**h**

**h** 2:10
**handle** 12:16
**hands** 12:7
**happened** 6:14
**happens** 7:7
**happier** 25:23
**happy** 6:17 16:15 17:21 22:2
**hear** 4:17 5:13 22:22
**heard** 12:2,5
**hearing** 13:9 20:6 20:7,18 24:13
**hearings** 7:6
**help** 16:18,22
**helpful** 22:21 25:16 26:1
**hey** 6:2 16:1
**hide** 13:6 22:20
**hopefully** 5:18 15:20 26:12

Page 3

[hour - need]

**hour** 18:1 19:7,20 20:3 26:5

### i

**idea** 5:1 13:16 21:4
**ideally** 25:21
**identified** 18:7
**impression** 14:5
**incredibly** 25:16
**indicated** 13:2 20:7
**infinite** 10:25
**infringement** 6:20 8:14,15 10:8,13,15 15:17 16:1 17:1
**insufficient** 18:15 18:20
**intent** 14:21,24
**interest** 13:3
**interested** 27:12
**internally** 5:15
**interrupt** 8:8
**iphone** 6:8 12:15
**iphones** 6:13
**irvine** 2:6
**issue** 6:3 7:13 9:3 10:3 16:8 17:3 19:4,5
**issues** 5:23 12:11 12:13 14:7 21:4 23:11

### j

**jensen** 2:3 5:15,16 6:25 8:13,18,25 12:22 14:16,19 18:24,24 21:13,13 23:2,12 24:16 25:5,10 26:2,17,18
**jlerner** 2:14

**job** 1:24
**josh** 9:22 10:6,18 12:24 23:23 24:5 25:14 26:20
**joshua** 2:10
**judge** 7:6 9:12,12 9:13 12:1,5,8 13:9 13:12 15:6 16:10 19:4,15,18 20:7,11 20:16,16,25 21:7 21:20
**jump** 4:14,17
**jvs** 1:8

### k

**keep** 22:9
**keeps** 17:6
**kicks** 11:6
**kind** 4:10 13:3,7 14:4,12,13 19:9,10 24:11
**knobbe** 2:3
**knobbe.com** 2:7
**know** 5:3,25 6:6,8 6:10,15 7:13,17 9:9,13,17,24 11:8 11:16 13:9,19 15:21 16:9 17:4 17:13,15 18:12,19 19:8 21:24,25 22:12 24:3,10 25:6
**known** 22:18
**knows** 15:5

### l

**laboratories** 1:6
**landed** 25:19
**landing** 22:7
**late** 4:9,22
**laws** 27:14

**learn** 23:7
**leave** 10:6 21:22
**left** 4:7
**lerner** 2:10 4:6 12:25 24:6,17 25:14 26:7,16,20 26:23
**letter** 18:7
**lines** 20:5,5
**list** 25:11
**litigation** 11:15
**little** 4:9 7:23
**live** 10:7
**llp** 2:9
**long** 11:13 14:4,8
**look** 7:2 8:2,19 11:1,12 21:20 22:2 23:24 24:16 24:17,24 25:3
**looked** 6:12,12
**looking** 19:19 20:19
**loop** 10:25 16:3 17:4 19:2
**los** 4:1 27:2
**lot** 17:23 25:21
**loud** 12:2 24:6
**lyon** 2:10 25:8

### m

**m** 2:3
**main** 2:5
**making** 15:1
**manner** 17:10 23:18
**mark** 2:10 25:6
**married** 20:23
**martens** 2:3
**masimo** 1:5
**matter** 6:11 22:6
**mean** 6:10 11:13 22:18,19 24:11

**meaningfully** 6:5
**means** 14:5 15:14 17:16
**mentality** 22:20
**mentioned** 6:13 8:3 15:18
**mildly** 13:15
**mind** 22:9 25:16
**minute** 6:22
**minutes** 26:4,5
**misled** 13:8
**missed** 15:12
**missing** 6:4
**mission** 2:12
**moment** 10:19 18:9
**motion** 6:1,3 7:17 11:25 13:10,16,21 13:23 14:6 15:25 16:1,13 18:14 19:11,12,22 20:22 21:9 22:3 24:14 24:18,20
**motions** 9:2,8,9 12:3 23:19 24:7 24:12
**mountain** 26:3
**move** 4:11 7:6,10 7:16 10:3 22:18 22:21
**moved** 15:7 16:2
**moves** 15:8,8

### n

**n** 3:1
**named** 27:9
**necessary** 17:10 17:19 18:10
**need** 11:15 18:11 21:22 22:17 23:11 23:25

[needed - read]

| | | | |
|---|---|---|---|
| **needed**  26:10 | **p** | **points**  14:14 | **production**  6:2,15 |
| **neither**  26:11 | | **position**  15:2 | 6:19,20 9:17 |
| 27:10 | **page**  3:2 14:8 | **possible**  7:5 12:6 | 11:23 17:23 18:2 |
| **new**  5:1 22:23 | **pages**  1:25 | 12:18 25:17,24 | 21:6 |
| **non**  5:3 | **part**  5:8 14:7 | **potential**  7:9 | **productive**  10:1 |
| **normal**  20:22 | **parte**  11:3 12:3 | **potentially**  7:18 | 11:6 17:10 |
| **notice**  9:8 | 16:1,11 17:9 18:9 | **powell**  2:4 8:23 | **proposal**  4:11 5:9 |
| **notion**  20:14 | 18:18 | **practical**  11:10,12 | 5:18 7:2 9:1 10:20 |
| **november**  8:16 | **participants**  2:1 | **practice**  7:18 | 11:5,19 12:9,21 |
| 10:10,11,13,14 | **particular**  19:18 | **pre**  15:15 16:14 | 16:21 17:7 22:23 |
| **number**  6:17 | 20:23 | **predeciding**  19:22 | **propose**  9:7 |
| | **parties**  4:5 7:19 | **predispose**  19:12 | **proposed**  15:4 |
| **o** | 19:17 24:11 | **prejudice**  9:9 | **proposing**  7:11,21 |
| | **party**  27:11 | 23:19 24:12 25:1 | 10:9 15:3 |
| **o0o**  4:4 | **party's**  5:19 | **preliminary**  8:15 | **protections**  6:20 |
| **obvious**  24:14 | **pass**  24:5 | **pressures**  8:4 | **prove**  17:20 |
| **obviously**  4:7,15 | **passed**  11:13 | **presuming**  26:3 | **provide**  5:6 6:4,19 |
| 13:24 | **patent**  10:7,18 | **pretty**  18:3 | 15:7,16,22 16:25 |
| **occur**  8:6 | **patents**  5:5 | **probably**  11:16 | **providing**  6:8 |
| **october**  10:22 | **pause**  14:13 | 14:7 15:11 | 16:15 |
| 18:17 26:12 27:17 | **penalty**  27:13 | **problem**  10:16,17 | **purpose**  24:2 |
| **okay**  6:25 8:24 | **perceive**  22:8 | 12:20 17:7,8 19:6 | **push**  13:15 22:1 |
| 12:22 18:24 19:7 | **period**  6:21 23:20 | 20:12,13,14,17 | **pushes**  10:8 |
| 22:25,25 23:10 | **perjury**  27:13 | 21:1 | **pushing**  17:6 |
| 25:5 26:7 | **perry**  2:4 5:22 | **proceeding**  23:1 | **put**  5:10 10:12 |
| **oldham**  2:4 26:8,8 | 16:5 23:13 25:10 | **proceedings**  3:2 | 13:15 19:19 23:16 |
| **olson**  2:3 | 26:8,16 | 26:25 27:11 | |
| **once**  25:25 | **personally**  19:6 | **process**  12:17 | **q** |
| **open**  21:23 23:10 | **perspective**  10:7 | 15:15 16:12,15 | |
| **openness**  13:3 | 10:17,18 12:9 | 17:9 18:14 19:19 | **question**  17:20 |
| **opposed**  20:16 | **piece**  7:20 | 20:23,25 | **questions**  5:11 |
| **order**  6:4 7:12 8:6 | **place**  27:8 | **produce**  10:22,24 | **quicker**  7:16 |
| **ordered**  16:11 | **plaintiff**  2:2 | 10:24 11:8,9 | **quickly**  5:4 |
| 19:5,16,18 21:17 | **plaintiffs**  1:7 | 15:19 18:4,21 | |
| **orders**  19:24 | **plan**  5:8 | **produced**  11:13 | **r** |
| **os**  22:15,23 | **planning**  7:8 | 11:25 17:13 18:4 | |
| **ought**  11:25 12:10 | 25:18,25 | 18:12 | **raise**  19:5 |
| **outcome**  27:12 | **plate**  12:7 23:12 | **producing**  5:2 | **raised**  11:25 15:10 |
| **outstanding**  5:11 | **play**  13:7 | 18:5 | **rapid**  22:1 |
| 5:23 | **please**  4:14 | **product**  5:6 | **reach**  13:20 |
| | **point**  25:4,8 | | **reached**  24:1,3 |
| | | | **reaction**  9:23 |
| | | | **read**  20:5 |

Page 5

[reading - sufficiency]

| | | | |
|---|---|---|---|
| **reading**  20:4 | **respect**  7:19 15:10 | **seeking**  25:1 | **southern**  1:3 |
| **ready**  4:10 | 17:11 22:8 24:7 | **selna**  7:6 9:12,13 | **speak**  4:23 5:18 |
| **really**  5:25 6:3,4 | **respond**  14:14 | 12:8 15:6 16:11 | **speaking**  25:7 |
| 9:17 16:21 22:11 | 17:21 25:22 | 19:4,15 20:7 | **specific**  14:9 |
| 22:19 | **response**  18:1 | 21:20 | **spot**  22:7 |
| **realm**  15:21 | **responsive**  18:6 | **selna's**  20:16,25 | **ss**  27:1 |
| **reason**  4:22 | **rest**  8:2 21:12 | 21:7 | **stand**  5:14 |
| **recognize**  14:20 | **right**  4:6 6:10,19 | **send**  9:8 | **standard**  13:14 |
| **recount**  23:25,25 | 8:13,17,20 12:16 | **sending**  25:16 | **standpoint**  11:11 |
| **refile**  11:2 24:17 | 14:1 15:5 16:24 | **sense**  6:23 7:3,8 | 11:11,12 |
| **refiled**  24:21 | 18:22 | 17:15 18:3 21:24 | **start**  6:18 14:17 |
| **regular**  12:17 | **rmr**  1:22 | **sentence**  23:15,17 | **state**  24:14 27:1,14 |
| 19:10 20:24 21:8 | **road**  11:6 | 25:18,23 | **stated**  5:19 |
| 22:2 | **rosenthal**  2:11 | **september**  1:14 | **states**  1:1 |
| **related**  27:11 | 4:13,19,19 6:24 | 4:2,25 | **stating**  15:12,13 |
| **released**  5:2 | 8:7,7,14,22 9:21 | **set**  26:14 | **stephen**  2:3 4:15 |
| **relevant**  13:10 | 9:21 16:19,20 | **shoot**  25:25 | 4:18 |
| **relief**  9:3 25:1,3 | 20:4,6 22:4 23:8 | **shorten**  7:14,24 | **stephen.jensen**  2:7 |
| **reluctant**  19:17 | 23:22,22 26:22 | 8:5 | **steve**  4:20 5:16 8:8 |
| 21:18 | **ruled**  9:13 | **shorthand**  27:5,8 | 8:18 11:7 14:15 |
| **reluctantly**  5:9 | **ruling**  13:16,22 | **shortly**  5:2,7 | 14:19 18:24 21:13 |
| **remaining**  5:23 | 14:22 | **side**  4:16 19:14 | 22:12 25:14 26:18 |
| 9:18 | **running**  6:18 | 26:11,18 | **stipulations**  12:19 |
| **remotely**  2:1 4:5 | | **signature**  27:19 | **stop**  5:24 24:19 |
| **replicate**  20:22,22 | **s** | **significantly**  24:15 | **straightforward** |
| **reported**  1:21 24:2 | | **situation**  10:21 | 13:13 |
| **reporter**  14:19 | **salyer**  1:22 27:5 | 11:18 20:10 22:2 | **streamline**  23:5 |
| 27:6 | 27:20 | 23:5 | **streamlined**  23:3 |
| **request**  18:9,18 | **san**  2:13 | **small**  5:20 | **street**  2:5,12 |
| **requests**  17:22 | **saying**  11:7 15:25 | **solution**  21:11,19 | **stressed**  22:13 |
| **require**  11:14 21:5 | 26:4 | **solve**  17:6,8 | **string**  7:15 |
| **requirement**  17:2 | **says**  8:25 | **somebody**  8:19 | **strongly**  14:3 |
| **resolution**  21:5 | **scenario**  18:9 | **soon**  26:6 | 19:13 |
| 22:11 | **schedule**  8:2 10:12 | **sorry**  4:20 8:7 | **stuff**  12:3 15:19,21 |
| **resolve**  8:1 10:3 | 14:11 19:7,10 | **sort**  5:2 10:3 17:9 | 17:24 22:16 |
| 12:11,14 14:6,23 | 20:19,24 21:8,8,23 | 20:19 | **subject**  20:12 |
| 22:10 23:11,17 | 22:1 24:10 | **sounds**  8:20 10:21 | 21:12 22:4 |
| **resolved**  6:1 23:17 | **second**  10:5 | 22:6 | **submit**  23:21 |
| 23:18 | **secret**  7:20 10:17 | **source**  5:3,7 | **subsequent**  6:18 |
| **resolves**  6:16 | **secrets**  13:18 | **south**  24:13 | **sufficiency**  9:3,13 |
| | **see**  6:1,15 8:3 9:4 | | 11:22,23,24 12:11 |
| | 9:20 16:8 17:8 | | |
| | 18:14 21:21 26:24 | | |

[sufficiency - yesterday's]

13:17 18:2 21:5
**sufficient** 15:23
    17:5,5 18:20
**suggest** 9:19 13:22
**suggested** 15:15
**suit** 5:5
**suite** 2:12
**sun** 18:21
**super** 26:1
**supposed** 9:11,16
    23:16
**sure** 14:16 21:3,21
    23:23 24:11 26:13
**surprised** 13:8
**surprises** 26:12
**suspect** 25:3

**t**

**table** 12:7
**take** 4:18 12:6
    14:18,21 16:4,6
**taken** 27:7
**takes** 6:25
**talk** 4:15 5:15,22
    18:12 19:8
**talked** 22:15,23
**talking** 6:8
**team** 5:22 19:8
    20:1,13 21:12
    22:5,13
**technical** 5:3 9:15
    11:2,13 15:23
    16:10 17:11,14,15
    17:18 19:5,14
    20:8,15 21:6
**telephonic** 27:7
**tentative** 7:18
**terms** 7:4 14:11,11
    24:7
**thank** 10:1 12:22
**thanks** 15:1 26:16

**theoretical** 11:11
**thereof** 27:12
**thing** 13:6 23:24
    25:15
**things** 4:24 5:21
    6:14 7:1 10:24
    16:5 18:25 23:15
    24:10 26:10
**think** 4:7,10,15
    5:11,19 6:6,10 7:3
    7:7,25 8:1,1 9:2
    10:1,2,7 11:1,5,10
    11:19 12:2,10,12
    12:13 13:12,13,19
    13:24 14:7 15:7
    17:10,12,17 18:2
    18:20 19:1,8,9,23
    19:25 20:1 21:1
    21:14,19,22 22:4
    22:11,20 23:2,4,14
    23:18,25 24:19
    25:9,11,22 26:17
**thinking** 13:1
    14:10 24:6
**thought** 8:8 15:11
**thoughts** 5:17
    12:23
**time** 7:14,23,24
    8:5 10:22 26:4
    27:8
**timing** 7:4 8:23
    10:6,8,16
**today** 8:1 18:22
    23:21 26:10,11
**trade** 7:20 10:17
**train** 8:8
**transcribed** 24:3
    27:9
**transcript** 25:13
**trigger** 8:10 16:16

**true** 27:15
**try** 12:6 14:22
    22:10 23:16 25:18
    26:5
**trying** 10:2 16:14
    21:25

**u**

**unable** 18:13
**understand** 8:9
    11:7 19:3 20:11
    26:11
**understanding**
    8:10
**understood** 16:21
    16:23 25:5
**unfolds** 14:12
**united** 1:1
**updated** 6:5,19
    15:16
**updates** 4:17
**use** 15:15 17:9
**useful** 16:6

**v**

**version** 5:1
**view** 17:12
**voice** 14:20
**vs** 1:8

**w**

**waiting** 23:8
**walk** 14:25
**walking** 14:4
**want** 4:13,16
    12:14 13:5,6,21,25
    18:21 19:8 20:25
    21:20,21 22:19,19
    23:23 24:17
**wanted** 4:15 13:3
    14:14 26:9
**wants** 12:6 26:11

**watch** 5:2 22:15
    22:22,23
**way** 5:10 7:16 9:1
    9:7,9 12:16 15:3
    19:19 20:15,21
    21:17 23:1 27:12
**we've** 6:1 8:12
    11:12,13 12:2
    13:25 14:6 17:17
    18:3,5 24:1,3,9
    25:11 26:9
**wednesday** 1:14
    4:2
**weeds** 24:8
**week** 7:14 10:9
    18:7
**weeks** 8:20,22
**weigh** 23:23
**went** 24:13
**willing** 7:6,14 8:5
    16:25
**withdraw** 9:8,19
    23:19
**word** 16:4,7
**work** 4:24,25 5:18
    11:19 12:10 22:5
    26:12
**workable** 21:11
**worry** 24:20
**wrapped** 13:21

**x**

**x** 3:1

**y**

**yeah** 8:23
**yesterday** 4:7,12
    4:21 5:20 7:4,12
    8:3 13:2,4 22:24
    26:9
**yesterday's** 9:25

Page 7

Exhibit S

US010219754B1

(12) **United States Patent**   (10) **Patent No.:**  **US 10,219,754 B1**
Lamego   (45) **Date of Patent:**  **Mar. 5, 2019**

(54) **MODULATION AND DEMODULATION TECHNIQUES FOR A HEALTH MONITORING SYSTEM**

(71) Applicant: **Apple Inc.**, Cupertino, CA (US)

(72) Inventor: **Marcelo M. Lamego**, Cupertino, CA (US)

(73) Assignee: **Apple Inc.**, Cupertino, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **14/621,268**

(22) Filed: **Feb. 12, 2015**

**Related U.S. Application Data**

(60) Provisional application No. 62/047,818, filed on Sep. 9, 2014.

(51) **Int. Cl.**
    *A61B 5/00*          (2006.01)
(52) **U.S. Cl.**
    CPC .......... *A61B 5/7228* (2013.01); *A61B 5/0059* (2013.01); *A61B 5/681* (2013.01); *A61B 5/7203* (2013.01); *A61B 5/725* (2013.01); *A61B 5/7225* (2013.01); *A61B 5/7278* (2013.01)

(58) **Field of Classification Search**
    CPC ............................ A61B 5/0059; A61B 5/0084
    See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,349,952 A * 9/1994 McCarthy ............ A61B 5/0059
                                                    356/41
2012/0253155 A1* 10/2012 Diab .................. A61B 5/14551
                                                    600/324

* cited by examiner

*Primary Examiner* — Hien Nguyen
(74) *Attorney, Agent, or Firm* — Brownstein Hyatt Farber Schreck, LLP

(57)          **ABSTRACT**

An electronic device includes one or more light sources for emitting light toward a body part of a user and one or more optical sensors for capturing light samples while each light source is turned on and for capturing dark samples while the light source(s) are turned off. A signal produced by the one or more optical sensors is demodulated produce multiple demodulated signals. Each demodulated signal is received by one or more decimation stages to produce a signal associated with each light source. Each signal associated with the light source(s) is analyzed to estimate or determine a physiological parameter of the user.

**6 Claims, 9 Drawing Sheets**





**FIG. 1**



*FIG. 2*



*FIG. 3*



*FIG. 4*



**FIG. 5**



**FIG. 6**



FIG. 7



**FIG. 8**



*FIG. 9*



**FIG. 10**

US 10,219,754 B1

**1**

## MODULATION AND DEMODULATION TECHNIQUES FOR A HEALTH MONITORING SYSTEM

### CROSS-REFERENCE TO RELATED APPLICATION

This application claims the benefit under 35 U.S.C. § 119(e) of U.S. Provisional Patent Application No. 62/047, 818, filed Sep. 9, 2014, entitled "Modulation and Demodulation Techniques for a Health Monitoring System," the entirety of which is incorporated herein by reference.

### TECHNICAL FIELD

The present invention relates generally to health monitoring systems, and more particularly to modulation and demodulation techniques for a health monitoring system that includes one or more optical sensors.

### BACKGROUND

Health monitoring devices, such as fitness and wellness devices, are capable of measuring a variety of physiological parameters and waveforms non-invasively via optical sensing. Light is applied to a measurement site, such as a user's wrist, finger, and ear, and the light is absorbed and scattered throughout the skin. An optical sensor in the health monitoring device captures the light that is reflected from or transmitted through the skin. The optical sensor, however, is subject to interferences caused by fluorescent bulbs, sun light, the electricity grid or network, and motion artifacts that are caused by the relative motion between the optical sensor and the user's measurement site. Thus, the light collected by the light sensor contains a component from the measurement site and component from one or more interferences. To estimate the physiological parameter and waveform, the optical sensor coverts the collected light into electrical signals, and the signal that represents the interference component is typically subtracted from the signal representing the measurement site component. After subtraction, only the component from the measurement site should remain, which is the component that is used to estimate the physiological parameter. However, subtraction cannot be performed instantaneously. A time delay exists between sampling the light and subtracting the interference component. The time delay can result in the creation of aliases in the signal, and the aliases produce errors in the estimation of the physiological parameter.

### SUMMARY

In one aspect, an electronic device includes one or more light sources for emitting light toward a body part of a user and one or more optical sensors for capturing light samples while each light source is turned on and for capturing dark samples while the light source(s) are turned off. A signal produced by the one or more optical sensors is demodulated produce multiple demodulated signals. Each demodulated signal is received by one or more decimation stages to produce a signal associated with each light source. A demultiplexer and multiplier circuit operably can be connected to an output of the decimation stage. The demultiplexer separates the signals by each associated light source and the multiplier multiplies each signal by one or more respective weights. The weights adjust the signals for variations in temperature and operating parameters of various compo-

**2**

nents in the electronic device. Each signal associated with the light source(s) is analyzed to estimate or determine a physiological parameter of the user.

In another aspect, a method for processing the signal received from the light sensor can include capturing multiple light samples while each light source emits light toward the body part of the user and converting the multiple light samples into the signal. The light sources can be modulated (e.g., turned on and off) according to a particular modulation pattern. The signal produced by the optical sensor is then demodulated to produce multiple demodulated signals. Each demodulated signal is associated with a particular light source. Each demodulated signal is then be processed by at least one decimation stage. In one embodiment, each decimation stage includes a low pass filter that receives a demodulated signal and a decimation circuit operably connected to an output of the low pass filter. A demultiplexer and multiplier circuit may then process the signals. Each signal associated with the light source(s) is analyzed to estimate or determine a physiological parameter of the user.

In yet another aspect, a method for operating an electronic device that includes multiple light sources, an optical sensor, and a processing device operably connected to the optical sensor can include turning on each light source one at a time and emitting light toward a body part of a user and capturing multiple light samples while each light source emits light toward the body part of the user and converting the multiple light samples into a signal. The signal is converted into a digital signal, and the digital signal is demodulated to produce multiple demodulated signals. Each demodulated signal is then processed by at least one decimation stage. In one embodiment, each decimation stage includes a low pass filter that receives a demodulated signal and a decimation circuit operably connected to an output of the low pass filter. Each signal associated with the light source(s) is analyzed to estimate or determine a physiological parameter of the user.

### BRIEF DESCRIPTION OF THE DRAWINGS

Embodiments of the invention are better understood with reference to the following drawings. The elements of the drawings are not necessarily to scale relative to each other. Identical reference numerals have been used, where possible, to designate identical features that are common to the figures.

