Joseph R. Re (Bar No. 134479)
joseph.re@knobbe.com
Stephen C. Jensen (Bar No. 149894)
steve.jensen@knobbe.com
Benjamin A. Katzenellenbogen (Bar No. 208527)
ben.katzenellenbogen@knobbe.com
Perry D. Oldham (Bar No. 216016)
perry.oldham@knobbe.com
Stephen W. Larson (Bar No. 240844)
stephen.larson@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, Fourteenth Floor
Irvine, CA 92614
Telephone: (949) 760-0404; Facsimile: (949) 760-9502

Adam B. Powell (Bar. No. 272725)
adam.powell@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
12790 El Camino Real
San Diego, CA 92130
Telephone: (858) 707-4000; Facsimile: (858) 707-4001

Attorneys for Plaintiffs,
Masimo Corporation and Cercacor Laboratories, Inc.

# IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| MASIMO CORPORATION, a Delaware corporation; and CERCACOR LABORATORIES, INC., a Delaware corporation <br><br> Plaintiffs, <br><br> v. <br><br> APPLE INC., a California corporation <br><br> Defendant. | Case No. 8:20-cv-00048-JVS-JDE <br><br> **DECLARATION OF ADAM B. POWELL IN SUPPORT OF PLAINTIFFS' OPPOSITION TO APPLE'S MOTION TO COMPLY WITH SECTION 2019.210** <br><br> Date:  January 7, 2021 <br> Time: 10:00 AM <br> Ctrm: 6A <br><br> Discovery Cut-Off:  7/5/2021 <br> Pre-Trial Conference:  3/21/2022 <br> Trial:  4/5/2022 |

I, Adam B. Powell, hereby declare as follows:

1.     I am a partner in the law firm of Knobbe, Martens, Olson & Bear, LLP, counsel for Plaintiffs Masimo Corporation ("Masimo") and Cercacor Laboratories, Inc. ("Cercacor") (collectively, "Plaintiffs") in this action.  I have personal knowledge of the matters set forth in this declaration and, if called upon as a witness, would testify competently thereto.  I submit this Declaration in support of Plaintiffs' Portion of the Joint Stipulation Regarding Defendant Apple Inc.'s Motion To Compel Plaintiffs To Comply With Section 2019.210.

2.     On July 16, 2020, Apple produced some documents that it designated as confidential pursuant to the Protective Order.  Apple's production email stated: "These documents should be treated as subject to the ethical wall referenced in my colleague Ilissa Samplin's July 15, 2020 email."  Because of that statement, I personally did not download Apple's production and instructed other lawyers and staff at my office not to download Apple's production.  To the best of my knowledge, Plaintiffs did not download or review those documents until after Apple produced them again following the Court's Order on July 29, 2020.  *See* Dkt. 92.

3.     On September 8 and September 9, 2020, the parties met to discuss Apple's production of core technical documents and Plaintiffs' production of a Section 2019.210 disclosure.  The parties agreed to a simultaneous exchange on October 9, 2020.  On October 9, Plaintiffs provided its Section 2019.210 Disclosure and Apple produced 170 documents totaling 860 pages.

4.     Apple's portion of the Joint Stipulation states: "in Plaintiffs' words, 'the parties have produced approximately 150,000 pages of discovery and spent 40-45 hours inspecting each other's source code."  At that time, Plaintiffs had produced approximately 91,000 pages of documents and Apple had produced approximately 56,000 pages of documents.

5.     Attached hereto as **Exhibit 1 [filed under seal]** is a true and correct copy of the Court's Minute Order re Motion for Preliminary Injunction, Dkt. No. 198, in this case.

6.     Attached hereto as **Exhibit 2** is a true and correct copy of Telephonic Conference re Defendant's Motion to Compel, Dkt. No. 185, in this case.

7.     Attached hereto as **Exhibit 3** is a true and correct copy of Apple's Memorandum in Support of Apple's Motion to Dismiss the Thirteenth Cause of Action for Trade Secret Misappropriation in Plaintiffs' First Amended Complaint, Dkt. No. 38-1, in this case.

8.     Attached hereto as **Exhibit 4** is a true and correct copy of the Court's Order Granting Plaintiffs' Renewed *Ex Parte* Application for an Order Requiring Apple to Comply with the Scheduling Order, Dkt. No. 92, in this case.

9.     Attached hereto as **Exhibit 5** is a true and correct copy of the Court's Minute Order Denying Defendant's Motion for Protective Order, Dkt. No. 54, in this case.

10.     Attached hereto as **Exhibit 6** is a true and correct copy of the Court's Order Denying Apple's *Ex Parte* Application for an Order Staying Magistrate Judge Early's June 15, 2020 Order Until the Hearing on July 20, 2020, Dkt. 76, in this case.

11.     Attached hereto as **Exhibit 7** is a true and correct copy of the Court's Minute Order re Motion for Review of and Objections to Magistrate Judge's Order, Dkt. 79, in this case.

12.     Attached hereto as **Exhibit 8** is a true and correct copy of the July 10, 2020, Telephonic Conference Transcript in this case.

13.     Attached hereto as **Exhibit 9** is a true and correct copy of an email chain dated July 17, 2020, from Ilissa Samplin (who is council of record for Apple in this case) to myself.

14.     Attached hereto as **Exhibit 10 [filed under seal]** is a true and correct copy of the Declaration of Mohamed Diab, Dkt. No. 119, in this case.

15.     Attached hereto as **Exhibit 11 [filed under seal]** is a true and correct copy of the Declaration of Jeroen Poeze, Dkt. No. 120, in this case.

16.     Attached hereto as **Exhibit 12 [filed under seal]** is a true and correct copy of Apple's Opposition to Plaintiffs' Motion for Preliminary Injunction, Dkt. No. 139-1, in this case.

17.     **Exhibit 13** has been intentionally omitted.

18.     Attached hereto as **Exhibit 14 [filed under seal]** is a true and correct copy of a letter dated October 16, 2020 from Ms. Samplin to Stephen Larson (who is also counsel of record for Plaintiffs in this case).

19.     Attached hereto as **Exhibit 15** is a true and correct copy of a letter dated October 28, 2020, from myself to Ms. Samplin.

20.     Attached hereto as **Exhibit 16** is a true and correct copy of a letter dated October 30, 2020, from Ms. Samplin to myself.

21.     Attached hereto as **Exhibit 17 [filed under seal]** is a true and correct copy of a letter dated November 12, 2020, from Ms. Samplin to myself.

22.     Attached hereto as **Exhibit 18** is a true and correct copy of an e-mail chain dated November 23, 2020, from myself to Ms. Samplin.  On December 1, I spoke to Ms. Samplin over the phone about the matters raised in this email.  I asked her when Apple planned to serve its portion of the joint stipulation and why Apple had not done so yet. Ms. Samplin informed me that Apple would serve its portion of the joint stipulation on December 2.  Ms. Samplin also informed me that Apple was waiting to serve its portion of the joint stipulation until after it filed its motion to dismiss.

23.     Attached hereto as **Exhibit 19** is a true and correct copy of a document obtained from the public docket in *AlterG, Inc. v. Boost Treadmills LLC*, Dkt. 41 (N.D. Cal. Sept. 5, 2019.

24.     Attached hereto as **Exhibit 20** is a true and correct copy of a document obtained from the public docket in *I-Flow Corp. v. Apex Medical Techs., et al.,* Dkt. No. 61-1 (S.D. Cal. May 1, 2008).

25.     Attached hereto as **Exhibit 21 [filed under seal]** is a true and correct copy of Plaintiffs' Supplemental Responses to Apple's First Set of Interrogatories, dated October 16, 2020, in this case.

26.     Attached hereto as **Exhibit 22** is a true and correct copy of a document obtained from the public docket in *General Elec. Co. v. Liang,* 2:13-cv-08670-DDP-CW, Dkt. No. 54 (C.D. Cal. Feb. 20, 2014).

27.     Attached hereto as **Exhibit 23** is a true and correct copy of Apple's Reply in support of Motion for Review of and Objections to Magistrate Judge Early's June 15, 2020 Order, Dkt. No. 71, in this case.

28.     Attached hereto as **Exhibit 24** is a true and correct copy of the Court's Minute Order re Motion for Review of an Objections to Magistrate Judge's Order, Dkt. No. 79, in this case.

29.     Attached hereto as **Exhibit 25 [filed under seal]** is a true and correct copy of the Apple's Memorandum in Support of Apple's Motion to Dismiss the Thirteenth Cause of Action in Plaintiffs' Second Amended Complaint, Dkt. No. 121, in this case.


I declare under the penalty of perjury that the foregoing is true and correct. Executed on December 23, 2020, at Encinitas, California.


                    */s/ Adam B. Powell*
                    Adam B. Powell

# EXHIBIT 2

1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(SOUTHERN DIVISION - SANTA ANA)


| | | |
|---|---|---|
| MASIMO CORPORATION, ET AL, | ) | CASE NO: 8:20-CV-00048-JVS-JDEx |
| | ) | |
| Plaintiffs, | ) | CIVIL |
| | ) | |
| vs. | ) | Santa Ana, California |
| | ) | |
| APPLE, INC, | ) | Wednesday, September 2, 2020 |
| | ) | |
| Defendant. | ) | (3:01 p.m. to 3:45 p.m.) |


TELEPHONIC CONFERENCE RE DEFENDANT'S MOTION TO COMPEL [169]

BEFORE THE HONORABLE JOHN D. EARLY,
UNITED STATES MAGISTRATE JUDGE


<u>APPEARANCES</u>:              SEE PAGE 2


Court Reporter:          Recorded; CourtSmart

Courtroom Deputy:        Maria Barr

Transcribed by:          Exceptional Reporting Services, Inc.
                         P.O. Box 8365
                         Corpus Christi, TX 78468
                         361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

Exhibit 2
-19-

2

<u>APPEARANCES</u>:


For Plaintiffs:          STEPHEN C. JENSEN, ESQ.
                         Knobbe Martens Olson & Bear, LLP
                         2040 Main Street
                         14th Floor
                         Irvine, CA 92614

                         ADAM POWELL, ESQ.
                         Knobbe Martens Olson & Bear, LLP
                         12790 El Camino Real
                         San Diego, CA 92130

For Defendant:           JOSHUA H. LERNER, ESQ.
                         Gibson Dunn & Crutcher, LLP
                         555 Mission Street
                         Suite 3000
                         San Francisco, CA 94105

                         ILISSA S. SAMPLIN, ESQ.
                         Gibson Dunn & Crutcher, LLP
                         2029 Century Park East
                         Suite 4000
                         Los Angeles, CA 90067

                         NATALIE POUS, ESQ.
                         Apple in-house counsel

**Exhibit 2
-20-**

3

1    **Santa Ana, California; Wednesday, September 2, 2020; 3:01 p.m.**

2    **(Appearances via Zoom Web Video Conference)**

3    **Call to Order**

4        **THE COURT:**  We're here on the record in *Masimo*

5    *Corporation, et al versus Apple Inc.*, Case Number Central

6    District SA-cv-20-00048-JVS-JDE.

7        We are here because -- I'll take appearances in a

8    moment, but we are here because I requested, this is Magistrate

9    Judge Early, I requested a telephonic conference regarding a

10   Motion that was filed and a Joint Stipulation and supporting

11   evidence filed yesterday regarding a request for a Section

12   2019.210 Disclosure.

13       As I understand it on the call we have on behalf of

14   Plaintiff we have Mr. Stephen Jensen, Mr. Adam Powell.

15       And on behalf of Defendant we have Ms. Ilissa Samplin

16   and Mr. Joshua Lerner, and a representative from Apple whose

17   name we weren't able to catch.

18       Before I get that name could I find out, and don't

19   say anything, but is there anyone else on the call whose name I

20   didn't call other than the representative of Apple?

21     **(No audible response)**

22       **THE COURT:**  All right, if I could get the name of the

23   Apple in house counsel representative who is on the call?

24       **MS. POUS:**  Yes, your Honor, this is Natalie Pous.

25       **THE COURT:**  And I'm sorry, it's a little hard to hear

**Exhibit 2**
**-21-**

4

1    you, could you give me your first and last name slowly, please?

2           **MS. POUS:**  My apologies Natalie and the last name

3    Pous, P-O-U-S.

4           **THE COURT:**  P-O-E-S?

5           **MS. POUS:**  P-O-U-S.

6           **THE COURT:**  U-S.  Thank you.

7           All right, I appreciate Counsel making themselves

8    available on short notice.  Here I want to tell you what I want

9    to do, I want to make your lives easier, that's what I'm here

10   for, not entirely, but maybe partly.  I want to make your lives

11   easier.

12          We issued an Order yesterday on an ex parte

13   application that had some language that I hope Counsel have

14   looked at.

15          There's a lot of Motions being filed, mostly

16   surrounding, not the substance of any issue in the case, but

17   the order in which discovery is going to take place.  It seems

18   like a lot of time, money and effort and on matters that I

19   would expect and anticipate Counsel can work out amongst

20   themselves.

21          I haven't read all of the cases cited in the Joint

22   Stipulation, but I will.

23          I have looked at all of the briefing and I have

24   looked at all of the supporting documentation and have some

25   concerns.  What I don't want to do is go off the cuff and make

**Exhibit 2**
**-22-**

5

1  allegations without backing those up and making findings about

2  how the case is being litigated without backing those up with

3  the record, but we're reaching a point where we're probably

4  going to need to start doing that.  And -- but before I do

5  something like that I always like to give a heads up that it's

6  potentially coming.

7           One thing I'll tell you that I've noticed is that

8  both Counsel do agree on something and it's great that you

9  agree on something; it's bad that you agree on this.

10          You both agree that the other side's engaging in

11 gamesmanship.  It's a word you both used referring to the

12 other.  I'm not going to make a finding right now, but I

13 certainly probably could go through the record and find

14 instances where counsel for both sides have engaged in conduct

15 that could meet that definition.  I'm not going to do that yet,

16 I want to give you an opportunity to try to work some of these

17 things out.  And I'll tell you I think it's both Counsel

18 represent clients who's going to take this case very seriously

19 and that's important, that's what we're here for, we do serious

20 work.  I'm sitting in a chair right now where we had a request

21 for detention on a man facing a life sentence for an alleged

22 bombing that resulted in a killing where the victim was

23 literally blown to bits, pieces of her found in a parking lot,

24 on a wall, all other nearby places, two other victims injured.

25          Earlier, not too many days ago, and I thought about

**Exhibit 2**
**-23-**

6

1    this when I was working on the ex parte, I think it was the

2    fourth one in this case that involved the issues we talked

3    about, not the fourth one for me, I think Judge Selna had the

4    pleasure on the earlier three, but the fourth one seeking

5    expedited resolution.  And I'm going to describe to you a

6    situation we had just a few days ago where someone asked for

7    expedited resolution.  It was a series of search and arrest

8    warrants for a person who had previously been convicted of

9    terrorism and at this time was facing additional charges, and

10   as part of the request for an estimate for when the warrants

11   would be approved one of the -- it was noted that a

12   neighborhood was surrounded by SWAT officers and a law

13   enforcement helicopter was in the air and needed to know

14   whether it needed to refuel before the warrants would be signed

15   off, approved so that the tactical team could make entry safely

16   and without incident, and I'm happy to report that that did

17   happen, it occurred without incident and we completed our

18   hearing this morning regarding the allegations of murder and a

19   request for continued detention.

20          I want you to really think about that when you folks

21   think about whether you're going to re-institute, this is now

22   the ninth Motion regarding the Order in which disclosures will

23   be made in this case.  I know the case is very important to

24   you.

25          I also want you to think about what Judge Selna's

**Exhibit 2**
**-24-**

```
 1   going through with his calendar with criminal cases circling
 2   waiting for trials where the Sixth Amendment mandates trials or
 3   the Constitution and the Speedy Trial Act mandate speedy trials
 4   where a Court's calendar is not an excuse for delaying a
 5   criminal defendant's right to a trial, and the fact that we're
 6   under an emergency declaration, and we're under an emergency
 7   declaration in this District for the District Courts for being
 8   so far down in what they should have in terms of Judges meaning
 9   that each Judge in the Central District does about, at this
10   point, getting close to two times the case load of what is
11   expected of District Judges.
12           And I gave you some numbers about if you plotted out
13   if every civil case litigated these issues like you are what it
14   would be like, and obviously not every case is litigated this
15   way, but this one is reaching a point that you folks really
16   need to think about that.
17           And part of this you may be playing tiny violins for
18   your concern about the Courts and the Court's calendar and the
19   fact that we have reduced staffing here, but part of it should
20   also be of concern because what I'm seeing doesn't reflect well
21   on Counsel, and when things don't reflect well on Counsel what
22   happens is things get more complicated at every stage of the
23   proceeding where the Court would like to rely on Counsel as
24   officers of the court to ensure that their complying with Rule
25   Number 1, and it's Rule Number 1 for a reason of the Federal
```

8

1  Rules of Civil Procedure to ensure the just timely and

2  inexpensive determination and resolution of disputes.  I want

3  you really to think about that and really focus on that as we

4  move forward.  And I don't necessarily expect us to resolve

5  this Motion today, but I want to give you some things to think

6  about.

7          You're going to have Supplemental Memoranda due in

8  about eight days and we may or may not have a hearing on the

9  Motion, but I'll be writing something up and I want you to have

10  an idea of some of the things that I'm thinking about including

11  in the Order and then ultimately you'll do what you'll do and

12  Judge Selna will have a chance to look at it, and you've seen

13  him express his views on some things in this case already and

14  some Orders, so I want you really to think about what's

15  happening in this case, what's happening with how the Court is

16  perceiving Counsel, and how that may affect how the case goes

17  forward.  And, obviously, we don't tie Counsel to their clients

18  and every client is entitled to a day in court and a fair day

19  in court, but I hope that the clients understand that how

20  things are being done may reflect on their representatives as

21  they make further appearances down the road.

22          I'm a lowly Magistrate Judge, though.  I am really

23  here to help you, I'm really here to maybe give you a sense of

24  what things look from this side and what things may look like

25  to Judge Selna, and how things may ultimately appear to a jury.

**Exhibit 2**
**-26-**

1          I have tried many cases in this building, I have

2   tried cases with Judge Selna.  I'm in front of Orange County --

3   or was in front of Orange County juries as a lawyer quite a

4   bit, and am still in front of them on consent cases and often

5   -- well, I'm going to leave that aside.

6          But juries don't necessarily like lawyers that snip

7   at each other and fight at each other and can't agree on what

8   even a juror can see is a relatively basic and simple process.

9   I'm not here to point a finger directly at one side or another,

10  but what I can tell you is it appears that this is happening

11  and coming from both sides, and when each side refers to the

12  other as "engaging in gamesmanship" I see support for both of

13  those -- each of those accusations.

14         Turning to the particular Motion that brings us here,

15  and that's Docket Number 169 filed yesterday, I think I heard

16  Mr. Powell had mentioned he's on the call -- Mr. Powell, are

17  you on the call?

18         **MR. POWELL:**  Yes, your Honor.

19         **THE COURT:**  All right.  I want to ask you about some

20  emails that you sent.

21         I'm looking at an email and I'll do it -- the Docket

22  Number, it's Docket Number 169-3, it's Page 7.  These are

23  otherwise referred to as, I think these are exhibits to

24  Ms. Samplin's Declaration, but it's easier for my record to

25  refer to them by their Docket Entry Number and their Page

10

1    Number, and it's a April 21st, 2020 email sent at 7:09 p.m., it

2    looks like Mountain Daylight Time, and you wrote to

3    Ms. Samplin:

4            "We will provide a Section 2019.210 disclosure in due

5            course, but will need a Protective Order in place

6            before doing so."

7            When you wrote that on February 21 of this year,

8    Mr. Powell, what date did you have in mind?

9            **MR. POWELL:**  I'm not sure we had a specific date in

10   mind, your Honor, and things have changed throughout this case.

11   I completely agree with you --

12           **THE COURT:**  Well, let's just focus on my question,

13   you answered it.  I asked what date you had in mind, although

14   you left some wiggle room, you said you're not sure you had a

15   date in mind, and that's -- I understand, it's been what,

16   counting with my fingers May, June, July, August, four and a

17   half months that you might not remember what you thought four

18   and a half months ago and that's fair.

19           I mean, did you have a general sense about a

20   particular event?  You mentioned a Protective Order, so you

21   named that.  Was there any other event you had in mind back in

22   April when you said that you'd make the Section 2019.210

23   disclosure in due course?

24           **MR. POWELL:**  Your Honor, to be honest, it's hard for

25   me to remember exactly what I was thinking on April 21st.

Exhibit 2
-28-

11

1          THE COURT:  Well, I want you -- I understand -- I

2  recognize, I want you to think, and if you say -- it's one

3  thing to say it's hard for you to remember, I acknowledge that,

4  but if you then follow it up by saying "and sitting here today

5  I can't remember" that's okay, tell me that.

6          MR. POWELL:  I don't think -- yeah, no, I can't

7  remember any specific thing.  I can tell you that at the time

8  the issue that we were dealing with with Apple concerned

9  primarily the Protective Order, and the reason is that both

10 parties had said "We won't provide confidential information

11 without a Protective Order."

12         THE COURT:  Okay.

13         MR. POWELL:  I think we just said we would provide

14 the information based on a mutual agreement to exchange it,

15 both parties would agree to (indiscernible) and Apple hadn't,

16 at the time, agreed to that agreement.  So we were and remain

17 to this day, always have been willing to provide confidential

18 information before entry of a Protective Order if both parties

19 did it.

20         THE COURT:  Right.

21         MR. POWELL:  That's all we were asking.

22         THE COURT:  Well, let's continue on.  So that was

23 April.

24         Let's look at Docket Entry -- the same Docket Entry

25 Number 169-3, and this is Page Number 14, this is an email you

**Exhibit 2**
**-29-**

12

1    wrote on June 9th so now we're getting a little closer in time,

2    maybe your memory is a little bit better.  We're talking about

3    three months -- a little less than three months ago, email June

4    9th, 2020 at 12:48 p.m. and, again, I'll quote:

5              "Plaintiffs expect to provide a 2019.210 statement

6              and other confidential information within a

7              reasonable period after entry of a Protective Order."

8              What was the reasonable time period you had in your

9    mind when you wrote that --

10             Oh, I'm sorry, that was actually not written by you,

11   that was written by Mr. Kachner.  I wonder, though, since it

12   looks like, Mr. Powell, you were copied on that, and if you had

13   an understanding about what Mr. Kachner meant by that?

14             **MR. POWELL:**  Yeah, I don't know exactly what

15   Mr. Kachner meant, but I think we were assuming that Apple

16   would answer the Amended Complaint after we filed it, and that

17   they would answer and we would provide a 2019 statement.

18             **THE COURT:**  But you don't know what he meant by that?

19             **MR. POWELL:**  I would be guessing if I told you

20   exactly what he meant, your Honor, I'm sorry.

21             **THE COURT:**  All right.  Let's jump ahead now to July

22   9th, so a month after Mr. Kachner's statement by email.  This

23   is Docket Entry Number 169-3 at Page 21, and this is from you,

24   Mr. Powell, once again referring to the 2019 statement.  You

25   write that, and I'm quoting in part:

**Exhibit 2**
**-30-**

 1          "Nonetheless Plaintiffs will provide that statement

 2          in due course."

 3          What did you mean -- so now we're only talking about,

 4   oh, a month and a half ago, what did you mean by "due course,"

 5   what date did you have in mind?

 6          MR. POWELL:  So, your Honor, at that time, and I'm

 7   trying to make sure I get my timeline right, I want to be

 8   accurate, but I believe we had filed the Second Amended

 9   Complaint at that time and we had provided what we believe was

10   an extraordinary amount of detail in the Second Amended

11   Complaint, and we assumed Apple would answer the Second Amended

12   Complaint, and it was not until I think -- I'll have to get the

13   exact date of the meet and confer, right around when Apple

14   indicated to us that they intended to still move to dismiss,

15   and that's when things really changed here is that we thought

16   this was going to move forward, Apple would answer, we would

17   provide the 2019, and when Apple indicated they would still

18   move to dismiss that's when we realized that it didn't make

19   sense to litigate this, some of this similar and/or identical

20   issues both before your Honor and before Judge Selna at the

21   exact same time, in two separate forums, before two separate

22   Judges.

23          THE COURT:  Well, you indicated that, in your view,

24   there was an "extraordinary amount of disclosure in the Second

25   Amended Complaint," is that -- am I quoting you correctly?

1      **MR. POWELL:**  I think I said "extraordinary," I'm not

2  sure.  I think we certainly complied with Judge Selna's Order

3  and I think we actually complied with the reasonable

4  particularity requirement of 2019.

5      **THE COURT:**  All right.  So why not tell Defendant

6  that, why not tell Apple that?  That "Our Second Amended

7  Complaint, we stand on that" and then if Judge Selna finds that

8  to be insufficient so be it.

9      **MR. POWELL:**  I'm not sure --

10      **MR. JENSEN:**  I'm sorry, were you trying to say

11  something else?  I didn't mean to interrupt you.

12      I was trying to ask -- Judge Early, this is Steve

13  Jensen, whether that was a question to Mr. Powell or whether

14  you would like me to address that as our argument?

15      **THE COURT:**  I guess I'm happy to listen to whomever

16  wants to speak, but ultimately you're each making

17  representations, or it's primarily Mr. Powell making

18  representations in the record before me so I want to understand

19  the bases for the recommendations.

20      You know, here's ultimately -- I don't really mean to

21  make Mr. Powell uncomfortable, if that's what happening, and I

22  hope it's not, but when an officer of the court is making

23  representations to another officer of the court about how the

24  case is proceeding I expect them to live up to the things that

25  they say, and so when they say four months ago that they're

1    going to be making a disclosure in due course after the entry

2    of a Protective Order, and when that Protective Order is

3    entered on June 30th, and they say in a separate email that

4    they will be making that 2019.210 disclosure in a reasonable

5    time after the entry of the Protective Order the shifting of

6    sands to say "Oh, no, I'm going to not do it because Apple is

7    challenging our Second Amended Complaint."

8              Hey, both sides agree on something, that the Second

9    Amended Complaint, the standard for under Rule 12(b)(6) and

10   Rule 8 for what's sufficient to state a claim is not the same

11   as the standard under 2019.210 for what's stating a trade

12   secret with reasonable particularity.  So a challenge to one

13   doesn't mean a challenge to the other.

14             If Judge Selna denies the Motion to Dismiss that

15   doesn't mean the language contained in the Second Amended

16   Complaint is sufficient under 2019.210.

17             If he grants it, well, since the standard is lower it

18   would, but it doesn't show a lot of faith in the adequacy of

19   the disclosure.

20             I'm troubled by that.  I'm troubled by the

21   argumentativeness of the contention that the issue has been

22   decided multiple times before about the 2019.210 disclosure.

23             The case isn't frozen in time.  What happened in

24   April, May, June in terms of what needs to be disclosed and

25   whether patent-related claims and trademark-related claims are

16

```
1    stayed or not stayed, or discovery is stayed or not stayed as
2    to Plaintiff's discovery under 2019.210 are -- that's one whole
3    set of issues and that changes over time.
4             But there's another big, big issue and that is
5    leaving aside 2019.210, Rule 26 gives Federal District Courts
6    broad discretion in controlling and scheduling discovery, and
7    you have read Judge Selna's Orders and I have read Judge
8    Selna's Orders and he certainly made it clear what he felt
9    about the issue of Apple not producing core technical data in,
10   what, Judge Selna found to be a timely or untimely fashion.
11            But the -- a corollary of that is Judge Selna wants
12   to get things moving, wants to get this case moving, you can
13   see it from his Orders.  And I'm concerned that Plaintiffs read
14   into that maybe more than they should have, and that Judge
15   Selna didn't say that there would never be a time for the
16   2019.210 disclosures, and he never said that there not be a
17   separate basis, whether it was in an interrogatory response or
18   a general controlling of the discovery process, that we didn't
19   need to get things going on the trade secret disclosure issue.
20            Your hearing in front of Judge Selna on the Motion to
21   Dismiss is, correct me if I'm wrong, it's September -- is it
22   14th?  Somebody tell me, what's the hearing on the Motion to
23   Dismiss?
24            MR. POWELL:  Just one moment, your Honor, I'll get
25   it.
```

**Exhibit 2**
**-34-**

1          **MR. LERNER:**  Yeah, your Honor, this is Josh Lerner

2     for Apple.  Sorry to jump in.  I think the date you had on the

3     14th is the date for the hearing on the Preliminary Injunction

4     which probably comes from the fact that we mentioned that in

5     our papers because obviously we feel like dealing with that

6     Motion without the disclosure is one of the issues here.  But

7     that's the hearing that's on the 14th, and I believe if

8     Mr. Powell doesn't have it yet, I'll have the date on the

9     Motion to Dismiss here in just one second, I'm just pulling it

10    up --

11         **MR. POWELL:**  Oh, I have it, your Honor, it's October

12    5th.

13         **THE COURT:**  All right.  And why don't I turn -- I'll

14    let Plaintiffs think about some of the things that I've said

15    and I'll turn to Apple.

16         If we just let this Motion that you filed go and let

17    it be heard in a regular hearing, which is probably what we're

18    going to wind up doing today short of giving you some things to

19    think about, if I do exactly what you asked me to do we have a

20    hearing on September 24th, I ordered disclosure in five days,

21    that would be September 29th.  What's the significance of that

22    date?

23         **MR. LERNER:**  The significance of that date, your

24    Honor, is that is the soonest we could find a way to get this

25    disclosure without, again, moving ex parte.  And to your

**Exhibit 2**
**-35-**

18

1    Honor's point we did see the language in your Order and we do

2    take it seriously.

3            I have practiced criminal law and I hear you and I

4    definitely get the importance of the matters you are describing

5    kind of as the relative importance of speed, and so the really

6    straightforward answer to your question is we really would like

7    to and I don't think it's overstating it to say we need a

8    disclosure earlier, but we also are aware of the burden on the

9    Court right now and we saw the Order and we didn't think it was

10   prudent to file another ex parte Motion notwithstanding the

11   fact that we are, as I mentioned, litigating it beyond.

12           **THE COURT:**  Well, I'm going out on a limb and saying

13   you had circulated the Joint Stipulation seven days before it

14   was filed so we were already going down that route by the time

15   my Order hit the Docket, right?

16           **MR. LERNER:**  Yes.  And even before that, though, your

17   Honor, I think this goes to your point, it was, I think,

18   evident to everybody that, you know, there are a lot of papers

19   in this case and we're trying to be mindful of that.

20           That said, if we can get this disclosure sooner

21   rather than later, even if it is on the regularly scheduled

22   hearing, that is a huge step forward for us because right now

23   we are litigating the case.  And I do think it's fair to say

24   this isn't disputed, I don't think opposing Counsel would

25   dispute it, they, of course, may, but the information, for

Exhibit 2
-36-

1   example, in the Motion for Preliminary Injunction and the

2   information in the Second Amended Complaint are not even close

3   to the same, and so we, Apple, are facing a situation where we

4   will take the disclosure identifying the secrets in this case

5   as soon as we can get it, and if that is after that hearing on

6   the regularly scheduled Motion and that's the best we can do we

7   absolutely will do that.

8            Now in terms of moving --

9            **THE COURT:**  Has Apple produced all of the core

10  technical data that was the subject of Judge Selna's Order last

11  month?  That's to Apple.

12           **MR. LERNER:**  Not only now, and this is kind of

13  ongoing and there's another Motion that you're probably aware

14  of before Judge Selna right now that's, I believe, also an ex

15  parte Motion from the Plaintiff and so I assume they may

16  disagree with us, but the answer to your Honor's question is we

17  do believe we have complied with that Order.

18           The Complaint was amended for new patents and there

19  is information that we believe is due requests which we have

20  been working very hard to gather with our clients, and I think

21  we can demonstrate well that since that Order came down we not

22  only have produced a ton of information including source code,

23  but also regularly updated that in follow-up requests for

24  anything missing we have responded as quickly as we could and

25  worked with the people on our end.  And Judge Selna's Order was

1  not and is not something that we were not taking seriously, so

2  I think, yes, we're in compliance with that part of it.

3          THE COURT:  Let me cut to the chase and make sure I'm

4  clear, that's great that you have produced a ton of

5  information, but if it calls for two tons of information I

6  don't necessarily know.

7          Here's what I want to hear from Apple:

8          Has Apple produced everything that Judge Selna

9  ordered relating to the core technical data?

10         MR. LERNER:  Our view, yes, we have produced the

11 documents that he ordered.  And I don't want to not answer your

12 question, but I do think it's relevant.  I think there is a

13 piece here which is there have been follow-up requests and --

14 yes --

15         THE COURT:  I understand -- let me say this, let me

16 stop you for a second.  I understand the Second Amended

17 Complaint and the parties can dispute how much it changed or

18 didn't change things referring to different patents and whether

19 that's subsumed in the prior Order.  I'm not concerned about

20 that.

21         I just want to know if based -- at the time Judge

22 Selna entered the Order has Apple produced everything that

23 Judge Selna ordered to be produced?

24         MR. LERNER:  Our position is yes, your Honor.

25         THE COURT:  All right.  Let me hear from Plaintiffs

1   on that question.

2          Has Apple produced everything that Judge Selna

3   ordered as of the date of that Order, leaving aside whether

4   things have changed in light of the Second Amended Complaint?

5   Has Apple produced everything that Judge Selna ordered as of

6   the date of that Order?

7          **MR. SPEAKER:**  Our position is absolutely not, your

8   Honor, not even close.

9          **THE COURT:**  What have they not -- if you're able to

10  be that definitive tell me specifically and if we need to --

11         **MR. SPEAKER:**  Yes.  There are --

12         **THE COURT:**  -- let me just -- hold on a second.  If

13  we need to --

14         **MR. SPEAKER:**  Okay.

15         **THE COURT:**  -- go with a confidential portion of this

16  proceeding alert me ahead of time and we'll designate the

17  transcript confidential.

18         **MR. SPEAKER:**  Yeah, and I don't have those kinds of

19  details in front of me, and if you want to know exactly if

20  there is a Motion that is --

21         **THE COURT:**  If I could interrupt you again, since

22  we're not here in court I need you to state your name when you

23  speak.

24         **MR. JENSEN:**  Right.  Oh, okay, sorry, this is Steve

25  Jensen.

22

1          There is a subsequent Motion which briefs the

2    deficiencies that we believe were in a place when Apple did not

3    comply with the Judge's Order to provide those core technical

4    documents in five days.  In fact, there were about 30 documents

5    which were produced and there was some source code.  We

6    immediately identified the deficiencies that were on the list.

7    Apple said they would look into it.  Two weeks later they were

8    still looking into it.

9          We did try to work through those things.  Judge Selna

10   had invited us to re-weigh the issue if the production was

11   insufficient.  That Motion, unfortunately, it's another Motion,

12   is briefed before Judge Selna asking that he, again, order them

13   to produce those documents.

14         Now they have subsequently agreed to looking into and

15   produce, there's a long list and it's very specific, of the

16   things we're asking for.  That correspondence has been from my

17   partner, Perry Oldham, and I think Brian Andrea who, I think,

18   have been dealing with the patent side of this case.  But we

19   strongly believe they have not complied with that, and we are

20   seeking those and trying to get those documents from them.

21         Once we filed the subsequent Motion we started

22   getting some additional documents from them.

23         **THE COURT:**  All right, so you strongly, "you" meaning

24   the Plaintiffs, strongly believe that Apple is --

25         **MR. JENSEN:**  Yes.

**Exhibit 2**
**-40-**

23

1          THE COURT:  -- has not produced the documents

2    required by Judge Selna.

3          You just heard Apple say they -- and Apple disagrees,

4    they think they have complied.

5          MR. JENSEN:  Yes.

6          THE COURT:  The flip side is, totally different

7    issue, one before -- that one before Judge Selna, now a Motion

8    before me where Apple strongly believes that Plaintiffs have

9    been "playing games," Apple's words, with the 2019 disclosure

10   or lack thereof, and has pointed me to a series of emails

11   which, for lack of a better term, look like a process of

12   stringing along, and Plaintiffs disagree that they have any

13   obligation to make a 2019 disclosure right now.  So you're at

14   loggerheads on the Motion before me; you're at loggerheads on

15   the ex parte application before Judge Selna, each side taking a

16   different view of the other side's recalcitrance.

17          Can you folks step back for a minute and see whether

18   there's a way to pick a date where Apple finishes its review

19   and produces whatever technical data that Plaintiffs claim

20   hasn't been produced in the matter that's sitting on Judge

21   Selna's desk, along with scores of other matters sitting on

22   Judge Selna's desk.  And I'm not kidding, I go up there

23   sometimes and he's got stuff stacked on the floor; he's got

24   stuff all over the place.  He's not in right now, but was in

25   earlier today, and we have got a Motion before me, thankfully

**Exhibit 2**
**-41-**

24

1    not anywhere near as difficult, I don't have the burdens that

2    he does of working criminal trials and finding a way to do this

3    and, frankly, I think this Motion before me, I'll be able to

4    get out a ruling on it, neither side is probably going to like

5    what the ruling says, but I'll be able to get a ruling out on

6    it.  But we've got loggerheads on production of information,

7    confidential, sensitive trade secret technical information, and

8    they both have been thrown into court for the Court to

9    determine.

10          By the way, probably the worst group of people to

11   make these determinations, Judge Selna is much smarter than I

12   am, but neither one of us knows the technology like your two

13   firms and your two clients know.  Neither one of us know what

14   you really need to prepare your case for Motions, for trial.

15          What both Judge Selna and I can do is smell out

16   gamesmanship and can make findings on that.

17          But what I think, again, I'm here to help, I'm not

18   going to order anything, but what I think you two sides really

19   ought to do is see whether you can take a break for a moment,

20   take a deep breath --

21          I know you've got a Motion for Preliminary

22   Injunction, a very important Motion pending, and you've got

23   another Motion to Dismiss pending.  Even if I order everything

24   that Apple wants it's not going to come until weeks after the

25   Motion for Preliminary Injunction is heard.

**Exhibit 2**
**-42-**

1          Why don't you two hold off on throwing stuff into

2    court for a while, try a little harder to work stuff out.  Try

3    a little harder to figure out what you really need and what's

4    really being withheld, and if you can't come back, but maybe

5    you can.  I actually think you can.  I look at this and I --

6    although I see a lot of difficulty I think you both know what's

7    going on.  Both of your firms have been on both sides of patent

8    cases, you know what's happening, you know what each side's

9    reasoning behind different things is, take some time, talk

10   amongst yourselves to see whether you can resolve these two

11   things working together in tandem at the same time.

12          Tell me what you think about that, and I'm going to

13   start with Plaintiff, even though they're not the moving party

14   on the Motion in front of me, I'm going to start with

15   Mr. Jensen.

16          **MR. JENSEN:**  Thank you, your Honor.  And, look, we

17   take your workload and what you're saying here very seriously

18   as we did in the Order that you issued the other day.

19          I think what you're suggesting is a fantastic

20   suggestion and we welcome it.  I was not on the phone, but I

21   understand that when they were asking for the 2019 earlier we

22   made a suggestion that we agreed to a mutual exchange date of

23   that.  So I think that, you know, when we get --

24   (indiscernible) for these cases the parties should be able to

25   negotiate, work things out, do a little horse trading and get

26

1  the case moving.  I couldn't agree with you more, your Honor,

2  and so we are more than happy to try to engage in that process

3  the best we can and still represent our clients as well, and I

4  welcome it.  I think it's -- and I know that at least I wasn't

5  on the call, but I know we tried something similar to those

6  before this 2019 thing got out of hand.

7          **THE COURT:**  I'm going to ask you not to point fingers

8  here, all right?

9          **MR. JENSEN:**  Okay.

10         **THE COURT:**  I'm going to turn to -- is it going to be

11  Mr. Lerner or Ms. Samplin to make their response on behalf of

12  Apple?

13         **MR. LERNER:**  Thank you, your Honor, Joshua Lerner and

14  Ilissa will definitely correct me if I get it wrong in speaking

15  for both of us.

16         But I obviously hear your guidance and it makes sense

17  and we obviously will follow up with the Plaintiff here and

18  appreciate the Court's thinking on it and suggestions.

19         **THE COURT:**  Well, I want to know, can we do something

20  right now?  You don't need to stroke my ego, whatever ego I get

21  gets knocked off my shoulder the moment I cross the threshold

22  of my own front door.  Let's try to work something out right

23  now, something procedurally where we've got two pending

24  Motions, one ex parte, one in front of Judge Selna, this one in

25  front of me.  Can we come up with a procedural mechanism where

**Exhibit 2**
**-44-**

 1  you let Judge Selna know "Hey, Judge, let's give that a break.

 2  We talked about it with Judge Early, there's a separate Motion,

 3  we're going to try to work this out for a week and see what we

 4  can do."

 5          Tell me if that's something you can agree to right

 6  now.

 7          **MR. LERNER:**  And I apologize for being dense, your

 8  Honor.  You just mean communicating to both Judge Selna and

 9  obviously yourself that we should put those Motions on hold

10  while the parties meet and confer on it and try and reach an

11  agreement as you discussed?

12          **THE COURT:**  Yes.  Yes.

13          **MR. LERNER:**  And, again, apologies for being dense.

14          **THE COURT:**  No, you're not being dense.  What I'm

15  trying to avoid is turning Judge Selna into Andrew Jackson and

16  have him fight the battle of New Orleans after the war is over.

17  If we can --

18          I don't know where he stands.  It might actually be

19  in for docketing right now or a ruling on the ex parte, I don't

20  know.  But if I say "Okay, you two see if you can talk about it

21  for a little bit," and it takes you -- we're now Wednesday and

22  you can't figure anything out until, you know, we've got a

23  three-day weekend coming up, there's a good chance Judge

24  Selna's going to rule on it and so you'll -- one side will be

25  very unhappy and kicking themselves and the other side who

28

1   winds up winning that is going to be glad that they didn't work

2   it out, but my suggestion is let's see if we can do something

3   right now where we put something on the docket and I try to get

4   ahold of Judge Selna or his chambers and let them know that

5   we're going to put a hold on that and see if you folks can work

6   it out.  Tell me what you think.

7           **MR. LERNER:**  Yes, that makes sense and apologies

8   again for being slow on that.

9           **THE COURT:**  So on behalf of Apple do you agree that I

10  can issue a Minute Order based on today's call that the parties

11  agree that this Motion that I referred to, it's Docket Number

12  169, and the ex parte that Plaintiff filed that's in front of

13  Judge Selna relating to the alleged failure to comply with his

14  July Order, that from Apple's standpoint I can issue an Order

15  and advise Judge Selna the parties agree to, for seven days,

16  hold those Motions in abeyance while the parties attempt to

17  resolve the issues therein.

18          Is that agreeable on behalf of Apple, Mr. Lerner?

19          **MR. LERNER:**  Yes.  Yes.

20          **THE COURT:**  And, Mr. Jensen, do you need me to repeat

21  that or can I just ask is that agreeable on behalf of

22  Plaintiffs?

23          **MR. JENSEN:**  No.  That's agreeable to Plaintiff.

24  (indiscernible)

25          **THE COURT:**  All right.  So what I'm going to do is

**Exhibit 2**
**-46-**

29

1    I'm going to go back into my chambers and write something up

2    very quickly and try to get ahold of Judge Selna's chambers.

3    And what's going to happen from you is you're going to be

4    required on September 9th, by noon, to advise the Court by way

5    of -- I'm going to ask Plaintiff to do it, but maybe I'm

6    expecting too much that I won't then get a counter-response

7    from Defendant, simply advising whether the Motions have been

8    resolved, the ex parte application and the Motions have been

9    resolved, or advising that they haven't been resolved.  No

10   argumentation, I don't need anything else, I just need a one

11   sentence statement that the Motions have been resolved and are

12   no longer needed to be determined by the Courts, or they

13   haven't been resolved.  Is that agreeable, Mr. Jensen?

14          **MR. JENSEN:**  That's agreeable.

15          **THE COURT:**  All right.  So I'm not going to waste any

16   more time, I'm going to go back and write something up and try

17   to get ahold of Judge Selna.

18          In the meantime I'm hoping that you folks can try to

19   work through these things.  I think it's going to be in your

20   best long term interests to do that.

21          But is there anything further?  Since I called it I

22   don't have anything further.  Is there anything further from --

23   on behalf of Plaintiffs with respect to what we've talked about

24   today?

25          **MR. JENSEN:**  Nothing from Plaintiffs, your Honor.

**Exhibit 2**
**-47-**

1          **THE COURT:**  And from the Defense?

2          **MR. LERNER:**  Nothing else from me, your Honor, except

3    one (indiscernible), what you mentioned, and hopefully it would

4    be avoided anyways, but should this submission on the 9th be

5    joint?  Just do the parties need to agree on it?  If not back

6    and forth or anything else?

7          **THE COURT:**  The only reason why I didn't want it to

8    be joint is I don't want you spending five hours going back and

9    forth on a one sentence submission.  So, listen, Plaintiffs

10   are --

11         **MR. LERNER:**  Okay.

12         **THE COURT:**  -- directed to file that one sentence

13   submission by noon on September 9th.

14         Defendants, should they desire, are permitted to file

15   a one sentence response to that by 1:00 p.m. on September 9th.

16         I don't want to add anymore because the more I add

17   the longer my Order gets and the greater the likelihood that

18   something from Judge Selna on the earlier ex parte hits the

19   docket, all right?

20         **MR. JENSEN:**  And my goal, your Honor -- this is

21   Mr. Jensen, my goal would be that our filing will not elicit a

22   response from Apple.  How's that?

23         **THE COURT:**  All right, I've got it and we, obviously,

24   can't make any promises so that's going to be --

25         **MR. JENSEN:**  Correct.  Correct.

31

1          **THE COURT:**  -- my Order and I'm going to let you

2    folks go so you have plenty of time to work on it.  And it

3    doesn't --

4          With respect to Judge Selna, what's in front of him

5    it doesn't change anything, you'll just let him know that he

6    can issue an Order.

7          With respect to me your Supplemental Memoranda are

8    due the following day on the 10th so you'll know by noon on the

9    9th whether you need to file a Supplemental Memoranda on the

10   pending Motion before me.

11         All right?

12         **MR. JENSEN:**  And just a clarification on that just so

13   I'm clear, we're not doing anything with Judge Selna now,

14   you're going to take care of that, right?  We're just doing the

15   thing a week from now to let us -- right?

16         **THE COURT:**  I'm going to issue an Order and I'm going

17   to try to reach him to let him know.

18         **MR. JENSEN:**  Okay.

19         **THE COURT:**  All right?

20         **MR. JENSEN:**  All right, sounds great.

21         **THE COURT:**  All right.

22         **MR. JENSEN:**  Thank you.

23         **THE COURT:**  Thank you.  We're adjourned.

24         **MR. LERNER:**  Thank you, your Honor.

25         **MS. SAMPLIN:**  Thank you, your Honor.

**Exhibit 2**
**-49-**

32

(This proceeding was adjourned at 3:45 p.m.)


### CERTIFICATION


I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    **September 9, 2020**

        Signed                                              Dated


*TONI HUDSON, TRANSCRIBER*

**Exhibit 2**
**-50-**

# EXHIBIT 3

Case 8:20-cv-00048-JVS-JDE Document 260-5 Filed 12/30/20 Page 40 of 234 Page ID
#:21667
Case 8:20-cv-00048-JVS-JDE Document 58-1 Filed 04/20/20 Page 1 of 34 Page ID
#:2603

1    JOSHUA H. LERNER, SBN 220755
       jlerner@gibsondunn.com
2    GIBSON, DUNN & CRUTCHER LLP
     555 Mission Street Suite 3000
3    San Francisco, CA 94105
     Tel.:  415.393.8200 / Fax: 415.393.8306
4
5    H. MARK LYON, SBN 162061
       mlyon@gibsondunn.com
     GIBSON, DUNN & CRUTCHER LLP
6    1881 Page Mill Road
     Palo Alto, CA 94304-1211
7    Tel.:  650.849.5300 / Fax: 650.849.5333
8    BRIAN M. BUROKER, *pro hac vice*
       bburoker@gibsondunn.com
9    GIBSON, DUNN & CRUTCHER LLP
     1050 Connecticut Avenue, N.W.
10   Washington, DC 20036
     Tel.: 202.955.8541 / Fax: 202.467.0539
11
12   ILISSA SAMPLIN, SBN 314018            ANGELIQUE KAOUNIS, SBN 209833
       isamplin@gibsondunn.com              akaounis@gibsondunn.com
     GIBSON, DUNN & CRUTCHER LLP          GIBSON, DUNN & CRUTCHER LLP
13   333 South Grand Avenue               2029 Century Park East Suite 4000
     Los Angeles, CA 90071-3197           Los Angeles, CA 90067
14   Tel.: 213.229.7000 / Fax: 213.229.7520   Tel.: 310.552.8546 / Fax: 310.552.7026
15   *Attorneys for Defendant Apple Inc.*

16

17                    **UNITED STATES DISTRICT COURT**
               **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
18                        **SOUTHERN DIVISION**

19   MASIMO CORPORATION,                  CASE NO. 8:20-cv-00048-JVS (JDEx)
     a Delaware corporation; and
20   CERCACOR LABORATORIES, INC.,         **MEMORANDUM OF POINTS AND**
     a Delaware corporation,              **AUTHORITIES IN SUPPORT OF**
21                                        **DEFENDANT APPLE INC.'S**
                    Plaintiffs,           **MOTION TO DISMISS THE**
22                                        **THIRTEENTH CAUSE OF ACTION**
            v.                            **FOR TRADE SECRET**
23                                        **MISAPPROPRIATION IN**
     APPLE INC.,                          **PLAINTIFFS' FIRST AMENDED**
24   a California corporation,            **COMPLAINT**

25                    Defendant.          **<u>Hearing</u>**

26                                        Date:      Date:  June 8, 2020
27                                        Time:      1:30 p.m.
                                          Courtroom: 10C
28                                        Judge:     Hon. James V. Selna

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ........................................................................................ 1

II.   BACKGROUND .......................................................................................... 3

      A.    Plaintiffs Allege an Effort by Apple to Misappropriate Their Trade
            Secrets More Than Six Years before Filing This Action. .......................... 3

      B.    A Published Patent Application Put Plaintiffs on Notice of Their
            Alleged Claim More Than Three Years Before They Filed. ..................... 4

III.  LEGAL STANDARD ................................................................................. 5

IV.   PLAINTIFFS' CUTSA CLAIM SHOULD BE DISMISSED. ........................... 6

      A.    Plaintiffs' CUTSA Claim Is Time-Barred. ............................................. 6

            1.    The Limitations Period Began More Than Three Years Ago. ........ 6

            2.    Plaintiffs Have Not Pleaded a Plausible Excuse for Their
                  Delay. ..................................................................................... 9

      B.    Plaintiffs Fail to Allege Any Protectable Trade Secrets. ....................... 14

            1.    Plaintiffs' Broad Allegations Fail under Fed. R. Civ. Proc. 8. ....... 15

            2.    Plaintiffs Have Not Distinguished Their Trade Secrets from
                  Patents. .................................................................................. 19

      C.    Plaintiffs Fail to Allege Misappropriation by "Improper Means." .......... 20

            1.    Plaintiffs Fail to Allege Improper Acquisition. ........................... 20

            2.    Plaintiffs Fail to Allege Improper Disclosure or Use by
                  Apple. ..................................................................................... 24

      D.    Plaintiffs Should Be Denied Leave to Amend Their CUTSA Claim. ...... 25

V.    CONCLUSION .......................................................................................... 25

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Acrisure of Cal., LLC v. SoCal Commercial Ins. Servs.*,
    2019 WL 4137618 (C.D. Cal. Mar. 27, 2019) .................................................. 14, 15

*Alamar Biosciences Inc. v. Difco Labs. Inc.*,
    1996 WL 648286 (E.D. Cal. Feb. 27, 1996) ....................................................... 7, 13

*Alta Devices, Inc. v. LG Elecs., Inc.*,
    2019 WL 1924992 (N.D. Cal. Apr. 30, 2019)............................................................ 7

*AlterG, Inc. v. Boost Treadmills LLC*,
    388 F. Supp. 3d 1133 (N.D. Cal. 2019).......................................................16, 17, 20

*Am. Hardware Mut. Ins. Co. v. Escamilla*,
    2010 WL 11574194 (N.D. Cal. Sept. 30, 2010)..................................................... 11

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).............................................................................................. 6, 25

*ATS Prods., Inc. v. Champion Fiberglass, Inc.*,
    2015 WL 6552698 (N.D. Cal. Oct. 28, 2015) ......................................................... 23

*Bd. of Trustees of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*,
    583 F.3d 832 (Fed. Cir. 2009) ................................................................................... 9

*Becton, Dickinson & Co. v. Cytek Biosciences Inc.*,
    2018 WL 2298500 (N.D. Cal. May 21, 2018).......................................................... 16

*Bell Atl. v. Twombly*,
    550 U.S. 544 (2007)..................................................................................................... 6

*Bladeroom Grp. Ltd. v. Facebook, Inc.*,
    2015 WL 8028294 (N.D. Cal. Dec. 7, 2015) ..................................................... 14, 19

*Carr v. AutoNation Inc.*,
    2018 WL 288018 (E.D. Cal. Jan. 4, 2018)............................................................... 23

*Citcon USA, LLC v. RiverPay, Inc.*,
    2018 WL 6813211 (N.D. Cal. Dec. 27, 2018) ......................................................... 20

*Citizens' Nat. Bank of Los Angeles v. Santa Rita Hotel Co.*,
22 F.2d 524 (9th Cir. 1927) ............................................................ 11

*In re City of Los Angeles Med. Marijuana Litig.*,
2014 WL 12783295 (C.D. Cal. June 13, 2014) ................................ 8, 14

*Cypress Semiconductor Corp. v. Super. Ct.*,
163 Cal. App. 4th 575 (Cal. Ct. App. 2008) .................................... 6

*Delphix Corp. v. Actifo, Inc.*,
2014 WL 4628490 (N.D. Cal. Mar. 19, 2014) ................................ 25

*Diodes v. Franzen*,
260 Cal. App. 2d 244 (Cal. Ct. App. 1968) .................................... 16

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
751 F.3d 990 (9th Cir. 2014) ........................................................ 14

*Forcier v. Microsoft Corp.*,
123 F. Supp. 2d 520 (N.D. Cal. 2000) ............................................ 7, 11

*Fox v. Ethicon Endo-Surgery*,
35 Cal. 4th 797 (2005) .................................................................. 10, 11

*Gabriel Techs. Corp. v. Qualcomm Inc.*,
857 F. Supp. 2d 997 (S.D. Cal. 2012) ............................................ 7, 10

*Globespan, Inc. v. O'Neill*,
151 F. Supp. 2d 1229 (C.D. Cal. 2001) .......................................... 19

*Green Crush LLC v. Paradise Splash I, Inc.*,
2018 WL 4940824 (C.D. Cal. Mar. 8, 2018) .................................. 17

*Hays v. VDF Futureceuticals, Inc.*,
2016 WL 5660395 (D. Haw. Sept. 28, 2016) ................................ 6, 8

*Human Longevity, Inc. v. J. Craig Venter Inst., Inc.*,
2018 WL 6617633 (S.D. Cal. Dec. 18, 2018) ........................ 14, 15, 17, 22

*InteliClear, LLC v. ETC Glob. Holdings, Inc.*,
2019 WL 4233578 (C.D. Cal. June 28, 2019) ................................ 18

*Invisible Dot, Inc. v. DeDecker*,
2019 WL 1718621 (C.D. Cal. Feb. 6, 2019) .................................. 23

*Klamath-Lake Pharma. Ass'n v. Klamath Med. Serv. Bureau,*
  701 F.2d 1276 (9th Cir. 1983) ............................................................25

*Klang v. Pflueger,*
  2014 WL 4922401 (C.D. Cal. July 10, 2014) ......................1, 6, 9, 10, 13

*Les Concierges, Inc. v. Robeson,*
  2009 WL 1138561 (N.D. Cal. Apr. 27, 2009).......................................21

*MedioStream, Inc. v. Microsoft Corp.,*
  869 F. Supp. 2d 1095 (N.D. Cal. 2012)................................................25

*MGA Entm't, Inc. v. Mattel, Inc.,*
  41 Cal. App. 5th 554 (Cal. Ct. App. 2019)...............................6, 7, 9, 13

*Pellerin v. Honeywell Int'l, Inc.,*
  877 F. Supp. 2d 983 (S.D. Cal. 2012) .............................................21, 24

*Reese v. TracFone Wireless, Inc.,*
  2014 WL 1872175 (C.D. Cal. May 9, 2014)..........................................12

*S. Cal. Inst. of Law v. TCS Educ. Sys.,*
  2011 WL 1296602 (C.D. Cal. Apr. 5, 2011)..........................................21

*Silvaco Data Sys. v. Intel Corp.,*
  184 Cal. App. 4th 210 (Cal. Ct. App. 2010)..........................................23

*Space Data Corp. v. X,*
  2017 WL 5013363 (N.D. Cal. Feb. 16, 2017).............................14, 19, 24

*Sprewell v. Golden State Warriors,*
  266 F.3d 979 (9th Cir. 2001) .................................................................8

*Synopsys, Inc. v. ATopTech, Inc.,*
  2013 WL 5770542 (N.D. Cal. Oct. 24, 2013) ......................15, 16, 18, 20

*Universal Analytics, Inc. v. MacNeal-Schwendler Corp.,*
  707 F. Supp. 1170 (C.D. Cal. 1989).................................................18, 22

*Vendavo, Inc. v. Price f(x) AG,*
  2018 WL 1456697 (N.D. Cal. Mar. 23, 2018) .............................2, 17, 19

*Veronica Foods Co. v. Ecklin,*
  2017 WL 2806706 (N.D. Cal. June 29, 2017)........................................14

*VIA Techs., Inc. (a Cal. Corp.) v. Asus Computer Int'l*,
    2016 WL 5930280 (N.D. Cal. Oct. 12, 2016) ........................................................ 18

*Wang v. Palo Alto Networks, Inc.*,
    2014 WL 1410346 (N.D. Cal. Apr. 11, 2014)........................................... 7, 8, 9, 12

*Webpass Inc. v. Banth*,
    2014 WL 7206695 (N.D. Cal. Dec. 18, 2014) ....................................................... 11

*Whyte v. Schlage Lock Co.*,
    101 Cal. App. 4th 1443 (Cal. Ct. App. 2002)....................................................... 19

*Wolf v. Travolta*,
    167 F. Supp. 3d 1077 (C.D. Cal. 2016) ................................................................ 10

*Zomm, LLC v. Apple Inc.*,
    391 F. Supp. 3d. 946 (N.D. Cal. 2019) ................................................................. 24

*Zora Analytics, LLC v. Sakhamuri*,
    2013 WL 12124612 (S.D. Cal. June 18, 2013) ..................................................... 24

**Statutes**

Cal. Bus. & Prof. Code § 16600 ................................................................................. 18

Cal. Civ. Code § 3426.1............................................................................... 18, 20, 21

Cal. Civ. Code § 3426.6.................................................................................... 1, 6

**TABLE OF ABBREVIATIONS**

| Abbreviation | Document |
|---|---|
| Apple | Defendant Apple Inc. |
| Masimo | Plaintiff Masimo Corporation |
| Cercacor | Plaintiff Cercacor Laboratories, Inc. |
| Plaintiffs | Masimo and Cercacor, collectively |
| Original Complaint, Compl. | Plaintiffs' Original Complaint (Dkt. No. 1) |
| FAC | Plaintiffs' First Amended Complaint (Dkt. No. 28) |
| '265 patent | U.S. Patent No. 10,258,265 |
| '266 patent | U.S. Patent No. 10,258,266 |
| '628 patent | U.S. Patent No. 10,292,628 |
| '708 patent | U.S. Patent No. 10,299,708 |
| '190 patent | U.S. Patent No. 10,376,190 |
| '191 patent | U.S. Patent No. 10,376,191 |
| '695 patent | U.S. Patent No. 10,470,695 |
| '994 patent | U.S. Patent No. 6,771,994 |
| '703 patent | U.S. Patent No. 8,457,703 |
| '776 patent | U.S. Patent No. 10,433,776 |
| '553 patent | U.S. Patent No. 10,588,553 |
| '554 patent | U.S. Patent No. 10,588,554 |
| '052 patent | U.S. Patent No. 10,078,052 |
| '095 patent | U.S. Patent No. 9,952,095 |

| '754 patent | U.S. Patent No. 10,219,754 |
|---|---|
| '997 patent | U.S. Patent No. 9,723,997 |
| '196 application | U.S. Patent Application No. 14/740,196 |
| '726 publication | U.S. Patent Publication No. 2016/0061726 |
| '268 application | U.S. Patent Application No. 14/621,268 |
| '422 application | U.S. Patent Application No. 14/617,422 |
| '664 application | U.S. Patent Application No. 14/618,664 |
| CUTSA | The California Uniform Trade Secret Act |
| DTSA | The Defend Trade Secrets Act of 2016 |
| RJN | Apple's Request for Judicial Notice in Support of Defendant's Motion to Dismiss (filed concurrently herewith) |
| RJN Decl. | Samplin Declaration in Support of Apple's Request for Judicial Notice |
| USPTO | U.S. Patent and Trademark Office |

# I.  **INTRODUCTION**

The FAC does nothing to change the fact that Plaintiffs' CUTSA claim is fatally flawed.  To the contrary, the FAC confirms that the claim is untimely.  And the shifting list of alleged trade secrets, which now number in the thousands, makes it impossible for the Court or Apple to determine if there are any real trade secrets at issue, let alone ones Apple knew about.  The claim should be dismissed for at least three reasons.

*First*, as to timeliness, the FAC confirms that Plaintiffs suspected Apple of misappropriation as early as 2014, and that the period for filing a CUTSA claim has therefore expired.  That year, Plaintiffs wrote that they *could not imagine* a reason for Apple to hire their former employee Marcelo Lamego *other than misappropriation*.  This suspicion triggered the running of the three-year statute of limitations as a matter of law.  Furthermore, in 2016, the USPTO published an Apple patent application listing Lamego as an inventor and relating to the field of healthcare monitoring technology—mobile health applications and the measurement of physiological data—in which Plaintiffs asserted in 2014 that Lamego could not possibly work without disclosing their trade secrets.  Therefore, even under *Plaintiffs' theory*, the statute of limitations was triggered no later than 2016—more than three years before Plaintiffs filed this lawsuit.

Plaintiffs cannot escape their 2014 concession that they suspected misappropriation or the 2016 patent publication that identifies Lamego and relates to the same technology field as the information they now claim as trade secrets.  The test for timely discovery of a CUTSA claim is whether Plaintiffs knew, *or should have known by the exercise of reasonable diligence*, of the alleged misappropriation.  Cal. Civ. Code § 3426.6.  Plaintiffs must plead specific facts explaining why a reasonable investigation would not have put them on notice.  *Klang v. Pflueger*, 2014 WL 4922401, at *6 (C.D. Cal. July 10, 2014).  Plaintiffs fail this test.  Plaintiffs give a long list of irrelevant excuses, but fail to explain how they were not on notice in 2014 when they not only suspected misappropriation, but also told Apple that they *could not imagine* a reason for Apple's actions *other than* misappropriation.  Plaintiffs also provide *no* explanation as

to how the 2016 patent publication differed from the later-published patents that Plaintiffs now allege disclosed their trade secrets.  This omission is particularly glaring given that the FAC asserts correction of inventorship and ownership claims not only for the Apple patent that issued from the 2016 published application (the '052 patent), but also for later-published Apple patents that allegedly disclose Plaintiffs' trade secrets.  Furthermore, the FAC alleges that *all* of these patents contain subject matter obtained from Masimo employees.  These facts—which appear in the FAC or are judicially noticeable—doom Plaintiffs' trade secret claim as a matter of law.

*Second*, the FAC further obscures the alleged trade secrets.  Plaintiffs *expanded* the open-ended list of seven broad categories of information in the Original Complaint to an even broader (and still open-ended) list of *50 categories of generic documents and information*, as well as unidentified combinations and generalized knowledge of those categories, in the FAC.  FAC ¶ 211.  Plaintiffs ask the Court to accept that within one paragraph of their FAC, they have pleaded *thousands* of combinations of trade secrets with sufficient detail.  They have not.  The countless categories are "more descriptive of the *types* of information that generally *may* qualify as protectable trade secrets than as any kind of listing of particular trade secrets [Plaintiffs] ha[ve] a basis to believe actually were misappropriated."  *Vendavo, Inc. v. Price f(x) AG*, 2018 WL 1456697, at *4 (N.D. Cal. Mar. 23, 2018).  More troubling still, Plaintiffs allege that certain of their trade secrets *already* have been made public in patent filings—and appear to concede that *all* of the alleged trade secrets may be public insofar as they allege that each trade secret was not public "at least at the time of Defendant's misappropriation."  FAC ¶ 212.  Plaintiffs have no reason for failing to identify *public* trade secrets in the FAC; this failure prevents Apple and the Court from assessing the viability of the CUTSA claim.

*Third*, Plaintiffs still fail to allege that Apple had requisite knowledge under the CUTSA to establish that Apple acquired their alleged trade secrets by improper means.  The FAC does not allege any facts suggesting that Apple knew or had reason to know which *specific* information from Plaintiffs' former employee (Lamego) came from

Plaintiffs, let alone the *specific* information that Lamego purportedly was banned from using.  Nor can it, because the trade secrets are alleged to be so vague that, as Plaintiffs concede, Lamego would not be permitted to work at all in the healthcare technology industry if all of the alleged information were in fact a trade secret.  Furthermore, Plaintiffs cannot base their CUTSA claim on the doctrine of inevitable disclosure—that because one or two people worked for Plaintiffs and then came to Apple, they *must have disclosed* unspecified trade secrets in their new employment.  California law, this Court, and others in this Circuit have roundly rejected such a theory.

The trade secrets claim is time-barred and fatally vague, and should be dismissed.

## II.  BACKGROUND[1]

### A.  Plaintiffs Allege an Effort by Apple to Misappropriate Their Trade Secrets More Than Six Years before Filing This Action.

According to the FAC, in 2013, Apple contacted Masimo "to understand more about Masimo's technology," "entered into a confidentiality agreement" with Masimo, and had "confidential discussions" with Masimo's management.  FAC ¶ 19.  Then, Apple "recruited . . . key Masimo personnel," including O'Reilly, Masimo's former Chief Medical Officer, and Lamego, former Cercacor CTO.  *Id.* ¶¶ 19–21.  "O'Reilly was privy to extremely sensitive information . . . about mobile medical products and applications, wellness applications, clinical data gathering and analytics, and other technology of Masimo."  *Id.* ¶ 20.  Lamego had access to "highly confidential technical information," "was taught about the keys to effective non-invasive monitoring," and "learned guarded secrets regarding Plaintiffs' mobile medical products."  *Id.* ¶ 22.

By January 2014, Plaintiffs were suspicious of Apple's conduct, including its hiring of Lamego.  On January 24, 2014, they sent Apple a letter "explaining that Lamego possessed Plaintiffs' confidential proprietary information and warning Apple to respect [their] rights in such information."  *Id.* ¶ 23.  The letter cautioned, "we trust that Apple will employ Mr. Lamego in an area that does not involve healthcare

---

[1] The allegations in the Original Complaint and the FAC are treated as true for purposes of this motion only.

Exhibit 3 -61-

technology, including mobile health applications and the measurement of physiological information." *Id.* The FAC quotes and refers to the letter (*id.* at ¶¶ 23, 216, 220), but fails to cite two admissions in the letter, or attach it. RJN Decl. Ex. A. First, the letter stated that Plaintiffs found it "difficult to imagine any reason for [Apple's conduct] other than [that] Apple [was] attempting to gain access to, or . . . the benefit of, [their] trade secrets." RJN Decl. Ex. A, at 4. Second, the letter accused Apple of "targeting" Plaintiffs' "personnel for some time." *Id.*[2] The letter also demanded that Apple not employ Lamego in the field of "healthcare technology," because doing so "necessarily [would] involve the use or disclosure of [Cercacor's] trade secrets." *Id.*; *see* FAC ¶ 23. Yet in the next six years—even after it became public that Lamego did work for Apple on the same technology to which Plaintiffs' alleged trade secrets supposedly relate (e.g., RJN Decl. Ex. B)—Plaintiffs did nothing.

## B.  A Published Patent Application Put Plaintiffs on Notice of Their Alleged Claim More Than Three Years Before They Filed.

Plaintiffs allege that Apple "used and disclosed Plaintiffs' Confidential Information at least by . . . filing patent applications containing" that information. FAC ¶ 218. They concede that "shortly after joining Apple in January 2014, Lamego began pursuing on behalf of Apple numerous patent applications directed toward technologies he worked on at Plaintiffs, and with which he had no prior experience or knowledge." *Id.* ¶ 24. The Original Complaint alleged this without qualification (Compl. ¶ 23); Plaintiffs now allege such facts were "[u]nbeknownst to Plaintiffs" in 2014 (FAC ¶ 24).

Despite Plaintiffs' newly claimed ignorance, the FAC still demonstrates that Plaintiffs knew or should have known about Lamego's pursuit of at least one relevant Apple patent application by at least March 2016: The '196 application was published as the '726 publication on March 3, 2016, naming Lamego as an inventor in the field of healthcare technology. *See id.* ¶ 39 (citing the '196 application, which issued as the '052 patent that is the subject of the Fourteenth Cause of Action); *id.* Ex. 27, at 1147 ('052

---

[2]  By September 2014, "Apple announced the first version of its watch"—an ostensibly competing technology. FAC ¶ 25.

1   patent, Prior Pub. Data); RJN Decl. Ex. B, at 11 ('726 publication, Pub. Date).  That

2   application is entitled "Reflective Surface Treatments For Optical Sensors," and relates

3   to "electronic . . . optical sensing systems" that "can be adapted to obtain physiological

4   data from a biological subject."  FAC Ex. 27, at 1154 ('052 patent, Title, 1:16–18, 1:45–

5   48); RJN Decl. Ex. B, at 11, 18 ('726 publication, Title, ¶¶ 2, 5).  Indeed, the Original

6   Complaint listed the '196 patent application, which published as the '726 publication,

7   as the *first example* of an application that allegedly included technologies with which

8   Lamego was intimately involved while working at Plaintiffs.  Compl. ¶¶ 23–24, 187.

9       Thus, a patent application that (i) referenced healthcare technology on which

10   Lamego was purportedly prohibited from working because, *according to Plaintiffs*, he

11   was incapable of doing so without using their confidential information (FAC ¶ 23; RJN

12   Decl. Ex. A, at 4–5), and (ii) named Lamego as inventor, was publicly available more

13   than three years before Plaintiffs filed this action.  The Original Complaint conceded

14   this publicly available application was an example of an application allegedly containing

15   information that Lamego acquired from them.  Compl. ¶¶ 23–24.  Nonetheless, Plaintiffs

16   now claim it was reasonable that they did nothing in the ensuing three years.

17       The FAC contains no explanation for Plaintiffs' delay.  Plaintiffs do not explain:

18   (1) why the '726 publication did not put them on notice of the alleged misappropriation,

19   or (2) how the '726 publication is different from those later-published patents that

20   Plaintiffs assert do contain their alleged trade secrets (*see* FAC ¶ 220)—even though the

21   '726 publication relates to the same technology as the later-published patents (*see, e.g.*,

22   Ex. 29, at 1193 ('095 patent, 1:15–19)), and Plaintiffs allege that the subject matter of

23   the '726 publication (as disclosed in the resultant '052 patent) and these later-published

24   patents all came from Masimo's employees (*see, e.g.*, FAC ¶¶ 227, 241, 248).  Plaintiffs

25   are also silent as to why they do not allege that the '196 patent application, which

26   published as the '726, is an example of an application containing their alleged secrets.

### III.   <u>LEGAL STANDARD</u>

27

28       A complaint must contain "sufficient factual matter, accepted as true, to state a

claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). For a claim to be facially plausible, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. Dismissal is warranted where a complaint fails to "raise a right to relief above the speculative level." *Bell Atl. v. Twombly*, 550 U.S. 544, 555 (2007). "Threadbare recitals of the elements of a [claim], supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

## IV. <u>PLAINTIFFS' CUTSA CLAIM SHOULD BE DISMISSED.</u>

### A. Plaintiffs' CUTSA Claim Is Time-Barred.

A CUTSA claim "must be brought within three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered." Cal. Civ. Code § 3426.6. Thus, "the statute of limitations begins to run when a plaintiff discovers, or has reason to discover, the cause of action." *Klang*, 2014 WL 4922401, at *1–2, *5–6 (dismissing CUTSA claim where patent applications disclosing invention published five years before filing). Suspicion starts the clock: "[w]hen there is reason to suspect" misappropriation, "and a reasonable investigation would produce facts sufficient to confirm this suspicion . . ., the limitations period begins, even though the plaintiff has not conducted such an investigation." *Hays v. VDF Futureceuticals, Inc.*, 2016 WL 5660395, at *3 (D. Haw. Sept. 28, 2016) (applying California law and granting motion to dismiss because "suspicion of wrongdoing will trigger the statute of limitations"); *see also MGA Entm't, Inc. v. Mattel, Inc.*, 41 Cal. App. 5th 554, 564 (Cal. Ct. App. 2019) ("[o]nce [plaintiff] had reason to suspect an injury and some wrongful cause, the statute [of limitations] . . . began to run" on CUTSA claim); *Cypress Semiconductor Corp. v. Super. Ct.*, 163 Cal. App. 4th 575, 587 (Cal. Ct. App. 2008) ("[M]isappropriation that triggers . . . the statute is that which the plaintiff suspects").

#### 1. The Limitations Period Began More Than Three Years Ago.

***The statute was triggered in 2014***. The FAC makes clear that Plaintiffs suspected Apple of misappropriating their alleged trade secrets in 2014. After Apple and Masimo

met to discuss a "potential collaboration" in 2013, and Lamego "join[ed] Apple in January 2014" (FAC ¶¶ 19, 21, 24), Plaintiffs immediately "warn[ed] Apple to respect [their] rights" in their "confidential proprietary information" (*id.* ¶ 23). The January 24, 2014 "warning" letter confirms Plaintiffs' suspicions and is fatal to their CUTSA claim. The letter states that "[i]t is difficult to imagine *any reason* for th[e] sequence of events *other than Apple is attempting to gain access to, or at least the benefit of, Cercacor and Masimo's trade secrets.*" RJN Decl. Ex. A, at 4 (emphasis added); *see, e.g.*, *Gabriel Techs. Corp. v. Qualcomm Inc.*, 857 F. Supp. 2d 997, 1004-06 (S.D. Cal. 2012) (email between plaintiff's employees saying defendant committed a "direct rip-off" of plaintiff's trade secret "established that [plaintiff] had a suspicion of wrong doing which triggered the statute of limitations"); *cf. Forcier v. Microsoft Corp.*, 123 F. Supp. 2d 520, 530–31 (N.D. Cal. 2000) (suspicion triggered limitations period for interference claim where defendant hired two employees allegedly possessing plaintiff's trade secrets to develop competing technology and file patent applications, and plaintiff sent a letter to defendant with "concern[] . . . that [defendant] might make use of the [misappropriated] technology"). Plaintiffs "had a suspicion that [Apple] had misappropriated [their] trade secrets" and "articulated that suspicion" in the January 2014 letter (*MGA Entm't*, 41 Cal. App. 5th at 565), and it was "common knowledge" by September 2014 that Apple was pursuing similar technology (*Alamar Biosciences Inc. v. Difco Labs. Inc.*, 1996 WL 648286, at *4 (E.D. Cal. Feb. 27, 1996)), when Apple "announced the first version of its watch" (FAC ¶ 25). Plaintiffs were on notice of their claim by 2014.

   ***The statute was alternatively triggered in 2016***. The "publication of patents (and now patent applications) must be deemed, as a matter of law, to place those practicing in the same field and prosecuting their own patent applications . . . on full notice of all of the contents of the publication." *Wang v. Palo Alto Networks, Inc.*, 2014 WL 1410346, at *6 (N.D. Cal. Apr. 11, 2014); *see Alta Devices, Inc. v. LG Elecs., Inc.*, 2019 WL 1924992, at *14 (N.D. Cal. Apr. 30, 2019) (reliance on *Wang* (a summary judgment case) for a motion to dismiss proper because the "Court takes as true . . . the allegations

Gibson, Dunn & Crutcher LLP

MEMO. ISO APPLE'S MOT. TO DISMISS THE THIRTEENTH CAUSE OF ACTION IN THE FAC    7    CASE NO. 8:20-cv-00048-JVS (JDEx)

Exhibit 3
-65-

in [the] complaint"). Courts routinely find that patent applications and patents trigger the statute of limitations for sophisticated parties like Plaintiffs, especially when they are trying to "commercialize [their] own technologies." *Wang*, 2014 WL 1410346, at *6; *Hays*, 2016 WL 5660395, at *5 (dismissing analogous Hawaii trade secrets claim, and holding that "statute . . . began to run when the patents were issued" because the patents sufficiently described the methods at issue for Plaintiff "at least to suspect a factual basis for [the] elements" of his claim).

Here, Plaintiffs cannot escape that the '726 application, naming Lamego as an inventor, published on March 3, 2016. RJN Decl. Ex. B, at 11; FAC Ex. 27, at 1147. The '726 publication relates to the same category of information—physiological measurement—as Plaintiffs' alleged trade secrets. *See* RJN Decl. Ex. B, at 18 ('726 publication, ¶¶ 2, 5); FAC ¶ 211. Indeed, the FAC alleges that the resultant '052 patent "claims subject matter that Lamego obtained from discussions with" Plaintiffs. FAC ¶ 227 & Ex. 27. And, again, the Original Complaint alleged that the '196 application, which published as the '726 application, was the *first example* of an application that Lamego pursued on behalf of Apple based on his work at, and knowledge from, Plaintiffs, and which allegedly disclosed Plaintiffs' confidential information "*by September 2014*." Compl. ¶¶ 23–24, 186–187 (emphasis added).

Now, *after* Apple raised the statute of limitations in its Motion to Dismiss the Original Complaint (Dkt. No. 16), Plaintiffs suddenly claim that they did not know about any disclosure until after January 10, 2017. FAC ¶¶ 219. The Court should not accept this new allegation because it "contradict[s] matters properly subject to judicial notice or by exhibit" (*Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)), and also "contradict[s] [and] obfuscate[s] facts alleged in the prior pleading" (*In re City of Los Angeles Med. Marijuana Litig.*, 2014 WL 12783295, at *3 (C.D. Cal. June 13, 2014)). Plaintiffs provide *no* colorable explanation for their failure to act upon the '726 publication, nor do they allege that they were not monitoring patent filings involving Lamego and Apple. *See Wang*, 2014 WL 1410346, at *6 ("[I]nventor actively practicing

Exhibit 3
-66-

in the field and prosecuting his own patent application must be deemed to be on constructive notice of published patent applications in the same field").

Even if the Court accepts as true these newly manufactured allegations (it should not), the '726 publication establishes that by March 3, 2016, Plaintiffs *should have known* about the alleged disclosure. The publication demonstrated that: (1) Lamego was employed by Apple in the field of physiological monitoring—in which Plaintiffs "expressed concern" (*MGA Entm't*, 41 Cal. App. 5th at 565) that Lamego could *not* work *without* using their confidential information (FAC ¶ 23; RJN Decl. Ex. A, at 4–5); (2) Apple and Lamego did not agree to Plaintiffs' 2014 demand that Lamego not work in the field (FAC Ex. 27; RJN Decl. Ex. B); and (3) Lamego purportedly was using their information in his work (FAC ¶ 227). Moreover, the '726 publication relates to light emitter technology used for *health monitoring* to increase reliability of *biological readings* (RJN Decl. Ex. B, at 18 ('726 publication, ¶¶ 2, 5))—like the three other patent applications (the '268, '422, and '664) that were published as patents after 2016 and *are* alleged to contain Plaintiffs' trade secrets (FAC ¶¶ 40–42, 220).[3] The FAC demonstrates that the '726 publication was "in the same field as" Plaintiffs' own supposedly misappropriated technology. *Wang*, 2014 WL 1410346, at *3. Accordingly, by March 3, 2016, Plaintiffs were on notice to investigate their trade secret claim, and the limitations period commenced by that date. *See id.* at *6; *Bd. of Trustees of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 583 F.3d 832, 846 (Fed. Cir. 2009) (party was on notice regarding possible "additional patents as to the same subject matter," even where the applications had not yet been filed), *aff'd*, 563 U.S. 776 (2011).

### 2. Plaintiffs Have Not Pleaded a Plausible Excuse for Their Delay.

The "[FAC] show[s] on [its] face that [Plaintiffs'] claim would be barred without the benefit of the discovery rule" (*Klang*, 2014 WL 4922401, at *6), because Plaintiffs allege that Apple used their information when Lamego caused Apple to file patent

---

[3] The corresponding patents are the '754, '997, and '095 patents. FAC ¶¶ 40–42, 220, Exs. 29–30. The FAC does not assert the '997 patent against Apple.

applications relating to Plaintiffs' technologies *in 2014* (FAC ¶¶ 24, 39–42 & Exs. 29–30). Plaintiffs' burden is to prove facts that toll the statute of limitations—i.e., "specifically plead[ed] facts to show (1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence." *Klang*, 2014 WL 4922401, at *6; *Fox v. Ethicon Endo-Surgery*, 35 Cal. 4th 797, 808 (2005) ("the burden [is] on the plaintiff to 'show diligence'"); *see also Gabriel Techs.*, 857 F. Supp. 2d at 1003 (same); Jud. Council of Cal. Civ. Jury Instr. (2019), No. 4421 (Plaintiffs must prove they "did not discover, nor with reasonable diligence should have discovered, facts that would have caused a reasonable person to suspect that [Defendant] had misappropriated [their information]"). Plaintiffs had to plead specific facts establishing that (1) despite their January 2014 letter to the contrary, they did not have reason to suspect Apple of misappropriation, and (2) despite the later-published patents, which purportedly put them on notice of their claim, they did not have reason to suspect the misappropriation from the '726 publication relating to the same technology. Plaintiffs' alleged reasons why they could not have discovered Apple's purported misappropriation before January 10, 2017, do not satisfy that burden.

    ***(i)    Plaintiffs' purported reliance on Apple's alleged non-response to their January 2014 "warning" letter is not reasonable***. Plaintiffs claim that Apple and Lamego "led Plaintiffs to believe they intended to respect Plaintiffs' intellectual property rights and concealed" Apple's alleged misappropriation. FAC ¶ 220. Apple purportedly did so because "Plaintiffs notified [Apple] that Lamego possessed the Confidential Information on January 24, 2014," and Apple "never informed [them] that Lamego had used or disclosed" that information. *Id*. Significantly, Plaintiffs do not allege (1) that Apple responded to the January 2014 "warning letter" (FAC ¶ 23), or (2) any *facts* suggesting that Apple misled them. Instead, Plaintiffs implausibly allege that they "had no reason to suspect or believe that [Apple] had ignored Plaintiffs' letter." *Id*. ¶ 219. Plaintiffs' claim that they simply interpreted Apple's ostensible silence as agreement to the demands in their letter fails. *Cf. Wolf v. Travolta*, 167 F. Supp. 3d 1077, 1096 (C.D.

Exhibit 3 -68-

Cal. 2016) (plaintiff's "purported inability to discover [copyright] infringement" unreasonable where investigation of suspicions involved asking defendant, his associate, and an employee of the organization with which they were working whether they had infringed, and infringer denied wrongdoing).[4]

> ***(ii)    Lamego's alleged representations are irrelevant***.  Plaintiffs also assert that *Lamego* "assured Plaintiffs that he would not violate his agreements with [them]" or "work on technology similar to Plaintiffs'."  FAC ¶ 23.  Based in part on "conversations with Lamego," Plaintiffs claim they "reasonably believed" he "would not use or disclose Plaintiffs' confidential information and that [Apple] would not induce [him] to do so." FAC ¶ 23.  But whatever supposed promises *Lamego* made in his personal capacity are irrelevant, because Lamego is not Apple; nor have Plaintiffs alleged facts plausibly establishing that his statements can be attributed to Apple.  *See Citizens' Nat. Bank of Los Angeles v. Santa Rita Hotel Co.*, 22 F.2d 524, 528 (9th Cir. 1927) ("[W]here one deals with an agent concerning a matter affecting his personal interest, he is not justified in relying upon the agent's statements and actions as being those of the principal . . . ."); *Am. Hardware Mut. Ins. Co. v. Escamilla*, 2010 WL 11574194, at *3 (N.D. Cal. Sept. 30, 2010) ("The burden of proving agency," and "the agent's authority, rests upon the party . . . who seeks to charge the principal for the acts or representations of the agent.").

> ***(iii)    Masimo's unidentified agreement with Apple only underscores the implausibility of Plaintiffs' delayed discovery claim***.  Plaintiffs also claim that based on Masimo's purported confidentiality agreement with Apple, they reasonably believed Apple would not induce Lamego to use their confidential information or do so itself. FAC ¶ 23.  Plaintiffs do not attach the agreement to their FAC; nor do they allege what it covered.  *Id*. ¶ 19.  Plaintiffs have failed to plead the agreement's material terms, and therefore the agreement cannot form the basis for their delayed discovery claim.  *Cf.*

---

[4]  Plaintiffs' implausible allegation that they "had no reason to suspect" the alleged misappropriation (FAC ¶ 219) concedes that suspicion triggers the limitations period. *Forcier*, 123 F. Supp. 2d at 530–31; *Fox*, 35 Cal. 4th at 808.

1  *Webpass Inc. v. Banth*, 2014 WL 7206695, at *4 (N.D. Cal. Dec. 18, 2014) (dismissing

2  claim based on defendant's alleged breach of plaintiff's confidentiality and non-

3  disclosure policy where plaintiff failed to allege the material terms of that policy).

4      ***(iv)    It is irrelevant that the first product "at issue" was announced in 2018***.

5  Plaintiffs claim that they "had no way of knowing, or learning," of Apple's alleged

6  misappropriation prior to January 10, 2017 because "the first [Apple] product at issue

7  was not announced until 2018" (FAC ¶ 219). This is wrong as a matter of law.

8      Plaintiffs admit that they demanded in January 2014 that Lamego not work on

9  technology similar to Plaintiffs'—or in the "healthcare technology" space at all. *Id*.

10  ¶ 23. But the FAC reveals that (i) in September 2014, Apple announced the first version

11  of the Apple Watch—an ostensibly competing, and indisputably similar product to the

12  allegedly infringing Series 4 Watch (*id*. ¶ 25); (ii) in April 2015, Apple began shipping

13  the Watch (*id*.); and (iii) on March 3, 2016, the '726 publication put Plaintiffs on notice

14  that Apple had rejected their demand that Lamego not work on healthcare monitoring

15  technology (*id*. Ex. 27, at 1154 ('052 patent, 1:16–18, 1:45–48); RJN Decl. Ex. B, at 18

16  ('726 publication, ¶¶ 2, 5)). The FAC also discloses that Masimo has "numerous U.S.

17  patents" in "noninvasive patient monitoring technologies," and Plaintiffs have

18  aggressively defended their intellectual property (e.g., patent) rights since 2014. *See*

19  FAC ¶¶ 13, 23. Each of these alleged facts alone puts Plaintiffs on notice of a potential

20  claim. *Cf. Reese v. TracFone Wireless, Inc*., 2014 WL 1872175, at *4 (C.D. Cal. May

21  9, 2014) ("Significant 'sales, marketing, publication, or public use of a product similar

22  to or embodying technology similar to the patented invention . . . gives rise to a duty to

23  investigate whether there is infringement.'"); *Wang*, 2014 WL 1410346, at *6 (an entity

24  "actively practicing in the field and prosecuting [its] own patent application must be

25  deemed to be on constructive notice of published patent applications in the same field").

26      ***(v)    The FAC and the '726 publication highlight the unreasonableness of***

27  ***Plaintiffs' inaction and implausibility of their discovery claim***. Plaintiffs also assert,

28  on information and belief, that Apple "requested non-publication of [certain patent]

applications to prevent Plaintiffs from learning" that (1) "those applications contained [their] Confidential Information," and (2) that Apple allegedly misappropriated that information. FAC ¶ 220. But courts bar misappropriation claims where (1) the plaintiff suspected the defendant of misappropriation, (2) a term search would have revealed the subject patent application, and (3) the plaintiff "had done patent searches on the technology of its competitors before." *Alamar*, 1996 WL 648286, at *5–6.

Here, in addition to the many admissions discussed above, eight of Masimo's asserted patents name Lamego as an inventor,[5] and at least one cites 56 prior patents and patent applications naming Lamego as an inventor.[6] It defies common sense that Plaintiffs would *not* have (i) suspected that Lamego was involved with filing multiple patent applications on Apple's behalf, or (ii) searched such filings once they learned in January 2014 that Lamego was working for Apple, particularly because they ostensibly "[s]earch[ed] for existing intellectual property rights," including competitors' patent filings. RJN Decl. Ex. C, at 64. "In these circumstances, a reasonable plaintiff is required to take the elementary step of checking all readily available patent applications" to avoid a limitations bar. *Alamar*, 1996 WL 648286, at *5–6.

That Plaintiffs now claim the '726 publication does not disclose their trade secrets is of no moment, since the publication describes technology Lamego purportedly could *not* work on without using their confidential information, and relates to technology described in three other applications that Plaintiffs claim *do* contain their trade secrets. FAC ¶¶ 39–42, 220; RJN Decl. Ex. A, at 4–5; RJN Decl. Ex. D, at 163–64 (*True Wearables* Am. Compl. ¶ 37). Thus, even accepting as true Plaintiffs' recent, feigned ignorance, they have not met their burden to show that *they could not have* discovered their claim. *Klang*, 2014 WL 4922401, at *4; *MGA Entm't*, 41 Cal. App. 5th at 561 ("plaintiff need not be aware of the specific 'facts' necessary to establish the claim; that

---

[5] FAC Exs. 1–6, 11–12 (the '265, '266, '628, '708, '190, '191, '553, and '554 patents).

[6] FAC Ex. 12, at 881–93 ('554 patent, citing Lamego as inventor 56 times).

1   is a process contemplated by pretrial discovery") (citation omitted).[7]

2          Finally, Plaintiffs' non-publication theory makes no sense.  If Apple were

3   attempting to hide Lamego's work on healthcare monitoring technologies, it would not

4   have permitted publication of *any* patent application in that field naming Lamego as an

5   inventor—yet it did just that.  RJN Decl. Ex. B.  Plaintiffs have no explanation for these

6   inconsistent allegations; their conclusory allegations of concealment fail.  *Eclectic*

7   *Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996–97 (9th Cir. 2014)

8   (complaint must allege "facts tending to exclude the possibility" that an "alternative

9   explanation is true"); *Veronica Foods Co. v. Ecklin*, 2017 WL 2806706, at *14 (N.D.

10  Cal. June 29, 2017) (alleged "facts that are not 'merely consistent with' both a theory of

11  innocent [conduct] and [misappropriation], but rather 'tend[ ] to exclude' an innocent

12  explanation" required to survive motion to dismiss).

13  **B.     Plaintiffs Fail to Allege Any Protectable Trade Secrets.**

14         "To adequately allege the existence of a trade secret, the plaintiff must describe

15  the trade secret with sufficient particularity to separate it from matters of general

16  knowledge in the trade . . . and to permit the defendant to ascertain at least the

17  boundaries within which the secret lies." *Acrisure of Cal., LLC v. SoCal Commercial*

18  *Ins. Servs.*, 2019 WL 4137618, at *3 (C.D. Cal. Mar. 27, 2019) (citation omitted).

19  "[A]llegations of broad categories relating to business or technology are not adequate to

20  support a trade secrets claim." *Human Longevity, Inc. v. J. Craig Venter Inst., Inc.*, 2018

21  WL 6617633, at *4 (S.D. Cal. Dec. 18, 2018); *see also Bladeroom Grp. Ltd. v.*

22  *Facebook, Inc.*, 2015 WL 8028294, at *3 (N.D. Cal. Dec. 7, 2015) ("generic list of

23  categories of various types of information" was "vague and conclusory" and

24  insufficient).  For these reasons, a CUTSA claim should be dismissed where, as here,

25  Plaintiffs simply plead "a high-level overview of . . . purported trade secrets." *Space*

26  *Data Corp. v. X*, 2017 WL 5013363, at *2 (N.D. Cal. Feb. 16, 2017).

27

28  ---

    [7]  The Court should not accept Plaintiffs' newfound allegations of ignorance, because they contradict the Original Complaint. *Los Angeles*, 2014 WL 12783295, at *3.

Plaintiffs allege that they own over 50 categories of supposed trade secrets that "include, but are not limited to, . . . technical information, sales and marketing information, and other business information relating to non-invasive monitoring of physiological parameters and products to perform such monitoring." FAC ¶ 211. Such "sweeping and vague" "references to an enormous array of potential sources" of information are insufficient to survive a motion to dismiss. *Synopsys*, 2013 WL 5770542, at *6 (N.D. Cal. Oct. 24, 2013) (description of information "relate[d] to [the plaintiffs'] products," including "proprietary input and output formats, scripts, and technical product documentation, which generally are not publicly known" too vague); *see, e.g.*, *Human Longevity*, 2018 WL 6617633, at *5 (dismissing where "allegations of [trade secrets] are expansive and lack particularity"); *Acrisure of Cal.*, 2019 WL 4137618, at *3 ("[t]he Ninth Circuit has rejected the use of 'catchall' language," as insufficiently specific "because it does not *clearly refer* to tangible trade secret material" (citations omitted)). Plaintiffs' pleading deficiency is even more egregious here because they allege that the Apple Watch "includes Plaintiffs' technologies" (FAC ¶ 25), and that their trade secrets were purportedly published in Apple's patent applications and patents (FAC ¶ 219).[8] Compounding the lack of particularity is Plaintiffs' inclusion of "secrets" for which they have not alleged misappropriation. *See, e.g.*, FAC ¶ 211 (listing "risk analysis," "customer information," "sales pipelines," "proposal and quote generation tools," "personnel information," "supplier information," and "spreadsheets," which plainly cannot be incorporated into Apple's patent applications or its Watch).

## 1. Plaintiffs' Broad Allegations Fail under Fed. R. Civ. Proc. 8.

*"Technical Information"*: This category "includes product plans, engineering plans, product briefs, technical drawings, technical specifications, technical data, product designs, system designs, design captures, assembly design requirements, risk

---

[8] Plaintiffs allege that their trade secrets "derive[] independent economic value" because they were, "at the time of . . . misappropriation, not generally known to the public" (FAC ¶ 213), but Plaintiffs' vague description of their alleged trade secrets do not allow the Court or Apple to determine what value any such trade secret may possess.

analysis, test procedures and results, test data, design review documents, software requirement specifications, technical know-how, manufacturing techniques and procedures, installation techniques and procedures, and invention disclosures." FAC ¶ 211. This list references "just about every piece of material Plaintiff[s] ha[ve] ever created or acquired" (*Synopsys, Inc.*, 2013 WL 5770542, at *8), and merely "summarize[s] rather broadly the categories of information" that any product manager in virtually any technology company *could* use to design products—thus failing to sufficiently identify the alleged trade secrets under Rule 8 (*AlterG, Inc. v. Boost Treadmills LLC*, 388 F. Supp. 3d 1133, 1145–46 (N.D. Cal. 2019) (granting motion to dismiss DTSA claim where alleged trade secrets "includ[ed] 'techniques, sketches, drawings, models, inventions, know-how, processes, apparatus, equipment, algorithms, software programs, software source documents, and formulae related to the current, future and proposed products and services of the Company, and includes, without limitation, its respective information concerning research, experimental work, development, design details, and specifications, engineering [information]'")). *See Becton, Dickinson & Co. v. Cytek Biosciences Inc.*, 2018 WL 2298500, at *3 (N.D. Cal. May 21, 2018) (allegations of "design review templates," "fluidics design files," or "source code files" lacked particularity, especially when "preceded by the phrases 'such files included' and 'such as'"). In addition, because Plaintiffs allege that their trade secrets include "manufacturing techniques" (FAC ¶ 211), they "must not only identify the end product manufactured, but also supply sufficient data concerning the process." *Diodes v. Franzen*, 260 Cal. App. 2d 244, 253 (Cal. Ct. App. 1968). Plaintiffs have not.

"***Sales and Marketing Information***": This category "includes product plans"— notably *not* distinguished from "product plans" identified as "Technical Information" above—"business plans, customer information, sales pipelines, proposal and quote generation tools, pricing models, pricing schedules, sales training materials, product training materials, marketing and launch plans, marketing analysis, and competitive analysis." FAC ¶ 211. But a "Complaint does not sufficiently put Defendants on notice

of what trade secrets they allegedly misappropriated," where it "lacks any description of what th[e] confidential information entails beyond general labels" such as "business model, business plans, recipes, processes and systems, POS System, means of identifying potential customers and markets, identification of customers' needs, customers' buying habits, . . . marketing plans, strategies, [and] forecasts." *Green Crush LLC v. Paradise Splash I, Inc.*, 2018 WL 4940824, at *5 (C.D. Cal. Mar. 8, 2018) (granting motion to dismiss); *see Vendavo*, 2018 WL 1456697, at *3 (information that "includes . . . customer lists and customer related information, pricing information, . . . marketing plans and strategic business development initiatives, . . . and other information related to the development of [Plaintiff's] price-optimization software, including ideas and plans for product enhancements" is too "broad" to state a trade secret claim); *AlterG, Inc.*, 388 F. Supp. 3d at 1145–46 (information concerning "procurement requirements, purchasing manufacturing, customer lists, business forecasts, sales, and merchandising and marketing plans and information" insufficient to state DTSA claim); *Human Longevity*, 2018 WL 6617633, at *5 (dismissing DTSA claim based on "identity and contact information [for] financing . . . sources" or "of clients and potential client[s]," "negotiating . . . strategies for potential transactions," "industry reports," "analysis of market competitors," and potential expansion "plans, [and] projections").

"***Other Business Information***":  This category "includes information for successfully operating a noninvasive patient monitoring company, including personnel information, supplier information, and other business spreadsheets and analysis."  FAC ¶ 211.  These allegations are even less specific than the "general labels" such as "vendor identities," "unpublished financial information," and "budgets and projections" that this Court rejected in *Green Crush*.  2018 WL 4940824, at *5; *see Vendavo*, 2018 WL 1456697, at *3 (rejecting as too "broad" identification of trade secrets that included "vendor lists and related information"); *Human Longevity*, 2018 WL 6617633, at *5 (dismissing DTSA claim where alleged trade secrets of "employee contact and compensation information" and "internal financial reports" "lack[ed] particularity").

Exhibit 3 -75-

"**Combinations**": Plaintiffs also claim as trade secrets "combinations and selections of the above information, and knowledge of the varying importance of the information." FAC ¶ 211. Plaintiffs, however, have not described the potential combinations of items in their catch-all description with sufficient particularity to enable either the Court or Apple to "ascertain which specific elements [Apple] is accused of misappropriating." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 2019 WL 4233578, at *4 (C.D. Cal. June 28, 2019) (summary judgment granted where potentially "unique combination[s] of . . . known elements" were pleaded with insufficient specificity); *see also VIA Techs., Inc. (a Cal. Corp.) v. Asus Computer Int'l*, 2016 WL 5930280, at *3 (N.D. Cal. Oct. 12, 2016) ("the Court or defendants [could not] identify" which "arrangements" were claimed trade secrets without a sufficiently particular "descri[ption of] *how* the combination of features . . . constitutes a trade secret").

"**Knowledge**": Plaintiffs further claim that "knowledge for selecting which information and technology are important for improving reliability, improving measurements, and how to successfully combine and implement them to achieve the desired functionality" is their trade secret. FAC ¶ 211. But "[i]f the principal person who can obtain economic benefit from information is aware of it, there is no trade secret." Cal. Civ. Code § 3426.1, 1984 Legis. Comm. Comments—Senate. For example, "[a] method of casting metal . . . may be unknown to the general public but readily known within the foundry industry;" so it cannot be a trade secret. *Id.*

Here, the FAC provides no guidance as to "where the boundary between th[e]se secrets and general knowledge might lie." *Synopsys*, 2013 WL 5770542, at *6. Consistent with Plaintiffs' unlawful demand that Lamego not be permitted to work in the "healthcare technology" industry at all (FAC ¶ 23; RJN Decl. Ex. A, at 5; *see* Cal. Bus. & Prof. Code § 16600), Plaintiffs improperly claim as their intellectual property any information Lamego (or any other former Masimo and/or Cercacor employee) learned while in Plaintiffs' employ. *Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*, 707 F. Supp. 1170, 1177–78 (C.D. Cal. 1989), *aff'd*, 914 F.2d 1256 (9th Cir.

1990) (knowledge "developed as a result of long employment in the particular trade may be carried over and put to use by the new employer"). Neither California law nor the Courts of this Circuit permit a Plaintiff to allege misappropriation based on a theory that a former employee inevitably will disclose general information learned during his former employment. *Globespan, Inc. v. O'Neill*, 151 F. Supp. 2d 1229, 1235 (C.D. Cal. 2001) (granting motion to dismiss); *Whyte v. Schlage Lock Co.*, 101 Cal. App. 4th 1443, 1463 (Cal. Ct. App. 2002).

"***Negative Information***": Finally, Plaintiffs claim that their "negative information, what works well under certain conditions, and trade-offs of selecting certain techniques" is a trade secret. FAC ¶ 211. Such a boilerplate description of trade secrets as "'negative knowhow' learned through the course of research and development" is insufficient to satisfy Rule 8. *Vendavo*, 2018 WL 1456697, at *3.

## 2. Plaintiffs Have Not Distinguished Their Trade Secrets from Patents.

A motion to dismiss should be granted where the plaintiff alleges that "[s]ome aspects" of its "know-how, design, supply chain, [and] fabrication . . . techniques" "are the subject of granted patents and pending patent applications," but does not describe "which aspects are publicly known and which are not." *Bladeroom*, 2015 WL 8028294, at *1, *4; *Space Data Corp.*, 2017 WL 5013363, at *2 (granting motion to dismiss for failure to plead "which aspects of [the] technology and other information are 'part of patents and pending patent applications,' if any, and which are secret").

Here, after alleging that Masimo has "received numerous U.S. patents" for "noninvasive patient monitoring technologies," Plaintiffs vaguely allege that they "also maintain[] *some* technology as trade secrets" and "closely guard[ their] future product and market plans." FAC ¶¶ 13, 17 (emphasis added). The FAC also alleges that Apple infringes twelve of Masimo's patents, all of which are directed to "noninvasive methods, devices, and systems for measuring various blood constituents." *E.g.*, FAC Ex. 1, at 95 ('265 patent, Abstract). But, in their "description" of their "trade secrets," Plaintiffs make no effort to differentiate between those secrets and their patented information. *See*

FAC ¶ 211 (alleging "trade secrets that include, but are not limited to, Plaintiffs' technical information . . . *relating to non-invasive monitoring of physiological parameters and products to perform such monitoring*" (emphasis added)).  To the contrary, by including "invention disclosures" in the description of trade secrets (*id.*), the description on its face fails to "delineate the boundaries between [the] trade secrets" and Plaintiffs' "information that has been made public through patents and patent applications," *AlterG*, 388 F. Supp. 3d at 1146 (dismissing DTSA claim).

Further compounding these deficiencies is the FAC's failure to delineate which trade secrets are owned by whom—let alone how each trade secret was misappropriated. FAC ¶ 211; *id.* ¶ 218 (alleging Apple's patent applications contain *both* Plaintiffs' information).  Apple has been deprived notice of what *each* Plaintiff claims are trade secrets, which affects Apple's purported duties with respect to the information.

Plaintiffs have not described the trade secrets with sufficient particularity to put either the Court or Apple on notice of "where trade secret protection begins and ends." *Synopsys*, 2013 WL 5770542, at *6.  The misappropriation claim must be dismissed.[9]

## C.   Plaintiffs Fail to Allege Misappropriation by "Improper Means."

Plaintiffs' theory of misappropriation—alleged on "information and belief" (FAC ¶ 217)—is that Apple, without their consent, "used and disclosed" their "Confidential Information at least by incorporating it into [Apple's] products and by filing patent applications containing [it]" (*id.* ¶ 218).  This theory is not supported by alleged facts.

### 1.   Plaintiffs Fail to Allege Improper Acquisition.

To allege misappropriation by acquisition, Plaintiffs must allege that Apple acquired their trade secret(s) and knew or had reason to know that the trade secret was acquired by "improper means."  Cal. Civ. Code § 3426.1(b)(1).  "'Improper means' includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage . . . ."  *Id.* § subd.(a).  To allege misappropriation by use

---

[9]  At a minimum, the Court should dismiss as to the trade secrets inadequately pleaded. *Citcon USA, LLC v. RiverPay, Inc.*, 2018 WL 6813211 (N.D. Cal. Dec. 27, 2018).

or disclosure, Plaintiffs must allege that Apple used or disclosed their alleged trade secrets without consent, and that Apple "[u]sed improper means" to acquire those secrets, or knew or should have known that its knowledge was:

> (i) Derived from . . . a person who had utilized improper means to acquire it; (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy . . .; or (iii) Derived from . . . a person who owed a duty to the person seeking relief to maintain its secrecy. [*Id*. § 3426.1(b)(2)(A)–(B).]

With respect to acquisition, Plaintiffs do not allege facts to plausibly claim that Apple knew or had reason to know that any purported acquisition of Plaintiffs' alleged trade secrets was by *improper means*. *S. Cal. Inst. of Law v. TCS Educ. Sys.*, 2011 WL 1296602, at *7 (C.D. Cal. Apr. 5, 2011) ("Alleging mere possession of trade secrets is not enough." (internal alteration omitted)). Plaintiffs do not allege facts plausibly establishing Apple's knowledge that either Lamego or O'Reilly had a duty to maintain confidentiality of *specific* information purportedly shared with Apple, or that Apple knew such information was confidential. FAC ¶¶ 215–16, 218. Instead, Plaintiffs allege that Apple "knew" that (1) "Lamego was the [CTO] of Cercacor and a Research Scientist at Masimo;" (2) "Lamego was under a duty to maintain the secrecy of the information he obtained from Plaintiffs" under his "employer-employee relationship, fiduciary relationship, and Lamego's employment agreements;" and (3) "Plaintiffs considered the information confidential by virtue of [Apple's] prior relationship with Plaintiffs." *Id*. ¶ 216. These allegations do not support a plausible inference of misappropriation.

> ***(i)*** ***Apple's hiring of Plaintiffs' former employees is not improper***. Under the CUTSA and the law of this Circuit, "a party cannot prove trade secret misappropriation by demonstrating that a former employee's new employment will inevitably lead the former employee to rely on the former employer's trade secrets." *Pellerin v. Honeywell Int'l, Inc.*, 877 F. Supp. 2d 983, 989 (S.D. Cal. 2012); *see Les Concierges, Inc. v. Robeson*, 2009 WL 1138561, at *2 (N.D. Cal. Apr. 27, 2009) ("a threat of misappropriation cannot, as a matter of California law, be inferred [because the employee], upon voluntarily terminating his employment . . ., immediately began

working for a direct competitor and appears to be performing . . . the same or similar job duties he performed" for plaintiff). Yet this is precisely what Plaintiffs attempt to do.

As to Lamego, Plaintiffs allege that he had "*access* to [their] highly confidential technical information," "*learned* guarded secrets regarding Plaintiffs' mobile medical products" while employed by them, and purportedly possessed unspecified confidential information after he left. FAC ¶¶ 22–23 (emphasis added). Plaintiffs do not allege that Lamego improperly took specific trade secrets or failed to return them. The allegations concerning O'Reilly are even more speculative. O'Reilly apparently did not even have access to trade secrets. Plaintiffs merely allege that O'Reilly was "privy to [Masimo's] *extremely sensitive information*." *Id*. ¶ 20 (emphasis added).

Without plausible factual allegations that either Lamego, O'Reilly, or one of the other *unidentified* former employees *improperly acquired* trade secrets, the FAC cannot plausibly allege that Apple improperly acquired (or used or disclosed) those secrets, because Plaintiffs' former employees are the only links alleged between Plaintiffs and Apple. *Cf. Human Longevity, Inc*., 2018 WL 6617633, at *6 (DTSA claim "inadequate[ly]" pleaded where based on theory that defendant who had access to trade secrets while in plaintiff's employ must have disclosed that information when he started working for competitor and began "development of a program to compete with" his former employer). That Lamego and O'Reilly continued to work in the "healthcare technology" field is irrelevant to Plaintiffs' CUTSA claim—an employee is entitled to carry over knowledge learned in a particular trade. *Universal*, 707 F.Supp. at 1177–78.

**(ii)**     ***Lamego's undefined "duty" per the January 2014 "warning" letter does not establish a plausible basis for Apple's alleged improper acquisition***. Plaintiffs attempt to charge Apple with knowledge of their unspecified "confidential" information by alleging that they sent Apple "a copy of Lamego's Employee Confidentiality Agreement with Cercacor." FAC ¶ 216. But the "warning" letter only underscores that Plaintiffs did *not* give Apple notice of the bounds of their purported trade secrets. RJN Decl. Ex. A. It describes "Confidential Information" as "any information in any form"

that Cercacor or its "affiliates" "consider[] confidential, *including without limitation*":

> business plans, customer files, customer lists, supplier lists, sales and marketing reports, forecasts, strategies, technical data, prices and costs, designs and formulas, discoveries, processes, manufacturing techniques, know-how, improvements, ideas or copyrightable works, software, databases, personnel and payroll records, mailing lists, accounting records, works of authorship, inventions, trade secrets and other business information. [*Id.* at 6 (emphasis added).]

For this reason, Plaintiffs' claim that Apple "induced" a breach of Lamego's confidentiality obligations fails. Apple could not induce Lamego to breach an agreement whose parameters are undefined. *Cf. Invisible Dot, Inc. v. DeDecker*, 2019 WL 1718621, at *5 (C.D. Cal. Feb. 6, 2019) ("[T]his laundry list of items separated by ellipses—presumably quoted from one of the several agreements that DeDecker signed . . . does not meaningfully define the trade secrets."). In addition, Plaintiffs allege absolutely no facts describing how Apple purportedly induced such a breach. *See* FAC ¶ 216; *ATS Prods., Inc. v. Champion Fiberglass, Inc.*, 2015 WL 6552698, at *3 (N.D. Cal. Oct. 28, 2015) (granting motion to dismiss because "nowhere in its complaint does [plaintiff] allege any facts that would allow the Court to infer that [defendant] knew or should have known that [the] trade secrets were misappropriated"); *Carr v. AutoNation Inc.*, 2018 WL 288018, at *3 (E.D. Cal. Jan. 4, 2018) (dismissing trade secrets claim where "conclus[ory] allegations do not explain how LKQ got the Business Plan (or its contents) from AutoNation, and what specifically would have caused LKQ to know or have reason to know that AutoNation's possession of the Business plan was wrongful").

Relatedly, that "*Lamego* knew or had reason to know" that "his knowledge of Plaintiffs' Confidential Information was acquired under . . . a duty to maintain its secrecy and limit its use" is irrelevant as to *Apple's* state of mind. FAC ¶ 217 (emphasis added). This allegation fails to plausibly allege improper acquisition by *Apple*, because any purported "passive reception" of trade secrets (there was none) is not "acquisition" under the CUTSA. *Silvaco Data Sys. v. Intel Corp.*, 184 Cal. App. 4th 210, 223 (Cal. Ct. App. 2010) ("The choice of that term ['acquire'] over 'receive' suggests that

1    inadvertently coming into possession of a trade secret will not constitute acquisition."),

2    *overruled on other grounds by Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310 (Cal. 2011);

3    *Pellerin*, 877 F. Supp. 2d at 989 (mere possession of trade secrets is not enough).

4    **(iii)    *Any agreements with Apple are insufficiently pleaded to establish***

5    ***"improper acquisition."***  Plaintiffs allege that in 2013, Apple and Masimo entered into

6    a confidentiality agreement for a potential collaboration and thereafter "confidential[ly]"

7    discussed Masimo's technology.  FAC ¶ 19.  The FAC does not allege (1) that Apple

8    breached that agreement, (2) what the agreement covered, (3) whether Apple actually

9    received any specific confidential information, and (4) if so, what Apple was entitled to

10   do with it.  *Id*.  Nor does it attach the agreement.  Plaintiffs have failed to plead the

11   material terms of the contract between Apple and Masimo; in turn, that contract cannot

12   serve as a basis for Apple's supposed knowledge that Plaintiffs' unspecified information

13   was confidential or could not be acquired, used, or disclosed.  *Zora Analytics, LLC v.*

14   *Sakhamuri*, 2013 WL 12124612, at *5 (S.D. Cal. June 18, 2013) (dismissing claim

15   where plaintiff "failed to adequately plead the terms of the NDA"; "[d]etermining

16   whether [defendant] has violated a NDA . . . is difficult without at least alleging the

17   NDA's material terms"); *Space Data*, 2017 WL 5013363, at *2 ("Google received the

18   alleged trade secrets pursuant to the NDA.  Accordingly, Space Data must plead facts

19   showing that Google had a duty not to use the information in the way alleged.").

20   The FAC does not even allege that Apple had a confidentiality agreement with

21   Cercacor.  The only plausible inference to draw from the omissions is that there was no

22   breach—i.e., that any supposed acquisition, use, or disclosure by Apple was permitted

23   by any agreement that existed.  *Cf. Zomm, LLC v. Apple Inc.*, 391 F. Supp. 3d 946, 952

24   (N.D. Cal. 2019) (dismissing breach claims where confidentiality provisions allowed

25   use of information that could be derived from reverse engineering or prior patents).

26   **2.    Plaintiffs Fail to Allege Improper Disclosure or Use by Apple.**

27   Plaintiffs also fail to plausibly allege Apple's improper *use* or *disclosure* of their

28   alleged trade secrets.  To survive a Rule 12(b)(6) motion, a plaintiff must "plead[] *factual*

*content* that allows the court to draw the *reasonable* inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (emphases added). Here, Plaintiffs allege that "*Lamego* used and disclosed" their information for Apple's benefit, and that Apple "*further* used and disclosed" Plaintiffs' information "at least by incorporating it into [Apple's] products and by filing patent applications containing" that information, without their "express or implied consent." FAC ¶¶ 217–18 (asserting, on information and belief, unauthorized use/disclosure of information obtained from Plaintiffs and their *unspecified* former employees); ¶ 215 (similar allegations on information and belief).

These conclusory allegations fail to identify how Apple knew which specific "Confidential Information" it purportedly used—let alone how the information allegedly was incorporated into Apple's products or patent applications. *E.g.*, *MedioStream, Inc. v. Microsoft Corp.*, 869 F. Supp. 2d 1095, 1114 (N.D. Cal. 2012) (dismissing trade secrets claims because plaintiff did not sufficiently allege that defendant, which had received technology from a third party under contract with plaintiff, knew the third party was not authorized to provide that technology). Plaintiffs fail to allege any plausible facts supporting their disclosure/use allegations, and for this reason too, their trade secret claim fails. *Delphix Corp. v. Actifo, Inc.*, 2014 WL 4628490, at *2 (N.D. Cal. Mar. 19, 2014) (dismissing complaint in part because allegation "on information and belief" gave rise to "reasonable inference . . . that it is intended as caveat," and "creates a further inference that plaintiff . . . is instead engaging in speculation to an undue degree").

**D.    Plaintiffs Should Be Denied Leave to Amend Their CUTSA Claim.**

Plaintiffs have now had two chances to plead:  (1) a timely trade secret claim; (2) cognizable trade secrets; and (3) improper acquisition, use, and/or disclosure by Apple. They have failed, and so their FAC should be dismissed with prejudice. *Klamath-Lake Pharma. Ass'n v. Klamath Med. Serv. Bureau*, 701 F.2d 1276, 1293 (9th Cir. 1983).

## V.    <u>CONCLUSION</u>

Apple respectfully requests that the Court dismiss Plaintiffs' Thirteenth Cause of Action for trade secret misappropriation under the CUTSA with prejudice.

Dated: April 20, 2020

Respectfully submitted,

JOSHUA H. LERNER
H. MARK LYON
BRIAN M. BUROKER
ILISSA SAMPLIN
ANGELIQUE KAOUNIS
GIBSON, DUNN & CRUTCHER LLP


By: */s/ Joshua H. Lerner*
    Joshua H. Lerner

*Attorneys for Defendant Apple Inc.*

Gibson, Dunn &
Crutcher LLP

MEMO. ISO APPLE'S MOT. TO DISMISS THE
THIRTEENTH CAUSE OF ACTION IN THE FAC

26

CASE NO. 8:20-cv-00048-JVS (JDEx)

Exhibit 3
-84-

# EXHIBIT 4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| MASIMO CORPORATION, a Delaware corporation; and CERCACOR LABORATORIES, INC., a Delaware corporation<br><br>Plaintiffs,<br><br>v.<br><br>APPLE INC., a California corporation<br><br>Defendant. | Case No. 8:20-cv-00048-JVS-JDE<br><br>Hon. James V. Selna<br>Magistrate Judge John D. Early<br><br>**ORDER GRANTING PLAINTIFFS' RENEWED *EX PARTE* APPLICATION FOR AN ORDER REQUIRING APPLE TO COMPLY WITH THE SCHEDULING ORDER**<br><br>Discovery Cut-Off:       7/5/2021<br>Pre-Trial Conference:  3/21/2022<br>Trial:                          4/5/2022 |

**Exhibit 4**
**-85-**

1    Having considered Plaintiffs' Renewed *Ex Parte* Application for an Order
2    Requiring Apple to Comply with the Scheduling Order, all the papers filed in
3    support thereof, all papers in opposition thereto, nd finding good cause, the
4    Court hereby GRANTS Plaintiffs' application as follows:

5    1.    Apple must produce core technical documents sufficient to show
6          the operation of the Accused Products, including source code,
7          within five (5) days of this Order;

8    2.    The Court rejects Apple's attempt to condition document
9          productions on an "ethical wall";

10   3.    Plaintiffs deadline for "Infringement Contentions (Patent L.R. 3-1
11         and 3-2)" is extended until forty-two (42) days after Apple
12         completes its production of core technical documents; and

13   4.    Should Plaintiffs dispute the sufficiency of Apple's core technical
14         document production, the parties shall present the dispute to this
15         Court on an *ex parte* basis, and Plaintiffs' deadline to present
16         infringement contentions will be tolled until forty-two (42) days
17         after the matter is resolved.

18

19

20

21

22

23

24

25

26

27

28

-1-

**Exhibit 4**
**-86-**

1    This issue has been litigated multiple times, and Apple has not prevailed.
2  Now is the time for Apple to act: The Court expects prompt and full
3  compliance.   Any further recalcitrance on Apple's part will likely draw an
4  application for contempt or sanctions under 28 U.S.C. § 1927 or an invitation
5  from the Court to seek such relief.

6

7    **IT IS SO ORDERED.**

8

9  DATED: July 29, 2020                    _____
10                                         The Honorable James V. Selna
11                                         United States District Judge

-2-

**Exhibit 4**
**-87-**

# EXHIBIT 5

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 8:20-cv-00048-JVS (JDEx) | Date | June 15, 2020 |
|---|---|---|---|
| Title | Masimo Corporation, et al. v. Apple Inc. | | |

| Present: The Honorable | John D. Early, United States Magistrate Judge |
|---|---|

| Maria Barr | n/a |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |

| Attorneys Present for Plaintiff(s): | Attorneys Present for Defendant(s): |
|---|---|
| n/a | n/a |

**Proceedings:**       Order Denying Defendant's Motion for Protective Order (Dkt. 43)

## I.
## INTRODUCTION

Plaintiffs Masimo Corporation and Cercacor Laboratories, Inc. (collectively, "Plaintiffs") filed their original complaint in this Action against Defendant Apple Inc. ("Apple" or "Defendant") on January 9, 2020. See Dkt. 1. On March 25, 2020, Plaintiffs filed the operative First Amended Complaint, alleging: (1) patent infringement (12 counts); (2) trade secret misappropriation under California Uniform Trade Secrets Act ("CUTSA") Cal. Civ. Code §§ 3426 et seq.; (3) correction of inventorship (five counts); and (4) declaratory relief (six counts). See Dkt. 28 ("FAC") at 11-89. On April 17, 2020, the Honorable James V. Selna, United States District Judge, issued an "Order Re Scheduling Dates" ("Scheduling Order"), adopting "the patent specific dates" provided by the parties in their Rule 26(f) Joint Report and staying "the trade secret discovery only pending compliance with [California Code of Civil Procedure Section] 2019.210." Dkt. 37.

On April 30, 2020, Defendant filed a Motion for Protective Order (Dkt. 43, "Motion")[1], with an accompanying Local Rule 37 Joint Stipulation (Dkt. 43-1, "Joint

---

[1] The Court declines Plaintiff's invitation to strike Defendant's Notice of Motion (Dkt. 48 at 1-2) but directs Defendant to avoid excessively argumentative notices of motion, which per Local Rule 7-4, should, other than containing the caption, title, date and time for hearing, and the name of the judicial officer hearing the motion, only contain a "concise statement of the relief of Court action the movant seeks." The limitation is particularly important in a motion under Local Rule 37-2, which contains detailed procedures for the presentation of the parties' respective arguments.

**Exhibit 5**
**-88-**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 8:20-cv-00048-JVS (JDEx) | Date | June 15, 2020 |
|---|---|---|---|
| Title | Masimo Corporation, et al. v. Apple Inc. | | |

Stipulation" or "Jt. Stip.") and supporting and opposing declarations (Dkt. 43-3, 43-4). On May 7, 2020, each party separately filed a Supplemental Memorandum in support of or in opposition to the Motion. See Dkt. 44, 46. Plaintiffs also filed a declaration and exhibits in support of their Supplemental Memorandum. See Dkt. 45, 45-1 to 45-11.

The Motion seeks a protective order directing that Defendant need not respond to requests for production numbers 5 to 25 ("RFP Nos. 5-25") of Plaintiffs' First Set of Requests for Production of Documents ("RFP") until Plaintiffs "describe their trade secrets with reasonable particularity consistent with California Code of Civil Procedure Section 2019.210" ("Section 2019.210"). Jt. Stip. at 1. A protective order is necessary, Defendant argues, because RFP Nos. 5-25 seek information that is "identical to the information Plaintiffs allege as their trade secrets," and Section 2019.210 "unequivocally bars discovery relating to the alleged trade secrets until Plaintiffs describe their alleged secrets." Dkt. 46 at 1 (emphasis omitted). Without a protective order, Defendant argues that Plaintiffs would be permitted "to parse through Apple's confidential information—and claim it as their own trade secrets—before Plaintiffs describe a single one of their trade secrets," thereby "erod[ing] the policies promoted by Section 2019.210." Id.

In opposition, Plaintiffs contend the Motion "is moot because Judge Selna already decided the issues raised in [this] Motion" in the Scheduling Order. Jt. Stip. at 3-4. Plaintiffs argue that RFP Nos. 5-25 seek patent discovery, which is not stayed under the Schedule Order. See Jt. Stip. at 4, 36; see also Jt. Stip. at 34 (RFP Nos. 5-25 "seek 'core technical documents' about the 'Accused Products,' which Plaintiffs specifically defined as the products accused of patent infringement." (emphasis omitted)). Plaintiffs also argue that the California courts interpret Section 2019.210 as barring "discovery on other claims only if the claim 'hinges upon the factual allegations that [defendant] misappropriated [plaintiff's] trade secrets,'" a condition that is not present here. Jt. Stip. at 30-31 (quoting Advanced Modular Sputtering, Inc. v. Superior Court, 132 Cal. App. 4th 826, 834 (2005)) (emphasis omitted). Thus, Plaintiffs argue, Defendant "cannot refuse to produce responsive documents by asserting some of the information may also be relevant to the trade secret claim." Jt. Stip. at 37 (emphasis omitted).

After having carefully reviewed the materials set forth above in support of and in opposition to the Motion, for the reasons set forth below, the Court DENIES the Motion.
/ / /
/ / /
/ / /

**Exhibit 5**
**-89-**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 8:20-cv-00048-JVS (JDEx) | Date | June 15, 2020 |
|---|---|---|---|
| Title | Masimo Corporation, et al. v. Apple Inc. | | |

**II.**
**RELEVANT LAW**

**A.   Discovery in General**

"Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. (singularly, "Rule") 26(b)(1). "Information within this scope of discovery need not be admissible in evidence to be discoverable." Id. "Generally, the purpose of discovery is to remove surprise from trial preparation so the parties can obtain evidence necessary to evaluate and resolve their dispute." Duran v. Cisco Sys., Inc., 258 F.R.D. 375, 378 (C.D. Cal. 2009) (citations omitted).

Under Rule 34(a)(1), a party may serve on any other party requests, within the scope of Rule 26(b), to produce or permit inspection of, among other things, "any designated documents or electronically stored information." Such requests "must describe with reasonable particularity each item or category of items to be inspected . . . [and] must specify a reasonable time, place, and manner for the inspection . . . ." Rule 34(b)(1)(A), (B).

**B.   Motions for Protective Order**

"A party or any person from whom discovery is sought may move for a protective order in the court where the action is pending . . . ." Rule 26(c)(1). For "good cause," a court may issue a protective order "to prevent disclosure of materials for many types of information," including "a trade secret or other confidential research, development, or commercial information." Rule 26(c)(1)(G); see also Phillips ex rel. Estates of Byrd v. Gen. Motors Corp., 307 F.3d 1206, 1211 (9th Cir. 2002) (noting that the Supreme Court has interpreted Rule 26(c) "as conferring 'broad discretion on the trial court to decide when a protective order is appropriate and what degree of protection is required.'" (quoting Seattle Times Co. v. Rhinehart, 467 U.S. 20, 36 (1984))).

The party seeking a protective order has the burden of "showing specific prejudice or harm [that] will result if no protective order is granted." Phillips, 307 F.3d at 1210-11. The showing must be "particularized": "Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test." Rivera v. NIBCO, Inc., 364 F.3d 1057, 1063 (9th Cir. 2004) (quoting Phillips, 307 F.3d at 1211); accord

**Exhibit 5**
**-90-**

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 8:20-cv-00048-JVS (JDEx) | Date | June 15, 2020 |
|---|---|---|---|
| Title | Masimo Corporation, et al. v. Apple Inc. | | |

Beckman Indus., Inc. v. Int'l Ins. Co., 966 F.2d 470, 476 (9th Cir. 1992). Moreover, the party seeking the protective order has a "heavy burden" of showing why discovery should be limited. Blankenship v. Hearst Corp., 519 F.2d 418, 429 (9th Cir. 1975); see DIRECTV, Inc. v. Trone, 209 F.R.D. 455, 458 (C.D. Cal. 2002) ("The party who resists discovery has the burden to show that discovery should not be allowed, and has the burden of clarifying, explaining, and supporting its objections." (citing Blankenship, 519 F.2d at 429)); see also La. Pac. Corp. v. Money Mkt. 1 Institutional Inv. Dealer, 285 F.R.D. 481, 485 (N.D. Cal. 2012) (citing DIRECTV, Inc., 209 F.R.D. at 458, for same proposition).

**C.    Scheduling Orders**

Rule 16(b) directs district courts to enter scheduling orders that "limit the time to join other parties, amend the pleadings, complete discovery, and file motions." Rule 16(b)(3)(A). Once issued, a scheduling order may be modified only upon a showing of good cause and with the judge's consent. Rule 16(b)(4); see also Zivkovic v. S. Cal. Edison Co., 302 F.3d 1080, 1087 (9th Cir. 2002) (citing same). As the Ninth Circuit has explained,

> A scheduling order "is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril." [Gestetner Corp. v. Case Equip. Co., 108 F.R.D. 138, 141 (D. Me. 1985)]. The district court's decision to honor the terms of its binding scheduling order does not simply exalt procedural technicalities over the merits of [plaintiff's] case. Disregard of the order would undermine the court's ability to control its docket, disrupt the agreed-upon course of the litigation, and reward the indolent and the cavalier. Rule 16 was drafted to prevent this situation . . . .

Johnson v. Mammoth Recreations, Inc., 975 F.2d 604, 610 (9th Cir. 1992); see also Tessera, Inc. v. Sony Corp., 2013 WL 97794, at *3 (N.D. Cal. Jan. 7, 2013) ("A scheduling order is not a mere suggestion or a trifle that can be disregarded when it becomes inconvenient; it is an order from the court. Just like any other order, the court expects compliance."); L.H. v. Schwarzenegger, 2008 WL 268983, at *6 (E.D. Cal. Jan. 29, 2008) ("Rule 16 and the court's scheduling order are not optional directives; the court is bound by them.").

In addition, this district's Local Rules provide that "[a]ny application to modify an order entered pursuant to [Rule] 16 shall be made to the judicial officer who entered the order." C.D. Cal. R. 16-14. Accordingly, magistrate judges lack authority to deviate from or alter a scheduling order set by a district judge. See Watts v. Allstate Indem. Co., 2012

**Exhibit 5**
**-91-**

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | 8:20-cv-00048-JVS (JDEx) | | Date | June 15, 2020 |
|---|---|---|---|---|
| Title | Masimo Corporation, et al. v. Apple Inc. | | | |

WL 5289314, at *2 (E.D. Cal. Oct. 23, 2012) (magistrate judge does not have authority to amend district judge's scheduling order or to hear untimely discovery disputes); UMG Recordings, Inc. v. Disco Azteca Distribs., Inc., 2006 WL 2034689, at *3 (E.D. Cal. July 18, 2006) ("Of course, the magistrate judge is not empowered to modify the district judge's scheduling order."); see also Hoist Fitness Sys., Inc. v. TuffStuff Fitness Int'l, Inc., 2018 WL 8193374, at *5 n.3 (C.D. Cal. May 14, 2018) (citing Watts, 2012 WL 5289314, at *2, and UMG Recordings, Inc., 2006 WL 2034689, at *3, for same proposition).

**D.**  **Section 2019.210**

Section 2019.210 requires that "[i]n any action alleging the misappropriation of a trade secret under the [California] Uniform Trade Secrets Act . . . , before commencing discovery relating to the trade secret, the party alleging the misappropriation shall identify the trade secret with reasonable particularity . . . ." Cal. Civ. Proc. Code § 2019.210.

When determining a state law claim, federal courts generally apply federal procedural law and the state's substantive law. Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1939); see also Indep. Living Ctr. of S. Cal., Inc. v. Kent, 909 F.3d 272, 283 (9th Cir. 2018) (noting that "the Erie doctrine 'applies irrespective of whether the source of subject matter jurisdiction is diversity or federal question.'" (quoting Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1102 (9th Cir. 2003))). Whether a rule is substantive or procedural "shifts as the legal context changes," and if a state rule conflicts with any applicable federal rule, the federal rule prevails. Hanna v. Plumer, 380 U.S. 460, 471 (1965).

The Ninth Circuit has not decided whether Section 2019.210 must be applied by district courts hearing CUTSA claims, and district courts that have considered the issue have handled the application of Section 2019.210 in various ways. See Conversion Logic, Inc. v. Measured, Inc., 2020 WL 2046391, at *2 (C.D. Cal. Jan. 16, 2020) (noting that the Ninth Circuit has not decided on the issue and outlining the different ways district courts have addressed the issue); E. & J. Gallo Winery v. Instituut Voor Landouw-En Visserijonderzoek, 2018 WL 3062160, at *3 (E.D. Cal. June 19, 2018) ("While the Ninth Circuit has not decided whether Section 2019.210 applies to actions in federal court, district courts within the circuit have reached differing conclusions on the issue." (quoting Social Apps, LLC v. Zynga, Inc., 2012 WL 2203063, at *1 (N.D. Cal. June 14, 2012), and citing Funcat Leisure Craft, Inc. v. Johnson Outdoors, Inc., 2007 WL 273949, at *2 (E.D. Cal. Jan. 29, 2007) (finding Section 2019.210 is a procedural provision and does not supersede the directly conflicting discovery requirements under Rule 26)); Gabriel Techs. Corp. v. Qualcomm Inc., 2012 WL 849167, at *2 (S.D. Cal. Mar. 13, 2012) (finding Section

**Exhibit 5**
**-92-**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 8:20-cv-00048-JVS (JDEx) | | Date | June 15, 2020 |
|---|---|---|---|---|
| Title | Masimo Corporation, et al. v. Apple Inc. | | | |

2019.210 does not conflict with any federal rule and its application avoids undesirable forum shopping); AtPac, Inc. v. Aptitude Sols., Inc., 2010 WL 11571246, at *1 (E.D. Cal. Sept. 22, 2010) (concluding Section 2019.210 is inapplicable in federal trade secret actions); Hilderman v. Enea TekSci, Inc., 2010 WL 143440, at *2 (S.D. Cal. Jan. 8, 2010) (finding Section 2019.210 conflicts with Rule 26); Advante Int'l Corp. v. Mintel Learning Tech., 2006 WL 3371576 (N.D. Cal. Nov. 21, 2006) (declining to decide applicability of Section 2019.210 in federal cases but using it as guide); Excelligence Learning Corp. v. Oriental Trading Co., Inc., 2004 WL 2452834 (N.D. Cal. June 14, 2004) (finding Section 2019.210 non-binding but applying it because there was no parallel trade secret discovery provision in federal discovery rules); Comput. Econs., Inc. v. Gartner Grp., Inc., 50 F. Supp. 2d 980, 988 (S.D. Cal. 1999) (holding Section 2019.210 complements rather than conflicts with federal discovery rules).

Even so, districts courts "possess[ ] inherent powers that are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." Dietz v. Bouldin, 136 S. Ct. 1885, 1891 (2016) (quoting Link v. Wabash R. Co., 370 U.S. 626, 630–631 (1962)); see also Crawford–El v. Britton, 523 U.S. 574, 599 (1998) ("Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly and to dictate the sequence of discovery."); Jardin v. DATAllegro, Inc., 2011 WL 3299395, at *3-4 (S.D. Cal. July 29, 2011) (noting that the district court judge "ordered discovery procedures similar to those" that Section 2019.210 require based on the case's facts and the judge's "responsibility and discretion under the Federal Rules of Civil Procedure," instead of deciding that, legally, Section 2019.210 does not apply).

**III.**
**DISCUSSION**

The Scheduling Order stays "the trade secret discovery only pending compliance with [Section] 2019.210." Plaintiffs argue the stay applies to discovery that is directed "only" to trade secret issues, but dual-purpose discovery with both patent and trade secret aspects is not stayed. Defendant disagrees.

Defendant contends this interpretation of the Scheduling Order—that only discovery exclusively relating to Plaintiffs' trade secret claim is stayed—is "contrary to the plain language of Section 2019.210, which unequivocally bars discovery relating to the alleged trade secrets until Plaintiffs describe their alleged secrets." Dkt. 46 at 1 (emphasis omitted); see also id. at 2-3 (citing Cal. Civ. Proc. Code § 2019.210). In support of this position,

**Exhibit 5**
**-93-**

Case 8:20-cv-00048-JVS-JDE   Document 260-5   Filed 12/30/20   Page 85 of 234   Page ID
#:21132
Case 8:20-cv-00048-JVS-JDE   Document 54   Filed 06/15/20   Page 7 of 9   Page ID #:3741

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 8:20-cv-00048-JVS (JDEx) | Date | June 15, 2020 |
|----------|--------------------------|------|---------------|
| Title | Masimo Corporation, et al. v. Apple Inc. | | |

Defendant notes that this Court, in an unrelated case, "recognized that 'Section 2019.210 does not limit discovery "exclusively" relating to the trade secrets. A request that relates to both trade secret and other issues still "relates to" the trade secret.'" Dkt. 46 at 2 (citing M/A-COM Tech. Sols., Inc. v. Litrinium, Inc., 2019 WL 4284523, at *5 (C.D. Cal. June 11, 2019)) (emphasis omitted). In addition, Defendant states that "Plaintiffs' RFPs use the identical language Plaintiffs use to allege their trade secrets in the FAC." Dkt. 46 at 2. Specifically, "RFPs 12 through 14 seek, in part, 'technical information,' 'design review documents,' 'technical specifications,' 'technical drawings,' 'product briefs,' 'product plans,' 'assembly design' documents, and 'invention disclosures,' which are the exact same categories of information Plaintiffs allege constitute their trade secrets." Id.; see also Jt. Stip. at 7-8 (RFP Nos. 12-14); FAC ¶ 211. According to Defendant, "[t]he information Plaintiffs seek in the RFPs here is identical to the information Plaintiffs allege as their trade secrets, and therefore the discovery is indisputably trade secret related." Dkt. 46 at 1 (emphasis omitted).

"The district court is given broad discretion in supervising the pretrial phase of litigation." Zivkovic v. S. Cal. Edison Co., 302 F.3d 1080, 1087 (9th Cir. 2002). District courts also retain broad discretion in deciding discovery issues and controlling . See Dietz, 136 S. Ct. at 1891; Crawford–El, 523 U.S. at 599. As noted, the Ninth Circuit also has not decided whether Section 2019.210 applies in federal court. However, there are good reasons for applying the general procedures of Section 2019.210 as a guide in cases filed in federal court alleging CUTSA claims. See Advante Int'l Corp., 2006 WL 3371576; see also Jardin, 2011 WL 3299395.

Significantly here, the parties presented many of the same arguments raised in the Joint Stipulation in summary form in their respective portions of their Rule 26 Joint Report to Judge Selna. See Dkt. 33 at 13-20. Having considered those arguments, Judge Selna adopted "the patent specific dates" presented by the parties in the Joint Report, and then, one sentence later, stayed "the trade secret discovery only pending compliance with 2019.210." Dkt. 37. Thus, Judge Selna, having considered the parties' positions, applied the parties agreed-to patent specific procedures, but stayed only the trade secret discovery. The word "only," which follows the phrase "the trade secret discovery," appears to reflect an intent to stay trade secret discovery "only," but permit discovery on the patent claims to proceed. Applying a contrary interpretation, that the word "only" refers to the time the "stay" should last, that is, "only" until Plaintiff complies with 2019.210, would render the word "only" superfluous. That is, the sentence "The Court stays the trade secret discovery only pending compliance with 2019.210" would mean the same thing as "The Court stays

**Exhibit 5
-94-**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 8:20-cv-00048-JVS (JDEx) | Date | June 15, 2020 |
|----------|--------------------------|------|---------------|
| Title | Masimo Corporation, et al. v. Apple Inc. | | |

the trade secret discovery pending compliance with 2019.210" if the word "only" modifies "pending compliance" rather than "trade secret discovery."

Courts should avoid interpretations that render a term superfluous. See A. Scalia & B. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 174 (2012) ("If possible, every word and every provision is to be given effect (*verba cum effectu sunt accipienda*)" (footnote omitted), noting that "[s]ometimes lawyers will seek to have a crucially important word ignored, such as *only, solely,* or *exclusively* . . ."). The sole interpretation that does not render the word "only" superfluous in the Scheduling Order is an interpretation that "only" limits they type of discovery stayed—trade secret discovery. By staying "only" trade secret discovery, the Scheduling Order, by negative implication, does not stay patent-related discovery, which is subject to the patent-related dates approved in the prior sentence. Regardless of how Section 2019.210 has been applied by California state or other courts, Judge Selna has wide discretion to order pretrial proceeding before him, and the Scheduling Order, binding on this Court and the parties, stays "trade secret discovery only" pending Plaintiff's compliance with Section 2019.210. Discovery that has other purposes is not stayed.

Further, contrary to Defendant's contentions, RFP Nos. 5-25 do not all appear to seek information "identical to the information Plaintiffs allege as their trade secrets." Dkt. 46 at 1. Based on the Court's review, out of the 21 RFPs at issue, only four—RFP Nos. 8, 12, 13 and 14—seek some of the same categories of information Plaintiffs allege as their trade secrets. See Jt. Stip. at 7-8; FAC ¶ 211. Even then, RFP Nos. 8 and 12-14 do not appear to seek solely information related to Plaintiffs' trade secret claim. Indeed, Plaintiffs argue that these requests relate to their patent infringement claims: RFP Nos. 12 to 14 "seek basic technical information about the structure and operation of the Accused Products," and RFP No. 8 seeks information pertaining to "Apple's public assertions about the functionality of its products (including comparisons to other products)," which is "relevant to patent issues, including infringement." Jt. Stip. at 34. Apple itself concedes that RFP Nos. 5-25 "may 'concern the asserted patents and technical information about the products accused of patent infringement' as Plaintiffs contend. . . ." Dkt. 33 at 7.

At most, some of RFP Nos. 5-25 may seek documents that overlap with Plaintiffs' trade secret claims. It cannot be said that RFP Nos. 5-25 seek "only" trade secret discovery. In light of Judge Selna's order, which, immediately after approving the patent-specific deadlines approved by the parties, stays "trade secret discovery only" pending Plaintiff's

**Exhibit 5**
**-95-**

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 8:20-cv-00048-JVS (JDEx) | Date | June 15, 2020 |
|---|---|---|---|
| Title | Masimo Corporation, et al. v. Apple Inc. | | |

compliance with Section 2019.210, Defendant has not met has not met its "heavy" burden in seeking a protective order to stay RFP Nos. 5-25. Accordingly, the Motion is denied.

## IV.
## CONCLUSION

For the foregoing reasons, the Motion (Dkt. 43) is DENIED.

IT IS SO ORDERED.

Initials of Clerk:    mba

**Exhibit 5**
**-96-**

# EXHIBIT 6

# DENIED
### BY ORDER OF THE COURT

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**
**SOUTHERN DIVISION**

| | |
|---|---|
| MASIMO CORPORATION, a Delaware corporation; and CERCACOR LABORATORIES, INC., a Delaware corporation, <br><br> Plaintiffs, <br><br> v. <br><br> APPLE INC., a California corporation, <br><br> Defendant. | CASE NO. 8:20-cv-00048-JVS (JDEx) <br><br> **[PROPOSED] ORDER GRANTING APPLE INC.'S *EX PARTE* APPLICATION FOR AN ORDER STAYING MAGISTRATE JUDGE EARLY'S JUNE 15, 2020 ORDER UNTIL THE HEARING ON JULY 20, 2020** <br><br> Hon. James V. Selna <br> No Hearing Noticed |

**Exhibit 6**
**-97-**

1   This matter is before the Court pursuant to Defendant Apple Inc.'s *Ex Parte*

2 Application for an Order Staying Magistrate Judge Early's June 15, 2020 Order until

3 the Hearing on July 20, 2020 ("*Ex Parte* Application"), under Local Rule 7-19.

4   Having considered the documents filed in support of and in opposition to the *Ex*

5 *Parte* Application, the argument of counsel, the pleadings on file in this action, and all

6 other matters properly before the Court, being fully advised on the proceedings, and

7 for good cause appearing:

8   IT IS HEREBY ORDERED that Defendant Apple Inc.'s *Ex Parte* Application is

9 GRANTED.  Enforcement of Magistrate Judge Early's June 15, 2020 Order Denying

10 Apple's Motion for a Protective Order Barring Trade Secret-Related Discovery Absent

11 a Trade Secret Identification (Dkt. No. 54) is STAYED pending the hearing before the

12 Court on Apple's Motion for Review of and Objections to Magistrate Judge Early's

13 Order (Dkt. No. 57), which is scheduled for July 20, 2020.

14

15   **IT IS SO ORDERED.**    **<span style="color:red">DENIED</span>**

16           BY ORDER OF THE COURT

17 Dated: 7/13/20

18          The Honorable James V. Selna
           United States District Judge

19

20

21

22

23

24

25

26

27

28

---

[PROPOSED] ORDER GRANTING APPLE INC.'S *EX PARTE* APPLICATION FOR AN ORDER STAYING
MAGISTRATE JUDGE EARLY'S JUNE 15, 2020 ORDER UNTIL THE HEARING ON JULY 20, 2020
CASE NO. 8:20-CV-00048-JVS (JDEX)

**Exhibit 6**
**-98-**

# EXHIBIT 7

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   SACV 20-48 JVS (JDEx)                      Date   July 14, 2020

Title   **Masimo Corporation et al v. Apple Inc.**

Present: The        **James V. Selna, U.S. District Court Judge**
Honorable

| Lisa Bredahl | Not Present |
|---|---|
| Deputy Clerk | Court Reporter |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| Not Present | Not Present |

**Proceedings:   [IN CHAMBERS] Order Regarding Motion for Review of and
Objections to Magistrate Judge's Order**

Defendant Apple Inc. ("Apple") moved to reverse Magistrate Judge Early's June
15, 2020 Order denying its motion for a protective order. Mot., Dkt. No. 57. Plaintiffs
Masimo Corporation ("Masimo") and Cercacor Laboratories, Inc. ("Cercacor")
(together, "Plaintiffs") opposed. Opp'n, Dkt. No. 64. Apple replied. Reply, Dkt. No.
71.

For the following reasons, the Court **DENIES** the motion.

**I. BACKGROUND**

Plaintiffs filed their Complaint against Apple on January 9, 2020. Dkt. No. 1. On
March 25, 2020, Plaintiffs filed the operative First Amended Complaint ("FAC"),
alleging patent infringement, trade secret misappropriation under the California Uniform
Trade Secrets Act ("CUTSA") Cal. Civ. Code §§ 3426 et seq., correction of inventorship,
and declaratory relief. See generally, FAC, Dkt. No. 28.

On March 16, 2020, Plaintiffs served their First Set of Requests for Production
("RFPs"), which included 25 RFPs. Declaration of Stephen Larson ("Larson Decl."),
Dkt. No. 65, Ex. 1.

On April 14, 2020, the parties filed a Joint Rule 26(f) Report. Dkt. No. 33.

On April 17, 2020, this Court issued a Scheduling Order "adopt[ing] the patent
specific dates" provided by the parties in their Rule 26(f) Joint Report and *stay[ing] the*

**Exhibit 7
-99-**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SACV 20-48 JVS (JDEx) | Date | July 14, 2020 |
|---|---|---|---|

| Title | **Masimo Corporation et al v. Apple Inc.** |
|---|---|

*trade secret discovery only* pending compliance with [California Code of Civil Procedure Section] 2019.210." Dkt. No. 37 (emphasis added).

On April 30, 2020, Apple filed a motion for a protective order. Dkt. No. 43. Apple sought a protective order directing that it need not respond to RFP Nos. 5-25 until Plaintiffs "describe their trade secrets with reasonable particularity consistent with California Code of Civil Procedure Section 2019.210" ("Section 2019.210"). Dkt. No. 43-1 ("Jt. Stip.") at 1. A protective order is necessary, Apple argued, because RFP Nos. 5-25 seek information that is "identical to the information Plaintiffs allege as their trade secrets," and Section 2019.210 "unequivocally bars discovery relating to the alleged trade secrets until Plaintiffs describe their alleged secrets." Dkt. No. 46 at 1 (emphasis omitted). Without a protective order, Apple contended that Plaintiffs would be permitted "to parse through Apple's confidential information—and claim it as their own trade secrets—before Plaintiffs describe a single one of their trade secrets," thereby "erod[ing] the policies promoted by Section 2019.210." Id.

Plaintiffs argued that RFP Nos. 5-25 seek patent discovery, which is not stayed under the Scheduling Order. See Jt. Stip. at 4, 36; see also Jt. Stip. at 34. Plaintiffs also argued that California courts interpret Section 2019.210 as barring "discovery on other claims only if the claim 'hinges upon the factual allegations that [defendant] misappropriated [plaintiff's] trade secrets.'" Jt. Stip. at 30-31 (quoting Advanced Modular Sputtering, Inc. v. Superior Court, 132 Cal. App. 4th 826, 834 (2005)) (emphasis omitted). Therefore, Plaintiffs argued, Apple "cannot refuse to produce responsive documents by asserting some of the information may also be relevant to the trade secret claim." Jt. Stip. at 37 (emphasis omitted).

On June 15, 2020, Magistrate Judge Early denied Apple's motion for a protective order. Order, Dkt. No. 54. Now, Apple requests that this Court reverse Judge Early's Order. See generally, Mot. Apple further requests that the Court order Plaintiffs to promptly describe their purported trade secrets in compliance with Section 2019.210. See id.

## II.  LEGAL STANDARD

**Exhibit 7**
**-100-**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SACV 20-48 JVS (JDEx) | Date | July 14, 2020 |
|---|---|---|---|

| Title | **Masimo Corporation et al v. Apple Inc.** |
|---|---|

A magistrate may issue non-dispositive rulings on pre-trial discovery matters. 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a); L.R. 72-2.1.  On a motion to review, a district court may set aside or modify these rulings only when the rulings are "clearly erroneous or contrary to law."  28 U.S.C. § 636(b)(1)(A).  The clearly erroneous standard applies to a magistrate's factual findings, and the contrary to law standard applies to the magistrate's legal conclusions.  See Crispin v. Christian Audigier, Inc., 717 F. Supp. 2d 965, 970–71 (C.D. Cal. 2010).  The clearly erroneous standard is "significantly deferential, requiring a definite and firm conviction that a mistake has been committed." Id. at 971 (internal quotations and citations omitted).  "By contrast, [t]he contrary to law standard . . . permits independent review of purely legal determinations by the magistrate judge."  Id. (internal quotations and citations omitted).  Courts have interpreted this standard "to provide for de novo review by the district court on issues of law." Med. Imaging Centers of Am., Inc. v. Lichtenstein, 917 F. Supp. 717, 719 (S.D. Cal. 1996). "A decision is contrary to law if it applies an incorrect legal standard or fails to consider an element of the applicable standard."  Forouhar v. Asa, No. C 10–3623 SBA, 2011 WL 4080862, at *1 (N.D. Cal. Sept. 13, 2011) (internal quotation marks and citations omitted).

### III. DISCUSSION

Section 2019.210 requires that "[i]n any action alleging the misappropriation of a trade secret under the [California] Uniform Trade Secrets Act . . . , before commencing discovery *relating* to the trade secret, the party alleging the misappropriation shall identify the trade secret with reasonable particularity . . . ." Cal. Civ. Proc. Code § 2019.210 (emphasis added).

In his Order, Magistrate Judge Early reasoned that this Court stayed discovery pertaining the Plaintiffs' trade secret claims, but did not stay discovery regarding Plaintiffs' patent claims.  Order at 7-8.  Judge Early found that RFP Nos. 5-25 did not seek information that was identical to the information Plaintiffs allege as their trade secrets; at most, four of the RFPs seek some of the same categories of information relevant to the trade secrets.  Id. at 8.  Accordingly, Judge Early concluded that Apple had not met its burden in seeking a protective order to stay RFP Nos. 5-25, and denied Apple's motion for a protective order.  Id. at 9.

Now, Apple contends that Judge Early's Order is inconsistent with the text and

**Exhibit 7
-101-**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | SACV 20-48 JVS (JDEx) | Date | July 14, 2020 |

| | |
|---|---|
| Title | **Masimo Corporation et al v. Apple Inc.** |

purpose of Section 2019.210.  Mot. at 6-13.  According to Apple, the Order allows Plaintiffs "to take any discovery they wish relating to the alleged trade secrets without providing a Section 2019.210 statement merely by claiming that the discovery relates to another claim, like the patent infringement claims . . . ."  Id. at 7.  Apple claims that Judge Early should have read the Scheduling Order to state that the stay applies to trade secret-*related* discovery, so as to not conflict with Section 2019.210.  Id. at 8.  And, Apples compares the wording of the RFPs at issue with the wording of the categories of information Plaintiffs allege comprise their trade secrets in their FAC to argue that "Plaintiffs' alleged trades secrets relate to the very same subject matter as their asserted patents."  Id. at 12.

The Court finds that Judge Early's Order was not contrary to law and correctly interpreted the Scheduling Order, which stayed only trade secret discovery pending Plaintiffs' compliance with Section 2019.210.  It did not stay discovery related to Plaintiffs' patent claims.   Apple asserted in the Rule 26(f) Report that "[a]ny discovery-related dates that [it] proposes . . . are subject to Plaintiffs providing an adequate identification of their alleged trade secrets in compliance with Section 2019.210 insofar as such an identification is a prerequisite to such discovery."  Dkt. No. 33 at 26, n.6.  The Court reviewed the Joint Report and rejected this argument that patent discovery was contingent on Plaintiffs' compliance with Section 2019.210.  Plaintiffs' patent claims are separate from the trade secret claims.  See, e.g., Space Data Corp. v. X, 2017 WL 3007078, *4 (N.D. Cal. July 14, 2017).  And Judge Early's finding that at most, "only four" of the 21 RFPs at issue arguably seek "some of the same categories of information" relevant to Plaintiffs' trade secrets was well-supported by the content of the RFPs.  Accordingly, the Court declines to reverse Judge Early's Order.

**IV.  CONCLUSION**

For the foregoing reasons, the Court **DENIES** the motion.  The Court finds that oral argument would not be helpful in this matter and **vacates** the July 20, 2020 hearing.  Fed. R. Civ. P. 78; L.R. 7-15.

**IT IS SO ORDERED.**

**Exhibit 7**
**-102-**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   SACV 20-48 JVS (JDEx)                     Date   July 14, 2020

Title      **Masimo Corporation et al v. Apple Inc.**

                                                    :          0

                              Initials of Preparer        lmb

**Exhibit 7
-103-**

# EXHIBIT 8

1

1

2

3

4                   UNITED STATES DISTRICT COURT

5                 CENTRAL DISTRICT OF CALIFORNIA

6                        SOUTHERN DIVISION

7                           –  –  –

8        THE HONORABLE JAMES V. SELNA, JUDGE PRESIDING

9

10          MASIMO CORPORATION, et al.,    )
                             Plaintiffs, )
11             vs.                         )
                                           )  SACV–20–00048–JVS
            APPLE, INC.,                   )
12                           Defendant.  )
            ––––––––––––––––––––––––––––––)

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                  Santa Ana, California

17                    July 10, 2020

18

19                      SHARON A. SEFFENS, RPR
                        United States Courthouse
20                      411 West 4th Street, Suite 1–1053
                        Santa Ana, CA  92701
21                      (714) 543–0870

22

23

24

25

           SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

Exhibit 8
-104-

2

```
 1   APPEARANCES OF COUNSEL:

 2   For the Plaintiffs:

 3   JOSEPH R. RE
     STEPHEN JENSEN
 4   KNOBBE MARTENS
     2040 Main Street, 14th Floor
 5   Irvine, CA  92614
     (949) 760-0404
 6
     For the Defendant:
 7
     H. MARK LYON
 8   JOSHUA LERNER
     BRIAN ROSENTHAL
 9   GIBSON DUNN & CRUTCHER, LLP
     1881 Page Mill Road
10   Palo Alto, CA  93403-1211
     (650) 849-5307
11
     JOSHUA LERNER
12   GIBSON DUNN & CRUTCHER, LLP
     555 Mission Street, Suite 3000
13   San Francisco, CA  94105-0921
     (415) 393-8254
14
     BRIAN ROSENTHAL
15   GIBSON DUNN & CRUTCHER, LLP
     200 Park Avenue
16   New York, NY  10166-0193
     (212) 351-2339
17

18

19

20

21

22

23

24
11:46
25
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

Exhibit 8
-105-

3

|       |     |                                                                      |
|-------|-----|----------------------------------------------------------------------|
|       | 1   | SANTA ANA, CALIFORNIA; FRIDAY, JULY 10, 2020; 2:58 P.M.               |
| 02:58 | 2   | (Per telephonic conference)                                          |
| 02:58 | 3   | THE CLERK:  Calling Item No. 1, SACV-20-00048-JVS,                    |
| 02:58 | 4   | Masimo Corporation versus Apple, Inc.                                |
| 02:58 | 5   | Appearances on behalf of the plaintiff, please.                      |
| 02:58 | 6   | MR. RE:  Thank you.  Good afternoon, Your Honor,                      |
| 02:58 | 7   | this is Joseph Re of Knobbe Martens on behalf of Masimo               |
| 02:58 | 8   | Corporation, and with me is my partner Stephen Jensen.               |
| 02:58 | 9   | THE CLERK:  And on behalf of the defendants,                          |
| 02:58 | 10  | please.                                                              |
| 02:58 | 11  | MR. LYON:  Good afternoon, Your Honor.  It's Mark                     |
| 02:58 | 12  | Lyon on behalf of Apple, and with me is Joshua Lerner, and           |
| 02:58 | 13  | Brian Rosenthal.                                                     |
| 02:58 | 14  | THE COURT:  Good afternoon.                                          |
| 02:58 | 15  | Thank you for your joint report that you filed                       |
| 02:58 | 16  | last week.  Let me share my thoughts with you, and then I'd          |
| 02:59 | 17  | be happy to hear you.                                                |
| 02:59 | 18  | I believe it's fundamentally unfair to the parties                   |
| 02:59 | 19  | and inefficient to require reduction of the number of claims         |
| 02:59 | 20  | for prior art references prior to the full disclosure of the         |
| 02:59 | 21  | infringement contentions and the invalidity contentions.            |
| 02:59 | 22  | Let me give you an example of the poker world.  Suppose              |
| 02:59 | 23  | Masimo has a claim that it would evaluate as a for basis,             |
| 02:59 | 24  | but when Apple makes its invalidity disclosures, it comes up         |
| 02:59 | 25  | with prior art that would amount to Royal Fresh.  It's               |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**Exhibit 8**
**-106-**

4

| | | |
|---|---|---|
| 02:59 | 1 | better for Masimo to designate a claim in light of prior art |
| 02:59 | 2 | demonstrating it wasn't viable. |
| 03:00 | 3 | So my thought is that the initial round of |
| 03:00 | 4 | disclosures ought to come after the parties have made their |
| 03:00 | 5 | invalidity disclosures and their prior art disclosures.  The |
| 03:00 | 6 | date for invalidity contentions is 9/7.  What I would |
| 03:00 | 7 | propose is that within two weeks of that date, the parties |
| 03:00 | 8 | present me with a proposal for an initial reduction of |
| 03:00 | 9 | claims and prior art references that would contemplate |
| 03:00 | 10 | actual disclosure of those reductions within 30 days of the |
| 03:00 | 11 | Court adopting a specific proposal.  I would then |
| 03:00 | 12 | contemplate that there would be a further reduction after |
| 03:00 | 13 | the Markman hearing, and I would leave to your discretion |
| 03:00 | 14 | the time for final disclosure as to what we go to trial on. |
| 03:01 | 15 | I think that may require some adjustments to |
| 03:01 | 16 | events leading to the Markman hearing.  If the invalidity |
| 03:01 | 17 | contentions come in on 9/7, the parties' exchange of |
| 03:01 | 18 | proposed claim terms is 9/21.  I don't think that gives you |
| 03:01 | 19 | enough time to reflect on both sides' disclosures, come up |
| 03:01 | 20 | with your proposal, and then for narrowing selections of |
| 03:01 | 21 | claims and prior art references. |
| 03:01 | 22 | So I think that the dates between the exchange of |
| 03:01 | 23 | claim terms and the Markman hearing need to be adjusted to |
| 03:01 | 24 | accommodate the disclosures pursuant to whatever proposal I |
| 03:01 | 25 | adopt for the disclosures following the invalidity and the |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**Exhibit 8**
**-107-**

5

| 03:01 | 1 | infringement contentions and the Markman hearing.  I'm not |
| 03:02 | 2 | adverse to slipping the Markman hearing a month or six weeks |
| 03:02 | 3 | if that makes sense.  That's in February, and we don't have |
| 03:02 | 4 | a trial date in 2021. |
| 03:02 | 5 | So those are my general thoughts.  I'll be happy |
| 03:02 | 6 | to hear you. |
| 03:02 | 7 | Let's begin with you, Mr. Re. |
| 03:02 | 8 | MR. RE:  Thank you, Your Honor. |
| 03:02 | 9 | I think we're in complete agreement with |
| 03:02 | 10 | everything you said.  I do think there needs to be an |
| 03:02 | 11 | exchange of information.  I do want to alert the Court that |
| 03:02 | 12 | we are planning on amending our pleading that's set forth in |
| 03:02 | 13 | the Court's order regarding the Motion to Dismiss.  In fact, |
| 03:02 | 14 | we will be substituting out some patents, so there needs to |
| 03:02 | 15 | be some more time for the parties to fully evaluate the |
| 03:02 | 16 | claims. |
| 03:02 | 17 | And, yes, we have not yet received the other |
| 03:02 | 18 | party's technical documents which were due back in June, and |
| 03:02 | 19 | that we of course need before we do our contentions.  But we |
| 03:02 | 20 | agree with everything you said, and I think the parties will |
| 03:03 | 21 | work it out and will come up with a proposal for this by |
| 03:03 | 22 | September 21 as you indicated. |
| 03:03 | 23 | THE COURT:  Mr. Lyon. |
| 03:03 | 24 | MR. LYON:  Thank you, Your Honor. |
| 03:03 | 25 | Just a couple points.  Let me just raise a |

**Exhibit 8**
**-108-**

6

| | | |
|---|---|---|
| 03:03 | 1 | concern, and you may have already considered this, but let |
| 03:03 | 2 | me at least just throw it out there so that we can have a |
| 03:03 | 3 | discussion if it's helpful.  The one thing I would say with |
| 03:03 | 4 | not putting in some kind of target limits at this point is |
| 03:03 | 5 | that you end up with potentially hundreds of claims that |
| 03:03 | 6 | both parties are going to be charting, that they're going to |
| 03:03 | 7 | be discussing and potentially arguing over as far as what |
| 03:03 | 8 | claim terms might be involved. |
| 03:03 | 9 | That is not a trivial aspect.  I mean, that's |
| 03:03 | 10 | something where some of these -- I'm sure you've seen them. |
| 03:03 | 11 | Some of these claim charts can wind up being hundreds or |
| 03:03 | 12 | thousands of pages long, which is a very significant effort |
| 03:03 | 13 | to create, even if it is copying and pasting some of the |
| 03:03 | 14 | information because these claims are so related, which still |
| 03:03 | 15 | winds up that somebody has to sit down and analyze each |
| 03:04 | 16 | individual claim to decide whether or not you can simply |
| 03:04 | 17 | copy a paragraph from a different claim or not.  You have to |
| 03:04 | 18 | do that, and then that has to go through whatever levels of |
| 03:04 | 19 | review with the client and with the firm to make sure that |
| 03:04 | 20 | that's okay. |
| 03:04 | 21 | Then to the extent that there's any dispute about |
| 03:04 | 22 | that, instead of having a single claim that the Court is |
| 03:04 | 23 | worrying about, it may end up being 15 or 16 claims, which |
| 03:04 | 24 | the Court would then have to do a similar review to make |
| 03:04 | 25 | sure it all makes sense, and the same argument applies |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**Exhibit 8
-109-**

03:04   1    equally to each of those 15 or 16 claims.

03:04   2              So our view of this would be if we set some

03:04   3    number, and it could be --  we don't think the numbers we

03:04   4    picked are terrible, but if there's a higher number, we

03:04   5    could talk about that.  But pick some target numbers now so

03:04   6    that we can get a bit more reign in on the case before we

03:04   7    get into charting everything with the idea that if there's

03:04   8    reasons to change these things down the road, that's

03:04   9    something that can always be done in good cause.

03:05   10             But it really needs to be done at the stage of

03:05   11   preparing it for Markman, and then have that kind of a

03:05   12   target, sort of like page limits in the brief in a lot of

03:05   13   ways.  If you put these claims and limits on people, they'll

03:05   14   make some hard choices that they otherwise wouldn't make or

03:05   15   -- and that they probably should make, but because of the

03:05   16   fact that they don't have to, everything just gets thrown in

03:05   17   with the kitchen sink.

03:05   18             That's why we were suggesting trying to do

03:05   19   something now.  Then if we need to have some discussions

03:05   20   about whether, you know, it's 50, 40, claims, whatever it is

03:05   21   we pick -- maybe the plaintiffs need a little bit more than

03:05   22   that, maybe another ten or so -- we could have those kinds

03:05   23   of discussions and maybe stipulate to that at the beginning.

03:05   24             This is the first we've heard that they're

03:05   25   planning on changing the patents again, so that's a little

**Exhibit 8
-110-**

8

03:05  1   troubling because we are already very far into the case, and
03:06  2   we're already trying to start gearing up for discovery on
03:06  3   the patents that we have.  But that may also throw a monkey
03:06  4   wrench into not just this but to more parts of the case
03:06  5   schedule if it changes substantially.
03:06  6           THE COURT:  I appreciate the fact that at some
03:06  7   point the parties will have to make hard choices.  I believe
03:06  8   they ought to be able to make fair hard choices.  But if you
03:06  9   want to have further discussions among yourselves and come
03:06  10  to a consensus as to how to do some limits at this time,
03:06  11  that's fine, but I'm not going to impose it.
03:06  12          What I'm going to order is that no later than 9/21
03:06  13  the parties will submit a joint proposal for the initial
03:06  14  round of productions and the number of infringement
03:06  15  contentions and prior art references, and a final proposal
03:06  16  as to what we ought to do following the Markman hearing, and
03:06  17  then what we ought to do as a final third stage in terms of
03:06  18  what we're actually going to go to trial on.
03:07  19          MR. RE:  T?hank you, Your Honor.
03:07  20          May I ask one more question about this, though,
03:07  21  Your Honor?  If we have currently set up infringement
03:07  22  contentions due on July 27, which then triggers our
03:07  23  invalidity contentions on September 7 to trigger off of
03:07  24  those -- if the patents are going to be changing because of
03:07  25  the new pleading, I guess I would want to know when is that

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**Exhibit 8**
**-111-**

03:07  1   going to happen, and are those target changes going to be

03:07  2   reflected in the infringement contentions we are going to

03:07  3   see in July, or is that going to be a completely separate

03:07  4   ball of wax that we have to deal with?

03:07  5          THE COURT:  Well, if Masimo changes the line of

03:07  6   both patents, I would reevaluate the dates for infringement

03:07  7   and invalidity contentions in light of that on a fairly

03:07  8   short ex-parte basis.

03:07  9          Let me circle back to one thing Mr. Re said.  I

03:07  10  don't think that Masimo should be required to make its

03:07  11  infringement contentions until you produce the core

03:08  12  technical information.  I understand that there is presently

03:08  13  in place a protective order to permit that, but to the

03:08  14  extent that production is made, these dates are just going

03:08  15  to drift out there and out there and out there.  And I would

03:08  16  be likely to entertain a motion made to me, not the

03:08  17  magistrate judge, with regard to patent production on the

03:08  18  core confidential information.

03:08  19          MR. LYON:  Your Honor, on that point -- this is

03:08  20  Mark Lyon again, Your Honor.  On that point, we did produce

03:08  21  nonconfidential technical documentation as part of the

03:08  22  schedule, and we're waiting on the protective order which

03:08  23  now is in place.  But as you may know, we filed an objection

03:08  24  to certain orders of Magistrate Early on the staging of

03:08  25  that, which we do hope to have -- because the issue, as you

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

Exhibit 8
-112-

03:08   1   may know, is that there needs to be a 2019 trade secret

03:08   2   statement in place before we can proceed on the trade secret

03:09   3   discovery.

03:09   4           The whole basis for that rule is to really avoid

03:09   5   the situation where plaintiffs get ahold of all these

03:09   6   technical documents and then can hunt and peck and kind of

03:09   7   try to come up with a list of trade secrets that they

03:09   8   otherwise really don't have but that they are trying to

03:09   9   create that way.  That is the whole purpose of being able to

03:09   10  have those trade secrets in before all that technical

03:09   11  information is out.

03:09   12          If that information is provided ahead of getting

03:09   13  those trade secrets, that bell can't be unrung.  That's one

03:09   14  concern, and we actually have that motion in place.  We

03:09   15  understood from yesterday that Masimo was asking us to

03:09   16  produce that information.  The first that they had come back

03:09   17  and talked to us was in an email yesterday asking for that

03:09   18  information immediately, knowing that we had these

03:09   19  objections out there.  We may need to actually file some

03:09   20  type of an ex-parte application, if necessary, to seek

03:09   21  relief on that so we can get that issue decided first, if

03:09   22  possible.

03:10   23          I don't know, Mr. Lerner, if you want to say

03:10   24  anything more on that.  Please feel free.

03:10   25          MR. LERNER:  First of all, thank you for having

03:10   1   this hearing by telephone, Your Honor.  We know during these

03:10   2   times it's busy, and we appreciate the opportunity to be

03:10   3   heard.

03:10   4           Second, I do not believe that anybody can dispute

03:10   5   the point that once these documents are out then you have

03:10   6   the issue that is raised by every case on point, which is,

03:10   7   one can make vague trade secret allegations and then claim

03:10   8   Apple's valuable confidential information based on years of

03:10   9   hard work on this product as their own.  That simply cannot

03:10   10  be undone once these documents are produced, and it leads to

03:10   11  all kinds of issues.

03:10   12          I think the two most relevant here are that what,

03:10   13  for example, do you do with the people that are going to

03:10   14  work on the trade secret disclosure when first Your Honor

03:11   15  did order compliance with Section 2019.210 many months ago?

03:11   16  What do you do with the lawyers who have seen our

03:11   17  confidential information, but also might want to work on

03:11   18  that disclosure, which does at some point obviously need to

03:11   19  be provided?  Our view, as we briefed, is that it should

03:11   20  have been provided a long time ago.

03:11   21          The other key policy matter here, I think, is that

03:11   22  we would not be having these discussions or these problems

03:11   23  if that disclosure had been provided, because I think the

03:11   24  most basic policy guidance behind the rule is it enables the

03:11   25  Court to determine the proper scope of discovery and whether

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**Exhibit 8
-114-**

03:11   1   or not discovery requests fall within it.  That just can't

03:11   2   be done until they provide this document, which the parties

03:11   3   briefed before the scheduling order, which Your Honor then

03:12   4   ruled on.

03:12   5          So as Mr. Lyon says, if necessary -- in fact,

03:12   6   we're planning on it if necessary to raise it as quickly as

03:12   7   possible now, so that we don't run into this waterfall of

03:12   8   problems that will follow if there's not compliance with

03:12   9   this basic rule.

03:12   10          THE COURT:  I guess I analyze things differently.

03:12   11   If core confidential documents are relevant to the patents,

03:12   12   they should be disclosed now, notwithstanding the fact that

03:12   13   they may overlap the trade secrets case.  We need to go

03:12   14   forward with the patent case.  And if and when there is

03:12   15   adequate disclosure for trade secrets, all other materials

03:12   16   should be produced.  But to the extent the core confidential

03:12   17   technical documents are relevant to the patent case, they

03:12   18   should be disclosed now and in advance of Masimo having to

03:12   19   identify which claims it wants to proceed on.

03:13   20          MR. LERNER:  If I may just very briefly respond to

03:13   21   that, Your Honor.  I understand that Masimo has raised that

03:13   22   argument, but it does render the statute a nullity.

03:13   23   2019.210 expressly states:  "Discovery related to the trade

03:13   24   secrets" -- indeed, in cases before Judge Early before, he

03:13   25   said just because discovery relates to a non-trade secret

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

Exhibit 8
-115-

13

03:13　1　claim it doesn't mean it also doesn't relate to the trade

03:13　2　secret.  Here, there's no dispute -- there can't be any

03:13　3　dispute that discovery on the patent side relates to the

03:13　4　trade secrets.

03:13　5　　　　　So if we're going to do that, it does render the

03:13　6　statute in this instance a nullity, and we will have, I

03:13　7　think, all the problems that follow and are the very basis

03:14　8　for the rule there.  So I think that it is important to

03:14　9　consider both the express language of that statute and then

03:14　10　what's behind it.

03:14　11　　　　　The only other thing I will mention is that every

03:14　12　case that Masimo has cited on this point that involved

03:14　13　parallel claims -- every single one there was a prior trade

03:14　14　secret disclosure.  It's possible that it could have been

03:14　15　amended at some later time, but there was at the very least

03:14　16　some disclosure.

03:14　17　　　　　The only exception I can think of was one where

03:14　18　there was a date certain order, and the plaintiff would have

03:14　19　had to show good cause if they ever wanted to change it

03:14　20　later.  Because without either the disclosure or that date

03:14　21　certain and an order that it can't be changed without good

03:14　22　cause, then we have the very real situation that Masimo can

03:15　23　just look through our confidential information in a case

03:15　24　with a patent thicket and use our confidential information

03:15　25　to try and craft their purported secrets in a way that (a)

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**Exhibit 8
-116-**

14

03:15     1    is allegedly theirs, even though it's based on our

03:15     2    confidential information, but (b) tries to weave around

03:15     3    their many patents so they don't run into the problem that

03:15     4    it's been disclosed.

03:15     5            For those reasons, I think it's in some ways of

03:15     6    critical importance here that we do it.  It's even more

03:15     7    important than I would say in a normal case where there

03:15     8    might not be quite so many patents in the space or so many

03:15     9    allegations that the secrets were allegedly disclosed in the

03:15    10    patents.

03:15    11            THE COURT:  Let's assume Masimo never asserted a

03:15    12    trade secret claim.  The confidential information which

03:15    13    involves the patent claims would be subject to production

03:16    14    whether it was a trade secret or not.  That's what

03:16    15    protective orders are for.

03:16    16            MR. LERNER:  We completely agree with that, Your

03:16    17    Honor.  If there were no trade secret claims in this case,

03:16    18    this would not be a problem.  But every case where there is

03:16    19    a trade secret, given the express language of the statute,

03:16    20    has found that you can't avoid that language.  I'm not aware

03:16    21    of any finding that ignores the language on point.

03:16    22            That's why in all of the cases there was a trade

03:16    23    secret disclosure before you had a ruling that patent

03:16    24    discovery could go forward, or at least as I said, an order

03:16    25    that the trade secret disclosure be produced by a date

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

Exhibit 8
-117-

15

03:16    1    certain along with admonition that the list couldn't change

03:16    2    without good cause.

03:17    3            So, yes, if there were no trade secret claim, then

03:17    4    2019.210 by and large would not come into play.  There are

03:17    5    some cases holding that if it's kind of, you know, a wolf in

03:17    6    sheep's clothing and it's obvious it's coming, then the

03:17    7    Court would say you still have to do the 2019.210

03:17    8    disclosure.

03:17    9            But here we don't have that situation.  This is a

03:17   10    case where they've suggested they have a serious trade

03:17   11    secret claim.  They've never described it with any

03:17   12    specificity whatsoever, even though they allege it has been

03:17   13    disclosed in public patent filings.  One could just say

03:17   14    here's the page and line number.

03:17   15            Not withstanding all of those things, there's no

03:17   16    description in a case that's, you know, roughly seven months

03:17   17    old, and they want this confidential information.  Again,

03:18   18    once that's done, we just cannot undo it, and we'll have I

03:18   19    think unfortunately a lot of unnecessary disputes both about

03:18   20    the scope of discovery, but also what to do about the fact

03:18   21    that you then have lawyers who have seen our secrets

03:18   22    drafting what their alleged secrets are.

03:18   23            THE COURT:  Mr. Re.

03:18   24            MR. RE:  Well, Your Honor, this is at least the

03:18   25    second or third time they've made this argument.  You are

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**Exhibit 8**
**-118-**

16

```
03:18   1   correct.  Our patent case is independent of the trade secret
03:18   2   case.  The case law that we already cited and briefed to
03:18   3   Judge Early on these other motions were breach of contract
03:18   4   cases that were factually dependent on the trade secret
03:18   5   claims.  Our case is not dependent on our trade secret case.
03:18   6   And currently the trade secret case has been dismissed on
03:18   7   their Motion to Dismiss.  It's not even pending before the
03:19   8   Court, and obviously the patent case gets to go forward.
03:19   9           I've never seen such strenuous objections to
03:19  10   producing just the core technical documents in a case.  They
03:19  11   are fighting tooth and nail, and they will keep fighting and
03:19  12   fighting no matter what.  They're going to file more motions
03:19  13   I understand today to prevent the disclosures that were due
03:19  14   back in June.  I think the time has come we move forward now
03:19  15   as the Court has indicated.
03:19  16           THE COURT:  Are you going to replead your trade
03:19  17   secret claim?
03:19  18           MR. RE:  Yes, we are.  We plan on complying with
03:19  19   the 30-day leave to amend date at the end of the month.
03:19  20           THE COURT:  Okay.  Well, I think you have my
03:19  21   general views.  Let's see what motion practice that results
03:19  22   in.
03:19  23           Anything else we should take up today?
03:19  24           MR. RE:  No.  Thank you, Your Honor.
03:20  25           MR. LYON:  Thank you, Your Honor.
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**Exhibit 8**
**-119-**

17

03:20  1            MR. LERNER:  Thank you very much, Your Honor.

03:20  2            THE COURT:  Okay.  Thank you very much.

03:20  3            (Whereupon, the proceedings were concluded.)

03:20  4                        *    *    *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**Exhibit 8**
**-120-**

18

**CERTIFICATE**

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date:  July 20, 2020

/s/   Sharon A. Seffens  7/20/20
_____
SHARON A. SEFFENS, U.S. COURT REPORTER

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

Exhibit 8
-121-

**/s [1]** 18/15

## 0

**0193 [1]** 2/16
**0404 [1]** 2/5
**0870 [1]** 1/21
**0921 [1]** 2/13

## 1

**1-1053 [1]** 1/20
**10 [2]** 1/17 3/1
**10166-0193 [1]** 2/16
**1053 [1]** 1/20
**1211 [1]** 2/10
**14th [1]** 2/4
**15 [2]** 6/23 7/1
**16 [2]** 4/4 4/12
**1881 [1]** 2/9

## 2

**20 [2]** 18/13 18/15
**200 [1]** 2/15
**2019 [1]** 10/1
**2019.210 [4]** 11/15 12/23 15/4 15/7
**2020 [3]** 1/17 3/1 18/13
**2021 [1]** 5/4
**2040 [1]** 2/9
**21 [3]** 4/18 5/22 8/12
**212 [1]** 2/16
**2339 [1]** 2/16
**27 [1]** 8/22
**28 [1]** 18/7
**2:58 [1]** 3/1

## 3

**30 [1]** 4/10
**30-day [1]** 16/19
**3000 [1]** 2/12
**351-2339 [1]** 2/16
**393-8254 [1]** 2/13

## 4

**40 [1]** 7/20
**411 [1]** 1/20
**415 [1]** 2/13
**4th [1]** 1/20

## 5

**50 [1]** 7/20
**5307 [1]** 2/10
**543-0870 [1]** 1/21
**555 [1]** 2/12

## 6

**650 [1]** 2/10

## 7

**7/20/20 [1]** 18/15
**714 [1]** 1/21
**753 [1]** 18/6
**760-0404 [1]** 2/5

## 8

**8254 [1]** 2/13
**849-5307 [1]** 2/10

## 9

**9/21 [2]** 4/18 8/12
**9/7 [2]** 4/6 4/17
**92614 [1]** 2/5
**92701 [1]** 1/20
**93403-1211 [1]** 2/10
**94105-0921 [1]** 2/13
**949 [1]** 2/5

## A

**able [2]** 8/8 16/9
**about [7]** 6/21 6/23 7/5 7/20 8/20 15/19 15/20
**above [1]** 18/9
**above-entitled [1]** 18/9
**accommodate [1]** 4/24
**actual [1]** 4/10
**actually [3]** 8/18 10/14 10/19
**adequate [1]** 12/15
**adjusted [1]** 4/23
**adjustments [1]** 4/15
**admonition [1]** 15/1
**adopt [1]** 4/25
**adopting [1]** 4/11
**advance [1]** 12/18
**adverse [1]** 5/2
**after [2]** 4/4 4/12
**afternoon [3]** 3/6 3/11 3/14
**again [3]** 7/25 9/20 15/17
**ago [2]** 11/15 11/20
**agree [2]** 5/20 14/16
**agreement [1]** 5/9
**ahead [1]** 10/12
**ahold [1]** 10/5
**al [1]** 1/7
**alert [1]** 5/11
**all [9]** 6/25 10/5 10/10 10/25 11/11 12/15 13/7 14/22 15/15
**allegations [2]** 11/7 14/9
**allege [1]** 15/12
**alleged [1]** 15/22
**allegedly [2]** 14/1 14/9
**along [1]** 15/1
**already [4]** 6/1 8/1 8/2 16/2
**also [4]** 8/3 11/17 13/1 15/20
**Alto [1]** 2/10
**always [1]** 7/9
**amend [1]** 16/19
**amended [1]** 13/15
**amending [1]** 5/12
**among [1]** 8/9
**amount [1]** 3/25
**Ana [3]** 1/16 1/20 3/1
**analyze [2]** 6/15 12/10
**another [1]** 7/22
**any [4]** 6/21 13/2 14/21 15/11
**anybody [1]** 14/4
**anything [2]** 10/24 16/23
**APPEARANCES [2]** 2/1 3/5
**APPLE [4]** 1/11 3/4 3/12 3/24
**Apple's [1]** 11/8
**application [1]** 10/20
**applies [1]** 6/25
**appreciate [2]** 8/6 11/2
**are [25]**
**arguing [1]** 6/7
**argument [3]** 6/25 12/22 15/25
**around [1]** 14/2
**art [7]** 3/20 3/25 4/1 4/5 4/9 4/21 8/15
**as [18]** 3/23 4/14 5/22 6/7 8/10 8/16 8/17 9/21 9/23 9/25 11/9 11/19 12/5 12/6 12/6 14/24 16/15
**ask [1]** 8/20
**asking [2]** 10/15 10/17
**aspect [1]** 6/9
**asserted [1]** 14/11
**assume [1]** 14/11
**Avenue [1]** 2/15
**avoid [2]** 10/4 14/20
**aware [1]** 14/20

## B

**back [4]** 5/18 9/9 10/16 16/14
**ball [1]** 9/4

**based [2]** 11/8 14/1
**basic [2]** 11/6 12/3
**basis [4]** 3/23 9/8 10/4 13/7
**be [36]**
**because [8]** 6/14 7/15 8/1 8/24 9/25 11/23 12/25 13/20
**been [6]** 11/20 11/23 13/14 14/4 15/12 16/6
**before [9]** 5/19 7/6 10/2 10/10 12/3 12/24 12/24 14/23 16/7
**begin [1]** 5/7
**beginning [1]** 7/23
**behalf [4]** 3/5 3/7 3/9 3/12
**behind [2]** 11/24 13/10
**being [3]** 6/11 6/23 10/9
**believe [3]** 3/18 8/7 11/4
**bell [1]** 10/13
**better [1]** 4/1
**between [1]** 4/22
**bit [2]** 7/6 7/21
**both [5]** 4/19 6/6 9/6 13/9 15/19
**breach [1]** 16/3
**BRIAN [3]** 2/8 2/14 3/13
**brief [1]** 7/12
**briefed [3]** 11/19 12/3 16/2
**briefly [1]** 12/20
**busy [1]** 11/2

## C

**CA [4]** 1/20 2/5 2/10 2/13
**CALIFORNIA [3]** 1/5 1/16 3/1
**Calling [1]** 3/3
**can [12]** 6/2 6/11 6/16 7/6 7/9 10/2 10/6 10/21 11/4 11/7 13/17 13/22
**can't [5]** 10/13 12/1 13/2 13/21 14/20
**cannot [2]** 11/9 15/18
**case [22]**
**cases [4]** 12/24 14/22 15/5 16/4
**cause [4]** 7/9 13/19 13/22 15/2
**CENTRAL [1]** 1/5
**certain [4]** 9/24 13/18 13/21 15/1
**CERTIFICATE [1]** 18/4
**certify [1]** 18/6
**change [3]** 7/8 13/19 15/1
**changed [1]** 13/21
**changes [3]** 8/5 9/1 9/5
**changing [2]** 7/25 8/24
**charting [2]** 6/6 7/7
**charts [1]** 6/11
**choices [3]** 7/14 8/7 8/8
**circle [1]** 9/9
**cited [2]** 13/12 16/2
**claim [15]** 3/23 4/1 4/18 4/23 6/8 6/11 6/16 6/17 6/22 11/7 13/1 14/12 15/3 15/11 16/17
**claims [15]** 3/19 4/9 4/21 5/16 6/5 6/14 6/23 7/1 7/13 7/20 12/19 13/13 14/13 14/17 16/5
**client [1]** 6/19
**clothing [1]** 15/6
**Code [1]** 18/7
**come [4]** 4/4 4/17 4/19 5/21 8/9 10/7 10/16 15/4 16/14
**comes [1]** 3/24
**coming [1]** 15/6
**complete [1]** 5/9
**completely [2]** 9/3 14/16
**compliance [2]** 11/15 12/8
**complying [1]** 16/18
**concern [2]** 6/1 10/14
**concluded [1]** 17/3
**conference [2]** 3/2 18/11
**confidential [10]** 9/18 11/8 11/17 12/11 12/16 13/23 13/24 14/2 14/12 15/17
**conformance [1]** 18/10
**consensus [1]** 8/10

Exhibit 8
-122-

**C**

consider [1] 13/9
considered [1] 6/1
contemplate [2] 4/9 4/12
contentions [12] 3/21 3/21 4/6 4/17 5/1
5/19 8/15 8/22 8/23 9/2 9/7 9/11
contract [1] 16/3
copy [1] 6/17
copying [1] 6/13
core [5] 9/11 9/18 12/11 12/16 16/10
CORPORATION [3] 1/9 3/4 3/8
correct [2] 16/1 18/8
could [6] 7/3 7/5 7/22 13/14 14/24 15/13
couldn't [1] 15/1
COUNSEL [1] 2/1
couple [1] 5/25
course [1] 5/19
COURT [10] 1/4 4/11 5/11 6/22 6/24
11/25 15/7 16/8 16/15 18/16
Court's [1] 5/13
Courthouse [1] 1/19
craft [1] 13/25
create [2] 6/13 10/9
critical [1] 14/6
CRUTCHER [3] 2/9 2/12 2/15
currently [2] 8/21 16/6

**D**

date [8] 4/6 4/7 5/4 13/18 13/20 14/25
16/19 18/13
dates [3] 4/22 9/6 9/14
day [1] 16/19
days [1] 4/10
deal [1] 9/4
decide [1] 6/16
decided [1] 10/21
Defendant [1] 1/12 2/6
defendants [1] 3/9
demonstrating [1] 4/2
dependent [2] 16/4 16/5
described [1] 15/11
description [1] 15/16
designate [1] 4/1
determine [1] 11/25
did [2] 9/20 11/15
different [1] 6/17
differently [1] 12/10
disclosed [5] 12/12 12/18 14/4 14/9
15/13
disclosure [13] 3/20 4/10 4/14 11/14
11/18 11/23 12/15 13/14 13/16 13/20
14/23 14/25 15/8
disclosures [8] 3/24 4/4 4/5 4/5 4/19
4/24 4/25 16/13
discovery [9] 8/2 10/3 11/25 12/1 12/23
12/25 13/3 14/24 15/20
discretion [1] 4/13
discussing [1] 6/7
discussion [1] 6/3
discussions [4] 7/19 7/23 8/9 11/22
Dismiss [2] 5/13 16/7
dismissed [1] 16/6
dispute [4] 6/21 11/14 13/2 13/3
disputes [1] 15/19
DISTRICT [2] 1/4 1/5
DIVISION [1] 1/6
do [19]
document [1] 12/2
documentation [1] 9/21
documents [7] 5/18 10/6 11/5 11/10
12/11 12/17 16/10
does [3] 11/18 12/22 13/5
doesn't [2] 13/1 13/1
don't [10] 4/18 5/3 7/3 7/16 9/10 10/8
23/12 23/17 14/3 15/9

done [4] 7/9 7/10 12/2 15/18
down [2] 6/25 8/5
drafting [1] 15/22
drift [1] 9/15
due [3] 5/18 8/22 16/13
DUNN [3] 2/9 2/12 2/15
during [1] 11/1

**E**

each [2] 6/15 7/1
Early [3] 9/24 12/24 16/3
effort [1] 6/12
either [1] 13/20
else [1] 16/23
email [1] 10/17
enables [1] 11/24
end [3] 6/5 6/23 16/19
enough [1] 4/19
entertain [1] 9/16
entitled [1] 18/9
equally [1] 7/1
et [1] 1/9
evaluate [2] 3/23 5/15
even [5] 6/13 14/1 14/6 15/12 16/7
events [1] 13/17
ever [1] 13/19
every [4] 11/6 13/11 13/13 14/18
everything [4] 5/10 5/20 7/7 7/16
ex [2] 9/8 10/20
ex-parte [2] 9/8 10/20
example [2] 3/22 11/13
exception [1] 13/17
exchange [3] 4/17 4/22 5/11
express [2] 13/9 14/19
expressly [1] 12/23
extent [3] 6/21 9/14 12/16

**F**

fact [6] 5/13 7/16 8/6 12/5 12/12 15/20
factually [1] 16/4
fair [1] 8/8
fairly [1] 9/7
fall [1] 12/1
far [2] 6/7 8/1
February [1] 3/1
feel [1] 10/24
fighting [3] 16/11 16/11 16/12
file [2] 10/19 16/12
filed [2] 3/15 9/23
filings [1] 15/13
final [3] 4/14 8/15 8/17
finding [1] 14/21
fine [1] 8/11
firm [1] 6/19
first [5] 7/24 10/16 10/21 10/25 11/14
Floor [1] 2/4
follow [2] 12/8 13/7
following [2] 4/25 8/16
foregoing [1] 18/7
format [1] 18/10
forth [1] 5/12
forward [4] 11/2 14/24 16/8 16/14
found [1] 14/20
Francisco [1] 2/13
free [1] 10/24
Fresh [1] 3/25
FRIDAY [1] 3/1
full [1] 3/20
fully [1] 5/15
fundamentally [1] 3/18
further [2] 4/12 8/9

**G**

gearing [1] 8/2
general [2] 5/5 16/21
get [4] 7/6 7/7 10/5 10/21

gets [2] 7/16 16/8
getting [1] 11/24
GIBSON [3] 2/9 2/12 2/15
give [1] 3/22
given [1] 14/19
gives [1] 4/18
go [6] 4/14 6/18 8/18 12/13 14/24 16/8
going [15] 6/6 6/6 8/11 8/12 8/18 8/24
9/1 9/1 9/2 9/3 9/14 11/13 13/5 16/12
16/16
good [7] 3/6 3/11 3/14 7/9 13/19 13/21
15/2
guess [2] 8/25 12/10
guidance [1] 11/24

**H**

had [5] 10/16 10/18 11/23 13/19 14/23
hank [1] 8/19
happen [1] 9/1
happy [2] 3/17 5/5
hard [4] 7/14 8/7 8/8 11/9
has [10] 3/23 6/15 6/18 12/21 13/12
14/20 15/12 16/6 16/14 16/15
have [34]
having [4] 6/22 10/25 11/22 12/18
he [1] 12/24
hear [2] 3/17 5/6
heard [2] 7/24 11/3
hearing [7] 4/13 4/16 4/23 5/1 5/2 8/16
11/1
held [1] 18/9
helpful [1] 6/3
here [5] 11/12 11/21 13/2 14/6 15/9
here's [1] 15/14
hereby [1] 18/6
higher [1] 7/4
holding [1] 15/5
Honor [17] 3/6 3/11 5/8 5/24 8/19 8/21
9/19 9/20 11/1 11/14 12/3 12/21 14/17
15/24 16/24 16/25 17/1
HONORABLE [1] 1/8
hope [1] 9/25
how [1] 8/10
hundreds [2] 6/5 6/11
hunt [1] 10/6

**I**

I'd [1] 3/16
I'll [1] 5/5
I'm [5] 5/1 6/10 8/11 8/12 14/20
I've [1] 16/9
idea [1] 7/7
identify [1] 12/19
ignores [1] 14/21
immediately [1] 10/18
importance [1] 14/6
important [2] 13/8 14/7
impose [1] 8/11
INC [2] 1/11 3/4
indeed [1] 12/24
independent [1] 16/1
indicated [2] 5/22 16/15
individual [1] 6/16
inefficient [1] 3/19
information [15] 5/11 6/14 9/12 9/18
10/11 10/12 10/18 10/18 11/8 11/17
13/23 13/24 14/2 14/12 15/17
infringement [7] 3/21 5/1 8/14 8/21 9/2
9/6 9/11
initial [3] 4/3 4/8 8/13
instance [1] 13/6
instead [1] 6/22
invalidity [8] 3/21 3/24 4/5 4/6 4/16 4/25
8/23 9/7
involved [2] 6/8 13/12
involves [1] 14/13

Exhibit 8
-123-

## I

**Irvine [1]** 2/5
**is [42]**
**issue [3]** 9/25 10/21 11/6
**issues [1]** 11/11
**it [35]**
**it's [15]** 3/11 3/18 3/25 6/3 7/20 11/2
13/14 14/1 14/4 14/5 14/6 15/5 15/6
15/6 16/7
**Item [1]** 3/3
**its [2]** 3/24 9/10

## J

**JAMES [1]** 1/8
**JENSEN [2]** 2/3 3/8
**joint [2]** 3/15 8/13
**JOSEPH [2]** 2/3 3/7
**JOSHUA [3]** 2/8 2/11 3/12
**judge [4]** 1/8 9/17 12/24 16/3
**Judicial [1]** 18/11
**July [5]** 1/17 3/1 8/22 9/3 18/13
**July 27 [1]** 8/22
**June [2]** 5/18 16/14
**just [13]** 5/25 5/25 6/2 7/16 8/4 9/14
12/1 12/20 12/25 13/23 15/13 15/18
16/10
**JVS [2]** 1/11 3/3

## K

**keep [1]** 16/11
**key [1]** 11/21
**kind [4]** 6/4 7/11 10/6 15/5
**kinds [2]** 7/22 11/11
**kitchen [1]** 7/17
**KNOBBE [2]** 2/4 3/7
**know [8]** 7/20 8/25 9/23 10/1 10/23 11/1
15/5 15/16
**knowing [1]** 10/18

## L

**language [4]** 13/9 14/19 14/20 14/21
**large [1]** 15/4
**last [1]** 3/16
**later [3]** 8/12 13/15 13/20
**law [1]** 16/2
**lawyers [1]** 11/16 15/21
**leading [1]** 4/16
**leads [1]** 11/10
**least [4]** 6/2 13/15 14/24 15/24
**leave [2]** 4/13 16/19
**LERNER [4]** 2/8 2/11 3/12 10/23
**let [5]** 3/16 3/22 5/25 6/1 9/9
**Let's [3]** 5/7 14/11 16/21
**levels [1]** 6/18
**light [2]** 4/1 9/7
**like [1]** 7/12
**likely [1]** 9/16
**limits [4]** 6/4 7/12 7/13 8/10
**line [2]** 9/5 15/14
**list [2]** 10/7 15/1
**little [2]** 7/21 7/25
**LLP [3]** 2/9 2/12 2/15
**long [2]** 6/12 11/20
**look [1]** 13/23
**lot [2]** 7/12 15/19
**LYON [5]** 2/7 3/12 5/23 9/20 12/5

## M

**made [4]** 4/4 9/14 9/16 15/25
**magistrate [2]** 9/17 9/24
**Main [1]** 2/4
**make [9]** 6/19 6/24 7/14 7/14 7/15 8/7
8/8 9/10 11/7
**makes [3]** 3/24 5/3 6/25
**many [4]** 11/15 14/3 14/8 14/8

## MARK [3] 2/7 3/19 9/20
**Markman [2]** 10/14 16/23
**MARTENS [2]** 2/4 3/7
**MASIMO [13]** 1/9 3/4 3/7 3/23 4/1 9/5
9/10 10/15 12/18 12/21 13/12 13/22
14/11
**materials [1]** 12/15
**matter [3]** 11/21 16/12 18/9
**may [4]** 4/15 6/1 6/23 8/3 8/20 9/23
10/1 10/19 12/13 12/20
**maybe [3]** 7/21 7/22 7/24
**me [9]** 3/8 3/12 3/16 3/22 4/8 5/25 6/2
9/9 9/16
**mean [2]** 6/9 13/1
**mention [1]** 4/20
**might [3]** 6/8 11/17 14/8
**Mill [1]** 2/9
**Mission [1]** 2/12
**monkey [1]** 8/3
**month [2]** 5/2 16/19
**months [2]** 11/15 15/16
**more [8]** 5/15 7/6 7/21 8/4 8/20 10/24
14/6 16/12
**most [2]** 11/12 11/24
**motion [5]** 5/13 9/16 10/14 16/7 16/21
**motions [2]** 16/3 16/12
**move [1]** 16/14
**Mr [1]** 12/5
**Mr. [5]** 5/7 5/23 9/9 10/23 15/23
**Mr. Lerner [1]** 10/23
**Mr. Lyon [1]** 5/23
**Mr. Re [3]** 5/7 9/9 15/23
**much [2]** 17/1 17/2
**my [5]** 3/8 3/16 4/3 5/5 16/20

## N

**nail [1]** 16/11
**narrowing [1]** 4/20
**necessary [3]** 10/20 12/5 12/6
**need [7]** 4/23 5/19 7/19 7/21 10/19
11/18 12/13
**needs [4]** 5/10 5/14 7/10 10/1
**never [3]** 14/11 15/11 16/9
**new [2]** 2/16 8/25
**no [8]** 3/3 8/12 13/2 14/17 15/3 15/15
16/12 16/24
**non [1]** 12/25
**non-trade [1]** 12/25
**nonconfidential [1]** 9/21
**normal [1]** 14/7
**not [21]**
**notwithstanding [1]** 12/12
**now [7]** 7/5 7/19 9/23 12/7 12/12 12/18
16/14
**nullity [2]** 12/22 13/6
**number [5]** 3/19 7/3 7/4 8/14 15/14
**numbers [2]** 7/3 7/5
**NY [1]** 2/16

## O

**objection [1]** 9/23
**objections [2]** 10/19 16/9
**obvious [1]** 15/6
**obviously [2]** 11/18 16/8
**off [1]** 8/23
**okay [3]** 6/20 16/20 17/2
**old [1]** 15/17
**once [3]** 11/5 11/10 15/18
**one [8]** 6/3 8/20 9/9 10/13 11/7 13/13
13/17 15/13
**only [2]** 13/11 13/17
**opportunity [1]** 7/11
**order [9]** 5/13 8/12 9/13 9/22 11/15 12/3
13/18 13/21 14/24
**orders [2]** 9/24 14/15

## other [5] 5/17 11/21 12/15 13/11 16/3
**otherwise [2]** 8/13 14/5
**ought [4]** 4/4 8/8 8/16 8/17
**our [13]** 5/12 5/19 7/2 8/22 11/6 11/19
13/23 13/24 14/1 15/21 16/1 16/5 16/5
**out [9]** 5/14 5/21 6/2 9/15 9/15 9/15
10/11 10/19 11/5
**over [1]** 6/7
**overlap [1]** 12/13
**own [1]** 11/9

## P

**P.M [1]** 3/1
**page [4]** 2/9 7/12 15/14 18/10
**pages [1]** 6/12
**Palo [1]** 2/10
**paragraph [1]** 6/17
**parallel [1]** 13/13
**Park [1]** 2/15
**part [1]** 9/21
**parte [2]** 9/8 10/20
**parties [9]** 3/18 4/4 4/7 5/15 5/20 6/6 8/7
8/13 12/2
**parties' [1]** 4/17
**partner [1]** 3/8
**parts [1]** 8/4
**party's [1]** 5/18
**pasting [1]** 6/13
**patent [10]** 9/17 12/14 12/17 13/3 13/24
14/13 14/23 15/13 16/1 16/8
**patents [9]** 5/14 7/25 8/3 8/24 9/6 12/11
14/3 14/8 14/10
**peck [1]** 10/6
**pending [1]** 16/7
**people [2]** 7/13 11/13
**Per [1]** 3/2
**permit [1]** 9/13
**pick [2]** 7/5 7/21
**picked [1]** 7/4
**place [4]** 9/13 9/23 10/2 10/14
**plaintiff [2]** 3/5 13/18
**plaintiffs [4]** 1/10 2/2 7/21 10/5
**plan [1]** 16/18
**planning [3]** 5/12 7/25 12/6
**play [1]** 15/4
**pleading [5]** 5/12 8/25
**please [3]** 3/5 3/10 10/24
**point [9]** 6/4 8/7 9/19 9/20 11/5 11/6
11/18 13/12 14/22 14/24
**points [1]** 5/25
**poker [1]** 3/22
**policy [2]** 11/21 11/24
**possible [3]** 10/22 12/7 13/14
**potentially [2]** 6/5 6/7
**practice [1]** 16/21
**preparing [1]** 7/11
**present [1]** 4/8
**presently [1]** 9/12
**PRESIDING [1]** 1/8
**prevent [1]** 16/13
**prior [9]** 3/20 3/20 3/25 4/1 4/5 4/9 4/21
8/15 13/13
**probably [1]** 7/15
**problem [2]** 14/3 14/18
**problems [3]** 11/22 12/8 13/7
**proceed [2]** 10/2 12/19
**proceedings [3]** 1/15 17/3 18/9
**produce [3]** 9/11 9/20 10/16
**produced [3]** 11/10 12/16 14/25
**producing [1]** 16/10
**product [1]** 11/9
**production [3]** 9/14 9/17 14/13
**productions [1]** 8/14
**proper [1]** 11/25
**proposal [7]** 4/8 4/11 4/20 4/24 5/21
8/13 8/15

Exhibit 8
-124-

# EXHIBIT 9

| From: | Samplin, Ilissa |
|---|---|
| To: | Adam.Powell; Mark.Kachner; Masimo.Apple |
| Cc: | Lerner, Joshua H.; Lyon, H. Mark; *** Apple-Masimo |
| Subject: | RE: Masimo v. Apple - Section 2019.210 disclosure and amended interrogatory responses |
| Date: | Friday, July 17, 2020 11:37:29 AM |

Adam,

We obviously disagree with your gross mischaracterization of Apple's position, set forth in the first paragraph of your email below—which is demonstrably wrong based on Apple's production of technical documents to your team less than two hours later.

We also continue to disagree with your incorrect positions on Section 2019.210 and trade secret-related interrogatories.  Plaintiffs should not need to prepare their amended complaint *before* serving a Section 2019.210 disclosure or amended interrogatory responses pertaining to their purported trade secrets because Plaintiffs presumably had a Rule 11 basis for their trade secret allegations when they first asserted them back in January 2020.  In other words, Plaintiffs knew (or should have known) what their alleged trade secrets were back when they first filed this case and therefore should not need to file an amended complaint before they can describe those trade secrets to Apple—in a Section 2019.210 disclosure and amended interrogatory responses that Plaintiffs previously, and repeatedly, agreed to provide once a protective order was entered, and did not make contingent on the earlier-in-time filing of an amended pleading.  Your suggestion that Apple's Motion to Dismiss created this problem is factually incorrect.  Plaintiffs' failure to describe their trade secrets even under Federal Rule of Civil Procedure 8 is, and continues to be, the problem here.  Your two week offer for amended interrogatory responses is *not* "more than diligent" as you contend below, and you have again failed to even commit to a date certain by which you will serve a Section 2019.210-compliant trade secret disclosure.  Please provide a date by which Plaintiffs will serve their Section 2019.210 disclosure; we have been asking for a date for so many months now.

With respect to the ethical wall, are you saying that Plaintiffs intend to review the material Apple produced yesterday without first putting a temporary ethical wall in place?

Apple likewise reserves all rights.

Regards.
Ilissa

**Ilissa Samplin**

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7354 • Fax +1 213.229.6354
ISamplin@gibsondunn.com • www.gibsondunn.com

**From:** Adam.Powell <Adam.Powell@knobbe.com>

**Exhibit 9**
**-125-**

**Sent:** Thursday, July 16, 2020 5:02 PM
**To:** Samplin, Ilissa <ISamplin@gibsondunn.com>; Mark.Kachner <Mark.Kachner@knobbe.com>; Masimo.Apple <Masimo.Apple@knobbe.com>
**Cc:** Lerner, Joshua H. <JLerner@gibsondunn.com>; Lyon, H. Mark <MLyon@gibsondunn.com>; *** Apple-Masimo <Apple-Masimo@gibsondunn.com>
**Subject:** RE: Masimo v. Apple - Section 2019.210 disclosure and amended interrogatory responses

[External Email]
Ilissa,

Your attempt to tie Apple's technical document production to Masimo possibly substituting patents is inconsistent with the facts.  I asked you about the timing of Apple's document production on July 8 and July 9.  You refused to answer.  Masimo did not mention it was considering substituting patents until July 10.  Regardless, as a courtesy, we responded yesterday concerning the possible patent family reduction to focus this case.  Apple's statement that it is now "preparing" its core technical document production demonstrates the extent to which Apple has flouted—and continues to flout—the Court's Scheduling Order.  Apple's statement that it needs more information "before" it produces documents confirms Apple's open contempt for the Court's Order and numerous rulings confirming that Order, which required Apple to produce documents weeks ago.

We disagree with your assertions regarding Section 2019.210 and Plaintiffs' interrogatory responses.  Plaintiffs are in the process of preparing an amended complaint, which will describe Plaintiffs' asserted trade secrets in more detail.  Plaintiffs' amended complaint will be relevant to the scope of trade secret discovery in this case and the Section 2019.210 statement.  Apple's Motion to Dismiss obviously drove that timing.  Moreover, Apple apparently already plans to continue prolonging the pleading stage by filing another motion to dismiss, even though it has not yet seen the amended complaint.  Apple's demand that we provide discovery now, before we amend the complaint, puts the cart before the horse.  It is reasonable for us to amend the complaint first and then update our interrogatories as they relate to the amended complaint.  Our agreement to provide discovery just two weeks after amending the complaint is more than diligent.

As for your request that we enact a temporary "ethical wall," that is another baseless attempt to tie Apple's disclosure of technical documents to Section 2019.210—a procedural ploy the Court has now rejected at least *four times*.  We are aware of no case imposing such a requirement.  The *Jardin* case you cited is irrelevant because it affirmed an order creating a temporary ethical wall for lawyers involved in a separate case.  Apple's ongoing defiance and contempt of this Court's numerous orders is prejudicial.  Plaintiffs reserve all rights.

Best regards,
Adam

**Adam Powell**
Partner
858-707-4245 **Direct**
**Knobbe Martens**

**Exhibit 9**
**-126-**

**From:** Samplin, Ilissa <ISamplin@gibsondunn.com>
**Sent:** Wednesday, July 15, 2020 4:46 PM
**To:** Adam.Powell <Adam.Powell@knobbe.com>; Mark.Kachner <Mark.Kachner@knobbe.com>; Masimo.Apple <Masimo.Apple@knobbe.com>
**Cc:** Lerner, Joshua H. <JLerner@gibsondunn.com>; Lyon, H. Mark <MLyon@gibsondunn.com>; *** Apple-Masimo <Apple-Masimo@knobbe.com>
**Subject:** RE: Masimo v. Apple - Section 2019.210 disclosure and amended interrogatory responses

Adam,

We have not answered your question about the timing of technical documents because you still have not answered our question about whether you are dropping a patent family.  We are preparing our core technical document production.  Before we produce, we need to know if you are contemplating dropping a patent family, and if so, which one(s).  This has an impact on what we produce.  If you are not contemplating dropping a patent family, we can make our production shortly.

With respect to your second question, no, we do not agree that we will rely on only public materials to defend our client in this case.

With respect to our request for amended interrogatory responses, please explain why your team feels it needs six weeks from the date the protective order was entered to serve the amended interrogatory responses Mark previously represented that your team was working on, and would be able to serve after entry of a protective order?  We don't understand why your team needs 2 weeks from the date of amendment to provide the amendments we've been waiting on for weeks.

Notably, you omitted from your email below any reference to the Section 2019.210 disclosure we've been asking about for many months now.  There is no reason why you cannot provide the Section 2019.210 disclosure now—indeed, your team has repeatedly represented that the absence of a protective order was the only cause for delay on the Section 2019.210 disclosure front.  A protective order has now been entered.  Plaintiffs should be in a position to provide the disclosure now, without any further delay.  Please confirm that Plaintiffs will produce a Section 2019.210-compliant disclosure this week.

Finally, please confirm that you will maintain an ethical wall to keep Plaintiffs' attorneys who will have actual access to Apple's confidential information from participating in drafting or revising Plaintiffs' Section 2019.210 statement.  As I am sure you can understand and appreciate, this temporary ethical wall is necessary because Plaintiffs' counsel who review Apple's core technical production will be unable to "divorce themselves from their knowledge of [Apple's] confidential material when identifying the information [Apple] allegedly misappropriated."  *Jardin v. DATAllegro, Inc.*, 2011 WL 3299395, at *5 (S.D. Cal. July 29, 2011) (affirming magistrate judge's order creating a temporary ethical wall because plaintiff's counsel that learns defendant's confidential information "simply cannot unring the bell").

**Exhibit 9**
**-127-**

Thank you,
Ilissa

**Ilissa Samplin**

## GIBSON DUNN

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7354 • Fax +1 213.229.6354
ISamplin@gibsondunn.com • www.gibsondunn.com

---

**From:** Adam.Powell <Adam.Powell@knobbe.com>
**Sent:** Wednesday, July 15, 2020 10:59 AM
**To:** Samplin, Ilissa <ISamplin@gibsondunn.com>; Mark.Kachner <Mark.Kachner@knobbe.com>; Masimo.Apple <Masimo.Apple@knobbe.com>
**Cc:** Lerner, Joshua H. <JLerner@gibsondunn.com>; Lyon, H. Mark <MLyon@gibsondunn.com>; *** Apple-Masimo <Apple-Masimo@knobbe.com>
**Subject:** RE: Masimo v. Apple - Section 2019.210 disclosure and amended interrogatory responses

[External Email]
Ilissa,

You still have not answered the questions I asked last week.  You cannot expect us to drop everything and respond in a single business day to your requests while ignoring our questions for a week.  Please provide an answer to the following questions as soon as possible.

1. What is Apple's basis for continuing to refuse to provide technical documents?
2. Will Apple confirm it will rely solely on public information for its non-infringement positions in this case?

As you know, Plaintiffs' amended complaint is due July 25.  Plaintiffs will agree to supplement their interrogatory answers within two weeks of filing the amended complaint.

Best regards,
Adam

**Adam Powell**
Partner

858-707-4245 **Direct**
**Knobbe Martens**

---

**From:** Samplin, Ilissa <ISamplin@gibsondunn.com>
**Sent:** Tuesday, July 14, 2020 9:40 PM

**Exhibit 9**
**-128-**

**To:** Adam.Powell <Adam.Powell@knobbe.com>; Mark.Kachner <Mark.Kachner@knobbe.com>; Masimo.Apple <Masimo.Apple@knobbe.com>
**Cc:** Lerner, Joshua H. <JLerner@gibsondunn.com>; Lyon, H. Mark <MLyon@gibsondunn.com>; *** Apple-Masimo <Apple-Masimo@gibsondunn.com>
**Subject:** RE: Masimo v. Apple - Section 2019.210 disclosure and amended interrogatory responses

Counsel:

We did not receive a response to the email below.  Please confirm, by **10 am PT tomorrow**, whether Plaintiffs will in fact serve their Section 2019.210 disclosure and amended responses to Apple's Interrogatory Nos. 5 through 13, and 17, by June 22, 2020.  We need to know where things stand on these matters as soon as possible, given that the parties have been meeting and conferring about all of them for months now—and Plaintiffs' only purported impediment to production was the absence of a protective order, which has now been entered.

We look forward to your prompt response.

Thank you,
Ilissa
**Ilissa Samplin**

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7354 • Fax +1 213.229.6354
ISamplin@gibsondunn.com • www.gibsondunn.com

**From:** Samplin, Ilissa
**Sent:** Monday, July 13, 2020 11:22 PM
**To:** Adam.Powell <Adam.Powell@knobbe.com>; Mark.Kachner <Mark.Kachner@knobbe.com>; Masimo.Apple <Masimo.Apple@knobbe.com>
**Cc:** Lerner, Joshua H. <JLerner@gibsondunn.com>; Lyon, H. Mark <MLyon@gibsondunn.com>; *** Apple-Masimo <Apple-Masimo@gibsondunn.com>
**Subject:** Masimo v. Apple - Section 2019.210 disclosure and amended interrogatory responses

Counsel:

You have repeatedly represented that "despite the stay" pertaining to trade secret discovery that you mistakenly contend applies to all parties, "Plaintiffs were not withholding discovery, even for requests related solely to trade secrets"—but rather, that "Plaintiffs will provide their 2019.210 statement and confidential documents after entry of a protective order."  (5/22/20 Kachner Ltr.; 6/2/20 Kachner Ltr.)  You likewise have represented that Plaintiffs would produce responsive documents, and amend numerous deficient interrogatory responses, upon entry of a protective order.  (*See, e.g.,* 6/6/20 Samplin Ltr. confirming parties' 6/3/20 meet and confer.)  As you know, the Protective Order was entered two weeks ago.  Plaintiffs nonetheless are still withholding their

**Exhibit 9**
**-129-**

Section 2109.210 disclosure, as well as documents and information responsive to Apple's trade secret-related and other discovery requests.  There is no justification for Plaintiffs' continued withholding of this relevant and responsive information.

For starters, please confirm that by no later than July 22, 2020, Plaintiffs will produce a Section 2019.210-compliant disclosure, as well as amended responses to Interrogatory Nos. 5 through 13, and 17.  Plaintiffs have now had *ample* time to prepare their Section 2019.210 disclosure and the amended responses to these Interrogatories.  There is no reason for Plaintiffs to continue to delay their production.

Please provide confirmation by 5 pm PT tomorrow, July 14.

Regards,
Ilissa
**Ilissa Samplin**

## GIBSON DUNN

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7354 • Fax +1 213.229.6354
ISamplin@gibsondunn.com • www.gibsondunn.com

---

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

---

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

---

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

---

**Exhibit 9**
**-130-**

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

**Exhibit 9**
**-131-**

# EXHIBIT 15

# Knobbe Martens

**KNOBBE, MARTENS, OLSON & BEAR, LLP**

12790 El Camino Real, Suite 100, San Diego, CA 92130
**T** (858) 707-4000

Adam Powell
Adam.Powell@knobbe.com

October 28, 2020

**VIA EMAIL**

Ilissa Samplin
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue,
Los Angeles, CA 90071-3197

Re:    Masimo Corp. and Cercacor Laboratories, Inc. v. Apple Inc.

Dear Ilissa:

We write in response to your October 16 letter and our October 26 meet and confer regarding Plaintiffs' Section 2019.210 Disclosure (the "Disclosure"). Although Apple's letter recites high-level arguments, it lacks specific criticisms of Plaintiffs' identification of each of its trade secrets. During the parties' meet and confer, we asked Apple to discuss each trade secret and why Apple contends it is unclear, but Apple refused. We address each of Apple's general arguments below in turn.

First, Apple's letter argues the Disclosure is "untethered to the trade secrets that were allegedly misappropriated through disclosure or use." We disagree. Plaintiffs' Section 2019.210 Disclosure identifies the trade secrets that Plaintiffs allege Apple misappropriated. During the meet and confer, Apple confirmed the Disclosure need not explain ***how*** Apple misappropriated Plaintiffs' trade secrets, but argued the Disclosure must describe ***where*** Apple published Plaintiffs' trade secrets. Plaintiffs do not understand the distinction that Apple is making, but have provided their contentions on this matter in response to interrogatories and will supplement as Plaintiffs discover more facts. We are aware of no authority holding that Plaintiffs must include such information in the 2019.210 Disclosure itself. We asked Apple for authority supporting its position and Apple pointed only to the cases on page 2 of its letter, none of which are relevant to this issue.

Second, Apple's letter argues the Disclosure "must distinguish Plaintiffs' alleged trade secrets from publicly available information, including patent applications and patents." The letter further asserts the Disclosure renders it "impossible for [Apple] to conduct public domain or other research to challenge the alleged secrecy of the information at issue." Apple's letter does not explain this assertion or provide any analysis as to why any portion of the Disclosure is unclear. Likewise, Apple does not identify any "patent applications and patents" that it believes shows the information in the Disclosure is generally known. During the meet and confer, we asked Apple to identify any specific patents or other publications that Apple asserts show the information described in the Disclosure was generally known. Apple identified no such patents or publications. Instead, Apple took the position that Plaintiffs must affirmatively distinguish their trade secrets over ***all*** patent publications. We disagree with Apple's unreasonable position that Plaintiffs' 2019.210 Disclosure must affirmatively distinguish Plaintiffs' trade secrets from all patent publications.

Exhibit 15
-189-

2

Third, Apple's letter argues the changes that Plaintiffs made compared to the Second Amended Complaint ("SAC") somehow "exacerbate the problems identified by the Court in dismissing Plaintiffs' SAC" and that Plaintiffs "double down on their use of vague language and catch-all phrases . . .." We disagree.  The Court found that Paragraph 39 of the SAC, and the word "including" before each bullet point list of specific trade secrets, rendered the bullet points mere "examples."  The Disclosure does not include Paragraph 39 from the SAC, and Plaintiffs further amended each section to refer to "the following" specific trade secrets, without using the word "including."

Fourth, Apple's letter argues the phrases "information regarding," "and/or," and "including" within bullet points are "catchall" phrases that should be removed.  During the meet and confer, Plaintiffs explained that they disagree with Apple's position, but would remove some or all of those phrases to avoid this dispute.  Plaintiffs asked Apple to identify any other phrases that Apple believed rendered the Disclosure unclear so that Plaintiffs could address all of Apple's objections at once.  Apple pointed to the separate reservation of rights paragraph discussed below, but did not identify any additional phrases in the Disclosure that it objected to.  Apple committed to doing so in writing, but has not yet done so.

Fifth, Apple's letter argues that Plaintiffs' reservation of the right to amend is "an end run around the very purpose of Section 2019.210."  We disagree.  Apple's own authority makes clear that Plaintiffs may amend their Section 2019.210 disclosure as discovery progresses.  *See Perlan Therapeutics, Inc. v. Superior Court*, 178 Cal.App.4th 1333, 1350 (2009) ("If, through discovery, Perlan uncovers information suggesting defendants misappropriated additional trade secrets, it may have good cause to amend its trade secret statement under appropriate circumstances.").  During the meet and confer, Apple also argued this paragraph somehow rendered the remainder of the Disclosure unclear.  However, other than arguing amendment was improper, Apple did not explain how this paragraph rendered any portion of the Disclosure unclear.  We asked if Apple was taking the position that a Section 2019.210 statement could never include a reservation of rights, but Apple did not take a position.  Apple cites no authority to support its proposition that merely including a reservation of rights somehow renders a disclosure unclear.  If you are aware of any supporting authority, please provide it.

Sixth, Apple's letter argues the Disclosure must follow a specific format and include four additional requirements.  Apple correctly notes that it has "requested" those requirements multiple times, but omits that the Court denied Apple's request.  As the California Court of Appeals explained, Section 2019.210 can be satisfied by any showing that is "reasonable, i.e. fair, proper, just, and rational, under all of the circumstances . . .." *Advanced Modular Sputtering, Inc. v. Superior Court*, 132 Cal. App. 4th 826, 836 (2005) (internal quotations and citation omitted).  No specific format is required.

Finally, during the meet and confer, we asked Apple which specific bullet points in the Disclosure Apple contends are unclear.  Apple responded it was "not going to go bullet point by bullet point."  We asked if Apple could point to any specific bullet point as being unclear, but Apple declined.  Given Apple's refusal to engage in any discussion of the actual substance of Plaintiffs' trade secrets, we asked if Apple had any basis for objecting to the Disclosure other than the objections set forth in Apple's October 16 letter.  Apple confirmed it has no additional basis for objecting to the Disclosure.

At the end of our call, Plaintiffs indicated that they would consider Apple's position and expected to respond within two or three days at most.   You again accused Plaintiffs' counsel of intentionally "delaying" resolution and stringing you along.  We disagree with your attempt to cast aspersions on counsel.  Plaintiffs met and conferred within the time permitted by the Local Rules, considered Apple's

**Exhibit 15**
**-190-**

position, have continued to express a good faith intent to try to address any specific concerns raised by Apple, and have now responded in just two days.  Moreover, Apple recently took far longer to respond to Plaintiffs' Local Rule 37-1 letter dated October 1, 2020.  Despite Apple taking much longer to respond, Plaintiffs did not ascribe any motive to Apple's counsel.

As discussed, Plaintiffs intend to make changes to their Section 2019.210 disclosure to narrow or eliminate the parties' dispute.  However, we are still waiting for Apple to identify any additional alleged phrases that render the Disclosure insufficient.  To avoid the need for multiple amendments, please provide Apple's position on that issue at your earliest opportunity.  After we have Apple's position, we will endeavor to provide an amended disclosure in one week or less.

Best regards,

Adam B. Powell

32641686

Exhibit 15
-191-

# EXHIBIT 16

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP

333 South Grand Avenue
Los Angeles, CA 90071-3197
Tel 213.229.7000
www.gibsondunn.com

Ilissa Samplin
Direct: +1 213.229.7354
Fax: +1 213.229.6354
ISamplin@gibsondunn.com

HIGHLY CONFIDENTIAL
PURSUANT TO PROTECTIVE ORDER

October 30, 2020

<u>VIA E-MAIL</u>

Adam B. Powell
Knobbe, Martens, Olson & Bear, LLP
12790 El Camino Real, Suite 100
San Diego, CA 92130
Adam.Powell@knobbe.com

Re:    *Masimo Corp. et al. v. Apple, Inc.*, C.A. 8:20-cv-00048 (C.D. Cal.)

Dear Adam,

We write in response to your October 28, 2020 letter purporting to defend Plaintiffs'
2019.210 Disclosure (the "Disclosure").  You are wrong to argue that Apple failed to make
specific criticisms of Plaintiffs' Disclosure.  In fact, Apple carefully detailed such criticisms
in our October 16 letter and reiterated them during the parties' October 26 meet and confer
call.  Nonetheless, we respond to the points raised in your October 28 letter below.

Plaintiffs feign confusion over the distinction between litigating the merits and providing an
identification of the specific trade secrets at issue in this case, but Apple has been clear that it
is not asking Plaintiffs to describe *how* Apple allegedly misappropriated their trade secrets.
Apple is asking Plaintiffs to identify their purported trade secrets *alleged in this case*, i.e., as
they exist in the accused patents and Apple Watch, so that Apple can discern the specific
information Plaintiffs allege to be trade secrets that Apple misappropriated.  We repeat the
law on this point:  a plaintiff must "identify with 'reasonable particularity' the purported
trade secrets *which allegedly have been misappropriated*" before trade secret-related
discovery can commence.  *Perlan Therapeutics, Inc. v. Superior Court*, 178 Cal. App. 4th
1333, 1336 (2009) (emphasis added).  Apple cited several cases directly relevant to this
issue, all of which found Section 2019.210 disclosures to be inadequate where a plaintiff
"ha[d] the ability (but not the inclination) to provide clearer, more specific information
about . . . its alleged trade secrets." *Id.* at 1345; *see also, e.g.*, *Space Data Corp. v. X*, 2017
WL 5013363, at *2 (N.D. Cal. Feb. 16, 2017) ("Moreover, Space Data has not made clear
which aspects of its technology and other information are 'part of patents and pending patent
applications,' if any, and which are secret."); *Loop AI Labs Inc. v. Gatti*, 195 F. Supp. 3d
1107, 1116 (N.D. Cal. 2016) (2019.210 disclosure deficient where "Plaintiff d[id] not specify
which contracts and agreements contain[ed] the alleged trade secrets" and "assert[ed] that its

Beijing · Brussels · Century City · Dallas · Denver · Dubai · Frankfurt · Hong Kong · Houston · London · Los Angeles · Munich
New York · Orange County · Palo Alto · Paris · San Francisco · São Paulo · Singapore · Washington, D.C.

**Exhibit 16
-192-**

**GIBSON DUNN**

HIGHLY CONFIDENTIAL
PURSUANT TO PROTECTIVE ORDER

Page 2

patent application is a trade secret," but "d[id] not specify which portion of the application describes the claimed secret").

Plaintiffs' assertion that they "have provided their contentions on this matter in response to interrogatories" is incorrect, and we previously explained that Plaintiffs' reservation to "supplement" their responses as they "discover more facts" represents a bald-faced attempt to make tactical use of discovery so Plaintiffs can later "change [their] claims to conform to the information defendant revealed in discovery." *Social Apps, LLC v. Zynga, Inc.*, 2012 WL 2203063, at *2 (N.D. Cal. June 14, 2012). Furthermore, if Plaintiffs believe that they have described key information in their discovery responses, it is troubling that they are not including that in the Disclosure. Plaintiffs' trade secrets should not be a moving target. That defeats the very purpose of Section 2019.2100—which requires that the purportedly misappropriated trade secrets be identified with particularity *before* the party alleging misappropriation commences discovery. From the beginning of this case, Plaintiffs have alleged that Apple disclosed Plaintiffs' trade secrets in patent applications and incorporated them in the Apple Watch. *See* Compl. ¶¶ 23–28, 185, 187; FAC ¶¶ 24–25, 218; SAC ¶¶ 24–25, 236–38. If this is true, Plaintiffs have at their disposal the information they need to identify those secrets. Plaintiffs have no excuse for their continued refusal to identify the specific secrets that they allege Apple misappropriated.

Plaintiffs further misconstrue Apple's position regarding Plaintiffs' duty to distinguish their trade secrets from public information. Apple's position, as buttressed by the case law, is that Plaintiffs must "clearly explain how [their] secrets (or secret combinations of publicly available processes) differ[] from publicly available knowledge." *Perlan*, 178 Cal. App. 4th at 1352; *see also Advanced Modular Sputtering, Inc. v. Superior Court*, 132 Cal. App. 4th 826, 835 (2005). As Apple explained in its letter and again on the parties' meet and confer call, Plaintiffs' Disclosure makes no attempt to distinguish between information generally known to those employed in the field and the proprietary information allegedly misappropriated by Apple. This problem is manifest throughout the Disclosure.

Apple appreciates Plaintiffs' willingness to remove "some or all" of the open-ended phrases that the Judge Selna found rendered Plaintiffs' trade secret claim indefinite; however, Plaintiffs' "use of the word 'including' alone was never sufficient on its own for the court to find dismissal warranted." Order at 4. For the same reason, Plaintiffs' willingness to remove "information regarding" and "and/or" also is not sufficient. The deeper problem remains: Plaintiffs still have not identified the purported trade secrets *which allegedly have been misappropriated* with sufficient particularity to separate them from matters of public knowledge.

**Exhibit 16
-193-**

# GIBSON DUNN

HIGHLY CONFIDENTIAL
PURSUANT TO PROTECTIVE ORDER

As to your suggestion that we made some commitment on the meet and confer call to point out any additional objectionable language in the Disclosure, that is wrong.  We said we would look back at the Disclosure and discuss with our team whether there were additional specific terms to raise.  But we specifically noted that to the extent the Disclosure is meant to be non-exhaustive, it is deficient regardless of any specific terms used.  We also specifically noted that even if the "catch-all" phrases in the Disclosure are limited to those identified in Apple's October 16 letter, the Disclosure remains deficient to the extent it does not specifically limit Plaintiffs' alleged trade secrets to the descriptions contained therein.  *See Gatan, Inc. v. Nion Co.*, 2018 WL 2117379, at *3 (N.D. Cal. May 8, 2018) ("If the trade secrets discussed in Nion's SBIR application are in fact the only trade secrets at issue, then Gatan's trade secrets designation should say so.").

Plaintiffs' reservations of right are a clear indicator that their trade secrets are not limited to the descriptions in the Disclosure.  *See, e.g.*, *Perlan*, 178 Cal. App. 4th at 1338 ("boilerplate reservations of right . . . make[] no attempt to comply with section 2019.210").  That is the problem with Plaintiffs' reservations that we again articulated during the October 26 meet-and-confer call.

Plaintiffs must amend their Disclosure in light of the deficiencies identified above.  Apple asks only for what is "reasonable, i.e., fair, proper, just and rational"—a Disclosure containing enough particularity to allow Apple to distinguish publicly available information and determine what it is it is accused of taking.  *Advanced Modular*, 132 Cal. App. 4th at 836.  Plaintiffs have had eight months or more to identify the trade secrets they publicly accused Apple of misappropriating.  The Disclosure Plaintiffs served on the parties' agreed upon deadline is inadequate.  Apple expected to receive an amended Disclosure along with Plaintiffs' October 28 letter.  Notwithstanding Plaintiffs' delay, Apple will wait until Friday, November 6 for Plaintiffs to address the defects in the Disclosure.  We trust that you actually need a week for substantive changes, not merely stripping the Disclosure of the terms "information regarding," "and/or," and "including," which would take little time and should already have been done.  After that date, Apple will move to compel Plaintiffs to provide a more definite statement that cannot be changed absent good cause.

Sincerely,

Ilissa Samplin

Exhibit 16
-194-

# EXHIBIT 18

| From: | Adam.Powell |
|---|---|
| Sent: | Monday, November 23, 2020 2:12 PM |
| To: | Samplin, Ilissa |
| Cc: | *** Apple-Masimo; Lerner, Joshua H.; Lyon, H. Mark; Buroker, Brian M.; Andrea, Brian; Rosenthal, Brian A.; Kaounis, Angelique; Masimo.Apple |
| Subject: | RE: Masimo v. Apple - Section 2019.210 Statement |

Ilissa,

Your November 12 letter continued to contain only high-level generalizations and no specifics.  The letter also did not invite or request a response.  Instead, Apple stated: "We plan to send our portion of the joint brief to you by November 18."

When we met and conferred on November 18 about another issue, you also never said you were waiting for a response to your November 12 letter.  You requested written confirmation regarding other discovery items.  We agreed to provide our position on those other issues in writing, and told you our response would not be ready by Friday, November 20.  We are working on a written response and plan to have that for you this week.  We note that Apple has also not sent us its written response to issues raised during the meet and confer.

Finally, your email did not answer my question regarding Steve Larson's November 16 letter.  Please let us know when Apple is available to meet and confer on the issues raised in that letter.

Best regards,
Adam

**Adam Powell**
Partner
858-707-4245 **Direct**
**Knobbe** **Martens**

**From:** Samplin, Ilissa <ISamplin@gibsondunn.com>
**Sent:** Friday, November 20, 2020 6:19 PM
**To:** Adam.Powell <Adam.Powell@knobbe.com>
**Cc:** *** Apple-Masimo <Apple-Masimo@gibsondunn.com>; Lerner, Joshua H. <JLerner@gibsondunn.com>; Lyon, H. Mark <MLyon@gibsondunn.com>; Buroker, Brian M. <BBuroker@gibsondunn.com>; Andrea, Brian <BAndrea@gibsondunn.com>; Rosenthal, Brian A. <BRosenthal@gibsondunn.com>; Kaounis, Angelique <AKaounis@gibsondunn.com>; Masimo.Apple <Masimo.Apple@knobbe.com>
**Subject:** Re: Masimo v. Apple - Section 2019.210 Statement

Adam,

Frankly, we thought you might have a response to our letter.  But since it's clear you do not, we will be sending you our portion of the joint stipulation regarding Section 2019.210. We were hoping to wrap up the meet and confer about the supplemental interrogatory responses at the same time but we still haven't heard back from you or Mark about when you can be ready with the positions you agreed to go back to your team on. As you know, we proposed today. When works?

Thanks,
Ilissa

**Exhibit 18**
**-197-**

**Ilissa Samplin**

GIBSON DUNN

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7354 • Fax +1 213.229.6354
ISamplin@gibsondunn.com • www.gibsondunn.com

On Nov 20, 2020, at 6:05 PM, Adam.Powell <Adam.Powell@knobbe.com> wrote:

[External Email]
Ilissa,

Your letter attached to your email below indicated that Apple would send its portion of the joint stipulation regarding Section 2019.210 by November 18.  We did not hear from you.  We also have not heard when you are available to meet and confer on the issues raised in Steve Larson's letter of November 16.  Please let us know when you are available for a meet and confer on that letter.

Best regards,
Adam

**Adam Powell**
Partner

858-707-4245 **Direct**

**Knobbe Martens**

**From:** Samplin, Ilissa <ISamplin@gibsondunn.com>
**Sent:** Thursday, November 12, 2020 12:27 PM
**To:** Adam.Powell <Adam.Powell@knobbe.com>; *** Apple-Masimo <Apple-Masimo@gibsondunn.com>; Lerner, Joshua H. <JLerner@gibsondunn.com>; Lyon, H. Mark <MLyon@gibsondunn.com>; Buroker, Brian M. <BBuroker@gibsondunn.com>; Andrea, Brian <BAndrea@gibsondunn.com>; Rosenthal, Brian A. <BRosenthal@gibsondunn.com>; Kaounis, Angelique <AKaounis@gibsondunn.com>
**Cc:** Masimo.Apple <Masimo.Apple@knobbe.com>
**Subject:** RE: Masimo v. Apple - Section 2019.210 Statement

Adam,

Please see the attached correspondence.

Regards,
Ilissa

**Ilissa Samplin**

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7354 • Fax +1 213.229.6354
ISamplin@gibsondunn.com • www.gibsondunn.com

**Exhibit 18
-198-**

**From:** Adam.Powell <Adam.Powell@knobbe.com>
**Sent:** Friday, November 6, 2020 7:12 PM
**To:** *** Apple-Masimo <Apple-Masimo@gibsondunn.com>; Lerner, Joshua H. <JLerner@gibsondunn.com>; Lyon, H. Mark <MLyon@gibsondunn.com>; Buroker, Brian M. <BBuroker@gibsondunn.com>; Andrea, Brian <BAndrea@gibsondunn.com>; Rosenthal, Brian A. <BRosenthal@gibsondunn.com>; Samplin, Ilissa <ISamplin@gibsondunn.com>; Kaounis, Angelique <AKaounis@gibsondunn.com>
**Cc:** Masimo.Apple <Masimo.Apple@knobbe.com>
**Subject:** Masimo v. Apple - Section 2019.210 Statement

[External Email]
Counsel,

Pursuant to our meet and confer, attached is Plaintiffs' revised Section 2019.210 Statement.  This document has been designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" pursuant to the Protective Order.  All changes made in this revised statement are being made without prejudice or admission.  Plaintiffs reserve all rights under relevant caselaw to amend this identification.

Best regards,
Adam

**Adam Powell**
Partner

858-707-4245 **Direct**

**Knobbe Martens**

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

**Exhibit 18
-199-**

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

**Exhibit 18**
**-200-**

# EXHIBIT 19

1

2

3

4                      UNITED STATES DISTRICT COURT

5                   NORTHERN DISTRICT OF CALIFORNIA

6

7    ALTERG, INC.,                          Case No.  18-cv-07568-EMC

8                  Plaintiff,

9           v.                              **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS**

10   BOOST TREADMILLS LLC, et al.,

11                  Defendants.             Docket No. 37

12

13

14          Plaintiff AlterG, Inc. ("AlterG") brings this action against three of its former employees,

15   Sean Whalen, Thomas Allen, and Michael James Bean (the "Individual Defendants"), and the

16   company they founded, Boost Treadmills LLC ("Boost," and together with the Individual

17   Defendants, "Defendants").  AlterG alleges that Defendants infringed its patents and misused its

18   trade secret information to create Boost products.  AlterG's complaint pleads nine causes of

19   action: (1) patent infringement; (2) breach of contract; (3) trade secret misappropriation; (4)

20   breach of fiduciary duty; (5) interference with contract; (6) interference with prospective economic

21   advantage; (7) false advertisement; (8) trade libel; and (9) unfair competition.

22          Upon Defendants' motion, the Court previously dismissed all nine causes of action as

23   insufficiently pleaded, with leave to amend.  Docket No. 29 ("Order").  AlterG subsequently filed

24   a First Amended Complaint.  Docket No. 33 ("FAC").  Defendant then filed a motion to dismiss

25   the FAC.  Docket No. 37 ("Mot.").

26   ///

27   ///

28   ///

United States District Court
Northern District of California

**Exhibit 19**
**-201-**

# I.   **BACKGROUND**

A.   Factual Background

The core allegations in the FAC remain unchanged from AlterG's original complaint. AlterG is a medical device company that is the "leading provider of impact reduction treadmills," also known as "Anti-Gravity Treadmills," that are used for orthopedic rehabilitation and training.  FAC ¶ 14.  "One of the keys [sic] drivers of AlterG's success is its patented Differential Air Pressure ('DAP') technology," which "use[s] a pressurized bag to provide a counterforce to the subject's body weight, reducing their effective weight on the treadmill surface."  *Id.* ¶ 15. From 2012 to 2015, AlterG devoted substantial resources to develop "a lower cost, bare bones AlterG machine" in response to "potential competitors who wanted to develop anti-gravity training and rehab machines using mechanical unweighting and other options, and at a lower price point than AlterG."  *Id.* ¶ 33.  AlterG calls this project the "Low-Cost Platform Project," or "LCPP."  *Id.*  AlterG ultimately decided not to "immediately commercialize" or sell any products developed as part of the LCPP.  *Id.* ¶ 34.

The Individual Defendants are three former employees of AlterG.  Whalen was a co-founder of AlterG as well as "the initial and primary inventor . . . principally involved in developing the technology and products of the company."  *Id.* ¶ 19.  In 2012, Whalen relinquished his former positions at AlterG but continued working for the company as a consultant until he stopped working for AlterG altogether on March 31, 2015.  *Id.* ¶¶ 21, 35.  During this consultancy period, "Whalen was the principal consultant and engineer" on the LCPP.  *Id.* ¶ 33.

Allen joined AlterG in 2007 and has "held numerous jobs at AlterG in sales, business development, and in international sales."  *Id.* ¶ 37.  Like Whalen, Allen worked closely with the LCPP team from 2012 through 2015.  *Id.* ¶ 40.  Allen was also AlterG's "principal liaison" to Woodway USA ("Woodway"), a longtime supplier of treadmills for AlterG.  *Id.* ¶¶ 41, 43.  He resigned from AlterG on April 28, 2015.  *Id.* ¶ 42.

Bean joined AlterG in 2008 and worked in various sales roles at the company.  *Id.* ¶ 47. He resigned from AlterG in April 2017.  *Id.* ¶ 50.  "Since Bean's departure from AlterG in April 2017, AlterG has discovered communications between Bean and Allen about Allen's work on a

United States District Court
Northern District of California

2

Exhibit 19
-202-

United States District Court
Northern District of California

1   competing anti-gravity unit while Bean was still an employee of AlterG."  *Id.*

2       Each of the Individual Defendants signed various confidentiality and non-disclosure

3   agreements with AlterG during their employment with the company.  Those agreements provided

4   that signatories would "not use or disclose AlterG's proprietary and confidential information in

5   any way contrary to the benefit of AlterG."  *Id.* ¶¶ 20, 37, 47.  AlterG and Woodway also "entered

6   into various confidentiality agreements whereby AlterG would provide to Woodway proprietary

7   and confidential information to assist Woodway to build and supply AlterG with anti-gravity

8   units."  *Id.* ¶ 44.

9       Boost was formed at the end of 2016 and registered in April 2017.  *Id.* ¶ 51.  Allen and

10   Bean are founders of Boost, and Whalen worked for the company in product development.  *Id.* ¶¶

11   51–52.  AlterG believes that "Defendants conspired almost immediately [upon leaving AlterG] to

12   create a competing machine incorporating AlterG intellectual property," and that "Boost was

13   developing an unweighting treadmill well prior to the company's registration."  *Id.* ¶¶ 51, 55.  As

14   part of this process, Whalen and Allen started "secretly" working with Woodway and "utilized

15   confidential, proprietary, and trade secret information from the [LCPP], and other AlterG

16   intellectual property, to shortcut the research and development time to come to market with a

17   lower cost unweighting treadmill."  *Id.* ¶ 46.  "At the end of 2017, Boost introduced its first

18   product—the Boost One," which "infringes AlterG patents" and "incorporates numerous

19   unpatented technology features developed by AlterG in connection with the [LCPP]."  *Id.* ¶ 54.

20       AlterG further alleges that Defendants "falsely claim that the problematic Boost One is a

21   superior product over the AlterG DAP systems 'at a fraction of the cost.'"  *Id.* ¶ 60.  Defendants

22   have also "told customers and prospects false statements to denigrate AlterG and its superior

23   technology, falsely claiming that AlterG was going out of business, is in poor financial health and

24   will not be able to get Woodway treadmills anymore."  *Id.* ¶ 61.  The upshot of Defendants'

25   allegations is that Defendants have been able to "sell over 20 units [of Boost products] to date to

26   customers considering an AlterG unit."  *Id.* ¶ 62.

27   B.   Procedural Background

28       After Defendants moved to dismiss the original complaint, the Court dismissed AlterG's

**Exhibit 19**
**-203-**

United States District Court
Northern District of California

1   claims with leave to amend.  *See* Order at 27–28.  The FAC presents two principal changes.  First,

2   while the original complaint asserted that Defendants infringed five of AlterG's patents, the FAC

3   alleges infringement of just one—U.S. Patent Number 7,591,795 (the "'795 patent").  FAC ¶ 64.

4   Second, AlterG alleges that it has had to withdraw its infringement claims with respect to one

5   patent, U.S. Patent Number 10,004,656 ("the '656 patent"), because Defendants argued in their

6   first motion to dismiss that the '656 patent was invalid in light of its public disclosure before the

7   patent application was filed.  *Id.* ¶ 27.  According to Defendants, Whalen gave a journalist a demo

8   of AlterG's P200/G-Trainer treadmill, the subject of the '656 patent, and the journalist then

9   featured the machine in an online article on August 18, 2006, more than a year before AlterG filed

10   the application for the patent.  *Id.*  AlterG now alleges that "Allen and Whalen kept the

11   information about the online article quiet and as an insurance policy so they could use the

12   information later to invalidate the '656 patent . . . , just in case the patent was asserted against

13   them for developing and selling an infringing product through Boost."  *Id.*  AlterG's breach of

14   fiduciary duty claim against Whalen is based in part on these allegations.  *Id.* ¶ 78.

## II.     <u>LEGAL STANDARD</u>

16       Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a complaint to include "a

17   short and plain statement of the claim showing that the pleader is entitled to relief."  A complaint

18   that fails to meet this standard may be dismissed pursuant to Rule 12(b)(6).  Fed. R. Civ. P.

19   12(b)(6).  To overcome a Rule 12(b)(6) motion to dismiss, a plaintiff must plead "enough facts to

20   state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544,

21   570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows

22   the court to draw the reasonable inference that the defendant is liable for the misconduct

23   alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "The plausibility standard is not akin to a

24   probability requirement, but it asks for more than a sheer possibility that a defendant has acted

25   unlawfully.  *Id.* (internal quotation marks omitted).  The Supreme Court has noted that, "[w]here

26   a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of

27   the line between possibility and plausibility of entitlement to relief."  *Id.* (internal quotation marks

28   omitted).

4

**Exhibit 19**
**-204-**

1   On a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the complaint as true

2   and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St.*

3   *Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). The Court need not, however,

4   "assume the truth of legal conclusions merely because they are cast in the form of factual

5   allegations." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (per curiam) (internal

6   quotation marks omitted). Thus, "a Plaintiff's obligation to provide the 'grounds' of his

7   'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the

8   elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*,

9   478 U.S. 265, 286 (1986)). The Court also "need not . . . accept as true allegations that contradict

10  matters properly subject to judicial notice or by exhibit." *Sprewell v. Golden State Warriors*, 266

11  F.3d 979, 988 (9th Cir. 2001).

12  Claims sounding in fraud or mistake are subject to the heightened pleading requirements of

13  Federal Rule of Civil Procedure 9(b), pursuant to which a plaintiff alleging fraud "must state with

14  particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To comply with this

15  heightened pleading standard, the plaintiff must allege the "who, what, when, where, and how" of

16  the alleged fraud. *Vess v. Ciba-Geigy Corp. USA,* 317 F.3d 1097, 1106 (9th Cir. 2003).

### III.     DISCUSSION

18  Defendants again move to dismiss all of AlterG's claims.

19  A.    Patent Infringement

20      1.    Direct Infringement

21  AlterG alleges that Defendants directly, indirectly, and willfully infringed the '795 patent,

22  which is titled "System, Method and Apparatus for Applying Air Pressure on a Portion of the

23  Body of an Individual." FAC, Exh. N ('795 patent). Defendants argue that the infringement

24  claim should be dismissed because AlterG has failed to allege how Boost's accused products

25  infringe on a claim-by-claim, element-by-element basis. *See* Mot. at 4. As the Court explained in

26  its prior Order, a direct infringement claim "does not satisfy the standards of *Twombly* and *Iqbal*

27  where it does not at least contain factual allegations that the accused product practices every

28  element of at least one exemplary claim." *Novitaz, Inc. v. inMarket Media, LLC*, No. 16-CV-

United States District Court
Northern District of California

5

**Exhibit 19**
**-205-**

United States District Court
Northern District of California

1    06795-EJD, 2017 WL 2311407, at *3 (N.D. Cal. May 26, 2017).  Here, AlterG has appended to

2    the FAC a "preliminary infringement claim chart" comparing the accused products to the

3    limitations of claims 1-6, 8-10, 20-22, 27, 30-34, 36-38, 46, 48, and 51 of the '795 patent.  FAC ¶

4    68; *see* FAC, Exh. O (claim chart).

5            Defendants contend that AlterG has not plausibly alleged that the accused products

6    practice one particular element of Claim 1—a method for "generating a relationship between

7    pressure [inside the treadmill chamber] and actual weight of the individual" treadmill user.  '795

8    patent, 8:43–44.  This argument is unpersuasive.

9            As an initial matter, Defendants are incorrect to assert that infringement *allegations* must

10   meet the standard of specificity applied to infringement *contentions* under this district's Patent

11   Local Rules simply because the complaint references a claim chart that conforms to Patent Local

12   Rule 3-1(c).   Rule 3-1(c) requires a plaintiff to provide a chart "identifying specifically where and

13   how each limitation of each asserted claim is found within each Accused Instrumentality[.]"  The

14   purpose of Rule 3-1 is "to require a plaintiff to crystalize its theory of the case and patent

15   claims."  *Finjan, Inc. v. Check Point Software Techs., Inc.*, No. 18-CV-02621-WHO, 2019 WL

16   955000, at *5 (N.D. Cal. Feb. 27, 2019) (citation omitted).  It therefore "requires exacting

17   identification of the accused instrumentalities and how those instrumentalities read on the alleged

18   claim limitations."  *Grecia v. Apple Inc.*, No. C-14-0775 EMC, 2014 WL 4685195, at *1 (N.D.

19   Cal. Sept. 19, 2014).  Accordingly, courts have held that "[a]t the Patent Local Rule 3-1

20   Disclosure stage, a plaintiff must put forth information so specific that either reverse engineering

21   or its equivalent is required."  *Finjan*, 2019 WL 955000, at *5.  But at present, Defendants are not

22   challenging AlterG's infringement contentions.  They are attacking the sufficiency of AlterG's

23   *pleadings* under Rule 12(b)(6), which requires a complaint to allege "sufficient factual matter . . .

24   to state a claim to relief that is *plausible* on its face."  *Iqbal*, 556 U.S. at 678 (emphasis added); *see*

25   *Novitaz*, 2017 WL 2311407, at *2 (explaining that under Rule 12(b)(6), courts "assess[] the

26   sufficiency of claims for direct patent infringement under the standard set forth

27

28

**Exhibit 19**
**-206-**

United States District Court
Northern District of California

1  in *Twombly* and *Iqbal*").  Infringement contentions generally follow the pleading stage.[1]  In any

2  event, the FAC incorporates the infringement contentions already exchanged in this case.

3  In the FAC, which incorporates the claims chart, AlterG has plausibly alleged that the

4  accused products "generat[e] a relationship between pressure and actual weight of the individual."

5  '795 patent, 8:43–44.  The claim chart cites a section from the Boost One training manual

6  describing that product's "calibrated" mode:

7

8

9

10

11

12

13
CALIBRATED VS. QUICK START

CALIBRATED - ENTER BAR HEIGHT LEVEL AND SHORT SIZE. THE WEIGHT CONTROL FUNCTION WILL BE DISPLAYED AS A PERCENTAGE OF YOUR BODY WEIGHT, AND ADJUSTABLE FROM 100% TO 20% IN 1% INCREMENTS. THIS ALLOWS FOR PRECISION UNWEIGHTING FOR SPECIFIC PROTOCOLS AND THE ABILITY TO FINELY TUNE AIR PRESSURE.

14  FAC, Exh. O at 6 (highlights in original).  The claim chart also quotes a Boost video touting the

15  Boost One's "incremental off-weighting" capabilities, which "create[] a bespoke workout or rehab

16  session for your personal goals and objectives."  *Id.*  These materials indicate that the Boost One

17  features a "weight control function" that gives the user "the ability fine tune air pressure" inside

18  the treadmill chamber based on the user's "body weight," "in 1% increments."  In other words,

19  they plausibly describe a system that "generat[es] a relationship between pressure" inside the

20  treadmill and the "actual weight of the individual," as the '795 patent claims.

21  Defendants next protest that AlterG cannot now allege that the accused products adjust air

22  pressure in relation to user weight after alleging in its original complaint that "the Boost One

23  [does] not calibrate to specific user's actual weight and volume dimensions like the AlterG DAP

24  systems."  Docket No. 1 ¶ 44.  Defendants believe this earlier allegation is a "judicial admission"

25  that is binding on AlterG.  Mot. at 5.  Judicial admissions are "formal admissions in the pleadings

26

27  ──────────────────

28  [1] It would make little sense to subject a complaint to the Rule 3-1 standard since courts have rejected the contention that "a formal charting of patent claim elements against each accused product is always necessary" at the pleading stage.  *Novitaz*, 2017 WL 2311407, at *3.

7

Exhibit 19
-207-

which have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact." *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988) (citation omitted).  The principle applies only to "factual allegations in a complaint, and not legal conclusions." *Nat'l Abortion Fed'n v. Ctr. for Med. Progress*, 134 F. Supp. 3d 1199, 1205 (N.D. Cal. 2015).

AlterG claims that its earlier statement that the Boost One does *not* calibrate to a user's actual weight merely expressed AlterG's belief that "as tested, Boost One failed to accurately calibrate to a specific user's actual weight."  Opp. at 7.  Put differently, AlterG was not alleging that the Boost One does not operate by generating a relationship between pressure and user weight, but rather that it does a poor job of generating the relationship.  Because "[a] judicial admission must be deliberate, clear, and unambiguous," *Lam Research Corp. v. Schunk Semiconductor*, 65 F. Supp. 3d 863, 870 (N.D. Cal. 2014) (citation omitted), and the Court finds the allegation at issue to be ambiguous, it accepts AlterG's explanation for the apparent inconsistency between its two complaints.  *See Nat'l Abortion Fed'n*, 134 F. Supp. 3d at 1206 ("Trial courts have discretion to accept or reject a judicial admission." (citing *Singer v. State Farm Mut. Auto. Ins. Co.*, 116 F.3d 373, 376 (9th Cir. 1997)).  Of course, AlterG has a duty under Rule 11 to make factual contentions with evidentiary support, and if it is later determined that AlterG knowingly mischaracterized the functioning of the Boost One, it can be subject to sanctions.

Defendants' remaining arguments for dismissal of the infringement claim raise factual disputes about how Boost products actually work.  *See, e.g.*, Mot. at 5 ("[T]here is no weight scale of any kind (e.g. a load cell) that measures the actual weight of the individual [in the accused products].");  Docket No. 39 ("Reply") at 3 n.6 ("Boost uses an assumed or designated weight based only on short size and the rack height adjustment.").  Defendants strongly emphasized these points during the hearing on the motion.  However, such disputes are inappropriate for resolution at the pleading stage, where the Court must accept AlterG's well-pleaded factual allegations as true.  *See Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).[2]

---

[2] The Court also notes that the '795 Patent's reference to "actual weight" and whether that feature is found in Boost One's products raise a matter that is likely subject to claims construction, a

United States District Court
Northern District of California

8

Exhibit 19
-208-

1        2.      Indirect and Willful Infringement

2        Defendants ask the Court to dismiss AlterG's indirect and willful infringement claims on

3    the sole ground that the predicate direct infringement claim fails.  *See* Mot. at 8.  Because AlterG's

4    direct infringement claim is adequately pleaded, its indirect and willful infringement claims also

5    survive.

6        In sum, the Court finds that AlterG's direct, indirect, and willful infringement claims were

7    sufficiently alleged.  Thus, the motion to dismiss is **DENIED** as to those claims, and any further

8    refinement of the infringement claims will require claim construction.

9    B.    Trade Secret Misappropriation

10       The FAC alleges that Defendants violated the Defend Trade Secrets Act ("DTSA") by

11   misappropriating eight of AlterG's trade secrets.  *See* FAC ¶ 90.  Defendants argue that two of the

12   eight trade secrets were not identified with sufficient particularity: the second, which is "the

13   concept of retrofitting an existing commercial treadmill with an air based unweighting system,"

14   and the eighth, which is "AlterG's pricing and market strategy, especially with respect to price-

15   sensitive accounts."  *Id.*

16       To state a claim for trade secret misappropriation under the DTSA, a plaintiff must allege

17   that: "(1) the plaintiff owned a trade secret; (2) the defendant misappropriated the trade secret; and

18   (3) the defendant's actions damaged the plaintiff."  *Alta Devices, Inc. v. LG Elecs., Inc.*, 343 F.

19   Supp. 3d 868, 877 (N.D. Cal. 2018) (citation omitted).  As set forth in the Order, at the pleading

20   stage, "[a] plaintiff need not spell out the details of the trade secret," but must "describe the

21   subject matter of the trade secret with sufficient particularity to separate it from matters of general

22   knowledge in the trade or of special persons who are skilled in the trade, and to permit the

23   defendant to ascertain at least the boundaries within which the secret lies."  *Id.* at 881 (citations,

24   internal quotation marks, and alterations omitted).

25       1.      Second Trade Secret

26       Defendants' argument with respect to the second trade secret is not a challenge to the

27

28   _____

matter not yet ripe in this litigation.

**Exhibit 19**
**-209-**

1    particularity of the pleading at all. Rather, it is a challenge to the validity of the trade secret:

2    Defendants claim that "the concept of retrofitting an existing commercial treadmill with an air

3    based unweighting system . . . falls squarely within the prior art and therefore does not qualify as a

4    trade secret." Mot. at 10.

5        ""[I]t is well established that disclosure of a trade secret in a patent places the information

6    comprising the secret into the public domain. Once the information is in the public domain and

7    the element of secrecy is gone, the trade secret is extinguished." *Ultimax Cement Mfg. Corp. v.*

8    *CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1355 (Fed. Cir. 2009) (citation and internal quotation

9    marks omitted). Defendants contend that AlterG made its purported trade secret public on June

10    18, 2015, when it filed a patent application titled "Pressure Chamber and Lift for Differential Air

11    Pressure System with Medical Data Collection Capabilities." Docket No. 37-1, Exh. 5.[3] In the

12    background section of the application, AlterG wrote that "Differential Air Pressure (DAP) partial

13    unweighting systems have typically comprised an OEM ['original equipment manufacturer']

14    treadmill enclosed in a flexible bag that applies air pressure to the lower portion of the user's

15    body." *Id.* ¶ 0007. According to Defendants, this sentence concedes that "DAP treadmill systems

16    typically employ 'the concept of retrofitting an existing commercial treadmill with an air based

17    unweighting system,' and what AlterG alleges as its trade secret is indisputably in the public

18    domain." Mot. at 10. AlterG counters that "'retrofitting an existing commercial treadmill' is an

19    entirely different concept than incorporating an OEM treadmill in an unweighting system. The

20    latter requires the OEM treadmill to be a necessary component of a fully functioning and specified

21    system (like the Woodway OEM treadmill incorporated in Boost One); whereas the former refers

22    to additions and improvements to a user's existing exercise equipment." Opp. at 9. AlterG thus

23    argues its trade secret was not publicly disclosed through the 2015 patent application.

24        The Court finds that as alleged in the FAC, constructing an air-based unweighting system

25    such as Boost One may involve methods and technology similar to prior art which addresses

United States District Court
Northern District of California

---

[3] Defendants asked the Court to take judicial notice of this exhibit. AlterG did not oppose the
request. The Court can and does take judicial notice of the "patent application because [it is a]
publicly available . . . government record[]." *GeoVector Corp. v. Samsung Elecs. Co.*, 234 F.
Supp. 3d 1009, 1016 n.2 (N.D. Cal. 2017) (citation and internal quotation marks omitted).

**Exhibit 19**
**-210-**

United States District Court
Northern District of California

1   retrofitting such a system.  It is not readily apparent what material differences there are between

2   retrofitting and use of an OEM treadmill.  Accordingly, AlterG's misappropriation of trade secrets

3   claim as it pertains to the second trade secret demands a greater degree of specificity than was

4   presented in the FAC.

5         2.      <u>Eighth Trade Secret</u>

6         Defendants also argue that AlterG's eighth trade secret, described as "AlterG's pricing and

7   market strategy, especially with respect to price-sensitive accounts," is not alleged with sufficient

8   particularity.  Mot. at 11.

9         The Court dismissed AlterG's trade secret allegations from the original complaint

10  regarding "its marketing and product strategy, cost strategies, [and] customer needs" for lacking

11  sufficient specificity.  Order at 9–10 (quoting Docket No. 1 ¶ 102).  In doing so, the Court relied

12  on *Vendavo, Inc. v. Price f(x) AG*, No. 17-CV-06930-RS, 2018 WL 1456697 (N.D. Cal. Mar. 23,

13  2018).  In *Vendavo*, the court dismissed claims regarding trade secrets characterized as "pricing

14  information, vendor lists and related information, [and] marketing plans" because the claims were

15  only "set out . . . in broad, categorical terms."  *Id.* at \*3–4.  The Court's prior concern about

16  AlterG's original allegations arose from their vagueness as to technical matters, which are more

17  complex to begin with and therefore warrant greater specificity.  *See* Order at 10 (noting that the

18  purported trade secrets "are not tethered to a specific technology; it cannot be discerned which

19  aspects of AlterG's 'anti-gravity rehabilitation and training units' the information pertains to").

20  Pricing and marketing strategy, by contrast, are less technical, and their description does not

21  demand the same level of specificity that applies to technical matters.  *Alta Devices*, 343 F. Supp.

22  3d at 877.  Pricing and marketing strategies tied to specific products are typical trade secrets.  The

23  Court finds that the claim for misappropriation of the eighth trade secret is adequately pleaded.

24        Accordingly, the motion to dismiss is **GRANTED** as to AlterG's second trade secret claim

25  and **DENIED** as to AlterG's eighth trade secret misappropriation claim.

26  C.    <u>Breach of Contract</u>

27        AlterG's alleges that Defendants breached several of their contracts with AlterG.  The

28  Court dismissed the breach of contract claims from the original complaint because AlterG merely

11

**Exhibit 19**
**-211-**

1    alluded to the underlying contracts without attaching them or identifying their essential terms.  *See*

2    Order at 11–19.  AlterG has now attached the contracts to the FAC: five agreements between

3    Whalen and AlterG (FAC, Exhs. A–E), four between Allen and AlterG (FAC, Exhs. F–I), and

4    three between Bean and AlterG (FAC, Exhs. J–L).

5         Defendants argue that many of these contracts are no longer valid or enforceable because

6    they have been superseded due to integration clauses in more recent agreements, as summarized in

7    the chart below:

8

| | Superseded | Superseded By or Latest |
|---|---|---|
| Whalen Agreements | July 11, 2005 (FAC Exh. A)<br>Dec. 27, 2007 (FAC Exh. B)<br>August 7, 2008 (FAC Exh. C)<br>June 30, 2010 (FAC Exh. D) | April 1, 2012.  (FAC Exh. E) |
| Allen Agreements | January 26, 2007 (FAC Exh. F)<br>August 7, 2008 (FAC Exh. G)<br>April 16, 2012 (FAC Exh. H) | July 28, 2013 (FAC Exh. I) |
| Bean Agreements | June 15, 2009 (FAC Exh. J)<br>June 18, 2009 (FAC Exh. K) | August 10, 2016 (FAC Exh. L) |

15   Mot. at 12.

16        1.    Breach of Confidentiality

17        AlterG alleges that Whalen, Allen, and Bean all breached confidentiality provisions in their

18   contracts with AlterG.  *See* FAC ¶ 82.  Defendants argue that the confidentiality provision in each

19   Individual Defendant's most recent agreement superseded the confidentiality provisions in their

20   earlier agreements, so AG's claims based on the earlier agreements must be dismissed.

21        a.    Whalen's Agreements

22        Under California law, "[t]he crucial issue in determining whether there has been an

23   integration [that supersedes prior contracts] is whether the parties intended their writing to serve as

24   the exclusive embodiment of their agreement."  *Grey v. Am. Mgmt. Servs.*, 204 Cal. App. 4th 803,

25   807 (2012) (citation omitted).  "The existence of an integration clause is a key factor in divining

26   that intent."  *Id.*  The integration clause in the 2012 Whalen agreement provides:

27              This Agreement constitutes the entire agreement of the parties with
                respect to its subject matter, superseding all prior oral and written
28              communications, proposals, negotiations, representations,

United States District Court
Northern District of California

12

**Exhibit 19**
**-212-**

1        understandings, courses of dealing, agreements, contracts, and the
       like between the parties in such respect.

2 FAC, Exh. E § 7(e).

3       AlterG contends that the "with respect to its subject matter" language in this clause is key,

4 because the 2012 Whalen agreement covers different subject matter than his earlier agreements,

5 and thus does not supersede the earlier agreements.  Opp. at 13.  Specifically, the 2012 agreement

6 governed Whalen's relationship with AlterG during the time he was a consultant, whereas the

7 2005 and 2008 agreements governed the period when Whalen was AlterG's employee.

8       The 2012 agreement is explicitly titled "Consultant Agreement," and it governed "the

9 services of [Whalen] as a consultant to [AlterG]."  FAC, Exh. E at 1.  The confidentiality

10 provision therein requires Whalen to "agree that he will not, *during the Consultation Period* or at

11 any time thereafter, disclose . . . any Proprietary Information or Inventions."  *Id.* § 4(a) (emphasis

12 added).  "Proprietary Information or Inventions" is in turn defined as "[a]ll inventions . . . made,

13 conceived, written, designed or developed by the Consultant in the course of the performance of

14 services hereunder."  *Id.* § 5(a).  Accordingly, the subject matter of the 2012 agreement is

15 Whalen's duty of confidentiality in connection with his work as a *consultant* to AlterG.  In

16 contrast, the 2005 and 2008 agreements provide that "[Whalen's] *employment* creates a

17 relationship of confidence and trust between [him] and the Company with respect to Proprietary

18 Information."  FAC, Exh. A § 1 (emphasis added); *see* FAC, Exh. C.  Under those agreements,

19 Whalen is bound not to disclose any of AlterG's proprietary information "during [his] *employment*

20 by the company."  FAC, Exh. A § 3.a. (emphasis added).  The subject matter of the 2005 and 2008

21 agreements is thus Whalen's duty of confidentiality in connection with his work as an *employee* of

22 AlterG.  The 2012 Agreement therefore does not pertain to the same "subject matter."

23       Defendants disagree, arguing that because all three agreements address confidentiality,

24 they cover the same "subject matter."  Reply at 8.  In contesting the scope of the term "subject

25 matter," the parties cite *Cione v. Foresters Equity Servs., Inc.*, 58 Cal. App. 4th 625 (1997), and

26 *Jenks v. DLA Piper Rudnick Gray Cary US LLP*, 243 Cal. App. 4th 1 (2015).  In *Cione*, a

27 securities industry employee (Cione) entered into an agreement with the National Association of

28 Securities Dealers ("NASD") in which he agreed to arbitrate any disputes with his employer.  58

United States District Court
Northern District of California

13

**Exhibit 19**
**-213-**

United States District Court
Northern District of California

1   Cal. App. 4th at 630.  Subsequently, Cione and his employer (FESCO) entered into an

2   employment agreement that did not contain an arbitration clause.  *Id.* at 630–31.  FESCO, as a

3   third-party beneficiary of the arbitration clause in the NASD agreement, sought to arbitrate a

4   dispute with Cione.  Cione opposed, arguing that his employment contract with FESCO included

5   an integration clause and thus superseded the NASD arbitration clause.  The court rejected Cione's

6   position because "the scope of the integration clause was 'limited' to the 'subject matter

7   contained' in the written employment agreement," and the employment agreement did not "refer

8   to Cione's . . . arbitration agreement with NASD or otherwise make any mention of arbitration."

9   *Id.* at 637–38.  The subject matter of the two contracts was therefore not the same.

10       In *Jenks*, the defendant (DLA Piper) moved to compel arbitration of a dispute with a

11   former employee (Jenks) pursuant to an arbitration clause contained in the offer letter Jenks signed

12   when he started the job. 243 Cal. App. 4th at 5.  Jenks opposed, arguing that the termination

13   agreement he signed when he left DLA Piper superseded the offer letter.  *Id.* at 15.  The court held

14   that the termination agreement did not supersede the offer letter because, as in *Cione*, the

15   integration clause in the termination agreement was "explicitly limited to 'the subject matter

16   hereof,'" and the termination agreement "d[id] not mention arbitration at all" or dispute resolution

17   generally.  *Id.* at 15–16 (citing *Cione*, 58 Cal. App. 4th at 639).

18       Defendants read *Cione* and *Jenks* to mean that "subject matter" refers to the type of

19   provision in a contract, *i.e.*, if one contract contains an arbitration provision and another does not,

20   they do not concern the same subject matter.  Accordingly, Defendants reason, Whalen's 2005,

21   2008, and 2012 agreements all contain confidentiality provisions and thus have the same "subject

22   matter."  *Cione* and *Jenks* are inapposite.  In those cases, the plaintiff was an employee of the

23   defendant throughout their relationship; neither court addressed the precise question that is

24   relevant here: whether a confidentiality provision in a *consultant* contract supersedes a

25   confidentiality provision in an *employment* contract.

26       A more recent decision sheds light on that question.  In *Oxford Preparatory Academy v.*

27   *Edlighten Learning Solutions*, 34 Cal. App. 5th 605 (2019), the parties entered into a termination

28   agreement on June 17, 2016 that ended a preexisting management services agreement between

**Exhibit 19**
**-214-**

United States District Court
Northern District of California

1    them.  *Id.* at 607.  The court held that the termination agreement did not supersede the

2    management services agreement because they concerned different subject matters: the former

3    prescribed the parties' "rights and obligations . . . after June 17, 2016" whereas the latter

4    prescribed their "rights and obligations . . . before June 17, 2016."  *Id.* at 610.  *Oxford Preparatory*

5    instructs that "the 'subject matter' of [an] agreement" refers to the "rights and obligations" of the

6    parties to the agreement.  *Id.* at 611.

7         The 2012 Whalen agreement set forth his rights and obligations during the period he

8    worked as a consultant.  In contrast, the 2005 and 2008 agreements set forth his rights and

9    obligations during the time he was AlterG's employee.  Thus, the 2012 Agreement involves a

10   different 'subject matter' from the 2005 and 2008 agreements, and it does not "waive, extinguish,

11   excuse, or release any right or obligation of either party arising prior to" Whalen's work as a

12   consultant.  Accordingly, the 2012 agreement did not supersede the 2005 and 2008 agreements,

13   and—as a result—the Court rejects Defendants' contention that any claims based on the earlier

14   agreements must be dismissed.

15            b.        Allen's and Bean's Agreements

16        The 2013 Allen agreement and the 2016 Bean agreement contain identical integration

17   clauses, which provide:

18           This Agreement together with the Exhibits herein and any executed
             written offer letter between me and the Company, to the extent such
19           materials are not in conflict with this Agreement, sets forth the
             entire agreement and understanding between the Company and me
20           with respect to the subject matter herein and supersedes all prior
             written and oral agreements, discussions, or representations between
21           us, including, but not limited to, any representations made during
             my interview(s) or relocation negotiations.
22

23   FAC, Exh. I § 16(C); FAC, Exh. L § 16(C).

24        AlterG maintains that these agreements did not supersede Allen's and Bean's earlier

25   agreements, although not on the ground that the subject matter differed (there is no dispute that all

26   of their agreements were employment agreements).  Instead, AlterG contends that "[t]here is

27   nothing inconsistent between the various agreements with respect to Defendants' non-disclosure

28   obligations, and therefore nothing to supersede."  Opp. at 14.  However, AlterG does not elaborate

15

**Exhibit 19**
**-215-**

1    further on this argument, and cites no legal authority for the proposition that an integration clause

2    has no effect on a consistent contract.  Perhaps AlterG is attempting to invoke the principle that

3    "[e]vidence would be properly admissible 'to prove the existence of a separate . . . agreement as to

4    any matter on which [a contract] is silent and is not inconsistent with its terms' . . . even though

5    the [contract] appeared to state a complete agreement."  *Cione*, 58 Cal. App. 4th at 639 (quoting

6    *Masterson v. Sine*, 68 Cal. 2d 222, 226 (1968)).  But the most recent Allen and Bean agreements

7    are not silent on the matter of confidentiality, *Cione* is distinguishable.

8            AlterG offered no persuasive explanation as to why the integration clause does not apply to

9    Allen's and Bean's earlier agreements.  The Court finds those agreements superseded, and

10   therefore directs AlterG to plead their breach-of-confidentiality claims with reference to the

11   superseding agreements.

12           2.    Breach and Damages

13           Defendants argue that AlterG's breach of confidentiality claims fail for the independent

14   reason that the FAC does not sufficiently plead how Defendants breached their duty of

15   confidentiality and what damage it caused to AlterG.  Mot. at 15.

16           Defendants first claim that AlterG failed to plead "what specific confidential information

17   [disclosed by Defendants] in fact was integrated into the Boost One."  *Id.*  Contrary to Defendants'

18   contention, the FAC explicitly alleges that Defendants "have taken and used" the following AlterG

19   trade secrets "in developing, making, and marketing . . . the Boost One treadmills": "(1) the

20   concept of optional calibration and the use of parameters such as height and waist/shorts size as a

21   proxy for DAP control in an air based unweighting system; (2) the concept of retrofitting an

22   existing commercial treadmill with an air based unweighting system; (3) the vendor and model of

23   the blower used in AG4 prototypes; (4) the control algorithm, at least at the block diagram level,

24   for the blower used in AG4 prototypes; (5) the layout and build of the electronic packages on the

25   circuit boards for the blower used in AG4 prototypes for DAP control; [and] (6) AlterG DAP bag

26   design and construction/assembly, including the selection of the panel design, selection of the

27   materials for the panels, construction and assembly techniques, and the selection of the designer

28   and manufacturer for the bag."  FAC ¶ 90.

United States District Court
Northern District of California

16

**Exhibit 19**
**-216-**

United States District Court
Northern District of California

1    Defendants next claim that AlterG failed to explain how the alleged disclosure of

2    confidential information from the LCPP caused damages, given that AlterG admits the LCPP was

3    "not commercialized." FAC ¶ 59. The Court already considered and rejected this argument when

4    Defendants made it on their first motion to dismiss. AlterG's damages theory does not hinge on

5    the commercialization of the LCPP. Rather, the FAC alleges that AlterG suffered monetary

6    damages because Defendants used confidential information from the LCPP to develop and sell

7    over 20 units of the Boost One "to customers considering an AlterG unit." FAC ¶ 62; *see* Order at

8    13–14. AlterG has thus adequately pleaded damages.

9        3.    Whalen's Breach of Obligation to Obtain and Maintain AlterG's Patents

10    AlterG also alleges that under his 2005 and 2008 employee agreements, "Whalen agreed to

11    perform, during and after his employment, all acts necessary to permit and assist AlterG in

12    obtaining and maintaining valid and enforceable patents and other rights on the inventions that he

13    developed during his employment with AlterG." FAC ¶ 78. AlterG believes Whalen breached

14    this obligation "by not disclosing crucial information relating to the patentability of the '656

15    patent and related patent applications" (*i.e.*, by not alerting AlterG that a journalist had written

16    publicly about the '656 patent before the patent application was submitted). *Id.* ¶ 82. Defendants

17    ask the Court to dismiss the claim on the ground that Whalen's 2005 and 2008 agreements were

18    superseded by his 2012 agreement. Mot. at 14. Defendants' argument is unavailing because, as

19    discussed above, the subject matter of Whalen's 2012 consultant agreement was not the same as

20    that of his 2005 and 2008 employment agreements. Whalen was bound under his 2005 and 2008

21    agreements "to perform, *during and after [his] employment*, all acts deemed necessary or desirable

22    by the Company to permit and assist it . . . in obtaining, maintaining, defending and enforcing

23    patents." FAC, Exh. A (emphasis added). AlterG adequately alleges a breach of the 2005 and

24    2008 employee agreements.

25        4.    Allen's and Bean's Breach of Non-Compete Provisions

26    Under Allen's and Bean's employment agreements, each agreed that "during his

27    employment with AlterG, he would not engage in any activity that was competitive with AlterG's

28    business or proposed business." FAC ¶¶ 79, 80. AlterG alleges that they breached this non-

17

**Exhibit 19**
**-217-**

United States District Court
Northern District of California

1    compete agreement.  *Id.* ¶ 82.  Defendants argue that any attempt "to enforce a non-compete

2    provision post-employment" is presumptively unenforceable in California.  Mot. at 15.

3           Defendants are correct that *post*-employment non-compete provisions are generally

4    unenforceable under California law.  In *Muggill v. Reuben H. Donnelley Corp.*, 62 Cal. 2d 239

5    (1965), the California Supreme Court held that California Business & Professions Code § 16600

6    "invalidates provisions in employment contracts prohibiting an employee from working for a

7    competitor *after* completion of his employment."  *Id.* at 242 (emphasis added).  But that rule has

8    no relevance here, because AlterG alleges only that the employment agreements barred Allen and

9    Bean from competing with AlterG "*during* [their] employment with AlterG," and that they

10   breached the agreements "by directly competing with or engaging in activities that were

11   competitive with AlterG's business or proposed business *during* their employment with AlterG."

12   FAC ¶¶ 79, 80, 82 (emphases added).

13          Moreover, "[c]ourts have found an exception to section 16600 . . . where the agreement is

14   'necessary to protect the employer's trade secrets' or confidential information."  *E.D.C. Techs.,*

15   *Inc. v. Seidel*, 216 F. Supp. 3d 1012, 1015 (N.D. Cal. 2016) (quoting *Muggill*, 62 Cal. 2d at 242).

16   AlterG's allegations in this case center around Allen's and Bean's unauthorized disclosure of

17   AlterG's trade secrets and proprietary information, so California's general prohibition against non-

18   compete agreements would not bar the existence of the specific agreement here.  *See id.* at 1015–

19   16 (plaintiff adequately pled the existence of a contract, notwithstanding a non-compete provision,

20   where "[m]any of the facts alleged in the amended complaint center around [defendant's]

21   unauthorized use of [plaintiff's] 'intellectual property and confidential information'").

22          In sum, the Court **GRANTS** the motion to dismiss AlterG's breach of contract claim to the

23   extent it arises from Allen's superseded contracts (from 2007, 2008, and 2012) and Bean's

24   superseded contracts (from June 15, 2009 and June 18, 2009), but **DENIES** the motion otherwise.

25   D.     <u>Breach of Fiduciary Duty</u>

26          The FAC alleges that Whalen, as a co-founder and director of AlterG, owed a fiduciary

27   duty to AlterG and breached it by disclosing AlterG's proprietary information to Boost and by

28   undermining AlterG's efforts to secure and maintain its '656 patent.  FAC ¶¶ 110, 113.

**Exhibit 19**
**-218-**

United States District Court
Northern District of California

1    Defendants first argue that Whalen's 2012 consultant agreement superseded all of his

2    earlier agreements—out of which his fiduciary duties to AlterG arose—and therefore his breach of

3    fiduciary duty claim has no contractual basis.  Mot. at 16–17.  This argument fails because, as

4    discussed in the previous section, Whalen's 2012 agreement did not supersede his earlier

5    agreements with AlterG.  To the extent that Defendants argue that Whalen's fiduciary duty is

6    abrogated by the superseding of his confidentiality agreements, Defendants' argument fails

7    because, as discussed in the previous section, Whalen's 2012 agreement did not supersede his

8    earlier agreements with AlterG.

9    Defendants next challenge the factual plausibility of AlterG's account of Whalen's actions

10   in connection with the '656 patent.  According to the FAC:

11         24. On August 2, 2007, prior to filing the provisional applications on
12   October 15, 2007 that resulted in the issuance of [the '656 patent], AlterG's patent counsel asked Whalen "when you started to sell
13   machines with the current support bar and saddle bar shape," and advised Whalen that "[w]e can only file patents on what is not
14   disclosed to the public and on what was disclosed to the public within one year."

15         25. In response, Whalen did not answer the question directly or advise the patent counsel of any public disclosure of the invention,
16   but asked: "if we sold our first unit 11 months ago, will a provisional still lock our invention date? What date will that be?"
17   Based on Whalen's response, patent prosecution that resulted in the issuance of the '656 patent proceeded under the assumption that
18   there was no prior public use of the inventions. . . .

19         26. The '656 patent issued on June 26, 2018. On information and belief, during the pendency of the patent application that issued as
20   the '656 patent or its parent patent applications, Whalen never advised AlterG or its patent counsel of any public disclosure by
21   Whalen that could have rendered the '656 patent invalid.

22         27. Only after AlterG filed its original complaint against Defendants, in which AlterG alleged infringement of the '656 patent
23   by Defendant Boost, did Whalen and other Defendants claim for the first time in their motion to dismiss that the '656 patent was invalid
24   in view of a demo of AlterG's P200/G-Trainer treadmill, the subject of the '656 patent, to a journalist, who then featured the machine
25   in an online article on August 18, 2006. On information and belief, Allen and Whalen kept the information about the online article quiet
26   and as an insurance policy so they could use the information later to invalidate the '656 patent . . . , just in case the patent was asserted
27   against them for developing and selling an infringing product through Boost.

28

19

**Exhibit 19**
**-219-**

28. As it turned out, unbeknownst to anyone currently employed at AlterG, at the invitation of and/or arranged by Whalen, a trail running blogger visited AlterG and tried the P200/G-Trainer on or about August 10, 2006, and published a blog post featuring the P200/G-Trainer a week later.

FAC ¶¶ 24–28. Defendants call this account "entirely contrived." Mot. at 17. Seizing on AlterG's allegation that Whalen arranged the journalist's visit "unbeknownst to anyone currently employed at AlterG," Defendants question how AlterG could have "conjure[d] up [the] fantastic chain of events" described in the FAC. *Id.* But the contradiction between current employees lacking information about the visit and AlterG offering a detailed description of what allegedly occurred does not necessarily discredit AlterG's allegations; it is entirely possible, for example, that once AlterG was alerted to the journalist's 2006 visit by Defendants' first motion to dismiss, AlterG reached out to former employees to ascertain more facts about the visit.

There is more merit in Defendants' challenge to the allegation that "Allen and Whalen kept the information about the online article quiet and as an insurance policy so they could use the information later to invalidate the '656 patent . . . , just in case the patent was asserted against them for developing and selling an infringing product through Boost." FAC ¶ 27. As Defendants point out, it seems highly improbable that in 2007—when Whalen was still a director and board member of AlterG, and Boost's formation was still almost a decade away—Whalen harbored the intent to sabotage AlterG's patent application process in case he later joined a competing company. Defendants believe that such an allegation about Whalen's state of mind is an "unwarranted deduction[] of fact" or "unreasonable inference[]" that the Court is not required to accept as true. *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008). The Court agrees. The alleged sequence is farfetched and implausible. *Cf. Starr v. Baca*, 652 F.3d 1202, 1216–17 (9th Cir. 2011) ("Plaintiff's complaint may be dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is *im*plausible.") (emphasis in original).

Nonetheless, this allegation may not be critical to AlterG's breach of fiduciary duty claim. Whalen was bound under his employment agreements "to perform, during and after [his] employment, all acts deemed necessary or desirable by the Company to permit and assist it . . . in

20

**Exhibit 19**
**-220-**

United States District Court
Northern District of California

obtaining, maintaining, defending and enforcing patents." FAC, Exh. A. Whalen's failure to inform AlterG's patent counsel about the journalist's article on the P200/G-Trainer treadmill on its own may have violated the duty he owed to AlterG, regardless of his motivations for doing so. Notably, when Whalen spoke to AlterG's patent counsel on August 2, 2007, it was still less than one year after the publication of the demo in the online article and the blog post.

Accordingly, the Court **DENIES** the motion to dismiss AlterG's breach of fiduciary duty claim.

E.      Interference with Contract

AlterG alleges that Defendants interfered with three sets of AlterG's contracts: (1) its confidentiality agreements with each Individual Defendant; (2) its confidentiality agreements with Woodway; and (3) its contract with the University of Tennessee, a customer. FAC ¶¶ 116–22. "The elements which a plaintiff must plead to state the cause of action for intentional interference with contractual relations are (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990). Defendants argue that AlterG's allegations are deficient as to the Woodway and University of Tennessee contracts. Mot. at 18.

1.      Pleading Standard

The parties first dispute the pleading standard that governs the interference of contract claim. Defendants urge the Court to apply the heightened standard for pleading fraud under Rule 9(b). Mot. at 19. Rule 9(b) requires that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Defendants point out that AlterG is seeking punitive damages for its interference with contract claim based on the allegation that "Defendants committed the [interference] maliciously, fraudulently, and oppressively, with the wrongful intention of injuring AlterG." FAC ¶ 123.

Fraud and malice are not essential elements of an interference with contract claim under California law. *See Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 55–56 (1998)

**Exhibit 19**
-221-

United States District Court
Northern District of California

United States District Court
Northern District of California

1  (holding that "it is not necessary that the defendant's conduct be wrongful apart from the

2  interference with the contract itself," so "[i]ntentionally inducing or causing a breach of

3  an existing contract" is "not an element of the tort").  Thus, "the heightened pleading standard

4  under Rule 9(b) generally does not apply to claims of intentional interference with contracts."

5  *Fabian v. Seto*, No. SACV15856JLSDFMX, 2015 WL 12683812, at *6 n.3 (C.D. Cal. Oct. 6,

6  2015).  But Rule 9(b) can apply even "[i]n cases where fraud is not a necessary element of a

7  claim."  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003).  For example, if a

8  plaintiff "allege[s] some fraudulent and some non-fraudulent conduct . . . . , only the allegations of

9  fraud are subject to Rule 9(b)'s heightened pleading requirements."  *Id.* at 1104.  And if a plaintiff

10  "allege[s] a unified course of fraudulent conduct and rel[ies] entirely on that course of conduct as

11  the basis of a claim . . . . [,] the pleading of that claim as a whole must satisfy the particularity

12  requirement of Rule 9(b)."  *Id.* at 1103–04.

13      Here, the FAC alleges that Defendants' interference with AlterG's contracts formed a

14  unified course of fraudulent conduct.  *See* FAC ¶ 123 ("Defendants committed the aforementioned

15  acts maliciously, fraudulently, and oppressively, with the wrongful intention of injuring AlterG . .

16  . ."), ¶ 142 (alleging that Boost representatives made false statements about AlterG to the

17  University of Tennessee).  Courts have evaluated interference with contract claims premised on

18  similar allegations under the Rule 9(b) standard.  *See, e.g.*, *United States v. Agbayani Constr.*

19  *Corp.*, No. 14-CV-02503-MEJ, 2014 WL 3866095, at *3 (N.D. Cal. Aug. 5, 2014) (plaintiff

20  sought punitive damages in connection with interference with contract claim based on allegations

21  of defendant's "willful, oppressive, and fraudulent" conduct).

22      AlterG cites two cases in which courts applied the regular Rule 8(a) pleading standard to

23  interference with contract claims.  Those cases are distinguishable because the acts of interference

24  there were not alleged to be fraudulent.  *See Seaman v. Valley Health Care Med. Grp., Inc.*, No.

25  CV098532DOCRNBX, 2011 WL 13213625, at *3 (C.D. Cal. Apr. 25, 2011); *Ordonez v. Saxon*

26  *Mortgages Servs., Inc.*, No. CVF 08-1148 LJO GSA, 2009 WL 395488, at *4 (E.D. Cal. Feb. 17,

27  2009).  The Court finds the Rule 9(b) standard to be appropriate here.  This means that AlterG's

28  allegations "must be accompanied by 'the who, what, when, where, and how' of the misconduct

**Exhibit 19**
**-222-**

United States District Court
Northern District of California

1    charged." *Vess*, 317 F.3d at 1106.

2             2.       Woodway

3             AlterG entered into a May 2007 confidentiality agreement with Woodway, under which

4    Woodway agreed that it "shall not use in any way, for [its] own account or the account of any third

5    party, nor disclose to any third party, any such confidential information which is revealed to it by

6    [AlterG]." FAC ¶ 199. AlterG alleges that "Defendants, Whalen and Allen especially," knew of

7    this agreement and induced Woodway to breach it "to produce a competitive product based on the

8    confidential information it obtained from AlterG." *Id.* Defendants contend this allegation is

9    deficient in three ways.

10            Defendants first argue that AlterG failed to allege the "who, what, when, where, and how"

11   of the interference with Woodway's confidentiality agreement. Contrary to Defendants' claim,

12   AlterG has alleged the who, what and how: "Defendants, Whalen and Allen especially, induced

13   Woodway to breach the confidentiality agreement with AlterG" by "utilizing a Woodway

14   treadmill" to "create[] an anti-gravity unit that derived directly from the technology Whalen and

15   other AlterG engineers developed for AlterG in the Low Cost Platform Project." FAC ¶¶ 119, 46.

16   However, Defendants are correct that AlterG failed to specify when and where Whalen and Allen

17   induced Woodway to give up AlterG's proprietary technology. The FAC only alleges in vague

18   fashion that "[u]nbeknownst to AlterG, Whalen and Allen started secretly working with Woodway

19   on developing a low-cost anti-gravity unit." FAC ¶ 46. While Plaintiff may not yet have

20   information to know precise facts, it is not unreasonable to ask Plaintiff to allege the "when" and

21   "where" in as much detail as they can reasonably muster, based on at least some broader

22   parameters.

23            Defendants next contend that it is implausible for AlterG to allege that Defendants knew

24   about a confidentiality agreement with Woodway that dated all the way back to 2007. Mot. at 19.

25   This is a strange argument to make, given that Whalen was with AlterG from its founding until

26   2015, and Allen was with the company from 2007 until 2015—and indeed was AlterG's "principal

27   liaison" to Woodway. *See* FAC ¶¶ 19, 37, 40–43. It is eminently plausible that they both would

28   have known about AlterG's 2007 contract with Woodway.

                                                      23

**Exhibit 19**
**-223-**

United States District Court
Northern District of California

1    Finally, Defendants argue that AlterG failed to allege the "actual . . . disruption of the

2    contractual relationship" and "resulting damage" elements of the interference with contract claim.

3    *Pac. Gas*, 50 Cal. 3d at 1126.  But this is not so.  AlterG alleged that "Whalen and Allen . . .

4    induced Woodway to breach the confidentiality agreement with AlterG to produce a competitive

5    product based on the confidential information it obtained from AlterG."  FAC ¶ 119.  AlterG has

6    also stated that Defendants have used the confidential information from Woodway to develop and

7    "sell over 20 [Boost] units to date to customers considering an AlterG unit."  *Id.* ¶ 62.  These

8    allegations are sufficient to establish actual disruption and resulting damages.

9         3.    <u>University of Tennessee</u>

10    AlterG alleges that in May 2018, AlterG won a bid to supply the University of Tennessee

11    with two anti-gravity treadmills.  FAC ¶ 120.  "However, in June 2018, after a person well

12    acquainted with Boost (and [who] later joined Boost) became involved in the University of

13    Tennessee's purchasing decision, and on information and belief, after Boost representatives made

14    contact with the University and made false representations about Boost capabilities and negative

15    libelous comments about AlterG, the University of Tennessee retracted the contract award to

16    AlterG and purchased two Boost One treadmills instead."  *Id.*

17    Defendants assert that AlterG merely won a bid with the University of Tennessee, which is

18    not a "valid contract" that is required for an interference with contract claim.[4]  *Pac. Gas*, 50 Cal.

19    3d at 1126.  It is true that AlterG did not explicitly allege it had entered into a complete contract

20    with the University of Tennessee.  But if inferences are drawn in AlterG's favor, it is plausible that

21    the University of Tennessee had a contractual obligation to purchase treadmills from whichever

22    vendor won the bidding process.  AlterG's claim thus will not be dismissed at this juncture.

23    Next, Defendants argue that AlterG failed to specify who made the false representations to

24    the University of Tennessee and what the false representations consisted of.  But the FAC alleges

25    that "sales representatives of the Boost One treadmill falsely told the University of Tennessee that

26    Woodway would stop selling treadmill[s] to AlterG."  FAC ¶ 142.  This specifies the "who"

27    _____

28    [4] Defendants did not make this argument in their motion, but raised it for the first time on reply.  *See* Reply at 12.

24

**Exhibit 19**
-224-

1  (Boost sales representatives) and the "what" (the false statement that Woodway would stop

2  supplying AlterG with treadmills).  Defendants complain that the FAC is vague regarding the

3  identity of the "person well acquainted with Boost (and later joined Boost) [who] became involved

4  in the University of Tennessee's purchasing decision."  FAC ¶ 120.  However, the identity of this

5  person does not appear to be material to AlterG's claim; it is the Boost sales representatives that

6  made the false representations at issue.

7        Accordingly, the Court **GRANTS** the motion to dismiss the interference with contract

8  claim with respect to Woodway **with leave to amend** with details of when and where Defendants

9  induced Woodway to breach its confidentiality agreement.  It **DENIES** the motion with respect to

10  the University of Tennessee.

11  F.     Interference with Prospective Economic Advantage

12        AlterG alleges that Defendants interfered with AlterG's prospective economic

13  relationships with Northwestern University and Woodway.[5]  *See* FAC ¶¶ 125–132.  The elements

14  of a claim for intentional interference with prospective economic advantage are: "(1) an economic

15  relationship between the plaintiff and some third person containing the probability of future

16  economic benefit to the plaintiff; (2) knowledge by the defendant of the existence of the

17  relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship;

18  (4) actual disruption of the relationship; and (5) damages to the plaintiff proximately caused by the

19  acts of the defendant."  *Blank v. Kirwan*, 39 Cal. 3d 311, 330 (1985).

20        As with its interference with contract claim, AlterG's interference with prospective

21  economic advantage claim seeks punitive damages because AlterG alleges that "Defendants

22  committed the [interference] maliciously, fraudulently, and oppressively, with the wrongful

23  intention of injuring AlterG."  FAC ¶ 133.  The claim therefore must also meet the pleading

24  requirements of Rule 9(b).

25

26

27  [5] The FAC also contains allegations that Defendants interfered with AlterG's relationship with

28  Bear Fitness, a service vendor.  *See* FAC ¶ 128.  However, AlterG clarifies in its opposition that this allegation is "relevant to show Defendants' pattern of behavior," but is not a standalone claim for interference.  Opp. at 20 n.16.

**Exhibit 19**
**-225-**

1         1.     <u>Northwestern University</u>

2     The FAC alleges that:

3
4
5
6
7
> Defendants, especially Bean, knew that Northwestern University was a sales target of AlterG's. In or around late March 2017, shortly before his resignation from AlterG, Bean was involved in developing a pricing strategy for potentially obtaining the Northwestern University account. On information and belief, Defendants used the information Bean obtained and developed while at AlterG to formulate Boost's sales pitch to Northwestern University, resulting in Boost's very first sale of the Boost One treadmill.

8   FAC ¶ 126.

9     This claim fails because a mere "sales target" does not constitute "an economic

10  relationship . . . containing the probability of future economic benefit." *Blank*, 39 Cal. 3d at 330.

11  Courts have made clear that "[t]he law precludes recovery for overly speculative expectancies by

12  initially requiring proof" that it is "reasonably probable that the prospective economic advantage

13  would have been realized but for defendant's interference." *Westside Ctr. Assocs. v. Safeway*

14  *Stores 23, Inc.*, 42 Cal. App. 4th 507, 522 (1996).  The allegation that Northwestern University

15  was a "sales target" indicates only that AlterG wished to acquire the university as a customer, not

16  that a sale would probably have been realized.  In *Silicon Knights, Inc. v. Crystal Dynamics, Inc.*,

17  983 F. Supp. 1303 (N.D. Cal. 1997), the court dismissed an interference with prospective

18  economic advantage claim in similar circumstances.  The plaintiff there alleged interference with

19  its "reasonable expectation of trade and business relationships with . . . prospective customers."

20  *Id.* at 1312.  But because the complaint did "not allege that [plaintiff] was in the midst of

21  negotiations" with the prospective customers or give any other indication that the prospective

22  relationships would likely have been realized as actual sales, the court found that the claim

23  "assert[ed] the type of speculative economic relationship [the court had previously] disapproved of

24  . . . ."  *Id.*; *see also A-Mark Coin Co. v. General Mills, Inc.*, 148 Cal. App. 3d 312, 324 (1983)

25  ("[I]t is no tort to beat a business rival to prospective customers.").

26     Based on AlterG's allegations here, any relationship it had with Northwestern University

27  was speculative and not probable.  The Court therefore **GRANTS** the motion to dismiss this claim

28  and allows AlterG one more opportunity to amend if it indicates it can plead additional facts to

**Exhibit 19**
**-226-**

1    take its claim out of the speculative realm.

2            2.      Woodway

3            AlterG alleges that "while Woodway currently supplies treadmills to AlterG, due to

4    Defendants' interference alleged herein, it is highly uncertain whether Woodway will continue to

5    supply treadmills to AlterG."  FAC ¶ 127.  According to AlterG, "[o]n at least one occasion, sales

6    representatives of the Boost One treadmill told the University of Tennessee . . . that Woodway

7    would stop selling treadmills to AlterG."  *Id.*

8            Defendants correctly point out that the FAC has not alleged "actual disruption of the

9    relationship" between AlterG and Woodway, nor has it alleged "damages . . . proximately caused

10   by the acts of the defendant."  *Blank*, 39 Cal. 3d at 330.  By AlterG's own admission, Woodway is

11   still supplying treadmills to AlterG, so there has been no actual disruption of the supplier

12   relationship.  Moreover, AlterG's claim that "it is highly uncertain whether Woodway will

13   continue to supply treadmills to AlterG" is undermined by its statement, in the same paragraph,

14   that "Woodway has also notified AlterG that it will raise the price of the treadmills supplied to

15   AlterG."  FAC ¶ 127.  The latter suggests Woodway intends to continue to make its treadmills

16   available to AlterG, albeit at a higher price.  Cessation of business with Woodway is not probable.

17           Because AlterG's own allegations indicate that there has been no actual or probable

18   disruption of its supplier relationship with Woodway, the Court **GRANTS** the motion to dismiss

19   the interference with prospective economic advantage claim as to Woodway **without leave to**

20   **amend**.

21   G.     False Advertisement

22           AlterG alleges that Defendants engaged in false advertising in violation of the Lanham Act

23   by "falsely claim[ing] that the Boost One is a superior product over the AlterG DAP systems 'at a

24   fraction of the cost.'"  FAC ¶ 135.  A false advertising claim under the Lanham Act has five

25   elements: "(1) a false statement of fact by the defendant in a commercial advertisement about its

26   own or another's product; (2) the statement actually deceived or has the tendency to deceive a

27   substantial segment of its audience; (3) the deception is material, in that it is likely to influence the

28   purchasing decision; (4) the defendant caused the false statement to enter interstate commerce; and

United States District Court
Northern District of California

**Exhibit 19**
-227-

United States District Court
Northern District of California

1    (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct

2    diversion of sales from itself to defendant or by a lessening of the goodwill associated with its

3    products." *Skydive Arizona, Inc. v. Quattrocchi,* 673 F.3d 1105, 1110 (9th Cir. 2012).  AlterG's

4    false advertising claim is subject to the Rule 9(b) pleading standard.  *See* Order at 19; *TransFresh*

5    *Corp. v. Ganzerla & Assoc., Inc.*, 862 F. Supp. 2d 1009, 1017–18 (N.D. Cal. 2012).  As noted

6    above, that means that the FAC must therefore allege "'the who, what, when, where, and how' of

7    the fraud." *TransFresh Corp.*, 862 F. Supp. 2d at 1017 (quoting *Vess*, 317 F.3d at 1106).

8            Defendants fault AlterG for failing to establish the second and third elements of a Lanham

9    Act claim; they challenge whether the false statements at issue actually deceived or have the

10   tendency to deceive a substantial segment of its audience and whether the statements were likely

11   to influence consumers' purchasing decisions.  Mot. at 24.  These challenges fail.  The FAC

12   alleges that by falsely representing the capabilities of the Boost One treadmill relative to AlterG

13   products, Defendants have succeeded in selling "over 20 [Boost] units to date to customers

14   considering an AlterG unit."  FAC ¶ 62.  These allegations suggest that Defendants' false

15   advertising may have, in fact, deceived customers and influenced their decisions to opt for the

16   Boost One over AlterG treadmills.

17           Defendants next claim that AlterG failed to specify the "where" and "when" of the false

18   advertising as required by Rule 9(b).  Again, Defendants are incorrect.  AlterG alleged that

19   Defendants made deceptive statements on Boost's own website and on Woodway's website, and it

20   specified when those statements were first posted to the websites.  *See* FAC ¶ 135.  Defendants

21   protest that the advertising on Woodway's website is not "necessarily attributable" to Boost.  Mot.

22   at 23–24.  However, as AlterG notes, at the pleading stage it needs only show that the false

23   advertising is plausibly attributable, not "necessarily attributable," to Defendants.  Opp. at 22.  The

24   FAC describes Woodway as an "affiliate and sales partner" of Boost, FAC ¶ 135, from which it

25   can be reasonably inferred that Boost is responsible for the statements about Boost products on the

26   website.

27           Defendants' argument that AlterG failed to identify "who" made the false statements is

28   more meritorious.  *See* Mot. at 23.  Under Rule 9(b), "there is no absolute requirement that where

**Exhibit 19**
**-228-**

1    several defendants are sued in connection with an alleged fraudulent scheme, the complaint must

2    identify false statements made by each and every defendant," but a plaintiff must "at a minimum,

3    identify the role of each defendant in the alleged fraudulent scheme."  *Swartz v. KPMG LLP*, 476

4    F.3d 756, 764 (9th Cir. 2007) (emphasis and brackets removed).  Accordingly, the Court

5    previously found lacking AlterG's "completely undifferentiated" allegations in the original

6    complaint "asserting that 'Defendants' are responsible for the statements."  Order at 21.  AlterG

7    has now amended the complaint to allege that "Defendants, either individually or collectively"

8    made the false statements.  FAC ¶ 135.  This is no clearer than the original allegation, and still

9    fails to identify the role of each Defendant in the alleged fraudulent scheme.  Again, even in the

10   absence of precise information, Plaintiff can allege with more detail even within broad parameters.

11   *See Swartz*, 476 F.3d at 764.  AlterG maintains it has "made specific allegations as to the role of

12   each Defendant," but the FAC paragraphs it cites to merely detail the role of each Defendant

13   within Boost generally, not their role in the false advertising.  Opp. at 23 (citing FAC ¶¶ 3–5, 51,

14   60).  Perhaps recognizing that its pleading lacks particularity, AlterG requests leave to amend its

15   FAC "to allege the false advertising claim only against Boost."  Opp. at 23 n.17.

16        The Court accordingly **GRANTS** Defendant's Motion to Dismiss as to AlterG's Lanham

17   Act claim, but permits AlterG leave to amend the claim to bring it into compliance with Rule 9(b)

18   by specifying that only Boost was responsible for the false advertising.  The Court finds the claim

19   adequately pleaded in all other respects.

20   H.    Trade Libel

21        AlterG asserts Defendants engaged in trade libel by making "false, disparaging, and

22   defamatory statements regarding AlterG's business and products to several AlterG customers and

23   potential AlterG customers."  FAC ¶ 140.  "Trade libel is defined as 'an intentional disparagement

24   of the quality of property, which results in pecuniary damage.'"  *Aetna Cas. & Sur. Co. v.

25   Centennial Ins. Co.*, 838 F.2d 346, 351 (9th Cir. 1988) (quoting *Erlich v. Etner*, 224 Cal. App. 2d

26   69, 73 (1964)).  A trade libel claim requires: (1) a publication, (2) which induces others not to deal

27   with plaintiff, and (3) special damages."  *Id.* (citing *Polygram Records, Inc. v. Superior Court*, 170

28   Cal. App. 3d 543, 548–49 (1985)).  Moreover, "a plaintiff must allege: (1) who made the

United States District Court
Northern District of California

29

**Exhibit 19**
-229-

United States District Court
Northern District of California

1    statements, (2) to whom the statements were made, (3) the time and place of publication, and (4)

2    the substance of the statements."  *NPK Indus. v. Hunter*, No. 15-CV-00811-SI, 2015 WL 5461667,

3    at *4 (N.D. Cal. Sept. 16, 2015) (citations omitted).

4         Defendants contend AlterG's trade libel claim is deficient because "[n]ot a single definitive

5    statement made to a specific AlterG customer or potential customer by a specific Defendant has

6    been identified."  Mot. at 24.  Defendants are incorrect.  The FAC details one particular instance

7    of trade libel: "[I]n or around May 2018, sales representatives of the Boost One treadmill falsely

8    told the University of Tennessee that Woodway would stop selling treadmill [sic] to AlterG."[6]

9    FAC ¶ 142.  This specifies who made the statements, to whom the statements were made, the time

10   and place of publication, and the substance of the statements.  *See NPK Indus.*, 2015 WL 5461667,

11   at *4.  Defendants fairly point out that there is some ambiguity as to whether the "sales

12   representatives" mentioned above actually refer to Defendants, but given that the same paragraph

13   describes the statements made to the University of Tennessee as "Defendants' misrepresentation,"

14   FAC ¶ 142, a reasonable inference in Plaintiff's favor requires that the ambiguity be resolved in

15   AlterG's favor.

16        Defendants also question the allegation that "AlterG lost the sales of two Pro200 treadmills

17   to the University of Tennessee at least *in part* due to Defendants' misrepresentation."  FAC ¶ 142

18   (emphasis added).  But to plead a trade libel claim, a plaintiff need only show that the

19   misrepresentation "played a material and substantial part in inducing others not to deal with [the

20   plaintiff]," not that it was the sole cause of the decision not to deal.  *Erlich v. Etner*, 224 Cal. App.

21   2d 69, 73 (1964).  That AlterG's loss of sales may have been attributable only "in part" to

22   Defendants' disparagement is not fatal to its trade libel claim.

23        Finally, Defendants also argue that AlterG's allegations are "based only on non-public and

24   non-published statements made to University of Tennessee."[7]  Reply at 15.  But Defendants

25   _____

26   [6] The FAC also describes an alleged instance of trade libel directed at Bear Fitness, a service
     vendor for AlterG.  *See* FAC ¶ 143.  However, AlterG clarifies in its opposition that this allegation
27   is "relevant to show Defendants' pattern of behavior," but is not a standalone trade libel claim.
     Opp. at 20 n.16.

28   [7] Again, this is an argument Defendants raise for the first time on reply.  It was not made in the

**Exhibit 19**
**-230-**

misconstrue the "publication" element of a trade libel claim.  In the context of trade libel and defamation, "publication" is simply "defined as a communication to some third person." *Ringler Assocs. Inc. v. Maryland Cas. Co.*, 80 Cal. App. 4th 1165, 1179 (2000).  "Publication need not be to the public or a large group; communication to a single individual is sufficient." *Id.* (citing *Cunningham v. Simpson*, 1 Cal. 3d 301, 306 (1969)).

Accordingly, the Court **DENIES** the motion to dismiss AlterG's trade libel claim.

I.     <u>Unfair Competition</u>

AlterG brings a claim under the "unlawful" prong of California's Unfair Competition Law ("UCL").  Under the "unlawful" prong, "[t]he UCL 'borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable.'" *Wilson v. Hewlett–Packard Co.,* 668 F.3d 1136, 1140 (9th Cir. 2012) (quoting *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.,* 20 Cal. 4th 163, 180 (1999)).  AlterG identifies its trade secret misappropriation and breach of fiduciary claims as the predicates for its UCL claim.  *See* FAC ¶¶ 147–48.  Because those two predicate claims are adequately pleaded (at least in part), the Court **DENIES** the motion to dismiss the UCL claim.

## IV.     <u>CONCLUSION</u>

For the foregoing reasons,

- The Court **DENIES** the motion to dismiss AlterG's direct, indirect, and willful infringement claims.

- The Court **GRANTS** the motion to dismiss as to AlterG's second trade secret claim and **DENIES** the motion as to AlterG's eighth trade secret misappropriation claim.

- The Court **GRANTS** the motion to dismiss AlterG's breach of contract claim to the extent it arises from Allen's superseded contracts (from 2007, 2008, and 2012) and Bean's superseded contracts (from June 15, 2009 and June 18, 2009), but **DENIES** the motion otherwise.

- The Court **DENIES** the motion to dismiss AlterG's breach of fiduciary duty claim.

motion to dismiss.

**Exhibit 19**
-231-

- The Court **GRANTS** the motion to dismiss the interference with contract claim with respect to Woodway **with leave to amend** with details of when and where Defendants induced Woodway to breach its confidentiality agreement.  The Court **DENIES** the motion with respect to the University of Tennessee.

- The Court **GRANTS** the motion to dismiss AlterG's claim that Defendants interfered with AlterG's prospective economic relationship with Northwestern University and allows AlterG one more opportunity to amend, if it indicates it can plead additional facts to take its claim out of the speculative realm.  The Court **GRANTS** the motion to dismiss the interference with prospective economic advantage claim as to Woodway **without leave to amend**.

- The Court **GRANTS** Defendant's Motion to Dismiss as to AlterG's Lanham Act claim, but permits AlterG leave to amend the claim to bring it into compliance with Rule 9(b) by specifying that only Boost was responsible for the false advertising.

- The Court **DENIES** the motion to dismiss AlterG's trade libel claim.

- The Court **DENIES** the motion to dismiss the UCL claim.

This order disposes of Docket No. 37.

**IT IS SO ORDERED**.

Dated: September 5, 2019

_____

EDWARD M. CHEN
United States District Judge

**Exhibit 19**
**-232-**

United States District Court
Northern District of California

# EXHIBIT 20

1   Steven J. Nataupsky (State Bar No. 155,913)
    snataupsky@kmob.com
2   Boris Zelkind (State Bar No. 214,014)
    boris.zelkind@kmob.com
3   Ali S. Razai (State Bar No. 246,922)
    ali.razai@kmob.com
4   KNOBBE, MARTENS, OLSON & BEAR, LLP
    550 West C Street, Suite 1200
5   San Diego, CA 92101
    Telephone: (619) 235-8550
6   Facsimile: (619) 235-0176

7   Attorneys for Plaintiff and Counter-Defendant
    I-FLOW CORPORATION

8

9                IN THE UNITED STATES DISTRICT COURT

10           FOR THE SOUTHERN DISTRICT OF CALIFORNIA

11

12   I-FLOW CORPORATION, a Delaware       )   Case No. 3:07-cv-1200-DMS-NLS
     corporation,                          )
13                                          )   **PLAINTIFF'S AMENDED**
                     Plaintiff,             )   **IDENTIFICATION OF TRADE**
14                                          )   **SECRETS MISAPPROPRIATED BY**
            v.                              )   **DEFENDANTS PURSUANT TO**
15                                          )   **C.C.P. § 2019.210**
     APEX MEDICAL TECHNOLOGIES, INC., a     )
16   California corporation; MARK           )
     MCGLOTHLIN, an Individual.             )   Judge: Honorable Dana M. Sabraw
17                                          )
                     Defendants.            )
18   ────────────────────────────────       )
     APEX MEDICAL TECHNOLOGIES, INC., a     )
19   California corporation,                )
                                            )
20                   Counter-Claimant,      )
                                            )
21          v.                              )
                                            )
22   I-FLOW CORPORATION, a Delaware         )
     corporation,                           )
23                                          )
                     Counter-Defendant.     )
24                                          )

25

26

27

28
                              -1-
                         **EXHIBIT A**        Notice of Trade Secret per C.C.P. sec. 2019.210
                         **PAGE 4**                        Case No. 07cv01200

**Exhibit 20**
**-233-**

1       Pursuant to Section 2019.210 of the California Code of Civil Procedure and the Court's

2  February 15, 2008 Order Granting Defendant's Motion To Compel Identification of Trade

3  Secrets, Plaintiff I-Flow Corporation ("I-Flow") hereby identifies the trade secrets that I-Flow

4  presently contends in this lawsuit were misappropriated by Defendants, Apex Medical

5  Technologies, Inc. and Mark McGlothlin (collectively referred to herein as "APEX"):

6       1.     During the course of a collaborative effort between I-Flow and APEX spanning

7  from approximately May, 2005 to approximately December, 2005 ("Collaborative Effort"),

8  APEX agreed to conduct modulus curve testing on elastomeric bladder materials for use in

9  I-Flow's infusion pump products.   To enable APEX to perform the testing, I-Flow

10  communicated to Apex I-Flow's requirements for modulus values at particular elongation

11  percentages.  I-Flow's requirements for modulus values are not generally known by those

12  skilled in the trade.  The results of the modulus curve testing for the specific materials tested

13  were also proprietary information owned by I-Flow and not generally known by those skilled in

14  the trade.  APEX misappropriated this valuable trade secret information in the course of

15  developing and manufacturing its own competing product.

16       2.     During the course of the Collaborative Effort, I-Flow communicated to APEX

17  its unique internally developed ranges of acceptable tensile strength of the elastomeric material

18  for I-Flow's elastomeric infusion pump bladders.  These unique ranges of acceptable tensile

19  strength were compiled through years of I-Flow's internal testing, experimentation and data

20  collection, and while certain individual acceptable tensile strength values may be known to

21  those skilled in the trade, I-Flow's compiled range of acceptable tensile strength values are not

22  generally known to those skilled in the trade.  APEX misappropriated this valuable trade secret

23  information in the course of developing and manufacturing its own competing product.

24       3.     During the course of the Collaborative Effort, I-Flow communicated to APEX

25  information describing I-Flow's unique ranges of acceptable elongation of elastomeric bladders

26  for I-Flow's infusion pumps.  This information included I-Flow's maximum fill volume

27  information and corresponding force applied at particular elongation percentages.  This

28  information was compiled through years of I-Flow's internal testing, experimentation and data

-2-

**EXHIBIT A
PAGE 5**

1  collection, and while certain individual elongation values may be known to those skilled in the

2  trade, I-Flow's compilation of information on its acceptable elongation requirements is not

3  generally known to those skilled in the trade.  APEX misappropriated this valuable trade secret

4  information in the course of developing and manufacturing its own competing product.

5      4.      During the course of the Collaborative Effort, I-Flow communicated to APEX

6  its unique acceptable ranges of thickness for elastomeric infusion pump bladders.  I-Flow's

7  acceptable bladder thicknesses are unique because I-Flow's latex bladder thickness is achieved

8  through a proprietary multilayer dipping process that provides material properties that are

9  unequaled by "standard" natural latex at the same thicknesses.   While certain acceptable

10 bladder thickness values may be measured by those skilled in the trade, I-Flow's acceptable

11 range of bladder thicknesses, achieved with its proprietary multilayer dipping process, is not

12 generally known to those skilled in the trade.  Apex misappropriated this valuable trade secret

13 information in the course of developing and manufacturing its own competing product.

14     5.      During the course of the Collaborative Effort, I-Flow communicated to APEX

15 its internally developed evaluation of acceptable burst rates for elastomeric infusion pump

16 bladders.  I-Flow's internally developed acceptable burst rate analysis is based on evaluation of

17 tens of millions infusion pump products and decades worth of market and product information.

18 The results of I-Flow's internal analysis of acceptable burst rates for elastomeric infusion pump

19 bladders are not generally known by those skilled in the trade.   APEX misappropriated this

20 valuable trade secret information in the course of developing and manufacturing its own

21 competing product.

22     6.      During the course of the Collaborative Effort, I-Flow collaborated with APEX

23 to develop an optimal dip molding process for manufacturing an isoprene elastomeric bladder

24 tailored to I-Flow's specifications.   Process modifications aimed at reducing drying time and

25 equipment wait time for the manufacture of an isoprene elastomeric bladder were developed for

26 I-Flow.   These developed molding process modifications are not generally known to those

27 skilled in the trade.     APEX misappropriated this valuable trade secret in the course of

28 developing and manufacturing its own competing product.

-3-

**EXHIBIT A**
**PAGE 6**

Notice of Trade Secret per C.C.P. sec. 2019.210
Case No. 07cv01200

**Exhibit 20**
**-235-**

7.     During the course of the Collaborative Effort, I-Flow communicated to APEX I-Flow's unique acceptable ranges for filling pressure requirements of I-Flow's elastomeric infusion pump bladders.   I-Flow determined and compiled its acceptable ranges of filling pressure through years of internal testing, experimentation and data collection.   While certain individual filling pressure values may have been known to be acceptable to those skilled in the trade, I-Flow's compilation of its acceptable ranges of filling pressure requirements are not generally known to those skilled in the trade.  APEX misappropriated this valuable trade secret information in the course of developing and manufacturing its own competing product.

8.     During the course of the Collaborative Effort, I-Flow communicated to APEX its infusion pump assembly methods, including assembly involving alcohol contact and effects of alcohol contact on assembly of the infusion pumps and testing of the assembled infusion pumps. I-Flow's proprietary pump assembly methods are not generally known to those skilled in the trade.   APEX misappropriated this valuable trade secret information in the course of developing and manufacturing its own competing product.

9.     During the course of the Collaborative Effort, I-Flow communicated to APEX I-Flow's acquired knowledge regarding market demand for infusion pump products in both the pain and homecare markets and marketing of safe elastomeric infusion pump bladders. I-Flow's acquired knowledge regarding market demand for specific market sectors is the result of nearly two decades of market participation and internal analysis, and is not generally known to those of skill in the trade.  APEX misappropriated this valuable trade secret information in the course of developing its own competing product.

10.     During the course of APEX's involvement with the advisory group The Adaptive Business Leaders ("ABL"), I-Flow communicated information regarding its sales infrastructure specifically designed to market pain management systems, including sales staff organization and structure and training of the sales staff.   I-Flow's sales staff organization and training techniques are not generally known to those skilled in the trade.   This valuable trade secret information was misappropriated by APEX in the course of developing a business strategy and marketing its own competing product.

-4-

**EXHIBIT A**
**PAGE 7**

11.     During the course of APEX's involvement with the ABL, I-Flow communicated its acquired knowledge of certain preferred distribution channels for the marketing of pain management systems.  I-Flow's acquired knowledge of preferred distribution channels is the result of nearly two decades of market participation and analysis, and said acquired knowledge is not generally known by those skilled in the trade.  This valuable trade secret information was misappropriated by APEX in the course of developing a business strategy and marketing its own competing product.

12.     During the course of APEX's involvement with the ABL, I-Flow communicated its acquired knowledge regarding potential earnings and pricing strategies for the infusion pump devices, such as the On-Q Pump, including I-Flow's customer discount strategies. I-Flow's acquired earnings and pricing strategy knowledge for the infusion pump market, including customer discounts, is the result of nearly two decades of market participation and analysis, and is not generally known to those skilled in the trade.  This valuable trade secret information was misappropriated by APEX in the course of developing a business strategy and marketing its own competing product.

13.     During the course of APEX's involvement with the ABL, I-Flow communicated its internal assessments of the pain management market, including analysis of market opportunities based on effectiveness of the elastomeric infusion pump technology for particular medical procedures and on profitability of the elastomeric infusion pump technology for particular medical procedures.  I-Flow's internal pain management market assessments are based on nearly two decades of market participation and analysis, and are not generally known to those skilled in the trade.  This valuable trade secret information was misappropriated by APEX in the course of developing a business strategy and marketing its own competing product.

14.     During the course of APEX's involvement with the ABL, I-Flow communicated its acquired billing strategies designed to boost revenues received for pain management devices, including the mechanics of I-Flow's billing program, I-Flow's analysis of target health care sectors and I-Flow's resultant billing revenues.  I-Flow's billing program, analysis of

-5-

**EXHIBIT A
PAGE 8**

1  target health care sectors and resultant billing revenues are not generally known to those of skill

2  in the trade.   This valuable trade secret information was misappropriated by APEX in the

3  course of developing a business strategy and marketing its own competing product.

4       15.    I-Flow communicated to APEX its unique manufacturing process for

5  manufacturing the elastomeric infusion pump products, including elastomeric bladder pressure

6  characterization and manufacturing methods designed to achieve desired flow characteristics of

7  the pump.   I-Flow's unique elastomeric infusion pump manufacturing process has been

8  developed through nearly two decades of experimentation, design and market participation.

9  This valuable trade secret information was misappropriated by APEX in the course of

10  developing and marketing its own competing product.

11       Plaintiff contends that the identifications present herein as well as the Second Amended

12  Complaint satisfy the requirements of C.C.P. § 2019.210.   This identification is also being

13  made without waiver of Plaintiffs' right to challenge the applicability of C.C.P. § 2019.210 in a

14  federal court action.

15       Additionally, pursuant to the Court's February 15, 2008 Order, I-Flow hereby includes

16  the following statement to distinguish the trade secret technical information (new items 1-8,

17  and 15) and the trade secret business information (new items 9-14) from what is considered to

18  be "non-trade secret Confidential Technical and Business Information" as alleged in the Third,

19  Fourth, and Fifth Causes of Action of the Second Amended Complaint.   Because C.C.P. §

20  2019.210 does not require identification of non-trade secret information and because discovery

21  on the non-patent issues has not commenced, I-Flow reserves the right to identify additional

22  non-trade secret Confidential Technical and Business Information that supports the allegations

23  of the Third, Fourth, and Fifth Causes of Action as such information is uncovered in the course

24  of discovery in this litigation.

25       The non-trade secret Confidential Technical Information referenced in the Second

26  Amended Complaint includes the following information that is distinct from the trade secret

27  technical information identified herein in numbered paragraphs 1-8 and 15.   During the course

28  of the Collaborative Effort, I-Flow communicated to APEX confidential information regarding

-6-

**EXHIBIT A
PAGE 9**

Notice of Trade Secret per C.C.P. sec. 2019.210
Case No. 07cv01200

**Exhibit 20**
-238-

1  I-Flow's past efforts to manufacture polyisoprene elastomeric infusion pump bladders.  This

2  confidential information include past data collected in testing, product samples and information

3  regarding formulations and manufacturing process control issues.  The confidential information

4  also included descriptions of problems encountered with past efforts.  I-Flow also

5  communicated to APEX confidential cost of manufacture information, including part pricing

6  and price targets that I-Flow considered necessary to maintain acceptable margins for its

7  infusion pump products.

8       I-Flow also communicated to APEX confidential information regarding the products

9  aging and stability requirements.  I-Flow communicated confidential sterilization requirements

10 and methods to APEX.  I-Flow disclosed to APEX confidential information regarding storage

11 requirements, such as material requirements to withstand freezing and refrigeration.  I-Flow

12 disclosed to APEX confidential residual volume requirements of the elastomeric bladders of I-

13 Flow's infusion pumps.  I-Flow also disclosed to APEX confidential information regarding

14 customer comments about use of latex in infusion pump products.  I-Flow also disclosed to

15 APEX confidential information describing I-Flow's techniques and methods of protecting users

16 of the pump from the latex that is used therein.  This confidential technical information is

17 distinct from the information that is identified in paragraphs 1-8 and 15 above.

18      The non-trade secret Confidential Business Information referenced in the Second

19 Amended Complaint includes the following information that is distinct from the trade secret

20 business information identified herein in numbered paragraphs 9-14.  During the course of

21 APEX's involvement with the ABL, I-Flow communicated confidential information regarding

22 points of differentiation and improvement of the On-Q Pump over competing products.  I-Flow

23 also disclosed confidential information regarding existing vendor relationships.  I-Flow

24 disclosed to APEX confidential strategies for marketing the product outside the United States.

25 I-Flow also disclosed to APEX confidential information regarding methods for segmenting the

26 market for selling particular types of pumps.

27      I-Flow disclosed to APEX confidential strategies for gaining entry into the market.  I-

28 Flow disclosed to APEX confidential market projections.  I-Flow also disclosed to APEX

-7-

**EXHIBIT A**
**PAGE 10**

Notice of Trade Secret per C.C.P. sec. 2019.210
Case No. 07cv01200

**Exhibit 20**
**-239-**

1   confidential competitor information.  I-Flow also disclosed to APEX confidential information

2   regarding strategic pitfalls to avoid in the pain management business.  I-Flow also disclosed to

3   APEX confidential information regarding building customer awareness.  I-Flow also disclosed

4   to APEX confidential information regarding clinical study status.  I-Flow also disclosed to

5   APEX confidential strategies for accelerating the adoption process of elastomeric infusion

6   pump technology.  This confidential business information is distinct from the information that

7   is identified in paragraphs 9-14 above.

8          Moreover, if any of the items/information that are currently identified as a trade secret

9   are ultimately determined not to constitute a protectable trade secret, then I-Flow reserves the

10  right to rely on any such information, in the alternative, as a confidential non-trade secret for

11  the purposes of the Third, Fourth, and Fifth Causes of Action.  Courts have held that that the

12  question of preemption cannot be addressed prior to determining whether the allegedly

13  misappropriated information constitutes a trade secret.  *See, e.g., Genzyme Corp. v. Bishop*, 463

14  F.Supp.2d 946, 949 (W.D. Wis. 2006); *Callaway Golf Co. v. Dunlop Slazenger Group*

15  *Americas, Inc.,* 295 F.Supp.2d 430,437 (D.Del. 2003); *Stone Castle Fin. v. Friedman, Billings,*

16  *Ramsey & Co.,* 191 F.Supp.2d 652, 658-659 (E.D. Va. 2002); *Combined Metals of Chicago*

17  *Ltd. P'ship v. Airtek, Inc.,* 985 F.Supp 827, 830 (N.D. Ill. 1997).

18         This identification is also being made without prejudice to I-FLOW amending its

19  Complaint, bringing additional claims of trade secret misappropriation, and/or supplementing

20  this identification of trade secrets based on additional investigation and discovery.

21                                    Respectfully submitted,

22                                    KNOBBE, MARTENS, OLSON & BEAR, LLP

23

24  Dated: 3-03-2008          By: _____
                                   Steven J. Nataupsky
25                                 Boris Zelkind
                                   Ali S. Razai
26
                                   Attorneys for Plaintiff and Counter-Defendant
27                                 I-FLOW CORPORATION

28

                              -8-
                        **EXHIBIT A**              Notice of Trade Secret per C.C.P. sec. 2019.210
                        **PAGE 11**                Case No. 07cv01200

                                                              **Exhibit 20**
                                                                 **-240-**

1                              **PROOF OF SERVICE**

2       I am a citizen of the United States of America and I am employed in San Diego,

3 California. I am over the age of 18 and not a party to the within action. My business address is

4 550 West C Street, Suite 1200, San Diego, California. On March 3, 2008, I served the within

5 **PLAINTIFF'S AMENDED IDENTIFICATION OF TRADE SECRETS**

6 **MISAPPROPRIATED BY DEFENDANTS PURSUANT TO C.C.P. § 2019.210** on the

7 parties or their counsel shown below:

8 **VIA E-MAIL:**

9

10                           Ralph B. Kalfayan, Esq.
                          David M. Watson, Esq.

11            KRAUSE, KALFAYAN, BENINK & SLAVENS LLP
                         625 Broadway, Suite 635

12                          San Diego, CA 92101
                      rkalfayan@kkbs-law.com

13

14                          Norbert Stahl, Esq.
                       STAHL LAW FIRM

15                        2 Meadowsweet Lane
                     San Carlos, CA 94070

16                    nstahl@patentlawservice.com

17       Executed on March 3, 2008, at San Diego, California.

18

19                         _B Zw_

20                    Boris Zelkind

21

22

23

24

25 IFLOWL.241L
    4957547

26

27

28

**EXHIBIT A**
**PAGE 12**

Notice of Trade Secret per C.C.P. sec. 2019.210
Case No. 07cv01200

**Exhibit 20**
**-241-**

# EXHIBIT 22

Case 8:20-cv-00048-JVS-JDE   Document 260-5   Filed 12/30/20   Page 184 of 234   Page ID #:21231
Case 8:20-cv-00048-JVS-JDE   Document 43-4   Filed 04/30/20   Page 66 of 150   Page ID #:3350
Case 2:13-cv-08670-DDP-CW   Document 54   Filed 02/20/14   Page 1 of 24   Page ID #:1286

1  SCOTT A. EDELMAN, SBN 116927
   sedelman@gibsondunn.com
2  ANGELIQUE KAOUNIS, SBN 209833
   akaounis@gibsondunn.com
3  GIBSON, DUNN & CRUTCHER LLP
   2029 Century Park East, Suite 4000
4  Los Angeles, CA  90067-3026
   Tel.: 310.552.8500 Fax: 310.551.8741
5  Attorneys for Plaintiffs
   GENERAL ELECTRIC COMPANY
6  and GE AVIATION SYSTEMS LLC

7  Abraham Mathew
   abraham@mathewandgeorge.com
8  Mathew & George
   801 S. Grand Ave., Suite 1610
9  Los Angeles, CA 90017
   Tel: 310.478.4349; Fax: 310.478.9580
10 Attorney for Defendant ERWIN W. LIANG

11                UNITED STATES DISTRICT COURT

12               CENTRAL DISTRICT OF CALIFORNIA

13                     WESTERN DIVISION

14

| | |
|---|---|
| 15  General Electric Company, and GE Aviation Systems LLC, | CASE NO.  CV13-08670-DDP (CWx) |
| 16                         Plaintiffs, | **RULE 26(f) REPORT** |
| 17            v. | [Proposed Protective Order and ADR Selection Form Filed Concurrently Herewith] |
| 18  Erwin Wenti Liang, Does 1-10, | **Scheduling Conference:** |
| 19                         Defendants. | Date:      February 27, 2014 |
| 20 | Time:     3:00 p.m. |
| 21 | Place:    312 N. Spring St., Courtroom 3 (2nd Flr.) |
| 22 | Judge:    Hon. Dean D. Pregerson |

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

**Exhibit 22**
-276-

1    Plaintiffs General Electric Company and GE Aviation Systems LLC

2    (collectively "GE") and Defendant Erwin Wenti Liang ("Liang") submit this Joint

3    Report to the Court regarding the meeting of counsel conducted by telephone

4    conference call on February 6, 2014, pursuant to Federal Rule of Civil Procedure 26(f).

5    The Parties discussed each of the topics covered by the Court's December 18, 2013

6    Order Setting Scheduling Conference.  (Dkt. 28.)  The Parties' respective positions are

7    detailed below.

8    **A.    STATEMENT OF THE CASE AND LEGAL ISSUES**

9        **GE's Statement**: This is a case of trade secret theft by Defendant Liang, a

10   former employee of GE subsidiary GE Aviation Systems LLC, who accessed, copied,

11   and downloaded tens of thousands of files from GE's internal network without

12   authorization to do so.  On November 25, 2013, GE filed claims against Liang for:

13   violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030;

14   violation of the Comprehensive Data Access and Fraud Act ("CDAFA"), California

15   Penal Code section 502; trade secret misappropriation under the California Uniform

16   Trade Secrets Act ("CUTSA"), California Civil Code sections 3426 through 3426.11;

17   breach of contract; conversion; and unfair competition under California Business and

18   Professions Code section 17200.[1]  (Dkt. 1.)  On December 3, 2013, the Court entered a

19   Preliminary Injunction requiring Liang (1) to return all GE Intellectual Property[2] in his

20   possession, custody, or control; (2) not to access, use, or disclose any GE Intellectual

21   Property; and (3) to preserve all relevant documents.  (Dkt. 14.)  Plaintiffs seek a

22   permanent injunction preventing Liang from using or disclosing GE Intellectual

23   Property, as well as damages and other relief.

24

25

26   [1]  Liang filed his Answer to GE's Complaint on December 17, 2013.  (Dkt. 26.)

27   [2]  "GE Intellectual Property" is defined as "confidential, proprietary GE materials and
     GE trade secrets."  *See* Dkt. 14 at 1.

28

Gibson, Dunn &
Crutcher LLP

1

Exhibit 22
-277-

1   Liang was an employee of GE Aviation Systems LLC until December 2012,

2   when a third party, Woodward HRT, Inc. ("Woodward"), bought the business where

3   he was employed.  To facilitate transition to the new owner, GE allowed Liang and

4   other transitioning employees to have access to GE email, computers, and network

5   resources for a specified period, subject to applicable GE policies, through the use of a

6   GE Single Sign On ("SSO")—a unique ID that allows GE employees to access GE

7   electronic resources when used in combination with a password.

8   GE has discovered that Liang misused his SSO in violation of the Transition

9   Services Agreement ("TSA") between GE and Woodward and numerous policies and

10   agreements restricting Liang's access to and use of GE Intellectual Property to only

11   those materials required to perform his job.  Specifically, despite these clear

12   restrictions, Liang accessed and downloaded tens of thousands of files from numerous

13   GE businesses outside the scope of his employment between March and October 2013.

14   Liang downloaded nearly half of the stolen files in October, just before his SSO

15   password was set to expire, and he had no legitimate business need to access or use the

16   vast majority of the files he took.

17   In an October 23, 2013 interview with GE and Woodward, Liang admitted that

18   what he did was "pretty bad" and "wrong," and that he knew he "didn't have the legal

19   right to obtain" the stolen files.  He also admitted that he used two USB devices to

20   download the files, that he downloaded tens of thousands of them, and that he knew his

21   GE SSO password was set to expire in November 2013.  Additionally, he told

22   investigators that he has two Yahoo! email accounts, a Gmail account, an MIT alumni

23   email account, a Facebook account, and a Google Drive cloud-storage account (to

24   which he admitted uploading some GE files).

25   Despite (a) Liang's admissions of wrongdoing, and this Court's December 3,

26   2013 Preliminary Injunction Order (b) requiring Liang to return all GE Intellectual

27   Property in his possession, custody or control, and (c) recognizing that Liang has

28   access to online accounts that are means of dissemination (Dkt. 14, at 1-2), Liang still

Gibson, Dunn &
Crutcher LLP

2

**Exhibit 22**
**-278-**

1    has not returned any of the stolen files.  Liang claims that his computing devices have

2    been confiscated by the FBI, but he has failed to account for the contents of his

3    personal email, Google Drive and Facebook accounts, despite GE's repeated requests.

4    Liang has declined to cooperate with GE because he says that he does not wish to

5    incriminate himself in connection with an ongoing criminal investigation into his

6    conduct.

7        Accordingly, GE still does not know how and to whom Liang distributed the

8    stolen files.  GE is therefore unable to prevent any ongoing and irreparable harm

9    caused by the disclosure and/or use of its trade secrets by Doe Defendants that are not

10   subject to the Court's Preliminary Injunction.

11       GE continues to investigate Liang's forensic trail on GE's internal networks and

12   systems.  Additionally, to attempt to learn the whereabouts of its information as

13   quickly as possible, GE filed a Motion for Expedited Discovery on January 14, 2014,

14   seeking, among other things, forensic inspection of Liang's online accounts and drives,

15   a limited deposition, production of bank records, and permission to subpoena the

16   internet-service providers ("ISPs") of Liang's online accounts.  (Dkt. 29.)  The motion

17   was heard by Judge Carla Woehrle on February 7, 2014—after the parties conducted

18   their Rule 26(f) conference of counsel.  Therefore, Magistrate Judge Woehrle

19   determined that the request for expedited discovery was moot.  Nonetheless,

20   Magistrate Judge Woehrle instructed the parties that discovery should proceed.

21       **Liang's Statement**:

22       As pointed out by GE in its statement above, a parallel criminal investigation is

23   currently pending against Mr. Liang conducted by the Federal Bureau of Investigation

24   and the United States Attorney's Office, National Security Division.  The investigation

25   arises from the same operative facts alleged by GE in this civil action.  To date a

26   charging decision has not been made by the government.  As a result, Mr. Liang filed

27   an Answer to GE's Complaint asserting, among others, the rights afforded under the

28   Fifth Amendment to the United States Constitution.  Within the Answer, Mr. Liang

**Exhibit 22**
**-279-**

Case 8:20-cv-00048-JVS-JDE   Document 260-5   Filed 12/30/20   Page 188 of 234   Page ID #:21235
Case 8:20-cv-00048-JVS-JDE   Document 43-4   Filed 04/30/20   Page 70 of 150   Page ID #:3354
Case 2:13-cv-08670-DDP-CW   Document 54   Filed 02/20/14   Page 5 of 24   Page ID #:1290

1  reserved the right to withdraw the privilege, and seek leave to amend and/or

2  supplement the Answer and also to object to the use or disclosure of the privilege at

3  trial.

4      **GE's Anticipated Legal Issues**:  GE anticipates that this case will present the

5  following legal issues:

6  - Whether Liang violated the CFAA, 18 U.S.C. § 1030 by "'intentionally

7    [accessing] a computer without authorization or [in] exce[ss] [of] authorized

8    access, and thereby obtain[ing] information from [a] protected computer,'"

9    when he used GE-provided devices and his SSO password to access GE's

10    internal networks and download and/or copy GE's files without permission and

11    beyond the scope of his employment.  *Ticketmaster LLC v. RMG Techs., Inc.*,

12    507 F. Supp. 2d 1096, 1113 (C.D. Cal. 2007) (quoting 18 U.S.C.

13    § 1030(a)(2)(C)).

14  - Whether Liang violated the CDAFA, California Penal Code section 502, by

15    knowingly and without authorization accessing GE's computer network and

16    "taking, copying, or us[ing] . . . data," when he used GE-provided devices and

17    his SSO password to access GE's internal networks and download and/or copy

18    GE's files without permission and beyond the scope of his employment.

19    *Facebook, Inc. v. ConnectU LLC*, 489 F. Supp. 2d 1087, 1091 (N.D. Cal. 2007).

20  - Whether Liang committed trade secret misappropriation under the CUTSA,

21    California Civil Code sections 3426 through 3426.11, by acquiring, using and/or

22    disclosing GE trade secrets without authorization; and thereby damaging GE

23    and/or unjustly enriching himself and/or others.  *See Therapeutic Research*

24    *Facility v. NBTY, Inc.*, 488 F. Supp. 2d 991, 999 (E.D. Cal. 2007).

25  - Whether Liang is liable for breach of contract, where he downloaded and/or

26    copied files containing GE Intellectual Property in violation of (1) his

27    Proprietary Information & Invention Agreement, which prohibited "disclos[ing]

28    or us[ing] . . . any Propriety Information known to [him] as a result of [his]

Gibson, Dunn &
Crutcher LLP

4

**Exhibit 22**
**-280-**

Case 8:20-cv-00048-JVS-JDE   Document 260-5   Filed 12/30/20   Page 189 of 234   Page ID #:21236
Case 8:20-cv-00048-JVS-JDE   Document 43-4   Filed 04/30/20   Page 71 of 150   Page ID #:3355
Case 2:13-cv-08670-DDP-CW   Document 54   Filed 02/20/14   Page 6 of 24   Page ID #:1291

1   employment except as required in [his] work" for GE, and/or (2) his Employee

2   Innovation and Proprietary Information Agreement, which prohibited him from

3   "us[ing], publish[ing] or otherwise disclos[ing] (except as [his] Company duties

4   [require]) . . . any secret or confidential information or data." *See Angelica*

5   *Textile Servs. v. Park*, 220 Cal. App. 4th 495, 504-08, 163 Cal. Rptr. 3d 192

6   (2013).

7   • Whether Liang is liable for conversion where he altered, damaged, or deleted

8      GE's files by downloading and/or copying them. *See Kremen v. Cohen*, 337

9      F.3d 1024, 1029-31 (9th Cir. 2003) (under California law, conversion may be

10     based on taking of "'*every species of personal property*,'" not just tangible

11     property).

12  • Whether Liang engaged in unfair competition under California Business and

13     Professions Code section 17200 when he violated the CFAA and CDAFA. *See,*

14     *e.g., Multiven, Inc. v. Cisco Sys., Inc.*, 725 F. Supp. 2d 887, 896-97 (N.D. Cal.

15     2010) (former employer could pursue unfair competition counterclaim based on

16     losses caused by computer fraud).

17  • Whether Liang may refuse to consent to the disclosure of his email and other

18     online communication content held by his ISPs, when the Court has found that

19     his email and cloud-storage accounts are means of disseminating the stolen files

20     and has ordered him to return all GE property. *See, e.g., Doe v. United States*,

21     487 U.S. 201, 217-19 (1988) (upholding court order compelling party to consent

22     to disclosure of bank account records in response to subpoenas despite assertion

23     of Fifth Amendment privilege); *Glazer v. Fireman's Fund Ins. Co.*, 2012 WL

24     1197167, at *2-3 (S.D.N.Y Apr. 5, 2012) (court could order a party to consent to

25     disclosure of chat transcripts held by a third party ISP); *see also Mintz v. Mark*

26     *Bartelstein & Associates, Inc.*, 885 F. Supp. 2d 987 (C.D. Cal. 2012)

27     (recognizing that "although the SCA prohibited the court from ordering

28

Gibson, Dunn &
Crutcher LLP

**Exhibit 22**
**-281-**

1  Facebook to produce copies of a juror's wall postings, the court could order the

2  juror to request the wall postings from Facebook directly" (citation omitted)).

3  •  Whether Liang can claim that his Fifth Amendment privilege prevents the

4  forensic inspection of his computing and storage devices, and email, Google

5  Drive and Facebook accounts; the production of the passwords to his online

6  accounts; and the production of his bank and safety deposit records, where it is a

7  foregone conclusion that the government knows of Liang's devices and drives,

8  online accounts and financial records, and knows that Liang is the sole user and

9  possessor of them.  *See Fisher v. United States*, 425 U.S. 391, 411, 96 S. Ct.

10  1569, 48 L. Ed. 2d 39 (1976) (foregone conclusion exception to Fifth

11  Amendment privilege); *United States v. Sideman & Bancroft, LLP*, 704 F.3d

12  1197, 1202-05 (9th Cir. 2013) (surrender of documents that government already

13  knows about is not compelled testimony).

14  •  Assuming, *arguendo*, that the Fifth Amendment applies to some of the

15  discovery sought by GE, whether Liang can make a blanket assertion that it

16  prevents all discovery (including his deposition), or whether he is required to

17  assert the privilege in response to particular requests for inspection of property

18  and production of documents, and deposition questions.  *See, e.g., Sallah v.*

19  *Worldwide Clearing LLC*, 855 F. Supp. 2d 1364, 1371 (S.D. Fla. 2012) ("A

20  person may not make a blanket [Fifth Amendment] objection to testifying," but

21  must "invoke the privilege question by question.").

22  •  Whether Liang can satisfy the standard for a civil stay, where he is under

23  investigation but "no criminal charges ha[ve] been filed."  *SEC v. Global*

24  *Express Capital Real Estate Inv. Fund*, 289 F. App'x 183, 191 (9th Cir. 2008).

25  **Liang's Anticipated Legal Issues**:

26  In addition to the issues identified by GE above, Mr. Liang expects the

27  following legal issues:

28

Gibson, Dunn &
Crutcher LLP

6

**Exhibit 22**
**-282-**

Case 8:20-cv-00048-JVS-JDE   Document 260-5   Filed 12/30/20   Page 191 of 234   Page ID #:21238
Case 8:20-cv-00048-JVS-JDE   Document 43-4   Filed 04/30/20   Page 73 of 150   Page ID #:3357
Case 2:13-cv-08670-DDP-CW   Document 54   Filed 02/20/14   Page 8 of 24   Page ID #:1293

1   • Whether this Civil Action should be stayed and/or discovery limited pending

2   resolution of the criminal investigation and potential criminal prosecution.

3   • Whether the government will intervene in this action and seek a stay after

4   discovery has commenced.

5   • Whether a civil protective order and discovery secured thereunder will shield

6   Mr. Liang from criminal prosecution and prevent the government from

7   accessing the discovery and using that information in a subsequent grand jury

8   proceeding and/or criminal prosecution.

9   • Whether or not Mr. Liang's access of GE files was authorized and encouraged

10   and whether GE took adequate precautions to safeguard the confidentiality of its

11   information.

12   • Whether or not Mr. Liang misappropriated any GE information and what if any

13   resulting damages were incurred.

14   • Whether or not Mr. Liang can amend his Answer and withdraw the assertion of

15   the Fifth Amendment Privilege and whether an adverse inference can be drawn

16   against Mr. Liang for asserting his Fifth Amendment rights.

17   **B.   SUBJECT MATTER JURISDICTION**

18   **GE's Statement**: The Court has subject matter jurisdiction over GE's claims

19   under 18 U.S.C. § 1030(g) and 28 U.S.C. §§ 1331, 1332, 1338 and 1367.

20   **Liang's Statement**:

21   Mr. Liang does not currently have sufficient information to determine whether

22   this Court has subject matter of the claims asserted by GE, but expects this may not be

23   an issue.

24   **C.   PARTIES AND EVIDENCE**

25   **1.   Current Parties And Whether Additional Parties Will Appear**

26   The Plaintiffs are General Electric Company and GE Aviation Systems LLC.

27   The Defendants are Erwin Wenti Liang and unidentified Does 1 through 10.

28

Gibson, Dunn &
Crutcher LLP

**Exhibit 22**
**-283-**

Case 8:20-cv-00048-JVS-JDE   Document 260-5   Filed 12/30/20   Page 192 of 234   Page ID
#:21239
Case 8:20-cv-00048-JVS-JDE   Document 43-4   Filed 04/30/20   Page 74 of 150   Page ID
#:3368
Case 2:13-cv-08670-DDP-CW   Document 54   Filed 02/20/14   Page 9 of 24   Page ID #:1294

1  Additional parties may be named as defendants, subject to discovery of the identities

2  of the Doe Defendants.

3      **2.**   <u>**Witnesses**</u>

4      **GE's List Of Percipient Witnesses**: GE anticipates, at this early stage of the

5  proceedings, and subject to the factual record developed during discovery, that the

6  following persons potentially may be percipient witnesses in this action:

7  - Ignatius B.D. Anandappa, GE CIO, Digital Technologies & Collaboration.

8  - Philip Beauchamp, Information Protection Leader, GE Global Research.

9  - Brenda Britton, Human Resources Manager, GE Aviation Systems LLC.

10  - Orrie Dinstein, Chief Privacy Leader and IP & IT Counsel, GE Capital.

11  - Harvey Dunn, Director, Intellectual Property | Global Legal & Compliance,
12     Woodward, Inc.

13  - Cindy Gao, wife of Defendant Erwin Liang.

14  - Kathleen Gough, Operations & Forensics Leader of the IP Protection Center of
15     Excellence, GE Power & Water, Oil & Gas, and Energy Management.

16  - Chris Graves, GE Cyber Forensics Leader.

17  - Arturo Z. Martinez, Woodward Human Resources Manager.

18  - Brian Neal, Landing Gear and Actuation Engineering Manager, GE Aviation
19     Systems LLC.

20  - James Peterson, GE Corporate Initiatives Director.

21  - Kevin C. Swailes, GE IP Protection Center of Excellence Leader.

22      **Liang's List Of Percipient Witnesses**:

23      In addition to the individuals identified above, Mr. Liang expects Special Agents

24  Sullivan and Yang of the Federal Bureau of Investigation to be percipient witnesses.

25      **3.**   <u>**Relevant Documents**</u>

26      **GE's List Of Relevant Documents**: GE anticipates, at this early stage of the

27  proceedings, and subject to the factual record developed during discovery, that the

28  following documents may be relevant.  The below listed categories do not include

Gibson, Dunn &
Crutcher LLP

**Exhibit 22**
**-284-**

Case 8:20-cv-00048-JVS-JDE   Document 260-5   Filed 12/30/20   Page 193 of 234   Page ID #:21240
Case 8:20-cv-00048-JVS-JDE   Document 43-4   Filed 04/30/20   Page 75 of 150   Page ID #:3859
Case 2:13-cv-08670-DDP-CW   Document 54   Filed 02/20/14   Page 10 of 24   Page ID #:1295

documents protected by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or protection, and by identifying these categories of documents GE does not waive any such privilege or protection.  The below listed categories also include specific documents containing confidential and proprietary information that, when produced, may be subject to a protective order, redaction and/or sealing.  GE specifically reserves the right to identify or rely upon additional categories of documents as the case proceeds.

- Documents related to GE policies and restrictions governing former GE employees' use of GE SSO passwords and access to and use of GE's internal network during the transition of the Duarte Aviation Systems business segment from GE to Woodward, such as the Transition Service Agreement.

- Documents that generally define what GE considers to be confidential and/or proprietary information, such as GE's Proprietary Information & Invention Agreement ("PIIA"), GE's Employee Innovation and Proprietary Information Agreement ("EIPIA"), GE's Acceptable Use of GE Information Resources Guidelines ("AUGIR"), and GE's Data Classification Guidelines.

- Documents related to GE policies and restrictions governing GE employees' and GE former employees' access to and use of GE Intellectual Property and GE's internal network, including through GE-provided work computers, portable devices and removable media, such as GE's AUGIR and Internet Policies, GE's Data Classification Guidelines and The Spirit And The Letter brochure.

- Documents related to GE policies and restrictions governing GE employees' access to, use and/or return of GE Intellectual Property during and after employment, such as GE's PIIA and EIPIA.

- Documents that reflect the GE Intellectual Property contained in the GE files that Liang downloaded and copied, including, for example, select exhibits to the Declarations of James Peterson, Orrie Dinstein, and Philip Beauchamp, which were filed with this Court on November 26, 2013.

Exhibit 22
-285-

- Documents showing Liang's downloading and copying of GE files, including audit trail reports, Data Loss Prevention Reports, forensic data and/or images of all assets seized from Mr. Liang by GE, forensic images of Mr. Liang's personal email, Google Drive and Facebook accounts, and other documents that show data such as the time and date of the downloads, the numbers of files downloaded and their sizes, the internet protocol address and/or addresses associated with the downloads, and/or the identities and/or locations of any third parties to whom Mr. Liang distributed GE's documents.

**Liang's List Of Relevant Documents**:

Mr. Liang agrees that the information identified by GE above may be relevant to this action, but because Mr. Liang does not have that information in his possession currently, he cannot now positively identify which of those documents are relevant.

**D.     DAMAGES AND INJUNCTIVE RELIEF**

**GE's Statement**: Because GE does not know the full extent to which Defendants have used and/or disclosed its trade secrets, it is not possible at this early stage of the proceedings to quantify its damages or the amount by which Defendants have been unjustly enriched.  However, given the number of person-hours that have been devoted to certain projects associated with the IP at issue, any use or disclosure of GE's files could cause GE significant damage and/or substantially unjustly enrich third parties, including competitors of GE.  GE has prayed for punitive and exemplary damages.  *See, e.g.*, Cal. Penal Code § 502(e)(4); Cal. Civ. Code § 3426.3(c).

GE may seek preliminary injunctions against Doe Defendants for the return and preservation of GE's Intellectual Property.

GE also seeks a permanent injunction requiring all Defendants to:  (1) return all GE Intellectual Property; and (2) cease further accessing, disclosing, copying, using or otherwise profiting from GE's Intellectual Property.  Additionally, GE seeks an order requiring Defendants to file with the Court and serve on GE a compliance report within thirty days of entry of any permanent injunction.

Gibson, Dunn &
Crutcher LLP

10

**Exhibit 22**
**-286-**

Case 8:20-cv-00048-JVS-JDE   Document 260-5   Filed 12/30/20   Page 195 of 234   Page ID #:21242
Case 8:20-cv-00048-JVS-JDE   Document 43-4   Filed 04/30/20   Page 77 of 150   Page ID #:3361
Case 2:13-cv-08670-DDP-CW   Document 54   Filed 02/20/14   Page 12 of 24   Page ID #:1297

**Liang's Statement**:

Mr. Liang agreed not to oppose GE's application for a Temporary Restraining Order and/or its Motion for a Preliminary Injunction and Mr. Liang has no information as to what damages GE may have suffered.

**E.     INSURANCE**

N/A

**F.     MOTIONS**

**GE's Statement**: GE anticipates filing a Motion for Summary Judgment.  As for non-dispositive motions, GE anticipates filing a Motion for Compliance with the Court's Preliminary Injunction Order, should Liang continue to refuse to confirm his compliance with the Preliminary Injunction.  (Dkt. 14.)

**Liang's Statement**:

Mr. Liang filed a motion to stay this civil action and the hearing is set for March 10, 2010.  If the motion is denied and due to the ongoing criminal investigation, Mr. Liang expects substantial motion work will follow dealing directly with discovery issues.  It is also likely that continued discovery will lead to the government intervening in this action for a stay.  Mr. Liang also anticipates filing a Motion for Summary Adjudication and/or Judgment and Motions in Limine.

**G.     COMPLEX DESIGNATION**

**GE's Statement**: Because this case does not meet the criteria of Federal Rule of Civil Procedure 16, lacking "difficult or protracted" problems related to "complex issues, multiple parties, difficult legal questions, or unusual proof problems," it is not complex.  Fed. R. Civ. P. 16(c)(2)(L).  Nor is this case the sort of highly technical intellectual property dispute contemplated by the Manual of Complex Litigation.  *See* Manual of Complex Litigation, Fourth § 33 (2004) (discussing complex intellectual property cases).  Therefore, the Manual of Complex Litigation does not need to be used.

Gibson, Dunn &
Crutcher LLP

11

**Exhibit 22**
**-287-**

**Liang's Statement**:

GE claims that Mr. Liang misappropriated hundreds of thousands of files containing GE Intellectual Property.  As a result, Mr. Liang believes that the civil prosecution of this case will be extremely time consuming and potentially complex depending on the information discovered through discovery.  Based upon currently available information, Mr. Liang cannot definitively state that this case should be designated as complex and that this discussion on this issue should be revisited at a later date after discovery is substantially completed.

**H.     STATUS OF DISCOVERY**

**GE's Statement**:  Regular discovery commenced on February 6, 2014 after the Rule 26(f) meeting of counsel on that same date.  On that date, GE served Liang with a Notice of Deposition and Rule 34 Requests for Inspection of Property and for Production of Documents.  The Rule 34 Request for Inspection sought a forensic inspection of Liang's property, including but not limited to his Google Drive account and any other cloud-based storage applications or services he has used in the last three years (including his Facebook account); all of his personal email accounts (including but not limited to his Gmail, Yahoo and MIT Alumni email accounts); any hardware he possesses, including, but not limited to, PCs, USB drives, smartphones, tablets, and any hardware or accounts being held by any third party on his behalf.  GE also served third party subpoenas on Liang's ISPs, including Google, Yahoo!, and Massachusetts Institute of Technology.  GE is in the process of serving third party subpoenas on Liang's wife (Cindy Gao) and Facebook, his online social network.  Plaintiffs are concurrently serving their initial disclosures under Federal Rule of Civil Procedure 26(a)(1)(A).

Due to the confidential, proprietary and private nature of the information and documents likely to be produced in discovery, GE has proposed that the parties stipulate to a Protective Order to be entered by the Court.  (*See* Ex. A.)  The Protective Order would limit access to designated information to the parties and/or their attorneys

Gibson, Dunn &
Crutcher LLP

12

**Exhibit 22**
**-288-**

Case 8:20-cv-00048-JVS-JDE   Document 260-5   Filed 12/30/20   Page 197 of 234   Page ID #:21244
Case 8:20-cv-00048-JVS-JDE   Document 43-4   Filed 04/30/20   Page 79 of 150   Page ID #:3363
Case 2:13-cv-08670-DDP-CW   Document 54   Filed 02/20/14   Page 14 of 24   Page ID #:1299

1   according to the specific designation—*i.e.*, "CONFIDENTIAL" or "HIGHLY

2   CONFIDENTIAL – ATTORNEYS' EYES ONLY".

3      **Liang's Statement**:

4      Liang has not commenced discovery as yet.  If the Court grants Mr. Liang's

5   Motion to Stay, the issue will be moot.  However, if the motion is denied, Liang will

6   commence discovery including written discovery, noticing depositions of percipient

7   and third party witnesses.  As to GE's proposal for a protective order, Mr. Liang

8   cannot stipulate to a protective order as to any testimony and discovery sought from

9   him because that information can be used in a criminal prosecution notwithstanding

10   the civil protective order.  (See, *In re* Grand Jury Subpoena Served on Meserve,

11   Mumper & Hughes, 62 F.3d 1222, 1227 (9th Cir. 1995).)

12   **I.**    **DISCOVERY PLAN**

13      **1.**    <u>**Changes To Timing of Discovery**</u>

14      **GE's Position**: Liang has moved to stay this action (Dkt. 44, at 16) and GE has

15   opposed the motion.  (Dkt. 53.)  It is well-established that (1) "[s]imultaneous parallel

16   civil and criminal proceedings are unobjectionable . . . [i]n the absence of substantial

17   prejudice to the rights of the parties involved" (*Keating v. Office of Thrift Supervision*,

18   45 F.3d 322, 324 (9th Cir. 1995) (internal citations and quotation marks omitted)), and

19   (2) "[t]he case for staying civil proceedings is weak when no indictment has been

20   returned."  *SEC v. Global Express Capital Real Estate Inv. Fund*, 289 F. App'x 183,

21   191 (9th Cir. 2008) (denial of stay request was "appropriate" where "no criminal

22   charges had been filed . . . at the time [defendant] moved for a stay").

23      Here, no indictments have been returned against Liang or anyone else in

24   connection with this matter (to GE's knowledge), and thus, his concerns about self-

25   incrimination are entirely speculative.  *See, e.g.*, *In re Homestore.com, Inc. Sec. Litig.*,

26   347 F. Supp. 2d 814, 820 (C.D. Cal. 2004) ("The mere possibility that [a civil

27   defendant] will be indicted is insufficient grounds for dragging out" a civil action

28   where there was "no evidence of any timeline for the government's investigation or

Gibson, Dunn &
Crutcher LLP

**Exhibit 22**
**-289-**

Case 8:20-cv-00048-JVS-JDE   Document 260-5   Filed 12/30/20   Page 198 of 234   Page ID
#:21245
Case 8:20-cv-00048-JVS-JDE   Document 43-4   Filed 04/30/20   Page 80 of 150   Page ID
Case 2:13-cv-08670-DDP-CW   Document 54 #1364/02/20/14   Page 15 of 24   Page ID #:1300

1   [the] indictment.").  By contrast, this Court *has already found* that Liang was capable

2   of "disseminat[ing] the confidential, proprietary GE materials and GE trade secrets . . .

3   in his possession, through the use of several personal email accounts, a Google Drive,

4   and/or his Facebook account."  (Dkt. 14, at 1.)  Liang's ability to transmit this

5   information was one of the primary findings underpinning the Court's conclusion that

6   GE was "likely to suffer irreparable harm" if a preliminary injunction was not issued.

7   (*Id.*)[3]  GE needs discovery to determine what happened to the intellectual property that

8   Liang took from it, including (1) the identities of any third parties (including possible

9   Doe Defendants) that received GE IP from Liang, (2) what GE information third

10  parties have access to, and (3) how those disclosures were made.  For these reasons,

11  Liang's asserted Fifth Amendment interest does not outweigh the severe prejudice that

12  GE *will* suffer if it is prevented from obtaining discovery.  *See, e.g.*, *eBay, Inc. v.*

13  *Digital Point Solutions, Inc.*, 2010 U.S. Dist. LEXIS 23253, at *10-13, *17 (N.D. Cal.

14  Feb. 25, 2010) (denying stay and noting that "[t]he potential prejudice to a civil

15  defendant facing a parallel criminal investigation is 'more remote' than it is for an

16  indicted defendant," whereas the plaintiff's "interest in preventing delay, [and]

17  accessing evidence … is substantial") (internal citations and quotation marks omitted).

18          **Liang's Position**:

19          Due to the ongoing criminal investigation, if this Court does not stay this action,

20  Mr. Liang proposes that all discovery be stayed for a period of six months or

21  alternatively that discovery directed to Mr. Liang be stayed for that period of time so

22  as to allow the parties to determine whether or not Mr. Liang will be criminally

23  indicted.

24          **2.      Changes To Initial Disclosures**

25

26  _____

27  [3] Even if Liang were indicted in the future, "[a] defendant has no absolute right not to be forced to choose between testifying in a civil matter and asserting his Fifth Amendment privilege."

28  *Keating*, 45 F. 3d at 326.

Gibson, Dunn &
Crutcher LLP

**Exhibit 22**
**-290-**

Case 8:20-cv-00048-JVS-JDE   Document 260-5   Filed 12/30/20   Page 199 of 234   Page ID #:21246
Case 8:20-cv-00048-JVS-JDE   Document 43-4   Filed 04/30/20   Page 81 of 150   Page ID #:3365
Case 2:13-cv-08670-DDP-CW   Document 54   Filed 02/20/14   Page 16 of 24   Page ID #:1301

1     **GE's Proposed Changes To Initial Disclosures**: GE does not currently expect

2     changes in the timing or content of the Rule 26(a)(1)(A) disclosures.

3     **Liang's Proposed Changes To Initial Disclosures**:

4     Mr. Liang proposes that his initial disclosures be stayed pending the hearing of

5     the stay motion.

6     **3.**     **Anticipated Deponents**

7     **GE's Anticipated Deponents**: At this early stage of the proceedings, and

8     subject to the factual record developed during discovery, GE anticipates deposing the

9     following individuals or entities:

10     • Liang;

11     • Liang's wife Cindy Gao; and

12     • Doe Defendants to be identified through discovery.

13     • Defendants' liability expert(s)

14     • Defendants' damages expert(s)

15     Given the scope of Defendant Liang's conduct, GE anticipates that Liang's

16     deposition will exceed 7 hours and respectfully requests that the Court permit GE to

17     take Liang's deposition for a total of 14 hours (*e.g.*, two days of seven hour sessions).

18     GE does not currently anticipate the need to depose more than 10 witnesses, though it

19     reserves all rights to seek permission of the Court to do so if and when further

20     discovery reveals such a need.

21     **Liang's Anticipated Deponents**:

22     Mr. Liang anticipates deposing each of GE's percipient witnesses identified in

23     Section C.2. above as well as FBI Special agents Yang and Sullivan, other witness

24     revealed through discovery; and experts designated by GE.

25     **4.**     **Anticipated Written Discovery**

26     **GE's Anticipated Written Discovery**:  At this early stage of the proceedings,

27     and subject to the factual record developed during discovery, GE anticipates serving

28

Gibson, Dunn &
Crutcher LLP

**Exhibit 22**
**-291-**

Case 8:20-cv-00048-JVS-JDE   Document 260-5   Filed 12/30/20   Page 200 of 234   Page ID
#:21247
Case 8:20-cv-00048-JVS-JDE   Document 43-4   Filed 04/30/20   Page 82 of 150   Page ID
Case 2:13-cv-08670-DDP-CW   Document 54#:3366 02/20/14   Page 17 of 24   Page ID #:1302

1   the following additional written discovery on Liang.  GE anticipates serving similar

2   discovery on Doe Defendants as their identities become known.

3   • Written interrogatories seeking the identities of Doe Defendants to whom Liang

4       disseminated GE's Intellectual Property, the means of dissemination and any

5       associated financial arrangements;

6   • Requests for production of documents on the same aforementioned topics;

7   • Requests for production of documents that reflect all communications about

8       GE's Intellectual Property between Liang and any third parties, including Doe

9       Defendants;

10  • Requests for Admission concerning Liang's access to, downloading, possession,

11      use and/or disclosure of GE Intellectual Property.

12      At this time, GE does not anticipate the need to propound more than 25

13  interrogatories, though it reserves all rights to seek permission of the Court to do so if

14  and when further discovery reveals such a need.  Given the scope of Defendant Liang's

15  conduct, GE currently cannot estimate the number of requests for admission it may be

16  required to propound.

17      **Liang's Anticipated Written Discovery**:

18      Liang expects substantial discovery to be served including written

19  interrogatories, production demands as well as requests for admission.  The scope of

20  discovery required is currently unknown to Mr. Liang but based upon GE's allegations

21  as to the breadth of the alleged misappropriation and the number of files involved,

22  Liang expects to propound more than 25 interrogatories.

23      **5.    Subjects On Which Discovery May Be Needed**

24      **GE's Statement**: At this early stage of the proceedings, and subject to the

25  factual record developed during discovery, GE anticipates seeking discovery on the

26  following topics: what information, including GE Intellectual Proprietary, Liang

27  downloaded and copied from GE; how Liang downloaded or copied that information;

28  where or how Liang stored or saved the information he stole; the means by which

Gibson, Dunn &
Crutcher LLP

16

**Exhibit 22
-292-**

1    Liang disseminated or shared that information with others, including Doe Defendants;

2    the identities of Doe Defendants; any financial arrangements between Liang, Doe

3    Defendants, and/or third parties related to Liang's dissemination of that information;

4    and the Defendants' use and/or disclosure of GE's Intellectual Property.

5    **Liang's Statement**:

6    Mr. Liang expects to conduct discovery on the scope of the alleged

7    misrepresentation including how many files are truly GE's Intellectual Property, what

8    measures GE took to safeguard and protect its Intellectual Property, and the damages

9    suffered.

10    **6.    Preservation of Electronically Stored Information**

11    **GE's Proposal**: GE has already taken measures to preserve electronically stored

12    information.  Specifically, GE has preserved forensic images of all assets seized from

13    Liang by GE.  GE also has issued an internal preservation notice to relevant persons

14    covering: documents related to Liang's employment; GE policies related to the

15    security, confidentiality, use, access, disclosure, destruction and/or deletion of GE

16    Intellectual Property; and documents related to GE's claim that Liang improperly

17    accessed, took, copied, deleted and/or altered GE files.  GE has preserved a sample set

18    of files that Liang accessed or copied; Data Loss Prevention Reports showing Liang's

19    downloading and/or copying of GE files to his laptop; and audit trial reports showing

20    Liang's downloading and/or copying of GE files from various GE systems.  Because

21    GE's efforts to investigate Liang's conduct and preserve documents are very costly

22    and time-consuming, GE requested (on January 17, 2014) that Liang notify it

23    immediately if he believed that further efforts were required to preserve such

24    information.  To date, Liang has not done so.

25    Liang has been ordered by the Court to preserve "documents that are relevant to

26    the parties' claims or defenses or likely to lead to the discovery of admissible

27    evidence." (Dkt. 14.)  To show compliance, he should arrange for a third-party

28    forensic analyst to preserve forensic images of all personal devices still in his

Gibson, Dunn &
Crutcher LLP

17

**Exhibit 22**
**-293-**

Case 8:20-cv-00048-JVS-JDE   Document 260-5   Filed 12/30/20   Page 202 of 234   Page ID
#:21249
Case 8:20-cv-00048-JVS-JDE   Document 43-4   Filed 04/30/20   Page 84 of 150   Page ID
Case 2:13-cv-08670-DDP-CW   Document 54   Filed 02/20/14   Page 19 of 24   Page ID #:1304

1   possession, custody or control,[4] including PCs, laptops, USB drives, smartphones and

2   tablets in order to preserve evidence of the GE files that he downloaded and/or copied

3   without authorization.  Further, Liang's email and cloud-storage accounts should be

4   backed up and the contents preserved going back for a period of at least three years.

5       **Liang's Proposal**:

6       On or about October 25, 2013, the FBI executed search and seizure warrants of

7   Mr. Liang's home and automobiles and seized any and all GE information as well as

8   electronic devices (phones, laptops, flash drives and desktop computers) that may

9   potentially contain GE information.  Also, Mr. Liang continues to comply with this

10  Court's December 3, 2013 Order and he has not accessed, used or otherwise disclosed

11  any GE Intellectual Property.

12      **7.      Proposed Protective Order**

13      GE has proposed a Protective Order to address the Parties' concerns about the

14  confidential, proprietary and private nature of the information and documents likely to

15  be produced in discovery.  The proposed Protective Order is attached.  (Ex. A.)  Mr.

16  Liang does not generally oppose a protective order for information flowing from GE to

17  Mr. Liang subject to the parties arriving upon mutually agreeable terms.  However to

18  the extent any proposed protective order seeks disclosure of information from Mr.

19  Liang in violation of his Fifth Amendment Rights, Mr. Liang cannot enter into such

20  stipulation.

21      **8.      Limitations on Discovery**

22      **GE's Statement**: At the outset, discovery should not be limited.  If specific

23  information sought is subject to some protection or privilege, the responding party

24  should simply assert the legal basis for withholding that information, so that the parties

25  can confer and resolve the issue or, if necessary, move the Court for resolution.  *See*

26  

27  _____

28  [4]  As previously noted, Liang claims that his personal computing devices have been
    confiscated by the FBI.

**Exhibit 22**
**-294-**

Case 8:20-cv-00048-JVS-JDE   Document 260-5   Filed 12/30/20   Page 203 of 234   Page ID
#:21250
Case 8:20-cv-00048-JVS-JDE   Document 43-4   Filed 04/30/20   Page 85 of 150   Page ID
Case 2:13-cv-08670-DDP-CW   Document 54-3 #:3369 02/20/14   Page 20 of 24   Page ID #:1305

1    *SEC v. Caramadre*, 717 F. Supp. 2d 217, 224 (D.R.I. 2010) (subpoenaed parties

2    required to assert Fifth Amendment as to particular documents in privilege log); *see*

3    *also Sallah*, 855 F. Supp. 2d at 1371.

4       **Liang's Statement**:

5       In the event the Court does not stay this action, Mr. Liang proposes that

6    discovery be stayed for a period of six months or alternatively that discovery directed

7    to Mr. Liang be stayed for that period of time.

8       **9.     Supplementation of Disclosures Under Rule 26(e)**

9       **GE's Statement**: GE proposes that any supplemental disclosures under Rule

10    26(a) be made on or before May 15, 2014.  Where later supplemental disclosures must

11    be made, the parties should meet and confer in good faith to agree on an appropriate

12    disclosure schedule or seek leave of court in the event they are unable to reach

13    agreement.

14       **Liang's Statement:**

15       Mr. Liang proposes that supplemental disclosures be made May 15, 2015.

16    **J.     PRETRIAL SCHEDULE**

17       **GE's Statement**: GE proposes a Non-Expert Discovery Cut-Off of June 15,

18    2014, by which to complete all depositions and resolve all discovery motions.  GE's

19    proposals for an Expert Discovery, Non-Dispositive Motion and Pretrial Schedule are

20    set forth below.

| Date | Event |
|---|---|
| May 15, 2014 | Last Day to Supplement Disclosures under Rule 26(a) |
| June 15, 2014 | Non-Expert Discovery Cut-Off |
| July 14, 2014 | Parties to identify experts and areas of expert opinion |
| August 11, 2014 | Parties to identify any rebuttal experts and areas of rebuttal expert opinion |
| September 8, 2014 | Parties to exchange expert reports |
| September 29, 2014 | Parties to exchange rebuttal reports |

Gibson, Dunn &
Crutcher LLP

**Exhibit 22
-295-**

Case 8:20-cv-00048-JVS-JDE   Document 260-5   Filed 12/30/20   Page 204 of 234   Page ID #:21251
Case 8:20-cv-00048-JVS-JDE   Document 43-4   Filed 04/30/20   Page 86 of 150   Page ID #:3360
Case 2:13-cv-08670-DDP-CW   Document 54   Filed 02/20/14   Page 21 of 24   Page ID #:1306

| October 21, 2014 | Expert discovery, including expert depositions, completed |
| --- | --- |
| November 21, 2014 | Dispositive Motions Cut-Off Date |
| December 12, 2014 | Dispositive Motions Opposing Papers Due |
| December 22, 2014 | Dispositive Motions Reply Papers Due |
| January 2, 2015 | Last day for parties to participate in ADR (45 days before Final Pretrial Conference). |
| January 12, 2015 | Latest Hearing Date for Dispositive Motions |
| January 16, 2015 | Last day to submit Rule 26(a)(3) witness lists, and designations of witnesses whose testimony will be presented by deposition. |
| January 27, 2015 | Last day to submit exhibit lists (no later than 21 days before Final Pretrial Conference). |
| February 6, 2015 | Last day to file objections under Rule 26(a)(3) (no later than 11 days before the date set for the Final Pretrial Conference). |
| February 17, 2015 | Requested date for final pretrial conference. |
| March  2, 2015 | Suggested trial date. |

**Liang's Statement**:  GE's proposed pretrial schedule is unrealistic and not grounded in the facts of this case.  As often mentioned by GE in its pleadings, motions and elsewhere, there are in excess of two hundred thousand files GE claims Mr. Liang downloaded and potentially misappropriated.  It will require a tremendous amount of time and resources to review the files, follow up with additional written discovery and deposition testimony; engage in what is certain to be protracted motion work especially involving claims of privilege, and all the while handle the parallel criminal investigation and potential indictment.  It is impossible to complete non expert discovery within 4 months as GE proposes.  Mr. Liang proposes the following pretrial schedule:

Gibson, Dunn &
Crutcher LLP

20

**Exhibit 22**
**-296-**

| Date | Event |
|------|-------|
| May 15, 2015 | Last Day to Supplement Disclosures under Rule 26(a) |
| May 19, 2016 | Non-Expert Discovery Cut-Off |
| May 23, 2016 | Parties to identify experts and areas of expert opinion |
| June 6, 2016 | Parties to identify any rebuttal experts and areas of rebuttal expert opinion |
| June 27, 2016 | Parties to exchange expert reports |
| July 25, 2016 | Parties to exchange rebuttal reports |
| August 22, 2016 | Expert discovery, including expert depositions, completed |
| September 19, 2016 | Dispositive Motions Cut-Off Date |
| October 31, 2016 | Dispositive Motions Opposing Papers Due |
| November 14, 2016 | Dispositive Motions Reply Papers Due |
| November 14, 2016 | Last day for parties to participate in ADR (45 days before Final Pretrial Conference). |
| December 5, 2016 | Latest Hearing Date for Dispositive Motions |
| December 12, 2016 | Last day to submit Rule 26(a)(3) witness lists, and designations of witnesses whose testimony will be presented by deposition. |
| January 9, 2017 | Last day to submit exhibit lists (no later than 21 days before Final Pretrial Conference). |
| January 16, 2017 | Last day to file objections under Rule 26(a)(3) (no later than 11 days before the date set for the Final Pretrial Conference). |
| January 30, 2017 | Requested date for final pretrial conference. |
| February 14, 2017 | Suggested trial date. |

## K.  TRIAL ESTIMATE

**GE's Estimate**: At this early stage, GE anticipates that trial will last approximately two weeks.  However, discovery has commenced only recently, and GE's estimate may be revised, depending on development of the factual record.

Exhibit 22
-297-

1   Additionally, the length of trial will depend on the nature and scope of the disclosure

2   and use of GE's trade secrets.  For similar reasons, GE cannot say with certainty how

3   many witnesses will be called.  However, GE expects to call some or all of the 13

4   percipient witness listed above (in section C.2), as well as at least two (2) expert

5   witnesses.

6          **Liang's Estimate**:

7          Mr. Liang estimates that trial will last at least 4 weeks if not more and that this

8   estimate will increase as discovery is conducted.

9   **L.     TRIAL COUNSEL**

10         **GE**:  Scott A. Edelman and Angelique Kaounis of Gibson, Dunn & Crutcher

11  LLP.

12         **Liang**:  Abraham Mathew, Jacob George and Mazyar Mazarei, Mathew &

13  George.

14  **M.     SETTLEMENT STATUS AND ADR SELECTION**

15         **GE's Statement**: The parties have not yet discussed settlement because such

16  discussions would be premature and unlikely to succeed at this stage.  Pursuant to

17  Local Rule 16-15, GE proposes that the parties participate in a private dispute

18  resolution proceeding once discovery has been completed and no later than forty-five

19  (45) days before the Final Pretrial Conference.  The ADR selection form is attached.

20  (Ex. B.)

21         **Liang's Statement**:

22         Mr. Liang agrees with GE's statement above.

23  **N.     OTHER ISSUES**

24         **GE's Statement**: California Code of Civil Procedure section 2019.210 requires

25  that a plaintiff alleging trade secret misappropriation in a state court action identify the

26  trade secrets at issue before discovery may commence.  Assuming, *arguendo*, that

27  2019.210 applies here, the statute has been satisfied by GE's Complaint (Dkt. 1, at

28  ¶ 54) and the declarations filed in support of GE's Motion for Preliminary Injunction,

Gibson, Dunn &
Crutcher LLP

22

**Exhibit 22**
**-298-**

Case 8:20-cv-00048-JVS-JDE   Document 260-5   Filed 12/30/20   Page 207 of 234   Page ID #:21254
Case 8:20-cv-00048-JVS-JDE   Document 43-4   Filed 04/30/20   Page 89 of 150   Page ID #:3373
Case 2:13-cv-08670-DDP-CW   Document 54   Filed 02/20/14   Page 24 of 24   Page ID #:1309

1    which detail the nature of the trade secrets at issue and provide specific examples of

2    those secrets (*see, e.g.*, Dkt. Nos. 7-2, 7-4, and 7-6).  In light of these filings, the Court

3    found on December 3, 2013, that "the documents taken by Liang embody and/or

4    reflect GE trade secrets such as product costs, profit margins, new product initiatives,

5    and strategic planning materials." (Dkt. 14.)  Thus, GE has sufficiently identified its

6    trade secrets.

7    **Liang's Statement**:

8    Mr. Liang disagrees with GE's position that it has complied with the provisions

9    of California Code of Civil Procedure Section 2019.210 as that section and relevant

10   authority requires specificity in identifying trade secret information as opposed to the

11   general statements GE has set forth to date.

12

13   Dated:  February 19, 2014                    Dated:  February 19, 2014

14   SCOTT A. EDELMAN                             ABRAHAM MATHEW
     ANGELIQUE KAOUNIS                            MAZYAR MAZAREI
15   GIBSON, DUNN & CRUTCHER LLP                  MATHEW & GEORGE

16

17   By:_____/s/ Scott A. Edelman_____       By:_____/s/ Abraham Mathew_____

18          Scott A. Edelman                              Abraham Mathew

19   Attorneys for General Electric              Attorneys for Erwin W. Liang
     Company and GE Aviation
20   Systems LLC

21

22

23   101676151.2

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

**Exhibit 22**
**-299-**

# EXHIBIT 23

1   JOSHUA H. LERNER, SBN 220755
      jlerner@gibsondunn.com
2   GIBSON, DUNN & CRUTCHER LLP
    555 Mission Street Suite 3000
3   San Francisco, CA 94105
    Tel.:  415.393.8200 / Fax: 415.393.8306
4
    H. MARK LYON, SBN 162061
5     mlyon@gibsondunn.com
    GIBSON, DUNN & CRUTCHER LLP
6   1881 Page Mill Road
    Palo Alto, CA 94304-1211
7   Tel.:  650.849.5300 / Fax: 650.849.5333

8   BRIAN M. BUROKER, *pro hac vice*
      bburoker@gibsondunn.com
9   BRIAN K. ANDREA, *pro hac vice*        ILISSA SAMPLIN, SBN 314018
      bandrea@gibsondunn.com                 isamplin@gibsondunn.com
10  GIBSON, DUNN & CRUTCHER LLP            GIBSON, DUNN & CRUTCHER LLP
    1050 Connecticut Avenue, N.W.          333 South Grand Avenue
11  Washington, D.C. 20036                 Los Angeles, CA 90071-3197
    Tel.: 202.955.8541 / Fax: 202.467.0539 Tel.: 213.229.7000 / Fax: 213.229.7520
12
    BRIAN A. ROSENTHAL, *pro hac vice*     ANGELIQUE KAOUNIS, SBN 209833
13    brosenthal@gibsondunn.com              akaounis@gibsondunn.com
    GIBSON, DUNN & CRUTCHER LLP            GIBSON, DUNN & CRUTCHER LLP
14  200 Park Avenue                        2029 Century Park East Suite 4000
    New York, NY 10166-0193                Los Angeles, CA 90067
15  Tel.: 212.351.2339 / Fax: 212.817.9539 Tel.: 310.552.8546 / Fax: 310.552.7026

16  *Attorneys for Defendant Apple Inc.*

17              **UNITED STATES DISTRICT COURT**
18          **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
                    **SOUTHERN DIVISION**
19

20  MASIMO CORPORATION,                CASE NO. 8:20-cv-00048-JVS (JDEx)
    a Delaware corporation; and
21  CERCACOR LABORATORIES, INC.,       **DEFENDANT APPLE INC.'S REPLY**
    a Delaware corporation,            **IN SUPPORT OF MOTION FOR**
22                                      **REVIEW OF AND OBJECTIONS TO**
                    Plaintiffs,         **MAGISTRATE JUDGE EARLY'S**
23                                      **JUNE 15, 2020 ORDER**
         v.
24                                      **Hearing**
    APPLE INC.,
25  a California corporation,           Date:        July 20, 2020
                                        Time:        1:30 p.m.
26                  Defendant.          Courtroom:   10C
                                        Judge:       Hon. James V. Selna
27

28

Gibson, Dunn &
Crutcher LLP

APPLE'S REPLY ISO MOT. FOR REVIEW OF AND
OBJECTIONS TO MAGISTRATE JUDGE'S ORDER          CASE NO. 8:20-CV-00048-JVS (JDEX)

**Exhibit 23
-300-**

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ............................................................................. 1

II.   ARGUMENT....................................................................................... 3

    A.    Judge Early's Order Is Erroneous and Contrary to Law........................... 3

        1.    This Court Ordered Plaintiffs to Comply with Section 2019.210................................................................................ 3

        2.    Judge Early's Order Permits Plaintiffs to Avoid Compliance with Section 2019.210. ....................................... 4

    B.    Apple's Requested Relief Is Consistent with Section 2019.210. ............. 13

III.  CONCLUSION .................................................................................. 15

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

*Advanced Modular Sputtering, Inc. v. Superior Court*,
    132 Cal. App. 4th 826 (2005) ................................................................. 6, 7

*Bal Seal Eng'g, Inc. v. Nelson Prod., Inc.*,
    2017 WL 10543565 (C.D. Cal. Mar. 13, 2017) ...................................... 14

*Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*,
    No. 5:10-cv-03428-LHK (N.D. Cal. Mar. 24, 2011) ................................ 8

*Bryant v. Mattel, Inc.*,
    2007 WL 5430888 (C.D. Cal. May 18, 2007) .......................................... 8

*Comput. Econs., Inc. v. Gartner Grp., Inc.*,
    50 F. Supp. 2d 980 (S.D. Cal. 1999) ....................................................... 9

*E. & J. Gallo Winery v. Instituut Voor Landbouw-En Visserijonderzoek*,
    2018 WL 3062160 (E.D. Cal. June 19, 2018) ........................................... 8

*Gatan, Inc. v. Nion Co.*,
    2018 WL 2117379 (N.D. Cal. May 8, 2018) ........................................... 14

*Jobscience, Inc. v. CVPartners, Inc.*,
    2014 WL 852477 (N.D. Cal. Feb. 28, 2014) ................................. 2, 8, 9, 14

*Lilith Games (Shanghai) Co. v. uCool, Inc.*,
    2015 WL 4149066 (N.D. Cal. July 9, 2015) ............................................. 9

*Loop AI Labs, Inc v. Gatti*,
    2015 WL 9269758 (N.D. Cal. Dec. 21, 2015) ......................................... 5

*M/A-COM Tech. Sols., Inc. v. Litrinium, Inc.*,
    2019 WL 4284523 (C.D. Cal. June 11, 2019) ........................................... 3

*M/A-COM Tech. Sols., Inc. v. Litrinium, Inc.*,
    2019 WL 8108729 (C.D. Cal. Sept. 3, 2019) ........................................... 9

*Openwave Messaging, Inc. v. Open-Xchange, Inc.*,
    2018 WL 2117424 (N.D. Cal. May 8, 2018) ........................................... 14

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Gibson, Dunn &
Crutcher LLP

**Exhibit 23
-302-**

*Radzanower v. Touche Ross & Co.*,
    426 U.S. 148 (1976) ................................................................................... 12

*ScaleMP, Inc. v. TidalScale, Inc.*,
    No. 3:18-cv-04716 EDL (N.D. Cal. Mar. 15, 2019) .................................... 6

*Silva v. U.S. Bancorp*,
    2011 WL 7096576 (C.D. Cal. Oct. 6, 2011) ............................................... 9

*Space Data Corp. v. X*,
    2017 WL 3007078 (N.D. Cal. July 14, 2017) ............................................ 5

*Tatum v. Schwartz*,
    2007 WL 419463 (E.D. Cal. Feb. 5, 2007) ................................................ 9

**Statutes**

Cal. Civ. Proc. Code § 2019.210 ......................................................... 1, 4, 12

**Other Authorities**

A. Scalia and B. Garner, *Reading Law: The Interpretation of Legal Texts*
    180 (2012) ................................................................................................. 12

**Exhibit 23**
**-303-**

## I.    **INTRODUCTION**

Apple's Motion simply seeks Plaintiffs' compliance with Section 2019.210.  This Court entered a Scheduling Order staying "trade secret discovery only pending compliance with Section 2019.210" nearly three months ago, but Plaintiffs still have not made any effort to comply with the statute.  Under the plain language of this Court's Scheduling Order, Plaintiffs' discovery pertaining to trade secrets therefore is stayed.  Plaintiffs should not be permitted to end-run around that stay merely by labeling the discovery they seek as "patent discovery."  That is, however, precisely what Magistrate Judge Early's June 15, 2020 Order, adopting Plaintiffs' argument, permits Plaintiffs to do.  As a result, Plaintiffs may continue to thwart the parties' and more importantly the Court's attempts to define the proper scope of discovery.[1]  Judge Early's Order is erroneous and contrary to law, and should be reversed accordingly.

The reach of Section 2019.210 is set forth in the statute:  It requires that a plaintiff alleging trade secret misappropriation identify the alleged trade secrets with reasonable particularity before commencing discovery "*relating*" to the alleged trade secrets.  Cal. Civ. Proc. Code § 2019.210 (emphasis added).  Far from identifying their trade secrets with reasonable particularity more than six months into this case, Plaintiffs have yet to even adequately plead those purported trade secrets under Federal Rule of Civil Procedure 8.  *See* Dkt. No. 60, at 6–8.  Nonetheless, Plaintiffs seek broad, technical information from Apple regarding the products that Plaintiffs allege incorporate their unspecified trade secrets (the Apple Watch Series 4 and 5).  In other words, Plaintiffs seek to discover *Apple's* confidential information and trade secrets pertaining to the Apple Watch Series 4 and 5 before they identify any of their own trade secrets.

Plaintiffs do not dispute that they seek discovery *relating* to trade secrets.  Plaintiffs simply contend that because the discovery they seek relating to trade secrets

---

[1]  While Plaintiffs' first amended trade secret claim was dismissed on June 25, 2020 (Dkt. No. 60), Plaintiffs have confirmed that they intend to replead the claim.  *See* Dkt. No. 68 (Plaintiffs agreeing to a schedule for Apple's motion to dismiss Plaintiffs' to-be-repleaded trade secret misappropriation claim).

Gibson, Dunn &
Crutcher LLP

APPLE'S REPLY ISO MOT. FOR REVIEW OF AND
OBJECTIONS TO MAGISTRATE JUDGE'S ORDER     1     CASE NO. 8:20-CV-00048-JVS (JDEX)

**Exhibit 23
-304-**

1 | *also* relates to their patent claims (because their trade secret and patent claims concern
2 | technical features of the *very same products*), they are permitted to bypass the
3 | requirements of Section 2019.210 and the stay imposed by this Court.  That position—
4 | which Judge Early adopted based on Plaintiffs' contention that the word "only" in this
5 | Court's Scheduling Order stays only discovery that is *solely* related to Plaintiffs' trade
6 | secret claim—would frustrate every policy consideration underlying Section 2019.210.
7 | *See, e.g.*, *Jobscience, Inc. v. CVPartners, Inc.*, 2014 WL 852477, at *5 (N.D. Cal. Feb.
8 | 28, 2014) ("Experience has shown that it is easy to allege theft of trade secrets with
9 | vagueness, then take discovery into the defendants' files, and then cleverly specify what
10 | ever [sic] happens to be there as having been trade secrets stolen from plaintiff.").

11 | Apple does not believe that this Court's stay of "trade secret discovery only
12 | pending compliance with 2019.210" was intended to render Section 2019.210's stay of
13 | discovery "relating to the trade secret[s]" meaningless.  It defies common sense to
14 | suggest that the Court ordered "compliance with Section 2019.210" yet intended to
15 | allow Plaintiffs to avoid providing a Section 2019.210 disclosure before taking trade
16 | secret-related discovery—i.e., avoid complying with Section 2019.210 at all—so long
17 | as Plaintiffs argued that the discovery also relates to patents.  Unless and until Plaintiffs
18 | satisfy the requirements of Section 2019.210, they should not be permitted to obtain
19 | discovery from Apple that relates to trade secrets even if it *also* relates to other issues.

20 | To that end, Plaintiffs are wrong to contend that Apple's Motion "identifies no
21 | error" in Judge Early's Order.  Apple identified the manner in which the Order deviates
22 | from (i) the plain language and intent of the statute (Section 2019.210) with which this
23 | Court ordered Plaintiffs to comply, and, in turn, (ii) the Scheduling Order wherein the
24 | Court ordered compliance.  Indeed, Apple cited a prior case where Judge Early correctly
25 | recognized that Section 2019.210 is contrary to the *exact* result he reached here:
26 | "Section 2019.210 does not limit discovery 'exclusively' relating to the trade secrets.  A
27 | request that relates to both trade secret and other issues still 'relates to' the trade secret."
28 | *M/A-COM Tech. Sols., Inc. v. Litrinium, Inc.*, 2019 WL 4284523, at *5 (C.D. Cal. June

**Exhibit 23**
**-305-**

11, 2019) (Early, J.).  Apple also identified how Plaintiffs' erroneous reading of the Scheduling Order—which Judge Early felt compelled to adopt and formed the basis for his ruling—is at odds with Section 2019.210.  Apple's Motion is a 13-page detailed explanation of the error inherent in Judge Early's Order.

This Court should prevent Plaintiffs from continuing to obfuscate the proper scope of discovery here and from gaining access to Apple's trade secrets under the guise of patent discovery before they identify their own purported trade secrets with the reasonable particularity required under Section 2019.210.

## II.    ARGUMENT

### A.    Judge Early's Order Is Erroneous and Contrary to Law.

Judge Early based his ruling on the portion of this Court's Scheduling Order that explicitly incorporates Section 2019.210:  the sentence staying "trade secret discovery only pending compliance with 2019.210."  Dkt. No. 37, at 1.  The interpretation of that sentence that Judge Early adopted to decide this dispute is erroneous and contrary to law—as evidenced by, *inter alia*, the language and purpose of the statute that this Court incorporated into that sentence over Plaintiffs' objection.

### 1.    This Court Ordered Plaintiffs to Comply with Section 2019.210.

Plaintiffs' Opposition Brief proceeds on the incorrect premise that this Court, in entering its Scheduling Order, rejected Apple's position on Section 2019.210.  In the Rule 26(f) Report that preceded entry of the Scheduling Order, Apple advocated for application of Section 2019.210—including by citing the many district courts throughout this Circuit that have applied Section 2019.210 to manage discovery in trade secret cases.  Dkt. No. 33, at 17–18 (citing cases).  Plaintiffs resisted entirely—arguing that Section 2019.210 does not apply in federal court, despite Apple's authority to the contrary, and that Apple should seek identification of Plaintiffs' alleged trade secrets through an interrogatory instead.  *Id.* at 6–7.  The Court responded with a Scheduling Order that mandates compliance with Section 2019.210 (Dkt. No. 37), thereby rejecting

**Exhibit 23**
**-306-**

1    *Plaintiffs'* position on Section 2019.210, not Apple's.[2]

2              Indeed, Plaintiffs' lead argument in opposition to Apple's Motion is that in its

3    Scheduling Order this Court "rejected Apple's attempt to stay patent discovery" (Opp.

4    at 7), but Apple never requested a stay of patent discovery.  In the Rule 26(f) Report that

5    preceded entry of the Scheduling Order, Apple specifically stated that it "intends to

6    move forward with producing responsive discovery that relates solely to Plaintiffs'

7    patent claims" without a Section 2019.210 disclosure.  Dkt. No. 33, at 8.  Apple does

8    not have—and has never had—any objection to producing discovery that relates solely

9    to Plaintiffs' patent claims pending Plaintiffs' compliance with Section 2019.210.

10   Indeed, in Apple's very first responses to Plaintiffs' RFPs, Apple agreed to produce

11   documents responsive to RFPs 1 through 4 on that basis.  *See* Dkt. No. 46, at 4 (Apple's

12   Supplemental Brief).  And now that a Protective Order has been entered (Dkt. No. 67),

13   Apple will begin producing its confidential discovery that relates solely to Plaintiffs'

14   patent claims.  Apple's objection is to Plaintiffs "commencing discovery *relating* to the

15   trade secret[s]" (Cal. Civ. Proc. Code § 2019.210) before they have identified their

16   alleged trade secrets with the reasonable particularity Section 2019.210—and, in turn,

17   the Scheduling Order incorporating the statute—requires.

18              **2.      Judge Early's Order Permits Plaintiffs to Avoid Compliance with**

19                       **Section 2019.210.**

20              There can be no dispute that Judge Early's Order would permit Plaintiffs to

21   commence discovery "relating" to trade secrets before they have complied with Section

22   2019.210, so long as Plaintiffs can claim the discovery is not "only" trade secret related.

23   Of course—as explained below—Plaintiffs' refusal to describe their alleged trade

24   secrets makes it difficult for Apple or the Court to even address Plaintiffs' flawed

25   argument.

26

27

28   _____

     [2] Apple therefore had no reason or basis on which to seek reconsideration of this
     Court's Scheduling Order as Plaintiffs suggest Apple should have done.  *See* Opp. at 9.

Gibson, Dunn &
Crutcher LLP

APPLE'S REPLY ISO MOT. FOR REVIEW OF AND
OBJECTIONS TO MAGISTRATE JUDGE'S ORDER          4          CASE NO. 8:20-CV-00048-JVS (JDEx)

**Exhibit 23**
**-307-**

a)  **Judge Early's Order Is Inconsistent with the Plain Language of the Statute with which this Court Ordered Plaintiffs to Comply.**

Section 2019.210 requires that Plaintiffs serve an adequate trade secret disclosure before obtaining any discovery from Apple "relating" to their (soon to be repleaded) trade secret claim.  Judge Early's Order, on the other hand, permits Plaintiffs to obtain discovery from Apple "relating" to their trade secret claim *without* a Section 2019.210-compliant disclosure, merely by claiming that the discovery relates to another claim, like their patent infringement claims.  Judge Early's Order is flatly at odds with the plain language of the statute with which this Court ordered Plaintiffs to comply.

The cases Plaintiffs cite do not help their cause.  To the contrary, none of those cases involved plaintiffs that refused to provide *any* disclosure for more than six months—or circumstances where there was not even a schedule for Section 2019.210 compliance—while attempting to take discovery as to the purported trade secrets.  In *Loop AI Labs, Inc v. Gatti*, 2015 WL 9269758 (N.D. Cal. Dec. 21, 2015) (Opp. at 8, 11), the plaintiff expressly alleged that its non-CUTSA claims "are not based on any allegations of misappropriation of trade secrets"—unlike the patent claims here.  *Id.* at *1–2, *4.  Furthermore—and this is critical—the plaintiff in *Loop AI Labs* was under court order to provide within 21 days a "thorough and complete" trade secret disclosure, *which it could not amend in the future* absent a showing of good cause. *Id.* at *4.  Here, Plaintiffs have not even agreed on a date by which they will serve their disclosure, let alone not to subsequently amend it.  Plaintiffs' sole articulated reason for not producing a Section 2019.210 disclosure for months was the absence of a Protective Order.  *See, e.g.*, Samplin Decl. Ex. B.  A Protective Order has since been entered. *See* Dkt. No. 67.  Yet Plaintiffs still have not produced a Section 2019.210 disclosure, have not committed to a date by which they will produce a Section 2019.210 disclosure, and have not represented that they will not amend the disclosure they produce in the future.

In *Space Data Corp. v. X*, 2017 WL 3007078 (N.D. Cal. July 14, 2017) (Opp. at 10), unlike this case, the plaintiffs provided a Section 2019.210 disclosure *and* amended

it prior to the order Plaintiffs cite.  Joint Br. at 2, 2017 WL 3007078, ECF No. 105.  In *ScaleMP, Inc. v. TidalScale, Inc.*, No. 3:18-cv-04716 EDL, ECF No. 52 (N.D. Cal. Mar. 15, 2019), at 2 (Opp. at 9–10; Larson Decl. Ex. 8), the plaintiff also had already served a Section 2019.210 disclosure, as well as "a voluminous set of documents" with "hundreds of pages" of extensive highlighting identifying its alleged trade secrets.  Larson Decl. Ex. 8, at 88–89 (*ScaleMP*, slip op. at 5–6).  And in *Advanced Modular Sputtering, Inc. v. Superior Court*, 132 Cal. App. 4th 826, 831 (2005) (Opp. at 9–10), the plaintiff likewise had already served *three* trade secret disclosures—the third of which was deemed by the court to be Section 2019.210-compliant.  Plaintiffs here, by contrast, have not even served a single disclosure.

Moreover, Plaintiffs are wrong to suggest that the court in *Advanced Modular* held that "hinging" was the test or a requirement under Section 2019.210.  Instead, the court found that on the facts of that particular case, "[a] fair reading of this complaint and its 10 causes of action compels the conclusion that each and every cause of action hinges upon the factual allegation that AMS misappropriated Sputtered Films' trade secrets." *Id.* at 834.  The court then held that where a complaint is comprised of causes of action that are "factually dependent on the misappropriation allegation," discovery cannot proceed absent a Section 2019.210-compliant disclosure.  The Plaintiffs here already *conceded* that their patent claims are "factually dependent on the same [trade secret] misappropriation allegations" in this case.  Dkt. No. 57, at 4, 7 (quoting Lerner Decl. Ex. I, at 206).  Plaintiffs made that concession because it is obvious from the face of their claims—they allege that the Apple Watch 4 and 5 incorporate their alleged trade secrets and infringe their patents.

In their Opposition Brief, Plaintiffs attempt for the first time to distance themselves from this concession, which was made orally during the course of the parties' meet and confers on this topic.  *See* Opp. at 12.  Notably, however, Plaintiffs did not contemporaneously refute Apple's April 7, 2020 summary of the meet and confer in which that statement was made.  *See* Samplin Decl. Ex. A [A. Powell April 7, 2020

**Exhibit 23**
**-309-**

1   Response on behalf of Plaintiffs].  Plaintiffs already conceded that this is a case of the

2   type for which *Advanced Modular* requires a Section 2019.210-compliant disclosure.  It

3   is improper for Plaintiffs to attempt to backtrack from that concession now, and argue

4   that their claims do not relate, particularly when they are withholding the description of

5   the alleged trade secrets at issue in their trade secret claim.  Indeed, even if Plaintiffs had

6   never made their concession, it is obvious from the face of Plaintiffs' pleading that their

7   trade secret misappropriation and patent claims hinge on the same facts.  Plaintiffs are

8   accusing the *same* products of incorporating their trade secrets and infringing their

9   patents.  Plaintiffs' position in the Opposition Brief about these claims is inconsistent

10   with their own pleading.

11        In any event, here, unlike in *Advanced Modular*, the factual dependency of *claims*

12   is not at issue—but rather the nature of *specific RFPs*.  Plaintiffs' RFPs at issue in

13   Apple's Motion for a Protective Order that Judge Early denied (Plaintiffs' RFPs 5

14   through 25) seek discovery about the very categories of information Plaintiffs claim as

15   trade secrets.  As Apple explained in its Motion (Mot. at 12)—and as Judge Early found

16   (Dkt. No. 54, at 8)—several of these RFPs seek the same categories of information

17   Plaintiffs allege in the First Amended Complaint ("FAC") (*see* Lerner Decl. Ex. F,

18   ¶ 211) as comprising their trade secrets.  *Compare, e.g.*, RFP No. 12 ("All technical

19   documents for the Accused Products, including, without limitation, product

20   specifications, diagrams, schematics, memos, conceptual or technical drawings, design

21   requirements documents, design capture documents, technical requirements documents,

22   product briefs, product plans, product requirements, document trees, assembly design

23   documents, design review documents, system design documents, fabricating drawings,

24   manufacturing documents, and technical meeting minutes."), *with* FAC ¶ 211

25   ("Plaintiffs' technical information includes product plans, engineering plans, product

26   briefs, technical drawings, technical specifications, technical data, product designs,

27   system designs, design captures, assembly design requirements, risk analysis, test

28   procedures and results, test data, design review documents, software requirement

Gibson, Dunn &
Crutcher LLP

APPLE'S REPLY ISO MOT. FOR REVIEW OF AND
OBJECTIONS TO MAGISTRATE JUDGE'S ORDER          7          CASE NO. 8:20-CV-00048-JVS (JDEx)

**Exhibit 23**
**-310-**

1   specifications, technical know-how, manufacturing techniques and procedures,
2   installation techniques and procedures, and invention disclosures."). Plaintiffs did not
3   even attempt to refute this obvious overlap in their Opposition Brief. The information
4   Plaintiffs seek in the RFPs here is identical to the information Plaintiffs allege as their
5   trade secrets, and therefore the discovery is indisputably trade secret related. Plaintiffs
6   must comply with Section 2019.210 to discover confidential documents responsive to
7   the RFPs at issue. *See E. & J. Gallo Winery v. Instituut Voor Landbouw-En*
8   *Visserijonderzoek*, 2018 WL 3062160, at *6 (E.D. Cal. June 19, 2018).

9        Plaintiffs also cite a scheduling order (Opp. at 10 (citing *Brocade Commc'ns Sys.,*
10  *Inc. v. A10 Networks, Inc.*, No. 5:10-cv-03428-LHK, ECF No. 72 (N.D. Cal. Mar. 24,
11  2011))), in which the court provided a general framework for future discovery but did
12  not assess specific RFPs to determine whether they "relate to" a CUTSA claim. In
13  addition, Plaintiffs cite *Bryant v. Mattel, Inc.*, 2007 WL 5430888, at *3 n.3 (C.D. Cal.
14  May 18, 2007) (Opp. at 11), which merely addresses Section 2019.210 in a footnote,
15  and Apple has not found a single court that has relied on it. Neither of these cases help
16  Plaintiffs' position, which is contradicted by the plain language of Section 2019.210,
17  with which this Court ordered them to comply.

18        **b)   Judge Early's Order Is Inconsistent with the Purposes of**
19              **Section 2019.210.**

20        Judge Early's Order likewise is inconsistent with the purposes of the statute with
21  which this Court ordered Plaintiffs to comply.

22        ***Promoting Well-Investigated Claims***. Apple argued in its Motion that by opening
23  the door for Plaintiffs to gain access to Apple's confidential information before serving
24  a Section 2019.210-compliant description of their alleged trade secrets, Judge Early's
25  Order permits Plaintiffs to build their trade secret case on Apple's information, instead
26  of requiring Plaintiffs to demonstrate that their trade secret claim was "well-
27  investigated" and not "meritless" at the outset. Mot. at 10 (quoting *Jobscience, Inc.*,
28  2014 WL 852477, at *5 ("A true trade secret plaintiff ought to be able to identify, up

1    front, and with specificity the particulars of the trade secrets without any discovery.")).

2    Plaintiffs did not refute this argument in their Opposition Brief, and therefore concede

3    it. *Cf. Silva v. U.S. Bancorp*, 2011 WL 7096576, at *3 (C.D. Cal. Oct. 6, 2011) (finding

4    that plaintiff conceded that his claim "should be dismissed by failing to address

5    Defendants' arguments in his Opposition"); *Tatum v. Schwartz*, 2007 WL 419463, at *3

6    (E.D. Cal. Feb. 5, 2007) (plaintiff "tacitly concede[d] th[e] claim by failing to address

7    defendants' argument in her opposition").

8         ***Preventing Discovery Abuse***.  Courts throughout this Circuit have recognized that

9    an important purpose of Section 2019.210 is that it "prevents plaintiffs from using the

10   discovery process as a means to obtain the *defendant's* trade secrets."  *Comput. Econs.,*

11   *Inc. v. Gartner Grp., Inc.*, 50 F. Supp. 2d 980, 985 (S.D. Cal. 1999) (emphasis added);

12   *see also M/A-COM Tech. Sols., Inc. v. Litrinium, Inc.*, 2019 WL 8108729, at *2 (C.D.

13   Cal. Sept. 3, 2019); *Lilith Games (Shanghai) Co. v. uCool, Inc.*, 2015 WL 4149066, at

14   *4 (N.D. Cal. July 9, 2015).  That is Apple's concern here—that Judge Early's Order

15   permits Plaintiffs to use patent-related discovery as a means to obtain *Apple's*

16   confidential information before identifying their own alleged trade secrets, instead of

17   preventing such discovery abuse.

18        Plaintiffs' efforts to distinguish Apple's cases on this score fall flat.  Apple need

19   not cite cases that "analyze the scope of discovery in a trade-secret case including patent

20   infringement claims" to make the basic point that Section 2019.210 is intended to,

21   among other things, prevent the type of discovery abuse that Judge Early's Order

22   threatens to facilitate here.  Opp. at 15.  The case law is clear that prevention of that type

23   of discovery abuse is at the heart of Section 2019.210.  *See, e.g.*, *Jobscience, Inc.*, 2014

24   WL 852477, at *5.  Indeed, in the cases Plaintiffs cite involving both trade secret and

25   patent claims in which the court permitted patent discovery to commence, the plaintiff

26   had already provided a Section 2019.210 disclosure or the Court had ordered production

27   of the disclosure by a date certain.  Plaintiffs therefore are wrong to suggest that Section

28   2019.210   serves   any   different   purpose   in   cases   involving   both   trade   secret

**Exhibit 23
-312-**

1    misappropriation and patent infringement claims.

2          As Apple explained in its Motion, Plaintiffs have already exhibited their intent to

3    delay describing their alleged trade secrets as long as possible by refusing to even

4    provide a date certain by which they will serve a Section 2019.210 disclosure, and Judge

5    Early's Order gives Plaintiffs the green light to continue their delay.  Mot. at 11.  If

6    Judge Early's Order is not reversed, Plaintiffs will have no incentive whatsoever to

7    comply with Section 2019.210 until after they obtain all of Apple's confidential

8    information through patent-related discovery for the very same products at issue in both

9    the patent and trade secret claims.  Plaintiffs' new offer to "provide their Section

10   2019.210 statement on the *same day* Apple provides its core technical documents and

11   other confidential discovery" (Opp. at 14) is a step in the right direction, but does not

12   solve the problem.  Section 2019.210 disclosures are heavily litigated—with trade secret

13   plaintiffs regularly ordered to amend, often on multiple occasions, before they achieve

14   the reasonable particularity threshold.  There is nothing preventing Plaintiffs from

15   agreeing to their proposed mutual exchange, and then providing a vague and unspecific

16   trade secret disclosure that leaves room for them to later claim ownership of the *Apple*

17   trade secrets they find in Apple's core technical documents and other confidential

18   information.[3]  That is the problem Section 2019.210 is intended to avoid, which would

19   be frustrated by Judge Early's Order requiring Apple to produce documents containing

20   *Apple* confidential information before Plaintiffs have identified their own alleged trade

21   secrets with reasonable particularity.

22         This frustration created by Judge Early's Order is the motivation for Apple's

23   present Motion.  Plaintiffs' suggestion that Apple is motivated by some desire to delay

24   "*all* patent discovery for months while it litigates" the sufficiency of Plaintiffs' Section

25   2019.210 statement (Opp. at 14 (emphasis added)) is, by contrast, demonstrably

26   incorrect.  Apple *already agreed* to produce patent-related discovery that is not also

27

28   _____
     [3]  For example, Plaintiffs might simply provide the same list of broad categories of
     alleged trade secrets from their FAC (*see* FAC ¶ 211), which this Court rejected as
     inadequate even at the pleading stage (Dkt. No. 60).

Gibson, Dunn &
Crutcher LLP

APPLE'S REPLY ISO MOT. FOR REVIEW OF AND
OBJECTIONS TO MAGISTRATE JUDGE'S ORDER          10          CASE NO. 8:20-CV-00048-JVS (JDEX)

Exhibit 23
-313-

1   trade secret-related.  *See supra* at 4.  And the fact that Apple "signaled that it intends to

2   file *another* motion to dismiss" before receiving Plaintiffs' amended pleading is not

3   indicative of any intent by Apple to delay patent-related discovery as Plaintiffs contend.

4   *Id.*  Rather, it is a natural response to Plaintiffs' stated effort to attempt to replead a claim

5   that this Court already dismissed as insufficiently pled.  Any delay here is a problem of

6   Plaintiffs' own making.  Plaintiffs have refused to produce a Section 2019.210 disclosure

7   *for months*, including after this Court ordered Section 2019.210 compliance.

8         ***Framing Discovery and Enabling a Defense***.  Plaintiffs' refusal to provide a

9   Section 2019.210-compliant disclosure makes it impossible for the Court to properly

10  frame the scope of trade secret-related discovery or for Apple to defend itself against

11  Plaintiffs' trade secret claim.  Plaintiffs' attempt to argue the contrary only highlights

12  the problem with their position.  Plaintiffs assert that the Court can easily frame the

13  appropriate discovery in this case because it can permit all "discovery that would

14  ordinarily be available in a patent infringement case. . . . without knowing if the

15  information is ***also*** relevant to" Plaintiffs' trade secret claim.  Opp. at 16–17.  But that

16  would turn Section 2019.210 on its head and leave the Court with no guidance by which

17  to determine if Plaintiffs are improperly attempting to discover information "related to"

18  their trade secret claim without first serving a Section 2019.210 statement—exactly as

19  Plaintiffs are attempting to do here.  Plaintiffs' other argument—that the proper scope

20  of *patent*-related discovery would still have to be determined even in the absence of a

21  trade secret claim (*id.* at 17)—is a strawman.  Without a trade secret claim, there would

22  be no need for the Court or Apple to determine which discovery is "related to" trade

23  secrets, because there would be no danger that Plaintiffs could abuse the discovery

24  process to manufacture a trade secret claim out of Apple's confidential information.

25         In sum, Plaintiffs' strained interpretation and Judge Early's erroneous application

26  of the Scheduling Order to stay only discovery that is solely related to Plaintiffs' trade

27  secret claim frustrates each of these purposes and effectively renders the ordered

28  discovery stay meaningless.

Gibson, Dunn &
Crutcher LLP

APPLE'S REPLY ISO MOT. FOR REVIEW OF AND
OBJECTIONS TO MAGISTRATE JUDGE'S ORDER    11     CASE NO. 8:20-CV-00048-JVS (JDEX)

**Exhibit 23
-314-**

1    In an effort to detract attention from this obvious problem with their position,

2    Plaintiffs lead the policy section of their Opposition Brief by arguing that Apple

3    requested that Judge Early "rewrite" the Scheduling Order. Opp. at 13. Not so. The

4    Scheduling Order clearly and unambiguously mandates compliance with Section

5    2019.210. *See* Dkt. No. 37, at 1. And Section 2019.210 clearly and unambiguously

6    prohibits a trade secret plaintiff from commencing discovery relating to the trade secrets

7    before those trade secrets have been identified with reasonable particularity. *See* Cal.

8    Civ. Proc. Code § 2019.210. This is all consistent with Apple's argument on this Motion

9    (and in its underlying Motion for Protective Order), and therefore no rewrite of the

10   Scheduling Order was required. By contrast, Plaintiffs' argument—i.e., that they are

11   absolved of Section 2019.210 compliance if they can show that their requested trade

12   secret-related discovery *also* relates to their patent claims—is patently *inconsistent* with

13   Section 2019.210 and, therefore, this Court's Scheduling Order incorporating that

14   statute. *Plaintiffs* seek a rewrite of this Court's Scheduling Order, not Apple.

15   This is epitomized by the fact that Plaintiffs' interpretation of the sentence of the

16   Scheduling Order incorporating Section 2019.210—which Judge Early unfortunately

17   adopted—does not render the sentence "compatible" with Section 2019.210, but rather,

18   "contradictory" thereto. A. Scalia and B. Garner, *Reading Law: The Interpretation of*

19   *Legal Texts* 180 (2012); *see also, e.g.*, *Radzanower v. Touche Ross & Co.*, 426 U.S. 148,

20   155 (1976) (noting that if two sources of law "are capable of co-existence, it is the duty

21   of the courts . . . to regard each as effective"). Judge Early should have read the

22   Scheduling Order in a manner consistent with Section 2019.210, by concluding that the

23   stay applies to trade secret-*related* discovery only—i.e., to discovery that relates solely

24   to trade secrets or to trade secrets and other matters, but *not* to discovery that is not in

25   *any way* related to the trade secrets. Judge Early's alternative read—which renders the

26   discovery stay meaningless and frustrates the purposes of Section 2019.210—is contrary

27   to law and should be reversed accordingly. *See* Mot. at 8–9.

28

**Exhibit 23**
**-315-**

**B.      Apple's Requested Relief Is Consistent with Section 2019.210.**

This Court should reverse Judge Early's Order and grant Apple's underlying Motion for Protective Order because the motion is consistent with the language and purpose of Section 2019.210 and, in turn, the Scheduling Order incorporating the statute.

Apple's Motion for Protective Order requested relief from Plaintiffs' RFPs seeking discovery "relating to the trade secret[s]" in the absence of a Section 2019.210-compliant disclosure, as well as a Section 2019.210-compliant disclosure.  Plaintiffs asserted a claim of trade secret misappropriation in this case.  While the claim has since been dismissed, Plaintiffs committed to amending their pleading to reassert the claim in the short term.  *See* Opp. at 6.  Section 2019.210 is clear that trade secret plaintiffs like these Plaintiffs must describe their alleged trade secrets with reasonable particularity, yet these Plaintiffs have thrown up every roadblock in resistance to doing so.  Apple has been asking Plaintiffs to describe the trade secrets that Plaintiffs allege are incorporated in the Apple Watch Series 4 and 5 for *more than five months* now.  That is precisely what Section 2019.210 requires of these Plaintiffs—and therefore Apple's Motion for Protective Order requesting that the Court order the same is entirely consistent with the statute.  Plaintiffs' argument that Judge Early's decision should be affirmed alternatively or in addition "because Apple requested relief that far exceeds the scope of Section 2019.210" (Opp. at 18) therefore is another strawman.  A request for a Section 2019.210-compliant disclosure is consistent with, and does not "far exceed," the statute.[4]

Plaintiffs appear to take issue with the specific elements of the Section 2019.210 disclosure Apple requested in its Motion for Protective Order.  *See* Opp. at 18.  But those elements are not new or novel.  They are the elements of Section 2019.210 disclosures that plaintiffs routinely have been ordered to provide by courts within this Circuit.  For

---

[4]  Plaintiffs' suggestion that Apple pursued this relief in its Motion for Protective Order *after* this Court issued its Scheduling Order (Opp. at 18) is wrong.  Consistent with Local Rule 37-2.2, Apple sent Plaintiffs its portion of the Joint Stipulation for the Motion on April 8, 2020, and did not edit it after that point (Samplin Decl. ¶ 5)—including after the Court entered the Scheduling Order on April 17, 2020 (Dkt. No. 37).

Exhibit 23
-316-

1   example, in *Jobscience*, the court ordered the plaintiff to file and serve, consistent with

2   Section 2019.210, a trade secret disclosure with *each* of the elements requested by Apple

3   in its Motion for Protective Order:

> For each trade secret, plaintiff must file, and serve on counsel, a statement, under seal, that should include: (1) a summary of the specific trade secret; (2) the background of the trade secret and a description of how each secret has derived independent, actual or potential economic value by virtue of not being generally known to the public; (3) a description of how each secret has been the subject of reasonable efforts to maintain its secrecy; and finally (4) each of the precise claimed trade secrets, numbered, with a list of the specific elements for each, as claims would appear at the end of a patent.   Plaintiff may not take any discovery *at all* until a satisfactory statement has been filed under seal and served on counsel for defendants.

12   2014 WL 852477, at *5.   The courts in *Openwave Messaging, Inc. v. Open-Xchange,*

13   *Inc.*, 2018 WL 2117424 (N.D. Cal. May 8, 2018) and *Gatan, Inc. v. Nion Co.*, 2018 WL

14   2117379 (N.D. Cal. May 8, 2018) did the same.   *See Openwave Messaging*, 2018 WL

15   2117424, at *4 (stating that to satisfy Section 2019.210, Openwave's trade secret

16   disclosure must include '"(1) a summary of the specific trade secret; (2) the background

17   of the trade secret and a description of how each secret has derived independent, actual

18   or potential economic value by virtue of not being generally known to the public; (3) a

19   description of how each secret has been the subject of reasonable efforts to maintain its

20   secrecy; and finally (4) each of the precise claimed trade secrets, numbered, with a list

21   of the specific elements for each, as claims would appear at the end of a patent"')

22   (quoting *Jobscience*, 2014 WL 852477, at *5); *Gatan*, 2018 WL 2117379, at *4

23   (deeming plaintiff's trade secret disclosure insufficient under Section 2019.210, and

24   ordering a revised disclosure that includes "(i) a summary in plain English of the specific

25   trade secrets at issue and (ii) a numbered list of the trade secrets with a corresponding

26   list of specific elements for each, as claims would appear at the end of a patent"); *see*

27   *also, e.g.*, *Bal Seal Eng'g, Inc. v. Nelson Prod., Inc.*, 2017 WL 10543565, at *3, *6 (C.D.

28   Cal. Mar. 13, 2017) (deeming adequate a trade secret disclosure that included (1) "a two-

1    page narrative describing the 'general category' of trade secrets at issue, (2) a list of

2    [plaintiff's] customers and the [plaintiff's] part numbers at issue for each customer

3    (which list contains 26 customers), and (3) drawings or design proposals that 'describe

4    the selected engineering solution and specifications for each part number'") (citation

5    omitted).

6         Even if Apple's requested relief was inconsistent with Section 2019.210 (it is not),

7    that would not be a basis on which to affirm Judge Early's Order as Plaintiffs suggest.

8    Opp. at 18.  If, for example, the Court agrees that Apple should not be required to

9    produce documents in response to Plaintiffs' RFPs 5 through 25 in the absence of a

10   Section 2019.210-compliant disclosure, but nonetheless does not feel compelled to order

11   Plaintiffs to produce such a disclosure on a specified timeline, it could grant only that

12   portion of Apple's Motion for Protective Order seeking relief from the RFPs.  The Court

13   is not constrained by the specific relief requested in Apple's Motion.

14        The bottom line is that Plaintiffs have refused for months to prosecute their trade

15   secret claim, in an effort to get access to *Apple's* confidential information and trade

16   secrets before doing so.  That is inconsistent with the plain language and purpose of

17   Section 2019.210.  Apple requests nothing more than Plaintiffs' prompt compliance with

18   that statute.

19              **III.   <u>CONCLUSION</u>**

20        Based on the foregoing and on Apple's moving brief, Apple respectfully requests

21   that the Court reverse Judge Early's Order (Dkt. No. 54), grant Apple's Motion for

22   Protective Order (Dkt. No. 43), and order Plaintiffs to promptly comply with Section

23   2019.210.

24   //

25   //

26   //

27

28

Gibson, Dunn & Crutcher LLP

**Exhibit 23**
**-318-**

1 | Dated:  July 6, 2020

Respectfully submitted,

JOSHUA H. LERNER
H. MARK LYON
BRIAN M. BUROKER
BRIAN A. ROSENTHAL
ILISSA SAMPLIN
ANGELIQUE KAOUNIS
BRIAN K. ANDREA
GIBSON, DUNN & CRUTCHER LLP


By:  */s/ Joshua H. Lerner*
        Joshua H. Lerner

*Attorneys for Defendant Apple Inc.*

Gibson, Dunn &
Crutcher LLP

APPLE'S REPLY ISO MOT. FOR REVIEW OF AND
OBJECTIONS TO MAGISTRATE JUDGE'S ORDER                16                CASE NO. 8:20-cv-00048-JVS (JDEx)

Exhibit 23
-319-

# EXHIBIT 24

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   SACV 20-48 JVS (JDEx)                Date   July 14, 2020

Title   **Masimo Corporation et al v. Apple Inc.**

Present: The Honorable        **James V. Selna, U.S. District Court Judge**

| Lisa Bredahl | Not Present |
|---|---|
| Deputy Clerk | Court Reporter |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| Not Present | Not Present |

**Proceedings:**   **[IN CHAMBERS] Order Regarding Motion for Review of and Objections to Magistrate Judge's Order**

Defendant Apple Inc. ("Apple") moved to reverse Magistrate Judge Early's June 15, 2020 Order denying its motion for a protective order. Mot., Dkt. No. 57. Plaintiffs Masimo Corporation ("Masimo") and Cercacor Laboratories, Inc. ("Cercacor") (together, "Plaintiffs") opposed. Opp'n, Dkt. No. 64. Apple replied. Reply, Dkt. No. 71.

For the following reasons, the Court **DENIES** the motion.

## I. BACKGROUND

Plaintiffs filed their Complaint against Apple on January 9, 2020. Dkt. No. 1. On March 25, 2020, Plaintiffs filed the operative First Amended Complaint ("FAC"), alleging patent infringement, trade secret misappropriation under the California Uniform Trade Secrets Act ("CUTSA") Cal. Civ. Code §§ 3426 et seq., correction of inventorship, and declaratory relief. See generally, FAC, Dkt. No. 28.

On March 16, 2020, Plaintiffs served their First Set of Requests for Production ("RFPs"), which included 25 RFPs. Declaration of Stephen Larson ("Larson Decl."), Dkt. No. 65, Ex. 1.

On April 14, 2020, the parties filed a Joint Rule 26(f) Report. Dkt. No. 33.

On April 17, 2020, this Court issued a Scheduling Order "adopt[ing] the patent specific dates" provided by the parties in their Rule 26(f) Joint Report and *stay[ing] the*

**Exhibit 24**
**-320-**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | SACV 20-48 JVS (JDEx) | Date | July 14, 2020 |

| | |
|---|---|
| Title | **Masimo Corporation et al v. Apple Inc.** |

*trade secret discovery only* pending compliance with [California Code of Civil Procedure Section] 2019.210." Dkt. No. 37 (emphasis added).

On April 30, 2020, Apple filed a motion for a protective order. Dkt. No. 43. Apple sought a protective order directing that it need not respond to RFP Nos. 5-25 until Plaintiffs "describe their trade secrets with reasonable particularity consistent with California Code of Civil Procedure Section 2019.210" ("Section 2019.210"). Dkt. No. 43-1 ("Jt. Stip.") at 1. A protective order is necessary, Apple argued, because RFP Nos. 5-25 seek information that is "identical to the information Plaintiffs allege as their trade secrets," and Section 2019.210 "unequivocally bars discovery relating to the alleged trade secrets until Plaintiffs describe their alleged secrets." Dkt. No. 46 at 1 (emphasis omitted). Without a protective order, Apple contended that Plaintiffs would be permitted "to parse through Apple's confidential information—and claim it as their own trade secrets—before Plaintiffs describe a single one of their trade secrets," thereby "erod[ing] the policies promoted by Section 2019.210." Id.

Plaintiffs argued that RFP Nos. 5-25 seek patent discovery, which is not stayed under the Scheduling Order. See Jt. Stip. at 4, 36; see also Jt. Stip. at 34. Plaintiffs also argued that California courts interpret Section 2019.210 as barring "discovery on other claims only if the claim 'hinges upon the factual allegations that [defendant] misappropriated [plaintiff's] trade secrets.'" Jt. Stip. at 30-31 (quoting Advanced Modular Sputtering, Inc. v. Superior Court, 132 Cal. App. 4th 826, 834 (2005)) (emphasis omitted). Therefore, Plaintiffs argued, Apple "cannot refuse to produce responsive documents by asserting some of the information may also be relevant to the trade secret claim." Jt. Stip. at 37 (emphasis omitted).

On June 15, 2020, Magistrate Judge Early denied Apple's motion for a protective order. Order, Dkt. No. 54. Now, Apple requests that this Court reverse Judge Early's Order. See generally, Mot. Apple further requests that the Court order Plaintiffs to promptly describe their purported trade secrets in compliance with Section 2019.210. See id.

II. LEGAL STANDARD

**Exhibit 24**
**-321-**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.    SACV 20-48 JVS (JDEx)                    Date    July 14, 2020

Title       **Masimo Corporation et al v. Apple Inc.**

A magistrate may issue non-dispositive rulings on pre-trial discovery matters.  28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a); L.R. 72-2.1.  On a motion to review, a district court may set aside or modify these rulings only when the rulings are "clearly erroneous or contrary to law."  28 U.S.C. § 636(b)(1)(A).  The clearly erroneous standard applies to a magistrate's factual findings, and the contrary to law standard applies to the magistrate's legal conclusions.  See Crispin v. Christian Audigier, Inc., 717 F. Supp. 2d 965, 970–71 (C.D. Cal. 2010).  The clearly erroneous standard is "significantly deferential, requiring a definite and firm conviction that a mistake has been committed." Id. at 971 (internal quotations and citations omitted).  "By contrast, [t]he contrary to law standard . . . permits independent review of purely legal determinations by the magistrate judge." Id. (internal quotations and citations omitted).  Courts have interpreted this standard "to provide for de novo review by the district court on issues of law." Med. Imaging Centers of Am., Inc. v. Lichtenstein, 917 F. Supp. 717, 719 (S.D. Cal. 1996). "A decision is contrary to law if it applies an incorrect legal standard or fails to consider an element of the applicable standard."  Forouhar v. Asa, No. C 10–3623 SBA, 2011 WL 4080862, at *1 (N.D. Cal. Sept. 13, 2011) (internal quotation marks and citations omitted).

## III. DISCUSSION

Section 2019.210 requires that "[i]n any action alleging the misappropriation of a trade secret under the [California] Uniform Trade Secrets Act . . . , before commencing discovery *relating* to the trade secret, the party alleging the misappropriation shall identify the trade secret with reasonable particularity . . . ." Cal. Civ. Proc. Code § 2019.210 (emphasis added).

In his Order, Magistrate Judge Early reasoned that this Court stayed discovery pertaining the Plaintiffs' trade secret claims, but did not stay discovery regarding Plaintiffs' patent claims.  Order at 7-8.  Judge Early found that RFP Nos. 5-25 did not seek information that was identical to the information Plaintiffs allege as their trade secrets; at most, four of the RFPs seek some of the same categories of information relevant to the trade secrets.  Id. at 8.  Accordingly, Judge Early concluded that Apple had not met its burden in seeking a protective order to stay RFP Nos. 5-25, and denied Apple's motion for a protective order.  Id. at 9.

Now, Apple contends that Judge Early's Order is inconsistent with the text and

**Exhibit 24**
**-322-**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   SACV 20-48 JVS (JDEx)                    Date   July 14, 2020

Title      **Masimo Corporation et al v. Apple Inc.**

purpose of Section 2019.210.  Mot. at 6-13.  According to Apple, the Order allows
Plaintiffs "to take any discovery they wish relating to the alleged trade secrets without
providing a Section 2019.210 statement merely by claiming that the discovery relates to
another claim, like the patent infringement claims . . . ."  Id. at 7.  Apple claims that Judge
Early should have read the Scheduling Order to state that the stay applies to trade secret-
*related* discovery, so as to not conflict with Section 2019.210.  Id. at 8.  And, Apples
compares the wording of the RFPs at issue with the wording of the categories of
information Plaintiffs allege comprise their trade secrets in their FAC to argue that
"Plaintiffs' alleged trades secrets relate to the very same subject matter as their asserted
patents."  Id. at 12.

     The Court finds that Judge Early's Order was not contrary to law and correctly
interpreted the Scheduling Order, which stayed only trade secret discovery pending
Plaintiffs' compliance with Section 2019.210.  It did not stay discovery related to
Plaintiffs' patent claims.   Apple asserted in the Rule 26(f) Report that "[a]ny discovery-
related dates that [it] proposes . . . are subject to Plaintiffs providing an adequate
identification of their alleged trade secrets in compliance with Section 2019.210 insofar
as such an identification is a prerequisite to such discovery."  Dkt. No. 33 at 26, n.6.  The
Court reviewed the Joint Report and rejected this argument that patent discovery was
contingent on Plaintiffs' compliance with Section 2019.210.  Plaintiffs' patent claims are
separate from the trade secret claims.  See, e.g., Space Data Corp. v. X, 2017 WL
3007078, *4 (N.D. Cal. July 14, 2017).  And Judge Early's finding that at most, "only
four" of the 21 RFPs at issue arguably seek "some of the same categories of information"
relevant to Plaintiffs' trade secrets was well-supported by the content of the RFPs.
Accordingly, the Court declines to reverse Judge Early's Order.

**IV. CONCLUSION**

     For the foregoing reasons, the Court **DENIES** the motion.  The Court finds that
oral argument would not be helpful in this matter and **vacates** the July 20, 2020 hearing.
Fed. R. Civ. P. 78; L.R. 7-15.

          **IT IS SO ORDERED.**

## UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | SACV 20-48 JVS (JDEx) | Date | July 14, 2020 |
| Title | **Masimo Corporation et al v. Apple Inc.** | | |

                                                      :     0

Initials of Preparer      lmb

**Exhibit 24**
**-324-**