JOSHUA H. LERNER, SBN 220755
  jlerner@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street Suite 3000
San Francisco, CA 94105
Tel.: 415.393.8200 / Fax: 415.393.8306

H. MARK LYON, SBN 162061
  mlyon@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA 94304-1211
Tel.: 650.849.5300 / Fax: 650.849.5333

BRIAN M. BUROKER, *pro hac vice*
  bburoker@gibsondunn.com
BRIAN K. ANDREA, *pro hac vice*
  bandrea@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Tel.: 202.955.8500 / Fax: 202.467.0539

BRIAN A. ROSENTHAL, *pro hac vice*
  brosenthal@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Tel.: 212.351.2339 / Fax: 212.817.9539

ILISSA SAMPLIN, SBN 314018
  isamplin@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Tel.: 213.229.7000 / Fax: 213.229.7520

ANGELIQUE KAOUNIS, SBN 209833
  akaounis@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2029 Century Park East Suite 4000
Los Angeles, CA 90067
Tel.: 310.552.8546 / Fax: 310.552.7026

*Attorneys for Defendant Apple Inc.*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

|  |  |
|---|---|
| MASIMO CORPORATION, CERCACOR LABORATORIES, INC., | CASE NO. 8:20-cv-00048-JVS (JDEx) |
| Plaintiffs, | **DECLARATION OF JOSHUA LERNER IN SUPPORT OF DEFENDANT APPLE INC.'S REQUEST FOR JUDICIAL NOTICE** |
| v. | |
| APPLE INC., | **Hearing:** |
| Defendant. | Date:    April 19, 2021<br>Time:    1:30 p.m.<br>Place:   Courtroom 10C<br>Judge:   Hon. James V. Selna |

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Gibson, Dunn & Crutcher LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## DECLARATION OF JOSHUA LERNER

I, Joshua Lerner, declare and state as follows:

1.      I am an attorney duly licensed to practice law before this Court and all courts of the State of California.  I am a partner with the law firm of Gibson, Dunn & Crutcher LLP, counsel of record for Defendant Apple Inc. ("Apple") in the above-captioned action.  I make this declaration in support of Apple's Request for Judicial Notice in Support of Apple's Motion to Dismiss Portions of the Thirteenth Cause of Action in Plaintiffs' Fourth Amended Complaint (the "Request").  I have personal, firsthand knowledge of the facts stated herein and, if called upon to do so, could and would competently testify thereto.

2.      Attached hereto as **Exhibit 1** is a true and correct copy of a publication from the U.S. Department of Health and Human Services, Food and Drug Administration ("FDA") titled "Guidance for Clinical Trial Sponsors Establishment and Operation of Clinical Trial Data Monitoring Committees" dated March 2006, which is publicly available at https://www.fda.gov/media/75398/download.

3.      Attached hereto as **Exhibit 2** is a true and correct copy of a publication from the FDA titled "Guidance for Clinical Investigators, Industry, and FDA Staff Financial Disclosure by Clinical Investigators" dated February 2013, which is publicly available at https://www.fda.gov/media/85293/download.

4.      Attached hereto as **Exhibit 3** is a true and correct copy of Form FDA 3454 from the FDA titled "Certification: Financial Interests and Arrangements of Clinical Investigators,"           which           is           publicly           available           at https://www.fda.gov/media/70465/download.

5.      Attached hereto as **Exhibit 4** is a true and correct copy of a page from Masimo's website that reflects a listing of its patents, which is publicly available at https://www.masimo.com/company/masimo/patents/ (last visited Feb. 23, 2021).

6. Attached hereto as **Exhibit 5** is a true and correct copy of a journal article titled "History of Blood Gas Analysis. VII Pulse Oximetry," written by John W. Severinghaus, MD, and Yoshiyuki Honda, MD.  This article is publicly available from Masimo's (Chinese) website at https://www.masimo.cn/Nellcorfiction/PDF_FF/History of Pulse Oximetry.pdf.

7. Attached hereto as **Exhibit 6** is a true and correct copy of an excerpt of MASA00080451, which is a document produced in this litigation by Plaintiffs and designated HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY and cited in the Fourth Amended Complaint as reflecting Plaintiffs' alleged trade secrets.

8. Attached hereto as **Exhibit 7** is a true and correct copy of a Masimo press release titled "New Clinical Studies Presented at the American Society of Anesthesiologists Annual Meeting Show Benefits of Masimo Noninvasive Technologies: SpHb, PVI, RRa, and SEDLine," (Oct. 11, 2011), which is publicly available at https://investor.masimo.com/news/news-details/2011/New-Clinical-Studies-Presented-at-the-American-Society-of-Anesthesiologists-Annual-Meeting-Show-Benefits-of-Masimo-Noninvasive-Technologies-SpHb-PVI-RRa-and-SEDLine/default.aspx.

9. Attached hereto as **Exhibit 8** is a true and correct copy of a Masimo press release titled "Canada's World-Renowned Hospital for Sick Children Standardizes on Masimo SET Pulse Oximetry," (Sept. 19, 2002), which is publicly available at https://www.masimo.com/company/news/news-media/2002/#news-51293e24-6fbd-4f50-a3f4-74700aed9a3b.  Other press releases from 2002 that were included on the webpage have been redacted.

10. Attached hereto as **Exhibit 9** is a true and correct copy of a journal article titled "Noninvasive Continuous Hemoglobin Monitoring in Combat Casualties: A Pilot Study," by Elizabeth Bridges and Jennifer J. Hatzfeld, published in 2016 by Shock journal, which is publicly available at

DECLARATION OF JOSHUA LERNER IN SUPPORT OF APPLE'S REQUEST FOR JUDICIAL NOTICE
CASE NO. 8:20-CV-00048-JVS (JDEX)

https://journals.lww.com/shockjournal/Fulltext/2016/09001/Noninvasive_Continuous_Hemoglobin_Monitoring_in.8.aspx.

11.    Attached hereto as **Exhibit 10** is a true and correct copy of a Masimo press release titled, "Masimo Signal Extraction Pulse Oximetry Debuted at the American Society of Anesthesiology Conference," (Oct. 14, 1998), which is publicly available at https://www.masimo.com/company/news/news-media/2005/#news-702b969a-bc54-4da1-9d92-0c85d1678c15.  Other press releases from 1998 that were included on the webpage have been redacted.

12.    Attached hereto as **Exhibit 11** is a true and correct copy of Marcelo Lamego's LinkedIn profile, which Apple's counsel accessed through LinkedIn.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 26th day of February, 2021, in San Francisco, California.


By:  */s/Joshua H. Lerner*_____
        Joshua H. Lerner

3

# EXHIBIT 1

Exhibit 1
Page 4

# Guidance for Clinical Trial Sponsors

## Establishment and Operation of Clinical Trial Data Monitoring Committees

For questions on the content of this guidance, contact the Office of Communication, Training, and Manufacturers Assistance (CBER) at 800-835-4709 or 301-827-1800.

.

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Biologics Evaluation and Research (CBER)**
**Center for Drug Evaluation and Research (CDER)**
**Center for Devices and Radiological Health (CDRH)**
**March 2006**

**OMB Control No.  0910-0581**
**Expiration Date:  10/31/2021**
**See additional PRA statement in Section 8 of this guidance**

Exhibit 1
Page 5

# Guidance for Clinical Trial Sponsors

## Establishment and Operation of Clinical Trial Data Monitoring Committees

*Additional copies of this guidance are available from:*
*Office of Communication, Training and*
*Manufacturers Assistance, HFM-40*
*Center for Biologics Evaluation and Research*
*Food and Drug Administration*
*1401 Rockville Pike, Rockville, MD 20852-1448*
*Phone:  800-835-4709 or 301-827-1800*
*Internet: http://www.fda.gov/cber/guidelines.htm*
*or*
*Office of Training and Communication*
*Division of Communications Management*
*Drug Information Branch, HFD-210*
*Center for Drug Evaluation and Research*
*Food and Drug Administration*
*5600 Fishers Lane, Rockville, MD 20857*
*Phone:  301-827-4573*
*Internet:  http://www.fda.gov/cder/guidance/index.htm*
*or*
*The Division of Small Manufacturers, International, and Consumer Assistance (DSMICA)*
*Center for Devices and Radiological Health*
*Food and Drug Administration*
*1350 Piccard Drive, Rockville, MD 20850*
*Phone:  800-638-2041 or 301-443-6597*
*Internet:  http://www.fda.gov/cdrh*
*Email:  DSMICA@cdrh.fda.gov*
*Facts-on-Demand (faxback): 800-899-0381 or 301-827-0111*

Exhibit 1
Page 6

# Table of Contents

1. **INTRODUCTION AND BACKGROUND** ........................................................................ 1
  1.1. **History of DMCs** ................................................................................................ 2
  1.2. **Current Status** .................................................................................................... 3
2. **DETERMINING NEED FOR A DMC** ..................................................................... 3
  2.1. **What is the Risk to Trial Participants?** ............................................................ 4
  2.2. **Is DMC Review Practical?** ............................................................................... 4
  2.3. **Will a DMC Help Assure the Scientific Validity of the Trial?** ....................... 5
3. **DMCs AND OTHER OVERSIGHT GROUPS** ...................................................... 5
  3.1. **Institutional Review Boards** ............................................................................ 6
  3.2. **Clinical Trial Steering Committees** ................................................................ 6
  3.3. **Endpoint Assessment/Adjudication Committees** ............................................ 7
  3.4. **Site/Clinical Monitoring** .................................................................................. 7
  3.5. **Others with Monitoring Responsibilities** ........................................................ 7
4. **DMC ESTABLISHMENT AND OPERATION** ..................................................... 8
  4.1. **Committee Composition** .................................................................................... 8
  4.2. **Confidentiality of Interim Data and Analyses** ............................................... 10
    4.2.1. Interim Data ............................................................................................ 10
    4.2.2. Interim Reports to the DMC .................................................................... 11
  4.3. **Establishing a Charter Describing Standard Operating Procedures** ............ 12
    4.3.1. Considerations for Standard Operating Procedures ................................. 12
      4.3.1.1. Meeting Schedule and Format ................................................ 12
      4.3.1.2. Meeting Structure ................................................................... 13
      4.3.1.3. Initial Meeting ........................................................................ 13
      4.3.1.4. Format of Interim Reports to the DMC and Use of Treatment Codes .......... 14
    4.3.2. Statistical Methods ................................................................................... 15
  4.4. **Potential DMC Responsibilities** ...................................................................... 16
    4.4.1. Interim Monitoring .................................................................................. 16
      4.4.1.1. Monitoring for Effectiveness .................................................. 17
      4.4.1.2. Monitoring for Safety ............................................................. 17
      4.4.1.3. Monitoring Study Conduct ..................................................... 20
      4.4.1.4. Consideration of External Data .............................................. 20
      4.4.1.5. Studies of Less Serious Outcomes ......................................... 22
    4.4.2. Early Studies ............................................................................................ 23
    4.4.3. Other Responsibilities ............................................................................. 24
      4.4.3.1. Making Recommendations ...................................................... 24
      4.4.3.2. Maintaining Meeting Records ................................................ 24
5. **DMC RECOMMENDATIONS AND REGULATORY REPORTING REQUIREMENTS** ... 25
6. **INDEPENDENCE OF THE DMC** ........................................................................... 26
  6.1. **Desirability of an Independent DMC** .............................................................. 27
  6.2. **Value of Sponsor Interaction with the DMC** ................................................. 27
  6.3. **Risks of Sponsor Exposure to Interim Comparative Data** ............................. 28
  6.4. **Statisticians Conducting the Interim Analyses** .............................................. 29
  6.5. **Sponsor Access to Interim Data for Planning Purposes** ................................ 31

Exhibit 1
Page 7

**7.     SPONSOR INTERACTION WITH FDA REGARDING USE AND OPERATION
        OF DMCs**.................................................................................................. **32**

**7.1.    Planning the DMC** ......................................................................... **32**

**7.2.    Accessing Interim Data**.................................................................. **32**

7.2.1.    DMC Recommendations to Terminate the Study ................................. 33

7.2.2.    FDA Interaction with DMCs ............................................................... 33

**7.3.    DMC Recommendations for Protocol Changes** ....................... **34**

**8.     PAPERWORK REDUCTION ACT OF 1995**........................................... **34**

Exhibit 1
Page 8

Guidance for Clinical Trial Sponsors

# Establishment and Operation of Clinical Trial Data Monitoring Committees

*This guidance represents the Food and Drug Administration's (FDA's) current thinking on this topic. It does not create or confer any rights for or on any person and does not operate to bind FDA or the public. You can use an alternative approach if the approach satisfies the requirements of the applicable statutes and regulations. If you want to discuss an alternative approach, contact the appropriate FDA staff. If you cannot identify the appropriate FDA staff, call the appropriate number listed on the title page of this guidance.*

## 1.    INTRODUCTION AND BACKGROUND

This guidance discusses the roles, responsibilities and operating procedures of Data Monitoring Committees (DMCs) (also known as Data and Safety Monitoring Boards (DSMBs) or Data and Safety Monitoring Committees (DSMCs)) that may carry out important aspects of clinical trial monitoring. This guidance is intended to assist clinical trial sponsors in determining when a DMC may be useful for study monitoring, and how such committees should operate. We recognize that in many clinical trials the sponsor delegates some decision-making regarding the design and conduct of the trial to some other entity such as a steering committee (see Section 3.2) or contract research organization (CRO) (see 21 Code of Federal Regulations (CFR) 312.3(b)). This document, while pertaining primarily to the sponsor with regard to trial management and decision-making, may also be relevant to any individual or group to whom the sponsor has delegated applicable management responsibilities (see Section 3). This guidance finalizes the draft guidance entitled "Guidance for Clinical Trial Sponsors: On the Establishment and Operation of Clinical Trial Data Monitoring Committees" dated November 2001.

Sponsors of studies evaluating new drugs, biologics, and devices are required to monitor these studies (see 21 CFR 312.50 and 312.56 for drugs and biologics, and 21 CFR 812.40 and 21 CFR 812.46 for devices). Various individuals and groups play different roles in clinical trial monitoring. One such group is a DMC, appointed by a sponsor to evaluate the accumulating outcome data in some trials.[1]

A clinical trial DMC is a group of individuals with pertinent expertise that reviews on a regular basis accumulating data from one or more ongoing clinical trials. The DMC advises the sponsor regarding the continuing safety of trial subjects and those yet to be recruited to the trial, as well as the continuing validity and scientific merit of the trial. When a single DMC is responsible for monitoring multiple trials, the considerations for establishment and operation of the DMC are generally similar to those for a DMC monitoring a single trial, but the logistics may be more

---

[1] Some government agencies that sponsor clinical research have required the use of DMCs in certain clinical trials. Current FDA regulations, however, impose no requirements for the use of DMCs in trials except under 21 CFR 50.24(a)(7)(iv) for research studies in emergency settings in which the informed consent requirement is excepted.

Exhibit 1
Page 9

complex.  For example, multiple conflict of interest determinations may be needed for each DMC member.

Many different models have been proposed and used for the operation of DMCs.  Although different models may be appropriate and acceptable in different situations, experience has shown that some approaches have particular advantages or disadvantages.  In this document, we highlight these advantages and disadvantages, with particular attention to the setting in which investigational products are being evaluated for possible marketing approval in well-controlled clinical trials. The intent of this guidance document is to ensure wide awareness of acceptable practices and of potential concerns regarding operation of DMCs that may arise in specific situations.

FDA's guidance documents, including this guidance, do not establish legally enforceable responsibilities.  Instead, guidances describe FDA's current thinking on a topic and should be viewed only as recommendations, unless specific regulatory or statutory requirements are cited. The use of the word *should* in FDA guidances means that something is suggested or recommended, but not required.

## 1.1.    History of DMCs

DMCs have been a component of some clinical trials since at least the early 1960's. DMCs were initially used primarily in large randomized multicenter trials sponsored by federal agencies, such as the National Institutes of Health (NIH) and the Department of Veterans Affairs (VA) in the U.S. and similar bodies abroad, that targeted improved survival or reduced risk of major morbidity (e.g., acute myocardial infarction) as the primary objective.  In 1967, an NIH external advisory group first introduced the concept of a formal committee charged with reviewing the accumulating data as the trial progressed to monitor safety, effectiveness, and trial conduct issues in a set of recommendations to the then-National Heart Institute.  (Heart Special Project Committee, 'Organization, Review and Administration of Cooperative Studies (Greenberg Report): A Report from the Heart Special Project Committee to the National Advisory Heart Council, May 1967;' *Controlled Clinical Trials*, vol. 9, 137-148, 1988.)  The recommendation for the establishment of such committees was based on the recognition that interim monitoring of accumulating study data was essential to ensure the ongoing safety of trial participants, but that individuals closely involved with the design and conduct of a trial may not be able to be fully objective in reviewing the interim data for any emerging concerns.  The involvement of expert advisors external to the trial organizers, sponsors, and investigators was intended to ensure that such problems would be addressed in an unbiased way by the trial leadership.  The operational and functional aspects of these committees, based on experience over several decades, were discussed in a 1992 NIH workshop (Ellenberg, S., Geller, N., Simon, R. and Yusuf, S. (eds.): Practical Issues in Data Monitoring of Clinical Trials (workshop proceedings). *Statistics in Medicine*, 12:415-616, 1993.)

Exhibit 1
Page 10

Few trials sponsored by the pharmaceutical/medical device industry incorporated DMC oversight until relatively recently.  The increasing use of DMCs in industry-sponsored trials is the result of several factors, including:

- The growing number of industry-sponsored trials with mortality or major morbidity endpoints;
- The increasing collaboration between industry and government in sponsoring major clinical trials, resulting in industry trials performed under the policies of government funding agencies, which often require DMCs;
- Heightened awareness within the scientific community of problems in clinical trial conduct and analysis that might lead to inaccurate and/or biased results, especially when early termination for efficacy is a possibility, and need for approaches to protect against such problems;
- Concerns of IRBs regarding ongoing trial monitoring and patient safety in multicenter trials.

## 1.2.    Current Status

DMCs are currently used in a variety of situations, and different models of operation have been employed.  Although no single model may be optimal for all settings, and there is not necessarily consensus about the optimal model in any given setting, there are advantages and disadvantages with respect to some of the different approaches that are in use.

As noted above, government agencies that sponsor clinical research, such as the NIH and the VA, have required the use of DMCs in certain trials.  Current FDA regulations, however, impose no requirements for the use of DMCs in trials except under 21 CFR 50.24(a)(7)(iv) for research studies in emergency settings in which the informed consent requirement is excepted.  FDA believes that the issues discussed in this document arise in trials with both private and public sponsorship.  We recognize that the potential conflicts of interest faced by government sponsors can be different from those of industry sponsors, so that the implications for the approach to monitoring, particularly with regard to confidentiality and independence issues (see Section 4.2 and Section 6), may also differ to some extent.  Nevertheless, we believe that the discussion of advantages and disadvantages of various approaches to DMC operation is relevant to all trials in which the use of a DMC is appropriate, regardless of the sponsor's funding  (i.e., public or private sector), the investigational setting of the trial (academic or other), trial size, or the phase of development.  In general, DMC models used in federally funded trials that are established in accordance with policies of the funding agencies are acceptable to FDA.

## 2.    DETERMINING NEED FOR A DMC

All clinical trials require safety monitoring, but not all trials require monitoring by a formal committee that may be external to the trial organizers, sponsors, and investigators.  As noted earlier, DMCs have generally been established for large, randomized multisite studies that evaluate treatments intended to prolong life or reduce risk of a major adverse health outcome

Exhibit 1
Page 11

such as a cardiovascular event or recurrence of cancer.  DMCs are generally recommended for any controlled trial of any size that will compare rates of mortality or major morbidity, but a DMC is not required or recommended for most clinical studies.  DMCs are generally not needed, for example, for trials at early stages of product development.  They are also generally not needed for trials addressing lesser outcomes, such as relief of symptoms, unless the trial population is at elevated risk of more severe outcomes (see Sections 4.4.1.5 and 4.4.2 for further discussion).

Although the value of a DMC is well accepted in settings such as those described above, it is important to recognize that DMCs add administrative complexity to a trial and require additional resources, so we recommend that sponsors limit the use of a DMC to the circumstances described in Section 2.1.  There are several factors to consider when determining whether to establish a DMC for a particular trial.  These factors, discussed below, relate primarily to safety, practicality, and scientific validity.

### 2.1.    What is the Risk to Trial Participants?

A fundamental reason to establish a DMC is to enhance the safety of trial participants in situations in which safety concerns may be unusually high, in order that regular interim analyses of the accumulating data are performed.  We recommend that sponsors consider using a DMC when:

- The study endpoint is such that a highly favorable or unfavorable result, or even a finding of futility, at an interim analysis might ethically require termination of the study before its planned completion;
- There are *a priori* reasons for a particular safety concern, as, for example, if the procedure for administering the treatment is particularly invasive;
- There is prior information suggesting the possibility of serious toxicity with the study treatment;
- The study is being performed in a potentially fragile population such as children, pregnant women or the very elderly, or other vulnerable populations, such as those who are terminally ill or of diminished mental capacity;
- The study is being performed in a population at elevated risk of death or other serious outcomes, even when the study objective addresses a lesser endpoint;
- The study is large, of long duration, and multi-center.

In studies with one or more of these characteristics, the additional oversight provided by a DMC can further protect study participants.  In other studies, such as short-term studies for relief of symptoms as noted above, such committees are generally not warranted.

### 2.2.    Is DMC Review Practical?

A second consideration is whether DMC review is practical.  If the trial is likely to be completed quickly, the DMC may not have an opportunity to have a meaningful impact.  In short-term trials with important safety concerns, however, a DMC may still be

Exhibit 1
Page 12

valuable.  In such cases, in order for the DMC to be informed and convened quickly in
the event of unexpected results that raise concerns, special mechanisms would have to be
developed to permit DMC evaluation and input.  Alternatively, the trial could build in
"pauses" so that interim data could be reviewed by a DMC before an additional cohort of
participants would be enrolled.

### 2.3.    Will a DMC Help Assure the Scientific Validity of the Trial?

A third consideration in the decision of whether to have a DMC for a trial is whether a
DMC can help assure scientific validity (and perception of such) of the trial.  Trials of
any appreciable duration can be affected by changes over time in the understanding of the
disease, the affected population, and the standard treatment used outside the trial.  These
external changes may prompt an interest in modifying some aspects of the trial as it
progresses.  When a DMC is the only group reviewing unblinded interim data, trial
organizers faced with compelling new information external to the trial may consider
making changes in the ongoing trial without raising concerns that such changes might
have been at least partly motivated by knowledge of the interim data and thereby
endanger trial integrity.  Sometimes accumulating data from within the trial (e.g., overall
event rates) may suggest the need for modifications.  Recommendations to change the
inclusion criteria, the trial endpoints, or the size of the trial are best made by those
without knowledge of the accumulating data (with the exception of changes the DMC
might recommend on the basis of emerging safety concerns, as discussed in Section
4.4.1.2).  When the trial organizers are the ones reviewing the interim data, their
awareness of interim comparative results cannot help but affect their determination as to
whether such changes should be made.  Changes made in such a setting would inevitably
impair the credibility of the study results.  This problem will be addressed more fully in
Section 6.3.

### 3.    DMCs AND OTHER OVERSIGHT GROUPS

Several different groups and individuals may assume or share responsibility for various aspects
of clinical trial monitoring and oversight, and it is important to recognize the different roles they
play.  These groups are all components of a system that assists sponsors in conducting trials that
are ethical and that produce valid and credible results.  The sponsor of a clinical trial takes
responsibility for and initiates the investigation (21 CFR 50.3(e); 21 CFR 312.3; 21 CFR
812.3(n)).  Typically, the sponsor holds the Investigational New Drug Application or
Investigational Device Exemption (IND/IDE)  (21 CFR 312.40(a)(1); 21 CFR 812.40).[2]

---

[2] This guidance document may also be relevant to parties who participate in leadership roles in a clinical
investigation other than sponsors, including funding organizations and/or others who share decision-making
authority for a trial. The sponsor may be an individual, committee, company, university, or government agency, or
some combination, that holds the IND or IDE and/or has responsibility for designing, initiating, funding, managing,
coordinating, continuing and/or concluding the clinical trial.  If a product manufacturer initiates a trial and delegates
decision-making authority to a steering committee on which it has a representative, the manufacturer and the
steering committee may also share certain responsibilities typically held by a sponsor.  When the holder of the IND
or IDE is also a study investigator, that individual is considered a sponsor-investigator (21 CFR 312.3(b); 21 CFR
812.3(o)).

Exhibit 1
Page 13

The responsibilities delegated to steering committees or contract research organizations (CROs) by a manufacturer and/or funding agency can vary considerably.  It is important that the responsibilities and authorities of the product manufacturer, the funding organization (if different) and any other entity be clearly defined and understood by all parties at the start of the endeavor.  Potential conflicts of interest of each party, especially sponsors and clinical investigators (see 21 CFR Part 54) should be carefully considered when determining roles and responsibilities.

### 3.1.    Institutional Review Boards

An institutional review board (IRB) is responsible for evaluating a trial to determine, among other things, whether "[r]isks to subjects are minimized" and "[r]isks to subjects are reasonable in relation to anticipated benefits" (21 CFR 56.111(a)).  An IRB's evaluation entails review of the study protocol, relevant background information, the informed consent document, proposed plans for informing participants about the trial, and any other procedures associated with the trial.  To determine whether risks to subjects are minimized by "using procedures which are consistent with sound research design"  (21 CFR 56.111(a)(1)(i)), an IRB may appropriately request information about the approach to trial monitoring, including the statistical basis for early termination, when relevant, and what steps the sponsor is taking to minimize the risks to patients.  As part of its oversight, therefore, an IRB may appropriately inquire as to whether a DMC has been established and, if so, seek information about its scope and composition.

For ongoing trials, the IRB is responsible for considering information arising from the trial that may bear on the continued acceptability of the trial at the study site(s) it oversees (see 21 CFR 56.103).  A DMC, on the other hand, generally has access to much more data than the IRB during the trial, including interim efficacy and safety outcomes by treatment arm, and makes recommendations with regard to the entire trial.  Given its obligation to minimize the risks to patients, an IRB may take action based on information from any appropriate source, including recommendations from a DMC to the sponsor.  A trial may have multiple IRBs, each responsible for the patients at a single site, but only one DMC.  Under 21 CFR 56.103, 21 CFR 312.66, 21 CFR 812.40, and 21 CFR 812.150(a), individual investigators (or the sponsor of investigational devices) are responsible for assuring that IRBs are made aware of significant new information that arises about a clinical trial.  Such information may include DMC recommendations to the sponsor that are communicated to IRB(s), either directly or through individual investigators or sponsors.  Additionally, it may be useful for sponsors to ensure that IRBs are informed when DMCs have met, even when no problems have been identified and the DMC has recommended continuation of the trial as designed.

### 3.2.    Clinical Trial Steering Committees

In some clinical trials the sponsor may choose to appoint a steering committee; this committee may include investigators, other experts not otherwise involved in the trial, and, usually, representatives of the sponsor.  A sponsor may delegate to a steering committee the primary responsibility for designing the study, maintaining the quality of

Exhibit 1
Page 14

study conduct, ongoing monitoring of individual toxicities and adverse events, and, in many cases, writing study publications. When there is a steering committee, the sponsor may elect to have the DMC communicate with this committee rather than directly with the sponsor. Interactions between the steering committee and the DMC consist primarily of discussions during "open sessions" (see Section 4.3) of DMC meetings and the communication of recommendations following each DMC review of the trial. More extensive interactions might occur when early termination is being considered, or when external forces (e.g., announcement of results of related studies) impact the ongoing trial.

### 3.3.    Endpoint Assessment/Adjudication Committees

Sponsors may also choose to establish an endpoint assessment/adjudication committee (these may also be known as clinical events committees) in certain trials to review important endpoints reported by trial investigators to determine whether the endpoints meet protocol-specified criteria. Information reviewed on each presumptive endpoint may include laboratory, pathology and/or imaging data, autopsy reports, physical descriptions, and any other data deemed relevant. These committees are typically masked to the assigned study arm when performing their assessments regardless of whether the trial itself is conducted in a blinded manner. Such committees are particularly valuable when endpoints are subjective and/or require the application of a complex definition, and when the intervention is not delivered in a blinded fashion. Although such committees do not share responsibility with DMCs for evaluating interim comparisons, their assessments (if performed at frequent intervals throughout the trial with results incorporated into the database in a timely manner) help to ensure that the data reviewed by DMCs are as accurate and free of bias as possible.

### 3.4.    Site/Clinical Monitoring

The sponsor or a group under contract to the sponsor generally performs site/clinical monitoring of a clinical trial to assure high quality trial conduct. They perform "on site" monitoring of individual case histories, assess adherence to the protocol, ensure the ongoing implementation of appropriate data entry and quality control procedures, and in general assess adherence to good clinical practices. In blinded studies, these monitors remain blinded to study arm assignment.

### 3.5.    Others with Monitoring Responsibilities

In addition to those described above, other groups have important monitoring responsibilities. Study investigators, of course, have the front-line responsibility for identifying potential adverse effects experienced by study participants, adjusting the intervention accordingly and reporting the experience to the sponsor. The sponsor is responsible for monitoring and analyzing these investigator reports and relaying them as required to FDA, other regulatory authorities (as appropriate) and other investigators (21 CFR 312.32(c), 21 CFR 812.40). The sponsor and FDA, respectively, also review adverse experience reports from all trials of a given product (21 CFR 312.32(c); 21 CFR 812.150(b)). In addition, for medical device studies, sponsors are responsible for

Exhibit 1
Page 15

ensuring that FDA and any reviewing IRB(s) are promptly informed of significant new information about an investigation (21 CFR 812.40). For drug and biologic studies, sponsors must notify IRBs, as well as FDA and other investigators, if the sponsor withdraws the IND for a safety reason (21 CFR 312.38(c)).

## 4.    DMC ESTABLISHMENT AND OPERATION

### 4.1.    Committee Composition

The selection of DMC members is extremely important, as DMC responsibilities relate to the safety of trial participants. A poorly constituted DMC may fail to note problems that should be addressed, or may make recommendations that are unwarranted or whose consequences are inadequately considered, thereby undermining the safety of participants as well as the value of the trial. The ability of DMCs to provide the anticipated additional assurance of patient safety and trial integrity therefore depends on appropriate selection of DMC members.

The sponsor and/or trial steering committee generally appoint members of a DMC. Factors to consider in the selection of individuals to serve on a DMC typically include relevant expertise, experience in clinical trials and in serving on other DMCs, and absence of serious conflicts of interest as discussed below. The objectives and design of the trial and the scope of the responsibilities given to the DMC determine the types of expertise needed for a particular DMC.

Most DMCs are composed of clinicians with expertise in relevant clinical specialties and at least one biostatistician knowledgeable about statistical methods for clinical trials and sequential analysis of trial data. For trials with unusually high risks or with broad public health implications, the DMC may include a medical ethicist knowledgeable about the design, conduct, and interpretation of clinical trials. Prior DMC experience is important when considering the committee as a whole; it is highly desirable that at least some members have prior DMC service. Prior DMC experience is particularly important for the statistical DMC member if there is only one statistician serving on the DMC.

Some trials may require participation of other types of scientists. Toxicologists, epidemiologists, and clinical pharmacologists, for example, could be included in particular cases when such expertise appears important for informed interpretation of interim results.

One or more individuals (often non-scientists) who may help bring to the DMC the perspectives of the population under study may be a useful addition in some settings. Generally, such a DMC member would not also be a participant in the trial, since awareness of the accumulating data could affect compliance or other aspects of trial participation. Rather, the member could be someone with the disease or condition under study or a close relative of such an individual, for example.

