JOSHUA H. LERNER, SBN 220755
  jlerner@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street Suite 3000
San Francisco, CA 94105
Tel.: 415.393.8200 / Fax: 415.393.8306

H. MARK LYON, SBN 162061
  mlyon@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA 94304-1211
Tel.: 650.849.5300 / Fax: 650.849.5333

BRIAN M. BUROKER, *pro hac vice*
  bburoker@gibsondunn.com
BRIAN K. ANDREA, *pro hac vice*
  bandrea@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Tel.: 202.955.8500 / Fax: 202.467.0539

BRIAN A. ROSENTHAL, *pro hac vice*
  brosenthal@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Tel.: 212.351.2339 / Fax: 212.817.9539

ILISSA SAMPLIN, SBN 314018
  isamplin@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Tel.: 213.229.7000 / Fax: 213.229.7520

ANGELIQUE KAOUNIS, SBN 209833
  akaounis@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2029 Century Park East Suite 4000
Los Angeles, CA 90067
Tel.: 310.552.8546 / Fax: 310.552.7026

*Attorneys for Defendant Apple Inc.*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SOUTHERN DIVISION

MASIMO CORPORATION,
a Delaware corporation; and
CERCACOR LABORATORIES, INC.,
a Delaware corporation,

        Plaintiffs,

    v.

APPLE INC.,
a California corporation,

        Defendant.

CASE NO. 8:20-cv-00048-JVS (JDEx)

**DECLARATION OF ILISSA SAMPLIN IN SUPPORT OF DEFENDANT APPLE INC.'S PORTION OF JOINT STIPULATION REGARDING PLAINTIFFS' MOTION TO COMPEL APPLE TO PRODUCE DOCUMENTS AND FULLY ANSWER INTERROGATORIES**

Judge:      Hon. John D. Early
Date/Time:  May 13, 2021, 10:00 AM
Courtroom: 6A

Discovery Cutoff:     7/5/2021
Pre-trial Conference:  3/21/2022
Trial:             4/5/2022

Gibson, Dunn & Crutcher LLP

SAMPLIN DECL. IN SUPPORT OF APPLE'S PORTION OF JOINT STIPULATION REGARDING PLAINTIFFS' MOTION TO COMPEL APPLE TO PRODUCE DOCUMENTS AND FULLY ANSWER INTERROGATORIES CASE NO. 8:20-CV-00048-JVS (JDEx)

I, Ilissa Samplin, declare and state as follows:

1.      I am an attorney duly licensed to practice law before this Court and all courts of the State of California.  I am a partner with the law firm of Gibson, Dunn & Crutcher LLP ("Gibson Dunn") and counsel of record for Apple Inc. ("Apple") in the above-captioned action.

2.      I have personal, firsthand knowledge of the facts stated herein and, if called upon to do so, could and would competently testify thereto.

3.      I make this declaration in support of Apple's Portion of the Joint Stipulation Regarding Plaintiffs' Motion to Compel Apple to Produce Documents and Fully Answer Interrogatories.

**Discovery Requests and Responses:**

4.      On August 17, 2020, Plaintiffs filed their motion for a preliminary injunction, and included a proposed order (Dkt. No. 108-1).  Pursuant to Local Rule 37-2.1, a true and correct copy of that proposed order is attached hereto as **Exhibit A**.

5.      On August 31, 2020, Plaintiffs filed their reply in support of their preliminary injunction motion (Dkt. No. 161-1).  Pursuant to Local Rule 37-2.1, a true and correct copy of that reply is attached hereto as **Exhibit B [filed under seal]**.

6.      On October 16, 2020, Plaintiffs served supplemental responses to Apple's First Set of Interrogatories.   A true and correct copy of Plaintiffs' Supplemental Responses to Apple's First Set of Interrogatories 6, 10, and 11 is attached hereto as **Exhibit C [filed under seal]**.

7.      On December 7, 2020, I received a letter from Mark Kachner (counsel of record for Plaintiffs), confirming the Parties' agreement that "the Parties may incorporate by reference other documents from the case so long as it is clear from the description which documents—and parts of those documents—are being incorporated, and the Parties reserve the right to request clarification if necessary."  A true and correct copy of Plaintiffs' December 7, 2020 letter is attached hereto as **Exhibit D**.

Gibson, Dunn & Crutcher LLP

1

SAMPLIN DECL. IN SUPPORT OF APPLE'S PORTION OF JOINT STIPULATION REGARDING PLAINTIFFS' MOTION TO COMPEL APPLE TO PRODUCE DOCUMENTS AND FULLY ANSWER INTERROGATORIES
CASE NO. 8:20-CV-00048-JVS (JDEx)

8.   On January 28, 2021, the parties filed a joint stipulation regarding Apple's motion to compel supplemental responses to Apple's Interrogatory Nos. 4–5 and 23 (Dkt. No. 288-1).  Pursuant to Local Rule 37-2.1, a true and correct copy of that joint stipulation is attached hereto as **Exhibit E**.

9.   On March 9, 2021, I sent a letter to Adam Powell (counsel of record for Plaintiffs), explaining Apple's positions on several of Plaintiff's written discovery requests, including Interrogatory 9.  A true and correct copy of the March 9, 2021 letter I sent to Mr. Powell is attached hereto as **Exhibit F [filed under seal]**.

10.   Documents bearing bates stamps APL-MAS_00090783 and APL-MAS_00090817 were produced by Apple to Plaintiffs on April 12, 2021.  These documents are responsive to Plaintiffs' Request for Production Nos. 148–149.

11.   A document bearing bates stamp APL-MAS_00028917 was produced by Apple to Plaintiffs on August 21, 2020.  A document bearing bates stamp APL-MAS_00077637 was produced by Apple to Plaintiffs on February 19, 2021.  Documents bearing bates stamps APL-MAS_00089399, APL-MAS_00089233, APL-MAS_00089075, and APL-MAS_00088927 were produced by Apple to Plaintiffs on March 8, 2021.  Documents bearing bates stamps APL-MAS_00100273 and APL-MAS_00099916 were produced by Apple to Plaintiffs on April 12, 2021.  These documents are responsive to Plaintiffs' Request for Production No. 186.

**Source Code:**

12.   On July 31, 2020, my colleague Brain Andrea (counsel of record for Apple) informed Perry Oldham (counsel of record for Plaintiffs) via email that Apple's source code for WatchOS versions 4–6 (which run on the Series 3–5 Apple Watch products) will be available for Plaintiffs' review starting on August 3, 2020.  Mr. Oldham confirmed via email on July 31, 2020, that he would begin reviewing this code on that date.  A true and correct copy of this email exchange is attached hereto as **Exhibit G.**

13.   In early October 2020, Apple made source code for WatchOS version 7 (used on the Series 6 Watch) available to Plaintiffs.  On October 7, 2020, Perry Oldham

Gibson, Dunn & Crutcher LLP

2

SAMPLIN DECL. IN SUPPORT OF APPLE'S PORTION OF JOINT STIPULATION REGARDING PLAINTIFFS' MOTION TO COMPEL APPLE TO PRODUCE DOCUMENTS AND FULLY ANSWER INTERROGATORIES CASE NO. 8:20-CV-00048-JVS (JDEX)

emailed my colleague Brian Andrea stating Plaintiffs' intention to begin reviewing the updated source code for Watch OS version 7 on October 12, 2020.  On October 9, 2020, Mr. Oldham followed up via email to indicate that he would be conducting the source code review.  A true and correct copy of this email exchange is attached hereto as **Exhibit H.**

14.   On October 12, 2020, my colleague Brian Andrea sent a letter to Perry Oldham confirming that, as of October 9, 2020, Apple had provided Plaintiffs with source code for the most recent Apple Watch Series 6 and SE and the most recent WatchOS 7 release.  A true and correct copy of the October 12, 2020 letter from Mr. Andrea to Mr. Oldham is attached hereto as **Exhibit I [filed under seal].**

15.   On February 18, 2021, Perry Oldham emailed my colleague Brian Andrea and confirmed that he "reviewed Apple's source code [for Watch OS version 7] on October 12[, 2020,] for approximately three hours."  On February 19, 2021, Mr. Oldham followed up via email and indicated that he would continue to review this source code. A true and correct copy of this email exchange is attached hereto as **Exhibit J [filed under seal].**

16.   On March 11, 2021, my colleague Brian Andrea emailed Perry Oldham to inform him that Apple was making an additional source code module relating to the oxygen saturation calculation function of the Apple Watch Series 6 available to Plaintiffs for review.  On March 17, 2021, Mr. Andrea followed up via email and informed Mr. Oldham that the source code review computer was updated with the additional module and was ready for Plaintiffs' review.  On March 19, 2021, the parties agreed via email that Mr. Oldham would begin his review of Apple's source code on Tuesday, March 23, 2021.  A true and correct copy of this email exchange is attached hereto as **Exhibit K [filed under seal]**.

**Miscellaneous:**

17.   A true and correct copy of the webpage for the "Masimo Personal Health" app, available in the Apple app store, is attached hereto as **Exhibit L** and available at

Gibson, Dunn & Crutcher LLP

https://apps.apple.com/us/app/masimo-personal-health/id568979246.

18.    A true and correct copy of U.S. Patent No. 10,078,052 that is asserted in this action is attached hereto as **Exhibit M**.

19.    A true and correct copy of the U.S. Patent No. 10,524,671 that is asserted in this action is attached hereto as **Exhibit N**.


Executed this 21st day of April, 2021 in Los Angeles, California.


By:   /s/ *Ilissa Samplin*
      Ilissa Samplin

4

Gibson, Dunn & Crutcher LLP

# Exhibit A

1

2

3

4

5

6

7

8

9

10

11      **IN THE UNITED STATES DISTRICT COURT**

12      **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

13      **SOUTHERN DIVISION**

14

| | |
|---|---|
| MASIMO CORPORATION, a Delaware corporation; and CERCACOR LABORATORIES, INC., a Delaware corporation | ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| APPLE INC., a California corporation | ) ) ) |
| Defendant. | ) ) ) ) ) ) |

Case No. 8:20-cv-00048-JVS-JDE

**[PROPOSED] ORDER GRANTING PLAINTIFFS MASIMO CORPORATION AND CERCACOR LABORATORIES, INC.'S MOTION FOR PRELIMINARY INJUNCTION**

Honorable James V. Selna

23

24

25

26

27

28

Having considered Plaintiffs' Motion for Preliminary Injunction, all the papers filed in support, in opposition and in reply thereof, and any oral argument by counsel on the motion, the Court hereby **GRANTS** Plaintiffs' Motion for Preliminary Injunction.  It is therefore **ORDERED** that:

1. Apple shall take all necessary steps to prevent publication of any Apple patent, patent application, document, or other presentation of information that:

    a. Concerns measurement or tracking of health-related or physiological information; and

    b. Names as an inventor or author one or more of Plaintiffs' former employees;

    ***Until,***

2. Apple provides Plaintiffs with a copy of the patent, patent application, document, or other presentation of information on a confidential basis and either:

    a. Plaintiffs do not seek injunctive relief within 60 days of receiving the information from Apple; or

    b. Plaintiffs seek injunctive relief and the Court denies such relief.

Dated: _____

                                                  Honorable James V. Selna

32548611

Exhibit A
Page 7

# Exhibit D

# Knobbe Martens

KNOBBE, MARTENS, OLSON & BEAR, LLP

1925 Century Park East, Suite 600, Los Angeles, CA 90067
**T** (310) 551-3450

Mark Kachner
Mark.Kachner@knobbe.com

December 7, 2020

**VIA EMAIL**

Ilissa Samplin
Gibson, Dunn & Crutcher LLP
333 South Grand Ave.
Los Angeles, CA 90071

Re:     Masimo Corp. and Cercacor Laboratories, Inc. v. Apple Inc.

Dear Ilissa:

We write in response to your November 27, 2020, letter which is a follow-up to the parties' November 18, 2020, meet and confer.

**Interrogatory No. 6**

We disagree with Apple's argument that Plaintiffs' supplemental response to this interrogatory is deficient, particularly at this stage of the case.  During our November 18th meet and confer and again in your November 27th letter, Apple stated it believes Plaintiffs should provide a separate narrative response as to each numbered trade secret as set forth in Plaintiffs' Section 2019.210 Statement. However in conjunction with Apple's discovery letter, Apple is maintaining that Plaintiffs' Section 2019.210 statement is deficient.  Moreover, on Wednesday December 2, 2020, Apple served its portion of a Joint Stipulation to compel Plaintiffs to further identify its trade secrets.  Apple also moved to dismiss Plaintiffs' claim on December 1, 2020, arguing that Plaintiffs have failed to describe their trade secrets in the complaint.  Based on those filings, it is apparent that, even if Plaintiffs responded to this integratory with a specific response for each of Plaintiffs' numbered trade secrets, Apple would continue to maintain that such a response is deficient.  In addition, we have repeatedly asked Apple to provide authority for its assertion that additional detail is required at this stage, but Apple has provided no authority that supports its position.  Plaintiffs maintain their response is sufficient at this time.

**Interrogatory No. 10**

Your November 27th letter argues that "the information alleged in the TAC is not sufficient to adequately respond to this Interrogatory."  Like Apple's arguments with respect to Interrogatory No. 6, it appears that Apple will argue that Plaintiffs' response is deficient no matter how much detail we provide.  It is also clear Apple will maintain that position until the pleadings in the case are settled and the Section 2019.210 dispute is resolved.  We have repeatedly asked Apple to provide authority for its assertion that additional detail is required at this stage, but Apple has provided no authority that supports its position.  That is especially problematic for this interrogatory, which seeks information that is in Apple's possession, custody, or control.  Plaintiffs maintain their response is sufficient at this time.

**Interrogatory No. 11**

Your November 27th letter argues that "Plaintiffs' supplemental response is deficient because it fails to provide the requested information '[f]or each alleged Trade Secret.'" Like Apple's arguments with respect to Interrogatory Nos. 6 and 10, it appears that Apple will argue that Plaintiffs' response is deficient no matter how much detail we provide. It is also clear Apple will maintain that position until the pleadings in the case are settled and the Section 2019.210 dispute is resolved. We have repeatedly asked Apple to provide authority for its assertion that additional detail is required at this stage, but Apple has provided no authority that supports its position. Plaintiffs maintain their response is sufficient at this time.

**Incorporation By Reference**

Plaintiffs agree that for both Parties' discovery responses the Parties may incorporate by reference other documents from the case so long as it is clear from the description which documents—and parts of those documents—are being incorporated, and the Parties reserve the right to request clarification if necessary.

**Interrogatory No. 7**

Plaintiffs previously agreed to supplement if they identify information suggesting that their safeguards differed for any particular trade secret. Plaintiffs' response is complete based on its investigation to date. To the extent Plaintiffs' investigation reveals additional responsive information, Plaintiffs will supplement.

**Interrogatory Nos. 13 and 17**

In addition to Apple's delay in removing its objection to Mr. Kinrich, Plaintiffs have also explained that Apple's failure to provide any trade secret discovery to date continues to frustrate Plaintiffs' ability to progress its case and thereby provide further contentions in response to Apple's Interrogatories Nos. 13 and 17. Understanding all of the ways Apple has misappropriated Plaintiffs' trade secrets is important for Plaintiffs to identify how that misappropriation has harmed Plaintiffs. Your November 27th letter fails to address this issue, and Apple has still not yet begun to provide trade secret discovery to alleviate this issue.

Further, Apple's November 27th letter fails to address that Plaintiffs have repeatedly asked Apple to provide authority supporting the level of detail Apple is requesting at this stage of the case. Apple has still provided no such authority. We again ask that Apple provide authority supporting the level of detail Apple seeks at this stage of the case.

Best regards,

Mark D. Kachner

33679283

# Exhibit E

Joseph R. Re (Bar No. 134479)
joseph.re@knobbe.com
Stephen C. Jensen (Bar No. 149894)
steve.jensen@knobbe.com
Perry D. Oldham (Bar No. 216016)
perry.oldham@knobbe.com
Stephen W. Larson (Bar No. 240844)
stephen.larson@knobbe.com
KNOBBE, MARTENS, OLSON &
BEAR, LLP
2040 Main Street, Fourteenth Floor
Irvine, CA 92614
Telephone: (949)-760-0404
Facsimile: (949)-760-9502

Adam B. Powell (Bar. No. 272725)
adam.powell@knobbe.com
KNOBBE, MARTENS, OLSON &
BEAR, LLP
12790 El Camino Real
San Diego, CA 92130
Telephone: (858) 707-4000;
Facsimile: (858) 707-4001

*Attorneys for Plaintiffs Masimo Corp. and
Cercacor Labs., Inc.*

JOSHUA H. LERNER, SBN 220755
jlerner@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street Suite 3000
San Francisco, CA 94105
Tel.: 415.393.8200 / Fax: 415.393.8306

H. MARK LYON, SBN 162061
mlyon@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA 94304-1211
Tel.: 650.849.5300 / Fax: 650.849.5333

*Attorneys for Defendant Apple Inc.*
*[Additional counsel listed on next page]*

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| MASIMO CORPORATION, CERCACOR LABORATORIES, INC., | CASE NO. 8:20-cv-00048-JVS (JDEx) |
| Plaintiffs, | **JOINT STIPULATION REGARDING DEFENDANT APPLE INC.'S MOTION TO COMPEL SUPPLEMENTAL RESPONSES TO APPLE'S INTERROGATORY NOS. 4–5 AND 23** |
| v. | |
| APPLE INC., | |
| Defendant. | Judge: Magistrate Judge John D. Early<br>Date/Time: February 18, 2021 / 10:00 AM<br>Courtroom: 6A |
| | Discovery Cutoff: 7/5/2021<br>Pre-trial Conference: 3/21/2022<br>Trial: 4/5/2022 |

BRIAN M. BUROKER, *pro hac vice*
  bburoker@gibsondunn.com
BRIAN K. ANDREA, *pro hac vice*
  bandrea@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Tel.: 202.955.8500 / Fax: 202.467.0539

BRIAN A. ROSENTHAL, *pro hac vice*
  brosenthal@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Tel.: 212.351.2339 / Fax: 212.817.9539

ILISSA SAMPLIN, SBN 314018
  isamplin@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Tel.: 213.229.7000 / Fax: 213.229.7520

ANGELIQUE KAOUNIS, SBN 209833
  akaounis@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2029 Century Park East Suite 4000
Los Angeles, CA 90067
Tel.: 310.552.8546 / Fax: 310.552.7026

*Attorneys for Defendant Apple Inc.*

# TABLE OF CONTENTS

**Page**

I.    THE INTERROGATORIES AT ISSUE..................................................1

II.   INTRODUCTORY STATEMENTS................................................10

    A.    Apple's Introductory Statement ........................................10

    B.    Plaintiffs' Introductory Statement....................................12

III.  ARGUMENT.................................................................................15

    A.    Apple's Interrogatory Nos. 4 and 5..................................15

        1.    Apple's Position.......................................................15

            a)    Apple Served Its Interrogatories Nine Months Ago............16

            b)    Apple Seeks Basic Information About Plaintiffs' Allegations So That It Can Adequately Prepare Its Defenses.................................18

            c)    Plaintiffs Have Never Disputed That The Vast Majority Of Information Apple Seeks Is Relevant. ...........21

            d)    Plaintiffs' Purported Reasons For Refusing To Provide Sufficient Responses Are Baseless.....................23

        2.    Plaintiffs' Position.................................................25

            a)    Apple's Interrogatories Are Overbroad And Seek Information That Is Neither Relevant Nor Proportional To The Needs Of This Case ...........25

            b)    Interrogatory Nos. 4 and 5 Are Improper Early Contention Interrogatories.................................27

            c)    Plaintiffs' Responses Are Sufficient At This Time............29

            d)    Apple's Remaining Arguments Are Meritless...................32

    B.    Apple's Interrogatory No. 23 ...........................................34

        1.    Apple's Position.......................................................34

         2.    Plaintiffs' Position.................................................39

             a)    Apple's Interrogatory Is Overbroad On Its Face................39

            b)    Apple Seeks Information That Is Neither Relevant Nor Proportional To The Needs Of The Case ...........41

Pursuant to Federal Rule of Civil Procedure 37 and Local Rule 37-2, Defendant Apple Inc. ("Apple"), as movant, and Plaintiffs Masimo Corporation ("Masimo") and Cercacor Laboratories, Inc. ("Cercacor") (collectively, "Plaintiffs"), as respondents, respectfully submit the following Joint Stipulation regarding Apple's Motion to Compel Supplemental Responses to Apple's Interrogatory Nos. 4–5 and 23. The parties met and conferred on December 9, 2020, but were unable to resolve the disputes presented here.

## I. THE INTERROGATORIES AT ISSUE

| Interrogatory | Plaintiffs' Objections and Responses |
|---|---|
| **Interrogatory No. 4:**<br>For each of the Apple Patents, identify in detail all facts relating to Plaintiffs' contention that any subject matter of such Apple Patent was invented by each of the Alleged Inventors, including, without limitation, for each Apple Patent and each Alleged Inventor, identifying by column and line number all subject matter of such Apple Patent that Plaintiffs assert was invented by such Alleged Inventor, describing the circumstances under which the Alleged Inventor and/or others conceived of such subject matter and/or reduced such subject | **Plaintiffs' Original Response (May 14, 2020):**<br>Plaintiffs incorporate their General Statement and Objections. Plaintiffs object to this interrogatory to the extent it seeks information protected by the attorney-client privilege, work product doctrine, or any other applicable privilege or immunity. Plaintiffs further object to this interrogatory to the extent it seeks information that is not relevant to any party's claims or defenses nor proportional to the needs of the case. Plaintiffs also object to this interrogatory as vague and ambiguous, particularly based on the phrase "and/or others." Plaintiffs further object to this interrogatory as compound and contend that it should be counted as multiple interrogatories because it combines multiple requests for information into a single interrogatory. Defendants must identify which of the many interrogatories it desires Plaintiffs to answer in this single interrogatory. Plaintiffs further note that inventorship is determined with respect to the subject matter claimed in a patent, not the subject matter disclosed in a patent specification. Many improper subparts of this interrogatory seek information that is irrelevant and where the burden of compiling it would be disproportionate to the needs of the case. Plaintiffs further object that this interrogatory seeks highly confidential information belonging to Plaintiffs. Plaintiffs intend to supplement this interrogatory after a protective order has been entered in this case.<br>Subject to and without waiving the foregoing objections, Plaintiffs respond as follows:<br>U.S. Patent No. 10,078,052 (the "'052 Patent") |

matter to practice, identifying when such conception and reduction to practice took place, describing each Person's contribution to the conception and/or reduction to practice of the subject matter, identifying corroborating evidence of conception and/or reduction to practice, and identifying and describing in detail all evidence to support any contention that the inventors named on that Apple Patent did not solely conceive and/or reduce to practice any of the claims of that Apple Patent.

The '052 Patent claims subject matter that Lamego obtained from discussions with, or jointly conceived with, Masimo employees. For example, Claim 1 of the '052 Patent recites an electronic device comprising a housing defining an aperture; an optical sensing system comprising a light emitter for emitting light through the aperture, the light emitter positioned adjacent the aperture; and a light detector for obtaining a first portion of the light after the first portion of the light reflects from an object; and a reflector disposed about the aperture and adapted to reflect a second portion of the light back into the object after the second portion of the light reflects from the object. Lamego obtained this subject matter from discussions with, or jointly conceived it with, Diab, while employed by Plaintiffs and while Lamego was under an obligation to assign any such invention to Masimo and/or Cercacor. Accordingly, Diab is a joint inventor of any patentable subject matter claimed in the '052 Patent.

U.S. Patent No. 10,247,670 (the "'670 Patent")

The '670 Patent claims subject matter that Lamego obtained from discussions with, or jointly conceived with, Masimo employees. For example, Claim 1 of the '670 Patent recites an electronic device comprising a housing with a surface; a reflective layer that is formed on the surface, wherein the reflective layer has first and second openings; a light emitter that emits light through the first opening; and a light detector that receives the light emitted by the light emitter through the second opening. Lamego obtained this subject matter from discussions with, or jointly conceived it with, Diab, while employed by Plaintiffs and while Lamego was under an obligation to assign such invention to Masimo and/or Cercacor. Accordingly, Diab is a joint inventor of any patentable subject matter claimed in the '670 Patent.

U.S. Patent No. 9,952,095 (the "'095 Patent")

The '095 Patent claims subject matter that Lamego obtained from discussions with, or jointly conceived with, Masimo employees. For example, Claim 1 of the '095 Patent recites an electronic device comprising a housing comprising a surface adapted to be positioned proximate a measurement site of a subject; a biometric sensor positioned at least partially within the surface and comprising: a plurality of light sources for emitting light toward the measurement site at a selected

modulation frequency; and an optical sensor for obtaining light exiting the measurement site; and an input amplifier coupled to the output of the biometric sensor and disposed within the housing; a high pass filter coupled to an output of the input amplifier and disposed within the housing, the high pass filter having a cutoff frequency above that of a periodic biometric property of the measurement site; an output amplifier coupled to an output of the high pass filter and disposed within the housing; and an analog to digital converter coupled to an output of the output amplifier and disposed within the housing. Lamego obtained this subject matter from discussions with, or jointly conceived it with, Diab, while employed by Plaintiffs and while Lamego was under an obligation to assign such invention to Masimo and/or Cercacor. Accordingly, Diab is a joint inventor of any patentable subject matter claimed in the '095 Patent.

U.S. Patent No. 10,219,754 (the "'754 Patent")

The '754 Patent claims subject matter that Lamego obtained from discussions with, or jointly conceived with, Masimo employees. For example, Claim 1 of the '754 Patent recites a method for estimating physiological parameters when modulated light from a first light source and a second light source is emitted toward a body part of a user, the method comprising determining a first multiplier value by: turning on the first light source; generating a first initial signal in response to capturing a first light sample corresponding to the first light source; demodulating the first initial signal to produce first initial demodulated signals; filtering and decimating the first initial demodulated signals; and determining the first multiplier value based on the filtered and decimated first initial demodulated signals; determining a second multiplier value by: turning on the second light source; generating a second initial signal in response to capturing a second light sample corresponding to the second light source; demodulating the second initial signal to produce second initial demodulated signals; filtering and decimating the second initial demodulated signals; and determining the second multiplier value based on the filtered and decimated second initial demodulated signals; capturing multiple light samples while the first light source and the second light source are turned on to emit modulated light toward the body part of

the user and converting the multiple light samples into a captured signal; demodulating the captured signal to produce multiple demodulated signals; performing a first decimation stage by: low pass filtering each demodulated signal; and decimating each demodulated signal; performing a second decimation stage after the first decimation stage by: low pass filtering each demodulated signal; and decimating each demodulated signal; demultiplexing each demodulated signal after the second decimation stage to produce a first signal associated with the first light source and a second signal associated with the second light source; multiplying the first signal by the first multiplier value using a first multiplier circuit to obtain a first conditioned signal; multiplying the second signal by the second multiplier value using a second multiplier circuit to obtain a second conditioned signal; and analyzing the first conditioned signal and the second conditioned signal to estimate the physiological parameter of the user. Lamego obtained this subject matter from discussions with, or jointly conceived it with, Al-Ali, Diab, and Weber, while employed by Plaintiffs and while Lamego was under an obligation to assign such invention to Masimo and/or Cercacor. Accordingly, Al-Ali, Diab, and Weber are joint inventors of any patentable subject matter claimed in the '754 Patent.

<u>U.S. Patent No. 10,524,671 (the "'671 Patent")</u>

The '671 Patent claims subject matter that Lamego obtained from discussions with, or jointly conceived with, Masimo employees. For example, Claim 1 of the '671 Patent recites a wearable device, comprising a first light source; a second light source, the second light source operating at a different wavelength than the first light source; at least one light receiver; and a processing unit communicably coupled to the first light source, the second light source, and the at least one light receiver; wherein the processing unit is configured to: use the first light source and the second light source to emit light into a body part of a user; and dependent on the light emitted by the first light source and received by the at least one light receiver, compute a pulse rate of the user using the light emitted by the second light source and received by the at least one light receiver. Lamego obtained this subject matter from discussions with, or jointly conceived it with, Diab and

Kiani, while employed by Plaintiffs and while Lamego was under an obligation to assign such invention to Masimo and/or Cercacor. Accordingly, Diab and Kiani are joint inventors of any patentable subject matter claimed in the '671 Patent.

Plaintiffs expect Apple will produce documents and other information that further confirms the named inventors obtained the claimed subject matter from discussions with, or jointly conceived it with, Diab and Kiani.

