JOSHUA H. LERNER, SBN 220755
jlerner@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street Suite 3000
San Francisco, CA 94105
Tel.: 415.393.8200 / Fax: 415.393.8306

H. MARK LYON, SBN 162061
mlyon@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA 94304-1211
Tel.: 650.849.5300 / Fax: 650.849.5333

BRIAN M. BUROKER, *pro hac vice*
bburoker@gibsondunn.com
BRIAN K. ANDREA, *pro hac vice*
bandrea@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Tel.: 202.955.8500 / Fax: 202.467.0539

BRIAN A. ROSENTHAL, *pro hac vice*
brosenthal@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Tel.: 212.351.2339 / Fax: 212.817.9539

ILISSA SAMPLIN, SBN 314018
isamplin@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Tel.: 213.229.7000 / Fax: 213.229.7520

ANGELIQUE KAOUNIS, SBN 209833
akaounis@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2029 Century Park East Suite 4000
Los Angeles, CA 90067
Tel.: 310.552.8546 / Fax: 310.552.7026

*Attorneys for Defendant Apple Inc.*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SOUTHERN DIVISION**

MASIMO CORPORATION,
a Delaware corporation; and
CERCACOR LABORATORIES, INC.,
a Delaware corporation,

Plaintiffs,

v.

APPLE INC.,
a California corporation,

Defendant.

CASE NO. 8:20-cv-00048-JVS (JDEx)

**DECLARATION OF ILISSA SAMPLIN IN SUPPORT OF DEFENDANT APPLE INC.'S PORTION OF JOINT STIPULATION REGARDING PLAINTIFFS' SECOND MOTION TO COMPEL APPLE TO PRODUCE DOCUMENTS AND FULLY ANSWER INTERROGATORIES**

Judge: Hon. John D. Early
Date/Time: May 20, 2021, 10:00 AM
Courtroom: 6A

Discovery Cutoff: 7/5/2021
Pre-trial Conference: 3/21/2022
Trial: 4/5/2022

Gibson, Dunn & Crutcher LLP

SAMPLIN DECL. IN SUPPORT OF APPLE'S PORTION OF JOINT STIPULATION REGARDING PLAINTIFFS' SECOND MOT. TO COMPEL APPLE TO PRODUCE DOCUMENTS AND FULLY ANSWER INTERROGATORIES
CASE NO. 8:20-CV-00048-JVS (JDEX)

I, Ilissa Samplin, declare and state as follows:

1. I am an attorney duly licensed to practice law before this Court and all courts of the State of California. I am a partner with the law firm of Gibson, Dunn & Crutcher LLP ("Gibson Dunn") and counsel of record for Apple Inc. ("Apple") in the above-captioned action.

2. I have personal, firsthand knowledge of the facts stated herein and, if called upon to do so, could and would competently testify thereto.

3. I make this declaration in support of Apple's Portion of the Joint Stipulation Regarding Plaintiffs' Second Motion to Compel Apple to Produce Documents and Fully Answer Interrogatories.

4. On April 3, 2020, Apple Served its First Set of Requests for Production of Documents and Things to Plaintiffs. A true and correct copy of Apple's First Set of Requests for Production is attached hereto as **Exhibit A**.

5. On May 22, 2020, I received a letter from Mark Kachner (counsel of record for Plaintiffs) concerning the parties' meet and confer regarding several of the parties' written discovery requests. A true and correct copy of Mr. Kachner's May 22, 2020 letter is attached hereto as **Exhibit B**.

6. On May 26, 2020, I sent a letter to Mark Kachner, responding to his May 22, 2020 letter and following up on the parties' meet and confer regarding several of the parties' written discovery requests. A true and correct copy of my May 26, 2020 letter is attached hereto as **Exhibit C**.

7. On June 2, 2020, I received a follow up letter from Mark Kachner responding to my May 26, 2020 letter. A true and correct copy of Mr. Kachner's June 2, 2020 letter is attached hereto as **Exhibit D**.

8. On March 12, 2021, I sent a letter to Mark Kachner pursuant to Rule 37-1 to address various deficiencies in Plaintiffs' responses to Apple's written discovery requests. A true and correct copy of my March 12, 2021 letter is attached hereto as **Exhibit E**.

1

Gibson, Dunn & Crutcher LLP

SAMPLIN DECL. IN SUPPORT OF APPLE'S PORTION OF JOINT STIPULATION REGARDING PLAINTIFFS' SECOND MOT. TO COMPEL APPLE TO PRODUCE DOCUMENTS AND FULLY ANSWER INTERROGATORIES
CASE NO. 8:20-CV-00048-JVS (JDEX)

9. On April 2, 2021, I received a letter from Mark Kachner concerning Apple's written discovery requests. A true and correct copy of Mr. Kachner April 2, 2021 letter is attached hereto as **Exhibit F [filed under seal]**.

10. A document bearing bates stamp APL-MAS_00082917 was produced by Apple to Plaintiffs on March 8, 2021. This document is responsive at least to Plaintiffs' Request for Production Nos. 165–170.

11. On December 30, 2020, Apple filed a Joint Stipulation Regarding its Motion to Compel Plaintiffs to Comply with Section 2019.210 (Dkt. No. 259-1). Pursuant to Local Rule 37-2.1, a true and correct copy of this Joint Stipulation is attached hereto as **Exhibit G [filed under seal]**.

12. On April 21, 2021, the Court issued it Order Regarding Motion to Dismiss, filed under seal (Dkt. No. 350), granting in part Apple's Motion to Dismiss portions of Plaintiffs' Trade Secret Misappropriation claim in the Fourth Amended Complaint. Pursuant to Local Rule 37-2.1, a true and correct copy of this Order is attached hereto as **Exhibit H [filed under seal]**.

13. A true and correct copy of the U.S. Food and Drug Administration's De Novo Summary of Apple's DE NOVO CLASSIFICATION REQUEST FOR ECG APP, located at https://www.accessdata.fda.gov/cdrh_docs/reviews/DEN180044.pdf, which granted Apple's request and classified Apple's ECG app, is attached hereto as **Exhibit I**.

14. A true and correct copy of a September 11, 2018 letter from the U.S. Food and Drug Administration to Apple, located at https://www.accessdata.fda.gov/cdrh_docs/pdf18/DEN180044.pdf, which informed Apple that its ECG app was classified into Class II under the generic name electrocardiograph software for over-the-counter use, is attached hereto as **Exhibit J**.

15. A true and correct copy of Apple's September 12, 2018 press release, announcing the launch of the Apple Watch Series 4, which was downloaded from https://www.apple.com/newsroom/2018/09/redesigned-apple-watch-series-4-

revolutionizes-communication-fitness-and-health/, is attached hereto as **Exhibit K**.

16. A true and correct copy of excerpts from Masimo's 2021 Form 10-K, which was downloaded from the SEC's Edgar website located at https://www.sec.gov/Archives/edgar/data/0000937556/000093755621000033/masi-20210102.htm, is attached hereto as **Exhibit L**.

17. A true and correct copy of excerpts from Masimo's 2015 Form 10-K, which was downloaded from the SEC's Edgar website located at https://www.sec.gov/Archives/edgar/data/937556/000093755615000024/masi-20150103x10k.htm, is attached hereto as **Exhibit M**.

18. On April 14, 2021, my colleague Brian Andrea sent a letter to Adam Powell (counsel of record for Plaintiffs), continuing the parties' negotiations concerning Apple's ESI custodians. A true and correct copy of Mr. Andrea's April 14, 2021 letter is attached hereto as **Exhibit N**.

Executed this 27th day of April, 2021 in Los Angeles, California.

By: */s/ Ilissa Samplin*
Ilissa Samplin

3

Gibson, Dunn & Crutcher LLP

SAMPLIN DECL. IN SUPPORT OF APPLE'S PORTION OF JOINT STIPULATION REGARDING PLAINTIFFS' SECOND MOT. TO COMPEL APPLE TO PRODUCE DOCUMENTS AND FULLY ANSWER INTERROGATORIES
CASE NO. 8:20-CV-00048-JVS (JDEX)

# Exhibit A

JOSHUA H. LERNER, SBN 220755
jlerner@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street Suite 3000
San Francisco, CA 94105
Telephone: 415.393.8200
Facsimile: 415.393.8306

H. MARK LYON, SBN 162061
mlyon@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA 94304-1211
Telephone: 650.849.5300
Facsimile: 650.849.5333

ILISSA SAMPLIN, SBN 314018
isamplin@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

BRIAN M. BUROKER, *pro hac vice*
bburoker@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Telephone: 202.955.8541
Facsimile: 202.467.0539

ANGELIQUE KAOUNIS, SBN 209833
akaounis@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2029 Century Park East Suite 4000
Los Angeles, CA 90067
Telephone: 310.552.8546
Facsimile: 310.552.7026

*Attorneys for Defendant Apple Inc.*

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION**

MASIMO CORPORATION,
a Delaware corporation; and
CERCACOR LABORATORIES, INC.,
a Delaware corporation,

Plaintiffs,

v.

APPLE INC.,
a California corporation,

Defendant.

CASE NO. 8:20-cv-00048-JVS (JDEx)

**DEFENDANT APPLE INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS TO PLAINTIFFS MASIMO CORPORATION AND CERCACOR LABORATORIES, INC.**

Action Filed: January 9, 2020

Gibson, Dunn & Crutcher LLP

APPLE INC.'S FIRST SET OF REQUESTS FOR
PRODUCTION OF DOCUMENTS AND THINGS TO PLAINTIFFS MASIMO AND CERCACOR
CASE NO. 8:20-cv-00048-JVS (JDEx)

Exhibit A
Page 5

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure and Rules 26 and 34 of the Local Civil Rules of the United States District Court for the Central District of California, Defendant Apple Inc.("Apple") hereby serves its First Set of Requests for Production of Documents and Things ("Requests") to Plaintiffs Masimo Corporation ("Masimo") and Cercacor Laboratories, Inc. ("Cercacor") (collectively, "Plaintiffs") in Civil Action No. 8:20-cv-00048-JVS (JDEx) to be responded to, in writing, within thirty (30) days of service hereof, and in accordance with the definitions and instructions below. These Requests are continuing in nature and responses thereto should be supplemented as required by Rule 26(e) of the Federal Rules of Civil Procedure.

## I. DEFINITIONS

Notwithstanding any definition set forth below, each word, term, or phrase used in these Requests is intended to have the broadest meaning permitted under the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the Central District of California. In these Requests, the following terms are to be given their ascribed definitions.

1. The term **"Action"** refers to *Masimo Corporation et al. v. Apple Inc.*, Civil Action No. 8:20-cv-00048-JVS (JDEx) (C.D. Cal.), commenced on January 9, 2020.

2. The term **"Complaint"** refers to the current operative complaint in the Action.

3. The term **"Masimo"** refers to Masimo Corporation and its officers, directors, current and former employees, counsel, agents, consultants, representatives, and any other Persons acting on behalf of any of the foregoing, and Masimo Corporation's affiliates, parents, divisions, joint ventures, licensees, franchisees, assigns, predecessors and successors in interest, and any other legal entities, whether foreign or domestic, that are owned, partially owned, or controlled

1

APPLE INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS TO PLAINTIFFS MASIMO AND CERCACOR
CASE NO. 8:20-CV-00048-JVS (JDEX)

Gibson, Dunn & Crutcher LLP

Exhibit A
Page 6

by Masimo Corporation.

4. The term **"Cercacor"** refers to Cercacor Laboratories, Inc. and its officers, directors, current and former employees, counsel, agents, consultants, representatives, and any other Persons acting on behalf of any of the foregoing, and Cercacor Laboratories, Inc.'s affiliates, parents, divisions, joint ventures, licensees, franchisees, assigns, predecessors and successors in interest, and any other legal entities, whether foreign or domestic, that are owned, partially owned, or controlled by Cercacor Laboratories, Inc.

5. The terms **"You," "Your," or "Plaintiffs,"** refer to Masimo and Cercacor, jointly or individually.

6. The terms **"Defendant"** or **"Apple"** refer to Apple Inc.

7. The term **"the '265 patent"** means U.S. Patent No. 10,258,265.

8. The term **"the '266 patent"** refers to U.S. Patent No. 10,258,266.

9. The term **"the '628 patent"** refers to U.S. Patent No. 10,292,628.

10. The term **"the '708 patent"** refers to U.S. Patent No. 10,299,708.

11. The term **"the '190 patent"** refers to U.S. Patent No. 10,376,190.

12. The term **"the '191 patent"** refers to U.S. Patent No. 10,376,191.

13. The term **"the '695 patent"** refers to U.S. Patent No. 10,470,695.

14. The term **"the '994 patent"** refers to U.S. Patent No. 6,771,994.

15. The term **"the '703 patent"** refers to U.S. Patent No. 8,457,703.

16. The term **"the '776 patent"** refers to U.S. Patent No. 10,433,776.

17. The term "**the '553 patent**" refers to U.S. Patent No. 10,588,553.

18. The term "**the '554 patent**" refers to U.S. Patent No. 10,588,554.

19. The terms "**Asserted Patents**" or "**Patents-in-Suit**" refer to the '265 patent, the '266 patent, the '628 patent, the '708 patent, the '190 patent, the '191 patent, the 695 patent, the '994 patent, the '703 patent, the '776 patent, the '553 patent, and the '554 patent, collectively, as well as any applications for and/or

2

APPLE INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS TO PLAINTIFFS MASIMO AND CERCACOR
CASE NO. 8:20-CV-00048-JVS (JDEX)

Gibson, Dunn & Crutcher LLP

Exhibit A
Page 7

counterparts to these patents, and any other patents that You may accuse Apple of infringing in this Action, and their applications and/or counterparts.

20. The term **"Related Patents and Applications"** refers to (i) all U.S. or foreign patents and patent applications related to the Asserted Patents or their applications by way of subject matter or claimed priority date, and (ii) any patent or patent application that claims priority to an Asserted Patent, or to which an Asserted Patent claims priority.

21. The terms **"Asserted Claim"** or **"Asserted Claims"** means the claims of the Asserted Patents that Plaintiffs contend Apple has infringed and/or is infringing.

22. The term **"Asserted Technologies"** refers to the alleged inventions claimed by the Asserted Claims.

23. The term **"Apple Patents"** refers to U.S. Patent Nos. 10,078,052, 10,247,670, 9,952,095, 10,219,754, and 10,524, 671, collectively, as well as any applications for and/or counterparts to these patents, and any other of Apple's patents for which Plaintiffs may bring claims of correction of inventorship in this Action, and their applications and/or counterparts.

24. The term "**Apple Applications**" refers to U.S. Patent Application Nos. 14/740,196, 16/114,003, 14/621,268, 14/617,422, 15/667,832 16/700,710, 14/618,664, and 15/960,507, and U.S. Provisional Patent Application Nos. 62/043,294, 62/047,818, 62/056,299, and 62/057,089, collectively, and any counterparts thereof, and any other of Apple's patent applications for which Plaintiffs may bring claims of ownership in this Action, and any counterparts thereof.

25. The term "**Alleged Inventors**" refers to Messrs. Al-Ali, Diab, and Weber, as described in paragraphs 22, 227, 234, 241, 248, 255, 262, 270, 278, 286, and/or 294 of the Complaint, collectively, and any other individuals who Plaintiffs

3

APPLE INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS TO PLAINTIFFS MASIMO AND CERCACOR
CASE NO. 8:20-CV-00048-JVS (JDEX)

Gibson, Dunn & Crutcher LLP

Exhibit A
Page 8

may contend in this Action should be named as inventors on the Apple Patents and Apple Applications.

26. The terms "**Trade Secret**" or "**Trade Secrets**" means the information identified in paragraph 211 of the Complaint as alleged trade secrets and any other trade secret that Plaintiffs allege Apple misappropriated. In referring to any information identified in paragraph 211 of the Complaint as a "Trade Secret," Apple in no way communicates its agreement that the information constitutes a trade secret.

27. The term "**Accused Products**" refers to the Apple Watch Series 4 and later devices, alone or in combination with Apple iPhones, that Plaintiffs assert infringe any of the Asserted Patents, and any other products that Plaintiffs are permitted to accuse of infringing any of the Asserted Patents in this Action. In referring to any product as an "Accused Product," Apple in no way communicates its agreement that the product infringes the Asserted Patents.

28. The term **"Prior art"** refers to all inventions, patents, publications, products, disclosures, or events falling within any of the categories set forth in 35 U.S.C. §§ 102 and 103 with respect to the Asserted Patents.

29. The term **"Licensee"** refers to any entity having a license, assignment, covenant not to sue, or other understanding, written, oral or implied, that the entity has any rights to the Asserted Patents or Related Patents, may practice one or more claims of the Asserted Patent and/or that Plaintiffs will not file suit or otherwise enforce against that entity one or more claims of the Asserted Patent or Related Patents and Applications.

30. The terms **"Person"** or **"Persons"** shall mean any natural person, or any business, legal or governmental entity or association.

31. The term **"Communication"** shall mean every manner of disclosure, transfer, or exchange of information whether person-to-person, in a group, orally, in

4

APPLE INC.'S FIRST SET OF REQUESTS FOR
PRODUCTION OF DOCUMENTS AND THINGS TO PLAINTIFFS MASIMO AND CERCACOR
CASE NO. 8:20-CV-00048-JVS (JDEX)

Gibson, Dunn & Crutcher LLP

Exhibit A
Page 9

writing, by telephone, by electronic transmission, or otherwise.

32. The terms **"Document"** or **"Documents"** is used in the most comprehensive and broadest sense permitted by the Federal Rules of Civil Procedure 26 and 34, and specifically includes electronically stored information and every "writing" and "recording," as those terms are defined in Rule 1001 of the Federal Rules of Evidence. A draft or non-identical copy is a separate Document within the meaning of this term.

33. The terms **"Thing"** or **"Things"** are used in the most comprehensive and inclusive sense permitted by the Federal Rules of Civil Procedure and includes, but is not limited to, prototypes, models, specimens, or other devices, and commercially manufactured items.

34. A Document, Thing, or Communication **"relating to," "related to," "concerning,"** or **"regarding"** a subject shall mean all Documents, Things, or Communications that directly or indirectly constitute, contain, embody, concern, evidence, show, comprise, reflect, identify, state, refer to, deal with, comment on, respond to, describe, involve, mention, discuss, record, support, negate, or are in any way pertinent to that subject.

35. The term **"each"** shall mean each and every.

36. The term **"any"** shall include the word "all," and vice versa.

37. The terms **"and," "or,"** and **"and/or"** shall be construed in the conjunctive or the disjunctive, whichever makes the discovery request more inclusive so as to bring within the scope of the request all Documents that might otherwise be construed to be outside of its scope.

38. The present tense includes the past and future tenses. The singular includes the plural, and the plural includes the singular. Words in the masculine, feminine or neutral form shall include all of the other genders.

39. The use of the term **"the"** shall not be construed as limiting the scope

5

APPLE INC.'S FIRST SET OF REQUESTS FOR
PRODUCTION OF DOCUMENTS AND THINGS TO PLAINTIFFS MASIMO AND CERCACOR
CASE NO. 8:20-CV-00048-JVS (JDEX)

Gibson, Dunn & Crutcher LLP

Exhibit A
Page 10

of any Request.

40. References to employees, officers, directors, or agents shall include both current and former employees, officers, directors, and agents.

## II. INSTRUCTIONS

1. All requests must be responded to fully and in writing in accordance with Fed. R. Civ. P. 34.

2. You are to produce all requested Documents, Communications, and Things that are in Your custody, control, or possession, or within the custody, control or possession of Your attorneys, accountants, agents, consultants, investigators, other representatives, affiliates, employees, and/or any other entities or individuals acting on Your behalf or on whose behalf You are acting. A Document, Communication, or Thing not in Your physical custody is nonetheless deemed to be in Your possession, custody, or control if You (i) own such Document, Communication, or Thing in whole or in part, (ii) have a right by contract, statute or otherwise, to use, examine, or copy such Document, Communication, or Thing on any terms, (iii) have an understanding, express or implied, that You may use, inspect, examine, or copy such Document, Communication, or Thing on any terms, or (iv) have, as a practical matter, been able to use, inspect, examine, or copy such Document, Communication, or Thing when You have sought to do so. In the event that You cannot produce any of the Documents, Communications, or Things designated in a particular request, You shall produce those Documents, Communications, or Things which You can produce, and shall describe in detail each reason for Your failure or inability to produce each of the remaining Documents, Communications, or Things.

3. If Your response to a Request is that Documents, Communications, and Things are not in Your possession, custody, or control, describe in detail the efforts You have made to locate the Documents, Communications, and Things, and

6

Gibson, Dunn & Crutcher LLP

APPLE INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS TO PLAINTIFFS MASIMO AND CERCACOR
CASE NO. 8:20-CV-00048-JVS (JDEX)

Exhibit A
Page 11

identify who has possession, custody, or control of them.

4. If any Request calls for the production of Documents, Communications, and Things that have been lost, discarded, or destroyed, You shall state the circumstances of the loss or destruction of each such Document, Communication, or Thing, including the identity of Person(s) having knowledge as to the circumstances of its loss or destruction and the date of its loss or destruction.

5. These Requests call for the production of all original Documents, all non-identical copies of such Documents, any preliminary drafts thereof, including all transmittal sheets, cover letters, exhibits, enclosures, or attachments to such Documents. Unless otherwise agreed in writing, each non-identical version of any Document, Communication, or Thing shall constitute a separate Document, Communication, or Thing. Each draft or version of any Document, Communication, or Thing also shall constitute a separate Document, Communication, or Thing.

6. Email attachments and embedded files must be mapped to their parent by the Document or by production number. If attachments and embedded files are combined with their parent Documents, then "BeginAttach" and "EndAttach" fields listing the unique beginning and end number for each attachment or embedded Document must be included.

7. If, for any reason other than a claim of privilege, You refuse to respond to any Request herein, please state the grounds upon which such refusal is based with sufficient particularity to permit a determination of the propriety of such refusal.

8. If You withhold any Document or Communication, or any portion of any Document or Communication, under a claim of confidentiality, privilege, or any other protection from production including, but not limited to, attorney work product or attorney-client privilege, You shall produce, in accordance with Rule 26 of the Federal Rules, a written privilege log that sets forth: (i) the author(s) and sender(s)

7

APPLE INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS TO PLAINTIFFS MASIMO AND CERCACOR
CASE NO. 8:20-CV-00048-JVS (JDEX)

Gibson, Dunn & Crutcher LLP

Exhibit A
Page 12

of the Document or Communication; (ii) the type of Document or Communication, e.g., letter or memorandum; (iii) the dates associated with the Document or Communication (the date it bears, the date it was sent, and the date it was received); (iv) all recipients of the Document or Communication; (v) the number of pages of the Document or Communication; (vi) the identity of each person who has custody or control over the Document or Communication and each copy thereof; (vii) such other information as is sufficient to identify the Document or Communication; and (viii) the nature of the privilege asserted.

9. If information is redacted from a Document or Communication produced in response to a Request, You shall identify the redaction by stamping the word "Redacted" on the Document at each place where information has been redacted and separately log each redaction on the privilege log.

10. No specific Request should be construed to limit the scope of any other Request, or of any term defined herein, and no subpart of any Request should be construed to limit the scope of any other subpart of such Request.

11. Whenever You object to a particular Request or portion thereof, You must produce all Documents, Communications, and Things called for that are not subject to that objection. Similarly, whenever a Document, Communication, or Thing is not produced in full, You must state with particularity the reason or reasons it is not being produced in full, and describe, to the best of Your knowledge, information, and belief those portions of the Document, Communication, or Thing that are not produced. If you object to a particular Request or portion thereof, You must also (i) identify with particularity any Document, Communication, or Thing falling within any category or item in the Request to which an objection is made, and (ii) set forth clearly the extent of, and the specific ground for, the objection.

12. Documents, Communications, and Things shall be produced in the same order as they are kept in the usual course of business and shall not be shuffled

8

Gibson, Dunn & Crutcher LLP

APPLE INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS TO PLAINTIFFS MASIMO AND CERCACOR
CASE NO. 8:20-CV-00048-JVS (JDEX)

Exhibit A
Page 13

or otherwise rearranged. Documents and Communications that were, in their original condition, stapled, clipped, contained in file folders or binders, or otherwise fastened together shall be produced in such form. Whenever it is reasonably practicable, please produce Documents, Communications, and Things in such a manner as will facilitate their identification with the particular Request or category of Requests to which they are responsive.

13. All Documents requested herein must be produced in their entirety, with all attachments and enclosures, regardless of whether You consider the attachment and enclosures to be relevant or responsive to the request.

14. Documents in electronic form, including, but not limited to, e-mail shall be produced electronically in a form to be agreed upon by the parties, replete with agreed upon metadata.

15. If there are no Documents, Communications, or Things responsive to a particular Request, You shall so state in writing.

16. Unless otherwise stated, each Request is directed towards each Plaintiff in this Action.

17. If, in responding to these Requests, You encounter any ambiguities when construing a Request, instruction, or definition, in Your response set forth the matter deemed ambiguous and the construction used in answering.

18. These Requests are continuing in nature, and require prompt and further supplemental production if You obtain additional responsive information.

19. Apple serves these Requests without prejudice to its right to serve additional requests for production in this Action.

20. Each of the foregoing Definitions and Instructions is hereby incorporated by reference into, and shall be deemed a part of, each Request.

## III. <u>REQUESTS FOR PRODUCTION</u>

1. All Documents, Communications, and Things relating to, identified

9

APPLE INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS TO PLAINTIFFS MASIMO AND CERCACOR
CASE NO. 8:20-CV-00048-JVS (JDEX)

Gibson, Dunn & Crutcher LLP

Exhibit A
Page 14

in, and/or relevant to Plaintiffs' Initial Disclosures, including any and all supplements and amendments thereto.

2. All Documents, Communications, and Things identified in, and/or relevant to the subject matter of Plaintiffs' responses to Defendant's Interrogatories, including any and all supplements and amendments thereto.

3. All Documents and Things relating to Plaintiffs' Communications that refer to any of the Asserted Patents or Asserted Technology, including without limitation, such Communications with, about, or referring to Apple.

4. All Documents, Communications, and Things concerning any inspection, testing, evaluation, or analysis of any product by any Person for any purpose that is related to any of the Asserted Patents, including, without limitation, each Accused Product.

5. All Documents, Communications, and Things that support, refute, or relate to any contention by Plaintiffs that any of the Accused Products infringes any claim of the Asserted Patents, either literally or under the Doctrine of Equivalents.

6. All Documents, Communications, and Things that support, refute, or relate to any contention by Plaintiffs regarding indirect infringement of each of the Asserted Patents.

7. All Documents, Communications, and Things concerning the basis and foundation for Plaintiffs' allegation that Defendant's alleged infringement of any of the Asserted Patents is or has been willful, including Documents relating to all supporting facts and circumstances.

8. All Documents and Communications concerning the basis and foundation for Plaintiffs' request for enhanced damages under 35 U.S.C. § 284.

9. All Documents and Communications concerning the basis and foundation for Plaintiffs' request for attorneys' fees under 35 U.S.C. § 285.

10. All Documents, Communications, and Things relating to Your

10

APPLE INC.'S FIRST SET OF REQUESTS FOR
PRODUCTION OF DOCUMENTS AND THINGS TO PLAINTIFFS MASIMO AND CERCACOR
CASE NO. 8:20-CV-00048-JVS (JDEX)

Gibson, Dunn & Crutcher LLP

Exhibit A
Page 15

discovery of the facts underlying the allegations in Your Complaint, including, but not limited to, all Documents concerning the circumstances under which You first became aware of the existence of each Accused Product, all Documents and Communications concerning any investigation or other inquiry that You undertook or that was undertaken on Your behalf, and all Documents concerning any Communications between any Plaintiff and any current or former employee(s) of Apple concerning any of the Asserted Patents or Asserted Technologies prior to the filing of the Complaint in this Action, such as, for example, any negotiations or offers to license the Asserted Patents.

11. All Documents and Communications that You reviewed or relied upon in drafting Your Complaint.

12. All Documents provided to any expert witness whom You have retained or plan to retain either to testify at trial or to provide an opinion relating to the matters at issue in this Action.

13. All Documents and Communications relating to any contemplated attempt, threatened attempt, or actual attempt by You to enforce Your purported intellectual property rights or interest in the Asserted Patents and/or Related Patents and Applications, including, without limitation, cease and desist letters, demands, notices of infringement, other correspondence, or pleadings, and any evaluation of value or risk to Plaintiffs of such an attempt, and any likelihood of success of such an attempt.

14. All Documents, Communications, and Things relating to any responses to any assertion by You of infringement of the Asserted Patents or any Related Patents and Applications.

15. All Documents produced in, filed in, served in, or concerning any litigation, including proceedings in any federal court or agency, related to the Asserted Patents or Related Patents and Applications, including but not limited to

11

APPLE INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS TO PLAINTIFFS MASIMO AND CERCACOR
CASE NO. 8:20-CV-00048-JVS (JDEX)

Gibson, Dunn & Crutcher LLP

Exhibit A
Page 16

all pleadings, motions, briefs, declarations, affidavits, expert witness disclosures and reports, discovery requests and responses, Documents produced by any party or non-party, hearing transcripts, deposition transcripts (and exhibits thereto), trial and hearing exhibits, Documents obtained by subpoena, asserted Prior Art, and correspondence between any Plaintiff (on the one hand) and any other party or any non-party or any expert witness (on the other hand) regarding any aspect of the litigation or proceeding, including but not limited to resolution or settlement.

16. All Documents concerning whether or not each product that was covered by any claim of the Asserted Patents, and that was made or sold within the United States by Plaintiffs or any Licensee prior to the filing of this Action, was marked with the number of that Asserted Patent or with an indication that the application for that Asserted Patent was pending.

17. For each Asserted Claim, all Documents and Communications concerning whether Defendant had actual or constructive notice of any alleged infringement of the Asserted Patents in compliance with 35 U.S.C. § 287 including, but not limited to, any patent marking(s) by Plaintiffs, any Licensees, or any other third parties.

18. All Documents and Communications that identify any Licensee that manufactures and/or sells products that utilize the Asserted Technologies or are covered by the Asserted Patents.

19. All Documents and Communications concerning Plaintiffs' efforts in monitoring or ensuring that Licensees mark products covered by any the Asserted Patents.

20. All Documents and Communications concerning the number of marked or unmarked products manufactured or sold by Plaintiffs or Licensees.

21. All Documents and Communications relating to the construction or interpretation of any terms in the claims of the Asserted Patents.

12

APPLE INC.'S FIRST SET OF REQUESTS FOR
PRODUCTION OF DOCUMENTS AND THINGS TO PLAINTIFFS MASIMO AND CERCACOR
CASE NO. 8:20-CV-00048-JVS (JDEX)

Gibson, Dunn & Crutcher LLP

Exhibit A
Page 17

22. Documents sufficient to identify Masimo's procedures or policies for the storage, retention, and destruction of Documents or records.

23. Documents sufficient to identify Cercacor's procedures or policies for the storage, retention, and destruction of Documents or records.

24. All organizational charts for Masimo from January 2003 to the present.

25. All organizational charts for Cercacor from January 2003 to the present.

26. All Documents concerning or relating to an appraisal or valuation of any patent, license, royalty, technology transfer, or authorization-to-use agreement that relates to any of the Asserted Patents and/or any Asserted Technologies, including appraisals or valuations performed for tax purposes.

27. All Documents and Communications concerning or relating to any license agreements concerning or covering, in whole or in part, any of the Asserted Patents or Asserted Technologies, including but not limited to any license agreement identified in other litigation, royalty reports, and Documents or correspondence generated in connection with negotiating such license agreements.

28. All Documents and Communications concerning any licensing practices or policies of the industry and market You contend to be relevant to the Asserted Patents or Asserted Technologies.

29. All Documents and Communications concerning any proposed or actual settlement of any litigation, prospective litigation, or disputes involving any of the Asserted Patents.

30. For all claims of the Asserted Patents, all Documents and Communications concerning the conception, reduction to practice (constructive or actual), first public use, first public disclosure, first publication, first offer for sale, first sale, first written description of each alleged invention, diligence used in

13

APPLE INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS TO PLAINTIFFS MASIMO AND CERCACOR
CASE NO. 8:20-CV-00048-JVS (JDEX)

Gibson, Dunn & Crutcher LLP

Exhibit A
Page 18

reducing the invention(s) to practice, and equipment used (and ownership and location thereof) in the conception, diligence, and reduction to practice.

31. All Documents (including all Prior Art) and Communications evidencing the state of the art and the level of ordinary skill in the art(s) to which the subject matter of each Asserted Patent pertain at the time of filing of each of the Asserted Patent.

32. All Documents You contend support any secondary considerations or objective evidence of non-obviousness as described in *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966), with respect to any asserted claim of the Asserted Patents, including, without limitation, any commercial success, long-felt need, failure of others, unexpected results, or industry acclaim.

33. For the Asserted Patents and counterparts thereof, all Documents and Communications concerning the inventorship of the alleged inventions claimed in the Asserted Patents, including without limitation what each inventor allegedly contributed to each Asserted Patent and counterparts thereof.

34. All Documents and Communications concerning each attempt by Plaintiffs or any Licensee—whether successful or unsuccessful—to assign, license, or enforce any of the Asserted Patents and/or any counterparts thereof, including, without limitation, Communications with or claims against third parties concerning the possible assignment, ownership, licensing (exclusive or non-exclusive, express or implied, written or oral), or infringement thereof.

35. All Documents that support, refute, or relate to Your contention that You are entitled to recover any damages from Apple as a result of Apple's purported conduct as described in the Complaint, including without limitation, damages claimed on the basis of lost profits, unjust enrichment, established royalties, reasonable royalties, price erosion, convoyed sales, or any other basis; and method(s) used by You to compute the amount of damages and the figures used in the

14

APPLE INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS TO PLAINTIFFS MASIMO AND CERCACOR
CASE NO. 8:20-CV-00048-JVS (JDEX)

Gibson, Dunn & Crutcher LLP

Exhibit A
Page 19

computation.

36. All Documents that support, refute, or relate to Your contention that You are entitled to recover an ongoing royalty from Apple; and method(s) used by You to compute the amount of an ongoing royalty.

37. All Documents that support, refute, or relate to any contention by You that any of the alleged inventions claimed in the Asserted Patents are the basis for the customer demand for any Accused Products.

38. All Documents, including without limitation, Prior Art, ever known or identified by or to Plaintiffs, the named inventors of any of the Asserted Patents, or any Person substantively involved in the prosecution of any of the Asserted Patents (including any attorney or patent agent having such involvement), as being relevant to or evidence of the validity, invalidity, enforceability, or unenforceability of any of the Asserted Patents, any counterparts thereof, or any other patent listing one or more named inventors on the cover as an inventor, including English language translations thereof.

39. All Documents and Communications relating to validity or invalidity of any of the Asserted Patents or Related Patents and Applications, including without limitation any invalidity contentions served on Plaintiffs and/or summary judgment motions, briefs, and related exhibits and expert reports, filed in any other actions or proceedings involving the Asserted Patents before any tribunal or agency, including, without limitation, in *Masimo et al. v. True Wearables, Inc. et al.*, Civil Action No. 8:18-CV-02001 (C.D. Cal.), commenced November 8, 2018.

40. All documents produced by Masimo and Cercacor in *Masimo et al. v. True Wearables, Inc. et al.*, Civil Action No. 8:18-CV-02001 (C.D. Cal.), commenced November 8, 2018.

41. All Documents concerning the subject matter disclosed in the Asserted Patents and which was ever known or identified by or to Plaintiffs, the

15

APPLE INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS TO PLAINTIFFS MASIMO AND CERCACOR
CASE NO. 8:20-CV-00048-JVS (JDEX)

Gibson, Dunn & Crutcher LLP

Exhibit A
Page 20

named inventors of any of the Asserted Patents, any Person substantively involved in the prosecution of any of the Asserted Patents (including any attorney or patent agent having such involvement), or any third party, whether or not the Documents technically qualify as Prior Art to any of the Asserted Patents.

42. Documents sufficient to identify each individual associated with the filing or prosecution of the patent application leading to each of the Asserted Patents and/or any counterparts thereof.

43. All published or unpublished articles, papers, manuscripts, technical reports, conference papers, presentations, grant requests, or other publications authored, co-authored, written, or co-written by any of the named inventors, or by any other employee, agent, or representative of Plaintiffs, relating to the Asserted Technologies, Asserted Patents, patent applications, license agreements, or this Action that qualify as Prior Art.

44. All Documents related to conferences, trade shows, and/or meetings attended by Plaintiffs or any of the named inventors of the Asserted Patents which relate to the Asserted Technologies and predate the filing dates of the Asserted Patents.

45. All prosecution file histories—both published and unpublished—for the Asserted Patents, counterparts thereof, foreign equivalents, and Related Patents and Applications, and including English translations thereof, together with all Communications to or from any Plaintiff, the named inventors of the Asserted Patents, and any Person substantively involved in the prosecution of any of the Asserted Patents, counterparts thereof, and/or Related Patents and Applications (including any attorney or patent agent having such involvement).

46. All Documents and Communications concerning or used in the filing and prosecution of the Asserted Patents, any counterparts thereof, foreign equivalents, and/or Related Patents and Applications, including, without limitation,

16

APPLE INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS TO PLAINTIFFS MASIMO AND CERCACOR
CASE NO. 8:20-CV-00048-JVS (JDEX)

Gibson, Dunn & Crutcher LLP

Exhibit A
Page 21

Documents and Communications concerning any decision to file such patent applications, and all notes (including interview notes), presentations, draft and final versions of such applications, draft and final versions of responses to office actions, Communications with or among the named inventors, concerning the filing and prosecution of the Asserted Patents and/or counterparts thereof, all Documents and Communications relating to the decision of any of the named inventors, or any other employee, agent, or representative of Plaintiffs, to submit any prior art during the prosecution of the Asserted Patents, counterparts thereof, foreign equivalents, and Related Patents and Applications, and all Documents and Communications submitted to or received from any patent office.

47. All Documents regarding any current or prior ownership, sale, and/or assignment of each of the Asserted Patents, including Documents sufficient to show the identity of each Person involved in such transfer of ownership, sale, and/or assignment and to describe each Person's involvement, and all agreements reflecting or otherwise relating to such transfer, sale, and/or assignment.

48. All Documents relating to grants, or other transfers of any rights, obligations or financial interest, including the right to grant licenses to others, in or to the Asserted Patents (collectively, "transactions"), including Documents sufficient to show the identity of each Person involved in such transactions and to describe each Person's involvement, and all agreements reflecting or otherwise relating to such transactions.

49. All Documents relating to any financial interest in or to the Asserted Patents by any Person, including Documents sufficient to identify all persons with such a financial interest, and the nature and amount of such financial interest.

50. All Documents relating to any financial interest in or to this litigation by any Person, including Documents sufficient to identify all persons with such a financial interest, and the nature and amount of such financial interest.

17

APPLE INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS TO PLAINTIFFS MASIMO AND CERCACOR
CASE NO. 8:20-CV-00048-JVS (JDEX)

Gibson, Dunn & Crutcher LLP

Exhibit A
Page 22

51. All Documents and Communications relating to any agreements between Masimo and Cercacor concerning or relating to any interest in the Asserted Patents and/or Related Patents and Applications.

52. All Documents and Communications relating to any agreements between any of the named inventors of the Asserted Patents and Masimo, Cercacor, or Plaintiffs concerning or relating to assignment of any interest in any patent or patent application naming such individuals as inventors.

53. To the extent not already requested or required, all Documents, Communications, and Things produced or provided by any non-party in connection with this Action, including Documents, Communications, and Things produced in response to subpoenas served by Plaintiffs.

54. All Documents and Communications that support, refute, or relate to Your allegations in the Complaint that the Alleged Inventors jointly invented the subject matter of the Apple Patents, including, without limitation, for each of the Apple Patents, Documents and Communications that (i) identify in detail the subject matter of such Apple Patent each of the Alleged Inventors allegedly invented, (ii) identify the circumstances under which each of the Alleged Inventor and/or others conceived of such subject matter and/or reduced such subject matter to practice, and (iii) describe each such Person's contribution to the conception and/or reduction to practice of the subject matter.

55. All Documents and Communications that support, refute, or relate to Your allegations in paragraphs 227, 234, 241, 248, 255, 262, 270, 278, 286, and 294 of the Complaint that the subject matter of Apple's Patents is based on discussions Marcelo Lamego had with the Alleged Inventors, including, without limitation, for each of the Apple Patents and each of the Alleged Inventors, Documents and Communications that (i) identify the dates such alleged discussions took place, (ii) identify all participants to such discussions and/or others present for such

18

APPLE INC.'S FIRST SET OF REQUESTS FOR
PRODUCTION OF DOCUMENTS AND THINGS TO PLAINTIFFS MASIMO AND CERCACOR
CASE NO. 8:20-CV-00048-JVS (JDEX)

Gibson, Dunn & Crutcher LLP

Exhibit A
Page 23

discussions, (iii) describe the circumstances under which such discussions took place, (iv) describe the subject matter of such discussions as it relates to each of the Apple Patents, and (v) describe in detail any other factual and legal bases for Your contention that the Alleged Inventors are entitled to be listed as inventors on the Apple Patents.

56. All Documents and Communications that support, refute, or relate to Your allegations in the Complaint that Marcelo Lamego developed the subject matter of the Apple Patents and Apple Applications while working for Plaintiffs and/or such subject matter was otherwise developed at Masimo, Cercacor, or Plaintiffs, including, without limitation, Documents and Communications that (i) identify in detail such subject matter of each Apple Patent and Apple Application, (ii) describe the circumstances under which Marcelo Lamego and/or others conceived of such subject matter and/or reduced to practice such subject matter, (iii) identify any other employee of Masimo, Cercacor, or Plaintiffs that contributed to the conception and/or reduction to practice of such subject matter, (iv) describe each such Person's contribution to the conception and/or reduction to practice of the subject matter, (v) identify which entity—Masimo, Cercacor, or Plaintiffs—You contend is entitled to joint and/or exclusive ownership of such Apple Patent or Apple Application, and (vi) describe in detail any other factual and legal bases for Your contention that You are entitled to joint and/or exclusive ownership of the Apple Patents and/or Apple Applications.

57. All Documents and Communications relating to Your search of patent applications or patents filed by or on behalf of Apple or any current or former employee(s) of Apple, or on which Cornelius Rath, Ehsan Masoumi, Michael O'Reilly, Ottavia Golfetto, Yinghui Lu, Joseph Jagenow, Vincent Wayne, Will Regan, lnje Lee, Shruti Koneru, Swapnil Harsule, John Aguilar, Boris Oreshkin, Pekka Talke, Haritha Haridas, Rich Young, Johannes Bruinsma, Felipe Tonello were

19

APPLE INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS TO PLAINTIFFS MASIMO AND CERCACOR
CASE NO. 8:20-CV-00048-JVS (JDEX)

Gibson, Dunn & Crutcher LLP

Exhibit A
Page 24

named as inventors, including, without limitation, all Documents and Communications relating to any such search that was undertaken by You or on Your behalf.

58. All Documents and Communications relating to any confidentiality obligations owed to You by Your employees, Your customers, and/or Your suppliers, including, without limitation, the identity of such employee, customer, and/or supplier, and the effective start and end dates for the obligation(s).

59. All Documents and Communications relating to Your purported efforts to enforce the confidentiality obligations referenced in Request No. 58.

60. All Documents and Communications relating to any and all purported confidentiality obligations of Apple to You, including but not limited to the confidentiality agreement between Apple and You referenced in paragraph 19 of the Complaint and all Communications relating thereto.

61. All Documents and Communications relating to requests by You to all of Your former employees who You believe were subsequently employed by Apple concerning  the return or destruction of any Documents You claim to reflect Your confidential or proprietary information, including but not limited to, all such requests made to Marcelo Lamego and Michael O'Reilly.

62. All Documents and Communications relating to Your personnel files, including but not limited to, all Documents and Communications relating to any exit interviews, for all of Your former employees who You believe were subsequently employed by Apple, including but not limited to, Marcelo Lamego and Michael O'Reilly.

63. All Communications between You and any current or former employee(s) of Apple relating to any of Your former employees who You believe were subsequently employed by Apple, including but not limited to Marcelo Lamego and Michael O'Reilly.

20

APPLE INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS TO PLAINTIFFS MASIMO AND CERCACOR
CASE NO. 8:20-CV-00048-JVS (JDEX)

Gibson, Dunn & Crutcher LLP

Exhibit A
Page 25

64. All Documents and Communications relating to the potential collaboration between Apple and You referenced in paragraph 19 of the Complaint.

65. All Documents and Communications sufficient to show the alleged Trade Secrets referenced in paragraphs 210–24 of the Complaint.

66. All Documents sufficient to show Your efforts to maintain the secrecy of the alleged Trade Secrets reference in paragraphs 211–24 of the Complaint, including without limitation (i) Documents sufficient to identify all Persons who have accessed the alleged Trade Secrets; and (ii) Documents sufficient to show the confidentiality obligations of each such Person to You, if such obligations differ from those identified and described in response to Request No. 58.

67. All Documents and Communications that support, refute, or relate to the allegations in paragraphs 210–24 of the Complaint that Apple has misappropriated Trade Secrets belonging to You.

68. All Documents and Communications relating to the conception, reduction to practice, diligence from conception to reduction to practice, development, and/or design of any information that You claim to be a Trade Secret misappropriated by Apple, including, without limitation, invention disclosure forms, laboratory notebooks, engineering notebooks, journals, laboratory reports, test results, test data, internal memoranda, correspondence, research reports, development proposals, Documents describing manufacturing techniques and specifications, product requirement Documents, product proposals, functional specifications, product literature, source code or other software, engineering drawings, Documents describing the system architecture, flow charts, user manuals, project approvals, research agreements, grant applications, business plans, articles, press releases, and sales and marketing materials.

69. All Documents sufficient to identify each Person involved in the design, development, and/or use of any information that You claim to be a Trade

Secret misappropriated by Apple, including Documents sufficient to show the nature and level of involvement of each such Person.

70. All Documents and Communications sufficient to show the value of each of Your alleged Trade Secrets that You allege was misappropriated by Apple, including any licensing agreements for the Trade Secrets that You possess with third parties.

71. All Documents and Communications sufficient to show the ownership of each of the alleged Trade Secrets that You claim was misappropriated by Apple.

72. All Documents and Communications relating to any meetings, telephone calls, videoconferences, or any other in-person or real-time interactions between any current or former employee(s) of Apple and any of Your current or former employee(s), including any notes taken during such interactions and any materials exhibited or exchanged during such interactions.

73. All Documents and Communications that support, refute, or relate to Your allegations in paragraphs 20–22 and 25 of the Complaint.

74. All Documents and Communications relating to the trade secrets which You alleged were misappropriated by the defendants in *Masimo Corp. v. Sotera Wireless Inc., et al.*, No. 30-2013-00649172-CU-IP-CJC (Orange County Superior Court, May 10, 2013).

75. All Documents and Communications concerning any litigation or prior legal action in which You accused another Person or Persons of misappropriating trade secrets, including, but not limited to, all transcripts of depositions (and exhibits thereto) in which You or persons acting on Your behalf were examined in connection with the claimed misappropriation.

76. All Documents and Communications concerning any contemplated, threatened, or actual accusation—made by You or Persons acting on Your behalf via

22

APPLE INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS TO PLAINTIFFS MASIMO AND CERCACOR
CASE NO. 8:20-CV-00048-JVS (JDEX)

Gibson, Dunn & Crutcher LLP

Exhibit A
Page 27

informal means (i.e., not via litigation or legal action)—of trade secret misappropriation, including, but not limited to, cease and desist letters, demands, notices, or other correspondence.

77. All Documents and Communications relating to any agreements with Apple regarding any product or technology that You contend involves or incorporates Your alleged Trade Secrets, including copies of all such agreements.

78. To the extent not already requested or required, all Documents, Communications, and Things that You may use to support any of Your allegations or contentions in Your Complaint or otherwise made in this Action, including, but not limited to, any Documents, Communications, and/or Things that You intend to introduce at trial.

Dated: April 3, 2020

Respectfully submitted,

JOSHUA H. LERNER
H. MARK LYON
BRIAN M. BUROKER
ILISSA SAMPLIN
ANGELIQUE KAOUNIS
GIBSON, DUNN & CRUTCHER LLP

By: */s/Joshua H. Lerner*
Joshua H. Lerner

*Attorneys for Defendant Apple Inc.*

23

APPLE INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS TO PLAINTIFFS MASIMO AND CERCACOR
CASE NO. 8:20-CV-00048-JVS (JDEX)

Gibson, Dunn & Crutcher LLP

Exhibit A
Page 28

**CERTIFICATE OF SERVICE**

I, Ilissa Samplin, hereby certify, under penalty of perjury pursuant to 28 U.S.C. § 1746, that on this 3rd day of April, 2020, I served a true and correct copy of the foregoing **DEFENDANT APPLE INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS TO PLAINTIFFS MASIMO CORPORATION AND CERCACOR LABORATORIES, INC.** by electronic mail on the following counsel of record:

Joseph R. Re (Bar No. 134479)
joseph.re@knobbe.com
Stephen C. Jensen (Bar No. 149894)
steve.jensen@knobbe.com
Perry D. Oldham (Bar No. 216016)
perry.oldham@knobbe.com
Stephen W. Larson (Bar No. 240844)
stephen.larson@knobbe.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, Fourteenth Floor
Irvine, CA 92614
Telephone: (949)-760-0404
Facsimile: (949)-760-9502

*Attorneys for Plaintiffs Masimo Corporation and Cercacor Laboratories, Inc.*

By: */s/ Ilissa Samplin*
Ilissa Samplin

24

Gibson, Dunn & Crutcher LLP

APPLE INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS TO PLAINTIFFS MASIMO AND CERCACOR
CASE NO. 8:20-CV-00048-JVS (JDEX)

Exhibit A
Page 29

# Exhibit B

Knobbe Martens

KNOBBE, MARTENS, OLSON & BEAR, LLP

1925 Century Park East, Suite 600, Los Angeles, CA 90067
**T** (310) 551-3450

Mark Kachner
Mark.Kachner@knobbe.com

May 22, 2020

**VIA EMAIL**

Ilissa Samplin
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue,
Los Angeles, CA 90071-3197

Re: Masimo Corp. and Cercacor Laboratories, Inc. v. Apple Inc.

Dear Counsel:

This letter is to follow-up on the parties' meet and confer calls on May 19 and May 20, 2020, where we discussed both parties' letters sent May 11, 2020 regarding Apple's Objections and Responses to Plaintiffs' First Set of Requests for Production (1-25) and Plaintiffs' Objections and Responses to Apple's First Set of Requests for Production (1-78). During this meet and confer there were certain issues Apple agreed to revisit, and certain issues Plaintiffs agreed to revisit. This letter confirms our discussions and is in follow-up on several of the issues Plaintiffs agreed to revisit.

## I. APPLE'S MAY 11 LETTER

**Discovery Related to Trade Secrets**: Apple explained that it understood the Court's Order (Dkt. 37) stayed only discovery requested by Plaintiffs, but did not stay discovery requested by Apple. Plaintiffs explained that the Court's Order (Dkt. No. 37) "stay[ed] the trade secret discovery only pending compliance with 2019.210" and this order does not distinguish the stay based on which party serves discovery. Plaintiffs further explained that despite the stay, Plaintiffs were not withholding discovery, even for requests related solely to trade secrets. However, Plaintiffs explained that for certain requests it is unable to provide responsive documents at this time, such as Apple's request to produce documents sufficient to show Plaintiffs' trade secrets, until after Plaintiffs serve the 2019.210 statement and after entry of a protective order. Plaintiffs will provide their 2019.210 statement and confidential documents after entry of a protective order.

**Apple's RFP No. 4**: Apple clarified that RFP No. 4 is directed to testing, analysis, and/or evaluation that was conducted for the purpose of determining whether any Apple or Masimo product is covered by the asserted claims. Plaintiffs agreed to produce non-privileged documents responsive to the clarified scope of the request.

**Apple's RFP Nos. 5-6**: Apple explained that its use of the phrase "relate to" includes documents that might not directly support or refute a contention when standing alone but that, when considered in connection with other documents, might support or refute a contention. With this understanding, and subject to Plaintiffs' other objections, Plaintiffs agreed to produce responsive, non-privileged documents.

**Apple's RFP No. 11**: Subject to Plaintiffs' objections, Plaintiffs will produce responsive, non-privileged documents.

**Apple's RFP No. 15**: Apple requested that Plaintiffs confirm that the patents asserted thus far in this case have only been asserted against Apple and no third-party. We have confirmed this to be true. Plaintiffs explained that based on their objections, they would not produce entire legal files (as Apple requested) for cases that relate to "Related Patents and Applications" none of which are asserted in this case. Apple explained it would discuss with its team and consider narrowing the request.

**Apple's RFP No. 16**: Apple stated that it is concerned that if Plaintiffs agree to produce only documents "sufficient to show" patent marking, Plaintiffs could withhold documents showing failure to mark. Plaintiffs explained that "all documents" concerning patent marking is overbroad and not proportional to the case, but that Plaintiffs would produce "all documents" that are responsive to the request subject to Plaintiffs' objections and based on a reasonable search.

**Apple's RFP No. 17**: Plaintiffs explained that Apple's request for documents showing constructive or actual notice on a claim-by-claim basis is unnecessary and irrelevant. Plaintiffs asked Apple to explain how any further documents, beyond those sufficient to show actual or constructive knowledge of the asserted patents, would be relevant to any issue in the case. Apple agreed to consider this further and report back to Plaintiffs.

**Apple's RFP No. 18**: Apple asked if Plaintiffs would agree to amend their response and agree to produce responsive, non-privileged documents, sufficient to identify Licensees that manufacture or sell products that utilize "the Asserted Patents or Asserted Technology," located after a reasonable search that are within Plaintiffs' possession, custody, or control. Plaintiffs agree with this proposed narrowing.

**Apple's RFP No. 20**: Apple explained that the request concerns patent marking of the asserted patents, and not unasserted patents. Apple further explained this request seeks documents related to patent marking but not sales data, and that with this request, Apple is not seeking data pulls from Plaintiffs' sales records. With this clarification, and subject to Plaintiffs' objections, Plaintiffs will produce responsive, non-privileged documents located after a reasonable search that are within Plaintiffs' possession, custody, or control.

**Apple's RFP Nos. 24-25**: Plaintiffs explained that the requests are overbroad in part because Plaintiffs' businesses include many departments and many employees that are not relevant to any issue in the case. Plaintiffs further explained that organizational charts could be updated frequently and would include a large amount of information that is not relevant to this case. Plaintiffs proposed narrowing the request to focus on relevant departments or employees. Apple stated that it is interested in information about the departments Marcelo Lamego worked in. Plaintiffs are investigating how they can reasonably search for responsive documents based on this clarification, and Apple agreed to consider adding other limitations to the scope of these requests.

**Apple's RFP No. 29**: Plaintiffs already agreed to produce responsive settlement agreements. During our meet and confer, we discussed that other documents "concerning" a settlement would almost certainly be privileged. Following up on our discussion and subject to Plaintiffs' objections, Plaintiffs agree to

produce responsive, non-privileged documents located after a reasonable search that are within Plaintiffs' possession, custody, or control.

**Apple's RFP No. 33**: Plaintiffs maintained their objection that the request is impermissibly overbroad to the extent it concerns "counterparts" of the asserted patents. Apple stated that it would revisit and considering narrowing the request to particular counterparts of the asserted patents that Apple has reason to believe are relevant to inventorship of the asserted patents.

**Apple's RFP No. 34**: As with RFP 33, Plaintiffs maintained their objection that the request is impermissibly overbroad to the extent it concerns "counterparts" of the asserted patents. Apple stated that it would revisit and considering narrowing the request to particular counterparts of the asserted patents that Apple has reason to believe are relevant to inventorship of the asserted patents. Plaintiffs further explained that their limitation to "non-litigation related communications" excludes communications made in the context of litigation, but includes communications like cease and desist letters. Apple agreed to consider this limitation.

**Apple's RFP No. 38**: Apple confirmed this request does not ask Plaintiffs to gather publicly available documents. Apple explained this request is directed at, for example, prior art that was attached to a response from a third party to a cease and desist letter sent by Plaintiffs. Plaintiffs maintained that this request is overbroad and not proportional to the case, and suggested that Apple consider narrowing the request to be limited to prior art related to the asserted patents. Apple agreed to revisit the scope of this request.

**Apple's RFP No. 39-40**: Plaintiffs explained that there is no overlap in the asserted patents in this case and the patents asserted in the *True Wearables* case. Apple agreed to revisit the scope of this request.

**Apple's RFP No. 41**: Plaintiffs maintained that this request is overbroad and that Plaintiffs do not have any practical way to search for the requested documents. The parties tentatively agreed any relevant documents would be responsive to other requests for which Plaintiffs had agreed to produce documents. Apple agreed to reconsider the scope of this request.

**Apple's RFP No. 42**: Plaintiffs maintained the objection that the request is impermissibly overbroad to the extent it concerns "counterparts" of the asserted patents. Apple stated that it would revisit and considering narrowing the request to particular counterparts of the asserted patents that Apple has reason to believe are relevant. For the asserted patents, Plaintiffs explained that lawyers who worked on prosecution of the patents could be identified in the file history. As a follow-up regarding non-lawyers, Plaintiffs agree that subject to its objections Plaintiffs will produce responsive, non-privileged documents located after a reasonable search that are within their possession, custody, or control.

**Apple's RFP No. 43**: Apple agreed to narrow the request to exclude unpublished materials, which are not prior art. Plaintiffs asked for clarification on the intended scope of the request as it pertains to "patent applications" or "license agreements." Apple agreed to revisit the scope of this request.

**Apple's RFP No. 44**: Plaintiffs maintained that the request was unreasonably overbroad and not proportional to the case. Plaintiffs stated that the only practical way to search for responsive documents

would be with ESI search terms and custodians.  Apple agreed to consider whether it would agree that electronic searching would satisfy this request.

**Apple's RFP Nos. 45-46**: Apple is reevaluating the scope of these requests, and considering limiting them to the asserted patents.

**Apple's RFP Nos. 47, 48, and 52**: After discussing Apple's intended scope of these requests, Plaintiffs proposed producing assignment records and documents showing any direct financial interest or ownership interest in the asserted patents.  Apple is considering this limitation on scope.

**Apple's RFP Nos. 49-50**: The parties discussed Apple's intended scope of these requests, and Apple is considering limiting the scope to documents related to whether Plaintiffs obtained litigation financing for this case.

**Apple's RFP Nos. 58-59**: Plaintiffs maintained that these requests are overbroad and not proportional to the needs of the case to the extent that they go beyond the asserted technologies and asserted patents and concern documents that are not relevant to this case.  Apple refused to narrow the scope of these requests. Regarding timing, Apple stated that it would consider whether it could hold off on demanding documents in response to these RFPs until receiving Plaintiffs' 2019.210 disclosure.

**Apple's RFP No. 62**: Plaintiffs explained that many documents in personnel files are not relevant to this case.  Apple agreed to reconsider the scope of this request.

**Apple's RFP Nos. 63 and 72**: Plaintiffs explained that they may not able to determine who is a former employee of Apple.  Apple agreed to consider limiting the requests to current employees of Apple. Plaintiffs also maintained that these requests were overbroad and not proportional to the needs of the case, since they seek all communications between certain individuals, even communications unrelated to any issue in the case.  Plaintiffs suggested limiting the requests to communications relevant to issues in this case.  Apple agreed to reconsider the scope of these requests.

**Apple's RFP No. 65**: Plaintiffs explained that their 2019.210 statement would be sufficient to show the alleged trade secrets.

**Apple's RFP No. 67**: Subject to Plaintiffs' objections, Plaintiffs agreed to produce documents that support, refute, or relate to (as that term was clarified by Apple), the trade secrets in Plaintiffs' 2019.210 statement.

**Apple's RFP No. 68**: Plaintiffs maintained their objections and Apple agreed to reconsider whether the request can be narrowed.

**Apple's RFP No. 69**: Plaintiffs offered to produce documents sufficient to identify the individuals involved in design and development of the trade secrets (as identified in Plaintiffs' 2019.210 statement) but that the request as written is far broader and is unreasonable in scope.  Apple agreed to reconsider whether it will narrow the scope of this request.

**Apple's RFP No. 70**: Apple confirmed it is satisfied with Plaintiffs' response.

**<u>Apple's RFP No. 74</u>**: Plaintiffs are not currently aware of any overlap in the trade secrets at issue in the *Sotera* case and this case. If Plaintiffs later identify any overlap, Plaintiffs will reevaluate their response to this request.

**<u>Apple's RFP Nos. 75-76</u>**: Plaintiffs maintained that these requests are overbroad and not proportional to the needs of the case and seek information not at issue in this case. Apple agreed to reconsider the scope of these requests.

## II. PLAINTIFFS' MAY 11 LETTER

**<u>Objections to Definition of "Apple iOS Products"</u>**: Plaintiffs took issue with Apple's objection to the term "Apple iOS Products." Apple requested additional information regarding Plaintiffs' position on the definition. This defined term is included in the definition of "Accused Products" and was intentionally included to ensure that Apple's responses provide responsive information regarding the Apple Watch Series 4 or later devices as well as combinations of the Apple Watch Series 4 or later devices ***and*** an iOS product. Such information is relevant to at least some claims of U.S. Patent No. 10,588,554. Please confirm Apple is not limiting or redefining the term "Apple iOS Products" and that Apple is not withholding responsive information based on this objection.

**<u>Objections to Producing Documents Before ESI Agreement Is Entered (RFP Nos. 1-8, and 10-25)</u>**: Plaintiffs stated that the ESI protocol has been largely agreed upon, including provisions regarding format and metadata, therefore Apple's objections regarding the ESI agreement should be moot. Apple disagreed regarding the status of the ESI protocol and maintained its objection on the timing of its document production.

**<u>Objections to Producing Documents Beyond Those Located by Custodian and Keyword Searching (RFP Nos. 1-4, 7, 8, and 10-25)</u>**: Plaintiffs again asked for Apple's agreement with the general proposition that using search terms alone to identify responsive documents would not satisfy Apple's discovery obligations. Apple would not confirm. Plaintiffs asked Apple to specifically identify which RFPs Apple believes could be responded to based only on searching for ESI documents by custodian and search terms. Apple was unable to provide such an identification during our call. Please inform us when Apple can provide such an identification.

**<u>Production of Non-Public Documents (RFP Nos. 5-8 and 10-25)</u>**: Plaintiffs asked Apple to confirm that once a Protective Order and ESI Stipulation are entered, Apple will produce non-public documents subject to Apple's other objections. Apple stated that to the extent non-public documents relate only to patent issues, Apple will produce them once a Protective Order and ESI Stipulation have been entered. Apple maintained it will not produce non-public documents that relate to trade secrets in any way until it receives an "adequate" 2019.210 statement from Plaintiffs. Apple agreed that issue was presented in Apple's Motion for Protective Oder.

**<u>Objections to Discovery Based on Section 2019.210 (General Objection 4 and RFP Nos. 1 and 3-25)</u>**: Plaintiffs asked Apple to confirm that Apple would produce responsive documents if Apple's Motion for a Protective Order is denied without requiring Plaintiffs to file a separate motion to compel. Apple could not confirm and stated that it depends on the scope and content of the Court's ruling.

**Apple's Objections Regarding Temporal Scope (RFP Nos. 1, 4, and 6-25)**: Plaintiffs explained that each request to which Apple raised a temporal scope objection had an inherent time limit based on the context of the request.  Apple confirmed it is not standing on these objections and Apple will not limit its production in response to these requests to an artificial temporal limitation.  Apple confirmed that this statement applies to all of its objections regarding temporal scope (RFP Nos. 1, 4, and 6-26).

**Apple's Objections Regarding Undefined Terms (RFP Nos. 1-6, 7-9, 11-13, and 15-25)**: Apple stated that it is not refusing to produce documents on the basis that any terms or phrases are "undefined." Apple confirmed that it will use the plain and ordinary meaning of the terms in Plaintiffs' RFPs.  Apple confirmed that it is aware of the plain and ordinary meaning for all the terms it had objected to as "undefined" and that it is not aware of two or more potential reasonable definitions for any of those terms.  Apple confirmed that this applies to all of its objections regarding all "undefined" terms and/or phrases in the objected to RFPs (RFP Nos. 1-6, 7-9, 11-13, and 15-25).

**Apple's Objections to Providing Documents Related to Non-Asserted Claims of the Asserted Patents (General Objection 6-7 and RFP Nos. 3-4, 12-25)**: The parties discussed Apple's objection to requests that were not limited to the asserted claims of the asserted patents.  Apple stated that it is not aware of any documents that are claim-specific at this time, and on that basis Apple is not presently withholding documents based on this objection.  However, unless specifically agreed to otherwise as described below, Apple stated that it intends to withhold any documents that are relevant specifically to non-asserted claims.  The parties did not reach agreement on this dispute.

**Plaintiffs' RFP No. 3**: Apple agreed to produce all responsive documents, rather than limiting its production to documents "sufficient to show."  For this RFP specifically, Apple agreed to withdraw its limitation to produce responsive documents related to asserted claims only, and Apple agreed to produce documents responsive to the full scope of this request regardless of whether the documents relate to asserted or non-asserted claims of the asserted patents.

**Plaintiffs' RFP No. 4**: Apple agreed to reconsider its response to this request and specifically whether it would withdraw its limitation to produce responsive documents related only to the asserted claims of the asserted patents.

**Plaintiffs' RFP No. 9**: Apple maintained its objection to "internet postings."  Plaintiffs clarified that it is seeking only documents in Apple's possession, custody or control, such as internet postings Apple saved or archived from the internet.  Plaintiffs explained that it is not asking Apple to gather documents it does not already possess.  Apple agreed to consider revising its response to this RFP.

**Plaintiffs' RFP No. 10**: Apple stated its belief that any items responsive to this request would be produced in response to RFP No. 6.  Please confirm Apple intends to produce "[a]ll videos or DVDs demonstrating or showing the operating of the Accused Products" in response to either this request or RFP No. 6.

Sincerely,

Mark D. Kachner

32641686

# Exhibit C

Exhibit C
Page 38

GIBSON DUNN

Gibson, Dunn & Crutcher LLP

333 South Grand Avenue
Los Angeles, CA 90071-3197
Tel 213.229.7000
www.gibsondunn.com

Ilissa Samplin
Direct: +1 213.229.7354
Fax: +1 213.229.6354
ISamplin@gibsondunn.com

May 26, 2020

VIA E-MAIL

Mark Kachner
Knobbe, Martens, Olson & Bear, LLP
1925 Century Park East, Suite 600
Los Angeles, CA 90067
Mark.Kachner@knobbe.com

Re: *Masimo v. Apple* – Apple's Response to Plaintiffs' May 22, 2020 Letter and Follow Up re the Parties' Meet and Confers

Dear Mark**:**

I write in response to your May 22, 2020 letter and as a follow up to the parties' meet and confer on May 19 and 20, 2020.

As an initial matter, we note that your May 11, 2020 letter requesting a meet and confer raised non-specific objections to Apple's Responses to Plaintiffs' First Set of RFPs. Nonetheless, during the parties' meet and confer, you asked us to walk through every one of Apple's responses to Plaintiffs' RFPs, regardless of whether the response was raised in your letter (even admitting at various points that your team had in fact failed to include the issue raised by you during the meet and confer in your May 11 letter). This was not an efficient or good faith use of the meet and confer process; we expect that you will identify specific issues for discussion prior to any future meet and confers so that we can prepare appropriately for the discussion. Relatedly, and as we already discussed, your May 15, 2020 letter responding to Apple's May 11, 2020 letter did nothing to advance the parties' preparation for the meet and confer—which was the goal of the May 15 exchange of letter responses. Our May 11 letter was 5 pages in length; you responded to that letter in *less than a page*, giving Apple absolutely no insight into the basis for Plaintiffs' *many* general offers to "meet and confer" and, therefore, no ability to meaningfully prepare for the discussion. We expect that you will approach the meet and confer process—including the parties' agreed-upon exchanges of letter responses preceding telephonic meet and confers—in good faith in the future.

## I. PLAINTIFFS' RESPONSES AND OBJECTIONS TO APPLE'S DISCOVERY

**Discovery Related to Trade Secrets:** As we noted during the meet and confer, the Court's Order (Dkt. No. 37) stayed *Plaintiffs' commencement of trade secret-related discovery from*

Beijing • Brussels • Century City • Dallas • Denver • Dubai • Frankfurt • Hong Kong • Houston • London • Los Angeles • Munich
New York • Orange County • Palo Alto • Paris • San Francisco • São Paulo • Singapore • Washington, D.C.

Exhibit C
Page 39

*Apple* until Plaintiffs provide a satisfactory Section 2019.210 disclosure. This includes discovery that overlaps with Plaintiffs' patent allegations. Under Section 2019.210 and Judge Selna's April 17, 2020 Order (Dkt. No. 37), Apple is not required to produce its confidential information relating to Plaintiffs' allegations of trade secret misappropriation before it receives from Plaintiffs a proper identification of the trade secrets that they contend have been misappropriated. Plaintiffs' refusal to produce such an identification until after entry of a protective order is unacceptable because Apple is willing to limit access to the identification to Apple's outside counsel. Plaintiffs' further refusal to even identify a date by which they will produce a Section 2019.210 disclosure is perplexing.

That being said, Section 2019.210—the statute governing the discovery of trade secret-related information on which Judge Selna's April 17 Order was based—is clear that it does not likewise limit *Apple's commencement of trade secret-related discovery from Plaintiffs*. And that makes perfect sense. Plaintiffs allege that Apple misappropriated their trade secrets. Plaintiffs therefore (presumably) know what those trade secrets are—whereas Apple cannot possibly know what those trade secrets are absent a Section 2019.210 disclosure. Therefore, Plaintiffs are in a position to respond to Apple's trade secret-related discovery requests with documents and information that pertain to the alleged trade secrets and not with documents and information that relate, for example, to Plaintiffs' other trade secrets that are not at issue in this case. Without a Section 2019.210 disclosure, Apple is not in the same position. Plaintiffs must produce discovery responsive to Apple's RFPs pertaining to Plaintiffs' trade secret allegations. Judge Selna's April 17 Order does not relieve Plaintiffs of that obligation.

This is not an isolated issue. Plaintiffs are relying on the same objection to resist producing highly relevant information in response to Apple's first set of interrogatories. For some reason, Plaintiffs are intent on delaying discovery pertaining to their trade secret claim and are relying on a misguided interpretation of Judge Selna's April 17 Order to do so. There simply is no support for Plaintiffs' position—set forth in their responses and objections to Apple's RFPs and interrogatories, and reiterated during our May 19 and 20 meet-and-confer calls—that Apple's discovery requests concerning Plaintiffs' alleged trade secrets are "premature" given the stay put in place by Judge Selna. That stay does not apply to Apple's discovery requests propounded on Plaintiffs.

While it seems clear that the parties are at an impasse on this issue, please let us know by Friday, May 29 whether Plaintiffs will withdraw this objection and amend their responses to Apple's trade secret-related discovery requests accordingly. If not, Apple will have no choice but to seek the Court's guidance on this issue.

**Apple's RFP No. 15:** Thank you for confirmation that the Asserted Patents have been asserted only against Apple in this litigation and not against any third party. We understand this to mean that the Asserted Patents have not been asserted in any litigation, agency proceeding, mediation, arbitration, or other legal proceeding. If this is incorrect, please let us know immediately.

Apple is not willing to limit this Request to documents produced, filed, or served in any litigation or proceeding involving the Asserted Patents, but is willing to limit the Request to non-publicly available documents produced, filed, or served in any litigation or proceeding involving the Asserted Patents or any of their family members. Indeed, if a family member was asserted in another proceeding, the documents from that proceeding are highly likely to be relevant to this litigation. Please let us know if this proposed modification is acceptable to Plaintiffs.

**Apple's RFP No. 17:** Apple is willing to limit the scope of this Request to documents sufficient to show actual or constructive notice of any alleged infringement of the Asserted Patents. Please let us know if this proposed modification is acceptable to Plaintiffs.

**Apple's RFP Nos. 24-25:** We appreciate Plaintiffs' continued investigation into these Requests, and look forward to hearing from you by Friday, May 29 with the results of that investigation. As noted during the meet and confer, Apple is unable to narrow the scope of these Requests without additional information from Plaintiffs, such as identification of the departments within Masimo and Cercacor. Without such additional information, Apple maintains that Plaintiffs should produce documents responsive to the Requests as written.

**Apple's RFP No. 33:** Apple proposes that this Request be limited to "all documents and communications concerning the inventorship of the alleged inventions claimed in the Asserted Patents, including without limitation what each inventors allegedly contributed to each Asserted Patent." Please let us know if this proposed modification is acceptable to Plaintiffs.

**Apple's RFP No. 34:** Apple proposes that this Request be limited to "All Communications with third parties concerning each attempt by Plaintiffs or any Licensee—whether successful or unsuccessful—to assign, license, or enforce any of the Asserted Patents and/or any counterparts thereof, including, without limitation, claims against third parties concerning the possible assignment, ownership, licensing (exclusive or non-exclusive, express or implied, written or oral), or infringement thereof." Apple agrees with Plaintiffs' proposal that this Request not include communications made in the context of litigation, but does include communications made outside of litigation, such as cease and desist letters. Please let us know if this proposed modification is acceptable to Plaintiffs.

**Apple's RFP No. 38:** Apple proposes that this Request be limited to "All Documents, including without limitation, Prior Art, ever known or identified by or to Plaintiffs, the named inventors of any of the Asserted Patents, or any Person substantively involved in the prosecution of any of the Asserted Patents (including any attorney or patent agent having such involvement), as being relevant to or evidence of the validity, invalidity, enforceability, or unenforceability of any of the Asserted Patents and/or any counterparts thereof." Please let us know if this proposed modification is acceptable to Plaintiffs.

**Apple's RFP No. 39-40:** Apple stands by RFP No. 39 as written: "All Documents and Communications relating to validity or invalidity of any of the Asserted Patents or Related Patents and Applications, including without limitation any invalidity contentions served on Plaintiffs and/or summary judgment motions, briefs, and related exhibits and expert reports, filed in any other actions or proceedings involving the Asserted Patents before any tribunal or agency, including, without limitation, in *Masimo et al. v. True Wearables, Inc. et al.*, Civil Action No. 8**:** 18-CV-02001 (C.D. Cal.), commenced November 8, 2018." During the meet and confer, Apple explained that at least a subset of the patents asserted in *True Wearables* are directly related to at least some of the Asserted Patents in this Action and thus documents responsive to this Request are highly relevant to claims and defenses at issue in this Action. Subject to the production of documents responsive to RFP No. 39, Apple agrees to withdraw RFP No. 40.

**Apple's RFP No. 44:** Apple proposes that this Request be limited to documents predating the earliest priority date of any Asserted Patent that Plaintiffs allegedly practice. Please let us know if this proposal is acceptable to Plaintiffs.

**Apple's RFP Nos. 45-46:** Apple is willing to limit these RFPs to the Asserted Patents and any family members thereof. Please let us know if this proposed modification is acceptable to Plaintiffs.

**Apple's RFP Nos. 47, 48, 49, 50, and 52:** We appreciate Plaintiffs' willingness to produce assignment records and documents showing any direct financial interest or ownership interest in the Asserted Patents. However, Apple seeks additional documents beyond the documents you identify in response to these RFPs. As explained during the meet and confer, Apple seeks all agreements involving transfer of rights in the Asserted Patents as well as documents sufficient to identify all individuals having a direct financial interest in the Asserted Patents and/or this litigation. To be clear, this would include any agreements with employees or executives that include provisions specifically tied to patent litigation, licensing revenue, or this litigation. Please confirm that Plaintiffs will produce all such documents in response to these RFPs.

**Apple's RFP Nos. 58-59:** Apple has considered Plaintiffs' objections to these Requests. Apple would be willing to limit these Requests (reserving their rights to re-evaluate, to the extent necessary, following receipt of Plaintiffs' Section 2019.210 disclosure) to documents evidencing the confidentiality obligations owed by any employees, contractors, or third parties to Plaintiffs with respect to the information claimed by Plaintiffs as trade secrets in this case. This includes all non-disclosure agreements third parties entered into with Plaintiffs concerning information claimed as trade secrets in this case. This also includes all agreements employees and contractors signed with Plaintiffs about their treatment of information claimed as trade secret in this case. Please let us know if this proposed modification is acceptable to Plaintiffs.

**Apple's RFP No. 62:** Apple proposes limiting this Request to "All Documents and Communications relating to any exit interviews, post-employment communications, and other communications relating to trade secrets and/or any alleged breach of contract, for all of Your former employees who You believe were subsequently employed by Apple, including but not limited to, Marcelo Lamego and Michael O'Reilly." Please let us know if this proposed modification is acceptable to Plaintiffs.

**Apple's RFP Nos. 63 and 72:** As we understand it, Plaintiffs' main objection to these RFPs is that they may not able to determine who is a former employee of Apple. Apple has considered this objection further and, frankly, is confused by it. As is the case with any RFP in any litigation, the responding party need only answer within the scope of its knowledge and a reasonable investigation. In other words, Plaintiffs would answer with respect to persons that they know are former employees of Apple or discern are employees of Apple after a reasonable investigation. Accordingly, Apple is inclined to stand by these Requests as written. We are willing to discuss these Requests further if Plaintiffs have any questions about Apple's position.

**Apple's RFP No. 65:** Plaintiffs agreed that they will in fact produce documents responsive to this Request. Plaintiffs will not do so, however, until the stay is lifted. As discussed during the meet and confer and above, Apple rejects Plaintiffs' interpretation of the stay and maintains that the stay has no bearing on *Apple's* commencement of trade secret-related discovery. The parties are in agreement about the Request and the scope of Plaintiffs' production in response thereto; the parties are at an impasse on the stay issue.

**Apple's RFP No. 67:** Plaintiffs agreed to produce documents that support, refute, or relate to (as that term was clarified by Apple during the meet and confer[1]), the trade secrets in Plaintiffs' Section 2019.210 statement. Plaintiffs will not do so, however, until the stay is lifted. As discussed during the meet and confer and above, Apple rejects Plaintiffs' interpretation of the stay and maintains that the stay has no bearing on *Apple's* commencement of trade secret-related discovery. The parties are in agreement about the Request and the scope of Plaintiffs' production in response thereto; the parties are at an impasse on the stay issue.

**Apple's RFP No. 68:** During the parties' meet and confer, Plaintiffs objected to this Request. Apple explained that the information requested is relevant to Plaintiff's trade secret claims, including, for example, Plaintiff's burden to demonstrate ownership of protectable trade secrets. Plaintiffs requested that Apple narrow the scope of the Request, but Apple cannot possibly do so without a Section 2019.210 disclosure. In the absence of a Section 2019.210 disclosure, Apple maintains the scope of this Request.

**Apple's RFP No. 69:** Based on the parties' discussion during the meet and confer, Apple proposes limiting this Request to "All documents sufficient to identify each Person involved in the design, development, and/or use of any information that you claim to be a Trade Secret misappropriated by Apple." Please let us know if this proposed modification is acceptable to Plaintiffs.

**Apple's RFP No. 70:** Plaintiffs' response is consistent with Apple's understanding from the meet and confer call.

**Apple's RFP No. 72:** Apple proposes limiting this request to "All Documents and Communications relating to any meetings, telephone calls, videoconferences, or any other in-person or real-time interactions between any current or former employee(s) of Apple and any of Your current or former employee(s), including any notes taken during such interactions and any materials exhibited or exchanged during such interactions, *relating to the subject matter of this Action.*" Please let us know if this proposed modification is acceptable to Plaintiffs.

**Apple's RFP No. 74:** Apple reserves all rights to re-evaluate this Request upon the receipt of a Section 2019.210 statement from Plaintiffs and upon Plaintiffs' identification of any

---

[1] Apple clarified, and Plaintiffs agreed, that documents that "relate to" the case are documents that may not within their four corners support or refute the claims or defenses at issue in the case but, in conjunction with other documents, do in fact support or refute claims or defenses at issue in the case or have some bearing on matters at issue in the case.

overlap in the trade secrets at issue in the *Sotera* case and this Action.

**Apple's RFP Nos. 75-76:** Apple maintains the scope of these RFPs as they seek information directly relevant to the claims and defenses at issue in this Action. Please let us know if Plaintiffs will reconsider their position—otherwise, Apple will proceed to move to compel accordingly.

## II. APPLE'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' DISCOVERY

**Objections to Definition of "Apple iOS Products":** As explained during the meet and confer, Apple objects to Plaintiffs' definition as overbroad and not relevant to this Action because it seeks information related to products that are not accused of infringing the Asserted Patents. Nonetheless, Apple will not withhold responsive information based solely on this objection.

**Objections to Producing Documents Before ESI Protocol Is Entered (RFP Nos. 1-8, and 10-25):** The parties are continuing to negotiate the ESI protocol. Apple will produce the documents it has agreed to produce after a Protective Order and an ESI Protocol are entered.

**Objections to Producing Documents Beyond Those Located by Custodian and Keyword Searching (RFP Nos. 1-4, 7, 8, and 10-25):** Please see Haley Morrisson's email of May 22, 2020 on this topic.

**Production of Non-Public Documents (RFP Nos. 5-8 and 10-25):** Apple reiterates the positions it enumerated during the meet and confer: Apple will produce non-public documents responsive to these RFPs that relate only to patent issues. Apple will not produce non-public documents that relate in any way to Plaintiffs' alleged trade secrets until an acceptable Protective Order has been entered, an acceptable ESI Protocol has been entered, *and* Apple receives an adequate Section 2019.210 disclosure from Plaintiffs.

**Objections to Discovery Based on Section 2019.210 (General Objection 4 and RFP Nos. 1 and 3-25):** Plaintiffs asked Apple to confirm that Apple will produce trade secret-related discovery if Apple's Motion for a Protective Order is denied without requiring Plaintiffs to file a separate motion to compel. As Apple explained during the meet and confer, it cannot take a position on this issue until it sees the scope and content of the Court's ruling (e.g., the Court's ruling could be limited to the specific RFPs raised in the filing, and may not reach the broader question of the timing of trade secret-related discovery generally).

**Plaintiffs' RFP No. 4:** Apple agrees to withdraw its objection related to Plaintiffs' failure to limit the Request to the asserted claims of the Asserted Patents.

**Plaintiffs' RFP No. 9:** Apple maintains its objection to this Request as overbroad to the extent it seeks publicly available documents.

**Plaintiffs' RFP No. 10:** Apple agrees to produce non-privileged documents responsive to this RFP.

* * *

We look forward to receiving Plaintiffs' prompt response to the proposed modifications enumerated above, as well as to the various points on which your team agreed to conduct follow-up. Apple continues to reserve all rights, including without limitation its right to challenge additional aspects of Plaintiffs' Responses that are not enumerated in this letter or my letter of May 11, 2020, and its right to challenge the sufficiency of Plaintiffs' document productions.

Sincerely,

Ilissa Samplin

cc**:** all counsel of record (via e-mail)

# Exhibit D

Knobbe Martens

KNOBBE, MARTENS, OLSON & BEAR, LLP

1925 Century Park East, Suite 600, Los Angeles, CA 90067
T (310) 551-3450

Mark Kachner
Mark.Kachner@knobbe.com

June 2, 2020

**VIA EMAIL**

Ilissa Samplin
Gibson, Dunn & Crutcher LLP
333 South Grand Ave.
Los Angeles, CA 90071

Re: Masimo Corp. and Cercacor Laboratories, Inc. v. Apple Inc.

Dear Angelique:

We write to respond to your May 26, 2020 letter regarding the parties' meet and confer calls on May 19 and May 20, 2020.

As a preliminary matter, we disagree the entirety of the second paragraph of your May 26, 2020 letter, your characterization of Plaintiffs' May 11, 2020 letter, and your commentary on the efficiency of the parties' meet and confer.

## I. APPLE'S MAY 11 LETTER

**Discovery Related to Trade Secrets**: Your letter repeatedly and incorrectly states Plaintiffs have refused to produce trade secret discovery until after the Court lifts the stay on trade secret discovery only. As explained in my letter to you dated May 22, 2020, "despite the stay, Plaintiffs were not withholding discovery, even for requests related solely to trade secrets." We also explained that "Plaintiffs will provide their 2019.210 statement and confidential documents after entry of a protective order." In view of my May 22, 2020, letter, we are confused as to why Apple believes this is a dispute on which the parties have reached an impasse.

**Apple's RFP No. 15**: Plaintiffs maintain their objections to this request as clarified by Apple. Despite your statement that Apple is "willing to limit the Request," Apple still seeks "documents produced, filed, or served in any litigation or proceeding involving the Asserted Patents or any of their family members." Apple seeks litigation files and reproduction of all written discovery and document productions, for unrelated lawsuits involving patents not at issue in this case. Accordingly, Plaintiffs continue to object because, among other things, Apple's request is overly broad and unduly burdensome, is not reasonably tailored to the issues in this case, and thereby seeks documents neither relevant to any claim or defense in this litigation nor proportional to the needs of the case.

**Apple's RFP No. 17**: Subject to Plaintiffs' objections, Plaintiffs will produce non-privileged documents sufficient to show actual or constructive notice to Apple of any alleged infringement of the Asserted Patents, located after a reasonable search that are within their possession, custody, or control.

**Apple's RFP Nos. 24-25**: Subject to Plaintiffs' objections, Plaintiffs will produce documents sufficient to identify the departments within Masimo and Cercacor.

**Apple's RFP No. 33**: Subject to Plaintiffs' objections, Plaintiffs will produce non-privileged documents and communications concerning the inventorship of the inventions claimed in the Asserted Patents, including documents concerning each inventor's contribution to the Asserted Patents, located after a reasonable search that are within their possession, custody, or control.

**Apple's RFP No. 34**: As we've discussed, Apple's requests that broadly seek documents about all counterparts to the Asserted Patents are overbroad and unduly burdensome, not reasonably tailored to the issues in this case, and thereby seek documents neither relevant to any claim or defense in this litigation nor proportional to the needs of the case.  Subject to Plaintiffs' objections, Plaintiffs agree to produce non-privileged, non-litigation communications concerning each attempt by Plaintiffs or any Licensee—whether successful or unsuccessful—to assign, license, or enforce any of the Asserted Patents, located after a reasonable search that are within their possession, custody, or control.

**Apple's RFP No. 38**: As we've discussed and like Plaintiffs' objections to Apple's RFP No. 34, Apple's requests that broadly seek documents about all counterparts to the Asserted Patents are overbroad and unduly burdensome, not reasonably tailored to the issues in this case, and thereby seek documents neither relevant to any claim or defense in this litigation nor proportional to the needs of the case. Subject to Plaintiffs' objections, Plaintiffs agree to produce Prior Art that is relevant to the validity, invalidity, enforceability, or unenforceability of the Asserted Patents, located after a reasonable search that are within their possession, custody, or control.

**Apple's RFP No. 44**: Your May 26th letter does not address the issue raised in our earlier May 22nd letter on this request.  Plaintiffs have explained that the only practical way to search for responsive documents for this request is by using ESI search terms and custodians.  Apple previously agreed to consider whether it would agree that electronic searching would satisfy this request.  Please let us know your position.

**Apple's RFP Nos. 45-46**: As we've discussed and like Plaintiffs' objections to Apple's RFP No. 34 and 38, Apple's requests that broadly seek documents about all counterparts or "family members" of the Asserted Patents are overbroad and unduly burdensome, not reasonably tailored to the issues in this case, and thereby seek documents neither relevant to any claim or defense in this litigation nor proportional to the needs of the case.

**Apple's RFP Nos. 47, 48, 49, 50, and 52**: Further to Plaintiffs' prior objections and responses, Plaintiffs agree to produce agreements involving transfer of rights in the Asserted Patents, agreements specifically tied to licensing revenue for the Asserted Patents, as well as any agreements regarding a specific financial interest in this lawsuit distinct from any general financial interest in the Plaintiffs themselves, that such agreements are located after a reasonable search.

**Apple's RFP Nos. 58-59**: Subject to Plaintiffs' objections, Plaintiffs will produce non-privileged representative documents evidencing confidentiality obligations owed by employees, contractors, or third parties to Plaintiffs with respect to Plaintiffs' asserted trade secrets, located after a reasonable search that are within their possession, custody, or control.

**<u>Apple's RFP No. 62</u>**: In response to Apple's amended RFP No. 62, subject to Plaintiffs' prior objections, Plaintiffs will produce responsive non-privileged documents located after a reasonable search that are within their possession, custody, or control.

**<u>Apple's RFP No. 63</u>**: Apple's May 26th letter did not address Plaintiffs objection that this request is overbroad and not proportional to the needs of the case, since it seeks all communications between certain individuals, even communications unrelated to any issue in the case. Plaintiffs suggested limiting this request (as well as RFP No. 72) to communications relevant to issues in this case. Apple narrowed RFP No. 72, but Apple did not respond to Plaintiffs' proposal on this RFP.

**<u>Apple's RFP No. 65 and 67</u>**: Your characterization of Plaintiffs' position is incorrect. As we have explained numerous times, Plaintiffs are not withholding documents based on the stay of trade secret discovery only. Plaintiffs have also explained they will provide their 2019.210 statement and other confidential information after entry of a protective order.

**<u>Apple's RFP No. 69</u>**: In response to Apple's amended RFP No. 69, subject to Plaintiffs' prior objections, Plaintiffs will produce responsive non-privileged documents located after a reasonable search that are within their possession, custody, or control.

**<u>Apple's RFP No. 72</u>**: In response to Apple's amended RFP No. 72, subject to Plaintiffs' prior objections, Plaintiffs will produce responsive non-privileged documents located after a reasonable search that are within their possession, custody, or control.

## II. <u>PLAINTIFFS' MAY 11 LETTER</u>

**<u>Objections to Producing Documents Beyond Those Located by Custodian and Keyword Searching (RFP Nos. 1-4, 7, 8, and 10-25)</u>**: Plaintiffs have repeatedly asked Apple to confirm it agrees that using search terms alone to identify responsive documents would not satisfy Apple's discovery obligations. Rather than confirm, in Apple's latest edits to the ESI Protocol, Apple changed the ESI Protocol to state that the parties agree search terms "may" not satisfy their discovery obligations. This confirms that Apple maintains its position that using search terms and custodians alone to identify responsive documents will satisfy Apple's discovery obligations in at least some circumstances. Accordingly, we repeat our prior request raised during the meet and confer and reiterated in my May 22, 2020 letter – please specifically identify which of Plaintiffs RFPs Apple believes could be responded to based only on searching for ESI documents by custodian and search terms.

**<u>Production of Non-Public Documents (RFP Nos. 5-8 and 10-25)</u>**: We continue to disagree with Apple's position on the scope of the Court's trade secret only discovery stay. This issue has been briefed to the Court in Apple's Motion for a Protective Order.

**<u>Apple's Objection to Requests Not Limited To the Asserted Claims in the First Amended Complaint (General Objection 6-7 and RFP Nos. 3-4, 12-25):</u>** Apple has now withdrawn this objection for Plaintiffs' RFPs Nos. 3-4, but Apple maintains this objection for Plaintiffs' RFPs Nos. 12-25 and stated that it intends to withhold any documents that are relevant specifically to any claim not asserted in this action. Apple could not explain how this objection would impact Apple's document collection process or Apple's process for determining whether to produce a responsive document,

particularly given that (1) the First Amended Complaint asserts patents but does not yet identify asserted claims, and (2) Plaintiffs have not yet narrowed the asserted patents to identify any unasserted claims. For Plaintiffs' RFPs Nos. 12-25, the parties are at an impasse on this issue.

**Plaintiffs' RFP No. 9**: The parties are at an impasse regarding Apple's refusal to produce documents Apple determines are publicly available.

Best regards,

Mark D. Kachner

32886275

# Exhibit E

GIBSON DUNN

Gibson, Dunn & Crutcher LLP

333 South Grand Avenue
Los Angeles, CA 90071-3197
Tel 213.229.7000
www.gibsondunn.com

Ilissa Samplin
Direct: +1 213.229.7354
Fax: +1 213.229.6354
ISamplin@gibsondunn.com

March 12, 2021

VIA E-MAIL

Mark Kachner
Knobbe, Martens, Olson & Bear, LLP
1925 Century Park East, Suite 600
Los Angeles, CA 90067
Mark.Kachner@Knobbe.com

Re: *Masimo Corp. et al. v. Apple, Inc.*, C.A. 8:20-cv-00048 (C.D. Cal.)

Dear Mark:

I write pursuant to Local Rule 37-1 to address various discovery issues and request a meet and confer.

**Apple's RFPs 55, 56, 66, 71, 77, 78, 84–89, 92, 99–101**: Based on the correspondence between the parties, we understand that Plaintiffs are not withholding and do not intend to withhold documents based on their objections for these RFPs and that Plaintiffs intend to produce all non-privileged documents responsive to these RFPs. Please confirm and let us know when Plaintiffs intend to produce such documents.

**Apple's RFP 62**: Based on the correspondence between the parties, we understand that the parties have agreed to a limitation for this RFP—"All Documents and Communications relating to any exit interviews, post-employment communications, and other communications relating to trade secrets and/or any alleged breach of contract, for all of Your former employees who You believe were subsequently employed by Apple, including but not limited to, Marcelo Lamego and Michael O'Reilly." Please confirm Apple's understanding and let us know when Plaintiffs intend to produce documents responsive to the agreed-upon limitation.

**Apple's RFP 68**: Based on the correspondence between the parties, we understand that Plaintiffs previously objected to this RFP as "overly broad and unduly burdensome." The information requested is relevant to Plaintiffs' trade secret claims, including, for example, Plaintiffs' burden to demonstrate ownership of protectable trade secrets. Please confirm that Plaintiffs are not withholding and do not intend to withhold documents based on their objections for this RFP and that Plaintiffs intend to produce all non-privileged documents responsive to this RFP. Please also let us know when Plaintiffs intend to produce such documents.

**Apple's Interrogatory 7**: This interrogatory requests Plaintiffs to, "[f]or each alleged Trade Secret that You contend was misappropriated by Apple, describe all actions You have taken to safeguard the alleged Trade Secret's secrecy." As Apple previously explained, it is

Beijing • Brussels • Century City • Dallas • Denver • Dubai • Frankfurt • Hong Kong • Houston • London • Los Angeles • Munich
New York • Orange County • Palo Alto • Paris • San Francisco • São Paulo • Singapore • Washington, D.C.

Exhibit E
Page 53

Plaintiffs' burden to prove that reasonable measures were taken to protect the secrecy of each of their allegedly misappropriated trade secrets. When Apple raised this deficiency with Plaintiffs previously, and asked if they had identified any information suggesting that their alleged safeguards differed for any particular trade secrets, Plaintiffs used hedging language—stating that they "*believe* they took the same safeguards with respect to all asserted trade secrets." *See* 11/24/2020 Kachner to Samplin Ltr at 3 (emphasis added). If Plaintiffs' response is that based on their investigation to date, Plaintiffs have taken the same safeguards for each alleged trade secret, then Plaintiffs should so state in their Interrogatory response—without qualifying their response through "believe" hedging language. Please confirm that, by March 22, 2021, Plaintiffs will supplement their interrogatory response to address this issue.

**Apple's Interrogatory 8**: This interrogatory requests Plaintiffs to, "[f]or each alleged Trade Secret that You contend was misappropriated by Apple, state precisely when, if ever, the alleged Trade Secret was disclosed, accessed, or otherwise provided to Apple." Plaintiffs' response is highly generalized and largely non-responsive. Nowhere in the Interrogatory response do Plaintiffs actually state when they contend a particular alleged trade secret was disclosed, accessed, or otherwise provided to Apple. For example, Plaintiffs contend that "Lamego joined Apple in 2014 and shared some of Plaintiffs' trade secrets with Apple." Which alleged trade secrets do Plaintiffs contend Lamego shared with Apple when he joined the Company? That is relevant information to which Apple is entitled. Please confirm that Plaintiffs will supplement their interrogatory response to provide the full scope of the information requested by March 22, 2021.

**Apple's Interrogatory 9**: This interrogatory requests Plaintiffs to, "[f]or each date identified in response to Interrogatory No. 8, describe the circumstances of the disclosure, including the recipients and the means of disclosure." Plaintiffs' response does not describe the circumstances of this disclosure, including the recipients and means of disclosure. Plaintiffs' response, which merely incorporates their response to Interrogatory 8 (which as explained above is itself inadequate), is deficient and does not provide the requested information. Please confirm that Plaintiffs will supplement their interrogatory response to provide the full scope of the information requested by March 22, 2021.

**Apple's Interrogatory 12**: This interrogatory requests Plaintiffs to "[i]dentify all third parties to whom Your alleged Trade Secrets have ever been disclosed, including the circumstances under which each alleged Trade Secret was disclosed to them." Plaintiffs' response does not confirm or deny that Plaintiffs disclosed any of the alleged trade secrets to others, and instead alleges generic practices in the event of disclosure. Plaintiffs' response is deficient. Apple is entitled to know whether the alleged trade secrets were disclosed to third parties, to whom, and the circumstances of the disclosure. Please confirm that Plaintiffs will supplement their

interrogatory response to provide the full scope of the information requested by March 22, 2021.

**Apple's Interrogatory 17**: This interrogatory requests Plaintiffs to "[s]tate in detail all factual and legal bases for Your contention that You are entitled to any relief in this case, including but not limited to, monetary damages and injunctive relief, including, without limitation, identifying and describing in detail all Documents and Communications relating to such contention and identifying all individuals having information about such contention." Plaintiffs have refused to adequately state the factual and legal bases requested in this Interrogatory. As a result, Plaintiffs' Interrogatory response is deficient, and Apple reserves all rights in that regard—and expects Plaintiffs to amend their response to this Interrogatory as their investigation proceeds. But at a minimum now, Plaintiffs should be able to identify the individuals that have information about the alleged harm Plaintiffs suffered as well as any supporting documents. The persons with knowledge, and the supporting documents, are entirely within Plaintiffs' control. Please confirm that, by March 22, 2021, Plaintiffs will supplement their interrogatory response to identify the individuals with information about the alleged harm Plaintiffs suffered as well as any documents supporting Plaintiffs' allegations of harm.

**Apple's Interrogatory 26**: This interrogatory requests Plaintiffs to, "[f]or each alleged Trade Secret that You contend was misappropriated by Apple, state precisely how You have used, are using, or plan to use the alleged Trade Secret, including the identity of every product, strategy, or plan that allegedly incorporates each alleged Trade Secret, the functionality that allegedly incorporates each alleged Trade Secret, when each alleged Trade Secret was incorporated into every product, strategy, or plan, and when each alleged Trade Secret ceased being incorporated into every product, strategy, or plan." Plaintiffs' response only provides examples of alleged incorporation. Plaintiffs' response does not identify all products performing such alleged incorporation and the dates of their alleged incorporation. Plaintiffs' response therefore is demonstrably deficient. Please confirm that Plaintiffs will supplement their interrogatory response to provide the full scope of the information requested by March 22, 2021.

**Apple's Interrogatory 27**: This interrogatory requests Plaintiffs to, "[f]or each alleged Trade Secret that You contend was misappropriated by Apple, state precisely the independent economic value of the alleged Trade Secret, and describe in detail Your calculation of this value, including by describing all calculations of the economic value You obtained or could obtain from maintaining the secrecy of the alleged Trade Secret, the extent to which others could obtain economic value were the secrecy of the alleged Trade Secret not maintained, the amount of time, money, and/or labor You expended in developing the alleged Trade Secret, the amount of time, money, and/or labor that you contend Apple saved by using the alleged

Trade Secret, and all other facts that You contend support this independent economic value." Plaintiffs' response fails to provide any calculation of the value of the trade secret. This information is entirely within Plaintiffs' possession and control. For each alleged Trade Secret, Plaintiffs should be able to provide "all calculations of the economic value [they] obtained … from maintaining the secrecy of the alleged Trade Secret," "the amount of time, money, and/or labor [they] expended in developing the alleged Trade Secret," "all other facts that [they] contend support this independent economic value." Plaintiffs do not need any discovery from Apple to identify any purported economic value they have derived from each alleged secret, the resources that went into developing each secret, and the documents that support their identification of the alleged value. Plaintiffs' response is demonstrably deficient and provides little of the requested information. Please confirm that Plaintiffs will supplement their interrogatory response to provide the full scope of the information requested by March 22, 2021.

Please let us know your availability to meet and confer pursuant to Local Rule 37-1 to address the above issues. Please also provide the responses requested by this letter before the meet and confer. Apple continues to reserve all rights, including without limitation its right to challenge additional aspects of Plaintiffs' Responses that are not enumerated in this letter.

Sincerely,

Ilissa Samplin

# Exhibit I

Exhibit I
Page 153

# DE NOVO CLASSIFICATION REQUEST FOR ECG APP

## REGULATORY INFORMATION

FDA identifies this generic type of device as:

**Electrocardiograph software for over-the-counter use.** An electrocardiograph software device for over-the-counter use creates, analyzes, and displays electrocardiograph data, and can provide information for identifying cardiac arrhythmias. This device is not intended to provide a diagnosis.

**NEW REGULATION NUMBER:** 21 CFR 870.2345

**CLASSIFICATION:** Class II

**PRODUCT CODE:** QDA

## BACKGROUND

**DEVICE NAME:** ECG App

**SUBMISSION NUMBER:** DEN180044

**DATE OF DE NOVO:** August 14, 2018

**CONTACT:** Apple Inc.
One Apple Park Way
Cupertino, CA 95014

## INDICATIONS FOR USE

The ECG app is a software-only mobile medical application intended for use with the Apple Watch to create, record, store, transfer, and display a single channel electrocardiogram (ECG) similar to a Lead I ECG. The ECG app determines the presence of atrial fibrillation (AFib) or sinus rhythm on a classifiable waveform. The ECG app is not recommended for users with other known arrhythmias.

The ECG app is intended for over-the-counter (OTC) use. The ECG data displayed by the ECG app is intended for informational use only. The user is not intended to interpret or take clinical action based on the device output without consultation of a qualified healthcare professional. The ECG waveform is meant to supplement rhythm classification for the purposes of discriminating AFib from normal sinus rhythm and not intended to replace traditional methods of diagnosis or treatment.

The ECG app is not intended for use by people under 22 years old.

**LIMITATIONS**

The device has only been evaluated for the detection of AFib or normal sinus rhythm and is not intended to detect any other type of arrhythmia. It cannot detect heart attacks. If you ever experience chest pain, pressure, tightness, or what you think is a heart attack, call emergency services.

Apple Watch may be unable to collect data when Apple Watch is in close vicinity to strong electromagnetic fields (e.g. electromagnetic anti-theft systems, metal detectors).

DO NOT wear your Apple Watch during a medical procedure (e.g., magnetic resonance imaging, diathermy, lithotripsy, cautery and external defibrillation procedures).

DO NOT change your medication without talking to your doctor.

Not intended for use by individuals under age 22.

Not intended for use by individuals previously diagnosed with AFib.

Notifications made by this feature are potential findings, not a complete diagnosis of cardiac conditions. All notifications should be reviewed by a medical professional for clinical decision-making.

Apple does not guarantee that you are not experiencing an arrhythmia or other health conditions even in the absence of an irregular rhythm notification. You should notify your physician if you experience any changes to your health.

The clinical study did not quantitatively assess the quality of the ECG waveform produced by the ECG App. The ECG produced by the ECG App is not intended for clinical use or as the basis for diagnosis or treatment. The ECG waveform is only intended for informational use.

PLEASE REFER TO THE LABELING FOR A COMPLETE LIST OF WARNINGS, PRECAUTIONS AND CONTRAINDICATIONS.

**DEVICE DESCRIPTION**

The device (ECG App) comprises a pair of mobile medical apps — one on Apple Watch (the Watch App) and the other on the iPhone (iPhone App) — intended to record, store, transfer, and display a single lead ECG signal similar to a lead I. The ECG Watch App is intended to analyze this single lead data and detect the presence of atrial fibrillation (referred into this document as AFib or AF) and sinus rhythm in adults. It is also intended to acquire and analyze the single lead ECG recordings for display on the iPhone. The ECG iPhone App is included in the Health App, which is intended to store, manage, and share health and fitness data, and comes pre-installed on every iPhone.



Figure 1: Apple Watch App and iPhone App components of the ECG App device

The ECG Watch App instructs the user to take an ECG measurement by holding their finger on the digital crown of the watch. The watch also contains electrodes on the back of the device which are in continuous contact with the user's wrist. The watch acquires the electrical potential between the electrodes and digital crown. The Watch App will display a visual representation of the ECG waveform to provide information regarding signal quality during the session. The waveform displayed on the watch during the session is not intended for clinical purposes. The session will last for 30 seconds. Upon completion of the recording, the ECG Watch App analyzes the acquired ECG data and produces a waveform that is similar to a Lead I ECG for the purposes of AF and sinus rhythm evaluation, calculates average heart rate, and classifies the rhythm of the waveform (collectively called "session result").



Figure 2: Taking a Measurement with the Digital Crown and the Watch App

The ECG rhythm will be classified into one of the following categories:
1. Sinus rhythm
2. Atrial Fibrillation
3. Inconclusive

There are two categories of Inconclusive rhythms: one for high heart rate, low heart rate or other arrhythmias; and one that is the result of poor signal quality and therefore unreadable by the algorithm.

| # | UI Output | Definition | Algorithm Output |
|---|---|---|---|
| 1 | Title: Sinus Rhythm<br><br>Description: This ECG does not show signs of Atrial Fibrillation. | Regular rhythm with a HR between 50-100 bpm and less than 4 ectopic beats | regular_rhythm |
| 2 | Title: Atrial Fibrillation<br><br>Description: This ECG shows signs of AFib.<br><br>If this is an unexpected result, you should talk to your doctor. | AF with a HR between 50-100 bpm | Afib |
| | | AF with a HR between 101-120 bpm | Afib_HighHR |
| 3 | Title: Inconclusive<br><br>Description: Your ECG is inconclusive and will be saved.<br><br>If you repeatedly get this result or you're not feeling well, you should talk to your doctor. | Regular rhythm with a HR greater than 100 bpm | Unclassified_SinusTach |
| | | HR over 120 | Unclassified_HighHR |
| | | HR under 50 | Unclassified_LowHR |
| | | "Other" Rhythms: Rhythms other than AF or regular rhythm) | Unclassified_other |
| 4 | Title: Inconclusive<br><br>Description: Your ECG is inconclusive due to a poor reading but will be saved. | Poor Recording (e.g., noise, artifact, or poor signal quality) | Unreadable |

Figure 3: ECG App analysis outputs

Once the ECG Watch App analyzes the ECG data, the Watch App displays the rhythm classification, average heart rate, and a description of the rhythm classification to the user on their Apple Watch. The session result is saved in Watch HealthKit and is then retrieved and stored in HealthKit on the paired iPhone.

Once the user sees the result of a given session on the Apple Watch App, the user will have the opportunity to pick from the following list of symptoms, which will be saved as part of the session result in Watch HealthKit:

- Rapid, pounding, or fluttering heartbeat
- Skipped heartbeat
- Fatigue
- Shortness of breath
- Chest tightness or pain
- Fainting
- Dizziness
- Other
- None

## SUMMARY OF NONCLINICAL/BENCH STUDIES

### EVALUATION OF INPUT SIGNAL QUALITY

To support the ability of the ECG App to obtain an ECG of sufficient quality for display and analysis, electromagnetic compatibility, electrical safety, and signal acquisition information was provided, in addition to clinical testing. Specifically, the Apple Watch claims conformance to EU and FCC compliance statements. The FCC listing includes all information needed for 47 CFR compliance. The Apple Watch conforms to EU standards EN 301 489-1 (V2.2.20), EN 301 489-3 (V2.1.1), EN 301 489-17 (V3.2.0), and EN 301 489-52 (V1.1.0). These standards were used as a comparator for IEC 60601-1-2, which is an FDA recognized consensus standard for medical device EMC. The following comparison data was submitted for the normative EMC standards referenced by EN 301 489-1 V2.2.20 and IEC 60601-1-2 (4th Edition):

- Radiated/Conducted Emissions
- Voltage Fluctuations and Flicker
- Harmonic Emissions
- Electrostatic Discharge
- Radiated Immunity and proximity fields
- Conducted Immunity
- Electrical Fast Transient/Burst
- Surge Immunity
- Voltage Dips/Interruptions
- Power Frequency Magnetic Fields
- Common Emitters

Electrical safety was assessed according to IEC 62368-1 (2014), “Audio/video, information and communication technology equipment – Part 1: Safety requirements.” Signal acquisition and platform (hardware) performance was assessed according to IEC 60601-2-47, “Particular requirements for the basic safety and essential performance of ambulatory electrocardiographic systems.” Platform performance testing included:

- Input differential range
- Input common-mode range
- ADC sampling rate
- ADC effective resolution
- Bandwidth
- Common-mode rejection
- Gain accuracy
- Linearity and dynamic range
- Input impedance
- System noise
- Frequency response
- Amplitude response
- Gain setting and stability
- Ambient temperature, humidity, and atmospheric pressure

## MAGNETIC RESONANCE (MR) COMPATIBILITY

The device is not intended for use in an MR environment.

## SOFTWARE

A failure or latent flaw in the ECG App could indirectly result in user injury; therefore, the software of this device is considered to have a "Moderate" level of concern. The submission contained all the elements of software documentation corresponding to the "Moderate" level of concern, as outlined in the FDA guidance document "Guidance for the Content of Premarket Submissions for Software Contained in Medical Devices." Documentation describing the software/firmware, software specifications, architecture design, software development environment, traceability, revision level history, unresolved anomalies, cybersecurity, and interoperability provide the foundation that the software will operate in a manner as described in the specifications. Hazard analysis was performed to characterize software risks including device malfunction and measurement related errors. The submission included verification and validation (V&V) testing to ensure that mitigation measures were successful.

## PERFORMANCE TESTING - BENCH

ECG Database Testing

Testing to databases in EC57 was conducted for rhythms containing AF or normal sinus rhythm (NSR):

- (b) (4) records from the adjudicated AHA and MIT databases were used
- Each record was split into 30 second segments for a total of (b) (4)
- Assessed QRS detection, rhythm classification, and HR

The database annotations were used as ground truth. If a strip included any portion or period of AF derived from the annotations it was labeled as AF. Everything else was labeled not AF and used for assessing the false positive rate. The only exclusions from the TP/FP statistics were the (b) (4) " by the algorithm (21 AF, (b) (4) Of the (b) (4) non-AF strips, (b) (4) were labeled as AF by the algorithm (false positives) and (b) (4) were true negatives (either sinus rhythm or inconclusive) (b) (4) of the available records were used for AF assessment.

Table 1: Database Testing Results

| | | Database Annotation | | |
|---|---|---|---|---|
| | | AF | NSR | Total |
| Algorithm Determination | AF | (b) (4) | | |
| | NSR | | | |
| | Unread/Unclass | | | |
| | Total | | | |

(b) (4)

There were (b) (4) AF strips in database testing, of which:
(b) (4) were "unreadable"
were classified as NSR
were "unclassified" (1 for being low HR)
(b) (4) were classified as AF (b) (4) of readable strips)

Human Factors

A Human Factors Validation Study was performed with a total of (b) (4) participants to demonstrate the usability of the user interface. The study enrolled (b) (4) user groups:

- Group 1 - Users diagnosed with AF (AF, n = 17)
- Group 2 - Users age 22-64 (Under 65, No AF, n = 17)
- Group 3 - Users age 65+ (Over 65, No AF, n = 16)

Each group included participants with and without smartphone experience as well as participants who use iPhone and Android.

Testing identified critical tasks as those tasks where the user does not understand the output from the device, or limitations of the device, and fails to seek medical care if there is a need based on the results from the app. Each task was assessed for completion and success criteria were clearly defined. Testing also collected subjective feedback in a written open response questionnaire and post-test interview.

## SUMMARY OF CLINICAL INFORMATION

A clinical study was performed to establish a reasonable assurance of safety and effectiveness of the ECG App.

**Methods**

The pivotal study was a prospective, parallel-cohort, non-randomized, multi-center, reader study using an enriched population. The study enrolled equal subjects with and without a known diagnosis of atrial fibrillation into two separate cohorts (AF Cohort and SR Cohort). Key exclusion criteria included antiarrhythmic drug use, the presence of a pacemaker or implantable cardioverter-defibrillator, and a history of abnormal life-threatening rhythms. Subjects in the SR cohort must not have any known diagnosis of AF. To be enrolled in the AF Cohort, the subject must be in atrial fibrillation at the time of enrollment.

Upon enrollment, the participant was coached on the appropriate posture and grip for acquiring an ECG recording using a prototype Apple Watch. After a 5-minute resting period, simultaneous 30-second ECG App and 12-lead ECG recordings were acquired. The ECG App rhythm strip was automatically classified by the algorithm as either "AF", "SR", "Unreadable", or

"Unclassified." Unclassified rhythms include any rhythms with rates > 120 or < 50 beats/min (bpm), regular rhythms with rates > 100 bpm or more than 4 ectopic beats.

Three blinded independent board-certified cardiologists reviewed all ECG recordings and assigned a classification of SR, AF, unreadable, or others. Others classification was defined to include normal sinus with premature ventricular contraction (if ≥4 beats in the strip), normal sinus with PACS, 2nd degree block, AF with a rate > 120 bpm, and supraventricular tachycardia. If the readers disagreed on the diagnosis, the final interpretation was determined by the simple majority rule.

In a subset of randomized selected subjects (Waveform Assessment Analysis Set), 3 independent certified cardiographic technicians synced and overlaid each ECG App rhythm strip with the Lead I strip of the corresponding 12-lead ECG. The first 6 consecutive distinct readable PQRST complexes were identified and used to determine if the morphology of the complexes appeared to overlay to the unaided eye. For the first two QRS complexes, the evaluators also measured and compared the R wave amplitude between the ECG App strip and the reference strip.

**Study Endpoints**

Primary Endpoint

Sensitivity and specificity of the ECG App algorithm in detecting AF compared with physician-adjudicated 12-lead ECG. The sensitivity and specificity performance goals were set at 90% and 92% respectively. Per the protocol, only readable and classifiable (Classifiable Analysis Set) paired recordings are included in the diagnostic performance assessment.

Secondary Endpoint

The ECG app produces a waveform that provides clinically equivalent information to the gold standard (Lead I ECG). The following criteria assess the endpoint

1. Qualitative assessment
   The proportion of paired ECG strips appear to overlay to the unaided eye > 0.80
2. Quantitative assessment
   The proportion of paired R-wave amplitude measurements within 2 mm of each other > 0.80

**Results**

Subject characteristics

The study enrolled a total of 602 subjects at 5 investigational sites. Subject disposition is provided in Figure below. The study analysis excluded 14 subjects in the SR cohort due to a history of paroxysmal AF.



Figure 4: Flow Chart of Subject Disposition

The median age was 71 years, ranging from 22 to 92 years. Comparing to the SR cohort, subjects in the AF cohort were older (mean age 73.8 vs. 59.5) and less likely to be female (30.6% vs. 55.4%). Most AF subjects had a history of permanent AF (58.1%) or persistent AF (34.9%). A vast majority of SR subjects (87.5%) had no prior history of heart rhythm abnormalities, other rhythm abnormalities include Atrial Flutter (AFL) (n=1, 0.3%), Atrial Tachycardia (n=2, 0.7%), and first-degree AV block (n=15, 5.2%). Aside from AF, the most common concomitant conditions reported by enrolled subjects were hypertension (55.3%), hyperlipidemia (43.4%), and drug hypersensitivity (32.9%).

ECG App Automated AF Detection

The ECG App strip and reference 12 lead ECG Classifications were shown in the table below:

Table 2: ECG App and Reference Strip Classifications

| | **Reference 12 Lead ECG Final Result** | | | | |
|---|---|---|---|---|---|
| **ECG App Algorithm** | SR | AF | Other | Unreadable | Total |
| Sinus Rhythm | 238 | 4 | 4 | 1 | 247 |
| Atrial Fibrillation | 1 | 236 | 2 | 2 | 241 |
| Unclassified | 6 | 7 | 6 | 0 | 19 |
| Unreadable | 18 | 30 | 1 | 0 | 49 |
| Device Result Not Reported | 32 | 13 | 1 | 0 | 46 |
| Total | 295 | 290 | 14 | 3 | 602 |

Of the 602 enrolled subjects who completed the study, 46 did not have an ECG App result. The reasons for ECG App result not reported are listed in the table below.

Table 3: Summary of ECG App Results Not Reported

| Exclusion Criterion | Number of Subjects |
|---|---|
| Paroxysmal AF protocol deviation | 14* |
| Data Interval < 30 Sec | 1 |
| Test Device Data Inverted | 3 |
| Fast Settle Switch Not Detected | 12 |
| Filename Cannot be Corrected | 1 |
| REF (reference) Data Inverted | 8 |
| Signals Not Aligned | 2 |
| Sync Not Detected | 6* |

*One subject is included in both Paroxysmal AF protection deviation and Sync not detected.

The automated algorithm determined that the recording was unreadable or unclassified in 8.8% (N = 49) and 3.4% (N=19) respectively, and a diagnosis (i.e., SR, AF) was provided in 488 (87.8%) of the remaining 556 subjects.

Among the recordings where the algorithm output a diagnosis (Classifiable Analysis Set), AF was correctly diagnosed with 98.3% sensitivity (97.5% LCB: 95.8%) and 99.6% specificity (97.5% LCB: 97.7%). The results indicate that the study met the protocol specified primary endpoint.

Taking into account the unreadable and unclassified results, the probability that a subject with AF would receive an AF diagnosis from the ECG App was 85.2%.

Table 4: Summary of ECG App Performance when Unreadable and Unclassified Results Included

| Performance | Probability |
|---|---|
| Pr (ECG App = SR \| Reference = SR) | 90.5% (95% CI: 86.3%, 93.8%) |
| Pr (ECG App = AF \| Reference = AF) | 85.2% (95% CI: 80.5%, 89.2%) |

ECG App ECG Recording

A total of 139 (AF Cohort: 69, SR Cohort: 70) subjects were randomly selected to be included in the Waveform Assessment Analysis Set. Of these, 8 AF subjects and 5 SR subjects were excluded.

*Waveform Assessment*

Of the remaining 126 subjects, 125 (60 AF, 65 SR, 99.2%) subjects had an ECG App waveform that was considered to be clinically equivalent to the gold standard. The 97.5% LCB is 95.7%, which meets the secondary endpoint performance goal of 80% ($p < 0.0001$).

*R Wave Amplitude*
The paired strips were examined for R-wave amplitude agreement. In 97.6% of subjects (n=123/126, 97.5% LCB: 93.2%), the paired R-Wave amplitude difference was ≤ 2 mm. The results meet the pre-specified PG of 80% ($p < 0.0001$).

*Additional Analysis*
To further evaluate the quality of the ECG App recording, additional analysis (ad hoc) was performed comparing physician interpretation of the ECG App strips to the rhythm classification of the paired reference 12 lead ECGs. The results showed good concordance between the interpretation of the ECG App strip and the reference 12-lead ECG

Table 5: Cardiologist-interpretation of ECG App recordings vs. 12-lead ECG

| | **Reference Strip Read (US Board Certified Cardiologists)** | | | |
|---|---|---|---|---|
| Manual Read of ECG App Strips | SR | AF | Unreadable | Total |
| SR | 251 | 0 | 1 | 252 |
| AF | 0 | 243 | 1 | 244 |
| Unreadable | 10 | 24 | 1 | 35 |
| Missing Data | 41 | 30 | 0 | 71 |
| Total | 302 | 297 | 3 | 602 |

Safety
There were no adverse events reported by any subject in the study.

Pediatric Extrapolation
The device is indicated for use only in adults – that is, persons aged 22 and older. The Federal Food, Drug, and Cosmetic Act defines pediatric patients as persons aged 21 or younger. In this De Novo request, existing clinical data were not leveraged to support the use of the device in a pediatric patient population.

## LABELING

The labeling for the device is sufficient and satisfies the requirements of 21 CFR 801 Subpart C for over-the-counter use. The labeling consists of Instructions for Use and an onboarding sequence for initial set-up. The Instructions for Use include the indications for use; a description of the device precautions; a detailed summary of the clinical data collected in support of the device; a list of potential adverse events; hardware and operating system compatibility requirements; guidance for interpretation of results; and instructions for the safe use of the device.

The ECG output of the device is limited to information use only. The qualitative nature of the Waveform Assessment could not determine if the ECG was sufficient for diagnostic use.

Please see the Limitations section above for important contraindications, warnings and precautions presented in the device labeling.

## RISKS TO HEALTH

The table below identifies the risks to health that may be associated with use of electrocardiograph software for over-the-counter use:

Table 6: Identified Risks to Health and Mitigation Measures

| **Identified Risks to Health** | **Mitigation Measures** |
|---|---|
| Poor quality ECG signal resulting in failure to detect arrhythmia | Clinical performance testing<br>Human factors testing<br>Labeling |
| Misinterpretation and/or over-reliance on device output, leading to:<br>• Failure to seek treatment despite acute symptoms<br>• Discontinuing or modifying treatment for chronic heart condition | Human factors testing<br>Labeling |
| False negative resulting in failure to identify arrhythmia and delay of further evaluation or treatment | Clinical performance testing<br>Software verification, validation, and hazard analysis<br>Non-clinical performance testing |
| False positive resulting in additional unnecessary medical procedures | Clinical performance testing<br>Software verification, validation, and hazard analysis<br>Non-clinical performance testing<br>Labeling |

## SPECIAL CONTROLS

In combination with the general controls of the FD&C Act, the electrocardiograph software for over-the-counter use is subject to the following special controls:

1. Clinical performance testing under anticipated conditions of use must demonstrate the following:
    a. The ability to obtain an ECG of sufficient quality for display and analysis; and
    b. The performance characteristics of the detection algorithm as reported by sensitivity and either specificity or positive predictive value.

2. Software verification, validation, and hazard analysis must be performed. Documentation must include a characterization of the technical specifications of the software, including the detection algorithm and its inputs and outputs.

3.  Non-clinical performance testing must validate detection algorithm performance using a previously adjudicated data set.

4.  Human factors and usability testing must demonstrate the following:
    a.  The user can correctly use the device based solely on reading the device labeling; and
    b.  The user can correctly interpret the device output and understand when to seek medical care.

5.  Labeling must include:
    a.  Hardware platform and operating system requirements;
    b.  Situations in which the device may not operate at an expected performance level;
    c.  A summary of the clinical performance testing conducted with the device;
    d.  A description of what the device measures and outputs to the user; and
    e.  Guidance on interpretation of any results.

## BENEFIT-RISK DETERMINATION

The ECG App is intended to record a single-channel ECG and detect the presence of atrial fibrillation and regular rhythm.  As an ambulatory single-lead ECG recorder, there are minimal safety concerns.  The probable risks associated with using the ECG App are nearly all related to false results in AF detection or human use errors.  False negative results may falsely reassure the user and cause delay or inappropriate changes in medical evaluation and treatment.  A false positive result can lead to additional unnecessary medical procedures.  In the clinical study, the false-positive and false-negative rates were 0.4% and 1.7% respectively when the device provided a rhythm classification.  However, approximately 1 in 8 readings were inconclusive.  There is also a risk of misinterpretation of the output by the user which can be compounded by false positive/negative results. However, this risk can be mitigated through labeling and requiring a human factors evaluation of whether users understand how the device output should be interpreted and when to seek further care from a physician.

The device provides the user a convenient and readily accessible means to record a 30-second single lead electrocardiogram (ECG) during the time of symptoms or unusual findings (e.g., irregular pulses).  The ECG can then be reviewed by a medical professional to determine if the symptoms may be related to cardiac rhythm abnormalities.  This is especially valuable for users with recurrent, transient but infrequent symptoms, which can be difficult to catch with traditional cardiac monitors.  The information can be helpful to make the medical evaluation more efficient and obviate some unnecessary procedures.

In the clinical study, the device was accurate in discriminating AF from sinus rhythm.  For users with undiagnosed AF, the device has the potential to provide early detection of the disease.  Timely diagnosis of atrial fibrillation and consequent use of chronic oral anticoagulation in high risk patients can reduce the risk of stroke.  Even in otherwise healthy users, atrial fibrillation may be the first manifestation of other diseases.  In most cases, early detection and prompt treatment are likely to improve clinical outcomes.

Overall, the probable benefits outweigh the probable risks given the available information concerning the benefits and risks. There is reasonable assurance of the safety and effectiveness for this device for the intended use.

Patient Perspectives

This submission did not include specific information on patient perspectives for this device.

Benefit/Risk Conclusion

In conclusion, given the available information above, for the following indication statement:

> The ECG app is a software-only mobile medical application intended for use with the Apple Watch to create, record, store, transfer, and display a single channel electrocardiogram (ECG) similar to a Lead I ECG. The ECG app determines the presence of atrial fibrillation (AFib) or sinus rhythm on a classifiable waveform. The ECG app is not recommended for users with other known arrhythmias.
>
> The ECG app is intended for over-the-counter (OTC) use. The ECG data displayed by the ECG app is intended for informational use only. The user is not intended to interpret or take clinical action based on the device output without consultation of a qualified healthcare professional. The ECG waveform is meant to supplement rhythm classification for the purposes of discriminating AFib from normal sinus rhythm and not intended to replace traditional methods of diagnosis or treatment.
>
> The ECG app is not intended for use by people under 22 years old.

The probable benefits outweigh the probable risks for the ECG App. The device provides benefits and the risks can be mitigated by the use of general controls and the identified special controls.

## CONCLUSION

The De Novo request for the ECG App is granted, and the device is classified under the following:

> Product Code: QDA
> Device Type: Electrocardiograph software for over-the-counter use
> Class: II
> Regulation Number: 21 CFR 870.2345

# Exhibit J



FDA U.S. FOOD & DRUG
ADMINISTRATION

September 11, 2018

Apple Inc.
% Donna-Bea Tillman
Senior Consultant, Biologics Consulting Group
Biologics Consulting Group, Inc.
1555 King St, Suite 300
Alexandria, Virginia 22314

Re: DEN180044
Trade/Device Name: ECG App
Regulation Number: 21 CFR 870.2345
Regulation Name: Electrocardiograph software for over-the-counter use
Regulatory Class: Class II
Product Code: QDA
Dated: August 13, 2018
Received: August 14, 2018

Dear Donna-Bea Tillman:

The Center for Devices and Radiological Health (CDRH) of the Food and Drug Administration (FDA) has completed its review of your De Novo request for classification of the ECG App, an over-the-counter device under 21 CFR Part 801 Subpart C, with the following indications for use:

> The ECG app is a software-only mobile medical application intended for use with the Apple Watch to create, record, store, transfer, and display a single channel electrocardiogram (ECG) similar to a Lead I ECG. The ECG app determines the presence of atrial fibrillation (AFib) or sinus rhythm on a classifiable waveform. The ECG app is not recommended for users with other known arrhythmias.
>
> The ECG app is intended for over-the-counter (OTC) use. The ECG data displayed by the ECG app is intended for informational use only. The user is not intended to interpret or take clinical action based on the device output without consultation of a qualified healthcare professional. The ECG waveform is meant to supplement rhythm classification for the purposes of discriminating AFib from normal sinus rhythm and not intended to replace traditional methods of diagnosis or treatment.
>
> The ECG app is not intended for use by people under 22 years old.

FDA concludes that this device should be classified into Class II. This order, therefore, classifies the ECG App, and substantially equivalent devices of this generic type, into Class II under the generic name electrocardiograph software for over-the-counter use.

FDA identifies this generic type of device as:

**Electrocardiograph software for over-the-counter use**. An electrocardiograph software device for over-the-counter use creates, analyzes, and displays electrocardiograph data, and can provide information for identifying cardiac arrhythmias. This device is not intended to provide a diagnosis.

Section 513(f)(2) of the Food, Drug and Cosmetic Act (the FD&C Act) was amended by section 607 of the Food and Drug Administration Safety and Innovation Act (FDASIA) on July 9, 2012. This law provides two options for De Novo classification. First, any person who receives a "not substantially equivalent" (NSE) determination in response to a 510(k) for a device that has not been previously classified under the Act may request FDA to make a risk-based classification of the device under section 513(a)(1) of the Act. On December 13, 2016, the 21st Century Cures Act removed a requirement that a De Novo request be submitted within 30 days of receiving an NSE determination. Alternatively, any person who determines that there is no legally marketed device upon which to base a determination of substantial equivalence may request FDA to make a risk-based classification of the device under section 513(a)(1) of the Act without first submitting a 510(k). FDA shall, within 120 days of receiving such a request, classify the device. This classification shall be the initial classification of the device. Within 30 days after the issuance of an order classifying the device, FDA must publish a notice in the Federal Register announcing the classification.

On August 14, 2018, FDA received your De Novo requesting classification of the ECG App. The request was submitted under section 513(f)(2) of the FD&C Act. In order to classify the ECG App into class I or II, it is necessary that the proposed class have sufficient regulatory controls to provide reasonable assurance of the safety and effectiveness of the device for its intended use. After review of the information submitted in the De Novo request, FDA has determined that, for the previously stated indications for use, the ECG App can be classified in class II with the establishment of special controls for class II. FDA believes that class II (special) controls provide reasonable assurance of the safety and effectiveness of the device type. The identified risks and mitigation measures associated with the device type are summarized in the following table:

Table 1 – Identified Risks to Health and Mitigation Measures

| **Identified Risks to Health** | **Mitigation Measures** |
|---|---|
| Poor quality ECG signal resulting in failure to detect arrhythmia | Clinical performance testing<br>Human factors testing<br>Labeling |
| Misinterpretation and/or over-reliance on device output, leading to:<br>• Failure to seek treatment despite acute symptoms<br>• Discontinuing or modifying treatment for chronic heart condition | Human factors testing<br>Labeling |
| False negative resulting in failure to identify arrhythmia and delay of further evaluation or treatment | Clinical performance testing<br>Software verification, validation, and hazard analysis<br>Non-clinical performance testing<br>Labeling |

| | |
|---|---|
| False positive resulting in additional unnecessary medical procedures | Clinical performance testing<br>Software verification, validation, and hazard analysis<br>Non-clinical performance testing<br>Labeling |

In combination with the general controls of the FD&C Act, the electrocardiograph software for over-the-counter use is subject to the following special controls:

1. Clinical performance testing under anticipated conditions of use must demonstrate the following:
   a. The ability to obtain an ECG of sufficient quality for display and analysis; and
   b. The performance characteristics of the detection algorithm as reported by sensitivity and either specificity or positive predictive value.

2. Software verification, validation, and hazard analysis must be performed. Documentation must include a characterization of the technical specifications of the software, including the detection algorithm and its inputs and outputs.

3. Non-clinical performance testing must validate detection algorithm performance using a previously adjudicated data set.

4. Human factors and usability testing must demonstrate the following:
   a. The user can correctly use the device based solely on reading the device labeling; and
   b. The user can correctly interpret the device output and understand when to seek medical care.

5. Labeling must include:
   a. Hardware platform and operating system requirements;
   b. Situations in which the device may not operate at an expected performance level;
   c. A summary of the clinical performance testing conducted with the device;
   d. A description of what the device measures and outputs to the user; and
   e. Guidance on interpretation of any results.

Section 510(m) of the FD&C Act provides that FDA may exempt a class II device from the premarket notification requirements under section 510(k) of the FD&C Act, if FDA determines that premarket notification is not necessary to provide reasonable assurance of the safety and effectiveness of the device type. FDA has determined premarket notification is necessary to provide reasonable assurance of the safety and effectiveness of the device type and, therefore, the device is not exempt from the premarket notification requirements of the FD&C Act. Thus, persons who intend to market this device type must submit a premarket notification containing information on the electrocardiograph software for over-the-counter use they intend to market prior to marketing the device.

Although this letter refers to your product as a device, please be aware that some granted products may instead be combination products. If you have questions on whether your product is a combination product, contact CDRHProductJurisdiction@fda.hhs.gov.

Please be advised that FDA's decision to grant this De Novo request does not mean that FDA has made a determination that your device complies with other requirements of the FD&C Act or any Federal statutes and regulations administered by other Federal agencies. You must comply with all the FD&C Act's requirements, including, but not limited to: registration and listing (21 CFR Part 807); labeling (21 CFR Part 801); medical device reporting (reporting of medical device-related adverse events) (21 CFR 803) for devices or postmarketing safety reporting (21 CFR 4, Subpart B) for combination products (see https://www.fda.gov/CombinationProducts/GuidanceRegulatoryInformation/ucm597488.htm); good manufacturing practice requirements as set forth in the quality systems (QS) regulation (21 CFR Part 820) for devices or current good manufacturing practices (21 CFR 4, Subpart A) for combination products; and if applicable, the electronic product radiation control provisions (Sections 531-542 of the FD&C Act); 21 CFR 1000-1050.

A notice announcing this classification order will be published in the Federal Register. A copy of this order and supporting documentation are on file in the Dockets Management Branch (HFA-305), Food and Drug Administration, 5630 Fishers Lane, Room 1061, Rockville, MD 20852 and are available for inspection between 9 a.m. and 4 p.m., Monday through Friday.

As a result of this order, you may immediately market your device as described in the De Novo request, subject to the general control provisions of the FD&C Act and the special controls identified in this order.

For comprehensive regulatory information about medical devices and radiation-emitting products, please see Device Advice (https://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/) and CDRH Learn (http://www.fda.gov/Training/CDRHLearn). Additionally, you may contact the Division of Industry and Consumer Education (DICE) to ask a question about a specific regulatory topic. See the DICE website (http://www.fda.gov/DICE) for more information or contact DICE by email (DICE@fda.hhs.gov) or phone (1-800-638-2041 or 301-796-7100).

If you have any questions concerning the contents of the letter, please contact Luke Ralston at 301-796-6362.

Sincerely,

Angela C. Krueger -S

Angela C. Krueger
Deputy Director, Engineering and Science Review
Office of Device Evaluation
Center for Devices and Radiological Health

# Exhibit K

4/27/2021 Redesigned Apple Watch Series 4 revolutionizes communication, fitness and health - Apple

Mac
iPad
iPhone
Watch
TV
Music
Support

Newsroom

Search Newsroom Popular Topics

PRESS RELEASE
September 12, 2018

# Apple Watch Series 4: Beautifully redesigned with breakthrough communication, fitness and health capabilities

## Featuring a Stunning New Display, Electrocardiogram and Fall Detection

https://www.apple.com/newsroom/2018/09/redesigned-apple-watch-series-4-revolutionizes-communication-fitness-and-health/ 1/12

Exhibit K
Page 175

The redesigned Apple Watch Series 4 features a stunning display with thinner borders and curved corners.

Cupertino, California — Apple today introduced Apple Watch Series 4, redesigned and re-engineered to help users stay connected, be more active and manage their health in powerful new ways. While retaining the original iconic design, the fourth-generation Apple Watch has been refined, combining new hardware and software enhancements into a genuinely singular, unified form. The stunning display is over 30 percent larger and seamlessly integrates into the thinner, smaller case, while the new interface provides more information with richer detail. Apple Watch Series 4 with watchOS 5 brings advanced activity and communications features, along with revolutionary health capabilities, including a new accelerometer and gyroscope, which are able to detect hard falls, and an electrical heart rate sensor that can take an electrocardiogram (ECG) using the new ECG app,[1] which has been granted a De Novo classification by the FDA.



A gorgeous new gold stainless steel case joins existing silver and space black models.

“We’re thrilled Apple Watch has become an essential part of people's lives,” said Jeff Williams, Apple’s chief operating officer. “The completely redesigned Apple Watch Series 4 continues to be an indispensable communication and fitness companion, and now with the addition of groundbreaking features, like fall detection and the first-ever ECG app offered directly to consumers, it also becomes an intelligent guardian for your health.”

Apple Watch with watchOS 5 is the ultimate fitness companion.

Beginning Friday, September 14, Apple Watch Series 4 (GPS) will be available to order in 26 countries and territories and Apple Watch Series 4 (GPS + Cellular) will be available to order in 16 countries and territories. Both models will be available in stores beginning Friday, September 21.

## Design

Apple Watch Series 4 is more than an evolution — it represents a fundamental redesign and re-engineering of Apple Watch. It's offered in two sizes, 40mm and 44mm. The speaker is 50 percent louder, optimized for phone calls, Siri and Walkie-Talkie, and the microphone has been relocated, to reduce echo for better sound quality. The device includes the next-generation S4 chip with a custom 64-bit dual-core processor, delivering twice the speed while maintaining the same all-day battery life.[2]

New watch faces like Fire react uniquely with the curved edges.

The back of Apple Watch Series 4 is composed of a gorgeous black ceramic and sapphire crystal, allowing radio waves to easily pass through the front and back for better cellular service. The Digital Crown now includes haptic feedback, offering a more mechanical and responsive feel through the sensation of incremental clicks.

With Apple Watch Series 4, app icons, buttons and fonts are larger, more glanceable and tappable.

The user interface is optimized for the larger display, allowing for app icons and fonts that are bigger and easier to read, while complications have been beautifully enhanced to be more precise and informative. New watch faces take full advantage of the Series 4 display, from the endlessly customizable Infograph face, to the Breathe face, where the animation is timed around a deep breath. Additionally, a suite of motion faces, including Vapor, Liquid Metal, Fire and Water react uniquely with the curved edges of the case.

Yoga and hiking are new dedicated workout types. 

## Health

Apple Watch Series 4 enables customers to take an ECG reading right from the wrist using the new ECG app, which takes advantage of the

electrodes built into the Digital Crown and new electrical heart rate sensor in the back crystal. With the app, users touch the Digital Crown and after 30 seconds, receive a heart rhythm classification. It can classify if the heart is beating in a normal pattern or whether there are signs of Atrial Fibrillation (AFib), a heart condition that could lead to major health complications. All recordings, their associated classifications and any noted symptoms are stored in the Health app in a PDF that can be shared with physicians.

Taking an ECG is easy with a touch of the Digital Crown. 

With watchOS 5, Apple Watch intermittently analyzes heart rhythms in the background and sends a notification if an irregular heart rhythm such as AFib is detected.[3] It can also alert the user if the heart rate exceeds or falls below a specified threshold.

Fall detection utilizes a next-generation accelerometer and gyroscope, which measures up to 32 g-forces, along with custom algorithms to identify when hard falls occur. By analyzing wrist trajectory and impact acceleration, Apple Watch sends the user an alert after a fall, which can be dismissed or used to initiate a call to emergency services. If Apple Watch senses immobility for 60 seconds after the notification, it

will automatically call emergency services and send a message along with location to emergency contacts.



Apple Watch Series 4 can detect hard falls and if required, initiate a call to emergency services. 

## Fitness

With watchOS 5, Apple Watch becomes an even better fitness and workout companion. Activity competitions allow users to challenge other Apple Watch wearers, automatic workout detection provides an alert to start a workout while giving retroactive credit, and Yoga and Hiking are new dedicated workout types that accurately track active calories burned and exercise minutes earned. Running enthusiasts can take advantage of extended battery life — which is increased to six hours — for outdoor workouts and enjoy high-performance features, including cadence for indoor and outdoor runs, pace alerts for outdoor runs and rolling mile pace, which shows pace for the immediately preceding mile.



With watchOS 5, users can challenge any Activity Sharing friend to a seven-day competition.

## Staying Connected

Customers can reach their friends with just a tap of the wrist with Walkie-Talkie, a watch-to-watch connection that is an entirely new way to communicate around the world over Wi-Fi or cellular.[4] The Siri watch face is more predictive and proactive, offering shortcuts and actionable content from favorite third-party apps. watchOS 5 also lets users listen to their favorite podcasts on the go with Apple Podcasts on Apple Watch, and stream any podcast in the catalog by using Siri. With Apple Watch Series 4, enriched complications offer a more detailed view of helpful third-party apps like Dexcom, which allows for continuous glucose monitoring, or Streaks, which shows daily progress on tasks.

The Walkie-Talkie feature offers quick voice communication with any Apple Watch user around the world.

## Apple Watch Line-Up

Apple Watch Series 4 (GPS) starts at **$399** (US) and Apple Watch Series 4 (GPS + Cellular) starts at **$499**, both featuring the updated design and new health features. Series 3 will be available at the new starting price of **$279**, making it even more accessible to customers. Along with the three aluminum finishes anodized in silver, gold and space gray, Apple Watch Series 4 now comes in a striking gold stainless steel with matching Milanese band, joining the silver and space black stainless steel models. A new collection of bands debut for fall and all bands continue to work with any generation of Apple Watch.

Apple Watch Series 4 comes in three aluminum finishes, anodized in silver, gold and

space gray.

Apple Watch Nike+ remains a customer favorite and the new collection features redesigned Nike watch faces, which match to the new band colors, including a Pure Platinum/Black Sport Band and a Summit White Sport Loop with reflective yarn. Apple Watch Hermès introduces an elegant assortment of color-blocked bands and exclusive watch faces that shift from one color to the other with the passage of the minute hand.

Apple Watch Series 4 now comes in a gorgeous new gold stainless steel with matching Milanese band.

**Pricing and Availability**

- Customers will be able to order Apple Watch Series 4 (GPS + Cellular) beginning Friday, September 14, with availability beginning Friday, September 21, in *Australia*, *Canada*, *China*, *Denmark*, *France*, *Germany*, *Hong Kong*, *Italy*, *Japan*, *Singapore*, *Spain*, *Sweden*, *Switzerland*, *the UAE*, *UK* and *US*, with other countries later this year. For carrier availability, visit apple.com/watch/cellular.[5]
- Customers will be able to order Apple Watch Series 4 (GPS) beginning Friday, September 14, with availability beginning Friday, September 21, in *Australia*, *Austria*, *Belgium*, *Canada*, *China*, *Denmark*, *Finland*, *France*, *Germany*, *Guernsey*, *Hong Kong*, *Ireland*, *Italy*, *Japan*, *Jersey*, *Luxembourg*, *Netherlands*, *New Zealand*, *Norway*,

*Portugal*, *Puerto Rico*, *Saudi Arabia*, *Singapore*, *Spain*, *Sweden*, *Switzerland*, *the UAE*, *UK*, *US* and *US Virgin Islands*.

- Apple Watch Nike+ will be available to order on apple.com and in the Apple Store app, beginning Friday, September 14, in select countries, with limited availability beginning on Friday, October 5, in *Australia*, *Austria*, *Bahrain*, *Belgium*, *Canada*, *China*, *Czech Republic*, *Denmark*, *Finland*, *France*, *Germany*, *Greece*, *Guam*, *Hong Kong*, *Hungary*, *Ireland*, *Italy*, *Japan*, *Kuwait*, *Luxembourg*, *Macau*, *Monaco*, *Netherlands*, *New Zealand*, *Norway*, *Oman*, *Poland*, *Portugal*, *Puerto Rico*, *Qatar*, *Russia*, *Saudi Arabia*, *Singapore*, *South Africa*, *Spain*, *Sweden*, *Switzerland*, *the UAE*, *UK* and *US*. For more information, visit apple.com/apple-watch-nike or nike.com/applewatch.

- Apple Watch Hermès will be available to order on apple.com and in the Apple Store app, beginning Friday, September 14, with availability beginning Friday, September 21, in *Australia*, *Canada*, *China*, *Denmark*, *France*, *Germany*, *Hong Kong*, *Italy*, *Japan*, *Singapore*, *Spain*, *Sweden*, *Switzerland*, *the UAE*, *UK* and *US*. For more information, visit apple.com/apple-watch-hermes or hermes.com/applewatchhermes.

- Apple Watch Series 4 (GPS) will be available beginning Friday, September 28, in *Bahrain*, *Croatia*, *Czech Republic*, *Greece*, *Guam*, *Hungary*, *Iceland*, *Kazakhstan*, *Kuwait*, *Macau*, *Monaco*, *Oman*, *Poland*, *Qatar*, *Romania*, *Russia*, *Slovakia* and *South Africa*.

- New Apple Watch bands will be available to order on apple.com and in the Apple Store app, beginning Friday, September 14, with availability beginning Friday, September 21, at Apple Stores, as well as select Apple Authorized Resellers and carriers in the US and over 35 countries and regions.

- With Apple GiveBack, customers in the US can trade in their eligible device for an Apple Store Gift Card or a refund on their purchase. If their device isn't eligible for credit, Apple will recycle it for free.

- Customers who buy Apple Watch from Apple will be offered free Personal Setup, in-store or online,[6] to help set up and personalize their new Apple Watch with calendars, notifications, apps and more.

**Images of Apple Watch Series 4**
Download all images

Apple revolutionized personal technology with the introduction of the Macintosh in 1984. Today, Apple leads the world in innovation with iPhone, iPad, Mac, Apple Watch and Apple TV. Apple's four software platforms — iOS, macOS, watchOS and tvOS — provide seamless experiences across all Apple devices and empower people with breakthrough services including the App Store, Apple Music, Apple Pay and iCloud. Apple's more than 100,000 employees are dedicated to making the best products on earth, and to leaving the world better than we found it.

[1] ECG app coming later this year (US only).
[2] Battery life depends on use and configuration.
[3] Irregular rhythm notification coming later this year, (US only).
[4] Walkie-Talkie is not available in China, UAE and Pakistan.
[5] Apple Watch requires a compatible iPhone. iPhone service provider must be the same. Not available with all service providers. Roaming is not available.
[6] In most countries.

## Press Contacts

### Lance Lin

Apple
lance_lin@apple.com
(408) 974-5036

### Amy Bessette

Apple
abessette@apple.com
(408) 862-8012

### Apple Media Helpline

media.help@apple.com
(408) 974-2042

Newsroom
The latest news and updates, direct from Apple.
Read more ›
Newsroom › Redesigned Apple Watch Series 4 revolutionizes communication, fitness and health
Shop and Learn
Mac
iPad
iPhone
Watch
TV
Music
AirPods
HomePod
iPod touch
Accessories
Gift Cards
Services
Apple Music
Apple TV+
Apple Fitness+
Apple News+
Apple Arcade
iCloud
Apple One
Apple Card
Apple Books
App Store
Account
Manage Your Apple ID
Apple Store Account
iCloud.com
Apple Store
Find a Store
Shop Online
Genius Bar
Today at Apple
Apple Camp
Apple Store App
Refurbished and Clearance
Financing
Apple Trade In
Order Status
Shopping Help
For Business
Apple and Business
Shop for Business
For Education
Apple and Education
Shop for K-12
Shop for College
For Healthcare
Apple in Healthcare
Health on Apple Watch
Health Records on iPhone
For Government
Shop for Government
Shop for Veterans and Military
Apple Values
Accessibility
Education
Environment
Inclusion and Diversity
Privacy
Racial Equity and Justice
Supplier Responsibility
About Apple
Newsroom
Apple Leadership
Job Opportunities
Investors
Events
Contact Apple
More ways to shop: Find an Apple Store or other retailer near you. Or call 1-800-MY-APPLE.
Copyright © 2021 Apple Inc. All rights reserved.
Privacy Policy | Terms of Use | Sales and Refunds | Legal | Site Map
United States

# Exhibit L

Exhibit L
Page 187

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549

## FORM 10-K

**(Mark One)**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended January 2, 2021**
**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _________ to _________**
**Commission File Number 001-33642**

MASIMO

# MASIMO CORPORATION

**(Exact name of registrant as specified in its charter)**

| DE | 33-0368882 |
|---|---|
| **(State or Other Jurisdiction of Incorporation or Organization)** | **(I.R.S. Employer Identification Number)** |
| 52 Discovery Irvine , CA | 92618 |
| **(Address of principal executive offices)** | **(Zip Code)** |

(949) 297-7000
**(Registrant's telephone number, including area code)**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class: | Trading symbol: | Name of each exchange on which registered: |
|---|---|---|
| Common Stock, par value $0.001 | MASI | The Nasdaq Stock Market, LLC |

**Securities registered pursuant to Section 12(g) of the Act:** None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. ☒ Yes ☐ No

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. ☐ Yes ☒ No

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. ☒ Yes ☐ No

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). ☒ Yes ☐ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act.) ☐ Yes ☒ No

The aggregate market value of the voting stock held by non-affiliates of the registrant, based upon the closing sale price of the common stock on June 27, 2020, the last business day of the registrant's most recently completed second fiscal quarter, as reported on the Nasdaq Global Select Market, was approximately $9.2 billion. Shares of stock held by officers, directors and 5 percent or more stockholders have been excluded in that such persons may be deemed to be affiliates. This determination of affiliate status is not necessarily a conclusive determination for other purposes. At January 30, 2021, the registrant had 55,266,559 shares of common stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Items 10, 11, 12, 13 and 14 of Part III of this Annual Report on Form 10-K incorporate information by reference from the registrant's proxy statement for the registrant's 2021 Annual Meeting of Stockholders to be filed with the Securities and Exchange Commission within 120 days after the close of the fiscal year covered by this annual report on Form 10-K.

Table of Contents

**MASIMO CORPORATION**
**FISCAL YEAR 2020 FORM 10-K ANNUAL REPORT**
**TABLE OF CONTENTS**

| | | Page |
|---|---|---|
| | **PART I** | |
| Item 1 | Business | 1 |
| Item 1A | Risk Factors | 35 |
| Item 1B | Unresolved Staff Comments | 62 |
| Item 2 | Properties | 62 |
| Item 3 | Legal Proceedings | 62 |
| Item 4 | Mine Safety Disclosures | 62 |
| | **PART II** | |
| Item 5 | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 63 |
| Item 6 | Selected Financial Data | 66 |
| Item 7 | Management's Discussion and Analysis of Financial Condition and Results of Operations | 68 |
| Item 7A | Quantitative and Qualitative Disclosures about Market Risk | 79 |
| Item 8 | Financial Statements and Supplementary Data | 79 |
| Item 9 | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 80 |
| Item 9A | Controls and Procedures | 80 |
| Item 9B | Other Information | 80 |
| | **PART III** | |
| Item 10 | Directors, Executive Officers and Corporate Governance | 81 |
| Item 11 | Executive Compensation | 81 |
| Item 12 | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 81 |
| Item 13 | Certain Relationships and Related Transactions and Director Independence | 81 |
| Item 14 | Principal Accounting Fees and Services | 81 |
| | **PART IV** | |
| Item 15 | Exhibits and Financial Statement Schedules | 82 |
| Item 16 | Form 10-K Summary | 85 |
| Signatures | | 86 |

## FORWARD-LOOKING STATEMENTS

*This Annual Report on Form 10-K contains "forward-looking statements" that involve risks and uncertainties, as well as assumptions that, if they never materialize or prove incorrect, could cause our results to differ materially and adversely from those expressed or implied by such forward-looking statements. The forward-looking statements are contained principally in Item 1—"Business," Item 1A—"Risk Factors" and Item 7—"Management's Discussion and Analysis of Financial Condition and Results of Operations" but appear throughout this Annual Report on Form 10-K. Examples of forward-looking statements include, but are not limited to, any projection or expectation of earnings, revenue or other financial items; the plans, strategies and objectives of management for future operations; factors that may affect our operating results, including accounting and tax estimates; our success in pending litigation; new products or services; the demand for our products; our ability to consummate acquisitions and successfully integrate them into our operations; future capital expenditures; effects of current or future economic conditions or performance; industry trends and other matters that do not relate strictly to historical facts or statements of assumptions underlying any of the foregoing. These statements are often identified by the use of words such as "anticipate," "believe," "continue," "could," "estimate," "expect," "intend," "may," "ongoing," "opportunity," "plan," "potential," "predicts," "seek," "should," "will," or "would," and similar expressions and variations or negatives of these words. These forward-looking statements are based on the expectations, estimates, projections, beliefs and assumptions of our management based on information currently available to management, all of which is subject to change. Such forward-looking statements are subject to risks, uncertainties and other factors that are difficult to predict and could cause our actual results and the timing of certain events to differ materially and adversely from future results expressed or implied by such forward-looking statements. Factors that could cause or contribute to such differences include, but are not limited to, those identified below, and those discussed under Item 1A—"Risk Factors" in this Annual Report on Form 10-K. Furthermore, such forward-looking statements speak only as of the date of this Annual Report on Form 10-K. We undertake no obligation to update or revise publicly any forward-looking statements to reflect events or circumstances after the date of such statements for any reason, except as otherwise required by law.*

## PART I

### ITEM 1. BUSINESS

***Overview***

We are a global medical technology company that develops, manufactures and markets a variety of noninvasive monitoring technologies and hospital automation solutions. Our mission is to improve patient outcomes and reduce the cost of patient care. Our patient monitoring solutions generally incorporate a monitor or circuit board, proprietary single-patient use or reusable sensors, software and/or cables. We provide our products to hospitals, emergency medical service (EMS) providers, home care providers, long-term care facilities, physician offices, veterinarians and consumers through our direct sales force, distributors and original equipment manufacturers (OEM) partners. We were incorporated in California in May 1989 and reincorporated in Delaware in May 1996.

Our core business is Measure-through Motion and Low Perfusion™ pulse oximetry, known as Masimo Signal Extraction Technology® (SET®) pulse oximetry. Our product offerings have expanded significantly over the years to also include noninvasive monitoring of blood constituents with an optical signature, optical regional oximetry monitoring, electrical brain function monitoring, acoustic respiration monitoring, exhaled gas monitoring, nasal high flow ventilation, minimally invasive neuromodulation technology for pain and addiction reduction, hospital automation and connectivity solutions and home wellness and monitoring.

These technologies are incorporated into a variety of product platforms designed to meet our customers' needs. In addition, we provide our technologies to OEMs in a form factor that is easy to integrate into their patient monitors, defibrillators, infant incubators and other devices.

Our technology is supported by a substantial intellectual property portfolio that we have built through internal development and, to a lesser extent, acquisitions and license agreements. We have also exclusively licensed from Cercacor Laboratories, Inc. (Cercacor) the right to certain OEM rainbow® technologies and to incorporate certain rainbow® technology into our products intended to be used by professional caregivers, including, but not limited to, hospital caregivers and alternate care facility caregivers.

***Core Business***

*Conventional Pulse Oximetry*

Pulse oximetry enables the noninvasive measurement of the oxygen saturation level of arterial blood ($SpO_2$), which delivers oxygen to the body's tissues. Pulse oximetry also measures pulse rate (PR), which, when measured by electrocardiogram (ECG), is called heart rate. Pulse oximeters use sensors attached to an extremity, typically the fingertip or certain core body sites. These sensors contain two light-emitting diodes that transmit red and infrared light from one side of the extremity through the tissue to a photodetector on the other side of the extremity. The photodetector in the sensor measures the amount of red and infrared light absorbed by the tissue. A microprocessor then analyzes the changes in light absorption to provide a continuous, real-time measurement of the amount of oxygen in the patient's arterial blood. Pulse oximeters typically give audio and visual alerts, or alarms, when the patient's arterial blood oxygen saturation level or pulse rate falls outside of a user-designated range. As a result, clinicians have the opportunity to assess patients who may need immediate treatment to prevent the serious clinical consequences of hypoxemia, or low arterial blood oxygen saturation levels, and hyperoxemia, or high arterial blood oxygen levels.

As one of the most common technologies used in and out of hospitals around the world, pulse oximetry has gained widespread clinical acceptance as a standard patient vital sign measurement because it can give clinicians a warning of possible hypoxemia or hyperoxemia. $SpO_2$ monitoring of oxygen saturation is critical because hypoxemia can lead to a lack of oxygen in the body's tissues, which can be toxic and result in organ damage or death. Pulse oximeters are used in a variety of critical care settings, including surgery, recovery rooms, intensive care units (ICUs), emergency departments and general care floors, as well as alternative care settings, such as long-term care facilities, physician offices and the home monitoring of patients with chronic conditions.

Clinicians also use pulse oximeters to monitor oxygen saturation in premature babies to ensure that appropriate oxygen saturation levels are maintained. In premature babies, oxygen saturation levels above clinically acceptable limits may lead to a condition known as retinopathy of prematurity (ROP), which, if left untreated, can lead to permanent eye damage or blindness. By ensuring that oxygen saturation levels in babies remain within clinically acceptable limits, clinicians believe they can lower the incidence of ROP.

Conventional pulse oximetry has limitations that can reduce its effectiveness and the quality of patient care. In particular, when using conventional pulse oximetry, oxygen saturation measurements can be distorted by motion artifact, or patient movement, and low perfusion, or low arterial blood flow at the measurement site. Motion artifact can cause conventional pulse oximeters to inaccurately measure the arterial blood oxygen saturation level, due mainly to the effect of movement-induced pulsations of venous blood, which is at a lower oxygen saturation than arterial blood. Low perfusion can also cause conventional pulse oximeters to report inaccurate measurements or, in some cases, no measurement at all. In addition, conventional pulse oximeters cannot distinguish oxygenated hemoglobin from dyshemoglobin, including the most prevalent forms of dyshemoglobins, carboxyhemoglobin and methemoglobin. As a result, conventional pulse oximeters may report falsely high oxygen levels when these dyshemoglobins are present in the blood. Furthermore, conventional pulse oximetry readings can also be impacted by bright light and electrical interference caused by the presence of electrical surgical equipment.

Independent research has shown that over 70% of oxygen saturation alarms outside the operating room are false when conventional pulse oximetry is used. In the operating room, conventional pulse oximeters can fail to give accurate measurements due to weak physiological signals or low perfusion. Manufacturers of pulse oximeters have attempted to address some of these limitations with varying degrees of success. Some competing devices have attempted to minimize the observed effects of motion artifact by repeating/freezing the last measurement before motion artifact was detected until a new, clean signal is detected and a new measurement can be displayed. Other competing devices increase the averaging time during motion, known as long averaging, in an attempt to reduce the observed effect of motion on their measurements. Still other competing devices extend the audible alarm notification delay, which reduces awareness of inaccurate measurements. These competing "motion tolerant" or "alarm management" techniques mask the limitations of conventional pulse oximetry. Several published studies have demonstrated that these also contribute to increased occurrences of undetected true alarms, or events where hypoxemia occurs but is not detected by the pulse oximeter.

Lastly, because conventional pulse oximetry cannot consistently measure $SpO_2$ and pulse rate in the presence of motion artifact or low perfusion, its use is limited in lower acuity settings in the hospital, such as in general care areas, where a hospital's staff-to-patient ratio is significantly lower and the staff have less tolerance for false alarms. In addition, two-wavelength pulse oximeters cannot distinguish oxygenated hemoglobin from dyshemoglobin, including the most prevalent forms of carboxyhemoglobin and methemoglobin. As a result of these dyshemoglobins, pulse oximeters will report falsely high oxygen levels when they are present in the blood.

***Masimo Difference***

*Masimo SET® Pulse Oximetry*

Masimo SET® was designed to overcome the primary limitations of conventional pulse oximetry by maintaining accuracy in the presence of motion artifact, low perfusion and weak signal-to-noise situations. Our Masimo SET® platform, which became available to U.S. hospitals in 1998, is the basis of our pulse oximetry products, and we believe represented the first significant technological advancement in pulse oximetry since its introduction in the early 1980s. Masimo SET® utilizes five signal processing algorithms, four of which are proprietary, in parallel to deliver high sensitivity and specificity in the measurement of arterial blood oxygen saturation levels. Sensitivity is the ability to detect true alarms and specificity is the ability to avoid false alarms. One of our proprietary processing algorithms, Discrete Saturation Transform®, separates the signal from noise in real time through the use of adaptive filtering and an iterative sampling technique that tests each possible saturation value for validity. Masimo SET® signal processing can therefore identify the venous blood and other "noise", isolate them and extract the arterial signal.

The performance of Masimo SET® pulse oximetry has been evaluated in more than 100 independent studies and thousands of clinical evaluations. We believe that Masimo SET® is trusted by clinicians to safely monitor in excess of approximately 200 million patients each year and has been chosen as the primary pulse oximeter technology used by nine of the top ten hospitals according to the 2020-2021 *U.S. News & World Report* Best Hospitals Honor Roll. Compared to conventional pulse oximeters, during patient motion and low perfusion, Masimo SET® provides measurements when other pulse oximeters cannot, significantly reduces false alarms (improved specificity), and accurately detects true alarms (improved sensitivity). Clinical studies have shown that the use of Masimo SET® pulse oximetry, in conjunction with modified clinical protocols, has helped clinicians reduce ROP in neonates and improve screening for newborns with critical congenital heart disease (CCHD). Clinical studies have also shown a reduction in rapid response activations and ICU transfers when Masimo SET® is used to continuously monitor patients on general wards. Additionally, researchers have found that the use of Masimo SET® is associated with reduced ventilator weaning time and arterial blood gas measurements in the ICU.

Our pulse oximetry technology is contained on a circuit board which can be placed inside a standalone pulse oximetry monitor, placed inside OEM multiparameter monitors, or included as part of an external "Board-in-Cable" solution that is plugged into a port on an OEM or other device. All of these solutions use our proprietary single-patient-use or reusable sensors and cables. We sell our products to end-users through our direct sales force and through certain distributors, as well as to our OEM partners, for incorporation into their products. In 2013, we also began selling our pulse oximetry products in the consumer market.

To complement our Masimo SET® platform, we have developed a wide range of proprietary single-patient-use (disposable) and multi-patient-use (reusable) sensors, cables and other accessories designed specifically to work with Masimo SET® software and hardware. Our single-patient-use sensors offer several advantages over reusable sensors, including improved performance, cleanliness, increased comfort and greater reliability. In addition, our neonatal adhesive sensors have been designed to exhibit greater durability compared to competitive sensors. Although our technology platforms operate solely with our proprietary sensor lines, our sensors have the capability to work with certain competitive pulse oximetry monitors through the use of adapter cables.

Adhesive sensors are single-patient-use items, but the U.S. Food and Drug Administration (FDA) allows third parties to reprocess pulse oximetry sensors. In response to some hospitals' requests to implement environmentally friendly or "green" products, we offer sensor reprocessing as well as sensor recycling programs.

*Masimo rainbow SET® Platform*

Since introducing Masimo SET®, we have continued to innovate by introducing noninvasive measurements that go beyond arterial blood oxygen saturation and pulse rate. Our Masimo rainbow SET® platform leverages our Masimo SET® technology and incorporates licensed rainbow® technology to enable real-time monitoring of additional noninvasive measurements. Our rainbow SET® platform includes our rainbow SET® Pulse CO-Oximetry products, which we believe are the first devices cleared by the FDA to noninvasively and continuously monitor additional hemoglobin species that were previously only measurable using intermittent invasive procedures using multiple wavelengths of light.

In addition to $SpO_2$, PR, perfusion index (Pi), Pleth Variability Index (PVi®) and respiration rate from the pleth (RRp®), rainbow® Pulse CO-Oximetry has the unique ability to measure and distinguish oxygenated hemoglobins from the dyshemoglobins that are incapable of transporting oxygen, carboxyhemoglobin (SpCO®) and methemoglobin (SpMet®). Besides the ability to measure SpCO® and SpMet®, the Masimo rainbow SET® platform also allows for the noninvasive and continuous monitoring of total hemoglobin concentration (SpHb®) as well as the monitoring of arterial oxygen saturation, in the presence of carboxyhemoglobin and methemoglobin, known as fractional arterial oxygen saturation ($SpfO_2$™). Additionally, the rainbow SET® platform also allows for the calculation of Oxygen Content (SpOC™) and Oxygen Reserve Index™ (ORi™). $SpfO_2$™ and ORi™ have received CE Marking, but are not currently available for sale in the U.S.

We believe that Masimo rainbow® Pulse CO-Oximetry products will become widely adopted for the noninvasive monitoring of these measurements in the future. We also believe that the addition of acoustic respiration rate (RRa®), using our rainbow Acoustic Monitoring® technology, will strengthen the clinical demand for noninvasive and continuous monitoring using our rainbow® platform, especially in the growing general floor market.

Products with our MX circuit board contain our Masimo SET® pulse oximetry technology as well as circuitry to support rainbow® measurements. At the time of purchase, or at any time in the future, our customers and our OEMs' customers have the option of purchasing additional rainbow® software measurements, which allow such customers to incrementally expand their patient monitoring systems with a cost-effective solution. To date, over thirty-eight companies have released rainbow SET® equipped products or announced rainbow® integration plans.

*Measurements*

*SpHb®*

Hemoglobin is the oxygen-carrying component of red blood cells (RBCs). Hemoglobin measurement is one of the most frequent invasive laboratory measurements in the world, and is often measured as part of a complete blood count (CBC), which measures multiple other blood components. A low hemoglobin status is a condition called anemia. As a chronic disorder, anemia can be treated by iron supplements, diet changes or drugs that increase the production of RBCs. As an acute disorder resulting from bleeding, anemia requires either stoppage of the bleeding or a blood transfusion in order to sustain organ function and life.

SpHb® is available as a continuous or a spot-check measurement. Continuous SpHb® monitoring provides real-time visibility into hemoglobin levels and the changes, or lack of changes, in hemoglobin levels, which can otherwise only be measured through intermittent, invasive blood testing. SpHb® monitoring is not intended to be used as the sole basis for making diagnosis or treatment decisions, but continuous SpHb® monitoring may help clinicians to trend hemoglobin in real time between invasive blood samples.

*SpOC™*

The oxygen content of blood is a function of both oxygen saturation and hemoglobin levels. SpOC™ provides a more complete picture of a patient's oxygenation status by combining noninvasive and continuous measurements of both hemoglobin and oxygen saturation levels into a single calculation.

*SpCO®*

Carbon monoxide (CO) is a colorless, odorless and tasteless gas that is undetectable by humans and is often unknowingly inhaled from combustion fumes, or during fires by victims and first responders. CO poisoning is the leading cause of accidental poisoning death in the U.S. and is responsible for up to 50,000 emergency department visits and 500 unintentional deaths annually. CO, when bound to hemoglobin cells, prevents those cells from carrying oxygen. Elevated CO levels may cause severe neurological damage, permanent heart damage or death. Screening for elevated CO levels in the emergency department is critical, as symptoms of CO poisoning in patients may be misdiagnosed because such symptoms are similar to the flu.

CO levels in the blood can be measured using a laboratory CO-Oximeter, which requires a patient or a patient's blood sample to be transported to a hospital with laboratory CO-Oximetry capability. Additional delays occur if a patient needs hyperbaric oxygen therapy, which often requires transfer to yet another medical center with hyperbaric capability. Outside the hospital, laboratory measurements of carboxyhemoglobin are not considered feasible. Historically, this meant that CO levels in the blood could not be assessed in environments in which such assessment would be very useful, such as in the home or as part of the medical evaluation of first responders potentially exposed to CO at the scene of a fire.

While SpCO® is not intended to replace invasive carboxyhemoglobin tests, when used with other clinical variables, SpCO® may help clinicians identify elevated CO levels and help determine additional test and treatment options. Multiple leading emergency first responder associations, including the National Association of Emergency Medical Technicians, the National Association of EMS Educators, the International Association of Fire Fighters and the International Association of Fire Chiefs, have educated their members on the benefits of noninvasive CO measurement when exposure is suspected or when an individual presents symptoms that could indicate elevated CO levels.

*SpMet®*

Methemoglobin in the blood leads to a dangerous condition known as methemoglobinemia, which occurs as a reaction to some common drugs used in hospitals and outpatient procedures. Methemoglobinemia reduces the amount of oxygen bound to hemoglobin for delivery to tissues and forces normal hemoglobin to bind more tightly to oxygen, releasing less oxygen to the tissues. Methemoglobinemia may go unrecognized or be subject to delayed diagnosis, increasing risk to the patient. Commonly prescribed drugs can introduce methemoglobin into the blood and cause methemoglobinemia. Some of the 30 drugs that are known to cause methemoglobinemia include benzocaine, a local anesthetic routinely used in procedures ranging from endoscopy to surgery; inhaled nitric oxide, routinely used in the Neonatal Intensive Care Unit; nitroglycerin, used to treat cardiac patients; and dapsone, used to treat infections for immune-deficient patients such as Human Immunodeficiency Virus (HIV) patients. Warnings, cautions and alerts regarding the clinical significance and prevalence of methemoglobinemia have been generated by the FDA, the Veterans Administration, the Institute for Safe Medication Practices and the National Academy of Clinical Biochemistry. The American Academy of Pediatrics recommends monitoring methemoglobin levels in infants who receive nitric oxide therapy. While SpMet® is not intended to replace invasive methemoglobin tests, when used with other clinical variables, SpMet® may help clinicians identify elevated methemoglobin levels and help determine additional test and treatment options.

*PVi®*

PVi® is a measure of the dynamic changes in the Perfusion Index (Pi) that occur during the respiratory cycle. The calculation is accomplished by measuring changes in Pi over a time interval where one or more complete respiratory cycles have occurred. PVi® is displayed as a percentage. The lower the number, the less variability there is in Pi over a respiratory cycle. PVi® may show changes that reflect physiologic factors such as vascular tone, circulating blood volume and intrathoracic pressure excursions. When used with other clinical variables, PVi® may help clinicians assess fluid responsiveness in surgical and intensive care patients who are mechanically ventilated and help determine other treatment options. In August 2020, PVi® received FDA 510(k) clearance as a continuous, noninvasive, dynamic indicator of fluid responsiveness in select populations of mechanically ventilated adult patients.

*RPVi™*

Rainbow® Pleth Variability Index (RPVi™) is a multi-wavelength version of PVi® that is designed to provide enhanced specificity to changes in fluid volume compared to PVi®. Similar to PVi®, RPVi™ is displayed as a percentage and is calculated by measuring changes in Pi over a time interval where one or more complete respiratory cycles have occurred. The lower the number, the less variability there is in Pi over a respiratory cycle, which indicates more fluid in the body. RPVi™ has received the CE Mark, but is not currently available for sale in the U.S.

*RRp®*

Respiration rate is defined as the number of breaths per minute. Changes in respiration rate provide an early warning sign of deterioration in patient condition. A low respiration rate is indicative of respiratory depression and high respiration rate is indicative of patient distress. Current methods of monitoring respiration rate include end tidal carbon dioxide ($EtCO_2$) monitoring, which requires a nasal cannula be inserted in the patient's nose or a mask to be worn, and therefore has low patient compliance; and impedance monitoring, which is considered unreliable and requires the placement of ECG electrodes on the chest. RRp® allows clinicians to noninvasively and continuously measure and monitor respiration rate using a standard Masimo SET® pulse oximetry sensor or rainbow® Pulse CO-Oximetry sensor. RRp® is determined by the variations in the plethysmograph waveform due to respiration, although the measurement is not possible in all patients or conditions and may not immediately indicate changes in respiration rate. RRp® has received the CE Mark, as well as FDA 510(k) clearance when used in healthcare settings with the MightySat® Rx fingertip SET® pulse oximeter. RRp® is also available in the U.S. for use by consumers for general health and wellness purposes as part of our MightySat® fingertip pulse oximeter. In March 2020, RRp® received FDA 510(k) clearance for continuous RRp® monitoring of adult and pediatric patients with Rad-97®, Radical-7® and Radius-7® Pulse Co-Oximeters®. With this clearance, both continuous and spot-check RRp® are now available in the U.S. and supported in a variety of pulse oximetry sensors and configurations, including a non-cabled, tetherless, wearable Radius PPG™.

Table of Contents

*RRa®*

Our sound-based monitoring technology, rainbow Acoustic Monitoring® (RAM®), enables RRa® and provides continuous and noninvasive monitoring of respiration rate. For patients requiring accurate and sensitive respiration rate monitoring, we believe that RRa® better detects pauses in breathing than respiration rate measurements from other technologies such as $EtCO_2$ monitoring and RRp®. RRa® also provides an important visual indication of breathing through a displayed acoustic waveform.
Multiple clinical studies have shown that the noninvasive measurement of acoustic respiration rate provides as good or better respiration rate monitoring accuracy as $EtCO_2$ monitoring, and can reliably detect episodes of respiratory pause, defined as the cessation of breathing for 30 seconds or more. When used with other clinical variables, RRa® may help clinicians assess respiratory depression and respiratory distress earlier and more often to help determine treatment options and potentially enable earlier interventions.

*SpfO2™*

Prior to our debut of $SpfO_2$™, pulse oximeters could only measure and display functional $SpO_2$ oxygen saturation. Therefore, when patients had elevated carboxyhemoglobin and/or elevated methemoglobin, the displayed *functional* $SpO_2$ oxygen saturation overestimated the actual oxygen saturation value. $SpfO_2$™, or *fractional* oxygen saturation, allows more precise arterial oxygenation assessment in patients with elevated dyshemoglobins, common throughout the hospital and pre-hospital setting, compared to functional oxygen saturation, and may also allow earlier interventions and more timely therapeutic decisions. $SpfO_2$™ has received the CE Mark, but is not currently available for sale in the U.S.

*ORi™*

ORi™ provides real-time visibility to oxygenation status in moderate hyperoxic range, which we define as a patient's oxygen "reserve". ORi™ can be trended and has optional alarms to notify clinicians of changes in a patient's oxygen reserve. When this technology is used with $SpO_2$ monitoring, ORi™ may extend the continuous and noninvasive visibility of a patient's oxygen status into ranges previously unmonitored in this fashion. ORi™ may also be of value in patients receiving supplemental oxygen, such as those in surgery, under conscious sedation or in the ICU, as ORi™ is represented as an "index" parameter with a unit-less scale between 0.00 and 1.00. Furthermore, ORi™ may provide an advance warning of an impending hypoxic state, or an indication of an unintended hyperoxic state, when evaluated in conjunction with the partial pressure of oxygen ($PaO_2$). In this way, ORi™ may assist in determining the need for proactive interventions to avoid hypoxia or unintended hyperoxia. ORi™ has received the CE Mark, but is not currently available for sale in the U.S.

***Other Noninvasive Measurements***

Following the introduction of our rainbow SET® platform, we have continued to expand our technology offerings by introducing additional noninvasive measurements and technologies to create new market opportunities in both hospital and non-hospital care settings.

*SedLine® Brain Function Monitoring*

Brain function monitoring is most commonly used during surgery to help clinicians avoid over-titration and under-titration of anesthesia and sedation. SedLine® brain function monitoring technology measures the brain's electrical activity by detecting EEG signals. In contrast to whole-scalp EEG monitoring, which is used for diagnostic purposes, this form of EEG monitoring is often referred to as processed EEG monitoring or brain function monitoring. Brain function monitors display the patient's EEG waveforms, but these may be difficult for clinicians to interpret. With SedLine® technology, EEG signals are processed and displayed as a single number called the Patient State Index (PSi), which gives a continuous quantitative indication of the patient's depth of anesthesia and sedation. SedLine® brain function monitoring technology also displays raw EEG waveforms, the PSi trend and a Density Spectral Array view, which allows clinicians to compare EEG power in both sides of the brain over time to facilitate the detection of asymmetrical activity and agent-specific effects on the EEG signal.

SedLine® brain function monitoring technology is available on Root® through the use of a Masimo Open Connect® (MOC-9®) connectivity port. The Root® patient monitoring and connectivity platform integrates rainbow® and SET® measurements with measurement technologies, such as SedLine®.

*NomoLine® Capnography and Gas Monitoring*

We offer a portfolio of capnography and gas monitoring products ranging from external "plug-in-and-measure" capnography and gas analyzers, integrated modules, handheld capnograph and capnometer devices and capnography sampling lines. Our NomoLine® capnography sampling lines are available in more than 40 configurations of airway adapter sets and cannulas for use in a variety of clinical scenarios on both intubated and non-intubated adult, pediatric, infant and neonatal patients, in both low and high humidity configurations, facilitating easy to use sidestream capnography and gas monitoring.

These products have the ability to measure multiple expired gases, such as carbon dioxide ($CO_2$), nitrous oxide ($N_2O$), oxygen ($O_2$) and other anesthetic agents. In addition, respiration rate is calculated from the $CO_2$ waveform. These measurements are possible through either mainstream monitoring, which samples gases from a ventilated patient's breathing circuit, or sidestream monitoring, which samples gases from a breathing circuit in mechanically ventilated patients or through a cannula or mask in spontaneously breathing patients. These capnography and gas measurements are standard-of-care in many hospital environments, such as operating rooms and ICUs, during procedural sedation. NomoLine® capnography sampling lines have received FDA 510(k) clearance.

*O3® Organ Oximetry*

O3® organ or Regional Oximetry, also known as tissue or cerebral oximetry, uses near-infrared spectroscopy (NIRS) to provide continuous measurement of tissue oxygen saturation ($rSO_2$) to help detect regional hypoxemia, or oxygen deficits in specific tissues such as the brain, that pulse oximetry alone cannot detect under certain conditions. In addition, O3® sensors, in conjunction with our Root® monitor, can automate the differential analysis of regional to central oxygen saturation derived from SET® pulse oximeters. O3® monitoring involves applying O3® Regional Oximetry sensors to the forehead and connecting the O3® MOC-9® module to a Root® monitor through one of its three MOC-9® ports. O3® Regional Oximetry has received the CE Mark and FDA 510(k) clearance for use in adult and pediatric patients. In June 2019, we announced FDA 510(k) clearance for use of O3® in infant and neonatal patients. In August 2020, O3® Regional Oximetry received 510(k) clearance for expanded use in monitoring somatic tissue oxygenation saturation in all patient populations and monitoring relative changes in hemoglobin, oxyhemoglobin and deoxyhemoglobin in adult brains. With this FDA 510(k) clearance, O3® Regional Oximetry is now indicated for use in both cerebral and somatic applications, both in the U.S. and in CE Mark countries, for all patient populations.

*Advanced Hemodynamic Monitoring Solutions*

In December 2020, we acquired a majority ownership stake of LiDCO Group, PLC, which specializes in hemodynamic monitoring solutions. With this acquisition, we will be able to provide clinicians with access to patients' cardiac output, stroke volume and systemic vascular resistance, which are used to assess preload and afterload, to help determine the current state of a patient's hemodynamic stability and whether any interventions are needed to optimize the delivery of oxygen to the tissues. Hemodynamic monitoring solutions is also used to monitor the response to therapies such as vasopressors, inotropes and fluids.

***The Masimo Hospital Automation™ Platform***

*Patient SafetyNet™[1]*

Patient SafetyNet™, our patient surveillance, remote monitoring and clinician notification solution, works in concert with our bedside and ambulatory monitoring devices to facilitate the supplemental monitoring of the oxygen saturation, pulse rate, perfusion index, hemoglobin, methemoglobin and respiration rate of up to 200 patients simultaneously from a single server. Patient SafetyNet™ offers an intuitive and powerful user interface with trending, real-time waveform capability at a central station, as well as remote clinician notification via pager, voice-over-IP phone or smart-phones. Patient SafetyNet™ also features an Adaptive Connectivity Engine™ (ACE™) that enables two-way, HL-7 based connectivity to clinical/hospital information systems. The ACE™ significantly reduces the time and complexity to integrate and validate custom HL-7 implementations, and demonstrates our commitment to innovation that automates patient care with open, scalable and standards-based connectivity architecture.

Patient SafetyNet™ Series 5000, along with Hospital Automation™ Connectivity, Iris® Gateway, Kite®, UniView™, UniView : 60™, and MyView® through the Root® patient monitoring and connectivity platform, offers a new level of interoperability designed to enhance clinician workflows and reduce the cost of care in a variety of hospital settings, including operating rooms and the general care floors. Patient SafetyNet™ Series 5000 with Iris® ports enables Root® to assimilate data from all devices connected to the patient, thereby acting as a comprehensive in-room patient monitor and connectivity hub. Alarms and alerts for all devices are seamlessly forwarded to the patient's clinician and device data can be transferred to the patient's electronic medical record (EMR). The patient-centric user interface of the Patient SafetyNet™ Series 5000 displays near real-time data from all devices with Kite®, providing a single unified dashboard of patient information. To simplify documentation of patient data, Root® enables clinicians to easily verify and send patient vitals and Early Warning Scores (EWS), as well as all connected medical device information data, to the EMR directly from Root®.

An interface between the Patient SafetyNet™ Series 5000 and the hospital admission, discharge and transfer (ADT) system allows clinicians to receive ADT information on Root® for positive patient identification at the bedside. Clinicians can also manually enter additional data on the Root® device, including temperature, blood pressure, level of consciousness, pain score and urine output.

---

(1) The use of the trademark Patient SafetyNet™ is under license from the University HealthSystem Consortium.

Table of Contents

In a series of studies published between 2010 and 2020 by Dartmouth-Hitchcock Medical Center, clinicians using Masimo SET® and Patient SafetyNet™ identified patient distress earlier, which decreased rapid response team activations, ICU transfers and ICU days. Per these studies, over ten years, there were zero preventable deaths or brain damage due to opioid-induced respiratory depression in monitored patients. In addition, we believe these studies demonstrated that the use of Masimo SET® and Patient SafetyNet™ can result in significant cost savings. Hospitals and other care centers may determine that they can reduce their costs by moving less critically ill patients from the ICU to the general care floors where they can be continuously and accurately monitored in a more cost-effective manner. We believe that the advanced performance of the Masimo SET® platform coupled with reliable, cost-effective and easy-to-use wireless remote monitoring will allow hospitals to create continuous surveillance solutions on general care floors where patients are at risk of avoidable adverse events and where direct patient observation by skilled clinicians is considered cost prohibitive.

*Kite®*

*Kite®* provides a supplemental display of data from a Masimo device on a compatible smart television and allows clinicians to configure the display differently than that of the connected Masimo device. Kite® integrates into existing hospital infrastructures where a supplementary display may be beneficial, such as the operating room.

*UniView™*

UniView™, an integrated display of real-time data and alarms from multiple Masimo and third-party devices, designed to reduce clinician cognitive overload and improve patient safety. UniView™ promotes data sharing and team coordination among multiple clinicians. UniView™ brings together data from a variety of sources – such as patient monitors, ventilators, anesthesia gas machines, and IV pumps – and provides a supplementary display for them, clearly organized, on one or more large, central monitors, so that all clinicians can simultaneously view and act upon the same, comprehensive real-time patient status and historical trends.

*UniView : 60™*

UniView : 60™ uses the Masimo Hospital Automation™ platform to aggregate and display pertinent patient information on a digital display just outside each patient's room, allowing clinicians to familiarize themselves with the most relevant details of each patient's case at the door in 60 seconds or less before they see the patient.

*Replica™*

Replica™, working in conjunction with Patient SafetyNet™, is a mobile application for smart phones and tablets that provides for supplemental remote monitoring and clinician notification. Replica™ was developed to allow clinicians to view continuous monitoring data for multiple patients, as well as view and respond to alarms and alerts, all from their smart phones, regardless of location.

*MyView®*

MyView® is a wireless, presence-detection system that enables the display of customized clinical profiles on Masimo devices, such as Root®, Radical-7® and the Patient SafetyNet™ View Station. When a clinician approaches the device, a clinician-worn MyView® badge signals the device to display a preselected set of parameters and waveforms tailored to the individual clinician's preferences. MyView® gives clinicians the ability to receive and review medical device information in a manner that is most conducive to optimizing their workflow, while the presence mapping data collected by all the Masimo devices can provide insight into how clinicians spend time with patients. This provides nursing leadership and management the opportunity to examine analytical data on patient-clinician interactions and optimize workflows across the unit, hospital and hospital system.

*Patient SafetyNet™ Surveillance*

Patient SafetyNet™ Surveillance is a software option that provides real-time video images of a patient's room, including the patient and connected monitoring devices, adding existing communication technology to central monitoring. Two-way audio is available to allow the caregiver to listen to and communicate with the patient. The system utilizes the existing hospital information technology network, precluding the installation of additional infrastructure.

***Connectivity***

Despite medical technology advances, the lack of device communication and integration creates risks to patient safety in hospitals around the world. Without device interoperability, critical patient information can go unnoticed, leaving clinicians unaware and patients at risk. Existing approaches for device interoperability require separate hardware, software and/or network infrastructure, which can clutter the patient room, increase complexity, burden IT management and increase costs. To address these challenges, we introduced Iris® connectivity in our Root® patient monitoring and connectivity platform. Iris® connectivity enables multiple standalone third-party devices such as intravenous pumps (IV), ventilators, hospital beds and other patient monitors to connect through Root®, enabling display, notification and documentation to the EMR through Masimo Patient SafetyNet™.

The addition of Iris® connectivity to Root® and Patient SafetyNet™ provides multiple advantages to hospitals, such as allowing standalone device information to be remotely viewed at a Patient SafetyNet™ view station, transmitted through notification systems to clinicians regardless of location or sent to electronic health record systems. This may enhance patient assessment, clinical workflows and decision support. In addition, bringing data from disparate devices together facilitates more integrated patient care and provides a flexible and cost-effective platform, while avoiding installation of separate costly systems and potentially reducing costs by leveraging existing network infrastructure.

***Nasal High Flow Ventilation***

With the acquisition of TNI medical AG (TNI®) in March 2020, we added TNI softFlow® technology to our product portfolio. The TNI softFlow® technology provides respiratory support by generating a precisely regulated, stable high flow of room air or a mix of room air and oxygen through the nose of the patient by means of thin nasal prongs. Controlled oxygen supply ensures oxygenation while, at the same time, the respiratory airways are humidified. A stable air flow is essential for treating hypoxemic and hypercapnic respiratory failure. Together with the TNI applicator, the TNI Flow generator provides a constant air flow and in doing so, it is completely independent of external pneumatic systems. Due to this, the TNI softFlow® technology is able to treat respiratory insufficiency and allows therapy at home in a manner that is as reliable and efficient as in the hospital.

***Neuromodulation Solution***

Bridge™ is the first FDA-cleared, drug-free, non-surgical device to use neuromodulation to aid in the reduction of symptoms associated with opioid withdrawal. Bridge™ can be used for patients experiencing opioid withdrawal symptoms, while undergoing treatment for opioid use disorder when initiating treatment, transitioning to naltrexone or tapering off medication-assisted treatment. In addition, we believe Bridge™ may reduce pain and addiction-related side-effects. Bridge™ is a small electrical nerve stimulator device that contains a battery-powered chip and wires that are applied percutaneously around a patient's ear. It requires a prescription and is offered to qualified healthcare professionals with training. Bridge™ has been granted a FDA 510(k) de novo classification.

***Coronavirus-2019 (COVID-19) Response and Telehealth Solutions***

*Masimo SafetyNet™*

In an effort to help clinicians and public health officials combat the COVID-19 pandemic, we developed the Masimo SafetyNet™ solution. The Masimo SafetyNet™ solution provides continuous tetherless pulse oximetry and respiration rate monitoring coupled with a patient surveillance platform. We announced the full market release of the Masimo SafetyNet™ solution in April 2020, and it is available worldwide. In addition, we announced a partnership with Samsung Electronics America (Samsung) to make the Masimo SafetyNet™ Patient App available on select Samsung smartphones, pre-installed and pre-configured.

*Masimo SafetyNet-OPEN™*

As the COVID-19 pandemic continues, companies and organizations worldwide struggle to find the appropriate balance between reopening and keeping people safe by reducing the risk of infection. Masimo SafetyNet-OPEN™ was designed to help businesses, governments and schools more responsibly manage employee and student health and safety during the COVID-19 pandemic. Masimo SafetyNet-OPEN™ helps address certain challenges of reopening responsibly and safely with a comprehensive, flexible, and easy-to-deploy continuous monitoring solution that, in conjunction with clinical guidance from partner hospitals, helps manage prevention, early identification, and recovery monitoring. As a global leader in noninvasive patient monitoring technologies and advanced connectivity and automation solutions, we believe we are uniquely positioned to provide organizations with tools to assist them in reopening safely.

***Our Strategy***

Our mission is to develop technologies that improve patient outcomes and reduce the cost of patient care. We intend to continue to grow our business and improve our market position by pursuing the following strategies:

- *Continue to Expand our Market Share in Pulse Oximetry.* We grew our product revenue to $1,143.7 million in 2020 from $738.2 million in 2017, representing a three-year compound annual growth rate of 15.7%. This growth can be attributed to continued expansion of our core SET® pulse oximeter customer base, higher revenues from rainbow® Pulse CO-Oximetry, NomoLine® capnography and other new technologies, and our expanding list of OEM partners. We supplement our direct sales to hospitals and other low-acuity healthcare facilities through various U.S. and international distributors. Combined sales through our direct and distributor sales channels increased to $958.8 million, or 83.8% of product revenue in 2020, from $644.7 million, or 87.3% of product revenue, in 2017. As the healthcare industry shifts toward hospitals, physicians and providers being rewarded by payers based on the quality and value of the services (as opposed to the volume of fee-for-service transactions), we expect to see more hospitals gravitate towards technologies like Masimo SET® that have a proven track record of improving patient care.
- *Expand the Pulse Oximetry Market to Other Patient Care Settings.* Many patients die due to unintended opioid overdoses after surgery while on general care floors. We believe the ability to continuously and accurately monitor patients outside of critical care settings, including the general, medical and surgical floors of the hospital, is currently an unmet medical need that has the potential to significantly improve patient care and increase the size of the pulse oximetry market. In addition, we believe the ability of Masimo SET® to accurately monitor and address the limitations of conventional pulse oximetry has enabled us, and will continue to enable us, to expand into non-critical care settings, and therefore, significantly expand the market for our products. To further support our expansion into the general care areas, we market Patient SafetyNet™, which enables continuous monitoring of up to 200 patients' $SpO_2$, PR, RRp® and with rainbow SET®, noninvasive monitoring of hemoglobin and other advanced measurements. We believe that Patient SafetyNet™, when combined with Masimo SET® pulse oximetry and RAM® or capnography, offers a clinically proven and cost-effective approach to continuous post-operative monitoring. Outside of the hospital setting, patients could die due to unintentional opioid overdose, even when opioids are being taken for short duration, such as after surgery, and as prescribed by a physician. We believe that in the home setting, accurate monitoring with Masimo SET® may help reduce the risk of opioid overdose by alerting family members and others when opioids have slowed a patient's breathing and caused a significant drop in oxygen saturation.
- *Expand the Use of rainbow® Technology in Hospital Settings.* We believe the noninvasive measurements of rainbow® Pulse CO-Oximetry (SpHb®, SpCO®, SpMet®, PVi®, $SpfO_2$™, SpOC™ and ORi™), RAM® and Halo Ion®, as well as future measurements, provide an excellent opportunity to help our customers improve patient care while reducing their overall cost of care.
- *Expand the Use of rainbow® Technology in Non-Hospital Settings.* We believe the noninvasive measurement of hemoglobin, SpHb®, creates a significant opportunity in markets such as physician offices, emergency departments and blood donation centers; and the noninvasive measurement of carboxyhemoglobin, SpCO®, creates a significant opportunity in the fire/alternate care market.
- *Expand the Use of Root® in Hospital Settings.* We believe Root® represents a powerful new paradigm in patient monitoring because it enhances our rainbow® and SET® measurements with multiple specialty parameters, including SedLine® brain function monitoring, O3® Regional Oximetry, and NomoLine® capnography and gas monitoring, and enables open-architecture connectivity in an integrated, clinician-centric hub. Our Hospital Automation™ integration platform for Root® provides a conduit to the patient's EMR for a range of clinical devices that may otherwise remain disconnected, and therefore, unable to communicate their information. Hospital Automation™, in conjunction with the Iris® ports found on Root®, offers clinical utility and flexibility by collecting device information from multiple sources and making it available to clinicians in one networked place, akin to an airplane cockpit. Complementary innovations like the Radius-7® wearable, wireless monitor foster an environment of safety without sacrificing patient mobility or comfort. Radius-7® provides patients in medical-surgical units with mobility, allowing them to visit common areas and labs, all while being continuously monitored around the clock. Root® is acuity-adaptable, meaning it can be configured for any care area, and is competitively priced.
- *Expand Hospital Automation and Connectivity in Hospital Settings*. We believe we can improve and automate the continuum of care through our connectivity platform by reducing complexity by integrating data from multiple disparate monitors and therapeutic devices through Root® and Iris® Gateway; by deploying decision support algorithms like Halo ION®; by saving time through semi-automated and automated bedside vital signs measurement and documentation with Patient SafetyNet™; by keeping patients connected with their care providers through Masimo SafetyNet™ and Rad 97® when they are discharged from hospitals; by improving data interpretation through adaptable and intuitive displays like UniView™, UniView : 60™ and MyView®; and through remote monitoring via Patient SafetyNet™ and Replica™.

- *Utilize our Customer Base and OEM Relationships to Market Masimo rainbow SET®, O3®, SedLine® and Capnography Products Incorporating Licensed rainbow® Technology.* We currently sell rainbow SET® products through our direct sales force and distributors. We include our MX circuit boards in our pulse oximeters and also sell them to our OEM partners. Our MX circuit boards are equipped with circuitry to support rainbow® Pulse CO-Oximetry measurements that can be activated at time of sale or through a subsequent software upgrade. We believe that, over time, the clinical need for these measurements, along with our installed customer base, will help drive the adoption of our rainbow® Pulse CO-Oximetry products.
- *Continue to Innovate and Maintain Our Technology Leadership Position.* We invented and pioneered the first pulse oximeter to accurately measure arterial blood oxygen saturation level and pulse rate in the presence of motion artifact and low perfusion. In addition, we launched our rainbow SET® platform that enabled what we believe is the first noninvasive monitoring of carboxyhemoglobin, methemoglobin and hemoglobin, as well as PVi®, all of which were previously only available with invasive and/or complicated testing. Furthermore, we believe that our introduction of RRa® with RAM® technology represented the first platform to enable noninvasive and continuous respiration monitoring through an easy-to-use single-patient adhesive acoustic sensor. Finally, we believe that our recent introduction of ORi™ may provide advance warning of an impending hypoxic state, or an indication of an unintended hyperoxic state.
- *Expand Masimo technology into the personal health consumer market.* Our first general wellness and personal health consumer market application was the MightySat®, a fingertip pulse oximeter with five important health and breathing measurements that was targeted at sports, fitness and relaxation. These values include: $O_2$, PR, RRp®, PI and PVI®. In 2020, we launched four additional products for the consumer market. We released the Radius T°™, a means to monitor a loved one's fever in a hassle-free continuous manner; Masimo Sleep™, a means to help you understand what is going on in your body that may be impacting your sleep; Bridge™, the first FDA-cleared, drug-free, non-surgical device to use neuromodulation to aid in the reduction of symptoms associated with opioid withdrawal; and finally, SafetyNet-OPEN™, a remote patient management solution for tracking key vital signs at the organizational level.
- *Expand the Masimo product portfolio through strategic investments and acquisitions.* In 2020, we successfully completed three strategic acquisitions and an exclusive license agreement, all of which are currently being integrated into our product portfolio. We continually evaluate new and exciting opportunities to expand our product portfolio. After we have applied both our strategic and financial filters, we pursue the opportunities that we believe will add stockholder value, can be successfully integrated within our business and show positive potential to achieve our short and long-term financial forecasts.

We plan to continue to innovate and develop new technologies and products, internally and through our collaboration with Cercacor, from whom we currently license certain rainbow® technologies.

Our future growth strategy is also closely tied to our focus on international expansion opportunities. Since 2007, we have continued to expand our sales and marketing presence in Europe, Asia, Asia Pacific, Middle East, Canada and Latin America. We have accomplished this by both additional staffing and adding or expanding sales offices in many of these territories. By centralizing a portion of our international operations, including sales management, marketing, customer support, planning, logistics and administrative functions, in Neuchâtel, Switzerland, we believe we have developed a more efficient and scalable international organization that is capable of being even more responsive to the business needs of our international customers under this centralized management structure.

***Our Products and Markets***

We develop, manufacture and market patient monitoring technologies that incorporate a monitor or circuit board and sensors, including proprietary single-patient-use and reusable sensors and patient cables. In addition, we offer remote alarm/monitoring solutions, software and connectivity solutions.

The following chart summarizes our principal product components and principal markets and methods of distribution:

Table of Contents

Patient Monitoring Solutions:

| *Description:* | *Use:* | *Distribution Channel:* |
|---|---|---|
| *Circuit Boards and Modules* *(e.g., MX-5, MSX (shown below), MS-2011, MS-2013, MS-2040, uSpO2®, SedLine®, ISA™ and IRMA™)*   | • Signal processing apparatus for all Masimo technology platforms<br>• Mainstream and sidestream capnography and gas monitoring | • Incorporated and sold to OEM partners who incorporate our circuit boards into their patient monitoring systems |
| *Monitors and Devices* *(e.g., Radical-7®, Rad-97® (both shown below), Rad-67®, Rad-57®, Root®, Rad-8®, Rad-5®, Radius-7®, Rad-G™, TIR-1™)*   | • Bedside, handheld and wireless monitoring devices that incorporate Masimo SET® with and without licensed Masimo rainbow SET® technology, noninvasive blood pressure and capnography. | • Sold directly to end-users and through distributors and in some cases to our OEM partners who sell to end-users |

Table of Contents

| *Description:* | *Use:* | *Distribution Channel:* |
|---|---|---|
| *Patient Monitoring and Connectivity Platform (e.g., Root®, Radius-7® and Root® with NIBP (shown below))*    | • Displays measurements from Masimo's Radical-7® (connected or hand carried) or Radius-7® (patient-worn)<br>• Provides additional specialty measurements from Masimo or third-party-developed applications through Masimo Open Connect® (MOC-9®)<br>• Integrates noninvasive blood pressure (NIBP) and temperature<br>• Connects third-party devices such as IV pumps, ventilators, beds and other patient monitors to automate data transfer to the EMR | • Sold directly to end-users and through distributors |
| *Sensors (e.g., SET®, rainbow® Pulse CO-Oximetry, rainbow Acoustic Monitoring® Sensors, RD SedLine™, TFA-1®, RD SET®, RD rainbow SET®, O3® Pediatric, RD rainbow Lite SET®, rainbow® DCI®-Mini, Centroid™, Radius PPG™ (last six shown below))*     | • Extensive line of both single-patient, reusable and rainbow® sensors<br>• Patient cables, as well as adapter cables that enable the use of our sensors on certain competitors' monitors | • Sold directly to end-users and through distributors and to OEM partners who sell to end-users |

4/27/2021 masi-20210102

https://www.sec.gov/Archives/edgar/data/0000937556/000093755621000033/masi-20210102.htm 16/135

Exhibit L
Page 203

| Description: | Use: | Distribution Channel: |
| --- | --- | --- |
| *Sensors (Continued)*  | | |
| *Line Filters and Mainstream Adapters for Capnography and Gas Monitoring (e.g., NomoLine® Cannula with Radius PCG™ Capnograph with disposable adapter, IRMA CO2, IRMA AX+, and EMMA® (shown below))*  | • Line of disposables to measure gas parameters using mainstream and sidestream capnography | • Sold directly to end-users and through distributors and to OEM partners who sell to end-users |
| *Proprietary Measurements (e.g., SpHb®, SpCO®, SpMet®, PVi®, RRa®, RRp®, ORi™, 3D Alarms® and Adaptive Threshold Alarm)*     Total Hemoglobin; SpCO® Carboxyhemoglobin;   Methemoglobin;   Oxygen Content;   Acoustic Respiration Rate | • rainbow® measurements and other proprietary features | • Sold directly to end-users and through OEM partners who sell to new and existing end-users |

Table of Contents

| *Description:* | *Use:* | *Distribution Channel:* |
|---|---|---|
| *Hospital Automation™ and Connectivity Suite (e.g., Iris® Connectivity, Iris® Gateway, Patient SafetyNet™, UniView™, and UniView : 60™, Replica™, Iris® Analytics, and Halo ION® (shown below))* | • Software and hardware enabling third-party devices to connect through Patient SafetyNet™ and to document data in the EMR | • Sold directly to end-users |

Exhibit L
Page 205

4/27/2021 masi-20210102

https://www.sec.gov/Archives/edgar/data/0000937556/000093755621000033/masi-20210102.htm 19/135

Exhibit L
Page 206

| *Description:* | *Use:* | *Distribution Channel:* |
|---|---|---|
| *Hospital Automation and Connectivity Suite (Continued)*  | • Network-linked, wired or wireless, multiple patient floor monitoring solutions<br>• Standalone wireless alarm notification solutions | • Sold directly to end-users |
|  | • Home-based patient engagement and remote data capture platform | • Sold directly to end-users and through distributors |
| *Nasal High Flow Ventilation (e.g. TNI softFlow® 50 and TNI softFlow® junior(shown below))*     | • Intensive care and inpatient care in clinics as well as home care | • Sold directly to end-users and through distributors |

4/27/2021 masi-20210102

16

https://www.sec.gov/Archives/edgar/data/0000937556/000093755621000033/masi-20210102.htm 21/135

Exhibit L
Page 208

Table of Contents

| *Description:* | *Use:* | *Distribution Channel:* |
| --- | --- | --- |
| *Home Wellness and Monitoring* <br> *(e.g. Radius T°™, Masimo Sleep™, MightySat® with PVi® and RRp®, and iSpO$_2$®)* <br>         | • Disposable thermometers, disposable fingertip sensors for sleep monitoring, fingertip pulse oximeter, or pulse oximeter cable and sensor for use with an iPhone, iPad, iPod touch and select Android smart phones | • Sold directly to consumers through the Masimo Personal Health website and through consumer retailers |

*Circuit Boards*

*Masimo SET® MS Circuit Boards*. Our Masimo SET® MS circuit boards perform all signal processing and other pulse oximetry functions incorporating the Masimo SET® platform. Our MS circuit boards are included in our proprietary monitors or sold to our OEM partners for incorporation into their monitors. Once incorporated into a pulse oximeter, the MS circuit boards perform all data acquisition processing and report the pulse oximetry measurements to the host monitor. The circuit boards and related software interface directly with our proprietary sensors to calculate SpO$_2$, PR and Pi. Our latest MSX family of circuit boards provide Masimo SET® SpO$_2$, PR, and Pi in a variety of small form factors with a typical power consumption of only 45 milliwatts.

*uSpO$_2$® Cable/Board.* Our SET® technology-in-a-cable contains the low power (MS-2040) technology in a reduced size, allowing it to be embedded into patient cables as part of the sensor connector. This allows the uSpO$_2$® cable/board to interface with monitoring devices externally via an existing communications port in instances where internal integration of a traditional Masimo SET® technology board is not feasible. The uSpO$_2$® cable/board provides the same Masimo SET® Measure-through Motion and Low Perfusion™ pulse oximetry found in our other products, with a typical power consumption of less than 45 milliwatts.

*Masimo rainbow SET® MX Circuit Boards.* Our circuit board is the foundation for our Masimo rainbow® Pulse CO-Oximetry and rainbow Acoustic Monitoring® platform, utilizing certain technology that is licensed from Cercacor. The MX circuit boards offer the full functionality of our rainbow® technology, which includes noninvasive measurements for SpHb®, SpOC™, SpCO®, SpMet®, PVi® and RRa®, in addition to providing Measure-through Motion and Low Perfusion™ SET® pulse oximetry measurements SpO$_2$, PR and Pi measurement capabilities of Masimo SET® pulse oximetry. Customers can choose to purchase additional measurements beyond SpO$_2$, PR and Pi at the time of sale or at any time in the future through a field-installed software upgrade.

Our MX-5 OEM circuit board deploys a technology platform that utilizes approximately half the power of previously available rainbow® circuit boards to deliver rainbow® Pulse CO-Oximetry noninvasive measurement performance. In addition to its lower power demands, the MX-5 adds dynamic power utilization to scale the MX-5's power draw based upon the combination of parameters being monitored to permit even longer battery run-times.

*Monitors / Devices*

*Root®*. Root® is a powerful patient monitoring and connectivity platform that integrates our rainbow® and SET® measurements with multiple additional specialty measurements through MOC-9® open architecture technology in an integrated, clinician-centric platform. The first MOC-9® technologies developed by Masimo were SedLine® brain function monitoring, NomoLine® capnography and gas monitoring and O3® Regional Oximetry. Root® with NomoLine® capnography, SedLine® brain function monitoring, wireless communication and Iris® connectivity for third-party medical devices has received FDA 510(k) clearance. O3® Regional Oximetry has received the CE Mark and FDA 510(k) clearance.

Early Warning Signs (EWS) for Root® aggregates information from multiple vital signs and clinical observations to generate a score that represents the potential degree of patient deterioration. There are several EWS protocols, such as the Pediatric Early Warning Score (PEWS), Modified Early Warning Score (MEWS) and National Early Warning Score (NEWS). These various scores require vital signs contributors such as oxygen saturation, pulse rate, respiration rate, body temperature and systolic blood pressure along with contributors input by clinicians, such as level of consciousness, use of supplemental oxygen and urine output. The weighting and number of contributors differ depending upon which EWS protocol is used. Root® can be customized for various predefined EWS protocols, or hospitals can configure their own set of required contributors, and their relative weights, to create an EWS unique to their care environment.

Our MOC-9® partnerships enable third parties to utilize Root®'s open architecture and built-in connectivity to independently develop, obtain regulatory approvals, and commercialize their own external MOC-9® module. Alternatively, third parties can develop Masimo Open Connect Control™ (MOC-C™) applications for Root® using the MOC-9® software development kit (SDK). While we support the development efforts of our MOC® partners as needed, and help increase awareness of the availability of non-Masimo MOC-9® modules and MOC-C™ applications, our MOC-9® partners use their existing distribution channels to sell their MOC-9® modules or MOC-C™ applications to customers.

Pathway™, a newborn oxygenation visualization mode for Root®, provides clinicians with a way to visualize a hospital's recommended resuscitation protocol for a newborn's oxygen saturation while continuously monitoring $SpO_2$ and PR during the first ten minutes after birth. Use of Pathway™ is intended to help streamline clinician workflow and improve protocol adherence during this critical period.

*Radical-7®*. The Radical-7® Pulse CO-Oximeter® is a wireless touchscreen device that incorporates our MX circuit board to allow upgradeable rainbow SET® measurements and offers three-in-one capability. The Radical-7® can be used as:

- a standalone device for bedside monitoring;
- a detachable, battery-operated handheld unit for easy portable monitoring;
- an integrated device as part of the Root® patient monitoring and connectivity platform; and
- a monitor interface via SatShare®, a proprietary technology allowing our products to work with certain competitor products, to upgrade existing conventional multiparameter patient monitors to Masimo SET® while displaying rainbow® measurements on the Radical-7® itself.

With its wide-ranging flexibility, Radical-7® can continuously monitor a patient from the ambulance, to the emergency room, to the operating room, to the general floor and beyond, until the patient is discharged. Radical-7® delivers the accuracy and reliability of Masimo rainbow SET® with multi-functionality, ease of use and the availability of measurement upgrades for existing monitors.

*Radius-7®*. Radius-7® for the Root® patient monitoring and connectivity platform is the first and only wearable, wireless monitor with rainbow SET® technology, enabling continuous monitoring and early identification of clinical deterioration while still allowing patients the freedom of movement. With Bluetooth® and Wi-Fi wireless connectivity, Radius-7® with Root® can alert clinicians at the bedside or remotely, through Masimo Patient SafetyNet™, of critical changes in a patient's $SpO_2$ and PR, even during states of motion and low perfusion, as well as RRa® and additional rainbow SET® measurements. Radius-7® with Root® has received both CE Mark and FDA 510(k) clearance.

*Radius PPG™*. Radius PPG™ is a tetherless sensor solution powered by Masimo SET® that represents a significant breakthrough in patient monitoring. Radius PPG™ eliminates the need for a cabled connection to a pulse oximetry monitor, allowing patients to move freely and comfortably while still being continuously monitored reliably and accurately. Via wireless connection, measurements are displayed on Masimo host devices or third-party multi-parameter monitors with integrated Masimo technology. Coupled with the proven benefits of Masimo SET® Measure-through Motion and Low Perfusion™ pulse oximetry, Radius PPG™ is ideally suited for use anywhere patients can benefit from mobility. Radius PPG™ is also available as part of the Masimo SafetyNet™ remote patient management solution designed for at home use.

*Radius VSM™*. Radius VSM™ is a wearable, tetherless vital signs monitor that provides the ability to monitor a wide variety of physiological measurements, including continuous SET® Pulse Oximetry, noninvasive blood pressure, body temperature, respiration rate and ECG. Designed on a wearable, modular platform, Radius VSM™ features can be scaled to accommodate surges in patient volume and for use across the continuum of patient care, based upon each patient's needs and level of acuity. For additional versatility, Radius VSM™ can operate as a self-contained device or be used wirelessly with Masimo bedside monitors and patient surveillance systems, automating the integration of expanded monitoring and the transfer of continuous monitoring data to EMRs. Radius VSM™ has received the CE Mark, and has been released in limited European markets.

*Radius PCG™*. Radius PCG™ is a portable-real-time capnograph with wireless Bluetooth® connectivity. Radius PCG™ connects with Root® to provide seamless, tetherless mainstream capnography for patients of all ages. Radius PCG™ has received the CE Mark.

*Rad-97®*. Rad-97® is a versatile standalone Pulse CO-Oximeter® that features a 1080p HD color display with user-friendly multi-touch navigation and Masimo SET® Measure-through Motion and Low Perfusion™ pulse oximetry technology that can be used to measure $SpO_2$, PR, PVi® and Pi rainbow SET® measurements such as SpHb®, SpOC™, SpCO®, SpMet® and RRa® can also be enabled. Rad-97® is the smallest Masimo bedside device currently capable of monitoring the full rainbow SET® platform. An optional integrated camera allows remote clinicians to interact with patients at home over live audio and video. With its built-in enterprise Wi-Fi capability, Rad-97® has the ability to connect wirelessly from the home to supplemental patient monitoring systems, including Patient SafetyNet™, facilitating automatic data transfer to hospital EMR systems. Rad-97® has received the CE Mark and FDA 510(k) clearance, including an additional Rad-97® configuration with integrated NomoLine® capnography. Rad-97® has also received FDA 501(k) clearance for home use, bringing hospital-grade technology to the home in a single integrated device that is a monitoring, connectivity and telecommunications hub.

*Rad-97® NIBP.* Rad-97® NIBP includes an integrated port that allows clinicians to connect a blood pressure cuff inflation hose directly to the device. Designed for reliability and patient comfort, Rad-97® NIBP is compatible with both disposable and reusable cuffs for a variety of patient types. Rad-97® NIBP enables clinicians to measure arterial blood pressure for adult, pediatric and neonatal patients, with three measurement modes: spot-check, automatic interval (which measures blood pressure routinely, at a desired interval) and stat interval (which continually measures blood pressure for a desired duration).

*Rad-67®*. Rad-67®, our handheld Pulse CO-Oximeter®, is a compact, portable spot-check device that offers Masimo SET® Measure-through Motion and Low Perfusion™ pulse oximetry technology with $SpO_2$, PR and Pi measurements and upgradeable rainbow® noninvasive monitoring technology for SpHb®. With the universal reusable rainbow® DCI®-mini sensor, Rad-67® features Next Generation SpHb® technology. The Rad-67® with next generation SpHb® technology has received the CE Mark and FDA 510(k) clearance.

*Rad-57®*. Rad-57® is a fully featured handheld Pulse CO-Oximeter® that provides continuous, noninvasive measurement of $SpO_2$, PR, PVi® and Pi with the ability to upgrade to SpHb®, SpCO®, SpMet® and SpOC™. Its rugged and lightweight design makes it applicable for use in hospital and field settings, specifically for fire departments and emergency medical service units.

*Rad-8®*. Rad-8® is a bedside pulse oximeter featuring Masimo SET® Measure-through Motion and Low Perfusion™ pulse oximetry technology with $SpO_2$, PR and Pi measurement, but without the ability to update to rainbow® technology. Rad-8® is an affordable, low-cost design with a streamlined feature set.

*Rad-5® & Rad-5v®*. Rad-5® and Rad-5v® were Masimo's first dedicated lightweight, user-configurable, handheld pulse oximeters to provide Masimo SET® Measure-through Motion and Low Perfusion™ technology with $SpO_2$, PR and Pi measurements, but without the ability to upgrade to rainbow® technology.

*Rad-G™*. Rad-G™ is a low-cost, rugged, handheld pulse oximetry device with a rechargeable battery and LCD display. It uses Masimo SET® Measure-through Motion and Low Perfusion™ pulse oximetry technology to measure $SpO_2$, PR, Pi, PVi® and RRp®. Rad-G™ was designed primarily for use in pneumonia screening, spot-checking, and continuous measurement of $SpO_2$ and RRp® in low-resource settings. Rad-G™ has received FDA 510(k) clearance.

*Pronto®*. Pronto® is a handheld noninvasive multiparameter testing device that uses Masimo rainbow SET® technology to provide spot-check measurement of $SpO_2$, PR, Pi and SpHb® in both hospitals (i.e., emergency departments) and remote settings such as physician offices.

*SatShare®*. Our SatShare® technology enables a conventional monitor to receive continuous measurement updates using Masimo SET® through a simple cable connection from the back of Radical-7® to the sensor input port on the conventional monitor. No software upgrades or new modules are necessary for the upgrade, which can be completed in minutes. SatShare® allows hospitals to standardize the technology and sensors used throughout the hospital while allowing them to gain the more accurate monitoring capabilities using Masimo SET®, as well as other additional functionality, in a cost-effective manner. SatShare® technology has facilitated many hospital-wide conversions of previously installed competitor monitors to Masimo SET®. In addition, Masimo rainbow SET® measurements such as SpHb® are available to clinicians on the Radical-7® itself while the device is being used in SatShare® mode.

*MightySat® Rx*. MightySat® Rx is a fingertip pulse oximeter that incorporates Masimo SET® Measure-through Motion and Low Perfusion™ pulse oximetry technology, which measures and displays $SpO_2$, PR and Pi with the option to add PVi® and RRp®. The MightySat® Rx has received the CE Mark and FDA 510(k) clearance. The RRp® measurement on the MightySat® Rx fingertip pulse oximeter has received the CE Mark. MightySat® Rx also received FDA 510(k) clearance of spot-check RRp® measurement.

*$iSpO_2$® Rx*. The $iSpO_2$® Rx pulse oximeter combines a fingertip sensor, cable and pulse oximeter in a lightweight, portable device that connects directly to a smart device for displaying measurements. $iSpO_2$® Rx uses Masimo SET® Measure-through Motion and Low Perfusion™ pulse oximetry technology to measure $SpO_2$, PR and Pi. The Masimo Professional Health app, available for both iOS® and Android® devices, allows clinicians to track, trend and download patient data. $iSpO_2$® Rx has received the CE Mark, but is not currently available for sale in the U.S.

*SedLine® MOC-9® Module.* Our SedLine® MOC-9® module for Root® is an EEG-based continuous brain function monitor that provides information about a patient's response to anesthesia. Our Next Generation SedLine® enhances PSi to make it less susceptible to EMG interference and to improve performance in low-power EEG cases.

*O3® MOC-9® Module.* Our O3® MOC-9® module for Root® uses NIRS to detect regional hypoxemia by continuously measuring tissue oxygen saturation ($rSO_2$), automating the differential analysis of regional to central oxygen saturation.

*NomoLine® Capnography and Gas Monitoring.* Our gas analyzers, IRMA™ and ISA™, are available through Root® MOC-9® modules via OEM integration or through an emergency capnometer (EMMA®). These analyzers enable our customers to benefit from $CO_2$, $N_2O$, $O_2$ and anesthetic agent monitoring in many hospital environments.

*TIR-1™.* Our non-contact clinical-grade infrared thermometer with Bluetooth® connectivity provides forehead temperature measurement across all patient populations. The non-contact module reduces the risk for patient cross-contamination while also reducing costs and waste by eliminating the need for probe covers and other disposables. The Bluetooth® technology automates data transfer to a connected Masimo device, such as Root®, enabling streamlined integration into the bedside device and EMR.

*Sensors*

*Sensors and Cables.* We have developed one of the broadest lines of single-patient-use (disposable), reusable and rainbow® sensors and cables. In total, we have over 150 different types of sensors designed to meet virtually every clinical need. Masimo SET® sensors are uniquely designed to reduce interference from physiological and non-physiological noise. Our proprietary technology platforms operate only with our proprietary sensor lines. However, through the use of adapter cables, our sensors can be connected to certain competitor pulse oximetry monitors. We sell our sensors and cables to end-users directly or through our distributors and OEM partners.

Our single-patient-use sensors offer several advantages over reusable sensors, including improved performance, cleanliness, increased comfort and greater reliability. Our reusable sensors are primarily used for short-term, spot-check monitoring.

*RD SET®, RD rainbow SET®, and RD rainbow Lite SET®.* Our RD family of sensors is designed to maximize patient comfort, optimize clinician workflow and reduce material waste. RD sensors are lightweight with no moving parts and a flat, soft cable with smooth edges. RD sensors are available in fold-over and wrap-around styles for a variety of patient types and clinical scenarios.

*SofTouch™ Sensors.* SofTouch™ sensors are designed with less or no adhesive for patients with compromised skin conditions. SofTouch™ sensors are available as single-patient sensors for newborns and multi-site reusable sensors for pediatrics and adults.

*Trauma and Newborn Sensors.* We have developed two specialty sensor lines, for trauma and resuscitation situations, as well as for newborns. These sensors contain an identifier that automatically sets the pulse oximeter to its maximum sensitivity and fastest settings, and allow for quick application, even in wet and slippery environments. Additionally, we introduced low-profile sensors LNCS® and M-LNCS® Neo, NeoPt and Inf sensors to monitor oxygen saturation in newborns. These sensors are smaller and thinner, making them significantly more comfortable for patients and easier for clinicians to apply.

*Blue® Sensors.* We believe our Blue® Sensors are the first FDA-cleared sensors to accurately monitor arterial blood oxygen saturation levels in cyanotic infants and children with abnormally low oxygen saturation levels.

*E1® Ear Sensor.* We believe that our E1® Ear Sensor is the first single-patient-use ear sensor that can be placed securely in the ear conchae, allowing clinicians to combine Masimo SET® performance and central monitoring to provide quick access and responsive assessment of oxygenation. The E1® Ear Sensor is designed for field emergency medical services utilization.

*TFA-1® Adhesive Forehead Sensor.* We designed our TFA-1® forehead sensor for hospitals desiring forehead monitoring using a disposable sensor. TFA-1® combines Masimo SET® performance with quick access and responsive oxygenation assessment.

*rainbow® Sensors.* We developed these proprietary, multi-wavelength sensors for use with our rainbow® Pulse CO-Oximetry products. In contrast to traditional sensors that only have the capability to monitor $SpO_2$, and PR, our rainbow® sensors can also monitor SpCO®, SpMet® and SpHb®. Our licensed rainbow SET® sensors are the only sensors that are compatible with our licensed rainbow SET® products. Rainbow® sensors are available in single-patient-use, and reusable spot-check sensor types.

The rainbow® DCI®-mini is the first noninvasive hemoglobin spot-check sensor for infants and small children (weight 3 to 30 kg). Paired with our handheld Pronto® or Rad-67® devices, the rainbow® DCI®-mini sensors are designed to help clinicians quickly and easily spot-check hemoglobin levels in infants and small children, which may facilitate the identification of anemia. When paired with Rad-67®, the rainbow® DCI®-mini enables Next Generation SpHb® measurements. The rainbow® DCI®-mini has received the CE Mark in Japan and Europe, but is not currently available for sale in the U.S. The rainbow® Super DCI®-mini sensor allows for the ability to measure SpHb®, SpCO®, SpMet® and $SpO_2$ on the same noninvasive reusable sensor. The rainbow® Super DCI®-mini has received the CE Mark in Europe and Ministry of Health, Labour and Welfare (MHLW) approval in Japan, but is not currently available for sale in the U.S.

*rainbow Acoustic® Sensors.* We believe we were the first to market a continuous respiration rate monitoring technology based on an acoustic sensor placed on the patient's neck. Our rainbow Acoustic® sensors detect the sounds associated with breathing and convert the sounds into continuous respiration rate using proprietary signal processing that is based on Masimo SET®. RAS-45, our single-use acoustic respiration sensor for RAM®, is designed to facilitate placement on and improve attachment to the neck. RAS-45 operates with Masimo MX circuit boards to measure RRa® and display an acoustic respiration wave form. Like the RAS-125c sensor, RAS-45 operates with Masimo MX technology boards to measure RRa®, display the acoustic respiration wave form and optionally allow clinicians to listen to the sound of breathing. Both the RAS-45 and RAS-125c are available in CE marked countries and the U.S. for adult and pediatric patients who weigh more than 10 kg. RAS-45 has received FDA 510(k) clearance and the CE Mark.

*SedLine® Sensor.* Used with the SedLine® MOC-9® module for the Root® patient monitoring and connectivity platform, the SedLine® sensor is a disposable sensor that collects EEG data for our SedLine® monitor. RD SedLine™ sensors feature a repositioned, color-coded sensor-cable connection that lies comfortably on the patient's head and soft foam pads to reduce discomfort upon application to the patient.

*O3® Sensors.* Used with the O3® MOC-9® module for the Root® patient monitor, each O3® sensor contains four light-emitting diodes and two detectors to continuously measure $rSO_2$. Our pediatric application of O3® regional oximetry with the O3® pediatric sensor for both adult patients and pediatric patients weighing more than 5 kg (11 lbs) and less than 40 kg (88 lbs) has received FDA 510(k) clearance. O3® sensors for use with infants and neonatal patients has also received FDA 510(k) clearance.

*Centroid™.* Centroid™ is a wearable wireless patient orientation, activity and respiration rate sensor. Centroid™ helps clinicians monitor a patient's position to avoid preventable pressure ulcers and can alert clinicians to sudden movements such as fall-like events. In addition, Centroid™ detects chest movements to continuously provide respiration rate, providing clinicians with additional data that may inform care decisions. Centroid™ pairs with the Root® platform using Bluetooth® to track a patient's posture, orientation and activity. The data transmitted by Centroid™ can be displayed in various formats on Root®, giving clinicians multiple ways to assess adherence to protocols regarding tissue stress and to tailor care to the specific needs of each patient.

*Proprietary Measurements and Features*

All of our monitors shipped since January 2006, including Radical-7® and certain future OEM products, that incorporate the MX circuit board will allow purchases of software for rainbow® measurements, as well as other future measurements. Our current rainbow® measurements include SpHb®, SpCO®, SpMet®, SpOC™ ORi™, Pi, PR, PVi®, RPVi™, RRp®, $SpfO_2$™ and RRa®.

Table of Contents

*Eve™.* Eve™ is our newborn screening software application for our Radical-7® Pulse CO-Oximeter®, is designed to help clinicians more effectively and efficiently screen newborns for CCHD. In the Radical-7® Pulse CO-Oximeter®, Eve™ automates the screening steps with animated instruction, including sensor application, measurement selection and screening result determination. Eve™ is intended to provide consistent application of the screening protocol to reduce method-and operator-induced variability and improve efficiency by automating the data capture and comparison between readings. Eve™ has received CE Marking, but is currently not available for sale in the U.S.

*X-Cal®*

Sensor and cable failures can prevent pulse oximeters from providing the patient safety advantages that continuous pulse oximetry monitoring is intended to provide. Our X-Cal® technology enhances patient safety and improves clinician efficiency by preserving system quality, performance and reliability and reducing the chances of bad or inferior sensors and cables being used on patients. X-Cal® technology enhances the benefits of Masimo's pulse oximetry by incorporating the means to track the expected monitoring life of our sensors and cables and provides appropriate user messaging on the host monitor.

X-Cal® addresses three common problems experienced by clinicians using an integrated Masimo system, including:

- Patient safety may be compromised by using counterfeit Masimo sensors and cables because they are not produced with comparable components, do not provide proper shielding from ambient interferences, create electrostatic noise caused by motion, do not have our quality and performance controls, and are not tested or warranted to work within a Masimo system;
- We design our sensors and cables to last well beyond their warranty period and customer feedback indicates our sensors and cables last significantly longer than competing products, but cable and sensor reliability may still be compromised when used beyond their intended life, affecting patient care and causing clinicians and biomedical engineers to spend time troubleshooting intermittent cable and sensor issues; and
- We believe that third-party reprocessed pulse oximetry sensors introduce challenges in the clinical environment due to potential quality issues. In fact, we believe that most third-party reprocessed sensors do not indicate that they are capable of performing in the same conditions as Masimo Measure-through Motion and Low Perfusion™ sensors or in neonatal applications, key performance requirements available with Masimo SET® sensors. To the best of our knowledge, no third-party company has attempted to reprocess rainbow SET® sensors.

*The Masimo Hospital Automation Platform and Iris® Connectivity*

*Masimo Patient SafetyNet™.* Patient SafetyNet™ is a supplemental remote monitoring and clinician notification system that routes bedside-generated alarms through a server to a qualified clinician's handheld paging device in real-time. Each system can support up to 200 bedside monitors and can either be integrated into a hospital's existing IT infrastructure or operate as a stand-alone wireless network.

*Iris®.* Iris® connectivity ports on Root®, allows third-party devices, such as intravenous pumps and ventilators, to connect to Root® enabling display of measurements and notification on the Root® monitor, with the ability to document results in the EMR through Masimo Patient SafetyNet™.

*Iris® Gateway.* Iris® Gateway bridges the gap between device data generated at the patient bedside and documentation in patient data management systems by automatically transferring data from medical devices to EMRs, improving productivity and reducing the likelihood of transcription errors.

*Iris® Device Management System (Iris® DMS).* Iris® DMS is an automation and connectivity solution designed to streamline management of Masimo devices used throughout a hospital system. Iris® DMS is designed to address the challenges of maintaining many patient monitors in a complex hospital environment. Iris® DMS securely connects over a hospital's existing network to all connected Masimo devices to provide an easy-to-use dashboard that allows biomedical engineers and IT professionals to view detailed diagnostic information about connected Masimo devices at a glance, without the need to physically interact with each device. Iris® DMS supports remote software upgrades to ensure all devices stay up to date, easily and efficiently.

*Analytics and Reporting*

*Trace™* is the first data visualization and reporting software compatible with the full capabilities of the Root® patient monitoring and connectivity platform, including Radical-7® and Radius-7® Pulse CO-Oximeters®, Root® with integrated noninvasive blood pressure and temperature, and connected MOC-9® modules such as SedLine® brain function monitoring, ISA™ and ISA™ OR+ capnography, and O3® Regional Oximetry. Trace™ can create insightful, easy-to-read patient reports that include parameter trends, histograms, event annotations, and key statistics. Trace™ can communicate with Masimo devices via high-speed wired or wireless connections, with the ability to transfer up to 96 hours of patient data.

Iris® Analytics is a supplemental tool that works in conjunction with the Masimo Hospital Automation™ platform to generate customizable alarm analytics, individual patient reports, and even hospital-wide reports across the continuum of care.

*Halo ION®.* Halo ION® is a comprehensive, scalable and customizable continuous early warning score. Halo ION® allows clinicians to aggregate trend data from as few as three physiological parameters (for example, $SpO_2$, PR and PI), and as many as are available, including data from EMRs, into a single continuous early warning score. Each patient's Halo ION® score is displayed on the Masimo Patient SafetyNet™ Supplemental Remote Monitoring and Clinician Notification System as a number ranging from zero to 100, helping to streamline clinicians' patient assessment workflow.

*Hospital-to-Home and Wellness*

*Masimo SafetyNet™* is a home-based patient engagement and remote care automation platform. Originally named Doctella™, Masimo SafetyNet™ provides a complete end-to-end home care solution, allowing clinicians to create and manage treatment plans, patient schedules and patient data flow using automated, customizable CarePrograms™, home device data aggregation, and a web-based provider dashboard. CarePrograms™ are delivered to patients' smartphones via an app (available for both iOS® and Android® devices) and dynamically update based on patient input, including both self-reported data and physiological data collected by connected monitoring devices. Masimo SafetyNet™ was developed in the wake of the COVID-19 pandemic to assist with hospital surge capacity and provide clinicians a secure cloud-based platform to remotely manage a patient's health. Powered by Masimo SET® Measure-through Motion and Low Perfusion™ technology, the tetherless single-patient-use sensor (Radius PPG™) provides continuous respiration rate and oxygen saturation monitoring, with a second tetherless sensor, Radius T°™, for continuous temperature measurements. Patient data is sent securely via Bluetooth to the Masimo SafetyNet™ mobile application.

*Radius T°™ Continuous Thermometer* is a wearable wireless thermometer that continuously and seamlessly measures temperatures using a small, inconspicuous, wearable sensor that can be easily applied to anyone from children to elderly adults with no action needed after initial application to the skin. Radius T°™ eliminates manual measurements while providing continuous insight into changes in the user's temperature and helps users understand which way their temperature is trending. In addition, Radius T°™ uses proprietary algorithms to provide body temperature measurements, for users five years or older, that approximate oral temperature, not just external skin temperature, with laboratory accuracy within ±0.1°C, whereas other thermometry solutions typically have laboratory accuracy within ±0.2°C.

*Masimo Sleep™* was designed to help consumers better understand the quality of their sleep. Masimo Sleep™ is fueled by the same expertise in signal processing and sensor development that drives our hospital products used by leading institutions to monitor millions of patients a year.

*MightySat®*, our fingertip pulse oximeter for personal use provides $SpO_2$, PR and Pi measurements for health and wellness applications. MightySat®, which is also available with RRp® and PVi®, provides measurements in a compact, battery-powered design with a large color screen that can be rotated for real-time display of the measurements. Bluetooth® wireless functionality enables measurement display via a free, downloadable Masimo Personal Health application on iOS® and Android® mobile devices, as well as the ability to trend and communicate measurements, including the Apple Health Kit. MightySat® is available through consumer retailers and directly from Masimo, and is intended for general health and wellness use only. MightySat® is not intended for medical use.

*$iSpO_2$®* is a personal use pulse oximeter that combines a fingertip sensor, cable and pulse oximeter in a lightweight, portable device that connects directly to a smart device for displaying measurements. $iSpO_2$® uses Measure-through Motion and Low Perfusion™ SET® technology to measure $SpO_2$, PR and Pi. The Masimo Personal Health app, available for both iOS® and Android® devices, allows users to track, trend and download their data, as well as share it with the Apple Health app. $iSpO_2$® is available through consumer retailers and directly from Masimo and is intended for general health and wellness use only. $iSpO_2$® is not intended for medical use.

***Cercacor Laboratories, Inc.***

Cercacor is an independent entity spun-off from us to our stockholders in 1998. Joe Kiani, our Chairman and Chief Executive Officer, is also the Chairman and Chief Executive Officer of Cercacor. We are a party to a cross-licensing agreement with Cercacor, which was amended and restated effective January 1, 2007 (the Cross-Licensing Agreement), which governs each party's rights to certain intellectual property held by the two companies.

The following table outlines our rights under the Cross-Licensing Agreement relating to specific end-user markets and the related technology applications of specific measurements.

| | End-User Markets | |
|---|---|---|
| **Measurements** | **Professional Caregiver and Alternate Care Market** | **Patient and Pharmacist** |
| Vital Signs[1] | Masimo (owns) | Cercacor (non-exclusive license) |
| Non-Vital Signs[2] | Masimo (exclusive license) | Cercacor (owns or exclusive license) |

(1) Vital signs measurements include, but are not limited to, $SpO_2$, peripheral venous oxygen saturation, mixed venous oxygen saturation, fetal oximetry, sudden infant death syndrome, ECG, blood pressure (noninvasive blood pressure, invasive blood pressure and continuous noninvasive blood pressure), temperature, respiration rate, $CO_2$, pulse rate, cardiac output, EEG, perfusion index, depth of anesthesia, cerebral oximetry, tissue oximetry and/or EMG, and associated features derived from these measurements, such as 3D alarm®, PVi® and other features.

(2) Non-vital signs measurements include the body fluid constituents other than vital signs measurements and include, but are not limited to, carbon monoxide, methemoglobin, blood glucose, hemoglobin and bilirubin.

*Our License to Cercacor.* We granted Cercacor an exclusive, perpetual and worldwide license, with sublicense rights, to use our Masimo SET® technology, including all improvements, for the monitoring of non-vital signs measurements and to develop and sell devices incorporating Masimo SET® for monitoring non-vital signs measurements in the "Cercacor Market". The Cercacor Market consists of any product market in which a product is intended to be used by a patient or pharmacist rather than a professional medical caregiver regardless of the particular location of the sale, including sales to doctors, hospitals, alternate care market professionals or otherwise, provided the product is intended to be recommended, or resold, for use by the patient or pharmacist. We also granted Cercacor a non-exclusive, perpetual and worldwide license, with sublicense rights, to use Masimo SET® for the measurement of vital signs in the Cercacor Market. In exchange, Cercacor pays us a 10% royalty on the amount of vital signs sensors and accessories sold by Cercacor.

*Cercacor's License to us.* We exclusively license from Cercacor the right to make and distribute products in the "Masimo Market" that utilize rainbow® technology for the measurement of carbon monoxide, methemoglobin, fractional arterial oxygen saturation, and hemoglobin, which includes hematocrit. The Masimo Market consists of any product market where the product is intended to be used by a professional medical caregiver, including hospital caregivers, surgicenter caregivers, paramedic vehicle caregivers, doctors' offices caregivers, alternate care facility caregivers and vehicles where alternative care services are provided. We also have the option to obtain exclusive licenses to make and distribute products in the Masimo Market that utilize rainbow® technology for the monitoring of other non-vital signs measurements, including blood glucose. We have 180 days after proof of feasibility to exercise the above-referenced option to obtain a license for the measurement of blood glucose for an additional $2.5 million and licenses for other non-vital signs measurements for an additional $0.5 million each. The licenses are exclusive until the later of 20 years from the grant of the applicable license or the expiration of the last patent included in the rainbow® technology related to the applicable measurements. To date, we have developed and commercially released devices that measure carbon monoxide, methemoglobin and hemoglobin using licensed rainbow® technology. We also make and distribute products that monitor respiration rate via rainbow Acoustic Monitoring®, which is a Masimo-developed rainbow® technology and, therefore, is not required to be licensed from Cercacor.

Our license to use rainbow® technology for these measurements in these markets is exclusive on the condition that we continue to pay Cercacor royalties on our products incorporating rainbow® technology, subject to certain minimum aggregate royalty thresholds, and that we use commercially reasonable efforts to develop or market products incorporating the licensed rainbow® technology. The royalty is up to 10% of the rainbow® royalty base, which includes handhelds, tabletop and multiparameter devices. Handheld products incorporating rainbow® technology carry a 10% royalty rate. For other products, only the proportional amount attributable to that portion of our devices used to monitor non-vital signs measurements, rather than to monitor vital signs measurements, and sensors and accessories for measuring only non-vital sign parameters are included in the 10% rainbow® royalty base. For multiparameter devices, the rainbow® royalty base includes the percentage of the revenue based on the number of rainbow®-enabled measurements.

Table of Contents

For hospital contracts where we place equipment and enter into a sensor contract, we pay a royalty to Cercacor on the total sensor contract revenue based on the ratio of rainbow®-enabled devices to total devices. Pursuant to the terms of the license, we are subject to certain specific annual minimum aggregate royalty payment obligations of $5.0 million per year.

*Change in Control*. The Cross-Licensing Agreement provides that, upon a change in control:

- if the surviving or acquiring entity ceases to use “Masimo” as a company name and trademark, all rights to the “Masimo” trademark will be assigned to Cercacor;
- the option to license technology developed by Cercacor for use in blood glucose monitoring will be deemed automatically exercised and a $2.5 million license fee for this technology will become immediately payable to Cercacor; and
- the minimum aggregate annual royalties payable to Cercacor for carbon monoxide, methemoglobin, fractional arterial oxygen saturation, hemoglobin and/or glucose will increase to $15.0 million per year until the exclusivity period of the agreement ends, plus up to $2.0 million for each additional measurement with no maximum ceiling for non-vital sign measurements.

For purposes of the Cross-Licensing Agreement, a change in control includes any of the following with respect to us or Cercacor:

- the sale of all or substantially all of either company’s assets to a non-affiliated third-party;
- the acquisition by a non-affiliated third-party of 50% or more of the voting power of either company;
- Joe Kiani, our Chief Executive Officer and the Chief Executive Officer of Cercacor, resigns or is terminated from his position with either company; or
- the merger or consolidation of either company with a non-affiliated third-party.

*Ownership of Improvements*. Any improvements to Masimo SET® or rainbow® technology made by Cercacor, by us, or jointly by Cercacor with us or with any third-party that relates to non-vital signs monitoring, and any new technology acquired by Cercacor, is and will be owned by Cercacor. Any improvements to the Masimo SET® platform or rainbow® technology made by Cercacor, by us, or jointly by Cercacor with us or with any third-party that relates to vital signs monitoring, and any new technology acquired by us, is and will be owned by us. However, for both non-vital signs and vital signs monitoring, any improvements to the technology, excluding acquired technology, will be assigned to the other party and will be subject to the terms of the licenses granted under the Cross-Licensing Agreement. Any new non-vital signs monitoring technology utilizing Masimo SET® that we develop will be owned by Cercacor and will be subject to the same license and option fees as if it had been developed by Cercacor. Also, we will not be reimbursed by Cercacor for our expenses relating to the development of any such technology.

*Other Agreements with Cercacor.* We have also entered into various other agreements with Cercacor, including an Administrative Services Agreement, a Consulting Services Agreement and a Sublease Agreement. See Note 3 to our accompanying consolidated financial statements included in Part IV, Item 15(a) of this Annual Report on Form 10-K for additional information on these agreements and other transactions with Cercacor.

### ***Government Regulation***

As a global medical technology company, we are subject to significant government regulation, compliance requirements, fees and costs, both in the U.S. and abroad. These regulatory requirements subject our products and our business to numerous risks that are specifically discussed within “Risks Related to Our Regulatory Environment” under Part I, Item 1A—“Risk Factors” within this Annual Report on Form 10-K. A summary of certain critical aspects of our regulatory environment is included below.

#### *Product Clearance and Approval Requirements*

Many of our products are regulated by numerous government agencies, the most significant of which are the U.S. FDA, the national authorities in the European Union (EU) and the United Kingdom (UK), and MHLW in Japan. In addition, there are government agencies that regulate our products in other countries, whose requirements vary substantially from country to country. These agencies require us to comply with laws that regulate the design, development, clinical trials, testing, manufacture, packaging, labeling, storage, distribution, import, export and promotion of many of our products.

In the U.S., unless an exemption applies, each medical device that we wish to market in the U.S. must, generally, first receive from the FDA either clearance of a 510(k) premarket notification or approval of a premarket application (PMA). In some cases, the device may be authorized by FDA through the *de novo* classification process. The FDA's 510(k) clearance process requires us to show that our new medical device is substantially equivalent to a legally marketed "predicate" medical device and usually takes from four to nine months, but it may take longer. The PMA process requires us to demonstrate through valid scientific evidence that there is reasonable assurance of safety and effectiveness of the device for its intended use. The PMA process is much more costly, lengthy and uncertain than the process of obtaining 510(k) clearance. Both 510(k) and PMA submissions are subject to user fees. The FDA determines the appropriate process based on the risk classification of the medical device. There are three classifications, from Class I to Class III. The majority of our current regulated products have been deemed Class II devices, requiring 510(k) clearance, while some have been deemed Class I devices.

Most of our OEM partners are required to obtain clearance or approval of their devices that incorporate Masimo's technologies, like Masimo SET® technology, Masimo rainbow SET® technology, Masimo Board-in-Cable technology, or are used with Masimo's sensors. We generally grant our OEM partners a right to cross-reference the 510(k) submission files from our cleared Masimo SET® circuit boards, sensors, cables and notification systems.

In the EU, medical devices are currently subject to the Medical Devices Directive 93/42/EEC (MDD). Under the MDD, a medical device may only be placed on the market within the EU if it conforms to certain "essential requirements". Key requirements include that a medical device achieves its intended performance and does not compromise the clinical condition or safety of patients or the safety and health of users and others, and bears the CE Mark. A medical device that conforms to such essential requirements can bear a CE Mark, which allows the device to be placed on the market throughout the EU. Each medical device that we wish to market in the EU must conform to these requirements.

Conformity is determined through an assessment procedure, which depends upon the risk classification of the device. For our EU medical devices, conformity assessment generally involves a notified body. Notified bodies are often private entities that are authorized or licensed by government authorities to perform, or otherwise have oversight over, such assessments. Notified bodies may also review a manufacturer's quality systems. If the conformity assessment is successfully completed, the manufacturer may apply a CE Mark to the product. This allows the general commercializing of a product in the EU. However, the product can also be subject to local registration requirements depending on the country.

On May 26, 2021, the existing MDD will be repealed and replaced by the Medical Devices Regulation (EU) 2017/745 (MDR). The MDR is similar to the MDD, though it includes significantly more stringent requirements, notably stronger conformity assessment procedures, greater control over notified bodies and their standards, increased transparency, and more robust device vigilance requirements. The MDR will apply to the medical devices we commercialize in the EU after May 26, 2021. However, the MDR is subject to certain transitional periods that enable certain notified body certificates to remain valid beyond 2021. For some of our devices, this could be as late as May 2024.

The UK exited the EU on December 31, 2020 (Brexit). The UK does not intend to implement the MDR into the laws of Great Britain (England, Scotland and Wales). Northern Ireland is an exception where the MDR will continue to apply. Great Britain instead introduced a new, standalone medical devices framework. Currently, this aligns closely to the MDD. Instead of a CE mark, medical devices marketed in Great Britain must bear a UKCA mark. However, EU CE marks will continue to be recognized in Great Britain until June 30, 2023, as will certificates issued by EU-recognized notified bodies. This arrangement is not reciprocated in the EU. Each medical device that we wish to market in the UK must comply with the national laws in the UK, which going forward may differ from the laws in the EU.

*Continuing FDA Regulation*

Clinical trials involving medical devices are subject to FDA regulation. Among other requirements, clinical trial sponsors must comply with requirements related to informed consent, Institutional Review Board (IRB) approval, monitoring, reporting, record-keeping, labeling and promotion. If the study involves a significant risk device, the sponsor must obtain FDA approval of an investigational device exemption in addition to IRB approval prior to beginning the study. Information regarding certain device clinical trials must also be submitted to a public database maintained by the National Institutes of Health.

After a device is approved and placed on the market, numerous regulatory requirements continue to apply. These regulatory requirements include, but are not limited to, the following: product listing and establishment registration; adherence to the Quality System Regulation (QSR) which requires stringent testing, control, documentation and other quality assurance procedures for the design, manufacture, storage and handling of devices; labeling requirements and FDA prohibitions against the promotion of off-label uses or indications; adverse event and device malfunction reporting; post-approval restrictions or conditions, including post-approval clinical trials or other required testing; post-market surveillance requirements; the FDA's recall authority, whereby it can ask for, or require, the recall of products from the market; and requirements relating to voluntary corrections or removals. Device manufacturers are subject to announced and unannounced inspections by the FDA to evaluate compliance with these requirements.

*Advertising and Promotion*

Advertising and promotion of medical devices, in addition to being regulated by the FDA, are also regulated by the Federal Trade Commission (FTC) and by federal and state regulatory and enforcement authorities, including the Department of Justice, the Office of Inspector General of the Department of Health and Human Services, and various state attorneys general. Although physicians are permitted to use their medical judgment to use medical devices for indications other than those cleared or approved by the FDA, we may not promote our products for such “off-label” uses and can only market our products for cleared or approved uses. Other companies’ promotional activities for their FDA-regulated products have been the subject of FTC enforcement actions brought under healthcare reimbursement laws and consumer protection statutes. FTC enforcement actions often result in consent decrees that constrain future actions. In addition, under the federal Lanham Act and similar state laws, competitors and others can initiate litigation relating to advertising claims.

*Import and Export Requirements*

To import a device, the importer must file an entry notice and bond with the United States Bureau of Customs and Border Protection (CBP). All devices are subject to FDA examination before release from CBP. Any article that appears to be in violation of the Federal Food, Drug and Cosmetics Act (FDCA) may be refused admission and a notice of detention and hearing may be issued. If the FDA ultimately refuses admission, the CBP may issue a notice for redelivery and, if a company fails to redeliver the goods or otherwise satisfy CBP and the FDA with respect to their disposition, may assess liquidated damages for up to three times the value of the lot. The CBP also imposes its own regulatory requirements on the import of our products, including inspection and possible sanctions for noncompliance.

Products exported from the United States are subject to foreign countries’ import requirements and the exporting requirements of the FDA or European regulating bodies, as applicable. In particular, international sales of medical devices manufactured in the United States that are not approved or cleared by the FDA for use in the United States, or are banned or deviate from lawful performance standards, are subject to FDA export requirements.

Foreign countries often require, among other things, a Certificate of Foreign Government (CFG) for export. To obtain a CFG, the device manufacturer must apply to the FDA. The FDA certifies that the product has been granted clearance or approval in the United States and that the manufacturing facilities were in compliance with the FDA’s QSR regulations at the time of the last FDA inspection.

*Conflict Minerals and Supply Chain*

We are subject to certain SEC rules adopted pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act concerning “conflict minerals” (generally tin, tantalum, tungsten and gold), From January 1, 2021, similar rules are in force in the EU. Certain of these conflict minerals are used in the manufacture of our products. Although the U.S. rules are being challenged in court, in their present form they require us to investigate the source of any conflict minerals necessary to the production or functionality of our products. If any such conflict minerals originated in the Democratic Republic of the Congo or adjoining countries (the DRC region), we must undertake comprehensive due diligence to determine whether such minerals financed or benefited armed groups in the DRC region. Since our supply chain is complex, our ongoing compliance with these rules could affect the pricing, sourcing and availability of conflict minerals used in the manufacture of our products.

We are also subject to disclosure requirements regarding abusive labor practices in portions of our supply chain under the California Transparency in Supply Chains Act.

*Environmental*

Our manufacturing processes involve the use, generation and disposal of solid wastes, hazardous materials and hazardous wastes, including silicone adhesives, solder and solder paste, sealants, epoxies and various solvents such as methyl ethyl ketone, acetone and isopropyl alcohol. As such, we are subject to stringent federal, state and local laws relating to the protection of the environment, including those governing the use, handling and disposal of hazardous materials and wastes. Products that we sell in Europe are subject to regulation in EU markets under the Restriction of Hazardous Substances Directive (RoHS). RoHS prohibits companies from selling products which contain certain hazardous materials, including lead, mercury, cadmium, chromium, polybrominated biphenyls and polybrominated diphenyl ethers, in EU member states. In addition, the EU’s Regulation-Registration, Evaluation, Authorization, and Restriction of Chemicals Directive also restricts substances of very high concern in products.

Future environmental laws may require us to alter our manufacturing processes, thereby increasing our manufacturing costs. We believe that our products and manufacturing processes at our facilities comply in all material respects with applicable environmental laws and worker health and safety laws; however, the risk of environmental liabilities cannot be completely eliminated.

*Health Care Fraud and Abuse*

In the U.S., there are federal and state anti-kickback laws that generally prohibit the payment or receipt of kickbacks, bribes or other remuneration in exchange for the referral of patients or other health-related business. For example, the Federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)) prohibits anyone from, among other things, knowingly and willfully offering, paying, soliciting or receiving any bribe, kickback or other remuneration intended to induce the referral of patients for, or the purchase, order or recommendation of, health care products and services reimbursed by a federal health care program, including Medicare and Medicaid. Recognizing that the federal anti-kickback law is broad and potentially applicable to many commonplace arrangements, Congress and the Office of Inspector General (OIG) within the Department of Health and Human Services have created statutory "exceptions" and regulatory "safe harbors". Exceptions and safe harbors exist for a number of arrangements relevant to our business, including, among other things, payments to bona fide employees, certain discount and rebate arrangements, and certain payment arrangements involving Group Purchasing Organizations (GPOs).

Although an arrangement that fits into one or more of these exceptions or safe harbors is immune from prosecution, arrangements that do not fit squarely within an exception or safe harbor do not necessarily violate the law, but the OIG or other government enforcement authorities may examine the practice to determine whether it involves the sorts of abuses that the statute was designed to combat. Violations of this federal law can result in significant penalties, including imprisonment, monetary fines and assessments, and exclusion from Medicare, Medicaid and other federal health care programs. Exclusion of a manufacturer, like us, would preclude any federal health care program from paying for its products. In addition to the federal anti-kickback law, many states have their own laws that are analogous to the federal anti-kickback law, but may apply regardless of whether any federal or state health care program business is involved. Federal and state anti-kickback laws may affect our sales, marketing and promotional activities, educational programs, pricing and discount practices and policies, and relationships with health care providers by limiting the kinds of arrangements we may have with hospitals, alternate care market providers, GPOs, physicians, payers and others in a position to purchase or recommend our products.

Federal and state false claims laws prohibit anyone from presenting, or causing to be presented, claims for payment to third-party payers that are false or fraudulent. For example, the Federal Civil False Claims Act (31 U.S.C. § 3729 et seq.) imposes liability on any person or entity who, among other things, knowingly and willfully presents, or causes to be presented, a false or fraudulent claim for payment by a federal health care program, including Medicaid and Medicare. Some suits filed under the False Claims Act, known as "qui tam" actions, can be brought by a "whistleblower" or "relator" on behalf of the government and such individuals may share in any amounts paid by the entity to the government in fines or settlement. Manufacturers, like us, can be held liable under false claims laws, even if they do not submit claims to the government, where they are found to have caused submission of false claims by, among other things, providing incorrect coding or billing advice about their products to customers that file claims, or by engaging in kickback arrangements or off-label promotion with customers that file claims. A number of states also have false claims laws, and some of these laws may apply to claims for items or services reimbursed under Medicaid and/or commercial insurance. Sanctions under these federal and state fraud and abuse laws may include civil monetary penalties and criminal fines, exclusion from government health care programs and imprisonment.

The Health Insurance Portability and Accountability Act of 1996 (HIPAA) created new federal crimes, including health care fraud and false statements related to health care matters. The health care fraud statute prohibits, among other things, knowingly and willfully executing a scheme to defraud any health care benefit program, including those offered by private payers. The false statements statute prohibits, among other things, knowingly and willfully falsifying, concealing or covering up a material fact or making any materially false, fictitious or fraudulent statement in connection with the delivery of or payment for health care benefits, items or services. A violation of either statute is a felony and may result in fines, imprisonment and other significant penalties.

The Physician Payment Sunshine Act (Sunshine Act), which was enacted by Congress as part of the ACA, requires medical device companies to track and publicly report, with limited exceptions, all payments and transfers of value to physicians and teaching hospitals in the U.S. Companies are required to track payments made and to report such payments to the government by March 31 of each year. Several states have similar requirements. Beginning in 2022, the reporting requirement will also apply to advance practice nurses and physician assistants.

The Foreign Corrupt Practices Act of 1977 and similar worldwide anti-bribery laws in non-U.S. jurisdictions generally prohibit companies and their intermediaries from making improper payments to non-U.S. officials for the purpose of obtaining or retaining business.

Due to the breadth of some of these laws, it is possible that some of our current or future practices might be challenged under one or more of these laws. In addition, there can be no assurance that we would not be required to alter one or more of our practices to be in compliance with these laws. Evolving interpretations of current laws or the adoption of new federal or state laws or regulations could adversely affect many of the arrangements we have with customers and physicians. Therefore, our risk of being found in violation of these laws is increased by the fact that some of these laws are broad and open to interpretation.

*Data Privacy and Protection of Health and Other Personal Information*

Data protection legislation is becoming increasingly common in the United States at both the federal and state level. For example, the California Consumer Privacy Act of 2018 (CCPA), which became effective on January 1, 2020, requires us to make disclosures to consumers about our data collection, use and sharing practices, allows consumers to opt out of certain data sharing with third parties, and provides a cause of action for data breaches. The CCPA, together with the newly passed Consumer Privacy Rights Act, which is effective beginning January 1, 2023, is the most comprehensive data privacy law in the United States, and could be the precursor to other similar legislation in other states or at the federal level. Internationally, the General Data Protection Regulation (GDPR) took effect in May 2018 within the European Economic Area (EEA) and many EEA jurisdictions. Other jurisdictions outside of the EEA have also adopted their own data privacy and protection laws. We have implemented, and continue to implement, procedures and processes to comply with these regulations and, as international data privacy and protection laws continue to evolve, and as new regulations, interpretive guidance and enforcement information become available, we may incur incremental costs to modify our business practices to comply with these requirements. In addition, our internal control policies and procedures may not always protect us from reckless or criminal acts committed by our employees or agents.

In addition, numerous federal, state and international laws and regulations, including HIPAA and GDPR, govern the collection, use and disclosure of patient-identifiable, protected health information (PHI) and other personal information. In the U.S., HIPAA applies to covered entities, which include most healthcare facilities that purchase and use our products, and their business associates. The HIPAA Privacy Rule restricts the use and disclosure of PHI, and requires covered entities and their business associates to safeguard that information and to provide certain rights to individuals with respect to that information. The HIPAA Security Rule establishes detailed requirements for safeguarding PHI transmitted or stored electronically.

Although we are not a covered entity, we are sometimes deemed by our customers to be a business associate of covered entities due to activities that we perform for or on behalf of covered entities, such as training customers on the use of our products or investigating product performance. As business associates, we are subject to many of the requirements of HIPAA and could be directly subject to HIPAA civil and criminal enforcement and the associated penalties for violation of the Privacy, Security and Breach Notification Rules.

The HIPAA standards also apply to the use and disclosure of PHI for research and generally require the covered entity performing the research to obtain the written authorization of the research subject (or an appropriate waiver) before providing that subject’s PHI to sponsors like us for purposes related to the research. These covered entities also typically impose contractual limitations on our use and disclosure of the PHI they disclose to us. We may be required to make costly system modifications to comply with the privacy and security requirements that will be imposed on us and our failure to comply may result in liability and adversely affect our business. Other countries also have, or are developing, laws governing the collection, use and transmission of health information, and these laws could create liability for us or increase our cost of doing business.

*Third-Party Reimbursement*

Health care providers, including hospitals, that purchase our products generally rely on third-party payers, including the Medicare and Medicaid programs and private payers, including indemnity insurers and managed care plans, to cover and reimburse all or part of the cost of the products and the procedures in which they are used. As a result, demand for our products is dependent in part on the coverage and reimbursement policies of these payers. No uniform coverage or reimbursement policy for medical technology exists among all third-party payers, and coverage and reimbursement can differ significantly from payer to payer.

The Centers for Medicare & Medicaid Services (CMS) is the federal agency responsible for administering the Medicare program. Along with its contractors, CMS establishes the coverage and reimbursement policies for the Medicare program. Because a large percentage of our products are used in the treatment of elderly or disabled individuals who are Medicare beneficiaries, Medicare’s coverage and reimbursement policies are particularly significant to our business. In addition, private payers often follow the coverage and reimbursement policies of Medicare.

In general, Medicare will cover a medical product or procedure when the product or procedure is included within a statutory benefit category and is reasonable and necessary for the diagnosis or treatment of an illness or injury, or to improve the functioning of a malformed body part. Even if the medical product or procedure is considered medically necessary and coverage is available, Medicare may place restrictions on the circumstances where it provides coverage. For example, several Medicare local contractors have issued policies that restrict coverage for pulse oximetry in hospital inpatient and outpatient settings to a limited number of conditions, including limiting coverage to patients who (i) exhibit signs of acute respiratory dysfunction, (ii) have chronic lung disease, severe cardiopulmonary disease or neuromuscular disease involving the muscles of respiration, (iii) are under treatment with a medication with known pulmonary toxicity, or (iv) have sustained multiple trauma or complaints of acute chest pain.

Reimbursement for our products may vary not only by the type of payer involved but also based upon the setting in which the product is furnished and utilized. For example, Medicare payment may be made, in appropriate cases, for patient stays in the hospital inpatient and in outpatient settings involving the use of our products. Medicare generally reimburses hospitals based upon prospectively determined amounts. For hospital inpatient stays, the prospective payment generally is determined by the patient’s condition and other patient data and procedures performed during the inpatient stay, using a classification system known as Medicare Severity Diagnosis-Related Groups (MS-DRGs). Prospective rates are adjusted for, among other things, regional differences, co-morbidity and complications. Hospitals generally do not receive separate Medicare reimbursement for the specific costs of purchasing our products for use in the inpatient setting. Rather, Medicare reimbursement for these costs is deemed to be included within the prospective payments made to hospitals for the inpatient services in which the products are utilized.

In contrast, some differences may be seen in the reimbursement for use of our products in hospital outpatient departments. In this setting, Medicare payments also are generally made under a prospective payment system based on the ambulatory payment classifications (APCs) under which individual items and procedures are categorized. Hospitals receive the applicable APC payment rate for the procedure regardless of the actual cost for such treatment. Some outpatient services such as oximetry services do not receive separate reimbursement. Rather, their reimbursement is deemed packaged into the APC for an associated procedure and the payment for that APC does not vary whether or not the packaged procedure is performed. Some procedures also are paid through composite APCs, which are APCs that establish a payment rate that applies when a specific combination of services is provided.

Reimbursement for certain pulse oximetry monitoring services, including those using our products, may be separately payable when they are the only service provided to the patient on that day, packaged if provided with certain critical care services, or reimbursed through a composite APC when provided in connection with certain other services.

Because payments through the Prospective Payment System in both the hospital inpatient and outpatient settings are based on predetermined rates and may be less than a hospital’s actual costs in furnishing care, hospitals have incentives to lower their operating costs by utilizing products that will reduce the length of inpatient stays, decrease labor or otherwise lower their costs. If hospitals cannot obtain adequate coverage and reimbursement for our products, or the procedures in which they are used, we cannot be certain that they will purchase our products, despite the clinical benefits and opportunity for cost savings that we believe can be derived from their use.

Our success with rainbow SET® technologies in U.S. settings of care with reimbursable monitoring procedures, such as hospital emergency departments, hospital procedure labs, and physician offices may largely depend on the ability of providers to receive reimbursement for such procedures. While private insurance payers often follow Medicare coverage and payment, we cannot be certain of this and, in many cases, cannot control the coverage or payment rates that private insurance payers put in place. In addition, the potential amendment, repeal or judicial invalidation of the ACA, and/or the enactment of other legislation or regulations, could affect future payment for services involving the use of our products.

Our success in non-U.S. markets depends largely upon the availability of coverage and reimbursement from the third-party payers through which health care providers are paid in those markets. Health care payment systems in non-U.S. markets vary significantly by country, and include single-payer government managed systems, as well as systems in which private payers and government managed systems exist side-by-side. Our ability to achieve market acceptance or significant sales volume in international markets we enter will be dependent in large part on the availability of reimbursement for procedures performed using our products under health care payment systems in such markets.

*Other U.S. and Foreign Regulation*

We and our OEM partners also must comply with numerous federal, state and local laws, as well as laws in other jurisdictions, relating to matters such as safe working conditions, manufacturing practices, environmental protection, fire hazard control and hazardous substance disposal. We cannot be sure that we will not be required to incur significant costs to comply with these laws and regulations in the future or that these laws or regulations will not hurt our business, financial condition and results of operations. Unanticipated changes in existing regulatory requirements or adoption of new requirements could hurt our business, financial condition and results of operations.

***Markets***

*Competitive Conditions*

The medical device industry is highly competitive and many of our competitors have substantially greater financial, technical, marketing and other resources than we do. While we regard any company that sells pulse oximeters as a potential customer, we also recognize that the companies selling pulse oximeters on an OEM basis and/or pulse oximetry sensors are also potential competitors. Our primary competitor, Medtronic plc (Medtronic, formerly Covidien Ltd.), currently holds a substantial share of the pulse oximetry market. In addition, large technology companies that have not historically operated in the healthcare or medical device space, such as Alphabet, Apple, Samsung and others, have developed or may develop products and technologies that may compete with our current or future products and technologies in the consumer and clinical marketplaces.

Medtronic sells its own brand of Nellcor pulse oximeters to end-users, sells pulse oximetry modules to other monitoring companies on an OEM basis, and licenses to certain OEMs the right to make their pulse oximetry platforms compatible with their sensors. We also face substantial competition from larger medical device companies, including companies that develop products that compete with our proprietary Masimo SET® and our OEM partners. We believe that a number of companies have announced products that claim to offer motion-tolerant accuracy. In addition, some of our patents have expired and others will expire over time in accordance with the laws of the jurisdiction in which they were issued.

We believe that the principal competitive factors in the market for pulse oximetry products include:

- accurate monitoring during both patient motion and low perfusion;
- ability to introduce other clinically beneficial measurements related to oxygenation and respiration, such as noninvasive and continuous oxygen reserve index and hemoglobin;
- competitive pricing;
- brand recognition and perception of innovation abilities;
- sales and marketing capability;
- access to hospitals which are members of GPOs;
- access to integrated delivery networks;
- access to OEM partners; and
- patent protection.

*Market Demand*

We currently sell all of our medical products both directly to hospitals and the alternate care market via our sales force and various distributors in the U.S. and around the world, including Europe, the Middle East, Asia, Latin America, Canada and Australia. We sell our non-medical/consumer products through e-commerce Internet sites such as www.masimopersonalhealth.com and www.amazon.com.

Our sales and marketing strategy for pulse oximetry has been, and will continue to be, focused on building end-user awareness of the clinical and cost-saving benefits of our technologies. Our sales representatives' primary focus is to facilitate the conversion of competitor accounts to our Masimo SET® pulse oximetry and rainbow SET® Pulse CO-Oximetry® products, to expand the use of Masimo SET® and Patient SafetyNet™ on the general floor and to create and expand the use of rainbow® measurements in both critical care and non-critical care areas. In addition to sales representatives, we employ clinical specialists to work with our sales representatives to educate end-users on the benefits of Masimo SET® and assist with the introduction and implementation of our technology and products to their sites.

For the year ended January 2, 2021, two just-in-time distributors, Medline Industries and Cardinal Health, represented approximately 11.5% and 10.1%, respectively, of our total revenue. These were the only two customers that represented 10% or more of our revenue for the year ended December 28, 2019. Importantly, these two distributors take and fulfill orders from our direct customers, many of which have signed long-term sensor purchase agreements with us. If a specific just-in-time distributor is unable to fulfill these orders, the orders would be redirected to other distributors or fulfilled directly by us.

Additionally, we sell certain of our products through our OEM partners who incorporate our technologies into their monitors and sometimes resell our sensors to their installed base. Our OEM agreements allow us to expand the availability of our technologies through the sales and distribution channels of each OEM partner. To facilitate clinician awareness of Masimo technologies, our OEM partners have generally agreed to place the applicable Masimo trademark prominently on their instruments.

In order to facilitate our U.S. direct sales to hospitals, we have signed contracts with what we believe to be the five largest national GPOs in the U.S., based on the total volume of negotiated purchases. In return for the GPOs putting our products on contract, we have agreed to pay the GPOs a percentage of our revenue from their member hospitals. In 2020 and 2019, revenue from the sale of our pulse oximetry products to hospitals that are associated with GPOs amounted to $564.0 million and $517.6 million, respectively.

***Resources***

*Intellectual Property*

We believe that in order to maintain a competitive advantage in the marketplace, we must develop and maintain protection of the proprietary aspects of our technology. We rely on a combination of patent, trademark, trade secret, copyright and other intellectual property rights and measures to protect our intellectual property.

We have developed a patent portfolio internally, and, to a lesser extent, through acquisitions and licensing, that covers many aspects of our product offerings. As of January 2, 2021, we had approximately 800 issued patents and approximately 500 pending applications in the U.S., Europe, Japan, Australia, Canada and other countries throughout the world. Our patents expire in accordance with the laws of the particular jurisdiction in which they were issued, which sometimes change. Additionally, as of January 2, 2021, we owned approximately 90 U.S. registered trademarks and approximately 300 foreign registered trademarks, as well as trade names that we use in conjunction with the sale of our products. Our trademarks are perpetually renewable.

Under the Cross-Licensing Agreement, we and Cercacor have agreed to allocate proprietary ownership of technology developed based on the functionality of the technology. We will have proprietary ownership, including ownership of all patents, copyrights and trade secrets, of all technology related to the noninvasive monitoring of vital signs measurements, and Cercacor will have proprietary ownership of all technology related to the noninvasive monitoring of non-vital signs measurements. We also rely upon trade secrets, continuing technological innovations and licensing opportunities to develop and maintain our competitive position.

We seek to protect our trade secrets and proprietary know-how, in part, with confidentiality agreements with consultants, vendors and employees, although we cannot be certain that the agreements will not be breached or that we will have adequate remedies for any breach.

There are risks related to our intellectual property rights. For further detail on these risks, see “Risks Related to Our Intellectual Property” under Item 1A—“Risk Factors” in this Annual Report on Form 10-K.

*Research and Product Development*

We believe that ongoing research and development efforts are essential to our success. Our research and development efforts focus primarily on continuing to enhance our technical expertise in pulse oximetry, expanding our noninvasive monitoring of other measurements and developing remote alarm and monitoring solutions.

Although we and Cercacor each have separate research and development projects, we collaborate with Cercacor on multiple research and development activities related to rainbow® technology and other technologies. Under the Cross-Licensing Agreement, the parties have agreed to allocate proprietary ownership of technology developed by either party based on the functionality of the technology. We will have proprietary rights to all technology related to the noninvasive measurement of vital signs measurements, and Cercacor will have proprietary ownership of all technology related to the noninvasive monitoring of non-vital signs measurements.

*Manufacturing*

Our strategy is to manufacture products in-house when it is efficient and cost-effective for us to do so. We currently manufacture our bedside and handheld pulse oximeters, our full line of disposable and reusable sensors and most of our patient cables in-house or through captive contract maquiladora operations. We maintain an approximate 70,700 square foot manufacturing facility in Irvine, California, and two separate manufacturing facilities in Mexicali and San Luis Rio Colorado, Mexico that have combined square footage of approximately 333,400 square feet. All three of these facilities are International Organization for Standardization (ISO) 13485:2016 certified. We also maintain an approximate 86,500 square foot facility in Hudson, New Hampshire, a portion of which is used to manufacture advanced light emitting diodes and other advanced component-level technologies.

We will continue to utilize third-party contract manufacturers for products and subassemblies that can be more efficiently manufactured by these parties, such as our circuit boards. We monitor our third-party manufacturers and perform inspections and product tests at various steps in the manufacturing cycle to ensure compliance with our specifications. We also do full functional testing of our circuit boards.

For raw materials, we and our contract manufacturers rely on sole source suppliers for some components, including digital signal processor chips and analog-to-digital converter chips. We and our contract manufacturers have taken steps to minimize the impact of a shortage or stoppage of shipments of digital signal processor chips or analog to digital converter chips, including maintaining a safety stock of inventory and designing software that may be easily ported to another digital signal processor chip. We believe that our sources of supply for components and raw materials are adequate. In the event of a delay or disruption in the supply of sole source components, we believe that we and our contract manufacturers will be able to locate additional sources of these sole source components on commercially reasonable terms and without experiencing material disruption in our business or operations. We have agreements with certain major suppliers and each agreement provides for varying terms with respect to contract expiration, termination and pricing. Most of these agreements allow for termination upon specified notice, ranging from four to twelve months, to the non-terminating party. Certain of these agreements with our major suppliers allow for pricing adjustments, each agreement provides for annual pricing negotiation, and one agreement also guarantees us the most favorable pricing offered by the supplier to any of its other customers.

***Human Capital Resources***

Core to our long-term strategy for human capital is attracting, developing and retaining the best talent globally with the right skills to drive our future success. We consider our employees to be our greatest assets and the greatest strength behind our innovation and success. We seek to attract and retain highly-talented, experienced and well-educated individuals to support our long-term growth and profitability goals.

Our success and future growth is largely dependent on our ability to retract, retain and develop a diverse workforce at all levels of the organization. To succeed, we have developed key recruitment and retention strategies that we focus on as part of our overall management of our business. These include:

- **Compensation.** Our compensation programs are designed to align the compensation of our employees with their performance and to provide the proper incentives to attract and retain employees while motivating them to achieve superior results. The structure of our compensation programs balance incentive earnings for both short-term and long-term performance.
  - Our executive compensation is aligned with stockholder interests by aligning pay-for-performance metrics.
  - We utilize nationally-recognized compensation consultants to evaluate our executive compensation benefit programs and provide benchmarking against our peer groups.
  - We provide employee wages that are competitive and consistent with employee positions, experience, skills, knowledge and geography.
  - Our annual increases and cash incentives are based on market and awarded based on merit.
  - We offer a wide variety of benefits, including health insurance, paid time off, retirement plans, and voluntary benefits such as financial and personal wellness benefits, etc.
- **Health and Safety.** We are committed to the safety and well-being of our employees. In response to the COVID-19 pandemic, we implemented changes to our business in an effort to protect our employees and customers and in support of the health and safety protocols. A large majority of our workforce has been working remotely since March 2020, and we instituted safety protocols and procedures for our essential employees who continue to work on site. We installed plexiglass partitions for our manufacturing/assemblies facilities and implemented extensive cleaning sanitation procedures for our both manufacturing/assembly facilities and our general administration and sales facilities.

- **Developing Leaders of Tomorrow/Succession Planning.** We are committed to identifying and developing the talents of our next generation of leaders. Our executive management team conducts an annual organization and leadership review of all business leaders, focusing on our high-performing and high potential talent, diversity, and the succession planning for critical roles.
- **Employee Feedback and Retention.** In November 2020, we were certified as a Great Place to Work®, earning a positive response of 84%, proving that we have created an amazing employee experience. To assess and improve employee retention and engagement, we survey employees with the assistance of third-party consultants, and take actions to address areas of employee concerns. The average tenure of our employee is approximately 5.5 years and more than 20% of our employees have been employed by us for more than ten years.
- **Diversity.** In fiscal 2020, our workforce grew at a faster pace than past years, increasing from approximately 1,600 full-time employees and approximately 3,700 dedicated contract personnel worldwide as of December 28, 2019 to 2,000 full-time employees and approximately 4,200 dedicated contract personnel worldwide as of January 2, 2021. Of our full-time employees, approximately 65% were male and approximately 35% were female, and women represented approximately 27% of our management/leadership roles. Minorities represented approximately 49% of our U.S. workforce, of which minorities accounted for approximately 39% of the employees in our management/leadership roles.

***Available Information***

Our annual reports on Form 10-K, quarterly reports on Form 10-Q, proxy statements, current reports on Form 8-K and amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended, are available free of charge at our website, www.masimo.com, as soon as reasonably practicable after electronically filing such reports with the SEC. Any information contained on, or that can be accessed through, our website is not incorporated by reference into, nor is it in any way a part of, this Annual Report on Form 10-K.

# Exhibit M

10-K 1 masi-20150103x10k.htm 10-K
Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

## FORM 10-K

**(Mark One)**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the fiscal year ended January 3, 2015**
**or**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934**
**Commission File Number 001-33642**

# Masimo Corporation
**(Exact name of registrant as specified in its charter)**

| **Delaware** | **33-0368882** |
|---|---|
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification Number) |
| **52 Discovery, Irvine, California** | **92618** |
| (Address of Principal Executive Offices) | (Zip Code) |

**(949) 297-7000**
**(Registrant's telephone number, including area code)**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class: | Name of each exchange on which registered: |
|---|---|
| **Common Stock, par value $0.001** | **The NASDAQ Global Select Market** |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐
Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒
Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐
Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒ No ☐
Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐
Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act (Check one).

| Large accelerated filer ☒ | Accelerated filer ☐ | Non accelerated filer ☐<br>(Do not check if a smaller reporting company) | Smaller reporting company ☐ |
|---|---|---|---|

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒
The aggregate market value of the voting stock held by non-affiliates of the registrant, based upon the closing sale price of the common stock on June 28, 2014, the last business day of the registrant's most recently completed second fiscal quarter, as reported on the NASDAQ Global Select Market, was approximately $730.9 million. Shares of stock held by officers, directors and 5 percent or more stockholders have been excluded in that such persons may be deemed to be affiliates. This determination of affiliate status is not necessarily a conclusive determination for other purposes.
At January 31, 2015, the registrant had 52,613,110 shares of common stock outstanding.

## DOCUMENTS INCORPORATED BY REFERENCE

Items 10, 11, 12, 13 and 14 of Part III of this Form 10-K incorporate information by reference from the registrant's proxy statement for the registrant's 2015 Annual Meeting of Stockholders to be filed with the Securities and Exchange Commission within 120 days after the close of the fiscal year covered by this annual report on Form 10-K.

**MASIMO CORPORATION**
**FISCAL YEAR 2014 FORM 10-K ANNUAL REPORT**
**TABLE OF CONTENTS**

| | | Page |
|---|---|---|
| | **PART I** | |
| Item 1 | Business | 1 |
| Item 1A | Risk Factors | 27 |
| Item 1B | Unresolved Staff Comments | 49 |
| Item 2 | Properties | 49 |
| Item 3 | Legal Proceedings | 49 |
| Item 4 | Mine Safety Disclosures | 51 |
| | **PART II** | |
| Item 5 | Market for the Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 52 |
| Item 6 | Selected Financial Data | 54 |
| Item 7 | Management's Discussion and Analysis of Financial Condition and Results of Operations | 57 |
| Item 7A | Quantitative and Qualitative Disclosures about Market Risk | 72 |
| Item 8 | Financial Statements and Supplementary Data | 73 |
| Item 9 | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 73 |
| Item 9A | Controls and Procedures | 73 |
| Item 9B | Other Information | 73 |
| | **PART III** | |
| Item 10 | Directors, Executive Officers and Corporate Governance | 74 |
| Item 11 | Executive Compensation | 74 |
| Item 12 | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 74 |
| Item 13 | Certain Relationships and Related Transactions and Director Independence | 74 |
| Item 14 | Principal Accounting Fees and Services | 74 |
| | **PART IV** | |
| Item 15 | Exhibits and Financial Statement Schedules | 75 |
| Signatures | | 79 |

## FORWARD-LOOKING STATEMENTS

*This Annual Report on Form 10-K, or this Form 10-K, contains "forward-looking statements" that involve risks and uncertainties, as well as assumptions that, if they never materialize or prove incorrect, could cause our results to differ materially and adversely from those expressed or implied by such forward-looking statements. The forward-looking statements are contained principally in Item 1—"Business," Item 1A—"Risk Factors" and Item 7—"Management's Discussion and Analysis of Financial Condition and Results of Operations" but appear throughout this Form 10-K. Examples of forward-looking statements include, but are not limited to, any projection or expectation of earnings, revenue or other financial items; the plans, strategies and objectives of management for future operations; factors that may affect our operating results, including accounting and tax estimates; our success in pending litigation; new products or services; the demand for our products; our ability to consummate acquisitions and successfully integrate them into our operations; future capital expenditures; effects of current or future economic conditions or performance; industry trends and other matters that do not relate strictly to historical facts or statements of assumptions underlying any of the foregoing. These statements are often identified by the use of words such as "anticipate," "believe," "continue," "could," "estimate," "expect," "intend," "may," "ongoing," "opportunity," "plan," "potential," "predicts," "seek," "should," "will," or "would," and similar expressions and variations or negatives of these words. These forward-looking statements are based on the expectations, estimates, projections, beliefs and assumptions of our management based on information currently available to management, all of which is subject to change. Such forward-looking statements are subject to risks, uncertainties and other factors that are difficult to predict and could cause our actual results and the timing of certain events to differ materially and adversely from future results expressed or implied by such forward-looking statements. Factors that could cause or contribute to such differences include, but are not limited to, those identified below, and those discussed under Item 1A—"Risk Factors" in this Form 10-K. Furthermore, such forward-looking statements speak only as of the date of this Form 10-K. We undertake no obligation to update or revise publicly any forward-looking statements to reflect events or circumstances after the date of such statements for any reason, except as otherwise required by law.*

## PART I

### ITEM 1. BUSINESS

***Overview***

We are a global medical technology company that develops, manufactures and markets a variety of noninvasive monitoring technologies. We provide our products directly and through distributors and original equipment manufacturers (OEM) partners to hospitals, emergency medical service (EMS) providers, physician offices, veterinarians, long term care facilities and consumers. Our mission is to improve patient outcomes and reduce the cost of care by taking noninvasive monitoring to new sites and applications. We were incorporated in California in May 1989 and reincorporated in Delaware in May 1996.

Our core business is measure-through-motion and low-perfusion pulse oximetry monitoring, known as Masimo Signal Extraction Technology® (SET®) pulse oximetry. Our product offerings have expanded significantly over the years to also include noninvasive optical blood constituent monitoring, optical organ oximetry monitoring, electrical brain function monitoring, acoustic respiration monitoring and optical gas monitoring. In addition, we have developed the Root® patient monitoring and connectivity platform, the Radical-7® bedside and portable patient monitor and the Radius-7™ wearable wireless patient monitor. We have also developed the Patient SafetyNet™ remote patient surveillance monitoring system, which currently allows up to 80 patients to be monitored simultaneously through a central station or remotely by care providers through their pagers or smart phones.

Our solutions and related products are based upon our proprietary Masimo SET® and rainbow® algorithms. These technologies are incorporated into a variety of product platforms depending on our customers' specifications. In addition, we provide our technologies to OEMs in a form factor that is easy to integrate into their patient monitors, defibrillators and infant incubators. Our technology is supported by a substantial intellectual property portfolio that we have built through internal development and, to a lesser extent, acquisitions and license agreements. We have also exclusively licensed from Cercacor Laboratories, Inc. (Cercacor) the right to OEM rainbow® technologies and to incorporate rainbow® technology into our products intended to be used by professional caregivers, including, but not limited to, hospital caregivers and alternate care facility caregivers.

***Conventional Pulse Oximetry***

Pulse oximetry enables the noninvasive measurement of the oxygen saturation level of arterial blood, which delivers oxygen to the body's tissues. Pulse oximetry also enables the measurement of pulse rate, which when measured by electrocardiogram (ECG), is called heart rate. Pulse oximeters use sensors attached to an extremity, typically the fingertip. These sensors contain two light emitting diodes that transmit red and infrared light from one side of the extremity through the tissue to a photodetector on the other side of the extremity. The photodetector in the sensor measures the amount of red and infrared light absorbed by

the tissue. A microprocessor then analyzes the changes in light-absorption to provide a continuous, real-time measurement of the amount of oxygen in the patient's arterial blood. Pulse oximeters typically give audio and visual alerts, or alarms, when the patient's arterial blood oxygen saturation level or pulse rate falls outside of a user-designated range. As a result, clinicians have the opportunity to assess patients who may need immediate treatment to prevent the serious clinical consequences of hypoxemia, or low oxygen saturation levels, and hyperoxemia, or high oxygen levels.

As one of the most common measurements taken in and out of hospitals around the world, pulse oximetry has gained widespread clinical acceptance as a standard patient vital sign measurement because it can give clinicians an early warning of low arterial blood oxygen saturation levels, known as hypoxemia. Early detection is critical because hypoxemia can lead to a lack of oxygen in the body's tissues, which can result in organ damage or death. Pulse oximeters are used primarily in critical care settings, including surgery, recovery rooms, intensive care units (ICUs), emergency departments and alternative care settings, such as long-term care facilities and for home monitoring of patients with chronic conditions.

Clinicians also use pulse oximeters to estimate whether there is too much oxygen in the blood, a condition called hyperoxemia. In premature babies, hyperoxemia can lead to permanent eye damage or blindness. By ensuring that oxygen saturation levels in babies remain within clinically accepted limits, clinicians believe they can lower the incidence of hyperoxemia. In adults, to prevent hyperoxemia, clinicians use pulse oximetry monitoring to guide the administration of oxygen to maintain normal saturation levels.

Conventional pulse oximetry is subject to technological limitations that reduce its effectiveness and the quality of patient care. In particular, when using conventional pulse oximetry, oxygen saturation measurements can be distorted by motion artifact, or patient movement, and low perfusion, or low arterial blood flow at the measurement site. Motion artifact can cause conventional pulse oximeters to inaccurately measure the arterial blood oxygen saturation level, due mainly to the movement and recognition of venous blood. Venous blood may cause falsely low oxygen saturation readings. Low perfusion can also cause conventional pulse oximeters to report inaccurate measurements, or in some cases, no measurement at all. Conventional pulse oximeters cannot distinguish oxygenated hemoglobin, or the component of red blood cells carrying oxygen, from dyshemoglobins, which are hemoglobin bound with carboxyhemoglobin or methemoglobin and are therefore incapable of carrying oxygen. In addition, conventional pulse oximetry readings can also be impacted by bright light and electrical interference from the presence of electrical surgical equipment.

Independent research has shown that over 70% of the alarms outside the operating room are false when using conventional pulse oximetry. In addition, in the operating room, conventional pulse oximeters can fail to give measurements due to weak physiological signals, or low perfusion, in up to 9% of all cases studied. Manufacturers of conventional pulse oximeters have attempted to address some of these limitations with varying degrees of success. Some competing devices have attempted to minimize the observed effects of motion artifact by repeating the last measurement before motion artifact is detected, until a new, clean signal is detected and a new measurement can be displayed, known as freezing values. Other competing devices increase the averaging time during motion, known as long-averaging, in an attempt to reduce the observed effect of motion on their measurements. Still other competing devices extend the audible alarm notification delay, which reduces the awareness of inaccurate measurements. These competing solutions, commonly referred to as "motion tolerant" or "alarm management" techniques, mask the limitations of conventional pulse oximetry. Several published studies have demonstrated that these also contribute to increased occurrences of undetected true alarms, or events where hypoxemia occurs, but is not detected by the pulse oximeter.

Conventional pulse oximetry technology also has several practical limitations. Because the technology cannot consistently measure oxygen saturation levels of arterial blood in the presence of motion artifact or low perfusion, conventional pulse oximetry is limited in non-critical care settings of the hospital, such as general care areas, where the hospital staff-to-patient ratio is significantly lower and the staff has lower tolerance for false alarms. In order for pulse oximetry to become a standard patient monitoring device in these settings, these limitations must be overcome.

In addition, two-wavelength pulse oximeters cannot distinguish oxygenated hemoglobin from dyshemoglobin, including the most prevalent forms of carboxyhemoglobin and methemoglobin. As a result of these dyshemoglobins, pulse oximeters will report falsely high oxygen levels when they are present in the blood.

***Masimo SET® Pulse Oximetry***

Masimo SET® was designed to overcome the primary limitations of conventional pulse oximetry by maintaining accuracy in the presence of motion artifact, low perfusion and weak signal-to-noise situations. Our Masimo SET® platform, which became available to hospitals in the U.S. in 1998, is the basis of our pulse oximetry products and we believe represented the first significant technological advancement in pulse oximetry since its introduction in the early 1980s. Masimo SET® utilizes five signal processing algorithms, four of which are proprietary, in parallel to deliver high sensitivity and specificity in the measurement of arterial blood oxygen saturation levels. Sensitivity is the ability to detect true events and specificity is the

ability to reject false alarms. One of our proprietary processing algorithms, Discrete Saturation Transform®, separates the signal from noise in real-time through the use of adaptive filtering and an iterative sampling technique that tests each possible saturation value for validity. Masimo SET® signal processing can therefore identify the venous blood and other noise, isolate them, and extract the arterial signal.

The performance of Masimo SET® pulse oximetry is proven by more than 100 independent studies and thousands of clinical evaluations. We believe that Masimo SET® is trusted by clinicians to safely monitor approximately 100 million patients each year and is used hospital-wide by eight of the top ten hospitals on the U.S. News & World Report Best Hospitals Honor Roll (2013-2014). Compared to conventional pulse oximeters, during patient motion and low perfusion, Masimo SET® provides measurements when other pulse oximeters cannot, dramatically reduces false alarms (specificity), and accurately detects true alarms (sensitivity) that can indicate a deteriorating patient condition. Masimo SET® pulse oximetry has also been shown to improve patient outcomes by helping clinicians reduce retinopathy of prematurity in neonates, screen newborns for critical congenital heart disease (CCHD), reduce ventilator weaning time and arterial blood gas measurements in the ICU, and save lives and costs while reducing rapid response activations and ICU transfers on the general floor.

Our pulse oximetry technology is contained on a circuit board which is placed inside a standalone pulse oximetry monitor, placed inside original equipment manufacturer (OEM) multiparameter monitors, or included as part of an external "Board-in-Cable" solution that is plugged into a port on an OEM or other device. All of these solutions use our proprietary single-patient use or reusable sensors and cables. We sell our products to end-users through our direct sales force and certain distributors, as well as to our OEM partners, for incorporation into their products. In 2013, we also began selling our pulse oximetry products in the consumer market. As of January 3, 2015, we estimate that the worldwide installed base of our pulse oximeters and OEM monitors that incorporate Masimo SET® and rainbow® SET was more than 1.3 million units, excluding handheld devices. Our installed base is the primary driver for the recurring sales of our pulse oximeter and Pulse CO-Oximeter® sensors, most notably, single-patient adhesive sensors.

To complement our Masimo SET® platform, we have developed a wide range of proprietary single-patient use (disposable) and multi-patient (reusable) sensors, cables and other accessories designed specifically to work with Masimo SET® software and hardware. Our single-patient use sensors offer several advantages over reusable sensors, including improved performance, cleanliness, increased comfort and greater reliability. In addition, our neonatal adhesive sensors have been designed to exhibit greater durability compared to competitive sensors. Although our technology platforms operate solely with our proprietary sensor lines, our sensors have the capability to work with certain competitive pulse oximetry monitors through the use of adapter cables.

Adhesive sensors are single-patient use items, but the U.S. Food and Drug Administration (FDA) allows third parties to reprocess pulse oximetry sensors. In response to some hospitals' requests to implement environmentally friendly or "green" products, we developed the rainbow ReSposable® sensor system. The rainbow ReSposable® sensor, part reusable and part disposable, combines the performance and comfort of single-use adhesive sensors with the economic and "green" advantages of reusable sensors.

Masimo SET® technologies and products offer multiple clinical and financial benefits, including:

- *Fewer false alarms and better true alarm detection*. Over 100 independent studies demonstrate the advantages of Masimo SET® during challenging conditions in adult, pediatric and neonatal patients.
- *Fewer arterial blood gas measurements, faster oxygen weaning time, and lower length of stay in the ICU.* Due to the ability of Masimo SET® to monitor patients during challenging conditions, studies have shown that Masimo SET® helps clinicians reduce the need for arterial blood gas, weaning times from the ventilator, and length of stay.
- *Lower sensor utilization.* Masimo SET® sensors provide enhanced durability for greater sensor longevity, and the underlying performance of Masimo SET® in challenging conditions makes it easier to obtain measurements on digits with low perfusion, which reduces the use of multiple sensors on the same patient.
- *Increased detection of critical congenital heart disease through newborn screening*. Four studies totaling 118,000 patients have shown that adding Masimo SET® to the standard physical exam helps clinicians to increase the detection of critical congenital heart disease, a potentially fatal disease, before the newborn leaves the hospital. The published evidence for Masimo SET® led the American Academy of Pediatrics and the U.S. Department of Health and Human Services to recommend mandatory screening for all newborns using "motion-tolerant pulse oximeters that report functional oxygen saturation and have been validated in low perfusion conditions". In 2012, we received FDA 510(k) clearance for Masimo SET® pulse oximeters and neonatal sensors with labeling for screening newborns for CCHD, marking the first time the FDA cleared specific labeling for the use of pulse oximeters, in conjunction with a physical exam, to screen newborns for CCHD.

- *Reduced retinopathy of prematurity in very low birth weight neonates.* In a two-phased study of two centers that previously used competing pulse oximetry, both centers simultaneously changed their neonatal oxygen targeting policy, and one of the centers switched to Masimo SET® pulse oximetry. In the first phase of the study, there was no decrease in retinopathy of prematurity at the center using competing pulse oximetry but there was a 58% reduction in significant retinopathy of prematurity and a 40% reduction in the need for laser eye treatment at the center using Masimo SET®. In the second phase of the study, the center still using competing pulse oximetry switched to Masimo SET® and it experienced results similar to the center already using Masimo SET®

***Masimo rainbow® SET® Platform***

Since introducing Masimo SET®, we have continued to innovate by introducing breakthrough noninvasive measurements that go beyond arterial blood oxygen saturation and pulse rate. In 2005, we introduced the Masimo rainbow® SET® platform, leveraging our Masimo SET® technology and incorporating licensed rainbow® technology to enable real-time monitoring of additional noninvasive measurements. Our rainbow® SET® platform includes our rainbow® SET® Pulse CO-Oximetry products, which we believe are the first devices cleared by the FDA to noninvasively and continuously monitor multiple blood-based measurements using multiple wavelengths of light, which was previously possible only through intermittent invasive procedures. In addition to monitoring oxygen saturation ($SpO_2$), pulse rate (PR), perfusion index (PI), Pleth Variability Index (PVI®) and Respiration Rate from Pleth (RRp™), Masimo rainbow® SET Pulse CO-Oximetry has the unique ability to measure and distinguish oxygenated hemoglobins from certain dyshemoglobins, hemoglobins that are incapable of transporting oxygen, and allows for the rapid noninvasive monitoring of hemoglobin (SpHb®), carboxyhemoglobin (SpCO®) and methemoglobin (SpMet®). The Masimo rainbow® SET platform also allows for monitoring of arterial oxygen saturation even under the presence of carboxyhemoglobin and methemoglobin, known as fractional arterial oxygen saturation ($SpfO_2$™). Additionally, the rainbow® SET platform also allows for the calculation of Oxygen Content (SpOC™) and Oxygen Reserve Index (ORI™). Although RRp™, $SpfO_2$™ and ORI™ have received CE Mark, they are not currently available for sale in the U.S.

We have also developed multi-wavelength sensors that have the ability to monitor multiple measurements with a single sensor. We believe that the use of Masimo rainbow® Pulse CO-Oximetry products will become widely adopted for the noninvasive monitoring of these measurements. We also believe that the addition of Acoustic Respiration Rate (RRa®) with our rainbow Acoustic® Monitoring technology for noninvasive and continuous monitoring will strengthen the clinical demand for the rainbow® platform, especially in the growing general floor market.

Products with our MX circuit board contain our Masimo SET® pulse oximetry technology as well as circuitry to support rainbow® measurements. At the time of purchase, or at any time in the future, our customers and our OEMs' customers have the option of purchasing additional rainbow® software measurements, which will allow the customer to expand their patient monitoring systems to monitor incremental measurements with a cost-effective solution. To date, over twenty five companies have released rainbow® SET® equipped products or announced rainbow® integration plans. Companies with released rainbow® SET® products include ATOM Medical, Dräger, Edwards, Fukuda Denshi,GS Corpuls, Philips, Physio-Control, Saadat, Schiller, Welch Allyn and ZOLL. Companies that have announced rainbow® SET integration, but have not yet released products, include CareFusion, and GE Medical Systems.

*SpHb®*

Hemoglobin is the oxygen-carrying component of red blood cells (RBC). Hemoglobin measurement is one of the most frequent invasive laboratory measurements in the world, and is often measured as part of a complete blood count (CBC), which measures multiple other blood components. A low hemoglobin status is called anemia, which is generally caused by bleeding or the inability of the body to produce red blood cells. As a chronic disorder, anemia can be treated by iron supplements, diet changes or drugs that increase the production of red blood cells. As an acute disorder, anemia due to bleeding requires stoppage of the bleeding before organ dysfunction or death occurs, or a blood transfusion to sustain organ function and life.

SpHb® is available as a continuous monitor or a spot check measurement. Continuous SpHb® monitoring provides real-time visibility into hemoglobin levels and the changes, or lack of changes, in hemoglobin levels, which can otherwise only be measured through intermittent, invasive blood testing. While SpHb® is not intended to replace invasive hemoglobin tests, when used with other clinical variables, SpHb® may help clinicians identify low hemoglobin and help determine additional test and treatment options.

*SpOC™*

SpOC™ provides a more complete picture of a patient's oxygenation status by combining noninvasive measurements of both hemoglobin and plasma oxygen levels into a single calculation.

*SpCO®*

Carbon monoxide (CO) is a colorless, odorless and tasteless gas that is undetectable by humans and is often unknowingly inhaled from combustion fumes, or during fires by victims and first responders. CO poisoning is the leading cause of accidental poisoning death in the U.S., responsible for up to 50,000 emergency department visits and 500 unintentional deaths annually. CO poisoning, which involves CO binding with hemoglobin cells, thereby preventing them from carrying oxygen, can cause severe neurological damage, permanent heart damage or death in a matter of minutes. Quick diagnosis and treatment of CO poisoning in the emergency department is critical in saving lives and preventing long-term damage, but the condition is often misdiagnosed because symptoms are similar to the flu.

CO levels in the blood can be measured using a laboratory CO-Oximeter, which requires a patient or a patient's blood sample to be transported to a hospital with laboratory CO-Oximetry capability. Additional delays occur if a patient needs hyperbaric oxygen therapy, which often requires transfer to yet another medical center with hyperbaric capability. Outside the hospital, laboratory measurements of carboxyhemoglobin are not considered feasible. Historically, this meant that CO levels in the blood could not be assessed in environments in which it would be very useful, such as in the home of a patient or in the medical evaluation of first responders exposed at the scene of a fire.

We believe that the greatest opportunity for SpCO® monitoring is in the EMS, fire and hospital emergency department settings. In a 2013 study, elevated SpCO® was used to help indicate a need for invasive testing in emergency department patients with headaches. This study found that 23% of the cases that were ultimately diagnosed with CO poisoning were only diagnosed after elevated SpCO® levels had been tested. While SpCO® is not intended to replace invasive carboxyhemoglobin tests, when used with other clinical variables, SpCO® may help clinicians identify elevated CO levels and help determine additional test and treatment options. Multiple leading emergency first responder associations, including the National Association of Emergency Medical Technicians, the National Association of EMS Educators, the International Association of Fire Fighters and the International Association of Fire Chiefs, now educate their members that noninvasive CO measurement is appropriate when exposure is suspected or when an individual presents symptoms that could indicate elevated CO levels. In addition, the National Fire Protection Association (NFPA), one of the world's authoritative sources on fire prevention and public safety, has recently released updated Fire Rehabilitation Standard 1584, *Standard on the Rehabilitation Process for Members During Emergency Operations and Training Exercises*, requiring firefighters exposed to smoke at incident scenes and during training to be accessed for elevated CO levels.

*SpMet®*

Methemoglobin in the blood leads to a dangerous condition known as methemoglobinemia, which occurs as a reaction to some common drugs used in hospitals and outpatient procedures. Methemoglobinemia reduces the amount of oxygen bound to hemoglobin for delivery to tissues and forces normal hemoglobin to bind more tightly to oxygen, releasing less oxygen to the tissues. Methemoglobinemia is often unrecognized or diagnosed late, increasing risk to the patient. Commonly prescribed drugs can introduce methemoglobin into the blood and cause methemoglobinemia. Some of the 30 drugs that are known to cause methemoglobinemia are benzocaine, a local anesthetic, which is routinely used in procedures ranging from endoscopy to surgery; inhaled nitric oxide, routinely used in the Neonatal Intensive Care Unit; nitroglycerin, used to treat cardiac patients, and dapsone, used to treat infections for immune deficient patients, such as HIV patients. Warnings, cautions and alerts regarding the clinical significance and prevalence of methemoglobinemia have been generated by the FDA, Veterans Administration, Institute for Safe Medication Practices and the National Academy of Clinical Biochemistry. The American Academy of Pediatrics recommends monitoring methemoglobin levels in infants who receive nitric oxide therapy.

While SpMet® is not intended to replace invasive methemoglobin tests, when used with other clinical variables, SpMet® may help clinicians detect methemoglobinemia and help determine additional test and treatment options.

*PVI®*

Pleth Variability Index (PVI®) calculation is a measure of the dynamic changes in the Perfusion Index (PI) that occur during the respiratory cycle. The calculation is accomplished by measuring changes in PI over a time interval where one or more complete respiratory cycles have occurred. PVI® is displayed as a percentage. The lower the number, the less variability there is in the PI over a respiratory cycle. PVI® may show changes that reflect physiologic factors such as vascular tone, circulating blood volume and intrathoracic pressure excursions. When used with other clinical variables, PVI® may help clinicians assess fluid responsiveness, improve fluid management in surgical and intensive care patients who are mechanically ventilated, and help determine other treatment options.

*RRp™*

Respiration rate is defined as the number of breaths per minute. Changes in respiration rate provide an early warning sign of deterioration in patient condition. A low respiration rate is indicative of respiratory depression and high respiration rate is

indicative of patient distress. Current methods to monitor respiration rate include end tidal $CO_2$ monitoring, which requires a nasal cannula to be inserted in the patient's nose and therefore has low patient compliance, and impedance monitoring, which is considered unreliable. RRp™ is a breakthrough measurement that allows clinicians to noninvasively and continuously measure and monitor respiration rate using a standard Masimo SET® pulse oximetry or rainbow® Pulse CO-Oximeter sensor®. The RRp™ measurement is determined by the variations in the plethysmograph waveform due to respiration, although the measurement is not possible in all patients or many conditions and may not immediately indicate changes in respiration rate. RRp™ is not currently available for sale in the U.S.

*RRa®*

Our sound-based monitoring technology, rainbow Acoustic Monitoring™ (RAM™), enables RRa® continuous and noninvasive monitoring of respiration rate. For patients requiring accurate and sensitive respiration rate monitoring, we believe that RRa® has been shown to better detect pauses in breathing than respiration rate measurements from other capnography technologies. The RRa® measurement also provides an important visual indication of breathing through the displayed acoustic waveform. Multiple clinical studies have shown that the noninvasive measurement of RRa® provides as good or better accuracy to monitor respiration rate as end tidal $CO_2$ monitoring, and can reliably detect respiratory pause episodes, defined as a cessation of breathing for 30 seconds or more. When used with other clinical variables, RRa® may help clinicians assess respiratory depression and respiratory distress earlier and more often to help determine treatment options and potentially enable earlier interventions.

*$SpfO_2$™*

Prior to our debut of $SpfO_2$™ in October 2012, pulse oximeters could only measure and display functional oxygen saturation ($SpO_2$). Therefore, when patients had elevated carboxyhemoglobin (from CO poisoning) and/or elevated methemoglobin (negative reaction to more than 30 common drugs used in hospitals, like caines, nitrates, and dapsone), the displayed *functional* oxygen saturation overestimated the actual oxygen saturation value. $SpfO_2$™, or *fractional* oxygen saturation, allows more precise arterial oxygenation assessment in patients with elevated dyshemoglobins, common throughout the hospital and pre-hospital setting, compared to *functional* oxygen saturation, and may also allow earlier interventions and more timely therapeutic decisions. *$SpfO_2$™* is not currently available for sale in the U.S.

*ORI™*

In October 2014, we announced CE Mark clearance and limited market release of Oxygen Reserve Index (ORI™). ORI™ provides real-time visibility to oxygenation status in moderate hyperoxic range, which we define as a patient's oxygen "reserve". ORI™ can be trended and has optional alarms to notify clinicians of changes in a patient's oxygen reserve. When this technology is used with oxygen saturation ($SpO_2$) monitoring, ORI™ may extend the continuous and noninvasive visibility of a patient's oxygen status into ranges previously unmonitored in this fashion. ORI™ may also be of value in patients receiving supplemental oxygen, such as those in surgery, under conscious sedation, or in the ICU, as ORI™ it is represented as an "index" parameter with a unit-less scale between 0.00 and 1.00. Furthermore, ORI™ may provide an advance warning of an impending hypoxic state, or an indication of an unintended hyperoxic state, when evaluated in conjunction with the partial pressure of oxygen ($PaO_2$). In this way, ORI™ may enable proactive interventions to avoid hypoxia and unintended hyperoxia. ORI™ is not currently available for sale in the U.S.

***Noninvasive Measurements and Technologies***

Following the introduction of our rainbow® SET® platform, we have continued to expand our technology offerings by introducing additional noninvasive measurements and technologies to create new market opportunities in both the hospital and non-hospital care settings.

*SedLine® Brain Function Monitoring*

Brain function monitoring is most commonly used during surgery to help clinicians avoid over-and under-titration of anesthesia and sedation. SedLine® brain function monitoring technology measures the brain's electrical activity by detecting EEG signals. In contrast to whole scalp EEG monitoring, which is used for diagnostic purposes, this form of EEG monitoring is often referred to as processed EEG monitoring, or brain function monitoring. Brain function monitors display the patient's EEG waveforms, but these are difficult for clinicians to interpret, so the EEG signals are processed and displayed as a single index that gives a continuous, quantitative indication of the patient's depth of anesthesia and sedation. Our SedLine® brain function monitoring technology can now be delivered through the Masimo Open Connect™ (MOC-9™) connectivity port within our Root® patient monitoring and connectivity platform that integrates our breakthrough rainbow® and SET® measurements with multiple additional parameters, such as SedLine®. In addition, our SedLine® brain function monitoring technology also displays raw EEG waveforms, the Patient State Index (PSI) and the Density Spectral Array view.

*Capnography and Gas Monitoring*

We offer a portfolio of capnography and gas monitoring products ranging from external “plug-in-and-measure” capnography and gas analyzers, integrated modules, and handheld capnograph and capnometer devices. These products have the ability to measure multiple expired gases, such as carbon dioxide ($CO_2$), nitrous oxide ($N_2O$), oxygen ($O_2$) and other anesthetic agents. In the case of capnography, respiration rate is also calculated from the $CO_2$ waveform. These measurements are possible through either mainstream monitoring, which samples gases from a ventilated patient’s breathing circuit, or sidestream monitoring, which samples gases from a breathing circuit in mechanically ventilated patients or through a cannula or mask in spontaneously breathing patients. These capnography and gas measurements are standard-of-care in many hospital environments, such as operating rooms, procedural sedation and ICUs.

*O3™*

$O_3$™ regional oximetry, also known as tissue oximetry and cerebral oximetry, uses near-infrared spectroscopy (NIRS) to provide for continuous measurement of tissue oxygen saturation (rSo2) to help detect regional hypoxemia that pulse oximetry alone can miss. In addition, our Root® monitor and $O_3$™ sensors can automate the differential analysis of regional to central oxygen saturation. $O_3$™ monitoring is as simple as applying $O_3$™ regional oximetry sensors to the forehead and connecting the $O_3$™ MOC-9™ module to any Root® monitor through one of its three MOC-9™ ports. $O_3$™ regional oximetry is currently intended for use in subjects larger than 40 kg (88 lbs) and has received the CE Mark, but is not currently available for sale in the U.S.

*Patient SafetyNet™*

Our patient surveillance, remote monitoring and clinician notification solution, Patient SafetyNet™, allows for monitoring of the oxygen saturation, pulse rate, perfusion index, hemoglobin, methemoglobin, and respiration rate of up to 80 patients simultaneously. Patient SafetyNet™ offers a rich user interface with trending, real-time waveform capability at the central station and remote notification via pager or smart phones. Patient SafetyNet™ also features the Adaptive Connectivity Engine™, which enables two-way, HL7-based connectivity to clinical/hospital information systems. The Adaptive Connectivity Engine™ significantly reduces the time and complexity to integrate and validate custom HL7 implementations, and demonstrates our commitment to innovation that automates patient care with open, scalable, and standards-based connectivity architecture.

In a landmark study published in 2010 by Dartmouth-Hitchcock Medical Center, clinicians using Masimo SET® and Patient SafetyNet™ identified patient distress earlier, which decreased rapid response team activations, ICU transfers and ICU days. Hospitals and other care centers may determine that they can reduce their costs by moving less critically ill patients from the ICU to the general care areas where these patients can be continuously and accurately monitored in a more cost effective manner. We believe that the advanced performance of the Masimo SET® platform coupled with reliable, cost effective and easy-to-use wireless remote monitoring will allow hospitals to create continuous surveillance solutions on general care floors where patients are at risk of avoidable adverse events and where direct patient observation by skilled clinicians is cost prohibitive.

*Halo Index™*

Halo Index™ is a dynamic indicator that facilitates continuous global trending and assessment of multiple physiological measurements to quantify changes in patient status with a single number displayed on our Patient SafetyNet™ screen. This may allow clinicians to identify patient risk that was otherwise not apparent and may also help clinicians, in the presence of individual parameter alarms, to assess that a patient’s risk remains low, allowing them to focus on other higher risk patients. Halo Index™ has received CE Mark, but is not currently available for sale in the U.S.

*Third-Party Device Connectivity*

Despite medical technology advances, the lack of device communication and integration creates risks to patient safety in hospitals around the world. Without device interoperability, critical patient information can go unnoticed - leaving clinicians unaware and patients at risk. Existing approaches for device interoperability require separate hardware, software and/or network infrastructure, which can clutter the patient room, increase complexity, burden IT management and increase costs. To address these challenges, we introduced Iris™ connectivity in our Root® patient monitoring and connectivity platform. Iris™ connectivity enables multiple standalone third-party devices such as intravenous pumps, ventilators, hospital beds and other patient monitors to connect through Root®, enabling display, notification and documentation to the electronic medical record through Masimo Patient SafetyNet™.

Masimo’s addition of Iris™ connectivity in Root® and Patient SafetyNet™ provides multiple advantages to hospitals, including the following:

- Allows standalone device information to be remotely viewed with Patient SafetyNet™, transmitted through notification systems or sent to electronic health record systems to facilitate better patient care and meaningful use.

- Designed to leverage existing network infrastructures and reduce costs while enhancing clinical workflows and decision support to improve patient safety, wherever the clinician is located.
- Flexible and cost-effective platform, avoiding installation of costly, separate systems.
- Brings all the data together to facilitate assessment and decision support.

***Our Strategy***

Since inception, our mission has been to develop noninvasive monitoring solutions that improve patient outcomes and reduce the cost of patient care. We intend to continue to grow our business and improve our market position by pursuing the following strategies:

- *Continue to Expand our Market Share in Pulse Oximetry.* We grew our product revenue to $556.8 million in 2014 from $406.5 million in 2011, representing a three year compound annual growth rate of 11.1%. This growth can be attributed to strong, independent clinical evidence that demonstrates the benefits of our technology, the increased access to pulse oximetry customers through our agreements with group purchasing organizations (GPOs), our expanding list of OEM partners and the continued expansion of our worldwide direct sales force. We supplement our direct sales to hospitals and other low acuity healthcare facilities through various U.S. and international distributors. Combined sales through our direct and distributor sales channels increased to $472.7 million, or 84.9% of product revenue in 2014, from $342.9 million, or 84.4% of product revenue in 2011.
- *Expand the Pulse Oximetry Market to Other Patient Care Settings.* We believe the ability to continuously and accurately monitor patients outside of critical care settings, including the general, medical and surgical floors of the hospital, are currently unmet medical needs and have the potential to significantly improve patient care and increase the size of the pulse oximetry market. We believe the ability of Masimo SET® to accurately monitor and address the limitations of conventional pulse oximetry has enabled, and will continue to enable, us to expand into non-critical care settings and therefore, significantly expand the market for our products. To further support our expansion into the general care areas, we market Patient SafetyNet™, which enables continuous monitoring of up to 80 patients' oxygen saturation, pulse rate and with rainbow® SET®, noninvasive hemoglobin and respiration rate.
- *Expand the Use of rainbow® Technology in Hospital Settings.* We believe the noninvasive measurement of rainbow® Pulse CO-Oximetry (SpHb®, SpCO®, SpMet®, PVI®, $SpfO_2$™, SPOC™, and ORI™), rainbow Acoustic Monitoring™ (RRa®), and the Halo Index™, as well as future measurements, will provide an excellent opportunity to leverage existing customer relationships into new opportunities to improve patient care and, at the same time, expand our product revenue opportunities through a greater ability to convert non-Masimo hospitals to Masimo hospitals due to our expanded rainbow® measurement capabilities.
- *Expand the Use of rainbow® Technology in the Non-Hospital Setting.* We believe the noninvasive measurement of hemoglobin creates a significant opportunity in markets such as the physician office and emergency departments, and the noninvasive measurement of carboxyhemoglobin creates a significant opportunity in the fire/alternate care market.
- *Utilize our Customer Base and OEM Relationships to Market our Masimo rainbow® SET® Products Incorporating Licensed rainbow® Technology.* We are currently selling our rainbow® SET® products through our direct sales force and distributors. We include our MX circuit boards in our pulse oximeters and sell them to our OEM partners, equipped with circuitry to support rainbow® Pulse CO-Oximetry measurements that can be activated at time of sale or through a subsequent software upgrade. We believe that, over time, the clinical need of these measurements along with our installed customer base will help drive the adoption of our rainbow® Pulse CO-Oximetry products.
- *Continue to Innovate and Maintain Our Technology Leadership Position.* We invented and pioneered what we believe is the first pulse oximeter to accurately measure arterial blood oxygen saturation level and pulse rate in the presence of motion artifact and low perfusion. In addition, we launched our rainbow® SET® platform that enabled what we believe is the first noninvasive monitoring of carboxyhemoglobin, methemoglobin and hemoglobin, as well as PVI®, all of which were previously only available with invasive and/or complicated testing. With our introduction of RRa® with rainbow Acoustic Monitoring™ technology, we believe we have launched the first platform to enable noninvasive and continuous respiration monitoring through an easy-to-use single patient adhesive acoustic sensor. We plan to continue to innovate and develop new technologies and products, internally and through our collaboration with Cercacor, from whom we currently license certain rainbow® technologies.

Our future growth strategy is also closely tied to our focus on international expansion opportunities. Since 2007, we have been expanding our sales and marketing presence in Europe, Asia, Canada and Latin America. We have accomplished this by both additional staffing and adding or expanding sales offices in many of these territories. By centralizing a portion of our international operations in Neuchatel, Switzerland, including sales management, marketing, customer support, planning, logistics and administrative functions, we believe we have developed a more efficient and scalable international organization

that is capable of being even more responsive to the business needs of our international customers under one centralized management structure.

***Operating Segment and Geographic Information***

We operate in one business segment, using one measurement of profitability to manage our business. Sales and other financial information by geographic area is provided in Note 16 to our consolidated financial statements that are included in this Annual Report on Form 10-K.

***Our Products and Markets***

We develop, manufacture and market patient monitoring technologies that incorporate a monitor or circuit board and sensors, including proprietary single-patient use, reusable and rainbow ReSposable® sensors and patient cables. In addition, we offer remote alarm/monitoring solutions, software and connectivity solutions.

The following chart summarizes our principal product components and principal markets and methods of distribution:

Patient Monitoring Solutions:

| Product | Description | Markets and Distribution |
|---|---|---|
| *Circuit Boards and Modules (e.g., MX-1®, MX-3®, MX-5, MS-2011, MS-2040, uSpO2®, SedLine®, ISA™, and IRMA™)* | • Signal processing apparatus for all Masimo technology platforms<br>• Mainstream and sidestream capnography and gas monitors | • Incorporated and sold to OEM partners who incorporate our circuit boards into their patient monitoring systems |
| *Monitors and Devices (e.g., Radical-7®, Pronto, Pronto-7®, Rad-57®, Root®, Radius-7™, and EMMA™)* | • Bedside, handheld and wireless monitoring devices that incorporate Masimo SET® with and without licensed Masimo rainbow® SET® technology<br>• Compact and self-contained capnometer which monitors $CO_2$ concentration | • Sold directly to end-users and through distributors and in some cases to our OEM partners who sell to end-users |
| *Patient Monitoring and Connectivity Platforms (e.g., Root®, Radius-7™)* | • Multi-specialty measurement monitor with connected and wireless capabilities<br>• Ability to connect third-party devices such as IV pumps, ventilators, beds, and other patient monitors to the electronic health record | • Sold directly to end-users and through distributors |
| *Sensors (e.g., SET®, rainbow® Pulse CO-Oximetry, rainbow Acoustic™ Sensors™, and SedLine®)* | • Extensive line of both single-patient, reusable and rainbow ReSposable® sensors<br>• Patient cables, as well as adapter cables that enable the use of our sensors on certain competitive monitors | • Sold directly to end-users and through distributors and to OEM partners who sell to end-users |
| *Line Filters, and Mainstream Adapters (e.g., capnography and gas disposables)* | • Line of disposables to measure mainstream and sidestream capnography and gas parameters | • Sold directly to end-users and through distributors and to OEM partners who sell to end-users |
| *Remote Alarm and Monitoring Solutions (e.g., Patient SafetyNet™)* | • Network-linked, wired or wireless, multiple patient floor monitoring solutions<br>• Standalone wireless alarm notification solutions | • Sold directly to end-users |

| | | |
|---|---|---|
| *Proprietary Measurements (e.g., SpHb®, SpCO®, SpMet®, PVI®, RRa®, ORI™, 3D Alarms, Adaptive Threshold Alarm and Halo Index™)* | • Rainbow® measurements and other proprietary features sold to installed monitors | • Sold directly to end-users and through OEM partners who sell to end-users |
| *Connectivity (e.g., Root®, Patient SafetyNet™)* | • Software and hardware enabling third-party devices to connect through Patient SafetyNet™ to clinicians and for documentation to the electronic health record | • Sold directly to end-users |
| Consumer Monitoring Solutions: | | |
| *Devices (e.g., iSpO$_2$®, MightySat™)* | • Pulse oximeter cable and sensor for use with an iPhone, iPad, iPod touch, and select Android smart phones | • Sold directly to consumers through on-line websites |

*Circuit Boards*

*Masimo SET® MS Circuit Boards*. Our Masimo SET® MS circuit boards perform all signal processing and other pulse oximetry functions incorporating the Masimo SET® platform. Our MS circuit boards are included in our proprietary monitors for direct sale or sold to our OEM partners for incorporation into their monitors. Once incorporated into a pulse oximeter, the MS circuit boards perform all data acquisition processing and report the pulse oximetry levels to the host monitor. The circuit boards and related software interface directly with our proprietary sensors to calculate arterial blood oxygen saturation level and pulse rate. Our latest generation boards include the MS-2003, MS-2011, MS-2013 and MS-2040, with a typical power consumption of less than 45 milliwatts.

*Masimo rainbow® SET® MX Circuit Boards.* Our next-generation circuit board is the foundation for our Masimo rainbow® Pulse CO-Oximetry and rainbow Acoustic Monitoring™ platform, utilizing technology licensed from Cercacor. The MX circuit boards offer full functionality of our breakthrough rainbow® technology for noninvasive measurements for total hemoglobin (SpHb®), oxygen content (SpOC™), carboxyhemoglobin (SpCO®), methemoglobin (SpMet®) and acoustic respiration rate (RRa®), in addition to providing Measure-Through-Motion and Low-Perfusion oxygen saturation (SpO2), pulse rate (PR) and perfusion index (PI) measurement capabilities of Masimo SET® pulse oximetry. Customers can choose to buy additional measurements beyond arterial blood oxygen saturation levels and pulse rate at the time of sale or at any time in the future through a field-installed software upgrade.

In September 2014, we announced our new MX-5 OEM circuit board, a technology platform that utilizes approximately half the power of previously available rainbow® circuit boards to deliver breakthrough rainbow® Pulse CO-Oximetry noninvasive measurement performance. In addition to the lower power demands compared to previous rainbow® technology boards, the MX-5 adds dynamic power utilization to scale the MX-5's power draw based upon the combination of parameters being monitored to permit even longer battery runtimes.

*uSpO$_2$® Cable/Board.* Our SET® technology-in-a-cable contains the low power (MS-2040) technology in a reduced size, allowing it to be embedded into patient cables as part of the sensor connector. This allows for the ability to interface the uSpO$_2$® cable/board to monitoring devices externally via an existing communications port in instances where internal integration of a traditional Masimo SET® technology board is not feasible. The uSpO$_2$® cable/board provides full Masimo SET® Measure-Through-Motion and Low-Perfusion pulse oximetry found in our other products, with a typical power consumption of less than 45 milliwatts.

*Monitors / Devices*

*Radical-7®*. The Radical-7® incorporates our MX circuit board, which enables rainbow® SET measurements, and offers three-in-one capability that can be used as:

- a standalone device for bedside monitoring;
- a detachable, battery-operated handheld unit for easy portable monitoring; and
- a monitor interface via SatShare®, a proprietary technology allowing our products to work with certain competitor products, to upgrade existing conventional multiparameter patient monitors to Masimo SET® while displaying rainbow® measurements on the Radical-7® itself.

The Radical-7® is a wireless, touch screen device, which is on an upgradeable rainbow® SET® platform. With its wide-ranging flexibility, Radical-7® can continuously monitor a patient from the ambulatory environment, to the emergency room, to the operating room, to the general floor and on, until the patient is discharged. Radical-7® delivers the accuracy and reliability of Masimo rainbow® SET® with multi-functionality, ease of use and a convenient upgrade path for existing monitors.

*Root®*. Root® is a powerful patient monitoring and connectivity platform that integrates our breakthrough rainbow® and SET® measurements with multiple additional specialty measurements through Masimo Open Connect™ (MOC-9™) in an integrated, clinician-centric platform. The first two MOC-9™ technologies for Root® were SedLine® brain function monitoring and Phasein™ capnography. Our third MOC-9™ technology for Root®, $O_3$™ regional oximetry, provides for continuous and simultaneous measurement of tissue oxygen saturation (rSo2) and SpO2 to help detect regional hypoxemia that pulse oximetry alone can miss. In addition, Iris™ connectivity in Root® enables 3rd party devices such as intravenous pumps and ventilators to connect through Root® and enables display, notification and documentation to the electronic medical record through Masimo Patient SafetyNet™. In June 2014, we announced FDA clearance for our Root® platform with capnography, wireless communication and Iris™ connectivity for third-party medical devices. $O_3$™ regional oximetry has received the CE Mark but is not currently available for sale in the U.S. In combination with a Radical-7® handheld monitor, Root® will display alarm information simplifying patient care workflows and potentially helping caregivers make quicker patient assessments.

*Radius-7™*. In July 2014, we announced CE Mark clearance and limited market release of Radius-7™ for the Root® patient monitoring and connectivity platform. Radius-7™ for the Root® is the first and only wearable, wireless monitor with our rainbow® SET® technology, enabling early identification of clinical deterioration while offering patients continuous monitoring with freedom of movement. With rainbow® SET® noninvasive measurements, Radius-7™ with Root® can alert clinicians at the bedside or remotely, through Masimo Patient SafetyNet™, of critical changes in a patient's oxygen saturation and pulse rate, even during states of motion and low perfusion, as well as respiration through RRa®. Radius-7™ with Root® obtained FDA 510(k) clearance in December 2014.

*SatShare®*. Our SatShare® technology enables a conventional monitor to receive continuous measurement updates using Masimo SET® through a simple cable connection from the back of Radical-7® to the sensor input port of the conventional monitor. No software upgrades or new modules are necessary for the upgrade, which can be completed in minutes. SatShare® allows hospitals to standardize the technology and sensors used throughout the hospital while allowing them to gain more accurate monitoring capabilities and additional multi-functionality in a cost-effective manner. This technology has facilitated many hospital-wide conversions of previously installed competitor monitors to Masimo SET®. In addition, Masimo rainbow® SET® measurements such as hemoglobin are available to clinicians on the Radical-7® itself while the device is being used in SatShare® mode.

*Pronto®*. The Pronto® is a handheld noninvasive multiparameter testing device that uses Masimo rainbow® SET® technology to provide oxygen saturation, pulse rate, perfusion index and spot-checking of hemoglobin levels for both hospitals (i.e., emergency departments) and remote settings such as physician offices.

*Pronto-7®*. The Pronto-7® is a noninvasive multiparameter device utilizing rainbow 4D™ that provides spot-checking of hemoglobin, oxygen saturation, pulse rate and perfusion index. With a touch screen for easy operation and wireless 802.11 and Bluetooth for printing and communication, the Pronto-7® is well-suited for spot-checking of hemoglobin in clinical and non-clinical settings.

*Rad-8®*. The Rad-8® is a bedside pulse oximeter featuring Masimo SET® (but without rainbow® capability) with a low cost design and streamlined feature set.

*Rad-5®*. In addition to the bedside monitors, we have developed handheld pulse oximeters using Masimo SET® (but without rainbow® capability). Our Rad-5® and Rad-5v™ handheld oximeters were the first dedicated handhelds with Masimo SET®.

*Rad-57®*. The Rad-57® is a fully featured handheld Pulse CO-Oximeter® that provides continuous, noninvasive measurement of hemoglobin, carboxyhemoglobin and methemoglobin in addition to oxygen saturation, pulse rate and perfusion index. Its rugged and lightweight design makes it applicable for use in hospital and field settings, specifically for fire departments and emergency medical service units.

*SedLine® MOC-9™ Module.* The SedLine® monitor measures brain function on a continuous basis. The SedLine® MOC-9™ module for Root® is an EEG-based brain function monitor that provides information about a patient's response to anesthesia.

*$O_3$™ MOC-9™ Module.* The $O_3$™ MOC-9™ module for Root® uses near-infrared spectroscopy (NIRS) to detect regional hypoxemia by continuously measuring tissue oxygen saturation (rSo2), automating the differential analysis of regional to central oxygen saturation.

*Capnography and Gas Monitoring.* Our gas analyzers, IRMA™ and ISA™, and emergency capnometer (EMMA™), enable our customers to benefit from $CO_2$, $N_2O$, $O_2$ and anesthetic agent monitoring in many hospital environments.

*uSpO2™ Cable/Board.* Our new SET® technology-in-a-cable contains our low power (MS-2040) technology in a reduced size, allowing it to be embedded into patient cables as part of the sensor connector.

*Sensors*

*Sensors and Cables.* We have developed one of the broadest lines of single-patient use (disposable), reusable and rainbow ReSposable® sensors and cables. In total, we have over 100 different types of sensors to meet virtually every clinical need. Masimo SET® sensors are uniquely designed to reduce interference from physiological and non-physiological noise. Our proprietary technology platforms operate only with our proprietary sensor lines. However, through the use of adapter cables, we can connect our sensors to certain competitor pulse oximetry monitors. We sell our sensors and cables to end-users directly or through our distributors and OEM partners.

Our single-patient use sensors offer several advantages over reusable sensors, including improved performance, cleanliness, increased comfort and greater reliability. Our reusable sensors are primarily used for short-term, spot-check monitoring. Our rainbow ReSposable® sensors are expected to provide performance advantages for customers currently using reusable and reprocessed sensors.

*SofTouch Sensors.* We have developed SofTouch sensors, designed with less adhesive or no adhesive at all for compromised skin conditions. These include single-patient sensors for newborns and multi-site reusable sensors for pediatrics and adults.

*Trauma and Newborn Sensors.* We have developed two specialty sensor lines, specifically designed for trauma and resuscitation situations, as well as for newborns. These sensors contain an identifier which automatically sets the oximeter to monitor with maximum sensitivity and the shortest-averaging mode and allows for quick application, even in wet and slippery environments. Additionally, we introduced low-profile sensors to monitor oxygen saturation in newborns. The newly enhanced low-profile LNCS® and M-LNCS™ Neo, NeoPt and Inf Sensors are smaller and thinner, making them significantly more comfortable for patients and easier to apply for healthcare workers.

*Blue Sensors.* We believe our Blue Sensors are the first FDA-cleared sensors to accurately monitor arterial blood oxygen saturation levels in cyanotic infants and children with abnormally low oxygen saturation levels.

*E1® Ear Sensor.* We believe that our E1® Ear Sensor was the first ever, single-patient-use ear sensor that is placed securely in the ear conchae, so clinicians can combine Masimo SET® performance and central monitoring to provide quick access and responsive assessment of oxygenation. The E1® Ear Sensor is designed for field emergency medical services utilization.

TFA-1™ Adhesive Forehead Sensor. We believe our TFA-1™ forehead sensor can combine Masimo SET® performance and central monitoring to provide quick access and responsive assessment of oxygenation, for hospitals desiring forehead monitoring with a disposable sensor.

*Rainbow® Sensors.* We have developed proprietary, multi-wavelength sensors for use with our rainbow® Pulse CO-Oximetry products. In contrast to traditional sensors that only have the capability to monitor arterial blood oxygen saturation levels and pulse rate, our rainbow® sensors can also monitor carboxyhemoglobin, methemoglobin and hemoglobin. Our licensed rainbow® SET® sensors are the only sensors that are compatible with our licensed rainbow® SET® products. Rainbow® sensors are available in single-patient use, rainbow ReSposable® and reusable spot-check sensor types.

In August 2014, we announced CE Mark regulatory clearance in Japan and limited market release of the rainbow® DCI-mini™, the first noninvasive hemoglobin (SpHb®) spot-check sensor for infants and small children (weight 3 to 30 kg). Paired with our handheld Pronto® device, the rainbow® DCI-mini™ sensors are designed to help clinicians quickly and easily spot-check hemoglobin levels in infants and small children, which may facilitate the identification of anemia. The rainbow® DCI-mini™ is not currently available for sale in the U.S. or Europe.

*Rainbow Acoustic™ Sensors.* We believe we were the first to market a continuous respiration rate monitoring technology based on an acoustic sensor placed on the patient's neck. Our rainbow Acoustic™ Sensors detect the sounds associated with breathing and convert the sounds into continuous respiration rate using proprietary signal processing that is based on Masimo SET®.

*SedLine® Sensor.* Used with the SedLine® MOC-9™ module for the Root® patient monitor, the SedLine® sensor is a disposable sensor that collects EEG data for out Sedline® monitor.

*Rainbow® Universal ReSposable SuperSensor™*. This sensor, which is not currently available for sale in the U.S., is the first noninvasive sensor to provide simultaneous monitoring of SpHb®, SpCO®, SpMet®, $SpfO_2$™, SpOC™, PI, PVI® and Measure-Through-Motion and Low-Perfusion arterial blood oxygen saturation ($SpO_2$) and pulse rate (PR).

*$O_3$™ Sensor*: Used with the $O_3$™ MOC-9™ module for the Root® patient monitor, each $O_3$™ sensor contains four light-emitting diodes and two detectors to continuously measure rSo2.

We offer our customers choices for reducing pollution and waste in our world while also reducing costs, including Masimo Reprocessed Sensors, the only reprocessing solution that maintains new Masimo sensor performance specifications, and rainbow ReSposable® Sensors, offering unprecedented sustainability with a lower carbon footprint and greater waste reduction than reprocessed or new sensors. Rainbow ReSposable® Sensors offer equivalent performance and comfort to single-patient use sensors and a similar sensor price-per-patient to mixed third-party reprocessed and new sensors.

*Remote Alarm and Monitoring Solutions*

*Masimo Patient SafetyNet™*. Patient SafetyNet™ is a remote monitoring and clinician notification system. It instantly routes bedside-generated alarms through a server to a qualified clinician's handheld paging device in real-time. Each system can support up to 80 bedside monitors and can either be integrated into a hospital's existing IT infrastructure or operate as a stand-alone wireless network.

*Proprietary Measurements*

All of our monitors shipped since January 2006, including Radical-7® and certain future OEM products, which incorporate the MX board will allow purchases of software for rainbow® measurements, as well as other future measurements or features that can be field installed. Our current rainbow® measurements include ORI™, PI, PR, PVI®, RRp™, SpHb®, $SpO_2$, SpCO®, SpMet®, SpOC™ and $SpfO_2$™, as well as rainbow® Acoustic Monitoring, RRa®

Currently, clinicians monitor multiple clinical measurements on each patient and respond independently to each of the measurements. Halo Index™ is a dynamic indicator that facilitates continuous global trending and assessment of multiple physiological measurements into a simple and comprehensive assessment within a single index to quantify changes in patient status, which is displayed on the Patient SafetyNet™ remote monitoring and notification system. Halo Index™ has received CE Mark, but is not currently available for sale in the U.S. In the future, subject to receipt of regulatory clearance, we expect Halo Index™ will also be available as part of our standalone devices and OEM boards. As more clinical evidence is collected on Halo Index™, its clinical utility in a variety of care areas and patient types will become more specific.

In October 2014, we announced CE Mark clearance of Eve™, a Newborn Screening Software Application for Radical-7® Pulse CO-Oximeters®. Eve™ is designed to help clinicians more effectively and efficiently screen newborns for critical congenital heart disease (CCHD). The Eve™ Newborn Screening Software Application in the Radical-7® Pulse CO-Oximeter® automates the screening steps with animated instruction, including sensor application, measurement selection and screening result determination. Eve™ is intended to provide consistent application of the screening protocol to reduce method and operator-induced variability and improve efficiency by automating the data capture and comparison between readings. Eve™ is currently not available for sale in the U.S.

*X-Cal™*

X-Cal™ preserves system quality, performance and reliability by reducing imitation sensor and cable use and monitoring component life. The technical benefit of X-Cal™ is based on the fact that the Masimo sensors, patient cables and instruments work as an integrated system to provide the physiologic measurements that have advanced the standard of care.

X-Cal™ addresses three common problems experienced by clinicians using an integrated Masimo system, including:

- Patient safety may be compromised by using imitation Masimo sensors and cables because they are not produced with comparable components, do not provide proper shielding from ambient interferences, create electrostatic noise caused by motion, do not have our quality and performance controls, and are not tested or warranted to work within a Masimo system;
- We design our sensors and cables to last well beyond their warranty and customer feedback indicates our sensors and cables last significantly longer than competing products, but cable and sensor reliability may still be compromised when used beyond the life they were reliably designed for, affecting patient care and causing clinicians and biomedical engineers to spend time troubleshooting intermittent cable and sensor issues; and
- We believe that third-party reprocessed pulse oximetry sensors introduce challenges in the clinical environment due to potential quality issues. Internal Masimo testing indicates that 91% of a leading third-party reprocessor's sensors that were

tested failed to meet our performance specifications. In fact, most third-party reprocessed sensors do not indicate that they are capable of performing in Measure-Through-Motion or Low-Perfusion conditions or neonatal applications, key performance requirements available with Masimo SET® sensors. Also, no third-party company has attempted to reprocess rainbow® SET® sensors.

*Connectivity*

*Iris™ connectivity in Root®* enables third-party devices such as intravenous pumps and ventilators to connect through Root® enabling display, notification and documentation to the electronic medical record through Masimo Patient SafetyNet™.

*Consumer Products*

The *iSpO$_2$®* pulse oximeter was designed for use with an iPhone, iPad, iPod touch and select Android smart phones. The iSpO$_2$® uses Masimo SET® for Measure-Through-Motion and Low-Perfusion performance to allow consumers to check their own $SpO_2$, PR and PI measurements through a pulse oximeter cable and sensor connected to an iPhone, iPad, iPod touch or select Android Smart Phone device. This version is not intended for medical use and is available online in the U.S. for sports and aviation use only. In December 2013, we received the CE Mark on iSpO$_2$® for the Android operating system, enabling functionality on select Android-based phones outside of the U.S. The iSpO$_2$® Rx, the professional version for medical use, also received the CE Mark in December 2013, but is not yet available for sale in the U.S.

Our *MightySat™* fingertip pulse oximeter for personal use provides accurate oxygen saturation and pulse rate measurements and is designed for those who want reliable measurements even under extreme conditions. MightySat™ is available in three versions, each of which provides $SpO_2$, PR, and PI measurements in a compact, battery-powered design with a large color screen that can be rotated for real-time display of the pleth waveform as well as measurements. Optional Bluetooth wireless functionality enables measurement display via a free, downloadable app on iOS and Android mobile devices, as well as the ability to trend and communicate measurements. MightySat™ is also available with optional PVI®, a measure of the dynamic changes in the PI that occur during one or more complete respiratory cycles. MightySat™ is available online and is intended for sports and aviation use only. MightySat™ is not intended for medical use.

***Cercacor Laboratories, Inc.***

Cercacor is an independent entity spun-off from us to our stockholders in 1998. Joe Kiani and Jack Lasersohn, members of our board of directors, are also members of the board of directors of Cercacor. Joe Kiani, our Chairman and Chief Executive Officer, is also the Chairman and Chief Executive Officer of Cercacor. We are a party to a cross-licensing agreement with Cercacor, which was amended and restated effective January 1, 2007 (the Cross-Licensing Agreement), which governs each party's rights to certain intellectual property held by the two companies.

The following table outlines our rights under the Cross-Licensing Agreement relating to specific end user markets and the related technology applications of specific measurements.

| | End User Markets | |
|---|---|---|
| **Measurements** | **Professional Caregiver and Alternate Care Market** | **Patient and Pharmacist** |
| Vital Signs(1) | Masimo (owns) | Cercacor (non-exclusive license) |
| Non-Vital Signs(2) | Masimo (exclusive license) | Cercacor (owns or exclusive license) |

(1) Vital Signs measurements include, but are not limited to, $SpO_2$, peripheral venous oxygen saturation, mixed venous oxygen saturation, fetal oximetry, sudden infant death syndrome, ECG, blood pressure (noninvasive blood pressure, invasive blood pressure and continuous noninvasive blood pressure), temperature, respiration rate, $CO_2$, pulse rate, cardiac output, EEG, perfusion index, depth of anesthesia, cerebral oximetry, tissue oximetry and/or EMG, and associated features derived from these measurements, such as 3-D alarms, PVI® and other features.

(2) Non-Vital Signs measurements include the body fluid constituents other than vital signs measurements and include, but are not limited to, carbon monoxide, methemoglobin, blood glucose, hemoglobin and bilirubin.

*Our License to Cercacor.* We granted Cercacor an exclusive, perpetual and worldwide license, with sublicense rights, to use our Masimo SET® technology, including all improvements, for the monitoring of non-vital signs measurements and to develop and sell devices incorporating Masimo SET® for monitoring non-vital signs measurements in the "Cercacor Market". The Cercacor Market consists of any product market in which a product is intended to be used by a patient or pharmacist rather than a professional medical caregiver regardless of the particular location of the sale, including sales to doctors, hospitals, alternate

care market professionals or otherwise, provided the product is intended to be recommended, or resold, for use by the patient or pharmacist. We also granted Cercacor a non-exclusive, perpetual and worldwide license, with sublicense rights, to use Masimo SET® for the measurement of vital signs in the Cercacor Market. In exchange, Cercacor pays us a 10% royalty on the amount of vital signs sensors and accessories sold by Cercacor.

*Cercacor's License to us.* We exclusively license from Cercacor the right to make and distribute products in the "Masimo Market" that utilize rainbow® technology for the measurement of carbon monoxide, methemoglobin, fractional arterial oxygen saturation, and hemoglobin, which includes hematocrit. The Masimo Market consists of any product market where the product is intended to be used by a professional medical caregiver, including hospital caregivers, surgicenter caregivers, paramedic vehicle caregivers, doctors' offices caregivers, alternate care facility caregivers and vehicles where alternative care services are provided. We also have the option to obtain exclusive licenses to make and distribute products in the Masimo Market that utilize rainbow® technology for the monitoring of other non-vital signs measurements, including blood glucose. We have 180 days after proof of feasibility to exercise the above-referenced option to obtain a license for the measurement of blood glucose for an additional $2.5 million and licenses for other non-vital signs measurements for an additional $0.5 million each. During the year ended December 28, 2013, we exercised our right to license five new non-vital sign measurements for $0.5 million each, or $2.5 million. The licenses are exclusive until the later of 20 years from the grant of the applicable license or the expiration of the last patent included in the rainbow® technology related to the applicable measurements. To date, we have developed and commercially released devices that measure carbon monoxide, methemoglobin and hemoglobin using licensed rainbow® technology. We also make and distribute products that monitor respiration rate via rainbow Acoustic Monitoring™, which is a Masimo-developed rainbow® technology and, therefore, is not required to be licensed from Cercacor.

Our license to rainbow® technology for these measurements in these markets is exclusive on the condition that we continue to pay Cercacor royalties on our products incorporating rainbow® technology, subject to certain minimum aggregate royalty thresholds, and that we use commercially reasonable efforts to develop or market products incorporating the licensed rainbow® technology. The royalty is up to 10% of the rainbow® royalty base, which includes handhelds, tabletop and multiparameter devices. Handheld products incorporating rainbow® technology carry a 10% royalty rate. For other products, only the proportional amount attributable to that portion of our devices used to monitor non-vital signs measurements, rather than to monitoring vital signs measurements, and sensors and accessories for measuring only non-vital sign parameters are included in the 10% rainbow® royalty base. For multiparameter devices, the rainbow® royalty base includes the percentage of the revenue based on the number of rainbow® enabled measurements. For hospital contracts where we place equipment and enter into a sensor contract, we pay a royalty to Cercacor on the total sensor contract revenue based on the ratio of rainbow® enabled devices to total devices. During the year ended January 3, 2015 and going forward, we are subject to certain specific annual minimum aggregate royalty payment obligations of $5.0 million per year.

*Change in Control*. The Cross-Licensing Agreement provides that, upon a change in control:

- if the surviving or acquiring entity ceases to use "Masimo" as a company name and trademark, all rights to the "Masimo" trademark will be assigned to Cercacor;
- the option to license technology developed by Cercacor for use in blood glucose monitoring will be deemed automatically exercised and a $2.5 million license fee for this technology will become immediately payable to Cercacor; and
- the minimum aggregate annual royalties payable to Cercacor for carbon monoxide, methemoglobin, fractional arterial oxygen saturation, hemoglobin and/or glucose will increase to $15.0 million per year until the exclusivity period of the agreement ends, plus up to $2.0 million for each additional measurement with no maximum ceiling for non-vital sign measurements.

A change in control includes any of the following with respect to us or Cercacor:

- the sale of all or substantially all of either company's assets to a non-affiliated third-party;
- the acquisition by a non-affiliated third-party of 50% or more of the voting power of either company;
- Joe Kiani, our Chief Executive Officer and the Chief Executive Officer of Cercacor, resigns or is terminated from his position with either company; and
- the merger or consolidation of either company with a non-affiliated third-party.

*Ownership of Improvements*. Any improvements to Masimo SET® or rainbow® technology made by Cercacor, by us, or jointly by Cercacor with us or with any third-party that relates to non-vital signs monitoring, and any new technology acquired by Cercacor, is and will be owned by Cercacor. Any improvements to the Masimo SET® platform or rainbow® technology made by Cercacor, by us, or jointly by Cercacor with us or with any third-party that relates to vital signs monitoring, and any new technology acquired by us, is and will be owned by us. However, for both non-vital signs and vital signs monitoring, any improvements to the technology, excluding acquired technology, will be assigned to the other party and will be subject to the

terms of the licenses granted under the Cross-Licensing Agreement. Any new non-vital signs monitoring technology utilizing Masimo SET® that we develop will be owned by Cercacor and will be subject to the same license and option fees as if it had been developed by Cercacor. Also, we will not be reimbursed by Cercacor for our expenses relating to the development of any such technology.

*Cercacor Services Agreement (Services Agreement).* We have also entered into a services agreement with Cercacor. Under this Services Agreement, we provide Cercacor with certain accounting, human resources, information technology, legal and other administrative services. For the year ended January 3, 2015, Cercacor paid us $0.2 million for these services. We expect Cercacor to continue to engage us for these services. However, pursuant to the Services Agreement, Cercacor may terminate the agreement by providing us a 30 day notice, and we may terminate with a 180 day notice to Cercacor.

*Cercacor's Expenses related to Pronto-7®.* In February 2009, in order to accelerate the development of the technology and product development supporting our Pronto-7® device, Cercacor agreed to re-direct a substantial amount of its engineering development activities to focus on this project and we agreed to fund such expenses. Accordingly, from April 2009 through June 2010, we agreed to reimburse Cercacor for all third-party engineering materials and supplies expenses related to Pronto-7® development and 50% of Cercacor's total engineering and engineering-related payroll expenses. Since July 2010, Cercacor has continued to assist us with other product development efforts and charged us accordingly. Beginning in 2012, due to a revised estimate of the support required by us to complete the various Pronto-7® related projects, our board of directors approved an increase in the percentage of Cercacor's total engineering and engineering related payroll expenses funded by us from 50% to 60%. For the year ended January 3, 2015, the total funding for these additional Cercacor expenses was $3.1 million. This arrangement has been discontinued by mutual agreement effective as of January 4, 2015.

### Government Regulation

As a global medical technology company, we are subject to significant government regulation, compliance requirements, fees and costs, both in the U.S. and abroad. These regulatory requirements subject our products and our business to numerous risks that are specifically discussed within "Risks Related to Our Regulatory Environment" under Part I, Item 1A—"Risk Factors" within this Annual Report on Form 10-K. A summary of certain critical aspects of our regulatory environment is included below.

#### *Food and Drug Administration (FDA) Premarket Clearance and Approval Requirements*

The FDA, along with other federal, state and local authorities, regulates our products and product-related activities. Pursuant to the U.S. Food, Drug, and Cosmetic Act (FDCA) and the regulations promulgated under that Act, the FDA regulates the design, development, clinical trials, testing, manufacture, packaging, labeling, storage, distribution and promotion of medical devices. We endeavor to ensure that our products and procedures remain in compliance with all applicable FDA regulations, but the regulations regarding the manufacture and sale of our products are subject to change. We cannot predict the effect, if any, that these changes might have on our business, financial condition and results of operations. Unless an exemption applies, each medical device that we wish to market in the U.S. must first receive from the FDA either 510(k) clearance, by filing a 510(k) pre-market notification, or PMA approval, by filing a pre-market approval application (PMA).

The FDA's 510(k) clearance process usually takes from four to twelve months, but it can take longer. The process of obtaining PMA approval is much more costly, lengthy and uncertain. We cannot be sure that 510(k) clearance or PMA approval will be obtained for any product we propose to market on a timely basis or at all. In addition, if the FDA discovers that an applicant has submitted false or misleading information, the FDA may refuse to review submissions until certain requirements are met pursuant to its Application Integrity Policy.

The FDA decides whether a device must undergo either the 510(k) clearance or PMA approval process based upon statutory criteria. These criteria include the level of risk that the agency perceives is associated with the device and a determination of whether the product is a type of device that is similar to devices that are already legally marketed. Devices deemed to pose relatively less risk are placed in either Class I or II, which generally requires the manufacturer to submit a pre-market notification requesting 510(k) clearance, unless an exemption applies.

Class I devices are those for which safety and effectiveness can be assured by adherence to the FDA's general regulatory controls (General Controls) for medical devices, which include compliance with the applicable portions of the FDA's Quality System Regulation (QSR) facility registration and product listing, reporting of adverse medical events, and appropriate, truthful and non-misleading labeling, advertising and promotional materials. Some Class I devices also require premarket clearance by the FDA through the 510(k) premarket notification process.

Class II devices are subject to the FDA's General Controls, the FDA's QSR, including the Design Control regulations, and any other special controls deemed necessary by the FDA to ensure the safety and effectiveness of the device. Premarket review and

clearance by the FDA for Class II devices is accomplished through the 510(k) premarket notification procedure. All of our current regulated devices are classified as Class II devices.

Class III devices are those deemed by the FDA to pose the greatest risk, such as life-sustaining, life-supporting or implantable devices, or those devices deemed not substantially equivalent to a legally marketed predicate device. The safety and effectiveness of Class III devices cannot be assured solely by the General Controls and the other requirements described above. These devices almost always require formal clinical studies to demonstrate safety and effectiveness and must be approved through the PMA approval process during which the manufacturer must establish the safety and effectiveness of the device to the FDA's satisfaction. A PMA application must be supported by valid scientific evidence, including extensive preclinical (including bench tests and laboratory and animal studies) and clinical trial data as well as information about the device and its components regarding, among other things, device design, manufacturing and labeling. Also during the review period, an advisory panel of experts from outside the FDA may be convened to review and evaluate the application and provide recommendations to the FDA as to the approvability of the device. As part of the PMA application review, the FDA will conduct a preapproval inspection of the manufacturing facility to ensure compliance with the FDA's QSR. If the FDA approves the PMA, it may place restrictions on the device or the labeling or require additional clinical studies. If the FDA's evaluation of the PMA application or the manufacturing facility is not favorable, the FDA may deny approval of the PMA application or issue a "not approvable" letter. The FDA may also require additional clinical trials, which can delay the PMA approval process by several years. None of our products are currently approved under the PMA process.

To obtain 510(k) clearance, a company must submit a premarket notification demonstrating that the proposed device is "substantially equivalent" in intended use and in technological and performance characteristics to a legally marketed "predicate device" that is either a Class I, Class II or Class III device that was in commercial distribution before May 28, 1976, for which the FDA has not yet called for submission of a PMA application. After a device receives 510(k) clearance, any modification that could significantly affect its safety or effectiveness, or that would constitute a major change in its intended use, requires a new 510(k) clearance or could require a PMA approval. The FDA requires each manufacturer to make this determination in the first instance, but the FDA can review any decision. If the FDA disagrees with a manufacturer's decision not to seek a new 510(k) clearance, the agency may retroactively require the manufacturer to seek 510(k) clearance or PMA approval. The FDA also can require the manufacturer to cease marketing and/or recall the modified device until 510(k) clearance or PMA approval is obtained.

A clinical trial may be required in support of a 510(k) submission and generally is required for a PMA application. These trials may require an Investigational Device Exemption (IDE) application approved in advance by the FDA for a specified number of patients, unless the proposed study is deemed a non-significant risk study, which is eligible for an exemption from the IDE requirements. The IDE application must be supported by appropriate data, such as animal and laboratory testing results. Clinical trials may begin if the IDE application is approved by the FDA and the appropriate institutional review boards (IRBs) at the clinical trial sites. Submission of an IDE application does not give assurance that the FDA will issue the IDE. If the IDE application is approved, there can be no assurance the FDA will determine that the data derived from the trials support the safety and effectiveness of the device or warrant the continuation of clinical trials. An IDE supplement must be submitted to and approved by the FDA before a sponsor or investigator may make a change to the investigational plan that may affect its scientific soundness, study indication or the rights, safety or welfare of human subjects. The trial must also comply with the FDA's regulations, including the requirement that informed consent be obtained from each subject. Even if a trial is completed, the results of clinical testing may not adequately demonstrate the safety and efficacy of the device or may otherwise not be sufficient to obtain FDA clearance to market the product in the U.S.

We believe that our OEM partners may be required to obtain 510(k) premarket clearance from the FDA for certain of their products that incorporate Masimo SET® technology, Masimo rainbow® SET® technology, Masimo Board-in-Cable technology or Masimo sensors. In order to facilitate our OEM partners in obtaining 510(k) clearance for their products that incorporate Masimo SET® or Masimo rainbow® SET® boards and sensors, we grant our OEM partners a right to cross-reference the files from our cleared Masimo SET® circuit boards, sensor, cable and notification system 510(k) submissions.

We recently launched $iSpO_2$®, a non-medical use pulse oximeter intended for sports and aviation use. We are marketing this product in accordance with the FDA's current policy and enforcement discretion which indicates that pulse oximeters that are not intended for medical purposes can be marketed directly to consumers without first obtaining 510(k) clearance. We cannot assure you that the FDA will not change its policy regarding the regulation of these products. If the FDA changes its policy, we may be required to seek 510(k) clearance to market this pulse oximeter. We also may be required to cease marketing and/or recall the product until we obtain a new 510(k) clearance.

Table of Contents

*User Fees*

Pursuant to the Medical Device User Fee and Modernization Act of 2002 (MDUFMA), the Medical Device User Fee Amendments of 2012 (MDUFA III) and provisions of the Food and Drug Administration Safety and Innovation Act (FDASIA), unless a specific exemption applies, both 510(k) submissions and PMA applications are subject to user fees. The PMA user fees are significantly higher.

*Pervasive and Continuing FDA Regulation*

After a device is placed on the market, it continues to be subject to the FDA's regulatory authority. FDA regulatory requirements include:

- product listing and establishment registration, which helps facilitate FDA inspections and other regulatory action;
- QSR and current good manufacturing practices, which requires manufacturers, including third-party manufacturers, to follow stringent design control, testing, change control, documentation and other quality assurance procedures during all aspects of the development and manufacturing process, including requirements for packaging, labeling and record keeping, complaint handling, corrective and preventive actions and internal auditing;
- labeling control and advertising regulations, including FDA prohibitions against the promotion of products for uncleared, unapproved or off-label uses or indications;
- clearance of product modifications that could significantly affect safety or efficacy or that would constitute a major change in intended use of one of our cleared devices;
- approval of product modifications that affect the safety or effectiveness of one of our future approved devices;
- medical device reporting (MDR), regulations, which require that manufacturers comply with FDA requirements to report if their device may have caused or contributed to a death or serious injury, or has malfunctioned in a way that would likely cause or contribute to a death or serious injury if the malfunction of the device or a similar device were to recur;
- post-approval restrictions or conditions, including post-approval study commitments;
- post-market surveillance requirements, which apply when necessary to protect the public health or to provide additional safety and effectiveness data for the device;
- the FDA's recall authority, whereby it can ask, or under certain conditions order, device manufacturers to recall from the market a product that is in violation of its conditions of approval, governing laws and/or regulations;
- regulations pertaining to voluntary recalls; and
- notices of corrections or removals.

We must also register with the FDA as a medical device manufacturer, list all products placed in commercial distribution and obtain all necessary state permits or licenses to operate our business. As a manufacturer, we are subject to announced and unannounced inspections by the FDA to determine our compliance with the FDA's QSR and other regulations. Our OEM partners also are subject to inspection and market surveillance by the FDA to determine compliance with regulatory requirements.

If the FDA finds that we or one of our OEM partners have failed to comply with the FDA's QSR, the agency can institute a wide variety of enforcement and other regulatory actions, including:

- an FDA Form 483, which is issued by the FDA at the conclusion of an inspection when an investigator has observed any conditions that may constitute violations of the FDCA and related Acts;
- a public warning letter outlining potential violations of the FDCA;
- fines and civil penalties against us and/or OEM partners;
- unanticipated expenditures to address or defend such actions;
- delays in clearing or approving, or refusal to clear or approve, our products;
- withdrawal or suspension of clearances and/or approvals of our products or those of our third-party suppliers by the FDA or other regulatory bodies;
- product recall;
- product detention or seizure;
- interruption of production;

- refusal to provide export certificates, which may be necessary to permit the export of devices from the U.S. to other countries;
- operating restrictions;
- injunctions of future violations (including those agreed to in a consent decree); and
- criminal prosecution.

The FDA also has the authority to request repair, replacement or refund of the cost of any medical device manufactured or distributed by us.

*Advertising and Promotion*

Advertising and promotion of medical devices, in addition to being regulated by the FDA, are also regulated by the Federal Trade Commission (FTC) and by federal and state regulatory and enforcement authorities, including the FDA, the Department of Justice, the Office of Inspector General of the Department of Health and Human Services, and various state attorneys general. Although physicians are permitted to use their medical judgment to use medical devices for indications other than those cleared or approved by the FDA, we may not promote our products for such "off-label" uses and can only market our products for cleared or approved uses. Recently, promotional activities for FDA-regulated products of other companies have been the subject of FTC enforcement actions brought under healthcare reimbursement laws and consumer protection statutes. FTC enforcement actions often result in consent decrees that constrain future actions. In addition, under the federal Lanham Act and similar state laws, competitors and others can initiate litigation relating to advertising claims.

*Import and Export Requirements*

To import a device, the importer must file an entry notice and bond with the United States Bureau of Customs and Border Protection (CBP). All devices are subject to FDA examination before release from CBP. Any article that appears to be in violation of the FDCA may be refused admission and a notice of detention and hearing may be issued. If the FDA ultimately refuses admission, the CBP may issue a notice for redelivery and assess liquidated damages for up to three times the value of the lot. The CBP also imposes its own regulatory requirements on the import of our products, including inspection and possible sanctions for noncompliance.

Products exported from the United States are subject to foreign countries' import requirements and the exporting requirements of the FDA or European regulating bodies, as applicable. In particular, international sales of medical devices manufactured in the United States that are not approved or cleared by the FDA for use in the United States, or are banned or deviate from lawful performance standards, are subject to FDA export requirements.

Foreign countries often require, among other things, an FDA certificate for products for export, also called a Certificate for Foreign Government. To obtain this certificate from the FDA, the device manufacturer must apply to the FDA. The FDA certifies that the product has been granted clearance or approval in the United States and that the manufacturing facilities were in compliance with the FDA's QSR regulations at the time of the last FDA inspection. If the FDA determines that our facilities or procedures do not comply with the FDA's QSR regulations, it may refuse to provide such certificates until we resolve the issues to the FDA's satisfaction.

*Foreign Regulation Regarding Clearance and Approval*

Many foreign countries in which we market or may market our products have regulatory bodies and restrictions similar to those of the FDA. International sales are subject to foreign government regulation, the requirements of which vary substantially from country to country. The time required to obtain approval by a foreign country may be longer or shorter than that required for FDA clearance and the requirements may differ.

In particular, marketing of medical devices in the European Economic Area (EEA) is subject to compliance with European Medical Device Directives. Under this regime, a medical device may be placed on the market within the EEA if it conforms to certain "essential requirements" and bears the CE Mark. The most fundamental and essential requirement is that a medical device must be designed and manufactured in such a way that it will not compromise the clinical condition or safety of patients, or the safety and health of users and others. In addition, the device must achieve the essential performance(s) intended by the manufacturer and be designed, manufactured and packaged in a suitable manner.

Manufacturers must demonstrate that their devices conform to the relevant essential requirements through a conformity assessment procedure. The nature of the assessment depends upon the classification of the device. The classification rules are mainly based on three criteria: the length of time the device is in contact with the body, the degree of invasiveness and the extent to which the device affects the anatomy. Conformity assessment procedures for all but the lowest risk classification of

device involve a notified body. Notified bodies are often private entities and are authorized or licensed to perform such assessments by government authorities. Manufacturers usually have some flexibility to select conformity assessment procedures for a particular class of device and to reflect their circumstances, e.g., the likelihood that the manufacturer will make frequent modifications to its products. Conformity assessment procedures require an assessment of available clinical evidence, literature data for the product and post-market experience in respect of similar products already marketed. Notified bodies also may review the manufacturer's quality systems. If satisfied that the product conforms to the relevant essential requirements, the notified body issues a certificate of conformity, which the manufacturer uses as a basis for its own declaration of conformity and application of the CE Mark. Application of the CE Mark allows the product to be distributed throughout the EEA. We maintain CE Marking on all of our products that require such markings.

*Other U.S. and Foreign Regulation*

We and our OEM partners also must comply with numerous federal, state and local laws relating to matters such as safe working conditions, manufacturing practices, environmental protection, fire hazard control and hazardous substance disposal. We cannot be sure that we will not be required to incur significant costs to comply with these laws and regulations in the future or that these laws or regulations will not hurt our business, financial condition and results of operations. Unanticipated changes in existing regulatory requirements or adoption of new requirements could hurt our business, financial condition and results of operations.

The Physician Payment Sunshine Act (Sunshine Act), which was enacted by Congress as part of the Patient Protection and Affordable Care Act (PPACA) on March 23, 2010, requires medical device companies to track and publicly report, with limited exceptions, all payments and transfers of value to physicians and teaching hospitals in the U.S. Implementing regulations for these tracking and reporting obligations were finalized in 2013, and companies are now required to track payments made and to report such payments to the government by March 31 of each year. In addition, in December 2005, the International Electrotechnical Commission published a revised version of its standard for medical electrical equipment, IEC, 60601-1:2005 (3rd edition). In this publication, standards are listed as general requirements concerning basic safety and the essential performance of equipment. These new standards were required to be in place by June 1, 2012 in Europe and by December 31, 2013 in the U.S. for new submissions. Failure to adhere to this regulation will prevent us from using our equipment in our clinical trials.

*Medical Device Tax*

In March 2010, the U.S. Congress adopted and President Obama signed into law comprehensive health care reform legislation. Among other initiatives, these laws impose significant new taxes on medical device makers in the form of a 2.3% excise tax on U.S. medical device sales, with certain exemptions, beginning on January 1, 2013. For the years ended January 3, 2015 and December 28, 2013, we recorded $6.6 million and $6.3 million, respectively, in medical device taxes that were included in selling, general and administrative expenses.

*Conflict Minerals and Supply Chain*

We are subject to SEC rules adopted pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act concerning "conflict minerals" (generally tin, tantalum, tungsten and gold) and similar rules are under consideration by the European Union (EU). Certain of these conflict minerals are used in the manufacture of our products. Although the rules are being challenged in court, in their present form they require us to investigate the source of any conflict minerals necessary to the production or functionality of our products. If any such conflict minerals originated in the Democratic Republic of the Congo or adjoining countries (the DRC region), we must undertake comprehensive due diligence to determine whether such minerals financed or benefited armed groups in the DRC region. Since our supply chain is complex, our ongoing compliance with these rules could affect the pricing, sourcing and availability of conflict minerals used in the manufacture of our products.

We are also subject to disclosure requirements regarding abusive labor practices in portions of our supply chain under the California Transparency in Supply Chains Act.

*Environmental*

Our manufacturing processes involve the use, generation and disposal of solid wastes, hazardous materials and hazardous wastes, including silicone adhesives, solder and solder paste, sealants, epoxies and various solvents such as methyl ethyl ketone, acetone and isopropyl alcohol. As such, we are subject to stringent federal, state and local laws relating to the protection of the environment, including those governing the use, handling and disposal of hazardous materials and wastes. Products that we sell in Europe are subject to regulation in EU markets under the Restriction of the Use of Hazardous Substances Directive (RoHS). RoHS prohibits companies from selling products which contain certain hazardous materials, including lead, mercury, cadmium, chromium, polybrominated biphenyls and polybrominated diphenyl ethers, in EU member states. In addition, the

EU's Registration, Evaluation, Authorization, and Restriction of Chemicals Directive also restricts substances of very high concern in products.

Future environmental laws may require us to alter our manufacturing processes, thereby increasing our manufacturing costs. We believe that our products and manufacturing processes at our facilities comply in all material respects with applicable environmental laws and worker health and safety laws; however, the risk of environmental liabilities cannot be completely eliminated.

*Health Care Fraud and Abuse*

In the U.S., there are federal and state anti-kickback laws that generally prohibit the payment or receipt of kickbacks, bribes or other remuneration in exchange for the referral of patients or other health-related business. For example, the Federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)) prohibits anyone from, among other things, knowingly and willfully offering, paying, soliciting or receiving any bribe, kickback or other remuneration intended to induce the referral of patients for, or the purchase, order or recommendation of, health care products and services reimbursed by a federal health care program, including Medicare and Medicaid. Recognizing that the federal anti-kickback law is broad and potentially applicable to many commonplace arrangements, Congress and the Office of Inspector General within the Department of Health and Human Services (OIG), have created statutory "exceptions" and regulatory "safe harbors". Exceptions and safe harbors exist for a number of arrangements relevant to our business, including, among other things, payments to bona fide employees, certain discount and rebate arrangements, and certain payment arrangements involving GPOs. Although an arrangement that fits into one or more of these exceptions or safe harbors is immune from prosecution, arrangements that do not fit squarely within an exception or safe harbor do not necessarily violate the law, but the OIG or other government enforcement authorities may examine the practice to determine whether it involves the sorts of abuses that the statute was designed to combat. Violations of this federal law can result in significant penalties, including imprisonment, monetary fines and assessments, and exclusion from Medicare, Medicaid and other federal health care programs. Exclusion of a manufacturer, like us, would preclude any federal health care program from paying for its products. In addition to the federal anti-kickback law, many states have their own laws that parallel and implicate anti-kickback restrictions analogous to the federal anti-kickback law, but may apply regardless of whether any federal health care program business is involved. Federal and state anti-kickback laws may affect our sales, marketing and promotional activities, educational programs, pricing and discount practices and policies, and relationships with health care providers by limiting the kinds of arrangements we may have with hospitals, alternate care market providers, GPOs, physicians and others in a position to purchase or recommend our products.

Federal and state false claims laws prohibit anyone from presenting, or causing to be presented, claims for payment to third-party payers that are false or fraudulent. For example, the Federal Civil False Claims Act (31 U.S.C. § 3729 et seq.) imposes liability on any person or entity who, among other things, knowingly and willfully presents, or causes to be presented, a false or fraudulent claim for payment by a federal health care program, including Medicaid and Medicare. Some suits filed under the False Claims Act, known as "qui tam" actions, can be brought by a "whistleblower", or "relator" on behalf of the government and such individuals may share in any amounts paid by the entity to the government in fines or settlement. Manufacturers, like us, can be held liable under false claims laws, even if they do not submit claims to the government, where they are found to have caused submission of false claims by, among other things, providing incorrect coding or billing advice about their products to customers that file claims, or by engaging in kickback arrangements with customers that file claims. A number of states also have false claims laws, and some of these laws may apply to claims for items or services reimbursed under Medicaid and/or commercial insurance. Sanctions under these federal and state laws may include civil monetary penalties, exclusion from government health care programs and imprisonment.

The Health Insurance Portability and Accountability Act of 1996 (HIPAA) created new federal crimes, including health care fraud and false statements related to health care matters. The health care fraud statute prohibits, among other things, knowingly and willfully executing a scheme to defraud any health care benefit program, including private payers. The false statements statute prohibits, among other things, knowingly and willfully falsifying, concealing or covering up a material fact or making any materially false, fictitious or fraudulent statement in connection with the delivery of or payment for health care benefits, items or services. A violation of either statute is a felony and may result in fines, imprisonment and exclusion from government health care programs.

The Foreign Corrupt Practices Act of 1977 and similar worldwide anti-bribery laws in non-U.S. jurisdictions generally prohibit companies and their intermediaries from making improper payments to non-U.S. officials for the purpose of obtaining or retaining business.

Due to the breadth of some of these laws, it is possible that some of our current or future practices might be challenged under one or more of these laws. In addition, there can be no assurance that we would not be required to alter one or more of our practices to be in compliance with these laws. Evolving interpretations of current laws or the adoption of new federal or state

laws or regulations could adversely affect many of the arrangements we have with customers and physicians. Therefore, our risk of being found in violation of these laws is increased by the fact that some of these laws are broad and open to interpretation.

*Privacy and Security of Health Information*

Numerous federal, state and international laws and regulations, including HIPAA, govern the collection, use and disclosure of patient-identifiable or protected health information (PHI). HIPAA applies to covered entities, which include most healthcare facilities that purchase and use our products. The HIPAA Privacy Rule restricts the use and disclosure of PHI, and requires covered entities and business associates under business associate agreements to safeguard that information and to provide certain rights to individuals with respect to that information. The HIPAA Security Rule establishes detailed requirements for safeguarding PHI transmitted or stored electronically. Although we are not a covered entity, we are sometimes deemed to be a business associate of covered entities due to activities that we perform for or on behalf of covered entities, which sometimes requires covered entities to contractually bind us, as a business associate, to protect the privacy and security of PHI we may encounter during activities such as training customers on the use of our products or investigating product performance.

Enacted in February 2009, the Health Information Technology for Economic and Clinical Health Act (HITECH) made significant amendments to the HIPAA Privacy and Security Rules. Under HIPAA and HITECH, business associates must comply with a number of HIPAA Privacy Rule requirements and all of the HIPAA Security Rule provisions, and business associates are directly subject to HIPAA civil and criminal enforcement and the associated penalties for violation of the Privacy and Security Rule requirements.

The HIPAA standards also apply to the use and disclosure of PHI for research and generally require the covered entity performing the research to obtain the written authorization of the research subject (or an appropriate waiver) before providing that subject’s PHI to sponsors like us for purposes related to the research. These covered entities also typically impose contractual limitations on our use and disclosure of the PHI they disclose to us. We may be required to make costly system modifications to comply with the privacy and security requirements that will be imposed on us and our failure to comply may result in liability and adversely affect our business.

Numerous other federal and state laws protect the confidentiality of PHI, including state medical privacy laws and federal and state consumer protection laws. These various laws in many cases are not preempted by the HIPAA rules and may be subject to varying interpretations by the courts and government agencies, creating complex compliance issues for us and our customers and potentially exposing us to additional expense, adverse publicity and liability. Other countries also have, or are developing, laws governing the collection, use and transmission of health information and these laws could create liability for us or increase our cost of doing business.

*Third-Party Reimbursement*

Health care providers, including hospitals, that purchase our products generally rely on third-party payers, including the Medicare and Medicaid programs and private payers, such as indemnity insurers and managed care plans, to cover and reimburse all or part of the cost of the products and the procedures in which they are used. As a result, demand for our products is dependent in part on the coverage and reimbursement policies of these payers. No uniform coverage or reimbursement policy for medical technology exists among all third-party payers, and coverage and reimbursement can differ significantly from payer to payer.

The Centers for Medicare and Medicaid Services (CMS), the federal agency responsible for administering the Medicare program, along with its contractors, establish coverage and reimbursement policies for the Medicare program. Because a large percentage of the hospitals using our products treat elderly or disabled individuals who are Medicare beneficiaries, Medicare’s coverage and reimbursement policies are particularly significant to our business. In addition, private payers often follow the coverage and reimbursement policies of Medicare. We cannot assure you that government or private third-party payers will cover and reimburse the procedures using our products in whole or in part in the future or that payment rates will be adequate.

In general, Medicare will cover a medical product or procedure when the product or procedure is reasonable and necessary for the diagnosis or treatment of an illness or injury, or to improve the functioning of a malformed body part. Even if the medical product or procedure is considered medically necessary and coverage is available, Medicare may place restrictions on the circumstances where it provides coverage. For example, several Medicare local contractors have issued policies that restrict coverage for pulse oximetry in hospital inpatient and outpatient settings to a limited number of conditions, including limiting coverage to patients who (i) exhibit signs of acute respiratory dysfunction, (ii) have chronic lung disease, severe cardiopulmonary disease or neuromuscular disease involving the muscles of respiration, (iii) are under treatment with a medication with known pulmonary toxicity, or (iv) have sustained multiple trauma or complaints of acute chest pain.

Table of Contents

Reimbursement for our products may vary not only by the type of payer involved but also based upon the setting in which the product is furnished and utilized. For example, Medicare payment may be made, in appropriate cases, for patient stays in the hospital inpatient and outpatient settings involving the use of our products. Medicare generally reimburses hospitals based upon prospectively determined amounts. For hospital inpatient stays, the prospective payment generally is determined by the patient's condition and other patient data and procedures performed during the inpatient stay, using a classification system known as Medicare Severity Diagnosis-Related Groups (MS-DRGs). Prospective rates are adjusted for, among other things, regional differences, co-morbidity and complications. Hospitals generally do not receive separate Medicare reimbursement for the specific costs of purchasing our products for use in the inpatient setting. Rather, Medicare reimbursement for these costs is deemed to be included within the prospective payments made to hospitals for the inpatient services in which the products are utilized.

In contrast, some differences may be seen in the reimbursement for use of our products in hospital outpatient departments. In this setting, Medicare payments also are generally made under a prospective payment system based on the ambulatory payment classifications (APCs) under which individual items and procedures are categorized. Hospitals receive the applicable APC payment rate for the procedure regardless of the actual cost for such treatment. Some outpatient services such as oximetry services do not receive separate reimbursement. Rather, their reimbursement is deemed packaged into the APC for an associated procedure, and the payment for that APC does not vary depending on whether the packaged procedure is performed. Some procedures also are paid through Composite APCs, which are APCs that establish a payment rate that applies when a specific combination of services is provided. Reimbursement for certain pulse oximetry monitoring services, including those using our products, may be separately payable when they are the only service provided to the patient on that day, packaged if provided with certain critical care services, or reimbursed through a composite APC when provided in connection with certain other services.

Because payments through the Prospective Payment System in both the hospital inpatient and outpatient settings are based on predetermined rates and may be less than a hospital's actual costs in furnishing care, hospitals have incentives to lower their operating costs by utilizing products that will reduce the length of inpatient stays, decrease labor or otherwise lower their costs. If hospitals cannot obtain adequate coverage and reimbursement for our products, or the procedures in which they are used, we cannot be certain that they will purchase our products, despite the clinical benefits and opportunity for cost savings that we believe can be derived from their use.

Our success with rainbow® SET® technologies in U.S. care areas with reimbursable monitoring procedures, such as hospital emergency departments, hospital procedure labs, and the physician office may largely depend on the ability of providers to receive reimbursement for such procedures. While private insurance payers generally follow Medicare coding and payment, we cannot be certain of this and, in many cases, cannot control the coverage or payment rates that private insurance payers put in place. In addition, the PPACA could affect future Medicare payment for services involving the use of our products.

Our success in non-U.S. markets depends largely upon the availability of coverage and reimbursement from the third-party payers through which health care providers are paid in those markets. Health care payment systems in non-U.S. markets vary significantly by country, and include single-payer government managed systems as well as systems in which private payers and government managed systems exist side-by-side. Our ability to achieve market acceptance or significant sales volume in international markets we enter will be dependent in large part on the availability of reimbursement for procedures performed using our products under health care payment systems in such markets.

***Competition***

The medical device industry is highly competitive and many of our competitors have substantially greater financial, technical, marketing and other resources than we do. While we regard any company that sells pulse oximeters as a potential customer, we also recognize that the companies selling pulse oximeters on an OEM basis and/or pulse oximetry sensors are also potential competitors. Our primary competitor, Covidien Ltd. (Covidien), who was recently acquired by Medtronic plc, currently holds a substantial share of the pulse oximetry market. Covidien sells its own brand of Nellcor pulse oximeters to end-users, sells pulse oximetry modules to other monitoring companies on an OEM basis, and licenses to certain OEMs the right to make their pulse oximetry platforms compatible with their sensors. We also face substantial competition from larger medical device companies, including companies that develop products that compete with our proprietary Masimo SET® and our OEM partners. We believe that a number of companies have announced products that claim to offer Measure-Through-Motion accuracy. Based on those announcements and our investigations, we further believe that many of these products include technology that infringes our intellectual property rights. We have settled claims against some of these companies and intend to vigorously enforce and protect our proprietary rights with respect to the others whom we believe are infringing our technology.

Table of Contents

We believe that the principal competitive factors in the market for pulse oximetry products include:

- accurate monitoring during both patient motion and low perfusion;
- ability to introduce other clinically beneficial measurements related to oxygenation and respiration, such as noninvasive and continuous hemoglobin and acoustic respiration rate;
- competitive pricing, including bundling practices;
- brand recognition and perception of innovation abilities;
- sales and marketing capability;
- access to hospitals which are members of GPOs;
- recent proliferation of integrated delivery networks;
- access to OEM partners; and
- patent protection.

***Seasonality***

The healthcare business in the United States and overseas is typically subject to quarterly fluctuations in hospital and other alternative care admissions. Historically, our third fiscal quarter revenues have generally experienced a sequential decline from our second fiscal quarter revenues. We believe this is primarily due to the summer vacation season during which people tend to avoid elective procedures. This historical trend did not occur in fiscal year 2014 primarily due, we believe, to the delayed installation of new hospitals contracted in 2013 and higher OEM revenues related to the introduction of RoHs-compliant products in Europe. Another factor affecting the seasonality of our quarterly revenues is the traditional "flu season" that often increases hospital and acute care facility admissions in the first and fourth calendar quarters. Because our non-sales variable operating expenses often do not fluctuate in the same manner as our quarterly product sales, this may cause fluctuations in our quarterly operating income that are disproportionate to fluctuations in our quarterly revenue.

***Sales and Marketing***

We have sales and marketing employees in the U.S. and abroad. We expect to moderately increase our worldwide sales and sales support organizations as we continue to expand our presence throughout both the U.S. and the world, including Europe, the Middle East, Asia, Latin America, Canada and Australia. We currently sell all of our medical products both directly to hospitals and the alternate care market via our sales force and certain distributors. We sell our non-medical/consumer products through e-commerce Internet sites such as Amazon.com.

The primary focus of our sales representatives is to facilitate the conversion of competitor accounts to our Masimo SET® and rainbow® SET® pulse oximetry products, to expand the use of Masimo SET® and Patient SafetyNet™ on the general floor and to create and expand the use of rainbow® measurements in both critical care and non-critical care areas. In addition to sales representatives, we employ clinical specialists to work with our sales representatives to educate end-users on the benefits of Masimo SET® and assist with the introduction and implementation of our technology and products to their sites. Our sales and marketing strategy for pulse oximetry has been and will continue to be focused on building end-user awareness of the clinical and cost-saving benefits of our Masimo SET® platform. More recently, we have expanded this communication and educational role to include our Masimo rainbow® Pulse CO-Oximetry and rainbow Acoustic Monitoring™ products, including hemoglobin, carboxyhemoglobin, methemoglobin, PVI®, acoustic respiration rate and Halo Index™. During 2014, we continued to build a dedicated worldwide blood management sales force whose primary focus is working with hospitals to identify new opportunities to deploy our SpHb® technology.

For the year ended January 3, 2015, two just-in-time distributors, Owens & Minor and Cardinal Health, represented approximately 14% and 11%, respectively, of our total revenue. These were the only two customers that represented 10% or more of our revenue for the year ended January 3, 2015. Importantly, these two distributors take and fulfill orders from our direct customers, many of whom have signed long-term sensor purchase agreements with us. As a result, in the event a specific just-in-time distributor is unable to fulfill these orders, the orders would be redirected to other distributors or fulfilled directly by us.

Additionally, we sell certain of our products through our OEM partners who both incorporate our boards into their monitors and resell our sensors to their customers' installed base of Masimo SET® products. Our OEM agreements allow us to expand the availability of Masimo SET® through the sales and distribution channels of each OEM partner. To facilitate clinician awareness of Masimo SET® installations, all of our OEM partners have agreed to place the Masimo SET® logo prominently on their instruments.

In order to facilitate our U.S. direct sales to hospitals, we have signed contracts with what we believe to be the five largest national GPOs in the U.S., based on the total volume of negotiated purchases. In return for the GPOs putting our products on contract, we have agreed to pay the GPOs a percentage of our revenue from their member hospitals. In 2014 and 2013, revenue from the sale of our pulse oximetry products to hospitals that are associated with GPOs amounted to $309.9 million and $287.9 million, respectively.

Our marketing efforts are designed to build end-user awareness through digital and print advertising, direct mail and trade shows. In addition, we distribute published clinical studies, provide product education for doctors, nurses, biomedical engineers and respiratory therapists and assist with product evaluations.

***Intellectual Property***

We believe that in order to maintain a competitive advantage in the marketplace, we must develop and maintain protection of the proprietary aspects of our technology. We rely on a combination of patent, trademark, trade secret, copyright and other intellectual property rights and measures to protect our intellectual property.

We have developed a patent portfolio internally, and, to a lesser extent, through acquisitions and licensing, that covers many aspects of our product offerings. As of January 3, 2015, we had 468 issued patents and 234 pending applications in the U.S., Europe, Japan, Australia, Canada and other countries throughout the world. Our issued U.S. patents have expiration dates (not including any patent term extensions) from 2015 to 2033. Additionally, as of January 3, 2015, we owned 61 U.S. registered trademarks and 194 foreign registered trademarks, as well as trade names that we use in conjunction with the sale of our products. Our trademarks are perpetually renewable.

Under the Cross-Licensing Agreement, we and Cercacor have agreed to allocate proprietary ownership of technology developed based on the functionality of the technology. We will have proprietary ownership, including ownership of all patents, copyrights and trade secrets, of all technology related to the noninvasive monitoring of vital signs measurements, and Cercacor will have proprietary ownership of all technology related to the noninvasive monitoring of non-vital signs measurements. We also rely upon trade secrets, continuing technological innovations and licensing opportunities to develop and maintain our competitive position. We seek to protect our trade secrets and proprietary know-how, in part, with confidentiality agreements with consultants, vendors and employees, although we cannot be certain that the agreements will not be breached or that we will have adequate remedies for any breach.

There are risks related to our intellectual property rights. For further detail on these risks, see “Risks Related to Our Intellectual Property” under Item 1A —“Risk Factors” in this on Form 10-K.

***Research and Product Development***

We believe that ongoing research and development efforts are essential to our success. Our research and development efforts focus primarily on continuing to enhance our technical expertise in pulse oximetry, expanding our noninvasive monitoring of other measurements and developing remote alarm and monitoring solutions.

Although we and Cercacor each have separate research and development projects, we collaborate with Cercacor on multiple research and development activities related to rainbow® technology and other technologies. Under the Cross-Licensing Agreement, the parties have agreed to allocate proprietary ownership of technology developed by either party based on the functionality of the technology. We will have proprietary rights to all technology related to the noninvasive measurement of vital signs measurements, and Cercacor will have proprietary ownership of all technology related to the noninvasive monitoring of non-vital signs measurements.

Our total research and development expenditures for fiscal year 2014 were $56.6 million, which included $3.1 million related to expenses incurred by Cercacor pursuant to the Cross-Licensing Agreement. In fiscal year 2013, our total research and development expenditures were $55.6 million, which included $3.9 million related to expenses incurred by Cercacor. We expect our research and development expenses to increase moderately in fiscal year 2015 and beyond as we expand our research and development staff, enhance our existing products and technologies and develop new products for market introduction.

***Manufacturing***

Our strategy is to manufacture products in-house when it is efficient and cost-effective for us to do so. We currently manufacture our bedside and handheld pulse oximeters, our full line of disposable and reusable sensors and most of our patient cables in-house. We maintain an approximate 15,000 square foot manufacturing area in our facility in Irvine, California, and an approximate 149,000 square foot manufacturing facility in Mexicali, Mexico, both of which are International Organization for Standardization (ISO) 13485:2012 certified. We also maintain an approximate 90,000 square foot facility in Hudson, New

Hampshire, a portion of which is used to manufacture advanced light emitting diodes and other advanced component-level technologies. In addition, we maintain an ISO Certified facility approximating 13,000 square feet in Danderyd, Sweden, a portion of which is used to manufacture ultra-compact mainstream and sidestream capnography and gas monitoring technologies. We will continue to utilize third-party contract manufacturers for products and subassemblies that can be more efficiently manufactured by these parties, such as our circuit boards. We monitor our third-party manufacturers and perform inspections and product tests at various steps in the manufacturing cycle to ensure compliance with our specifications. We also do full functional testing of our circuit boards.

For raw materials, we and our contract manufacturers rely on sole source suppliers for some components, including digital signal processor chips and analog to digital converter chips. We and our contract manufacturers have taken steps to minimize the impact of a shortage or stoppage of shipments of digital signal processor chips or analog to digital converter chips, including maintaining a safety stock of inventory and designing software that may be easily ported to another digital signal processor chip. We believe that our sources of supply for components and raw materials are adequate. In the event of a delay or disruption in the supply of sole source components, we believe that we and our contract manufacturers will be able to locate additional sources of these sole source components on commercially reasonable terms and without experiencing material disruption in our business or operations.

We have agreements with certain major suppliers and each agreement provides for varying terms with respect to contract expiration, termination and pricing. Most of these agreements allow for termination upon specified notice, ranging from four to six months, to the non-terminating party. Certain of these agreements with our major suppliers allow for pricing adjustments, each agreement provides for annual pricing negotiation, and one agreement also guarantees Masimo the most favorable pricing offered by the supplier to any of its other customers.

***Employees***

As of January 3, 2015, we had approximately 1,200 full-time employees and approximately 2,400 dedicated contract employees worldwide.

***Address***

Our principal executive offices are located at 52 Discovery, Irvine, California 92618, and our telephone number at that address is (949) 297-7000. Our website address is www.masimo.com. Our annual reports on Form 10-K, quarterly reports on Form 10-Q, proxy statements, current reports on Form 8-K and amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended, are available free of charge at www.masimo.com as soon as reasonably practicable after electronically filing such reports with the SEC. Any information contained on, or that can be accessed through, our website is not incorporated by reference into, nor is it in any way a part of, this Annual Report on Form 10-K.

# Exhibit N

GIBSON DUNN

Gibson, Dunn & Crutcher LLP

1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Tel 202.955.8500
www.gibsondunn.com

Brian K. Andrea
Direct: +1 202.887.3624
Fax: +1 202.530.4220
BAndrea@gibsondunn.com

April 14, 2021

Adam Powell
Knobbe, Martens, Olson & Bear, LLP
12790 El Camino Real
Suite 100
San Diego, CA 92130

Re: *Masimo Corp. et al. v. Apple Inc.* (C.A. No. 8:20-cv-48-JVS-JDE)

Dear Adam:

We write in response to your April 7 letter.

**<u>ESI Custodians</u>**

The state of play of the parties' negotiations regarding ESI custodians is spelled out in detail in the joint stipulation pending before the Court, so we will not belabor those points here. However, we do note that it is disappointing that it took filing a joint stipulation for Plaintiffs to agree to provide *any* information as to the purported relevance of your expansive list of proposed ESI custodians, despite our repeated requests for such information and your representation that you would provide such information during our meet and confer on April 2, 2021. Nonetheless, we appreciate you sharing Plaintiffs' alleged basis, which plainly illustrates and confirms that the list is overbroad. Indeed, it is clear Plaintiffs are basing their request for the majority of custodians on rank speculation, and are seeking the same information from dozens of people, which flies in the face of the letter and spirit of Rule 26. For example, Plaintiffs copy and paste the phrase "likely has technical documents relating to the Accused Products" 27 times, (J.S. at 26–31) but provide no basis to believe that a) those "technical documents" exist, or b) that they are non-duplicative of documents you have already received or will receive from the custodians Apple has identified as ESI custodians that "are knowledgeable about and were involved with the core issues or subjects in this case," as required by the parties' ESI Stipulation. Plaintiffs also copy and paste the verbatim conclusory statement that proposed custodians may have documents related to the "implementation of Plaintiffs' trade secrets" 28 times (J.S. at 27–32), but fail to specify which trade secrets Plaintiffs are referring to or why Plaintiffs believe these documents exist and would not otherwise be produced through Apple's document productions and from the ESI of the custodians Apple has identified. Further, the fact that you suggest in your letter that someone was a "top priorit[y] for Lamego to meet" does nothing to show that such individual was involved in the issues in the case (as required by the ESI Agreement) or are likely to have non-duplicative, non-cumulative documents that are relevant and proportional

Beijing • Brussels • Century City • Dallas • Denver • Dubai • Frankfurt • Hong Kong • Houston • London • Los Angeles • Munich
New York • Orange County • Palo Alto • Paris • San Francisco • São Paulo • Singapore • Washington, D.C.

Exhibit N
Page 257

to the needs of the case (as required by the Federal Rules). As we have requested many times, please provide the specific basis as to why Plaintiffs believe that each identified custodian is someone that is likely to have non-duplicative, non-cumulative documents that are relevant and proportional to the needs of the case. Without such information, Apple cannot reasonably assess Plaintiffs' demands.

Nonetheless, based on your descriptions, Apple agrees to add Ueyn Block and Tao Shui as ESI custodians. As you note in your briefing, Apple has already produced several documents from these individuals. Apple does not believe they are likely to have significant non-duplicative ESI that is relevant at this point, as their primary relevance to the issues in this case relates to the patent infringement allegations, which have been stayed. But, in the spirit of cooperation and in a good faith effort to make progress on this dispute, we are willing to add them as custodians.

Finally, Apple reiterates that Tim Cook is not an appropriate ESI custodian, and Plaintiffs' request that Apple go through the process of collecting his documents is a particularly egregious example of Plaintiffs' overreach, as we have explained. Plaintiffs aptly note that *Lauris v. Novartis*, 2016 WL 7178602, at *5 (E.D. Cal. Dec. 8, 2016) denied discovery from an apex custodian because "there was no evidence the executive had relevant information." The same is true here as well. Additionally, please provide Plaintiffs' legal basis for seeking documents from a top executive who was not involved in the issues in the case. Apple has requested this numerous times, including during the March 29 and April 2 meet and confer calls and in Apple's April 1 letter, and Plaintiffs have not cited a single supporting case.

**Former Employees of Plaintiffs Later Employed by Apple**

Your statement that you "do not understand why it took Apple so long" to provide the information laid out in Apple's April 1 letter is disingenuous. This information is all available either publicly or through Apple's prior discovery responses, so Plaintiffs did not have to wait until now to eliminate clearly irrelevant individuals like Linus Conrad, Megan Eilers, or Shruti Koneru. Apple should not—and cannot—be faulted for Plaintiffs' failure to do a complete investigation before requesting discovery regarding these individuals.

To the extent you seek additional information about any of these individuals, the proper way to obtain it is through the discovery process. Apple provided the chart in its April 1 letter as a courtesy and in order to comply with Plaintiffs' requests for this information. Now that Apple has provided the information Plaintiffs' requested, Plaintiffs respond by requesting even more information. This is an improper discovery request—to the extent Plaintiffs seek additional information about these individuals, the proper way to make such a request is through the formal discovery process, which permits Apple to make formal objections as appropriate based on, for example, relevance, overbreadth, and proportionality. Indeed, the

scope of this case is not so broad as to grant Plaintiffs *carte blanche* to probe the work histories of current or former Apple employees (including, but not limited to, the employees specifically named in your April 7 letter) to determine if they "have []ever been involved in any physiological, monitoring, sensing, or other health-related project" or worked on what Plaintiffs subjectively deem to be "relevant projects." If Plaintiffs have a basis to believe those individuals performed such work, based on their own investigation and the information Apple has already provided as a courtesy, please let us know.

To be clear, and consistent with its obligations under Rule 26 and the ESI Agreement, Apple will agree to produce documents from custodians who are likely to have relevant, non-duplicative information that is proportional to the needs of the case. Based on its own reasonable investigation, Apple maintains that Johannes Bruinsma, Ottavia Golfetto, Haritha Haridas, and Inje Lee do not fit that description. The inclusion of Inje Lee is particularly illustrative of how overreaching Plaintiffs' requests are. Mr. Lee's only known experience with Masimo was an internship a decade ago, before he began pursuing his Bachelor's degree. If Plaintiffs have a basis for believing that a pre-college intern was entrusted with Masimo's trade secrets, held on to them throughout college, graduate school, and numerous post-graduate jobs, and then disclosed them to Apple when he joined in November 2018, please explain the basis for that belief.

**Search Terms**

Pursuant to your request, a Word file with Apple's search terms is attached to our cover email sending this letter.

Thank you for confirming that you are working on a hit count report. Based on prior correspondence, our understanding was that you had yet to acquire the technological infrastructure needed to do so. If that impediment no longer exists, let's put a date on the calendar to mutually exchange hit reports for each of the initial twelve custodians on each side.[1] Apple proposes Monday, April 19, 2021 by 5 p.m. PDT. Please let us know if this works for you.

**Data for Former Employees of Apple and Masimo**

Thank you for confirming that Plaintiffs have retained files and emails for Apple's proposed custodians.

[1] Apple will also provide a hit report for Ueyn Block and Tao Shui but may not be able to do so by Monday due to the time required to collect and process their data. That process is underway and we will revert with a date by which we anticipate being able to provide hit reports for these additional two custodians.

As you know, Apple has already communicated that, in accordance with its document retention policy, Apple no longer has access to Mr. Lamego or Mr. Nazarro's emails and files (or email folders). Nonetheless, Apple is continuing its internal assessment to determine whether any of the files can be recovered.

At this point, Apple is baffled by Plaintiffs' continued interest in Apple's data systems. Despite Apple's request that Plaintiffs provide legal authority supporting its position, Plaintiffs have cited no precedent for the suggestion that adverse parties in litigation must share the "technical specifics" of their data retention systems so that the opposing party can weigh in on whether it thinks data removed in accordance with a data retention policy can somehow be recovered. Moreover, as Plaintiffs repeatedly have repeatedly emphasized, Apple is a large, sophisticated technology company. Apple has not asked for Plaintiffs' advice or input on the recoverability of data, and it is unclear what unique technical expertise Plaintiffs have to offer here. Apple knows, and is following, its obligations under the law. Apple never suggested that Plaintiffs must "first convince Apple that it had a legal obligation to preserve data." Rather, Apple was merely inquiring as to the reason for the otherwise irrelevant requests for broad technical inside information about how Apple stores, retains, archives, and otherwise handles former employee data. If Plaintiffs wish to continue this line of inquiry, Apple reiterates the request laid out in its April 1 letter that Plaintiffs provide a specific list of questions, a detailed explanation for why the answer to each question is relevant to the assessment of Apple's legal obligations, and supporting legal authority.

Apple reserves all rights and waives none.

Sincerely,

Brian Andrea