Joseph R. Re (Bar No. 134479)
joseph.re@knobbe.com
Stephen C. Jensen (Bar No. 149894)
steve.jensen@knobbe.com
Benjamin A. Katzenellenbogen (Bar No. 208527)
ben.katzenellenbogen@knobbe.com
Perry D. Oldham (Bar No. 216016)
perry.oldham@knobbe.com
Stephen W. Larson (Bar No. 240844)
stephen.larson@knobbe.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, Fourteenth Floor
Irvine, CA 92614
Telephone: (949) 760-0404; Facsimile: (949) 760-9502

Adam B. Powell (Bar. No. 272725)
adam.powell@knobbe.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
3579 Valley Centre Drive
San Diego, CA 92130
Telephone: (858) 707-4000; Facsimile: (858) 707-4001

Attorneys for Plaintiffs,
MASIMO CORPORATION and CERCACOR LABORATORIES, INC.

# IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| MASIMO CORPORATION, a Delaware corporation; and CERCACOR LABORATORIES, INC., a Delaware corporation<br><br>Plaintiffs,<br><br>v.<br><br>APPLE INC., a California corporation<br><br>Defendant. | ) Case No. 8:20-cv-00048-JVS-JDE<br>)<br>) Hon. James V. Selna<br>) Magistrate Judge John D. Early<br>)<br>)<br>) **DECLARATION OF ADAM B.**<br>) **POWELL IN SUPPORT OF**<br>) **PLAINTIFFS' OPPOSITION TO**<br>) **APPLE INC.'S NOTICE AND *EX***<br>) ***PARTE* APPLICATION (DKT. 371)**<br>)<br>)<br>)<br>) |

I, Adam B. Powell, hereby declare as follows:

1.    I am a partner in the law firm of Knobbe, Martens, Olson & Bear, LLP, counsel for Plaintiffs Masimo Corporation ("Masimo") and Cercacor Laboratories, Inc. ("Cercacor") (collectively, "Plaintiffs") in this action.  I have personal knowledge of the matters set forth in this declaration and, if called upon as a witness, would testify competently thereto.

2.    I submit this Declaration in support of Plaintiffs' Opposition to Defendant Apple Inc.'s Notice and *Ex Parte* Application For An Order Directing Depositions To Proceed Remotely (Dkt. 371).

3.    Attached hereto as **Exhibit 1** is a true and correct copy of a printout from https://www.gov.ca.gov/2021/03/25/state-expands-vaccine-eligibility-to-50-californians-starting-april-1-and-all-individuals-16-on-april-15-based-on-expected-supply-increases/.

4.    Attached hereto as **Exhibit 2** is a true and correct copy of a printout from https://covid19.sccgov.org/dashboard-vaccinations.

5.    Attached hereto as **Exhibit 3** is a true and correct copy of a printout from https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated.html.

6.    Attached hereto as **Exhibit 4** is a true and correct copy of a printout from https://abc7news.com/san-francisco-yellow-tier-california-sf-changes/10579414/.

7.    Attached hereto as **Exhibit 5** is a true and correct copy of a March 1, 2021, transcript in *Epic Games, Inc. v. Apple, Inc.*, case no. C-20-5640 YGR.

8.    Attached hereto as **Exhibit 6** is a true and correct copy of a printout from https://www.businessinsider.com/apple-pto-sick-pay-for-vaccines-report-2021-3.

9.    Attached hereto as **Exhibit 7** is a true and correct copy of a printout from https://www.reuters.com/technology/apple-help-employees-get-covid-19-vaccines-bloomberg-news-2021-04-23/.

10.    Attached hereto as **Exhibit 8** is a true and correct copy of a printout from https://www.cnbc.com/2021/03/01/apple-stores-in-us-open-for-first-time-since-last-march.html.

11.    Attached hereto as **Exhibit 9** is a true and correct copy of a printout from https://9to5mac.com/2021/03/18/tim-cook-routine-apple-work/.

12.    Attached hereto as **Exhibit 10** is a true and correct copy of the Civil Minutes For Hearing re Defendant's Motion for Discovery (Dkt. 199) in *Masimo Corporation, et al. v. True Wearables, Inc., et al.*, case number 8:18-cv-02001-JVS (JDEx), dated April 15, 2021.

13.    Attached hereto as **Exhibit 11** is a true and correct copy of a printout of a document that was downloaded from https://www.cacd.uscourts.gov/news/phased-reopening-court-0.

14.    Attached hereto as **Exhibit 12** is a true and correct copy of a printout from https://www.biaprotect.com/blog/legal-document-review-q-a/.

I declare under the penalty of perjury that the foregoing is true and correct. Executed on May 11, 2021, at Encinitas, California.

                          */s/ Adam B. Powell*
                          Adam B. Powell

34942536

-2-

# EXHIBIT 1

# State Expands Vaccine Eligibility to 50+ Californians Starting April 1 and All Individuals 16+ on April 15 Based on Expected Supply Increases

Published: Mar 25, 2021

*Even with increased vaccine supply, vaccination of willing Californians will take several months*

*State supporting trusted providers and counties for non-traditional outreach in hard-to-reach communities*

SACRAMENTO – With supply of vaccines expected to significantly increase in the coming weeks, the state is expanding vaccine eligibility to more Californians. Starting April 1, individuals aged 50+ will be eligible to make an appointment, and individuals 16+ will be eligible to make an appointment to be vaccinated starting on April 15.

"With vaccine supply increasing and by expanding eligibility to more Californians, the light at the end of the tunnel continues to get brighter," said Governor Newsom. "We remain focused on equity as we extend vaccine eligibility to those 50 and over starting April 1, and those 16 and older starting April 15. This is possible thanks to the leadership of the Biden-Harris Administration and the countless public health officials across the state who have stepped up to get shots into arms."

Based on the current estimates, California expects to be allocated approximately 2.5 million first and second doses per week in the first half of April, and more than 3 million doses in the second half of April. California currently receives about 1.8 million doses per week. These estimates may be adjusted as time goes on. The state has the capacity to administer more than 3 million vaccines per week, and is building the capacity to administer 4 million vaccines weekly by the end of April.

"We are even closer to putting this pandemic behind us with today's announcement and with vaccine supplies expected to increase dramatically in the months ahead," said California Health and Human Services Secretary Dr. Mark Ghaly. "However, we are not there yet. It will take time to vaccinate all eligible Californians. During this time, we must not let our guard down. It is important that we remain vigilant, continue to wear masks and follow public health guidance."

In addition to increased allocations of vaccines to providers serving the hardest hit communities, the state has embarked on a series of initiatives to vaccinate those populations that have faced the highest rates of COVID infections before vaccines become available to the entire 16+ population. These efforts include:

- Provider funding for programs to reach and vaccinate communities facing the biggest health disparities
- Working with organized labor to reach essential workers
- Partnering with agricultural organizations and community-based organizations to vaccinate agricultural workers
- Allowing providers to target by ZIP code via My Turn with single-use codes (scheduled to launch at the end of March)
- Supporting a subset of community-based organizations currently partnering with the state on COVID-19 education to provide direct vaccination appointment assistance
- Prioritizing currently eligible populations and allowing providers the discretion to vaccinate those who live in high-impact areas (County Healthy Places Index Quartiles 1 and 2), including families

Even with expanded vaccine supplies, it is expected to take several months for willing Californians to be vaccinated. Based on public information shared by vaccine manufacturers and the federal government, California expects to receive several million vaccine doses per week starting sometime in April.

Along with the expanded eligibility and to align with upcoming federal guidance, California will update its vaccine allocation methodology. This will transition over four weeks, beginning with the March 22 allocation (delivered to providers the following week), from one based on the distribution of the 65+ population, workers in the agriculture and food, education and child care, and emergency services sectors to one based on the distribution of the 16+ population across California. This will be done in conjunction with completion of the shift to the state directly allocating vaccines to providers. The state will continue to double the amount of vaccine allocated to the lowest Healthy Places Index (HPI) quartile as announced on March 4.

Forty percent of COVID-19 cases and deaths have occurred in the lowest quartile of the HPI, developed by the Public Health Alliance of Southern California, which provides overall scores and data that predict life expectancy and compares community conditions that shape health across the state. The rate of infections for households making less than $40,000 per year (5.7) is 84 percent higher than that of households with an income of $120,000 or more (3.1). At the same time, California's wealthiest populations have received 50 percent more vaccinations when compared to the rate of our most vulnerable populations. This approach recognizes that the pandemic did not affect California communities equally and that the state is committed to doing better.

###

**Exhibit 1**
**-3-**

# EXHIBIT 2



County of Santa Clara

**Emergency Operations Center**

I am looking for...

Menu                                                                    ⌄



Novel Coronavirus **(COVID-19)**

slow the spread • frene la propagación • 减缓傳播
hãy làm chậm sự lây nhiễm bệnh • ipabagal ang pagkalat

**RISK REDUCTION ORDER**

🏠 **Home**   ▸   COVID 19 Vaccinations Among County Residents Dashboard

# COVID-19 Vaccinations Among County Residents Dashboard

This dashboard provides information about vaccine administration to Santa Clara County residents who are currently eligible to receive a COVID-19 vaccination. This includes residents who have been vaccinated by providers within Santa Clara County and residents who have been vaccinated outside of the county. This does not include people who were vaccinated by providers in Santa Clara County but are not residents of Santa Clara County, for information about vaccinations done by providers in Santa Clara County please see the Vaccine Inventory Dashboard. These dashboards are based on different data sets.

For more information about COVID-19 vaccinations in Santa Clara County please visit www.sccfreevax.org.

> Due to issues with the California Immunization Registry data system, the number of vaccines administered is currently underreported.

5/11/2021 COVID-19 Vaccinations Among County Residents | Dashboard | Emergency Operations Center | County of Santa Clara

Case 8:20-cv-00048-JVS-JDE Document 379-1 Filed 05/11/21 Page 8 of 97 Page ID #:33860



The dashboard shares information about people who live in Santa Clara County who are currently eligible for vaccination and have received at least one dose of COVID-19 vaccine. People who work, but do not live in the county are not included in the dashboard data.

| Residents Ages 16 and Older with at least One Dose | Percent of Residents Ages 16 and Older with at least One Dose | Residents Ages 16 and Older with Completed Vaccination | Percent of Residents Ages 16 and Older with Completed Vaccination |
|---|---|---|---|
| 1,179,578 | 73.3% | 836,614 | 52.0% |

Displaying:   Cumulative Doses   **Vaccinations by Day**   Demographics: All Residents Ages 16+   Demographics: Select Age Group



This dashboard is updated daily.

Source: California Department of Public Health, California Immunization Registry; State of California, Department of Finance, State and County Population Projections by Race/Ethnicity and Age, 2010-2060.

**Data Notes:**

Residents who are vaccinated for whom we do not have information on their age or gender are counted in the overall count of residents who received at least one dose and residents with completed vaccination, but they are not included in the breakdown of vaccinated residents by age or gender.

Doses administered are categorized as single dose vaccine if the vaccine administered was a vaccine the requires only one dose (Johnson & Johnson). Doses administered are categorized as a first dose or second dose if the vaccine administered was part of a series requiring two doses (Moderna or Pfizer).

Number of people with at least one dose is the number of county residents who either received a vaccine requiring a single dose or received the first dose of a vaccine requiring multiple doses. Number of people with completed vaccination is the number of county residents who either received a vaccine requiring a single dose or received the final dose of a vaccine requiring multiple doses. The cumulative count of COVID-19 vaccine doses by day are the cumulative total number of vaccinations administered to county residents on that day. Daily count of COVID-19 vaccine doses administered are reported by the date of vaccine administration. The 7-

day rolling average of COVID-19 vaccine doses administered is the average number of daily doses administered each day in the past seven days.

The number of people vaccinated by demographic group is based on demographic information provided at the time vaccination. The number of people not yet vaccinated by demographic group is based on is based in part on estimates from a population-based survey sample, which is subject to error. As a result, the number of people not yet vaccinated in each demographic group may be over- or under-estimated. Total population counts for "other" or "unknown" race/ethnicity categories are not available for comparison and therefore the number of not vaccinated residents in these categories is not available.

Although providers are required to report data into the State's CAIR2 system within 24 hours of vaccine administration, there may be additional delays in reporting from some providers; therefore, data for the most recent period is preliminary. The data in this dashboard will also change as data reporting issues are resolved in systems that report into CAIR2 and new providers are onboarded.

Click here to return to main COVID-19 Data and Reports page

▸ Report a problem on this page

FOLLOW PHD
──────────────────────────────
 Facebook

 Twitter

 YouTube

 Instagram

 LinkedIn

LANGUAGES
──────────────────────────────
中文

Español

Tiếng Việt

Tagalog

CONTACT
──────────────────────────────
United Way 2-1-1: Call 24 hours a day, 7 days a week, available in 150 languages

MORE INFORMATION
──────────────────────────────
California Department of Public Health (CDPH)

Center for Disease Control and Prevention (CDC)

Subscribe to our newsletter in English, Chinese, Spanish, or Vietnamese

## ABOUT SCCGOV

Agencies & Departments

Contact Us

County Holidays

Newsroom

Parking and Transit Information

## TERMS OF USE

Accessibility

Links Policy

Privacy Policy

Terms of Use

## MOBILE GALLERY

SCCDineOut

SCCVector

SCCVote

Property Tax Payment

Weed Hazard

View All

## SCC SOCIAL MEDIA

Facebook

Twitter

©2021 County of Santa Clara. All rights reserved.

Exhibit 2
-7-

# EXHIBIT 3





## COVID-19

# When You've Been Fully Vaccinated

How to Protect Yourself and Others

Updated Apr. 27, 2021          Print

### Choosing Safer Activities

- If you are fully vaccinated, you can start doing many things that you had stopped doing because of the pandemic.
- When choosing safer activities, consider how COVID-19 is spreading in your community, the number of people participating in the activity, and the location of the activity.
- Outdoor visits and activities are safer than indoor activities, and fully vaccinated people can participate in some indoor events safely, without much risk.
- If you haven't been vaccinated yet, find a vaccine.



Safer Activities

COVID-19 vaccines are effective at protecting you from getting sick. Based on what we know about COVID-19 vaccines, people who have been fully vaccinated can start to do some things that they had stopped doing because of the pandemic.

In **indoor public spaces**, the vaccination status of other people or whether they are at increased risk for severe COVID-19 is likely unknown. Therefore, fully vaccinated people should continue to wear a mask that fits snugly against the sides of your face and doesn't have gaps, cover coughs and sneezes, wash hands often, and follow any applicable workplace or school guidance.

These recommendations can help you make decisions about daily activities after you are fully vaccinated. They are *not* intended for healthcare settings.

