1

```
              UNITED STATES DISTRICT COURT
              CENTRAL DISTRICT OF CALIFORNIA
              (SOUTHERN DIVISION - SANTA ANA)
```

MASIMO CORPORATION, ET AL,   ) CASE NO: 8:20-CV-00048-JVS-JDEx
                             )
              Plaintiffs,    )              CIVIL
                             )
      vs.                    )         Santa Ana, California
                             )
APPLE, INC,                  )         Thursday, May 20, 2021
                             )
              Defendant.     )
_____)


                  PARTIAL TRANSCRIPT RE:

          MOTION TO COMPEL [DKT.NOS.351,357]


          BEFORE THE HONORABLE JOHN D. EARLY,
            UNITED STATES MAGISTRATE JUDGE

               (SEALED PORTIONS OMITTED)


APPEARANCES:              SEE PAGE 2


Court Reporter:          Recorded; REMOTE; Wave

Courtroom Deputy:        Maria Barr

Transcribed by:          Exceptional Reporting Services, Inc.
                         P.O. Box 8365
                         Corpus Christi, TX 78468
                         361 949-2988



Proceedings recorded by electronic sound recording;
transcript produced by transcription service.
```

<u>APPEARANCES</u>:


For Plaintiffs:            BENJAMIN A. KATZENELLENBOGEN, ESQ.
                           Knobbe Martens Olson & Bear, LLP
                           2040 Main Street
                           14th Floor
                           Irvine, CA 92614

                           ADAM POWELL, ESQ.
                           Knobbe Martens Olson & Bear, LLP
                           12790 El Camino Real
                           San Diego, CA 92130


For Defendant:             JOSHUA H. LERNER, ESQ.
                           Gibson Dunn & Crutcher, LLP
                           555 Mission Street
                           Suite 3000
                           San Francisco, CA 94105

                           ILISSA S. SAMPLIN, ESQ.
                           Gibson Dunn & Crutcher, LLP
                           2029 Century Park East
                           Suite 4000
                           Los Angeles, CA 90067

| | |
|---|---|
| 1 | **Santa Ana, California; Thursday, May 20, 2021** |
| 2 | **(Remote Appearances)** |
| 3 | **Call to Order** |
| 4 | **THE CLERK:**  Please come to order.  This United States |
| 5 | District Court is now in session, the Honorable John D. Early, |
| 6 | United States Magistrate Judge presiding. |
| 7 | **THE COURT:**  Good morning, everyone, please be seated. |
| 8 | **(All respond good morning)** |
| 9 | **THE COURT:**  All right, calling the case of *Masimo* |
| 10 | *Corporation, et al versus Apple Inc.*, Central District of |
| 11 | California Case Number 8:20-00048-JVS. |
| 12 | We are here on two Motions.  We'll take appearances |
| 13 | with Counsel and then we'll describe the Motion.  We'll start |
| 14 | with Counsel for Plaintiff. |
| 15 | **MR. POWELL:**  Thank you, Your Honor, Adam Powell for |
| 16 | the Plaintiff Masimo Corporation and Cercacor. |
| 17 | With me is my partner Ben Katzenellenbogen. |
| 18 | **THE COURT:**  All right, thank you, good morning. |
| 19 | And for Defendants -- for Defendant? |
| 20 | **MR. LERNER:**  Good morning, Your Honor, Joshua Lerner |
| 21 | of Gibson Dunn on behalf of Apple, and with me is my partner, |
| 22 | Ilissa Samplin. |
| 23 | **THE COURT:**  All right, good morning and welcome, as |
| 24 | well. |
| 25 | We are proceeding and everyone is wearing a mask. |

4

1    I'm going to ask you to do me a favor, when you argue just stay

2    at counsel table, no need to go to the lectern, but pull the

3    microphones that are in front of you, whoever is going to be

4    speaking, a little bit closer because we are proceeding with an

5    audio recording and unless you're -- if you're not going to be

6    going back and forth in terms of who's arguing you only need to

7    state your appearance the first time you argue, but if there is

8    going to be different people arguing different points please

9    announce yourselves.

10           All right, so we're here for two Motions, it is both

11   Motions by Plaintiff to Compel Further Discovery Responses from

12   Defendant.

13           The Motion Docket Numbers are Docket Number 351,

14   which I'll refer to as the first Motion, and Docket Number 357,

15   which I'll refer to as the second Motion.

16           Each Motion is supported by a Joint Stipulation.  I

17   think the first Motion is a 109-page Joint Stipulation, and the

18   second Motion is a 130-page Joint Stipulation, as well as

19   Declarations from counsel, I believe it's counsel only, and

20   exhibits and, ballpark, I think the total number of pages,

21   including sealing applications, et cetera of both Motions in

22   total was 2,497 pages.

23           The Court has reviewed that material.

24           There is also two Supplemental Memoranda and a

25   Supplemental Declaration with an exhibit submitted by

5

1    Plaintiff.

2            I don't think there were Supplemental Memoranda

3    submitted by Apple, and I see counsel for Apple shaking her

4    head indicating no so I didn't miss that.  That's good.

5            I always wonder why there's a need for Supplemental

6    Memoranda from the opposing party in a Rule 37 Joint

7    Stipulation since, if it's done correctly, they got the last

8    word in the Joint Stipulation and there's really nothing for

9    the opposing party to be responding to in a Supplemental

10   Memorandum, so there's no downside to not filing it.

11           All right, we're going to proceed.  I have reviewed

12   the materials, I'm ready to go forward.  I'm going to talk a

13   little bit and then we're going to jump right in.

14           There are a total of 92 discovery requests at issue

15   in both Motions.  We're going to start with the first Motion

16   and we're going to go through them one at a time.

17           I was torn between whether to do them in sequential

18   number order or as they are grouped in the Joint Stipulation

19   and I'll probably do as they're grouped in the Joint

20   Stipulation even though my mind is better served by going

21   sequentially, but it's my intention that we're going to be

22   issuing the Order today and any subsequent written Order is

23   merely going to refer to today's transcript for what that Order

24   is.

25           And in that regard what the Orders are going to be,

6

1   considering the volume of the material and the number of

2   requests at issue, we're not going to be doing a lot of

3   negotiating and a lot of finessing the Requests or the Answers.

4   The Motion is either going to be granted or denied.

5           You folks haven't been here before, we haven't had

6   very many in person hearings in the last 16 months so you

7   haven't heard my speech.  I'll try to keep it short since I

8   want to get jumped into things.

9           But my role in these Discovery Motions, from my

10  viewpoint, using an analogy of building a house, your folks --

11  you're going to go to trial, that trial is going to be your

12  house.  You're each going to be building different parts of

13  that house.  But ultimately you have to work together to some

14  extent to build that house and there's going to be design,

15  architecture, structure, all sorts of things that you're going

16  to have to put into that you work together to get yourself

17  ready for trial.

18          On a Discovery Motion I'm not anything other than a

19  person who's going to hammer nails, either granted or denied,

20  granted or denied, so we're going to go through this with 92

21  Requests.  If we take five minutes per Request today that will

22  take us seven hours and 40 minutes, and if that's what it

23  takes, that's what it takes.

24          If we can get it down to two minutes per Request that

25  will take us about three hours, a little over three hours.

7

1    I've already reviewed all of the parties' arguments and

2    materials so I'm hoping to keep this moving, but I want you to

3    know we're hammering nails, so we're going to go Request by

4    Request, and it's important that we do it Request by Request

5    because even though arguments are grouped everything goes back

6    to what's the language of the Request?

7             If I'm going to grant or deny a Motion to Compel it's

8    going to be to respond further to the language of the Request,

9    so we are going to be looking very closely at the language of

10   the Request.

11            Any questions before we get started, and why don't I

12   start with this, has anything changed in the last two weeks

13   since Plaintiff's Supplemental Memoranda on the second Motion,

14   or three weeks since Plaintiff's Supplemental Memoranda on the

15   first Motion?

16            From Plaintiff?

17            **MR. POWELL:**  No, Your Honor.

18            **THE COURT:**  From Defendant, from Apple?

19            **MR. LERNER:**  No, Your Honor.

20            **THE COURT:**  All right, so let's jump right in.  First

21   Motion --

22            And lastly, Maria, my CRD might be in and out.  To

23   the extent somebody wants to get into something that they think

24   needs to be sealed as based on confidentiality you need to let

25   me know.  My plan is not to discuss anything that coming from

1    me that's designated as confidential, but if the parties wish

2    to get into it you need to let me know so that we can note the

3    time potentially, if it's warranted, to have that portion of

4    our proceedings today sealed.

5            All right, so I think the first one we're going to be

6    looking at is Request for Production Number 63.

7            Now I'm looking at and, forgive me, it's sometimes

8    difficult to find the best copy for me to go for.  I'm going to

9    tell you I'm looking at the under seal application version of

10    the unredacted Joint Stipulation, which is at Docket Number

11    353-1, so that's what I'm looking at.  It's Page 8 on the

12    original pagination, and Request for Production Number 63:

13            "Documents sufficient to show any heart rate

14            algorithms used in any of the Apple Watch products."

15            Parties have lots of wonderful arguments about this

16    and I'll hear from you on each of them.  I'll tell you my

17    initial take is that that Request seeks relevant information,

18    so I'm actually going to turn to Apple to tell me if there's

19    anything they want to add to their arguments or highlight.

20    You're certainly free, it's your time.  I want you to take as

21    much time -- my discussion of the potential time that we may

22    take, I don't want you to be concerned about that, we want to

23    get it right, so take whatever time you want to need -- you

24    need to address or highlight any of the objections and the

25    support for those objections.

1          **MR. LERNER:**  Thank you, Your Honor.

2          So with respect to Request for Production Number 63,

3     the problem, and the reason it's not relevant is the heart rate

4     algorithms used in any Apple Watch product is not tethered to

5     the claims or the alleged secrets in this case.

6          There are many heart rate algorithms that are called

7     for here that have nothing to do with the alleged secrets, and

8     the alleged secrets that Plaintiffs point to here are -- and I

9     don't know if this needs to be sealed at this point, if this is

10    a heading or not, according to the --

11         **THE COURT:**  Well, let's just say -- why don't you

12    refer to the page that you're referring to of their arguments,

13    we don't have to get into the specifics.

14         Joint Stipulation, you're referring to Pages 21 and

15    22 of the Joint Stipulation?  The highlighted material/redacted

16    material?

17         **MR. LERNER:**  Correct.

18         **THE COURT:**  All right.  And I should add Page 20

19    potentially as well.  All right.

20         **MR. LERNER:**  And the issue is that the two alleged

21    secrets that they try and tie this request to are much narrower

22    than the Request, and if it's not tethered then we're off

23    looking for algorithms, like I said, that have nothing to do

24    with this case.

25         And I think this is going to boil down to an issue

1  that you're going to hear repeatedly, but I don't think it

2  matters what lens you view it through, whether or not it's

3  relevance or 2019.210, or the claims as they have been set

4  forth.

5         Any heart rate algorithms used in any Apple Watch

6  product is unequivocally overbroad, it captures heart rate

7  algorithms that do not relate to any issue in this case.

8         **THE COURT:**  How do I know that?  What's the evidence

9  that I have that I can cite to for that?

10         **MR. LERNER:**  The only two secrets that they point to

11  in this argument, and there's two of them, and we've set them

12  out and it's hard to do this without saying the words --

13         **THE COURT:**  Well, I guess what I'm asking -- let me

14  talk a little bit and then I'll have you respond, the 2019.210

15  argument is going to keep coming up so let me talk to you about

16  it.  I think both sides have gone to their respective corners

17  on what this all means, and you used the phrase "tethered to"

18  and I love language, all language is to some extent analogy and

19  metaphor, right, words are metaphors for things.  I'm not going

20  to go too deep into Plato's cave, but "tethered" is a great

21  analogy.

22         What is a tether?

23         There is a fixed point that a rope is connected to,

24  and then whatever is at the end of that rope, a boat, a dog,

25  whatever, roams around, but there is a fixed point to which

11

1   something is tethered and then there's a penumbra, to use a

2   Supreme Court word, around which the attachment moves, and I

3   think that is a great analogy for the 2019 concept, it's a

4   great analogy for discovery relevance in general, just like the

5   pleadings frame or tether the allegations for purposes of

6   discovery.

7          What is relevant to those allegations is not just the

8   specific words used in the 2019.210 designation, or the

9   specific words used in a Complaint, discovery is broader than

10  that.  Federal Rule of Evidence 401 is broader than that.

11         Rule 401 is "any fact that has any tendency to make

12  another fact of consequence more or less likely is relevant."

13         And the definition of discovery is even greater than

14  the definition of relevance for trial.

15         So what is the 2019 or what is the pleadings -- where

16  does that fit in there?

17         That determines under Rule 401 what is "of

18  consequence."

19         So Rule 401 doesn't say any fact of consequence is

20  relevant and any fact not of consequence is not relevant, it's

21  merely any fact that makes such other fact more or has any

22  tendency to make it more or less likely.

23         So how do we deal with that?

24         Every single discovery request has to deal with that.

25  We can't just say "I want every fact tied to just the

1   allegations in the Complaint."  So it's a matter of balancing.

2          To some extent every discovery request has built into

3   it a proportionality, a Rule 26(b) proportionality analysis.

4          Here's my difficulty from Apple's standpoint:

5          I don't have any evidence.  I don't know why this

6   would be disproportionate.  I don't know how difficult it would

7   be for Apple to produce this.

8          Facially it looks relevant.  Facially you're saying

9   "Well, maybe aspects of it are tied to this trade secret

10  designation, but that's very narrow compared to the world and

11  universe of documents that we would be required to search for."

12  And that's where I'm going to refocus this to the language and

13  we'll talk to Plaintiffs about it.

14         But Apple is taking too restrictive of a view of what

15  2019.210 does; what the definition of relevance is for

16  discovery.  But let me tell you, I'm sympathetic and I want to

17  listen to you because at some point things do get too broad.

18         But what I need, what Rule 26 tells me, is I've got

19  to do that proportionality balancing based on certain factors,

20  and one of them is the cost, the burden, the expense, and I

21  don't have any of that from Apple here.

22         Now, again, I'm talking more and we're going way over

23  our five-minute target, but there's sometimes, and this --

24  you'll see different District Courts, usually Central District,

25  most Magistrate Judges and District Judges, they go by the

1    propounding party demonstrates relevance, then all objections,

2    the burden's on the Defense, and within that is

3    proportionality, et cetera because there's a de facto balancing

4    that requires analysis.

5            Other Districts say "Well, no, the propounding party

6    has to make an initial showing of proportionality."  And I

7    think they're both saying the same thing, and here's my

8    example:

9            If somebody propounds on Coca Cola "produce all

10   documents that relate to Coca Cola period," I don't need

11   evidence from Coca Cola to know, all right, that's

12   disproportionate without even knowing what the issue is in the

13   case, but let's say it's a relatively narrow issue.  I don't

14   need evidence for that.

15           But if somebody says "give me all documents that

16   mention RC Cola for the year 2014 produced in the country of

17   Portugal," all right, you come and tell me that that's

18   disproportionate, now I've got something that I'm going to need

19   evidence if you're going to come and tell me that's

20   disproportionate, so there is a common sense aspect to this.

21           I can't tell from looking at Request for Production

22   Number 63 "Documents" -- and I really want to focus on the

23   language, "sufficient to show" and I'm going to talk to

24   Plaintiff about this, "sufficient to show" does not, to me,

25   mean every single document that mentions heart rate algorithms,

14

1   okay?  It's "sufficient to show the heart rate algorithms in

2   any of the Apple Watch products."

3          I'm also interested if they want duplicative

4   documents.  Let's say there's 10 million pages, do they want

5   all 10 million pages, or do they want enough that are

6   sufficient to show what heart rate algorithms are used in the

7   different products which could be just enough so that they can

8   proceed.

9          And then Apple, and its counsel, acting in good

10  faith, acting as Officers of the Court, acting under Rule 26(g)

11  when they certify Responses and comply with discovery that

12  they're basically making a certification, subject to sanctions,

13  that they're interpreting it reasonably and appropriately, they

14  come back and say "Okay, here's the universe of documents that

15  are sufficient to show what algorithms are used in these

16  products."

17         That seems like a fairly narrow, and to my mind not

18  particularly burdensome request.

19         The fact that you say "Well, it's not specifically

20  tied to the trade secrets and what heart rate algorithms

21  because there are other aspects of the Apple Watch that uses

22  heart rate algorithms for different things."

23         You didn't give me anything to tell me how burdensome

24  that is, how difficult it is for you to just say "Whatever, I'm

25  just going to give you all documents that are just sufficient

1   to show, not 10 million, but documents sufficient to show how

2   the heart rate algorithm is calculated."

3            I'm not a technical person, I can't make a

4   determination, again, without evidence, that Plaintiff's

5   argument to some extent, and I may be broadening a little bit

6   as well, the fact that in the Apple Watch, what are we up to, 6

7   now, in the Apple Watch 6 they've come up with a heart rate

8   algorithm for sleep analysis and, again, I'm probably way off

9   base, but they've come up with something that is not tethered

10  to the pulse oximetry that's the main issue here, but Apple has

11  suggested that these different, the originating algorithm that

12  they claim was stolen, has now branched off into other aspects

13  and if it hasn't you're going to want to demonstrate that

14  anyway.

15           But my main point is I don't have information from an

16  evidentiary standpoint from Apple about how burdensome this

17  would be, how difficult it would be.

18           So having heard what I have to say I'm going to turn

19  it back to you, Mr. Lerner.  What are your thoughts on what

20  I've had to say?

21           **MR. LERNER:**  Thank you.  So I think we agree on what

22  you have outlined as a standard, which is let's just call it,

23  not using tethered, relevant to, which as you said means more

24  or less likely to have some bearing on the facts in this case.

25           **THE COURT:**  Any tendency in reason, yes.

1          **MR. LERNER:**  Right.  And I think we're also on the

2     same page that the claims in this case as it's currently

3     situated, are claims for trade secret misappropriation.

4          And the two alleged types of misappropriation that

5     the Plaintiffs are relying on for this request are -- and I

6     think it's very important, you just said that they're

7     suggesting the algorithm has somehow bled into its request for

8     the heart rate --

9          **THE COURT:**  Well, what I'm saying is from a damages

10     standpoint.  You're telling me that there's no aspect of this,

11     that they're not saying that a trade secret was stolen, and

12     here's the trade secret that was stolen, and now five or six

13     years later it has been used and developed to these other

14     elements.  You're saying they're not alleging that.

15          **MR. LERNER:**  They are not, and I think this is very

16     important.  They already have the source code which they -- and

17     a lot of this starts on Page 35 of our Brief, and I do want to

18     answer all of your questions on this, but they already have the

19     source code that shows them how we do the two trade secrets

20     that they are claiming this Request is relevant to.

21          They are not coming to Your Honor and saying what you

22     just said, which is "We looked at how Apple does it; we have

23     looked at how Apple accomplishes those two secrets, and we

24     found that they're using our secrets and we have a reason to

25     tell you, Judge Early, that having looked at how -- at Apple's

17

1    code, and certainly not telling you having looked at Apple's

2    code we can tell you that they're using the secrets," but let

3    alone the Request here, which is that having looked at it and

4    somehow figured out that -- looking at that source code and

5    which, to use their own words, they said "will show whether or

6    not Apple is using the secrets."

7           They're not saying "We looked at that and there is

8    some connection to this much broader set of heart rate

9    algorithms."

10          And to Your Honor's question about burden and

11   whatnot, you used the Coca Cola analogy, at a certain point it

12   does get difficult to put that in a Declaration, but we did

13   explain they are talking about secret --

14          **THE COURT:**  You can put anything in a Declaration.

15          **MR. LERNER:**  Correct.

16          **THE COURT:**  I don't have any facts in front of me

17   about burden.  I don't know how hard it is for you to run what,

18   again, looks like a -- to me, a narrow Request, as I interpret

19   it, "documents sufficient to confirm it," does not mean

20   everything, it means relating to any heart rate algorithms, so

21   I don't know.

22          For instance -- wait, let me finish, how many heart

23   rate algorithms are implicated?

24          I don't know, is it two?  Is it 10?  Is it 500?  I

25   don't know.

1           And don't you think that that would be the kind of

2     thing that would help me to be able to do a Rule 26(b)

3     proportionality analysis?

4           How hard would it be to obtain documents sufficient

5     to show the -- any heart rate algorithm used in any of the

6     Apple Watch products

7           **MR. LERNER:**  And the answer, Your Honor, is it is

8     actually -- and I hope it's clear that we do want to tell you

9     information that we think would be helpful.

10          They're asking about algorithms that we are all, I

11    think, acknowledging sitting here, go far beyond the two

12    secrets they tie it to and (indisc.) --

13          **THE COURT:**  How do I know that?  You say "we're all

14    acknowledging."  How do I know that?  I mean, I created some --

15          **MR. LERNER:**  The Plaintiffs will not, I don't think,

16    be able to stand up and tell you that they can claim here, to

17    Your Honor's point, as members of the Court, that every Apple

18    heart rate algorithm has any chance --

19          **THE COURT:**  Okay --

20          **MR. LERNER:**  -- of making it more or less likely that

21    we misappropriated a secret, or even bearing on that --

22          **THE COURT:**  Well, doesn't it -- if they get it and it

23    doesn't bear on it, doesn't that make it less likely?

24          Therefore, isn't that going to be something that

25    they're going to be able to say "Well, if I see that it's not

1  then it's -- that it's not related to the allegedly stolen

2  algorithm" then that fact is more or less likely, and it helps

3  narrow the issues for trial that okay, we don't have to worry

4  about that one.

5          But getting back to my main point, all right, let me

6  focus you on the main point, how do I know how many heart rate

7  algorithms are implicated by Request Number 63?

8          **MR. LERNER:**  And the reason it is not -- I don't even

9  know, if possible, to answer that question, is we are talking

10  about, and we did set this out, six generations of Apple

11  Watches over eight years that involved thousands of people.

12          The idea that we could tell you, again to your point,

13  in good faith, that we know precisely what it is or how many,

14  that's not something that we can easily capture, but I think it

15  is very important that the standard cannot be that we should

16  produce documents, and if there's nothing there that makes it

17  more or less likely that it's relevant.

18          **THE COURT:**  Well, the standard is you need -- if you

19  want to make a proportionality or a burdensomeness objection

20  you need to give me something, and this is a facially relevant

21  request.  You're saying it's too broad, and what I'm saying is

22  how do I know it's too broad?

23          In essence that's what you're telling me, is it's too

24  broad, it implicates other heart rate algorithms that are not

25  tethered to the trade secret -- trade secrets.  How do I know

1    that?

2              MR. LERNER:  As I said, there's -- there are -- as we

3    have said here in our papers as members of the Court, there are

4    -- it's very difficult to put a number on it.  Heart rate

5    algorithms are numerous.  There are many and I don't think

6    there can be a dispute about this, that are not connected,

7    tethered, have anything to do with the two secrets that they

8    are trying to point to to get this information.

9              THE COURT:  All right.  Now let me turn to Plaintiffs

10   since I had some questions for them.

11             First of all, is my interpretation of Request Number

12   63 correct, that Plaintiffs are not seeking any single -- every

13   single, and I use the term "document" to include ESI, any

14   single document that makes any reference to heart rate

15   algorithms used in any Apple Watch products, but you are

16   seeking documents sufficient to show heart rate algorithms used

17   in any Apple Watches, meaning once Apple produces such a

18   document sufficient to show they don't have to produce every

19   single document that is also sufficient to show the same heart

20   rate algorithm used in the same product, correct or incorrect?

21             MR. POWELL:  That is correct, Your Honor.

22             THE COURT:  All right.  What, if anything, do you

23   want to offer in support relating to any argument that's been

24   made so far this morning with respect to Request for Production

25   Number 63?

21

1      **MR. POWELL:**  Thank you, Your Honor.  I'll be very

2  brief here unless you have any specific questions.

3      But I think the Court is correct that the

4  interpretation and the scope of 2019 is at issue, and

5  Mr. Lerner is interpreting 2019 too narrowly, and that I think

6  you're correct in your analogy of a tether that not just these

7  specific words are relevant.  And the reason is we have both

8  the *PMC* case and the -- I'm sorry.

9      Both the *PMC* case and the *SkinMedica* case made clear

10  that you can use a trade secret in a lot of different ways, and

11  I think Your Honor was correct when you said that a trade

12  secret can be incorporated in an initial product and then it

13  can be tweaked, it can be modified, it can be changed, and

14  those products still misappropriate a trade secret.

15      So that's why I think, again, we don't know how many

16  heart rate algorithms are even at issue.  We don't know how

17  many they have because we haven't been told how many they have

18  for the same reason as the Court, we don't have that evidence.

19  It could be two, it could be 20, I have no idea.

20      **THE COURT:**  Right.

21      **MR. POWELL:**  And that's why we think that it's just

22  not that burdensome to --

23      **THE COURT:**  So I'm going to cut you off because -- to

24  keep things moving, a part of the reason I'm going to cut you

25  off is I think Mr. Lerner might more appreciate some thoughts I

22

1   have on the very next one, Request Number 64, and this is why

2   we're tying these to the specific Request, it's great to have

3   global discussions.

4           Request Number 64:

5           "All documents and things that refer or relate to

6           selection between any heart rate algorithm used in

7           any of the Apple Watch products."

8           I read that as a much, much, much, much, much, much,

9   much, much broader Request than Number 63 'cause here we get

10  into "refer or relate to documents and things."

11          Now we get into it's slightly narrowed as it relates

12  to "selection," but now we get to the exact thing I said that I

13  don't interpret 63 to call for, and you have confirmed, we're

14  now opening the proverbial Pandora's Box where I think on this

15  one I can say, without a showing of burdensome from Apple, of

16  burdensomeness without evidence, that I can read this just like

17  that Coca Cola example, wow, that's pretty broad.

18          Am I wrong?

19          **MR. POWELL:**  Your Honor, I would respectfully

20  disagree, and I'll tell you why.

21          Number 1, we're not asking for every single document

22  in the company, we're asking for a reasonable search pursuant

23  to Rule 26, so what --

24          **THE COURT:**  Well -- so you've got your custodians,

25  there was a big fight over custodians, you got how many, 39

23

1   custodians?  Okay.

2           So you're right that there are limitations, but

3   "refer or relate to," the only thing that might save you here

4   is the modifier "selection between."  That does narrow it,

5   okay?

6           But whatever you got through that narrowing I'm

7   imagining piping, I did some plumbing, you've got a narrowing

8   and then all of a sudden you've got an explosion.  So the

9   narrowing helps, right?  The flow of water is going to be

10  slowed, but that "refer or relate to" I wish you had written

11  this one the way -- I shouldn't say "I wish," you know, I get

12  things as they come; had you written this that said "all

13  documents sufficient to show how heart rate algorithms were

14  selected in any Apple Watch product" I would view it much more

15  like 63, but this is not worded that way, so I'm inclined to

16  say that this one is too broad.  I can see it on the face of

17  the Request even without evidence, Apple, and as I mentioned to

18  you I'm not going to be in the business with 92 Requests to

19  start narrowing on the fly, it's either going to be granted or

20  denied.

21          My inclination is to grant the Motion as indicated,

22  as interpreted as to 63 and deny it as to 64.

23          So let me hear from you.

24          **MR. LERNER:**  Thank you, Your Honor.  I'll be very

25  brief.

24

1          I think the selection between heart rate algorithms

2    does sufficiently narrow this Request and I'll tell you why.

3          One of the trade secrets at issue here, I'll try to

4    be broad, but perhaps we'll need to seal this portion of the

5    transcript if I get too detailed, would that be okay?

6          **THE COURT:**  So this is ultimately your information,

7    you don't need to ask my permission, but you need to let me

8    know when you think something is confidential, and then I'll

9    ask Plaintiff whether they have any objection to sealing a

10   portion of the transcript.  It's going to complicate any effort

11   to obtain a copy of the transcript, but I defer to you, if you

12   need to do it; otherwise you can point to particular pages on

13   the sealed exhibit and I can review it silently, you are free

14   to do any mechanism you wish.

15         **MR. LERNER:**  Thank you, Your Honor.  So I will refer

16   you to -- then I will refer to Exhibit 28 of my Declaration,

17   and specifically Page --

18         **THE COURT:**  (indisc.)

19         **MR. LERNER:**  I'm sorry, Your Honor, do you need the

20   Docket Number?

21         **THE COURT:**  Help me, it would be helpful and, again,

22   it gets back to something that gets very complicated when we

23   have some sealed and some unsealed, and I can't tell by Exhibit

24   Number whether it's in a sealed portion of a Declaration, which

25   is filed differently so, yes, a Docket Number would be helpful.

25

1          MR. LERNER:  Okay, it is Docket 353-2, and this is

2  Page 13, Lines 4 through 7.

3          THE COURT:  It's loading so give me a moment.

4          MR. LERNER:  I apologize.

5      (Pause)

6          THE COURT:  All right, 4 through 7 you said.  I may

7  be looking at the wrong document.  You said 353-2?

8          MR. LERNER:  Correct, Your Honor.

9          THE COURT:  Page 15?

10         MR. LERNER:  Page 13.

11         THE COURT:  13, all right.  So just to be clear are

12  you talking about the document pagination or the CM pagination?

13         MR. LERNER:  I am sorry, Your Honor, I was talking

14  about the document pagination, so this is on the document --

15  the Docket Number is Page 315.

16         THE COURT:  All right.

17     (Pause)

18         THE COURT:  All right, I'm at Page 315, Docket

19  pagination of Docket Number 353-2, and I'm looking at Lines 4

20  through 7.

21         MR. LERNER:  Okay, it begins with Paragraph 1.

22         THE COURT:  You don't have to read it if it's -- I'm

23  -- it's F1.

24         MR. LERNER:  Thank you, Your Honor.  So if you look

25  specifically at Lines 6 through 7, the last portion of that

1    recitation, that's what we're dealing with here is the idea of

2    the selecting between heart rate algorithms in the Apple Watch

3    product.

4            And, again, this goes back to Counsel, in their

5    papers, argued for this one that the word "the" or "a"

6    singular, refers to a single algorithm and, again, this goes

7    back to the *PMC* and *SkinMedica* case, by using the trade secret

8    you can modify it and use only a portion of the trade secret,

9    so it's not limited to just a single algorithm.

10            And I think it's -- the difference between

11    "sufficient to show" and "documents that refer or relate" in

12    this particular circumstance is "documents sufficient to show a

13    selection" would not show documents about the discussion of how

14    important it is, who presented that idea to Apple.

15            So, for example, if Lamego presented that idea that

16    is a highly relevant document that would be important showing

17    misappropriation; whereas, if somebody else presented the idea

18    it may be exculpatory.  And so that's why I think "refer or

19    relate" is more specific, or more important when we're talking

20    about a specific request.  Whereas, Request 63, like you said,

21    was trying to figure out the universe so we could try to refer

22    to the specific algorithms at issue.

23            64 is more directed towards specific trade secrets

24    and trying to get documents to figure out where that idea came

25    from.

27

1          And with that I'll conclude if Your Honor doesn't

2    have any other questions.

3          **THE COURT:**  Well, why -- when is your discovery

4    cutoff?  I know we've got half the case stayed, but you still

5    have a discovery -- you still have an Operating Scheduling

6    Order.  Is it July -- July 5th, is that what my memory is?

7          **MR. LERNER:**  Correct, Your Honor.

8          **THE COURT:**  You're nodding heads, but I want to --

9    okay.  So we are now -- and I want to get you guys a ruling as

10   quickly as possible, we're now May -- what are we?

11         **MR. POWELL:**  20th.

12         **THE COURT:**  20th.  So it would be tight, but you have

13   time to propound a more narrowed Request.

14         All of these rulings would be without leave to filing

15   or serving Supplemental Requests, but I have heard the

16   argument.  I'm still of the view that when we're dealing with a

17   situation covering a massive amount of both -- I did this once

18   before, of time -- I say "physical time," which, of course, is

19   an oxymoron, but a massive amount of time, and 39 custodians,

20   and I'm taking that into account.  I know that's not what Apple

21   wanted, they wanted it, what, 12 or 13 and it's 39.

22         So any baseball fans here?  Yeah.

23         I grew up a Yankees fan, never liked the Red Sox,

24   hated the Red Sox, this expression they used to have about the

25   Green Monster in Boston was "The Green Monster giveth and the

28

1  Green Monster taketh away."  Sometimes it's (indisc.), a fly

2  ball is a home run, sometimes a line drive that would be out in

3  any other ballpark as a single.

4       You've got most of what you wanted on your number of

5  custodians, but that also educates me and is part of my

6  analysis here for how difficult it would be to search for some

7  of these things, and this one, it's that "refer or relate"

8  language with 39 custodians, especially considering you're

9  getting and are going to be ordered to get documents sufficient

10 to show the heart rate algorithms.

11      My hope is that can be done quickly and I'm going to

12 have some pretty quick turnarounds on these, and if you want to

13 serve a follow-up Request when you see some algorithms that

14 look like something you're interested in and you want to get

15 information about how that algorithm was selected you can do a

16 targeted follow-up request rather than a scatter shot request

17 like this that has that.  There is a narrowing, but then it

18 expands so that's my thinking.

19      I'll let Mr. Lerner, who has been sitting as I have

20 been discussing, and you can talk about 63 or 64, but I hope

21 this gives you some insight into where we're going to be going

22 on a lot of these individual requests.

23      **MR. LERNER:**  I think I understand Your Honor's points

24 given the amount of time Your Honor has devoted to this

25 already.  I don't have more on these two unless, for some

1   reason, you were inclined to revisit your inclination on 64,

2   I'm fine keeping going.

3            **THE COURT:**  All right.  So let's turn to 65, and

4   these are kind of a group because they are similar.

5            "All documents and things that refer or relate to

6            power consumption by any heart rate algorithm used in

7            any of the Apple Watch products."

8            We've got the same issue here.  There's a narrowing,

9   okay, power consumption and, again, if it were "sufficient to

10  show power consumption," "sufficient to show how the selection

11  of power consumption for the heart rate algorithm," much more

12  narrow, I think.  But with 39 custodians covering how many

13  years?

14           When did Mr. Lamego -- was it 2013 or 2014 that he

15  arrived at Apple?

16           **MR. LERNER:**  I believe he arrived in early 2014.

17           **THE COURT:**  Okay.  And, again, you're -- we're going

18  up through the current IPhone 6, that's a lot of time, that's

19  eight years, that's a lot of records, 39 custodians over,

20  again, what I would consider --

21           And don't take it as a critique that I'm saying it's

22  a scatter shot, that's a loaded term, I don't want to see that

23  referenced in some future filing that I accused Plaintiffs of

24  scatter shot --

25           **MR. LERNER:**  (indisc.)  I won't do it.

30

1          **THE COURT:**  Okay.  Although this is shorthand, we're

2    trying to work things out.

3          **MR. LERNER:**  Yes.

4          **THE COURT:**  What I'd like to see you do is you've got

5    six weeks, it's going to be tight, and I'm going to want some

6    of the stuff that I order to have a quick turnaround and then

7    you can serve more narrowly tailored Requests that are more

8    directed to.  So you get the power consumption, you find out

9    there's five algorithms that look like they're something you're

10   interested in, follow-up Requests on those five algorithms.

11          Now if Apple doesn't give you -- you know, if the

12   responses that come back, again, I'm talking loosely, are

13   garbage, all right, well, then you're going to be okay to file

14   a more broader follow-up request, okay?

15          We want this to be, and the ADA litigants, we want

16   this to be an (indisc.) process, a little bit at a time, okay?

17          I know you've got a July 5th discovery cutoff, again,

18   I'm wasting time, but I'm going to waste it.  What's going to

19   happen with this case?  Where do things stand with the IPR?  Is

20   there timing?  Is there anything that we have on it in terms of

21   an estimate of when that's coming back?

22          **MR. POWELL:**  I don't have an estimate on the IPR, but

23   I can tell you, Your Honor, the parties are in discussion about

24   the schedule and we expect to file a Motion on that on Monday.

25          **THE COURT:**  All right.  Is that going to include a

31

1    fact discovery cutoff on the trade secret aspect of the case

2    stipulated?

3             **MR. POWELL:**  The -- right now we're looking at

4    extending the fact discovery cutoff.  I think both parties

5    agree, the issue is how long is one of the issues.

6             **MR. LERNER:**  And, Your Honor --

7             **THE COURT:**  Would you pull the microphone a little

8    bit closer, I'm just worried that we're not going to get a good

9    recording.

10            **MR. LERNER:**  I apologize, you asked us to do that.

11            The parties have been discussing it.  We take your

12   point about the deadline.

13            I would say that if Your Honor is amenable to it at

14   any point I think the parties could dearly use your input on

15   the schedule and some of -- there's a discrete set of issues we

16   are facing there and I don't think it needs to be delayed by a

17   ton of briefing, I think both parties would listen if you had

18   input, and I'll leave it at that.

19            **THE COURT:**  Well, I want to get you a ruling on this

20   one.

21            **MR. LERNER:**  Yes.

22            **THE COURT:**  But if there is going to be an extension

23   I don't --

24            I want to tell you this in advance, I have a

25   settlement conference that got scheduled at the last minute for

1    tomorrow starting at 10:30.  If we don't finish today my plan

2    is to bring you back here tomorrow morning, that's why I ran

3    the numbers and I'm trying to get you through this because I

4    want you to get -- I saw the July 5th, I want to get this thing

5    moving.

6              If that's not necessary for you to have to come back

7    tomorrow, and you might wind up, unfortunately, sitting here

8    because my settlement conference starts at 10:30, I don't know

9    how long it's going to last, but it probably won't last all

10   day, but I want to keep any momentum that we have.  Maybe it's

11   worth talking about this informal issue before we run through

12   this, but that's going to cost us time.

13             Do you want to talk about this issue, this scheduling

14   issue now?  Will it make our lives easier with respect to these

15   two Motions, or do you not want to talk about it?

16             And I'll start with you, Mr. Lerner?

17             **MR. LERNER:**  We recognize that you already have put a

18   lot of work into this.

19             My thought when you mentioned tomorrow had been if it

20   works for Your Honor let's try and get through this given how

21   much time you spent on it, and then talk with you tomorrow

22   about the scheduling issues, particularly because the parties

23   can obviously take one more stab at trying resolving anything

24   on that.  That had been my thought.

25             If you prefer to talk about it first, obviously happy

33

1    to do that, but I'm just mindful of what you said about the

2    time and also how much effort has gone into this.

3            THE COURT:  All right.  So if I don't hear you saying

4    you want to talk about it now we're not going to talk about it.

5    So you don't want to talk about it now?

6            I don't know what it is so I'm going to give you the

7    option to, and then I'm going to ask Plaintiff's position if

8    they know what we're talking about.

9            MR. LERNER:  Okay.  Yeah, so we are -- I apologize

10   for asking your inclination, I should have just answered.  I

11   think it is intelligent from an efficiency standpoint to

12   address it now because there are issues that are going to

13   impact the timing that you just mentioned.

14           THE COURT:  All right.  So this is your Motion,

15   Mr. Powell -- you're Mr. Powell, right?

16           MR. POWELL:  Yes, Your Honor.

17           THE COURT:  Okay, I had a sudden brain freeze.

18           It's your Motion, or your two Motions.  We can

19   proceed forward with these two Motions, or if there's a

20   discussion, an issue about trying to, for efficiency sake, take

21   up maybe another informal matter before we proceed down the

22   line, what would you like to do?

23           First of all, do you know what this informal

24   scheduling matter is?

25           MR. POWELL:  I do, Your Honor, but I'm not sure that

34

1   I can fully address it and be in a position to make any

2   agreements without other counsel here and without speaking to

3   the client.

4            THE COURT:  Right.

5            MR. POWELL:  So I don't know if it would work today.

6            THE COURT:  Well, let's just keep plugging along.

7            MR. POWELL:  Okay.

8            THE COURT:  65.  You've heard what I've said,

9   Mr. Powell.  Anything you want to add?

10           MR. POWELL:  Yes, Your Honor, just a few things.

11           So, first of all, I recognize Your Honor's ruling on

12   the 39 custodians and I appreciate that.

13           If that is going to affect Your Honor's ruling today,

14   though, I do think Your Honor should be aware that we do have a

15   dispute still on that issue.  Apple is still taking the

16   position that it does not have to search custodians that it

17   does not believe are relevant.  So we are actually going to be

18   filing another Motion today on one custodian that Apple is

19   refusing to search, and then just I think yesterday or the day

20   before they told us there was another custodian they won't

21   search.

22           THE COURT:  We are going to take a detour right now.

23           Mr. Powell, how many discovery disputes right now,

24   today, are there for which -- we're going to start with this,

25   for which a Joint Stipulation under Rule -- Local Rule 37 has

35

1    been circulated?  Right now, how many Local Rule -- Joint

2    Stipulations under Local Rule 37 are there?

3            **MR. POWELL:**  Beyond the two Motions at issue today

4    there are two more.

5            **THE COURT:**  Okay, tell me about the first one.

6            **MR. POWELL:**  The first one is the issue I just

7    mentioned about the ESI custodians, and that one is directed to

8    Tim Cook in particular.

9            And then the second one is an issue on Apple's

10   deletion of documents; in particular Mr. Lamego's documents.

11           Mr. Lamego, as Your Honor is aware, is one of the key

12   individuals at issue here.  Apple has deleted all of his emails

13   and files.  They have told us they have located some of them,

14   but they won't give us any details about whether the files can

15   be recovered, what they have located and they haven't produced

16   any of the files they've located so --

17           **THE COURT:**  I want to hear argument.  So those are

18   two.

19           Mr. Lerner, are you aware of any other Joint

20   Stipulations, Local Rule 37 Joint Stipulations, that have been

21   forwarded -- other than the two that we're here today on, and

22   the two just mentioned?

23           **MR. LERNER:**  No.  But I will add that I --

24           **THE COURT:**  If you're going to add -- there's other

25   disputes out there, we're going to get to that next.

1    **MR. LERNER:**  No, there's no others.  I just would add

2    that, as with our prior Motions, and as to your question, we

3    have tried to be really selective and I feel a little bit like

4    I'm paying the price for that with another one of these Joint

5    Stipulations every day with 99 Requests, and I do think that is

6    worth noting.

7         I also think it's worth noting, when Counsel were

8    addressing your question, that to say we're not conferring and

9    cooperating on custodians when the dispute they have identified

10   is Tim Cook, of course there's a dispute about that.

11        We did not take Your Honor's ruling to mean that the

12   Plaintiffs could pick any person they wanted up to 39 no matter

13   how they relate to the case.

14        **THE COURT:**  All right.  I'm not going to get into --

15   that's not before me.

16        **MR. LERNER:**  Understood.

17        **THE COURT:**  Other than -- Mr. Powell, other than the

18   two Joint Stipulations that have been circulated that you

19   mentioned, are there any meet and confer letters out there

20   regarding other discovery from any party?

21        **MR. POWELL:**  Yes, Your Honor.

22        **THE COURT:**   Tell me how many letters, and obviously

23   letters have issues and sometimes there's crossover, how many

24   other meet and confer letters are out there regarding discovery

25   response disputes?

1      **MR. POWELL:**  I don't know if I can give you an exact

2  answer, Your Honor.  My estimate would be half a dozen.

3      **THE COURT:**  How many are coming from Plaintiff

4  regarding -- Plaintiffs regarding Defendant's Responses?

5      **MR. POWELL:**  There is -- just Defendant's Discovery

6  responses?

7      **THE COURT:**  Yes.

8      **MR. POWELL:**  There's one outstanding letter on

9  discovery responses right now that I'm aware of that I've been

10  handling.  I suspect we may be able to reach an agreement on

11  most or all of that.

12      There's another letter outstanding on a separate set

13  of discovery Requests.  I believe -- to be honest I'm not

14  handling that letter, but my understanding is that deals with

15  prototypes and that is also on a Request for Production.

16      And then there is another letter on -- well, there

17  will be another dispute on this other custodian that Apple has

18  declined to search beyond Tim Cook, and that one we didn't know

19  about when we prepared the first Motion, so that's why it would

20  have to be a separate matter.

21      **THE COURT:**  So you have identified three meet and

22  confer letters from your clients challenging responses by

23  Defendant.

24      Are the other three meet and confer letters

25  challenges by Defendant with respect to Plaintiffs Discovery

38

1    Responses?

2           **MR. POWELL:**  Again, and I apologize, I don't know the

3    exact answer, but there are a couple others from the

4    Defendants, I believe we received one as early as this morning.

5           **THE COURT:**  All right.

6           **MR. POWELL:**  Oh, I'm sorry, Your Honor, there is one

7    other issue that my co-counsel has pointed out.  There is an

8    expert witness that we are hoping the parties can reach an

9    agreement on.  If they don't there may be a Joint Stipulation

10   there, but we are hoping we can reach an agreement there as we

11   have for, I think, all of the other experts.

12          **THE COURT:**  Okay, so there is the meet and confer

13   letter, Mr. Powell, that you're handling regarding Requests for

14   Production.

15          There's the meet and confer letter being handled by

16   someone else with your firm regarding a Request for Production

17   relating to prototypes.

18          There's an outstanding meet and confer letter

19   regarding a different custodian, not Mr. Cook.

20          You received this morning a meet and confer letter

21   from Defendant and I don't recall if the issue on that was

22   described.

23          And then there is a separate issue, meet and confer

24   issue regarding an expert witness that you think may be

25   resolved, so that's five.

39

1          You had mentioned six.  Was there something else you

2    were thinking of when you mentioned six?

3          **MR. POWELL:**  Nothing specific, Your Honor, but I just

4    think there may be another outstanding one from the Defendants

5    that someone else with my firm is handling and I just don't

6    know.

7          **THE COURT:**  All right.

8          **MR. POWELL:**  I apologize.

9          **THE COURT:**  That's all right, we're just trying to

10   get as much information as we can.

11          Mr. Lerner, you have heard about five and maybe six

12   meet and confer issues between the parties.  Is there anything

13   that you want to add or supplement?

14          **MR. LERNER:**  To Your Honor's point about not being

15   quoted, I'm sure I'll be quoted on plenty of things I've said

16   today, but I didn't want to seem clever.  I just realized that

17   in the true -- this has happened once already and we dealt with

18   it in the Northern District of California; now it's happened

19   again.

20          Apple has been served with a subpoena, including for

21   some of the same documents that Your Honor is ruling on today,

22   in the *True Wearables* case.  And I would have hoped that would

23   be dealt with in this case.  If they don't then, obviously,

24   that is the one Motion, it's in the *True Wearables* case, not

25   this case, but I did want to flag that because you asked us and

40

1  it seems to me that it's related to your question.  So we do

2  have an issue about that subpoena served in the *True Wearables*

3  case.

4          There also was one served on our firm in this case,

5  and I don't know what's going to happen with that.

6          **THE COURT:**  Served on your firm directly in this case

7  --

8          **MR. LERNER:**  Yes.

9          **THE COURT:**  -- meaning with our case -- this current

10  case number served by Plaintiffs on Gibson, Dunn and Crutcher,

11  is that right?

12          **MR. LERNER:**  That's correct.

13          **THE COURT:**  All right.  So, there's -- you're

14  expecting a dispute on that?

15          **MR. LERNER:**  Again, I would hope -- I would hope not

16  and I think the ratio that we've identified here shows it's not

17  just me saying it or arguing, there's a pretty big difference

18  in the number of pending motions and whatnot.  I hope we'll

19  resolve it.

20          **THE COURT:**  All right, so 20 -- 2,497 pages submitted

21  in connection with these two motions.  One joint stipulation

22  was about 103 or 105 pages.  One joint stipulation was 130

23  pages.  One joint stipulation cited 51 cases.  The handling of

24  sealed material makes review and analysis of motions, it adds

25  an extra layer to it.

41

1          Now, I'm here to help, but what I just heard,

2  considering how much time I spent on these three motions,

3  almost fulltime for a week -- I'm sorry, on these two motions,

4  what's coming down the pike, I'm going to go out on a limb and

5  say that there's going to be substantial briefing relating to a

6  dispute over Mr. Cook as an ESI custodian and that there will

7  be a great deal of briefing on a Rule 37(e) spoliation type

8  motion, which it sounds like it's coming.

9          Maybe we're not there, but as it was characterized

10  it's going to be something that's going to be hotly contested.

11          **MR. LERNER:**  Yeah, and I just want to flag Your Honor

12  on that again to the point about being candid with you.  The

13  Plaintiffs are not even alleging we had a duty to preserve

14  those documents.  As you pointed out, this related to

15  Mr. Lamego --

16          **THE COURT:**  I'm not going to --

17          **MR. LERNER:**  -- in 2014 --

18          **THE COURT:**  -- I'm not going to get into the

19  argument.  What's been represented to me --

20          **MR. LERNER:**  Understood.

21          **THE COURT:**  -- is that that's a motion --

22          **MR. LERNER:**  Understood.

23          **THE COURT:**  -- a joint stipulation that's out there.

24  All right?  And what you were about to get into was a perfect

25  example of how heavily and thoroughly that's going to be

42

1    briefed by all parties and I'm sure, 50 cases from one joint

2    stipulation in this case, that's going to have far more because

3    it's such a -- I'm sure both parties believe an important

4    issue.

5         So, we raised the issue of a special discovery master

6    before.  The parties indicated, I think it was a telephonic

7    hearing -- it's funny, when I have telephonic hearings I'm

8    sitting here in the courtroom and actually talk to the tables.

9    And I can remember, I think it -- maybe it wasn't a telephonic

10   hearing, maybe we just did it on paper.  But my memory is that

11   the parties indicated they weren't interested in a discovery

12   special master.

13        But here's the language.  And I can't appoint one.

14   Only Judge Selna can.  But it's very rare that I get here

15   earlier than Judge Selna does, but I did today.  I got here

16   before 7:00.  Judge Carter was here, though.  He was in the

17   judges' gym.  So, I don't know if Judge Selna's here today,

18   because when I pulled in his car wasn't here.  But here's the

19   language:

20        The Court can appoint a special master to, and I'm

21   cherry picking, address pretrial matters, quote, "that cannot

22   be effectively and timely addressed by an available District

23   Judge or Magistrate Judge of the District."

24        I don't decide.  Judge Selna's going to decide.  But

25   from what you've described to me, my practice, my ability to

43

1    assist the Court, from what you've described if I have to

2    handle these in serial matters with a discovery cutoff that

3    apparently may be stipulated to continue, and bearing in mind

4    that, depending on the outcome of the review before the Patent

5    Appeals Board, we may be having a whole separate side of the

6    case where we're going to have discovery motions similarly

7    contested, what you've described I don't think I can

8    effectively and timely handle these things.  All right?

9            You don't have to -- we're not going to make a

10   decision.  I can't order it.  But let me hear you talk about

11   it, because we have to hear from you.  It's part of Rule 53.

12   That's why I grabbed the Rule book.  And I'm going to give you

13   an opportunity in writing.  But I'm probably going to direct

14   that the parties, in light of what's just been described to me,

15   show cause why a discovery special master should not be

16   appointed.  And if you don't mind and agree to having a special

17   master appointed, I think it's going to make your lives a

18   lot -- well, I'm not going to say anything further.

19           So, let me start with Mr. Powell.  What's Plaintiffs'

20   position regarding the appointment of a discovery special

21   master?

22           **MR. POWELL:**  Thank you, Your Honor.

23           I don't have a position myself right now.  I would

24   need to speak to co-counsel and my client.  That's not

25   something that we have discussed recently.

44

