JOSHUA H. LERNER, SBN 220755
  jlerner@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street Suite 3000
San Francisco, CA 94105
Tel.: 415.393.8200 / Fax: 415.393.8306

H. MARK LYON, SBN 162061
  mlyon@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA 94304-1211
Tel.: 650.849.5300 / Fax: 650.849.5333

BRIAN M. BUROKER, *pro hac vice*
  bburoker@gibsondunn.com
BRIAN K. ANDREA, *pro hac vice*
  bandrea@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Tel.: 202.955.8500 / Fax: 202.467.0539

ILISSA SAMPLIN, SBN 314018
  isamplin@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Tel.: 213.229.7000 / Fax: 213.229.7520

BRIAN A. ROSENTHAL, *pro hac vice*
  brosenthal@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Tel.: 212.351.2339 / Fax: 212.817.9539

ANGELIQUE KAOUNIS, SBN 209833
  akaounis@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2029 Century Park East Suite 4000
Los Angeles, CA 90067
Tel.: 310.552.8546 / Fax: 310.552.7026

*Attorneys for Defendant Apple Inc.*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

MASIMO CORPORATION, a Delaware corporation; and CERCACOR LABORATORIES, INC., a Delaware corporation,

Plaintiffs,

v.

APPLE INC., a California corporation,

Defendants.

CASE NO. 8:20-cv-00048-JVS (JDEx)

**DECLARATION OF ANGELIQUE KAOUNIS IN SUPPORT OF APPLE'S OPPOSITION TO PLAINTIFFS' MOTION TO DENY ACCESS TO CONFIDENTIAL INFORMATION TO DR. MARCO PEREZ**

**Hearing:**
Date:     Thurs., June 24, 2021
Time:     10:00 a.m.
Place:    Courtroom 10C
Judge:    Hon. John D. Early

Gibson, Dunn & Crutcher LLP

KAOUNIS DECLARATION IN SUPPORT OF APPLE'S OPPOSITION TO PLAINTIFFS' MOTION TO DENY ACCESS TO CONFIDENTIAL INFORMATION TO DR. MARCO PEREZ
CASE NO. 8:20-cv-00048-JVS (JDEx)

I, Angelique Kaounis, declare and state as follows:

1.      I am an attorney duly licensed to practice law before this Court and all courts of the State of California.  I am Of Counsel with the law firm of Gibson, Dunn & Crutcher LLP ("Gibson Dunn") and counsel of record for Apple Inc. ("Apple") in the above-captioned action.  I make this declaration in support of Apple's Opposition to Plaintiffs' Motion to Deny Access to Confidential Information to Dr. Marco Perez.  I have personal, firsthand knowledge of the facts stated herein, and if called upon to do so, could and would competently testify thereto.

2.      Attached hereto as **Exhibit A** is a true and correct copy of an April 20, 2021 email I sent to Plaintiffs disclosing Dr. Marco Perez as an expert under the Protective Order, which attached true and correct copies of (a) the Protective Order signed by Dr. Marco Perez, (b) Dr. Perez's Curriculum Vitae, and (c) a listing of Dr. Perez's past and current expert witness work, and additional consulting work.  Dr. Perez is not a technical expert working with patents in this case.  Further, as reflected in Exhibit A, Dr. Perez expressly has agreed to the Protective Order's future limits on serving as "an officer, director, or employee of a Party or of a competitor of a Party."  Dkt. 67 § 9.2(c).  Apple has not retained other experts to address Plaintiffs' alleged business and marketing or hospital-related trade secrets at this time.

3.      On May 4, 2021, Plaintiffs' counsel Perry Oldham objected by email to Dr. Perez, to which I responded by email on May 6 to answer Mr. Oldham's questions and provide further information about Dr. Perez.  *See* Oldham Decl., Ex. 1, at 9-10.  On May 14, I emailed Mr. Oldham and explained that I had not heard back from him in response to my May 6 email providing further information about Dr. Perez.  *Id*. at 8.  I explained that the Protective Order ("PO") said "if an objection [to an expert] is received within th[e] fourteen (14) day [objection] period," under PO Section 9.2, "the Parties agree to meet and confer within seven (7) days following the objection and to use good faith to resolve any such objection."  *Id*. (citing Dkt. 67 § 9.2).  I further explained that based on Mr. Perry's May 4 email, that seven day period ended Tuesday, May 11.  *Id*.  I also

explained that the PO provides "[i]f the Parties are unable to resolve any objection, the objecting Party shall serve on the other Party a Joint Stipulation pursuant to Local Rule 37-2.1 within seven (7) days of the meet and confer," and that the seven-day period lapsed Thursday, May 13—seven days from my May 6 email. *Id*. In light of the lapse of these deadlines and the information provided in my May 6 email, I explained to Mr. Oldham that we assumed Plaintiffs' objection to Dr. Perez had been resolved and would proceed accordingly. *Id*. Later that same day, I, along with my colleague Nathan Powell, participated in a telephone call with Mr. Oldham, in an attempt to resolve Plaintiffs' objections, notwithstanding their waiver and while reserving all rights. During that call, I, on behalf of Apple, proposed that Dr. Perez not receive relevant algorithms designated by Plaintiffs as "Confidential" or "Highly Confidential" and requested that Plaintiffs provide any proposed compromise in writing as soon as practicable. I, on behalf of Apple, also noted that Plaintiffs' proposed restriction on Dr. Perez's future consulting work was not supported by the Protective Order.

4.     Attached hereto as **Exhibit B** is a true and correct copy of an email string dated May 17, 18, 20, 21 and 22, 2021 between myself and Perry Oldham, counsel of record for Plaintiffs and copying other counsel of record.

5.     Attached hereto as **Exhibit C** is a true and correct copy of the American Medical Association Code of Medical Ethics. This page is available at https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/principles-of-medical-ethics.pdf.

6.     Attached hereto as **Exhibit D** is a true and correct copy of a clinical trial description of the study titled "Apple Heart Study: Assessment of Wristwatch-Based Photoplethysmography to Identify Cardiac Arrhythmias." This page is available at https://clinicaltrials.gov/ct2/show/NCT03335800.

7.     Attached hereto as **Exhibit E** is a true and correct copy of a protocol of the study titled "Apple Heart Study: Assessment of Wristwatch-Based Photoplethysmography to Identify Cardiac Arrhythmias" and dated March 20, 2018.

Gibson, Dunn &
Crutcher LLP

8.     Attached hereto as **Exhibit F** is a true and correct copy of a May 7, 2021 email Perry Oldham sent to me disclosing Jack Goldberg as an expert under the Protective Order, which attached (a) Jack Goldberg's Curriculum Vitae, and (b) Exhibit A to the Protective Order signed by Jack Goldberg.

9.     Attached hereto as **Exhibit G** is a true and correct copy of a May 7, 2021 email Perry Oldham sent to me disclosing John L. Smith as an expert under the Protective Order, which attached (a)  John L. Smith's Curriculum Vitae, (b) Exhibit A to the Protective Order signed by John L. Smith, (c) a listing of John L. Smith's past and current litigation work, and (d) a listing of John L. Smith's past and current consulting work.

10.     Attached hereto as **Exhibit H** is a true and correct copy of a webpage reflecting information concerning the Board of Directors for the Masimo Foundation for Ethics, Innovation, and Competition in Healthcare.   This page is available at https://www.masimofoundation.com/about/board-of-directors.htm.

Executed this 2nd day of June 2021 in Malibu, California.

By: _____

Angelique Kaounis

KAOUNIS DECLARATION IN SUPPORT OF APPLE'S OPPOSITION TO PLAINTIFFS' MOTION
TO DENY ACCESS TO CONFIDENTIAL INFORMATION TO DR. MARCO PEREZ
CASE NO. 8:20-CV-00048-JVS (JDEx)

Gibson, Dunn &
Crutcher LLP

# Exhibit A

| | |
|---|---|
| **From:** | Kaounis, Angelique |
| **Sent:** | Tuesday, April 20, 2021 8:52 PM |
| **To:** | Masimo.Apple |
| **Cc:** | *** Apple-Masimo |
| **Subject:** | Masimo Corp. et al. v. Apple Inc., Case No. 8:20-cv-00048-JVS-JDE - Disclosure of Dr. Marco Perez |
| **Attachments:** | 2021.03.31 Marco Perez Curriculum Vitae.pdf; Protective Order_signedMP.pdf; 2021.04.20 Perez Testimony-Consulting List.pdf |

Counsel,

Under Section 9.2 of the Protective Order, Apple discloses Dr. Marco Perez as an expert in the above-captioned action to whom it intends to disclose Confidential and Highly Confidential information or items.  The following information, which provides the information required by paragraphs 9.2(i) to (v) of the Protective Order, is attached:

- Dr. Perez's signed copy of Exhibit A to the Protective Order;
- Dr. Perez's current CV;
- a listing of Dr. Perez's past and current expert witness work, and additional consulting work.

Dr. Perez is a named inventor on US Patent No. 10,172,916.

Finally, I confirm that Dr. Perez is not presently an officer, director, or employee of a party to this litigation or of a competitor of a party to this litigation, nor is he anticipated to become an officer, director, or employee of a Party or a competitor of a party to this litigation.  He is also not involved in competitive decision making on behalf of a party to this litigation or a competitor of a party to this litigation.

Thanks,
Angelique

**Angelique Kaounis**

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP
2029 Century Park East Suite 4000, Los Angeles, CA 90067-3026
Tel +1 310.552.8546 • Fax +1 310.552.7026
AKaounis@gibsondunn.com • www.gibsondunn.com

Exhibit A
Page 5

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

|  |  |
|---|---|
| MASIMO CORPORATION, a Delaware corporation; and CERCACOR LABORATORIES, INC., a Delaware corporation, <br><br> Plaintiffs, <br><br> v. <br><br> APPLE INC., a California corporation, <br><br> Defendant. | CASE NO. 8:20-cv-00048-JVS (JDEx) <br><br> PROTECTIVE ORDER |

Based on Plaintiffs' Motion for Protective Order (Dkt. 61, "Motion"), the Joint Stipulation of the parties (Dkt. 61-1), the evidence submitted in support of and in opposition to the Motion (Dkt. 61-2 to 61-5), including the parties' respective proposed protective orders (Dkt. 61-2, Exh. 2, and Dkt. 61-5, Exh. A), and the June 23, 2020 Order by the Honorable Judge James V. Selna, United States District Judge (Dkt. 59), and good cause appearing therefor, the Motion is granted, in part, and the Court finds and orders as follows.

### 1. <u>PURPOSES AND LIMITATIONS</u>

Discovery in this action is likely to involve production of confidential, proprietary or private information for which special protection from public disclosure and from use for any purpose other than pursuing this litigation may be warranted. The parties acknowledge that this Order does not confer blanket protections on all disclosures or responses to discovery, including disclosures under Rule 26, and that the protection it affords from public disclosure and use extends only to the limited information or items that are entitled to confidential treatment under the applicable legal principles.

### 2. <u>GOOD CAUSE STATEMENT</u>

This action is likely to involve trade secrets, customer and pricing lists and other valuable research, development, commercial, financial, technical and/or proprietary information for which special protection from public disclosure and from use for any purpose other than prosecution of this action is warranted. Such confidential and proprietary materials and information consist of, among other things, confidential business or financial information, information regarding confidential business practices, or other confidential research, development, or commercial information (including information implicating privacy rights of third parties), information otherwise generally unavailable to the public, or which may be privileged or otherwise protected from disclosure under state or federal statutes, court rules, case decisions, or common law. Accordingly, to expedite the flow of information, to facilitate the prompt resolution of disputes over confidentiality of discovery materials, to adequately protect information the parties are entitled to keep confidential, to ensure that the parties are permitted reasonable necessary uses of such material in preparation for and in the conduct of trial, to address their handling at the end of the litigation, and serve the ends of justice, a protective order for such

information is justified in this matter, pursuant to Rule 26(c) of the Federal Rules of Civil Procedure or any other applicable authority. It is the intent of the parties that information will not be designated as confidential for tactical reasons and that nothing be so designated without a good faith belief that it has been maintained in a confidential, non-public manner, and there is good cause why it should not be part of the public record of this case.

### 3. ACKNOWLEDGMENT OF UNDER SEAL FILING PROCEDURE

The parties further acknowledge, as set forth in Section 14.3, below, that this Protective Order does not entitle them to file confidential information under seal; Local Civil Rule 79-5 sets forth the procedures that must be followed and the standards that will be applied when a party seeks permission from the court to file material under seal. There is a strong presumption that the public has a right of access to judicial proceedings and records in civil cases. In connection with non-dispositive motions, good cause must be shown to support a filing under seal. *See Kamakana v. City and County of Honolulu*, 447 F.3d 1172, 1176 (9th Cir. 2006), *Phillips v. Gen. Motors Corp.*, 307 F.3d 1206, 1210-11 (9th Cir. 2002), *Makar-Welbon v. Sony Electrics, Inc.*, 187 F.R.D. 576, 577 (E.D. Wis. 1999) (even stipulated protective orders require good cause showing), and a specific showing of good cause with proper evidentiary support and legal justification, must be made with respect to Protected Material that a party seeks to file under seal. The parties' mere designation of Disclosure or Discovery Material as CONFIDENTIAL does not—without the submission of competent evidence by declaration, establishing that the material sought to be filed under seal qualifies as confidential, privileged, or otherwise protectable—constitute good cause.

-2-

Exhibit A
Page 8

Further, if a party requests sealing related to a dispositive motion or trial, then compelling reasons, not only good cause, for the sealing must be shown, and the relief sought shall be narrowly tailored to serve the specific interest to be protected. *See Pintos v. Pacific Creditors Ass'n.*, 605 F.3d 665, 677-79 (9th Cir. 2010). For each item or type of information, document, or thing sought to be filed or introduced under seal in connection with a dispositive motion or trial, the party seeking protection must articulate compelling reasons, supported by specific facts and legal justification, for the requested sealing order. Again, competent evidence supporting the application to file documents under seal must be provided by declaration.

Any document that is not confidential, privileged, or otherwise protectable in its entirety will not be filed under seal if the confidential portions can be redacted. If documents can be redacted, then a redacted version for public viewing, omitting only the confidential, privileged, or otherwise protectable portions of the document, shall be filed. Any application that seeks to file documents under seal in their entirety should include an explanation of why redaction is not feasible.

4.    <u>DEFINITIONS</u>

4.1    Action: this pending federal lawsuit.

4.2    Challenging Party: a Party or Non-Party that challenges the designation of information or items under this Order.

4.3    "CONFIDENTIAL" Information or Items: information (regardless of how it is generated, stored or maintained) or tangible things that qualify for protection under Federal Rule of Civil Procedure 26, and as specified above in the Good Cause Statement.

4.4    "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" Information or Items: extremely confidential and/or sensitive "Confidential

-3-

Information or Items," disclosure of which to another Party or Non-Party is likely to cause harm or significant competitive disadvantage to the Producing Party.

4.5 "HIGHLY CONFIDENTIAL – SOURCE CODE" Information or Items: extremely sensitive "Confidential Information or Items" representing computer code, scripts, assembly, binaries, object code, source code listings (e.g., file names and path structure), source code comments, object code listings, and Hardware Description Language (HDL) or Register Transfer Level (RTL) files that describe the hardware design of any ASIC or other chip, disclosure of which to another Party or Non-Party is likely to cause harm or significant competitive disadvantage to the Producing Party. Other documents that quote source code or internal documents that contain specific descriptions of source code (e.g. descriptions of declarations, functions, and parameters) that describe how the source code operates, to be narrowly applied, may be designated pursuant to this Paragraph, provided that the Producing Party also produces a redacted version designated "HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY," which removes the quoted source code or specific descriptions of source code. Native Computer Aided Design (CAD) files may be designated pursuant to this Paragraph, provided that any printouts of CAD files shall be designated "HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY" and will not be included in the page limits discussed in Section 11 below.

4.6 Counsel: Outside Counsel of Record and House Counsel (as well as their support staff).

4.7 Designating Party or Producing Party: a Party or Non-Party that designates information or items that it produces in disclosures or in responses to discovery as "CONFIDENTIAL," HIGHLY CONFIDENTIAL –

-4-

ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL – SOURCE CODE."

4.8    Disclosure or Discovery Material: all items or information, regardless of the medium or manner in which it is generated, stored, or maintained (including, among other things, testimony, transcripts, and tangible things), that are produced or generated in disclosures or responses to discovery.

4.9    Expert: a person with specialized knowledge or experience in a matter pertinent to the litigation who has been retained by a Party or its counsel to serve as an expert witness or as a consultant in this Action.

4.10    House Counsel: attorneys who are employees of a party to this Action.   House Counsel does not include Outside Counsel of Record or any other outside counsel.

4.11    Non-Party: any natural person, partnership, corporation, association or other legal entity not named as a Party to this action.

4.12    Outside Counsel of Record: attorneys who are not employees of a party to this Action but are retained to represent a party to this Action and have appeared in this Action on behalf of that party or are affiliated with a law firm that has appeared on behalf of that party, and includes support staff.

4.13    Party: any party to this Action, including all of its officers, directors, employees, consultants, retained experts, and Outside Counsel of Record (and their support staffs).

4.14    Producing Party: a Party or Non-Party that produces Disclosure or Discovery Material in this Action.

4.15    Professional Vendors: persons or entities that provide litigation support services (e.g., photocopying, videotaping, translating, preparing exhibits or demonstrations, and organizing, storing, or retrieving data in any form or medium) and their employees and subcontractors.

-5-

Case 8:20-cv-00048-JVS-JDE   Document 435-2   Filed 06/03/21   Page 13 of 229   Page ID #:38026
Case 8:20-cv-00048-JVS-JDE   Document 417-1   Filed 06/30/20   Page 7 of 32   Page ID #:38026
#:38026

4.16   Protected Material: any Disclosure or Discovery Material that is designated as "CONFIDENTIAL," HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL – SOURCE CODE."  Protected Material shall not include:  (i) advertising materials that have been actually published or publicly disseminated; and (ii) materials that show on their face they have been disseminated to the public.

4.17   Receiving Party: a Party that receives Disclosure or Discovery Material from a Producing Party.

5.   <u>SCOPE</u>

5.1   All Protected Material shall be used solely for this case or any related appellate proceeding, and not for any other purpose whatsoever, including without limitation any other litigation, patent prosecution or acquisition, patent reexamination or reissue proceedings, or any business or competitive purpose or function.  Protected Material shall not be distributed, disclosed or made available to anyone except as expressly provided in this Order.

5.2   The protections conferred by this Order cover not only Protected Material (as defined above), but also (1) any information copied or extracted from Protected Material; (2) all copies, excerpts, summaries, or compilations of Protected Material; and (3) any testimony, conversations, or presentations by Parties or their Counsel in court or in other settings that might reveal Protected Material.

5.3   Nothing in this Protective Order shall prevent or restrict a Producing Party's own disclosure or use of its own Protected Material to any person for any purpose.

-6-

5.4     This Order does not preclude any Party or Non-Party from using Protected Material with the consent of the Producing Party or by order of the Court.

5.5     This Order does not preclude any Party or Non-Party from moving the Court for additional protection of any Discovery Material or modification of this Order, including, without limitation, moving for an order that certain matter not be produced at all.

5.6     Any use of Protected Material at trial shall be governed by the orders of the trial judge and other applicable authorities. This Order does not govern the use of Protected Material at trial.

6.     <u>DURATION</u>

Even after Final Disposition of this litigation, the confidentiality obligations imposed by this Order shall remain in effect until a Designating Party agrees otherwise in writing, a court order otherwise directs, or the information was made public during trial. For purposes of this Order, "Final Disposition" occurs after an order, mandate, or dismissal finally terminating the above-captioned action with prejudice, including all appeals.

7.     <u>DESIGNATING PROTECTED MATERIAL</u>

7.1     <u>Exercise of Restraint and Care in Designating Material for Protection</u>. Each Party or Non-Party that designates information or items for protection under this Order must take care to limit any such designation to specific material that qualifies under the appropriate standards.

Mass, indiscriminate or routinized designations are prohibited. Designations that are shown to be clearly unjustified or that have been made for an improper purpose (e.g., to unnecessarily encumber the case development process or to impose unnecessary expenses and burdens on other parties) may expose the Designating Party to sanctions.

-7-

If it comes to a Designating Party's attention that information or items that it designated for protection do not qualify for protection, that Designating Party must promptly notify all other Parties that it is withdrawing the inapplicable designation.

7.2    <u>Manner and Timing of Designations</u>. Except as otherwise provided in this Order, or as otherwise stipulated or ordered, Disclosure of Discovery Material that qualifies for protection under this Order must be clearly so designated before the material is disclosed or produced.

Designation in conformity with this Order requires:

(a) for information in documentary form (e.g., paper or electronic documents, but excluding transcripts of depositions or other pretrial or trial proceedings), that the Producing Party affix at a minimum, the legend "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" (hereinafter "Confidentiality legend"), to each page that contains protected material. If only a portion of the material on a page qualifies for protection, the Producing Party also must clearly identify the protected portion(s) (e.g., by making appropriate markings in the margins).  For digital files being produced, the Producing Party may mark each viewable page or image with the appropriate designation, and mark the medium, container, and/or communication in which the digital files were contained.

A Party or Non-Party that makes original documents available for inspection need not designate them for protection until after the inspecting Party has indicated which documents it would like copied and produced. During the inspection and before the designation, all of the material made available for inspection shall be deemed "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY." After the inspecting Party has identified the documents it wants

-8-

Case 8:20-cv-00048-JVS-JDE   Document 435-2   Filed 06/03/21   Page 16 of 229   Page ID
#:38029
Case 8:20-cv-00048-JVS-JDE   Document 6   Filed 06/30/20   Page 16 of 32   Page ID #:585

copied and produced, the Producing Party must determine which documents, or portions thereof, qualify for protection under this Order. Then, before producing the specified documents, the Producing Party must affix the appropriate Confidentiality legend to each page that contains Protected Material. If only a portion of the material on a page qualifies for protection, the Producing Party also must clearly identify the protected portion(s) (e.g., by making appropriate markings in the margins).

   (b) for testimony given in depositions that the Designating Party identifies the Disclosure or Discovery Material on the record at the time the testimony is given or by sending written notice of which portions of the transcript of the testimony are designated within 30 days of receipt of the transcript of the testimony.  During the 30-day period, the entire transcript will be treated as "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY." Any Protected Material that is used in the taking of a deposition shall remain subject to the provisions of this Protective Order, along with the transcript pages of the deposition testimony dealing with such Protected Material.  In such cases the court reporter shall be informed of this Protective Order and shall be required to operate in a manner consistent with this Protective Order.  In the event the deposition is recorded (by video or otherwise), the original and all copies of the recording shall be  designated pursuant to the terms of this Protective Order.  Counsel for any Producing Party shall have the right to exclude from oral depositions, other than the deponent, deponent's counsel, the reporter and videographer (if any), any person who is not authorized by this Protective Order to receive or access Protected Material based on the designation of such Protected Material.  Such right of exclusion shall be applicable only during periods of examination or testimony regarding such Protected Material.

-9-

(c) for information produced in some form other than documentary and for any other tangible items, that the Producing Party affix in a prominent place on the exterior of the container or containers in which the information is stored the appropriate Confidentiality legend. If only a portion or portions of the information warrants protection, the Producing Party, to the extent practicable, shall identify the protected portion(s).

(d) When electronic files or documents are printed for use at deposition, in a court proceeding, or for provision in printed form to an expert or consultant pre-approved pursuant to Paragraph 9.2(c), the party printing the electronic files or documents shall affix a legend to the printed document corresponding to the designation of the Designating Party and including the production number and designation associated with the native file. The parties reserve the right to object to the use of any image format version of a document produced in native file format to the extent any information has been altered.

7.3     <u>Inadvertent Failures to Designate</u>. An inadvertent failure to designate qualified information or items does not, standing alone, waive the Designating Party's right to secure protection under this Order for such material, provided that the Producing Party notifies all Receiving Parties that such Discovery Material is protected under one of the categories of this Order within fourteen (14) days of the Producing Party learning of the inadvertent failure to designate. Upon such timely correction of a designation, the Receiving Party must make reasonable efforts to assure that the material is treated in accordance with the provisions of this Order. The Producing Party shall reproduce the Protected Material with the correct confidentiality designation within seven (7) days upon its notification to the Receiving Parties. Upon receiving the Protected Material with the correct confidentiality designation, the Receiving

-10-

Parties shall return or securely destroy all Discovery Material that was not designated properly.

A Receiving Party shall not be in breach of this Order for any use of such Discovery Material before the Receiving Party receives such notice that such Discovery Material is protected under one of the categories of this Order, unless an objectively reasonable person would have realized that the Discovery Material should have been appropriately designated with a confidentiality designation under this Order. Once a Receiving Party has received notification of the correct confidentiality designation for the Protected Material with the correct confidentiality designation, the Receiving Party shall treat such Discovery Material (subject to the exception in the following Paragraph below) at the appropriately designated level pursuant to the terms of this Order.

A subsequent designation of "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" shall apply on a going forward basis and shall not disqualify anyone who reviewed "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" materials while the materials were not marked "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" from engaging in the activities set forth in Paragraph 10.

## 8    CHALLENGING CONFIDENTIALITY DESIGNATIONS

8.1.    <u>Timing and Form of Challenges</u>. Any Party or Non-Party may challenge a designation of confidentiality at any time that is consistent with the Court's Scheduling Order.   Any challenge to a designation of Discovery Material under this Order shall comply with the procedures set forth in Local Rule 37-1.

-11-

8.2　Meet and Confer. It shall be the responsibility of the Challenging Party to initiate the dispute resolution process under Local Rule 37-1 et seq.

8.3　Joint Stipulation. Any challenge submitted to the Court shall be via a joint stipulation pursuant to Local Rule 37-2.

8.4　The burden of persuasion in any such challenge proceeding shall be on the Designating Party. Frivolous challenges, and those made for an improper purpose (e.g., to harass or impose unnecessary expenses and burdens on other parties) may expose the Challenging Party to sanctions. Unless the Designating Party has waived or withdrawn the confidentiality designation, all parties shall continue to afford the material in question the level of protection to which it is entitled under the Producing Party's designation until the Court rules on the challenge.

9　ACCESS TO AND USE OF PROTECTED MATERIAL

9.1　Basic Principles. A Receiving Party may use Protected Material that is disclosed or produced by another Party or by a Non-Party in accordance with Section 5. Such Protected Material may be disclosed only to the categories of persons and under the conditions described in this Order. When the Action has been terminated, a Receiving Party must comply with the provisions of section 17 below (FINAL DISPOSITION).

Protected Material must be stored and maintained by a Receiving Party in a secure manner at a location in the United States that ensures that access is limited to the persons authorized under this Order. For any Protected Material that is subject to export control, such material shall be so marked or designated by the Designating Party and the Receiving Party shall upon receipt be responsible for complying with all applicable United States Export Administration Regulations and shall take all reasonable steps to so comply,

-12-

including taking steps to ensure such material is not exported outside the United States or provided to foreign nationals to whom such assess is restricted.

Nothing in this Protective Order shall be construed to prevent counsel from advising their clients with respect to this case based in whole or in part upon Protected Materials, provided counsel does not disclose the Protected Material itself except as provided in this Order.

Nothing in this Protective Order shall preclude a party from using material obtained lawfully from a source other than the Producing Party, even if the Producing Party also designated the material pursuant to this Protective Order.

9.2 <u>Disclosure of "CONFIDENTIAL" Information or Items</u>. Unless otherwise ordered by the court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "CONFIDENTIAL" only to:

(a) the Receiving Party's Outside Counsel of Record in this Action, as well as employees of said Outside Counsel of Record to whom it is reasonably necessary to disclose the information for this Action;

(b) the officers, directors, and employees (including House Counsel) of the Receiving Party to whom disclosure is reasonably necessary for this Action and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(c) Experts (as defined in this Order) of the Receiving Party to whom disclosure is reasonably necessary for this Action, including the expert's support staff, provided that: (1) such consultants or experts are not presently an officer, director, or employee of a Party or of a competitor of a Party, nor anticipated at the time of retention to become an officer, director or employee of a Party or of a competitor of a Party and (2) such expert or consultant is not

-13-

Case 8:20-cv-00048-JVS-JDE   Document 435-2   Filed 06/03/21   Page 21 of 229   Page ID
Case 8:20-cv-00048-JVS-JDE   Document 674-3   Filed 06/30/20   Page 20 of 32   Page ID #5570
#:38034

involved in competitive decision-making, as defined by *U.S. Steel v. United States*, 730 F.2d 1465, 1468 n.3 (Fed. Cir. 1984), on behalf of a Party or a competitor of a Party.  At least fourteen (14) days before access to the Protected Material is to be given to a consultant or expert, the consultant or expert shall complete the "Acknowledgment and Agreement to Be Bound" (Exhibit A) and the same shall be served upon the producing Party along with the following "Pre-Access Disclosure Requirements":

(i)     a current curriculum vitae of the consultant or expert;

(ii)     identification of the consultant or expert's present employer and job title;

(iii)     identification of all of the person's past and current employment and consulting relationships in the past five years, including direct relationships and relationships through entities owned or controlled by the person, including but not limited to, an identification of any individual or entity with or for whom the person is employed or to whom the person provides consulting services relating to the design, development, operation, or patenting of non-invasive physiological monitoring technologies, or relating to the acquisition of intellectual property assets relating to non-invasive physiological monitoring;

(iv)     identification (by application number, title, and filing date) of all pending patent applications on which the person is named as an inventor, in which the person has any ownership interest, or as to which the person has had or anticipates in the future any involvement in advising on, consulting on, preparing, prosecuting, drafting, editing, amending, or otherwise affecting the scope of the claims; and

-14-

(v)    a listing (by name and number of the case, filing date, and location of court) of any litigation in connection with which the person has offered expert testimony, including through a declaration, report, or testimony at a deposition or trial, during the preceding five years.

The Party seeking to disclose Protected Material shall provide such other information regarding the person's professional activities reasonably requested by the Producing Party for it to evaluate whether good cause exists to object to the disclosure of Protected Material to the outside expert or consultant. Objection Process: The producing party may object to and notify the receiving Party in writing that it objects to disclosure of Protected Material to the consultant or expert.  In the absence of an objection within fourteen (14) days of the date on which the Producing Party receives notice that a consultant or expert will be given access to Protected Material, the person shall be deemed approved under this Protective Order.  There shall be no disclosure of Protected Material to the person prior to expiration of this fourteen (14) day period.  If an objection is received within that fourteen (14) day period, the Parties agree to meet and confer within seven (7) days following the objection and to use good faith to resolve any such objection.  If the Parties are unable to resolve any objection, the objecting Party shall serve on the other Party a Joint Stipulation pursuant to Local Rule 37-2.1 within seven (7) days of the meet and confer.  The objecting Party shall have the burden of proving the need for a protective order.  No disclosure shall occur until all such objections are resolved by agreement or Court order;

(d) the court and its personnel;

(e) court reporters, videographers, and their staff;

-15-

(f)   professional jury or trial consultants, mock jurors, and Professional Vendors to whom disclosure is reasonably necessary for this Action and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(g) the author, recipient, or custodian of a document containing the information, or any other individual who appears to have had access to the specific information at issue based on the face of the document, the document's metadata, other documents, or sworn witness testimony;

(h) any mediators or settlement officers and their supporting personnel, mutually agreed upon by any of the parties engaged in settlement discussions;

(i) any other person with the prior written consent of the Producing Party; and

(j) during their depositions, witnesses, and attorneys for witnesses, in the Action to whom disclosure is reasonably necessary provided: (1) the deposing party requests that the witness sign the form attached as Exhibit A hereto; and (2) they will not be permitted to keep any confidential information unless they sign the "Acknowledgment and Agreement to Be Bound" (Exhibit A), unless otherwise agreed by the Designating Party or ordered by the court. Pages of transcribed deposition testimony or exhibits to depositions that reveal Protected Material may be separately bound by the court reporter and may not be disclosed to anyone except as permitted under this Protective Order. If a Designating Party believes a party is not acting in good faith in seeking to show Protected Material to a witness during a deposition, the Designating Party may seek a further protective order under Local Rule 37 to prevent the showing of Protected Material to the witness, with the Designating Party bearing the burden

-16-

of proof to show that the party seeking to show Protected Material to a witness during a deposition is not acting in good faith.

9.3. <u>Disclosure of "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" Information or Items</u>. Unless otherwise ordered by the court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" only to the individuals identified in Paragraphs 9.2 (a), (c)-(i), who are not competitive decision-makers of a Party as defined by applicable authorities.

10. <u>PROSECUTION BAR</u>

After the adoption of this provision by the parties, Outside Counsel of Record and any person associated with a Party who receive a Producing Party's material designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" under this Protective Order who accesses or otherwise learns of, in whole or in part, said material designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" under this Protective Order shall not prepare, prosecute, supervise, advise, counsel, or assist in the preparation or prosecution of any patent application seeking a patent on behalf of the Receiving Party or its acquirer, successor, or predecessor in the field of non-invasive monitoring during the pendency of this Action and for two years after final termination of this action. To avoid any doubt, "prosecution" as used in this paragraph does not include representing or advising a Party before a domestic or foreign agency in connection with a reissue, ex parte reexamination, covered business method review, *inter partes* review, opposition, cancelation, or similar proceeding; though in connection with any such agency proceeding involving the patents-in-suit, Outside Counsel

-17-

Case 8:20-cv-00048-JVS-JDE   Document 435-2   Filed 06/03/21   Page 25 of 229   Page ID
#:38038
Case 8:20-cv-00048-JVS-JDE   Document 6   Filed 06/30/20   Page 19 of 32   Page ID #:574

of Record for a Receiving Party shall not: (i) participate in the preparation, prosecution, supervision, advice, counsel, or assistance of any amended claims; (ii) reveal a Producing Party's Protected Material to any prosecuting reexamination counsel or agent; or (iii) use a producing Party's Protected Material for any purpose not permitted by Section 5. The applicability of this provision is to be determined on an individual-by-individual basis such that an individual attorney who has not received Protected Material designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" is not restricted from undertaking any activities by virtue of this provision even if said individual attorney is employed by or works for the same firm or organization as an individual who has received such Protected Material.

11.   SOURCE CODE

(a)   To the extent production of source code becomes necessary in this case, a Producing Party may designate source code as "HIGHLY CONFIDENTIAL - SOURCE CODE" if it comprises or includes confidential, proprietary or trade secret source code. Nothing in this Order shall be construed as a representation or admission that Source Code is properly discoverable in this action, or to obligate any Party to produce any Source Code.

(b)   Protected Material designated as "HIGHLY CONFIDENTIAL – SOURCE CODE" shall be subject to all of the protections afforded to "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" information including the Prosecution Bar set forth in Paragraph 10, and may be disclosed only to the individuals identified in Paragraphs 9.2(a), (c), (d), (e), (g), and (j), subject to the restrictions set forth in Paragraph 9.3.

(c)   Any source code produced in discovery shall be made available for inspection, in a format allowing it to be reasonably reviewed and

-18-

Case 8:20-cv-00048-JVS-JDE   Document 435-2   Filed 06/03/21   Page 26 of 229   Page ID
Case 8:20-cv-00048-JVS-JDE   Document 67-3   Filed 06/30/20   Page 26 of 52   Page ID #:5875
#:38039

searched, during normal business hours or at other mutually agreeable times, at an office of the Producing Party's counsel in the Central District of California or another mutually agreed upon location. The source code shall be made available for inspection on a secured computer in a secured room without Internet access or network access to other computers, and the Receiving Party shall not copy, remove, or otherwise transfer any portion of the source code onto any recordable media or recordable device.  No recordable media or recordable devices, including without limitation sound recorders, computers, cellular telephones, peripheral equipment, cameras, CDs, DVDs, or drives of any kind, shall be permitted into the Source Code Review Room. The Producing Party may visually monitor the activities of the Receiving Party's representatives during any source code review, but only to ensure that there is no unauthorized recording, copying, or transmission of the source code.

(d)     The Producing Party shall install tools that are sufficient for viewing and searching the code produced, on the platform produced, if such tools exist and are presently used in the ordinary course of the Producing Party's business.  The Receiving Party's outside counsel and/or experts may request that commercially available software tools for viewing and searching Source Code be installed on the secured computer, provided, however, that (a) the Receiving Party possesses an appropriate license to such software tools; (b) the Producing Party approves such software tools; and (c) such other software tools are reasonably necessary for the Receiving Party to perform its review of the Source Code consistent with all of the protections herein.  The Receiving Party must provide the Producing Party with the CD or DVD containing such licensed software tool(s) at least fourteen (14) days in advance of the date upon which the Receiving Party wishes to have the additional software tools available for

-19-

use on the Source Code Computer.     The Parties agree to cooperate in good faith if additional software becomes necessary on an expedited basis.

(e)     The Receiving Party's outside counsel and/or experts shall be entitled to take notes relating to the Source Code but may not copy the Source Code into the notes and may not take such notes electronically on the Source Code Computer itself or any other computer.

(f)     The Receiving Party may request paper copies of limited portions of source code that are reasonably necessary for the preparation of court filings, pleadings, expert reports, or other papers, or for deposition or trial, but shall not request paper copies for the purposes of reviewing the source code other than electronically as set forth in Paragraph (c) in the first instance.  Any printed portion that consists of more than fifteen (15) pages of a continuous block of Source Code or more than two hundred (200) pages total shall be presumed to be excessive, and the burden shall be on the Receiving Party to demonstrate the need for such a printed copy.   Within ten (10) days, the Producing Party shall either (i) provide one copy set of such pages to the Receiving Party or (ii) inform the Requesting Party that it objects that the printed portions are excessive and/or not done for a permitted purpose.   The Parties will cooperate in good faith if a different timeframe for production is required.    If, after meeting and conferring, the Producing Party and the Receiving Party cannot resolve the objection, the Receiving Party shall be entitled to seek a Court resolution of whether the printed Source Code in question is narrowly tailored and was printed for a permitted purpose.   The burden shall be on the Receiving Party to demonstrate that such printed portions are no more than is reasonably necessary for a permitted purpose and not merely printed for the purposes of review and analysis elsewhere.   The printed pages

-20-

shall constitute part of the Source Code produced by the Producing Party in this action.

(g)     All persons who will review a Producing Party's Source Code on behalf of a Receiving Party, including members of a Receiving Party's outside law firm, shall be identified in writing to the Producing Party at least five (5) days in advance of the first time that such person reviews such Source Code.  Such identification shall be in addition to any other disclosure required under this Order.   All persons viewing Source Code on the source code computer shall sign on each day they view Source Code a log that will include the names of persons who enter the locked room to view the Source Code and when they enter and depart.  The log shall be kept by the Producing Party.

(h)     Unless otherwise agreed in advance by the Parties in writing, following each day on which inspection is done under this Order, the Receiving Party's outside counsel and/or experts shall remove all notes, documents, and all other materials from the Source Code Review Room; failure to do so could be deemed a waiver of confidentiality to any materials left behind.  The Producing Party is not responsible for any items left in the room following each inspection session. But all counsel remain bound by their ethical duties regarding the handling and possible return of work product inadvertently left behind by a representative of an opposing party. Proper identification of all authorized persons shall be provided prior to any access to the secure room or the computer containing Source Code.  Proper identification requires showing, at a minimum, a photo identification card sanctioned by the government of any State of the United States, by the government of the United States, or by the nation state of the authorized person's current citizenship. Access to the secure room or the Source Code Computer may be denied, at the discretion of the supplier, to any individual who fails to provide proper identification.

-21-

(i)     The Receiving Party's outside counsel of record may make no more than three (3) additional paper copies of any portions of the Source Code received from a Producing Party pursuant to Paragraph 11(f), not including copies attached to court filings or used at depositions, and shall maintain a log of all paper copies of the Source Code.  The log shall include the names of the reviewers and/or recipients of paper copies and locations where the paper copies are stored.  Upon request from the Producing Party, the Receiving Party shall provide a copy of this log to the Producing Party as soon reasonably practicable and in no event more than three (3) days after receipt of such request.

(j)     The Receiving Party's outside counsel of record and any person receiving a copy of any Source Code shall maintain and store any paper copies of the Source Code at their offices in a manner that prevents duplication of or unauthorized access to the Source Code, including, without limitation, storing the Source Code in a locked room or cabinet at all times when it is not in use.  Absent agreement of the Parties or order of this Court, no more than a total of fifteen (15) individuals identified by the Receiving Party shall have access to the printed portions of the Source Code (except insofar as such code appears in any court filing or expert report).  The Parties agree to cooperate in good faith if it becomes necessary for more than fifteen (15) individuals to have access to the printed portions of the Source Code. Nothing in this paragraph reflects an agreement by any Party in advance that access by more than fifteen individuals is warranted.

(k)     For depositions, the Receiving Party shall not bring copies of any printed Source Code.  Rather, at least ten (10) days before the date of the deposition, the Receiving Party shall notify the Producing Party it wishes to use Source Code at the deposition, and the Producing Party shall bring printed

-22-

Case 8:20-cv-00048-JVS-JDE Document 435-2 Filed 06/03/21 Page 30 of 229 Page ID
Case 8:20-cv-00048-JVS-JDE Document 6:35-2 Filed 06/30/20 Page 24 of 92 Page ID #:5379
#:38043

copies of the Source Code to the deposition for use by the Receiving Party. Copies of Source Code that are marked as deposition exhibits shall not be provided to the Court Reporter or attached to deposition transcripts; rather, the deposition record will identify the exhibit by its production numbers. The Producing Party shall maintain the marked deposition exhibits during the pendency of this case. All other paper copies of Source Code brought to the deposition by the Producing Party shall remain with the Producing Counsel's outside counsel for secure destruction in a timely manner following the deposition.

(l) Except as provided in this sub-paragraph, absent express written permission from the Producing Party, the Receiving Party may not create electronic images, or any other images, or make electronic copies, of the Source Code from any paper copy of Source Code for use in any manner (including by way of example only, the Receiving Party may not scan the Source Code to a PDF or photograph the code). Images or copies of Source Code shall not be included in correspondence between the Parties (references to production numbers shall be used instead), and shall be omitted from pleadings and other papers whenever possible. If a Party reasonably believes that it needs to submit a portion of Source Code as part of a filing with the Court, the Parties shall meet and confer as to how to make such a filing while protecting the confidentiality of the Source Code and such Source Code will not be filed absent agreement from the Producing Party that the confidentiality protections will be adequate or order of this Court. If a Producing Party agrees to produce an electronic copy of all or any portion of its Source Code or provide written permission to the Receiving Party that an electronic or any other copy needs to be made for a Court filing, access to the Receiving Party's submission, communication, and/or disclosure of electronic files or other materials

-23-

Case 8:20-cv-00048-JVS-JDE Document 435-2 Filed 06/03/21 Page 31 of 229 Page ID
#:38044
Case 8:20-cv-00048-JVS-JDE Document 6:435-2 Filed 06/30/20 Page 25 of 32 Page ID #:5580

containing any portion of Source Code (paper or electronic) shall at all times be limited solely to individuals who are expressly authorized to view Source Code under the provisions of this Order. Where the Producing Party has provided the express written permission required under this provision for a Receiving Party to create electronic copies of Source Code, the Receiving Party shall maintain a log of all such electronic copies of any portion of Source Code in its possession or in the possession of its retained consultants, including the names of the reviewers and/or recipients of any such electronic copies, and the locations and manner in which the electronic copies are stored. Additionally, any such electronic copies must be labeled "HIGHLY CONFIDENTIAL - SOURCE CODE" as provided for in this Order.

12. PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED IN OTHER LITIGATION

If a Party is served with a subpoena, including one issued by any court, arbitral, administrative or legislative body or a court order issued in other litigation, that requests or compels disclosure of any Protected Material, that Party must:

(a) promptly notify in writing each Designating Party. Such notification shall include a copy of the subpoena or court order;

(b) promptly notify in writing the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is subject to this Protective Order. Such notification shall include a copy of this Protective Order; and

(c) cooperate with respect to all reasonable procedures sought to be pursued by the Designating Party whose Protected Material may be affected. If the Designating Party timely seeks a protective order, the Party served with the subpoena or court order shall not produce any information designated in this

-24-

action as "CONFIDENTIAL," HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" before a determination by the court from which the subpoena or order issued, unless the Party has obtained the Designating Party's permission. The Designating Party shall bear the burden and expense of seeking protection in that court of its confidential material and nothing in these provisions should be construed as authorizing or encouraging a Receiving Party in this Action to disobey a lawful directive from another court.

13. <u>A NON-PARTY'S PROTECTED MATERIAL SOUGHT TO BE PRODUCED IN THIS LITIGATION</u>

(a) The terms of this Order are applicable to information produced by a Non-Party in this Action and designated as Protected Material. Such information produced by Non-Parties in connection with this litigation is protected by the remedies and relief provided by this Order. Nothing in these provisions should be construed as prohibiting a Non-Party from seeking additional protections.

(b) In the event that a Party is required, by a valid discovery request, to produce a Non-Party's confidential information in its possession, and the Party is subject to an agreement with the Non-Party not to produce the Non-Party's confidential information, then the Party shall:

(1) promptly notify in writing the Requesting Party and the Non-Party that some or all of the information requested is subject to a confidentiality agreement with a Non-Party;

(2) promptly provide the Non-Party with a copy of the Protective Order in this Action, the relevant discovery request(s), and a reasonably specific description of the information requested; and

-25-

Case 8:20-cv-00048-JVS-JDE   Document 435-2   Filed 06/03/21   Page 33 of 229   Page ID
#:38046
Case 8:20-cv-00048-JVS-JDE   Document 6   Filed 06/30/20   Page 206 of 32   Page ID #:5582

(3) make the information requested available for inspection by the Non-Party, if requested.

(c) If the Non-Party fails to seek a protective order from this court within 14 days of receiving the notice and accompanying information, the Receiving Party may produce the Non-Party's confidential information responsive to the discovery request. If the Non-Party timely seeks a protective order, the Receiving Party shall not produce any information in its possession or control that is subject to the confidentiality agreement with the Non-Party before a determination by the court. Absent a court order to the contrary, the Non-Party shall bear the burden and expense of seeking protection in this court of its Protected Material.

14.   UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL

If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Protected Material to any person or in any circumstance not authorized under this Protective Order, the Receiving Party must immediately (a) notify in writing the Designating Party of the unauthorized disclosures, (b) use its best efforts to retrieve all unauthorized copies of the Protected Material and to ensure that no further or greater unauthorized disclosure and/or use thereof is made, (c) inform the person or persons to whom unauthorized disclosures were made of all the terms of this Order and (d) request such person or persons to execute the "Acknowledgment an Agreement to Be Bound" attached hereto as Exhibit A.  Unauthorized or inadvertent disclosure does not change the status of Discovery Material or waive a Producing Party's right to maintain the disclosed document or information as Protected Material.

-26-

Case 8:20-cv-00048-JVS-JDE   Document 435-2   Filed 06/03/21   Page 34 of 229   Page ID
#:38047
Case 8:20-cv-00048-JVS-JDE   Document 673-5   Filed 06/30/20   Page 28 of 32   Page ID #:5583

15.    INADVERTENT PRODUCTION OF PRIVILEGED OR
OTHERWISE PROTECTED MATERIAL

(a) The inadvertent production by a Party of Discovery Material subject to the attorney-client privilege, work-product protection, or any other applicable privilege or protection, despite the Producing Party's reasonable efforts to prescreen such Discovery Material prior to production, will not waive the applicable privilege and/or protection if a request for return of such inadvertently produced Discovery Material is made promptly after the Producing Party learns of its inadvertent production.

(b) Upon a request from any Producing Party who has inadvertently produced Discovery Material that it believes is privileged and/or protected, each Receiving Party shall immediately return such Protected Material or Discovery Material and all copies to the Producing Party, except for any pages containing privileged markings by the Receiving Party which shall instead be destroyed and certified as such by the Receiving Party to the Producing Party.

(c) Nothing herein shall prevent the Receiving Party from preparing a record for its own use containing the date, author, addresses, and topic of the inadvertently produced Discovery Material and such other information as is reasonably necessary to identify the Discovery Material and describe its nature to the Court in any motion to compel production of the Discovery Material.

16.    MISCELLANEOUS

16.1    Right to Further Relief. Nothing in this Order abridges the right of any person to seek its modification by the Court in the future.

16.2    Right to Assert Other Objections. By agreeing to the entry of this Protective Order, no Party waives any right it otherwise would have to object to

-27-

Case 8:20-cv-00048-JVS-JDE   Document 435-2   Filed 06/03/21   Page 35 of 229   Page ID
#:38048
Case 8:20-cv-00048-JVS-JDE   Document 6-3   Filed 06/30/20   Page 29 of 52   Page ID #:584

disclosing or producing any information or item on any ground not addressed in this Protective Order. Similarly, no Party waives any right to object on any ground to use in evidence of any of the material covered by this Protective Order.

16.3   Filing Protected Material. A Party that seeks to file under seal any Protected Material must comply with Local Civil Rule 79-5. Protected Material may only be filed under seal pursuant to a court order authorizing the sealing of the specific Protected Material. If a Party's request to file Protected Material under seal is denied by the court, then the Receiving Party may file the information in the public record unless otherwise instructed by the court.

16.4   Termination of Matter and Retention of Jurisdiction.  The Parties agree that the terms of this Protective Order shall survive and remain in effect after the Final Disposition of the above-captioned matter.  The Court shall retain jurisdiction after Final Determination of this matter to hear and resolve any disputes arising out of this Protective Order.

16.5   Successors.  This Order shall be binding upon the Parties hereto, their successors, and anyone who obtains access to Protected Material.

16.6   Modification by Court.  This Order is subject to further court order based upon public policy or other considerations, and the Court may modify this Order sua sponte in the interests of justice.  All disputes between the Parties concerning Protected Material, however designated, produced under the protection of this Order shall be resolved by the United States District Court for the Central District of California.

16.7   Computation of Time.  The computation of any period of time prescribed or allowed by this Order shall be governed by the provisions for computing time set forth in Federal Rules of Civil Procedure 6.

-28-

17.   <u>FINAL DISPOSITION</u>

After the Final Disposition of this Action, as defined in Paragraph 6, within 60 days of a written request by the Designating Party, each Receiving Party shall return all Protected Material to the Producing Party or destroy such material. As used in this subdivision, "all Protected Material" includes all copies, abstracts, compilations, summaries, and any other format reproducing or capturing any of the Protected Material. Whether the Protected Material is returned or destroyed, the Receiving Party must submit a written certification to the Producing Party (and, if not the same person or entity, to the Designating Party) by the 60-day deadline that (1) identifies (by category, where appropriate) all the Protected Material that was returned or destroyed and (2) affirms that the Receiving Party has not retained any copies, abstracts, compilations, summaries or any other format reproducing or capturing any of the Protected Material. Notwithstanding this provision, Counsel are entitled to retain an archival copy of all pleadings, motion papers, trial, deposition, and hearing transcripts, legal memoranda, correspondence, deposition and trial exhibits, expert reports, attorney work product, and consultant and expert work product, even if such materials contain Protected Material, but must return or destroy any pleadings, correspondence, and consultant or expert work product that contain information designated "HIGHLY CONFIDENTIAL – SOURCE CODE." Any such archival copies that contain or constitute Protected Material remain subject to this Protective Order as set forth in Paragraph 6 (DURATION).

/ / /

/ / /

/ / /

/ / /

-29-

18.    <u>VIOLATION</u>

Any violation of this Order may be punished by appropriate measures including, without limitation, contempt proceedings and/or monetary sanctions.

**IT IS SO ORDERED.**

Dated:  June 30, 2020                        _____

JOHN D. EARLY
United States Magistrate Judge

-30-

**EXHIBIT A**

I, _____Marco Perez_____, acknowledge and declare that I have received a copy of the Protective Order ("Order") in *Masimo Corp., et al. v. Apple Inc.*, United States District Court, Central District of California, Southern Division, Civil Action No. 8:20-cv-00048-JVS (JDEx). Having read and understood the terms of the Order, I agree to be bound by the terms of the Order and consent to the jurisdiction of said Court for the purpose of any proceeding to enforce the terms of the Order.

Name of individual: _____Marco Perez_____

Present occupation/job description: ___Associate Professor of Medicine___

Name of Company or Firm: ___Stanford University___

Address: _300 Pasteur Dr., Stanford, CA 94305_

Dated: ___3/30/2021___

_____
[Signature]

-31-

*Curriculum Vitae*

# Marco Valentin Perez, M.D., FAHA

**Work Address**

Cardiac Electrophysiology & Arrhythmia Service
300 Pasteur Drive, M/C 5773
Stanford, CA 94305-5773
Office: 650-723-9363
Fax: 650-725-7568
mvperez@stanford.edu

**Home Address**

2170 Bello Ave.
San Jose, CA 95125
650-292-0818

**EDUCATION**

| | | | |
|---|---|---|---|
| 1992-1996 | Harvard University | B.A. *Magna Cum Laude* | Biochemistry |
| 1996-2001 | Harvard Medical School | M.D. *Cum Laude* | Medicine |

**POSTGRADUATE TRAINING**

| | | | |
|---|---|---|---|
| 2001-2002 | Massachusetts General Hospital | Internship | Internal Medicine |
| 2002-2004 | Massachusetts General Hospital | Residency | Internal Medicine |
| 2004-2007 | Stanford University Medical Center | Fellowship | Cardiology |
| 2006-2007 | Stanford University Medical Center | Chief Fellow | Cardiology |
| 2006-2008 | NIH F32 NRSA Research Fellowship | Fellowship | Cardiac Genetics |
| 2008-2010 | Stanford University Medical Center | Fellowship | Card. Electrophysiology |
| 2010-2011 | NIH T32 Research Fellowship | Fellowship | Cardiac Genetics |

**FACULTY ACADEMIC TITLES**

| | |
|---|---|
| 2018 - | Associate Professor, Stanford University, Cardiovascular Medicine |
| 2015 – 2018 | Assistant Professor, Stanford University, Cardiovascular Medicine |
| 2011 – 2015 | Instructor, Stanford University, Cardiovascular Medicine |

**MAJOR ADMINISTRATIVE POSITIONS**

| | |
|---|---|
| 2013 – | Director, Stanford Inherited Cardiac Arrhythmia Clinic |
| 2017 – | Director, Stanford Electrocardiography Department |

**HONORS AND AWARDS**

| | |
|---|---|
| 1992-1996 | Harvard University Dean's List |
| 1992 | Harvard-Radcliffe Scholarship |
| 1992 | National Hispanic Institute's Academic Excellence Award |
| 1994 | David Rockefeller Center for Latin American Studies Research Award |
| 1995 | Harvard University Dean's Summer Research Award |
| 1996 | Harvard University Graduation *Magna Cum Laude* |
| 1997 | Harvard Medical School Research Scholarship |
| 2001 | Harvard Medical School Graduation *Cum Laude* |

**Marco Valentin Perez**   Page 2

| | |
|---|---|
| 2002 | Harvard Medical School's Resident Teaching Award |
| 2006,2007 | Recipient, National Research Service Award (NIH) |
| 2006,2007 | Recipient, Stanford University Dean's Scholarship |
| 2007 | Stanford University Cardiovascular Outstanding Clinical Fellow |
| 2009 | Broad Institute Award for Workshop in Complex Disease Genomics |
| 2010 - 2018 | Recipient, NIH Loan Repayment Award |
| 2011 | Semi-finalist for "Best Poster" at the 2011 ACC Scientific Sessions |
| 2011 | Recipient, AHA Fellow to Faculty Award |
| 2012 | Recipient, Harold Amos Medical Faculty Development Award |
| 2013 | Young Investigator Award Finalist, AHA FGTB Council |
| 2014 | Stanford University Department of Medicine Teaching Award |
| 2020 | Clinical Research Forum Top 10 Clinical Research Achievement Award |

**GRANT REVIEWER**

| | |
|---|---|
| 2019 | NIH – Loan Repayment Program Review Committee |
| 2018 | AHA AF SFRN Network Grant Review Committee |
| 2017 | NIH/NHLBI – CICS Study Section |
| 2015-2016 | AHA Research Committee |

**EDITORIAL ACTIVITIES**

2017 – Present  Associate Editor, *Circulation Arrhythmia & Electrophysiology*

Ad Hoc Reviewer:
*1. Nature Communications*
*2. Journal of the American Medical Association (JAMA)*
*3. Circulation*
*4. Journal of the American College of Cardiology (JACC)*
*5. Archives of Internal Medicine*
*6. American Journal of Cardiology*
*7. Journal of Investigative Medicine*
*8. Journal of Interventional Cardiac Electrophysiology*
*9. Journal of Biomedical Engineering*
*10. Pharmacoepidemiology and Drug Safety*
*11. BMC Cardiovascular Disorders*
*12. British Journal of Sports Medicine*
*13. PLOS*
*14. JAMA Cardiology*
*15. Journal of Cardiovascular Electrophysiology*
*16. The Physician and Sportsmedicine*
*17. International Journal of Cardiology*
*18. Trends in Cardiovascular Medicine*
*19. JACC Electrophysiology*
*20. American Heart Journal*

**LICENSURE & CERTIFICATION**

| | |
|---|---|
| 1998-2001 | United States Medical Licensing Exam (USMLE) Steps I, II, III |

| | |
|---|---|
| 2003-2004 | Massachusetts state medical license #219298 |
| 2004- | California state medical license #A86952, NPI#1740296607 |
| 2004- | Federal Drug Enforcement Agency (DEA) |
| 2004-2014 | Diplomate, Internal Medicine, American Board of Internal Medicine |
| 2007-2017 | Diplomate, Cardiovascular Disease, American Board of Internal Medicine |
| 2011- | Diplomate, Cardiac Electrophysiology, American Board of Internal Medicine |

## PROFESSIONAL ORGANIZATIONS

| | |
|---|---|
| 1996-2004 | Massachusetts Medical Society |
| 2004- | American Heart Association |
| 2006- | Heart Rhythm Society |

## NATIONAL LEADERSHIP COMMITTEES

| | |
|---|---|
| 2014- | Women's Health Initiative Cardiovascular Interest Group – Co-leader |
| 2014- | Women's Health Initiative Atrial Fibrillation Interest Group – Leader |
| 2014-2017 | Member, AHA Research Committee |
| 2014-2016 | Member, AHA National Research Program Subcommittee |
| 2014- | Medical Director, Racing Hearts Community AED program |
| 2013-2015 | Member, AHA FGTB Early Career Committee |
| 2013-2015 | Advocacy Ambassador, AHA FGTB Leadership Committee |
| 2016- | Member, AHA Portfolio Management Subcommittee |

## RESEARCH SUPPORT

**Active**

**NIH/NHLBI  1R01HL136390-01**                                                        2017-2022
"The WHI Strong and Healthy SilenT Atrial Fibrillation Recording Study (WHISH STAR)"
Principal Investigator: Marco Perez, MD
Study Goals: To measure the effect of exercise intervention on clinical and asymptomatic forms of atrial fibrillation using loop recorders.
Role: PI. Designed the project and will analyze and interpret results of the study.

**NIH/NHLBI HHSN268201100003C**                                                    2015 – 2020
Women's Health Initiative Extension 2010-2015
Principal Investigator: Marcia Stefanick, PhD
Role: Co-investigator
Goal:  The WHI Clinical Trials studied the effects of hormone therapies on health outcomes including cardiovascular disease.  The extension grant will launch critically important cardiovascular research projects that target older women by taking advantage of the large Women's Health Initiative (WHI) cohort.
Role:  Lead AF working group and investigate epidemiology and genetics of atrial fibrillation in the WHI.

**NIH/NHLBI 1R01HL149134-01**                                                        2020-2024
"Machine Learning in Atrial Fibrillation"
Principal Investigator: Sanjiv Narayan, MD PhD
Study Goals: To identify electrical and structural characteristics of AF to predict long-term outcomes using ML approaches"
Role: Co-investigator

**Completed**

**Apple Heart Study**
"The Apple Heart Study"
Co-Principal Investigators: Marco Perez, MD, Mintu Turakhia, MD
Study Goals: To measure the ability of the Apple watch to detect new onset atrial fibrillation using long-term intermittent photoplethysmogram monitoring.
Role: Co-PI: Designed the project and will analyze and interpret results of the study.

**American Heart Association – Fellow to Faculty Award**                    2011-2016
"Genetic Determinants of Atrial Fibrillation in a Multiethnic Cohort of Post-Menopausal Women"
Principal Investigator: Marco Perez, MD
Role: PI
Study Goals: To identify genetic determinants of atrial fibrillation in a cohort of African American and Hispanic patients in the Women's Health Initiative and collaborating cohorts.
Role:  Designed the project and will analyze and interpret the results of this study.  Responsible for reporting the findings at national meetings and in peer-reviewed journals.

**Robert Wood Johnson - Harold Amos Medical Faculty Development Program**     2013-2017
"Network Analysis of Genomic Variation and Gene Expression Associated with Atrial Fibrillation"
Principal Investigator: Marco Perez, MD
Role: PI
Study Goals: To identify gene networks associated with atrial fibrillation based on gene expression measured from RNA sequencing of atrial tissue extracted during cardiac surgery.
Role: Designed the project and will analyze and interpret the results of this study.

**Weston Havens Foundation Grant** Perez (PI)                    2017-2018
"Novel role for hypocretin receptor 2 in Regulating Ventricular Function"
Study Goals: To identify novel small molecules that activate hypocretin receptor 2 and improve cardiac function.
Role: PI

**NIH Loan Repayment Program Award**                    2010-2018
"Genetic Determinants of Atrial Fibrillation"
Principal Investigator: Marco Perez, MD
Role: PI
Study Goals: To identify genetic determinants of atrial fibrillation in a cohort of African American and Hispanic patients in the Women's Health Initiative and collaborating cohorts.
Role of Candidate:  Dr. Perez designed the project and will analyze and interpret the results of this study. He will be responsible for reporting the findings at national meetings and in peer-reviewed journals.

**Stanford Cardiovascular Division Seed Grant**                    2016-2017
"Molecular and Genetic Mechanisms of Very Early Onset Atrial Fibrillation"
Principal Investigator: Marco Perez, MD
Study Goals: To identify novel genes linked to early onset atrial fibrillation through broad sequencing approaches.
Role: PI

**SPARK/SPECTRUM Grant** Perez (PI)                    2014-2017
"Novel role for hypocretin receptor 2 in Regulating Ventricular Function"
Study Goals: To identify novel small molecules that activate hypocretin receptor 2 and improve cardiac function.
Role: PI

**Gootter Foundation Grant**  Perez (PI)                                    7/1/2014 – 7/1/2015
"Electrocardiographic differences between patients with hypertrophic cardiomyopathy and athletes"
Study Goals: To identify the electrocardiographic characteristics that best distinguish patients with hypertrophic cardiomyopathy and athletes undergoing preparticipation sports screening.
Role: PI

**Stanford Cardiovascular Institute**                                    2013-2014
"Genetic Variation Near *HCRTR2* is Associated with Dramatic Improvement of Heart Function in Patients with Heart Failure".
Principal Investigator: Marco Perez, MD
Role: PI
Study Goals:  To identify the mechanistic link between *HCRTR2* and response to medical therapy in patients with heart failure.

**NIH/NHLIBI 1R01DK095024-01A1**                          8/1/2012-05/31/2013
 "The Atrial Fibrillation - Factor Identification to Risk Modification Study in Hemodialysis Study"
Principal Investigator: Wolfgang Winkelmayer, MD
Role: Co-Investigator
Goal: To study the risk factors associated with development of atrial fibrillation in patients with end-stage renal disease undergoing hemodialysis.
Role of Candidate: Dr. Perez will take charge of studying the electrocardiographic determinants of AF in this study population.

**STUDENTS/TRAINEES MENTORED**

| Dates | Name | Role | Current Position |
|---|---|---|---|
| 2008-2011 | Narmadan Kuramasami | Research Advisor | Oncology Fellow |
| 2007-2010 | Maneesh Singh | Research Advisor | Gastroenterology Flw |
| 2012-2014 | Farnaz Azarbal | Research Advisor | Cardiology Fellow |
| 2013-2015 | Rachel Bent | Research Advisor | Medical Student |
| 2014-2016 | Simon Ermakov | Research Advisor | Cardiology Fellow |
| 2015-2017 | Fatima Rodriguez | Research Advisor | Assistant Professor |
| 2016- | Alvin Chen | Research Advisor | Medical Resident |
| 2016- | Justin Parizo | Research Advisor | Cardiology Fellow |
| 2016- | Daniel Gerber | Research Advisor | Cardiology Fellow |
| 2017- | James Tooley | Research Advisor | Medical Resident |

**PEER-REVIEWED PUBLICATIONS**

**Journal Articles**

1.   Benjamin EJ, Go AS, Desvigne-Nickens P, Anderson CD, Casadei B, Chen LY, Crijns HJGM, Freedman B, Hills MT, Healey JS, Kamel H, Kim D-Y, Link MS, Lopes RD, Lubitz SA, McManus DD, Noseworthy PA, **Perez MV**, Piccini JP, Schnabel RB, Singer DE, Tieleman RG, Turakhia MP, Van Gelder IC, Cooper LS and Al-Khatib SM. Research Priorities in Atrial Fibrillation Screening. *Circulation*. 2021;143:372-388.
2.   Giacomazzi C, Diaz R, Syrop I, **Perez M**, Froelicher VF, Fredericson M., Palpitations in an Elite Running Athlete: When to Run Through the Beat? A Case Report. *Curr Sports Med* Rep. 2021 Feb 1;20(2):84-86.
3.   Sanchis-Gomar F, Lavie CJ, **Perez MV**. Consumer wearable technologies to identify and monitor exercise-related arrhymias in athletes. *Curr Opin Cardiol*. 36(1):10-16, 2021.

4.   Tarakji KG, Silva JNA, Chen LY, Turakhia MP, **Perez MV,** Attia ZI, Passman R, Boissy A, Cho DJ, Majmudar M, Mehta N, Wan EY, Chung MK. Digital Health and the Care of the Arrhythmia Patient; What Every Electrophysiologist Needs to Know. *Circ Arrhythm Electrophysiol*. 2020

5.   Weng LC, Hall AW, Choi SH, Jurgens SJ, Haessler J, Bihlmeyer NA, Grarup N, Lin H, Teumer A, Li-Gao R, Yao J, Guo X, Brody JA, Müller-Nurasyid M, Schramm K, Verweij N, van den Berg ME, van Setten J, Isaacs A, Ramírez J, Warren HR, Padmanabhan S, Kors JA, de Boer RA, van der Meer P, Sinner MF, Waldenberger M, Psaty BM, Taylor KD, Völker U, Kanters JK, Li M, Alonso A, **Perez MV,** Vaartjes I, Bots ML, Huang PL, Heckbert SR, Lin HJ, Kornej J, Munroe PB, van Duijn CM, Asselbergs FW, Stricker BH, van der Harst P, Kääb S, Peters A, Sotoodehnia N, Rotter JI, Mook-Kanamori DO, Dörr M, Felix SB, Linneberg A, Hansen T, Arking DE, Kooperberg C, Benjamin EJ, Lunetta KL, Ellinor PT, Lubitz SA. Genetic Determinants of Electrocardiographic P-Wave Duration and Relation to Atrial Fibrillation. *Circ Genom Precis Med*. 2020 Oct;13(5):387-395.

6.   Sanchis-Gomar F, Lavie CJ, Morin DP, Perez-Quilis C, Laukkanen JA, **Perez MV**. Amiodarone in the COVID-19 Era: Treatment for Symptomatic Patients Only, or Drug to Prevent Infection? *Am J Cardiovasc Drugs*. 2020 Oct;20(5):413-418.

7.   Shoemaker MB, Shah RL, Roden DM, **Perez MV**. How will genetics inform the clinical care of atrial fibrillation? (In press, *Circ Res.*, 2020)

8.   Daniel A. Gerber, Ann M. Dubin, Scott R. Ceresnak, Kara S. Motonaga, Margaret Bussineau, Kyla Dunn, Colleen Caleshu, M. Benjamin Shoemaker, Steven A. Lubitz, **Marco V. Perez.** Structural Abnormalities on Cardiac MRI in Patients with Catecholaminergic Polymorphic Ventricular Tachycardia.    (in press,    *J of American Coll of Card: Clinical Electrophysiology*, 2020).

9.   Feeny AK, Chung MK, Madabhushi A, Attia ZI, Cikes M, Firouznia M, Friedman PA, Kalscheur MM, Kapa S, Narayan SM, Noseworthy PA, Passman RS, **Perez MV,** Peters NS, Piccini JP, Tarakji KG, Thomas SA, Trayanova NA, Turakhia MP, Wang PJ. Artificial Intelligence and Machine Learning in Arrhythmias and Cardiac Electrophysiology. (in press, Circ Arrhythm Electrophysiol. 2020 Jul 6).

10.  O'Sullivan JW, Grigg S, Crawford W, Turakhia MP, **Perez M**, Ingelsson E, Wheeler MT, Ioannidis JPA, Ashley EA.  Accuracy of Smartphone Camera Applications for Detecting Atrial Fibrillation: A Systematic Review and Meta-analysis.  JAMA Netw Open. 2020 Apr 1;3(4):e202064.

11.  Leischik R, Strauss M, Horlitz M, Pareja-Galeano H, de la Guía-Galipienso F, Lippi G, Lavie CJ, **Perez MV**, Sanchis-Gomar F.  Exercise-induced right ventricular injury or arrhythmogenic cardiomyopathy (ACM): The bright side and the dark side of the moon. (in press) Prog Cardiovasc Dis. 2020

12.  Roberts JD, Asaki SY, Mazzanti A, Bos JM, Tuleta I, Muir AR, Crotti L, Krahn AD, Kutyifa V, Shoemaker MB, Johnsrude CL, Aiba T, Marcondes L, Baban A, Udupa S, Dechert B, Fischbach P, Knight LM, Vittinghoff E, Kukavica D, Stallmeyer B, Giudicessi JR, Spazzolini C, Shimamoto K, Tadros R, Cadrin-Tourigny J, Duff HJ, Simpson CS, Roston TM, Wijeyeratne YD, El Hajjaji I, Yousif MD, Gula LJ, Leong-Sit P, Chavali N, Landstrom AP, Marcus GM, Dittmann S, Wilde AAM, Behr ER, Tfelt-Hansen J, Scheinman MM, **Perez MV,** Kaski JP, Gow RM, Drago F, Aziz PF, Abrams DJ, Gollob MH, Skinner JR, Shimizu W, Kaufman ES, Roden DM, Zareba W, Schwartz PJ, Schulze-Bahr E, Etheridge SP, Priori SG, Ackerman MJ. An International Multicenter Evaluation of Type 5 Long QT Syndrome: A Low Penetrant Primary Arrhythmic Condition. Circulation. 2020 Feb 11;141(6):429-439.

13.  Adler A, Novelli V, Amin AS, Abiusi E, Care M, Nannenberg EA, Feilotter H, Amenta S, Mazza D, Bikker H, Sturm AC, Garcia J, Ackerman MJ, Hershberger RE, **Perez MV,** Zareba W, Ware JS, Wilde AAM, Gollob MH. An International, Multicentered, Evidence-Based Reappraisal of Genes Reported to Cause Congenital Long QT Syndrome. Circulation. 2020 Feb 11;141(6):418-428.

14.  **Perez MV,** Mahaffey KW, Hedlin H, Rumsfeld JS, Garcia A, Ferris T, Balasubramanian V, Russo AM, Rajmane A, Cheung L, Hung G, Lee J, Kowey P, Talati N, Nag D, Gummidipundi SE, Beatty A, Hills MT, Desai S, Granger CB, Desai M, Turakhia MP; Apple Heart Study Investigators.

Large-Scale Assessment of a Smartwatch to Identify Atrial Fibrillation. *N Engl J Med*. 2019 Nov 14;381(20):1909-1917

15. Roberts JD, Asaki SY, Mazzanti A, Bos JM, Tuleta I, Muir AR, Crotti L, Krahn AD, Kutyifa V, Shoemaker MB, Johnsrude CL, Aiba T, Marcondes L, Baban A, Udupa S, Dechert B, Fischbach P, Knight LM, Vittinghoff E, Kukavica D, Stallmeyer B, Giudicessi JR, Spazzolini C, Shimamoto K, Tadros R, Cadrin-Tourigny J, Duff HJ, Simpson CS, Roston TM, Wijeyeratne YD, El Hajjaji I, Yousif MD, Gula LJ, Leong-Sit P, Chavali N, Landstrom AP, Marcus GM, Dittmann S, Wilde AAM, Behr ER, Tfelt-Hansen J, Scheinman MM, **Perez MV**, Kaski JP, Gow RM, Drago F, Aziz PF, Abrams DJ, Gollob MH, Skinner JR, Shimizu W, Kaufman ES, Roden DM, Zareba W, Schwartz PJ, Schulze-Bahr E, Etheridge SP, Priori SG, Ackerman MJ. An International Multi-Center Evaluation of Type 5 Long QT Syndrome: A Low Penetrant Primary Arrhythmic Condition. *Circulation*. In Press 2019.

16. Goodyer WR, Dunn K, Caleshu C, Jackson M, Wylie J, Moscarello T, Platt J, Reuter C, Smith A, Trela A, Ceresnak SR, Motonaga KS, Ashley E, Yang P, Dubin AM, **Perez M**. Broad Genetic Testing in a Clinical Setting Uncovers a High Prevalence of Titin Loss-of-Function Variants in Very Early-Onset Atrial Fibrillation. *Circ Genom Precis Med*. 2019 Oct 22

17. Kooreman Z, Giraldeau G, Finocchiaro G, Kobayashi Y, Wheeler M, **Perez M**, Moneghetti K, Oxborough D, George KP, Myers J, Ashley E, Haddad F. Athletic Remodeling in Female College Athletes: The "Morganroth Hypothesis" Revisited. *Clin J Sport Med*. 2019 May;29(3):224-231

18. Tikkanen E, Gustafsson S, Knowles JW, **Perez M**, Burgess S, Ingelsson E. Body composition and atrial fibrillation: a Mendelian randomization study. *Eur Heart J*. 2019 Apr 21;40(16):1277-1282.

19. Tooley J, Ouyang D, Hadley D, Turakhia M, Wang P, Ashley E, Froelicher V, **Perez M.**, Comparison of QT Interval Measurement Methods and Correction Formulas in Atrial Fibrillation. *Am J Cardiol*.  2019 Jun 1;123(11):1822-1827.

20. Harati H, Zanetti D, Rao A, Gustafsson S, **Perez M**, Ingelsson E, Knowles JW. No evidence of a causal association of type 2 diabetes and glucose metabolism with atrial fibrillation. Diabetologia. 2019 May;62(5):800-804.

21. Mintu P. Turakhia MD MAS, Manisha Desai PhD, Haley Hedlin PhD, Amol Rajmane MD MBA, Nisha Talati MBA, Todd Ferris MD MS, Sumbul Desai MD, Divya Nag, Mithun Patel MD, Peter Kowey MD, John S. Rumsfeld MD PhD, Andrea M. Russo MD, Mellanie True Hills1, Christopher B. Granger MD, Kenneth W. Mahaffey MD, **Marco V. Perez MD**, Rationale and design of a large-scale app-based study to identify cardiac arrhythmias using a smartwatch: The Apple Heart Study, *American Heart Journal* 2019;207:66-75.

22. Boursiquot BC, Larson JC, Shalash OA, Vitolins MZ, Soliman EZ, **Perez MV**. Vitamin D with calcium supplementation and risk of atrial fibrillation in postmenopausal women. *Am Heart J*. 2019 Mar 13;209:68-78

23. Seung-Pyo Lee, MD, PhD, Euan A. Ashley MRCP, DPhil, Colleen Caleshu, MS, Eric M. Green, MD, PhD, Daniel Jacoby, MD, Steve D. Colan, MD, Alexandre Pereira, MD, Sharlene M. Day, MD, Francesca Girolami, BSc, Iacopo Olivotto, MD, Michelle Michels, MD, PhD, Carolyn Y. Ho, **Marco V. Perez, MD**, Incident Atrial Fibrillation is Associated with MYH7 Sarcomeric Gene Variation in Hypertrophic Cardiomyopathy, *Circulation Heart Failure* 2018 11(9):e005191.

24. Bihlmeyer, N. A., Brody, J. A., Smith, A., Warren, H. R., Lin, H., Isaacs, A., Liu, C., Marten, J., Radmanesh, F., Hall, L. M., Grarup, N., Mei, H., Muller-Nurasyid, M., Huffman, J. E., Verweij, N., Guo, X., Yao, J., Li-Gao, R., van den Berg, M., Weiss, S., Prins, B. P., van Setten, J., Haessler, J., Lyytikainen, L., Li, M., Alonso, A., Soliman, E. Z., Bis, J. C., Austin, T., Chen, Y., Psaty, B. M., Harrris, T. B., Launer, L. J., Padmanabhan, S., Dominiczak, A., Huang, P. L., Xie, Z., Ellinor, P. T., Kors, J. A., Campbell, A., Murray, A. D., Nelson, C. P., Tobin, M. D., Bork-Jensen, J., Hansen, T., Pedersen, O., Linneberg, A., Sinner, M. F., Peters, A., Waldenberger, M., Meitinger, T., Perz, S., Kolcic, I., Rudan, I., de Boer, R. A., van der Meer, P., Lin, H. J., Taylor, K. D., de Mutsert, R., Trompet, S., Jukema, J., Maan, A. C., Stricker, B. C., Rivadeneira, F., Uitterlinden, A., Volker, U., Homuth, G., Volzke, H., Felix, S. B., Mangino, M., Spector, T. D., Bots, M. L., **Perez, M.,** Raitakari, O. T., Kahonen, M., Mononen, N., Gudnason, V., Munroe, P. B., Lubitz, S. A., van

Duijn, C. M., Newton-Cheh, C. H., Hayward, C., Rosand, J., Samani, N. J., Kanters, J. K., Wilson, J. G., Kaab, S., Polasek, O., van der Harst, P., Heckbert, S. R., Rotter, J. I., Mook-Kanamori, D. O., Eij-Gelsheim, M., Dorr, M., Jamshidi, Y., Asselbergs, F. W., Kooperberg, C., Lehtimaki, T., Arking, D. E., Sotoodehnia, N. ExomeChip-Wide Analysis of 95 626 Individuals Identifies 10 Novel Loci Associated With QT and JT Intervals. *Circulation Cardiovasclar Genetics* 2018; 11 (1)

25. Pallisgaard JL, Brooks MM, Chaitman BR, Boothroyd DB, **Perez M**, Hlatky MA; Bypass Angioplasty Revascularization Investigation 2 Diabetes Study Group.. Thiazolidinediones and Risk of Atrial Fibrillation Among Patients with Diabetes and Coronary Disease. Am J Med. 2018 Jul;131(7):805-812.

26. Garg P, Oikonomopoulos A, Chen H, Li Y, Lam CK, Sallam K, **Perez M**, Lux RL, Sanguinetti MC, Wu JC. Genome Editing of Induced Pluripotent Stem Cells to Decipher Cardiac Channelopathy Variant. *J Am Coll Cardiol*. 2018 Jul 3;72(1):62-75

27. Prins BP, Mead TJ, Brody JA, Sveinbjornsson G, Ntalla I, Bihlmeyer NA, van den Berg M, Bork-Jensen J, Cappellani S, Van Duijvenboden S, Klena NT, Gabriel GC, Liu X, Gulec C, Grarup N, Haessler J, Hall LM, Iorio A, Isaacs A, Li-Gao R, Lin H, Liu CT, Lyytikäinen LP, Marten J, Mei H, Müller-Nurasyid M, Orini M, Padmanabhan S, Radmanesh F, Ramirez J, Robino A, Schwartz M, van Setten J, Smith AV, Verweij N, Warren HR, Weiss S, Alonso A, Arnar DO, Bots ML, de Boer RA, Dominiczak AF, Eijgelsheim M, Ellinor PT, Guo X, Felix SB, Harris TB, Hayward C, Heckbert SR, Huang PL, Jukema JW, Kähönen M, Kors JA, Lambiase PD, Launer LJ, Li M, Linneberg A, Nelson CP, Pedersen O, **Perez M**, Peters A, Polasek O, Psaty BM, Raitakari OT, Rice KM, Rotter JI, Sinner MF, Soliman EZ, Spector TD, Strauch K, Thorsteinsdottir U, Tinker A, Trompet S, Uitterlinden A, Vaartjes I, van der Meer P, Völker U, Völzke H, Waldenberger M, Wilson JG, Xie Z, Asselbergs FW, Dörr M, van Duijn CM, Gasparini P, Gudbjartsson DF, Gudnason V, Hansen T, Kääb S, Kanters JK, Kooperberg C, Lehtimäki T, Lin HJ, Lubitz SA, Mook-Kanamori DO, Conti FJ, Newton-Cheh CH, Rosand J, Rudan I, Samani NJ, Sinagra G, Smith BH, Holm H, Stricker BH, Ulivi S, Sotoodehnia N, Apte SS, van der Harst P, Stefansson K, Munroe PB, Arking DE, Lo CW, Jamshidi Y. Exome-chip meta-analysis identifies novel loci associated with cardiac conduction, including ADAMTS6. *Genome Biol*. 2018 Jul 17;19(1):87

28. Parikh NI, Kapphahn K, Hedlin H, Olgin JE, Allison MA, Magnani JW, Ryckman KR, Waring ME, **Perez MV**, Howard BV. Effects of reproductive period duration and number of pregnancies on midlife ECG indices: a secondary analysis from the Women's Health Initiative Clinical Trial. *BMJ Open*. 2018 Aug 17;8(8):e019129.

29. Lin Y. Chen, MD, MS, Chair; Larry A. Allen, MD, MHS; Michael Ezekowitz, MBChB, DPhil; Karen L. Furie, MD,MPH; Pamela McCabe, PhD, RN; Peter A. Noseworthy, MD; **Marco V. Perez, MD**; Mintu P. Turakhia, MD, MAS; Mina K. Chung, MD, Vice Chair. Atrial Fibrillation Burden—Moving Beyond Atrial Fibrillation as a Binary Entity. May 15; 137(20):e623-e644. *Circulation*

30. Honghuang Lin, PhD; Jessica van Setten, PhD; Albert V Smith, PhD; Nathan A Bihlmeyer, BS; Helen R. Warren, PhD; Jennifer A Brody, BA....**Marco Perez, MD**...James G. Wilson, PhD; Patrick T. Ellinor, MD, PhD; Steven A. Lubitz, MD, MPH; Aaron Isaacs, PhD. Common and Rare Coding Genetic Variation Underlying the Electrocardiographic PR Interval. (98 authors total) *Circ Genom Precis Med* (in press 2018).

31. Alvin S. Chen, MD, Rachel E. Bent, BA, Matthew T. Wheeler, MD, PhD, Joshua W. Knowles, MD, PhD, Francois Haddad, MD, Victor Froelicher, MD, Euan Ashley, MRCP, DPhil, and **Marco V. Perez, MD**. Large Q and S waves in Lead III on the Electrocardiogram Distinguish Patients with Hypertrophic Cardiomyopathy from Athletes. *Heart* (in press, 2018)

32. Joao Mesquita, Sonny Bisla, Anson Lee, **Marco Perez**. Video-Assisted Thoracoscopic Surgery to displace the Phrenic Nerve during Endocardial Ablation of Right Atrial Tachycardia, *Heart Rhythm Case Reports* (in press, 2018)

33. Kooreman Z, Giraldeau G, Finocchiaro G, Kobayashi Y, Wheeler M, **Perez M**, Moneghetti K, Oxborough D, George KP, Myers J, Ashley E, Haddad F., Athletic Remodeling in Female College Athletes, the "Morganroth Hypothesis" Revisited. *Clin J Sport Med*. 2018 (in press).

34. Kobayashi Y, Wheeler M, Finocchiaro G, Ariyama M, Kobayashi Y, **Perez MV**, Liang D, Kuznetsova T, Schnittger I, Ashley E, Haddad F. Left atrial function and phenotypes in asymmetric hypertrophic cardiomyopathy. *Echocardiography*. 2017 Jun;34(6):843-850.

35. Kathleen F. Kerr, PhD, Christy L. Avery, PhD, MPH, Henry J. Lin, MD, Laura M. Raffield, PhD, Qian S. Zhang, BA, Brian L. Browning, PhD, Sharon R. Browning, PhD, Matthew P. Conomos, PhD, Stephanie M. Gogarten, PhD, Cathy C. Laurie, PhD, Tamar Sofer, PhD, Timothy A. Thornton, PhD, Chancellor Hohensee, MA, Rebecca D. Jackson, MD, Charles Kooperberg, PhD, Yun Li, PhD, Raul Méndez-Giraldez, PhD, **Marco V. Perez**, MD, Ulrike Peters, PhD, MPH,kk Alexander P. Reiner, MD, MSc, Zhu-Ming Zhang, MD, MPH, Jie Yao, MD, MS, Nona Sotoodehnia, MD, MPH, Kent D. Taylor, PhD, Xiuqing Guo, PhD, Leslie A. Lange, PhD, Elsayed Z. Soliman, MD, MSc, MS, James G. Wilson, MD, Jerome I. Rotter, MD, Susan. Genome-wide association study of heart rate and its variability in Hispanic/Latino cohorts. *Heart Rhythm* 2017 Nov;14(11):1675-1684

36. Ingrid E Christophersen, Michiel Rienstra, Carolina Roselli, Xiaoyan Yin, Bastiaan Geelhoed, John Barnard, Dan E Arking...**Marco Perez**...Susan R Heckbert, Emelia J Benjamin, Toshihiro Tanaka, Kathryn L Lunetta, Steven A Lubitz & Patrick T Ellinor (150 authors total).  Large-scale analyses of common and rare variants identify 12 new loci associated with atrial fibrillation. *Nature Genetics* 2017 Jun;49(6):946-952

37. Kiran Musunuru, Erik Ingelsson, Co-Myriam Fornage, Peter Liu, Anne M. Murphy, L. Kristin Newby, Christopher Newton-Cheh, **Marco V. Perez**, Deepak Voora, Daniel Woo. The Expressed Genome in Cardiovascular Diseases and Stroke: Refinement, Diagnosis, and Prediction.  A Scientific Statement From the American Heart Association. *Circ Cardiovasc Genet* 2017 Aug;10(4).

38. Sylvia Wassertheil-Smoller,  Aileen P. McGinn,  Lisa Martin,  Beatriz L. Rodriguez,  Marcia L. Stefanick, **Marco Perez**. The Associations of Atrial Fibrillation With the Risks of Incident Invasive Breast and Colorectal Cancer. *Am J Epidemiol* 185 (5):372-384, 2017.

39. Sharma S, Drezner JA, Baggish A, Papadakis M, Wilson MG, Prutkin JM, La Gerche A, Ackerman MJ, Borjesson M, Salerno JC, Asif IM, Owens DS, Chung EH, Emery MS, Froelicher VF, Heidbuchel H, Adamuz C, Asplund CA, Cohen G, Harmon KG, Marek JC, Molossi S, Niebauer J, Pelto HF, **Perez MV**, Riding NR, Saarel T, Schmied CM, Shipon DM, Stein R, Vetter VL, Pelliccia A, Corrado D.   International Recommendations for Electrocardiographic Interpretation in Athletes *J Am Coll Cardiol* 2017 Feb 28;69(8):1057-1075.

40. Drezner JA, Sharma S, Baggish A, Papadakis M, Wilson MG, Prutkin JM, Gerche A, Ackerman MJ, Borjesson M, Salerno JC, Asif IM, Owens DS, Chung EH, Emery MS, Froelicher VF, Heidbuchel H, Adamuz C, Asplund CA, Cohen G, Harmon KG, Marek JC, Molossi S, Niebauer J, Pelto HF, **Perez MV**, Riding NR, Saarel T, Schmied CM, Shipon DM, Stein R, Vetter VL, Pelliccia A, Corrado D. International criteria for electrocardiographic interpretation in athletes. *Br J Sports Med.* 2017 May;51(9):704-731

41. Sharma S, Drezner JA, Baggish A, Papadakis M, Wilson MG, Prutkin JM, La Gerche A, Ackerman MJ, Borjesson M, Salerno JC, Asif IM, Owens DS, Chung EH, Emery MS, Froelicher VF, Heidbuchel H, Adamuz C, Asplund CA, Cohen G, Harmon KG, Marek JC, Molossi S, Niebauer J, Pelto HF, **Perez MV**, Riding NR, Saarel T, Schmied CM, Shipon DM, Stein R, Vetter VL, Pelliccia A, Corrado D.  International recommendations for electrocardiographic interpretation in athletes.  Eur Heart J. 2018 Apr 21;39(16):1466-1480

42. Pan S, Cabral CS, Ashley EA, **Perez MV**. Orexin: A Missing Link Between Sleep Disorders and Heart Failure? *Curr Heart Fail Rep*. 2017 Apr;14(2):100-105.

43. Ullal AJ, Kaiser DW, Fan J, Schmitt SK, Than CT, Winkelmayer WC, Heidenreich PA, Piccini JP, **Perez MV**, Wang PJ, Turakhia MP. Safety and Clinical Outcomes of Catheter Ablation of Atrial Fibrillation in Patients With Chronic Kidney Disease. J Cardiovasc Electrophysiol. 2017 Jan;28(1):39-48.

44. James Rush Priest, Charles Gawad, Kristopher M. Kahlig, Joseph K. Yu, Thomas O'Hara, Patrick M. Boyle, Sridharan Rajamanie, Michael J. Clark, Sarah T. K. Garcia, Scott Ceresnaka, Jason Harris, Sean Boyle, Frederick E. Dewey, Lindsey Malloy-Walton, Kyla Dunn, Megan Grovea,

**Marco V. Perez**, Norma F. Neff, Richard Chen, Katsuhide Maeda, Anne Dubin, Luiz Belardinelli, John West, Christian Antolik, Daniela Macaya, Thomas Quertermous, Natalia A. Trayanova, Stephen R. Quakek, and Euan A. Ashley.  Early somatic mosaicism is a rare cause of long-QT syndrome. *Proc Natl Acad Sci U S A*. 2016 Oct 11;113(41):11555-11560.

45. Steven A. Lubitz, Jennifer A. Brody, Nathan A. Bihlmeyer, Carolina Roselli, Lu-Chen Weng, Ingrid Christophersen, Alvaro Alonso, Eric Boerwinkle, Richard A. Gibbs, Joshua C. Bis, NHLBI GO Exome Sequencing Project, L. Adrienne Cupples, Peter J. Mohler, Debbie A. Nickerson, Donna Muzny, **Marco V. Perez**, Bruce M. Psaty, Elsayed Z. Soliman, Nona Sotoodehnia, Kathryn L. Lunetta, Emelia J. Benjamin, Susan R. Heckbert, Dan E. Arking, Patrick T. Ellinor, Honghuang Lin. Whole Exome Sequencing in Atrial Fibrillation. *PLOS Genetics* Sep 12;12(9):e1006284, 2016.

46. Fatima Rodriguez, Marcia L. Stefanick, Philip Greenland, Elsayed Z. Soliman, JoAnn E. Manson, Nisha Parikh, Lisa W. Martin, Joseph C. Larson, Mark Hlatky, Rami Nassir, Crystal Cene, Beatriz Rodriguez, Christine Albert, **Marco V. Perez**. Racial and Ethnic Differences in Atrial Fibrillation Risk Factors and Predictors in Women: Findings from the Women's Health Initiative. *Am Heart J* 2016 Jun;176:70-7.

47. Pickham D, Hsu D, Soofi M, Goldberg JM, Saini D, Hadley D, **Perez M**, Froelicher VF. Optimizing QT Interval Measurement for the Preparticipation Screening of Young Athletes.Med Sci Sports Exerc. Sep;48(9):1745-50, 2016

48. Colleen Caleshu, Nadine A. Kasparian, Katharine S. Edwards, Laura Yeates, Christopher Semsarian, **Marco Perez**, Euan Ashley, Christian J. Turner, Joshua W. Knowles, Jodie Ingles. Interdisciplinary psychosocial care for families with inherited cardiovascular diseases. *Trends in Cardiovascular Medicine* 2016 Oct;26(7):647-53.

49. Ermakov S, Azarbal F, Stefanick ML, LaMonte MJ, Li W, Tharp KM, Martin LW, Nassir R, Salmoirago-Blotcher E, Albert CM, Manson JE, Assimes TL, Hlatky MA, Larson JC, **Perez MV.** The associations of leptin, adiponectin and resistin with incident atrial fibrillation in women. *Heart* Sep 1;102(17):1354-62, 2016.

50. Roberts JD,  Hu D,  Heckbert S,  Alonso A,  Dewland TA,  Vittinghoff E,  Liu Y, Psaty BM,  Olgin JE,  Magnani J,  Huntsman S,  Burchard EG,  Arking DE,  Bibbins-Domingo K,  Harris TB,  **Perez MV**, Ziv E, Marcus GM. Genetic Investigation into the Paradoxical Differential Risk of Atrial Fibrillation Among Black and Whites. *JAMA Cardiology* 2016 Jul 1;1(4):442-50.

51. Kristen K. Patton, MD, Chair; Patrick T. Ellinor, MD, PhD; Michael Ezekowitz, MBChB, DPhil, FAHA; Peter Kowey, MD, FAHA; Steven A. Lubitz, MD, MPH, FAHA; **Marco Perez, MD**; Jonathan Piccini, MD, FAHA; Mintu Turakhia, MD, MAS; Paul Wang, MD, FAHA; Sami Viskin, MD. Electrocardiographic Early Repolarization, A Scientific Statement From the American Heart Association. *Circulation*. Apr 12;133(15):1520-9, 2016.

52. Farnaz Azarbal, MD, Marcia L. Stefanick, PhD, Themistocles L. Assimes, MD, PhD, JoAnn E. Manson, MD, DrPH, Jennifer W. Bea, PhD, Wenjun Li, PhD, Mark A. Hlatky, MD, Joseph C. Larson, MS, Erin S. LeBlanc, MD, MPH, Christine M. Albert, MD, MPH, Rami Nassir, PhD, Lisa W. Martin, MD, **Marco V. Perez, MD**. Lean Body Mass and Risk of Incident Atrial Fibrillation in Post-Menopausal Women. *Eur Heart J* May 21;37(20):1606-13, 2016.

53. **Marco V. Perez, MD**, Aleksandra Pavlovic, BS, Ching Shang, PhD,  Matthew T. Wheeler, MD, PhD,  Clint L. Miller, PhD, Jing Liu, MD, Frederick E. Dewey, MD, PhD, Stephen Pan, MD, MS, Porama K. Thanaporn, MD, Devin Absher, PhD, Jeffrey Brandimarto, Heidi Salisbury, RN, MSN, Khin Chan, MD, Rupak D. Mukherjee, PhD, Roda P. Konadhode, PhD, Richard M Myers, PhD, Daniel Sedehi, MD, Thomas E. Scammell, MD, Thomas Quertermous, MD, Thomas Cappola, MD, ScM and Euan Ashley, MRCP, DPhil. Systems genomics identifies a key role for hypocretin/orexin receptor 2 in human heart failure. *J Am Coll Cardiol*  8;66(22):2522-33, 2015.

54. Giraldeau G, Kobayashi Y, Finocchiaro G, Wheeler M, **Perez M**, Kuznetsova T, Lord R, George KP, Oxborough D, Schnittger I, Froelicher V, Liang D, Ashley E, Haddad F., Gender Differences in Ventricular Remodeling and Function in College Athletes, Insights from Lean Body Mass Scaling and Deformation Imaging. Am J Cardiol. 2015 Sep 3. pii: S0002-9149(15)01853-6.

55. Dov Shiffman, **Marco V. Perez**, Lance A. Bare, Judy Z. Louie, Andre R. Arellano, James J. Devlin. Genetic risk for atrial fibrillation could motivate patient adherence to warfarin therapy: a cost effectiveness analysis. *BMC Cardiovascular Disorders* 2015; 15(1):104.

56. Bent, R. E., Wheeler, M. T., Hadley, D., Froelicher, V., Ashley, E., **Perez, M. V** Computerized Q wave dimensions in athletes and hypertrophic cardiomyopathy patients *Journal of Electrocardiography* 2015; 48 (3): 362-367

57. Vedant S Pargaonkar, MD; **Marco V Perez, MD**; Akash Jindal, BS; Maya B Mathur MS;Jonathan Myers, PhD; Victor F Froelicher, MD. A Long-Term Prognostic Study 1 of Early Repolarization with J wave Patterns on the Resting Electrocardiogram. *Annals Int. Medicine* 2015 Nov 17;163(10):747-55.

58. Michelle D. Schmiegelow, MD, Haley Hedlin, PhD, Rachel H. Mackey, MD, Lisa W. Martin, MD, Mara Z. Vitolins, DrMPH, Marcia . Stefanick, PhD, **Marco V. Perez, MD**, Matthew Allison, MD, MPH, Mark A. Hlatky, MD. Race/ethnicity, obesity, metabolic health and risk of cardiovascular disease in postmenopausal women. *J Am Heart Assoc.* 2015;4:e001695.

59. Rachel E. Bent, Matthew T. Wheeler, MD, PhD, David Hadley, PhD, Joshua W. Knowles, MD, PhD, Aleksandra Pavlovic, BS, Gherardo Finocchiaro, MD, Francois Haddad, MD, Heidi Salisbury, RN, MSN, Sarah Race RN, MSN, Yael Shmargad, BS, Gordon O. Matheson, MD, PhD, Nikhil Kumar, Divya Saini, Victor Froelicher, MD, Euan Ashley, MRCP, DPhil, and **Marco V. Perez, MD;** Systematic Comparison of Digital Electrocardiograms from healthy Athletes and Patients with Hypertrophic Cardiomyopathy, *J Am Coll Cardiol*, 2015 Jun 9;65(22):2462-3

*60.* Gherardo Finocchiaro, MD,Francois Haddad, MD,Joshua W. Knowles, MD, PHD,Colleen Caleshu, SCM, Aleksandra Pavlovic, BS, Julian Homburger, BS, Yael Shmargad, BS, Gianfranco Sinagra, MD, Emma Magavern, MD, Myo Wong, MD,k **Marco Perez, MD**, Ingela Schnittger, MD, Jonathan Myers, PHD, Victor Froelicher, MD, Euan A. Ashley, MD, DPHIL. Cardiopulmonary Responses and Prognosis in Hypertrophic Cardiomyopathy *J Am Coll Cardiol HF* 2015 May;3(5):408-418.

*61.* Tim P. Dunn, MD, David Pickham, PhD, RN, Sonya Aggarwal, BA, Divya Saini, Nikhil Kumar, Matthew T. Wheeler, MD, PhD, **Marco Perez, MD**, Euan Ashley, MRCP, DPhil and Victor F. Froelicher, MD Limitations of Current AHA Guidelines and Proposal of New Guidelines for the Preparticipation Examination of Athletes. *Clin J Sport Med* 2015 Nov;25(6):472-7.

62. Mintu P. Turakhia MD MAS, Aditya J. Ullal BA, Donald D. Hoang BA, Claire T. Than MPH, Jared D. Miller MD, Karen J. Friday MD, Marco V. **Perez MD**, James V. Freeman MD MPH, Paul Wang MD, Paul A. Heidenreich MD MSFeasibility of Extended Ambulatory ECG Monitoring to Identify Silent Atrial Fibrillation in High-Risk Patients: the Screening Study for Undiagnosed Atrial Fibrillation (STUDY-AF). Clinical Cardiology, 2015, May;38(5):285-92.

63. Priest JR, Ceresnak SR, Dewey FE, Malloy-Walton LE, Dunn K, Grove ME, **Perez MV**, Maeda K, Dubin AM, Ashley EA. Molecular diagnosis of long QT syndrome at 10 days of life by rapid whole genome sequencing. *Heart Rhythm*. 2014 Oct;11(10):1707-13.

64. Seyerle AA, Young AM, Jeff JM, Melton PE, Jorgensen NW, Lin Y, Carty CL, Deelman E, Heckbert SR, Hindorff LA, Jackson RD, Martin LW, Okin PM, **Perez MV**, Psaty BM, Soliman EZ, Whitsel EA, North KE, Laston S, Kooperberg C, Avery CL. Evidence of Heterogeneity by Race/Ethnicity in Genetic Determinants of QT Interval. *Epidemiology*. 2014 Nov;25(6):790-8.

65. Azarbal F, Stefanick ML, Salmoirago-Blotcher E, Manson JE, Albert CM, LaMonte MJ, Larson JC, Li W, Martin LW, Nassir R, Garcia L, Assimes TL, Tharp KM, Hlatky MA, **Perez MV**. Obesity, physical activity, and their interaction in incident atrial fibrillation in postmenopausal women. *J Am Heart Assoc*. 2014 Aug 20;3(4). pii: e001127. doi: 10.1161/JAHA.114.001127.

66. Pentti M. Rautaharju, MD, PHD, Zhu-Ming Zhang, MD, Mara Vitolins, PhD, **Marco Perez, MD,** Matthew A. Allison, MD, MPH, Philip Greenland, MD, Elsayed Z. Soliman, MD, MSc, MS. Electrocardiographic Repolarization-Related Variables as Predictors of Coronary Heart Disease Death in the Women's Health Initiative (WHI) Study. *Journal of Amer Heart Assoc* 2014 Jul 28;3(4).

67. Perino AC, Hoang DD, Holmes TH, Santangeli P, Heidenreich PA, **Perez MV**, Wang PJ, Turakhia MP. Association Between Success Rate and Citation Count of Studies of Radiofrequency

Catheter Ablation for Atrial Fibrillation: Possible Evidence of Citation Bias. *Circ Cardiovasc Qual Outcomes* 2014; 7(5):687-692.

68. Latent obstruction and left atrial size are predictors of clinical deterioration leading to septal reduction in hypertrophic cardiomyopathy. Finocchiaro, G., Haddad, F., Pavlovic, A., Sinagra, G., Schnittger, I., Knowles, J. W., **Perez, M**., Magavern, E., Myers, J., Ashley, E. *Journal of cardiac failure* 2014; 20 (4): 236-243.

69. Wong, J., Lobato, R., Pinesetts, A., Maxwell, B., Mora-Mangano, C., **Perez, M.** P-wave characteristics on routine preoperative ECG improve prediction of new-onset postoperative atrial fibrillation in cardiac surgery. *J Cardiothoracic Vasc Anesth*. 2014; 28(6):1497-504.

70. Hlatky MA, Ray RM, Burwen DR, Margolis KL, Johnson KC, Kucharska-Newton A, Manson JE, Robinson JG, Safford MM, Allison M, Assimes TL, Bavry AA, Berger J, Cooper-Dehoff RM, Heckbert SR, Li W, Liu S, Martin LW, **Perez MV**, Tindle HA, Winkelmayer WC, Stefanick ML. Use of Medicare Data to Identify Coronary Heart Disease Outcomes in the Women's Health Initiative. *Circ Cardiovasc Qual Outcomes*. 2014; 7(1):157-62.

71. Muramoto D, Yong CM, Singh N, Aggarwal S, **Perez M**, Ashley E, Hadley D, Froelicher V. Patterns and prognosis of all components of the J-wave pattern in multiethnic athletes and ambulatory patients. *Am Heart J*. 2014 Feb;167(2):259-66.

72. Heidenreich, P. A., Lin, S., Knowles, J. W., **Perez, M.,** Maddox, T. M., Ho, M. P., Rumsfeld, J. S., Sahay, A., Massie, B. M., Tsai, T. T., Witteles, R. M., Variation in Use of Left Ventriculography in the Veterans Affairs Health Care System *Circ Cardiovasc Qual Outcomes*. 2013; 6 (6): 687-693

73. Farnaz Azarbal, Maneesh H. Singh, Gherardo Finocchiaro, Vy-Van Le, Ingela Schnittger, Paul Wang, Jonathan Myers, Euan A. Ashley, **Marco V. Perez**. Exercise Capacity and Paroxysmal Atrial Fibrillation in Patients with Hypertrophic Cardiomyopathy, Heart 2014; 100(8):624-630.

74. Finocchiaro G, Knowles JW, Pavlovic A, **Perez M**, Magavern E, Sinagra G, Haddad F, Ashley E, Prevalence and Clinical Correlates of Right Ventricular Dysfunction in Patients With Hypertrophic Cardiomyopathy, *Am J Cardiol*, Epub 2013 Oct 4

75. Park S, Wang PJ, Zei PC, Hsia HH, Turakhia M, **Perez M**, Al-Ahmad A. Pacemaker Therapy in Atrial Fibrillation. J Cardio Vasc Med. 2013. 1: 1-7.

76. **Marco V. Perez,  MD**, Thomas J. Hoffmann, PhD  , Hua Tang, PhD, Timothy Thornton, PhD, Marcia L. Stefanick, PhD, FAHA, Joseph C. Larson, MS, Charles Kooperberg, PhD, Alex P. Reiner, MD, MPH, Bette Caan, DrPH, Carlos Iribarren, MD, MPH, PhD, Neil Risch, PhD, African-American race but not genome-wide African ancestry is negatively associated with atrial fibrillation among postmenopausal women, *American Heart Journal* 2013 Sep;166(3):566-572.

77. Zhu-ming Zhang, MD, MPH, Pentti M. Rautaharju MD, PhD, Elsayed Z. Soliman, MD, MSc, MS, JoAnn E. Manson, MD, DrPH, Lisa W Martin, MD, **Marco Perez, MD**, Mara Vitolins, PhD, Ronald J. Prineas, MB, BS, PhD, Different Patterns of Bundle Branch Blocks and Risk of Incident Heart Failure in the Women's Health Initiative. *Circulation Heart Failure* 6:655-661, 2013.

78. **Perez MV**, Froelicher VF, J wave patterns and their Prognostic Value in African-Americans. *JECG*, 46(5):442-5, 2013.

79. Yong CM, **Perez MV**, Froelicher VF Prognostic Implications of the Jwave/slur ECG Patterns. *JECG*, 46(5):408-10, 2013.

80. **Marco V. Perez, MD**; Paul J. Wang, MD; Joseph C. Larson, MS; Elsayed Z. Soliman, MD, MSc, MS; Marian Limacher, MD; Beatriz Rodriguez, MD, MPH, PhD; Liviu Klein, MD; JoAnn E. Manson, MD, DrPH; Lisa W. Martin, MD, FACC; Ronald Prineas, PhD, MRCP, FACC; Stephanie Connelly, MD, MPH; Mark Hlatky, MD;  Sylvia Wassertheil-Smoller, PhD, FAHA; Marcia L. Stefanick, PhD  Risk Factors for Atrial Fibrillation and their Population Burden in Postmenopausal Women: The Women's Health Initiative Observational Study  *Heart* 2013 Aug;99(16):1173-8.

81. JoEllyn M. Abraham, MD, Joseph Larson, MS, Mina K. Chung, MD, Anne B. Curtis, MD, Kamakshi Lakshminarayan, MD, PhD, Jonathan D. Newman, MD, MPH, **Marco Perez, MD**, Kathryn Rexrode, MD, Nawar Shara, MS, PhD, Allen J. Solomon, MD, Marcia L. Stefanick, PhD, James C. Torner, MD, Bruce L. Wilkoff, MD and Sylvia Wassertheil-Smoller, PhD. Does

CHA2DS2-VASc improve stroke risk stratificationin postmenopausal women with atrial fibrillation? *American J Medicine,* 2013 Dec; 126(12):1143.e1-8.

82. **Marco V. Perez**, MD; Paul J. Wang, MD; Joseph C. Larson, MS;  Barbara Cochrane, PhD, RN, FAAN; J. David Curb, MD; Liviu Klein, MD; JoAnn E. Manson, MD, DrPH; Lisa W. Martin, MD, FACC;  Jennifer Robinson, MD, PhD; Sylvia Wassertheil-Smoller, PhD, FAHA; Marcia L. Stefanick, PhD. Effects of Postmenopausal Hormone Therapy on incident Atrial Fibrillation: The Women's Health Initiative Randomized Controlled Trials. *Circulation: Arrhythmia and Electrophysiology* 5(6):1108-16, 2012.

83. Karim Sallam MD, Abhimanyu Uberoi MD MS, Nikhil A. Jain, **Marco Perez MD**, Euan Ashley MRCP Dphil, Victor Froelicher, MD, FACC. Prognostic implications of Q waves and T wave Inversion associated with Early Repolarization.  *Mayo Clinical Proceedings* 87(7):614-619, 2012.

84. Santangeli P, Di Biase L, Burkhardt DJ, Horton R, Sanchez J, Bai R, Pump A, **Perez M**, Wang PJ, Natale A, Al-Ahmad A. Catheter ablation of atrial fibrillation: state-of-the-art techniques and future perspectives. *J Cardiovasc Med* 2012; 13 (2): 108-24

85. Ronald M. Witteles MD, Joshua W. Knowles MD,PhD, **Marco Perez MD,** William M. Morris BS, Claire M. Spettell PhD, Troyen A. Brennan MD,JD,MPH, Paul A. Heidenreich MD,MS, Use and Overuse of Left Ventriculography, *American Heart J*  2012 Apr;163(4):617-23.e1

86. **Marco V. Perez MD**, Abhimanyu Uberoi MD MS, Nikhil A. Jain, Euan Ashley MRCP Dphil, Mintu P. Turakhia MD MAS, Victor Froelicher MD FACC.  The Prognostic Value of Early Repolarization in African Americans. *HeartRhythm* Apr; 9(4):558-65, 2012.

87. S. Pan, F. E. Dewey, **M. V. Perez**, J. W. Knowles, R. Chen, A. J. Butte, and E. A. Ashley, "Personalized Medicine and Cardiovascular Disease: From Genome to Bedside," *Current Cardiovascular Risk Reports*, vol. 5, pp. 542–551, 2011.

88. Abhimanyu Uberoi MD, MS, Nikhil A. Jain BS, **Marco Perez MD**, Anthony Weinkopff BS, Euan Ashley MRCP Dphil, David Hadley, PhD, Mintu P. Turakhia MD MAS,  Victor Froelicher MD, Early Repolarization in an Ambulatory Clinical Population. *Circulation* 2011, Nov 15;124(20):2208-14.

89. Troy Leo, MD, Abhimanyu Uberoi, MD, MS, Nikhil A. Jain, Daniel Garza, MD, Shilpy Chowdhury, MD, MPH, James V. Freeman, MD, MPH, **Marco Perez, MD**, Euan Ashley, MRCP, Dphil, and Victor Froelicher, MD. The Impact of ST Elevation on Athletic Screening. *Clin J Sport Med* 2011. 21: 5: 433-40

90. Abhimanyu Uberoi MD MS, Ricardo Stein MD ScD, **Marco V. Perez MD**, James Freeman MD MPH, Matthew Wheeler MD PhD, Frederick Dewey MD, Roberto Peidro MD, David Hadley PhD, Jonathan DreznerMD, Sanjay Sharma FRCP, Antonio Pelliccia MD, Domenico Corrado MD, Josef Niebauer MD PhD MBA, N.A. Mark Estes III MD, Euan Ashley MRCP DPhil, Victor Froelicher MD, Interpretation of the electrocardiogram of young athletes. *Circulation,* 2011 124(6):669-71.

91. **Perez, M.**, Kumarasamy, N., Owens, D., Wang, P., Hlatky, M. Cost-Effectiveness of Genetic Testing in Family Members of Patients with Long QT Syndrome.  *Circulation: Cardiovascular Quality and Outcomes,* 2011 Jan 1;4(1):76-84.

92. Frederick E. Dewey MD, **Marco V. Perez MD**, Matthew T. Wheeler MD PhD, Clifton Watt MD, Joshua Spin, MD PhD, Robert Tibshirani PhD, Peter Langfelder PhD, Stephen Horvath hD, Sridhar Hannenhalli PhD, Thomas P. Cappola MD MSc, Euan A. Ashley MRCP DPhil. Gene Coexpression Network Topology of Cardiac Development, Hypertrophy and Failure. *Circulation: Cardiovascular Genetics,* 2011 1;4(1):26-35.

93. **Perez MV**, Al-Ahmad AA, Wang PJ, Turakhia MP. Inappropriate Pacing in a Patient with Managed Ventricular Pacing (MVP): What is the Cause? *Heart Rhythm,* 2010. 7(9):1336-7.

94. Le VV, Wheeler MT, Mandic S, Dewey F, Fonda H, **Perez M**, Sungar G, Garza D, Ashley EA, Matheson G, Froelicher V. Addition of the electrocardiogram to the preparticipation examination of college athletes. *Clin J Sport Med*. 2010 Mar;20(2):98-105.

95. **Perez, M.,** Dewey, F., Tan, S., Myers, J., Froelicher, V.: Added Value of a Resting ECG Neural Network that Predicts Cardiovascular Mortality.  *Annals of Noninvasive Electrocardiography*, 2009; 14(1):26-34.

96. **Marco V. Perez**, M.D.; Frederick E. Dewey; Rachel Marcus, M.D.; Euan A. Ashley MRCP, DPhil, M.D.; Amin A. Al-Ahmad, M.D.; Paul J. Wang, M.D.; Victor F. Froelicher, M.D., FACC: Electrocardiographic Predictors of Atrial Fibrillation. *American Heart Journal,* 2009; 158: 622-8.

97. **Marco Perez**, Holly Fonda, Vy-Van Le, Rick Dewey, Teferi Mitiku, Matt Wheeler, Jeremiah Ray, James Freeman, Euan Ashley and Vic Froelicher:  Adding an Electrocardiogram to the Pre-Participation Exam in Competitive Athletes: A Systematic Review. *Current Problems in Cardiology*. 2009. Dec; 34(12):586-662

98. **Perez, M**., Wheeler, M., Ho, M., Pavlovic, A., Wang, P.: Ashley, E. Genetics and Arrhythmias: Discovering Disease Pathways Beyond Ion Channels. *Journal of Cardiovascular Translational Research*, 2008 1:155-165.

99. **Perez, M.V**., Yaw TS, Myers J, Froelicher VF.: Prognostic value of the computerized ECG in Hispanics. *Clinical Cardiology*, 2007. **30**(4): p. 189-94

100.    Vy-Van Le, **Marco Perez,** Matthew Wheeler, Jonathan Myers, Ingela Schnittger, Euan Ashley.  Mechanisms of Exercise Intolerance in Patients with Hypertrophic Cardiomyopathy. *American Heart Journal*, 2009 Sep;158(3):e27-34.

*101.*    Kapoor JR, Gienger AL, Ardehali R, Varghese R, **Perez MV**, Sundaram V, McDonald KM, Owens DK, Hlatky MA, Bravata DM.  Isolated disease of the proximal left anterior descending artery comparing the effectiveness of percutaneous coronary interventions and coronary artery bypass surgery.  *JACC Cardiovasc Interv*. 2008 Oct;1(5):483-91.

102.    Dena M. Bravata, MD, MS; Allison L. Gienger, BA; Kathryn M. McDonald, MM; Vandana Sundaram, MPH; **Marco V. Perez, MD**; Robin Varghese, MD, MS; John R. Kapoor, MD, PhD; Reza Ardehali, MD, PhD; Douglas K. Owens, MD, MS; and Mark A. Hlatky, MD. Systematic Review: The Comparative Effectiveness of Percutaneous Coronary Interventions and Coronary Artery Bypass Graft Surgery. *Ann Int Med,* 2007. 147(10):732-4

103.    Dewey, Frederick; **Perez, Marco**; Hadley, David; Freeman, James; Wang,  Paul; Ashley, Euan; Myers, Jonathan; Froelicher, Victor: Statin use and ventricular arrhythmias during clinical treadmill testing. *J Cardiovasc Electrophysiol*. 2009 Feb;20(2):193-9.

104.    Haddad, F., **Perez, M.,** et al., Giant coronary aneurysms in heart transplantation: an unusual presentation of cardiac allograft vasculopathy. *J Heart Lung Transplant*, 2006. **25**(11): p. 1367-70.

105.    Grossman, S.R., **Perez, M**., Kung AL, Joseph M, Mansur C, Xiao ZX, Kumar S, Howley PM, Livingston DM. p300/MDM2 complexes participate in MDM2-mediated p53 degradation. *Molecular Cell*, 1998. **2**(4): p. 405-15.


## NON PEER-REVIEWED PUBLICATIONS

### Invited Editorials

1. **Perez, MV;** Ashley, EA, Taming Rare Variation with Known Biology in Long QT Syndrome, *Circulation Genetics* 2013 Jun;6(3):227-9.

### Letters to the Editor

1. Turakhia MP, Desai M, **Perez MV**; Apple Heart Study Investigators. A Smartwatch to Identify Atrial Fibrillation. Reply. *N Engl J Med*. 2020 Mar 5;382(10):975-976

2. Wong, J, Maxwell, B, **Perez, MV**, Reply to Van Oosten et al: "P-wave characteristics on routine preoperative electrocardiogram improve prediction of new-onset postoperative atrial fibrillation in cardiac surgery". *Journal of Cardiothoracic and Vascular Anesthesia*, 2015 Oct;29(5):e63-4.

3. **Perez MV**, Al-Ahmad AA, Wang PJ, Turakhia MP. Response to Letter by Dr. Subramanian: Inappropriate Pacing in a Patient with Managed Ventricular Pacing (MVP): What is the Cause? *Heart Rhythm,* 2010; 7(12):e3.

4. **Perez, M**., Froelicher, V.: Response to Letter by Drs. Dilaveris and Stefanadis: Electrocardiographic predictors of atrial fibrillation: Methodological considerations. *American Heart Journal*, 2010; 159:e5.

5. **Marco Perez, MD**; Victor Froelicher, From bedside to bench; *JECG* 46(2):114-115, 2013.

## Commentary

1. **Marco V. Perez,** Karen Friday, Victor Froelicher, Semantic Confusion: The Case of Early Repolarization and the J point. *The American J of Medicine*, 2012 Sep;125(9):843-4.

## Books

1. Reza Ardehali, **Marco Perez**, Paul Wang. *A Practical Handbook of Cardiovascular Medicine,* Blackwell Publishing. ISBN 978-1405180399

## Book Chapters

1. **Perez**, **M**. and A. Al-Ahmad, Role of Catheter Control Systems in Ablation of Ventricular Tachycardia, in *Ventricular Arrhythmias and Sudden Death*, P. Wang, Editor. 2008, Blackwell Publishing. ISBN 978-1-4051-6114-5

2. **Marco Perez,** MD, Henry Hsia, MD, Paul C. Zei, MD, Mintu Turakia, MD, Paul J. Wang, MD and Amin Al-Ahmad, MD.  Automatic Threshold measuring algorithms in *Pacemakers and Implantable Defibrillators: An Expert's Manual*. 2010, Cardiotext. ISBN 9780979016462

3. **Perez**, **M**. and Fellows, C: Emerging Technologies in Electrophysiology. in *Science Innovation Synergy*. 2006. Chicago.

4. Paul J. Wang, MD, Amin Al-Ahmad, MD, Henry H. Hsia, MD, Paul C. Zei, MD, PhD, Mintu Turakhia, MD, MAS, **Marco Perez, MD**, Christian S. Eversull, MD.  Intraprocedural Techniques: Angioscopy and Optical Mapping in *Cardiac Imaging in Electrophysiology* 2012, Springer. ISBN 978-1-84882-485-0.

5. Paul J. Wang, MD, Amin Al-Ahmad, MD, Henry H. Hsia, MD, Paul C. Zei, MD, PhD, Mintu Turakhia, MD, MAS, **Marco Perez, MD**, Timing Cycles of Implantable Devices in Clinical Cardiac Pacing, Defibrillation, and Resynchronization Therapy, 4th Ed., Elsevier Science 2012. ISBN 978-1-4377-1616-0

6. John Evans, Karin Chia, Mintu P. Turakhia, Henry Hsia, Paul Zei, **Marco V. Perez**, Paul J. Wang, Amin Al-Ahmad, Radiologic Aspects of Implantable Device Systems, *Interventional Cardiac Electrophysiology*, Cardiotext 2014.  ISBN 978-0-9790164-8-6

7. **Marco V. Perez,** Amin Al-Ahmad, Andrea Natale, How to Perform Pulmonary Vein Antrum Isolation for Atrial Fibrillation, *Hands-On Ablation*, Cardiotext 2014. ISBN 978-1-935395-24-9

8. Ronald Jones, **Marco V. Perez**, Clinical Management of the Inherited Cardiac Arrhythmias. Encyclopedia of Cardiovascular Research and Medicine, Elsevier 2017, ISBN 9780128096574.

## Honors Theses

1. **Perez**, **M**. A Tripartite mdm2/p53/p300 complex that may regulate p53 degradation, in Molecular Biology. 2001, Harvard Medical School: Boston.

2. **Perez**, **M**. The Role of Tetrahydrobiopterin in Endothelial Nitric Oxide Synthase Catalysis and L-arginine Binding, in Department of Biochemical Sciences. 1996, Harvard University: Cambridge. p. 39

## INVITED TALKS

1. Perez, M., Dewey, F., Tan, S., Myers, J., Froelicher, V.: A Resting ECG Neural Network Predicts Cardiovascular Mortality.  American Heart Association, Chicago,  Circulation, Oct 2006; 114: II_427.

2.  Perez, M., Dewey, F., Tan, S., Myers, J., Froelicher, V: Added Value of a Resting ECG Neural Network that Predicts Cardiovascular Mortality. American Heart Association, Orlando, 2007. Circulation, Oct 2007; 116: II_821

3.  Marco V. Perez, Narmadan A. Kumarasamy, Douglas K Owens, Paul J Wang, Mark A. Hlatky: Cost-effectiveness of Genetic Testing in Family Members of Patients with Long QT Syndrome. American Heart Association,  New Orleans, Circulation, Oct 2008; 118: S_882.

4.  Sex and Race in Cardiac Arrhythmias. Electrophysiology in the West. Monterrey, CA. 12/2010.

5.  ICD Management of Inappropriate Shocks.  Instituto de Cardiologia Medicina Vascular, Monterrey, MEXICO. 8/2010

6.  Novel Anticoagulants.  Instituto de Cardiologia Medicina Vascular, Monterrey, MEXICO. 8/2010

7.  ICD Implantation and Defibrillation Threshold Testing, Device Management – Beyond the Basics for the EP Fellow Course, Scottsdale, Arizona, March 11, 2011

8.  Antitachycardia Pacing, Device Management – Beyond the Basics for the EP Fellow Course, Scottsdale, Arizona, March 11, 2011

9.  Long QT Syndrome – An Overview.  American Association of Critical-Care Nurses South Bay Chapter Fall Symposium, San Jose, California.  November 2011

10. Pre-participation ECG screening in the Athlete, Cardiology Grand Rounds, Stanford Hospital, December, 2011

11. Long QT Syndrome and CPVT. CARDIA Conference. Monterrey, CA 6/2012.

12. Using Gene Networks and Race in Genomic Analyses of Cardiovascular Disease.  Frontiers in Cardiovascular Science Seminar.  Stanford, CA 6/2012.

13. Genetics of Cardiac Arrhythmias, Cardiology Grand Rounds, Royal Brisbane & Women's Hospital, Brisbane, AUSTRALIA, July 2012

14. The Genomics of Atrial Fibrillation, Cardiovascular and Pulmonary Sciences Seminar, Stanford University Medical School, CA October, 2012.

15. Long QT and Screening Recommendations for Psychotropic Therapy, Vaden Medical Center, Stanford University Medical School, CA February, 2013

16. Clinical and Genetic Implications of Atrial Fibrillation in Hypertrophic Cardiomyopathy, Biodesign New Arrhythmia Technologies Retreat, Denver, CO May 2013

17. Inherited Arrhythmia Syndromes, Cardiology Grand Rounds, Stanford University Medical School, June, 2013.

18. Cardiac Arrhythmias and Devices in Patients with Myotonic Dystrophy, Myotonic Patient Meeting, Stanford University, February 2014.

19. Novel Insights from the study of Atrial Fibrillation in Women, 11th Winter Arrhythmia School, University of Toronto, Toronto, CANADA, February 2014

20. Interpreting the Athlete ECG, Cardiology Grand Rounds, Stanford University Medical School, February 2014.

21. The Inherited Arrhythmia Syndromes, Stanford International Medical Services Presentation, site: Sao Paolo, BRAZIL, March 2014.

22. Advances in Genetic Testing for Inherited Arrhythmias, Biodesign New Arrhythmia Technologies, Palo Alto, CA May 2014.

23. Systematic comparison of the electrocardiogram between athletes and patients with hypertrophic cardiomyopathy. Heart Rhythm Scientific Sessions, San Francsico, 2014.

24. Evaluation of Sudden Cardiac Death, Cardiology Grand Rounds, Kaiser San Francisco, 2014.

25. Systematic Comparison of Electrocardiograms in Patients with Hypertrophic Cardiomyopathy and Athletes, Seattle Summit 2015, University of Washington, 2015.

26. Cardiac Arrhythmias in Athletes, Stanford Health Fair, Stanford University 2015.

27. Gene Therapy in Cardiac Arrhythmias, American College of Cardiology, San Diego, 2015.

28. Genetic Conditions of Sudden Unexplained Death, Stanford Vascular Biology and Disesae, Stanford 2015

29. Genetics of Sudden Cardiac Death, BIO 109B, Human Genome and Disease, undergraduate course, 2015.

30. Long QT and Brugada Syndrome, Genetic Counseling Students, Stanford online course, 2015

31. Long QT, Early Repolarization and Familial Atrial Fibrillation – CARDIA conference, Napa, California, 2016

32. Genomewide Association Studies and Exomes are Dead: Prepare for the $1000 Whole Genome. Heart Rhythm Scientific Sessions, San Francisco, 2016.

33. Big data in cardiac arrhythmias. Stanford Biodesign Conference, Stanford, 2016

34. Arrhythmogenic Right Ventricular Cardiomyopathy, Pulmonary Hypertension Conference, Stanford, 2016

35. Clinical Genetic Testing in Very Early Onset AF, Heart Rhythm Scientific Sessions, Chicago, IL, 2017.

36. Clinical Management of Long QT Syndrome, Dominical Hospital Grand Rounds, Santa Cruz, CA, 2017

37. The genetics of arrhythmic disease, Stanford Center for Arrhythmia Research, Stanford University, CA 2017.

38. Identification of Athletes with Subclinical Arrhythmia Syndromes, American Heart Association Scientific Sessions, Anaheim, CA 2017

39. Personalized Medicine for Fibrillation Tailored to Genetic Profiling, Electrophysiology in the West, Palo Alto, CA 2017

40. Long QT Syndrome, EP in the West, Stanford, CA 2018

41. Narcolepsy and Heart Failure, the Role of HCRTR2 in regulating heart function. Cardiology Grand Rounds, Stanford University, Stanford, CA 2018

42. The Apple Heart Study, Cedars Sinai Cardiology Symposium, Cedars Sinai, Los Angeles CA 2018

43. Exercise and Inherited Cardiac Arrhythmias, UCSF Inherited Arrhythmia Symposium, San Francisco, CA 2018

44. Genetic Testing in Early Onset Atrial Fibrilaltion, Stanford Biodesign Symposium, Boston, MA, 2018

45. The WHISH STAR Study, Women's Health Initiative Investigator Meeting, Seattle, WA 2018

46. Exercise and Atrial Fibrillation, Asia Pacific Heart Rhythm Society Scientific Sessions, Taipei, Taiwan 2018

47. Monitoring for Atrial Fibrillation, DCRI Virtual Grand Rounds, Duke, Durham, NC 2018

48. Genetic Testing in Early onset Atrial Fibrillation, Smidt Heart Institute Grand Rounds at Cedars Sinai Medical Center, Los Angeles CA 2019

49. The Apple Heart Study, Late-Braking Clinical Trials, American College of Cardiology, New Orleans, LA 2019

50. Using Stem Cells to guide clinical care of Inherited Cardiac Arrhythmia Patients. Stanford Biodesign, Stanford, CA, 2019

51. Prevention and Management of Atrial Fibrillation, American College of Sports Medicine Scientific Sessions, Orlando, FL 2019

52. Exercise and Atrial Fibrillation – Prevention or Causation? Heart Rhythm Scientific Sessions, San Francisco, CA, 2019

53. Meet The Trialists: The Apple Heart Study, Heart Rhythm Scientific Sessions, San Francisco, CA, 2019

54. Should Atrial Fibrillation Burden be Added to the CHA2DS2-VASc Score? Heart Rhythm Scientific Sessions, San Francisco, CA, 2019

55. The Apple Heart Study, Electrophysiology in the West, Palo Alto, CA 2019

56. Applying Genetics to Classify Patients, Electrophysiology in the West, Palo Alto, CA 2019

57. The Apple Heart Study and Beyond, American Heart Association Scientific Sessions, Philadelphia, PA 2019

58. How I manage a family with Sudden Cardiac Death, American Heart Association Scientific Sessions, Philadelphia, PA 2019

59. The Evidence behind use of Wearables, American Heart Association Scientific Sessions, Philadelphia, PA 2019

60. How to Get Published, American Heart Association Scientific Sessions, Philadelphia, PA 2019

61. The Role of the ICD in CPVT, American Heart Association Scientific Sessions, Philadelphia, PA 2019

62. The Apple Watch and Patient Monitoring, Texas American College of Cardiology Scientific Sessions, Dallas, Texas 2019.

63. The Dawn of the Patient-Acquired Wearable Devices: AI is Here. American Heart Association Scientific Sessions, Virtual Meeting, 2020

64. Data, Big Data, Biggest Data and Stroke: Big Data Counterpoint. American Stroke Association, Scientific Sessions, Virtual Meeting 2021


**RECURRENT TEACHING LECTURES**

1. Long QT Syndrome for the EP, Stanford Electrophysiology Fellows Core Conference, annual

2. Brugada Syndrome and Early Repolarization, Cardiac Electrophysiology Core conference, annual

3. Antitachycardia Pacing for the Electrophysiology Fellow, annual

4. Cardiac Genetics for the Electrophysiologist, Cardiac Electrophysiology Core Conference, annual

5. Introduction to the EP Study parts I & II, Cardiology Fellows Core Conference, biannual

6. Introduction to the Electrocardiogram, Stanford Medical Students, annual

7. Inherited Cardiac Arrhythmias, Stanford University Medicine Residents, annual


**Poster Abstracts (Total = 23)**

1. William R. Goodyer, MD PhD1, 2, Mary Jackson3, Jennifer Wylie, MS3, Kyla Dunn, MS2,3, Colleen Caleshu, MS3, Allysonne Smith, RN3, Anthony Trela, NP2, Scott R. Ceresnak, MD2, Kara S. Motonaga, MD2, Anne M. Dubin, MD2, Euan Ashley, MD PhD1,3, and **Marco Perez**,

**MD**1,3. Early-onset atrial fibrillation: expanded genetic testing uncovers a high rate of looming inherited cardiomyopathy. Heart Rhythm Scientific Sessions, Boston, MA 2018

2. James Tooley, MD1, David Ouyang, MD, David Hadley, PhD, Victor Froelicher, MD. **Marco Perez, MD**. Analysis of QT interval correction formulas in atrial fibrillation – A big data approach. Heart Rhythm Scientific Sessions, Chicago, IL 2017

3. Alvin S. Chen, MD, Rachel E. Bent, BA, Matthew T. Wheeler, MD, PhD, Joshua W. Knowles, MD, PhD, Francois Haddad, MD, Victor Froelicher, MD, Euan Ashley, MRCP, DPhil, and **Marco V. Perez, MD**; Large Q and S waves in Lead III on the Electrocardiogram Distinguish Patients with Hypertrophic Cardiomyopathy from Athletes. Heart Rhythm Scientific Sessions, 2017.

4. Daniel A Gerber, Ann M Dubin, Scott R Ceresnak, Kara S Motonaga, Kyla Dunn, Colleen Caleshu, Allysonne Smith, Mary Jackson, **Marco V. Perez**.  Occult Structural Disease in Patients with Catecholaminergic Polymorphic Ventricular Tachycardia. American Heart Association Scientific Sessions, 2016, New Orleans, LA 2016

5. Simon Ermakov, MD, Farnaz Azarbal, MD1, Marcia L. Stefanick, PhD1,Michael J. LaMonte, PhD, MPH, Wenjun Li, PhD, Katie M. Tharp, PhD, MPH, Lisa W. Martin, MD, FACC, Rami Nassir, PhD, Lorena Garcia, PhD, Elena Salmoirago-Blotcher, MD, PhD, Christine M. Albert, MD, MPH, JoAnn E. Manson, MD, DrPH10, Themistocles L. Assimes, MD, PhD,  Mark A. Hlatky, MD, Joseph Larson, **Marco V. Perez, MD**. The Role of Leptin, Adiponectin, and Resistin with in Incident Atrial Fibrillation in Post-menopausal Women: Findings from the Women's Health Initiative. Heart Rhythm Scientific Sessions, Boston, 2015.

6. Genevieve Giraldeau, MD, David Boulate, MD, Dipanjan Banerjee, Miyuki Ariyama, MD, MaJhew Wheeler, Joshua Knowles, Yukari Kobayashi, MD, **Marco Perez, MD**, Joseph C. Wu, MD, Ingela SchniJger, Tatyana Kouznetsova, BojanVrtovec, MD, Jonathan Myers, PhD, François Haddad, MD and Euan Ashley, MRCP DPhilThe Independent Predictive Value of Peak Oxygen Consumption, Left ventricular Strain and Atrial Remodelling in Patients with Dilated Cardiomyopathy. International Society of Heart and Lung Transplants, Nice, Italy, 2015.

7. **Marco Perez**, MD, Colleen Caleshu, MS, CGC, Josh Knowles, MD, PhD, Aleksandra Pavlovic, BS, Kyla Dunn, MS, CGC, Gherardo Finocchiaro, MD, Heidi Salisbury, RN, Matthew Wheeler, MD, PhD, Sarah Race, RN, Allysonne Smith, RN and Euan Ashley, MD, DrPH. Rare variation in MYH7 is Associated with Atrail Fibrillation in Patients with Hypertrophic Cardiomyopathy, Heart Rhythm Scientific Sessions, Denver 2013.

8. Farnaz Azarbal, Maneesh Singh, Gherardo Finocchiaro, Vy-Van Le, Ingela Schnittger, Paul Wang, Jonathan Myers, **Marco Perez**, Euan Ashley.  Paroxysmal Atrial Fibrillation Is Associated with Exercise Intolerance among Individuals with Hypertrophic Cardiomyopathy.  American College of Cardiology Scientific Sessions, San Francisco, 2013.

9. **Marco V. Perez**, Paul J. Wang, Barbara Cochrane, J. David Curb, Liviu Klein, Joseph Larson, JoAnn Manson, Lisa W. Martin, Jennifer Robinson, Sylvia Wassertheil-Smoller, Marcia L. Stefanick: Effects of Postmenopausal Hormone Therapy on Atrial Fibrillation: The Women's Health Initiative Randomized Controlled Trials, *J Am Coll Card* 2012; 59; E661.

10. JoEllyn M. Abraham, MD, Joseph Larson, MS, Mina K. Chung, MD, Anne B. Curtis, MD, Kamakshi Lakshminarayan, MD, PhD, Jonathan D. Newman, MD, MPH, **Marco Perez, MD**, Kathryn Rexrode, MD, Nawar Shara, MS, PhD, Allen J. Solomon, MD, Marcia L. Stefanick, PhD, James C. Torner, MD, Bruce L. Wilkoff, MD and Sylvia Wassertheil-Smoller, PhDStroke Risk in Post-menopausal Women with Atrial Fibrillation in the Women's Health Initiative: A Validation and Comparison of the CHADS2, and CHA2DS2-VASc Risk Scores, *J Am Coll Cardiol*. 2012;59(13s1):E569-E569.

11. Hoang DD, Ullal A, **Perez** MV, Froelicher VF, Heidenreich PA, Yang F, Turakhia MP. Early Repolarization Pattern on ECG and Risk of Arrhythmic Death: A Systematic Review. Poster presentation at Bay Area Clinical Research Symposium, San Francisco, November 4, 2011.

12. **Marco V. Perez**, MD, Aleksandra Pavlovic, Matthew T. Wheeler, MD, Frederick E. Dewey, Daniel Bernstein, MD, Robert C. Robbins, MD, Michael B. Fowler, Thomas Quertermous, MD, Devin Absher, PhD, Michael Ho, MD, Elizabeth Cretti BA, Audrey Southwick, PhD, David Rosenthal, MD, Richard M Myers, PhD, Paul Heidenreich, MD, Lisa Garrett, BA, Daniel Sedehi, MD, David Kao, MD, and Heidi Salisbury, RN, MSN, Khin Chan MD and Euan Ashley, MRCP, DPhil.,

Genetic Determinants of Dramatic Improvement in Left Ventricular Function in Patients with Heart Failure. American College of Cardiology Scientifc Sessions, New Orleans, April, 2011

13. **Marco V. Perez**, MD, Aleksandra Pavlovic, Matthew T. Wheeler, MD, Frederick E. Dewey, Devin Absher, PhD, Michael Ho, MD, Audrey Southwick, PhD, PhD, Paul Heidenreich, MD, Daniel Sedehi, MD, Heidi Salisbury, RN, MSN, Khin Chan MD, Robert C. Robbins, MD, Michael B. Fowler, Thomas Quertermous, MD, Richard M Myers, Daniel Bernstein, MD, and Euan Ashley, MRCP, DPhil., A genetic Variant of NMNAT3 is associated with Atrial Fibrillation in Patients with Heart Failure, Heart Rhythm Scientific Sessions, San Francisco, May 2011.

14. **Marco V. Perez**, MD, Abhimanyu Uberoi MD, MS; Nikhil A. Jain; Euan Ashley MRCP Dphil; Mintu P. Turakhia MD MAS; Vic Froelicher MD, Early repolarization is more prevalent but carries a limited prognostic value in African Americans, Heart Rhythm Scientific Sessions, San Francisco, May 2011.

15. Kojiro Tanimoto, **Marco V. Perez**, Henry H. Hsia, Catheter Ablation of Ventricular Tachycardia Guided by Decremental Late Potential Mapping, Heart Rhythm Scientific Sessions, San Francisco, May 2011.

16. Young M. Kim, MD, DPhil; Maneesh H. Singh, MD; Saugata Ray PhD; Ayaaz Sachedina BSc **Marco Perez, MD**; Liyong Zhang, PhD; Pilar Ruiz-Lozano, PhD; Subodh Verma MD, PhD; Peter P. Liu, MD; Barbara Casadei, MD, DPhil; Euan A. Ashley, MRCP, DPhil; Peter H. Backx, DVM, PhD, FRS. Modulation Of Atrial Electrophysiology And Oxidative Stress By The Endogenous Peptide Hormone Apelin – Implications In Human Atrial Fibrillation, Basic Cardiovascular Sciences, Rancho Mirage, 2010.

17. **Marco V. Perez**, Paul J. Wang, Barbara Cochrane, J. David Curb, Liviu Klein, Joseph Larson, JoAnn Manson, Lisa W. Martin, Jennifer Robinson, Sylvia Wassertheil-Smoller, Marcia L. Stefanick: Effects of Postmenopausal Hormone Therapy on Atrial Fibrillation: The Women's Health Initiative Randomized Controlled Trials,  American Heart Association, Orlando. *Circulation*, Nov 2009; 120: S519

18. **Marco V. Perez**, Paul J. Wang, Liviu Klein, Stephanie Connelly, Joseph Larson, Marian Limacher, JoAnn Manson, Lisa W. Martin, Ronald Prineas, Beatriz L. Rodriguez, Sylvia Smoller, Elsayed Z. Soliman, Marcia L.  Stefanick Independent Clinical Correlates of Atrial Fibrillation in Postmenopausal Women: The Women's Health Initiative Observational Study, American Heart Association, Orlando, *Circulation*, Nov 2009; 120: S520.

19. Dewey, Frederick; **Perez, Marco;** Hadley, David; Freeman, James; Wang,  Paul; Ashley, Euan; Myers, Jonathan; Froelicher, Victor:  Statin Therapy and Exercise Induced Ventricular Arrhythmias.  Oral Abstract, American College of Cardiology, Chicago, 2008.

20. Vy-Van Le, **Marco Perez**, Matthew Wheeler, Ingela Schnittger, Euan Ashley. Left Atrial Volume and E/E' Ratio are Most Predictive of Exercise Capacity in Hypertrophic Cardiomyopathy. Poster Abstract, *American Heart Association*, New Orleans,  *Circulation*, Oct 2008; 118: S_835.

21. Vy-Van Le, Frederick Dewey, **Marco Perez**, Matthew Wheeler, Sandra Mandic, Gannon Sungar, Euan Ashley, Gordon Matheson, Victor Froelicher.  Addition of the Electrocardiogram to the Pre-participation Examination of College Athletes. Oral Abstract, *American Heart Association*, New Orleans, *Circulation*, Oct 2008; 118: S_835.

22. Z.  Cheng,  R. Lo, A. Gupta, **M. Perez**, P. Zei, H.H. Hsia, M. Turakhia, A. Al-Ahmad, P.J. Wang, Atrial Mechanical Function Using Left Atrial Pressure Waveform Analysis in Persistent and Paroxysmal Atrial Fibrillation Patients. Poster Abstract, American Heart Association, Orlando, *Circulation*, Nov 2009; 120: S628.

23. Wheeler MT, Pavlovic A, Dewey F, **Perez M**, Absher D, Ho M, Cretti E, Southwick A, Rosenthal D, Bernstein D, Myers JM, Heidenreich PA, Fowler MB, Robbins R, Ashley EA.  Evaluation of Polymorphisms in Candidate Genes in the Dramatic Response to Pharmacologic Therapy of Heart Failure.  AHA Basic Cardiovascular Science Conference, Keystone, May 2008.

**REFERENCES**

Thomas Quertermous, MD
Chief, Cardiovascular Medicine
Stanford University Medical Center
650-723-5013
tomq1@stanford.edu

Euan Ashley, MD
Professor, Cardiovascular Medicine
Director, Stanford Hypertrophic Cardiomyopathy Center
650-736-7878
euan@stanford.edu

Paul Wang, MD
Chief, Electrophysiology Department
Electrophysiology Fellowship Program Director
Stanford University Medical Center
650-723-6459
pwang@cvmed.stanford.edu

Victor Froelicher, MD
Professor, Cardiovascular Medicine
Palo Alto VA Medical Center
650-493-5000 x64605
vicmdatg@gmail.com

Marcia Stefanick, PhD
Professor of Medicine
Stanford Prevention Research Center
Medical School Office Building
1265 Welch Rd, Room X308
Stanford, CA 94305-5411
650-725-5041
stefanick@stanford.edu

**Marco Perez**

**Testimony**

*Vizzone v. Rush University Medical Center*: Circuit Court of Cook County, IL; No.: 2016 L 008291; June 4, 2019

*Bardhan D v. Northwestern Medical*: Circuit Court of Cook County, IL; No. 2019 L 004362; April 24, 2019

**Other Consulting**

1.  Apple Inc., Consulted regarding new technologies to detect cardiac arrhythmias
2.  Boston Scientific, Consulted for educational course on subcutaneous defibrillators
3.  AltaThera, Consulted regarding use of a medicinal therapeutic
4.  Biotronik, Consulted regarding development of a novel therapeutic implantable device

# Exhibit B

| | |
|---|---|
| **From:** | Perry.Oldham <Perry.Oldham@knobbe.com> |
| **Sent:** | Saturday, May 22, 2021 1:34 AM |
| **To:** | Kaounis, Angelique |
| **Cc:** | *** Apple-Masimo; Masimo.Apple |
| **Subject:** | RE: Masimo Corp. et al. v. Apple Inc., Case No. 8:20-cv-00048-JVS-JDE - Draft Agreement for Dr. Marco Perez |
| **Attachments:** | Proposed Order.pdf; Notice of Motion.pdf; Oldham Declaration and Exhibits.pdf; Joint Stipulation re Expert Perez.DOC |

[External Email]

Dear Angelique,

We have not received a response to my email from earlier today, and it appears the parties are at an impasse.

Please find attached Plaintiffs' portion of the Joint Stipulation, along with the Oldham Declaration, Proposed Order, and Notice of Motion.

Please provide your availability to discuss the briefing schedule. I am available over the weekend if needed.

Best regards,

Perry

**Perry Oldham**
Partner
949-721-2961
**Knobbe** Martens

---

**From:** Perry.Oldham
**Sent:** Friday, May 21, 2021 3:35 PM
**To:** Kaounis, Angelique <AKaounis@gibsondunn.com>
**Cc:** *** Apple-Masimo <Apple-Masimo@gibsondunn.com>; Masimo.Apple <Masimo.Apple@knobbe.com>
**Subject:** RE: Masimo Corp. et al. v. Apple Inc., Case No. 8:20-cv-00048-JVS-JDE - Draft Agreement for Dr. Marco Perez

Dear Angelique,

Thank you for agreeing to the further limitations in Paragraph No. 1.  We seem to be making progress.

On the clinical trial issue, we do not understand your claim that the language somehow restricts Dr. Perez' ability to practice medicine, and that is not our intent.  Thus, it appears you may be interpreting the language differently than we intend.  We simply maintain that, if he actually reviews Plaintiffs' highly confidential information (some of which has been refined over the past 30 years) on how they design and conduct clinical trials in the specifically identified areas, that Dr. Perez should not provide design input for clinical trials in the same area in the future.  Your email suggests that Dr. Perez will under no circumstances agree to any restrictions on him designing clinical trials in the future, even directly in the area of those clinical trial designs he saw in Plaintiffs' highly confidential documents.  But, that is not simply practicing medicine.  Please let us know immediately if our understanding is incorrect, as we would like to clarify the language if the issue can be resolved.

Exhibit B
Page 61

We did not intend the language on clinical trials to place restrictions on Dr. Perez ability to practice medicine. It only places restrictions on the development of clinical protocols in the subject areas for which he receives confidential information revealing how Plaintiffs design or conduct clinical trial.  Please let us know immediately why this limitation would prevent Dr. Perez from practicing medicine.

Plaintiffs have not attempted to redefine the word employee. Rather, your arguments continue to attribute a position to Plaintiffs that Plaintiffs have never taken.

The simple fact remains that Dr. Perez was retained by Apple to "design the protocols for the Apple Heart Study," and not as an individual "to whom disclosure [was] reasonably necessary for this Action." Thus, the work that Dr. Perez previously performed for Apple was not pursuant to being a consultant as that term is defined in the protective order.  The label Apple chooses to apply to the prior work does not change the nature of that work.  Designing protocols for the Apple Heart Study does not make Dr. Perez an individual "to whom disclosure [was] reasonably necessary for this Action."

To be clear on something you appear to have misunderstood, as I stated earlier, "[t]he conference of counsel occurred on Friday, May 14, and we will timely provide Plaintiff's portion of the Joint Stipulation later today on May 21."

The Protective Order does not specify which party is to request  a conference of counsel when objections are made.  Rather, Paragraph 9.2(c) of the Protective Order simply states "the Parties agree to meet and confer within seven (7) days following the objection and to use good faith to resolve any such objection."  Previously, Apple requested the conference of counsel when Plaintiffs made objections under the protective order.  *See*, *e.g.*, Brian Andrea's 9/1/2020 email to Adam Powell requesting a meet and confer. When you raised the issue with respect to Dr. Perez, we promptly conferred with you.

Plaintiffs maintain that this course of action is consistent with the Protective Order and the parties' prior interactions.

Assuming we do not get further agreement from Apple, we will provide the Joint Stipulation later today.

Best regards,

Perry

**Perry Oldham**
Partner
949-721-2961
**Knobbe Martens**

---

**From:** Kaounis, Angelique <AKaounis@gibsondunn.com>
**Sent:** Friday, May 21, 2021 1:42 PM
**To:** Perry.Oldham <Perry.Oldham@knobbe.com>
**Cc:** *** Apple-Masimo <Apple-Masimo@gibsondunn.com>; Masimo.Apple <Masimo.Apple@knobbe.com>
**Subject:** RE: Masimo Corp. et al. v. Apple Inc., Case No. 8:20-cv-00048-JVS-JDE - Draft Agreement for Dr. Marco Perez

Perry,
Thanks for your email.  As you note below, Dr. Perez already agreed to a compromise as set forth in Paragraph No. 1 of the proposed agreement I sent you.  We expect Dr. Perez will agree to Plaintiffs' addition limitations in Paragraph No. 1 highlighted below:

I will not review algorithms for calculating heart rate, oxygen saturation, ==electrocardiograms, or arrhythmia detection== designated by Plaintiffs as "Confidential" or "Highly Confidential".

Exhibit B
Page 62

However, as we've explained, Dr. Perez cannot agree to a future limitation on his ability to conduct research and practice medicine.  Plaintiffs' speculative concern that he will violate the terms of the Protective Order in his future consulting work based on his past work for Apple does not justify such an unreasonable restriction.  Dr. Perez already has agreed to abide by the terms of the Protective Order.

Plaintiffs' discussion of Section 9.2(c) below does not advance the dialogue.  Plaintiffs' attempt to redefine the term "employee" to include a "consultant"—by claiming the phrase "contract employee" (which appears nowhere in the PO) somehow encompasses a "consultant" is unsupported by the PO.  Plaintiffs are attempting to retroactively insert a restriction into the Protective Order that they could have negotiated, or presented to the Court at the time they submitted their proposed Protective Order, but did not.  We encourage Plaintiffs to reconsider their position.  However, if they choose not to do so, we expect to receive Plaintiffs' portion of the joint stipulation today.

Finally, as you know, it remains Apple's position that Plaintiffs waived their objections to Dr. Perez by failing to timely meet and confer or timely provide their portion of the joint stipulation under the terms of the PO and the local rules, as I previously explained.  Your attempt to characterize last week's meet and confer as a "timely" conference of counsel is not well-taken for the reasons I previously described.  Apart from the timeliness issue, as you know, Plaintiffs did not serve a letter requesting such a Rule 37 conference—let alone identify any legal authority Plaintiffs believe is dispositive of the dispute or specify the terms of the discovery order to be sought as required by Rule 37.

Apple reserves all rights.
Thanks,
Angelique


**Angelique Kaounis**

## GIBSON DUNN

Gibson, Dunn & Crutcher LLP
2029 Century Park East Suite 4000, Los Angeles, CA 90067-3026
Tel +1 310.552.8546 • Fax +1 310.552.7026
AKaounis@gibsondunn.com • www.gibsondunn.com

---

**From:** Perry.Oldham <Perry.Oldham@knobbe.com>
**Sent:** Thursday, May 20, 2021 11:50 PM
**To:** Kaounis, Angelique <AKaounis@gibsondunn.com>; Masimo.Apple <Masimo.Apple@knobbe.com>
**Cc:** *** Apple-Masimo <Apple-Masimo@gibsondunn.com>
**Subject:** Re: Masimo Corp. et al. v. Apple Inc., Case No. 8:20-cv-00048-JVS-JDE - Draft Agreement for Dr. Marco Perez

[External Email]
Dear Angelique,

The document you attached today appears to be the same document you sent two days ago.  Please confirm that you have simply reverted to your prior draft, without further compromise.

Based on our understanding that you intended to send us the same document again, we accepted your changes and made a further compromise for your consideration.  The redlines include more specificity to the types of algorithms that Dr. Perez will not receive, and establish that Dr. Perez will not develop clinical studies in areas for which he receives Plaintiffs' confidential information regarding clinical studies.

3

It also appears that you have misunderstood our interpretation of Protective Order.

Consultants can be employed in a variety of contexts, including both legal and non-legal matters. Section 9.2(c) uses the term "consultants" in the context of legal matters ("to whom disclosure is reasonably necessary for this Action"). Apple's prior retention of Dr. Perez was not in the context of a legal matter. Rather, it was in the context of the type of work that would be done by a contract employee.

Regardless, whether he was called a "consultant" or something else in the context of his work for Apple is irrelevant. Our understanding is that Dr. Perez worked for Apple in a non-legal context, advising on physiological measurement analysis and clinical studies. We believe that type of work presents a very high risk of inadvertent disclosure.

The conference of counsel occurred on Friday, May 14, and we will timely provide Plaintiff's portion of the Joint Stipulation on Friday, May 21.

Please let us know if Apple agrees with any portion of the redlines in the attached document, or if Apple stands on its original draft.

Best regards,

Perry


**Perry Oldham**

Partner

949-721-2961


# Knobbe Martens


---

**From:** Kaounis, Angelique <AKaounis@gibsondunn.com>
**Sent:** Tuesday, May 18, 2021 6:29 PM
**To:** Perry.Oldham <Perry.Oldham@knobbe.com>; Masimo.Apple <Masimo.Apple@knobbe.com>
**Cc:** *** Apple-Masimo <Apple-Masimo@gibsondunn.com>
**Subject:** RE: Masimo Corp. et al. v. Apple Inc., Case No. 8:20-cv-00048-JVS-JDE - Draft Agreement for Dr. Marco Perez

Perry,
Thanks for the draft proposal. Plaintiffs' proposal is not workable for Dr. Perez. As we explained on last week's call, Plaintiffs' further limitations on Dr. Perez's ability to practice medicine and engage in clinical research are not required by the Protective Order. Among other things, as we pointed out, the PO distinguishes between consulting and employment roles, a distinction that Plaintiffs now wish to ignore.
We reiterate our proposal to not show Dr. Perez Plaintiffs' algorithms and have revised the attached proposed agreement accordingly. We also have stricken some unnecessary language. Please let us know if this proposal is acceptable or if Plaintiffs intend to maintain their objection. If the latter, please send us Plaintiffs' portion of the joint stipulation tomorrow.
Apple reserves all rights.
Thanks,
Angelique

Exhibit B
Page 64

**Angelique Kaounis**

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP
2029 Century Park East Suite 4000, Los Angeles, CA 90067-3026
Tel +1 310.552.8546 • Fax +1 310.552.7026
AKaounis@gibsondunn.com • www.gibsondunn.com

---

**From:** Perry.Oldham <Perry.Oldham@knobbe.com>
**Sent:** Monday, May 17, 2021 10:21 AM
**To:** Kaounis, Angelique <AKaounis@gibsondunn.com>
**Cc:** Masimo.Apple <Masimo.Apple@knobbe.com>; *** Apple-Masimo <Apple-Masimo@gibsondunn.com>
**Subject:** Masimo Corp. et al. v. Apple Inc., Case No. 8:20-cv-00048-JVS-JDE - Draft Agreement for Dr. Marco Perez

[External Email]
Dear Angelique,

Attached is a draft agreement for Dr. Perez that incorporates some of the ideas we discussed last week.  Please let me know when you are ready to discuss further.

Best regards,

Perry


**Perry Oldham**

Partner

949-721-2961

## Knobbe Martens

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

---

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

---

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

Exhibit B
Page 65

# Exhibit C

Exhibit C
Page 66

# AMA CODE OF MEDICAL ETHICS

## AMA PRINCIPLES OF MEDICAL ETHICS[*]

*Preamble*

The medical profession has long subscribed to a body of ethical statements developed primarily for the benefit of the patient. As a member of this profession, a physician must recognize responsibility to patients first and foremost, as well as to society, to other health professionals, and to self. The following Principles adopted by the American Medical Association are not laws, but standards of conduct that define the essentials of honorable behavior for the physician.

*Principles of medical ethics*

I. A physician shall be dedicated to providing competent medical care, with compassion and respect for human dignity and rights.

II. A physician shall uphold the standards of professionalism, be honest in all professional interactions, and strive to report physicians deficient in character or competence, or engaging in fraud or deception, to appropriate entities.

III. A physician shall respect the law and also recognize a responsibility to seek changes in those requirements which are contrary to the best interests of the patient.

IV. A physician shall respect the rights of patients, colleagues, and other health professionals, and shall safeguard patient confidences and privacy within the constraints of the law.

V. A physician shall continue to study, apply, and advance scientific knowledge, maintain a commitment to medical education, make relevant information available to patients, colleagues, and the public, obtain consultation, and use the talents of other health professionals when indicated.

VI. A physician shall, in the provision of appropriate patient care, except in emergencies, be free to choose whom to serve, with whom to associate, and the environment in which to provide medical care.

VII. A physician shall recognize a responsibility to participate in activities contributing to the improvement of the community and the betterment of public health.

VIII. A physician shall, while caring for a patient, regard responsibility to the patient as paramount.

IX. A physician shall support access to medical care for all people.

---

[*] Revised June 2001.

Copyright © 2016 American Medical Association.
Distribution, printing, or copying of this PDF is strictly prohibited without the written permission of the American Medical Association.
1

Exhibit C
Page 67

# Exhibit D

**COVID-19 Information**

**Public health information (CDC)**

**Research information (NIH)**

**SARS-CoV-2 data (NCBI)**

**Prevention and treatment information (HHS)**

**Español**

 U.S. National Library of Medicine

*ClinicalTrials.gov*

**Find Studies** ▾
**About Studies** ▾
**Submit Studies** ▾
**Resources** ▾
**About Site** ▾
**PRS Login**

## Apple Heart Study: Assessment of Wristwatch-Based Photoplethysmography to Identify Cardiac Arrhythmias

⚠ The safety and scientific validity of this study is the responsibility of the study sponsor and investigators. Listing a study does not mean it has been evaluated by the U.S. Federal Government. Read our disclaimer for details.

ClinicalTrials.gov Identifier: NCT03335800

Recruitment Status ⓘ : Completed
First Posted ⓘ : November 8, 2017
Results First Posted ⓘ : March 30, 2020
Last Update Posted ⓘ : March 30, 2020

**Sponsor:**
   Apple Inc.

Exhibit D
Page 69

**Collaborator:**

Stanford University

**Information provided by (Responsible Party):**

Minang (Mintu) Turakhia, Stanford University

| Study Details | Tabular View | Study Results | Disclaimer |
|---|---|---|---|

How to Read a Study Record

## Study Description

Go to ▼

Brief Summary:

The Apple Heart Study (AHS) is a research study conducted to evaluate whether the Apple Heart Study App can use data collected on the Apple Watch to identify irregular heart rhythms, including those from potentially serious heart conditions such as atrial fibrillation. Up to 500,000 can participate in the study.

| Condition or disease ❶ | Intervention/treatment ❶ | Phase ❶ |
|---|---|---|
| Atrial Fibrillation<br>Arrhythmias, Cardiac<br>Atrial Flutter | Device: Apple Heart Study App | Not Applicable |

## Study Design

Go to ▼

| | |
|---|---|
| Study Type ❶ : | Interventional  (Clinical Trial) |
| Actual Enrollment ❶ : | 419927 participants |
| Allocation: | N/A |
| Intervention Model: | Single Group Assignment |
| Masking: | None (Open Label) |
| Primary Purpose: | Screening |
| Official Title: | Apple Heart Study: Assessment of Wristwatch-Based Photoplethysmography to Identify Cardiac Arrhythmias |
| Actual Study Start Date ❶ : | November 29, 2017 |
| Actual Primary Completion Date ❶ : | February 21, 2019 |
| Actual Study Completion Date ❶ : | February 21, 2019 |



**Resource links provided by the National Library of Medicine**

MedlinePlus Genetics related topics:

   Familial atrial fibrillation

MedlinePlus related topics:   Arrhythmia   Atrial Fibrillation

U.S. FDA Resources

## Arms and Interventions

Go to ▼

| Arm  | Intervention/treatment  |
|---|---|
| Experimental: Apple Heart Study App | Device: Apple Heart Study App<br><br>The Apple Heart Study app is a mobile medical app that analyzes pulse rate data. The app identifies episodes of irregular heart rhythms consistent with atrial fibrillation and other arrhythmias. |

## Outcome Measures

Go to ▼

Primary Outcome Measures  :

1. Atrial Fibrillation (AF) of Greater Than 30 Seconds [ Time Frame: During ambulatory ECG monitoring (up to 8 days) ]

   Proportion of notified participants who received an irregular pulse notification and that had AF detected on the ambulatory ECG.

2. Confirmed AF With a Detection by a Component of the App [ Time Frame: During ambulatory ECG monitoring (up to 8 days) ]

   Simultaneous ambulatory ECG monitoring indicating an irregular rhythm consistent with AF during time intervals when an app component (tachogram) is positive for an irregular pulse among those who received an irregular heartbeat notification.

Secondary Outcome Measures  :

1. Concordant AF With App Algorithm Notification [ Time Frame: During ambulatory ECG monitoring (up to 8 days) ]

   Simultaneous ambulatory ECG monitoring indicating an irregular rhythm consistent with AF when the app based algorithm is positive for an irregular pulse among those who received a notification.

2. Self-reported Contact With a Health Care Provider [ Time Frame: 90 days to 15 months ]

   Percentage of participant who self-reported contact with a health care provider within 90 days following an irregular pulse watch notification. Participants could self-report this health-care provider contact from 90 days following notification until the study survey went offline at end of study.

## Eligibility Criteria

Go to ▼

**Information from the National Library of Medicine**      NIH▶NLM

*Choosing to participate in a study is an important personal decision. Talk with your doctor and family members or friends about deciding to join a study. To learn more about this study, you or your doctor may contact the study research staff using the contacts provided below. For general information,* Learn About Clinical Studies.

Ages Eligible for Study:      22 Years and older   (Adult, Older Adult)
Sexes Eligible for Study:      All
Accepts Healthy Volunteers:   Yes

**Criteria**

Inclusion Criteria:

Possession of the following at time of eligibility screening, ascertained from automatic hardware/software/device pairing check:

- iPhone (5s or later) with iOS version 11.0 or later defined as iPhone model/iOS version used to complete screening eligibility.

- Apple Watch (Series 1 or later) with watchOS version 4.0 or later defined as Apple Watch model/watchOS paired with iPhone used to complete screening eligibility.

- Current resident of the United States at time of eligibility screening, defined by self-reported state of residence within the 50 states of the United States or District of Columbia.

- Proficient in written and spoken English, defined by self-report of comfort reading, writing, and speaking English on iPhone.

- Valid phone number associated with iPhone, ascertained from self-report.

- Valid email address, ascertained from self-report.

Exclusion Criteria:

- Self-reported diagnosis of Atrial Fibrillation.

- Self-reported diagnosis of Atrial Flutter.

- Currently on anti-coagulation therapy.

## Contacts and Locations

Go to ▼

**Information from the National Library of Medicine** 

*To learn more about this study, you or your doctor may contact the study research staff using the contact information provided by the sponsor.*

*Please refer to this study by its ClinicalTrials.gov identifier (NCT number):* **NCT03335800**

**Locations**

**United States, California**

Stanford University
Stanford, California, United States, 94304

**Sponsors and Collaborators**

Apple Inc.

Stanford University

**Investigators**

Principal Investigator:   Minang (Mintu) Turakhia, MD, MAS   Stanford University

Principal Investigator:   Marco V. Perez, MD                        Stanford University

## Study Documents (Full-Text)

Documents provided by Minang (Mintu) Turakhia, Stanford University:

Study Protocol and Statistical Analysis Plan  [PDF] March 20, 2018

## More Information                                    Go to  ▼

**Additional Information:**

Website for study information   [EXIT]

**Publications automatically indexed to this study by ClinicalTrials.gov Identifier (NCT Number):**

Perez MV, Mahaffey KW, Hedlin H, Rumsfeld JS, Garcia A, Ferris T, Balasubramanian V, Russo AM, Rajmane A, Cheung L, Hung G, Lee J, Kowey P, Talati N, Nag D, Gummidipundi SE, Beatty A, Hills MT, Desai S, Granger CB, Desai M, Turakhia MP; Apple Heart Study Investigators. Large-Scale Assessment of a Smartwatch to Identify Atrial Fibrillation. N Engl J Med. 2019 Nov 14;381(20):1909-1917. doi: 10.1056/NEJMoa1901183.

Turakhia MP, Desai M, Hedlin H, Rajmane A, Talati N, Ferris T, Desai S, Nag D, Patel M, Kowey P, Rumsfeld JS, Russo AM, Hills MT, Granger CB, Mahaffey KW, Perez MV. Rationale and design of a large-scale, app-based study to identify cardiac arrhythmias using a smartwatch: The Apple Heart Study. Am Heart J. 2019 Jan;207:66-75. doi: 10.1016/j.ahj.2018.09.002. Epub 2018 Sep 8.

Responsible Party:          Minang (Mintu) Turakhia, Associate Professor of Medicine, Stanford University, Stanford University

ClinicalTrials.gov Identifier: NCT03335800      History of Changes

Other Study ID Numbers:     1.0

First Posted:               November 8, 2017    Key Record Dates

Results First Posted:       March 30, 2020

Last Update Posted:         March 30, 2020

Last Verified:              March 2020

Individual Participant Data (IPD) Sharing Statement:

  Plan to Share IPD:        No

Studies a U.S. FDA-regulated Drug Product:        No

Studies a U.S. FDA-regulated Device Product:      Yes

Device Product Not Approved or Cleared by U.S. FDA:  Yes

Product Manufactured in and Exported from the U.S.:  Yes

Additional relevant MeSH terms:

  Atrial Fibrillation              Heart Diseases

  Arrhythmias, Cardiac             Cardiovascular Diseases

  Atrial Flutter                   Pathologic Processes

# Exhibit E

Protocol

Study Official Title: Apple Heart Study: Assessment of Wristwatch-Based Photoplethysmography to Identify Cardiac Arrhythmias

ClinicalTrials.gov Identifier: NCT03335800

Document Date: 20 Mar 2018

Confidential

**Protocol**

# Apple Heart Study

**Assessment of Wristwatch-Based Photoplethysmography to Identify Cardiac Arrhythmias**

**Protocol Version:**    8.0

**Protocol Date:**    March 20, 2018

**Sponsor:**    Apple Inc.
1 Infinite Loop
Cupertino CA 95014
United States

**Coordinating Principal Investigators and Study Contacts:**

| | |
|---|---|
| Marco V. Perez, MD<br>Assistant Professor of Medicine<br>Stanford University<br>300 Pasteur Dr., M/C 5773<br>Stanford, CA 94305<br>Tel (650) 723-9363<br>Fax (650) 725-7568<br>E-mail: mvperez@stanford.edu | Minang (Mintu) Turakhia, MD, MAS<br>Associate Professor of Medicine<br>Stanford University<br>1070 Arastradero Rd<br>Palo Alto, CA 94304<br>Phone: (650) 497-9345<br>E-mail: mintu@stanford.edu |

In collaboration with Stanford Center for Clinical Research (SCCR), Quantitative Sciences Unit (QSU), and Center for Digital Health (CDH).

This document contains information that is privileged or confidential and may not be disclosed unless such disclosure is required by applicable laws and regulations. The information in this document is the property of Apple Inc. and may not be reproduced, published, or disclosed to others without written authorization from Apple Inc.

Confidential

## PROTOCOL APPROVAL PAGE

**STUDY TITLE:**    Apple Heart Study: Assessment of Wristwatch-Based Photoplethysmography to Identify Cardiac Arrhythmias

**Protocol Version:**    8.0

**Protocol Date:**    March 20, 2018

This Non-Significant Risk (NSR) study will be conducted in the United States, in accordance with applicable parts of 21 CFR Parts 50, 54, 56 and 812.

**I, the undersigned, have read and approved this protocol, and agree on its contents.**



This document contains information that is privileged or confidential and may not be disclosed unless such disclosure is required by applicable laws and regulations. The information in this document is the property of Apple Inc. and may not be reproduced, published, or disclosed to others without written authorization from Apple Inc.

Confidential

## INVESTIGATORS' SIGNATURE PAGE

**STUDY TITLE:**       Apple Heart Study: Assessment of Wristwatch-Based
                     Photoplethysmography to Identify Cardiac Arrhythmias

**Protocol Version:**  8.0

**Protocol Date:**     March 20, 2018

I have read this Study Protocol and agree to adhere to the requirements of this current version of the protocol.

I have not been restricted from participating in clinical research, nor is any action pending that could result in such restriction.  If this occurs, I shall provide immediate notification to the Sponsor.

I, the undersigned, have read and understand the protocol specified above and agree on its content.  I agree to perform and conduct the study as described in the protocol and in accordance with applicable parts of 21 CFR Parts 50, 54, 56 and 812, and all governing IRB requirements.



This document contains information that is privileged or confidential and may not be disclosed unless such disclosure is required by applicable laws and regulations. The information in this document is the property of Apple Inc. and may not be reproduced, published, or disclosed to others without written authorization from Apple Inc.

Confidential

## TABLE OF CONTENTS

**PROTOCOL APPROVAL PAGE** 2

**INVESTIGATORS' SIGNATURE PAGE** 3

**ACRONYMS** 5

**PROTOCOL SYNOPSIS** 6

**1.0 INTRODUCTION** 9

**2.0 STUDY OBJECTIVES** 13

**3.0 ENDPOINTS** 14

**4.0 STUDY DESIGN** 15

**5.0 STUDY POPULATION** 18

**6.0 STUDY DEVICE** 19

**7.0 STUDY PROCEDURES** 21

**8.0 STUDY OUTCOMES** 33

**9.0 ADVERSE EVENTS REPORTING** 34

**10.0 WITHDRAWAL** 38

**11.0 STATISTICAL CONSIDERATIONS** 39

**12.0 TRAINING** 44

**13.0 STEERING AND DATA MONITORING COMMITTEES** 44

**14.0 ETHICAL AND REGULATORY CONSIDERATIONS** 44

**15.0 HUMAN SUBJECTS PROTECTION** 45

**16.0 RECORD KEEPING/REPORTING** 46

**17.0 REFERENCES** 47

This document contains information that is privileged or confidential and may not be disclosed unless such disclosure is required by applicable laws and regulations. The information in this document is the property of Apple Inc. and may not be reproduced, published, or disclosed to others without written authorization from Apple Inc.

4

Apple Heart Study                    Protocol Version: 8.0, Date: March 20, 2018

Confidential

## ACRONYMS

AF - Atrial Fibrillation or Atrial Flutter

AHS - Apple Heart Study

CFR - Code of Federal Regulations

DSMB - Data and Safety Monitoring Board

EAS - ECG Analysis Set

ECG - Electrocardiography, Electrocardiogram, Electrocardiographic

EMS - Emergency Medical Services

EOS PRO - End Of Study PRO

FAS - Full Analysis Set

FDA - Food and Drug Administration

HIPAA - Health Insurance Portability and Accountability Act

HITRUST - Health Information Trust Alliance

HR - Heart Rate

IPNA - Irregular Pulse Notification Algorithm

IRB - Institutional Review Board

NAS - Notification Analysis Set

NOC - Network Operating Center

OAC - Oral anticoagulation

OCG - Online Care Group

PCI - Payment Card Industry

PPG - Photoplethysmography, Photoplethysmogram

PPV - Positive Predictive Value

PRO - Patient Reported Outcomes

SC - Steering Committee

This document contains information that is privileged or confidential and may not be disclosed unless such disclosure is required by applicable laws and regulations. The information in this document is the property of Apple Inc. and may not be reproduced, published, or disclosed to others without written authorization from Apple Inc.

Confidential

# PROTOCOL SYNOPSIS

| | |
|---|---|
| **Study Title** | Apple Heart Study: Assessment of Wristwatch-Based Photoplethysmography to Identify Cardiac Arrhythmias |
| **Protocol Version** | 8.0 |
| **Protocol Date** | March 20, 2018 |
| **Study Design** | Prospective, single arm, experimental, non-significant risk study. |
| **Inclusion Criteria** | 1. Possession of the following at time of eligibility screening, ascertained from automatic hardware/software/device pairing check:<br>   I. iPhone (5s or later) with iOS version 11.0 or later defined as iPhone model/iOS version used to complete screening eligibility.<br>   II. Apple Watch (Series 1 or later) with watchOS version 4.0 or later defined as Apple Watch model/watchOS paired with iPhone used to complete screening eligibility.<br>2. Age $\geq$ 22 years at time of eligibility screening, ascertained from self-reported date of birth.<br>3. Current resident of the United States at time of eligibility screening, defined by self-reported state of residence within the 50 states of the United States or District of Columbia.<br>4. Proficient in written and spoken English, defined by self-report of comfort reading, writing, and speaking English on iPhone.<br>5. Valid phone number associated with iPhone, ascertained from self-report.<br>6. Valid email address, ascertained from self-report. |
| **Exclusion Criteria** | 1. Self-reported diagnosis of Atrial Fibrillation at the time of consent.<br>2. Self-reported diagnosis of Atrial Flutter at the time of consent.<br>3. Currently on anticoagulation therapy, as self-reported at the time of consent. |

This document contains information that is privileged or confidential and may not be disclosed unless such disclosure is required by applicable laws and regulations. The information in this document is the property of Apple Inc. and may not be reproduced, published, or disclosed to others without written authorization from Apple Inc.

Confidential

| | |
|---|---|
| **Study Objectives** | Objective 1a: To measure the proportion of participants aged ≥ 65 with irregular pulse watch notifications who have demonstrable atrial fibrillation or flutter (AF) as confirmed by ambulatory electrocardiographic (ECG) patch monitoring.<br><br>Objective 1b: To measure the proportion of all participants with irregular pulse watch notifications who have demonstrable atrial fibrillation or flutter (AF) as confirmed by ambulatory ECG patch monitoring.<br><br>Objective 2: To characterize the concordance between pulse irregularity determined using spot tachograms (approximately one minute of beat-to-beat intervals) and AF detected by simultaneous ambulatory ECG patch monitoring.<br><br>Objective 3: To estimate the rate of initial contact with a health care provider within 3 months after an irregular pulse watch notification. |
| **Co-Primary Endpoints** | 1. AF of greater than 30 seconds duration detected on ambulatory ECG monitoring for a participant who received an irregular pulse watch notification.<br><br>2. Simultaneous ambulatory ECG monitoring indicating an irregular rhythm consistent with AF during time intervals when the spot tachogram is positive for an irregular pulse among those who received a notification. |
| **Secondary Endpoints** | 1. Simultaneous ambulatory ECG monitoring indicating an irregular rhythm consistent with AF when the Irregular Pulse Notification Algorithm (IPNA) based on multiple tachograms is positive for an irregular pulse among those who received a notification.<br><br>2. Self-reported contact with a health care provider within 3 months following an irregular pulse watch notification. |
| **Test Device** | Apple Heart Study app |

This document contains information that is privileged or confidential and may not be disclosed unless such disclosure is required by applicable laws and regulations. The information in this document is the property of Apple Inc. and may not be reproduced, published, or disclosed to others without written authorization from Apple Inc.

Confidential

| | |
|---|---|
| **Duration of Study Participation** | Participants will have approximately 10 month-period to enroll. For each participant, the monitoring period will begin upon consent for that participant and end on September 1, 2018 (for those who never receive a notification) or on January 31, 2019 (for those who receive a notification). Every participant who receives a notification will receive an in-app Patient Reported Outcomes (PRO) survey within the app 90 days following the notification. All participants will receive a web-based End Of Study PRO (EOS PRO) survey that they will have until January 31, 2019, to complete. |
| **Number of Participants** | We anticipate total enrollment to be approximately 500,000 participants. Ambulatory ECG monitoring is expected on approximately 500-5000 participants comprised of participants from two main subgroups (< 65 yrs, ≥ 65 yrs). |

This document contains information that is privileged or confidential and may not be disclosed unless such disclosure is required by applicable laws and regulations. The information in this document is the property of Apple Inc. and may not be reproduced, published, or disclosed to others without written authorization from Apple Inc.

Confidential

# 1.0 INTRODUCTION

## 1.1 Background

**Impact of Undiagnosed Atrial Fibrillation**

Atrial fibrillation, the most common sustained cardiac arrhythmia with an estimated lifetime risk of one in four,[1,2] accounts for 15% of the 700,000 strokes per year in the United States.[3] The prevalence of AF in the United States is estimated to be between 3 and 5 million[4] and this number is expected to rise sharply due to an aging population and a rising age-adjusted incidence of AF. Oral anticoagulation (OAC) has been shown to substantially reduce the risk of AF associated stroke.[5] However, 18% of AF-related strokes occur in patients with asymptomatic or subclinical AF that is newly-detected at the time of stroke.[6] Asymptomatic and subclinical AF have been associated with similar morbidity and mortality rates as symptomatic AF,[7] and with similar rates of silent embolic events.[8] Moreover, untreated AF substantially increases the risk of the development of heart failure and other cardiac complications. Therefore, earlier detection of asymptomatic or subclinical AF could reduce the total public-health burden of ischemic stroke, heart failure, and other AF-related sequelae with upstream therapies.

With an aging population in which AF prevalence is forecast to increase substantially,[1] effective AF screening strategies may have important public health implications.

**Guidelines for AF Screening**

Contemporary international guidelines on primary prevention of AF-related stroke, and general guidelines on AF management, recommend opportunistic pulse detection (pulse palpation by trained health care personnel during routine health care contact) in patients ≥ 65 years of age.[9,10] Guideline statements recognize the demonstrated improvements to sensitivity for AF detection achieved through ambulatory ECG (both intermittent and continuous) monitoring. Professional society clinical guidelines and the U.S. Preventive Services Task Force have not yet recommended systematic screening for AF in general or high-risk populations.

However, further studies are needed to clarify the effectiveness of screening (e.g., sensitivity/specificity, cost-effectiveness, subsequent health care utilization, and downstream impact on stroke incidence), before endorsing broader AF screening approaches utilizing contemporary technologies.

This document contains information that is privileged or confidential and may not be disclosed unless such disclosure is required by applicable laws and regulations. The information in this document is the property of Apple Inc. and may not be reproduced, published, or disclosed to others without written authorization from Apple Inc.

Confidential

## Prevalence of Undiagnosed AF

Prior work indicates a high rate of undiagnosed AF in the general population. In a back calculating modeling study based on incidence of AF shortly following ischemic stroke in Medicare and commercial claims beneficiaries, there are an estimated 500,000 persons with undiagnosed AF in the United States, with an estimated incremental cost burden of $3.2 billion.[11]

In a study of patients with no AF by history, AF was identified in 10 of 767 (1.3%) participants on baseline electrocardiogram (ECG). Intermittent ECG monitoring over a 2-week period (Zenicor ECG, Zenicor Medical Systems, Stockholm, Sweden), identified an additional 20 of 403 (5.0%) participants with previously undiagnosed AF.[7] Similarly, the SEARCH-AF study screened 1,000 patients with a 30-second single vector ECG rhythm strip coupled to a smartphone device (AliveCor Kardia Mobile, AliveCor, Inc., Ashmore, Australia).[12] In this population (mean age 76 years; 44% male), newly-identified AF was found in 1.5% of participants. Recently, results have been published from the STROKE-STOP study, a large randomized control trial of systematic AF screening of individuals in Sweden who were 75 to 76 years of age.[13] Patients were advised to assess their heart rhythm twice a day or during symptoms such as palpitations, with a handheld heart rate monitor (Zenicor ECG, Zenicor Medical Systems, Stockholm, Sweden). In the 14,487 patients enrolled, 12.3% were found to have AF, 3.0% were found to have previously unknown AF, and 5.1% of the screened population had AF and were not receiving adequate stroke prevention therapy. Screening resulted in the initiation of OAC in 3.7% of the screened population, demonstrating that screening can lead to AF treatment both in patients with newly-diagnosed as well as prevalent AF.

However, given the paroxysmal and asymptomatic nature of AF, brief intermittent screening strategies are highly insensitive and likely to only capture patients with high AF burdens. This issue is highlighted by a recent retrospective study that showed in patients diagnosed with AF after stroke, using a 14-day ambulatory ECG monitor, the median AF burden was 0.33 hours.[14] Similarly, the investigation of prolonged ambulatory ECG screening (30 days) for AF after stroke, as compared to conventional 24-hour Holter monitors, detected 5-fold more AF (16.1% vs. 3.2%).[15] With improvements in AF detection algorithms, long-term implantable loop recorders are being increasingly used to screen for occult AF. However, the benefits of long-term screening with this modality come with the downsides of an invasive procedure.

## Wearable Health Technologies

Recently, there has been substantial uptake, both from consumers and patients, of wearable health technology such as wrist-worn devices incorporating multiple sensors. Such

This document contains information that is privileged or confidential and may not be disclosed unless such disclosure is required by applicable laws and regulations. The information in this document is the property of Apple Inc. and may not be reproduced, published, or disclosed to others without written authorization from Apple Inc.

Confidential

technologies can generate large amounts of real-time data on patient activity and heart rate variability, often through photoplethysmography (PPG) based measurements of capillary blood volume. As technologies advance and adoption increases, wearable health technologies will be able to deliver increasingly more complex information on patient health. To date, efficient utilization of these data sources to effect improvement in traditional patient outcomes has been limited. For decades, cardiac implanted electronic devices (e.g., pacemakers and implantable cardioverter defibrillators) have collected and transmitted real time patient data, ranging from measures of patient activity to life-threatening arrhythmia notifications. These systems have been shown to improve clinical outcomes (e.g., time to clinical decision and mortality) and serve as proof of concept for wearable health technology based patient monitoring. However, further investment and study is needed to develop and define wearable health technologies' health care applications.

**App Based Health Care Research**

Traditional approaches to prospective health care investigation are limited by high start-up costs and large infrastructure requirements. Utilization of apps in health care research can streamline patient consent, data collection, and distribution of health care interventions (e.g., medical information, medication reminders, etc.).  App-based research also enables enrollment of a broader population. ResearchKit, an open source framework to conduct medical research, developed by Apple, has been effectively used to operationalize large prospective observational studies. MyHeart Counts, a Stanford led app-based investigation of cardiovascular health and patient activity, demonstrated impressive enrollment metrics, with 50,000 participants enrolled within the first year of launch. Altogether, app based health care research can decrease the barriers to, and costs of, performing large studies quickly.

**Apple Watch Irregular Pulse Notification Algorithm (IPNA)**

Using observable variations in PPG signal intensity, changes in blood flow can be measured and beat-to-beat pulse measurements can be made. During normal sinus rhythm, there is minimal variation in pulse. However, during AF, the beat-to-beat variability increases significantly. Therefore, a PPG signal can be used to differentiate between a regular pulse and an irregular pulse that may be indicative of AF.

An algorithm has been developed by Apple to identify periods of irregular pulse based on PPG signal variation as measured by the Irregular Pulse Notification Algorithm (IPNA). The time between PPG signal peaks observed during periods of minimal arm movement are marked as intervals between heart beats. A tachogram is a period of time over which heart beat intervals are measured. The degree of beat-to-beat variability is measured from spot tachograms over the course of approximately one minute intervals. An irregular tachogram is flagged when the variability, measured using a Poincare plot, crosses a predefined threshold. An IPNA checks

This document contains information that is privileged or confidential and may not be disclosed unless such disclosure is required by applicable laws and regulations. The information in this document is the property of Apple Inc. and may not be reproduced, published, or disclosed to others without written authorization from Apple Inc.

Confidential

multiple tachograms over a period of approximately an hour or more. A notification is then sent to the user when a period of an irregular pulse consistent with AF has been identified.

## 1.2 Study Rationale

Leveraging existing wearable technology paired with a novel app-based health algorithm that analyzes heart rate irregularity consistent with AF has the potential to scale opportunistic AF screening strategies across large populations.

In recent years, wearable technology has rapidly diffused into consumer markets and provides unique opportunities to engage individuals on health issues of personal interest, and to collect personal health data. One example of such technology are PPG sensors that can measure heart rate and heart rate variability for exercise and training purposes. However, utilization of this data source to improve patient outcomes has not been fully realized in the health care field. An app-based heart irregularity algorithm that identifies possible AF from collected PPG data and then notifies the user of such potential irregularities could lead to widespread screening and subsequent early AF detection and oral anticoagulation initiation, ultimately resulting in reductions in stroke incidence.

This document contains information that is privileged or confidential and may not be disclosed unless such disclosure is required by applicable laws and regulations. The information in this document is the property of Apple Inc. and may not be reproduced, published, or disclosed to others without written authorization from Apple Inc.

Confidential

## 2.0 STUDY OBJECTIVES

### 2.1 Research Question

The overarching objective is to evaluate the ability of the IPNA to identify AF and guide subsequent clinical evaluation.

### 2.2 Study Objectives

**Objective 1a**: To measure the proportion of participants aged ≥ 65 with irregular pulse watch notifications who have demonstrable AF as confirmed by ambulatory ECG patch monitoring.

**Objective 1b:** To measure the proportion of all participants with irregular pulse watch notifications who have demonstrable AF as confirmed by ambulatory ECG patch monitoring.

**Objective 2:** To characterize the concordance between pulse irregularity determined using spot tachograms and AF detected by simultaneous ambulatory ECG patch monitoring.

**Objective 3:** To estimate the rate of initial contact with a health care provider within 3 months after an irregular pulse watch notification.

This document contains information that is privileged or confidential and may not be disclosed unless such disclosure is required by applicable laws and regulations. The information in this document is the property of Apple Inc. and may not be reproduced, published, or disclosed to others without written authorization from Apple Inc.

Confidential

# 3.0 ENDPOINTS

## 3.1 Co-Primary Endpoints

1. Atrial fibrillation or atrial flutter (AF) of greater than 30 seconds duration detected on ambulatory ECG monitoring for a participant who received an irregular pulse watch notification.

2. Simultaneous ambulatory ECG monitoring indicating an irregular rhythm consistent with AF during time intervals when the spot tachogram is positive for an irregular pulse among those who received a notification. This endpoint will be evaluated during time intervals when the watch provides tachogram data. Thus, each participant contributes multiple observations for this endpoint.

## 3.2 Secondary Endpoints

1. Simultaneous ambulatory ECG monitoring indicating an irregular rhythm consistent with AF when the IPNA based on multiple tachograms is positive for an irregular pulse among those who received a notification.

2. Self-reported contact with a health care provider within 3 months following an irregular pulse watch notification.

## 3.3 Tertiary Endpoints

1. Arrhythmias, other than AF, detected on an ambulatory ECG monitor that can also result in an irregular pulse. These include sinus arrhythmia, frequent premature atrial contractions, frequent premature ventricular contractions, intermittent heart block, multifocal atrial tachycardia, and atrial tachycardia with variable conduction.

2. AF of greater than 6 minutes, 1 hour, 6 hours, and 24 hours duration detected on an ambulatory ECG monitor following an irregular pulse watch notification.

3. Self-reported initiation of therapies for AF, including anticoagulant, rate-controlling and antiarrhythmic therapy.

4. Self-reported electrical or chemical cardioversion by a health care provider.

This document contains information that is privileged or confidential and may not be disclosed unless such disclosure is required by applicable laws and regulations. The information in this document is the property of Apple Inc. and may not be reproduced, published, or disclosed to others without written authorization from Apple Inc.

Confidential

# 4.0 STUDY DESIGN

## 4.1 Overall Study Design

**Scope**

This will be a prospective, single arm, experimental non-significant risk study, conducted with the assistance of eligible participants without a known history of atrial fibrillation or atrial flutter.

Participants who download the Apple Heart Study app and meet the eligibility criteria will enroll on a metered basis, whereby a maximum number of participants will be allowed to enroll, and then proceed to consent. Enrollment will initially be weighted heavily towards participants who are at least 65 years of age. Those who are not enrolled immediately will be placed in a "waiting period", and notified via a notification in the Apple Heart Study app when their opportunity to enroll is available. Participants will be required to provide signed informed consent; once enrolled they will complete a short questionnaire to collect demographic information and medical history, after which the monitoring period will commence.

**Monitoring**

During the monitoring period, upon the detection of a series of irregular tachograms, and based on the IPNA, the Apple Heart Study app will notify the participant that an irregular rhythm was identified.  When notified of a pulse irregularity, participants will be asked to contact the telemedicine technology services company, American Well Corporation (together with Online Care Group, the "Study Telehealth Provider") administered within the app that will manage the participant's study follow-up throughout study participation.  Following the first notification, the participant will be reminded daily to contact the Study Telehealth Provider via the app. This reminder will be repeated each day until the participant contacts the Study Telehealth Provider, for a maximum period of 14 days. The first contact made by the participant to the Study Telehealth Provider will constitute Study Visit #1. After 14 days from the initial notification, no further reminders will be sent by the app. The participant will become part of the fall-out subgroup if they do not contact the Study Telehealth Provider and complete Study Visit #1 within 30 days of receiving the first notification. These participants in the fall-out subgroup who call after 30 days will still be able to initiate Visit #1 with the Study Telehealth Provider and undergo remaining study procedures.

During Study Visit #1 (voice/video), participants will undergo a virtual medical evaluation including an assessment for symptoms, medical history, and medication use. Participants with urgent symptoms (chest pain, shortness of breath, fainting/losing consciousness) will be

This document contains information that is privileged or confidential and may not be disclosed unless such disclosure is required by applicable laws and regulations. The information in this document is the property of Apple Inc. and may not be reproduced, published, or disclosed to others without written authorization from Apple Inc.

Confidential

directed to an urgent care clinic or emergency room for medical evaluation. Such participants who are directed to either emergency care or urgent care will also be included in the fall-out subgroup.

Participants without urgent symptoms who received a notification and who confirm that they are not currently on an anticoagulant therapy or are on an anticoagulant therapy that started after enrollment in the study will then be offered an ambulatory ECG monitor (ePatch, BioTelemetry, Inc., Conshohocken, PA). The participants will be mailed the ambulatory ECG monitor, which the participant will then be requested to wear for up to 7 days. The minimum analyzable time acceptable for analysis is one hour. The participant will then mail the ambulatory ECG monitor back to BioTelemetry, which will generate a standard technical report that will be read by BioTelemetry's technical readers. This report will then be finally adjudicated by board certified clinicians in a double-adjudication fashion, and a final report will be made available to the Study Telehealth Provider by BioTelemetry.

A second follow-up visit (telephone/video), Study Visit #2, will occur with the Study Telehealth Provider once the ambulatory ECG monitor results are available.  If AF or any other arrhythmias have been detected in reviewing the ambulatory ECG monitor data, or if there are other non-urgent symptoms needing further evaluation, the Study Telehealth Provider will direct the participant to their primary health care provider, or other health care provider as deemed appropriate by the Study Telehealth Provider.  The report and visit summary will be made available to the participant and also to participant's physician or health care provider, if during Study Visit #1, the participant provides his/her physician information and permission to send that physician a copy of the report.  For participants who do not have an established primary health care provider, the Study Telehealth Provider will encourage and offer advice in establishing a primary care provider per standard Study Telehealth Provider protocol.

**Patient Reported Outcomes (PROs)**

90 days after the irregular pulse notification, only those participants who received an irregular pulse notification will receive a separate app notification to complete the patient reported outcomes (PRO) questionnaire within the app. These outcomes will include whether or not the participant contacted a primary health care provider and what additional treatments or diagnostic tests they underwent. They will also be asked questions related to measures of anxiety related to the notification.  Participants will receive reminders via notifications from the app to complete the 90-day PROs prior to the due date.

All enrolled participants, regardless of whether or not they received an irregular pulse notification, will receive an End Of Study (EOS) PRO questionnaire towards the end of the study. Those who do not receive a notification will receive the EOS PRO on September 1, 2018. Those who do receive a notification will receive the EOS PRO on January 2, 2019.This

This document contains information that is privileged or confidential and may not be disclosed unless such disclosure is required by applicable laws and regulations. The information in this document is the property of Apple Inc. and may not be reproduced, published, or disclosed to others without written authorization from Apple Inc.

Confidential

questionnaire will be administered through a website, and participants will have until the end of study to complete. Participants will receive reminders via notifications from the app to complete the EOS PROs prior to the due date. This questionnaire will include questions on whether or not they were diagnosed with AF, started an anticoagulant medication, had any new symptoms during the monitoring period including palpitations, dizziness, fatigue, or had any major gastrointestinal or cerebrovascular bleeding. For those who indicated a new diagnosis of AF, further questions regarding additional treatments or diagnostic tests will be asked.

## 4.2 Rationale for Study Design

The study aims to estimate how frequently AF is diagnosed on the basis of a confirmatory ambulatory ECG monitoring in participants who receive an irregular pulse notification, and to validate the concordance of the spot tachograms and the IPNA algorithm with cardiac arrhythmias detected by simultaneous ambulatory ECG monitoring. To reach the required number of participants who receive a clinical diagnosis and undergo simultaneous ambulatory ECG patch monitoring, a large number of participants will need to be enrolled, given the relatively low rate of undiagnosed AF in our target population.

This document contains information that is privileged or confidential and may not be disclosed unless such disclosure is required by applicable laws and regulations. The information in this document is the property of Apple Inc. and may not be reproduced, published, or disclosed to others without written authorization from Apple Inc.

Confidential

# 5.0 STUDY POPULATION

## 5.1 Inclusion Criteria

1. Possession of the following at time of eligibility screening, ascertained from automatic hardware/software/device pairing check:

    I. iPhone (5s or later) with iOS version 11.0 or later defined as iPhone model/iOS version used to complete screening eligibility.

    II. Apple Watch (Series 1 or later) with watchOS version 4.0 or later defined as Apple Watch model/watchOS paired with iPhone used to complete screening eligibility.

2. Age ≥ 22 years at time of eligibility screening, ascertained from self-reported date of birth.

3. Current resident of the United States at time of eligibility screening, defined by self-reported state of residence within the 50 states of the United States or District of Columbia.

4. Proficient in written and spoken English, defined by self-report of comfort reading, writing, and speaking English on iPhone.

5. Valid phone number associated with iPhone, ascertained from self-report.

6. Valid email address, ascertained from self-report.

## 5.2 Exclusion Criteria

1. Self-reported diagnosis of Atrial Fibrillation at the time of consent.

2. Self-reported diagnosis of Atrial Flutter at the time of consent.

3. Currently on anticoagulation therapy, as self-reported at the time of consent.

This document contains information that is privileged or confidential and may not be disclosed unless such disclosure is required by applicable laws and regulations. The information in this document is the property of Apple Inc. and may not be reproduced, published, or disclosed to others without written authorization from Apple Inc.

Confidential

## 6.0 STUDY DEVICE

Device Name: Apple Heart Study app

The Apple Heart Study app is a mobile medical app that analyzes pulse rate data.  The app identifies episodes of irregular heart rhythms consistent with atrial fibrillation and other arrhythmias.

Device Description:

The Apple Heart Study app is an application that analyzes heart rate (HR) and beat-to-beat data captured by the Apple Watch photoplethysmogram (PPG) sensor.  The Apple Heart Study app uses this data to identify irregular heart rhythms consistent with atrial fibrillation and other arrhythmias.  Analysis is initiated when the Apple Heart Study app successfully retrieves approximately one minute of beat-to-beat intervals, defined as a tachogram, derived from the Apple Watch PPG HR sensor through HealthKit, a data repository on a user's iPhone.

In practice, tachograms are collected and stored at selected times throughout the day when a user appears to be still enough for a successful reading to be taken.  If, and when, the Apple Heart Study app retrieves a tachogram and subsequently classifies it as "irregular", it shifts into a "confirmation mode" and begins requesting, and analyzing, tachograms on a more frequent basis until it is able to confirm sustained irregularities or the confirmation cycle is otherwise ended.

Upon completion of a positive confirmation cycle within a 48-hour period, the Apple Heart Study app provides a notification to the user on their Apple Watch and subsequently on their iPhone app.

While the app is able to identify irregular heart rhythms consistent with atrial fibrillation and other arrhythmias, the app is not intended to diagnose atrial fibrillation, and any irregular readings or subsequent notifications displayed by the app should be confirmed by ECG and/or by a clinician.  The app is not intended to be used on an on-demand basis and should not be used to guide medical therapy decisions.

The Apple Heart Study app is not intended as an implant but rather is stand-alone software that runs on general purpose platforms (the Apple iPhone and Apple Watch).  The Apple Heart Study app is also not claimed or otherwise represented to be for a use in supporting or sustaining human life.  The Apple Heart Study app is further not intended for use in diagnosing, curing, mitigating or treating disease, as the app is not an atrial fibrillation diagnostic device and should not be used to guide medical therapy decisions.  Finally, the Apple Heart Study app does not present a potential for serious risk to the health, safety, or welfare of a participant as the app only serves as a method to detect irregular heart rhythms and

This document contains information that is privileged or confidential and may not be disclosed unless such disclosure is required by applicable laws and regulations. The information in this document is the property of Apple Inc. and may not be reproduced, published, or disclosed to others without written authorization from Apple Inc.

Confidential

notify users of sustained pulse irregularities that must ultimately be confirmed by an ECG and/or a clinician.

This document contains information that is privileged or confidential and may not be disclosed unless such disclosure is required by applicable laws and regulations. The information in this document is the property of Apple Inc. and may not be reproduced, published, or disclosed to others without written authorization from Apple Inc.

Confidential

# 7.0 STUDY PROCEDURES



**Figure 1.** Study Timeline

## 7.1 Eligibility Determination and Enrollment

The potential participant will first download the Apple Heart Study app. The app will automatically ensure compatibility with the iPhone iOS version and Watch version. If compatible, the participant will be able to continue forward in the app. An overview of the study will be displayed in the app.

The participant will then advance to a screen for study enrollment, where they will confirm whether they meet general participation requirements. The participant will be asked questions based on study inclusion and exclusion criteria. The app will automatically determine eligibility based on the responses provided. If the participant is determined to be eligible, they may continue to the "waiting period", based on the enrollment metering schema and study infrastructure capacity, until it is time for them to consent and enroll. The waiting period for each participant will end once they are able to enroll based on the enrollment metering schema and study infrastructure capacity. After the waiting period, before the potential participant can initiate the consenting process, the participants will be asked to re-confirm their eligibility. Upon responding, they will be presented with an in-app consent and authorization form to be read and signed if they agree to participate.

The study anticipates a very large volume of participants to be screened and consented in the initial days following study opening. There is a potential risk of overwhelming the study infrastructure if all participants are allowed to enter the study monitoring phase instantly.

To maintain operational efficiency, the study will use an enrollment metering schema, whereby participants who are eligible for inclusion may be delayed in consent and enrollment (baseline characterization, and initiation into the monitoring portion of the study). Participant safety will be monitored through interim checks (see Section 11.5 below).

This document contains information that is privileged or confidential and may not be disclosed unless such disclosure is required by applicable laws and regulations. The information in this document is the property of Apple Inc. and may not be reproduced, published, or disclosed to others without written authorization from Apple Inc.

Confidential

Enrollment metering will be adaptable based on study and clinical bandwidths, with metering instituted by invitation to consent. Once consent is obtained, enrollment and initiation of monitoring for pulse irregularity will commence. Initial enrollment will be heavily weighted towards enrollment of a population more likely to be at risk for undiagnosed AF, such as those over age 65 years.

Pre-planned enrollment metering strategy will include two enrollment waves:

1.  Wave 1: Weighted enrollment

    During the first two weeks that the study is open, approximately 1000 new participants aged $\geq$ 65 years will be enrolled per week, and approximately 700 participants aged 22-64 years will be enrolled per week.

2.  Wave 2: Open enrollment

    Two weeks after the start of Wave 1, enrollment metering of all eligible participants will be based on notification rates and as study infrastructure allows.

### 7.1.1. Expected Enrollment and Study Participant Timeline



$T_N$ – Notification Timeline
$T_A$ – American Well Visits timeline

**Figure 2.** Participant Level Flow Chart

We expect to reach our full enrollment target within the first nine months following study opening on November 29, 2017. Participants will be able to enroll between November 29, 2017, and August 1, 2018.

This document contains information that is privileged or confidential and may not be disclosed unless such disclosure is required by applicable laws and regulations. The information in this document is the property of Apple Inc. and may not be reproduced, published, or disclosed to others without written authorization from Apple Inc.

Confidential

On August 1, 2018, enrollment will close. On September 1, 2018, no further irregular pulse notifications will be sent. Monitoring will end on September 1, 2018 in participants who never received a notification, and the EOS PRO will become available to this group.

Participants who receive a notification of an irregular pulse from their app will continue to be monitored until the end of study for the purpose of data collection for the concordant Apple Watch and ECG patch monitoring analyses. A 90-day PRO will become available 90 days after notification, no later than December 1, 2018. The EOS PRO will become available to the notification subgroup on January 2, 2019.

All PROs will be due by end of study on January 31, 2019. After this date, all monitoring will end, the American Well line will be closed and no further data will be collected.

### 7.2 Enrollment: Consent, Baseline Demographics and Medical History Collection

The Apple Heart Study (AHS) is an app-based research study utilizing the ResearchKit open source framework on the iOS platform. As in other mobile-mediated research studies, the informed consent process in the AHS is conducted remotely in a completely self-administered setting with no required contact with the research team prior to consent and enrollment.

The approach to informed consent for the AHS has been adapted accordingly to ensure the ethical requirement of informedness, i.e. that participants are adequately informed about the research before participation, is met. Potential candidates as well as enrolled participants will be able to contact an AHS hotline (available 24/7 at 1-844-606-1609) anytime and have the ability to ask questions and request clarifications at any time prior to or during the study. This hotline will be open from the study start date until study closure.

Participants who successfully pass the eligibility criteria will be directed to a page requesting their consent to participate. Participants will be asked to read and sign the study informed consent and authorization document within the app if they agree and are willing to participate. A copy of the signed study consent and authorization document will be available for review and download to the participant via the app. The participant will be considered 'enrolled' from this point and the study app monitoring of Apple Watch PPG sensor data will begin thereafter.

After consenting to participate, the participant will be directed to complete a brief questionnaire to collect self-reported baseline demographics and medical history.

This document contains information that is privileged or confidential and may not be disclosed unless such disclosure is required by applicable laws and regulations. The information in this document is the property of Apple Inc. and may not be reproduced, published, or disclosed to others without written authorization from Apple Inc.

Confidential

### 7.3 Overall Procedures for Enrolled Participants: Monitoring Initiation and Patient Reported Outcomes

After completing the baseline demographics and medical history questionnaires within the app, the participant will wear their Apple Watch as per normal usage with the IPNA analyzing intermittent passively collected PPG pulse data, with two possible outcomes:

1. No pulse irregularities that meet the IPNA notification threshold are identified from the time monitoring begins (after consenting) to September 1, 2018.

   or;

2. Pulse irregularities are identified by the IPNA that meet notification threshold during the study. The participant is then notified via the app of this irregularity. Participants who receive a notification during the study will enter the positive notification workflow [see 7.4.1 Monitoring Workflow - Positive Notification].

All study participants who do not actively withdraw, and who do not receive an irregular pulse notification, will be invited to complete a web-based EOS PRO survey on September 1, 2018 and participants can complete this survey any time before January 31, 2019 [see 7.5 PRO Instruments].

### 7.4 Monitoring Flow

### 7.4.1 Monitoring Flow - Positive Notification

After the participant receives a pulse irregularity notification within the Apple Heart Study App:

1. The app notification will provide a button for the participant to connect with the Study Telehealth Provider. Participant will be instructed to contact the Study Telehealth Provider and be informed that they will receive no further **irregular pulse notifications**, even if pulse irregularity that meets IPNA notification threshold occurs at any time point until the study end.

2. If the participant does not connect with the Study Telehealth Provider within 24 hours of receiving the original notification, the participant will continue to receive in-app **reminder notifications** daily for 14 consecutive days following the initial notification. The reminder will include an alert indicating a possible irregular pulse and that they should connect with the Study Telehealth Provider.  The first connection with the Study

This document contains information that is privileged or confidential and may not be disclosed unless such disclosure is required by applicable laws and regulations. The information in this document is the property of Apple Inc. and may not be reproduced, published, or disclosed to others without written authorization from Apple Inc.

Confidential

Telehealth Provider will constitute Study Visit #1 [see 7.4.2 Study Telehealth Provider Service Workflow].

3. If no connection is made with the Study Telehealth Provider within 30 days, participant will be placed in a fall-out subgroup. After 14 days, the app on participant's phone will send no further reminder notifications or irregular pulse notifications. Those in the fall-out subgroup will receive the positive-notification PRO survey at 90 days following initial notification and EOS PRO on January 2, 2019.

The study team may contact participants who receive the irregular pulse notification in order to remind participants to connect with the Study Telehealth Provider.

## 7.4.2 Study Telehealth Provider Service Workflow

American Well (Boston, MA) is a healthcare technology company that developed the telehealth platform being used to support study visits. The American Well technology supports mobile-based interactions between patients and providers during the study, in which both the participant and provider can see and hear each other through American Well's proprietary videoconferencing capabilities. Virtual visits can be conducted using a wireless or network connection, meaning a study participant can initiate a visit from anywhere. American Well's platforms are a SaaS (Software as a Service) offering—this means all operational hardware and support software is housed and maintained within American Well data centers and is serviced by the American Well Hosting Operations department. American Well is a PCI- and HIPAA-compliant, HITRUST-certified, federally recognized security platform.

The Online Care Group (OCG) is American Well's clinical partner.  OCG providers are responsible for conducting the study required assessments at visit #1 and #2.  All OCG physicians are licensed, board certified, and have 10-15 years of experience in a brick-and-mortar practice, and have undergone a vigorous training on American Well's platform. Additionally, the OCG has an internal credentialing process that meets all standards as dictated by the National Committee for Quality Assurance. The Online Care Group's staff physician-led credentialing committee (comprised of a chief medical officer, staff physician, and director of behavioral health) reviews and approves all practitioners before they are permitted to practice on the American Well System.

Study Telehealth Provider Team, a term used throughout this protocol, relates to physicians from the OCG, Level 1 agents operating the 24-hour hotline and the Network Operating Center (NOC) staff who coordinates efforts to initiate shipment of the ambulatory ECG monitoring

This document contains information that is privileged or confidential and may not be disclosed unless such disclosure is required by applicable laws and regulations. The information in this document is the property of Apple Inc. and may not be reproduced, published, or disclosed to others without written authorization from Apple Inc.

Confidential

patch and facilitates the communication of patch report results and clinical summaries to the participant. All these groups provide services through American Well platform.

After the participant connects with the Study Telehealth Provider team, they will undergo:

1. **Study Visit #1:**

   The participant will be asked about cardiovascular clinical signs and symptoms. If the Study Telehealth Provider concludes that the participant has a medical emergency, the Study Telehealth Provider will follow its emergency protocol and either instruct the participant and/or a family member, if available, to call emergency medical services (EMS) or will call on the participant's behalf if the participant and/or a family member are unable to contact EMS. Those with emergent symptoms will be moved to the fall-out subgroup and still receive a positive-notification PRO survey at 90 days. These participants will not receive the ambulatory ECG monitors.

   Once emergency symptoms have been ruled out, the telehealth clinician will perform a standard review of medical history, confirm that the subject is not on anticoagulant therapy or is on anticoagulant therapy that started after enrollment in the study, and perform a virtual review of physical symptoms. The information obtained will assure that the Study Telehealth Provider Data Collection variables [see 7.4.3 Study Telehealth Provider Data Collection] are obtained. The Study Telehealth Provider will provide the participant information about the ePatch to those who have confirmed that they are not on anticoagulant therapy or are on anticoagulant therapy that started after enrollment in the study, answer any questions the participant might have and contact BioTelemetry to initiate the order and shipment of the ambulatory ECG monitor (ePatch). After the ambulatory ECG monitor has been worn by the participant for up to 7 days and returned back to BioTelemetry, BioTelemetry will perform data extraction and an initial interpretation of the ambulatory ECG findings by trained ECG technicians. The ECG technician review will determine if the participant has any serious or potentially life-threatening abnormality. Although extremely rare, this includes sustained ventricular tachycardia or ventricular fibrillation, high-degree heart block, and long pauses. If one of these life-threatening arrhythmias is identified, then the participant will be contacted and directed to local emergency care or advised how to seek local emergency care. Best attempt will be made to send the ECG report to participant's emergency care provider.

   After confirmation that a participant's ambulatory ECG data does not have any of these life-threatening arrhythmias, the ambulatory ECG study will be processed into the adjudication workflow. The adjudication workflow is described in a separate charter.

This document contains information that is privileged or confidential and may not be disclosed unless such disclosure is required by applicable laws and regulations. The information in this document is the property of Apple Inc. and may not be reproduced, published, or disclosed to others without written authorization from Apple Inc.

Confidential

The adjudication process will result in generation of a final adjudicated report. Once the adjudicated report is complete, it will be issued to the Study Telehealth Provider. When the Study Telehealth Provider receives this final adjudicated report from BioTelemetry, the participant will be notified by way of a secure email that their patch report is ready and will be instructed to contact the Study Telehealth Provider to conduct Study Visit #2.

2.  **Study Visit #2:**

The Study Telehealth Provider will review the ambulatory ECG monitoring report with the participant and make any necessary recommendations to the participant.  The Study Telehealth Provider will then refer participants with AF, any clinically relevant cardiac arrhythmias, or any non-urgent symptoms requiring follow up detected on patch monitoring to their primary health care provider for further treatment and diagnostic testing. For participants without established primary health care providers, the Study Telehealth Provider will offer referral per standard Study Telehealth Provider protocols. The ambulatory ECG monitoring report and visit summary will be made available to the participant and also to participant's physician or health care provider, if the participant provides the Study Telehealth Provider information of participant's physician and permission to send that physician a copy of the report. Any referral visits will be conducted outside of the study, at the discretion of the participant, and at the cost of the participant.

The research team may contact participants to ensure that participants complete all study-related visits and procedures or for other purposes as deemed necessary by the investigators.

### 7.4.3 Study Telehealth Provider Data Collection

**Study Visit #1:**

The following data elements will be collected during visit intake or during the visit:

1.  Demographics
2.  Past medical history
3.  Medications
4.  Symptoms
5.  Clinical assessment
6.  Complaints

**Study Visit #2:**

This document contains information that is privileged or confidential and may not be disclosed unless such disclosure is required by applicable laws and regulations. The information in this document is the property of Apple Inc. and may not be reproduced, published, or disclosed to others without written authorization from Apple Inc.

Confidential

The following data elements will be collected:

1. Symptoms during ECG monitoring period
2. Actions taken by participant since initial visit
3. Clinical assessment
4. Complaints

### 7.4.4 BioTelemetry ePatch Monitoring



The BioTelemetry ePatch Monitor will be used for ambulatory ECG monitoring. The battery life with a single channel recording is 7 days. The participant will be instructed to wear the ePatch for up to 7 days. However, the data collected from a participant will be considered adequate for a participant with a minimum analyzable time of 1 hour.

BioTelemetry will send participants, via courier, an ambulatory ECG monitoring kit containing one sensor and two adhesive patches. If the adhesive patch is no longer functional, the sensor can be moved to the backup adhesive patch. At the end of the recording period, the participant will be required to mail the monitor back to BioTelemetry using the supplied prepaid mailer.

**Study Visit #1:**

During Study Visit #1, participants will receive brief instructions on ePatch, get any of their questions on ePatch answered and be notified that an ePatch will be mailed to them within approximately 5 days.

In the event it is discovered that the participant never received the ePatch due to a shipping error or became lost in transit, then BioTelemetry will issue a second ePatch to that participant. Any subsequent loss of ePatches will not be replaced.

**After Initial Visit:**

This document contains information that is privileged or confidential and may not be disclosed unless such disclosure is required by applicable laws and regulations. The information in this document is the property of Apple Inc. and may not be reproduced, published, or disclosed to others without written authorization from Apple Inc.

Confidential

Approximately 14-20 days after the Visit #1 it is expected that most participants will have completed wearing the patch for up to 7 days and will have returned the patch to BioTelemetry via a provided tracked USPS mailer.  The ambulatory ECG monitor should be received by BioTelemetry within 45 days from the date of Study Visit #1. Those who return patches beyond 45 days will be included in the fall-out subgroup, however they will still be eligible for a follow-up visit with the Study Telehealth Provider. Those who never return ePatch will also be placed in the fall-out subgroup.

**Study Visit #2:**

Once the ePatch has been received by BioTelemetry and the final report has been adjudicated, BioTelemetry will issue a notification to the Study Telehealth Provider. The Study Telehealth Provider will notify the participant by way of a secure email that their patch report is ready and will be instructed to contact the Study Telehealth Provider for Study Visit #2. This visit will occur approximately 60 days following Visit #1, but will vary depending on the time it takes the participant to wear and return the ePatch. During this visit, results of ambulatory ECG monitoring will be reviewed and further clinical care options will be discussed. The report and visit summary will be made available to the participant and also to participant's physician or health care provider, if the participant provides the Study Telehealth Provider information of participant's physician and permission to send that physician a copy of the report.

## 7.5 PRO Instruments

### 7.5.1 90-Day PRO

Participants who receive an irregular pulse notification will be notified by alert via the Apple Heart Study app to complete the 90-day PRO questionnaire at 90 days following their irregular pulse notification. The questionnaire will be administered through the Apple Heart Study app, and the participant will have until January 31, 2019, to complete it. Participants will receive reminders via notifications from the app to complete the EOS PROs prior to the due date. Questions will ask if the participant followed up with the Study Telehealth Provider and/or a non-study health care provider, received an AF diagnosis, was evaluated in-person by a non-study health care provider, the type of non-study health care provider and/or specialists, received additional cardiac testing, received other clinical arrhythmia diagnoses, and whether the participant experienced any anxiety as a result of participation.

### 7.5.2 End of Study (EOS) PRO

This document contains information that is privileged or confidential and may not be disclosed unless such disclosure is required by applicable laws and regulations. The information in this document is the property of Apple Inc. and may not be reproduced, published, or disclosed to others without written authorization from Apple Inc.

Confidential

For those who do not receive an irregular pulse notification, the End of Study (EOS) PRO will become available to complete on September 1, 2018.  All enrolled participants who received an irregular pulse notification during the monitoring period, prior to September 1, 2018, will be notified instead on January 2, 2019 to complete the EOS PRO questionnaire.  The EOS PRO will be available via a link in the app to a website where the EOS PRO questionnaire will be administered. Participants will have up until January 31, 2019, to complete this questionnaire. Participants will receive reminders via notifications from the app to complete the EOS PROs prior to the due date.  Questions will cover whether, during the study period, the participant received a diagnosis of AF, they received treatment for their AF, and whether the participant experienced any anxiety as a result of participation.

This document contains information that is privileged or confidential and may not be disclosed unless such disclosure is required by applicable laws and regulations. The information in this document is the property of Apple Inc. and may not be reproduced, published, or disclosed to others without written authorization from Apple Inc.

Confidential

## 7.6 Time and Events Schedule

| Evaluation | Screening and Eligibility | Consent and Enrollment | Study Visit #1 (≤ 30 days after notification) | Study Visit #2 ~60 days after Visit #1 | 90 Day PRO | End of Study PRO |
|---|---|---|---|---|---|---|
| **All Participants** | | | | | | |
| Inclusion/ Exclusion Criteria | X | | | | | |
| Informed Consent | X | X | | | | |
| Demographics/ Medical History | | X | | | | |
| Survey Completion | | | | | | X |
| **Notification Subgroup** | | | | | | |
| Virtual Review of Medical History / Physical Symptoms | | | X | | | |
| Ambulatory ECG Monitor - Introduction/ Shipment | | | X | | | |
| Ambulatory ECG Monitor - Results Review | | | | X | | |
| Arrhythmia Recommendations for PCP referral | | | | X | | |
| Survey Completion | | | | | X | |

This document contains information that is privileged or confidential and may not be disclosed unless such disclosure is required by applicable laws and regulations. The information in this document is the property of Apple Inc. and may not be reproduced, published, or disclosed to others without written authorization from Apple Inc.

31
Apple Heart Study                    Protocol Version: 8.0, Date: March 20, 2018

Confidential

### 7.7 Fall-out Subgroup

The fall-out subgroup will include participants who received a notification, but provide incomplete data for various reasons. The reasons may include:

1. Failure to call Study Telehealth Provider within 30 days after notification.

2. Urgent symptoms discovered during Study Visit #1 virtual medical evaluation by Study Telehealth Provider requiring immediate direction to EMS (urgent care clinic or emergency room) for medical care.

3. Failure to return an ePatch within 45 Days after Visit #1.

This document contains information that is privileged or confidential and may not be disclosed unless such disclosure is required by applicable laws and regulations. The information in this document is the property of Apple Inc. and may not be reproduced, published, or disclosed to others without written authorization from Apple Inc.

Confidential

## 8.0 STUDY OUTCOMES

1. Atrial fibrillation $\geq$ 30 seconds ascertained by ambulatory ECG monitoring,

2. Concordant AF (any duration) detected simultaneously by spot tachogram from PPG based pulse irregularities and ambulatory ECG monitor.

3. Concordant AF (any duration) detected simultaneously by positive IPNA from PPG based pulse irregularities and ambulatory ECG monitor.

4. Self-reported participant contact with health care provider within 3 months after irregular pulse notification.

5. Patient reported outcomes (PRO) collected:

    1. 90 days after notification of pulse irregularity, and/or
    2. At the end of study (EOS).

This document contains information that is privileged or confidential and may not be disclosed unless such disclosure is required by applicable laws and regulations. The information in this document is the property of Apple Inc. and may not be reproduced, published, or disclosed to others without written authorization from Apple Inc.

Confidential

# 9.0 ADVERSE  EVENTS REPORTING

All suspected adverse events (AEs) will be reported to the Study Safety Monitoring Desk by the Study Telehealth Provider Team. The Study Safety Monitoring Desk will review suspected AEs and determine whether they are adverse device effects (ADEs).

## 9.1 Definitions and Classification

| Term | Definition | Reference |
|---|---|---|
| **Adverse Event (AE)** | Any untoward medical occurrence, unintended disease or injury, or untoward clinical signs (including abnormal laboratory findings) in participants, users or other persons, whether or not related to the investigational device. | ISO 14155-1 |
| **Adverse Device Effect (ADE)** | Adverse event related to the use of an investigational medical device.<br><br>Notes: This definition includes adverse events resulting from insufficient or inadequate instructions for use, deployment, implantation, installation, or operation, or any malfunction of the investigational medical device. This definition includes any event resulting from use error or from intentional misuse of the investigational medical device. | ISO 14155-1 |
| **Serious Adverse Event (SAE)** | Adverse event that<br>a) Led to death,<br>b) Led to serious deterioration in the health of the participant, that either resulted in<br>    1) A life-threatening illness or injury, or<br>    2) A permanent impairment of a body structure or a body function, or<br>    3) In-patient or prolonged hospitalization, or<br>    4) Medical or surgical intervention to prevent life-threatening illness or injury or permanent impairment to a body structure or a body function,<br>c) Led to fetal distress, fetal death or a congenital abnormality or birth defect | ISO 14155-1 |

This document contains information that is privileged or confidential and may not be disclosed unless such disclosure is required by applicable laws and regulations. The information in this document is the property of Apple Inc. and may not be reproduced, published, or disclosed to others without written authorization from Apple Inc.

Confidential

| Unanticipated Adverse Device Effect (UADE) | Any serious adverse effect on health or safety or any life-threatening problem or death caused by, or associated with, a device, if that effect, problem, or death was not previously identified in nature, severity, or degree of incidence in the investigational plan or application (including a supplementary plan or application), or any other unanticipated serious problem associated with a device that relates to the rights, safety, or welfare of participants. | 21 CFR 812.3(s) |
|---|---|---|

## 9.2 Adverse Events (AEs)

Adverse events that will be collected do not have to be related to use of the investigational device, ePatch, iPhone, or Apple Watch. The Study Safety Monitoring Desk is responsible for determining whether the adverse event is associated with the investigational device, and would therefore be considered an "adverse device effect."

Possible AEs related to participation in the study, but not related to use of the investigational device, include the following:

- Skin rash due to wearing the ambulatory ECG monitor (ePatch);
- Skin itchiness due to wearing the ambulatory ECG monitor (ePatch);
- Blister due to wearing the ambulatory ECG monitor (ePatch);
- Skin rash on wrist due to wearing the Apple Watch;
- Pressure artifacts on wrist due to wearing the Apple Watch.

The following occurrences are not to be regarded as AEs:

- Underlying (pre-existing) symptoms or diseases, unless there is an increase in severity or frequency during the course of the investigation;
- Receipt of an IPNA notification;
- Detection of atrial fibrillation or other irregular heartbeat through the IPNA and confirmation by ePatch;
- Pre-planned procedure(s);
- Complaint about iPhone or Apple Watch functionality;
- Failure of the participant to regularly wear the Apple Watch or to wear the ePatch as described by the Study Telehealth Provider.
- Apple Heart Study app functionality issues related to poor wifi or cellular connectivity or user error

This document contains information that is privileged or confidential and may not be disclosed unless such disclosure is required by applicable laws and regulations. The information in this document is the property of Apple Inc. and may not be reproduced, published, or disclosed to others without written authorization from Apple Inc.

Confidential

### 9.3 Adverse Device Effects (ADEs)

ADEs are those effects determined by the Study Safety Monitoring Desk to be related to use of the investigational device, the Apple Heart Study app.

Anticipated ADEs include the following:

- Signs or symptoms related to participation in the study, including those determined to be related to the Apple Heart Study app.  The common signs and symptoms include stress and anxiety and associated symptoms that may include dizziness, depression, palpitations, tremors, sleep difficulty and shortness of breath.

### 9.4 Recording of Adverse Events (AEs) and Adverse Device Effects (ADEs)

All suspected AEs will be recorded by the Study Telehealth Provider Team during the scheduled virtual visits as well as at any time point during the study where the participant or their representative contacts the Study Telehealth Provider to report such an event.  The Study Safety Monitoring Desk personnel will assess suspected AEs for classification as suspected ADEs. All suspected AEs and ADEs will be tracked by the Study Safety Monitoring Desk personnel and all suspected ADEs will be reviewed and classified by the Study Safety Monitor.

### 9.5 Recording of Serious Adverse Events (SAEs)

All suspected SAEs will be recorded by the Study Telehealth Provider Team during the scheduled virtual visits as well as at any time point during the study where the participant or their representative contacts the Study Telehealth Provider to report such an event.  The Study Safety Monitoring Desk personnel will track all SAEs and all SAEs that are potentially ADEs will be reviewed and classified by the Study Safety Monitor.

### 9.6 Reporting of Serious and Unanticipated Adverse Device Effects (UADEs)

For this non-significant risk (NSR) study, the Investigators will be responsible for reporting any unanticipated adverse device effects (UADEs), as required by the IRB's procedures and in conformance with FDA regulatory requirements. Reporting requirements as per 21 CFR 812.150 will be followed for this study.

All UADEs shall be reported to the sponsor and reviewing IRB as soon as possible, but no later than 10 working days after the Study Safety Monitoring Desk's confirmation of the event as an UADE. IRB reporting will be performed according to governing IRB requirements.

This document contains information that is privileged or confidential and may not be disclosed unless such disclosure is required by applicable laws and regulations. The information in this document is the property of Apple Inc. and may not be reproduced, published, or disclosed to others without written authorization from Apple Inc.

Apple Heart Study                    Protocol Version: 8.0, Date: March 20, 2018

Confidential

The Principal Investigators are responsible for informing the IRB of any UADE and submit a copy of the report to the sponsor within 5 working days.

The study sponsor will conduct an evaluation of a UADE under 812.46(b) and report the results of such evaluation to FDA within 10 working days after the sponsor first receives notice of the effect.

This document contains information that is privileged or confidential and may not be disclosed unless such disclosure is required by applicable laws and regulations. The information in this document is the property of Apple Inc. and may not be reproduced, published, or disclosed to others without written authorization from Apple Inc.

Confidential

## 10.0 WITHDRAWAL

Every participant should be encouraged to remain in the study until they have completed the protocol-required follow-up period. If the participant withdraws prematurely from the study, the reason for withdrawal should be documented. Possible reasons for premature withdrawal may include, but are not limited to the following:

- Withdrawal of consent: participant decides to withdraw from the study for any reason. This may be concluded if/when a participant taps the withdraw button within the app or asks to be withdrawn.
- Investigators believe it is in the best interest of the participant to discontinue the study, for any reason.

Withdrawal Process:

Participants will have the option to withdraw from the study by tapping a "Withdraw from Study" button within the app. This will disable notifications and will result in a cessation of data collection.  If a participant calls the Study Telehealth Provider requesting withdrawal from the study, the Study Telehealth Provider will instruct the participant how to initiate withdrawal on the app. It will not be possible for any party other than the study participant themselves to withdraw from the study. In the few cases where the participant has received a notification, and has initiated contact with the Study Telehealth Provider, and thereafter selects "Withdraw from Study" on the app, they may still receive follow-up communication from the Study Telehealth Provider.  In order to stop further communication, these participants would need to inform the Study Telehealth Provider Team that they wish to be withdrawn.

Once withdrawn, participants would be able to re-enroll only by reinstalling the application, but will be considered a new study participant without linkage to their prior data.

The following will be considered lost-to-follow-up:

- Death of the participant
- Lost/stolen iPhone and/or Apple Watch

This document contains information that is privileged or confidential and may not be disclosed unless such disclosure is required by applicable laws and regulations. The information in this document is the property of Apple Inc. and may not be reproduced, published, or disclosed to others without written authorization from Apple Inc.

Confidential

# 11.0 STATISTICAL CONSIDERATIONS

## 11.1 Analysis Sets

The Full Analysis Set (FAS) will consist of all participants who are enrolled in the study.

The Notification Analysis Set (NAS) will consist of all participants who receive a IPNA. This analysis set is equivalent to the Notification Subgroup. The co-primary AF endpoint will be collected from these participants to evaluate Objective 1.

The ECG Analysis Set (EAS) will consist of all participants who receive an ambulatory ECG monitor, wear it for a minimum amount of time providing a minimum analyzable time of 1 hour, and self-report no history of AF prior to the time of consent. This analysis set includes all participants in the ambulatory ECG monitor subgroup who wear their patch providing at least 1 hour of analyzable time. The co-primary tachogram endpoint will be collected from these participants to evaluate Objective 2. All tachogram- and alert-level outcomes will be estimated from this analysis set during times when tachograms are being recorded by Apple Watch during simultaneous, analyzable ECG monitoring. The ambulatory ECG monitor recordings will be measured during the entire period the patch is worn.

## 11.2 Endpoints and Definitions

### 11.2.1 Co-Primary Endpoints

1. AF of greater than 30 seconds duration detected on ambulatory ECG monitoring for a participant who received an irregular pulse watch notification.
2. Simultaneous ambulatory ECG monitoring indicating an irregular rhythm consistent with AF during time intervals when the spot tachogram is positive for an irregular pulse among those who received a notification. Each participant contributes multiple observations for this endpoint.

### 11.2.2 Secondary Endpoints

1. Simultaneous ambulatory ECG monitoring indicating an irregular rhythm consistent with AF when the IPNA based on multiple tachograms is positive for an irregular pulse among those who received a notification. These positive IPNA triggers will not result in additional notifications to participant, but will be available for analyses. Each participant contributes multiple observations for this endpoint.
2. Self-reported contact with a health care provider within 3 months following an irregular pulse watch notification.

This document contains information that is privileged or confidential and may not be disclosed unless such disclosure is required by applicable laws and regulations. The information in this document is the property of Apple Inc. and may not be reproduced, published, or disclosed to others without written authorization from Apple Inc.

Confidential

### 11.2.3 Tertiary Endpoints

1. Arrhythmias, other than AF, detected on an ambulatory ECG monitor that can also result in an irregular pulse. These include sinus arrhythmia, frequent premature atrial contractions, frequent premature ventricular contractions, intermittent heart block, multifocal atrial tachycardia and atrial tachycardia with variable conduction.
2. AF of greater than 6 minutes, 1 hour, 6 hours, and 24 hours duration detected on ambulatory ECG monitor following an irregular pulse watch notification.
3. Self-reported initiation of therapies for AF, including anticoagulant, rate-controlling and antiarrhythmic therapy.
4. Self-reported electrical or chemical cardioversion by a health care provider.

## 11.3 Statistical Approaches

### 11.3.1 Estimating Positive Predictive Value (PPV) in the First Objective

We have designed the study to estimate the proportion of participants age 65 or older diagnosed with AF within a 5% margin of error. In other words, we have designed the study so the 97.5% confidence interval around the estimate will have a width of 10%. Our analysis will include the participants 65 or older in the NAS. There is no hypothesis testing for the co-primary outcomes. We use 97.5% confidence intervals to account for the co-primary outcomes.

### 11.3.2 Estimating PPV of the Spot Tachogram to Address the Second Objective

We assume that each tachogram measured on a participant is independent of other intervals measured from that participant. In sensitivity analyses, we will evaluate the impact of this assumption. From the available intervals, we will randomly select 10 intervals per participant in the EAS to ensure each participant contributes a comparable period of data on which to evaluate concordance. All intervals will be used in participants who have fewer than 10 intervals available.

We will conclude that the algorithm may be promising if the PPV is extremely high. Our hypothesis is that the proportion of intervals that are true positives out of the total intervals where the spot tachogram is positive for an irregular pulse will be at least 0.75 in participants 65 or older. We will design our study so that we will have ~99% power to detect whether the lower bound of a 97.5% confidence interval is greater than 0.70 and the upper bound is at least 0.75 if the PPV is truly 0.75. The power will increase if the PPV is higher than 0.75 in reality.

This document contains information that is privileged or confidential and may not be disclosed unless such disclosure is required by applicable laws and regulations. The information in this document is the property of Apple Inc. and may not be reproduced, published, or disclosed to others without written authorization from Apple Inc.

Confidential

### 11.3.3 Secondary and Tertiary Analyses

All secondary and tertiary outcomes will be analyzed as proportions with 95% confidence intervals. Outcomes measured at the tachogram- or alert-level will be analyzed in the EAS while self-reported contact with a health care provider and initiation of therapies or cardioversion will be analyzed in the NAS. The self-reported outcomes will also be analyzed in the FAS.

### 11.3.4 Sensitivity and Sub-Analyses

As a sensitivity analysis, the estimates for the co-primary outcomes will be repeated for participants of all ages.

The proportions and 97.5% confidence intervals used to analyze the co-primary outcomes will be performed separately by age (<55, 55-64, ≥65), AF burden, type of AF and non-AF irregular rhythms. Additionally, we will perform chi-squared tests to test whether the PPV proportions differ by age or burden.

To better understand the performance of the IPNA across the participant population, we will construct separate 95% confidence intervals around the proportion of participants diagnosed with AF according to tertiles of spot tachogram PPV observed in the secondary objective.

### 11.4 Handling of Missing Data

All participants who receive a positive IPNA will be included in the analysis of the co-primary endpoint indicating AF after positive IPNA regardless of whether they receive and wear the ambulatory ECG monitor. Participants who do not have at least an hour of analyzable wear time from the ambulatory ECG monitor will be considered to have missing data. Multiple imputation methods will be used to account for the participants who are missing the AF endpoint.

In analyses where the tachogram or an IPNA is the unit of analysis, participants who have at least one tachogram recorded during the simultaneous ECG monitoring will be including in the analyses. We will use any available tachograms and no data will be considered missing.

Multiple imputation methods will be used in the analyses of patient reported outcomes to account for an expected small proportion of participants who do not complete all questions.

This document contains information that is privileged or confidential and may not be disclosed unless such disclosure is required by applicable laws and regulations. The information in this document is the property of Apple Inc. and may not be reproduced, published, or disclosed to others without written authorization from Apple Inc.

Confidential

## 11.5 Interim Checks

A series of interim checks will be performed.

Throughout the course of the study, the number of irregular pulse watch notifications occurring per age subgroup will be checked. A check will be performed 2 weeks after the first participant is enrolled (see Figure 1. Study Timeline). If a high number of alerts is observed (greater than 10%), enrollment may be paused or throttled downward in any age subgroup (<40, 40-54, 55-64, ≥65). If the number of notifications observed is less than the study infrastructure capacity, the numbers of participants invited to enroll from the "waiting period" may be increased.

An interim check will be performed upon completion of the first 100 ambulatory ECG monitors in any of the four age subgroups (see Figure 1 Study Timeline). The interim check will be performed for each subgroup regardless of how many patches are received in other age subgroups. We estimate the check to occur at approximately 6-8 weeks after the first participant enrolled to check the following:

1. At least 50% of participants notified of an irregular pulse are ultimately wearing and returning the ambulatory ECG monitor. A low rate of ambulatory ECG monitor use would result in an increase in the rates of invitations to enrollment in any age subgroup.

2. Percentage of atrial fibrillation noted on ambulatory ECG monitoring is greater than 1%. A detection of atrial fibrillation less than 1% will prompt a cessation of enrollment in any corresponding age subgroup.

3. Percentage of non-clinically relevant irregular rhythms is greater than 90%. If the vast majority of rhythms detected on ambulatory ECG monitoring are due to other irregular, non-AF arrhythmias, such as sinus arrhythmia, frequent PACs and frequent PVCs, this will prompt a cessation of enrollment in any corresponding age subgroup.

The co-primary endpoints will be evaluated after 503 participants aged ≥65 have completed their virtual visit and have at least 1 hour of ambulatory ECG monitor data recorded, i.e. at least 503 participants who are in the EAS.

These interim analyses are not designed to evaluate ultimate efficacy or futility and do not impact the Type I error as we will not be examining the final positive predictive values of the co-primary endpoints using this interim analysis.

A much higher than anticipated rate of notifications and subsequent ePatch evaluations may result in marginal benefit of additional participant enrollment. The following will be set as

This document contains information that is privileged or confidential and may not be disclosed unless such disclosure is required by applicable laws and regulations. The information in this document is the property of Apple Inc. and may not be reproduced, published, or disclosed to others without written authorization from Apple Inc.

Confidential

maximum targets for ePatch monitoring. Exceeding these limits will trigger either a throttling downward or cessation of enrollment:

1. Completion of 5,000 ePatches in total in either participants ≥ 65 or participants aged 22-64 will result in cessation of enrollment in the corresponding age group.

2. Completion of > 100 ePatches per week in either participants ≥ 65 or participants aged 22-64 will result in a throttling downward of enrollment invitations in the corresponding age groups.

### 11.6 Sample Size and Power Considerations

We anticipate identifying 750 participants age 65 or older who qualify for an ePatch during the initial study period of 3 months. Among these, we anticipate a clinical diagnosis will be available on 503 participants. The proportion of participants with clinically important AF will be estimated and a 97.5% confidence interval will be constructed around the estimate. Similarly, a 97.5% confidence interval will be constructed for the estimated proportion of participants with clinically important AF among those who receive an irregular pulse watch notification of all ages. With 503 participants, we will have sufficient observations to estimate the proportion with a margin of error of 5% or smaller, regardless of what the true proportion is.

Our decision rule for concluding the IPNA is promising to address Objective 2 is sensible given the amount of data with which we will rule our algorithm as promising or in need of greater refinement. With 3000 observed intervals where ePatch and tachogram data is available in participants 65 or older, we will have at least ~98% power to rule out a PPV of 0.70 or lower (using the decision rule and assumptions described in Section 11.3.2).

If we assume that we will sample 10 intervals from each person with an ePatch, then we will need 300 participants with ePatches to get 3000 observed intervals, which is well below the 503 participants required for the AF co-primary endpoint.

We are assuming that 1% of participants 65 and older will get a notification and receive an ePatch, which corresponds to 75,000 participants older than 65 needed to enroll in the study to achieve sufficient power. We additionally plan to enroll approximately 425,000 participants aged less than 65 during the study period. We are making the conservative assumption that ~2 participants out of 1000 in the younger age group will qualify to receive an ambulatory ECG monitor, from which we expect 503 participants to have data available from their ambulatory ECG monitor.

This document contains information that is privileged or confidential and may not be disclosed unless such disclosure is required by applicable laws and regulations. The information in this document is the property of Apple Inc. and may not be reproduced, published, or disclosed to others without written authorization from Apple Inc.

Confidential

## 12.0 TRAINING

To ensure accurate, complete, and reliable data, the Stanford study team in conjunction with sponsor, will provide instructional material to Study Telehealth Provider, BioTelemetry, ECG Adjudicating Clinicians and other study personnel as appropriate.

## 13.0 STEERING COMMITTEE AND DATA AND SAFETY MONITORING BOARD

A Steering Committee (SC) will be commissioned to monitor the practical aspects of the study and to provide independent scientific guidance regarding the protocol, implementation, execution and analysis. SC will perform periodic review of the study progress, recruitment figures, data, data quality, analysis and results. SC will resolve any differences within the research team or between research team and the sponsor on the data management or study procedures and will provide recommendations for modifications to the protocol if needed.

An independent Data and Safety Monitoring Board (DSMB) will be appointed and will report to the Steering Committee.  The DSMB will be responsible for safeguarding the interests of the participants and for reviewing the overall conduct of the clinical study. The DSMB charter will be prepared to detail precise roles and responsibilities and procedures and interactions with the Steering Committee.

## 14.0 ETHICAL AND REGULATORY CONSIDERATIONS

This study will be conducted in accordance with FDA regulations (21 CFR Parts 50, 54, 56 and 812).

### 14.1 Institutional Review Board/Medical Ethics Committee

The protocol must be submitted to the appropriate Institutional Review Board (IRB) and written approval must be obtained prior to enrolling any participants. Yearly approvals for the continuation of the study must be obtained by the Investigator.

This document contains information that is privileged or confidential and may not be disclosed unless such disclosure is required by applicable laws and regulations. The information in this document is the property of Apple Inc. and may not be reproduced, published, or disclosed to others without written authorization from Apple Inc.

Confidential

## 14.2  Informed Consent and HIPAA Authorization

The Informed Consent will be provided within the study app and will employ ResearchKit electronic consent framework for the signature view to obtain signed and dated informed consent and HIPAA authorization prior to enrollment. Signed consent forms will be stored on an encrypted server which is 21 CFR Part 11 compliant. The protocol and informed consent form must be approved by the reviewing IRB prior to commencement of the study. Any subsequent revisions to the informed consent form must also receive IRB approval prior to use.

## 14.3 Confidentiality of participants

Participant confidentiality will be maintained throughout the clinical study in a way that ensures the information can always be tracked back to the source data. For this purpose, a unique participant identification code (ID number) will be used that allows identification of all data reported for each participant. The ID number will be randomly generated.

Participant information collected in this study will comply with the standards for protection of privacy of individually identifiable health information. The Sponsor, investigators and all study affiliates will make every reasonable effort to protect the confidentiality of the participants participating in this study. Participant records may be released to governing regulatory authorities, if requested. In all cases, caution will be exercised to assure the data are treated confidentially and that the participant's privacy is protected.

## 15.0 HUMAN SUBJECTS PROTECTION

## 15.1 Research participant Selection and Justification of Exclusions

There will be no exclusion from participation in the study on the basis of ethnicity or race. Participants younger than 22 years of age will be excluded from the study, as the target population is adults ≥ 22 years. Participants who are not proficient in written English will be excluded as this will prohibit informed consent as well as completion of any necessary data collection forms.

## 15.2 Compensation to participants

There will be no direct monetary remuneration to study participants.

This document contains information that is privileged or confidential and may not be disclosed unless such disclosure is required by applicable laws and regulations. The information in this document is the property of Apple Inc. and may not be reproduced, published, or disclosed to others without written authorization from Apple Inc.

Confidential

# 16.0 RECORD KEEPING/REPORTING

## 16.1 Data Collection

The study will create 21 CFR Part 11 compliant data flows for relevant study sources to 21 CFR Part 11 compliant servers housing information on participant demographics, baseline health history, data on watch PPG detected pulse irregularities, ambulatory ECG monitor results, Adverse Events and 90-day PRO.

## 16.2 Study Documentation

Study documentation includes but is not limited to all consent forms, app screens, app based screening forms, PROs, ambulatory ECG monitor reports, and regulatory documents (e.g., signed protocol and amendments, IRB correspondence and approval, approved and signed participant consent forms, Statement of Investigator form, etc.). The investigator will prepare and maintain complete and accurate study documentation in compliance with applicable federal, state, and local laws, rules, and regulations.

This document contains information that is privileged or confidential and may not be disclosed unless such disclosure is required by applicable laws and regulations. The information in this document is the property of Apple Inc. and may not be reproduced, published, or disclosed to others without written authorization from Apple Inc.

Confidential

## 17.0 REFERENCES

1.  Miyasaka Y, Barnes ME, Gersh BJ, et al. Secular trends in incidence of atrial fibrillation in Olmsted County, Minnesota, 1980 to 2000, and implications on the projections for future prevalence. *Circulation.* 2006;114(2):119-125.
2.  Andrade J, Khairy P, Dobrev D, Nattel S. The clinical profile and pathophysiology of atrial fibrillation: relationships among clinical features, epidemiology, and mechanisms. *Circ Res.* 2014;114(9):1453-1468.
3.  Wolf PA, Abbott RD, Kannel WB. Atrial fibrillation: a major contributor to stroke in the elderly. The Framingham Study. *Arch Intern Med.* 1987;147(9):1561-1564.
4.  Writing Group M, Mozaffarian D, Benjamin EJ, et al. Heart Disease and Stroke Statistics-2016 Update: A Report From the American Heart Association. *Circulation.* 2016;133(4):e38-360.
5.  van Walraven C, Hart RG, Singer DE, et al. Oral anticoagulants vs aspirin in nonvalvular atrial fibrillation: an individual patient meta-analysis. *JAMA.* 2002;288(19):2441-2448.
6.  Lin HJ, Wolf PA, Benjamin EJ, Belanger AJ, D'Agostino RB. Newly diagnosed atrial fibrillation and acute stroke. The Framingham Study. *Stroke.* 1995;26(9):1527-1530.
7.  Engdahl J, Andersson L, Mirskaya M, Rosenqvist M. Stepwise screening of atrial fibrillation in a 75-year-old population: implications for stroke prevention. *Circulation.* 2013;127(8):930-937.
8.  Cullinane M, Wainwright R, Brown A, Monaghan M, Markus HS. Asymptomatic embolization in participants with atrial fibrillation not taking anticoagulants: a prospective study. *Stroke.* 1998;29(9):1810-1815.
9.  Meschia JF, Bushnell C, Boden-Albala B, et al. Guidelines for the primary prevention of stroke: a statement for healthcare professionals from the American Heart Association/American Stroke Association. *Stroke.* 2014;45(12):3754-3832.
10. Kirchhof P, Benussi S, Kotecha D, et al. 2016 ESC Guidelines for the management of atrial fibrillation developed in collaboration with EACTS. *Eur Heart J.* 2016;37(38):2893-2962.
11. Turakhia MP, Shafrin J, Bognar K, et al. Economic Burden of Undiagnosed Nonvalvular Atrial Fibrillation in the United States. *Am J Cardiol.* 2015;116(5):733-739.
12. Lowres N, Neubeck L, Salkeld G, et al. Feasibility and cost-effectiveness of stroke prevention through community screening for atrial fibrillation using iPhone ECG in pharmacies. The SEARCH-AF study. *Thromb Haemost.* 2014;111(6):1167-1176.
13. Svennberg E, Engdahl J, Al-Khalili F, Friberg L, Frykman V, Rosenqvist M. Mass Screening for Untreated Atrial Fibrillation: The STROKESTOP Study. *Circulation.* 2015;131(25):2176-2184.
14. Tung CE, Su D, Turakhia MP, Lansberg MG. Diagnostic Yield of Extended Cardiac Patch Monitoring in Patients with Stroke or TIA. *Front Neurol.* 2014;5:266.

This document contains information that is privileged or confidential and may not be disclosed unless such disclosure is required by applicable laws and regulations. The information in this document is the property of Apple Inc. and may not be reproduced, published, or disclosed to others without written authorization from Apple Inc.

Confidential

15. Gladstone DJ, Spring M, Dorian P, et al. Atrial fibrillation in patients with cryptogenic stroke. *N Engl J Med.* 2014;370(26):2467-2477.

This document contains information that is privileged or confidential and may not be disclosed unless such disclosure is required by applicable laws and regulations. The information in this document is the property of Apple Inc. and may not be reproduced, published, or disclosed to others without written authorization from Apple Inc.

Apple Heart Study                    Protocol Version: 8.0, Date: March 20, 2018

Statistical Analysis Plan

Study Official Title: Apple Heart Study: Assessment of Wristwatch–Based Photoplethysmography to Identify Cardiac Arrhythmias

ClinicalTrials.gov Identifier: NCT03335800

Document Date: 09 Nov 2018



| Statistical Analysis Plan | |
|---|---|
| Study Name | Apple Heart Study |
| Version Number | 1.6 |
| Date | 9 November 2018 |

# Apple Heart Study

# Assessment of Wristwatch-Based Photoplethysmography to Identify Cardiac Arrhythmias

Statistical Analysis Plan
Apple Heart Study
Version 1.6
9 November 2018

## SIGNATURE PAGE



2

Statistical Analysis Plan
Apple Heart Study
Version 1.6
9 November 2018

## TABLE OF CONTENTS                                    PAGE

*1. Study Details* _____ *6*

   1.1 Study objectives _____ 6

   1.2 Study design _____ 6

   1.3 Number of Participants Needed to Address Objectives _____ 7

*2. Endpoints* _____ *9*

   2.1 Primary Endpoints _____ 9

   2.2 Secondary Endpoints _____ 9

   2.3 Tertiary Endpoints _____ 9

*3. Analysis Sets* _____ *10*

*4. Analysis Methods* _____ *11*

   4.1 General Principles _____ 11

   4.2 Study Population _____ 12

   4.3 Analysis Methods _____ 16

   4.4 Tertiary Endpoints _____ 19

   4.5 Definitions _____ 23

   4.6 Handling of Missing Data _____ 25

   4.7 Potential Limitations and Mitigation Strategies _____ 25

*5. Interim Checks* _____ *27*

*6. Validation Plan* _____ *29*

   6.1 Reproducibility Plan on Sub-Study Analysis _____ 29

   6.2 Replication on Final AHS Study Data _____ 30

*A1. Appendix: AHS Sub-Study Protocol and SAP* _____ *30*

3

Statistical Analysis Plan
Apple Heart Study
Version 1.6
9 November 2018

# LIST OF ABBREVIATIONS

The following abbreviations and special terms are used in this Statistical Analysis Plan (SAP).

| Abbreviation or special term | Explanation |
| --- | --- |
| AE | Adverse Event |
| AF | Atrial Fibrillation and Atrial Flutter |
| ARR | Arrhythmia |
| CI | Confidence Interval |
| EAS | ECG Analysis Set |
| ECG | Electrocardiography |
| FAS | Full Analysis Set |
| IPN | Irregular Pulse Watch Notification |
| IPNA | Irregular Pulse Watch Notification Algorithm |
| NAS | Notification Analysis Set |
| PAC | Premature Atrial Contractions |
| PCP | Primary Care Provider |
| PPG | Photoplethysmography |
| PPV | Positive Predictive Value |
| PRO | Patient Reported Outcome |
| PVC | Premature Ventricular Contractions |
| SAE | Serious Adverse Event |
| SAP | Statistical Analysis Plan |

4

Statistical Analysis Plan
Apple Heart Study
Version 1.6
9 November 2018

**Revision history**

| Revision | Date | Section/Page | Changes Made -- Reasons for the Change |
|---|---|---|---|
| 1 | 4/19/18 | Throughout document | Added table shells |
| 2 | 4/19/18 | Section 1.1/Page 6 | Updated text of Objective 3 to be consistent with protocol v8.0 |
| 3 | 4/19/18 | Section 1.2/Page 7 | Defined ECG acronym in text |
| 4 | 4/19/18 | Section 2.3, 4.4/Page 9, 18 | Updated tertiary endpoint to be consistent with protocol v8.0 |
| 5 | 4/19/18 | Section 3/Page 10 | Updated definitions of analysis sets for clarification and to reflect protocol amendment in v8.0 |
| 6 | 4/19/18 | Section 4.3/Page 17 | Clarified analysis sets in tertiary analyses |
| 7 | 4/19/18 | Section 4.4/Page 20 | Updated definition of fall-out subgroup to be consistent with protocol v8.0 |
| 8 | 4/19/18 | Section 5/Page 25 | Updated interim checks text to be consistent with protocol v8.0 |
| 9 | 5/24/18 | Section 4.2/Page 14 | Updated categories in Table 2 to be consistent with options available in app |
| 10 | 5/24/18 | Section 6/Page 27 | Added validation plan and appendix containing sub-study protocol and SAP |
| 11 | 5/31/18 | Section 4.4/Page 19 | Added resampling to characterize uncertainty of confidence interval estimates |
| 12 | 11/9/18 | Section 1.3, 4.3/Page 8, 17 | Updated tachogram sampling plan |

5

Statistical Analysis Plan
Apple Heart Study
Version 1.6
9 November 2018

# INTRODUCTION

This statistical analysis plan (SAP) is a comprehensive and detailed description of the strategy, rationale and statistical techniques that will be used to assess and evaluate the ability of the Irregular Pulse Watch Notification Algorithm (IPNA) to identify atrial fibrillation and atrial flutter (AF) and guide subsequent clinical evaluation.

# 1. STUDY DETAILS

## 1.1 Study objectives

**Objective 1a:** To measure the proportion of participants aged $\geq 65$ with irregular pulse watch notifications who have demonstrable AF as confirmed by ambulatory electrocardiographic patch monitoring.

**Objective 1b:** To measure the proportion of all participants with irregular pulse watch notifications who have demonstrable AF as confirmed by ambulatory electrocardiographic patch monitoring.

**Objective 2:** To characterize the concordance between pulse irregularity determined using spot tachograms (approximately one minute of beat-to-beat intervals) and AF detected by simultaneous ambulatory electrocardiographic patch monitoring.

**Objective 3:** To estimate the rate of initial contact with a health care provider within 3 months after an irregular pulse notification.

## 1.2 Study design

This will be a prospective, single arm, experimental study using participants wearing an Apple Watch with the Apple Heart Study app. Using observable variations in photoplethysmogram (PPG) signal intensity, changes in blood flow can be measured and beat-to-beat pulse measurements can be made. During normal sinus rhythm, there is minimal variation in pulse. However, during AF, the beat-to-beat variability increases significantly. Therefore, a PPG signal can be used to differentiate between a regular pulse and an irregular pulse that may be indicative of AF.

An algorithm has been developed by Apple to identify periods of irregular pulse based on PPG signal variation as measured by the Irregular Pulse Notification Algorithm (IPNA) within the Apple Heart Study app. The algorithm's analysis is initiated when the Apple Heart Study app successfully retrieves approximately one minute of beat-to-beat intervals, defined as a tachogram, derived from the Apple Watch PPG HR sensor through HealthKit, a data repository on a user's iPhone. If, and when, the Apple Heart Study app retrieves a tachogram

6

Statistical Analysis Plan
Apple Heart Study
Version 1.6
9 November 2018

and subsequently classifies it as "irregular", it shifts into a "confirmation mode" and begins requesting, and analyzing, tachograms on a more frequent basis until it is able to confirm sustained irregularities or the confirmation cycle is otherwise ended. Upon completion of a positive confirmation cycle within a 48-hour period, the Apple Heart Study app provides a notification (IPN) to the user on their Apple Watch and subsequently on their iPhone app.

Participants without urgent symptoms who receive an irregular pulse notification will be offered an ambulatory electrocardiographic (ECG) monitor (ePatch). Participants will be requested to wear the ePatch for 7 days.  An independent team of board certified clinicians will adjudicate the technical report generated from the ePatch monitoring to identify periods of AF and other rhythm irregularities. Additionally, this team will adjudicate the raw ECG data that is matched to the time period of the individual tachograms.

Participants who receive an irregular pulse notification (IPN) will receive an additional request to enter participant reported outcomes (PRO) three months after the notification. All participants, regardless of whether they received an irregular pulse notification (IPN), will receive an end-of-study PRO questionnaire at the end of the study, which is anticipated to be approximately one year after initial Apple Heart Study App availability.

## 1.3 Number of Participants Needed to Address Objectives

The minimum number of ePatches needed was calculated based on our desire to estimate the proportions in Objectives 1a and 1b such that the 97.5% confidence interval around the estimate is no wider than 0.10 in both age groups (< 65 and ≥ 65). We derived the number of enrolled participants and the number of tachograms needed from the number of ePatches required to achieve our desired precision in Objectives 1a and 1b.

The feasibility of our study relies on an assumption that 1% of participants 65 and older will receive a notification and that approximately ⅔ of those receiving a notification will return their ePatch and receive a clinical diagnosis. This corresponds to 75,000 participants older than 65 needed to enroll in the study to achieve sufficient precision. We anticipate identifying at least 750 participants age 65 or older who qualify for an ePatch during the initial study period of 3 months. Among these participants, we anticipate a clinical diagnosis (via adjudication of the ECG patch) will be available on 503 participants. The proportion of participants age 65 or older with clinically important AF will be estimated and a two-sided 97.5% confidence interval will be constructed for the probability of clinically important AF in this population (Objective 1a).

We are making the conservative assumption that ~2 participants out of 1000 in the younger age groups (total of all participants in <40, 40-54, 55-64) will qualify to receive an ePatch, from which we expect at least 503 participants to have data available from their ePatch. A two-sided 97.5% confidence interval will be constructed among all participants for the probability of observing clinically important AF among all adults who receive an irregular

Statistical Analysis Plan
Apple Heart Study
Version 1.6
9 November 2018

pulse watch notification (Objective 1b). With 503 participants, we will have sufficient observations to estimate the probability with a confidence interval width of 0.10 or smaller, regardless of what the true proportion is.

Objective 2 will be devoted to evaluating the concordance between irregularity identified by the spot tachograms and that detected by the ePatch. We will conclude that the algorithm produces clinically meaningful alerts if the PPV is high, where ePatch is considered the gold standard against which to gauge performance of the spot tachograms. We expect that the proportion of intervals that are true positives out of the total intervals where the spot tachogram is positive for an irregular pulse will be at least 0.75 in participants 65 or older. Our decision rule for concluding the IPNA is sufficiently concordant with ePatch is that the lower bound of a two-sided 97.5% confidence interval is greater than 0.70 and the upper bound is at least 0.75. The same decision rule will be applied to analyses performed on participants of all ages.

Our decision rule is sensible given the amount of data with which we will rule our algorithm produces clinically meaningful alerts. The properties of our decision rule are based on observing 3000 tachograms where the ePatch is concurrently available in participants 65 or older. The same decision rule will be applied to analyses performed on participants of all ages. We evaluated the properties of our decision rule using 1000 simulated data sets each with 3000 tachograms. We assumed 2250 (75%) tachograms were concordant with the ambulatory ECG monitoring and constructed the 97.5% confidence intervals using an asymptotic Gaussian approximation. With 3000 observed tachograms where ePatch is concurrently available in participants 65 or older, we will have at least 98% power to detect whether the lower bound of a 97.5% confidence interval is greater than 0.70 and the upper bound is at least 0.75 if the PPV is truly 0.75.

While this is not a traditional hypothesis test, we have set 0.75 as the threshold to be met or exceeded in order to determine if the algorithm produces meaningful alerts. This threshold was chosen as a clinically meaningful parameter for the individual tachogram concordance. This threshold will be applied to analyses performed on participants 65 or older and to analyses including all ages.

Our enrollment plan will allow us to evaluate the appropriate number of tachograms from the appropriate number of participants.  Specifically, we will randomly sample at least 10 positive tachograms from each person with an ePatch, requiring at most 300 participants with positive tachograms recorded while wearing ePatches to provide 3000 observed intervals, which is well below the 503 participants required for the AF co-primary endpoint. Based on preliminary data, an average of 4 tachograms per day are expected to be collected in participants with regular rhythms and a higher number in participants with irregular rhythms. Hence, we expect to have at least 10 positive tachograms observed during the simultaneous ECG monitoring period lasting approximately 7 days in most participants being monitored.

8

Statistical Analysis Plan
Apple Heart Study
Version 1.6
9 November 2018

## 2. ENDPOINTS

## 2.1 Primary Endpoints

The co-primary endpoints of the study are

- An indicator for whether AF of greater than 30 seconds duration was detected on
  ambulatory ECG monitoring for a participant who received an irregular pulse notification.
  (AF after IPN)

- Simultaneous ambulatory ECG monitoring indicating an irregular rhythm consistent with
  AF during time intervals when the spot tachogram is positive for an irregular pulse among
  those who received a notification. This endpoint will be measured during time intervals
  when the watch provides tachogram data and the participant has patch data recorded. Each
  participant contributes multiple observations for this endpoint. (ePatch+)

## 2.2 Secondary Endpoints

The secondary variables are

- Simultaneous ambulatory ECG monitoring indicating an irregular rhythm consistent with
  AF of greater than 30 seconds duration when the IPNA based on multiple tachograms is
  positive for an irregular pulse among those who received a notification. These positive
  IPNA triggers will not result in additional notifications to participant, but will be available
  for analyses.  Each participant contributes one observation. (IPNA+)
- Self-reported contact with a health care provider within 3 months following an irregular
  pulse notification. (PCP PRO after IPN)

## 2.3 Tertiary Endpoints

- An indicator for the presence of arrhythmias other than AF detected on ambulatory ECG
  monitoring that can also result in an irregular pulse. Arrhythmias considered include sinus
  arrhythmia, frequent premature atrial contractions (PAC), frequent premature ventricular
  contractions (PVC), intermittent heart block, multifocal atrial tachycardia, and atrial
  tachycardia with variable conduction. Definitions of each arrhythmia are provided in
  Section 4.4. (ARR after IPN)
- AF of greater than 6 minutes, 1 hour, 6 hours, and 24 hours duration detected on
  ambulatory ECG monitoring following an irregular pulse watch notification. (AFtime after
  IPN)
- Self-reported initiation of therapies for AF, including anticoagulant, rate-controlling and
  anti-arrhythmic therapy. (therapies)

9

- Self-reported electrical or chemical cardioversion by a health care provider. (cardioversion)

# 3. ANALYSIS SETS

The Full Analysis Set (FAS) will consist of all participants who are enrolled in the study.

The Notification Analysis Set (NAS) will consist of all participants who receive a IPNA. This analysis set is equivalent to the Notification Subgroup. The co-primary AF endpoint will be collected from these participants to evaluate Objective 1.

The ECG Analysis Set (EAS) will consist of all participants who receive an ambulatory ECG monitor, wear it for a minimum amount of time providing a minimum analyzable time of 1 hour, self-report no history of AF prior to the time of consent, and who were not associated with a technical issue arising from the AHS app preventing linkage of the patch data with the tachogram data.  The identification of the subjects to be removed from the EAS will be finalized prior to data analysis. This analysis set includes all participants in the ambulatory ECG monitor subgroup who wear their patch providing at least 1 hour of analyzable time. The co-primary tachogram endpoint will be collected from these participants to evaluate Objective 2. All tachogram- and alert-level outcomes will be estimated from this analysis set during times when tachograms are being recorded by Apple Watch during simultaneous, analyzable ECG monitoring.  The ambulatory ECG monitor recordings will be measured during the entire period the patch is worn.

Analyses performed at the tachogram level will further restrict the EAS to participants who began wearing their patch within 14 days of shipment.

**Table 1**          **Analysis Sets and the Unit of Analysis to be Used for Each Endpoint**

| Endpoint | Analysis set | Unit of analysis | Concurrent |
|---|---|---|---|
| AF after IPN [primary] | EAS | participant | not concurrent |
| ePatch+ [primary] | EAS | tachogram | concurrent |
| IPNA+ [secondary] | EAS | participant | concurrent |
| PCP PRO after IPN [secondary] | NAS | participant | not concurrent |
| ARR after IPN [tertiary] | EAS | participant | not concurrent |

10

Statistical Analysis Plan
Apple Heart Study
Version 1.6
9 November 2018

| AFtime after IPN [tertiary] | EAS | participant | not concurrent |
| Therapies [tertiary] | NAS, FAS | participant | not concurrent |
| Cardioversion [tertiary] | NAS, FAS | participant | not concurrent |

Note: The concurrent column indicates whether the estimate is based on measures recorded simultaneously.

# 4. ANALYSIS METHODS

## 4.1 General Principles

**Method for Constructing Confidence Intervals**

We will construct confidence intervals using the asymptotic Gaussian approximation. For proportions near 1 or 0, a potential drawback of this method is confidence intervals containing values outside of the range [0,1]. If we encounter confidence intervals with bounds outside of the [0,1] range we will instead construct the confidence intervals using the BCa method of creating a bootstrap confidence interval.

**Incomplete Dates**

If only the year of a date is given (YY), then the date shall be set to 'YY0701'. If only the year and month of a date is given (YYMM), then the date shall be set to 'YYMM15'.

**Descriptive Statistics**

Numerical variables will be summarised using standard summary statistics including the number of participants, mean, standard deviation, median, 10th and 90th percentile and range (i.e., minimum and maximum) as appropriate.  For categorical data, proportions will be presented in a frequency table format.

**Multiple Patches per Participant**

In rare instances where a single user ID is associated with data available from more than one patch, only data from the final patch will be used in statistical analyses.

11

Statistical Analysis Plan
Apple Heart Study
Version 1.6
9 November 2018

## 4.2 Study Population

**Participant Disposition**

The number and percent of participants who completed the study, discontinued from the study, and reasons for discontinuation from the study will be summarized by age group and overall, for the NAS and FAS.

|  | NAS | FAS |
|---|---|---|
| **22-39**  N<br><br>Completed the study #,%<br><br>Discontinued from study #,%<br><br>Reasons for discontinuation |  |  |
| **40-54**  N<br><br>Completed the study #,%<br><br>Discontinued from study #,%<br><br>Reasons for discontinuation |  |  |
| **55-64**  N<br><br>Completed the study #,%<br><br>Discontinued from study #,%<br><br>Reasons for discontinuation |  |  |

12

Statistical Analysis Plan
Apple Heart Study
Version 1.6
9 November 2018

| | | | |
|---|---|---|---|
| **65+** N<br><br>Completed the study #,%<br><br>Discontinued from study #,%<br><br>Reasons for discontinuation | | | |
| **Overall** N<br><br>Completed the study #,%<br><br>Discontinued from study #,%<br><br>Reasons for discontinuation | | | |

The number and percent of participants who withdrew from the study will be summarized by age group and overall, for the NAS and EAS.

| | Withdrawals | | | |
|---|---|---|---|---|
| | N NAS | % NAS | N EAS | % EAS |
| 22-39 | | | | |
| 40-54 | | | | |
| 55-64 | | | | |
| 65+ | | | | |
| Overall | | | | |

13

Statistical Analysis Plan
Apple Heart Study
Version 1.6
9 November 2018

Participants having protocol deviations will be summarized using the FAS population.

|       | N FAS | N PDs | PDs/FAS |
|-------|-------|-------|---------|
| 22-39 |       |       |         |
| 40-54 |       |       |         |
| 55-64 |       |       |         |
| 65+   |       |       |         |

**Demographic and Other Baseline Characteristics**

Demographic and other baseline characteristics will be summarized by age and overall using the FAS and the EAS. No statistical test will be performed for comparison of any baseline measurement by age group.

All summaries of continuous characteristics will be based on non-missing observations and the percent of participants missing values will be reported. For categorical characteristics, percents will be calculated out of the total number of participants in the data set, overall and by treatment group (i.e., each denominator includes the number of participants with missing/unknown values for the variable), where the percentage missing will also be reported.

14

Statistical Analysis Plan
Apple Heart Study
Version 1.6
9 November 2018

**Table 2**          **Summaries of Demographic and Other Characteristics at Baseline.**

| Characteristic | Summarized as | Categories |
|---|---|---|
| Age | Categorical and Continuous | <40, 40-54, 55-64, >= 65 years |
| Gender | Categorical | Female<br>Male<br>Non-binary |
| Race | Categorical | White<br>Hispanic, Latino, or Spanish origin<br>Black or African American<br>Asian<br>American Indian or Alaska Native<br>Middle Eastern or North African<br>Native Hawaiian or other Pacific Islander<br>Some other race, ethnicity, or origin<br>Prefer not to respond |
| BMI | Categorical and Continuous | <30 kg/m2 and ≥30 kg/m2 |
| Medical History | Categorical | Hypertension<br>Diabetes mellitus<br>Myocardial infarction<br>Heart failure<br>Stroke or transient ischemic attack<br>Peripheral arterial disease |
| Average number of cigarettes smoked per day | Categorical | None<br>1-10<br>11-20<br>21-40<br>41 or more<br>Rather not say |

15

Statistical Analysis Plan
Apple Heart Study
Version 1.6
9 November 2018

| Average number of alcoholic beverages consumed per week | Categorical | Less than 1<br>1-5<br>6-9<br>10 or more<br>Rather not say |
|---|---|---|

## Medications

Medications reported during study visit 1 will be summarized using the FAS by drug category or generic drug name by age group.

| Drug Category or Name | N Responding | % Responding (of FAS) | % Responding (of NAS) | N on Medication(%)* |
|---|---|---|---|---|
| Beta blockers | | | | |
| Calcium channel blockers | | | | |
| Aspirin | | | | |
| Anticoagulants | | | | |

* Percent calculated as percent of participants who responded to whether they used the corresponding drug type.

## 4.3 Analysis Methods

### Analysis of the Co-primary Endpoint Addressing Objective 1

We have designed the study to estimate the proportion of participants age 65 or older diagnosed with AF within a 0.10 confidence interval width. This proportion will be estimated

16

Statistical Analysis Plan
Apple Heart Study
Version 1.6
9 November 2018

as the number of participants who receive an IPN and have AF confirmed via adjudication of
the ambulatory ECG monitoring divided by the number of participants who receive an IPN
and who have analyzable ECG patch data. In other words, we have designed the study so the
97.5% confidence interval around the probability of AF diagnosis among those 65 and older who
receive a notification will have a width of 10%. Our analysis set will be the participants
65 or older in the EAS. We will repeat the analysis to include participants of all ages in the
EAS to address Objective 1b.

| | N EAS | N IPN and AF diagnosis | IPN and AF diagnosis/EAS | 97.5% CI |
|---|---|---|---|---|
| 65+ | | | | |

There is no hypothesis testing for the co-primary objectives. We use 97.5% confidence
intervals to account for having two primary objectives.

**Analysis of the Co-primary Endpoint Addressing Objective 2**

We assume that each tachogram measured on a participant is independent of other intervals
measured from that participant. In sensitivity analyses, we will evaluate the impact of this
assumption. From the available intervals, we will sample intervals as follows:
1. Randomly sample 10 intervals per participant in the EAS to ensure each participant
   contributes a comparable period of data on which to evaluate concordance. We ignore
   whether the tachograms are positive or not in this step. All intervals will be selected in
   participants who have fewer than 10 intervals available.
2. Sum the number of positive tachograms sampled.
   a. Sample from the unsampled positive tachograms until that participant has 25
      positive tachograms or until all positive tachograms for that participant have
      been sampled if that participant has less than 25 positive tachograms.
3. Sample 1 silent IPN per participant that contains the full series of >= 5 tachograms and
   select all tachograms corresponding to that silent IPN for adjudication.

This proportion will be estimated as the number of tachograms indicating an irregular rhythm
where AF is present as confirmed via adjudication of the ambulatory ECG monitoring divided
by the number of tachograms indicating an irregular rhythm sampled from the period of time
when the participant provides analyzable ECG patch data.

17

Statistical Analysis Plan
Apple Heart Study
Version 1.6
9 November 2018

|  | N Irregular tachograms | N Irregular rhythm on ECG | Irregular rhythm on ECG/ Irregular tachograms | 97.5% CI |
|---|---|---|---|---|
| 22-39 |  |  |  |  |
| 40-54 |  |  |  |  |
| 55-64 |  |  |  |  |
| 65+ |  |  |  |  |

**Secondary and Tertiary Analyses**

All secondary and tertiary endpoints will be analyzed as proportions with 95% confidence intervals. Endpoints measured using data collected from the ambulatory ECG monitoring will be analyzed in the EAS while self-reported contact with a health care provider and initiation of therapies or cardioversion will be analyzed in the NAS. The self-reported outcomes (90-day after notification of pulse irregularity and end of study PROs) will also be analyzed in the NAS and FAS, respectively. Generalized linear regression techniques will be employed to evaluate the variation observed in secondary and tertiary endpoints by subgroups described by age, race, gender, and family history.

- Simultaneous ambulatory ECG monitoring indicating an irregular rhythm consistent with AF of greater than 30 seconds duration when the IPNA based on multiple tachograms is positive for an irregular pulse among those who received a notification. These positive IPNA triggers will not result in additional notifications to participant, but will be available for analyses. Each participant contributes one observation. (IPNA+)

|  | N EAS | N IPNA+ | Irregular tachogram on ECG (within the alert timeframe) | Irregular tachogram on ECG (within the alert timeframe)/IPNA+ | 95% CI |
|---|---|---|---|---|---|
| 22-39 |  |  |  |  |  |
| 40-54 |  |  |  |  |  |

18

Statistical Analysis Plan
Apple Heart Study
Version 1.6
9 November 2018

| | | | | | |
|---|---|---|---|---|---|
| 55-64 | | | | | |
| 65+ | | | | | |

- Self-reported contact with a health care provider within 3 months following an irregular pulse notification. (PCP PRO after IPN)

| | N NAS | N Self-reported contact | Self-reported contact/NAS | 95% CI |
|---|---|---|---|---|
| 22-39 | | | | |
| 40-54 | | | | |
| 55-64 | | | | |
| 65+ | | | | |

-

## 4.4 Tertiary Endpoints

- An indicator for the presence of arrhythmias other than AF detected on ambulatory ECG monitoring that can also result in an irregular pulse. Arrhythmias considered include sinus arrhythmia, frequent premature atrial contractions (PAC), frequent premature ventricular contractions (PVC), intermittent heart block, multifocal atrial tachycardia, and atrial tachycardia with variable conduction. Definitions of each arrhythmia are provided in Section 4.4. (ARR after IPN)

| | N EAS | N ARR on ECG | N Alerts | Alert/ARR on ECG | 95% CI |
|---|---|---|---|---|---|
| 65+ | | | | | |

- AF of greater than 6 minutes, 1 hour, 6 hours, and 24 hours duration detected on ambulatory ECG monitoring following an irregular pulse watch notification. (AFtime after IPN)

19

Statistical Analysis Plan
Apple Heart Study
Version 1.6
9 November 2018

- Self-reported initiation of therapies for AF, including anticoagulant, rate-controlling and anti-arrhythmic therapy. (therapies)
- Self-reported electrical or chemical cardioversion by a health care provider. (cardioversion)

## Sensitivity and Sub-analyses

As a sensitivity analysis, a per-protocol analysis will be performed for the primary endpoints excluding participants with protocol deviations.

Proportions along with 97.5% confidence intervals will be used to analyze the co-primary objectives and will be presented separately by age (<40, 40-54, 55-64, 65+), sex, race, medical history, type of AF, and non-AF irregular rhythms. Frequency of notifications will be estimated separately by age, sex, race, and medical history in the FAS. These analyses will also be performed on participants of all ages combined.

To better understand the performance of the IPNA across the participant population, we will perform a subgroup analysis to understand the proportion estimated in Objective 1a and 1b according to the burden of AF. We will consider three approaches to split the participants into tertiles, each capturing AF burden or a related measure.

- We will split the participants into tertiles based on AF burden obtained from their ambulatory ECG monitoring.
- We will calculate each participant's PPV by calculating the proportion of their 10 sampled positive tachograms that are concordant with the ambulatory ECG monitoring and split the participants into tertiles according to the PPV calculated.
- We will split the participants into tertiles based on the time until AF appears on their ambulatory ECG monitoring.

For each approach, we will construct separate 95% confidence intervals around the probability of being diagnosed with AF in each tertile. These analyses will help us to understand how the estimates addressing Objective 1a and 1b differ according to AF burden.

We will summarize the self-reported contact with a health care provider, use of subsequent therapies for AF, and reason for not following up with a health care provider within 3 months after notification among participants who receive a notification but do not receive an ePatch.

To understand the sensitivity of our findings to the assumptions about missing data due to short wear times, we will vary the requirement that participants with less than 1 hour of wear time be considered as missing their ECG data. We will conduct additional sensitivity analyses considering the following alternative minimum wear times: 6 hours, 1 day, 2 days, and 5 days. Such analyses may provide insight into whether performance of the IPNA varies by a minimal

20

Statistical Analysis Plan
Apple Heart Study
Version 1.6
9 November 2018

observational time, which may or may not have a correlation to characteristics of clinical relevance including burden of AF.

To evaluate the uncertainty introduced by sampling tachograms in the co-primary endpoint, we will perform additional analyses to understand the variability in the estimated confidence intervals across various samples. Because only sampled tachograms will be adjudicated by clinicians, we will use the results of the BioT overreads in place of the adjudicated results. We will repeat the tachogram sampling in 10,000 bootstrap resamples and calculate the confidence interval in each replicate to generate a distribution of confidence intervals based on the resamples. We will graphically display the distribution of confidence intervals and will summarize the upper and lower bounds of the confidence intervals to characterize the uncertainty in our estimated confidence intervals.

**Adverse Events**

A participant will be counted once for a reported AE even if the participant had multiple occurrences of that AE. We will summarize the proportion of participants reporting anxiety in the FAS and the NAS and will summarize the proportion of participants reporting rash in the NAS and EAS. AEs reported with an action taken of "Investigational product permanently stopped" will be summarized by age group and overall in participants who receive notifications, in participants who do not receive notifications, and overall. All AEs will be collected; however, these AEs are of most interest to the study device (anxiety) and are highest risk in the study (rash).

|              | N FAS | % FAS | N NAS | % NAS |
|--------------|-------|-------|-------|-------|
| #AEs Anxiety |       |       |       |       |
| #AEs Rash    |       |       |       |       |

The participant incidence of all serious adverse events will be presented for each analysis set by age group and overall.

21

Statistical Analysis Plan
Apple Heart Study
Version 1.6
9 November 2018

|  | N SAEs | N unique participants with SAEs | SAEs/participants with SAEs |
|---|---|---|---|
| 22-39 |  |  |  |
| 40-54 |  |  |  |
| 55-64 |  |  |  |
| 65+ |  |  |  |
| Overall |  |  |  |

**Analysis of Fall-Out Subgroup**

The fall-out subgroup (a subset of the NAS) will include participants who received a notification, but provide incomplete data for various reasons or delay in providing data. The reasons for inclusion in the fall-out subgroup are:

- Failure to call Study Telehealth Provider within 30 days after notification.
- Urgent symptoms discovered during Study Visit #1 virtual medical evaluation by Study Telehealth Provider requiring immediate direction to EMS (urgent care clinic or emergency room) for medical care.
- Failure to return an ePatch within 45 Days after Visit #1.

We will estimate the proportion who self-report contact with a health care provider within 3 months after notification and subsequent therapies for AF in the fall-out subgroup. Furthermore, we will summarize the self-reported reasons for not following up with a health care provider in the fall-out subgroup.

**Analysis to Determine Minimum Requirements for Wear Time of the ePatch**

An analysis will be conducted to identify the minimum amount of wear time of the ePatch required to identify most cases of AF. For all participants positively determined to have AF

22

Statistical Analysis Plan
Apple Heart Study
Version 1.6
9 November 2018

during their observation time via ePatch, we will graphically depict the time at which AF was first detected over time. In addition, for all patients with an IPN in the EAS, time to AF will be derived as a right-censored variable where the variable is equal to the minimum of the time until the first AF event or the length of time the ambulatory ECG patch is worn. Participants who do not have any AF events during their patch wear time will be right-censored at the end of their patch wear.

Our objective will be to identify the amount of wear time needed to capture 90% of AF events occurring during the 7 day wear period. To that end, we will graphically depict the AF-free curve using Kaplan-Meier methods. The time when 90% of AF events have occurred will be estimated from the curve along with a 95% confidence interval calculated using Greenwood's formula.

### Device Sensitivity Analysis

We will perform an analysis to estimate the sensitivity (i.e. the true positive rate) of the device in detecting irregularities consistent with AF. In the analysis, we will estimate the proportion of participants who have an IPNA positive for an irregular rhythm consistent with AF during the period when they are undergoing simultaneous ambulatory ECG monitoring among participants with AF confirmed by ECG. These positive IPNA triggers will not result in additional notifications to participant, but will be available for analyses.  Each participant contributes one observation in this analysis. We expect that the device sensitivity may be low. The low sensitivity is expected because tachograms are retrieved only when available from the Apple Watch platform; the Heart Study app does not have the ability to control the collection and storage of tachograms and relies on the platform to do this.

## 4.5 Definitions

### Irregular Arrhythmias

AF is defined as irregular QRS complexes with no clearly discernible p-waves lasting 30s or more ever during the ECG monitoring. In tertiary analyses, we consider definitions requiring longer periods of AF, up to 24 hours.

Sinus arrhythmia is defined as a beat-to-beat variation lasting at least 120ms with discernible sinus p-waves ever during the ECG monitoring.

Frequent PACs are defined as p-waves that are observed before the predicted time interval. A participant is considered to have frequent PACs if they average 30 or more PACs/hour during the ambulatory ECG monitoring.

Statistical Analysis Plan
Apple Heart Study
Version 1.6
9 November 2018

Frequent PVCs are defined as wide QRS complexes without preceding p-waves. A participant is considered to have frequent PVCs if their (total number of PVCs/total number of beats)*100% is ≥ 5% and very frequent PVCs if ≥ 15% during the ambulatory ECG monitoring. (See the next subsection for criteria used to indicate presence of PACs and PVCs at the tachogram-level.)

Intermittent heart block is defined as the presence of p-waves that are not followed by a QRS complex and are not preceded by a gradually prolonging PR interval. No minimum amount of time is required.

Multifocal atrial tachycardia is defined as an irregular, narrow complex tachycardia with discernable preceding p-waves preceding the QRS complex that are of at least two different morphologies, lasting at least 30 seconds.

Atrial tachycardia with variable conduction is defined as an irregular narrow complex tachycardia with one predominant p-wave morphology lasting at least 30 seconds. The p-waves are followed by QRS complexes with varying ratios, from one QRS for every p-wave, to one QRS for multiple p-waves. The p-waves are a distinct morphology from typical flutter waves.

## Tachogram Level Concordance

For AF, the ambulatory ECG monitoring will be considered to be concordant with a positive tachogram if there is at least 30 seconds of AF observed on the ambulatory ECG monitor during the tachogram and the 1 minute recorded before and after the tachogram. The participant-level definition described above for sinus arrhythmia, intermittent heart block, multifocal atrial tachycardia, and atrial tachycardia with variable conduction will be applied to the period of ambulatory ECG monitoring during the tachogram and the 1 minute recorded before and after the tachogram. The 1 minute buffer is to ensure that clock drift between the Watch and ECG patch does not invalidate the "simultaneous" nature of the comparison.

For frequent PACs, the ambulatory ECG monitoring will be considered to be concordant with a positive tachogram if there are 3 or more PACs observed on the ambulatory ECG monitor during the tachogram and the 1 minute recorded before and after the tachogram. For frequent PVCs, the ambulatory ECG monitoring will be considered to be concordant with a positive tachogram if there are 3 or more PVCs observed on the ambulatory ECG monitor during the tachogram and the 1 minute recorded before and after the tachogram. Very frequent PVCs occur when 9 or more PVCs are observed.

Tachogram level concordance will only be estimated for participants who began wearing the ECG patch within 14 days of shipment so that clock drift between the Watch and ECG patch

24

does not exceed the 1 minute buffer described above and invalidate the "simultaneous" nature
of the comparison.

**Notification Level Concordance**

The ambulatory ECG monitoring will be considered to be concordant with a positive IPNA if
30 seconds of AF is observed on the ambulatory ECG monitor during any of the 5-6
tachograms recorded during the period triggering the notification and the 1 minute recorded
before and after each of the tachograms.

## 4.6  Handling of Missing Data

In analyses where the endpoint is measured using data collected from the ambulatory ECG
monitoring, participants who have at least one hour of analyzable wear time during the
simultaneous ECG monitoring will be included in the analyses (EAS). We will use any
available tachograms and no data will be considered missing.

Multiple imputation methods will be used in the analyses of patient reported outcomes to
account for an expected small proportion of participants who do not complete all questions.

## 4.7  Potential Limitations and Mitigation Strategies

We have identified several potential limitations in our planned analyses and have planned
various sensitivity analyses and alternate approaches to understand and mitigate the impact of
these limitations on our findings. The ePatch is not worn at the time of the initial notification
and we may not detect AF on the subsequent ambulatory ECG monitoring, particularly in
participants with low burden AF. We additionally expect that some participants will wear their
ePatch for a period shorter than 7 days. We acknowledge that several factors may contribute
to an overestimated or underestimated proportion of the true AF in participants who receive an
irregular pulse notification. We describe above sensitivity analyses to evaluate the sensitivity
of our estimate to the minimum wear time for inclusion in the analysis (described in Section
4.3).

In particular, we anticipate several biases that may impact the estimate of the true PPV.

- Patch Wear Bias: We anticipate that not all participants will wear their patches for the
  full 7 day wear period. We acknowledge that wear periods shorter than 7 days and a
  study design where the ePatch is worn during a period that follows the initial
  notification (and not simultaneously) will likely contribute to an underestimated true
  proportion of AF in participants who receive an IPN because the AF that triggered the
  initial notification may not be detected during the subsequent ambulatory ECG

25

Statistical Analysis Plan
Apple Heart Study
Version 1.6
9 November 2018

monitoring. To evaluate the degree that the true proportion may be underestimated, we will compare the proportion of patients with AF as estimated in Objective 1a and 1b (the first primary endpoint below) with the proportion of concordant intervals as estimated in the first secondary endpoint. Furthermore, we will evaluate the sensitivity of our estimates addressing Primary Objectives 1 and 2 to the minimum wear time for inclusion in the analysis (described in Section 4.3).

- Missing Data Bias: For some participants, the IPN will occur but no subsequent analyzable ECG monitoring data will be available (e.g., participant requires urgent care, participant doesn't return patch).  Because these participants will not provide ambulatory ECG monitoring data, they will not be included in analyses to estimate the proportions in Primary Objectives 1 and 2 . Their exclusion may bias the estimates up or down. Participants who require urgent care are presumably more likely to have AF and their exclusion would lead to an underestimate. On the other hand, participants who do not return patch may be less sick and their exclusion would result in an overestimate of the proportion of participants with AF. This bias is an inherent limitation of an observational study.

- Observation Period Bias: It is possible that participants may receive an IPN but the subsequent ECG monitoring may not be of sufficient length to observe AF. If this bias is present, we would expect to see the Kaplan-Meier plot in the analysis to determine minimum requirements for wear time of the ePatch continue to increase through the maximum wear time observed (as opposed to a Kaplan-Meier plot that plateaus prior to the maximum wear time observed).

- Spectrum Bias: Varying lengths of watch wearing across participants could lead us to identify more paroxysmal than persistent AF. In a tertiary analysis, we aim to understand the sensitivity of our findings to the definition of AF based on observing at least 60 seconds of AF. We consider AF lasting at least 6 minutes, 1 hour, 6 hours, and 24 hours as alternative definitions.

- Gold Standard Bias: It is possible that an IPN may occur during the simultaneous ambulatory ECG monitoring but the ECG incorrectly indicates no AF is present. We aim to mitigate this bias by using an FDA-cleared device and implementing a clinical adjudication process to over-read both the ePatch report and individual tachogram time-point on the raw ECG data.

Analyses performed at the tachogram level assume that the tachograms within the same participant are independent; however, this assumption may be violated because the tachograms are samples from an underlying process. We will evaluate our assumption of independence using the Wald-Wolfowitz run test to evaluate whether the sequence of positive tachograms within participants is longer than expected. If the test indicates that the

26

Statistical Analysis Plan
Apple Heart Study
Version 1.6
9 November 2018

assumption may be violated (as indicated by a p-value less than 0.05), we will consider alternate methods to account for the non-independence of tachograms, including statistical methods that incorporate the correlation within a participant and a sampling approach to select tachograms that are farther apart in time and hence expected to be less correlated.

## 5. INTERIM CHECKS

A series of interim checks will be performed.

Throughout the course of the study, we will check the number of irregular pulse watch notifications occurring per age subgroup. If a high number of notifications is observed (greater than 10%), enrollment may be paused or throttled downward in any age subgroup (<40, 40-54, 55-64, ≥65), as informed by the empirical findings. If the number of notifications observed is less than the study infrastructure capacity, the numbers of participants invited to enroll from the "waiting period" may be increased.

|       | N FAS | N IPN | Alert Rate (IPN/FAS) | Greater than 10%? |
|-------|-------|-------|----------------------|-------------------|
| <40   |       |       |                      |                   |
| 40-54 |       |       |                      |                   |
| 55-64 |       |       |                      |                   |
| 65+   |       |       |                      |                   |

An interim check will be performed upon completion of the first 100 ambulatory ECG monitors in each of the four age subgroups. The interim check will be performed for each subgroup regardless of how many patches are received in other age subgroups. We estimate the first check to occur at approximately 6-8 weeks after the first participant enrolled to check the following:

1) At least 50% of participants notified of an irregular pulse are ultimately wearing and returning the ambulatory ECG monitor. A low rate of ambulatory ECG monitor use would result in an increase in the rates of invitations to enrollment in any age subgroup.

27

Statistical Analysis Plan
Apple Heart Study
Version 1.6
9 November 2018

2) Percentage of AF noted on ambulatory ECG monitoring is greater than 1%.   A detection of AF less than 1% will prompt a cessation of enrollment in any corresponding age subgroup.

3) Percentage of non-clinically relevant irregular rhythms is greater than 90%. If the vast majority of rhythms detected on ambulatory ECG monitoring are due to other irregular, non-AF arrhythmias, such as sinus arrhythmia, frequent PACs and frequent PVCs, this will prompt a cessation of enrollment in any corresponding age subgroup.

The co-primary endpoints will be evaluated after at least 503 participants aged ≥65 have at least 1 hour of ambulatory ECG monitor data recorded, i.e. at least 503 participants who are in the EAS.

| | N EAS | N IPN | N AF diagnosis | IPN and AF diagnosis/EAS (97.5% CI) | N Irregular rhythm on ECG | N Irregular tachograms | Irregular rhythm on ECG/# Irregular tachograms (97.5% CI) |
|---|---|---|---|---|---|---|---|
| 22-39 | | | | | | | |
| 40-54 | | | | | | | |
| 55-64 | | | | | | | |
| 65+ | | | | | | | |

These analyses are designed to maintain trial integrity and patient safety and not designed to evaluate ultimate efficacy or futility and do not impact the Type I error as we will not be examining the positive predictive values of the co-primary endpoints using this interim analysis.

A much higher than anticipated rate of notifications and subsequent ePatch evaluations may result in marginal benefit of additional participant enrollment. The following will be set as maximum targets for ePatch monitoring.  Exceeding these limits will trigger either a throttling downward or cessation of enrollment:

28

Statistical Analysis Plan
Apple Heart Study
Version 1.6
9 November 2018

1) Completion of 5,000 ePatches in total in either participants ≥ 65 or participants aged 22-64 will result in cessation of enrollment in the corresponding age group.

2) Completion of > 100 ePatches per week in either participants ≥ 65 or participants aged 22-64 will result in a throttling downward of enrollment invitations in the corresponding age groups.

# 6. VALIDATION PLAN

## 6.1  Reproducibility Plan on Sub-Study Analysis

Stanford will follow the methods described in the AHS Sub-Study SAP (SSSAP) with the goal of reproducing Apple's results using the data collected per the AHS Sub-Study Protocol. The Sub-Study is limited to the sub-study participants as of approximately June 22, 2018. This reproducibility plan encompasses all primary and secondary endpoints described in Section 5 of the SSSAP (primary efficacy endpoint, secondary efficacy endpoint, and the primary safety endpoint).

The reproduction will include reproducing the sampling of the tachograms. Apple will provide Stanford with the seed used to generate the pseudorandom numbers used to select the sampled tachograms. Stanford will apply the seed to the data provided by Apple to check that the tachograms sampled match the sample used by Apple in the Sub-Study analysis. Apple will provide Stanford with the sampled tachograms used by Apple in the Sub-Study analysis for verification.

Next, we will compare 1) the number of tachograms classified as AF according to the spot tachogram algorithm and 2) the number of tachograms classified as AF by both the spot tachogram algorithm and the paired ECG strip is classified as AF. If both of these counts match, the PPV has been reproduced. If either count does not match, Stanford will share the list of tachograms identified as being AF by the spot tachogram algorithm and in the paired ECG strips with Apple to identify the source of the discrepancy. This process will be repeated for the secondary efficacy endpoint looking at the PPV of the alerts.

Next, a 97.5% lower confidence bound will be calculated for the primary efficacy endpoint of spot tachogram-level PPV for AF following the methods outlined in Section 9.3 of the SSSAP. If the lower bound for the spot tachogram-level PPV exceeds 70%, the null hypothesis described in the SSSAP will be rejected. For the PPV of the alerts, a two-sided exact 95% confidence interval will be computed per Section 9.3 of the SSSAP. Stanford will

29

Statistical Analysis Plan
Apple Heart Study
Version 1.6
9 November 2018

compare all confidence interval bounds and the results of the hypothesis test with Apple. If any discrepancies are found, the two groups will discuss to identify the discrepancy.

Finally, the number of serious adverse device events (ADEs) and the number and percent of participants experiencing ADEs will be calculated. If any of the counts or the percent do not match, Stanford will share their list of ADEs and participants experiencing ADEs with Apple to identify the source of the discrepancy.

## 6.2 Replication on Final AHS Study Data

Stanford will repeat the analyses described in the reproducibility plan using the final Apple Heart Study data set. The results of the analyses will be compared with the results based on the adjudicated patches received by approximately June 22, 2018. If discrepancies are found, the results will additionally be displayed separately using data obtained before and after June 22, 2018 to demonstrate the difference between the two time periods.

The results will also be compared with the results obtained using the methods described in earlier sections of this SAP. If a discrepancy is observed here, additional investigations will be undertaken to identify the methodological source of the discrepancy between the two approaches.

## A1. APPENDIX: AHS SUB-STUDY PROTOCOL AND SAP

# Exhibit F

| | |
|---|---|
| **From:** | Perry.Oldham <Perry.Oldham@knobbe.com> |
| **Sent:** | Friday, May 7, 2021 12:23 PM |
| **To:** | *** Apple-Masimo |
| **Cc:** | Masimo.Apple |
| **Subject:** | Masimo Corp. et al. v. Apple Inc., Case No. 8:20-cv-00048-JVS-JDE - Disclosure of Expert |
| **Attachments:** | Jack Goldberg CV 2021 May07.pdf; Signature page from 2020-06-30 [067] Protective Order [Masimo v Apple].pdf |

[External Email]

Counsel,

Pursuant to Section 9.2 of the Protective Order, please find attached the CV and completed "Acknowledgment and Agreement to Be Bound" (Exhibit A) for Jack Goldberg.

He is not presently an officer, director, or employee of a Party or of a competitor of a Party, nor anticipated at the time of retention to become an officer, director or employee of a Party or of a competitor of a Party.  In addition, he is not involved in competitive decision-making on behalf of a Party or a competitor of a Party.

The attached CV provides the information required by paragraphs 9.2(i) to (v) of the Protective Order.

There may be pending international applications related to U.S. Patent 10,753,337.

Best regards,

Perry

**Perry Oldham**
Partner
949-721-2961
**Knobbe Martens**

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

# metrionix

Metrionix, Inc.
14590 Crestline Drive
Poway, CA  92064-6311
Mobile:  858.735.9411
Fax:       858.876.1899

## Jack Goldberg | Curriculum Vitae

Mr. Goldberg has over 40 years of experience in electronic and electromechanical instrumentation research and product development, with extensive involvement in medical devices, software, audio and acoustics, signal processing, sensors and transducers, measurement, control, and RF and digital communications.  Detailed knowledge also includes embedded hardware and software, biological, speech and radio frequency signal processing, vital signs measurement, infusion pumps, hearing science, and sound reproduction.  He has served as an expert in intellectual property, product liability, breach of contract, and trade secret matters in cases involving medical and scientific instruments, communications systems, and a variety of other complex electronic systems.  His experience includes extensive trial and deposition testimony on behalf of both plaintiffs and defendants, including at the International Trade Commission, as well as litigation support involving the Patent Trial and Appeal Board.  He is a named inventor on 15 issued U.S. patents.

## Jack Goldberg | Expertise

- Acoustics
- Analog & Digital Circuit Design
- Analog & Digital Signal Processing
- Electromagnetics
- Electromechanical Systems
- Embedded Firmware and Software
- Fluid Flow
- Handheld and Low-Power Design
- Hearing Sciences
- Infusion Systems
- Medical Instrumentation
- Microcontroller-Based Systems
- Radio Frequency Technology
- Sensor Technologies
- Vital Signs Measurement
- Litigation Support & Expert Witness

## Jack Goldberg | Education

| Year | College or University | Degree |
|------|----------------------|--------|
| 1993 | California Institute of Technology | Mgmt of Technology and Innovation (certificate) |
| 1978 | Massachusetts Institute of Technology | M.S., Electrical Engineering and Computer Science |
| 1973 | Massachusetts Institute of Technology | B.S., Electrical Engineering and Computer Science |

**m e t r i o n i x**

Metrionix, Inc.
14590 Crestline Drive
Poway, CA  92064-6311
Mobile:  858.735.9411
Fax:      858.876.1899

## Jack Goldberg | Professional Experience

From:           1995
To:             Present
Organization:   Metrionix, Inc.
Title:          President & Owner
Summary:        An engineering and consulting business specializing in areas of electrotechnology and focusing on sensors, control, measurement, medical instrumentation, signal processing, RF technology, communications, audio and acoustics.

- Consulting efforts have included: research and development for various medical, scientific and audio instrument manufacturers, and expert witness work related to intellectual property, product liability, manufacturing and design defects, and breach of contract.

- R&D projects have included: analog and digital radio frequency communication devices; sound measurement and processing systems; miniature human implantable devices and associated sensing means; an optical system for analysis of biomaterials; a system for irrigation control which improves efficiency and conserves water; a solar-powered electrochemical apparatus for mosquito abatement; and acoustical apparatus to assist in the fitting of hearing aids.

- Design of analog and digital circuitry, signal processing and control algorithms, acoustical planning and analysis, testing and evaluation, embedded firmware development and software application development.

- Staff and associates include electrical, software, mechanical, industrial and bioengineers, technicians, and assemblers.  Metrionix has laboratory space for device development, analysis and testing.

From:           2005
To:             December 2012
Organization:   Hearing Enhancement Group, LLC
Title:          Chief Technical Officer / Owner
Summary:        Business involved with the development and marketing of listening devices and other products related to hearing.  Technology focused in the areas of acoustics, signal processing, and control.  Responsibilities included acoustical design, transducer selection, hardware and software design, intellectual property strategy, management of all aspects of product development, and technical interface with overseas factory, including manufacture of acoustic components.  Developed proprietary position-sensing and automatic shutoff system.

# metrionix

Metrionix, Inc.
14590 Crestline Drive
Poway, CA  92064-6311
Mobile:  858.735.9411
Fax:      858.876.1899

From:              1984
To:                1995
Organization       IVAC Corporation
Summary:

1992 – 1995     **Vital Signs Engineering Manager**

- Directed entire staff of 24 in Business Unit of hospital equipment manufacturer. Technical and managerial contributor to three Product Development programs. Managed Operations Engineering efforts for existing line of products, with emphasis on cost and quality improvements, automation, regulatory issues, and customer complaints.  Achievements included:

  o Led team tasked with Product Recall effort and associated response to FDA.

  o Formulated long-term strategy for business unit and sought both technical and marketing partnerships.

  o Created systems to streamline and better control existing business practices to ensure timely introduction of new products and responsiveness to ongoing production issues.

  o Products included infrared and conventional clinical thermometers, and blood pressure measurement systems.

1984 - 1992     **Principal Engineer, Research and Advanced Development Project Leader**

- Performed research and developed proprietary technology in support of fluid delivery systems product line, including flow and pressure measurement subsystems, sensors for detection of air in fluid path and novel temperature measurement technologies.

  o Conceptualized new products, recommended patent strategy, and evaluated business and technical proposals from outside organizations.

  o Led teams for review of technologies for parent corporation, Eli Lilly, including flow measurement of fluids by means of thermal markers, microwave sensing of fluid composition, catheter-based RF tissue ablation, non-invasive measurement of blood glucose and acoustical thermometry.

  o Set up microelectronics prototype lab.

  o Prepared clinical protocols and regulatory submittals.  Served as technical leader in development of new clinical thermometer and devised unique calibration method.

# metrionix

Metrionix, Inc.
14590 Crestline Drive
Poway, CA  92064-6311
Mobile:  858.735.9411
Fax:       858.876.1899

| | |
|---|---|
| From: | 1983 |
| To: | 1984 |
| Organization: | Dyn-Aura Engineering Laboratories |
| Title: | Chief Engineer |
| Summary: | |

- Managed design, production, and test engineering functions for manufacturer of hearing aids, hearing test equipment and associated components.
- Designed analog circuitry and acoustic subassemblies, and improved assembly and test procedures.
- Supervised microelectronics assembly line, significantly increasing production yield.
- Implemented documentation standards and inventory control system.
- Conducted training seminars and product presentations, and contributed to company marketing plans.

| | |
|---|---|
| From: | 1979 |
| To: | 1983 |
| Organization: | Steinbrecher Corporation |
| Title: | Project Leader |
| Summary: | |

- Led product development teams for manufacturer of scientific instruments. Projects included a navigation system based on GPS signals, a sonar signal processing subsystem, and a moisture measurement system employing microwave technology.
- Designed control algorithms, data acquisition subsystems, and software for data analysis and information display.
- Analyzed communications systems for various military and commercial clients.
- Wrote technical operation and service manuals for products.

| | |
|---|---|
| From: | 1978 |
| To: | 1979 |
| Organization: | Mech-El Industries |
| Title: | Manager of Electrical Design |
| Summary: | Managed engineering group for supplier of equipment used in semiconductor manufacturing. |

| | |
|---|---|
| From: | 1973 |
| To: | 1978 |
| Organization: | Grason-Stadler, Inc. |
| Title: | Staff Engineer |
| Summary: | Member of product development team for manufacturer of hearing test and acoustic measurement equipment. |



Metrionix, Inc.
14590 Crestline Drive
Poway, CA  92064-6311
Mobile:  858.735.9411
Fax:      858.876.1899

## Jack Goldberg | Litigation Support Experience

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | Patent Infringement |
| Law Firm: | Knobbe Martens, Irvine, CA |
| Case Name: | Masimo Corp. and Cercacor Labs v True Wearables, Inc. and Marcelo Lamego [No. 18-CV-02001, U.S. District Court, Central District of CA, Southern Div.] |
| Services Provided: | Engaged as expert in patent infringement related to medical instrument design, on behalf of plaintiff and patent owner.  Technology involves pulse oximetry and patient monitoring. |
| Disposition: | Ongoing |
| Date: | May 2021 – present |

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | Patent Infringement |
| Law Firm: | Knobbe Martens, Irvine, CA |
| Case Name: | E&E Co., Ltd. v London Luxury LLC [No. 20-CV-9610, U.S. District Court for Southern District of NY] |
| Services Provided: | Engaged as expert in patent infringement related to heating blanket design, on behalf of plaintiff and patent owner.  Technology involves temperature control and system ergonomics. |
| Disposition: | Ongoing |
| Date: | April 2021 – present |

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | *Inter partes* review, Patent Trial and Appeal Board |
| Law Firm: | Knobbe Martens, Irvine, CA |
| Case Name: | Sotera Wireless v Masimo Corporation [IPR2020-00967, IPR2020-01019, IPR2020-01033, IPR2020-01078] |
| Services Provided: | Defense against *inter partes* review regarding four patents related to medical instrument design, on behalf of patent owner.  Technology involves pulse oximetry and patient monitoring. |
| | Deposed:            Apr 13, 2021; Apr-14, 2021; Apr 22, 2021 |
| Disposition: | Ongoing |
| Date: | December 2020 – present |

# metrionix

Metrionix, Inc.
14590 Crestline Drive
Poway, CA  92064-6311
Mobile:  858.735.9411
Fax:       858.876.1899

---

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | Patent Infringement |
| Law Firm: | Knobbe Martens, Irvine, CA |
| Case Name: | Masimo Corporation v Sotera Wireless and Hon Hai Precision Industry Co. |
| | [No. 19CV1100 BAS NLS, U.S. District Court for Southern District of CA] |
| Services Provided: | Engaged as expert in patent infringement related to medical instrument design, on behalf of plaintiff and patent owner.  Technology involves pulse oximetry and patient monitoring. |
| | Deposed:                    Sep 9, 2020 |
| Disposition: | Case stayed pending conclusion of IPR |
| Date: | April 2020 – present |

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | Misappropriation of trade secrets, International Trade Commission |
| Law Firm: | Brinks Gilson & Lione, Washington, DC |
| Case Name: | Knowles Corporation, et al v Bellsing Corporation, Liang Li, Suzhou Mingshi Automation Technology Co, et al |
| | [No. 337-TA-1186, International Trade Commission] |
| Services Provided: | Engaged as expert in trade secrets matter related to miniature acoustic transducer devices, on behalf of Bellsing and other Respondents. |
| Disposition: | Law firm filed a Withdraw of Appearance in this case |
| Date: | Feb 2020 – Sep 2020 |

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | Product liability, design and manufacturing defects, negligence |
| Law Firm: | Clark Hill, PLC, Los Angeles, CA |
| Case Name: | Aimmy Wilson, et al v Welch Allyn, Scale-Tronix, Kaiser Hospitals, et al |
| | [No. BC677924, Superior Court, County of Los Angeles] |
| Services Provided: | Engaged as expert in case related to injury having to do with Pediatric Scale, on behalf of defendant Scale-Tronix. |
| Disposition: | Ongoing |
| Date: | June 2019 – present |

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | Professional and corporate negligence |
| Law Firm: | Gerald I. Gillock & Associates, Timothy R. O'Reilly, CHTD, Las Vegas, NV. |
| Case Name: | Troy Spriggs v Summerlin Hospital, Joyce Parco, RN, Irene Voo, MD, et al. |
| Services Provided: | Engaged as expert in case related to retina repair surgery, on behalf of plaintiff. |
| Disposition: | Settled |
| Date: | January 2019 – Nov 2019 |

---

**Jack Goldberg | Curriculum Vitae**          May7, 2021                              page 6 of 22

**metrionix**

Metrionix, Inc.
14590 Crestline Drive
Poway, CA  92064-6311
Mobile:  858.735.9411
Fax:      858.876.1899

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | Breach of contract, fraud |
| Law Firm: | Borgelt Powell Peterson & Frauen, Milwaukee, WI. |
| Case Name: | RF Technologies, Inc. v LS Research, LLC and Laird Technologies, LLC. [No. 2:17-CV-94, Eastern District of Wisconsin] |
| Services Provided: | Engaged as expert in case related to design and development of drive-through restaurant communications system, on behalf of defendants. |
| Disposition: | Settled |
| Date: | September 2018 – November 2018 |

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | Design defect, manufacturing defect, product liability |
| Law Firm: | Brock & Goetzmann, PLCC, Dallas, TX |
| Case Name: | Crystal Duran et al v Carefusion 303, et al [No. 3:16-cv-01724, Northern District of Texas, Dallas Div.] |
| Services Provided: | Engaged as expert in case related to medical infusion pump, on behalf of plaintiffs. |
| Disposition: | Settled |
| Date: | February 2018 – October 2018 |

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | *Inter partes* review, Patent Trial and Appeal Board |
| Law Firm: | Robins Kapan LLP, Minneapolis, MN |
| Case Name: | Medtronic v Boston Scientific |
| Services Provided: | Preparation for filing *inter partes* review challenges regarding patents related to spinal neurostimulation technology, on behalf of petitioner. |
| Disposition: | Case transferred to alternative expert |
| Date: | April 2017 – May 2017 |

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | Patent infringement, International Trade Commission |
| Law Firm: | Procopio, Cory, Hargreaves & Savitch, San Diego, CA |
| Case Name: | Neology, Inc. v Kapsch Trafficcom IVHS Inc., Star Systems Int'l Ltd., et al [No. 337-TA-979, International Trade Commission] |
| Services Provided: | Engaged as expert in patent infringement related to radio frequency identification devices, on behalf of Complainant and patent owner Neology. Deposed:           Aug 1, 2016; Aug 2, 2016 Hearing Testimony:    Sep 14, 2016; Sep 15, 2016 Sep 21, 2016, Sep 22, 2016 |
| Disposition: | Finding of no violation of Section 337 |
| Date: | December 2015 – June 2017 |

# metrionix

Metrionix, Inc.
14590 Crestline Drive
Poway, CA  92064-6311
Mobile:  858.735.9411
Fax:       858.876.1899

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | Patent infringement |
| Law Firm: | Knobbe Martens Olson & Bear, Irvine, CA |
| Case Name: | Masimo v Philips Electronics and Philips Medizin Systeme Boblingen GMBH [No. 09-80; District of Delaware] |
| Services Provided: | Engaged as expert in patent infringement related to medical instrument design; on behalf of plaintiff and patent owner.  Technology involves pulse oximetry. |
| Disposition: | Settled |
| Date: | January 2010 – November 2016 |

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | *Inter partes* review, Patent Trial and Appeal Board |
| Law Firm: | Procopio, Cory, Hargreaves & Savitch, San Diego, CA |
| Case Name: | Kapsch Trafficcom IVHS Inc., et al v Neology, Inc. [IPR2015-0814, IPR2015-0818, IPR2015-0819] |
| Services Provided: | Defense against *inter partes* review regarding three patents related to radio frequency identification devices, on behalf of patent owner. |
| | Deposed:               Feb 10, 2016; Feb 16, 2016 |
| Disposition: | Project completed |
| Date: | February 2015 –September 2016 |

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | *Inter partes* review, Patent Trial and Appeal Board |
| Law Firm: | Sterne, Kessler, Goldstein & Fox, Washington, DC |
| Case Name: | Hearing Instrument Manufacturers Patent Partnership v AT&T |
| Services Provided: | Preparation of potential *inter partes* review filings related to hearing aids and telephone/wireless communications technologies, on behalf of petitioner. |
| Disposition: | Settled |
| Date: | February 2015 – May 2016 |

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | Patent infringement |
| Law Firm: | Procopio, Cory, Hargreaves & Savitch, San Diego, CA |
| Case Name: | Neology, Inc. v Kapsch Trafficcom IVHS Inc., Star Systems Int'l Ltd., et al [No. 13-2052; District of DE] |
| Services Provided: | Engaged as expert in patent infringement related to radio frequency identification devices, on behalf of plaintiff and patent owner. |
| Disposition: | Case stayed |
| Date: | February 2014 –January 2016 |

# metrionix

Metrionix, Inc.
14590 Crestline Drive
Poway, CA 92064-6311
Mobile: 858.735.9411
Fax:       858.876.1899

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | Patent infringement |
| Law Firm: | Knobbe Martens |
| Case Name: | Dane Technologies, Inc. v Gatekeeper Systems, Inc. |
| | [No. 12-cv-2730, District of Minnesota] |
| Services Provided: | Engaged as expert in patent infringement related to remotely controllable electric-powered vehicles, on behalf of defendant accused of infringement. |
| | Deposed:                  Apr 8, 2015; Apr 9, 2015 |
| Disposition: | Settled |
| Date: | January 2014 – January 2016 |

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | Patent infringement |
| Law Firm: | K&L Gates LLP, Chicago, IL |
| Case Name: | Baxter International, Inc. v Fresenius Medical Care |
| | [No. 12-cv-06890; Northern District of IL, Eastern Division] |
| Services Provided: | Engaged as expert in patent infringement related to medical instrument design, on behalf of plaintiff and patent owner.  Technology involves dialysis. |
| Disposition: | Settled |
| Date: | October 2012 – April 2015 |

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | Patent infringement |
| Law Firm: | Brown Wegner McNamara |
| Case Name: | Gatekeeper Systems, Inc. v Carttronics |
| | [No. 13-cv-2531, Southern District of California] |
| Services Provided: | Engaged as expert in patent infringement related to systems to prevent theft of shopping carts, on behalf of plaintiff and patent owner and on behalf of counter-defendant accused of infringement. |
| Disposition: | Settled |
| Date: | May 2014 – July 2014 |

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | Patent infringement |
| Law Firm: | Parsons, Behle and Latimer |
| Case Name: | Exergen Corp. v Thermomedics, Inc. and Sonomedics Intl |
| | [No. 13-cv-11243, District of Massachusetts] |
| Services Provided: | Engaged as expert in patent infringement related to medical forehead thermometer design, on behalf of defendant accused of infringement. |
| Disposition: | Case transferred to a different law firm |
| Date: | December 2013 – July 2014 |

# metrionix

Metrionix, Inc.
14590 Crestline Drive
Poway, CA  92064-6311
Mobile:  858.735.9411
Fax:       858.876.1899

---

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | Patent infringement |
| Law Firm: | Brinks Hofer Gilson & Lione, Chicago, IL |
| Case Name: | Northgate Technologies, Inc. v. Stryker Corporation and World Of Medicine [No. 12-cv-7032, Northern District of IL, Eastern Division] |
| Services Provided: | Engaged as expert in patent infringement related to medical instrument design involving laparoscopic insufflation, on behalf of plaintiff and patent owner. Deposed:                    May 6, 2014 |
| Disposition: | Settled |
| Date: | April 2013 – May 2014 |

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | Breach of contract and intellectual property infringement |
| Law Firm: | Ogletree, Deakins, Nash, Smoak & Stewart, Los Angeles, CA |
| Case Name: | Mortgage Industry Solutions, Inc. v. Collabera, Inc. [No. 2:11-CV-4008, Central District of CA] |
| Services Provided: | Engaged as expert in case related to mortgage-location software, on behalf of defendant. |
| Disposition: | Settled |
| Date: | April 2012 – September 2013 |

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | Patent infringement |
| Law Firm: | Knobbe Martens Olson & Bear, Irvine, CA |
| Case Name: | DatCard Systems, Inc. v Pacsgear, Inc. [No. SACV 10-1288; Central District of CA, Southern Div.] |
| Services Provided: | Engaged as expert in patent infringement related to medical informatics, on behalf of plaintiff and patent owner. Deposed:                    Dec 14, 2011 |
| Disposition: | Final judgement in favor of defendant |
| Date: | September 2011 – June 2013 |

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | Patent infringement, International Trade Commission |
| Law Firm: | Procopio, Cory, Hargreaves & Savitch, San Diego, CA |
| Case Name: | Neology, Inc. v Federal Signal Corp, et al [No. 337-TA-875, International Trade Commission] |
| Services Provided: | Engaged as expert in patent infringement related to radio frequency identification devices, on behalf of Complainant and patent owner Neology. |
| Disposition: | Settled |
| Date: | February 2013 – May 2013 |

---

# metrionix

Metrionix, Inc.
14590 Crestline Drive
Poway, CA  92064-6311
Mobile:  858.735.9411
Fax:       858.876.1899

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | Patent infringement |
| Law Firm: | Procopio, Cory, Hargreaves & Savitch, San Diego, CA |
| Case Name: | Neology, Inc. v Federal Signal Corp, et al |
| | [No. 11-672; District of Delaware] |
| Services Provided: | Engaged as expert in patent infringement related to radio frequency identification devices, on behalf of plaintiff and patent owner. |
| | Deposed:                      Apr 20, 2012 |
| | Hearing Testimony:      May 1, 2012. |
| Disposition: | Settled |
| Date: | October 2011 – February 2013 |

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | Patent infringement |
| Law Firm: | Knobbe Martens Olson & Bear, Irvine, CA |
| Case Name: | SIPCO LLC v SmartLabs Inc, et al |
| | [No. 6:11-cv-00048; Eastern District of TX, Tyler Division] |
| Services Provided: | Engaged as expert in patent infringement related to monitoring and controlling of remote devices, on behalf of defendant accused of infringement. |
| Disposition: | Settled |
| Date: | September 2012 – February 2013 |

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | Patent infringement |
| Law Firm: | Olson & Cepuritis, Ltd; Chicago, IL |
| Case Name: | Medisim Ltd v BestMed, LLC |
| | [No. 10-CV-2463; Southern District of New York] |
| Services Provided: | Engaged as expert in patent infringement related to medical thermometer design, on behalf of defendant accused of infringement. |
| | Trial Testimony:       Feb 6, 2013; Feb 7, 2013 |
| Disposition: | Jury verdict in favor of plaintiff subsequently overturned by court. |
| Date: | March 2011 – February 2013 |

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | Patent infringement |
| Law Firm: | Nixon Peabody, LLP; Palo Alto, CA |
| Case Name: | HID Global Corp, et al. v Farpointe Data, Inc., et al. |
| | [No. SACV 10-01954; Central District of California] |
| Services Provided: | Engaged as expert in patent infringement related to radio frequency identification devices, on behalf of defendant accused of infringement. |
| | Deposed:                      Sep 23, 2011 |
| Disposition: | Settled |
| Date: | July 2011 – August 2012 |

# metrionix

Metrionix, Inc.
14590 Crestline Drive
Poway, CA  92064-6311
Mobile:  858.735.9411
Fax:       858.876.1899

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | Patent infringement, International Trade Commission |
| Law Firm: | Quinn Emanuel Urquhart & Sullivan, New York, NY |
| Case Name: | Apple Inc. v Samsung Electronics Co., Ltd., et al. |
| | [No. 337-TA-796; International Trade Commission] |
| Services Provided: | Engaged as expert in patent infringement related to audio and communication devices, on behalf of Respondent Samsung accused of infringement. |
| | Deposed:                    Oct 20, 2011 |
| Disposition: | Project complete |
| Date: | September 2011 –July 2012 |

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | Breach of contract, misappropriation of trade secrets. |
| Law Firm: | Holme Roberts & Owen, Denver, CO |
| Case Name: | SA Neurelec v. Otologics et al |
| | [No. 2008CV10601; District Court, City and County of Denver, Colorado] |
| Services Provided: | Engaged as expert in case related to cochlear implant development, on behalf of plaintiff. |
| | Deposed:                    Nov 23, 2010 |
| | Trial Testimony:        Feb 9, 2011; Feb 10, 2011 |
| Disposition: | Jury verdict in favor of plaintiff |
| Date: | June 2010 – February 2011 |

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | Patent infringement, technology review |
| Law Firm: | Law Offices of S.J. Christine Yang, Fountain Valley, CA |
| Case Name: | -- |
| Services Provided: | Review and prior art search related to infrared thermometry patents. |
| Disposition: | Project complete |
| Date: | March 2010 – August 2010 |

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | Breach of contract |
| Law Firm: | Carstens & Cahoon, LLP, Dallas, TX |
| Case Name: | Jin Song v. PIL, LLC and Publications International, Ltd. |
| | [No. 08-CV-2807; Northern District of Illinois] |
| Services Provided: | Engaged as expert in case regarding royalty agreement on behalf of plaintiff. Technology involves electromagnetic sensing. |
| Disposition: | Settled |
| Date: | November 2009 – June 2010 |

# metrionix

Metrionix, Inc.
14590 Crestline Drive
Poway, CA  92064-6311
Mobile:  858.735.9411
Fax:      858.876.1899

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | Product liability |
| Law Firm: | Law Offices of Randolph M. Even & Assoc, Woodland Hills, CA |
| Case Name: | Vega, et al v. Verizon, Selander, et al |
| | [No. 1341106, Superior Court of California, County of Santa Barbara] |
| Services Provided: | Engaged as expert in case related to operation of infusion pump worn by diabetic driver involved in an automobile accident on behalf of defendant. |
| Disposition: | Case transferred to different law firm |
| Date: | May 2010 |

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | Patent infringement |
| Law Firm: | Foley Hoag LLP, Boston, MA |
| Case Name: | Analog Devices v. Hittite Microwave |
| | [No. 1:2008cv11626; District of Massachusetts] |
| Services Provided: | Engaged as expert in patent infringement related to analog circuit design and power detection on behalf of defendant accused of infringement. |
| Disposition: | Settled |
| Date: | November 2008 – April 2010 |

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | False advertising, unfair competition |
| Law Firm: | Law Offices of Michael Kinney, Bonsall, CA |
| Case Name: | Codonics, Inc. v. DatCard Systems |
| | [No. 1:08-cv-1885; Northern District of Ohio] |
| Services Provided: | Engaged as expert in case related to hospital information system on behalf of defendant. |
| | Deposed:                       Dec 29, 2009 |
| Disposition: | Settled |
| Date: | April 2009 – January 2010 |

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | Patent infringement |
| Law Firm: | Knobbe Martens Olson & Bear, Irvine, CA |
| Case Name: | DatCard Systems, Inc. v. Codonics, Inc. |
| | [No. SA CV 08-00063, Central District of California, Southern Div.] |
| Services Provided: | Engaged as expert in patent infringement related to medical informatics on behalf of plaintiff and patent owner. |
| Disposition: | Stayed pending patent re-examination |
| Date: | December 2008 – October 2009 |

# metrionix

Metrionix, Inc.
14590 Crestline Drive
Poway, CA  92064-6311
Mobile:  858.735.9411
Fax:       858.876.1899

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | Patent infringement |
| Law Firm: | Howrey, LLP, San Francisco, CA |
| Case Name: | AuthenTec, Inc. v. Atrua Technologies, Inc. |
| | [No. 3:08-CV-1423, Northern District of California, San Francisco Div.] |
| Services Provided: | Engaged as expert in patent infringement related to biometric sensing, on behalf of plaintiff and patent owner. |
| | Technology Tutorial:     Apr 16, 2009. |
| Disposition: | Settled |
| Date: | November 2008 – June 2009 |

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | Patent infringement |
| Law Firm: | Baker & McKenzie, San Diego, CA |
| Case Name: | Single Chip Systems and Neology v. Transcore and Intermec |
| | [No. 04 CV 1517; Southern District of California] |
| Services Provided: | Engaged as expert in patent infringement related to radio frequency communications devices on behalf of plaintiff and counter-defendant. |
| | Deposed:                    Jun 9, 2006; May 11, 2007 |
| | Trial Testimony:          Aug 22, 2007; Aug 23, 2007 |
| Disposition: | Settled |
| Date: | March 2006 – August 2007 |

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | Product liability |
| Law Firm: | Lemons, Grundy & Eisenberg, Las Vegas, NV |
| Case Name: | Linda Wissenback v. BMW of North America, LLC, et al. |
| | [No. A474540, District Court, Clark County, Nevada] |
| Services Provided: | Engaged as expert in case related to failure of sound system, on behalf of plaintiff. |
| | Deposed:                    Nov 20, 2006 |
| Disposition: | Settled |
| Date: | September 2006 – April 2007 |

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | Product liability, negligence |
| Law Firm: | Law Offices of Robert Goldberg, Roswell, GA |
| Case Name: | Tara Lena Cameron v. Apria Healthcare, Inc., Respironics, Oxyplus |
| | [No. 2005CV101016, Superior Court of Georgia, Fulton County] |
| Services Provided: | Engaged as expert in case related to alleged failure of infant apnea monitor on behalf of plaintiff. |
| Disposition: | Settled |
| Date: | March 2006 – November 2006 |

**m e t r i o n i x**

Metrionix, Inc.
14590 Crestline Drive
Poway, CA  92064-6311
Mobile:  858.735.9411
Fax:       858.876.1899

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | Patent infringement |
| Law Firm: | Sheppard Mullin Richter & Hampton, Los Angeles, CA |
| Case Name: | Beckman Coulter, Inc. v. Applera Corp. |
| | [No. SA CV 02-624, Central District of California, Southern Div.] |
| Services Provided: | Engaged as expert in patent infringement related to biotechnology instrument design; on behalf of plaintiff.  Technology involves temperature control |
| | Deposed:            Jun 8, 2005 |
| Disposition: | Settled |
| Date: | June 2004 – April 2006 |

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | Opposition regarding European patent validity |
| Law Firm: | Vossius & Partner, Munich, Germany |
| Case Name: | Opposition to EP 763349 B1 (Exergen Corp.) by S.A.A.T. Ltd |
| Services Provided: | Engaged as expert in case related to patent involving infrared medical thermometry, on behalf of opponent. |
| Disposition: | Patent not amended |
| Date: | October 2004 – March 2006 |

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | Patent infringement |
| Law Firm: | Knobbe Martens Olson & Bear, Irvine, CA |
| Case Name: | Nellcor / Tyco Healthcare v. Masimo |
| Services Provided: | Engaged as expert in patent infringement related to medical instrument design; on behalf of defendant.  Technology involves pulse oximetry |
| Disposition: | Settled |
| Date: | September 2005 – January 2006 |

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | Patent infringement |
| Law Firm: | McDermott, Will & Emery, San Diego, CA |
| Case Name: | Medtronic Minimed, Inc. v. Smiths Medical MD, Inc. |
| | [No. 03-776, District of Delaware] |
| Services Provided: | Engaged as expert in patent infringement related to medical infusion instrument design, on behalf of counter-defendant. |
| | Deposed:            Jan 26, 2005 |
| Disposition: | Settled |
| Date: | October 2004 – July 2005 |

# metrionix

Metrionix, Inc.
14590 Crestline Drive
Poway, CA  92064-6311
Mobile:  858.735.9411
Fax:        858.876.1899

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | Patent infringement |
| Law Firm: | Knobbe Martens Olson & Bear, Irvine, CA |
| Case Name: | Exergen Corp. v. S.A.A.T., Ltd, Wal-Mart, et al |
| | [No. 01-CV-11306, District of Massachusetts] |
| Services Provided: | Engaged as expert in patent infringement related to medical infrared thermometer design; on behalf of defendant. |
| | Trial Testimony:        Jul 1, 2005; Jul 5, 2005; Jul 6, 2005 |
| Disposition: | Jury verdict in favor of plaintiff subsequently overturned by court |
| Date: | November 2002 – July 2005 |

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | Product liability |
| Law Firm: | Law Offices of Kenneth R. Ivory, P.C.; Sandy, UT |
| Case Name: | Hatch v. Disetronic |
| Services Provided: | Engaged as expert in case related to failure of external insulin infusion pump, on behalf of plaintiff |
| Disposition: | Settled |
| Date: | May 2005 |

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | Misappropriation of trade secrets, breach of contract, Section 730 expert |
| Law Firm: | Rutan & Tucker LLP, Costa Mesa, CA |
| | Cohen Sakaguchi & English LLP, Irvine, CA |
| Case Name: | Star Envirotech, Inc v. Kenneth A. Pieroni, Redline Detection LLC, et al |
| | [No. 05 CC 01870, Superior Court of California, County of Orange] |
| Services Provided: | Engaged as expert in case related to control of heating elements of automotive leak testing device. |
| Disposition: | Settled |
| Date: | February 2005 – March 2005 |

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | Product liability |
| Law Firm: | Osborne and Harris, Paducah, KY |
| Case Name: | Conwell v. Medtronic |
| Services Provided: | Engaged as expert in case related to implanted medical infusion pump; on behalf of plaintiff. |
| Disposition: | Settled |
| Date: | February 2004 – March 2004 |

# metrionix

Metrionix, Inc.
14590 Crestline Drive
Poway, CA  92064-6311
Mobile:  858.735.9411
Fax:        858.876.1899

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | Patent infringement |
| Law Firm: | Knobbe Martens Olson & Bear; Irvine, CA |
| Case Name: | Nellcor / Tyco Healthcare v. Masimo Corporation |
| | [No. CV 00-6506, Central District of California, Western Div.] |
| Services Provided: | Engaged as expert in patent infringement related to medical instrument design; on behalf of Masimo as counterclaimant.  Technology involves pulse oximetry |
| | Trial Testimony:          Feb 24, 2004; Feb 25, 2004; Mar 9, 2004; |
| | Mar 16, 2004; Mar 25, 2004 |
| Disposition: | Jury verdict in favor of Masimo |
| Date: | May 2002 –March 2004 |

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | Product liability |
| Law Firm: | Wingert Grebing Brubaker & Ryan, San Diego, CA |
| Case Name: | Svenerik Eklund, et al v. Baxter Heathcare Corp, Scripps Health, et al |
| | [No. GIC796806, Superior Court of CA, County of San Diego) |
| Services Provided: | Engaged as expert in case related to infusion pump for patient-controlled analgesia; on behalf of plaintiff. |
| Disposition: | Case transferred to different law firm |
| Date: | August 2003 – December 2003 |

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | Product liability |
| Law Firm: | Thomas J. Massey, Fallbrook, CA |
| Case Name: | Dickinson v. Active-Ear, Fox Hearing Aid, et al. |
| | [No. GIN015787, Superior Court of CA, County of San Diego, North Div] |
| Services Provided: | Engaged as expert in case related to failure of hearing aid and improper instruction to hearing aid user on behalf of plaintiff. |
| | Deposed:                       Aug 21, 2002 |
| Disposition: | Settled |
| Date: | January 2002 – December 2002 |

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | Criminal sentencing |
| Law Firm: | Dawnella Gilzean, Public Defender, San Diego, CA |
| Case Name: | People of California v. Calvin Lamont Parker |
| | [No. SCD154640, Superior Court of CA, County of San Diego, Central Div] |
| Services Provided: | Engaged as expert in case related to sound isolation at crime scene and possible ear-witness to murder on behalf of defendant. |
| | Trial Testimony:           Jul 1, 2002 |
| Disposition: | Jury verdict in favor of the People |
| Date: | December 2001 – July 2002 |

**metrionix**

Metrionix, Inc.
14590 Crestline Drive
Poway, CA  92064-6311
Mobile:  858.735.9411
Fax:       858.876.1899

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | Misappropriation of trade secrets |
| Law Firm: | McDermott, Will & Emery; Irvine, CA |
| Case Name: | Bird Products Corp v. Pulmonetic Systems, Inc., et al |
| Services Provided: | Engaged as expert in case related to medical instrument development; on behalf of plaintiff.  Technology involves ventilation support equipment. |
| Disposition: | Settled |
| Date: | October 2001 – April 2002 |

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | Product liability |
| Law Firm: | Downey, Brand, Seymour & Rohwer; Sacramento, CA |
| Case Name: | Humphrey v. SIMMS Level1, Inc., et al |
| Services Provided: | Engaged as expert in case related to misuse and failure of pump and fluid warmer during surgery, on behalf of plaintiff. |
| Disposition: | Settled |
| Date: | September 2001 – October 2001 |

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | Product liability |
| Law Firm: | Martin Roy Robles and Associates; South Pasadena, CA |
| Case Name: | Leraas v. Demeter and Ellman Intl Corp, et al |
| Services Provided: | Engaged as expert in case related to failure of radiosurgical instrument, on behalf of plaintiff. |
| Disposition: | Settled |
| Date: | July 2000 – December 2000 |

**Expert Engagement:**

| | |
|---|---|
| Type of Matter: | Product liability |
| Law Firm: | Bullivant Houser Bailey Pendergrass & Hoffman; Portland, OR |
| Case Name: | Scroggins v. McGaw, et. al. |
| Services Provided: | Engaged as expert in case related to misuse and failure of hospital infusion pump, on behalf of defendant |
| Disposition: | Settled |
| Date: | July 1998 – August 1998 |

**metrionix**

Metrionix, Inc.
14590 Crestline Drive
Poway, CA  92064-6311
Mobile:  858.735.9411
Fax:      858.876.1899

## Jack Goldberg | Research and Development Projects

From:          January 2008
To:             October 2019
Organization:  Jain Irrigation, Inc., Fresno, CA
Summary:     Research and prototype development: communication and control system to improve efficiency and flexibility irrigation systems.

From:          March 1995
To:             March 2018
Organization:  Etymotic Research, Elk Grove Village, CA
Summary:     Product development and consulting:  sound and noise measurement systems; communication system for hard of hearing; apparatus to assist in fitting hearing aids.

From:          September 2014
To:             December 2014
Organization:  San Diego Home Inspection
Summary:     Consultation toward development of apparatus and method to aid in the non-invasive discovery of unreliable plumbing in homes and associated intellectual property strategy.

From:          May 2014
To:             August 2014
Organization:  K&L Gates LLP
Summary:     Consultation regarding potential intellectual property licensing dispute in relation to medical instrumentation for dialysis

From:          October 2004
To:             December 2012
Organization:  Hearing Enhancement Group, LLC, Thousand Oaks, CA
Summary:     Product development and consulting regarding acoustics, headset design and listening devices.

From:          February 2007
To:             February 2010
Organization:  Med-e-Cell, San Diego, CA
Summary:     Research and prototype development: solar-powered system for mosquito abatement.

From:          June 2008
To:             August 2008
Organization:  Moriah Partners, LLC, Long Beach, CA
Summary:     Technology due diligence regarding acquisition of medical device company.

**Jack Goldberg | Curriculum Vitae**       May 7, 2021

**metrionix**

Metrionix, Inc.
14590 Crestline Drive
Poway, CA  92064-6311
Mobile:  858.735.9411
Fax:      858.876.1899

From:          April 2004
To:            October 2004
Organization:  Coradiant Canada, Inc., Montreal, Quebec
Summary:       Product development, consulting and prototype production: custom printed circuit
               board for LAN/power/communications interconnect.

From:          June 2003
To:            November 2003
Organization:  Misonix
Summary:       Consultation regarding validation test station for controller board of system for soft
               tissue aspiration and emulsification.

From:          November 2002
To:            January 2003
Organization:  IntellectExchange
Summary:       Product design review and consulting for developer of esophageal ablation apparatus.

From:          September 2000
To:            December 2002
Organization:  Calypso Medical, Seattle, WA
Summary:       Product research and development, manufacturing process development: system which
               aids surgeon, including miniature human implantable devices and extensive signal
               processing. Technology involves electromagnetic sensing.

From:          April 2002
To:            December 2002
Organization:  Curt Mixon and Associates
Summary:       Product development and consulting: motor control subsystem for laser focus as part of
               eye surgery system.

From:          December 2001
To:            June 2002
Organization:  Advanced Pollution Instrumentation, Teledyne Instruments, San Diego, CA
Summary:       Product development: enhancement of device for the measurement of ozone in gas
               samples.

From:          May 1999
To:            December 2000
Organization:  Progeny Systems, LLC, San Diego, CA
Summary:       Product development and consulting: system for the analysis of farm animal
               biomaterials. Technology involves optical transmission and signal processing.

# metrionix

Metrionix, Inc.
14590 Crestline Drive
Poway, CA  92064-6311
Mobile:  858.735.9411
Fax:      858.876.1899

From:           January 1999
To:             November 1999
Organization:   Poco Power Corporation, San Luis Obispo, CA
Summary:        Product development and consulting regarding acoustics, headset design and listening devices.

From:           May 1997
To:             March 1999
Organization:   nCom Systems, San Diego, CA
Summary:        Database design effort in support of thick film integrated circuit manufacturing process.

From:           September 1996
To:             October 1996
Organization:   Akos Biomedical, Inc., San Diego, CA
Summary:        Consultation regarding FDA document submittal.  Technology involves endoscopic surgery.

## Jack Goldberg | Professional Affiliations, Achievements & Awards

- Senior Member, Institute of Electrical and Electronics Engineers
  - *Medicine and Biology, Signal Processing*
- Member, Acoustical Society of America
- Organizing Committee Member, MIT Enterprise Forum, 1986 – 1991
- Amateur Radio Extra Class license holder: W6JZ
- Russian Language skills

## Jack Goldberg | Publications & Presentations

2006    American Board of Trial Advocates, Orange County, CA
        *Masters in Trial (Expert presentation at mock trial)*

2006    American Auditory Society Annual Meeting
        *An inexpensive noise dosimeter*

2001    141st Meeting, Acoustical Society of America
        *A new handheld meter for measuring the occlusion effect produced by, and leakage around, earmolds*

1997    134th Meeting, Acoustical Society of America
        *Analog and Digital Signal Processing in a High Performance Miniature Sound Level Meter*

1993    13th Annual Northeast Symposium on Health Care Technology
        *Infrared Thermometry*

**Jack Goldberg | Curriculum Vitae**          May7, 2021          page 21 of 22



Metrionix, Inc.
14590 Crestline Drive
Poway, CA 92064-6311
Mobile: 858.735.9411
Fax: 858.876.1899

## Jack Goldberg | U.S. Patents

| Patent | Date Issued | Description |
|--------|-------------|-------------|
| 10,753,337 | 2020 | Motion Control system and method with energy harvesting |
| 8,322,222 | 2012 | Method and system for noise dosimeter with Quick-Check mode and earphone adapter |
| 8,270,658 | 2012 | Position sensing apparatus and method for active headworn devices |
| 7,913,565 | 2011 | Method and system for predicting long-term exposure to a hazardous environment |
| 7,903,833 | 2011 | Headworn listening device and method |
| 7,882,743 | 2011 | Method and system for noise dosimeter |
| 7,836,770 | 2010 | Method and system for noise dosimeter with Quick-Check mode and earphone adapter |
| 7,535,363 | 2009 | Miniature resonating marker assembly |
| 7,135,978 | 2006 | Miniature resonating marker assembly |
| 6,098,463 | 2000 | Method and apparatus for measurement of wide dynamic range signals |
| 5,966,639 | 1999 | System and Method for Enhancing Speech Intelligibility Utilizing Wireless Communication |
| 5,455,565 | 1995 | Fluid Monitor System and Method Using a Resonator |
| 5,260,665 | 1993 | In-Line Fluid Monitor System and Method |
| 5,150,969 | 1992 | System and Method for Temperature Determination and Calibration |
| 4,938,079 | 1990 | Thermal Transit Time Flow Measurement System |

References and further detail regarding litigation support are available upon request.

## EXHIBIT A

I, _____Jack Goldberg_____, acknowledge and declare that I have received a copy of the Protective Order ("Order") in *Masimo Corp., et al. v. Apple Inc.*, United States District Court, Central District of California, Southern Division, Civil Action No. 8:20-cv-00048-JVS (JDEx). Having read and understood the terms of the Order, I agree to be bound by the terms of the Order and consent to the jurisdiction of said Court for the purpose of any proceeding to enforce the terms of the Order.

Name of individual: _____Jack Goldberg_____

Present occupation/job description: __President / owner of Metrionix, Inc., a business__ specializing in areas of electrotechnology and focusing on sensors, control, measurement, medical instrumentation, signal processing, RF technology, communications, audio and acoustics.

Name of Company or Firm: __Metrionix, Inc._____

Address:_____14590 Crestline Drive, Poway, CA  92064_____

Dated: ___May 7, 2021_____

_Jack Goldberg_
[Signature]

-31-

# Exhibit G

| From: | Perry.Oldham <Perry.Oldham@knobbe.com> |
|---|---|
| **Sent:** | Friday, May 7, 2021 12:33 PM |
| **To:** | *** Apple-Masimo |
| **Cc:** | Masimo.Apple |
| **Subject:** | Masimo Corp. et al. v. Apple Inc., Case No. 8:20-cv-00048-JVS-JDE - Disclosure of Expert |
| **Attachments:** | Resume John L. Smith.pdf; Litigation list.docx; Consulting clients 2016-2021.docx; 2020-06-30 [067] Protective Order Signed.PDF |

[External Email]

Counsel,

Pursuant to Section 9.2 of the Protective Order, please find attached the Resume and completed "Acknowledgment and Agreement to Be Bound" (Exhibit A) for John L. Smith.

Mr. Smith is not presently an officer, director, or employee of a Party or of a competitor of a Party, nor anticipated at the time of retention to become an officer, director or employee of a Party or of a competitor of a Party.  In addition, he is not involved in competitive decision-making on behalf of a Party or a competitor of a Party.

The following provides the information required by paragraphs 9.2(i) to (v) of the Protective Order:

(i)      Mr. Smith's current resume is attached.

(ii)      Mr. Smith is not currently employed, but is a Principal of NIVG Consulting, LLC, 9042 NW Murdock St., Portland, OR 97229.

(iii)      A list of consulting clients in the area of noninvasive physiological monitoring technologies over the past five years is attached.

(iv)      Mr. Smith has no known pending applications where he is named as an inventor or in which he has any ownership interest. He has no current intention of having any involvement in advising on, consulting on, preparing, prosecuting, drafting, editing, amending, or otherwise affecting the scope of the claims of any patent application. In the past five years, he has been engaged in that manner by Zyomed Corp of 2400 Lincoln Ave., Altadena, CA 91001 (now dissolved).

(v)      A list of the litigations in which he has offered expert testimony over the past five years is attached.

Best regards,

Perry

**Perry Oldham**
Partner
949-721-2961
**Knobbe** Martens

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

Exhibit G
Page 183

**John L. Smith, Ph.D.**
**NIVG Consulting, LLC**
**9042 NW Murdock St.**
**Portland, OR 97229**

## PROFESSIONAL EXPERIENCE

**Consultant (Principal, NIVG Consulting, LLC 2015-Present)**                1998-2004, 2006-Present

Independent consultant in the areas of analytical chemistry, clinical chemistry, blood glucose monitoring, noninvasive blood measurements, grape growing, winemaking, patent prosecution and litigation. Performed technological evaluations for invasive and noninvasive monitoring of blood glucose. I have consulted for more than 50 blood glucose companies or their investors. Qualified in U.S. Federal Court as an expert witness in the fields of Clinical Chemistry, Blood Glucose Monitoring, Cholesterol Testing, Dry Chemistry Test Strip Technology, noninvasive monitoring, and the Chemistry of Wine. I have participated as an expert witness in patent infringement litigation, including consulting, expert reports, depositions, and court testimony in Markman hearings, arbitrations, bench trials, jury trials, *Inter Partes* Reviews, and International Trade Commission actions in 33 separate engagements.

**Fovioptics, Inc. Santa Clara, CA**                                                                2003-2006

Consultant                                                                                              2003-2004
President and CEO                                                                                  2004-2005
Sr. VP and Chief Technical Officer                                                          2005-2006
Exited retirement to become early-stage CEO for a startup company developing a noninvasive glucose monitor. Obtained Series B financing ($4.35M), relocated company to Santa Clara from Lexington, KY, completed feasibility and proof of principle studies, hired professional CEO and professional staff, assisted in obtaining Series C financing ($19.7M). Returned over $17M to investors when the technology was found not to be commercially viable.

**LifeScan. Inc. (Johnson & Johnson) Milpitas, CA**                                    1987-1998

Vice President and Chief Scientific Officer                                              1995-1998
Worldwide Vice President, R, D & E                                                        1994-1995
Vice President, R, D & E                                                                        1987-1994
Responsible for the invention, research and development of novel technology for the world market leader in blood glucose monitoring. Directed the activities of 180 professionals in applied and advanced research and in product development. Conducted fundamental research into noninvasive techniques for measurement of blood glucose, both in-house and through research contracts worldwide. Evaluated over 100 technologies intended for noninvasive measurement of blood glucose. Managed research and development efforts for new products and technology to enable diversification of LifeScan's product line. Responsible for the establishment and maintenance of LifeScan's patent portfolio, and liaison with corporate and outside counsel for all patent infringement litigation. Retired in 1998.

**Baker Instruments Corporation Allentown, PA**                                       1984-1987

Vice President, R, D & E - Responsible for entire development process, from conception to pilot production of new instruments for clinical chemistry and hematology; development and implementation of new analytical procedures, improved clinical methods, and reagent formulations. Directed the activities of 30 professionals, including engineers, chemists, and scientists from technician to Ph.D. level. Responsible for negotiation of research contracts and licensing arrangements for new technology in physicians' office test kits, allergy

research, and novel immunoassay techniques. Budget responsibility for $4.5 million annual expense budget, including administration of research contracts. Planning, scheduling and cost estimation for new projects.

## Technicon Instruments Corporation (now Siemens) Tarrytown, NY                    1978-1984

Staff Systems Engineer (1978-1982) - Directed a research and engineering group to extract revenue-producing products from proprietary but unexploited technology. Developed fundamentals which led to, and led the team that developed, the Chem-1 Analyzer.

Director, Decentralized Testing Technology (1982-1984) - Responsibility for about fifty percent of the Applied Research program, including semiconductor biosensors, dry chemistry technology, and colorimetric methods for sodium and potassium. Technical member of negotiating team to develop a joint venture with a major Japanese chemistry company. Extensive contact with and administration of academic research programs and contract research projects.

## Princeton Applied Research Corporation (EG&G) Princeton, NJ                    1974-1978

Manager, Product Development - Directed a group of 14 engineers in the development of electrochemical analytical instruments for research, quality control, corrosion and chromatography. Inventor of the static mercury drop electrode which allowed significant increases in sensitivity of electrochemical analysis. Developed the first microprocessor-controlled electroanalytical instrument and wrote the assembly-language software for the user interface, calculation and presentation of results.

## Union Carbide Corporation Tarrytown, NY                    1970-1974

Analytical Chemist - Developed methods and performed analysis for organic functional groups, trace metals, silicones, and polymers for research support, competitive products, and customer technical support.

## Additional Full-time Positions Held Prior to or During Graduate School:

Hospital laboratory chemist and computer systems analyst; supervisor of raw material quality control for a pharmaceutical company; chief technician for a feed and fertilizer analytical laboratory.

## EDUCATION:

Ph.D. Analytical Chemistry, University of Illinois, Urbana, IL 1970. Thesis topic:
    Analysis of Polymers via Photolysis-Gas Chromatography (R.S. Juvet)
B.S. Chemistry, Butler University, Indianapolis, IN 1966.

## U.S. PATENTS (most with foreign counterparts):

4,142,944 Apparatus and Method for Effluent Stream Analysis (Liquid Chromatography Detector)
4,260,467 Static Mercury Drop Electrode (Analytical system for electrochemistry)
4,422,773 Apparatus and Method for the Non-Invasive Mixing of a Flowing Stream (mixing coil for blood analyzers)
4,515,753 Integral Reagent Dispenser (Reagent container for Technicon Chem-1 analyzer)
4,602,995 Liquid Level Adjusting and Filtering Device (Sample tube for blood serum)
4,853,336 Apparatus for Random-Access Continuous-Flow Analysis (Technicon Chem-1 system)
5,526,120 Test Strip with an Asymmetrical End Insuring Correct Insertion for Measuring (SureStep Blood Glucose Test Strip)
5,753,452 Reagent Test Strip for Blood Glucose Determination (One Touch Test Strip)
5,972,294 Reagent test strip for determination of blood glucose (One Touch Test Strip)
9,448,164 Systems and Methods for Noninvasive Blood Glucose and Other Analyte Detection and Measurement Using Collision Computing
9,448,165 Systems and Methods for Control of Illumination or Radiation Collection for Blood Glucose

and Other Analyte Detection and Measurement Using Collision Computing

9,453,794 Systems and Methods for Blood Glucose and Other Analyte Detection and Measurement Using Collision Computing

9,459,201 Systems and Methods for Noninvasive Blood Glucose and Other Analyte Detection and Measurement Using Collision Computing

9,459,202 Systems and Methods for Collision Computing For Detection and Noninvasive Measurement of Blood Glucose and Other Substances and Events

9,459,203 Systems and Methods for Generating and Using Projector Curve Sets for Universal Calibration for Noninvasive Blood Glucose and Other Measurements

9,554,738 Spectroscopic Tomography Systems and Methods for Noninvasive Detection and Measurement of Analytes Using Collision Computing

9,610,018 Systems and Methods for Measurement of Heart Rate and other Heart-Related Characteristics from Photoplethysmographic (PPG) Signals Using Collision Computing

## PUBLISHED U.S. PATENT APPLICATIONS:

20050010091A1: Non-invasive measurement of blood glucose using retinal imaging (use of regeneration rate of visual pigments in the retina to measure blood glucose), and continuations 20050245796A1, US20060020184A1, US20050267344A1, 20050267343A1

## SCIENTIFIC PUBLICATIONS

John L. Smith and Benjamin T. Williams, "Interface for the Technicon SMA 12/60 Autoanalyzer with the Linc-8 Labcom System," DECUS Proceedings Spring 1969, 325- 329 (1969).

Richard S. Juvet, Jr., John L. S. Smith, and Kuang-Pang Li, "Polymer Identification and Quantitative Determination of Additives by Photolysis-Gas Chromatography," Anal. Chem. 44, 49-56 (1972).

John Smith, Dario Svenjak, John Turrell, and Dan Vlastelica, "An Innovative Technology for 'Random-Access' Sampling," Clinical Chemistry 28, 1867-1872 (1982).

John L. Smith, Mark J. Rice, "Why Have So Many Intravascular Glucose Monitoring Devices Failed?" J Diabetes Sci Technol July 2015 9: 782-791, doi:10.1177/1932296815587013.

Yafen Liang, John L. Smith, Mark J. Rice, "Emerging Technologies: Let's Not Jump the Gun," Anesth Analg, 124:3 1372 (2017).

Rice, Mark J, John L. Smith, Douglas B. Coursin, "Glucose Measurement in the ICU: Regulatory Intersects Reality," Critical Care Medicine: April 2017 - Volume 45 - Issue 4 - p 741–743.

Rice, Mark J.; Smith, John L.; Coursin, Douglas B. "The authors reply" Critical Care Medicine. 45(11):e1188-e1189, November 2017.

Book: John L. Smith, *The Pursuit of Noninvasive Glucose: "Hunting the Deceitful Turkey" (6th Edition, 2018).* https://www.nivglucose.com/.

## MEMBERSHIPS AND ASSOCIATIONS:

| | |
|---|---|
| American Chemical Society | 1964-present |
| Greiner Instruments Scientific Advisory Board, Langenthal, Switzerland | 1986-1987 |
| Adjunct Professor of Chemistry, San José State University | 1991-1997 |
| El Dorado Winery Association | 1993-2012 |
| Fair Play Winery Association (President, 2000-2001) | 1997-2012 |
| El Dorado County Agricultural Commission | 2009-2014 |

## OTHER ACTIVITIES

Founder and founding winemaker, Oakstone Winery, Inc. and Obscurity Cellars, Fair Play, CA.
Owner, Paso Vista Vineyard, Fair Play, CA.

Instructor, San José State University: Advanced Analytical Chemistry, Patents in Chemistry, and The Chemistry of Wine (uncompensated appointment).

United Way Campaigns—Company and community chairman.

Pioneer Fire Protection District—long-range planning committee, ordinance committee, hosted 30 firefighter fund-raising events.

## Expert Witness Engagements, Filings, and Testimony for John L. Smith

LifeScan, Inc., v. Home Diagnostics, Inc., and MIT Development Corporation, United States District Court for Northern California, case #5:92cv20811 (for plaintiff). Filed expert reports, deposition testimony as expert and percipient witness (1992-3). Blood glucose testing systems. Judgment of infringement for LifeScan after a CAFC ruling against lower court claim interpretation.

LifeScan, Inc. v. Can-Am Care Corp Diagnostic Solutions, Inc., United States District Court for Northern California, case #5:93cv20430 (for plaintiff, 1993-4). Filed expert report, court testimony on hearing for permanent injunction. Blood glucose testing systems. Matter settled out of court

LifeScan, Inc. v. Polymer Technology International, Issaquah, WA. United States District Court for the Western District of Washington, Case #93-6983 (for Plaintiff 1993-5). Filed expert reports, provided deposition and trial testimony. Blood glucose testing systems. LifeScan was awarded a judgment of willful infringement, a permanent injunction and attorney's fees.

LifeScan, Inc., v. Home Diagnostics, Inc., and MIT Development Corporation, United States District Court for the District of Delaware, Civil Action 96-597JJF (for Plaintiff, 1996-1999). Deposition and trial testimony. Blood glucose testing systems. LifeScan was awarded jury verdict of ~$6 million; overturned on a JMOL.

Abbott Laboratories, Inc., v. LifeScan, Inc., and SelfCare, Inc. United States District Court for the District of Massachusetts, Civil Action #98-CV12053EFH (for Defendant). Declaration, deposition testimony, 1998-2000. Blood glucose testing systems. Matter settled under seal.

Home Diagnostics, Inc., v. LifeScan, Inc., United States District Court for the Northern District of California, Case #99-21269JW, and case #01-20725 JW PVT  (for Defendant). Deposition and hearing testimony (evidentiary deposition and hearing to establish qualification under a protective order, 2001). Blood glucose testing systems. Matter settled out of court.

LifeScan, Inc., v. Diagnostics Solutions, Inc., American Arbitration Association Case #801330004900, Irvine, CA, March - May, 2001. Fact witness deposition, 30(b)(6) deposition, expert deposition, arbitration testimony (for LifeScan), 2000-2001. Blood glucose testing systems. Arbitration award in favor of LifeScan, including attorney's fees.

LifeStream Diagnostics, Inc. v. Polymer Technology Systems, Inc., United States District Court for the District of Idaho, Coeur D'Alene Division, Case No. CV 00-0300-N-MHW (for defendant). Two Expert reports, expert deposition, Markman hearing court testimony, 2001-2003. Cholesterol testing systems. Favorable Markman ruling obtained, judgment of noninfringement entered for LifeStream following a SJ motion.

Roche Diagnostics  Corporation, et al., v. Cholestech Corporation, Indiana Southern District Court, Case No. 1:03-cv-00303 (for defendant). Retained as consultant. Point of care cholesterol testing systems. Matter settled out of court (2003).

Abbott Diabetes Care, Inc. and Abbott Laboratories v. AgaMatrix, Inc., United States District Court for the Northern District of California, San Jose Division, Case #C 06 07268-JF (for defendant). Filed expert reports re claim interpretation, deposition testimony. Blood glucose testing systems. Matter settled out of court (2007-2009).

Becton Dickenson and Company v. Insulet, United States District Court, District of New Jersey, Case# 10-04371-PGS –ES (for defendant). Retained as expert for defendant, filed expert reports on invalidity and noninfringement, deposition. Insulin pumps. Matter settled out of court. (2011-2013)

Medtronic, et al. v Insulet, United States District Court for Central California, Case No. 2:12-CV-8048-PA-CWx (for defendant). Retained as expert for defendant, filed declarations on claim construction, filed expert report on noninfringement. Insulin pumps; matter settled out of court (2013).

Masimo Corp. v. Philips Electronics North American Corporation and Philips Medizin Systeme Böblingen GmbH, Civil Action No. 1:09-cv-00080-JJF-MPT United States District Court for the District of Delaware. Retained as expert for plaintiff. Noninvasive analyte measurement, case settled out of court (2013-2015).

Masimo Corporation ("Masimo") and Cercacor Laboratories, Inc. ("Cercacor") arbitration against Nova Biomedical Corporation, JAMS Reference # 1220045324, retained as consultant for Masimo. (2013-2014)

Pharmatech Solutions, Inc, *Inter Partes* Review of U.S. Patent No. 7,250,105, assigned to LifeScan Scotland Ltd. For LifeScan, retained as consultant for LifeScan, filed declaration before the USPTO Patent Trial and Appeal Board, case settled in favor of Pharmatech (2013-2015).

Dominion Assets, LLC, v. Masimo Corporation and Cercacor Laboratories, Case CV 12 2773, United States District Court for Northern California, for defendant, filed expert report. Noninvasive glucose systems. Case dismissed for lack of standing (2013-2014).

LifeScan Scotland, Ltd v. Pharmatech Solutions, Inc., Case CV 11-04494 MEJ, United States District Court for the Northern California, for Plaintiff, retained as expert for plaintiff. Blood glucose test strips. Settled out of court (2014-2016).

Dominion Assets, LLC v. Masimo Corporation and Cercacor Laboratories, Case 14-cv-03002-BLF, United States District Court for Northern California, retained as expert for defendant, filed expert report. Noninvasive glucose systems. Matter settled in favor of Masimo (2014-2018).

LifeScan, Inc. v. Unistrip Technologies, LLC., Case 3:14-CV-00274, United States District Court for the Western District Of North Carolina, Charlotte Division, retained as expert for plaintiff. Blood glucose test strips. Matter settled out of court. (2014-2017).

WaveForm Technologies, Inc. (AgaMatrix) v. Dexcom, Inc., Case No. 3:16-cv-536, United States District Court for the District of Oregon, retained as testifying expert for plaintiff. Summary judgement for Dexcom. Continuous glucose monitors. Matter settled out of court (2016-2019).

Dexcom, Inc, v. AgaMatrix, Inc., Case 2:16-cv-05947-SJO-AS, United States District Court for the Central District of California, Western Division, retained as testifying expert for defendant. Blood glucose monitoring systems. Summary judgment of noninfringement for AgaMatrix, award of fees as exceptional. Upheld on appeal to the Court of Appeals for the Federal Circuit (2016-2019).

Dexcom, Inc. U.S. Patent and Trial Appeal Board *Inter Partes* Review 2016-01679 of U.S. Patent No. 7,146,202, retained as testifying expert for AgaMatrix, Continuous glucose monitors. Three claims found

patentable, upheld on appeal to the Court of Appeals for the Federal Circuit (2016-2018).

Dexcom, Inc. U.S. Patent and Trial Appeal Board *Inter Partes* Review 2016-01680 of U.S. Patent No. 8,187,433, retained as testifying expert for AgaMatrix, all 10 claims found patentable, upheld on appeal to the Court of Appeals for the Federal Circuit (2016-2018).

Pharma Tech Solutions, Inc. and Decision IT Corp. v. LifeScan, Inc, LifeScan Scotland, Ltd, and Johnson and Johnson, Case No. 2:16-cv-00564-RFB-PAL, United States District Court, District of Nevada, retained as expert for LifeScan (2016-2018). Blood glucose test strips. Summary judgment of noninfringement for LifeScan, upheld on appeal to the Court of Appeals for the Federal Circuit.

DexCom, Inc. U.S. Patent and Trial Appeal Board *Inter Partes* Review 2017-01051 of U.S. Patent No. 7,529,574, retained as testifying expert for WaveForm Technologies, Inc. Continuous glucose monitors. Two original claims found patentable, three substitute claims granted. (2016-2018).

Certain Electrochemical Glucose Monitoring Systems and Components thereof, Investigation No_337_TA_1075, U.S. International Trade Commission, Washington, DC; Dexcom, Inc., Complainant; Agamatrix, Inc., Proposed Respondent, retained as consulting expert for AgaMatrix. Blood glucose monitoring systems. AgaMatrix awarded summary determination of noninfringement (2017-2019).

DexCom, Inc., v. Agamatrix, Inc., C.A. No. 17-1310 (RGA), United States District Court, District of Delaware, retained as consulting expert for AgaMatrix. Continuous glucose monitors. Case stayed, then canceled (2017-2019).

AgaMatrix U.S. Patent and Trial Appeal Board *Inter Partes* Reviews IPR2018-01715 and IPR2018-01716 of U.S. Patent No. 9724045, retained as expert for AgaMatrix (2018-2019). Continuous glucose monitors. Not instituted.

AgaMatrix U.S. Patent and Trial Appeal Board *Inter Partes* Reviews IPR2018-01717 and IPR2018-01718 of U.S. Patent No. 9750460, retained as expert for AgaMatrix (2018-2019). Continuous glucose monitors. Not instituted.

Arbmetrics, LLC v. Dexcom, Inc., Case 3:18-cv-00134-JLS-MSB, United States District Court for the Southern District of California, retained as expert for Arbmetrics. Continuous glucose monitors. Judgment for Dexcom, affirmed by the Federal Circuit (2019-2020).

LifeScan, Inc (Under Platinum Equity). U.S. Patent and Trial Appeal Board *Inter Partes* Review for U.S. Patent No. 8480878, retained as expert for LifeScan (2019). Blood glucose test strips. Not instituted.

LifeScan, Inc (Under Platinum Equity). U.S. Patent and Trial Appeal Board *Inter Partes* Review for U.S. Patent No. 8349157, retained as expert for LifeScan (2019). Blood glucose test strips. Not instituted.

Abbott Diabetes Care, unspecified case, 2021

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| MASIMO CORPORATION,<br>a Delaware corporation; and<br>CERCACOR LABORATORIES, INC.,<br>a Delaware corporation,<br><br>            Plaintiffs,<br><br>    v.<br><br>APPLE INC.,<br>a California corporation,<br><br>            Defendant. | CASE NO. 8:20-cv-00048-JVS (JDEx)<br><br>PROTECTIVE ORDER |

Based on Plaintiffs' Motion for Protective Order (Dkt. 61, "Motion"), the Joint Stipulation of the parties (Dkt. 61-1), the evidence submitted in support of and in opposition to the Motion (Dkt. 61-2 to 61-5), including the parties' respective proposed protective orders (Dkt. 61-2, Exh. 2, and Dkt. 61-5, Exh. A), and the June 23, 2020 Order by the Honorable Judge James V. Selna, United States District Judge (Dkt. 59), and good cause appearing therefor, the Motion is granted, in part, and the Court finds and orders as follows.

## 1.   PURPOSES AND LIMITATIONS

Discovery in this action is likely to involve production of confidential, proprietary or private information for which special protection from public disclosure and from use for any purpose other than pursuing this litigation may be warranted. The parties acknowledge that this Order does not confer blanket protections on all disclosures or responses to discovery, including disclosures under Rule 26, and that the protection it affords from public disclosure and use extends only to the limited information or items that are entitled to confidential treatment under the applicable legal principles.

## 2.   GOOD CAUSE STATEMENT

This action is likely to involve trade secrets, customer and pricing lists and other valuable research, development, commercial, financial, technical and/or proprietary information for which special protection from public disclosure and from use for any purpose other than prosecution of this action is warranted. Such confidential and proprietary materials and information consist of, among other things, confidential business or financial information, information regarding confidential business practices, or other confidential research, development, or commercial information (including information implicating privacy rights of third parties), information otherwise generally unavailable to the public, or which may be privileged or otherwise protected from disclosure under state or federal statutes, court rules, case decisions, or common law. Accordingly, to expedite the flow of information, to facilitate the prompt resolution of disputes over confidentiality of discovery materials, to adequately protect information the parties are entitled to keep confidential, to ensure that the parties are permitted reasonable necessary uses of such material in preparation for and in the conduct of trial, to address their handling at the end of the litigation, and serve the ends of justice, a protective order for such

-1-

information is justified in this matter, pursuant to Rule 26(c) of the Federal Rules of Civil Procedure or any other applicable authority. It is the intent of the parties that information will not be designated as confidential for tactical reasons and that nothing be so designated without a good faith belief that it has been maintained in a confidential, non-public manner, and there is good cause why it should not be part of the public record of this case.

3.   ACKNOWLEDGMENT OF UNDER SEAL FILING PROCEDURE

The parties further acknowledge, as set forth in Section 14.3, below, that this Protective Order does not entitle them to file confidential information under seal; Local Civil Rule 79-5 sets forth the procedures that must be followed and the standards that will be applied when a party seeks permission from the court to file material under seal. There is a strong presumption that the public has a right of access to judicial proceedings and records in civil cases. In connection with non-dispositive motions, good cause must be shown to support a filing under seal. *See Kamakana v. City and County of Honolulu*, 447 F.3d 1172, 1176 (9th Cir. 2006), *Phillips v. Gen. Motors Corp.*, 307 F.3d 1206, 1210-11 (9th Cir. 2002), *Makar-Welbon v. Sony Electrics, Inc.*, 187 F.R.D. 576, 577 (E.D. Wis. 1999) (even stipulated protective orders require good cause showing), and a specific showing of good cause with proper evidentiary support and legal justification, must be made with respect to Protected Material that a party seeks to file under seal. The parties' mere designation of Disclosure or Discovery Material as CONFIDENTIAL does not—without the submission of competent evidence by declaration, establishing that the material sought to be filed under seal qualifies as confidential, privileged, or otherwise protectable—constitute good cause.

-2-

Further, if a party requests sealing related to a dispositive motion or trial, then compelling reasons, not only good cause, for the sealing must be shown, and the relief sought shall be narrowly tailored to serve the specific interest to be protected. *See Pintos v. Pacific Creditors Ass'n.*, 605 F.3d 665, 677-79 (9th Cir. 2010). For each item or type of information, document, or thing sought to be filed or introduced under seal in connection with a dispositive motion or trial, the party seeking protection must articulate compelling reasons, supported by specific facts and legal justification, for the requested sealing order. Again, competent evidence supporting the application to file documents under seal must be provided by declaration.

Any document that is not confidential, privileged, or otherwise protectable in its entirety will not be filed under seal if the confidential portions can be redacted. If documents can be redacted, then a redacted version for public viewing, omitting only the confidential, privileged, or otherwise protectable portions of the document, shall be filed. Any application that seeks to file documents under seal in their entirety should include an explanation of why redaction is not feasible.

4.    <u>DEFINITIONS</u>

4.1    Action: this pending federal lawsuit.

4.2    Challenging Party: a Party or Non-Party that challenges the designation of information or items under this Order.

4.3    "CONFIDENTIAL" Information or Items: information (regardless of how it is generated, stored or maintained) or tangible things that qualify for protection under Federal Rule of Civil Procedure 26, and as specified above in the Good Cause Statement.

4.4    "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" Information or Items: extremely confidential and/or sensitive "Confidential

-3-

Information or Items," disclosure of which to another Party or Non-Party is likely to cause harm or significant competitive disadvantage to the Producing Party.

    4.5   "HIGHLY CONFIDENTIAL – SOURCE CODE" Information or Items: extremely sensitive "Confidential Information or Items" representing computer code, scripts, assembly, binaries, object code, source code listings (e.g., file names and path structure), source code comments, object code listings, and Hardware Description Language (HDL) or Register Transfer Level (RTL) files that describe the hardware design of any ASIC or other chip, disclosure of which to another Party or Non-Party is likely to cause harm or significant competitive disadvantage to the Producing Party.  Other documents that quote source code or internal documents that contain specific descriptions of source code (e.g. descriptions of declarations, functions, and parameters) that describe how the source code operates, to be narrowly applied, may be designated pursuant to this Paragraph, provided that the Producing Party also produces a redacted version designated "HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY," which removes the quoted source code or specific descriptions of source code.  Native Computer Aided Design (CAD) files may be designated pursuant to this Paragraph, provided that any printouts of CAD files shall be designated "HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY" and will not be included in the page limits discussed in Section 11 below.

    4.6   Counsel: Outside Counsel of Record and House Counsel (as well as their support staff).

    4.7   Designating Party or Producing Party: a Party or Non-Party that designates information or items that it produces in disclosures or in responses to discovery as "CONFIDENTIAL," HIGHLY CONFIDENTIAL –

-4-

ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL – SOURCE CODE."

4.8    Disclosure or Discovery Material: all items or information, regardless of the medium or manner in which it is generated, stored, or maintained (including, among other things, testimony, transcripts, and tangible things), that are produced or generated in disclosures or responses to discovery.

4.9    Expert: a person with specialized knowledge or experience in a matter pertinent to the litigation who has been retained by a Party or its counsel to serve as an expert witness or as a consultant in this Action.

4.10   House Counsel: attorneys who are employees of a party to this Action.  House Counsel does not include Outside Counsel of Record or any other outside counsel.

4.11   Non-Party: any natural person, partnership, corporation, association or other legal entity not named as a Party to this action.

4.12   Outside Counsel of Record: attorneys who are not employees of a party to this Action but are retained to represent a party to this Action and have appeared in this Action on behalf of that party or are affiliated with a law firm that has appeared on behalf of that party, and includes support staff.

4.13   Party: any party to this Action, including all of its officers, directors, employees, consultants, retained experts, and Outside Counsel of Record (and their support staffs).

4.14   Producing Party: a Party or Non-Party that produces Disclosure or Discovery Material in this Action.

4.15   Professional Vendors: persons or entities that provide litigation support services (e.g., photocopying, videotaping, translating, preparing exhibits or demonstrations, and organizing, storing, or retrieving data in any form or medium) and their employees and subcontractors.

4.16   Protected Material: any Disclosure or Discovery Material that is designated as "CONFIDENTIAL," HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL – SOURCE CODE."  Protected Material shall not include:  (i) advertising materials that have been actually published or publicly disseminated; and (ii) materials that show on their face they have been disseminated to the public.

4.17    Receiving Party: a Party that receives Disclosure or Discovery Material from a Producing Party.

5.   SCOPE

5.1   All Protected Material shall be used solely for this case or any related appellate proceeding, and not for any other purpose whatsoever, including without limitation any other litigation, patent prosecution or acquisition, patent reexamination or reissue proceedings, or any business or competitive purpose or function.  Protected Material shall not be distributed, disclosed or made available to anyone except as expressly provided in this Order.

5.2    The protections conferred by this Order cover not only Protected Material (as defined above), but also (1) any information copied or extracted from Protected Material; (2) all copies, excerpts, summaries, or compilations of Protected Material; and (3) any testimony, conversations, or presentations by Parties or their Counsel in court or in other settings that might reveal Protected Material.

5.3    Nothing in this Protective Order shall prevent or restrict a Producing Party's own disclosure or use of its own Protected Material to any person for any purpose.

-6-

5.4     This Order does not preclude any Party or Non-Party from using Protected Material with the consent of the Producing Party or by order of the Court.

5.5     This Order does not preclude any Party or Non-Party from moving the Court for additional protection of any Discovery Material or modification of this Order, including, without limitation, moving for an order that certain matter not be produced at all.

5.6     Any use of Protected Material at trial shall be governed by the orders of the trial judge and other applicable authorities. This Order does not govern the use of Protected Material at trial.

6.     <u>DURATION</u>

Even after Final Disposition of this litigation, the confidentiality obligations imposed by this Order shall remain in effect until a Designating Party agrees otherwise in writing, a court order otherwise directs, or the information was made public during trial. For purposes of this Order, "Final Disposition" occurs after an order, mandate, or dismissal finally terminating the above-captioned action with prejudice, including all appeals.

7.     <u>DESIGNATING PROTECTED MATERIAL</u>

7.1     <u>Exercise of Restraint and Care in Designating Material for Protection</u>. Each Party or Non-Party that designates information or items for protection under this Order must take care to limit any such designation to specific material that qualifies under the appropriate standards.

Mass, indiscriminate or routinized designations are prohibited. Designations that are shown to be clearly unjustified or that have been made for an improper purpose (e.g., to unnecessarily encumber the case development process or to impose unnecessary expenses and burdens on other parties) may expose the Designating Party to sanctions.

-7-

If it comes to a Designating Party's attention that information or items that it designated for protection do not qualify for protection, that Designating Party must promptly notify all other Parties that it is withdrawing the inapplicable designation.

7.2   <u>Manner and Timing of Designations</u>. Except as otherwise provided in this Order, or as otherwise stipulated or ordered, Disclosure of Discovery Material that qualifies for protection under this Order must be clearly so designated before the material is disclosed or produced.

Designation in conformity with this Order requires:

(a) for information in documentary form (e.g., paper or electronic documents, but excluding transcripts of depositions or other pretrial or trial proceedings), that the Producing Party affix at a minimum, the legend "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" (hereinafter "Confidentiality legend"), to each page that contains protected material. If only a portion of the material on a page qualifies for protection, the Producing Party also must clearly identify the protected portion(s) (e.g., by making appropriate markings in the margins).  For digital files being produced, the Producing Party may mark each viewable page or image with the appropriate designation, and mark the medium, container, and/or communication in which the digital files were contained.

A Party or Non-Party that makes original documents available for inspection need not designate them for protection until after the inspecting Party has indicated which documents it would like copied and produced. During the inspection and before the designation, all of the material made available for inspection shall be deemed "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY." After the inspecting Party has identified the documents it wants

-8-

copied and produced, the Producing Party must determine which documents, or portions thereof, qualify for protection under this Order. Then, before producing the specified documents, the Producing Party must affix the appropriate Confidentiality legend to each page that contains Protected Material. If only a portion of the material on a page qualifies for protection, the Producing Party also must clearly identify the protected portion(s) (e.g., by making appropriate markings in the margins).

(b) for testimony given in depositions that the Designating Party identifies the Disclosure or Discovery Material on the record at the time the testimony is given or by sending written notice of which portions of the transcript of the testimony are designated within 30 days of receipt of the transcript of the testimony. During the 30-day period, the entire transcript will be treated as "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY." Any Protected Material that is used in the taking of a deposition shall remain subject to the provisions of this Protective Order, along with the transcript pages of the deposition testimony dealing with such Protected Material. In such cases the court reporter shall be informed of this Protective Order and shall be required to operate in a manner consistent with this Protective Order. In the event the deposition is recorded (by video or otherwise), the original and all copies of the recording shall be  designated pursuant to the terms of this Protective Order. Counsel for any Producing Party shall have the right to exclude from oral depositions, other than the deponent, deponent's counsel, the reporter and videographer (if any), any person who is not authorized by this Protective Order to receive or access Protected Material based on the designation of such Protected Material. Such right of exclusion shall be applicable only during periods of examination or testimony regarding such Protected Material.

-9-

(c) for information produced in some form other than documentary and for any other tangible items, that the Producing Party affix in a prominent place on the exterior of the container or containers in which the information is stored the appropriate Confidentiality legend. If only a portion or portions of the information warrants protection, the Producing Party, to the extent practicable, shall identify the protected portion(s).

(d) When electronic files or documents are printed for use at deposition, in a court proceeding, or for provision in printed form to an expert or consultant pre-approved pursuant to Paragraph 9.2(c), the party printing the electronic files or documents shall affix a legend to the printed document corresponding to the designation of the Designating Party and including the production number and designation associated with the native file. The parties reserve the right to object to the use of any image format version of a document produced in native file format to the extent any information has been altered.

7.3     <u>Inadvertent Failures to Designate</u>. An inadvertent failure to designate qualified information or items does not, standing alone, waive the Designating Party's right to secure protection under this Order for such material, provided that the Producing Party notifies all Receiving Parties that such Discovery Material is protected under one of the categories of this Order within fourteen (14) days of the Producing Party learning of the inadvertent failure to designate. Upon such timely correction of a designation, the Receiving Party must make reasonable efforts to assure that the material is treated in accordance with the provisions of this Order.  The Producing Party shall reproduce the Protected Material with the correct confidentiality designation within seven (7) days upon its notification to the Receiving Parties.  Upon receiving the Protected Material with the correct confidentiality designation, the Receiving

-10-

Parties shall return or securely destroy all Discovery Material that was not designated properly.

A Receiving Party shall not be in breach of this Order for any use of such Discovery Material before the Receiving Party receives such notice that such Discovery Material is protected under one of the categories of this Order, unless an objectively reasonable person would have realized that the Discovery Material should have been appropriately designated with a confidentiality designation under this Order. Once a Receiving Party has received notification of the correct confidentiality designation for the Protected Material with the correct confidentiality designation, the Receiving Party shall treat such Discovery Material (subject to the exception in the following Paragraph below) at the appropriately designated level pursuant to the terms of this Order.

A subsequent designation of "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" shall apply on a going forward basis and shall not disqualify anyone who reviewed "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" materials while the materials were not marked "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" from engaging in the activities set forth in Paragraph 10.

## 8    CHALLENGING CONFIDENTIALITY DESIGNATIONS

8.1.    <u>Timing and Form of Challenges</u>. Any Party or Non-Party may challenge a designation of confidentiality at any time that is consistent with the Court's Scheduling Order.   Any challenge to a designation of Discovery Material under this Order shall comply with the procedures set forth in Local Rule 37-1.

-11-

8.2 <u>Meet and Confer</u>. It shall be the responsibility of the Challenging Party to initiate the dispute resolution process under Local Rule 37-1 et seq.

8.3 <u>Joint Stipulation</u>. Any challenge submitted to the Court shall be via a joint stipulation pursuant to Local Rule 37-2.

8.4 The burden of persuasion in any such challenge proceeding shall be on the Designating Party. Frivolous challenges, and those made for an improper purpose (e.g., to harass or impose unnecessary expenses and burdens on other parties) may expose the Challenging Party to sanctions. Unless the Designating Party has waived or withdrawn the confidentiality designation, all parties shall continue to afford the material in question the level of protection to which it is entitled under the Producing Party's designation until the Court rules on the challenge.

9 <u>ACCESS TO AND USE OF PROTECTED MATERIAL</u>

9.1 <u>Basic Principles</u>. A Receiving Party may use Protected Material that is disclosed or produced by another Party or by a Non-Party in accordance with Section 5. Such Protected Material may be disclosed only to the categories of persons and under the conditions described in this Order. When the Action has been terminated, a Receiving Party must comply with the provisions of section 17 below (FINAL DISPOSITION).

Protected Material must be stored and maintained by a Receiving Party in a secure manner at a location in the United States that ensures that access is limited to the persons authorized under this Order. For any Protected Material that is subject to export control, such material shall be so marked or designated by the Designating Party and the Receiving Party shall upon receipt be responsible for complying with all applicable United States Export Administration Regulations and shall take all reasonable steps to so comply,

-12-

Case 8:20-cv-00048-JVS-JDE   Document 435-2   Filed 06/03/21   Page 204 of 229   Page ID
#:38217
Case 8:20-cv-00048-JVS-JDE   Document 437   Filed 06/30/20   Page 14 of 32   Page ID #:4369

including taking steps to ensure such material is not exported outside the United States or provided to foreign nationals to whom such assess is restricted.

Nothing in this Protective Order shall be construed to prevent counsel from advising their clients with respect to this case based in whole or in part upon Protected Materials, provided counsel does not disclose the Protected Material itself except as provided in this Order.

Nothing in this Protective Order shall preclude a party from using material obtained lawfully from a source other than the Producing Party, even if the Producing Party also designated the material pursuant to this Protective Order.

9.2     <u>Disclosure of "CONFIDENTIAL" Information or Items</u>. Unless otherwise ordered by the court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "CONFIDENTIAL" only to:

(a) the Receiving Party's Outside Counsel of Record in this Action, as well as employees of said Outside Counsel of Record to whom it is reasonably necessary to disclose the information for this Action;

(b) the officers, directors, and employees (including House Counsel) of the Receiving Party to whom disclosure is reasonably necessary for this Action and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(c) Experts (as defined in this Order) of the Receiving Party to whom disclosure is reasonably necessary for this Action, including the expert's support staff, provided that: (1) such consultants or experts are not presently an officer, director, or employee of a Party or of a competitor of a Party, nor anticipated at the time of retention to become an officer, director or employee of a Party or of a competitor of a Party and (2) such expert or consultant is not

-13-

involved in competitive decision-making, as defined by *U.S. Steel v. United States*, 730 F.2d 1465, 1468 n.3 (Fed. Cir. 1984), on behalf of a Party or a competitor of a Party. At least fourteen (14) days before access to the Protected Material is to be given to a consultant or expert, the consultant or expert shall complete the "Acknowledgment and Agreement to Be Bound" (Exhibit A) and the same shall be served upon the producing Party along with the following "Pre-Access Disclosure Requirements":

(i)  a current curriculum vitae of the consultant or expert;

(ii)  identification of the consultant or expert's present employer and job title;

(iii)  identification of all of the person's past and current employment and consulting relationships in the past five years, including direct relationships and relationships through entities owned or controlled by the person, including but not limited to, an identification of any individual or entity with or for whom the person is employed or to whom the person provides consulting services relating to the design, development, operation, or patenting of non-invasive physiological monitoring technologies, or relating to the acquisition of intellectual property assets relating to non-invasive physiological monitoring;

(iv)  identification (by application number, title, and filing date) of all pending patent applications on which the person is named as an inventor, in which the person has any ownership interest, or as to which the person has had or anticipates in the future any involvement in advising on, consulting on, preparing, prosecuting, drafting, editing, amending, or otherwise affecting the scope of the claims; and

-14-

Case 8:20-cv-00048-JVS-JDE   Document 435-2   Filed 06/03/21   Page 206 of 229   Page ID
#:38219
Case 8:20-cv-00048-JVS-JDE   Document 67-1   Filed 06/30/20   Page 18 of 32   Page ID #:571

(v)     a listing (by name and number of the case, filing date, and location of court) of any litigation in connection with which the person has offered expert testimony, including through a declaration, report, or testimony at a deposition or trial, during the preceding five years.

The Party seeking to disclose Protected Material shall provide such other information regarding the person's professional activities reasonably requested by the Producing Party for it to evaluate whether good cause exists to object to the disclosure of Protected Material to the outside expert or consultant. Objection Process: The producing party may object to and notify the receiving Party in writing that it objects to disclosure of Protected Material to the consultant or expert.  In the absence of an objection within fourteen (14) days of the date on which the Producing Party receives notice that a consultant or expert will be given access to Protected Material, the person shall be deemed approved under this Protective Order.  There shall be no disclosure of Protected Material to the person prior to expiration of this fourteen (14) day period.  If an objection is received within that fourteen (14) day period, the Parties agree to meet and confer within seven (7) days following the objection and to use good faith to resolve any such objection.  If the Parties are unable to resolve any objection, the objecting Party shall serve on the other Party a Joint Stipulation pursuant to Local Rule 37-2.1 within seven (7) days of the meet and confer.  The objecting Party shall have the burden of proving the need for a protective order.   No disclosure shall occur until all such objections are resolved by agreement or Court order;

(d) the court and its personnel;

(e) court reporters, videographers, and their staff;

-15-

(f) professional jury or trial consultants, mock jurors, and Professional Vendors to whom disclosure is reasonably necessary for this Action and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(g) the author, recipient, or custodian of a document containing the information, or any other individual who appears to have had access to the specific information at issue based on the face of the document, the document's metadata, other documents, or sworn witness testimony;

(h) any mediators or settlement officers and their supporting personnel, mutually agreed upon by any of the parties engaged in settlement discussions;

(i) any other person with the prior written consent of the Producing Party; and

(j) during their depositions, witnesses, and attorneys for witnesses, in the Action to whom disclosure is reasonably necessary provided: (1) the deposing party requests that the witness sign the form attached as Exhibit A hereto; and (2) they will not be permitted to keep any confidential information unless they sign the "Acknowledgment and Agreement to Be Bound" (Exhibit A), unless otherwise agreed by the Designating Party or ordered by the court. Pages of transcribed deposition testimony or exhibits to depositions that reveal Protected Material may be separately bound by the court reporter and may not be disclosed to anyone except as permitted under this Protective Order. If a Designating Party believes a party is not acting in good faith in seeking to show Protected Material to a witness during a deposition, the Designating Party may seek a further protective order under Local Rule 37 to prevent the showing of Protected Material to the witness, with the Designating Party bearing the burden

-16-

of proof to show that the party seeking to show Protected Material to a witness during a deposition is not acting in good faith.

9.3. <u>Disclosure of "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" Information or Items</u>. Unless otherwise ordered by the court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" only to the individuals identified in Paragraphs 9.2 (a), (c)-(i), who are not competitive decision-makers of a Party as defined by applicable authorities.

10. <u>PROSECUTION BAR</u>

After the adoption of this provision by the parties, Outside Counsel of Record and any person associated with a Party who receive a Producing Party's material designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" under this Protective Order who accesses or otherwise learns of, in whole or in part, said material designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" under this Protective Order shall not prepare, prosecute, supervise, advise, counsel, or assist in the preparation or prosecution of any patent application seeking a patent on behalf of the Receiving Party or its acquirer, successor, or predecessor in the field of non-invasive monitoring during the pendency of this Action and for two years after final termination of this action. To avoid any doubt, "prosecution" as used in this paragraph does not include representing or advising a Party before a domestic or foreign agency in connection with a reissue, ex parte reexamination, covered business method review, *inter partes* review, opposition, cancelation, or similar proceeding; though in connection with any such agency proceeding involving the patents-in-suit, Outside Counsel

-17-

of Record for a Receiving Party shall not: (i) participate in the preparation, prosecution, supervision, advice, counsel, or assistance of any amended claims; (ii) reveal a Producing Party's Protected Material to any prosecuting reexamination counsel or agent; or (iii) use a producing Party's Protected Material for any purpose not permitted by Section 5. The applicability of this provision is to be determined on an individual-by-individual basis such that an individual attorney who has not received Protected Material designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" is not restricted from undertaking any activities by virtue of this provision even if said individual attorney is employed by or works for the same firm or organization as an individual who has received such Protected Material.

11.    SOURCE CODE

(a)    To the extent production of source code becomes necessary in this case, a Producing Party may designate source code as "HIGHLY CONFIDENTIAL - SOURCE CODE" if it comprises or includes confidential, proprietary or trade secret source code. Nothing in this Order shall be construed as a representation or admission that Source Code is properly discoverable in this action, or to obligate any Party to produce any Source Code.

(b)    Protected Material designated as "HIGHLY CONFIDENTIAL – SOURCE CODE" shall be subject to all of the protections afforded to "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" information including the Prosecution Bar set forth in Paragraph 10, and may be disclosed only to the individuals identified in Paragraphs 9.2(a), (c), (d), (e), (g), and (j), subject to the restrictions set forth in Paragraph 9.3.

(c)    Any source code produced in discovery shall be made available for inspection, in a format allowing it to be reasonably reviewed and

-18-

searched, during normal business hours or at other mutually agreeable times, at an office of the Producing Party's counsel in the Central District of California or another mutually agreed upon location. The source code shall be made available for inspection on a secured computer in a secured room without Internet access or network access to other computers, and the Receiving Party shall not copy, remove, or otherwise transfer any portion of the source code onto any recordable media or recordable device.  No recordable media or recordable devices, including without limitation sound recorders, computers, cellular telephones, peripheral equipment, cameras, CDs, DVDs, or drives of any kind, shall be permitted into the Source Code Review Room. The Producing Party may visually monitor the activities of the Receiving Party's representatives during any source code review, but only to ensure that there is no unauthorized recording, copying, or transmission of the source code.

(d)     The Producing Party shall install tools that are sufficient for viewing and searching the code produced, on the platform produced, if such tools exist and are presently used in the ordinary course of the Producing Party's business.  The Receiving Party's outside counsel and/or experts may request that commercially available software tools for viewing and searching Source Code be installed on the secured computer, provided, however, that (a) the Receiving Party possesses an appropriate license to such software tools; (b) the Producing Party approves such software tools; and (c) such other software tools are reasonably necessary for the Receiving Party to perform its review of the Source Code consistent with all of the protections herein.  The Receiving Party must provide the Producing Party with the CD or DVD containing such licensed software tool(s) at least fourteen (14) days in advance of the date upon which the Receiving Party wishes to have the additional software tools available for

-19-

use on the Source Code Computer.      The Parties agree to cooperate in good faith if additional software becomes necessary on an expedited basis.

(e)      The Receiving Party's outside counsel and/or experts shall be entitled to take notes relating to the Source Code but may not copy the Source Code into the notes and may not take such notes electronically on the Source Code Computer itself or any other computer.

(f)      The Receiving Party may request paper copies of limited portions of source code that are reasonably necessary for the preparation of court filings, pleadings, expert reports, or other papers, or for deposition or trial, but shall not request paper copies for the purposes of reviewing the source code other than electronically as set forth in Paragraph (c) in the first instance.  Any printed portion that consists of more than fifteen (15) pages of a continuous block of Source Code or more than two hundred (200) pages total shall be presumed to be excessive, and the burden shall be on the Receiving Party to demonstrate the need for such a printed copy.  Within ten (10) days, the Producing Party shall either (i) provide one copy set of such pages to the Receiving Party or (ii) inform the Requesting Party that it objects that the printed portions are excessive and/or not done for a permitted purpose.  The Parties will cooperate in good faith if a different timeframe for production is required.  If, after meeting and conferring, the Producing Party and the Receiving Party cannot resolve the objection, the Receiving Party shall be entitled to seek a Court resolution of whether the printed Source Code in question is narrowly tailored and was printed for a permitted purpose.  The burden shall be on the Receiving Party to demonstrate that such printed portions are no more than is reasonably necessary for a permitted purpose and not merely printed for the purposes of review and analysis elsewhere.  The printed pages

-20-

shall constitute part of the Source Code produced by the Producing Party in this action.

(g) All persons who will review a Producing Party's Source Code on behalf of a Receiving Party, including members of a Receiving Party's outside law firm, shall be identified in writing to the Producing Party at least five (5) days in advance of the first time that such person reviews such Source Code. Such identification shall be in addition to any other disclosure required under this Order. All persons viewing Source Code on the source code computer shall sign on each day they view Source Code a log that will include the names of persons who enter the locked room to view the Source Code and when they enter and depart. The log shall be kept by the Producing Party.

(h) Unless otherwise agreed in advance by the Parties in writing, following each day on which inspection is done under this Order, the Receiving Party's outside counsel and/or experts shall remove all notes, documents, and all other materials from the Source Code Review Room; failure to do so could be deemed a waiver of confidentiality to any materials left behind. The Producing Party is not responsible for any items left in the room following each inspection session. But all counsel remain bound by their ethical duties regarding the handling and possible return of work product inadvertently left behind by a representative of an opposing party. Proper identification of all authorized persons shall be provided prior to any access to the secure room or the computer containing Source Code. Proper identification requires showing, at a minimum, a photo identification card sanctioned by the government of any State of the United States, by the government of the United States, or by the nation state of the authorized person's current citizenship. Access to the secure room or the Source Code Computer may be denied, at the discretion of the supplier, to any individual who fails to provide proper identification.

-21-

(i) The Receiving Party's outside counsel of record may make no more than three (3) additional paper copies of any portions of the Source Code received from a Producing Party pursuant to Paragraph 11(f), not including copies attached to court filings or used at depositions, and shall maintain a log of all paper copies of the Source Code. The log shall include the names of the reviewers and/or recipients of paper copies and locations where the paper copies are stored. Upon request from the Producing Party, the Receiving Party shall provide a copy of this log to the Producing Party as soon reasonably practicable and in no event more than three (3) days after receipt of such request.

(j) The Receiving Party's outside counsel of record and any person receiving a copy of any Source Code shall maintain and store any paper copies of the Source Code at their offices in a manner that prevents duplication of or unauthorized access to the Source Code, including, without limitation, storing the Source Code in a locked room or cabinet at all times when it is not in use. Absent agreement of the Parties or order of this Court, no more than a total of fifteen (15) individuals identified by the Receiving Party shall have access to the printed portions of the Source Code (except insofar as such code appears in any court filing or expert report). The Parties agree to cooperate in good faith if it becomes necessary for more than fifteen (15) individuals to have access to the printed portions of the Source Code. Nothing in this paragraph reflects an agreement by any Party in advance that access by more than fifteen individuals is warranted.

(k) For depositions, the Receiving Party shall not bring copies of any printed Source Code. Rather, at least ten (10) days before the date of the deposition, the Receiving Party shall notify the Producing Party it wishes to use Source Code at the deposition, and the Producing Party shall bring printed

-22-

copies of the Source Code to the deposition for use by the Receiving Party. Copies of Source Code that are marked as deposition exhibits shall not be provided to the Court Reporter or attached to deposition transcripts; rather, the deposition record will identify the exhibit by its production numbers. The Producing Party shall maintain the marked deposition exhibits during the pendency of this case. All other paper copies of Source Code brought to the deposition by the Producing Party shall remain with the Producing Counsel's outside counsel for secure destruction in a timely manner following the deposition.

(l)     Except as provided in this sub-paragraph, absent express written permission from the Producing Party, the Receiving Party may not create electronic images, or any other images, or make electronic copies, of the Source Code from any paper copy of Source Code for use in any manner (including by way of example only, the Receiving Party may not scan the Source Code to a PDF or photograph the code). Images or copies of Source Code shall not be included in correspondence between the Parties (references to production numbers shall be used instead), and shall be omitted from pleadings and other papers whenever possible. If a Party reasonably believes that it needs to submit a portion of Source Code as part of a filing with the Court, the Parties shall meet and confer as to how to make such a filing while protecting the confidentiality of the Source Code and such Source Code will not be filed absent agreement from the Producing Party that the confidentiality protections will be adequate or order of this Court. If a Producing Party agrees to produce an electronic copy of all or any portion of its Source Code or provide written permission to the Receiving Party that an electronic or any other copy needs to be made for a Court filing, access to the Receiving Party's submission, communication, and/or disclosure of electronic files or other materials

-23-

containing any portion of Source Code (paper or electronic) shall at all times be limited solely to individuals who are expressly authorized to view Source Code under the provisions of this Order. Where the Producing Party has provided the express written permission required under this provision for a Receiving Party to create electronic copies of Source Code, the Receiving Party shall maintain a log of all such electronic copies of any portion of Source Code in its possession or in the possession of its retained consultants, including the names of the reviewers and/or recipients of any such electronic copies, and the locations and manner in which the electronic copies are stored. Additionally, any such electronic copies must be labeled "HIGHLY CONFIDENTIAL - SOURCE CODE" as provided for in this Order.

## 12. PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED IN OTHER LITIGATION

If a Party is served with a subpoena, including one issued by any court, arbitral, administrative or legislative body or a court order issued in other litigation, that requests or compels disclosure of any Protected Material, that Party must:

(a) promptly notify in writing each Designating Party. Such notification shall include a copy of the subpoena or court order;

(b) promptly notify in writing the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is subject to this Protective Order. Such notification shall include a copy of this Protective Order; and

(c) cooperate with respect to all reasonable procedures sought to be pursued by the Designating Party whose Protected Material may be affected. If the Designating Party timely seeks a protective order, the Party served with the subpoena or court order shall not produce any information designated in this

-24-

action as "CONFIDENTIAL," HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" before a determination by the court from which the subpoena or order issued, unless the Party has obtained the Designating Party's permission. The Designating Party shall bear the burden and expense of seeking protection in that court of its confidential material and nothing in these provisions should be construed as authorizing or encouraging a Receiving Party in this Action to disobey a lawful directive from another court.

13. <u>A NON-PARTY'S PROTECTED MATERIAL SOUGHT TO BE PRODUCED IN THIS LITIGATION</u>

(a) The terms of this Order are applicable to information produced by a Non-Party in this Action and designated as Protected Material. Such information produced by Non-Parties in connection with this litigation is protected by the remedies and relief provided by this Order. Nothing in these provisions should be construed as prohibiting a Non-Party from seeking additional protections.

(b) In the event that a Party is required, by a valid discovery request, to produce a Non-Party's confidential information in its possession, and the Party is subject to an agreement with the Non-Party not to produce the Non-Party's confidential information, then the Party shall:

(1) promptly notify in writing the Requesting Party and the Non-Party that some or all of the information requested is subject to a confidentiality agreement with a Non-Party;

(2) promptly provide the Non-Party with a copy of the Protective Order in this Action, the relevant discovery request(s), and a reasonably specific description of the information requested; and

-25-

(3) make the information requested available for inspection by the Non-Party, if requested.

(c) If the Non-Party fails to seek a protective order from this court within 14 days of receiving the notice and accompanying information, the Receiving Party may produce the Non-Party's confidential information responsive to the discovery request. If the Non-Party timely seeks a protective order, the Receiving Party shall not produce any information in its possession or control that is subject to the confidentiality agreement with the Non-Party before a determination by the court. Absent a court order to the contrary, the Non-Party shall bear the burden and expense of seeking protection in this court of its Protected Material.

14.    UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL

If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Protected Material to any person or in any circumstance not authorized under this Protective Order, the Receiving Party must immediately (a) notify in writing the Designating Party of the unauthorized disclosures, (b) use its best efforts to retrieve all unauthorized copies of the Protected Material and to ensure that no further or greater unauthorized disclosure and/or use thereof is made, (c) inform the person or persons to whom unauthorized disclosures were made of all the terms of this Order and (d) request such person or persons to execute the "Acknowledgment an Agreement to Be Bound" attached hereto as Exhibit A.  Unauthorized or inadvertent disclosure does not change the status of Discovery Material or waive a Producing Party's right to maintain the disclosed document or information as Protected Material.

-26-

15.   **INADVERTENT PRODUCTION OF PRIVILEGED OR OTHERWISE PROTECTED MATERIAL**

(a) The inadvertent production by a Party of Discovery Material subject to the attorney-client privilege, work-product protection, or any other applicable privilege or protection, despite the Producing Party's reasonable efforts to prescreen such Discovery Material prior to production, will not waive the applicable privilege and/or protection if a request for return of such inadvertently produced Discovery Material is made promptly after the Producing Party learns of its inadvertent production.

(b) Upon a request from any Producing Party who has inadvertently produced Discovery Material that it believes is privileged and/or protected, each Receiving Party shall immediately return such Protected Material or Discovery Material and all copies to the Producing Party, except for any pages containing privileged markings by the Receiving Party which shall instead be destroyed and certified as such by the Receiving Party to the Producing Party.

(c) Nothing herein shall prevent the Receiving Party from preparing a record for its own use containing the date, author, addresses, and topic of the inadvertently produced Discovery Material and such other information as is reasonably necessary to identify the Discovery Material and describe its nature to the Court in any motion to compel production of the Discovery Material.

16.   **MISCELLANEOUS**

16.1   <u>Right to Further Relief</u>. Nothing in this Order abridges the right of any person to seek its modification by the Court in the future.

16.2   <u>Right to Assert Other Objections</u>. By agreeing to the entry of this Protective Order, no Party waives any right it otherwise would have to object to

-27-

disclosing or producing any information or item on any ground not addressed in this Protective Order. Similarly, no Party waives any right to object on any ground to use in evidence of any of the material covered by this Protective Order.

16.3 <u>Filing Protected Material</u>. A Party that seeks to file under seal any Protected Material must comply with Local Civil Rule 79-5. Protected Material may only be filed under seal pursuant to a court order authorizing the sealing of the specific Protected Material. If a Party's request to file Protected Material under seal is denied by the court, then the Receiving Party may file the information in the public record unless otherwise instructed by the court.

16.4 <u>Termination of Matter and Retention of Jurisdiction</u>. The Parties agree that the terms of this Protective Order shall survive and remain in effect after the Final Disposition of the above-captioned matter. The Court shall retain jurisdiction after Final Determination of this matter to hear and resolve any disputes arising out of this Protective Order.

16.5 <u>Successors</u>. This Order shall be binding upon the Parties hereto, their successors, and anyone who obtains access to Protected Material.

16.6 <u>Modification by Court</u>. This Order is subject to further court order based upon public policy or other considerations, and the Court may modify this Order sua sponte in the interests of justice. All disputes between the Parties concerning Protected Material, however designated, produced under the protection of this Order shall be resolved by the United States District Court for the Central District of California.

16.7 <u>Computation of Time</u>. The computation of any period of time prescribed or allowed by this Order shall be governed by the provisions for computing time set forth in Federal Rules of Civil Procedure 6.

-28-

17.   <u>FINAL DISPOSITION</u>

After the Final Disposition of this Action, as defined in Paragraph 6, within 60 days of a written request by the Designating Party, each Receiving Party shall return all Protected Material to the Producing Party or destroy such material. As used in this subdivision, "all Protected Material" includes all copies, abstracts, compilations, summaries, and any other format reproducing or capturing any of the Protected Material. Whether the Protected Material is returned or destroyed, the Receiving Party must submit a written certification to the Producing Party (and, if not the same person or entity, to the Designating Party) by the 60-day deadline that (1) identifies (by category, where appropriate) all the Protected Material that was returned or destroyed and (2) affirms that the Receiving Party has not retained any copies, abstracts, compilations, summaries or any other format reproducing or capturing any of the Protected Material. Notwithstanding this provision, Counsel are entitled to retain an archival copy of all pleadings, motion papers, trial, deposition, and hearing transcripts, legal memoranda, correspondence, deposition and trial exhibits, expert reports, attorney work product, and consultant and expert work product, even if such materials contain Protected Material, but must return or destroy any pleadings, correspondence, and consultant or expert work product that contain information designated "HIGHLY CONFIDENTIAL – SOURCE CODE." Any such archival copies that contain or constitute Protected Material remain subject to this Protective Order as set forth in Paragraph 6 (DURATION).

/ / /

/ / /

/ / /

/ / /

-29-

18.   <u>**VIOLATION**</u>

Any violation of this Order may be punished by appropriate measures including, without limitation, contempt proceedings and/or monetary sanctions.

**IT IS SO ORDERED.**

Dated:  June 30, 2020

_____
JOHN D. EARLY
United States Magistrate Judge

-30-

**EXHIBIT A**

I, _____, acknowledge and declare that I have received a copy of the Protective Order ("Order") in *Masimo Corp., et al. v. Apple Inc.*, United States District Court, Central District of California, Southern Division, Civil Action No. 8:20-cv-00048-JVS (JDEx). Having read and understood the terms of the Order, I agree to be bound by the terms of the Order and consent to the jurisdiction of said Court for the purpose of any proceeding to enforce the terms of the Order.

Name of individual: _____

Present occupation/job description: _____

_____

_____

Name of Company or Firm: _____

Address:_____



Dated: _____



_____

[Signature]

-31-

## EXHIBIT A

I, __John L. Smith, Ph.D.__, acknowledge and declare that I have received a copy of the Protective Order ("Order") in *Masimo Corp., et al. v. Apple Inc.*, United States District Court, Central District of California, Southern Division, Civil Action No. 8:20-cv-00048-JVS (JDEx). Having read and understood the terms of the Order, I agree to be bound by the terms of the Order and consent to the jurisdiction of said Court for the purpose of any proceeding to enforce the terms of the Order.

Name of individual: __John L. Smith, Ph.D.__

Present occupation job description: __Consultant__

Name of Company or Firm: __NIVG Consulting, LLC__

Address: __9042 NW Murdock St., Portland, OR 97229__

Dated: __May 7, 2021__

[Signature]

-31-

Litigation list for John L. Smith, Ph.D.

> Listing (by name and number of the case, filing date, and location of court) of any litigation in connection with which the person has offered expert testimony, including through a declaration, report, or testimony at a deposition or trial, during the preceding five years

LifeScan Scotland, Ltd v. Pharmatech Solutions, Inc., Case CV 11-04494 MEJ, United States District Court for the Northern California, for Plaintiff, retained as expert for plaintiff. Blood glucose test strips. Settled out of court (2014-2016).

Dominion Assets, LLC v. Masimo Corporation and Cercacor Laboratories, Case 14-cv-03002-BLF, United States District Court for Northern California, retained as expert for defendant, filed expert report. Noninvasive glucose systems. Matter settled in favor of Masimo (2014-2018).

WaveForm Technologies, Inc. (AgaMatrix) v. Dexcom, Inc., Case No. 3:16-cv-536, United States District Court for the District of Oregon, retained as testifying expert for plaintiff. Summary judgement for Dexcom. Continuous glucose monitors. Matter settled out of court (2016-2019).

Dexcom, Inc, v. AgaMatrix, Inc., Case 2:16-cv-05947-SJO-AS, United States District Court for the Central District of California, Western Division, retained as testifying expert for defendant. Blood glucose monitoring systems. Summary judgment of noninfringement for AgaMatrix, award of fees as exceptional. Upheld on appeal to the Court of Appeals for the Federal Circuit (2016-2019).

Dexcom, Inc. U.S. Patent and Trial Appeal Board *Inter Partes* Review 2016-01679 of U.S. Patent No. 7,146,202, retained as testifying expert for AgaMatrix, Continuous glucose monitors. Three claims found patentable, upheld on appeal to the Court of Appeals for the Federal Circuit (2016-2018).

Dexcom, Inc. U.S. Patent and Trial Appeal Board *Inter Partes* Review 2016-01680 of U.S. Patent No. 8,187,433, retained as testifying expert for AgaMatrix, all 10 claims found patentable, upheld on appeal to the Court of Appeals for the Federal Circuit (2016-2018).

Pharma Tech Solutions, Inc. and Decision IT Corp. v. LifeScan, Inc, LifeScan Scotland, Ltd, and Johnson and Johnson, Case No. 2:16-cv-00564-RFB-PAL, United States District Court, District of Nevada, retained as expert for LifeScan (2016-2018). Blood glucose test strips. Summary judgment of noninfringement for LifeScan, upheld on appeal to the Court of Appeals for the Federal Circuit.

DexCom, Inc. U.S. Patent and Trial Appeal Board *Inter Partes* Review 2017-01051 of U.S. Patent No. 7,529,574, retained as testifying expert for WaveForm Technologies, Inc. Continuous glucose monitors. Two original claims found patentable, three substitute claims granted. (2016-2018).

Certain Electrochemical Glucose Monitoring Systems and Components thereof, Investigation No_337_TA_1075, U.S. International Trade Commission, Washington, DC; Dexcom, Inc., Complainant; Agamatrix, Inc., Proposed Respondent, retained as consulting expert for AgaMatrix. Blood glucose monitoring systems. AgaMatrix awarded summary determination of noninfringement (2017-2019).

AgaMatrix U.S. Patent and Trial Appeal Board *Inter Partes* Reviews IPR2018-01715 and IPR2018-01716 of U.S. Patent No. 9724045, retained as expert for AgaMatrix (2018-2019). Continuous glucose monitors. Not instituted.

AgaMatrix U.S. Patent and Trial Appeal Board *Inter Partes* Reviews IPR2018-01717 and IPR2018-01718 of U.S. Patent No. 9750460, retained as expert for AgaMatrix (2018-2019). Continuous glucose monitors. Not instituted.

Arbmetrics, LLC v. Dexcom, Inc., Case 3:18-cv-00134-JLS-MSB, United States District Court for the Southern District of California, retained as expert for Arbmetrics. Continuous glucose monitors. Judgment for Dexcom, affirmed by the Federal Circuit (2019-2020).

LifeScan, Inc (Under Platinum Equity). U.S. Patent and Trial Appeal Board *Inter Partes* Review for U.S. Patent No. 8480878, retained as expert for LifeScan (2019). Blood glucose test strips. Not instituted.

LifeScan, Inc (Under Platinum Equity). U.S. Patent and Trial Appeal Board *Inter Partes* Review for U.S. Patent No. 8349157, retained as expert for LifeScan (2019). Blood glucose test strips. Not instituted.

John L. Smith, Ph.D. Consulting clients in the area of non-invasive physiological monitoring technologies, 2016-2021

1. Biolab Technologies Ltd, Israel
2. Sensorflo Ltd, New Zealand
3. LifeScan Global Corporation
4. Senserion AG, Switzerland
5. 1625986 Ontario Ltd, Mount Brydges, Ontario

# Exhibit H

MASIMO Foundation for Ethics, Innovation, and Competition in Healthcare

HOME     ABOUT US     GRANT-MAKING GUIDELINES     CONTACT US

## ABOUT US

About Us

Chairman's Message

**Board of Directors**

Masimo Corporation

Downloads

# Board of Directors



**Joe E. Kiani, Chairman**

As Chairman of the Board of Masimo Foundation, Mr. Kiani brings vision, expertise, and proven management capabilities to the Foundation. His responsibilities include serving as the Foundation's Chief Executive Officer, leading and overseeing the Board of Directors in the fulfillment of its duties, providing policy leadership, and presiding at meetings of the Board. He receives no compensation from the Foundation.

Mr. Kiani is also Chief Executive Officer and Chairman of the Board of Masimo Corporation, a global medical technology company that develops and manufactures innovative non-invasive patient monitoring technologies. Masimo is the primary contributor to the Foundation. Mr. Kiani founded Masimo in 1989 as a private company to improve the accuracy of noninvasive patient monitoring. Under his leadership, Masimo has grown from a "garage start up" into a successful publicly traded medical technology company employing over 2,000 people worldwide and increasing product revenue four-fold in the last five years. Since 1998, Mr. Kiani has also been the CEO and Chairman of Masimo Labs, a research and development company focused on non-invasive monitoring. Mr. Kiani has served on the board of the Medical Device Manufacturers Association since 2002, and is the past Chair of MDMA. Mr. Kiani has testified before the US Senate and FTC on issues related to Group Purchasing Organizations, and the patent system. Mr. Kiani is also on the Board of Trustees of Chapman University, and an Advisor to the College of Engineering of San Diego State University. Mr. Kiani holds a B.S.E.E. and an M.S.E.E. from San Diego State University and is an inventor on more than 50 patents.



**Stephen C. Jensen, Director**

Stephen C. Jensen is a partner at Knobbe, Martens, Olson & Bear LLP, one of the largest intellectual property law firms in the country.  He has been practicing law for over 25 years, with most of that representing innovative medical technology companies.  Mr. Jensen received his J.D., *Order of the Coif*, at the University of California - Los Angeles in 1990, and his B.S. in Electrical Engineering , *magna cum laude*, from Brigham Young University in 1987.  Prior to becoming a lawyer, he worked for Hughes Aircraft where he was involved in development of airborne radar systems.

He served on the Board of Directors of Sedline, Inc, a company that developed non-invasive brain function monitoring products.  He also served as the Senior Vice President of OEM Business and Business Development at Masimo Corporation, and currently serves on the board of directors of Cercacor Corporation, a company that is developing non-invasive monitoring technology.   He brings true passion for patient safety, particularly through innovation.  He believes that if we apply Voltaire's principal of "no problem can withstand the assault of sustained thinking," and stop worrying about who gets credit, we can solve any patient safety problems presented.

Mr. Jensen, with his wife and five children have been serving the vision impaired community for over a decade, through their passion for raising seeing-eye dogs.  These dogs are provided to the vision impaired at no charge.  He also provided volunteer service overseas for about a year and a half before finishing his undergraduate degree.



**Sarah Kiani, Director**

Sarah has been a devoted mother, wife and philanthropist since the age of 21.  She has served as a member of the Board of Masimo Foundation for Ethics, Innovation, and Competition in Healthcare a year after its founding.   The foundation has focused on improvement of patient care with many projects, including the founding of Patient Safety, Science and Technology Summit (patientsafetysummit.org). She and her husband, Joe Kiani, have also been involved in various

international projects, including building schools in Uganda with their support of Clinton Global Initiatives.

In addition, Sarah has been involved in many local programs, including the Booster club at George White Elementary School, where she spearheaded various programs including raising money to buy all Apple computers for the computer lab.  She and her husband have also helped the school by improving its image and communications with the entire school community.  In addition, Sarah chaired the March of Dimes fundraising event in 2003, and together with her husband is leading this year's MOD Walk, as they did for Juvenile Diabetes Research Foundation in 2009 for their annual walk.

Sarah has also involved her daughters, Kayla and Nessa, in volunteerism as they tutored students at a title 1 elementary school in Santa Ana.  Kayla and Nessa have made gift bags for kids at CHOC hospital during holidays and have taken care of families for the holidays sponsor meals.

Sarah has been a student of nutrition and its impact on children and has become an expert in proper diet and supplements to encourage a healthy mind and body.



**Mary Kiani, Director**

Mary was a full-time dentist when her brother, Joe Kiani, founded Masimo. With a strong desire to help her brother launch the company, Mary pitched in whenever she could on whatever was needed—fundraising, conducting patent searches, organizing investor meetings, and even fielding calls on behalf of the company. As the only member of the Board with medical credentials, Mary was Masimo's original Director of Medical Affairs. With Mary's invaluable contributions, it wasn't long before the fledgling Masimo took flight.

Mary has always had a keen interest in all aspects of healthcare, especially patient safety. When Joe founded the Patient Safety Movement Foundation in 2012, Mary was eager to help. She was a key lieutenant in the army of volunteers that organized the inaugural Patient Safety, Science & Technology Summit in January 2013. She continues to help shepherd the Patient Safety Movement towards its ambitious goal of eliminating all preventable patient deaths by 2020.

Outside of her endeavors in healthcare, both with Masimo and as a practicing dentist, Mary has devoted her time to Orange County's public schools by participating in local Parent Teacher Association (PTA) chapters. She has served on the PTA Council for four years and was the President of Laguna Beach Unified School District's middle school and high school.

Mary received her B.S. degree from San Diego State University at the age of 19. She earned her D.D.S. at the age of 23 from Creighton University in Omaha, NE.



**Frederick J. Harris, Director**

Dr. harris serves as a Director of the Foundation. He is a professor of Electrical and Computer Engineering at San Diego State University, where he holds the CUBIC Signal Processing Chair of the Communication Systems and Signal Processing Institute. Dr. harris has taught at SDSU since 1967 in the areas related to Digital Signal Processing (DSP) and Communication Systems. He has extensive practical experience applying his skills, is well published, and has contributed to a number of books on DSP. He is a Fellow of the IEEE and holds a B.S.E.E. from the Polytechnic Institute of Brooklyn, a master's degree in M.S.E.E. from San Diego State University, and a Ph.D. from Aalborg University. He receives no compensation from the Foundation.


secured transaction

Privacy Policy | Terms of Use | Cookie Preferences
© 2020 Masimo Foundation for Ethics, Innovation, and Competition in Healthcare. All Rights Reserved.