UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(SOUTHERN DIVISION - SANTA ANA)

| | | |
|---|---|---|
| MASIMO CORPORATION, ET AL, | ) | CASE NO: 8:20-CV-00048-JVS-JDEx |
| | ) | |
| Plaintiffs, | ) | CIVIL |
| | ) | |
| vs. | ) | Santa Ana, California |
| | ) | |
| APPLE, INC, | ) | Thursday, June 3, 2021 |
| | ) | |
| Defendant. | ) | (10:05 a.m. to 12:59 p.m. |

HEARING RE: PLAINTIFFS' MOTION TO COMPEL [DKT.NO.357]


BEFORE THE HONORABLE JOHN D. EARLY,
UNITED STATES MAGISTRATE JUDGE


** NOTE:  WORD REDACTED ON PAGE 90 PER ORDER OF THE COURT **



**APPEARANCES:**              SEE PAGE 2



Court Reporter:          Recorded; CourtSmart

Courtroom Deputy:        Maria Barr

Transcribed by:          Exceptional Reporting Services, Inc.
                         P.O. Box 8365
                         Corpus Christi, TX 78468
                         361 949-2988




Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

**APPEARANCES:**

For Plaintiffs:                 BENJAMIN A. KATZENELLENBOGEN, ESQ.
                                Knobbe Martens Olson & Bear, LLP
                                2040 Main Street
                                14th Floor
                                Irvine, CA 92614

                                ADAM POWELL, ESQ.
                                Knobbe Martens Olson & Bear, LLP
                                12790 El Camino Real
                                San Diego, CA 92130

For Defendant:                  JOSHUA H. LERNER, ESQ.
                                Gibson Dunn & Crutcher, LLP
                                555 Mission Street
                                Suite 3000
                                San Francisco, CA 94105

                                ILISSA S. SAMPLIN, ESQ.
                                Gibson Dunn & Crutcher, LLP
                                2029 Century Park East
                                Suite 4000
                                Los Angeles, CA 90067

1       **Santa Ana, California; Thursday, June 3, 2021; 10:05 a.m.**

2                            **(Call to Order)**

3              **THE COURT:**  Good morning, everyone.

4          **(Counsel greet the Court)**

5              **THE COURT:**  We're calling the case of *Masimo*

6    *Corporation, et al. v. Apple Inc.*, Central District of

7    California Case Number 8:20-cv-48-JVS-JDE.  We're here for the

8    continued hearing on Plaintiffs' Second Motion to Compel, which

9    is Docket Number 357.  We'll now take appearances from counsel,

10   starting with Plaintiffs, please.

11             **MR. POWELL:**  Thank you, Your Honor.  Adam Powell for

12   Plaintiffs Masimo Corporation and Cercacor Laboratories, Inc.

13   With me is my partner, Ben Katzenellenbogen.

14             **THE COURT:**  Good morning.

15             And on behalf of Apple?

16             **MR. LERNER:**  Good morning, Your Honor.  Josh Lerner

17   and Ilissa Samplin on behalf of Apple.

18             **THE COURT:**  Good morning.

19             All right.  As I mentioned, we're here for the

20   continued hearing on Plaintiffs' Second Motion to Compel,

21   Docket 357.  I think I went over for our hearing two weeks ago

22   on May 27th what I've reviewed, and I've reviewed all the

23   relevant material.  In addition, there was a supplement or a

24   joint statement filed on June 1st, 2021, at Docket Number 419

25   that indicates that the parties have reached an agreement on

4

1    Requests for Production Numbers 101, 102, 103, 106, 107, 108,

2    109, and 235 and, therefore, the motion is withdrawn as to

3    those Requests for Production.  And it indicates certain

4    proposals made by Plaintiff as to Requests Numbers 226, 230

5    through 234, 180, 187, 192, 198 through 201, and 203 through

6    206 with the Defendant responding with a counter proposal as to

7    one of them -- I think it was 226.  Yes.

8            Has anything else changed since the filing of the

9    joint statement from Plaintiffs' standpoint?

10           **MR. POWELL:**  Yes, Your Honor.  In preparing for the

11   hearing we did review some of the requests and we've identified

12   some with counsel that I think there's no issue on.  And we've

13   also proposed some compromises on a few other requests based on

14   what we thought the parties had agreed to on the other requests

15   and what might be a reasonable compromise.

16           **THE COURT:**  All right.  So, let me start with what

17   you think agreements have been reached that that would

18   potentially moot further argument and then I'll confer with

19   Defense counsel if they agree.

20           **MR. POWELL:**  Sure.  So, on Requests 191, 197, and

21   202, we believe that --

22           **THE COURT:**  Let me do this.  Just slow down, because

23   I've got like three different places that I've got to jump back

24   and forth.  So, 190 -- say again.

25           **MR. POWELL:**  I apologize, Your Honor.  191.

1        **THE COURT:**  You don't have to apologize.

2        **MR. POWELL:**  All right, 191.

3        **THE COURT:**  Okay.

4        **MR. POWELL:**  197.

5        **THE COURT:**  Okay.

6        **MR. POWELL:**  And 202.

7        **THE COURT:**  Tell me what's the new status of those.

8        **MR. POWELL:**  It appears that Apple has agreed to

9    search for all responsive documents and so we would agree that

10   that representation has mooted the motion.

11       **THE COURT:**  Let me ask Apple if that's correct.

12       **MS. SAMPLIN:**  It is correct, Your Honor, with the

13   caveat we said we were conducting a reasonable and diligent

14   search for all responsive documents.  I just want to make sure

15   that we're clear on that.

16       **THE COURT:**  Let me be very clear that anything that's

17   ordered and with respect to a request for production is whether

18   you want to say limited to or requires a reasonable and

19   diligent search.

20       So, based on my understanding there is then an

21   agreement and Requests for Production Numbers 191, 202, and 197

22   are moot, the motion as to those three Requests for Production

23   are moot.

24       Mr. Powell, anything further?

25       **MR. POWELL:**  Yes, there's two other categories.  The

6

1    first is Request for Production Number 82.

2              THE COURT:  All right.

3              MR. POWELL:  That request, Apple has agreed to

4    conduct a reasonable search for responsive documents and has

5    limited the request -- or the search to ESI custodian

6    searching.

7              THE COURT:  All right.

8              MR. POWELL:  And so that would moot our motion, this

9    particular motion, but we do have another issue about whether

10   that's appropriate that's being discussed for a bunch of

11   different RFPs.  So, we would just like to reserve our right to

12   discuss that issue with the other RFPs on the same issue later.

13             THE COURT:  Well, what I really want is a clear

14   answer.  Is Number 82 moot or not?

15             MR. POWELL:  It is moot for this motion, Your Honor.

16             THE COURT:  All right.  From Apple's standpoint, is

17   it your understanding that the motion as to Request for

18   Production Number 82 is moot?

19             MS. SAMPLIN:  Well, it's moot, Your Honor, if we have

20   an agreement that we're limiting our search to ESI, meaning

21   search terms and custodians, but what I hear I think, it wasn't

22   clear to me --

23             THE COURT:  So, the answer's no.  Is that correct?

24   You don't understand that it's moot and we'll have to have a

25   hearing on it.

7

1          **MS. SAMPLIN:**  I'm actually not sure, Your Honor.

2          **THE COURT:**  All right.

3          **MS. SAMPLIN:**  Because I didn't understand what

4    Mr. Powell was just saying about wanting to reserve the right

5    to deal with something later.  I'm not sure what he means.  I

6    thought we had reached agreement before this conference that it

7    was moot, but he seems to be saying he's reserving some right

8    to raise something later and I just don't know what that

9    something is.

10         **THE COURT:**  Mr. Powell, here's what I need to know.

11   Do I have to have a hearing, are we having a hearing today on

12   Request for Production Number 82, or have the parties reached

13   an agreement as to Request for Production Number 82?

14         **MR. POWELL:**  I don't think we need a hearing as to 82

15   at this time.  This is just --

16         **THE COURT:**  I mean really be very clear.  Without

17   wiggle room, okay -- I'm here to make decisions.  It's okay if

18   you want a decision or a ruling on something.  But the I don't

19   think and at this time, now is the time and not think maybe,

20   yes or no, are we going to go forward with a hearing on

21   Number 82?  I'm happy to do it either way.

22         **MR. POWELL:**  No, Your Honor, and I just want to

23   explain why for me.  The only reason is that this issue that

24   I'm discussing has not been briefed to the Court and so we

25   don't think it's an issue the Court needs to decide.  There's

1  just a separate discussion we've been having on custodians and

2  search terms and whether RFPs should be searched only by

3  custodians and search terms.  And that pertains to a bunch of

4  different RFPs.  We've had it in our letters back and forth.

5          **THE COURT:**  All right.

6          **MR. POWELL:**  It has not been briefed to the Court and

7  I don't think it's at issue in this motion.

8          **THE COURT:**  And it's I don't think.  That's the

9  issue.  So, here's what I'm going to tell each side.  When you

10  write to each other, that's an officer of the court writing to

11  each other.  When you have a commitment from one side to take

12  certain actions, that's going to be, barring some reason why it

13  shouldn't, some good reason, that's going to be enforceable on

14  a subsequent motion to ask a party to comply with their own

15  statement of compliance.

16          But, since I don't know what the dispute is, my

17  question to you, Mr. Powell, it's your clients' motion, is the

18  motion as to Number 82 withdrawn?

19          **MR. POWELL:**  Yes.  That dispute we're talking about

20  is not at issue in this motion.

21          **THE COURT:**  All right.  So, I don't need your

22  approval.  They've withdrawn it.

23          So, what else, Mr. Powell?

24          **MR. POWELL:**  Requests for Production Numbers 98, 99,

25  and 163.

1          **THE COURT:**  All right.  My memory is that has to deal

2    with third party, potential third-party objections, that Apple

3    made agreements to comply subject to not receiving objections

4    from third parties.  Is that right with respect to those three?

5          **MR. POWELL:**  Correct.  The issue there is Apple has

6    agreed to produce documents from third parties if it gets

7    approval.  That's fine.  And it has stated that it represents

8    it does not have any of its own forecasts and all I did is I

9    clarified with counsel this morning that if they do find such

10   forecasts later, they will produce them, they won't just mark

11   them nonresponsive.  And I believe counsel confirmed that for

12   me.

13         **THE COURT:**  Is that representation correct on behalf

14   of Apple?

15         **MS. SAMPLIN:**  Yes, that's accurate, Your Honor.

16         **THE COURT:**  So, again getting to the bottom line,

17   Mr. Powell, with respect to Requests for Production Number 98,

18   99, and 163, is the motion withdrawn?

19         **MR. POWELL:**  Yes, Your Honor.

20         **THE COURT:**  All right.  Is there anything further,

21   Mr. Powell?

22         **MR. POWELL:**  Yes.  There were proposals that we

23   provided on eight additional Requests for Production and Apple

24   declined those proposals.  If Your Honor would -- thinks it

25   would be helpful, I can either --

1          **THE COURT:**  Truthfully, no, it's not helpful.

2          **MR. POWELL:**  Okay.

3          **THE COURT:**  I thought I was clear -- and I'm sure it

4    was done in good faith, but I thought I was clear with respect

5    to the supplement that all I wanted was these are withdrawn or

6    not withdrawn.  I didn't want further argument.  I didn't want

7    further proposals.  We talked about it at the hearing.  Once

8    you get here, you're kind of stuck with what you've got.  By

9    making further proposals -- you know, I may look at them, I may

10   consider them, because I had a little bit of time with the

11   supplement to consider them.  But doing it on the fly, the time

12   for that has passed.  I don't want to hear about eight more new

13   proposals.  The time to have made those proposals was weeks

14   ago.

15          I'm going to leave -- you know, we can argue whatever

16   you want.  When you get to it if you want to ask and we can

17   talk about it, that's fine.  But the number of places I have to

18   go to get to the bottom of these disputes is seemingly endless

19   and I don't want to add to that on the fly.

20          All right?  Anything further, Mr. Powell?

21          **MR. POWELL:**  No, Your Honor.

22          **THE COURT:**  On behalf of Apple, anything beyond what

23   Mr. Powell has set forth?

24          **MS. SAMPLIN:**  No, Your Honor.

25          **THE COURT:**  All right, let's get started.

11

1          Turning to the Joint Stipulation -- and we're going

2    to stay on the record in public session unless someone tells me

3    you wish to have the transcript sealed.  But I'd really like to

4    go as far as we can without doing sealed filings if we can

5    handle it.

6          All right, so with the Joint Stipulation, and it's

7    category or Heading Number 2, where we get into the RFPs.

8    Heading Number 2 deals with Numbers 82, 98, 99, 107, 163, and

9    164.  It looks to me that, based on what Mr. Powell just said

10   and based on the supplemental filing, the motion is either,

11   call it withdrawn, you can call it mooted as to Numbers 82, 98,

12   99, 107, and 163, and that leaves us 164.

13          Is that correct, Mr. Powell?

14          **MR. POWELL:**  Yes, Your Honor.

15          **THE COURT:**  All right.  I'm going to give you my

16   tentative on 164.  And that is that the main objection appears

17   to be overbreadth.  The argument from Apple is the use of the

18   term "physiological monitoring" is overbroad considering the

19   trade secrets at issue in the case.  It appears, however, that

20   RFP Number 164 actually uses the phrase pulse oximetry, which

21   is narrower and generally seems more limited.  And again, this

22   falls in the category of facially.  164 appears to seek

23   relevant information.  An argument could certainly be made that

24   it's overly broad, unduly burdensome, and not proportional to

25   the needs of the case.  But what I didn't get from Apple was

1    any evidence to support that, and the argument refers to a

2    phrase that's not contained in that particular RFP.

3            So, I'll hear from Apple, because my tentative would

4    be to grant the motion as to 164.

5            **MS. SAMPLIN:**  Your Honor, we think RFP 164 exceeds

6    the scope of the alleged trade secrets in this case.  Pulse

7    oximetry is not a trade secret at issue in this case.  And as

8    we discussed this with Your Honor last time, it's a broad

9    terminology, it extends well beyond the trade secrets in this

10   case.  We have a 2019.210 disclosure that sets forth the trade

11   secrets at issue.  We respectfully submit that these RFPs

12   should be limited to those trade -- those alleged trade

13   secrets.

14           When the parties met and conferred after we were

15   before Your Honor last week, and the reason why we were able to

16   reach agreement on requests such as 107, is because Plaintiffs

17   went back and agreed to narrow their requests to, I'm not going

18   to say them out loud, but trade secrets that are actually at

19   issue in this case.  They didn't do that with respect to

20   RFP 164.  Pulse oximetry is overbroad.  It goes well beyond

21   that which is at issue in this case.

22           Another issue is, as we told Plaintiffs, we don't

23   have forecasts of the type they are looking for here.  So, I

24   also don't even know how we would search for this because we

25   don't have a defined set of forecasts of the type that maybe

1    other companies have.  We've conducted our due diligence, we

2    don't have those kind of documents.

3         So, this request is overbroad in that it would

4    require us to just search within ESI for any kind of documents

5    that could be taken as some kind of projections or sales,

6    revenue, expenses type documents, which is pretty broad, and

7    then untethered to the trade secrets alleged in this case.

8         So, we think this RFP is broad and it could be

9    narrowed potentially in the way that Plaintiffs have agreed to

10   narrow other requests to focus them on the alleged trade

11   secrets in this case, per the discussion at the last hearing

12   before Your Honor.

13        **THE COURT:**  All right.  I appreciate your argument.

14   Let me just say I'm not going to hold somebody -- hold it as a

15   negative if somebody narrowed other requests and didn't narrow

16   this particular request.  And again, using what you heard last

17   time, my pipe analysis.  It's relating to and it's limited by

18   forecasts or projections, so that's the first narrowing.  It's

19   only forecasts and projections.  It's not past sales history or

20   anything like that.  It's just forecasts or projections.  And

21   then it's only regarding sales, revenue, expenses, or profit,

22   and it's further limited because it's only regarding the

23   inclusion of pulse oximetry and then it's even further limited

24   in Apple Watch Product.

25        I know we've had a discussion about how broad that

14

1   last category is, but we get down to a fairly discreet set of

2   documents.  Pulse oximetry may or may not be a specifically

3   identified trade secret, but it is, in the context of how this

4   is worded and how narrow it is, to me a sufficient, to use that

5   tethered word, it is tethered with this narrowing sufficient to

6   make this at least a relevant and facially proportional

7   request.

8          If I had evidence that this was going to be

9   impossible or really expensive to comply with, I would

10  certainly consider it, but I don't have that.  And when you

11  tell me that you don't -- that Apple doesn't think it has any

12  of that sort of forecast information, that cuts against a

13  proportionality argument.  And it may be that the simple answer

14  is you search for it and there are none.

