Joseph R. Re (Bar No. 134479)
joseph.re@knobbe.com
Stephen C. Jensen (Bar No. 149894)
steve.jensen@knobbe.com
Benjamin A. Katzenellenbogen (Bar No. 208527)
ben.katzenellenbogen@knobbe.com
Perry D. Oldham (Bar No. 216016)
perry.oldham@knobbe.com
Stephen W. Larson (Bar No. 240844)
stephen.larson@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, Fourteenth Floor
Irvine, CA 92614
Telephone: (949) 760-0404; Facsimile: (949) 760-9502

Adam B. Powell (Bar. No. 272725)
adam.powell@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
3579 Valley Centre Drive
San Diego, CA 92130
Telephone: (858) 707-4000; Facsimile: (858) 707-4001

Attorneys for Plaintiffs,
MASIMO CORPORATION and CERCACOR LABORATORIES, INC.

# IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| MASIMO CORPORATION, a Delaware corporation; and CERCACOR LABORATORIES, INC., a Delaware corporation <br><br> Plaintiffs, <br><br> v. <br><br> APPLE INC., a California corporation <br><br> Defendant. | Case No. 8:20-cv-00048-JVS-JDE <br><br> **SUPPLEMENTAL DECLARATION OF ADAM B. POWELL IN SUPPORT OF PLAINTIFFS' MOTION FOR RECONSIDERATION OF THE COURT'S JUNE 10 ORDER DENYING MOTION TO COMPEL DISCOVERY FROM TIM COOK (DKT. 455)** <br><br> [Discovery Document: Referred to Magistrate Judge John D. Early] <br><br> Date: Sept. 2, 2021 <br> Time: 10:00 a.m. <br> Ctrm: 6A <br><br> Discovery Cut-Off: 3/7/2022 <br> Pre-Trial Conference: 11/21/2022 <br> Trial: 12/6/2022 |

I, Adam B. Powell, hereby declare as follows:

1.     I am a partner in the law firm of Knobbe, Martens, Olson & Bear, LLP, counsel for Plaintiffs Masimo Corporation and Cercacor Laboratories, Inc. (collectively, "Masimo") in this action.  I have personal knowledge of the matters set forth in this declaration and, if called upon as a witness, would testify competently thereto.  I submit this Supplemental Declaration in Support of Plaintiffs' Motion for Reconsideration of the Court's June 10 Order Denying Motion to Compel Discovery From Tim Cook (Dkt. 455).

2.     Attached hereto as **Exhibit 23** is a true and correct copy of a printout of the webpage located at https://9to5mac.com/2021/07/22/youtuber-sends-airtag-to-tim-cook-and-apple-returns-it-with-a-letter/, entitled "YouTuber sends AirTag to Tim Cook, and Apple returns it with a letter," dated June 22, 2021.

3.     Attached hereto as **Exhibit 24** is a true and correct redacted copy of an email from myself to Jason Lo (who is counsel for Apple), dated July 29, 2021.  I intended to send this email in a reply to Exhibit I of the Lerner Declaration (Dkt. 479-1), but invertedly included this email in a reply to a more recent email from Mr. Lo.  As of this date, Apple has not responded to my email.

4.     Attached hereto as **Exhibit 25** is a true and correct copy of *The trouble with patent-troll-hunting*, Economist, Dec. 14, 2019.

5.     Attached hereto as **Exhibit 26** is a true and correct copy of *Hearing on Online Platforms and Market Power, Part 6*, 116th Cong. (2020) (Questions for Rec. from Hon. Henry "Hank" Johnson, Jr.; Questions for Tim Cook, CEO, Apple, Inc.).

I declare under the penalty of perjury that the foregoing is true and correct.  Executed on August 5, 2021, at Irvine, California.