FIG. **1** a perspective front view of one example of an electronic device that provides health-related information;

FIG. **2** depicts a back view of the electronic device **100** shown in FIG. **1**;

FIG. **3** is an illustrative block diagram of the electronic device **100** shown in FIGS. **1** and **2**;

FIG. **4** is a flowchart of one example method of operating the health monitoring system **312** in FIG. **3**;

FIGS. **5**-**6** depict example modulation patterns suitable for use in blocks **400** and **402** in FIG. **4**;

FIG. **7** is a data flow diagram of a processing channel that performs blocks **408**, **410**, and **412** in FIG. **4**;

FIG. **8** is a flowchart of one example method of determining a matrix used in block **718** of FIG. **7**;

FIG. **9** is a flowchart of one example method of performing block **800** in FIG. **8**; and

FIG. **10** is a flowchart of one example method of performing block **802** in FIG. **8**.

### DETAILED DESCRIPTION

Embodiments described herein provide modulation and demodulation techniques that reduce or eliminate undesired

US 10,219,754 B1

3

interferences and produce demodulated signals that can be analyzed to estimate a physiological parameter of a user. A time multiplexed modulation pattern is used to turn the light sources on and off and to cause the optical sensor to capture multiple light and dark samples. Demodulation operations are applied to the signal produced by the optical sensor to produce a signal associated with each light source. In general, the demodulation operation can be

$$\sin 2\pi \frac{kt}{N} \text{ or } \cos 2\pi \frac{kt}{N}.$$

The demodulated signals may then be processed by one or more decimation stages. Each decimation stage can include a low pass filter and a decimation circuit.

Any suitable type of electronic device can include a health monitoring system. Example electronic devices include, but are not limited to, a smart telephone, a headset, a pulse oximeter, a digital media player, a tablet computing device, and a wearable electronic device. A wearable electronic device can include any type of electronic device that can be worn on a limb of a user. The wearable electronic device can be affixed to a limb or body part of a user, such as a wrist, an arm, a finger, a leg, an ear, or a chest. In some embodiments, the wearable electronic device is worn on a limb of a user with a band that attaches to the body and includes a holder or case to detachably or removably hold the electronic device, such as an armband, an ankle bracelet, a leg band, and/or a wristband. In other embodiments, the wearable electronic device is permanently affixed or attached to a band, and the band attaches to the body of the user.

As one example, a wearable electronic device can be implemented as a wearable health assistant that provides health-related information (whether real-time or not) to the user, authorized third parties, and/or an associated monitoring device. The wearable health assistant may be configured to provide health-related information or data such as, but not limited to, heart rate data, blood pressure data, temperature data, blood oxygen saturation level data, diet/nutrition information, medical reminders, health-related tips or information, or other health-related data. The associated monitoring device may be, for example, a tablet computing device, phone, personal digital assistant, computer, and so on.

As another example, the electronic device can be configured in the form of a wearable communications device. The wearable communications device may include a processor coupled with or in communication with a memory, one or more sensors, one or more communication interfaces, output devices such as displays and speakers, one or more input devices, and a health monitoring system. The communication interface(s) can provide electronic communications between the communications device and any external communication network, device or platform, such as but not limited to wireless interfaces, Bluetooth interfaces, USB interfaces, Wi-Fi interfaces, TCP/IP interfaces, network communications interfaces, or any conventional communication interfaces. The wearable communications device may provide information regarding time, health, statuses or externally connected or communicating devices and/or software executing on such devices, messages, video, operating commands, and so forth (and may receive any of the foregoing from an external device), in addition to communications.

Referring now to FIG. 1, there is shown a perspective view of one example of an electronic device that provides health-related information. In the illustrated embodiment,

4

the electronic device 100 is implemented as a wearable communication device. Other embodiments can implement the electronic device differently. As described earlier, the electronic device can be a smart telephone, a gaming device, a digital music player, a device that provides time, a health assistant, and other types of electronic devices that provide health-related information.

The electronic device 100 includes an enclosure 102 at least partially surrounding a display 104 and one or more buttons 106 or input devices. The enclosure 102 can form an outer surface or partial outer surface and protective case for the internal components of the electronic device 100, and may at least partially surround the display 104. The enclosure 102 can be formed of one or more components operably connected together, such as a front piece and a back piece. Alternatively, the enclosure 102 can be formed of a single piece operably connected to the display 104.

The display 104 can be implemented with any suitable technology, including, but not limited to, a multi-touch sensing touchscreen that uses liquid crystal display (LCD) technology, light emitting diode (LED) technology, organic light-emitting display (OLED) technology, organic electroluminescence (OEL) technology, or another type of display technology. A button 106 can take the form of a home button, which may be a mechanical button, a soft button (e.g., a button that does not physically move but still accepts inputs), an icon or image on a display or on an input region, and so on. Other buttons or mechanisms can be used as input/output devices, such as a speaker, a microphone, an on/off button, a mute button, or a sleep button. In some embodiments, the button or buttons 106 can be integrated as part of a cover glass of the electronic device.

The electronic device 100 can be permanently or removably attached to a band 108. The band 108 can be made of any suitable material, including, but not limited to, leather, metal, rubber or silicon, fabric, and ceramic. In the illustrated embodiment, the band is a wristband that wraps around the user's wrist. The wristband can include an attachment mechanism (not shown), such as a bracelet clasp, Velcro, and magnetic connectors. In other embodiments, the band can be elastic or stretchy such that it fits over the hand of the user and does not include an attachment mechanism.

FIG. 2 depicts a back view of the electronic device 100 shown in FIG. 1. As described earlier, the electronic device can include one or more sensors, and at least one of these sensors may provide health-related information. As one example, the wearable communication device can include an optical sensor, such as a photoplethysmography (PPG) sensor. A PPG sensor uses light to measure changes in the volume of a part of a user's body. As the light passes through the user's skin and into the underlying tissue, some light is reflected, some is scattered, and some light is absorbed, depending on what the light encounters. Blood can absorb light more than surrounding tissue, so less reflected light will be sensed by the PPG sensor when more blood is present. The user's blood volume increases and decreases with each heartbeat. A PPG sensor detects changes in blood volume based on the reflected light, and one or more physiological parameters of the user can be determined by analyzing the reflected light. Example physiological parameters include, but are not limited to, heart rate and respiration.

The electronic device 100 includes one or more apertures 200 in the enclosure 102. Each aperture is associated with a light source 202. In one embodiment, each light source is implemented as a light-emitting diode (LED). Four apertures 200 and four light sources 202 are used in the illustrated embodiment. Other embodiments can include any

US 10,219,754 B1

5

number of light sources 200. For example, two light sources can be used in some embodiments.

The light sources 202 can operate at the same light wavelength range, or the light sources can operate at different light wavelength ranges. As one example, with two light sources one light source may transmit light in the visible wavelength range while the other light source can emit light in the infrared wavelength range. With four light sources, two light sources may transmit light in the visible wavelength range while the other two light sources can emit light in the infrared wavelength range. For example, in one embodiment, at least one light source can emit light in the wavelength range associated with the color green while another light source transmits light in the infrared wavelength range. When a physiological parameter of the user will be determined, the light sources emit light toward the user's skin and the optical sensor 204 senses an amount of reflected light. The optical sensor 204 may sense the reflected light through an aperture (not shown) that is formed in the electronic device. As will be described in more detail later, a modulation pattern can be used to turn the light sources on and off and sample or sense the reflected light.

FIG. 3 is an illustrative block diagram of the electronic device 100 shown in FIG. 1. The electronic device 100 can include the display 104, one or more processing devices 300, memory 302, one or more input/output (I/O) devices 304, one or more sensors 306, a power source 308, a network communications interface 310, and a health monitoring system 312. The display 104 may provide an image or video output for the electronic device 100. The display may also provide an input surface for one or more input devices, such as, for example, a touch sensing device and/or a fingerprint sensor. The display 104 may be substantially any size and may be positioned substantially anywhere on the electronic device 100.

The processing device 300 can control some or all of the operations of the electronic device 100. The processing device 300 can communicate, either directly or indirectly with substantially all of the components of the electronic device 100. For example, a system bus or signal line 314 or other communication mechanisms can provide communication between the processing device(s) 300, the memory 302, the I/O device(s) 304, the sensor(s) 306, the power source 308, the network communications interface 310, and/or the health monitoring system 312. The one or more processing devices 300 can be implemented as any electronic device capable of processing, receiving, or transmitting data or instructions. For example, the processing device(s) 200 can each be a microprocessor, a central processing unit (CPU), an application-specific integrated circuit (ASIC), a digital signal processor (DSP), or combinations of such devices. As described herein, the term "processing device" is meant to encompass a single processor or processing unit, multiple processors, multiple processing units, or other suitably configured computing element or elements.

The memory 302 can store electronic data that can be used by the electronic device 100. For example, a memory can store electrical data or content such as, for example, audio and video files, documents and applications, device settings and user preferences, timing and control signals or data for the health monitoring system 312, data structures or databases, and so on. The memory 302 can be configured as any type of memory. By way of example only, the memory can be implemented as random access memory, read-only memory, Flash memory, removable memory, or other types of storage elements, or combinations of such devices.

6

The one or more I/O devices 304 can transmit and/or receive data to and from a user or another electronic device. One example of an I/O device is button 106 in FIG. 1. The I/O device(s) 304 can include a display, a touch sensing input surface such as a track pad, one or more buttons, one or more microphones or speakers, one or more ports such as a microphone port, and/or a keyboard.

The electronic device 100 may also include one or more sensors 306 positioned substantially anywhere on the electronic device 100. The sensor or sensors 306 may be configured to sense substantially any type of characteristic, such as but not limited to, images, pressure, light, touch, heat, position, motion, and so on. For example, the sensor(s) 308 may be an image sensor, a heat sensor, a light or optical sensor, a pressure transducer, a magnet, a gyroscope, an accelerometer, and so on.

The power source 308 can be implemented with any device capable of providing energy to the electronic device 100. For example, the power source 308 can be one or more batteries or rechargeable batteries, or a connection cable that connects the remote control device to another power source such as a wall outlet.

The network communication interface 310 can facilitate transmission of data to or from other electronic devices. For example, a network communication interface can transmit electronic signals via a wireless and/or wired network connection. Examples of wireless and wired network connections include, but are not limited to, cellular, Wi-Fi, Bluetooth, IR, and Ethernet.

The health monitoring system 312 can include the light sources 202, one or more optical sensors 204, and a processing device 316. The processing device 316 may be any suitable type of processing device. In one embodiment, the processing device 316 is a digital signal processor. The processing device 316 may receive signals from the optical sensor(s) 204 and processes the signals to correlate the signal values with a physiological parameter of the user. As one example, the processing device can apply one or more demodulation operations to the signals received from the optical sensor. Additionally, the processing device may control the modulation (e.g., turning on and off) of the light sources 202 according to a given modulation pattern. In one embodiment, one or more modulation patterns may be stored in memory 302 and accessed by the processing device 316 to modulate the light sources 202.

As discussed earlier, the light sources can emit light in the visible and/or infrared wavelength ranges. The optical sensor or sensors 204 is implemented as a photodetector that senses light and converts the light into an electrical signal that represents the amount of light sensed by the photodetector. In one embodiment, the photodetector can be a photodiode. Other embodiments can use a different type of photodetector, such as a phototube or photoresistor.

In another embodiment, the processing device 316 is not included in the health monitoring system 312 and the processing device 300 receives signals from the optical sensor(s) 204 and processes the signals to correlate the signal values with a physiological parameter of the user. Additionally or alternatively, the processing device 300 can control the operations of the light sources (e.g., turn on and off). One or more modulation patterns may be stored in memory 302 and accessed by the processing device 300 to modulate the light sources 202.

It should be noted that FIGS. 1-3 are illustrative only. In other examples, an electronic device may include fewer or more components than those shown in FIG. 3. Additionally or alternatively, the electronic device can be included in a

US 10,219,754 B1

7

system and one or more components shown in FIG. 3 are separate from the electronic device but in communication with the electronic device. For example, an electronic device may be operatively connected to, or in communication with a separate display. As another example, one or more applications or data can be stored in a memory separate from the electronic device. As another example, a processing device in communication with the electronic device can control various functions in the electronic device and/or process data received from the electronic device. In some embodiments, the separate memory and/or processing device can be in a cloud-based system or in an associated monitoring device.

Referring now to FIG. 4, there is shown a flowchart of one example method of operating the health monitoring system 312 in FIG. 3. Initially, a light source is turned on to illuminate the user's skin and the optical sensor senses an amount of reflected or transmitted light (blocks 400, 402). A determination can then be made at block 404 as to whether or not another light source is to be turned on. For example, in one embodiment, the light sources are turned on sequentially and the optical sensor senses the light multiple times while each light source is turned on.

If another light source is to be turned on, the process passes to block 406 where the light source that is currently turned on is turned off. The method then returns to block 400 and repeats until all of the light sources have been turned on and the optical sensor has obtained light samples.

When a determination is made at block 404 that all of the light sources have been turned on, the process continues at block 408 where the signal received from the optical sensor is digitized by inputting the signal into an analog-to-digital converter. The digitized signal is then demodulated at block 410. Demodulating the signal produces multiple demodulated signals, with a demodulated signal associated with each light source. Each demodulated signal is then received and processed by a low pass filter and a decimation circuit (block 412).

The signals may then be analyzed at block 414 to determine or estimate a physiological parameter of the user. As described earlier, in one embodiment the signals can be analyzed to determine a heart rate of the user. As one example, the processing device 316 can analyze the signals to estimate a physiological parameter of the user. In another example, the processing device 300 can analyze the signals to determine a physiological parameter of the user. And in yet another example, both processing devices 300, 316 can perform various steps in the analysis to estimate a physiological parameter of the user.

In other embodiments, the light source need not be turned off or on entirely. Instead, certain embodiments may modulate the brightness of the light source in place of or in addition to the turning of lights on and off. In some embodiments, certain light sources may be turned on and off while other light sources are alternately dimmed and brightened.

FIGS. 5-6 depict example modulation patterns suitable for use in blocks 400 and 402 in FIG. 4. FIGS. 5 and 6 are described with reference to a health monitoring system that includes four light sources. As described earlier, other embodiments can include fewer or more light sources. The embodiments described hereinafter are described with reference to a thirty sample modulation cycle operating at 4096 hertz. This is provided by way of example and is not required. Other modulation cycle frequencies and/or sampling frequencies may be selected. For example, the modu-

8

lation cycle frequencies may range, as a non-limiting example, from one hundred hertz to several hundred kilohertz.

In many examples, the modulation cycle frequency and the sampling frequency may be interrelated. For example, certain embodiments may be limited by hardware or software to a particular maximum sampling frequency. In such an example, the modulation cycle frequency may be selected such that the transmitted signal can be adequately reconstructed. In some cases, the modulation cycle may be less than half the sampling rate. Stated another way, if a certain embodiment requires a particular bandwidth, the sampling frequency may be at least twice the selected maximum frequency of the selected bandwidth.

Other embodiments can obtain a different number of samples and/or operate at a different frequency. The frequency may be determined based on a number of factors, one of which is the harmonics of the electrical network or grid. For example, when an electrical network produces a signal at 60 Hz, the harmonics are multiples of 60 (e.g., 120 Hz, 180 Hz, 240 Hz, etc.). Also, some electrical networks produce a signal at 50 Hz, and the harmonics of multiples of 50 Hz (e.g., 100 Hz, 150 Hz, 200 Hz, etc.).

Additionally, some electrical networks can be less reliable at generating a signal with a specific frequency, and the frequency may vary by a certain amount or deviation (e.g., a frequency of 60 Hz may operate at 60+/−1% Hz). And the deviation increases with each harmonic. Thus, in one embodiment, the frequency of the modulation cycle is selected to be in a harmonic gap that exists between the various harmonics and harmonic deviations of at least one electrical network.

The illustrated modulation patterns are time-multiplexed modulation patterns that drive the light sources. The time periods when the light sources are turned on and off are multiplexed in time. In FIG. 5, the first light source is turned on for the time period 500. The other three light sources are turned off during the time period 500. An optical sensor captures a light sample multiple times 502 during the time period 500. In the illustrated embodiment, the optical sensor obtains five light samples 502. The first light source is then turned off and the optical sensor captures the light at time 504. A light sample obtained when all of the light sources are turned off is known as a dark sample.

The second light source is then turned on for the time period 506. Again, the other three light sources are turned off during the time period 506. The optical sensor captures multiple light samples 508 during the time period 506. In the illustrated embodiment, the optical sensor obtains five samples 508. The second light source is then turned off and the optical sensor captures a dark sample at time 510.

Similarly, only the third light source is turned on for the time period 512, and the optical sensor senses an amount of light multiple times 514 (e.g., five times) during the time period 512. The third light source is then turned off and the optical sensor captures a dark sample at time 516.

The fourth light source is then turned on for the time period 518, and the optical sensor obtains multiple light samples 520 (e.g., five times) during the time period 518. The fourth light source is then turned off and the optical sensor captures multiple dark samples 522. In the illustrated embodiment, the optical sensor obtains seven dark samples 522. Thus, the optical sensor captures thirty samples during one modulation cycle 524. The modulation cycles can repeat a given number of times when estimating a physiological parameter. As described earlier, the modulation cycle can have a frequency of 4096 Hz in one embodiment.

US 10,219,754 B1

9

The modulation pattern in FIG. 6 is similar to the modulation pattern in FIG. 5 except that the optical sensor does not capture dark samples in between the time periods when a light source is turned on. In other words, the optical sensor does not sense dark samples at times 504, 510, and 516. The light sensor obtains multiple dark samples 600 after the time period 518 has ended (after the fourth light source is turned off). In the illustrated embodiment, the light sensor captures ten dark samples 600. Like the FIG. 5 embodiment, the optical sensor obtains thirty samples during one modulation cycle 602.

The analog signal produced by the optical sensor includes information associated with all four light sources. Thus, in one embodiment, the analog signal is demodulated by a single optical sensor to produce four signals. In some cases, each signal is associated with a specific light source. In other examples, two optical sensors may be used to generate eight signals associated with the four light sources. In some cases, the two optical sensors may be physically separated so as to measure light associated with the four light sources from different points along the user's skin. In other embodiments, more than two optical sensors may be used.

FIG. 7 is a data flow diagram of an illustrative processing channel that performs blocks 408, 410, and 412 in FIG. 4. The analog signal received from the optical sensor on signal line 700 is converted to a digital signal by analog-to-digital converter 702 in the processing channel 704. The digital signal is then received by the mixer circuit 706. The mixer circuit 706 also receives one or more demodulation operations 708. In general, the demodulation operation can be sin

$$2\pi\frac{kt}{N} \text{ or } \cos2\pi\frac{kt}{N},$$

where k is defined by 1≤k≤n/2, N represents the number of samples obtained by the optical sensor, and t=0, 1, . . . , N−1. The number of demodulation operations input into the mixer circuit 704 may be based on the number of light sources. In one embodiment, each harmonic of the signal received from the optical sensor has two orthogonal components. Thus, in some cases, the number of harmonics may depend upon the number of channels multiplexed and de-multiplexed. As one example, when the health monitoring system includes two light sources, the demodulation operations can be sin 2π/N or cos 2π/N for the first harmonic frequency. Two signals will be produced after both demodulation operations have been applied to the digital signal by mixer circuit 706. When the health monitoring system has four light sources, the demodulation operation can be sin 2π/N or cos 2π/N for the first harmonic frequency, and sin 4π/N or cos 4π/N for the second harmonic frequency. Four signals will be produced after the four demodulation operations have been applied to the digital signal by mixer circuit 706.

The signal output by the mixer circuit 706 is received by a low pass filter 710 and a decimation circuit 712. The low pass filter 710 and the decimation circuit 712 form a first decimation stage. Embodiments can include any number of decimation stages K. The number of decimation stages K can be based on the frequency of the sampling cycle of the optical sensor and the frequency of the physiological parameter. For example, in the embodiments shown in FIGS. 5 and 6, thirty samples are obtained by the optical sensor. When the frequency of the physiological parameter is approximately ten hertz and the frequency of the thirty sample cycle

10

is 4096 hertz, six decimation stages are used with each stage reducing the frequency of the signal by two.

After the signal is processed by the low pass filter 714 and decimation circuit 716 in the last decimation stage K, each signal is received by a demultiplexer and multiplier circuit 718. The demultiplexer separates the signals by associated light source. Thus, the signal associated with the first light source is separated from the signals associated with the other light sources, and so on for each signal. The multiplier circuit then multiplies each signal by respective weights or values. As one example, the values can be stored in a matrix, and each signal is multiplied by the values in a respective row in the matrix.

The values in the matrix are a function of the dynamics and components of the health monitoring system. The operations of the components such as the optical sensor, the filters (e.g., high pass filters, low pass filters), the operational amplifiers, and the like, change over time due to temperature and other factors. The values in the matrix adjust the signals for these changes. One method for determining the values in the matrix is described in conjunction with FIG. 8.

The signals output on signal line 720 represent the signals received from the user's tissue, and these signals can be analyzed to determine or measure the physiological parameter. As one example, these signals can be analyzed to determine the heart rate of the user.

FIG. 8 is a flowchart of one example method of determining the values in a matrix used in block 718 of FIG. 7. Initially, the values in the matrix are determined at block 800. FIG. 9 is a flowchart of one example method of performing block 800. In block 900, a single light source is turned on for a given period of time. The signal produced by the optical sensor is then processed to obtain some of the matrix values. For example, when the health monitoring system includes four light sources, s signal value or amplitude associated with each light source will be output by the decimation circuit 716. Thus, four signal values will be output by the decimation circuit 716 based on the single light source emitting light toward the user's skin. These four signal values are included in one row in the matrix.

Returning to FIG. 9, a determination is then made at block 904 as to whether or not all of the light sources have been individually turned on. If not, the process passes to block 906 where the light source that is currently turned on is turned off. The method then returns to block 900 where another single light source is turned on and the signal produced by the optical sensor processed to obtain matrix values for another row in the matrix. The method in FIG. 9 repeats until all of the light sources have been turned on and all of the values determined for the matrix. For four light sources, the values in the matrix are as follows:

Returning to FIG. 8, after the matrix values are determined at block 800 the matrix values can be verified at block 802. FIG. 10 is a flowchart of one example method of performing block 802. Initially, all of the light sources except one are turned on for a given period of time (block 1000). The signal produced by the optical sensor is then processed based on the data flow diagram shown in FIG. 7. As described earlier, the demultiplexer and multiplier circuit 718 outputs signals that are associated with each light source in the health monitoring system. The signal value associated with the light source that is turned off should have a value that is substantially zero, while the signal values associated with the light sources that are turned on should be greater than zero.

Returning to FIG. 10, a determination is made at block 1004 as to whether or not the signal value associated with

US 10,219,754 B1

11

the light source that is turned off equals zero. If not, the method passes to block **1006** where the matrix values in the matrix are recalculated. Thus, the method shown in FIG. **9** may be repeated and the method shown in FIG. **10** repeated until it is determined at block **1004** that the signal value associated with each light source is turned off and the other light sources are turned on.

If the signal value equals zero, the process continues at block **1008** where a determination is made as to whether or not all of the light sources have been turned off while the other light sources are turned on. If not, the method passes to block **1010** where the light sources that are currently turned on are turned off. The method then returns to block **1000** where all light sources except another single light source is turned on. The method in FIG. **10** repeats until all of the light sources have been turned off while the other light sources are turned on and the signal value output from the demultiplexer and multiplier circuit **718** associated with each light source equals zero when the respective light source is turned off and the other light sources are turned on.

Returning to FIG. **8**, if the matrix values are not verified at block **804**, the method returns to block **800** as described earlier. If the matrix values are verified at block **804**, the process continues at block **806** where the matrix is applied in the demultiplexer and multiplier circuit **718** in FIG. **7**. A determination may then be made at block **808** as to whether or not the matrix values are to be recalculated. As one example, the matrix values can be recalculated after a given period of time has passed. Additionally or alternatively, the matrix values may be recalculated each time a user activates the heath monitoring system. The process waits at block **808** if the matrix values are not recalculated. If the matrix values are to be recalculated, the method returns to block **800**.

Various embodiments have been described in detail with particular reference to certain features thereof, but it will be understood that variations and modifications can be effected within the spirit and scope of the disclosure. For example, as described earlier, a health monitoring system can include a different number of light sources (e.g., two or six). Additionally or alternatively, a health monitoring system can be included in, or connected to a different type of electronic device.

Even though specific embodiments have been described herein, it should be noted that the application is not limited to these embodiments. In particular, any features described with respect to one embodiment may also be used in other embodiments, where compatible. Likewise, the features of the different embodiments may be exchanged, where compatible.