Exhibit 1
Page 16

Appropriate representation of gender and ethnic groups may be of particular importance for some trials.  DMCs for international trials will usually include representatives from at least a subset of participating countries or regions; however, it is often not feasible to have every participating country represented on the DMC.  For the reasons discussed at the beginning of Section 4.1, we recommend that the primary criterion for selecting all appointees should be their respective expertise and experience.  An important practical consideration would be their ability to commit to attending DMC meetings and to maintaining confidentiality of the interim results they have reviewed (see Section 4.2).  A DMC may have as few as 3 members, but may need to be larger when representation of multiple scientific and other disciplines, or a wider range of perspectives generally, is desirable.  For logistical reasons, sponsors typically wish to keep the DMC as small as possible, while still having representation of all needed skills and experience.  Some redundancy may be desirable, however, in scientifically and/or ethically complex trials, trials of long duration in which DMC attrition might be anticipated, or in trials in which the DMC must meet fairly frequently so that not all members would likely be able to attend all meetings.

Conflicts of interest deserve special consideration in choosing individuals to serve on a DMC.  The most obvious conflict is financial interest that could be substantially affected by the outcome of the trial.  (See Section 6 for further discussion.  See also Department of Health and Human Services, Financial Relationships and Interests in Research Involving Human Subjects: Guidance for Human Subject Protection, available at http://www.hhs.gov/ohrp/humansubjects/finreltn/fguid.pdf.)

Investigators entering subjects into the trial have a different type of conflict of interest—their knowledge of interim results could influence their conduct of the trial.  An investigator who is aware of early trends might change his or her pattern of recruitment, or modify his or her usual way of monitoring the status of participants.  We therefore recommend that DMC members for a given trial not include investigators in that trial.

Individuals known to have strong views on the relative merits of the interventions under study may have an "intellectual" conflict of interest and might not be able to review the data in a fully objective manner; such individuals may therefore not be optimal DMC members.  We recommend that sponsors avoid appointing to a DMC any individuals who have relationships with trial investigators or sponsor employees that could be considered reasonably likely to affect their objectivity.

We recommend that sponsors establish procedures to:

- Assess potential conflicts of interest of proposed DMC members;
- Ensure that those with serious conflicts of interest are not included on the DMC;
- Provide disclosure to all DMC members of any potential conflicts that are not thought to impede objectivity and thus would not preclude service on the DMC;
- Identify and disclose any concurrent service of any DMC member on other DMCs of the same, related or competing products.

Exhibit 1
Page 17

The sponsor often appoints the DMC chair, but may seek advice from trial investigators or trial steering committee members.  Prior DMC experience is more important for the chair than for other DMC members, as members will look to the chair for leadership on administrative as well as scientific issues.  Sponsors will typically want to select a chair who is capable of facilitating discussion, integrating differing points of view, and moving toward consensus on recommendations to be provided to the sponsors.  Sponsors may also want to be assured that a potential chair is willing to make a firm commitment to participate for the duration of the trial (or for the term of the appointment, for chairs of DMCs monitoring multiple trials).

## 4.2.     Confidentiality of Interim Data and Analyses

As described in 21 CFR 314.126(b)(5) (drugs) and 21 CFR 860.7(f)(1) (devices), sponsors of well-controlled studies should take appropriate measures to minimize bias.[3] Knowledge of unblinded interim comparisons from a clinical trial is generally not necessary for those conducting or sponsoring the trial; further, such knowledge can bias the outcome of the study by inappropriately influencing its continuing conduct or the plan of analyses.  Unblinded interim data and the results of comparative interim analyses, therefore, should generally not be accessible by anyone other than DMC members or the statistician(s) performing these analyses and presenting them to the DMC (see id.). Consistent with 21 CFR 314.126(b)(5) (drugs) and 21 CFR 860.7(f)(1) (devices), sponsors should establish written procedures, which may be included in the DMC charter, to ensure the minimization of bias, such as maintaining confidentiality of the interim data (see Section 4.3.1.4).  Sponsors may, of course, also address such confidentiality issues in written agreements between the sponsor and members of the DMC as well as written agreements between the sponsor and investigators.

Even for trials not conducted in a double-blind fashion, where investigators and patients are aware of individual treatment assignment and outcome at their sites, the summary evaluations of comparative unblinded treatment results across all participating centers would usually not be available to anyone other than the DMC.  Section 6 addresses the particular confidentiality issues for the statistician/statistical team performing the interim analyses.

### 4.2.1.   Interim Data

Interim comparative data, whether treatment assignment is revealed or coded, will be most securely protected from inadvertent or inappropriate access by the sponsor or its project team if the data are prepared for analysis by a statistical group that is independent of the sponsor and investigators—that is, the group is not otherwise involved in the trial design or conduct and has no financial or other important connections to the sponsor or other trial organizers (see Section 6).  The

---

[3] All discussions in this guidance relating to adoption of procedures for the minimization of bias refer to the minimization of bias in adequate and well-controlled clinical trials for drugs, as described in 21 CFR 314.126, and well-controlled clinical trials for devices, as described in 21 CFR 860.7(f).

Exhibit 1
Page 18

lead investigators, the study steering committee, and/or the sponsor generally develop the analytical plan (often collaboratively), but problems can arise when these same individuals are involved in the actual preparation of the interim results, for reasons discussed in Section 6.4.  They may, however, work with the statistician who will be preparing and presenting the interim analyses prior to the first analysis of unblinded data to develop a template for the interim reports. Procedures should be established to safeguard confidential interim data from the project team, investigators, sponsor representatives, or anyone else outside the DMC and the statistician(s) performing the interim analyses (see 21 CFR 314.126(b)(5) (drugs) and 21 CFR 860.7(f)(1) (devices)).

Although assigning responsibility for interim analysis to individuals employed by the sponsor is generally discouraged, such assignment may be appropriate if sufficiently secure procedures are in place to credibly ensure that the results of such analyses are not revealed to other sponsor employees or to anyone other than DMC members. We recommend that a description of such procedures be included in the DMC charter (see Section 4.3).

### 4.2.2.  Interim Reports to the DMC

We recommend that any part of the interim report to the DMC that includes comparative effectiveness and safety data presented by study group, whether coded or completely unblinded, be available only to DMC members during the course of the trial, including any follow-up period—that is, until the trial is completed and the blind is broken for the sponsor and investigators.  If interim reports are shared with the sponsor, it may become impossible for the sponsor to make potentially warranted changes in the trial design or analysis plan in an unbiased manner (see Section 6.3).  Even aggregate data on safety and efficacy may be informative; these data may be needed for some trial management functions (e.g., sample size adjustments, centralized endpoint assessment), but are best limited to those who cannot otherwise carry out their trial management responsibilities.

In some cases (for example, in open-label trials with special concerns about safety), there may be a rationale for the sponsor and/or investigators to have access to the ongoing comparative safety data to ensure continuous monitoring. Such access should be specified and justified in the study protocol and understood by the DMC  (see 21 CFR 314.126(b)(5) (drugs) and 21 CFR 860.7(f)(1) (devices)).

In many cases, the DMC receives reports in two parts:  an "open" section, which presents data only in aggregate and focuses on trial conduct issues such as accrual and dropout rates, timeliness of data submission, eligibility rates and reasons for ineligibility; and a "closed" section, in which the comparative outcome data are presented.  The open section of these reports is usually provided to sponsors, who may convey any relevant information in these reports to investigators, IRBs, and

Exhibit 1
Page 19

other interested parties, as the data presented in the "open" section are not likely to bias the future conduct of the trial and are often important for improving trial management.

## 4.3.    Establishing a Charter Describing Standard Operating Procedures

DMCs typically operate under a written charter that includes well-defined standard operating procedures.  Such charters are important for the same reason that study protocols and analytical plans are important—they document that procedures were pre-specified and thereby reduce concerns that operations inappropriately influenced by interim data could bias the trial results and interpretation.  The sponsor may draft this charter and present it to the DMC for agreement, or the DMC may draft the charter with subsequent concurrence by the sponsor. Topics to be addressed would normally include a schedule and format for meetings, format for presentation of data, specification of who will have access to interim data and who may attend all or part of DMC meetings, procedures for assessing conflict of interest of potential DMC members, the method and timing of providing interim reports to the DMC, and other issues relevant to committee operations.  FDA may request that the sponsor submit the charter to FDA well in advance of the performance of any interim analyses, ideally before the initiation of the trial (see 21 CFR 312.23(a)(6)(iii)(g); 21 CFR 312.41(a); 21 CFR 812.150(b)(10)).  In such cases, FDA would usually consider the charter when FDA reviews the study protocol.

### 4.3.1.   Considerations for Standard Operating Procedures

#### 4.3.1.1.    Meeting Schedule and Format

The initial frequency of DMC meetings will depend on the expected rate of accrual and event occurrence at the time the trial is designed as well as the perceived risk of the experimental and/or control interventions.  Annual meetings may be adequate for some studies; other trials will require more frequent review.  Occasionally, there may be a need for extra meetings, when, for example, there is concern about potentially emerging safety problems, or when important new information external to the trial arises.  The study protocol will generally describe the schedule of interim analyses to be considered by the DMC, or the considerations that will determine the timing of meetings (e.g., a plan for interim analysis after a certain number of primary outcomes have been reported).  The study protocol will also typically describe the statistical approach to the interim analysis of trial data.  To minimize the potential for bias, these descriptions should be complete before the conduct of any unblinded interim analyses (see 21 CFR 314.126(b)(5) (drugs) and 21 CFR 860.7(f)(1) (devices)).

Face-to-face meetings are generally preferable, but telephone meetings may be necessary in some situations, particularly when new information must be urgently considered.  In some settings, when the DMC has already had numerous meetings and the committee is very familiar with the trial and the

Exhibit 1
Page 20

analytical issues, telephone meetings may be sufficient.   When telephone meetings are held, precautions may be needed to assure the confidentiality of the proceedings, and to prevent inadvertent access to conversations.

### 4.3.1.2.    Meeting Structure

Attendance at meetings raises the same confidentiality issues as access to interim reports provided to the DMC.  A central tenet of clinical trials is the importance of maintaining confidentiality of interim comparative data (see the Guidance for Industry, ICH E9, Statistical Principles for Clinical Trials, available at http://www.fda.gov/cder/guidance/ICH_E9-fnl.pdf).   Although FDA typically expects that confidentiality of the interim data will be maintained, the DMC may interact with the sponsor and/or trial lead investigators to clarify issues relating to the conduct of the trial, potential impact on the trial of external data, or other topics.  In order to permit such interaction without compromising confidentiality, many DMC meetings include an "open" session in which information in the open report is discussed.  These non-confidential data may include, for example, status of recruitment, baseline characteristics, ineligibility rate, accuracy and timeliness of data submissions, and other administrative data.  Sponsors may also use open sessions to provide external data to the DMC that may be relevant to the study being monitored.  Open session discussions might include representatives of the sponsor, steering committee, study investigators, FDA representatives, or others with trial responsibilities. There is a benefit to having a wider attendance at these sessions, since they provide an opportunity for those with the most intimate knowledge of the study to share their insights with the DMC and raise issues for the DMC to consider.  The DMC generally considers the comparative interim data contained in the closed report in a "closed" session attended only by the DMC members and the statistician who prepared and is presenting the interim analyses to the DMC.  Following the closed session, the DMC may meet again with the sponsor to relay any recommendations the DMC has made.

Section 6 describes the risks to study integrity when sponsor representatives have access to unblinded interim data and attend closed sessions of DMC meetings.  In settings in which a sponsor chooses to permit its representatives or other non-DMC members to attend the closed session despite the risks of such arrangements, we recommend that the DMC have the option of conducting an "executive" session with no participants other than DMC members.

### 4.3.1.3.    Initial Meeting

Scheduling the initial meeting of a DMC before the study is initiated has many advantages.  At this meeting, the DMC can discuss the protocol and analytic plan, model informed consent form, data collection instruments and

Exhibit 1
Page 21

other important trial documents, and present any suggestions for modifications to the sponsor and/or steering committee.  Regulatory considerations may also be discussed.  Meeting participants typically discuss and complete plans for monitoring the safety and effectiveness data, including:

- Scheduling of meetings;
- Format for the interim reports to the DMC;
- Timing of the delivery of the report to the DMC members prior to the meeting;
- Definition of a "quorum" of DMC members, including representation of essential scientific and other disciplines;
- Handling of meeting minutes; and
- Other aspects of the process.

It is particularly important that the sponsor and the DMC agree on the data monitoring plan, including the approach to early termination.

### 4.3.1.4. *Format of Interim Reports to the DMC and Use of Treatment Codes*

It is important that the general format and content of interim reports to the DMC be acceptable to the DMC.  This may be accomplished most efficiently if the sponsor proposes a template for these reports at its first meeting, so that changes requested by the DMC may be implemented before interim data are first presented.  However, the templates may change during the course of the trial as experience is accrued.  Further, the DMC will generally need easy and timely access to any additional data and analyses deemed important, and may request such additional material when needed.

We recommend that a DMC have access to the actual treatment assignments for each study group.  Some have argued that DMCs should be provided only coded assignment information that permits the DMC to compare data between study arms, but does not reveal which group received which intervention, thereby protecting against inadvertent release of unblinded interim data and ensuring a greater objectivity of interim review.  This approach, however, could lead to problems in balancing risks against potential benefits in some cases.  For example, to maintain blinding of the actual treatment assignments, safety outcomes would have to be coded differently from effectiveness outcomes when adverse effects would reveal the assigned intervention.  This would prevent the DMC from evaluating the balance of risks and benefits of the active interventions, its most critical responsibility.

Also, decisions about a trial are often asymmetric with respect to study arms; that is, a DMC may recommend termination of a study with a trend toward showing harm on the basis of data that, were they in the other direction, would

Exhibit 1
Page 22

not be considered strong enough to terminate early with a conclusion of benefit.  Similarly, a trend suggesting a safety concern with a new intervention could be sufficient to suggest the need for trial modification, while a similar trend in the opposite direction (new intervention looks better than standard) might not.

A common approach is presentation of results in printed copy using codes (for example, Group A and Group B) to protect against inadvertent unblinding should a report be misplaced, with separate access to the actual study arm assignments provided to DMC members by the statistical group responsible for preparing DMC reports.  To ensure the DMC's and sponsor's ability to address an emerging safety concern rapidly, they should establish a process to unblind treatment codes to DMC members in a timely fashion when needed (cf. 21 CFR 312.32(d); 21 CFR 812.46(b)(2)).  For example, DMC members might routinely receive the unblinded treatment codes in a mailing separate from that containing the interim reports.

### 4.3.2.  Statistical Methods

Statistical approaches to monitoring trials, and the principles involved in their implementation, are addressed in Guidance for Industry, ICH E9, Statistical Principles for Clinical Trials, available at http://www.fda.gov/cder/guidance/ICH_E9-fnl.pdf [4].  Planners of clinical trials most commonly use group sequential methods, in which interim analyses are performed at regular intervals based either on chronological time or amount of information accrued, but other approaches, such as those based on Bayesian methods, have been used as well.  Statistical methods are also available to assess stopping for futility; that is, when the likelihood that the treatment effect being sought, based on the interim data, is very unlikely to be established.  Other statistical strategies for monitoring may also be appropriate.

The sponsor or trial steering committee usually proposes the particular statistical approach to interim monitoring, but the DMC should generally review it before it is made final, to ensure that the DMC agrees to be guided in its actions by the planned approach.  FDA will typically request that the sponsor submit a final monitoring plan once it has been put in place, and before the initiation of interim monitoring, as such a plan would typically be considered a critical component of the study protocol (see 21 CFR 312.23(a)(6)(iii)(g); 21 CFR 312.41(a); 21 CFR 812.150(b)(10)).  Because statistical approaches based on classical hypothesis testing methods are by far the most common, the remaining discussion in this section will focus on issues within that framework.  As noted earlier, other monitoring strategies may also be appropriate.

---

[4] Although ICH documents are meant to provide guidance for drug and biologics sponsors, the statistical monitoring principles in ICH E9 could be used in the evaluation of medical devices as well.

Exhibit 1
Page 23

One of the major responsibilities of a DMC is to evaluate the relative treatment effects based on protocol-specified endpoints to determine if the trial is meeting its objectives.  A major concern when data on group differences are assessed repeatedly as they accumulate is that the Type I error (false positive) rate may be inflated if adjustment is not made for the multiple looks at the data.  Typically, the monitoring plan will specify a statistical approach that permits multiple interim reviews while maintaining the Type I error rate at the desired level.  These approaches usually generate boundaries for interim estimates of benefit that indicate the magnitude of benefit needed to support stopping the trial at interim points prior to its planned completion, while maintaining the desired overall probability of Type I error.  Such boundaries can serve as useful guidelines to the DMC in making recommendations regarding continued accrual to and conduct of the trial.  The DMC will usually recommend termination when these thresholds are crossed, but it is not obligated to do so, since other aspects of the interim data may complicate the issue.  For example, the data on effectiveness may be very strong, with a stopping boundary having been crossed, but emerging safety concerns may make the benefit-to-risk assessment non-definitive at that interim review.  FDA expects the sponsor to direct the DMC to exercise its own judgment in such circumstances; the DMC can be flexible in assessing the data relative to the stopping boundaries.  If the DMC recommends early termination for efficacy before a boundary is crossed, however, and this recommendation is implemented, the Type I error cannot be preserved and the study results may be difficult to interpret.

Statistical assessment may also suggest that early termination of a trial be considered on the basis of futility, as defined previously.  In this case, a DMC may recommend early termination on the grounds that the trial is unlikely to meet its objectives and is therefore no basis for continuing enrollment and/or follow-up.  Before recommending that a trial be terminated due to futility, a DMC will typically consider the Type II error, the chance of making a false negative conclusion.  Stopping on the basis of futility does not raise concerns about Type I error in that trial, since the conclusions of the trial will not be positive.  Nevertheless, protection of Type I error may be important even when there is a stated intention to stop early only for futility reasons since interim review of outcome data always raises the possibility that the DMC may find early results so persuasive that it would recommend early termination of the trial.

## 4.4.   Potential DMC Responsibilities

### 4.4.1.  Interim Monitoring

Most experience with DMCs has been in the setting of studies that address major outcomes such as mortality or serious irreversible morbidity.  Although many such studies focus on short-term endpoints such as 30-day survival, other studies often use endpoints that require a substantial duration of follow-up after the intervention delivery has been completed.  The need for monitoring in such

Exhibit 1
Page 24

studies often extends beyond the time when individuals are treated, since trends in
survival or other serious outcomes may not become evident until some time
during the follow-up period. Thus, the DMC's responsibility to monitor the study
generally continues until the planned completion of follow-up, regardless of the
duration of treatment.

### 4.4.1.1.    Monitoring for Effectiveness

In studies with serious outcomes, all parties would wish that any major
treatment advance be identified and made available as soon as possible. It is
critical, however, that the study yield a valid and definitive result. Thus,
tensions between ethical and scientific considerations may arise. Consider,
for example, a placebo-controlled trial of a new product for a serious illness or
condition for which there is no standard treatment. If the emerging data
suggest that those receiving the treatment are doing better, one might expect
that a DMC would consider whether the study should be terminated earlier
than planned. Estimates of treatment effect, however, will be unstable at early
points in a study, and the chance is substantial of observing a nominally
statistically significant benefit (e.g., p<0.05) at one of multiple interim
analyses during a study of an ineffective product (see Section 4.4.2). A DMC,
guided by a pre-specified statistical monitoring plan acceptable to both the
DMC and the study leadership, will generally be charged with recommending
early termination on the basis of a positive result only when the data are truly
compelling and the risk of a false positive conclusion is acceptably low.

A second type of consideration is whether the hypothesized benefit is likely
ultimately to be achieved. If the interim data suggest that the new product is
of no benefit—that is, there is no trend indicating superiority of the new
product—or that accrual rates are too low or noncompliance too great to
provide adequate power for identifying the specified benefit, a DMC may
consider whether continuation of the study is futile and may recommend early
termination on this basis. In this case, false negative conclusions are of
concern; statistical procedures are available to guide such determinations (see
Section 4.3.2).

### 4.4.1.2.    Monitoring for Safety

There are several aspects to safety monitoring in long-term outcome studies.
First, the primary efficacy endpoint itself often has safety implications. If
individuals given the investigational intervention are found to be at higher risk
for the outcome of interest (e.g., mortality, disease progression, loss of organ
function) sooner than those given the control, the DMC may consider
recommending early termination on safety grounds. Such assessments have
potential implications for falsely concluding that there is an adverse effect,
just as regular assessments of efficacy have the potential to lead to false
positive conclusions about benefit. Statistical considerations for early

Exhibit 1
Page 25

stopping when the data are trending in the direction of harm are often different from the case of trends in the direction of benefit, however.  It is usually appropriate to demand less rigorous proof of harm to justify early termination than would be appropriate for a finding of benefit.  In some cases, however, it may be appropriate to establish a harmful effect more definitively—for example, if a positive effect on the primary endpoint has been demonstrated or appears to be emerging, a precise assessment of a negative trend on a potentially important safety endpoint may be required for benefit-to-risk considerations.

A second important aspect of safety monitoring in these trials is comparison of adverse event rates in each treatment arm.  In some cases adverse events of particular concern can be identified in advance of the trial, and particular attention will be given to monitoring these events.  For example, in a large trial of hormone replacement therapy, specific monitoring plans were established to detect a possible increase in breast cancer incidence in women taking active therapy.  Because many types of adverse reactions cannot be anticipated prior to a large-scale study, the DMC should generally be provided with interim summaries by treatment arm of adverse events observed, not limited to those identified in advance.  This is particularly important for serious events that may result from the disease being treated as well as the intervention itself, or occur at an observable background rate in the population under study.  An effect of the drug on these events can only be detected by comparing the rates of the events in treatment and control groups.

To illustrate the process, consider acute myocardial infarctions (AMIs) occurring during a study of an antidiabetic therapy.  Diabetics are at increased risk of AMI so that a specific AMI in a participant could not be attributed to the new drug.  A DMC for such a trial, however, would regularly review the number of myocardial infarctions observed in each study arm.  If an imbalance between groups emerges, concerns will arise that some of the myocardial infarctions may be due to the intervention rather than the disease itself.  Since a potentially large number of adverse event categories may be observed and compared between the study arms, sensitivity on the part of the DMC to the issues of multiplicity, i.e., the elevated probability of "false positives" when performing multiple analyses, is warranted.  Not all potential risks can be identified in advance of the trial, so pre-specifying risks of concern cannot always be done.

A third aspect of safety monitoring is consideration of individual events of particular concern.  Although a DMC typically reviews summary adverse event data as discussed above, it will not usually review in detail every adverse event reported, or even every serious adverse event.  This responsibility generally lies with the sponsor, who must assure review of such events promptly (see, e.g., 21 CFR 312.32(b); 21 CFR 812.42(d); 21 CFR 812.46(b)).  The sponsor has the responsibility of reporting to FDA serious,

Exhibit 1
Page 26

unexpected adverse events in drugs and biologics trials under 21 CFR 312.32 and unanticipated adverse events in the case of device trials under 21 CFR 812.150(b)(1).  For clinical trials involving drugs and biologics, we recommend that sponsors notify DMCs about any waivers granted by FDA for expedited reporting of certain serious events.

The involvement of a DMC in the review of individual adverse event reports will vary from case to case.  In some studies, it may be important for the DMC to see detailed information on all deaths or other specified events, particularly events that are likely to have been caused by the product being tested (e.g., acute liver failure in a drug study).  In other studies, where many deaths or other serious events are expected, the DMC may view only the summary tabulations and comparative statistics to determine whether there appears to be an excess of an important adverse event in one of the study arms.  Simple listings of adverse outcomes, especially without treatment assignments, are rarely useful for DMC discussion.

The sponsor may ask the DMC to review any individual event thought to be of major significance by the study's medical monitor; such events would generally include deaths or other serious outcomes for which a causal connection with the intervention is plausible. We recommend that the DMC be informed in a timely manner of any cases for which unblinding of treatment code at the clinical site or by the treating clinician is thought to be necessary to provide an appropriate intervention, so that the DMC can assess the potential impact of such actions on the overall study blind.  Review of individual cases by the DMC does not relieve the sponsor of the regulatory responsibilities, discussed above, regarding evaluation of these events and reporting as required to FDA.

Concerns about the extent and type of adverse events observed may lead to early termination of the trial when the DMC judges that the potential benefits of the intervention are unlikely to outweigh the risks.  In other cases, a DMC may recommend measures short of termination that might reduce the risk of adverse events.  For example, the DMC might recommend:

- Changing the eligibility criteria if the risks of the intervention seem to be concentrated in a particular subgroup.
- Altering the product dosage and/or schedule if the adverse events observed appear likely to be reduced by such changes.
- Instituting screening procedures that could identify those at increased risk of a particular adverse event.
- Informing current and future study participants of newly identified risks via changes in the consent form and, in some cases, obtaining re-consent of current participants to continued study participation.

Exhibit 1
Page 27

### 4.4.1.3.    Monitoring Study Conduct

The DMC typically shares responsibility for assessment of data related to study conduct with the sponsor, the study leadership (such as a steering committee), and to some extent with IRBs.  A DMC will generally review data related to the conduct of the study (that is, the quality of the study and its ultimate ability to address the scientific questions of interest), in addition to data on effectiveness and safety outcomes.  These data may include, among other items:

- Rates of recruitment, ineligibility, noncompliance, protocol violations and dropouts, overall and by study site;
- Completeness and timeliness of data;
- Degree of concordance between site evaluation of events and centralized review;
- Balance between study arms on important prognostic variables;
- Accrual within important subsets.

The DMC may issue recommendations to the sponsor regarding trial conduct when concerns arise that some aspects of trial conduct may threaten the safety of participants or the integrity of the study.  For example, if the data presented to the DMC are not current, the DMC will not be able to meet its responsibility of ensuring that the study continues to be safe for its current and future participants.  As another example, an excess of dropouts may endanger the ultimate interpretability of the study results.

### 4.4.1.4.    Consideration of External Data

A DMC may be asked to consider the impact of external information on the study being monitored.  Release of results of a related study may have implications for the design of the ongoing study, or even its continuation.  In some cases, particularly when unexpected safety issues arise in related studies, the sponsor may bring external data to the attention of the DMC; in other cases, the data may be publicly reported.  Such data may lead to recommendations ranging from termination of the study, termination of one or more study arms, changes in target population, dose and/or duration of the intervention, or use of concomitant treatments.  The DMC may also recommend changes to the consent form or investigator's brochure, and/or letters from the sponsor to study participants describing the new results.

The role of the DMC in considering interim changes to a study protocol or other aspects of study conduct in response to external information raises additional issues that merit consideration.

In many cases, access to the unblinded data will be essential to making the best decision regarding changes to an ongoing trial that are suggested by

Exhibit 1
Page 28

external data.  For example, if external reports indicate that use of the study drug in a different indication raised serious, unexpected safety concerns, a decision about continuing the ongoing trial may depend on whether the interim data suggest important benefits that may make the newly found risks acceptable, or the extent to which the newly identified concerns are evident in the ongoing study.  In some circumstances, DMCs of separate but closely related trials (e.g., trials of the same product in different patient populations) may consider sharing confidential interim data when unexpected safety issues arise in one trial and information from the two trials together may improve decision-making in both trials.  Because such sharing limits the extent to which the trials can be considered independent, it should be pursued only in the rare situations when early stopping might be considered, but the issues leading to this consideration are ambiguous, for example, when a safety concern arises that appears biologically implausible.  Both DMCs would typically require the express consent of the respective sponsors prior to sharing such information.

In some cases, however, significant involvement of the DMC in considerations of changes based on external data could have undesirable consequences precisely because the DMC is aware of the interim study results.  Many kinds of trial modifications (e.g., changing endpoints, changing or adding to prespecified analysis subgroups) could, if made with knowledge of trial results, have significant effects on type I error and interpretation of final results.  If it is perceived that emerging results could have influenced these types of interim protocol changes, the credibility of the trial may be severely damaged.  In general, to minimize the potential for bias, the trial leadership, which is insulated from knowledge of the interim data, rather than the DMC, should be responsible for proposing potential changes other than those driven by safety considerations (cf. 21 CFR 314.126(b)(5), 21 CFR 860.7(f)(1)).

The principle that interim protocol changes should not be influenced by emerging results has implications for sponsors, who would initiate requests for protocol changes, and FDA staff, who would need to evaluate any such requests for protocol changes for INDs under 21 CFR 312.30 and for IDEs under 21 CFR 812.35.  Sponsors who wish to have the ability to request interim protocol changes without raising concerns about biasing the study should establish procedures to minimize bias, such as ensuring that they are completely unaware of unblinded comparative data (see 21 CFR 314.126(b)(5), 21 CFR 860.7(f)(1)).  If the study is performed with blinded treatment allocation, and access to unblinded data is limited to the DMC, making such changes as requested by the sponsor is straightforward.  If treatment allocation is not blinded, it is more difficult to maintain confidentiality of interim comparative results, as sponsor staff such as medical monitors will be reviewing data on each case.  In such circumstances it may be very advantageous for the sponsor to set up a "firewall" to ensure that those

Exhibit 1
Page 29

who would be proposing interim protocol changes based on external data are insulated from knowledge of interim comparative results.  To avoid any influence of interim data on consideration of protocol changes, FDA staff will also generally remain blinded to the interim results.  Under 21 CFR 312.41(a) (drugs) or 21 CFR 812.150(b)(10) (devices), we may request additional information or data to aid in FDA's review of protocol amendments and other aspects of clinical trials under an IND or IDE, respectively.  Under these authorities, we will typically request that, once interim data have been seen by the sponsor, such data should also be available to FDA, provided such data form the basis for a request by the sponsor to amend a study protocol.  It may be necessary for FDA to play a more active role regarding interim results in rare cases when there is an immediate need to evaluate a serious safety concern, especially when we may have important relevant information that may not otherwise be available to the DMC.  Even in such cases, however, it will generally be preferable for FDA to provide such information to the DMC, where possible, rather than taking a direct role in interim evaluations.

### 4.4.1.5.    *Studies of Less Serious Outcomes*

Many clinical trials evaluate interventions to relieve symptoms.  These studies are generally short-term, evaluating treatment effect over periods of a few days to a few months.  These studies tend to be smaller than major outcome studies and, therefore, are completed more quickly.  Because the primary endpoints of such studies are not serious irreversible events, as in a major outcome study, the ethical issues for monitoring are different.  In these studies, valuable secondary objectives such as characterization of the effect (i.e., magnitude, duration, time to response), assessment of the effect in population subsets, comparison of several doses and/or comparison of the new product to an active control can be ethically pursued even when the conclusion regarding the primary outcome is clear.  Early termination for effectiveness is rarely appropriate in such studies.  First, the study may be essentially completed by the time any interim analysis could be undertaken.  Second, the effectiveness of an intervention to relieve symptoms would not generally be so compelling as to override the need to collect the full amount of safety data, or to collect other information of interest and importance that characterizes the effect, as noted above.

DMCs have not been commonly established for short-term studies of interventions to relieve symptoms.  The need for an outside group to monitor data regularly to consider questions of early stopping for efficacy or protocol modification is usually not compelling in this situation.  Such a group is probably warranted only when termination of the trial for efficacy, even at the expense of obtaining more complete safety information, would be indicated for ethical reasons.

Exhibit 1
Page 30

For products intended solely to relieve symptoms, as opposed to curing or delaying progress of a serious disease or medical condition, an expert group to oversee all studies at all stages of development, monitor the developing safety database and make recommendations for design of successive studies based on early results may be useful.  The sponsor or investigator could refer an unusual safety concern arising in any study to this type of external group for review, while maintaining its own primary role in monitoring the accumulating results.  Such a group may be particularly valuable when the patient population is at relatively high risk of serious events; for example, in studies of drugs to control symptoms of angina, congestive heart failure, or chronic obstructive lung disease.  The external group would independently evaluate individual events and overall event rates in ongoing studies and advise the sponsor about emerging concerns.  Clearly, monitoring considerations of this type are more clinical than statistical.  Sponsors frequently constitute internal groups to monitor these types of studies, and these may be satisfactory in most cases.  Nevertheless, external advisors, who will be less committed to the existing development plan, may identify some problems more readily than internal reviewers.  Thus, sponsors may find it valuable to augment such internal groups with one or more external advisors.