Discovery in this matter has only recently begun, the Court has not entered a Protective Order, Apple has not yet filed an Answer or provided any discovery, and Plaintiffs are continuing to investigate the subject matter of this interrogatory. Plaintiffs reserve the right to amend and/or supplement this interrogatory response pursuant to Rule 26(e)(1) of the Federal Rules of Civil Procedure as they identify additional information. In particular, Plaintiffs expect they may provide additional information in accordance with the expert discovery deadlines set forth in the Court's scheduling order.

**<u>Plaintiffs' First Supplemental Response (August 14, 2020)</u>**:
Plaintiffs incorporate their original objections and response above as if set forth in full herein. Subject to and without waiving the foregoing general and specific objections, Plaintiffs further respond as follows:
<u>U.S. Patent No. 9,723,997 (the "'997 Patent")</u>
The '997 Patent claims subject matter that Lamego obtained from discussions with, or jointly conceived with, Cercacor employees. For example, Claim 20 of the '997 Patent recites a method for using a mobile personal computing device to obtain health data, comprising using a camera and a proximity sensor to emit light into a body part of a user touching a surface of the mobile personal computing device; using at least two of the camera, an ambient light sensor, or the proximity sensor to receive at least part of the emitted light reflected by the body part of the user and generate sensor data; and computing health data of the user, utilizing the processing unit, using at least the sensor data regarding the received light. Lamego obtained this subject matter from discussions with, or jointly conceived it with, Greg Olsen. Accordingly, Olsen is a

| | |
|---|---|
| | joint inventor of any patentable subject matter claimed in the '997 Patent. |
| |     Discovery in this matter has only recently begun, Apple has provided minimal discovery, and Plaintiffs are continuing to investigate the subject matter of this interrogatory. Plaintiffs reserve the right to amend and/or supplement this interrogatory response pursuant to Rule 26(e)(1) of the Federal Rules of Civil Procedure as they identify additional information. |
| **Interrogatory No. 5**:<br><br>    For each of the Apple Patents and for each of the Apple Applications, identify in detail all facts relating to Plaintiffs' contention that any subject matter of such Apple Patent and/or Apple Application was developed by Marcelo Lamego while working for Plaintiffs and/or was otherwise developed at Masimo, Cercacor, or Plaintiffs, including, without limitation, for each Apple Patent and/or Apple Application, identifying by patent column and line number or application page and paragraph number all subject matter of such Apple Patent or such Apple Application that Plaintiffs assert was developed by Marcelo | **Plaintiffs' Original Response (May 14, 2020)**:<br><br>    Plaintiffs incorporate their General Statement and Objections. Plaintiffs object to this interrogatory to the extent it seeks information protected by the attorney-client privilege, work product doctrine, or any other applicable privilege or immunity. Plaintiffs further object to this interrogatory to the extent it seeks information that is not relevant to any party's claims or defenses nor proportional to the needs of the case. Plaintiffs further object to this interrogatory as compound and contend that it should be counted as multiple interrogatories because it combines multiple requests for information into a single interrogatory. Plaintiffs further note that inventorship is determined with respect to the subject matter claimed in a patent, not the subject matter disclosed in a patent specification. Many improper subparts of this interrogatory seek information that is irrelevant and where the burden of compiling it would be disproportionate to the needs of the case. Plaintiffs further object that this interrogatory seeks highly confidential information belonging to Plaintiffs. Plaintiffs intend to supplement this interrogatory after a protective order has been entered in this case.<br><br>    Subject to and without waiving the foregoing objections, Plaintiffs respond as follows:<br><br>    Plaintiffs incorporate their response to Interrogatory No. 4, including any supplements, in full by reference. Plaintiffs further respond that any inventive contribution that Lamego could have made to the alleged invention of the subject matter claimed in U.S. Patent Application No. 15/960,507 (the "'507 Application) was made while Lamego was employed by Plaintiffs and while Lamego was under an obligation to assign such invention to Masimo and/or Cercacor. For example, |

| | |
|---|---|
| Lamego, describing the circumstances under which Marcelo Lamego and/or others conceived of such subject matter, identifying when such conception and reduction to practice took place, identifying any other employee of Masimo, Cercacor, or Plaintiffs that contributed to the conception of such subject matter and/or reduction to practice of such subject matter, describing each such Person's contribution to the conception and/or reduction to practice of the subject matter, identifying corroborating evidence of conception and/or reduction to practice, identifying which entity—Masimo, Cercacor, or Plaintiffs—You contend is entitled to joint and/or exclusive ownership of such Apple Patent or Apple Application, and stating in detail any other factual and legal bases for Your contention that You are entitled to joint and/or | Claim 21 of the '507 Application recites a biometric sensor within a housing of a wearable electronic device, the biometric sensor comprising: an emitter for transmitting modulated light toward a measurement site of a subject through a first aperture in the housing; an optical sensor for receiving modulated light through a second aperture in the housing, the modulated light at least partially exiting the measurement site; a high pass filter to receive an output of the optical sensor, the high pass filter having a cutoff frequency above a frequency of a periodic optical property of the measurement site; and an analog to digital converter to receive an output of the high pass filter. Lamego obtained this subject matter from discussions with, or jointly conceived it with, Al-Ali, Diab, and Weber, while they were employees of Masimo, or while Lamego was an employee of Cercacor.

In written assignments, Lamego, as well as Al-Ali, Diab, and Weber, agreed to assign and assigned to Masimo all patentable subject matter (as well as all works of authorship, developments, or improvements) conceived during their employment at Masimo, including ownership of all patents and patent applications claiming such subject matter. Those assignments vested in Masimo all legal and equitable title to all patents and patent applications reciting inventions made during their employment, such that Masimo is at least a joint owner of the '052, '670, '095, '750 and '671 Patents, and the '507 Application.

In at least one written assignment, Lamego agreed to assign and assigned to Cercacor all patentable subject matter (as well as all works of authorship, developments, or improvements) conceived during his employment at Cercacor, including ownership of all patents and patent applications claiming such subject matter. An exemplary agreement conveying such rights was attached as Exhibit A to Apple's Motion to Dismiss (Doc. No. 16-3). Accordingly, to the extent the evidence establishes that Lamego obtained patentable subject matter claimed in the '052, '670, '095, '750 and '671 Patents, and the '507 Application from, or jointly conceived such subject matter with, Masimo employees while Lamego was an employee of Cercacor, Cercacor would be a joint owner of the '052, '670, '095, '750 and '671 Patents, and the '507 Application. |

| | |
|---|---|
| exclusive ownership of the Apple Patents and/or Apple Applications. | Plaintiffs expect Apple will produce documents and other information that further confirms the named inventors obtained the claimed subject matter from discussions with, Lamego, who in turn obtained the contribution from Al-Ali, Diab and Weber.

Discovery in this matter has only recently begun, the Court has not entered a Protective Order, Apple has not yet filed an Answer or provided any discovery, and Plaintiffs are continuing to investigate the subject matter of this interrogatory. Plaintiffs reserve the right to amend and/or supplement this interrogatory response pursuant to Rule 26(e)(1) of the Federal Rules of Civil Procedure as they identify additional information. In particular, Plaintiffs expect they may provide additional information in accordance with the expert discovery deadlines set forth in the Court's scheduling order. |
| | **Plaintiffs' First Supplemental Response (August 14, 2020)**:

Plaintiffs incorporate their original objections and response above as if set forth in full herein. Subject to and without waiving the foregoing general and specific objections, Plaintiffs further respond as follows:

In written assignments, Lamego, as well as Olsen, agreed to assign and assigned to Cercacor all patentable subject matter (as well as all works of authorship, developments, improvements, or trade secrets) conceived during their employment at Cercacor, including ownership of all patents and patent applications claiming such subject matter. An exemplary agreement conveying such rights was attached as Exhibit A to Apple's Motion to Dismiss (Doc. No. 16-3). Those assignments vested in Cercacor all legal and equitable title to all patents and patent applications reciting inventions made during their employment, such that Cercacor is at least a joint owner of the '997 Patent and Cercacor has standing to seek correction of inventorship to perfect Cercacor's ownership interest in the '997 Patent.

In at least one written assignment, Lamego agreed to assign and assigned to Masimo all patentable subject matter (as well as all works of authorship, developments, improvements, or trade secrets) conceived during his employment at Masimo, |

| | | |
|---|---|---|
| | | including ownership of all patents and patent applications claiming such subject matter. Accordingly, to the extent the evidence establishes that Lamego obtained patentable subject matter claimed in the '997 Patent from, or jointly conceived such subject matter with, Masimo employees while Lamego was an employee of Masimo, Masimo would be a joint owner of the '997 Patent.<br><br>Discovery in this matter has only recently begun, Apple has provided minimal discovery, and Plaintiffs are continuing to investigate the subject matter of this interrogatory. Plaintiffs reserve the right to amend and/or supplement this interrogatory response pursuant to Rule 26(e)(1) of the Federal Rules of Civil Procedure as they identify additional information. |
| **Interrogatory No. 23**:<br><br>Identify all facts of which You are aware that relate to each of the Apple Patents and each of the Apple Applications. Your response should identify at least the circumstances and dates relating to your first awareness of each of the Apple Patents and each of the Apple Applications. | **Plaintiffs' Original Response (November 5, 2020)**:<br><br>Plaintiffs incorporate their General Statement and Objections. Plaintiffs object to this interrogatory to the extent it seeks information protected by the attorney-client privilege, work product doctrine, or any other applicable privilege or immunity. Plaintiffs further object to this interrogatory to the extent it seeks information that is not relevant to any party's claims or defenses nor proportional to the needs of the case. Plaintiffs object to this interrogatory as overly broad and unduly burdensome because it requests "all facts of which You are aware that relate to each of the Apple Patents and each of the Apple Applications." Plaintiffs also object to this interrogatory as vague and ambiguous with respect to the phrase "Identify all facts of which You are aware that relate to each of the Apple Patents and each of the Apple Applications."<br><br>Subject to and without waiving the foregoing objections, Plaintiffs respond as follows:<br><br>Plaintiffs incorporate by reference their responses to Interrogatories Nos. 4 and 5, including any supplements thereto. Plaintiffs also incorporate by reference the allegations set forth in their Complaint, including any amendments thereto, regarding the Apple Patents and each of the Apple Applications. Plaintiffs are further aware of the contents of and statements made in the Apple Patents and Applications, as |

| | well as the prosecution histories of the Apple Patents and Applications.<br><br>    Plaintiffs request a meet and confer about the scope of this interrogatory.<br><br>    Plaintiffs are continuing to investigate the subject matter of this interrogatory. Plaintiffs reserve the right to amend and/or supplement this interrogatory response pursuant to Rule 26(e)(1) of the Federal Rules of Civil Procedure as they identify additional information. |
|---|---|

## II.    INTRODUCTORY STATEMENTS

### A.    Apple's Introductory Statement

Apple moves to compel responses to three interrogatories requesting factual information about Plaintiffs' correction of inventorship and ownership allegations. Plaintiffs' Complaint includes thirteen (13) counts alleging that Plaintiffs' employees are co-inventors of certain Apple patents and an application, and that Plaintiffs have an ownership interest in the patents and application.  Notwithstanding Plaintiffs' very serious allegations against Apple, Plaintiffs have provided virtually no factual basis for these allegations, and instead argue that they should not be required to provide basic information about those allegations, taking the position that it would be "premature" for them to provide the information without taking additional discovery.   Plaintiffs' arguments are backwards and should be rejected.   Plaintiffs brought this case, presumably with some factual basis for doing so.  Plaintiffs have the burden to establish that correction of inventorship and ownership is warranted.  And it is Plaintiffs—and only Plaintiffs—who know what facts they relied on to make these allegations in the first place.  Courts, including this one, have recognized that providing "inventorship contentions" early in the case is appropriate, because such contentions allow the parties to understand the other parties' theories, assess their own case, and prevent the "shifting sands" approach the Federal Circuit has warned against in patent cases.

Correction of inventorship requires Plaintiffs—not Apple—to establish that each of the individuals alleged to be inventors of an invention claimed in a patent made a

significant contribution to the invention that is distinguishable from concepts known in the art.  *In re VerHoef*, 888 F.3d 1362, 1366 (Fed. Cir. 2018).  The information sought by Apple's interrogatories is directly relevant to these issues.  Specifically, Interrogatory Nos. 4 and 5 seek the identity of the specific subject matter from each claim Plaintiffs allege their alleged inventors contributed, who invented that subject matter and when, what evidence Plaintiffs are aware of that support their contention, and an identification of how the subject matter they supposedly contributed differs from what was known in the prior art.  Interrogatory No. 23 seeks information about Plaintiffs' first awareness of the disputed Apple patents and application and what steps were taken upon learning about the patents.  Apple requires this information in order to understand what claims are at issue, the scope of the dispute between the parties with respect to each claim, to determine whether claim construction is necessary, and to develop its defenses to Plaintiffs' allegations.

There is no credible reason that Plaintiffs cannot or should not provide the information Apple seeks.  Plaintiffs must have had the information at least as of the filing of their Complaint, as they would not have had a Rule 11 basis to file Counts 14–26 if they did not.  Plaintiffs' refusal to provide the information is plainly an attempt to avoid having to take any positions on what they are actually alleging at this stage—more than one year into the case—so that they can change course later.  This refusal to provide actual positions has been Plaintiffs' *modus operandi* in this case, as their repeated refusals to provide basic information about their allegations have necessitated the filing of multiple motions, placing a significant burden on the Court.  Apple tried to avoid the need for filing this motion, repeatedly urging Plaintiffs to reconsider their position, but Plaintiffs flatly refused Apple's request with no arguable support. For the reasons discussed below, the Court should order Plaintiffs to provide complete responses to Apple's Interrogatory Nos. 4–5 and 23, and put a stop to Plaintiffs' continued attempts to delay this case by refusing to provide basic discovery responses about the claims they filed.

**B.    Plaintiffs' Introductory Statement**

Apple argues Interrogatories 4 and 5 seek "basic information" that Plaintiffs refused to provide.  Both assertions are incorrect.  Apple seeks detailed and complex legal positions as to numerous individuals who contributed to the claimed subject matter of numerous patents.  For example, Apple's interrogatories seek the "column and line number" of all subject matter contributed by each individual, a detailed description of how each person contributed such subject matter, and a detailed description of all supporting evidence.  Ex. A at 18.[1]  Apple now goes further and seeks an identification of how such subject matter differs from the prior art.  Jt. Stip. at 20-21.

Much of the information Apple seeks is irrelevant.  For example, seeking each individual's contribution by "column and line number" of the specification is irrelevant because inventorship is based on the **claims**, not the specification.  *See Egenera, Inc. v. Cisco Sys., Inc.*, 972 F.3d 1367, 1376 (Fed. Cir. 2020).  Seeking an explanation of how each individual's contributions differ from the prior art is also irrelevant because a coinventor need not contribute subject matter that is distinguishable over the prior art.  "Virtually all inventions are combinations and virtually all are combinations of old elements."  *Env't Designs Ltd. v. Union Oil Co. of Cal.*, 713 F.2d 693, 698 (Fed. Cir. 1983).  Instead, an inventor must do more than merely explain "**well-known** concepts and/or the **current state** of the art," *In re VerHoef*, 888 F.3d at 1365.  Moreover, Plaintiffs need not contend or establish that **Apple's** patent claims are valid.

Apple also argues as if Plaintiffs' responses provided no facts.  That is not true.  Plaintiffs provided reasonable responses and anticipate supplementing their responses as discovery unfolds.  As Plaintiffs explained in their opposition to Apple's other pending motion to compel, Apple served early contention interrogatories as to nearly every aspect of the complaint.  *See, e.g.*, Ex. A at Nos. 2-3 (patent infringement), Nos.

---

[1] All citations to lettered exhibits in Plaintiffs' sections are citations to exhibits attached to the Declaration of Brian Andrea, filed herewith.  All citations to numbered exhibits are citations to exhibits attached to the Declaration of Mark Kachner, filed herewith.  All emphasis added unless otherwise noted.

4-5 (patent ownership), Nos 6-13 (trade secret misappropriation).  Such early contention interrogatories that "systematically track all the allegations in an opposing party's pleadings [are] a *serious form of discovery abuse*."  *In re Convergent Techs. Sec. Litig.*, 108 F.R.D. 328, 337 (N.D. Cal. 1985).  Such interrogatories can be "almost mindlessly generated, can be used to impose *great burdens* on opponents, and can generate a great deal of counterproductive friction between parties and counsel."  *Id.*

Apple has also been withholding discovery relating to the very contentions on which it moves to compel.  Apple has produced only a handful of documents regarding ownership and inventorship of Apple's patents.  For months, Apple indicated it would produce more documents on a "rolling basis," but failed to do so.  Apple has even declined to confirm it will produce specific categories of documents.  Apple cannot demand Plaintiffs provide detailed *contentions* regarding patent inventorship and ownership while refusing to provide any real discovery relating to those issues.  Indeed, Apple admits its goal is to prevent Plaintiffs from refining their contentions based on facts that may be discovered later.  *See* Jt. Stip. at 11 (arguing plaintiffs will use discovery to "change course later").

Regardless, Plaintiffs identified facts supporting their contentions, including the names of individuals who contributed to claimed subject matter, how those individuals worked with Lamego, and their respective contractual obligations to assign the claimed subject matter to Plaintiffs.  Plaintiffs provided a reasonable response and agreed to supplement as they learn more.  That is sufficient, particularly before Plaintiffs have an opportunity to examine Apple's documents and depose the alleged inventors.  Plaintiffs should not be required to provide detailed contentions and identify supporting evidence before taking relevant discovery.  As the Federal Circuit observed, evaluating joint inventorship is a fact-intensive exercise and "one of the muddiest concepts in the muddy metaphysics of patent law."  *In re VerHoef*, 888 F.3d 1362, 1365 (Fed. Cir. 2018).

As for Interrogatory No. 23, Apple's position has been a moving target.  The interrogatory seeks "all facts of which You are aware that relate to each of the Apple

Patents and each of the Apple Applications." When Plaintiffs pointed out the incredibly broad and unbounded scope of the interrogatory, Apple argued that it sought "at least" certain information. For the first time in its Motion, Apple now suggests it may be seeking *only* specific information, but does not clearly explain how, if at all, it is limiting the request. Regardless, Apple seeks burdensome and privileged discovery, including "discussions with prosecution counsel and litigation counsel." Ex. J at 159.

Apple also fails to show the specific information it now claims to seek is relevant. Apple's introduction argues this information is somehow relevant to showing "what claims are at issue," the "scope of the dispute," and "whether claim construction is necessary." Jt. Stip. at 11. But Apple fails to explain how the date and circumstances of Plaintiffs learning about Apple's patents have anything to do with those issues. Later, Apple argues its requests are relevant to "potential" defenses like laches. But Apple has not yet filed an answer and has refused to identify its defenses in response to Plaintiffs' interrogatories. Apple's most recent response identified no such defenses and stated: "Apple's affirmative defenses *do not yet exist* in this action because it has not filed an Answer to the Complaint in this action." Ex. 1 at 4. Plaintiffs should not have to provide detailed contentions rebutting defenses that Apple argues "do not yet exist." The irony in Apple's Motion is apparent. For Interrogatory Nos. 4 and 5, Apple hopes to restrict Plaintiffs to presently known facts. But with regard to Interrogatory No. 23, Apple demands discovery so that it can formulate its initial answer.

Apple also casts baseless aspersions on Plaintiffs and their counsel. Contrary to Apple's assertions, Plaintiffs had more than enough information to satisfy Rule 11. Indeed, Apple dropped its pleading challenge to Plaintiffs' inventorship and ownership claims. Apple also argues Plaintiffs' "*modus operandi*" has been to delay and refuse to provide discovery. Jt. Stip. at 11. Apple points to its Section 2019.210 motion as support, but this Court has since denied that motion. Jt. Stip. at 21; Ex. 11. Apple's arguments casting aspersions on Plaintiffs lack merit.

## III.   **ARGUMENT**

Consistent with Local Rule 37-2, in this section the parties address their disputes with respect to individual Interrogatories and responses.   The text of the disputed Interrogatories and Plaintiffs' responses is set forth above.

**A.   Apple's Interrogatory Nos. 4 and 5**

**1.   Apple's Position**

Apple's Interrogatory No. 4 seeks the facts of which Plaintiffs are aware that relate to their allegations that the subject matter set forth in various Apple Patents and a patent application (the "Disputed Patents") were invented by certain employees of Plaintiffs (the "Alleged Inventors").  Similarly, Apple's Interrogatory No. 5 seeks facts relating to Plaintiffs' allegations that the subject matter in the Disputed Patents was invented by Marcelo Lamego while he was employed by Plaintiff Cercacor.[2]

In response to Interrogatory No. 4, for each of the Disputed Patents, Plaintiffs merely recite the following canned response:  "The [PATENT] claims subject matter that Lamego obtained from discussions with, or jointly conceived with, [Masimo/Cercacor] employees. For example, [CLAIM] of the [PATENT] recites [FULL QUOTE OF CLAIM].  Lamego obtained this subject matter from discussions with, or jointly conceived it with, [NAMES], while employed by Plaintiffs and while Lamego was under an obligation to assign such invention to Masimo and/or Cercacor. Accordingly, [NAMES] are joint inventors of any patentable subject matter claimed in the [PATENT]."  Andrea Decl., Ex. B at 37–42.  This language is almost verbatim to that contained in Plaintiffs' Third Amended Complaint ("TAC").  Plaintiffs' response to Interrogatory No. 5 offers no additional details, other than to state that Lamego assigned rights to Masimo and Cercacor.  *Id.* at 42–45.

---

[2]  Because of the overlap in the information sought by both interrogatories, and the fact that the parties addressed both interrogatories together in correspondence and during the meet and confer, Apple addresses them together.

Gibson, Dunn & Crutcher LLP

Joint Stip. Re Apple's Mot. to Compel          15          Case No. 8:20-cv-00048-JVS (JDEx)
Exhibit E
Page 96

Despite many requests, detailed below, Plaintiffs refuse to provide any specifics as to what claims they allege they invented, which individual(s) allegedly invented *what* aspects of the claims, *when* such invention allegedly occurred, and what documents Plaintiffs rely on for such contentions. Instead, Plaintiffs merely say discovery is in its early stages and they expect to get further discovery on the issue from *Apple*. But Plaintiffs do not need discovery from Apple to answer these interrogatories. The information sought by these interrogatories includes, for example, the specific subject matter in each of the claims in each of the Disputed Patents that was allegedly invented by each Alleged Inventor and the circumstances under which each Alleged Inventor and Mr. Lamego allegedly developed the subject matter (including an identification of when such development occurred and documents that support such development). There should be no dispute that the information sought by these interrogatories is relevant to Plaintiffs' correction of inventorship and ownership allegations (*see* Dkt. 233 ¶¶ 253–349 (Counts 14–26))—indeed, Plaintiffs concede that the vast majority of information Apple seeks via this interrogatory is relevant. There should also be no dispute that Plaintiffs are in possession of this information if they had a Rule 11 basis to make the allegations in the first place. Nonetheless, Plaintiffs have refused for *nine months* to provide the information Apple has requested.

### a)   Apple Served Its Interrogatories Nine Months Ago.

Apple served Interrogatory Nos. 4 and 5 early in the case, on April 14, 2020, in an effort to obtain critical information about Plaintiffs' allegations. Andrea Decl., Ex. A at 18–19. In their initial response to Interrogatory No. 4, Plaintiffs provided a single paragraph for each of the Disputed Patents that summarily alleges that each patent "claims subject matter that [Marcelo] Lamego obtained from discussions with, or jointly conceived with, Masimo employees."[3] Andrea Decl., Ex. B at 37–42. For each of the

---

[3] Nearly all of Plaintiffs' trade secret and correction of inventorship and ownership claims involve Marcelo Lamego, who was previously employed by Plaintiffs and later employed by Apple for approximately six months in 2014. Mr. Lamego is a listed inventor on each of the Disputed Patents.

Disputed Patents, Plaintiffs listed out verbatim all of the elements of one claim from the patent and concluded that Lamego allegedly developed "this subject matter" while he was employed by Plaintiffs, and identified one or more of Plaintiffs' employees who allegedly co-invented "this subject matter." *Id.* In their initial response to Interrogatory No. 5, Plaintiffs merely added that because Lamego had agreed to assign patentable subject matter conceived during his employment with Plaintiffs, Plaintiffs therefore own the Disputed Patents. *Id.* at 42–45.

After Apple sent a letter to Plaintiffs about their responses, the parties met and conferred and Plaintiffs agreed to supplement after entry of the Protective Order. Andrea Decl., Ex. D at 74. On August 14, 2020, after the Court entered the Protective Order in this case, Plaintiffs served a supplemental response. Their supplemental responses, however, did not provide *any* additional details about the patents discussed in Plaintiffs' initial response; rather, the supplemental responses added the same insufficient level of detail regarding a newly plead Disputed Patent and included likewise conclusory information about that patent. Andrea Decl., Ex. E at 93, 97–98.

On November 19, 2020, Apple sent a letter to Plaintiffs requesting a meet and confer regarding Plaintiffs' responses, noting that Plaintiffs' responses are deficient and "merely provide a laundry list of claim elements that appear in [each Disputed Patent], and assert, in conclusory fashion, that Marcelo Lamego must have obtained information regarding those claim elements from Masimo or Cercacor." Andrea Decl., Ex. H at 151. Apple further noted that "Plaintiffs' Responses provide no information and cite to no documents or other sources in an effort to even attempt to establish that Plaintiffs invented the subject matter they cite in the responses." *Id.* Plaintiffs provided a short response (Andrea Decl., Ex. I at 155–56), and the parties met and conferred on December 9, 2020. Andrea Decl. ¶ 15.

During the meet and confer, Apple explained its position as to why Plaintiffs' responses are deficient, and Plaintiffs agreed to let Apple know whether it would agree to supplement. In a follow-up letter, Apple laid out the information that should be

included in full and complete responses, including "an identification of each Alleged Inventor (including Mr. Lamego) of the subject matter in each [Disputed Patent] and what specific subject matter (by column and line number) in each [Disputed Patent] each Alleged Inventor contributed, along with an identification of supporting evidence (including documents and/or source code) and an explanation as to how the subject matter is distinguishable from what was known in the art." Andrea Decl., Ex. J at 158–59.

On December 16, 2020, Plaintiffs responded that "Apple's demand for additional detail in response to these contention interrogatories at this stage of the case is premature." Andrea Decl., Ex. K at 162. Plaintiffs took the position that they would first need discovery from Apple and a deposition of Marcelo Lamego and indicated that they would "supplement their response to these interrogatories as discovery proceeds in this case." *Id.* In an effort to avoid burdening the Court with another motion involving Plaintiffs' refusal to provide sufficient discovery responses, Apple sent another letter to Plaintiffs noting, *inter alia*, that Apple is not seeking information that may later be obtained from discovery, but instead is seeking "a response to the interrogatories with the facts they are aware of that allegedly support their allegations." Andrea Decl., Ex. L at 165. Apple asked Plaintiffs to reconsider their position and to let Apple know by December 31, 2020 if Plaintiffs would be willing to provide responses to the interrogatories by January 4, 2021. *Id.* at 167. If not, Apple noted that it would "have no choice but to move the Court to compel Plaintiffs to supplement their responses. . . ." *Id.*

Plaintiffs ignored Apple's email entirely, and never responded to Apple's request that they reconsider their position.

### b) Apple Seeks Basic Information About Plaintiffs' Allegations So That It Can Adequately Prepare Its Defenses.

Apple's interrogatories seek basic factual information that Plaintiffs undoubtedly already have in their possession and should be required to produce. As discussed below,

Apple needs this information so that it can understand the scope of the dispute, prepare its defenses, and determine whether or not claim construction is necessary. *See, e.g.*, *Trovan, Ltd. v. Sokymat SA, Irori*, 299 F.3d 1292, 1302 (Fed. Cir. 2002) ("[A]n inventorship analysis, like an infringement or invalidity analysis, begins as a first step with a construction of each asserted claim to determine the subject matter encompassed thereby."). Without knowledge of Plaintiffs' actual allegations, Apple is left to guess as to the contours of Plaintiffs' allegations and the actual dispute between the parties.

To establish that Plaintiffs' own employees should be listed as co-inventors on the Disputed Patents (and that Plaintiffs thus have an ownership right in the Disputed Patents), Plaintiffs will have to prove that each of the Alleged Inventors:

> (1) contribute[d] in some significant manner to the conception or reduction to practice of the invention, (2) ma[d]e a contribution to the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention, and (3) [did] more than merely explain to the real inventors well-known concepts and/or the current state of the art.