# Have You Been Fully Vaccinated?

In general, people are considered fully vaccinated: [±]

- 2 weeks after their second dose in a 2-dose series, such as the Pfizer or Moderna vaccines, or
- 2 weeks after a single-dose vaccine, such as Johnson & Johnson's Janssen vaccine

If you don't meet these requirements, you are NOT fully vaccinated. Keep taking all precautions until you are fully vaccinated.

If you have a condition or are taking medications that weaken your immune system, you may NOT be fully protected even if you are fully vaccinated. Talk to your healthcare provider. Even after vaccination, you may need to continue taking all precautions.

# What You Can Start to Do

  

If you've been fully vaccinated:

- You can gather indoors with fully vaccinated people without wearing a mask or staying 6 feet apart.
- You can gather indoors with unvaccinated people of any age from one other household (for example, visiting with relatives who all live together) without masks or staying 6 feet apart, unless any of those people or anyone they live with has an increased risk for severe illness from COVID-19.
- You can gather or conduct activities outdoors **without** wearing a mask except in certain crowded settings and venues.
- If you travel in the United States, you do not need to get tested before or after travel or self-quarantine after travel.
- You need to pay close attention to the situation at your international destination before traveling outside the United States.
    - You do NOT need to get tested **before** leaving the United States unless your destination requires it.
    - You still need to show a negative test result or documentation of recovery from COVID-19 **before** boarding an international flight to the United States.
    - You should still get tested 3-5 days **after** international travel.
    - You do NOT need to self-quarantine **after** arriving in the United States.
- If you've been around someone who has COVID-19, you do not need to stay away from others or get tested unless you have symptoms.
    - However, if you live in a group setting (like a correctional or detention facility or group home) and are around someone who has COVID-19, you should still get tested, even if you don't have symptoms.

# What You Should Keep Doing

  

For now, if you've been fully vaccinated:

- You should still protect yourself and others in many situations by wearing a mask that fits snugly against the sides of your face and doesn't have gaps. Take this precaution whenever you are:
    - In indoor public settings
    - Gathering indoors with unvaccinated people (including children) from more than one other household
    - Visiting indoors with an unvaccinated person who is at increased risk of severe illness or death from COVID-19 or who lives with a person at increased risk
- You should still avoid indoor large gatherings.
- If you travel, you should still take steps to protect yourself and others. You will still be required to wear a mask on planes, buses, trains, and other forms of public transportation traveling into, within, or out of the United States, and in U.S. transportation hubs such as airports and stations. Fully vaccinated international travelers arriving in the United

Exhibit 3
-9-

U.S. transportation hubs such as airports and stations. Fully vaccinated international travelers arriving in the United
States are still required to get tested within 3 days of their flight (or show documentation of recovery from COVID-19 in
the past 3 months) and should still get tested 3-5 days after their trip.

- You should still watch out for symptoms of COVID-19, especially if you've been around someone who is sick. If you have
symptoms of COVID-19, you should get tested and stay home and away from others.

- You will still need to follow guidance at your workplace.

- People who have a condition or are taking medications that weaken the immune system, should talk to their healthcare
provider to discuss their activities. They may need to keep taking all precautions to prevent COVID-19.

# What We Know

- COVID-19 vaccines are effective at preventing COVID-19 disease, especially severe illness and death.
- Other prevention steps help stop the spread of COVID-19, and that these steps are still important, even as vaccines are
being distributed.

# What We're Still Learning

- How effective the vaccines are against variants of the virus that causes COVID-19. Early data show the vaccines may work
against some variants but could be less effective against others.
- How well the vaccines protect people with weakened immune systems, including people who take immunosuppressive
medications.
- How well COVID-19 vaccines keep people from spreading the disease.
  - Early data show that the vaccines may help keep people from spreading COVID-19, but we are learning more as
  more people get vaccinated.
- How long COVID-19 vaccines can protect people.

As we know more, CDC will continue to update our recommendations for both vaccinated and unvaccinated people. Until we
know more about those questions, everyone—even people who've had their vaccines—should continue taking steps to
protect themselves and others when recommended.

Want to learn more about these recommendations? Read our expanded Interim Public Health Recommendations for Fully
Vaccinated People.

± This guidance applies to COVID-19 vaccines currently authorized for emergency use by the U.S. Food and Drug
Administration: Pfizer-BioNTech, Moderna, and Johnson and Johnson (J&J)/Janssen COVID-19 vaccines.  This guidance can also
be applied to COVID-19 vaccines that have been authorized for emergency use by the World Health Organization (e.g.
AstraZeneca/Oxford).

## Related Pages

› Interim Public Health Recommendations for Fully Vaccinated People

› Science Brief: Background Rationale and Evidence for Public Health Recommendations

› Infection Control after Vaccination for Healthcare Workers

Last Updated Apr. 27, 2021

# EXHIBIT 4

CA COVID-19 vaccine tracker: See your status here



☰ menu  abc **7NEWS**  ▶ WATCH VIDEOS

San Francisco   East Bay   South Bay   Peninsula   North Bay

☀ 62°
San Francisco, CA
EDIT

Log In
🔍

shutterstock   Download Now   ✕


f SHARE


🐦 TWEET


✉ EMAIL

REOPENING CALIFORNIA

# San Francisco is joining the yellow tier: Here's what can reopen

By Alix Martichoux, Lyanne Melendez and J.R. Stone
Tuesday, May 4, 2021 11:33PM



San Francisco is eligible to join the yellow tier this week, which is good news for bars, gyms and other businesses. Here's what can change and reopen in the yellow tier.

[EMBED <>]  [MORE VIDEOS ▶]

SAN FRANCISCO (KGO) -- Big news for San Francisco: the city and county is eligible to join the yellow tier this week, according to the California Department of Public Health.

"I didn't think the yellow tier was ever going to come!" says D. Miles Jr., the 'Godfather of Skate' in San Francisco. Miles says his Church of 8 Wheels roller rink will open Friday.

Good news after they tried to unsuccessfully open twice in the orange tier, and were shutdown by the city.

"Now it's my turn so I'm on top of the world today. It's fantastic. We're ready, we're prepared, and the funky good time will continue," says Miles.

And funky times will be continuing a week from Thursday at California Academy of Science's NightLife, a weekly nighttime event with a DJ that had become popular before the pandemic.

**VIDEO: Closed businesses optimistic as SF enters yellow tier**




TRAVEL GOT YOU
BACKED UP?
BUY NOW

**From the Web**


Here's what UC says about the chances of being plucked from...
LA Times


Why not switch to a 15-Year Mortgage if you owe less than...
Quicken Loans NMLS#3030


If You Can Qualify for Any Credit Card, These Are the Top 6
NerdWallet


Forget the 30yr mortgage if you owe less than $356K. (...
LowerMyBills
NMLS#167283; 3306


Tommy Chong: Throw Away Your CBD
Tommy Chong's CBD


Chrissy Metz Is So Skinny Now And Looks Like a Model...
Mortgage After Life

Sponsored Links by Taboola

## REOPENING CALIFORNIA


San Mateo, Mono counties join yellow tier: See all changes in CA


Stimulus checks, rent relief: Newsom unveils CA recovery plan


Legion of Honor reopens in San Francisco


'Cave syndrome' keeps some in social isolation as COVID improves

## MORE VIDEOS


(LKL) MASK MANDATES QUESTIONED AS COVID RISK REDUCED (3:30pmET)





Businesses that have been closed due to coronavirus restrictions are looking to rebound as San Francisco enters the yellow tier.

"We just thought it was the perfect time to bring back nightlife," says Lin Kung who is NightLife event program manager at California Academy of Sciences. Kung went on to say, "It is a big, well ventilated space and we are taking as many precautions as we can."

And while business travel isn't yet back, leisure travel is, says those at Hotel Zepplin near Union Square.

"We are seeing occupancies rise, seeing more interest and demand in people getting out," says Aaron Feeney who is the area director of sales and marketing for three San Francisco Hotels which include Hotel Zepplin, Hotel Zetta, and Hotel Zelos.

There is a hope though and a wonder if that trend will continue.

"The question now is what is the public's tier? What is their comfort zone? Are people really going to feel comfortable right now going into a movie theater, going to a sports event, going into a bar?" says ABC7 News Insider Phil Matier.

Come Friday, the Church of 8 Wheels roller rink will be at 50 percent capacity.

"What I'm gonna do is get back in the saddle, back in the roller skates and we're gonna roll, we're gonna have a funky good time," says D. Miles Jr.

Here's what can change for businesses in the yellow tier:

Recent Stories from ABC 7 News

US Mint wants you to choose women who will appear on new quarters

- Gyms can increase capacity from 25% to 50%. They can also reopen saunas, spas and steam rooms.
- Wineries, breweries and distilleries can boost indoor capacity to 50% or 200 people, whichever number is fewer.
- Bars that don't serve food can reopen indoors at 25% capacity. Group sizes will be limited to eight per table. In the orange tier, they were only allowed to reopen outdoors.
- Indoor restaurants are no longer required to limit parties to three households. Up to eight diners are allowed per table.
- Professional sports teams can have more fans at outdoor stadiums. In the yellow tier, 67% capacity is allowed. That's compared to 33% in the orange tier.
- Live performances like concerts and plays can also increase audience capacity to 67% outdoors. At indoor performance venues, capacity can expand to 50%.

**Health**







‹ ›

● ○ ○ ○

From CNN Newsource affiliates

## TOP STORIES


A's to work with MLB on possible relocation
Updated an hour ago


Newsom announces $12B plan to house CA's homeless
Updated an hour ago


San Mateo, Mono counties join yellow tier: See all changes in CA

San Luis Obispo officer killed while serving warrant identified
Updated 19 minutes ago

Video shows teens attack, rob older Asian man in San Leandro

Where is my Golden State stimulus check?

Judge dismisses NRA bankruptcy case in blow to gun group
Updated an hour ago

Filipino American nurses disproportionately impacted by COVID-19

Many Bay Area 12-15 year-olds eager for Pfizer's COVID vaccine

EXCLUSIVE: Document shows recall supporters' strategy to beat Newsom

SF mayor proposes street team for wellness checks

Security cut at half the major parking garages in SF

MORE TOP STORIES NEWS ▶

- Museums, zoos and aquariums no longer have a 50% capacity limit. They still need to follow COVID-19 safety precautions like mandatory face coverings.

- Family entertainment centers like arcades, ice skating, roller skating, and indoor playgrounds can boost capacity to 50%.

- Theme parks can increase capacity from 25% to 35%.

- Cardrooms' capacity can increase from 25% to 50%.

There are also a few changes for social gatherings. Outdoor gatherings can expand to 75 people, even if food and drink are consumed. Indoor gatherings, like weddings for example, are limited to 50% of the venue's capacity or 50 people.

San Francisco said it plans to implement the above changes starting Thursday. It's the first time indoor bars will be allowed to operate in the city since March of last year.

Earlier on in the pandemic, the city was often stricter with COVID-19 restrictions than the state allowed. Recently, however, San Francisco has been quicker to reopen as case rates plummet and vaccinations continue to climb.

**MAP: CA counties that can, can't reopen under new rules**

For some businesses, like hair salons or retail stores, being in the yellow tier doesn't change anything at all, except that it speaks to how low COVID-19 cases are in San Francisco.

Between April 18 and April 24, San Francisco's test positivity rate was at 0.6% and its average rate of new COVID-19 cases was 1.8 per 100,000 residents. Those low numbers qualify the county to join the state's least restrictive tier.

About 72% of San Franciscans over 16 have received at least one dose of the COVID-19 vaccine. About 49% are fully vaccinated.

Even more surprising than San Francisco going yellow this week is that Los Angeles County is doing the same. Once the epicenter of California's coronavirus crisis, Los Angeles now has a 0.5% positivity rate.



*For a better experience, click here to view the full map in a new window*
**RELATED STORIES & VIDEOS:**

- Map shows which counties can, can't reopen under reopening tiers

- Cheat sheet: What you can and can't do after being fully vaccinated

- COVID-19 vaccine: Everything to know about your 2nd Pfizer or Moderna shot

**Exhibit 4**
**-13-**

- CA COVID-19 Vaccine Tracker: See your status here

- These CA counties are way ahead in vaccinations

- How to register for a COVID-19 vaccine in every Bay Area county

- Map shows everywhere you can get a COVID-19 test in the Bay Area

- Interactive map shows what's closed and what's reopening in the San Francisco Bay Area

- Data tracker: Coronavirus cases, deaths, hospitalizations in every Bay Area county

- COVID-19 Diaries: Personal stories of Bay Area residents during pandemic

- Get the latest updates on California EDD, stimulus checks, unemployment benefits

- Coronavirus origin: Where did COVID-19 come from?

- What is a COVID-19 genetic, antigen and antibody test?

- What does COVID-19 do to your body and why does it spread so easily?

- Coronavirus Timeline: Tracking major moments of COVID-19 pandemic in San Francisco Bay Area

- Coronavirus Doctor's Note: Dr. Alok Patel gives his insight into COVID-19 pandemic



**Get ABC7 breaking news delivered to your inbox**

Sign up for our breaking newsletter

Email Address

By providing my email address, I agree to the Terms of Use and acknowledge that I have read the Privacy Policy.

Sign me up

**Report a correction or typo**

RELATED TOPICS:

health & fitness   san francisco   bar   gym   coronavirus california   business   coronavirus   covid 19 vaccine

coronavirus pandemic   covid 19 pandemic   reopening california   covid 19

Copyright © 2021 KGO-TV. All Rights Reserved.



Taboola Feed



Exhibit 4
-14-



**Here's what UC says about the chances of being plucked from massive waitlists**
LA Times | Sponsored



**California Launches New Policy For Cars Used Less Than 49 Miles/Day**
★ ★ ★ ★ ★
Comparisons.org | Sponsored

Learn More

**Health Insurance Is More Affordable Than It's Ever Been**
Covered CA | Sponsored

CLICK HERE



**Plan a safe return to work for your business**
SurveyMonkey | Sponsored

CLICK HERE



**Cash Rewards You Can Count on and Count Up.**
Wells Fargo | Sponsored

CLICK HERE



**Irvine Drivers Surprised By New Rule**
Instanthub | Sponsored

Learn More





NMLS #3030

**Why not switch to a 15-Year Mortgage if you owe less than $356K? (Evaluate options.)**
With rates at near-historic lows, homeowners can lower their monthly payment and save thousands overall. Use our easy tool to run the numbers and see what your new payment could look like without any obligations.