```
 1            I can tell you, if it puts your mind at ease, the
 2    briefing on the upcoming two joint stipulations is actually
 3    quite short.  I believe our portion of the first motion was six
 4    or seven pages long, and the second our portion is I believe
 5    eight pages long or maybe seven and a half.  So, both of our
 6    portions are very short on those.  I think we cited five or six
 7    cases.
 8            THE COURT:  How many discovery motions do you think,
 9    motions, applications, ex partes that have come through me in
10    the case so far?  And bearing in mind we're now since October
11    only dealing with half the case.
12            MR. POWELL:  I am aware of six, I believe.  Five or
13    six.
14            THE COURT:  All right.
15            MR. POWELL:  And I greatly appreciate what Your Honor
16    is doing, and we have --
17            THE COURT:  Don't butter me up.  I'm here.  Part of
18    the problem is I'm not just here for you.  I'm here for lots of
19    other cases.  I have criminal duty responsibilities that I go
20    back on duty next week when I can't do anything regarding my
21    discovery cases.  I have habeas cases.  I have all sorts of
22    other responsibilities.  I have settlement conferences that get
23    scheduled at the last minute, like the one tomorrow.  I'm here
24    to help the District Court.  The District Court is far busier
25    than I am.  But I have to keep in mind my obligation to these
```

45

1   other litigants and these other parties and they -- I know this

2   is very important to your firms and your clients.  I recognize

3   that.  That's why I'm working as hard as I am for you.

4           But I want you to also recognize that part of what I

5   do are Social Security disability denial appeals.  And as

6   important as this case is to your clients, those cases are

7   sometimes the difference between housing and not housing for

8   people.  If they lose, they are not going to be able pay rent

9   or a mortgage.  Those people, and the Social Security

10  Administration is a party to that, they deserve to have timely

11  and appropriate dispositions of their matters.  As do prisoners

12  who are filing habeas petitions.  They only get one in Federal

13  Court.  They deserve to have those ruled on.  So, everybody

14  deserves.

15          There's nobody in a Social Security appeal that's got

16  two joint stipulations out while two more are being heard with

17  up to six more disputes percolating.  All right?

18          All right, what I'm going to do is I'm going to try

19  to -- yeah, we did talk about this.  This was on January 21st.

20  And what did we do?  And then on February 1st you folks did a

21  joint statement at Docket Number 289 saying that you don't

22  believe a special master is necessary.

23          Mr. Powell, you've told me that you're not -- you

24  don't have a position currently.

25          Mr. Lerner, does your client have a position on the

1    appointment of a special master?

2          **MR. LERNER:**  I'm sure they do.  I always come with

3    the belief that I should answer your questions and I will sort

4    that out and not avoid it.  My first thought at least is I

5    think we still prefer working with Your Honor.  We would

6    certainly I think stipulate to a limit on what is being

7    submitted to you.

8          I agree, this is -- this is a process that I have

9    never -- I've never seen.  It's incredibly long.  It doesn't

10   have limits.  And if you want to do five pages per side and

11   then, like you said, Your Honor does thumbs up or thumbs down,

12   we will work with you on limits that make it possible.

13         **THE COURT:**  So, I don't want to get into the details.

14   Because they're going to say the reason why there are so many

15   is because you're an obstructionist.  Okay?

16         **MR. LERNER:**  Understood.

17         **THE COURT:**  So, I'm not going to be -- I hammer

18   nails.  All right?  But right now I'm getting bags of nails

19   thrown at me, all right, and I can't hammer them all.  And I

20   want to do it right.  And I think you would want these things

21   done right.  I think you would want someone who has the time

22   and the ability to dedicate, particularly once I hear there's

23   now going to be crossover with the True Wearables case and we

24   have law firms being subpoenaed in connection presumably with

25   the representation of their client and there may have to be a

```
 1  separate special master appointed to handle those issues.