15         You don't have to make that specific representation.

16  That's not required by Rule 34.  You are required to make a

17  reasonable and diligent search for documents within your

18  possession, custody, or control that aren't privileged that

19  fall within that narrowing pipe.

20         So, in light of that I'm going to grant the motion as

21  to 164.

22         **MS. SAMPLIN:**  Can I just say one more thing, Your

23  Honor?  The reason I don't think that not having forecasts cuts

24  against us, and I apologize if I wasn't clear, if the request

25  was forecasts or projections regarding and then the language

1   that you said, I would agree with you that it's a narrow set of

2   documents, but the beginning of the request is all documents

3   and things referring or relating to forecasts or projections --

4           **THE COURT:**  And if there was never a --

5           **MS. SAMPLIN:**  -- so then --

6           **THE COURT:**  If there was never a forecast or

7   projection, then there won't be any documents referring or

8   relating to and that's fair.

9           **MS. SAMPLIN:**  An official forecast or projection.

10  But if there is communications among Apple employees --

11          **THE COURT:**  And after a reasonably -- reasonably and

12  diligent search is all that's required.  All right?

13          I'm going to grant the motion as to 164.

14          All right, that concludes category Heading 2 from the

15  Joint Stipulation.  Heading 3 is Requests for Production

16  Numbers 101 through 106, 108 and 109.  Those have all been

17  withdrawn by the filing on June 1st.

18          Turning to Heading Number 4, Requests for Production

19  Numbers 165 through 170.  I'm going to need to hear argument.

20  To me we once again have a situation where there's an argument

21  about proportionality and burden from Defendants, but no

22  evidence to suggest to me how difficult it would be or why it

23  would be difficult at all to conduct a reasonable and diligent

24  search for documents relating to a Masimo pulse oximeter or two

25  different Masimo pulse oximeter products.  Maybe it would be.

1   I don't know.  I don't have any evidence to support that.

2        But the flip side evidence, I'll say that Plaintiffs

3   statement of relevance here is pretty weak, all things

4   considered.  Just as we talked about before, it's got that

5   wiggle language of the word, and this is at Page 61, and I'm

6   not going to read it -- I'm not going to read the substance

7   because it's under seal, but I guess it's sort of halfway

8   between Line 17 and Line 18, the very first word there is the

9   word "may."  And you don't have to prove your case in order to

10  get discovery, but you do have to show some tie of relevance.

11       So, I don't have a tentative on this one.  I think

12  the Requests for Production ties to relevance are somewhat

13  weak, but the countervailing arguments regarding

14  proportionality and burden, I wish I had evidence to support

15  them.  I don't.  I don't know how hard it would be for Apple to

16  search, to do a reasonable and diligent search for these

17  records.

18       So, since I haven't found that these are sufficiently

19  described with reasonable particularity and supported by

20  relevance I'm going to start with Plaintiffs to justify these

21  five requests -- six requests.

22       **MR. POWELL:**  Thank you, Your Honor.  And I'll just

23  note, I think we missed Heading 3, but we can come back to

24  that.  I'm happy to go to Heading 4.

25       **THE COURT:**  Well, start with Heading 4.  If I missed

1  Heading 3, we'll go back to it.

2          **MR. POWELL:**  Okay.  Thank you, Your Honor.

3          These requests are directly relevant because

4  Plaintiffs have alleged that Apple met with Plaintiffs back in

5  2014 and wanted our technology in their product.  They stated

6  that our technology was, quote/unquote, "the platinum, the best

7  around," and it seems almost impossible that after focusing on

8  our product so much and --

9          **THE COURT:**  Well, I'm going to interrupt you.

10  Heading 3 we did cover.  Those are all out.  Those were all

11  withdrawn.  Right?  That's at Page 119.  It lists 101 through

12  106, 108 and 109.  Those were all withdrawn on the June -- am I

13  wrong?

14          **MR. LERNER:**  I may -- so, first of all, with the

15  caveat that I confess I have tried mightily but might have lost

16  the thread a little bit.  I think the confusion, Your Honor,

17  may be that we would -- I can't get the exact percentage rate,

18  but 98 percent rate, I think maybe it's 104 and 5 are still at

19  issue.  That's all I could figure out.  But I admittedly am

20  doing what you're doing, which is looking between a lot of

21  different things.  So, if I'm wrong about that, I'll defer

22  that.

23          **MR. POWELL:**  That is correct, Your Honor.  Everything

24  except 104 and 105 was resolved.

25          **THE COURT:**  All right, let's do them in order.  Let's

18

1    go back to 104 and 105.

2        **(Pause)**

3            104 and 105 are denied.

4            All right, let's get back then to Heading 4, 165 to

5    170.

6            **MR. POWELL:**  Thank you, Your Honor.

7            So, again, Apple was pursuing Plaintiffs and their

8    technology back at the beginning in 2014, before they recruited

9    Mr. O'Reilly and Mr. Lamego and a number of others, and they

10   were focused on our technology because they wanted to

11   incorporate the technology into the watch, and so we think that

12   it is directly relevant.  Apple's efforts and analysis and

13   discussions of our products is directly relevant to many issues

14   in the case, including Apple's knowledge that it was taking our

15   trade secrets, it's relevant to willfulness on the trade secret

16   claims.  If Apple, for example --

17           **THE COURT:**  When did the MightySat pulse oximeter hit

18   the market?

19           **MR. POWELL:**  I would have to check the exact date,

20   Your Honor.

21           **THE COURT:**  Can you give me a timeframe?

22           **MR. POWELL:**  I want to say somewhere around that

23   time.

24           **THE COURT:**  When you say "that time," what are you

25   referring to?

1          MR. POWELL:  2014/2015.  Same with iSpO2.  That's my

2   understanding, but --

3          THE COURT:  So, there wouldn't be any relevance --

4   explain the relevance after it's hit the market.

5          MR. POWELL:  I'm not sure I understand Your Honor's

6   question.

7          THE COURT:  Explain the relevance of Apple having

8   documents relating to Masimo's MightySat pulse oximeter after

9   it was publicly available for anyone to look at and discuss.

10          MR. POWELL:  Oh, it's not the documents that -- you

11   know, the Masimo marketing materials or something.  That's not

12   what we're talking --

13          THE COURT:  I'm not asking about marketing material.

14   I'm asking about anything.

15          MR. POWELL:  Right.  So, Apple's analysis of the

16   product.  Apple, for example --

17          THE COURT:  Is it unlawful for Apple to look at a

18   potential competitor's product and say, wow, this is really

19   good, we should include something like that in our watch?

20          MR. POWELL:  No, but if Apple --

21          THE COURT:  So, tell me the relevance to a trade

22   secret claim of documents that Apple has that are related to

23   Masimo's MightySat pulse oximeter or the SpO2 pulse oximeter

24   after they hit the market.

25          MR. POWELL:  Sure.  So, again, Apple's -- for

1   example, if they tore down the product, they reverse engineered

2   it, they investigated it, and they said this is --

3             **THE COURT:**  Reverse engineering would not be a theft

4   of a trade secret, is that right?

5             **MR. POWELL:**  That's correct, Your Honor.

6             **THE COURT:**  Okay.

7             **MR. POWELL:**  But it's not going to -- the reverse

8   engineering is not going to show theft of a trade secret

9   itself.  And that's straight from the statute.  You are

10   correct.  But what it does show is a motivation to obtain our

11   technology.  Testing, for example, showing that these are the

12   best products around and that they outperform Apple's products

13   when Apple was investigating --

14             **THE COURT:**  When did Mr. Lamego arrive?

15             **MR. POWELL:**  In 2014.

16             **THE COURT:**  All right.  So, I'm struggling for the

17   relevance of this after both Mr. Lamego's arrival and after the

18   public release of the product.  As opposed to a more -- I'm not

19   saying that there isn't a portion that conceivably could be

20   more narrowly crafted that would say documents showing Apple's

21   intention to use the Masimo MightySat technology in one of its

22   products and documents along those lines.  But --

23             **MR. POWELL:**  And I agree that would certainly be

24   relevant as well.  But the issue of whether they are testing

25   the product and realizing that it outperforms Apple's products

1    and that they need to get our technology, they need to obtain

2    it, they need to change what they are doing so that they can

3    match our performance, that all is going to be directly

4    relevant to again willfulness and it's going to be directly

5    relevant to damages.  It shows how important our technology is.

6              So, for example, a document at Apple that tears down

7    and looks at our product, tests it, and benchmarks it next to

8    Apple's product and says, wow, this is the best, we will never

9    be able to compete unless we have technology this good, that's

10   going to be directly relevant to our damages case.

11             **THE COURT:**  That's not what this asks for though.

12   This asks for anything related to either of those pulse

13   oximeters.

14             **MR. POWELL:**  Right, and that's Requests for

15   Production 165 and 166, and I would submit that those are very

16   easy to search for.  This isn't a question of --

17             **THE COURT:**  Why do you say that?

18             **MR. POWELL:**  Because we're already doing ESI

19   searching and they can just run the term MightySat and iSpO2

20   through ESI searching and I --

21             **THE COURT:**  You're suggesting that this be limited to

22   the ESI custodians?

23             **MR. POWELL:**  We would agree to that.

24             **THE COURT:**  All right.  What about 168 and 169, which

25   relate to Apple's sales or marketing of -- and I'm not sure I

1  understand it, so maybe you can explain it to me -- Apple's

2  sales or marketing of Masimo's, either the iSpO2 pulse oximeter

3  or the MightySat pulse oximeter.

4       **MR. POWELL:**  Thank you, Your Honor.

5       So, these are examples of a couple that when I was

6  looking at them last night we would be happy to, for example,

7  cross out the communications with customers.  I didn't see that

8  initially when I was doing the briefing and I apologize for

9  that.

10      But the marketing of the product again is going to be

11 relevant to the damages because, for example, if Apple's

12 marketing says, wow, this product is incredibly successful,

13 it's done quite well --

14      **THE COURT:**  Maybe I'm -- I admit I'm not the sharpest

15 tool in the toolbox.  What -- you're asking for Apple's sales

16 or marketing of Masimo's MightySat pulse oximeter.  What does

17 that mean?

18      **MR. POWELL:**  So, Apple marketed both the MightySat

19 and the iSpO2 for a period of time in roughly 2016 onward.  And

20 I believe they stopped very recently, but I don't have the

21 exact date.  Anyway, these products were marketed as being

22 compatible with the iPhone and what happened is Apple, now that

23 it has its own competing pulse oximetry product on the watch, I

24 believe is no longer marketing at least one or both of those

25 products and has essentially replaced us, our products, with

1    its watch product.

2            **THE COURT:**  Where were they --

3            **MR. POWELL:**  And so, the --

4            **THE COURT:**  Where were they selling or marketing

5    Masimo's product?

6            **MR. POWELL:**  I believe it was on Apple.com and in

7    Apple stores.

8            And then you'll notice in 168 we have a specific

9    reference to advertisements in the Apple Magazine.  And in

10   167 --

11           **THE COURT:**  If I can ask you, and again I -- when you

12   say there's items in Apple Magazine, are those advertisements

13   that Apple is putting in Apple Magazine or that Masimo is

14   putting or requesting to be put in Apple Magazine?

15           **MR. POWELL:**  My understanding is it was Apple, but we

16   may have been involved in the process.  I don't know for sure.

17           **THE COURT:**  All right.  And then 170 is similar to --

18           **MR. POWELL:**  Right.  So, Your Honor, 169 and --

19           **THE COURT:**  169 and 170 just are only different in

20   one is MightySat and one is the iSpO2.  168 appears to be --

21   well, it's hard to distinguish between some of these.  But --

22           **MR. POWELL:**  If I may --

23           **THE COURT:**  -- all right, anything further in support

24   of Requests Numbers 165 through 170?

25           **MR. POWELL:**  I'll just note on 169 -- so, 167 and 168

1  are the parallels on iSpO2 and MightySat for marketing.  169

2  and 170, again parallels for MightySat and iSpO2, directed more

3  towards the communications discussing sales of those products

4  in comparison to Apple's own products.  And so that's why 169

5  and 170 are a slightly different scope and they are directly

6  relevant.  Again, for example, if Apple says, wow, these

7  products are doing fantastically well, we need to get pulse

8  oximetry in our watch and we need it to perform as well as

9  Masimo's so that we can replace the Masimo products with our

10  own.

11      THE COURT:  All right.  Let me hear from Apple,

12  focusing, if you don't mind, on what evidence I have of how

13  difficult or burdensome this would be in light of the

14  restriction that it would be related -- it would be limited to

15  ESI custodian searches.

16      MS. SAMPLIN:  Well, Your Honor, I think the first

17  question is relevance, respectfully.  And the problem, even if

18  it's limited to the ESI custodians is, as you heard Mr. Powell

19  say, you know, Apple sold and marketed these products, so a

20  request for production that asks for all documents and things

21  related to Masimo's MightySat pulse oximeter is not limited to

22  this claim he's now saying, which, by the way, is not in his

23  Complaint, but a claim that Apple intended to use that

24  technology in its own technology.  If that's their claim, as

25  Your Honor said, they can serve a targeted request that goes to

1    documents showing Apple's intention to use Masimo's MightySat

2    in its Apple Watch technology.

3           THE COURT:  Okay, I'm going to ask you to focus on my

4    question.  Do I have evidence of burden for Apple to respond to

5    these?

6           MS. SAMPLIN:  I don't think you have evidence beyond

7    the fact that we've been ordered to search for documents from

8    39 different custodians and Apple --

9           THE COURT:  I don't know where that's coming from.

10   You were not ordered to search from 39 custodians.  I believe

11   the Order said up to 39 custodians.

12          MS. SAMPLIN:  And Plaintiffs have interpreted that

13   Order to mean that we're obligated to search from 39

14   custodians.

15          THE COURT:  I'm only telling you what the Order said.

16          MR. LERNER:  So, I think, Your Honor, if it helps,

17   just on Page 63, and hopefully this answers your question --

18          THE COURT:  Could you pull the microphone towards

19   you?  I'm not sure --

20          MR. LERNER:  Yes.

21          THE COURT:  -- that you're getting picked up by the

22   recording.

23          MR. LERNER:  I apologize.  I think the place where we

24   at least attempt to address this is on Page 63, where we talk

25   about the fact that we, as has been discussed before, are

26

1    talking about marketing their products, which we do do, and I

2    would just offer two other facts which I think are important.

3    You didn't hear anything about the timing of these devices --

4         **THE COURT:**  Could I really focus -- let's get

5    focused.

6         **MR. LERNER:**  Okay.

7         **THE COURT:**  Where is the evidence on Page 63 of

8    burdensomeness?

9         **MR. LERNER:**  There's -- so, we pointed out that we

10   are marketing -- we marketed and sold these products, which is

11   what Ms. Samplin was talking about.  So, you're talking about,

12   as they concede, every document about marketing and selling

13   their product, which they wanted us to do.  There's no dispute

14   about that.  You're correct that we don't have a declaration as

15   to, you know, how many pages that would be and the answer there

16   is that we don't have that because we cannot wrap our head

17   around how marketing relating to devices that are on your

18   finger from the Plaintiffs years ago have something to do with

19   any issue in this case, which Your Honor asked about, and they

20   don't.  Even if --

21        **THE COURT:**  All right, so I just want --

22        **MR. LERNER:**  -- everything Plaintiffs said was

23   right --

24        **THE COURT:**  There is a period at the end of the

25   sentence.  There is no evidence to support a burdensomeness

1    that's been submitted by Apple.  Is that right?  So, I don't

2    have to look at Page 63 anymore for that issue?

3             **MR. LERNER:**  It says we were marketing and selling

4    their product.  We thought that was sufficient.  It sounds like

5    it's not.  But the burden is that we marketed and sold their

6    product and now they're asking for all documents relating to

7    marketing and selling their product.

8        **(Pause)**

9             **MS. SAMPLIN:**  And I guess, Your Honor, one other

10   thing I'd --

11            **THE COURT:**  I'm very sorry, we're submitted on these

12   right now.

13       **(Pause)**

14            All right, the motion's going to be granted as to

15   Numbers 165 and 166, but limited so that it will read as

16   follows:

17            165:  All documents and things reflecting an intent

18   by Apple to investigate technology for commercial use based on

19   Masimo's MightySat pulse oximeter.

20            166 will be the same except instead of MightySat it

21   will refer to iSpO2.

22            **MS. SAMPLIN:**  Your Honor, can I ask a clarifying

23   question?

24            **THE COURT:**  Not right now.

25            The motion is denied as to Numbers 167, 168, 169, and

1   170.

2           What is the clarifying question?

3           **MS. SAMPLIN:**  The clarifying question is the meaning

4   of commercial use.  And so, I'm just -- you know, if we sold

5   their products just generally to the market, is that a

6   commercial use that's picked up by that request, or is it

7   commercial use in terms of intent to use it in our own product?

8           **THE COURT:**  Intent to use in Apple's own product.