                    */s/ Adam B. Powell*
                    Adam B. Powell

53918143

-1-

# EXHIBIT 23

9T⊙5Mac ⌄

Exclusives   Guides ⌄   Mac ⌄   iPhone ⌄   Watch ⌄   iPad ⌄   Music ⌄   TV ⌄

JULY 22

## YouTuber sends AirTag to Tim Cook, and Apple returns it with a letter

Filipe Espósito - Jul. 22nd 2021 7:33 pm PT   🐦 @filipeesposito



**Apple HQ**
Apple Park, 1 Apple Park Way, Cupertino, CA  95014, United States
1 minute ago

35 Comments   f  🐦  📌  in  🔴

We have already seen some really amusing stories about how people have been using AirTags since they were introduced earlier this year. However, an YouTuber decided to do something bold and sent three AirTags to different places. One of them was sent to none other than Tim Cook at Apple Park.

Exhibit 23
-2-



YouTube channel MegaLag sent one AirTag addressed to Tim Cook and another to Elon Musk. Not satisfied with just those two adventures, he also sent another AirTag to North Korea. The whole story is quite long and has been split into two videos, but they are quite interesting as the YouTuber details what happened to each AirTag and how the item tracker worked on each journey.

The AirTags were all shipped from Frankfurt, Germany, and the Find My network was able to show where the packages were located. The Find My app located the AirTags in places such as DHL facilities and even at the airport before they left for other countries.

Interestingly, the AirTag sent to Apple Park was suddenly identified somewhere in Nevada, US. The YouTuber checked Flight Radar and found that the flight carrying his package flew over that place, so presumably the AirTag communicated with someone's iPhone on the plane and immediately sent the location to Find My.

The AirTag sent to Elon Musk arrived at SpaceX headquarters and stayed there for two and a half weeks, when it was then detected at a recycling center before its last signal in Castaic, California. Unsurprisingly, the AirTag sent to North Korea never reached its destination. A fun fact is that the AirTag was shipped to South Korea instead, but it never showed up on Find My since the Find My network is not available there due to local regulation.

The AirTag sent to Tim Cook, on the other hand, arrived at Apple Park and stayed there for six weeks before being sent back to Germany. It turns out that Apple returned the AirTag with a letter to the YouTuber. The letter was even printed on a paper with rounded corners, and was signed by one of Tim Cook's assistants.

The assistant, identified as Michael, said that the company was "delighted to hear about creative uses for AirTags" and mentioned that Tim Cook receives hundreds of letters every month, but that he can't answer all the letters himself. Still, it is quite interesting to see that someone at Apple actually took the package, wrote a letter, and returned it.

Exhibit 23
-3-



9TO5Mac

Exclusives    Guides ▾    Mac ▾    iPhone ▾    Watch ▾    iPad ▾    Music ▾    TV ▾



> *Dear Jonathan,*
>
> *Thank you for sharing about your project for Apple AirTags. We're delighted to hear about creative uses for AirTags and how they can improve our customers' lives. As you can imagine, Mr. Cook receives hundreds of letters each month from customers like yourself. Unfortunately he is unable to respond to every request. But we hope you continue to enjoy your AirTag as it returns from its unique journey across the world!*

You can check out the full story in the two videos below:

**I sent an AirTag to North Korea, Tim Cook and Elon Musk!**



Exhibit 23

-4-

9TO5Mac

Exclusives    Guides ▾    Mac ▾    iPhone ▾    Watch ▾    iPad ▾    Music ▾    TV ▾

## Read also:

- Apple releases new AirTag loops and keyring through its Amazon storefront
- Apple releases new colors for AirTag leather key ring and leather loop
- A reader made this fake AirTag Hermès Key Ring, and you can too

*FTC: We use income earning auto affiliate links.* More.




Check out 9to5Mac on YouTube for more Apple news:

Eve Spectrum 4K/144Hz Review - A Great Gaming Monitor with a …



Exhibit 23
-5-

9T○5Mac

Exclusives    Guides ▾    Mac ▾    iPhone ▾    Watch ▾    iPad ▾    Music ▾    TV ▾

# Guides



### AirTag
AirTag is Apple's rumored Tile-like item tracker.



### AirTags

# About the Author



### Filipe Espósito
🐦 @filipeesposito

Filipe Espósito is a Brazilian tech Journalist who started covering Apple news on iHelp BR with some exclusive scoops — including the reveal of the new Apple Watch Series 5 models in titanium and ceramic. He joined 9to5Mac to share even more tech news around the world.