What is claimed is:

**1.** A method for estimating physiological parameters when modulated light from a first light source and a second light source is emitted toward a body part of a user, the method comprising:

determining a first multiplier value by:

turning on the first light source;

generating a first initial signal in response to capturing a first light sample corresponding to the first light source;

demodulating the first initial signal to produce first initial demodulated signals;

filtering and decimating the first initial demodulated signals; and

determining the first multiplier value based on the filtered and decimated first initial demodulated signals;

12

determining a second multiplier value by:

turning on the second light source;

generating a second initial signal in response to capturing a second light sample corresponding to the second light source;

demodulating the second initial signal to produce second initial demodulated signals;

filtering and decimating the second initial demodulated signals; and

determining the second multiplier value based on the filtered and decimated second initial demodulated signals;

capturing multiple light samples while the first light source and the second light source are turned on to emit modulated light toward the body part of the user and converting the multiple light samples into a captured signal;

demodulating the captured signal to produce multiple demodulated signals;

performing a first decimation stage by:

low pass filtering each demodulated signal; and

decimating each demodulated signal;

performing a second decimation stage after the first decimation stage by:

low pass filtering each demodulated signal; and

decimating each demodulated signal;

demultiplexing each demodulated signal after the second decimation stage to produce a first signal associated with the first light source and a second signal associated with the second light source;

multiplying the first signal by the first multiplier value using a first multiplier circuit to obtain a first conditioned signal;

multiplying the second signal by the second multiplier value using a second multiplier circuit to obtain a second conditioned signal; and

analyzing the first conditioned signal and the second conditioned signal to estimate the physiological parameter of the user.

**2.** The method as in claim **1**, wherein the capturing multiple light samples comprises capturing multiple light samples while:

the first light source is turned on and the second light source is turned off;

the second light source is turned on and the first light source is turned off; and

the first light source and the second light source are turned off after being turned on.

**3.** The method as in claim **2**, wherein the capturing multiple light samples further comprises capturing one or more light samples after the first light source is turned off and before the second light source is turned on.

**4.** The method as in claim **1**, wherein the demodulating the captured signal to produce multiple demodulated signals comprises:

applying a first demodulation operation of a sine function to the captured signal; and

applying a second demodulation operation of a cosine function.

**5.** The method as in claim **2**, wherein the multiple light samples comprise at least five light samples captured when the first light source is turned on and the second light source is turned off.

**6.** The method as in claim **1**, wherein:

when the first light source is turned on, the first light source emits infrared light; and

US 10,219,754 B1

**13**

when the second light source is turned on, the second light
source emits visible light.

\* \* \* \* \*

**14**

Exhibit T



US009723997B1

(12) **United States Patent**
Lamego

(10) **Patent No.:** **US 9,723,997 B1**
(45) **Date of Patent:** **Aug. 8, 2017**

(54) **ELECTRONIC DEVICE THAT COMPUTES HEALTH DATA**

(71) Applicant: **Apple Inc.**, Cupertino, CA (US)

(72) Inventor: **Marcelo M. Lamego**, Cupertino, CA (US)

(73) Assignee: **Apple Inc.**, Cupertino, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 44 days.

(21) Appl. No.: **14/617,422**

(22) Filed: **Feb. 9, 2015**

**Related U.S. Application Data**

(60) Provisional application No. 62/056,299, filed on Sep. 26, 2014.

(51) **Int. Cl.**
| | |
|---|---|
| *A61B 5/0205* | (2006.01) |
| *A61B 5/1455* | (2006.01) |
| *A61B 5/0402* | (2006.01) |
| *A61B 5/00* | (2006.01) |
| *A61B 5/021* | (2006.01) |
(Continued)

(52) **U.S. Cl.**
CPC .......... ***A61B 5/0205*** (2013.01); ***A61B 5/0402*** (2013.01); ***A61B 5/14551*** (2013.01); ***A61B 5/6898*** (2013.01); ***A61B 5/70*** (2013.01); ***A61B 5/7203*** (2013.01); ***A61B 5/742*** (2013.01); ***A61B 5/7405*** (2013.01); ***A61B 5/7455*** (2013.01); *A61B 5/021* (2013.01); *A61B 5/0261* (2013.01); *A61B 5/02416* (2013.01); *A61B 5/0537* (2013.01)

(58) **Field of Classification Search**
CPC . A61B 5/0205; A61B 5/0402; A61B 5/14551; A61B 5/6898
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,486,386 B1 * | 2/2009 | Holcombe | G01C 3/08 356/4.01 |
| 7,915,601 B2 | 3/2011 | Setlak et al. | |
(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 2001145607 | 5/2001 |
| WO | WO 2015/030712 | 3/2015 |

OTHER PUBLICATIONS

Ohgi et al., "Stroke phase discrimination in breaststroke swimming using a tri-axial acceleration sensor device," *Sports Engineering*, vol. 6, No. 2, Jun. 1, 2003, pp. 113-123.
(Continued)

*Primary Examiner* — Paula J Stice
(74) *Attorney, Agent, or Firm* — Brownstein Hyatt Farber Schreck, LLP

(57) **ABSTRACT**

An electronic device includes a camera, an ambient light sensor, and a proximity sensor. The electronic device uses one or more of the camera and the proximity sensor to emit light into a body part of a user touching a surface of the electronic device and one or more of the camera, the ambient light sensor, and the proximity sensor to receive at least part of the emitted light reflected by the body part of the user. The electronic device computes health data of the user based upon sensor data regarding the received light. In some implementations, the electronic device may also include one or more electrical contacts that contact one or more body parts of the user. In such implementations, the health data may be further computed based on the an electrical measurement obtained using the electrical contacts.

**21 Claims, 7 Drawing Sheets**



**US 9,723,997 B1**

Page 2

(51) **Int. Cl.**

| | |
|---|---|
| *A61B 5/024* | (2006.01) |
| *A61B 5/026* | (2006.01) |
| *A61B 5/053* | (2006.01) |

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2008/0167834 A1 * | 7/2008 | Herz ..................... G06F 1/3203 | |
| | | | 702/150 |
| 2011/0015496 A1 | 1/2011 | Sherman et al. | |
| 2013/0072145 A1 | 3/2013 | Dantu | |
| 2013/0215042 A1 * | 8/2013 | Messerschmidt ....... G06F 3/041 | |
| | | | 345/173 |
| 2013/0310656 A1 * | 11/2013 | Lim ..................... A61B 5/6898 | |
| | | | 600/301 |
| 2014/0160314 A1 * | 6/2014 | Schatvet ............... H04N 7/142 | |
| | | | 348/223.1 |
| 2014/0275832 A1 * | 9/2014 | Muehlsteff ........... A61B 5/0205 | |
| | | | 600/301 |

OTHER PUBLICATIONS

Zijlstra et al., "Assessment of spatio-temporal gait parameters from trunk accelerations during human walking," *Gait & Posture,* vol. 18, No. 2, Oct. 1, 2003, pp. 1-10.

* cited by examiner



*FIG. 1*



*FIG. 2*



*FIG. 3*



*FIG. 4*



500

USE AT LEAST ONE OF CAMERA AND A PROXIMITY SENSOR TO EMIT LIGHT INTO A BODY PART OF A USER TOUCHING A SURFACE OF THE DEVICE — 501

USE AT LEAST ONE OF THE CAMERA, AN AMBIENT LIGHT SENSOR, OR THE PROXIMITY SENSOR TO RECEIVE AT LEAST PART OF THE EMITTED LIGHT REFLECTED BY THE BODY PART OF THE USER — 502

COMPUTE HEALTH DATA OF THE USER BASED AT LEAST UPON SENSOR DATA REGARDING THE RECEIVED LIGHT — 503

PROVIDE THE COMPUTED HEALTH DATA FOR THE USER — 504

*FIG. 5*



600

| |
|---|
| DETECT, UTILIZING A CAMERA, A PROFILE OF A BODY PART OF A USER CONTACTING THE CAMERA |

601

| |
|---|
| USE THE PROFILE, IF THE BODY PART IS MISALIGNED WITH A COMBINATION OF THE CAMERA, AN AMBIENT LIGHT SENSOR, AND A PROXIMITY SENSOR FOR PURPOSES OF OBTAINING HEALTH DATA FOR THE USER |

602

| |
|---|
| PROVIDE GUIDANCE TO CORRECT THE MISALIGNMENT |

603

**FIG. 6**



***FIG. 7***

US 9,723,997 B1

**1**

# ELECTRONIC DEVICE THAT COMPUTES HEALTH DATA

## CROSS-REFERENCE TO RELATED APPLICATION

This application claims the benefit under 35 U.S.C. §119 (e) of U.S. Provisional Patent Application No. 62/056,299, filed on Sep. 26, 2014, and entitled "Electronic Device that Computes Health Data," which is incorporated by reference as if fully disclosed herein.

## TECHNICAL FIELD

This disclosure relates generally to health data, and more specifically to an electronic device that computes health data

## BACKGROUND

It may be beneficial for a user to have information about his or her health data, including fitness data and wellness data. For example, health data may indicate emergency conditions or to enable the user to maximize fitness or wellness activities. Traditionally, health data is provided to users by health care professionals. However, it may be beneficial for users to have more access to health data.

## SUMMARY

The present disclosure discloses systems, apparatuses, and methods related to an electric device that computes health data. An electronic device may include a camera, an ambient light sensor, and a proximity sensor. The electronic device may use one or more of the camera and the proximity sensor to emit light into a body part of a user touching a surface of the electronic device and one or more of the camera, the ambient light sensor, and the proximity sensor to receive at least part of the emitted light reflected by the body part of the user. The electronic device may compute health data of the user based upon sensor data regarding the received light. In some implementations, the electronic device may also include one or more electrical contacts that contact one or more body parts of the user. In such implementations, the health data may be further computed based on the an electrical measurement obtained using the electrical contacts.

In some implementations, the electronic device may utilize the camera to determine the user's body part is misaligned with the camera, the ambient light sensor, and the proximity sensor for purposes of detecting the information about the body part of the user. In such implementations, the electronic device may provide guidance to correct the misalignment.

In various embodiments, a mobile personal computing device may include a camera, an ambient light sensor, a proximity sensor, and a processing unit communicatively coupled to the camera, the ambient light sensor, and the proximity sensor. The processing unit may be configured to: use at least one of camera and a proximity sensor to emit light into a body part of a user touching a surface of the mobile personal computing device; use at least one of the camera, an ambient light sensor, or the proximity sensor to receive at least part of the emitted light reflected by the body part of the user and generate sensor data; and computing health data of the user, utilizing the processing unit, using at least the sensor data regarding the received light.

**2**

In some embodiments, a method for using a mobile personal computing device to obtain health data may include: using at least one of camera and a proximity sensor to emit light into a body part of a user touching a surface of the device; using at least one of the camera, an ambient light sensor, or the proximity sensor to receive at least part of the emitted light reflected by the body part of the user and generate sensor data; and computing health data of the user, utilizing the processing unit, using at least the sensor data regarding the received light.

In one or more embodiments, a method for guiding use of a mobile personal computing device to obtain health data may include: detecting, utilizing a camera, a profile of a body part of a user contacting the camera; determining, using the profile, if the body part is misaligned with a combination of the camera, an ambient light sensor, and a proximity sensor for purposes of obtaining health data for the user; and providing guidance to correct the misalignment.

In various embodiments, a computer program product including a non-transitory storage medium may include a first set of instructions, stored in the non-transitory storage medium, executable by at least one processing unit to use at least one of a camera and a proximity sensor to emit light into a body part of a user touching a surface of a mobile personal computing device; a second set of instructions, stored in the non-transitory storage medium, executable by the least one processing unit to use at least one of the camera, an ambient light sensor, or the proximity sensor to receive at least part of the emitted light reflected by the body part of the user and generate sensor data; and a third set of instructions, stored in the non-transitory storage medium, executable by the least one processing unit to compute health data of the user using at least the sensor data regarding the received light.

It is to be understood that both the foregoing general description and the following detailed description are for purposes of example and explanation and do not necessarily limit the present disclosure. The accompanying drawings, which are incorporated in and constitute a part of the specification, illustrate subject matter of the disclosure. Together, the descriptions and the drawings serve to explain the principles of the disclosure.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is an isometric view an example system for obtaining health data utilizing an electronic device.

FIG. **2** illustrates the view of FIG. **1** while the example system is being utilized to obtain health data.

FIG. **3** illustrates the view of FIG. **2** while the example system is providing guidance to obtain health data.

FIG. **4** illustrates the view of FIG. **2** while the example system is providing the obtained health data.

FIG. **5** is a flow chart illustrating an example method for using an electronic device to obtain health data. This method may be performed by the system of FIG. **1**.

FIG. **6** is a flow chart illustrating an example method for guiding use of an electronic device to obtain health data. This method may be performed by the system of FIG. **1**.

FIG. **7** is a block diagram illustrating functional relationships among components of the example system of FIG. **1**.

## DETAILED DESCRIPTION

The description that follows includes sample systems, apparatuses, and methods that embody various elements of

US 9,723,997 B1

3

the present disclosure. However, it should be understood that the described disclosure may be practiced in a variety of forms in addition to those described herein.

The present disclosure details systems, apparatuses, and methods related to an electric device that computes health data. An electronic device (such as a smart phone, tablet computer, mobile computer, digital media player, wearable device, or other electronic device) may include a camera, an ambient light sensor, and a proximity sensor. The electronic device may use one or more of the camera and the proximity sensor to emit light into a body part of a user (such as a finger, and ear, and so on) touching a surface of the electronic device. The electronic device may use one or more of the camera, the ambient light sensor, and the proximity sensor to receive at least part of the emitted light reflected by the body part of the user. The electronic device may compute health data of the user based upon sensor data regarding the received light. In this way, the health data of the user may be detected utilizing an electronic device including a camera, ambient light sensor, and proximity sensor without making the user obtain access to a dedicated fitness and/or wellness device.

In various implementations, the camera, ambient light sensor, and proximity sensor may be positioned such that they are all at least partially covered (and/or contacted) by the user's body part at the same time, such as when the health data is computed. In one or more implementations, the electronic device may also include electrical contacts. The health data of the user may also be computed using an electrical measurement obtained using from the electrical contacts. In some examples of such implementations, the electrical contacts may be positioned to contact the body part of the user and an additional body part such that electrical measurement represents the electrical properties of organs or portions of the body located between the two contacting body parts. In some embodiments, the two body parts are the user's left and right hands and the electrical measurement corresponds to an electrical property that is measured across the user's chest.

In some implementations, the electronic device may utilize the camera to determine the user's body part is misaligned with the camera, the ambient light sensor, and the proximity sensor for purposes of detecting the information about the body part of the user. In such implementations, the electronic device may provide guidance (such as visual, audio, haptic, and/or other guidance) to correct the misalignment. The information from the camera may be utilized to detect this misalignment even in implementations where the camera is configured with a focal distance greater than a distance between the camera and the user's body part when the user's body part is touching the surface of the electronic device.

In various implementations, the proximity sensor may be a multiple light wavelength sensor (such as a sensor that utilizes infrared and visible light, infrared and red light, and so on). In some implementations, the ambient light sensor may be a silicon ambient light sensor, an indium gallium arsenide ambient light sensor, and/or other kind of ambient light sensor. In various implementations, the camera may be both an infrared and visible light camera.

The health data may include one or more of a variety of different wellness, fitness, and/or other parameters relating to the health of a user. For example, in various implementations the health data may include: a blood pressure index, a blood hydration, a body fat content, an oxygen saturation, a pulse rate, a perfusion index, an electrocardiogram, a photoplethysmogram, and/or any other such health data. In

4

some implementations, the electronic device may provide the computed health data to the user.

FIG. 1 is an isometric view an example system 100 for obtaining health data utilizing an electronic device. As illustrated, the system may include an electronic device 101. The electronic device is shown as a smart phone. However, it is understood that this is an example. In various implementations, the electronic device may be any kind of electronic device such as any kind of mobile personal computing device (such as a smart phone, tablet computer, a mobile computer, a digital media player, a cellular telephone, a laptop computer, a wearable device, and so on), a desktop computer, a display, and/or any other electronic device.

As also illustrated, the electronic device 101 may include a housing 102 with a surface 103 where a camera 104, an ambient light sensor 105, and a proximity sensor 106 are positioned. As illustrated in FIG. 2, the camera, ambient light sensor, and proximity sensor may be positioned such that they are partially or entirely covered (and/or contacted) by the body part 202 of a user (illustrated as a finger though such a body part may be an ear, a palm, and/or other body part of the user) at the same time. At such a time, the electronic device may compute health data for the user.

Traditionally, a camera may be capture images using a visible light imaging sensor and a lens focused at a focal distance away from the lens, an ambient light sensor may use a broad range photodiode or similar non-imaging light detector to determine ambient light conditions, and a proximity sensor may use a limited range light source (such as an infrared light emitting diode or "LED") to emit limited range light and a limited range non-imaging light detector to detect if the emitted limited range light is reflected by one or more object to determine whether or not such an object is proximate to the proximity sensor. However, the electronic device 101 may camera 104, the ambient light sensor 105, and the proximity sensor 106 in non-traditional ways to detect information about the body part 202.

The electronic device 101 may use one or more of the camera 104 and the proximity sensor 106 to emit light into a body part of a user 202 touching a surface 103 of the electronic device. The electronic device may use one or more of the camera, the ambient light sensor 105, and the proximity sensor to receive at least part of the emitted light reflected by the body part of the user. The electronic device may compute health data of the user based upon sensor (such as the camera, the ambient light sensor, and/or the proximity sensor) data regarding the received light.

For example, one or more of the camera 104, the ambient light sensor 105, and the proximity sensor 106 may receive light reflected off of the body part 202 of the user. Such light may originate from one or more of the camera (in implementations where the camera includes a light source such as a LED used as a flash), the ambient light sensor (which may be a non-imaging photodiode in some implementations), the proximity sensor (such as in implementations where the proximity sensor is a non-imaging photodiode and one or more LEDs that determine proximity by measuring the time between transmission of light by the LED and receipt of the light by the non-imaging photodiode after reflection off of an object such as the body part 202 of the user), and/or other light source. The electronic device 101 may analyze sensor data regarding the received light and compute information such as the light absorption of the body part. Various health data for the user may be computed from the computed light absorption of the body part.

By way of illustration, sensor data regarding the received light may be used to estimate changes in the volume of the

US 9,723,997 B1

5

body part **202** of the user. In general, as light passes through the user's skin and into the underlying tissue, some light is reflected, some light is scattered, and some light is absorbed, depending on what the light encounters. In some instances, blood may absorb light more than surrounding tissue, so less reflected light may be sensed when more blood is present. the user's blood volume generally increases and decreases with each heartbeat. Thus, analysis of sensor data regarding the reflected light may reflect changes in blood volume and thus allow health data such as oxygen saturation, pulse rate, perfusion index, and such to be computed.

By way of another example, one or more images of the body part **202** of the user captured by the camera **104** may be analyze to compute various health data for the user. In some implementations, the camera may be an infrared camera and/or a combined visible light and infrared camera. In such implementations, infrared data in the image may be analyzed to compute temperature of the body part, changing blood flow in the body part, and so on. In various implementations, the ambient light sensor and/or proximity sensor may be utilized to obtain such infrared data regarding the body part.

In various implementations, various information may be obtained regarding the body part **202** utilizing data from the camera **104**, the ambient light sensor **105**, and the proximity sensor **106**. Such information may be utilized in a variety of different ways. For example, in some implementations each of the camera, the ambient light sensor, and the proximity sensor may capture sensor data regarding light absorption of the body part **202**. However, the light absorption represented by the light received by each may be different based on the particular sensor strengths and/or weaknesses of the respective device. In such an implementation, the sensor data related to light absorption from each may be compared to the others and/or combined in order to obtain a more accurate, single light absorption measurement.

By way of another example, in some implementations sensor data from one or more of the camera **104**, the ambient light sensor **105**, and the proximity sensor **106** may be used to adjust information from one or more others of the camera, the ambient light sensor, and the proximity sensor. For example, in various implementations the proximity sensor may be utilized to obtain sensor data related to light absorption of the body part **202** and the camera may be utilized to determine the specific area of the body part the information relates to. Light absorption may be interpreted differently in computing health data for different areas of the body part (such as where the area of the body part is hairless versus containing hair, where the area is a highly callused area as opposed to a non-callused area, and so on). As such, the sensor data from the camera regarding the specific area of the body part being analyzed may be utilized to adjust the sensor data related to light absorption obtained from the proximity sensor to account for the specific characteristics of the area of the body part that may influence interpretation of light absorption for computing health data for the user.

As also illustrated in FIGS. **1** and **2**, the electronic device **101** may also include electrical contacts such as electrical contacts **107a** and **107b** disposed on an exterior surface of the electronic device. In various implementations, the electronic device **101** may compute health data of the user based upon sensor data obtained from the camera **104**, the ambient light sensor **105**, and the proximity sensor **106** as well as an electrical measurement obtained using the electrical contacts.

As illustrated in FIG. **2**, the electrical contacts **107a** and **107b** may be positioned to contact the body part **202** of the

6

user (such as during the time when the information is being detected) and/or an additional body part **201** of the user. For example, as shown a finger of the user may contact a top electrical contact **107a** while a palm of the user contacts a bottom electrical contact **107b**. However, it is understood that this is an example and the electrical contacts may be configured to contact other body parts of the user (such as an ear, a cheek, and so on) without departing from the scope of the present disclosure.

In some implementations, the electrical contacts **107a** and **107b** may be positioned to contact the body part **202** of the user and an additional body part of the user such that electrical measurement obtained using the electrical contacts corresponds to an electrical characteristic across the user's chest. For example, as shown a finger of the user's left hand may contact a top electrical contact **107a** while a right palm of the user (connected to each other through the user's chest) contacts a bottom electrical contact **107b**. Positioning the electrical contacts to contact user body parts such that the electrical measurement obtained using the electrical contacts corresponds to an electrical property across the user's chest. Such a measurement may enable information related to health data (such as an electrocardiogram) to be obtained that might not otherwise be possible absent such positioning.

By way of illustration, electrical measurements may be taken via the electrical contacts **107a** and **107b** (which may respectively be configured as positive and negative terminals) that may be used to detect electrical activity of the user's body. Such electrical measurements may be used (in some cases along with analysis of the received light) to measure heart function, compute an electrocardiogram, compute a galvanic skin response that may be indicative of emotional state and/or other physiological condition, and/or compute other health data such as body fat, or blood pressure.

Although FIG. **1** illustrates a specific configuration including the camera **104**, the ambient light sensor **105**, the proximity sensor **106**, and the electrical contacts **107a** and **107b**, it is understood that this in an example. In various implementations other configurations are possible and contemplated without departing from the scope of the present disclosure.

For example, the ambient light sensor **105** and the proximity sensor **106** are illustrated and described as separated sensors. However, in some implementations the ambient light sensor and the proximity sensor may be incorporated into a single, unified sensor that may detect both ambient light and proximity without departing from the scope of the present disclosure.

In some implementations, the proximity sensor **106** may operate utilizing a single wavelength of light, such as the infrared portion of the light spectrum. However, in other implementations the proximity sensor (and/or the camera **104** and/or the ambient light sensor **105**) may be a multiple wavelength proximity sensor that operates utilizing multiple wavelengths of light.

For example, in various implementations the proximity sensor **106** may operate utilizing infrared and visible light (such as red light). In some embodiments of such an implementation, the proximity sensor may include an infrared LED for producing infrared light and a red LED for producing red light.

Sensor data obtained utilizing different wavelengths of light may be different based on the particular detection strengths and/or weaknesses of the respective wavelength. By utilizing multiple wavelengths, the information detected

US 9,723,997 B1

7

utilizing the various wavelengths may be combined and/or utilized to adjust each other in order to obtain greater accuracy.

For example, dark and light hairs may have different light absorption due to their different pigmentation regardless of their other physical characteristics. By averaging light absorption detected utilizing both infrared and red light, a more accurate light absorption that accounts for such color difference may be possible such that detecting light absorption of different colored hairs does not result in inaccurate measurements.