### 4.4.2.  Early Studies

DMCs are not usually warranted in early studies such as Phase 1 or early Phase 2 studies, or pilot/feasibility studies, but formal monitoring groups may be useful for certain types of early clinical studies.  While these formal monitoring groups will often consist of individuals internal to the sponsor and/or investigators, a DMC overseeing safety may be considered when risk to participants appears unusually high, e.g., with particularly novel approaches to treating a disease or condition.  When the investigator is also the product manufacturer or IND/IDE sponsor, and thereby subject to potentially strong influences related to financial and/or intellectual incentives, a DMC could provide additional, independent oversight that would enhance safety of study participants and the credibility of the product development.  Sponsors may therefore wish to consider establishing DMCs in such settings.

A DMC's role in early phase studies would be different from that in late Phase 2 or Phase 3 studies.  Early studies are often exploratory in nature; they are frequently not randomized or controlled and therefore accumulating results are known to the investigators and sponsor.  Issues regarding statistical interpretation of interim data, or confidentiality of interim data, are therefore generally less relevant in this setting.  Nevertheless, for difficult situations in which the potential scientific gain from continuing a study must be evaluated in the context of ethical considerations for ensuring subjects' rights and welfare, particularly in settings such as those described above, DMCs may be helpful to investigators, sponsors and IRBs by providing independent, objective expert counsel.  We expect,

Exhibit 1
Page 31

however, that the need for independent DMCs in early phase studies will be infrequent.

### 4.4.3.   Other Responsibilities

#### 4.4.3.1.   *Making Recommendations*

A fundamental responsibility of a DMC is to make recommendations to the sponsor (and/or, as noted in the Introduction, a steering committee or other group delegated by the sponsor to make decisions about the trial) concerning the continuation of the study.  Most frequently, a DMC's recommendation after an interim review is for the study to continue as designed.  Other recommendations that might be made include study termination, study continuation with major or minor modifications, or temporary suspension of enrollment and/or study intervention until some uncertainty is resolved.

Because a DMC's actions potentially impact the safety of trial participants, it is important that a DMC express its recommendations very clearly to the sponsor.  Both a written recommendation and oral communication, with opportunity for questions and discussion, can be valuable.  Recommendations for modifications are best accompanied by the minimum amount of data required for the sponsor to make a reasoned decision about the recommendation, and the rationale for such recommendations should be as clear and precise as possible.  Sponsors may wish to develop internal procedures to limit the interim data released by a DMC after a recommendation until a decision is made regarding acceptance or rejection of the recommendation, to facilitate maintaining confidentiality of the interim results should the trial continue.  We recommend that a DMC document its recommendations, and the rationale for such recommendations, in a form that can be reviewed by the sponsor and then circulated, if and as appropriate, to IRBs, FDA, and/or other interested parties.  Sections 5 and 7.2.1 address implications for reporting to FDA of DMC recommendations for major study changes such as early study termination.

#### 4.4.3.2.   *Maintaining Meeting Records*

We recommend that the DMC keep minutes of all meetings (see Guidance for Industry, ICH E6, Good Clinical Practice: Consolidated Guidance, Section 5.5 at 5.5.2, available at http://www.fda.gov/cder/guidance/959fnl.pdf).  We also recommend that the DMC divide meeting minutes into two parts, according to whether they include discussion of confidential data (usually unblinded comparative data).  The second part of the minutes will typically summarize discussion of the comparative unblinded outcome data and provide the rationale for the recommendations made to the sponsor.  Generally, the DMC does not circulate this portion of the minutes or the interim study reports for the closed session outside the DMC membership until the trial is terminated.

Exhibit 1
Page 32

We also recommend that after each meeting, the DMC issue a written report to the sponsor based on the meeting minutes.  This report does not have to be extremely detailed, but should include sufficient information to explain the rationale for any recommended changes.  Sponsors should establish procedures to minimize the potential for bias, such as requiring that reports to the sponsor include only those data generally available to the sponsor (e.g., number screened, number enrolled at each site) (see 21 CFR 314.126(b)(5) (drugs) and 21 CFR 860.7(f)(1) (devices)).  If no changes are recommended, the report may be as simple as "The DMC recommends that the study continue as designed."  We further recommend that the report to the sponsor include a summary of the discussion in any open session of the meeting and document any information provided orally to the sponsor that was not included in the written report.  The sponsor may convey the relevant information in this report to other interested parties such as the study investigators, who should provide any such information, as appropriate, to participating IRBs.  Of course, sponsors and/or investigators must report to participating IRBs, as well as to FDA, applicable changes in the protocol or study procedures made as a result of DMC recommendations (see 21 CFR 56.108(a)(3) and (4) and 312.30 and 312.66 for drugs and 21 CFR 812.40 for devices).

We recommend that the DMC or the group preparing the confidential interim reports to the DMC maintain all meeting records in order to best ensure continued confidentiality of interim data.  We may request copies of these records when the study is completed (21 CFR 312.58 (drugs); 21 CFR 812.150(b)(10) (devices)).  We may also request access to the electronic data sets used for each set of interim analysis.  We therefore recommend that sponsors arrange for archiving such electronic data sets.

## 5.    DMC RECOMMENDATIONS AND REGULATORY REPORTING REQUIREMENTS

All clinical trials conducted under an IND or IDE are subject to regulatory safety reporting requirements.  These requirements include prompt reporting to FDA of certain serious and unexpected adverse events (see 21 CFR 312.32(c), 21 CFR 312.52, 21 CFR 812.46(b), 21 CFR 812.150(b)(1)).  In general, for an event that is individually recognizable as a serious event potentially related to administration of a medical product (e.g., agranulocytosis, hepatotoxicity for drug studies), the sponsor (sometimes through a CRO managing that aspect of the trial, see 21 CFR 312.52) is responsible for notifying FDA (21 CFR 312.32, 21 CFR 812.150(b)(1)).  The sponsor may make this notification with or without unblinding the individual case, as appropriate.

As discussed above in Section 4.4.1.2, evidence of a possible relationship between many serious adverse events and an investigational drug might be detectable only by comparison of rates in the two arms of a controlled trial and not by review of individual cases.  For example, in a drug trial carried out in patients with coronary artery disease, in whom heart attacks and strokes would be expected to occur, an increased heart attack or stroke rate would not be recognized except by

Exhibit 1
Page 33

comparison to the rate in the control group; if such comparison demonstrated an increase in heart attack and stroke rate, it could be presumed that the increase in heart attack and stroke rate was drug-related.  Such a finding involving a serious adverse event, conveyed to a sponsor by a DMC with a recommendation to change the trial (e.g., design, informed consent), could represent, on its face, a report of one or more serious unexpected adverse event(s).  As required by 21 CFR 312.32(d)(1), the sponsor would need to investigate a DMC's recommendation relating to such events as potentially reportable to FDA under 21 CFR 312.32.  If the sponsor concluded that the increased rate of serious unanticipated adverse events was "associated with the use of the drug," the finding, and support for it (which could include the DMC report, any analysis, and pertinent data) would need to be submitted as a serious unexpected adverse experience.  These considerations would also apply to unanticipated adverse device effects under 21 CFR 812.50(b)(1).

Findings conveyed to a sponsor by a DMC as part of a recommendation to modify the trial could therefore mean that serious and unexpected events were occurring, and the sponsor would consequently be required to report an analysis of these events to FDA and to all study investigators according to 21 CFR 312.32(c)(1)(B)(ii) (drug trials) and 21 CFR 812.150(b)(1) (device trials).  Study investigators are generally responsible for reporting such findings to their IRBs, according to 21 CFR 312.66 (drug trials) and 21 CFR 812.150(a)(1) and 21 CFR 812.40 (device trials), although direct reporting from sponsors to responsible IRBs may be arranged and may be preferable in some situations; for example, when a central IRB has been established.  For a device trial, however, the sponsor is responsible for notifying all participating IRBs when an evaluation of an unanticipated adverse event is conducted (21 CFR 812.150(b)(1)).

The requirement to report DMC recommendations related to serious adverse events in an expedited manner in clinical trials of new drugs (21 CFR 312.32(c)) would not apply when the DMC recommendation is related to an excess of events not classifiable as serious.  Nevertheless, we recommend that sponsors inform FDA about all recommendations related to the safety of the investigational product whether or not the adverse event in question meets the definition of "serious."  Examples might be recommendations to lower the dose of a study agent because of excess toxicity, or to inform current and future trial participants of an emerging safety concern that had not been recognized at the start of the trial.

## 6.      INDEPENDENCE OF THE DMC

Independence of a DMC depends on the relationships of its members to those sponsoring, organizing, conducting, and regulating the trial.  Independence is greatest when members have no involvement in the design and conduct of the trial except through their role on the DMC, and have no financial or other important connections to the sponsor (other than their compensation for serving on the DMC) or other trial organizers that could influence (or be perceived to influence) their objectivity in evaluating trial data.

Independence is defined on a continuum.  DMCs are rarely, if ever, entirely independent of the sponsor, as the sponsor generally selects the members, gives the committee its charge, and pays committee members for their expenses and services.  Aside from being compensated for their duties as DMC members, however, we recommend that these members generally have no

Exhibit 1
Page 34

ongoing financial relationship with a trial's commercial sponsor and not be involved in the conduct of the trial in any role other than that of a DMC member.

A critical issue in planning and managing operations of a DMC is resolving the tension that can arise between having a maximally independent DMC and having a DMC that is well informed about the trial: its objectives, its design, and its conduct. To narrowly defining "independence" may result in eliminating from consideration the most knowledgeable researchers, who are likely to have had some past interaction with others sponsoring or performing research in their area of expertise. Additionally, while sponsor involvement in looking at comparative data threatens independence, sponsor representatives, study statisticians, and study investigators may contribute valuable perspectives regarding the trial that may not be available to the committee from more independent sources. With regard to sponsor/investigator involvement with the DMC, this tension is best resolved by permitting interaction with the committee in a carefully defined and limited manner, as described in Section 4.3.1.2. The involvement of such individuals with the DMC will typically be limited in terms of what interim data may be viewed, which sessions may be attended, what topics may be discussed, and what roles (e.g., observer, consultant, member), may be played. Some of the considerations in addressing these issues are discussed below.

## 6.1. Desirability of an Independent DMC

Independence of the DMC from the sponsor offers the following advantages:

- Independence from the sponsor helps ensure that sponsor interests do not unduly influence the DMC, promoting objectivity that benefits the subjects and the trial.
- Through enhancement of objectivity and reduction of the possibilities for bias, independence of the DMC increases the credibility of the trial's conclusions.
- Independence of the DMC and complete blinding of the sponsor to interim outcome data preserve the ability of the sponsor to make certain modifications to a trial in response to new external information without introducing bias.
- In a commercially sponsored trial, independence of the DMC may shield the sponsor (and thus the trial) from securities issues by maintaining the sponsor in a fully blinded situation.

## 6.2. Value of Sponsor Interaction with the DMC

A sponsor's decision to establish an independent DMC does not preclude interaction of the sponsor with the DMC. Sponsor involvement in an open part of the DMC meeting, during which data such as enrollment, compliance, and event rates may be viewed in aggregate but not separately by study arm, has significant advantages. The sponsor may provide important information to the DMC regarding the sponsor's goals, plans, and resources that the DMC can later integrate into its deliberation. Further, the review of interim comparative data may raise certain questions that the DMC might want to address to the sponsor. These interactions may improve the quality of the monitoring process and may also provide the sponsor with information relevant to the costs, timetable, and likely interpretability of the study that can be of significant value in planning future studies and/or other aspects of product development. The risk to the study of such sponsor

Exhibit 1
Page 35

involvement can be quite limited provided that (1) appropriate care is taken to ensure that the sponsor does not see outcome data separately by study arm and (2) the sponsor does not unduly influence the closed deliberations of the committee.

On the other hand, involvement by sponsor representatives and certain investigators in the portion of the DMC meeting where unblinded data are reviewed presents substantial disadvantages, as discussed in Sections 6.1 and 6.3.  Even so, such involvement is not entirely without rationale.  When a DMC is facing difficult decisions based on interim safety or efficacy data, the sponsor representatives, study statisticians, and study investigators may contribute valuable perspectives that may not be available from more independent sources.  For example, such individuals might point out that unanticipated difficulties in collecting certain data may affect their reliability.  In addition, such individuals might have detailed knowledge of other relevant information about the drug (or disease) gained from the trial in question or from other studies that could enhance the DMC's ability to monitor the current trial.  To the extent such perspectives can be obtained through a combination of having independent DMC members who are very familiar with the drug, the disease, and trial and having sponsor involvement in open session only, some risks (see Section 6.3) will be minimized.  When a trial's procedures are such that sponsor representatives or investigators do see unblinded data with the DMC, the DMC may wish to develop its recommendations in an executive session (see Section 4.3.1.2).

### 6.3.    Risks of Sponsor Exposure to Interim Comparative Data

Sponsor exposure to unblinded interim data, through the DMC or otherwise, can present substantial risk to the integrity of the trial.  One concern is that unblinding of the sponsor increases the risk of further unblinding, e.g., of participants, potential participants, or investigators, thereby potentially compromising objective safety monitoring, equipoise, recruitment, administration of the intervention, or other aspects of the trial.  In some cases, this risk may be limited and manageable.  However, even when unblinding is limited to a small group or a single individual within the sponsoring organization who maintains confidentiality of the results, it is possible that an individual with knowledge of interim data may reveal, or be perceived to reveal, information inadvertently, e.g., by facial expression or body language.

An additional problem arising from a sponsor's access to interim data is the diminution of the sponsor's ability to manage the trial without introducing bias.  Many trials, particularly those with DMCs, take place over several years.  During that time, it is not uncommon for scientific advancements, e.g., development of new tests, approval of new products, announcement of results of other trials, to significantly affect a given trial.  Such developments may suggest a need for modifications of the experimental protocol, e.g., allowing certain concomitant treatments, changing endpoints.  Non-scientific developments, such as new financial considerations, production problems, enrollment problems, and missing data, may also suggest the need for protocol changes.  If the sponsor has had access to interim data, it may be impossible to avoid allowing that knowledge to influence decisions regarding modifications of the trial; it may also be

Exhibit 1
Page 36

impossible for outside evaluators to assess the impact of that influence.  For example, if based on external developments, a sponsor were considering terminating accrual in one subgroup or changing an endpoint, knowledge of current results in that subgroup or with regard to that endpoint would introduce unavoidable, but unmeasurable bias.  Thus, the sponsor who knows interim data may well find itself in a position where a protocol change that appears to be in the interest of the trial or even essential for continuing the trial, cannot be made without potentially introducing biases that can be neither quantified nor corrected.  This may lead to major difficulties in interpreting the results of statistical comparisons.

In certain situations, exceptions to the strict maintenance of confidentiality of interim data will be warranted.  For example, as noted earlier, in trials in which severe toxicity or other severe morbidity is expected and ongoing continual monitoring is required to ensure maximal protection of trial participants, the sponsor may need to be more actively involved in monitoring unblinded safety data despite the risks to confidentiality of the interim results.

## 6.4.     Statisticians Conducting the Interim Analyses

As discussed in Section 2.1, DMCs add administrative complexity to a trial, adding complexity to the statistician's analyses of the trial.  Traditionally, the primary trial statistician performs interim analyses and reports to the DMC.  "Primary trial statistician" may refer to an individual statistician or statistical group responsible for designing the trial and managing its conduct in collaboration with the study chair and others in the trial leadership.  This arrangement can be appealing because the primary trial statistician will be extremely knowledgeable about the study and will be able to provide the most informative interaction with the DMC.

Assigning the primary trial statistician the responsibility for interim analysis and reporting to the DMC can be problematic, however.  When issues arise that might suggest changes to the trial design, a statistician performing both the primary collaborative and the interim analysis functions including reporting to the DMC, will probably be the only member of the trial management team with knowledge of the interim data.  In considering possible changes, the statistician's objectivity will inevitably be compromised by the knowledge of the potential impact of such changes on the outcome of the trial.  When statisticians with knowledge of interim data participate in trial management meetings in which potential changes to study size, entry criteria, or endpoints are discussed, perceptions of biased decision-making could arise.  Even if the statisticians remain silent about the interim data, it is essentially impossible for any opinion they may express not to be influenced by knowledge of these data.  When the statistician is present for such discussions and knows which of the alternative courses of action is more likely to result in the experimental intervention being shown effective, even unintentional non-verbal communication may reveal (or may be perceived to reveal) some of that knowledge.  Furthermore, if the sponsor must make a decision with major financial implications and a statistician in the sponsor's employ possesses information

Exhibit 1
Page 37

critical to that decision, both may be placed in a very uncomfortable position in which the risk is high of verbal or non-verbal transmission of information regarding interim data.

For this reason, when there is a DMC and a formal mechanism for interim analyses, it is advantageous for the statistician performing the interim analysis to be uninvolved in managing the conduct of the trial, especially in regard to making decisions about design modifications. This could mean that a statistician other than the primary trial statistician would take responsibility for the interim analysis and reporting to the DMC. Alternatively, the primary statistician could maintain this role, but forego further involvement in trial management once interim analysis was undertaken. Sponsors may identify and develop other approaches to reduce potential inappropriate influence of interim data on trial management.

Another important issue relating to the role of the statistician arises when the statistician is employed by the sponsor. Elsewhere in this guidance, we have described the concerns associated with sponsors being aware of the interim comparative data. For purposes of quality assurance, sponsors often wish to maintain control of the data and have their own statisticians perform the analyses, including the unblinded analyses for the DMC. Typically and appropriately, such statisticians are instructed not to disclose interim data to others within the sponsoring organization. Questions can always arise, however, as to whether the statisticians are adequately separated from others within the sponsoring organization involved in managing the trial.

For these reasons, the integrity of the trial may be best protected when the statisticians preparing unblinded data for the DMC are external to the sponsor and uninvolved in discussions regarding potential changes in trial design while the trial is ongoing. This is an especially important consideration for critical studies intended to provide definitive evidence of effectiveness. Balanced against this concern, however, is the need for the statisticians reporting to the DMC to be very familiar with details of the study and have ample opportunity to assess the interim data. The primary trial statistician, whether or not employed by the sponsor, is usually best situated to play this role. We recognize that an external statistician contracted by the sponsor to perform interim analysis may not be entirely free from the types of pressures and concerns that may affect a statistician employed by the sponsor.

There has been substantial experience with the model in which the primary trial statistician also analyzes interim data and reports to the DMC. This arrangement has worked well, for the most part. In the admittedly infrequent situation in which interim protocol changes need to be considered, however, participation of statisticians with knowledge of interim data could complicate the interpretability of the data. Sponsors may wish to take the above considerations into account in establishing procedures for the operation of the DMC and the process of interim monitoring.

If the statistician reporting unblinded data to the DMC is not the primary trial statistician, it is particularly important that efforts be made to ensure both that the unblinded statistician is very familiar with the design, setting, and objectives of the trial, and has

Exhibit 1
Page 38

sufficient time and access to the data to provide insightful analyses responsive to the DMC's needs.

If the primary trial statistician takes on the responsibility for interim analysis and reporting to the DMC, we recommend that this statistician have no further responsibility for the management of the trial once interim analysis begins and have minimal contact with those who have such involvement.  In this case, we recommend that sponsors establish and document procedures to ensure this separation, and designate a different statistician to advise on the management of the trial.

If the primary trial statistician takes on the responsibility for interim analysis and reporting to the DMC, and it appears infeasible or highly impractical for any other statistician to take over responsibilities related to trial management, we recommend that sponsors consider, develop and document procedures to minimize the risks of bias that are associated with such arrangements, as described above.

If the statistician responsible for interim analysis and reporting to the DMC is employed by the sponsor, special care should be taken to minimize the potential for bias, such as ensuring that confidential interim data are not revealed to anyone else within the sponsor organization (see 21 CFR 314.126(b)(5) (drugs) and 21 CFR 860.7(f)(1) (devices)).

While the sponsor or the DMC may suggest to the statistician the nature of the analyses and tables they wish reported to the DMC, we recommend the statistician also have the familiarity with the study and data access necessary to perform additional analyses that might be suggested by the accumulating data and/or requested by the DMC.

## 6.5.    Sponsor Access to Interim Data for Planning Purposes

Often, sponsors wish to have access to unblinded interim data for the purpose of planning product development, e.g., designing/initiating further trials or making decisions regarding production facilities.  This interest is understandable, but such access is problematic for reasons already discussed.  In general, sponsors are advised to avoid seeking information about unblinded interim data because of the significant possibility that they may wind up impairing trial management or even making the trial results uninterpretable by doing so.  Further, plans or decisions based on statistically imprecise interim data may often be suboptimal.  Where the sponsor nonetheless has a compelling need to review such information, certain approaches may lessen, although they do not eliminate, risks to the trial:

- Discussion of such an action with FDA in advance.  This is particularly advisable when the sponsor intends to use the study in support of a licensing or marketing application.
- Development of appropriate stopping rules and apportionment of type I error ($\alpha$) before performing any unblinded interim analysis.  This is important because any viewing of study arm-specific effectiveness data by the DMC and/or sponsor in a study of a serious illness raises the possibility that an unanticipated extreme

Exhibit 1
Page 39

finding of effectiveness might create an ethical imperative to stop the trial, and it would not be possible to quantitate the level of evidence provided by the data if the monitoring plan had not been established prior to data review.

- Determination of the minimum amount of information needed. For example, to assist in defining eligibility criteria for a subsequent trial, the sponsor may wish to know only whether estimates of treatment effect in a subgroup are less or greater than in the overall data set.
- Formulation of written questions, preferably with yes/no rather than numerical answers, that will elicit only that minimal required information and nothing more.
- Receiving only written information regarding the requested data (thereby documenting what was received and avoiding additional unnecessary communications) and abstaining from participation in closed DMC meetings or discussions of data with unblinded DMC members (except as otherwise requested by the DMC).
- Identification of those sponsor employees with a critical "need-to-know" and restriction of such information to those individuals only.
- Ensuring that individuals with access to the information avoid any subsequent role in the management of the trial and minimize interactions with others in that role.
- Ensuring that individuals who have access to such information make every effort to avoid taking actions that will assist others in inferring what the information is.
- Ensuring that reports of study findings describe any access to interim data by individuals involved with study management, and steps taken to prevent such access from potentially biasing the study results.

## 7.    SPONSOR INTERACTION WITH FDA REGARDING USE AND OPERATION OF DMCs

There are many situations, several mentioned earlier, in which sponsor consultation with FDA on matters regarding a DMC is advisable.

### 7.1.    Planning the DMC

In planning a clinical trial, a sponsor makes several decisions regarding use, types of membership, and operations of a DMC. Many of these can be critical to the success of the trial in meeting regulatory requirements. This guidance document is intended to provide general FDA guidance regarding those decisions, but each set of circumstances can raise unique considerations. Issues regarding use of DMCs are appropriate topics for FDA-sponsor meetings (in person or by telephone) at the sponsor's request.

### 7.2.    Accessing Interim Data

As discussed above, accessing interim data by the sponsor carries many risks, not all of which may be fully appreciated by the sponsor. We recommend that sponsors contact FDA before initiating communication with the DMC regarding access to interim data

Exhibit 1
Page 40

from a trial likely to be an important part of a regulatory submission.   While FDA permission is not required, a discussion regarding the potential risks and implications of that action and of methods to limit the risks may contribute to informed decision making.

### 7.2.1.   DMC Recommendations to Terminate the Study

In almost all cases, a DMC is advisory to the sponsor; the sponsor decides whether to accept recommendations to discontinue a trial.  FDA will rarely, if ever, tell a sponsor which decision to make.  For trials that may be terminated early because a substantial benefit has been observed, however, consideration may still need to be given to the adequacy of data with regard to other issues such as safety, duration of benefit, outcomes in important subgroups and important secondary endpoints.   We recommend that sponsors of trials that could potentially be terminated early for efficacy reasons discuss these issues with FDA prior to implementing the trial, when the statistical monitoring plan and early stopping boundaries are being developed.  In these settings, consultation with FDA may provide the sponsor with important information regarding the regulatory and scientific implications of a decision and may lead to better decisions.  Sponsors are encouraged to revisit these issues with FDA when considering DMC recommendations for early termination if new issues have arisen and/or if the regulatory implications of early termination were not adequately clarified at the outset of the trial.

For trials that may be terminated because of safety concerns, timely communication with FDA is often required (see, e.g., 21 CFR 312.56(d) (drugs); 21 CFR 812.150 (devices)).  In such cases, we recommend that the sponsor initiate discussion as soon as possible about the appropriate course of action, for the trial in question as well as any other use of the investigational product.

We strongly recommend that sponsors initiate discussion with FDA prior to early termination of any trial implemented specifically to investigate a potential safety concern.

### 7.2.2.   FDA Interaction with DMCs

In rare cases, we may wish to interact with a DMC of an ongoing trial to ensure that specific issues of urgent concern to FDA are fully considered by the DMC or to address questions to the DMC regarding the consistency of the safety data in the ongoing trial to that in the earlier trials, to optimize regulatory decision-making.  An example might be a situation in which FDA is considering a marketing application in which a safety issue is of some concern, and the sponsor has a second trial of the investigational agent ongoing.  In such a situation, we might wish to be sure that the DMC for the ongoing trial is aware of the existing safety data contained in the application and is taking those data into consideration in evaluating the interim safety data from the ongoing trial.  In such a case, we could request that the sponsor arrange for FDA to communicate with, or even

Exhibit 1
Page 41

meet with, the DMC (see 21 CFR 312.41(a); 21 CFR 812.150(b)(10)), and care should be taken to minimize the possibility of jeopardizing the integrity of the ongoing trial.

**7.3.    DMC Recommendations for Protocol Changes**

A DMC may, in some instances, recommend changes to the study protocol, particularly in the context of their responsibilities for monitoring patient safety.   Many protocol changes have little impact on the usefulness of a trial to gain regulatory approval.   Certain types of changes to the protocol, however, such as changes in the primary endpoints, could have substantial impact on the validity of the trial and/or its ability to support the desired regulatory decision if they potentially could have been motivated by the interim data.   We recommend that sponsors discuss proposed changes of the latter type with FDA before implementation.

## 8.    PAPERWORK REDUCTION ACT OF 1995

This guidance contains information collection provisions that are subject to review by the Office of Management and Budget (OMB) under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501-3520).

The time required to complete this information collection is estimated to average 11.75 hours per response, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection.   Send comments regarding this burden estimate or suggestions for reducing this burden to:

Food and Drug Administration
Center for Biologics Evaluation and Research (HFM-99)
1401 Rockville Pike, Suite 200N
Rockville, MD 20852-1448

This guidance also refers to previously approved collections of information fund in FDA regulations.   The collections of information in §§ 312.30, 312.32, 312.38, 312.55, and 312.56 have been approved under OMB Control No. 0910-0014; the collections of information in § 314.50 have been approved under OMB Control No. 0910-0001; and the collections of information in §§ 812.35 and 812.150 have been approved under OMB Control No. 0190-0078.

> An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB Control No.  The OMB Control No. for this information collection is 0910-0581 (Expires 10/31/2021).

Exhibit 1
Page 42

# EXHIBIT 2

Exhibit 2
Page 43

# Guidance for Clinical Investigators, Industry, and FDA Staff

# Financial Disclosure by Clinical Investigators

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Office of Good Clinical Practice**
**Center for Drug Evaluation and Research**
**Center for Biologics Evaluation and Research**
**Center for Devices and Radiological Health**

**February 2013**

Exhibit 2
Page 44

# Guidance for Clinical Investigators, Industry, and FDA Staff

# Financial Disclosure by Clinical Investigators

*Additional copies are available from:*

*Office of Communication, Division of Drug Information, Building 51, Room 2201*
*Center for Drug Evaluation and Research*
*Food and Drug Administration*
*10903 New Hampshire Avenue, Bldg. 51, rm. 2201, Silver Spring, MD  20993-0002*
*Tel:  301-796-3400; Fax:  301-847-8714; E-mail:  druginfo@fda.hhs.gov*
*http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/default.htm*
*and/or*
*Office of Communication, Outreach and Development, HFM-40*
*Center for Biologics Evaluation and Research*
*Food and Drug Administration*
*1401 Rockville Pike, Rockville, MD 20852-1448*
*Tel:  800-835-4709 or 301-827-1800; E-mail:  ocod@fda.hhs.gov*
*http://www.fda.gov/BiologicsBloodVaccines/GuidanceComplianceRegulatoryInformation/Guidances/default.htm*
*and/or*
*Division of Small Manufacturers, International, and Consumer Assistance*
*Center for Devices and Radiological Health*
*Food and Drug Administration*
*10903 New Hampshire Avenue, Bldg. 66, rm. 4621, Silver Spring, MD 20993-0002 U.S.A.*
*Tel:  1-800-638-2041 or 301-796-7100; Fax:  301-847-8149; E-mail:  dsmica@fda.hhs.gov*
*http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/default.htm*
*and/or*
*Office of the Commissioner, Office of Good Clinical Practice*
*Food and Drug Administration*
*10903 New Hampshire Avenue, Bldg. 32, rm. 5173, Silver Spring, MD 20993-0002 U.S.A.*
*Tel:  301-796-8340; Fax:  301-847-8640; E-mail:  gcp.questions@fda.hhs.gov*
*http://www.fda.gov/ScienceResearch/SpecialTopics/RunningClinicalTrials/GuidancesInformationSheetsandNotices/ucm219433.htm*

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Office of Good Clinical Practice**
**Center for Drug Evaluation and Research**
**Center for Biologics Evaluation and Research**
**Center for Devices and Radiological Health**

**February 2013**

Exhibit 2
Page 45

## TABLE OF CONTENTS

I. INTRODUCTION.................................................................................................. 1

II. BACKGROUND ................................................................................................. 1

III. FINANCIAL DISCLOSURE REQUIREMENTS .......................................... 2

 A. Definitions................................................................................................ 2

 B. Disclosable Financial Interests and Arrangements.................................. 4

 C. Agency Actions......................................................................................... 4

IV. QUESTIONS AND ANSWERS ....................................................................... 5

 A. GENERAL................................................................................................ 5

 B. FORMS AND INFORMATION TO BE SUBMITTED .......................... 6

 C. FINANCIAL INTERESTS AND ARRANGEMENTS SUBJECT TO DISCLOSURE........ 11

 D. CLINICAL INVESTIGATOR ................................................................ 15

 E. SPONSOR................................................................................................. 17

 F. APPLICANT ............................................................................................. 21

 G. COVERED CLINICAL STUDY .............................................................. 23

 H. FDA REVIEW .......................................................................................... 26

 I. RECORDKEEPING ................................................................................. 29

 J. FDA INSPECTIONS ................................................................................ 30

 K. CONTACTS .............................................................................................. 31

APPENDIX ........................................................................................................... 32

Exhibit 2
Page 46

# Guidance for Clinical Investigators, Industry, and FDA Staff[1]
# Financial Disclosure by Clinical Investigators

This guidance represents the Food and Drug Administration's (FDA's) current thinking on this topic. It does not create or confer any rights for or on any person and does not operate to bind FDA or the public. You can use an alternative approach if the approach satisfies the requirements of the applicable statutes and regulations. If you want to discuss an alternative approach, contact the FDA staff responsible for implementing this guidance. If you cannot identify the appropriate FDA staff, call the appropriate number listed on the title page of this guidance.

## I.    INTRODUCTION

This guidance is intended to assist clinical investigators, industry, and FDA staff in interpreting and complying with the regulations governing financial disclosure by clinical investigators, 21 CFR part 54. This document is a revision of the *Guidance for Industry: Financial Disclosure by Clinical Investigators* dated March 20, 2001. In order to address issues raised by the Office of the Inspector General (OIG), Department of Health and Human Services, in its report, OEI-05-07-00730, *The Food and Drug Administration's Oversight of Clinical Investigators' Financial Information*[2] as well as questions FDA has received from industry and the public, FDA issued a revised guidance in draft in May 2011 for public comment. Comments were received from 13 individuals and entities, which were considered in preparing this final guidance. FDA encourages applicants and sponsors to contact the agency for advice concerning specific circumstances regarding financial disclosures that may raise concerns as early in the product development process as possible.