*VerHoef*, 888 F.3d at 1366. The burden of establishing these elements through clear and convincing evidence is on Plaintiffs, not Apple. Apple's discovery requests seek the factual information of which Plaintiffs are aware that is related to these elements. *See Shum v. Intel Corp.*, 633 F.3d 1067, 1083 (Fed. Cir. 2010); *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1358 (Fed. Cir. 2004); *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1461 (Fed. Cir. 1998); *Hess v. Advanced Cardiovascular Sys., Inc.*, 106 F.3d 976, 980 (Fed. Cir. 1997).

Plaintiffs' responses do not even come close to providing the information Apple requested. The responses for each of the Disputed Patents essentially amount to: "at least one claim of Apple's patent recites the following elements; we invented this claim; therefore we own Apple's patent." Such generic responses are useless as far as providing Apple with information from which it may determine the contours of the actual dispute. As a particularly egregious example, each of the claims of the Disputed

Patents recites the use of a light emitter/light sources and/or a light detector/receiver/sensor. Andrea Decl., Ex. B at 37–42. It is inconceivable that Plaintiffs could be alleging that they invented these elements, as the use of light emitters and detectors in physiological monitors has been known for many decades. *See, e.g.*, Andrea Decl., Ex. S at 324, lines 8–11 (discussing a 1978 publication discussing a physiological sensor that used "5 LEDs and a plurality of photodiodes"); Ex. T at 341 (disclosing a physiological sensor that illuminates blood "with light at four different wavelengths" and detects reflected light using a "photodetector"). Plaintiffs cannot dispute this. Many other examples abound. Plaintiffs provide no information as to which claims, and *which* elements of those claims, they allegedly invented, leaving Apple to guess what Plaintiffs actually contend.

Plaintiffs should identify to Apple the underlying factual information that supports their contention. Such identification should include, for each claim, the specific subject matter Plaintiffs allege they contributed, which individual(s) invented that specific subject matter and when, what evidence Plaintiffs are aware of that support their contention, and an identification of how the subject matter they supposedly contributed differs from what was known in the prior art.[4] All of these pieces of information are necessary elements of proof for Plaintiffs' case that do not depend on any documents or information in Apple's possession—and thus, Apple's request for such information from Plaintiffs is not premature at all. Plaintiffs should provide such information (and should have no problem providing such information) for all subject matter they allege their employees or former employees contributed to the inventions in the Disputed Patents.

Plaintiffs' refusal to provide the information requested by the interrogatory—forcing Apple to move the Court—is confounding, but consistent with Plaintiffs' pattern

---

[4] In correspondence, Apple suggested the use of a table that would clearly delineate which allegations are relevant to each alleged inventor of each Disputed Patent. Andrea Decl., Ex. J at 158–59. Plaintiffs stated that they "do not commit to provide supplemental responses" in this format, but have not provided the information in *any* format. Andrea Decl., Ex. K at 162.

of refusing to provide information *about their own allegations*. *See, e.g.,* Dkts. 258-1, 266-1, 271-1. Indeed, as they have done with their trade secret allegations, Plaintiffs have refused to provide any useful information about their correction of inventorship allegations, while at the same time pushed for broad discovery from Apple relating to their allegations. *See, e.g.,* Andrea Decl., Ex. M (letter from Plaintiffs pushing for production of expansive categories of documents). There are only two plausible reasons Plaintiffs could be refusing to provide the requested information: either Plaintiffs want to keep Apple in the dark so that they can adjust their contentions as discovery proceeds; or they cannot provide the requested information because there is none (which would raise serious questions about their Rule 11 basis for bringing the lack of inventorship and ownership claims in the first place).

To be clear, Apple seeks responses to the interrogatories that set forth the facts of which Plaintiffs are aware at this time—to date, Plaintiffs have not provided those facts. Obviously if Plaintiffs timely learn more responsive facts during discovery, they can supplement, as is their obligation. But Plaintiffs should not need to engage in discovery in order to identify now the facts of which they are currently aware, which they must have possessed to file this case.

### c) Plaintiffs Have Never Disputed That The Vast Majority Of Information Apple Seeks Is Relevant.

The only aspect of Apple's request that Plaintiffs dispute is relevant is Apple's request that Plaintiffs identify how the subject matter each Alleged Inventor differs from the prior art. *See* Andrea Decl., Ex. K at 162. Contrary to Plaintiffs' position that they "are not required to affirmatively distinguish each subject matter contribution from any and all prior art" (*id.*), the case law makes clear that such an inquiry is relevant to claims for correction of inventorship. As noted above, one of the elements of a correction of inventorship claim requires a showing that the alleged inventors did "more than merely explain to the real inventors well-known concepts and/or the current state of the art." *In re Verhoef*, 888 F.3d at 1366; *see also, e.g., Eastman v. Apple Inc.*, 2018 WL 5982440,

at *6 (N.D. Cal. Nov. 14, 2018) (in dismissing a claim for correction of inventorship, citing *In re Verhoef*, and noting that "[t]he Court cannot reasonably infer that an alleged contribution that simply mirrors prior art and is seemingly unrelated to the novel aspect of the invention provides a basis for a nonjoinder claim"); *Caterpillar Inc. v. Sturman Indus., Inc.*, 387 F.3d 1358, 1377 (Fed. Cir. 2004) ("[A] person will not be a co-inventor if he or she does not more than explain to the real inventors concepts that are well known in the current state of the art."); *Ethicon*, 135 F.3d at 1460 ("One who simply provides the inventor with well-known principles or explains the state of the art without ever having a firm and definite idea of the claimed invention as a whole does not qualify as a joint inventor."); *see also Nartron Corp. v. Schukra U.S.A. Inc.*, 558 F.3d 1352, 1356 (Fed. Cir. 2009) (reversing lower court's summary judgment of inventorship upon a finding that alleged co-inventor's contribution was insignificant "not just because it was in the prior art," but "including it as part of the claimed invention was merely the basic exercise of ordinary skill in the art"). In short, whether or not the Alleged Inventors' contributions are known in the prior art is critical to the correction of inventorship inquiry, and Plaintiffs should be required to identify how the subject matter they allege they contributed differs from what is known in the prior art.

Since all of the information sought by Apple's interrogatories is relevant and narrowly tailored to Plaintiffs' allegations—and Plaintiffs surely have the information in their possession, based at least on the fact that they made the allegations in the first place—Plaintiffs should be required to disclose the information to Apple. *Diagnostics Sys. Corp. v. Symantec Corp.*, 2008 WL 9396386, at *4 (C.D. Cal. Apr. 4, 2008) (Rule 26 "provides that a party may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party' and the court may order discovery of any matter that 'appears reasonably calculated to lead to the discovery of admissible evidence." (internal quotations omitted)); *see also Kajeet, Inc. v. Qustodio, LLC*, 2019 WL 8060078, at *1 (C.D. Cal. Oct. 22, 2019) ("Relevance is broadly construed 'to encompass any matter that bears on, or that reasonably could lead to other matter that

Case 8:20-cv-00048-JVS-JDE   Document 258-4   Filed 01/22/21   Page 36 of 47   Page ID #:16667

1   could bear on,' any party's claim or defense." (quoting *Oppenheimer Fund, Inc. v.*

2   *Sanders*, 437 U.S. 340, 351 (1978))).

3   **d)    Plaintiffs' Purported Reasons For Refusing To Provide**

4   **Sufficient Responses Are Baseless.**

5   Plaintiffs' sole basis for arguing that Apple's request for complete responses to

6   the interrogatories is "premature" is that they need discovery from *Apple* and a

7   deposition of Marcelo Lamego.  Andrea Decl., Ex. K at 162.  But the fact that there is

8   still discovery to be exchanged is not a valid reason for Plaintiffs to withhold providing

9   information about their claims that is ***currently***—and has been since the beginning of

10  this suit—in their possession.  Plaintiffs' argument is simply another attempt to delay

11  providing meaningful discovery that sets forth the basis of their claims in this case,

12  despite the fact that the case has been pending for *over a year*.

13  As Apple noted to Plaintiffs in the parties' correspondence, courts (including this

14  Court) have recognized that a party seeking correction of inventorship should provide

15  their "inventorship contentions" early in a case.  Andrea Decl., Ex. L at 166–67; *see also*

16  *Huang v. Cal. Inst. of Tech.*, 2004 WL 2296330, at *3 (C.D. Cal. Feb. 18, 2004) (noting

17  that Plaintiff provided early inventorship contentions and revised those contentions as

18  discovery proceeded); *see also, e.g.*, *Dey, L.P. v. Ivax Pharms., Inc.*, 233 F.R.D. 567,

19  570 (C.D. Cal. 2005) ("Defendants were entitled to know [Plaintiff's] position on

20  inventorship during fact discovery so that they could ask [Plaintiff] to state the facts on

21  which it intended to rely to support its position at trial."); *Hoffman-La Roche Inc. v.*

22  *Orchid Chemicals & Pharm. Ltd.*, 2011 WL 5508485, at *3 (D.N.J. Nov. 7, 2011)

23  (Plaintiffs are "entitled to early notice which pins down Defendants' theory of defense

24  involving inventorship").  As the Northern District of California has acknowledged, the

25  same policy considerations requiring parties to "provide early notice of their

26  infringement and invalidity contentions, and to proceed with diligence in amending

27  those contentions when new information comes to light in the course of discovery," also

28  apply to inventorship contentions.  *See, e.g.*, *Swanson v. ALZA Corp.*, 2014 WL

4441161, at *2 (N.D. Cal. Sept. 9, 2014) (quoting *Golden Hour Data Sys., Inc. v. Health Servs. Integration, Inc.*, 2008 WL 2622794, at *2 (N.D. Cal. July 1, 2008)).

Plaintiffs' argument that they need discovery in order to provide their contentions is not credible. Plaintiffs "must meet the heavy burden of proving [their] case by clear and convincing evidence and must provide evidence to corroborate the alleged joint inventor's conception." *Eli Lilly*, 376 F.3d at 1358 (internal citations omitted). The reason for this is that the "inventors as named in an issued patent are presumed to be correct." *Hess v. Advanced Cardiovascular Sys., Inc.*, 106 F.3d at 980 (quoting *Amax Fly Ash Corp. v. United States*, 514 F.2d 1041, 1047 (1975)); *Eastman v. Apple, Inc.*, 2019 WL 1559015, at *4 (N.D. Cal. Apr. 10, 2019) ("named inventors do not bear the burden of producing such evidence"). Thus, Plaintiffs do not need discovery from Apple and/or third party Lamego to provide their contentions.

Plaintiffs' attempts to delay providing factual information regarding their contentions is exactly the type of "shifting sands" approach the Federal Circuit has cautioned against in patent cases. *See O2 Micro Intern. Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1364 (Fed. Cir. 2006). In order for Apple to understand Plaintiffs' allegations, Plaintiffs should provide information regarding those allegations now, and supplement their responses as discovery proceeds, as required by Rule 26. For now, however, Apple is left without adequate responses to their interrogatories, which were served nine months ago, and Plaintiffs' responses are so generic and conclusory that Apple is left guessing as to what specific subject matter Plaintiffs allege to have invented. Presumably, Plaintiffs had a Rule 11 basis to bring their claims for correction of inventorship, and Apple is entitled to know the facts that formed that basis. This lack of disclosure severely prejudices Apple's ability to investigate Plaintiffs' allegations and prepare its defenses. The Court should put a stop to Plaintiffs' continued attempts to delay this case and order Plaintiffs to supplement their responses to include the information in the tabular format requested in Apple's letter dated December 10, 2020. Andrea Decl., Ex. J at 159.

## 2. Plaintiffs' Position

Apple's Interrogatory Nos. 4 and 5 are exceptionally broad and seek information that is neither relevant nor proportional to the needs of the case. Plaintiffs nevertheless provided a reasonable response and agreed to supplement as discovery progresses. That is more than sufficient, especially because the interrogatories are classic contention interrogatories that are best answered later in discovery. Instead of allowing discovery to progress in an orderly fashion, Apple demands that Plaintiffs identify the positions and supporting factual evidence that Plaintiffs will present at trial so Apple can purportedly try to lock them in before Apple provides any discovery. Apple's approach is inconsistent with the purpose of discovery. If parties were expected to prove their claims at the outset of litigation, there would be no need for discovery. Apple's arguments are also inconsistent with Apple's approach to its own discovery obligations. Apple has never suggested it has, or could, articulate all of its legal theories and identify all of the evidence on which it may rely before taking any discovery of Plaintiffs. The court should reject Apple's one-sided approach to discovery.

### a) Apple's Interrogatories Are Overbroad And Seek Information That Is Neither Relevant Nor Proportional To The Needs Of This Case

Apple repeatedly argues these interrogatories seek only "basic information" about Plaintiffs' claims. Jt. Stip. at 10, 11, 19. That is not true. Among other things, these Interrogatories demand that Plaintiffs provide their legal contentions as to (1) the "column and line number" of all subject matter invented by each person, (2) the "circumstances under which" each person conceived of and/or reduced to practice such information, (3) when such conception or reduction to practice occurred, (4) a description of each person's efforts, (5) an identification of all corroborating evidence, and (6) a "detail[ed]" description of "all evidence" to support Plaintiffs' contentions. While it is unclear if Apple is narrowing its requests, Apple's joint stipulation demands, for "each claim," (1) the "specific subject matter Plaintiffs allege they contributed," (2)

which individual(s) invented that specific subject matter and when, (3) the "evidence" that supports Plaintiffs' legal contentions, and (4) an "identification of how the subject matter they supposedly contributed differs from what was known in the prior art."  Jt. Stip. at 20.

Interrogatories seeking "all facts" and "all evidence" relating to contentions are overbroad, especially at this stage of the case.  *See Anokiwave, Inc. v. Rebeiz*, 2019 WL 3935817, at *3 (S.D. Cal. Aug. 20, 2019) ("because the contention interrogatories seek 'all facts' supporting Plaintiff's allegations, they are overly broad and unduly burdensome on their face").  The interrogatories are also overbroad because they ask for detailed and complex legal positions as to each separate person who contributed to the claimed subject matter in numerous patents and applications.

Apple's interrogatories also demand that Plaintiffs identify each individual's contribution "by column and line number" of the specification.  As Plaintiffs explained in their objections, such information is irrelevant because "inventorship is determined with respect to the subject matter **claimed** in a patent, not the subject matter disclosed in a patent specification."  Ex. E at 10; *see also Egenera*, 972 F.3d at 1376 ("like validity, inventorship is a **claim-by-claim** question").  It is also irrelevant because development does not necessarily occur in that manner.  Plaintiffs' interrogatory responses explained that numerous individuals collaborated on the claimed subject matter.  Parsing precisely who "invented" every phrase or limitation in each claim is not consistent with how the information was developed and shared at Plaintiffs.  Nor is such a response necessary for Plaintiffs to prove their claims because a person is properly named as an inventor of a patent if they contributed to any aspect of any claim.

Finally, Apple asks Plaintiffs to engage in a burdensome exercise of explaining "how the subject matter they supposedly contributed differs from what was known in the prior art."  Jt. Stip. at 20.  Apple's interrogatories did not request that.  Ex. E at 9-10, 15-16.  Moreover, Apple misunderstands the relevant inquiry for inventorship.  There is no requirement that an inventor contribute subject matter that "differs from what was

1    known in the prior art." Jt. Stip. at 20. "Virtually all inventions are combinations and

2    virtually all are combinations of old elements." *Env't Designs Ltd.*, 713 F.2d at 698.

3    The standard is that an inventor must do more than merely explain "**well-known**

4    concepts and/or the **current state** of the art," *In re VerHoef*, 888 F.3d at 1365. Thus,

5    Apple's demand that Plaintiffs affirmatively distinguish contributions from "what was

6    **known** in the prior art" requests legally irrelevant information and is not proportional to

7    the needs of this case. Even if Apple sought relevant information, its request is

8    overbroad.

9        Apple's cases do not hold otherwise. Most merely addressed general inventorship

10   standards. *See Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1358 (Fed. Cir. 2004);

11   *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1460 (Fed. Cir. 1998); *Hess v.

12   Advanced Cardiovascular Sys., Inc.*, 106 F.3d 976, 980 (Fed. Cir. 1997); *Caterpillar

13   Inc. v. Sturman Indus., Inc.*, 387 F.3d 1358, 1377 (Fed. Cir. 2004); *Nartron Corp. v.

14   Schukra U.S.A. Inc.*, 558 F.3d 1352, 1356–57 (Fed. Cir. 2009). Apple's remaining cited

15   case granted a motion to dismiss with leave to amend after finding the alleged

16   contribution as a whole was "well-known in the prior art." *Eastman v. Apple Inc.*, 2018

17   WL 5982440, at *6 (N.D. Cal. Nov. 14, 2018). None of Apple's cited cases ordered a

18   plaintiff to affirmatively distinguish each individual's contribution over the prior art,

19   particularly where no prior art has been identified.

**b)    Interrogatory Nos. 4 and 5 Are Improper Early
Contention Interrogatories**

22       As discussed above, Interrogatory Nos. 4 and 5 ask for Plaintiffs' contentions on

23   who invented each aspect of the claimed subject matter, how they invented it, and more.

24   Ex. E at 9-10, 15-16. These contention interrogatories are objectionable because they

25   assume positions that Plaintiffs have never taken. Plaintiffs explained that Lamego

26   obtained the claimed subject matter "from discussions with, or jointly conceived it with,"

27   numerous individuals at Plaintiffs. *See, e.g.*, Ex. A at Ex. B at 13-16, 19. Apple's

28   demand that Plaintiffs identify who "invented" every word in every claim, and how that

1   subject matter differs from the prior art, is inconsistent with the facts already disclosed

2   regarding how the information was developed and shared at Plaintiffs.

3         It is also still early in the case.  The pleadings have not yet closed, Apple has not

4   pleaded or identified its defenses, the parties are just beginning to discuss ESI discovery,

5   and there have been no depositions.  Kachner Decl. ¶ 2.  "[C]ourts tend to deny

6   contention interrogatories filed before substantial discovery has taken place."  *See*

7   *AMEC Env't & Infrastructure, Inc. v. Geosyntec Consultants, Inc.*, 2013 WL 3923459,

8   at *2 (N.D. Cal. July 26, 2013).  Accordingly, "it is generally accepted that courts '[will]

9   *not* order responses to contention interrogatories until late in the pretrial period' and that

10  'the wisest general policy is to defer propounding and answering contention

11  interrogatories until near the end of the discovery period.'"  *In re Allergan, Inc. Sec.*

12  *Litig.*, 2016 WL 10719393, at *3 (C.D. Cal. Sept. 23, 2016) (quoting *In re Convergent*,

13  108 F.R.D. at 333).  Apple's approach of serving early contention interrogatories that

14  "systematically track all the allegations in an opposing party's pleadings is a serious

15  form of discovery abuse."  *In re Convergent*, 108 F.R.D. at 333.  Such interrogatories

16  can be "almost mindlessly generated, can be used to impose great burdens on opponents,

17  and can generate a great deal of counterproductive friction between parties and counsel."

18  *Id.*

19        In prior briefing, Apple has argued that Plaintiffs' reliance on *Convergent* "is

20  wrong because '*Convergent* is not controlling authority,' and this District 'does not find

21  it persuasive as a rule of general application.'"  Dkt. 271-2 at 2 (quoting *Kraft Ams. v.*

22  *Oldcastle Precast*, 2013 WL 12125759, at *7 (C.D. Cal. Dec. 18, 2013)).  Apple implies

23  *Kraft* held "this District" rejects *Convergent*.  In reality, *Kraft* merely declined to follow

24  *Convergent* in that particular case.  *See Kraft*, 2013 WL 12125759, at *7 ("Whether

25  contention interrogatories are appropriate is appropriately addressed on a case-by-case

26  and interrogatory-by-interrogatory basis.")  Contrary to Apple's assertions, courts in this

27  District routinely follow *Convergent* in finding contention interrogatories are best

28  answered towards the ***end*** of discovery.  *See, e.g., In re Allergan*, 2016 WL 10719393,

1  at *3 (agreeing with *Convergent* and denying motion to compel); *Kas*, 2011 WL
2  13234106, at *3 (same); *Sec. & Exch. Comm'n v. Moshayedi*, 2013 WL 12172127, at
3  *1 (C.D. Cal. Mar. 21, 2013) (same); *Timken Co. v. Wilshire Assocs. Inc.*, 2013 WL
4  12141419, at *4 (C.D. Cal. Jan. 10, 2013) (same); *Open Text Inc v. Northwell Health,
5  Inc.*, 2020 WL 6050595, at *4 (C.D. Cal. Aug. 6, 2020) (agreeing with *Convergent* but
6  granting motion because "discovery closes in less than a month").

7      Apple claims that courts have found that parties should provide "inventorship
8  contentions early in a case." Jt. Stip. at 23-24. Apple cites two cases from this District,
9  but both required contentions far later in the case. *See Dey, L.P. v. Ivax Pharm., Inc.*,
10  233 F.R.D. 567, 570-71 (C.D. Cal. 2005) (granting motion where plaintiff stated it would
11  not provide its contentions until after the close of evidence at trial); *Huang v. Cal. Inst.
12  of Tech.*, (C.D. Cal. June 19, 2003), Dkt. No. 40 (setting accelerated schedule whereby
13  the plaintiff provided initial contentions three months before the close of fact discovery
14  and final contentions after the close of fact discovery). Apple also cites *Hoffmann-La
15  Roche Inc. v. Orchid Chems. & Pharm. Ltd.*, 2011 WL 5508485 (D.N.J. Nov. 7, 2011).
16  That case found that an inventorship **defense** to a patent infringement claim was "an
17  invalidity defense under § 102(f)" that "trigger[ed]" requirements of the patent local
18  rules. Finally, Apple cites *Swanson v. ALZA Corp.*, 2014 WL 4441161, at *2 (N.D. Cal.
19  Sept. 9, 2014). That case did not involve a motion to compel contention interrogatories.
20  *Swanson* addressed whether a party could amend contentions later in the case even
21  though the parties stipulated to a unique schedule to provide final contentions early in
22  the case. *See* Ex. 2 at 2. None of Apple's cases required final responses to inventorship
23  contention interrogatories in circumstances similar to this case.

24              c)    **Plaintiffs' Responses Are Sufficient At This Time**

25      Even though Apple's requests are facially overbroad and seek premature
26  contentions, Plaintiffs responded and confirmed they would supplement as they learned
27  additional facts. In another case, Apple successfully argued such responses to contention
28  interrogatories were sufficient even though it was "***not*** early in the case." *See Qualcomm*

*Inc. v. Apple Inc.*, 2018 WL 5829940, at *2 (S.D. Cal. Nov. 7, 2018) (denying motion to compel where Apple "identified certain relevant licenses and states that it will identify others as its investigation proceeds and third parties are given notice").

Apple complains that Plaintiffs' responses "do not even come close" to providing the required information. Jt. Stip. at 20. That is not true. In response to Interrogatory No. 4, Plaintiffs identified at least one claim for each disputed patent, recited the claim elements at issue, and explained that they believe Lamego obtained the claimed subject matter from, or jointly conceived of it with, specifically named Masimo or Cercacor employees. Plaintiffs explained that discovery only recently began and agreed to supplement as they learn new information. Ex. E at 10-15. In response to Interrogatory No. 5, Plaintiffs incorporated their response to Interrogatory No. 4 and provided additional information about Lamego. Plaintiffs explained Lamego's obligation to assign to Masimo and/or Cercacor. Plaintiffs identified and quoted Lamego's relevant obligations to assign and similar obligations of other employees of Plaintiffs. *Id.* at 16-20. Plaintiffs agreed to supplement as they learn information in discovery. *Id.* at 20.

Apple argues it is "particularly egregious" that Plaintiffs' response mentioned light emitters or detectors and argues it is "inconceivable" that Plaintiffs could allege they invented those elements. Jt. Stip. at 20. Once again, Apple takes a small snippet of Plaintiffs' response out of context. Plaintiffs nowhere claimed to have invented light emitters or detectors. Plaintiffs' contentions concern entire patent claims. Apple avoids arguing the entire claims are disclosed in the prior art. Any such argument would be inconsistent with Apple's successful argument to the Patent Office that those claims were novel and non-obvious over the prior art. Apple has not taken the position that its own claims are invalid. Moreover, unlike validity, there is no requirement that a particular inventor's contribution be novel over the prior art. As discussed, "[v]irtually all inventions are combinations and virtually all are combinations of old elements." *Env't Designs Ltd.*, 713 F.2d at 698.

Apple also argues that Plaintiffs should provide contentions now because Plaintiffs bear the burden of proving their inventorship claims. Jt. Stip. at 10, 24. Apple cites no authority to support that assertion. Just because Plaintiffs bear the burden of proof does not mean Apple's early contention interrogatories are proper. Indeed, one purpose of discovery is to obtain information from an opposing party to support a party's claims or defenses. *Surfvivor Media, Inc. v. Survivor Prods.* 406 F.3d 625, 635 (9th Cir. 2005) (citing Fed. R. Civ. P. 26(b)(1)).

Finally, Apple argues its contention interrogatories are not premature because they do "not depend on any documents or information in Apple's possession . . .." Jt. Stip. at 20-21. That too is incorrect. Lamego is a former employee of Plaintiffs who worked at Apple in 2014 and then started his own company. Because these interrogatories ask detailed questions about the contributions of Marcelo Lamego and others who worked with him, Plaintiffs need discovery from Lamego and others. Lamego is a third-party to whom Plaintiffs cannot talk because they are currently suing him and his new company for trade secret misappropriation and patent infringement. *See Masimo v. True Wearables*, Case No. 18-cv-02001-JVS-JVE (C.D. Cal.). Moreover, Apple's documents, or lack of documents, may establish that Lamego could not have made his allegedly inventive contribution while employed at Apple. Apple will likely try to prove the opposite; that Apple employees contributed some or all of the subject matter. Accordingly, information in Apple's possession is relevant to Plaintiffs' interrogatory responses. For many months, however, Apple has withheld ownership discovery, despite Plaintiffs' many attempts to obtain that discovery.

- On August 17, Apple agreed to produce responsive documents regarding Plaintiffs' inventorship and ownership claims. Ex. 3 at 76-103.
- When Apple had not produced any documents after **six weeks**, Plaintiffs wrote to request a meet and confer. Ex. 4. Apple committed to produce documents on a "rolling basis," but did not say when. Ex. 5 at 5.

- When Apple had not produced its documents **four weeks** later, Plaintiffs followed up again and Apple again stated it would produce documents on a "rolling basis." Ex. 6 at 4; Ex. 7 at 4.

- At the parties' December 1, 2020, meet and confer, Apple again refused to commit to producing documents and argued there was no deadline to do so. Ex. 8 at 3.

- Apple produced a small handful of documents on December 16, but omitted critical documents. Kachner Decl. ¶ 3. On December 30, Plaintiffs again wrote to Apple and identified categories of missing documents. *See* Ex. M.

- On January 13, Apple continued to claim it would produce documents on a "rolling basis" at some unidentified date. Ex. 9 at 1-2.

Apple has also withheld documents related to Plaintiffs' trade secret claims, which are relevant here because Plaintiffs assert that Apple misappropriated some of Plaintiffs' trade secrets by publishing them in some of the patents that are the subject of Plaintiffs' inventorship/ownership claims. *See e.g.*, Dkt. No. 233 at ¶¶ 231, 239, 247-249. Plaintiffs served a Section 2019.210 statement on October 9, 2020, and revised it on November 6, 2020, to address Apple's stated concerns. *See* Ex. 10. Apple argued Plaintiffs' statement was insufficient and refused to meet and confer to discuss Plaintiffs' requests for production until after the Court resolved Apple's Section 2019.210 motion. Ex. 5 at 2; Ex. 7 at 4; Ex. 8 at 1-3; Ex. 9 at 2-3; Ex. M at 1-2. On January 21, the Court resolved that motion by rejecting Apple's position and finding Plaintiffs had satisfied Section 2019.210. Ex. 11.

Apple should not be permitted to demand detailed contentions early in discovery while withholding discovery that is relevant to those contentions.

### d) Apple's Remaining Arguments Are Meritless

Apple makes other assertions that Plaintiffs contend are not relevant to the issue before this Court. Nevertheless, Plaintiffs briefly address them for completeness.

First, Apple argues that Plaintiffs' response to Apple's burdensome contention interrogatories is part of a "pattern" of refusing to provide information. Jt. Stip. at 21. In support, Apple cites its own briefing on its Motion To Compel Plaintiffs To Comply With Section 2019.210 (Dkt. Nos. 258-1, 266-1). This Court rejected that argument when it denied Apple's motion and confirmed that Plaintiffs *had* satisfied Section 2019.210. Ex. 11. Apple also cites its own Motion To Compel Supplemental Responses to Interrogatories 6, 10, 11, 13. Dkt. No. 271-1. That motion is also another attempt by Apple to demand premature responses to contention interrogatories. Dkt. No. 271-1 at 29-30, 54-55, 58, 60-61, 69-72.