Quicken Loans NMLS#3030 | Sponsored    [ Learn More ]



**New Relief Bill Is Making Health Insurance More Affordable**

Covered CA | Sponsored    [ CLICK HERE ]



**People Born 1951-1991 (With No Life Insurance) Should Claim This Benefit In M...**

Comparisons.org | Sponsored    [ Learn More ]





**Exhibit 4**
**-16-**

# EXHIBIT 5

Pages 1 - 37

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**Before The Honorable YVONNE GONZALEZ ROGERS, Judge**

EPIC GAMES, INC., )
)
        Plaintiff, )    NO. C-20-5640 YGR
)
  vs. )    Monday, March 1, 2021
)
APPLE, INC., )    Oakland, California
)
)    FURTHER CASE MANAGEMENT
)        CONFERENCE
        Defendant. )
_____)

## <u>REPORTER'S TRANSCRIPT OF ZOOM PROCEEDINGS</u>

<u>**APPEARANCES:**</u>

For Plaintiff:          CRAVATH, SWAINE & MOORE, LLP
                        825 Eighth Avenue
                        New York, New York 10019
                   **BY:  KATHERINE B. FORREST, ESQUIRE**
                        **GARY A. BORNSTEIN, ESQUIRE**


For Defendant:          GIBSON, DUNN & CRUTCHER
                        2100 McKinney Avenue, Suite 1100
                        Dallas, Texas 75201
                   **BY:  VERONICA S. MOYE, ESQUIRE**

                        GIBSON, DUNN & CRUTCHER
                        333 South Grand Avenue
                        Los Angeles, California 90071
                   **BY:  RICHARD J. DOREN, ESQUIRE**


Reported By:            Diane E. Skillman, CSR 4909, RPR, FCRR
                        Official Court Reporter

         TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

1    <u>Monday, March 1, 2021</u>                    <u>9:30 a.m.</u>

2                    P R O C E E D I N G S

3                          o0o

4          **THE COURT:**  Good morning, everyone.  Let's go ahead

5    and call your case.

6          **THE CLERK:**  Calling Civil Action 20-5640 Epic Games,

7    Inc. versus Apple, Inc.

8        Counsel, please state your appearances.

9          **MS. FORREST:**  Good morning, Your Honor.  This is

10   Katherine Forrest for plaintiff Epic.

11         **MR. BORNSTEIN:**  Good morning.  Gary Bornstein also

12   for Epic Games.

13         **MS. MOYE:**  Good morning, Your Honor.  Veronica Moye

14   for Apple.

15         **MR. DOREN:**  Good morning, Your Honor.  Richard Doren

16   for Apple.

17         **THE COURT:**  Good morning.

18       All right.  Ms. Stone, you have something to read.

19         **THE CLERK:**  All right.

20       This Court is participating in a pilot program approved by

21   the Judicial Council to study the practice of live streaming

22   audio of civil proceedings.

23       Under the pilot guidelines, with the parties' consent, a

24   judge may allow audio of certain civil proceedings to be live

25   streamed to the Court's YouTube channel where it will be

---

**DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC**

Exhibit 5
-18-

1    accessible to the public.  The parties to this proceeding have

2    consented to audio of the proceeding being live streamed to

3    the Court's YouTube channel.

4        To help ensure the audio is clear, please speak into your

5    microphones, mute your microphone when not speaking, and limit

6    background noises.

7        Thank you.

8            **THE COURT:**  Thank you.

9        All right.  When I originally set this, I thought perhaps

10   I was going to have all of the cases against Apple on the

11   platform.  We were going to do some coordinating.  That's not

12   necessary given the changes that the Court made in terms of

13   scheduling, which is why I vacated the hearings -- the Case

14   Management hearings in the other two Apple cases.

15       So today we are going to focus on getting ready for the

16   bench trial.  As I indicated, I received your emails on Friday

17   evening or late afternoon.  Appreciate that.  Gave me lots to

18   think about over the weekend.  And I also have received some

19   additional information from our Court staff here.  So, let me

20   tell you where I'm coming out on this.

21       I understand that Apple wants and is committed to a fully

22   in-person trial to the fullest extent possible and they would

23   prefer a date later if that means that we can't have it in

24   May.  Epic Games wants to have it in May as their first and

25   foremost priority, but they would prefer not to do it in

1    person.

2        I had -- when I talked to you all informally before, I

3    told you that I might be able to give you a couple of days in

4    person, which would make it hybrid, which has its own pros and

5    cons, but it turns out that our Court staff thinks that by May

6    I should be able to give you a fully in-person trial.

7        And given some of the considerations, which we will go

8    through, what I would be willing to do is have longer days.  I

9    will move my criminal calendars so that I can give you five

10   days a week as opposed to four.

11       I understand that there are risks, so let's talk about

12   some of that.

13       The reality is, is that given the allegations that Epic

14   Games has brought against Apple, and the significance of this

15   case, as I reflected on the various issues, it fundamentally

16   occurred to me, or really what is driving this is, that these

17   allegations in this case is so significant it warrants the

18   best that the judiciary has to give.  And the best is in

19   person.  And that is because credibility matters.  You're

20   going to have experts who have diametrically opposed views of

21   what's going on.  We are going to have people from Apple

22   probably come in and say they've got to do what they have to

23   do and people from Epic who say absolutely not, you are

24   constraining competition.

25       When someone walks into the United States courthouse

1   through the courtroom doors and onto that stand, and they have

2   to stand and raise their right hand in a court of law, it

3   gives them pause.  It makes them twice -- think twice about

4   lying or stretching.  That's really different from sitting in

5   the comfort of your house or the comfort of your office, and

6   Cross-Examination is different in person.

7       A deposition shows us that it's possible; we do it all the

8   time.  But we all know, as trial attorneys and as judges, we

9   all know that a deposition does not take the place of a

10  courtroom.  So, the best that the judiciary has to offer is in

11  person.  And I think that I can give it to you, and so that's

12  what I am going to do.

13      That being said, I am not going to, and I will be quite

14  generous with requests for people to appear remotely if

15  necessary for health considerations.  I've been in touch with

16  Judge Albright down in Texas.  Actually, just this morning an

17  article came out about his jury trials down there.  And he's

18  going to confer with me later this week.  He is making at

19  least the lawyers take daily COVID tests to make sure that

20  they are coming in without that.  The parties are paying for

21  it, I believe, but I'm going to find out the specifics which

22  will help, I think, with the -- some of the concerns.

23      I do -- I do think that the health considerations are

24  important, but I also don't want it to be used as an excuse.

25  So if you tell me that someone cannot come for health

1    considerations, we better not find out that they have been on

2    vacation somewhere else, that they've -- you know, that they

3    are COVID deniers, I should say, in a way.  We just -- I'm

4    asking you, as lawyers, to make sure that you investigate the

5    people who are telling you that they cannot show up.

6        I've got a case supposed to go to trial this summer, a

7    jury trial.  And all of a sudden the -- one of the key people

8    in the trial is, you know, all over Facebook denying that

9    COVID-19 even exists, that is, that the problem is even there.

10       So, lots of people have different views.  What I won't

11   allow is for someone to want to avoid the in-person

12   cross-examination by claiming a health concern, and then we

13   find out that that health concern is not genuine.  If I find

14   that out, then, you know, I will consider striking the entire

15   testimony of that person.  I won't be lied to.

16       Does that make sense?  Do you all agree with that

17   approach?

18           **MS. FORREST:**  Certainly, Your Honor, in terms of the

19   way in which witnesses should be handled and always should be

20   truth-telling and forthcoming with the Court as to the

21   realities of the situation.

22       We very much appreciate the Court's maintaining the

23   May 3rd date.  We will abide by the Court's determination

24   here.  We know that the Court has carefully considered our

25   concerns that we previously raised, so we won't go through

**DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC**

Exhibit 5
-22-

1    them again here right now.  May 3rd is the most important

2    aspects of this for us.

3            **THE COURT:**  Ms. Forrest, I will say, Epic Games has

4    lots of law firms that are local that are representing them.

5    You've got local counsel, Winston & Strawn and Fenwick both

6    represent Epic Games.  They have local offices.  To the extent

7    that you feel like you've got support staff, I'm sure that

8    these other law firms can give you local support staff.

9        Cravath and Epic, you know, you have considerable

10   resources.  There are ways to do this in a way that maintains

11   the safety of individuals.  And the reason, you know -- I

12   understand that people may have to quarantine when they go

13   home, but even that can be dealt with in terms of extra

14   resources.

15       Plus, you are all asking for five weeks.  I told you

16   three.  So add your two weeks to my three, and you get your

17   five.  You know, I think that -- look, I have a lot of respect

18   for trial lawyers.  Because sometimes you have to pick up and

19   leave and sometimes you leave for months your families.

20       A four- to five-week trial is, in the big scheme of

21   things, you know, is not the longest trials we do.  I've done

22   four- to five-month trials.  So it's not as if it -- it kind

23   of just comes with the nature of the practice.  So, that's why

24   I left big firm law because I couldn't leave my kids with a

25   spouse who was always traveling.  I couldn't do it anymore.

1    So that's, you know, that's part of why you get paid the big

2    bucks, so to speak.

3           **MS. FORREST:**  Your Honor, I won't repeat because I

4    know that Your Honor has carefully considered our views.  But

5    please understand that it has nothing to do with really the

6    convenience of the counsel.  We understand, as trial lawyers,

7    and we try cases all over the country, that we are prepared to

8    do what's necessary.  These are unusual times with unusual

9    issues associated with them.  We are fully prepared to

10   resource ourselves appropriately and to try this case on

11   May 3rd in your courtroom.

12          **THE COURT:**  Okay.

13          **MS. MOYE:**  Your Honor, Veronica Moye for Apple.

14      I just want to reiterate our thanks for your careful

15   consideration of the issues and your decision on that.

16      Apple has had to do multiple jury trials during this

17   pandemic -- some in Texas -- and has come up with careful

18   protocols that we are confident will ensure everyone's safety.

19      I just wanted to be sure that you understood that we, of

20   course, are sensitive to safety and health concerns.  We, too,

21   have a team that's located all over the country with, you

22   know, members from DC, from Texas, from Los Angeles.  And so

23   we are just as concerned about health and safety as Epic is.

24   It's just that we are confident that we can have a safe and

25   healthy proceeding in part based on our experience during this

1    pandemic.

2            **THE COURT:**  I asked you to meet and confer on some of

3    those proposed protocols.  I am happy to order them.

4        And I would say the other thing is, you know, my intent is

5    to have very few people in the courtroom at any one time.  It

6    may be different people over different days.  But, you know,

7    we'll have the witness, the Court, I have to figure out what

8    Court staff I need to have in the courtroom because I expect

9    that most everything that we will be doing in terms of

10   documents, et cetera, will be electronic.  So -- and then, you

11   know, at most, two to three people on the side, and that's it.

12   That would be the extent of the people in the courtroom for

13   any given day of proceeding.

14       I think those numbers will help immeasurably to keep

15   everyone safe.  Like I said, I've -- Judge Albright has agreed

16   to chat with me later this week and share with me the

17   protocols he is using that he thinks is helpful.

18       Now, again, this is all tentative.  I am telling you what

19   our people are hopeful that we are going to be able to achieve

20   by May.  But we look at the numbers on a weekly basis.  Right

21   now we have authorized criminal jury trials to proceed.  So, I

22   wanted to give you that information so that you could start

23   planning.

24            **MS. FORREST:**  Your Honor, may I just ask a logistical

25   question in terms of how Your Honor has done this?

---

**DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC**

Exhibit 5
-25-

1        As you know from our emails on this topic where we laid

2    out the Epic concerns about in-person proceedings, one of the

3    issues is whether or not the witnesses will be testifying with

4    masks or without masks.

5        With your -- in your experience, Your Honor, how would

6    that be likely to work?

7            **THE COURT:**  Different judges have done it different

8    ways.  I haven't had -- I mean, I haven't felt compelled to

9    have an in-person hearing yet.  By the time I get to you, I

10   will have already had a criminal hybrid proceeding.  Right now

11   I am just doing pleas and sentencings in person, and we have

12   used masks for those.

13       But the courtrooms are outfitted with shields.  So there

14   are shields everywhere which, I think, helps.  And then I know

15   that people have tried to use the masks that are see-through

16   so that you can see expressions, which I think will be

17   helpful.

18       The witnesses will be far away from all of you when they

19   are testifying.  And by May, I should be fully vaccinated, so

20   I would be the person who is closest to that individual.  So,

21   you know, I think, again, this is reason to let you know now

22   is because we have two months to figure out what is best

23   practice.

24           **MS. MOYE:**  Your Honor, our experience has been that

25   it is safe and workable to do witness testimony without masks.

1    We have used plexiglass shields and, of course, now we are

2    having just a bench trial where there are fewer people in the

3    courtroom and there would be a lot of distance between the

4    parties.

5        So we think we can come up with a protocol that would

6    allow a safe proceeding where witnesses can speak clearly

7    without masks.  And we are happy to go over that protocol with

8    Epic's counsel, to meet and confer with them about it.

9        **MS. FORREST:**  Well, one thing I just -- I don't know

10   that we have to resolve that particular issue at this point.

11   I had wanted to just get the Court's guidance at this point,

12   if the Court had any.  It may be to be determined.

13       I think from our perspective, indoor, unmasked testimony

14   could provide -- present some very significant health

15   concerns, but I think the Court has now laid out the

16   plexiglass, clear masks.  I think that this is one of those

17   issues that we can put a pin in, so to speak, and revisit as

18   we get closer to the trial proceeding itself.  I think that we

19   now have the direction, Your Honor, thank you very much, for

20   where it will be, and we will then set up the appropriate

21   precautions to preserve as much health and safety around that.

22       **THE COURT:**  So my plan would be -- so the May 3rd

23   date is confirmed.  What we are still trying to work on is the

24   precise format.  If for some -- you know, worst case scenario

25   it's a full bench trial by Zoom, worst case scenario, but it

1   will happen March (sic) 3rd.

2           **MS. FORREST:**  May 3rd, Your Honor?

3           **THE COURT:**  May 3rd.  Did I say something else?

4           **MS. FORREST:**  I think you said March 3 the last time,

5   but we knew what you meant.

6           **THE COURT:**  I'm not starting in two days.  May 3rd.

7       Like I said, because I would like to plan for it being as

8   compact as possible, I will change my trial day.  So we will

9   go from 8:00 to 10:00, 20-minute break, 10:20 to 12:20 with a

10  40-minute break, and then 1:00 to 3:00.

11      That will give me a few extra hours in the afternoon if

12  there's something I have to absolutely do for some other case.

13  As all of you know, but maybe not members of the public,

14  federal judges, our hundreds of cases do not go away while we

15  are in trial.  That's a great thing about being a state court

16  judge, try a case and that's the only thing I had to do.

17  Nothing else.  So, not so as a federal court judge.

18      The findings of fact and conclusions of law that are due

19  in a month or so, April 7th, what I would like you to do is

20  the following:  I do this when I use jury instructions.