 2         MR. LERNER:  Then I apologize I didn't answer your

 3  question then.  We --

 4         THE COURT:  Well, you did answer it.  You said you

 5  don't know, and I respect that.  I didn't push Mr. Powell on

 6  it.  And if you want to tell me your thoughts, you're welcome

 7  to.

 8         MR. LERNER:  I had thought perhaps cutting down the

 9  size of what's being submitted would help.  If Your Honor's

10  direction is go work it out to get a special master, we'll talk

11  with them again about who we'd agree on and try and get it

12  sorted out for you.

13         THE COURT:  Well, I can't appoint a special master.

14  I see that --

15         MR. LERNER:  Understood.

16         THE COURT:  -- you did agree to -- at least the two

17  judges you agreed to, retired judges, Judge Segal and

18  Judge Guilford, I had Judge Guilford appointed as a special

19  master in another case from Judge Staton, and Judge Segal I

20  think would be a great person with all kinds of experience to

21  help you work through a lot of the issues here.  I don't know

22  what her availability is.

23         But I'm at a bit of a loss after putting in as much

24  time as I did on these two motions to hear that I've got two

25  more coming.  And the fact that something is six or eight pages
```

1  on one side, I don't know what's coming from the other side.

2  And I had a 240-page joint stipulation not too long ago that

3  was not difficult at all to rule on.  Sometimes I have six-page

4  apex-type depositions that are incredibly complex and require a

5  great deal of thought.

6        And -- again you're getting too inside baseball here.

7  Law clerks are great.  Law clerks who have never practiced I

8  don't think are able to handle a lot of the discovery disputes

9  as easily as someone who has practiced.  So -- I don't want to

10  waste any more time.  You don't have positions on it.  We're

11  going to proceed, but it can't go on like this and I don't know

12  what to do.

13        I think we had -- and maybe it was that same phone

14  call or maybe it was on a subsequent Order, but I on one issue

15  offered to have an informal, made myself available to have an

16  informal telephone call about whatever the issue was, and my

17  mind is forgetting what that was, and I wasn't taken up on it.

18        I don't know if that's going to help, but things like

19  spoliation or spolation, that's not one I can rule on on the

20  fly and that's not one anyone can.  But if we -- if this is the

21  reality of what we have, we're going to have to come up with

22  another way or a better way to handle it that takes into

23  account that this is a public office that serves all sorts of

24  people, not just one case.

25        So, let's proceed on with -- we left off at Request

49

1    Number 65.  I read it into the record.  I gave some tentative

2    thoughts to you, Mr. Powell.  It's the refer or relate and any

3    ruling would be without prejudice to you or your client serving

4    a follow-up request for production.

5            And I'm going to throw this out there.  I don't mind

6    seeing request for production number 850.  That in and of

7    itself tells me nothing, because 850 carefully crafted requests

8    for production are much better than ten, you know, give me

9    every single document referring, relating, concerning, having

10   anything to do with some general topic.  So, I don't mind if

11   the numbers get up there high.

12           What I mind is trying to figure out how on an eight-

13   year time period with I understand there's still a dispute on

14   up to 39 custodians, and possibly more if a showing is made

15   that it's warranted, how refer or relate to documents are

16   needed.  You know, I don't -- the difficulty is I don't have on

17   the flip side the evidence of the burden.  But on this one,

18   when I see refer or relate to it causes me concern and we'll

19   continue to hear that as we go through this.

20           But let me hear from you, Mr. Powell.  I don't

21   actually recall if you had an opportunity to be heard on 65.

22           **MR. POWELL:**  Sure, Your Honor.

23           So, just a few things.  And I recognize what you're

24   saying about it being -- this language being a bit broad.  And

25   part of that is because we're in a situation where we don't

50

1   have discovery yet and we've gotten very little in response.

2           And so, there is one option that I wanted to mention

3   and it's something that we are discussing about the schedule

4   with the other side.  If the schedule was extended to allow

5   sufficient time to get some discovery and then propound more

6   requests that are narrower, then that would be something that

7   we would certainly be interested in.

8           The problem is we've been -- on this particular

9   request we've been negotiating for about four months now and

10  we're six weeks out from the close of fact discovery.  So, I

11  apologize, and I really did not want to bring this sort of

12  motion to you.  I just did not think that we had any other

13  choice because we'd already gone four months of negotiations,

14  multiple meet and confers.  I think there were two dozen

15  letters on these requests alone back and forth.

16          And so that's why we felt like we had no choice.  If

17  there was more time in the schedule, I would be happy to get

18  some discovery and try to propound narrower requests to try to

19  alleviate some of the burden on the Court.  But that's -- it's

20  this crunch in the schedule that is part of the problem here.

21          And so that I think would also alleviate some of the

22  problem on some of these motions.  Again, there is a crunch in

23  the schedule and that's why some of these motions are getting

24  filed now, because we have frankly no other choice with the

25  schedule.

51

1          **THE COURT:**  I am not casting any aspersion on filing

2    motions.  All right?  Let's get back to Number 65.

3          **MR. POWELL:**  Okay.  So, on Number 65 specifically,

4    power consumption is an advantage of the trade secret

5    specifically mentioned.  It's in our interrogatory responses

6    and that's why this is a topic.  Again, it's the final decision

7    of how a product is implemented that's sufficient to show and

8    that certainly gets you a starting point, and that's Number 63.

9    But that's not going to show you who suggested a given change

10   to help power consumption.  It's not going to show you why

11   power consumption is so important.  All of those things are

12   directly relevant to damages and to misappropriation in the

13   case.

14          This is a critical issue directed towards an

15   advantage of a trade secret and frankly if all we get is

16   discovery that's sufficient to show --

17          **THE COURT:**  Tell me a little bit about power

18   consumption.  How -- what's the nature of it?  How -- I walk

19   into this, again is why I think a special master is going to be

20   great for you, I don't know anything about the Apple Watch, I

21   don't know anything about pulse oximetry, I don't know anything

22   about heart rate algorithms, and I don't know anything about

23   how a heart rate algorithm is beneficial to power consumption.

24   Okay?  This is a different language.

25          So -- but what I do know is all documents and things

1    that refer or relate to.  That I understand.  Well, those words

2    I've seen before.  When you have that massive amount of

3    opening, an opening salvo, using the piping example, you start

4    out here.  I don't know how narrow power consumption by heart

5    rate algorithms, but it gets back to, and I'm telling this to

6    Apple, using 39 custodians, if those aren't being searched I

7    may have to rethink some of this stuff about whether it is more

8    reasonable to, if we're only looking at 12 custodians, that

9    maybe I'm misreading this.  So, maybe we need to wait for

10   whatever further issues might be coming up on this custodian

11   issue to rule on some of these things.

12          What do you think about that, Mr. Powell?

13          **MR. POWELL:**  Well, I completely understand, Your

14   Honor.  I don't think -- it's not going to be 12.  Right?  I

15   think the parties have agreed to roughly 28 or 29.  Mr. Lerner

16   can correct me if I'm wrong.

17          But on the power consumption, I could direct Your

18   Honor, if you have the trade secret statement up on your screen

19   I could direct you.  On that same page, if we look down at

20   Number 3 on that same page, Page 315 of Docket 353-2, and I'm

21   looking at the second line after the first "and."  You can see

22   that phrase there.

23          **THE COURT:**  I'm sorry, say that again.

24          **MR. POWELL:**  The second line of Paragraph 3.

25          **THE COURT:**  Paragraph 3, second -- so what -- on the

53

1  litigation line, what --

2          **MR. POWELL:**  Oh, I'm sorry.  I'm sorry.  Line 12 of

3  the pleading.

4          **THE COURT:**  All right.

5          **MR. POWELL:**  I'm sorry, Line 13 of the pleading.  And

6  if you look after the word "and," that's what I would be

7  referring to here.  And so that's a critical aspect of this

8  trade secret.

9          And again, I recognize what Your Honor is saying

10 about refer or relate and that language is language both

11 parties have used and both parties have agreed to produce on,

12 and I think the understanding is the reason --

13         **THE COURT:**  The issue is when you come to court and

14 want on 89, or what did I say, 92 requests -- I'm holding

15 Apple's feet to the fire for not giving the evidence when

16 they're saying undue burden or lack of proportionality.  But

17 I'm holding your feet to the fire that -- I'm hammering nails.

18 I look at the words.  You may have reached an agreement on

19 other ones that you're going to use your best efforts for refer

20 and relate to, but if I make an order, it's an order of the

21 Court that Apple has to produce every -- all documents and

22 things that refer or relate to power consumption.  To me, my

23 gut instinct on that is that's a pretty big task.

24         Now again, now we're at 28 or 29, I thought we were

25 at 39, maybe we were at 12, we have 28 or 29 record custodians,

54

1  refer or relate to power consumption by any heart rate, and

2  it's any heart rate algorithm used in any Apple Watch.  You get

3  some more information, you tie it to some specific algorithms

4  and/or specific products that those algorithms are used in,

5  much easier for me to say, okay, you've got to produce that

6  unless you give me some evidentiary showing that it's going to

7  take you 25 years because our search parameters came up with

8  50 million documents.  Okay?

9         I don't have any of that.  What's what I usually see.

10  And that's why I'm surprised.  All right?  If I'm going to get

11  something where people -- the parties have put in this much

12  time, money, and effort, that's what I usually see.  Instead,

13  I'm left -- you're left with poor old government major, me,

14  trying to figure out how burdensome, how proportionate to the

15  needs of the case these things are.  And you get -- that's what

16  you get.

17         So, I'm reading it.  This one looks pretty broad to

18  me.

19         **MR. POWELL:**  Can I say one other thing, Your Honor?

20  And then I will stop.

21         I fully understand and the only reason why I'm

22  engaging so much on this one is I think it will be an issue

23  throughout the day.  There are a lot of requests that say refer

24  or relate.

25         **THE COURT:**  Right.  There sure are.

1          **MR. POWELL:**  Yes.  And part of the reason is, like I

2    said, that's been the parties' practice and we've never

3    expected every single document, just a reasonable search.  And

4    all I wanted to say is if there is something -- I know you

5    don't want to compromise and try to narrow individual requests

6    and I'm not asking that --

7          **THE COURT:**  You know, what, that's what the meet and

8    confer process is for.  As a matter of fact, it's in Local

9    Rule 37.  That's one of the things that's supposed to go in the

10   joint stipulation, is, hey, how did you propose to resolve

11   this?  Just -- I'm glad you're here.  I think you were on the

12   phone last time.  Not the door Maria's been walking in, the one

13   over there with the giant lock on it, okay, that's what

14   happens, that's the logical endpoint of someone -- when I say

15   you're ordered, Apple, to produce all documents and things that

16   refer or relate to power consumption by any heart rate

17   algorithm used in any of the Apple Watch Products, okay, there

18   could be lots of steps along the way.  Well, you could have --

19   you don't produce it, you could have issue sanctions, you know,

20   but ultimately it's a Court order.  And I have had people walk

21   in through that door and be led out through that door.

22          You're asking, so what you do amongst yourselves is

23   great.  I encourage it.  Keep doing it.  But when you walk into

24   court I can pull down your proposed order that you submitted to

25   me.  It's we want an order that Apple produce all responsive

56

1    documents without objection to Request Number 65 within

2    whatever days you asked for.  If you want that order, you'd

3    better come in with something that's sufficiently narrowly

4    crafted, and that's what Rule 34 requires, with reasonable

5    particularity for me to feel comfortable in what I see is the

6    logical endpoint of that order.  All right?

7              So, I appreciate that you folks are working together

8    on refer or relate to.  I wish you weren't -- you know, however

9    many meet and confers later, sometimes the answer to a problem

10   with the meet and confers, you look at your own request and

11   say, hmmm, all right, they're fighting me on this, you know

12   what I'm going to need to do, I'm going to need to serve a more

13   narrowly crafted one, knowing that this is going to wind up in

14   a motion before the judge, so I'd better make sure that it's

15   with reasonable particularity, as required by Rule 34.

16             So, I am not unmoved.  I love the -- what's the Latin

17   phrase for that?  There's a Latin phrase for the double

18   negative.  I'm not unmoved and I'm not unsympathetic to your

19   plight, but, you're right, we're going to come up on this a

20   lot.  That's why I kind of wanted to move off of 63, because I

21   knew Mr. Lerner might change his view of some of the things

22   that I'm going to have to say as we go forward.

23             And if you get your extension, all the better.

24   Because ultimately if Apple doesn't do what they're going to

25   need to do on 63, there's going to be a reckoning for them on

```
 1   all these other ones when you serve your follow-up discovery
 2   requests and you come back and say, hey, we did what you asked,
 3   Judge Early, but we got garbage from Apple, so we narrowed it a
 4   little, we got rid of refer or relate to, but we can't be any
 5   more specific about what heart rate algorithms we're talking
 6   about because we got garbage from Apple in response to
 7   Number 63.  I'm going to be very sympathetic to that.
 8          Understood?
 9          MR. POWELL:  I understand, Your Honor, and I don't
10   want to overstay my welcome, I just wanted to point out one
11   thing and then I'll --
12          THE COURT:  You've got as much time as you want.
13          MR. POWELL:  Okay.  And I apologize, Your Honor, I
14   just wanted to point out that our proposed order did not ask
15   for all documents, it asked -- it did say that we wanted them
16   to conduct a reasonable and good faith search.  That's all
17   we're asking for.  And I would be willing to agree right now
18   for all of these refer or relate requests that we're going to
19   see today that this is not about every single document and we
20   just want a reasonable search.
21          THE COURT:  You put that in front of me and you're
22   asking to compel those responses.  So, yeah, of course every
23   single Rule 34 response, complicit in it is a reasonable and
24   good faith search.  But a reasonable and good faith search is,
25   in the context of 28 or 29 custodians when you factor in refer
```

58

```
 1   or relate to is not narrowly tailored, not specified with
 2   reasonable particularity, and I can look at that and see that
 3   it's not proportional to the needs of the case without the
 4   evidentiary showing.
 5            Not always going to be true here, but -- and it's --
 6   you know, you'd be better -- well, I'll leave it at that.
 7   Anything further?
 8            MR. POWELL:  Understood, Your Honor.
 9            THE COURT:  Anything further, Mr. Powell, on 65?
10            MR. POWELL:  No, Your Honor.
11            THE COURT:  All right.  Mr. Lerner, anything you want
12   to say on Number 65?
13            MR. LERNER:  No, Your Honor, we don't need to spend
14   more time on it.
15            THE COURT:  All right, Number 66.  This is -- long
16   isn't necessarily bad -- quote,
17            "All documents and things that refer or relate to any
18            testing and/or analysis of the properties and/or
19            characteristics of any of the Apple Watch Products or
20            any component of any of the Apple Watch Products that
21            relate to pulse rate detection, pulse rate
22            measurement, power consumption by pulse rate
23            detection, or power consumption by pulse rate
24            measurement, including, without limitation, testing
25            protocols, reports, results, notes, and summaries."
```

1          Looks pretty broad to me. Mr. Powell.  I'll hear from

2    you, though.

3          **MR. POWELL:**  Your Honor, I don't want to again

4    overstay my welcome and keep arguing the same thing on --

5          **THE COURT:**  You've got as much time as you want.

6    We're only at 11:25.

7          **MR. POWELL:**  Again, I do think that this one is

8    reasonable here and again there are very similar requests being

9    served on the other side here.

10          The issue of testing and analysis of the properties,

11    we've limited it to specific properties that are directly at

12    issue in this case.  So, we have that relate to pulse rate

13    detection, pulse rate measurement, power consumption by pulse

14    rate, or power consumption by pulse rate measurement, so we

15    have those things are specifically limited.  And then we gave

16    some examples of the types of documents we're looking for.

17          **THE COURT:**  Nothing wrong with examples.

18          **MR. POWELL:**  Right.

19          **THE COURT:**  Examples can be helpful.  I'm not holding

20    that against you.  But I am noting we've got two refer or

21    relate to.  We've got a refer or relate to and then a separate

22    relate to.  We've got multiple conjunctive/disjunctive.  You

23    know, we've got testing and/or analysis and/or characteristics,

24    and then we get back to the of any Apple Watch Products or any

25    component of any Apple Watch Products, and then that relate to

60

1    several different and again in the disjunctive items.

2         **MR. POWELL:**  I understand, Your Honor, and the issue

3    here is again we are narrowed to specifically pulse rate and

4    it's testing and/or analysis of pulse rate, various different

5    aspects of pulse rate.  And Apple has provided no evidence that

6    it has conducted any testing, much less shown that the testing

7    it has conducted would be so burdensome.

8         So, if they just went and searched, how much testing

9    and analysis of those specific things, pulse rate detection,

10   pulse rate measurement, power consumption by pulse rate

11   detection, or power consumption by pulse rate measurement, I

12   have no idea how much testing or analysis they've done.  It

13   might only be one document.  And they haven't -- like you said,

14   they haven't provided any evidence to either of us.

15        **THE COURT:**  I agree with you.  I wish I had that, but

16   I don't.  All I have is a very broad request in the disjunctive

17   that uses relate to twice relating to, pardon the usage,

18   several different catchall terms.  So, this one is, of the ones

19   we've seen so far, the least described with particularity.

20        Again, if it were more specific -- and I understand,

21   you don't know which algorithms you're necessarily looking for.

22   But I don't even know how you would search for this.  I don't

23   know how you would generate search terms with that many

24   options.

25        **MR. POWELL:**  I mean I could tell you how we are

61

1   searching for a very similar request, and it's asking the

2   person that does the testing and analysis and says we will talk

3   to him and I say, hey, what have you done, how much testing

4   analysis have you done, and they give me documents and then I

5   search for other information about those documents.  We're

6   doing that on our end and we're producing those types of

7   documents on our end.  And it's -- that to us, we speak to our

8   client, we speak to the knowledgeable custodians.

9           It's difficult for me to craft something exactly

10  specific because I don't have any evidence from Apple about

11  what they're doing or what their documents look like.  I have

12  very little information from them.  And I -- the issue here

13  about I think both Plaintiffs and the Court would love to have

14  more evidence from Apple so we could actually evaluate the

15  issue and I would respectfully submit that we shouldn't hold

16  the lack of evidence against us.

17          **THE COURT:**  I'm not holding lack of evidence against

18  you.  I'm holding the grammatical meaning of your requests

19  against you.  You want an order; it has to be under Rule 34

20  stated with reasonable particularity.

21          I'm not holding the lack of evidence against you

22  because you don't have a burden once it's shown to be relevant.

23  But this proportionality discussion and analysis, I can read

24  English and I can say if I can't tell what you're looking for,

25  if it's not really described with specifics, then I don't need

62

1   evidence if it's obvious, using that Coca-Cola example.

2          Again, this is far worse than 64 and 65.  I'll be

3   honest with you, 64 and 65 are a close call.  This one isn't.

4          **MR. POWELL:**  Understood, Your Honor.

5          **THE COURT:**  All right, Mr. Lerner, do you want to be

6   heard on 66?

7          **MR. LERNER:**  No, Your Honor, other than to say I

8   think this flavor that keeps coming through saying we have very

9   little evidence, I don't want to revisit it because it's in our

10  papers, I don't think somebody who's sitting on all the source

11  code -- and I want to be very clear about this, there is no

12  dispute that they have the crown jewels as to how you look at

13  how Apple does the alleged secrets and I think it's pretty darn

14  important that Your Honor is not hearing we've got the code and

15  they use our secrets.

16         So, this business that we keep hearing about they

17  didn't give us evidence or we haven't produced, we also agreed,

18  and I'll double check this to make sure I don't misspeak, you

19  heard it, 28 custodians, and yes, there will be more,

20  consistent with Your Honor's ruling, I assume, but I believe

21  that's just about everybody they asked for but for two

22  individuals who Court after Court have said no to.  So, the

23  idea that we're holding something back and they can't figure it

24  out, as you can tell, gets a rise out of me because I don't

25  think it -- first of all, I don't think it's relevant here to

63

1    Your Honor's point about reading the language; and second, it's

2    wrong.

3              **THE COURT:**  Well, the good news is when you respond

4    to Number 63, presumably they'll be able to see that.

5    Sometimes giving information vitiates the need -- obviates is

6    the right word, obviates the need for a lot of discovery down

7    the line.  Or maybe it won't.  We'll see.

8              All right, let's move on to -- we're not going now in

9    order, but let's move on to 148, quote,

10             "All document and things that refer or relate to the

11             calculation of oxygen saturation in any Apple Watch

12             Product."

13             We've moved off of the heart rate algorithm.  We've

14   moved into oxygen saturation.  We have refer or relate, but

15   here is the calculation of oxygen saturation in any Apple Watch

16   Product.  We're now back into the zone of I wish I had

17   information from Plaintiff about what that means in the form of

18   evidence.  You mentioned that, hey, I can go to my IT guy and

19   run the search.  You also could have put a declaration in to

20   help me understand, what is calculation of oxygen saturation?

21   Your client performs that function in some of its devices.

22   What does that mean?  How hard is it, what sort of documents

23   would be looked for?  I don't know, but I would have loved to

24   have had something from Apple that says oh, my gosh, I don't

25   know how I respond to that, that's going to potentially

64

1    implicate all sorts of things.

2           Here's what I know.  We've got an eight-year time

3    period.  We've got the words Apple Watch Product, which I don't

4    want to characterize it as overly broad, broad, or narrow, but

5    it's a defined term that is more than just one product.  What

6    do I do with this?

7           I'll hear from you, Mr. Powell.

8           **MR. POWELL:**  Thank you, Your Honor.

9           So, oxygen saturation is the calculation of the

10   amount of oxygen in a patient's blood.  Right?  And so, if you

11   go to the hospital you get a sensor placed on your finger --

12          **THE COURT:**  I guess I'm going to ask you, you know,

13   is there evidence of this?  In which case you can just say,

14   well, we don't have any evidence but here's what I'm going to

15   tell you, here's my understanding of how difficult it would be

16   to find all document, and I assume that's a typo, and things

17   that refer or relate to the calculation of oxygen saturation.

18   How do I know that that's described with reasonable

19   particularity?

20          **MR. POWELL:**  So, Your Honor, and, yeah, the

21   definition of oxygen saturation, I don't think that's in the

22   record.  I was just doing that as a --

23          **THE COURT:**  All right.  Okay, I appreciate it.  But I

24   really want to get -- I want to focus on what's in the record

25   and, you know, how is this described with reasonable

65

1    particularity?

2              **MR. POWELL:**  Correct.  And so, two things, Your

3    Honor.  Number one, oxygen saturation, this is discussed again

4    at that same page of the same exhibit that we've been looking

5    at.  And the issue here is oxygen saturation is a relatively

6    new feature of the Apple Watch that was released in the Series

7    6 in September.

8              **THE COURT:**  All right.

9              **MR. POWELL:**  So, in general we're not looking at as

10   long of a time period except to the extent it was being

11   developed beforehand.

12             **THE COURT:**  Is there anything in the record that I

13   know that, that 148 only refers to Apple Watch 6?

14             **MR. POWELL:**  It is not that it only refers to Apple

15   Watch 6, it's that that is the only product that released -- or

16   I'm sorry, that has that feature.  And that is in the record.

17   I can give you a citation.  It's in our Complaint.  So, that is

18   Exhibit 26 of that same document, 353-2.

19             **THE COURT:**  All right.

20             **MR. POWELL:**  And I can tell you the -- I'll point to

21   a couple paragraphs for the record.  Paragraph 25 of the

22   Complaint discusses when the Series 6 was released.

23             **THE COURT:**  When you say, "the Complaint," you're

24   talking about the -- we're at the Fourth Amended?

25             **MR. POWELL:**  Fourth Amended Complaint.  This is

66

1    Exhibit 26.

2                THE COURT:  All right.

3                MR. POWELL:  And so, Paragraph 25 discusses the Apple

4    Watch Series 6 announced on September 15th, 2020.  And if we go

5    forward, and now I will be referring to Paragraph 254 through

6    256 discusses the allegations with respect to this issue here.

7                THE COURT:  All right.  Mr. Lerner?

8                MR. LERNER:  Yes, so --

9                THE COURT:  Hold one, let me ask my question.  What

10   evidence do I have that this request is disproportionate or

11   unduly burdensome to Apple?  Just start with that question.

12               MR. LERNER:  So, the first piece of evidence you have

13   is that they are trying to rewrite it to make it less

14   burdensome on the fly, without answering Your Honor's question.

15               It is true that this only relates to one watch;

16   however, the way they have defined Apple Watch Products, they

17   say that means smart watches produced by Apple, including the

18   original Apple Watch and Apple Watch Series 1 through 6, i.e.,

19   real Apple Watch devices.  So, they -- this isn't limited --

20               THE COURT:  Understood, but, you know, here's where

21   Mr. Powell's point earlier about a reasonable and diligent

22   search -- I don't know how old you folks are, if you're as old

23   as I am.  I started out my career in the proverbial warehouse

24   full of boxes of records in the old days, going through looking

25   for records.  Okay?  They still exist to some extent, but the

67

1    job now is different.  And in terms of a reasonable or diligent

2    search, the difference between 148 and some of the other ones

3    is I do have information as to a reasonable and diligent search

4    would be limited to a product that actually has the

5    functionality referenced in this Complaint.

6           So, I kept talking about, you know, eight years,

7    because I couldn't tie down the parameters of the heart rate

8    algorithm because -- okay.  This one has been tied down a

9    little bit for me.  So --

10          **MR. LERNER:**  No.  To the contrary, that's why we have

11   this fight.  And they have to live by the sword and die by the

12   sword on this.  Apple Watch Product is capitalized.

13          **THE COURT:**  I understand, but what I'm saying is in

14   terms of a reasonable and diligent search, you don't have to

15   go -- if this functionality didn't exist in the first watch, a

16   reasonable and diligent search wouldn't require a custodian who

17   only worked on the first watch, unless, right, we're talking

18   about reasonable, unless there's some reason to believe that

19   that custodian, let's say Mr. Lamego, had information, trade

20   secret information from the trade secret that's referenced in

21   the Complaint and is referenced in the 2019.210 disclosures,

22   that someone back then had that.

23          So, that's what we're getting at.  I've got a little

24   bit more information here.

25          **MR. LERNER:**  And I want to -- I think we missed a key

1    point here and I think Your Honor's point made it because we're

2    going out of order.  If you look at Pages 28 --

3            THE COURT:  Wait, wait.  I'm going in the order of --

4    that it's been presented to me.

5            MR. LERNER:  Understood.  I meant this numbers-wise.

6    If you look at Pages 28 and 29 of our portion of the brief, we

7    did exactly what Your Honor just said, and it wasn't enough.

8    We said to them 148 and 149 concern the calculation of oxygen

9    saturation by the Apple Watch, as we just discussed, and we

10   agreed to produce documents responsive to both requests.  Their

11   Complaint --

12           THE COURT:  Well --

13           MR. LERNER:  -- they say this specifically in their

14   supplemental brief, their Complaint is that, exactly as Your

15   Honor just instructed and exactly as we just suggested, there's

16   only one Apple Watch that does it, which is the 6.  And as to

17   the 6, we already have begun producing the technical documents

18   related to oxygen saturation.

19           THE COURT:  So, here's the difficulty I have.  I hear

20   you.  I look at -- and I'm looking at Apple's response to

21   Request Number 148.  Okay?  And I used the word garbage a

22   little bit earlier.  I'm not going to characterize this.  But I

23   defy you to read the response to Request Number 148 and tell me

24   with any clarity what actually Apple has agreed to produce.

25           Now, if you're saying during the meet and confer

1    process that representation has been made, that some agreement

2    has been reached, let me hear it.  But I read the response to

3    Number 148 very closely and in addition, and maybe it's just

4    because it was cut and pasted, there's some typo or spacing

5    issues.  I defy you to say, to tell me that that's a

6    declarative statement that Apple will comply with 148, and to a

7    lesser extent, 149 isn't quite as bad, to a lesser extent 149.

8    Let's focus on 148.

9              **MR. LERNER:**  You're absolutely correct that this was

10   discussed at length during the meet and confer.  And to point

11   Your Honor to the place where you can find the answer to your

12   question, it's on Page 29 of our portion of the brief.  And you

13   can start at Line 1, but really where it gets into the details

14   is Line 4 through 11.

15             And we made -- we not only have started producing

16   documents.  We showed --

17             **THE COURT:**  Can I interrupt you?  Here's the critical

18   thing.  They need something in writing so that they know what

19   you're producing.  That's what Rule 34 requires.  Right?  And

20   we can walk through that if you want.  If you're going to make

21   an objection and say that only a portion of the request or you

22   need to clarify what you're going to -- you've got to say in

23   writing what you are producing.  And if that's where we are,

24   then that's what we're moving on.  If that representation has

25   been made, I'll turn it back over to Mr. Powell, but that's

1   what I need to know.

2           MR. LERNER:  And I invite them to say in any way,

3   shape, or form, that we did not offer and make it clear that we

4   were making available, which we did, inspection of the Series 6

5   source code that relates to calculating oxygen saturation and

6   we started producing the technical documents in response to

7   this.  And the dispute that was raised then, although it sounds

8   like it's being walked back now, was that's not enough, it's

9   got to relate to --

10          THE COURT:  I'm hearing what you're saying.  You're

11  saying you made it available.  What I'm saying is, is there a

12  representation that has been made --

13          MR. LERNER:  Yes.

14          THE COURT:  Wait.  Let me finish my question.

15          MR. LERNER:  Sorry.

16          THE COURT:  Is there a representation that has been

17  made in writing that's going to be binding on your client that

18  your client has produced -- and it's got that refer or relate

19  to, but let's -- actually, why don't you just tell me, what is

20  the specific representation, rather than me asking a question

21  without seeing it, what is the specific written representation

22  binding on your client that's been made that you think

23  adequately responds to Request Number 148?  Because it

24  certainly is not the response on Pages 12 and 13 of the Joint

25  Stipulation.

71

1              **MR. LERNER:**  So -- and if you walk through there

2    obviously are a lot of iterations of this in our declaration

3    supported here, where we're talking about these various issues.

4    But when you get to Exhibit J, for example, we expressly tell

5    them we are making the source code for Series 6 Watch available

6    to address this issue.

7              **MS. SAMPLIN:**  And they respond, "Thank you for

8    confirming."

9              **MR. LERNER:**  Right.

10             **THE COURT:**  Got to be careful when you switch back

11   and forth.

12             **MR. LERNER:**  Sorry.

13             **THE COURT:**  That was Ms. --

14             **MR. LERNER:**  Samplin.

15             **THE COURT:**  -- Samplin.

16             **MS. SAMPLIN:**  Samplin.  Apologies.

17             **THE COURT:**  So, slow down here.  We are making the

18   source code --

19             **MR. LERNER:**  We say in that email to their counsel,

20   another lawyer who is not here, the source code for the

21   Series 6 Watch, which includes the oxygen saturation code, was

22   on the source code computer as of October 12, 2020.

23             **THE COURT:**  All right, so there's two things.

24             **MR. LERNER:**  And then they, as Ms. Samplin indicated,

25   they respond thank you.

72