9           **MS. SAMPLIN:**  Okay.  Thank you, Your Honor.

10          **THE COURT:**  All right, turning to Heading 5.  This is

11  RFAs 67 -- I'm sorry, RFPs 67 to 70 and 155 to 157.

12          **MR. LERNER:**  Your Honor, I apologize.  May I ask you

13  one other question?

14          **THE COURT:**  Let's save it till the end, all right?

15          **MR. LERNER:**  Okay.

16          **THE COURT:**  On 1 -- I'm sorry, 155 to 157, my

17  tentative is to grant the motion.  67 through 70, my intention

18  and tentative is to deny the motion and it would be denied as

19  to Number 70 based on Apple's representation contained, I don't

20  recall if it's in its original response or if it's in the

21  briefing, but based on that representation the motion would be

22  denied.  So, 67 through 70 are denied, 155 to 157 would be

23  granted.

24          I'll start with you, Mr. Powell.  It's your motion.

25          **MR. POWELL:**  Thank you, Your Honor.

1              I'm not sure what representation you're referring to

2     on Number 70.  I apologize.

3              **THE COURT:**  So, Apple agrees to produce documents

4     related to the technical features accused of infringement and

5     responsive to the unobjectionable scope of this request to the

6     extent such information exists and is located after a

7     reasonably diligent search.

8              Other than the phrase "unobjectionable scope,"

9     because I don't know what that means, I'm striking that, but

10    subject to that statement of compliance the motion would be

11    denied because that's a sufficient response, a sufficient

12    statement that responsive documents related to the technical

13    features accused of infringement and responsive -- and maybe

14    I'll change that from infringement to technical features that

15    are subject to the trade secret claims.  So, I appreciate that.

16    I should amend that to say the technical features in the trade

17    secret disclosures.

18              **MR. POWELL:**  Thank you, Your Honor.

19              If -- sorry, I wasn't sure if you were done or if I

20    should start.

21              **THE COURT:**  No, you can proceed.

22              **MR. POWELL:**  Okay, thank you.

23              I would submit that on 67 through 69, in particular

24    69, these are appropriate and relevant, and I would direct Your

25    Honor to one particular trade secret here on Exhibit 29.  This

1    is Document -- Docket Number 3 --

2          **THE COURT:**  Before you get into it.  Read that --

3    read Number 69.

4          **MR. POWELL:**  All documents and things submitted to or

5    received from the FDA or any other government agency that refer

6    or relate to the Apple Watch Products.

7          **THE COURT:**  If I can be blunt, are you kidding me?

8    Any government agency that sends anything to Apple about any

9    Apple Watch you think is a reasonably narrowly tailored request

10   for information tied to the issues in this case?

11         **MR. POWELL:**  Well, Your Honor, I guess I was focused

12   on the FDA, and I have not heard any --

13         **THE COURT:**  Well, I'm not focused on the FDA.  I'm

14   focused on the request that's in front of me.  I hammer nails.

15   This is what you put in front of me.  You can point me to

16   whatever you want, but I don't know how you get around that.

17         **MR. POWELL:**  Well, Your Honor, how I would get around

18   that is Apple has not indicated that there are any documents

19   responsive to this request or any evidence of burden or

20   anything.  I don't know if there have been documents --

21         **THE COURT:**  Any government agency.  Any communication

22   from any government agency, not limited to topic, time,

23   jurisdiction, any government agency that sent something to

24   Apple at any time that referenced any Apple Watch Product you

25   want.

1          **MR. POWELL:**  Well, Your Honor, primarily what we're

2     looking for --

3          **THE COURT:**  Primarily doesn't -- we're past

4     primarily.  That's what meet-and-confer is about.  You're

5     asking me to issue an order and I'm not going to issue that

6     order.

7          **MR. POWELL:**  I understand, Your Honor, and the only

8     thing I would add is that during the meet-and-confer, Apple did

9     not object on that basis and if they had, we would have struck

10    "or other government agency" from that.  I would have had no

11    problem doing that but that issue never came up during the

12    meet-and-confer.  So I didn't have an opportunity to do so.

13    And I understand Your Honor's concerns and I would happily

14    strike "or other government agency."

15         **THE COURT:**  The time has passed for that.  You -- as

16    I told you last time, you're here -- you stand and fall with

17    what's in front of me and that's what's in front of me.  So 69

18    is denied.  It's tentatively denied.

19         Anything else you want to offer, Mr. Powell?

20         **MR. POWELL:**  Well, I would direct Your Honor to

21    Number 68 then and Number 68 is directed towards documents and

22    things concerning the FDA approval of any of the Apple Watch

23    products.  My understanding is that there's only been one FDA

24    approval of one app on the FDA -- on the Apple Watch products.

25         That issue is directly relevant to one of our trade

1  secrets which is not limited to pulse oximetry and pulse rate.

2  The business and sales trade secrets go beyond those two things

3  and so the trade secret at issue -- we could seal it or I could

4  direct Your Honor to it but the -- obtaining FDA approval on

5  any feature of the watch would be directly relevant to that

6  trade secret.

7         THE COURT:  It's overbroad.  Anything further?

8         MR. POWELL:  No, Your Honor.

9         THE COURT:  All right.  From Apple on that group?

10         MR. LERNER:  I think the only ones that were grant --

11  if I heard correctly and I apologize if I didn't -- were 155

12  and 156.  Is that correct, Your Honor.

13         THE COURT:  Well, let me ask you a question.  I

14  actually changed your response because I think your responses

15  were written when the focus was --

16         MR. LERNER:  Yes.

17         THE COURT:  -- on the patent and I have amended it.

18  So I would -- if you tell me that your Statement of Compliance

19  includes what I said, I will leave it as a denied but let me

20  read it to you again.  So we're at Page 69 of the joint

21  stipulation and it's Apple's response to RFP Number 70 after

22  the -- oh, I don't know -- 25 lines of objections.  We get to

23  the Statement of Compliance.  Subject to those objections,

24  here's what I would deem my interpretation.  Tell me if you

25  agree on behalf of Apple.

1              "Apple agrees to produce documents related to the

2              technical features alleged in the -- in Plaintiffs'

3              trade secret disclosures responsive to this request

4              to the extent such information exists and is located

5              after a reasonably diligent search."

6          **MR. LERNER:**  Thank you, Your Honor.  No objection to

7    Your Honor's revision.

8          **THE COURT:**  Okay.  With that being -- and just to be

9    clear that that's what Apple is now agreeing, because I changed

10   it, I'm asking for Apple's confirmation that they are agreeing

11   to comply as just stated; is that correct?

12         **MR. LERNER:**  Yes, Your Honor.

13         **THE COURT:**  All right.  So, yes, Number 170 (sic)

14   would be denied and that leaves the grants as 156, 157 and 155.

15         **MR. LERNER:**  Your Honor, I apologize.  Can we just

16   clarify?  I believe you said "170" instead of "70."

17         **THE COURT:**  I'm sorry.  It's 70.

18         **MR. LERNER:**  Thank you.  And I'm happy to address 155

19   through 157, Your Honor.

20         **THE COURT:**  Please.

21         **MR. LERNER:**  So with respect to these -- and,

22   obviously, I don't have the benefit of Your Honor's thinking on

23   the reason for the grant but as we mentioned before, pulse

24   oximetry is not a secret here.  It's --

25         **THE COURT:**  So I'm going to give you a little insight

34

1    into what I'm thinking.

2           **MR. LERNER:**  Okay.

3           **THE COURT:**  So starting with 150, as we get into the

4    specific language, it's the decision not to seek FDA approval

5    for pulse oximetry and I understand there's a dispute about how

6    focused pulse oximetry is and how critical it is.  It's within

7    the penumbra of relevance here.

8           If there is no decision not to seek FDA approval, I

9    don't know -- again, I don't have anything in front of me to

10   tell me how burdensome that would be and maybe there wasn't a

11   decision.  Maybe there was.  I don't know how difficult it

12   would be to search for that.  So that's 155.

13          156 is a closer call and here it is limited as

14   opposed to the one I raked Mr. -- and I'm being, of course,

15   facetious.  You can't see the smile on my face but raked

16   Mr. Powell over the coals on for asking for any communications

17   with any governmental entity.  It's attempts to obtain FDA

18   approval on the pulse oximetry feature of any Apple Watch

19   product.

20          Using the pipe analogy, you have a number of things

21   that narrow it and I don't have anything in response that tells

22   me how difficult it would be for Apple to find that.  But it

23   doesn't strike me without such evidence that it's inherently

24   overly broad.

25          The last one is -- well, let me see here.  Well,

1  actually, 157 I may reconsider a little bit but why don't you

2  tell me what evidence I have?  Because this does have the other

3  government agency but I don't know what other government agency

4  would be looking into pulse -- the pulse oximetry feature other

5  than potentially the FDA but if you can point me to something

6  in the record that would suggest to me that that's an overly

7  broad or unduly burdensome search, I'd be happy to consider it.

8        **MR. LERNER:**  Okay.  So I'll tackle your points in the

9  order raised.  Starting with 155 on relevance and the penumbra,

10  I just -- I want to make clear our position so that, hopefully,

11  it is helpful.  The allegations in this case that relate to the

12  FDA or anything pertaining to the alleged secrets here relate

13  to -- according to the complaint, relate to one person which is

14  Michael O'Reilly.  That's the one person the Plaintiffs have

15  connected from Apple to the FDA when you look at their

16  complaint.

17        They say that he approached the FDA shortly after he

18  joined Apple.  They don't say he disclosed any secrets there.

19  There's not some, to Your Honor's earlier point, strong --

20  remotely strong showing on the threshold question of relevance

21  here when we're talking about FDA approval or not approval or

22  seeking or not seeking approval with respect to a subject

23  that's broader than the secret.

24        But even if you drill down from there, Your Honor

25  correctly asked this earlier about questions, for example, with

36

1    respect to reverse engineering or looking at a product.  In

2    what universe is that relevant to any legal claim?  If the

3    allegation here is that we somehow misappropriated pulse

4    oximetry secrets which it isn't.  It's much, much narrower than

5    that.  Even if it were, what's the relevance of not seeking

6    approval given the allegations in this case just with the

7    threshold question of relevance?  And that's 155.

8            On 156, any attempt to obtain FDA approval on that

9    subject for any watch, again, it's not limited.  I --

10           **THE COURT:**  As I understand --

11           **MR. LERNER:**  I understand the penumbra point but --

12           **THE COURT:**  -- as I understand, you've indicated that

13   the only thing we're talking about from Apple's standpoint is

14   an app; is that right?

15           **MR. LERNER:**  Well, that's the biggest problem of all,

16   is -- and this goes to Your Honor's point about how these were

17   drafted and if --

18           **THE COURT:**  Okay.  Can --

19           **MR. LERNER:**  -- we have tried to explain this until

20   we are blue in the face.

21           **THE COURT:**  -- I interrupt?  Can you answer my

22   question?

23           **MR. LERNER:**  Yes.  The answer is "Yes."

24           **THE COURT:**  Okay.  Now, if you want to explain,

25   please explain.

1    **MR. LERNER:**  The answer may be very simple based on

2  Your Honor's point.  We didn't seek approval of any feature of

3  the Apple Watch product.  We sought approval of an app.  And

4  this request -- and I think this may be the easiest way to

5  address it and so I appreciate Your Honor perhaps directing me

6  to this point.

7           If you look at the definition of an Apple Watch

8  product, it does not include the app.  So we don't have this

9  stuff and we tried to explain that and as on many of these

10  things, we nonetheless are here.  But we didn't seek approval

11  for a feature of an Apple Watch.  This relates to an app.

12           **THE COURT:**  All right.

13           **MS. SAMPLIN:**  And could I just add one thing to what

14  Mr. Lerner said which is that the app offers an ECG feature

15  which isn't -- doesn't use any of the technology that

16  Plaintiffs say Apple misappropriated.  It's not alleged to

17  either.  And the ECG app and its features are not alleged

18  anywhere in the complaint or the 2019 210 disclosure.

19           **THE COURT:**  Well, I don't want to get too wrapped up

20  in that point.  Here's what I want to tell you.  They live and

21  die with what they wrote.

22           **MR. LERNER:**  Okay.

23           **THE COURT:**  If they defined -- and this is what I was

24  reading, that Apple Watch product -- it has the word "product"

25  in it and if a fair reading of that is that it doesn't include

1   apps -- and I know that Plaintiff said, wow, well, wait a

2   minute.  It does include apps.

3          We all use common sense in reading and interpreting

4   language.  And when you have a defined term, we have to use

5   common sense.  We have to use a fair reading.  If a fair

6   reading of this does not include the app, I don't -- I think

7   we're fighting over nothing.  One exception to this may be 157

8   and, again, this gets back to the idea of any government agency

9   and it's "all documents submitted to or received from the FDA

10  or any government agency."

11         And as I went back and reread it, I started

12  rethinking this one.  I don't know what other government agency

13  -- whereas the last one was just in general, here it's

14  referring specifically to pulse oximetry.  I don't know if

15  there could be any other government agency that would have

16  communications with Apple.  I wish I knew that but I don't.

17         But I'd be inclined to say 157 -- I'd amend my

18  tentative order to grant the motion but I would strike "or any

19  other government agency."  And if the reality is that under the

20  definition of "Apple Watch product" there's been no

21  communication with the FDA and any no attempt for approval from

22  the FDA, the answer is simple.  But that does circle us back to

23  155.

24         And, again, this is where there is a balancing here.

25  I don't think it's all that relevant but I also have no idea

1  how difficult -- whether there was a decision to not -- and

2  it's a double negative but whether there was a decision not to

3  seek approval or whether it was simply, it wasn't even

4  discussed.  It was -- there's no need for FDA approval for a

5  public-facing commercial product.  I don't know the answer to

6  that.

7      So that -- let's turn back to 155.  How difficult

8  would that be to comply with?

9      **MR. LERNER:**  And I do not want to try and evade Your

10  Honor's questions.  When we take requests like this one, we did

11  not brief the burden for you because if every request we

12  briefed the burden, we -- first of all, we can't even discuss

13  most of these things with our client because not even in-house

14  counsel is allowed to see any of the alleged secrets.

15      **THE COURT:**  Well --

16      **MR. LERNER:**  Second --

17      **THE COURT:**  -- let me stop you.  You've been telling

18  me that it's not tied to the secret.  So you couldn't go to

19  in-house counsel to say, hey, did Apple even make a decision to

20  seek FDA approval of the pulse oximetry feature?

21      **MR. LERNER:**  It's public that the pulse oximetry

22  feature is not -- from the app is not FDA approved.  That's --

23      **THE COURT:**  Okay.  That's a different question.  The

24  question is, did -- was there a decision within Apple not to

25  seek FDA approval or was it simply, hey, I don't need FDA

1  approval to manufacture a pen or to a large extent --

2          **MR. LERNER:** And, again, I want to be very clear. We

3  did not get to that issue because we do not believe that this

4  question is relevant full stop and feel strongly about that.

5  It is a question relating to not seeking approval of something

6  that's not a secret. And so we did not do, to answer Your

7  Honor's question, the burden analysis here.

8          **THE COURT:** But now I'm asking you, outside of that,

9  what can you tell me? Anything on it?

10          **MR. LERNER:** No. I -- we did not do that analysis

11 here as to the decision-making behind FDA approval of this

12 feature, particularly when it's not to seek.

13          **THE COURT:** But that's my point. That one would have

14 been easy.

15          **MR. LERNER:** It is -- and I appreciate Your Honor's

16 point. I think hopefully the following seems fair and

17 accurate. We are dealing with hundreds of these. So we have

18 to make a judgment call as to, okay, this looks like it might

19 actually relate to the case and what's happening here but it's

20 going to require so much work that we'll go get a declaration

21 from an engineer to submit or it's so divorced that we're going

22 to say, we're sorry, this doesn't have anything to do with the

23 case and we're not going to have declarations about the burden.

24          And a lot of this here, all documents and things

25 concerning any decision by Apple not to seek FDA approval, we

41

1   feel comfortable that on its face that it's not relevant to the

2   case and it's overbroad.  So that's what we live with on this

3   one and I can't read this and come to a different conclusion

4   than what I just said.

5           **THE COURT:**  All right.  I'm sorry, Mr. Powell.  I saw

6   movement out of the corner of my eye.  Were you raising your

7   hand or no?

8           **MR. POWELL:**  No, Your Honor, I was scratching my

9   head.

10           **THE COURT:**  All right.  I'm going to amend my

11   tentative and I'm going to deny the motion as to 155 but based

12   on the representations about how "Apple Watch product" is

13   defined, I'm going to grant the motion as to Requests for

14   Production Numbers 156 and 157.  And if there are no responsive

15   documents, there are no responsive documents.

16           **MS. SAMPLIN:**  And, Your Honor, are you striking the

17   "any other governmental agency" from 157 or leaving that in?