**Apple now selling standalone Magic Keyboard w/ Touch ID**

**Everything we know so far about Apple Watch Series 7**

**Apple Stores float new portless MagSafe dock design**

Exhibit 23
-6-

9TO5Mac

Exclusives    Guides ▾    Mac ▾    iPhone ▾    Watch ▾    iPad ▾    Music ▾    TV ▾

Exhibit 23
-7-

# EXHIBIT 24

| From: | Adam.Powell |
|---|---|
| To: | Lo, Jason |
| Cc: | Masimo.Apple; *** Apple-Masimo |
| Subject: | RE: Masimo v. Apple - 30(b)(6) Notice |
| Date: | Thursday, July 29, 2021 2:00:09 PM |

Jason,

Thank you for agreeing to search Mr. Williams' ESI.  We disagree with the remainder of your email, including your characterizations of our motion for reconsideration.  We do not believe Apple has presented any basis for its demand that we withdraw our motion.  Indeed, Apple is demanding Masimo accept Apple's view of Mr. Williams' documents without first seeing those documents itself.  The simple way to resolve this dispute is to search Mr. Cook's ESI.

Best regards,
Adam

**Adam Powell**
Partner

858-707-4245  Direct

**Knobbe Martens**

**From:** Lo, Jason <JLo@gibsondunn.com>
**Sent:** Wednesday, July 28, 2021 11:12 AM
**To:** Adam.Powell <Adam.Powell@knobbe.com>
**Cc:** Masimo.Apple <Masimo.Apple@knobbe.com>; *** Apple-Masimo <Apple-Masimo@gibsondunn.com>
**Subject:** RE: Masimo v. Apple - 30(b)(6) Notice

Adam,

With regard to topic 3, Apple's witness will address Apple's handling of the relevant files, including any steps taken that resulted in the files no longer being available many years after the relevant employees left Apple.

With regard to topic 7, Apple will not limit the topic to a particular form of electronic communication.  Apple's witness will provide testimony on Apple's capability to search all electronic communication streams to the extent that those forms of communication are used for work-related purposes.

**Jason C. Lo**

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7153 • Fax +1 213.229.6153
JLo@gibsondunn.com • www.gibsondunn.com

Exhibit 24
-8-

**From:** Adam.Powell <Adam.Powell@knobbe.com>
**Sent:** Tuesday, July 27, 2021 10:25 AM
**To:** Lo, Jason <JLo@gibsondunn.com>
**Cc:** Masimo.Apple <Masimo.Apple@knobbe.com>; *** Apple-Masimo <Apple-Masimo@gibsondunn.com>; Schuemann, Susanna G. <SSchuemann@gibsondunn.com>
**Subject:** RE: Masimo v. Apple - 30(b)(6) Notice

   **[WARNING: External Email]**

Jason,

We have not received a response to this email.  Please provide Apple's position on Topics 3 and 7.

Best regards,
Adam

**Adam Powell**
Partner

858-707-4245 **Direct**

**Knobbe** **Martens**

---

**From:** Adam.Powell <Adam.Powell@knobbe.com>
**Sent:** Friday, July 23, 2021 7:04 PM
**To:** jlo@gibsondunn.com
**Cc:** Masimo.Apple <Masimo.Apple@knobbe.com>; *** Apple-Masimo <Apple-Masimo@gibsondunn.com>; Schuemann, Susanna G. <SSchuemann@gibsondunn.com>
**Subject:** RE: Masimo v. Apple - 30(b)(6) Notice

Jason,

It was nice to meet you today.  I write to memorialize our call on Masimo's first 30(b)(6) deposition notice.

For topics 1, 2, and 4-6, you indicated Apple changed the wording of its response to avoid admitting certain facts exist.  Apple was not relying on its objections to narrow these topics and did not intend to narrow these topics, other than explaining it would not provide privileged information or information Apple does not know.  Thus, the parties agree Apple will designate a witness to testify on the full scope of these topics.