In some implementations, the ambient light sensor 105 may be a silicon ambient light sensor, such as a silicon non-imaging photodiode. In other implementations, the ambient light sensor 105 may be an indium gallium arsenide ambient light sensor, such as an indium gallium arsenide non-imaging photodiode. In various implementations, use of an indium gallium arsenide non-imaging photodiode may allow for detection of a larger spectrum of light than use of a silicon non-imaging photodiode. An indium gallium arsenide non-imaging photodiode may not be typically used as an ambient light sensor as such may be more expensive than a silicon non-imaging photodiode that may adequately be used to determine ambient light conditions by detecting a more limited spectrum of light.

In various implementations, a variety of different health data for the user may be computed based at least thereon. For example, in one or more implementations the health data may include one or more of a variety of different wellness, fitness, and/or other parameters relating to the health of a user such as: a blood pressure index, a blood hydration, a body fat content, an oxygen saturation, a pulse rate, a perfusion index, an electrocardiogram, a photoplethysmogram, and/or any other such health data.

FIG. 7 is a block diagram illustrating functional relationships among components of the example system 100 of FIG. 1. As shown, the electronic device 101 may include one or more processing units 701, one or more non-transitory storage media 702 (which may take the form of, but is not limited to, a magnetic storage medium; optical storage medium; magneto-optical storage medium; read only memory; random access memory; erasable programmable memory; flash memory; and so on), one or more communication components 703 (such as a Wi-Fi or other antenna that may be utilized to transmit computed health data for the user), one or more input/output components 704, a display 108 (which may be utilized to present computed health data for the user), the camera 104, the ambient light sensor 105, the proximity sensor 106, and/or the electrical contacts 107a and 107b. However, it is understood that this is an example. In various implementations, the electronic device 101 may omit one or more of these components and/or utilize one or more additional components not shown.

Returning to FIG. 2, in various implementations the electronic device 101 may provide guidance to the user for aligning the user's body part 202 with the camera 104, the ambient light sensor 105, the proximity sensor 106, and/or the electrical contacts 107a and 107b. Such correct alignment may aid in utilizing camera, the ambient light sensor, the proximity sensor, and/or the electrical contacts in detecting the information regarding the body part of the user. In some implementations, misalignment of the user's body part with the camera, the ambient light sensor, the proximity sensor, and/or the electrical contacts for purposes of obtaining the information may reduce the accuracy of the information and/or prevent detection of the information. As such,

8

the guidance may aid in the detection of the information and/or the computing of the health data.

For example, FIG. 3 illustrates the view of FIG. 2 while the example system 100 is providing guidance to obtain health data. As illustrated in this example, the electronic device 101 provides a current body part position indicator 301 and a goal position indicator 302. A user may compare the visual positions of the current body part position indicator and the goal position indicator to determine how to move the user's body part 202 into correct alignment. As shown, the user may move the user's body part down and to the right, aligning the current body part position indicator with the goal position indicator 302, to move the user's body part into correct alignment.

Further, the electronic device 101 may also provide a status indicator 303 that indicates a progress 304 of obtaining the information. In this way, the user may be alerted to how long the user should stay in position once the user aligns the user's body part so that the information may be detected.

In some implementations, the camera 104 may be utilized to detect the position of the user's body part for purposes of determining alignment/misalignment. The camera may be configured to detect this information even in implementations where the camera is configured with a focal distance greater than the distance from the camera to the user's body part 202 shown as less than full focused image quality may be adequate for determining alignment/misalignment. In other implementations, the ambient light sensor 105, the proximity sensor 106, the electrical contacts 107a and 107b, and/or other components may be utilized instead of and/or in addition to the camera for determining alignment/misalignment of the user's body part.

Although FIG. 3 illustrates the electronic device 101 providing guidance output graphically using a visual output component, it is understood that this is an example. In various implementations, such output may be provided in one or more of a variety of different ways. For example, audio guidance instructions may be provided utilizing an audio output component and/or vibration guidance instructions may be provided utilizing a haptic output component without departing from the scope of the present disclosure.

FIG. 4 illustrates the view of FIG. 2 while the example system 100 is providing the obtained health data. As illustrated, a variety of different health data may be presented. Although FIG. 4 illustrates the electronic device 101 providing the health data graphically using a visual output component, it is understood that this is an example. In various implementations, such health may be provided in one or more of a variety of different ways, such as audibly utilizing an audio output component without departing from the scope of the present disclosure. In other implementations, the health data may be communicated to another electronic device (such as a health data database maintained by a doctor and/or other medical or health provider) utilizing a communication component.

FIG. 5 is a flow chart illustrating an example method 500 for using an electronic device to obtain health data. This method may be performed by the system of FIG. 1.

The flow may begin at block 501 where at least one of camera and a proximity sensor may be used to emit light into a body part of a user touching a surface of the electronic device. The flow may proceed to block 502 where at least one of the camera, an ambient light sensor, or the proximity sensor may be used to receive at least part of the emitted light reflected by the body part of the user to produce sensor output and generate sensor data. The flow may then proceed

US 9,723,997 B1

9

to block **503** where health data of the user may be computed using at least the sensor data regarding the received light.

At block **504**, the computed health data for the user may be provided. In some implementations, the computed health data for the user may be provided to the user. Such providing may be performed using one or more visual output components such as a display, audio output components such as a speaker, haptic output components, and so on.

In one example, the proximity sensor may be used to emit light into the user's body part, the ambient light sensor and the camera may be used to receive at least part of the emitted light reflected by the user's body part, and electrical contacts may be used to obtain electrical measurements from the skin of the user's body part. In such an example, a blood pressure index, a body fat content, and an electrocardiogram may be computed using data from the ambient light sensor, the camera, and the electrical contacts.

In another example, the proximity sensor may be a multiple light wavelength proximity sensor that utilizes infrared and visible light and the ambient light sensor may be a indium gallium arsenide ambient light sensor. The proximity sensor may be used to emit light into the user's body part, the ambient light sensor and the camera may be used to receive at least part of the emitted light reflected by the user's body part, and electrical contacts may be used to obtain electrical measurements from the skin of the user's body part. In such an example, a blood hydration may be computed using data from the ambient light sensor, the camera, and the electrical contacts.

In yet another example, the proximity sensor may be used to emit light into the user's body part and the ambient light sensor and the camera receive at least part of the emitted light reflected by the user's body part. In such an example, an oxygen saturation, a pulse rate, a perfusion index and a photoplethysmogram may be computed using data from the ambient light sensor and the camera.

Although the example method **500** is illustrated and described above as including particular operations performed in a particular order, it is understood that this is an example. In various implementations, various orders of the same, similar, and/or different operations may be performed without departing from the scope of the present disclosure.

For example, block **503** is illustrated and described as providing the computed health data for the user. However, in various implementations this operation may be omitted. In some examples of such an implementation, the computed health data for the user may be stored for later use as opposed to being provided to the user.

FIG. **6** is a flow chart illustrating an example method **600** for guiding use of an electronic device to obtain health data. This method may be performed by the system of FIG. **1**.

The flow may begin at block **601** where at least a profile of a body part of a user (such as the outline, location, or orientation) contacting a camera may be detected using a camera. The flow may proceed to block **602** where it is determined based on the detection that the user's body part is misaligned with a combination of the camera, an ambient light sensor, and a proximity sensor for purposes of obtaining health data for the user.

Detection of the user's body part may include comparing the profile to data representing a correct alignment. For example, an image of the profile of the user's body part may be captured and compared to a sample image representing what the image of the profile of the user's body part should look like if the user's body part is correctly aligned. A mismatch may indicate that the user's body part is misaligned.

10

At block **603**, guidance to correct the misalignment may be provided. In the example discussed above where a mismatch between the image of the profile of the user's body part and the sample image indicated that the user's body part was misaligned, the differences between the two images may be utilized to determine guidance to provide. By way of illustration, if the image of the profile of the user's body part has the user's body part further to the left than the sample image then it may be determined that the user should move the user's body part to the right. Such guidance may be provided using one or more visual output components such as a display, audio output components such as a speaker, haptic output components such as a vibrator, and so on.

For example, a user may place his finger on the camera. An image may be taken of the profile of the user's finger and compared to a sample image of what the profile of the user's finger should look like if correctly aligned with a combination of the camera, an ambient light sensor, and a proximity sensor for purposes of obtaining health data for the user. Comparison of the two images may indicate that the two images do not match and the user's finger is not correctly aligned. In this example, the image of the profile of the user's finger may be further up and to the right of the sample image. As such, a correct placement indicator and a current placement indicator may be displayed to the user where the current placement indicator is displayed further up and to the right of the correct placement indicator. In this way, the user can see that to correctly align the user's finger the user should move the user's finger down and to the left.

To continue with this example, the user may move the user's finger based on the provided guidance. A new image may be taken of the current profile of the user's finger and compared to the sample image. Comparison of the two images may indicate that the two images, though closer, still do not match and the user's finger is not still correctly aligned. In this example, the image of the profile of the user's finger may be less but still further up and to the right of the sample image. As such, the current placement indicator may be displayed moved closer but still further up and to the right of the correct placement indicator. In this way, the user can see that to correctly align the user's finger the user should move the user's finger still further down and to the left.

The process in this example may be repeated until comparison of an image of profile of the user's finger matches the sample image. The current placement indicator may then be displayed over the correct placement indicator to indicate to the user that the user's finger is correctly aligned and to not move further until health data is obtained.

Although the example method **600** is illustrated and described above as including particular operations performed in a particular order, it is understood that this is an example. In various implementations, various orders of the same, similar, and/or different operations may be performed without departing from the scope of the present disclosure.

For example, though blocks **601-603** are described as a series of linear operations that are performed a single time, it is understood that this is an example. In various implementations, one or more of blocks **601-603** may be repeated until the user's body part is no longer misaligned without departing from the scope of the present disclosure.

As discussed above and illustrated in the accompanying figures, the present disclosure details systems, apparatuses, and methods related to an electric device that computes health data. An electronic device (such as a smart phone, tablet computer, mobile computer, digital media player, wearable device, or other electronic device) may include a

US 9,723,997 B1

11

camera, an ambient light sensor, and a proximity sensor. The electronic device use one or more of the camera and the proximity sensor to emit light into a body part of a user (such as a finger, and ear, and so on) touching a surface of the electronic device. The electronic device may use one or more of the camera, the ambient light sensor, and the proximity sensor to receive at least part of the emitted light reflected by the body part of the user. The electronic device may compute health data of the user based upon sensor data regarding the received light. In this way, the health data of the user may be detected utilizing an electronic device including a camera, ambient light sensor, and proximity sensor without making the user obtain access to a dedicated fitness and/or wellness device.

In the present disclosure, the methods disclosed may be implemented as sets of instructions or software readable by a device. Further, it is understood that the specific order or hierarchy of steps in the methods disclosed are examples of sample approaches. In other embodiments, the specific order or hierarchy of steps in the method can be rearranged while remaining within the disclosed subject matter. The accompanying method claims present elements of the various steps in a sample order, and are not necessarily meant to be limited to the specific order or hierarchy presented.

Techniques detailed in the described disclosure may be provided as a computer program product, or software, that may include a non-transitory machine-readable medium having stored thereon instructions, which may be used to program a computer system (or other electronic devices) to perform a process according to the present disclosure. A non-transitory machine-readable medium includes any mechanism for storing information in a form (e.g., software, processing application) readable by a machine (e.g., a computer). The non-transitory machine-readable medium may take the form of, but is not limited to, a magnetic storage medium (e.g., floppy diskette, video cassette, and so on); optical storage medium (e.g., CD-ROM); magneto-optical storage medium; read only memory (ROM); random access memory (RAM); erasable programmable memory (e.g., EPROM and EEPROM); flash memory; and so on.

It is believed that the present disclosure and many of its attendant advantages will be understood by the foregoing description, and it will be apparent that various changes may be made in the form, construction and arrangement of the components without departing from the disclosed subject matter or without sacrificing all of its material advantages. The form described is merely explanatory, and it is the intention of the following claims to encompass and include such changes.

While the present disclosure has been described with reference to various embodiments, it will be understood that these embodiments are illustrative and that the scope of the disclosure is not limited to them. Many variations, modifications, additions, and improvements are possible. More generally, embodiments in accordance with the present disclosure have been described in the context or particular embodiments. Functionality may be separated or combined in blocks differently in various embodiments of the disclosure or described with different terminology. These and other variations, modifications, additions, and improvements may fall within the scope of the disclosure as defined in the claims that follow.

I claim:

1. A mobile personal computing device, comprising:
a camera;
an ambient light sensor;
a proximity sensor; and

12

a processing unit communicably coupled to the camera, the ambient light sensor, and the proximity sensor;
wherein the processing unit is configured to:
use the camera and the proximity sensor to emit light into a body part of a user touching a surface of the mobile personal computing device;
use at least one of the camera, an ambient light sensor, or the proximity sensor to receive at least part of the emitted light reflected by the body part of the user and generate sensor data; and
compute health data of the user, utilizing the processing unit, using at least the sensor data regarding the received light.

2. The mobile personal computing device of claim **1**, wherein the camera, the ambient light sensor, and the proximity sensor are positioned to be at least partially covered by the body part of the user at a same time.

3. The mobile personal computing device of claim **1**, wherein the proximity sensor is configured to detect multiple wavelengths of light.

4. The mobile personal computing device of claim **3**, wherein multiple light wavelength proximity sensor is configured to emit and receive infrared and visible light.

5. The mobile personal computing device of claim **3**, wherein multiple light wavelength proximity sensor is configured to emit and receive infrared and red light.

6. The mobile personal computing device of claim **1**, wherein the ambient light sensor is a at least one of a silicon ambient light sensor or an indium gallium arsenide ambient light sensor.

7. The mobile personal computing device of claim **1**, wherein the camera is configured to detect infrared light.

8. The mobile personal computing device of claim **1**, wherein the device is configured to compute the health-related information when the body part of the user is positioned at least partially over the camera, the ambient light sensor, and the proximity sensor.

9. The mobile personal computing device of claim **1**, wherein the processing unit utilizes the camera to determine when the body part of the user is misaligned with the camera, the ambient light sensor, and the proximity sensor for purposes of detecting the information about the body part of the user.

10. The mobile personal computing device of claim **9**, wherein the processing unit provides an output that can be used as guidance to correct a misalignment.

11. The mobile personal computing device of claim **10**, wherein the processing unit is configure to provide the output to at least one visual output component, audio output component, or haptic output component.

12. The mobile personal computing device of claim **1**, wherein the camera is configured with a focal distance greater than a distance between the camera and the body part of the user when the body part is touching the surface of the mobile personal computing device.

13. The mobile personal computing device of claim **1**, further comprising
electrical contacts disposed on an exterior surface of the device, wherein the processing unit is further configured to compute additional health-related information regarding the user based on an electrical measurement obtained using the electrical contacts.

14. The mobile personal computing device of claim **13**, wherein the electrical contacts are positioned to contact the body part of the user and an additional body part of the user.

US 9,723,997 B1

13

**15**. The mobile personal computing device of claim **14**, wherein the electrical measurement obtained using the electrical contacts corresponds to an electrical property across the user's chest.

**16**. The mobile personal computing device of claim **13**, wherein the processing unit is further configured to:

use at least the proximity sensor to emit the light;

use the ambient light sensor and the camera to receive the reflected light; and

compute a blood pressure index, a body fat content, and an electrocardiogram using data from the ambient light sensor, the camera, and the electrical contacts.

**17**. The mobile personal computing device of claim **13**, wherein the proximity sensor is a multiple light wavelength proximity sensor that utilizes infrared and visible light, the ambient light sensor is a indium gallium arsenide ambient light sensor, and the processing unit is further configured to:

use at least the proximity sensor to emit the light;

use the ambient light sensor and the camera receive the reflected light; and

compute a blood hydration using data from the ambient light sensor, the camera, and the electrical contacts.

**18**. The mobile personal computing device of claim **1**, wherein the processing unit is further configured to:

use at least the ambient light sensor and the camera receive the reflected light; and

compute an oxygen saturation, a pulse rate, a perfusion index, or a photoplethysmogram using data from the ambient light sensor and the camera.

**19**. The mobile personal computing device of claim **1**, wherein the processing unit is configured to use data from the camera indicating characteristics of the body part that

14

influence light absorption to adjust the sensor data regarding the received light as part of computing the health data.

**20**. A method for using a mobile personal computing device to obtain health data, comprising:

using a camera and a proximity sensor to emit light into a body part of a user touching a surface of the mobile personal computing device;

using at least two of the camera, an ambient light sensor, or the proximity sensor to receive at least part of the emitted light reflected by the body part of the user and generate sensor data; and

computing health data of the user, utilizing the processing unit, using at least the sensor data regarding the received light.

**21**. A computer program product including a non-transitory storage medium, comprising:

a first set of instructions, stored in the non-transitory storage medium, executable by at least one processing unit to use a camera and a proximity sensor to emit light into a body part of a user touching a surface of a mobile personal computing device;

a second set of instructions, stored in the non-transitory storage medium, executable by the least one processing unit to use the camera and an ambient light sensor to receive at least part of the emitted light reflected by the body part of the user and generate sensor data; and

a third set of instructions, stored in the non-transitory storage medium, executable by the least one processing unit to compute health data of the user using at least the sensor data regarding the received light.

*   *   *   *   *

Exhibit W

Joseph R. Re (Bar No. 134479)
joseph.re@knobbe.com
Stephen C. Jensen (Bar No. 149894)
steve.jensen@knobbe.com
Perry D. Oldham (Bar No. 216016)
perry.oldham@knobbe.com
Stephen W. Larson (Bar No. 240844)
stephen.larson@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, Fourteenth Floor
Irvine, CA  92614
Telephone:  (949)-760-0404
Facsimile:  (949)-760-9502

Attorneys for Plaintiffs,
**Masimo Corporation and Cercacor Laboratories, Inc.**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

# SOUTHERN DIVISION

| | |
|---|---|
| MASIMO CORPORATION, a Delaware corporation; and CERCACOR LABORATORIES, INC., a Delaware corporation<br><br>Plaintiffs,<br><br>v.<br><br>APPLE INC., a California corporation<br><br>Defendant. | Case No. 8:20-cv-00048-JVS-JDE<br><br>**PLAINTIFFS MASIMO CORPORATION AND CERCACOR LABORATORIES, INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT APPLE INC. (NOS. 1-25)**<br><br>Hon. James V. Selna |

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Plaintiffs MASIMO CORPORATION ("Masimo") and CERCACOR LABORATORIES, INC. ("Cercacor") (collectively, "Plaintiffs") hereby request that Defendant APPLE INC. ("Apple") respond to the following Requests for the Production of Documents and Things (the "Requests") within thirty (30) days of service of these Requests and produce the documents and things described herein at the offices of counsel for Masimo within the time prescribed by the Federal Rules of Civil Procedure. These Requests are deemed continuing in nature, requiring amended or supplemental responses as necessary.

## **DEFINITIONS**

Notwithstanding any definition set forth below, each word, term or phrase used in these Requests is intended to have the broadest meaning permitted under the Federal Rules of Civil Procedure. As used in these Requests, the following terms are to be interpreted in accordance with these definitions:

1. The terms "Apple," "Defendant," "You," and "Your" mean Defendant Apple, Inc., as well as any present or former officer, director, employee, agent, attorney, or other representative acting for or on behalf of Defendant Apple, Inc.

2. "Masimo" means Masimo Corporation, including its divisions, departments, parents, subsidiaries, affiliates or predecessors.

3. "Cercacor" means Cercacor Laboratories, Inc., including its divisions, departments, parents, subsidiaries, affiliates or predecessors.

4. The term "Plaintiffs" shall mean Masimo and Cercacor as defined above.

5. "Masimo Asserted Patents" means the patents Plaintiffs are asserting in this case, including U.S. Patent No. 10,258,265, U.S. Patent No. 10,258,266, U.S. Patent No. 10,292,628, U.S. Patent No. 10,299,708, U.S. Patent No. 10,376,190, U.S. Patent No. 10,376,191, U.S. Patent No. 10,470,695,

-1-

U.S. Patent No. 6,771,994, U.S. Patent No. 8,457,703, and U.S. Patent No. 10,433,776.   To the extent Masimo asserts additional patents in a future pleading, "Masimo Asserted Patents" shall be construed to include such patents.

6.     "Apple iOS Products" means products that use Apple's mobile iOS operating system.

7.     "Accused Products" means Apple Watch Series 4 or later, as well as the combination of Apple Watch Series 4 or later with an Apple iOS Product.

8.     The term "documents" shall be construed to include all writings and graphics of any sort whatsoever, together with any data stored in electronic or any other form, including, but not limited to, books, records, microfilm, tape or video recordings, emails, voice mails, handwritten notes, phone messages, pictures, and all copies of such documents except those that are identical in every respect to the original document.

9.     The term "things" shall mean all tangible objects of any type, composition, construction, or nature.

10.    The term "and" shall be construed to include "or" and vice versa, and each of them shall be the logical equivalent of "and/or."

11.    The term "concerning" shall mean relating to, referring to, describing, evidencing, or constituting.

12.    The term "communication" shall mean and refer to the transmittal of information (in the form of facts, ideas, inquiries, or otherwise).

13.    The use of the singular form of any word also includes the plural and vice versa, and a verb tense includes all other verb tenses wherever possible.

### **INSTRUCTIONS**

1.     Produce all documents specified below that are in Your possession, custody, or control, or otherwise known and available to You, Your agents, employees, representatives, investigators, attorneys or their agents, employees, representatives, or investigators at the time and place indicated.

2.     If You claim that any requested documents or things are privileged, then provide all information falling within the scope of the Request that is not privileged and identify with sufficient particularity for purposes of a motion to compel the information, document, or thing, separately, with respect to which You claim a privilege, and state:

          a.     the basis on which the privilege is claimed;

          b.     the author or creator of the information, document, or thing;

          c.     each individual or other person to whom the information, document, copy thereof, or thing was sent or otherwise disclosed; and

          d.     the date of the information or document.

3.     If You are aware of the existence, past or present, of a requested document or thing, but the document or thing is not in Your possession, custody, or control, then so state in Your response to the request for that document or thing.  Identify such document or thing and identify, by name, title, and address, the person who last maintained possession, custody, or control of the document or thing.  If the requested document or thing no longer exists, then Your response should state when, how, and why this is the case.

4.     Produce each requested document or thing along with all non-identical drafts thereof.  Furthermore, produce each document in its entirety, without abbreviation or redaction.

5.     Identify specifically the derivation and source of each document and thing to be produced.

## REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 1:**

All documents and things that refer or relate to the Masimo Asserted Patents.

**REQUEST FOR PRODUCTION NO. 2:**

All documents and things that refer or relate to Apple's first awareness of

the Masimo Asserted Patents.

**REQUEST FOR PRODUCTION NO. 3:**

All documents and things that refer or relate to any efforts to design any of the Accused Products around the inventions claimed in the Masimo Asserted Patents.

**REQUEST FOR PRODUCTION NO. 4:**

All documents and things concerning, evaluating, discussing, and/or commenting on the existence, infringement, or scope of the Masimo Asserted Patents.

**REQUEST FOR PRODUCTION NO. 5:**

Documents sufficient to show the design and operation of the Accused Products.

**REQUEST FOR PRODUCTION NO. 6:**

All documents and things describing the operation of the Accused Products, including, without limitation, product brochures, user manuals, instructional materials, and directions for use.

**REQUEST FOR PRODUCTION NO. 7:**

All training materials concerning any of the Accused Products, including, without limitation, training manuals, training videos, presentations, and handouts.

**REQUEST FOR PRODUCTION NO. 8:**

All marketing materials concerning any of the Accused Products, including, without limitation, advertisements, promotional materials, pamphlets, brochures, product catalogs, websites, product brochures, informational materials, and videos.

**REQUEST FOR PRODUCTION NO. 9:**

All publications, articles, abstracts, papers, presentations, seminars, speeches, press releases, and internet postings relating to any of the Accused Products.

**REQUEST FOR PRODUCTION NO. 10:**

All videos or DVDs demonstrating or showing the operation of the Accused Products.

**REQUEST FOR PRODUCTION NO. 11:**

All documents and things that refer or relate to the use, effectiveness, capabilities, functionality, or characteristics of the physiological monitoring features of any of the Accused Products.

**REQUEST FOR PRODUCTION NO. 12:**

All technical documents for the Accused Products, including, without limitation, product specifications, diagrams, schematics, memos, conceptual or technical drawings, design requirements documents, design capture documents, technical requirements documents, product briefs, product plans, product requirements, document trees, assembly design documents, design review documents, system design documents, fabricating drawings, manufacturing documents, and technical meeting minutes.