FDA's guidance documents, including this guidance, do not establish legally enforceable responsibilities. Instead, guidances describe the agency's current thinking on a topic and should be viewed only as recommendations, unless specific regulatory or statutory requirements are cited. The use of the word *should* in agency guidances means that something is suggested or recommended, but not required.

## II.    BACKGROUND

The Financial Disclosure by Clinical Investigators regulation (21 CFR part 54) requires applicants who submit a marketing application for a drug, biological product or device to submit certain information concerning the compensation to, and financial interests and arrangements of, any clinical investigator conducting clinical studies covered by the regulation (see generally the

---

[1] This revised guidance was prepared by the Office of the Commissioner, with input from the Center for Drug Evaluation and Research (CDER), Center for Biologics Evaluation and Research (CBER) and Center for Devices and Radiological Health (CDRH).

[2] The OIG's report is available at http://oig.hhs.gov/oei/reports/oei-05-07-00730.pdf.

Exhibit 2
Page 47

purpose of the regulation at 21 CFR § 54.1).  The regulation, which became effective on February 2, 1999, applies to clinical studies submitted in a marketing application, including a supplement or amendment to an original application, that the applicant or FDA relies on to establish that the product is effective, and any study in which a single investigator makes a significant contribution to the demonstration of safety (21 CFR §§ 54.2(e) and 54.3).  The regulation requires applicants to certify the absence of certain financial interests and arrangements of clinical investigators that could affect the reliability of data submitted to FDA, or to disclose those financial interests and arrangements to the agency and identify steps taken to minimize the potential for bias (21 CFR § 54.4(a)).  If the applicant does not include certification and/or disclosure, or does not certify that it was unable to obtain the information despite exercising due diligence, the agency may refuse to file the application (21 CFR § 54.4(c)).

## III.    FINANCIAL DISCLOSURE REQUIREMENTS

Under the applicable regulations,[3] an applicant is required to submit to FDA a list of all clinical investigators who conducted covered clinical studies and to identify those who are full-time or part-time employees of the sponsor of each covered study (21 CFR § 54.4).  For each clinical investigator who was not a full-time or part-time employee of a sponsor of the clinical study, the applicant must provide either a certification, using FORM FDA 3454, that none of the financial interests or arrangements described in 21 CFR § 54.4(a)(3) (see Section III.B. below) exists, or completely and accurately disclose, using FORM FDA 3455, the nature of those interests and arrangements to the agency and describe any steps taken to minimize the potential for bias resulting from those interests and arrangements (21 CFR § 54.4(a)).  If the applicant acts with due diligence to obtain the required information but is unable to do so, the applicant may certify that it acted with due diligence but was unable to obtain the information and include the reason the information could not be obtained (21 CFR § 54.4).

FDA generally expects that applicants will be able to provide this information.  Under 21 CFR §§ 312.53(c), 812.20(b)(5) and 812.43(c), a sponsor is required to obtain clinical investigator financial information before allowing the clinical investigator to participate in a covered clinical study.  Under 21 CFR § 54.4(b), each clinical investigator who is not a full-time or part-time employee of the sponsor of the covered clinical study is required to provide the sponsor with sufficient accurate financial information to allow for complete disclosure or certification and to update this information if any relevant changes occur during the study and for one year following its completion.

### A.    Definitions

**Clinical Investigator** – For purposes of part 54, "clinical investigator" means a "listed or identified investigator or subinvestigator who is directly involved in the treatment or evaluation of research subjects," including the spouse and each dependent child of the investigator or subinvestigator.  (See 21 CFR § 54.2(d).)  See Section IV.D, Clinical Investigator, for additional information.  Clinical investigators are included in the definition even if they did not participate for the entire length of the study.  If a clinical investigator did not participate in the entire study,

---

[3] 21 CFR parts 54, 312, 314, 320, 330, 601, 807, 812, 814, and 860

Exhibit 2
Page 48

information collected should be for the period of time he or she participated in the study and for one year following the end of his or her participation.

**Covered clinical study** – The part 54 regulations define "covered clinical study" to mean "any study of a drug or device in humans submitted in a marketing application or reclassification petition subject to this part that the applicant or FDA relies on to establish that the product is effective (including studies that show equivalence to an effective product) or any study in which a single investigator makes a significant contribution to the demonstration of safety.  This would, in general, not include phase 1 tolerance studies or pharmacokinetic studies, most clinical pharmacology studies (unless they are critical to an efficacy determination), large open safety studies conducted at multiple sites, treatment protocols and parallel track protocols."  (See 21 CFR § 54.2(e).)  This definition includes clinical studies submitted in support of new drug applications (NDAs) submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act (FD&C Act), abbreviated new drug applications (ANDAs) under section 505(j) of the FD&C Act, premarket notification submissions under section 510(k) of the FD&C Act, reclassification petitions under section 513 of the FD&C Act, premarket approval applications (PMAs) under section 515 of the FD&C Act, and biologics licensing applications (BLAs) submitted under section 351 of the Public Health Services Act (PHS Act), as well as studies submitted in support of amendments or supplements to any such applications.  (See 21 CFR §§ 54.3 and 54.4(a).)  Covered clinical studies would generally not include expanded access under section 561 of the FD&C Act.  If an applicant is unsure of whether a particular study is included in this definition, it may consult with FDA as to which clinical studies constitute "covered clinical studies" for purposes of complying with financial disclosure requirements.  (21 CFR § 54.2(e).)  See Section IV.G, Covered Clinical Study, for additional information.

**Applicant** – "Applicant" means the party who submits a marketing application to FDA for approval of a drug, device or biologic product or who submits a reclassification petition.  The applicant is responsible for submitting the required certification and disclosure statements.  (See 21 CFR § 54.2(g).)  Note that for purposes of financial disclosure the term "applicant" includes "submitter" and the term "application" includes "510(k) submission."  See Section IV.F, Applicant, for additional information.

**Sponsor of the covered clinical study** – For purposes of part 54, "sponsor of the covered clinical study" means "a party supporting a particular study at the time it was carried out."  (See 21 CFR § 54.2(h).)  A covered clinical study may have more than one sponsor for whom financial information will need to be collected.  For example, if one party designed and conducted the covered clinical study, a second party provided funding, and a third party provided the test product, there would be three sponsors of the covered clinical study.  However, if the third party in this example was reimbursed for the test product, it would not be considered a sponsor of the covered clinical study and the study would be considered to have two sponsors.  Note also that the definition of "sponsor" for purposes of part 54 is different than the definition of "sponsor" for purposes of investigational new drug applications (INDs) and investigational device exemptions applications (IDEs) (see 21 CFR §§ 312.3(b) and 812.3(n)).  See Section IV.E, Sponsor, for additional information.

Exhibit 2
Page 49

B.      **Disclosable Financial Interests and Arrangements**

The financial interests, arrangements, and payments that must be disclosed (see 21 CFR § 54.4(a)(3), referred to herein as "disclosable financial interests and arrangements") are described below.[4]  Note that the dollar amounts that trigger reporting are the combined financial interests of the investigator, spouse, and dependent children.

1.  Any compensation made to the investigator by any sponsor of the covered clinical study in which the value of compensation could be affected by study outcome.

2.  A proprietary interest in the tested product including, but not limited to, a patent, trademark, copyright or licensing agreement.

3.  Any equity interest in any sponsor of the covered clinical study, i.e., any ownership interest, stock options, or other financial interest whose value cannot be readily determined through reference to public prices.  The requirement applies to interests held during the time the clinical investigator is carrying out the study and for one year following completion of the study.

4.  Any equity interest in any sponsor of the covered study if the sponsor is a publicly held company and the interest exceeds $50,000 in value.  The requirement applies to interests held during the time the clinical investigator is carrying out the study and for one year following completion of the study.

5.  Significant payments of other sorts (SPOOS) are payments that have a cumulative monetary value of $25,000 or more and are made by any sponsor of a covered study to the investigator or the investigator's institution during the time the clinical investigator is carrying out the study and for one year following completion of the study.  This would include payments that support activities of the investigator (e.g., a grant to the investigator or to the institution to fund the investigator's ongoing research or compensation in the form of equipment), exclusive of the costs of conducting the clinical study or other clinical studies, or to provide other reimbursements such as retainers for ongoing consultation or honoraria.  See Section IV, Questions C.4, C.5, and C.6 for additional information on SPOOS.

C.      **Agency Actions**

The agency may refuse to file a marketing application that does not contain the financial information required by 21 CFR part 54 or a certification by the applicant that the applicant has

---

[4] These are the requirements for studies begun on or after the effective date of the part 54 regulations, February 2, 1999.  For older studies, the disclosure requirements vary based on the study's status as of the effective date of the regulation.  For studies that were completed prior to February 2, 1999, disclosure of financial interests and arrangements described in paragraphs 1 through 3 is required.  For studies ongoing as of February 2, 1999, disclosure of financial interests and arrangements described in paragraphs 1 through 4 is required as well as payments as described in paragraph 5 that were made on or after February 2, 1999.  (See *Federal Register*, volume 63, December 31, 1998, page 72172-3.)

Exhibit 2
Page 50

acted with due diligence to obtain the information but was unable to do so stating a sufficient reason.  (21 CFR § 54.4(c).)

If FDA determines that the financial interests or arrangements of any clinical investigator raise a serious question about the integrity of the data, FDA will take any action it deems necessary to ensure the reliability of the data (21 CFR § 54.5(c)) including:

1. Initiating agency audits of the data derived from the clinical investigator in question;

2. Requesting that the applicant submit further analyses of data, e.g., to evaluate the effect of the clinical investigator's data on the overall study outcome;

3. Requesting that the applicant conduct additional independent studies to confirm the results of the questioned study; and

4. Refusing to treat the covered clinical study as providing data that can be the basis for an agency action.

## IV.    QUESTIONS AND ANSWERS

### A.    GENERAL

**A.1.  Q:  Why did FDA develop the financial disclosure regulations?**

**A:**  In June 1991, the Inspector General of the Department of Health and Human Services submitted a management advisory report[5] to FDA stating that FDA's failure to have a mechanism for collecting information on "financial conflicts of interest" of clinical investigators who study products that undergo FDA review could constitute a material weakness under the Federal Managers' Financial Integrity Act.  As stated in the preamble to the final rule, although FDA determined that a material weakness did not exist, the agency did conclude that there was a need to address this issue through regulation.[6] During the rulemaking process, FDA also learned about potentially problematic financial interests and arrangements through published newspaper articles, Congressional inquiries, and public testimony and comments.  Based on the information gathered, FDA determined that it was appropriate to require the submission of certain financial information with marketing applications that, in part, rely on clinical data.

---

[5] Office of the Inspector General (OIG), Department of Health and Human Services (DHHS), *Management Advisory Report – Financial Involvement of Clinical Investigators with Sponsors of Research Leading to Food and Drug Administration Marketing Approval*, June 1991, OI-HQ-91-003.
[6] The final rule was published in the *Federal Register*, Vol. 63, February 2, 1998, pages 5233-5254.  The referenced statement appears on page 5235.

Exhibit 2
Page 51

**A.2.  Q:  What is the purpose of FDA's review of clinical investigator financial disclosure information and how can sponsors minimize bias?**

**A:**  FDA's review of clinical investigator financial disclosure information alerts FDA staff to financial interests and arrangements that could lead to bias in covered clinical studies.  The financial disclosure process also provides FDA with information regarding whether and to what extent the sponsors have taken steps to minimize the risk of bias.  An important means of minimizing the potential for bias resulting from such financial interests and arrangements is through proper study design (see 21 CFR § 54.5(b)).  For example, using randomization and blinding helps to minimize the potential for bias in assigning subjects to receive the test article or placebo and in assessing study outcomes and analyzing results.  Similarly, having someone with no financial interests or arrangements evaluate study endpoints, especially in an unblinded study, can help minimize potential bias in assessing therapy outcomes.

FDA staff consider the financial disclosure information and the methods the sponsor used to minimize bias during the review of marketing applications to assess the reliability of the clinical data (see 21 CFR § 54.1).  Additionally, because sponsors of studies conducted under INDs and IDEs are required to collect financial information from clinical investigators prior to study initiation,[7] sponsors can work with FDA to minimize any potential bias.  FDA strongly encourages sponsors of studies not conducted under an IND/IDE to collect financial information prior to study initiation for the same reasons.

**B.      FORMS AND INFORMATION TO BE SUBMITTED**

**B.1.  Q:  What financial disclosure information is to be included in a marketing application?**

**A:**  The application must contain a list of all clinical investigators who conducted each covered clinical study (21 CFR § 54.4).  For purposes of this list, investigators and subinvestigators who meet the definition of "clinical investigator" in 21 CFR § 54.2(d) must be included.  Note that the term clinical investigator includes the spouse and each dependent child of a clinical investigator (21 CFR § 54.2(d)).  This list must also identify those clinical investigators who are full or part-time employees of the sponsor of the covered study (21 CFR § 54.4).  If a spouse or dependent child is an employee of a sponsor, that clinical investigator should be identified as an employee for purposes of financial disclosure.  For each clinical investigator who is not identified as an employee of the sponsor, <u>one</u> of the following must be submitted (21 CFR § 54.4(a)):

---

[7] 21 CFR §§ 312.53(c)(4), 812.20(b)(5), and 812.43(c)

Exhibit 2
Page 52

1. FORM FDA 3455, Disclosure Statement,[8] for each clinical investigator who, or whose spouse or dependent child, had disclosable financial interests in and/or arrangements with any sponsor of the covered clinical study.  The form should include an attachment with detailed information about those financial interests and arrangements (for example, the nature of the contingent payment or the equity holdings of the investigator, or the investigator's spouse or dependent child, that exceeded the threshold) and a description of the steps taken to minimize the potential for bias resulting from the disclosed financial interests and arrangements (21 CFR § 54.4(a)(3)).  See Section IV.C for additional information;

2. FORM FDA 3454, Certification, for any clinical investigator who has no disclosable financial interests in or arrangements with any sponsor of the covered clinical study (21 CFR § 54.4(a)(1)); the applicant may append a list of investigator names to a single FORM FDA 3454 for those investigators with no disclosable financial interests or arrangements; or

3. If the applicant was unable to obtain some or all of the financial information needed to disclose or certify for a clinical investigator, the applicant must identify any disclosable financial interests or arrangements of which it is aware, certify that it acted with due diligence to obtain the information (listed as option 3 on FORM FDA 3454), and include an attachment identifying the reason why any missing information could not be obtained (21 CFR § 54.4).  FDA expects that in the vast majority of cases, applicants will be able to provide a complete financial Certification or Disclosure Statement and that the need to certify that they acted with due diligence will be rare.  See Question B.7 and Question F.2 for additional information on due diligence.

FDA encourages applicants to submit financial disclosure information in a format that will ensure all required information is included.  For example, applicants should provide the total number of investigators in the study and a table indicating, for each clinical investigator listed who is not identified as an employee, whether they are providing a Certification (FORM FDA 3454), a Disclosure Statement (FORM FDA 3455) or certification that they acted with due diligence but were unable to obtain the information (option 3 on FORM FDA 3454).  Applicants should also ensure that all required attachments, as identified above, are included.  Applicants with questions about acceptable formats for submitting the financial disclosure information should contact the Center representatives identified in Question K.1.

---

[8] As an alternative to a separate FORM FDA 3455 for each clinical investigator with information to disclose, applicants may submit a single FORM FDA 3455, with attachments clearly identifying all clinical investigators with information to disclose and, for each investigator, identifying the study, the specific details of their financial interests and arrangements and the steps taken to minimize the potential for bias.  Applicants with questions about alternative formats should contact the Center representatives identified in Question K.1.

Exhibit 2
Page 53

**B.2.   Q:  May an applicant rely upon the policies and procedures of the clinical investigator's institution for disclosure, review and management of financial conflicts of interest of their employees (including spouse and dependent children)?**

**A:**  Each applicant is responsible for disclosing or certifying as required by 21 CFR part 54.  Compliance with institutional policies or procedures by an investigator is not a substitute for compliance with part 54.

Although a clinical investigator's institution may take steps to manage a clinical investigator's financial interests and arrangements, in order to minimize study bias, FDA must make its own evaluation of the clinical investigator's financial interests and arrangements (21 CFR § 54.5).  When a clinical investigator has disclosable financial interests and arrangements, the disclosure statement submitted to FDA is required to include a description of any steps taken to minimize the potential for bias resulting from any of the disclosed financial interests and arrangements (21 CFR 54.4(a)(3)(v)).  A description of the steps taken by the institution to minimize bias should be included with the disclosure statement, if pertinent.  See Section IV, Question D.7 for additional information.

**B.3.   Q:  Where in a marketing application for a drug or a biological product should an applicant include the certification or disclosure forms and attachments?**

**A:**  Applicants using the format described in FORM FDA 356h (Application to Market a New Drug, Biologic, or an Antibiotic Drug for Human Use) should include the clinical investigator list and financial certification and/or disclosure forms and attachments as part of item 19 (Financial Information) of the application.[9]  Applicants using the Common Technical Document (CTD) format should include this information in Module 1.3.4.[10]

**B.4.   Q:  Where should the information be included in a device marketing application?**

**A:**  Applicants should submit the clinical investigator list and financial certification/disclosure forms and attachments according to the format outlined in the appropriate submission guidance.[11]

---

[9] Application to Market a New Drug, Biologic, or an Antibiotic Drug for Human Use, available at http://www.fda.gov/downloads/AboutFDA/ReportsManualsForms/Forms/UCM082348.pdf.

[10] The eCTD Backbone Files Specification for Module 1, available at http://www.fda.gov/downloads/Drugs/DevelopmentApprovalProcess/FormsSubmissionRequirements/ElectronicSubmissions/UCM163552.pdf.

[11] For premarket notification submissions, see "Guidance for Industry and FDA Staff: Format for Traditional and Abbreviated 510(k)s," available at www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm084365.htm.
For premarket approval applications, see "Guidance for Industry and FDA Staff: Premarket Approval Application Filing Review," available at http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm089430.htm.

Exhibit 2
Page 54

**B.5.   Q:  How should the financial information be submitted?**

**A:**  The financial information is required to be submitted using FORMS FDA 3454 and/or 3455 (21 CFR § 54.4(a)), which are available on the Web at the following Internet address:  http://www.fda.gov/AboutFDA/ReportsManualsForms/Forms/default.htm (Forms are listed in numerical order).

**B.6.   Q:  Who, specifically, is responsible for signing the financial certification/disclosure forms?**

**A:**  The forms are to be signed and dated by the chief financial officer or other responsible corporate official or representative of the applicant.  FDA recommends that the "other responsible corporate official or representative" be a senior official who has the authority to ensure the information is collected and reported accurately.  Depending on company structure, such an individual could be the person in charge of regulatory or clinical affairs.

**B.7.   Q:  What does FDA mean by the term "due diligence"?**

**A:**  "Due diligence" is a measure of activity expected from a reasonable and prudent person under a particular circumstance, in this case, collecting information about financial interests or arrangements.  FDA expects that applicants will typically be able to obtain the required information because investigators are required to provide financial disclosure information to sponsors before participating in a clinical study.  (21 CFR §§ 54.4, 312.53(c), 812.43(c) and 812.20(b)(5).)  In the rare circumstance where applicants are unable to obtain required financial information, applicants must certify that they acted with due diligence and explain why the information was not obtainable (21 CFR § 54.4).

If all of the information required to make a complete certification or disclosure is not available from a sponsor, applicants should make appropriate efforts to obtain the information by other means.  That may mean contacting an individual investigator or subinvestigator directly.  If an investigator's whereabouts are unknown, for example because the investigator left a study prior to its completion or prior to one year following completion of the study, FDA recommends that sponsors and/or applicants try to locate the clinical investigator.  Sponsors and applicants should exercise reasonable judgment regarding the appropriate amount of effort to expend when attempting to contact investigators, which may include consideration of the role of the investigator in the study and the importance of the investigator's data contribution.

In most cases, FDA suggests that more than one attempt at contacting an investigator would be appropriate and that more than one method of contact be attempted.  FDA also recommends that each attempt to contact the investigator be documented, for example, by maintaining copies of e-mails and letters and documenting telephone calls and conversation by written memoranda.  FDA also suggests that sponsors and applicants consider using a method of contacting investigators that allows verification of receipt, such as certified mail or reliable courier service that provides notice of recipient's receipt

Exhibit 2
Page 55

of a letter.  When such methods are used, copies of the delivery notice or undeliverable
notice should be maintained.

If an investigator is no longer at the institution where the study was conducted, FDA
recommends that the sponsor or applicant make a reasonable attempt to locate the
investigator, for example, by requesting contact information from the institution where
the study was conducted or the institution with which the investigator was affiliated,
contacting professional associations the investigator may have been affiliated with,
and/or conducting Internet searches.

If a clinical investigator cannot be located or information for some other reason cannot be
obtained from the investigator, the sponsor should have access to certain disclosable
financial information and arrangements, for example, payments made specifically to the
investigator or information related to product sales that may generate royalties due to the
investigator.  On request from an applicant, sponsors should check their records for such
information and, subject to any privacy laws (noting that other countries' laws may differ
from United States law), the sponsor should then provide disclosable information to the
applicant.  In addition, and as necessary, efforts should be made to obtain disclosable
financial information from other reasonably available, reliable, public sources of
information.  For example, information on proprietary interests in the test product, such
as patents and trademarks, should be available from publicly available sources.[12]
Another possible source of information is the clinical investigator's institution, which
may have collected financial information and, if consistent with their policies, may
release this information to the applicant upon request.  Appropriate certifications,
disclosures, and/or explanations should be provided to FDA on the basis of information
obtained.  See Question F.2 for additional information.

An applicant must exercise due diligence whether a covered study is conducted at foreign
or domestic sites.  The agency expects that a reasonable and prudent applicant will take
affirmative steps at the first opportunity to see that the financial information required for
a complete certification or disclosure under part 54 is collected and maintained.  This is
not only to ensure that the applicant will be able to make a complete submission but also
to ensure that the study sponsor will take steps to protect the study against possible bias.
See Questions E.3, E.5, and F.3 for additional information.

### B.8.   Q:  Is clinical investigator financial disclosure information required in IND or IDE applications?

**A:**  No, IND/IDE sponsors are not required to submit information regarding clinical
investigator financial interests or arrangements in IND or IDE applications.  They are,
however, required to collect this information before a clinical investigator participates in
a clinical study (see 21 CFR §§ 312.53(c)(4), 812.20(b)(5), and 812.43(c)(5)), and

---

[12] Such sources include the Patent and Trademark Office website and, once available, the federal reporting website
proposed by the Centers for Medicare & Medicaid Services as required by Section 6002 of the Patient Protection
and Affordable Care Act.  See the final rule, "Transparency Reports and Reporting of Physician Ownership or
Investment Interests," *Federal Register*, Vol. 78, February 8, 2013, page 9458.

Exhibit 2
Page 56

clinical investigators are required to disclose financial information to sponsors (see 21 CFR §§ 312.64(d) and 812.110(d)).  The information need not be submitted to FDA until a marketing application is submitted containing the results of the covered clinical study (21 CFR § 54.4).

Study sponsors are encouraged to consult with FDA prior to and during clinical studies about the management of specific situations involving potential bias on the part of a clinical investigator.  During these consultations, FDA staff should focus on the protection of research subjects and the minimization of bias from all potential sources.

## C.  FINANCIAL INTERESTS AND ARRANGEMENTS SUBJECT TO DISCLOSURE

**C.1.  Q:  What information about a financial interest or arrangement should be disclosed to the agency?  For example, if an investigator owns more than $50,000 of stock in a publicly held company, can the applicant just disclose that there is an interest that exceeds the $50,000 threshold or is it necessary to disclose in written detail the interest or arrangement in question?**

**A:**  The applicant must make a complete and accurate disclosure (21 CFR § 54.4(a)(3)).  The specific details of the financial interest or arrangement, including its size and nature, should be disclosed as should any steps taken to minimize the potential for study bias resulting from the interest or arrangement.  In describing financial interests, for example, the applicant might list:  stock valued at $77,000, speaking fees of $7,500, consulting fees of $22,000, and a grant of $125,000 and include a discussion of the specific steps taken to minimize potential bias.  Sponsors should request that clinical investigators provide sufficient detail about their financial disclosure information to allow the appropriate disclosures to be made.

**C.2.  Q:  Should a clinical investigator report all fluctuations above and below the $50,000 level during the course of the investigation and one year after completion of the study?**

**A:** In light of the potential volatility of stock prices, FDA recognizes that the dollar value of an investigator's equity holding in a sponsoring company is likely to fluctuate during the course of a study.  Clinical investigators should report an equity interest when the investigator becomes aware that the holding has exceeded the threshold and the investigator should use judgment in updating and reporting on fluctuations in equity interests exceeding $50,000.  FDA does not expect the investigator to report when an equity interest fluctuates below that threshold.  See Question E.4 for additional information.

**C.3.  Q:  Are equity interests in mutual funds and 401(k)s reportable?**

**A:**  FDA expects that equity interests held in publicly traded mutual funds will not be reportable in the vast majority of cases.  If, however, an investigator would have control

Exhibit 2
Page 57

over buying or selling stocks in a mutual fund, equity interests held in such publicly traded mutual funds would be reportable.

If an investigator holds an equity interest in a sponsor over $50,000 in a 401(k) or equivalent account, and has control over whether to buy or sell the interest, the equity interest is reportable.

**C.4. Q:  How do significant payments of other sorts (SPOOS) relate to the variety of payments the sponsor might make to an individual or institution for various activities?**

**A:**  The term "significant payments of other sorts" was intended to capture substantial payments or other support that has a value of more than $25,000 provided to an investigator or institution that could create a sense of obligation to the sponsor.

These payments do not include payments for the cost of conducting the clinical study of the product under consideration or clinical studies of other products, under a contractual arrangement, but do include other payments made directly to the investigator or to an institution for direct support of the investigator.

"Significant payments of other sorts" would include, for example, payments, retainers and honoraria from a sponsor to a clinical investigator for activities such as participating on committees, providing consultation, or serving as a preceptor (21 CFR § 54.2(f)). Grants to fund ongoing research, including laboratory activities and equipment, and compensation in the form of actual equipment for the laboratory/clinic would also be considered significant payments of other sorts.  This means that if an investigator were given equipment or money to purchase equipment for use in the laboratory/clinic but not in relation to the conduct of the clinical study, payment would be considered a significant payment of other sorts (21 CFR § 54.4(a)(3)(ii)).  If, however, the investigator were provided with computer software or money to buy software needed for use in the clinical study, that payment would not need to be reported.

Payments made to the institution that are not made on behalf of the investigator and are not specifically targeted towards the investigator generally would not need to be reported. Under certain circumstances, however, a grant made to an institution would be considered targeted towards the investigator (and therefore considered reportable); for example, if the grant is worded in such a way that only the investigator could fulfill it.

Finally, payments that meet the criteria for significant payments of other sorts that are made to other researchers at the institution, who are not part of the covered study, do not need to be reported.

Exhibit 2
Page 58

**C.5.  Q:  Are payments made to investigators to cover travel expenses (such as
transportation, lodgings and meal expenses) reportable as significant payments of
other sorts (SPOOS)?**

A:  Generally, reasonable payments made to investigators to cover reimbursable expenses
such as transportation, lodgings and meals do not fall within the definition of SPOOS
and, therefore, would not need to be reported.  Payment for other expenses that are
generally considered outside of normal reimbursable expenditures and not expenses
necessary to conduct the study would be considered SPOOS.  Such payments would
include, for example, entertainment costs, travel costs associated with transporting and/or
providing lodgings and meals for family members, and other payments that exceed
reasonable expectations (for example, if an investigator was flown to a resort location for
an extra week of vacation).  These types of expenses are reportable and should be tracked
as SPOOS.  FDA understands that such payments may be limited or prohibited by
industry ethical codes.[13]  To the extent such payments are made, they would be SPOOS.

**C.6.  Q:  Is the dollar amount that triggers reporting of significant payments of other
sorts (SPOOS) cumulative over the course of the study or is it based on the amount
received on an annual basis?**

A:  The $25,000 threshold amount for reporting SPOOS is based on the cumulative
amount of SPOOS received by the clinical investigator (including payments made to the
spouse and dependent children) over the course of the study and for one year following
completion of the study.

**C.7.  Q:  Does FDA have expectations about how the financial information should be
collected?  Will FDA consider it acceptable practice for a company to use a
questionnaire to collect financial information from investigators rather than
constructing an internal system to collect and report this information?**

A:  FDA regulations do not prescribe a particular method for collecting financial
information from investigators.  Sponsors/applicants have the flexibility to collect the
information in the most efficient and least burdensome manner that will allow for
complete and accurate certifications and disclosures.  They may use questionnaires
completed by the clinical investigators and/or information already available to the
sponsor, as appropriate.  FDA does not require sponsors to establish elaborate systems to
collect and track financial information.

If sponsors intend to use a questionnaire to collect financial information from
investigators, FDA recommends that they develop forms suited to that purpose.  FORM
FDA 3455 was designed for applicants to use to report financial information they
collected from clinical investigators to FDA.  It does not include the background

---

[13] Examples of industry ethical codes would be the "Principles on Conduct of Clinical Trials and Communication of
Clinical Trials Results" from the Pharmaceutical Research and Manufacturers of America (PhRMA) and the "Code
of Ethics on Interactions with Health Care Professionals" from the Advanced Medical Technology Association
(AdvaMed).

Exhibit 2
Page 59

information needed for clinical investigators to be aware of the financial information to be provided.  For example, there is no statement that the reporting requirements apply to the spouse and dependent children as well as to the investigator; no information as to the dollar amounts triggering reporting of equity interests or SPOOS; and no statement that the investigator must report the details of the financial interests and arrangements, not just a statement, for example, of equity interest greater than $50,000.  In addition, when there is more than one sponsor for financial disclosure purposes, the investigator should be apprised that the dollar amounts triggering reporting apply separately to each sponsor.  This type of explanatory information should be provided to the clinical investigators to ensure that the financial disclosure information collected is as accurate and complete as possible.  Please see the Appendix for considerations for collecting financial disclosure information from clinical investigators.

**C.8.  Q:  The regulation requires that investigators provide information on financial interests and arrangements during the course of the study and for one year after completion of the study (see 21 CFR § 54.4(b)).  What does "during the course of the study" mean?  What does "completion of the study" mean?**

A:  "During the course of the study" refers to the time from the date the clinical investigator entered into an agreement with the sponsor to conduct the study until the completion of the study.  For the purposes of financial disclosure under part 54, completion of the study means that all study subjects have been enrolled and follow-up of primary endpoint data on all subjects has been completed in accordance with the clinical protocol.  Many studies have more than one phase (e.g., a study could have a short-term endpoint and a longer term follow-up phase).  "Completion of the study" here refers to the part of the study that is being submitted in the application.  If there were a subsequent application based on longer term data, completion of the study would be defined using completion of follow-up for the longer term data.  An applicant is not required to submit updated financial information to FDA after submission of the application, but applicants must retain complete records (21 CFR § 54.6).  Where there is more than one study site, the sponsor may consider completion of the study to occur when the last study site is complete, or may consider each study site individually as it is completed.

**C.9.  Q:  What if the sponsor changes during the course of the study or within one year of completion of the study, for example, through purchase or merger?**

A:  Agency regulations require that an IND/IDE sponsor collect financial information from all clinical investigators and that clinical investigators promptly update this information if any relevant changes occur during the course of the investigation and for one year following completion of the study (21 CFR §§ 54.4, 312.53(c)(4), 312.64(d), 812.43(c)(5) and 812.110(d)).  Therefore, if the study sponsor changes during the course of the study, the clinical investigators will need to update their financial disclosure information relevant to the new sponsor.  The new sponsor is responsible for collecting this information, and to ensure that the new sponsor has complete financial disclosure information, the new sponsor should seek this information from the original sponsor, and the agency encourages the original sponsor to share their records with the new sponsor.

Exhibit 2
Page 60

With respect to covered clinical studies conducted outside the United States not pursuant to an IND or IDE (such as studies submitted pursuant to § 312.120 or § 814.15), the agency expects applicants to take affirmative action, at the earliest opportunity, to see that this information is collected and available to make a complete disclosure and/or certification under part 54.