Second, Apple asserts that the reason Plaintiffs have not complied with Apple's demands is because Plaintiffs supposedly "want to keep Apple in the dark so that they can adjust their contentions as discovery proceeds." Jt. Stip. at 21. Apple provides nothing to support its attempt to attribute motive to Plaintiffs. Plaintiffs provided reasonable responses at this time and committed to supplement as they learn more facts, just as required by the Federal Rules. There is nothing nefarious or improper about recognizing that, as in all cases, Plaintiffs may use the discovery they obtain from their adversary to support and refine their contentions.

Third, Apple repeatedly suggests Plaintiffs had no proper basis to file suit under Rule 11. *See* Jt. Stip. at 11, 16, 21, 24-25. That insinuation is baseless. While Apple's initial motion to dismiss challenged Plaintiffs' inventorship and ownership claims, Apple dropped its challenge after Plaintiffs voluntarily amended to address Apple's minor complaints. *Compare* Dkt. No. 16-1 *with* Dkt. No. 38-1. Regardless, this Court rejected the same argument in another case. *Kas v. Mercedes-Benz U.S.A., LLC*, 2011 WL 13234106, at *3 (C.D. Cal. Nov. 8, 2011) (rejecting the argument that plaintiffs should answer contention interrogatories and rejecting the premise that "Plaintiff was required to have had evidence to support these allegations when she filed her Complaint").

Fourth, Apple cites a patent claim-construction case and accuses Plaintiffs of in engaging in a "shifting sands" approach to discovery. Jt. Stip. at 24 (citing *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1364 (Fed. Cir. 2006)). But Apple has pointed to nothing to show any changes in Plaintiffs' theories. Plaintiffs provided a reasonable response based on currently available information and agreed to supplement as they learn more. Moreover, Apple does not identify any aspect of Plaintiffs' inventorship and ownership claims that could improperly "shift" based on Apple's discovery. Apple's concern appears to be that Plaintiffs will use discovery from Apple to prove Plaintiffs' claims. That is one of the main purposes of discovery.

Finally, Apple suggests Plaintiffs are attempting to "delay this case." Jt. Stip. at 25. The record rebuts Apple's accusations of "delay." Apple states it served its contention interrogatories "Nine Months Ago." Jt. Stip. at 16. Apple omits that Plaintiffs served their initial responses in May of 2020 and Apple's initial letters identified no purported deficiency in Plaintiffs' response to Interrogatory No. 4. *See* Exs. C and D. Apple identified no deficiencies in Interrogatory No. 4 until *six months later* in November of 2020. *See* Ex. H. Apple conducted the initial meet and confer on Interrogatory No. 5 in June of 2020, but waited *months* before following up in November of 2020. *See* Ex. H. Nothing supports Apple's continued rhetoric accusing Plaintiffs of delay.[5]

## B.    Apple's Interrogatory No. 23

### 1.    Apple's Position

Apple's Interrogatory No. 23, served October 6, 2020, seeks all facts of which Plaintiffs are aware that relate to each of the Disputed Patents, including the circumstances and dates relating to Plaintiffs' first awareness of each of the Disputed

---

[5] Apple argues Plaintiffs "ignored" Apple's most recent letter. Jt. Stip. at 18. Apple omits that it sent its letter the day before Christmas Eve, demanded that Plaintiffs agree to supplement by New Years Eve, and demanded Plaintiffs provide the requested supplement one business day after the holidays. *See* Ex. L.

---

JOINT STIP. RE APPLE'S MOT. TO COMPEL          34          CASE NO. 8:20-cv-00048-JVS (JDEx)

Patents. Andrea Decl., Ex. F at 138. In response to Plaintiffs' objections (*id.*, Ex. G at 147–48), Apple clarified during the meet and confer and in follow-up correspondence that the Interrogatory is seeking "facts about Plaintiffs' knowledge, awareness, and actions taken with respect to each [Disputed Patent]" and listed the types of information it was seeking. Andrea Decl., Ex. J at 159–60 at 2–3. Specifically, Apple stated that it was seeking the following information:

- the date Plaintiffs first learned about each Disputed Patent;

- how Plaintiffs learned about each Disputed Patent;

- who first learned about each Disputed Patent, who they discussed each [Disputed Patent] with, and when those discussions occurred; and

- what actions Plaintiffs took with respect to each [Disputed Patent] after they learned of them, including but not limited to internal discussions, discussions with prosecution counsel, . . . any steps that were taken to investigate the inventorship/ownership of each [Disputed Patent], and any alleged harm Plaintiffs believe they suffered as a result of Apple's filing of each [Disputed Patent].

*Id.* Apple explained that it is aware that Plaintiffs identified certain of the Disputed Patents to the U.S. Patent & Trademark Office ("PTO") in information disclosure statements filed during prosecution of Plaintiffs' own patents. *Id.* at 160. Apple further stated during the meet and confer that the fact that the Disputed Patents were cited to the PTO long before they filed this litigation demonstrated that Plaintiffs were clearly aware of the Disputed Patents years before they filed their initial Complaint. To understand more about Plaintiffs' actions, Apple filed this Interrogatory seeking information about when Plaintiffs first learned of the Disputed Patents and what steps were taken once Plaintiffs learned about the patents.

     After the meet and confer, Plaintiffs sent a letter asking why the information Apple seeks is relevant and indicated that, absent such an explanation, "Plaintiffs maintain that this interrogatory seeks information not relevant to any party's claims or

defenses because the information sought would not be relevant to any inquiry for inventorship, and is therefor is [sic] not proportional to any needs in the case." Andrea Decl., Ex. K at 162–63.  Apple responded that the information sought is "relevant to Apple's potential defenses to Plaintiffs' claims—if, for example, Plaintiffs learned of the [Disputed Patents] and sat on them for years, as it appears they did, that would be relevant to defenses such as waiver, estoppel, and unclean hands." Andrea Decl., Ex. L at 166.  Accordingly, Apple urged Plaintiffs to reconsider their position, but Plaintiffs ignored Apple's response, necessitating the present motion. *Id.* at 167.

There should be no dispute that the information sought by Interrogatory No. 23 is relevant to Plaintiffs' correction of inventorship and ownership allegations (*see* Dkt. 233 ¶¶ 253–349 (Counts 14–26)), and more specifically to Apple's potential equitable defenses to those allegations.  The subject matter in the Disputed Patents was published by the PTO starting in 2016, and, as noted below, Plaintiffs themselves cited several of the Disputed Patents to the PTO in conjunction with their own patent applications in 2018, 2019, and 2020.   For example, the following patents subject to Plaintiffs' inventorship and ownership allegations were cited:

- U.S. Patent No. 10,078,052 ("the '052 patent"), the subject of Counts 14 and 20 in this action (TAC ¶¶ 253–59, 295–302), was published in March 3, 2016.  Plaintiffs cited the '052 patent in four separate Information Disclosure Statements ("IDSs") to the PTO (three in 2018 and one in 2019).  Andrea Decl., Ex. N at 175, Ex. O at 203, Ex. P at 240, Ex. Q at 255.

- U.S. Patent 9,723,997 ("the '997 patent"), the subject of Counts 18 and 24 in this action (TAC ¶¶ 281–87, 327–34), was published on August 8, 2017.  Plaintiffs cited the '997 patent in three separate IDSs to the PTO in 2018.  Andrea Decl., Ex. N at 174, Ex. O at 203, Ex. P at 240.

- U.S. Patent 9,952,095 ("the '095 patent"), the subject of Counts 16 and 22 in this action (TAC ¶¶ 267–73, 311–18), was published on April 24,

2018.  Plaintiffs cited the '095 patent in three separate IDSs to the PTO in 2018.  Andrea Decl., Ex. N at 175, Ex. O at 203, Ex. P at 240.

- U.S. Patent 10,247,670 ("the '670 patent"), the subject of Counts 15 and 21 in this action (TAC ¶¶ 260–66, 303–10), was published on December 20, 2018.  Plaintiffs cited the '670 patent in an IDS to the PTO in 2019. Andrea Decl., Ex. Q at 255.

Plaintiffs were indisputably aware of these Disputed Patents (and presumably others) well before they filed this suit early last year; Apple's Interrogatory No. 23 seeks information about Plaintiffs' first awareness of the Disputed Patents and what steps they took upon learning about the patents.  If Plaintiffs were aware of the Disputed Patents and their potential claims for correction of inventorship/ownership and did nothing for years, that may give rise to various equitable defenses such as laches and equitable estoppel.

"[T]he defenses of laches and estoppel have been applied in actions" involving correction of inventorship.  *Stark v. Advanced Magnetics, Inc.*, 29 F.3d 1570, 1573 (Fed. Cir. 1994); *see also Ferring B.V. v. Allergan, Inc.*, 980 F.3d 841, 853 (Fed. Cir. 2020) (analyzing equitable estoppel defense to correction of inventorship allegations); *see also Degui Chen v. Jung*, 2018 WL 7500274, at *1 (C.D. Cal. Sept. 12, 2018) (declining to dismiss affirmative defenses of unclean hands, waiver, equitable estoppel and laches alleged against improper inventorship claims).  Here, the question of whether Plaintiffs sat on their claims to their unjust benefit is at the heart of Apple's potential equitable defenses.  *See, e.g., Studio & Partners, s.r.l. v. Kl*, 2007 WL 3342597, at *5 n.7 (E.D. Wis. Nov. 7, 2007) ("the entire purpose of laches and other equitable defenses is to prevent a party from sitting on his rights"); *Peikin v. Kenner*, 2008 WL 11411358, at *7 (C.D. Cal. Oct. 24, 2008) ("The defense of equitable estoppel is intended to promote equity in a case by preventing a party from asserting its rights where the party 'has so conducted [itself] that it would be contrary to equity and good conscience' to permit the party to recover." (quoting *Granite State Ins. Comp. v. Smart Modular Techs., Inc.*, 76

1    F.3d 1023, 1027 (9th Cir. 1996))); *Vita-Herb Nutriceuticals Inc. v. Probiohealth LLC*,

2    2012 WL 3903454, at *9 (C.D. Cal. Sept. 6, 2012).

3    For example, the defense of laches seeks to prevent a plaintiff who with "full

4    knowledge of the facts, acquiesces in a transaction and sleeps upon his rights." *Danjaq*

5    *LLC v. Sony Corp.*, 263 F.3d 942, 950–51 (9th Cir. 2001) (internal citations omitted);

6    *see also James v. J2 Cloud Servs., LLC*, 823 F. App'x 945, 948 n.5 (Fed. Cir. 2020);

7    *Intel Corp. v. Tela Innovations, Inc.*, 2020 WL 7868111, at *13 (N.D. Cal. Dec. 22,

8    2020). As the Federal Circuit has made clear, "[l]aches is an equitable defense that may

9    bar an inventorship claim." *Serdarevic v. Advanced Med. Optics., Inc.*, 532 F.3d 1352,

10   1358 (Fed. Cir. 2008). To prevail on a defense of laches, a defendant must prove: (1)

11   "unreasonable delay by the plaintiff" and (2) "prejudice to itself." *Kling v. Hallmark*

12   *Cards, Inc.*, 225 F.3d 1030, 1036 (9th Cir. 2000) (internal citations omitted). "What

13   constitutes unreasonable delay largely depends on the circumstances of each particular

14   case." *Peikin*, 2008 WL 11411358, at *7 (citation omitted). Apple simply seeks to learn

15   the facts and circumstances that may be relevant to such a defense and other potential

16   equitable defenses in this case. Plaintiffs' actions with respect to the Disputed Patents

17   suggest that those facts exist.

18   Moreover, Plaintiffs' awareness of the publication of the Disputed Patents is

19   directly relevant to Plaintiffs' trade secret allegations. Plaintiffs' theory of trade secret

20   misappropriation in this case includes an allegation that Apple improperly disclosed,

21   through publication of patent applications, certain alleged trade secrets belonging to

22   Masimo. TAC ¶¶ 231–39. One of these patent applications was issued as the '997

23   patent, a patent that is also the subject of Plaintiffs' inventorship and ownership claims.

24   *Id.* ¶¶ 281–87, 327–34. If Plaintiffs learned of the publication of those alleged trade

25   secrets and then did *nothing* about that publication, as appears to be the case, that would

26   bear directly on whether Plaintiffs took adequate steps to reasonably maintain the alleged

27   trade secrets as secrets. *See Intermedics, Inc. v. Ventritex, Inc.*, 822 F. Supp. 634, 654

28   (N.D. Cal. 1993) (where, as here, a plaintiff alleges that the defendant misappropriated

one trade secret, "it is unreasonable for that plaintiff simply to assume that that defendant can be trusted to protect other secrets"); *see also Alamar Biosciences Inc. v. Difco Labs. Inc*., 1996 WL 648286, at *6 (E.D. Cal. Oct. 13, 1996) ("[Trade secret plaintiff] must exercise eternal vigilance.  This calls for constant warnings to all . . . to whom the trade secret has become known and obtaining from each an agreement, preferably in writing, acknowledging its secrecy and promising to respect it.").  This provides an independent reason why Plaintiffs should be compelled to provide the basic information Interrogatory No. 23 seeks.

Furthermore, Plaintiffs have alleged that Lamego agreed not to compete with them and "volunteered that he would not work on technology similar to Plaintiffs' technology."  TAC ¶¶ 18, 23, 225–29, 248.  Therefore, when Plaintiffs learned that Lamego was an inventor on these patents is also relevant to Plaintiffs' knowledge as to when Lamego allegedly breached the agreements with Plaintiffs.  *Intermedics*, 822 F. Supp. at 652 ("courts' central concern . . . is with identifying the point at which the first apparent breach of the confidential relationship occurred, or when plaintiff knew or should have known about that first breach").

In short, the information Apple has requested from Plaintiffs is relevant to the claims and defenses in this case, and Plaintiffs should have agreed to provide the information without requiring Court intervention.  As discussed above with respect to Interrogatory Nos. 4–5, the Court should put a stop to Plaintiffs' continued attempts to delay this case and order Plaintiffs to supplement their response to Interrogatory No. 23 to include the information requested in Apple's letter dated December 10, 2020.  Andrea Decl., Ex. K at 158–59.

## 2. Plaintiffs' Position

### a) Apple's Interrogatory Is Overbroad On Its Face

Interrogatory No. 23 asks Plaintiffs to "[i]dentify all facts of which You are aware that relate to each of the Apple Patents and each of the Apple Applications."  Ex. G at 5.  During the parties meet and confer, Plaintiffs explained "there was no apparent

boundary to this interrogatory" and requested that Apple identify the specific information sought. Ex. K at 1. Plaintiffs expected Apple might limit the interrogatory to the information requested in the second sentence of the interrogatory ("Your response should identify at least the circumstances and dates relating to your first awareness of each of the Apple Patents and each of the Apple Applications"). Instead, Apple identified several broad topics of information that it sought by way of "example," while refusing to narrow its request. Ex. J at 2. In particular, Apple's letter stated:

> **For example**, Plaintiffs should identify **at least** the following information for each Apple Patent or Application:
> - the date Plaintiffs first learned about each Apple Patent or Application;
> - how Plaintiffs learned about each Apple Patent or Application;
> - who first learned about each Apple Patent or Application, who they discussed each Apple Patent or Application with, and when those discussions occurred; and
> - what actions Plaintiffs took with respect to each Apple Patent or Application after they learned of them, including but not limited to internal discussions, discussions with prosecution counsel and litigation counsel (while the subject matter of those discussions may be privilege, the date on which they occurred and who was present is not privileged), any steps that were taken to investigate the inventorship/ownership of each Apple Patent or Application, and any alleged harm Plaintiffs believe they suffered as a result of Apple's filing of each Apple Patent or Application. **As an example**, Apple explained that we are aware that Plaintiffs cited specific Apple Patents on information disclosure statements submitted in connection with their own patent applications, and the facts and circumstances surrounding those citations is directly relevant to this case (as well as facts surrounding any other actions Plaintiffs took after learning of the Apple Patents and Application).

Ex. J at 2-3.

In its motion to compel, Apple suggests for the first time that it may be narrowing this interrogatory to four specific bullet points. *See* Jt. Stip. at 35. Apple purports to

quote its letter, but alters the text of the bullet points and omits that its letter used the language "at least" and "for example." *Compare* Jt. Stip. at 35 *with* Ex. J. at 2-3. It remains unclear whether Apple is actually narrowing its request and, if so, whether it is narrowing its request to the bullet points set forth in its letter or the bullet points in its portion of the joint stipulation. If Apple is narrowing its interrogatory, it should make that clear.

### b)  Apple Seeks Information That Is Neither Relevant Nor Proportional To The Needs Of The Case

Even if Apple had narrowed its interrogatory through this Motion, Apple's narrowed request remains overbroad and not proportional to the needs of this case. Apple's bullet point list seeks mainly privileged information by targeting "discussions with prosecution counsel." Jt. Stip. at 35. Apple's letter also targeted "discussions with . . . litigation counsel," though Apple omitted this request in the joint stipulation. *Compare* Ex. J at 2 *with* Jt. Stip. at 35. Apple's arguments in the joint stipulation also focus heavily on Plaintiffs' attorney's citation of the Disputed Patents to the PTO in conjunction with Plaintiffs' patent applications. Thus, Apple's interrogatory calls for privileged information with both prosecution and litigation counsel. Apple's portion of the joint stipulation omits its prior acknowledgement that "while the subject matter of those discussions may be privileged, the date on which they occurred and who was present is not privileged." *See* Ex. J at 2. If all Apple sought was the date of a meeting and who was present, Plaintiffs would have provided such information.[6] However, the additional discovery requested by Apple's bullet points targets privileged communications.

Apple's broad discovery demand is also not justified by its relevancy arguments. First, Apple argues this interrogatory is relevant to several "***potential*** defenses,"

---

[6] Plaintiffs currently understand they likely learned of some of the patents only shortly before the December 2018 IDS filings and the remainder of the patents in 2019 or 2020.

1  including waiver, estoppel, unclean hands, and laches.  Jt. Stip. at 36.  But Apple has
2  never identified any of those "potential defenses" to Plaintiffs.  Apple has not yet filed
3  an answer and did not disclose any of these defenses in response to Plaintiffs'
4  interrogatory seeking disclosure of Apple's defenses.  Ex. 1 at 3.  Apple's current
5  interrogatory response states: "Apple's affirmative defenses ***do not yet exist in this***
6  ***action*** because it has not filed an Answer to the Complaint in this Action."  Ex. 1 at 4.
7  Apple identified some defenses to other claims, but did not identify ***any*** defenses to
8  Plaintiffs' ownership/inventorship claims.  *Id.*  The Court should not order discovery as
9  to defenses that Apple has not pleaded and has maintained "do not yet exist."

10  Apple also recently obtained an extension to answer Plaintiffs' complaint so that
11  Apple's answer is due on February 4—the same day supplemental memorandums are
12  due on this motion.  *See* L.R. 37-2.3.  Apple has not stated whether it will assert waiver,
13  estoppel, unclean hands, or laches defenses in its answer.  If it does, the timing of the
14  present Motion will prevent Plaintiffs from having any opportunity to explain whether
15  Apple's actual defenses warrant the discovery Apple seeks.  Plaintiffs presently have no
16  understanding of what defenses Apple will plead nor the basis for any such defenses.

17  Apple suggests its "potential" defenses will be meritorious because "Plaintiffs
18  were clearly aware of the Disputed Patents years before they filed their initial
19  Complaint."  Jt. Stip. at 35.  This acknowledges that the defenses do not yet exist and
20  Apple has not pleaded any of the underlying contentions.  Moreover, Apple's support
21  are documents dated no earlier than December 2018—just 13 months before Plaintiffs
22  filed suit.  *See* Jt. Stip. at 36-37 (citing Exs. N-Q); Dkt. No. 1.

23  Apple's cases also fail to support Apple's motion.  Apple cites cases that describe
24  the elements for laches and equitable estoppel.  These cases highlight that both defenses
25  require facts that Apple has never contended exist.  *See e.g., Kling v. Hallmark Cards,*
26  *Inc.*, 225 F.3d 1030, 1036 (9th Cir. 2000) (laches requires defendant to prove "prejudice
27  to itself"); *Intel Corp. v. Tela Innovations, Inc.*, 2020 WL 7868111, at *15 (N.D. Cal.
28  Dec. 22, 2020) (equitable estoppel bars claims only when there is "prejudice to the

Gibson, Dunn & Crutcher LLP

defendant as a result of the delay," "affirmative conduct by the party against whom estoppel is asserted inducing the belief that it had abandoned its claim", and "detrimental reliance by the party asserting estoppel.") Plaintiffs also do not understand what basis Apple has for a "potential" waiver or unclean hands defense, neither of which would appear to be relevant in this case. At present, it is not clear whether Apple will actually plead any of the "potential" defenses upon which it relies in its Motion.

Apple also argues Plaintiffs' awareness of publications is "directly relevant to Plaintiffs' trade secret allegations." Jt. Stip. at 38. Apple argues Plaintiffs did not take reasonable efforts to protect their trade secrets because Plaintiffs sued two years after *Apple* published some of Plaintiffs' trade secrets. Jt. Stip. at 38-37. Apple unsuccessfully made the identical argument in its motion to dismiss and cited the same two cases that it cites here. *Compare id. with* Ex. 12 at 12 (citing *Intermedics* and *Alamar Biosciences*). Judge Selna rejected Apple's argument, explaining:

> [I]f the owner of a trade secret allows for one party to publish its trade secrets to the world, and the other takes no reasonable efforts to counteract that misappropriation, the information can hardly be considered "secret" when *other* parties *subsequently* appropriate it. But this does *not* mean that a suit filed within the statute of limitations against a known misappropriator, alleged in this case to be Apple, must be dropped if the owner does not take immediate action against that misappropriator.

Ex. 13 at 10. Judge Selna also specifically held that Apple's primary cited authority in that motion (*HiRel Connectors*) did not support its position. *Id.* Though Judge Selna did not expressly address the two overlapping cases that Apple cited in both motions, he presumably did not mention those cases because they merely applied the statute of limitations and said nothing of Apple's theory on efforts to maintain secrecy. *See Alamar Biosciences Inc. v. Difco Labs. Inc.*, 1996 WL 648286, at *6 (E.D. Cal. Feb. 27, 1996); *Intermedics, Inc. v. Ventritex, Inc.*, 822 F. Supp. 634, 657 (N.D. Cal. 1993) (where one trade secret claim was brought outside the statute of limitations the statute applied to related trade secrets).

1  Accordingly, Apple's basis for asserting relevance are "potential defenses" that

2  "do not yet exist" and a trade secret theory that Judge Selna rejected.[7]  The Court should

3  deny Apple's Motion.

4

Dated: January 28, 2021                    GIBSON, DUNN & CRUTCHER LLP

5

6                                          By:  /s/ Joshua H. Lerner
                                                Joshua H. Lerner
7                                               H. Mark Lyon
                                                Brian M. Buroker
8                                               Brian A. Rosenthal
                                                Ilissa Samplin
9                                               Angelique Kaounis
                                                Brian K. Andrea
10

11                                         Attorneys for Defendant Apple Inc.

12

13 Dated:  January 28, 2021                  KNOBBE, MARTENS, OLSON & BEAR LLP

14

15                                         By:  /s/ Mark D. Kachner
                                                Joseph R. Re
16                                              Stephen C Jensen
                                                Perry D. Oldham
17                                              Stephen W Larson
                                                Mark D. Kachner
18                                              Adam B. Powell

19                                         Attorneys for Plaintiffs Masimo Corporation
                                           and Cercacor Laboratories, Inc.
20

21         **ATTESTATION UNDER LOCAL RULE 5-4.3.4(a)(2)(i)**

22 Pursuant to Civil L. R. 5-4.3.4(a)(2)(i), I attest that concurrence in the filing of this

23 document has been obtained from each of the signatories above.

24                                         By: /s/ Joshua H. Lerner
                                                Joshua H. Lerner
25                                              Attorney for Defendant Apple Inc.

26 _____

27 [7] Apple also claims this information is "relevant to Plaintiffs' knowledge as to when
   Lamego allegedly breached the agreements with Plaintiffs." Jt. Stip. at 39.  But Apple
28 never explains how that would be relevant to this case.  Plaintiffs did not assert a breach-
   of-contract claim and Lamego is not a defendant.

# Exhibit G

| | |
|---|---|
| **From:** | Perry.Oldham |
| **To:** | Andrea, Brian; Rosenthal, Brian A. |
| **Cc:** | Masimo.Apple; *** Apple-Masimo; Rice-Isaacs, Wendy |
| **Subject:** | Re: Masimo v. Apple - Source code inspection |
| **Date:** | Friday, July 31, 2020 6:35:57 PM |

[External Email]

Hi Brian,

Thank you for sending the computer to your Orange County office.

I will begin the review at 1:00 pm, and I plan to continue the review daily thereafter beginning at 8:30 am.

My responses to the questions below have not changed, and I will inform you if they do.

Best regards,

Perry

---

**From:** Andrea, Brian <BAndrea@gibsondunn.com>
**Sent:** Friday, July 31, 2020 3:23 PM
**To:** Perry.Oldham <Perry.Oldham@knobbe.com>; Rosenthal, Brian A. <BRosenthal@gibsondunn.com>
**Cc:** Masimo.Apple <Masimo.Apple@knobbe.com>; *** Apple-Masimo <Apple-Masimo@gibsondunn.com>; Rice-Isaacs, Wendy <WRice-Isaacs@gibsondunn.com>
**Subject:** RE: Masimo v. Apple - Source code inspection

Perry,

Thanks for providing this information.  Given your request to review Monday morning and the pandemic-related closures to all of our offices in California, we hoped you would agree to review the code in our Palo Alto office.  We have now made arrangements for a source code computer to be shipped to our Orange County office and arranged for someone to be in the office to meet you on Monday.  Unfortunately, the computer will not arrive at that office until Monday morning, so you will not be able to commence your review until 1pm PT on Monday (August 3).

 The Orange County office is located at:  3161 Michelson Drive, Irvine, CA 92612-4412.

 As stated in my earlier email, due to pandemic-related restrictions with regard to our offices, prior to entering the office (and for any subsequent days of desired review), we must receive at least one business day prior to each day's review an identification of who will be attending the review (including cell phone number and email address for contact tracing purposes) and answers from all guests regarding the following:

- Please verify you do not have any of the following symptoms that aren't related to an existing medical condition: fever over 100.4, intense shivering or chills, cough, shortness of breath or difficulty breathing, unusual fatigue, muscle or body aches,

headache, new loss of taste or smell, sore throat, congestion or runny nose, nausea or
vomiting, or diarrhea.

- Please advise if you have had overnight interstate or international travel in the last 14
  days.

- Please advise if you have had close contact with someone with symptoms of COVID-19
  or a known COVID-19 infection.

- You will be given the attached form upon your arrival.  Please note:  you must contact
  us if you develop COVID-19 symptoms within 14 days of your visit.

Everyone will be required to wear a mask and maintain social distancing throughout the
building and within the office.
 The hours of availability will be from 8:30 am to 4:30 pm.  Upon arrival to the 12th floor, you
should contact Dora Moran at 714-721-9419.  She will take your temperature, provide you
with a copy of the completed form noted above, help you secure your items as noted below,
and escort you to the Source Code Review Room.  Please note that you will not be permitted
to walk around the offices, but you will be shown the location of and be able to access the
restrooms near the Source Code Review Room.  Additionally, we ask that you please bring
your own food and drinks, to the extent you desire any during the course of the review.
 Pursuant to the Protective Order, including, but not limited to, paragraphs 11 (c) and (e)
(which will be enforced), before you may enter the Source Code Review Room, your mobile
devices, laptop, and any recordable devices must be left in a separate room.  You will have
access to a separate room that includes a landline for your use.  When you have ended your
inspection, we will escort you out of our offices.  To the extent you are still performing your
review at the end of the day, we will likely provide you with a 10-minute warning by knocking
on the door and talking through a closed door.
 Please confirm that you agree to abide by these procedures.
 Thanks,
Brian

**Brian Andrea**

### GIBSON DUNN

Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W., Washington, DC 20036-5306
Tel +1 202.887.3624 • Fax +1 202.530.4220
BAndrea@gibsondunn.com • www.gibsondunn.com

**From:** Perry.Oldham <Perry.Oldham@knobbe.com>
**Sent:** Friday, July 31, 2020 1:37 AM
**To:** Andrea, Brian <BAndrea@gibsondunn.com>; Rosenthal, Brian A.
<BRosenthal@gibsondunn.com>
**Cc:** Masimo.Apple <Masimo.Apple@knobbe.com>; *** Apple-Masimo <Apple-
Masimo@gibsondunn.com>
**Subject:** Re: Masimo v. Apple - Source code inspection

[External Email]
Hi Brian,

Paragraph 11(c) of the protective order entered by Judge Selna requires production of the source code at an office in the Central District of California.  Please provide an address that complies with the Court's order.