21      If what you will do is have just a one-page caption, the

22  title with your signature blocks that says attached hereto are

23  the proposed findings of facts and conclusions of law, and

24  then the attachments.  If you will do it just in a Word

25  document, no pleading pages or anything, and then make sure to

1    send it to us electronically.  That will just make it so much

2    faster for me to reconfigure it for my own purposes.

3       Okay?

4           **MR. DOREN:**  Your Honor, in terms of format for the

5    Word document, is something with -- like an outline form or

6    with paragraphs as opposed to a table as you might see with a

7    summary judgment motion?  I just want to make sure we do the

8    format that is useful.

9           **THE COURT:**  What I want, Mr. Doren, is I want

10   things -- every paragraph numbered, so that if we need to talk

11   about issues, I can just say, you know, number 75 of 120 or

12   whatever it is, and everybody knows where to go to.

13      If you look at Docket 18-5712, *California versus Bernhardt*

14   Docket number 177, that's a sample of something that

15   doesn't -- the paragraphs aren't numbered, but it will give

16   you a pretty good concept.

17          **MR. DOREN:**  Thank you.

18          **THE COURT:**  If you want to include some table in

19   advance that -- you know, that would help me navigate it,

20   that's always appreciated.

21      So, findings 1 through 52 relate to the Breach of

22   Contract; 53 to 3,000 relate to the Antitrust -- anyhow, if

23   there's some way to make it more accessible to me, that would

24   be helpful.

25      With respect to those proposed findings of fact, each fact

Exhibit 5
-29-

```
 1        shall include the witness and/or document that you believe

 2        proves the fact.  Again, that helps me navigate and understand

 3        where all of the testimony is coming from.

 4            With respect to the conclusions of law, those need to --

 5        you need to make sure you do those by claim for brevity.  Not

 6        that you all have done things that are brief, but to the

 7        extent that something rises or falls with something else, just

 8        say so and then cross-reference the ones that you've already

 9        done.

10            Within seven days of the bench trial being finished,

11        before your trial briefs are done, within seven days

12        thereafter, I'm going to ask you for a redline version of the

13        proposed findings of fact indicating what was actually proved

14        and the record references.  And then to the extent you're

15        making any changes on the conclusions of law that are

16        corollary to those findings of fact, then those would be

17        redlined as well.

18            I will let you know that I will start writing before I get

19        your final briefing.  I'm not -- and in fact -- well, we'll

20        see how it goes to a 3:00 o'clock day.  When I do bench

21        trials, I usually finish at 1:30, do what I have to do and

22        then I start writing.  Otherwise I can't get my orders out

23        quickly enough.  It is these kinds of things that help me

24        navigate and help me be able to start writing.

25            Let's see.  Under all circumstances we will be using Zoom
```

**Exhibit 5**
**-30-**

1    because we still have people who need to be participating

2    remotely, whether it's Court staff.  And I think it also helps

3    for purposes of document management.

4        I expect there will be at least, you know, one person who

5    can't testify because of health concerns, so I want to make

6    sure that we have all of the technology in place.

7        So, again, I think if you all can meet and confer and try

8    to figure out a third-party vendor that can help you with all

9    of the documents, that would be helpful for everybody, and

10   especially for things like impeachment.  And that way, we are

11   not -- we're not exchanging documents in the courtroom that

12   everybody is touching, et cetera.

13           **MS. FORREST:**  Your Honor, we began to meet and confer

14   on that in the latter part of last week and have made some

15   progress on that issue.

16           **THE COURT:**  Great.

17       So I went through my standing order on bench trials.  And

18   there are a number of things that I don't think you need to

19   do, so I'm going to relieve you of the obligations of my

20   standing order.  That is the other point that I need to be

21   clear on in case -- so that there is no confusion.

22       While Zoom has allowed us to provide access over and

23   beyond what we have ever done, we're doing this by video and

24   everybody can see the video who wants to see it.  Looks like

25   we've got, you know, 65 people watching in addition to 11

**DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC**

Exhibit 5
-31-

1    participating.  I cannot and, in fact, am not allowed to do

2    that by the Administrative Office of the Courts for purposes

3    of evidentiary hearings, including trials.

4        So everybody understands that public access will be audio

5    only.  All right?  And perhaps the U.S. Courts will change

6    their mind over time, but right now that's the only option

7    that's available.

8            MS. FORREST:  Your Honor, can I just ask just a

9    question on that:  Whether we will nonetheless be able to have

10   a corporate representative in the room during the trial

11   testimony?

12           THE COURT:  I'm going to give you an allocation.  I

13   think the number is three.  Use it however you want to.

14           MS. FORREST:  That would include lawyers and

15   representatives?

16           THE COURT:  Right.

17           MS. FORREST:  Thank you.

18           THE COURT:  I might be able to increase that to four,

19   but given the concerns that everybody has, the fewer number of

20   people in the courtroom the better.

21           MR. DOREN:  Just one observation, Your Honor.  As I

22   think about it, the parties may want to have a hot seat

23   operator in the courtroom who could be distant from the

24   lawyers but will facilitate the electronic use of documents.

25       So from out here, that may weigh in favor of four, but

Exhibit 5
-32-

1    obviously whatever the Court orders.

2            **THE COURT:**  Well, if you are both sharing and both

3    agreeing, I'll take the hit myself.

4            **MS. FORREST:**  I'm sure, Your Honor, we'll be able to

5    meet and confer on that issue as well and perhaps come up with

6    just one person who could fill that role for both of us.

7            **THE COURT:**  And that person doesn't need to be close.

8    They can be the furthest person away since it's all just

9    remote.

10       Okay.  Under my standing order with respect to trials,

11   Section 2 a. requires that you give me a brief description of

12   the claims and defenses, et cetera.  You are relieved.  I

13   don't need that.  I already have your 167 pages.  At some

14   point I'm going to give you a great quote on brevity, but

15   we're not there yet.

16       2 b. ii. requires plain and concise statement of disputed

17   factual issues.  I don't need that.

18       2 b. i. does provide for undisputed facts.  I would ask

19   you to meet and confer on undisputed facts.  There has to be

20   things that we do not have to argue about or take evidence on.

21   So that should be a separate filing.  You all can agree what

22   doesn't have to be proved here and is just stipulated.

23       2 c., disputed legal issues.  I don't need that.  What I

24   need is what I've already told you to do.

25       2 d., I don't want to know about any discovery issues.

**Exhibit 5**
**-33-**

```
 1    I'm assuming by the time we get there we have what we have.

 2         2 f., no Motions in Limine.

 3         2 g., it's not applicable.

 4         2 h., trial alternatives; not necessary to go through

 5    that.

 6         3 f., jury instructions does not apply.

 7         3 g., joint statement of the case does not apply.

 8         3 h., jury selection does not apply.

 9         3 i., proposed verdict forms does not apply.

10         And then in terms of exhibits, 6 i. does not apply.

11         My first inclination is always to have -- I need one set.

12         Well, what are we looking at in terms of the exhibits?

13    Does anybody have a ballpark of the numbers of documents?

14              MS. FORREST:  Actually, Your Honor, this raises one

15    point that we wanted to address.  I think we are still

16    assessing that very quickly because we've got a -- I think it

17    is the way we count back, it's a March 24th submission of the

18    trial exhibits to each other.

19         One thing that would help, and counsel, Ms. Moye, and I

20    this morning were having a meet and confer on just this, is

21    getting an earlier date lined up for the exchange of witness

22    lists, at least tentative witness lists that precedes the date

23    that we submit it to the Court so we can be certain to have

24    the right trial exhibits lined up and not have to have a whole

25    slew of things that are on the list just in case somebody gets
```

Exhibit 5
-34-

19

```
1    called that we're not expecting, that we've guessed wrong.
2        So we are trying to work that out, but we would very much
3    like to have something in advance of March 24th be a date when
4    we exchange tentative trial witness lists.
5            MS. MOYE:  Yes, Your Honor, we have discussed that
6    issue --
7            THE COURT:  Ms. Moye, your volume is pretty low.  So
8    you are going to need to sit closer to your computer.
9            MS. MOYE:  Okay.  Is this better, Your Honor?
10           THE COURT:  It is.  Thank you.
11           MS. MOYE:  Thank you.
12       Yes, we did discuss that issue this morning just before
13   the -- our meeting here today.  And we need to consider it
14   further with the client.
15       Of course, we want to do everything we can to narrow the
16   number of exhibits that are presented to the Court.  It's just
17   that we need to give that thought of whether we would be able
18   to exchange lists earlier further consideration.  So we will
19   continue to talk to Epic's counsel about that.
20           THE COURT:  Here's your problem.  Until I get those
21   lists, you don't know how much time you have.  So, if you want
22   to know if this is a two-week, three-week, or five-week trial,
23   you better try to get those things done so that I can look at
24   it and tell you what I'm going to give you.  You won't
25   necessarily get what you want.
```

Exhibit 5
-35-

```
 1        I mean, just remember, our rule of thumb generally is,

 2   that lawyers ask for twice the amount of time that judges want

 3   to give 'em.  So I know you are at four to five weeks, you

 4   know I'm at two to three weeks.  But I don't like to do things

 5   in a vacuum.  So I need to see those lists and I need to see

 6   what it is you think they are going to testify to and how much

 7   time you think you are going to need.

 8        So the sooner you can do it, the better for everyone.

 9             MS. FORREST:  Your Honor, I think that that --

10             MS. MOYE:  Thank you, Your Honor, yes.

11             MS. FORREST:  It might assist the parties just to

12   have Your Honor give us a date certain when we can give you

13   exactly that information.

14        There are not that many witnesses I think that we are all

15   choosing from frankly.  I don't know that this exercise is

16   particularly difficult.  We may need to have some leeway in

17   case one person swaps out or in, but we would certainly be

18   prepared to give you that information as soon as the Court

19   would like.

20        The 12th of March, as a for instance, as a date to shoot

21   at so we can get that very important direction that Your Honor

22   has indicated in terms of trial duration, so we can plan

23   presentations, written directs, what should go in with

24   written, what might not, you know, be amenable to a written

25   process, et cetera.
```

Exhibit 5
-36-

1        **MS. MOYE:**  Well, your Honor, we're not prepared to

2   agree to expedite the current schedule in that regard --

3        **THE COURT:**  I am going to expedite it.  So what's the

4   best you can do?

5        **MS. MOYE:**  I believe certainly not March 12th is

6   doable.  I think we would need at least another week after

7   that.  I would like the opportunity just to confer with the

8   client if that's possible.

9      Again, this is an issue that was raised for the first time

10  shortly before our conference here today.

11       **MR. DOREN:**  Your Honor, if I may?  Two thoughts.

12     First of all, as the defendant, of course, who we will

13  call will depend in part on who Epic calls, so perhaps the

14  staging of this.

15     And second of all, expert discovery is still ongoing.  The

16  rebuttal experts' reports will be issued on March 15, and then

17  expert depositions will take place over the next two weeks.

18  So, those also may factor into who will ultimately be called

19  at trial.

20     So, the timing towards later in the month, I think, would

21  facilitate this and then also a staging.

22       **MS. FORREST:**  Your Honor, one point on that.

23     And March 24th is the date for the exchange of the trial

24  exhibits.  So if this is to have the ability to assist us with

25  having a realistic and narrowed list, something in advance of

Exhibit 5
-37-

```
 1    March 24th, I think, would be certainly very helpful in that

 2    regard.  Otherwise, we end up putting things on the list that

 3    really would never have to go on the list and end up having

 4    discussions that nobody ever has to have.

 5        In terms of the experts, the experts have put in their

 6    affirmative reports.  We could wait until March 16th.  That's

 7    certainly, I think, still an advancement over the timing and

 8    people will, I'm sure, proceed with deliberate speed to read

 9    these reports as quickly as possible to see if it adjusts our

10    initial impressions.

11        But we know who the experts are.  That's for sure.  Those

12    lists don't change.

13            THE COURT:  I can't imagine at this point that -- are

14    you suggesting you are not going to put your experts on,

15    Mr. Doren?

16            MR. DOREN:  No, Your Honor.

17            THE COURT:  Well, you don't have time to replace

18    them, so --

19            MR. DOREN:  Your Honor, specifically, I mean, we just

20    learned -- I believe we just learned that there will be no new

21    experts on rebuttal.  So that's helpful information.  We did

22    not know that before just now.

23        And, again, Your Honor, for example, as to what documents

24    go on the exhibit list, we as defendants have to cover a

25    broader potential range of issues.  Epic knows what their case
```

1    is and knows what they want to put on the list.

2        Again, I'm just suggesting that a staging where Epic lets

3    us know who they are going to call, and then we can add from a

4    more educated perspective who we will be calling as defendants

5    to respond.

6        **THE COURT:**  All right.  Let's do this:  These are

7    tentative lists, right?  I'm going to give you the leeway to

8    adjust them later, but you better have a good reason why.

9        So, plaintiff, you exchange your list on March 12th.

10   Defense, exchange their list March 16th.  And then plaintiff,

11   you go ahead and respond by March 18th in case they bring

12   someone in that you didn't anticipate for your list.  So --

13       **MS. FORREST:**  Thank you, Your Honor.  That works very

14   well.

15       **MR. DOREN:**  Thank you, Your Honor.

16       **THE COURT:**  Okay.

17       I like to have a physical copy.  I'm still old school.  I

18   still like physical copies.  It allows me to go through the

19   totality of what you have very quickly, and I get tired of

20   doing things on screens.  So, I am going to need at least one

21   physical copy of the exhibits.

22       We'll need a thumb drive or something and then we'll load

23   everything electronically.  Everybody else in the court can

24   do -- can have it electronically.  At the end of it all,

25   whatever is admitted, just to be super clear, we will just

1    have you give us, again, a thumb drive with the culled out --

2    I mean, if it is easy enough for us to do it, that's fine.

3    But it may be easier for you to just send us a thumb drive.

4        Yes, Ms. Stone, I don't know if you want 50 binders.

5            THE CLERK:  We have to keep a paper copy that goes as

6    a set if it gets appealed.  We still keep a paper set.

7            THE COURT:  Okay.  Then maybe they can provide us the

8    paper set.  That way -- I don't know that you want -- well,

9    did you really want 50 binders?  That's why I'm saying, if

10   they provide it after-the-fact and everything else is

11   electronic.

12       You are not going to be giving it to them, to the

13   witnesses.

14           THE CLERK:  Right.  What the Court, as exhibits,

15   always keep a paper copy in case it is appealed it goes to the

16   Ninth Circuit.  I mean that's been the protocol in the Clerk's

17   office to have a paper copy.

18           THE COURT:  All right.

19           MS. FORREST:  Would it assist, Your Honor, if what we

20   did was give a paper copy of the received exhibits at the

21   conclusion of the bench trial?  That way you don't have 50

22   binders in case it turns out only 20 had been admitted?