```
 1          THE COURT:  Okay, so there's two things.  That's
 2   telling them that the source code was on the computer.  I've
 3   got to make sure that that properly responds to 148.  But
 4   secondly, they are entitled under Rule 34 to a statement that
 5   says here's how we're complying, here's the compliance.
 6          I don't know.  We'll hear from Mr. Powell, his
 7   thoughts on that.  But why couldn't you have done just an
 8   amended response that said exactly what you just read, that we
 9   will produce the source code which provides the calculation of
10   oxygen saturation in the Apple Watch 6, which is the only
11   product that calculates oxygen saturation?
12          MR. LERNER:  Totally fair question, Your Honor.  The
13   answer is that we didn't understand that it would have
14   accomplished anything.  And if we should have, then we will --
15          THE COURT:  Well --
16          MR. LERNER:  -- do that going forward.  But we told
17   them that this is what we were doing, and it wasn't good
18   enough.
19          THE COURT:  And again, there's a lot of this
20   goose/gander thing.  They're stuck with their request they want
21   to move to compel.  Unless I've got something else, you're
22   stuck with this answer unless I can see, like Rule 37 requires,
23   that here's the proposal that I made.  And in 2,497 pages, if
24   you're going to ask me to go and see if that representation is
25   sufficient -- and again, that representation is nice, but
```

1   outside of the context of what that means, saying like we told

2   them we produced the source code for the Apple Watch Series 6,

3   how do I know, Mr. Government Major know that that sufficiently

4   responds to Document Request for Production Number 148?

5            That's what I'm getting at here.  And so, I'll hear

6   from Mr. Powell whether there really is a dispute, but I need

7   to have this in writing in front of me so that I can see these

8   things if you want me to consider it.  If you want -- if you're

9   going to be going to court and you know you're going to court,

10  do a supplemental response.

11           Because here's what it is, sometimes there's this

12  feeling, I'm riffing a little bit now, but there's a feeling

13  that, oh, if I do a supplemental response I'm admitting I was

14  wrong.  You're not.  You're trying to position yourself, the

15  same way you can agree to limit a request during the meet and

16  confer process.  It's not showing weakness, it's showing when

17  the judge looks at it he's going to see that I limited it to

18  this and then they still wouldn't produce, or I supplemented my

19  response, and it still wasn't good enough.  The kind of things

20  I'm looking for buried in 2,457 pages, a big chunk of which is

21  under seal under a difficult -- I don't like to print out under

22  seal things because then I've got to have them specially

23  shredded, but I do want you folks, I mentioned it before, to

24  send them to me.

25           All right.  Mr. Powell, what do you have to say about

74

1    what Mr. Lerner just pointed me to?

2          **MR. POWELL:**  A few things, Your Honor.  Number one,

3    the issue of a written response, I wanted to clarify first

4    on -- with respect to a lot of these, including those ones that

5    we just addressed, like 66 and 63 and all of those, the written

6    response provided is not Apple's current representation of what

7    it'll produce.  So, on those early ones it represented that it

8    would produce for the patent -- when the patent case was -- or

9    the patent claims were pending, before they were stayed, and

10   then after the patent claims were stayed they said I'm not

11   producing any more.  And so that written response, if you're

12   looking at that and saying what will they produce, they're

13   currently telling us they won't produce things that they

14   previously agreed to.

15         **THE COURT:**  Okay.  Well, for 66 I didn't get to the

16   response because I found the request itself didn't describe the

17   items sought with reasonable particularity.  I have gotten past

18   that hurdle tentatively with 148, which is why I'm getting to

19   the response and trying to figure out whether there's a

20   sufficient response under Rule 34 that explains --

21         And again, a lot of this stuff you folks do this all

22   the time.  I did it.  You work through these things.  You've

23   got a representation that says, hey, this is what I'm going to

24   do, is that okay?  Yes.  Then you don't have to do a

25   supplemental response.  But if the other side -- and I hear it

1  was apparently said thanks, sounds like maybe that was okay.

2  Maybe it wasn't.  But if you're going to come to court --

3         I'm wasting a lot of time here, but I'm going to tell

4  you something else.  We have lawyers that come in here, and

5  you've both dealt with them, there are some lawyers that, boy,

6  they get their discovery and the next day they send out a

7  48-page meet and confer letter.  Boy, you better respond with a

8  48-page response or be prepared to go through each and every

9  one of them because that lawyer's going to move.  There's a big

10  red flag coming.  When you get one of those, there's a good

11  chance he's going to move.  So, what do you do?  Just like when

12  you're in trial.  Somebody makes an objection and the judge

13  overruled the objection, but you realize, oh, actually that

14  does call for hearsay or, oh, that could be a problem, at a

15  deposition, right, what do you do?  I'll go ahead and have the

16  question answered, but then I'm going to go and rephrase it

17  because I don't want to have to defend this thing that I know

18  has got an issue.

19         Do the same thing with your discovery responses and

20  your meet and confer.  It's usually done informally.  You folks

21  should know by now it looks like everything's going to wind up

22  in court, so make sure you're on strong footing.

23         So, I don't know what I'm going to do on 148 right

24  now, but tell me what you think about what Mr. Lerner said.

25         **MR. POWELL:**  Thank you, Your Honor.

76

1          So, they referenced the source code in the computer

2   October 12th, 2020.  First of all, that was not tied to this

3   request at all.  That was just stating source code was

4   available.

5          Second of all, Apple has since admitted that the

6   oxygen saturation code was not in fact produced on October 2020

7   and they've produced more code more recently.  So, the idea

8   that the code has been produced on 2020 -- October 2020 is not

9   correct.  It was later the parties realized, and discussed, and

10  worked out, that the code had not been produced.

11          **THE COURT:**  Okay.  Tell me whether that code gives

12  you what you think is the information you need that you were

13  seeking from Request Number 148.

14          **MR. POWELL:**  I don't think it does because source

15  code alone is just the source code and the final product,

16  right?  We have no information about how it got there, who put

17  it there, right?  That's what we're trying to look for.

18          And the issue here Your Honor pointed out is that,

19  was Mr. Lamego involved in this, right?  We're just trying to

20  get some documents to figure out what Mr. Lamego's involvement

21  was.

22          **THE COURT:**  So, now we're a little bit tenuous

23  though, right?

24          **MR. POWELL:**  I'm not sure I understand.

25          **THE COURT:**  The Series 6 was released November of

1   last year, somewhere late last year, and Mr. Lamego left Apple

2   in 2014, after roughly six months, right?

3           **MR. POWELL:**  But we do have some evidence already --

4           **THE COURT:**  The answer to that question is right --

5   the answer is, yes?

6           **MR. POWELL:**  Correct.

7           **THE COURT:**  Okay.  So, it's seven years later; you

8   may have evidence that traces it to it, but wouldn't a good

9   first step to say, well, I've looked at what they've described

10  as responsive, that is, the source code for the Series 6, and

11  here's what -- here's the trails that we think suggests that it

12  came from Mr. Lamego or it came from our trade secret?  Is

13  there anything like that?

14          **MR. POWELL:**  Your Honor, I personally don't read

15  source code, so I couldn't tell you what the code said.  I can

16  tell you that my understanding is that the code is, I think,

17  only the most recent version.  I don't think we have all

18  versions of code.  I would have to check with counsel that

19  reads source code.  I don't.

20          But the issue again is, I don't think that simply

21  producing source code is enough.  That doesn't show how -- who

22  wrote the code, how it got there.

23          Just giving us a piece of code and saying, figure it

24  out, there's all kinds of emails and history that shows how

25  this stuff is there.

1          And the other thing I'd like to point out is, you

2     know, oxygen saturation is only in the Series 6, according to

3     Apple, right?  And so, on all of these earlier watches, there

4     should be no, or few, documents about them that are responsive

5     to this, right?

6          So, the idea that this is overbroad and unduly

7     burdensome, it's kind of self-correcting in that if it's really

8     not relevant, and it's not here in the earlier watches, then

9     there shouldn't be any documents that are really responsive.

10         **THE COURT:**  All right.  Well, in my view, there's

11    been a breakdown of the meet and confer process as to 148;

12    Apple saying that they've produced responsive information.  I

13    don't know what that means.  I don't know what it means in this

14    context, taking a line out of a meet and confer letter that

15    says, "We're producing the source code".  According to

16    plaintiff, it was in a different context.

17         There's too much that leaves me with going back to

18    Apple's initial response to 148.  I think 148 looks like a

19    grant to me.

20         Plaintiff has met their initial threshold, and

21    obviously, the search is a "reasonable and diligent search"

22    doesn't necessarily require -- if a reasonable and diligent

23    search doesn't require a search through all 28 or 29

24    custodians, it doesn't require anything beyond based on Apple's

25    assessment what's in the Series 6; whether it's just the source

79

1    code or other background relating to the development of the

2    source code, so be it.

3            But this one, since I don't have any evidence of

4    burdensomeness, I don't have any evidence of lack of

5    proportionality from Apple, 148 looks like a grant to me.  If

6    Apple believes they've produced everything that's responsive,

7    or that is responsive following a reasonable and diligent

8    search, so be it.

9            All right.  Let's move on to 149.

10           **MR. LERNER:**  Your Honor, can I just -- since this may

11   come up again, can I give you a couple of facts that are

12   relevant here?

13           **THE COURT:**  Are they in the record?

14           **MR. LERNER:**  I believe so, yes.

15           **THE COURT:**  All right.

16           **MR. LERNER:**  All right.  First of all, oxygen

17   saturation is not a secret in this case or anywhere else.

18   People have been doing it literally for decades.

19           So, that's the first point, which I think is

20   critical.  And that is in the record, and it's why this is so

21   broad.

22           **THE COURT:**  Well, I don't -- I wish I had something

23   that said when you just said it's so broad.  I don't.

24           **MR. LERNER:**  You do, and it is -- I really have to

25   emphasize how important this is.  You do.

80

1          You have a litigated, which you took the time to rule

2     on, description of the secrets.  And if you go and look at that

3     description, oxygen saturation is in --

4          **THE COURT:**  There's only one -- I'm going to

5     interrupt you.

6          There's only one Apple Watch Product that has the

7     calculation of oxygen saturation; that's what's been

8     represented to me.

9          And this request is specifically tied to the

10    calculation of oxygen saturation in any -- it's not generally.

11    It's the calculation of oxygen saturation in any Apple Watch

12    Product.

13         **MR. LERNER:**  Right, which is eight years of watches

14    we have to go back and look through to find -- given exactly

15    what you just said --

16         **THE COURT:**  I don't know that you do because I don't

17    have any evidence of that.  All I've been told, and both sides

18    agree, is that that functionality is only contained in the

19    Series 6.

20         So, 148 is a grant.  We're going to move on to 149.

21         **MR. LERNER:**  But -- okay.  Apple Watch Product is

22    not --

23         **THE COURT:**  We're moving on to 149.

24         **MR. LERNER:**  Okay.

25         **THE COURT:**  "Documents sufficient to show any pulse"

**EXCEPTIONAL REPORTING SERVICES, INC**

81

1    -- I'm sorry.  I'm going to make it clear I'm quoting.

2              Request 149.  "Documents sufficient to show any pulse

3    oximetry algorithms used in any of the Apple Watch Products."

4              It's your motion, Mr. Powell.  What do you have to

5    say about Request 149?

6              **MR. POWELL:**  I think, Your Honor, 149, I believe, is

7    very similar to 63.  The difference is that 63 was for heart

8    rate algorithms, and 149 is for pulse oximetry algorithms.

9              I would submit that it should be granted for the same

10   reasons as Request 63.

11             **THE COURT:**  Mr. Lerner.

12             **MR. LERNER:**  Apple Watch Products is not Series 6.

13   We -- Your Honor has actually raised exactly the question we

14   fought over, and they are effectively trying to revise it.

15             **THE COURT:**  Then you have nothing to worry about.  If

16   it's not included in the definition, then you don't have to

17   produce it.

18             **MR. LERNER:**  No, that's the problem is, it is.  They

19   -- Apple Watch Products means 1 through 6.

20             **THE COURT:**  Okay.

21             **MR. LERNER:**  We have to go look at eight years of

22   versions of the watch for, in the last request, any --

23             **THE COURT:**  I've already discussed this.  What else

24   do you have to say about 149?

25             **MR. LERNER:**  Again, we are not -- we are not talking

82

1   as a threshold matter about something relevant to this case.

2   Nobody has argued to Your Honor as a threshold matter that

3   pulse oximetry algorithms are a secret because they can't.

4   That's information that you have.

5        And we're being asked to provide documents sufficient

6   to show any algorithms that are not a secret used in any watch

7   from 1 through 6.  It's the same problem as the last one.

8   It's --

9        **THE COURT:**  Sufficient to show.  So, they've

10  clarified that that means -- all you've got to do is whatever

11  algorithm and whatever watch, you produce that one algorithm,

12  and you haven't told me that, hey, there's 50 pulse oximetry

13  algorithms used in each watch, there's 6 watches, that's 300

14  algorithms that we have to go search for.

15       **MR. LERNER:**  This is no more relevant, Your Honor,

16  than what you or I had for lunch yesterday.  It does not bear

17  on any fact related to the case.

18       As a threshold matter, nobody can tell you, sitting

19  in the court today, that pulse oximetry algorithms are a

20  secret, and that we should have to provide documents sufficient

21  to show for six generations of watches.

22       It has no relevance.  I can't make it more relevant

23  than what, and like I said, an Apple employee had for lunch.  I

24  can't -- I -- and that's not hyperbole.  I cannot make it more

25  or less relevant under the Federal Rules.

83

1      **THE COURT:**  All right.  Mr. Powell, I'll give you the

2 last word.

3      **MR. POWELL:**  Unless Your Honor has any specific

4 questions, I'll --

5      **THE COURT:**  Well, respond to what counsel just

6 argued.

7      **MR. POWELL:**  Your Honor, I do think that pulse

8 oximetry is relevant.  I think that it's in the 2019 and the

9 complaint, the citations that we've given you before.

10      I do think, frankly, it's hyperbole to say that pulse

11 oximetry is no more relevant than what someone ate for lunch.

12 I think it's highly relevant in the case, and I think this

13 request is directly limited -- if there is only one algorithm,

14 it shouldn't be a big deal, but we have no idea.  Again, just

15 like you said, it could be one, it could be 50, but they

16 haven't told us, and we don't know.

17      **THE COURT:**  And was -- I don't want to get into

18 anything that's confidential, but was the pulse oximetry

19 algorithm --

20      **MR. POWELL:**  So, Your Honor --

21      **THE COURT:**  -- only -- well, wait.  Similar to the

22 issue of oxygen saturation, is the pulse oximetry algorithm

23 only used in the Series 6 Apple Watch, or is that also used in

24 other watches?

25      **MR. POWELL:**  I know the Series 6 is the only one that

84

1    appears to calculate oxygen saturation.  So, oxygen saturation

2    is the parameter in the blood; pulse oximetry is how you get

3    there.  It's how you calculate it.

4           So, they're pretty much one and the same here.  And I

5    don't know, unless there is some background algorithm that

6    Apple hasn't told us about in the earlier watches, the Series 6

7    is the only one that features that -- or has that feature.

8           **THE COURT:**  And it's both 148 and 149 that Apple has

9    made available the source code for Series 6 Watch, which Apple

10   indicates is that both 148 and 149 are limited to the Series 6

11   Watch; is that correct, Mr. Lerner?

12          **MR. LERNER:**  Yes, it's correct, and if we -- as they

13   have been looking at this code --

14          **THE COURT:**  Let me --

15          **MR. LERNER:**  -- yeah.

16          **THE COURT:**  -- allow me to guide things here.

17          Does the source code -- can one determine the

18   algorithms for pulse oximetry and calculation of oxygen

19   saturation from the source code for the Series 6 that you

20   indicate has already been provided?

21          **MR. LERNER:**  We provided the source code and --

22          **THE COURT:**  And the question is very specific.  Does

23   the source code that has been provided allow plaintiffs to

24   determine or see, for lack of a better term, if you have

25   someone who reads code, the pulse oximetry algorithms?

85

1        **MR. LERNER:**  And this is a little tricky.  The answer

2   to Your Honor's question is, it enables them to look at how we

3   calculate and handle pulse oximetry.  This is what I was saying

4   before.  There are algorithms that are -- have nothing to do

5   with the secrets as described in the 2019.210 disclosure, but

6   if you are talking about -- and the way you can know this is

7   because we briefed it extensively on their motion -- their

8   failed motion for a preliminary injunction.

9        And they ended up with this very, very narrow slice

10  relating to pulse oximetry, and we have produced the code that

11  relates to the alleged secrets, which I won't put on the

12  record, that relate to pulse oximetry.

13       There is no complaint to us or to Your Honor that

14  they do not have the code sufficient to figure out how we do

15  exactly what they claim is the pulse oximetry secret.

16       But if Your Honor's question is, does the code enable

17  someone to see every pulse oximetry algorithm at Apple --

18       **THE COURT:**  Used in the Apple Watch 6, Series 6.

19       **MR. LERNER:**  -- it.  No, because it's not a -- those

20  are not the secrets.  We can't go looking for every algorithm.

21       It's not -- it's not possible to just put easy

22  numbers on these, and that's why when I said before, it is so

23  important that we produced the source code, and nobody is

24  telling Your Honor we don't know how Apple does this.  We can

25  see that they're using our secrets.  We produced the very best

86

1    evidence to show whether or not we are using the alleged secret

2    related to pulse oximetry that they have described in the case.

3    And there is no dispute about that.

4            This is about a much broader set of information.  And

5    you're absolutely right, and I apologize that I can't tell you

6    how many algorithms there -- I don't know if anybody could.

7    But I can tell you that we produced for the one they accused in

8    this case, and they're not saying otherwise, which is why, and

9    I have tried to be judicious on where I argue things, but

10   that's why I'm putting so much emphasis on this.

11           It is not relevant.  And when they say it's in our

12   complaint, or it's in our 2019.210 disclosure, that is not

13   true.  What's in the complaint and the 2019.210 disclosure is

14   the alleged secret for which we have produced the code, full

15   stop.

16           **THE COURT:**  All right.  Mr. Powell, please respond to

17   what Mr. Lerner says, which is that they've produced everything

18   that relates to the alleged trade secret as it relates to pulse

19   oximetry algorithms.

20           **MR. POWELL:**  Your Honor, I'll be very brief.  I think

21   the issue --

22           **THE COURT:**  I don't care if you're brief or not.

23   Please respond.

24           **MR. POWELL:**  -- okay.  Thank you, Your Honor.

25           I think the issue is, again, about the -- how you

87

1    interpret the Section 2019 statement.

2            From what I'm hearing from counsel, it sounds like

3    they have picked some, but not all pulse oximetry algorithms to

4    disclose to us, and that they think that those algorithms show

5    that they -- those algorithms don't misappropriate the trade

6    secrets.

7            The issue is, I think we're entitled to discovery to

8    see what the algorithms they use are so that we can make that

9    determination, rather than just have them pick one algorithm

10   and produce source code on it.

11           I don't know what I don't know.  So, I can't tell

12   you, yeah, I know there's 50 other algorithms, and one of them

13   misappropriates my trade secret because they haven't told me

14   what the other algorithms are.  They've only produced what they

15   want us to see.

16           **THE COURT:**  All right; 149 is going to be granted for

17   lack of evidence in support of objections.

18           150.  "All documents and things that refer or relate

19   to selection between any pulse oximetry algorithm used in the

20   Apple Watch Products."

21           This is analogous to Request Number 64, which related

22   to heart rate algorithms.

23           Mr. Powell, why should I treat this differently than

24   64?

25           **MR. POWELL:**  Your Honor, I would submit we should

88

1    treat it differently because of the way Your Honor treated 148

2    and 149.   The difference between pulse oximetry and pulse rate.

3            **THE COURT:**  Well, it's the difference between

4    sufficient to show and refer or relate to.

5            **MR. POWELL:**  Yes, Your Honor, but I guess on 148, the

6    idea was that pulse oximetry or calculation of oxygen

7    saturation, which are one and the same, that that was

8    sufficiently narrowed based on the fact that the Series 6 is

9    the only watch that says it calculates oxygen saturation.

10           So, that's the same thing here that the pulse

11   oximetry algorithm, again, that's the same as calculation of

12   oxygen saturation in Request 148.

13           So, again, 150 is actually slightly narrower in that

14   it's only looking for selection between pulse oximetry

15   algorithms.  And again, that's directly at issue in that same

16   portion of the 2019, Exhibit 28, that we looked at earlier.

17           **THE COURT:**  All right.  Well, partly -- so, the issue

18   I -- one of the issues I have with 150 is the response, which

19   we talked about in connection with 148.

20           Mr. Lerner, is it your contention that 150 -- is it

21   Apple's contention that 150 has been responded to the way 148

22   and 149 were, through the production of the source code for the

23   Apple Watch Series 6, or is there some other position with

24   respect to 150 by Apple?

25           **MR. LERNER:**  It's not just, as I said, and it's in

1    our declaration.  It's not just source code.  We also have been

2    producing documents that we actually even attached examples of.

3    And this is on Page 29, as we referred to earlier in terms of

4    productions here.

5            So, it is not just that it is solely the code, and it

6    is the same issue, Your Honor.  This is kind of unbounded

7    discovery that, A, isn't about a secret; and B, isn't -- I

8    don't know how to say it more clearly.  They keep saying now --

9        **(Mr. Lerner confers with Ms. Samplin)**

10           -- they keep saying, Your Honor, well, it's only in

11   one watch.

12           If I draft a response that says I want everything

13   related to elephants, zebras, and giraffes, I can't come back

14   to you and say, no, no, it's just about elephants.

15           This would require us to go look for all of it.

16       **THE COURT:**  Well, wait a minute.  Wait a minute.

17   Rule 34 and the application note to Rule 34 does allow a

18   responding party, when asked for antelopes, elephants, and

19   giraffes, to say, it's unduly burdensome, and antelopes and

20   elephants are not relevant to any issue.  So, we will object

21   and not produce in response to that, but we will produce as to

22   elephants.  And that is an appropriate response under Rule 34.

23           The response I have on 150 concludes with, "Apple

24   declines to respond to the request at this time".  Now, that

25   was the pending one, 2019.210, but there is -- I don't know

1    what this response is.  So, had Apple responded with, "Listen,

2    you're asking for five watches; there's one that has this

3    functionality, and we'll respond with respect to that one and

4    not as to the other five".

5           I'm not saying that plaintiff couldn't, in that

6    situation, move to compel, and say that response is

7    insufficient because the other four or five watches may contain

8    relevant information, but in terms of the strict language and

9    requirements of Rule 34, that response wouldn't run afoul of

10   Rule 34.

11          Again, it gets back to the difficulty here.  We're

12   moving to compel.  I'm hitting nails.  I have a request, and I

13   have a response.

14          I then have 2,497 pages to try to figure out whether

15   the request has been narrowed, whether the response has been

16   amended to see that something would be produced or wouldn't be

17   produced.  And I'm trying to do the best I can with what's in

18   front of me.

19          I wish I had more clarity from -- in terms of

20   narrowing of a response and/or meaning of some of these terms.

21   I wish I had information from Apple, evidence that suggested or

22   showed how burdensome or expensive it would be to comply with

23   this, but you've given imperfect information, and I do the best

24   I can.

25                MR. LERNER:  The last thing I'd say, Your Honor,

1   which I think answers the last question you asked me is, we did

2   produce the code.  As I said, there's no dispute that they

3   don't know how we do it.  That's -- you're never hearing

4   counsel say that.  They know exactly how we do it.  They're not

5   -- they don't have a basis to say, there's some other way they

6   do it over here, because we showed them how we did it.

7           The -- all that you heard was, "I don't know what I

8   don't know".  That is not relevance.  And what we do know is we

9   produced the code, and I think the most important answer to

10  Your Honor's question is, nobody is coming back and saying a

11  reason why they need this other stuff other than what you just

12  heard, which is "I don't know what I don't know".

13          **THE COURT:**  Is Apple claiming that the source code

14  for the Apple Watch 6 is in place to pulse oximetry or the

15  other issues we've been discussing is dependent -- was

16  developed independently of Mr. Lamego or any trade secret of

17  plaintiff?

18          **MR. LERNER:**  Absolutely.

19          **THE COURT:**  All right.

20          **MR. LERNER:**  And I do want to go back and say,

21  because Your Honor has asked very good questions, and earlier

22  on this you said, "Well, these questions are pretty broad in

23  relation to both the analog in the last set and this one".  And

24  they said, "Well, we don't know how it got there.  Who put it

25  there?".

1          We're -- why isn't the request here, "Please tell us

2     Mr. Lamego's source code commit history"?  That's not what this

3     is.  This is everything related to pulse oximetry, and

4     everything related to oxygen saturation.

5          There is one person who has alleged six years ago to

6     have done this.  You don't have a Rule 11 basis in front of you

7     to hear that anybody else took any secret from them and gave it

8     to us.  One person.  And we're doing 28 custodians.

9          And the question is, to your point, if you want to

10    ask, "Did Lamego write that?", that's a whole lot different

11    than every document related to pulse oximetry or oxygen

12    saturation.  It's also a whole lot different than sufficient to

13    show.

14          **THE COURT:**  All right; 150, the motion is denied

15    without prejudice.

16          And I'm going to clarify on 148, and it's because

17    it's what Apple has put in its portion of the joint stipulation

18    where I want 148, Apple to -- the motion is granted in part

19    that Apple has to put in writing in response -- an amended

20    response compliant with Rule 34 that states what they have

21    produced and what they are not producing, or what they have

22    searched for and what they will not search for in response to

23    148 so that, at a minimum, plaintiff knows what it has and what

24    it doesn't have.

25          And that's without prejudice to plaintiff being able

1   to move on that response or move -- serve an additional more

2   narrow request.

3         All right.  Let's move on to 151.  And 151, I'm

4   probably going to treat the same way I did 150.  And let's see.

5   And 65; although as I mentioned with 65, it's a close call, I'm

6   inclined to deny that without prejudice to a more narrowly

7   served request.

8         Mr. Powell, I'll hear from you.

9         **MR. POWELL:**  Your Honor, I would submit I still think

10  that pulse oximetry is different than pulse rate for the