18           **THE COURT:**  Yes, that'll be ordered further response

19   with the exclusion of "any other" -- "or any other government

20   agency."

21           **MR. LERNER:**  Your Honor, would the Court like to hear

22   any argument on 155?

23           **THE COURT:**  No, I've heard enough.

24           All right.  Let's turn to Heading VI on Page 78 and

25   this is where the supplement will guide our discussion to some

42

1    extent.  Numbers 226 -- RFP Numbers 226 and 230 through 235,

2    Number 235 has been resolved and is removed.

3            With respect to the remaining documents, we have

4    Number 226, parties in the supplement at Docket 419 have given

5    counterproposals.  Maybe we can hash this out.

6            To Apple, is the only difference between the

7    proposals, you're limiting it specifically the nature of the

8    electronic search fields?

9            **MS. SAMPLIN:**  Yes, Your Honor.

10           **THE COURT:**  Explain to me -- I don't want to get into

11   the weeds of telling people how to conduct ESI searches.  If

12   that proviso is a -- still results in a reasonable and diligent

13   search, I don't think it's necessary.  If it's narrowing what

14   would otherwise be a reasonable and diligent search into

15   something more narrow, I'd like an explanation as to why.

16           So I guess where I'm circling back to is I don't want

17   to get into the weeds of how your ESI techs are going to be

18   doing word searches or other things and how they're going to --

19   I don't even know how they're going to break things into

20   fields.

21           So why should I get into this as opposed to simply

22   say, as with all Requests for Production, it's a reasonable and

23   diligent search and does not require people to go through every

24   file cabinet in Apple to look for responsive documents?

25           **MS. SAMPLIN:**  Well, Your Honor, the request as

43

1   written is, "All documents and things owned by, created in

2   whole or in part by or originating with Masimo or Cercacor."

3   We think that's overbroad.

4        THE COURT:  Understood.  And Masimo made a proposal

5   and that's what we're talking about.  We're now to their

6   counterproposal.

7        MS. SAMPLIN:  Right, I know but I'm just trying to

8   set up the context.  The reason that we would agree to this

9   broad request if tethered to ESI's metadata field is because

10  that is a reasonable search in our mind because we can look to

11  certain fields and then produce anything to them that has

12  Masimo or Cercacor in that field.  If it's not limited by that

13  field --

14       THE COURT:  But -- well, here's what I'm telling you.

15  I don't know what a "field" means.  I don't know how your ESI

16  people are setting things up.  I don't know how they're

17  breaking down the electronic data.  So I don't know if -- how

18  much harder it would be to push "field search" or "document

19  search."  I don't know what the numbers that would pop up.  So

20  it would be limited to a reasonable and diligent search but I

21  do not want to get into the technicalities of this.

22       MR. LERNER:  If we can't do that, Your Honor, then

23  this one on its face should be denied.  We tried and we

24  understand that Your Honor doesn't want to get into the

25  particulars of it but if it's not possible, then this on its

44

1    face is a denial.  We were just discussing a moment ago all the

2    stuff that they said we marketed for them for however many

3    years.

4             THE COURT:  Okay.  So this says, "originating with,"

5    right?

6             MR. LERNER:  Yes.

7             THE COURT:  Are you saying that the marketing

8    material would fall within that?  That's what I was getting at

9    before, is who is doing the marketing?  Who is -- like, who did

10   the advertisement at *Apple Magazine*?  Did that originate from

11   Masimo or is that something that --

12            MR. LERNER:  So even if you put aside that tougher

13   question, which I don't think Plaintiffs answered, it's hard

14   for me to imagine people are doing advertising without their

15   input for them but --

16            THE COURT:  Well, that was why I was confused by the

17   whole concept but --

18            MR. LERNER:  Yeah.  I agree but --

19            THE COURT:  -- I want to understand it.

20            MR. LERNER:  -- but documents and things -- before we

21   even get to that issue -- that originate with them, we were

22   selling their products.

23            THE COURT:  Okay.  How about if we put "non-public"?

24            MR. LERNER:  What's that?

25            THE COURT:  We add the phrase "non-public" which is

1  what they added to their proposal.  So things that go out in

2  marketing materials are public.  So it's non-public documents

3  or things owned by, originated or created by Plaintiffs.

4         **MR. LERNER:**  Right.  So every communication about the

5  boxes of MightySats they're sending over or every communication

6  about things that everybody agrees has absolutely zero to do

7  with this case.

8         **THE COURT:**  We're going to use a reasonable

9  interpretation.  Non-public documents and things owned by,

10  created in whole or in part or originating with Masimo --

11  there's no reasonable interpretation that says an email about

12  what we're going to advertise in Apple's magazine is, again,

13  pipes -- non-public, owned by or originating with Masimo --

14  that's a communication above board.  If you want to try to

15  narrow it down further, that's fine but I don't want to get

16  into saying only in a field --

17         **MS. SAMPLIN:**  Well, wouldn't that be --

18         **MR. LERNER:**  It's "or originating."

19         **MS. SAMPLIN:**  -- originating?  Wouldn't that be a

20  document originating with --

21         **THE COURT:**  You know what they're asking for.

22         **MR. LERNER:**  I really, really don't.

23         **THE COURT:**  I really, really think you do.

24         **MR. LERNER:**  Well --

25         **THE COURT:**  Okay.  Let's sit there and figure --

46

 1          **MS. SAMPLIN:**  Your Honor, this is --

 2          **THE COURT:**  Let's sit -- please don't interrupt me.

 3          **MS. SAMPLIN:**  Sorry.

 4          **THE COURT:**  Let's sit here and figure it out.

 5          **MR. LERNER:**  Okay.

 6          **THE COURT:**  Masimo, do you want to narrow this down

 7  to be specific to exclude communications relating to ongoing

 8  business between the companies?

 9          **MR. POWELL:**  That's fine, Your Honor.

10          **THE COURT:**  Okay.

11          **MR. POWELL:**  What is it that we are looking for?

12  What documents or things that will come from them?

13          **THE COURT:**  They're looking for their trade secrets

14  or documents relating to their trade secrets, right?  Isn't

15  that what you're looking for?  You're looking for the origin of

16  how our information owned by Masimo -- whether it's a trade

17  secret or related to the trade secret, your allegation is it

18  wound up at Apple.  That's what you're looking for; is that

19  right?

20          **MR. LERNER:**  Yes, Your Honor.

21          **THE COURT:**  All right.  So --

22          **MS. SAMPLIN:**  Can we add that to the request because

23  the request doesn't say that?

24          **THE COURT:**  Let's work it out.

25          **MR. LERNER:**  That's -- what you just said is -- has,

47

1  A, already been asked and argued and, B, is actually completely

2  different from --

3           **THE COURT:**  Well, I disagree.  I think the intent is

4  clear enough and if you folks want to narrow it down so that

5  you're more comfortable with it, I think that it's a fair

6  request as narrowed.

7           **MS. SAMPLIN:**  Can we add in what Your Honor just said

8  which is related to the alleged trade secrets in this case?  I

9  do agree that that is a more fair narrowing but right now, it

10  says, "anything that originates with Masimo or Cercacor."

11           **THE COURT:**  Well, non-public but if you want it to be

12  non-public documents relating to the trade secrets owned by,

13  created in whole or in part or originating with Masimo or

14  Cercacor; is that right?

15           **MR. LERNER:**  In general, yes, Your Honor.  The

16  problem is we have this dispute over how they're -- or how they

17  are interpreting the trade secrets, right.  We've talked about

18  this before on how they've interpreted the Section 2019

19  statement and I think Apple is interpreting it very narrowly.

20           **THE COURT:**  Well, they do that at their own risk.

21  They do that at their own risk.  I mean, I'm not going to go

22  into Apple's file cabinets and look myself.  We trust lawyers

23  to be ethical, to interpret requests for production using

24  common sense and rationality.  And the penalties, if it should

25  turn out at some future time that it's discovered that relevant

1  information was withheld, are potentially severe both to an

2  entity and to an attorney who's found to have done that.

3          What's fascinating in the world of patent litigation

4  and trade secret litigation -- and I'm not going to say it's

5  going to happen here.  You never know and maybe we've talked

6  about this.  Companies that are fighting tooth and nail over

7  patent infringement or trade secret infringement sometimes a

8  year later are in acquisition talks and you have teams going

9  doing due diligence and suddenly things pop up that should have

10  been disclosed.  And that can happen.

11          But if you're asking me to say, well, I don't trust

12  them to produce documents asking -- relating to the -- how long

13  -- how many pages were the trade secret disclosures?

14          **MR. LERNER:**  I don't remember at this point, Your

15  Honor.

16          **THE COURT:**  It's pretty long.  I've looked at them a

17  lot.  It's pretty long.  I know it's A, B, C, D, E and F,

18  right?  They've offered that, that they'll respond to this

19  relating to that lengthy trade secret.  That's not good enough

20  for you?

21          **MR. LERNER:**  Well, Your Honor, it's not that I don't

22  trust counsel and I'm not trying to imply that at all.  I think

23  we just have a disagreement.  So, for example, on the pulse

24  oximetry issue, counsel earlier explained to Your Honor that

25  they don't think pulse oximetry is relevant to the trade

1    secrets.  We think it is.

2         So I would be okay if you want to narrow these to

3    some subject matter rather than a broad -- anything in the

4    2019, for example -- so if you wanted to say anything in the

5    2019 and pulse rate and pulse oximetry, for example.  So we at

6    least get everything that talks about pulse oximetry without

7    this dispute as to whether that's relevant to the trade

8    secrets.

9         **MR. POWELL:**  And, Your Honor, I will just say, I am

10   trying my best here but doing this months after, A, Apple paid

11   for me to brief this and, B, I can't talk with them about these

12   proposals which are rewriting this request in wholesale, I

13   can't do.

14        **THE COURT:**  All right, thank you.  I appreciate that.

15   226 will be granted as limited and as rewritten as follows:

16   "Non-public documents and things relating to Plaintiffs' trade

17   secrets as identified in their disclosure owned by, created in

18   whole or in part by or originating with Masimo and Cercacor."

19        All right, 230.  Now, from here on out, we have no

20   counterproposal.  It's just Masimo's proposal.  I'm really not

21   sure whether I want to go through and try to figure out what to

22   do with competing proposals at this stage in the game when I

23   made it -- I thought I had made it clear that I didn't want

24   more argument on these issues.  All I wanted in the statement

25   that was filed was a statement of which Request for Production

1   had been agreed to and which hadn't or just which ones had been

2   agreed to.

3              **MS. SAMPLIN:**  And, Your Honor, can I just --

4              **THE COURT:**  I'm going to -- just wait, please.

5              How is -- let me start with one issue.  How is

6   "former employee" defined?

7              **MR. POWELL:**  "Former" -- sorry, Your Honor.  Was that

8   directed at me?

9              **THE COURT:**  I don't care who.

10             **MR. POWELL:**  Okay.

11             **THE COURT:**  I'm assuming you all know how it was

12  defined.  There's only one definition, right?  How is it

13  defined?

14             **MR. POWELL:**  Correct.  I can get the exact definition

15  but --

16             **THE COURT:**  Let's get the exact definition.  I have a

17  hard time finding things in here.

18             **MR. POWELL:**  Okay, Your Honor, I have it.

19             **THE COURT:**  All right.

20             **MR. POWELL:**  This is at Docket 353-2, Exhibit 3, Page

21  2.  That's Page 5 of the docket number.  And it cites, "The

22             term 'former employee' shall mean and refer to any

23             current or former Apple employee who worked at Masimo

24             or Cercacor before being employed by Apple."

25             **THE COURT:**  How many people do you think that would

1   encompass?

2           **MR. POWELL:**  I am aware of roughly, I think, 17 or

3   18.  And we've --

4           **THE COURT:**  Tell me about those 17 or 18.

5           **MR. POWELL:**  Well, this is addressed at the briefing,

6   Your Honor, at Page 84 of the Joint Stipulation.

7           **THE COURT:**  All right.  And beyond Mr. O'Reilly and

8   Mr. Lamego.  So you -- tell me about Ms. -- and I'm just going

9   to use last names -- Conrad, Eylers, Panaro (all spelled

10  phonetically).

11          **MR. POWELL:**  So those three individuals we agreed in

12  our joint stipulation that we were not seeking information

13  about.

14          **THE COURT:**  All right.  How about Briglia, Lu,

15  Tonello, Young, Jaginou, Raths, Aguirre, Arsul, Masume,

16  Oreshkin, Paul, Reagan and Wayne (all spelled phonetically)?

17          **MR. POWELL:**  So those individuals, it's unclear based

18  on the information we have from Apple of whether they were

19  involved --

20          **THE COURT:**  What do you know about them?

21          **MR. POWELL:**  We know these are individuals who were

22  -- worked at Masimo, later --

23          **THE COURT:**  Where did they work at Masimo?

24          **MR. POWELL:**  I'm sorry?

25          **THE COURT:**  What did they do at Masimo?

1          **MR. POWELL:**  It depends on the person but

2    generally --

3          **THE COURT:**  Let's go through them.  Mr. -- or I don't

4    know -- Anderson Briglia, what did that person do at Masimo?

5          **MR. POWELL:**  I do not know off the top of my head,

6    Your Honor.  Most of these people are engineers.  I --

7          **THE COURT:**  What did Ying Wi (phonetic) Lu do at

8    Masimo?

9          **MR. POWELL:**  Again, I don't know off the top of my

10   head for any of these people, what their title was at Masimo.

11         **THE COURT:**  Okay.  So I can just -- we don't have to

12   go through the list.  You don't know what they did there?  But

13   you want me to issue an order that Apple needs to look for

14   things that these people wrote, reviewed, et cetera, related to

15   the Apple Watch.  It could be the Apple Watch band, the Apple

16   Watch clock, the Apple Watch -- what else does Apple Watch do?

17   Does it drive your car yet?  You want me to order them for all

18   those people that you don't even know what they did at Masimo

19   to find all these various types of documents?

20         **MR. POWELL:**  No, Your Honor, that's not what we're

21   asking.  And I'll --

22         **THE COURT:**  It sure seems like it.  I mean, let me

23   read it.

24         And this is the original of 230.  "All documents and

25         things authored by, prepared by, provided by,

53

1          reviewed by or in the possession, custody or control

2          of any former employee that relate to Masimo or

3          Cercacor or any Masimo or Cercacor products or

4          technology including without limitations internal and

5          external communications and studies, reports,

6          memoranda, presentations or other documents."

7          So if it relates to -- it has the word "Masimo" or

8  "Cercacor," any of those people and you don't know what they

9  did there, they have to go search for it and produce it?

10         **MR. POWELL:**  No, Your Honor.  We narrowed that

11 request during the meet-and-confer as set forth in the Joint

12 Stipulation and it was our understanding that Your Honor was

13 okay if we narrowed requests during the meet-and-confer --

14         **THE COURT:**  Well, what I told you is if that was an

15 agreement to narrow it, that's fine.  If there wasn't an

16 agreement to narrow it, I'm just going to rule on what's in

17 front of me.  I'm not going to be jumping back and forth

18 between meet-and-confer letters, joint stipulations, a new

19 document filed three days ago to try to figure out what I'm

20 ruling on.  I'm ruling on the requests in front of me.

21         **MR. POWELL:**  And, Your Honor, if I may?  I'm just

22 directing Your Honor straight to the Joint Stipulation where we

23 just were.  And what we say on Category 2 -- and I'll quote it

24 -- is the issue is, "Plaintiffs asked" -- this is Page 84 at

25 Line 25.  "Plaintiffs asked Apple for more information on

1  individuals in Category 2 and asked Apple to produce

2  information on the individuals in Category 3."

3          And then if you look at Page 85, Line 1, so we state

4  -- I guess, let me continue.  So on 84, Line 27, we say the

5  Court "should order Apple to produce information on at least

6  the individuals in Category 3 because they are relevant for the

7  reasons discussed above."

8          **THE COURT:**  This is a request for production of

9  documents.  All right.  It's not an interrogatory.  You could

10  have asked an interrogatory.  You can't even tell me what

11  Category 2 folks did at Masimo and you want me to order Apple

12  to -- on a request for production to tell you what these people

13  did at Apple?

14          **MR. POWELL:**  No, Your Honor.  That's -- if you look

15  at Page --

16          **THE COURT:**  The Court should order Apple to produce

17  information for any individuals on Capital 2 that had any

18  involvement in the developing or marketing of the Apple Watch

19  or Apple health monitoring technology.  So if they made --

20  essentially making the band or the clock, you want that.  You

21  want anything that they reviewed, anything that -- how do you

22  search for that?

23          **MR. POWELL:**  I think that the way you would search

24  for that is you would ask those individuals.  It's going to be

25  the Category 3 individuals and then only Category 2 if they

1    were involved.