For topic 3, you indicated you did not know what we meant by "removing."  I explained that we were referring to Brian Andrea's emails on this topic, which repeatedly use the word "removing."  Part of the parties' dispute is that Apple has not explained what it meant by the word "removing."  The topic includes the circumstances surrounding the relevant files no longer being available for any reason, whether that be by "removal," "destruction," or whatever other term Apple's witness will use.  You indicated the parties likely did not have a dispute, but would let us know.

Exhibit 24
-9-

For topic 7, we discussed whether Apple was narrowing this topic (1) to exclude "other electronic communication streams" or (2) based on the phrase "for any purpose."  On the first issue, you indicated Apple's witness would likely be prepared to discuss whether such communication streams exist and, if so, any software capable of searching them.  You also indicated that Apple was not excluding software capable of searching communication streams used for a purpose other than e-discovery (e.g., software available to Apple's IT team but not to the legal department).  However, you indicated that you would confirm Apple's position on both issues.

Finally, you indicated Apple would designate Robin Goldberg on all topics and that she is out of the country until August 16.  You indicated the first date that worked for her and counsel was August 31.  You also indicated that she would testify in person, but asked us to agree to hold the deposition at Gibson Dunn's Palo Alto office.  We agreed to get back to you on the date and location.

Best regards,
Adam

**Adam Powell**
Partner
**858-707-4245 Direct**
**Knobbe Martens**

---

**From:** Adam.Powell <Adam.Powell@knobbe.com>
**Sent:** Thursday, July 22, 2021 4:55 PM
**To:** Schuemann, Susanna G. <SSchuemann@gibsondunn.com>; *** Apple-Masimo <Apple-Masimo@gibsondunn.com>
**Cc:** Masimo.Apple <Masimo.Apple@knobbe.com>
**Subject:** RE: Masimo v. Apple - 30(b)(6) Notice

Hi Susanna,

1:30 works for me.  Please use the following dial in:



Best regards,
Adam

**Adam Powell**
Partner
**858-707-4245 Direct**
**Knobbe Martens**

---

**From:** Schuemann, Susanna G. <SSchuemann@gibsondunn.com>
**Sent:** Thursday, July 22, 2021 8:09 AM

Exhibit 24
-10-

**To:** Adam.Powell <Adam.Powell@knobbe.com>; *** Apple-Masimo <Apple-Masimo@gibsondunn.com>
**Cc:** Masimo.Apple <Masimo.Apple@knobbe.com>
**Subject:** RE: Masimo v. Apple - 30(b)(6) Notice

Adam,

Can we speak at some point between 12:30-2pm on Friday?

Susanna

**Susanna G. Schuemann**

## GIBSON DUNN

Gibson, Dunn & Crutcher LLP
555 Mission Street, San Francisco, CA 94105-0921
Tel +1 415.393.8321 • Fax +1 415.374.8455
SSchuemann@gibsondunn.com • www.gibsondunn.com

---

**From:** Adam.Powell <Adam.Powell@knobbe.com>
**Sent:** Wednesday, July 21, 2021 2:33 PM
**To:** Schuemann, Susanna G. <SSchuemann@gibsondunn.com>; *** Apple-Masimo <Apple-Masimo@gibsondunn.com>
**Cc:** Masimo.Apple <Masimo.Apple@knobbe.com>
**Subject:** RE: Masimo v. Apple - 30(b)(6) Notice

   **[WARNING: External Email]**
Susanna,

We received Apple's objections and are ready to meet and confer.  I am not available on Thursday but can talk this afternoon or anytime on Friday.  Please let me know when is a convenient time for you.

Please also provide dates when Apple's designee will be available.

Best regards,
Adam

**Adam Powell**
Partner

858-707-4245 **Direct**

**Knobbe Martens**

---

**From:** Adam.Powell <Adam.Powell@knobbe.com>

Exhibit 24
-11-

**Sent:** Tuesday, July 20, 2021 11:04 AM
**To:** Schuemann, Susanna G. <SSchuemann@gibsondunn.com>; *** Apple-Masimo <Apple-Masimo@gibsondunn.com>
**Cc:** Masimo.Apple <Masimo.Apple@knobbe.com>
**Subject:** RE: Masimo v. Apple - 30(b)(6) Notice

Susanna,

We are surprised Apple anticipates serving objections.  Please do so today so that we can consider them in a timely manner.  After we have had a chance to review Apple's objections, we will arrange a time to meet and confer.