**REQUEST FOR PRODUCTION NO. 13:**

All documents and things that refer or relate to technical information, specifications, and research data for any of the Accused Products.

**REQUEST FOR PRODUCTION NO. 14:**

All documents and things concerning the research, design, and development of any of the Accused Products or any component of any of the Accused Products, including, without limitation, laboratory notebooks, invention disclosures, memoranda, product specifications, conceptual or

technical drawings, schematics, diagrams, technical specifications, meeting minutes, presentations, and prototypes.

**REQUEST FOR PRODUCTION NO. 15:**

All documents and things that refer or relate to optical or structural components of any of the Accused Products, including emitters, sensors, detectors, filters, covers, lenses, masks, housing, adhesives, openings, magnets, magnetic shields, carriers, bodies, interior surfaces, walls, protrusions, and sensor subsystems.

**REQUEST FOR PRODUCTION NO. 16:**

All documents and things that refer or relate to any components, surface areas, or adhesives that separate light emitted by LEDs from other components of any of the Accused Products.

**REQUEST FOR PRODUCTION NO. 17:**

Documents sufficient to show the operation of any algorithms used to monitor any physiological parameter in any of the Accused Products.

**REQUEST FOR PRODUCTION NO. 18:**

Documents sufficient to show the operation of any heart rate algorithms used in any of the Accused Products.

**REQUEST FOR PRODUCTION NO. 19:**

All documents and things that refer or relate to the development of the heart rate algorithms for any of the Accused Products.

**REQUEST FOR PRODUCTION NO. 20:**

All documents and things that refer or relate to selection between any heart rate algorithms used in any of the Accused Products.

**REQUEST FOR PRODUCTION NO. 21:**

All documents and things that refer or relate to power consumption by any heart rate algorithms used in any of the Accused Products.

**REQUEST FOR PRODUCTION NO. 22:**

All documents and things that refer or relate to the operation of any LEDs used to determine pulse rate or heart rate for any of the Accused Products, including but not limited to documents and things that refer or relate to LED timing, duty cycle, current, or power usage.

**REQUEST FOR PRODUCTION NO. 23:**

All documents and things that refer or relate to collecting first heart rate metrics using a first technique during a first period and collecting second heart rate metrics using a second technique during a second period for any of the Accused Products.

**REQUEST FOR PRODUCTION NO. 24:**

All documents and things that refer or relate to changes in collecting heart rate metrics based on user input for any of the Accused Products.

**REQUEST FOR PRODUCTION NO. 25:**

All documents and things that refer or relate to changes in collecting heart rate metrics based on a change in operating mode for any of the Accused Products.

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  March 16, 2020          By: */s/ Stephen W. Larson*

Joseph R. Re
Stephen C. Jensen
Perry D. Oldham
Stephen W. Larson

Attorneys for Plaintiffs,
Masimo Corporation and
Cercacor Laboratories, Inc.

-7-

**PROOF OF SERVICE**

I am a citizen of the United States of America and I am employed in Irvine, California.  I am over the age of 18 and not a party to the within action.

On March 16, 2020, I served the within **PLAINTIFFS MASIMO CORPORATION AND CERCACOR LABORATORIES, INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT APPLE INC. (NOS. 1-25)** on the parties or their counsel shown at the email addresses shown below:

GIBSON, DUNN & CRUTCHER LLP

JOSHUA H. LERNER
jlerner@gibsondunn.com

H. MARK LYON,
mlyon@gibsondunn.com

I certify and declare under penalty of perjury under the laws of the State of California that I am employed in the office of a member of the bar of this Court at whose direction the service was made, and that the forgoing is true and correct.

Executed on March 16, 2020, at Irvine, California.

Karina Villanueva

32027361

-8-

Exhibit X

1   Joseph R. Re (Bar No. 134479)
    joseph.re@knobbe.com
2   Stephen C. Jensen (Bar No. 149894)
    steve.jensen@knobbe.com
3   Perry D. Oldham (Bar No. 216016)
    perry.oldham@knobbe.com
4   Stephen W. Larson (Bar No. 240844)
    stephen.larson@knobbe.com
5   KNOBBE, MARTENS, OLSON &
    BEAR, LLP
6   2040 Main Street, Fourteenth Floor
    Irvine, CA 92614
7   Telephone: (949)-760-0404
    Facsimile: (949)-760-9502
8
    Adam B. Powell (SBN 272725)
9   adam.powell@knobbe.com
    KNOBBE, MARTENS, OLSON &
10  BEAR, LLP
    12790 El Camino Real
11  San Diego, CA 92130
    Telephone: (858) 707-4000
12  Facsimilie: (858) 707-4001

13  *Attorneys for Plaintiffs Masimo*
    *Corporation and Cercacor Laboratories,*
14  *Inc.*

    JOSHUA H. LERNER, SBN 220755
      jlerner@gibsondunn.com
    GIBSON, DUNN & CRUTCHER LLP
    555 Mission Street Suite 3000
    San Francisco, CA 94105
    Tel.: 415.393.8200 / Fax: 415.393.8306

    H. MARK LYON, SBN 162061
      mlyon@gibsondunn.com
    GIBSON, DUNN & CRUTCHER LLP
    1881 Page Mill Road
    Palo Alto, CA 94304-1211
    Tel.: 650.849.5300 / Fax: 650.849.5333

    BRIAN M. BUROKER, *pro hac vice*
      bburoker@gibsondunn.com
    GIBSON, DUNN & CRUTCHER LLP
    1050 Connecticut Avenue, N.W.
    Washington, DC 20036
    Tel.: 202.955.8541 / Fax: 202.467.0539

    BRIAN A. ROSENTHAL, *pro hac vice*
      brosenthal@gibsondunn.com
    GIBSON, DUNN & CRUTCHER LLP
    200 Park Avenue
    New York, NY 10166-0193
    Tel.: 212.351.2339 / Fax: 212.817.9539

    *Attorneys for Defendant Apple Inc.*
    [Additional counsel on following page]

15

16

17

18   **UNITED STATES DISTRICT COURT**

     **FOR THE CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION**

19

20   MASIMO CORPORATION,
     CERCACOR LABORATORIES, INC.,

21                    Plaintiffs,

22        v.

23   APPLE INC.,

24                    Defendant.

     CASE NO. 8:20-cv-00048-JVS (JDEx)

     **JOINT STIPULATION REGARDING
     DEFENDANT APPLE INC.'S MOTION
     FOR PROTECTIVE ORDER
     BARRING TRADE SECRET-
     RELATED DISCOVERY ABSENT
     TRADE SECRET IDENTIFICATION**

25

26

27

28

     Hr'g Date/Time: May 21, 2020, at 10 a.m.
     Courtroom:      6A
     Judge:          Hon. John D. Early
     Discovery Cutoff:   July 5, 2021
     Pretrial Conference: March 21, 2022
     Trial:          April 5, 2022

ILISSA SAMPLIN, SBN 314018
 isamplin@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Tel.: 213.229.7000 / Fax: 213.229.7520

ANGELIQUE KAOUNIS, SBN 209833
 akaounis@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2029 Century Park East Suite 4000
Los Angeles, CA 90067
Tel.: 310.552.8546 / Fax: 310.552.7026

*Attorneys for Defendant Apple Inc.*

Gibson, Dunn &
Crutcher LLP

Joint Stip. Re Apple's Mot. for Prot. Order      Case No. 8:20-cv-00048-JVS (JDEx)

Case 8:20-cv-00048-JVS-JDE Document 260-2 Filed 12/06/20 Page 305 of 353 Page ID
#:20586
Case 8:20-cv-00048-JVS-JDE Document 43-1 Filed 04/30/20 Page 35 of 53 Page ID
#:2955

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTORY STATEMENTS .................................................. 1

    A.  Apple's Introductory Statement .......................................... 1

    B.  Plaintiffs' Introductory Statement ..................................... 3

II.  The Discovery Requests At Issue ............................................. 6

III.  APPLE'S POSITION ........................................................... 10

    A.  FACTS ................................................................... 10

    1.  Plaintiffs Impermissibly Sought To Obtain Discovery Of Apple's Confidential Information In The *True Wearables* Case. ......................... 10

    2.  Plaintiffs Failed To Allege Their Purported Trade Secrets With Any Particularity. .................................................... 11

    3.  Plaintiffs Ignored Apple's Request For A Section 2019.210 Disclosure And Propounded Trade Secret-Related Discovery. ............... 11

    4.  Plaintiffs Filed An FAC That Merely Expanded The Generic Categories Of Information Claimed As Trade Secrets. ........................ 12

    5.  Plaintiffs' Requests For Production Nos. 5-25 Seek Premature Trade-Secret Related Discovery From Apple. .............................. 12

    6.  The Parties Met And Conferred About Plaintiffs' Premature Requests For Production. .............................................. 17

    B.  ARGUMENT ............................................................... 18

    1.  That Plaintiffs Filed Their CUTSA Claim In Federal Court Does Not Mean Plaintiffs Need Not Describe Their Secrets. ..................... 19

    2.  Plaintiffs Have Not Identified Their Purported Trade Secrets, And The FAC Does Not Suffice. ........................................ 20

    3.  Plaintiffs' Refusal To Comply With Section 2019.210 Frustrates Each Of The Four Purposes Of The Statute. ............................. 21

        a)  Plaintiffs Have Not Demonstrated That Their Trade Secret Claim Has Any Merit. .................................. 22

        b)  Plaintiffs Have Not Demonstrated That They Are Actually Looking For *Their* Secrets In Apple's Files. ........ 24

        c)  Plaintiffs Have Not Assisted The Court In Framing The Scope Of Trade Secret-Related Discovery. ................ 26

        d)  Plaintiffs Have Not Enabled Apple To Defend Against Their Trade Secret Misappropriation Claim. ................. 27

1    C.    CONCLUSION ....................................................................... 28

2  IV.   PLAINTIFFS' POSITION ........................................................ 29

3    A.    Judge Selna Already Decided Patent Discovery Is Not Stayed .............. 29

4    B.    Section 2019.210 Does Not Bar Patent Discovery ................................. 30

5    C.    The Discovery At Issue Is Patent Discovery ........................................ 34

6    D.    Apple's Other Arguments Are Irrelevant and Incorrect ......................... 37

7    E.    Conclusion ............................................................................ 40

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Pursuant to Federal Rule of Civil Procedure 37 and Local Rule 37-2, Defendant Apple Inc. ("Apple"), as movant, and Plaintiffs Masimo Corporation ("Masimo") and Cercacor Laboratories, Inc. ("Cercacor"), as respondents, submit the following Joint Stipulation regarding Apple's Motion for a Protective Order. Pursuant to Local Rule 37-1, the parties met and conferred in good faith in an effort to resolve the Motion.

## I.     INTRODUCTORY STATEMENTS

### A.     Apple's Introductory Statement

Apple seeks an order barring Plaintiffs from taking trade secret-related discovery until Plaintiffs describe their trade secrets with reasonable particularity consistent with California Code of Civil Procedure Section 2019.210 ("Section 2019.210"). Apple wants to address the trade secret claim in this action as quickly as possible, and therefore has repeatedly requested that Plaintiffs comply with the procedures set out in Section 2019.210 since the outset of the case. Plaintiffs have refused.

District courts throughout California, *including this Court*, recognize that Section 2019.210 serves an essential function in cases like this one—it discourages meritless trade secret claims, prevents plaintiffs from abusing the discovery process to access the defendant's trade secrets, assists the court in framing the appropriate scope of discovery, and enables a defendant to form "complete and well-reasoned defenses" against claims of misappropriation. *M/A-COM Tech. Sols., Inc. v. Litrinium, Inc.*, 2019 WL 8108729, at *2 (C.D. Cal. Sept. 3, 2019) (Early, J.).

The need for a reasonable description of the alleged secrets in this case is acute. Plaintiffs' allegations of trade secret misappropriation raise *every* problem that Section 2019.210 is intended to solve:

*First*, the only description of the alleged trade secrets provided by Plaintiffs—in their First Amended Complaint—provides no hint as to the merits of the misappropriation claim. To the contrary, Plaintiffs' original complaint claimed a non-exhaustive list of seven broad categories of information, such as "business plans" and "technical data." Lerner Decl. Ex. C (Compl.) ¶ 181. Plaintiffs then compounded the

problem by amending to allege a new list of *50* generalized categories of information, *including but not limited to* "technical information, sales and marketing information, and other business information," as well as unspecified combinations. *Id.* Ex. G (FAC) ¶ 211. Plaintiffs allege thousands of potential trade secrets in non-descript categories that cover every aspect of Plaintiffs' business. These broad categories and combinations are insufficient to plead a claim, and are *unquestionably* insufficient to satisfy Plaintiffs' obligation to identify their alleged secrets with particularity before taking trade secret-related discovery. Furthermore, Plaintiffs concede that many, if not all, of their purported secrets are now public. Plaintiffs cannot force Apple to search for the proverbial needle in the haystack by claiming generalized categories of information that might or might not qualify as trade secrets.

*Second*, Plaintiffs repeatedly have tried to access Apple's confidential information before they identify their own alleged trade secrets. Just *one day before* Plaintiffs filed this case, they sought discovery of Apple's confidential information through a third-party subpoena in *Masimo Corp. et al. v. True Wearables Inc. et al.*, No. 8:18-cv-02001-JVS-JDE (the "*True Wearables* Case"). The subpoena created the obvious risk that Section 2019.210 guards against: Plaintiffs could review whatever confidential information about health monitoring technology they could find in Apple's files and claim it as their own. Plaintiffs jettisoned their subpoena after Apple sought a protective order and their strategy was exposed. The requests for production at issue here are merely a continuation of that strategy. Plaintiffs characterize the requests for production as patent-related, but that is nothing more than an attempted end-run around Section 2019.210. The requests for production, on their face, seek the very categories of information that Plaintiffs allege as their trade secrets. Plaintiffs cannot use their patents as a vehicle by which to review Apple's confidential information in another effort to concoct a misappropriation claim.

*Third*, until Plaintiffs specifically define their alleged trade secrets, neither the Court nor the parties can tailor or manage the discovery process in this case. Among

other things, it is impossible to measure proportionality under Rule 26. Indeed, Plaintiffs allege that their list of about 50 generalized categories of purported trade secret information, plus unspecified combinations of those categories, is not even complete. Plaintiffs state that their trade secrets "include, but are not limited to," 50 general categories of information (Lerner Decl. Ex. G (FAC) ¶ 211)—a caveat that renders the scope of the already broad categories unbounded, making it impossible to efficiently and effectively conduct discovery in this case.

*Fourth*, without a clear articulation of the trade secrets at issue, Apple cannot formulate complete and well-reasoned defenses. A reasonable description of the alleged secrets will assist Apple in addressing basic issues, including the statute of limitations and, relatedly, which alleged secrets were public and when. Furthermore, if there are any valid secrets here—and Apple does not believe there are—an adequate description will enable Apple to curtail any purported future harm to Plaintiffs.

For these reasons, Apple respectfully requests that the Court grant a protective order prohibiting Plaintiffs from "commencing discovery relating to the [alleged] trade secret[s]" until Plaintiffs provide a Section 2019.210 disclosure that describes their purported secrets with the "reasonable particularity" the law requires. Cal. Code Civ. Proc. § 2019.210.

## B. Plaintiffs' Introductory Statement

Apple's Motion is moot because Judge Selna already decided the issues raised in Apple's Motion. After Apple served its portion of the joint stipulation, the parties submitted a Rule 26(f) report addressing whether and how Section 2019.210 applies to this case. *See* Powell Decl., Ex. 8. Like it does here, Apple argued Section 2019.210 bars discovery of information concerning Plaintiffs' patent case that may ***also*** be relevant to trade secrets. *Id*. at 13, 16-20. Apple "request[e]d that Plaintiffs be barred from commencing" such discovery until Plaintiffs serve a Section 2019.210 statement. *Id*. at 20. The parties proposed patent-specific dates, including dates for infringement contentions and Apple disclosing "core technical documents" concerning the "accused

products." *Id.* at 25-26.  Apple argued, however, that these patent-specific dates should be "subject to Plaintiffs providing an adequate identification of their alleged trade secrets in compliance with Section 2019.210 insofar as such an identification is a prerequisite to such discovery." *Id.* at 26.

Judge Selna rejected Apple's argument and resolved the dispute, holding: "The Court **adopts the patent specific dates**.  The Court stays the **trade secret discovery only** pending compliance with 2019.210."  Powell Decl., Ex. 9 (emphasis added).  After the ruling, Plaintiffs stated they will provide a Section 2019.210 statement before serving trade secret discovery and asked Apple to withdraw this Motion because the requests at issue seek **patent discovery**, which is **not** stayed.  Apple refused, maintaining that **all** discovery concerning the accused products is barred because it is also relevant to trade secrets.  Apple thus seeks a do-over through this Joint Stipulation.

Apple's objective is obvious: Apple intends to litigate the sufficiency of whatever Section 2019.210 statement Plaintiffs serves and thereby delay **all** technical discovery.  Apple asserts that, in a "typical case," the plaintiff "serves a Section 2019.210 disclosure and the parties litigate the deficiencies."  Joint Stipulation at 20.  Allowing Apple to delay patent discovery while it litigates the sufficiency of Plaintiffs' Section 2019.210 disclosure directly contradicts Judge Selna's ruling adopting the "patent specific dates" and staying "trade secret discovery only."  Powell Decl., Ex. 9.  This Court should refrain from modifying what the Order already says: patent discovery must move forward.

Patent discovery is necessary to comply with Court-ordered deadlines, including infringement contentions.  The requests seek basic information about the accused products.  Some are even directed towards particular claim limitations. For example, RFP No. 16 seeks information about components that "separate light emitted by LEDs from other components of any of the Accused Products."  That is relevant at least to claim language reciting "a light block forming an enclosing wall between the light emission source and the plurality of detectors . . . ."  Powell Decl., Ex. 1 at Claim 1.

Even if Judge Selna had not already entered his Order, nothing would support

Apple's argument. Apple recites Section 2019.210, but ignores the case law interpreting the statute. *See* Cal. Code Civ. Proc. § 2019.210 ("before commencing discovery relating to the trade secret, the party alleging the misappropriation shall identify the trade secret with reasonable particularity"). Apple argues the "relating to" language bars all patent discovery if the requested information is ***also*** relevant to trade secrets. But the California Court of Appeals construed Section 2019.210 as barring discovery of other claims only if the claim is "factually dependent" or "hinges upon" the misappropriation of trade secrets. *See Advanced Modular Sputtering, Inc. v. Superior Court*, 132 Cal. App. 4th 826, 835 (2005).

As a result, California courts routinely require a defendant to produce technical documents relevant to patent infringement even if the documents could also be relevant to a trade secret claim. *See, e.g.*, *Space Data Corp. v. X*, 2017 WL 3007078, *4 (N.D. Cal. July 14, 2017). Similarly, this Court refused to bar discovery of "drawings and designs for unreleased products" under Section 2019.210 because the information was "relevant to claims other than the trade secret misappropriation claim, such as [plaintiff]'s claim for copyright infringement." *Bryant v. Mattel*, 2007 WL 5430888, *3 n.3 (C.D. Cal. May 18, 2007); *see also E. & J. Gallo Winery v. Instituut Voor Landbouw-En Visserijonderzoek*, 2018 WL 3062160, at *6 (E.D. Cal. June 19, 2018) (finding Section 2019.210 disclosure was insufficient, but holding the parties "shall proceed with discovery on non-trade secret claims" while plaintiffs prepared an amended disclosure).

Apple originally relied on *Advanced Modular* during the meet-and-confer. However, Plaintiffs pointed out that *Advanced Modular* supports Plaintiffs because, in this case, patent infringement is not "factually dependent" on misappropriation of trade secrets. Apple did not argue otherwise, instead abandoning its reliance on *Advanced Modular* and relying exclusively on the "related to" language of Section 2019.210. Nothing supports Apple's sweeping interpretation of the statute.

Apple also sets forth a series of largely irrelevant and factually misleading arguments. For example, Apple argues the First Amended Complaint broadened

Plaintiffs' trade secret definition.  The amendment actually provided additional detail about the categories of trade secrets identified in the initial Complaint.  Apple also asserts "Plaintiffs concede that many, if not all, of their purported secrets are now public."  Joint Stipulation at 2.  That is incorrect.  Plaintiffs alleged Apple published *some* of their trade secrets in patent publications, but never alleged all of their trade secrets are public.

Apple also complains about the timing of a subpoena Plaintiffs served on Apple in *Masimo Corp. et al. v. True Wearables Inc. et al.*, No. 8:18-cv-02001-JVS-JDE (the "*True Wearables* Case").  The timing was dictated by the rapidly approaching close of fact discovery.  Once the Court extended the fact discovery deadline, Plaintiffs withdrew the subpoena to determine if it was necessary in view of the extended discovery deadline.  Plaintiffs cannot be faulted for trying to avoid unnecessarily burdening the courts.

Nothing supports Plaintiffs attempt to bar *all* technical discovery—including patent discovery—until Apple agrees that Plaintiffs have complied with Section 2019.210.  Judge Selna already resolved this issue and held that patent discovery should proceed.  Plaintiffs respectfully request the Court deny Apple's motion and order Apple to substantively respond to patent discovery, including RFP Nos. 5-25.

## II.  THE DISCOVERY REQUESTS AT ISSUE

In accordance with Local Rule 37-2.1, below are the verbatim Requests for Production that are the subject of this Motion.  Apple has not yet served responses because the parties agreed to extend its time to respond until April 30, 2019.

### REQUEST FOR PRODUCTION NO. 5:

Documents sufficient to show the design and operation of the Accused Products.

### REQUEST FOR PRODUCTION NO. 6:

All documents and things describing the operation of the Accused Products, including, without limitation, product brochures, user manuals, instructional materials, and directions for use.

**REQUEST FOR PRODUCTION NO. 7:**

All training materials concerning any of the Accused Products, including, without limitation, training manuals, training videos, presentations, and handouts.

**REQUEST FOR PRODUCTION NO. 8:**

All marketing materials concerning any of the Accused Products, including, without limitation, advertisements, promotional materials, pamphlets, brochures, product catalogs, websites, product brochures, informational materials, and videos.

**REQUEST FOR PRODUCTION NO. 9:**

All publications, articles, abstracts, papers, presentations, seminars, speeches, press releases, and internet postings relating to any of the Accused Products.

**REQUEST FOR PRODUCTION NO. 10:**

All videos or DVDs demonstrating or showing the operation of the Accused Products.

**REQUEST FOR PRODUCTION NO. 11:**

All documents and things that refer or relate to the use, effectiveness, capabilities, functionality, or characteristics of the physiological monitoring features of any of the Accused Products.

**REQUEST FOR PRODUCTION NO. 12:**

All technical documents for the Accused Products, including, without limitation, product specifications, diagrams, schematics, memos, conceptual or technical drawings, design requirements documents, design capture documents, technical requirements documents, product briefs, product plans, product requirements, document trees, assembly design documents, design review documents, system design documents,

fabricating drawings, manufacturing documents, and technical meeting minutes.

**REQUEST FOR PRODUCTION NO. 13:**

All documents and things that refer or relate to technical information, specifications, and research data for any of the Accused Products.

**REQUEST FOR PRODUCTION NO. 14:**

All documents and things concerning the research, design, and development of any of the Accused Products or any component of any of the Accused Products, including, without limitation, laboratory notebooks, invention disclosures, memoranda, product specifications, conceptual or technical drawings, schematics, diagrams, technical specifications, meeting minutes, presentations, and prototypes.

**REQUEST FOR PRODUCTION NO. 15:**

All documents and things that refer or relate to optical or structural components of any of the Accused Products, including emitters, sensors, detectors, filters, covers, lenses, masks, housing, adhesives, openings, magnets, magnetic shields, carriers, bodies, interior surfaces, walls, protrusions, and sensor subsystems.

**REQUEST FOR PRODUCTION NO. 16:**

All documents and things that refer or relate to any components, surface areas, or adhesives that separate light emitted by LEDs from other components of any of the Accused Products.

**REQUEST FOR PRODUCTION NO. 17:**

Documents sufficient to show the operation of any algorithms used to monitor any physiological parameter in any of the Accused Products.

**REQUEST FOR PRODUCTION NO. 18:**

Documents sufficient to show the operation of any heart rate algorithms used in any of the Accused Products.