## D.    CLINICAL INVESTIGATOR

### D.1.  Q:  Who is included in the definition of "clinical investigator"?

**A:**  Under part 54, "clinical investigator means only a listed or identified investigator or subinvestigator who is directly involved in the treatment or evaluation of research subjects" (21 CFR § 54.2(d)).  This definition is intended to identify the individuals for whom reporting under this regulation is required.  Generally, these individuals are considered to be the investigators and subinvestigators taking responsibility for the study at a given study site. The definition also includes the spouse and each dependent child of such an investigator or subinvestigator.

It should be noted that hospital staff, including nurses, residents, fellows, and office staff who provide ancillary or intermittent care but who do not make direct and significant contribution to the data are not meant to be included under the definition of clinical investigator.  Additionally, individuals who only collect specimens or perform routine tests (such as blood pressure, EKG, x-ray) are not meant to be included under the definition of clinical investigator for purposes of financial disclosure.

### D.2.  Q:  How does the definition of "clinical investigator" in the financial disclosure regulation (21 CFR part 54) relate to the definition in the IND regulations (21 CFR part 312)?

**A:**  For drugs and biological products, an investigator under 21 CFR part 312 is defined as "an individual who actually conducts a clinical investigation (i.e., under whose immediate direction the drug is administered or dispensed to a subject).  In the event an investigation is conducted by a team of individuals, the investigator is the responsible leader of the team.  'Subinvestigator' includes any other individual member of that team."  (21 CFR § 312.3(b).)

For purposes of the financial disclosure regulation, a clinical investigator is an investigator or subinvestigator who is directly involved in the treatment or evaluation of research subjects (21 CFR § 54.2(d)).  Therefore, the term clinical investigator in this context would generally include anyone who fits any of the following criteria:  signs the FORM FDA 1572 (Statement of Investigator), is identified as an investigator in initial submissions or protocol amendments under an IND, or is identified as an investigator in the marketing application.  This could include individuals identified as subinvestigators

Exhibit 2
Page 61

on a FORM FDA 1572.[14]  For studies not conducted under an IND, the sponsor will need to identify the investigators and subinvestigators they consider covered by the regulation and provide FORMS FDA 3454 and/or 3455 as appropriate.  FDA expects that there will be at least one such person at each clinical site.  If other individuals are responsible for a study at a site, those persons should also be included as clinical investigators.

**D.3.  Q:  How does the definition of "clinical investigator" in the financial disclosure regulation (21 CFR part 54) relate to the definition in the medical device regulations (21 CFR part 812)?**

**A:**  For medical devices, investigator is defined under 21 CFR part 812 as an individual under whose immediate direction the subject is treated and the investigational device is administered, including follow-up evaluations and treatments.  Where an investigation is conducted by a team of individuals, the investigator is the responsible leader of the team. (21 CFR § 812.3(i).)

In general, investigators and subinvestigators sign "investigator agreements" in accordance with 21 CFR § 812.43(c), and it is these individuals whose financial interests and arrangements should be reported as they would fall under the definition at 21 CFR § 54.2(d).  For studies not conducted under an FDA-approved IDE (that is, a non-significant risk IDE or an exempt study), the sponsor would need to identify the investigators and subinvestigators they consider covered by the regulation and provide FORMS FDA 3454 and/or 3455, as appropriate.  We expect that there will be at least one such person at each clinical site.

**D.4.  Q:  Is it necessary to collect financial information on spouses and dependent children of clinical investigators?**

**A:**  Yes.  The definition of clinical investigator in 21 CFR part 54 includes the spouse and dependent children of the investigators and subinvestigators who are required to report. Therefore, the financial interests and arrangements of the spouse and each dependent child of each investigator and subinvestigator are to be included in the disclosure (21 CFR § 54.2(d)).  The dollar amount that triggers reporting is the total of the financial interests of the investigator, spouse, and dependent children (21 CFR § 54.2(d)).  If a spouse or dependent child is an employee of the sponsor, the clinical investigator should be identified as an employee of the sponsor and no further disclosure is required.  (See 21 CFR § 54.4.)

**D.5.  Q:  Who is considered a "dependent child"?**

**A:**  For purposes of clinical investigator financial disclosure under part 54, a dependent child is the investigator's child (whether by blood or adoption), stepchild or foster child who is unmarried, and for whom the investigator provides more than one-half of the

---

[14] For guidance on who should be listed as an investigator or subinvestigator on Form FDA 1572, please see FDA's Information Sheet Guidance, "Frequently Asked Questions – Statement of Investigator (Form FDA 1572)" available at http://www.fda.gov/downloads/RegulatoryInformation/Guidances/UCM214282.pdf.

Exhibit 2
Page 62

child's support.  This would include a child who, at any time during the course of the study and for one year following completion of the study, is under the age of 19, under the age of 24 if a full-time student, or who is permanently and totally disabled.  Such a child would generally have the same principal residence as the investigator.

**D.6.  Q:  What obligations does the clinical investigator have under the financial disclosure regulations?**

**A:**  Clinical investigators are to provide sponsors sufficient accurate financial information to allow the applicant to submit complete and accurate certification or disclosure statements (see 21 CFR §§ 54.4, 312.53(c)(4), 312.64(d), 812.43(c)(5) and 812.110(d)).  Clinical investigators must provide this information to sponsors and also promptly update the information if any relevant changes occur during the course of the investigation and for one year following the completion of the study (see 21 CFR §§ 54.4(b), 312.53(c)(4), 312.64(d), 812.43(c)(5) and 812.110(d)).  See also Question C.2.

**D.7.  Q:  May a clinical investigator rely on the information he/she provided to comply with his/her institution's policies and procedures pertaining to financial conflicts of interest to comply with the investigator obligations for financial disclosure under FDA's regulations?**

**A:**  The financial information a clinical investigator provides to his/her institution is based on the institution's requirements, which may not be sufficient to meet FDA's regulations.  FDA's regulations require the clinical investigator to provide sufficient and accurate financial information to the sponsor to allow the sponsor to submit complete and accurate certification or disclosure statements under FDA's clinical investigator financial disclosure regulations (21 CFR § 54.4(b)).  However, if an investigator determines that the financial information he/she provided to his/her institution adequately fulfills the disclosure requirements in FDA's regulations, a clinical investigator could provide the same information to the sponsor.  The clinical investigator would still need to commit to promptly updating the financial information if any relevant changes occur during the course of the study and for one year following completion of the study (21 CFR § 54.4(b)).

**E.      SPONSOR**

**E.1.  Q:  How does the definition of "sponsor" in the financial disclosure regulation (21 CFR part 54) relate to the definition in the IND/IDE regulations (21 CFR parts 312 and 812)?**

**A:**  In 21 CFR part 54, the term "sponsor of the covered clinical study" means "the party supporting a particular study at the time it was carried out" (21 CFR § 54.2(h)).  FDA interprets "support" to include those who provide material support, for example, monetary support or the test product under study.  (See Question E.9 for further explanation of "material support.")  This differs from the meaning of "sponsor" in other FDA regulations (such as 21 CFR parts 312 and 812), where the sponsor may be the

Exhibit 2
Page 63

person who initiates or takes responsibility for a clinical investigation (21 CFR §§ 312.3(b) and 812.3(n)).  While the definition of sponsor under part 54 usually would include the sponsor of an IND/IDE (as defined in 21 CFR parts 312 and 812), it also includes any other individuals who provide material support for the study.  Therefore, a covered clinical study may have more than one sponsor for financial disclosure purposes.  When there is more than one sponsor, FDA interprets the regulation to mean that the dollar amounts triggering reporting apply separately to each sponsor.

**E.2.  Q:  What obligations do IND and IDE sponsors have regarding information collection prior to study start?**

**A:**  The IND and IDE regulations provide that, before permitting an investigator to begin participation in an investigation, the IND/IDE sponsor (that is, the sponsor as defined in 21 CFR parts 312 and 812) must obtain sufficient and accurate financial information that will allow an applicant to submit complete and accurate certification or disclosure statements as required under 21 CFR part 54 (21 CFR §§ 312.53 and 812.43).  In order to fulfill these requirements and ensure complete disclosure, the IND/IDE sponsor should identify all "sponsors of the covered clinical study" (as defined in 21 CFR § 54.2(h)) for investigators because the identity of all parties providing support may not be known to investigators.

The sponsor is also required to obtain the investigator's commitment to promptly update this information if any relevant changes occur during the course of the investigation and for one year following the completion of the study (21 CFR §§ 312.53 and 812.43).  By collecting the information prior to the study start, the sponsor will be aware of any potential problems, can consult with the agency early on, and can take steps to minimize any possibility for bias.

**E.3.  Q:  Why is the IND/IDE sponsor responsible for obtaining financial information from investigators?**

**A:**  Although reporting to the FDA is the responsibility of the applicant, the IND/IDE sponsor is required to collect the financial information before permitting an investigator to participate in a clinical study (21 CFR §§ 312.53, 812.20(b)(5), and 812.43).  The purpose of this requirement is twofold:

1.  to alert the IND/IDE sponsor of the study of any potentially problematic financial interests or arrangements as early in the product development process as possible in order to minimize the potential for study bias, and

2.  to facilitate the accurate collection of financial information that may not be submitted until several years later.

The IND/IDE sponsor, who is in contact with the investigator, is best placed to inquire as to the financial interests and arrangements of investigators, and this obligation applies to any IND/IDE sponsor (e.g., commercial, government, or contract research organization

Exhibit 2
Page 64

(CRO)).  The IND/IDE sponsor is required to maintain complete and accurate records showing any financial interest in, or arrangement with, a sponsor of the covered study, as described in 21 CFR § 54.4(a)(3)(i-iv) (21 CFR §§ 312.57(b) and 812.140(b)(3)).  The IND/IDE sponsor is also best situated to ensure that required financial information is collected and made available to the applicant company, so that the information can be included in the marketing application.  (Refer to 21 CFR §§ 54.4, 312.53, 312.57(b), 812.43, and 812.140(b)(3).)

IND/IDE sponsors conducting covered clinical studies outside the United States should note that the part 54 regulations do not distinguish between foreign and domestic sites.  See Question F.3 for additional information.

### E.4.  Q:  Is the IND/IDE sponsor responsible for obtaining 1-year follow-up financial information from clinical investigators?

**A:**  As noted in response to Question E.2 above, the IND/IDE sponsor is required to obtain financial information from clinical investigators before permitting the investigators to begin participation in an investigation and to obtain the investigator's commitment to promptly update this information if any relevant changes occur during the course of the study and for one year following the completion of the study (21 CFR §§ 312.52 and 812.43).  The regulations do not specifically require the IND/IDE sponsor to obtain information from clinical investigators one year following completion of the study.  The regulations, however, do require IND/IDE sponsors to maintain complete and accurate records concerning all financial interests and arrangements of clinical investigators subject to part 54 (see 21 CFR §§ 312.57(b) and 812.140(b)(3)) and to secure investigator compliance with the regulations (see 21 CFR §§ 312.56(b) and 812.46(a)).  Therefore, an IND/IDE sponsor should take steps to ensure clinical investigator compliance, such as reminding the clinical investigators of the requirement to promptly update their financial information when any relevant changes occur during the study and for one year following completion.

### E.5.  Q:  What if the IND/IDE sponsor is not the party who will be submitting a marketing application?

**A:**  In many cases, the IND/IDE sponsor, the part 54 sponsor, and the applicant will be the same party.  However, there may be times when they are not.  For example, consider the case when an academic institution serves as the IND/IDE sponsor and a drug company serves as the part 54 sponsor by providing funding or the investigational drug for the study.  When a marketing application is submitted, the drug company is likely to be the applicant.  If, however, the drug company was sold to another company, the applicant may be neither the IND/IDE sponsor nor a part 54 sponsor.

It should be noted, however, that even if the IND/IDE sponsor will not be submitting the marketing application, the IND/IDE sponsor is still responsible for collecting financial information from the clinical investigators.  The responsibility for reporting financial information to FDA falls upon the applicant; that is, part 54 requires the applicant to

Exhibit 2
Page 65

submit financial information when the marketing application is submitted to FDA (21 CFR § 54.4(a)).

As stated above and in Question E.3, an IND/IDE sponsor is responsible for collecting financial information from both foreign and domestic clinical investigators.  If a sponsor did not collect this information, for example, because the sponsor conducted a foreign study that was not conducted under an IND/IDE and was not originally intended for submission to the FDA, the applicant is expected to contact the sponsor and/or clinical investigators to retrospectively obtain the financial disclosure information.  See Questions F.2 and F.3 for additional information.

**E.6.  Q:  If a contract research organization (CRO) is conducting a covered clinical study on behalf of another company, should the CRO collect the financial information from investigators?  Is it necessary to collect financial information from investigators who have financial interests in or arrangements with CROs?**

**A:**  If a CRO meets the definition of an IND/IDE sponsor or has contracted to collect financial information from clinical investigators on behalf of a sponsor, the CRO must collect financial information on clinical investigators' interests in any sponsors of the covered clinical study.  See 21 CFR § 312.52.  To satisfy the requirements in part 54, if the CRO provides material support for a covered study, financial information on clinical investigators' financial interests in and arrangements with the CRO is to be collected.  If another entity provided material support for the study, and the CRO was responsible for collecting the information, then the CRO also would collect financial information relative to that entity.

**E.7.  Q:  Suppose a public or academic institution conducts a covered clinical study without any support from a commercial sponsor, but the study is later used by an applicant to support its marketing application.  In that case, who is the "sponsor" of the study and what information should the applicant submit?**

**A:**  In this case, the part 54 sponsor of the study is the public or academic institution.  Because such institutions are often not commercial entities, there may not be relevant equity interests to report.  However, if the clinical investigator is not a full-time or part-time employee of the public or academic institution, the clinical investigator would need to report any relevant interests under 21 CFR § 54.4, such as any proprietary interest in the tested product, including but not limited to a patent, trademark, copyright or licensing agreement, and reportable financial arrangements with the institution, such as compensation affected by the outcome of studies or significant payments of other sorts.  The clinical investigator's financial interests in and arrangements with the applicant would not need to be reported because the company was not a sponsor of the covered clinical study.

If, however, the applicant provided material support for the study (for example, by providing the study product for free), then it would be considered a sponsor for financial disclosure purposes.  The academic institution conducting the study would need to collect

Exhibit 2
Page 66

information regarding the clinical investigators' financial interests and arrangements with the company.

**E.8.   Q:  If a subsidiary of a larger parent company is conducting a covered clinical study, are the financial interests and arrangements of the clinical investigators with only the subsidiary reported?  Or, are the financial interests of the investigators in the parent company to be reported also?**

**A:**  If the subsidiary company meets the definition of a sponsor of the covered study as defined in 21 CFR part 54, the IND/IDE sponsor is required to collect clinical investigators' financial information related to the subsidiary company.  If the parent company is a 21 CFR part 54 sponsor of the study, the IND/IDE sponsor also must collect financial information related to the parent company.  If there are multiple companies providing material support for a covered study, the IND/IDE sponsor is responsible for collecting financial information from clinical investigators related to all companies providing that support (21 CFR §§ 54.4, 312.53 and 812.43).  The company that will submit the marketing application is ultimately responsible for submitting to the agency the disclosable financial interests and arrangements of clinical investigators with respect to all the covered study's sponsors, as defined in 21 CFR part 54, at the time the marketing application is submitted (21 CFR § 54.4).

**E.9.   Q:  What is considered "material support" when identifying sponsors of the covered study?**

**A:**  Parties that provide "material support" are considered sponsors of the covered clinical study.  This would include providing direct funding or other monetary support such as through a grant, or providing services or materials.  If a party receives reimbursement for the services and/or materials it is providing, then that party generally would not be considered a sponsor.  For example, a CRO paid by a sponsor to perform services would not be considered a sponsor of the covered clinical study.  Materials could include the product under study as well as other products and/or equipment that are needed for the conduct of the study, such as ancillary medication and equipment used in testing required by the protocol.

## F.   APPLICANT

**F.1.   Q:  Do applicant companies need to collect information for a year after completion of the study?  Who is responsible for collecting/providing this information?**

**A:**  The investigator must promptly provide updated financial information to the sponsor whenever any relevant changes occur during the course of the investigation and for a one-year period following completion of the study (21 CFR §§ 54.4(b), 312.64(d) and 812.110(d)).  In addition, sponsors should record SPOOS that are paid to the investigator or the investigator's institution to support activities of the investigator that have a cumulative monetary value of more than $25,000, exclusive of the costs of conducting the covered clinical studies, both during the study and for one year following completion

Exhibit 2
Page 67

of the study (21 CFR §§ 54.2(f) and 54.4(a)(3)(ii)).  FDA specified the one-year time frame because anticipation of payments or expectation of employment may be as influential as payments already received.  Applicants need only report these financial interests and arrangements when the marketing application is submitted, but sponsors and applicants are responsible for keeping updated financial information from the investigators in company files (21 CFR §§ 54.6, 312.57 and 812.140).

**F.2.   Q:  Suppose an applicant has obtained the results of a clinical study conducted by another sponsor and that sponsor certifies it has no financial disclosure information in its files.  Is the applicant obligated to use due diligence in attempting to contact the clinical investigators directly to obtain the information?  Is the applicant obligated to provide any certification as to proprietary interests?  Is the sponsor obligated to provide the applicant with a statement as to outcome payments?**

**A:**  The applicant is required to provide financial disclosure information in a marketing application or certify that it acted with due diligence to obtain necessary information but was unable to do so and state the reason (21 CFR § 54.4).  (See Question B.7 for a further explanation of "due diligence.")  The sponsor should collect financial disclosure information from the clinical investigators, and, regardless of whether it collected all necessary financial information, should have information on any outcome payments (that is, payment that is dependent on the outcome of the study) and/or SPOOS made to the investigators.  The applicant should request this information from the sponsor.  The applicant should also make reasonable efforts to contact the clinical investigators to obtain disclosable financial information.  Information on proprietary interests, such as patents and trademarks, should also be available to the applicant from publicly available sources.

**F.3.   Q:  Do applicants need to provide information on investigators who participate in foreign studies?**

**A:**  The applicant has the same financial disclosure obligations (21 CFR part 54) with respect to studies conducted at foreign and domestic sites.  An applicant must include a certification or disclosure of information for each investigator participating in a foreign covered study, or, to the extent the applicant is unable to obtain sufficient information to certify or disclose, it must certify that it acted with due diligence but was unable to obtain the information and state the reason why (21 CFR § 54.4).

Sponsors of foreign covered studies should obtain financial disclosure information from clinical investigators prior to study initiation and provide this information to applicants.[15]

The agency believes that a prudent applicant would take affirmative action at its earliest opportunity to collect financial information relating to a foreign covered study or to ensure that the information is collected by the study sponsor.  Where possible, the agency strongly encourages the applicant to arrange for the collection of financial information

---

[15] If a foreign study is conducted pursuant to an IND or IDE, the sponsor has a legal obligation to comply with applicable rules, including the requirement to collect and maintain financial disclosure information.

Exhibit 2
Page 68

prior to study initiation – to ensure that the information is preserved so that a complete submission can be made and to take any steps necessary to minimize potential bias. Where this is not possible, for example, because an applicant is submitting a foreign covered study sponsored by another entity and the applicant did not oversee, support, or direct the study, the applicant should take appropriate steps to obtain financial information from the study sponsor, investigators, or other reasonably available sources. See Question F.2.

## G.    COVERED CLINICAL STUDY

**G.1.  Q:  Disclosure of financial interests and arrangements is required only for covered clinical studies, specifically, those studies relied upon to provide support for the effectiveness of a product or in which a single investigator makes a significant contribution to the demonstration of safety (21 CFR §§ 54.2(e) and 54.3).  An IND sponsor, acting much earlier, must inquire into investigator financial interests and arrangements before the ultimate role of a study in the application is determined (21 CFR § 312.53).  How will the IND sponsor determine which studies will ultimately require certification/disclosure statements?**

**A:**  The IND sponsor will need to consider the potential role of a particular study based on study size, design, and other considerations.  Almost any controlled effectiveness study could, depending on outcome, become part of a marketing application, but other studies might be critical too, such as a pharmacodynamic study in a population subset or a bioequivalence study supporting a new dosage form.  So, for many studies, it would be prudent to collect the information in the event that the study will ultimately require certification and disclosure statements.

**G.2.  Q: Do the reporting requirements apply to studies that include large numbers of investigators and multiple sites?  Will the agency consider a waiver mechanism to exempt applicants from collecting information from clinical investigators conducting these kinds of studies?**

**A:**  Large multi-center efficacy studies with many investigators are considered covered clinical studies within the meaning of the regulation (21 CFR § 54.2(e)).  Data from investigators having only a small percentage of the total subject population (in a study with large numbers of investigators and multiple sites) could still affect the overall study results depending on the impact of their results on the overall study results.  Or, if a sponsor submitted data from a large, multi-center, double-blind study that included several thousand subjects, a single clinical investigator at a large site could be responsible for a significant number of study subjects.  In either case, if the investigator fabricated data or otherwise affected the integrity of the data, the results could have been influenced.

By contrast, large open safety studies and treatment protocols that have large numbers of investigators would generally not be considered covered clinical studies.  As discussed in the preamble to the final rule,[16] in these large open safety studies and treatment protocols,

---

[16] See *Federal Register*, volume 63, February 2, 1998, page 5239.

Exhibit 2
Page 69

the large number of investigators generally means that no single investigator has a major impact on the data.  In addition, important adverse events will generally be apparent because they lead to cessation of therapy and submission of the case report form.  Although it is possible that a financial interest could be important in these studies, it is relatively unlikely.

The regulations[17] allow a sponsor to seek a waiver of certain requirements, including financial disclosure requirements.  FDA believes it is highly unlikely, however, that a waiver would be justified for studies begun after February 2, 1999, the effective date of the regulation, because the sponsor should already have begun collecting the information on an ongoing basis.  FDA will evaluate any request for waiver on a case-by-case basis.

### G.3.  Q:  The definition of a covered clinical study includes "any study in which a single investigator makes a significant contribution to the demonstration of safety."  What does this mean?

**A:**  Examples of commonly conducted studies in which a single investigator makes a significant contribution to the demonstration of safety would be studies that are designed to address a particular safety concern.  For example, an endoscopy study to evaluate a product's effect on the stomach lining or a study in a subset of patients with a particular pre-existing condition or disease, such as significant cardiovascular risk factors or a history of poor (adverse) response to other treatments.  Such studies could have a single investigator, or could involve more than one clinical investigator.  If each investigator makes a significant contribution to the study and, therefore, to a demonstration of safety, such studies would be considered covered clinical studies and subject to financial disclosure.

Studies that generally would not be covered studies are large open safety studies (where a large number of clinical investigators enroll subjects) that are designed to look at adverse events in general and do not focus on specific safety concerns.

### G.4.  Q:  Can a literature report be considered a covered clinical study?

**A:**  Yes, a literature report could be considered a covered clinical study if it is being relied upon by the applicant or FDA to establish that the product is effective (including showing equivalence to an effective product) or where a single investigator makes a significant contribution to the demonstration of safety.[18]  When an applicant relies on a literature report in this manner, clinical investigator financial disclosure is required.  The author(s) and clinical investigators in the study should be contacted for this information to allow the applicant to submit the certification and/or disclosure forms or, if the applicant is unable to obtain the information, certification that the applicant acted with due diligence to obtain the information.  Because the financial interests and arrangements

---

[17] See 21 CFR §§ 312.10, 812.10, 314.90 and 814.20.
[18] Applicants should be aware that additional information may be needed in order for the agency to be able to use published literature reports in support of a marketing application.  For example, details about study methodology, the actual products studied, specifics about the patient population, patient accounting, etc. may be needed.

Exhibit 2
Page 70

to be reported are those relating to the sponsor(s) of the covered clinical study and the product under study, the clinical investigators would not be required to report their financial interests in and arrangements with the applicant unless the applicant was a sponsor of the covered study.

**G.5.  Q:  Does the regulation include abbreviated new drug applications (ANDAs)?  Does the regulation include 510(k)s that include clinical data?  What about biosimilars?**

**A:**  The regulation requires an applicant whose submission relies in part on clinical data to disclose certain financial interest and arrangements.  A "covered clinical study" means any study of a drug (including a biological product) or device in humans submitted in a marketing application or reclassification petition that the applicant or FDA relies on to establish that the product is effective (including studies that show equivalence to an effective product), or any study in which a single investigator makes a significant contribution to the demonstration of safety.  This would, in general, not include phase 1 tolerance studies or pharmacokinetic studies, most clinical pharmacology studies (unless they are critical to an efficacy determination), large open safety studies conducted at multiple sites, treatment protocols, and expanded access protocols.  (21 CFR §§ 54.2 and 54.3.)  ANDAs are subject to 21 CFR part 54 (21 CFR § 314.94(a)(13)), as are 510(k)s (21 CFR § 807.87(i)).  In addition, applications for biological products, including applications submitted under 351(k) of the Public Health Services Act, are also subject to the regulation.

**G.6.  Q:  Does the regulation apply to studies in support of labeling changes?**

**A:**  The regulation applies to studies submitted in a supplement when those studies meet the definition of a covered clinical study.  The definition includes studies to support safety labeling changes where individual investigators make a significant contribution to the safety information.  Studies to support the effectiveness of a new claimed indication are also included.  (21 CFR §§ 54.2 and 54.3.)

**G.7.  Q:  Do actual use and labeling comprehension studies conducted to support a request to switch a drug product from prescription to over-the-counter (OTC) status fit the definition of covered clinical study?**

**A:**  Applicants who file supplements requesting that FDA approve a switch of a prescription drug to OTC status or who file a new drug application for OTC use often conduct actual use and labeling comprehension studies.  These may be intended to demonstrate that the product is safe and effective when used without the supervision of a licensed practitioner; in other cases, they may test labeling comprehension or other aspects of treatment by consumers.  Actual use studies performed to support these applications are considered covered clinical studies if they are used to demonstrate effectiveness in the OTC setting or if they represent a safety study where any investigator makes a significant contribution (21 CFR §§ 54.2 and 54.3).  Labeling comprehension studies would not be considered covered studies.

Exhibit 2
Page 71

**G.8.  Q:  Are clinical investigators of in vitro diagnostics (IVDs) covered under this regulation?**

**A:**  Yes.  Applicants who submit marketing applications for IVDs that include covered clinical studies must provide the appropriate financial certification or disclosure information (21 CFR § 54.3).  Although IVD studies may only involve specimens, under 21 CFR § 812.3(p), "subject" is defined as a "human who participates in an investigation, either as an individual on whom or on whose specimen an investigational device is used or as a control."  Under 21 CFR § 812.3(h), an "investigation" is defined as a clinical investigation or research involving one or more subjects to determine the safety or effectiveness of a device."  Thus, if an investigation of an IVD is used to support a marketing application and it meets the definition of a covered clinical study, it would be subject to this regulation (21 CFR § 54.3).

## H.    FDA REVIEW

**H.1.  Q:  Under what circumstances relating to financial disclosure would FDA refuse to file an application?**

**A:**  FDA may refuse to file any marketing application supported by covered clinical studies that does not contain, for each clinical investigator who is not an employee of the sponsor, a certification that no financial interest or arrangement specified in 54.4(a)(3) exists, a disclosure statement identifying the specified financial interests or arrangements and the steps taken to minimize bias, or a certification that the applicant has acted with due diligence to obtain the required information but was unable to do so and stating the reason (21 CFR § 54.4(c)).  In general, if, during the filing review, an FDA reviewer identifies missing information, an attempt will be made to contact the applicant to obtain the missing information; however, applicants should take reasonable steps to ensure that applications are complete upon submission.  Applicants are encouraged to discuss their concerns on particular matters about financial information with FDA.

**H.2.  Q:  Who will review a disclosure of the specified financial interests and arrangements when such information is submitted in a marketing application?**

**A:**  FDA review staff, which may include project managers, consumer safety officers, medical officers, and/or others with regulatory or scientific expertise or supervisory authority, will evaluate financial disclosure information.

**H.3.  Q:  What will FDA reviewers consider when evaluating the financial disclosure information?**

**A:**  FDA reviewers will evaluate the information disclosed about each covered clinical study in an application to determine the impact of any disclosed financial interests or arrangements on the reliability of the data.  See 21 CFR § 54.5(a).  FDA may consider many factors in making its evaluation (21 CFR §§ 54.5(a) and (b)).

Exhibit 2
Page 72

Part 54 does not categorically prohibit financial interests or arrangements, but it does require applicants to submit a list of clinical investigators who are full-time and part-time employees of the sponsor and to disclose or certify with respect to other investigators so that FDA can assess the possibility of bias.  The type of financial interest or arrangement disclosed is important because some financial interests and arrangements are of greater concern than others when assessing the reliability of the data.  For example, outcome payments (that is, payment that is dependent on the outcome of the study) elicit the highest concerns, followed by proprietary interests in the test article (such as patents, royalties, etc.).  With respect to equity interests and/or SPOOS, the amount and nature of the equity interests and payments may be considered.

When a clinical investigator has disclosable financial interests or arrangements, the FDA reviewer will carefully consider the steps taken by the sponsor to minimize bias[19] as described in the attachment to the FORM FDA 3455.  These steps may include study design, use of multiple clinical investigators and study sites, and replication of study results.  The agency also gives careful scrutiny to data from clinical investigators who are full-time or part-time employees of the sponsor, because of the possibility of significant financial interests in the outcome of studies.  (Hereafter, we refer to these investigator types jointly as "disclosing investigators.")  Investigators for whom the applicant is not able to disclose or certify, despite exercising due diligence, will be considered on a case by case basis.

The FDA reviewer may consider elements of the study design, including the method of randomization, the level of blinding (double-blind, single-blind), the presence or absence of a control group, whether placebo or active, the nature of the primary and secondary endpoints (objective, subjective), the method of endpoint assessment, the method of evaluation (including whether someone other than the disclosing investigator measured the endpoints), and whether many investigators, most  of whom were not disclosing investigators, participated in the study.  The FDA reviewer may also consider the total number of investigators and subjects in the study, the number and percentage of subjects enrolled by the disclosing investigator, information obtained from on-site inspections, and the data (including adverse events) of the disclosing investigator compared to other investigators in the study.  The reviewer may look at a re-analysis of the data performed either by the applicant or FDA that excludes the disclosing investigator's results, other relevant types of reanalysis, and/or whether the results were replicated over multiple studies.

The reviewer will make a judgment as to whether the financial interests or arrangements disclosed may have affected the interpretation of study results or otherwise require further action.  For example, if a disclosing investigator was a participant in a covered clinical study that (1) had randomized assignment of patients to treatment, (2) had a clearly objective endpoint (such as survival) or an endpoint assessed by a blinded observer other than the clinical investigator, (3) had multiple study sites (so that each investigator enrolled a small fraction of the total number of subjects), and (4) had results generally similar to the results of other investigators, then provided there were no other

---

[19] See Question A.2 for a discussion of methods to minimize bias.

Exhibit 2
Page 73

material, countervailing considerations, the reviewer might determine that a financial interest, employment relationship, or lack of certification or disclosure does not raise serious questions about the integrity of the covered study that require further action.  On the other hand, if the results of the disclosing investigator are clearly more favorable than results of the other investigators or centers and the disclosing investigator's results could have influenced outcome, the reviewer would generally need to consider further action. (21 CFR § 54.5(c).)

FDA reviewers should consult with their management as needed to determine appropriate actions.

### H.4.  Q:  What actions may FDA take when a clinical investigator is the employee of a sponsor or has disclosable financial interests or arrangements?

**A:**  If FDA determines that an investigator's financial interests raise a serious question about the integrity of the data, FDA will take any action it deems necessary to ensure the reliability of the data (21 CFR § 54.5(c)).  Please see Section III.C of this guidance for actions that may be taken.

### H.5.  Q:  How is the review to be documented?

**A:**  Each FDA Center provides review templates or checklists for their review staff to use that include a section on financial disclosure issues.

In general, the review should document that a list of clinical investigators for each covered clinical study was provided, and that, as applicable, there was either certification or documentation of disclosable financial interests and arrangements for each investigator on the list who is not an employee of the sponsor[20] (21 CFR § 54.4).