I will be attending the review.  My cellphone number is (949) 422-4221.  My email address is perry.oldham@knobbe.com.

I verify that I will not travel overnight for at least 14 days before the August 3 inspection, and I do not presently have any of the listed symptoms.  I also have not had contact with anyone with symptoms of COVID-19 or a known COVID-19 infection.  I will let you know if any of my responses change before the inspection.

The protective order does not provide for the confiscation of my personal belongings.  I will keep any cellular telephone, laptop, or recordable devices outside the Source Code Review Room in accordance with Judge Selna's order.

Best regards,

Perry

---

**From:** Andrea, Brian <BAndrea@gibsondunn.com>
**Sent:** Thursday, July 30, 2020 5:51 PM
**To:** Perry.Oldham <Perry.Oldham@knobbe.com>; Rosenthal, Brian A. <BRosenthal@gibsondunn.com>
**Cc:** Masimo.Apple <Masimo.Apple@knobbe.com>; *** Apple-Masimo <Apple-Masimo@gibsondunn.com>
**Subject:** RE: Masimo v. Apple - Source code inspection

Hi Perry,

We plan to make Apple's source code production available for your review on Monday, August 3, at Gibson Dunn's Palo Alto office located at 1881 Page Mill Road, Palo Alto, CA 94304.  While the office is currently closed due to the pandemic (as are all of our California offices), we have made special arrangements for you to perform the inspection starting Monday as you requested.  I can also confirm that the Source Code Computer will contain Xcode.

Due to pandemic-related restrictions with regard to our offices, prior to entering the office next week (and for any subsequent days of desired review), we must receive at least one business day prior to each day's review an identification of who will be attending the review (including cell phone number and email address for contact tracing purposes) and answers from all guests regarding the following:

- Please verify you do not have any of the following symptoms that aren't related to an existing medical condition: fever over 100.4, intense shivering or chills, cough,

shortness of breath or difficulty breathing, unusual fatigue, muscle or body aches, headache, new loss of taste or smell, sore throat, congestion or runny nose, nausea or vomiting, or diarrhea.

- Please advise if you have had overnight interstate or international travel in the last 14 days.

- Please advise if you have had close contact with someone with symptoms of COVID-19 or a known COVID-19 infection.

- You will be given the attached form upon your arrival.  Please note:  you must contact us if you develop COVID-19 symptoms within 14 days of your visit.

Everyone will be required to wear a mask and maintain social distancing throughout the building and within the office.

The hours of availability will be from 8:30 am to 4:30 pm.  Upon arrival, you should contact the Palo Alto office Copy Center at 650-849-5311 to request entrance, and someone will admit you into the office, provide you with a copy of the completed form noted above, secure your items as noted below, and escort you to the Source Code Review Room.  Please note that you will not be permitted to walk around the offices, but you will be shown the location of and be able to access the restrooms near the Source Code Review Room.  Additionally, we ask that you please bring your own food and drinks, to the extent you desire any during the course of the review.

Pursuant to the Protective Order, including, but not limited to, paragraphs 11 (c) and (e) (which will be enforced), before you may enter the Source Code Review Room, your mobile devices, laptop, and any recordable devices will be removed and secured during the course of your review.  You will have access to a separate conference room that includes a landline for your use.  When you have ended your inspection, we will return your removed devices and escort you out of our offices.  To the extent you are still performing your review at the end of the day, we will likely provide you with a 10-minute warning by knocking on the door and talking through a closed door.

Please confirm that you agree to abide by these procedures.

Thank you.

**Brian Andrea**

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W., Washington, DC 20036-5306
Tel +1 202.887.3624 • Fax +1 202.530.4220
BAndrea@gibsondunn.com • www.gibsondunn.com

---

**From:** Andrea, Brian <BAndrea@gibsondunn.com>
**Sent:** Thursday, July 30, 2020 3:17 PM
**To:** Perry.Oldham <Perry.Oldham@knobbe.com>; Rosenthal, Brian A.

<BRosenthal@gibsondunn.com>
**Cc:** Masimo.Apple@knobbe.com>; *** Apple-Masimo <Apple-Masimo@gibsondunn.com>
**Subject:** RE: Masimo v. Apple - Source code inspection

Perry,

We are working on the logistics, and hope to be able to confirm them for you later today or tomorrow.

Thanks,
Brian

**Brian Andrea**

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W., Washington, DC 20036-5306
Tel +1 202.887.3624 • Fax +1 202.530.4220
BAndrea@gibsondunn.com • www.gibsondunn.com

---

**From:** Perry.Oldham <Perry.Oldham@knobbe.com>
**Sent:** Wednesday, July 29, 2020 1:56 PM
**To:** Rosenthal, Brian A. <BRosenthal@gibsondunn.com>
**Cc:** Masimo.Apple <Masimo.Apple@knobbe.com>; *** Apple-Masimo <Apple-Masimo@gibsondunn.com>
**Subject:** Masimo v. Apple - Source code inspection

[External Email]
Brian,

Pursuant to ¶ 11(g) of the Protective Order and Judge Selna's order this morning, I will commence reviewing Apple's source code beginning at 9:00 a.m. on Monday, August 3, 2020.

Please provide the address for the source code inspection.

Best regards,

Perry

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

This message may contain confidential and privileged information for the sole use of the
intended recipient. Any review, disclosure, distribution by others or forwarding without
express permission is strictly prohibited. If it has been sent to you in error, please reply to
advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm
and/or our privacy policy.

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and
privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not
the intended recipient, please contact the sender by reply email and destroy all copies of the original
message.

This message may contain confidential and privileged information for the sole use of the
intended recipient. Any review, disclosure, distribution by others or forwarding without
express permission is strictly prohibited. If it has been sent to you in error, please reply to
advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm
and/or our privacy policy.

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and
privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not
the intended recipient, please contact the sender by reply email and destroy all copies of the original
message.

# Exhibit H

| From: | Perry.Oldham |
| To: | Andrea, Brian |
| Cc: | Masimo.Apple; *** Apple-Masimo; Moran, Dora |
| Subject: | RE: Masimo v. Apple - source code inspection |
| Date: | Friday, October 9, 2020 12:30:32 PM |

[External Email]

Hi Brian,

I will conduct the inspection.

The answers to the enumerated questions are no.

The length of time required to review the code will depend on the amount of new code made available for inspection.  I will let you know on Monday if it appears additional days will be needed.

Best regards,

Perry

**Perry Oldham**
Partner
949-721-2961
**Knobbe** **Martens**

---

**From:** Andrea, Brian <BAndrea@gibsondunn.com>
**Sent:** Thursday, October 8, 2020 6:03 PM
**To:** Perry.Oldham <Perry.Oldham@knobbe.com>
**Cc:** Masimo.Apple <Masimo.Apple@knobbe.com>; *** Apple-Masimo <Apple-Masimo@gibsondunn.com>; Moran, Dora <DMoran@gibsondunn.com>
**Subject:** RE: Masimo v. Apple - source code inspection

Hi Perry,

We can accommodate a review on Monday starting at 8:30am – will you be the one performing the inspection?  Please note that anyone planning to perform the inspection will need to answer the following questions by email before they arrive at our building (security will also ask the questions in the attached questionnaire upon arrival):

1) Do you have any symptoms such as fever, cough or shortness of breath?

(2) Have you traveled outside of CA and or traveled to one of the countries significantly impacted by COVID-19 in the past 14 days?

(3) To your knowledge, have you been in contact with anyone who has or is suspected of

Exhibit H
Page 150

having COVID-19, or who has traveled outside of California, in the past 14 days?

Finally, please also let us know if Plaintiffs intend to review the code beyond Monday next week so that we can make appropriate arrangements.

Thanks,
Brian


**Brian Andrea**

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W., Washington, DC 20036-5306
Tel +1 202.887.3624 • Fax +1 202.530.4220
BAndrea@gibsondunn.com • www.gibsondunn.com

---

**From:** Perry.Oldham <Perry.Oldham@knobbe.com>
**Sent:** Wednesday, October 7, 2020 8:04 PM
**To:** Andrea, Brian <BAndrea@gibsondunn.com>
**Cc:** Masimo.Apple <Masimo.Apple@knobbe.com>; *** Apple-Masimo <Apple-Masimo@gibsondunn.com>
**Subject:** Masimo v. Apple - source code inspection

[External Email]
Hi Brian,

We would like to inspect the source code on Monday, October 12, beginning at 8:30.  Please confirm that works for your team.

Thanks,

Perry

**Perry Oldham**
Partner
949-721-2961
**Knobbe Martens**


NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

---

This message may contain confidential and privileged information for the sole use of the

intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

---

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

# Exhibit L

Exhibit L
Page 173



## App Store Preview

This app is available only on the App Store for iPhone and iPad.



### Masimo Personal Health 4+
Masimo Corporation

★★☆☆☆ 2.4 • 35 Ratings

Free

---

### iPhone Screenshots



---

### Additional Screenshots
iPad

---

Track and trend your biometric information with the Masimo Personal Health App to guide changes in diet, exercise, stress reduction, and sleep to improve your health and wellness, as well as strength and conditioning regimens to improve your athletic performance.

Key Features:                                                    more

---

### What's New

Exhibit L
Page 174

4/21/2021    Case 8:20-cv-00048-JVS-JDE    Document 352-4    Filed 04/22/21    Page 73 of 110    Page ID
Masimo Personal Health on the App Store
#:31404



**What's New**                                                                            Version History

Version 2.3.0

This app has been updated by Apple to use the latest Apple signing certificate.

* Removed Threshold and Heart Rate Recovery features for the Japan market.

---

## Ratings and Reviews                                                                    See All

**2.4**



out of 5                                                                                   35 Ratings

★★☆☆☆                              ★★★☆☆                                ★★★☆☆
Vlynxxx, 02/12/2019                 ageezz, 08/04/2019                   Bowk5150, 04/28/2019

**Dumbed down version—good versio...**    **Needs improvements**              **Ehh works but needs some fine tuning**
I purchased a Masimo pulse oximeter for   The app seems to have been released a   Syncs to Training Peaks and Apple
use with my iPhone in 2013 for $250. I    tad too soon and has a number of bugs   Health. Reliable syncing to Training
liked it a lot. The app allowed me to do  that would seem easy to fix.           Peaks but hit or miss on Apple sync.
long continuous recordings and I c  more  The Edit function available in Histo  more    more

---

## App Privacy                                                                            See Details

The developer, **Masimo Corporation**, indicated that the app's privacy practices may include handling of data as described below. For more
information, see the developer's privacy policy.



**Data Not Collected**

The developer does not collect any data from this app.

Privacy practices may vary, for example, based on the features you use or your age. Learn More

---

## Information

Seller
Masimo

Size
74.7 MB

Category
Health & Fitness

Compatibility
**iPhone**
Requires iOS 10.0 or later.

**iPad**
Requires iPadOS 10.0 or later.

**iPod touch**
Requires iOS 10.0 or later.

Languages
English, French, German, Italian, Japanese, Simplified Chinese, Spanish

Age Rating
4+

Copyright
© 2018 All rights reserved. All trademarks and/or copyrights are properties of their respective owners.

Price
Free

Developer Website ↗
App Support ↗
Privacy Policy ↗

## Supports

 Family Sharing
With Family Sharing set up, up to six family members can use this app.

## More By This Developer

   

Masimo Professio...    Masimo SafetyNet    Masimo Sleep    Masimo Radius T°
Medical                Medical             Health & Fitness    Medical

## You May Also Like                                                    See All

     

Kenek Edge    PulseOximeter    Heart Rate Plus LI...    Oxi tracker    DBP Oximeter    Oximeter
Health & Fitness    Medical    Health & Fitness    Medical    Medical    Medical

# Exhibit M

US010078052B2

(12) **United States Patent** (10) Patent No.: **US 10,078,052 B2**
Ness et al. (45) **Date of Patent:** **Sep. 18, 2018**

(54) **REFLECTIVE SURFACE TREATMENTS FOR OPTICAL SENSORS**

(71) Applicant: **Apple Inc.**, Cupertino, CA (US)

(72) Inventors: **Trevor J. Ness**, Cupertino, CA (US); **Chin San Han**, Cupertino, CA (US); **David I. Nazzaro**, Cupertino, CA (US); **Marcelo M. Lamego**, Cupertino, CA (US); **Naoto Matsuyuki**, Tokyo-to (JP); **Wolf Oetting**, Cupertino, CA (US)

(73) Assignee: **Apple Inc.**, Cupertino, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 351 days.

(21) Appl. No.: **14/740,196**

(22) Filed: **Jun. 15, 2015**

(65) **Prior Publication Data**

US 2016/0061726 A1 Mar. 3, 2016

**Related U.S. Application Data**

(60) Provisional application No. 62/043,294, filed on Aug. 28, 2014.

(51) **Int. Cl.**
| | |
|---|---|
| *A61B 5/00* | (2006.01) |
| *G01N 21/55* | (2014.01) |
| *G01N 21/47* | (2006.01) |
| *A61B 5/021* | (2006.01) |
| *A61B 5/024* | (2006.01) |
| *A61B 5/08* | (2006.01) |
| *A61B 5/145* | (2006.01) |

(52) **U.S. Cl.**
CPC ............... *G01N 21/55* (2013.01); *A61B 5/00* (2013.01); *A61B 5/0059* (2013.01); *G01N 21/4738* (2013.01); *A61B 5/0002* (2013.01); *A61B 5/021* (2013.01); *A61B 5/024* (2013.01);

*A61B 5/0816* (2013.01); *A61B 5/14532* (2013.01); *A61B 5/14542* (2013.01); *A61B 5/681* (2013.01); *A61B 5/7203* (2013.01); *G01N 2201/0221* (2013.01); *G01N 2201/0625* (2013.01)

(58) **Field of Classification Search**
USPC ........................................................ 600/476
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 6,115,621 | A | 9/2000 | Chin | |
| 6,343,223 | B1 | 1/2002 | Chin et al. | |
| 6,491,647 | B1 * | 12/2002 | Bridger | A61B 5/021 |
| | | | | 128/900 |
| 7,890,153 | B2 | 2/2011 | Hoarau | |
| 8,005,624 | B1 | 8/2011 | Starr | |
| 9,314,197 | B2 | 4/2016 | Eisen et al. | |
| 2005/0230603 | A1 * | 10/2005 | Langland | G01N 3/14 |
| | | | | 250/221 |
| 2013/0006074 | A1 | 1/2013 | Pologe | |

* cited by examiner

*Primary Examiner* — Nicole F Johnson
(74) *Attorney, Agent, or Firm* — Joseph F. Guihan

(57) **ABSTRACT**

An electronic device includes one or more light emitters for emitting light toward an object and one or more light detectors for collecting light exiting the object. A reflective coating, surface, or surface finish can be applied adjacent to the area to which light is emitted and/or through which light exits in order to increase the light collected by the light detector. The reflective coating can be oriented so as to reflect light back into the object.

**17 Claims, 6 Drawing Sheets**





FIG. 1A                    FIG. 1B



*FIG. 2A*



*FIG. 2B*

Exhibit M
Page 180



*FIG. 3A*



*FIG. 3B*



*FIG. 3C*



*FIG. 3D*



*FIG. 3E*



FIG. 4A          FIG. 4B



FIG. 5

U.S. Patent          Sep. 18, 2018          Sheet 5 of 6          US 10,078,052 B2



*FIG. 6A*



*FIG. 6B*

**U.S. Patent**          Sep. 18, 2018          Sheet 6 of 6          US 10,078,052 B2



*FIG. 7*

US 10,078,052 B2

1

# REFLECTIVE SURFACE TREATMENTS FOR OPTICAL SENSORS

## CROSS-REFERENCE TO RELATED APPLICATION

This application is a nonprovisional patent application of, and claims the benefit to, U.S. Provisional Patent Application No. 62/043,294, filed Aug. 28, 2014 and titled "Reflective Surface Treatments for Optical Sensors," the disclosure of which is hereby incorporated herein by reference in its entirety.

## FIELD

This disclosure relates generally to sensor devices, and more particularly to electronic devices incorporating one or more optical sensing systems.

## BACKGROUND

An electronic device can include an optical sensing system for quantifying surface or subsurface characteristics of an object onto which the electronic device is placed. The optical sensing system can include a light emitter to illuminate the object with light that may be absorbed or reflected by the object in a manner related to the characteristics of the surface or subsurface thereof. The optical sensing system may also include a light detector to generate electrical signals corresponding to light reflected from the object as a result of the illumination. These signals can be conveyed to the electronic device by the optical sensing system so that the electronic device can quantify characteristics of the surface or subsurface of the object.

In many cases, the electronic device may be undesirably responsive to noise (e.g., resulting from ambient light) present in the signals conveyed to it by an optical sensing system.

## SUMMARY

Certain embodiments described herein reference an electronic device configured to quantify subsurface characteristics of an object onto which the electronic device is placed. In one aspect, an electronic device can be adapted to obtain physiological data from a biological subject after being placed in contact with or proximate to a surface of the subject. For example, an electronic device such as a wearable fitness device can be positioned against the skin of a user's wrist (hereinafter the "measurement site") and can obtain therefrom certain physiological data about the user such as heart rate, respiration rate, blood oxygenation, blood pressure, and so on.

In many embodiments, an electronic device (such as a smart watch, fitness device, cellular phone, tablet computer, other computing device, exercise equipment, exercise monitor, physiology monitor, and so on) can include an optical sensing system positioned behind or within one or more apertures defined within a bottom surface of the electronic device. The optical sensing system can include a light emitter (e.g., a light emitting diode) for illuminating a measurement site of an object and a light detector (e.g., a photodiode, a phototransistor, and/or an optical image sensor) for receiving light reflecting from the measurement site. In one aspect, the light emitter can be oriented to emit light toward a portion of the measurement site most adjacent to the light emitter (hereinafter the "illumination area"). Simi-

2

larly, the light detector can be oriented to receive light exiting a portion of the measurement site most adjacent to the light detector (hereinafter the "collection area"). In many cases, the illumination area may be adjacent to the collection area. For example, in one embodiment, the illumination area and the collection area can be spaced one centimeter apart.

The electronic device can also include one or more reflectors positioned on or nearby the surface and adjacent to the one or more apertures defined therein. In some examples, the reflectors can be formed from mirrored films and can be positioned around the perimeter of the apertures.

Additional embodiments described herein may reference lenses positioned within each of the apertures defined by the bottom surface, disposed respectively over the light emitter and the light detector. One or more of the lenses may be formed from the same material as the surface, although this is not required. In one embodiment, one or more of the lenses can be configured to diffuse light. In other embodiments, one or more of the lenses can be configured to focus light onto a particular point or along a particular direction. In other embodiments, one or more of the lenses can be configured to polarize light to a particular orientation. In other embodiments, one or more of the lenses may be configured to exhibit transparency to a first frequency band of light and to exhibit opacity to a second frequency band of light. In one example, the first frequency band of light can be infrared light and the second frequency band of light can be green light. In some embodiments, a reflector as described above can be positioned around the perimeter of a bottom surface of a lens. In other embodiments, a lens can be formed from a multi-layered laminate material and a reflector can be interstitially disposed between the layers thereof. In some examples, each lens can be configured to provide the same functionality, although this is not required of all embodiments. For example, in some cases, different lenses can be configured to provide different functionality. For example, a lens positioned over a light emitter can be configured to focus light from the light emitter into the measurement site whereas a lens positioned over a light detector can be configured to focus light exiting the measurement site onto the light detector.

Still further embodiments described herein reference a method of optical sensing, including at least the operations of emitting light toward a measurement site of an object, receiving light exiting a first sub-area of the measurement site, and reflecting light exiting a second sub-area of the measurement site back into the measurement site.

## BRIEF DESCRIPTION OF THE DRAWINGS

Reference will now be made to representative embodiments illustrated in the accompanying figures. It should be understood that the following descriptions are not intended to limit the disclosure to one preferred embodiment. To the contrary, each is intended to cover alternatives, modifications, and equivalents as may be included within the spirit and scope of the described embodiments and as defined by the appended claims.

FIG. 1A depicts a top plan view of an example electronic device.

FIG. 1B depicts a bottom plan view of the example electronic device of FIG. 1A, showing separated apertures associated with an optical sensing system defined within a bottom surface of the example electronic device.

FIG. 2A depicts a simplified cross-section view of a light emitter and a light detector of an optical sensing system taken through section A-A of FIG. 1B.

US 10,078,052 B2

3

FIG. **2B** depicts the simplified cross-section view of FIG. **2A**, showing a set of example light reflection and absorption paths from the light emitter, through a measurement site of a subject, to the light detector of the optical sensing system.

FIG. **3A** depicts a bottom plan view of a wearable electronic device showing an optical sensing system implemented with one example of a reflector.

FIG. **3B** depicts an example cross-section of FIG. **3A** taken through section B-B, showing a simplified view of the optical sensing system of FIG. **3A**.

FIG. **3C** depicts an alternative example simplified cross-section of FIG. **3A** taken through section B-B, showing a simplified view of the optical sensing system of FIG. **3A** implemented with a bottom surface having a convex curvature.

FIG. **3D** depicts the simplified cross-section of FIG. **3A**, showing a set of example light reflection and absorption paths from a light emitter, through a measurement site of a subject, to a light detector of the optical sensing system of FIG. **3A**.

FIG. **3E** depicts an alternative example simplified cross-section of FIG. **3A**, showing a set of example light absorption and reflection paths from a light emitter, through a measurement site of a subject, to a light detector of the optical sensing system of FIG. **3A** implemented with a bottom surface having a convex curvature.

FIG. **4A** depicts a bottom surface of an example electronic device with a reflector adapted for use with an optical sensing system.

FIG. **4B** depicts a bottom surface of an example electronic device with another reflector adapted for use with an optical sensing system.

FIG. **5** depicts a bottom surface of an example electronic device with another reflector adapted for use with an optical sensing system.

FIG. **6A** depicts a bottom surface of an example electronic device with another reflector adapted for use with an optical sensing system.

FIG. **6B** depicts a bottom surface of an example electronic device with another reflector adapted for use with an optical sensing system.

FIG. **7** depicts example operations of a method of operating an optical sensing system in accordance with embodiments described herein.

The use of the same or similar reference numerals in different drawings indicates similar, related, or identical items.

The use of cross-hatching or shading in the accompanying figures is generally provided to clarify the boundaries between adjacent elements and also to facilitate legibility of the figures. Accordingly, neither the presence nor the absence of cross-hatching or shading conveys or indicates any preference or requirement for particular materials, material properties, element proportions, element dimensions, commonalities of similarly illustrated elements, or any other characteristic, attribute, or property for any element illustrated in the accompanying figures.

DETAILED DESCRIPTION

Reference will now be made in detail to representative embodiments illustrated in the accompanying drawings. It should be understood that the following descriptions are not intended to limit the embodiments to one preferred embodiment. To the contrary, it is intended to cover alternatives,

4

modifications, and equivalents as can be included within the spirit and scope of the described embodiments as defined by the appended claims.

Embodiments described herein reference systems and methods for increasing the speed, sensitivity, accuracy, precision, and/or reliability of optical sensing systems configured for use with small form factor electronic devices, such as wearable devices, although the various systems and methods described herein are not limited to particular form factors and can apply equally to larger embodiments. Further, it should be appreciated that the various embodiments described herein, as well as the functionality, operation, components, and capabilities thereof may be combined with other elements as necessary, and so any physical, functional, or operational discussion of any element, feature, structure, or interrelation is not intended to be limited solely to a particular embodiment to the exclusion of others. Moreover, although many embodiments described herein reference optical sensing systems configured to provide functionality such as fitness or health tracking or physiological data collection to a wearable electronic device, one may appreciate that the various systems and methods described herein are not limited to use of optical sensing systems in this manner. In other words, the various optical sensing systems as described herein (and methods associated therewith) can be used to detect, sense, or quantify other biological or non-biological properties of a user, another biological subject, a non-biological object or surface, or for any other purpose. For example, an optical sensing system can be used to detect subsurface characteristics of a material during a manufacturing process to determine whether the material should be rejected or accepted. In another example, an optical sensing system can be disposed onto or into a veterinary or medical diagnostic tool (e.g., wand, pen, etc.) that can be placed against a patient's skin in order to obtain physiological characteristics of said patient. Such a medical diagnostic tool can be used, in one example, with multiple patients in an emergency setting to assist veterinary or medical professionals with triage decisions.

Many embodiments described herein reference an optical sensing system disposed below a convex surface defining two apertures symmetrically spaced about the principal axis of the curve. A light emitter of the optical sensing system can be positioned behind one aperture and a light detector of the optical sensing system can be positioned behind the other aperture. In this manner, when the optical sensing system is placed in contact with a measurement site, the light emitter and the light detector can be optically isolated from one another by the apex of the convex curvature.

More particularly, because the apex of the convex curvature is the portion of the surface extending outwardly the farthest, the apex will contact the surface of a prospective measurement site first, thereby forming an opaque boundary with the measurement site that optically partitions the illumination area from the collection area. In these embodiments, the quantity of light exiting the collection area after being affected by the characteristics of the subsurface of the measurement site (hereinafter the "subsurface-affected light") may be greater than the quantity of light reflecting directly from the surface of the measurement site (hereinafter the "surface-reflected light") because surface-reflected light may be substantially or entirely blocked by the optical barrier established by the convex curvature of the surface.

Further embodiments can incorporate an optically reflective material disposed on, within, or adjacent to the apertures defined by the convex surface. In these embodiments, the optically reflective material can be disposed about the

US 10,078,052 B2

5

perimeter of the apertures respectively associated with the light emitter and the light detector of the optical sensing system. More particularly, the optically reflective material may be disposed and oriented to reflect light onto or into the measurement site. In this manner, both surface-reflected light and subsurface-affected light that exits the measurement site outside of the collection area can be reflected back into the measurement site (hereinafter the "recovered light"), thereby increasing the quantity of subsurface-affected light received by the light detector.

In one non-limiting alternative phrasing, these embodiments can incorporate reflective materials so as to direct as much light as possible into the subsurface of the measurement site so that said light, via specular or diffuse reflection, may have one or more additional chances to be reflected toward the collection area. Thus, in these embodiments, the quantity of subsurface-affected light received by the light detector of the optical sensing system may be greater than the quantity of subsurface-affected light received by the light detector of embodiments omitting said reflective material.

Optical sensing system embodiments described herein can exceed the performance of conventional optical sensing systems unable to discriminate between surface-reflected light and subsurface-affected light while orienting the light emitter and light detector to face the same surface. Particularly, in many conventional examples, the quantity of surface-reflected light received by a light detector may predominate the quantity of subsurface-affected light received by the same. As a result, many conventional optical sensing systems require a substantial amount of data over a substantial period of time in order to account for the effects of noise and to detect and quantify characteristics of the measurement site.

Conversely, an electronic device incorporating optical sensing systems as described herein may quantify surface and/or subsurface characteristics of a measurement site onto which the electronic device is placed with increased speed, accuracy, and precision.

Example electronic devices that can incorporate optical sensing systems as described herein can include, but are not limited to, a telephone, a headset, a pulse oximeter, a digital media player, a tablet computing device, a laptop computer, a desktop computer, a timekeeping device, a peripheral input device (e.g., keyboard, mouse, trackpad), a sports accessory device, a wearable device, a medical diagnostic device, a biometric authentication device, and so on.

For example, in one embodiment, an electronic device incorporating an optical sensing system in accordance with embodiments described herein can be worn by a user so as to obtain physiological data from the user such as, but not limited to, heart rate data, blood pressure data, temperature data, oxygen level data, and so on. The wearable electronic device incorporating such an optical sensing system can provide to the user, or a third party authorized by the user, diet or nutrition information, medical reminders, physiological tips or information, or other raw or processed physiological data.

In these embodiments, the optical sensing system may be included within a housing that encloses the internal components of the wearable electronic device. In another example, an optical sensing system may be partially or entirely separate from the wearable electronic device. In these examples, the wearable electronic device can include one or more communication channels, either wired or wireless, to facilitate communication with the external optical sensing system.