23           THE COURT:  You know what would be helpful?

24       Let's have you -- so, every day -- well, to the extent

25   that you have -- let's have you, the day after the testimony

1    if I have admitted something, bring the paper copy in and hand

2    it to Ms. Stone.  Those are the admitted exhibits.

3        That way she's got a paper copy every day or the next day

4    and then she'll just hang on to those as they get admitted.

5            THE CLERK:  Okay.

6            MS. FORREST:  We can give it to her with tab numbers

7    that are three-hole punched to be inserted into the binder

8    directly.

9            THE COURT:  I don't know that she -- do you want them

10   in a binder or do you --

11           THE CLERK:  They can be loose.  I will figure it out.

12   If I need a binder, we have them.

13           THE COURT:  Okay.

14       I will require deposition transcripts.  The way that works

15   is, about a week before the trial starts, you will need to

16   make arrangements with Ms. Stone to bring those transcripts

17   in.  And, again, everything is changing.  So she'll let you

18   know the day.

19       The transcripts will need to be brought in with -- I

20   require that you provide a list or a chart of everything that

21   you are bringing.  And that chart has to have a place for your

22   person who is delivering to initial and Ms. Stone to initial

23   received.  That way I confirm that you believe you brought it

24   to us and your person has initialed that, and she has

25   explicitly agreed that we have it.

1          I require that because I had instances, and it happens in

2     trial, where someone says -- I haven't had it recently because

3     that's why I have this protocol -- but way back when, Your

4     Honor, we brought the transcript.  I say, no, you didn't.

5     Ms. Stone says I didn't have it, or my state court clerk, and

6     we can't find the deposition transcript.  So this is what I do

7     to make sure that I actually have what you say I have.  Okay?

8     So that, you will have to do as well.

9          Let me see if there is anything else.

10         Do you have any questions?

11              **MS. FORREST:**  One point that I just wanted to

12    clarify, not so much a question.

13         But when I made my comment earlier about everybody knows

14    their expert witnesses, that is certainly true.  We may have a

15    rebuttal expert that has been added because of the opening of

16    Apple's, but we will be able to take care of that with a list,

17    but I wanted the record to be clear on that.

18         And to report also that we have continued discussions on

19    the possibility of some written direct.  I don't know if Your

20    Honor is now thinking that we should not proceed further with

21    that in light of the live proceeding in your courtroom?

22              **THE COURT:**  No, I think that you should, but you also

23    have to get that to me early enough for me to read.  Because

24    having a Cross-Examination without having had the opportunity

25    to read the Direct Examination is kind of pointless -- not

Exhibit 5
-42-

```
 1    pointless, but just not as effective.

 2            MS. FORREST:  Your Honor, it could well be that it's

 3    some substantial portions of some expert Direct Examination,

 4    so they might be complex and lengthy.  What would your

 5    preference be in terms of timing for that if we do end up

 6    reaching such an agreement?

 7       As I said, we are still continuing that conversation, but

 8    it has been productive so far.

 9            THE COURT:  Couple of weeks.

10            MS. FORREST:  The middle of April, Your Honor?  I can

11    take a look at the calendar.

12            THE COURT:  Again, it depends on how much you're

13    sending.

14            MS. FORREST:  April 20th, Your Honor?

15            THE COURT:  That would be great.

16            MS. FORREST:  And we can tell Your Honor in advance

17    perhaps what we will be sending.  And if you decide to adjust

18    the date in any way, we can take Your Honor's direction at

19    that time.

20            THE COURT:  Okay.

21            MS. MOYE:  Your Honor, just to be clear, we have had

22    a number of discussions and the parties have agreed that for

23    fact witnesses, their entire testimony should be live, both

24    Direct and Cross-Examination.

25            THE COURT:  That's fine.  It's really the expert --
```

Exhibit 5
-43-

1          **MS. MOYE:**  Correct.

2          **THE COURT:**  -- testimony that is pretty complicated

3      and is, you know, it works -- I think it works well to have

4      it, the Direct, at least, portions of it done in writing.

5          **MS. MOYE:**  That's exactly what we were thinking.  We

6      are continuing to discuss how to make that most effective and

7      efficient for the Court.

8      So it may be that we end up posing some kind of hybrid

9      model where there is a little bit of Direct, the balance of it

10     being written and then live Cross.  But we are continuing

11     those conversations trying to make it the most workable as

12     possible.

13         **THE COURT:**  Okay.

14     The other thing that I do is, I do require you to give

15     each other -- it sounds like you are all cooperating so it

16     shouldn't be an issue.  It has been an issue in other trials,

17     which is why it's a standard order of mine.

18     I do require that you give each other 24 hours advance

19     notice of someone's testimony.  For Monday testimony, you are

20     required to do it by noon on Saturday.

21     People need to prepare for witnesses.  And I've had

22     instances, again early on, where a lawyer came in and said,

23     Your Honor, I told her, we were standing at the elevator, that

24     I was going to bring in this witness.  And I suggest you were

25     probably right, you probably did tell her, but she's in trial

DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC

Exhibit 5
-44-

```
1    and she probably didn't pay any attention.

2       So, I require it be in writing.  And I've had some

3    lawyers, when I used to say one day, well, 10:00 o'clock is

4    the day before.  That doesn't work for me either.  So now I

5    say 24 hours.

6           MS. MOYE:  Understood, Your Honor.  We believe it

7    should be at least 24 hours and would like to, you know, have

8    the opportunity to confer with Epic about the possibility of

9    it even being 48.  Just, again --

10          THE COURT:  I will order 48 if you all agree on 48,

11   but I am not going to order it.

12          MS. MOYE:  Understood.

13          MS. FORREST:  Your Honor, along those lines, I think

14   we understood that when we are planning the presentation at

15   trial, we should plan to have like expert followed by like

16   expert.  So, for instance, a primary economist would be

17   followed by somebody speaking on the same topic from the other

18   side so that I think I understood Your Honor as wanting those

19   sort of joined up and paired.

20       Is that correct?

21          THE COURT:  Yes.

22          MS. MOYE:  Your Honor, just for clarity on this, what

23   I understood is that you wanted experts to testify by subject

24   matter, by the same subject matters.

25          THE COURT:  All I'm saying is, however you present --
```

1    and Epic goes first.  So you have -- I don't know how you

2    divided up your experts and the topics upon which they are

3    going to opine.  But I expect that for every expert and on

4    every topic on which they are going to opine, the other side

5    is going to have a counter expert.  I want that testimony back

6    to back.

7         **MS. MOYE:**  Understood.  Understood, Your Honor.

8         In our situation, there are experts that cover multiple

9    topics.  And so this is, again, another issue I think we will

10   have to meet and confer with Epic about to try to come to some

11   agreement on how to stage the expert testimony that, again,

12   makes it effective for the Court.

13        I understand the goal.  It's just that one of Epic's

14   expert, for example, covers kind of the whole waterfront.  So

15   if he testifies to all of his opinions, then we'd have five

16   experts behind him testifying to all their opinions.  So it is

17   just something we need to confer further about and come up

18   with a proposal to submit to the Court.

19        **MS. FORREST:**  I think that we are certainly open to

20   conferring.  The issue is that we have one primary economist

21   and then another economist who will be very short.  And Apple

22   has multiple economists who cover the same material.

23        We would prefer to put our economist on.  It's no surprise

24   that we would like to start him and then finish him because a

25   lot of these pieces, particularly market definition, things

1    like that, they flow one to the other.  And he tells a story

2    then about competitive effects that are based upon how the

3    market is defined.

4        So putting the story together is holistic.  We can do this

5    in perhaps multiple ways, but we would like to put the expert

6    on, let's just say in the morning and have him end by the end

7    of the day or however long he takes, and then his

8    Cross-Examination to follow and however Your Honor would like

9    to structure it after that.

10            MS. MOYE:  And, you know, again, this is something

11   we'll talk further about, but what we would like the

12   opportunity for the Court to consider is, does it want to hear

13   our expert testimony on market definition, for example, and

14   then move to expert testimony on other issues?

15       So to the extent one expert covers multiple issues, they

16   may have to take the stand multiple times.  The question is

17   what would be most --

18            THE COURT:  The problem with that is, Ms. Moye, the

19   problem with that is if we are live and this expert doesn't

20   live in the Bay Area, and I looked at the expert reports this

21   morning, and it doesn't look like they -- it doesn't look like

22   many of them live in the Bay Area, I'm not going to have that

23   person sitting around and wait --

24            MS. MOYE:  Absolutely.

25            THE COURT:  -- multiple days to finish up their

1    testimony.

2        So if it makes it more complicated for me, so be it.  I'm

3    just telling you what would be most helpful for me in terms of

4    understanding the experts' opinions.

5        The other thing I will say is that, you know, remember,

6    experts, much of their testimony is hearsay.  That is -- at

7    least with respect to the factual basis.  So they don't get to

8    testify on the hearsay until the facts are in the record.

9    Don't forget that.  And I am a stickler about that issue.

10       If the facts aren't coming in or do not come in, then

11   entire opinions could be invalidated or perhaps opinions don't

12   come in.  So it is important to remember that while experts

13   can talk and their opinions can be based on hearsay, the

14   underlying factual material actually needs to be in the

15   record.

16           **MS. MOYE:**  Understood.

17           **THE COURT:**  Okay.

18       If you're going to want daily transcripts, which I suspect

19   you might, we are going to need to know that and the order

20   will have the contact information.  Because typically our

21   court reporters have to hire somebody to help them turn out

22   those dailies and especially if we are going until

23   3:00 o'clock every day.

24           **MR. DOREN:**  I am guessing it's fair to say we will

25   want dailies, Your Honor.

1          THE COURT:  I figured as much, Mr. Doren.

2          MS. FORREST:  Your Honor, one other point that will,

3    I think, hopefully narrow the case, at least a little bit is,

4    that we do plan on making a stipulation that I will continue

5    to work with Apple's counsel on related to the Breach of

6    Contract claim where we will essentially stipulate that claim

7    away in terms of -- from my client.  So we will work on how

8    that will -- how that will come into the Court and to the

9    extent to which it impacts the proof.

10          THE COURT:  I commend you for that.  As I was

11   thinking about this trial, it seemed to me that that, even

12   though your client might not want to stipulate, that the

13   Breach of Contract was actually pretty straightforward.

14          MS. MOYE:  Yes, Your Honor --

15          THE COURT:  Maybe the affirmative defenses is not,

16   but on a, you know -- I mean the terms aren't unambiguous.  It

17   seems to be straightforward.

18          MS. FORREST:  Correct, Your Honor.

19          MS. MOYE:  Yes, Your Honor.  Of course we appreciate

20   Epic's willingness to stipulate to the breach.  Our view is

21   that that stipulation is unlikely to have any impact on the

22   presentation of evidence in the case.  Because the facts

23   related to the breach are related to many of the other claims,

24   including the unclean hands issue.

25          So we don't expect that there will be much of an

```
 1    evidentiary impact from that stipulation, but we do appreciate
 2    the willingness to admit that they breached.
 3            THE COURT:  Except that then I don't have to write
 4    about it.
 5            MS. MOYE:  Correct.
 6            THE COURT:  So it impacts me.
 7            MS. MOYE:  Correct, Your Honor.
 8            THE COURT:  Okay.  Let's see.
 9        The tentative lists of witnesses, I do want you to file
10    those and you can identify them as tentative until the final
11    ones are due.
12        With the final one coming in 3/18, if they are substantive
13    enough, that is, if you are identifying -- well, if you will
14    do this, identify the scope of what you think they are going
15    to testify to, and what you anticipate in terms of time,
16    Apple, when you file your list on the 16th, if you will also
17    file a response to the plaintiff's in terms of how much time
18    you think your Cross is going to take with their witnesses.
19        And then on the 18th, Ms. Forrest, when you file your
20    response, if you will take Apple's list and give me the Cross.
21            MS. FORREST:  I can certainly --
22            THE COURT:  I will need one more filing on the Epic's
23    list from the 18th.
24        You can do that by the 22nd, Ms. Moye?
25            MS. MOYE:  Yes, Your Honor.
```

```
 1              THE COURT:  Okay.  Then you said your exhibit lists

 2    are due to each other on the 24th?

 3              MS. FORREST:  I think counting back, Your Honor, from

 4    the conference and the trial book, yes, that's the date that I

 5    have.

 6              MR. DOREN:  That's the date we have as well.

 7              THE COURT:  All right.

 8       I go into trial on the 29th.  So why don't we go ahead and

 9    if you're available on March 26th, we can have another trial

10    conference.  By then I'll have had an opportunity to look at

11    your lists and we will be approximately a month away, so I

12    will be able to confirm more details.

13              MS. FORREST:  Very well.  That works.

14              MR. DOREN:  Your Honor, for purposes of the witness

15    lists, one other question.

16       Will it be the Court's practice that if Epic were to call

17    an Apple witness in their case-in-chief, that that witness

18    would appear once for all purposes?

19              THE COURT:  You know, I think that that would be --

20    wouldn't that be your preference?

21              MR. DOREN:  Yes, Your Honor.

22              THE COURT:  Okay.  Look, you will find that I will

23    give you some flexibility if there's some reason -- if there's

24    some reason to do it differently.  But I would expect that it

25    will probably be easier for everyone if that person just
```

```
1    testifies one time.
2              MR. DOREN:  Thank you, Your Honor.
3              THE COURT:  Okay.
4         Friday, March 26th, 9:30 works?
5              MS. MOYE:  Yes, Your Honor.
6              MS. FORREST:  Yes.
7              THE COURT:  Okay.
8         There are some other miscellaneous things you may find in
9    the Order, but just read the Order.  It's not really something
10   that's objectionable in any way.  It's court protocol.
11             MR. BORNSTEIN:  Would Your Honor like to receive a
12   statement seven days in advance of the March 26th conference
13   per the usual --
14             THE COURT:  My view is that we will discuss trial
15   logistics, trial time.  If you want to submit an agenda a
16   couple of days in advance, that's fine.
17             MR. BORNSTEIN:  Very good.  Thank you.
18             THE COURT:  Okay.  Anything else you want to do
19   today?
20             MS. FORREST:  Nothing more from Epic, Your Honor.
21             MS. MOYE:  Nothing more from Apple, Your Honor.
22             THE COURT:  All right.
23        And I will ask that you meet and confer on those
24   protocols.  To the extent that you have ideas that you would
25   like me to order or to consider, please feel free to reach out
```

1    and let me know so that we can make some progress here over

2    the next month even though we are not going to have a formal

3    hearing.  Okay?

4            **MS. FORREST:**  Yes.

5            **MS. MOYE:**  Thank you, Your Honor.

6            **THE COURT:**  All right.  Everybody stay safe.  Thank

7    you very much.  We are adjourned.