11  reasons discussed, but I understand your Court's ruling -- or

12  the Court's ruling.

13        **THE COURT:**  All right.  Mr. Powell, anything more

14  having heard the tentative on 151 that you -- that Apple wants

15  to be heard on?

16        **MR. LERNER:**  No, Your Honor.

17        **THE COURT:**  All right; 153.  This is a little

18  different.

19        "All documents and things that refer or relate to the

20        operation of any LEDs used to determine oxygen

21        saturation for any Apple Watch Product, including but

22        not limited to documents and things that refer or

23        relate to LED timing, duty cycle, current, or power

24        usage."

25        Mr. Powell, I'll start with you on the issue of both

94

1    relevance and reasonable particularity.

2         **MR. POWELL:**  Thank you, Your Honor.  In this one in

3    particular, I'd like to point to specifically we're looking at

4    the operation of the LEDs used to determine oxygen saturation.

5    So again, this is far narrower, I think, than some of the other

6    requests we've looked at.

7         What it is relevant to is, there is a number of

8    things; both the trade secret that we discussed, where we

9    talked about power consumption.

10        At the end of this Request 153, we tried to include

11   some examples to show what we wanted because we thought it

12   would be helpful, right?  So, referring to timing, duty cycle,

13   current, power usage --

14        **THE COURT:**  Let me just say, examples are fine.  I

15   don't have a problem with examples.  It's the more broad

16   language preceding examples that's usually the problem.

17        **MR. POWELL:**  Right, and so that's the issue here is

18   that the language we have here is, I think it's very narrow.

19   It's operation of LEDs used in determining oxygen saturation.

20   That is a narrow topic.

21        The examples are intended to give some examples of

22   what we're looking for, and explain why it's relevant.  One of

23   the reasons is power usage that we talked about.

24        Another reason is this timing and duty cycle.  That

25   is relevant to a different trade secret.  The first category of

95

1  trade secrets; again, I won't quote it, but in that -- the

2  identification, Exhibit 28, that is the first category of trade

3  secrets where we are talking about some of those issues.

4          And I don't want to get more specific on the public

5  record here, but those examples are really kind of explaining

6  the relevance of this in the request itself.  But like you

7  said, it's narrowly directed, or it's the first part that is

8  controlling, and that's narrowly directed, I think, to the

9  operation of LEDs using oxygen saturation.  I think that's a

10 much narrower topic than what we've been discussing.

11         **THE COURT:**  All right.  Mr. Lerner.

12         **MR. LERNER:**  Again, Your Honor, it's every document

13 and everything that relates to something that nobody is telling

14 you is a secret.  LEDs used to determine oxygen saturation;

15 that's not a secret.  And because of the definitions, it's six

16 series over eight years.  It's never tethered in any way,

17 shape, or form.  I'm going to stop using that word.

18         It's never tied or there's no reference to

19 Mr. Lamego at any point.  And those aren't examples.  It's

20 including but not limited to.  This is somewhat similar to the

21 one that you said was worse, not better, than the earlier one.

22         **THE COURT:**  And Mr. Powell, I may have missed it.

23 Which trade secret does this refer to?

24         **MR. POWELL:**  There are two categories, Your Honor.

25 So, if I'm looking at Exhibit 28, this is Docket 353-2, and if

96

1    I'm looking at the ECF Numbers -- so, Number 1 is we have the

2    trade secrets at Page 315 that we've been discussing directly.

3           And then the other one is the --

4           **THE COURT:**  So, in terms of -- and I'm going to speak

5    about what's in the joint stipulation; that the LEDs, is that

6    referring to Page ECF -- I'm sorry -- CME-CF, Page 315, Line 4?

7           **MR. POWELL:**  Right.  So -- correct, Your Honor.  That

8    is one aspect referring to those LEDs.  So, the --

9           **THE COURT:**  So, and what else -- I want to focus

10   really on the LED issue.  What else in the trade secrets has to

11   do with LEDs?

12          **MR. POWELL:**  Sure.  So, that is one.  And then also

13   on Page 303 of ECF -- of the ECF Page 353-2, Page 303,

14   beginning at Heading A.

15          And for this, we have -- I will direct you, for

16   example, to look at Line 10.  Or actually, I'm sorry, Line 7,

17   Line 10.

18          So, we have these references to light sources.  I can

19   say that.  That is an LED.  An LED is a light source, and a

20   sensor is a light detector.

21          And then we have, when we're talking about timing and

22   duty cycle, for example, I'd direct you to Line 8, second word.

23   And then, I could keep going throughout, but I think this

24   entire category of trade secrets, if Your Honor wants more

25   detail, we might need to seal the transcript for that part.

1          **THE COURT:**  Give me that cite again for the last --

2   the most recent citation you gave me.

3          **MR. POWELL:**  That was Page 303, I'm looking at

4   Line 8, second word.

5          **THE COURT:**  Uh-huh.  I've got that one.  I thought

6   there was something beyond that.  That's --

7          **MR. POWELL:**  It goes on, you know, if -- you can see

8   similar concepts at Line 13.

9          **THE COURT:**  And what -- are there other aspects of an

10  Apple Watch, for example, that uses a light-emitting diode?

11          **MR. POWELL:**  Right, so the light-emitting diode is

12  used for both calculation of pulse rate and oxygen saturation.

13          **THE COURT:**  Well, does it -- I mean, an LED is used

14  for lots of things.  This is something, and again, I don't need

15  a declaration to know that LEDs, particularly in a watch, and

16  tell me if you disagree, are pretty common for all sorts of

17  functionality.

18          **MR. POWELL:**  I think it may depend on the watch.

19  We're specifically referring here, and I think the reasonable

20  interpretation of this request, is the LEDs on the back of the

21  watch that are talking about physiological parameters.

22          I know there's an LED display on the front, but I'll

23  be very clear.  We're not talking about the LED display.

24          So, these are the LEDs on the back of the watch.

25  They're used in pulse rate, yeah.  And in this particular

1  request, it's LEDs used to determine oxygen saturation is the

2  language of the request.  So, it's not, again, other LEDs used

3  for other purposes.

4          **THE COURT:**  All right.  Mr. Lerner.

5          **MR. LERNER:**  I think Your Honor's first question was

6  a very good one, if I don't know --

7          **THE COURT:**  Well, I went back and looked, and looked

8  at the request --

9          **MR. LERNER:**  -- yeah.

10         **THE COURT:**  -- and it is tied.  LEDs used to

11  determine oxygen saturation.

12         **MR. LERNER:**  Right, which again -- I'll note that you

13  didn't hear anybody disagree.  Oxygen saturation is not a

14  secret.  People have been doing it effectively forever in the

15  context of this case.  So, saying LED lights, which to Your

16  Honor's point, if you take off almost any watch these days that

17  does anything related to your physiology, you always see those

18  lights on the back.

19         **THE COURT:**  Uh-huh.

20         **MR. LERNER:**  The best analogy I can give you, which

21  is kind of why this breakdown is so important, is this is akin

22  to saying, "Your Honor, the headlights of my car are a secret".

23  And that could be fine.  You could have a secret design.  It

24  doesn't mean you can come back and say, "I want everything

25  about every light on the car".

1          It's -- there are lots of things involved, and again,

2  no dispute about that.

3          **THE COURT:**  What if it was, "I want everything about

4  lights on the car used to detect" -- my wife just got a new

5  car, and it's got one of those things where you drive, and if

6  you get close to the lane, it like, bumps you.  And I don't

7  really like it.

8          **MR. LERNER:**  No, and neither do I.

9          **THE COURT:**  But what if it was limited to lights to

10  detect road lights?  That's a more narrow one.

11          **MR. LERNER:**  Yeah.  And that -- you got it exactly.

12  That would work if your allegation were that that function were

13  a secret.  But it's not.

14          **THE COURT:**  So, let's get back to, and maybe we will

15  need to discuss it, but to the extent we can avoid it, we're

16  going to try to avoid it.  Let's get back to what Mr. Powell

17  identified at -- starting at Page 303, Line -- let's just call

18  the whole thing Lines 7 through 11.

19          And let's seal this portion of the transcript.  So,

20  it's -- the time is 12:28, and we're going to -- I find that

21  the following discussion, until we lift the seal is -- there is

22  good cause to seal it.

23      **(Sealed portion omitted from 12:28 p.m. to 12:44 p.m.;**

24  **Counter Numbers 12:00:45 through 12:16:42)**

25  *//*

1          **THE COURT:**  Yeah, we're going to -- unless you tell

2    me you're going to get into sensitive material, we will be in

3    the public record and will end the "Under Seal" portion.  And

4    it's 12:44.

5          **MR. KATZENELLENBOGEN:**  Your Honor, I think here that

6    what we have is the narrowing language, because what we're

7    talking about is testing or analysis, so it's limited there.

8          **THE COURT:**  Well, and/or analysis, yes.

9          **MR. KATZENELLENBOGEN:**  And/or analysis.  Correct.

10   So, it could be testing, it could be analysis, or it could be

11   both.

12         **THE COURT:**  That's three options.

13         **MR. KATZENELLENBOGEN:**  And it's properties and/or

14   characteristics.  So, you have the three options there.

15         **THE COURT:**  Times two; six, six.

16         **MR. KATZENELLENBOGEN:**  Yeah.  And it's with respect

17   to --

18         **THE COURT:**  I'm not saying limitations.  I'm saying

19   options.  It's different from the last one.  So, that's six

20   different -- if we were a flow chart --

21         **MR. KATZENELLENBOGEN:**  Yes.

22         **THE COURT:**  -- there's now six different arrows

23   coming out of 154.

24         **MR. KATZENELLENBOGEN:**  Yes, I think though --

25         **THE COURT:**  That relate to any Apple Product, and

1    there's six of those.  So, there's now 36 different arrows

2    coming out of the flow chart.

3            **MR. KATZENELLENBOGEN:**  -- and then --

4            **THE COURT:**  Or any component of an Apple Watch, and

5    how many components are there in the Apple Watch?

6            **MR. KATZENELLENBOGEN:**  Well, and that's where I think

7    the critical narrowing takes place, is that it's not any

8    component.  It's a component that relates to pulse --

9            **THE COURT:**  No, the word is "or".  But the word is

10   "or".  Okay?  So, it's characteristics of any Apple Watch or

11   any component of any Apple Watch that relates.

12           So as a matter of grammar, the third "or" -- or maybe

13   it's the -- actually it is the third "or" in the sentence so

14   far but it's the second one as it relates to a list.  That

15   "relate to" applies to everything that came before it.  So that

16   limits testing and/or analysis of the properties and/or

17   characteristics of any Apple Watch or any component of any

18   Apple Watch that relate to.

19           So imagine trying to respond to that.  Imagine trying

20   to tell a paralegal to run a search or to -- as I used to do in

21   the old days, try to go through boxes of documents with this in

22   mind.  Does that -- and then we get back to the reasonable

23   particularity.  With this in mind, how do you look for records?

24           **MR. KATZENELLENBOGEN:**  This would be records dealing

25   with testing or analysis of the watch or component that relates

1   to the pulse oximetry or power consumption by pulse oximetry.

2   So what we're talking about is the analysis or testing of the

3   pulse oximetry.

4        **THE COURT:**  Well, the analysis or testing of the

5   properties or characteristics of any Apple Watch or any

6   component of the Apple Watch that relate to pulse oximetry or

7   power consumption by pulse oximetry.

8        **MR. KATZENELLENBOGEN:**  Correct.

9        **THE COURT:**  So if this were documents sufficient to

10  show power consumption by pulse oximetry -- I'm sorry --

11  documents sufficient to show testing of pulse oximetry or power

12  consumption by pulse oximetry of Apple Watch products, okay, I

13  can sit down and say, okay, I know what that's asking for.

14  This is not that.

15       **MR. KATZENELLENBOGEN:**  And in terms of the practical

16  ability of us to request that, I think this is one where asking

17  for documents sufficient to show testing, we --

18       **THE COURT:**  Then do it that relate to but this is a

19  grammar one.  This is one I don't really know -- I've sat in

20  their chair or in your chair or you probably have -- I was

21  going to say "minions."  I'm not going to say "minions."  You

22  have very important associates who take care of assisting your

23  IT and paralegals in finding things and responsive to discovery

24  requests.  I don't know how I give that person guidance on what

25  they're looking for here.

1          **MR. KATZENELLENBOGEN:**  And I think as Mr. Powell

2     mentioned, this is not -- in this type of case, I don't know

3     that that discovery can be done by a paralegal.  I think it

4     does take the attorneys talking to the technical people

5     involved.

6          **THE COURT:**  Okay.  Let me tell you.  As a judge, I

7     don't know how I'd do it.  Okay.  I'm inclined to deny 154.

8     I'll let you continue, Mr. Katzenellenbogen?

9          **MR. KATZENELLENBOGEN:**  Exactly, Your Honor.

10         **THE COURT:**  I know it wasn't exactly but I -- as

11    someone whose last name is "Early," I appreciate you telling me

12    that.

13         **MR. KATZENELLENBOGEN:**  No, it's entirely phonetic.

14    It's just too long.

15         **THE COURT:**  Okay.

16         **MR. KATZENELLENBOGEN:**  All right.

17         **THE COURT:**  All right.  Anything further on 154?

18         **MR. KATZENELLENBOGEN:**  Your Honor, I think you've

19    heard our argument.  I think certainly the intent and we

20    thought a fair reading of this was that this was asking for the

21    testing and analysis of this specific functionality so that we

22    can determine how they do it and because we don't, at this

23    point, know, is this documented in lab notebooks, is this

24    documented in test reports, is this documented in meeting

25    minutes, is this documented in a project timeline that --

104

1    because we don't know that, what we asked for was all of the

2    documents.

3              And if they said, well, we have these documents, we

4    have these documents, we have these documents and we're willing

5    to produce those, then I think as part of that iterative

6    process, we would have said, well, okay, produce those and

7    we'll take a look and if there's a dispute about the something

8    else, then we can address that.  And I think the problem we've

9    run into here is largely that the response was, well, because

10   we think that Apple is saying because there might theoretically

11   be something within the technical encompassment of this request

12   that they might not think they need to produce, they're not

13   going to produce anything in response to it.

14             **THE COURT:**  All right.  Anything further?

15             **MR. KATZENELLENBOGEN:**  No, Your Honor.

16             **THE COURT:**  All right.  So 154 is going to be denied.

17   Let's move on to 172.  And from now on, if I'm ruling in your

18   client's favor, I'm not going to ask you for your opinion

19   unless somebody wants to chime in.  Number 1 -- let's see, one,

20   two, three, four, five, six, seven, eight, nine, ten.  Hey, we

21   just finished our tenth.  Eighty-two more to go.

22             172, "All documents and things referring to

23             performance of the pulse oximetry feature in the

24             Apple Watch Series 6 including documents relating or

25             referring to whether the pulse oximetry feature in

1          the Apple Watch Series 6 accurately or reliably

2          measures blood oxygen levels."  I'll turn it to

3    Plaintiffs' counsel, whoever wants to tell me the relevance to

4    the trade secrets and the -- defend the reasonable

5    particularity of the request.

6          **MR. POWELL:**  Thank you, Your Honor.  As we've

7    discussed, pulse oximetry, oxygen saturation, blood oxygen

8    levels, those are all basically the same and they're central to

9    this case on a number of trade secrets that we have.  The

10   performance of that feature is going to be critical to the

11   damages case.  How important is it to have really accurate

12   pulse oximetry measurements?

13          The critical thing here is that Plaintiffs are the

14   number one provider of pulse oximetry products and they're

15   known for their accuracy.  That's what they do best.  They

16   fixed a problem.  Years and years ago, it was all about

17   accuracy and making sure you have the best pulse oximetry

18   readings you can get.

19          And so the internal documents at Apple talking about

20   how we have to get the most accurate pulse oximetry, we have to

21   get hospital grade, the best you can get -- those types of

22   documents are going to be absolutely critical to the damages in

23   this case to showing how important it was that they took our

24   trade secrets.

25          And I'll mention on the trade secrets themselves, the

1    oxygen -- or the -- on, again, Exhibit 28 -- so this is 353-2

2    -- we talked about Page 315 and Your Honor is very familiar

3    with that.  And the other page that we referred to before was

4    Page 303.

5          **THE COURT:**  Just a general question.  You said

6    "damages."  Okay.  Why does the reliability -- how does that

7    factor into damages?

8          **MR. POWELL:**  It's all about the importance of the

9    trade secret which is one of the key characteristics in a

10   *Georgia Pacific* analysis of the factors for what a reasonable

11   royalty would be.

12         **THE COURT:**  Okay.

13         **MR. POWELL:**  Also the undue -- unjust enrichment to

14   the Defendant, the fact that if they say, if we have -- for

15   example, if we had a document that said, pulse oximetry is the

16   most important thing to make sure it's accurate.  If we get

17   accurate pulse oximetry, we think we can capture this amount of

18   the market.

19         **THE COURT:**  Wouldn't the issue then be

20   advertisements, marketing materials touting the accuracy, not

21   necessarily the accuracy itself?  If that's the measure and the

22   marketplace is -- and you have to distinguish between the

23   wonderful other features of the Apple Watch but for lack of a

24   better term, it's analogous to an infringement reasonable

25   royalty.  I think that's available in a trade secret.  Is that

1   right, reasonable royalty is one of the damage possibilities?

2   Do you dispute that?

3          MR. LERNER:  It -- I just want to answer Your Honor's

4   question to be accurate on the law.  This is a California Trade

5   Secret Act claim and the law is that you only get there if the

6   other two measures are not working.

7          THE COURT:  Understood but from a discovery

8   standpoint, it would be very -- a judge would be hard-pressed,

9   particularly a Magistrate judge who is working for a District

10  judge to rule out discovery on something only to determine --

11         MR. LERNER:  I was -- understood.  I was only trying

12  to answer the question.

13         THE COURT:  It is one measure and it's not limited to

14  a patent case.  It's one measure for a trade secret damages --

15         MR. LERNER:  Absolutely correct.

16         THE COURT:  -- is the reasonable royalty in this.

17  There are hoops that need to be gone through but my real

18  question is, again, whether it's patent or whether it's a trade

19  secret.  Isn't the issue -- the marketplace isn't the issue

20  since we're trying to distinguish this -- and I'm going to use

21  broadly infringing -- we could say "trade secret violation" but

22  it's easier for me to say "infringing."

23         Does everybody understand I'm not talking about a

24  patent claim but the infringing element?  What's the reasonable

25  royalty based on sales and is it -- is the actual performance

108

1    -- and if you've got a case for me, let me know.  Is it the

2    actual performance or is it the marketing or the consumer

3    studies regarding the performance?

4          MR. POWELL:  So I think the marketing and consumer

5    studies would certainly be relevant but the internal value to

6    Apple is relevant and I will read you a case.  This is --

7          THE COURT:  That's -- I just want you to hear -- I'm

8    saying something different.  Okay.  You're not asking in 172

9    for the internal assessment.  It's for the performance itself

10   and it's a different issue.

11         And we'll hear from Apple again.  I wish I had

12   evidence from them where they could say, oh, my gosh, we run

13   performance tests all the time and the data is so vast that

14   what do they want?  I mean, they're going to see that when we

15   do rollouts, we do performance testing and we do beta testing.

16   We do all this stuff and this is asking for an incredible

17   amount of stuff and as it relates to pulse oximetry even as

18   limited as that.  I wish I had it.  I don't.

19         But my point is, I think a better question would be,

20   what are the consumer responses as opposed to just all

21   documents and things referring to performance of the pulse

22   oximetry feature in the Apple Watch 6 including documents

23   relating or referring to whether the pulse oximetry feature

24   accurately or reliably measures blood oxygen levels?

25         MR. POWELL:  Right.  So, Your Honor -- and I

1    completely appreciate that the third-party marketing-type

2    documents are going to be relevant here.  And the request

3    though is performance of the pulse oximetry feature.  I think

4    that is both referring to third-party documents and internal

5    documents.  And why internal documents are important is this

6    case is *Atlantic Inertial v Condor Pacific*.  I'll read the

7    citation, 2015 WL 3825318.  This is C.D. Cal. June 2015.

8            And what this case did is it applied the *Georgia*

9    *Pacific* factors to trade secret royalties.  One of those

10   factors is, "The existing value of the invention to the

11   licensor as a generator of sales of its non-patented items and

12   the extent of such derivative or convoyed sales."  Right.  So

13   we're talking about internal documents here, frankly, on both

14   sides about the value of the performance of the pulse oximetry

15   feature.

16           **THE COURT:**  And if you were asking for documents

17   about their internal assessed value of the pulse oximetry

18   feature, we would be talking about something else but you're

19   just talking about the reliability of it.  And, again, I don't

20   need, in this particular case, a declaration to know that --

21   common sense tells me that there's going to be -- that's a big

22   request for a consumer-facing product to produce all of their

23   reliability data when what you really want is their assessment

24   of the value of the reliability of that functionality.  So here

25   I can do that analysis and it appears to me that 172 would be

110

1    denied.

2           But let me give -- although I said -- just said I

3    wasn't going to have people speak, I'm going to give Mr. Powell

4    an opportunity to briefly try to talk me out of my tentative

5    decision in favor of his client's position.

6           **MR. POWELL:**  I'm sorry.

7           **THE COURT:**  Do you want to be heard?  My tentative is

8    to --

9           **MR. POWELL:**  Oh --

10          **THE COURT:**  -- deny the motion as to 172 but if

11   there's anything that you want to offer to me responsive --

12          **MR. POWELL:**  This was actually my most brilliant

13   argument but given that you've spent time on it, I don't

14   actually need to unless you're inclined to revisit it.  The

15   joking aside, to be very quick, you're absolutely right about

16   your questions but I will also just briefly point out that it

17   is -- in this case, they have pointed out that we don't have

18   accuracy and we actually don't claim to do what they do which

19   is provide a clinical device.  We expressly don't do that and

20   their CEO, in a declaration to the Court, cited a bunch of

21   articles about how much less accurate our device is.

22          I will also add, relevant to Your Honor's questions,

23   we agreed to provide with search terms complaints about the

24   accuracy of the watch.  So we are providing documents.

25          I -- the last thing I just want to say on the case,

111

1   if for some reason Your Honor were inclined -- what was the

2   name of the case?

3           **MR. SPEAKER:**   *Atlantic Inertial v Condor Pacific.*

4           **MR. POWELL:**   And is that cited in the papers?

5           **MR. SPEAKER:**   It's cited in the second motion to

6   compel.

7           **MR. POWELL:**   Right, not this one.  So if for any

8   reason there were going to be any briefing on it, it's not here

9   but we completely agree with Your Honor's take on this.  It is

10  overbroad and it's not tethered -- I'm going to stop saying

11  that word.  I promise.  I've been trained.

12          It is not connected to the issues we have here and if

13  they have a question that is more directly tied to Your Honor's

14  point to actually getting some of the theories they have, they

15  can try again but this isn't it.

16          **THE COURT:**   All right.  So 172 is denied.

17          Turning to 186, I'm not going to read it.  I'm going

18  to read part of it.  186, "Documents sufficient to identify

19  any" and then there are particular terms that are part of the

20  trade secret disclosure.  Getting back to the quotation,

21  "Process that You," with a capital Y, "have implemented or ever

22  considered implementing in the accused product's period."

23          So I guess I'm going to -- rather than focus on the

24  language and we'll leave aside the phrase "accused products,"

25  I'm going to once again assume that that is not intended to

112

1    seek patent-related information.  But it's Apple's argument in

2    the joint stipulation concludes -- and this is on Page 29,

3    original pagination of the joint stipulation.  "Apple is not

4    withholding any documents responsive to this RFP."  That's at

5    Line 26.  And Plaintiffs' motion with respect to this RFP

6    should be denied as moot.

7            So, again, the official response to 186 was not a

8    statement of compliance.  The joint stipulation states Apple is

9    not withholding any documents responsive to this RFP.

10           Mr. Lerner, if you will simply confirm that to me, I

11   will deny this as moot.  But you'll be stating on the record

12   that Apple has done a reasonable and diligent search and

13   produced all responsive documents in its possession, custody or

14   control with respect to RFP Number 186.  And if you're able to

15   make that representation, I will deny the motion as to 186 as

16   moot.

17           **MR. LERNER:**  So -- and I just want to answer your

18   question very accurately here.  We believe we have because we

19   have produced exactly what we described here.

20           **THE COURT:**  Well, let me stop you.  That's the issue.

21   All right.  That's where I figured we were going.

22           **MR. LERNER:**  Right.

23           **THE COURT:**  I don't like a statement like, Apple is

24   not withholding any documents responsive to this RFP followed

25   by what you just said, oh, well, we think we've produced

1   everything we said we would produce in the joint stipulation.

2   That's not what you wrote.  Line 26 of Page 29 says you are not

3   withholding any documents responsive to this RFP.  And I just

4   read this RFP partially.

5         And what you just said is, well, we're not

6   withholding anything subject to what we clarified or limited

7   earlier in the joint stipulation.  And that -- I'm taking a

8   moment here to highlight this.  That is very frustrating for me

9   to have a declarative-without-limitation statement like Apple

10  is not withholding any documents responsive to this RFP and

11  find out that that's not actually -- those words don't mean

12  what they say.  So --

13         **MR. LERNER:   (Omitted and Sealed)**

14     **(Excerpt of Mr. Lerner's statement is omitted and placed**

15  **under seal from Counter Number 12:36:05 to Counter Number**

16  **12:36:31)**

17         **THE COURT:**  So my question is -- again, I'm circling

18  back.  Is that statement on Line 26, Apple is not withholding

19  any documents responsive to this RFP -- as worded, RFP Number

20  186 -- is that true?

21         And we have a finger raised by Plaintiffs' counsel.

22  Is there something you want to interject?

23         **MR. KATZENELLENBOGEN:**  I apologize but just because

24  counsel read a portion that I believe was filed under seal, I

25  just wanted -- perhaps we should note the --

114

1           **MR. LERNER:**  I apologize, sorry about that.

2           **THE COURT:**  All right.

3           **MR. KATZENELLENBOGEN:**  I -- Your Honor, I wasn't

4    accusing it.  I just wanted to make a note.

5           **THE COURT:**  I understand.  So you want that portion

6    placed under seal when Mr. Lerner was speaking a moment ago; is

7    that correct?

8           **MR. KATZENELLENBOGEN:**  Yes, Your Honor, and this --

9           **THE COURT:**  We will place under seal -- and there

10   were -- actually what we will do is we will -- yeah, we're just

11   going to have to retroactively place Mr. Lerner's response

12   under seal.

13          We are now no longer under seal.

14          Mr. Lerner?  You can give me -- if you can give me --

15   if you can say Page 29, Line 26 is unqualifiedly accurate, we

16   will deny the motion as moot and move on.

17          **MR. LERNER:**  And I apologize.  I think this is the --

18   I understand why it frustrates you and I want to try and

19   explain why it's difficult for me.  We have -- we said that