2          **THE COURT:**  Do you understand what you're -- first of

3    all, what you're asking me to do and then what you're asking

4    them to do is try to divine from multiple different sources for

5    multiple different people who you can't even tell me what they

6    did at Masimo to start inquiring them -- who may or may not

7    still be there and then have an ESI search if they have any

8    leftover email account and you can designate that person.

9          **MR. POWELL:**  And, Your Honor, I could tell you what

10   these individuals did.  I just don't know off the top of my

11   head.  That is information that would be easy for us to find.

12   Apple --

13         **THE COURT:**  Well, that's the risk when you have

14   defined -- we see it all the time.  When you have these defined

15   terms -- right, my favorite one is "you."  "You" means, when

16   it's a company, yourself, all your officers, all your

17   employees, you're your affiliates, anyone who was ever an

18   affiliate.  And then you're stuck with that.  How are they

19   going to respond to that?

20         When you define "former employees" to be any current

21   or former employee who formally was employed by Masimo and you

22   tell me there's -- what did you say -- 19 of them, that's 19

23   and you're putting them in three different categories and I

24   want you to do this for these people and that for these people.

25   I don't know what to do about these.  Why don't we just have

56

1      these under submission?  All right.

2              Do you want to be heard on behalf of Apple on this?

3              **MR. LERNER:**  Very briefly, Your Honor.  These should

4      be denied for four reasons.  First of all, this is not a joint

5      stipulation on Plaintiffs' proposals.  We said, we don't have

6      an agreement on these.  They just gave you their position on

7      them.

8              Second, the idea that you can say -- even if they

9      could tell you what these people did at Masimo that they should

10     have discovery of everything that was prepared by them or

11     anything else without a showing that they are somehow tied to

12     any wrongdoing flies in the face of California law.  We do not

13     assume that people are going to disclose secret information

14     about what they worked on.  Full stop.  Your Honor obviously

15     knows that.

16             Second (sic), we don't say that people can't talk

17     with their former co-workers.  Again, full stop.

18             And, third (sic) -- which to me in some ways is the

19     worst thing of all here and it happened the last time, too.

20     They asked Judge Selna to order us to give them a copy of any

21     patent, patent application, document or other presentation of

22     information by any of the former employees.  And that was not

23     ordered.  Yet we're still back here arguing the same thing

24     again.

25             And it is not relevant.  It's also not appropriate

57

1    and they should be denied as drafted.

2              MS. SAMPLIN:  And can I just add one more point which

3    goes to Your Honor's comment on the definition of "former

4    employees"?  The definition that is used throughout these

5    requests brings in former Apple employees who worked in entry-

6    level positions, people who worked in customer service

7    positions at retail locations at Apple and people who left

8    Plaintiffs decades before they went to Apple because maybe they

9    interned at Masimo, had a bunch of other jobs and then went out

10   to Apple.  So we really think this term "former employees" is

11   very, very overbroad.

12             THE COURT:  All right.  Let's -- for the time being,

13   Numbers 226, 230 through 234 are under submission.

14             MR. KATZENELLENBOGEN:  Your Honor, this is Ben

15   Katzenellenbogen.  Would you like us to address the reference

16   to the inevitable disclosure doctrine or should we leave it on

17   the current record?

18             THE COURT:  Is it in the briefing?

19             MR. KATZENELLENBOGEN:  I think the point is not

20   because Mr. Lerner's point --

21             THE COURT:  Well, then we're going to move on.  We've

22   had plenty of briefing on this.  I'm going to rule on what's in

23   front of me.

24             MS. SAMPLIN:  I'm sorry.  Just -- Your Honor, one

25   more clarification because you just said 226 is under

1    submission but I believe Your Honor decided that one.

2         **THE COURT:**  Well, for the time being, that -- this

3    whole category is under submission.

4         **MS. SAMPLIN:**  Okay.

5         **THE COURT:**  It might not be by the time we get to the

6    end of the hearing.

7         **THE COURT:**  All right.  Let's turn to Category VII;

8    RFP Numbers 236, 237, 239, 240, 241, 244, 245, 246, and 248.

9         I don't know of a better way with these than to go

10   through them one by one.  Some of the issues are overlapping to

11   some earlier ones.

12        236 is, "All communications between Apple and any

13   former employee while the former employee was working at Masimo

14   and Cercacor."

15        And I understand, and I'm not saying it's the sole

16   objection.  But the primary objections from Apple on these

17   three coming up are, "Well, there's no solicitation -- improper

18   solicitation claim in this case; therefore, the recruitment

19   efforts are not relevant."  That's sort of the lead argument.

20        I don't agree with that.  But I do agree that, when

21   you, if referring to all former employees, I don't know --

22   again, I'm sort of stuck with what I have in front of me.

23   There has been -- there's no attempt to narrow this one.

24        And if it were certain identifiable former employees

25   who Mr. Lamego, and I think -- I assume maybe we even covered

59

1    that last time that there have been requests for that --

2    Mr. O'Reilly, maybe others who are known to have been involved

3    in the issues relating to the trade secrets.  That certainly

4    seems like a reasonable request.

5            But, again, the broad definition of former employee

6    is troubling.  But that's 236.

7            237 seems it's -- the main distinction being, one,

8    "while the person was working at Masimo."  Now 237, it's

9    "before the person began working for Apple."

10           Again, this could envelop someone who worked for

11   Masimo ten years earlier, and now is coming to Apple from some

12   third-party company.  That seems even less reasonably

13   calculated, or less relevant.

14           239.  This is a closer call to me.  It gets to what I

15   think -- even though there's not a solicitation claim, if there

16   is efforts to -- and I'm not -- and maybe I can get some

17   clarification on this -- but efforts to cease doing business

18   with Masimo, if that's in some way different from quitting a

19   job.

20           But, again, the broad term, "former employee," is not

21   tied to our issues here, and it's not a situation where -- as

22   we often see in unfair competition cases where someone is using

23   allegedly confidential information to raid a competitor, that's

24   not what we're seeing here.

25           I wish there hadn't been this former employee defined

60

1    term that requires me to now potentially go through 19

2    different people to see who fits in and who doesn't.  But those

3    are a little bit difficult.

4         I'm just reading my own notes for Number 240.  I

5    wrote, "Seems unnecessary."  And that is, again, not tied to

6    the specific issues of the case.  The personnel file for anyone

7    who falls into the definition of former employee seems

8    unnecessary.

9         241.  So, "Hiring or termination of any former

10   employees."  If we're talking about people tied to the trade

11   secrets and potential theft of trade secrets, that could be a

12   ripe area for discovery.  But it's any former employee not tied

13   to the issues.

14        244.  So now we get to a specifically identified

15   former employee, Mr. O'Reilly.  That's good.  But, "All

16   communications between Mr. O'Reilly and any hospital or

17   healthcare provider in the first 12 months that he worked at

18   Apple."

19        Again, I understand.  But is that speaking generally

20   as a trade secret E, D?

21        **MR. POWELL:**  D and E, Your Honor.

22        **THE COURT:**  D and E.  That you're interested in

23   certain things, but, you know, to the extent -- my guess is,

24   when he arrived at Apple, he probably sent out announcements

25   and sent out requests to have meetings.  It seems excessive.

61

1  That's what I wrote, and that's what I still think.

2          Again, I wrote the same note, "In tangential," on

3  245.  "Document sufficient to show the date and reason for any

4  of Michael O'Reilly's changes in titles or job responsibilities

5  at Apple.

6          Number 246.  "All communications between Marcelo

7  Lamego and any hospital or healthcare provider while Mr. Lamego

8  worked at Apple."

9          Similar concerns.  And I don't know that there's any

10 basis for me to think -- and you can tell me if you're wrong.

11 I think Mr. Lamego was sitting in that chair about 12 or 13

12 days ago -- if there's any reason to think that he has -- that

13 he had communications with healthcare providers while at Apple,

14 as opposed to being an engineer.  But we can see whether I have

15 evidence of that.

16         248.  So this is one that might be worth more

17 discovery or more discussion.  "Documents sufficient to show

18 the date and reason for Marcelo Lamego's employment at Apple

19 ending.

20         That one -- I'm interested in that one.  So you've

21 got me on that one.

22         So having heard my admittedly vague thoughts, I'm

23 going to let you, Mr. Powell, pick -- you can talk about all of

24 them.  But pick -- I'd suggest you spend your time on the ones

25 that maybe there's a good chance of getting some success with

1    respect to those requests.

2           **MR. POWELL:**  Thank you, Your Honor.  I'll start with

3    Number 248 then.  That's the one about sufficient to show the

4    reasons for Marcelo Lamego's employment at Apple ending.

5           **THE COURT:**  Uh-huh.

6           **MR. POWELL:**  This is an extremely important request.

7    And we think it's directly relevant.  Because we don't know

8    why, and Apple won't tell us, and neither will Mr. Lamego, as

9    to why he was terminated from Apple.

10          If Mr. Lamego was terminated because Apple knew that

11   he was stealing our trade secrets, that would be extraordinary

12   relevant to the case.

13          Likewise, if he was termination because he was -- he

14   had access to -- or he was using some other documents from

15   Masimo even if they're not identified as a specific trade

16   secret in this case, again, extremely relevant because Apple is

17   contesting and stating that it had no reason to know that

18   Mr. Lamego took any of our information.

19          That's an argument that Apple made in the Motion to

20   Dismiss several times now.

21          And so, if Apple did, in fact, know that Mr. Lamego

22   was using our information, then that would be extremely

23   relevant.

24          And that is a very small and discrete set of

25   documents that would be easy to find, is what -- it's not

63

1  something that's difficult to search for and not something that

2  is burdensome.  There's no evidence of burden there.  So that's

3  number one.

4       Number 245 is a similar issue.  This is the reason

5  for O'Reilly's change in title or job responsibilities -- is,

6  again --

7       **THE COURT:**  Let me just say, there is a potential

8  inference; termination a short time after arrival that -- and

9  he hadn't been there long enough.  And I don't even know if

10  termination.  He could have left on his own -- but a short

11  departure time, and then why did he depart.

12       And we're slicing things now.  But that's something

13  I'm interested in; why Mr. O'Reilly had any change in title or

14  job responsibility.

15       Let's just say the inferential chain that somehow

16  either he's being rewarded for stealing trade secrets or he's

17  being punished for receiving trade -- the inferential chain

18  there is getting pretty removed when it's just change in title

19  or job responsibility.

20       **MR. POWELL:**  I understand, Your Honor's point.  But,

21  again, I would submit that this is a very, again, easy-to-

22  locate set of documents.

23       Frankly, Request Number 240, the HR file for -- if it

24  was just for Lamego and O'Reilly, that would likely contain

25  documents --

64

1          THE COURT:  But you're not asking --

2          MR. POWELL:  -- sufficient to show.

3          THE COURT:  -- just for Lamego and O'Reilly.  You're

4   asking for any former employee.  So let's -- I'm not going to

5   grant 240.

6          MR. POWELL:  I know.  And that's not what I was

7   trying to --

8          THE COURT:  Okay.

9          MR. POWELL:  -- imply, Your Honor.

10          What I meant was, for Number 245 and Number 248, the

11   HR file would be -- of Lamego and O'Reilly would be a document

12   sufficient to show both of those things.

13          THE COURT:  Well, now, a termination letter, if he

14   was terminated for cause and it set forth the grounds for

15   termination; not the entire HR file.

16          MR. POWELL:  Okay.

17          THE COURT:  I'm not going to start saying what is or

18   what isn't.  Because I don't think you wrote -- well, you

19   write, "Sufficient to show and date."

20          So a termination letter or an internal memorandum

21   saying, "Mr. Lamego resigned today because he wanted to be

22   closer to his family" or "because he wanted to work for

23   himself."

24          And that's what we're talking about here; not the

25   entirety of an HR file.

1          **MR. POWELL:**  And that's fine.  I don't know what

2    documents are there.  I was just suggesting that the HR file is

3    a very easy place to look for those documents.

4          **THE COURT:**  All right.

5          **MR. POWELL:**  Right?

6          **THE COURT:**  Anything further on any of these?

7          **MR. POWELL:**  The only thing further that I would

8    mention is recruiting of all of our employees is directly

9    relevant again because this issue of Apple claiming it had no

10   knowledge that it was obtaining our trade secrets.

11         And if the evidence would, for example, show that

12   Apple did know it was recruiting our trade secrets and was --

13   or I'm sorry -- it was recruiting employees for the purpose of

14   obtaining our trade secrets, that would be directly relevant.

15         And the reason why we ask for communications with

16   former employees, like 236, while they were employed with

17   Masimo, I can easily give them the Masimo email accounts for

18   all of these people.  It makes it very easy to search, to just

19   search for emails sent to those Masimo email accounts.

20         I have no indication that there's any burden, no

21   evidence, no declaration submitted.

22         **THE COURT:**  It's all true.  My biggest problem are

23   two.  There is a global issue that just because someone changed

24   jobs does not make it relevant to a trade secret case.

25         And, secondly, if you had listed certain names and

1 said, "Well, here's five people," yeah.  But when you get to 19

2 or even if you narrow it down to 14, I got to get into a

3 balancing.  You're right.  I don't have evidence of burden on

4 that one.

5         But by the same token, we talked about this last

6 time.  Reasonable particularity; that's what Rule 34 requires.

7 And that definition, to me, is not reasonably particular.

8         I'm glad that you folks tried to work it out and come

9 up with a narrower version of names that we know what we're

10 looking for.  But I don't know -- I wish I did.  But I don't

11 know the specific of how burdensome it would be.

12         But trying to do searches, even if you narrow it to

13 custodians -- and I'm not sure if that's what you're saying --

14 for all these email addresses across Apple, companywide, is

15 potentially burdensome; if you narrow it to just DSI (phonetic)

16 custodians, maybe not so burdensome.

17         But if you had limited this to, "Here's the four or

18 five key people -- because you know who your people are, and

19 you know generally who the -- whether those key people went

20 straight to Masimo or went to Masimo within a short enough time

21 period that, conceivably, there could be an issue about what

22 they may have brought with them.  That's not what this does.

23         So anything further?

24         **MR. POWELL:**  Only that Apple had agreed, in the

25 portion of the joint stipulation on defining former employee,

67

1   to at least include Marcelo Lamego and Michael O'Reilly.

2          And so I would request that, if Your Honor is

3   inclined to not grant on the full definition, that Apple's

4   proposal be adopted to --

5          **THE COURT:**  Did they say they would produce?

6          We're leaving aside to the definition.  Did they say

7   they would produce with respect to Numbers 236, 237, 239 to

8   241, 244 to 246, and 248, to the extent it referred to Messrs.

9   Lamego and O'Reilly?

10         **MR. POWELL:**  No.  I believe there were other

11  objections to those requests.

12         **THE COURT:**  Okay.

13         **MS. SAMPLIN:**  We did, Your Honor, to be candid.  We

14  did for 236, 237, and 239, on page 98.  We agreed to produce

15  documents responsive to those three RFPs to the extent they

16  pertain to O'Reilly and Lamego.

17         **MR. LERNER:**  And that -- we weren't taken up on that.

18  So now what we're getting is, "Now we'll take those."  And I

19  just go back -- we can't keep doing it this way.

20         **THE COURT:**  Yes, we can.

21         **MR. LERNER:**  Okay.

22         **MS. SAMPLIN:**  But I want to be clear that those were

23  the only three we said that for.

24         **THE COURT:**  236, 237, and 239; is that right?

25         **MS. SAMPLIN:**  Yes.

1       **THE COURT:**  All right.  Anything else from Apple?

2   Let me focus you particularly on 248.

3       **MR. LERNER:**  Yeah.  I'll skip the other former

4   employee issues and go straight to 248.

5       It is important to us -- and I think correct -- that

6   we should not be producing documents from HR files, which I

7   think we all agree.  We shouldn't be producing personal

8   documents about people.

9       **THE COURT:**  Hold on.  I don't know what you're

10   getting at.

11       **MR. LERNER:**  Well, what I'm getting --

12       **THE COURT:**  I'm not going to tell you where -- I'm

13   not going to get in -- I'm not micromanaging where something

14   comes from.

15       **MR. LERNER:**  Okay.  We shouldn't be --

16       **THE COURT:**  If you have the best -- if the best

17   document responsive -- I'm tentatively going to grant 248 -- is

18   contained in Mr. Lamego's personnel file, that doesn't make not

19   subject to discovery.

20       We've got an Attorneys' Eyes Only protective order to

21   the extent you're worried about confidential private

22   information of an employee.

23       **MR. LERNER:**  No.  This goes to relevance.  The

24   request here is, "Documents sufficient to show the date and

25   reason for Marcelo Lamego's employment at Apple ending."

69

1          We told them, "We will give you any documents from

2     his file that relate to" -- and, again, maybe this is one where

3     we tried to resolve it, and this is what we'll live with now.