Best regards,
Adam

**Adam Powell**
Partner
858-707-4245 **Direct**

**Knobbe Martens**

---

**From:** Schuemann, Susanna G. <SSchuemann@gibsondunn.com>
**Sent:** Tuesday, July 20, 2021 9:09 AM
**To:** Adam.Powell <Adam.Powell@knobbe.com>; *** Apple-Masimo <Apple-Masimo@gibsondunn.com>
**Cc:** Masimo.Apple <Masimo.Apple@knobbe.com>
**Subject:** RE: Masimo v. Apple - 30(b)(6) Notice

Hi Adam,

Apple's designee will be out of the country on July 26, so we will need to discuss a mutually convenient time and place for this deposition.  We anticipate serving objections shortly and are available to meet and confer on Thursday from 10am-12pm.  Does that window work for you?

Thanks,
Susanna

**Susanna G. Schuemann**

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP
555 Mission Street, San Francisco, CA 94105-0921
Tel +1 415.393.8321 • Fax +1 415.374.8455
SSchuemann@gibsondunn.com • www.gibsondunn.com

Exhibit 24
-12-

**From:** Adam.Powell <Adam.Powell@knobbe.com>
**Sent:** Monday, July 19, 2021 7:39 PM
**To:** *** Apple-Masimo <Apple-Masimo@gibsondunn.com>
**Cc:** Masimo.Apple <Masimo.Apple@knobbe.com>
**Subject:** Masimo v. Apple - 30(b)(6) Notice

**[WARNING: External Email]**

Counsel,

On July 12, Masimo served a 30(b)(6) notice on Apple pursuant to the Court's June 17 Order.  We noticed the deposition for July 26.  We write to conduct a meet and confer to confirm you have no objections to the matters listed, as we intended to track the Court's order as closely as possible.  Please let us know when you are available to discuss.  I am generally free from 10:30 – 4 pm tomorrow and most of the day on Wednesday.
Thanks,
Adam

**Adam Powell**
Partner
858-707-4245 **Direct**

**Knobbe** **Martens**

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Exhibit 24
-13-

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

Exhibit 24
-14-

# EXHIBIT 25



Business
Dec 14th 2019 edition ›

Intellectual property

# The trouble with patent-troll-hunting

**Rules to curb frivolous patent claims may encourage infringement**



Bloomberg

Dec 14th 2019
NEW YORK

Nucurrent, a startup in Chicago, has come up with a way to charge electronic gizmos wirelessly—a nifty trick for devices such as smartphones. So nifty, in fact, that Samsung, a giant South Korean device-maker, uses it in its mobile phones—or so NuCurrent claims. In 2018 NuCurrent sued Samsung in America for using its technology without paying royalties. In February Samsung denied NuCurrent's allegations in a court filing. Then, between March and June, it filed seven legal challenges against NuCurrent's patents. Navigating each will cost NuCurrent between $500,000 and $1m, says its boss, Jacob Babcock—a lot of money for a firm with 35 employees and no in-house lawyers.

Predicaments like Mr Babcock's are increasingly common. Paul Michel, a former top judge on America's patent court, attributes them to an "unco-ordinated overcorrection" to the plague of patent trolls, who accumulate patent rights with an eye to extorting payments

Exhibit 25
-15-

from supposed infringers. To fight them, America's government has weakened some intellectual-property protections, notably by reducing the threat of an injunction to block sales of the technology in question. In 2012 it created the Patent Trial and Appeal Board (ptab) to hear retrospective challenges to a patent's validity. And Supreme Court rulings have made it easier to prove patents invalid by narrowing the criteria for what constitutes an eligible patent.