**REQUEST FOR PRODUCTION NO. 19:**

All documents and things that refer or relate to the development of the heart rate algorithms for any of the Accused Products.

**REQUEST FOR PRODUCTION NO. 20:**

All documents and things that refer or relate to selection between any heart rate algorithms used in any of the Accused Products.

**REQUEST FOR PRODUCTION NO. 21:**

All documents and things that refer or relate to power consumption by any heart rate algorithms used in any of the Accused Products.

**REQUEST FOR PRODUCTION NO. 22:**

All documents and things that refer or relate to the operation of any LEDs used to determine pulse rate or heart rate for any of the Accused Products, including but not limited to documents and things that refer or relate to LED timing, duty cycle, current, or power usage.

**REQUEST FOR PRODUCTION NO. 23:**

All documents and things that refer or relate to collecting first heart rate metrics using a first technique during a first period and collecting second heart rate metrics using a second technique during a second period for any of the Accused Products.

**REQUEST FOR PRODUCTION NO. 24:**

All documents and things that refer or relate to changes in collecting heart rate metrics based on user input for any of the Accused Products.

**REQUEST FOR PRODUCTION NO. 25:**

All documents and things that refer or relate to changes in collecting heart rate metrics based on a change in operating mode for any of the Accused Products.

Case 8:20-cv-00048-JVS-JDE Document 143-1 Filed 04/30/20 Page 316 of 453 Page ID #:9745

### III.  APPLE'S POSITION

**A.   FACTS**

For the past 44 years, Apple has been able to revolutionize the mobile and personal computing markets because of its significant investment in technological innovation, and its ability to translate its trade secrets into transformative products, such as the Apple Watch.  Years after the Apple Watch became a commercial success, Plaintiffs filed this lawsuit alleging trade secret misappropriation.  Plaintiffs now improperly seek unfettered access to confidential information relating to the Apple Watch without first describing their alleged secrets.

Below, Apple sets forth a timeline of the facts relevant to this Motion.

**1.    Plaintiffs Impermissibly Sought To Obtain Discovery Of Apple's Confidential Information In The *True Wearables* Case.**

One day before Plaintiffs filed the complaint in this case, Plaintiffs served a subpoena on Apple in the *True Wearables* Case.  *See* Lerner Decl. ¶ 2 & Ex. A.  As this Court is likely aware, on November 8, 2018, Plaintiffs filed the *True Wearables* Case against former Apple employee, Marcelo Lamego, and his company, True Wearables, alleging claims of breach of contract, breach of fiduciary duty, trade secret misappropriation, and patent infringement.  Plaintiffs' subpoena to Apple, served nearly one year after discovery began in the *True Wearables* Case, sought information that was not relevant to the *True Wearables* Case, but on its face pertained to the trade secret misappropriation claim Plaintiffs intended to file against Apple the very next day, in this case.

After Apple filed a motion to quash and requested a protective order that, *inter alia*, identified Plaintiffs' requirement under Section 2019.210 to identify their purported trade secrets with reasonable particularity before commencing trade secret-related discovery from Apple (*Id.* ¶ 3 & Ex. B), Plaintiffs withdrew the subpoena to Apple in the *True Wearables* Case.

Gibson, Dunn & Crutcher LLP

## 2. Plaintiffs Failed To Allege Their Purported Trade Secrets With Any Particularity.

Plaintiffs' original complaint, filed January 9, 2020, alleged that Apple misappropriated seven broad categories of generic business or technical information, "including, but not limited to, Plaintiffs' business plans, know-how, technical information, technical data, designs, manufacturing techniques and other business information." Lerner Decl. Ex. C (Compl.) ¶ 181. Even though Plaintiffs alleged that Apple had disclosed the alleged trade secrets "by filing patent applications containing Masimo's Confidential Information" and disclosed their "Confidential Information . . . in [] patent filings," the complaint failed to identify the portions of Apple's patent filings containing their alleged trade secrets. *Id.* ¶¶ 185, 187.

## 3. Plaintiffs Ignored Apple's Request For A Section 2019.210 Disclosure And Propounded Trade Secret-Related Discovery.

After Plaintiffs filed their complaint, the parties met and conferred on February 25, 2020. Lerner Decl. ¶ 5. Apple explained that the complaint failed to identify Plaintiffs' alleged trade secrets with sufficient particularity. *Id.*

Shortly thereafter, on March 6, 2020, Apple requested in writing that Plaintiffs identify (by line and page number) their trade secrets that purportedly were disclosed in any published patent application filed by Apple or in any patent held by Apple, as alleged in the complaint. *Id.* Ex. E. Apple explained that because Section 2019.210 requires Plaintiffs to describe all of their alleged trade secrets with "reasonable particularity" before commencing trade secret-related discovery, Plaintiffs should be able to identify those secrets promptly. *Id.* Plaintiffs ignored this request.

Instead, on March 16, 2020, Plaintiffs propounded 25 requests for production on Apple, the majority of which relate to Apple's confidential information—thereby evidencing Plaintiffs' intent to commence trade secret-related discovery in the absence of a Section 2019.210-compliant disclosure. *Id.* ¶ 8 & Ex. F.

### 4. Plaintiffs Filed An FAC That Merely Expanded The Generic Categories Of Information Claimed As Trade Secrets.

After Apple filed a motion to dismiss for failure to state a claim, asserting, among other things, that Plaintiffs failed to allege any trade secrets with particularity (*see* Lerner Decl. Ex. D), Plaintiffs voluntarily elected to amend their complaint. *See* Dkt. No. 21. On March 25, 2020, Plaintiffs filed their First Amended Complaint (the "FAC"). Lerner Decl. ¶ 9 & Ex. G. Rather than correct the deficiencies in the original complaint, the FAC lists *more—and in some cases, even broader*—categories of generic business information as Plaintiffs' claimed trade secrets. *Id.* Ex. G (FAC) ¶ 211. The number of categories of purported trade secrets multiplied from seven to approximately *50*, if not more—given that Plaintiffs now claim that combinations of the 50 categories may *also* be secrets. In addition, the FAC alleges that the following catch-all categories of illusory information are trade secrets:

- "combinations and selections of the above information";
- "knowledge of the varying importance of the information";
- "knowledge for selecting which information and technology are important for improving reliability, improving measurements, and how to successfully combine and implement them to achieve the desired functionality"; and
- "negative information, what works well under certain conditions, and trade-offs of selecting certain techniques."

*Id.* Plaintiffs' FAC was not accompanied by a Section 2019.210 disclosure. To date, Plaintiffs have refused to serve a Section 2019.210 disclosure on Apple.

### 5. Plaintiffs' Requests For Production Nos. 5-25 Seek Premature Trade-Secret Related Discovery From Apple.

At issue in this Stipulation are Plaintiffs' Requests for Production Nos. 5 through 25. *See* Lerner Decl. Ex. F. Each of these requests seek to uncover Apple's confidential information.

Specifically, 12 of the Requests seek confidential information about the design

and/or operation of the Apple Watch's non-invasive monitoring technology—which is not public information, but rather some of Apple's most closely guarded, confidential information:

> **REQUEST FOR PRODUCTION NO. 5:**
> Documents sufficient to show the design and operation of the Accused Products.

> **REQUEST FOR PRODUCTION NO. 6:**
> All documents and things describing the operation of the Accused Products, including, without limitation, product brochures, user manuals, instructional materials, and directions for use.

> **REQUEST FOR PRODUCTION NO. 7:**
> All training materials concerning any of the Accused Products, including, without limitation, training manuals, training videos, presentations, and handouts.

> **REQUEST FOR PRODUCTION NO. 10:**
> All videos or DVDs demonstrating or showing the operation of the Accused Products.

> **REQUEST FOR PRODUCTION NO. 11:**
> All documents and things that refer or relate to the use, effectiveness, capabilities, functionality, or characteristics of the physiological monitoring features of any of the Accused Products.

> **REQUEST FOR PRODUCTION NO. 12:**
> All technical documents for the Accused Products, including, without limitation, product specifications, diagrams, schematics, memos, conceptual or technical drawings, design requirements documents, design capture documents, technical requirements documents, product briefs, product plans, product requirements, document trees, assembly design documents, design review documents, system design documents, fabricating drawings, manufacturing documents, and technical meeting minutes.

**REQUEST FOR PRODUCTION NO. 13:**

All documents and things that refer or relate to technical information, specifications, and research data for any of the Accused Products.

**REQUEST FOR PRODUCTION NO. 14:**

All documents and things concerning the research, design, and development of any of the Accused Products or any component of any of the Accused Products, including, without limitation, laboratory notebooks, invention disclosures, memoranda, product specifications, conceptual or technical drawings, schematics, diagrams, technical specifications, meeting minutes, presentations, and prototypes.

**REQUEST FOR PRODUCTION NO. 15:**

All documents and things that refer or relate to optical or structural components of any of the Accused Products, including emitters, sensors, detectors, filters, covers, lenses, masks, housing, adhesives, openings, magnets, magnetic shields, carriers, bodies, interior surfaces, walls, protrusions, and sensor subsystems.

**REQUEST FOR PRODUCTION NO. 16:**

All documents and things that refer or relate to any components, surface areas, or adhesives that separate light emitted by LEDs from other components of any of the Accused Products.

**REQUEST FOR PRODUCTION NO. 21:**

All documents and things that refer or relate to power consumption by any heart rate algorithms used in any of the Accused Products.

**REQUEST FOR PRODUCTION NO. 22:**

All documents and things that refer or relate to the operation of any LEDs used to determine pulse rate or heart rate for any of the Accused Products, including but not limited to documents and things that refer or relate to LED timing, duty cycle, current, or power usage.

Four of the Requests seek materials pertaining to the algorithms Apple developed to monitor heart rates or other "physiological parameters"—again, Apple's confidential information:

> **REQUEST FOR PRODUCTION NO. 17:**
> Documents sufficient to show the operation of any algorithms used to monitor any physiological parameter in any of the Accused Products.

> **REQUEST FOR PRODUCTION NO. 18:**
> Documents sufficient to show the operation of any heart rate algorithms used in any of the Accused Products.

> **REQUEST FOR PRODUCTION NO. 19:**
> All documents and things that refer or relate to the development of the heart rate algorithms for any of the Accused Products.

> **REQUEST FOR PRODUCTION NO. 20:**
> All documents and things that refer or relate to selection between any heart rate algorithms used in any of the Accused Products.

Three of the Requests seek information about how the Apple Watch collects heart rate metrics—confidential technical information that Apple does not publicly disclose, but rather, safely guards:

> **REQUEST FOR PRODUCTION NO. 23:**
> All documents and things that refer or relate to collecting first heart rate metrics using a first technique during a first period and collecting second heart rate metrics using a second technique during a second period for any of the Accused Products.

> **REQUEST FOR PRODUCTION NO. 24:**
> All documents and things that refer or relate to changes in collecting heart rate metrics based on user input for any of the Accused Products.

> **REQUEST FOR PRODUCTION NO. 25:**
> All documents and things that refer or relate to changes in collecting heart rate metrics based on a change in operating mode for any of the Accused Products.

And two of the Requests seek materials related to Apple's marketing strategy for the Apple Watch—which, again, is Apple's confidential and sensitive information that Apple does not disclose publicly:

> **REQUEST FOR PRODUCTION NO. 8:**
> All marketing materials concerning any of the Accused Products, including, without limitation, advertisements, promotional materials, pamphlets, brochures, product catalogs, websites, product brochures, informational materials, and videos.

> **REQUEST FOR PRODUCTION NO. 9:**
> All publications, articles, abstracts, papers, presentations, seminars, speeches, press releases, and internet postings relating to any of the Accused Products.

Plaintiffs therefore seek a soup-to-nuts blueprint of the non-invasive monitoring technology developed by their competitor, Apple—from its inception, to its design, to how the physical parts function together, to the way in which Apple markets its product containing the technology to consumers—without first identifying in a Section 2019.210 disclosure any trade secrets belonging to Plaintiffs that Apple allegedly misappropriated to create the technology.

Plaintiffs contend that certain of these Requests seek information pertaining to their patent claims. Even if that is true, the language of the Requests makes crystal clear that the Requests *also* seek information *relating to* Plaintiffs' trade secret claim. Indeed, Plaintiffs use the term "Accused Products" throughout these Requests, defined as "Apple Watch Series 4 or later, as well as the combination of Apple Watch Series 4 or later with an Apple iOS Product." These are the very same Apple Watches that Plaintiffs contend incorporate their trade secrets. Plaintiffs' Requests for Production 5 through 25 therefore seek discovery that should not commence until Plaintiffs have identified their alleged trade secrets with reasonable particularity under Section 2019.210. *See* Cal. Code Civ. Proc. § 2019.210 ("before commencing discovery *relating to* the trade secret, the party alleging the misappropriation shall identify the trade secret with reasonable

particularity") (emphasis added).

To be clear, Apple does not seek to withhold responsive, *public* documents pending a Section 2019.210 disclosure. In particular, Apple acknowledges that Plaintiffs' Requests for Production 5 through 12 seek certain information that is public, and Apple is prepared to produce responsive, public documents—as indicated in its responses and objections to Plaintiffs' Requests for Production. But to the extent Requests 5 through 12 also seek *non-public* documents, Plaintiffs' discovery of those documents should not commence until Plaintiffs serve an adequate Section 2019.210 disclosure. The remainder of Plaintiffs' Requests for Production—Requests 13 through 25—appear to seek only non-public documents and, therefore, Plaintiffs' discovery of documents responsive to those Requests should not commence until Plaintiffs serve an adequate Section 2019.210 disclosure.

### 6. The Parties Met And Conferred About Plaintiffs' Premature Requests For Production.

On March 28, 2020, Apple initiated the meet-and-confer process in connection with this Stipulation. Lerner Decl. ¶ 11.

On April 6, 2020, the parties' counsel met and conferred by telephone. *Id.* ¶ 13. During that call, Apple reiterated its position that Plaintiffs are required to identify their trade secrets with reasonable particularity pursuant to Section 2019.210 and for the purpose of efficient case management, and therefore, that Plaintiffs are not permitted to proceed with discovery "related to" the alleged trade secrets until an adequate disclosure has been made. Plaintiffs expressed the view that unless the discovery Requests were "solely" related to trade secrets, they were proper, to which Apple responded that Section 2019.210 does not require that discovery be "solely" related to the trade secrets to be stayed absent a proper trade secret disclosure. That would defeat the purpose of Section 2019.210, as a plaintiff could simply claim that its discovery touches on a non-trade secret claim. The test is whether discovery is "related" to the alleged trade secrets. *Id.* Notably, Plaintiffs *admit* that they are alleging that the "Apple Accused Products"

identified as the subject of their patent infringement claims incorporate "some" of Plaintiffs' claimed trade secrets. *Id.*

Even though they claim to be ready and able to describe their secrets, Plaintiffs have insisted that Apple serve an interrogatory requesting that Plaintiffs identify their trade secrets. *Id.* Ex. J. Apple responded as it has numerous times previously:

> [T]urning to the question of an interrogatory, as we have explained multiple times, Plaintiffs' demand that Apple serve an interrogatory is improper. To begin with, Plaintiffs have never agreed—and are not agreeing now—that Plaintiffs will not commence discovery relating to trade secrets until they provide an adequate description of their alleged secrets. That is critical because, as we explained on the call, there is nothing stopping Plaintiffs from cutting and pasting the vague description of the secrets in the FAC into an interrogatory response (served 30 days, if not more, after the interrogatory is propounded) and claiming that they have complied. This will not solve the lack of disclosure problem—it will just invite motion practice, which will further delay the process. Therefore, contrary to Plaintiffs' suggestion that an interrogatory would be faster here, a disclosure pursuant to Section 2019.210 will in fact be faster, as well as more efficient and fair to the parties.

*Id.*

The parties have not been able to resolve their dispute informally, and therefore are proceeding with this Stipulation.

## B.   ARGUMENT

Apple's position here is not complicated. *First*, Plaintiffs cannot escape the requirement set forth in Section 2019.210 by claiming it is a state court rule. It is well-established that in state or federal court, Plaintiffs bringing a claim under California's Uniform Trade Secrets Act ("CUTSA," Cal. Civ. Code § 3426.1 *et seq.*) must provide a description of their alleged secrets before they take trade secret-related discovery. *Second*, the broad allegations in the FAC are not sufficient to satisfy Plaintiffs' burden to identify their alleged secrets with reasonable particularity. It is well-established that the pleading standard is less demanding—and serves a different purpose—than Section 2019.210's requirement that Plaintiffs provide an adequate identification of the alleged

Gibson, Dunn & Crutcher LLP

Joint Stip. Re Apple's Mot. for Prot. Order   18          Case No. 8:20-cv-00048-JVS (JDEx)

secrets.  *Third*, application of Section 2019.210 is essential in this case because Plaintiffs' conduct frustrates the common-sense considerations that underlie Section 2019.210 and which are essential to effective case management.

### 1.    That Plaintiffs Filed Their CUTSA Claim In Federal Court Does Not Mean Plaintiffs Need Not Describe Their Secrets.

Plaintiffs refuse to provide a Section 2019.210 disclosure in this case based on their contention that Section 2019.210 does not apply to CUTSA cases filed in federal court.  That is wrong.  Federal courts in California have held that Section 2019.210 applies to CUTSA cases filed in federal court.  Moreover, as this Court has already recognized, Section 2019.210 can and should be applied in federal court under the Court's discretion as a matter of case management.  It assists the Court and the parties in efficiently litigating the case.  *M/A-COM Tech. Sols.*, 2019 WL 4284523, at *2 (finding "that, under the particular facts of this case, the procedural requirements of Section 2019.210 are warranted and appropriate to assist in the orderly and expeditious handling of discovery").

This Court is far from alone in managing discovery in trade secret cases by applying Section 2019.210.  *See, e.g.*, *E. & J. Gallo Winery v. Instituut Voor Landbouw-En Visserijonderzoek*, 2018 WL 3062160, at *4 (E.D. Cal. June 19, 2018) ("After review of the law and circumstances in this case, the Court will require that Plaintiffs identify their trade secrets with reasonable particularity compliant with Section 2019.210.  Applying Section 2019.210 here will narrow and clarify the basic issues between the parties, thereby furthering the goal of efficiency for the court and litigants."); *Swarmify, Inc. v. Cloudflare, Inc.*, 2018 WL 2445515, at *2 (N.D. Cal. May 31, 2018) ("Insofar as controlling law on this subject remains ambiguous, district courts may also exercise discretion in case management to enforce Section 2019.210, and the undersigned judge has in fact done so."); *Jobscience, Inc. v. CVPartners, Inc.*, 2014 WL 852477, at *4 (N.D. Cal. Feb. 28, 2014) ("This order agrees and the trade secret disclosure provisions in Section 2019.210 of the California Code of Civil Procedure shall be applied here.").

Tellingly, after two and a half weeks of meet and confers on this topic, Plaintiffs provided one case in support of their position—*SMC Networks, Inc. v. Hitron Techs., Inc.*, 2013 WL 12136372 (C.D. Cal. Mar. 15, 2013)—which is from 2013 and has never been followed by another court. The Rutter Guide, after citing *SMC Networks*, observes that "[e]ven if state law limitations on discovery are not binding in federal actions, the district court will often grant a protective order (FRCP 26(c), ¶ 11:1060 ff) that accomplishes the same result." Rutter Group Prac. Guide Fed. Civ. Pro. Before Trial Ch. 11(III)-A.

As set forth below, application of Section 2019.210 is particularly essential to the management of this case.

### 2. Plaintiffs Have Not Identified Their Purported Trade Secrets, And The FAC Does Not Suffice.

This is not the typical case where the trade secret plaintiff serves a Section 2019.210 disclosure and the parties litigate the deficiencies. Here, Plaintiffs have refused to serve *any* Section 2019.210 disclosure at all. That is a violation of Section 2019.210, and it calls into question the basis for Plaintiffs' trade secret claim in the first place.

Rather than provide a description of their secrets, Plaintiffs have argued that their FAC is sufficient. Not so. Again, the FAC sets forth a non-exhaustive list of approximately 50 broad categories of information (*see* Lerner Decl. Ex. G (FAC) ¶ 211), and alleges that Plaintiffs' "trade secrets" also include unspecified "combinations and selections" of those 50 broad categories (*id*). That is not sufficient to survive a motion to dismiss. And even if the FAC did adequately plead a trade secret—which it does not—that still would not satisfy Plaintiffs' obligation to describe the alleged secret with specificity. A finding that allegations are sufficient to survive a motion to dismiss does not mean the trade secret allegations are sufficient under Section 2019.210. *See, e.g., Gatan, Inc. v. Nion Co.*, 2018 WL 2117379, at *2 (N.D. Cal. May 8, 2018) (explaining that the district court's finding that trade secret allegations were sufficient to survive a

motion to dismiss "did not prejudge whether plaintiff's trade secret allegations satisfied § 2019.210," and concluding that the disclosures were insufficient under Section 2019.210).[1] Thus, Plaintiffs cannot hide behind a flawed FAC and demand access to Apple's confidential files to manufacture a trade secret claim. Unless and until Plaintiffs serve an adequate Section 2019.210 disclosure, they should not be permitted to commence with trade secret-related discovery in this case.

### 3. Plaintiffs' Refusal To Comply With Section 2019.210 Frustrates Each Of The Four Purposes Of The Statute.

Permitting Plaintiffs to commence with trade secret-related discovery in the absence of a sufficient Section 2019.210 disclosure would frustrate the important four-pronged purpose of the statute.

The policy behind Section 2019.210 is straightforward. The statute was enacted "to curb unsupported trade secret lawsuits routinely commenced to harass competitors and former employees." *Computer Econs., Inc. v. Gartner Grp., Inc.*, 50 F. Supp. 2d 980, 992 (S.D. Cal. 1999). The California legislature "understood that plaintiffs in trade secret cases are often unable to identify any trade secrets," and that such claims therefore are "especially prone to discovery abuse." *Id.* By requiring a plaintiff to identify its trade secrets early and with particularity, and restricting the plaintiff's ability to engage in discovery until it does so, Section 2019.210 serves four distinct purposes: Section 2019.210 (1) "promotes well-investigated claims and dissuades the filing of meritless trade secret complaints"; (2) "prevents plaintiffs from using the discovery process as a means to obtain the defendant's trade secrets"; (3) "assists the court in framing the appropriate scope of discovery and in determining whether plaintiff's

---

[1] Indeed, where, as here, the alleged trade secrets reside in "a highly specialized technical field, a more exacting level of particularity may be required to distinguish the alleged trade secrets from matters already known to persons skilled in that field." *Perlan Therapeutics, Inc. v. Superior Court*, 178 Cal. App. 4th 1333, 1346 (2009); *Diodes, Inc. v. Franzen*, 260 Cal. App. 2d 244, 253 (1968) (plaintiff "should describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons who are skilled in the trade").

discovery requests fall within that scope"; and (4) "enables defendants to form complete and well-reasoned defenses, ensuring that they need not wait until the eve of trial to effectively defend against charges of trade secret misappropriation." *Id.* at 985; *see also, e.g.*, *M/A-COM Tech. Sols., Inc.*, 2019 WL 8108729, at *2 (stating that Section 2019.210's "reasonable particularity" requirement should be understood in light of this four-pronged purpose of the statute). Plaintiffs' refusal to comply with Section 2019.210 interferes with each of these goals and will continue to do so unless this Court enters the protective order Apple requests.

### a) Plaintiffs Have Not Demonstrated That Their Trade Secret Claim Has Any Merit.

In the absence of a Section 2019.210-compliant disclosure, Plaintiffs have done nothing to demonstrate that they have a CUTSA claim justifying discovery of Apple's confidential information. Even a cursory review of Plaintiffs' sole attempt at a list of their purported trade secrets makes clear that Plaintiffs have no idea what, if any, relevant trade secrets they actually possess:

> Plaintiffs own trade secrets that include, but are not limited to, Plaintiffs' technical information, sales and marketing information, and other business information relating to non-invasive monitoring of physiological parameters and products to perform such monitoring. Plaintiffs' technical information includes product plans, engineering plans, product briefs, technical drawings, technical specifications, technical data, product designs, system designs, design captures, assembly design requirements, risk analysis, test procedures and results, test data, design review documents, software requirement specifications, technical know-how, manufacturing techniques and procedures, installation techniques and procedures, and invention disclosures. Plaintiffs' sales and marketing information includes product plans, business plans, customer information, sales pipelines, proposal and quote generation tools, pricing models, pricing schedules, sales training materials, product training materials, marketing and launch plans, marketing analysis, and competitive analysis. Plaintiffs' other business information includes information for successfully operating a noninvasive patient monitoring company, including personnel information, supplier information, and other business spreadsheets and analysis. Plaintiffs trade secrets also include combinations and selections

Case 8:20-cv-00048-JVS-JDE Document 243 Filed 04/30/20 Page 27 of 453 Page ID #:2992

of the above information, and knowledge of the varying importance of the information.  Plaintiffs trade secrets also include knowledge for selecting which information and technology are important for improving reliability, improving measurements, and how to successfully combine and implement them to achieve the desired functionality.  Plaintiffs' trade secrets also include negative information, what works well under certain conditions, and trade-offs of selecting certain techniques.