When a disclosure of financial interests and arrangements is included (FORM FDA 3455), reviewers should ensure that the details of the disclosable financial interests and arrangements are attached to the forms along with a description of the steps the sponsor has taken to minimize the potential bias of clinical study results by any of the disclosed interests or arrangements (21 CFR § 54.4(a)(3)).  The reviewer will address the question of whether these interests and arrangements raise questions about the integrity of the data and describe any actions taken to minimize bias.  The reviewer will also describe any actions taken by the agency to address any questions raised by a disclosable financial interest or provide an explanation for why no action was indicated (21 CFR § 54.5).  This documentation should be included in the appropriate section of the review template.

When a sponsor certifies that he/she acted with due diligence to obtain information regarding the clinical investigator's financial interests and arrangements but was unable to obtain it, reviewers should ensure that an explanation of the reason why the information could not be obtained and the efforts made to obtain the information is

---

[20] If the spouse or dependent child of an investigator is an employee of the sponsor, the investigator should be identified as an employee and further financial disclosure under this provision is not required.

Exhibit 2
Page 74

attached to the FORM FDA 3454 (21 CFR § 54.4).  See Question B.7 for a discussion of due diligence.

**H.6.  Q:  Under what circumstances will FDA publicly discuss financial interests and arrangements disclosed to the agency?**

**A:**  As discussed in the preamble to the 1998 final rule,[21] FDA's policy is that certain types of financial information requested under the rule, notably clinical investigators' equity interests, will be protected from public disclosure unless circumstances relating to the public interest clearly outweigh the clinical investigator's identified privacy interest.  FDA cited the example of a financial interest or arrangement so affecting the reliability of a study as to warrant its public disclosure during evaluation of the study by an advisory panel.  FDA expects that only rarely would an investigator's privacy interest be outweighed by the public interest and thus warrant disclosure of the details of financial interest or arrangement.  The agency will carefully evaluate each circumstance on a case-by-case basis.

FDA recognizes, however, that there is increased interest in the financial arrangements between clinical investigators and sponsors of the clinical trials in which the investigators participate.  For this reason, FDA intends to provide information about the number of clinical investigators with disclosable financial interests or arrangements in the new product reviews FDA posts for an approval decision.  This information would not identify clinical investigators by name but likely would include information such as the number of clinical investigators in the study and the number of investigators, if any, with disclosable financial interests or arrangements.[22]

## I.    RECORDKEEPING

**I.1.  Q:  What are the recordkeeping requirements for financial disclosure information?**

**A:**  The recordkeeping requirements for applicants are described in 21 CFR § 54.6.  Applicants must retain certain information on clinical investigators' financial interests and arrangements (21 CFR § 54.6(a)) and permit FDA employees to have access to the information and to copy the records at reasonable times (21 CFR § 54.6(b)(2)).  Records are to be maintained for two years after the date of approval of the application (21 CFR § 54.6(b)(1)).

Additionally, IND and IDE sponsors are required to maintain complete and accurate records of financial disclosure information as part of the records for the investigation (21

---

[21] *Federal Register*, February 2, 1998, 63 *FR* 5233

[22] FDA also recognizes that subjects participating in a clinical trial may be interested in the financial interests/arrangements of the clinical investigator at the site where the subject is considering participation.  The Department of Health and Human Services Guidance Document, "Financial Relationships and Interests in Research Involving Human Subjects: Guidance for Human Subject Protection," which is applicable to FDA regulated research, recommends that consideration be given to providing potential subjects with information about the financial interests and arrangements of the parties involved in the research.  This guidance is available at http://www.hhs.gov/ohrp/policy/fguid.pdf.

Exhibit 2
Page 75

CFR §§ 312.57(b) and 812.140(b)(3)) and to retain the records pursuant to the required retention periods identified in the IND and IDE regulations (21 CFR §§ 312.57(c) and 812.140(d)).

**I.2.  Q:  What kind of documentation is necessary for applicants to keep in case questions about certification and/or disclosure arise?**

**A:**  To the extent that applicants have relied on investigators as the source of information about potentially disclosable financial interests and arrangements, the underlying documentation (e.g., copies of executed questionnaires returned by investigators, correspondence on the subject of financial disclosure, mail receipts, etc.) should be retained.  Likewise, to the extent that applicants who did not sponsor a covered clinical study rely on information furnished by the sponsor, the underlying documentation, including all relevant correspondence with and reports from the sponsor, should be retained.  To the extent that applicants rely upon information available internally, all appropriate financial documentation regarding the financial interests or arrangements in question should be retained.  For example, in the case of significant payments of other sorts, applicants should keep documentation including, but not limited to, records of electronic financial transactions, certified mail delivery receipts, etc.  (21 CFR §§ 54.6(a), 312.57(b) and 812.140(b)(3).)

If storage space is a concern, sponsors and applicants may use electronic storage.  For example, required records may be scanned as certified copies [23] of the original and stored electronically, as long as the records remain accessible for inspection and copying by FDA (see Question J.1).  If electronic records are used, you should consult guidance on electronic storage of clinical trial records under part 11, "Computerized Systems Used in Clinical Investigations,"[24] for further information about maintaining scanned documents.

**J.      FDA INSPECTIONS**

**J.1.   Q:  Will financial disclosure information be reviewed during a bioresearch monitoring program (BIMO) inspection of the sponsor?**

**A:**  During a sponsor inspection, it is FDA's policy to review financial disclosure information that clinical investigators provide to the sponsor, although FDA may request access to these records at other reasonable times.  FDA has the authority to access and copy documents supporting an applicant's certification or disclosure statement submitted to the agency in a marketing application (21 CFR § 54.6(b)(2)).  FDA's regulations require sponsors to establish and maintain records of data obtained during investigational

---

[23] FDA's guidance on "Computerized Systems Used in Clinical Investigations" defines "certified copy" as a copy of original information that has been verified, as indicated by dated signature, as an exact copy having all the same attributes and information as the original.

[24] This guidance may be accessed at http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM070266.pdf.

Exhibit 2
Page 76

studies of drugs, biological products, and devices that will enable the agency to evaluate a product's safety and effectiveness.[25]

**J.2.   Q:  Will financial disclosure be part of a BIMO inspection of a clinical site?**

**A:**  It is FDA's policy that FDA investigators should ask the clinical investigator if he/she submitted information to the sponsor prior to initiation of the study and updated that information, as needed, for up to one year after completion of the study at the site.

**J.3.   Q:  Are there any instructions for FDA's inspectional staff with respect to reviewing records pertaining to financial disclosure?**

**A:**  FDA has provided instructions in the Compliance Program Guidance Manual (CPGM) chapters on clinical investigator inspections[26] and sponsor inspections.[27]

## K.   CONTACTS

**K.1.   Q:  Who may be contacted in each FDA Center to answer questions regarding this regulation?**

**A:**  The following entities may be contacted:  Division of Drug Information in the Center for Drug Evaluation and Research, phone 888-463-6332 or 301-796-3400, Division of Small Manufacturers, International and Consumer Assistance in the Center for Devices and Radiological Health, phone 800-638-2041 or 301-796-7100, and the Office of Communication, Outreach and Development in the Center for Biologics Evaluation and Research, phone 800-835-4709 or 301-827-1800.

---

[25] 21 CFR §§ 54.6, 312.57, 312.58, 812.140 and 812.145.
[26] http://www.fda.gov/ICECI/EnforcementActions/BioresearchMonitoring/ucm133562.htm
[27] http://www.fda.gov/ICECI/EnforcementActions/BioresearchMonitoring/ucm133777.htm

Exhibit 2
Page 77

*Contains Nonbinding Recommendations*

**APPENDIX**

## Considerations for Collecting
## Financial Disclosure Information
## from Clinical Investigators

Suggested items to provide to clinical investigators to assist them in complying with financial disclosure reporting requirements:

1) Identify the sponsor(s) of the covered clinical study.  **See Section IV.E.**

2) Identify whose financial interests and arrangements need to be reported (e.g., clinical investigators, their spouses and dependent children).  **See Section IV.D.**

3) Identify the financial interests and arrangements that must be disclosed in detail.  **See Section III.B and Question C.1.**

   **NOTE:**  The threshold amounts apply separately for each sponsor (**see Question E.1**) but are cumulative for the investigator and his/her spouse and dependent children (**see Section III.B**).

   a) Employment by any sponsor.  **See Section III and Questions B.1 and D.4.**

   b) Any compensation by any sponsor in which the value of compensation is affected by study outcome.  **See Section III.B.1.**

   c) Any proprietary interest in the tested product.  **See Section III.B.2.**

   d) Any equity interest in any sponsor of the covered clinical study whose value cannot be readily determined through reference to public prices.  **See Section III.B.3.**

   e) Any equity interest in any sponsor of the covered clinical study if that sponsor is a publicly held company and the interest exceeds $50,000.  **See Section III.B.4 and Questions C.2 and C.3.**

   f) Significant payments of other sorts (SPOOS) that have a cumulative monetary value of $25,000 or more made to the investigator or the investigator's institution.  **See Section III.B.5 and Questions C.4, C.5 and C.6.**

4) Remind investigators of obligation to promptly update their financial disclosure information when relevant changes occur during the study and for one year following study completion.  **See Questions C.2 and D.6.**

Exhibit 2
Page 78

# EXHIBIT 3

Exhibit 3
Page 79

DEPARTMENT OF HEALTH AND HUMAN SERVICES
Food and Drug Administration

**CERTIFICATION: FINANCIAL INTERESTS AND ARRANGEMENTS OF CLINICAL INVESTIGATORS**

Form Approved: OMB No. 0910-0396
Expiration Date: March 31, 2019

---

*TO BE COMPLETED BY APPLICANT*

With respect to all covered clinical studies (or specific clinical studies listed below (if appropriate)) submitted in support of this application, I certify to one of the statements below as appropriate. I understand that this certification is made in compliance with 21 CFR part 54 and that for the purposes of this statement, a clinical investigator includes the spouse and each dependent child of the investigator as defined in 21 CFR 54.2(d).

*Please mark the applicable check box.*

☐ (1) As the sponsor of the submitted studies, I certify that I have not entered into any financial arrangement with the listed clinical investigators (enter names of clinical investigators below or attach list of names to this form) whereby the value of compensation to the investigator could be affected by the outcome of the study as defined in 21 CFR 54.2(a). I also certify that each listed clinical investigator required to disclose to the sponsor whether the investigator had a proprietary interest in this product or a significant equity in the sponsor as defined in 21 CFR 54.2(b) did not disclose any such interests. I further certify that no listed investigator was the recipient of significant payments of other sorts as defined in 21 CFR 54.2(f).

| Clinical Investigators | | |
|---|---|---|
| | | |
| | | |
| | | |

☐ (2) As the applicant who is submitting a study or studies sponsored by a firm or party other than the applicant, I certify that based on information obtained from the sponsor or from participating clinical investigators, the listed clinical investigators (attach list of names to this form) did not participate in any financial arrangement with the sponsor of a covered study whereby the value of compensation to the investigator for conducting the study could be affected by the outcome of the study (as defined in 21 CFR 54.2(a)); had no proprietary interest in this product or significant equity interest in the sponsor of the covered study (as defined in 21 CFR 54.2(b)); and was not the recipient of significant payments of other sorts (as defined in 21 CFR 54.2(f)).

☐ (3) As the applicant who is submitting a study or studies sponsored by a firm or party other than the applicant, I certify that I have acted with due diligence to obtain from the listed clinical investigators (attach list of names) or from the sponsor the information required under 54.4 and it was not possible to do so. The reason why this information could not be obtained is attached.

| NAME | TITLE |
|---|---|
| | |
| FIRM/ORGANIZATION | |
| | |
| SIGNATURE | DATE *(mm/dd/yyyy)* |

---

**This section applies only to the requirements of the Paperwork Reduction Act of 1995.**

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. Public reporting burden for this collection of information is estimated to average 1 hour per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the necessary data, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information to the address to the right:

*"An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB number."*

**Do NOT send your completed form to the PRA Staff email address below.**

Department of Health and Human Services
Food and Drug Administration
Office of Operations
*PRAStaff@fda.hhs.gov*

**FORM FDA 3454  (3/16)**

PSC Publishing Services (301) 443-6740

Exhibit 3
Page 80

# EXHIBIT 4

Exhibit 4
Page 81

Home (/healthcare/) / Patents

# Patents

---

## Sensors

| Radius PPG | ⌄ |
|---|---|

| Red Diamond | ⌄ |
|---|---|

| LNOP | ⌄ |
|---|---|

| LNCS | ⌄ |
|---|---|

| M-LNCS | ⌄ |
|---|---|

| Direct Connect | ⌄ |
|---|---|

| rainbow | ⌄ |
|---|---|

| spo2.com | ⌄ |
|---|---|

| LNOPv | ⌄ |
|---|---|

| RAM | ⌄ |
|---|---|

| E1 (Ear) | ⌄ |
|---|---|

Exhibit 4
Page 82

2/23/2021

Sensor Kits                                    ⌄

O3                                            ⌄

iSpo2                                         ⌄

Blue Sensor                                   ⌄

## Monitors

Radical-7                                     ⌄

Radius-7                                      ⌄

Rad-5/5v                                      ⌄

Rad-57                                        ⌄

Rad-6/67                                      ⌄

Rad-8                                         ⌄

Rad-87                                        ⌄

Rad-9/97                                      ⌄

Rad-G                                         ⌄

Pronto                                        ⌄

Pronto-7                                      ⌄



IntelliVue Module ⌄

Root ⌄

Covered by one or more of the following U.S. Patents: 6360114, 6388240,
6430525, 6463311, 6515273, 6584336, 6606511, 6654624, 6658276,
6684090, 6770028, 6822564, 6999904, 7295866, 7355512, 7373194,
7377899, 7428432, 7438683, 7467002, 7471969, 7499741, 7499835,
7530949, 7865222, 7873497, 7880606, 7880626, 7962188, 7988637,
7990382, 7991446, 8046040, 8150487, 8185180, 8190223, 8203438,
8224411, 8260577, 8265723, 8280473, 8337403, 8405608, 8414499,
8457703, 8457707, 8483787, 8489364, 8498684, 8532727, 8532728,
8547209, 8560032, 8570167, 8626255, 8641631, 8652060, 8676286,
8718735, 8790268, 8840549, 8847740, 8892180, 8929964, 8996085,
9131883, 9153121, 9161696, 9195385, 9195385, 9241662, 9307928,
9436645, 9492110, 9560998, 9636055, 9636056, 9675286, 9724016,
9724024, 9730640, 9750461, 9795300, 9778079, 9787568, 9808188,
9814418, 9839381, 9848806, 9867578, 9877650, 9848800, 9913617,
9943269, 9949676, 9993207, 10007758, 10010276, 10032002, 10039482,
10064562, 10092200, 10092249, 10098550, 10098610, 10123726, 10130289,
10149616, 10188296, 10194847, 10219746, 10292664, 10305775,
10342470, 10342497, 10383520, 10433776, 10441181, 10463340, 10503379,
10512486, RE47218, RE47244, RE47249, RE47353, international equivalents,
or one or more of the patents referenced at www.masimo.com/patents
(/link/bf883e69dfcb484b9d0f6a7e59e23d7e.aspx). Other patents pending.

Mighty Sat ⌄



Cables

NC Cable ⌄

ProCal Cable ⌄

SatShare Cable ⌄

IntelliVue Cable ⌄



LNCS to LNOP Adapter

Red Patient Cable - LNOP

SensAid Multisite Sensor

MAC-1 and LNOP CMS

Rainbow Cables

Adapter Cables

Finger Gauge

O3 Cables

## OEM Boards



MS-xx

MS-20xx

MX-xx

MSLP (Low Power)

## Systems

Patient SafetyNet

MyView



| Field Upgrader | ⌄ |

| Iris Gateway | ⌄ |

| Field Upgrader | ⌄ |

| CCHD Screening | ⌄ |

## SedLine

| Monitor, Modules, and Sensors | ⌄ |

## Capnography



| Monitor, Modules, and Sensors | ⌄ |

| NomoLine | ⌄ |

| Cannula | ⌄ |

PLCO-003940/PLM-10721D-0520

---

# Masimo

(/)

Improving Patient Outcomes and Reducing
the Cost of Care®

## Follow Us

  

(https://twitter.com/Masimo) (https://www.youtube.com/ (https://www.facebook.com

Exhibit 4
Page 86
2/23/2021



(https://www.linkedin.com/company
corporation)

---

**ABOUT US**

(/link/29a43906dbce43889c9322abcc38b5d8.aspx)

Contact Us
(/company/contact/contact-
us/)

Guiding Principles
(/company/masimo/guiding-
principles/)

Company Evolution
(/company/masimo/evolution/)

Investor Relations
(https://investor.masimo.com/overview/default.aspx)

Press Room
(/company/news/news-
media/)

Media Room
(/company/news/media-
room/)

Careers
(/company/opportunities/careers/)

Newsletter sign-up
(/company/news/livewire-
registration-form/)

**FOR HEALTHCARE**

Technology
(/technology/co-
oximetry/set/)

Product
(/products/continuous/root/)

Solutions (/automating-
care/)

Clinical Evidence
(/evidence/featured-
studies/feature/)

OEM Solutions
(/oem/solutions/)

Sensors and Cannulas
(/sensors/)

Support
(/company/global-
services/technical-
services/)

Resources ⎘
(http://techdocs.masimo.com/)

**FOR CONSUMERS** ⎘

(https://www.masimopersonalhealth.com/)

Products ⎘
(https://www.masimopersonalhealth.com/)

Experience ⎘
(https://www.masimopersonalhealth.com/)

Education ⎘
(https://www.masimopersonalhealth.com/pages/what-
is-a-pulse-oximeter)

Support ⎘
(https://www.masimopersonalhealth.com/pages/troublesho
use/)

**PRIVACY**

Privacy Notice
(/company/masimo/privacy/)

Cookie Preferences

Cookie Notice
(/company/cookie-
notice/)

**LEGAL**

Regulatory
(/company/masimo/codes-
of-conduct/declaration/)

Codes of Conduct
(/company/masimo/codes-
of-conduct/)

Patents
(/company/masimo/patents/)

Terms
(/company/terms-of-
use/)

**SITEMAP**
**(/SITEMAP/)**

© 2021 Masimo. All Rights Reserved.

# EXHIBIT 5

Exhibit 5
Page 88

*Historical Review*

# HISTORY OF BLOOD GAS ANALYSIS. VII. PULSE OXIMETRY

*John W. Severinghaus, MD,\**
*and Yoshiyuki Honda, MD†*

Severinghaus JW, Honda Y. History of blood gas analysis. VII. Pulse oximetry.

J Clin Monit 1987;3:135–138

**ABSTRACT.** Pulse oximetry is based on a relatively new concept, using the pulsatile variations in optical density of tissues in the red and infrared wavelengths to compute arterial oxygen saturation without need for calibration. The method was invented in 1972 by Takuo Aoyagi, a bioengineer, while he was working on an ear densitometer for recording dye dilution curves. Susumu Nakajima, a surgeon, and his associates first tested the device in patients, reporting it in 1975. A competing device was introduced and also tested and described in Japan. William New and Jack Lloyd recognized the potential importance of pulse oximetry and developed interest among anesthesiologists and others concerned with critical care in the United States. Success brought patent litigation and much competition.

**KEY WORDS.** Oxygen: saturation. Measurement techniques: oximetry. Blood: gas analysis, history.

Within the last four years, pulse oximetry has become widely used in anesthesiology and many critical-care situations; at least 15 manufacturers are now marketing pulse oximetry instruments. Severinghaus and Astrup's review of the history of oximetry in a preceding issue of this journal [1] contained several errors relating to the origin and development of pulse oximetry. Perhaps because of the difficulty of uncovering original Japanese sources, its origin has been ascribed variously to the anesthesiologist Yoshiya and his colleagues in 1980 [2] or to the surgeon Nakajima and his colleagues in 1975 [1], and the development of the pulse oximeter has been attributed to the wrong company as well. Corrections to and further details of the history of pulse oximetry are presented here.

## ORIGIN OF PULSE OXIMETRY

The idea of using pulsatile light variation to measure arterial oxygen saturation was conceived by the Japanese physiological bioengineer Takuo Aoyagi (Fig 1). Aoyagi was born February 14, 1936, in Niigata Prefecture, Japan. In 1958, he was graduated from the Faculty of Engineering at Niigata University, where his speciality was electrical engineering. Initially he worked at the Shimazu Corporation on instrumentation, and in February 1971 he joined the Research Division of Nihon Kohden Corporation, one of Japan's leading medical electronics firms. His research interests have been instrumentation for monitoring fetal heart rate during childbirth, electrical bio-impedance monitoring of ventilation, the phenomenon of airway closure at low lung volume, pulmonary circulation, and cardiac output

From the \*Department of Anesthesia and the Cardiovascular Research Institute, University of California Medical Center, San Francisco, CA, and the †Department of Physiology, Chiba University Medical School, Chiba 280, Japan.

Received Nov 8, 1986. Accepted for publication Nov 21, 1986.

Address correspondence to Dr Severinghaus, Anesthesia Research Center, 1386 HSE, University of California Medical Center, San Francisco, CA 94143.

Exhibit 5
Page 89
135



*Fig 1. Takuo Aoyagi.*

measurement by dye dilution using an improved earpiece.

In the early 1970s, Aoyagi's research concerned the measurement of cardiac output by dye dilution, a well-developed technology in which light of specified wavelengths is passed through blood, usually as it flows from an artery through an external cuvette, and is detected by photocells. Various investigators had attempted to use ear oximeters for dye measurement to avoid the need for arterial blood sampling. The transmitted light signal was noted to exhibit pulsatile variations, which made it nearly impossible to compute cardiac output accurately from these noninvasive dye dilution curves.

To effectively use the earpiece for dye densitometry, Aoyagi devised a method of cancelling the pulsatile variations by electrically subtracting a pulse signal detected at 900 nm (infrared), where the cardiogreen dye is transparent, from the dye-sensing 630 nm red signal. However, he and his associate noted that this cancellation was fickle (probably due to changes in the oxygen saturation). Fortunately for the discovery of pulse oximetry, the effect of oxygen desaturation increases infrared light transmission while decreasing red light transmission. Therefore, oxygen saturation changes had the best possible chance of "spoiling" his dye dilution curves.

Here is a classic example of the wisdom that "one man's noise is another man's signal." This failure of elimination of pulsatility in the dye curves led directly to pulse oximetry. Aoyagi had long been interested in oximetry and was familiar with the work of Millikan and Wood. He knew that the older oximeters compensated the red light signal with a signal from infrared light at 805 nm, the "isobestic" wavelength, where oxygen has no effect on the optical density of hemoglobin. Fortunately, however, instead of choosing the isobestic 805 nm infrared light, Aoyagi continued to use 900 nm because he hoped to make an earpiece that would have a dual purpose, not only measuring oxygen saturation but also recording dye dilution curves.

Aoyagi also was aware of the principle of compressing the tissue to set a bloodless zero, first introduced in 1940 by Squire and Goldie [1]. He was well prepared to recognize the opportunity inherent in the noise in his dye dilution curves: to create from it a signal for oxygen measurement. Credit thus belongs to Aoyagi for the idea of measuring only the pulsatile *changes* in light transmission through living tissues to compute the arterial saturation. He realized that these changes of light transmission at all wavelengths would solely be due to pulsatile variations of the intervening arterial blood volume. Thus, the unpredictable absorption of light by tissue, bone, skin, and pigments would be eliminated from analysis. It was this key idea that permitted the development of instrumentation that required no calibration after its initial factory setting, as all human blood has essentially identical optical characteristics in the red and infrared bands used in oximetry.

In early 1973, Susumu Nakajima, a surgeon then working at the Sapporo Minami National Sanatorium, heard about Aoyagi's idea from Aoyagi's supervisor, Y. Sugiyama. Nakajima placed an order with Nihon Kohden for the apparatus, which he wanted to test in patients.

In January 1974, an abstract in Japanese describing the invention, titled "Improvement of the Earpiece Oximeter," was submitted to the Japanese Society of Medical Electronics and Biological Engineering by the developing team of Aoyagi and associates Michio Kishi, Kazuo Yamaguchi, and Shinichi Watanabe of the Second Division of Technology, Nihon Kohden Corporation [3]. The new oximeter used an incandescent lamp with filters at 630 and 900 nm and analog detection of the pulsatile optical signal ratio at these wavelengths. The paper was presented by Aoyagi on April 26, 1974. On March 29, 1974, a patent application titled "Apparatus for Photometric Blood Analysis" was submitted to the Japanese Patent Office by the Nihon Kohden Corporation, naming Aoyagi and Kishi as inventors. The application was publicly disclosed on October 9, 1975 and published on August 2, 1978 (No. 53-26437), and the patent was granted on April 20, 1979 (No. 947714).

On April 24, 1974, a patent application based on a similar idea was submitted by Masaichiro Konishi, who

Exhibit 5
Page 90

was named as inventor and was working at the Minoruta Camera Company (known in the United States as Minolta). How this competing application arose and whether Aoyagi's idea was discovered and copied has never been established. Konishi's patent application was rejected by the Japanese Patent Office on February 9, 1982. However, Minolta applied for and obtained patent protection in the United States.

## DEVELOPMENT OF THE INSTRUMENTATION

The prototype pulse oximeter was made by Aoyagi between September 1973 and March 1974. That instrument was used by Nakajima and his associates Yasuro Hirai, Hiroshi Takase, and Akihiko Kuze at the Sapporo Minami National Sanatorium. Their first publication (reference 97 in Severinghaus and Astrup [1]) included the developers—Takuo Aoyagi, Micho Kishi, and Kazuo Yamaguchi of the Nihon Kohden Corporation—as the fifth, sixth, and seventh authors. The first commercial instrument, the OLV-5100 (Fig 2), was made available in 1975 as an ear oximeter by Aoyagi and his associates. However, Nihon Kohden did not continue to develop or market this instrument and made no effort to patent it abroad.

The Minoruta Camera Company developed their similar device, marketing it as the Oximet MET-1471 in 1977 with a fingertip probe and fiberoptic cables from the instrument. This was the design illustrated as Figure 15 in Severinghaus and Astrup's history [1]. Nakajima and nine associates then tested and used this Minoruta fingertip pulse oximeter and described it in 1979 [4].

## SUCCESS, PATENTS, AND SUITS

Several groups began developmental work in pulse oximetry using Aoyagi's idea in the late 1970s. Important advances in the technology were made by the Biox Company of Boulder, Colorado, and were protected by patents. However, limited interest was generated by the development of pulse oximetry during the first 8 to 10 years. Few foresaw its value in anesthesiology, intensive care, and other emergent situations, probably because conventional oximetry had never been convenient enough for these uses. The Hewlett-Packard ear oximeter had been used almost entirely in pulmonary function laboratories and other physiologic environments. Indeed, the initial work on pulse oximetry in the United States by several firms (Minolta, Corning, Biox) considered these types of laboratories to be the probable market.

Credit for the present enormous interest in pulse oximetry belongs to anesthesiologist William New, of





*Fig 2. Oximeter OLV-5100.*

Stanford University Medical School, who with engineer Jack Lloyd founded Nellcor Incorporated. New recognized the potential importance of and market for a convenient, accurate oximeter in the operating room and all other hospital and clinic sites where patients are sedated, anesthetized, unconscious, comatose, paralyzed, or in some way limited in their ability to regulate their own oxygen supply.

Exhibit 5
Page 91

With the worldwide interest in pulse oximetry has come patent litigation initiated by Ohmeda, the owner of Biox, against Nellcor. The case was recently settled out of court, leaving the Biox patent intact. It remains unclear whether this precedent will be applied to the entire mushrooming industry surrounding pulse oximetry.

The role of patents in medical instrumentation is fascinating and sometimes depressing. The links between innovation and income are tortuous and tenuous; patents were intended to forge an invulnerable chain binding them. But human struggle for achievement finds the weak links and breaks the bond wherever possible. It is a rare inventor who enjoys financial reward from his or her brilliant insight.

The story of the patent litigation surrounding the polarographic oxygen electrode is a classic example. One court determined that the initial oxygen electrode patent was invalid because it did not describe the Stow carbon dioxide electrode as prior art. A third trial was needed to establish that the omission was not evidence of deceit and therefore not basis for triple damages under the Sherman antitrust law. Above all, the careers of the principals, Leland Clark and Ryan Neville, were disrupted for many years.

The winners are usually those who persist in developing and marketing an invention; particularly those who continue to improve and to respond to criticism and suggestion while keeping costs down and quality high. The relationships between users and manufacturers are fragile and especially vulnerable when bright small companies are bought out, moved, mismanaged, neglected, starved, or rejected in their attempts to make a better product. Perhaps in the long run, the best society can do is to acknowledge innovation and honor in print the men and women whose ideas initiate innovations in life-support technology.

## REFERENCES

1. Severinghaus J, Astrup P. History of blood analysis. VI. Oximetry. J Clin Monit 1986;2:270–288
2. Petersen J. The development of pulse oximetry. Science 1986;232:G135–136
3. Aoyagi T, Kishi M, Yamaguchi K, Watanabe S. Improvement of the earpiece oximeter. Abstracts of the 13th annual meeting of the Japanese Society of Medical Electronics and Biological Engineering, 1974:90–91 (Jap)
4. Nakajima S, Ikeda K, Nishioka H, et al. Clinical application of a new (fingertip type) pulse wave oximeter. Translated from the Japanese. Jap J Surg 1979;41:57–61 (Jap)

Exhibit 5
Page 92

# Exhibit 6

## Redacted Version of Document Proposed to be Filed Under Seal

Exhibit 6
Page 93

# EXHIBIT 7

Exhibit 7
Page 106

Case 8:20-cv-00048-JVS-JDE   Document 208-3   Filed 02/26/21   Page 96 of 124   Page ID #:26604



**NEWS DETAILS**

## New Clinical Studies Presented at the American Society of Anesthesiologists Annual Meeting Show Benefits of Masimo Noninvasive Technologies: SpHb, PVI, RRa, and SEDLine

*10/19/2011*

IRVINE, Calif., Oct. 19, 2011 /PRNewswire via COMTEX/ -- Masimo (NASDAQ: MASI) announced today that over 25 new clinical studies evaluating Masimo noninvasive patient monitoring technologies were presented at the largest gathering of anesthesiologists in the world, the American Society of Anesthesiologists (ASA) Annual Meeting in Chicago, Illinois. The following studies highlight the positive clinical outcomes and patient safety impact of Masimo's unique noninvasive measurement technologies, including: total hemoglobin (SpHb®), pleth variability index (PVI®), acoustic respiration rate (RRa(TM)), and SEDLine® brain function monitoring.