6

In addition to the optical sensing system, the wearable electronic device can include other sensors or sensor systems configured to obtain physiological data from a user. Example sensors can include, but may not be limited to, movement sensors, orientation sensors, temperature sensors, electrodermal sensors, blood pressure sensors, heart rate sensors, respiration rate sensors, oxygen saturation sensors, plethysmographic sensors, activity sensors, pedometers, blood glucose sensors, body weight sensors, body fat sensors, blood alcohol sensors, dietary sensors, and so on.

As with other embodiments described herein, an optical sensing system incorporated by a wearable electronic device can be implemented with a light emitter and a light detector. As noted above, the optical sensing system can be configured to measure changes in the light reflected from a measurement site, such as a wrist of a user.

As used herein, the phrases "reflected from a measurement site" and "exiting a measurement site" (in addition to similar phrases or terminology) generally refer to both surface-reflected light and to subsurface-affected light that originated from a light emitter and, via specular or diffuse reflection from the surface or subsurface of the measurement site, have become oriented to propagate away from the measurement site.

More particularly, the optical sensing system of a wearable electronic device can orient a light emitter to illuminate a portion of the user's wrist. As noted above, this portion of a measurement site is generally referred to herein as "the illumination area." The optical sensing system can also orient the light detector to receive light exiting a separate portion of the user's wrist. As noted above, this portion of the measurement site is generally referred to herein as "the collection area."

In some cases, light from the light emitter may be reflected (specularly and/or diffusely) by the surface of the user's wrist. As noted above, this light is generally referred to herein as "the surface-reflected light." In other cases, light from the light emitter can penetrate the surface of the user's wrist and can be absorbed or reflected (specularly or diffusely) by the subsurface of the wrist. As noted above, this light is generally referred to herein as "the subsurface-affected light." In many cases, the amount of absorption or reflection provided by a particular measurement site at a particular time may depend upon the characteristics of the measurement site at that time. In other words, surface-reflected light may vary predictably with the characteristics of the surface of the measurement site and, similarly, subsurface-affected light may vary predictably with the characteristics of the subsurface of the measurement site.

For example, the tissue of the user's wrist can absorb or reflect light differently depending on physiological characteristics of the surface (e.g., skin, hair, sweat) or subsurface (e.g., stratum corneum of the skin, dermis, blood vessels beneath the skin, and so on) of the user's wrist. For example, sweat on the user's wrist can affect the quantity or quality of surface-reflected light.

In another example, a user's heartbeat can affect the quantity or quality of subsurface-affected light received by the light detector. More particularly, the user's heartbeat can affect an increase or decrease in the user's blood volume within the user's wrist. This periodic distention and contraction is commonly referred to as the user's pulse. As a direct result of changes in the volume of blood proximate to the measurement site, the light absorption capacity of the measurement site may correspondingly increase or decrease which, in turn, can cause the amount of subsurface-affected light received by the light detector to increase and decrease

US 10,078,052 B2

7

8

with the user's pulse. This type of volumetric data collection via optical sensing is conventionally referred to as photoplethysmographic data collection (hereinafter "PPG").

As noted above, the light detector of an optical sensing system can receive light exiting the collection area and generate electrical signals corresponding thereto. In certain embodiments, light exiting the collection area can include a component corresponding to surface-reflected light and a component corresponding to subsurface-affected light. In certain embodiments implementing an optical barrier between the light emitter and light detector (e.g., the apex of a concave surface associated with the optical sensing system), the component corresponding to the surface-reflected light can be substantially reduced or eliminated. In these embodiments, the electrical signals generated by the light detector may correspond substantially only to subsurface-affected light.

In many embodiments, the electrical signals generated by the light detector of the optical sensing system can be conveyed as data to the wearable electronic device which, in turn, can utilize the data to quantify one or more physiological characteristics of the user at that time. In many examples, data from the light detector can include information about the collected light such as the chromaticity, brightness, frequency, and/or luminance of the light.

Optical sensing systems as described herein can also be used to obtain non-physiological information or data. For example, the wearable electronic device can use the optical sensing system as a surface audio sensor (e.g., microphone). In other examples, a wearable electronic device can use the optical sensing system as an input device (e.g., wrist-tap input). In still further embodiments, the wearable electronic device can use an optical sensing system to determine a state of the electronic device (e.g., connected to a user, connected to a charger, sitting on a surface such as a table, and so on). In another example, an optical sensing system can be used as a liveness verification for biometric authentication or security embodiments.

Accordingly, optical sensing systems incorporated by embodiments described herein may serve as multi-purpose sensors.

These and other embodiments are discussed below with reference to FIGS. 1A-7. However, those skilled in the art will readily appreciate that the detailed description given herein with respect to these Figures is for explanatory purposes only and should not be construed as limiting.

FIG. 1A depicts a top plan view of an example wearable electronic device 100. In the illustrated embodiment, the wearable electronic device 100 may be implemented as a portable electronic device that is adapted to be worn by a user such as a smart watch. Other embodiments can implement the wearable electronic device 100 differently. For example, the wearable electronic device 100 can be a smart phone, a gaming device, a digital music player, a sports accessory device, a medical device, a device that provides time and/or weather information, a fitness device, and other types of electronic devices suitable for attaching to a user.

The wearable electronic device can be implemented as a fitness device that provides physiological information (whether real-time or not) to the user, authorized third parties, and/or an associated monitoring device. The wearable fitness device may be configured to provide physiological information or data such as, but not limited to, heart rate data, blood pressure data, temperature data, blood oxygen saturation level data, diet/nutrition information, medical reminders, physiological tips or information, or other physiological data. The associated monitoring device may be, for

example, a tablet computing device, a phone device, a personal digital assistant, computer, and so on.

The wearable electronic device 100 can be configured in the form of a wearable communications device. A wearable communications device may include a processor coupled with or in communication with a memory, one or more sensors, one or more communication interfaces, output devices such as displays and speakers, one or more input devices, and a fitness or health tracking system. The communication interfaces can provide electronic communications between the communications device and any external communication network, device or platform, such as but not limited to wireless interfaces, Bluetooth interfaces, universal serial bus interfaces, Wi-Fi interfaces, TCP/IP interfaces, network communications interfaces, or any conventional communication interfaces. The wearable communications device may provide information regarding time, health, statuses of externally connected or communicating devices and/or software executing on such devices, messages, video, operating commands, and so forth (and may receive any of the foregoing from an external device), in addition to communications. For simplicity of illustration, the wearable electronic device 100 is depicted in FIG. 1A without many of these elements, each of which may be included, partially, optionally, or entirely, within a housing 102.

The housing 102 can be configured to, at least partially, surround a display 104. In many examples, the display 104 may incorporate an input device configured to receive touch input, force input, and the like and/or may be configured to output information to a user, such as various health parameters or physiological suggestions. The display 104 can be implemented with any suitable technology, including, but not limited to, a multi-touch or multi-force sensing touchscreen that uses liquid crystal display (LCD) technology, light emitting diode (LED) technology, organic light-emitting display (OLED) technology, organic electroluminescence (OEL) technology, or another type of display technology. A button (not shown) might take the form of a home button, which may be a mechanical button, a soft button (e.g., a button that does not physically move but still accepts inputs), an icon or image on the display 104 or on an input region, and so on. Other buttons or mechanisms can be used as input/output devices, such as a speaker, a rotary input device, a microphone, an on/off button, a mute button, or a sleep button.

Additionally, the housing 102 can form an outer surface or partial outer surface and protective case for the internal components of the wearable electronic device 100. In the illustrated embodiment, the housing 102 is formed into a substantially rectangular shape, although this configuration is not required.

The housing 102 can be formed of one or more components operably connected together, such as a front piece and a back piece or a top clamshell and a bottom clamshell. Alternatively, the housing 102 can be formed of a single piece (e.g., uniform body or unibody). The housing 102 can be coupled to a coupling mechanism used to attach to a user. For example, as illustrated, the housing 102 can be coupled to a band suitable for attaching to a user's wrist. The band can include a first band portion 106 and a second band portion 108. The first band portion 106 can be configured to join with or couple to the second band portion 108 around the user's wrist, thereby removably attaching the wearable electronic device 100 to the user. The wearable electronic device 100 may include one or more sensors configured to obtain physiological information or data from a user. In some cases, these sensors can be configured to operate via

US 10,078,052 B2

9

non-invasive optical sensing. In such an embodiment, one or more optical sensors configured for obtaining health-related and/or physiological information from a user can be disposed adjacent to a bottom surface of the housing 102.

FIG. 1B depicts a bottom plan view of the wearable electronic device of FIG. 1A, showing two sensor windows 114*a*, 114*b* associated with an optical sensing system. In many cases, an optical sensing system can be a distributed system such that one portion of the optical sensing system is positioned proximate to one of the two sensor windows 114*a*, 114*b* whereas another portion of the optical sensing system is positioned proximate to another of the two sensor windows 114*a*, 114*b*. In still further embodiments, an optical sensing system can be disposed proximate to a single sensor window. In still further embodiments, an optical sensing system can be disposed proximate to more than two sensor windows. In still further examples, an optical sensing system can be disposed in another manner that incorporates the optical sensing system within an optical circuit that includes a measurement site or a measurement subject.

An optical sensing system can include a light emitter and a light detector (not shown in FIG. 1B, see, e.g., FIG. 2A). In many embodiments, the light emitter can be configured to illuminate a portion of a measurement site and a light detector can be configured to receive light exiting the measurement site. In these examples, the light emitter can be a light emitting diode and the light detector can be a photodiode, phototransistor, and/or an optical image sensor. In other embodiments, a light emitter and a light detector can be formed from the same material and/or may be formed as the same component, such as a phototransistor. In these examples, the light emitter and light detector can each operate as the other element. Accordingly, for certain embodiments described herein, a light emitter may be operable to function as a light emitter in a first mode (e.g., light emitting mode) and also operable to function as a light detector in a second mode (e.g., light receiving mode). Similarly, a light detector may be operable to function as a light detector in a first mode (e.g., light receiving mode) and also operable to function as a light emitter in a second mode (e.g., light emitting mode). The light emitter and the light detector of the optical sensing system are not shown in FIG. 1B for simplicity of illustration, although it may be understood that the light emitter and the light detector can be disposed entirely or partially within the housing of the wearable electronic device 100.

By monitoring the output from the light detector of the optical sensing system, the wearable electronic device 100 can quantify physiological information related to the measurement site or related to the user of the wearable electronic device 100.

For one non-limiting example, the light emitter of the optical sensing system of the wearable electronic device 100 can be configured to emit green light toward the skin of the user's wrist. Some of the light may be reflected by the skin and some of the light may penetrate the skin. A portion of the penetrating light may be absorbed while another portion of the penetrating light can be reflected, exit the wrist, and return toward the wearable electronic device 100 (e.g., subsurface-affected light). The green light exiting the skin of the wrist can be received by the light detector and correlated to physiological properties of the subsurface of the user or the user's wrist. For example, a small amount of green light received by the light detector may correspond to a high amount of absorption which, in turn, may indicate a high volume of blood within blood vessels below the skin, which

10

in turn may correspond to an ejection portion (e.g., higher blood pressure) of the user's cardiac cycle.

In many embodiments, the light emitted by the light emitter may be specifically regulated (hereinafter the "modulated light"). For example, light emitted by the light emitter can have a selected frequency, amplitude, color, direction, and/or modulation pattern. In these embodiments, the light received by the light detector can be demodulated prior to further signal processing (hereinafter the "demodulated light"), thereby attenuating or eliminating the components of the signal from the light detector associated with interference (e.g., noise).

In many embodiments, the light emitter can be disposed adjacent to a sensor window 114*a* and the light detector can be disposed adjacent to a second window 114*b*. In some embodiments, the light emitter may be positioned within the housing behind the first sensor window 114*a* and the light detector may be positioned within the housing behind the sensor window 114*b*. In many cases, the sensor windows 114*a*, 114*b* can be formed from optically-transparent lenses or covers that are disposed above the light emitter and light detector within apertures defined within the bottom surface 112.

As used herein, the term "optically transparent" and variants thereof does not necessarily mean that the referent structure is transparent to all visible or invisible light. Instead, the phrase is generally used to indicate transparency or translucency to the particular wavelength of light emitted by the light emitter and/or received by the light detector for a particular embodiment. Thus, some optically transparent sensor windows may be substantially transparent to infrared light while blocking visible light. In other examples, some optically transparent sensor windows may be substantially transparent to a particular wavelength of visible light while blocking other frequency bands of visible light. In other embodiments, some optically transparent sensor windows may have electrically or thermally variable transparency or opacity. For example, some embodiments can include sensor windows with a liquid crystal diode layer positioned between one or more polarizers. In these examples, the optically transparent sensor window can be optically transparent in a first mode and optically opaque (or substantially opaque) in a second mode.

In some embodiments, the sensor windows 114*a*, 114*b* can cooperate with the bottom surface 112 of the housing 102 to form a convex shape. In these examples, the sensor windows 114*a*, 114*b* may be separated from one another, disposed symmetrically (or asymmetrically) about the principal axis of the convex curvature of the bottom surface 112.

In these embodiments, the bottom surface 112 can curve outwardly from the housing 102, defined by a particular radius of curvature. In some examples, the sensor windows 114*a*, 114*b* can be disposed such that the central axis of each respective sensor window is perpendicular to a plane tangent to the curvature of the bottom surface 112. In other words, each sensor window can be oriented at an angle from the principal axis of the curvature of the bottom surface 112 such that the external surface of each sensor window forms a substantially continuous surface with the portions of the bottom surface 112 adjacent thereto (see, e.g., FIG. 3C).

In some examples, the light emitter and light detector can be oriented to be parallel to the axis through the center of each respective sensor window. In other words, the light emitter may be configured to emit light parallel to the axis through the center of the sensor window 114*a* and the light detector may be configured to receive light directed parallel to the axis through the center of the sensor window 114*b*. In

Exhibit M
Page 189

US 10,078,052 B2

11                                                      12

other examples, the light emitter and light detector can be oriented to be parallel to one another. In these embodiments, the light emitter can be oriented to emit light in a direction parallel to the principal axis of the convex curvature and the light detector may be configured to receive light directed parallel to the principal axis of the convex curvature.

In some embodiments, the sensor windows 114a, 114b can take a shape that is discontinuous with the shape of the bottom surface 112. For example, the sensor windows 114a, 144b protrude from or depress into the bottom surface 112 in a manner that breaks the continuity of the shape of the bottom surface 112. In other examples, the sensor windows 114a, 114b can be substantially flat. In till other examples, the sensor windows 114a, 114b, can take a concave and/or convex shape so as to protrude from or depress into the bottom surface 112. In other embodiments, the sensor windows 114a, 114b can take a different shape.

In these embodiments, the curvature of the housing itself can provide an optical barrier between the light emitter and the light detector (see, e.g., FIG. 3C). The optical barrier between the light emitter and the light detector can improve the performance of the optical sensing system by reducing the amount of surface-reflected light received by the light detector.

More specifically, in many embodiments, the apex of the convex curvature of the bottom surface 112 can physically and optically separate the light emitter from the light detector when the wearable electronic device 100 is positioned on a measurement site. In other words, the portion of the bottom surface 112 extending outwardly the farthest (which will contact the measurement site first) will ensure optical separation between the light emitter and light detector. In this manner, any modulated light received by the light detector will have either passed through the measurement site (e.g., subsurface-affected light) or will result from an external source (e.g., hereinafter the "external noise"). As noted above, external noise can be effectively mitigated or eliminated via demodulation of the light received by the light detector.

Thus, absent an optical barrier between the light emitter and the light detector, the light detector can receive both modulated surface-reflected light and modulated subsurface-affected light. As noted above, modulated surface-reflected light can predominate modulated subsurface-affected light which, in turn, can cause physiological characteristics of the subsurface to be substantially obscured, distorted, or otherwise concealed.

Accordingly, many embodiments described herein implement a selected radius of curvature of the bottom surface 112 so as to reduce the amount of surface-reflected light received by the light detector and to increase the amount of subsurface-affected light received by the light detector. For example, the greater the radius of curvature of the bottom surface 112, the greater the angle between the axis of the sensor window 114a and the axis of the sensor window 114b may become. In some embodiments, the convex curvature of the bottom surface 112 can take a substantially spherical convex shape. In other embodiments, the convex curvature of the bottom surface 112 can take a parabolic convex shape.

In many embodiments, and as illustrated, the sensor windows 114a, 114b can be separated by a selected distance either symmetrically or asymmetrically about the apex of the convex curvature of the bottom surface 112. In other examples, the sensor windows 114a, 114b can be disposed in other locations.

For example, in embodiments implemented with closely-spaced (e.g., adjacent to the apex of the convex curvature) sensor windows, the quantity of light lost to absorption within the measurement site can decrease thereby increasing the quantity of subsurface-affected light received. On the other hand, for closely-spaced sensor windows, the quantity of surface-reflected light may also increase as a result of the relative proximity of the light emitter and the light detector.

Conversely, in examples implemented with sensor windows spaced a greater distance apart (e.g., closer toward the perimeter of the bottom surface 112), the quantity of light lost to absorption within the measurement site may increase, potentially decreasing the quantity of subsurface-affected light received. However, the quantity of surface-reflected light may also decrease.

In a non-limiting alternate phrasing of the considerations presented above, the measurement site may appear more brightly illuminated to the light detector if the sensor windows 114a, 114b are sufficiently close to one another, but may appear too dimly illuminated if the sensor windows 114a, 114b are positioned too far apart. Similarly, the light detector may collect a greater proportion of light corresponding only to subsurface events if the sensor windows 114a, 114b are sufficiently far apart, but the light emitter may emit too much light for the light detector to detect subsurface events if the sensor windows 114a, 114b are too close together.

Accordingly, the distance separating the sensor windows 114a, 114b may vary from embodiment to embodiment and may depend upon the output capacity of the light emitter, the sensitivity of the light detector, the modulation pattern or scheme associated with the optical sensing system, and/or the characteristics of the measurement site. Alternatively or additionally, the output of the light emitter, the sensitivity of the light detector, and/or the modulation pattern or scheme used by the optical sensing system can each be selected based, in part, upon the distance separating the sensor windows 114a, 114b, the locations of which may be fixed or influenced by the layout of components, certain manufacturing tolerances, certain material selections, certain assembly considerations, certain aesthetic preferences, and so on.

In many embodiments, the distance separating the sensor windows 114a, 114b (and, correspondingly the distance separating the light emitter and light detector) can be defined by the placement of apertures within the housing of the wearable electronic device 100. For example, as illustrated, the sensor windows 114a, 114b can be disposed within circular apertures defined within the bottom surface 112, each centered approximately half a radius length from the center of the bottom surface 112.

Furthermore, although many embodiments are described herein with reference to optical sensors disposed within axially-symmetric convexly-curved surfaces, such a configuration may not be required of all embodiments. For example, in other embodiments, the bottom surface 112 of the wearable electronic device 100 can be formed to take the shape of a pitched roof. In another embodiment, the bottom surface 112 can be formed to take the shape of an arch. In other embodiments, the bottom surface 112 can include a protrusion that physically separates the sensor windows. In still further embodiments, the bottom surface 112 can be flat, faceted, or concave. In further embodiments, the bottom surface 112 can take an arbitrary shape. In other embodiments, the sensor windows 114a, 114b can be disposed within a convexly curved bottom surface without being oriented to follow the curve thereof. In other words, the sensor windows 114a, 114b can be disposed so as to be parallel to the principal axis of the curvature of the bottom surface 112.

US 10,078,052 B2

13                                                                14

FIG. 2A depicts a simplified cross-section of FIG. 1B taken through section A-A, showing a simplified view of the optical sensing system of FIG. 1B. The optical sensing system includes a light emitter 116 and a light detector 122 both coupled to a controller 200. In many examples, the controller 200 can be implemented as a processor, a digital circuit, an analog circuit, or any combination thereof, that is configured to perform and/or coordinate one or more operations of the optical sensing system or the wearable electronic device 100. In one embodiment, the controller 200 can be coupled to a processor associated with the wearable electronic device 100. In another embodiment, the controller 200 can be a processor associated with the wearable electronic device 100 such that the controller 200 is configured to perform and/or coordinate the interoperation of the various components of the wearable electronic device 100 such as, but not limited to, driving a display, receiving input from a touch or force sensor, receiving input from a button or rotary dial, communicating with other electronic devices via a communication channel, distributing power from a battery, and so on.

In one embodiment the light emitter 116 may be a light emitting diode configured to emit light at a particular frequency. For example, in certain embodiments the light emitter 116 can be configured to emit green light. In another example, the light emitter 116 can emit infrared light. In still further examples, the light emitter 116 can be configured to emit light in another frequency band.

The light detector 122 can be a photodiode, phototransistor, and/or an optical image sensor such as a charge-coupled device ("CCD") or complementary metal-oxide semiconductor ("CMOS") array.

The light emitter 116 can be disposed within the housing of the wearable electronic device and can be positioned below the sensor window 114a. In one example, the light emitter 116 can be disposed within a cavity 118 defined within the housing of the wearable electronic device. In these examples, the cavity 118 can be defined by the housing such that the cavity 118 is axially aligned with the central axis of the sensor window 114a. In many cases, the interior of the cavity 118 can be painted with a reflective surface treatment. In some embodiments, the cavity 118 may have a shorter width than that of the sensor window 114a so as to form a shelf therewith, although this configuration is not required. In some examples, the cavity 118 can be filled with a filler material. In some examples, the filler material can be optically transparent. In other examples, the filler material can be optically diffusive.

A lens 120 or window may seal the cavity 118; the lens 120 need not focus or scatter light in any particular fashion. The lens 120 may be formed from the same material as the bottom surface 112, although this is not required. In one embodiment, the lens 120 can be configured to diffuse light, while in other embodiments it may focus light or may not affect the directionality of light passing therethrough. In some embodiments, the lens 120 may be optically transparent. In still further embodiments, the lens 120 may be configured to exhibit transparency in a first frequency band of light and to be opaque in a second frequency band of light. For one example, the first frequency band of light can be infrared light and the second frequency band of light can be visible light.

As with the light emitter 116, the light detector 122 can be disposed within the housing of the wearable electronic device and can be positioned below the sensor window 114b. In one example, the light detector 122 can be disposed within a cavity 124 defined within the housing of the

wearable electronic device. As with the cavity 118, the cavity 124 can be defined by the housing such that the cavity 124 is axially aligned with the central axis of the sensor window 114b. In many cases, the interior of the cavity 124 can be painted with a reflective surface treatment. In many examples, the cavity 124 can be sealed with a lens 126.

As with the lens 120, the lens 126 can be configured to diffuse light. In other embodiments, the lens 126 may be optically transparent, or may be shaped to focus light to a particular focal point. In still further embodiments, the lens 126 may be configured to exhibit transparency in a first frequency band of light and to be opaque in a second frequency band of light. For one example, the first frequency band of light can be infrared light and the second frequency band of light can be visible light.

FIG. 2B depicts a second cross-section like that of FIG. 2A, now showing a set of example light paths from a light emitter through a measurement site 110 of a subject to a light detector of the optical sensing system. As illustrated, light emitted from the light emitter 116 passes into an illumination area 130 of the measurement site 110, through an intermediate volume 128 of the measurement site 110, to a collection area 132 of the measurement site 110, and, thereafter, exits the collection area 132 where it may be collected by the light detector 122 and conveyed to the wearable electronic device 100 via the controller 200 (not shown). In many embodiments, the subject may be a human user. As illustrated, point-terminated light vectors represent light absorbed by the measurement site or another material. Similarly, arrow-terminated light vectors represent light reflected either specularly or diffusely.

As illustrated, a portion of the light emitted from the light emitter 116 may not exit the intermediate volume 128 through the collection area 132. For example, some light may continue transmitting in a direction parallel to the length of the intermediate volume 128. In addition, some light can transmit in directions away from the collection area 132. In addition, some light can be absorbed within the intermediate volume, depicted in FIG. 2B as point-terminated lines. Accordingly, the quantity of light received by the light detector 122 may be less than the quantity of light emitted by the light emitter 116.

FIG. 3A depicts a bottom plan view of a wearable electronic device 300 showing an optical sensing system having reflective surface treatments. As with the embodiment depicted in FIG. 2A, the wearable electronic device 300 can include two separated sensor windows 314a, 314b associated with a light emitter and a light detector of an optical sensing system, respectively. In addition, the wearable electronic device 300 can include a reflector 330 that surrounds the sensor windows 314a, 314b. The reflector 330 can also include an extended portion 332 that extends toward the sensor window 314b from the sensor window 314a. The extended portion 332 can provide a reflective surface to the entire area between the sensor windows 314a, 314b. It should be appreciated that various embodiments may have more or fewer apertures, more or fewer light emitters and more or fewer light detectors.

In many examples, and as illustrated in FIG. 3A, the reflector 330 can be disposed on an outer surface of the bottom surface 312. In these examples, the reflector 330 can be disposed onto the bottom surface 312 via an adhesive. In another embodiment, the reflector(s) and/or reflective surface(s) can be disposed onto the bottom surface 312 via another means such as vapor deposition, laser etching, pressure bonding, welding, and so on.

US 10,078,052 B2

15

In still further embodiments the reflector(s) and/or reflective surface(s) can be disposed below the outermost surface of the bottom surface 312. For example, in some cases, the bottom surface 312 can be formed from a laminate material. In these examples, the reflector(s) and/or reflective surface (s) can be intestinally disposed between layers of the laminate material.

In still other examples, the reflector(s) and/or reflective surface(s) can be disposed onto or into the sensor windows 314a, 314b. For example, in one embodiment, the reflector 330 can be disposed onto an outer surface about the perimeter of the sensor windows 314a, 314b. In another example, the reflector 330 can additionally or separately be disposed onto a sidewall of the sensor windows 314a, 314b. In another example, the reflector 330 can be additionally or separately disposed onto a sidewall of a cavity and/or aperture defined within the bottom surface 312. In still further embodiments, the reflector 330 can be disposed onto, attached to, or adhered to other portions of the bottom surface 312, the sensor windows 314a, 314b, or any other portion of the wearable electronic device 300 suitable for reflecting light back into a measurement site.

In still further embodiments, the reflector 330 can be oriented to reflect light in a particular direction. For example, the reflector 330 disposed most adjacent to the sensor window 314a can be positioned, oriented, disposed, or configured to reflect light generally toward the sensor window 314b. Similarly, the reflector 330 disposed most adjacent to the sensor window 314b can be positioned, oriented, disposed, or configured to reflect light generally toward a center point of the sensor window 314b. In this manner, various areas of the reflector 330 can be configured to reflect light in different directions. In many cases, the different directions that different areas of the reflector 330 are configured to reflect toward may be selected, at least in part, on the positioning of a light emitter and a light detector of an optical sensing system with which the reflector 330 is associated. More particularly, many embodiments can configure the reflector 330 to reflect light generally toward a light detector of an optical sensing system.

As noted with respect to other embodiments described herein, the reflector 330 and the extended portion 332 can be formed from any suitable optically reflective material such as glass, crystal, sapphire, zirconia, metals, and so on. In certain embodiments, the reflective surface can be configured to be optically transparent in one frequency band of light and optically reflective in another frequency band of light. As a non-limiting example, the reflector 330 may be configured to reflect infrared light while absorbing red light. In other examples, the reflector 330 can be configured to reflect more than one frequency band of light. For example, certain embodiments may include a configuration in which the reflective surface reflects green light and infrared light while substantially absorbing all other frequencies of light.

FIG. 3B depicts a simplified cross-section of FIG. 3A taken through section B-B, showing a simplified view of the optical sensing system of FIG. 3A. As with the embodiment depicted in FIGS. 2A-2B, the optical sensing system includes a light emitter 316 and a light detector 322. In one embodiment the light emitter 316 may be a light emitting diode configured to emit light at a particular frequency. For example, in certain embodiments, the light emitter 316 can be configured to emit green light. In another example, the light emitter 316 can emit infrared light. In still further examples, the light emitter 316 can be configured to emit light in another frequency band of light.

16

The light emitter 316 can be disposed adjacent to a cavity 318 that extends toward the sensor window 314a. In some embodiments, the cavity 318 may have a shorter width than that of the sensor window 314a, although this configuration is not required. The cavity 318 can be sealed with a lens that, in certain embodiments, may be either optically diffusive or optically transmissive.

As with the light emitter 316, the light detector 322 can be disposed adjacent to a cavity 324 and below a lens that, in certain embodiments, may be either optically diffusive or optically transmissive.