8            **MR. DOREN:**  Thank you, Your Honor.

9            **MS. FORREST:**  Thank you.

10           **MR. BORNSTEIN:**  Thank you.

11

12           (Proceedings concluded at 10:27 a.m.)

13

14                    **CERTIFICATE OF REPORTER**

15           I, Diane E. Skillman, Official Reporter for the

16    United States Court, Northern District of California, hereby

17    certify that the foregoing is a correct transcript from the

18    record of proceedings in the above-entitled matter.

19

20           *Diane E. Skillman*

21           DIANE E. SKILLMAN, CSR 4909, RPR, FCRR

22                Monday, March 1, 2021

23

24

25

**DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC**

Exhibit 5
-53-

# **EXHIBIT 6**


OR
Web app and API security you'll actually use.
*fastly*    Learn more

## INSIDER

Log in    Subscribe

US MARKETS CLOSED
▲ DOW -1.36%    ▲ S&P 500 -0.87%    ▲ NASDAQ 100 -0.09%

HOME  >  TECH

# Apple is reportedly incentivizing employees to get the COVID vaccine by offering paid time off for appointments and sick pay if they feel side effects

**Avery Hartmans**  Mar 29, 2021, 1:20 PM



**Apple CEO Tim Cook.**  AP Photo/Richard Drew

- Apple will offer workers paid time off for vaccine appointments, according to Bloomberg.

- The company will also offer employees sick pay if they experience side effects from the shot.

- Apple previously said employees will start returning to the office in June.

- See more stories on Insider's business page.


Get started →
IBM

**VIDEOS YOU MAY LIKE**  by Taboola


Inside the largest fish market in the world, where a single tuna


We spoke to Melinda Gates in 2019 about marriage, gender


Why black opal is one of the most expensive gemstones


Jeff Lane's $10 million collection of rare and odd cars

**FROM THE WEB**  by Taboola


If You Can Qualify for Any Credit Card, These Are the Top 6
Sponsored by NerdWallet


Here's what UC says about the chances of being plucked from
Sponsored by LA Times


**39 Of The Most Beautiful Women In History**
Sponsored by Gadgetheory


**Why not switch to a 15-Year Mortgage if you owe less than**
Sponsored by Quicken Loans NMLS#3030

Apple is encouraging its employees to get the COVID-19 vaccine by offering time off, according to a report from Bloomberg's Mark Gurman.

Apple employees will reportedly receive paid time off for vaccine appointments, as well as sick pay if they experience side effects following the vaccine. The company does not have access to vaccines itself and will not be providing shots to its employees, Bloomberg reports.

A spokesperson for Apple did not immediately respond to Insider's request for comment.

**Read more:** *Inside Apple's ambitious next decade, where it could redefine consumer tech with a VR headset, foldable iPhone, and even an Apple Car*

NEWSLETTER

**Start your day with the biggest stories in tech. Sign up for 10 Things in Tech.**

| Email address | SIGN UP |

By clicking 'Sign up', you agree to receive marketing emails from Insider as well as other partner offers and accept our Terms of Service and Privacy Policy.

**SPONSORED FINANCIAL CONTENT**

**Kitchen a Little Too Kitschy? Find a Personal Loan To Update It**
NerdWallet

**Motley Fool Issues Rare "All In" Buy Alert**
The Motley Fool

**Schwab Market Perspective**
Charles Schwab

**Save on interest with our Low Intro APR on purchases**
Up Your Savings Game

**Earn Up To a $700 cash bonus with required activities. Member FDIC >**
Citi Limited-Time Offers

Dianomi

**POPULAR WITH SUBSCRIBERS**



**Amazon managers say they 'hire to fire' to meet internal turnover goal**

**POPULAR WITH SUBSCRIBERS**



**Shopify CEO email to managers: We are not a family**

**POPULAR WITH SUBSCRIBERS**

Many of Apple's employees have been working remotely since last March. Cook said during an interview on the "Outside Podcast" in December that about 15% of employees were reporting to Apple Park, Apple's Cupertino, California-based headquarters.

Cook previously told workers they should expect to start returning to the office in June 2021, though he cautioned that Apple would not

Exhibit 6
-55-

"return to the way we were."

"There are some things that actually work really well virtually," Cook said in an interview at The Atlantic Festival last September.

Apple is famous for its culture of secrecy, and The Wall Street Journal reported last spring that working from home was challenging for employees. Some workers said they were unable to access internal systems from outside the office because of Apple's strict security measures, while others were confused over what work they were allowed to do from home.



**Market outlook: 4 indicators lined up for bubble burst, Grantham says**

POPULAR WITH SUBSCRIBERS



**How to buy your first rental property: Brandon Turner advice, strategy**

POPULAR WITH SUBSCRIBERS



**Crypto trading tips, ether outlook from a 29-year-old billionaire**

The pandemic also affected a crucial aspect of Apple's business: hardware production. As Bloomberg reported late last year, Apple created workarounds, like remotely controlled robots and iPads equipped with augmented-reality software, to work with the employees at its factories in China.

**NOW WATCH: How Apple makes its keynote presentations so engaging**



More:   Apple   Office reopening   COVID-19 vaccine   Vaccine rollout ⌄

Taboola Feed ⓘ



If You Can Qualify for Any Credit Card, These Are the
Sponsored by NerdWallet



Here's what UC says about the chances of being
Sponsored by LA Times



Former Congressman and Flight Surgeon Has Serious
Sponsored by Stansberry Research

Exhibit 6
-56-



**6 Credit Cards You Should Not Ignore If You Have Excellent Credit**

Sponsored by NerdWallet



**California Guard members feared fighter jet would be ordered to frighten protesters**

PC: Ben Margot / Associated Press

Sponsored by LA Times



**We've tested several cloth face masks over the past 5 months — here are the 9 best ones**



**Ivanka Trump posts COVID-19 vaccination pics, gets angry comments**



**Melinda Gates bought $1.2 million home in Seattle weeks before divorce**



**Pornhub founder Feras Antoon's $20 million Montreal mansion went up in**

**Exhibit 6**
-57-

# EXHIBIT 7



World    Business    Markets    Breakingviews    Technology    Investigations    More ⌄

Sign In

Lifestyle ⌄
Graphics ⌄
Pictures ⌄
Video ⌄

April 23, 2021
1:36 PM PDT

**Technology**

# Apple to help workers get COVID-19 shots at its offices

2 minute read

**Reuters**

Read Next
Judge in U.S. case against Facebook delays trial preparation

Read Next
U.S. senator asks firms about sales of hard disk drives to Huawei



Apple logo is seen on the Apple store at The Marche Saint Germain in Paris, France July 15, 2020. REUTERS/Gonzalo Fuentes

Apple Inc **(AAPL.O)** said on Friday that it is starting a program to help employees get voluntary COVID-19 vaccinations at the iPhone maker's offices.

The company is working with drugstore chain Walgreens Boots Alliance Inc **(WBA.O)** as its vendor and will open a website for its workers to sign up for appointments, an Apple spokeswoman said.

Apple is one of the first large Silicon Valley companies to launch a program to help workers get vaccinated.

Deutsche Bank AG **(DBKGn.DE)** earlier this month became the first big bank in New York to say it would offer employees COVID-19 vaccinations at its offices.

Exhibit 7
-58-

Last month, Amazon.com Inc (**AMZN.O**) started onsite vaccinations for front-line employees, starting in Missouri, Nevada and Kansas.

Our Standards: **The Thomson Reuters Trust Principles.**

## Sponsored Content





**Where should you invest $1,000 right now?**

Sponsored by The Motley Fool



**7 Mistakes You'll Make When Hiring a Financial Advisor**

Sponsored by smartasset



**What Is The Biggest Mistake People Make With $1 Million?**

Sponsored by Fisher Investments



**Compare online savings accounts and earn more interest**

Sponsored by NerdWallet

## Technology



Technology · 9:35 AM PDT

# Tech giants join call for funding U.S. chip production

Some of the world's biggest chip buyers, including Apple Inc (AAPL.O), Microsoft Corp (MSFT.O) and Alphabet Inc's (GOOGL.O) Google, are joining top chip-makers such as Intel Corp (INTC.O) to create a new lobbying group to press for government chip manufacturing subsidies.



Technology

**Samsung sees pandemic-led appliances boom extending run to rest of year**

8:06 AM PDT

Technology

How much did Marvel heroes help lift Disney+? Answer due Thursday

3:33 AM PDT



Technology

**'Do you want Tesla to accept Doge?' Musk asks Twitter users**

Technology

YouTube to launch $100 mln creator fund for Shorts video feature

Exhibit 7
-59-

1:21 PM PDT                    9:51 AM PDT

## Sponsored Content

Dianomi



**Compare 2021 Robo Advisors- Too Many Robo Options?**

Sponsored by NerdWallet



**10 Lessons to Take From Millionaires Who Are Really Good With Money**

Sponsored by The Penny Hoarder



**$250,000 in Term Life Coverage Starting at $14/month**

Sponsored by AIG Direct



**Our wealth advisors ask, have you saved enough to enjoy retirement?**

Sponsored by Motley Fool Wealth Management

## Sponsored Content

Dianomi



**Earn a $1,500 cash bonus with Citigold® after required activities >**

Sponsored by Citigold® Offer



**7 Mistakes You'll Make When Hiring a Financial Advisor**

Sponsored by smartasset



**How Far Does $1 Million Go in Retirement?**

Sponsored by Fisher Investments



**The best bank for your bucks: compare online savings accounts.**

Sponsored by NerdWallet

## Sponsored Content

Dianomi



**Under-the-Radar Company Receives Rare "All In" Buy Signal**

Sponsored by The Motley Fool



**This Company Pays Californians up to $300 to Do Their Dishes at Night**

Sponsored by The Penny Hoarder



**The #1 TaaS Stock for 2021 (It's Not Tesla)**

Sponsored by Empire Financial Research



**0% Intro APR on balance transfers & purchases for 18 months**

Sponsored by Citi® Diamond Preferred® Card

Latest

Home

Browse

World
Business
Markets
Breakingviews
Technology
Investigations
Lifestyle

Media

Videos
Pictures
Graphics

About Reuters

About Reuters
Careers
Reuters News Agency
Brand Attribution Guidelines
Reuters Leadership
Reuters Fact Check
Reuters Diversity Report

Stay Informed

Download the App
Newsletters

Information you can trust

Reuters, the news and media division of Thomson Reuters, is the world's largest multimedia news provider, reaching billions of people worldwide every day. Reuters provides business, financial, national and international news to professionals via desktop terminals, the world's media organizations, industry events and directly to consumers.

Follow Us

Thomson Reuters Products

**Westlaw**
Build the strongest argument relying on authoritative content, attorney-editor expertise, and industry defining technology.

**Onesource**
The most comprehensive solution to manage all your complex and ever-expanding tax and compliance needs.

**Checkpoint**
The industry leader for online information for tax, accounting and finance professionals.

Refinitiv Products

**Eikon**
Information, analytics and exclusive news on financial markets - delivered in an intuitive desktop and mobile interface.

**Refinitiv Data Platform**
Access to real-time, reference, and non-real time data in the cloud to power your enterprise.

**World-Che**
Screen for h individual a globally to h hidden risks relationship networks.

Advertise With Us     Advertising Guidelines

Cookies     Terms of Use     Privacy     Corrections     Site Feedback
Do Not Sell My Personal Information

All quotes delayed a minimum of 15 minutes. See here for a complete list of exchanges and delays.

© 2021 Reuters. All rights reserved

Exhibit 7
-61-

# EXHIBIT 8

✓   "''5)))

CNBC | MARKETS | BUSINESS | INVESTING | TECH | POLITICS | CNBC TV | WATCHLIST | MAKE IT | PRO | INTL    SIGN IN

TECH

# All Apple stores in U.S. open for business for first time since start of the pandemic

PUBLISHED MON, MAR 1 2021-10:26 AM EST | UPDATED MON, MAR 1 2021-11:29 AM EST

**Kif Leswing**
@KIFLESWING

SHARE

**KEY POINTS**

- All 270 Apple stores in the United States are open for business as of Monday.
- It's the first time that all U.S. stores are open since Apple started closing stores in response to the Covid-19 pandemic last spring.
- The reopening of Apple's last closed U.S. locations in Texas on Monday marks a milestone as the United States begins to emerge from lockdowns.



A customer exits after picking up Apple's new 5G iPhone 12 that went on sale, as the coronavirus disease (COVID-19) outbreak continues, at an Apple Store in Brooklyn, New York, October 23, 2020.
*Brendan McDermid | Reuters*

All 270 Apple stores in the United States are open for business on Monday, a company spokesperson confirmed.

It's the first time that all U.S. stores are open since Apple started closing stores in response to the Covid-19 pandemic last spring. Apple reopened its last closed U.S. locations in Texas on Monday.

The United States is beginning to emerge from lockdowns as the number of new cases falls and vaccines are distributed.

Not all Apple stores in the U.S. are fully open for walk-in customers to go inside and browse, however. Customers should check Apple's website before heading to their store in case it is appointment-only or service is limited in other ways.

Last year, on March 13, Apple announced it was closing all its stores outside China as the coronavirus pandemic started to pick up around the world. At the time, the closings were only scheduled through March 27, although it soon became clear that the lockdowns would stretch for months.

Since that first announcement, Apple has reopened and reclosed locations around the world in response to Covid-19 conditions, often deciding to temporarily close a store ahead of official government restrictions.

In response to the pandemic, Apple experimented with new store services, including appointment-only service or shopping, and an "express pickup" option that gets customers in and out quickly. Apple also started to require masks in stores and implemented health and safety guidelines that included reduced occupancy.

 PRO   Jim Cramer's list of attractive stocks he likes right now   [SUBSCRIBE NOW]   ✕

months in the world. Apple stores in Germany were closed on Saturday. Two stores in Brazil are also closed. Two stores in Mexico reopen on Tuesday.

9to5Mac first reported that all U.S. Apple stores were open.

Apple has not had problems selling its products while its stores have been closed, especially through its online store, which has been open. However, Apple CEO Tim Cook said recently that its holiday quarter could have been even bigger if its physical stores had been open.

Although the pandemic appears to be slowing down in the U.S. and businesses are reopening, the country is still recording at least 67,300 new cases of Covid-19 and at least 2,010 deaths each day, according to a seven-day average calculated by CNBC using Johns Hopkins University data.