20   because we believe it and maybe we should have said, as we did

21   above, we've produced the documents sufficient to identify --

22          **THE COURT:**  Well, don't read.

23          **MR. LERNER:**  -- but the reason -- the only reason why

24   I am pushing back is I do believe that statement is accurate.

25   If it were objectively unquestionably true, we wouldn't be

1    here.  And so I understand the Plaintiffs disagree but the

2    answer to Your Honor's question is, yes, we feel like that line

3    is true.

4            **THE COURT:**  Okay.  Let me -- I don't care -- and I

5    don't like to point.  I don't care if they disagree with a

6    representation.  I'm not deciding that.  How possibly -- how

7    could I possibly?  I don't care if they disagree and say, no,

8    you haven't.

9            If you as an officer of the court and acting within

10   the confines of Rule 26 make a representation that after

11   reasonable and diligent search, all responsive documents either

12   have been or will be produced to the extent they're in Apple's

13   possession, custody or control and you say that's the case, I'm

14   going to accept it and deny it as moot.

15           But if you say, I'm going to -- and this is what

16   people do all the time and it frustrates me.  They'll say, yes,

17   that's true to the extent the documents are relevant.  And if

18   that's the case, then we're going to have a very different

19   outcome.

20           Yes, Ms. Samplin?

21           **MS. SAMPLIN:**  May I step in here for a second?  I

22   think that the struggle here is what you just said, Your Honor,

23   which is a representation by us that we've produced all

24   responsive documents.  The document request calls for documents

25   sufficient to identify.

116

1           **THE COURT:**  Uh-huh.

2           **MS. SAMPLIN:**  So I --

3           **THE COURT:**  Okay.

4           **MS. SAMPLIN:**  -- think the rub here is there may be a

5    duplicative document that we haven't produced.

6           **THE COURT:**  I'm telling you -- I'm repeating what I

7    said before.  When I see that language, it relates to -- and,

8    again, it's sealed but the particular process or processes

9    described that documents have been produced that are sufficient

10   to identify those processes that have been implemented or that

11   Apple considered implementing in connection with the accused

12   processes -- products.

13          As long as that's true and you say that you have, as

14   previously described, produced all those documents -- and it

15   doesn't mean every single document that refer or relate to --

16   and I hope you see why now we're going through these one at a

17   time because even though you folks grouped them, the particular

18   language of the request is very important here.

19          If you could tell me that, we're done.  If you can't

20   make that representation, then we have to figure out, well,

21   what did you -- how have you limited this and if so, is it

22   reasonable and should I just grant the motion or accept the

23   limitation?

24          **MR. LERNER:**  Yeah, and I will just confess -- I

25   apologize.  I'm just confused here.  That -- we lay out what we

1   have done starting at Line 16.  And that is the basis for the

2   statement that we're not withholding anything.  I can't be more

3   clear than that.

4           **THE COURT:**  Well, you can be.  Okay.  You're very

5   clear at Line 26.

6           **MR. LERNER:**  I'm -- well, I think that --

7           **THE COURT:**  And that -- let's stop, let's stop.

8   Please listen.  You say you can't be any more clear.  You can

9   be.  Right there.  That's very clear.  You tell me, Judge, Line

10  26 is true.  We're done.  That's being very clear.

11          **MR. LERNER:**  Okay.  I am not sitting here aware of

12  documents that we are holding back that mean that we have not

13  provided documents sufficient to identify that process.

14          **THE COURT:**  So Line 26 is correct?

15          **MR. LERNER:**  I believe so.

16          **THE COURT:**  All right.  I'm going to deny the motion

17  as moot based on that representation.

18          All right, we finished Section 1 -- or Section 2.  On

19  to Section 3 of the first motion.

20          **MR. POWELL:**  Your Honor, and I'm very sorry for

21  interjecting.  Can I say just one comment on there because I'm

22  a little confused?  What I just heard was that counsel was not

23  aware of additional documents and I don't think that's quite

24  the same thing as saying they've produced all responsive

25  documents.  I apologize.  I just -- I'm just confused by what

118

1   we're -- what that means, whether he personally is aware,

2   whether that someone else at his firm knows of other

3   documents --

4           **THE COURT:**  As a representative of Apple speaking

5   under Rule 26 -- is it (e) or (f) -- he's made a representation

6   that he's not aware of Apple having withheld any documents that

7   are responsive to Request Number 186.

8           All right.  Request Number 186 doesn't ask for every

9   single document that refer earlier to its documents that

10  sufficient to identify the particular processes noted.  That's

11  what Apple -- a representative of Apple has made that

12  representation.  Whether he does it that way or he signs a

13  discovery response that says that, I don't see a difference.

14  There's nothing being withheld.

15          **MR. POWELL:**  Okay, thank you, Your Honor.  And that

16  was just the clarification whether it was him personally or

17  whether it was Apple is not whoever is withholding anything.

18          **THE COURT:**  It's important that we try to work

19  together to accept things and if we're really going to start

20  counting angels dancing on the head of a pin, we're going to be

21  here a long time.

22          **MR. POWELL:**  Understood, Your Honor.

23          **THE COURT:**  All right.  Turning to Request Number 71,

24  "Documents sufficient to identify all persons involved in the

25  research, design and development of any physiological

1   monitoring capability of the Apple Watch products."

2          Mr. Powell, tell me why that seeks relevant

3   information and why it's described with reasonable

4   particularity.

5          **MR. POWELL:**  Thank you, Your Honor.  First of all, we

6   are in a document sufficient to identify request here, again,

7   not every document in the company.  We're just trying to figure

8   out who was involved in R&D of the physiological monitoring

9   capability of the Apple Watch.

10         So it's not everyone involved in the Apple Watch.  I

11  don't care who invented the clock feature or the calendar

12  feature.  But I'm trying to figure out who are the relevant

13  players in R&D of physiological monitoring which is a very

14  narrow portion of the Apple Watch.  And I don't think it would

15  be that burdensome to produce a document showing us who those

16  individuals are so that we can then know whether to get

17  discovery from them.

18         **THE COURT:**  Well, I know there's a fight about

19  physiological monitoring and it said, well, it's used in this

20  place and it may be appropriate in some places but, again, I'm

21  getting back to two things, 28 to 29 custodians.  Whether you

22  call that large or small, I don't care.  But it's not an

23  insignificant number of custodians in eight years.  And right,

24  I say eight years.  It's probably longer, right?  I mean, it's

25  from the time Mr. Lamego got there.

120

 1          But this isn't limited to since Mr. Lamego got there.

 2     It's limited to physiological monitoring going back to the

 3     origin.  Now, I don't know if the first Apple Watch had any

 4     physiological monitoring, again, falls in the category of

 5     things I wish I knew more about was how burdensome this would

 6     be.

 7          But we're talking about trade secrets.  We've seen

 8     what the trade secrets are.  There's -- they are much more

 9     narrow than relating to physiological monitoring.  That's a

10     pretty -- that's a fairly broad term.  So you're asking a lot,

11     in my opinion, here.  Now, there are certainly some relevant

12     aspects of it but how relevant and how narrowly tailored this

13     is is an issue.  But I've heard from you.

14          Let me hear from Mr. Lerner.

15          **MR. LERNER:**  Thank you, Your Honor.  This series of

16     questions regarding physiological monitoring is not limited or

17     relevant to the issues in this case and we did give you

18     examples and I'm happy to give you more although I think Your

19     Honor already hit on them.  There's a ton -- and opposing

20     counsel actually said this earlier.  It's not --

21          **THE COURT:**  Have you guys ever met before?

22          **MR. LERNER:**  On the phone.

23          **THE COURT:**  I mean --

24          **MR. LERNER:**  We even --

25          **THE COURT:**  Have you physically met?  It used to be,

1   you just said "met."  Now I guess you have to say, "physically

2   met."  Have you folks ever met before?

3           MR. LERNER:  Today was the first just because we're

4   in opposite cities.

5           THE COURT:  Other than phone and potential video.  So

6   it's all been phone and video.  How many email, phones, or

7   videoconferences at depositions have you -- think you've

8   interacted with each other on this case?

9           MR. LERNER:  Oh, a lot.

10          THE COURT:  All right.  I'm going to -- again, I'm

11  stepping and wasting time and I apologize.  People complain

12  about our local rule.  You're not from this district, right?

13          MR. LERNER:  No, Your Honor, I come down a fair

14  amount but I'm Northern District.

15          THE COURT:  Well, Northern District, I think, has

16  the --

17          MR. LERNER:  Yes.

18          THE COURT:  -- same in-person if you're in the same

19  -- for us, it's county.  I don't know if it's the same in the

20  Northern District.  But as a practitioner, I hated it.  I've

21  got to tell you, from this side, it makes a difference.  It

22  makes a big difference.

23          I wish you folks could sit down rather than sending

24  emails back and forth which usually involve digging in heels

25  and defensiveness.  I wish you'd sit down and go through this

1    stuff because -- and I don't know what triggered this in me

2    because -- oh, it was -- you were referring to him as "opposing

3    counsel," right?

4            I've had lots of cases, very hard-fought cases.  I

5    was just mentioning it in another hearing.  I had a case where

6    the opposing client was arrested in the middle of the

7    deposition in our offices by the FBI.  There was some bad blood

8    but you still talk to people by their name and you still --

9    okay, I recognize that you've got a different -- and what's

10   tough is I think you're both very nice lawyers -- you're

11   excellent lawyers and I think you're all very nice people.

12           And I think if you actually sat down and said, hey,

13   here's why this is crazy as opposed to, here's where your

14   answer is deficient.  Well, here's where your question is

15   inappropriate -- I think you could get through a lot of these

16   issues.  Now, you might not be able to decide whether Tim Cook

17   is going to have his email searched or not but so much of this

18   -- maybe except for Mr. Katzenellenbogen -- sorry -- use their

19   names.  I'm sorry, sir.  That might be a tough one.  It's tough

20   for me but --

21           **MR. LERNER:**  I apologize, Your Honor.  Believe it or

22   not, the only reason I didn't do it -- and I usually call him

23   "Adam" and he normally calls me "Josh" is I recently have run

24   into --

25           **THE COURT:**  Well, I'm not a judge that scolds lawyers

123

1    for referring to each other by first names.  Witnesses --

2    referring to a witness by a first name is not good but --

3              **MR. LERNER:**  I ran into trouble even on the other

4    pronouns.  I won't get into it but I was trying to be most

5    respectful in the way I understood I should be these days and I

6    will use Mr. Powell's name.

7              **THE COURT:**  All right.  Well --

8              **MR. LERNER:**  My apologies.

9              **THE COURT:**  Okay.  Please continue but --

10             **MR. LERNER:**  Yeah.  So physiological monitoring with

11   respect to the watch -- and Mr. Powell alluded to it earlier.

12   Their product has largely been focused in one area.  There's no

13   dispute that the watch from the outset has done a ton of

14   different things.  And if we're going to be talking about

15   physiological monitoring, that covers -- and, again, we put

16   this in the papers and it's not disputed.  That would cover

17   ECG.  That would cover the accelerometer.  That would cover the

18   VO2 max issues.  That would cover all kinds of issues that

19   have, again, nothing to do with the case and that's in the

20   papers and it's not disputed.

21             Physiological monitoring is going to capture every

22   way in which the Apple Watch monitors physiology, obviously,

23   and there is -- nobody is telling you that that is in any way,

24   shape or form limited to the alleged secrets in this case

25   because it's not.

124

1          **THE COURT:**  All right.  I'm going to just go jump

2    ahead and say that all of the RFPs in Section III in the first

3    motion all appear to me to be not narrowly tailored, not

4    described with reasonable particularity.  And even though I

5    don't have evidence to show the burden, I have enough to tell

6    me I'm going to deny the motion and the basis is that

7    noninvasive physiological parameters or measurements or

8    monitoring.  And some of these are even more broad than that.

9    Some of them just simply refer to physiological parameters

10   which arguably is broader than noninvasive.

11          And I think 72 -- is it 72 or 70 -- yeah, 73 refers

12   to changes, any changes to any -- not tied to any particular

13   issue.  It's changes to firmware, software or comments thereto

14   between the Apple Watch Series 3 and Series 4 is not described

15   with reasonable particularity and in any way tied to the issues

16   currently existing not stayed in the case.

17          And I'm going to deny the motion as to RFP Number 71

18   through 77 and 83 through 86.

19          But, Mr. Powell, I'll give you an opportunity to let

20   me know if there's generally or if there's anything in

21   particular with respect to that grouping that you want to be

22   heard further on.

23          **MR. POWELL:**  Thank you, Your Honor.  I have one

24   comment generally and then a couple specific RFPs, if I may.

25          **THE COURT:**  All right.

1          **MR. POWELL:**  Generally, physiological monitoring,

2     right, Mr. Lerner just mentioned ECG, an accelerometer or VO2

3     max and said those are all completely irrelevant.  Well, VO2

4     max is related to oxygen saturation.  We've explained that an

5     accelerometer is often used and --

6          **THE COURT:**  VO2 max is -- takes oxygen saturation but

7     adds a bunch more processes to it.  So if you get the VO2 max,

8     that's what's in your -- well, okay, keep going.

9          **MR. POWELL:**  No, you are correct, Your Honor, but the

10    point is that these are all interrelated and particularly 71.

11    All we're asking is the people who were involved and we have no

12    indication whether that's ten people or a hundred people.

13         **THE COURT:**  I don't -- what's the Bob Dylan line?  I

14    don't need a weatherman to know which way the wind blows.  On

15    that one, I don't need a declaration to know that there are a

16    lot of people involved in the development of every single

17    version of the Apple Watch as it relates to physiological

18    monitoring over eight-plus years and it includes research

19    design and development, design being if -- the design of the

20    watch implicates physiological monitoring because it has to be

21    -- have a mechanism to record pulse, et cetera.  So -- anyway,

22    keep going.

23         **MR. POWELL:**  Okay.  I mean, I guess, Your Honor, it's

24    design of any physiological monitoring capability, not design

25    of the watch as a whole.  But I understand Your Honor's ruling

126

1   on that point.

2          The issue we have here is -- I'm going to fast-

3   forward a little bit to Request 76 and 77 here.  So we're

4   talking about changes in the performance of noninvasive

5   physiological monitoring or measurements between the Apple

6   Watch 3 to 4 and then 4 to 5.  Right?

7          And I'll direct you to our complaint.  This is

8   directly at issue.  It's a key issue in the case.  The

9   complaint at Exhibit 26 -- so this is Document 353-2, Fourth

10  Amended Complaint and I'll direct Your Honor to Paragraph 25.

11  This is on Page 101 of the docket entry.

12          And we're dealing with, "Upon information and belief,

13          Apple announced the first version of its watch in

14          September 2014 and began shipping its watch in April

15          2015.  The Apple Watch Series 3 was released on

16          September 22nd, 2017 and upon information believed

17          had significant performance issues with the

18          noninvasive physiological measurements.  Apple

19          announced the Series 4 on September 12th, 2018 and

20          upon information believed that watch includes

21          technology that tracks Plaintiffs' technologies to

22          solve some of the performance issues.  The Apple

23          Watch Series 5 was announced on September 10th, 2019,

24          released on September 20th.  Upon information

25          believed the Apple Watch Series 5 also included

127

1              Plaintiffs' technologies to solve some of the prior

2              performance issues including technology as to which

3              Lamego was an inventor while at Plaintiffs."

4         And the other issue, I'll refer to the 13th cause of

5  action.  This is the trade secret cause of action.  And at

6  Paragraph 238 -- and I won't read this portion because it's

7  sealed, Your Honor.  But Paragraph 238 specifically discusses

8  the changes that were made between the 3 to the 4 to the 5 to

9  the 6.  The changes that were made are critical to this case

10  and show why those products are performing more accurately.

11         So that's why I think these particular ones, 76 and

12  77, do call for absolutely relevant information.  When we're

13  talking about changes just between -- what did they change on

14  physiological monitoring between Series 3 and 4?  What did they

15  change between 4 and 5?  That's directly key at issue in the

16  case.

17         **THE COURT:**  Any further?

18         **MR. POWELL:**  Not on those.  I have one other issue on

19  some other RFPs.

20         **THE COURT:**  Go ahead.

21         **MR. POWELL:**  The last one, I would say, is Numbers 85

22  and 86, particularly 86.  Your Honor mentioned earlier when we

23  were talking about performance that the issue was less about

24  Apple's internal evaluation and more about what customers

25  thought.  Well, 86 is all documents and things referring or

1    relating to or otherwise evidencing the parameters by which

2    Defendant or its customers evaluates the performance of

3    physiological monitoring -- physiological parameter monitoring

4    technology.

5             And 85 is factors Apple itself considered when

6    selecting technology to be used.  So, again, we think -- I

7    would submit that those are also directly relevant.

8             **THE COURT:**  All right, understood.  The motion is

9    denied as to 71 to 77 -- RFP Number 71 to 77, 83 to 86.  That

10   denial is without prejudice to Plaintiffs' ability to propound

11   Request for Production more narrowly tailored to its -- the

12   alleged trade secrets at issue rather than physiological

13   testing or noninvasive physiological testing in general.

14            All right.  Turning to Request -- this is now Section

15   4 of Motion 1.  Request for Production Number 97, "All

16   documents and things that refer or relate to any comparison

17   between any Masimo or" -- and how do you pronounce your

18   client's name?

19            **MR. POWELL:**  Cercacor.

20            **THE COURT:**  -- "Cercacor product or testimony and any

21   Apple Watch products."

22            And, Mr. Powell, I guess I'm going to cut right to

23   the chase.  Why wouldn't this be limited to -- and it may take

24   several requests for production but limited to comparisons

25   relating to the trade secrets that are at issue?  And -- so

1    let's start with that.

2          **MR. POWELL:**  So a few things, Your Honor.  First of

3    all, many of the features in the Apple Watch are simply not

4    features that are at issue in our product.  So we don't think

5    there's any -- I can't imagine there's a comparison at issue

6    there anyways.  Our products are physiological monitoring

7    products and so they are -- they center on pulse rate, oxygen

8    saturation and other light-based parameters such as hemoglobin

9    and that sort of thing, again, things that you're measuring

10   with light.

11         So the comparisons are, I believe, going to be

12   directly at -- related to the issues that are relevant to the

13   trade secrets here and we haven't gotten any evidence from

14   Apple that there's any other comparisons.  I mean, if they told

15   us, hey, we also have been comparing the colors of the products

16   and that would be really burdensome for me to have to produce

17   everything on the colors and what we think the difference

18   between those are or the plastics that you use in the casing or

19   something like that, I easily could have during the meet-and-

20   confer narrowed that.

21         But I got nothing on that.  That's not -- we have no

22   evidence, no assertion of -- frankly, I don't know if there was

23   even one comparison done between the products.

24         **THE COURT:**  From the joint stipulation, the proffer

25   of relevance was, well, if there's documents showing

130

1   comparisons, that's relevant to showing Apple's desire to

2   obtain and use Plaintiffs' technology.  I almost -- well, I'm

3   not following that.

4           MR. POWELL:  So let me explain, Your Honor.  For

5   example, if a product -- they have a comparison between our

6   product and theirs related to oxygen saturation and they say,

7   wow, Plaintiffs' product performed so much better than ours.

8   Ours does not perform well at all -- we need to get what they

9   have.  We need to be able to compete.  We need our performance

10  to be as good as theirs.

11          THE COURT:  Well, I think the second clause is a fair

12  inference, the second thing you said, that they compare the

13  products and say, wow, they're better at oxygen saturization

14  (sic) measurement.  We better do better.  That's fair.  But I

15  don't see the leap that that's going to show evidence of

16  Apple's desire to obtain and use Plaintiffs' technology.

17          So that's your proffer of relevance here.  If it were

18  documents that show or evidence Apple's desire to obtain

19  exactly what you said -- to obtain Plaintiffs' technology,

20  yeah.  But here's where the 401 -- any fact that in reason

21  makes another fact of consequence more or less likely, you're

22  getting very attenuated there just because, again, without

23  tying to a particular technology, just saying any document that

24  refers to a comparison between, there is somehow evidence of an

25  intent to steal.

1        **MR. POWELL:**  I appreciate that, Your Honor, and I'm

2   not trying to imply that any comparison at all is evidence of

3   an intent to steal.

4        What we're looking for is defining a narrow universe

5   of documents that's likely to have relevant information to the

6   case.  Right.  And in my experience in these types of cases,

7   those types of comparison documents are often where you find

8   things like, wow, that's amazing, I need it.  I need that

9   technology.  That sort of thing.  That's highly relevant to

10  damages.  It's not necessarily relevant to say they took

11  something.  It could be; it could be not.

12       **THE COURT:**  I think you can ask for something that is

13  at least tied to the technology at issue and maybe even more

14  specific than that but just saying a comparison between two

15  products, other than doing -- again, part of this is now

16  circling back to how you do a search for it, telling these 29

17  custodians to do a search for "Masimo" or "Cercacor, you may

18  say, well, that's easy.

19       I don't know if it is or it isn't but I think you

20  could propound a more narrowly tailored -- and even if it's

21  narrowed to a comparison, I think you can do this in a more

22  narrowly tailored fashion that gets you what you're looking for

23  which is evidence of what you've put as the proffer of

24  relevance, Apple's desire to obtain and use Plaintiffs'

25  technology, a mere comparison, something comparing the two.

1          That happens all the time and it's not in and of

2     itself evidence of bad faith or an intent to steal.

3          **MR. POWELL:**  Well, and it may not always be evidence

4     of that.  The issue though when you start saying, well, I want

5     a document that evidences Apple's intent to steal, right, we

6     all know that Apple doesn't think it intended to stead.  And

7     Apple's position and -- is that it didn't intend to steal our

8     trade secrets and so --

9          **THE COURT:**  Documents reflecting an intent to recruit

10    employees to bring technology with them from their employers

11    relating to the technology -- something that ties in your

12    inference that you want me to draw.  I don't draw an inference

13    that just because two competing -- companies that have a

14    competing business line -- and you're correct.  The Masimo

15    business line is narrow and the Apple business lines are broad

16    but two companies that have a competing business line and

17    merely the fact that there is a comparison of the products is

18    evidence or even considering the broad scope of -- for

19    discovery purposes of relevance compared to what -- it's overly

20    broad and it's not tied to the needs of the case.  You can

21    propound that more specifically.

22         **MR. POWELL:**  I hear what you're saying, Your Honor.

23    We will do that.  I think the -- it's just the issue of Apple

24    always thinks -- so, for example, the example you gave, a

25    document requesting -- or reflecting an intent by Apple to

133

1  recruit our employees to obtain our technology.  Apple is going

2  to say there are no such documents because it didn't intend to

3  take our -- recruit our employees to take our technology.

4        My definition -- I might look at a document and be

5  able to piece together based on circumstantial evidence that

6  you looked at this document here --

7        **THE COURT:**  No, you can ask for the recruitment of

8  Mr. Lamego, right.  That's fair.  Isn't that -- you're not

9  going to fight -- they're not going to fight you when they say,

10  oh, we've got records regarding the recruitment of Mr. Lamego

11  to Apple.  Is that something that's being fought over?

12        **MR. POWELL:**  Yes, it is being fought over, Your

13  Honor.

14        **THE COURT:**  Well, then, good.  Then you're going to

15  get what you're looking for or you're going to have a hearing

16  on it.

17        **MR. LERNER:**  Where is it?  I -- that's a -- the thing

18  that's being fought over is the request for sensitive HR

19  information which comes up later and I'm surprised that people

20  are asking you to provide.  I'm not sure what Mr. Powell is

21  referring to about --

22        **THE COURT:**  Have they -- I'll ask you for the -- I'll

23  ask you.  Mr. Lerner, has Plaintiffs asked for documentation --

24  and I seem to recall it from your custodian motion that there's

25  an issue regarding documentation of the recruitment of

134

1    Mr. Lamego.  Has that been requested?

2              **MR. LERNER:**  I do not -- the honest answer is I don't

3    know off the top of my head.

4              **THE COURT:**  Wasn't -- and I won't name any names but

5    weren't at least some of the proposed custodians by Apple

6    people -- again, I'm -- and I want to be careful because I

7    think it was a confidential document.  So I'm not going to use

8    any names but the statement of relevance of their -- of the

9    reason why they should be a custodian was that they were

10   involved in the recruitment of Dr. Lamego to Apple.

11             **MR. LERNER:**  I believe that's correct, Your Honor,

12   and I just --

13             **THE COURT:**  All right.  Well --

14             **MR. LERNER:**  -- like I wanted to be candid.  I just

15   didn't remember --

16             **THE COURT:**  So the difficulty is I have these things

17   in my head but that's -- to you, Mr. Powell, that's what I'm

18   talking about.  I'm assuming that from your custodian list that

19   had -- again, shared an office with Dr. Lamego, was involved in

20   the recruitment of Dr. Lamego.  And this may be where the --

21   Mr. Cook's battle is going to be begun.  My memory is also that

22   there was some allegation that Mr. Cook somehow recruited

23   Mr. Lamego.  I don't know if that's true.  I'm just saying for

24   some reason, I have that from your custodian motion.

25             But be that as it may, you're going to be able to ask

135

1    for and presumably are asking for information regarding the

2    recruitment of Mr. Lamego or anybody else who you contend

3    improperly was induced to bring trade secret information.  This

4    doesn't ask for that.  This asks for something much broader.

5           So I'm making clear to you that I'm not saying that

6    the issues that I'm talking about and that -- and I'm not

7    saying that your statement of relevance is wrong.  I'm just

8    saying the link between your statement of relevance and this

9    request is lacking.

10          So I'm going to deny the motion as to 97 and my

11   memory is that 100 was very similar but let me compare them.

12          **MR. POWELL:**  It's very similar, Your Honor.

13          **THE COURT:**  What am I missing?  How is 100 different

14   from 97?

15          **MR. POWELL:**  I don't think there's a substantive

16   difference.

17          **THE COURT:**  Okay.  So 97 and 100 are denied and as

18   with all denials, it's without prejudice to propounding a more

19   narrowly crafted request or if -- and sometimes this happens.

20   I deny it because there isn't a sufficient showing of

21   relevance.  It's too broad.  You all of a sudden get a document