4          We said, "We'll produce documents from the HR files

5     of Marcelo Lamego" -- and we also did it for O'Reilly -- "that

6     relate to the acquisition, use, or disclosure of confidential

7     or proprietary information to the extent those documents

8     exist."

9          We didn't limit it even to theirs.  We just said --

10    this is a trade secret case.  There were some patent claims

11    too.  If there's anything that has anything to do with an

12    intellectual property claim of any of the 31 flavors --

13          **THE COURT:**  So I'm going to cut you off.  That's one

14    basis for it.  There's all sorts of other things that could be

15    relevant to why Mr. Lamego left.

16          The mere fact that there -- you're saying, "Well, I'm

17    going to give you evidence if it relates to the theft of trade

18    secrets."

19          Bias is always relevant, all right?  Maybe Mr. Lamego

20    has a bias against Apple.  That's relevant for them to know,

21    all right?

22          Maybe there's a basis for Apple to have a claim

23    against Mr. Lamego, which could shape or shade his testimony.

24    That's relevant for them to know.

25          The reason why he left Apple is relevant.  And the

70

1   date, because it relates to the entirety of the case, is

2   relevant too.

3        So there's more to relevance than just saying, "Well,

4   I'll give it to you if it relates to disclosure of trade

5   secrets."  There's more to it.  And I'm inclined to grant it.

6        Again, I'll hear from you if there's some particular

7   privilege or some claim.  But it certainly doesn't sound unduly

8   burdensome.

9        **MR. LERNER:**  I don't think it's burdensome at all.  I

10  think I can't -- my answering your question is the very basis

11  for our objection.

12        I think there are a ton of reasons he could have left

13  Apple that --

14        **THE COURT:**  You're right.  And if we were talking

15  about --

16        **MR. LERNER:**  -- had nothing to do with --

17        **THE COURT:**  -- 15 different --

18        **MR. LERNER:**  -- the case --

19        **THE COURT:**  If you were talking about 15 different

20  people, I agree.  But we're talking about one person who

21  everyone agrees, right, central to this case.

22        A representation has been made to me by Mr. Powell --

23  and you could tell me if it's not true -- that Apple hasn't

24  told Masimo why Mr. Lamego left, what, six or eight months

25  after he arrived in 2014.

1          Is that right?

2          **MR. LERNER:**  Absolutely correct.

3          **THE COURT:**  Okay.  They're going to be entitled to

4    this in discovery here.

5          All right.  So my tentative is going to be for the

6    reasons stated, largely dealing with scope and overbreadth due

7    to the definition of former employee and, to the lesser extent,

8    not tying it to the specific issues in the case, that all of

9    Category Seven is denied except for 248, except to the extent

10   Apple agreed to produce information with respect to Numbers

11   236, 237, and 239, relating to Messrs. O'Reilly and Lamego.

12         I may not include that in the actual order.  I'm just

13   telling Apple that I'm holding you to that representation that

14   was made in the joint stipulation.

15         All right.  Interrogatory Number 10.  Give me one

16   moment.  All right.

17         So rather than read -- it's a lengthy interrogatory.

18   I'm going to talk to you about getting to the practicality of

19   this.  Page 105 of the joint stipulation, starting at line --

20   first full sentence, starting at line four, Apple writes, this

21   investigation -- why don't I start at line 3, first full

22   sentence.

23         "To the contrary, Apply conducted a reasonable

24   investigation to identify responsive information.  This

25   investigation yielded few results because the Apple Watch was

72

1    developed in-house by Apple's own engineers.

2            "Nonetheless, Apple did identify a document

3    containing analysis of various wrist-worn monitors, citation,

4    and asked Plaintiffs whether the information in this comparison

5    was of the type sought by Interrogatory Number 10."

6            And then there's back and forth between both sides,

7    including an in-Plaintiff supplemental memoranda about whether

8    there was a response given.

9            Apple, is there any reason -- on behalf of Apple, is

10   there any reason why Apple can't just write, "The investigation

11   yielded few results," and then identify the documents, under

12   Rule 33(d), that contain the information?

13           This question is directed to Apple.

14           MS. SAMPLIN:  Your Honor, we can do that.

15           I think our concern was the indications we were

16   getting in the meet-and-confer process was that that wouldn't

17   be sufficient to Plaintiffs.  And so we would end up back

18   before Your Honor.

19           And so that's why we were trying to negotiate with

20   Plaintiffs about the interrogatory.  But if Your Honor wants us

21   to do that, in the interrogatory, we can certainly do so.  I

22   just suspect that we'll be back here.

23           THE COURT:  Well, I'm not going to micromanage it.

24           MS. SAMPLIN:  Yeah.

25           THE COURT:  You know, right now, there's no response,

1   okay?

2          What's difficult for me is, on lots of other things,

3   you're giving me a long list of objections and told me that

4   this is irrelevant, has nothing to do with the case.

5          What I don't have -- I don't have that here.  I'm

6   glad.  It makes it easier for me.  But what I do have is,

7   "Well, we kind of raised a trial balloon, and said, 'Is this

8   what you're looking for?'"

9          And, you know, that's not how discovery works.

10  Either make a response and let them challenge it, or, you know,

11  and then you can either stand on it or supplement.

12          But what I have right now is almost -- I've use it

13  before -- the unbaked cake analogy.  I don't really have much

14  to rule on right here.  I have the trial balloon, and then

15  someone saying, "Well, they never actually gave me the trial

16  balloon.  It's still just a trial balloon."

17          So give them a trial balloon.  And if you want to

18  move to compel on it later -- I don't want to be giving

19  advisory opinions on what should or shouldn't be in an answer

20  when I don't have the full answer.

21          You know, and there's language like, "Well, the

22  investigation yielded few results."

23          I don't know what that means.  Are there other

24  documents out there?  Is there a more fulsome answer that could

25  be provided?

74

1          **MR. LERNER:**  Understood.

2          **THE COURT:**  I'm going to order this one -- the motion

3    granted to require a further response.  I'm not ruling on what

4    the further response should or shouldn't be.  All right?

5          **MS. SAMPLIN:**  Understood, Your Honor.

6          **THE COURT:**  So let's turn to Numbers 180 -- RFP

7    Numbers 180, 187, 191, 192, 197 through 206.

8          And let's see here.  We have determined that 191,

9    197, and 202 are moot.

10         Is that right, Mr. Powell?

11         **MR. POWELL:**  I believe so, Your Honor.  Did you say,

12   "191, 197, and 202"?

13         **THE COURT:**  Yes.

14         **MR. POWELL:**  That's correct, Your Honor.

15         **THE COURT:**  Okay.  So we'll recognize that the joint

16   stipulation has material under seal.

17         I think we can deal with this largely by referring to

18   them by their letter in the 2019.210 disclosure.  And some of

19   these Masimo -- I guess, perhaps it's all the ones other than

20   the ones that were mooted.

21         Masimo provided an additional compromise on the

22   Tuesday, June 1st filing, which, again, complicates how we

23   proceed on this.

24         And there's a sense in which these requests general,

25   and there's a difference -- I'll say that the disclosures --

1    the D and E disclosures are a little bit broader.

2            But there's a sense that -- I'm glad that these are

3    tied to some specific trade secrets.  But is it at such a level

4    of generality that -- how do we -- well, why don't you --

5            Why don't I start with you, Mr. Powell.  But focus me

6    on how -- and I appreciate the attempt to limit it in the

7    proposed modification from three days ago.  I wish it were -- I

8    wish that had come a long time earlier.

9            But how do we deal with this?  I think the general

10   topic is very fair, right?  That's what I've been asking you to

11   do since our hearing two weeks ago.  But it's also, when you're

12   using the headings as opposed to the subfactors -- help me.

13           Walk me through this.  Why is this a fair, reasonable

14   request?

15           **MR. POWELL:**  Thank you, Your Honor.  So I will say --

16   and I apologize if I misunderstood as for whether you wanted to

17   see proposed compromises.

18           The reason why those weren't made earlier is that we

19   did not understand that Your Honor would have a problem with

20   the language of all documents that refer or relate to.

21           That's language that Apple has used in its request.

22   And we have -- and when we heard that at the hearing, I

23   thought, let's --

24           **THE COURT:**  Can I tell you --

25           **MR. POWELL:**  -- "Let's fix that."

1          **THE COURT:**  I don't have a problem with that,

2    depending on what follows.

3          If what follows is a very discrete issue -- and I use

4    the example of Coca-Cola, right?  All documents related to

5    caffeine, well, that's huge.

6          All documents related to the distribution of Coca-

7    Cola products in the Ukraine during, you know, the calendar

8    year 2014, you know, throw in enough limitations, okay, that's

9    narrow enough.

10         So I don't have a problem with refer or relate-to.

11   What I have a problem refer or relate-to against the pipe

12   scenario, where does it go?  Does it narrow or is it broad, all

13   right?

14         **MR. POWELL:**  I understand, Your Honor.  And the issue

15   here is we've drafted kind of two separate types of requests.

16         One of them is directed toward specific types of

17   documents that we're looking for that we think would have

18   information relevant to the trade secrets.

19         And on those requests, many of the objections we get

20   is, "Well, those documents that can be contained documents that

21   relate to the trade secrets and documents that don't relate to

22   the trade secrets.  So you need to go narrower," right?

23         And so we tried these that say, "Okay, just give me

24   the documents that actually relate to the trade secrets," and

25   that the intent here is, well --

1          **THE COURT:**  I mean, let's work through this.  I mean,

2   I don't think you disagree.  You've been saying it all along;

3   "Tie it to the trade secret, tie it to the trade secret."

4          The problem is -- I assume you're going to tell me,

5   is, well, if you tie it to a level of generality so high,

6   that's not -- and we had a fight about this, right, whether the

7   headings were themselves Attorneys' Eyes Only or not.

8          And correct me if I'm wrong, I think I said they

9   weren't Attorneys' Eyes Only, but I also said, "But they are

10  still confidential."

11         So it's this middle ground.  What can you folks do to

12  get what you are entitled to and that doesn't overburden them?

13         And if we have to go through these one by one, we

14  can.  But I'm disappointed that you couldn't work these out a

15  little bit; that you couldn't say, "Okay, what is it you're

16  looking for here?  How can we narrow this?  Can we do it either

17  with a time frame limitation?  Can we do it to get the -- we

18  start out with Trade Secret Category A.  Can we be a little bit

19  more specific about what we're looking for?  Can you have your

20  tech people come up with a search term list that gets you what

21  you want?"

22         I'm disappointed that you couldn't work this out.

23         **MR. POWELL:**  All right.

24         **THE COURT:**  So here's what I'm saying.  That these

25  categories generally are relevant, and it's really what I've

1  been telling the Plaintiffs to do the entire time.

2           And, frankly, Mr. Lerner, it's kind of what you've

3  been telling them, whenever they say, "pulse oximetry," well,

4  tie it to the trade secret.

5           So here, these are tied to the trade secret, but is

6  it a high-level generality?  What can we do?

7           **MR. POWELL:**  Well, Your Honor --

8           **THE COURT:**  Any offers, Mr. Powell?

9           **MR. POWELL:**  Well, I would clarify the request.  I'm

10  looking at Request Number 180.  It does specify described under

11  Heading A.

12           So we're not asking about heading -- headings.  We're

13  only asking about the specific numbered trade secrets that are

14  set forth under --

15           **THE COURT:**  Okay.

16           **MR. POWELL:**  -- the headings.

17           **THE COURT:**  Fair enough.

18           **MR. POWELL:**  And, again, the objection that we've

19  received to these was, for example, that they were not -- each

20  of the requests were not limited to the Apple Watch itself.

21  That's what -- one of Apple's primary objections to this.

22           And two issues with that.  Number one, none of these

23  trade secrets have to be directed towards the Apple Watch.

24           Some of them, like Categories D and E, are business

25  and marketing plans that would apply beyond the Apple Watch,

1    frankly.

2            And I think all of them, if Apple has some other

3    product -- say it's making a pulse oximeter that is not the

4    Apple Watch, and it uses all of our trade secrets in that

5    product, I think we're entitled to that.

6            And that's -- the issue here is I don't know what is

7    out there.  I don't know if the Apple Watch is the only

8    relevant thing because we've received no indication from Apple

9    to state that there is anything beyond the Apple Watch.

10           There's no declaration saying, "Yeah, we have all of

11   these other products that might use that.  And it would be

12   burdensome for this reason."  I just don't know.

13           But I do think that there's use of our trade secrets

14   in a product other than Apple Watch, I think that's directly

15   relevant to the case, and I think that it's --

16           **THE COURT:**  Well, let me --

17           **MR. POWELL:**  -- within the scope.

18           **THE COURT:**  -- just say I don't disagree with you,

19   okay?  But here's where digging into the individual trade

20   secrets matters.

21           And I hope you don't mind.  Can I characterize

22   certain trade secrets as relating to marketing?

23           **MR. POWELL:**  Sure.

24           **THE COURT:**  All right.  And looking at -- let's look

25   at Number 200; Request for Production Number 200, "All

80

1    documents and things that refer or relate to Apple's business

2    and marketing plans for products that calculate one or more

3    physiological parameters."

4         You're right.  It's not limited to the Apple Watch.

5    And I'm not necessarily requiring -- you know, a trade secret

6    could be used as some other product.  But I don't know what

7    else Apple makes that would use the trade secrets.

8         And that Number 120 that I just read is not tied to

9    the trade secrets specifically.  And, more generally, if you

10   look at 198 and 199, you know, here's where the specificity of

11   the trade secret that I found sufficient, under 2019.210,

12   depending on the trade secret --

13        We had a long discussion about tethering, right?

14        Sometimes the radius of the tether might be greater

15   or less, based on the nature of the trade secret.  Some of D

16   and E -- and I'm going from memory.  I want to be careful that

17   I don't contradict myself.  But some of D and E, I would say,

18   should have a shorter tether in terms of relevance for

19   discovery purposes.

20        Then maybe some of the technical descriptions in A,

21   B, C, and F -- am I talking too much in code for you to

22   understand what I'm saying, Mr. Powell?

23        **MR. POWELL:**  I understand what you're saying, Your

24   Honor.

25        **THE COURT:**  I'll ask Mr. Lerner, am I -- are you

81

1    understanding what I'm saying?

2              **MR. LERNER:**  Yes, Your Honor.

3              **THE COURT:**  All right.  So tell me what you think of

4    that, Mr. Powell.

5              Maybe it can be asked another way.  I can't ask it

6    that way, because I know what that answer will be.

7              But, in all seriousness, how important is -- are the

8    requests here that are tied -- that it makes specific reference

9    to business and marketing plans, and how far does the refer or

10   relate-to as to those, should I extend the tether as opposed to

11   specific technical specifications contained in the others?

12             **MR. POWELL:**  Well, Your Honor, the trade secret set

13   forth in Categories D and E are important.

14             **THE COURT:**  I knew that was going to be the answer.

15             But here's what I'm going to say.  I can imagine

16   doing a search -- again, I'm not going to be specific -- for

17   technical terms in A, B, C, and F, having my IT person, say,

18   "Look for this, within three of this."

19             Or, D and E, I can see having much more difficulty

20   coming up with a search paradigm -- search algorithm that will

21   get you what you want that won't bring up -- with a company

22   like Apple, that won't bring up tens of millions of hits.

23             Now, I don't know.  And I don't have that in front of

24   me.  This is where I wish I had something, where I could say,

25   "Hey, listen.  This is what trying to do this would result in."

1          So I'm not sure what I'm going to do with these.

2          MR. POWELL:  Well, in that --

3          THE COURT:  Tell me anything else you want to tell me

4    in defense of your position in the motion, Mr. Powell.

5          MR. POWELL:  Thank you, Your Honor.  I think, when

6    we're talking about the idea of how long the tether is, that is

7    certainly relevant when we're talking about requests that

8    aren't directly -- directed specifically to the trade secrets.

9          These, I think, it's not really an issue of the

10   tether, because they're directed right at the trade secret.

11         THE COURT:  But let's focus on the marketing ones.

12         MR. POWELL:  Sure.

13         THE COURT:  And you could use a specific term, right?

14   A defined technical term to run a search.  It's much harder to

15   run a defined technical term because marketing -- the terms in

16   the marketing -- not all of them.  But the terms in D and E are

17   more general.

18         That's not to say -- and that's where I wanted to

19   catch myself.  It's not to say they're too general to be trade

20   secrets.  But they can apply across different platforms that

21   really have no actual connection to the specific trade secret.

22         Does that make sense?  And that's what I want to get

23   at.  How referring or relating to those two, whether there's a

24   way to narrow those.