The well-meaning rules appear to have beaten back the trolls; the number of patent disputes this year is down 37% from 2015, according to Unified Patents, a research firm. The ptab has invalidated thousands of patents. But the reforms have strengthened the position of big firms in relation to the little guy, say entrepreneurs and venture capitalists. Christopher Coons, a Democratic senator critical of the rule changes, has spoken of a "steady erosion of patent rights". Worse, Mr Coons has argued, they create perverse incentives for big companies to flout patents. Boris Teksler, Apple's former patent chief, observes that "efficient infringement", where the benefits outweigh the legal costs of defending against a suit, could almost be viewed as a "fiduciary responsibility", at least for cash-rich firms that can afford to litigate without end.

Samsung's fellow tech giants, including Apple, Google and Intel, have filed numerous patent-validity reviews. Big Tech is, predictably, firmly opposed to tougher rules, which Mr Coons and others have proposed. Supporters of strengthening note that weakened patent protection has coincided with a decline in the share of American venture capital going to patent-heavy fields like advanced manufacturing or medical technology, from 21% to 3% between 2004 and 2017, according to a study commissioned by the National Venture Capital Association, an industry body. Richardson Oliver Insights, a research firm, reckons the average value of an American patent traded in the secondary market fell by 58% from 2013 to 2018. Feebler intellectual-property rights may not be the sole explanation. But having long harrangued China for its disrespect of such rights, America now finds itself badgered, too.

*This article appeared in the Business section of the print edition under the headline "The trouble with troll-hunting"*

Exhibit 25
-16-

# EXHIBIT 26

**Online Platforms and Market Power Part 6: Examining the Dominance of Amazon, Apple, Facebook, and Google**

**Questions for the Record from the Honorable Henry "Hank" Johnson, Jr.**

**Questions for Tim Cook, CEO, Apple, Inc.**

1. **"Efficient infringement"—the use of another company's patents without authorization, based on the understanding that litigation will be too slow to meaningfully stop the infringement and will ultimately only result in the payment of a royalty if the suit is lost (approximately the same royalty that would be paid up front if a license were taken) is a way in which dominant companies currently may be stifling innovation and undermining competitors.**

   **Apple's former patent chief even admitted as much: "efficient infringement, where the benefits outweigh the legal costs of defending against a suit, could almost be viewed as a 'fiduciary responsibility,' at least for cash-rich firms that can afford to litigate without end."[1] As the Chairman of the subcommittee with responsibility for oversight of the patent system, I am concerned about the impact of efficient infringement on the ability of patents to spur innovation and allow startups to effectively compete against established companies.**

Apple is a leading innovator in the fields of wireless communication and mobile devices. Over the past decade, Apple products like the iPhone and iPad have revolutionized these industries. Innovating on this scale requires an extraordinary investment of energy and resources, and Apple relies in part upon a healthy patent system to protect this investment. Apple owns thousands of U.S. patents and is licensed to use thousands more. And when disputes arise, Apple sometimes finds itself in court, whether to enforce its own rights or to defend against allegations of infringement levied by another firm. Apple therefore has a keen interest in a balanced patent system that encourages competition and innovation, and discourages hold-up and waste.

The concept of "efficient infringement" is an anathema to Apple. This is not a concept or idea embraced by our company. As for the individual cited in the article, he is not an Apple employee, he was never the "patent chief" at Apple, and he does not speak for the company. And, since leaving Apple seven years ago, he has gone on to work for several patent assertion entities ("PAEs"), sometimes referred to as patent trolls. He is currently employed by Conversant, one of the largest PAEs in the world. These entities are hardly champions of innovation, entrepreneurs, or start-ups.

The verdict in *Wisconsin Alumni Research Foundation v. Apple Inc.* referenced in the article was overturned two years ago. The Federal Circuit found that, as a matter of law, the jury was incorrect, and that Apple did *not* infringe WARF's patent. WARF petitioned for and was denied further review by the Supreme Court in October 2019.

---

[1] Joe Nocera, *Why Sonos Has Already Lost Its Patent Suit Against Google*, Bloomberg (Jan. 10, 2020), https://www.bloomberg.com/opinion/articles/2020-01-10/even-if-sonos-wins-its-suit-against-google-it-loses.