Lerner Decl. Ex. G (FAC) ¶ 211.

As a threshold matter, the very first line of Plaintiffs' allegation is problematic—using expansive terms like "including" weighs against a finding that secrets have been identified with particularity.  *M/A-COM Tech. Sols., Inc.*, 2019 WL 4284523, at *2 (citing *Gatan, Inc.*, 2018 WL 2117379, at *3 (noting the "use of catchall words such as 'including' weighs against a finding that the designation satisfies § 2019.210")).

The 50 broad categories here, which expand to thousands of broad categories when one accounts for Plaintiffs' vague allegation that the secrets include combinations, is equally problematic.  As this Court previously ruled in another case, "catchall descriptions, lists of categories of alleged trade secrets in broad terms, or a listing of concepts that the plaintiff asserts constitute its trade secret information are all insufficient" bases on which to permit a plaintiff to proceed to discovery in a trade secrets case.  *M/A-COM Tech. Sols., Inc.*, 2019 WL 8108729, at *2 (internal quotations omitted) (prohibiting commencement of discovery until plaintiffs provide supplemental disclosures identifying their purported trade secrets with reasonable particularity); *Loop AI Labs Inc. v. Gatti*, 195 F. Supp. 3d 1107, 1113-1114 (N.D. Cal. 2016) (finding 53 paragraphs of asserted trade secret disclosures were not identified with reasonable particularity under Section 2019.210); *Perlan Therapeutics*, 178 Cal. App. 4th at 1350 ("Perlan is not entitled to include broad, 'catch-all' language as a tactic to preserve an unrestricted, unilateral right to subsequently amend its trade secret statement.").  But that is the *only* type of information Plaintiffs have supplied Apple with to date.  For example, the FAC's general categories of "technical drawings," "technical know-how," and "business plans" provide Apple with zero indication about what Plaintiffs

Gibson, Dunn & Crutcher LLP

Case 8:20-cv-00048-JVS-JDE Document 143-1 Filed 04/30/20 Page 330 of 453 Page ID #:20561

specifically claim are their trade secrets, and instead force Apple—and the Court—to simply "guess at the specifics." *Loop AI Labs Inc.*, 195 F. Supp. 3d at 1115 (staying discovery of trade secret claims where disclosure was insufficient). Such generalized descriptions fall short of the specificity the law requires, and, in the absence of any Section 2019.210 disclosure, let alone a reasonably particularized one, constitute the hallmarks of a plaintiff with a meritless CUTSA claim.

Particular allegations in the FAC further underscore the problems with Plaintiffs' CUTSA claim. For example, Plaintiffs describe several categories of purported trade secret information as including "knowledge" about the importance of the information in the health monitoring business. Lerner Decl. Ex. G (FAC) ¶ 211. Plaintiffs thereby anchor their CUTSA claim on a theory of inevitable disclosure that California does not recognize (*Whyte v. Schlage Lock Co.*, 101 Cal. App. 4th 1443, 1463 (2002) ("Lest there be any doubt about our holding, our rejection of the inevitable disclosure doctrine is complete.")), and seek to thwart former employees' mobility (and competition generally) in violation of California Business and Professions Code Section 16600. And, again, Plaintiffs allege that Apple incorporated Plaintiffs' undefined trade secrets into Apple's patent applications (Lerner Decl. Ex. G (FAC) ¶ 218), yet Plaintiffs have failed to identify the Apple patent applications that supposedly contain their secrets, let alone where in the thousands of pages of these applications the secrets can be found.

A CUTSA claim requires a plaintiff with actual trade secrets, and, in the absence of a Section 2019.210-compliant disclosure, Plaintiffs have done nothing but demonstrate that they *do not* in fact possess relevant, actionable trade secrets. Permitting Plaintiffs to commence trade secret-related discovery simply is not warranted on this record.

### b) Plaintiffs Have Not Demonstrated That They Are Actually Looking For *Their* Secrets In Apple's Files.

Plaintiffs' continued refusal to identify their purported secrets likewise suggests that Plaintiffs hope to sift through Apple's confidential information so that they can

Case 8:20-cv-00048-JVS-JDE Document 260-2 Filed 12/30/20 Page 331 of 353 Page ID
#:29154
Case 8:20-cv-00048-JVS-JDE Document 143-1 Filed 04/30/20 Page 29 of 45 Page ID
#:2962

1    claim it as their own.  Without a Section 2019.210 disclosure, Plaintiffs have failed to

2    demonstrate that their request for trade secret-related discovery is anything more than

3    an attempt to obtain *Apple's* confidential information.

4         Perhaps the most direct evidence of this improper motive is the third-party

5    subpoena Plaintiffs served on Apple in connection with the *True Wearables* Case just

6    *one day before* filing the complaint in this case.  Rather than simply identify their trade

7    secrets in this case, Plaintiffs attempted an end run around Section 2019.210 by serving

8    a subpoena on Apple in the *True Wearables* Case.  That subpoena on its face called for

9    confidential information from Apple relevant to the subject matter of this case—in a

10   transparent attempt to discover Apple's confidential information in connection with the

11   *True Wearables* Case and claim it as their own in *this* case.  When Plaintiffs were caught

12   red-handed, they withdrew the subpoena.

13        With the subpoena now withdrawn, Plaintiffs have sought expeditious access to

14   Apple's files via the discovery process in this case.  But a plaintiff in a trade secret case

15   is supposed to search the defendant's files for the *plaintiff's* confidential information

16   that was allegedly misappropriated.  In the absence of any identification by Plaintiffs of

17   reasonably particularized trade secrets to search for, it appears that Plaintiffs seek to

18   engage in the type of discovery abuse that was the California legislature's prime

19   motivation for enacting Section 2019.210 in the first place.  *See Computer Econs., Inc.*,

20   50 F. Supp. 2d at 992 (noting that in enacting Section 2019.210, the California legislature

21   "understood that plaintiffs in trade secret cases are often unable to identify any trade

22   secrets," and that such claims therefore are "especially prone to discovery abuse").

23   Plaintiffs should not be permitted to commence trade secret-related discovery in Apple's

24   files unless and until they are able to satisfy Section 2019.210, and thereby demonstrate

25   to Apple and to the Court that Apple's confidential information is not in fact what they

26   are after.

27

28

c) **Plaintiffs Have Not Assisted The Court In Framing The Scope Of Trade Secret-Related Discovery.**

Plaintiffs' refusal to identify their trade secrets with anything close to "reasonable particularity" also makes it impossible for the Court or Apple to properly frame the scope of trade secret-related discovery.

First, the only list of Plaintiffs' purported trade secrets that currently exists—the FAC's amorphous list of approximately 50 categories of "trade secrets," as well as unidentified "combination" trade secrets (Lerner Decl. Ex. G (FAC) ¶ 211)—is so broad that it essentially encompasses Plaintiffs' entire business.  Without a particularized trade secret disclosure, it will be impossible for the Court and the parties to define the permissible scope of trade secret-related discovery in this case.  As set forth above, Plaintiffs' open-ended list that "includes" 50 vague categories means Plaintiffs could amend at any time, which is utterly improper.  *Swarmify*, 2018 WL 2445515, at *3 ("Swarmify should not be allowed to drag Cloudflare into court based on meritless arguments, only to reboot its alleged trade secrets lineup and try again when the opening skirmish illuminates glaring flaws in Swarmify's case.").  The same is true of Plaintiffs' demand for an interrogatory—Plaintiffs could amend their response.  Plaintiffs' reference to undefined combinations only compounds the problem.  *E. & J. Gallo Winery*, 2018 WL 3062160, at *5 ("Section 2019.210 mandates a more refined description of each individual component and combination of components purported to be a trade secret prior to commencing discovery on these claims.").

Second, without an adequate description of Plaintiffs' trade secrets, neither the Court nor Apple will have any idea which secrets are in fact public.  Indeed, Plaintiffs allege that their purported trade secrets were *already* disclosed in Apple's published patent applications.  Therefore, Plaintiffs *must* know by page and line number where their alleged secrets appear in Apple's patent applications.  Yet, Plaintiffs have twice refused Apple's request for a disclosure identifying those page and line numbers.  *See* Lerner Decl. ¶¶ 7, 12 & Exs. E & I.  This makes no sense and makes it impossible for

1  Apple to figure out where the alleged secrets lie. *See Space Data Corp. v. X*, 2017 WL

2  5013363, at *2 (N.D. Cal. Feb. 16, 2017) ("Moreover, Space Data has not made clear

3  which aspects of its technology and other information are 'part of patents and pending

4  patent applications,' if any, and which are secret.")[2]; *Bladeroom Grp. Ltd. v. Facebook,*

5  *Inc.*, 2015 WL 8028294, at *4 (N.D. Cal. Dec. 7, 2015); *see also M/A-COM Tech. Sols.,*

6  *Inc.*, 2019 WL 8108729, at *4 ("[A]s a general matter, . . . identifying large numbers of

7  documents without any reference to specific pages does not provide an adequate

8  substitute for detailed information of the trade secrets, as a review of the documents may

9  not provide Defendants sufficient information to identify what precisely Plaintiffs are

10  asserting as a trade secret.").

### d)  Plaintiffs Have Not Enabled Apple To Defend Against Their Trade Secret Misappropriation Claim.

13  Finally, without a Section 2019.210 disclosure, Apple is not in a position to

14  formulate "complete and well-reasoned defenses" to Plaintiffs' claim of trade secret

15  misappropriation. *M/A-COM Tech. Sols., Inc.*, 2019 WL 8108729, at *2. The most

16  rudimentary example is Apple's inability to possibly formulate a defense to Plaintiffs'

17  allegation that Apple has already disclosed trade secrets belonging to Plaintiffs in Apple

18  patent applications (*see* Lerner Decl. Ex. G (FAC) ¶ 218), because Plaintiffs refuse to

19  identify those purported secrets in the first place. Without this information, Apple

20  cannot determine whether the allegation has merit, Apple cannot determine whether it

21  has a viable defense, and Apple cannot take steps to remove the alleged trade secrets

22  from patent documents on a prospective basis—to prevent against the harm that

23  Plaintiffs contend will continue unabated. Instead, Plaintiffs' non-exhaustive list of

24  dozens of vague categories has foisted on Apple the impossible task of deciphering

25  precisely what Plaintiffs claim is actually a trade secret. *See Loop AI Labs Inc.*, 195 F.

---

[2]  Like the court in *Bladeroom Group Ltd. v. Facebook, Inc.*, 2015 WL 8028294 (N.D. Cal. Dec. 7, 2015), the court in *Space Data* focused on the failure to distinguish between public and confidential information even at the pleadings stage.

Supp. 3d at 1115 (defendant could not develop an adequate defense where plaintiff's Section 2019.210 disclosure listed broad categories of potentially protectable secrets, forcing the defendant to "guess" what the actual secrets were); *see also Perlan Therapeutics*, 178 Cal. App. 4th at 1350 (Section 2019.210 disclosure deemed inadequate where plaintiff hid trade secrets "in plain sight" by "including surplusage and voluminous attachments").

Plaintiffs should not be permitted to proceed with trade secret-related discovery at the expense of Apple's ability to defend itself against Plaintiffs' trade secret-related claim.

## C.   CONCLUSION

For all of the aforementioned reasons, Apple respectfully requests that the Court grant its motion; enter a protective order prohibiting Plaintiffs from commencing any trade secret-related discovery (including, without limitation, discovery of any non-public documents responsive to Plaintiffs' Requests for Production 5 through 25) until Plaintiffs identify their alleged trade secrets with the reasonable particularity Section 2019.210 requires; and order Plaintiffs to serve on counsel a statement, under seal, that includes the following:

(1) a summary of the specific alleged trade secrets;

(2) the background of the trade secrets and a description of how each secret has derived independent, actual, or potential economic value by virtue of not being generally known to the public;

(3) a description of how each secret has been the subject of reasonable efforts to maintain its secrecy; and

(4) each of the precise claimed trade secrets, numbered with a list of the specific elements for each, as claims would appear at the end of a patent.

Case 8:20-cv-00048-JVS-JDE Document 260-2 Filed 12/30/20 Page 335 of 453 Page ID
#:29166
Case 8:20-cv-00048-JVS-JDE Document 143-1 Filed 04/30/20 Page 335 of 453 Page ID
#:2956

## IV.   **PLAINTIFFS' POSITION**

The Parties' conference of counsel addressed two issues: (1) whether Section 2019.210 applies in Federal Court and (2) if it applies, whether Section 2019.210 also bars patent discovery that may be relevant to the trade secret allegations.  Powell Decl., Ex. 6 at 1-2.  The parties briefed both issues in detail in a 26-page Rule 26(f) report, and Judge Selna decided both issues.  *Id.*, Exs. 7 & 8.  Apple should have withdrawn its Motion instead of unnecessarily burdening this Court.

### A.   **Judge Selna Already Decided Patent Discovery Is Not Stayed**

In the Rule 26(f) report, the parties presented extensive argument on whether and how Section 2019.210 applies to this case.  Powell Decl., Ex. 8 at 6-8 and 13-20.  Apple acknowledged Requests for Production ("RFP") Nos. 5-25 may "concern the asserted patents and technical information about the products accused of patent infringement . . .."  *Id.* at 7.  However, Apple argued it need not provide such discovery until after Plaintiffs provide a Section 2019.210 disclosure because the discovery is ***also*** relevant to Plaintiffs' trade secret claim.  *Id.* at 7-8.  The Rule 26(f) report contained a deadline to disclose "core technical documents" for infringement contentions.  *Id.* at 26.  But Apple argued such patent-specific dates should not apply until Plaintiffs provided an adequate Section 2019.210 disclosure.  *Id.* at 26, n.6 (stating "discovery-related dates that Apple proposes in this Presumptive Schedule of Pretrial Dates are subject to Plaintiffs providing an adequate identification of their alleged trade secrets in compliance with Section 2019.210").

Plaintiffs originally disputed the applicability of Section 2019.210 in Federal Court based on decisions from this Court holding that Section 2019.210 is a procedural rule that conflicts with Rule 26.  *Id.* at 13-14.  Plaintiffs also argued that, if Section 2019.210 applies, it cannot be used to bar patent discovery merely because the discovery could ***also*** be relevant to trade secrets.  *Id.* at 14-15.  As Plaintiffs explained:

> Apple has refused to provide any responsive information on the grounds
> that Apple believes the requests ***also*** relate to the trade secret allegations.

Gibson, Dunn &
Crutcher LLP

Accordingly, Apple is using a California state procedural rule concerning trade secrets to preclude typical patent discovery. Apple provides no case law to support that position, which has been rejected by at least one court in this District. *See Bryant v. Mattel*, 2007 WL 5430888, *3 n.3 (C.D. Cal. May 18, 2007) (refusing to limit discovery of product information under Section 2019.210 because the information was also "relevant to claims other than the trade secret misappropriation claim, such as Mattel's claim for copyright infringement").

*Id.* Plaintiffs also repeatedly "object[ed] to Apple's attempt to use a California state procedural rule to bar all discovery, including patent discovery." *Id.* at 11-12.

Judge Selna rejected Apple's request to stay patent deadlines by holding: "The Court adopts the **patent specific dates**. The Court stays the **trade secret discovery only** pending compliance with Section 2019.210." Powell Decl., Ex. 9 (emphasis added). Thus, Judge Selna determined Section 2019.210 applies to "trade secret discovery only"—not patent discovery that may also be relevant to trade secrets. Accordingly, all patent discovery should proceed. Instead, Apple continues to refuse to produce any technical discovery.

### B.     Section 2019.210 Does Not Bar Patent Discovery

Even if Judge Selna had not ordered the patent case to proceed, nothing would support Apple's assertion that Section 2019.210 bars all patent discovery on the accused products because that information may **also** be relevant to trade secrets. Section 2019.210 states: "In any action alleging the misappropriation of a trade secret under the [CUTSA], before commencing discovery **relating to** the trade secret, the party alleging the misappropriation shall identify the trade secret with reasonable particularity" (emphasis added). Apple asserts the "relating to" language means that **all** discovery as to **all** causes of action is barred if it is **also** related in any way to the trade secret. Joint Stipulation at 16. In doing so, Apple ignores that the California Court of Appeals interpreted Section 2019.210 as barring discovery on other claims only if the claim

Gibson, Dunn & Crutcher LLP

"***hinges upon*** the factual allegations that [defendant] misappropriated [plaintiff's] trade secrets." *Advanced Modular Sputtering, Inc. v. Superior Court*, 132 Cal. App. 4th 826, 835 (2005) (barring contract discovery because the only alleged breach was for disclosing trade secrets) (emphasis added).[3]    Similarly, Apple relies on *Perlan Therapeutics, Inc. v. Superior Court*, 178 Cal. App. 4th 1333 (2009), but that case acknowledged discovery may proceed on "claims not dependent upon proof of [plaintiff]'s claim under the Uniform Trade Secrets Act." *Id.* at 1337 n.2 (noting the trial court did not decide whether non-trade secret claims based "at least in part" on misappropriation of trade secrets also included theories not dependent on proof of misappropriation such that discovery could move forward on those theories).

   Numerous courts—including at least one on which Apple relies—refuse to stay discovery as to patent claims merely because the discovery could ***also*** relate to a trade secret.  For example, Apple relies on *Space Data Corp. v. X*, 2017 WL 5013363, at *2 (N.D. Cal. Feb. 16, 2017), but omits that a later decision in the same case refused to stay patent discovery that also related to trade secrets.  *See Space Data Corp. v. X*, 2017 WL 3007078, *4 (N.D. Cal. July 14, 2017).  Similar to this case, the court in *Space Data* had "stayed trade secret discovery pending Space Data's identification of its trade secrets." *Id.*  Like Apple, the defendant argued it should not have to produce "core technical documents" relevant to patent infringement until after the plaintiff identified its trade secrets.  *Id.*  The court rejected that argument because  "the patent infringement claims asserted in this case are substantive and separate from the trade secret claims." *Id.*

   Similarly, in *ScaleMP, Inc. v. TidalScale, Inc.*, No. 18-CV-4716 EDL, Dkt. No. 52 (N.D. Cal. Mar. 15, 2019) (Powell Decl., Ex. 3), the defendant also argued it should

---

[3]    Apple's meet-and-confer letter quoted *Advanced Modular* in arguing Section 2019.210 bars discovery of other causes of action.  Powell Decl., Ex. 6 at 2.  Plaintiffs pressed Apple on how patent infringement was "factually dependant" on misappropriation of trade secrets.  *Id.* ¶ 8.  Apparently recognizing *Advanced Modular* supports Plaintiffs, Apple avoids citing it (or any other case) to support its argument.

Gibson, Dunn & Crutcher LLP

not have to produce technical documents related to the patent claims until after the Plaintiff complied with Section 2019.210. *Id.* at 7. The court rejected that argument, explaining:

> While Plaintiff's patent infringement claim is related to its trade secret misappropriation claim in the sense that the alleged misappropriation led to Defendant's development of infringing technology, the patent infringement claim does not "hinge" on the misappropriation allegation. Plaintiff's ability to succeed on the infringement claim is independent of the viability of its misappropriation claim. Thus, the statutory language does not require a postponement of patent-related disclosures in this case, even while Plaintiff revises its trade secret disclosures.

*Id.* at 8. The court also rejected the same policy argument that Apple makes here that all technical discovery should be barred to prevent a plaintiff from using technical documents relevant to the patent case "to obtain Defendant's trade secrets." *Id.* at 8-9.

In *Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*, No. 10-CV-03428-LHK, Dkt. No. 72 (N.D. Cal. Mar. 24, 2011) (Powell Decl., Ex. 4), the court rejected the defendant's attempt to avoid producing technical information in an action involving trade secret, patent, and copyright claims. The court held discovery "***unique*** to Plaintiffs' claims of trade secret misappropriation" could not proceed until the plaintiff complied with Section 2019.210. *Id.* (emphasis added). However, "[a]ll other discovery shall commence now, including discovery of source code relevant to the copyright and patent infringement claims." *Id.*

Courts also refuse to stay discovery as to claims other than patent infringement pending compliance with Section 2019.210. For example, in *Bryant v. Mattel*, 2007 WL 5430888, *3 n.3 (C.D. Cal. May 18, 2007), the defendant argued that "discovery of drawings and designs for unreleased products is barred unless and until [plaintiff] complies with California Code of Civil Procedure section 2019.210." *Id.* The Court rejected that argument because "[d]rawings and designs for unreleased products are

relevant to claims other than the trade secret misappropriation claim, such as [plaintiff]'s claim for copyright infringement." *Id.*

Apple relies on *E. & J. Gallo Winery v. Instituut Voor Landbouw-En Visserijonderzoek*, 2018 WL 3062160, at *6 (E.D. Cal. June 19, 2018), but that decision actually **rejected** a defendant's request to stay discovery relevant to contract and unfair competition claims. The court held that Section 2019.210 applies to trade secret discovery, but held the parties "shall proceed with discovery on non-trade secret claims." *Id.* Similarly, Apple relies on *Loop AI Labs Inc. v. Gatti*, 195 F. Supp. 3d 1107, 1113-1114 (N.D. Cal. 2016), but omits that an earlier decision in that case **refused** to stay discovery relevant to claims other than the trade secret claim. *See Loop AI Labs Inc. v. Gatti*, 2015 WL 9269758, at *4 (N.D. Cal. Dec. 21, 2015); *see also Monolithic Power Sys., Inc. v. Silergy Corp.*, 2015 WL 5948159, at *4 (N.D. Cal. Oct. 14, 2015) (refusing to limit discovery relevant to the contract claim because "Defendants have not shown 'that this claim is based on an allegation that [] Defendants disclosed or misused [Plaintiff's] trade secrets").

Even after Plaintiffs serve the Section 2019.210 disclosure, Apple will continue to refuse discovery by litigating the sufficiency of that disclosure regardless of its specificity. *See* Joint Stipulation at 20 (arguing in a "typical case," the plaintiff "serves a Section 2019.210 disclosure and the parties litigate the deficiencies"). Apple should not be allowed to hold up **all** technical discovery for weeks or months while it litigates the sufficiency of Plaintiffs' disclosure. That is inconsistent with the language of Judge Selna's Order and court decisions addressing the issue. *See E. & J. Gallo*, 2018 WL 3062160, at *6 (finding Section 2019.210 disclosure was insufficient, but holding the parties "shall proceed with discovery on non-trade secret claims" while plaintiffs prepared an amended trade secret disclosure); *Loop AI*, 2015 WL 9269758, at *4 (same).

Apple fails to cite a single case supporting its position that a California state-law requirement bars patent discovery.[4] Precedent—including much of Apple's own precedent—is to the contrary. Moreover, Judge Selna already decided the issue in a decision imposing specific deadlines for Apple to "disclose core technical documents sufficient to show the operation of the accused products" and for Plaintiffs to provide infringement contentions. Powell Decl., Ex. 8 at 26. Apple should be ordered to produce discovery pursuant to Plaintiffs' requests.

## C. The Discovery At Issue Is Patent Discovery

Plaintiffs crafted RFP Nos. 5-25 to seek "core technical documents" about the "Accused Products," which Plaintiffs specifically defined as the ***products accused of patent infringement***. The information is highly relevant to upcoming patent deadlines, including infringement contentions. RFP Nos. 5-15 seek basic technical information about the structure and operation of the Accused Products. For example, RFP No. 5 seeks "Documents sufficient to show the design and operation of the Accused Products." Similarly, RFP No. 6 seeks documents "describing the operation of the Accused Products, including, without limitation, product brochures, user manuals, instructional materials, and directions for use."