### SpHb® & PVI®

Researchers Steven Frank, M.D., James Rothschild, M.D., and John Ulatowski, M.D., at Johns Hopkins Hospital in Maryland found that the combination of continuous SpHb and PVI monitoring "may improve the efficacy and safety of the intraoperative autologous normovolemic hemodilution (IAHD) blood conservation technique that helps avoid allogeneic blood transfusions." The study, conducted in patients undergoing major abdominal or orthopedic surgery, concluded that SpHb was advantageous in "eliminating the delay in intraoperative decision-making that occurs when Hb measurements are obtained by conventional laboratory testing" while PVI was a "useful index of intravascular volume during the significant fluid shifts that occurred with IAHD, with increasing PVI indicating hypovolemia and decreasing PVI indicating adequate fluid resuscitation and blood re-infusion." (1)

Two studies, conducted by the Long Beach Veterans Healthcare System in California, found that noninvasive SpHb measurements provided valuable clinical assessment information in remote, rural, and community settings. Nitin Shah, M.D., and Kinjal Shah, B.S., led a study using the Radical-7 in rural India, which concluded that SpHb measurements provided "reliable information compared to the invasive method" with a bias and precision of 0.2+/- 1.2 g/dL and was "very convenient to use in a rural camp setting" while also eliminating "biohazard risks of venipuncture and blood handling."(2) The second study, led by Nitian Shah with Deval Modi, M.B, B.S., performed at two community health fairs in Long Beach concluded that the Pronto-7 spot-check device, with a bias and standard deviation of -0.06 +/-1.07 g/dL, provides "similar values and offers acceptable accuracy" when compared to values obtained from laboratory analysis of invasive blood samples. Researchers also noted the advantages of Pronto-7 in that it "gives immediate result" and has the potential to be "very helpful in spot checking for anemia in the general community without the need for exhaustive set-up or processing time."(3)

Two separate studies showed that the new In Vivo Adjustment(TM) feature for noninvasive SpHb measurements, included as part of the new 2011 Radical-7, along with the newest generation rainbow ReSposable Sensors (Rev. E) helped clinicians to improve the agreement in subsequent comparisons between invasive (tHb) and noninvasive (SpHb) hemoglobin measurements. Researchers Kathleen Richard, M.D., Timothy Quill, M.D., Thomas Dodds, M.D., and Matthew Koff, M.D., M.S., at Dartmouth Hitchcock Medical Center in New Hampshire found that the "accuracy and descriptive statistics improved when each time-matched SpHb value was adjusted by the magnitude of difference between the first tHb and corresponding SpHb." Researchers concluded that "if this type of adjustment were performed in real-time in vivo (intra-operatively), overall accuracy of SpHb values may be further improved," which may also "add value to care" during high risk surgical procedures in patients with co-morbidities and "in many other clinical locations and scenarios (ICU, PACU, pediatrics, emergency medicine, surgical ward)."(4) Another study, conducted by Ryo Miyashita, M.D., Shigekazu Sugino, M.D., Yukitoshi Niiyama, M.D., Mitsuko Mimura, M.D., Ph.D., and Michiakii Yamakage, M.D., Ph.D., in Japan at the Sapporo Medical University School of Medicine, found that "SpHb values corrected using the novel program were more accurate than those obtained conventionally." Study results showed that In Vivo Adjustment improved bias and standard deviation from 1.1 +/- 1.0 to 0.0 +/- 0.61 g/dL) and concluded that In Vivo Adjustment should "contribute to the accurate measurement of SpHb in the clinical setting."(5)

Researchers Peter Winch, M.D., Aymen Naguib, M.D., Julie Rice, R.N., and Joseph Tobias, M.D., at Nationwide Children's Hospital showed that SpHb measurements obtained in pediatric patients undergoing acute blood loss correlated to hemoglobin values obtained from a point-of-care device. Researchers

2/26/2021          New Clinical Studies Presented at the American Society of Anesthesiologists Annual Meeting Show Benefits of Masimo Noninv…

Case 8:20-cv-00048-JVS-JDE   Document 208-3   Filed 02/26/21   Page 97 of 124   Page ID
#:26605



SEARCH          MENU

In a separate study, also conducted at Nationwide Children's Hospital, the same research team found that monitoring changes in PVI could be used as a guide for volume replacement during isovolemic hemodilution in pediatric patients undergoing congenital cardiac surgery. Patients were evaluated in two groups-- group 1 had starting PVI values less than 14 and group 2 had starting PVI values greater than 14. Results showed that the average crystalloid replacement in group 1 was 5ml/kg, while volume replacement in group 2 was 11ml/kg in order to maintain the same hemodynamics during hemodilution. Researchers noted that the "data demonstrates the possible advantage of using the PVI value as a tool for identifying patients who would be good candidates for isovolemic hemodilution."(7)

### Rainbow Acoustic Monitoring(TM) for RRa(TM)

Researchers Basavana Goudra, M.D., and Lakshmi Penugonda, M.D., at the Hospital of the University of Pennsylvania, evaluated RRa measurements obtained using the Masimo Rad-87 during upper gastrointestinal endoscopy and found it had the "best accuracy and precision (-0.3 +/- 1.0 bpm) of monitoring respiration rate," whereas EtCO2 (-0.6 +/- 6.1 bpm) and impedance pneumography (0.2 +/- 4.3 bpm) are "subject to frequent false alarms." Results showed that EtCO2 had the "highest incidence of false alarms" with 45 false alarms out of 52 events, while RRa had the "lowest rate of false alarms" with just 3 out of 52 events.(8)

### SEDLine®

In a study conducted at Loma Linda University Medical Center, researchers Kevin Nasseri-Noori, M.D., Deborah McIvor, M.D., Frank Hsu, M.D., Moses Olson, B.S., Martin Allard, M.D., Travis Losey, M.D., Mark Macknet, M.D., and Richard Applegate, M.D., demonstrated that the SEDLine 4-channel (PSA array) brain function monitor "correctly detected an excessively deep intraoperative burst suppression therapy (IBST) pattern given a nearly isoelectric EEG" in 16 out of 19 events during intracranial surgery. With an overall correlation of 93% between SEDLine (PSA array) and EEG--showing strong agreement--study results indicate that SEDLine may be an effective tool for IBST detection versus standard EEG, which is expensive and requires a special technician in the room.(9)

According to Nitin Shah, MD, Chief of Surgical ICU at Long Beach VA Hospital and Professor of Anesthesiology at Loma Linda University, "Noninvasive SpHb is the way of the future. It is truly a blessing for a developing country with limited resources. Patients appreciate that it eliminates the need for traditional needle stick blood draws, so they are much more relaxed and willing to complete the pain-free SpHb testing. And, for healthcare professionals it is unbelievable. There are no biohazard risks, no formal training required to operate, and no calibration required with SpHb testing and they get instant results that they can use immediately to advise their patients right on the spot. In my view, SpHb should be routinely used in clinics and community settings across the globe."

Basavana Goudra, MD, Assistant Professor of Anesthesiology and Critical Care at the Hospital of the University of Pennsylvania, commented, "Masimo rainbow acoustic monitoring is better than anything else we have at the moment for accurate and reliable respiration rate measurements. Not only was it easy to use in the majority of the patients enrolled in our study, but our results show that it is the perfect solution for routine use in upper GI endoscopy procedures and post-operative monitoring as EtCO2 is not useful in these situations."

(1) Frank S, Rothschild J, Ulatowski J. "Continuous Noninvasive Hemoglobin Monitoring for Jehovah's Witness Patients Undergoing Intraoperative Autologous Normovolemic Hemodilution" ASA 2011 Presentation A408.

(2) Shah N, Shah K. "Evaluation of a Pulse CO-Oximeter for Noninvasive Hemoglobin Measurement in Adult Population in Rural India" ASA 2011 Presentation A283.

(3) Shah N, Modi D. "Accuracy of Noninvasive Hemoglobin Measurement Through a Pulse CO-Oximeter Compared to Venous Blood Draw in a Community Setting" ASA 2011 Presentation A285.

(4) Richard K, Quill T, Dodds T, Koff M. "Improved Accuracy and Trending of Noninvasive Hemoglobin Measurements with 'In Vivo Adjustment'" ASA 2011 Presentation A1667.

(5) Miyashita R, Sugino S, Niiyama Y, Mimura M, Yamakage M. "Improved Noninvasive Total Hemoglobin Measurements After In Vivo Adjustment" ASA 2011 Presentation A410.

(6)Winch P, Naguib A, Rice J, Tobias J. "The Accuracy of Noninvasive Hemoglobin Monitoring Following Phlebotomy in a Pediatric Patient Population" ASA 2011 Presentation A411.

(7) Naguib A, Winch P, Rice J, Tobias J. "Can the Starting Pulse Oximeter Derived Pleth Variability Index (PVI) Predict Total Crystalloid Replacement During Isovolemic Hemodilution in Congenital Cardiac Surgery?" ASA 2011 Presentation A207.

(8) Goudra B., Penugonda L. "Monitoring Respiration in Upper GI Endoscopy Anesthesia" ASA 2011 Presentation A246.

(9) Nasseri-Noori K, McIvor D, Hsu F, Olson M, Allard M, Losey T, Macknet M, Applegate R. "Prospective Comparison of Global Electroencephalogram to Frontal SEDLine Electroencephalogram Monitoring for the Evaluation of Intraoperative Burst Suppression During Elective Intracranial Surgery" ASA 2011 Presentation A499.

*In-Vivo Adjustment is pending FDA 510(k) clearance.

**To see a summary of all known clinical studies and abstracts on Masimo technologies and noninvasive measurements, please visit: http://www.masimo.com/cpub/clinicals.htm.

### About Masimo

Masimo (NASDAQ: MASI) is the global leader in innovative noninvasive monitoring technologies that significantly improve patient care--helping solve "unsolvable" problems. In 1995, the company debuted Measure-Through Motion and Low Perfusion pulse oximetry, known as Masimo SET®, which virtually eliminated false alarms and increased pulse oximetry's ability to detect life-threatening events. More than 100 independent and objective studies demonstrate Masimo SET provides the most reliable SpO2 and pulse rate measurements even under the most challenging clinical conditions, including patient motion and low peripheral perfusion. In 2005, Masimo introduced rainbow SET® Pulse CO-Oximetry(TM) technology, allowing noninvasive and continuous monitoring of blood constituents that previously required invasive procedures, including total hemoglobin (SpHb®), oxygen content (SpOC(TM)), carboxyhemoglobin (SpCO®), methemoglobin (SpMet®), and Pleth Variability Index (PVI®), in addition to SpO2, pulse rate, and perfusion index (PI). In 2008, Masimo introduced Patient SafetyNet(TM), a remote monitoring and wireless clinician notification system designed to help hospitals avoid preventable deaths and injuries associated with failure to rescue events. In 2009, Masimo introduced rainbow Acoustic Monitoring(TM), the first-ever noninvasive and continuous monitoring of acoustic respiration rate (RRa(TM)). Masimo's rainbow SET technology platform offers a breakthrough in patient safety by helping clinicians detect life-threatening conditions and helping guide treatment options. In 2010, Masimo acquired SEDLine®, a pioneer in the development of innovative brain function monitoring technology and devices. Masimo SET and Masimo rainbow SET technologies can be also found in over 100 multiparameter patient monitors from

Exhibit 7
Page 108

Case 8:20-cv-00048-JVS-JDE   Document 308-3   Filed 02/26/21   Page 98 of 124   Page ID #:26606



SEARCH     MENU

**Forward-Looking Statements**

This press release includes forward-looking statements as defined in Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934, in connection with the Private Securities Litigation Reform Act of 1995. These forward-looking statements are based on current expectations about future events affecting us and are subject to risks and uncertainties, all of which are difficult to predict and many of which are beyond our control and could cause our actual results to differ materially and adversely from those expressed in our forward-looking statements as a result of various risk factors, including, but not limited to: risks related to our assumptions regarding the repeatability of clinical results; risks related to our belief that Masimo's unique noninvasive measurement technologies, including: total hemoglobin (SpHb®), PVI®, acoustic respiration rate (RRa(TM)), and SEDLine® contribute to positive clinical outcomes and patient safety; risks related to our belief that Masimo noninvasive medical breakthroughs provide cost-effective solutions with comparable accuracy and unique advantages, including: immediate and continuous results that enable earlier treatment without causing invasive trauma in all patients and in every clinical situation; as well as other factors discussed in the "Risk Factors" section of our most recent reports filed with the Securities and Exchange Commission ("**SEC**"), which may be obtained for free at the SEC's website at www.sec.gov. Although we believe that the expectations reflected in our forward-looking statements are reasonable, we do not know whether our expectations will prove correct. All forward-looking statements included in this press release are expressly qualified in their entirety by the foregoing cautionary statements. You are cautioned not to place undue reliance on these forward-looking statements, which speak only as of today's date. We do not undertake any obligation to update, amend or clarify these statements or the "Risk Factors" contained in our most recent reports filed with the SEC, whether as a result of new information, future events or otherwise, except as may be required under the applicable securities laws.

**Media Contacts:**
Dana Banks
Phone: (949) 297-7348
Email: dbanks@masimo.com

Masimo, SET, Signal Extraction Technology, Improving Patient Outcome and Reducing Cost of Care... by Taking Noninvasive Monitoring to New Sites and Applications, rainbow, SpHb, SpOC, SpCO, SpMet, PVI, rainbow Acoustic Monitoring, RRa, Radical-7, Rad-87, Rad-57, Rad-8, Rad-5 ,Pulse CO-Oximetry, Pulse CO-Oximeter, Adaptive Threshold Alarm, and SEDLine are trademarks or registered trademarks of Masimo Corporation.
The use of the trademarks Patient SafetyNet and PSN are under license from University Health System Consortium.

SOURCE Masimo Corporation

*View All News*



Follow us

 

Privacy

Privacy Notice

Cookie Notice

Skip to main content

Case 8:20-cv-00048-JVS-JDE Document 308-3 Filed 02/26/21 Page 99 of 124 Page ID #:26607



Information Request          Email Alerts

© 2021 Masimo. All Rights Reserved.

Exhibit 7
Page 110

# EXHIBIT 8

Exhibit 8
Page 111

Masimo - News & Media - 2002

# News & Media

2002 ⌄

| Date |
|------|
| Title |

Exhibit 8
Page 112

| Date |
| --- |
| Title |



| 09/18/2002 |
| --- |
| Canada's World-Renowned Hospital for Sick Children Standardizes on Masimo SET® Pulse Oximetry |

Exhibit 8
Page 113





**Canada's World-Renowned Hospital for Sick Children Standardizes on Masimo SET® Pulse Oximetry**

*Proven Clinical Performance and Reduced Cost of Care are Cited as Key Factors*

Irvine, California, September 19, 2002. Masimo Corporation, the innovator of Signal Extraction Pulse Oximetry, announced that the Hospital for Sick Children (Sick Kids), the largest pediatric academic health science center in Canada and one of the largest and most respected in the world, has chosen to standardize on Masimo SET pulse oximetry throughout the hospital. Sick Kids chose Masimo SET following an extensive effort by the hospital's patient monitoring task force, which established generic patient monitoring protocols, and evaluated technologies most suited to implementing these protocols.

Helen Edwards, manager of the Patient Monitoring Practices Project said, "Our protocols identified oxygen saturation monitoring as one of the most important parameters to measure for our patients at Sick Kids. A key factor in our decision was the proven clinical performance of Masimo SET, which will contribute to the quality and reduced cost of care."

"The Hospital for Sick Children is recognized and respected the world over for its excellence in patient care, education and clinical research," said Kevin Mosher, President, Masimo Americas. "Sick Kids is among the leaders in advancing standards of patient care, and we are honored by The Hospital for Sick Children's affirmation of Masimo SET and proud to be selected by an institution that represents the best in pediatric patient care."

About The Hospital for Sick Children
The Hospital for Sick Children, affiliated with the University of Toronto, is the largest pediatric academic health science center in Canada and one of the largest in the world. Its mission is to provide the best in family-centered, compassionate care, to lead in scientific and clinical advancement, and to prepare the next generation of leaders in child health. For more information, please visit www.sickkids.ca.



# EXHIBIT 9

Exhibit 9
Page 116

SHOCK, Vol. 46, Supplement 1, pp. 55–60, 2016

# NONINVASIVE CONTINUOUS HEMOGLOBIN MONITORING IN COMBAT CASUALTIES: A PILOT STUDY

## Elizabeth Bridges[*] and Jennifer J. Hatzfeld[†]

[*]Biobehavioral Nursing and Health Systems, University of Washington School of Nursing, Seattle, Washington; and [†]Defense Medical Research and Development Program Combat Casualty Care, Research (MRMC-RTC), Fort Detrick, Maryland

Received 27 Feb 2016; first review completed 25 Mar 2016; accepted in final form 11 May 2016

ABSTRACT—Objective: To describe the accuracy and precision of noninvasive hemoglobin measurement (SpHb) compared with laboratory or point-of-care Hb, and SpHb ability to trend in seriously injured casualties. Methods: Observa-Observational study in a convenience sample of combat casualties undergoing resuscitation at two US military trauma hospitals in Afghanistan. SpHb was obtained using the Masimo Rainbow SET (Probe Rev E/Radical-7 Pulse CO-Oximeter v 7.6.2.1). Clinically indicated Hb was analyzed with a Coulter or iStat and compared with simultaneous SpHb values. Results: Twenty-three patients were studied (ISS $20 \pm 9.8$; age $29 \pm 9$ years; male 97%; 100% intubated). Primary injury cause: improvised explosive device (67%) or gunshot (17%). There were 49 SpHb-Hb pairs (median 2 per subject). Bias: $0.3 \pm 1.6$ g/dL (95% LOA $-2.4$, 3.4 g/dL). The SpHb-Hb difference $< \pm 1$ g/dL in 37% of pairs. Eighty-six percent of pairs changed in a similar direction. Using an absolute change in Hb of >1 g/dL, a concurrent absolute change in SpHb of >1 g/dL had a sensitivity: 61%, specificity 85%, positive predictive value: 80%, and a negative predictive value: 69%. The SpHb signal was present in 4643 of 6137 min monitored (76%). Conclusions: This was the first study to describe continuous SpHb in seriously injured combat casualties. Using a threshold of 1 g/dL previously specified in the literature, continuous SpHb is not precise enough to serve as sole transfusion trigger in trauma patients. Further research is needed to determine if it is useful for trending Hb changes or as an early indicator of deterioration in combat casualties.

KEYWORDS—Military, oximetry, trauma

## INTRODUCTION

Combat casualties are at high risk for hemorrhage due to the severity and complexity of their injuries. In severely injured casualties evacuated from Iraq and Afghanistan, 69% suffered polytrauma (1), with an average of 4.6 injuries per patient (2). Many of these casualties require hemorrhage control, damage control resuscitation (including massive transfusions), and surgery and rapid evacuation to a higher level of care. The ability to continuously monitor patients during this dynamic period is essential. Intermittent measurements of physiologic indicators such as vital signs, indications of perfusion (e.g., lactate, base deficit, urine output) and hemoglobin may not detect acute changes preceding deterioration or provide timely assessment of treatment response.

Continuous noninvasive hemoglobin monitoring may provide insight into the patient's status during this dynamic period. Most research on the accuracy and precision of continuous hemoglobin (SpHb) has been conducted under steady-state conditions. These conditions have included the induction of anesthesia and patients who are not actively bleeding in the intensive care unit or in emergency department (3–5). Additional studies have been conducted during controlled dynamic conditions, such as a fluid bolus, hemodilution, or controlled hemorrhage with concurrent volume resuscitation (6–8). A limited number of studies monitored patients during acute surgical hemorrhage (9–13), with trauma (14–16), or with postoperative blood loss (17, 18). However, among these studies the reported blood loss ranged only from 200 mL to 847 mL (9–12, 19). Only one study has been completed in patients with massive blood loss, and this study occurred during planned surgical procedures (20). No studies using SpHb have been conducted in combat trauma during resuscitation and stabilization.

The purpose of this study is to describe the accuracy (bias), precision (SD), and trending of continuous hemoglobin (SpHb) compared with laboratory hemoglobin (Hb) during the resuscitation and stabilization of combat trauma patients admitted to two US military trauma hospitals in Afghanistan.

## PATIENTS AND METHODS

This was a prospective observational study supported by the Joint Combat Casualty Care Research Team and approved with a waiver of consent by the US Army Medical Research and Materiel Command Institutional Review Board. A consecutive convenience sample of combat trauma patients admitted to US military hospitals at Bagram Air Field or Kandahar, Afghanistan from July to September 2010 were included. Subjects were 18 years of age or older, had an admission base deficit of $-5$ or less, and/or systolic blood pressure of $\leq 100$ mm Hg, and were intubated. The patients, who came directly from the point of injury or were transferred from another facility where damage control resuscitation/surgery had been performed, were enrolled upon arrival in the trauma bay. Patients who had detainee status or who had injuries to their hands that would

Address reprint requests to Elizabeth Bridges, PhD, RN, CCNS, Biobehavioral Nursing and Health Systems, University of Washington School of Nursing, 1959 NE Pacific, Seattle, WA 98103. E-mail: ebridges@u.washington.edu

The opinions or assertions contained herein are the private views of the authors and are not to be construed as official or as reflecting the views of the Department of the Air Force, Department of the Army, or the Department of Defense.

This study was supported by a grant from the TriService Nursing Research Program N05-P05: Arterial Based and Non-Invasive Functional Hemodynamic Indices in Combat Trauma Resuscitation.

Preliminary results of this study were presented at the USAF Military Research Symposium (Aug 2010) and the Society for Critical Care Medicine—Critical Care Congress (Jan 2012).

The authors report no conflicts of interest.

DOI: 10.1097/SHK.0000000000000654
Copyright © 2016 by the Shock Society

Copyright © 2016 by the Shock Society. Unauthorized reproduction of this article is prohibited.

Exhibit 9
Page 117

preclude placement of the pulse oximeter probe were excluded. Routine care of the patients was not altered for this study, and clinicians were blinded to the SpHb results.

Patients were monitored during resuscitation and stabilization in the emergency department, operating room (OR), and intensive care unit (ICU) with a noninvasive pulse oximeter (Masimo Rainbow SET, Masimo, Irvine, CA, Probe Rev E) attached to a Radical-7 Pulse CO-Oximeter (version 7.6.2.1) for SpHb, $SpO_2$, and pulse rate. The perfusion index (PI) was also monitored. The PI, which is an indicator of pulsatile strength, is derived from the pulse oximeter signal and is affected by changes in vascular tone (21). The manufacturer recommends caution interpreting SpHb results when the PI is <1.4. The sensor was positioned on the ring finger of the non-dominant hand (if available). If there was an injury to the extremity/hand the alternate hand was used. The probe was covered with an opaque shield to eliminate any potential error due to extraneous light sources. The placement of the SpHb probe did not circumvent the placement of a pulse oximeter probe for clinical monitoring. Venous or arterial Hb were drawn as routine part of care during resuscitation and analyzed via laboratory (Beckman Coulter Ac-T 5diff and Ac-T or Beckman Coulter Ac-T diff2) or point of care (iStat). All equipment underwent quality control procedures according to laboratory standards. The laboratory or iStat Hb was used as the reference. Additional variables collected included age, sex, mechanism of injury, Injury Severity Score (ISS), interventions (fluids, blood products, vasoactive medications), vital signs every 15 min and before/after the administration of fluids or blood products, and interventions (fluids, blood products, vasoactive medications).

## ANALYSIS

The SpHb data were recorded continuously and stored every 6 s in the Masimo Radical-7 Pulse CO-Oximeter. For analysis, the data were downloaded and averaged over 1 min. The average SpHb in the minute preceding the lab Hb draw was used for analysis. The Bland Altman method accounting for multiple observations (22) was used to evaluate the agreement and precision between the SpHb and Hb. An *a priori* clinical limit of ± 1 g/dL was applied to the Bland Altman plot. This limit was based on research that suggests that point-of-care devices are generally within 1 g/dL Hb compared with laboratory Hb testing and that Hb paired differences larger than this may lead to an inappropriate transfusion trigger (23, 24). Error grid analysis (25, 26) was used to graphically demonstrate the clinical significance of the differences between methods using a hemoglobin cutoff of 9 g/dL. A four-quadrant plot was used to demonstrate trending over time (27). Data were reported as mean (SD). A *P* value <0.05 was considered statistically significant.

## RESULTS

Data were collected from 24 combat trauma patients. Data pairs from one patient were excluded from further analysis as the laboratory Hb was drawn from an intravenous line and thought by the treating anesthesiologist to be diluted. This decision was supported by the laboratory and SpHb results (Hb 6–8 g/dL vs. SpHb 11.2–12.8 g/dL), with the SpHb thought to be more consistent with the patient's clinical status and preoperative Hb (13.3 g/dL). A summary of patient characteristics from the final sample size of 23 is presented in Table 1. Based on the Injury Severity Score (ISS), six patients (25%) had minor/moderate injuries, seven (29%) had a moderate/severe injury (ISS 15–24), and nine (38%) had severe/critical injury. During the study period, 15 patients received blood/blood products. No data were recorded on blood products administered before the study. For the 10 patients with direct admission,

TABLE 1. **Patient characteristics** (n = 24)

| | |
|---|---|
| Age (mean) | 29 ± 9 |
| Male | 97% |
| Nationality | |
|   US military | 17 (71%) |
|   US civilian | 3 (12%) |
|   Host national | 4 (17%) |
| Injury Severity Score (ISS) | 21 ± 9.7 |
|   <15 (minor/moderate) | 6 (25%) |
|   15–24 (moderate/severe) | 7 (29%) |
|   ≥25 (severe/critical) | 9 (38%) |
|   Missing | 2 (8%) |
| Mechanism of injury | |
|   Improvised explosive device (IED) | 67% |
|   Gunshot wounds | 17% |
|   Other (MVC, rocket, fragment NOS) | 16% |
| Time from injury to monitoring (median) | 345 min (25% <80 min from injury) |
|   Direct admission (n = 10) | 82 min (IQR 55) |
|   Transfer (n = 11) | 11.2 h (IQR 22.4) |
|   Missing (n = 3) | – |
| Monitoring time | 256 ± 76 min (median: 255; IQR 111) |
| Blood products administered during study period (n = 15) | |
|   PRBCs (n = 12) | 3.3 ± 4.9 units (median 2; range: 0–20 units) |
|   Whole blood (n = 1) | 8 units |
|   Fresh frozen plasma (FFP) (n = 11) | 2.8 ± 4.9 units (median 0.5; range 0–18) |
|   Platelets (6 units per pack) (n = 6) | 0.3 ± 0.6 packs (median 0; range 0–20) |

the median time from injury to study monitoring was 82 min, in contrast to the 11 patients who were transferred to a study site (median time from injury to monitoring, 11.2 h). Patients were monitored for the first 2 to 6 h after admission (mean 3.4 h). There were no deaths during the study period.

Forty-nine paired sets of hemoglobin data from 23 patients were analyzed. Each subject contributed between one and five paired sets (median = 2). The Hb ranged from 4.4 g/dL to 15.1 g/dL. The mean laboratory Hb (Coulter or iStat) was 11.0 ± 2.0 g/dL (Coulter, n = 32: 11.3 ± 1.8 g/dL; iStat, n = 17: 10.3 ± 2.2 g/dL). The mean SpHb was 11.5 ± 1.7 g/dL. In four cases, Hb samples were run on both the iStat and the Coulter. The Coulter Hb was significantly higher than the iStat Hb (1.38 ± 0.3 g/dL; 95% CI −1.87, −0.88, $P = 0.003$). The lab Hb was ≥9 g/dL in 45 (92%) of the pairs; thus an analysis of bias for Hb greater than or less than 9 g/dL was not conducted. The bias (SpHb-Hb) was 0.5 ± 1.8 g/dL (95% CI of bias = 0.03 to 1.0, $P = 0.04$), with upper and lower limits of agreement of 3.97 g/dL to −2.97 g/dL (Fig. 1), indicating that on average the SpHb tended to overestimate the lab Hb. The underestimation of the laboratory Hb by the iStat Hb values may have introduced increased bias and imprecision of the SpHb-iStat comparison (SpHb-Coulter Hb bias: 0.3 ± 1.6, 95% LOA −2.8 to 3.4 vs. SpHb-iStat Hb bias: 0.8 ± 2.0; 95% LOA −3.1 to 4.7). The error introduced by the iStat was also

Copyright © 2016 by the Shock Society. Unauthorized reproduction of this article is prohibited.

Exhibit 9
Page 118



Fig. 1.  **Bland Altman plot for bias (SpHb-Hb).** Each dot represents one data pair. The dotted lines represent the bias and 95% limits of agreement (LOA). Data pairs based on the perfusion index (PI) are denoted for PI <1.4 (X) versus PI ≥ 1.4 (star).



Fig. 2.  **Error grid analysis for pairs laboratory Hb to SpHb.** The error grid (25, 26) has three zones based on the difference between the SpHb and the control Hb value. Zone A reflects a clinically acceptable difference (±10%) for Hb concentration from 6 g/dL to 10 g/dL. Zone B reflects differences between the SpHb-Hb greater ± 10% with a potential for therapeutic error. Zone C reflects differences that may result in a major therapeutic error, such as the failure to administer blood.

found in another study of severely injured ICU patients (28), which supports the need to separate out all pairs using the iStat when evaluating the accuracy and precision of the SpHb. A secondary analysis was conducted to determine if the increased bias observed with the iStat was related to its increased use in unstable patients. Using the shock index (SI) as an indicator of hemodynamic instability (29–32), the SI was higher in the cases where the iStat was used ($-1.1 \pm 0.4$) compared with the Coulter ($0.9 \pm 0.4$), but the difference was not significant ($P = 0.06$). Further, there was no significant relationship ($r = 0.04$) between the Hb-SpHb bias and the SI, nor was there a significant difference in the use of the iStat versus the Coulter using SI thresholds of 0.9 and 1.0 as indicators of hemodynamic instability (29–32). There was no proportional bias between the mean Hb and the SpHb-Hb bias ($R^2 = 0.03$, $P > 0.05$). Thirty-seven percent of the paired samples had a bias ≤1 g/dL (37% of SpHb-Coulter pairs and 35% of SpHb-iStat pairs, NS) and 53% of the pairs had a bias <1.5 g/dL.

An error grid (Fig. 2) (25, 26) was constructed to demonstrate the clinical importance of the differences between the laboratory (Coulter or iStat) and SpHb values. The error grid has three zones based on the difference between the SpHb and the control Hb value, and allows for visualization of the potential clinical implications of the differences in values. As described by Morey and Rice (25, 26), Zone A contains an isthmus that represents 10% error for Hb values between 6 g/dL and 10 g/dL (an area where a transfusion decision may occur), whereas the areas below 6 g/dL reflect an area where a transfusion will most likely occur and above 10 g/dL where a transfusion is unlikely. Zone C represents potential for a major therapeutic error in the administration of blood, and reflects a potential for therapeutic error that is not as severe as Zone C. Ninety percent (44/49) of the data-pairs were in Zone A (SpHb bias ± 10% Hb) and 10% (5/49) were in Zone B. There were no cases in Zone C. The iStat was the source of the lab value in 4 of 5 of the Zone B readings.

Trend analysis was conducted to describe the concordance in the direction of change in Hb-SpHb relative to the last paired set using a four-quadrant plot (Fig. 3) (27). For this analysis, a central exclusion zone of 1 g/dL was used, as small changes in Hb tend to cause a large random error. As demonstrated in



Fig. 3.  **Four quadrant plot demonstrating 86% concordance in the direction of change in Hb-SpHb relative to the last paired set.** The quadrants show the direction of the change. The central gray box indicates the ±1 g/dL exclusion zone for analysis, as small changes in hemoglobin do not effectively evaluate trending ability. Concordance is measured by the percentage of data points that fall into the quadrants (upper right and lower left) indicating agreement in the direction of change. Data pairs based on Hb source are denoted for Coulter (star) and iStat (triangle).

Copyright © 2016 by the Shock Society. Unauthorized reproduction of this article is prohibited.

Exhibit 9
Page 119

Figure 3, 86% (12/14) of the pairs outside the 1 g/dL exclusion zone had similar directional change, with a coefficient of determination ($R^2 = 0.51$) for the trend. Using an absolute change in Hb of $>1$ g/dL, a concurrent absolute change in SpHb of $>1$ g/dL provided the following diagnostic values: sensitivity: 61% (95% CI 32%–86%), specificity 85% (95% CI 55%–98%), positive likelihood ratio 4.0 (95% CI: 1.04–15.36), negative likelihood ratio: 0.45 (95% CI 0.22–0.94), positive predictive value: 80% (95% CI 44%–97%), and a negative predictive value: 69% (41%–89%).

The SpHb signal was present in 4643 of the 6137 min monitored (76%). By subject, the SpHb was present $76 \pm 28\%$ (95% CI: 65%–89%); median 93% of the minutes monitored. In three subjects we were unable to acquire a consistent SpHb signal. Field notes related to these three patients all included comments on cold extremities, despite normothermia.