The depicted embodiment also includes a reflective coating or surface 330 (collectively, the "reflective surface"), which, as illustrated, may contour to the geometry of the sensor windows 314a, 314b and the cavities 318, 324. In one embodiment, the bottom surface 312 can take a substantially flat shape such as shown in FIG. 3B. In other embodiments, the bottom surface 312 can take a substantially convex shape such as shown in FIG. 3C.

Independent of shape, the reflector 330 can serve the dual purpose of providing a reflector for both the light emitter 316 and the light detector 322 while also providing a reflective surface to redirect light exiting a measurement site. For example, FIG. 3D depicts the simplified cross-section of FIG. 3B, showing a set of example light paths from a light emitter through a measurement site 310 of a subject to a light detector of the optical sensing system. As illustrated, light emitted from the light emitter 316 passes into an illumination area 336 of the measurement site 310, through an intermediate volume 328 of the measurement site 310, to a collection area 338 of the measurement site 310, and, thereafter, exits the collection area 338 where it may be collected by the light detector 322 and conveyed to the wearable electronic device 300. In some embodiments the reflective surface may be shaped to focus reflected light at a particular point or otherwise shape light exiting or entering the respective cavities.

As noted above, in certain embodiments, the bottom surface 312 can take a substantially flat shape such as shown in FIG. 3D. In other embodiments, the bottom surface 312 can take a substantially convex shape such as shown in FIG. 3E.

Additionally, as illustrated, the sensor windows 314a, 314b can be spatially separated by a particular distance.

As with the embodiment depicted in FIG. 2B, a portion of the light emitted from the light emitter 316 may not exit the intermediate volume 328 through the collection area 338. Correspondingly, a greater portion of the light emitted from the light emitter 316 can be reflected by the reflector 330 back into the intermediate volume 328. The recovered light can thereafter be reflected, diffused, or absorbed by the tissue of the intermediate volume 328. In the case that the recovered light is either reflected or diffused by the tissue of the intermediate volume 328, the recovered light may have another opportunity to exit through the collection area 338. In these embodiments, the quantity of light collected by the light detector 322 may be greater than the quantity of light received by the light detector 122 of FIG. 2B.

Similarly, the extended portion 332 of the reflector 330 can reflect light recovered light back into the intermediate volume 328 across the area extending between the sensor windows 314a, 314b. More particularly, the extended portion 332 can guide light exiting the intermediate volume 328 toward the collection area 338 by repeatedly reflecting the light back into the intermediate volume 328.

Other wearable electronic devices may include a reflective surface having different geometry than that shown in

US 10,078,052 B2

17

FIGS. **3A-3**E. For example, FIG. **4**A depicts a bottom surface of a wearable electronic device **400** having two separated reflective surfaces **402**. In such an example, the reflective surfaces can be formed as rings of reflective material surrounding one or more apertures associated with a light emitter and/or a light detector. In other embodiments, an optical sensing system can include more than one pair of sensor windows associated with more than one light emitter and more than one light detector, such as shown in FIG. **4**B. In such an embodiment, a single optical sensing system can include more than one light emitter and more than one light detector. Alternatively, a first optical sensing system can be associated with a first pair of sensor windows and a second optical sensing system can be associated with a second pair of sensor windows.

In one embodiment, a first light emitter can be disposed symmetrically opposite a first light detector (e.g., top and bottom sensor windows as illustrated in FIG. **4**B) and a second light emitter can be disposed symmetrically opposite a second light detector (e.g., left and right sensor windows as illustrated in FIG. **4**B). In such an embodiment, the first light emitter can be configured to emit light in a first frequency band of light and the second light emitter can be configured to emit light in a second frequency band of light.

For one non-limiting example, the first light can be configured to emit green light whereas the second light emitter can be configured to emit infrared light. Correspondingly, the first and second light detectors can be configured to receive green and infrared light, respectively. In these embodiments, the light emitted from the first light emitter can be modulated differently from the light emitted by the second light emitter. In this manner, the first and second light emitters can operate at substantially the same time without mutually interfering. In other embodiments, the first and second light emitters can be configured to operate in a sequence (e.g., first light emitter active, second light emitter active, first light emitter active, second light emitter active, and so on). In other embodiments, an arbitrary pattern can be used.

In still further embodiments, a single sensor window can be positioned above both a light emitter and a light detector, each associated with a different optical sensing system. For example, the top sensor window as illustrated in FIG. **4**B can be positioned above a light emitter that is associated with a light detector positioned below the bottom sensor window of the same figure. In addition, the top sensor window as illustrated in FIG. **4**B can also be positioned above a light detector that is associated with a light emitter positioned below the bottom sensor window of the same figure. In this manner, more than one optical sensing system and/or light emitter and detector pair can be disposed below a single sensor window.

In still further embodiments, the first light emitter can be associated with a light detector that is disposed to be axially symmetric thereto. For example, a first light emitter can be configured to operate with a first light detector positioned adjacent to the first light emitter (e.g., top and left sensor windows as illustrated in FIG. **4**B). In this manner, multiple measurement sites can be measured with a single optical sensing system. For example, in an embodiment in which each sensor window of FIG. **4**B is positioned above both a light emitter and a light detector, twelve possible combinations of light emitter and light detector may be possible (e.g., top emitter with right detector, top emitter with bottom detector, and so on). In still further embodiments, a light emitter can be configured to operate with a light detector disposed below the same sensor window. In these embodi-

18

ments, four additional measurement areas can be measured in order to obtain additional information about the characteristics of the measurement site.

In other embodiments, reflective surfaces can have different reflective properties. For example, as shown in FIG. **5**, a wearable electronic device **505** can include a first reflective surface **502** having a first reflectivity characteristic (e.g., reflecting a certain frequency band, absorbs a certain frequency band, etc.), and a second reflective surface **504** that has a second reflectivity characteristic. In still further embodiments, the entire bottom surface of a fitness or health tracking system may form a reflective surface, such as depicted in FIGS. **6A-6**B.

In some embodiments, the bottom surface of the fitness or health tracking system that surrounds apertures provided for sensors within the fitness or health tracking system (e.g., optical sensing systems) can be made from an optically reflective material so as to form a reflective surface, such as depicted in FIG. **6**A. In other embodiments, the bottom surface **600** of a wearable electronic device can include a first reflective surface **602** having a first reflectivity characteristic (e.g., reflecting a certain frequency band, absorbs a certain frequency band, etc.), and a second reflective surface **604** that has a second reflectivity characteristic, such as depicted in FIG. **6**B. In these embodiments, the first reflective surface **602** can be configured to reflect light within a first frequency band of light and the second reflective surface **604** can be configured to reflect light within a second frequency band of light. In some examples, the first and second reflective surface **602**, **604** can be configured to reflect light within overlapping frequency bands of light. For one non-limiting example, both reflective surfaces can be reflective to light within the visible spectrum, while the second reflective surface **604** is transparent to light within the infrared spectrum. In this manner, the bottom surface **600** of the wearable electronic device can appear to a user to form a substantially continuous mirrored surface.

Although many embodiments described herein refer to an optical sensing system having a reflective surface, such a configuration is not required. For example, in certain embodiments, an existing surface of the housing of a wearable electronic device can be coated with a mirror like coating. For example, a polished metal coating may be applied around or between the one or more apertures associated with the optical sensing system. In other examples, a thin metallic layer can be deposited via vapor deposition or another suitable process. More specifically, aluminum or chromium may be deposited via vapor deposition to create a highly reflective surface proximate to or between the one or more apertures associated with the optical system.

In these embodiments, the coating can be applied to the housing of the wearable electronic device or, in the alternative, can be applied in a layered fashion beneath another optically clear layer. More particularly, a coating can be applied to an inside surface of a transparent material (e.g., glass, sapphire, zirconia, etc.). Thereafter, in some embodiments, a subsequent layer may be applied over the coating. In this manner, the coating may be sealed from environments to which the wearable electronic device may be exposed.

In other examples, the reflective surface may be formed from a material that is reflective to infrared light but absorbs visible wavelengths. In these examples, a reflective coating may appear as a darkened or otherwise opaque area that may be cosmetically indistinguishable from other portions of the housing of the wearable electronic device.

In still further examples, the reflective surface may utilize or exploit diffuse reflectivity. More particularly, the reflec-

US 10,078,052 B2

19

tive surface may be formed from a material that diffuses
light. In one example, an optically white ink layer can be
applied proximate to or between the one or more apertures
associated with the optical sensing system. In these embodi-
ments, the lenses associated with the light detector and/or
light emitter may be similarly formed from a diffuse mate-
rial.

In still further embodiments, the reflective coating may be
configured to be reflective to a particular frequency band of
light. In one example, a reflective coating may be reflective
to green light only. In such an example, the light emitter may
be configured to emit green light and the light detector may
be configured to collect green light. In other examples,
different frequency bands may be used. In still further
examples, more than one frequency may be used. More
particularly, the reflective coating can be reflective to one or
more bands of light, and can absorb all or substantially all
other bands. In these examples, the frequency band of lights
that the reflective coating reflects can be the band of light
that the light emitter is configured to emit and that the light
detector is configured to collect.

In still further embodiments, an additional coating may
not necessarily be required. For example, one or more areas
of an aluminum housing of a wearable electronic device can
be polished to a mirror finish. In these examples, either the
entire housing of the wearable electronic device can be
polished to a mirror finish (or, alternative to a mirror finish,
polished to a high degree to increase optical reflectivity), or
distinct portions of the housing may be polished to increase
optical reflectivity.

In still further embodiments, one or more of the reflective
coatings and/or reflective coating and/or reflective surface
finishes may be used in conjunction to increase the quantity
of light received by the light detector of an optical sensing
system.

Although many embodiments described herein refer to an
optical sensing system with a single light emitter and a
single light detector, such a configuration is not required. For
example, in certain embodiments more than one light detec-
tor can be configured to collect light initially emitted from
a single light emitter. In addition, more than one light emitter
may be configured to emit light to be collected by a single
light detector. In certain embodiments light emitters and
light detectors can be included in pairs that are configured to
emit and collect light at different frequencies. For example,
a first light emitter and light detector pair may be configured
to emit and collect light in a first frequency band and a
second light emitter and light detector pair can be configured
to emit and collect light in a second frequency band. In such
embodiments, the first light emitter can be disposed adjacent
to the same aperture as the second light emitter and, corre-
spondingly, the first light detector can be disposed adjacent
to the same aperture as the second light detector. In alter-
native embodiments, the first light emitter can be positioned
in the same aperture as the second light detector, and the
second light emitter can be positioned in the same aperture
as the first light detector.

Further, although many embodiments described herein
refer to an optical sensing system with a dedicated light
emitter and a light detector, such a configuration is not
required. For example, in some embodiments, the light
emitter and/or light detector may also be associated with
other features, functions, or operations of a wearable elec-
tronic device or optical sensing system. For example, a
fitness or health tracking system can include a status-
indicating light emitting diode to convey to a user an
operational state of the fitness or health tracking system. In

20

such an embodiment, the status-indicating light can be used
as the light emitter of an optical sensing system. In this
manner, both the light emitter and the light detector of an
optical sensing system can be operated in one or more
modes. For example, in one case, a light detector can be
operated as a light emitter (e.g., light emitting diode and
phototransistor). Similarly, a light emitter or light emitter
can be operated as a light detector (e.g., phototransistor and
light emitting diode).

FIG. 7 depicts example steps of a method of operating an
optical sensing system. The method can begin at operation
700 in which light can be emitted toward a measurement
area. At 702, light exiting the measurement area from a first
sub-area of the measurement area can be reflected back into
the measurement area. At 704, light exiting the measurement
area from a second sub-area of the measurement area can be
received.

Many embodiments of the foregoing disclosure may
include or may be described in relation to various methods
of operation, use, manufacture, and so on. Notably, the
operations of methods presented herein are meant only to be
exemplary and, accordingly, are not necessarily exhaustive.
For example, an alternate operation order, or fewer or
additional steps, may be required or desired for particular
embodiments.

The foregoing description, for purposes of explanation,
used specific nomenclature to provide a thorough under-
standing of the described embodiments. However, it will be
apparent to one skilled in the art that the specific details are
not required in order to practice the described embodiments.
Thus, the foregoing descriptions of the specific embodi-
ments described herein are presented for purposes of illus-
tration and description. They are not meant to be exhaustive
or to limit the embodiments to the precise forms disclosed.
It will be apparent to one of ordinary skill in the art that
many modifications and variations are possible in view of
the above teachings. In particular, any features described
with respect to one embodiment may also be used in other
embodiments, where compatible. Likewise, the features of
the different embodiments may be exchanged, substituted, or
omitted where compatible and appropriate.

The present disclosure recognizes that personal informa-
tion data, including biometric and/or physiological data, in
the present technology, can be of benefit to users. For
example, the use of physiological or medical data can inform
a user of the user's general health. In other examples, user
medical data can be anonymously collected for providing to
authorized medical professionals information about the
health or fitness levels of a geographic or demographic
group of patients. Further, other uses for personal medical or
health information data that benefit the user, including
biometric authentication data, are also contemplated by the
present disclosure.

In addition, the present disclosure contemplates that the
entities responsible for the collection, analysis, disclosure,
transfer, storage, or other use of such personal information
or data will comply with well-established privacy policies,
privacy practices, and/or individual privacy preferences of
particular users or authorized third parties. In particular,
such entities should implement and consistently use privacy
policies and practices that are generally recognized as meet-
ing or exceeding industry or governmental requirements for
maintaining personal information data private and secure,
including the use of data encryption and security methods
that meets or exceeds industry or government standards. For
example, personal information from users should be col-
lected for legitimate and reasonable uses of the entity and

US 10,078,052 B2

21

not shared or sold outside of those legitimate uses. Further, such collection should occur only after receiving the explicit and informed consent of the users or a user's legal guardian or representative. Additionally, such entities would take any needed steps for safeguarding and securing access to such personal information or data and ensuring that others with access to the personal information or data adhere to their privacy policies and procedures. Further, such entities can subject themselves to evaluation by third parties to certify their adherence to widely accepted privacy policies and practices.

Despite the foregoing, the present disclosure also contemplates embodiments in which users selectively block the use of, or access to, personal information data, including biometric and medical data. That is, the present disclosure contemplates that hardware and/or software elements can be provided to prevent or block access to such personal information data. For example, users can select to remove, disable, or restrict access to certain health-related applications collecting users' personal health or fitness data.

What is claimed is:

**1**. An electronic device comprising:
a housing defining an aperture;
an optical sensing system comprising:
  a light emitter for emitting light through the aperture, the light emitter positioned adjacent the aperture; and
  a light detector for obtaining a first portion of the light after the first portion of the light reflects from an object; and
  a reflector disposed about the aperture and adapted to reflect a second portion of the light back into the object after the second portion of the light reflects from the object.

**2**. The electronic device of claim **1**, wherein the reflector comprises an optically reflective material disposed around a perimeter of the first aperture.

**3**. The electronic device of claim **1**, wherein:
the aperture is a first aperture; and
the housing defines a second aperture, wherein the light detector is positioned adjacent the second aperture.

**4**. The electronic device of claim **3**, wherein:
the reflector is a first reflector, and
the electronic devices further comprises a second reflector disposed about the second aperture and adapted to reflect light exiting from or reflecting off the object back into the object.

**5**. The electronic device of claim **4**, wherein the second reflector comprises an optically reflective material disposed around a perimeter of the second aperture.

22

**6**. The electronic device of claim **3**, further comprising:
a first sensor window positioned over the light detector and disposed within the first aperture; and
a second sensor window positioned over the light emitter and disposed within the second aperture.

**7**. The electronic device of claim **6**, wherein the first sensor window is adapted to focus light onto the light detector.

**8**. The electronic device of claim **6**, wherein the first and second sensor windows are configured to diffuse light passing therethrough.

**9**. The electronic device of claim **6**, wherein the first sensor window transmits a first frequency band of light and reflects a second frequency band of light.

**10**. The electronic device of claim **9**, wherein the first frequency band of light comprises infrared light and the second frequency band of light comprises visible light.

**11**. The electronic device of claim **6**, wherein the second sensor window transmits a first frequency band of light and reflects a second frequency band of light.

**12**. The electronic device of claim **11**, wherein the first frequency band of light comprises infrared light and the second frequency band of light comprises visible light.

**13**. The electronic device of claim **1**, wherein:
the light emitter comprises a light emitting diode; and
the light detector comprises one of the group consisting of a photodiode, a phototransistor, or an optical image sensor.

**14**. The electronic device of claim **1**, wherein the electronic device is configured to be worn on a wrist of a user, and wherein the electronic device further comprises:
a processor disposed within the housing and coupled to the optical sensing system;
a display in communication with the processor;
a button in communication with the processor;
a rotary input device in communication with the processor; and
a battery disposed within the housing and coupled to the processor.

**15**. The electronic device defined in claim **1**, wherein the aperture is a first aperture, the housing defines a second aperture, the light detector is positioned adjacent the second aperture, and the reflector is interposed between the first aperture and the second aperture.

**16**. The electronic device defined in claim **15**, further comprising:
a first window that covers the light emitter; and
a second window that covers the light detector.

**17**. The electronic device of claim **16**, wherein the reflector is formed around a perimeter of the first window and a perimeter of the second window.

\* \* \* \* \*

# Exhibit N

US010524671B2

(12) **United States Patent**

Lamego

(10) Patent No.: **US 10,524,671 B2**

(45) Date of Patent: ***Jan. 7, 2020**

(54) **ELECTRONIC DEVICE THAT COMPUTES HEALTH DATA**

(71) Applicant: **Apple Inc.**, Cupertino, CA (US)

(72) Inventor: **Marcelo M. Lamego**, Cupertino, CA (US)

(73) Assignee: **Apple Inc.**, Cupertino, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 185 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/667,832**

(22) Filed: **Aug. 3, 2017**

(65) **Prior Publication Data**

US 2017/0354332 A1     Dec. 14, 2017

**Related U.S. Application Data**

(63) Continuation of application No. 14/617,422, filed on Feb. 9, 2015, now Pat. No. 9,723,997.

(Continued)

(51) **Int. Cl.**
    ***A61B 5/0205*** (2006.01)
    ***A61B 5/00*** (2006.01)
    (Continued)

(52) **U.S. Cl.**
    CPC .......... ***A61B 5/0205*** (2013.01); ***A61B 5/0402*** (2013.01); ***A61B 5/14551*** (2013.01);
    (Continued)

(58) **Field of Classification Search**
    CPC ..... A61B 5/0205; A61B 5/007; A61B 5/0402; A61B 5/14551; A61B 5/6898; A61B 5/70;
    (Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,486,386 | B1 | 2/2009 | Holcombe |
| 7,729,748 | B2 | 6/2010 | Florian |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 102483608 | 5/2012 |
| CN | 203732900 | 7/2014 |

(Continued)

OTHER PUBLICATIONS

Ohgi et al., "Stroke phase discrimination in breaststroke swimming using a tri-axial acceleration sensor device," *Sports Engineering*, vol. 6, No. 2, Jun. 1, 2003, pp. 113-123.

(Continued)

*Primary Examiner* — Paula J Stice

(74) *Attorney, Agent, or Firm* — Brownstein Hyatt Farber Schreck, LLP

(57) **ABSTRACT**

An electronic device includes a camera, an ambient light sensor, and a proximity sensor. The electronic device uses one or more of the camera and the proximity sensor to emit light into a body part of a user touching a surface of the electronic device and one or more of the camera, the ambient light sensor, and the proximity sensor to receive at least part of the emitted light reflected by the body part of the user. The electronic device computes health data of the user based upon sensor data regarding the received light. In some implementations, the electronic device may also include one or more electrical contacts that contact one or more body parts of the user. In such implementations, the health data may be further computed based on the an electrical measurement obtained using the electrical contacts.

**20 Claims, 7 Drawing Sheets**



US 10,524,671 B2

Page 2

## Related U.S. Application Data

(60) Provisional application No. 62/056,299, filed on Sep. 26, 2014.

(51) **Int. Cl.**

| | |
|---|---|
| *A61B 5/1455* | (2006.01) |
| *A61B 5/0402* | (2006.01) |
| *A61B 5/021* | (2006.01) |
| *A61B 5/024* | (2006.01) |
| *A61B 5/026* | (2006.01) |
| *A61B 5/053* | (2006.01) |

(52) **U.S. Cl.**
CPC .............. *A61B 5/6898* (2013.01); *A61B 5/70* (2013.01); *A61B 5/7203* (2013.01); *A61B 5/742* (2013.01); *A61B 5/7405* (2013.01); *A61B 5/7455* (2013.01); *A61B 5/021* (2013.01); *A61B 5/0261* (2013.01); *A61B 5/02416* (2013.01); *A61B 5/0537* (2013.01)

(58) **Field of Classification Search**
CPC ..... A61B 5/703; A61B 5/4705; A61B 5/7455; A61B 5/02055; A61B 5/021; A61B 5/02416; A61B 5/02438; A61B 5/0245; A61B 5/0261; A61B 5/0537
See application file for complete search history.

(56) **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,822,469 | B2 | 10/2010 | Lo |
| 7,915,601 | B2 | 3/2011 | Setlak et al. |
| 7,957,762 | B2 | 6/2011 | Herz et al. |
| 8,954,135 | B2 | 2/2015 | Yuen et al. |
| 8,988,372 | B2 | 3/2015 | Messerschmidt et al. |
| 9,042,971 | B2 * | 5/2015 | Brumback .......... A61B 5/02438 |
| | | | 600/509 |
| 9,100,579 | B2 | 8/2015 | Schatvet et al. |
| 9,348,322 | B2 | 5/2016 | Fraser et al. |
| 9,485,345 | B2 | 11/2016 | Dantu |
| 9,557,716 | B1 | 1/2017 | Inamdar |
| 9,620,312 | B2 | 4/2017 | Ely et al. |
| 9,627,163 | B2 | 4/2017 | Ely et al. |
| 9,723,997 | B1 | 8/2017 | Lamego |
| 9,848,823 | B2 | 12/2017 | Raghuram et al. |
| 10,123,710 | B2 | 11/2018 | Gassoway et al. |
| 10,126,194 | B2 | 11/2018 | Lee |

| | | | |
|---|---|---|---|
| 2011/0015496 | A1 | 1/2011 | Sherman et al. |
| 2013/0310656 | A1 | 11/2013 | Lim |
| 2014/0128690 | A1* | 5/2014 | LeBoeuf ............ A61B 5/02055 |
| | | | 600/301 |
| 2014/0275832 | A1 | 9/2014 | Muehlsteff et al. |
| 2016/0058313 | A1 | 2/2016 | Weil et al. |
| 2016/0058309 | A1 | 3/2016 | Han |
| 2016/0058375 | A1 | 3/2016 | Rothkopf |
| 2016/0198966 | A1 | 7/2016 | Uernatsu et al. |
| 2016/0242659 | A1 | 8/2016 | Yamashita et al. |
| 2016/0338598 | A1 | 11/2016 | Kegasawa |
| 2016/0338642 | A1 | 11/2016 | Parara et al. |
| 2016/0349803 | A1 | 12/2016 | Dusan |
| 2016/0378071 | A1 | 12/2016 | Rothkopf |
| 2017/0011210 | A1 | 1/2017 | Cheong et al. |
| 2017/0090599 | A1 | 3/2017 | Kuboyama et al. |
| 2017/0181644 | A1 | 6/2017 | Meer et al. |
| 2017/0354332 | A1 | 12/2017 | Lamego |
| 2019/0072912 | A1 | 3/2019 | Pandya et al. |
| 2019/0090806 | A1 | 3/2019 | Harrison-Noonan et al. |
| 2019/0101870 | A1 | 4/2019 | Pandya et al. |
| 2019/0220069 | A1 | 7/2019 | Dusan |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 104050444 | 9/2014 |
| CN | 105339871 | 2/2016 |
| CN | 106462665 | 2/2017 |
| JP | 2001145607 | 5/2001 |
| KR | 1020160145284 | 12/2016 |
| TW | 201610021 | 3/2016 |
| TW | 201621491 | 6/2016 |
| WO | WO 15/030712 | 3/2015 |
| WO | WO 16/040392 | 3/2016 |
| WO | WO 16/204443 | 12/2016 |

### OTHER PUBLICATIONS

Zijlstra et al., "Assessment of spatio-temporal gait parameters from trunk accelerations during human walking," *Gait & Posture*, vol. 18, No. 2, Oct. 1, 2003, pp. 1-10.
U.S. Appl. No. 16/118,254, filed Aug. 30, 2018, Harrison-Noonan et al.
U.S. Appl. No. 16/118,282, filed Aug. 30, 2018, Clavelle et al.
U.S. Appl. No. 16/193,836, filed Nov. 16, 2018, Pandya et al.
U.S. Appl. No. 15/296,681, filed Apr. 25, 2017, Dusan.
Onizuka et al., Head Ballistocardiogram Based on Wireless Multi-Location Sensors, 2015 EEE, pp. 1275-1278.

* cited by examiner



*FIG. 1*



*FIG. 2*

U.S. Patent        Jan. 7, 2020        Sheet 3 of 7        US 10,524,671 B2



*FIG. 3*

Exhibit N
Page 201

**U.S. Patent**     Jan. 7, 2020     Sheet 4 of 7     US 10,524,671 B2



*FIG. 4*

Exhibit N
Page 202

**U.S. Patent**   Jan. 7, 2020   Sheet 5 of 7   **US 10,524,671 B2**



*FIG. 5*

Exhibit N
Page 203



*FIG. 6*



*FIG. 7*

US 10,524,671 B2

1

# ELECTRONIC DEVICE THAT COMPUTES HEALTH DATA

## CROSS-REFERENCE TO RELATED APPLICATION

This application is a continuation of U.S. patent application Ser. No. 14/617,422, filed Feb. 9, 2015, and entitled "Electronic Device that Computer Health Data," which claims the benefit under 35 U.S.C. § 119(e) of U.S. Provisional Patent Application No. 62/056,299, filed on Sep. 26, 2014, and entitled "Electronic Device that Computes Health Data," both of which are incorporated by reference as if fully disclosed herein.

## TECHNICAL FIELD

This disclosure relates generally to health data, and more specifically to an electronic device that computes health data

## BACKGROUND

It may be beneficial for a user to have information about his or her health data, including fitness data and wellness data. For example, health data may indicate emergency conditions or to enable the user to maximize fitness or wellness activities. Traditionally, health data is provided to users by health care professionals. However, it may be beneficial for users to have more access to health data.

## SUMMARY

The present disclosure discloses systems, apparatuses, and methods related to an electric device that computes health data. An electronic device may include a camera, an ambient light sensor, and a proximity sensor. The electronic device may use one or more of the camera and the proximity sensor to emit light into a body part of a user touching a surface of the electronic device and one or more of the camera, the ambient light sensor, and the proximity sensor to receive at least part of the emitted light reflected by the body part of the user. The electronic device may compute health data of the user based upon sensor data regarding the received light. In some implementations, the electronic device may also include one or more electrical contacts that contact one or more body parts of the user. In such implementations, the health data may be further computed based on the an electrical measurement obtained using the electrical contacts.

In some implementations, the electronic device may utilize the camera to determine the user's body part is misaligned with the camera, the ambient light sensor, and the proximity sensor for purposes of detecting the information about the body part of the user. In such implementations, the electronic device may provide guidance to correct the misalignment.

In various embodiments, a mobile personal computing device may include a camera, an ambient light sensor, a proximity sensor, and a processing unit communicably coupled to the camera, the ambient light sensor, and the proximity sensor. The processing unit may be configured to: use at least one of a camera and a proximity sensor to emit light into a body part of a user touching a surface of the mobile personal computing device; use at least one of the camera, an ambient light sensor, or the proximity sensor to receive at least part of the emitted light reflected by the body part of the user and generate sensor data; and computing

2

health data of the user, utilizing the processing unit, using at least the sensor data regarding the received light.

In some embodiments, a method for using a mobile personal computing device to obtain health data may include: using at least one of camera and a proximity sensor to emit light into a body part of a user touching a surface of the device; using at least one of the camera, an ambient light sensor, or the proximity sensor to receive at least part of the emitted light reflected by the body part of the user and generate sensor data; and computing health data of the user, utilizing the processing unit, using at least the sensor data regarding the received light.

In one or more embodiments, a method for guiding use of a mobile personal computing device to obtain health data may include: detecting, utilizing a camera, a profile of a body part of a user contacting the camera; determining, using the profile, if the body part is misaligned with a combination of the camera, an ambient light sensor, and a proximity sensor for purposes of obtaining health data for the user; and providing guidance to correct the misalignment.