However, the pace of vaccines being administered throughout the country continues to increase, raising hope that business could return to normal later this year. According to the CDC, 49.8 million people have received at least one dose of a Covid-19 vaccine.



watch now

VIDEO 03:21

**Apple's iPhone 12 is more water resistant and battery life is great: Todd Haselton**

**MORE FROM CNBC**

Canceling dinner reservations could now have 'devastating' effects for a restaurant

Elizabeth Holmes' lavish lifestyle looms over Theranos fraud case

Copper is 'the new oil' and low inventories could push it to $20,000 per ton, analysts say

Jim Cramer dismisses Treasury Secretary Yellen's inflation assessment

Ford launching new off-road Timberline models starting with Explorer SUV

Boeing beefs up business to convert old 737 passenger planes into cargo jets

**FROM THE WEB**


Illinois Program Pays Homeowners Thousands After Install of USA Made Solar + Battery
Powerhome Solar


We Surveyed Thousands Of Experts About Walk-In Showers (Here's What We Found Out)
American Sofa Showers


Forget The 30yr Mortgage If You Owe Less Than $356K. (Do This To Cut Your Mortgage In Half)
LowerMyBills NMLS#167283; 3306

Learn More

by Taboola

## MORE IN TECHNOLOGY



**Amazon employee dies at Bessemer, Alabama, warehouse, site of unionization drive**

Annie Palmer



**Ethereum: What is it and how is it different from bitcoin?**

Ryan Browne







Document title: All Apple stores in U.S. open for first time since last March
Capture URL: https://www.cnbc.com/2021/03/01/apple-stores-in-us-open-for-first-time-since-last-march.html
Capture timestamp (UTC): Tue, 11 May 2021 20:44:56 GMT

**Exhibit 8**
**-63-**

# EXHIBIT 9

Tim Cook says he 'can't wait' for return to the office - 9to5Mac

9TO5Mac ⌄    ☰ ▶️ f ⋮ ☀️ 🔍

---

**MARCH 18**

# Tim Cook talks personal routine, Apple's return to in-person work, and more

José Adorno - Mar. 18th 2021 9:56 am PT



30 Comments  f 🐦 📌 in 🔴

The pandemic has affected the way all of us work and interact with family and friends, and Apple's CEO Tim Cook is no exception. In a new interview with *People*, Cook talks about working from home, and he

Exhibit 9 -64-



Cook spoke to *People* about the importance of in-person interaction:

> *My gut says that, for us, it's still very important to physically be in touch with one another because collaboration isn't always a planned activity. Innovation isn't always a planned activity. It's bumping into each other over the course of the day and advancing an idea that you just had. And you really need to be together to do that.*

Although Apple's CEO wants to go back into the office as soon as possible, he reflects on all the things the company achieved last year. It also launched a $100 million racial justice initiative and pledged to be carbon neutral by 2030.

> *You look back, and the shutdown occurred in mid-March. Post that, we had this enormous, prolific product period, [introducing] the first 5G iPhone. We introduced the M1 chip in the Mac. These are major, major accomplishments. We did all of that while reinventing the way we were working.*

In a "rapid-fire questions with Tim Cook" video, Apple's CEO shared a bit about his daily routine. For example, Cook says he wakes up at 4 a.m., the first app he opens is Apple News, and that he can't live without coffee and his iPhone.

His favorite emoji? The peace emoji ✌️.

Now we have to see if other employees are ready to go back to work at Apple Park, and when Apple will announce a hybrid model in the following months. I bet the Underdogs are ready to go back.

*FTC: We use income earning auto affiliate links. More.*

**Exhibit 9**
**-65-**



Cirkus: Scheduling and Collaboration on your mac.

You're reading 9to5Mac — experts who break news about Apple and its surrounding ecosystem, day after day. Be sure to check out our homepage for all the latest news, and follow 9to5Mac on Twitter, Facebook, and LinkedIn to stay in the loop. Don't know where to start? Check out our exclusive stories, reviews, how-tos, and subscribe to our YouTube channel

Check out 9to5Mac on YouTube for more Apple news:

Apple AirTags Unboxing, Setup & Review - Tile's Obitu…



# Guides



### Tim Cook

The CEO of Apple



## About the Author

### José Adorno

Brazilian tech Journalist. Author at 9to5Mac. Previously at Rede Globo, the main TV broadcaster in Latin America.

Got tips, feedback, or questions? jose@9to5mac.com



Microsoft 365

virtually with



Video: Purple iPhone 12 hands-on

Concept: Taking tvOS even further

Find My Diary: The

Comments for this thread are now closed.    ✕

30 Comments    **9to5Mac**    🔒 Disqus' Privacy Policy    ① Login ▾

♡ Recommend    🐦 Tweet    f Share    Sort by Best ▾

### Like this article?

Subscribe to 9to5Mac's Newsletter for the roundup of news FREE to your inbox daily

✉ Enter email address    Subscribe    Hide this message

**NickName** • 2 months ago

Picking Tim as his successor was one of the smartest things Steve Jobs ever did. Apple has

9T⏻5Mac

Now Apple is ditching Intel because they can design their own silicon way better than Intel can. Who would have predicted that back in 2011 when Tim took over?

16 ∧ | ∨ 5 • Share ›



**JumpingCat** ➔ NickName • 2 months ago

one of the worst things Steve did.

5 ∧ | ∨ 8 • Share ›



**Warren Buffduck** ➔ NickName • 2 months ago • edited

Product aversive accountant that became the best politician the 🌎's largest tech bureaucrazy ehhh sorry -cracy could have.

Missed chance for product innovation or excitement of any other kind, sadly.

Btw Who gains from a 2T$ stagnant market cap really ? Some (self-)upvoters here perhaps

4 ∧ | ∨ 6 • Share ›



**Kaibelf** ➔ Warren Buffduck • 2 months ago

Since Apple is one of the most widely held stocks (if not THE most widely held stock) in almost any decent fund, the ones who gained are pretty much any American with a 401(k) or Roth, so that's about half of the working population.

5 ∧ | ∨ • Share ›



**Warren Buffduck** ➔ Kaibelf • 2 months ago • edited

I have that stock and its by far - quite far less spectaculair than so many others.
Solid but that's it

2 ∧ | ∨ 3 • Share ›



**FOHEng** ➔ Warren Buffduck • 2 months ago

Better call up Warren Buffet and give him some stock advice.

2 ∧ | ∨ • Share ›



**Warren Buffduck** ➔ FOHEng • 2 months ago • edited

Not necessary
He sold much off and transferred it elsewhere - like I did.
Again: solid but relatively stagnant by lack of growth or disruptive innovation

1 ∧ | ∨ 3 • Share ›



**PestoB** ➔ Warren Buffduck • 2 months ago

It is under valued by about 10x. The current innovations they have are so unappreciated from a valuation standpoint that is ridiculous.

**Exhibit 9**
**-68-**

9T○5Mac



**Warren Buffduck** ➜ PestoB • 2 months ago • edited

Like AirTags, AirPower, HomePod... WHAHAHA really
Tim got himself saved by the Mx/Ax cpu group but that's basically it. They
guy can't invent or launch anything.

∧ | ∨ • Share ›



**Joshua Hayden** ➜ Warren Buffduck • 2 months ago

I love when people say something along the lines of Apple isn't innovative
anymore. What magical device have you dreamt up in your mind that Apple hasn't
produced?

1 ∧ | ∨ • Share ›



**Warren Buffduck** ➜ Joshua Hayden • 2 months ago • edited

Well, if you really love that, let me make your day:
Except from the usual ☐Car, ☐Glasses, AirPower, AirTags, iPhone battery
lasting a week, iDevices that won't crack into pieces at any 5 foot drop, a
HomeKit hub, a TV replacement with a working remote.
Some interesting new (not: recycled) designs for all designs sitting there
for 5+ years without being touched.
Gt rid of ALL bezels and MOST dongles across all product lines by better
engineering, more (sensible) ports and true standards (instead of lightning
vs. USB-C, 25 display ports, all sorts of incompatible MagSafe's/☐Watch
charging stds) True wireless charging (3+ feet distance)
Start Siri all over again or license Alexa but *get this problem solved
structurally* instead of looking away
Principle improvements on screens and cam (like 10x optical zoom)
instead of gradual, yearly obligated minima - that made us so far behind
the competition. And decent (and affordable) battery cases for all devices
for the time where they lament in real improvement. Split HomePod into a
more affordable mini and a better equipped hi-end with LARGE screens.
Formulate a proper Home Audio strategy instead of hiding out and
cancelling Events (by lack of inspiration or content)
+100s of things more when I really get started (without being
inspirationally impaired by those grey Apple Board pigeon's that made ☐
the most boring 🐖🐖 giant ever, 10k patents 🐖🐖 , hundreds of young
talented designers 🐖🐖, device development mostly 🐖🐖 or
denied/captivated by sr management, with so litttle new appliances/device
categories/idea's being lanched for a 2T$ market cap. They're really
underperforming versus their potential/momentum. Aside and probably as
a result of excess revenue)

∧ | ∨ • Share ›



**Joshua Hayden** ➜ Warren Buffduck • 2 months ago

Sorry. Your response was a gigantic waste of time. I don't see anything

Exhibit 9
-69-

9T○5Mac

just want to complain. Happy Friday!!!

∧ | ∨ • Share ›

 **Warren Buffduck** ➜ Joshua Hayden • 2 months ago • edited

Dude, adding 2 pixels to a cam sensor is an innovation at 🍎.
So this is not just a roadmap, but a landslide of innovation that will keep them busy for another 5 years (tips for 📱 and 🚗 rather 25)

A VR-ed thought-generator might help them (/you) generate some decent idea's autonomously (as a last resort to the Great Void by👨‍💼, his fake troll fanbase & emptyheads like yourself)

∧ | ∨ • Share ›

 **OCLife** • 2 months ago

For being a tech company, this is so dumb. Other big tech companies are allowing their employees to work from home, with this whole pandemic, it only exposed that we can work from anywhere and still be productive.

2 ∧ | ∨ • Share ›

 **lifeainteasy20** ➜ OCLife • 2 months ago

I've been working remote since last March. A full year now. It has clearly worked for us. My company is in discussions of asking us to come back. A lot of us have adapted to being fully remote, and do NOT want to go back. It should be optional, for those who want to be back.

1 ∧ | ∨ • Share ›

 **Warren Buffduck** ➜ OCLife • 2 months ago • edited

Yet this sociality smalltalk is supposed to distract our attention from the lack of events, keynotes, product launches, 🍎Car accomplishments, iPad/Mac integration, a HomeAudio/HomeKit strategy, product pipelines, unused patents, unused (design) talents ....

∧ | ∨ • Share ›

 **Reasonablecash** • 2 months ago

Re: returning to in-person service: yeah congrats on getting back to something grocery store employees never stopped doing. Big ups, Timmy. Slow golf clap.

5 ∧ | ∨ 4 • Share ›

 **Kaibelf** ➜ Reasonablecash • 2 months ago

What are you complaining about? That people are excited to get back to normal in-person lives or that cashiers and stockers haven't been replaced by robots?

5 ∧ | ∨ • Share ›

 **PestoB** ➜ Kaibelf • 2 months ago

**Exhibit 9**
**-70-**


9TO5Mac

Share ›


**Kaibelf** → PestoB • 2 months ago

What are you yammering on about? There is no $15 minimum wage and I
know I've certainly said nothing about one at all.

∧ | ∨ • Share ›


**FOHEng** → Reasonablecash • 2 months ago

Always whining.

The way I see it is Apple was far more cautious than other companies. They closed
stores early and opened late.

Seems they care more about their employees than other businesses do. Apple even
opened up their wallet to continue paying employees during the pandemic. Likely costing
them a billion or two in wages.

3 ∧ | ∨ 2 • Share ›


**Not Now** → Reasonablecash • 2 months ago • edited

I agree. CEO's will champion this opportunity bringing people back to the workplace. It
will most likely become a look at me, I have X% of people back To working in office
before anyone else.
As you pointed out, the grocery workers, those shopping for others and those big box
stores workers have been showing up all along; the are the true heroes.
Unrelated to replying to Reasonable;
I know not all workers were mentioned so fire away with your whatabout's

1 ∧ | ∨ • Share ›


**Warren Buffduck** • 2 months ago • edited

So much sociality smalltalk to distract from events, keynotes, product launches, ☐Car, iPad/Mac
integration, a HomeAudio/HomeKit strategy, product pipelines, unused patents, unused (design)
talents ....
Indeed - money always pouring in, but at what (intellectual) sacrifice ?

2 ∧ | ∨ 1 • Share ›


**Aeronaut** • 2 months ago • edited

I don't care how Grandpa Crook spends his day.

1 ∧ | ∨ 2 • Share ›


**FOHEng** → Aeronaut • 2 months ago

Yet you make sure to post in every single article about him.

It appears you DO care. A lot.

3 ∧ | ∨ 1 • Share ›

9T⊕5Mac

1 ∧ | ∨ 2 • Share ›

Powered by WordPress.com VIP

Exhibit 9
-72-

# EXHIBIT 10

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 8:18-cv-02001-JVS (JDEx) | Date | April 15, 2021 |
|---|---|---|---|
| Title | Masimo Corporation, et al., v. True Wearables, Inc., et al. | | |

| Present: The Honorable | John D. Early, United States Magistrate Judge |
|---|---|

| Nancy Boehme for Maria Barr | CS 04/15/21 |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |

| Attorneys Present for Plaintiff: | Attorneys Present for Defendants: |
|---|---|
| Irfan A. Lateef, Joseph R. Re | Amanda Washton, Scott P. Shaw (by telephone), Paige S. Stradley (by telephone) |

**Proceedings:**     Hearing re Defendant's Motion for Discovery (Dkt. 199)

Case called. Appearance made. The Court discusses the Motion with counsel and invites the counsel to further discuss the Motion in the hallway. After approximately 30 minutes of discussions, the parties reported that no resolution was reached. The Court directs counsel for Defendants to, by April 19, 2021, serve upon counsel for Plaintiffs any additional information it wishes to disclose regarding the issues discussed at the hearing. The parties are directed to meet and confer further on the issues in a good faith effort to eliminate as many disputes as possible by April 20, 2021. The parties are ORDERED to file a Joint Status Report by April 22, 2021, in which the parties advise whether the dispute or any issues have been resolved. If the dispute is not resolved, each side is also ORDERED to set forth in the Joint Report: (1) any additional information that that side wishes to provide regarding the issues in dispute; and (2) a specific proposed resolution of the dispute.