22   that references, oh, we did this great analysis of the Masimo

23   detector and we should run a comparison to see what else we can

24   steal from them.  I'm obviously joking but that would suddenly

25   potentially make Request Number 97, oh, okay, that ties those

1  two things together but right now, the tie is lacking.

2          All right.  Moving on to 128.  Reading -- quoting,

3  "All communications between Defendant and Plaintiffs referring

4  or relating to subject matter disclosed or claimed in the

5  disputed patents."  And let's see.  Is it all of 128, 129, 184,

6  196?  They're all referring to the patents.

7          **MR. POWELL:**  Right, Your Honor.  And these are not

8  the patent infringement patents.  These are the patents subject

9  to our correction of inventorship and ownership claims which

10  are not stayed.

11          **THE COURT:**  Okay.  So when -- so some of the patents

12  are specifically referred to by number.  128 and 129, however,

13  are just "disputed patents."  So make sure I'm not missing

14  something.  Does disputed patents -- is that limited to the

15  claims that are still alive or does that include the patents

16  that have been stayed, the claims relating to patents that have

17  been stayed?

18          **MR. POWELL:**  It is limited, Your Honor, to the claims

19  are not stayed.  Again, patent infringement, that's our patents

20  against them.  That's stayed.

21          **THE COURT:**  Okay.

22          **MR. POWELL:**  Apple's patents that we're asserting

23  correction of inventorship and ownership are not stayed and

24  I'll direct Your Honor to Exhibit 2 of my declaration.  There's

25  a definition of what "disputed patents" means.

1          **THE COURT:**  All right.  You've answered my question.

2          **MR. POWELL:**  Thank you.

3          **THE COURT:**  All right.  Let's start with 128.  I

4     guess I'm going to turn to Apple on this.  Tell me what's wrong

5     with that request.

6          **MR. LERNER:**  Sure.  I think it's a problem that

7     affects a number, if not -- it's not fair to say, I suppose,

8     all of them, but it affects a number of these.

9          As Your Honor obviously knows from your earlier

10    statements, subject matter disclosed in a patent is very, very

11    different from the subject matter claimed.  And I want to give

12    you -- since we've talked today about the importance of

13    examples and how this impacts the case, for example, the

14    subject matter disclosed in the '052 patent, which is one of

15    the disputed patents, is a health monitoring device that can be

16    a smartphone, a gaming device, a digital music player, a sports

17    accessory device, etcetera.  So, what you go down -- what you

18    go down with, with this road, it's not a perfect analogy to

19    kind of the physiological monitoring, but because what patents

20    disclose is often much broader than what's claimed, here what

21    you'd be ending up with is requiring Apple to produce all

22    communications referring or relating to health monitoring in

23    any device, including --

24          **THE COURT:**  Well, I've got to stop you.  You left out

25    an important qualification.

1          **MR. LERNER:**  Yep.

2          **THE COURT:**  You said all communications referring --

3   it's all communications between Apple and plaintiffs.

4          **MR. LERNER:**  Correct, on this one.  So, anything

5   between -- and keep in mind that these are -- this is a company

6   that asks us to sell their devices.  So, any -- any

7   communication we have had between the parties about any device,

8   including the iPhone, the iPad, the iPod, and, as we said

9   elsewhere in our briefing, this is going to get broad in a

10  hurry because, for example, they have an app that they have on

11  our app store.

12         **THE COURT:**  And my -- tell me if I'm -- I might be

13  confusing this with a different one.  Was that excluded?  Did

14  they tell you they weren't asking about -- oh, no, that's

15  the -- that's the FDA one.  Never mind.

16         **MR. LERNER:**  No.  So, and I will add that I do not

17  think -- and, again, it's kind of --

18         **THE COURT:**  What would happen if I -- if I amended my

19  statement that I'm not going to get into narrowing requests and

20  eliminated from its purview anything relating to sales of

21  plaintiff's products through the app?

22         **MR. LERNER:**  It still doesn't -- it still doesn't

23  work, because what we're talking about here is -- and I

24  realize -- I don't want to repeat myself, because you already

25  know this, but there are tons of parts of a patent in terms of

1    what it discloses as the subject matter.

2            THE COURT:  I hear you on that.

3            MR. LERNER:  Yeah.

4            THE COURT:  But what I don't -- what I don't hear you

5    on is how hard would it be for Apple to look for communications

6    with Masimo?  You pointed out in connection with the other

7    group that, Hey, we're -- other than in this limited field,

8    we're doing separate things.  So, how hard is it to find

9    official communications between Apple and Masimo?

10           MR. LERNER:  As a --

11           THE COURT:  Leaving aside that it's a vast scope.

12           MR. LERNER:  Understood.  As a threshold matter as to

13   the issues here, a whole lot harder than it is for Masimo to

14   find them.  Apple is huge --

15           THE COURT:  Well --

16           MR. LERNER:  -- and the people that have -- and to

17   answer your question, the people that have this information are

18   across -- when you're talking about, for example, the issues I

19   just disclosed, which are just one subset, if you're just

20   talking about sales alone, then you'd have to go find all the

21   people that have ever communicated about their app, the sales

22   of every device they've put on our app store.  It is very

23   expansive, and that's just -- I'm just giving you one example

24   from one patent.  We would have to go to -- and it's not just

25   sales.  We would have to go to everybody on all of the subject

140

1  matter disclosed, including in the spec, on all of these

2  patents and say, Have you ever talked with Masimo about this?

3  And I -- I do think -- the only other thing I was going to say,

4  which I -- I do think is important and relevant here, because

5  Your Honor knew it was important to us, and -- and we didn't

6  get it.  When we said to them, You are claiming that you

7  invented these patents and that you should get them, what did

8  they say?  The claim specific inquiry is not about subject

9  matter; we do not have to identify by line and column because

10 it's only the claimed subject matter that matters.

11         And the final piece I'll say there, aside from goose

12 and gander, is it's not the whole patent that is the basis for

13 the inventorship claim.  To the contrary, what they're saying

14 is, there's these very specific snippets that they allege one

15 person, Mr. Lamego, is responsible for getting in there, and

16 that's why they own these patents.  But what we've got is, give

17 us anything everybody ever talked about between us that relate

18 to anything in the subject matter the entire patent.

19         **THE COURT:**  All right.  Mr. Powell.

20         **MR. POWELL:**  Your Honor, I think the biggest thing

21 here is how Apple is interpreting the interrogatory -- or the

22 requests.  So, I'll bring Your Honor to -- there is a case that

23 we cited in our supplemental brief.  This is *O.L. v City of El*

24 *Monte*.

25         **THE COURT:**  Don't cite *O.L.*  I know *O.L.*  Very

1    different.  Let me just tell you, very different case than what

2    we have here.

3            MR. POWELL:  Okay.

4            THE COURT:  It's funny when people cite -- and I

5    won't make many more comment -- people cite -- I was just

6    talking with Judge McCormick about this.  People cite cases

7    that are from the particular judge.  You can take a piece of

8    language out of it, but this particular -- the particular judge

9    lived with the case and knows the details about it, so you can

10   pull out language that says, Oh, well, if you haven't made an

11   objection, then the RFP is to be answered as -- as written.

12   Let's just say *O.L.* was a very different case than the case we

13   have here.

14           MR. POWELL:  I recognize that, Your Honor, and, to be

15   honest, I didn't know that was your case.  I apologize.  That

16   was not my --

17           THE COURT:  You don't have to apologize, but I'm

18   letting you know I'm very familiar with the probably 10 to 12

19   discovery rulings in that case.

20           MR. POWELL:  Okay.  And my only point here was that a

21   party has an obligation to interpret the request reasonably.

22           THE COURT:  You have to interpret it reasonably, but

23   when you come -- so, where that usually comes in is someone

24   says, "I can't answer this; it's vague and ambiguous.  I don't

25   know what you mean by communication."  Okay, that's not what

1   they're saying.  They're saying, "When you come on a motion to

2   compel and you want the judge to order us to produce this" --

3   and we're getting right back to the same issue we've had all

4   day long.  I wish I had some evidence saying, "Judge, I'm the

5   corporate communications person," or, "I'm our IT person that's

6   helping.  We tried to figure out how many hits we would get if

7   we did a search for Masimo on a random sampling of 10 of the

8   custodians, and we got five million."  I wish I had that.  It

9   would make it a lot easier for me to say, yeah, this is -- this

10   is beyond the pale.

11         I hear what you're saying about the scope of the

12   disputed patents.  The issue is I don't know how hard it is for

13   Masimo to do this.  I would like to see if we can work

14   something out on these four, whether it's limited to time,

15   whether it's limited to specific people.  I think that we

16   should be able to -- and I'd be willing to change my approach

17   on these, because I do think it's a fair area of inquiry,

18   generally, if we can come up with a reasonable way to do it.

19         So -- but let me keep hearing from you.  I jumped on

20   you, Mr. Powell, when you mentioned Ms. O.L., who is going to

21   be sitting in your chair in a week on a summary judgment

22   motion.  So, I'm not going to say anything further.  But please

23   continue.

24        **MR. POWELL:**  Thank you, Your Honor.  The point just

25   is that I think these requests really are very specific and

143

1   directed towards the disputed patents here, subject matter

2   claimed or disclosed in those disputed patents.

3           **THE COURT:**  Well, let me ask you, can you narrow it

4   by timeframe?  Can you narrow it by listing persons who -- you

5   know, subject to, again, further -- an ability to further

6   request, can you narrow it?  Thinking how you would think if --

7   I'll let you speak, but thinking how you would think if asked

8   to call up your in-house counsel to say, "Here's what we need

9   to look for," and he or she says to you, "How do I look for

10  that," what -- you know, search for a name, search during a

11  particular time period, search for a -- in a particular area,

12  exclude a particular area.  What can be done to narrow this to

13  get you what you're looking for or to find out there is nothing

14  and to make it so that, even though they didn't give me the

15  evidence that I would have liked, to make it so it's something

16  that they can physically do?

17          **MR. POWELL:**  I -- go ahead.

18          **MR. KATZENELLENBOGEN:**  Your Honor, this is

19  Mr. Katzenellenbogen.

20          In light of that guidance, I am -- I suspect that we

21  will be able to work with opposing counsel and --

22          **THE COURT:**  I want to get it done today.

23          **MR. KATZENELLENBOGEN:**  What?

24          **THE COURT:**  I want to get it done today.

25          **MR. KATZENELLENBOGEN:**  You want us to narrow it on

144

 1    the fly here as we're sitting?

 2            **THE COURT:**  Why not?  So -- well, let me -- I'm going

 3    to ask Mr. Powell to let me know -- I'm sorry, Mr. Lerner; I'm

 4    getting confused -- to let me know, what can they do to narrow

 5    this for you?

 6            **MR. LERNER:**  So, first of all, it's subject matter

 7    disclosed.  As Your Honor knows, when people write a patent

 8    that's intended to be broad --

 9            **THE COURT:**  Well, what about this?  You narrow it to

10    communications with Mr. Lamego.  Right?  Would that be that

11    difficult?  Communications with -- and they give you another

12    list of names.  Or communications about -- and they'll tell you

13    what they're looking for from the disputed patents during this

14    time period.

15            When were these patents -- when were these patents

16    entered or filed?

17            **MR. LERNER:**  It was over a course of time, but the

18    key thing is that the only thing about these patents that

19    creates the, quote, "dispute" is a very, very specific set of

20    line and page numbers.

21            **THE COURT:**  Well, maybe you can narrow that down with

22    them.

23            **MR. LERNER:**  I -- the only other thing I'll say is

24    that I -- I sure would have loved on lots of our stuff to be

25    able to narrow it down.

1           THE COURT:  And --

2           MR. LERNER:  We live with Your Honor's rulings.  If

3    they're going to get to --

4           THE COURT:  So --

5           MR. LERNER:  -- rewrite theirs --

6           THE COURT:  -- do you want me to go back and count

7    the number of denieds versus the number of grants?

8           MR. LERNER:  No.  No.  I hear you.

9           THE COURT:  Because we can go back and -- and --

10          MR. LERNER:  I hear you.

11          THE COURT:  -- and maybe what we'll do is that's what

12   we'll do.  I'll -- I'll revisit some of the denieds, because

13   you've suggested it --

14          MR. LERNER:  I was worried that's what --

15          THE COURT:  -- and go back and rewrite them.  Maybe

16   we should.  What do you think?

17          MR. LERNER:  I do not, Your Honor.  I do not.  And

18   if -- the way that I can see to narrow these is only by

19   focusing on the portions that they have claimed are theirs

20   because Lamego took them from -- took the alleged information

21   from the plaintiffs and disclosed it in the patents.  I don't

22   have another good way to do it.  Because those are the

23   allegations.

24          THE COURT:  Do you folks -- do you guys want to talk

25   amongst yourselves and make a proposal to me?

1          **MR. POWELL:**  I mean, I think, Your Honor, one way

2    that these could be addressed is the named inventors, at least

3    as a starting point.  Right?  There's, I believe, five people.

4    I'd have to look.  There's Mr. Lamego, and I think there's

5    four, maybe five other people at Apple that are named inventors

6    with him.  Searching those folks would certainly be a starting

7    point.  I don't know if they worked with other people, because

8    I don't have the documents yet.  I don't know who else was

9    involved.  I don't have documents.

10          **THE COURT:**  To be honest, I'm more thinking about

11   when you say all communications between defendant and

12   plaintiffs, if you can identify who at plaintiffs you're

13   referring to.

14          **MR. POWELL:**  Well, that's certainly Mr. Lamego, and

15   it would be if they had communications with other people, for

16   example, the other people that they recruited.  There's about

17   20 people that were recruited from plaintiffs.

18          **THE COURT:**  So, why can't you give them a list of

19   those 20 names and say all communications with these 20 people

20   at the time they were employed or within six months after if --

21   if -- we can work this out; all communications regarding

22   subject matter disclosed in the disputed patents.

23          **MR. POWELL:**  Uh --

24          **THE COURT:**  And, then, from an Apple standpoint,

25   you're not doing a general search of people you don't know who

1   they are; you're doing a search for those names, other -- I

2   don't -- you know, within reason.

3            **MR. LERNER:**  Between Lamego and a set of people to be

4   identified?

5            **THE COURT:**  Well --

6            **MS. SAMPLIN:**  No, I think he means Lamego while he --

7            **THE COURT:**  What I'm saying is they're going to give

8   you a list of persons from their side, and you're going to

9   search for communications with those persons relating to the

10  disputed patents or some way that they can characterize the

11  information in the disputed patents that they're interested in.

12           **MR. LERNER:**  And if -- I apologize, Your Honor, but

13  when we say search, are we talking about our 28 people?

14           **THE COURT:**  A reasonable and diligent search.  You

15  might not have to search all of them, right?  If someone -- if

16  there are people that only came to Apple in the last six

17  months, I don't think that that's something that's -- this is

18  material -- by definition, it has to come before the filing of

19  the last patent, unless I'm missing something.

20           **MR. SPEAKER:**  Right.

21           **THE COURT:**  So, and we should be able to limit the

22  time, and, you know, I'm looking at 129, all communications

23  between defendant and any individual who previously worked for

24  plaintiffs referring or relating to the subject.

25           How are they going to know who previously worked for

148

1    plaintiffs?  I mean, that's a -- that's what I'm trying to get

2    around, is give you a list of people to look for.  I think it's

3    fair if they give you a reasonable number of people to say,

4    "Just give me the communications that relate to" -- whether you

5    call it the disputed patents or these issues that relate to

6    arguable trade secrets that have been incorporated into the

7    disputed patents, this should be something you work out.

8           **MR. LERNER:**  I -- I agree with the latter point, Your

9    Honor.  If it's the former point, then, to your point about

10   fairness, you're capturing communications -- there would be

11   communications that we'd have to search for about the iPhone.

12   The iPhone is clearly covered, as I mentioned, by the subject

13   matter disclosed.

14          **THE COURT:**  No, have them identify -- you can go out

15   in the hallway right now and see if you can come up with

16   something, about -- you tell them who you want searched for and

17   what specific topics within the disputed patents you want

18   searched for, and you'll come back and tell me whether that's

19   something you can do.

20          Do you want to do it right now?  You can do it while

21   we're sitting here.

22          **MR. KATZENELLENBOGEN:**  Your Honor -- I'm sorry.

23          **THE COURT:**  Go ahead.

24          **MR. KATZENELLENBOGEN:**  Your Honor, this is

25   Mr. Katzenellenbogen.  We could certainly take a shot at that.

1   My thought would be that if we identify a group of people at

2   Apple to focus on -- and it would likely be primarily the named

3   inventors on the patents, and then the group of people at

4   plaintiffs, and it would be the communications between them, I

5   believe, given the subject matter of what they were working on,

6   that would exclude all of these other extraneous issues like

7   the iPhone or sales on the app store or anything like that,

8   because I have no reason to believe any of those people were

9   working on those issues.

10          **THE COURT:**  All right.  Why don't you try to see if

11  you can come up with that list right now.  Go talk.  I'll sit

12  here and wait.  Let me know when you're done.

13          **(Off Record; Back on the Record)**

14          **THE COURT:**  All right.  We had a long, dry spell on

15  our recording, but we're all back.  Counsel are all present.

16  We're continuing.

17          Was there any resolution or proposal agreed to or

18  reached with respect to the issues we were just discussing?

19          **MR. KATZENELLENBOGEN:**  Yes, Your Honor.  This is Ben

20  Katzenellenbogen.  Plaintiffs proposed narrowing the request in

21  two ways, and I believe one of the two narrowings was

22  acceptable, and the other Apple did not agree to.

23          So, we proposed to narrow it -- essentially, to

24  narrow it to two searches regarding communications involving

25  specific people on the Apple side, and then a separate

150

1    limitation with specific people on plaintiff's side.  So, the

2    first limitation was any communications that met the criteria

3    of the request between one of the named inventors on the

4    disputed patents and anyone at Masimo or Cercacor.  And we can

5    confirm on the record with Apple's counsel, but I believe that

6    that was agreeable and they are willing to do that.

7           The second way in which we were going to limit this

8    was what we also wanted was communications between anyone at

9    Apple and any of the -- I believe it's approximately 20

10   identified employees of plaintiffs Masimo and Cercacor who then

11   left and joined Apple.  So, what we sometimes called the former

12   employees.  And, so, that was limiting it to specific folks on

13   the plaintiff's side.  And that was something that Apple was

14   not willing to agree to.

15          **THE COURT:**  All right.  I'm going to get back -- come

16   back to you on exactly what we're referring to, but I'll hear

17   from Apple on, first of all, what was just said.

18          **MR. LERNER:**  Thank you, Your Honor.

19          So, the proposal that we can agree with and that

20   seems to make sense, given that we're talking about the

21   disputed patents, on the Apple side, is the inventors, and then

22   in order to avoid dispute, we said we'll look for

23   communications with Masimo or Cercacor.  And the reason that's

24   important is twofold.  It's not everyone at Apple, which we

25   won't do.  If that doesn't make sense, there's 10,000

1   employees.  It's --

2          THE COURT:  Well, I mean, you'll do it if someone

3   orders you to.  But you're not willing to voluntarily agree to

4   do it.

5          MR. LERNER:  Fair enough.  Misstatement on my side.

6   We don't want to do that.  There's a lot of employees at Apple.

7          And the other thing is that the list of, quote,

8   "former employees" has been debated, to put it mildly, and it's

9   changed, and, unfortunately, to give you some examples, there

10  have been, if my memory is correct, summer interns, people that

11  work in sales in foreign countries.  This -- this is not

12  something that we think it worth having a fight over, so what

13  we said was we'll do the named inventors on those patents and

14  communications with Masimo or Cercacor.

15         THE COURT:  Regarding what?

16         MR. LERNER:  This subject.  Sorry.  The subject

17  matter, and -- and in order to get through this dispute, the

18  subject matter disclosed or claimed.

19         THE COURT:  All right.  So, I'm going to accept that

20  first proposal with respect to Request for Production Number

21  128 as limited to refer to all communications between the named

22  inventors on the disputed patents and plaintiffs referring or

23  relating to the subject matter disclosed or claimed in the

24  disputed patents.  And I'm not saying that the parties proposed

25  this.  I'm saying that's what I'm going to order.

152

1     **(Pause)**

2          **THE COURT:**  So, I'm going to order Apple to produce

3     responsive documents.  I'm going to deny -- to that.  I'm going

4     to deny the motion in other respects.  I'm going to deny the

5     motion as to 129 without prejudice to plaintiff following up

6     with a request for production that identifies particular

7     individuals that they seek to have communications between those

8     folks and Apple's that relate to relevant topics.  So, draft it

9     a little bit more narrowly.  I know there is a dispute over

10    these 20 people.  Why don't you focus on the ones that you

11    really think might be related to the issues.  So, we'll deny

12    129 outright.

13         The issues in 184 and 196 are a little different.  We

14    didn't really talk about them.  It looks awful broad to me.

15    I'm inclined to deny the motion as to those requests for

16    production, again, without prejudice to serving a more limited

17    request, but I'll give you a chance, because we didn't really

18    talk about those either, Mr. Powell or Mr. Katzenellenbogen.

19         **MR. POWELL:**  Sure.  So, Your Honor, this is

20    Mr. Powell.

21         I'll address both of these.  These specific patent

22    numbers are at issue.  Again, without getting into too much

23    detail here, this is both the disputed patents and the trade

24    secrets here.  So, these are patents that contain information

25    that we assert is -- was misappropriated and then ended up in

1    these patents, and so that's the basis for -- partially the

2    basis for the correction of inventorship as well as some of the

3    trade secret claims.  So, the idea being Apple took this

4    information, put it in this patent; so, for example, the '754,

5    '095 patents that we seek --

6              THE COURT:  Tell me what this means:  refer or relate

7    to Apple implementing any of the techniques described in the

8    patent.  What does that mean?

9              MR. POWELL:  That means --

10             THE COURT:  I'm a layperson.  What does that mean?

11             MR. POWELL:  So, these particular patents, I would

12   look at that particular patent, see the technique described

13   therein, which was the subject of prior motion practice,

14   without getting into details here, and did Apple put that

15   technique into one of its products?  Did it implement that

16   technique?  Did it use -- does it use that technique or does it

17   not?  And that's going to be relevant --

18             THE COURT:  When you say, "that technique," it says

19   any of the techniques described.  I know you don't want to get

20   into it, and we can -- we can go in a sealed portion, but it's

21   the breadth of the language here, and the -- the mere fact that

22   there is an allegation that trade secret information was

23   misappropriated and used in a patent, understood, but then,

24   again, I don't know how broad a category of all documents and

25   things that refer or relate to Apple implementing any of the

1   techniques described in that -- in those two patents in any of

2   those products; I don't know what that -- I don't know what

3   that asks for.  And that's my -- let's go on the sealed --

4   we're going to seal it right now at 2:16.

5         **(Sealed portion omitted from 2:16 p.m. to 3:22 p.m. (per**

6   **tags); Counter Numbers 13:48:52 through 14:54:06)**

7         **THE COURT:**  Thank you for that.  You don't have to

8   apologize.  I appreciate that.  And we're no longer under seal.

9         Interrogatory Number 9, the motion is denied without

10  prejudice to -- and I'm going to do this on a shortened time

11  basis.

12        So upon receipt of documents responsive to Request

13  Number 63 as to which the motion is granted, if Plaintiff

14  identifies heart rate algorithms or pulse rate algorithms -- I

15  don't know if there's a distinction between sometimes it's

16  heart rate, sometimes it's pulse rate referred in the

17  documents.  But if, in response to Number 63, Plaintiff

18  identifies heart rate -- documents that show heart rate

19  algorithms that are relevant to the alleged trade secret issues

20  in this case, Plaintiff may follow up and propound a new

21  version of Document -- or Interrogatory Number 9 requesting a

22  description of the development of each of those heart rate

23  algorithms that are relevant to the trade secrets at issue in

24  the case.  And any response shall be provided, instead of 30

25  days to that interrogatory, shall be provided within 14 days.

155

1   And that interrogatory will not count against the Rule 33

2   interrogatory limit.  All right?

3          So would you each like me -- I'm going to issue an

4   order.  Would you each like me to go through what's been

5   granted and what's been denied right now?

6          **MR. LERNER:**  We don't need you to, Your Honor.

7   You've been at it a while and I think it's all on the record.

8          **THE COURT:**  It is and I'm going to incorporate this

9   record as the basis for it.  To the extent anyone wants to take

10  further action, they're welcome to.

11         And there will be a separate written order.  But all

12  the written order is going to say is, For the reasons stated on

13  the record -- and it's going to list which ones are granted and

14  which ones are denied.

15         128 is a special case.

16         186 is moot on a special case.

17         148 is slightly different;

18         And obviously Interrogatory Number 9 has some special

19  language.

20         So what do you folks want to do?  It's 3:25.  Do you

21  want to turn to Motion Number 2 or do you want to save that

22  motion?  Maybe after having heard me talk for five and a half

23  hours, you folks want to talk some more with the wonderful

24  benefit of an in-person meeting if you'd like to?  Or do you

25  want to come back?  We can keep going right now; you can come

156

1  back tomorrow morning.  We can come back some future date next

2  Thursday.  I mentioned we've got some other summary judgment

3  motions coming through.  You tell me.

4        Let me start with -- it's your motion.  Mr. Powell,

5  tell me what your desire is?

6        **MR. POWELL:**  Your Honor, I think it would probably

7  make sense.  We've gotten some good guidance from the Court.

8  Perhaps we can resolve some of the rest of these issues on the

9  second motion amongst counsel and I'd love to give it another

10  shot with him.

11        **THE COURT:**  All right.  Mr. Lerner?

12        **MR. LERNER:**  We're happy to keep going to get it

13  done.  We're happy to come back tomorrow.  We don't want to

14  drag it out for all of the reasons you said.  So we'd either

15  like to get through it or come back tomorrow.

16        I also would like to commit to Your Honor that you

17  asked the parties some questions that they didn't answer and I

18  want to try and get you answers to those questions and I can do

19  that before tomorrow.

20        **THE COURT:**  Well those were questions relating to the

21  last motion.  That motion's --

22        **MR. LERNER:**  No, no, I apologize.  I was asking --

23        **THE COURT:**  Oh, you're talking about the Special

24  Master --

25        **MR. LERNER:**  Yes, sir.

157