25         MR. POWELL:  Well, I understand what Your Honor is

83

```
 1    saying.  And I appreciate it.  I'm trying to answer it as best

 2    I can.

 3           I think these trade secrets -- there is language in

 4    these trade secrets that can be searched from.  And I think

 5    this all goes back to what the Federal Rules say.  It's a

 6    reasonable search.

 7           I would be happy to work with Apple if they want to

 8    propose some search terms and say, "Would you agree that this

 9    is reasonable?"  I'd be happy to talk to them about that.

10           The other thing is -- again, I don't want to get into

11    too much of the details about what they're doing on their side.

12    But if it were me, and what I do on my side, is I'd call up my

13    witness, and I'd say, "Hey, who is, you know, in charge of

14    marketing and the plans for the Apple Watch?"

15           And I would say, "Okay.  Can you" -- I'd talk to them

16    about it and try to get some information from them about what

17    type of documents they have and get those documents.

18           I'd run a search on whatever terms that are unique in

19    this trade secret disclosure.  And that's how I would craft a

20    reasonable search.

21           And I'm happy to work with Mr. Lerner, if he wants to

22    run that by us to try to get our approval so that there's not a

23    dispute on that.  That's something we can certainly talk about.

24           **THE COURT:**  All right.  And let me just tell you, in

25    terms of a tentative, for 200, 201, 202; those, I think I can
```

84

1    find are overly broad and not tied on a reasonable tether to

2    the trade secrets at issue, and are beyond the scope of

3    relevance for purposes of damages at this stage.

4            **MR. POWELL:**  The only thing I would add, Your Honor,

5    is I believe we reached an agreement on 202.

6            **THE COURT:**  Oh, 202, okay.

7            **MR. POWELL:**  So you don't need to address that one.

8            **THE COURT:**  Well, good.  You've stopped me.

9            All right.  So 200 and 201.  The other ones, I'm

10   still considering.

11           And, again, I'll turn to you, Mr. Lerner.  But part

12   of my thinking here is, as you have pointed out in other

13   filings, that the last motion was denied, what, 30 out of 34,

14   primarily over me telling Mr. Powell and you arguing, "Tie it

15   to the trade secrets; tie it to the trade secrets."

16           Here, they have tied it to the trade secrets in

17   large -- to a large extent.

18           So tell me --

19           **MR. LERNER:**  Sorry.  One question that I -- I should

20   have tried to catch this before.

21           I'm not aware -- and I may have dismissed an

22   agreement on 202.  And I'm happy to take this in whatever order

23   you want.  We can address that later.  We can --

24           **THE COURT:**  I have that, earlier today, I was advised

25   that 191, 197, and 202 are moot, based on an agreement.

85

1           But I'm not going to put "based on agreement."
2     They've been mooted or withdrawn.
3           **MR. LERNER:**  Okay.  Let me put a pin in that.
4           There's obviously been a lot going on.  So let me try
5     and answer your question, and I'll come back to 202, if that
6     makes sense?
7           **THE COURT:**  All right.
8           **MR. LERNER:**  Okay.  So the issue here -- and I do
9     want to address your point about trying to work this out -- is,
10    when you were talking about the technical secrets -- so let's
11    take 180, for example -- we went through and tried to point out
12    carefully that what's happening here is kind of only half of
13    the equation, which is, they're saying, "Every document and
14    thing that relates to this entire alleged secret, under the
15    heading of A, and all of the many steps thereunder."
16          They're not limiting it to -- and this is important,
17    because it is what frames what they have an allegation -- a
18    basis to allege in this case -- is the watch.
19          We went through -- there is nowhere in the
20    complaint -- which guides this -- where they say, "These
21    secrets are incorporated in some other Apple device.  It is
22    only the watch."
23          So that's why we were focusing on the watch.
24          Now, why is that important?  Well, to Your Honor's
25    point about trying to figure this out, one way to limit this is

86

1    where you would look for this.

2           And as I said last time, we have said, "If you want

3    to know how we do this process that's set out in A, here is the

4    source code that shows how we do it."

5           So we've tried to look for ways to show them the

6    documents that get to the crux of the issue.  And they have it.

7    And they haven't ever told you again that we do it the way they

8    do.  And the problem that arises when you get beyond trying to

9    actually show them, for example, how we do it, is --

10          And this came up at the last hearing.  Your Honor,

11   pointed out that these -- and I'll just keep focusing on A --

12   there are parts of this broad concept that are not a secret.

13          What's alleged to be a secret is the very specific

14   way in which they do it, and the order in which they do it,

15   which they claim has -- apparently, you know, generates certain

16   results or something else.

17          But the point is, if you just start saying anything

18   that refers or relates to, then we're in the universe where we

19   were two weeks ago where we're talking about, well, anything

20   that refers or relates to them relates to component pieces that

21   everybody agrees are not a secret.

22          Which is why we've been trying to work this out by

23   saying, for example, we're giving you what everybody says are

24   the crown jewels; the source code.

25          If you see anything there, let's go forward with

1    Judge Early and have a dispute about why this needs to go

2    broader or anything else, but what we don't have here is even a

3    limit to the product that allegedly incorporates the secrets, a

4    limit to the patents that allegedly disclose the secrets.

5    Those are the two places; no limits to the individual who

6    allegedly disclosed this stuff to us.

7            All you have is everything in Apple that refers or

8    relates to the entire subject matter.  And that, to us, to Your

9    Honor's point, is A, overbroad, but B, not really workable,

10   which is why we've done things like hand over all of the source

11   code that relates to this.

12           So, that's why we disagree with this set, and until

13   having had, for example, the source code, which shows how we do

14   it, somebody says to Your Honor, "They do it the same way we

15   do", all of this seems overbroad and, you know, obviously,

16   burdensome.

17           But I don't understand how we can go from "The watch

18   that incorporates this or a patent discloses it" to "Every

19   document in the whole company that refers or relates to any

20   component", I think, was the word Your Honor used the last

21   time, "that's a part of any of these secrets".  That does not

22   seem workable as these are drafted.

23           **THE COURT:**  Well --

24           **MR. LERNER:**  And I will -- the final thing I'll add,

25   which I think you've touched on is, the parties are in

1   agreement on 28 custodians and their negotiating terms.  So, if

2   there is some additional overflow that -- where the source code

3   isn't good enough, then the parties are going through the

4   terms, and I don't think anybody in the court is going to tell

5   you that they haven't been thinking about these secrets when

6   they've been giving us their terms.

7           **THE COURT:**  All right.  Anything further?

8           **MR. POWELL:**  Submitted, Your Honor.

9           **MS. SAMPLIN:**  I'll just add that 202, Mr. Powell is

10  correct.  We did reach agreement on that.

11          **MR. LERNER:**  Sorry about that; I was wrong.

12          **THE COURT:**  Well, I have a question for both of you.

13  I know you've been back and forth on this, but these are

14  important, these requests.

15          You've now sat with me for over eight hours.  Do you

16  think, Mr. Powell, that you can find a way to get what you're

17  looking for?  What Mr. Lerner is saying, among other things, is

18  hey, you've got the source code; that shows how our Apple Watch

19  uses these things.

20          One of the things you're saying is A, well, I

21  shouldn't just be limited to what Apple says; I should be able

22  to get other records to test that.  And also, I don't know that

23  the Apple Watch is the only product that my alleged trade

24  secrets were either used or contemplated being used in, and so,

25  it shouldn't be limited to the Apple Watch.

1          The complaint refers only to the Apple Watch

2     Products, but that doesn't mean that, to the extent there is

3     discoverable information elsewhere, that that's the end of the

4     inquiry.

5          But I get back to how one would conduct a search.  Is

6     there a way that you can be more specific in what you're asking

7     for for each of the trade secrets, and just say, "Look, if we

8     get search terms that have these things through these -- with

9     these custodians, that's good enough for me"?  Or even just

10    say, "No, I just want a ruling up or down on these RFPs as

11    written".

12          **MR. POWELL:**  We never just want a ruling up or down.

13    I'm always happy to negotiate and try to reach an agreement.

14          **THE COURT:**  Well, but here's my take.  Okay.  I hear

15    it, but now we're here.

16          **MR. POWELL:**  Yeah.

17          **THE COURT:**  And now all I can do is up or down.  I

18    can't modify these.  These are as they incorporate the trade

19    secrets, some of which are pages long, I can't start saying

20    this, not that, this, not that.  I don't know enough, and I

21    wouldn't want to do that.  But you know enough.  It's being

22    represented that some of the things in the trade secrets are

23    not themselves confidential; that they're public information.

24          There's, you know, different characterizations of the

25    dispute.  Is there anything that you can do, do you think you

1  can do, with Mr. Lerner or Ms. Samplin to try to resolve this

2  to get what you really want, and to save Apple from having to

3  attempt to do a broad-based search for anything relating to,

4  again, however many pages of trade secrets we have?  Can we

5  find a more targeted way to get what you need?

6          **MR. POWELL:**  I think so.  I think that we could work

7  with them, like I said, if they want to propose some search

8  terms.  I also think that they should talk to their witnesses

9  and try to find out where the documents, for example, on

10 xxxxxx          are.  And the reason that's important, I just want

11 to --

12          **THE COURT:**  Do you need that in any way shielded?

13 That term.

14          **MR. POWELL:**  -- I'm sorry.  Yes, I do.  I'm so sorry.

15          **MR. LERNER:**  You just --

16          **THE COURT:**  Yeah.  We're -- all right.  Any

17 transcript of this proceeding will redact the word that --

18 beginning with the letter "D" that Mr. Powell just used from

19 public view.

20          **MR. POWELL:**  Thank you, Your Honor.  I apologize.

21          So, the issue here is the source code, we've heard

22 this quite a bit, that the source code has been produced; that

23 should be good enough.  And we haven't told them that the

24 source code misappropriates our trade secrets.

25          So, a couple of things there.  Number one, this isn't

1  summary judgment, or we haven't even done expert reports yet.

2  So, yes, we've looked at the source code.  We have some

3  analysis on it.  I am not the person that did that because I

4  don't read source code, so it's difficult for me to try to

5  rebut those arguments on the fly.

6          But more importantly, research and development, and

7  consideration is a use of trade secrets.  It doesn't have to be

8  in the final product in the source code.

9          And this is -- I'll just refer Your Honor to the *PMC*

10  case and the *SkinMedica* case that's cited in our briefing.  And

11  *PMC* states that employing the confidential information and

12  manufacturing --

13          **THE COURT:**  If I can cut to the chase --

14          **MR. POWELL:**  Okay.

15          **THE COURT:**  -- I've already told you, I'm not viewing

16  solely what's in the complaint in reference to the Apple Watch

17  as being a hard slamming of the door if there's relevant

18  responsive information located -- reasonably located in other

19  places.

20          But how do we work out a mechanism for Apple to be

21  able to search that which is a reasonable search?

22          **MR. POWELL:**  I would think that we trust counsel's

23  representation that they've conducted a reasonable and diligent

24  search, and I'm happy to work with them if they want to say,

25  hey, for the ESI portion of this search, are these search terms

1    good enough?  Do you have anything to add?  I would be happy to

2    have that discussion with them.

3            THE COURT:  Well, you're asking for them to propose

4    the search terms.  Why -- have you proposed search terms for

5    these particular RFPs?

6            MR. POWELL:  We have proposed search terms.

7            THE COURT:  What was -- what was the response?

8            MR. POWELL:  We are still working on those search

9    terms with each other that's --

10           THE COURT:  I'm asking you about these specific, that

11   there's objections to.  You proposed search terms for 236

12   through 248, and that's not -- there's some gaps in there, as

13   well as 180, 187 -- I'm sorry.

14           Yes, 180, 187, 192, 198, 201, 203 to 206.  You're

15   telling me you proposed search terms for those requests?

16           MR. POWELL:  No, they weren't tied to any particular

17   request.  What we did is we provided --

18           THE COURT:  I appreciate that.  So, did those search

19   terms, if you get an appropriate response from Apple, will that

20   encompass what you're looking for in these?

21           MR. POWELL:  To give you an answer on that, Your

22   Honor, I would need to check.  I might need a brief recess.

23           MR. LERNER:  Your Honor, can I just try and answer

24   this?

25           THE COURT:  Well, I'm asking what Mr. Powell's

1  understanding is.  If you want to give your understanding, then

2  go ahead.

3         **MR. LERNER:**  I don't need to if I'm interrupting.  I

4  just thought it might be helpful.

5         The parties are negotiating terms, and I think Your

6  Honor's at least thought on this seems useful to me which is,

7  the answer to your question is, even if their terms are not

8  tied to these specific RFPs, they are tied directly to, without

9  stating any of them, for example, Secret A.

10        The very terms they are giving us come out of the

11  alleged secrets, and then to Your Honor's point about what the

12  parties are doing to make this workable or not workable, we're

13  actually sharing the data on the burden in terms of the hit

14  counts.

15        So, I think at least the answer to Your Honor's

16  question, and people can take a break if they need to check it,

17  is, yes, there are terms that are directly related to each of

18  these because they are directly related to the alleged secrets,

19  which is no surprise, and the parties are exchanging the hit

20  counts on those terms.

21        **THE COURT:**  All right.  I don't remember who it was,

22  but someone had earlier said, "Hey, we want to get moving on

23  this".  You've got a motion, dueling motions to extend the

24  discovery cutoff date.

25        I hate to leave this open to say, you folks work it

94

1  out, because past history -- don't take this the wrong way;

2  past history tells me it won't be worked out and we're merely

3  delaying the inevitable.

4       But if each of you are saying you think there is a

5  reasonable likelihood that Plaintiff will get what it wants

6  from these requests based on the negotiations that are ongoing,

7  here's what I want to do.

8       I don't want to throw a hand grenade in the middle of

9  your garden party, but I tried to change it from an unpleasant

10  metaphor, and created an even more unpleasant metaphor.

11       So, I don't want to invite the skunk to the garden

12  party, and blow up a negotiation -- boy, now, I've completely

13  mixed the metaphors -- by issuing a ruling that one party is

14  going to say, aha, we get everything, or aha, you get nothing,

15  if you folks are in good faith trying to work through this.

16       Here's what I'll tell you.  I don't like to give

17  advisory opinions, but this is what I was trying to get at last

18  time.  Focus on what you need, but at the same time, balance

19  out the difficulties for any company, much less a, you know, I

20  was going to say multibillion, but is it multitrillion?  I

21  don't know.  A very large company, and how they're going to

22  find responsive information.

23       And the way you do that, you're both technically

24  proficient, I'm not, is by the iterative process of back and

25  forth these search terms, a quick check yielded x number of

1    hits.  Try this, try that.

2            But I don't want to do something that's going to

3    grind that to a halt by issuing a ruling that someone's going

4    to say, aha, I don't have to do that, or aha, you have to do

5    ten times that.

6            So, with respect to Category IX, don't take this the

7    wrong way, but I also don't want to leave things open.  What I

8    may do is say, I'm going to deny the motion subject to the

9    parties' neutral representation that they are working through

10   search terms and a procedure to get Plaintiffs a reasonable --

11   the relevant information that is reasonably available subject

12   to a reasonable and diligent search.

13           And if the parties are unable to reach that

14   agreement, they can -- Plaintiff can file a notice, and what's

15   Category IX in the joint stipulation will immediately be

16   considered an active motion again.  And there'll be no further

17   briefing.  We're just going to issue rulings.  If Plaintiff

18   issues that notice, it'll be immediately under submission for

19   an immediate ruling.

20           Does that make sense?  But first of all, I want --

21   I'm going to first ask if what I -- the premise of that is

22   true, that each side thinks they may be able to work this out

23   with respect to these requests for productions.

24           From -- Mr. Powell, from Plaintiff's standpoint, is

25   that true?

1        **MR. POWELL:**  Yes, but I'd like to add one quick

2   thing, Your Honor.

3        **THE COURT:**  Okay.

4        **MR. POWELL:**  And that is only that at the beginning

5   of this, we talked about both search terms and discussing the

6   matter with witnesses as part of a reasonable search.

7        We think that part of that reasonable search would be

8   asking the witnesses, "Hey, where do you keep documents on

9   Category blank".

10        **THE COURT:**  I'm not going to order anything other

11   than what the Rules require and what the cases require from

12   counsel in responding to discovery and engaging in a good faith

13   meet and confer process, which is designed in good faith to

14   resolve all or as many of the disputes as possible, which one

15   would be hard-pressed to say involves no communication between

16   an attorney and his or her client, but I don't want to

17   micromanage things here.

18        We're assuming good faith, and you said you take

19   counsel at their word when they make representations to you.

20   So, I'm assuming that this is not Apple's counsel that's

21   driving everything; that there are -- in fact, they fought

22   tooth and nail to get as much access to non-AEO information as

23   possible to their in-house counsel that -- in-house counsel are

24   involved in this as well.

25        So, I'm going to take that as a yes to my question.

97

1  Mr. Lerner, do you think on behalf of your clients that the

2  parties could reasonably resolve these disputes, bearing in

3  mind that I think that each party has valid interests in their

4  positions with respect to what I called Category IX?