Exhibit 26
-17-

**1.1  To me, these factors suggest that the Supreme Court's decision in *eBay v. MercExchange*, 547 U.S. 388 (2006), to reverse the presumption of awarding injunctive relief to a prevailing patent owner should be reevaluated to ensure that smaller patent owners are playing on a level playing field in patent disputes. Do you agree or disagree, and why?**

Injunctive relief is equally available to "smaller patent owners" and larger ones. *eBay* properly emphasizes that injunctive relief should only be available to avoid irreparable harm, when monetary relief is not sufficient, and after weighing both the balance of hardships and the public interest. Injunctions remain available to protect true innovation from infringement by competitors. Over 1,000 permanent injunctions have been granted in patent litigation matters in the last five years. When requested, permanent injunctions are granted in almost 90% of cases.[2]

*eBay* has made it difficult for PAEs to secure an injunction. These entities exist only to acquire and litigate patents. They "don't actually produce anything themselves."[3]  Instead, their business model is "to essentially leverage and hijack somebody else's idea and see if they can extort some money out of them."[4]  Because these entities' only aim is monetary relief, courts have correctly recognized that injunctive relief should not be available to them—they would abuse their injunctions to obtain improper leverage and extract outsized monetary settlements. Apple believes that *eBay* strikes a fair balance by making injunctive relief available only when monetary relief is insufficient.

Apple respectfully submits that a concern that requires further study and action is the plague of PAEs. Apple's commercial success has made it a target for PAEs. Our experience confirms what many others have documented: although PAE activity is not necessarily harmful in theory, far too many PAEs exist only to extract undeserved royalties. For example, one study estimated that patent litigation brought by PAEs in the United States resulted in expenditures of $29 billion in 2011 for licensing fees, legal fees, and other costs of responding to PAE litigation.[5]  Another study found, by looking at the impact on stock price, that lawsuits by PAEs from 1990 through 2010 were responsible for the defendants losing half a trillion dollars.[6]  And those losses are not offset by corresponding gains to patent holders that promote innovation. One study found that the profits received by PAEs from litigation amounted to less than 10% of the lost share value of companies targeted by the PAEs.[7]

**1.2  What steps does your company take to ensure that any intellectual property it gains access to during acquisition negotiations is not copied or used without authorization if those acquisition negotiations prove to be unfruitful?**

Apple respects the intellectual property rights of third parties and strictly protects third-party confidential information.

Apple enters into Non-Disclosure Agreements ("NDAs") with potential acquisition targets that set forth the requirements and restrictions for treatment, use, and destruction or return of information received

---

[2] Josh Landau, *Much Ado About Injunctions*, Patent Progress (Aug. 1, 2019), https://www.patentprogress.org/2019/08/01/much-ado-about-injunctions/.

[3] *President Obama Participates in a Fireside Hangout on Google+*, YouTube (Feb. 14, 2013), https://www.youtube.com/watch?v=kp_zigxMS-Y.

[4] *Id.*

[5] James Bessen & Michael J. Meurer, *The Direct Costs from NPE Disputes*, 99 Cornell L. Rev. 387, 389–90 (2014).

[6] James Bessen, Jennifer Ford, & Michael J. Meurer, *The Private and Social Costs of Patent Trolls*, 34 Regulation 26, 31 (2011-12).

[7] Bessen & Meurer, *supra*, at 411.

2

during negotiations.  The NDAs typically permit Apple to use the potential acquisition targets' information solely for evaluating and implementing a potential transaction and require Apple to limit disclosure of the potential acquisition targets' information to those with a need to know who are bound by confidentiality obligations to Apple.  When acquisition negotiations terminate, a target may ask Apple to destroy or return its confidential information.  Apple takes steps to ensure compliance with these requests and all other operative provisions in the NDAs, including requirements that information be used solely for a potential acquisition and no other purpose.

Apple also has policies that expressly prohibit the unauthorized use of third-party intellectual property.  When Apple hires an employee, the parties' employment agreement expressly provides that no third-party intellectual property may be used for work at Apple.  Apple also has an internal Business Conduct Policy for employees that prohibits the unauthorized use of third-party intellectual property.

3

Exhibit 26
-19-