Apple incorrectly asserts RFP Nos. 8-9 seek "Apple's marketing strategy," which is "confidential and sensitive information that Apple does not disclose publicly." Joint Stipulation at 16. That is false. Those requests expressly seek public information, including "advertisements," "promotional materials," "product brochures," "publications," "press releases," and "internet postings." Apple's public assertions about the functionality of its products (including comparisons to other products) is relevant to patent issues, including infringement.

---

[4] Any attempt by Apple to add support for the first time in a Supplemental Memorandum would be improper.

RFP Nos. 16-25 are specifically tailored towards particular claim limitations of the patents-in-suit. For example, RFP No. 16 seeks information about "components, surface areas, or adhesives that separate light emitted by LEDs from other components of any of the Accused Products." Such information is relevant at least to claim 1 of U.S. Patent No. 10,470,695, which recites in part: "a light block forming an enclosing wall between the light emission source and the plurality of detectors . . . ." Powell Decl., Ex. 1 at Claim 1.

RFP Nos. 17-20 seek information about heart rate algorithms used in the Accused Products, including selecting different heart rate algorithms. Such information is relevant at least to claim 1 of U.S. Patent No. 10,433,776, which recites in part:

when operating according to the ***first control protocol***, calculating, by the patient monitor, ***measurement values of the pulse rate***, the measurement values responsive to light from the first control protocol light source, detected by a detector of an optical sensor after attenuation by body tissue of the patient using the patient monitor

. . .

in response to receiving the trigger signal, operating the patient monitor according to a ***second control protocol different from the first control protocol***

. . .

when operating the patient monitor according to the ***second control protocol***, calculating the ***measurement values of the pulse rate***, the measurement values responsive to light from the second control protocol light source, detected by the detector after attenuation by the body tissue of the patient using the patient monitor.

Powell Decl., Ex. 2 at Claim 1 (emphasis added).

RFP No. 21 seeks information about the power consumption of the heart rate algorithms used in the Accused Products. RFP No. 22 seeks information about the

operation of LEDs used to determine pulse or heart rate, including timing, duty cycle, current, or power usage. RFP No. 23 seeks information about collecting heart rate metrics using a first technique during a first period and a second technique during a second period. Such information is relevant at least to Claim 1 of U.S. Patent No. 10,433,776, which recites in part:

> wherein said operating of the patient monitor according to the first control protocol operates the first control protocol light source according to a ***first duty cycle*** and said operating of the patient monitor according to the second control protocol operates the second control protocol light source according to a ***second duty cycle***, wherein ***power consumption*** of the first control protocol light source according to the ***first duty cycle*** is different than ***power consumption*** of the second control protocol light source according to the ***second duty cycle***.

Powell Decl., Ex. 2 at Claim 1 (emphasis added).

Finally, RFP Nos. 24-25 seeks information about changes in collecting heart rate metrics based on user input or operating mode. Such information is relevant at least to claim 1 of U.S. Patent No. 10,433,776, which recites in part:

> in response to receiving the trigger signal, ***operating the patient monitor according to a second control protocol different from the first control protocol***, wherein said operating includes activating a second control protocol light source in accordance with the second control protocol, the second control protocol light source including one or more of the plurality of light sources.

Powell Decl., Ex. 2 at Claim 1 (emphasis added).

Accordingly, RFP Nos. 5-25 are quintessential patent requests. By contrast, trade secret RFPs would seek, for example, information about Apple's employment of Plaintiffs' former employees, whether and how those former employees provided Plaintiffs' confidential information to Apple, communications with those former

employees, and other trade secret information. Plaintiffs will serve such RFPs after providing the confidential Section 2019.210 disclosure pursuant to a Protective Order.

Apple cannot refuse to produce responsive documents by asserting some of the information may **also** be relevant to the trade secret claim. There is no conceivable interpretation of *Erie* that would permit a defendant in Federal district court to refuse providing discovery relevant to **Federal claims** based on a state procedure applying solely to **state claims**. Apple cites no case supporting its erroneous position, and Judge Selna already rejected it. Moreover, Apple's own case law is to the contrary. The Court should order Apple to produce the requested documents under RFP Nos. 5-25.

### D. Apple's Other Arguments Are Irrelevant and Incorrect

Apple devotes most of its portion of this Joint Stipulation to arguing Plaintiffs should provide a Section 2019.210 disclosure. *See* Joint Statement at 18-28. Those arguments are also moot now that Judge Selna determined that Section 2019.210 applies and Plaintiffs will provide a Section 2019.210 disclosure before seeking trade secret discovery.

Apple also presents a series of irrelevant and misleading "facts." *See* Joint Statement at 8-17. First, Apple faults Plaintiffs for serving a third-party subpoena on Apple in *Masimo Corp. et al. v. True Wearables Inc. et al.*, No. 8:18-cv-02001-JVS-JDE (the "*True Wearables* Case"). Joint Statement at 8. But Apple admitted it has information relevant to the *True Wearables* Case by arguing the allegations in both cases were "nearly identical" and involved Apple's employment of a former employee of Plaintiffs. D.I. 14 (Apple's Notice of Related Cases). There is no dispute that Plaintiffs adequately identified their trade secrets in the *True Wearables* case. There is no basis for Apple's allegation that Plaintiffs have no valid trade secrets and are simply on a fishing expedition to look at Apple's confidential information. Apple speculates about the timing of Plaintiffs' subpoena, but that was dictated by the rapidly-approaching deadline for the close of fact discovery. Once the Court extended the fact discovery deadline, Plaintiffs withdrew the subpoena to determine if it was necessary in view of

1    the extended discovery deadline. Plaintiffs cannot be faulted for trying to avoid
2    unnecessarily burdening the courts.
3         Apple's claim that Plaintiffs' withdrawal of the subpoena shows Plaintiffs were
4    "caught red handed" is absurd. Plaintiffs withdrew its subpoena to avoid unnecessarily
5    burdening the court. Indeed, Plaintiffs had committed to working with Apple to narrow
6    the existing subpoena and the parties were engaged in ongoing communications
7    regarding the scope of Plaintiffs' subpoena. Apple unexpectedly cut off the parties'
8    communications and suddenly filed a motion to quash. Apple's vivid imagination is
9    inconsistent with the actual facts surrounding the subpoena.
10        Second, Apple incorrectly asserts Plaintiffs "ignored" its request for a Section
11   2019.210 disclosure. Joint Statement at 10. To the contrary, Plaintiffs repeatedly
12   responded and explained their contention at the time that Section 2019.210 did not apply
13   in Federal Court. *See, e.g.*, Powell Decl. ¶ 8. While Judge Selna eventually decided to
14   require such a disclosure, it was not improper or unreasonable for Plaintiffs to rely on
15   cases holding Section 2019.210 conflicts with Rule 26 under the *Erie* doctrine. *See, e.g.*,
16   *SMC Networks, Inc. v. Hitron Techs., Inc.*, 2013 WL 12136372 (C.D. Cal. Mar. 15,
17   2013); *Funcat Leisure Craft, Inc. v. Johnson Outdoors, Inc.*, 2007 WL 273949, at *2
18   (E.D. Cal. Jan. 29, 2007). Indeed, while Apple now argues the application of Section
19   2019.210 in Federal court is clear, the same lawyer representing Apple in this case took
20   a contrary position when representing a trade-secret plaintiff in this Court. *See General
21   Elec. Co. v. Liang*, 2:13-cv-08670-DDP-CW, Dkt. No. 54 (C.D. Cal. Feb. 20, 2014)
22   (Powell Decl., Ex. 5) at 22 (Apple's current counsel asserting: "2019.210 requires that
23   a plaintiff alleging trade secret misappropriation in a ***state court action*** identify the trade
24   secrets at issue before discovery may commence. Assuming, ***arguendo***, that 2019.210
25   applies here, the statute has been satisfied" by other documents in the lawsuit (emphasis
26   added)).
27        Third, Apple argues the First Amended Complaint does not satisfy Section
28   2019.210. But that is irrelevant because Apple acknowledges Section 2019.210 does

Case 8:20-cv-00048-JVS-JDE Document 260-2 Filed 12/30/20 Page 345 of 353 Page ID
#:29076
Case 8:20-cv-00048-JVS-JDE Document 143-1 Filed 04/30/20 Page 345 of 453 Page ID
#:9906

not apply to pleadings.  *See* Joint Statement at 17.  Apple also complains that the First Amended Complaint "multiplied" the number of trade secrets "from seven to approximately 50, if not more."  *Id.* at 10-11.  That is not true.  The First Amended Complaint simply provided more detail about each category of trade secrets.  For example, while the initial Complaint alleged Plaintiffs' trade secrets include "technical information," the First Amended Complaint elaborated by stating: "Plaintiffs' technical information includes product plans, engineering plans, product briefs, technical drawings, . . . ." D.I. 28 ¶ 211.  Likewise, while the initial complaint identified "business information," the First Amended Complaint explained what type of sales, marketing, and other information Plaintiffs possess.  *Id.*  Regardless, the sufficiency of Plaintiffs' pleading is a different question that will be addressed by resolving Apple's pending Motion to Dismiss.  *See* D.I. 38.

Apple also argues "Plaintiffs concede that many, if not all, of their purported secrets are now public." Joint Statement at 2.  That is also false.  Plaintiffs alleged Apple misappropriated ***some*** of its trade secrets by disclosing them in patent applications.  D.I. 28 ¶ 218.  Plaintiffs never limited its trade secrets to information Apple had already disclosed in patent applications.  Moreover, the identification of what in those applications originates from Plaintiffs remains secret.

Apple's requested relief also far exceeds the "reasonable particularity" requirement of Section 2019.210.  *See* Joint Statement at 27.  In particular, Apple demands that Plaintiffs also provide background information about the trade secret, contentions regarding economic value, contentions regarding efforts to maintain secrecy, ***and*** format the trade secrets as a list of specific elements "as claims would appear at the end of a patent."  *Id.*  Apple does not even attempt to justify these requirements, which are found nowhere in Section 2019.210.  Indeed, Apple itself appears to acknowledge it is asking for ***more*** than mere compliance with Section 2019.210.  *See id*. (requesting an order requiring Plaintiffs to "[1] identify their alleged trade secrets with the reasonable particularity Section 2019.210 requires; ***and*** [2] order

Plaintiffs to serve on counsel a statement, under seal, that includes [the additional requirements]" (emphasis added)). Moreover, Judge Selna already rejected the identical request to impose these four additional requirements. *See* Powell Decl., Ex. 8 at 20 (Apple requesting identical relief); *Id.*, Ex. 9 (Court order requiring only "compliance with 2019.210"). This Court should reject Apple's attempt at a do-over.

### E.  Conclusion

Nothing supports Apple's attempt to bar *all* technical discovery—including patent discovery—until Apple agrees that Plaintiffs have complied with Section 2019.210. Plaintiffs respectfully request the Court deny Apple's motion and order Apple to engage in patent discovery by producing the documents requested by RFP Nos. 5-25.

Dated: April 30, 2020

**GIBSON, DUNN & CRUTCHER LLP**

By: /s/ *Joshua H. Lerner*
   Joshua H. Lerner
   H. Mark Lyon
   Brian M. Buroker
   Brian A. Rosenthal
   Ilissa Samplin
   Angelique Kaounis

*Attorneys for Defendant Apple Inc.*

Dated:  April 30, 2020

**Knobbe, Martens, Olson & Bear LLP**

By: /s/ *Adam B. Powell*
   Joseph R. Re
   Stephen C Jensen
   Perry D. Oldham
   Stephen W Larson
   Adam B. Powell

*Attorneys for Plaintiffs Masimo Corporation and Cercacor Laboratories, Inc.*

**ATTESTATION UNDER LOCAL RULE 5-4.3.4(a)(2)(i)**

Pursuant to Civil L. R. 5-4.3.4(a)(2)(i), I attest that concurrence in the filing of this document has been obtained from each of the signatories above.


By: */s/ Joshua H. Lerner*
Joshua H. Lerner

*Attorney for Defendant Apple Inc.*

# Exhibit Y

# Knobbe Martens

KNOBBE, MARTENS, OLSON & BEAR, LLP

2040 Main St., 14th Fl., Irvine, CA 92614
**T** (949) 760-0404

Stephen W. Larson
Stephen.Larson@knobbe.com

November 16, 2020

**<u>VIA EMAIL</u>**

Brian Andrea
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.,
Washington, DC 20036-5306

Re:      Masimo Corp. and Cercacor Laboratories, Inc. v. Apple Inc.

Dear Brian:

We write in response to your October 17, 2020 letter, and pursuant to Local Rule 37-1 to address various ongoing discovery issues and request a meet and confer.   Apple's letter did not address Plaintiffs' requests for Apple's positions on numerous issues.

### <u>Apple's Reliance on Custodians and Search Terms</u>

Apple has now identified RFP Nos. 26, 31, 32, 80-82, 89-97, 117, 128, 129, and 136 as the only RFPs as to which it intends to solely use search terms to identify responsive documents.  Plaintiffs disagree that Apple can satisfy its discovery obligations as to these requests through ESI searching alone.  For example, RFP 26 requests "[a]ll documents and things identified in, and/or relevant to the subject matter of Apple's responses to Plaintiffs' Interrogatories, including any and all supplements and amendments thereto."   At a minimum, as part of a reasonable search, Apple should identify all the documents it cited in its responses to Plaintiffs' interrogatories and consult with relevant Apple employees that may have other documents responsive to this request.  As another example, RFP 89 requests "[a]ll documents and things that refer or relate to any analysis, reverse engineering, and/or study of any Masimo or Cercacor product or technology."   As part of a reasonable search, at a minimum, Apple should consult with relevant employees to identify responsive documents as well as determine whether Apple currently and/or in the past has maintained files or folders containing responsive documents.  Apple should take a similar approach to identify documents responsive to the other RFPs separate and apart from ESI searching.   Please confirm Apple will do so.

### <u>Plaintiffs' First and Second Set of Requests For Production (RFPs 1-60)</u>

**Plaintiffs' RFPs 1, 3, 4, 34, 40, 51, and 59:** Plaintiffs' letter requested that Apple identify when it would produce responsive documents.  Apple did not respond.  Please identify Apple's positions as to these RFPs.  To the extent that Apple is asserting that it need not provide responsive documents due to the recent stay of the patent case, Apple should have collected and produced responsive documents months ago and long before the stay.  Regardless, many of these requests seek discovery that is relevant to claims that have not been stayed.  For example, RFP 51 requests year-end financial statements that

**Knobbe Martens**

are relevant to Plaintiffs' non-patent claims.  Please provide Apple's position as to RFPs 1, 3, 4, 34, 40, 51, and 59.

**Plaintiffs' RFPs 5-27:**  Apple asserts that it need not respond to these requests because the Court stayed the patent infringement case and because Plaintiffs have purportedly not yet served an adequate 2019.210 statement.  Plaintiffs disagree on both points.  First, Plaintiffs 2019.210 statement is adequate.  Indeed, Plaintiffs recently revised their Section 2019.210 statement to address Apple's purported concerns and Apple has failed to identify any specific deficiency.  Second, Apple ignores that it repeatedly argued that documents requested by these RFPs relate to Plaintiffs' trade secret requests.  Indeed, both parties acknowledged these RFPs could be relevant to ***both*** trade secrets and patents.  As such, Apple cannot use the stay to avoid producing responsive documents.  Moreover, Judge Early, found that at least RFPs 8 and 12-14 seek "some of the same categories of information Plaintiffs allege as their trade secrets."  RFP 26, which requests documents related to Apple's interrogatory responses, also clearly seeks documents related to Plaintiffs' non-patent claims.

### Plaintiffs' Third Set of Requests For Production (RFPs 61-147)

**Section 2019.210**:  In our previous letter, we requested that Apple identify each RFP in response to which Apple is withholding documents based on its section 2019.210 objection.  Apple did not respond.  Plaintiffs are entitled to understand the objections upon which Apple is relying to withhold documents in response to each of Plaintiffs' RFPs.  Plaintiffs request again that Apple provide this information so that the parties can have a productive meet and confer.

**Temporal Scope:**  Apple confusingly asserts "it is not withholding documents based on this objection" while also stating that "[u]pon Plaintiffs' identification of relevant time periods, Apple will provide information and documents in its possession, custody, or control for the relevant time period."  Plaintiffs disagree with this approach.  Unless a time frame is specified in a RFP, Apple should produce all documents responsive to that RFP that are obtained after a reasonable search.  To the extent that Apple is limiting its production to a certain time period, Apple should identify such limitations for each RFP so that the parties can conduct a productive meet and confer.

**Products Not Identified in the Complaint:**  Apple did not respond to Plaintiffs' letter regarding this issue.  Please provide Apple's position.  If Apple is relying on this objection to limit its responses to Plaintiffs' RFPs, Apple should identify the RFPs so the parties can have a productive meet and confer.

**Not Limited to the Publicly Released Apple Watch Series 3-5 Devices:**  Apple did not respond to Plaintiffs' letter regarding this issue.  If Apple is relying on this objection to limit its responses to Plaintiffs' RFPs, Apple should identify the RFPs so that the parties can have a productive meet and confer.

**Public Documents:**  Apple asserts that it is not withholding documents based on this objection.  However, Apple also asserts that "it will not specifically search for publicly available documents as those are equally available to Plaintiffs."  Apple cannot unilaterally refuse to search for and produce documents merely because it contends the documents are publicly available elsewhere, particularly without informing Plaintiffs what documents it is refusing to search for.  So that the parties can conduct

# Knobbe Martens

a meaningful meet and confer, please identify the categories of documents that Apple contends are publicly available and that Apple contends it need not search for and produce.

**Plaintiffs' RFPs 63-65, 70-85, and 87:**  Apple did not respond to our letter on this issue.  Please provide Apple's position.  To extent Apple contends that it need not respond to these RFPs because the patent case is stayed, Apple is incorrect.  For example, RFP 70 requests documents related to the clinical trials of the Apple Watch, which are relevant to Apple's misappropriation of Plaintiffs' trade secrets regarding business plans and strategies for interacting with hospitals.  RFP 70 seeks technical documents relevant to many issues in this case.  RFP 71 requests documents sufficient to identify all persons involved in the research, design, and development of any physiological monitoring capability of the Apple Watch Products, which is a general RFP that relates to all of Plaintiffs' non-patent claims and will allow Plaintiffs to evaluate proposed custodians for ESI searching.  Please provide Apple's position on these RFPs.

**Plaintiffs' RFPs 67-69, 86, 88, 101, 122, 128-130, and 133-135:**  We disagree with Apple's positions on these requests.  First, Apple's letter claims it is unclear "how documents related to FDA correspondence or approval (RFP Nos. 67-69) and physiological parameter evaluation (RFP No. 86) are relevant to this litigation."  FDA correspondence and approval, however, are at least relevant to the timing of when various features were incorporated into Apples devices.  They are also relevant to Apple's misappropriation of Plaintiffs' trade secrets regarding business plan and strategies for interacting with hospitals.  These RFPs also seek technical documents relevant to many other issues in this case.

Second, Apple again claims that RFP Nos. 88, 101, 122, 128-130, and 133-135 are overly broad and unduly burdensome.  However, Apple does not explain why.  Apple should provide its position so that the parties can have a productive meet and confer.

Third, Apple objects to RFP No. 128 to the extent it requests "subject matter disclosed or claimed in the disputed patents" because the "language of this Request requires Apple to draw a legal conclusion in order to respond."  Apple need not draw a legal conclusion to produce relevant discovery.  Apple should interpret the phrase "subject matter disclosed or claimed in the disputed patents" according to its plain and ordinary meaning.

**Plaintiffs' RFPs 80-82, and 136:**  Apple continues to identify RFPs 80-82 and 136 as RFPs "whose discovery obligations are met by a search of (i) the files of specific custodians negotiated between the parties, whose files are in the possession, custody, or control of Apple and (ii) specific search terms negotiated between the parties." As discussed above, Apple should perform a reasonable search for documents separate and apart from ESI searching for these RFPs.  Please confirm that Apple will perform a reasonable search for and produce the requested documents.

**Plaintiffs' RFPs 89-97, 129 and 136:**  Apple continues to identify these RFPs as RFPs where it intends to solely use search terms and custodians to identify responsive documents.  As explained above, Apple should perform a reasonable search for documents separate and apart from ESI searching.  Apple also argues that these RFPs are overly broad and unduly burdensome.  However, Apple does not explain why.  Please provide your position so that the parties can have a productive discussion at the meet and confer.  Finally, Apple continues to object to RFPs 91, 129, and 136 because they seek "'any

**Knobbe Martens**

communications,' which will be negotiated and produced pursuant to the ESI Order in this case." Plaintiffs' letter asked Apple to explain this objection, but Apple did not do so.  Please explain.

**Plaintiffs' RFPs 98 and 99:**  Apple did not respond to Plaintiffs' letter regarding this issue. Please provide Apple's position.

**Plaintiffs' RFPs 132 and 144:**  Apple continues to assert that it does not have organizational charts.  Please identify what documents Apple maintains that show Apple's organizational structure or the reporting and supervisory obligations of various employees, regardless of whether they are labeled as organization charts.

### Compliance with ESI Order

In the stipulated ESI Order, the parties agreed to "provide a proposed list of individual custodians who are knowledgeable about and were involved with the core issues or subjects in this case" in conjunction with a meet and confer on ESI.  Apple asserts it is "premature" to do so because "Plaintiffs have yet to provide a sufficient trade secret disclosure or responses to Apple's discovery, and Apple has not yet filed an answer."  Plaintiffs provided an adequate section 2019.210 statement, however, and have responded to Apple's discovery.  Further, in the parties' October 27, 2020, Joint Stipulation, Apple agreed "that it will not use the fact that it has not yet Answered as a basis for refusing to provide or delaying providing discovery."  Thus, it is not premature for the parties to begin the stipulated process to agree on search terms and custodians.  Apple further "contends that the parties should discuss reasonable limits on the number of custodians before any exchanges of custodians can occur."  The stipulated ESI Order, however, does not require this.  Please confirm that Apple will proceed in accordance with the stipulated ESI Order.

### Apple's Deficient Document Production

Apple claims it will produce documents on a rolling basis, but has produced less than 1400 documents.  Apple has not produced responsive documents even as to RFPs as to which it committed to produce documents months ago.  Moreover, Apple agreed to produce the documents identified in its initial disclosures almost four months ago, but has not produced the documents, including documents concerning Apple's conception, reduction to practice, diligence, ownership, marketing, sales, development, operation, regulation, and implementation of the inventions claimed in the patents and patent applications at issue in Plaintiffs' Correction of Inventorship and Declaratory Judgment claims. Please let us know when Apple will make substantial document productions.

### Plaintiffs' Interrogatories Nos. 7-10

As explained in Plaintiffs' letter, Interrogatories 7-9 request details on the design and development of the Apple Watch.  Apple's responses are woefully deficient and provides little of the requested information.  Apple did not respond to Plaintiffs' letter on this topic.  To the extent Apple contends that it need not respond to these interrogatories because the patent case is stayed, Apple is incorrect.  The requested information is relevant to Plaintiffs' non-patent claims at least to show when Plaintiffs' trade secrets were incorporated into the Apple Watch and to show if Apple in fact invented

# Knobbe Martens

any of the subject matter claimed in the disputed patents.  Please confirm that Apple will supplement its response by December 2, 2020.

Interrogatory 10 also requests details on any test, analysis, comparison, or competitive analysis that Apple performed on any non-Apple physiological monitor.  Apple's response requested a meet and confer to discuss the relevance of this interrogatory.  Plaintiffs' letter asked Apple to explain its position, but Apple did not respond.  Again, to the extent that Apple contends that it need not respond to this interrogatory because the patent case is stayed, Apple is incorrect.  The requested information is relevant, for example, to any contention by Apple that it independently derived Plaintiffs' trade secrets and to any contention by Apple that it invented any of the subject matter claimed in the disputed patents.  Apple should explain its position on Interrogatory 10 so the parties can have a productive meet and confer.

### **Apple Watch Series 6 and SE**

Plaintiffs' letter requested that Apple confirm that it will not withhold documents on the Apple Watch Series 6 and SE now that those products are released.  Apple did not respond.  Please confirm that Apple will provide Plaintiffs' requested discovery as to the Apple Watch Series 6 and Series SE.

Best regards,

Stephen W. Larson

32796726

knobbe.com