The mean perfusion index (PI) was $2.6 \pm 2.8$, with 75% of the PI values $\leq 3.6$. The PI was significantly higher when the SpHb signal was present versus lost ($2.5 \pm 2.6$ vs. $0.95 \pm 1$, $P < 0.001$), with an absolute PI dropout threshold of 0.53. There was a significant relationship between the PI and the bias ($r_s = 0.5$, $P < 0.001$). As the manufacturer recommends caution when the PI is $<1.4$, a subset analysis of the bias was performed using this threshold. As demonstrated in Figure 1, in the 45 sets with concurrent bias and PI data, when PI was $<1.4$, the SpHb underestimated the Hb (n = 21 pairs; bias= $-0.24 \pm 1.8$; 95% LOA: $-3.7$, 3.3). In contrast, when the PI was $\geq 1.4$, the SpHb overestimated the laboratory Hb (n = 24 pairs; bias =1.1 $\pm$ 1.4, 95% LOA = $-1.6$, 3.3). Further exploration of the effect of vasoconstriction (forearm-finger temperature) on the PI and bias is warranted (33), considering the potential use of SpHb monitoring in seriously injured patients under thermally stressful conditions in the field and during aeromedical transport.

There are several limitations in this pilot study. The sample size was small; however, a majority of the patients included were moderately or severely injured as indicated by the ISS. Despite the severity of the injuries of these combat casualties, only four of the data pairs had a Hb <9 g/dL. The study did not collect data on pre-admissions care, but these results likely reflect the use of tourniquets, and the military hypovolemic and blood transfusion practices used during damage control resuscitation (34).

## DISCUSSION

This is the only study to describe continuous SpHb monitoring in combat casualties undergoing resuscitation and surgical care. The population studied is unique as they were cared for under battlefield conditions, with some of the casualties coming directly from the point of injury. This investigation also provides insight into the patient's physiologic status during emergent resuscitation and stabilization.

The results for pairs using only the Coulter Hb (0.3 g/dL $\pm$ 1.6 g/dL; 95% LOA: $-2.97$ to 3.97 g/dL) can be compared to other studies to avoid any potential measurement error associated with the iStat. This bias and precision are similar to studies where the patient is in a dynamic state such as acute surgical hemorrhage (Table 2) (11–14, 20, 27). The studies by Berkow (20), Baulig (14, 18), Moore (35) are most similar to the present study in regards to the acuteness and amount of blood loss. In the present study, the EBL was not recorded, but 15 patients received blood transfusions during the study period (PRBCs: median 2; range: 0–20 units; whole blood 8 units for one patient), which is consistent with other studies reported in Table 2. In 37% of the data pairs the bias was <1 g/dL, and in 53% of the pairs the bias was <1.5 g/dL. The primary difference between the prior studies and the present study may be the

Table 2. **Bias and precision of SpHb-Hb under dynamic conditions**

| Study | Sample (n) | Bias and precision (SpHb-Hb) |
| --- | --- | --- |
| Miller (13) | Spinal surgery (n = 20; 78 pairs). EBL: 500 mL (median); blood products: NR | 0.26 g/dL; (95% LOA −3.24 to 3.77) |
| Lamhaut (11) | Urologic surgery (n = 44; 85 pairs). EBL NR. PRBC: 1.1 $\pm$ 1.9 units | $-0.02 \pm 1.11$ g/dL; 95% LOA −2.75, 2.70) |
| Berkow (20) | Complex spinal surgery (n = 29; 186 pairs). EBL: median 1800 mL (100–4500 mL). PRBCs: median 4 units (range 0–25 units) | $-0.3 \pm 1.0$ g/dL (95% LOA −2.4, 1.7) |
| Colquhoun (27) | Spinal surgery (n = 20; 88 pairs). EBL NR. Blood products: NR | $-1.27$ g/dL (95% LOA −5.05, −2.51) |
| Applegate (12) | Major surgery (n = 45; 218 pairs). EBL: 847 $\pm$ 1053 mL, median 500 mL. Blood products: NR | $-0.1 \pm 1.3$ g/dL (95% LOA −2.73, 2.53) -Rev G; 0.5 $\pm$ 1.4 g/dL (95% LOA of −2.3, 3.3) Rev E |
| Baulig (14) | Severely injured patients undergoing surgery (n = 26; 102 pairs). Blood products: NR | $-0.9$ g/dL $\pm$ 1.1 (95% LOA −3.16, 1.36) |
| Moore (35) | Severely injured trauma patients—first 24 h after admission (n = 525; 861 pairs). EBL: NR. PRBC: 37% patients received >1 unit; volume not reported | Bias: NR; 95% CI −3.84, 3.89 |
| Joseph (16) | Severely injured trauma patients over 72 h in ICU (n = 23; 89 pairs). EBL: NR. Blood products: nine patients received blood transfusion during hospitalization, timing, and volume not reported | Mean difference 1 g/dL |
| Tsuei (28) | ICU patients at risk for hemorrhage (n = 88; 572 pairs). EBL: NR, blood products: NR | SpHb-CBC 1.49 (95% LOA −2.2, 5.0); iStat-CBC: −0.63 g/dL (95% LOA −3.4, 2.2); SpHb-iStat: 2.1 g/dL (95% LOA −1.7. 5.9) |
| Baulig (18) | Trauma patients and bleeding surgical patients (n = 35; 141 pairs). EBL: NR. PRBC: median 0 (IQR 0–300) | $-0.6$ g/dL (95% LOA −3.0 to 1.9) |

EBL indicates estimated blood loss; NR, not reported.

Copyright © 2016 by the Shock Society. Unauthorized reproduction of this article is prohibited.

Exhibit 9
Page 120

urgency of the surgical procedures, with some of the patients in our study in a more dynamic state associated with emergent resuscitative procedures in contrast to planned surgery. Moore's study followed 418 severely injured trauma patients (69% blunt trauma) for 24-h. Compared with this study, 36.6% of the patients in Moore's study received blood transfusions, and there was no difference in bias for patients who did or did not receive a transfusion. Among the 153 patients who received a transfusion, the 95% confidence limits for the lab Hb and the SpHb were 2.97 to $-4.62$.

The perfusion state of the patients (75% of data pairs obtained with a PI <3.6) may have contributed to the increased bias in this study. The results of this study are consistent with Miller (13) and Kondo (36) studies where there was increased bias with a lower PI. The effect of low perfusion on the ability to monitor is of concern. In our study the SpHb measurements were obtained in 93% of the minutes monitored; however, there were three patients for whom we were not able to obtain a signal. In contrast, in Moore (35) study, the signal was not obtainable in 34% of the readouts. The difference between the studies may reflect the length of time being monitored.

The results of the error grid analysis, in which 90% of the pairs were in Zone A and 10% were in Zone B (Fig. 2) exceed the limits specified by Morey et al. (25), who suggested that 95% of the pairs be in Zone A and 5% in Zone B. Several factors may be associated with these findings including the use of a point-of-care monitor (four of the five pairs in Zone B used the iStat at the value for comparison) and that an acute change in the patient's status may cause a lag between the microcirculatory (as measured by the SpHb) and macrocirculatory Hb levels (37). One potential method to improve the bias and precision of the SpHb measurements is a single calibration based on the initial Hb-SpHb difference (38, 39). It is not known if this recalibration needs to be accomplished under dynamic conditions.

A potential benefit of continuous SpHb is the ability to detect acute changes in Hb and occult bleeding (37). In this study the SpHb had a sensitivity of 61% and specificity of 85% to detect a 1 g/dL change in Hb. In Baulig (14) study of 26 severely traumatized patients undergoing surgery SpHb had a sensitivity of 59% and specificity of 83% to detect a Hb change greater than 0.5 g/dL. The ability of SpHb to accurately detect changes in Hb was demonstrated in the trend analysis for concurrence (Fig. 3). In Colquhoun (27) study of patients undergoing major spine surgery, 94% of the data were in the quadrants indicating correct directional change, and in Tsuei (28) study of ICU patients at risk for bleeding the SpHb-CBC concordance was 60%, in contrast to the 86% concordance in our study that included patients in both the OR and ICU. The trend analysis for concurrence in our study ($r^2 = 0.51$) was comparable to studies under steady-state conditions in patients in the ICU ($r^2 = 0.41$) and OR ($r^2 = 0.45$) (3, 10), during dynamic conditions, including hemodilution ($r^2 = 0.78$), surgical blood loss ($r^2 = 0.37$), boluses ($r^2 = 0.56$) (7, 10, 12), and trauma surgery ($r^2 = 0.43$) (14).

Noninvasive SpHb did not have adequate precision to serve as a sole indicator of the need for transfusion in the unstable trauma patient. Continuous SpHb may be potentially useful in

following trends and in detecting acute changes in Hb in combat casualties. The continuous measurement also provides insight into the variability of Hb in patients in a dynamic state (actively bleeding or being resuscitated), and as suggested by the concordance analysis, may provide an early indicator of clinical changes or deterioration. Additional studies are needed to further describe the changes in SpHb under dynamic conditions and to monitor a patient's state during en route transport.

## REFERENCES

1. Bridges E, Evers K: Wartime critical care air transport. *Mil Med* 174(4):370–375, 2009.
2. Champion HR, Holcomb JB, Lawnick MM, Kelliher T, Spott MA, Galarneau MR, Jenkins DH, West SA, Dye J, Wade CE, et al.: Improved characterization of combat injury. *J Trauma* 68(5):1139–1150, 2010.
3. Frasca D, Dahyot-Fizelier C, Catherine K, Levrat Q, Debaene B, Mimoz O: Accuracy of a continuous noninvasive hemoglobin monitor in intensive care unit patients. *Crit Care Med* 39(10):2277–2282, 2011.
4. Gayat E, Bodin A, Sportiello C, Boisson M, Dreyfus JF, Mathieu E, Fischler M: Performance evaluation of a noninvasive hemoglobin monitoring device. *Ann Emerg Med* 57(4):330–333, 2011.
5. Knutson T, Della-Giustina D, Tomich E, Wills B, Luerssen E, Reynolds P: Evaluation of a new noninvasive device in determining hemoglobin levels in emergency department patients. *West J Emerg Med* 14(3):283–286, 2013.
6. Macknet M, Norton S, Kimball-Jones P, Applegate R, Martin R, Allard M: Continuous noninvasive measurement of hemoglobin via pulse co-oximetry. *Anesth Analg* 105(6):S108–S109, 2007.
7. Macknet MR, Allard M, Applegate RL, Rook J: The accuracy of noninvasive and continuous total hemoglobin measurement by pulse CO-oximetry in human subjects undergoing hemodilution. *Anesth Analg* 111(6):1424–1426, 2010.
8. Kinsky M, Salter M, Daneshvari S, Indrikovs A, George K: Continuous noninvasive hemoglobin: Impact of hemorrhage on volume expansion of crystalloids in humans. *Annual Meeting of the American Society of Anesthesiologists*; 2010;A391, 2010.
9. Causey MW, Miller S, Foster A, Beekley A, Zenger D, Martin M: Validation of noninvasive hemoglobin measurements using the Masimo Radical-7 SpHb Station. *Am J Surg* 201(5):592–598, 2011.
10. Vos JJ, Kalmar AF, Struys MM, Porte RJ, Wietasch JK, Scheeren TW, Hendriks HG: Accuracy of non-invasive measurement of haemoglobin concentration by pulse co-oximetry during steady-state and dynamic conditions in liver surgery. *Br J Anaesth* 109(4):522–528, 2012.
11. Lamhaut L, Apriotesei R, Combes X, Lejay M, Carli P, Vivien B: Comparison of the accuracy of noninvasive hemoglobin monitoring by spectrophotometry (SpHb) and HemoCue (R) with automated laboratory hemoglobin measurement. *Anesthesiology* 115(3):548–554, 2011.
12. Applegate R, Collier C, Mangus D, Barr S, Macknet M, Hassanian M, Allard M: Evaluation of absolute and trend accuracy of revision G noninvasive and continuous hemoglobin monitoring during major surgery. *Anesth Analg* 116(Suppl 1):S-384, 2013.
13. Miller RD, Ward TA, Shiboski SC, Cohen NH: A comparison of three methods of hemoglobin monitoring in patients undergoing spine surgery. *Anesth Analg* 112(4):858–863, 2011.
14. Baulig W, Prassler S, Sulser S, Dambach M, Biro P, Theusinger O: Non-invasive detection of hemoglobin concentration by pulse co-oximetry in severely traumatized patients. *Eur J Anaesthesiol* 30(Suppl 51):50, 2013.
15. Engels P, Romanovsky A, Bagshaw S: Noninvasive hemoglobin monitoring in trauma patients. *Am J Respir Crit Care Med* 183:A5851, 2011.
16. Joseph B, Hadjizacharia P, Aziz H, Snyder K, Wynne J, Kulvatunyou N, Tang A, O'Keeffe T, Latifi R, Friese R, et al.: Continuous noninvasive hemoglobin monitor from pulse ox: ready for prime time? *World J Surg* 37(3):525–529, 2013.
17. Nguyen BV, Vincent JL, Nowak E, Coat M, Paleiron N, Gouny P, Ould-Ahmed M, Guillouet M, Arvieux CC, Gueret G: The accuracy of noninvasive hemoglobin measurement by multiwavelength pulse oximetry after cardiac surgery. *Anesth Analg* 113(5):1052–1057, 2011.
18. Baulig W, Seifert B, Spahn DR, Theusinger OM: Accuracy of non-invasive continuous total hemoglobin measurement by pulse CO-oximetry in severe traumatized and surgical bleeding patients. *J Clin Monit Comput*; 2015 [epub ahead of print].

Exhibit 9
Page 121

Copyright © 2016 by the Shock Society. Unauthorized reproduction of this article is prohibited.

19. Giraud B, Frasca D, Debaene B, Mimoz O: Comparison of haemoglobin measurement methods in the operating theatre. *Br J Anaesth* 111(6):946–954, 2013.

20. Berkow L, Rotolo S, Mirski E: Continuous noninvasive hemoglobin monitoring during complex spine surgery. *Anesth Analg* 113(6):1396–1402, 2011.

21. Whitepaper: Clinical Applications of Perfusion Index. 2007; Available at: http://www.masimo.co.uk/pdf/whitepaper/LAB3410F.pdf. Accessed Jan 15, 2016.

22. Bland JM, Altman DG: Agreement between methods of measurement with multiple observations per individual. *J Biopharm Stat* 17(4):571–582, 2007.

23. Bosshart M, Stover JF, Stocker R, Asmis LM, Feige J, Neff TA, Schuepbach RA, Cottini SR, Bechir M: Two different hematocrit detection methods: different methods, different results? *BMC Res Notes* 3:65, 2010.

24. Gehring H, Hornberger C, Dibbelt L, Rothsigkeit A, Gerlach K, Schumacher P, Schmucker P: Accuracy of point-of-care-testing (POCT) for determining hemoglobin concentrations. *Acta Anaesthesiol Scand* 46(8):980–986, 2002.

25. Morey TE, Gravenstein N, Rice MJ: Let's think clinically instead of mathematically about device accuracy. *Anesth Analg* 113(1):89–91, 2011.

26. Rice MJ, Gravenstein N, Morey TE: Noninvasive hemoglobin monitoring: how accurate is enough? *Anesth Analg* 117(4):902–907, 2013.

27. Colquhoun DA, Forkin KT, Durieux ME, Thiele RH: Ability of the Masimo pulse CO-oximeter to detect changes in hemoglobin. *J Clin Monit Comput* 26(2):69–73, 2012.

28. Tsui BJ, Hanseman DJ, Blakeman MJ, et al.: Accuracy of noninvasive hemoglobin monitoring in patients at risk for hemorrhage. *J Trauma Acute Care Surg* 77(3 Suppl 2):S134–S139, 2014.

29. Rady MY, Nightingale P, Little RA, Edwards JD: Shock index: a re-evaluation in acute circulatory failure. *Resuscitation* 23(3):227–234, 1992.

30. Cannon CM, Braxton CC, Kling-Smith M, Mahnken JD, Carlton E, Moncure M: Utility of the shock index in predicting mortality in traumatically injured patients. *J Trauma* 67(6):1426–1430, 2009.

31. Apodaca AN, Morrison JJ, Spott MA, Lira JJ, Bailey J, Eastridge BJ, Mabry RL: Improvements in the hemodynamic stability of combat casualties during en route care. *Shock* 40(1):5–10, 2013.

32. Mutschler M, Nienaber U, Munzberg M, Bouillon B, Maegele M: TraumaRegister DGU: The Shock Index revisited—a fast guide to transfusion requirement? A retrospective analysis on 21,853 patients derived from the Trauma Register DGU. *Crit Care* 17(4):R172, 2013.

33. Yamaura K, Nanishi N, Higashi M, Hoka S: Effects of thermoregulatory vasoconstriction on pulse hemoglobin measurements using a co-oximeter in patients undergoing surgery. *J Clin Anesth* 26(8):643–647, 2014.

34. Butler FK Jr, Blackbourne LH: Battlefield trauma care then and now: a decade of Tactical Combat Casualty Care. *J Trauma Acute Care Surg* 73(6 Suppl 5):S395–S402, 2012.

35. Moore LJ, Wade CE, Vincent L, Podbielski J, Camp E, Junco DD, Radhakrishnan H, McCarthy J, Gill B, Holcomb JB: Evaluation of noninvasive hemoglobin measurements in trauma patients. *Am J Surg* 206(6):1041–1047, 2013.

36. Kondo I, Takamiya T, Suzuki N: Influence of peripheral perfusion index on accuracy of noninvasive hemoglobin monitoring (SpHb). *Eur J Anaesthesiol* 30(Suppl 51):48–49, 2013.

37. Naftalovich R, Naftalovich D: Error in noninvasive spectrophotometric measurement of blood hemoglobin concentration under conditions of blood loss. *Med Hypotheses* 77(4):665–667, 2011.

38. Torp K, Aniskevich S, Pai S, Shine T, Peiris P, Crawford C. In-vivo calibration improves accuracy of non-invasive hemoglobin measurements. Paper presented at: Proceedings of the American Society of Anesthesiologists2012; Washington, DC.

39. Miyashita R, Hirata N, Sugino S, Mimura M, Yamakage M: Improved non-invasive total haemoglobin measurements after in-vivo adjustment. *Anaesthesia* 69(7):752–756, 2014.








Copyright © 2016 by the Shock Society. Unauthorized reproduction of this article is prohibited.

Exhibit 9
Page 122

# EXHIBIT 10

Exhibit 10
Page 123

# News & Media

Home (/healthcare/) / News & Media (/company/news/news-media/) / 1998

## NEWS & MEDIA:        1998 ⌄



| Date | Title |
|------|-------|
| ████████ | ████████████████████████████████ ████████████████ |
| ████████ | ████████████████████████████████████ ████████████████████████████ ██████████████████████ |
| ████████ | ████████████████████████████████ ██████████████ |
| 10/14/1998 | Masimo Signal Extraction Pulse Oximetry Debuted at the American Society of Anesthesiology Conference |
| ████████ | ████████████████████████████████████ ████ |
| ████████ | ████████████████████████████████ ████ |
| ████████ | ████████████████████████████████████ ████████████ |
| | ████████████████████████████████████ |
| | ██████████████████████ |





**Masimo Signal Extraction Pulse Oximetry Debuted at the American Society of Anesthesiology Conference**

October 14, 1998 - Masimo Corporation (Irvine, CA) announced that its breakthrough Signal Extraction™ pulse oximetry will be demonstrated at the upcoming meeting of the American Society of Anesthesiologists which will be held in Orlando, Florida (October 18 – 21). The Company plans to have its technology and products on display at its own booth as well as at the booths of several of its licensees. The Company will also be sponsoring a symposium regarding the clinical implications of Masimo SET® pulse oximetry on October 15.

Masimo, a medical technology company, has created a fundamentally advanced method of measuring arterial oxygen saturation and pulse rate. Masimo Signal Extraction pulse oximetry is the only technology clinically proven accurate during patient motion and is designed for accuracy during conditions of low perfusion, bright ambient light and electro-surgical interference. Numerous published studies have shown a virtual elimination of false alarms with Masimo Signal Extraction pulse oximetry, as compared with conventional pulse oximetry, without sacrificing the ability to detect true alarms. In one such study published in the Journal of Anesthesiology, Dr. Steven Barker, Chairman of the Dept. of Anesthesiology at the University of Arizona, and Dr. Nitin Shah at the University of California, Irvine reported that, under conditions of motion, Masimo SET had no false alarms while catching all of the true alarms as compared to the latest conventional pulse oximeter (Oxismart - N290, N295 & N3000) manufactured by Nellcor which false alarmed 36% of the time and missed 16% of the true alarms.

"Masimo SET is the first significant advancement in pulse oximetry since the introduction of pulse oximetry," stated Steven Barker, Ph.D, M.D. "Masimo SET should clearly become the new standard for pulse oximetry."

The Company has a business strategy of licensing its technology to leading patient monitoring companies in an effort to rapidly improve the standard for pulse oximetry measurement. The Company believes that by offering a clearly superior product without charging a price premium over existing products, it offers clinicians the opportunity of improving patient care while reducing cost through truly reliable monitoring and durable adhesive sensors. To date the Company has signed licensing agreements with more than one quarter of the world's suppliers of pulse oximetry. Several of the Company's licensees have recently launched products with Masimo SET pulse oximetry and several others are due to launch by year end.

Joe E. Kiani, President and Chief Executive Officer of Masimo Corporation, stated, "Over the last 15 years, clinicians have learned to accept the shortcomings of conventional pulse oximetry. Signal degradation due to motion artifact and low perfusion were assumed to be insurmountable limitations of pulse oximetry. We have solved these problems and now offer a pulse oximetry technology that does what it is supposed to do – reliably monitor the patient."

"Masimo has a very solid technology and strategy," stated Jonathan Osgood, Managing Director and medical device analyst for BT Alex. Brown. "Masimo is offering a product which is certain to improve the quality of care and decrease the cost of care as well. This is a rare and impressive combination which is why I believe that many of the leading patient monitoring companies are adopting Masimo SET as their standard pulse oximetry product."

Exhibit 10
Page 125

The Company's plans for the ASA include live demonstrations of its technology in its booth and several of its licensees' (Allegiance Healthcare, Cardiopulmonary Corporation, Datascope Corporation, and Invivo Research) booths as well as sponsoring a clinical symposium. The symposium, which will be held on October 15 from 6:30 – 8:30 at the Clarion Plaza hotel in Orlando, will focus on the clinical implications of Masimo Signal Extraction pulse oximetry. The speakers are world renowned clinical researchers, Jeremy Swan, Ph.D., M.D., Steven Barker, Ph.D., M.D., Christian Poets, M.D. and Kevin Tremper, Ph.D., M.D. known for their contribution to the field of medicine.



# EXHIBIT 11

Exhibit 11
Page 127







Message

# Marcelo Lamego   · 3rd

Founder and CEO - True Wearables

Rancho Santa Margarita, California, United States   ·   500+ connections   ·   Contact info



True Wearables



Stanford University

## About

Marcelo Malini Lamego is currently with True Wearables, Rancho Santa Margarita, CA. Throughout his career, he concentrated his efforts on the development of medical technologies and products. He is an inventor on more than 100 patents related to optimization and signal processing, devices, sensors and patient monitoring technologies, and author on more than 30 peer-reviewed journal and international conference articles in the areas of Automatic Control and Optimization, Adaptive Systems and Neural Networks, Power Electronics, and Mossbauer Spectroscopy applied to environmental control. Marcelo holds a Ph.D. degree in Electrical Engineering from Stanford University, California.

Exhibit 11
Page 128

## Activity

1,394 followers



Messaging

Posts Marcelo created, shared, or commented on in the last 90 days are displayed here.

See all activity

## Experience



**Founder and CEO**
True Wearables
Aug 2014 – Present
· 6 yrs 7 mos
29826 Avenida de Las Banderas, Suite 300, Rancho Santa Margarita CA 92688

True Wearables is a medical device company based in Rancho Santa Margarita, California. We aim at creating low cost, reliable, fully disposable, and wireless devices that will disrupt the medical industry and make the world a better place. Oxxiom is our FDA 510(k) cleared product and the world's first wireless (completely cordless), fully disposable, single-use pulse oximeter, and recipient of:
(1) The 2017 Good Design Award by the Chicago Athenaeum Museum of Architecture and Design, in the medical category. The award is presented to the most innovative and cutting-edge industrial, product and graphic designs produced around the world. Winners are selected among thousands of submissions from leading manufacturers and industrial and graphic designers from over 48 countries, representing the most important and influential corporations around the world.
(2) The 2018 iF DESIGN AWARD. Each year, the world's oldest independent design organization, Hannover-based iF International Forum Design GmbH, organizes the iF DESIGN AWARD. Oxxiom won over the 63-member jury, made up of independent experts from all over the world, with its original origami-style design. Over 6,400 entries were submitted from 54 countries in hopes of receiving the seal of quality.

see less



**R&D**
Apple
Jan 2014 – Jul 2014
· 7 mos
Cupertino, CA

Worked in the Apple Watch project. Activities included:
(1) Produced key intellectual property related to bio-sensing under the form of several issued patents (US9723997, US9952095, US10078052, US10219754, US10247670, US10524671);
(2) Defined required resources for current and future bio-sensing functionalities;
(3) Selected and hired scientists and engineers;
(4) Proposed and reviewed hardware and algorithm architectures, and advised team regarding bio-sensing functionalities;
(5) Negotiated and signed contract with large local university for data collection on human subjects to model the interaction between the subjects' physiology and bio-sensing technology.

see less

Exhibit 11
Page 129



Chief Technical Officer


Cercacor Laboratories, Inc.
2006 – Jan 2014
· 8 yrs
189 Technology, Irvine CA 92618

Responsible for the engineering team and Cercacor's research and product development. Developed the Pronto-7, a FDA/CE approved noninvasive hemoglobin meter, currently being sold worldwide by Masimo Corp, and recipient of:
(1) The 2011 Medical Design Excellence Award;
(2) The 2011 iF Product Design Award;
(3) The 2011 TechAmerica High-Tech Innovation Award;
(4) The 2011 World Health Organization Innovative Medical Technology (cost-effectively address global health concerns and needs);
(5) The 2012 GOLD Stevie® American Business Award for the Best New Product or Service in the Health & Pharmaceuticals category.
Pronto-7 uses Rainbow 4D Technology, an extension of Rainbow Technology.

Management activities included:
(i) Budget forecast, product roadmap, IP strategy, and updates to the Board of Directors;
(ii) Project management and design controls per ISO13485 and FDA Quality System Regulation (QSR);
(iii) Regulatory (510k, CE Mark, etc.) and clinical (IRB sites/protocols, demographics, etc.) strategies;
(iv) Negotiated supplier agreements and NDAs;
(v) Engineering and clinical labs (layout, equipment, people, workflow, etc.);
(vi) Setup HR (payroll and insurances, hiring package, evaluations, etc.), building lease, biz licenses and insurances.
(vii) Hired/trained engineering and clinical teams (over 50 employees).

Technical activities included:
(i) Modeling: Numerical solver for 3D simulation of light transport in biological tissues;
(ii) HW: Device and sensor circuit architectures, and HW characterization metrics;
(iii) Algorithm: Design methodology and all core real-time estimation algorithms;
(iv) SW: Architecture, kernels, services, drivers, and graphical interface;
(v) Biosensor: Mechanical, electrical, and optical specifications of emitters and detectors;
(vi) Industrial design: Device and sensor form factors to receive certifications;
(vii) Connectivity: EMR connectivity for data sharing with HIPAA compliance via standard protocols (HL7, POCT1A, etc.).

 see less



Exhibit 11
Page 130

### Research Scientist



Masimo
Jan 2003 – Nov 2006
· 3 yrs 11 mos
50 Parker, Irvine, CA 92618

Leading scientist in the development of the Rainbow Technology and of the first FDA/CE approved noninvasive carboxyhemoglobin and methemoglobin meter Rad-57, currently being sold worldwide by Masimo Corp, and recipient of:
(1) The 2006 Medical Design Excellence Award;
(2) The STA 2006 Application of Technology Award;
(3) The 2006 AEA Innovative Medical Technology Award.
This technology required mathematical concepts in several fields, ranging from optimal control theory and optimization, adaptive systems and statistics, transport theory and light interaction with biological tissues, light modulation, advanced digital signal processing techniques, embedded HW and SW.

see less

### Professor

Universidade de São Paulo
Jan 2002 – Dec 2002
· 12 mos
MBA in Management and Product Engineering - PECE program

Taught during two semesters a graduate course entitled "Strategic Consulting for Engineers", wherein students learned and developed a number of business concepts and investment science skills needed to analyze business problems and create visual presentations in order to advise corporate management in the decision making process.

### Management Consultant

The Boston Consulting Group
Jan 2001 – Dec 2002
· 2 yrs
Sao Paulo, Brazil

Worked in several projects in the areas of energy, technology, banking, new investment opportunities, and pharmaceuticals, mainly helping a pharmaceutical company on market assessment of various highly specialized drugs (HIV, Cancer, Hepatitis, etc.).
Completed The Boston Consulting Group 2001 Business Essentials Program at Babson College, Wellesley. see less

### Algorithm Engineer

Masimo
2000
· less than a year
Irvine, CA

Developed estimation algorithms, simulation tools, and experimental clinical data collection setups for the noninvasive measurement of blood constituents.

Exhibit 11
Page 131

Assistant Professor (full tenure)


Universidade Federal do Espírito Santo (Oficial)
Jan 1994 – Aug 1996
· 2 yrs 8 mos
Electrical Engineering Department, Vitoria, ES, Brazil

Taught undergraduate semester courses in Automatic Control (Classic and Modern), Electronics and Electrical Circuits II, with twice a week lectures (2 hours each with 40 to 60 students), and weekly laboratory sections (smaller number of students). Member of the Power Electronics Laboratory (LEPAC), conducting research in Automatic Control and Power Electronics (results published in 20+ papers)see more

Visiting Researcher


NHL Hogeschool
Feb 1993 – Aug 1993
· 7 mos
Leeuwarden, The Netherlands

Developed a fuzzy logic laboratory comprising of laboratory-scale experiments /setups for educational purposes, including an inverted pendulum, an interval fuzzy simulator for differential equations, and a high-performance motion control system using extremity fuzzy PID controllers. The results were published in a number of research-oriented conference papers.

Co-founder
Hard Sistemas
Jul 1990 – Jan 1993
· 2 yrs 7 mos
Vitoria, ES, Brazil

Projects Developed:
(1) Audio Switching Power Amplifier - developed as a prototype (the first of its kind), delivering over 1kW rms high-quality audio power. Patent was filed in the Brazilian Patent Office (INPI, 22/08/1991, # 103746-8)                                                                                     ... see more

Show fewer experiences

# Education


Stanford University
Doctor of Philosophy (Ph.D.), Electrical and Electronics Engineering
1996 – 2000

Media (4)

Previous          Next

Exhibit 11
Page 132



Automata Control Systems



Quantification of Air Pollution Sources



Adaptive Structures with Algebraic Loops



Neurointerfaces

Universidade Federal do Espírito Santo (Oficial)

Master of Science (MS), Electrical and Electronics Engineering

1991 – 1993

Media (1)

Exhibit 11
Page 133



Modeling and Simulation of a Complex
Industrial Process

Universidade Federal do Espírito Santo (Oficial)
 Bachelor of Engineering (B.E.), Electrical and Electronics Engineering
1985 – 1990

## Skills & endorsements

R&D · 41

Marco Antônio Malini Lamego and 40 connections have given endorsements for this skill

Medical Devices · 37



Endorsed by tho tran and 4 others who are highly skilled at this



Endorsed by 2 of Marcelo's colleagues at Apple

Product Development · 30

Endorsed by Gopi Soundararajan and 2 others who are highly skilled at this

Endorsed by 2 of Marcelo's colleagues at Apple

Show more

## Recommendations

Exhibit 11
Page 134

Received (1)        Given (1)



### Yannick de Alwis

Systems and Electrical Lead at
Raytheon Missiles & Defense

February 6, 2014, Marcelo was
senior to Yannick but didn't
manage directly

Marcelo hired me on to the team at Cercacor in 2010, generously giving me an even more rewarding position than the one I had applied for. Marcelo is a brilliant engineer with many inventions to his name. He has the heart of a teacher, and was eager to help me in my career growth by freely sharing his experience a... See more

## Accomplishments

2

Languages

English  •  Portuguese

## Interests



Medical Device Engineers Network
14,275 members



Stanford University
358,050 followers



Universidade Federal do Espírito Santo (Oficia
29,932 followers



True Wearables
122 followers

Innovation in Biotechnology, Medical Device,

Exhibit 11
Page 135