In various embodiments, a computer program product including a non-transitory storage medium may include a first set of instructions, stored in the non-transitory storage medium, executable by at least one processing unit to use at least one of a camera and a proximity sensor to emit light into a body part of a user touching a surface of a mobile personal computing device; a second set of instructions, stored in the non-transitory storage medium, executable by the least one processing unit to use at least one of the camera, an ambient light sensor, or the proximity sensor to receive at least part of the emitted light reflected by the body part of the user and generate sensor data; and a third set of instructions, stored in the non-transitory storage medium, executable by the least one processing unit to compute health data of the user using at least the sensor data regarding the received light.

It is to be understood that both the foregoing general description and the following detailed description are for purposes of example and explanation and do not necessarily limit the present disclosure. The accompanying drawings, which are incorporated in and constitute a part of the specification, illustrate subject matter of the disclosure. Together, the descriptions and the drawings serve to explain the principles of the disclosure.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is an isometric view an example system for obtaining health data utilizing an electronic device.

FIG. **2** illustrates the view of FIG. **1** while the example system is being utilized to obtain health data.

FIG. **3** illustrates the view of FIG. **2** while the example system is providing guidance to obtain health data.

FIG. **4** illustrates the view of FIG. **2** while the example system is providing the obtained health data.

FIG. **5** is a flow chart illustrating an example method for using an electronic device to obtain health data. This method may be performed by the system of FIG. **1**.

FIG. **6** is a flow chart illustrating an example method for guiding use of an electronic device to obtain health data. This method may be performed by the system of FIG. **1**.

FIG. **7** is a block diagram illustrating functional relationships among components of the example system of FIG. **1**.

## DETAILED DESCRIPTION

The description that follows includes sample systems, apparatuses, and methods that embody various elements of

US 10,524,671 B2

3

the present disclosure. However, it should be understood that the described disclosure may be practiced in a variety of forms in addition to those described herein.

The present disclosure details systems, apparatuses, and methods related to an electric device that computes health data. An electronic device (such as a smart phone, tablet computer, mobile computer, digital media player, wearable device, or other electronic device) may include a camera, an ambient light sensor, and a proximity sensor. The electronic device may use one or more of the camera and the proximity sensor to emit light into a body part of a user (such as a finger, and ear, and so on) touching a surface of the electronic device. The electronic device may use one or more of the camera, the ambient light sensor, and the proximity sensor to receive at least part of the emitted light reflected by the body part of the user. The electronic device may compute health data of the user based upon sensor data regarding the received light. In this way, the health data of the user may be detected utilizing an electronic device including a camera, ambient light sensor, and proximity sensor without making the user obtain access to a dedicated fitness and/or wellness device.

In various implementations, the camera, ambient light sensor, and proximity sensor may be positioned such that they are all at least partially covered (and/or contacted) by the user's body part at the same time, such as when the health data is computed. In one or more implementations, the electronic device may also include electrical contacts. The health data of the user may also be computed using an electrical measurement obtained using from the electrical contacts. In some examples of such implementations, the electrical contacts may be positioned to contact the body part of the user and an additional body part such that electrical measurement represents the electrical properties of organs or portions of the body located between the two contacting body parts. In some embodiments, the two body parts are the user's left and right hands and the electrical measurement corresponds to an electrical property that is measured across the user's chest.

In some implementations, the electronic device may utilize the camera to determine the user's body part is misaligned with the camera, the ambient light sensor, and the proximity sensor for purposes of detecting the information about the body part of the user. In such implementations, the electronic device may provide guidance (such as visual, audio, haptic, and/or other guidance) to correct the misalignment. The information from the camera may be utilized to detect this misalignment even in implementations where the camera is configured with a focal distance greater than a distance between the camera and the user's body part when the user's body part is touching the surface of the electronic device.

In various implementations, the proximity sensor may be a multiple light wavelength sensor (such as a sensor that utilizes infrared and visible light, infrared and red light, and so on). In some implementations, the ambient light sensor may be a silicon ambient light sensor, an indium gallium arsenide ambient light sensor, and/or other kind of ambient light sensor. In various implementations, the camera may be both an infrared and visible light camera.

The health data may include one or more of a variety of different wellness, fitness, and/or other parameters relating to the health of a user. For example, in various implementations the health data may include: a blood pressure index, a blood hydration, a body fat content, an oxygen saturation, a pulse rate, a perfusion index, an electrocardiogram, a photoplethysmogram, and/or any other such health data. In

4

some implementations, the electronic device may provide the computed health data to the user.

FIG. 1 is an isometric view an example system 100 for obtaining health data utilizing an electronic device. As illustrated, the system may include an electronic device 101. The electronic device is shown as a smart phone. However, it is understood that this is an example. In various implementations, the electronic device may be any kind of electronic device such as any kind of mobile personal computing device (such as a smart phone, tablet computer, a mobile computer, a digital media player, a cellular telephone, a laptop computer, a wearable device, and so on), a desktop computer, a display, and/or any other electronic device.

As also illustrated, the electronic device 101 may include a housing 102 with a surface 103 where a camera 104, an ambient light sensor 105, and a proximity sensor 106 are positioned. As illustrated in FIG. 2, the camera, ambient light sensor, and proximity sensor may be positioned such that they are partially or entirely covered (and/or contacted) by the body part 202 of a user (illustrated as a finger though such a body part may be an ear, a palm, and/or other body part of the user) at the same time. At such a time, the electronic device may compute health data for the user.

Traditionally, a camera may be capture images using a visible light imaging sensor and a lens focused at a focal distance away from the lens, an ambient light sensor may use a broad range photodiode or similar non-imaging light detector to determine ambient light conditions, and a proximity sensor may use a limited range light source (such as an infrared light emitting diode or "LED") to emit limited range light and a limited range non-imaging light detector to detect if the emitted limited range light is reflected by one or more object to determine whether or not such an object is proximate to the proximity sensor. However, the electronic device 101 may camera 104, the ambient light sensor 105, and the proximity sensor 106 in non-traditional ways to detect information about the body part 202.

The electronic device 101 may use one or more of the camera 104 and the proximity sensor 106 to emit light into a body part 202 of a user touching a surface 103 of the electronic device. The electronic device may use one or more of the camera, the ambient light sensor 105, and the proximity sensor to receive at least part of the emitted light reflected by the body part of the user. The electronic device may compute health data of the user based upon sensor (such as the camera, the ambient light sensor, and/or the proximity sensor) data regarding the received light.

For example, one or more of the camera 104, the ambient light sensor 105, and the proximity sensor 106 may receive light reflected off of the body part 202 of the user. Such light may originate from one or more of the camera (in implementations where the camera includes a light source such as a LED used as a flash), the ambient light sensor (which may be a non-imaging photodiode in some implementations), the proximity sensor (such as in implementations where the proximity sensor is a non-imaging photodiode and one or more LEDs that determine proximity by measuring the time between transmission of light by the LED and receipt of the light by the non-imaging photodiode after reflection off of an object such as the body part 202 of the user), and/or other light source. The electronic device 101 may analyze sensor data regarding the received light and compute information such as the light absorption of the body part. Various health data for the user may be computed from the computed light absorption of the body part.

By way of illustration, sensor data regarding the received light may be used to estimate changes in the volume of the

US 10,524,671 B2

5

body part **202** of the user. In general, as light passes through the user's skin and into the underlying tissue, some light is reflected, some light is scattered, and some light is absorbed, depending on what the light encounters. In some instances, blood may absorb light more than surrounding tissue, so less reflected light may be sensed when more blood is present. the user's blood volume generally increases and decreases with each heartbeat. Thus, analysis of sensor data regarding the reflected light may reflect changes in blood volume and thus allow health data such as oxygen saturation, pulse rate, perfusion index, and such to be computed.

By way of another example, one or more images of the body part **202** of the user captured by the camera **104** may be analyze to compute various health data for the user. In some implementations, the camera may be an infrared camera and/or a combined visible light and infrared camera. In such implementations, infrared data in the image may be analyzed to compute temperature of the body part, changing blood flow in the body part, and so on. In various implementations, the ambient light sensor and/or proximity sensor may be utilized to obtain such infrared data regarding the body part.

In various implementations, various information may be obtained regarding the body part **202** utilizing data from the camera **104**, the ambient light sensor **105**, and the proximity sensor **106**. Such information may be utilized in a variety of different ways. For example, in some implementations each of the camera, the ambient light sensor, and the proximity sensor may capture sensor data regarding light absorption of the body part **202**. However, the light absorption represented by the light received by each may be different based on the particular sensor strengths and/or weaknesses of the respective device. In such an implementation, the sensor data related to light absorption from each may be compared to the others and/or combined in order to obtain a more accurate, single light absorption measurement.

By way of another example, in some implementations sensor data from one or more of the camera **104**, the ambient light sensor **105**, and the proximity sensor **106** may be used to adjust information from one or more others of the camera, the ambient light sensor, and the proximity sensor. For example, in various implementations the proximity sensor may be utilized to obtain sensor data related to light absorption of the body part **202** and the camera may be utilized to determine the specific area of the body part the information relates to. Light absorption may be interpreted differently in computing health data for different areas of the body part (such as where the area of the body part is hairless versus containing hair, where the area is a highly callused area as opposed to a non-callused area, and so on). As such, the sensor data from the camera regarding the specific area of the body part being analyzed may be utilized to adjust the sensor data related to light absorption obtained from the proximity sensor to account for the specific characteristics of the area of the body part that may influence interpretation of light absorption for computing health data for the user.

As also illustrated in FIGS. **1** and **2**, the electronic device **101** may also include electrical contacts such as electrical contacts **107a** and **107b** disposed on an exterior surface of the electronic device. In various implementations, the electronic device **101** may compute health data of the user based upon sensor data obtained from the camera **104**, the ambient light sensor **105**, and the proximity sensor **106** as well as an electrical measurement obtained using the electrical contacts.

As illustrated in FIG. **2**, the electrical contacts **107a** and **107b** may be positioned to contact the body part **202** of the

6

user (such as during the time when the information is being detected) and/or an additional body part **201** of the user. For example, as shown a finger of the user may contact a top electrical contact **107a** while a palm of the user contacts a bottom electrical contact **107b**. However, it is understood that this is an example and the electrical contacts may be configured to contact other body parts of the user (such as an ear, a cheek, and so on) without departing from the scope of the present disclosure.

In some implementations, the electrical contacts **107a** and **107b** may be positioned to contact the body part **202** of the user and an additional body part of the user such that electrical measurement obtained using the electrical contacts corresponds to an electrical characteristic across the user's chest. For example, as shown a finger of the user's left hand may contact a top electrical contact **107a** while a right palm of the user (connected to each other through the user's chest) contacts a bottom electrical contact **107b**. Positioning the electrical contacts to contact user body parts such that the electrical measurement obtained using the electrical contacts corresponds to an electrical property across the user's chest. Such a measurement may enable information related to health data (such as an electrocardiogram) to be obtained that might not otherwise be possible absent such positioning.

By way of illustration, electrical measurements may be taken via the electrical contacts **107a** and **107b** (which may respectively be configured as positive and negative terminals) that may be used to detect electrical activity of the user's body. Such electrical measurements may be used (in some cases along with analysis of the received light) to measure heart function, compute an electrocardiogram, compute a galvanic skin response that may be indicative of emotional state and/or other physiological condition, and/or compute other health data such as body fat, or blood pressure.

Although FIG. **1** illustrates a specific configuration including the camera **104**, the ambient light sensor **105**, the proximity sensor **106**, and the electrical contacts **107a** and **107b**, it is understood that this in an example. In various implementations other configurations are possible and contemplated without departing from the scope of the present disclosure.

For example, the ambient light sensor **105** and the proximity sensor **106** are illustrated and described as separated sensors. However, in some implementations the ambient light sensor and the proximity sensor may be incorporated into a single, unified sensor that may detect both ambient light and proximity without departing from the scope of the present disclosure.

In some implementations, the proximity sensor **106** may operate utilizing a single wavelength of light, such as the infrared portion of the light spectrum. However, in other implementations the proximity sensor (and/or the camera **104** and/or the ambient light sensor **105**) may be a multiple wavelength proximity sensor that operates utilizing multiple wavelengths of light.

For example, in various implementations the proximity sensor **106** may operate utilizing infrared and visible light (such as red light). In some embodiments of such an implementation, the proximity sensor may include an infrared LED for producing infrared light and a red LED for producing red light.

Sensor data obtained utilizing different wavelengths of light may be different based on the particular detection strengths and/or weaknesses of the respective wavelength. By utilizing multiple wavelengths, the information detected

US 10,524,671 B2

7

utilizing the various wavelengths may be combined and/or utilized to adjust each other in order to obtain greater accuracy.

For example, dark and light hairs may have different light absorption due to their different pigmentation regardless of their other physical characteristics. By averaging light absorption detected utilizing both infrared and red light, a more accurate light absorption that accounts for such color difference may be possible such that detecting light absorption of different colored hairs does not result in inaccurate measurements.

In some implementations, the ambient light sensor 105 may be a silicon ambient light sensor, such as a silicon non-imaging photodiode. In other implementations, the ambient light sensor 105 may be an indium gallium arsenide ambient light sensor, such as an indium gallium arsenide non-imaging photodiode. In various implementations, use of an indium gallium arsenide non-imaging photodiode may allow for detection of a larger spectrum of light than use of a silicon non-imaging photodiode. An indium gallium arsenide non-imaging photodiode may not be typically used as an ambient light sensor as such may be more expensive than a silicon non-imaging photodiode that may adequately be used to determine ambient light conditions by detecting a more limited spectrum of light.

In various implementations, a variety of different health data for the user may be computed based at least thereon. For example, in one or more implementations the health data may include one or more of a variety of different wellness, fitness, and/or other parameters relating to the health of a user such as: a blood pressure index, a blood hydration, a body fat content, an oxygen saturation, a pulse rate, a perfusion index, an electrocardiogram, a photoplethysmogram, and/or any other such health data.

FIG. 7 is a block diagram illustrating functional relationships among components of the example system 100 of FIG. 1. As shown, the electronic device 101 may include one or more processing units 701, one or more non-transitory storage media 702 (which may take the form of, but is not limited to, a magnetic storage medium; optical storage medium; magneto-optical storage medium; read only memory; random access memory; erasable programmable memory; flash memory; and so on), one or more communication components 703 (such as a Wi-Fi or other antenna that may be utilized to transmit computed health data for the user), one or more input/output components 704, a display 108 (which may be utilized to present computed health data for the user), the camera 104, the ambient light sensor 105, the proximity sensor 106, and/or the electrical contacts 107a and 107b. However, it is understood that this is an example. In various implementations, the electronic device 101 may omit one or more of these components and/or utilize one or more additional components not shown.

Returning to FIG. 2, in various implementations the electronic device 101 may provide guidance to the user for aligning the user's body part 202 with the camera 104, the ambient light sensor 105, the proximity sensor 106, and/or the electrical contacts 107a and 107b. Such correct alignment may aid in utilizing camera, the ambient light sensor, the proximity sensor, and/or the electrical contacts in detecting the information regarding the body part of the user. In some implementations, misalignment of the user's body part with the camera, the ambient light sensor, the proximity sensor, and/or the electrical contacts for purposes of obtaining the information may reduce the accuracy of the information and/or prevent detection of the information. As such,

8

the guidance may aid in the detection of the information and/or the computing of the health data.

For example, FIG. 3 illustrates the view of FIG. 2 while the example system 100 is providing guidance to obtain health data. As illustrated in this example, the electronic device 101 provides a current body part position indicator 301 and a goal position indicator 302. A user may compare the visual positions of the current body part position indicator and the goal position indicator to determine how to move the user's body part 202 into correct alignment. As shown, the user may move the user's body part down and to the right, aligning the current body part position indicator with the goal position indicator 302, to move the user's body part into correct alignment.

Further, the electronic device 101 may also provide a status indicator 303 that indicates a progress 304 of obtaining the information. In this way, the user may be alerted to how long the user should stay in position once the user aligns the user's body part so that the information may be detected.

In some implementations, the camera 104 may be utilized to detect the position of the user's body part for purposes of determining alignment/misalignment. The camera may be configured to detect this information even in implementations where the camera is configured with a focal distance greater than the distance from the camera to the user's body part 202 shown as less than full focused image quality may be adequate for determining alignment/misalignment. In other implementations, the ambient light sensor 105, the proximity sensor 106, the electrical contacts 107a and 107b, and/or other components may be utilized instead of and/or in addition to the camera for determining alignment/misalignment of the user's body part.

Although FIG. 3 illustrates the electronic device 101 providing guidance output graphically using a visual output component, it is understood that this is an example. In various implementations, such output may be provided in one or more of a variety of different ways. For example, audio guidance instructions may be provided utilizing an audio output component and/or vibration guidance instructions may be provided utilizing a haptic output component without departing from the scope of the present disclosure.

FIG. 4 illustrates the view of FIG. 2 while the example system 100 is providing the obtained health data. As illustrated, a variety of different health data may be presented. Although FIG. 4 illustrates the electronic device 101 providing the health data graphically using a visual output component, it is understood that this is an example. In various implementations, such health may be provided in one or more of a variety of different ways, such as audibly utilizing an audio output component without departing from the scope of the present disclosure. In other implementations, the health data may be communicated to another electronic device (such as a health data database maintained by a doctor and/or other medical or health provider) utilizing a communication component.

FIG. 5 is a flow chart illustrating an example method 500 for using an electronic device to obtain health data. This method may be performed by the system of FIG. 1.

The flow may begin at block 501 where at least one of camera and a proximity sensor may be used to emit light into a body part of a user touching a surface of the electronic device. The flow may proceed to block 502 where at least one of the camera, an ambient light sensor, or the proximity sensor may be used to receive at least part of the emitted light reflected by the body part of the user to produce sensor output and generate sensor data. The flow may then proceed

US 10,524,671 B2

9

to block **503** where health data of the user may be computed using at least the sensor data regarding the received light.

At block **504**, the computed health data for the user may be provided. In some implementations, the computed health data for the user may be provided to the user. Such providing may be performed using one or more visual output components such as a display, audio output components such as a speaker, haptic output components, and so on.

In one example, the proximity sensor may be used to emit light into the user's body part, the ambient light sensor and the camera may be used to receive at least part of the emitted light reflected by the user's body part, and electrical contacts may be used to obtain electrical measurements from the skin of the user's body part. In such an example, a blood pressure index, a body fat content, and an electrocardiogram may be computed using data from the ambient light sensor, the camera, and the electrical contacts.

In another example, the proximity sensor may be a multiple light wavelength proximity sensor that utilizes infrared and visible light and the ambient light sensor may be a indium gallium arsenide ambient light sensor. The proximity sensor may be used to emit light into the user's body part, the ambient light sensor and the camera may be used to receive at least part of the emitted light reflected by the user's body part, and electrical contacts may be used to obtain electrical measurements from the skin of the user's body part. In such an example, a blood hydration may be computed using data from the ambient light sensor, the camera, and the electrical contacts.

In yet another example, the proximity sensor may be used to emit light into the user's body part and the ambient light sensor and the camera receive at least part of the emitted light reflected by the user's body part. In such an example, an oxygen saturation, a pulse rate, a perfusion index and a photoplethysmogram may be computed using data from the ambient light sensor and the camera.

Although the example method **500** is illustrated and described above as including particular operations performed in a particular order, it is understood that this is an example. In various implementations, various orders of the same, similar, and/or different operations may be performed without departing from the scope of the present disclosure.

For example, block **503** is illustrated and described as providing the computed health data for the user. However, in various implementations this operation may be omitted. In some examples of such an implementation, the computed health data for the user may be stored for later use as opposed to being provided to the user.

FIG. **6** is a flow chart illustrating an example method **600** for guiding use of an electronic device to obtain health data. This method may be performed by the system of FIG. **1**.

The flow may begin at block **601** where at least a profile of a body part of a user (such as the outline, location, or orientation) contacting a camera may be detected using a camera. The flow may proceed to block **602** where it is determined based on the detection that the user's body part is misaligned with a combination of the camera, an ambient light sensor, and a proximity sensor for purposes of obtaining health data for the user.

Detection of the user's body part may include comparing the profile to data representing a correct alignment. For example, an image of the profile of the user's body part may be captured and compared to a sample image representing what the image of the profile of the user's body part should look like if the user's body part is correctly aligned. A mismatch may indicate that the user's body part is misaligned.

10

At block **603**, guidance to correct the misalignment may be provided. In the example discussed above where a mismatch between the image of the profile of the user's body part and the sample image indicated that the user's body part was misaligned, the differences between the two images may be utilized to determine guidance to provide. By way of illustration, if the image of the profile of the user's body part has the user's body part further to the left than the sample image then it may be determined that the user should move the user's body part to the right. Such guidance may be provided using one or more visual output components such as a display, audio output components such as a speaker, haptic output components such as a vibrator, and so on.

For example, a user may place his finger on the camera. An image may be taken of the profile of the user's finger and compared to a sample image of what the profile of the user's finger should look like if correctly aligned with a combination of the camera, an ambient light sensor, and a proximity sensor for purposes of obtaining health data for the user. Comparison of the two images may indicate that the two images do not match and the user's finger is not correctly aligned. In this example, the image of the profile of the user's finger may be further up and to the right of the sample image. As such, a correct placement indicator and a current placement indicator may be displayed to the user where the current placement indicator is displayed further up and to the right of the correct placement indicator. In this way, the user can see that to correctly align the user's finger the user should move the user's finger down and to the left.

To continue with this example, the user may move the user's finger based on the provided guidance. A new image may be taken of the current profile of the user's finger and compared to the sample image. Comparison of the two images may indicate that the two images, though closer, still do not match and the user's finger is not still correctly aligned. In this example, the image of the profile of the user's finger may be less but still further up and to the right of the sample image. As such, the current placement indicator may be displayed moved closer but still further up and to the right of the correct placement indicator. In this way, the user can see that to correctly align the user's finger the user should move the user's finger still further down and to the left.

The process in this example may be repeated until comparison of an image of profile of the user's finger matches the sample image. The current placement indicator may then be displayed over the correct placement indicator to indicate to the user that the user's finger is correctly aligned and to not move further until health data is obtained.

Although the example method **600** is illustrated and described above as including particular operations performed in a particular order, it is understood that this is an example. In various implementations, various orders of the same, similar, and/or different operations may be performed without departing from the scope of the present disclosure.

For example, though blocks **601-603** are described as a series of linear operations that are performed a single time, it is understood that this is an example. In various implementations, one or more of blocks **601-603** may be repeated until the user's body part is no longer misaligned without departing from the scope of the present disclosure.

As discussed above and illustrated in the accompanying figures, the present disclosure details systems, apparatuses, and methods related to an electric device that computes health data. An electronic device (such as a smart phone, tablet computer, mobile computer, digital media player, wearable device, or other electronic device) may include a

US 10,524,671 B2

11

camera, an ambient light sensor, and a proximity sensor. The electronic device use one or more of the camera and the proximity sensor to emit light into a body part of a user (such as a finger, and ear, and so on) touching a surface of the electronic device. The electronic device may use one or more of the camera, the ambient light sensor, and the proximity sensor to receive at least part of the emitted light reflected by the body part of the user. The electronic device may compute health data of the user based upon sensor data regarding the received light. In this way, the health data of the user may be detected utilizing an electronic device including a camera, ambient light sensor, and proximity sensor without making the user obtain access to a dedicated fitness and/or wellness device.

In the present disclosure, the methods disclosed may be implemented as sets of instructions or software readable by a device. Further, it is understood that the specific order or hierarchy of steps in the methods disclosed are examples of sample approaches. In other embodiments, the specific order or hierarchy of steps in the method can be rearranged while remaining within the disclosed subject matter. The accompanying method claims present elements of the various steps in a sample order, and are not necessarily meant to be limited to the specific order or hierarchy presented.

Techniques detailed in the described disclosure may be provided as a computer program product, or software, that may include a non-transitory machine-readable medium having stored thereon instructions, which may be used to program a computer system (or other electronic devices) to perform a process according to the present disclosure. A non-transitory machine-readable medium includes any mechanism for storing information in a form (e.g., software, processing application) readable by a machine (e.g., a computer). The non-transitory machine-readable medium may take the form of, but is not limited to, a magnetic storage medium (e.g., floppy diskette, video cassette, and so on); optical storage medium (e.g., CD-ROM); magneto-optical storage medium; read only memory (ROM); random access memory (RAM); erasable programmable memory (e.g., EPROM and EEPROM); flash memory; and so on.

It is believed that the present disclosure and many of its attendant advantages will be understood by the foregoing description, and it will be apparent that various changes may be made in the form, construction and arrangement of the components without departing from the disclosed subject matter or without sacrificing all of its material advantages. The form described is merely explanatory, and it is the intention of the following claims to encompass and include such changes.

While the present disclosure has been described with reference to various embodiments, it will be understood that these embodiments are illustrative and that the scope of the disclosure is not limited to them. Many variations, modifications, additions, and improvements are possible. More generally, embodiments in accordance with the present disclosure have been described in the context or particular embodiments. Functionality may be separated or combined in blocks differently in various embodiments of the disclosure or described with different terminology. These and other variations, modifications, additions, and improvements may fall within the scope of the disclosure as defined in the claims that follow.

I claim:

1. A wearable device, comprising:
a first light source;
a second light source, the second light source operating at a different wavelength than the first light source;

12

at least one light receiver; and
a processing unit communicably coupled to the first light source, the second light source, and the at least one light receiver;
wherein the processing unit is configured to:
use the first light source and the second light source to emit light into a body part of a user;
dependent on the light emitted by the first light source and received by the at least one light receiver, compute a pulse rate of the user using the light emitted by the second light source and received by the at least one light receiver.

2. The wearable device of claim 1, wherein the first light source is a proximity sensor.

3. The wearable device of claim 2, wherein the second light source is a camera.

4. The wearable device of claim 2, wherein the at least one light receiver is the proximity sensor.

5. The wearable device of claim 1, wherein the at least one light receiver is at least one of a camera, an ambient light sensor, or a proximity sensor.

6. The wearable device of claim 1, further comprising electrical contacts, wherein the processing unit is further configured to compute health data of the user using an electrical measurement obtained via the electrical contacts.

7. The wearable device of claim 1, wherein the first light source is configured for a first light color and the second light source is configured for a second light color.

8. A portable electronic device, comprising:
a first light source that is configured for a first colored light;
a second light source that is configured for a second colored light;
a first light receiver;
a second light receiver, the second light receiver operating at a different wavelength than the first light receiver; and
a processing unit communicably coupled to the first light source, the second light source, the first light receiver, and the second light receiver;
wherein the processing unit is configured to:
use the first light source to emit the first colored light into a body part of a user;
use the second light source to emit the second colored light into the body part of the user; and
upon receipt of the first colored light by the first light receiver or the second light receiver, compute a pulse rate of the user using the first colored light received by the first light receiver and the second colored light received by the second light receiver.

9. The portable electronic device of claim 8, wherein the portable electronic device is a wearable electronic device.

10. The portable electronic device of claim 8, wherein the first light receiver is a camera.

11. The portable electronic device of claim 10, wherein the second light receiver is at least one of an ambient light sensor or a proximity sensor.

12. The portable electronic device of claim 10, wherein the first light source is the camera.

13. The portable electronic device of claim 8, further comprising electrical contacts, wherein the processing unit is further configured to obtain an electrical measurement via the electrical contacts.

14. The portable electronic device of claim 8, wherein the processing unit is configured to use data indicating characteristics of the body part that influence light absorption to

US 10,524,671 B2

13

adjust data regarding the second colored light received by the first light receiver or the second colored light received by the second light receiver.

15. A wearable electronic device, comprising:
a first light source that operates at a first wavelength;
a second light source that operates at a second wave-length;
a light receiver; and
a processing unit communicably coupled to the first light source, the second light source, and the light receiver;
wherein the processing unit is configured to:
use the first light source to emit first light having the first wavelength into a body part of a user;
use the second light source to emit second light having the second wavelength into the body part of the user; and
compute a pulse rate of the user using a portion of the first light received by the light receiver and a portion of the second light received by the light receiver.

14

16. The wearable electronic device of claim 15, wherein the light receiver operates at a third wavelength.

17. The wearable electronic device of claim 16, wherein the third wavelength at least partially overlaps the first and second wavelengths.

18. The wearable electronic device of claim 16, further comprising an additional light receiver that operates at a fourth wavelength.

19. The wearable electronic device of claim 18, wherein the processing unit computes the pulse rate of the user using the portion of the first light received by the light receiver, the portion of the second light received by the light receiver, and the first and second light received by the additional light receiver.

20. The wearable electronic device of claim 18, wherein the fourth wavelength at least partially overlaps the first and second wavelengths.

* * * * *