IT IS SO ORDERED.

|  | 00 | : | 40 |
|---|---|---|---|

Initials of Clerk:     nb for mba

**Exhibit 10**
**-73-**

**From:** noreply@courtdrive.com <noreply@courtdrive.com>
**Sent:** Thursday, April 15, 2021 2:00 PM
**To:** Lit MASIMOL.1085L <LitMASIMOL.1085L@knobbe.com>; Mark Blake <mark.blake@masimo.com>
**Subject:** Activity in Case 8:18-cv-02001-JVS-JDE Masimo Corporation et al v. True Wearables, Inc. et al Motion Hearing

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA

## Notice of Electronic Filing

The following transaction was entered on 4/15/2021 at 1:58 PM PDT and filed on 4/15/2021

**Case Name:**      Masimo Corporation et al v. True Wearables, Inc. et al
**Case Number:**      8:18-cv-02001-JVS-JDE
**Filer:**
**Document Number:** 239

**Docket Text:**
**MINUTES OF Hearing re Defendant's Motion for Discovery (Dkt. [199]) held before Magistrate Judge John D. Early. The parties are ORDERED to file a Joint Status Report by April 22, 2021, in which the parties advise whether the dispute or any issues have been resolved. If the dispute is not resolved, each side is also ORDERED to set forth in the Joint Report: (1) any additional information that that side wishes to provide regarding the issues in dispute; and (2) a specific proposed resolution of the dispute. (see document for further details) Court Recorder: CS 04/15/21. (hr)**

**8:18-cv-02001-JVS-JDE Notice has been electronically mailed to:**

Sherron L Wiggins     support@conklelaw.com, s.wiggins@conklelaw.com

Radhika K Raman     radhika.raman@knobbe.com

Adam Powell     litigation@knobbe.com, adam.powell@knobbe.com, 2abp@knobbe.com

Ryan J Fletcher     kdrieman@merchantgould.com, rfletcher@merchantgould.com, smaney@merchantgould.com

Brian Christopher Claassen     brian.claassen@knobbe.com, knobbeadmin@ecf.courtdrive.com

**Exhibit 10
-74-**

Amanda Rose Washton    a.washton@conklelaw.com, support@conklelaw.com, awashton@hotmail.com

Peter A Gergely    pgergely@merchantgould.com

Mark D Kachner    litigation@knobbe.com, mark.kachner@knobbe.com, doreen.buluran@kmob.com

Joseph R. Re    joe.re@knobbe.com, litigation@kmob.com, knobbeadmin@ecf.courtdrive.com, jre@kmob.com

James Eugene Youngblood    jamie.youngblood@knobbe.com

Paige S Stradley    pstradley@merchantgould.com

Irfan A Lateef    litigation@kmob.com, irfan.lateef@knobbe.com, ial@kmob.com

Stephen C Jensen    sjensen@kmob.com, steve.jensen@knobbe.com

Scott P Shaw    sshaw@calljensen.com, sshaw@merchantgould.com, smaney@merchantgould.com, kholst@merchantgould.com

Zach Kachmer    zkachmer@merchantgould.com

Perry D Oldham    2pdo@kmob.com, litigation@kmob.com, perry.oldham@knobbe.com

**8:18-cv-02001-JVS-JDE Notice has been delivered by First Class U. S. Mail or by other means <u>BY THE FILER</u> to :**
Andrew T Pouzeshi
Merchant and Gould PC
1801 California Street Suite 3300
Denver CO 80202

**Exhibit 10**
**-75-**

# EXHIBIT 11



## UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

## NOTICE *from the* CLERK

### Phased Reopening of the Court

The United States District Court for the Central District of California has adopted the Plan for Phased Resumption of Operations ("Reopening Plan"), which consists of three phases: Phase 1 (return of certain staff to the courthouses to prepare for limited in-court hearings); Phase 2 (reopening courthouses for limited in-court hearings); and Phase 3 (resumption of jury trials).  Per the gating criteria that was adopted by the Court, local COVID-19 exposure risks in the Central District of California are decreasing, such that the transition of all divisions to Phase 3 of the Court's Reopening Plan is appropriate at this time. Therefore, the Court announces the following regarding its operations.

Effective April 19, 2021:

**Access to the Courthouses**
- All Courthouses of the Central District of California remain open to persons with court business and subject to all posted restrictions.

**Court Hearings**
- In-court hearings will be permitted in all matters at the discretion of the assigned judge.
  - Hearings by video or telephonic conference may continue to be held in civil matters at the discretion of the assigned judge.
  - Hearings by video or telephonic conference may continue to be held in certain criminal matters as set forth in Order of the Chief Judge No. 20-043, unless the findings and authorizations in the Order are subsequently terminated.
- For information about how to view or listen to video and telephonic proceedings, please see the March 19, 2021 Notice from the Clerk.

**Jury Trials**
- Jury trials will be permitted in civil and criminal cases.
- Southern Division: Since jury summonses were issued starting on March 22, 2021, jury trials will commence in the Southern Division on May 10, 2021.

**All posted notices are also available on the Court's public website at www.cacd.uscourts.gov.**

- Eastern and Western Divisions: Jury summonses will be issued starting on April 19, 2021, and jury trials will commence on June 7, 2021.

**Mandatory Chambers Copies**
- Until further notice, all district judges and magistrate judges do not require mandatory chambers copies during the pandemic.
- Any judge can require chambers copies in a particular case if desired.

**COVID-19 Safety Protocols**
- All individuals seeking entry to, or occupying, the United States Courthouses or Probation and Pretrial Services Offices in the Central District of California must wear masks in all spaces, except under certain circumstances during in-court proceedings as noted below.
  - The mask must completely conceal the individual's nose and mouth at all times.
  - Court employees who are alone in a non-public, private office or workspace, which permits at least six feet of physical distance from others, may temporarily remove their masks.
  - Anyone violating this mask requirement will be denied entry by the United States Marshal, his Deputies, or the Court Security Officers.  Individuals who are denied entry will be asked to contact the office or courtroom to be visited to explore alternatives to entering the building.
- All individuals occupying the United States Courthouses or Probation and Pretrial Services Offices in the Central District of California must practice physical distancing in all spaces.
  - To practice physical distancing, individuals must stay at least six feet from other people.
  - Exceptions to this physical distancing requirement may be permitted for individuals who reside in the same household and counsel under certain circumstances during in-court proceedings as noted below.
  - Anyone not practicing physical distancing in accordance with these protocols will be instructed to leave the building by the United States Marshal, his Deputies, or the Court Security Officers.  Individuals who are instructed to leave will be asked to contact the office or courtroom to be visited to explore alternatives.
- The following protocols are adopted for all in-court proceedings:
  - Everyone in the courtroom must wear a mask.  The removal of masks is authorized only as necessary for testifying witnesses, jurors while being questioned individually, and in-court identifications, if permitted by the judge.  An individual who is permitted to remove or lower his or her mask will be required to wear a face shield and/or speak from behind a plexiglass barrier and maintain appropriate physical distancing while the individual is not wearing a mask.
  - In-court proceedings must be conducted in a manner that allows for all participants to practice physical distancing.  An exception may be permitted for counsel who choose not to physically distance from each other or their clients.

**All posted notices are also available on the Court's public website at www.cacd.uscourts.gov.**

o   In addition to these protocols, see this document for suggested practices for conducting jury trials during the COVID-19 pandemic.

The Court continues to monitor the COVID-19 pandemic as it evolves and will provide updates concerning the Court's operations as adjustments are made.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Kiry K. Gray**
**District Court Executive/Clerk of Court**
**April 15, 2021**

# EXHIBIT 12

# Answering Your Questions about Legal Document Review

<span style="background-color:#f5b642">BLOG</span>    October 10, 2019 by BIA | 9 min read



Back in 2017, we partnered with Emily Cobb from Ropes & Gray, LLC and the team at ACEDS to host a webinar covering the ins and outs of successful document review. It was a thoughtful, helpful discussion on strategies and tips for improving the document review process, and we covered a lot of ground during the one-hour program, from modern approaches to managed review, technology-assisted review (TAR), putting together a review team and more.

Attendees posed a lot of great questions and we shared them on the BIA Blog. Since managed review tools and strategies are always changing for the better, we thought it would be beneficial to refresh and re-share the Q&A to keep the discussion fresh and ongoing. We hope you find this information helpful!

Exhibit 12
-79-

# 1. What is the average rate of legal document review, per reviewer, on an hourly basis?

It all depends on the complexity of the legal document review protocol, really. Reviews with simple protocols and easy "yes" or "no" questions will go very quickly, but if your review project is highly complex, then the review rate will be slower.

For example, the average rate of legal document review for emails only, if you're only coding for responsiveness, could be anywhere from 70-80 documents per hour. However, if your reviewers are sifting through formulas in spreadsheets, you can expect them to spend a lot more time on each document, not only to review the information but to open the document in its native software. While some review platforms provide a decent spreadsheet view, the best way to view all the information in a spreadsheet is still to open it in Excel or Google Sheets. That means a reviewer may only look at 20-30 documents in an hour.

In general, assuming that reviewers are looking at a mix of documents that include some spreadsheets, most reviewers average 40-50 documents per hour.

# 2. When a law firm associate is overseeing an eDiscovery/managed legal document review project, what is the role of the project manager at the vendor or corporate client?

Put simply, the role of the project manager is to work with a law firm associate to keep him or her informed on the status of each step of the project, including document collection, processing, search results, review and production. In addition to providing reports and metrics on the case, the project manager is also there to troubleshoot any issues or facilitate things like complicated search term requests.

A project manager at the corporate client would be in a similar position. There's usually a point person at the corporation who takes the lead in facilitating data collections. During the webinar, our colleague and fellow presenter Emily Cobb pointed out that it's the law firm's neck on the line in terms of what's reported out. As such, it's the law firm associate that has the final say on most substantive issues.

**Exhibit 12**
**-80-**

We also did a previous webinar on the role of the eDiscovery project manager, which goes more in-depth, and can be seen here.

# 3. Does outside counsel need to do 100% of the quality control of documents reviewed by contract attorneys or the managed review vendor?

Generally speaking, no. Of course, that assumes that you have a reasonable level of confidence in the process, the people and the vendor. Whether done in-house with contract attorneys or outsourced to a vendor, quality results depend on a quality process from the outset. It helps to have an ongoing dialogue between the review team and counsel so there is a process to track questions asked and answered. This promotes consistency and quality in the review product.

Quality control in document review typically involves random samplings throughout the review process. If the review is being handled by a vendor's review team or contract attorneys, they usually have their own QC process, in addition to what outside counsel will do.

We suggest that the samplings happen more often and are more encompassing at the beginning of the process, looking at the results on an individual reviewer basis to get a sense of how accurately each person is coding. Also look to see if any problems are widespread, as this could mean the review protocol was not properly explained or understood.

It's also good to look at overturn reports, which show when document coding was overturned by the QC person. If there are patterns there – such as certain types of documents that get changed often, or if one reviewer's coding calls are overturned more regularly – you can gain insight into any potential issues and make adjustments as needed.

With a strong focus on quality, combined with both general and individual feedback addressing any quality concerns from the outset, you can help ensure that the overall process is a success. As that proceeds and you become comfortable with your reviewers and the protocols for that review project, the QC process can be scaled back a bit, but should still include random samplings of the entire document set throughout the review.

That said, there are certain documents for which we do recommend to have a 100% quality-check review, whether it's done by outside counsel or senior level reviewers at your vendor (or

Answering Your Questions about Legal Document Review – BIA

a combination of both). At BIA, for example, we always make sure there is a second set of eyes from our team on all documents coded as privileged or "hot."

# 4. How has the quality control process matured over time with the "modern" approach? How can we best leverage technology to track errors, etc.?

Technology now allows us to more easily locate items that need to be quality controlled. For example, we utilize TAR technologies not just in review, but also in our QC processes, helping to quickly highlight any quality concerns. In the past, we would have had to go through the entire document review process before there were insights to pull. Now, we can quickly and easily glean valuable insights, such as specific areas of documents that need to be quality controlled.

# 5. What kind of supervision do you give to a first or second-year associate managing an eDiscovery/managed legal document review project?

We do give more training and support to people who are new to the process. We believe it is BIA's responsibility to our clients to make sure all associates – and really everyone involved – fully understand and are comfortable with the proven processes that we have established. We don't want anyone to fail.

# 6. Why do firms not utilize eDiscovery staff attorneys more?

This is an interesting question. Before BIA, I (Barry) worked at a law firm that managed document review projects with more than 160 contract attorneys on multiple projects. What we found was that having so many contract attorneys on multiple projects kept us from building institutional knowledge for a case or client. We changed that process to employ 10-11 staff attorneys and recruited out of our existing talent pool of 160+ contract attorneys.

Staff attorneys cost less because they're not on the partner track at a firm, but they still bill higher than contract attorneys – so there are two sides at play. But in general, staff attorneys *build cost-effective institutional knowledge*, and they provide consistent coding.

**Exhibit 12**
**-82-**

That's the same philosophy that we use at BIA with our Managed Document Review Services team, which provides the benefits of staff attorneys – including being cost-effective and maintaining institutional knowledge – with the ability for our clients to use our attorneys as needed like one would with a contract attorney review team.

## 7. Are there any quality issues with the per-doc model's incentive to get through legal document review quickly?

No, quite the opposite. With the per-document pricing model, the incentive is directly built into the model to get it right the first time around.

BIA's preferred practice is to bill per document versus per hour, as we find it's not only more predictable for the client, but easier for everyone to manage. We touched on this somewhat during the webinar, and it is discussed in more depth here.

Simply put, legal document review must be done accurately, or, regardless of how quickly it was done or how it was billed, it will have to be done again. Our per-doc model of review puts that burden where it should be – on us. If we don't maintain the highest quality, then documents will need to be re-reviewed, which negatively impacts our profit on the project. Thus, inherent in the very model is the incentive for quality from the outset.

BIA's well-designed process allows for reviewers to take the necessary time to code documents correctly the first time and includes both team management and our comprehensive quality control process all in one simple price. We are convinced of this model's effectiveness for several reasons, but our favorite is that not a single BIA client utilizing this model has ever looked back.

## 8. If the other party does not specify format can you produce in the format you deem reasonable?

Per the federal rules, the answer is yes. However, what one side deems reasonable isn't necessarily what the other side will agree upon. It's good to confirm – more than once – what the specified format will be, just to avoid any back-and-forth in court. It's not worth the money or time on either side to argue about the format. We suggest agreeing on an ESI production protocol at the outset of a matter to minimize ambiguity when completing productions.

**Exhibit 12**
**-83-**

# 9. How do you measure, monitor and track productivity and quality?

This is a good sum-up question. At BIA, we look at each individual reviewer's rate of review (documents per hour) and then measure speed, accuracy, the difficulty of the review material, amount of errors per set and time spent reviewing. Conducting these measurements gives us a good indication of how the review is going and points out areas for improvement, be that for an individual or an entire team.

Want to streamline your document review? Check out our webinar, **Document Review: The EDRM's Final Frontier**, that discusses how to approach, plan for and execute a successful document review.

Want to learn about using analytics in document review? In our recent Practical Uses of Brainspace webinar, we discuss how we leverage their technology to deliver unparalleled accuracy and cost savings to our Managed Document Review offering.

**Exhibit 12**
**-84-**