```
 1        THE COURT:   Okay.  So the second motion has 58 items.
 2   I couldn't fit -- I take like little, like reminders on each
 3   one and I couldn't even fit them all -- and I write pretty
 4   small -- on one page.
 5        So my guess is, Motion Number 2 is going to take
 6   longer, even though -- some of it is repetitive, some of it
 7   isn't.  So if I'm being told by the moving party that they
 8   would like additional time to discuss it, I'm going to grant
 9   that but I don't want it to be a lot of time.  Your discovery
10   cutoff is coming up.
11        Mr. Lerner, there was something that we didn't talk
12   about and I'm in the dark, actually, I'm pins and needles to
13   know what this issue is.
14        Since I'm inclined to put the hearing off on Motion
15   Number 2 until June 3rd, that cuts it close for any follow-up
16   discovery.
17        MS. SAMPLIN:   Your Honor, could I suggest could we
18   possibly pick a day early next week and so we'll try to work it
19   out.
20        THE COURT:   No, I'm on criminal duty next week so it
21   becomes impossible for me to schedule any large blocks of time.
22   And we already -- my Thursday morning, which I try to do my
23   best to keep open, we're going to be busy so next week we -- I
24   think next week might be the busiest week I have, it looks
25   like, since I started on this job so next week's just not
```

158

1    available for me.

2           I'm going to continue it to June 3rd.  And should the

3    parties be able to narrow issues down, they're certainly free

4    -- only in a joint statement.  I don't want separate

5    statements.

6           And I only want to be alerted if an issue has been

7    resolved and doesn't need a hearing.  I don't want any more

8    evidence; I don't want any more argument.  We're going to

9    continue hearing on the Second Motion to June 3rd and --

10          **MR. KATZENELLENBOGEN:**  Your Honor, I apologize.  And

11   if, in light of that length of the continuance, I think we were

12   hoping to try to be able to work with counsel for Apple this

13   afternoon and to try to resolve these things.  And so if Your

14   Honor is available tomorrow --

15          **THE COURT:**  I have about an hour tomorrow.

16          **MR. KATZENELLENBOGEN:**  Okay.

17          **THE COURT:**  And you can come and then you can wait

18   until my settlement conference is over which could take an

19   hour, it could take six hours.

20          **MR. KATZENELLENBOGEN:**  Your Honor, would it be okay

21   if we took a five minute recess so that we could confer with

22   other members of our team who are not here?

23          **THE COURT:**  Five minute recess.

24          **MR. POWELL:**  Thank you, Your Honor.

25   //

1          **(Five minute recess taken; resume)**

2          **THE COURT:**  All right.  We're back on the record.

3     All counsel are present.

4          Mr. Powell?

5          **MR. POWELL:**  Thank you, Your Honor.

6          We would suggest we'll try to work things out with

7     Counsel and we'll be back on June 3rd -- if that's your first

8     available hearing date -- if we can't resolve everything with

9     Counsel.

10         **THE COURT:**  All right.  That's what we're going to

11    do.  We're going to continue the hearing.

12         Do you have any objection to June 3rd?  Mr. Lerner?

13         **MR. LERNER:**  I do not, Your Honor.

14         As I said at the beginning of the day, if Your Honor

15    is willing and we can do it from 9:00 to 10:00 or after your

16    settlement conference, we would like to (a), I committed to

17    getting feedback on the question you had about a magistrate

18    but, (b) get your input on scheduling issues where Your Honor

19    offered it before.  We're getting pretty close and I think it

20    would be --

21         **THE COURT:**  All right.  So here's what I'm going to

22    do.

23         We're going to continue the hearing on the Second

24    Motion, Plaintiffs' Second Motion to Compel to June 3rd at

25    10:00 a.m.

1          One moment.

2      **(Pause)**

3          And we'll continue this to June 3rd at 10:00 a.m.,

4  the hearing on what I call the Second Motion.

5          If there's no requirement, if counsel are able to, in

6  light of the information and argument today, narrow issues or

7  simply stand on positions taken in this motion, the issues are

8  -- a few are similar but they are largely different so they're

9  welcome to.  But only file something if to advise me that

10 certain requests are no longer subject to a motion.  I don't

11 really want further argument and I shouldn't say "I don't

12 really want" --I don't want and you're not permitted to offer

13 further argument.

14         Mr. Lerner, you're here.  Why don't you tell me what

15 the issue is regarding scheduling?

16     **MR. LERNER:**  Sure.  The issue regarding scheduling is

17 that the parties have been having a number of disputes that

18 relate to depositions, including the depositions that Your

19 Honor ruled on and it is affecting scheduling.  And more

20 broadly, I think getting Your Honor's feedback on the parties

21 engaging in what strikes to me as a sensible order which is

22 documents and then depositions would be very helpful.

23     **THE COURT:**  Well in a vacuum I'm happy to discuss.

24 It's very hard for me to give informed advice other than this:

25         In any case, party wants to take a depositions before

1    they have documents, they're welcome to.  And they do it at the

2    risk of not being permitted to reopen a deposition if documents

3    later become available.  Obviously, that's if it's shown that

4    documents were intentionally withheld and only came out through

5    bad faith later after the deposition, that's something

6    different but -- and I'm going to let Mr. Powell talk to me.

7    But other than that general thought which is, a party wants to

8    take a deposition, we have cases where plaintiff -- you know,

9    was immediately upon the Rule 26(f) report wants to get running

10   and take somebody's deposition, they can do it but they run the

11   risk that they're done with that particular deponent and they

12   won't be able to show good cause to reopen or to go beyond

13   whatever the deposition limit is.

14           But Mr. -- Plaintiffs' counsel, either one, if you

15   want to be heard on what was just said, there's not a motion or

16   anything; I'm just giving you some thoughts.

17           **MR. POWELL:**  Right.  And I think I agree, Your Honor.

18   I think in an ideal world, everyone would like to get documents

19   before the depositions, assuming we have time.

20           I think both parties agree that there is going to

21   need to be some sort of extension.  There is a dispute on what

22   sort of extension there is and I believe that would go to Judge

23   Selna anyways.  So our plan was to file our motion on Monday to

24   Judge Selna.

25           And I don't want to speak out of turn.  I believe

1   yesterday we asked counsel -- I believe it was Ms. Sample and

2   I'd have to look at my emails -- who was talking about this

3   issue with me.  And we had talked about a number of issues on

4   how we address the fact that there's a 28-day lead time to get

5   a motion heard from Judge Selna.  We don't want to go ex parte

6   so we would suggest an interim extension that we submit on a

7   joint ex parte basis that's stipulated to and approved.

8           That was what I suggested and we haven't quite heard

9   back yet and that's okay; we've all been busy with this hearing

10  today but that was our proposal and suggestion.

11          **MS. SAMPLIN:**  If I can just respond to that, if you

12  don't mind, Your Honor?

13          We -- I initiated a call with Mr. Powell because

14  they're looking for a very very long extension of the schedule

15  which we don't agree with.  We're amenable to a one or two

16  month extension but we're not looking for a seven-plus month

17  extension which is what they're looking for.  But I said,

18  Listen, we have a different view of what an extension should

19  look like if there is going to be one.  Why don't we, instead

20  of burdening Judge Selna with competing motions -- they've told

21  us they want to make their motion on Monday so now we're

22  preparing a motion -- burdening him with motions, competing

23  motions that will likely speak past each other, why don't we

24  see about filing a stipulation with Judge Selna saying that the

25  parties would like to discuss scheduling, would be amenable to

1    a conference, and a joint report maybe to him that's no more

2    than 10 pages, five page each with our respective positions so

3    he has them together.  We're not engaging in six briefs on this

4    issue.  Plaintiffs denied that option.  They said they want to

5    file a motion.  So we're kind of at a loss for how to go

6    forward.  I think that's one of the issues I would love your

7    guidance on because it is something that needs to be raised.

8    We want to be respectful of Judge Selna's time, at least that

9    was my goal in raising that kind of truncated approach.  But we

10   need to talk schedule, we need to get it resolved fairly

11   quickly because we do have, as you've noted, a discovery cutoff

12   around the corner.  And I don't think Mr. Powell's suggestion

13   of the parties agreeing to an interim stay while that schedule

14   issue is worked out works either.  One, I don't even think the

15   parties have the power to decide that they're staying a

16   schedule that's in place from a district court judge; and

17   (two), if Judge Selna denies any kind of change in the

18   schedule, then we've lost valuable time on proceeding with the

19   case.  So that's how Defendants are -- Defendant is looking at

20   this issue.

21           **THE COURT:**  I have no guidance to give you.  Everyone

22   acts in accordance with their own interests.  And in

23   furtherance of the current scheduling order, the Federal Rules

24   of Civil Procedure, the Local Rules.  But I don't have any

25   authority to alter Judge Selna's scheduling order and you folks

164

 1  feel free to do what you think is best.  I'm not sure what

 2  guidance I can give you.

 3          **MR. LERNER:**  That's fair.  We have one thing that I

 4  think is more specific to Your Honor's ruling on that point --

 5          **MS. SAMPLIN:**  Yeah and I'm just trying to --

 6          **MR. LERNER:**  -- which is the --

 7          **MS. SAMPLIN:**  Yeah to pull up the exact language on

 8  my phone but --

 9          **MR. LERNER:**  -- it's the depositions.

10          **MS. SAMPLIN:**  But the depositions, yeah.

11          You had asked us in your order, the Motion for Remote

12  Depositions was granted on the condition that we submit a

13  declaration that answered specific questions for each of the

14  11 deponents.  I submitted that declaration to the other side

15  on time.

16          There's two issues in that declaration.  One is that

17  certain deponents didn't answer the questions all perfectly to

18  your order to get a remote deposition.  We've ask the other

19  side to still consider because these deponents have said --

20  have reiterated their fears about proceeding in person.  We'd

21  asked for their courtesy to allow them to proceed remotely but

22  we can even put that to the side.

23          There are a large chunk of deponents who answered

24  every question perfectly but Plaintiffs are now taking the

25  position because the wording wasn't the exact words in your

1    order -- I think one example is we said "work related" instead

2    of "work meetings;" we said "work-related meetings".  They say

3    we haven't complied with your order.

4          Also, we had our in -- given the timeframe -- it was

5    a quick turnaround -- we had our in-house counsel send the

6    emails to the employees and asked them to answer these

7    questions.  In-house counsel then forwarded me all the

8    responses.  I personally placed eyes on every single email from

9    each of those 11 folks but their side is taking the position

10   because those emails weren't sent directly to me, we didn't

11   comply with your order.

12         So I'm raising now -- they requested a meet and

13   confer in fairness on it today but they've put this position in

14   the email and we kind of just looked at it and said, I don't

15   really want to brief this issue to you.  I think we did our

16   best to comply with your order.  I don't think there's any

17   question that we satisfied the order with respect to many of

18   the deponents who have answered all the questions perfectly.  I

19   don't really want to engage in a joint stipulation quibbling

20   over the language but I'm kind of at a loss of what to do

21   because we have these deponents who answered the questions.

22   And I think under the order should be proceeding with remote

23   depositions.  And we're happy to show you the declaration; I

24   have it here today if that would be helpful.

25              THE COURT:  Plaintiffs' counsel?

1          **MR. POWELL:**  Thank you, Your Honor.

2          Frankly, we suggested in speaking about this because

3    we're open to trying to compromise if we can.

4          And the issue here, though, I would take issue. It's

5    not a quibbling with a word here or there.  I think Your Honor

6    was very specific in stating a number of things.

7          Number one was that Apple required -- the employee

8    was advised by Apple that they were required to work remotely

9    for the next 60 days.  Every single one of the deponents came

10   back and the language was that they understand that Apple's

11   policy is that they should work remotely whenever possible; it

12   doesn't say that they were told they were required to work

13   remotely.

14         And then again you have the issue of who spoke

15   directly with these people, and you have the issue there were,

16   I think I believe four people who do regularly attend meetings

17   at Apple; and of course we'd be willing to talk about some of

18   those people.

19         Like for example, there's one I can think of and I

20   wish I could remember who it was -- it might be Ms. Haggarty

21   (phonetic) who has -- she said she has a family member who's

22   immunocompromised.  That's certainly something I'm happy to

23   talk to them about and see if this is someone, for example,

24   that she's worked -- living with or sees all the time, we can

25   work that out and that's why we wanted to talk to them about

1   it.  Even though that -- Ms. Haggarty -- I think if it was

2   Ms. Haggarty, she does attend meetings at Apple so she wouldn't

3   qualify under Your Honor's order.  But look, I'm sensitive to

4   that and I have a family member who's immunocompromised myself.

5   And so I wanted to try to talk to them and if it's really

6   someone that she sees all the time and she's very worried about

7   it, then we could talk about that one, for example.  That was

8   what we were planning on doing.

9           MS. SAMPLIN:  I will just say the email from their

10  counsel yesterday said the Court's order is denied with respect

11  to your depositions and we need to talk about proceeding with

12  in-person depositions.  So I didn't really get the sense that

13  there was room there.  Happy to discuss and particularly -- and

14  I said, you know, myself, for certain people they didn't answer

15  the questions the way Your Honor had envisioned because some

16  people have gone into Apple.  I understand those present

17  different circumstances.  I think Plaintiffs are well within

18  their right to ask to meet and confer about those folks because

19  they didn't directly comply with the order and I'm happy to

20  discuss those.  But for the other folks, I respectfully do

21  think it's quibbling over language.  I'm happy to show you the

22  declaration.  I don't know that a meet and confer really should

23  be required on those because I think they answered all of your

24  questions.  Of course if Your Honor tells us they didn't, we're

25  happy to provide or revise wording but I think they answered

1    the questions.  I saw -- they were forwarded to me all the

2    emails.  I saw the correspondence so I don't think there's a

3    question of who had it or in-house counsel sent the email, just

4    given the timeframe, but I have all of them in my inbox and I

5    wouldn't have signed the declaration had I not seen those

6    representations directly from the employees.

7               **THE COURT:**  The order speaks for itself.  The

8    language in the order is there because that's what was in the

9    application.  The ex parte application twice asserted it was

10   urgent.  One place I think said it was an emergency but it

11   certainly twice said it was urgent.  And it was the ex parte

12   application that said things like Apple has advised employees

13   that -- for I think it was the next 90 days or until September

14   -- they should be working from home.  That's why that provision

15   is in there.

16              And with respect to other provisions, there was

17   language in the application that said -- and I'm paraphrasing

18   words to the effect of -- It's not fair that Apple employees

19   who by virtue of their being designated as relevant witnesses

20   or custodians, should have to have their level of risk

21   increased beyond what they would normally have as an Apple

22   employee.  And that's why it's well if you haven't been

23   required and haven't come to work or attended in person work-

24   related meetings, that would fall within that category.  So

25   that's why those certifications are there.

1          The order also said at the end, as I recall, this is

2    just ruling on this application.  It's not saying that if

3    someone can't meet those requirements that they have to appear

4    in person.  It may be that another application is required but

5    those rulings were based on the information that was presented

6    to me in an ex parte application that was filed at what?

7    5:36 p.m.  The opposition came in at 4:00 p.m.  And Marie, I

8    think you hit the docket with our order at exactly 5:00 p.m.

9    the next day because it was so urgent.  If it really is that

10   urgent, then you've got to comply with what you say.  And by

11   "you" I mean Apple says, this is the situation that employees

12   aren't permitted to or are required to work remotely and that

13   this would put them at an increased risk than what they're

14   facing at work.  If that's not the case, but there's some other

15   basis -- because this is a serious issue for these folks to

16   need remote depositions -- meet and confer.  If you can't

17   agree, we're going to go forward.  But I'm not going to sit

18   here and assess the sufficiency of responses because even if a

19   response is insufficient, it doesn't mean the person then has

20   been ordered to appear in person.  That order does not say

21   that.  It merely says the application's either granted or

22   denied for all those people that meet these restrictions.  If

23   the application is denied, those people are still free to make

24   a separate application.  But lumping 11 people together with a

25   bunch of representations that may or may not apply to each of

 1   them -- and I didn't even know, that it didn't even appear to

 2   me that counsel had even conferred with each of those folks to

 3   see if they really wanted to do it remotely rather than in

 4   person.  So that's what the ruling was a ruling on that

 5   application and the unique facts presented as the basis for

 6   both it being urgent and for the relief requested.

 7              I can believe -- now I'm going to step aside.

 8              I can't believe you folks are fighting about this.  I

 9   really can't.  I can't believe it.  I'm looking at both of you

10   by the way.  So you're nodding your head, Oh, I can't believe

11   they're doing it too.  I'm looking at both of you.  Work it

12   out.

13              I really -- I know every client is different but when

14   you get stuff thirdhand through in-house counsel, through a

15   supervisor, to get to the person who is the relevant person,

16   things get lost in the middle, in the muddle.  And in-house

17   counsel, great people, I'm sure, but their loyalty is to the

18   entity.

19              I want to know, if I see one of these, what the

20   particular person wants.  If the particular person has a

21   reasonable concern, why are we fighting about this?  If you

22   think that the particular person is faking and you really want

23   me to start making rulings on whether someone is faking

24   discomfort at appearing in person due to COVID, I'm going to do

25   it but that means I'm going to have to hear from the person,

1   all right?  And if I put someone through that and it turns out

2   they're honestly have a very real and rational concern about

3   their health or a family member's health, there's going to be

4   consequences to the side that wouldn't accept that and contest

5   it.  You better have a good-faith basis to say, No, no, this

6   person's not really -- doesn't really feel concerned.  This is

7   an under the table effort to have a deposition be remote

8   because that gives them more time to think about questions or

9   it makes it harder for us to proceed.  But if you want to

10  proceed down that route -- and I'm looking now at Plaintiffs'

11  side, feel free.  But I'm letting Defendant know, if that's

12  where we go, I need evidence from the person, not from an in-

13  house counsel lawyer who says, We're not letting anybody

14  participate in person because I get it.  They protect -- they

15  want to protect their people.  Okay?  I have to protect the

16  system and the person.  All right?  Due process rights over

17  here.  Health rights of our witnesses.  We're going to assess

18  that.  But I can't believe that it's going to come to that and

19  if it does, nobody's asking for sanctions here and it's

20  probably because what you folks are spending just on your meet

21  and confer letters would dwarf what any sanction order would be

22  on a discovery motion.  But it'll start becoming a sua sponte

23  thing and the language in the orders are going to be much more

24  blunt and direct and reference whatever is appropriately

25  referenced in terms of how things are being handled and what

1  the parties are putting everyone thorough and what the lawyers

2  are doing.  It's all going to be part of the future findings on

3  these things.  All right?  So forewarned is forearmed.

4      Bring me whatever disputes you can't resolve but this

5  case has taken up an awful lot of this whole chamber's time and

6  I'm really hoping not to see you as much.

7      All right?

8      **MS. SAMPLIN:**  Understood, Your Honor, thank you.

9      **THE COURT:**  All right?  Is there anything further?

10 So we'll see you back on June 3rd at 10:00 o'clock.

11     And if there's anything in the interim, let me do

12 this.  Let me ask you to file it by -- any further results of

13 any further meet and confer by a week from today, May 27th.

14 All right?

15     **MR. LERNER:**  Thank you.

16     **THE COURT:**  All right.  We are adjourned.

17     **(Proceeding adjourned)**

18

19

20

21

22

23

24

25

## CERTIFICATION

     I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    **May 26, 2021**

        Signed                                    Dated


*TONI HUDSON, TRANSCRIBER*