5          **MR. LERNER:**  Yes, Your Honor.  And I don't have an

6  additional argument point; I just had a question, and I realize

7  you've been at this for a while, so I apologize for the

8  question.

9          My sense is that's true for the technical ones, but

10  200 and 201 are out.

11          **THE COURT:**  Yes --

12          **MR. LERNER:**  Okay.

13          **THE COURT:**  -- 200 and 201 are -- make sure I'm

14  looking at the right ones.  Yes, that's --

15          **MR. LERNER:**  With that submitted, Your Honor, nothing

16  else from us.

17          **THE COURT:**  -- okay.  So, here's what I'm going to

18  do.  And I'm going to ask about the procedure, make sure you're

19  okay with it, Mr. Powell.  My procedure is going to be, I'm

20  going to deny the motion as to the requests in Category IX; 200

21  and 201 will just be straight denials.  The remainders -- and

22  202 has been withdrawn.

23          The remainders I will deny based on counsel's

24  representation that they think they can potentially be

25  resolved, and it's without prejudice to Plaintiff filing a

98

1    notice with respect to any failure to finally resolve the

2    matter, identifying which requests for production they're -- no

3    resolution could be reached.

4           There will be no argument in that notice, and

5    there'll be no response to that notice.  As of that notice,

6    those requests for production will be immediately under

7    submission and subject to immediate ruling based on the

8    arguments that have already been presented.

9           Is that acceptable to you, Mr. Powell?

10          **MR. POWELL:**  Yes, Your Honor.

11          **THE COURT:**  Mr. Lerner.

12          **MR. LERNER:**  Yes, Your Honor.

13          **THE COURT:**  All right.  I have to now circle back

14   because there was one grouping that I took under submission.

15          **MR. POWELL:**  Your Honor, could I ask one

16   clarification question?

17          **THE COURT:**  Yes.

18          **MR. POWELL:**  If such a notice is required, and we're

19   really hoping it is not, would you like the last best proposals

20   from each party?

21          **THE COURT:**  Well, I'm going to let you know, here --

22   since -- if I go just by what the record is, Apple's official

23   response to I think each of these was no statement that they

24   would comply; is that correct?

25          What does -- does Apple want to have an opportunity

99

1    to potentially have a -- no, I'm just going to leave it, we're

2    going to leave it as is.  We're going to leave it as is.

3         I don't want to overcomplicate things, and we'll just

4    rule.  I certainly encourage you to try to resolve this.

5         Now, I need to circle back because I didn't take good

6    enough notes.

7         **(Pause)**

8         **THE COURT:**  All right.  And as to Category 7, I'm

9    just trying to remind myself now because I did not take good

10   notes on it.

11        **MR. LERNER:**  That was --

12        **THE COURT:**  So as to Number 248, that, I indicated

13   was a grant.  Does that sound right?

14        **MR. LERNER:**  Yes, Your Honor.

15        **THE COURT:**  But --

16        **MR. LERNER:**  I think it was 236 to 246 were under

17   submission on the --

18        **THE COURT:**  Okay.

19        **MR. LERNER:**  Reargue it.  I'll just leave it at that.

20        **THE COURT:**  Well I'd like to -- if I can give you a

21   ruling today, I'd like to do it.

22        **MS. SAMPLIN:**  I thought we ruled on Category 7.  I

23   thought it was 226 and 230 to 234 that you took under

24   submission.

25        **THE COURT:**  Well let me see here.

1            Yeah, I think I denied it.  236, 237, 239, 240 --

2            **MS. SAMPLIN:**  Do you want me to read you my notes?

3            **THE COURT:**  -- 241, 244, 245, 246.  Yes, I denied as

4    to all those and granted as to 248.

5            **MR. LERNER:**  Okay.  Then that resolves it.

6            **MS. SAMPLIN:**  Yeah.  And then you said "except to the

7    extent Apple agreed to produce for 236, 237 --

8            **THE COURT:**  Right.

9            **MS. SAMPLIN:**  -- and 239."  So I think that resolves

10   Category 7.

11           **MR. LERNER:**  Right.

12           **MS. SAMPLIN:**  I believe it's Category 6 that you took

13   under submission.

14           **THE COURT:**  All right.

15      **(Pause; Counsel conferring)**

16           **MR. LERMA:**  So the ones that were under submission,

17   Your Honor, as I understand it were 226 and 230 to 234.

18           **THE COURT:**  All right.  And --

19           **MR. POWELL:**  Your Honor --

20           **THE COURT:**  Just a second please.

21           226, as limited.

22      **(Pause)**

23           So 235, of Roman Numeral 6, 235 is out; that's been

24   resolved.

25           **MS. SAMPLIN:**  Yes, Your Honor.

1    **THE COURT:**  236 -- I'm jumping back between different

2  documents.

3    **MS. SAMPLIN:**  236 is in Category 7, Your Honor.

4    **THE COURT:**  I'm sorry.  226, we had nonpublic --

5    Why did I write this?  I remember doing it.

6    Nonpublic documents and it was relating to (reads

7  under breath) Oh, I know why.  I have two copies of this.

8    **MR. KATZENELLENBOGEN:**  Yes, Your Honor.  I believe

9  that was --

10    **THE COURT:**  I got it.  I actually wrote it in the

11  blueback copy.

12    So 226 is granted based on an amended version of

13  Masimo's proposal contained in Docket 419.

14    "Nonpublic documents and things relating to

15  Plaintiffs' trade secret (plural) as identified on their

16  disclosures, owned by, created, in whole or in part, by or

17  originating with Masimo or Cercacor."

18    Then 230 was a no, denied.

19    231 is a denied.

20    232 is denied.

21    233 is denied.

22    234 is denied.

23    And 235 was previously resolved.

24    Actually, let me go back and look at 234 for a

25  moment.

1          235 is out.

2     **(Pause)**

3          You know what?  234, I have a question mark.  And I

4   don't remember if we discussed 234.  Did we specifically

5   discuss 234?

6          **MR. LERMA:**  I think only as part of a group, Your

7   Honor.

8          **THE COURT:**  All right.  It has to do with part of the

9   problem is the former employee.  And the physiological

10  monitoring technology is broader than some of the other ones

11  that I've granted.

12         What was the -- can you tell me what the resolution

13  was with respect to 235?

14         **MS. SAMPLIN:**  I believe I have that, Your Honor.

15         The resolution, Your Honor, for 235 was:

16         "Any disclosure to Apple regarding pulse rate or

17          oxygen saturation by any former employee."

18         **MR. POWELL:**  And Your Honor, if I may?

19         We had a similar proposal on 234 that was in Docket

20  419 limiting this to pulse rate and pulse oximetry.

21         **THE COURT:**  All right.  Let me hear from Apple why a

22  similar striking of "any physiological monitoring technology"

23  and replacing it with "any pulse rate or oxygen saturation

24  technology" would still be overbroad in Number 234.

25         **MS. SAMPLIN:**  Your Honor, they didn't propose a

1    limitation with pulse rate or oxygen saturation.  That was why

2    we rejected their proposal.

3              THE COURT:  Right.  I'm now proposing it.

4              MS. SAMPLIN:  Okay.

5              THE COURT:  Let me know what you think.

6              MR. LERMA:  So I think that -- to be as straight-

7    forward as I can on the fly -- I think the difference is that

8    you've got a bunch of commas and disjunctives here.  And so

9    even if you were to try and limit it that way --

10             THE COURT:  Let me read this to you.

11             MR. LERMA:  -- you would still have --

12             THE COURT:  Let me read this to you.

13             MR. LERMA:  Yeah.

14             THE COURT:  "All documents and things that refer to,

15                 relate -- refer or relate to any pulse rate or oxygen

16                 saturation technology that was developed or

17                 manufactured by Plaintiffs or any former employee."

18                 (Period).

19             MR. LERMA:  Right.  And that would be, for example --

20   and this puts us back where we were before.  That would include

21   or relate to, for example, any document or things that relate

22   to the products that we sold for them.  That was why we

23   rejected this one.  We couldn't find a way to fix it.

24             THE COURT:  How about excluding marketing materials?

25             MS. SAMPLIN:  The --

1   **MR. LERMA:**  It would still -- go ahead.

2   **MS. SAMPLIN:**  Yeah.  I was just going to say, the

3   reason we agreed to the modification for 235 because it was a

4   disclosure to Apple regarding pulse rate or oxygen saturation

5   by any former employee.  So I think that's their argument.

6   They --

7   **THE COURT:**  But this is developed or manufactured.

8   That seems even more restrictive than coming from Plaintiffs

9   which could be all sorts of different things.

10  **MS. SAMPLIN:**  But it's all the former employees.  And

11  so that's I think it still suffers from the overbreadth.

12  **THE COURT:**  Isn't Number 235 all former employees?

13  **MS. SAMPLIN:**  Right, but disclosed to Apple.  So

14  we're searching in Apple's files for things that were

15  disclosed.

16  **THE COURT:**  If I got rid of any former employees it

17  wouldn't narrow this at all.

18  **MR. LERMA:**  No I mean that's -- there's all these

19  "or's".  But to Your Honor's point, it wouldn't just be

20  marketing; it would be anything about since it's developed or

21  manufactured, it's anything about any of their products.  Full

22  stop.

23  **THE COURT:**  Well, pulse rate or oxygen saturation

24  technology.

25  **MR. LERMA:**  But that's what their products do.  They

1    don't anything else.

2             **THE COURT:**  Excluding marketing materials.

3             **MR. LERMA:**  Right.  Even if you exclude marketing

4    materials, it's still everything related to their products.  We

5    just could not find a way to fix it.

6             **THE COURT:**  Why would you have things relating to

7    their products other than in the marketing that we talked about

8    earlier?

9             **MR. LERMA:**  Because we sell them and have for --

10            **THE COURT:**  That's marketing material.

11            **MR. LERMA:**  And I think part of the --

12            **THE COURT:**  That's what we're --

13            **MR. LERMA:**  No, not just mark -- we have

14   everything --

15            **THE COURT:**  Anything relating to sales or marketing.

16            **MR. LERMA:**  What's that?

17            **THE COURT:**  Excluding sales or marketing.

18            **MR. LERMA:**  That's my point is there's a whole

19   universe when you sell something that has nothing to -- we're

20   not just engaged in the sales -- the marketing.  We actually

21   have the store.  And so there's communications about how much

22   of these do you want?  How much are you paying?  When are you

23   getting them?  There's all this stuff that has nothing to do

24   with the case.

25            And just to give Your Honor some idea, the stuff that

1   we're talking about of theirs is a thing that goes on your

2   finger.  And then in many instances it connects to a phone,

3   including ours.  So we're talking about a large universe of

4   stuff with 234 that we couldn't find a way to fix that doesn't

5   have anything to do with the case.

6          THE COURT:  All right.  Anything further from

7   Plaintiffs on 234?

8          MR. POWELL:  Not unless Your Honor has any questions

9   for us.

10          THE COURT:  Well, I'm probably going to deny the

11   motion.  So if you have anything you want to add, add it now,

12   just as to 234.

13          MR. POWELL:  Okay.  Thank you, Your Honor.

14          I would think that the pulse rate and oxygen

15   saturation limitation is more than appropriate.

16          And Counsel has identified sales and marketing

17   documents as being a problem and we can easily exclude those.

18   And that is, again, after discussing about excluding those,

19   Counsel mentioned that documents about how many products are

20   purchased and how many products are shipped to stores and that

21   kind of thing, those are, again, part of the sales and

22   marketing.

23          If it helps, we can change this to exclude nonpublic

24   -- or I'm sorry, to include only nonpublic documents and

25   exclude any of these public documents that might be out there

1  that they're referring to.

2          But I do think this is directly relevant.  It's

3  similar to what they agreed to on 235.  And I do think it is

4  appropriate.

5          **MR. LERMA:**  It's not remotely.

6          **THE COURT:**  Whoa, whoa, whoa, I'll let you know if I

7  need to hear further argument.

8          **MR. LERMA:**  Apologies.

9      **(Pause)**

10         **THE COURT:**  I'm going to add 234 to the Category 9,

11 that you folks are to meet and confer further on this to see

12 whether since we're really talking about what needs to be

13 excluded from an otherwise broadly relevant but argument is

14 overbroad request, that you folks are to meet and confer

15 further with respect to 234.

16         It's denied without prejudice, following the meet and

17 confer, to Plaintiff filing a notice that it could not be

18 resolved.

19         **MR. POWELL:**  Understood, Your Honor.

20         **THE COURT:**  I'm working my way backwards to make sure

21 I've got everything down.

22     **(Pause)**

23         All right.  Adding Number 5, 67 through 70,

24 155 through 157 or 67 through 69, it's denied.

25         70 is denied but it's subject to what's been

1  confirmed at the hearing with that Apple will comply as

2  modified to replace "accused of infringement" with "Plaintiffs'

3  trade secret disclosures".

4          As to 155, that's a deny.

5          166 -- is a grant -- I'm sorry.

6          156 is a grant;

7          And 157 is a grant but with the reference to, "or any

8  other government agency," stricken.

9          Roman Numeral 4, 165 to 170.

10          165, and reworded, "All documents and things

11 reflecting an intent by Apple to investigate for commercial use

12 technology based on Masimo's MightySat Pulse Oxsimeter".

13          And similar for 166, with the difference being the

14 iSpO2 Pulse Oximeter.  So those are both granted as reworded.

15          And the motion is denied as to 167, 168, 169 and 170.

16          Moving back to heading Roman Numeral 3, I think these

17 have largely been withdrawn, except for 104 and 105 which were

18 denied.  And the basis for the denial was overbreadth, not

19 reasonably calculated or not proportional to the needs of the

20 case, and not sufficiently reasonably narrowly tailored with

21 respect to 104 and 105.

22          And then finally, Category Heading Roman Numeral 2:

23          Number 82, that has been withdrawn as moot.

24          Number 98, also withdrawn.

25          Number 99, also withdrawn.

1          Number 107 was withdrawn in the filing on Tuesday.

2          163 is also withdrawn.

3          And 164 is a grant.  And I don't think there was any

4   change to the language of 164.

5          **MS. SAMPLIN:**  No, there was not, Your Honor.

6          **THE COURT:**  Yes, so 164 is a grant.

7          What's a reasonable time to make production or

8   respond to Interrogatory Number 10?  I think, Plaintiffs, you

9   asked for 14 days on the motion.

10          Is there any separate request based on the current

11  status of the case?

12          **MR. POWELL:**  I think we would leave it with our

13  request on the motion.

14          **THE COURT:**  Okay.  Mr. Lerner, do you want to be

15  heard on the amount of time needed to comply?

16          **MR. LERMA:**  On the -- on the -- sorry for pausing for

17  a second.

18          On the interrogatories -- on the interrogatory, two

19  weeks works.

20          **THE COURT:**  All right.  What about the production of

21  documents?

22          **MR. LERMA:**  Given the number that we are talking

23  about here and the ongoing discussions about terms and

24  custodians, that is obviously more difficult, particularly

25  because some of these, as Your Honor has indicated, are

1    substantial.  I certainly think we --

2            THE COURT:  Let me interrupt.

3            As of this moment your discovery cutoff is July 5th?

4        MR. LERMA:  Yep.

5            THE COURT:  I wouldn't want to set it out beyond

6    then.

7            MR. LERMA:  Understood.

8            THE COURT:  July 5th is I think it's a federal

9    holiday; it may not be a holiday for the entire entirety of

10   folks but how about today is the 3rd; how about by Friday, June

11   21 which would be 22 days.  And obviously if the parties get an

12   extension of the discovery cutoff, they can agree amongst

13   themselves to extend the dates.

14           MR. KATZENELLENBOGEN:  Your Honor, I believe that's a

15   Monday.

16           THE COURT:  I'm sorry.  June 25.  What did I say?

17           MR. LERMA:  June 25th works, Your Honor.  Obviously

18   we'll confer with counsel if there's --

19           THE COURT:  You don't need an extension if it's

20   granted by the other side if for whatever reason as you work

21   things out you discover more time is needed.

22           All right.  So why don't -- I'll leave the

23   Interrogatory Number 10 supplemental response due by June 17th,

24   and any further production of documents due by June 25th, and

25   the parties may, on their own without coming to court, grant

1    extensions for such further responses as they may agree.

2           Is there anything further that we should take up on

3    this motion, Number 357?

4           **MR. POWELL:**  Nothing from Masimo, Your Honor.

5           **THE COURT:**  And from Apple?

6           **MR. LERMA:**  No, Your Honor, thank you for your time.

7           **THE COURT:**  All right.  Thank you.  You-all have a

8    good day.

9           **MR. LERMA:**  You too.

10          **MR. POWELL:**  Thank you, Your Honor.

11          **(Proceeding adjourned at 12:59 p.m.)**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    June 5, 2021

        Signed                                    Dated


*TONI HUDSON, TRANSCRIBER*