# EXHIBIT 6

Joseph R. Re (Bar No. 134479)
joseph.re@knobbe.com
Stephen C. Jensen (Bar No. 149894)
stephen.jensen@knobbe.com  Irfan
Irfan A. Lateef (Bar No. 204004)
irfan.lateef@knobbe.com
Perry D. Oldham (Bar No. 216016)
perry.oldham@knobbe.com
Brian C. Claassen (Bar No. 253627)
brian.claassen@knobbe.com
**KNOBBE, MARTENS, OLSON
  & BEAR, LLP**
2040 Main Street, Fourteenth Floor
Irvine, CA  92614
Telephone:  (949) 760-0404
Facsimile:  (949) 760-9502

Attorneys for Plaintiffs,
Masimo Corporation and
Cercacor Laboratories, Inc.

Mark D. Kachner (Bar No. 234192)
mark.kachner@knobbe.com
**KNOBBE, MARTENS, OLSON
  & BEAR, LLP**
1925 Century Park East, Suite 600
Los Angeles, CA 90067 Telephone:
(310) 551-3450 Facsimile: (310)
601-1263

# IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| MASIMO CORPORATION, a Delaware corporation; and CERCACOR LABORATORIES, INC., a Delaware corporation,<br><br>Plaintiffs/Counterdefendants,<br><br>v.<br><br>TRUE WEARABLES, INC., a Delaware corporation; and MARCELO LAMEGO, an individual,<br><br>Defendants/Counterclaimants. | Case No. 8:18-CV-02001-JVS-JDE<br><br>**PLAINTIFFS' EXHIBITS 3-5, 8, AND 10 TO THE DECLARATION OF MARK D. KACHNER IN SUPPORT OF OPPOSITION TO APPLE INC.'S MOTION TO QUASH AND FOR A PROTECTIVE ORDER**<br><br>**Hon. James V. Selna**<br>**Hon. Magistrate John D. Early**<br><br>**[Discovery Document: Referred to Magistrate Judge John D. Early]**<br><br>**Hearing: June 24, 2021**<br>**Time: 10:00 a.m.**<br>**Court: Room: 6A** |

UNREDACTED VERSION OF DOCUMENTS FILED PURSUANT TO ORDER OF THE COURT DATED JUNE 24, 2021 (DKT. NO. 311)

Exhibit 6

# EXHIBIT 4

## [TRUE016520-522]

Exhibit 6

Stanford Alumni Mail - The three equations                                                                    11/24/18, 11:30 AM



## The three equations

**Marcelo Lamego** <mmlamego@stanfordalumni.org>                                          Wed, Oct 2, 2013 at 12:54 AM
To: tcook@apple.com

Dear Tim Cook,

I was approached by Apple in the beginning of this year (by David Affourtit and James Foster) and was asked if I would like to join the executive technical team. Because I did not want to sign the Apple's NDA  for an onsite interview, the process came to a halt. I felt that it was not appropriate to receive confidential information from or disclose confidential information to Apple given my fiduciary responsibilities as the Chief Technical  Officer of Cercacor.

I have developed several medical devices in the last 10 years and I am positively sure I could add a significant value to the Apple team, if I was given the chance of becoming part of  it  in a senior technical executive position and without conflicting with the large IP I have developed for Masimo and Cercacor during the same period.

What I am sure Apple soon  will realize  is that medical, wellness and fitness technologies are very deceptive in the sense that they are easy to develop for products that work in most (~80%) the users. Getting the same technology to work in almost the entire population is a problem extremely   more complex . This is the very reason most medical device startups become insolvent. Knowing Apple's reputation, I am sure you would not settle for even 99%, imagine then, 80%.

As you probably know, regulatory barriers are another important consideration when dealing with medical technologies in general. If the FDA or any other regulatory agency worldwide (i.e., Canada, Japan, Korea, Europe, etc.) believe your product should be regulated by their standards then,  the choice of intended use combined with the technology realization strategy can make the development shorten or longer by several years.

The reason I feel attracted by Apple as a company is not related to the things most people are interested in, i.e., brand recognition, great culture, great products,  great people. It has to do with the fact that, as an engineer, I realized that there are three important equations to be solved in order to create a competitive global medical, wellness and fitness product portfolio:

(i) The user equation - Apple has solved it and created the industry standard. With a brand recognition similar to the ones from luxury products, everybody is interested in understanding and using Apple's intuitive interfaces.

(ii) The patient equation - This is the deceptive part.

(iii) The connectivity equation - This can only be solved with scale and brand recognition, which are synonymous for Apple. Reliable wireless technology and device interoperability will become a must in the medical device segment.

**EXHIBIT 4**
**-36-**

CONFIDENTIAL
                                                                                    TRUE016520
                                                                                    Exhibit 6

Stanford Alumni Mail - The three equations                                                                    11/24/18, 11:30 AM

I believe Apple has solved (i) and has enough resources to solve (iii). I can help you to solve (ii).

I would appreciate if the content of this letter could be kept confidential, since it can jeopardize the outcome of my career at Cercacor.

I strongly believe that we can develop the  new wave of technology that will make Apple the number one brand in the medical, fitness and wellness device market. If you agree, feel free to contact me anytime.

All the best,

Marcelo Malini Lamego

18 Lyra Way

Coto de Caza CA 92679

Home phone: (949) 216-9294

My resume is available at http://www.linkedin.com/pub/marcelo-lamego/54/644/725

Confidentiality notice: This e-mail may contain information confidential and/or privileged from disclosure. If the reader is not the intended recipient, copying, dissemination or continued possession of this communication is strictly prohibited.

**EXHIBIT 4**
-37-

CONFIDENTIAL                                                                                   TRUE016521
                                                                                              Exhibit 6

Stanford Alumni Mail - Apple                                                                   11/26/18, 9:09 PM



Marcelo Lamego <mmlamego@alumni.stanford.edu>

---

## Apple

**David Affourtit** <affourtit@apple.com>                          Wed, Oct 2, 2013 at 10:25 AM
To: Marcelo Lamego <mmlamego@stanfordalumni.org>
Cc: Denby Frazier <denby@apple.com>

Hello Marcelo,

Thank you for your voicemail and follow up.  I saw your note to Tim Cook.  I'm glad you remain enthusiastic about Apple.

As I've transitioned out of the Exec Recruiting team into a management role, I've asked my associate from the Exec Recruiting team to reach out to you directly.  Her name is Denby Frazier, cc'd.

Denby, meet Marcelo, Marcelo, Denby.

All the best and thanks again!

Cheers,
Dave



**EXHIBIT 4**
-38-
CONFIDENTIAL                                                        TRUE016522
                                                                                Exhibit 6

EXHIBIT 8

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(SOUTHERN DIVISION - SANTA ANA)

MASIMO CORPORATION, ET AL,    ) CASE NO: 8:20-CV-00048-JVS-JDEx
                              )
              Plaintiffs,     )            CIVIL
                              )
     vs.                      )      Santa Ana, California
                              )
APPLE, INC,                   )      Thursday, June 10, 2021
                              )
              Defendant.      )     (10:01 a.m. to 10:19 a.m.)
_____

HEARING RE: PLAINTIFFS' MOTION TO COMPEL [DKT.NO.377]
AND ORDER DENYING THE MOTION

BEFORE THE HONORABLE JOHN D. EARLY,
UNITED STATES MAGISTRATE JUDGE

**APPEARANCES**:            SEE PAGE 2

Court Reporter:         Recorded; CourtSmart

Courtroom Deputy:       Maria Barr

Transcribed by:         Exceptional Reporting Services, Inc.
                        P.O. Box 8365
                        Corpus Christi, TX 78468
                        361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

**APPEARANCES**:


For Plaintiffs:          JOSEPH R. RE, ESQ.
                         Knobbe Martens Olson & Bear, LLP
                         2040 Main Street
                         14th Floor
                         Irvine, CA 92614

                         ADAM POWELL, ESQ.
                         Knobbe Martens Olson & Bear, LLP
                         12790 El Camino Real
                         San Diego, CA 92130


For Defendant:           JOSHUA H. LERNER, ESQ.
                         Gibson Dunn & Crutcher, LLP
                         555 Mission Street
                         Suite 3000
                         San Francisco, CA 94105

                         ANGELIQUE KAOUNIS, ESQ.
                         Gibson Dunn & Crutcher, LLP
                         2029 Century Park East
                         Suite 4000
                         Los Angeles, CA 90067

Exhibit 8

1        **Santa Ana, California; Thursday, June 10, 2021; 10:01 a.m.**

2                          **(Call to Order)**

3           **THE COURT:**  Good morning, everyone.

4        **(Attorneys greet the Court)**

5              We're calling the case of *Masimo Corporation, et al.*

6    *versus Apple, Inc.*; Central District of California Case Number

7    8:20-cv-48-JVS-JDEx.  We're here on Plaintiffs' Motion to

8    Compel which is Docket Number 377.

9              And we'll take appearances of counsel, starting with

10   counsel for Plaintiffs.

11          **MR. RE:**  Good morning, Your Honor.  Joseph Re from

12   Knobbe Martens.  With me is my partner, Adam Powell.

13          **THE COURT:**  Good morning.

14              And on behalf of Defendant?

15          **MR. LERNER:**  Good morning, Your Honor.  Joshua Lerner

16   and Angelique Kaounis from Gibson Dunn on behalf of Apple.  And

17   with us today is Ryan Moran, in-house counsel at Apple.

18          **THE COURT:**  All right.  Good morning.

19              All right.  We're here on the Motion to Compel.  I've

20   reviewed the motion; I've reviewed the joint stipulation; I've

21   reviewed declarations and exhibits offered in support and

22   opposition to the requested relief and Plaintiffs' supplemental

23   memorandum and related information.

24              We're going to get started.

25              I have a tentative.  I'm going to give you the short

4

1  version.

2          The tentative is I'm tentatively inclined to deny the

3  motion.

4          I'm going to assume, without deciding, that it was

5  Apple's burden here, based on both the case law and the

6  existing order previously entered by me in this case, that

7  Apple had the burden here to oppose the relief Plaintiffs seek

8  with respect to Mr. Cook's -- a search of Mr. Cook's -- or

9  designating Mr. Cook as an ESI custodian.

10         And although the apex doctrine relating to

11  depositions and 30(b) -- or depositions doesn't apply directly

12  here; some, but not all, of the considerations that underly

13  that doctrine apply; and that is that it is more burdensome.

14  And I don't need a declaration to know this; that it is more

15  burdensome to search the CEO of a multi-billion dollar, maybe

16  multi-trillion dollar international corporation for records.

17  But the burden is not the same as having that person appear for

18  an apex depositions but there is some burden, there is some

19  burden and that's facially apparent.

20         And the proffer made by Plaintiffs, I'm going to

21  characterize as relatively weak in connection with the

22  relevance of Mr. Cook's email and other electronically stored

23  information sources as it relates to the claim in this case --

24  claims in this case -- claims and defenses in this case.

25         Gonna have a big bright light proviso now.  Counsel

Exhibit 8

5

1   have heard me say this at least once, maybe twice.

2          I'm going on what's in front of me; and in

3   particular, I would take counsel at their word.  We've got

4   excellent counsel in this case.  And I've got a representation

5   by counsel for Apple -- and although only -- it's

6   electronically signed by one person, there are (one, two,

7   three, four, five, six) seven attorneys underneath that

8   signature so I'm attributing this to all those counsel and the

9   firm representing Apple and Apple itself.

10          Quote, page -- this is from page 9 of the Joint

11  Stipulation, (quote):

12          "Tim Cook (comma), Apple's CEO (comma), is not likely

13          to have discoverable information relevant to any

14          parties' claims or defenses." (period, close/quote).

15          It's a conclusory statement but it's made by an

16  Officer of the Court and Officers of the Court, to this Court

17  in connection with this motion.  And I want Apple and its

18  counsel to understand that's the basis for my tentative and

19  potentially the basis for my ruling.

20          The world's a funny place.  We talked about it

21  before.  Sometimes there are acquisitions.  Sometimes things

22  come out that no one knew were going to come out and no one

23  understood were going to come out that can change how things

24  are looked at later.

25          I'm accepting that representation, that counsel's

Exhibit 8

Case 8:20-cv-00048-JVS-JDE   Document 570-1   Filed 01/20/22   Page 13 of 593   Page ID #:42917

6

1   done an inquiry and based on their inquiry, Tim Cook is not

2   likely to have discoverable information relevant to any

3   parties' claims or defenses.  And I've read -- there's dueling

4   declarations here.  Frankly, the issues at depth in those

5   dueling declarations are sort of tersely.  They're not to the

6   heart of the case.

7          But that statement, I'm relying on.  If that turns

8   out to not be true, through some other source, there will be

9   severe repercussions because I'm relying on it.  So I want to

10  make sure Apple understands that.

11         Regardless of my ruling here, Apple can still agree

12  to conduct a search of Mr. Cook's email as an ESI custodian.

13  I'm not -- my tentative is not to order it but be on notice.

14  You have put yourself out there and I'm relying on it.  If it

15  turns out not to be true, the consequences, we will be back

16  here and there will be an evidentiary hearing.

17         All right.  So let me hear -- Plaintiff, it's your

18  motion.  You've heard my tentative is to rule against you.  Let

19  me hear from you.

20         **MR. RE:**  Thank you, Your Honor.

21         I think --

22         **THE COURT:**  And this is Mr. Re speaking for our

23  recording.

24         **MR. RE:**  Thank you.  Mr. Re, R-e, is the last name.

25         I don't see any record evidence at all about burden.

EXCEPTIONAL REPORTING SERVICES, INC

Exhibit 8

7

1    This is simply an ESI search.  It is minimal effort.

2            **THE COURT:**  And if you heard what I said, there are

3    -- you haven't been here for all the discovery motions in here

4    and I've talked about that issue, that there are some -- some

5    cases where the burden is facially apparent.  And I'm not

6    saying it rises to the level of what the burden would be for an

7    apex deposition but I am saying it's facially apparent that

8    there is a burden to -- and we've also talked about pipes in

9    this case a lot -- that discovery requests are going through

10   pipes.  The pipes here are expanded in terms of the number of

11   potential custodians.  But we're trying to do things that make

12   economic sense under Rule 1 of the Federal Rules of Civil

13   Procedure but also get you what you're looking for.

14           Your showing to me, Plaintiffs showing to me is

15   minimal at best.  The fact that the CEO of Apple indicated he's

16   very interested in health care technology, it has very little

17   weight in terms of making that person's email subject to

18   search.

19           The issues regarding Dr. O'Riley, the fact that

20   regardless of how you characterize it, I don't see evidence.

21   We have Dr. O'Riley's first person attestation that his

22   interaction with Mr. Kirk at his interviews was essentially a

23   windup; they did not discuss substance of any Masimo

24   technology.  And the fact that the CEO met with someone at the

25   end of a day's worth of interviews, even taking into account

Exhibit 8

8

1   all the information, is not to me sufficient to overcome that

2   limited burden that's facially apparent from the request.

3       **MR. RE:**  Okay.  You say "facially apparent."  I do

4   want to address the basis for the tentative.

5       The representation made that you're relying upon is

6   made without any representation as to how they could possibly

7   know this.  What's the basis for the representation?  I don't

8   even see them even suggesting that they've done any ESI

9   searching to even have a basis for the representation.

10      **THE COURT:**  And again, it gets back to they're -- I

11  think I quoted Bob Dylan at one of our earlier hearings.  I

12  don't need a weatherman to know which way the wind blows.

13      I can -- you don't have to have 15 declarations to

14  say doing an ESI search for the President and CEO of Apple,

15  Inc. from 2013 to the present -- where, again, talking

16  generally about whatever the time period is going to be -- the

17  number of devices, the number of avenues of communication that

18  need to be searched and the heightened -- the heightened need

19  for review when you're looking at a CEO's search is different

20  from the type of review, an attorney review that you're doing

21  for an engineer's -- search of an engineer's email.  These are

22  all things that I don't need a declaration to tell me.  They're

23  independently knowable.

24      That said, I'm not saying it's a massive showing or a

25  massive, per se, burden demonstrated, but that's the whole

Exhibit 8

9

1   purpose of the apex doctrine in depositions is it goes without

2   saying that that's a burden.

3          Now I'm not saying the apex doctrine applies here but

4   the aspects of it are equally available.  And I'm going to ask

5   you, Mr. Re, if you can if you can keep your mask on.

6          Aspects of it, aspects of it, the theory of it is the

7   same but I'm being very clear and I'm repeating that

8   representation that I mentioned and that you mentioned.

9          Implicit in every discovery response is an

10  affirmation and attestation by the attorney that it's made in

11  good faith; that it's made not to conceal or not to

12  unnecessarily delay the case.  Ramp it up when it's made in a

13  brief to the court.

14         I don't believe that Apple's lawyers would make that

15  willy-nilly without some foundation and I'm accepting it.  But

16  I am letting everyone know if it turns out from some other

17  source that Mr. Cook actually does have discoverable

18  information relevant to any parties' claims or defenses in his

19  ESI streams, we will be having a hearing and it may involve a

20  hearing of Mr. Cook testifying in this court, in person, if

21  that turns out to be a representation that was made to me that

22  I'm relying on for purposes of making this order.  And it may

23  also require testimony from counsel who made this

24  representation but that's only if it turns out to potentially

25  not be true.

**EXCEPTIONAL REPORTING SERVICES, INC**

Exhibit 8

10

1          All right.  Please continue, Mr. Re.

2          **MR. RE:**  Well, it sounds like you made up your mind

3  and --

4          **THE COURT:**  I mean I have thought about it and -- but

5  I want to make sure you have a full and fair opportunity to be

6  heard.

7          **MR. RE:**  Well, my only point is that there's no basis

8  for the statement.  You're just relying on the good-faith

9  Officer of the Court; I assume it's true.  If that's the

10  analysis, I have nothing further to add.

11          **THE COURT:**  Well let me just say, combined with what

12  doesn't require evidence; and that is, there is a burden on the

13  CEO of one of the largest corporations in the world to have me

14  have that person designated as an ESI custodian beyond what it

15  would be for, say, an engineer or a lesser person who's not

16  dealing with lawyers on a regular basis, who's not probably got

17  a the same level of communications.

18          So I don't need an expert, I don't need a declaration

19  to understand that that's where the apex doctrine comes from.

20          **MR. RE:**  But the apex doctrine is based on the burden

21  and oppression to the witness.  We have no evidence or

22  suggestion by anybody that the witness is even involved --

23          **THE COURT:**  So I'm going to disagree with you.  The

24  apex doctrine is not just the burden on the witness; it's the

25  burden on the entity to have --

1           We talked about the *Mattel versus Bratx* case, right?

2    We were here -- I know you were here, Mr. Lerner, when you had

3    the CEO of Mattel International sitting up in Judge Carter's

4    courtroom in the back row for a week.  That was a burden on him

5    but it was also a burden on Mattel.  And what we're talking

6    about with respect to the apex doctrine is a burden on the

7    witness but also a burden on the company itself to have the CEO

8    pulled out for eight hours or four hours or whatnot.  So it's a

9    burden on both.

10           **MR. RE:**  I agree with what you just said but we have

11    no evidence that Mr. Cook will be pulled to do anything.

12    That's the difference between a personal appearance and a ESI.

13    You can check my ESI and I don't even know it's happening so

14    there's no participation --

15           **THE COURT:**  Well so again I'm going to stop you.

16           I expect more from counsel when checking ESI.  If

17    Mr. Cook or any custodian uses devices, uses a communications

18    stream other than company email, it's up to the lawyers to

19    investigate that and find out.  What's the simplest way?  Ask

20    the person.  And he may say well that takes three seconds to

21    ask.

22           Easier said than done when presumably the primary

23    time period you're talking about is 2013 and 2014, to ask the

24    CEO where and what communication streams he or she used during

25    that time period is not an easy task.

Exhibit 8

12

1          **MR. RE:**  I can't debate non-existent evidence.  You

2    tell me this.  I've been doing this for 35 years.  If you say

3    so, okay.  I can't convince you but I can't rebut non-existent

4    evidence.

5          **THE COURT:**  Well again, I'm doing a balancing, and

6    one of the things I'm balancing is what's the relevance.  And

7    what I'm telling you is what's been presented is not compelling

8    in terms of even if it's just a limited burden, what's been

9    presented is not compelling.  Most of it relates to, again, the

10   idea of Mr. Cook was interested in health care products.  All

11   right.  Mr. Cook spoke with Dr. Riley after his interviews.

12   Okay.

13          And the rest of it is primarily Mr. Cook's, as it's

14   characterized -- and I'm doing air quotes -- "right-hand man,"

15   (close/quote), also had interactions that you want to know

16   about.  But my understanding is that right-hand man is one of

17   the custodians.  And so to the extent Mr. Cook was

18   communicating with the right-hand man, presumably you're going

19   to get that.

20          So I don't find the showing by Plaintiffs

21   particularly compelling.

22          And from the defense standpoint, it's by operation of

23   law and commonsense that there is a burden and I don't find --

24   I find that you haven't overcome it.

25          But again, I'm going to reiterate what I said before

Exhibit 8

13

1    about none of this prevents Defendant from going forward with

2    the ESI search of Mr. Cook and agreeing to do so.  And if they

3    don't, they do it at their own risk.

4            All right.  Anything else, Mr. Re?

5        **MR. RE:**  Nothing further.

6        **THE COURT:**  All right.  Mr. Lerner, unless there's

7    something you want to add or clarify or find out about, the

8    tentative will be the order of the court and the motion will be

9    denied for the reasons stated on the record.

10       **MR. LERNER:**  No, Your Honor.  We agree with both the

11   reasoning as to relevance on the issues raised in the

12   plaintiffs' papers like health care and with respect to the

13   burden.

14       **THE COURT:**  All right.  And do you hear and

15   understand what I said about the representation made at page 9

16   of the Joint Stipulation?

17       **MR. LERNER:**  Yes, Your Honor.

18       **THE COURT:**  All right.  Could you make sure.  And I

19   know we have a representative from Apple's in-house counsel.

20   Could you make sure that that is passed on.  And nothing

21   prevents you and Apple from going forward with Mr. Cook, doing

22   a search of Mr. Cook's ESI.  This order merely denies the

23   motion.  And I'm letting plaintiffs know if they get further

24   information that bears on -- that causes me to question this

25   linchpin of what I'm relying on, this is without prejudice to

Exhibit 8

14

1   re-raising this motion and I would expect that there would be a

2   hearing.  But it depends on what the showing is; I'm not going

3   to prejudge anything but I expect that there would be a hearing

4   where live testimony would be taken if that's the case and a

5   sufficient showing is made and there will be likely -- well

6   I'll leave it at that.

7           All right?

8           **MR. LERNER:**  Thank you.

9           **MR. RE:**  Thank you.

10          **THE COURT:**  Thank you.  We're adjourned.

11          **MS. KAOUNIS:**  Thank you, Your Honor.

12      **(Proceeding adjourned at 10:19 a.m.)**

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit 8

15

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    June 12, 2021

            Signed                                          Dated


*TONI HUDSON, TRANSCRIBER*

Exhibit 8

# EXHIBIT 9

1  Joseph R. Re (Bar No. 134479)
    joseph.re@knobbe.com
2  Stephen C. Jensen (Bar No. 149894)
    stephen.jensen@knobbe.com
3  Perry D. Oldham (Bar No. 216016)
    perry.oldham@knobbe.com
4  Irfan A. Lateef (Bar No. 204004)
    irfan.lateef@knobbe.com
5  Brian C. Claassen (Bar No. 253627)
    brian.claassen@knobbe.com
6  James E. Youngblood (Bar No. 325993)
    jamie.youngblood@knobbe.com
7  KNOBBE, MARTENS, OLSON &
    BEAR, LLP
8  2040 Main Street, Fourteenth Floor          JOSHUA H. LERNER, SBN 220755
   Irvine, CA 92614                              jlerner@gibsondunn.com
9  Telephone: (949)-760-0404                    GIBSON, DUNN & CRUTCHER LLP
   Facsimile: (949)-760-9502                    555 Mission Street Suite 3000
10                                              San Francisco, CA 94105
                                                Tel.: 415.393.8200 / Fax: 415.393.8306
11  Adam B. Powell (Bar. No. 272725)
     adam.powell@knobbe.com
12 KNOBBE, MARTENS, OLSON &                     H. MARK LYON, SBN 162061
    BEAR, LLP                                    mlyon@gibsondunn.com
13 3579 Valley Centre Drive                     GIBSON, DUNN & CRUTCHER LLP
   San Diego, CA 92130                          1881 Page Mill Road
14 Telephone: (858) 707-4000;                   Palo Alto, CA 94304-1211
   Facsimile: (858) 707-4001                    Tel.: 650.849.5300 / Fax: 650.849.5333

15 *Attorneys for Plaintiffs Masimo Corp. and*   *Attorneys for Non-Party Apple Inc.*
   *Cercacor Laboratories, Inc.*                *[Additional counsel listed on next page]*
16 *[Additional counsel listed on next page]*

17              **UNITED STATES DISTRICT COURT**

18             **CENTRAL DISTRICT OF CALIFORNIA**

19                   **SOUTHERN DIVISION**

20 MASIMO CORPORATION, a                 CASE NO. 8:18-cv-02001-JVS (JDEx)
   Delaware corporation; and
21 CERCACOR LABORATORIES, INC.,          **JOINT STIPULATION REGARDING**
   a Delaware corporation,               **NON-PARTY APPLE INC.'S**
22                                        **MOTION TO QUASH SUBPOENA**
                                          **AND FOR A PROTECTIVE ORDER**
23              Plaintiffs,

24      v.                               **Hearing:**
                                         Date:    June 24, 2021
25 TRUE WEARABLES, INC., a               Time:    10:00 a.m.
   Delaware corporation; and             Place:   Courtroom 6A
26 MARCELO LAMEGO, an individual,        Judge:   Hon. John D. Early

27              Defendants.              [Discovery Document Referred to
                                         Hon. Magistrate John D. Early]

28   UNREDACTED VERSION OF DOCUMENT FILED PURSUANT TO ORDER OF THE
            COURT DATED JUNE 24, 2021 (DKT. NO. 311)

Gibson, Dunn &
Crutcher LLP

JOINT STIPULATION REGARDING NON-PARTY APPLE INC.'S MOTION TO QUASH
SUBPOENA AND FOR A PROTECTIVE ORDER
CASE NO. 8:18-CV-02001-JVS (JDEX)                                    Exhibit 9

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Mark D. Kachner (Bar No. 234192)
  mark.kachner@knobbe.com
KNOBBE MARTENS OLSON &
BEAR LLP
1925 Century Park East, Suite 600
Los Angeles, CA 90067
Telephone: (310) 551-3450
Facsimile: (310) 601-1263

*Attorney for Plaintiffs Masimo Corp. and
Cercacor Laboratories, Inc.*

ILISSA SAMPLIN, SBN 314018
  isamplin@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Tel.: 213.229.7000 / Fax: 213.229.7520
*Attorney for Non-Party Apple Inc.*

Gibson, Dunn &
Crutcher LLP

JOINT STIPULATION REGARDING NON-PARTY APPLE INC.'S MOTION TO QUASH
SUBPOENA AND FOR A PROTECTIVE ORDER
CASE NO. 8:18-CV-02001-JVS (JDEx)

Exhibit 9

# TABLE OF CONTENTS

Page

I.  INTRODUCTORY STATEMENTS ................................................................. 1

    A.    Apple's Introductory Statement ................................................. 1

    B.    Masimo's Introductory Statement ............................................. 3

II. DISCOVERY AT ISSUE ........................................................................ 6

    A.    Deposition Topics ..................................................................... 6

    B.    Requests for Production ............................................................ 6

III. APPLE'S POSITION ........................................................................... 8

    A.    Factual Background .................................................................. 8

        1.    Plaintiffs Filed The True Wearables Case Against Mr. Lamego And True Wearables ................................................ 8

        2.    Plaintiffs First Served Apple With A Subpoena In The True Wearables Case One Day Before Filing The Apple Case ............................................................................... 8

        3.    A Dispute Concerning The Same Discovery Plaintiffs Seek Via Their Subpoena In This Case Is Before This Court In The Apple Case .................................................. 10

        4.    Apple's Counsel Met And Conferred With Plaintiffs' Counsel About The Pending Apple Subpoena ........................... 11

    B.    Legal Standard......................................................................... 12

    C.    Argument................................................................................. 14

        1.    The Information Sought By The Subpoena Is Neither Relevant Nor Proportionate To This Case................................. 14

            a.    Plaintiffs Seek Discovery For The Apple Case................. 15

            b.    The Documents And Testimony Requested From Apple Are Not Relevant To This Case............................... 16

            c.    The Discovery Sought Is Unduly Burdensome And Not Proportionate To The Needs Of This Case ................. 18

i

Gibson, Dunn &
Crutcher LLP

Exhibit 9

# TABLE OF CONTENTS
## (*Cont'd*)

Page

2. Plaintiffs Have Not Demonstrated A Substantial Need For Seeking Confidential Discovery From Apple In This Case ........ 19

3. Plaintiffs' Subpoena Improperly Seeks To Duplicate Discovery Work In The Apple Case ............................................. 21

4. Plaintiffs' Subpoena Is An End Run Around The Discovery Limits Imposed By The Court In The Apple Case ................................................................................................ 25

D. Conclusion ................................................................................ 26

IV. MASIMO'S POSITION ...................................................................... 26

A. Factual Background ................................................................. 26

1. Lamego Pursued An Executive Position At Apple While Still Serving as Cercacor's Chief Technology Officer ................ 26

2. Lamego Put His Apple Job Duties at Issue in This Case ............ 27

3. Lamego Put His Termination From Apple at Issue In This Case ................................................................................................ 28

4. Apple's Actions Show That Facts About Apple Are Relevant to This Case ................................................................ 29

B. Legal Standard ........................................................................ 30

C. Argument ................................................................................. 30

1. Masimo Seeks Limited Discovery that is Relevant and Proportionate to This Case ......................................................... 30

a. Apple's recruitment of Lamego while still at Cercacor is highly relevant to this case ............................. 31

b. Limited discovery about Lamego's job duties at Apple is highly relevant in this case ................................... 32

c. Apple terminating Mr. Lamego is highly relevant in this case ................................................................................ 33

ii

JOINT STIPULATION REGARDING NON-PARTY APPLE INC.'S MOTION TO QUASH SUBPOENA AND FOR A PROTECTIVE ORDER
CASE NO. 8:18-CV-02001-JVS (JDEx)

Exhibit 9

1

**TABLE OF CONTENTS**
(*Cont'd*)

2

3

<u>Page</u>

4
    2.    Masimo Has a Substantial Need For the Requested

5
            Discovery ........................................................................... 35

6
    3.    Masimo's Subpoena Does Not Impose an Undue Burden
            on Apple ............................................................................ 35

7

8
    4.    Apple's Remaining Arguments Do Not Justify Quashing
            The Subpoena .................................................................... 36

9
            a.    Masimo timely served its subpoena ................................... 36

10
            b.    Masimo is not seeking to avoid discovery limits in

11
                 the Apple case ................................................................... 37

12
            c.    Masimo's first subpoena is irrelevant ................................ 37

13
            d.    Masimo properly focused the subpoena ............................. 38

14
            e.    Any overlap in discovery between this case and the
                 Apple Case is not a basis to quash ..................................... 39

15

16
  D.    Conclusion .............................................................................. 40

17

18

19

20

21

22

23

24

25

26

27

28

J<small>OINT</small> S<small>TIPULATION</small> R<small>EGARDING</small> N<small>ON</small>-P<small>ARTY</small> A<small>PPLE</small> I<small>NC</small>.'<small>S</small> M<small>OTION TO</small> Q<small>UASH</small>
S<small>UBPOENA AND FOR A</small> P<small>ROTECTIVE</small> O<small>RDER</small>
CASE NO. 8:18-<small>CV</small>-02001-JVS (JDE<small>X</small>)

Gibson, Dunn &
Crutcher LLP

Exhibit 9

Pursuant to Federal Rules of Civil Procedure 37 and 45, and Local Rules 37-2 and 45-1, Non-Party Apple Inc. ("Apple"), as movant, and Plaintiffs Masimo Corporation ("Masimo") and Cercacor Laboratories, Inc. ("Cercacor") (collectively, "Plaintiffs"), as respondents, respectfully submit the following Joint Stipulation regarding Apple's Motion to Quash Subpoena and for a Protective Order. The parties met and conferred on May 19, 2021, but were unable to resolve the disputes presented in this Joint Stipulation. *See* Declaration of Ilissa Samplin ("Samplin Decl.") ¶ 5.

# I. INTRODUCTORY STATEMENTS

## A. Apple's Introductory Statement

This is the second time Plaintiffs Masimo and Cercacor have served an improper subpoena on Apple to obtain evidence that has nothing to do with this case. After Apple went through the burden and expense of challenging their last such subpoena, Plaintiffs withdrew it. Apple asks the Court to quash Plaintiffs' second subpoena (the "Subpoena"), which is even more improper than the first. This time Plaintiffs seek evidence concerning Mr. Lamego's employment history with Apple that is not only irrelevant to this case but also is the subject of a fully briefed motion to compel in Plaintiffs' separate case against Apple. Apparently aware of the weakness of their pending motion in their case against Apple, Plaintiffs are using the subpoena process in this case to improperly take a second shot at the same evidence. The Court should grant Apple's motion and quash the Subpoena for four reasons:

*First*, Plaintiffs' Subpoena for information related to Marcelo Lamego's connections to Apple violates Federal Rule of Procedure 26 because none of the discovery sought is relevant to, or proportionate to the needs of, *this* case (the "True Wearables Case"). In this case, Plaintiffs' claims are based on Mr. Lamego's conduct while employed by Cercacor and in connection with the company he founded, True Wearables. The claims are not based on Mr. Lamego's conduct at Apple, for Apple, or on behalf of Apple—Apple is not even mentioned in any of Plaintiffs' eleven causes of action in this case. *See generally* Samplin Decl. Ex. A, at 43–95 (Subpoena Addendum

1

JOINT STIPULATION REGARDING NON-PARTY APPLE INC.'S MOTION TO QUASH SUBPOENA AND FOR A PROTECTIVE ORDER
CASE NO. 8:18-CV-02001-JVS (JDEx)

Exhibit 9

2, True Wearables Case, Dkt. No. 42, First Am. Compl.) ("True Wearables FAC"). Accordingly, Plaintiffs' Subpoena is not designed to elicit discovery relevant to Plaintiffs' claims in, and proportional to the needs of, this case. Rather, the Subpoena on its face pertains to Plaintiffs' claims against Apple in Plaintiffs' separate case against Apple, *Masimo Corp. et al. v. Apple Inc.*, 8:20-cv-00048-JVS (JDEx) (C.D. Cal.) (the "Apple Case").

*Second*, the information Plaintiffs seek is not only irrelevant to this case, it is Apple's confidential information—including, to give a few examples, documents relating to Apple's patent applications and communications, including with Apple attorneys, relating to hiring and termination decisions. Plaintiffs have made no showing of a "substantial need" for this confidential information in the True Wearables Case that cannot be otherwise met without undue hardship. Indeed, the information Plaintiffs seek here is the same discovery they seek in the Apple Case (where Plaintiffs also lack a basis for the discovery, as explained in Section III.A.3 below). Plaintiffs' lack of substantial need for Apple's confidential information responsive to the Subpoena provides the Court with further good cause to quash the Subpoena and enter a protective order.

*Third*, it is inappropriate and inefficient for Plaintiffs to propound discovery in this case that has nothing to do with this case and requires both Apple and the Court to duplicate work that already is being done in the Apple Case. The deposition topics and document requests in Plaintiffs' Subpoena are identical in subject matter to several of Plaintiffs' requests at issue in a pending motion to compel in the Apple Case. Plaintiffs' attempt to use this case to duplicate discovery is highly improper; it is nothing more than an attempted end run around the relevance and proportionality requirements of Federal Rule of Civil Procedure 26.

*Fourth*, Plaintiffs' Subpoena also is an end run around the Scheduling Order in the Apple Case (Samplin Decl. Ex. M (Dkt. No. 37)) because Plaintiffs are attempting to take the equivalent of an additional Rule 30(b)(6) deposition of Apple's corporate witness that will not count against the 100-hour deposition limit set by the Court in the

2

Gibson, Dunn & Crutcher LLP

JOINT STIPULATION REGARDING NON-PARTY APPLE INC.'S MOTION TO QUASH SUBPOENA AND FOR A PROTECTIVE ORDER
CASE NO. 8:18-CV-02001-JVS (JDEX)

Exhibit 9

Apple case. Plaintiffs' attempt to obtain additional deposition time is even more troubling given their steadfast refusal to serve on Apple in the Apple Case their Rule 30(b)(6) notice or deposition topics, despite Apple's repeated requests for such a notice since the middle of May.

Plaintiffs should not be permitted to use the existence of the True Wearables Case to circumvent discovery rules and the Court's Scheduling Order in the Apple Case. Apple respectfully requests that this Court quash the Subpoena in full and enter a protective order prohibiting the deposition and document production sought.

## B.    Masimo's Introductory Statement

Plaintiffs Masimo Corporation and Cercacor Laboratories, Inc. (collectively, "Masimo") served the subpoena at issue to discover discrete facts from Apple that are at issue in this case. Masimo seeks a very narrow set of documents related to (1) Apple's recruitment of Lamego while he worked at Cercacor, (2) Lamego's title and duties at Apple, and (3) Apple's basis for terminating Lamego. These limited topics are highly relevant in this case. Also, Lamego put all three topics directly at issue in this case.

As part of the meet-and-confer process, Masimo focused the document requests to make clear these were the only topics on which Masimo sought discovery. Apple still refused discovery. Apple mischaracterizes the subpoena as broadly seeking information concerning "Mr. Lamego's employment history with Apple." To the contrary, the subpoena is limited to three discrete topics, which are highly relevant in this case.

Apple's recruitment of Lamego is highly relevant. In October 2013, while serving as the Chief Technical Office of Cercacor, Lamego emailed Apple's CEO, Tim Cook, to seek an executive position at Apple. At that same time, Lamego was telling Cercacor's Board of Directors that he had made a significant breakthrough, and Cercacor engineers were very excited about the company's future. Lamego's alleged breakthrough included the feasibility of measuring blood glucose non-invasively. Yet, Lamego was secretly seeking employment from Apple. Lamego told Mr. Cook that, with his 10 years of exposure to Masimo and Cercacor's technology, he "could add a

Exhibit 9

significant value to the Apple team" to help solve "the patient problem." Lamego offered that, as a senior executive at Apple, he could solve that very difficult problem for Apple. Lamego then interviewed with Apple. Lamego's email and interview occurred months *before* he left Cercacor, while still under a fiduciary duty to Cercacor. Apple's recruitment of Lamego while he was still at Cercacor is highly relevant to the claims in this case. For example, Masimo is entitled to discover the specifics of what Lamego offered Apple in exchange for an executive position. This information is directly relevant to at least the breach-of-fiduciary-duty claims in this case.

Lamego's title and duties at Apple are also highly relevant. In response to Masimo's accusations *in this case*, Lamego initially denied that his work at Apple had any connection to Masimo or Cercacor. But Lamego now admits he worked on noninvasive physiological measurements for the Apple Watch. Masimo must be allowed some modest discovery on Lamego's activities at Apple to test the veracity of Lamego's seemingly contradictory statements. Further, Lamego specifically requested an executive level position at Apple. Masimo's modest request for information about Lamego's title and duties is not burdensome and highly relevant to paint a complete picture of Lamego's motivation for leaving Cercacor, his intent to commit the misconduct at issue here, and his intent to harm Masimo. This information is relevant to at least the breach-of-fiduciary-duty claims, the breach-of-contract claims, and Lamego's willful and malicious misappropriation of trade secrets.

Apple's basis for terminating Lamego is also highly relevant. Lamego and True Wearables have put Apple's firing of Lamego directly at issue. Lamego contends that Masimo "repeatedly tried to disrupt Dr. Lamego's career and business efforts." Lamego and his family blame Masimo for causing Apple to terminate Lamego's employment. Yet, Lamego refuses to provide any information about his termination by claiming he owes a duty of confidentiality to Apple. Because Defendants have put Lamego's termination at issue *in this case*, Masimo is entitled to discover the basis for the termination. This discovery is also relevant to Lamego's motive to harm Masimo.

4

Gibson, Dunn &
Crutcher LLP

Exhibit 9

Apple cannot genuinely contend that all facts about Lamego's employment with Apple are irrelevant to this case. Apple filed a notice of related cases identifying **this case** as related to the Apple Case. Moreover, Apple and the Defendants in this case recently entered into a common-interest agreement. To support that agreement, Defendants contend they have a common interest with Apple based on overlapping facts between this case and the Apple Case. But they steadfastly refuse to identify those alleged overlapping facts. They also refuse to provide any discovery about Apple. Apple's agreement with Defendants and their reliance on overlapping facts to support a common-interest agreement, and the notice of related case, show some facts from Apple are relevant in this case.

Rather than address the relevant facts, Apple accuses Masimo of engaging in "gamesmanship with respect to basic discovery rules." Apple speculates about the timing of Masimo's original subpoena to Apple, but that was dictated by the then-rapidly approaching deadline for the close of fact discovery in this case. Once the Court extended the fact discovery deadline, Masimo promptly withdrew the subpoena to continue obtaining as much discovery as possible from Defendants. Masimo cannot be faulted for trying to avoid unnecessarily burdening the Court. Indeed, Masimo committed to narrow that subpoena before Apple unexpectedly cut off the parties' communications and suddenly filed a motion to quash. Apple's accusations contradict the simple facts surrounding the original subpoena.

Apple speculates that Masimo is seeking discovery in this case to use in the Apple case. But the protective orders in both cases preclude a party from using protected material in connection with any other case, absent agreement or further court order. The email between Tim Cook and Marcelo Lamego, that Defendants produced under the protective order in this case, is a perfect example. While that email is directly relevant to the Apple case, Masimo cannot present it in the Apple case until it is produced in that case. In this case, Apple is not a party and thus Masimo must subpoena Apple for information that is relevant to this case even if the information is also relevant and will

5

Gibson, Dunn & Crutcher LLP

Joint Stipulation Regarding Non-Party Apple Inc.'s Motion to Quash Subpoena and for a Protective Order
CASE NO. 8:18-cv-02001-JVS (JDEx)

Exhibit 9

be produced in the Apple case.  Thus, Apple cannot support its argument that Masimo is seeking discovery for the Apple case.

Masimo seeks a very narrow and targeted set of information from Apple that is directly relevant to the issues in this case.  The discovery would not be burdensome for Apple to produce.  Apple fails to meet its burden to preclude this discovery.

## II. DISCOVERY AT ISSUE

Consistent with Local Rule 37-2, this section contains the full text of the deposition topics and documents requests contained in Plaintiffs' Subpoena.  A copy of the Subpoena is also attached as Exhibit A to the Samplin Declaration.

**A.     Deposition Topics**

**TOPIC NO. 1:**

Apple's reasons for hiring Marcelo Lamego.

**TOPIC NO. 2:**

Reasons for termination of Marcelo Lamego's employment relationship with Apple.

**TOPIC NO. 3:**

Apple's communications with Marcelo Lamego concerning Apple recruiting Marcelo Lamego.

**TOPIC NO. 4:**

Apple's communications with Marcelo Lamego concerning termination of Marcelo Lamego's employment relationship with Apple.

**B.     Requests for Production**

**REQUEST FOR PRODUCTION NO. 1:**

The personnel file for Marcelo Lamego.

**REQUEST FOR PRODUCTION NO. 2:**

All documents related to Apple hiring Marcelo Lamego.

**REQUEST FOR PRODUCTION NO. 3:**

All documents related to the termination of Marcelo Lamego's employment

6

Gibson, Dunn &
Crutcher LLP

JOINT STIPULATION REGARDING NON-PARTY APPLE INC.'S MOTION TO QUASH
SUBPOENA AND FOR A PROTECTIVE ORDER
CASE NO. 8:18-CV-02001-JVS (JDEx)

Exhibit 9

relationship with Apple.

**REQUEST FOR PRODUCTION NO. 4:**

All communications with Marcelo Lamego regarding his employment at Apple, including his recruitment and termination.

**REQUEST FOR PRODUCTION NO. 5:**

All documents reflecting Marcelo Lamego's job duties and title, who he reported to, group he was assigned to, compensation, severance, and communications regarding patent applications.

After Apple served its portion of the Joint Stipulation on Masimo, Masimo proposed to revise the Subpoena's Document Requests Nos. 2-5, as reflected in the parties' correspondence in Exhibits 1 and 2 to the Kachner Declaration, as follows:

**ORIGINAL REQUEST FOR PRODUCTION NO. 1:**

The personnel file for Marcelo Lamego.

**REVISED REQUEST FOR PRODUCTION NO. 2:**

Documents and Communications about Apple's consideration and hiring of Marcelo Lamego, prior to January 21, 2014.

**REVISED REQUEST FOR PRODUCTION NO. 3:**

Apple's communications with Marcelo Lamego regarding the end of his employment.

**REVISED REQUEST FOR PRODUCTION NO. 4:**

Apple's communications with Marcelo Lamego regarding his hiring by Apple.

**REVISED REQUEST FOR PRODUCTION NO. 5:**

Documents sufficient to show Marcelo Lamego's job duties and title at Apple.

/ / /

/ / /

/ / /

Gibson, Dunn & Crutcher LLP

JOINT STIPULATION REGARDING NON-PARTY APPLE INC.'S MOTION TO QUASH SUBPOENA AND FOR A PROTECTIVE ORDER
CASE NO. 8:18-CV-02001-JVS (JDEX)

Exhibit 9

# III. APPLE'S POSITION

## A. Factual Background

### 1. Plaintiffs Filed The True Wearables Case Against Mr. Lamego And True Wearables.

Plaintiffs filed suit against Mr. Lamego and his company, True Wearables, on November 8, 2018, alleging breach of contract, breach of fiduciary duty, trade secret misappropriation, and patent infringement.

In their Complaint in the True Wearables Case, Plaintiffs allege that, following his roles at Masimo and Cercacor, Mr. Lamego worked at Apple for seven months before he founded True Wearables. Samplin Decl. Ex. A, at 57–58 (Subpoena Addendum 2, Dkt. No. 42, First Am. Compl. ¶¶ 35, 37, 38) ("True Wearables FAC"). Plaintiffs do not allege any claims against Mr. Lamego or True Wearables based on Mr. Lamego's seven months at Apple. The claims in the True Wearables Case do not concern Mr. Lamego's conduct for, on behalf of, or during his seven-month tenure at, Apple. Nor do they concern the circumstances of Mr. Lamego's departure from Apple. While Plaintiffs allege in the True Wearables Case that Apple recruited Mr. Lamego, *see id.* at 57 (¶ 35), there are no claims asserted in this case based on that alleged conduct by Apple. Indeed, Apple is not a party to the case.

The same Plaintiffs separately sued Apple in this Court on January 1, 2020. The parties are actively litigating the Apple Case and are in the middle of negotiating and litigating numerous discovery-related issues, including a dispute pertaining to the same discovery Plaintiffs seek in their Subpoena in this case.

### 2. Plaintiffs First Served Apple With A Subpoena In The True Wearables Case One Day Before Filing The Apple Case.

Again, this is not the first time Plaintiffs have tried to use this case to seek discovery that they know they are unlikely to obtain in the Apple case. On January 8, 2020, Plaintiffs served a subpoena on Apple in connection with this case, noticing a deposition and requesting the production of documents. Samplin Decl. Ex. C, at 318.

8

JOINT STIPULATION REGARDING NON-PARTY APPLE INC.'S MOTION TO QUASH
SUBPOENA AND FOR A PROTECTIVE ORDER
CASE NO. 8:18-CV-02001-JVS (JDEx)

Exhibit 9

1 The subpoena noticed seven topics for deposition concerning Mr. Lamego's alleged
2 "disclosures to Apple" about physiological parameter monitoring, Mr. Lamego's
3 "contributions to Apple's marketing strategies" for the same, and Apple's
4 communications with Mr. Lamego regarding his employment with Apple and his
5 termination thereof. *Id.* at 323 (January 8, 2020 Subpoena Ex. A, at 2). The eleven
6 requests for production in that prior subpoena covered similar topics, including
7 documents concerning Mr. Lamego's "disclosures to Apple" and "involvement in" and
8 "contributions to" work for Apple. *Id*. at 329–331 (January 8, 2020 Subpoena Ex. B, at
9 7–9). Indeed, Plaintiffs' RFP No. 4 in this latest Subpoena is identical to RFP No. 10 in
10 their prior improper subpoena—both request "All communications with Marcelo
11 Lamego regarding his employment at Apple, including his recruitment and termination."
12 *Compare id.* at 330 (January 8 Subpoena Ex. B, at 8), *with id.* Ex. A, at 19 (May 11,
13 2021 Subpoena Ex. B. at 6).

14 On January 9, 2020, one day after serving their prior subpoena on Apple in
15 connection with this case, Plaintiffs filed the Apple Case—alleging claims against Apple
16 for patent infringement and trade secret misappropriation relating to physiological
17 parameter monitoring in the Apple Watch. Plaintiffs allege, among other things, that
18 Apple recruited Mr. Lamego, who had been "taught about the keys to effective non-
19 invasive monitoring" by Plaintiffs, which he then disclosed to Apple. *Id.* Ex. N, at 568–
20 70 (Apple Case, Dkt. No. 296-1, Fourth Am. Compl. ¶¶ 22, 24–35). On February 28,
21 2020, Apple filed a notice of related cases pursuant to Local Rule 83-1.3.1, identifying
22 this case as related to the Apple Case. Apple Case, Dkt. No. 14. On March 4, 2020, the
23 Central District transferred the Apple Case to Judge James V. Selna, who is presiding
24 over this action.

25 On March 10, 2020, Apple filed a Motion to Quash and for a Protective Order in
26 the Northern District of California, directed at Plaintiffs' first subpoena to Apple in the
27 True Wearables Case. Samplin Decl. Ex. D (March 10, 2020 N.D. Cal. Motion to
28 Quash). Faced with that motion, which underscored Plaintiffs' gamesmanship with

9

Gibson, Dunn & Crutcher LLP

JOINT STIPULATION REGARDING NON-PARTY APPLE INC.'S MOTION TO QUASH
SUBPOENA AND FOR A PROTECTIVE ORDER
CASE NO. 8:18-CV-02001-JVS (JDEx)

Exhibit 9

1  respect to basic discovery rules, Plaintiffs voluntarily withdrew their subpoena on March
2  18, 2020, and Apple voluntarily dismissed the miscellaneous action it was forced to file
3  in the Northern District in connection with its motion to quash.  *Id.* Ex. E (March 20,
4  2020 N.D. Cal. Notice of Voluntary Dismissal).

5  **3.    A Dispute Concerning The Same Discovery Plaintiffs Seek Via Their**
6  **Subpoena In This Case Is Before This Court In The Apple Case.**

7  Plaintiffs filed a Motion to Compel in the Apple Case on April 28, 2021, laying
8  out the parties' respective positions on, *inter alia*, discovery requests that seek the same
9  information requested in the Subpoena in this case.  *Compare id.* Ex. A, at 19 (Subpoena
10  Request No. 1) (seeking "[t]he personnel file for Marcelo Lamego"), *with id.* Ex. G, at
11  390 (Apple Case Request for Production No. 240) (requesting "[a] full and complete
12  copy of Apple's human resources file for each of the Former Employees," which
13  includes Mr. Lamego); *compare id.* Ex. A, at 19 (Subpoena Request Nos. 2–3)
14  (requesting "all documents related to Apple hiring Marcelo Lamego" and "all documents
15  related to the termination of Marcelo Lamego's employment relationship with Apple"),
16  *with id.* Ex. G, at 391 (Apple Case Request for Production No. 248) (seeking
17  "[d]ocuments sufficient to show the date and reason for Marcelo Lamego's employment
18  at Apple ending"); *see also id.* Ex. G, at 390 (Apple Case Request for Production No.
19  239, 241) (requesting documents "relat[ing] to any efforts by Apple or any Former
20  Employee to . . . recruit . . . any employee or consultant of Masimo or Cercacor" and
21  "concerning Apple's hiring or termination of any of the Former Employees").  As Apple
22  explained in its portion of that Motion to Compel briefing, Plaintiffs seek information
23  that is not even relevant to the Apple Case—in which Mr. Lamego's work for Apple
24  actually is at issue (unlike in this case, where it is not).

25  For example, Plaintiffs failed to demonstrate that their request for documents
26  showing the reason for Mr. Lamego's employment at Apple ending was relevant to the
27  Apple Case.  In support of their motion to compel such documents, Plaintiffs merely put
28  forth a speculative theory that Mr. Lamego's employment at Apple ended because he

10

JOINT STIPULATION REGARDING NON-PARTY APPLE INC.'S MOTION TO QUASH
SUBPOENA AND FOR A PROTECTIVE ORDER
CASE NO. 8:18-CV-02001-JVS (JDEx)

Exhibit 9

Gibson, Dunn &
Crutcher LLP

1   stole Plaintiffs' alleged trade secrets (which is not true). Plaintiffs did not provide *any*
2   basis to suggest that their alleged secrets had anything to do with Mr. Lamego's
3   termination.

4       Plaintiffs also failed to demonstrate that their request for the full personnel file of
5   Mr. Lamego (or any other former employee of Masimo or Cercacor) was relevant to the
6   Apple Case. Plaintiffs' asserted justification for full personnel files in the Apple Case
7   amounted to nothing more than speculation. For example, Plaintiffs argued that
8   "individuals *may have* gotten a promotion shortly after providing Plaintiffs' trade secrets
9   to Apple or Apple *may have* reprimanded an employee for sharing Plaintiffs' trade
10  secrets." *Id.* Ex. H, at 493 (Dkt. 359-1 at 96) (emphasis added). Plaintiffs further argue
11  that the documents "*could show* Apple's knowledge that it was using Plaintiffs'
12  technology." *Id.* at 491 (Dkt. 359-1 at 95) (emphasis added). And with respect to
13  Mr. Lamego's personnel file in particular, Plaintiffs put forth no compelling need for the
14  entirety of his personnel file. Indeed, when Apple served an RFP on Plaintiffs in the
15  Apple Case for Plaintiffs' full personnel file for Mr. Lamego, *Plaintiffs* objected on the
16  basis of relevance and overbreadth—and Apple greatly narrowed its request in response.
17  *Id.* at 497 (Dkt. 359-1 at 100).

18      The Court continued the hearing on Plaintiffs' Motion to Compel in the Apple
19  Case from May 20, 2021, to June 3, 2021, to give the parties another opportunity to meet
20  and confer in an effort to resolve or narrow their disputes. *Id.* ¶ 15. Unwilling to wait
21  or to abide by the rules governing discovery in the Apple Case, Plaintiffs resorted to
22  burdening Apple and the Court by seeking much of the same information that is the
23  subject of that Motion to Compel through non-party discovery in this case.

24      **4.    Apple's Counsel Met And Conferred With Plaintiffs' Counsel About**
25           **The Pending Apple Subpoena.**

26      Plaintiffs served the Subpoena late in the day on May 11, 2021, demanding
27  production of documents less than 10 days later, on May 20, 2021—the same day the
28  Court in the Apple Case was at the time scheduled to hear Plaintiffs' Motion to Compel

Exhibit 9

the same documents in the Apple case. Plaintiffs also noticed a deposition of Apple for May 21, 2021. Samplin Decl. ¶ 4 & Ex. A, at 7 (Subpoena at 1).

On May 18, 2021, Apple asked Plaintiffs to meet and confer to discuss the Subpoena, and Plaintiffs agreed to discuss via telephone the following day. *Id.* ¶ 5. In advance of the call, Apple requested that Plaintiffs consent to a reasonable extension of time to respond to the Subpoena, noting that Plaintiffs provided less than 14 days' notice, which was unreasonable and insufficient to allow any dispute about the Subpoena to be briefed before this Court according to the joint stipulation process called for by the Local Rules. *Id.* Apple also requested that Plaintiffs provide a similar reasonable extension of time for Apple to serve its objections to this Subpoena. *Id.*

The parties met and conferred on May 18, 2021. *Id.* Plaintiffs agreed to an extension that would permit the parties to brief this dispute in accordance with the procedures set by Local Rule 37 (as required by Local Rule 45). *Id.* With respect to Apple's objections to the Subpoena, Plaintiffs conditioned any extension on Apple waiving all objections except for those that form the basis for this Motion. *Id.* & Ex. B, at 304. Apple declined to accept Plaintiffs' conditions and served its objections to the Subpoena on May 20, 2021. *Id.* Ex. B, at 304.

## B. Legal Standard

The scope of civil discovery is not unlimited. A party may obtain discovery only insofar as it relates to "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). The scope of permissible nonparty discovery under Rule 45 mirrors that of party discovery under Rule 26. *See* Fed. R. Civ. P. 45 advisory committee note (1970 amendment) ("[T]he scope of discovery through a subpoena is the same as that applicable to . . . other discovery rules."). "Relevancy, for the purposes of discovery, is defined broadly, although it is not without ultimate and necessary boundaries." *Gonzales v. Google, Inc.*, 234 F.R.D. 674, 679–80 (N.D. Cal. 2006) (citation omitted).

/ / /

Exhibit 9

1   ''While discovery is a valuable right and should not be unnecessarily

2   restricted . . . the "necessary" restriction may be broader when a nonparty is the target

3   of discovery.'' *Waymo LLC v. Uber Techs., Inc.*, 2017 WL 2929439, at *3 (N.D. Cal.

4   July 7, 2017), *mot. for relief from judgment denied*, 2017 WL 6883928 (N.D. Cal. Aug.

5   8, 2017) (quoting *Dart Indus. Co. v. Westwood Chem. Co.*, 649 F.2d 646, 649 (9th Cir.

6   1980)).  The party issuing a subpoena must take "reasonable steps to avoid imposing

7   undue burden or expense" on the subject.  Fed. R. Civ. P. 45(d)(1).

8        If a subpoena "fails to allow a reasonable time to comply," seeks "disclosure of

9   privileged or other protected matter," or "subjects a person to undue burden," the Court

10  shall quash or modify the subpoena.  Fed. R. Civ. P. 45(d)(3)(A)(i), (iii)–(iv).  A court

11  may also quash or modify a subpoena if it "requires . . . disclosing a trade secret or other

12  confidential research, development, or commercial information."  Fed. R. Civ. P.

13  45(d)(3)(B)(i).  Once it is shown that a subpoena requests such confidential information,

14  "the burden shifts to the requesting party to show a 'substantial need for the testimony

15  or material that cannot be otherwise met without undue hardship; and [to] ensure[ ] that

16  the subpoenaed person will be reasonably compensated."  *Verinata Health, Inc. v.*

17  *Sequenom, Inc.*, 2014 WL 2582097, at *2 (N.D. Cal. June 9, 2014) (quoting *In re*

18  *Subpoena of DJO, LLC*, 295 F.R.D. 494, 497 (S.D. Cal. 2014), and Fed. R. Civ. P.

19  45(d)(3)(C)(i)–(ii)).

20       "[A] court determining the propriety of a subpoena balances the relevance of the

21  discovery sought, the requesting party's need, and the potential hardship to the party

22  subject to the subpoena."  *ATS Prod., Inc. v. Champion Fiberglass, Inc.*, 309 F.R.D. 527,

23  531 (N.D. Cal. 2015) (citation omitted).  However, "if the sought-after [information is]

24  not relevant . . . then *any burden whatsoever* imposed . . . would be by definition

25  'undue.'"  *Williams v. Cty. of San Diego*, 2019 WL 5963969, at *3 (S.D. Cal. Nov. 13,

26  2019) (quoting *Compaq Comput. Corp. v. Packard Bell Elec., Inc.*, 163 F.R.D. 329,

27  335–36 (N.D. Cal. 1995)) (emphasis in original).  "[T]he party issuing the subpoena

28  must demonstrate that the information sought is relevant and material to the allegations

13

JOINT STIPULATION REGARDING NON-PARTY APPLE INC.'S MOTION TO QUASH
SUBPOENA AND FOR A PROTECTIVE ORDER
CASE NO. 8:18-CV-02001-JVS (JDEX)

Exhibit 9

1   and claims at issue in the proceedings." *Unsworth v. Musk*, 2019 WL 5550060, at \*4

2   (N.D. Cal. Oct. 28, 2019) (citation omitted).

3         "A non-party moving to quash a subpoena may also seek a protective order under

4   Federal Rule of Civil Procedure 26." *Williams*, 2019 WL 5963969, at \*4; *see also* Fed.

5   R. Civ. P. 26(c) (providing that "[a] party or any person from whom discovery is sought

6   may move for a protective order"). "The court may, for good cause, issue an order to

7   protect a party or a person from annoyance, embarrassment, oppression, or undue

8   burden." Fed. R. Civ. P. 26(c). The court may also issue a protective order to prevent

9   discovery that is irrelevant to any of the claims at issue. *See, e.g.*, *V5 Techs. v. Switch,*

10   *Ltd.*, 2019 WL 7489108, at \*5 n.9 (D. Nev. Dec. 20, 2019) ("[C]ourts may enter

11   protective orders preventing irrelevant questioning at deposition."); *Nguyen v. LVNV*

12   *Funding, LLC*, 2017 WL 951026, at \*11 (S.D. Cal. Mar. 10, 2017) (declining to compel

13   deposition testimony that was irrelevant and instead issuing a protective order); *United*

14   *States v. Capriotti*, 2012 WL 2994244, at \*2 (E.D. Cal. July 20, 2012) (finding "good

15   cause" for a protective order when "the proposed subject matter of the depositions is

16   irrelevant to [the] proceeding").

17 **C.**   **Argument**

18         The Subpoena is improper because (1) it is not relevant or proportionate to the

19   claims in this action, but rather is designed for Plaintiffs' separate lawsuit against Apple;

20   (2) it requires Apple to disclose confidential information without the requisite showing

21   of substantial need; (3) it duplicates discovery efforts in the Apple Case, including those

22   covered by a pending Motion to Compel in the Apple Case; and (4) it attempts an end

23   run around the Scheduling Order in the Apple Case by demanding a Rule 30(b)(6)-

24   equivalent deposition outside the 100-hour limit on depositions imposed by that Order.

25   This Court should quash Plaintiffs' improper Subpoena and enter a protective order.

26       **1.**   **The Information Sought By The Subpoena Is Neither Relevant Nor**

27            **Proportionate To This Case.**

28         Discovery must be "relevant" to a "party's claim or defense." Fed. R. Civ. P.

14

Gibson, Dunn &
Crutcher LLP

JOINT STIPULATION REGARDING NON-PARTY APPLE INC.'S MOTION TO QUASH
SUBPOENA AND FOR A PROTECTIVE ORDER
CASE NO. 8:18-CV-02001-JVS (JDEx)

Exhibit 9

26(b)(1). Courts routinely reject requests for discovery that "bear no indication of any nexus to the disputes" in the case. *Gilead Scis., Inc. v. Merck & Co, Inc.*, 2016 WL 146574, at *2 (N.D. Cal. Jan. 13, 2016). In addition to relevance, Rule 26 imposes a proportionality requirement—which creates a "collective responsibility" for "[t]he parties and the court . . . to consider the proportionality of all discovery and consider it in resolving discovery disputes." Fed. R. Civ. P. 26 advisory committee notes (2015 amendments); *Goes Int'l, AB v. Dodur Ltd.*, 2016 WL 427369, at *4 (N.D. Cal. Feb. 4, 2016) (citing committee notes requiring that "parties . . . tailor their efforts to the needs of this case"). Thus, any discovery propounded by Plaintiffs in the True Wearables Case must be relevant and proportionate to the needs of *that* case. Plaintiffs cannot satisfy these relevance or proportionality requirements, which is fatal to their Subpoena.

### a. Plaintiffs Seek Discovery For The Apple Case.

The Subpoena Plaintiffs propounded on Apple in this case plainly was drafted based on Plaintiffs' claims in the Apple Case. Every one of the Subpoena's requests on its face is directed to Mr. Lamego's employment *at Apple*, which is one of two asserted bases for all allegations concerning Plaintiffs' trade secret misappropriation, correction of inventorship, and patent ownership claims in the Apple Case. *See generally* Samplin Ex. N, at 568–70 (Apple Case Fourth Am. Compl. ¶¶ 20–25, 228–263) (alleging improper disclosure of purported confidential information to Apple by Mr. Lamego and Mr. O'Reilly); *id.* at 582–83, 665–691 (¶¶ 47–50, 268–371) (alleging that the subject matter of certain patents that Mr. Lamego assigned to Apple was invented by Masimo and/or Cercacor). Specifically:

- Subpoena Deposition Topic Nos. 1–2 seek information about *Apple's* reasons for hiring or terminating Mr. Lamego, and Deposition Topic Nos. 3–4 seek information about *Apple's* communications with Mr. Lamego concerning the same, Samplin Decl. Ex. A, at 12 (Subpoena Ex. A, at 2);

- Subpoena Request for Production No. 1 seeks a copy of *Apple's* personnel file for Mr. Lamego, *id.* at 19 (Subpoena Ex. B, at 6) (emphasis added);

15

Gibson, Dunn & Crutcher LLP

JOINT STIPULATION REGARDING NON-PARTY APPLE INC.'S MOTION TO QUASH
SUBPOENA AND FOR A PROTECTIVE ORDER
CASE NO. 8:18-CV-02001-JVS (JDEX)

Exhibit 9

- Subpoena Request for Production Nos. 2–4 seek documents and communications related to *Apple's* hiring and termination of Mr. Lamego, including all communications "*regarding his employment at Apple*," *id.* (Subpoena Ex. B, at 6) (emphasis added);

- Subpoena Request for Production No. 5 seeks documents concerning details of Mr. Lamego's position, duties, and compensation while *employed by Apple*, *id.* (Subpoena Ex. B, at 6) (emphasis added); and

- Subpoena Request for Production No. 5 seeks Apple's documents concerning Mr. Lamego's "patent applications," which go directly to Plaintiffs' correction of inventorship and patent ownership claims in the Apple Case, *id.*[1]

*None* of these Subpoena requests have anything to do with Plaintiffs' claims in this case.

### b. The Documents And Testimony Requested From Apple Are Not Relevant To This Case.

While Mr. Lamego's employment at Apple is one of two asserted bases for Plaintiffs' claims in the Apple Case, Mr. Lamego's employment at Apple is *not* an asserted basis for any of Plaintiffs' claims in the True Wearables Case. *None* of Plaintiffs' claims in this case are based on Mr. Lamego's employment at Apple, or his conduct at, for, or on behalf of, Apple. Rather, this case concerns solely Mr. Lamego's conduct while still employed by Cercacor, as well as his conduct at, and disclosures to, True Wearables—the company he founded *after* he left Apple.

For example, the first two of Plaintiffs' causes of action in this case are for breach of contract, in which Plaintiffs allege that Mr. Lamego breached his contracts with Masimo and Cercacor "by taking and using Masimo's [and Cercacor's] confidential information for his own benefit and for the benefit of True Wearables." Samplin Decl. Ex. A, at 60–61 (Subpoena Addendum 2, True Wearables FAC ¶¶ 49, 63). These causes of action do not implicate Apple in any way. Plaintiffs also accuse Mr. Lamego of

[1] Moreover, the Subpoena's Request for Production No. 5 is identical to Request for Production No. 293 that Plaintiffs just served in the Apple Case on May 19, 2021. *Compare* Samplin Decl. Ex. A, at 19, *with id.* Ex. J, at 548.

JOINT STIPULATION REGARDING NON-PARTY APPLE INC.'S MOTION TO QUASH SUBPOENA AND FOR A PROTECTIVE ORDER
CASE NO. 8:18-CV-02001-JVS (JDEX)

Exhibit 9

"failing to pursue the patenting of certain subject matter" on *their behalf*, *id.* at 60, 62 (¶¶ 51, 66), which has nothing to do with any patent applications for which Mr. Lamego was responsible while at Apple.

Plaintiffs' other causes of action in this case likewise have no relation to Mr. Lamego's employment at Apple. Plaintiffs' third and fourth causes of action, which concern trade secret misappropriation, allege that Mr. Lamego disclosed Plaintiffs' supposed confidential information to True Wearables and used that information "in deciding to form True Wearables" and "during [his] employment at True Wearables" to "improperly develop [True Wearables'] Oxxiom product." *Id.* at 64–66, 68–69 (¶¶ 80–83, 94–97). Plaintiffs' fifth cause of action is for breach of fiduciary duty based on Mr. Lamego's alleged failure "to pursue patent subject matter he was instructed to pursue" while at Cercacor and his alleged failure "to disclose sufficient information to Cercacor regarding feasibility of [certain] technology." *Id.* at 70–71 (¶¶ 104–110). Plaintiffs' remaining causes of action in this case concern True Wearables' alleged infringement of Plaintiffs' patents. Nothing in these causes of action implicates Apple or its employment of Mr. Lamego in any way—Apple is not mentioned once in *any* of Plaintiffs' causes of action in this case.

Thus, Apple's hiring of Mr. Lamego, the details of his position and compensation, his involvement in Apple programs or projects during his seven-month tenure at Apple, including his work on Apple's patent applications and Apple's termination of his employment—the focus of the Subpoena—are not bases for any of Plaintiffs' claims against Mr. Lamego and True Wearables in this case. Plaintiffs admit as much by alleging in their True Wearables FAC that Mr. Lamego engaged in pulse oximetry work "on his own *after leaving Apple*" and basing their claims on that pulse oximetry work. *See id.* at 57 (¶ 36) (emphasis added). The claims here are based on Mr. Lamego's conduct while at Cercacor and his conduct at and on behalf of True Wearables. Plaintiffs cannot satisfy the threshold relevance requirement for pursuit of their Subpoena on these facts, which demonstrate that Plaintiffs' Subpoena is actually directed, if anywhere, at

17

JOINT STIPULATION REGARDING NON-PARTY APPLE INC.'S MOTION TO QUASH SUBPOENA AND FOR A PROTECTIVE ORDER
CASE NO. 8:18-CV-02001-JVS (JDEx)

Exhibit 9

Gibson, Dunn & Crutcher LLP

1  their Apple Case.  *See In re REMEC, Inc. Secs. Litig.*, 2008 WL 2282647, at *2 (S.D.
2  Cal. May 30, 2008) ("Parties have no entitlement to discovery to develop new claims or
3  defenses that are not identified in the pleadings.").

4  Because there is no connection between the Subpoena's deposition topics or
5  discovery requests and Plaintiffs' claims in the True Wearables Case, the Subpoena
6  should be quashed.  *See Cacique, Inc. v. Robert Reiser & Co.*, 169 F.3d 619, 622 (9th
7  Cir. 1999) ("Enforcing a discovery request for *irrelevant* information is a per se abuse
8  of discretion." (emphasis in original)); *see also Williams*, 2019 WL 5963969, at *8–10
9  (granting motion to quash deposition subpoena and for a protective order because
10 discovery sought was not relevant); *see also* Fed. R. Civ. P. 26(b)(1) (a party is only
11 entitled to discovery "regarding any nonprivileged matter that is *relevant* to any party's
12 claim or defense") (emphasis added); Fed. R. Civ. P. 26(b)(2)(C) ("[T]he court must
13 limit the frequency or extent of discovery . . . if it determines that . . . the proposed
14 discovery is outside the scope permitted by Rule 26(b)(1).").

15     c.    **The Discovery Sought Is Unduly Burdensome And Not**
16         **Proportionate To The Needs Of This Case.**

17 Rule 26's proportionality requirement considers, among other things, "the needs
18 of the case, . . . the parties' relative access to relevant information," and "the importance
19 of the discovery in resolving the issues."  Fed. R. Civ. P. 26(b)(1).  The "needs" of this
20 case do not support Plaintiffs' Subpoena to Apple because the case does not involve any
21 claims of breach, misappropriation, or infringement, based on or relating to Apple.  *See*
22 Section III.C.1.b, *supra*.  Nor do any of Rule 26's other proportionality considerations
23 favor Plaintiffs.

24 Indeed, because the discovery the Subpoena seeks is not relevant to this case (*see*
25 Section III.C.1.b, *supra*), it is "inherently unduly burdensome."  *P&P Imports LLC v.*
26 *Johnson Enters. LLC*, 2020 WL 4258817, at *1 (C.D. Cal. Apr. 16, 2020) (Early, J.)
27 (citing *Wheel Grp. Holdings, LLC v. Cub Elecparts, Inc.*, 2018 WL 6264980, at *4 (C.D.
28 Cal. Sept. 4, 2018)).  The Federal Rules require the Court to "quash or modify" a

18

JOINT STIPULATION REGARDING NON-PARTY APPLE INC.'S MOTION TO QUASH
SUBPOENA AND FOR A PROTECTIVE ORDER
CASE NO. 8:18-CV-02001-JVS (JDEx)

Exhibit 9

Gibson, Dunn & Crutcher LLP

1    subpoena in such circumstances where, as here, the subpoena "subjects a person to

2    undue burden." Fed. R. Civ. P. 45(d)(3)(A)(iv); *see also In re Glumetza Antitrust Litig.*,

3    2020 WL 3498067, at *7 (N.D. Cal. June 29, 2020) ("[C]ourts are required to limit

4    discovery if the burden or expense of the proposed discovery outweighs its likely

5    benefit; such is 'the essence of proportionality,' an all-too-often ignored discovery

6    principle." (citing Fed. R. Civ. P. 26(b)(1) and *Apple Inc. v. Samsung Elecs. Co.*, 2013

7    WL 4426512, at *3 (N.D. Cal. Aug. 14, 2013))).

8         The discovery Plaintiffs seek from Apple is not relevant or proportionate to the

9    needs of this case, but rather is on its face designed to elicit discovery Plaintiffs seek for

10   the Apple Case.  This is confirmed by the fact that the subject matter of this discovery

11   is identical to that of several of Plaintiffs' requests for production served in the Apple

12   Case—which are the subject of a dispute that has already been briefed for the Court in

13   the Apple Case, in a Motion to Compel scheduled to be heard on June 3, 2021.  Samplin

14   Decl. ¶¶ 12, 15 & Ex. A, at 7 (Subpoena at 1).  Thus, while this Court is currently dealing

15   with the parties' dispute concerning the same requests in the Apple Case, Plaintiffs are

16   blatantly seeking to misuse the nonparty subpoena process in this case to short-circuit

17   requirements attendant to discovery in the Apple Case.[2]  The discovery sought by the

18   Subpoena is not relevant or proportionate to the needs of this case—and thus, the

19   Subpoena should be quashed.

20   **2.    Plaintiffs Have Not Demonstrated A Substantial Need For Seeking**

21         **Confidential Discovery From Apple In This Case.**

22         In circumstances where confidential information is at issue, Federal Rule of

23   Procedure 45(d)(3) permits the Court to quash the Subpoena unless the requesting party

24   demonstrates a "substantial need for the testimony or material that cannot be otherwise

25   met without undue hardship." *Verinata Health*, 2014 WL 2582097, at *2; *see also Katz

26   v. Batavia Marine & Sporting Supplies, Inc.*, 984 F.2d 422, 425 n.1 (Fed. Cir. 1993); *In

27   ──────────────
28   [2] Further underscoring the impropriety of Plaintiffs' attempt to circumvent the
     discovery rules here is the fact that the *same* attorneys from the *same* law firm represent
     Plaintiffs in both the True Wearables Case and the Apple Case.

19

Exhibit 9

*re Subpoena of DJO*, 295 F.R.D. at 497. This showing must be particularly strong "when confidential information from a non-party is sought." *Compaq Computer Corp. v. Packard Bell Elecs., Inc.*, 163 F.R.D. 329, 338 (N.D. Cal. 1995) (requiring moving party to show "substantial need" before compelling "disclosure of trade secrets or other confidential research, development or commercial information"). Plaintiffs have not, and cannot, make any such "strong showing of need" here. *Convolve, Inc. v. Dell, Inc.*, 2011 WL 1766486, at *2 (N.D. Cal. May 9, 2011) ("The subpoena calls for confidential technology . . . . While a protective order would restrict access to some extent, it would still allow access by counsel, legal assistants, experts, their assistants, the jury, and court staff . . . . [The non-party] should not have to suffer such disclosure without a clear-cut need and a subpoena narrowly drawn to meet that need.").

Plaintiffs' Subpoena improperly seeks production of Apple's privileged and confidential documents, such as Apple's confidential documents relating to its patent applications and its hiring practices, and privileged communications with Apple's attorneys relating to hiring and termination decisions. Yet Plaintiffs have not demonstrated any need—much less a *substantial* need—for the documents because they cannot: the discovery requests in Plaintiffs' Subpoena have already been propounded on Apple in the Apple Case, and a dispute concerning that discovery is presently before the Court in that case. And in that case, where Mr. Lamego's work at Apple actually is at issue (in this case, it is not), the requests are still irrelevant and overbroad—because they seek entire personnel files and communications that have nothing to do with the conduct or claims alleged. If the Court denies Plaintiffs' Motion to Compel that discovery in the Apple Case, then Plaintiffs *ipso facto* have no need for such discovery in either case, much less a substantial need. For this additional and independent reason, Plaintiffs' Subpoena should be quashed and a protective order entered.

/ / /

/ / /

/ / /

JOINT STIPULATION REGARDING NON-PARTY APPLE INC.'S MOTION TO QUASH
SUBPOENA AND FOR A PROTECTIVE ORDER
CASE NO. 8:18-CV-02001-JVS (JDEx)

Exhibit 9

### 3. Plaintiffs' Subpoena Improperly Seeks To Duplicate Discovery Work In The Apple Case.

The Subpoena Plaintiffs propounded on Apple in the True Wearables Case unnecessarily duplicates work that is already being done in the Apple Case, including Plaintiffs' pending Motion to Compel in the Apple Case. *See* Apple Case Dkt. Nos. 357–359; Samplin Decl. Ex. H. The deposition topics and document requests in Plaintiffs' Subpoena are identical in subject matter to several of Plaintiffs' requests at issue in that Motion to Compel (*see* Samplin Decl. Ex. F, at 370, *id.* Ex. H, at 487–91; *id.* Ex. I, at 533–34; *id.* J, at 548), as shown in the following table:

| Document Requests in Plaintiffs' Subpoena | Related Document Requests in the Apple Case |
|---|---|
| **SUBPOENA REQUEST NO. 1:** The personnel file for Marcelo Lamego. | **RFP NO. 240:** A full and complete copy of Apple's human resources file for each of the Former Employees.[3] |
| **SUBPOENA REQUEST NO. 2:** All documents related to Apple hiring Marcelo Lamego. | **RFP NO. 239:** All documents and things that refer or relate to any efforts by Apple or any Former Employee to solicit, recruit, or induce any employee or consultant of Masimo or Cercacor to quit his or her employment or to cease doing business with Masimo or Cercacor. <br><br> **RFP NO. 241:** All documents concerning Apple's hiring or termination of any of the Former Employees. |
| **SUBPOENA REQUEST NO. 3:** All documents related to the termination of Marcelo Lamego's employment relationship with Apple. | **RFP NO. 241:** All documents concerning Apple's hiring or termination of any of the Former Employees. |

---

[3] Plaintiffs defined the term "Former Employee" to "mean and refer to any current or former Apple employee who worked at Masimo or Cercacor before being employed by Apple." Samplin Decl. Ex. G, at 378 (Plaintiffs' Fifth Set of Requests of Production to Apple). Plaintiffs' definition of "Former Employee" covers Mr. Lamego, who is a former employee of Apple and worked for Plaintiffs prior to his employment at Apple.

21

JOINT STIPULATION REGARDING NON-PARTY APPLE INC.'S MOTION TO QUASH SUBPOENA AND FOR A PROTECTIVE ORDER
CASE NO. 8:18-CV-02001-JVS (JDEx)

Exhibit 9

Gibson, Dunn & Crutcher LLP

| | **RFP NO. 248:** Documents sufficient to show the date and reason for Marcelo Lamego's employment at Apple ending. |
|---|---|
| **SUBPOENA REQUEST NO. 4:** All communications with Marcelo Lamego regarding his employment at Apple, including his recruitment and termination. | **RFP NO. 236:** All communications between Apple and any Former Employee while the Former Employee was working for Masimo or Cercacor. |
| | **RFP NO. 237:** All communications between Apple and any Former Employee before the Former Employee began working for Apple. |
| | **RFP NO. 239:** All documents[4] and things that refer or relate to any efforts by Apple or any Former Employee to solicit, recruit, or induce any employee or consultant of Masimo or Cercacor to quit his or her employment or to cease doing business with Masimo or Cercacor. |
| | **RFP NO. 241:** All documents concerning Apple's hiring or termination of any of the Former Employees. |
| | **RFP NO. 248:** Documents sufficient to show the date and reason for Marcelo Lamego's employment at Apple ending. |
| | **RFP NO. 258:** All communications between (1) Marcelo Lamego or other individuals associated with True Wearables, Inc. including employees of Merchant & Gould, P.C., and (2) any |

---

[4] Plaintiffs' definition of "documents" is broad enough to include "communications." *See* Samplin Decl. Ex. G, at 378–79 (Plaintiffs' Fifth Set of Requests of Production to Apple) (defining "documents" to "include all writings and graphics of any sort whatsoever, together with any data stored in electronic or any other form, *including, but not limited to . . .video recordings, emails, voice mails, handwritten notes, [and] phone messages*" (emphasis added)).

JOINT STIPULATION REGARDING NON-PARTY APPLE INC.'S MOTION TO QUASH SUBPOENA AND FOR A PROTECTIVE ORDER
CASE NO. 8:18-CV-02001-JVS (JDEx)

Exhibit 9

| | Apple employee or other individuals associated with Apple, including Apple in-house council or employees of Gibson, Dunn & Crutcher LLP, regarding this case or the allegations in [the Apple Case].[5] |
|---|---|
| **SUBPOENA REQUEST NO. 5:** All documents reflecting Marcelo Lamego's job duties and title, who he reported to, group he was assigned to, compensation, severance, and communications regarding patent applications. | **RFP NO. 129:** All communications between [Apple] and any individual who previously worked for Plaintiffs referring or relating to subject matter disclosed or claimed in the Disputed Patents.[6] **RFP NO. 239:** All documents and things that refer or relate to any efforts by Apple or any Former Employee to solicit, recruit, or induce any employee or consultant of Masimo or Cercacor to quit his or her employment or to cease doing business with Masimo or Cercacor. |

---

[5] Plaintiffs' RFP No. 258 in the Apple Case was served on April 28, 2021, less than 30 days ago, and so is not part of Plaintiffs' pending Motion to Compel. Nonetheless, it also seeks documents that would be responsive to Plaintiffs' Subpoena Request No. 4. *Compare* Samplin Decl. Ex. I, at 533–34, *with id.* Ex. A, at 19.

[6] Plaintiffs have defined the term "Disputed Patents" to mean "the patents Plaintiffs assert should have their inventorship and/or ownership corrected" in the Apple Case. Samplin Decl. Ex. G, at 378 (Plaintiffs' Fifth Set of Requests of Production to Apple). Accordingly, communications "referring or relating to subject matter disclosed or claimed in the Disputed Patents" include communications concerning the patent applications from which the Disputed Patents issued. To the extent Plaintiffs are seeking communications concerning patent applications other than those from which issued the Disputed Patents in the Apple Case, such discovery is irrelevant to *both* the True Wearables Case *and* the Apple Case, because it is not related to any claim or defense in either case. Indeed, on May 20, 2021, Judge Early denied Plaintiffs' Motion to Compel with respect to RFP 129 and RFPs 242 and 243 (which sought *all* patent applications from Apple). Samplin Decl. ¶ 15 & Ex. G, at 390.

*(Cont'd on next page)*

23

JOINT STIPULATION REGARDING NON-PARTY APPLE INC.'S MOTION TO QUASH
SUBPOENA AND FOR A PROTECTIVE ORDER
CASE NO. 8:18-CV-02001-JVS (JDEX)

Exhibit 9

Gibson, Dunn & Crutcher LLP

| | **RFP NO. 240:** A full and complete copy of Apple's human resources file for each of the Former Employees.[7]<br><br>**RFP NO. 293:** All documents reflecting Marcelo Lamego's job duties and title, who he reported to, group he was assigned to, compensation, severance, and communications regarding patent applications.[8] |
|---|---|

Plaintiffs' Subpoena deposition topics—which seek testimony concerning Mr. Lamego's termination by Apple—also will likely be duplicative of Plaintiffs' Rule 30(b)(6) topics in the Apple Case.[9]

Plaintiffs' Subpoena clearly has but one purpose—to seek the same irrelevant discovery from Apple in this case that is at issue in Plaintiffs' pending Motion to Compel in the Apple Case  The abridged timing of Plaintiffs' Subpoena and its substance—which tracks Plaintiffs' claims in the Apple Case and seeks documents that are the subject of a discovery dispute in that case—confirms its improper purpose.  Such a thinly-veiled end run around Federal Rule of Civil Procedure 26 and this Court's discovery procedures is improper.  *See Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 2019 WL 1236054, at *2 (N.D. Cal. Mar. 18, 2019) (quashing a

---

[7] Documents "reflecting Marcelo Lamego's job duties and title, who he reported to, group he was assigned to, compensation, [and] severance" would be located in his human resource file at Apple.

[8] Plaintiffs' RFP No. 293 in the Apple Case was served on May 19, 2021, just one day before Apple's production in response to this Subpoena was initially due, and is therefore not part of Plaintiffs' pending Motion to Compel.  *See* Samplin Decl. Ex. J. RFP 293 in the Apple Case is *identical* to Plaintiffs' Subpoena Request No. 5.  *Compare id.* Ex. A, at 19, *with id.* Ex. J, at 548.

[9] Plaintiffs have refused to propound their Rule 30(b)(6) topics in the Apple Case, despite Apple having served its Rule 30(b)(6) notice and topics on May 10, 2021, and despite Apple's repeated requests that Plaintiffs do the same.  Samplin Decl. ¶ 17. Nonetheless, given that the majority of Plaintiffs' allegations in the Apple Case center on Mr. Lamego's employment by Apple, it is very likely that Plaintiffs will seek to depose an Apple corporate witness about such topics.

24

JOINT STIPULATION REGARDING NON-PARTY APPLE INC.'S MOTION TO QUASH
SUBPOENA AND FOR A PROTECTIVE ORDER
CASE NO. 8:18-CV-02001-JVS (JDEx)

Exhibit 9

Gibson, Dunn &
Crutcher LLP

1  subpoena that "amounts to an improper end run around the court's prior orders" because
2  defendant "is not entitled to discovery from third parties that the court has already ruled
3  out-of-bounds"); *see also Thogus Prod. Co. v. Bleep, LLC*, 2021 WL 827003, at *5 (N.D.
4  Ohio Mar. 4, 2021) (quashing subpoenas that "improperly attempt to circumvent this
5  Court's . . . Order denying expedited discovery" because "in large measure, [the
6  subpoenas] seek production of the same universe of documents and information").
7  Plaintiffs should not be permitted to bypass the Federal Rules through a third-party
8  subpoena directed at discovery that has no relevance to this case and to which they will
9  not even be entitled in the Apple Case.

10  Plaintiffs' attempt to use this case to obtain discovery that is irrelevant here and
11  duplicative to that being challenged by Apple in the Apple Case is highly improper. The
12  parties fully briefed Plaintiffs' Motion to Compel on these topics in the Apple case (in a
13  motion totaling over 130 pages and approximately 960 pages of exhibits, *see* Samplin
14  Decl. ¶ 12 & Ex. H). The Court has already expended significant time and resources
15  reviewing the briefing and scheduled a hearing on June 3 to resolve the motion.
16  Plaintiffs should not be permitted to waste the Court's time by bypassing the Court's
17  discovery procedures with this Subpoena. This attempt to obtain the same discovery
18  here that is being actively litigated in the Apple Case is an improper end run around
19  Federal Rule of Civil Procedure 26, and should be denied.

20  **4. Plaintiffs' Subpoena Is An End Run Around The Discovery Limits**
21  **Imposed By The Court In The Apple Case.**

22  The Subpoena is also improper because it attempts to circumvent the deposition
23  time limits imposed by the Court in the Apple Case Scheduling Order. This Court
24  limited each party to 100 hours of depositions in the Apple Case, which includes the
25  parties' Rule 30(b)(6) depositions. Samplin Decl. Ex. M, at 560 (Apple Case, Dkt. No.
26  37 at 1). Yet Plaintiffs seek a deposition from Apple in this case that is equivalent to a
27  Rule 30(b)(6) deposition—and concerns topics related solely to the Apple Case—but
28  would not count against Plaintiffs' 100-hour limit in the Apple Case. Such an end run

25

Gibson, Dunn & Crutcher LLP

around the Court's Scheduling Order in the Apple Case is improper.

Plaintiffs' attempt to circumvent the Scheduling Order in the Apple Case is particularly egregious given their refusal to even provide to Apple their Rule 30(b)(6) notice and topics in the Apple Case, despite Apple's repeated requests for such information. *See* Samplin Decl. ¶¶ 16–17 & Exs. K–L. By seeking to take a Rule 30(b)(6)-equivalent deposition in this case, Plaintiffs plainly hope to obtain additional testimony from Apple beyond that which the Court has permitted in the Apple Case. Plaintiffs should not be permitted to evade the Apple Case Scheduling Order in this manner.

## D. Conclusion

For all of the foregoing reasons, Apple respectfully requests that the Court grant its motion to quash the Subpoena in its entirety and enter a protective order prohibiting the deposition testimony and document discovery Plaintiffs seek from Apple in this case.

# IV. MASIMO'S POSITION

## A. Factual Background

### 1. Lamego Pursued An Executive Position At Apple While Still Serving as Cercacor's Chief Technology Officer

Apple began recruiting Lamego from Cercacor in early 2013. Kachner Decl. Ex. 3, at 250:14-251:20. Lamego later touted his exposure to developing noninvasive patient monitors in an email to Apple's CEO, Mr. Cook. Kachner Decl. Ex. 4.[10] Lamego told Mr. Cook that he had developed intellectual property for Masimo and Cercacor over a ten-year period and he was "sure [he] could add a significant value to the Apple team." *Id*. Lamego also told Mr. Cook that, while it is easy to develop medical products that work well for most users, "[g]etting the same technology to work in almost the entire population is extremely more complex." *Id*. Lamego referred to this complexity as the

---

[10] Defendants produced the Lamego email as confidential under the protective order. Defendants refuse to allow Masimo to disclose to Apple's counsel all information in this brief that Defendants designated as confidential, including the Lamego email. Kachner Decl. Ex. 5.

Exhibit 9

Gibson, Dunn & Crutcher LLP

"patient equation." *Id*. Lamego went on to explain to Mr. Cook that he could "solve" this "patient equation" for Apple "without conflicting with the large IP I have developed for Masimo and Cercacor." *Id*. Lamego asked Mr. Cook for an executive position in exchange for providing the solution. *Id*. When Lamego wrote to Mr. Cook, he was still the Chief Technical Officer at Cercacor, with a fiduciary duty.

At that time, Lamego was preparing to reveal a supposed breakthrough to the Board of Directors at Cercacor. Kachner Decl. Ex. 7 at 164:19-25. He "enthusiastically" claimed that he had proven the feasibility of measuring glucose and several other parameters non-invasively. *Id*. at 166:20-23; Dkt. 42, ¶¶ 42, 67. This would have been a major technological and commercial accomplishment for Masimo and Lamego. Lamego understood that these breakthroughs were very significant to Cercacor and would have made him wealthy. Kachner Decl. 8 at MASM0205492.

Apple hired Lamego in January 2014. After Lamego left Cercacor, Cercacor was unable to replicate the feasibility Lamego claimed to have achieved. *See* Kachner Decl. Ex. 7 at 182:25-184:8.

### 2. Lamego Put His Apple Job Duties at Issue in This Case

Before departing Cercacor for Apple, Lamego told Masimo's CEO, Joe Kiani, that he would not work on technologies that compete with Masimo and Cercacor. Dkt. 152-4 ¶ 6; Kachner Decl. Ex. 7 at 69:16-70:19, 88:10-15. After Lamego left Apple but before Masimo filed this suit, Masimo confronted Lamego. In response, Lamego denied any wrongdoing and accused Masimo of attempting to "disrupt Dr. Lamego's career and business efforts" since January 2014, before he started at Apple. Kachner Decl. 8 at TRUE16532 ¶ 16. Lamego represented Apple hired him "to work in (sic.) a project that had **no connection** with any products developed by Masimo or Cercacor." *Id*. (emphasis added).

Masimo is entitled to test the veracity of Lamego's denials, representations, and bases for his accusations. Lamego's representations appear to conflict with his recent public statements about his actual role at Apple. *See* Kachner Decl. Ex. 9. According

27

Gibson, Dunn &
Crutcher LLP

JOINT STIPULATION REGARDING NON-PARTY APPLE INC.'S MOTION TO QUASH
SUBPOENA AND FOR A PROTECTIVE ORDER
CASE NO. 8:18-CV-02001-JVS (JDEx)

Exhibit 9

to Lamego's current LinkedIn profile, his work at Apple included developing "bio-sensing functionalities" and designing "hardware and algorithm architectures." *Id*. Such activities appear to compete with Masimo. Masimo is also entitled to explore from Apple precisely what Lamego was offering when he emailed Mr. Cook. Masimo should also be entitled to explore what Apple understood by Lamego's statement that Apple could leverage value from his Masimo and Cercacor experience. But Lamego has refused to answer any questions about Apple, citing a confidentiality obligation to Apple. *See* Kachner Decl. Ex. 3 10:13-12:18. Masimo should be allowed to explore the apparent contradictions in Mr. Lamego's statements and testimony.

### 3. Lamego Put His Termination From Apple at Issue In This Case

Shortly after leaving Apple, Lamego's friend and then-Cercacor employee Cristiano Dalvi told Masimo's CEO that Lamego left Apple because Apple asked Lamego to compete with Masimo and Cercacor. Kachner Decl. Ex. 6 at 69:16-70:19, 88:16-20. This explanation was consistent with Lamego's prior statements that he would not work on competing technologies while at Apple. Dkt. 152-4 (Kiani Decl.) ¶ 6; Kachner Decl. Ex. 6 at 69:16-70:19, 88:10-15. Much later, it became clear that Lamego worked in exactly the same technical area at Apple as he had at Masimo and Cercacor. Kachner Decl. Ex. 9.

Now, Lamego contends that Apple terminated his employment because of Masimo. Lamego contends that Masimo "repeatedly tried to disrupt Dr. Lamego's career and business efforts" while he was at Apple. Kachner Decl. Ex. 8 at TRUE165232 ¶ 16. Lamego further testified that Masimo's CEO threatened his employment with Apple. Kachner Decl. Ex. 3 at 423:11-424:12. Lamego and his family blame Masimo for disrupting his employment with Apple. *See also* Kachner Decl. Ex. 10 at 49:15-18; 56:9-14.

But Lamego refuses to provide any discovery about why Apple terminated him. Kachner Decl. Ex. 3 at 10:13-12:18. Lamego refused to answer direct questions about why he was fired, again citing his confidentiality obligations to Apple. *Id*. at 231:14-

28

Gibson, Dunn &
Crutcher LLP

JOINT STIPULATION REGARDING NON-PARTY APPLE INC.'S MOTION TO QUASH
SUBPOENA AND FOR A PROTECTIVE ORDER
CASE NO. 8:18-CV-02001-JVS (JDEx)

Exhibit 9

233:16.  Masimo is entitled to discover why Apple fired Lamego to rebut Lamego's accusations that Masimo is supposedly the cause for all of his unfortunate circumstances. Masimo is also entitled to discover why Lamego intended to harm Masimo, especially in response to Apple firing him.  Such discovery is relevant to Lamego's willful and malicious misappropriation of Masimo's trade secrets.  *See* Cal. Civ. Code § 3426.3(c); 18 U.S.C. § 1836(b)(3)(C).

### 4.    Apple's Actions Show That Facts About Apple Are Relevant to This Case

At the outset of the Apple Case, Apple filed a notice of related cases.  *Masimo Corp. et al. v. Apple Inc.*, Case no. 8:20-cv-00048-JVS-JDE (C.D. Cal.) (Dkt. 14).  Apple represented the Apple Case "arises from the same or a closely related ***transaction, happening, or event*** as the 20-00048 case presently before this Court, [and] calls for determination of the same or substantially related or similar questions of law and fact." *Id*. (emphasis added).  Having filed that notice—and obtaining a transfer to Judge Selna based on that notice—Apple cannot now genuinely argue the cases are unrelated and that information about Apple is irrelevant.

Apple also recently entered into a common-interest agreement with Defendants in this case.  *See* Kachner Decl. Ex. 11.  Attempting to justify that common-interest agreement, Defendants contend that the Apple Case and this case involve "overlapping facts and legal issues."  *Id*. at p.3.[11]  Presumably Apple must also believe that some overlap in the two cases justify entering into this common-interest agreement.  That overlap pertains to Lamego and his involvement with Apple.  Apple's common-interest agreement and representations to this Court that the two cases are legally and factually

---

[11] Defendants refused to identify those overlapping facts, claiming that would reveal work product.  Kachner Decl. Ex. 11.  A common-interest privilege does not shield the overlapping facts from discovery.  *Eli Lilly and Co. v. Arch Ins. Co.*, 2016 WL 5394402, *6 (S.D. Ind. Sept. 27, 2016) (common interest privilege shields only documents that "advance a shared legal interest and seek an attorney's advice to advance that interest").

29

Gibson, Dunn & Crutcher LLP

Exhibit 9

1   related contradict Apple's argument that the cases are unrelated and that Lamego's

2   recruitment, employment, and termination by Apple are irrelevant.

## B.    Legal Standard

4       The party who moves to quash a subpoena has the "burden of persuasion" under

5   Rule 45(c)(3).  *Moon v. SCP Pool Corp.*, 232 F.R.D. 633, 637 (C.D. Cal. 2005).  A party

6   "claiming undue burden as a basis for a motion to quash is held to a high burden of proof

7   which requires the party to demonstrate the actual 'manner and extent of the burden and

8   the injurious consequences of insisting upon compliance with the subpoena.'" *Ohio*

9   *Valley Envtl. Coal., Inc. v. U.S. Army Corps of Eng'rs*, 2012 WL 112325, at *2 (N.D.

10  W.Va. Jan.12, 2012), *quoting* 9A C. Wright and A. Miller, M. Kane, *Federal Practice*

11  *and Procedure*, Civ.3d § 2463.1.

12      "In deciding whether to quash or modify a subpoena to a third party, a court must

13  balance the relevance of the discovery sought and the burden to the party seeking the

14  subpoena against the potential hardship to the deponent, keeping in mind Rule 26's

15  broad policy favoring full discovery."  *Apple, Inc. v. Samsung Elecs. Co.*, No.

16  SACV122176AGJPRX, 2013 WL 12324184, at *1 (C.D. Cal. Jan. 3, 2013) (citing Fed.

17  R. Civ. P. 26(b)(1); *Heat & Control, Inc. v. Hester Indus., Inc.*, 785 F.2d 1017, 1024

18  (Fed. Cir. 1986); *Exxon Shipping Co. v. U.S. Dep't of Interior*, 34 F.3d 774, 779 (9th

19  Cir. 1994)) (denying motion to quash).

## C.    Argument

21      The Court should deny Apple's attempt to quash Masimo's subpoena because (1)

22  the subpoena is narrowly drawn to relevant discovery in this case; (2) Masimo has a

23  substantial need for the requested discovery; and (3) Masimo's subpoena does not

24  require Apple to duplicate any effort, much less incur a substantial burden.

### 1.    Masimo Seeks Limited Discovery that is Relevant and Proportionate
        to This Case

27      Masimo narrowly tailored the Apple subpoena to seek discovery on just three

28  topics that are at issue in this case: (1) Apple's recruitment of Lamego while he worked

at Cercacor, (2) Lamego's title and duties at Apple, and (3) Apple's basis for terminating Lamego. These topics are highly relevant to Masimo's breach-of-fiduciary-duty claim and misappropriation-of-trade-secret claims. These topics are also highly relevant to show Lamego's intentions when he departed Cercacor and when he later departed Apple to form True Wearables. Lamego and True Wearables have also put all three topics at issue in this case.

### a. Apple's recruitment of Lamego while still at Cercacor is highly relevant to this case

As Apple acknowledges, this case concerns "Mr. Lamego's conduct while employed by Cercacor." Br. at 1. But Apple must not appreciate that Lamego was communicating directly with Apple and its CEO Tim Cook while he was still a fiduciary at Cercacor. *See* Kachner Decl. Ex. 4. Lamego was claiming to Cercacor that he had made a major technology breakthrough and, at the same time, he was seeking executive employment from Apple. In seeking that employment, Lamego offered what he had learned at Cercacor and Masimo. Those interactions are highly relevant to Masimo's breach-of-fiduciary-duty and trade-secret claims in this case.

Lamego's interactions with Apple are also relevant to whether he believed in the breakthrough he was presenting to Cercacor. Those communications with Apple to secure employment show the gravity of Lamego's breach of his fiduciary duty and his intent to harm Masimo and Cercacor upon his departure.

Based on the foregoing, Masimo should be permitted to depose Apple regarding:

**TOPIC NO. 1:**

Apple's reasons for hiring Marcelo Lamego.

**TOPIC NO. 3:**

Apple's communications with Marcelo Lamego concerning Apple recruiting Marcelo Lamego.

Before any deposition, Masimo should also receive documents pertaining to Apple's recruiting and hiring of Lamego. Presumably those documents would be inside

31

Gibson, Dunn & Crutcher LLP

JOINT STIPULATION REGARDING NON-PARTY APPLE INC.'S MOTION TO QUASH
SUBPOENA AND FOR A PROTECTIVE ORDER
CASE NO. 8:18-CV-02001-JVS (JDEx)

Exhibit 9

Lamego's personnel file maintained at Apple (RFP No. 1). If those documents are maintained elsewhere, Masimo has specified that Apple produce any documents concerning Apple's recruiting and hiring of Lamego. (Revised RFP Nos. 2 and 4). Accordingly, Masimo should be permitted to discover the following Apple documents, as Masimo clarified as part of the meet and confer with Apple:

> **REQUEST FOR PRODUCTION NO. 1:**
>
> The personnel file for Marcelo Lamego.
>
> **REVISED REQUEST FOR PRODUCTION NO. 2:**
>
> Documents and Communications about Apple's consideration and hiring of Marcelo Lamego, prior to January 21, 2014.
>
> **REVISED REQUEST FOR PRODUCTION NO. 4:**
>
> Apple's communications with Marcelo Lamego regarding his hiring by Apple.

### b. Limited discovery about Lamego's job duties at Apple is highly relevant in this case

Lamego's title and job duties at Apple will show the nature of the position which enticed Lamego to leave Cercacor. That position is also part of the exchange between Lamego and Apple for which Apple was to obtain help to solve their "patient problem." The title and job duties complete the story pertaining to Lamego's email to Mr. Cook.

Specifically, Lamego told Apple's CEO Tim Cook that he had developed intellectual property for Masimo and Cercacor over a ten year period and he was "sure [he] could add a significant value to the Apple team." Kachner Decl. Ex. 4. Lamego also told Mr. Cook that he could "solve" Apple's issues with non-invasive measurement technologies. *Id*. In exchange, Lamego sought an executive position at Apple. Information about Lamego's duties and title at Apple are relevant to understand how Lamego planned to execute on his proposal to help Apple and how Apple enticed Lamego to leave Cercacor. This information is also highly relevant to Lamego's state of mind upon departing Cercacor, his intent to harm Masimo, and his breach of his

32

Gibson, Dunn & Crutcher LLP

JOINT STIPULATION REGARDING NON-PARTY APPLE INC.'S MOTION TO QUASH SUBPOENA AND FOR A PROTECTIVE ORDER
CASE NO. 8:18-CV-02001-JVS (JDEx)

Exhibit 9

fiduciary duty to Cercacor.

Moreover, the title and duties Lamego had at Apple will also allow Masimo to test Lamego's credibility. Specifically, Lamego told Masimo's CEO he would not work on technologies that compete with Masimo and Cercacor. Dkt. 152-4 (Kiani Decl.) ¶ 6; Kachner Decl. Ex. 6 at 69:16-70:19, 88:10-15. After Lamego left Apple he represented to Masimo that Apple hired him "to work in (sic.) a project that had **no connection** with any products developed by Masimo or Cercacor." Kachner Decl. Ex. 8 at TRUE165232 ¶ 16. (emphasis added). Lamego's representations appear to conflict with his own recent public statements about his actual role at Apple. *See* Kachner Decl. Ex. 9. Masimo should be allowed to explore the apparent contradictions in Mr. Lamego's statements.

Based on the foregoing, Masimo should be permitted to discover Lamego's personnel file maintained at Apple (RFP No. 1), which presumably contains documents showing Lamego's duties and title at Apple. If those documents are maintained elsewhere, Masimo has specified that Apple produce documents sufficient to show Lamego's job duties and title. (Revised RFP No. 5). Thus, Masimo should be permitted to discover the following Apple documents:

**REQUEST FOR PRODUCTION NO. 1:**

The personnel file for Marcelo Lamego.

**REVISED REQUEST FOR PRODUCTION NO. 5:**

Documents sufficient to show Marcelo Lamego's job duties and title at Apple.

**c.     Apple terminating Mr. Lamego is highly relevant in this case**

In this case, Lamego has blamed Masimo for Apple firing him. Even before Masimo filed this lawsuit, Lamego claimed Masimo caused Apple to fire him, and that he "had no choice other than to return to Orange County and open his own company," True Wearables. Kachner Decl. Ex. 8 at TRUE16532 ¶ 16. Lamego put his termination from Apple directly at issue by blaming Masimo for that termination. Masimo should

33

be permitted to ask Apple about the basis for that termination to defend itself from this accusation.

Lamego's termination by Apple is also independently discoverable to show evidence of Lamego's character. *United States v. Shanshan Du*, 570 F. App'x 490, 498 (6th Cir. 2014). Such discovery could help complete the story of Lamego's misconduct that started when he was Cercacor's Chief Technology Officer and continued when he founded True Wearables. *See id.* (defendant's firing by former employer "was admissible character evidence as background information that completed story" of misconduct).

Based on the foregoing, Masimo should be permitted to depose Apple regarding:

**TOPIC NO. 2:**

Reasons for termination of Marcelo Lamego's employment relationship with Apple.

**TOPIC NO. 4:**

Apple's communications with Marcelo Lamego concerning termination of Marcelo Lamego's employment relationship with Apple.

Before any deposition, Masimo should also receive documents pertaining to Apple's termination of Lamego. Presumably those documents would also be inside Lamego's personnel file maintained at Apple (RFP No. 1). If those documents are maintained elsewhere, Masimo has specified that Apple produce any documents concerning Apple's termination of Lamego. (Revised RFP No. 3). Accordingly, Masimo should be permitted to discover the following Apple documents, as Masimo clarified as part of the meet and confer with Apple:

**REQUEST FOR PRODUCTION NO. 1:**

The personnel file for Marcelo Lamego.

**REVISED REQUEST FOR PRODUCTION NO. 3:**

Apple's communications with Marcelo Lamego regarding the end of his employment.

34

JOINT STIPULATION REGARDING NON-PARTY APPLE INC.'S MOTION TO QUASH
SUBPOENA AND FOR A PROTECTIVE ORDER
CASE NO. 8:18-CV-02001-JVS (JDEx)

Exhibit 9

Gibson, Dunn &
Crutcher LLP

### 2. Masimo Has a Substantial Need For the Requested Discovery

The parties agree that a Court should not quash a subpoena if the need for the discovery "cannot be otherwise met without undue hardship." *See* Br. at 1, 19. Apple is the only source of the documents Masimo seeks, and therefore, Masimo has no other options for the discovery. Lamego confirmed that he has incomplete copies of his communications with Apple. Kachner Decl. Ex. 3 at 327:17-328:14. And in the final days of fact discovery in this case, Lamego refused to provide any meaningful testimony about Apple, citing his confidentiality obligations to Apple. Id. at 10:13-12:18. Thus, Apple is the only source of this relevant discovery.

Apple's cases do not support quashing Masimo's subpoena. Apple cites two cases, but both are inapposite because both cases concern confidential research and technology. *See Compaq Computer Corp. v. Packard Bell Elecs., Inc.*, 163 F.R.D. 329, 338 (N.D. Cal. 1995) (discussing a subpoena that sought "trade secrets or other confidential research, development or commercial information"); *Convolve, Inc. v. Dell, Inc.*, 2011 WL 1766486, at *2 (N.D. Cal. May 9, 2011) (discussing a subpoena that sought "confidential technology"). Masimo seeks no such information here. Rather, Masimo seeks limited discovery on: (1) Apple's recruitment of Lamego while he worked at Cercacor, (2) Lamego's title and duties at Apple, and (3) Apple's basis for terminating Lamego. All three topics are directly relevant in this case, and Defendants have also put all three topics at issue.

### 3. Masimo's Subpoena Does Not Impose an Undue Burden on Apple

Apple contends that Masimo's subpoena "unnecessarily duplicates work that is already being done in the Apple Case." Br. 21. This argument is not a basis to deny discovery, and Apple provides no evidence to support its position. It also falls well short of showing an undue burden.

For the subpoenaed documents, Apple merely identifies similarities between the subpoena and certain document requests that Masimo served in the Apple case. Br. at 21-24. But Apple identifies no extra effort or cost to produce the same document in two

35

Gibson, Dunn & Crutcher LLP

JOINT STIPULATION REGARDING NON-PARTY APPLE INC.'S MOTION TO QUASH
SUBPOENA AND FOR A PROTECTIVE ORDER
CASE NO. 8:18-CV-02001-JVS (JDEX)

Exhibit 9

different cases.  Moreover, Apple has not committed to producing all of the documents at issue in the Apple case.

For the deposition topics, Apple contends Masimo seeks testimony that will "also will likely be duplicative of Plaintiffs' Rule 30(b)(6) topics in the Apple Case."  Br. at 24.  But any duplication does not show an undue burden.  Rather, any duplication is merely the result of the protective orders governing each case.  Those protective orders prohibit use of confidential discovery in another case without authorization or further court order.  Kachner Decl. Ex. 12 at ¶ 5.1; Dkt. 260 ¶ 5.  Masimo is merely complying with the protective orders by seeking relevant information by subpoena so that the information can be used in this case.  Masimo did not serve the subpoena for "gamesmanship" or for an "improper purpose" as Apple alleges.  *See* Br. at 9.

Masimo has no desire to take the same deposition or duplicate Apple's documents in both cases.  Similarly, it appears Apple would prefer not to duplicate its discovery efforts.  The parties could avoid any duplicate effort if Apple simply allows confidential discovery to be used in both cases, and Masimo is perfectly willing to enter into such a stipulation.  If Apple refuses, any duplicate discovery efforts would be of Apple's own making.  Moreover, Apple is of course presuming that it has already produced all of the information sought by the subpoena in the Apple Case.  But Apple is fighting that discovery in the Apple Case as well.

### 4. Apple's Remaining Arguments Do Not Justify Quashing The Subpoena

#### a. Masimo timely served its subpoena

Apple argues that Masimo timed this subpoena to disrupt or conflict with the timing of discovery hearings in the Apple case.  Br. at 24.  Apple argues "the abridged timing of Plaintiffs' Subpoena … confirms its improper purpose."  *Id*.  This argument is baseless.  The timing is actually very simple.  The timing of the subpoena was due to the case schedule in this case, and Masimo's attempts to obtain all discovery possible from True Wearables and Lamego before pursuing the discovery from Apple.   Indeed,

36

JOINT STIPULATION REGARDING NON-PARTY APPLE INC.'S MOTION TO QUASH SUBPOENA AND FOR A PROTECTIVE ORDER
CASE NO. 8:18-CV-02001-JVS (JDEX)

Exhibit 9

Masimo just recently completed Lamego's deposition where he refused to provide information about his employment at Apple. Masimo timely served the subpoena near the close of fact discovery. Any overlap with proceedings in the Apple Case was merely the result of the deadline for discovery in this case. Apple's attempt to attribute improper motive to Masimo is baseless. And because the protective order prohibits the use of protected material in another case, Apple's claims of improper purposes is not plausible.

Apple's legal citations are also misplaced. In *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 2019 WL 1236054, at *2 (N.D. Cal. Mar. 18, 2019), the court quashed a subpoena seeking discovery from a third party that the court had already ruled was "out-of-bounds." But here, this Court has not yet considered, much less ruled on, the relevance of the requested discovery in either this case or the Apple Case. *Thogus Prod. Co. v. Bleep, LLC*, 2021 WL 827003, at *5 (N.D. Ohio Mar. 4, 2021), is also inapposite. There the court denied Plaintiff's attempt to take expedited discovery from the Defendant. Plaintiff then served fifteen subpoenas on Defendant's customers, seeking the very same expedited discovery the court had already denied. Masimo is not seeking to bypass any court order. Masimo merely seeks very focused and limited discovery from Apple that is relevant to this case and is available from no other source.

> **b.** **Masimo is not seeking to avoid discovery limits in the Apple case**

Apple also argues Masimo's subpoena is an attempt to avoid the 100-hour deposition limit in the Apple case.[12] Br. at 2, 14, 25. This argument is pure conjecture. Masimo has not yet used a single hour of deposition time in the Apple case, and does not currently expect to be short on hours. Apple should not be able to rely on the deposition clock in the Apple Case (which has not started to run) to avoid a deposition in this case.

> **c.** **Masimo's first subpoena is irrelevant**

As Apple acknowledges, Masimo voluntarily withdrew a prior subpoena to Apple

---

[12] This argument is irrelevant to Masimo's subpoena for documents.

JOINT STIPULATION REGARDING NON-PARTY APPLE INC.'S MOTION TO QUASH
SUBPOENA AND FOR A PROTECTIVE ORDER
CASE NO. 8:18-CV-02001-JVS (JDEX)

Exhibit 9

1   more than a year ago.  Br. at 10.  Apple argues that Masimo's withdrawn subpoena and

2   the current subpoena are merely attempts to "use this case to seek discovery that

3   [Plaintiffs] know they are unlikely to obtain in the Apple case." *Id*. at 8.  Apple further

4   accuses Masimo of engaging in "gamesmanship with respect to basic discovery rules."

5   *Id*. at 9.  Apple's argument and accusations are unsupported.

6          Masimo's withdrawn subpoena is not before this Court.  Apple's discussion of

7   that subpoena distracts from the narrowly focused subpoena at issue.  Masimo served

8   the withdrawn subpoena when it was facing a discovery deadline, before Defendants sat

9   for a single deposition or produced significant discovery.  That discovery deadline was

10  subsequently moved. *See* Dkt. 79.  With the additional time, Masimo withdrew the

11  subpoena to first pursue as much discovery as possible from Defendants in this case

12  before serving Apple with the subpoena at issue.  That is entirely proper.

13         The discovery Masimo obtained has allowed Masimo to narrowly focus the

14  current subpoena on discovery that is directly at issue in this case that Masimo cannot

15  receive from Lamego.  Apple understood that Masimo reserved the right to re-serve a

16  new subpoena at a later stage in the case.  For that reason, Apple dismissed its motion

17  to quash without prejudice, "reserving the right to refile both should Plaintiffs at any

18  time decide to re-issue the subpoena to Apple in connection with the True Wearables

19  Case." Samplin Decl. Ex. E.

20             **d.     Masimo properly focused the subpoena**

21         After meeting and conferring on Apple's motion, Masimo further focused the

22  subpoena in response to Apple's objections.  Kachner Decl. Ex. 1.  Despite Masimo's

23  clarification, Apple still refused to respond.  Kachner Decl. Ex. 2.

24         Apple contends that Masimo is not permitted to clarify and narrow the scope of

25  its subpoena.  *Id*.  Apple's argument lacks support.  Nothing precludes an issuing party

26  from focusing a subpoena to resolve objections.  Indeed, that is what the meet and confer

27  process is supposed to facilitate.  Apple cites no authority, and Masimo is aware of none,

28  holding that a party may not narrow a subpoena after it is served.  Apple's own cited

38

JOINT STIPULATION REGARDING NON-PARTY APPLE INC.'S MOTION TO QUASH
SUBPOENA AND FOR A PROTECTIVE ORDER
CASE NO. 8:18-CV-02001-JVS (JDEX)

Exhibit 9

Gibson, Dunn &
Crutcher LLP

authority recognizes that a subpoena may be narrowed by agreement. *Alcon Vision, LLC v. Allied Vision Grp., Inc.*, 2019 WL 4242040, at *3 (S.D.N.Y. Sept. 6, 2019). Courts have denied motions to quash when the moving party refuses efforts to narrow the subpoena. *See, e.g., In re Broiler Chicken Antitrust Litig.*, No. 16 C 8637, 2019 WL 2764260, at *2 (N.D. Ill. May 6, 2019).

Instead, Apple argues Masimo must withdraw its subpoena and issue a new subpoena if Masimo seeks to clarify the subpoena's scope. Kachner Decl. Ex. 2. This is unnecessary for four reasons. First, Masimo's subpoena as served is already directed to the three relevant issues identified above. Second, Masimo is permitted to further focus its subpoena. Third, Apple's suggestion is not available here because discovery has now closed in this case. By serving this subpoena near the end of fact discovery, Masimo was able to focus the subpoena on narrow issues for which discovery from Apple was still needed. Fourth, Apple's suggestion would not resolve the matter because Apple objects to the narrowed topics based on the same objections raised here. *Id.*

### e. Any overlap in discovery between this Case and the Apple Case is not a basis to quash

The facts in this case overlap to some degree with the Apple Case. Indeed, True Wearables and Apple entered a common-interest agreement based on purported overlapping factual issues. Kachner Decl. Ex. 11 at p.3. Their reliance on overlapping facts to support a common-interest agreement shows some facts from Apple are relevant in this case. Apple also relied on the overlap in its notice of related case when Masimo sued Apple. *Masimo Corp. et al. v. Apple Inc.*, Case no. 8:20-cv-00048-JVS-JDE (C.D. Cal.) (Dkt. 14). There appears to be no genuine dispute that some discovery will be relevant to both cases. Masimo should be entitled to relevant discovery from Apple in this case, even though that discovery is also relevant in the Apple case.

Based on discovery in this case, Masimo learned that Apple is the unique source for some discovery. For example, when Masimo questioned Lamego about Apple, he

Exhibit 9

refused to respond and explained that some discovery was available only from Apple. *See* Kachner Decl. Ex. 3 10:13-12:18, 327:17-328:14. Apple should provide Masimo with this relevant discovery.

Apple's argument that Masimo is seeking discovery for use in the Apple Case is also baseless. Masimo needs, and is entitled to, discovery from Apple ***in this case***. Even if Apple were to produce the requested discovery in the Apple Case, the protective order there would preclude Masimo from using that discovery outside that case, unless Masimo obtained relief from the protective order. Kachner Decl. Ex. 12 at ¶ 5.1. Similarly, the protective order in this case precludes Masimo from using any discovery in any other case, including the Apple case, absent relief from the protective order. Dkt. 260 ¶ 5. Masimo's subpoena is necessary for Masimo to secure discovery from Apple for use in this case.

**D.    Conclusion**

Because Masimo's subpoena is focused on relevant issues in this case, and because the discovery is available only from Apple, Masimo respectfully requests that the Court deny Apple's motion to quash.

Dated: June 3, 2021              GIBSON, DUNN & CRUTCHER LLP

                                 By:     */s/ Joshua H. Lerner*
                                         Joshua H. Lerner
                                         H. Mark Lyon
                                         Ilissa Samplin

                                         *Attorneys for Non-Party Apple Inc.*

Gibson, Dunn &
Crutcher LLP

40
JOINT STIPULATION REGARDING NON-PARTY APPLE INC.'S MOTION TO QUASH
SUBPOENA AND FOR A PROTECTIVE ORDER
CASE NO. 8:18-CV-02001-JVS (JDEX)

Exhibit 9

Dated: June 3, 2021

KNOBBE, MARTENS, OLSON & BEAR LLP

By: /s/ Mark D. Kachner
Joseph R. Re
Stephen C. Jensen
Perry D. Oldham
Irfan A. Lateef
Brian C. Claassen
James E. Youngblood
Adam B. Powell
Mark D. Kachner

*Attorneys for Plaintiffs,*
*Masimo Corporation and Cercacor*
*Laboratories, Inc.*

## ATTESTATION UNDER LOCAL RULE 5-4.3.4(a)(2)(i)

Pursuant to Civil L. R. 5-4.3.4(a)(2)(i), I attest that concurrence in the filing of this document has been obtained from each of the signatories above.

By: /s/ Joshua H. Lerner
Joshua H. Lerner

Gibson, Dunn &
Crutcher LLP

Exhibit 9

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

## Notice of Electronic Filing

The following transaction was entered by Lerner, Joshua on 7/2/2021 at 6:21 PM PDT and filed on 7/2/2021

| | |
|---|---|
| **Case Name:** | Masimo Corporation et al v. True Wearables, Inc. et al |
| **Case Number:** | 8:18-cv-02001-JVS-JDE |
| **Filer:** | Apple Inc. |
| **Document Number:** | 321 |

**Docket Text:**
**JOINT STIPULATION to MOTION to Quash Subpoena for Documents and Deposition of Apple Inc. [282]** *(Unredacted)* **filed by Miscellaneous Apple Inc.. (Attachments: # (1) Unredacted Document Exhibits 3-5, 8, and 10 to Kachner Declaration (Dkt. No. 282-3))(Lerner, Joshua)**

**8:18-cv-02001-JVS-JDE Notice has been electronically mailed to:**

Adam Powell    adam.powell@knobbe.com, 2abp@knobbe.com, litigation@knobbe.com

Amanda Rose Washton    a.washton@conklelaw.com, awashton@hotmail.com, support@conklelaw.com

Brian Christopher Claassen    brian.claassen@knobbe.com, KnobbeAdmin@ecf.courtdrive.com

Eric R. Chad    echad@merchantgould.com

Irfan A Lateef    irfan.lateef@knobbe.com, ial@kmob.com, litigation@kmob.com

James Eugene Youngblood    jamie.youngblood@knobbe.com

Joseph R. Re    litigation@kmob.com, joe.re@knobbe.com, jre@kmob.com, KnobbeAdmin@ecf.courtdrive.com

Joshua Hawkes Lerner    jlerner@gibsondunn.com, amoser@gibsondunn.com

Mark D Kachner    mark.kachner@knobbe.com, doreen.buluran@kmob.com, litigation@knobbe.com

Paige S Stradley    pstradley@merchantgould.com

Exhibit 9

Perry D Oldham    perry.oldham@knobbe.com, 2pdo@kmob.com, litigation@kmob.com

Peter A Gergely    pgergely@merchantgould.com

Ryan J Fletcher    rfletcher@merchantgould.com, KDrieman@merchantgould.com, smaney@merchantgould.com

Scott P Shaw    sshaw@merchantgould.com, kholst@merchantgould.com, smaney@merchantgould.com

Sherron L Wiggins    s.wiggins@conklelaw.com, Support@conklelaw.com

Stephen C Jensen    steve.jensen@knobbe.com, sjensen@kmob.com

Zach Kachmer    ZKachmer@merchantgould.com

**8:18-cv-02001-JVS-JDE Notice has been delivered by First Class U. S. Mail or by other means BY THE FILER to :**

Andrew T Pouzeshi
Merchant and Gould PC
1801 California Street Suite 3300
Denver, CO 80202

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**C:\fakepath\UNREDACTED 2021-06-03 Joint Stipulation re Apple's Mot to Quash_REVISED.pdf
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=7/2/2021] [FileNumber=32221376-0] [a8d44a8fb3472ba7a6d367e0b5b19052b16b713cb7cf2e3ec224b942c9cebb72ba7f a127f9cebb66dccfd0fdd1e7e8b181f495a94bb0c00a76904c8ec8bb242b]]
**Document description:**Unredacted Document Exhibits 3-5, 8, and 10 to Kachner Declaration (Dkt. No. 282-3)
**Original filename:**C:\fakepath\UNREDACTED Exhibits to Kachner Declaration.pdf
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=7/2/2021] [FileNumber=32221376-1] [00a736379237c706b24f74865adc0d139f28d73773d2e90a4f07dc748edcb023c5c8 8c17afe1477407fb4b0fe26a1c654872e0856c30692cbb959b30443ac7a1]]

Exhibit 9

# EXHIBIT 10

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(SOUTHERN DIVISION - SANTA ANA)

MASIMO CORPORATION, ET AL,    ) CASE NO: 8:18-CV-02001-JVS-JDE
                           )
            Plaintiffs,    )           CIVIL
                           )
    vs.                )     Santa Ana, California
                           )
TRUE WEARABLES, INC, ET AL,    )    Thursday, June 24, 2021
                           )
            Defendants.    )

HEARING RE: NON-PARTY APPLE, INC'S MOTION TO QUASH SUBPOENA
[DKT.NO.282];

AND SEALING APPLICATIONS [DKT.NOS.280,289,291]

BEFORE THE HONORABLE JOHN D. EARLY,
UNITED STATES MAGISTRATE JUDGE

<u>APPEARANCES</u>:           SEE PAGE 2

Court Reporter:        Recorded; Digital

Courtroom Deputy:      Maria Barr

Transcribed by:        Exceptional Reporting Services, Inc.
                         P.O. Box 8365
                         Corpus Christi, TX 78468
                         361 949-2988

**Proceedings recorded by electronic sound recording;
transcript produced by transcription service.**

Exhibit 10

2

<u>APPEARANCES</u>:


For Plaintiffs:              JOSEPH R. RE, ESQ.
                             Knobbe Martens Olson & Bear, LLP
                             2040 Main Street
                             14th Floor
                             Irvine, CA 92614

                             MARK D. KACHNER, ESQ.
                             Knobbe Martens Olson & Bear, LLP
                             1925 Century Park East
                             Suite 600
                             Los Angeles, CA 90067


For Moving Party:            ILISSA S. SAMPLIN, ESQ.
                             Gibson Dunn & Crutcher, LLP
                             2029 Century Park East
                             Suite 4000
                             Los Angeles, CA 90067

Exhibit 10

1          **Santa Ana, California; Thursday, June 24, 2021**

2                    **(Remote appearances)**

3                      **(Call to Order)**

4          **THE CLERK:**  Please remain seated, and come to order.

5    This United States District Court is now in session.  The

6    Honorable John D. Early, United States Magistrate Judge,

7    presiding.

8          **THE COURT:**  Good morning everyone.  We're calling the

9    case of Masimo Corporation, et al, versus True Wearables, Inc.,

10   et al; Case Number 8:18-cv-2001-JVS-JDE.

11         Let's have appearances from Counsel, starting with

12   Counsel for the Plaintiffs.

13         **MR. RE:**  Thank you, Your Honor.  For the Plaintiff

14   Masimo Corporation and Cercacor Laboratories, my name is Joseph

15   Re from the law firm of Knobbe Martens.  And to my left is my

16   partner, Mark Kachner.

17         **THE COURT:**  All right.  And on behalf of Debtor -- or

18   I'm sorry -- on behalf of moving party Apple Inc.

19         **MS. SAMPLIN:**  Yes.  Good morning, Your Honor.  On

20   behalf of a non-party, but moving party in this case, on the

21   Motion to Quash, Apple Inc., Ilissa Samplin from Gibson, Dunn &

22   Crutcher.

23         **THE COURT:**  All right.  Is there any appearance or

24   person here on behalf of any of the Defendants; True Wearables,

25   or the other Defendant, Mr. Lamego?

4

1          Seeing or hearing nothing.  It was noticed for today.

2  They are not required to be here if they don't find an interest

3  in it.

4          All right.  We're here for one substantive motion,

5  and that's Docket Number 282, non-party Apple's Motion to Quash

6  and/or for a protective order regarding a subpoena.

7          In connection with that motion, there's a joint

8  stipulation supporting and opposing evidence.  There are

9  supplemental memoranda filed by each Plaintiff and moving party

10  Apple, at least one of which is supported by additional

11  evidence.  And then there are three applications to seal

12  documents in connection with the initial motion and joint

13  stipulation in evidence, and then in connection with each

14  supplemental memorandum.

15          We're going to start with the Motions to Seal -- or

16  the Requests to Seal.  We're going to go through these item by

17  item.  And we're going to start -- and I know it was a

18  different case, but at least some of the same Counsel were here

19  last week, or two weeks ago, where we talked about Local Rule

20  79-5.2.2, governs sealing.

21          Our protected order in this case also requires

22  parties, if they seek to seal documents, to proceed under Local

23  Rule 79.

24          And I'm just going to read, so that we all are on the

25  same footing.

Exhibit 10

5

1           This is Subsection B.

2           The heading is, "Documents designated by another as

3           confidential pursuant to a protective order."

4   And now I'll quote.  And this is a long quote:

5           "At least three days before seeking to file under

6           seal a document containing information previously

7           designated as confidential by another pursuant to a

8           protected order, the filing party must confer with

9           the person that designated the material confidential,

10          open paren, (the, (quote), 'designating party')

11          (close quote, close paren), "in an attempt to

12          eliminate or minimize the need for filing under

13          sealing by means of redaction. (period).

14          "If the document cannot be suitably redacted by

15          agreement, comma, the filing party may file an

16          application pursuant to Subsection A, comma, but the

17          supporting declaration must identify the material

18          previously identified as confidential, (comma), as

19          well as the designating party, (comma), and must

20          describe in detail the efforts made to resolve the

21          issue. (period).

22          I'm going to skip a sentence.  And then:

23          "Subsequently: (colon) --

24   Again, we're just going to talk about little i:

25          "Within four days of the filing of the application,

**EXCEPTIONAL REPORTING SERVICES, INC**

Exhibit 10

6

1            comma, the designating party must file a declaration

2            establishing that all or part of the designated

3            material is sealable by showing good cause or

4            demonstrating compelling reasons why the strong

5            presumption of public access in civil cases should be

6            overcome, (comma), with citations to the applicable

7            legal author -- legal standard. (period).

8        I'm going to end it there.  There's discussions about

9   if the designating party maintains that only a portion of the

10  material is sealable, the designated party should file, with

11  that declaration, a copy of what the proposed portion to be

12  sealed should be highlighted.

13        The last sentence of Subsection (i) provides,

14  (quote):

15            "Failure to file a declaration or other required

16            document may be deemed sufficient grounds for denying

17            the application."  (period, close quote).

18  Then little i-2 -- so little ii.

19            "If the application is denied, the filing party may

20            file the document in the public case file, i.e.,

21            unsealed, no earlier than four days and no later than

22            ten days after the application is denied unless the

23            Court orders otherwise." (period).

24        All right.  So with that standard in mind, let's turn

25  to Docket Number 289.  And that is an application to seal --

Exhibit 10

7

1    I'm sorry -- Docket Number 280.  That is an application to file

2    certain documents under seal along with redacted versions, and

3    then, in conjunction with that Docket 281, which is sealed.

4           And I won't, at this moment, get into anything that

5    appears to be confidential or had been designated as

6    confidential in those documents, but I will momentarily.

7           The declaration in support of the sealing request --

8    and this all relates to the original motion, which is Docket

9    282.  So we're in Docket 281.  It's by Mr. Lerner, Counsel for

10   moving party Apple.  And it cites to the appropriate Local Rule

11   79-5.2.2.  And it says it seeks to seal portions of the joint

12   stipulation.  And there is a sealed version, which is

13   unredacted and then separately filed at Docket 280; 281 is a

14   redacted version, along with Exhibits H and N to the

15   declaration of Ilissa Samplin, and Exhibits 3 through 8 and 10

16   through 11, to the declaration of Mark Kachner -- I'm sorry, I

17   butchered that.  Is it --

18           **MR. RE:**  Kachner.

19           **MR. KACHNER:**  Kachner, thank you.

20           **THE COURT:**  Kat --

21           **MR. KACHNER:**  Kack --

22           **THE COURT:**  Kachner -- which are all submitted in

23   connection with the motion.

24           So I'll tell you, I preliminarily looked at the

25   Documents H and N; they're Exhibits H and N to Ms. Samplin's

**EXCEPTIONAL REPORTING SERVICES, INC**

Exhibit 10

8

1    declaration.  And I find, based on what's in front of me and

2    the reference to the Case 8:20-cv-48-JVS that a sufficient

3    showing has been made to seal those documents.

4              As to the exhibits to Mr. Kachner's declaration, let

5    me start by asking.  I didn't see it on the docket.  And I'll

6    start with you, Ms. Samplin, because it's Mr. Lerner's

7    declaration that seeks sealing.

8              Turning -- and I'm going to go in a quick aside,

9    turning to paragraph 7 of that declaration, at Docket 281, it

10   indicates that Exhibits 3 through 8, 10 through 11, to the

11   Kachner declaration, contain material designated as

12   confidential or confidential attorney eyes' only, "AEO," by

13   Plaintiff and/or Defendants True Wearables and Marcelo Lamego

14   under the protected order in this case.

15             And I'm going to start with you, Ms. Samplin.  To

16   your knowledge, has anyone filed a declaration, either from

17   Plaintiffs or Defendants, as required under Local Rule

18   79-5.2.2(b), as I previously read from?

19             **MS. SAMPLIN:**  Your Honor, I don't have knowledge of

20   that off the top of my head.  But it --

21             **THE COURT:**  All right.

22             **MS. SAMPLIN:**  -- doesn't mean it's going to happen.

23             **THE COURT:**  Okay.  I'll ask Plaintiffs.

24             Are you aware of anyone having filed a declaration as

25   required to maintain a request to seal an evidentiary showing

Exhibit 10

9

1   under -- or just right now, it's a yes or no question, okay --

2   under Local Rule 79.5.2.2(b), to support sealing of the

3   documents attached -- that are sought to be sealed, attached to

4   your declaration?

5        **MR. RE:**  No, Your Honor.

6        **THE COURT:**  All right.  So with that being the lay of

7   the land, tentatively, under the Local Rules, I could, based on

8   that alone, order the request for sealing denied.

9            But let's do this:  Let's go through these, because I

10  don't want to do anything that's going to create unnecessary

11  heartburn due to maybe an oversight by someone.  So let's pull

12  up -- and, unfortunately, my computer right now is really slow.

13  But let's go through Exhibits 3 through 8, comma, 10 through

14  11, from Mr. Kachner's declaration.

15           And the only -- you're the only person here between

16  Plaintiffs and Defendants, who I can hear from, about the --

17  any basis to grant the sealing request.

18           So let's start with Exhibit 3.  Which I think I'm

19  safe to say is -- let's characterize it as a portion of a

20  transcript of a deposition taken on May 20, 2021.  I don't know

21  if we want me to get more specific than that.

22           But from Plaintiffs' standpoint, is this transcript

23  something that needs to remain under seal?  Is there

24  appropriate evidentiary showing?  And if there hasn't, do you

25  want to try to make one now?

Exhibit 10

1          **MR. RE:**  Thank you, Your Honor.  This is a deposition

2    transcript of the Defendant in the litigation that Defendant's

3    Counsel designated confidential.

4          **THE COURT:**  All right.  Are you requesting

5    confidential or attorneys' eyes only treatment for it?

6          **MR. RE:**  Yes, Your Honor.

7          **THE COURT:**  You are?  I want to be clear.  The way it

8    works is, they had an opportunity -- the Defendants did -- had

9    an opportunity to support the sealing request that was made

10   here under the Local Rules.

11         They did not make an evidentiary showing.  But if we

12   have a kind of situation where someone made a mistake, they're

13   not here today -- I wish they were -- they're not here today.

14         And if there's something in here that maybe you, as

15   an officer of the Court, are going to tell me, "Well, you know,

16   Judge, there's something in here that I think that they've

17   expressed separately or in some other circumstance."

18         And if you want to take a few moments to review it, I

19   encourage you to.  But my tentative is to find that the sealing

20   requirements have not been met, and order that this be filed in

21   the public docket within four days, and that we're going to

22   talk about these things today.

23         So let me start with -- it was a bit of a litany of

24   questions.  It's not your -- you never requested attorneys'

25   eyes only or confidential treatment of this portion of the

Exhibit 10

11

1    transcript, correct?

2            **MR. RE:**  Correct.

3            **THE COURT:**  And by you, I mean your clients.

4            Defendants did.  Is there anything in there that --

5    and, again, I'm putting you in an awkward spot, and I'm just

6    asking if you can tell me anything that you see in there that I

7    should independently verify.

8            Because I'll tell you, I don't see anything in there

9    that looks some -- looks like something that rises to the level

10   of attorneys' eyes only substantively or even to the level of

11   confidential.  I largely see objections and colloquies between

12   Counsel here.

13           So tell me if you see anything.  And when you're

14   done, after you've had enough time to look at it, tell me if

15   there's anything in here that you think I should be concerned

16   with.

17           **MR. RE:**  I attended the deposition.  And I know

18   exactly what the situation is.  The deposition --

19           **THE COURT:**  This is Mr. Re?

20           **MR. RE:**  This is Mr. Re.  Under the protected order,

21   the parties are given 30 days in which to make the redactions.

22           At the time of this filing, the entirety of the

23   transcript has to be treated as confidential or AEO under the

24   protected order until a certain amount of time -- I believe

25   it's 30 days -- passes for the witness to then designate the

Exhibit 10

12

```
1    portions they want to make AEO or confidential.

2              The trouble was, at the time this was filed, the

3    30-day --

4              THE COURT:  Understood.

5              MR. RE:  -- time passed.

6              THE COURT:  So has there been any specific

7    designation of any of this portion to your knowledge?

8              MR. RE:  To my knowledge, no.

9              THE COURT:  And do you see anything independently in

10   there that would -- that I should really look closely at,

11   because I'm inclined to deny the sealing request as to this

12   transcript?

13             You're not representing them.  I'm just asking you,

14   as an officer of the Court, sometimes things come up in

15   litigation where the parties know, "Hey, this is a very

16   sensitive topic for the other side."

17             MR. RE:  I believe that the Defendant has

18   over-designated.  I'm with the Court.  I think much has been

19   over-designated.

20             THE COURT:  Is there anything in here that is not

21   over-designated, from your view?  We're just talking about

22   Exhibit 3.

23             MR. RE:  In my opinion, nothing should be

24   designated --

25             THE COURT:  I don't even want you to give your
```

Exhibit 10

13

1    opinion.  It's more, has anything come to you from the

2    Defendants?

3            **MR. RE:**  Yes.  The Defendant has previously

4    designated documents that are inferentially referred to --

5            **THE COURT:**  We're going to be getting to those, I

6    believe.

7            **MR. RE:**  -- into the --

8            **THE COURT:**  We're going to be --

9            **MR. RE:**  -- deposition.

10           **THE COURT:**  -- getting to those.

11           **MR. RE:**  Particularly the deposition on page 327; the

12   email in question, which has been designated as confidential,

13   is --

14           **THE COURT:**  All right.  And I'll tell you --

15           **MR. RE:**  -- is discussed.

16           **THE COURT:**  -- that I've looked at that, and I don't

17   think that's confidential.

18           **MR. RE:**  I agree with you.

19           **THE COURT:**  All right.  So other than -- thank you

20   for relaying that information that's come from the Defendants

21   who were -- had notice of this hearing and are not appearing,

22   had an opportunity to file the required declaration, under

23   Local Rule 79.5.2.2(b), and did not.

24           So other than that, anything else you should -- that

25   I should look at closely that you're aware of?

EXCEPTIONAL REPORTING SERVICES, INC

Exhibit 10

14

1              **MR. RE:**  Nothing from the Plaintiff.

2              **THE COURT:**  All right.  So I'm going to deny the

3    motion -- the Request to Seal Exhibit 3 to the Kachner

4    declaration.

5              Let's move on to Exhibit 4.

6              And I should say that Exhibit 3, actually it's

7    several sessions of a deposition transcript of Mr. Lamego, just

8    to be clear for the record.

9              All right.  Exhibit 4 is, I believe, two emails.  I'm

10   not going to say the substance yet.  But the header -- I'll

11   put -- I'll say the date and time -- is an email dated

12   Wednesday, October 2, 2013, at 12:54 a.m.  It's a three-page

13   email followed by -- it's part of the same exhibit -- a

14   separate email, dated Wednesday, October 2, 2013, at 10:25 a.m.

15             I'll start with you, Ms. Samplin.  Are you aware of

16   any filing by Defendants seeking to support -- it's

17   Mr. Lerner's declaration -- seeking to support an evidentiary

18   finding to keep this document -- or to file this document under

19   seal?

20             **MS. SAMPLIN:**  I am not, Your Honor.

21             **THE COURT:**  All right.  On behalf of Plaintiffs,

22   either Mr. Re or Mr. Kachner, are you aware of any information

23   in the record -- let's just start with on the docket -- of an

24   evidentiary showing to support the continued sealing of

25   Exhibit 4?

Exhibit 10

15

1          **MR. RE:**  No, Your Honor.

2          **THE COURT:**  And is there anything in there -- and

3  I've reviewed it.  And it tentatively appears to me to not

4  contain anything that would rise to the level of -- and we're

5  looking at good cause here as opposed to compelling reasons --

6  but good cause to overcome the general presumption of public

7  access.

8          But tell me if you, first of all, on behalf of your

9  client, do you see anything in there that you think requires

10  sealing?

11          **MR. RE:**  No, Your Honor.

12          **THE COURT:**  And is there anything that you know of

13  from your dealings with Mr. Lamego or his Counsel -- Mr. Re had

14  mentioned that this is something that they had taken the

15  position, was -- is it attorneys' eyes only?  Is that how they

16  designated it, or just confidential?

17          **MR. RE:**  Just confidential.

18          **MR. KACHNER:**  Just confidential.

19          **THE COURT:**  All right.  That they find this document

20  confidential, other than generally attesting to that and

21  stating that in other portions of the litigation?

22          **MR. RE:**  We only know, having attended the Lamego

23  deposition, that he believes he kept it confidential because he

24  feels he has an obligation to Apple.

25          **THE COURT:**  Okay.  And just to be clear, Mr. Lerner's

EXCEPTIONAL REPORTING SERVICES, INC

Exhibit 10

16

 1    declaration, the only basis for sealing the Request to Seal

 2    anything in Mr. Kachner's declaration is the assertion that the

 3    material had been designated confidential or AEO by Plaintiffs

 4    and/or Defendants, correct?

 5            MR. RE:  There's one item, Your Honor.  We requested

 6    to True Wearables' Counsel that we could disclose this to

 7    Apple.  And they put conditions on that.

 8            THE COURT:  I recall that.  And I saw that there's

 9    references in the briefing to that.  But here's my -- stepping

10    back, there's only one basis that's -- now it's in front of me.

11    There's a request to seal it.  The only basis for the request

12    to seal it is Mr. Lerner's statement that this document has

13    been designated confidential or confidential attorneys' eyes

14    only by Plaintiffs and/or Defendant.  Is that correct?

15            MR. RE:  It's misleading.  We only designated it --

16            THE COURT:  No, no, no.  I guess -- is there anybody

17    else?  Did Apple?  Has Apple attempted to designate this email

18    in connection with this motion?

19            MR. KACHNER:  No, Your Honor.

20            THE COURT:  Okay.  So we're just focusing on

21    Plaintiffs and/or Defendants.  I wish we knew who it was.  My

22    understanding is that you advised him that Defendants -- you

23    advised Apple that the Defendants had designated this as

24    confidential.  And then as pursuant to the protective order

25    would need to be filed under the procedures of Local Rule

Exhibit 10

17

1  79-5.2.  But no one has filed any evidentiary showing with

2  respect to this email; is that correct?

3              **MR. KACHNER:**  Correct.

4              **THE COURT:**  All right.  And other than the general

5  history of the litigation where they have stated they consider

6  it confidential, is there anything before today's hearing or

7  anything that you've been advised, recognizing that they didn't

8  initially want to share it with Apple.  Anything other than

9  that that contains information in here that's been relayed to

10 you as somehow particularly sensitive in this eight-year-old,

11 nearly eight-year-old email involving being approached for

12 potentially joining an executive team?

13             **MR. RE:**  No, Your Honor.

14             **THE COURT:**  All right.  I find that I'm going to deny

15 the request to seal Exhibit 4.  And as with all the exhibits I

16 decline, we're going to follow the procedure in Local Rule

17 79-5.2 that that's ordered to be filed in the public docket

18 between four 10 days from today.

19             Let's move on to Exhibit 5, looks like a meet-and-

20 confer correspondence.  And I think this was at least generally

21 what Mr. Kachner was talking about, that there was

22 communications with between counsel for Plaintiffs and

23 Defendants regarding certain records and this motion.

24             Then I'll ask Ms. Samplin, are you aware of anything

25 that's been submitted by Defendants that would support an

18

1    evidentiary showing to continue to seal Exhibit 5?

2           **MS. SAMPLIN:**  No, Your Honor.

3           **THE COURT:**  All right.  And on behalf of Plaintiffs,

4    do Plaintiffs contend that Exhibit 5 contains confidential or

5    attorneys'-eyes-only information under the protective order?

6           **MR. KACHNER:**  No, Your Honor.

7           **THE COURT:**  All right.  Having independently reviewed

8    it, I don't see anything in Exhibit 5 that would warrant or

9    justify any finding of confidentiality or other basis to

10   overcome the general presumption of public access.  And there's

11   been no evidentiary showing as required under Local Rule

12   79-5.2.2(b), so I'm going to deny the motion to seal Exhibit 5.

13          Exhibit 6 is another deposition transcript.  This is

14   a deposition, I won't say of whom, but of a representative of

15   Plaintiffs that was designated attorneys' eyes only.  And

16   again, it does not appear that there's been an evidentiary

17   showing with respect to Exhibit 6.

18          Ms. Samplin, are you aware of any that I have missed?

19          **MS. SAMPLIN:**  I am not, Your Honor.

20          **THE COURT:**  All right.  On behalf of Plaintiffs,

21   since I can't tell from Mr. Lerner's declaration because it

22   says "and/or," I can't tell who designated this.  Do you know

23   who designated this for purposes of our hearing here today,

24   designated it as attorneys' eyes only?

25          **MR. KACHNER:**  Understood, Your Honor.

Exhibit 10

1          **THE COURT:**  Okay.  And what is your view about

2    whether it should continue to be attorneys' eyes only or

3    confidential; or maybe more generally, should it be filed under

4    seal or not?

5          **MR. KACHNER:**  There are some materials in here, Your

6    Honor, that we would like to maintain under seal.

7          **THE COURT:**  All right.  Even though the showing is

8    late, I'm going to allow you, counsel for Plaintiffs, to file a

9    supplemental declaration setting forth, as required under Local

10   Rule 79-5.2.2(b), with highlighting what portions of Exhibit 6

11   you believe are -- should be maintained under seal, with an

12   evidentiary showing as to why.  And that filing may itself be

13   under seal.  And then we'll make a ruling on Exhibit 6.

14          All right.  Let's turn to Exhibit 7.  It looks like a

15   series of a family of email chain.

16          Ms. Samplin, do you have any -- is there anything in

17   the docket that suggests that any party made an evidentiary

18   showing to continue sealing Exhibit 7?

19          **MS. SAMPLIN:**  No, Your Honor.

20          **THE COURT:**  And on behalf of Plaintiffs, did you

21   designate this confidential or attorneys' eyes only or did

22   Defendants designate that?

23          **MR. KACHNER:**  Plaintiffs designated Exhibit 7.

24          **THE COURT:**  All right.  They had an opportunity and

25   did not submit any follow up and did not appear at the hearing

20

1    -- have not appeared at the hearing this morning.

2           Is there anything that you'd like to offer?  And

3    Mr. Kachner, you raised your hand.

4           **MR. KACHNER:**  I just want to be clear.  Plaintiffs

5    designated this document.

6           **THE COURT:**  Oh you said "Plaintiffs".  All right.

7    Well what's the basis for it?

8       **(Pause)**

9           **MR. KACHNER:**  We withdraw the confidentiality

10   designation, Your Honor.

11          **THE COURT:**  I don't want to rush you.  Here's what I

12   really don't want to do.  I don't want to have someone come

13   rushing back and say, whoops, we forgot this, so take as much

14   time as you need.  And if you withdraw it then it will be

15   withdrawn and the request to seal as to Exhibit 7 will be

16   denied but take your time.

17      **(Pause; Counsel confer).**

18          **THE COURT:**  Mr. Re, you want to speak.

19          **MR. RE:**  Yes.  I wonder if we can include this with

20   Exhibit 6 and go back to see our clients.  We're a little

21   concerned that there's individual names and their immigration

22   status --

23          **THE COURT:**  All right.

24          **MR. RE:**  -- that's mentioned on the document.

25          **THE COURT:**  The same order for Exhibit 7 as to

**EXCEPTIONAL REPORTING SERVICES, INC**

Exhibit 10

21

1   Exhibit 6 that to the extent continued sealing is requested, I

2   need a basis for it and I need an evidentiary showing to

3   support it.  And if not all of the document needs to be sealed,

4   I need a redacted version and then a version highlighting -- a

5   clean and unredacted version but has the portions to be

6   redacted highlighted.  And that submission may be made under

7   seal.

8           Exhibit 8, this is a letter dated July 23rd, 2016.

9   On its face, it indicates that there may be a basis to maintain

10  it confidential although the basis is an evidentiary basis as

11  opposed to meaning the basis to treat it as restricted that's

12  on the face of it is as an evidentiary privilege, not as a

13  public privilege.

14          So I'll ask you again, Ms. Samplin, any information

15  that you're aware of in the docket that I've missed about an

16  evidentiary showing to keep Exhibit 7 confidential or under

17  seal?

18          **MS. SAMPLIN:**  Are we on Exhibit 7 or Exhibit 8?

19          **THE COURT:**  You're right, Exhibit 8.

20          **MS. SAMPLIN:**  No, Your Honor.

21          **THE COURT:**  All right.  And on behalf of Plaintiffs,

22  who designated Exhibit 8?

23          **MR. KACHNER:**  This was designated by Defendants.

24          **THE COURT:**  All right.  Anything in there that you're

25  aware of that -- bearing in mind if it's filed in the public

Exhibit 10

22

1    docket, it doesn't alter any -- for lack of a better term --

2    "mediation privilege" or "settlement communication privilege"

3    but that's the one that caused me a little bit of pause.

4              **MR. KACHNER:**  We do not maintain confidentiality --

5              **THE COURT:**  All right.  Exhibit -- I'm going to deny

6    the motion as to Exhibit 8.

7              And then we turn to Exhibit 10.

8              So Exhibit 8 I actually left off.  There are

9    attachments to Exhibit 8 that have photos.

10             I just want to make sure, none of that is an issue

11   for Plaintiffs, correct?

12             **MR. KACHNER:**  None of that's an issue for Plaintiffs.

13             **THE COURT:**  All right.  Turning to exhibit -- well

14   there's more even beyond that but it looks like some emails but

15   since there's been no evidentiary showing I'm going to deny the

16   application.

17             Exhibit 10 is additional transcript of a different

18   witness' deposition in this case.

19             Ms. Samplin, any information that you're aware of

20   that's on the record that any party made an evidentiary showing

21   to support a sealing request?

22             **MS. SAMPLIN:**  No, Your Honor.

23             **THE COURT:**  On behalf of Plaintiffs, who requested

24   this transcript to be treated confidential?

25             **MR. KACHNER:**  Defendants, Your Honor.

Exhibit 10

23

1          **THE COURT:**  All right.  And it looks like it's dated

2    back in December of 2020 so the earlier situation seems less at

3    issue.

4          Is there anything in this transcript that you appear

5    cause -- would cause -- would support just facially a continued

6    sealing of Exhibit 10?

7          **MR. KACHNER:**  No, Your Honor.  I would qualify that,

8    that this also falls in the category of documents that we

9    requested True Wearables' permission to disclose to Apple, and

10   even right before the filing they conditioned that disclosure.

11         **THE COURT:**  All right.  And there's a reference to an

12   investigation, a government investigation.  Is there anything

13   that you're aware of that that -- this wasn't sealed based on

14   some governmental request or agency request that something be

15   kept confidential.  Is that correct?  From your perspective?

16         **MR. KACHNER:**  I don't believe so, Your Honor.

17         **THE COURT:**  Okay. All right.  The motion will be

18   denied for lacking and evidentiary support as to Exhibit 10.

19         And lastly, Exhibit 11 is another email chain with

20   counsel.

21         Ms. Samplin, are you aware of any evidentiary basis

22   on the docket to support the continued or the request to seal

23   beyond Mr. Lerner's declaration for Exhibit 11?

24         **MS. SAMPLIN:**  No, Your Honor.

25         **THE COURT:**  Oh behalf of Plaintiffs, do you know who

Exhibit 10

24

1    designated Exhibit 11 to be treated as confidential?  It's not

2    facially stamped confidential.

3              **MR. KACHNER:**  Plaintiffs designated this document,

4    Your Honor.

5              **THE COURT:**  Plaintiffs did.

6              **MR. KACHNER:**  Yes, Your Honor.

7              **THE COURT:**  All right.  What's the basis?

8              **MR. KACHNER:**  There is material in here discussing

9    confidential development work that was going on at Masimo and

10   Cercacor.

11             **THE COURT:**  All right.  Other than that, is there

12   anything that Plaintiff based its designation on?

13             **MR. KACHNER:**  No, Your Honor.

14             **THE COURT:**  All right.  As with Exhibit 6 and 7

15   authorized Plaintiff to make a filing with respect to

16   Exhibit 11 that sets forth what the legal basis for the

17   sealing, what an evidentiary foundation would be for sealing.

18   And take proposed redacted (indisc. papers shuffling) if

19   anything can be publicly disclosed to propose redacted and a

20   unredacted version with the proposed redactions highlighted in

21   the unredacted version.

22             So that's with respect to just the motion.  As I

23   noted, I don't see a problem with Exhibits H and N to

24   Ms. Samplin's declaration based on what's in the record and

25   what's in the record in the other case being under seal, but

Exhibit 10

25

1  everything else will be unsealed with an unredacted copy to be

2  filed within four days, except for Exhibits 6, 7 and 11 and

3  we'll await further ruling on that based on a further showing

4  by Plaintiffs.

5          In terms of the two supplemental memoranda, I think

6  that Apple's supplemental memoranda was only -- sought an

7  under-seal filing because argument portions in the supplemental

8  memoranda referred to other materials that were provisionally

9  sought sealing, so we're going to take that up after everything

10  gets final.  And we'll direct that with respect to Apple's

11  supplement -- and also the joint stipulation -- anything that

12  is ordered unsealed will no longer be a basis to redact from

13  the joint stipulation.  Anything that remains sealed will

14  remain.  And so since it's a joint submission, we're going to

15  have to have the parties work together to submit a redacted

16  joint -- a newly redacted joint stipulation with everything

17  that's been ordered not sealed to be included in that new

18  redacted joint stipulation to be filed.  Everybody understand

19  that?

20          And the same applies to the supplemental memoranda.

21          There are some exhibits to Plaintiffs' supplemental

22  memoranda.  I think it's Exhibit 16 which Plaintiff seeks

23  sealing.  And let's pull that up.  And while I'm doing that

24  I'll ask since this is at Plaintiffs' request -- well let me

25  take a look.

Exhibit 10

1      **(Pause)**

2              **MR. RE:**  Your Honor, I might be able to make this one

3      easy for you.

4              **THE COURT:**  All right.

5              **MR. RE:**  The Exhibit 16 is a continuation of an email

6      chain that was previously filed at Exhibit 5.  And there's

7      nothing new in the additional discussion that would warrant

8      sealing.  So the same treatment applies to Exhibit 5 which was

9      unsealed, I believe.

10             **THE COURT:**  All right.  I guess -- let me ask you.

11             Who -- although you did the declaration, did you do

12     the declaration seeking sealing of Exhibit 16 because

13     Defendants had designated Exhibit 16 confidential?

14             **MR. RE:**  That's right, Your Honor.

15             **THE COURT:**  All right.  And you're not aware of any

16     filing by Defendants providing an evidentiary basis to keep

17     that document under seal since you filed your request to seal?

18             **MR. RE:**  No, Your Honor.

19             **THE COURT:**  And do you independently see anything

20     from your perspective that would require sealing with respect

21     to Exhibit 16?

22             **MR. RE:**  No, Your Honor.

23             **THE COURT:**  All right.  Exhibit 16 -- the request to

24     seal Exhibit 16 is denied.  And it will be ordered to be filed

25     on the public docket four days after today.

Exhibit 10

27

1          And your joint -- I don't actually recall any

2     redactions from your joint or your supplemental memoranda --

3     Oh, there are, okay.

4               **MS. SAMPLIN:**  For Apple, Your Honor?

5               **THE COURT:**  Pardon?

6               **MS. SAMPLIN:**  Apple you mean?

7               **THE COURT:**  I was talking about for Plaintiffs but I

8     see that there are.

9          So you're each going to go through -- for your

10    supplemental memoranda, you're going to file a new one.  And

11    it's going to be redacted, only the materials that have been

12    approved for redaction which as of right now is only the two

13    exhibits to Ms. Samplin's declaration, and may also include the

14    three exhibits, Exhibits 6, 7 and 11 from Mr. Kachner's

15    declaration.  Anything that's in the joint stipulation or

16    either supplemental memoranda that's maintained as redacted

17    will be -- as deemed confidential will be maintained as

18    redacted.  Anything else that's redacted based on one of the

19    other things that the application had been denied, you're going

20    to be filing a new one but we're going to wait four days so

21    we're going to get new -- what did I say, the rule say it's

22    either four to 10 days you're going to be filing all this stuff

23    and so I do -- actually, you know what?  For your supplemental

24    memoranda and your joint stipulations, you're going to have to

25    wait to file that until I've ruled on the new submissions by

Exhibit 10

28

1    Plaintiffs with respect to Exhibits 6, 7 and 11.  So we'll hold

2    off on that and there'll be a separate order regarding those.

3            All right.  So that's the sealing.

4            **MS. SAMPLIN:**  Your Honor, I just have one question.

5            **THE COURT:**  Yeah.

6            **MS. SAMPLIN:**  Our supplemental memorandum only quotes

7    from Exhibit 8 which you just denied the motion so should we

8    just go ahead and file that and not wait --

9            **THE COURT:**  Wait --

10           **MS. SAMPLIN:**  -- or --

11           **THE COURT:**  Wait four days because that's what the

12   local rules provide.  It says "Unless by order of the court".

13   If we had Defendants here I would just do it now but we're

14   going to wait.  It doesn't mean that they have -- having had

15   both an ability to comply with the rule as required and appear

16   here today that -- well I'm just going to leave it at that but

17   we'll have  it --

18           **MS. SAMPLIN:**  But we don't need to wait for your

19   further order on the other exhibit.

20           **THE COURT:**  Correct.  On that one once four days have

21   passed, you can go ahead and file it unless you hear otherwise

22   from the Court.

23           Okay.  Let's now turn to the substance.

24           And I'm going to speak about everything that's been

25   unsealed.  And in the event that anything changes on that,

29

```
 1  we'll go back and have to perhaps designate from here on

 2  forward this transcript confidential but for now it's not and

 3  we're proceeding in a public fashion.

 4          My tentative is to deny the motion in its entirety

 5  with the possible exception -- I haven't decided -- as to

 6  Request for Production Number 1 which is the entire human

 7  resources employee file for Mr. Lamego and we can talk further

 8  about that.  And I'm going to tell you that I'm using the

 9  amended categories for document productions proffered by

10  Plaintiff in their portion of the joint stipulation as opposed

11  to what's in the original subpoena.

12          I find that, tentatively, that both the requested

13  categories of records and the topics for testimony are relevant

14  -- again, with a little proviso on the employee file -- are

15  relevant and are proportional to the needs to the case, taking

16  into account the somewhat heightened review under Rule 45

17  because Apple is a nonparty.  But I do find that the material

18  sought is relevant; it's narrowly crafted to go to those

19  issues; again, bearing in mind that even with the heightened

20  relevance standard of Rule 45, relevance is still broadly

21  construed.

22          To the extent Apple argues that confidential

23  information is sought, I find that the protective order in this

24  case is sufficient to protect any such interests and does not

25  overcome the need and proportionality for the information.
```

Exhibit 10

30

1   There's an argument that these requests duplicate requests for

2   documents in what Apple designated as a related case in Masimo,

3   et al. v. Apple, Inc; Case Number 8:20-cv-48-JVS.  And I think

4   that argument is somewhat related but not identical to Apple's

5   last argument that the subpoena is -- and they used the phrase

6   "and around" various limitations and discovery that were either

7   agreed to or imposed in that other case.  And on each of those

8   grounds I deny the motion and find that this is an appropriate

9   effort to obtain legitimate discovery.

10          And I'm not going to at this point make any findings

11   about Apple and counsel but I'm going to say that there is a

12   whiff of Three-card Monte going on here about getting documents

13   and finding documents and doing a shell game about where

14   Plaintiffs are supposed to go and the procedural mechanisms.

15          And we have -- it's actually referenced in one of the

16   exhibits that we were just discussing that's been unsealed --

17   an assertion of a common interest privilege.  And there's been

18   fingers pointing that you can't disclose this or you can't use

19   something disclosed in this case in another case -- and that's

20   what the protective orders do say that parties are limited.

21   And so to the extent a party is -- demands that a party obtain

22   discovery through another case because that party is not

23   allowed to obtain it or use it under the protective order in

24   that case, then that's a perfectly appropriate situation.

25          And when defendants who are apparently in a common

Exhibit 10

31

1    interest privilege with nonparty Apple assert that they're not

2    going to answer questions or provide information because they

3    deem it to be confidential and that confidentiality is alleged

4    to be held by Apple, these are all the factors that go into why

5    those final two arguments raised by Apple, that it's Plaintiffs

6    that are doing an end-around or -- and this may be my words,

7    not theirs -- playing games that I do not agree.  And I'm not

8    going to make a finding, at least not at this juncture, about

9    good faith or bad faith but I'll certainly be willing to hear.

10           So having heard my tentative, Apple -- Ms. Samplin,

11   it's Apple's motion.  I'll hear from you.

12           **MS. SAMPLIN:**  Thank you, Your Honor.  I just want to

13   clarify.

14           Our end run argument was about the fact that we

15   appeared before Your Honor a few weeks ago, on request in the

16   Apple case that related to Marcelo Lamego's duties at Apple or

17   job responsibilities and hiring and whatnot, and Your Honor

18   denied all but one of those requests.  And so the end run that

19   we are arguing is that they are trying to get documents of the

20   type that were deemed overbroad and irrelevant to the Apple

21   case.  They're now trying to get it in the True Wearables case

22   which has nothing to do with Apple or Marcelo Lamego's time at

23   Apple.  That's the argument we were trying to make.

24           I hear Your Honor on your other point but

25   respectfully, we believe if the discovery is not relevant in

Exhibit 10

32

1    the Apple case where Apple is a party, and the issues in the

2    case are tied to Lamego's work at Apple, we don't see how those

3    documents are relevant in this case where all of the causes of

4    action are about Lamego's time at True Wearables.

5              And then when you look at the supplemental memorandum

6    from Plaintiffs, their justification is basically an email from

7    Lamego, that was Exhibit 16, and then all they point to at the

8    end is that it's relevant to their breach of fiduciary duty

9    claim.  But that claim in the complaint is that Lamego breached

10   his fiduciary duty to Cercacor by, one, failing to disclose

11   facts that showed some noninvasive measurement technology was

12   not feasible, causing Cercacor to license this technology to

13   Masimo even though it did not work; and, two, failing to file

14   patents on subject matter he was instructed to include.  That

15   has nothing to do with Apple; that has nothing to do with the

16   email to Tim Cook; that has nothing to do with Apple hiring

17   Lamego or Lamego choosing to work at Apple.  So I'm just

18   struggling to see the relevance of the breach of fiduciary duty

19   claim which is the only purported basis set forth in the

20   supplemental memorandum for the discovery at issue.

21        **THE COURT:**  Where did Mr. Lamego work between the

22   time he worked at Cercacor and True Wearables?

23        **MS. SAMPLIN:**  He worked at Apple, Your Honor, but the

24   claims in this case are not based on his time at Apple.

25        **THE COURT:**  He's alleged to have taken trade secrets

Exhibit 10

33

```
 1   and used them at his new business, correct?

 2           MS. SAMPLIN:  His new business meaning True

 3   Wearables?

 4           THE COURT:  Yes.

 5           MS. SAMPLIN:  Yes, correct.

 6           THE COURT:  And that was roughly six, seven, eight

 7   months after he left Cercacor, correct?

 8           MS. SAMPLIN:  That is correct.

 9           THE COURT:  And in that intervening six, seven, eight

10   months he was at Apple, correct?

11           MS. SAMPLIN:  That is correct.

12           THE COURT:  And I have in front of me an email that

13   he sent to Apple's CEO.  Let's just say it speaks for itself as

14   to what Mr. Lamego was saying.  And then the timing is that

15   email was sent at what?  12:00 a.m.?  1:00 a.m.?  And then at

16   10:00 a.m. -- I'm sorry, even earlier than that.  What is it?

17   10:30 a.m. an Apple recruiter responds to that email that was

18   sent to Mr. Cook by Mr. Lamego, correct?

19           MS. SAMPLIN:  That's correct.

20           THE COURT:  Well, I'm going to tell you that in my

21   view, under the broad definition of relevance, even as somewhat

22   constricted by the Rule 45 requirements that we have tried to

23   avoid an undue burden on a party or on a nonparty that a

24   sufficient showing of relevance as to why the hiring and

25   potential grounds for termination, grounds which apparently --
```

Exhibit 10

34

1    it's unrebutted -- Mr. Lamego has refused to answer, stating

2    that it's because he owes a duty of confidentiality to Apple

3    that I think rise to the level of relevance, that rise to the

4    level of proportional to the needs of the case.

5            And again, I don't really want to but maybe I should

6    get into some other issues that this email disclosure raises.

7    I'm not going to but if we want to go talk about it more, let's

8    do that.  I'll leave it up to you, Ms. Samplin.

9            **MS. SAMPLIN:**  I defer to Your Honor as to what you --

10           **THE COURT:**  Well I guess what I'm saying is, argue as

11   much if you want.  If we really want to get into -- when you

12   say there's no connection or no relevance to this case for

13   information about Mr. Lamego's short stint at Apple, why he was

14   hired, why he was terminated, this email sheds a lot of light

15   on some issues.  It's not in and of itself going to be a case

16   dispositive but it's certainly --

17           I've done a lot of trials and you want to tell a

18   story.  And part of -- and I don't mean like a fairy tale.  I

19   mean there's a beginning, middle and end.  And Mr. Lamego's

20   time at Apple is fairly -- I'm not going to overstate it -- but

21   fairly described as part of the middle of this story.  And to

22   excise it would not meet with what a trial is for, what a jury

23   is for.  Again, I'm not going to do the trial; that's going to

24   be up to Judge Selna to see what comes in and what doesn't but

25   I'm not going to, at this stage, excise what I believe -- and

Exhibit 10

1   this email seems to confirm -- there's a significant,

2   potentially significant information in that six, seven or

3   eight-month period that are part of the story.  And maybe

4   there's nothing, maybe there's nothing to it but there's enough

5   here to fall within the definition of relevance and

6   proportionality to tell a story.

7           And the email, the follow-up email from a recruiter,

8   the whole history of the allegations in the case, and we'll see

9   what happens.  It may be -- again, it may be nothing; there may

10  be nothing to it but it appears relevant and it appears

11  proportional.

12          And in terms of the end-run language -- well, I think

13  that there's more going on here than -- I'm going to leave it

14  at that.  There's more going on here.  And I have some concerns

15  about some of the things that are going on but I'm just going

16  to leave it at that and give you an opportunity, Ms. Samplin,

17  to argue anything else that you want on anything in my

18  tentative or anything else.

19          **MS. SAMPLIN:**  Well, Your Honor, can we talk about --

20  or did you want to do it separately, the personnel file?

21          **THE COURT:**  Sure, let's talk about the personnel

22  file.  I'll tell you my concerns are it's -- somebody's

23  personnel file could contain a lot of things that I don't think

24  are necessarily relevant, things like medical leave, things

25  like reasonable accommodations.  I don't know if any of these

36

1   things exist; I don't have a factual basis.  Mr. Lamego who I

2   kind of would have thought would have filed something to the

3   extent my concerns are based on his right to privacy, he didn't

4   and he's not here.  It's kind of why I'm surprise -- one of the

5   reasons I'm surprised his counsel isn't here.  But that said, I

6   do still have to take everything into account.

7            We have a protective order but we have Rule 45.  I

8   don't know how burdensome it would be to produce the personnel

9   file but maybe we can get some clarification on why the

10  entirety of the personnel file is relevant and proportional.

11           But first of all, it's your motion, Ms. Samplin.  And

12  having heard my thoughts, you tell me what you think.

13           **MS. SAMPLIN:**  I believe that the request for the full

14  personnel file is overbroad and not proportional.  And if we're

15  going based on Your Honor's articulation of relevance and why

16  you believe certain of these requests fit in the relevance

17  standard, then I would argue that the requests that they're

18  going to get, if you're going to deny our motion, elsewhere

19  between Requests for Production 2 to 5, as modified -- because

20  I understand we're going by their modified requests for

21  production -- they're getting the information that you've

22  articulated as relevant.  I don't see why they need to open up

23  an entire personnel file which Your Honor already said did need

24  to be produced in the Apple case.

25           **THE COURT:**  well let's -- to some extent the Apple

Exhibit 10

37

```
1    case had different issues.  There where what?  Ten or 12 former
2    employees governed by the request at issue in that case,
3    although there were one or two that related to Mr. Lamego and
4    the issues are somewhat subtly different.  And in the Apple
5    case, Mr. Lamego wasn't a party whereas here, I'm just -- again
6    I'm surprised he's not here to assert a right to privacy
7    because that would be the primary basis.
8              I don't really see -- I don't know how big his
9    personnel file is, considering the number of motions, both in
10   this case and the related case.  From a comparison standpoint,
11   I don't imagine the photocopying costs of a personnel file are
12   unduly burdensome or expensive under Rule 45 but that's the
13   only one that I'm unsure about and particularly considering.
14   I'm tentatively going to grant it as to all those other
15   categories.
16             So anything else, Ms. Samplin?
17             MS. SAMPLIN:  Yes.  So Your Honor I just want to
18   point you to page 1 in our Supplemental Memorandum because you
19   are correct that requests in the Apple case did have that
20   definition of former employees that was broader and went beyond
21   Lamego.
22             But then we specifically spoke about the personnel
23   file as it related to Lamego.  And on page 64 of the transcript
24   you reiterated that you weren't compelling Apple to produce the
25   entire HR files of Lamego.  I hear you that Lamego is a party
```

Exhibit 10

38

1    here and he's not here to assert privacy interests but we still

2    think it's overbroad and not proportional to the needs of the

3    case, particularly if you are going to grant the other requests

4    for production.

5              **THE COURT:**  All right.  Anything further?

6              **MS. SAMPLIN:**  I guess I would just ask for

7    clarification.

8              Your tentative on Requests 2 through 5, that's for

9    all modified versions of those requests.

10             **THE COURT:**  Yes.

11             **MS. SAMPLIN:**  Right?  Okay.

12         **(Pause)**

13             I guess I would still argue that I think Request

14   Number 2, for example, is too broad because weren't limited by

15   Plaintiffs to "documents sufficient to show".  They were just

16   enlarged to "documents and communications".  So we're now

17   requesting documents and communications related to the hiring

18   of Lamego.  I understand they dropped the word "all" but the

19   fact that they've used documents sufficient to show elsewhere

20   shows that their request for documents, as opposed to all

21   documents is really just the same thing.  And so I think the

22   request is still broad -- is still overbroad.

23             **THE COURT:**  Anything further?

24             **MS. SAMPLIN:**  Are we going to deal with the

25   deposition topic separately?

Exhibit 10

1          **THE COURT:**  No.  It's your motion.  Anything else you

2    want to raise with respect to the motion?

3          **MS. SAMPLIN:**  Yes.  So I would say that I think the

4    deposition topics are unnecessary if Your Honor is granting the

5    request -- sorry -- is denying the motion with respect to

6    Requests 2 through 5.  The deposition topics get at largely the

7    same material.  And I would suggest at a minimum the Plaintiff

8    should get the documents -- if we're being ordered to produce

9    the documents -- see what's in the documents and then decide.

10   And maybe we can work together and meet and confer as to

11   whether a deposition is actually necessary from a nonparty in

12   this case on the same exact topics that they're seeking

13   documents about.

14         **THE COURT:**  Well the good news is that will be my

15   order with one little proviso.  Apple will be ordered to

16   produce the documents first.  And then once the documents are

17   received, the 30(b)(6) or the Rule 45 deposition will proceed.

18   And if for whatever reason Plaintiff doesn't need it any

19   further or doesn't want it any further, they can cancel it but

20   it will be ordered and it will be ordered to take place after

21   the documents are received.

22         Anything further?

23         **MS. SAMPLIN:**  The deposition topics, Your Honor.

24      **(Pause)**

25         I would also just add, I think the deposition topics

Exhibit 10

40

1   were not revised and they still go beyond the revised requests

2   for production.  And so again, I think the deposition is not

3   necessary here on these broad topics, getting at all

4   communications that were had between Apple and Marcelo Lamego

5   related to hiring or termination.  And I think the documents

6   are sufficient in that regard.  And if they're not, if the

7   Court deemed them not, the deposition should be tailored to the

8   revised topics.

9            **THE COURT:**  Anything further?

10            **MS. SAMPLIN:**  No, Your Honor.

11            **THE COURT:**  All right.  On behalf of Plaintiffs, I'm

12   telling you, I'm inclined at this point to stick with my

13   tentative, including the tentative to deny the request for the

14   entirety of Mr. Lamego's personnel file.

15            If there's something specific, other than what's

16   already been granted, that there's a proffer of relevance, I'll

17   hear it.  But I'm, at this point, inclined to stick with my

18   tentative.  But you can argue anything you wish.

19            **MR. RE:**  Well, I agree with the tentative.  And we

20   have no interest in trying to invade his right to privacy on

21   the medical.  And those types of issues are obviously not of

22   interest to us at all.

23            And I haven't seen any evidence of burden.  And I

24   think the Court's correct.  And I agree with tentative.

25            I just want to correct one thing on the record.

Exhibit 10

1    Ms. Samplin repeatedly has stated as if this Court has denied

2    the Apple Motion to Compel.  And I agree with you, it's

3    slightly different circumstances.

4          But just so the record is clear, we submitted the

5    order from that Apple hearing.  And the reason why 236, 237,

6    and 239 were denied, they were denied as moot.  Because Apple

7    agreed to produce the documents with respect to Lamego and

8    O'Reilly.

9          So it's not correct that these motions were just

10   denied outright.  They were denied as moot, as unnecessary

11   because they did agree to produce, even in the Apple case, the

12   Lamego-related documents.  So I wanted that to be clear.

13         And with regard to this discussion we're having now

14   about the Cook email and all of that, they had the Cook email,

15   they had all the evidence, and their supplemental memorandum

16   ignored the notice of related cases, ignored the confidential

17   agreement, ignored the Tim Cook email, and, as you noted, they

18   didn't even contest that Lamego is not giving us the

19   information, because he's saying, "Go to Apple."

20         And I attended that Lamego deposition.  And his --

21   he's not even taking the view that this stuff is irrelevant.

22   He's just taking, you know, "Go to Apple.  I don't want to be

23   sued by Apple."

24         So you're right.  Lamego himself is not even

25   contesting the relevance of this information.  He's just not

Exhibit 10

42

1    comfortable with us seeing it because he's afraid of Apple.

2            I have nothing further, and I agree with the

3    tentative.

4            **THE COURT:**  All right.  The tentative order, with

5    respect to the motion itself, Docket 282, will be the order of

6    the Court.  There will be a written order to follow.  The

7    motion will be denied with the exception of Category I, the

8    entirety of the personnel file.  I'm not going to order that.

9    I didn't hear anything about some sub-information other than

10   what's contained in Request Numbers 2 through 5.

11           So that will be the order of the Court.  And in terms

12   of the sealing applications, the three sealing applications we

13   mentioned, the request to seal the two exhibits to

14   Ms. Samplin's declaration, Exhibits H and N, those -- that

15   request will be granted as to those, and it will be denied as

16   to Exhibits 3, 4, 5, 9, and 10 to the declaration of

17   Mr. Kachner, with respect -- and that's the initial declaration

18   of Mr. Kachner -- with respect to Exhibit 6, 7, and 11.

19           Apple is -- or Plaintiffs are ordered to file a

20   supplemental declaration under seal that provides their grounds

21   for continued sealing as to those exhibits, and an evidentiary

22   showing in support of those grounds, and newly redacted and

23   highlighted versions of those exhibits, to only seek to redact

24   those portions as to which confidentiality or attorneys' eyes

25   only or whatever the legal basis for sealing is made.

Exhibit 10

43

1          And as to the, I think it was Exhibit -- what did we

2     say Exhibit 12 in -- filed by -- in Mr. Kachner's declaration,

3     in support of Plaintiffs' supplemental memorandum, that request

4     to seal is denied.

5          **MS. SAMPLIN:**  I think it's Exhibit 16, Your Honor.

6          **THE COURT:**  Oh, 16.  I'm sorry.  Thank you.

7          Exhibit 16, that request is denied.  All those

8     documents as to which requests to seal have been denied are to

9     be filed within four to ten days from today, on the public

10    record.

11         And Apple's showing -- how much time do you think you

12    need to make your showing with respect to Exhibits 6, 7, and

13    11?

14         **MR. SPEAKER:**  Maybe by Monday.

15         **THE COURT:**  All right.

16         **MR. SPEAKER:**  Monday is fine, Your Honor.

17         **THE COURT:**  By Monday, June 28th.  Apple will file

18    that request.

19         And then I know this is a lot.  Apple's supplemental

20    memoranda should be refiled without any item under seal, let's

21    say, by Tuesday, June 29th -- and I may have said, "July 28th"

22    earlier -- June 28th -- by Tuesday, June 29th.

23         And then the joint stipulation, the parties are to

24    meet and confer and determine, after this hearing and the

25    rulings, what still needs to be redacted, and then to file a

Exhibit 10

44

1   redacted version of the joint stipulation with only the

2   provisions that remain under seal redacted.

3           And Plaintiffs' supplemental memorandum, same with

4   that, because there were some provisions in the supplemental

5   memorandum that are redacted -- or that were redacted because

6   of earlier filings.

7           Does that all make sense?

8           **MR. SPEAKER:**  Yes, Your Honor.

9           **THE COURT:**  Any questions?

10          In terms of the timing of the production, I guess,

11  since I'm denying the motion, I don't necessarily want to get

12  into timing.  It's not really before me.  It was a Motion to

13  Quash.  So the subpoena goes forward.  Obviously, the return

14  date has passed.

15          I'd be inclined to say ten days, produce documents.

16  And when is our discovery cutoff in this case?  It's already

17  passed, right?

18          **MR. RE:**  No.

19          **MR. KACHNER:**  Yes, Your Honor.  True Wearables,

20  (audio glitch).

21          **THE COURT:**  Okay.  And it was in May, right?

22          **MR. RE:**  Yes.  We're now in expert discovery.

23          **THE COURT:**  Okay.  So let's --

24          **MS. SAMPLIN:**  Your Honor, I would just ask, with the

25  July 4th holiday, I'm just -- it's just going to be a little

Exhibit 10

45

1  tough for -- our client shuts down the arm of production.

2          THE COURT:  Well, how much -- can I ask you -- of the

3  requested documents, how much is different from what I assume

4  your clients are already gathering in the 20-48 case?

5          MS. SAMPLIN:  Your Honor, honestly, most of these

6  requests were denied in that case, so -- or they were narrowed.

7  I mean, I just do want to want to say --

8          THE COURT:  All right.  We don't need to hear

9  anymore.  We've got trial dates, Selma has trial dates.

10  They've got expert discovery cutoffs; they've got motion

11  deadlines coming up.

12          There was no expedited request for a hearing on this

13  motion, so I won't make an unreasonably short response.  But

14  for June 24th, I'm not really sure why Friday, July 2nd

15  wouldn't be a reasonable deadline to get what, to me, for a guy

16  that worked at Apple for seven months, we're not talking

17  about -- I don't think.

18          I don't see anything in front of me that would

19  suggest that we're talking about a substantial amount of

20  documents.  There may be work to locate them.

21          MS. SAMPLIN:  I'm just saying the client is closed on

22  July 2nd.  And I believe July 1st.  So that's my hesitation.

23  I'm not sure about July 1st, but I know July 2nd.  So that's my

24  hesitation.

25          THE COURT:  Apple, as a company, company-wide is

Exhibit 10

1  closed?

2          **MS. SAMPLIN:**  Production.  The production team that

3  does the productions for us.

4          **THE COURT:**  When is your expert discovery cutoff?

5          **MR. SPEAKER:**  August.

6          **MR. SPEAKER:**  Opening reports have already been

7  served.  August is --

8          **MR. SPEAKER:**  Yeah.  We're in the middle of rebuttal

9  reports.  So we probably have about six weeks.

10         **THE COURT:**  All right.  Well, I'm not sure that this

11  has -- I don't know you case well enough to know how much this

12  has to do with expert reports.

13         But I'll tell you what, I'll give Apple until July

14  7th, which is 13 days.  And the parties are to schedule the

15  deposition testimony to take place expeditiously after the

16  production and the full production of documents.

17         All right.  Is there anything further that I need to

18  take up this morning with request to the motions, the sealing

19  applications, or any other matter?

20         On that general question, I'll start with Plaintiff.

21         **MR. RE:**  Nothing further from the Plaintiff.

22         **THE COURT:**  All right.  From Apple?

23         **MS. SAMPLIN:**  I do just want to state on the record

24  that I think Mr. -- just to the extent there was a suggestion

25  by Mr. Re that we have somehow mislead the Court as to what was

47

1   ordered or agreed to in the Apple case, our supplemental

2   memorandum is clear.  On page 2, we said Apple voluntarily

3   agreed to produced.  And we referred to RFP 236.

4          So I just want to correct the record before the

5   Court.  I don't think there was any effort.  I know there

6   wasn't an effort to mislead the Court as to what Apple

7   voluntarily agreed to do in the Apple case.

8          **THE COURT:**  We'll leave it at that.  I'm not making

9   any findings one way or another right now.

10         I'll tell Apple I almost did.  And I'm not going to,

11  based on what seems to be going on, on some of these issues.

12  But we're just going to leave it -- we're going to leave it at

13  that.

14         All right.  So we are adjourned.

15      **(Proceeding Concluded)**

16

17

18

19

20

21

22

23

24

25

Exhibit 10

48

<u>**CERTIFICATION**</u>

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    <u>June 26, 2021</u>

        Signed                                                    Dated

*TONI HUDSON, TRANSCRIBER*

**EXCEPTIONAL REPORTING SERVICES, INC**

Exhibit 10

**From:** noreply@courtdrive.com <noreply@courtdrive.com>
**Sent:** Tuesday, June 29, 2021 10:13 PM
**To:** Lit MASIMOL.1085L <LitMASIMOL.1085L@knobbe.com>; Mark Blake <mark.blake@masimo.com>
**Subject:** Activity in Case 8:18-cv-02001-JVS-JDE Masimo Corporation et al v. True Wearables, Inc. et al Transcript (CV)

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

### UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA

## Notice of Electronic Filing

The following transaction was entered on 6/29/2021 at 10:12 PM PDT and filed on 6/28/2021
**Case Name:**         Masimo Corporation et al v. True Wearables, Inc. et al
**Case Number:**      8:18-cv-02001-JVS-JDE
**Filer:**
**Document Number:** 316

**Docket Text:**
**TRANSCRIPT for proceedings held on 6/24/2021. Court Reporter/Electronic Court Recorder: EXCEPTIONAL REPORTING SERVICES, INC., phone number (361) 949-2988. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 7/19/2021. Redacted Transcript Deadline set for 7/29/2021. Release of Transcript Restriction set for 9/27/2021. (ls)**

**8:18-cv-02001-JVS-JDE Notice has been electronically mailed to:**

Adam Powell     adam.powell@knobbe.com, 2abp@knobbe.com, litigation@knobbe.com

Amanda Rose Washton     a.washton@conklelaw.com, awashton@hotmail.com, support@conklelaw.com

Brian Christopher Claassen     brian.claassen@knobbe.com, KnobbeAdmin@ecf.courtdrive.com

Eric R. Chad     echad@merchantgould.com

Irfan A Lateef     irfan.lateef@knobbe.com, ial@kmob.com, litigation@kmob.com

Exhibit 10

James Eugene Youngblood     jamie.youngblood@knobbe.com

Joseph R. Re     litigation@kmob.com, joe.re@knobbe.com, jre@kmob.com, KnobbeAdmin@ecf.courtdrive.com

Joshua Hawkes Lerner     jlerner@gibsondunn.com, amoser@gibsondunn.com

Mark D Kachner     mark.kachner@knobbe.com, doreen.buluran@kmob.com, litigation@knobbe.com

Paige S Stradley     pstradley@merchantgould.com

Perry D Oldham     perry.oldham@knobbe.com, 2pdo@kmob.com, litigation@kmob.com

Peter A Gergely     pgergely@merchantgould.com

Ryan J Fletcher     rfletcher@merchantgould.com, KDrieman@merchantgould.com, smaney@merchantgould.com

Scott P Shaw     sshaw@merchantgould.com, kholst@merchantgould.com, smaney@merchantgould.com

Sherron L Wiggins     s.wiggins@conklelaw.com, Support@conklelaw.com

Stephen C Jensen     steve.jensen@knobbe.com, sjensen@kmob.com

Zach Kachmer     ZKachmer@merchantgould.com

**8:18-cv-02001-JVS-JDE Notice has been delivered by First Class U. S. Mail or by other means <u>BY THE FILER</u> to :**

Andrew T Pouzeshi
Merchant and Gould PC
1801 California Street Suite 3300
Denver, CO 80202

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**C:\fakepath\TR Masimo v True Wearables_062421.pdf
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=6/29/2021] [FileNumber=32197652-0
] [0e063645cebd11e488481a319652ba782307d45ae1d4f306b6d94a431adaa749e1c
cc04df24b098d69147031d2671b3a015fe5effbca6837d2387086b14c35f1]]

Exhibit 10

EXHIBIT 11

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(SOUTHERN DIVISION - SANTA ANA)


MASIMO CORPORATION, ET AL,    ) CASE NO: 8:20-CV-00048-JVS-JDEx
                              )
              Plaintiffs,     )            CIVIL
                              )
     vs.                      )      Santa Ana, California
                              )
APPLE, INC,                   )   Thursday, September 23, 2021
                              )
              Defendant.      )
_____)


IN-PERSON HEARING RE: PLAINTIFFS' MOTION FOR RECONSIDERATION

BEFORE THE HONORABLE JOHN D. EARLY,
UNITED STATES MAGISTRATE JUDGE



**APPEARANCES**:          SEE PAGE 2


Court Reporter:        Recorded; Digital wave file


Courtroom Deputy:      Maria Barr


Transcribed by:        Exceptional Reporting Services, Inc.
                       P.O. Box 8365
                       Corpus Christi, TX 78468
                       361 949-2988






Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

Exhibit 11

2

**<u>APPEARANCES</u>:**


For Plaintiffs:              JOSEPH R. RE, ESQ.
                            Knobbe Martens Olson & Bear, LLP
                            2040 Main Street
                            14th Floor
                            Irvine, CA 92614

                            ADAM POWELL, ESQ.
                            Knobbe Martens Olson & Bear, LLP
                            12790 El Camino Real
                            San Diego, CA 92130


For Defendant:              JOSHUA H. LERNER, ESQ.
                            Gibson Dunn & Crutcher, LLP
                            555 Mission Street
                            Suite 3000
                            San Francisco, CA 94105

                            NATALIE POUS, ESQ.
                            Apple In-House Counsel

Exhibit 11

1          **Santa Ana, California; Thursday, September 23, 2021**

2                          **(Call to Order)**

3              **THE COURT:**  Good morning, everyone.

4              **MR. RE:**  Good morning.

5              **MR. LERNER:**  Good morning, Your Honor.

6              **THE COURT:**  One item on calendar today.  Calling Case

7      Number Central District of California 8:20-cv-48-JVS-JDE,

8      *Masimo Corporation, et al., versus Apple, Inc.*

9              Appearances for this in-person hearing, Counsel,

10     starting with counsel for plaintiff.

11             **MR. RE:**  For Masimo and Cercacor, Joseph Re from

12     Knobbe Martens Olson and Bear.  With me is my partner, Adam

13     Powell.

14             **THE COURT:**  Good morning.  Thank you.

15             And on behalf of defendant?

16             **MR. LERNER:**  Good morning, Your Honor.  Joshua

17     Lerner, Gibson Dunn, on behalf of Apple, and with me today is

18     Natalie Pous, legal counsel, litigation, from Apple.

19             **THE COURT:**  I'm sorry; what was the last name?

20             **MR. LERNER:**  P-O-U-S, Your Honor.

21             **THE COURT:**  All right.  And that's in-house counsel

22     at Apple?

23             **MR. LERNER:**  Yes.

24             **THE COURT:**  All right.  All right.  We're here for

25     a -- what's been styled as a motion for reconsideration of my

Exhibit 11

4

1    June 10th ruling regarding Mr. Cook's being designated as an

2    ESI custodian, a motion that I denied on June 10th.  I'll tell

3    you what I've reviewed.  Then I'm going to give you my

4    tentative thoughts.

5             I have reviewed the motion, which, let's see, is

6    Docket Number 471, and memorandum and exhibits and

7    declarations, some of which were filed under seal.  I've

8    reviewed Apple's opposition, which is at 479, along also with

9    two declarations and exhibits.  I don't think any of that was

10   filed -- oh, no, some of it was filed under seal; and a reply

11   from plaintiffs filed on August 5th, also with exhibits and a

12   declaration, some of which was filed under seal.

13            I'm going to now first ask, on plaintiffs' behalf, is

14   there anything that I should have reviewed that I haven't

15   referenced, from your perspective?

16            **MR. RE:**  Nothing, Your Honor.

17            **THE COURT:**  And on behalf of defendant?

18            **MR. LERNER:**  No, Your Honor.

19            **THE COURT:**  All right.  Here is my tentative.  My

20   tentative is to grant the motion for reconsideration, finding

21   that plaintiff under Local Rule 7-18 did act appropriately and

22   in a timely fashion and there is good cause for the motion not

23   being filed within 14 days after the hearing because -- for the

24   reasons stated in the papers, but the -- I don't want to

25   characterize one piece of evidence more important than another,

Exhibit 11

5

```
 1   but certainly the public filing on July 2nd by Apple of an
 2   October 2nd, 2013, email from Mr. Marcelo Lamego to Mr. Tim
 3   Cook, and I think there was a follow-up email back to
 4   Mr. Lamego from a representative at Apple later that same
 5   morning, that was publicly filed on July 2nd.  There was a
 6   meet-and-confer session requested, I think the next business
 7   day, which was July 6th, and a meet-and-confer took place on
 8   July 9th, and then per Local Rule 7-8 the motion couldn't have
 9   been filed until July 16th, and it was filed on the next
10   business day thereafter, on July 19th, which I, based on all
11   the circumstances -- and I've summarized it; I haven't included
12   everything -- find was -- that plaintiffs acted diligently and
13   had good cause to not file the motion within 14 days after the
14   prior ruling.
15            And I'll also note that, from the bench, the last --
16   at the hearing on the July 10th original motion, I had invited
17   plaintiffs' counsel that should there be new information they
18   could refile the motion.  So, although it's styled as a motion
19   for reconsideration, they could have just filed a brand-new
20   motion.  I offered that up as an option, and that, obviously,
21   would not have been subject to the Local Rule 7-18, 14-day plus
22   good cause requirement.  Now, I may be speaking too much.  Had
23   that happened, it might have been heard by Judge Guilford
24   instead of me under the special master reference, but be that
25   as it may, I find good cause for the filing of motion.
```

Exhibit 11

6

1          Turning to the substance, I think it was the same

2   counsel who were here on July -- on June 10th.  I expressed

3   that it was a -- and I may not have used these words, but the

4   essence of it was it was a close call.  I found that the -- the

5   factual evidentiary showing relatively weak by plaintiff in

6   connection with their request to show that there was some

7   reasonable likelihood that Mr. Cook might have relevant

8   information in his emails or other streams.  The flip side was

9   I noted that defendants offered no evidence of the burden.

10  And, so, essentially, on that close call, I relied on two

11  people.  One of them was Bob Dylan, and one of them was

12  Mr. Lerner and four or five other attorneys from Gibson Dunn

13  and Crutcher who represented -- and I'm going to paraphrase --

14  that it was unlikely that Mr. Cook would have any relevant

15  discoverable information in his ESI.

16          That statement was confirmed at the hearing, and I

17  gave Mr. Lerner an opportunity to recognize that that was an

18  important basis for my ruling and that should that at some

19  future date turn out not to be true, there could be -- and I

20  used the word "severe" -- there could be severe repercussions.

21  I'm not inclined right now to get into repercussions.  I think

22  I'd need to gather some more information.  We can do that if

23  the parties wish.  Right now I'm inclined to move forward with

24  your case, help you each move forward with your respective

25  cases, and rule on the substance of the motion, but we can get

Exhibit 11

7

```
 1   into a more deep dive into some other issues that may be
 2   lurking out there.
 3            And I'll note, in terms of the good cause, moving
 4   back in time, that I have considered Apple's arguments that
 5   plaintiffs' counsel, at least the firm, had possession of the
 6   October 2nd, 2013, email as long ago as last year, and there is
 7   a declaration from a paralegal from another firm regarding
 8   production in another case.  I'm happy to get into a deep dive
 9   on that.
10            I actually -- I don't think you were here,
11   Mr. Lerner, on that other case -- had some thoughts about what
12   was happening, and I used a term from my days visiting New York
13   City when I was a kid in the 1970s where you'd pop out of Penn
14   Station or Grand Central Station and there would be guys with
15   little tables set up playing Three Card Monte.  And I want to
16   explain what that is.  It's a game where you're trying to pick
17   the queen out of three cards.  And the queen is there, and the
18   person dealing the cards isn't cheating; and by dealing, he
19   just throws three cards around, but is being somewhat opaque.
20   And sometimes it involves having a third party who appears to
21   be an independent third party who's actually working with the
22   dealer out on this little table outside the station looking for
23   tourists coming into town to have the third party, who looks to
24   be independent, win a couple times, and then when the tourist
25   puts their money down, suddenly the card is much harder to
```

Exhibit 11

8

1   find.  The card exists; it's just being obscured.

2           I'm happy to hear from Apple about anything that they

3   want to talk about.  But one of the things we might get into

4   and have to get into if we're going to do a deep dive is the

5   relationship between Apple and True Wearables, the defendant in

6   the other case; how it came to pass that the October 2nd email

7   was designated as confidential in that case; maybe we need to

8   get into communications between the parties.  I don't know, and

9   I certainly am not going to issue any orders on the fly on

10  that, but maybe we need to, to find out how it came to pass.

11  And there is an argument from Apple that plaintiff --

12  plaintiffs could have just moved to de-designate that October

13  2nd, 2013, email in the True Wearables case.  I'm not sure what

14  the basis for that argument is.  There is no basis in the

15  protective order in that case to simply say:  I want to use

16  something that was designated as confidential in another case.

17  You can move to de-designate by saying something isn't

18  confidential.  And here at least it was represented at the last

19  hearing that -- I think it was by Mr. Re -- that during the

20  course of the True Wearables case Mr. Lamego said that that

21  email, he designated that as confidential at the request of --

22  and I'm not sure if it was expressed or in his mind

23  interpreted -- at the request of Apple.  And you each have

24  heard me talk about my views of protective orders and that

25  they're not to be willy-nilly disregarded, and that protective

Exhibit 11

9

1  order limited the use of that email once it was designated as

2  confidential to the prosecution or defense of that case only.

3  So, plaintiffs could not have simply thrown it in front of me.

4       Now, the timing here, perhaps it was a genius move by

5  plaintiffs to serve a third-party subpoena on Apple, have Apple

6  file a motion to quash, and then have that document be brought

7  to my attention in connection with that motion to quash, but be

8  that as it may, that was -- they didn't have an ability to

9  bring it to my attention in this court in this hearing on June

10 10th.  And I'm a little troubled by the suggestion that it was

11 that simple or that plaintiffs here were at fault.  And, so, if

12 we want to go down that road, we will, but we're probably at

13 that point going to have to have some evidentiary issues if we

14 really want to push it.  But I'm comfortable right now with

15 what I see to say they did not have authorization from me or

16 Mr. Lamego.  And I saw the emails from Mr. Lamego's counsel

17 essentially telling plaintiff they couldn't even disclose this

18 to in-house counsel at Apple; it could only be an attorneys'-

19 eyes-only presentation of the email from plaintiff to Apple's

20 counsel before plaintiffs' counsel would be authorized to file

21 it in connection with the motion to quash in the True Wearables

22 case.

23       So, I'm riffing a little bit.  I've given you the

24 short version of my tentative.  I guess I'll start with you,

25 Mr. Re, or Mr. Powell.  It's plaintiffs' motion.  At the risk

Exhibit 11

```
 1   of potentially snatching defeat from the jaws of victory,

 2   you're welcome to offer any additional argument, since you have

 3   the burden here, but -- or give me any new information, since I

 4   think the last filing was your reply over a month ago, if

 5   there's any new information that you want to impart to me.

 6           Mr. Re, the floor is yours.

 7           MR. RE:  Thank you, Your Honor.  I only have one

 8   statement to make, and that is, we, in an abundance of caution,

 9   had the same interpretation of the protective order that you

10   just gave.  And that is, even if I were to show it to

11   Mr. Lerner, for example, for a meet-and-confer to get a court

12   order to approve it after the fact, that might even be deemed a

13   use.  So, we have an ambiguity on the word "use," and we took

14   the broadest interpretation, just like you just did in your

15   explanation.

16           THE COURT:  Anything further?

17           MR. RE:  Nothing further.

18           THE COURT:  All right.  Subject to your ability to

19   respond, any arguments from Mr. Lerner?  Mr. Lerner, you've

20   heard my tentative and my thoughts.  Let me hear what you want

21   to argue.

22           MR. LERNER:  Thank you, Your Honor.  I will not spend

23   time on your point about the procedure here.  I want to get to

24   the substance, which is that there's new information that

25   changes the basis for the Court's prior ruling.
```

Exhibit 11

1           THE COURT:  Could I ask you a favor?  Just pull the

2   microphone a little closer to you so I make sure that if there

3   is a transcript that the transcriber can hear the recording.

4           MR. LERNER:  Yeah.  Is that better, Your Honor?

5           THE COURT:  Yes.

6           MR. LERNER:  Okay.  So, the argument that you heard

7   and, obviously, what Your Honor has focused on is the email

8   from Mr. Lamego to Mr. Cook.

9           THE COURT:  And there's multiple facts, but that's

10  the one that I focused on in giving my tentative.  It's not the

11  only reason.

12          MR. LERNER:  Understood.  And I'll quickly address

13  the others, as well.  But that unsolicited email to Mr. Cook

14  notes that Apple -- to other people, not Mr. Cook, and not --

15  is suggested in the email that Mr. Cook's suggestion or

16  anything else had already approached Mr. Lamego.

17          THE COURT:  Okay.

18          MR. LERNER:  And --

19          THE COURT:  Let me slow everything down.  Okay.  The

20  question is whether Mr. Cook has relevant information, and

21  they're not going to prove their case by this email.  I want

22  you to -- tell you I don't view this as the smoking gun that

23  declares victory for plaintiffs in this case.  But the question

24  is, does -- have they shown enough to show that Mr. Cook has

25  potentially relevant information in his electronic streams,

Exhibit 11

12

1    email, or whatnot.  And I mentioned I relied heavily on what

2    you told me, in writing and affirmed at the hearing, that there

3    is -- it's unlikely that there is relevant, discoverable

4    information in his email streams.

5         I have a question for you:  Is the email, from your

6    perspective, from Mr. Lamego to Mr. Cook on August -- I'm

7    sorry -- on October 2nd, 2013, relevant?

8         **MR. LERNER:**  We have been consistent on the point

9    that not only is the answer to that no, it should not be and

10   cannot be to bring Mr. Cook into a dispute --

11        **THE COURT:**  Okay.  You say the answer is no.  We're

12   going to do a little bit more of a deep dive now.  So, let's --

13   so that we're -- all know what we're talking about, let's pull

14   up -- well, first of all, let's talk about some of the claims

15   in the case.  Theft of trade secrets is a claim in the case,

16   right?

17        **MR. LERNER:**  Yes, sir.

18        **THE COURT:**  My days as a prosecutor, whenever you

19   file a -- whenever you investigate a charge, file a charge, get

20   ready for trial, you pull up the elements, right?  What are

21   some of the elements of a claim for theft of trade secret?

22        **MR. LERNER:**  You need a trade secret, and you need

23   misappropriation.

24        **THE COURT:**  Okay.  And in order for there to be

25   misappropriation, if a third party doesn't have any idea that

Exhibit 11

13

1   something is a trade secret, and some third party who just

2   walks in and without any knowledge or notice that it's

3   potentially a confidential trade secret, the company uses it,

4   would that company have a defense in that situation of lack of

5   knowledge and intent?

6           **MR. LERNER:**  Yes, Your Honor.

7           **THE COURT:**  Okay.  So, knowledge and intent of the

8   receiving party matters.  Is that true?

9           **MR. LERNER:**  Yes, it is, Your Honor.

10          **THE COURT:**  And tell me, in the grand scheme of

11  things, does knowledge and intent by the third person, who

12  allegedly walks out with a trade secret, does that matter?  Is

13  that something that -- under the broad definition of relevance

14  of Rule 401 under the evidence code, is that something that

15  matters?

16          **MR. LERNER:**  Could be, in that --

17          **THE COURT:**  Okay.  Could be.

18          **MR. LERNER:**  -- hypothetical; I don't know.

19          **THE COURT:**  All right.  We're at a stage where we

20  don't know; there's going to be -- you've got more than a year

21  until trial.

22          All right.  So, let's talk about -- those are some of

23  the issues, what Mr. Lamego, who's the person we're talking

24  about here, knew; what Apple knew when Mr. Lamego came on

25  board; and I think from your papers you concede that you hired

Exhibit 11

14

1   him effective to start January, 2014.  There is a dispute about

2   whether he was -- he was recruited or -- was recruited as part

3   of a grander scheme, but that that's part of the case.

4           So, let's turn to that email, because that's going to

5   be what we're focusing on.  The very first paragraph -- and I'm

6   looking at -- I'm going to go -- because some of this is

7   sealed, some of it isn't.  I don't think this -- I know this

8   was unsealed, and I'm just going to tell you where in the

9   record I'm finding it.  It is in a few places in connection

10  with the motion, but this is at Document Number 321-1, page 37

11  of 94, and this is -- it has the little Stanford alumni

12  insignia on top of it.  It's an email entitled:  The Three

13  Equations.  It's from, at least facially, from Mr. Lamego to T.

14  Cook at Apple.com dated Wednesday, October 2nd, 2013, at

15  12:54 a.m.  The first paragraph:

16              "I was approached by Apple in the beginning of this

17              year and was asked if I would like to join the

18              executive team."

19          Leaving aside where it was found, do you think that

20  that's -- that statement has any bearing on Mr. Lamego's state

21  of mind in connection with the issues in this case?

22          **MR. LERNER:**  Saying that he was approached by two

23  other people, to me, Your Honor, does not reflect on his state

24  of mind.

25          **THE COURT:**  Okay.  How about Apple's state of mind?

Exhibit 11

15

1    Does it have any bearing?  Remembering that Rule 401 means,

2    does the evidence at issue or the fact at issue have any

3    tendency to make a fact of consequence at issue in the case

4    more or less likely, does an assertion by Mr. Lamego that he

5    was approached by Apple in the beginning of 2013 and asked if

6    he would like to join the executive team, does that have any

7    bearing on any issue in this case?  That statement.

8              **MR. LERNER:**  Yes, and that's --

9              **THE COURT:**  Okay.

10             **MR. LERNER:**  -- actually where I was starting.  If I

11   can --

12             **THE COURT:**  Perfect.

13             **MR. LERNER:**  -- just get a word in --

14             **THE COURT:**  No, no.

15             **MR. LERNER:**  -- edgewise, Your Honor --

16             **THE COURT:**  No, no, no.  No, no, no, no.  I've read

17   your papers.  So, that fact is material.  Where did that fact

18   originate?  Where did Mr. Lamego send that email with that fact

19   in it?

20             **MR. LERNER:**  It originated with two other gentlemen,

21   David Affourtit and James Foster, who were the people who

22   approached him.

23             **THE COURT:**  I'm asking you.  The statement that --

24   leaving that aside, may or may not be true -- I don't know if

25   it's true or not -- but I know that from this record, on its

Exhibit 11

16

1    face, Mr. Lamego says it's true.  So, where did Mr. Lamego send

2    that?

3             **MR. LERNER:**  He sent it to Mr. Cook.

4             **THE COURT:**  And, so, it existed at least at one time

5    in Mr. Cook's email stream.

6             **MR. LERNER:**  Yes.  And --

7             **THE COURT:**  All right.  Let's turn to the next thing

8    I want to ask you about.

9             **MR. LERNER:**  May I offer a point on that, Your Honor?

10            **THE COURT:**  No.  "Because I did not" -- I'm reading

11   from the email again.

12            "Because I did not want to sign the Apple's NDA for

13            onsite review, the process came to a halt."

14            Period.  Next sentence:

15            "I felt that it was not appropriate to receive

16            confidential information from or disclose

17            confidential information to Apple given my fiduciary

18            responsibilities as technical officer of Cercacor."

19            Period.  Close quote.

20            Do you think that a statement by Mr. Lamego in an

21   email directed to Mr. Cook stating, one, earlier in the year he

22   didn't want to sign an NDA, in part because he felt it was,

23   quote, "not appropriate," close quote, to, quote, "disclose

24   confidential information to Apple," and, two, that described he

25   had and owed, quote, "fiduciary responsibilities as technical

Exhibit 11

1    officer of Cercacor."  Period, close quote.

2         Are those two facts that are contained in this email

3    in any way relevant to any issue in this case?

4         **MR. LERNER:**  They could be.  The point which we've

5    been consistent on throughout, Your Honor, is that --

6         **THE COURT:**  Thank you.  They could be.

7         **MR. LERNER:**  -- is that --

8         **THE COURT:**  Let's talk about --

9         **MR. LERNER:**  Your Honor, may I please --

10        **THE COURT:**  Let's talk about one more --

11        **MR. LERNER:**  -- answer your question?

12        **THE COURT:**  -- clause from this email.  Let's talk

13   about one more clause from this email.  Next page.  We're now

14   at page 38 of Docket Number 321-1, second to last substantive

15   paragraph.  Quote:

16            "I would appreciate if the content of this letter

17            could be kept confidential since it can jeopardize

18            the outcome of my career at Cercacor."

19        Period.  Close quote.

20        Do you think that that expression of concern about

21   his career at Cercacor, based on this letter that he sent to

22   Mr. Cook, that that has any bearing on any fact of consequence

23   in this case?

24        **MR. LERNER:**  In this case?  It sounds like it was a

25   big deal in the other case where he was very concerned.

18

1          THE COURT:  I'm asking about this case.

2          MR. LERNER:  I --

3          THE COURT:  Do you think that Apple being placed on

4   notice that the person who, in your words, unsolicitedly sent

5   an email to Tim Cook, asked Mr. Cook to keep this email

6   confidential, a potential -- I don't know if you were

7   competing, if the companies were competitors at that point --

8   but asked to have this communication confidential, do you think

9   that that has any bearing on -- for instance, we talked about

10  knowledge of the receiving party in a trade secret case knowing

11  that the potential information is a trade secret or is

12  confidential -- does this have any bearing on any issue of

13  consequence in this case?

14          MR. LERNER:  It could, and we're addressing --

15          THE COURT:  Okay.  It could.

16          MR. LERNER:  -- two separate --

17          THE COURT:  It could.  Thank you.

18          MR. LERNER:  -- issues.  We're addressing --

19          THE COURT:  So, now let's turn to -- let's get --

20  let's really get into the weeds now.  I really want to get into

21  this.

22          MR. LERNER:  Your Honor --

23          THE COURT:  Let's talk about -- no, no.  I've read

24  your papers.

25          MR. LERNER:  I'm not commenting on my papers.  I just

Exhibit 11

19

1   would like to be heard.

2          **THE COURT:**  We're going to turn now to the -- what I

3   think is the operative pleading, which is the fourth

4   amendment -- fourth amended complaint.  Paragraph 21 of the

5   fourth amended complaint reads, in part:

6                "Apple systematically recruited other key Masimo

7                personnel, such as Marcello Lamego, who was the

8                former chief technical officer at Cercacor and a

9                former research scientist at Masimo."

10         The remainder of paragraph 21 describes dates that

11  Mr. Lamego worked at Masimo or Cercacor.

12         Here is -- and that's -- that's the fourth amended

13  complaint.  Here is defendant's, Apple's, amended answer to the

14  fourth amended complaint with respect to paragraph 21:

15                "To the extent it implicates a legal conclusion, no

16                response is required.  To the extent that a response

17                is required, Apple admits that it hired Marcelo

18                Lamego in 2014.  Apple denies that it systematically

19                recruited other key Masimo personnel, such as Marcelo

20                Lamego.  Apple lacks information sufficient to form a

21                belief about the truth of the remaining allegations

22                and characterizations in paragraph 21 of the fourth

23                amended complaint, and, therefore, Apple denies

24                them."

25         End of quotation.

Exhibit 11

20

1        So, Apple, in responding to paragraph 21, did not

2   admit and, in fact, denied, based on lack of information, that

3   Marcelo Lamego was the former chief technical officer of

4   Cercacor.  So, apparently, that Apple's taking is challenging

5   that based on lack of information or belief.

6        Does the -- Mr. Lerner, does the first line of -- or

7   not the first line, but the -- Mr. Lamego's letter, does that

8   have any bearing on whether he was the former chief technical

9   officer of Cercacor?

10        **MR. LERNER:**  It doesn't say he was former.  It says

11   as the chief, at this time.

12        **THE COURT:**  Okay.

13        **MR. LERNER:**  He held multiple positions.

14        **THE COURT:**  We're talking about relevance.  You're

15   not proving your case.  Does it have any bearing on the issue

16   of whether he was, at one time, the chief technical officer at

17   Cercacor?

18        **MR. LERNER:**  He says:  "My responsibilities as the

19   chief technical officer of Cercacor."

20        **THE COURT:**  So, could you answer my question?  Does

21   it have any bearing on the issue of a fact that apparently

22   Apple contests, due to lack of information or belief, whether

23   Mr. Lamego was the chief technical officer at Cercacor?

24        **MR. LERNER:**  He held multiple positions, and we're

25   talking about different times, but, yes, this does say he was

Exhibit 11

21

1    the --

2              **THE COURT:**  All right.  Yes.  Let's go on --

3              **MR. LERNER:**  -- chief technical officer.

4              **THE COURT:**  -- to paragraph 22.  All right.

5    Paragraph 22 of the fourth amended complaint.  Just read the

6    first sentence for now:

7              "Lamego had unfettered access to plaintiffs' highly

8              confidential, technical information."

9              Here is reading now from Apple's answer to the fourth

10   amended complaint:

11             "To the extent paragraph" -- 22 -- although it says,

12   "To the extent paragraph 23," I believe that's a typo, because

13   it's numbered 22.

14             "To the extent" -- the paragraph -- "implicates legal

15             conclusions, no response is required.  To the extent

16             that a response is required, Apple lacks knowledge or

17             information sufficient to form a belief about the

18             truth of the allegations and characterizations of

19             paragraph 22 of the fourth amended complaint, and

20             therefore Apple denies them."

21             So, that puts -- that statement whether or not

22   Mr. Lamego had unfettered access to plaintiffs' highly

23   confidential technical information, do you think, since that's

24   now at issue and plaintiff has to prove it since it's been

25   denied by Apple, that that letter has any bearing on that

Exhibit 11

1  issue?

2         **MR. LERNER:**  Whether or not he had unfettered access?

3         **THE COURT:**  Yeah.

4         **MR. LERNER:**  He says:  "I developed several medical

5  devices in the last 10 years."

6         **THE COURT:**  He also said that he didn't want to sign

7  an NDA because of -- that would require him -- by which he

8  would have shared confidential information, he wasn't

9  comfortable, given his fiduciary duties.  So --

10         **MR. LERNER:**  No, no, that's --

11         **THE COURT:**  -- does that letter have any bearing on

12  this?

13         **MR. LERNER:**  This is important.  That is not what

14  that says.

15         **THE COURT:**  All right.  Fine.  Your --

16         **MR. LERNER:**  It does not say he would have --

17         **THE COURT:**  Is it your contention -- yes or no, is it

18  your contention that that letter has any bearing on plaintiffs'

19  now requirement to prove its contentions in paragraph 22 of its

20  answer, this contention that Apple denies?

21         **MR. LERNER:**  Mr. Lamego sent this --

22         **THE COURT:**  Yes or no?  Just give me a yes or no.

23  Does it have any bearing?

24         **MR. LERNER:**  As to Apple, he sent this email.  The

25  whole point of our argument and what I've been trying to

Exhibit 11

1  explain is that it cannot be the test that sending an email to

2  Mr. Cook, where he effectively says, by forwarding it without

3  comment, this is not on my plate; I'm not --

4         **THE COURT:**  He doesn't say that.  He doesn't say that

5  at all.  We're moving on now.

6         **MR. LERNER:**  He --

7         **THE COURT:**  Since you didn't answer my question,

8  we're going to keep going.  Paragraph 228 of the fourth amended

9  complaint.

10        **MR. LERNER:**  I apologize.

11        **THE COURT:**  I'm going to --

12        **MR. LERNER:**  How did I not answer your question?

13        **THE COURT:**  I'm going to -- I asked you for a yes or

14  no question of whether it had any bearing on the issue of the

15  case, and you didn't answer that.

16        **MR. LERNER:**  That's --

17        **THE COURT:**  So, we're moving forward to paragraph 228

18  of the fourth amended complaint.  I'm reading a portion of it.

19            "At the time of the disclosure, O'Reilly and Lamego

20            knew, or had reason to know, that their knowledge of

21            plaintiffs' confidential information was acquired by

22            an employer-employee relationship, fiduciary

23            relationship, and employment agreements, which

24            created a duty for them to keep plaintiffs'

25            confidential information secret."

Exhibit 11

24

1          That's the allegation of paragraph 228.  In response,

2     in its answer to paragraph 228, leaving aside the legal

3     conclusion statement previously read, this is the entirety of

4     the answer:

5               "To the extent that a response is required, Apple

6               denies the allegations and characterizations in

7               paragraph 228 of the fourth amended complaint and

8               specifically denies that it has committed any active

9               trade secret misappropriation."

10         So, Apple is affirmatively denying all the

11    allegations contained in paragraph 28, including the allegation

12    that Mr. Lamego knew, or had reason to know, that their

13    knowledge of confidential information was required by, among

14    other -- was acquired by, among other things, a fiduciary

15    relationship.

16         Does the October 2nd, 2013, from Mr. Lamego have any

17    bearing on what plaintiff now has to prove -- because Apple has

18    denied it -- that Mr. Lamego knew that he had knowledge of

19    plaintiffs' confidential information acquired as a result of a

20    fiduciary obligation?

21         **MR. LERNER:**  It well could, and I will not contest

22    any of the further points, Your Honor.  I don't think I can get

23    out my point, but I take Your Honor's questions, understand

24    your point.  I don't need to keep arguing it.

25         **THE COURT:**  Well, we're going to go a little more;

Exhibit 11

25

1   because I want to make sure that -- you know, you had some

2   pushback there.  Let's go to paragraph 229, the next paragraph

3   of the fourth amended complaint:

4           "Plaintiffs allege at the time of the acquisition

5           defendant also knew, or had reason to know, that its

6           employees obtained plaintiffs' confidential

7           information pursuant to a duty to keep plaintiffs'

8           confidential information secret."

9           And, then, skipping down:

10          "Defendants also knew Lamego was the chief technical

11          officer of Cercacor and a research scientist at

12          Masimo.  Defendant knew Lamego and O'Reilly were each

13          under a duty to maintain the secrecy of the

14          information they obtained from plaintiffs.  Defendant

15          knew plaintiffs considered the information

16          confidential by virtue of its prior relationship of

17          plaintiffs."

18          And we talked earlier about in a trade secret case

19   the state of mind of the defendant matters, right?

20          **MR. LERNER:**  Yes, Your Honor.

21          **THE COURT:**  And this allegation is that the

22   defendant, Apple, a corporation, knew that, among other things,

23   Lamego was the chief technical officer of Cercacor and was

24   under a duty to maintain the secrecy of information --

25   confidential information contained, and that defendant knew

Exhibit 11

26

1  that plaintiffs considered information confidential by virtue

2  of that relationship.  Apple in its answer to paragraph 229

3  admits that it received a letter from plaintiffs on or around

4  January 24th, 2014, containing the language quoted in paragraph

5  229, but denied the remaining allegations and characterizations

6  of paragraph 229.

7         Do you think that Mr. Lamego's October 2nd, 2013,

8  letter bears in any way on Apple's denial -- other than

9  referencing the January 24th, 2014, letter -- has any bearing

10 on the issue of Apple's state of mind with respect to the trade

11 secret case?

12         **MR. LERNER:**  Not as we understood the accusations

13 there, Your Honor.  They were based on, as we understood them,

14 on that letter.

15         **THE COURT:**  So, you say it has no bearing whatsoever.

16 That letter has no bearing whatsoever about whether defendant

17 knew Lamego was the chief technical officer and that he was

18 under a duty to maintain secrecy of confidential information.

19 You're saying that that letter is irrelevant to plaintiffs'

20 obligation to prove those allegations.

21         **MR. LERNER:**  No, Your Honor.  The point we've been

22 trying to make -- and I accept your point, and I don't want to

23 keep arguing it, because I understand you don't --

24         **THE COURT:**  Yeah, and I can go on for --

25         **MR. LERNER:**  -- accept my argument.  So, I --

EXCEPTIONAL REPORTING SERVICES, INC

Exhibit 11

1          **THE COURT:**  -- for quite a long time.  But we'll stop

2    now on the fourth amended complaint.

3          And, now, before you get to what you want to tell

4    me --

5          **MR. LERNER:**  No, I --

6          **THE COURT:**  -- I want to ask you:  What did you know

7    at the time you wrote and affirmed in court when you said that

8    Mr. Cook's email is unlikely to contain relevant, discoverable

9    information?  Were you aware of the October 2nd, 2013, from

10   Mr. Lamego that you have now repeatedly confirmed contains

11   relevant information?  Were you aware of it at the time you

12   wrote your brief in connection with the June 10th, 2021, motion

13   or opposi- -- motion, and were you aware of it at the time you

14   sat here in court on June 10th and said you understood that I

15   was relying on that representation?  Were you aware of that

16   email at that time?

17         **MR. LERNER:**  Yes, Your Honor.  We had talked about it

18   with the Court a week earlier.

19         **THE COURT:**  You hadn't talked about it to me.

20         **MR. LERNER:**  I'm sorry.

21         **THE COURT:**  When did you talk about it to me a week

22   earlier?

23         **MR. LERNER:**  We --

24         **THE COURT:**  Tell me what day you spoke to me about

25   that email.

28

```
 1          MR. LERNER:  I apologize if I got that incorrect in

 2   terms of my characterization.  On June 3rd, at set forth in the

 3   papers here, we had communicated with the plaintiffs about this

 4   email.  They gave us a brief that was redacted and didn't have

 5   the information, and we said, "What's redacted?"  And they went

 6   to True Wearables and got approval to show it to us, and it was

 7   this email.

 8          THE COURT:  Are you saying that's the first you've

 9   ever seen that email?

10          MR. LERNER:  No, Your Honor.

11          THE COURT:  Okay.

12          MR. LERNER:  So, at that point --

13          THE COURT:  So, when did you -- when did you -- you

14   said you told me about it a week before June 10th.  When did

15   you tell me about it?

16          MR. LERNER:  We -- I apologize.  We filed the brief

17   that day, June 3rd, with Your Honor.  As described there, we

18   didn't tell you about it; we filed the paper.  So, obviously,

19   we were aware of it.

20          THE COURT:  But you didn't tell me about it, and I --

21          MR. LERNER:  No, that's correct.

22          THE COURT:  Do you want to take a look at what I get

23   every morning?  It's a list of every document filed in every

24   case that I'm on.  Do you think, as I'm getting ready for

25   hearings, I open up and analyze every filing, in every other
```

Exhibit 11

29

1    case, on the off chance that there's something in there that

2    might have relevance?  Do you think that I do that?

3          **MR. LERNER:**  No, Your Honor.

4          **THE COURT:**  Of course not.  What do I do?  I rely on

5    the candor of counsel at times, like I did on June 10th, when

6    you told me Mr. Cook is unlikely to have any relevant,

7    discoverable material in his email, and you just confirmed to

8    me -- we could talk about the issue of ESI custodian in a

9    moment -- but you just confirmed to me that this email is

10   relevant on so many issues that you -- you don't even want to

11   talk about it anymore.  Did you lie to me?

12         **MR. LERNER:**  Certainly it was not my intent, Your

13   Honor, and I apologize that you feel that way.

14         The -- very quickly, the point that I have been

15   trying to make to explain why I don't want you to feel that way

16   is that we have been very consistent in pointing out that

17   sending an email to Mr. Cook --

18         **THE COURT:**  I'm not -- we'll get to that.

19         **MR. LERNER:**  Okay.

20         **THE COURT:**  The question isn't -- look, there's all

21   sorts of things that you can argue.  You could have argued on

22   June 10th to say:  You know what, Your Honor?  I wrote in the

23   brief that there is -- his email is unlikely to have relevant,

24   discoverable information; you know, there is this email,

25   unsolicited from Mr. Lamego, that, you know, came in, I guess

Exhibit 11

1    that's relevant, but here's the reasons why that doesn't make

2    him and Mr. Cook a proper ESI custodian.  You didn't say that.

3    And to the extent you think that I'm scouring files --

4            **MR. LERNER:**  No.

5            **THE COURT:**  -- for -- for --

6            **MR. LERNER:**  I do not.

7            **THE COURT:**  -- when you tell me --

8            **MR. LERNER:**  I do not.

9            **THE COURT:**  -- there is unlikely to have relevant,

10   discoverable information, and this email is in there, separate

11   and apart from whether he's an appropriate discussion, and you

12   knew about it, and you told me:  No, nothing relevant or

13   discoverable; unlikely to have anything relevant and

14   discoverable in his email.  You sat there when I said --

15   because I'm relying on you and your four or five colleagues

16   that signed that brief -- that this is a close call.  But I'm

17   relying on that statement to deny the motion, and you didn't

18   say:  By the way, there is this other thing out there.  And

19   they couldn't tell me.  Because they heard me, and they heard

20   me when I talked about protective orders and what they mean.

21   They knew about it from a protective order.  They couldn't tell

22   me in the context of this case.  And you sat there and let it

23   all go by like it didn't exist.

24           So, before we get to the appropriateness of the

25   custodian, I want to get -- since we've now gone down this

31

 1   road, I want to get to the bottom of this.  Do you still

 2   contend -- and I noticed from your papers you no longer say his

 3   email is unlikely to contain discoverable, relevant

 4   information.  It now says it's unlikely to contain discoverable

 5   non-duplicative information.  So, that tells me that you

 6   recognized that you were not completely candid with me on June

 7   10th.  And we can get to your other arguments, but how am I

 8   supposed to trust anything you say now?

 9         **MR. LERNER:**  I apologize, Your Honor.  As I said

10   earlier, the way that we understood the argument here and the

11   issues is, did he have information that made him a proper

12   custodian.

13         **THE COURT:**  Okay.  That's not what you wrote, and I

14   was at the hearing --

15         **MR. LERNER:**  I --

16         **THE COURT:**  -- and you were at the hearing, and I

17   made it very clear that there was a careful balancing going on

18   here, and that the plaintiffs' showing was not particularly

19   strong about specific contacts.  There was references to public

20   statements about Mr. Cook saying he wanted the future of Apple

21   to be and the health -- the health monitoring field, and the

22   statements around the timing and conversations and meetings

23   with Mr. O'Reilly, but that that didn't really show a lot of

24   relevance to our dispute here and in connection to it.

25         And on your side, you didn't show me any burden, and

Exhibit 11

32

1    so it was a close call, but I'm going to take you at your word

2    when you tell me as an officer of the Court it's not likely to

3    have any relevant discoverable information.  And to hear that

4    you knew about this October 2nd, 2013, letter at the time you

5    made that representation, and assured me that you understood

6    that that's what I was relying on, and to hear as we sat here

7    today the various myriad ways in ways that letter is relevant

8    to the issues in this case, I'm not sure what to do with that.

9            But let's move on.  You want to tell me something.

10   Do you now concede that that representation was, let's just say

11   not entirely accurate, and that there is reason to believe --

12   in fact, there is -- you've now conceded that there was at

13   least at one time relevant information in Mr. Cook's email?

14           **MR. LERNER:**  I understand your point, Your Honor, and

15   I apologize --

16           **THE COURT:**  I'm not making a point.  I'm asking a

17   question.  Can we move past that?

18           **MR. LERNER:**  Yes.

19           **THE COURT:**  Is it now the state of play that we can

20   start from this spot, where we couldn't start from last time.

21   I now have evidence in front of me that at least at one time

22   Mr. Cook had relevant information in his email strings.

23           **MR. LERNER:**  Yes.

24           **THE COURT:**  All right.  Make whatever further

25   argument you want to make.

33

1          **MR. LERNER:**  Two very quick points.

2          **THE COURT:**  I don't want you to be rushed.  Take as

3     much time as you want.

4          **MR. LERNER:**  I understand Your Honor's point so far.

5     When we briefed this throughout, and Your Honor just raised,

6     for example, the meeting with Mr. O'Reilly, that was a meeting.

7     We didn't say they didn't meet.  To the contrary.  We went and

8     got a declaration from Mr. O'Reilly about the meeting with

9     Mr. Cook.

10         **THE COURT:**  And as you heard, I'm not talking about

11    that.  I found that insufficient before.

12         **MR. LERNER:**  And what we had when we looked at this

13    email isn't even a meeting.  We have an email that comes in.

14    He forwards it, and as far as we can tell, has nothing else to

15    do with it.  And then, in order to make sure, and give the

16    Plaintiffs every opportunity we can to test this theory that

17    Mr. Cook knew anything about this, we said, on each of these

18    documents actually, we'll make the people involved custodians.

19    So, this was forwarded to Jeff Williams.

20         **THE COURT:**  What day did you offer Jeff Williams as

21    an ESI custodian?

22         **MR. LERNER:**  I think as they pointed out, it was

23    right before one of our briefs.

24         **THE COURT:**  Maybe the day before your opposition?

25         **MR. LERNER:**  I think that's what -- that's what was

Exhibit 11

34

1   said in the papers, and if that's so, that's accurate.

2          **THE COURT:**  And why should they take your word that

3   that's going to, in your words, "put the matter to bed"?

4          **MR. LERNER:**  That was one of many people who -- to

5   whom we said, let's make them a custodian so you can test this

6   theory.  That is who Tim Cook in the first instance forwarded

7   this to.

8          And by the way, when we -- when we went and looked,

9   and provided information about his emails, there was not, as

10  far as we can tell, not follow-ups until November.  And not to

11  involve Mr. Cook as we saw.

12         Now, on the second point where they say --

13         **THE COURT:**  When you say you investigated the email

14  chain, did you ask Mr. Cook?

15         **MR. LERNER:**  We have not asked Mr. Cook.

16         **THE COURT:**  Okay.

17         **MR. LERNER:**  And again, that goes, I think, to the

18  point I was trying to make.  And I understand Your Honor's

19  response to it which is, if in every instance where somebody

20  sends Mr. Cook an unsolicited email, and he forwards it to

21  other people to deal with, we have to go talk to him or review

22  his emails, that's not a workable standard.

23         **THE COURT:**  Well, when you make a representation that

24  an email account is not likely to have relevant information at

25  a time you know and knew that it did, I'd suggest, if you're

Exhibit 11

35

1    going to come back and say, "Oh, well, never mind, this was

2    never followed up on".

3           In that situation, when your credibility is now at

4    issue, maybe you should ask, or ask someone, and say, and this

5    is what you stated in your declaration at Paragraph 7 in

6    connection with the opposition, "I attest that a reasonably

7    diligent search did not yield any indication that Tim Cook ever

8    responded to or substantively commented on this email chain".

9    That doesn't mean that there isn't other information in his

10   email or that there isn't other potential information in the

11   question as -- well.

12          That's a very narrow statement.  "Oh, well, we

13   couldn't find that Mr. Cook further commented on this email

14   chain".

15          What about other email chains?  Did you ask him?

16   Apparently not.

17          **MR. LERNER:**  We --

18          **THE COURT:**  And we're starting from a kernel that

19   didn't exist at the last hearing that now exists, and you have

20   said a couple of times "unsolicited email".  Well, fine.

21   Unsolicited as to Mr. Cook, but at least according to the

22   email, Mr. Lamego had been contacted by two people from Apple.

23          So, it's not, as you put in your opposition, a

24   statement from customers that email Tim Cook, and he didn't

25   respond to.  It's unsolicited in the sense that Mr. Cook didn't

Exhibit 11

36

1    ask for it, but people from Apple contacted Mr. Lamego, and he

2    dealt directly with Mr. Cook.  Why did he deal directly with

3    Mr. Cook?  Well, maybe there's a -- we're now getting into

4    Mr. Lamego's head, but maybe there's a bit of an inkling in

5    that last second to last paragraph.  "Please keep this

6    confidential".  He's going to the top.

7            And you indicated, and your papers indicated, that

8    Mr. Cook, "Oh, he just forwarded it on for other people,

9    without any comment".

10           I'm going to tell you, just like I said, and I quoted

11   Bob Dylan last time, that I don't need a weather man to know

12   which way the wind blows.

13           I'm going to go out on a limb, and we do have an

14   Apple representative in court.  I'm going to go out on a limb

15   that if Mr. Cook got an email at 12:53 a.m. and forwarded it to

16   the head of HR and the head of the, what is it, the Health

17   Sciences Division, at what was it, like 7:00 a.m.  I mean, we

18   don't even have a minute of 9:00 to 5:00 business time before

19   that was sent out.

20           Now, obviously, Apple doesn't necessarily work on a

21   9:00 to 5:00 business, but you're talking about that's an

22   immediate turn around, and it's not just going to an assistant

23   or going to someone.  It's going to the head of HR and the head

24   of the relevant department.  So, he did put thought into it.

25   He didn't just slough it off.  He picked two critical people

Exhibit 11

37

1   that bear directly on what Plaintiffs are alleging, and he did

2   it almost instantaneously considering the time it came in.

3           And one of those people almost instantaneously

4   reached back out to Mr. Lamego within a couple of hours.  I am

5   very curious about whether there was any other communication

6   with Mr. Cook about this issue.  I'm sure the Plaintiffs are

7   interested were there emails to other people.

8           So, to say, "Well, we didn't find him commenting on

9   this email thread", doesn't answer the question and doesn't

10  really get to it other than it -- the fact that it's there

11  makes one of the legs that underpinned my prior ruling go away.

12  And it's more than just a customer sending an email that he has

13  his assistant look at.

14          And I'll say something else.  Again, this comes from

15  my time as a prosecutor.  The metadata on this is going to be

16  important because your client may say, "You know what, Tim Cook

17  doesn't even monitor his email account, the general email

18  account.  He's got an assistant that does that.  An assistant

19  made this decision".  Maybe so.  I don't know.  But I'd be

20  interested to know what came in before, what came in after.

21  And I'm not saying that's discoverable, but what I'm saying is

22  potentially where this goes, if there's an argument that

23  Mr. Cook didn't forward it, someone else did, well, they may

24  have the ability and be approved to make an ability to test

25  that.

Exhibit 11

38

1          But this is an important email.  What happened to it

2   is important, and it suggests to me, reasonable cause to

3   believe that there -- that first of all, Mr. Cook is

4   knowledgeable about the facts, because he didn't just send it

5   to his assistant and say, "I don't know what this is, deal with

6   it".  And sometimes saying nothing is saying a lot.  What is

7   it, Cool Hand Luke?  Sometimes nothing is a pretty cool hand?

8          Sometimes when the CEO of the world's largest company

9   forwards, without comment, an email about an unsolicited email

10  from the chief technology officer from a competitor or

11  potential competitor to the head of HR and the head of the

12  Health Sciences Division, that speaks loudly, even if there

13  isn't anything written in text in the email.

14         So, please continue.

15         **MR. LERNER:**  I do not need to continue to test your

16  patience, Your Honor.  As I can tell, so only --

17         **THE COURT:**  I have -- listen, you're not testing my

18  patience.

19         **MR. LERNER:**  -- the only two points I would clarify

20  is that I tend to read my email sometimes around 8:00 or 9:00

21  in the morning.  That's what Mr. Cook did based on the

22  documents we saw here.  I just want to clarify that point.

23         **THE COURT:**  Can I get the exact time?  When was the

24  exact time --

25         **MR. LERNER:**  8:50 a.m.

Exhibit 11

39

```
1          THE COURT:  -- because again, it might be important
2   for the metadata to see when it was opened; how quickly it was
3   sent out.
4          What was the exact time he forwarded it to
5   Mr. Williams and --
6          MR. LERNER:  8:50 and 57 seconds Pacific time.
7          THE COURT:  All right.  And it was sent at 1:50 a.m.
8          MR. LERNER:  Right.  So --
9          THE COURT:  So, we're -- we didn't even get to
10  business hours.  You're right.  Maybe he does it first thing in
11  the morning, but again it shows you something.
12          MR. LERNER:  I just --
13          THE COURT:  You check your email in the morning.  I
14  check my Court docket in the morning.  Important things, I send
15  something to Maria right away.  Oh, we've got to deal with
16  this.  We've got an ex parte from -- well, leave it at that.
17  We've got to deal with this right away.
18          Less important things, they kind of filter out
19  through the day.  Maria is nodding her head.  We deal with them
20  when we deal with them, but important things, boy, we send them
21  out right away, and we make sure we get it to the right person
22  right away.
23          So, when Judge Carter or Judge Selna sends me an
24  email, even without comment, I'm getting back to him, or Judge
25  Staton right away because, boy, that's important.
```

Exhibit 11

40

1          So, go ahead.

2          **MR. LERNER:**  I, like I said, I do not have more to

3    take your time with this other than that the two people you

4    mentioned, Mr. Cook tends to interact with other senior people.

5    So, he forwarded it to senior people, and as you can tell from

6    the follow-up, some of those people, it sounds like already

7    knew about the discussions and there were discussions in place.

8    So, there was -- there was follow-up.

9          These are all factual issues.  I understand Your

10   Honor's point that you would like to know more about them.  We

11   understand your tentative.

12         I think I've made my point about the standard for

13   making him a custodian.  I understand that's not carrying

14   water, and I understand your other points.

15         **THE COURT:**  Well, do you have anything you want to

16   add from a legal standpoint?  Have I said anything wrong from a

17   legal standpoint about what the right standard is?

18         **MR. LERNER:**  For making him a custodian?

19         **THE COURT:**  Yeah, what's -- what do you contend the

20   standard is?

21         **MR. LERNER:**  I contend the standard should not and

22   cannot, and I don't have a case specific to these facts because

23   we have not seen one, but it should not be enough to make the

24   CEO of a company a custodian because he receives and forwards

25   an email.

Exhibit 11

1          **THE COURT:**  All right.  You cited two cases in your

2    opposition that dealt with the ESI custodian issue.  All the

3    other cases --

4          **MR. LERNER:**  Yep.

5          **THE COURT:**  -- deal with the issue of the timing and

6    appropriateness of the requests for -- of the motion for

7    reconsideration under the rules.  Is there anything you want to

8    tell me about those cases that you think should guide my

9    analysis here?

10          **MR. LERNER:**  No, Your Honor.  I'm sure you've already

11    reviewed them and read the papers, as you've said.  So I,

12    again, don't need to take more of your time.

13          **THE COURT:**  Well, I want -- listen.  Tell me if

14    there's anything, and I'm going to point out from my reading.

15    You're right.  I did read them, the *BlackBerry* case, and that

16    was Judge Stevenson in L.A. from 2019, and the citation is 2019

17    WL 4544425.

18          I don't know that that helps your cause because

19    although Judge Stevenson denied a motion, and it relates to

20    Mr. Mark Zuckerberg from Facebook, denied a motion to require

21    that he search -- or that Facebook search his email strings as

22    to four categories or four search issues.

23          She had earlier had required Facebook to conduct a

24    search of Mr. Zuckerberg's email for a particular issue that

25    she found relevant, and then because -- it was largely because

42

1    it was a patent case, patent infringement case, there was no

2    showing that Mr. Zuckerberg knew anything about the patents at

3    issue, those other patent-related ESI terms were not required

4    to be searched, but he was required -- Facebook was required to

5    search as to an issue which he did have knowledge.

6            MR. LERNER:  And we cited that case, to be clear,

7    Your Honor, because the proposed order here that you've been

8    asked, is not just to run the terms that the parties have

9    negotiated on Mr. Cook --

10           THE COURT:  But what I'm -- but this is a very

11   different situation.  And if this were just a patent case,

12   we're not dealing with just a patent case.  We're dealing with

13   the very issue that that letter goes -- that email goes to the

14   heart of as it relates to the trade secret case.

15           MR. LERNER:  And --

16           THE COURT:  So, the relevant information that at

17   least at one time was in his email string, and that again, by

18   not speaking, he spoke loudly; by how quickly he forwarded it

19   and to whom he forwarded it to shows that he did have some

20   knowledge and did -- and there is reason to believe that

21   there'd be more information in his emails.

22           And then the other case is the *Lauris versus Novartis*

23   from 2016.  That's Stan Boone's case in the Eastern District.

24   And he also denied an ESI request for four senior executives of

25   Novartis, but first of all said, and I'm quoting from Star

Exhibit 11

43

1   Three of the Opinion, "That the Court is not persuaded that the

2   Apex Doctrine applies to discovery at issue", and then found

3   that the discovery sought was not proportionate to the needs of

4   the case noting that it would double the costs of the discovery

5   that had taken place thus far.

6           So, he had information from the Defense about what

7   the costs would be to do these four, and I'm using the term

8   loosely, Apex ESI searches, whereas I have none.  And I do find

9   that it is relevant, and there is reason to believe that

10  material information would be contained in the email thread,

11  and I'll note Judge Stevenson also did not apply, and expressly

12  said she was not applying an Apex Doctrine approach to the

13  issue, but was instead just relying on relevance and

14  proportionality.

15          And based on the information that I have, I find that

16  there is reason to believe that there's relevant information

17  and that I, having no countervailing facts, and the only thing

18  that I relied on last time, which was counsel's representation,

19  which turned out not to be true, from a proportionality

20  analysis, I find that -- or I am tentatively finding that the

21  -- Mr. Cook being designated as an ESI custodian is

22  proportional to the needs of the case, as Defendant has not

23  shown me any evidence otherwise.

24          Anything else, Mr. Lerner?

25          **MR. LERNER:**  No, Your Honor.

Exhibit 11

44

1          THE COURT:  Mr. Re or Mr. Powell, any rebuttal or

2    response?

3          MR. RE:  Nothing, Your Honor.

4          THE COURT:  So, I'm going to ask this.  I'm going to

5    hold off on issuing a ruling.  I'm not sure that -- I'm not

6    saying he isn't, I'm not saying he is.  I'm not sure that the

7    same search terms that might apply to the head of R and D or

8    the head of some of the other issues, would necessarily apply

9    to Mr. Cook in a search of his email, as I know there's this

10   issue of efficient infringement.

11          I'm not making a ruling on it, but I want there to be

12   some discussion among the parties about whether this -- whether

13   the search terms can be agreed to or whether I need to make a

14   finding.  I'll hear from you on that, Mr. Re.

15          MR. RE:  We did propose a very, very, very few terms

16   for Mr. Cook.

17          THE COURT:  Is this in the proposed order?

18          MR. RE:  It is in, actually in a letter to Mr. Brian

19   Andrea at Gibson Dunn.  And it's at Exhibit 22.  Oh, it's

20   Document 475-2, filed July 19th this year, and its Page 46 of

21   47; otherwise Exhibit 22 at 190.

22          And you'll see at the very, very bottom of that page

23   just how limited the terms are for Mr. Cook compared to

24   everybody else.  And so, you're right.  We have already had

25   correspondence setting forth a very, very targeted number of

Exhibit 11

1   search terms for Mr. Cook.

2           **THE COURT:**  All right.  So, for the record, those

3   search terms are, "Masimo, or Cercacor, or Kiani, or Diab" is

4   one Boolean search.  A second one is, "Lamego, or Marcelo, or

5   O'Reilly, or O'Riley", spelled alternatively.  The third one is

6   the phrase, "efficient infringement".  And the last is,

7   "healthcare, or embedded patient or medical closed in bed

8   (phonetic) within five of monitor, with an end Boolean change

9   allotment".  Those are the four terms.

10          Tell me what you think about those terms, Mr. Lerner.

11          **MR. LERNER:**  We think, as we briefed, that "efficient

12  infringement" has nothing to do with this case.  It feels like

13  it's plucked out of the media.

14          The last one on its face is not as described.  Asking

15  us to look through all of Tim Cook's emails for healthcare

16  is --

17          **THE COURT:**  All right.  Mr. Re.

18          It sounds like the main objection is to the final

19  two, so let's focus on those two.  Is there any connection that

20  you found in discovery thus far to the phrase "efficient

21  infringement" as it relates to this case?

22          **MR. RE:**  I will defer to Mr. Powell, who is the

23  author of that letter.

24          **MR. POWELL:**  Thank you, Your Honor.  I'm not aware of

25  any documents in discovery using that phrase that we've

Exhibit 11

46

1   received yet.  The phrase came out, and you'll see this in our

2   reply brief, is the issue is that there's been statements,

3   public statements about this is a practice at Apple known as

4   efficient infringement --

5        THE COURT:  I've seen it, and there was back and

6   forth about whether the person who made the allegation actually

7   was who, in terms of his position at Apple, was who he claimed

8   to be.  And my memory is whoever wrote the response to that

9   said something to the effect of Apple doesn't do that and

10  doesn't believe in that.

11       MR. POWELL:  Right, Your Honor.  So, Mr. Cook

12  indicated that he does not think Apple does that and so, our

13  point is this is just a search term.  If Apple doesn't do that,

14  then it shouldn't have any hits.  And if it does have hits, it

15  might be Mr. Cook saying, "Yeah, we definitely don't do

16  efficient infringement, that's not our practice".  You would

17  think that Apple would want to produce such documents.

18       THE COURT:  All right.  And tell me about the other

19  category that seems like it has the potential in using the

20  phrase "patient within five of monitor or monitoring"

21  considering the nature of some of Apple's products that that

22  conceivably could result in a large number of documents that

23  have nothing to do with the claims in this case.

24       MR. POWELL:  Yeah, I don't know how many documents it

25  would result on.  I think the issue here is to at least run the

Exhibit 11

47

1    search terms and get hit counts.  If the search terms don't

2    result in many documents, then there's no burden.  If the

3    search terms result in, you know, a million documents or

4    something, just for Mr. Cook, then of course we can -- I'm

5    happy to have that conversation with Mr. Lerner.

6         THE COURT:  All right.  Anything further on this

7    issue, Mr. Lerner?

8         MR. LERNER:  The only other thing that I'll add is,

9    particularly for Mr. O'Reilly obviously, you're talking about

10   an Apple employee.  So, just the name doesn't limit it to this

11   case.  You're talking about every communication with a

12   gentleman who was -- whose title at one point was chief medical

13   officer.  So, there's no limit there.

14        THE COURT:  Let me ask you, if I give you guys -- and

15   I understand you object and you don't agree with my ruling, but

16   if I give you guys 10 minutes, do you think you can narrow

17   this, or at least narrow some of it, because I am cognizant to

18   the potential -- because we're talking about -- what's the

19   timeframe we're talking about?

20        MR. POWELL:  We're talking roughly 2013 to present.

21        THE COURT:  Yeah, I'd like to see whether it's

22   something that you folks can narrow a little bit, but I'm not

23   making a ruling on whether that's inappropriate as stated, but

24   it might be worthwhile to, you know, any email for an eight-

25   year period -- is Mr. O'Reilly still at Apple?

Exhibit 11

48

1          **MR. LERNER:**  Yes, Your Honor.  And --

2          **THE COURT:**  Any email that comes up with the name

3    "O'Reilly", which seems to be what Bullet Point 2 would

4    authorize, seems likely to, even though we don't have the

5    testing, seems likely to pull up an untoward and unnecessary

6    number of documents.

7          **MR. POWELL:**  Well, Your Honor, I would be happy to

8    have that conversation.  I would just only note that what we've

9    done before is we run the search terms and get hit counts --

10          **THE COURT:**  I hear you.

11          **MR. POWELL:**  -- okay.

12          **THE COURT:**  And the problem with that here is, we're

13    trying -- I'm cognizant of a lot of issues, and to the extent

14    you can try to narrow things a little bit now and see whether

15    there's a way that you won't have to run it again, that way you

16    can get to -- hey, nothing is going to be perfect.  You're not

17    necessarily going to capture everything you want, and you're

18    probably going to capture some things that they don't want

19    captured that are going to be produced.  And I don't mean that

20    in a nefarious way.

21          Let's try to work it out.  Let's take five minutes.

22    Just give me five minutes to talk and see if the parties can

23    first talk amongst themselves, and then talk with each other to

24    see if there's a way to narrow these in a way that is less

25    objectionable.  And I'm not saying, again, that I'm not

Exhibit 11

49

1   ultimately going to order it.

2          And I'm just going to -- just going to sit here for

3   five minutes, and if you folks want to step outside, you may.

4      **(A five-minute recess was taken)**

5          **THE COURT:**  All right.  Counsel have returned.  Do

6   you need a minute?

7          **MR. POWELL:**  No.  You may not like what we're going

8   to say, but --

9          **THE COURT:**  Okay.  I don't --

10         **MR. POWELL:**  -- I think we both thought we needed to

11  have consultation with the rest of the people on our teams.  We

12  didn't feel that we could do the kind of job on the fly here at

13  the courthouse because we all rely on other people, and we

14  would kindly request if we could have additional time to --

15         **THE COURT:**  What's going -- obviously, we used to

16  meet regularly, and we don't anymore.  What's going on in your

17  case?  Are there any deadlines or any reasons that this needs

18  to be expedited?

19         **MR. POWELL:**  No, and in fact, we even postponed this

20  hearing a few weeks so that we both could be here.  So, there

21  -- the answer is no.

22         **THE COURT:**  How much time do you think you need to

23  talk?  And again, I'm not expecting Apple to agree with the

24  ruling, but to the extent there are things that are less

25  objectionable that can be worked out, I want to provide that

Exhibit 11

50

1   opportunity.

2          How much time to you think you need from Plaintiffs'

3   standpoint just to consult with your team and make a

4   presentation to Apple?

5          **MR. POWELL:**  A day or two.

6          **THE COURT:**  So, by Monday.

7          **MR. POWELL:**  Monday.

8          **THE COURT:**  Okay.  Monday, the 20th -- I'm sorry, the

9   27th.

10         And Mr. Lerner, assuming you get a proposal from

11  Apple by Monday, the 20th, is that something you can respond to

12  -- I'm sorry, the 27th.

13         **MR. LERNER:**  Proposal on the 27th.

14         **THE COURT:**  Monday the 27th.

15         **MR. LERNER:**  Yes, Your Honor.

16         **THE COURT:**  All right.  So, what I'll do is I'm going

17  to hold off on a written ruling at least until Monday, the

18  27th, and I'll direct Plaintiffs' counsel to file just a status

19  report if there's any change to the request by nature of search

20  terms for Mr. Cook's email, but my tentative will be the order

21  that the motion will be granted.

22         And in terms of the timing, Mr. Lerner, Plaintiffs

23  ask for this to be done within -- to be completed, including

24  production, within 14 days.  What's an appropriate time from

25  your perspective?

Exhibit 11

51

1          **MR. LERNER:**  It will obviously depend a little bit on

2  -- not a little bit, a lot on the search terms, just in terms

3  of volume and review.  And as Your Honor has noted before,

4  which should surprise nobody, it takes additional review of

5  Mr. Cook's emails, just given the importance.

6          If we could get 30 days at the very least, that is

7  much more workable for us.  It may, as I said, we may need more

8  time just given the volume, if it turns out to be a lot more.

9          **THE COURT:**  All right.  Is there any reason why 30

10  days -- why a faster time period is required, Mr. Re or

11  Mr. Powell?

12          **MR. POWELL:**  No, Your Honor.

13          **THE COURT:**  All right.  So, here's what we're going

14  to do.  The order is going to be, the parties are directed to

15  meet and confer, file a -- Plaintiff is directed to file a

16  status report as of September 27th regarding requested terms

17  following that meet and confer for the ESI search.  And the

18  production will be ordered to be made by October 27th.  And if

19  more time is needed, the parties can agree among themselves.

20  An if the parties can't agree, they can return this one issue

21  back to me on that.

22          Is there anything further with respect to this motion

23  on behalf of Plaintiffs?

24          **MR. POWELL:**  Nothing further, Your Honor.

25          **THE COURT:**  And on behalf of Defendants?

Exhibit 11

52

1          **MR. LERNER:**  No, Your Honor.

2          **THE COURT:**  All right.  Thank you.  We're adjourned.

3      **(Proceeding adjourned)**

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit 11

53

## CERTIFICATION

     I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    **September 29, 2021**

       Signed                                                                Dated


*TONI HUDSON, TRANSCRIBER*

**EXCEPTIONAL REPORTING SERVICES, INC**

Exhibit 11

EXHIBIT 12

**UNITED STATES INTERNATIONAL TRADE COMMISSION
WASHINGTON, D.C.**

| | |
|---|---|
| **In the Matter of Certain Light-Based Physiological Measurement Devices and Components Thereof** | Investigation No. 337-TA-_____ |

**FIRST AMENDED COMPLAINT UNDER SECTION 337 OF
THE TARIFF ACT OF 1930, AS AMENDED**

Complainants:

Masimo Corporation
52 Discovery
Irvine, CA 92618
Telephone: 949-297-7000

Cercacor Laboratories, Inc.
15750 Alton Pkwy
Irvine, CA 92618
Telephone: 800-610-8522

Respondent:

Apple Inc.
One Apple Park Way
Cupertino, CA 95014
Telephone:  408-996-1010

Counsel for Complainants:

Stephen C. Jensen
Joseph R. Re
Sheila N. Swaroop
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, 14th Floor
Irvine, CA  92614
Telephone:  (949) 760-0404

Jonathan E. Bachand
KNOBBE MARTENS OLSON & BEAR, LLP
1717 Pennsylvania Ave NW, Suite 900
Washington DC, 20006
Telephone: (202) 640-6400

Exhibit 12

# TABLE OF CONTENTS

**Page No.**

I. INTRODUCTION ........................................................................................................1

II. COMPLAINANTS ....................................................................................................3

III. PROPOSED RESPONDENT ...................................................................................7

IV. PRODUCTS AND TECHNOLOGY AT ISSUE ....................................................8

    A.    Complainants' Technology ...........................................................................8

    B.    Apple's Copying of Complainants' Technology.........................................11

    C.    The Accused Products.................................................................................13

V. THE ASSERTED PATENTS ...................................................................................14

    A.    U.S. Patent No. 10,912,501 ........................................................................14

            1.    Identification of the Patent and Ownership by Masimo Corporation .......14

            2.    Foreign Counterparts to the '501 Patent...................................................16

            3.    Non-Technical Description of the '501 Patent .........................................17

    B.    U.S. Patent No. 10,912,502 ........................................................................18

            1.    Identification of the Patent and Ownership by Masimo Corporation .......18

            2.    Foreign Counterparts to the '502 Patent...................................................20

            3.    Non-Technical Description of the '502 Patent .........................................20

    C.    U.S. Patent No. 10,945,648 ........................................................................21

            1.    Identification of the Patent and Ownership by Masimo Corporation .......21

             2.    Foreign Counterparts to the '648 Patent...................................................23

            3.    Non-Technical Description of the '648 Patent .........................................24

    D.    U.S. Patent No. 10,687,745 ........................................................................24

            1.    Identification of the Patent and Ownership by Masimo Corporation .......24

Exhibit 12

2.      Foreign Counterparts to the '745 Patent.....................................25

3.      Non-Technical Description of the '745 Patent ...............................26

E.      U.S. Patent No. 7,761,127 .........................................................26

1.      Identification of the Patent and Ownership by Cercacor...........................26

2.      Foreign Counterparts to the '127 Patent.....................................27

3.      Non-Technical Description of the '127 Patent ...............................28

F.      Licensees .................................................................................28

VI. UNLAWFUL AND UNFAIR ACTS OF PROPOSED RESPONDENT ...........................29

VII. THE DOMESTIC INDUSTRY Related to Asserted Patents.............................37

A.      Technical Prong ........................................................................38

B.      Economic Prong.........................................................................38

VIII. SPECIFIC INSTANCES OF UNFAIR IMPORTATION AND SALE............................40

IX. CLASSIFICATION OF THE INFRINGING PRODUCTS UNDER THE HARMONIZED
     TARIFF SCHEDULE OF THE UNITED STATES ........................................41

X. RELATED LITIGATION .................................................................41

XI. REQUESTED RELIEF...................................................................42

Exhibit 12

**LIST OF EXHIBITS**

| Exhibit No. | Description |
|---|---|
| 1 | Certified Copy of U.S. Patent No. 10,912,501 |
| 2 | Copy of U.S. Patent No. 10,912,502 |
| 3 | Certified Copy of U.S. Patent No. 10,945,648 |
| 4 | Certified Copy of U.S. Patent No. 10,687,745 |
| 5 | Certified Copy of U.S. Patent No. 7,761,127 |
| 6 | Certified Assignment Documents for U.S. Patent No. 10,912,501 |
| 7 | Certified Assignment Documents for U.S. Patent No. 10,912,502 |
| 8 | Certified Assignment Documents for U.S. Patent No. 10,945,648 |
| 9 | Certified Assignment Documents for U.S. Patent No. 10,687,745 |
| 10 | Certified Assignment Documents for U.S. Patent No. 7,761,127 |
| 11 | CONFIDENTIAL EXHIBIT: Amended and Restated Cross-Licensing Agreement between Masimo Laboratories and Masimo Corporation Effective January 1, 2007 |
| 12 | Listing of All Foreign Patents and All Foreign Patent Applications Corresponding to Asserted Patents |
| 13 | Representative Photos of Representative Apple Watch Series 6 (Model No. 109.627 shown) |
| 14 | Product Literature Regarding the Apple Watch Series 6 |
| 15 | CONFIDENTIAL EXHIBIT:  Claim Chart Comparing Claims of the '501 Patent to an Apple Watch Series 6 |
| 16 | CONFIDENTIAL EXHIBIT: Claim Chart Comparing Claims of the '502 Patent to an Apple Watch Series 6 |
| 17 | CONFIDENTIAL EXHIBIT: Claim Chart Comparing Claims of the '648 Patent to an Apple Watch Series 6 |
| 18 | CONFIDENTIAL EXHIBIT: Claim Chart Comparing Claims of the '745 Patent to an Apple Watch Series 6 |
| 19 | CONFIDENTIAL EXHIBIT: Claim Chart Comparing Claims of the '127 Patent to an Apple Watch Series 6 |
| 20 | CONFIDENTIAL EXHIBIT Drawings, Photographs, or Other Visual Representations of Masimo's rainbow® Sensors |
| 21 | CONFIDENTIAL EXHIBIT:  Drawings, Photographs, or Other Visual Representations of Masimo's Confidential Domestic Industry Product |
| 22 | CONFIDENTIAL EXHIBIT:  Claim Chart Comparing Exemplary Claims of the '501 Patent to Masimo's Domestic Industry Product |
| 23 | CONFIDENTIAL EXHIBIT:  Claim Chart Comparing Exemplary Claims of the '502 Patent to Masimo's Domestic Industry Product |
| 24 | CONFIDENTIAL EXHIBIT:  Claim Chart Comparing Exemplary Claims of the '648 Patent to Masimo's Domestic Industry Product |

Exhibit 12

| Exhibit No. | Description |
|:---:|:---|
| 25 | CONFIDENTIAL EXHIBIT:  Claim Chart Comparing Exemplary Claims of the '745 Patent to Masimo's Domestic Industry Product |
| 26 | CONFIDENTIAL EXHIBIT:  Claim Chart Comparing Exemplary Claims of the '127 Patent to Masimo's Domestic Industry Products |
| 27 | CONFIDENTIAL EXHIBIT:  Confidential Declaration of Bilal Muhsin |
| 28 | CONFIDENTIAL EXHIBIT: Confidential Declaration of Micah Young |
| 29 | September 15, 2020 Press Release |
| 30 | CONFIDENTIAL EXHIBIT: Invoice dated April 19, 2021 |
| 31 | Photographs of Product Packaging of the Apple Watch Series 6 |
| 32 | January 28, 2021 Apple 10K Filing with SEC |
| 33 | Fowler, Geoffrey, "The new Apple Watch says my lungs may be sick. Or perfect.  It can't decide." *Washington Post*, September 23, 2020. |
| 34 | Masimo Form 10-K, dated February 23, 2021 |
| 35 | "The Apple Watch's blood oxygen sensor is less accurate than you think" |
| 36 | "Can the Apple Watch Series 6 Keep the Doctor Away?" |
| 37 | "Apple Watch Series 6 review – Minute Improvements" |
| 38 | "The New Apple Watch 6 May Have a Problem.  Oddly Enough, That's OK" |
| 39 | "Apple Watch Series 6 and SE Review – Watch Out for the Upsell" |
| 40 | Provisional Application No. 60/367,428 |

Exhibit 12

## LIST OF APPENDICES

| Appendix | Description |
|----------|-------------|
| A | File History for U.S. Patent No. 10,912,501 |
| B | Relevant Technical References Cited in File History for U.S. Patent Nos. 10,912,501, 10,912,502, and 10,945,648 |
| C | File History for U.S. Patent No. 10,912,502 |
| D | File History for U.S. Patent No. 10,945,648 |
| E | Certified File History for U.S. Patent No. 10,687,745 |
| F | Relevant Technical References Cited in File History for U.S. Patent No. 10,687,745 |
| G | Certified File History for U.S. Patent No. 7,761,127 |
| H | Relevant Technical References Cited in File History for U.S. Patent No. 7,761,127 |

Exhibit 12

# I.  INTRODUCTION

1.       Masimo Corporation and Cercacor Laboratories, Inc. (collectively, "Masimo" or "Complainants") request that the United States International Trade Commission ("Commission") institute an investigation into violations of Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337 ("Section 337") committed by Respondent Apple Inc. ("Apple") ("Apple" or "Respondent").

2.       This First Amended Complaint ("Complaint") is based on Respondent's unlawful and unauthorized importation into the United States, sale for importation, and/or sale within the United States after importation of certain light-based physiological measurement devices and components thereof.  Respondent's products, including, but not limited to, the "Apple Watch Series 6," or "Series 6" ("Accused Products") infringe at least one claim of U.S. Patent No. 10,912,501, titled "User-Worn Device for Noninvasively Measuring a Physiological Parameter of a User," ("the '501 Patent"), U.S. Patent No. 10,912,502, titled "User-Worn Device for Noninvasively Measuring a Physiological Parameter of a User," ("the '502 Patent"), U.S. Patent No. 10,945,648, titled "User-Worn Device for Noninvasively Measuring a Physiological Parameter of a User," ("the '648 Patent"), U.S. Patent No. 10,687,745, titled "Physiological Measurement Devices, Systems, and Methods," ("the '745 Patent"), and U.S. Patent No. 7,761,127, titled "Multiple Wavelength Sensor Substrate," ("the '127 Patent") (collectively, "the Asserted Patents"), either literally or under the doctrine of equivalents.

Exhibit 12

3.      The Accused Products directly infringe and/or induce the infringement of, literally or under the doctrine of equivalents, at least the following claims (collectively, "the Asserted Claims") of the Asserted Patents:

| U.S. Patent | Asserted Claims[1] |
|---|---|
| '501 Patent | **1**-9, 11-18, **19**-25 and **26**-30 |
| '502 Patent | **1**-2, 4-6, 8-12, 14-18, **19**-22, 24-26, and **28**-30 |
| '648 Patent | **1**-5, **6**-17, 19, and **20**-30 |
| '745 Patent | **1**-6, 8-9, 11, 14, **20**-24, and 26-27 |
| '127 Patent | **7**-9 |

Further discovery may reveal that Respondent infringes additional claims.

4.      Certified copies of the '501 Patent, '502 Patent, '648 Patent, '745 Patent, and '127 Patent are attached hereto as **Exhibits 1, 2, 3, 4, and 5**, respectively.  Masimo Corp. owns by assignment the entire right, title, and interest in and to the '501 Patent, '502 Patent, '648 Patent, and '745 Patent (collectively, "the Masimo Patents").  Certified copies of the recorded assignments of the Masimo Patents are attached hereto as **Exhibits 6, 7, 8, and 9**, respectively.  Masimo Corp. exclusively licenses certain rights to the Masimo Patents to Cercacor.  A copy of the Amended and Re-Stated Cross-Licensing Agreement between Masimo Corp. and Cercacor (formerly known as Masimo Laboratories) granting the license to Cercacor is attached hereto as **Confidential Exhibit 11**.  Cercacor owns by assignment the entire right, title, and interest in and to the '127 Patent ("the Cercacor Patent").  Certified copies of the recorded assignment of the Cercacor Patent are attached hereto as **Exhibit 9**.  Masimo is a licensee of certain exclusive rights to the Cercacor Patents, as reflected in **Confidential Exhibit 11.**

5.      Respondent's activities with respect to the importation into the United States, the

---

[1]      Independent claims are noted in **BOLD**.

Exhibit 12

sale for importation into the United Sates, and/or the sale within the United States after importation of certain light-based physiological measurement devices and components thereof, described more fully *infra*, are unlawful under 19 U.S.C. § 1337(a)(1)(B)(i) in that they constitute infringement of the valid and enforceable Asserted Patents.

6.      As required by Section 337(a)(2) and defined by Section 337(a)(3), industries exist in the United States relating to articles covered by the Asserted Patents or alternatively such industries relating to articles protected by the Asserted Patents are in the process of being established.

7.      Complainants seek relief from the Commission in the form of a permanent limited exclusion order, pursuant to Section 337(d), excluding from entry into the United States the Accused Products that infringe one or more claims of the Asserted Patents.  Complainants also seek a permanent cease and desist order, pursuant to Section 337(f), directing Respondent to immediately cease and desist from importing, marketing, advertising, demonstrating, warehousing inventory for distribution, distributing, offering for sale, selling, or using in the United States the certain light-based physiological measurement devices and components thereof that infringe one or more claims of the Asserted Patents.

8.      Complainants further seek as relief a bond, for the 60-day Presidential review period pursuant to Section 337(j), for the importation of the certain light-based physiological measurement devices and components thereof that infringe one or more claims of the Asserted Patents.

## II. <u>COMPLAINANTS</u>

9.      Complainant Masimo Corporation is a Delaware corporation having its principal place of business at 52 Discovery, Irvine, California 92618.  Masimo owns the Masimo Patents and has certain exclusive rights to the Cercacor Patent.  (*See* **Exhibits 1-4, 6-9, Confidential**

Exhibit 12

**Exhibit 11**).  Complainant Cercacor is a Delaware corporation having its principal place of

business at 15750 Alton Pkwy, Irvine, CA 92618.  Cercacor is the owner of the Cercacor Patent

and has certain exclusive rights to the Masimo Patents.  (*See* **Exhibits 5 and 10, Confidential**

**Exhibit 11**).

10.     Masimo is a global medical technology company that has revolutionized non-

invasive monitoring of physiological parameters, such as pulse rate, arterial oxygen saturation and

many others.  These innovations have been repeatedly recognized by Federal courts.  *See*

*Mallinckrodt, Inc. v. Masimo Corp.*, Case No. 2:00-CV-06506 (C.D. Cal. Apr. 5, 2004), ECF No.

588; *Mallinckrodt, Inc. v. Masimo Corp.*, Case No. 2:00-CV-06506 (C.D. Cal. July 12, 2004), ECF

No. 622; *Mallinckrodt, Inc. v. Masimo Corp.*, Case No. 2:00-CV-06506 (C.D. Cal. Aug. 4, 2004),

ECF No. 632, *aff'd in part and rev'd in part*, 147 F. App'x 158 (Fed. Cir. 2005); *Mallinckrodt,*

*Inc. v. Masimo Corp.*, 147 F. App'x 158 (Fed. Cir. 2005); *Masimo Corp. v. Philips Elec. N. Am.*

*Corp.*, Case No. 1:09-CV-00080 (D. Del. Oct. 17, 2014), ECF No. 919; *Masimo Corp. v. Philips*

*Elec. N. Am. Corp.*, Case No. 1:09-CV-00080 (D. Del. May 18, 2015), ECF No. 997; *Masimo*

*Corp. v. Philips Elec. N. Am. Corp.*, Case No. 1:09-CV-00080 (D. Del. May 18, 2015), ECF No.

998.

11.     Masimo develops, manufactures, and markets a variety of noninvasive patient

monitoring technologies and hospital automation solutions as part of its mission to improve patient

outcomes and reduce the cost of patient care.  Masimo's patient monitoring solutions are systems

that generally incorporate a monitor or circuit board, proprietary single-patient use or reusable

sensors, software and/or cables.  Masimo primarily sells its products to professional caregivers,

such as hospitals, emergency medical service providers, home care providers, physician offices,

Exhibit 12

veterinarians, long term care facilities and also to consumers, through its direct sales force, online, distributors, and original equipment manufacturer (OEM) partners.

12.     Masimo has rapidly expanded its workforce despite the COVID-19 Pandemic.  As of December 28, 2019, Masimo had approximately 1,600 full-time employees and approximately 3,700 dedicated contract personnel worldwide.  **Exhibit 34** (Masimo Form 10k) at 34.  By January 2, 2021, Masimo had grown to 2,000 full-time employees and approximately 4,200 dedicated contract personnel worldwide.

13.     Masimo's core business is referred to as Masimo SET® pulse oximetry.  Pulse oximetry allows for the noninvasive measurement of the oxygen saturation level of arterial blood, which delivers oxygen to the body's tissues.  Pulse oximetry also allows for the measurement of pulse rate.  "SET" refers to Masimo's Signal Extraction Technology, a technology invented by Masimo that, for the first time, allowed pulse oximeters to provide accurate measurements of oxygen saturation even during patient motion and low perfusion (i.e., decreased arterial blood flow) conditions.

14.     Over the years, Masimo's product offerings have expanded significantly to also include rainbow® Pulse CO-Oximetry, with its unique ability to allow for real-time non-invasive monitoring of additional physiological measurements, including carboxyhemoglobin (SpCO®), methemoglobin (SpMet®), total hemoglobin concentration (SpHb®) and fractional arterial oxygen saturation (SpfO2™).  Rainbow® Pulse CO-oximetry also has the ability to measure pulse rate, perfusion index (Pi), Pleth Variability Index (PVi®) and respiration rate from the pleth (RRp®).  The rainbow SET® platform also allows for the calculation of Oxygen Content (SpOC™) and Oxygen Reserve Index (ORi™).

5

Exhibit 12

15.     Masimo's current technology offerings also include remote patient monitoring, connectivity, and hospital automation solutions, including Masimo Patient SafetyNet™, Masimo Patient SafetyNet™ Surveillance, Replica™, Iris®, MyView®, UniView™ and Trace™. Masimo's technologies are supported by a substantial intellectual property portfolio.

16.     Masimo invests significantly in its research and development efforts, and currently spends about 10% of its sales revenue on research and development activities.  For the year ending January 2, 2021, Masimo spent approximately $118,689,000 for research and development activities.  **Exhibit 34** (Masimo Form 10k) at 66.  The majority of these activities take place in the United States.  **Exhibit 34** (Masimo Form 10k) at 62.  As a result of these efforts, Masimo has been awarded numerous patents in the United States and around the world.  As of January 2, 2021, Masimo had approximately 800 issued patents and approximately 500 pending applications in the U.S., Europe, Japan, Australia, Canada and other countries throughout the world.  **Exhibit 34** (Masimo Form 10k) at 32.

17.     Masimo owns two facilities in Irvine, California, with combined square footage of approximately 314,400, housing its corporate headquarters and the majority of its U.S. research and development activities.  Masimo also owns approximately 86,500 square feet of property in Hudson, New Hampshire, which is used to develop and manufacture advanced light emitting diodes and other advanced component-level technologies, as well as warehousing and administrative operations.

18.     Masimo also leases and occupies approximately 105,800 square feet of additional building space in Irvine, California for product manufacturing and warehousing.  Masimo also leases or owns an additional 61,000 square feet at various locations throughout the United States, that provide centers for distribution of Masimo's products directly to its customers, and is in the

Exhibit 12

███████████████████████████████████

process of establishing distribution centers throughout the United States, ███████████

███████████████████████████████████.

19.     Complainant Cercacor is a health and wellness innovator based in Irvine, California.   In 1998, Masimo spun certain technology off into a new company, Masimo Laboratories, Inc. or "Masimo Labs," to further research and develop the technologies.  The name of the company was later changed to "Cercacor."  Cercacor and Masimo have a license agreement between them to facilitate collaboration between the companies.

20.     Like Masimo, Cercacor is an innovator of non-invasive monitoring technologies. Cercacor is on the frontline of understanding how measuring, tracking, and analyzing physiological parameters can impact pre-diabetic and diabetic patients, endurance sports training and performance, and overall health and wellness.  Cercacor continued the development that started at Masimo on numerous non-invasive parameters.  Leading hospitals around the world use Cercacor technology licensed to Masimo and sold under the name Masimo rainbow SET®.  This technology was the first, and remains the only, noninvasive monitoring technology that can measure carbon monoxide, methemoglobin, and total hemoglobin in the blood.

### III.  PROPOSED RESPONDENT

21.     Respondent Apple Inc. ("Apple") is a California corporation having a principal place of business at One Apple Park Way, Cupertino, California 95014.  Apple unlawfully sells for importation, imports, and/or sells after importation into the United States certain light-based physiological measurement devices and components thereof, including the Apple Watch Series 6, that infringe the '501 Patent, the '502 Patent, the '648 Patent, the '745 Patent, and the '127 Patent, either literally or under the doctrine of equivalents.

22.     Apple is in the business of designing, manufacturing, and marketing smartphones, personal computers, tablets, wearables, and accessories, and sells a variety of related services.

7

Exhibit 12

Apple's wearables include certain light-based physiological measurement devices and components thereof, including the Apple Watch Series 6.

## IV.  PRODUCTS AND TECHNOLOGY AT ISSUE

### A.  Complainants' Technology

23.     Products that practice one or more claims of the Asserted Patents—including the Accused Products and Masimo's Domestic Industry products—are light-based physiological measurement devices and components thereof.   These physiological measurement devices typically rely on light that is transmitted through the body tissue.  The received light, that has been attenuated by the various components of the body tissue, including the pulsing arterial blood, is known in the industry as a photoplethysmography or "PPG."  The transmission and receipt of this light is typically accomplished through a sensor that is applied to a body part such as a finger, arm, toes, forehead or ear.

24.     Before Masimo, non-invasive measurements from the PPG were plagued by unreliability, often when the measurement was needed most, due to the person moving or having low peripheral blood flow (known as "low perfusion").  The industry had essentially given up on solving these problems, concluding they were largely unsolvable.   In the medical context, clinicians had to live with the results—patient monitors gave excessive false alarms, froze their measurements for prolonged periods of time despite potential changes in the physiological parameter (e.g., oxygen saturation or pulse rate), delayed notification of alarms due to long averaging times of sensor data, produced inaccurate measurements, or were unable to obtain data on the most critical patients and babies who cannot be instructed to stay still.  Masimo's pioneering Masimo SET® technology, solves this problem and dramatically improved the reliability of monitoring and reporting physiological signals derived from the PPG.

Exhibit 12

████████████████████████████████████████████████████

25.     Following its initial success with Masimo SET® technology, Masimo invested heavily in developing additional breakthrough measurement technologies, such as non-invasively measuring total hemoglobin, carboxyhemoglobin, and methemoglobin.  Masimo has continued to innovate, succeeding where others have consistently failed.  Masimo was the first, and remains the only, company delivering these game-changing technologies to hospitals in the United States.  Use of Masimo's technology in the clinical setting has been proven to reduce blindness in premature infants, detect congenital heart disease in infants, save lives on the general care floor and post-surgery, and improve transfusion management, while also saving substantial money for the hospitals providing care.

26.     Masimo's investment in its technology and research and development has included significant investments in wrist-worn devices for measurements of physiological parameters. Masimo's patent filings as early as 2002 disclose wrist-worn devices for measuring physiological parameters that wirelessly connected to monitors.  *See* **Exhibit 40** (Provisional Application No. 60/367,428 filed on March 25, 2002).

27.     One of Masimo's commercially marketed wrist-worn device for measuring physiological parameters, the Radius PPG, was cleared by the FDA in May of 2019.  The Radius PPG eliminated the need for a cabled connection to a pulse oximetry monitor, allowing patients to move freely and comfortably while still being continuously monitored reliably and accurately. The device communicated with monitors via a wireless connection allowing patients to benefit from mobility.

28.     ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

Exhibit 12

29.     Given its success selling medical-grade devices for non-invasively measuring physiological parameters, Complainants decided to leverage these clinical grade products for sale directly to consumers where allowable.  Masimo noticed that there has been many devices sold to consumers purporting to provide physiological measurements, but could identify none that provided clinical grade measurement.  The devices available to consumers were more like toys. In 2013, Masimo first began selling its pulse oximetry products to the consumer market.  After Masimo began selling directly to consumers, it also increased its investment in direct-to-consumer advertising, including being a premium sponsor of the BNP Paribas Open Tennis Tournament in Palm Springs, CA.

30.     Notably, despite the acute awareness of pulse oximetry created by the COVID-19 pandemic, the large multitude of so-called pulse oximeters offered to consumers are prohibited for medical purposes.  Unfortunately, the consumers do not recognize this, which puts their health at risk.

31.     The Asserted Patents claim devices and/or components of devices used in the non-invasive measurement of physiological parameters such as oxygen saturation.  For example, the four Masimo Patents claim devices containing multiple optical sources that emit light at different wavelengths and numerous light detectors.  The light detectors are configured to detect the optical radiation from the tissue and output a respective signal stream responsive to this detection.  The devices are configured in specific ways which improve the successful detection of the signal while minimizing the effects of light-piping.  The Cercacor Patent also claims novel technologies assisting in the non-invasive measurement of physiological parameters.  The '127 Patent claims a

Exhibit 12

sensor using a thermal mass within a substrate to measure and account for effects on measurements from temperature changes.

### B.   Apple's Copying of Complainants' Technology

32.     In 2013, Apple contacted Masimo and asked to meet regarding a potential collaboration.  Apple told Masimo that Apple would like to understand more about Masimo's technology to potentially integrate that technology into Apple's products.  Apple and Masimo later entered into a confidentiality agreement, and Masimo's management met with Apple.  The meetings included confidential discussions of Masimo's technology.  After what seemed to Masimo to have been productive meetings, Apple quickly began hiring Masimo's employees, including engineers and key management.

33.     Masimo employed Michael O'Reilly as its Chief Medical Officer and Executive Vice President for Medical Affairs beginning in January 2008.  As part of the Masimo executive team, O'Reilly was privy to extremely sensitive information, including information about mobile medical products and applications, wellness applications, clinical data gathering and analytics, and other technology of Masimo.  Upon information and belief, Apple employed O'Reilly in July 2013, shortly after the meetings with Masimo, to assist in wellness and mobile applications that include non-invasive measurement of physiological parameters.  Not long after, by December of 2013, O'Reilly was already meeting with the FDA on behalf of Apple to discuss medical applications and discuss medical products that non-invasively measures blood constituents.

34.     Apple systematically recruited other key Masimo personnel, such as Marcelo Lamego (a named inventor on many of the Asserted Patents), who was the former Chief Technical Officer of Cercacor and a former Research Scientist at Masimo.  Lamego was a Masimo employee during 2000-2001 and 2003-2006, and the Cercacor Chief Technical Officer during 2006-2014.

Exhibit 12

35.     Lamego had unfettered access to Complainants' technical information.  He was
trained and mentored at Masimo by the most skilled engineers and scientists, and was taught about
the keys to effective non-invasive monitoring, something he was not involved in prior to Masimo.
Masimo engineers and scientists including, among others, Ammar Al-Ali, Mohamed Diab, and
Walter Weber, exposed Lamego to all of Masimo's technology on non-invasive monitoring.  The
Masimo engineers, including Al-Ali, Diab, and Weber, were Masimo employees at all relevant
times.  Lamego also had access to and learned guarded secrets regarding Complainants' mobile
medical products, including key technology and advance plans for future products.

36.     When Lamego left Cercacor, he assured Complainants that he would not violate his
agreements with Complainants and volunteered that he would not work on technology similar to
Complainants' technology.  On January 24, 2014, Complainants sent a letter to Apple explaining
that Lamego possessed Complainants' confidential proprietary information and warning Apple to
respect Complainants' rights in such information.  The letter stated, "we trust that Apple will
employ Mr. Lamego in an area that does not involved healthcare technology, including mobile
health applications and the measurement of physiological information."  The letter also asked that
"Apple refrain from inducing Mr. Lamego to take actions that would violate the Agreement while
he performs services for Apple" and asked Apple to "direct Mr. Lamego to honor his obligations
to all of his prior employers."   Based on Complainants' conversations with Lamego,
Complainants' letter to Apple, and Complainants' confidentiality agreement with Apple,
Complainants' reasonably believed that Lamego would not use or disclose Complainants'
confidential information and that Apple would not induce Lamego to do so or itself use
Complainants' confidential information.

Exhibit 12

37.    Unbeknownst to Complainants at the time, it now appears that, shortly after joining Apple in January 2014, Lamego began pursuing on behalf of Apple numerous patent applications directed toward technologies he worked on at Complainants, and with which he had no prior experience or knowledge.

38.    Apple announced the first version of its watch in September 2014 and began shipping its watch in April 2015.  On information and belief, Apple began incorporating Masimo's technology in later versions of its watch.  Ultimately with the launch of the Apple Watch Series 6 in September 2020, Apple for the first time purported to have incorporated the ability to measure blood oxygen saturation (pulse oximetry) into its watches—technology, which as described in more detail below, infringes the Asserted Claims.  Unfortunately for U.S. consumers, the Apple Watch Series 6 differs from Masimo's medical grade technology in that Apple's Accused Products do not reliably measure blood oxygen concentrations, as described in **Exhibits 33 and 35-39**.

## C.    The Accused Products

39.    Pursuant to 19 C.F.R. § 210.12(a)(12), the category of the Accused Products may be plainly described as wearable electronic devices with light-based pulse oximetry functionality, including various devices made by Apple, including, but not limited to, various models of the Apple Watch Series 6.  The Apple Watch Series 6 is an electronic smartwatch, which purportedly includes pulse oximetry functionality.   Relevant here, the Accused Products contain LEDs, photodiodes, and other features within the scope of the Masimo Patents to measure the oxygen saturation of the user.  The Accused Products also contain the thermal mass technology claimed in the '127 Patent.  The infringing products—including their associated systems, and components thereof—are further described in **Exhibits 15, 16, 17, 18, and 19**, which include claim charts comparing the Asserted Claims to the Apple Watch Series 6.  The Apple Watch Series 6 either

13

Exhibit 12

infringes these claims upon importation or Apple induces consumers to infringe these claims through its sale of the Apple Watch Series 6 and its recommendation, encouragement, and/or instruction to users to use the Apple Watch Series 6 in connection with an iPhone.

40.     The Apple Watch Series 6 is imported into and sold within the United States by or on behalf of Apple.  On information and belief, commercially significant volumes of infringing products are maintained in inventory by Apple in the United States.

41.     The identification of exemplary Accused Products is intended purely for illustration and is not intended to limit the scope of the investigation.  Any remedy should extend to all present and future infringing products of Apple, regardless of model number, name, or type of product.

## V.  **THE ASSERTED PATENTS**

### A.  **U.S. Patent No. 10,912,501**

#### 1.     **Identification of the Patent and Ownership by Masimo Corporation**

42.     Masimo Corporation owns by assignment the entire right, title, and interest in the '501 Patent, entitled "User-Worn Device for Noninvasively Measuring a Physiological Parameter of a User," which issued on February 9, 2021.  **Exhibit 1**.  The '501 Patent issued from U.S. Patent Application Serial No. 17/031,356, filed on September 24, 2020.  The '501 Patent is a continuation of U.S. Patent Application No. 16/834,538, filed March 30, 2020, which is a continuation of U.S. Patent Application No. 16/725,292, filed December 23, 2019, which is a continuation of U.S. Patent Application No. 16/534,949, filed August 7, 2019, which is a continuation of U.S. Patent Application No. 16/409,515, filed May 10, 2019, which is a continuation of U.S. Patent Application No. 16/261,326, filed January 29, 2019, which is a continuation of U.S. Patent Application No. 16/212,537, filed December 6, 2018, which is a continuation of U.S. Patent Application No. 14/981,290 filed December 28, 2015, which is a continuation of U.S. Patent

Exhibit 12

Application No. 12/829,352 filed July 1, 2010, which is a continuation of U.S. Patent Application No. 12/534,827 filed August 3, 2009, which claims the benefit of priority under 35 U.S.C. § 119(e) of the following U.S. Provisional Patent Application Nos. 61/086,060 filed August 4, 2008, 61/086,108 filed August 4, 2008, 61/086,063 filed August 4, 2008, 61/086,057 filed August 4, 2008, and 61/091,732 filed August 25, 2008.   U.S. Patent Application No. 12/829,352 is also a continuation-in-part of U.S. Patent Application No. 12/497,528 filed July 2, 2009, which claims the benefit of priority under 35 U.S.C. § 119(e) of the following U.S. Provisional Patent Application Nos. 61/086,060 filed August 4, 2008, 61/086,108 filed August 4, 2008, 61/086,063 filed August 4, 2008, 61/086,057 filed August 4, 2008, 61/078,228 filed July 3, 2008, 61/078,207 filed July 3, 2008, and 61/091,732 filed August 25, 2008.   U.S. Patent Application No. 12/497,528 also claims the benefit of priority under 35 U.S.C. § 120 as a continuation-in-part of the following U.S. Design Patent Application Nos. 29/323,409 filed August 25, 2008 and 29/323,408 filed August 25, 2008.   U.S. Patent Application No. 12/829,352 is also a continuation-in-part of U.S. Patent Application No. 12/497,523 filed July 2, 2009, which claims the benefit of priority under 35 U.S.C. § 119(e) of the following U.S. Provisional Patent Application Nos. 61/086,060 filed August 4, 2008, 61/086,108 filed August 4, 2008, 61/086,063 filed August 4, 2008, 61/086,057 filed August 4, 2008, 61/078,228 filed July 3, 2008, 61/078,207 filed July 3, 2008, and 61/091,732 filed August 25, 2008.   U.S. Patent Application No. 12/497,523 also claims the benefit of priority under 35 U.S.C. § 120 as a continuation-in-part of the following U.S. Design Patent Application Nos. 29/323,409 filed August 25, 2008 and 29/323,408 filed August 25, 2008.   A certificate of correction issued on the '501 Patent on April 6, 2021.   Pursuant to Commission Rule 210.12(a)(9)(xi) the expiration date of the '501 Patent is August 25, 2028.

Exhibit 12

43.     The inventors of the '501 Patent, Jeroen Poeze, Marcelo Lamego, Sean Merritt, Cristiano Dalvi, Hung Vo, Johannes Bruinsma, Ferdyan Lesmana, Massi Joe E. Kiani, and Greg Olsen, assigned to Masimo Laboratories, Inc. the entire right, title, and interest throughout the world in, to and under said improvements in the invention described and claimed in U.S. Patent Application No. 12/534,827 and all divisions and continuations thereof, which includes the '501 Patent.  **Exhibit 9**.  On August 2, 2010, Masimo Laboratories Inc. changed its name to Cercacor Laboratories, Inc.  **Exhibit 9**.  On July 29, 2019, Cercacor assigned to Masimo Corporation, the entire right, title and interest to U.S. Application No. 16/212537 and all continuations thereof, which includes the '501 Patent.  **Exhibit 9**.  Cercacor is the licensee of certain exclusive rights to the '501 Patent.  **Confidential Exhibit 17**.  The '501 Patent is valid, enforceable, and is currently in full force and effect.

44.     Pursuant to Rule 210.12(c) of the Commission's Rules of Practice and Procedure, this Complaint is accompanied by: 1) an electronic copy of the prosecution history of the '501 Patent[2]; and 2) an electronic copy of each patent and applicable pages of each technical reference mentioned in the prosecution history.  These materials are included in Appendices A and B, respectively.

## 2.      Foreign Counterparts to the '501 Patent

---

[2]      Due to USPTO errors, Complainants submitted certificates of correction to correct typographical errors in U.S. Patent Nos. 10,912,501, 10,912,502, and 10,945,648 as originally issued.  Complainants have not yet received a certified copy of U.S. Patent No. 10,912,502 with the certificate of correction attached and have not yet received the certified copies of the prosecution histories which contain the information related to the certificates of correction for U.S. Patent Nos. 10,912,501, 10,912,502, and 10,945,648.  Accordingly, Complainants are submitting uncertified copies of the prosecution histories of U.S. Patent Nos. 10,912,501, 10,912,502, and 10,945,648, and an uncertified copy of U.S. Patent No. 10,912,502, and will submit certified copies once received.

Exhibit 12

45.     Pursuant to Commission Rule 210.12(a)(9)(v), Complainants submit the attached list of foreign patents, foreign patent applications (not already issued as a patent), and each foreign patent application that has been denied, abandoned, or withdrawn corresponding to the '501 Patent. **Exhibit 12**.  No other foreign patents or patent applications corresponding to the '501 Patent are known to Masimo Corporation.

### 3.     Non-Technical Description of the '501 Patent

46.     The '501 Patent involves devices for the non-invasive measurement of physiological parameters such as blood oxygen saturation and pulse rate.  The devices include multiple optical sources that emit light at different wavelengths and numerous light detectors.  The light detectors are configured to detect the optical radiation from the tissue and output a respective signal stream responsive to this detection.  This data is then processed by a processing device which outputs a measurement of the physiological parameter.  The '501 Patent includes limitations to novel architecture features to implement the required measurement while limiting any light noise that could impact the accuracy of measurements.  The '501 Patent also includes limitations to novel arrangements of light sources and photodetectors.  The '501 Patent also contains limitations to processors, network devices, and user interfaces, allowing the device to be easily used by consumers.

47.     In sum, the invention of the '501 Patent provides a novel combination of features allowing for the measurement of a user's physiological parameters. ███████████████████ ██████████████████████████████████████████████████.

48.     The foregoing non-technical description of the patented technology is not intended to limit, define, or otherwise affect the scope of the claimed inventions, nor is the non-technical description in any way intended to construe or define any word, phrase, term, or limitation recited in any claim of the '501 Patent.

17

Exhibit 12

B.   **U.S. Patent No. 10,912,502**

   1.   **Identification of the Patent and Ownership by Masimo Corporation**

49.     Masimo Corporation owns by assignment the entire right, title, and interest in the '502 Patent, entitled "User-Worn Device for Noninvasively Measuring a Physiological Parameter of a User," which issued on February 9, 2021. **Exhibit 2**. The '502 Patent issued from U.S. Patent Application Serial No. 17/031,407, filed on September 24, 2020. The '502 Patent is a continuation of a continuation of U.S. Patent Application No. 16/834,538, filed March 30, 2020, which is a continuation of U.S. Patent Application No. 16/725,292, filed December 23, 2019, which is a continuation of U.S. Patent Application No. 16/534,949, filed August 7, 2019, which is a continuation of U.S. Patent Application No. 16/409,515, filed May 10, 2019, which is a continuation of U.S. Patent Application No. 16/261,326, filed January 29, 2019, which is a continuation of U.S. Patent Application No. 16/212,537, filed December 6, 2018, which is a continuation of U.S. Patent Application No. 14/981,290 filed December 28, 2015, which is a continuation of U.S. Patent Application No. 12/829,352 filed July 1, 2010, which is a continuation of U.S. Patent Application No. 12/534,827 filed August 3, 2009, which claims the benefit of priority under 35 U.S.C. § 119(e) of the following U.S. Provisional Patent Application Nos. 61/086,060 filed August 4, 2008, 61/086,108 filed August 4, 2008, 61/086,063 filed August 4, 2008, 61/086,057 filed August 4, 2008, and 61/091,732 filed August 25, 2008. U.S. Patent Application No. 12/829,352 is also a continuation-in-part of U.S. Patent Application No. 12/497,528 filed July 2, 2009, which claims the benefit of priority under 35 U.S.C. § 119(e) of the following U.S. Provisional Patent Application Nos. 61/086,060 filed August 4, 2008, 61/086,108 filed August 4, 2008, 61/086,063 filed August 4, 2008, 61/086,057 filed August 4, 2008, 61/078,228 filed July 3, 2008, 61/078,207 filed July 3, 2008, and 61/091,732 filed August 25,

Exhibit 12

2008.  U.S. Patent Application No. 12/497,528 also claims the benefit of priority under 35 U.S.C. § 120 as a continuation-in-part of the following U.S. Design Patent Application Nos. 29/323,409 filed August 25, 2008 and 29/323,408 filed August 25, 2008.  U.S. Patent Application No. 12/829,352 is also a continuation-in-part of U.S. Patent Application No. 12/497,523 filed July 2, 2009, which claims the benefit of priority under 35 U.S.C. § 119(e) of the following U.S. Provisional Patent Application Nos. 61/086,060 filed August 4, 2008, 61/086,108 filed August 4, 2008, 61/086,063 filed August 4, 2008, 61/086,057 filed August 4, 2008, 61/078,228 filed July 3, 2008, 61/078,207 filed July 3, 2008, and 61/091,732 filed August 25, 2008.  U.S. Patent Application No. 12/497,523 also claims the benefit of priority under 35 U.S.C. § 120 as a continuation-in-part of the following U.S. Design Patent Application Nos. 29/323,409 filed August 25, 2008 and 29/323,408 filed August 25, 2008.  On May 25, 2021, the PTO approved a certification of correction for the '502 patent and the certificate of correction issued on July 6, 2021.  Pursuant to Commission Rule 210.12(a)(9)(xi) the expiration date of the '502 Patent is August 25, 2028.

50.    The inventors of the '502 Patent, Jeroen Poeze, Marcelo Lamego, Sean Merritt, Cristiano Dalvi, Hung Vo, Johannes Bruinsma, Ferdyan Lesmana, Massi Joe E. Kiani, and Greg Olsen, assigned to Masimo Laboratories, Inc. the entire right, title, and interest throughout the world in, to and under said improvements in the invention described and claimed in U.S. Patent Application No. 12/534,827 and all divisions and continuations thereof, which includes the '502 Patent.  **Exhibit 7**.  On August 2, 2010, Masimo Laboratories Inc. changed its name to Cercacor Laboratories, Inc.  **Exhibit 7**.  On July 29, 2019, Cercacor assigned to Masimo Corporation, the entire right, title and interest to U.S. Application No. 16/212537 and all continuations thereof, which includes the '502 Patent.  **Exhibit 7**.  Cercacor is the licensee of certain exclusive rights to

Exhibit 12

the '502 Patent.  **Confidential Exhibit 11**.  The '502 Patent is valid, enforceable, and is currently in full force and effect.

51.     Pursuant to Rule 210.12(c) of the Commission's Rules of Practice and Procedure, this Complaint is accompanied by: 1) an electronic copy of the prosecution history of the '502 Patent; and 2) a electronic copy of each patent and applicable pages of each technical reference mentioned in the prosecution history.  These materials are included in Appendices C and B, respectively.  Because the '501 Patent, '502 Patent, and '648 Patent are related, there is a substantial overlap of the patents and applicable pages of each technical reference mentioned in the prosecution histories and the copies are provided together in Appendix B.

### 2.     Foreign Counterparts to the '502 Patent

52.     Pursuant to Commission Rule 210.12(a)(9)(v), Complainants submit the attached list of foreign patents, foreign patent applications (not already issued as a patent), and each foreign patent application that has been denied, abandoned, or withdrawn corresponding to the '502 Patent. **Exhibit 12**.  No other foreign patents or patent applications corresponding to the '502 Patent are known to Masimo Corporation.

### 3.     Non-Technical Description of the '502 Patent

53.     Like the '501 Patent, the '502 Patent involves devices for the non-invasive measurement of physiological parameters such as blood oxygen saturation and pulse rate.  The devices include multiple optical sources that emit light at different wavelengths and numerous light detectors.  The light detectors are configured to detect the optical radiation from the tissue and output a respective signal stream responsive to this detection.  This data is then processed by a processing device which outputs a measurement of the physiological parameter.  The '502 Patent includes limitations to novel architecture features to implement the required measurement while limiting any light noise that could impact the accuracy of measurements.  The '502 Patent also

Exhibit 12

includes limitations to novel arrangements of light sources and photodetectors.  The '502 Patent

also contains limitations to processors, network devices, and user interfaces, allowing the device

to be easily used by consumers.

54.     In sum, the invention of the '502 Patent provides a novel combination of features

allowing for the measurement of a user's physiological parameters. ███████████████████

███████████████████████████████████████████████████████ .

55.     The foregoing non-technical description of the patented technology is not intended

to limit, define, or otherwise affect the scope of the claimed inventions, nor is the non-technical

description in any way intended to construe or define any word, phrase, term, or limitation recited

in any claim of the '502 Patent.

### C.     U.S. Patent No. 10,945,648

#### 1.     Identification of the Patent and Ownership by Masimo Corporation

56.     Masimo Corporation owns by assignment the entire right, title, and interest in the

'648 Patent, entitled "User-Worn Device for Noninvasively Measuring a Physiological Parameter

of a User," which issued on March 16, 2021.  (*See* **Exhibit 3**).  The '648 Patent issued from U.S.

Patent Application Serial No. 17/031,316, filed on September 24, 2020.  The '648 Patent is a

continuation of is a continuation of U.S. Patent Application No. 16/834,538, filed March 30, 2020,

which is a continuation of U.S. Patent Application No. 16/725,292, filed December 23, 2019,

which is a continuation of U.S. Patent Application No. 16/534,949, filed August 7, 2019, which is

a continuation of U.S. Patent Application No. 16/409,515, filed May 10, 2019, which is a

continuation of U.S. Patent Application No. 16/261,326, filed January 29, 2019, which is a

continuation of U.S. Patent Application No. 16/212,537, filed December 6, 2018, which is a

continuation of U.S. Patent Application No. 14/981,290 filed December 28, 2015, which is a

Exhibit 12

continuation of U.S. Patent Application No. 12/829,352 filed July 1, 2010, which is a continuation of U.S. Patent Application No. 12/534,827 filed August 3, 2009, which claims the benefit of priority under 35 U.S.C. § 119(e) of the following U.S. Provisional Patent Application Nos. 61/086,060 filed August 4, 2008, 61/086,108 filed August 4, 2008, 61/086,063 filed August 4, 2008, 61/086,057 filed August 4, 2008, and 61/091,732 filed August 25, 2008.  U.S. Patent Application No. 12/829,352 is also a continuation-in-part of U.S. Patent Application No. 12/497,528 filed July 2, 2009, which claims the benefit of priority under 35 U.S.C. § 119(e) of the following U.S. Provisional Patent Application Nos. 61/086,060 filed August 4, 2008, 61/086,108 filed August 4, 2008, 61/086,063 filed August 4, 2008, 61/086,057 filed August 4, 2008, 61/078,228 filed July 3, 2008, 61/078,207 filed July 3, 2008, and 61/091,732 filed August 25, 2008.  U.S. Patent Application No. 12/497,528 also claims the benefit of priority under 35 U.S.C. § 120 as a continuation-in-part of the following U.S. Design Patent Application Nos. 29/323,409 filed August 25, 2008 and 29/323,408 filed August 25, 2008.  U.S. Patent Application No. 12/829,352 is also a continuation-in-part of U.S. Patent Application No. 12/497,523 filed July 2, 2009, which claims the benefit of priority under 35 U.S.C. § 119(e) of the following U.S. Provisional Patent Application Nos. 61/086,060 filed August 4, 2008, 61/086,108 filed August 4, 2008, 61/086,063 filed August 4, 2008, 61/086,057 filed August 4, 2008, 61/078,228 filed July 3, 2008, 61/078,207 filed July 3, 2008, and 61/091,732 filed August 25, 2008.  U.S. Patent Application No. 12/497,523 also claims the benefit of priority under 35 U.S.C. § 120 as a continuation-in-part of the following U.S. Design Patent Application Nos. 29/323,409 filed August 25, 2008 and 29/323,408 filed August 25, 2008.  A certificate of correction issued on the '648 Patent on April 20, 2021.  Pursuant to Commission Rule 210.12(a)(9)(xi) the expiration date of the '648 Patent is August 25, 2028.

Exhibit 12

57.     The inventors of the '648 Patent, Jeroen Poeze, Marcelo Lamego, Sean Merritt, Cristiano Dalvi, Hung Vo, Johannes Bruinsma, Ferdyan Lesmana, Massi Joe E. Kiani, and Greg Olsen, assigned to Masimo Laboratories, Inc. the entire right, title, and interest throughout the world in, to and under said improvements in the invention described and claimed in U.S. Patent Application No. 12/534,827 and all divisions and continuations thereof, which includes the '648 Patent.  **Exhibit 8**.  On August 2, 2010, Masimo Laboratories Inc. changed its name to Cercacor Laboratories, Inc.  **Exhibit 8**.  On July 29, 2019, Cercacor assigned to Masimo Corporation, the entire right, title and interest to U.S. Application No. 16/212537 and all continuations thereof, which includes the '648 Patent.  **Exhibit 8**.  Cercacor is the licensee of certain exclusive rights to the '648 Patent.  **Confidential Exhibit 11**.  The '648 Patent is valid, enforceable, and is currently in full force and effect.

58.     Pursuant to Rule 210.12(c) of the Commission's Rules of Practice and Procedure, this Complaint is accompanied by: 1) an electronic copy of the prosecution history of the '648 Patent; and 2) a electronic copy of each patent and applicable pages of each technical reference mentioned in the prosecution history.  These materials are included in Appendices D and B, respectively.  Because the '501 Patent, '502 Patent, and '648 Patent are related, there is a substantial overlap of the patents and applicable pages of each technical reference mentioned in the prosecution histories and the copies are provided together in Appendix B.

## 2.     <u>Foreign Counterparts to the '648 Patent</u>

59.     Pursuant to Commission Rule 210.12(a)(9)(v), Complainants submit the attached list of foreign patents, foreign patent applications (not already issued as a patent), and each foreign patent application that has been denied, abandoned, or withdrawn corresponding to the '648 Patent.  **Exhibit 12**.  No other foreign patents or patent applications corresponding to the '648 Patent are known to Masimo Corporation.

Exhibit 12

### 3.      Non-Technical Description of the '648 Patent

60.      Like the '501 and '502 Patents, the '648 Patent involves devices for the non-invasive measurement of physiological parameters such as blood oxygen saturation and pulse rate. The devices include multiple optical sources that emit light at different wavelengths and numerous light detectors.  The light detectors are configured to detect the optical radiation from the tissue and output a respective signal stream responsive to this detection.  This data is then processed by a processing device which outputs a measurement of the physiological parameter.  The '648 Patent includes limitations to novel architecture features to implement the required measurement while limiting any light noise that could impact the accuracy of measurements.  The '648 Patent also includes limitations to novel arrangements of light sources and photodetectors.  The '648 Patent also contains limitations to processors, network devices, and user interfaces, allowing the device to be easily used by consumers.

61.      In sum, the invention of the '648 Patent provides a novel combination of features allowing for the measurement of a user's physiological parameters. ███████████████████ ████████████████████████████████████████████.

62.      The foregoing non-technical description of the patented technology is not intended to limit, define, or otherwise affect the scope of the claimed inventions, nor is the non-technical description in any way intended to construe or define any word, phrase, term, or limitation recited in any claim of the '648 Patent.

### D.      U.S. Patent No. 10,687,745

### 1.      Identification of the Patent and Ownership by Masimo Corporation

63.      Masimo Corporation owns by assignment the entire right, title, and interest in the '745 Patent, entitled "Physiological Monitoring Devices, Systems, and Methods," which issued on

Exhibit 12

June 23, 2020.  (*See* **Exhibit 4**).  The '745 Patent issued from U.S. Patent Application Serial No. 16/835,772, filed on March 31, 2020.  The '745 Patent is a continuation of U.S. Patent Application No. 16/791,963, filed February 14, 2020, which is a continuation of U.S. Patent Application No. 16/532,065 filed August 5, 2019, which is a continuation of U.S. Patent Application No. 16/226,249 filed December 19, 2018, which is a continuation of U.S. Patent Application No. 15/195,199 filed June 28, 2016, which claims priority benefit under 35 U.S.C. § 119(e) from U.S. Provisional Application No. 62/188,430, filed July 2, 2015.  A certificate of correction issued on the '745 Patent on September 22, 2020.  Pursuant to Commission Rule 210.12(a)(9)(xi) the expiration date of the '745 Patent is June 28, 2029.

64.     The inventor of the '745 Patent, Ammar Al-Ali, assigned to Masimo Corporation the entire right, title, and interest in in U.S. Patent Application No. 15/195199, and all divisions and continuations thereof, which includes the '745 Patent.  **Exhibit 9**.  Cercacor is the licensee of certain exclusive rights to the '745 Patent.  **Confidential Exhibit 11**.  The '745 Patent is valid, enforceable, and is currently in full force and effect.

65.     Pursuant to Rule 210.12(c) of the Commission's Rules of Practice and Procedure, this Complaint is accompanied by: 1) an electronic copy of the certified prosecution history of the '745 Patent; and 2) an electronic copy of each patent and applicable pages of each technical reference mentioned in the prosecution history.  These materials are included in Appendices E and F, respectively.

### 2.     Foreign Counterparts to the '745 Patent

66.     Pursuant to Commission Rule 210.12(a)(9)(v), Complainants submit the attached list of foreign patents, foreign patent applications (not already issued as a patent), and each foreign patent application that has been denied, abandoned, or withdrawn corresponding to the '745 Patent.

Exhibit 12

See **Exhibit 12**.  No other foreign patents or patent applications corresponding to the '745 Patent are known to Masimo Corporation.

### 3.    Non-Technical Description of the '745 Patent

67.    The '745 Patent involves devices for the non-invasive measurement of physiological parameters such as blood oxygen saturation and pulse rate.  The devices include multiple optical sources that emit light at different wavelengths and numerous light detectors.  The devices also include optical transmission materials configured to change the shape of the emitted light or diffusers to spread the light.  The devices also contain light blocks to inhibit light from the optical sources from reaching the detectors before being attenuated by the user's skin.  The light detectors are configured to detect the optical radiation from the tissue and output a respective signal stream responsive to this detection.  This data is then processed by a processing device which outputs a measurement of the physiological parameter.  The '745 Patent includes limitations to novel architecture features to implement the required measurement while limiting any light noise that could impact the accuracy of measurements.  The '745 Patent also includes limitations to novel arrangements of light sources and photodetectors.

68.    In sum, the invention of the '745 Patent provides a novel combination of features allowing for the measurement of a user's physiological parameters.

69.    The foregoing non-technical description of the patented technology is not intended to limit, define, or otherwise affect the scope of the claimed inventions, nor is the non-technical description in any way intended to construe or define any word, phrase, term, or limitation recited in any claim of the '745 Patent.

### E.    U.S. Patent No. 7,761,127

#### 1.    Identification of the Patent and Ownership by Cercacor

26

Exhibit 12

70.     Cercacor owns by assignment the entire right, title, and interest in the '127 Patent, entitled "Multiple Wavelength Sensor Substrate," which issued on July 20, 2010.  **Exhibit 5**.  The '127 Patent issued from U.S. Patent Application Serial No. 11/366,209, filed on March 1, 2006.  The '127 Patent claims priority to Provisional Application No. 60/657,596, filed on March 1, 2005, Provisional Application No. 60/657,281, filed on March 1, 2005, Provisional Application No. 60/657,268, filed on March 1, 2005, and Provisional Application No. 60/657,759, filed on March 1, 2005.  Certificates of correction issued on the '127 Patent on January 4, 2011 and February 1, 2011.  Pursuant to Commission Rule 210.12(a)(9)(xi) the expiration date of the '127 Patent is April 28, 2029.

71.     The inventors of the '127 Patent, Ammar Al-Ali, Mohamed Diab, Marcelo Lamego, James Coffin, and Yassir Abdul-Hafiz, assigned to Masimo Laboratories, Inc. the entire right, title, and interest in U.S. Patent Application No. 11/366,209, and all patents granted thereof, which includes the '127 Patent.  **Exhibit 10**.  On August 2, 2010, Masimo Laboratories, Inc. changed its name to Cercacor Laboratories, Inc.  **Exhibit 10**.  Masimo is a licensee of certain exclusive rights to the '127 Patent.  **Confidential Exhibit 11**.  The '127 Patent is valid, enforceable, and is currently in full force and effect.

72.     Pursuant to Rule 210.12(c) of the Commission's Rules of Practice and Procedure, this Complaint is accompanied by: 1) an electronic copy of the certified prosecution history of the '127 Patent; and 2) an electronic copy of each patent and applicable pages of each technical reference mentioned in the prosecution history.  These materials are included in Appendices G and H, respectively.

### 2.     Foreign Counterparts to the '127 Patent

73.     Pursuant to Commission Rule 210.12(a)(9)(v), Complainants submit the attached list of foreign patents, foreign patent applications (not already issued as a patent), and each foreign

Exhibit 12

patent application that has been denied, abandoned, or withdrawn corresponding to the '127 Patent.

**Exhibit 12**.  No other foreign patents or patent applications corresponding to the '127 Patent are

known to Masimo Corporation.

### 3.    Non-Technical Description of the '127 Patent

74.    The '127 Patent discloses and involves a physiological sensor for the non-invasive

measurement of physiological parameters such as blood oxygen saturation and pulse rate.  The

sensor includes a thermal mass, a plurality of light emitting sources operating at a plurality of

wavelengths thermally coupled to the thermal mass, a temperature sensor to determine the bulk

temperature of the thermal mass, and a detector capable of detecting light emitted from the light

emitting sources after attenuation by the user's skin.  Based on the bulk temperature of the thermal

mass, the sensor is able to compensate for shifts in the LED wavelengths due to temperature.

75.    In sum, the '127 Patent provides a novel combination of features allowing for the

measurement of a user's physiological parameters.  Confidential samples of rainbow® sensors that

embody the claims of the '127 Patent are available upon request.

76.    The foregoing non-technical description of the patented technology is not intended

to limit, define, or otherwise affect the scope of the claimed inventions, nor is the non-technical

description in any way intended to construe or define any word, phrase, term, or limitation recited

in any claim of the '127 Patent.

### F.    Licensees

77.    Masimo has licensed certain exclusive rights to the Masimo Patents to Cercacor.

**Confidential Exhibit 11**.  Cercacor has licensed certain exclusive rights to the Cercacor Patent to

Masimo.  **Confidential Exhibit 11**.  There are no other licensees to the Asserted Patents.

Exhibit 12

## VI.  <u>UNLAWFUL AND UNFAIR ACTS OF PROPOSED RESPONDENT</u>

78.    Respondent manufactures, markets, sells for importation, imports and/or sells after importation into the United States products that directly infringe the '501 Patent, the '502 Patent, the '648 Patent, the '745 Patent, and the '127 Patent, either literally or under the doctrine of equivalents.  Apple also induces the infringement of claims 20-24 and 26-27 of the '745 Patent by recommending, encouraging, and/or suggesting that consumers use their Apple Watch Series 6 with the consumer's iPhone in an infringing manner.  On information and belief, Apple has knowledge of the '745 Patent because it monitors Masimo's patent filings.  Apple will also have knowledge of the '745 Patent before the issuance of any requested relief in this Investigation, from the filing of this lawsuit itself and service of this complaint.

79.    Respondent's Apple Watch Series 6 are sold under the below model names and numbers.

| <u>Model Name</u> | <u>Model Number</u> |
|---|---|
| Apple Watch Series 6 (GPS) 40 mm case | A2291 |
| Apple Watch Series 6 (GPS) 44 mm case | A2292 |
| Apple Watch Nike (GPS) 40 mm case | A2291 |
| Apple Watch Nike (GPS) 44 mm case | A2292 |
| Apple Watch Series 6 (GPS + Cellular) Aluminum 40 mm case | A2293 |
| Apple Watch Series 6 (GPS + Cellular) Aluminum 44 mm case | A2294 |
| Apple Watch Nike (GPS + Cellular) 40 mm case | A2293 |
| Apple Watch Nike (GPS + Cellular) 44 mm case | A2294 |
| Apple Watch Series 6 (GPS + Cellular) Stainless Steel 44 mm case | A2293 |
| Apple Watch Series 6 (GPS + Cellular) Stainless Steel 44 mm case | A2294 |

29

Exhibit 12

| Model Name | Model Number |
|---|---|
| Apple Watch Hermes (GPS + Cellular) 40 mm case | A2293 |
| Apple Watch Hermes (GPS + Cellular) 44 mm case | A2294 |
| Apple Watch Edition (GPS + Cellular) Titanium 40 mm case | A2293 |
| Apple Watch Edition (GPS + Cellular) Titanium 44 mm case | A2294 |

80.    Photographs of a representative Apple Watch Series 6 (specifically Model No. 2291) are attached to this Complaint as **Exhibit 13**.  A copy of information regarding the Apple Watch Series 6 from Apple's website is attached hereto as **Exhibit 14**.  Samples of the Apple Watch Series 6 can be made available upon request.

81.    On information and belief, Respondent and others on its behalf manufacture the Accused Products at least in China, and then import them into the United States, sell them for importation into the United States, and/or sell them within the United States after importation.

82.    These acts of Respondent constitute infringement of the Asserted Patents.

83.    Claim charts demonstrating how a representative Apple Watch Series 6 infringes the '501 Patent, the '502 Patent, the '648 Patent,'745 Patent, and the '127 Patent are attached as **Confidential Exhibits 15, 16, 17, 18, and 19**, respectively.  While a representative Apple Watch Series 6 is shown in the claim charts in **Confidential Exhibits 15, 16, 17, 18, and 19**, Respondent does not distinguish in any relevant manner between other model numbers of the Apple Watch Series 6 in their marketing or promotional materials, and Masimo alleges that all of Respondent's Apple Watch Series 6 identified in ¶79 above infringe at least one Asserted Claim of the Asserted Patents.

Exhibit 12

████████████████████████████████████████

84.     Masimo has not licensed or otherwise authorized Respondent to make, use, sell, offer to sell, or import the Accused Products.

85.     Respondent has sought to capitalize on Masimo's extensive research and development efforts.

## VII.  THE DOMESTIC INDUSTRY RELATED TO ASSERTED PATENTS

86.     A domestic industry exists or is in the process of being established as defined by 19 U.S.C. §§ 1337(a)(2)–(3) relating to Masimo's significant investment in plant and equipment; significant employment of labor or capital; research and development activities; and substantial investment in exploitation of the patents, including engineering with respect to Masimo's physiological measurement devices and monitors.  With respect to the '501 Patent, the '502 Patent, the '648 Patent, and the '745 Patent, Masimo's activities in the United States with respect to ██ ████████████████████████████████████████—constitute a domestic industry for purposes of Section 337.  To the extent it is determined that a domestic industry ████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ███████████████████████████████ is protected by one or more claims of each of the '501 Patent, the '502 Patent, the '648 Patent, and the '745 Patent.

87.     With respect to the '127 Patent, Masimo's activities in the United States with respect to at least its rainbow® sensor technology constitute a domestic industry for purposes of Section 337.  Masimo's rainbow® sensors—including the, RD rainbow® Set-2, rainbow® R1, rainbow® R25, rainbow® R20, rainbow® DCI SC 200, rainbow® DCI SC 400, rainbow® DCI SC 1000, rainbow® DCI mini SC-200, rainbow® DCI mini SC-400, rainbow® DCI mini SC-1000,

Exhibit 12

rainbow® Super DCI mini SC-200, rainbow® Super DCI mini SC-400, rainbow® Super DCI mini-SC-1000, rainbow® DCI, rainbow® DCI-dc, RD rainbow® 8 λ SpCO Adhesive Sensor, LNCS-II™ rainbow® DCI 8λ SpHb, LNCS-II™ rainbow® DCIP® 8λ SpHb, LNCS-II™ rainbow® DCI® 8λ SpCO, and LNCS-II™ rainbow® DCIP® 8λ SpCO—are protected by at least one claim of the '127 Patent.

### A.   Technical Prong

88.   Masimo has designed and developed its domestic industry products through its extensive research and development efforts based almost entirely in the United States.  Moreover, Masimo ███████████████████████████████████ in the United States and manufactures a material amount of the components of its rainbow® sensors in the United States. As set forth in more detail herein, Masimo's domestic industry products incorporate the inventions claimed in one or more claims of the Asserted Patents.

89.   Drawings, photographs, or other visual representations of representative Masimo domestic industry products (specifically, ████████████ and certain rainbow® sensors) are attached hereto as **Confidential Exhibit 20 and Confidential Exhibit 21**.  Claim charts showing how a representative Masimo domestic industry product practices exemplary claims of the '501 Patent, the '502 Patent, the '648 Patent, the '745 Patent, and the '127 Patent are attached hereto as **Confidential Exhibits 15, 16, 17, 18 and 19**, respectively.  Additional information regarding the domestic industry products is found in the Declaration of Bilal Muhsin, attached hereto as **Confidential Exhibit 27**.

### B.   Economic Prong

90.   The domestic industry in this case is based on significant investments Masimo has made and/or plans to make and activities Masimo has undertaken and/or plans to undertake in the

Exhibit 12

United States relating to products protected by one or more claims of the Asserted Patents. These investments and activities include research and development, manufacturing, testing, and engineering for the Masimo domestic industry products. Specific, non-limiting examples of Masimo's substantial investments and activities related to the Asserted Patents are set forth in the confidential declaration of Micah Young, attached to this complaint as **Confidential Exhibit 28**.

91.     Masimo employs a significant number of employees in its U.S facilities in Irvine, California. These employees devote substantial personnel-hours toward the research and development, testing and engineering for the Masimo domestic industry products. The confidential declaration of Micah Young sets forth details regarding the investments it has made in these U.S. employees.

92.     Masimo also invests capital toward manufacturing and research and development for products protected by the Asserted Patents. The confidential declaration of Micah Young provides additional details regarding Masimo's capital investments.

93.     In addition, Masimo has made substantial investments in plant and equipment in the United States. Masimo's facilities in Irvine, California, houses activities for research and development, manufacturing, testing and engineering for the Masimo domestic industry products. Masimo also owns a facility in New Hampshire where manufacturing activities for its rainbow® sensors take place. The confidential declaration of Micah Young includes further non-limiting examples of Masimo's investments in this category.

94.     To the extent it is determined that a domestic industry does not currently exist, Masimo is in the process of establishing a domestic industry with respect to the Masimo Patents because it is actively engaged in the steps leading to the exploitation of its intellectual property rights, and there is a significant likelihood that an industry will be established in the United States

Exhibit 12

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

in the future ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.  Further, non limiting examples regarding the active steps taken by Masimo to establish a domestic industry are included in the confidential declaration of Micah Young filed herewith as **Confidential Exhibit 28**.

## VIII.   <u>SPECIFIC INSTANCES OF UNFAIR IMPORTATION AND SALE</u>

95.    Respondent, and/or others on its behalf, manufactures the Accused Products at least in China, and then imports them into the United States, sells them for importation into the United States, and/or sells them after importation into the United States.  Respondent sells and offers for sale the Accused Products directly to customers in the United States.  Respondent stated in a press release dated September 15, 2020, that it was introducing the Series 6 in the United States for sale starting on September 18, 2020.  **Exhibit 29**

96.    Prior to filing this Complaint, a representative Apple Watch Series 6 product was purchased on April 19, 2021, in the United States.  A copy of the invoice of this purchase is attached hereto as **Confidential Exhibit 30**.  The packaging of this Accused Product indicates that it was made outside the United States.  Photographs of the product packaging for this Apple Watch product, showing that it was made in China, are attached hereto as **Exhibit 31**.

97.    In addition, Apple's 10K filed with the SEC on January 28, 2021 states that "[s]ubstantially all of the Company's hardware products are manufactured by outsourcing partners that are located primarily in Asia, with some Mac computers manufactured in the U.S. and Ireland."  **Exhibit 32**.

Exhibit 12

### IX.  CLASSIFICATION OF THE INFRINGING PRODUCTS UNDER THE HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES

98.     Upon information and belief, the Accused Products may be classified under at least the following heading of the Harmonized Tariff Schedules of the United States: 8517.62.0090. This HTS identification is illustrative and not exhaustive.  The identification is not intended to limit the scope of the Investigation, nor is it intended to restrict the scope of any exclusion order or other remedy ordered by the Commission.

### X.  RELATED LITIGATION

99.     On January 9, 2020, Masimo Corp. and Cercacor filed suit in the United States District Court for the Central District of California, Case No. 8:20-cv-00048.  In that case, Complainants assert that Respondent Apple has, *inter alia*, engaged in trade secret misappropriation and has infringed patents not asserted in this complaint by the sale of the certain products, including the Apple Watch Series 6.  Complainants also seek a declaration of ownership of several patents and applications filed by Apple.  That case is currently pending before the district court, but Complainants' patent infringement claims are stayed pending resolution of the below referenced *inter partes* review proceedings.

100.     Respondent has filed numerous petitions for *inter partes* review of the patents involved in Case No. 8:20-cv-0048, none of which are asserted in this complaint:  IPR2020-01520 (Instituted March 2, 2021); IPR2021-00208 (Instituted June 3, 2021); IPR2020-01521 (Instituted April 14, 2021); IPR2021-00193 (Instituted June 3, 2021); IPR2021-00195 (Instituted June 3, 2021); IPR2021-00209 (Instituted June 3, 2021); IPR2020-01524 (Instituted April 16, 2021); IPR2020-01722 (Instituted May 12, 2021); IPR2020-01723 (Institution denied May 12, 2021); IPR2020-01536 (Instituted March 2, 2021); IPR2020-01537 (Instituted March 2, 2021); IPR2020-

Exhibit 12

01538 (Instituted March 2, 2021); IPR2020-01539 (Instituted March 2, 2021); IPR2020-01526 (Instituted April 16, 2021); and IPR2020-01523 (Instituted April 14, 2021).

101.    There have been no other foreign or domestic court or agency litigations involving any of the Asserted Patents.

## XI.   **REQUESTED RELIEF**

102.    WHEREFORE, by reason of the foregoing, Complainants request that the United States International Trade Commission:

   a)   institute an immediate investigation pursuant to 19 U.S.C. § 1337 into the violations of that section based on Respondent's unlawful importation into the United States, sale for importation into the United States, and/or sale in the United States after importation of certain light-based physiological measurement devices and components thereof that infringe one or more claims of U.S. Patent Nos. 10,912,501, 10,912,502, 10,945,648, 10,687,745, and/or 7,761,127;

   b)   schedule and conduct a hearing pursuant to Section 337(c), for the purposes of receiving evidence and hearing argument concerning whether there has been a violation of Section 337;

   c)   determine that there has been a violation of Section 337 by Respondent;

   d)   issue a permanent exclusion order, pursuant to 19 U.S.C. § 1337(d), excluding from entry into the United States all of Respondent's light-based physiological measurement devices and components thereof, including Apple Watch Series 6, that infringe one or more claims of U.S. Patent Nos. 10,912,501, 10,912,502, 10,945,648, 10,687,745, and/or 7,761,127;

Exhibit 12

e)   issue a permanent cease and desist order, pursuant to 19 U.S.C. § 1337(f), directing Respondent to cease and desist from importing, marketing, advertising, demonstrating, warehousing of inventory for distribution, sale, or use of certain light-based physiological measurement devices and components thereof that infringe one or more claims of U.S. Patent Nos. 10,912,501, 10,912,502, 10,945,648, 10,687,745, and/or 7,761,127;

f)   impose a bond upon Respondent should Respondent continue to import infringing articles during the 60-day Presidential Review period pursuant to 19 U.S.C. § 1337(j); and

g)   grant such other and further relief as the Commission deems appropriate and just under the law, based on the facts complained of herein and determined by the investigation.

Respectfully submitted,


Dated:  July 7, 2021                    By: /s/ *Jonathan E. Bachand*
                                        Jonathan E. Bachand
                                        KNOBBE, MARTENS, OLSON & BEAR, LLP
                                        1717 Pennsylvania Ave NW STE 900
                                        Washington, DC 20006
                                        Telephone: 202-640-6400
                                        Facsimile: 949-760-9502

                                        Stephen C. Jensen
                                        Joseph R. Re
                                        Sheila N. Swaroop
                                        KNOBBE, MARTENS, OLSON & BEAR, LLP
                                        2040 Main Street, 14th Floor
                                        Irvine, CA  92614
                                        Telephone:  (949) 760-0404
                                        Facsimile:  (949) 760-9502

Exhibit 12

## VERIFICATION OF FIRST AMENDED COMPLAINT

I, Jonathan E. Bachand, declare, in accordance with 19 C.F.R. §§ 210.4 and 210.12(a), under penalty of perjury, that the following statements are true:

1.      I am Counsel for Complainants Masimo Corporation and Cercacor Laboratories, Inc. and I am duly authorized to sign the First Amended Complaint on behalf of Complainants;

2.      I have read the foregoing First Amended Complaint;

3.      To the best of my knowledge, information, and belief, based upon reasonable inquiry, the foregoing First Amended Complaint is well-founded in fact and is warranted by existing law or by a non-frivolous argument for the extension, modification, or reversal of existing law, or the establishment of new law;

4.      The allegations and other factual contentions have evidentiary support or are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

5.      The foregoing First Amended Complaint is not being filed for an improper purpose, such as to harass or cause unnecessary delay or needless increase in the cost of litigation.

Executed this 7th day of July, 2021.


/s/ *Jonathan E. Bachand*
Jonathan E. Bachand
Counsel for Complainants
Masimo Corporation and Cercacor
Laboratories, Inc.

35273626

44

Exhibit 12

# Notice of Receipt

## Document Filing Information

**Document ID:**
**746186**



**Document Type:**
Complaint
**Security Level:**
Public
**Document Title:**
Cover Letter attaching Amended Complaint, Request for Confidential Treatment, Amended Complaint, Exhibit 2, Appendix C
**Document Title:**
**Document Date:**
07/07/2021
**Official Received Date:**
07/07/2021 03:15 PM
**System Received Date:**
07/07/2021 03:15 PM
**Party Has Been Served:**
No
**APO Release Flag:**
No

## Investigation Information

**Investigation Number**
NR-004
**Investigation Phase**
New Request
**Investigation Type**
Sec 337
**Investigation Title**
Sec 337 New Request

## Submitter Information

**Filed By:**
Jonathan Bachand
**Firm/Organization:**
Knobbe, Martens, Olson & Bear
**Submitted By:**
JONATHANBACHAND
**On Behalf Of:**

Exhibit 12

Masimo Corporation and Cercacor Laboratories

## Attachments

| TITLE | FILE NAME | SIZE | PAGE COUNT | DATE CREATED |
|---|---|---|---|---|
| Public Cover Letter, Request for Confidential Treatment, Amended Complaint | [PUBLIC] Cover Letter, Req for Conf. Treatment, Amended Complaint.pdf | 1.20 MB | 48 | 07/07/2021 03:00 PM |
| Exhibit 2 - USP10,912,502 | Exhibit 02 - USP10,912,502 with cert of correction.pdf | 6.08 MB | 111 | 07/07/2021 03:01 PM |
| Appendix C - File History for USP10,912,502 | Appendix C - FH of USP 10,912,502 .pdf | 24.63 MB | 574 | 07/07/2021 03:03 PM |

## Paper Copies Required

**Copies Required:**
8
**Delivery Requirement:**
Simultaneous with any filing

Exhibit 12

EXHIBIT 13

## UNITED STATES INTERNATIONAL TRADE COMMISSION
### Washington, D.C.

| | |
|---|---|
| In the Matter of<br><br>**CERTAIN LIGHT-BASED PHYSIOLOGICAL MEASUREMENT DEVICES AND COMPONENTS THEREOF** | Inv. No. 337-TA-1276 |

## NOTICE OF INSTITUTION OF INVESTIGATION

Institution of Investigation Pursuant to 19 U.S.C. 1337

**AGENCY**:  U.S. International Trade Commission

**ACTION**:  Notice

**SUMMARY**:  Notice is hereby given that a complaint was filed with the U.S. International Trade Commission on June 30, 2021, under section 337 of the Tariff Act of 1930, as amended, on behalf of Masimo Corporation of Irvine, California and Cercacor Laboratories, Inc. of Irvine, California.  An amended complaint was filed on July 12, 2021.  A supplement was filed on July 19, 2021.  The complaint, as amended, alleges violations of section 337 based upon the importation into the United States, the sale for importation, and the sale within the United States after importation of certain light-based physiological measurement devices and components thereof by reason of infringement of certain claims of U.S. Patent No. 10,912,501 ("the '501 patent"); U.S. Patent No. 10,912,502 ("the '502 patent"); U.S. Patent 10,945,648 ("the '648 patent"); U.S. Patent No. 10,687,745 ("the '745 patent"); and U.S. Patent No. 7,761,127 ("the '127 patent").  The amended complaint further alleges that an industry in the United States exists and/or is in the process of being established as required by the applicable Federal Statute.

The complainants request that the Commission institute an investigation and, after the investigation, issue a limited exclusion order and a cease and desist order.

**ADDRESSES**:  The complaint, as amended, except for any confidential information contained therein, may be viewed on the Commission's electronic docket (EDIS) at https://edis.usitc.gov. For help accessing EDIS, please email EDIS3Help@usitc.gov.  Hearing impaired individuals are advised that information on this matter can be obtained by contacting the Commission's TDD terminal on (202) 205-1810.  Persons with mobility impairments who will need special assistance in gaining access to the Commission should contact the Office of the Secretary at (202) 205-2000. General information concerning the Commission may also be obtained by accessing its internet server at https://www.usitc.gov.

Exhibit 13

**FOR FURTHER INFORMATION CONTACT**:  Katherine Hiner, Office of Docket Services, U.S. International Trade Commission, telephone (202) 205-1802.

**SUPPLEMENTARY INFORMATION**:

**AUTHORITY**:  The authority for institution of this investigation is contained in section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. 1337, and in section 210.10 of the Commission's Rules of Practice and Procedure, 19 C.F.R. 210.10 (2020).

**SCOPE OF INVESTIGATION**:  Having considered the complaint, the U.S. International Trade Commission, on August 13, 2021, **ORDERED THAT** –

(1)  Pursuant to subsection (b) of section 337 of the Tariff Act of 1930, as amended, an investigation be instituted to determine whether there is a violation of subsection (a)(1)(B) of section 337 in the importation into the United States, the sale for importation, or the sale within the United States after importation of certain products identified in paragraph (2) by reason of infringement of one or more of claims 1-9 and 11-30 of the '501 patent; claims 1-2, 4-6, 8-12, 14-22, 24-26, and 28-30 of the '502 patent; claims 1-17 and 19-30 of the '648 patent; claims 1-6, 8-9, 11, 14, 20-24, and 26-27 of the '745 patent; and claims 7-9 of the '127 patent; and whether an industry in the United States exists and/or is in the process of being established as required by subsection (a)(2) of section 337;

(2)  Pursuant to section 210.10(b)(1) of the Commission's Rules of Practice and Procedure, 19 C.F.R. 210.10(b)(1), the plain language description of the accused products or category of accused products, which defines the scope of the investigation, is "wearable electronic devices with light-based pulse oximetry functionality and components thereof";

(3)  For the purpose of the investigation so instituted, the following are hereby named as parties upon which this notice of investigation shall be served:

(a)  The complainants are:

Masimo Corporation
52 Discovery
Irvine, CA 92618

Cercacor Laboratories, Inc.
15750 Alton Pkwy
Irvine, CA 92618

(b)  The respondent is the following entity alleged to be in violation of section 337, and is the party upon which the complaint is to be served:

Apple Inc.
One Apple Park Way
Cupertino, CA 95014

Exhibit 13

(4)  For the investigation so instituted, the Chief Administrative Law Judge, U.S. International Trade Commission, shall designate the presiding Administrative Law Judge.

The Office of Unfair Import Investigations will not participate as a party in this investigation.

Responses to the complaint and the notice of investigation must be submitted by the named respondent in accordance with section 210.13 of the Commission's Rules of Practice and Procedure, 19 C.F.R. 210.13.  Pursuant to 19 C.F.R. 201.16(e) and 210.13(a), as amended in 85 Fed. Reg. 15798 (March 19, 2020), such responses will be considered by the Commission if received not later than 20 days after the date of service by the complainants of the complaint and the notice of investigation.  Extensions of time for submitting responses to the complaint and the notice of investigation will not be granted unless good cause therefor is shown.

Failure of the respondent to file a timely response to each allegation in the complaint and in this notice may be deemed to constitute a waiver of the right to appear and contest the allegations of the complaint and this notice, and to authorize the administrative law judge and the Commission, without further notice to the respondent, to find the facts to be as alleged in the complaint and this notice and to enter an initial determination and a final determination containing such findings, and may result in the issuance of an exclusion order or a cease and desist order or both directed against the respondent.

By order of the Commission.

Lisa R. Barton
Secretary to the Commission

Issued: August 13, 2021

3

Exhibit 13

**CERTAIN LIGHT-BASED PHYSIOLOGICAL**                          **Inv. No. 337-TA-1276**
**MEASUREMENT DEVICES AND COMPONENTS**
**THEREOF**

Certificate of Service – Page 1

### PUBLIC CERTIFICATE OF SERVICE

    I, Lisa R. Barton, hereby certify that the attached **INSTITUTION OF INVESTIGATION** has been served upon the following parties as indicated, on **August 13, 2021**.

Lisa R. Barton, Secretary
U.S. International Trade Commission
500 E Street, SW, Room 112
Washington, DC  20436

**Complainants:**

Masimo Corporation
52 Discovery
Irvine, CA 92618

☐ Via Hand Delivery
☐ Via Express Delivery
☐ Via First Class Mail
☒ Other: Email Notification
of Availability for Download

Cercacor Laboratories, Inc.
15750 Alton Pkwy
Irvine, CA 92618

☐ Via Hand Delivery
☐ Via Express Delivery
☐ Via First Class Mail
☒ Other: Email Notification
of Availability for Download

**On Behalf of Complainants:**

Jonathan Bachand, Esq.
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
1717 Pennsylvania Avenue, NW, Suite 900
Washington, DC 20006
Email: Jonathan.Bachand@knobbe.com

☐ Via Hand Delivery
☐ Via Express Delivery
☐ Via First Class Mail
☒ Other: Email Notification
of Availability for Download

**Respondent:**

Apple Inc.
One Apple Park Way
Cupertino, CA 95014

☐ Via Hand Delivery
☐ Via Express Delivery
☐ Via First Class Mail
☒ Other: Service to Be

Exhibit 13

**CERTAIN LIGHT-BASED PHYSIOLOGICAL**                    **Inv. No. 337-TA-1276**
**MEASUREMENT DEVICES AND COMPONENTS**
**THEREOF**

Certificate of Service – Page 2

Completed by Complainants

**<u>Government Agencies:</u>**

Lynda Marshall                                          ☐ Via Hand Delivery
International Section, Antitrust Division                ☐ Via Express Delivery
U.S. Department of Justice                              ☐ Via First Class Mail
450 5th Street NW, Room 11000                           ☒ Other: Email Notification
Washington, DC 20530                                    of Availability for Download

U.S. Bureau of Customs and Border Protection            ☐ Via Hand Delivery
Intellectual Property Rights Branch                     ☐ Via Express Delivery
Mint Annex Building                                     ☐ Via First Class Mail
799 9th Street, NW, 7th floor                           ☒ Other: Email Notification
Washington, DC 20229                                    of Availability for Download

Elizabeth Kraus, Deputy Director                        ☐ Via Hand Delivery
International Antitrust, Office of International Affairs  ☐ Via Express Delivery
Federal Trade Commission                                ☐ Via First Class Mail
600 Pennsylvania Avenue, Room 498                       ☒ Other: Email Notification
Washington, DC 20580                                    of Availability for Download

Dale D. Berkley, Ph.D., J.D.                            ☐ Via Hand Delivery
Office of the General Counsel, PHD, NIH Branch           ☐ Via Express Delivery
National Institutes of Health                           ☐ Via First Class Mail
31 Center Drive                                          ☒ Other: Email Notification
Bldg. 31, Rm. 47                                        of Availability for Download
Bethesda, MD 20892

Exhibit 13



# UNITED STATES INTERNATIONAL TRADE COMMISSION

WASHINGTON, DC 20436

August 13, 2021

Jonathan E. Bachand
Knobbe, Martens, Olson & Bear, LLP
1717 Pennsylvania Ave., NW, Suite 900
Washington, DC 20006

**Re:** **Certain Light-Based Physiological Measurement Devices and Components Thereof**
**Inv. No. 337-TA-1276**

Dear Jonathan E. Bachand:

This letter is to advise you that the U.S. International Trade Commission has instituted an investigation pursuant to section 337 of the Tariff Act of 1930 (19 U.S.C. 1337). A copy of the Commission's notice of investigation is enclosed. Also enclosed is the Section 337 Mediation Program brochure. After reviewing the brochure, please sign and return the enclosed certification of receipt.

Sincerely,

Lisa R. Barton
Secretary

Enclosures:
1. Notice of Investigation
2. Publication Regarding the Section 337 Mediation Program
3. Certification of Receipt of Mediation Materials

Exhibit 13



# UNITED STATES INTERNATIONAL TRADE COMMISSION

WASHINGTON, DC 20436

August 13, 2021

Masimo Corporation
52 Discovery
Irvine, CA 92618

**Re:    Certain Light-Based Physiological Measurement Devices and Components
       Thereof
       Inv. No. 337-TA-1276**

Dear Sir/Madam:

This letter is to advise you that the U.S. International Trade Commission has instituted an
investigation pursuant to section 337 of the Tariff Act of 1930 (19 U.S.C. 1337).  A copy
of the Commission's notice of  investigation is enclosed.  Also enclosed is the Section
337 Mediation Program brochure.  After reviewing the brochure, please sign and return
the enclosed certification of receipt.

Sincerely,

Lisa R. Barton
Secretary

Enclosures:
1. Notice of Investigation
2. Publication Regarding the Section 337 Mediation Program
3. Certification of Receipt of Mediation Materials

Exhibit 13



# UNITED STATES INTERNATIONAL TRADE COMMISSION

WASHINGTON, DC 20436

August 13, 2021

Cercacor Laboratories, Inc.
15750 Alton Pkwy
Irvine, CA 92618

**Re:    Certain Light-Based Physiological Measurement Devices and Components
          Thereof
          Inv. No. 337-TA-1276**

Dear Sir/Madam:

This letter is to advise you that the U.S. International Trade Commission has instituted an
investigation pursuant to section 337 of the Tariff Act of 1930 (19 U.S.C. 1337).  A copy
of the Commission's notice of  investigation is enclosed.  Also enclosed is the Section
337 Mediation Program brochure.  After reviewing the brochure, please sign and return
the enclosed certification of receipt.

Sincerely,

Lisa R. Barton
Secretary

Enclosures:
1. Notice of Investigation
2. Publication Regarding the Section 337 Mediation Program
3. Certification of Receipt of Mediation Materials

Exhibit 13



## UNITED STATES INTERNATIONAL TRADE COMMISSION

WASHINGTON, DC 20436
August 13, 2021

Apple Inc.
One Apple Park Way
Cupertino, CA 95014

**Re:**   **Certain Light-Based Physiological Measurement Devices and Components Thereof Inv.  No.  337-TA-1276**

Dear Sir/Madam:

This letter is to advise you that the United States International Trade Commission has instituted an investigation pursuant to Section 337 of the Tariff Act of 1930 (19 U.S.C. 1337). **Apple Inc.** is a named respondent in this investigation.

We are hereby serving you with a copy of the Complaint and the Notice of Investigation issued in this matter.  Enclosed is a copy of the Code of Federal Regulations.  Also enclosed is a the Section 337 Mediation Program brochure.  After reviewing this brochure, please sign and return the enclosed certification of receipt.

Please note that the Notice requires a response to the allegations in the Complaint and the response must be received not later than twenty (20) days after the date of service of the Complaint.  Failure to file a response may result in inferences being drawn against your interests.

Sincerely,

Lisa R. Barton
Secretary

`
Enclosures:
1. Complaint
2. Notice of Investigation
3. Code of Federal Regulation
4. Publication Regarding the Section 337 Mediation Program
5. Certification of Receipt of Mediation Materials

Exhibit 13



## UNITED STATES INTERNATIONAL TRADE COMMISSION

WASHINGTON, DC 20436

August 13, 2021

Lynda Marshall
International Section
Antitrust Division
U.S. Dept of Justice
450 5th Street NW, Room 11000
Washington, DC 20530

**Re:     Certain Light-Based Physiological Measurement Devices and Components
        Thereof
        Inv.  No.  337-TA-1276**

Dear Lynda Marshall:

This letter is to advise you that the United States International Trade Commission has
instituted an investigation pursuant to Section 337 of the Tariff Act of 1930 (19 U.S.C.
1337).  A copy of the Notice of Investigation is enclosed.  Non-confidential copies of the
Complaint and any supplements filed in the investigation will be provided upon request.
Requests should be directed to Docket Services at (202) 205-1802.

If you have any questions concerning this investigation, please contact the Commission
Investigative Attorney whose name and telephone number appear in the enclosed Notice.

Sincerely,

Lisa R. Barton
Secretary

Enclosure:
    1.  Notice of Investigation

Exhibit 13



# UNITED STATES INTERNATIONAL TRADE COMMISSION

## WASHINGTON, DC 20436

August 13, 2021

Dax Terrill, Chief
Exclusion Order Enforcement Branch
U.S. Customs and Border Protection
Regulations and Rulings
90 K Street NE – 10th Floor
Washington, DC  20229-1177

**Re:**  **Certain Light-Based Physiological Measurement Devices and Components Thereof**
**Inv.  No.  337-TA-1276**

Dear Dax Terrill:

This letter is to advise you that the United States International Trade Commission has instituted an investigation pursuant to Section 337 of the Tariff Act of 1930 (19 U.S.C. 1337).  A copy of the Notice of Investigation is enclosed.  Non-confidential copies of the Complaint and any supplements filed in the investigation will be provided upon request. Requests should be directed to Docket Services at (202) 205-1802.

If you have any questions concerning this investigation, please contact the Commission Investigative Attorney whose name and telephone number appear in the enclosed Notice.

Sincerely,

Lisa R. Barton
Secretary

Enclosure:
   1.  Notice of Investigation

Exhibit 13



## UNITED STATES INTERNATIONAL TRADE COMMISSION

WASHINGTON, DC 20436

August 13, 2021

Elizabeth Kraus, Deputy Director
International Antitrust, Office of
International Affairs
Federal Trade Commission
600 Pennsylvania Avenue, Room 498
Washington, DC 20580

**Re:     Certain Light-Based Physiological Measurement Devices and Components
        Thereof
        Inv.  No.  337-TA-1276**

Dear Elizabeth Kraus:

This letter is to advise you that the United States International Trade Commission has
instituted an investigation pursuant to Section 337 of the Tariff Act of 1930 (19 U.S.C.
1337).  A copy of the Notice of Investigation is enclosed.  Non-confidential copies of the
Complaint and any supplements filed in the investigation will be provided upon request.
Requests should be directed to Docket Services at (202) 205-1802.

If you have any questions concerning this investigation, please contact the Commission
Investigative Attorney whose name and telephone number appear in the enclosed Notice.

Sincerely,

Lisa R. Barton
Secretary

Enclosure:
   1.  Notice of Investigation

Exhibit 13



# UNITED STATES INTERNATIONAL TRADE COMMISSION

WASHINGTON, DC 20436

August 13, 2021

Dale D. Berkley, Ph.D., J.D.
Office of the General Counsel, PHD, NIH Branch
National Institutes of Health
31 Center Drive
Bldg. 31, Rm. 47
Bethesda, MD  20892

Re:   **Certain Light-Based Physiological Measurement Devices and Components Thereof**
      **Inv.  No.  337-TA-1276**

Dear Dale Berkley:

This letter is to advise you that the United States International Trade Commission has instituted an investigation pursuant to Section 337 of the Tariff Act of 1930 (19 U.S.C. 1337).  A copy of the Notice of Investigation is enclosed.  Non-confidential copies of the Complaint and any supplements filed in the investigation will be provided upon request. Requests should be directed to Docket Services at (202) 205-1802.

If you have any questions concerning this investigation, please contact the Commission Investigative Attorney whose name and telephone number appear in the enclosed Notice.

Sincerely,

Lisa R. Barton
Secretary

Enclosure:
   1.  Notice of Investigation

Exhibit 13

# EXHIBIT 14

**UNITED STATES INTERNATIONAL TRADE COMMISSION**

**Washington, D.C.**

| | |
|---|---|
| **In the Matter of**<br><br>**CERTAIN LIGHT-BASED PHYSIOLOGICAL MEASUREMENT DEVICES AND COMPONENTS THEREOF** | **Inv. No.  337-TA-1276** |

**ORDER NO. 1:      PROTECTIVE ORDER**

(August 18, 2021)

WHEREAS, documents and information may be sought, produced or exhibited by and among the parties to the above captioned proceeding, which materials relate to trade secrets or other confidential research, development or commercial information, as such terms are used in the Commission's Rules, 19 C.F.R. § 210.5;

IT IS HEREBY ORDERED THAT:

1. Confidential business information is information which concerns or relates to the trade secrets, processes, operations, style of work, or apparatus, or to the production, sales, shipments, purchases, transfers, identification of customers, inventories, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or other organization, or other information of commercial value, the disclosure of which is likely to have the effect of either (i) impairing the Commission's ability to obtain such information as is necessary to perform its statutory functions; or (ii) causing substantial harm to the competitive position of the person, firm, partnership, corporation, or other organization from which the information was obtained, unless the Commission is required by law to disclose such

Exhibit 14

information.  The term "confidential business information" includes "proprietary information"
within the meaning of section 777(b) of the Tariff Act of 1930 (19 U.S.C. § 1677f(b)).

2(a).  Any information submitted, in pre hearing discovery or in a pleading, motion, or
response to a motion either voluntarily or pursuant to order, in this investigation, which is
asserted by a supplier to contain or constitute confidential business information shall be so
designated by such supplier in writing, or orally at a deposition, conference or hearing, and shall
be segregated from other information being submitted.  Documents shall be clearly and
prominently marked on their face with the legend: "CONFIDENTIAL BUSINESS
INFORMATION, SUBJECT TO PROTECTIVE ORDER," or a comparable notice.  Such
information, whether submitted in writing or in oral testimony, shall be treated in accordance
with the terms of this protective order.

(b).  The Administrative Law Judge or the Commission may determine that information
alleged to be confidential is not confidential, or that its disclosure is necessary for the proper
disposition of the proceeding, before, during or after the close of a hearing herein.  If such a
determination is made by the Administrative Law Judge or the Commission, opportunity shall be
provided to the supplier of such information to argue its confidentiality prior to the time of such
ruling.

3.  In the absence of written permission from the supplier or an order by the Commission
or the Administrative Law Judge, any confidential documents or business information submitted
in accordance with the provisions of paragraph 2 above shall not be disclosed to any person other
than:  (i) outside counsel for parties to this investigation, including necessary secretarial and
support personnel assisting such counsel; (ii) qualified persons taking testimony involving such
documents or information and necessary stenographic and clerical personnel thereof; (iii)

- 2 -

Exhibit 14

technical experts and their staff who are employed for the purposes of this litigation (unless they are otherwise employed by, consultants to, or otherwise affiliated with a non-governmental party, or are employees of any domestic or foreign manufacturer, wholesaler, retailer, or distributor of the products, devices or component parts which are the subject of this investigation); (iv) the Commission, the Administrative Law Judge, the Commission staff, and personnel of any governmental agency as authorized by the Commission; (v) the Commission, its employees and Offices, and contract personnel (a) for developing or maintaining the records of this investigation or related proceedings, or (b) in internal investigations, audits, reviews, evaluations relating to the programs, personnel, and operations of the Commission including under to 5 U.S.C. Appendix 3; and (vi) U.S. government employees and contract personnel, solely for cybersecurity purposes.[1]

4. Confidential business information submitted in accordance with the provisions of paragraph 2 above shall not be made available to any person designated in paragraph 3(i)[2] and (iii) unless he or she shall have first read this order and shall have agreed, by letter filed with the Secretary of this Commission:  (i) to be bound by the terms thereof; (ii) not to reveal such confidential business information to anyone other than another person designated in paragraph 3; and (iii) to utilize such confidential business information solely for purposes of this investigation. The letter shall also include the following acknowledgement:

> I, the undersigned, on behalf of _____, acknowledge that information submitted for purposes of this Investigation may be disclosed to and used:
>
> (i) by the Commission, its employees and Offices, and contract personnel (a) for developing or maintaining the records of this or a related proceeding, or (b) in

---

[1] *See* Commission Administrative Order 16-01 (Nov. 7, 2015).
[2] Necessary secretarial and support personnel assisting counsel need not sign onto the protective order themselves because they are covered by counsel's signing onto the protective order.

Exhibit 14

internal investigations, audits, reviews, and evaluations relating to the programs, personnel, and operations of the Commission including under 5 U.S.C. Appendix 3; or

(ii) by U.S. government employees and contract personnel, solely for cybersecurity purposes. I understand that all contract personnel will sign appropriate nondisclosure agreements.

5.  If the Commission or the Administrative Law Judge orders, or if the supplier and all parties to the investigation agree, that access to, or dissemination of information submitted as confidential business information shall be made to persons not included in paragraph 3 above, such matter shall only be accessible to, or disseminated to, such persons based upon the conditions pertaining to, and obligations arising from this order, and such persons shall be considered subject to it, unless the Commission or the Administrative Law Judge finds that the information is not confidential business information as defined in paragraph 1 thereof.

6.  (a). Any confidential business information submitted to the Commission or the Administrative Law Judge in connection with a motion or other proceeding within the purview of this investigation shall be submitted under seal pursuant to paragraph 2 above.  Any portion of a transcript in connection with this investigation containing any confidential business information submitted pursuant to paragraph 2 above shall be bound separately and filed under seal.  When any confidential business information submitted in accordance with paragraph 2 above is included in an authorized transcript of a deposition or exhibits thereto, arrangements shall be made with the court reporter taking the deposition to bind such confidential portions and separately label them "CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER."  Before a court reporter or translator receives any such information, he or she shall have first read this order and shall have agreed in writing to be bound by the terms thereof.  Alternatively, he or she shall sign the agreement included as Attachment A hereto.

- 4 -

Exhibit 14

Copies of each such signed agreement shall be provided to the supplier of such confidential business information and the Secretary of the Commission.

(b).      Submitters[3] are strongly encouraged to encrypt nonpublic documents that are electronically transmitted to the Commission to protect your sensitive information from unauthorized disclosure. The USITC secure drop-box system and the Electronic Document Information System (EDIS) use Federal Information Processing Standards (FIPS) 140-2 cryptographic algorithms to encrypt data in transit. Submitting your nonpublic documents by a means that does not use these encryption algorithms (such as by email) may subject your firm's nonpublic information to unauthorized disclosure during transmission. If you choose a non-encrypted method of electronic transmission, the Commission warns you that the risk of such possible unauthorized disclosure is assumed by you and not by the Commission.

7.   The restrictions upon, and obligations accruing to, persons who become subject to this order shall not apply to any information submitted in accordance with paragraph 2 above to which the person asserting the confidential status thereof agrees in writing, or the Commission or the Administrative Law Judge rules, after an opportunity for hearing, was publicly known at the time it was supplied to the receiving party or has since become publicly known through no fault of the receiving party.

8.   The Commission, the Administrative Law Judge, and the Commission investigative attorney acknowledge that any document or information submitted as confidential business information pursuant to paragraph 2 above is to be treated as such within the meaning of 5 U.S.C. § 552(b)(4) and 18 U.S.C. § 1905, subject to a contrary ruling, after hearing, by the

---

[3] "Submitters" of confidential business information are the same as "suppliers" of confidential business information as that term is used in the context of this order.  *See* Commission Administrative Order 16-01 (Nov. 7, 2015).

- 5 -

Exhibit 14

Commission or its Freedom of Information Act Officer, or the Administrative Law Judge.  When such information is made part of a pleading or is offered into the evidentiary record, the data set forth in 19 C.F.R. § 201.6 must be provided except during the time that the proceeding is pending before the Administrative Law Judge.   During that time, the party offering the confidential business information must, upon request, provide a statement as to the claimed basis for its confidentiality.

9.   Unless a designation of confidentiality has been withdrawn, or a determination has been made by the Commission or the Administrative Law Judge that information designated as confidential, is no longer confidential, the Commission, the Administrative Law Judge, and the Commission investigative attorney shall take all necessary and proper steps to preserve the confidentiality of, and to protect each supplier's rights with respect to, any confidential business information designated by the supplier in accordance with paragraph 2 above, including, without limitation:  (a) notifying the supplier promptly of (i) any inquiry or request by anyone for the substance of or access to such confidential business information, other than those authorized pursuant to this order, under the Freedom of Information Act, as amended (5 U.S.C. § 552) and (ii) any proposal to redesignate or make public any such confidential business information; and (b) providing the supplier at least seven days after receipt of such inquiry or request within which to take action before the Commission, its Freedom of Information Act Officer, or the Administrative Law Judge, or otherwise to preserve the confidentiality of and to protect its rights in, and to, such confidential business information.

10.  If while an investigation is before the Administrative Law Judge, a party to this order who is to be a recipient of any business information designated as confidential and submitted in accordance with paragraph 2 disagrees with respect to such a designation, in full or in part, it

- 6 -

Exhibit 14

shall notify the supplier in writing, and they will thereupon confer as to the status of the subject information proffered within the context of this order.  If prior to, or at the time of such a conference, the supplier withdraws its designation of such information as being subject to this order, but nonetheless submits such information for purposes of the investigation; such supplier shall express the withdrawal, in writing, and serve such withdrawal upon all parties and the Administrative Law Judge.  If the recipient and supplier are unable to concur upon the status of the subject information submitted as confidential business information within ten days from the date of notification of such disagreement, any party to this order may raise the issue of the designation of such a status to the Administrative Law Judge who will rule upon the matter.  The Administrative Law Judge may sua sponte question the designation of the confidential status of any information and, after opportunity for hearing, may remove the confidentiality designation.

11.  No less than 10 days (or any other period of time designated by the Administrative Law Judge) prior to the initial disclosure to a proposed expert of any confidential information submitted in accordance with paragraph 2, the party proposing to use such expert shall submit in writing the name of such proposed expert and his or her educational and detailed employment history to the supplier.  If the supplier objects to the disclosure of such confidential business information to such proposed expert as inconsistent with the language or intent of this order or on other grounds, it shall notify the recipient in writing of its objection and the grounds therefore prior to the initial disclosure.  If the dispute is not resolved on an informal basis within ten days of receipt of such notice of objections, the supplier shall submit immediately each objection to the Administrative Law Judge for a ruling.  If the investigation is before the Commission the matter shall be submitted to the Commission for resolution.  The submission of such confidential business information to such proposed expert shall be withheld pending the ruling of the

- 7 -

Exhibit 14

Commission or the Administrative Law Judge.  The terms of this paragraph shall be inapplicable to experts within the Commission or to experts from other governmental agencies who are consulted with or used by the Commission.

12.   If confidential business information submitted in accordance with paragraph 2 is disclosed to any person other than in the manner authorized by this protective order, the party responsible for the disclosure must immediately bring all pertinent facts relating to such disclosure to the attention of the supplier and the Administrative Law Judge and, without prejudice to other rights and remedies of the supplier, make every effort to prevent further disclosure by it or by the person who was the recipient of such information.

13.   Nothing in this order shall abridge the right of any person to seek judicial review or to pursue other appropriate judicial action with respect to any ruling made by the Commission, its Freedom of Information Act Officer, or the Administrative Law Judge concerning the issue of the status of confidential business information.

14.   Upon final termination of this investigation, each recipient of confidential business information that is subject to this order shall assemble and return to the supplier all items containing such information submitted in accordance with paragraph 2 above, including all copies of such matter which may have been made.  Alternatively, the parties subject to this order may, with the written consent of the supplier, destroy all items containing confidential business information and certify to the supplier (or his counsel) that such destruction has taken place. This paragraph shall not apply to the Commission, including its investigative attorney, and the Administrative Law Judge, which shall retain such material pursuant to statutory requirements and for other recordkeeping purposes, but may destroy such material (including electronic media containing such information) in its possession which it regards as surplusage.

Exhibit 14

Notwithstanding the above paragraph, confidential business information may be transmitted to a district court pursuant to Commission Rule 210.5(c).

15.   If any confidential business information which is supplied in accordance with paragraph 2 above is supplied by a nonparty to this investigation, such a nonparty shall be considered a "supplier" as that term is used in the context of this order.

16.   Each nonparty supplier shall be provided a copy of this order by the party seeking information from said supplier.

17.   The Secretary shall serve a copy of this order upon all parties.


Charles E. Bullock
Chief Administrative Law Judge

Exhibit 14

Attachment A

NONDISCLOSURE AGREEMENT FOR REPORTER/STENOGRAPHER/TRANSLATOR

I, _____, do solemnly swear or affirm that I will not divulge any information communicated to me in any confidential portion of the investigation or hearing in the matter of *Certain_____*, Investigation No. 337-TA-___, except as permitted in the protective order issued in this case.  I will not directly or indirectly use, or allow the use of such information for any purpose other than that directly associated with my official duties in this case.

Further, I will not by direct action, discussion, recommendation, or suggestion to any person reveal the nature or content of any information communicated during any confidential portion of the investigation or hearing in this case.

I also affirm that I do not hold any position or official relationship with any of the participants in said investigation.

I am aware that the unauthorized use or conveyance of information as specified above is a violation of the Federal Criminal Code and punishable by a fine of up to $10,000, imprisonment of up to ten (10) years, or both.

Signed _____

Dated _____

Firm or affiliation _____

- 10 -

Exhibit 14

**CERTAIN LIGHT-BASED PHYSIOLOGICAL**          Inv. No. 337-TA-1276
**MEASUREMENT DEVICES AND COMPONENTS**
**THEREOF**

Certificate of Service – Page 1

## PUBLIC CERTIFICATE OF SERVICE

I, Lisa R. Barton, hereby certify that the attached **ORDER** has been served upon the following parties as indicated, on **August 18, 2021**.

Lisa R. Barton, Secretary
U.S. International Trade Commission
500 E Street, SW, Room 112
Washington, DC  20436

**On Behalf of Complainants Masimo Corporation and Cercacor Laboratories, Inc.:**

Jonathan Bachand, Esq.                          ☐ Via Hand Delivery
**KNOBBE, MARTENS, OLSON & BEAR, LLP**           ☐ Via Express Delivery
1717 Pennsylvania Avenue, NW, Suite 900         ☐ Via First Class Mail
Washington, DC 20006                            ☒ Other: Email Notification
Email: Jonathan.Bachand@knobbe.com              of Availability for Download

**Respondent:**

Apple Inc.                                      ☐ Via Hand Delivery
One Apple Park Way                              ☐ Via Express Delivery
Cupertino, CA 95014                             ☐ Via First Class Mail
                                                ☒ Other: Service to Be
                                                Completed by Complainants

Exhibit 14

## UNITED STATES INTERNATIONAL TRADE COMMISSION

### Washington, D.C.

| | |
|---|---|
| In the Matter of<br><br>**CERTAIN LIGHT-BASED PHYSIOLOGICAL MEASUREMENT DEVICES AND COMPONENTS THEREOF** | Inv. No.  337-TA-1276 |

**ORDER NO. 13:   GRANTING JOINT MOTION TO AMEND THE PROTECTIVE ORDER TO ADD PROVISIONS REGARDING PRODUCTION AND REVIEW OF SOURCE CODE**

(January 10, 2022)

On January 5, 2021, Complainants Masimo Corporation and Cercacor Laboratories, Inc. (collectively, "Masimo") and Respondent Apple Inc. ("Apple") filed a joint motion (1276-014) to amend the Protective Order (Order No. 1) to establish procedures for enhanced confidentiality protections regarding the production and review of source code and to implement a prosecution and development bar.  The motion is jointly filed by all parties in the investigation.

Additional provisions may be added to the protective order pursuant to Commission Rule 210.34(a)(7), which states:

> Upon motion by a party or by the person from whom discovery is sought or by the administrative law judge on his own initiative, and for good cause shown, the administrative law judge may make any order that may appear necessary and appropriate for the protection of the public interest or that justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following:
>
> . . . .
>
> (7) That a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way[.]

Exhibit 14

19 C.F.R. § 210.34(a)(7).  The parties submit that there is a need for enhanced confidentiality protections for source code in this investigation, and the parties also seek to adopt a prosecution and development bar to address certain objections regarding expert witnesses.  Motion at 2; *see* Complainants' Contingent Notice of Withdrawal of Motions for Protective Orders, EDIS Doc. ID 760064 (Jan. 7, 2022).[1]  Based on the parties' representations, the undersigned finds that there is good cause to amend the protective order.  *See, e.g., Certain Power Inverters and Converters, Vehicles Containing the Same, and Components Thereof*, Inv. No. 337-TA-1267, Order No. 18, EDIS Doc. ID 757403 (Nov. 29, 2021) (amending protective order for source code); *Certain Non-Invasive Aesthetic Body Contouring Devices, Components Thereof, and Methods of Using the Same*, Inv. No. 337-TA-1219, Order No. 7, EDIS Doc. ID 728703 (Dec. 22, 2020) (amending protective order for prosecution bar); *Certain Wearable Electronic Devices With ECG Functionality and Components Thereof*, Inv. No. 337-TA-1266, Order No. 7, EDIS Doc. ID 749871 (Aug. 18, 2021) (amending protective order to include provisions regarding source code and a prosecution and development bar).

Accordingly, the motion (1276-014) is hereby GRANTED, and the Protective Order (Order No. 1) shall be supplemented with the addendum set forth in paragraphs 18 and 19 below:[2]

18.   **Source Code**.  A supplier may designate non-public Source Code as "HIGHLY CONFIDENTIAL SOURCE CODE – ATTORNEYS' EYES ONLY."

A.   "Source Code" shall mean source code, source code listings (e.g., file names and path structures), object code (e.g., computer instructions and data definitions

---

[1] The Notice indicates that Complainants' previously filed objections to Apple's experts (Motion Docket Nos. 1276-004, 1276-005, 1276-006) will be mooted by the adoption of the proposed prosecution and development bar and that these objections will be withdrawn.

[2] An updated certification for expert witnesses and consultants is attached hereto as Exhibit A.

Exhibit 14

expressed in a form suitable for input to an assembler, compiler, or other translator), object code listings and descriptions of object code, scripts, assemblies, binaries, descriptions of source code (e.g., descriptions of declarations, functions, and parameters), microcode, register transfer level ("RTL") files that describe the hardware design of any ASIC or other chip, and hardware description language ("HDL"), as well as any and all programmer notes, annotations, and other comments of any type related thereto and contained within a file also containing the code.  For avoidance of doubt, Source Code includes source files, make files, intermediate output files, executable files, header files, resource files, library files, module definition files, map files, object files, linker files, browse info files, and debug files.  Computer aided design (CAD) files may be designated pursuant to this Paragraph, provided that any printouts of CAD files shall be designated "CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER."

B.  "Party" shall mean (i) Complainants Masimo Corporation and Cercacor Laboratories, Inc. collectively on the one hand, and (ii) Respondent Apple Inc. on the other hand.

C.  "Supplying Party" with respect to particular Source Code or other discovery shall mean the Party that supplies that Source Code or other discovery.

D.  "Receiving Party" with respect to particular Source Code or other discovery shall mean the Party that received (e.g., through production or inspection) that Source Code or other discovery from the Supplying Party.

Exhibit 14

E.      Materials designated as "HIGHLY CONFIDENTIAL SOURCE CODE –

ATTORNEYS' EYES ONLY," shall only be reviewable by SOURCE CODE-

QUALIFIED PERSONS.  SOURCE CODE QUALIFIED PERSONS include the

following:

(i)      outside litigation counsel for Complainants and Respondent in this

Investigation who have subscribed to the Administrative Protective Order

in this Investigation, and necessary secretarial and support personnel

assisting such counsel;

(ii)     the Commission, the Administrative Law Judge ("ALJ"), Commission

personnel and contract personnel who are acting in the capacity of

Commission employees as indicated in paragraph 3 of this Protective

Order;

(iii)    court reporters, stenographers and videographers transcribing or recording

testimony at depositions, hearings or trial in this Investigation; and

(iv)    Qualified Consultants and/or Qualified Experts in this Investigation (under

Paragraph 11 of the Protective Order in this Investigation) to whom

disclosure is reasonably necessary for this Investigation, provided that

each Qualified Consultant and/or Qualified Expert complies with the

requirements of Paragraph 11 of the Protective Order and completes the

"CERTIFICATION OF EXPERT/CONSULTANT REGARDING

PROTECTIVE ORDER" (Exhibit A) which shall be served upon the

supplier.

F.      Source Code shall be provided with the following additional protections:

Exhibit 14

(i)      Nothing in this Protective Order shall obligate the parties to produce any Source Code, nor act as an admission that any particular Source Code is discoverable.

(ii)     Access to Source Code will be given only to SOURCE CODE QUALIFIED PERSONS.

(iii)    Access to Source Code shall be made available for inspection, in a format allowing it to be reasonably reviewed and searched, during normal business hours or at other mutually agreeable times, at an office of the Producing Party's outside litigation counsel WilmerHale (Los Angeles office) or Knobbe Martens (New York office) or another mutually agreed upon location on a "stand-alone secure computer" (*i.e.*, the computer(s) may not be linked to any network, including a local area network ("LAN"), an intranet, or the Internet, and may not be connected to any printer or storage device other than the internal hard disk drive of the computer).  The stand-alone secure computer(s) may be provided in a secured room without Internet access or network access to other computers ("Source Code Review Room") at the offices of the supplier's outside litigation counsel, or at such other location as the Supplying Party and Receiving Party mutually agree.  No recordable media or recordable devices, including without limitation sound recorders, computers, cellular telephones, peripheral equipment, cameras, CDs, DVDs, or drives of any kind, shall be permitted into the Source Code Review Room.

- 5 -

Exhibit 14

(iv)     The supplier shall install tools that are sufficient for viewing and searching the code produced, on the platform produced, if such tools exist and are presently used in the ordinary course of the supplier's business. The Receiving Party's outside counsel and/or experts may request that commercially available software tools for viewing and searching Source Code be installed on the secured computer, provided, however, that (a) the Receiving Party possesses an appropriate license to such software tools; (b) the supplier approves such software tools; and (c) such other software tools are reasonably necessary for the Receiving Party to perform its review of the Source Code consistent with all of the protections herein. The Receiving Party must provide the supplier with access to the installation copy of such licensed software tool(s) (e.g., through the installer package or a URL to download it from, or its CD or DVD) at least ten (10) days in advance of the date upon which the Receiving Party wishes to have the additional software tools available for use on the stand-alone secure computer(s). The Parties agree to cooperate in good faith if additional software becomes necessary.

(v)     The Receiving Party shall provide at least two (2) business days' notice to access the source code and make reasonable efforts to restrict its requests for access to the stand-alone secure computer to normal business hours, which for purposes of this paragraph shall be 9:00 a.m. through 6:00 p.m. local time at the reviewing location.  Upon reasonable notice from the Receiving Party, which shall not be less than five (5) business days in

- 6 -

Exhibit 14

advance, the supplier shall make reasonable efforts to accommodate the Receiving Party's request for access to the computer outside of normal business hours.  Such an expanded review period shall not begin earlier than 8:00 a.m. and shall not end later than 8:00 p.m. local time at the reviewing location.  The parties are to cooperate in good faith such that maintaining the Source Code at the offices of the supplier's outside litigation counsel shall not unreasonably hinder the Receiving Party's ability to efficiently conduct the prosecution or defense in this investigation.  It is expected that access to the Source Code shall be provided at the site of any hearing.  Proper identification of all SOURCE CODE QUALIFIED PERSONS shall be provided prior to any access to the stand-alone secure computer(s).  Proper identification requires showing, at a minimum, a photo identification card sanctioned by the government of any State of the United States, by the government of the United States, or by the nation state of the authorized person's current citizenship. Access to the Source Code Review Room or the stand-alone secure computer(s) may be denied, at the discretion of the supplier, to any individual who fails to provide proper identification.

(vi)   All SOURCE CODE QUALIFIED PERSONS who will review Source Code on behalf of a Receiving Party shall be identified in writing to the supplier at least two (2) business days in advance of the first time that such person reviews such Source Code.  Such identification shall be in addition to any disclosure required under paragraph 18(B) of this Protective Order.

- 7 -

Exhibit 14

The supplier shall provide these individuals with information explaining how to start, log on to, and operate the stand-alone secure computer in order to access the produced Source Code on the stand-alone secure computer.  For subsequent reviews by SOURCE CODE QUALIFIED PERSONS, the Receiving Party shall give at least 24 hours' notice to the supplier of such review.  All persons viewing Source Code on the source code computer in an office of outside litigation counsel shall sign on each day they view Source Code a log that will include the names of persons who enter the Source Code Review Room to view the Source Code and when they enter and depart.  The log shall be kept by the supplier.

(vii)   No person other than the supplier may alter, dismantle, disassemble, or modify the stand-alone secure computer in any way, or attempt to circumvent any security feature of the computer.

(viii)  No copies shall be made of Source Code, whether physical, electronic, or otherwise, other than volatile copies necessarily made in the normal course of accessing the Source Code on the stand-alone secure computer, except for:  (1)  print outs of portions of the Source Code that are reasonably necessary for the preparation of filings, pleadings, expert reports, or other papers, or for deposition or hearing; and (2) such other uses to which the parties may agree or that the ALJ or the Commission may order.  The Receiving Party shall not request paper copies for the purposes of reviewing the source code in the first instance and shall not use any outside electronic device to copy, record, photograph, or

- 8 -

Exhibit 14

otherwise reproduce Source Code.  Any printed portion of Source Code that consists of more than fifteen (15) pages of a continuous block of Source Code or more than two hundred (200) pages total shall be presumed to be excessive, and the burden shall be on the Receiving Party to demonstrate the need for such a printed copy.  Further, more than two hundred (200) pages of CAD printouts shall be presumed to be excessive, and the burden shall be on the Receiving Party to demonstrate the need for such a printed copy.  The supplier shall not unreasonably withhold approval and the parties shall meet and confer in good faith to resolve any disputes.

(ix)    The Receiving Party may take notes, but may not copy the Source Code into the notes and may not take notes on a laptop or other personal electronic device.  For clarity, the Receiving Party may include the names of source code files, variables, and functions within their notes, as reasonably necessary for notetaking purposes.  Any such notes must be treated as HIGHLY CONFIDENTIAL SOURCE CODE – ATTORNEYS' EYES ONLY under the Protective Order.   Unless otherwise agreed in advance by the Parties in writing, following each day on which inspection is done under this Order, the Receiving Party's outside counsel and/or experts shall remove all notes, documents, and all other materials from the Source Code Review Room. The supplier is not responsible for any items left in the room following each inspection session. But all counsel remain bound by their ethical duties regarding the handling and possible return of

Exhibit 14

work product inadvertently left behind by a representative of an opposing

Party.

(x)     The supplier may exercise personal supervision from outside the review

room over the Receiving Party when the Receiving Party is in the Source

Code Review Room.  Such supervision, however, shall not entail review

of any work product generated by the Receiving Party, *e.g.,* monitoring

the screen of the stand-alone secure computer, monitoring any surface

reflecting any notes or work product of the Receiving Party, or monitoring

the key strokes of the Receiving Party.  There will be no video supervision

by any supplier when the review occurs in the office of outside litigation

counsel.

(xi)    Nothing may be removed from the stand-alone secure computer(s), either

by the Receiving Party or at the request of the Receiving Party, except for

(1) print outs of reasonable portions of the Source Code in accordance

with the provisions of paragraphs 18(C)(ix)-(x) of this Protective Order;

and (2) such other uses to which the parties may agree or that the ALJ or

the Commission may order.

(xii)   At the request of the Receiving Party, the supplier shall within three (3)

business days provide two (2) hard copy print outs of the specific lines,

pages, or files of the Source Code that the Receiving Party believes in

good faith are necessary to understand a relevant feature of an accused

product.  The Receiving Party may identify those lines, pages, or files by

printing them to a temporary file on the computer, such as in PDF format.

- 10 -

Exhibit 14

If the supplier objects in any manner to the production of the requested source code (*e.g.,* the request is too voluminous), it shall state its objection within the allotted two (2) business days pursuant to this paragraph.  In the event of a dispute, the parties will meet and confer within five (5) business days of the objection being raised and if they cannot resolve the objection, the parties will raise it with the ALJ.  The burden shall be on the Receiving Party to demonstrate that any such printed portions of Source Code are no more than is reasonably necessary for a permitted purpose and not merely printed for the purposes of review and analysis elsewhere.

(xiii)   Hard copy print outs of Source Code shall be provided on Bates numbered and watermarked or colored paper clearly labeled HIGHLY CONFIDENTIAL SOURCE CODE – ATTORNEYS' EYES ONLY on each page and shall be maintained by the Receiving Party's outside litigation counsel or SOURCE CODE QUALIFIED PERSONS in a secure locked area.  For avoidance of doubt, an access-restricted location within the facilities of outside litigation counsel or a qualified expert, such as a conference room within an access restricted office or a locked drawer or cabinet, shall constitute a secured locked area.  The Receiving Party may also temporarily keep the print outs at: (1) the Commission for any proceeding(s) relating to the Source Code, for the dates associated with the proceeding(s); (2) the sites where any deposition(s) relating to the Source Code are taken, for the dates associated with the deposition(s); and (3) any intermediate location reasonably necessary to transport the print outs (*e.g.,*

Exhibit 14

a hotel prior to a Commission proceeding or deposition).  The Receiving Party shall exercise due care in maintaining the security of the print outs at these temporary locations.  No further hard copies of such Source Code shall be made and the Source Code shall not be transferred into any electronic format or onto any electronic media except that:

1.     The Receiving Party is permitted to request that the supplier make additional hard copies of printed Source Code designated as HIGHLY CONFIDENTIAL SOURCE CODE – ATTORNEYS' EYES ONLY for use at a deposition.  Copies of Source Code designated as HIGHLY CONFIDENTIAL SOURCE CODE – ATTORNEYS' EYES ONLY that are marked as deposition exhibits shall not be provided to the Court Reporter or attached to deposition transcripts; rather, the deposition record will identify the exhibit by its production numbers.  All such copies shall remain with the supplier's outside counsel for secure destruction in a timely manner following the deposition.

2.     The Receiving Party is permitted to make up to five (5) additional hard copies for the Commission or the ALJ in connection with a filing, hearing, or trial, and of only the specific pages directly relevant to and necessary for deciding the issue for which the portions of the Source Code are being filed or offered.

3.     Except as provided in this sub-paragraph, absent express written permission from the supplier, the Receiving Party may not create

- 12 -

Exhibit 14

electronic images, or any other images, or make electronic copies, of the Source Code from any paper copy of Source Code for use in any manner (including by way of example only, the Receiving Party may not scan the Source Code to a PDF or photograph the code). Images or copies of Source Code shall not be included in correspondence between the Parties (references to production numbers shall be used instead), and shall be omitted from pleadings and other papers whenever possible.  If a Party reasonably believes that it needs to reference a portion of Source Code as part of a filing, or as part of an expert report, contention, or discovery response, the Party shall cite the page and line numbers of the relevant Source Code and such Source Code will not be filed or otherwise attached absent agreement from the supplier or order of the ALJ or Commission.  If a supplier agrees to produce an electronic copy of all or any portion of its Source Code or provides written permission to the Receiving Party that an electronic or any other copy may be made for a filing, expert report, contention, or discovery response, access to the Receiving Party's submission, communication, and/or disclosure of electronic files or other materials containing any portion of Source Code (paper or electronic) shall at all times be limited solely to individuals who are expressly authorized to view Source Code under the provisions of this Order.  Where the supplier has

- 13 -

Exhibit 14

provided the express written permission required under this provision for a Receiving Party to create electronic copies of Source Code, the Receiving Party shall maintain a log of all such electronic copies of any portion of Source Code in its possession or in the possession of its retained consultants, including the names of the reviewers and/or recipients of any such electronic copies, and the locations and manner in which the electronic copies are stored. Any such electronic copies must be labeled "HIGHLY CONFIDENTIAL – SOURCE CODE" as provided for in this Order.

4.     The supplier shall, on request, make a searchable electronic copy of the Source Code available on a stand-alone secure computer during depositions of witnesses who would otherwise be permitted access to such Source Code.  The Receiving Party shall make such request at the time of the notice for deposition.

(xiv)   Nothing in this Protective Order shall be construed to limit how a supplier may maintain the supplier's own material designated as HIGHLY CONFIDENTIAL SOURCE CODE – ATTORNEYS' EYES ONLY.

(xv)   Outside litigation counsel for the Receiving Party with custody of HIGHLY CONFIDENTIAL SOURCE CODE – ATTORNEYS' EYES ONLY  shall maintain a source code log containing the following information: (1) the identity of each person granted access to the HIGHLY CONFIDENTIAL SOURCE CODE – ATTORNEYS' EYES ONLY; and

- 14 -

Exhibit 14

(2) the first date on which such access was granted.  Outside litigation counsel for the Receiving Party will produce, upon request, each such source code log to the supplier within twenty (20) days of the final determination of the investigation.

(xvi)   A Receiving Party may not cause a supplier's Source code to leave the United States absent written agreement.

**19.**   **Prosecution and Development Bar.**

A.   "Relevant Technology" means technology related to wearable non-invasive monitoring of pulse oximetry, total hemoglobin, oxygen content, carboxyhemoglobin, and/or methemoglobin.

B.   Unless otherwise permitted in writing between Supplying Party and Receiving Party, any individual who personally receives, other than on behalf of the Supplying Party, any material showing or describing the technical functionality of the Supplying Party's products designated as CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER or HIGHLY CONFIDENTIAL SOURCE CODE – ATTORNEYS' EYES ONLY under this Protective Order shall not prepare, prosecute, supervise, advise, counsel, or assist in the preparation or prosecution of any patent application seeking a patent on behalf of the Receiving Party or its acquirer, successor, or predecessor in the Relevant Technology during the pendency of this Investigation and for two years after final termination of this Investigation  or, alternatively, for two years after the time the individual person(s) formally withdraws from the Administrative Protective Order.  In addition, any such person is prohibited from having any

- 15 -

Exhibit 14

involvement in the prosecution of any patent, patent application or re-examination

in the Relevant Technology that was filed, or that claims priority from any

application that was filed, for up to one year following the final termination of

this Investigation (including any appeals).  To avoid any doubt, "prosecution" as

used in this paragraph does not include representing or advising a Party before a

domestic or foreign agency in connection with a reissue, ex parte reexamination,

*inter partes* review, opposition, cancelation, or similar proceeding; though in

connection with any such agency proceeding involving the patents-in-suit,

Outside Counsel of Record for a Receiving Party shall not: (i) participate in the

preparation, prosecution, supervision, advice, counsel, or assistance of any

amended claims; (ii) reveal a supplier's CONFIDENTIAL BUSINESS

INFORMATION SUBJECT TO PROTECTIVE ORDER or HIGHLY

CONFIDENTIAL SOURCE CODE – ATTORNEYS' EYES ONLY material to

any prosecuting reexamination counsel or agent; or (iii) use a supplier's

CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE

ORDER or HIGHLY CONFIDENTIAL SOURCE CODE – ATTORNEYS'

EYES ONLY for any purpose prohibited by this Protective Order Addendum.

The applicability of this provision is to be determined on an individual-by-

individual basis such that an individual attorney who has not received

CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE

ORDER or HIGHLY CONFIDENTIAL SOURCE CODE – ATTORNEYS'

EYES ONLY is not restricted from undertaking any activities by virtue of this

Exhibit 14

provision even if said individual attorney is employed by or works for the same firm or organization as an individual who has received such material.

C.   Unless otherwise permitted in writing between Supplying Party and Receiving Party, any Qualified Consultant or Qualified Expert or other SOURCE CODE QUALIFIED PERSON retained on behalf of Receiving Party who is to be given access to any material showing or describing the technical functionality of the Supplying Party's products designated as CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER or HIGHLY CONFIDENTIAL SOURCE CODE – ATTORNEYS' EYES ONLY produced by another Party must agree in writing not to be involved in creating, developing, or modifying, for commercial use (which, for the avoidance of doubt, does not include academic research which is not for industry), any Relevant Technology from the time of first receipt of such material designated as CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER or HIGHLY CONFIDENTIAL SOURCE CODE – ATTORNEYS' EYES ONLY through one year after the date the Qualified Expert or other SOURCE CODE QUALIFIED PERSON formally withdraws from the Protective Order.  For avoidance of doubt, during periods in which the individual person(s) has ceased to have possession of such material or any documents or notes reflecting such material, this section shall not apply.

D.   Documents produced by a Supplying Party depicting tear downs of the Receiving Party's publicly-available products and not containing other material that qualifies as the Supplying Party's Confidential Business Information shall not be

- 17 -

Exhibit 14

designated as CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER.  For the avoidance of doubt, review of documents depicting tear downs of a Receiving Party's publicly-available products and not containing other material that qualifies as the Supplying Party's Confidential Business Information produced by the Supplying Party shall not trigger the above-outlined Prosecution and Development Bar for any expert or other representative of the Receiving Party.  For example, review of Complainants' infringement contentions by Apple's experts shall not alone trigger the above-outlined Prosecution and Development Bar for those experts.  However, review of a teardown of a product that the Receiving Party cannot publicly obtain shall trigger the above-outlined Prosecution and Development Bar for the Receiving Party's experts.  For example, review of tear-downs of a Masimo domestic industry article for the '501, '502, '648, and/or '745 patent, such as within Complainants' technical domestic industry contentions, by Apple's experts shall trigger the above-outlined Prosecution and Development Bar for those experts unless the tear-downs are of a unit that Apple publicly obtained. Unless otherwise permitted in writing, documents depicting tear downs of any non-public products shall be designated and treated as CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER and review of such documents shall trigger the above-outlined Prosecution and Development Bar.

**SO ORDERED.**

Monica Bhattacharyya
Administrative Law Judge

- 18 -

Exhibit 14

**EXHIBIT A**

**CERTIFICATION OF EXPERT/CONSULTANT REGARDING PROTECTIVE ORDER**

I,_____[print or type full name], of

_____am not an employee of the Party who retained me or of a

competitor of any Party and will not use any information, documents, or things that are subject to

the Protective Order entered ____August 18, 2021____, for any purpose other than this litigation.

I agree not to be involved in creating, developing, or modifying, for commercial use

(which, for the avoidance of doubt, does not include academic research which is not for

industry), any technology designed for performing wearable non-invasive monitoring of pulse

oximetry, total hemoglobin, oxygen content, carboxyhemoglobin,  and/or methemoglobin, from

the time of receipt of material designated as CONFIDENTIAL BUSINESS INFORMATION

SUBJECT TO PROTECTIVE ORDER or HIGHLY CONFIDENTIAL SOURCE CODE –

ATTORNEYS' EYES ONLY of any Party other than the Party who retained me, through the

date that I cease to have access to any such designated material.  For avoidance of doubt, during

periods in which I have ceased to have possession of such material or any documents or notes

reflecting such material, this paragraph shall not apply.

I state under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Executed On_____.

_____

[Printed Name]

_____

[Signature]

Exhibit 14

Certain Light-Based Physiological Measurement Devices and Components Thereof; Inv.   337-1276 Violation
No. 337-TA-1276 (Violation)

## CERTIFICATE OF SERVICE

I, Lisa R. Barton, hereby certify that the attached document has been served via EDIS upon the Commission OUII Investigative Attorney and the following parties as indicated, upon the date listed below.

| Document | Security | Document Type | Official Rec'd Date | Title |
|----------|----------|---------------|---------------------|-------|
| 760100 | Public | Order | 01/10/2022 12:21 PM | Granting Joint Motion to Amend the Protective Order to Add Provisions regarding Production and Review of Source Code |

Service Date:        January 10, 2022

/s/
_____
Lisa R. Barton
U.S. International Trade Commission
500 E Street, S.W.
Suite 112
Washington, D.C. 20436

Exhibit 14

Certain Light-Based Physiological Measurement Devices and Components Thereof; Inv.   337-1276 Violation
No. 337-TA-1276 (Violation)

## CERTIFICATE OF SERVICE

**On behalf of Complainant Cercacor Laboratories,
Inc.;Masimo Corporation:**

Joseph R. Re

**Knobbe, Martens, Olson & Bear**

2040 Main St.

14th Floor

Irvine, California 92614, United States

Electronic Service

**On behalf of Respondent Apple Inc.:**

Sarah  Frazier

**Wilmer Cutler Pickering Hale and Dorr LLP**

1875 Pennsylvania Avenue, NW

Washington, District of Columbia 20006, United States

Electronic Service

Service Date:        January 10, 2022                    PDF Generated on:       January 10, 2022

Exhibit 14

# EXHIBIT 15

UNITED STATES INTERNATIONAL TRADE COMMISSION

Washington, D.C.

| In the Matter of | |
|---|---|
| CERTAIN LIGHT-BASED PHYSIOLOGICAL MEASUREMENT DEVICES AND COMPONENTS THEREOF | Inv. No.  337-TA-1276 |

ORDER NO. 6:        SETTING PROCEDURAL SCHEDULE

(October 14, 2021)

Pursuant to Order No. 5 (Sept. 22, 2021), the parties submitted a proposed procedural

schedule.  The proposed dates are hereby adopted with additional deadlines for expert reports on

claim construction (if necessary) and modifications to the deadlines for submitting proposed

exhibits and filing post-hearing briefs.  The investigation shall proceed in accordance with the

deadlines set forth below:

| Event | Date |
|---|---|
| File identification of expert witnesses, including their expertise and curriculum vitae | Wednesday, November 10, 2021 |
| Exchange list of claim terms to be construed | Friday, November 12, 2021 |
| Exchange of proposed claim constructions | Wednesday, November 24, 2021 |
| Initial deadline for responses to contention interrogatories on issues for which the responding party bears the burden of proof | Friday, December 3, 2021 |
| Initial deadline for responses to contention interrogatories on issues for which the responding party does not bear the burden of proof | Wednesday, December 22, 2021 |
| Meet and confer to discuss and limit number of disputed terms | Wednesday, January 5, 2022 |
| File joint proposed claim construction chart | Thursday, January 13, 2022 |
| Exchange of initial expert reports (if any) on claim construction issues | Tuesday, January 18, 2022 |

Exhibit 15

| Exchange of rebuttal expert reports (if any) on claim construction issues | Tuesday, January 25, 2022 |
|---|---|
| Initial *Markman* briefs | Thursday, January 27, 2022 |
| Rebuttal *Markman* briefs | Thursday, February 10, 2022 |
| Cut-off date for supplements to contention interrogatories on issues for which the responding party bears the burden of proof | Friday, February 11, 2022 |
| File notice of prior art | Tuesday, February 15, 2022 |
| **Joint Tutorial and Markman hearing** | **Thursday, February 17, 2022** |
| Cut-off date for supplements to contention interrogatories on issues for which the responding party does not bear the burden of proof | Friday, February 18, 2022 |
| Submission of updated joint proposed claim construction chart | Wednesday, February 23, 2022 |
| Fact discovery cutoff and completion | Wednesday, February 23, 2022 |
| Deadline for motions to compel discovery | Friday, March 4, 2022 |
| Exchange of initial expert reports (identify tests/surveys/data) | Friday, March 4, 2022 |
| File tentative lists of witnesses a party will call to testify at the hearing, with an identification of each witness' relationship to the party | Friday, March 18, 2022 |
| Exchange of rebuttal expert reports | Tuesday, March 22, 2022 |
| Expert discovery cutoff and completion | Tuesday, April 5, 2022 |
| Deadline for motions to compel expert discovery | Thursday, April 7, 2022 |
| Deadline for filing motions for summary determination | Thursday, April 7, 2022 |
| Attendance at one-day mediation session | No later than April 21, 2022 |
| Exchange of exhibit lists among the parties | Friday, April 22, 2022 |
| Exchange proposed direct exhibits, with physical exhibits available | Thursday, April 28, 2022 |
| Submission of joint report on mediation | No later than May 1, 2022 |
| Exchange proposed rebuttal exhibits, with rebuttal physical exhibits available | Thursday, May 5, 2022 |
| File pre-hearing statements and briefs | Friday, May 13, 2022 |

Exhibit 15

| File requests for receipt of evidence without a sponsoring witness | Friday, May 13, 2022 |
|---|---|
| Deadline to file motions in *limine* | Tuesday, May 17, 2022 |
| File high priority objections statements | Tuesday, May 17, 2022 |
| Submit proposed exhibits to the Administrative Law Judge | Monday, May 23, 2022 |
| File responses to requests for receipt of evidence without a sponsoring witness | Tuesday, May 24, 2022 |
| File responses to motions in *limine* | Tuesday, May 24, 2022 |
| File responses to high priority objection statements | Tuesday, May 24, 2022 |
| **Pre-hearing conference** | **Friday, June 3, 2022** |
| **Hearing** | **Week of June 6-10, 2022** |
| File initial post-trial briefs and final exhibit lists | Monday, June 27, 2022 |
| File reply post-trial briefs | Monday, July 11, 2022 |
| Initial determination due | Friday, September 16, 2022 |
| Target date for completion of investigation | Monday, January 16, 2023 |

**SO ORDERED.**

Monica Bhattacharyya
Administrative Law Judge

- 3 -

Exhibit 15

Certain Light-Based Physiological Measurement Devices and Components Thereof; Inv.   337-1276 Violation
No. 337-TA-1276 (Violation)

## CERTIFICATE OF SERVICE

I, Lisa R. Barton, hereby certify that the attached document has been served via EDIS upon the Commission OUII Investigative Attorney and the following parties as indicated, upon the date listed below.

| Document | Security | Document Type | Official Rec'd Date | Title |
|---|---|---|---|---|
| 754138 | Public | Order | 10/14/2021 09:12 AM | Setting Procedural Schedule |

Service Date:          October 14, 2021

_____

/s/

Lisa R. Barton

U.S. International Trade Commission

500 E Street, S.W.

Suite 112

Washington, D.C. 20436

Exhibit 15

Certain Light-Based Physiological Measurement Devices and Components Thereof; Inv.    337-1276 Violation
No. 337-TA-1276 (Violation)

## CERTIFICATE OF SERVICE

**On behalf of Complainant Cercacor Laboratories,
Inc.;Masimo Corporation:**

Joseph R. Re

**Knobbe, Martens, Olson & Bear**

2040 Main St.

14th Floor

Irvine, California 92614, United States

Electronic Service

**On behalf of Respondent Apple Inc.:**

Sarah  Frazier

**Wilmer Cutler Pickering Hale and Dorr LLP**

1875 Pennsylvania Avenue, NW

Washington, District of Columbia 20006, United States

Electronic Service

| | | | |
|---|---|---|---|
| Service Date: | October 14, 2021 | PDF Generated on: | October 14, 2021 |

Exhibit 15

# UNITED STATES INTERNATIONAL TRADE COMMISSION

Docket Services Division
500 E. Street SW
Washington, DC 20436

Selected Documents: [754138]

Creation Date: 10/14/2021 12:00 PM

| DOCUMENT ID | FILE NAME | INVESTIGATION | DOCUMENT TITLE | ATTACHMENT TITLE | DOCUMENT TYPE | FIRM/ORG | FILED BY | ON BEHALF OF | DOCUMENT DATE | OFFICIAL RECEIVED DATE | SECURITY |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 754138 | 754138-1711678.pdf | 337-1276 Violation | Setting Procedural Schedule | 1711678 | Order | USITC | Monica Bhattacharyya | Administrative Law Judge | 10/14/2021 12:00 AM | 10/14/2021 09:12 AM | Public |
| 754138 | 754138-1711702.pdf | 337-1276 Violation | Setting Procedural Schedule | Certificate of Service 10/14/2021 | Order | USITC | Monica Bhattacharyya | Administrative Law Judge | 10/14/2021 12:00 AM | 10/14/2021 09:12 AM | Public |

Exhibit 15

EXHIBIT 16

```
 1                    UNITED STATES DISTRICT COURT
                      CENTRAL DISTRICT OF CALIFORNIA
 2                    SOUTHERN DIVISION - SANTA ANA

 3

 4   MASIMO CORPORATION, et al. )  Case No. SACV 20-48-JVS (JDEx)
                                )
 5        Plaintiffs,           )  Santa Ana, California
                                )  Thursday, November 18, 2021
 6            v.                )  10:06 A.M. to 11:02 A.M.
                                )
 7   APPLE INC.,                )
                                )
 8        Defendant.            )
     _____)

 9

10

11

12                    TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE JOHN D. EARLY
13                UNITED STATES MAGISTRATE JUDGE

14

15

16   Appearances:              See Page 2

17   Deputy Clerk:             Maria Barr

18   Court Reporter:           Recorded; CourtSmart

19   Transcription Service:    JAMS Certified Transcription
                               16000 Ventura Boulevard #1010
20                             Encino, California  91436
                               (661) 609-4528
21

22

23

24
     Proceedings recorded by electronic sound recording;
25   transcript produced by transcription service.
```

Exhibit 16

```
 1   APPEARANCES:

 2

 3   For the Plaintiffs:        Knobbe Martens
                                By:  ADAM POWELL
 4                              3579 Valley Centre Drive
                                San Diego, California  92130
 5                              (858) 707-4000
                                adam.powell@knobbe.com
 6

 7
     For the Defendant:         Wilmer Cutler Pickering Hale & Dorr
 8                              LLP
                                By:  MARK D. SELWYN
 9                              2600 El Camino Real, Suite 400
                                Palo Alto, California  94306
10                              (650) 858-6031
                                mark.selwyn@wilmerhale.com
11
                                Gibson Dunn & Crutcher LLP
12                              By:  ILISSA S. SAMPLIN
                                333 South Grand Avenue
13                              Los Angeles, California  90071-3197
                                (213) 229-7000
14                              isamplin@gibsondunn.com

15

16

17

18

19

20

21

22

23

24

25
```

Exhibit 16

1   SANTA ANA, CALIFORNIA, THURSDAY, NOVEMBER 18, 2021, 10:06 A.M.

2           THE COURT:  All right.  We have two matters on

3   calendar for law and motion this morning.  We're going to

4   start with the *Masimo v. Apple* case.  The reason we're doing

5   that -- I'll call it in just a moment -- is I think your

6   matter will be quicker but two things: I've been wrong

7   before; and, second, I said, "quicker," not "quick."  So

8   everyone else just get comfortable, and we'll get started.

9           So we're calling *Masimo Corporation, et al. v.*

10  *Apple Inc.*, Case No. 8:20-CV-48-JVS-JDE, and we will take

11  appearances from -- I believe everyone is here in person --

12  starting with counsel for plaintiff.

13          ADAM POWELL:  Thank you, Your Honor.  I forget.

14  Would you like me top stand at the podium?

15          THE COURT:  You can -- because we're staying

16  distant, you can stay seated, but make sure everyone keeps

17  the microphone close enough so that I can hear you.

18          MR. POWELL:  Thank you, Your Honor.  This is

19  Adam Powell for Plaintiffs Masimo Corporation and Cercacor

20  Laboratories, Inc.  With me is my partner Sheila Swaroop.

21          THE COURT:  And my understanding -- Mr. -- or,

22  Ms. Swaroop has not made an appearance on the docket yet?

23          MR. POWELL:  I believe that's correct, Your Honor.

24          THE COURT:  Okay.

25          MR. POWELL:  Ms. Swaroop is ITC counsel.

Exhibit 16

```
 1              THE COURT:  Okay.  Is she planning on offering
 2  argument this morning?
 3              MR. POWELL:  Not unless there are any questions
 4  about the ITC specifically.
 5              THE COURT:  All right.  Thank you.
 6              And on behalf of Apple?
 7              MARK D. SELWYN:  Good morning, Your Honor.  For
 8  Apple, Mark Selwyn, Ilissa Samplin, and with us from in-house
 9  at Apple is Natalie Pous, senior litigation counsel.
10              THE COURT:  All right.  Good morning, counsel.  And
11  it's Ms. "Post"?
12              MR. SELWYN:  Pous, P-o-u-s.
13              THE COURT:  Oh, okay.  Good morning.
14              All right.  We are here for a motion to modify --
15  plaintiffs' motion to modify the protective order.  I'll tell
16  you what I've looked at, and we'll first start if there's
17  anything I've missed, and then I'll ask whether there's
18  anything I should be aware of before we jump into it.
19              What I have reviewed and considered is Docket
20  No. 505; 506; 507, which is the notice of motion, the motion,
21  the memorandum in support of the motion, and a declaration
22  with one -- it says one exhibit but multiple exhibits that
23  just have one docket entry.  Then I have reviewed Docket
24  No. 511; and 512, which is a memorandum in opposition and a
25  declaration of counsel with -- and a series of at least one
```

Exhibit 16

 1  exhibit; and a reply, Docket 513, with another declaration

 2  from Mr. Powell.

 3          So, Mr. Powell, is there anything that I should

 4  have reviewed that I didn't just read?

 5          MR. POWELL:  No, Your Honor, not from my

 6  perspective.

 7          THE COURT:  And Mr. Selwyn?

 8          MR. SELWYN:  No, Your Honor.  That's the complete

 9  set of papers.

10          THE COURT:  All right.

11          Mr. Powell, is there anything factually or any new

12  legal developments that I should be aware of before we jump

13  into things, from your perspective?  Just a "yes" or "no" to

14  start.

15          MR. POWELL:  Nothing major, Your Honor.  A couple

16  small things.

17          THE COURT:  All right.

18          Mr. Selwyn, anything --

19          MR. SELWYN:  No.  I don't believe so.

20          THE COURT:  All right.

21          Mr. Powell, what are the small things that I should

22  be aware of that have changed since the reply briefing on

23  November 4th?

24          MR. POWELL:  Is just an update, Your Honor -- is

25  last night counsel for Apple suggested that -- or requested

Exhibit 16

1  that we copy ITC counsel on all discovery correspondence in

2  this case moving forward.

3            MR. SELWYN:  Your Honor, one clarification.

4            THE COURT:  Okay.  Give me one -- just give me one

5  second.

6            All right.  Mr. Selwyn, your clarification?

7            MR. SELWYN:  The clarification is I am counsel in

8  both cases.  I asked to be served with copies of the papers

9  that they were sending to the special master.  I didn't think

10 it was anything of particular significance, but I wanted to

11 clarify that.

12           THE COURT:  All right.  So I'm actually going to --

13 I'm not going to give you a tentative.  I have a tentative in

14 my head, but I wanted to talk to you about some thoughts

15 because I know I probably am living in a fantasy world

16 because I've asked before to see if you folks can informally

17 resolve things, and it usually doesn't end -- well, I should

18 say that.  Sometimes it does end well.  But I think you folks

19 should be able to come to a reasonable accommodation on the

20 issues that are raised in the motion, and you've each taken,

21 as good lawyers do, strong positions on *Foltz* and on what the

22 Ninth Circuit said and how district courts have interpreted

23 motions to modify protective orders.

24           And you're all correct and incorrect insofar as

25 each of you argue, and I guess what I'll say is I could

Exhibit 16

1    cherry-pick lines from each of your briefing that I think

2    overstate your respective positions.  On the one hand,

3    plaintiffs have, at least by negative implication, suggested

4    that if there's any overlap in the issues or the discovery at

5    issue between the two cases that that's sufficient relevance

6    or connectivity requirement under the first prong for

7    modifying a protective order to collateral proceedings, and I

8    don't believe that's a fair statement of law, and I'm sure

9    plaintiff would tell me, "Well, there's more nuance to what

10   we're saying, and we're not actually saying it," and that's

11   fine.

12           And from the defense's standpoint, the suggestion

13   that there -- or implication that there needs to be complete

14   or near-complete overlap between the issues and discovery in

15   the two cases, and you're going to tell me, "Well, that's not

16   quite our position," but I could cherry-pick things from your

17   briefing that suggest that maybe that's what your saying

18   isn't really -- it's somewhere in the middle, like everything

19   else.

20           Mr. Selwyn, I don't recall how many of the hearings

21   you've been at.  I know Ms. Samplin has been in some lengthy

22   hearings that we have here, and I know Mr. Powell has.

23   Everything is a balancing.  All the -- everything I make is a

24   balancing, and this is a balancing, keeping in mind, the

25   Ninth Circuit has said they strongly favor, for various good

Exhibit 16

1   policy reasons, sharing information, making discovery

2   available in collateral proceedings.  It's not automatic, and

3   I still need to look at the unique facts of the case, and

4   here's what our tell you:

5           There are some very unique facts here.  One of them

6   -- and maybe the most -- well, I'm not going to characterize

7   it, but one of the unique and important facts is the

8   protective order here.  It was heavily litigated as to many,

9   many, many issues.  There was no litigation -- the parties

10  agreed and it was stipulated that it was to contain a

11  provision that it was any documents designated under the

12  protective order were only to be used in the context of this

13  litigation, and that's what this motion is to amend or

14  change, but that was submitted as a stipulation and

15  agreement.

16          But there were scores of other provisions that,

17  frankly, were, at least to me, unique in terms of the

18  hundreds of protective orders that I look -- have looked at

19  over the years and were the subject of substantial briefing

20  and, frankly, compromise, in some respects, by the parties

21  and then the Court picking and choosing and sometimes

22  charting a middle course on things like access to in-house

23  counsel -- who those in-house counsel could be, how many

24  there could be.  Vendors -- which vendors could be used,

25  whether they needed to be preapproved before vendors could be

Exhibit 16

1    shown various levels of information.

2          Outside counsel -- we had disputes and litigation

3    over what outside counsel could be -- have access to the

4    information.  The prosecution bar was something that you

5    folks had disagreements on.  And a great deal of, I'll say,

6    getting into the minutiae of the handling of source code --

7    confidential source code -- who could look at it, how it

8    could be viewed, how many lines of it could be printed.  I

9    think -- how many pages?  I actually printed -- it was

10   something like 27 pages was our protective order.  So this is

11   a unique protective order.

12          And the second factor in *Foltz* and in the other

13   cases -- the reliance by the designating party here --

14   because they're opposing it -- Apple -- I just want to say

15   that because of the very specific, heavily litigated, and

16   otherwise carefully crafted terms of this protective order --

17   and the reason why it was so heavily litigated is -- and it's

18   in the record -- Apple's view, at least -- and I think to

19   some extent it's shared by Masimo -- is that the technology

20   underlying the trade secret claims is highly, highly, highly

21   sensitive, proprietary.  I don't know how you would put a

22   value on it, but it's been represented to me that various

23   aspects of the discovery in this case is of great financial

24   import and there would be severe consequences were it to --

25   through advertence or inadvertence -- be disclosed.

Exhibit 16

1          And in light of that, I've also had conversations

2    with counsel about how I view protective orders, and I don't

3    know if anybody is going to look over to the marshals' door

4    with the big lock, but that's where -- what I tell people is

5    the logical end point of someone's failure to comply with a

6    protective order, as with any order, is a potential contempt

7    and the logical end point of a potential contempt -- it's not

8    the starting point, but it's a potential end point -- is

9    being taken out from the courtroom through that door with the

10   big heavy lock by marshals.  And so I've told counsel that in

11   this case -- I've referenced it in other cases -- I take this

12   protective order and any order of the court very seriously

13   and expect counsel to abide by it.

14          And so that is a very long way of letting you know,

15   unlike in *Foltz*, where the protective order is attached as an

16   appendix to the opinion and it's about three-pages long and

17   is almost, for lack of a better term, pro forma, this is a

18   very detailed, very comprehensive protective order that I do

19   believe Apple relied on.  It's been called a "blanket"

20   protective order, and as that term is used, there's one sense

21   in which it was blanket, and that's done for everybody's

22   interest because, if you folks were going to be coming to me

23   for every document in this case that someone said was

24   confidential, let's just say you wouldn't be coming to me;

25   you'd be going to Judge Guilford and an army of other special

Exhibit 16

1    masters.  So this case needs it, this case is unique, and

2    this protective order is unique, and reliance on it, I

3    believe, is real regardless of whether it's categorized as a

4    "blanket" protective order or not.  That element of the *Foltz*

5    balancing is one that I'm taking very seriously.

6          The other aspect of *Foltz* -- and it's important to

7    remember, in *Foltz* -- God bless whoever the district judge

8    was who entered the order -- I've never seen one in all my

9    years of practice -- the protective order in *Foltz* was an

10   order -- a case was settled, and the judge entered the

11   confidentiality protective order that allowed either party to

12   designate documents as confidential without judicial review

13   and then ordered those documents that were in the court files

14   sealed and ordered the parties -- both parties not to

15   disclose those documents to anyone outside of the contours of

16   the protective order.

17          So the protective order in *Foltz* was not like our

18   standard protective order and not like the protective order

19   in this case.  It covered both sides.  So the third parties

20   -- the intervenors in *Foltz* -- were folks who hadn't seen the

21   documents that were subject to the protective order, and they

22   were trying to get them from -- was it Allstate? -- trying to

23   get them from Allstate for a similar case because they

24   couldn't get them from plaintiff, because Allstate had

25   designated them confidential, but Allstate refused to give

Exhibit 16

 1   them to them because they -- Allstate argued, "The judge in

 2   this other case told us we can't release them.  They're

 3   subject to a protective order."  Even though they're

 4   Allstate's own documents, right.  So bear that in mind.  That

 5   was the state of play in *Foltz*.

 6          Now, that's not to say that anything in *Foltz* that

 7   changes the outcome or that other subsequent cases that have

 8   interpreted *Foltz* make that a distinction that changes the

 9   Ninth Circuit general rule that we're to liberally share

10   collateral discovery, but it's just important to note that

11   that was what the Ninth Circuit was ruling on, and that's not

12   our situation here.

13          Here, plaintiff can get this -- these records --

14   first of all, plaintiff knows what the records are, right,

15   what's -- it's not a situation like in *Foltz* where the

16   intervenor didn't know what the records were, hadn't seen

17   them; and, secondly, it's a situation where plaintiff can get

18   the records from Apple.  They know what they are.  They can

19   get them.  It's just a matter of are we wasting everyone's

20   time, money, and effort by saying, "Well, you have to ask for

21   them in the ITC matter," or can we just lift the veil of the

22   protective order and make everything that Apple produced in

23   this case usable in that other case?

24          The last thing I want to -- just general topic I

25   want to talk about is all of the cases -- *Foltz* and all of

Exhibit 16

1    the cases, in discussing the first element, the relevance,

2    the test isn't the general connectivity, relevance connection

3    between the issues in the cases or the discovery in the cases

4    alone.  What *Foltz* talks about and what the other district

5    court cases relying on *Foltz* talk about is the connection

6    between the documents that are subject to the protective

7    order that are being sought, and the language that is

8    repeatedly used is -- and this is from *Foltz* at 1132 -- the

9    party seeking to amend the protective order in that case --

10   must demonstrate the relevance of the "protected discovery"

11   to the collateral proceedings.  And I could go on.  That

12   phrase is used over and over again in *Foltz* and over and over

13   again in the district cases.  So what we're looking at is the

14   connection to the "protected discovery."

15           In this case, plaintiff is free to use anything

16   Apple has produced that's not subject to the protective

17   order.  The only thing we're talking about are documents that

18   are subject to the protective order, and here's where, in my

19   view -- I've told you my views about the second prong -- the

20   motion is -- I don't want to say "weak" or "lacking," but

21   it's a little weak and a little lacking in pointing to me

22   what is the "protected discovery" that Apple thinks is

23   relevant to the ITC proceeding?

24           And I -- based on the record that's in front of me

25   -- there's nothing in the motion -- there's a lot of cross --

Exhibit 16

1   there's a lot of reference to "Well, here's the crossover of

2   issues" -- I shouldn't say "a lot."  There's some references

3   "Here's the crossover of issues," and then some relevance and

4   some references to "Here's some discovery that we sought in

5   this case, and here's some discovery that's being sought in

6   the ITC case," but I don't see anything that tells me what is

7   the confidential or "attorneys' eyes only" or source code

8   that's being sought to be introduced or used in the ITC case?

9   and that's the relevant inquiry.  That's what *Foltz* says, and

10  that's what these other cases say.  It's what is the

11  relevance of the protected discovery"

12          And so I'll let counsel be heard on all this, but

13  this is not a case that it's just going to be a knee-jerk

14  "Yes, we're going to share it," because here's some of the

15  things I don't know: I don't know how much protected

16  discovery there's been.  Is it in -- if it's in the record,

17  I'll ask you to point me to it.  How many documents have been

18  produced that were designated confidential or "attorneys'

19  eyes only"?  How much source code?  And then -- I don't know

20  that.  How much is it as a percentage of the overall

21  production?  I think -- tell me if I'm wrong -- that

22  somewhere in the record Apple told me that they've produced

23  50,000 pages of records or something along those lines.

24  Frankly, it seemed low.  I would have thought it was much

25  higher.

Exhibit 16

1          But be that as it may, tell me: What do I have that
2    tells me the protected discovery -- what's the overreach?
3    How is that going to be used in the ITC case?  Again, what
4    Apple's telling -- or, what -- yeah -- what Apple's telling
5    me is "It's just a patent case, and this confidential
6    information isn't really going to be a part of that case."
7    Maybe they're right, and maybe they're wrong, but what do I
8    have to assess that one way or another?

9          So on both the relevance and on the prejudice,
10   reliance issues, this is not *Foltz,* and it's not a lot of the
11   other cases that we're looking at.

12         And one thing I'll agree with plaintiffs is that --
13   obviously, we have the same parties here, right, and so to
14   the extent there's a concern that some third party that Apple
15   didn't foresee having access to the confidential information
16   isn't a part of this, but I don't know enough about ITC
17   proceedings, about whether some other intervenor can join.

18         I went through the materials and noted that it
19   looked like the -- a -- the secretary Lisa Barton sent
20   letters out to Dale Berkley at that National Institute of
21   Health; to Elizabeth Kraus, who is the deputy director for
22   International Antitrust in the Office of International
23   Affairs of the FTC; Dax Terrill, who's the chief exclusion
24   officer of the enforcement branch for the United States
25   Customs and Border Patrol; and Lynda Marshall, the

Exhibit 16

1    International Division of the Antitrust Division of the

2    Department of Justice all got notice of this case.  I don't

3    know -- they're all -- sounds like all government officials,

4    and maybe that doesn't -- shouldn't be something I would

5    factor in, but I don't know who is going to have access to

6    this.

7              I did look at the protective order that the ALJ in

8    the FTC case issued.  I'll say it is not coextensive with the

9    protective order in this case, and it does make reference to,

10   for instance, vendors, who presumably may have access

11   different than what's the access level permitted under the

12   current protective order; and then the protective order

13   expressly does not cover government technical experts or the

14   commission -- the ALJ, the commission staff, personnel of any

15   government agency.  Now, I'm a former prosecutor.  I know

16   that all of those folks are ethically bound, but it wasn't

17   something that was part of the negotiation or part of the

18   hearing we had here that -- when Apple was subject to the

19   protective order that these materials would be shared.

20             And again, one of the lines in *Foltz* and in some

21   other cases is this ready promotion of sharing information

22   should be done -- or is properly done when it can be subject

23   to -- and in some cases say -- the "same level of protection"

24   in the other case.  Well, I can't order an ALJ to follow my

25   protective order or other vendors who get access to it.  So

Exhibit 16

1    there are differences here.

2          And it's not to say that the *Foltz* rule doesn't

3    apply to collateral litigation involving the ITC.  It does --

4    or it can, but what I'm saying here is this is a unique

5    protective order, this is a unique case, and my thought is --

6    with all those thoughts -- we'll certainly hear about it --

7    maybe this is something that plaintiff can simply -- and I

8    know the proposal from Apple was "Well, we'll designate our

9    own documents that we want to use, and you designate your own

10   documents that you want to use, and that should be good

11   enough."  Well, no, that's not good enough.  I think there's

12   -- we should try to work something out that's better, but it

13   seems to me I need more information, and I don't have it in

14   what's in front of me to make the relevant -- the first part

15   of the *Foltz* inquiry appropriate.

16         So why don't I start with this, Mr. Powell: Why

17   don't you tell me: Do you think there's any other approach

18   that we could take, or is it just going to be an all-or-

19   nothing ruling on me -- motion granted or motion denied?

20         MR. POWELL:  Your Honor, I don't think it has to be

21   all or nothing.  We're never -- that's never our position

22   that something has to be all or nothing, up or down.  I'm

23   happy to discuss and try to reach a resolution.

24         The issue is -- I think what you pointed out was

25   Apple's position has been that each party gets to pick what

Exhibit 16

18

1  it believes is relevant and -- or what it believes will be

2  relevant in the ITC case.  And I'll go to your point about

3  how we haven't explained what documents we think in this case

4  are --

5          THE COURT:  All right.  So before you get to that

6  --

7          MR. POWELL:  Okay.

8          THE COURT:  -- let me turn to Apple and say: Do you

9  think, on behalf of Apple, that this is just a motion I have

10  to rule -- I have to hit the nail or not hit the nail --

11  grant or deny -- or is there is something, maybe, that either

12  the parties can come to a resolution that serves their

13  interests -- for instance, if you're concerned about turning

14  over everything, if that's -- if the motion is granted,

15  that's what the proposed order says -- and by "turning over

16  everything," it doesn't' mean turn over everything.  They

17  already have it.  It's just be able to use it without

18  restriction other than the protective order in that case --

19  or it is something that the parties can, maybe, work out?

20  What do you think?

21          MR. SELWYN:  Apple is not trying to keep relevant

22  documents and information from the ITC.  And to answer one of

23  your questions, we have in fact already produced 64,000 pages

24  that were first produced in this case in the ITC.  So we're

25  not trying to prevent relevant documents and information

Exhibit 16

1   being accessed in the ITC, and we ourselves have produced

2   them, but what we are trying to prevent is irrelevant

3   documents and irrelevant information from this case being

4   used in the ITC --

5           THE COURT:  All right.  So here's -- I appreciate

6   that.  Let's get -- let's hit that one right now.  I have no

7   control and make no ruling -- and I'm not going to make a

8   ruling -- on what's relevant in the ITC case.  The only thing

9   I can do here is either lift or carve out the -- portions of

10  the protective order or not.

11          But you've really hit on, I think, a critical,

12  critical issue.  I don't know what's relevant in the ITC,

13  right.  You do, and they do.  It seems to me you could go in

14  a room and at least say, "Here's what I'm talking about."

15  You don't have to go document by document, but "Here's the

16  types of documents that I think are relevant that you, Apple,

17  have designated as confidential."

18          And then you can say, "Okay.  I can see A, B, C,

19  but, boy, I disagree with D."  All right.

20          Then I get a much better sense of -- and then you

21  folks brief that -- and obviously it'll be under seal, but

22  you folks brief that, and I get a much better sense of where

23  things fall in the universe: What are we talking about?  Is

24  it a large overlap?  Is it a small overlap?  I'm not going to

25  rule on relevance in the ITC case, but then I get some sense

Exhibit 16

```
 1  of what we're talking about.  Right now I don't have that
 2  sense.  All right.
 3          So that's just me talking.  It sounds like it's
 4  something you would be willing to talk about.
 5          And I'll go back to you, Mr. Powell, but is there
 6  any sort of -- your discovery cutoff in the ITC case is
 7  February.  Your trial is June.  There's -- it's a patent
 8  case.  There aren't a lot of secrets, I would imagine, in
 9  terms of, at least, what the case is going to be.  There may
10  be secrets in terms of -- from third parties, but between you
11  two, you folks pretty much know where this is going.  Is
12  there any reason why you can't just put in a letter to Apple,
13  "All right.  Here are" -- by Bates numbers or by whatever you
14  want -- "the documents that I believe" -- "that we believe
15  are relevant and need to be considered in the ITC case"?
16          MR. POWELL:  Well, there's a couple issues with
17  that, Your Honor, and I'll explain our hesitation.
18          Number one is our great respect for the protective
19  order in this case and Your Honor's statements about that
20  door, frankly.
21          THE COURT:  Okay.  And so let me be clear.  What I
22  just described is within the confines of this case, you
23  sending it to them in terms of this case saying, "Do you have
24  any opposition to us being able to use these in another
25  case?"  That's not outside the scope of the protective order.
```

Exhibit 16

1 So you can do that, and if there's any doubt, I'm telling you

2 right now, I interpret the protective order for you to be

3 able to meet and confer with Apple to say, "I would like to

4 use these documents in another case.  What's your position?"

5           MR. POWELL:  I would definitely appreciate that,

6 Your Honor, and thank you.  The issue is that we were

7 concerned that by analyzing the ITC claims using the

8 documents from this case that it would be a violation of the

9 protective order.  That's number one.

10           THE COURT:  And what I'm telling is that step one,

11 which is to ask Apple, "Do you have an objection to these

12 being considered and used in the ITC case?" is not part of

13 that.

14           MR. POWELL:  Okay.  So as long as --

15           THE COURT:  So that's not a violation of the order.

16           MR. POWELL:  Okay.

17           The second issue, then, is -- you have issues of

18 work product, right.  So the work product doctrine --

19           THE COURT:  I hear you, but at this point you're

20 going to trial in eight months.  What's the work product to

21 simply saying, "Here are documents that we think are

22 relevant."  That's not work product.  That's just -- Rule 26

23 requires you to identify documents that are relevant to your

24 -- to the claims or defenses.  That's just basic trial law.

25           MR. POWELL:  Well, the selection of documents, I

Exhibit 16

1  would argue, is --

2          THE COURT:  Rule 26 requires you to make a

3  selection of documents.  So -- you're not selecting documents

4  to, say, show to a witness because you think it's important

5  to this witness or to this particular issue.  You're saying,

6  "These are relevant documents to the issues in this case."

7  That's not work product.

8          MR. POWELL:  I guess what I'm thinking is the

9  explanation -- where that will go is "Okay.  Why is this

10 document relevant?  What part of this case is it relevant

11 to?" and explaining all of that and parsing out "These 10

12 documents are relevant to this element and these," you know,

13 "2,000 documents" --

14         THE COURT:  Well, we're not there yet.

15         MR. POWELL:  -- "are relevant to that one."

16         THE COURT:  We're not there yet, but maybe it will

17 because you do that every day in a discovery motion: "What is

18 this discovery request relevant to?  Oh, it's relevant to

19 this issue."  This happens every day in lawyers' offices all

20 over the country -- one side wants something, and the other

21 side says, "I don't think it's relevant.  What's your

22 proffer?"

23         "It's relevant to this."

24         MR. POWELL:  Well, and, frankly, the -- the other

25 issue, then, is simply a matter of logistics, right.  The

Exhibit 16

1    exhibit list in the ITC, I believe, are due in February?  And

2    so that's an analysis that, frankly, neither party, I think,

3    has determined and looked at every document and said, "Which

4    one" -- "Which are all of the documents that we plan to rely

5    on in the ITC?"  We certainly haven't done that because, up

6    until today, I thought that would be a violation of the

7    protective order and so we -- that is something that I

8    suppose could be done, but that's a large process because we

9    are talking about a huge number of documents.  It's not

10   50,000 pages.  There's a -- the parties are producing quite a

11   few documents this week, actually.  Our deadline that we've

12   negotiated amongst ourselves to complete ESI email discovery

13   -- or substantially complete -- is tomorrow.  So there's been

14   a lot of documents produced in the last few days.

15          And I would note on the number of documents

16   produced, counsel indicated that they have produced

17   64,000 pages of documents from this case in the ITC case.  If

18   anything, I believe that reduces the reliance interest

19   because that shows that counsel does not have a problem

20   producing Apple confidential information in the ITC case, the

21   same type of information that's produced here.  The issue is

22   that we have very different definitions of "relevance" in

23   this case.

24          THE COURT:  Well, let me just cut to one thing.

25   For instance, source code -- I mean, there's huge swaths of

Exhibit 16

1    information that you could either say you want or just say,

2    "Listen, I'm not talking about source code" or "I'm not

3    talking about Mr. Marcelo's development of this line of

4    product."  You could do this by category, by substance, and

5    see whether they agree or not.

6           Right now it's all or nothing, and I just don't

7    have a sense of how much of -- what "all" is.  I don't --

8    tell me if I missed it.  Is there something in the pleadings

9    that tells me what's the overall number of documents produced

10   by Apple? what's the number of documents that were produced

11   that were confidential? what's the number of documents that

12   were produced that were "attorneys' eyes only"? what were the

13   number of documents that were produced that was sensitive

14   source code? and then, with -- if I had all that information,

15   what's your general sense about how much of that needs to be

16   used in the ITC case?

17          And if you're telling me that you don't know

18   because you haven't done the assessment and you think it

19   would be work product for you to disclose that, I guess I'm

20   telling you that I'm not sure you've made a showing for me to

21   make the blanket exclusion to the protective order to just

22   say, "Okay.  You can have it all and use whatever you want in

23   the other case."

24          MR. POWELL:  Sure, Your Honor, and I completely

25   understand the concern.  I would note I think there's another

Exhibit 16

1   one other unique fact here, and this is why there is not a

2   lot of case law in situations where you have the same parties

3   and the same lawyers on both sides.

4          Most of the case law, as you noted -- *Foltz* and

5   most of the decisions deal with third-party intervenors, and

6   I think the reason is that most of the times, when it's the

7   same parties and the same lawyers, they just stipulate.  And

8   in fact, Apple did stipulate in the *Apple-Samsung* case, which

9   we cited in our reply brief at page 6 -- they did stipulate

10  to a cross-use agreement with the district court and the ITC.

11  Parties routinely do this, and I think that's why there's not

12  a lot of case law.

13         And the issue on third-party intervenors -- that's

14  a situation, as you noted, where the third-party intervenor

15  does not have access to any of the documents, and so that's

16  why the district courts and the rule set out in *Foltz* and

17  other decisions is to compare the allegations in the

18  pleadings -- what people from the outside can see, rather

19  than the specific documents.  And we actually cited the

20  *Universal* case -- this is *Universal*, 220WL2308226 -- which

21  explains the movant, quote, "need not identify specific

22  documents they want to share."

23         THE COURT:  And I told you, you don't have to, but

24  what I am also telling you is you can discuss categories, you

25  can discuss what you're looking at, and of course in

Exhibit 16

26

 1    *Universal*, there were two rulings.  One, it involved a

 2    criminal case where the protective order was not modified to

 3    allow sharing.  Now, there are lots of factual reasons for

 4    that, and I think one of them was there was no evidence that

 5    the criminal case was ongoing at that time.  And then there

 6    was a separate civil case where the protective order was

 7    modified to allow the information to be shared in the

 8    *Universal* case but -- I will note there are some similarities

 9    -- well, I'm going to leave it at that.

10              The point being, the existence of third parties

11    does -- is a different way of looking at it, but I don't

12    think that helps you, because the third party can't say, "I

13    don't know exactly what the information is.  So I can't tell

14    you, Judge, how it would be crossed over and used in the

15    other case because I don't know what it is."  You do know

16    here.  You know exactly what it is.  You know what documents

17    you're talking about.  They apparently don't because you

18    haven't told them, and I don't because you haven't told me,

19    and so whereas a third party can't do what you could do, you

20    can do it.  You just haven't.  Does that make sense?

21              MR. POWELL:  I understand your point, Your Honor.

22    And the issue, though, is I do think there is a significant

23    difference with third-party intervenor cases, and I think it

24    does significantly support our position, and the reason is on

25    prejudice.  A third-party-intervenor case forces a party to

Exhibit 16

1   disclose their information to someone else, to new lawyers,

2   different parties in the -- in a totally different case when

3   they relied on the protective order for disclosing the

4   information to only one -- or group of parties and they have

5   to suddenly disclose it to someone entirely different.

6   That's very different here, and that's why we have the -- the

7   cases have explained -- and I'll get the citation for you in

8   just a moment here.

9           THE COURT:  So I know the cases, I read your

10  papers, but let me ask you: Did the cases also say that --

11  and maybe we should pull up *Foltz* and read from it -- that

12  the protected discovery in the original case, when it's

13  shared in the collateral case, should be done under the "same

14  terms" that it was shared in the original case?  So yes, it's

15  a different party, but the protective order is supposed to be

16  the "same terms."

17          MR. POWELL:  And, Your Honor, we are trying our

18  best to make the protective order in the ITC case coextensive

19  in the --

20          THE COURT:  Good luck.

21          MR. POWELL:  I know.  We are working on it as best

22  we can, and we have gotten some pushback from Apple.  I

23  understand we're still talking about that and trying to

24  adjust that protective order.  We are happy to treat the

25  documents as designated under both protective orders.

Exhibit 16

1           And to your point on source code, I do think that

2   that is a narrow issue that we could carve out and further

3   discuss if there's a specific issue on source code, but the

4   reality is the vast, vast, vast majority of Apple's

5   production has been designated as confidential or "attorneys'

6   eyes only."  I think both parties have produced most of the

7   documents in this case in that manner.  So it isn't an issue

8   of a few documents here or there.  It's virtually everything

9   in the case.

10          The main issue here -- and I'd just ask that we

11  would like to avoid -- is the situation that occurred with

12  the *True Wearables* case, where we were -- we had dealt with a

13  position that counsel had taken, which we believed was

14  inconsistent with the record, and we were prevented and

15  hamstrung from being able to tell the court about that.  I

16  would, at least, ask that both parties be able to use

17  discovery if they -- in the ITC when we're talking about

18  discovery disputes in that case.

19          So that goes both ways.  If they think that we've

20  made a representation in the ITC that's inconsistent with

21  something we've produced here, I think they should have the

22  right to show that to us, hopefully resolve the dispute

23  between the parties, and if not, take it to the ITC judge,

24  and I think both parties should have that right because,

25  otherwise --

Exhibit 16

```
 1              THE COURT:  Okay.  So I'm happy to listen to that.
 2   That's not what you're asking for, and that's kind of where
 3   -- to circle back where I started, there's lots of ways to
 4   handle this.  Ultimately, I'm probably just going to rule
 5   thumbs' up or thumbs' down, and I don't know that that's
 6   really what you all -- would serve you best.  Because I can't
 7   get into things like does it -- should source code be part of
 8   what's -- where the gate's lifted and source code can be used
 9   in the ITC hearing?  I don't know.  Is it an issue?  I have
10   no idea.  But that seemed like, based on the amount of
11   litigation of it in the protective order, is a very important
12   thing.  You guys were fighting over how many -- the number of
13   lines of source code that could be printed off by an expert
14   in a clean room.  Am I remembering that correctly?
15              MR. SELWYN:  That's right.
16              THE COURT:  I mean, this is the level of importance
17   that was put on this issue.  That's not in the current ALJ
18   protective order, and maybe it's irrelevant, but I don't know
19   that.  What you're asking is -- lift it.  Whatever you want
20   to do, do it in the -- with the ITC with this lesser
21   protective order, and I'm telling you I'm uncomfortable with
22   that.  I would be much more comfortable with it targeted.
23              And by the way, there's two ways to do -- we just a
24   solar eclipse -- or a lunar eclipse, right.  There's two ways
25   to do it.  You could say, "Here's what I want," or you could
```

Exhibit 16

1    say, "Listen, here's what I don't want.  I don't need source

2    code, I don't need material relating to issue X, Y, and Z,

3    but everything else I want to have the ability to use in the

4    ITC."  That's a more reasonable -- you just told me there's

5    "vast amounts" of confidential information covered in the --

6    by the protective order in this case.  I wish I had a better

7    understanding of what that was and how much of that you

8    anticipate wanting to have the ability to use before the ITC.

9    I don't have that.

10           MR. SELWYN:  And --

11           MR. POWELL:  And --

12           THE COURT:  So, Mr. -- and we're going to shout out

13   names just so that whoever does the ultimate transcript here

14   --

15           MR. SELWYN:  Mark Selwyn, Your Honor.

16           THE COURT:  Mr. Selwyn?

17           MR. SELWYN:  And, Your Honor, the motion that we

18   have been confronted with asks that the protective order be

19   modified such that they can take all of the documents that

20   Apple has produced in this case, use and produce them

21   themselves in the ITC, and we'd respectfully suggest that's

22   quite inconsistent with both the language and what the

23   parties contemplated in the protective order.  And from our

24   perspective, the key here is that the claims and the issues

25   in the ITC investigation are different from those in --

Exhibit 16

1          THE COURT:  I understand.  I'll read -- just to

2   back you up on that, here's the proposed order, paragraph 5.1

3   of the protective order is to be changed and -- to use solely

4   -- "All Protected Materials shall be used solely for this

5   case," comma -- and this is the addition -- "the ITC

6   investigation captioned as" -- and I don't -- won't read that

7   into the record -- and then also added, "Nothing in this

8   Protective Order shall prevent or restrict a Party from

9   producing"..."Material in the ITC" investigated --

10  "Investigation, provided that the material is

11  designated"..."'CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO

12  PROTECTIVE ORDER,' or with a comparable notice, under

13  Paragraph 2(a) of the Protective Order in the ITC

14  investigation."

15          So what you're asking me to do is all these

16  restrictions that you fought about and that I stayed up late

17  working through one night in my back office in here -- throw

18  it all out for -- I don't know how much information -- and

19  "Here, you can do whatever you want with the ITC

20  investigation."  There's great reasons -- the Ninth Circuit

21  is right, and there's lots of good reasons for saving

22  resources to make information readily available in collateral

23  cases, but this is a unique case, a unique situation, and I

24  don't have a lot of information to tell: Are we talking about

25  50 documents? are we talking about source code? are we

Exhibit 16

 1   talking about the crown jewels? or are we talking about

 2   something that relates to the actual publicly filed -- I

 3   assume they're publicly filed -- patents in the ITC

 4   litigation?  I don't know any of that.

 5         MR. POWELL:  So --

 6         THE COURT:  And that's where, again, the third-

 7   party issue -- you're right, you don't -- we're not sharing

 8   it with a third party, but you know this, and you didn't tell

 9   me, and so I'm fighting with dragons in the dark trying to

10   figure out where I go with this.

11         MR. SELWYN:  And I --

12         MR. POWELL:  Your Honor, if I may?

13         THE COURT:  Let -- I was talking to Mr. Powell.  So

14   let me let Mr. Powell speak.

15         MR. SELWYN:  All right.

16         MR. POWELL:  Your Honor, and I want to try to

17   dispel you of something.  It's not that I know this and I'm

18   not telling you.  I did not analyze the ITC claims using the

19   documents in this --

20         THE COURT:  All right.  Fair enough.  Fair enough.

21   You were being overprotective --

22         MR. POWELL:  -- because I thought that would

23   violate --

24         THE COURT:  -- and I appreciate that.  Maybe the

25   right answer here is to deny the motion without prejudice to

Exhibit 16

1    re-bringing it after you've now heard me say you are allowed

2    to analyze -- you're one person -- and Mr. Selwyn's working

3    on both cases.  You're one person.  You cannot divide your

4    brain in making an assessment, and we have requirements for

5    good-faith meet-and-confer, and that's what you're doing, and

6    this is solely in the context of this case, 20 -- 8:20-CV-48

7    -- you are going to figure out what you think might be

8    relevant in the other case without doing anything with it,

9    and then you're going to talk to Mr. Selwyn.  Just like he

10   can do the same to you to the extent there's Masimo

11   confidential information that he thinks is going to be

12   relevant in the FTC case.  He's allowed to talk to you about

13   it and see what your position would be for purposes of your

14   professional responsibility and your responsibilities to the

15   Court to meet and confer.

16          So, if that was the issue for why that's not in

17   here, I'm telling you it can be, and maybe the answer is go

18   forth, meet and confer, and then come back to me if you can't

19   reach a resolution, and if you do come back to me, give me

20   much more specifics so I know what we're talking about but I

21   -- and I'm telling you, I don't really put much weight in the

22   work product suggestion that telling someone, "Here's the

23   potential evidence," that is relevant in a case -- that's

24   what lawyers do all the time.  That's what Rule 26(a) initial

25   disclosure are all about.  So --

Exhibit 16

1          MR. POWELL:  I think -- yeah, and I appreciate

2    that.  And I just think it probably depends on the level of

3    specificity, but I understand what Your Honor is saying, and

4    we can certainly take another look at the documents.

5          With that in mind, I want to clarify -- hopefully

6    that order is not just for me personally but for my law firm.

7    I do not -- I'm not heavily involved in the ITC case.  That's

8    why I have Ms. Swaroop with me today.  So just to be clear, I

9    want to make sure that the people that are cleared under the

10   protective order in this case would be allowed to view the

11   information in this case and use it to analyze whether it's

12   relevant in the ITC case.

13         THE COURT:  For purposes -- I'll hear from

14   Mr. Selwyn if he disagrees, but for purposes of meeting your

15   professional obligations and my direction that -- and the

16   Court's direction and the Local Rules and Rule 37's

17   requirement to meet and confer before bringing discovery

18   disputes -- and this is a discovery dispute -- yes.

19         Mr. Selwyn, do you disagree?

20         MR. SELWYN:  I don't disagree, Your Honor.  I think

21   that's, actually, a suggestion that we had made of them, but

22   in the event -- that is what we see in some of the cases that

23   have been presented in the briefing where parties identify in

24   the case -- the *Katz* case, for example -- four opinions --

25   four documents, and they come to the court, and they say, "We

Exhibit 16

1  want to modify the protective order with respect to these

2  specific documents."  That's not this situation.  They're

3  asking to modify it to use all.  But if they want to come to

4  us and say, "Hey, we have identified" -- these 20, these 50,

5  these 100 -- "documents.  We think they're relevant to the

6  ITC case," we'll hear them.  We'll meet and confer in good

7  faith.

8          THE COURT:  All right.  Well, I told you I have a

9  tentative in my head.  You may have guessed what it is, but

10  I'll see whether you think -- you each told me you thought,

11  maybe, there's stuff that could be worked out.

12          Mr. Powell, I'll circle back to that.  Would you

13  like -- and what I would probably do in this situation is

14  deny the motion without prejudice following further meet and

15  confer in light of the clarification that I've given to the

16  parties that it can be brought back.  I know you've got --

17  you're time sensitive here, but let's just say, where things

18  are going, it's probably not going to be the ruling that you

19  want anyway.  So is that something that you can live with --

20  denial without prejudice -- and you can meet and confer

21  subject to what I described in terms of the -- use of the

22  documents -- to meet and confer -- under the protective

23  order?

24          MR. POWELL:  Yes, Your Honor, although I would ask

25  that we can expedite the meet-and-confer process because we

Exhibit 16

1  do have a very short time line in the ITC.

2            THE COURT:  Why can't you do it today?

3            MR. POWELL:  Well, we will need to identify the

4  documents first, which we haven't done yet because we were

5  afraid it would violate the protective order.

6            THE COURT:  Okay.  How much time do you need to

7  identify the documents?

8            MR. POWELL:  May I confer for a moment?

9            THE COURT:  Yes.

10            And while they're conferring, Mr. Selwyn, assuming

11  that I do what I've just tentatively said I'm going to do,

12  which is deny the motion without prejudice to it being re-

13  brought following further meet-and-confer on -- subject to

14  the clarification of the protective order, is there any

15  objection from Apple to that?

16            MR. SELWYN:  There's no objection to Apple --

17            THE COURT:  And is Apple going to agree to work

18  quickly to try to reach resolution or determine there is no

19  resolution that can be agreed to?

20            MR. SELWYN:  We will.  But let me just say one

21  thing: My expectation would be that it would be a fairly

22  small amount of documents that they would be identifying, and

23  if that's the case, we'll be able to get through them very

24  rapidly.  If they come back to us and say, "It's all the

25  documents," that's going to be a different story.

Exhibit 16

1    THE COURT:  In terms of time, understood.  What I'm

2   -- I'm not going to pre-direct how this could go.  Like I

3   told you, it could be "Here's the documents we want" or "Here

4   are huge of swaths of documents you can exclude that we're

5   not going to include," but something that tells me more

6   specifically -- maybe not 4 documents but something more

7   specifically what we're talking about because, again, you

8   know what your -- you may not have done the analysis yet, but

9   you can, and you may not have to be document-by-document

10   specific but -- you know, the other option is you can just

11   ask for it in the FTC case.  This is all about trying to

12   preserve resources, but it's -- a denial doesn't leave you

13   without recourse, right.

14        So, Mr. Powell, after your conference, how much

15   time?

16        MR. POWELL:  So it will take probably a little bit

17   of time for us to identify the documents.  I'm guessing we

18   can do so within the typical 10-day time under the meet-and-

19   confer, but I'd like to, hopefully, when we identify them,

20   meet with Apple promptly --

21        THE COURT:  Well, the Local Rule 37 meet-and-confer

22   is only 10 days from the date the moving party sends a

23   letter.  So there's no limit to how long you can take to

24   figure out what documents or information you're looking for,

25   but what I'm trying to is if you were worried about this

Exhibit 16

1   slipping, I'll set a schedule right now, and I'll shorten the

2   10-day response time, but if you tell me it's going to take

3   you 20 days to come up with the list and that the list

4   conceivably could be a million pages, then I'm probably not

5   going to shorten the 10-day-response time period.

6           MR. POWELL:  Okay.  Thank you, Your Honor.  It's

7   difficult for me to know.  So why don't we stick with the

8   same -- the standard schedule because I don't know yet.  We

9   haven't looked at the documents --

10          THE COURT:  All right.

11          MR. POWELL:  -- with that in mind.

12          THE COURT:  So I'm going to deny the motion for the

13  reasons stated on the record here, that recognizing the

14  Ninth Circuit and *Foltz*'s rulings, that based on what's in

15  front of me, under the *Foltz* factors, I'm not going to order

16  a modification of the protective order, but that's without

17  prejudice to, upon further meet and confer by -- between the

18  parties with the understanding that they are able to review

19  the documents for purposes of assessing a desire to use them

20  in the FTC case without violating the protective order, that

21  this motion may be re-brought, or Apple might bring the

22  motion if they want to have some of Masimo's documents carved

23  out, or it could be a joint stipulated request.

24          But however it's done procedurally, the motion is

25  going to be denied without prejudice to it being re-brought

Exhibit 16

1  following further meet-and-confer.  All right?

2          Mr. Powell, anything further?

3          MR. POWELL:  Yes.  May I ask one clarification?

4          THE COURT:  Yes.

5          MR. POWELL:  Your Honor mentioned that in the ITC

6  case we may seek these documents from Apple in the ITC case.

7  Are we allowed to identify documents from this case in the

8  ITC and say, "Apple, this is what we want"?

9          THE COURT:  Let me say -- here's what you can do --

10  we'll -- I'm not going to call it a "wall," but as part of

11  your meet-and-confer, you can simply say, "I'm going to" --

12  "If I don't" -- "If you don't agree to this, I'm going to ask

13  for them in the ITC case," and it seems to me -- unless Apple

14  -- I won't characterize it but -- there's nothing that would

15  prevent you -- actually, let me put this way: You can do an

16  alternative request that "Here's what I want, and if I can't

17  get it, I want the ability to use my knowledge from this case

18  to ask specific requests in the ITC case."  And the benefit

19  to that is it lets the ALJ decide the relevance of the

20  information if that's what Apple's objection is, and that

21  seems, maybe, like a fair way of resolving it.  It puts -- it

22  essentially punts it to the ITC judge to determine whether

23  it's relevant if that's what Apple's objection is.

24          MR. SELWYN:  Can I be heard on that, Your Honor?

25          THE COURT:  Well, I haven't made a decision on it.

Exhibit 16

 1                  But is that what you're asking, Mr. Powell?

 2                  MR. POWELL:  Yes.  But I believe Apple would need

 3     to agree to that in -- for --

 4                  THE COURT:  Well, what I'm saying is you -- if you

 5     can't agree to lift the veil as to some certain number of

 6     documents, then you can come forward and say, "I want to lift

 7     the veil as to" this, "but alternatively, Judge Early, I want

 8     you to authorize me, if you're not going to lift the veil, to

 9     use my knowledge of this case to ask for specific documents

10     from Apple in the ITC case," and --

11                  MR. POWELL:  Right, and I do think that would be

12     very supported by *Foltz* and that would address the problem we

13     had with *True Wearables*.  The issue is we don't know -- and I

14     don't -- I don't mean this in a negative light.  It might be

15     that counsel doesn't know about a particular document and we

16     do, and I'd love to be able to say, if it comes up in the ITC

17     where they're saying, you know, "X document doesn't exist,"

18     I'd love to be able to tell them, "No.  Here it is.  You

19     produced it in the district court.  I'd like you to produce

20     it here."

21                  THE COURT:  Well, I'm not concerned about you

22     telling Apple's counsel that.  I am concerned about putting

23     it in a filing to the ALJ that says, "They produced this

24     document in this other case.  They haven't produced it here.

25     We want it in this case."  Talking to counsel about it is

Exhibit 16

1   within, I think, a fair reading of the protective order.

2   Once you throw it out into the ITC proceeding world and now

3   it -- whatever you've just filed in the ITC to say, "I want

4   this document.  They haven't given it to me" -- this is the

5   *True Wearables* paradigm -- I'm a little concerned about that.

6   But you can certainly raise it with Apple.  If they say no,

7   come and see me.  But that's what we're talking about here is

8   -- then we're talking about a particular document or a

9   particular category of documents -- something smaller than

10  "everything."  All right?

11              And, Apple, you wanted to chime in on that?

12              MR. SELWYN:  I think you struck the right line.  I

13  thought the suggestion was being made that they should be

14  able to use the documents from this case without going first

15  to you and going to the ALJ and saying, "Something was

16  produced in the district court.  We want you to order it in

17  the ITC."  That we would view as a violation of the

18  protective order.  They have to come back to you first.

19              THE COURT:  So at this point I tend to agree with

20  that, but what I'm saying is if, after you've tried to

21  resolve this informally and it's not made and you come back

22  and say, "Okay.  I'm back here, Judge Early, and now I've got

23  the stuff that you said you didn't have" in front of me.

24  "Here's the data on how many confidential documents there

25  are, generally speaking how many we think they're going to be

Exhibit 16

 1 │ relevant to the ITC, and you either lift the veil entirely,

 2 │ or maybe we exclude some things and then lift the veil as to

 3 │ everything else," or "Here's seven categories that we want

 4 │ the veil lifted, and oh, by the way, if you don't want to do

 5 │ any of that, just authorize us to ask the ALJ" -- or -- I'm

 6 │ sorry -- to propound -- and forgive me.  I don't how it works

 7 │ on the -- in the ITC.  I saw you have a discovery cutoff of

 8 │ February -- to propound Apple, "Hey, produce to me" -- and

 9 │ you can identify them by Bates number from this case --

10 │ "produce me these documents in that case."  You can't do that

11 │ now, but if you come to me as that being an alternative way

12 │ of handling it, I'll consider it.  I'm not making a ruling

13 │ right now on it, though.

14 │       What I'm saying is you folks need to talk about it

15 │ because you didn't -- you don't -- they don't know what

16 │ you're talking about, I don't know what you're talking about,

17 │ and I don't even know the orders of magnitude of what you're

18 │ talking about and how it fits in with this case and how it

19 │ fits in with the ITC action.  So share a little information;

20 │ it's going to go a long way.  And maybe it won't work out and

21 │ you'll be back, and I'll be happy to take it up again.

22 │       MR. POWELL:  Understood, Your Honor.  I guess the

23 │ only thing that I would note is what we just heard, that --

24 │ this idea of compartmentalizing and "if you use it here, it's

25 │ a violation; if you use it in that way, it's a violation."  I

Exhibit 16

1    think the only thing that serves to do is slow things down

2    and cost a lot of money between the parties.  And I do think

3    that it would make sense for both parties if we were -- if

4    neither of us were trying to hide anything, it would make

5    sense that both of us would allow the other one to look at

6    information and show it to the ALJ if we think there's a

7    representation that's correct.

8            THE COURT:  Lots of things would make sense, and

9    you argued earlier that the reason why there's no law in this

10   case is -- according to your inference -- is that the parties

11   typically agree to share and cross-designate materials.  It's

12   not happened here.  So the fact that people didn't agree -- I

13   can't force people to agree, I can only issue rulings, and

14   what I can suggest is you're in the best position to know

15   what serves you; Apple's in the best position to know what

16   serves them; see if you can reach an agreement.  If -- I

17   quoted Bob Dylan last time.  I'll quote Mick Jagger this

18   time: You can't always get what you want, but if you try some

19   time, you just might find you get what you need.

20           All right.  So that's going to be the ruling of the

21   Court.  The motion is denied without prejudice.

22           MR. SELWYN:  Thank you, Your Honor.

23           THE COURT:  Thank you.

24           MR. POWELL:  Thank you, Your Honor.

25        (Proceedings adjourned at 11:03 a.m.)

Exhibit 16

1

2

3

4                              CERTIFICATE

5              I certify that the foregoing is a correct

6    transcript from the electronic sound recording of the

7    proceedings in the above-entitled matter.

8

9    /s/ Julie Messa                    November 20, 2021
     Julie Messa, CET**D-403            Date
10   Transcriber

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit 16

EXHIBIT 17

# Knobbe Martens

KNOBBE, MARTENS, OLSON & BEAR, LLP

2040 Main St., 14th Fl., Irvine, CA 92614
**T** (949) 760-0404

Kendall M. Loebbaka
Kendall.Loebbaka@knobbe.com

November 24, 2021
*Via Email*

Sarah R. Frazier
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA  02109

Re:    *Certain Light-Based Physiological Measurement Devices and Components Thereof*
Inv. No. 337-TA-1276

Dear Sarah:

I write regarding Apple's deficient discovery responses served on October 14, 2021 in response to Masimo's Third Set of Requests for Production (Nos. 131-133). Apple's refusal to produce responsive documents is prejudicing Masimo's ability to prepare its case, and we reserve all rights to seek relief based upon such deficient responses. Details regarding the deficiencies are provided below.

RFP No. 131 seeks documents and things produced by Apple in *Masimo Corp. v. Apple Inc.*, No. 8:20-cv-00048 (C.D. Cal.) ("the district court litigation"). RFP No. 132 seeks transcripts of any depositions taken in the district court litigation.  And RFP No. 133 seeks responses to interrogatories or to requests for admission served by Apple in the district court litigation. Masimo's requests are relevant to various issues in this Investigation, including at least the development of Apple's products within the scope of this Investigation, infringement, and secondary considerations.  Moreover, Apple's discovery responses in the district court litigation are relevant to how Apple characterizes its products.  Masimo is entitled to production of relevant responsive information that would demonstrate, for example, if Apple is taking inconsistent positions between the two cases.  Apple states that it will not produce documents in response to these requests, except to the extent it has already agreed to produce responsive documents for another request, yet fails to identify any specific request.  During a hearing in the district court litigation on Masimo's request to use documents from the district court litigation in this Investigation, Apple represented that it has produced 64,000 pages of documents from the district court litigation in this Investigation.  Please identify the documents from the district court litigation that have been produced in this Investigation.

Apple's objections to RFP Nos. 131-133 are ineffectual, and its responses are deficient as detailed below.

First, Apple objects to RFP Nos. 131-133 for purportedly involving "different patents, different products, and different accused functionalities than are at issue in this Investigation, and also trade secret and correction of inventorship claims unrelated to any claim or defense in this Investigation."  However, Apple has overlooked the overlapping products at issue in both proceedings and by its own production has acknowledged that documents from the district court litigation are relevant to the issues in this investigation.

## Knobbe Martens

Second, Apple objects to RFP Nos. 131-133 "to the extent it seeks documents in contravention of or to circumvent the Protective Order issued [i.e., Dkt. No. 67] . . . [in the district court litigation]." However, the Protective Order issued in the district court litigation prohibits only the *unauthorized* disclose of information, and expressly permits the *authorized* disclosure of information designated under that Protective Order to "any other person with the prior written consent of the Producing Party." *Masimo Corp. v. Apple Inc.*, No. 8:20-cv-00048 (C.D. Cal.), Dkt. No. 67 ¶¶ 9.2(i); *id.* ¶ 9.3. Accordingly, Apple, as the producing party of the information designated under the district court litigation Protective Order that is responsive to RFP Nos. 131-133 as clarified above, can simply authorize the production of said responsive information and has articulated no basis for refusing to authorize such disclosure. Thus, the request does not "seek documents in contravention of or to circumvent the Protective Order," and Apple's objections to the contrary are not well-founded. Moreover, Apple's production of 64,000 pages from the district court litigation in this Investigation confirms that this objection is not well-founded. Please confirm that Apple will withdraw such objections.

### 1. RFP No. 131

Beyond the first and second objections discussed above, Apple has raised no other objections to RFP No. 131. Accordingly, please confirm that in addition to withdrawing those objections for the reasons explained above, Apple will promptly complete its production of documents responsive to RFP No. 131.

### 2. RFP Nos. 132-133

In addition to the two improper objections discussed above, Apple objects to RFP No. 132 "to the extent it contravenes or seeks to circumvent the limitations on discovery in . . . 19 C.F.R. § 210.28" and similarly objects that RFP No. 133 "to the extent it contravenes or seeks to circumvent the limitations on discovery in . . . 19 C.F.R. § 210.29." Such objections are ineffectual. 19 C.F.R. § 210.28 is inapplicable to RFP No. 132, which merely seeks the production of responsive deposition transcripts, not the actual depositions of witnesses. Apple cites 19 C.F.R. § 210.28 broadly but provides no basis for objecting under that rule, nor does the rule appear to apply at all to limit Apple's response to this request. Accordingly, as Apple's objection to RFP No. 132 based on 19 C.F.R. § 210.28 is not well-founded, please confirm such objection will promptly be withdrawn and that documents responsive to RFP No. 132 as clarified above will be produced.

Apple's related objection based on 19 C.F.R. § 210.29 for RFP No. 133 is similarly misplaced. RFP No. 133 does not ask Apple to answer the interrogatories or RFAs it served in the district court litigation, and thus the request does not "contravene[] or seek[] to circumvent" the limitations on discovery in 19 C.F.R. § 210.29. Rather, the request merely seeks the production of the responses to such discovery requests served by Apple in the district court litigation. And the production of Apple's written discovery responses from the district court litigation plainly qualifies as a single discovery request given the discrete category of documents sought. Accordingly, as Apple's objection to RFP No. 133 based on 19 C.F.R. § 210.29 is again, not well-founded, please confirm such objection will promptly be withdrawn and that documents responsive to RFP No. 133 as clarified above will be produced.

* * * * * * *

knobbe.com

Exhibit 17

**Knobbe Martens**

Sarah R. Frazier<br>Page 3

---

     Please advise immediately as to when Apple will withdraw its objections to RFP Nos. 131-133 and begin its production of documents to correct the above-identified deficiencies, and provided the requested confirmations by November 30, 2021.

Sincerely,

Kendall M. Loebbaka

Exhibit 17

EXHIBIT 18

| From: | Passamaneck, Nora Q.E. |
|---|---|
| To: | Adam.Powell |
| Cc: | *** Apple-Masimo; Masimo.Apple; WH Apple-Masimo Service List; Aglipay, Ernest L. |
| Subject: | RE: Masimo v. Apple - Documents Produced In District Court and the ITC |
| Date: | Thursday, December 23, 2021 1:25:26 PM |

Adam,

We can provide by COB today and via FTP a .DAT file for the District Court action that will correlate ITC bates numbers to the District Court production.  Please confirm you will be providing the same.

Thanks,

Nora

**From:** Adam.Powell <Adam.Powell@knobbe.com>
**Sent:** Thursday, December 23, 2021 10:16 AM
**To:** Passamaneck, Nora Q.E. <Nora.Passamaneck@wilmerhale.com>
**Cc:** *** Apple-Masimo <Apple-Masimo@gibsondunn.com>; Masimo.Apple <Masimo.Apple@knobbe.com>; WH Apple-Masimo Service List <WHApple-MasimoServiceList@wilmerhale.com>
**Subject:** RE: Masimo v. Apple - Documents Produced In District Court and the ITC

**EXTERNAL SENDER**

Hi Nora,

We can provide an overlay today if you are ready.  We understand the overlay will correlate ITC bates numbers to district court bates numbers (as opposed to just a "yes" or "no" as to whether the document was produced in both cases).  Please confirm.

Thanks,

Adam

**Adam Powell**
Partner
858-707-4245 **Direct**

**Knobbe Martens**

**From:** Passamaneck, Nora Q.E. <Nora.Passamaneck@wilmerhale.com>
**Sent:** Monday, December 20, 2021 11:35 AM
**To:** Adam.Powell <Adam.Powell@knobbe.com>
**Cc:** *** Apple-Masimo <Apple-Masimo@gibsondunn.com>; Masimo.Apple <Masimo.Apple@knobbe.com>; WH Apple-Masimo Service List <WHApple-MasimoServiceList@wilmerhale.com>
**Subject:** RE: Masimo v. Apple - Documents Produced In District Court and the ITC

Adam,

Exhibit 18

We disagree that Plaintiffs are entitled to an overlay to determine what documents Masimo contends are relevant to the ITC.  This information is not required in the ESI order, and Judge Early made clear that Masimo could review the district court production for purposes of meeting and conferring with Apple about specific documents within Apple's production that Masimo contends are relevant to the ITC.  However, to avoid a dispute, we will provide this information if Plaintiffs do the same.  Please let us know when Plaintiffs will be able to make this exchange.

Regards,
Nora

**Nora Q.E. Passamaneck | WilmerHale**
1225 Seventeenth St.
Suite 2600
Denver, CO 80202 USA
+1 720 274 3152 (t)
+1 720 274 3133 (f)
nora.passamaneck@wilmerhale.com

**Please consider the environment before printing this email.**

This email message and any attachments are being sent by Wilmer Cutler Pickering Hale and Dorr LLP, are confidential, and may be privileged. If you are not the intended recipient, please notify us immediately—by replying to this message or by sending an email to postmaster@wilmerhale.com—and destroy all copies of this message and any attachments. Thank you.

For more information about WilmerHale, please visit us at http://www.wilmerhale.com.

**From:** Adam.Powell <Adam.Powell@knobbe.com>
**Sent:** Wednesday, December 15, 2021 6:06 PM
**To:** Passamaneck, Nora Q.E. <Nora.Passamaneck@wilmerhale.com>
**Cc:** *** Apple-Masimo <Apple-Masimo@gibsondunn.com>; Masimo.Apple <Masimo.Apple@knobbe.com>; WH Apple-Masimo Service List <WHApple-MasimoServiceList@wilmerhale.com>
**Subject:** RE: Masimo v. Apple - Documents Produced In District Court and the ITC

**EXTERNAL SENDER**

Nora,

Thank you for meeting and conferring with me on this issue at a break during the deposition today.  We agreed that we don't need a separate call on Friday and that you would provide Apple's final position soon.  I would appreciate you doing so tomorrow.

Best regards,
Adam

Exhibit 18

**Adam Powell**
Partner
858-707-4245 **Direct**

## Knobbe Martens

---

**From:** Adam.Powell
**Sent:** Wednesday, December 15, 2021 2:43 PM
**To:** Passamaneck, Nora Q.E. <Nora.Passamaneck@wilmerhale.com>
**Cc:** *** Apple-Masimo <Apple-Masimo@gibsondunn.com>; Masimo.Apple <Masimo.Apple@knobbe.com>; WH Apple-Masimo Service List <WHApple-MasimoServiceList@wilmerhale.com>
**Subject:** RE: Masimo v. Apple - Documents Produced In District Court and the ITC

Nora,

Apple's unwillingness to provide this information is prejudicing our ability to identify documents from this case that we believe should be usable in the ITC case.  Apple clearly has this information available and could easily provide it, but is refusing to do so.  Your assertion that Masimo did not provide this information is irrelevant because Apple never asked.  Masimo is happy to identify the documents produced in both the district court and ITC if Apple will also do so.  Please confirm Apple agrees.  Otherwise, we look forward to speaking to you at 2pm Friday about this issue.  Please use the following dial in:



We sent the initial email before you requested that we include the WH listserv and I simply replied to that email below.  We will endeavor to include the listserv on future emails.

Best regards,
Adam

**Adam Powell**
Partner
858-707-4245 **Direct**

## Knobbe Martens

---

**From:** Passamaneck, Nora Q.E. <Nora.Passamaneck@wilmerhale.com>
**Sent:** Wednesday, December 15, 2021 12:01 PM
**To:** Adam.Powell <Adam.Powell@knobbe.com>
**Cc:** *** Apple-Masimo <Apple-Masimo@gibsondunn.com>; Masimo.Apple <Masimo.Apple@knobbe.com>; WH Apple-Masimo Service List <WHApple-MasimoServiceList@wilmerhale.com>
**Subject:** RE: Masimo v. Apple - Documents Produced In District Court and the ITC

Exhibit 18

Counsel,

We are unaware of any requirement that we provide the information you seek.  Masimo has not provided this information with respect to the documents it has produced.  Please explain the basis for your request so that we can consider it before a meet and confer.  I am available Friday 9-10, or 2-3 PST.  Also, as I requested during our Monday meet and confer, please include the WH listserv (copied above), as I was not on the emails below.

Regards,
Nora

**From:** "Adam.Powell" <Adam.Powell@knobbe.com>
**Date:** December 15, 2021 at 2:42:31 PM EST
**To:** *** Apple-Masimo <Apple-Masimo@gibsondunn.com>
**Cc:** "Masimo.Apple" <Masimo.Apple@knobbe.com>, "Selwyn, Mark" <Mark.Selwyn@wilmerhale.com>
**Subject: RE: Masimo v. Apple - Documents Produced In District Court and the ITC**

[WARNING: External Email]

Counsel,

We have not heard back from Apple on this issue.  Please let us know when you are available to meet and confer.

Best regards,
Adam

**Adam Powell**
Partner
858-707-4245 **Direct**

**Knobbe Martens**

**From:** Adam.Powell
**Sent:** Friday, December 10, 2021 6:27 PM
**To:** *** Apple-Masimo <Apple-Masimo@gibsondunn.com>
**Cc:** Masimo.Apple <Masimo.Apple@knobbe.com>; Selwyn, Mark <Mark.Selwyn@wilmerhale.com>
**Subject:** Masimo v. Apple - Documents Produced In District Court and the ITC

Counsel,

At the November 18 hearing, Apple represented that it had "already produced 64,000 pages that were first produced in this case in the ITC."  Masimo promptly asked Apple's ITC counsel to identify those documents so that Masimo could determine what documents Apple had or had not produced

Exhibit 18

in both cases.  Apple ignored our request.

We write again to request the same information.  Please provide an overlay identifying those documents immediately.  If Apple declines, please let us know when you are available to meet and confer pursuant to the Special Master Order.

Best regards,
Adam

**Adam Powell**
Partner

**858-707-4245** Direct

**Knobbe Martens**

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

---

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

---

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

Exhibit 18

# EXHIBIT 21

UNITED STATES INTERNATIONAL TRADE COMMISSION
WASHINGTON, D.C.

**Before the Honorable Charles Bullock**
**Chief Administrative Law Judge**

| | |
|---|---|
| **In the Matter of**<br><br>**CERTAIN LIGHT-BASED PHYSIOLOGICAL MEASUREMENT DEVICES AND COMPONENTS THEREOF** | Inv. No. 337-TA-1276 |

**MASIMO CORPORATION AND CERCACOR LABORATORIES, INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS TO APPLE INC. (1-126)**

Exhibit 21

Pursuant to the United States International Trade Commission's Rules of Practice and Procedure and 19 C.F.R. §§ 210.27 and 210.30, Complainants Masimo Corporation and Ceracor Laboratories, Inc. (collectively, "Complainants") hereby request that Respondent Apple Inc. ("Apple") responds to the following Requests for Production of Documents and Things within the time prescribed by the rules of the Administrative Law Judge and the Commission.

## DEFINITIONS

The following definitions shall apply to each of the interrogatories herein:

1.      The terms "Respondent," "Apple," "You," and "Your" mean Apple Inc., including, without limitation: any predecessor, predecessor-in-interest, successor, subsidiary, affiliate, and/or division; and any past or present principal, officer, director, employee, former employee, servant, agent, attorney, or other representative.

2.      The terms "Complainants" mean Masimo Corporation and Ceracor Laboratories, Inc., collectively and individually, including: any predecessor, predecessor-in-interest, successor, subsidiary, affiliate, and/or division; and any principal, officer, director, employee, former employee, servant, agent, attorney, or other representative.

3.      The term "Complaint" means the operative complaint under § 337 of the Tariff Act of 1930, in this Investigation, which at the time of the service of this document is the amended complaint filed on July 12, 2021 and identified in 86 F.R. 38764.

4.      The terms "Present Investigation" or "Investigation" means *In the Matter of Certain Light-Based Physiological Measurement Devices and Components Thereof*, ITC Inv. No. 337-TA-1276.

5.      The term "Commission" or "ITC" means and refers to the United States International Trade Commission, Washington D.C.

Exhibit 21

6.      The term "Section 337" refers to 19 U.S.C. § 1337.

7.      "The '501 Patent" means U.S. Patent No. 10,912,501 and any application leading thereto.

8.      "The '502 Patent" means U.S. Patent No. 10,912,502 and any application leading thereto.

9.      "The '648 Patent" means U.S. Patent No. 10,945,648 and any application leading thereto.

10.     "The '745 Patent" means U.S. Patent No. 10,687,745 and any application leading thereto.

11.     "The '127 Patent" means U.S. Patent No. 7,761,127 and any application leading thereto.

12.     The term "Patents-in-Suit" shall mean the '501 Patent, '502 Patent, '648 Patent, '745 Patent, and '127 Patent, and any additional patents that may be added to the Investigation in the future.

13.     The term "Asserted Claim(s)" means any claim of the Patents-in-Suit that Complainants allege Respondents infringe or any claim Complainants contend is practiced by Domestic Industry Products, including those claims identified in the Complaint and exhibits thereto.

14.     The terms "person," "individual," and "entity" shall include natural persons, corporate or other business entities, and all other forms of legal entities.  The acts of a person, individual, or entity shall include the acts of directors, officers, owners, members, employees, agents, attorneys, or other representatives acting on the person's, individual's, or entity's behalf.

Exhibit 21

15.     The term "document" shall be construed under the broadest possible construction under the Federal Rules of Civil Procedure and shall include without limitation any written, recorded, graphic, or other matter, whether sent or received or made or used internally, however produced or reproduced and whatever the medium on which it was produced or reproduced (whether on paper, cards, charts, file, or printouts; tapes, discs, video tapes, audiotapes, tape recordings, cassettes, or other types of voice recording or transcription; computer tapes, databases, or emails; pictures, photographs, slides, films, microfilms, or motion pictures; or any other medium), and any other tangible item or thing of readable, recorded, or visual material of whatever nature including without limitation originals, drafts, and all non-identical copies of each document (which, by reason of any variation, such as the presence or absence of hand-written notes or underlining, represents a distinct version).   By way of example, the terms "document" or "documents" as used herein shall include, without limitation: correspondence; blueprints; memoranda; notes; diaries; letters; e-mails; text messages; metadata; minutes; agendas; contracts; reports; studies; checks; statements; receipts; returns; summaries; pamphlets; circulars; press releases; advertisements; books; inter-office and intra-office communications; handwritten or typewritten notes; notations or summaries of telephone conversations, meetings, or conferences; bulletins; computer printouts; databases; invoices; worksheets; photographs; tape recordings; and all other tangible items of readable, recorded, or visual material of any kind.

16.     The term "thing" means tangible objects of any type, composition, construction, or nature.

17.     The term "communication" means all written, electronic, oral, telephonic, or other inquiries, dialogues, conversations, interviews, correspondence, consultations, negotiations, agreements, understandings, meetings, letters, notes, advertisements, computer mail, email, text

Exhibit 21

messages, and all other documents evidencing any verbal or nonverbal interaction between persons and entities.

18.     The term "concerning" is used in its customary broad sense and, by way of example and not by way of limitation, it includes referring to, relating to, mentioning, discussing, stating, describing, noting, recording, embodying, studying, analyzing, evaluating, evidencing, reflecting, containing, demonstrating, identifying, comprising, constituting, supporting, and undermining, and shall encompass all express and implied references to the specified person, subject, event, or thing.  A document concerning a particular subject includes documents concerning the preparation of other documents or draft documents that concern the subject.

19.     The term "Patent and Trademark Office," "PTO," or "USPTO" means United States Patent and Trademark Office.

20.     The term "Infringement" means and refers to direct, contributory, and induced infringement, whether literally or under the doctrine of equivalents, under the applicable laws.

21.     The term "Domestic Industry" means domestic industry as that term is used in Commission Rule 210.12(a)(6)(i), 19 C.F.R. § 210.12(a)(6)(i), and alleged in Section VII of the Complaint.

22.     The term "Domestic Industry Product" means any product on which Complainant relies for its contention that a Domestic Industry either exists or is in the process of being established, including the products identified in the Complaint and Ex. 27 to the Complaint.

23.     The term "Accused Product(s) and Components Thereof" means any product of Respondents that is accused of infringement in the Present Investigation, including the Apple Watch Series 6, including all components of those products, all spare parts of those products, and all variants of those products designed, developed, manufactured, assembled, offered for sale,

Exhibit 21

distributed, imported or sold by Apple or on behalf of Apple in the United States that include light-based pulse oximetry functionality. By way of example, the term "Accused Product(s) and Components Thereof" shall include any and all hardware and software utilized in or contributing to the measurement of blood oxygen saturation, including but not limited to hardware such as processors, light-emitting diodes, photodetectors, lenses, magnets, thermistors, and materials covering or surrounding the light emitting diodes or photodiodes, and including but not limited to software such as source code, libraries, and firmware.

24.     The term "prosecution," in relation to a patent or patent application, means all proceedings before, and communications with, a patent office relating to a patent, patent application, continuation, continuation-in-part, and/or divisional, including, but not limited to, interference, reissue, reexamination, opposition, cancellation, inter partes review or other post grant proceedings.

25.     The term "Prior Art" is defined in its broadest sense under the patent laws to include, for example, all publications, patents, patent applications, disclosures, presentations, physical specimens, products, devices, uses, sales, offer for sale, or other activity concerning the subject matter of any Asserted Claim of the Patents-in-Suit (or that any person has alleged to be concerning the patentability of any Asserted Claim of the Patents-in-Suit, and related patent or application, or any foreign counterpart of these patents and applications) and existing or occurring prior to the filing date of the Patents-in-Suit.

## **INSTRUCTIONS**

The following instructions shall apply to each of the requests for production of documents and things herein:

Exhibit 21

1.      If You contend that any information called for by these requests is privileged or otherwise excludable from discovery, provide all responsive information that is not privileged and, with respect to each responsive document or thing withheld or redacted, provide the information required under Commission Rule 210.27(e).

2.      The definitions set forth herein have the broadest possible meaning under Commission Rule 210.27.

3.      Written responses to these requests for production are required pursuant to Commission Rule 210.30(b)(2).

4.      State, for each request, whether or not any documents within the scope of the request exist and whether any such documents are in Your possession, custody, or control.

5.      These document requests call for all documents that are known or available to You, including all documents in the custody, possession or control of or available to Your attorneys, agents, or representatives, or any investigators or any other person acting on Your behalf or under the direction or control of You or Your attorneys or agents, and including documents maintained by any employee, officer, director, agent or other representative in any files at such person's home or on such person's personal computer.

6.      If You object in part to any request for production, provide a complete answer to all portions of the request to which You have not objected.

7.      If You claim that a request is overly broad and/or unduly burdensome, produce documents responsive to any portion of the request to which You have not objected and specifically identify the respect in which the request is allegedly overly broad and/or unduly burdensome.

Exhibit 21

8.      If You claim that a request is vague and/or ambiguous, produce documents responsive to any portion of the request to which You have not objected and specifically identify the particular words, terms or phrases that You assert make such request vague and/or ambiguous.

9.      If no documents are responsive to a particular request, state that no responsive documents exist.

10.     The singular form of a word should be interpreted in the plural and vice versa. Any pronoun shall be construed to refer to the masculine, feminine, or neuter gender as in each case is most appropriate. The words "and" and "or" shall be construed conjunctively or disjunctively, whichever makes the request most inclusive. The word "including" shall be without limitation. The terms "each" and "any" shall mean any and all.

11.     To the extent these requests seek information that is recorded in any form of document, including electronically stored documents such as word processing files and email, take steps to ensure that all such documents are preserved for this litigation and to ensure that no responsive electronically stored documents are erased or deleted.

12.     Produce all documents requested in the same file or other organizational environment in which they are maintained. For example, a document that is part of a file, docket, or other grouping, should be physically produced together with all other documents from said file, docket, or grouping, in the same order or manner of arrangement as the original. Alternatively, as to each document and thing produced in response hereto, You shall identify the request for production and where applicable, the interrogatory number, in response to which the document or thing is being produced. Where a document or thing exists in hard copy and electronic format, You shall produce both the hard and the electronic copy.

Exhibit 21

13.     These requests seek all responsive documents in their original language and, if such original language is not English, these requests also seek all English-language translations that exist now, or any English-language translations that may exist at any time in the future, for any such documents.

14.     You shall keep and produce a record of the source of each document produced. This shall include the name and location of the file where each document was located and the name of the person, group, or department having possession, custody, or control of each document.

15.     These requests shall include information acquired or identified up to the date(s) of Your answers and shall be deemed to be continuing.   Therefore, promptly produce to Complainants, as supplemental responses to these requests in accordance with 19 C.F.R. § 210.27(f), any additional information that You identify, acquire, or become aware of up to and including the time of the hearing.

## **REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS**

**REQUEST FOR PRODUCTION NO. 1:**

All documents and things concerning Your first knowledge of the Patents-in-Suit.

**REQUEST FOR PRODUCTION NO. 2:**

All documents and things concerning any discussion, investigation, analysis, evaluation, review, consideration, search, or conclusion undertaken or made by You or on Your behalf concerning the patentability, Infringement, enforceability, or scope of any subject matter described in the Patents-in-Suit.

**REQUEST FOR PRODUCTION NO. 3:**

All documents and things concerning Your Infringement (or non-Infringement) of the Patents-in-Suit by any Accused Product or component thereof.

Exhibit 21

**REQUEST FOR PRODUCTION NO. 4:**

All documents and things that You contend supports the assertion, if any, that any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6, does not Infringe any claim of the Patents-in-Suit.

**REQUEST FOR PRODUCTION NO. 5:**

All documents and things which refer or relate to any Infringement or Non-Infringement analysis regarding the Patents-in-Suit, based on products manufactured or sold by You.

**REQUEST FOR PRODUCTION NO. 6:**

All documents and things concerning any comparisons between the Patents-in-Suit and any Accused Product and Components Thereof.

**REQUEST FOR PRODUCTION NO. 7:**

All Prior Art to the Patents-in-Suit of which You are aware and believe to be material to patentability of any claim of the Patents-in-Suit.

**REQUEST FOR PRODUCTION NO. 8:**

All documents and things concerning all searches, investigations, and/or analyses performed by You or on behalf of You concerning Prior Art to the Patents-in-Suit.

**REQUEST FOR PRODUCTION NO. 9:**

All documents and things concerning the validity of the Patents-in-Suit.

**REQUEST FOR PRODUCTION NO. 10:**

All documents that You contend support the assertion, if any, that any Asserted Claim of the Patents-in-Suit is invalid for any reason.

**REQUEST FOR PRODUCTION NO. 11:**

All documents and things concerning the enforceability of the Patents-in-Suit.

Exhibit 21

**REQUEST FOR PRODUCTION NO. 12:**

All documents that You contend support the assertion, if any, that any claim of the Patents-in-Suit is unenforceable for any reason.

**REQUEST FOR PRODUCTION NO. 13:**

All documents that You contend support Your construction of every element of each Asserted Claim.

**REQUEST FOR PRODUCTION NO. 14:**

All documents and things concerning the construction, interpretation, or scope of any of the claims of the Patents-in-Suit, including any extrinsic evidence that You consider relevant to an interpretation of the Asserted Claims.

**REQUEST FOR PRODUCTION NO. 15:**

All documents and things referring or relating to any advice or opinion of counsel relating to the Patents-in-Suit, including all documents and things considered in the formation and presentation of any such advice.

**REQUEST FOR PRODUCTION NO. 16:**

All documents and things referring or relating to any meeting, discussion, or communication with Complainants, any third party, or any non-party concerning the Patents-in-Suit.

**REQUEST FOR PRODUCTION NO. 17:**

All documents and things concerning any agreement or discussion between or among any manufacturer, distributor, importer, exporter, or seller of the Accused Products and Components Thereof, including You, and any agent or employee of any government, at any level, relating to the Complaint or any of the Patents-in-Suit.

Exhibit 21

**REQUEST FOR PRODUCTION NO. 18:**

Documents and things sufficient to identify all brands, models, product names, internal names, product numbers, and SKU codes for any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6.

**REQUEST FOR PRODUCTION NO. 19:**

Documents sufficient to identify each person involved in research, design, and development of the pulse oximeter and thermistor features on any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6.

**REQUEST FOR PRODUCTION NO. 20:**

Documents sufficient to identify all present employees, past employees, consultants, and contract employees, whether full- or part-time, whose responsibilities or assignments include work concerning the design, research, development, analysis, testing, manufacturing, purchase, marketing, importation, exportation or sale of any pulse oximeter and thermistor features on any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6, including organizational charts and telephone and/or email directories.

**REQUEST FOR PRODUCTION NO. 21:**

Documents sufficient to identify all third parties that worked with You or on Your behalf concerning the conception, design, development, implementation, testing, and manufacturing of the pulse oximeter and thermistor features on any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6 and all documents received by You from such third parties concerning such work.

Exhibit 21

**REQUEST FOR PRODUCTION NO. 22:**

All documents and things concerning the design and development of the pulse oximeter and thermistor features on any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6.

**REQUEST FOR PRODUCTION NO. 23:**

All communications and files of anyone involved in the design or development of the Accused Products and Components Thereof , including the Apple Watch Series 6, concerning the pulse oximeter and thermistor features in such products.

**REQUEST FOR PRODUCTION NO. 24:**

All documents and things concerning any contracts, agreements, or understandings with any person or entity concerning the research, design, and development of the pulse oximetry and thermistor features on any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6.

**REQUEST FOR PRODUCTION NO. 25:**

All documents and things concerning any consulting, contracting or design work performed for You by any third party relating to the pulse oximeter and thermistor features on any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6.

**REQUEST FOR PRODUCTION NO. 26:**

All documents and things concerning the conception, engineering, design, qualification, testing, and development of any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6, including design briefs, knowledge sheets, bills of materials, specifications, reference designs, schematics, block diagrams, data sheets, layouts, databases, depictions, photographs, simulations, test plans, test results, users manuals or other manuals,

Exhibit 21

journals, notes, laboratory notebooks, engineering notebooks, communications, and correspondence.

**REQUEST FOR PRODUCTION NO. 27:**

All documents and things concerning any proposed production model, prototype, or other preproduction embodiment of any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6.

**REQUEST FOR PRODUCTION NO. 28:**

All diaries, appointment calendars, journals, notebooks, and trip reports prepared at the direction of or maintained by any person involved in the research, design, development, marketing importation, or sale of any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6, concerning or evidencing in any way events concerning the research, design, development, marketing, importation, or sale of such products.

**REQUEST FOR PRODUCTION NO. 29:**

Documents, publications, articles, manuscripts, papers, technical disclosures, abstracts, papers, presentations, or speeches authored or given, in whole or in part, by any person involved in the research, design, development, marketing or sale of pulse oximeter and thermistor features on any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6, concerning any such products.

**REQUST FOR PRODUCTION NO. 30:**

Documents and things sent to or from any person substantively involved in the research, design, development, marketing, importation, or sale of any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6, concerning such products.

Exhibit 21

**REQUEST FOR PRODUCTION NO. 31:**

All documents and things concerning any testing or studies involving the pulse oximeter and thermistor features on any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6, including clinical studies, testing protocols, reports, results, notes, and summaries.

**REQUEST FOR PRODUCTION NO. 32:**

All documents and things concerning the design, structure, composition, function, and/or operation of the pulse oximeter feature on any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6.

**REQUEST FOR PRODUCTION NO. 33:**

All documents and things concerning the design, structure, composition, function, and/or operation of the thermistor feature on any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6.

**REQUEST FOR PRODUCTION NO. 34:**

All documents and things concerning the design, structure, composition, function, and/or operation of any light-emitting diodes ("LEDs") on any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6.

**REQUEST FOR PRODUCTION NO. 35:**

All documents and things concerning the design, structure, composition, function, and/or operation of any photodiodes on any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6.

Exhibit 21

**REQUEST FOR PRODUCTION NO. 36:**

All documents and things concerning the design, structure, composition, function, and/or operation of any lens, or other transparent component through which light may pass, on any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6.

**REQUEST FOR PRODUCTION NO. 37:**

All documents and things regarding the design and testing of any lens, or other transparent component through which light may pass, in any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6.

**REQUEST FOR PRODUCTION NO. 38:**

All documents and things concerning the design, structure, composition, function, and/or operation of any processors on any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6.

**REQUEST FOR PRODUCTION NO. 39:**

A copy of the complete design history file for each project that resulted in any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6.

**REQUEST FOR PRODUCTION NO. 40:**

All documents and things concerning the design, structure, composition, function, and/or operation of any components of any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6, used for photoplethysmography, including hardware, software, and firmware.

**REQUEST FOR PRODUCTION NO. 41:**

All internal, confidential, or restricted access versions of technical reference manuals, engineering specifications, requirements specifications, functional specifications, and design

16

Exhibit 21

specifications concerning the structure, function and operation of pulse oximeter and thermistor features on any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6.

**REQUEST FOR PRODUCTION NO. 42:**

All user manuals and user guides for any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6.

**REQUEST FOR PRODUCTION NO. 43:**

A complete set of engineering drawings, source code, and specifications for each Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6, including all revisions of each engineering drawing and all engineering change orders.

**REQUEST FOR PRODUCTION NO. 44:**

All documents and things concerning changes or modifications to the design of any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6.

**REQUEST FOR PRODUCTION NO. 45:**

All documents and things concerning any papers, articles or scientific works which refer to the oxygen saturation and heart rate measurement features of any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6, or discuss the scientific or engineering principles on which the design of pulse oximeter and thermistor features in any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6, is based.

**REQUEST FOR PRODUCTION NO. 46:**

All technical papers, journal articles, and professional association presentations authored by You or Your employees, consultants, or affiliated entities that relate in whole or in part to the

Exhibit 21

design of the pulse oximeter and thermistor features on any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6, regardless of whether such documents are published or unpublished.

**REQUEST FOR PRODUCTION NO. 47:**

For each model or version of any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6, all documents and things concerning or relating to the structure, design, architecture and operation of the relevant features of the product, including, without limitation, the design, specification, definition, features, architecture, engineering, verification, simulation, emulation, and operation of the product.

**REQUEST FOR PRODUCTION NO. 48:**

All documents and things concerning any effort by You, Your affiliates, or Your suppliers or on behalf of You, Your affiliates, or Your suppliers to design, redesign, commercialize or modify any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6, in view of the Patents-in-Suit, including all laboratory notebooks, engineering notebooks, logs, records, files, and models generated by or at the direction of any person involved in the design-around process by or at Your direction.

**REQUEST FOR PRODUCTION NO. 49:**

All documents concerning any effort by You or on behalf of You to incorporate any feature or functionality of any of Complainants' products into any product containing either pulse oximeter or thermistor features.

Exhibit 21

**REQUEST FOR PRODUCTION NO. 50:**

All documents concerning any effort by Apple to incorporate any feature or functionality of any of Complainants' products into any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6.

**REQUEST FOR PRODUCTION NO. 51:**

All documents and things concerning any reverse engineering or other analysis performed by You or on behalf of You on any of Complainants' products, including but not limited to the Domestic Industry Products.

**REQUEST FOR PRODUCTION NO. 52:**

All documents and things concerning the Domestic Industry Products.

**REQUEST FOR PRODUCTION NO. 53:**

All documents concerning research, design, or development agreements entered into between Apple and any third party for any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6.

**REQUEST FOR PRODUCTION NO. 54:**

Five samples of each model of any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6.

**REQUEST FOR PRODUCTION NO. 55:**

All documents and things concerning the manufacture of any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6.

**REQUEST FOR PRODUCTION NO. 56:**

All documents concerning original equipment manufacturer ("OEM") agreements relating to the pulse oximeter and thermistor features on any Accused Product and Components Thereof,

Exhibit 21

including but not limited to, the Apple Watch Series 6, entered into between You and any third party.

**REQUEST FOR PRODUCTION NO. 57:**

All documents concerning assembly and/or testing agreements relating to the pulse oximeter and thermistor features on any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6, entered into between You and any third party.

**REQUEST FOR PRODUCTION NO. 58:**

All documents concerning quality control relating to the pulse oximeter and thermistor features on any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6, including quality control protocols, methods, tests, specifications, tolerances, reports, and results.

**REQUEST FOR PRODUCTION NO. 59:**

Documents and things sufficient to show the location and name of each design, manufacturing, and testing facility for any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6.

**REQUEST FOR PRODUCTION NO. 60:**

Documents sufficient to identify every location at which You, or any entity on behalf of You, has manufactured any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6.

**REQUEST FOR PRODUCTION NO. 61:**

Documents that reference or discuss any plans by You to change the location of any engineering, assembly, or manufacturing activities for any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6.

Exhibit 21

**REQUEST FOR PRODUCTION NO. 62:**

All documents and things relating to or evidencing the supply and distribution chain in the United States for any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6.

**REQUEST FOR PRODUCTION NO. 63:**

Documents and things concerning all versions of the crate, box, package and product labels found on any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6, imported into the United States.

**REQUEST FOR PRODUCTION NO. 64:**

Documents sufficient to show all labeling that You have ever used on any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6, indicating a country of origin.

**REQUEST FOR PRODUCTION NO. 65:**

All documents and things that are or have been included with the sale of any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6, including instructions for use, product manuals, data sheets, installation manuals, or specifications.

**REQUEST FOR PRODUCTION NO. 66:**

All documents and things showing a complete Bill of Materials (BOM) for any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6, for each year at each manufacturing and assembly location, including but not limited to (a) part numbers, (b) description of the item and (c) if the item was purchased, supplier name and contact information, supplier part number and description, supplier manufacturing location, supplier labor hours required to manufacture and supply the item, supplier investment in equipment allocable to

Exhibit 21

the item, and cost of the item, or (d) if the item is manufactured and assembled by Apple, investment in equipment allocable to the item, labor hours and cost per hour for labor for the item, description of the labor skills required, and total manufactured cost for the item.

**REQUEST FOR PRODUCTION NO. 67:**

Documents sufficient to identify the locations and owners, including joint ventures, of any manufacturing plants, including third party manufacturing plants, engaged in the production, packaging, or rebranding, of any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6.

**REQUEST FOR PRODUCTION NO. 68:**

All documents and things showing all manufacturing and assembly work steps for any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6, including documents that identify the location where each work step is performed, including but not limited to process flow charts, operations manuals, and training manuals.

**REQUEST FOR PRODUCTION NO. 69:**

Documents sufficient to demonstrate and explain how each Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6, is transferred from the manufacturer to all retailers that sell such product or offer such product for sale in the United States.

**REQUEST FOR PRODUCTION NO. 70:**

Documents sufficient to identify each Apple entity and/or third party that holds title to any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6, at any time from the point of manufacture to retail sale or offer for sale of such products in the United States.

Exhibit 21

**REQUEST FOR PRODUCTION NO. 71:**

All documents and things concerning the importation into the United States of any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6, including all importation records, airbills or receipts, customs reports and documentation, correspondence with the United States Customs & Border Protection, correspondence with any customs broker acting on behalf of Apple, and/or contracts, correspondence, meeting minutes, reports, and presentations with any third-party customers.

**REQUEST FOR PRODUCTION NO. 72:**

Documents sufficient to identify the importer or importers for any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6.

**REQUEST FOR PRODUCTION NO. 73:**

Documents sufficient to identify all ports of entry in the United States for any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6.

**REQUEST FOR PRODUCTION NO. 74:**

Documents sufficient to show the U.S. Harmonized Tariff Schedule ("HTSUS") classifications or numbers for any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6.

**REQUEST FOR PRODUCTION NO. 75:**

Documents sufficient to identify the total quantity of Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6, that Apple holds title to and that are located in the United States.

Exhibit 21

**REQUEST FOR PRODUCTION NO. 76:**

All documents and things constituting or concerning advertising materials or promotional materials for any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6, in the United States, including drafts of such materials.

**REQUEST FOR PRODUCTION NO. 77:**

All marketing plans, business plans, strategic plans, operating plans, financial plans, and sales plans concerning any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6.

**REQUEST FOR PRODUCTION NO. 78:**

Documents sufficient to show the actual, budgeted, estimated, or projected number of unit sales of any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6, in the United States on a quarterly basis from the time each was first sold in the United States until the target date for completion of this Investigation.

**REQUEST FOR PRODUCTION NO. 79:**

All press releases concerning any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6.

**REQUEST FOR PRODUCTION NO. 80:**

All communications and files regarding the pulse oximeter and thermistor features on any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6, of anyone involved in developing marketing or sales material for those products.

**REQUEST FOR PRODUCTION NO. 81:**

All communications and documents exchanged with anyone who has promoted, written about or spoken publicly about any pulse oximeter or thermistor features on any Accused Product

Exhibit 21

and Components Thereof, including but not limited to, the Apple Watch Series 6, concerning such

products.

**REQUEST FOR PRODUCTION NO. 82:**

All documents and things showing or describing demonstrations of any pulse oximetry or

thermistor features of any Accused Product and Components Thereof, including but not limited

to, the Apple Watch Series 6, including those held at industry trade shows or other meetings within

the United States and including all documents concerning any products or materials distributed by

You to third parties at such demonstrations.

**REQUEST FOR PRODUCTION NO. 83:**

All documents and things concerning the commercial release of any Accused Product and

Components Thereof, including but not limited to, the Apple Watch Series 6, including business

plans, marketing requirements documents, customer requirement specifications, results data

reports and analysis underlying any patient preference studies, results data reports and analysis

underlying any clinical trials, results data reports and analysis of comparisons made between said

products and any of Complainants' products and meeting minutes and similar documents reflecting

internal discussions of said products.

**REQUEST FOR PRODUCTION NO. 84:**

All documents and things concerning Your decisions, strategies, motivations, and/or goals

to sell any Accused Product and Components Thereof, including but not limited to, the Apple

Watch Series 6, in the United States.

Exhibit 21

**REQUEST FOR PRODUCTION NO. 85:**

All documents and things concerning Your decision, strategies, motivations, reasons, or goals to research and develop any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6.

**REQUEST FOR PRODUCTION NO. 86:**

All product roadmaps for each Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6.

**REQUEST FOR PRODUCTION NO. 87:**

For each entity involved in the manufacture, importation into the U.S., or sale in the U.S. of any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6, documents sufficient to show that entity's organizational structure and the reporting relationships among its departments or business functions, including the executive, engineering, design, research, testing, development, manufacturing, fabrication, assembly, packaging, marketing, promotion, sales, licensing, accounting, finance, and export/import departments or business functions, and the persons holding positions in its departments or business functions since the date of the first sale of the Apple Watch Series 6.

**REQUEST FOR PRODUCTION NO. 88:**

For each entity involved in the manufacture, importation into the U.S., or sale in the U.S. of any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6, documents sufficient to show its corporate structure, including the identity of each legal entity within its corporate family as well as each partner entity and affiliate.

Exhibit 21

**REQUEST FOR PRODUCTION NO. 89:**

For each entity involved in the manufacture, importation into the U.S., or sale in the U.S. of any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6, documents and things sufficient to identify each person or entity that owns, controls, or has an ownership interest in the entity, and the amount or extent of such ownership, control, or ownership interest.

**REQUEST FOR PRODUCTION NO. 90:**

Documents sufficient to identify all of Apple's officers, directors, and managing agents from the earliest date that development or planning for the Apple Watch Series 6 began through the present.

**REQUEST FOR PRODUCTION NO. 91:**

Documents that reference or discuss the internal organization of Apple, including but not limited to:

> (a) the relationship between Apple and any of its parents, subsidiaries, or affiliates;
>
> (b) the organization of Apple's engineering, designing, testing, and research and development functions; and
>
> (c) the organization of Apple's distribution, marketing, sale, licensing, export, and import functions.

**REQUEST FOR PRODUCTION NO. 92:**

Documents sufficient to show Apple's relationships with all related entities, including parents, predecessors, direct or indirect subsidiaries, joint ventures, holding companies and other affiliated entities, that are involved with manufacture, sale within the United States or importation into the United States of the Accused Products and Components thereof.

Exhibit 21

**REQUEST FOR PRODUCTION NO. 93:**

All documents and things concerning any agreements governing the legal relationships between or among Apple and any of Apple's parents, predecessors, direct or indirect subsidiaries, joint ventures, holding companies or other affiliated entities that have been involved in the research, design, development, manufacture, distribution, importation, or sale of the Accused Products and Components thereof , including the Apple Watch Series 6.

**REQUEST FOR PRODUCTION NO. 94:**

All Apple annual reports and other securities related filings with the SEC and analogous agencies outside of the United States, from the earliest date that any strategic planning regarding the product branded as the Apple Watch Series 6 or development of the Apple Watch Series 6 took place to the present.

**REQUEST FOR PRODUCTION NO. 95:**

All documents and things of Apple's officers or Board of Directors referring or relating to the development, manufacture, sale, profits, marketing plans, strategic plans, and capital expenditure requests for any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6, including Board meeting minutes, briefing books, presentations, memoranda, strategic plans, or other management reports.

**REQUEST FOR PRODUCTION NO. 96:**

Any corporate reports or communications to or from Apple's officers or Board of Directors or shareholders concerning the alleged Infringement of any of Complainants' patents by Apple.

Exhibit 21

**REQUEST FOR PRODUCTION NO. 97:**

All documents and things concerning any proposed or actual discontinuance and/or phase-out of any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6.

**REQUEST FOR PRODUCTION NO. 98:**

All documents and things concerning any intra-company transfer process for any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6, between or among You and any of Your parents, divisions, or subsidiaries.

**REQUEST FOR PRODUCTION NO. 99:**

Documents sufficient to show the actual, budgeted, estimated, or projected revenues from sales of any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6, in the United States on a quarterly basis from the time each was first sold in the United States until today.

**REQUEST FOR PRODUCTION NO. 100:**

All documents and things constituting or discussing budgets that relate to any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6, including budgets related to the design, development, testing, manufacturing, or sale of such products.

**REQUEST FOR PRODUCTION NO. 101:**

Documents sufficient to show the costs or expenses associated with the design, research, development, manufacture, sale, or distribution of any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6, from the commencement of such activities to the present.

Exhibit 21

**REQUEST FOR PRODUCTION NO. 102:**

All Documents and things as well as communications concerning the preparation of any Public Interest Statement under 19 C.F.R. § 210.8(c) in the above-captioned matter.

**REQUEST FOR PRODUCTION NO. 103:**

All Documents and things supporting the statements made in any Public Interest Statement under 19 C.F.R. § 210.8(c) in the above-captioned matter.

**REQUEST FOR PRODUCTION NO. 104:**

All documents that Apple contends support the assertion, if any, that issuance of a Limited Exclusion Order, cease and desist order, and/or other relief in this Investigation will adversely impact the public health, safety, or welfare conditions in the United States, competitive conditions in the United States economy, the production of like or directly competitive articles in the United States, or United States consumers.

**REQUEST FOR PRODUCTION NO. 105:**

All documents and things provided to, reviewed by, or prepared for or by any person whom You expect to provide testimony (written or oral) as a fact or expert witness at any hearing or trial in this Investigation, including all documents such person(s) plan to use, refer to, or rely on in connection with such testimony.

**REQUEST FOR PRODUCTION NO. 106:**

All affidavits or declarations ever signed, served, or filed, and transcripts of any sworn testimony in any litigation, arbitration, or government agency proceeding concerning products that include pulse oximetry or thermistor features, from any individual that will testify on behalf of Apple at the evidentiary hearing in this investigation.

Exhibit 21

**REQUEST FOR PRODUCTION NO. 107:**

All documents and things concerning any communication between Apple and the Food and Drug Administration regarding any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6.

**REQUEST FOR PRODUCTION NO. 108:**

All documents and things prepared in connection with this Investigation by any person Apple expects to call as a witness (including both fact and expert witnesses) at any hearing or at trial in this Investigation.

**REQUEST FOR PRODUCTION NO. 109:**

All keys, codes, explanations, manuals, and other documents necessary to the interpretation or understanding of the financial and technical documents produced in response to these requests for production.

**REQUEST FOR PRODUCTION NO. 110:**

All documents and things that You may offer into evidence, submit to the ITC, or otherwise use in any way at any hearing in this Investigation.

**REQUEST FOR PRODUCTION NO. 111:**

To the extent not otherwise produced, all documents and things that Apple intends to offer or believes may be offered as evidence in this Investigation.

**REQUEST FOR PRODUCTION NO. 112:**

Biographies, each publication of any kind published (including on the Internet), personnel records, curriculum vitae, and resumes sufficient to provide a comprehensive educational and work history for each fact and/or expert witness Apple intends to call in this Investigation.

Exhibit 21

**REQUEST FOR PRODUCTION NO. 113:**

All documents and things requested to be identified in Complainants' interrogatories to Apple in this Investigation.

**REQUEST FOR PRODUCTION NO. 114:**

All documents and things identified in response to any interrogatory responses provided in this Investigation.

**REQUEST FOR PRODUCTION NO. 115:**

All document and things referenced, relied upon, or consulted in forming a response to any interrogatory, request for admission, or request for production served on Apple in this Investigation.

**REQUEST FOR PRODUCTION NO. 116:**

All documents and things produced to Apple by any non-party pursuant to any formal or informal document request or any subpoena issued in this Investigation.

**REQUEST FOR PRODUCTION NO. 117:**

To the extent available, English language translations of any foreign language documents produced in response to these requests for production.

**REQUEST FOR PRODUCTION NO. 118:**

All non-privileged documents relied upon by Apple to create any brief or other document filed in this Investigation, including documents regarding any denials of allegations in Complainants' Complaint in this Investigation and any affirmative defenses.

Exhibit 21

**REQUEST FOR PRODUCTION NO. 119:**

Documents sufficient to identify any prior or present litigation, arbitration, or government agency proceeding involving any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6.

**REQUEST FOR PRODUCTION NO. 120:**

Documents and things sufficient to show Your document retention and destruction policies since the earliest date of development or strategic planning for the Apple Watch Series 6.

**REQUEST FOR PRODUCTION NO. 121:**

Documents and things sufficient to identify each repository of documents and things from which You produced or will produce documents and things responsive to these Requests for Production, including repositories of electronically stored information.

**REQUEST FOR PRODUCTION NO. 122:**

Documents and things sufficient to show Your policies with respect to the intellectual property rights of other companies.

**REQUEST FOR PRODUCTION NO. 123:**

All patent applications and their corresponding file histories filed with the PTO relating to any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6.

**REQUEST FOR PRODUCTION NO. 124:**

All documents and things regarding customer complaints relating to pulse oximetry features on any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6, regardless of the complaint's country of origin, including documents regarding any action taken in response to the complaint.

Exhibit 21

**REQUEST FOR PRODUCTION NO. 125:**

All documents and things concerning consumer feedback relating to the pulse oximetry features on any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6, regardless of the country of origin, including documents regarding any action taken in response to the feedback.

**REQUEST FOR PRODUCTION NO. 126:**

All copies of Complainants' documents in Your possession, custody, or control, including, without limitation, all manuals, schematics, drawings, blueprints, block diagrams, software, and manufacturing, marketing, advertising, and promotional documents.

Dated:  August 19, 2021

By: */s/ Jonathan E. Bachand*
Stephen C. Jensen
Joseph R. Re
Sheila N. Swaroop
Jonathan E. Bachand

**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, Fourteenth Floor
Irvine, CA  92614
Telephone:   (949) 760-0404
Facsimile:    (949) 734-4988
Emails: steve.jensen@knobbe.com;
joe.re@knobbe.com;
sheila.swaroop@knobbe.com;

and

1717 Pennsylvania Ave NW #900
Washington, DC 20006
Telephone:   (202) 640-6400
Facsimile:    (949) 734-4988
Email: jonathan.bachand@knobbe.com

*Counsel for Complainants*
*Masimo Corporation and*
*Ceracor Laboratories, Inc.*

Exhibit 21

**In the Matter of Certain Physiological Measurement Devices and Components Thereof Investigation No. 337-TA-1276**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 19, 2021, I caused a copy of **MASIMO CORPORATION AND CERACOR LABORATORIES, INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS TO APPLE INC. (1-126)** to be served as indicated below:

| Respondent Apple Inc. | |
|---|---|
| Agent for Service of Process:<br>CT Corporation<br>330 N Brand Blvd<br>Suite 700<br>Glendale, CA 91203 | ☑ Via hand delivery<br>☐ Via E-mail to<br>☐ Via Express Delivery<br>☐ Via facsimile |

August 19, 2021

/s/ Claire A. Stoneman
Claire A. Stoneman
Litigation Paralegal
Knobbe, Martens, Olson & Bear, LLP

35033336

Exhibit 21

EXHIBIT 22

# UNITED STATES INTERNATIONAL TRADE COMMISSION
## WASHINGTON, D.C.

**Before the Honorable Charles Bullock**
**Chief Administrative Law Judge**

| | |
|---|---|
| In the Matter of<br><br>**CERTAIN LIGHT-BASED PHYSIOLOGICAL MEASUREMENT DEVICES AND COMPONENTS THEREOF** | Inv. No. 337-TA-1276 |

**MASIMO CORPORATION AND CERCACOR LABORATORIES, INC.'S FIRST SET OF INTERROGATORIES TO APPLE INC. (1-25)**

Exhibit 22

Pursuant to the United States International Trade Commission's Rules of Practice and Procedure and 19 C.F.R. §§ 210.27 and 210.29, Complainants Masimo Corporation and Ceracor Laboratories, Inc. (collectively, "Complainants") direct the following Interrogatories to Respondent Apple Inc. ("Apple") to be answered separately and fully, in writing and under oath within the time prescribed by the rules of the Administrative Law Judge and the Commission.

## DEFINITIONS

The following definitions shall apply to each of the interrogatories herein:

1.      The terms "Respondent," "Apple," "You," and "Your" mean Apple Inc., including, without limitation: any predecessor, predecessor-in-interest, successor, subsidiary, affiliate, and/or division; and any past or present principal, officer, director, employee, former employee, servant, agent, attorney, or other representative.

2.      The term "Complainants" mean Masimo Corporation and Ceracor Laboratories, Inc., collectively and individually, including: any predecessor, predecessor-in-interest, successor, subsidiary, affiliate, and/or division; and any principal, officer, director, employee, former employee, servant, agent, attorney, or other representative.

3.      The term "Complaint" means the operative complaint under § 337 of the Tariff Act of 1930, in this Investigation, which at the time of the service of this document is the amended complaint filed on July 12, 2021 and identified in 86 F.R. 38764.

4.      The terms "Present Investigation" or "Investigation" means *In the Matter of Certain Light-Based Physiological Measurement Devices and Components Thereof*, ITC Inv. No. 337-TA-1276.

5.      The term "Commission" or "ITC" means and refers to the United States International Trade Commission, Washington D.C.

2

Exhibit 22

6.      The term "Section 337" refers to 19 U.S.C. § 1337.

7.      "The '501 Patent" means U.S. Patent No. 10,912,501 and any application leading thereto.

8.      "The '502 Patent" means U.S. Patent No. 10,912,502 and any application leading thereto.

9.      "The '648 Patent" means U.S. Patent No. 10,945,648 and any application leading thereto.

10.     "The '745 Patent" means U.S. Patent No. 10,687,745 and any application leading thereto.

11.     "The '127 Patent" means U.S. Patent No. 7,761,127 and any application leading thereto.

12.     The term "Patents-in-Suit" shall mean the '501 Patent, '502 Patent, '648 Patent, '745 Patent, and '127 Patent, and any additional patents that may be added to the Investigation in the future.

13.     The term "Asserted Claim(s)" means any claim of the Patents-in-Suit that Complainants allege Respondents infringe or any claim Complainants contend is practiced by Domestic Industry Products, including those claims identified in the Complaint and exhibits thereto.

14.     The terms "person," "individual," and "entity" shall include natural persons, corporate or other business entities, and all other forms of legal entities.  The acts of a person, individual, or entity shall include the acts of directors, officers, owners, members, employees, agents, attorneys, or other representatives acting on the person's, individual's, or entity's behalf.

3

Exhibit 22

15.     The term "document" shall be construed under the broadest possible construction under the Federal Rules of Civil Procedure and shall include without limitation any written, recorded, graphic, or other matter, whether sent or received or made or used internally, however produced or reproduced and whatever the medium on which it was produced or reproduced (whether on paper, cards, charts, file, or printouts; tapes, discs, video tapes, audiotapes, tape recordings, cassettes, or other types of voice recording or transcription; computer tapes, databases, or emails; pictures, photographs, slides, films, microfilms, or motion pictures; or any other medium), and any other tangible item or thing of readable, recorded, or visual material of whatever nature including without limitation originals, drafts, and all non-identical copies of each document (which, by reason of any variation, such as the presence or absence of hand-written notes or underlining, represents a distinct version).   By way of example, the terms "document" or "documents" as used herein shall include, without limitation: correspondence; blueprints; memoranda; notes; diaries; letters; e-mails; text messages; metadata; minutes; agendas; contracts; reports; studies; checks; statements; receipts; returns; summaries; pamphlets; circulars; press releases; advertisements; books; inter-office and intra-office communications; handwritten or typewritten notes; notations or summaries of telephone conversations, meetings, or conferences; bulletins; computer printouts; databases; invoices; worksheets; photographs; tape recordings; and all other tangible items of readable, recorded, or visual material of any kind.

16.     The term "thing" means tangible objects of any type, composition, construction, or nature.

17.     The term "communication" means all written, electronic, oral, telephonic, or other inquiries, dialogues, conversations, interviews, correspondence, consultations, negotiations, agreements, understandings, meetings, letters, notes, advertisements, computer mail, email, text

Exhibit 22

messages, and all other documents evidencing any verbal or nonverbal interaction between persons and entities.

18.     The term "concerning" is used in its customary broad sense and, by way of example and not by way of limitation, it includes referring to, relating to, mentioning, discussing, stating, describing, noting, recording, embodying, studying, analyzing, evaluating, evidencing, reflecting, containing, demonstrating, identifying, comprising, constituting, supporting, and undermining, and shall encompass all express and implied references to the specified person, subject, event, or thing.  A document concerning a particular subject includes documents concerning the preparation of other documents or draft documents that concern the subject.

19.     The term "Patent and Trademark Office," "PTO," or "USPTO" means United States Patent and Trademark Office.

20.     The term "Infringement" means and refers to direct, contributory, and induced infringement, whether literally or under the doctrine of equivalents, under the applicable laws.

21.     The term "Domestic Industry" means domestic industry as that term is used in Commission Rule 210.12(a)(6)(i), 19 C.F.R. § 210.12(a)(6)(i), and alleged in Section VII of the Complaint.

22.     The term "Domestic Industry Product" means any product on which Complainant relies for its contention that a Domestic Industry either exists or is in the process of being established, including the products identified in the Complaint and Ex. 27 to the Complaint.

23.     The term "Accused Product(s) and Components Thereof" means any product of Respondents that is accused of infringement in the Present Investigation, including the Apple Watch Series 6, including all components of those products, all spare parts of those products, and all variants of those products designed, developed, manufactured, assembled, offered for sale,

Exhibit 22

distributed, imported or sold by Apple or on behalf of Apple in the United States that include light-based pulse oximetry functionality.  By way of example, the term "Accused Product(s) and Components Thereof" shall include any and all hardware and software utilized in or contributing to the measurement of blood oxygen saturation, including but not limited to hardware such as processors, light-emitting diodes, photodetectors, lenses, magnets, thermistors, and materials covering or surrounding the light emitting diodes or photodiodes, and including but not limited to software such as source code, libraries, and firmware.

24.     The term "prosecution," in relation to a patent or patent application, means all proceedings before, and communications with, a patent office relating to a patent, patent application, continuation, continuation-in-part, and/or divisional, including, but not limited to, interference, reissue, reexamination, opposition, cancellation, inter partes review or other post grant proceedings.

## **INSTRUCTIONS**

The following instructions shall apply to each of the interrogatories herein:

1.     If You contend that any information called for by these interrogatories is privileged or otherwise excludable from discovery, provide all responsive information that is not privileged and, with respect to any withheld information, provide the following: (a) a summary statement of such information in sufficient detail to permit the court to reach a determination in the event of a motion under CFR § 210.29(2); and (b) the grounds on which the information is being withheld (*e.g.*, "attorney-client privilege," "work product immunity").

2.     If any information, document or thing requested herein was, but no longer is, in Your possession, custody, or control, state whether it has been lost, destroyed, or transferred, is missing, or has otherwise been disposed of, and in each instance, explain the circumstances

6

Exhibit 22

surrounding the disposition of the information, document or thing and the date that such disposal occurred.

3.      If You object to any part of any interrogatory or object to providing certain information requested, state Your objection and answer the part(s) of the interrogatory to which You have not objected and/or supply the requested information to which You have not objected.

4.      If You object to any interrogatory on the ground that it is overbroad or unduly burdensome for any reason, respond to that interrogatory as narrowed to the least extent necessary to render it not overbroad or unduly burdensome and state the extent to which You have narrowed that interrogatory for purposes of Your response.

5.      If You object to any interrogatory on the ground that it is vague or ambiguous, identify the particular words, terms or phrases that You assert make such interrogatory vague or ambiguous and specify the meaning actually attributed by You to such words for purposes of Your response thereto.

6.      If any of the following interrogatories cannot be responded to in full after exercising reasonable diligence to secure the information, please so state, supply the information for those portions You are able to answer, and supply whatever information You have concerning the portion that cannot be answered in full.  If any answers are qualified in any particular respect, set forth the details of such qualification.

7.      The singular form of a word should be interpreted in the plural and vice versa. Any pronoun shall be construed to refer to the masculine, feminine, or neuter gender as in each case is most appropriate.   The words "and" and "or" shall be construed conjunctively or disjunctively, whichever makes the request most inclusive.   The word "including" shall be without limitation.  The terms "each" and "any" shall mean any and all.

Exhibit 22

8.      Any term not specifically defined herein is to be defined in accordance with the Federal Rules of Civil Procedure.

9.      To the extent these interrogatories seek information that is recorded in any form of document, including electronically stored documents such as word processing files and email, take steps to ensure that all such documents are preserved for this litigation and to ensure that no responsive electronically stored documents are erased or deleted.

10.     These interrogatories shall include information acquired or identified up to the date(s) of Your answers and shall be deemed to be continuing.  Therefore, promptly produce to Complainants, as supplemental responses to these interrogatories in accordance with Fed. R. Civ. P. 26(e) and 19 C.F.R. § 210.27(f), any additional information that You identify, acquire, or become aware of up to and including the time of hearing.

## **INTERROGATORIES**

### **INTERROGATORY NO. 1:**

Identify each Accused Product and Component Thereof, separately by release, version, product, brand name, marketing name, internal or project name, part number, model name, design number, SKU code, and any other identifying means, that is, has been, or is intended to be imported, sold for importation into the United States, and/or sold in the United States by Apple or any third party, and the three (3) individuals at Apple most knowledgeable about its design, structure, composition, function, and/or operation.

### **INTERROGATORY NO. 2:**

Describe in detail the design and development of the pulse oximetry feature and thermistor feature in the Accused Products and Components Thereof identified in Your response to Interrogatory No. 1, including by describing the design goals that motivated the development

8

Exhibit 22

process, by identifying the date when the design and development work began, by providing an overview of the work done to design and develop the pulse oximeter and thermistor functionality in the Accused Products and Components Thereof, by identifying and describing the role of each person involved in the design and development process, by describing the process used to assess the pulse oximetry feature and thermistor feature in the Accused Products, by identifying and describing the role of each business entity involved in the design and development process, and identify the three (3) people at Apple most knowledgeable about the decision to include a pulse oximetry feature and thermistor feature in any product.

**INTERROGATORY NO. 3:**

For each individual identified in response to Interrogatory No. 2, identify the current (or, if current is unknown, the last known) residential mailing address, employer, employment mailing address, telephone number, and email address; and whether that Person is currently represented by counsel, and if so the identity of that counsel.

**INTERROGATORY NO. 4:**

Identify by Bates number all documents reflecting the design and development process of the pulse oximetry or thermistor feature in the Accused Products and Components Thereof identified in Your response to Interrogatory No. 1.

**INTERROGATORY NO. 5:**

For each of the Accused Products and Components Thereof You identified in response to Interrogatory No. 1, identify each element and component by part number, name, cost, manufacturer, supplier, and provide a detailed description of all functions performed by that element or component in the Accused Products and Components Thereof, including but not limited to elements and components such as processors, light-emitting diodes, photodetectors,

Exhibit 22

lenses, magnets, thermistors, and materials covering or surrounding the light emitting diodes or photodiodes.

**INTERROGATORY NO. 6:**

Identify and describe each business entity involved in the manufacture, assembly, importation into the U.S., marketing in the U.S., sale in the U.S., or distribution in the U.S. of the Apple Watch Series 6, either directly or through subsidiaries, including by identifying the name and address of each such entity, by identifying the role of each entity, by describing any agreements between those entities that relate to corporate ownership or the Apple Watch Series 6, and by identifying each employee of those entities who is or has been significantly involved in the manufacture, assembly, importation into the U.S., marketing in the U.S., sale in the U.S., or distribution in the U.S. of the Apple Watch Series 6 and the nature of their involvement.

**INTERROGATORY NO. 7:**

Identify all products that Apple is currently developing or intends to import during the pendency of this Investigation that include light-based pulse oximetry functionality.

**INTERROGATORY NO. 8:**

Identify all Harmonized Tariff Schedule of the United States numbers under which each of the Accused Products and Components Thereof identified in Your response to Interrogatory No. 1, is or has been imported into the United States.

**INTERROGATORY NO. 9:**

For each of the Accused Products and Components Thereof identified in Your response to Interrogatory No. 1, on a product-by-product basis, describe the importation process for each such product, including in Your response: a description of how each such product is transferred from the manufacturer to a retailer that sells such product or offers such product for sale in the United States; an identification of each entity that holds title to each such product during each

10

Exhibit 22

step of the importation process; an identification of each owner, importer, and consignee involved in the importation process; and identify the three (3) individuals most knowledgeable about the importation process for each product.

**INTERROGATORY NO. 10:**

State the total quantity of the Accused Products and Components Thereof identified in Your response to Interrogatory No. 1 to which Apple holds title and that are located in the United States, and that are within Apple's possession, custody, or control and located in the United States.  To the extent inventory of Accused Products and Components Thereof within the United States is in the actual possession or custody of third parties, identify by name and location each such third party and, for each such third party, indicate the total number of Accused Products in that party's actual possession or custody.

**INTERROGATORY NO. 11:**

For each model number of the Apple Watch Series 6 imported and sold in the United States, provide all financial information relevant to sales - including the date the model was first offered for sale in the United States, the quantity sold in the United States in each quarter less returns, the revenue generated by U.S. sales in each quarter less returns, and the average U.S. sales price in each quarter - and identify documents sufficient to show this financial information.

**INTERROGATORY NO. 12:**

Identify the person(s) most knowledgeable about the following:

(a) The manufacture of the Accused Products and Components Thereof identified in Your response to Interrogatory No. 1;

(b) The distribution of the Accused Products and Components Thereof identified in Your response to Interrogatory No. 1 from the point of manufacture to the final destination in the United States;

11

Exhibit 22

(c) The importation of the Accused Products and Components Thereof identified in Your response to Interrogatory No. 1 into the United States;

(d) Your creation and distribution of advertisements and promotional materials concerning the Accused Products and Components Thereof identified in Your response to Interrogatory No. 1;

(e) Your activities in advertising and promoting the Accused Products and Components Thereof identified in Your response to Interrogatory No. 1 in the United States; and

(f) Your sales of the Accused Products and Components Thereof identified in Your response to Interrogatory No. 1 in the United States.

**INTERROGATORY NO. 13:**

Describe the circumstances relating to Your awareness of the Patents-in-Suit prior to the filing of the Complaint, including by identifying each person who was aware of one or more of the Patents-in-Suit, the circumstances under which such individuals became aware of the Patents-in-Suit, the date each such person became aware of the Patents-in-Suit, and by describing any actions taken by each such person upon becoming aware of the Patents-in-Suit, including any testing, analysis, or attempts to design-around the Patents-in-Suit and identify all documents concerning such facts.

**INTERROGATORY NO. 14:**

State what You contend is the level of ordinary skill in the art and the relevant art with respect to the inventions of the Patents-in-Suit, and identify all documents on which You rely to support Your contention.

Exhibit 22

**INTERROGATORY NO. 15:**

If You contend that an Accused Product and Components Thereof identified in Your response to Interrogatory No. 1 does not infringe an Asserted Claim, for each such Asserted Claim, describe in detail all bases for Apple's noninfringement defense and include in Your answer: an identification of each claim element(s) of the Asserted Claim allegedly not present in or practiced by the Accused Products and Components Thereof, and an identification by Bates number of all documents Apple relies on to support such non-infringement defense.

**INTERROGATORY NO. 16:**

Describe any testing or analysis performed by You or on Your behalf to determine whether the Apple Watch Series 6 infringes any Asserted Claim of the Patents-in-Suit, including by describing any test protocols or analytical methods used, by describing the results of the tests or analyses, by identifying the date and location of the tests or analyses, by identifying the persons who performed, directed, and/or observed the tests or analyses, by describing all documents, test samples or other things reviewed, analyzed, or evaluated in connection with the tests or analyses, and by describing any constructions You applied to claim terms to engage in such analysis.

**INTERROGATORY NO. 17:**

If You contend that any Asserted Claim is invalid under 35 U.S.C. §§ 102 and/or 103, identify each theory of invalidity under 35 U.S.C. §§ 102 and 103 supporting Apple's invalidity defenses, and for each theory of invalidity under 35 U.S.C. §§ 102 and 103, provide a claim chart that describes in detail, on an element-by-element basis, how each prior art reference or combination of prior art references discloses each Asserted Claim; and identify all documents by Bates number supporting each theory of invalidity under 35 U.S.C. §§ 102 and 103.

Exhibit 22

**INTERROGATORY NO. 18:**

If You contend that any Asserted Claim is invalid under 35 U.S.C. § 112, identify each theory of invalidity under 35 U.S.C. § 112 supporting Apple's invalidity defenses and, for each theory of invalidity, describe in detail how the Asserted Claim fails to satisfy the requirements for patentability set forth in 35 U.S.C. § 112, and identify all documents by Bates number supporting each theory of invalidity under 35 U.S.C. § 112.

**INTERROGATORY NO. 19:**

If You contend that any Asserted Claim is invalid under any theory not addressed in the prior interrogatories, identify each such theory of invalidity and, for each such theory of invalidity, describe in detail why You contend any or all claims are invalid, and identify all documents by Bates number supporting each theory of invalidity.

**INTERROGATORY NO. 20:**

For any other affirmative defenses Apple may assert in this investigation not addressed in response to another of Complainants' interrogatories, describe in detail the factual bases for each defense and, for each such defense, identify all documents by Bates number that You rely on for that defense.

**INTERROGATORY NO. 21:**

State in detail all factual and legal bases for any contention by Apple that Complainants are not entitled to a Limited Exclusion Order, cease and desist order, or bonding in this Investigation, including the identification by Bates number of all documents and things You believe concern Your contention, and identify the three (3) individuals at Apple most knowledge about such contentions and bases.

14

Exhibit 22

**INTERROGATORY NO. 22:**

State Your contention regarding the bond that should be imposed pursuant to 19 U.S.C. § 1337(j) for continued importation, and sale of the Accused Products and Components Thereof during the pendency of the Presidential review period in the event that the Commission orders relief to Complainants, identifying the amount of bond You would contend would be appropriate, and state the factual and/or legal basis for Your contention, identify the three (3) individuals at Apple most knowledgeable about such contentions and bases, and the identity of all documents (by Bates numbers) that concern such contention and bases.

**INTERROGATORY NO. 23:**

If You contend that any of the Domestic Industry Products are not an article protected by one or more Asserted Claims, as required by 19 U.S.C. § 1337(a)(2), describe in detail all factual and legal bases for Your contention including: identification of each claim element(s) of the Asserted Claims allegedly not present in or practiced by the Domestic Industry Product; description of any analysis performed and the conclusion; and identification by Bates number of all documents and things You rely on to support such contention and the identification of the three (3) individuals at Apple most knowledge about such contentions and bases. Your response should also identify all facts, theories or arguments supporting Your contention, including a claim chart on a limitation-by-limitation basis identifying each claim limitation that You contend is not met by each Domestic Industry Product.

**INTERROGATORY NO. 24:**

If You contend that an industry in the United States concerning the Patents-in-Suit does not exist and/or is not in the process of being established by Complainants as required under 19 U.S.C. § 1337(a)(2)-(3) with respect to the Domestic Industry Products protected by one or more Asserted Claims of the Patents-in-Suit, identify all facts, theories and arguments supporting Your

15

Exhibit 22

contention, all products analyzed, the identify of any individuals involved in such analysis, and an identification by Bates number of all documents Apple relies on to support that position.

**INTERROGATORY NO. 25:**

Describe Your organizational structure for the following areas: engineering, design, and research and development; manufacture, fabrication, and assembly; exportation; importation; and marketing, sales and promotion of the Accused Products and Components Thereof You identified in response to Interrogatory No. 1; and identify documents sufficient to describe that organizational structure, the three (3) persons most knowledgeable in the above-listed areas, and the managers, directors, and officers who are involved in each of the above-listed areas.

Dated:  August 19, 2021

By: _/s/ Jonathan E. Bachand_
Stephen C. Jensen
Joseph R. Re
Sheila N. Swaroop
Jonathan E. Bachand

**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, Fourteenth Floor
Irvine, CA  92614
Telephone:   (949) 760-0404
Facsimile:   (949) 734-4988
Emails: steve.jensen@knobbe.com;
joe.re@knobbe.com;
sheila.swaroop@knobbe.com;

and

1717 Pennsylvania Ave NW #900
Washington, DC 20006
Telephone:   (202) 640-6400
Facsimile:   (949) 734-4988
Email: jonathan.bachand@knobbe.com

_Counsel for Complainants_
_Masimo Corporation and_
_Cercacor Laboratories, Inc._

16

Exhibit 22

**In the Matter of Certain Physiological Measurement Devices and Components Thereof**
**Investigation No. 337-TA-1276**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 19, 2021, I caused a copy of **MASIMO CORPORATION AND CERACOR LABORATORIES, INC.'S FIRST SET OF INTERROGATORIES TO APPLE INC. (1-25)** to be served as indicated below:

| Respondent Apple Inc. | |
|---|---|
| Agent for Service of Process:<br>CT Corporation<br>330 N Brand Blvd<br>Suite 700<br>Glendale, CA 91203 | ☑ Via hand delivery<br>☐ Via E-mail to<br>☐ Via Express Delivery<br>☐ Via facsimile |

August 19, 2021

*/s/ Claire A. Stoneman*
Claire A. Stoneman
Litigation Paralegal
Knobbe, Martens, Olson & Bear, LLP

35033522

17

Exhibit 22

EXHIBIT 23

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**WASHINGTON, D.C.**

**Before the Honorable Monica Bhattacharyya**
**Administrative Law Judge**

| | |
|---|---|
| **In the Matter of**<br><br>**CERTAIN LIGHT-BASED PHYSIOLOGICAL MEASUREMENT DEVICES AND COMPONENTS THEREOF** | Inv. No. 337-TA-1276 |

**MASIMO CORPORATION AND CERCACOR LABORATORIES, INC.'S FOURTH SET OF INTERROGATORIES TO APPLE INC. (55–61)**

Pursuant to the United States International Trade Commission's Rules of Practice and Procedure and 19 C.F.R. §§ 210.27 and 210.29, Complainants Masimo Corporation and Ceracor Laboratories, Inc. (collectively, "Complainants") direct the following Interrogatories to Respondent Apple Inc. ("Apple") to be answered separately and fully, in writing and under oath within the time prescribed by the rules of the Administrative Law Judge and the Commission.

## DEFINITIONS

The following definitions shall apply to each of the interrogatories herein:

1.      The terms "Respondent," "Apple," "You," and "Your" mean Apple Inc., including, without limitation: any predecessor, predecessor-in-interest, successor, subsidiary, affiliate, and/or division; and any past or present principal, officer, director, employee, former employee, servant, agent, attorney, or other representative.

2.      The term "Complainants" mean Masimo Corporation and Ceracor Laboratories, Inc., collectively and individually, including: any predecessor, predecessor-in-interest, successor, subsidiary, affiliate, and/or division; and any principal, officer, director, employee, former employee, servant, agent, attorney, or other representative.

Exhibit 23

3.      The term "Complaint" means the operative complaint under § 337 of the Tariff Act of 1930, in this Investigation, which at the time of the service of this document is the amended complaint filed on July 12, 2021 and identified in 86 F.R. 38764.

4.      The terms "Present Investigation" or "Investigation" means *In the Matter of Certain Light-Based Physiological Measurement Devices and Components Thereof*, ITC Inv. No. 337-TA-1276.

5.      The term "Commission" or "ITC" means and refers to the United States International Trade Commission, Washington D.C.

6.      The term "Section 337" refers to 19 U.S.C. § 1337

7.      "The '501 Patent" means U.S. Patent No. 10,912,501 and any application leading thereto.

8.      "The '502 Patent" means U.S. Patent No. 10,912,502 and any application leading thereto.

9.      "The '648 Patent" means U.S. Patent No. 10,945,648 and any application leading thereto.

10.      "The '745 Patent" means U.S. Patent No. 10,687,745 and any application leading thereto.

11.      "The '127 Patent" means U.S. Patent No. 7,761,127 and any application leading thereto.

12.      The term "Patents-in-Suit" shall mean the '501 Patent, '502 Patent, '648 Patent, '745 Patent, and '127 Patent, and any additional patents that may be added to the Investigation in the future.

Exhibit 23

13.     The term "Asserted Claim(s)" means any claim of the Patents-in-Suit that Complainants allege Respondents infringe or any claim Complainants contend is practiced by Domestic Industry Products, including those claims identified in the Complaint and exhibits thereto.

14.     The term "Related Patent(s)" means: (a) all United States patent applications that claim priority to the Patents-in-Suit, (b) all United States patent applications from which priority is claimed by the Patents-in-Suit, (c) all United States patent applications that claim priority to a patent application identified in (a) and/or (b), and/or (d) any foreign counterpart patents or patent applications to any of (a), (b), or (c).

15.     The terms "person," "individual," and "entity" shall include natural persons, corporate or other business entities, and all other forms of legal entities.  The acts of a person, individual, or entity shall include the acts of directors, officers, owners, members, employees, agents, attorneys, or other representatives acting on the person's, individual's, or entity's behalf.

16.     The term "document" shall be construed under the broadest possible construction under the Federal Rules of Civil Procedure and shall include without limitation any written, recorded, graphic, or other matter, whether sent or received or made or used internally, however produced or reproduced and whatever the medium on which it was produced or reproduced (whether on paper, cards, charts, file, or printouts; tapes, discs, video tapes, audiotapes, tape recordings, cassettes, or other types of voice recording or transcription; computer tapes, databases, or emails; pictures, photographs, slides, films, microfilms, or motion pictures; or any other medium), and any other tangible item or thing of readable, recorded, or visual material of whatever nature including without limitation originals, drafts, and all non-identical copies of each document (which, by reason of any variation, such as the presence or absence of hand-written notes or

Exhibit 23

underlining, represents a distinct version). By way of example, the terms "document" or "documents" as used herein shall include, without limitation: correspondence; blueprints; memoranda; notes; diaries; letters; e-mails; text messages; metadata; minutes; agendas; contracts; reports; studies; checks; statements; receipts; returns; summaries; pamphlets; circulars; press releases; advertisements; books; inter-office and intra-office communications; handwritten or typewritten notes; notations or summaries of telephone conversations, meetings, or conferences; bulletins; computer printouts; databases; invoices; worksheets; photographs; tape recordings; and all other tangible items of readable, recorded, or visual material of any kind.

17.     The term "thing" means tangible objects of any type, composition, construction, or nature.

18.     The term "communication" means all written, electronic, oral, telephonic, or other inquiries, dialogues, conversations, interviews, correspondence, consultations, negotiations, agreements, understandings, meetings, letters, notes, advertisements, computer mail, email, text messages, and all other documents evidencing any verbal or nonverbal interaction between persons and entities.

19.     The term "concerning" is used in its customary broad sense and, by way of example and not by way of limitation, it includes referring to, relating to, mentioning, discussing, stating, describing, noting, recording, embodying, studying, analyzing, evaluating, evidencing, reflecting, containing, demonstrating, identifying, comprising, constituting, supporting, and undermining, and shall encompass all express and implied references to the specified person, subject, event, or thing.  A document concerning a particular subject includes documents concerning the preparation of other documents or draft documents that concern the subject.

Exhibit 23

20.     The term "Patent and Trademark Office," "PTO," or "USPTO" means United States Patent and Trademark Office.

21.     The term "Infringement" means and refers to direct, contributory, and induced infringement, whether literally or under the doctrine of equivalents, under the applicable laws.

22.     The term "Domestic Industry" means domestic industry as that term is used in Commission Rule 210.12(a)(6)(i), 19 C.F.R. § 210.12(a)(6)(i), and alleged in Section VII of the Complaint.

23.     The term "Domestic Industry Product" means any product on which Complainant relies for its contention that a Domestic Industry either exists or is in the process of being established, including the products identified in the Complaint and Ex. 27 to the Complaint.

24.     The term "Accused Product(s) and Components Thereof" means any product of Respondents that is accused of infringement in the Present Investigation, including the Apple Watch Series 6, including all components of those products, all spare parts of those products, and all variants of those products designed, developed, manufactured, assembled, offered for sale, distributed, imported or sold by Apple or on behalf of Apple in the United States that include light-based pulse oximetry functionality. By way of example, the term "Accused Product(s) and Components Thereof" shall include any and all hardware and software utilized in or contributing to the measurement of blood oxygen saturation, including but not limited to hardware such as processors, light-emitting diodes, photodetectors, lenses, magnets, thermistors, and materials covering or surrounding the light emitting diodes or photodiodes, and including but not limited to software such as source code, libraries, and firmware.

25.     The term "prosecution," in relation to a patent or patent application, means all proceedings before, and communications with, a patent office relating to a patent, patent

Exhibit 23

application, continuation, continuation-in-part, and/or divisional, including, but not limited to, interference, reissue, reexamination, opposition, cancellation, inter partes review or other post grant proceedings.

26.     The term "Blood Oxygen App" means any feature of any Apple Watch that You refer to as the Watch's "Blood Oxygen app," and any software and hardware relied upon by that app to take a blood oxygen measurement.

## **INSTRUCTIONS**

The following instructions shall apply to each of the interrogatories herein:

1.     If You contend that any information called for by these interrogatories is privileged or otherwise excludable from discovery, provide all responsive information that is not privileged and, with respect to any withheld information, provide the following: (a) a summary statement of such information in sufficient detail to permit the court to reach a determination in the event of a motion under CFR § 210.29(2); and (b) the grounds on which the information is being withheld (*e.g.*, "attorney-client privilege," "work product immunity").

2.     If any information, document or thing requested herein was, but no longer is, in Your possession, custody, or control, state whether it has been lost, destroyed, or transferred, is missing, or has otherwise been disposed of, and in each instance, explain the circumstances surrounding the disposition of the information, document or thing and the date that such disposal occurred.

3.     If You object to any part of any interrogatory or object to providing certain information requested, state Your objection and answer the part(s) of the interrogatory to which You have not objected and/or supply the requested information to which You have not objected.

4.     If You object to any interrogatory on the ground that it is overbroad or unduly

Exhibit 23

burdensome for any reason, respond to that interrogatory as narrowed to the least extent necessary to render it not overbroad or unduly burdensome and state the extent to which You have narrowed that interrogatory for purposes of Your response.

5.      If You object to any interrogatory on the ground that it is vague or ambiguous, identify the particular words, terms or phrases that You assert make such interrogatory vague or ambiguous and specify the meaning actually attributed by You to such words for purposes of Your response thereto.

6.      If any of the following interrogatories cannot be responded to in full after exercising reasonable diligence to secure the information, please so state, supply the information for those portions You are able to answer, and supply whatever information You have concerning the portion that cannot be answered in full.  If any answers are qualified in any particular respect, set forth the details of such qualification.

7.      The singular form of a word should be interpreted in the plural and vice versa.  Any pronoun shall be construed to refer to the masculine, feminine, or neuter gender as in each case is most appropriate.  The words "and" and "or" shall be construed conjunctively or disjunctively, whichever makes the request most inclusive.  The word "including" shall be without limitation. The terms "each" and "any" shall mean any and all.

8.      Any term not specifically defined herein is to be defined in accordance with the Federal Rules of Civil Procedure.

9.      To the extent these interrogatories seek information that is recorded in any form of document, including electronically stored documents such as word processing files and email, take steps to ensure that all such documents are preserved for this litigation and to ensure that no responsive electronically stored documents are erased or deleted.

Exhibit 23

10.     These interrogatories shall include information acquired or identified up to the date(s) of Your answers and shall be deemed to be continuing.  Therefore, promptly produce to Complainants, as supplemental responses to these interrogatories in accordance with Fed. R. Civ. P. 26(e) and 19 C.F.R. § 210.27(f), any additional information that You identify, acquire, or become aware of up to and including the time of the evidentiary hearing in this Investigation.

## INTERROGATORIES

### INTERROGATORY NO. 55:

Describe in detail any and all differences in the Blood Oxygen App amongst each model number of Apple Watch Series 6.

### INTERROGATORY NO. 56:

Describe in detail any and all differences in the Blood Oxygen App amongst each model number of Apple Watch Series 7.

### INTERROGATORY NO. 57:

Describe in detail any and all differences in the Blood Oxygen App of Apple Watch Series 6 and the Blood Oxygen App of Apple Watch Series 7.

### INTERROGATORY NO. 58:

Identify the number of units of Apple Watch Series 6 and Apple Watch Series 7, by model number, that You have imported into the United States, or had imported into the United States, since August 13, 2021 and the date, quantity, port of entry, port of departure, and importing entity for each such importation.

Exhibit 23

**INTERROGATORY NO. 59:**

For each location in the United States where You have inventory of Apple Watch Series 6 or Apple Watch Series 7, identify that location by address, the number of such units in inventory by model number, and the total retail value of that location's inventory.

**INTERROGATORY NO. 60:**

For all units of Apple Watch Series 6 and Apple Watch Series 7 that You have imported into the United States, or had imported into the United States, since August 13, 2021, identify by address all locations where those units were manufactured and all entities responsible for that manufacture.

**INTERROGATORY NO. 61:**

Identify representative examples of all packaging of Apple Watch Series 6 and Apple Watch Series 7 that You have imported into the United States, or had imported into the United States, since August 13, 2021, including all freight packaging, pallet packaging, bulk packaging, distribution packaging, and retail unit packaging.


Dated:  October 7, 2021          By: /s/ *Alan G. Laquer*
                                     Stephen C. Jensen
                                     Joseph R. Re
                                     Sheila N. Swaroop
                                     Ted. M. Cannon
                                     Alan G. Laquer
                                     Kendall M. Loebbaka
                                     Douglas B. Wentzel
                                     **KNOBBE, MARTENS, OLSON & BEAR, LLP**
                                     2040 Main Street, Fourteenth Floor
                                     Irvine, CA  92614
                                     Telephone:  (949) 760-0404
                                     Facsimile:  (949) 760-9502

                                     William R. Zimmerman

Exhibit 23

Jonathan E. Bachand
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
1717 Pennsylvania Avenue N.W., Suite 900
Washington, DC 20006
Telephone:  (202) 640-6400
Facsimile:  (202) 640-6401

Brian C. Horne
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
1925 Century Park East
Suite 600
Los Angeles, CA 90067
Telephone:  (310) 551-3450
Facsimile:  (310) 551-3458

Carol Pitzel Cruz
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
925 4th Ave., #2500
Seattle, WA 98104
Telephone:  (206) 405-2000
Facsimile:  (206) 405 2001

Karl W. Kowalis
Matthew S. Friedrichs
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
1155 Avenue of the Americas
24th Floor
New York, NY 10036
Telephone:  (212) 849-3000
Facsimile:  (212) 849-3001

*Counsel for Complainants*
*Masimo Corporation and*
*Cercacor Laboratories, Inc.*

Exhibit 23

**In the Matter of Certain Light-Based Physiological Measurement Devices
and Components Thereof
Investigation No. 337-TA-1276**

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that on October 7, 2021, I caused copies of the foregoing
document to be served as indicated below:

| Counsel for Respondent Apple, Inc. | |
|---|---|
| Michael Esch and co-counsel<br>**WILMER CUTLER PICKERING HALE AND DORR LLP**<br>1875 Pennsylvania Avenue, NW<br>Washington, DC 20006<br><br>Mark Selwyn and co-counsel<br>**WILMER CUTLER PICKERING HALE AND DORR LLP**<br>2600 El Camino Real<br>Suite 400<br>Palo Alto, California 94306<br><br>Joseph Mueller and co-counsel<br>**WILMER CUTLER PICKERING HALE AND DORR LLP**<br>60 State Street<br>Boston, Massachusetts 02109 | ☑  Via E-mail to<br>WHApple-<br>Masimo1276ServiceList@wilmerhale.com |

October 7, 2021

/s/ *Claire A. Stoneman*
Knobbe, Martens, Olson & Bear, LLP

Exhibit 23

EXHIBIT 24

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**WASHINGTON, D.C.**

**Before the Honorable Monica Bhattacharyya**
**Administrative Law Judge**

| | |
|---|---|
| **In the Matter of**<br><br>**CERTAIN LIGHT-BASED PHYSIOLOGICAL MEASUREMENT DEVICES AND COMPONENTS THEREOF** | Inv. No. 337-TA-1276 |

**MASIMO CORPORATION AND CERCACOR LABORATORIES, INC.'S FIFTH SET OF INTERROGATORIES TO APPLE INC. (62-70)**

Pursuant to the United States International Trade Commission's Rules of Practice and Procedure and 19 C.F.R. §§ 210.27 and 210.29, Complainants Masimo Corporation and Cercacor Laboratories, Inc. (collectively, "Complainants") direct the following Interrogatories to Respondent Apple Inc. ("Apple") to be answered separately and fully, in writing and under oath within the time prescribed by the rules of the Administrative Law Judge and the Commission.

## DEFINITIONS

The following definitions shall apply to each of the interrogatories herein:

1. The terms "Respondent," "Apple," "You," and "Your" mean Apple Inc., including, without limitation: any predecessor, predecessor-in-interest, successor, subsidiary, affiliate, and/or division; and any past or present principal, officer, director, employee, former employee, servant, agent, attorney, or other representative.

2. The term "Complainants" mean Masimo Corporation and Cercacor Laboratories, Inc., collectively and individually, including: any predecessor, predecessor-in-interest, successor, subsidiary, affiliate, and/or division; and any principal, officer, director, employee, former employee, servant, agent, attorney, or other representative.

Exhibit 24

3.      The term "Complaint" means the operative complaint under § 337 of the Tariff Act of 1930, in this Investigation, which at the time of the service of this document is the amended complaint filed on July 12, 2021 and identified in 86 F.R. 38764.

4.      The terms "Present Investigation" or "Investigation" means *In the Matter of Certain Light-Based Physiological Measurement Devices and Components Thereof*, ITC Inv. No. 337-TA-1276.

5.      The term "Commission" or "ITC" means and refers to the United States International Trade Commission, Washington D.C.

6.      The term "Section 337" refers to 19 U.S.C. § 1337.

7.      "The '501 Patent" means U.S. Patent No. 10,912,501 and any application leading thereto.

8.      "The '502 Patent" means U.S. Patent No. 10,912,502 and any application leading thereto.

9.      "The '648 Patent" means U.S. Patent No. 10,945,648 and any application leading thereto.

10.     "The '745 Patent" means U.S. Patent No. 10,687,745 and any application leading thereto.

11.     "The '127 Patent" means U.S. Patent No. 7,761,127 and any application leading thereto.

12.     The term "Patents-in-Suit" shall mean the '501 Patent, '502 Patent, '648 Patent, '745 Patent, and '127 Patent, and any additional patents that may be added to the Investigation in the future.

Exhibit 24

13.     The term "Asserted Claim(s)" means any claim of the Patents-in-Suit that Complainants allege Respondents infringe or any claim Complainants contend is practiced by Domestic Industry Products, including those claims identified in the Complaint and exhibits thereto.

14.     The term "Related Patent(s)" means: (a) all United States patent applications that claim priority to the Patents-in-Suit, (b) all United States patent applications from which priority is claimed by the Patents-in-Suit, (c) all United States patent applications that claim priority to a patent application identified in (a) and/or (b), and/or (d) any foreign counterpart patents or patent applications to any of (a), (b), or (c).

15.     The terms "person," "individual," and "entity" shall include natural persons, corporate or other business entities, and all other forms of legal entities.  The acts of a person, individual, or entity shall include the acts of directors, officers, owners, members, employees, agents, attorneys, or other representatives acting on the person's, individual's, or entity's behalf.

16.     The term "document" shall be construed under the broadest possible construction under the Federal Rules of Civil Procedure and shall include without limitation any written, recorded, graphic, or other matter, whether sent or received or made or used internally, however produced or reproduced and whatever the medium on which it was produced or reproduced (whether on paper, cards, charts, file, or printouts; tapes, discs, video tapes, audiotapes, tape recordings, cassettes, or other types of voice recording or transcription; computer tapes, databases, or emails; pictures, photographs, slides, films, microfilms, or motion pictures; or any other medium), and any other tangible item or thing of readable, recorded, or visual material of whatever nature including without limitation originals, drafts, and all non-identical copies of each document (which, by reason of any variation, such as the presence or absence of hand-written notes or

Exhibit 24

underlining, represents a distinct version). By way of example, the terms "document" or "documents" as used herein shall include, without limitation: correspondence; blueprints; memoranda; notes; diaries; letters; e-mails; text messages; metadata; minutes; agendas; contracts; reports; studies; checks; statements; receipts; returns; summaries; pamphlets; circulars; press releases; advertisements; books; inter-office and intra-office communications; handwritten or typewritten notes; notations or summaries of telephone conversations, meetings, or conferences; bulletins; computer printouts; databases; invoices; worksheets; photographs; tape recordings; and all other tangible items of readable, recorded, or visual material of any kind.

17.    The term "thing" means tangible objects of any type, composition, construction, or nature.

18.    The term "communication" means all written, electronic, oral, telephonic, or other inquiries, dialogues, conversations, interviews, correspondence, consultations, negotiations, agreements, understandings, meetings, letters, notes, advertisements, computer mail, email, text messages, and all other documents evidencing any verbal or nonverbal interaction between persons and entities.

19.    The term "concerning" is used in its customary broad sense and, by way of example and not by way of limitation, it includes referring to, relating to, mentioning, discussing, stating, describing, noting, recording, embodying, studying, analyzing, evaluating, evidencing, reflecting, containing, demonstrating, identifying, comprising, constituting, supporting, and undermining, and shall encompass all express and implied references to the specified person, subject, event, or thing.  A document concerning a particular subject includes documents concerning the preparation of other documents or draft documents that concern the subject.

Exhibit 24

20.     The term "Patent and Trademark Office," "PTO," or "USPTO" means United States Patent and Trademark Office.

21.     The term "Infringement" means and refers to direct, contributory, and induced infringement, whether literally or under the doctrine of equivalents, under the applicable laws.

22.     The term "Domestic Industry" means domestic industry as that term is used in Commission Rule 210.12(a)(6)(i), 19 C.F.R. § 210.12(a)(6)(i), and alleged in Section VII of the Complaint.

23.     The term "Domestic Industry Product" means any product on which Complainant relies for its contention that a Domestic Industry either exists or is in the process of being established, including the products identified in the Complaint and Ex. 27 to the Complaint.

24.     The term "Accused Product(s) and Components Thereof" means any product of Respondents that is accused of infringement in the Present Investigation, including the Apple Watch Series 6, including all components of those products, all spare parts of those products, and all variants of those products designed, developed, manufactured, assembled, offered for sale, distributed, imported or sold by Apple or on behalf of Apple in the United States that include light-based pulse oximetry functionality. By way of example, the term "Accused Product(s) and Components Thereof" shall include any and all hardware and software utilized in or contributing to the measurement of blood oxygen saturation, including but not limited to hardware such as processors, light-emitting diodes, photodetectors, lenses, magnets, thermistors, and materials covering or surrounding the light emitting diodes or photodiodes, and including but not limited to software such as source code, libraries, and firmware.

25.     The term "prosecution," in relation to a patent or patent application, means all proceedings before, and communications with, a patent office relating to a patent, patent

Exhibit 24

application, continuation, continuation-in-part, and/or divisional, including, but not limited to, interference, reissue, reexamination, opposition, cancellation, inter partes review or other post grant proceedings.

26.     The term "Blood Oxygen App" means any feature of any Apple Watch that You refer to as the Watch's "Blood Oxygen app," and any software and hardware relied upon by that app to take a blood oxygen measurement.

27.     The "Already Released Apple Watches" means Apple Watch Series 1, Apple Watch Series 2, Apple Watch Series 3, Apple Watch Series 4, Apple Watch Series 5, Apple Watch Series 6, Apple Watch SE, and Apple Watch Series 7.

28.     The term "Target Date" means the target date in this Investigation, which is currently January 16, 2023.

## **INSTRUCTIONS**

The following instructions shall apply to each of the interrogatories herein:

1.     If You contend that any information called for by these interrogatories is privileged or otherwise excludable from discovery, provide all responsive information that is not privileged and, with respect to any withheld information, provide the following: (a) a summary statement of such information in sufficient detail to permit the court to reach a determination in the event of a motion under CFR § 210.29(2); and (b) the grounds on which the information is being withheld (*e.g.*, "attorney-client privilege," "work product immunity").

2.     If any information, document or thing requested herein was, but no longer is, in Your possession, custody, or control, state whether it has been lost, destroyed, or transferred, is missing, or has otherwise been disposed of, and in each instance, explain the circumstances surrounding the disposition of the information, document or thing and the date that such disposal

Exhibit 24

occurred.

      3.     If You object to any part of any interrogatory or object to providing certain information requested, state Your objection and answer the part(s) of the interrogatory to which You have not objected and/or supply the requested information to which You have not objected.

      4.     If You object to any interrogatory on the ground that it is overbroad or unduly burdensome for any reason, respond to that interrogatory as narrowed to the least extent necessary to render it not overbroad or unduly burdensome and state the extent to which You have narrowed that interrogatory for purposes of Your response.

      5.     If You object to any interrogatory on the ground that it is vague or ambiguous, identify the particular words, terms or phrases that You assert make such interrogatory vague or ambiguous and specify the meaning actually attributed by You to such words for purposes of Your response thereto.

      6.     If any of the following interrogatories cannot be responded to in full after exercising reasonable diligence to secure the information, please so state, supply the information for those portions You are able to answer, and supply whatever information You have concerning the portion that cannot be answered in full.  If any answers are qualified in any particular respect, set forth the details of such qualification.

      7.     The singular form of a word should be interpreted in the plural and vice versa.  Any pronoun shall be construed to refer to the masculine, feminine, or neuter gender as in each case is most appropriate.  The words "and" and "or" shall be construed conjunctively or disjunctively, whichever makes the request most inclusive.  The word "including" shall be without limitation. The terms "each" and "any" shall mean any and all.

      8.     Any term not specifically defined herein is to be defined in accordance with the

-7-

Exhibit 24

Federal Rules of Civil Procedure.

9.      To the extent these interrogatories seek information that is recorded in any form of document, including electronically stored documents such as word processing files and email, take steps to ensure that all such documents are preserved for this litigation and to ensure that no responsive electronically stored documents are erased or deleted.

10.     These interrogatories shall include information acquired or identified up to the date(s) of Your answers and shall be deemed to be continuing.  Therefore, promptly produce to Complainants, as supplemental responses to these interrogatories in accordance with Fed. R. Civ. P. 26(e) and 19 C.F.R. § 210.27(f), any additional information that You identify, acquire, or become aware of up to and including the time of the evidentiary hearing in this Investigation.

## **INTERROGATORIES**

### **INTERROGATORY NO. 62:**

Separately for each of the Accused Products and Components Thereof identified in Your response to Interrogatory No. 1, provide an index of the final versions of Your non-duplicative technical drawings sufficient to accurately describe the Accused Products and Components Thereof, including, for each drawing, the drawing name, drawing number, drawing author(s), date issued, revision number, and Bates numbers for drawings produced.

### **INTERROGATORY NO. 63:**

To the extent You deny Masimo's Request for Admission No. 1, describe the current status of Your importation of the Apple Watch Series 6 into the United States and Your plans regarding importation of the Apple Watch Series 6 into the United States during the pendency of this Investigation (including, but not limited to, an explanation of when You will stop importing the

Exhibit 24

Apple Watch Series 6 into the United States), and identify corroborating documents by Bates number.

**INTERROGATORY NO. 64:**

Describe in detail the date and circumstances under which You first became aware of the disclosure of any patent, publication, or application to which any of the Asserted Patents claim priority, and identify documents by Bates number corroborating Your awareness of said disclosure and the three (3) persons most knowledgeable about Your awareness of said disclosure.

**INTERROGATORY NO. 65:**

Identify by codename, project name, model number (actual or anticipated), and product name (actual or anticipated, such as Apple Watch Series 8) all Apple Watch models other than the Already Released Apple Watches that You believe it is more likely than not You will import or have imported into the United States any type of units of (including any prototypes, research and development units, pre-production units, test units, marketing units, units for use in any launch event or taping, or commercial units) by the Target Date.

**INTERROGATORY NO. 66:**

Identify by codename, project name, model number (actual or anticipated), and product name (actual or anticipated) all devices with any feature for or referred to as measuring blood oxygen saturation, blood oxygen concentration, pulse oximetry, or any "Blood Oxygen App," other than any Apple Watch product, that You believe it is more likely than not You will import or have imported into the United States any type of units of (including any prototypes, research and development units, pre-production units, test units, marketing units, units for use in any launch event or taping, or commercial units) by the Target Date.

Exhibit 24

**INTERROGATORY NO. 67:**

For each category of device identified in response to Interrogatory No. 65 or 66, describe in detail your plans for any Blood Oxygen App in that device, including whether you believe it is more likely than not that it will include a Blood Oxygen App and any similarities and differences (including regarding any functionality, hardware, and software related to any Blood Oxygen App) between its Blood Oxygen App and the Blood Oxygen App of the Apple Watch Series 7.

**INTERROGATORY NO. 68:**

For each category of device identified in response to Interrogatory No. 65 or 66, for each type of unit for that device (including any prototypes, research and development units, pre-production units, test units, marketing units, units for use in any launch event or taping, or commercial units), describe in detail when You believe it is most likely that the first unit of that type will be imported into the United States.

**INTERROGATORY NO. 69:**

Describe in detail whether You have stopped importing or having imported into the United States Apple Watch Series 6, and if not, when You believe it is most likely that You will stop importing or having imported into the United States Apple Watch Series 6, including whether You expect that importation to stop before the Target Date.

**INTERROGATORY NO. 70:**

Describe in detail when You believe it is most likely that You will stop importing or having imported into the United States Apple Watch Series 7, including whether You expect that importation to stop before the Target Date.

Dated:  October 21, 2021                    By: /s/ *Kendall M. Loebbaka*
                                                                Stephen C. Jensen
                                                                Joseph R. Re

-10-

Exhibit 24

Sheila N. Swaroop
Ted. M. Cannon
Alan G. Laquer
Kendall M. Loebbaka
Douglas B. Wentzel
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, Fourteenth Floor
Irvine, CA  92614
Telephone:  (949) 760-0404
Facsimile:  (949) 760-9502

William R. Zimmerman
Jonathan E. Bachand
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
1717 Pennsylvania Avenue N.W., Suite 900
Washington, DC 20006
Telephone:  (202) 640-6400
Facsimile:  (202) 640-6401

Brian C. Horne
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
1925 Century Park East
Suite 600
Los Angeles, CA 90067
Telephone:  (310) 551-3450
Facsimile:  (310) 551-3458

Carol Pitzel Cruz
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
925 4th Ave., #2500
Seattle, WA 98104
Telephone:  (206) 405-2000
Facsimile:  (206) 405 2001

Karl W. Kowalis
Matthew S. Friedrichs
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
1155 Avenue of the Americas
24th Floor
New York, NY 10036
Telephone:  (212) 849-3000
Facsimile:  (212) 849-3001

*Counsel for Complainants*
*Masimo Corporation and*
*Cercacor Laboratories, Inc.*

Exhibit 24

**In the Matter of Certain Light-Based Physiological Measurement Devices and Components Thereof**
**Investigation No. 337-TA-1276**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on October 21, 2021, I caused copies of the foregoing document to be served as indicated below:

| Counsel for Respondent Apple, Inc. | |
|---|---|
| Michael Esch and co-counsel<br>**WILMER CUTLER PICKERING HALE AND DORR LLP**<br>1875 Pennsylvania Avenue, NW<br>Washington, DC 20006<br><br>Mark Selwyn and co-counsel<br>**WILMER CUTLER PICKERING HALE AND DORR LLP**<br>2600 El Camino Real<br>Suite 400<br>Palo Alto, California 94306<br><br>Joseph Mueller and co-counsel<br>**WILMER CUTLER PICKERING HALE AND DORR LLP**<br>60 State Street<br>Boston, Massachusetts 02109 | ☑ Via E-mail to WHApple-Masimo1276ServiceList@wilmerhale.com |

October 21, 2021

/s/ *Claire A. Stoneman*
Knobbe, Martens, Olson & Bear, LLP

Exhibit 24

EXHIBIT 39

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**WASHINGTON, D.C.**

**Before the Honorable Charles Bullock**
**Chief Administrative Law Judge**

| | |
|---|---|
| In the Matter of<br><br>**CERTAIN LIGHT-BASED PHYSIOLOGICAL MEASUREMENT DEVICES AND COMPONENTS THEREOF** | **Investigation No. 337-TA-1276** |

**MASIMO CORPORATION AND CERACOR LABORATORIES, INC.'S SECOND SET OF INTERROGATORIES TO APPLE INC. (26–49)**

Pursuant to the United States International Trade Commission's Rules of Practice and Procedure and 19 C.F.R. §§ 210.27 and 210.29, Complainants Masimo Corporation and Ceracor Laboratories, Inc. (collectively, "Complainants") direct the following Interrogatories to Respondent Apple Inc. ("Apple") to be answered separately and fully, in writing and under oath within the time prescribed by the rules of the Administrative Law Judge and the Commission.

<u>**DEFINITIONS**</u>

The following definitions shall apply to each of the interrogatories herein:

1.      The terms "Respondent," "Apple," "You," and "Your" mean Apple Inc., including, without limitation: any predecessor, predecessor-in-interest, successor, subsidiary, affiliate, and/or division; and any past or present principal, officer, director, employee, former employee, servant, agent, attorney, or other representative.

2.      The term "Complainants" mean Masimo Corporation and Ceracor Laboratories, Inc., collectively and individually, including: any predecessor, predecessor-in-interest, successor, subsidiary, affiliate, and/or division; and any principal, officer, director, employee, former employee, servant, agent, attorney, or other representative.

Exhibit 39

3.      The term "Complaint" means the operative complaint under § 337 of the Tariff Act of 1930, in this Investigation, which at the time of the service of this document is the amended complaint filed on July 12, 2021 and identified in 86 F.R. 38764.

4.      The terms "Present Investigation" or "Investigation" means *In the Matter of Certain Light-Based Physiological Measurement Devices and Components Thereof*, ITC Inv. No. 337-TA-1276.

5.      The term "Commission" or "ITC" means and refers to the United States International Trade Commission, Washington D.C.

6.      The term "Section 337" refers to 19 U.S.C. § 1337

7.      "The '501 Patent" means U.S. Patent No. 10,912,501 and any application leading thereto.

8.      "The '502 Patent" means U.S. Patent No. 10,912,502 and any application leading thereto.

9.      "The '648 Patent" means U.S. Patent No. 10,945,648 and any application leading thereto.

10.     "The '745 Patent" means U.S. Patent No. 10,687,745 and any application leading thereto.

11.     "The '127 Patent" means U.S. Patent No. 7,761,127 and any application leading thereto.

12.     The term "Patents-in-Suit" shall mean the '501 Patent, '502 Patent, '648 Patent, '745 Patent, and '127 Patent, and any additional patents that may be added to the Investigation in the future.

Exhibit 39

13.     The term "Asserted Claim(s)" means any claim of the Patents-in-Suit that Complainants allege Respondents infringe or any claim Complainants contend is practiced by Domestic Industry Products, including those claims identified in the Complaint and exhibits thereto.

14.     The term "Related Patent(s)" means: (a) all United States patent applications that claim priority to the Patents-in-Suit, (b) all United States patent applications from which priority is claimed by the Patents-in-Suit, (c) all United States patent applications that claim priority to a patent application identified in (a) and/or (b), and/or (d) any foreign counterpart patents or patent applications to any of (a), (b), or (c).

15.     The terms "person," "individual," and "entity" shall include natural persons, corporate or other business entities, and all other forms of legal entities.  The acts of a person, individual, or entity shall include the acts of directors, officers, owners, members, employees, agents, attorneys, or other representatives acting on the person's, individual's, or entity's behalf.

16.     The term "document" shall be construed under the broadest possible construction under the Federal Rules of Civil Procedure and shall include without limitation any written, recorded, graphic, or other matter, whether sent or received or made or used internally, however produced or reproduced and whatever the medium on which it was produced or reproduced (whether on paper, cards, charts, file, or printouts; tapes, discs, video tapes, audiotapes, tape recordings, cassettes, or other types of voice recording or transcription; computer tapes, databases, or emails; pictures, photographs, slides, films, microfilms, or motion pictures; or any other medium), and any other tangible item or thing of readable, recorded, or visual material of whatever nature including without limitation originals, drafts, and all non-identical copies of each document (which, by reason of any variation, such as the presence or absence of hand-written notes or

Exhibit 39

underlining, represents a distinct version). By way of example, the terms "document" or "documents" as used herein shall include, without limitation: correspondence; blueprints; memoranda; notes; diaries; letters; e-mails; text messages; metadata; minutes; agendas; contracts; reports; studies; checks; statements; receipts; returns; summaries; pamphlets; circulars; press releases; advertisements; books; inter-office and intra-office communications; handwritten or typewritten notes; notations or summaries of telephone conversations, meetings, or conferences; bulletins; computer printouts; databases; invoices; worksheets; photographs; tape recordings; and all other tangible items of readable, recorded, or visual material of any kind.

17.    The term "thing" means tangible objects of any type, composition, construction, or nature.

18.    The term "communication" means all written, electronic, oral, telephonic, or other inquiries, dialogues, conversations, interviews, correspondence, consultations, negotiations, agreements, understandings, meetings, letters, notes, advertisements, computer mail, email, text messages, and all other documents evidencing any verbal or nonverbal interaction between persons and entities.

19.    The term "concerning" is used in its customary broad sense and, by way of example and not by way of limitation, it includes referring to, relating to, mentioning, discussing, stating, describing, noting, recording, embodying, studying, analyzing, evaluating, evidencing, reflecting, containing, demonstrating, identifying, comprising, constituting, supporting, and undermining, and shall encompass all express and implied references to the specified person, subject, event, or thing.  A document concerning a particular subject includes documents concerning the preparation of other documents or draft documents that concern the subject.

Exhibit 39

20.     The term "Patent and Trademark Office," "PTO," or "USPTO" means United States Patent and Trademark Office.

21.     The term "Infringement" means and refers to direct, contributory, and induced infringement, whether literally or under the doctrine of equivalents, under the applicable laws.

22.     The term "Domestic Industry" means domestic industry as that term is used in Commission Rule 210.12(a)(6)(i), 19 C.F.R. § 210.12(a)(6)(i), and alleged in Section VII of the Complaint.

23.     The term "Domestic Industry Product" means any product on which Complainant relies for its contention that a Domestic Industry either exists or is in the process of being established, including the products identified in the Complaint and Ex. 27 to the Complaint.

24.     The term "Accused Product(s) and Components Thereof" means any product of Respondents that is accused of infringement in the Present Investigation, including the Apple Watch Series 6, including all components of those products, all spare parts of those products, and all variants of those products designed, developed, manufactured, assembled, offered for sale, distributed, imported or sold by Apple or on behalf of Apple in the United States that include light-based pulse oximetry functionality. By way of example, the term "Accused Product(s) and Components Thereof" shall include any and all hardware and software utilized in or contributing to the measurement of blood oxygen saturation, including but not limited to hardware such as processors, light-emitting diodes, photodetectors, lenses, magnets, thermistors, and materials covering or surrounding the light emitting diodes or photodiodes, and including but not limited to software such as source code, libraries, and firmware.

25.     The term "prosecution," in relation to a patent or patent application, means all proceedings before, and communications with, a patent office relating to a patent, patent

Exhibit 39

application, continuation, continuation-in-part, and/or divisional, including, but not limited to,
interference, reissue, reexamination, opposition, cancellation, inter partes review or other post
grant proceedings.

### INSTRUCTIONS

The following instructions shall apply to each of the interrogatories herein:

1.     If You contend that any information called for by these interrogatories is privileged
or otherwise excludable from discovery, provide all responsive information that is not privileged
and, with respect to any withheld information, provide the following: (a) a summary statement of
such information in sufficient detail to permit the court to reach a determination in the event of a
motion under CFR § 210.29(2); and (b) the grounds on which the information is being withheld
(*e.g.*, "attorney-client privilege," "work product immunity").

2.     If any information, document or thing requested herein was, but no longer is, in
Your possession, custody, or control, state whether it has been lost, destroyed, or transferred, is
missing, or has otherwise been disposed of, and in each instance, explain the circumstances
surrounding the disposition of the information, document or thing and the date that such disposal
occurred.

3.     If You object to any part of any interrogatory or object to providing certain
information requested, state Your objection and answer the part(s) of the interrogatory to which
You have not objected and/or supply the requested information to which You have not objected.

4.     If You object to any interrogatory on the ground that it is overbroad or unduly
burdensome for any reason, respond to that interrogatory as narrowed to the least extent necessary
to render it not overbroad or unduly burdensome and state the extent to which You have narrowed
that interrogatory for purposes of Your response.

Exhibit 39

5.      If You object to any interrogatory on the ground that it is vague or ambiguous, identify the particular words, terms or phrases that You assert make such interrogatory vague or ambiguous and specify the meaning actually attributed by You to such words for purposes of Your response thereto.

6.      If any of the following interrogatories cannot be responded to in full after exercising reasonable diligence to secure the information, please so state, supply the information for those portions You are able to answer, and supply whatever information You have concerning the portion that cannot be answered in full.  If any answers are qualified in any particular respect, set forth the details of such qualification.

7.      The singular form of a word should be interpreted in the plural and vice versa.  Any pronoun shall be construed to refer to the masculine, feminine, or neuter gender as in each case is most appropriate.  The words "and" and "or" shall be construed conjunctively or disjunctively, whichever makes the request most inclusive.  The word "including" shall be without limitation. The terms "each" and "any" shall mean any and all.

8.      Any term not specifically defined herein is to be defined in accordance with the Federal Rules of Civil Procedure.

9.      To the extent these interrogatories seek information that is recorded in any form of document, including electronically stored documents such as word processing files and email, take steps to ensure that all such documents are preserved for this litigation and to ensure that no responsive electronically stored documents are erased or deleted.

10.      These interrogatories shall include information acquired or identified up to the date(s) of Your answers and shall be deemed to be continuing.  Therefore, promptly produce to Complainants, as supplemental responses to these interrogatories in accordance with Fed. R. Civ.

Exhibit 39

P. 26(e) and 19 C.F.R. § 210.27(f), any additional information that You identify, acquire, or become aware of up to and including the time of the evidentiary hearing in this Investigation.

## **INTERROGATORIES**

### **INTERROGATORY NO. 26:**

From the date Apple decided to pursue pulse oximetry in its products to present, identify all Apple employees, officers, director, agents, engineers, scientists, researchers, developers, consultants, members, and representatives who at any time were employed by or worked with either of the Complainants and were involved in the design, development, or testing of pulse oximetry technology at Apple.

### **INTERROGATORY NO. 27:**

For each individual identified in Your response to Interrogatory No. 26, provide the following information:

(a)     The identity of the Complainant entity(ies) that the identified individual was employed by;

(b)     The dates during which the identified individual worked for the Complainant(s);

(c)     The date on which the identified individual began working for Apple;

(d)     All current and past positions held by the identified individual during their employment with or work for Apple, and the dates during which they held each such position;

(e)     A detailed description of the responsibilities for each position identified in subpart (d); and

(f)     A detailed description of any work performed by the identified individual relating to pulse oximetry projects or any of the Accused Products and Components Thereof identified in Your response to Interrogatory No. 1.

Exhibit 39

**INTERROGATORY NO. 28:**

For each of the Accused Products and Components Thereof identified in Your response to Interrogatory No. 1, on a product-by-product basis, identify where the research, development, manufacturing, production, assembly, and testing of the product occurred, is occurring, and/or is planned to occur.

**INTERROGATORY NO. 29:**

Describe Your past and present policies and practices concerning filing, storage, retention, and destruction of documents, and identify documents that describe such policies and practices and the three (3) person(s) most knowledgeable about such policies and practices.

**INTERROGATORY NO. 30:**

For each Manufacturer and/or supplier identified in response to Interrogatory No. 5, describe in detail the Manufacturer and/or supplier's role in the manufacturing process, including which components of each product the Manufacturer and/or supplier makes, assembles and/or supplies, the name, model number, part number, and/or other identifying means of each such component, and how the Manufacturer transfers the finished good(s) to Apple.

**INTERROGATORY NO. 31:**

Describe in detail each entity involved in the research, production, manufacture, assembly, packaging, and/or testing of each Accused Product and Component Thereof identified in Your response to Interrogatory No. 1, including the name and location of each such entity, a detailed description of each entity's precise role in the aforementioned activities, and the identity of each person at each such entity with whom You have been or are in contact.

**INTERROGATORY NO. 32:**

Describe in detail all activities undertaken to meet Your document-related discovery obligations in this Investigation, including in Your answer an identification of all Apple personnel

Exhibit 39

who searched for documents responsive to Complainants' discovery requests, and an identification and location of all physical, electronic, and other document repositories—including centralized and noncentralized servers or networks; shared drives; email servers; email archives, back-up medial (including materials that Apple retains for disaster recovery purposes), hard copy files; engineer, developer, researcher, and consultant, and employee desktop and/or laptop computers; and databases containing electronically stored information concerning the Accused Products and Components Thereof identified in Your response to Interrogatory No. 1 that were searched in response to Complainants' discovery requests.

## INTERROGATORY NO. 33:

For each of the Accused Products and Components Thereof identified in Your response to Interrogatory No. 1, identify and describe with particularity the location(s) of all documents, physical and electronic, relating to the design, development, and structure of each such product and component, including, but not limited to, the precise locations of any such physical documents and a summary of the documents present at each physical location, and the precise locations of any such electronic documents and a summary of the documents present at each electronic location.

## INTERROGATORY NO. 34:

Identify any agreements or discussions between or among manufacturers, distributors, exporters, importers, or sellers of the Accused Products and Components Thereof identified in Your response to Interrogatory No. 1, including You, to coordinate a response to the Complaint or to investigate and analyze the infringement, validity, and enforceability of any of the Asserted Claims; describe the substance of any such agreements or discussions; identify the parties to any such agreements or discussions; and identify the date(s) any such agreements were entered into or discussions were held.

Exhibit 39

**INTERROGATORY NO. 35:**

Describe in detail any patent protection sought by You in any country regarding any of the Accused Products and Components Thereof identified in Your response to Interrogatory No. 1 including an identification of any patent application numbers and patent numbers, dates and countries of filing, and an identification by Bates number of said patent applications and patents.

**INTERROGATORY NO. 36:**

Identify any proceeding, including litigation, arbitration, or dispute resolution proceeding, or any charge of infringement (whether formal or informal), pending or threatened, relating to any of the Accused Products or Components Thereof identified in Your response to Interrogatory No. 1, including the name and location of the court or administrative body, the parties involved, the date the action was filed or initiated, all corresponding pleadings and transcripts, and identify the three (3) individuals at Apple most knowledgeable about each such litigation, arbitration, and proceeding.

**INTERROGATORY NO. 37:**

Identify and describe any Communications, either written or oral, relating to Your infringement of any of the Patents-in-Suit, or any Related Patent, including, without limitation, (a) each Communication in which infringement of one or more of the Patents-in-Suit or Related Patents is discussed or mentioned, and (b) all subsequent Communications sent or received that relate to any such discussion or mention of Your infringement of any Patents-in-Suit or Related Patents.

**INTERROGATORY NO. 38:**

Identify and describe all testing, evaluation, analysis, or examination of any Domestic Industry Products, components, or parts by either Apple, or on Apple's behalf, including, without limitation:

Exhibit 39

(a)      the name and model number of the Domestic Industry Product, component, or part;

(b)      the current location of the Domestic Industry Product, component, or part;

(c)      the date and manner in which the Domestic Industry Product, component, or part was acquired;

(d)      the identity of all persons who obtained or handled the Domestic Industry Product, component, or part;

(e)      the identity of all persons who participated in the testing, evaluation, analysis or examination of the Domestic Industry Product, component, or part;

(f)      each process step used in the testing, evaluation, analysis, or examination of the Domestic Industry Product, component, or part;

(g)      all written or oral reports, observations, or conclusions that were the result of such testing, evaluation, analysis, or examination;

(h)      every document relating to such testing, evaluation, analysis, or examination;

(i)      the persons most knowledgeable about Communications between Apple and each third party that performed testing, evaluation, analysis, or examination of the Domestic Industry Product, component, or part; and

(j)      any other circumstances not yet provided in response to this Interrogatory that pertain to the testing, evaluation, analysis, or examination of any Domestic Industry Products, as well as all documents reviewed or created that relate to such testing, evaluation, analysis, or examination.

**INTERROGATORY NO. 39:**

Identify all persons, whether or not employed by You, who have been in charge of, or responsible for, performing quality control activities concerning the Accused Products and

Exhibit 39

Component Thereof identified in Your response to Interrogatory No. 1, including the titles of such persons, and a description of the dates and the substance of their involvement.

**INTERROGATORY NO. 40:**

Separately identify each and every payment made by Apple or anyone acting on its behalf to anyone in connection with his or her involvement in this Investigation or in any other litigation or legal action related to any Accused Product and Component Thereof identified in Your response to Interrogatory No. 1, including, but not limited to, the recipient of such payment, the form of such payment, the amount of such payment, the date such payment was made, the identity of each person who was involved in the decision to make the payment, the identity of each person with knowledge of such payment, all reasons for such payment, and any documents relating to such payment.

**INTERROGATORY NO. 41:**

Separately identify each and every agreement or contract between Apple, or anyone acting on its behalf, and any person or entity, including, but not limited to, Apple's employees and former employees, relating to this Investigation, or any other litigation or legal action related to any Accused Product and Component Thereof identified in Your response to Interrogatory No. 1, including, but not limited to, the name of such agreement or contract, the dates on which each such agreement or contract was executed, the circumstances under which each such agreement or contract was proposed and executed, an identification of the parties to each such agreement or contract, an identification of all amounts invoiced or paid pursuant to each such agreement or contract, and an identification by Bates number of each such agreement or contract.

**INTERROGATORY NO. 42:**

Separately for each Accused Product and Component Thereof identified in Your response to Interrogatory No. 1 provide, on a calendar quarter basis and for the period from the inception of

Exhibit 39

production through the present, the total units of each product imported into the United States, and the total units of each product warehoused in the United States.

**INTERROGATORY NO. 43:**

Separately for each forthcoming version or model of an Accused Product or Component Thereof identified in Your response to Interrogatory No. 1 that Apple expects to be sold in the United States (*e.g.*, Apple Watch Series 7, etc.), provide all forecasts for the production or sale of such products (the total units of each product forecast to be produced in the United States, the total units of each product forecast to be imported into the United States, the total units of each product forecast to be warehoused in the United States, the total units of each product forecast to be sold in the United States, the revenues forecast to be received for the products sold in the United States, and the total forecasted expenses associated with each product to be sold in the United States (including, but not limited to research and development expenses, marketing expenses, and manufacturing expenses), and describe with particularity all bases for such forecasts and all assumptions used to generate such forecasts.

**INTERROGATORY NO. 44:**

For each Accused Product or Component Thereof identified in Your response to Interrogatory No. 1, identify the individuals, whether or not employed by Apple, who are most knowledgeable about each of the following subjects:

(a)    research and development of the technology embodied in the product or component;

(b)    Apple's alleged infringement of the Patents-in-Suit;

(c)    any customer surveys, in any form, involving any such product or component;

(d)    the existence and scope of any license, implied or express, relating to any such product or component.

Exhibit 39

**INTERROGATORY NO. 45:**

State Your contention regarding (a) the extent to which any remedy for a violation of Section 337 would extend to components and parts of the Accused Products identified in Your response to Interrogatory No. 1, (b) whether a certification procedure should be established in the event that the Commission finds a violation of Section 337 in this Investigation, (c) identifying by Bates number all documents and other evidence tending to support or refute Your contentions (a) and (b), and (d) identifying the three (3) person(s) most knowledgeable of such factual bases.

**INTERROGATORY NO. 46:**

Identify any other person not previously identified that is likely to have knowledge of relevant facts or any discoverable information relevant to any disputed fact alleged in the Complaint, and for each individual so identified, state the subject or subjects of the discoverable information the individual is likely to have.

**INTERROGATORY NO. 47:**

Identify all persons who You expect will offer testimony on Your behalf at the hearing in this Investigation, including any expert witnesses, and state the substance of the facts or opinions to which each such person is expected to testify.

**INTERROGATORY NO. 48:**

Provide the name and, if known, the address and telephone number of each person likely to have discoverable information concerning the facts alleged by any party in this Investigation, whether or not You may rely on that person to support Your claims or defenses, and for each person so identified state the subject matter of the information known by the person.

Exhibit 39

**INTERROGATORY NO. 49:**

Separately answering for each of these Interrogatories, identify any person who provided information for use in preparing Your responses to these Interrogatories; and, for each such person, identify the answer or part thereof for which he or she provided information.

Dated:  September 3, 2021                By: */s/ Sheila N. Swaroop*

Stephen C. Jensen
Stephen C. Jensen
Joseph R. Re
Sheila N. Swaroop
Ted. M. Cannon
Alan G. Laquer
Kendall M. Loebbaka
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, Fourteenth Floor
Irvine, CA  92614
Telephone:  (949) 760-0404
Facsimile:  (949) 760-9502

William R. Zimmerman
Jonathan E. Bachand
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
1717 Pennsylvania Avenue N.W., Suite 900
Washington, DC 20006
Telephone:  (202) 640-6400
Facsimile:  (202) 640-6401

Brian C. Horne
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
1925 Century Park East
Suite 600
Los Angeles, CA 90067
Telephone:  (310) 551-3450
Facsimile:  (310) 551-3458

Karl W. Kowalis
Matthew S. Friedrichs
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
1155 Avenue of the Americas
24th Floor
New York, NY 10036
Telephone:  (212) 849-3000

Exhibit 39

Facsimile:  (212) 849-3001

*Counsel for Complainants*
*Masimo Corporation and*
*Cercacor Laboratories, Inc.*

Exhibit 39

**In the Matter of Certain Physiological Measurement Devices and Components Thereof**
**Investigation No. 337-TA-1276**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on September 3, 2021, I caused copies of **MASIMO CORPORATION AND CERCACOR LABORATORIES, INC.'S SECOND SET OF INTERROGATORIES TO APPLE INC. (26–49)** to be filed and served as indicated below:

| Counsel for Respondent Apple Inc. | |
|---|---|
| Michael Esch<br>**WILMER CUTLER PICKERING HALE AND DORR LLP**<br>1875 Pennsylvania Avenue, NW<br>Washington, DC 20006<br><br>Mark Selwyn<br>**WILMER CUTLER PICKERING HALE AND DORR LLP**<br>2600 El Camino Real<br>Suite 400<br>Palo Alto, California 94306<br><br>Joseph Mueller<br>Sarah Frazier<br>**WILMER CUTLER PICKERING HALE AND DORR LLP**<br>60 State Street<br>Boston, Massachusetts 02109 | ☐ Via hand delivery<br>☑ Via E-mail to<br>WHApple-Masimo1276ServiceList@wilmerhale.com<br>☐ Via Express Delivery<br>☐ Via facsimile |

September 3, 2021

_/s/ Claire A. Stoneman_

Claire A. Stoneman
Litigation Paralegal
Knobbe, Martens, Olson & Bear, LLP

Exhibit 39

# EXHIBIT 50

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**WASHINGTON, D.C.**

**Before the Honorable Monica Bhattacharyya**
**Administrative Law Judge**

| | |
|---|---|
| **In the Matter of**<br><br>**CERTAIN LIGHT-BASED PHYSIOLOGICAL MEASUREMENT DEVICES AND COMPONENTS THEREOF** | Inv. No. 337-TA-1276 |

**MASIMO CORPORATION AND CERCACOR LABORATORIES, INC.'S SIXTH SET OF INTERROGATORIES TO APPLE INC. (71-77)**

Pursuant to the United States International Trade Commission's Rules of Practice and Procedure and 19 C.F.R. §§ 210.27 and 210.29, Complainants Masimo Corporation and Cercacor Laboratories, Inc. (collectively, "Complainants") direct the following Interrogatories to Respondent Apple Inc. ("Apple") to be answered separately and fully, in writing and under oath within the time prescribed by the rules of the Administrative Law Judge and the Commission.

## DEFINITIONS

The following definitions shall apply to each of the interrogatories herein:

1.      The terms "Respondent," "Apple," "You," and "Your" mean Apple Inc., including, without limitation: any predecessor, predecessor-in-interest, successor, subsidiary, affiliate, and/or division; and any past or present principal, officer, director, employee, former employee, servant, agent, attorney, or other representative.

2.      The term "Complainants" mean Masimo Corporation and Cercacor Laboratories, Inc., collectively and individually, including: any predecessor, predecessor-in-interest, successor, subsidiary, affiliate, and/or division; and any principal, officer, director, employee, former employee, servant, agent, attorney, or other representative.

Exhibit 50

3.      The term "Complaint" means the operative complaint under § 337 of the Tariff Act of 1930, in this Investigation, which at the time of the service of this document is the amended complaint filed on July 12, 2021 and identified in 86 F.R. 38764.

4.      The terms "Present Investigation" or "Investigation" means *In the Matter of Certain Light-Based Physiological Measurement Devices and Components Thereof*, ITC Inv. No. 337-TA-1276.

5.      The term "Commission" or "ITC" means and refers to the United States International Trade Commission, Washington D.C.

6.      The term "Section 337" refers to 19 U.S.C. § 1337.

7.      "The '501 Patent" means U.S. Patent No. 10,912,501 and any application leading thereto.

8.      "The '502 Patent" means U.S. Patent No. 10,912,502 and any application leading thereto.

9.      "The '648 Patent" means U.S. Patent No. 10,945,648 and any application leading thereto.

10.     "The '745 Patent" means U.S. Patent No. 10,687,745 and any application leading thereto.

11.     "The '127 Patent" means U.S. Patent No. 7,761,127 and any application leading thereto.

12.     The term "Patents-in-Suit" shall mean the '501 Patent, '502 Patent, '648 Patent, '745 Patent, and '127 Patent, and any additional patents that may be added to the Investigation in the future.

Exhibit 50

13.     The term "Asserted Claim(s)" means any claim of the Patents-in-Suit that Complainants allege Respondents infringe or any claim Complainants contend is practiced by Domestic Industry Products, including those claims identified in the Complaint and exhibits thereto.

14.     The term "Related Patent(s)" means: (a) all United States patent applications that claim priority to the Patents-in-Suit, (b) all United States patent applications from which priority is claimed by the Patents-in-Suit, (c) all United States patent applications that claim priority to a patent application identified in (a) and/or (b), and/or (d) any foreign counterpart patents or patent applications to any of (a), (b), or (c).

15.     The terms "person," "individual," and "entity" shall include natural persons, corporate or other business entities, and all other forms of legal entities.  The acts of a person, individual, or entity shall include the acts of directors, officers, owners, members, employees, agents, attorneys, or other representatives acting on the person's, individual's, or entity's behalf.

16.     The term "document" shall be construed under the broadest possible construction under the Federal Rules of Civil Procedure and shall include without limitation any written, recorded, graphic, or other matter, whether sent or received or made or used internally, however produced or reproduced and whatever the medium on which it was produced or reproduced (whether on paper, cards, charts, file, or printouts; tapes, discs, video tapes, audiotapes, tape recordings, cassettes, or other types of voice recording or transcription; computer tapes, databases, or emails; pictures, photographs, slides, films, microfilms, or motion pictures; or any other medium), and any other tangible item or thing of readable, recorded, or visual material of whatever nature including without limitation originals, drafts, and all non-identical copies of each document (which, by reason of any variation, such as the presence or absence of hand-written notes or

Exhibit 50

underlining, represents a distinct version). By way of example, the terms "document" or "documents" as used herein shall include, without limitation: correspondence; blueprints; memoranda; notes; diaries; letters; e-mails; text messages; metadata; minutes; agendas; contracts; reports; studies; checks; statements; receipts; returns; summaries; pamphlets; circulars; press releases; advertisements; books; inter-office and intra-office communications; handwritten or typewritten notes; notations or summaries of telephone conversations, meetings, or conferences; bulletins; computer printouts; databases; invoices; worksheets; photographs; tape recordings; and all other tangible items of readable, recorded, or visual material of any kind.

17.     The term "thing" means tangible objects of any type, composition, construction, or nature.

18.     The term "communication" means all written, electronic, oral, telephonic, or other inquiries, dialogues, conversations, interviews, correspondence, consultations, negotiations, agreements, understandings, meetings, letters, notes, advertisements, computer mail, email, text messages, and all other documents evidencing any verbal or nonverbal interaction between persons and entities.

19.     The term "concerning" is used in its customary broad sense and, by way of example and not by way of limitation, it includes referring to, relating to, mentioning, discussing, stating, describing, noting, recording, embodying, studying, analyzing, evaluating, evidencing, reflecting, containing, demonstrating, identifying, comprising, constituting, supporting, and undermining, and shall encompass all express and implied references to the specified person, subject, event, or thing.  A document concerning a particular subject includes documents concerning the preparation of other documents or draft documents that concern the subject.

Exhibit 50

20.     The term "Patent and Trademark Office," "PTO," or "USPTO" means United States Patent and Trademark Office.

21.     The term "Infringement" means and refers to direct, contributory, and induced infringement, whether literally or under the doctrine of equivalents, under the applicable laws.

22.     The term "Domestic Industry" means domestic industry as that term is used in Commission Rule 210.12(a)(6)(i), 19 C.F.R. § 210.12(a)(6)(i), and alleged in Section VII of the Complaint.

23.     The term "Domestic Industry Product" means any product on which Complainant relies for its contention that a Domestic Industry either exists or is in the process of being established, including the products identified in the Complaint and Ex. 27 to the Complaint.

24.     The term "Accused Product(s) and Components Thereof" means any product of Respondents that is accused of infringement in the Present Investigation, including the Apple Watch Series 6, including all components of those products, all spare parts of those products, and all variants of those products designed, developed, manufactured, assembled, offered for sale, distributed, imported or sold by Apple or on behalf of Apple in the United States that include light-based pulse oximetry functionality. By way of example, the term "Accused Product(s) and Components Thereof" shall include any and all hardware and software utilized in or contributing to the measurement of blood oxygen saturation, including but not limited to hardware such as processors, light-emitting diodes, photodetectors, lenses, magnets, thermistors, and materials covering or surrounding the light emitting diodes or photodiodes, and including but not limited to software such as source code, libraries, and firmware.

25.     The term "prosecution," in relation to a patent or patent application, means all proceedings before, and communications with, a patent office relating to a patent, patent

-5-

Exhibit 50

application, continuation, continuation-in-part, and/or divisional, including, but not limited to,
interference, reissue, reexamination, opposition, cancellation, inter partes review or other post
grant proceedings.

26.     The term "Blood Oxygen Component" means any hardware, software, firmware,
or other component of any device that the device uses to take a blood oxygen measurement,
including any light emitting diode of the device used in blood oxygen measurement, any
photodiode of the device that receives any light from any light emitting diode of the device used
in blood oxygen measurement, any component of the device through which light from any light
emitting diode of the device used in blood oxygen measurement travels before being received by
any sensor of the device, or any thermistor used in any blood oxygen measurement.

27.     The "Already Released Apple Watches" means Apple Watch Series 1, Apple
Watch Series 2, Apple Watch Series 3, Apple Watch Series 4, Apple Watch Series 5, Apple Watch
Series 6, Apple Watch SE, and Apple Watch Series 7.

28.     The term "Upcoming Apple Watch" means the next Apple Watch, planned for
introduction by Apple after the Apple Watch Series 7, that includes blood oxygen measurement.

29.     The term "Target Date" means the target date in this Investigation, which is
currently January 16, 2023.

## **INSTRUCTIONS**

The following instructions shall apply to each of the interrogatories herein:

1.     If You contend that any information called for by these interrogatories is privileged
or otherwise excludable from discovery, provide all responsive information that is not privileged
and, with respect to any withheld information, provide the following: (a) a summary statement of
such information in sufficient detail to permit the court to reach a determination in the event of a

Exhibit 50

motion under CFR § 210.29(2); and (b) the grounds on which the information is being withheld
(*e.g.*, "attorney-client privilege," "work product immunity").

      2.      If any information, document or thing requested herein was, but no longer is, in
Your possession, custody, or control, state whether it has been lost, destroyed, or transferred, is
missing, or has otherwise been disposed of, and in each instance, explain the circumstances
surrounding the disposition of the information, document or thing and the date that such disposal
occurred.

      3.      If You object to any part of any interrogatory or object to providing certain
information requested, state Your objection and answer the part(s) of the interrogatory to which
You have not objected and/or supply the requested information to which You have not objected.

      4.      If You object to any interrogatory on the ground that it is overbroad or unduly
burdensome for any reason, respond to that interrogatory as narrowed to the least extent necessary
to render it not overbroad or unduly burdensome and state the extent to which You have narrowed
that interrogatory for purposes of Your response.

      5.      If You object to any interrogatory on the ground that it is vague or ambiguous,
identify the particular words, terms or phrases that You assert make such interrogatory vague or
ambiguous and specify the meaning actually attributed by You to such words for purposes of Your
response thereto.

      6.      If any of the following interrogatories cannot be responded to in full after exercising
reasonable diligence to secure the information, please so state, supply the information for those
portions You are able to answer, and supply whatever information You have concerning the
portion that cannot be answered in full.  If any answers are qualified in any particular respect, set
forth the details of such qualification.

Exhibit 50

7.      The singular form of a word should be interpreted in the plural and vice versa.  Any pronoun shall be construed to refer to the masculine, feminine, or neuter gender as in each case is most appropriate.  The words "and" and "or" shall be construed conjunctively or disjunctively, whichever makes the request most inclusive.  The word "including" shall be without limitation. The terms "each" and "any" shall mean any and all.

8.      Any term not specifically defined herein is to be defined in accordance with the Federal Rules of Civil Procedure.

9.      To the extent these interrogatories seek information that is recorded in any form of document, including electronically stored documents such as word processing files and email, take steps to ensure that all such documents are preserved for this litigation and to ensure that no responsive electronically stored documents are erased or deleted.

10.      These interrogatories shall include information acquired or identified up to the date(s) of Your answers and shall be deemed to be continuing.  Therefore, promptly produce to Complainants, as supplemental responses to these interrogatories in accordance with Fed. R. Civ. P. 26(e) and 19 C.F.R. § 210.27(f), any additional information that You identify, acquire, or become aware of up to and including the time of the evidentiary hearing in this Investigation.

## **INTERROGATORIES**

### **INTERROGATORY NO. 71:**

Describe in detail any communications, either written or oral, that You have had with the Food and Drug Administration, or any agents, affiliates, or employees thereof, relating to the Accused Products, including but not limited to the Apple Watch Series 6 and Series 7, including, without limitation, submission of any applications, filings, samples, exemplars, tutorials, specifications, scientific or clinical studies, or testing results, or receipt of any requests for

Exhibit 50

information or documents or approval or denial of any applications, and identify all documents by Bates number evidencing the foregoing.

**INTERROGATORY NO. 72:**

Describe in detail any and all differences in the Blood Oxygen Component amongst each model number of Apple Watch Series 6.

**INTERROGATORY NO. 73:**

Describe in detail any and all differences in the Blood Oxygen Component amongst each model number of Apple Watch Series 7.

**INTERROGATORY NO. 74:**

Describe in detail any and all differences in the Blood Oxygen Component of Apple Watch Series 6 and the Blood Oxygen Component of Apple Watch Series 7.

**INTERROGATORY NO. 75:**

Describe in detail the current status of any research and development for any device that performs any blood oxygen measurement and that You have not released to the public.

**INTERROGATORY NO. 76:**

Identify when You expect the Upcoming Apple Watch to have what You consider to be a sufficiently complete design to be within the scope of discovery in this Investigation.

**INTERROGATORY NO. 77:**

Identify when Apple Watch Series 7 had what You consider to be a sufficiently complete design to be within the scope of discovery in this Investigation.

Dated:  November 4, 2021          By: /s/ *Kendall M. Loebbaka*
                                                  Stephen C. Jensen
                                                  Joseph R. Re
                                                  Sheila N. Swaroop
                                                  Ted. M. Cannon

-9-

Exhibit 50

Alan G. Laquer
Kendall M. Loebbaka
Douglas B. Wentzel
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, Fourteenth Floor
Irvine, CA  92614
Telephone:  (949) 760-0404
Facsimile:  (949) 760-9502

William R. Zimmerman
Jonathan E. Bachand
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
1717 Pennsylvania Avenue N.W., Suite 900
Washington, DC 20006
Telephone:  (202) 640-6400
Facsimile:  (202) 640-6401

Brian C. Horne
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
1925 Century Park East
Suite 600
Los Angeles, CA 90067
Telephone:  (310) 551-3450
Facsimile:  (310) 551-3458

Carol Pitzel Cruz
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
925 4th Ave., #2500
Seattle, WA 98104
Telephone:  (206) 405-2000
Facsimile:  (206) 405 2001

Karl W. Kowalis
Matthew S. Friedrichs
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
1155 Avenue of the Americas
24th Floor
New York, NY 10036
Telephone:  (212) 849-3000
Facsimile:  (212) 849-3001

*Counsel for Complainants*
*Masimo Corporation and*
*Cercacor Laboratories, Inc.*

Exhibit 50

**In the Matter of Certain Light-Based Physiological Measurement Devices and Components Thereof**
**Investigation No. 337-TA-1276**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 4, 2021, I caused a copy of the foregoing document to be served as indicated below:

| Counsel for Respondent Apple, Inc. | |
|---|---|
| Michael Esch and co-counsel<br>**WILMER CUTLER PICKERING HALE AND DORR LLP**<br>1875 Pennsylvania Avenue, NW<br>Washington, DC 20006<br><br>Mark Selwyn and co-counsel<br>**WILMER CUTLER PICKERING HALE AND DORR LLP**<br>2600 El Camino Real<br>Suite 400<br>Palo Alto, California 94306<br><br>Joseph Mueller and co-counsel<br>**WILMER CUTLER PICKERING HALE AND DORR LLP**<br>60 State Street<br>Boston, Massachusetts 02109 | ☑  Via E-mail to WHApple-Masimo1276ServiceList@wilmerhale.com |

November 4, 2021

/s/ *Claire A. Stoneman*
Knobbe, Martens, Olson & Bear, LLP

Exhibit 50

EXHIBIT 51

UNITED STATES INTERNATIONAL TRADE COMMISSION
WASHINGTON, D.C.

**Before the Honorable Monica Bhattacharyya**
**Administrative Law Judge**

| | |
|---|---|
| In the Matter of | |
| **CERTAIN LIGHT-BASED PHYSIOLOGICAL MEASUREMENT DEVICES AND COMPONENTS THEREOF** | Inv. No. 337-TA-1276 |

### COMPLAINANTS' MOTION TO COMPEL RESPONDENT TO PROVIDE RESPONSES TO REQUEST FOR PRODUCTION NO. 107 AND INTERROGATORY NO. 71

Pursuant to Commission Rules 210.15 and 210.33 and Ground Rules 3.1 and 3.4, Complainants Masimo Corporation and Cercacor Laboratories, Inc. (collectively, "Masimo" or "Complainants") respectfully move for an order compelling Respondent Apple Inc. ("Apple" or "Respondent") to respond to Masimo's Request for Production No. 107 and Interrogatory No. 71, which seek documents and information concerning Apple's communications with ▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇ regarding the Accused Products. A supporting memorandum containing evidence and argument on these issues accompanies this motion.

### Ground Rule 3.2 Certification

Masimo certifies that it has contacted Respondent concerning this dispute at least two business days in advance of filing this motion in a good faith effort to reach resolution, including discussions in Discovery Committee Meetings, but reached an impasse. At the December 6, 2021 teleconference, the Administrative Law Judge granted Masimo leave to file this motion to compel. After the ALJ granted Masimo leave to file this motion, Masimo asked if Apple would produce the requested documents. Apple maintained its relevancy objection and offered to produce some

Exhibit 51

responsive documents, but did not commit to producing all responsive documents or providing a

full response to the discovery requests.

Dated:  December 20, 2021          By: /s/ Sheila N. Swaroop
                                        Stephen C. Jensen
                                        Joseph R. Re
                                        Sheila N. Swaroop
                                        Ted. M. Cannon
                                        Alan G. Laquer
                                        Kendall M. Loebbaka
                                        Douglas B. Wentzel
                                        **KNOBBE, MARTENS, OLSON & BEAR, LLP**
                                        2040 Main Street, Fourteenth Floor
                                        Irvine, CA  92614
                                        Telephone:  (949) 760-0404
                                        Facsimile:  (949) 760-9502

                                        William R. Zimmerman
                                        Jonathan E. Bachand
                                        **KNOBBE, MARTENS, OLSON & BEAR, LLP**
                                        1717 Pennsylvania Avenue N.W., Suite 900
                                        Washington, DC 20006
                                        Telephone:  (202) 640-6400
                                        Facsimile:  (202) 640-6401

                                        Brian C. Horne
                                        **KNOBBE, MARTENS, OLSON & BEAR, LLP**
                                        1925 Century Park East
                                        Suite 600
                                        Los Angeles, CA 90067
                                        Telephone:  (310) 551-3450
                                        Facsimile:  (310) 551-3458

                                        Carol Pitzel Cruz
                                        **KNOBBE, MARTENS, OLSON & BEAR, LLP**
                                        925 4th Ave., #2500
                                        Seattle, WA 98104
                                        Telephone:  (206) 405-2000
                                        Facsimile:  (206) 405 2001

                                        Karl W. Kowalis
                                        Matthew S. Friedrichs
                                        **KNOBBE, MARTENS, OLSON & BEAR, LLP**
                                        1155 Avenue of the Americas

-2-

Exhibit 51

24th Floor
New York, NY 10036
Telephone:  (212) 849-3000
Facsimile:  (212) 849-3001

*Counsel for Complainants*
*Masimo Corporation and*
*Cercacor Laboratories, Inc.*

Exhibit 51

**In the Matter of Certain Light-Based Physiological Measurement Devices
and Components Thereof
Inv. No. 337-TA-1276**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on December 23, 2021, I caused copies of the foregoing document to be filed and served as indicated below:

| Secretary – U.S. International Trade Commission | |
|---|---|
| The Honorable Lisa R. Barton<br>Secretary to the Commission<br>U.S. International Trade Commission<br>500 E Street, SW, Room 112<br>Washington, DC  20436 | ☑ Via Electronic Filing [EDIS]<br>☐ Via hand delivery<br>☐ Via Express Delivery<br>☐ Not filed |
| Administrative Law Judge – U.S. International Trade Commission | |
| The Honorable Monica Bhattacharyya<br>U.S. International Trade Commission<br>500 E Street, S.W., Room 317<br>Washington, D.C. 20436 | ☑ Via E-mail to edward.jou@usitc.gov and michael.maas@usitc.gov and Bhattacharyya337@usitc.gov |
| Counsel for Respondent Apple, Inc. | |
| Michael Esch<br>David Cavanaugh<br>**WILMER CUTLER PICKERING HALE AND DORR LLP**<br>1875 Pennsylvania Avenue, NW<br>Washington, DC 20006<br><br>Mark Selwyn<br>**WILMER CUTLER PICKERING HALE AND DORR LLP**<br>2600 El Camino Real<br>Suite 400<br>Palo Alto, California 94306<br><br>Joseph Mueller<br>Richard Goldenberg<br>Sarah Frazier<br>**WILMER CUTLER PICKERING HALE AND DORR LLP**<br>60 State Street<br>Boston, Massachusetts 02109 | ☐ Via Hand Delivery<br>☑ Via E-mail to WHApple-Masimo1276ServiceList@wilmerhale.com<br>☐ Via Express Delivery<br>☐ Via Facsimile |

-1-

Exhibit 51

December 23, 2021

/s/ *Claire A. Stoneman*
Claire A. Stoneman
Litigation Paralegal
Knobbe, Martens, Olson & Bear, LLP

Exhibit 51

UNITED STATES INTERNATIONAL TRADE COMMISSION
WASHINGTON, D.C.

Before the Honorable Monica Bhattacharyya
Administrative Law Judge

| | |
|---|---|
| **In the Matter of**<br><br>**CERTAIN LIGHT-BASED PHYSIOLOGICAL MEASUREMENT DEVICES AND COMPONENTS THEREOF** | Inv. No. 337-TA-1276 |

**MEMORANDUM IN SUPPORT OF COMPLAINANTS' MOTION TO COMPEL RESPONDENT TO PROVIDE RESPONSES TO REQUEST FOR PRODUCTION NO. 107 AND INTERROGATORY NO. 71**

Exhibit 51

**TABLE OF CONTENTS**

**Page No.**

I.     INTRODUCTION ...................................................................................... 1

II.    FACTUAL BACKGROUND ..................................................................... 1

III.   ARGUMENT ............................................................................................. 3

       A.    Apple's Communications with ▓▓▓▓ Concerning the Accused
             Devices Are Relevant to Multiple Issues in This Investigation ......... 3

       B.    Apple's Communications with ▓▓▓▓ Are Not Unduly
             Burdensome to Produce ...................................................................... 6

IV.    CONCLUSION .......................................................................................... 7

Exhibit 51

## TABLE OF AUTHORITIES

**Page No(s).**

.............................................................................4, 6

*Certain GPS Chips, Associated Software & Systems, & Prods. Containing Same,*
   Inv. No. 337-TA-596, Order No. 16, 2007 WL 2285474
   (U.S.I.T.C. July 10, 2007) ........................................................................................3

## OTHER AUTHORITIES

19 C.F.R. 210.27 .................................................................................................3

Exhibit 51

Complainants Masimo Corporation ("Masimo Corp.") and Cercacor Laboratories, Inc. ("Cercacor") (collectively, "Masimo") hereby move for an order compelling Respondent Apple Inc. ("Apple" or "Respondent") to respond to Masimo's Request for Production No. 107 and Interrogatory No. 71 within seven (7) days of the date of any Order granting this Motion.

## I.   **INTRODUCTION**

Masimo's Request for Production ("RFP") No. 107 and Interrogatory No. 71 seek Apple's communications with the ▮▮▮▮▮▮▮▮▮ concerning the Accused Products in this Investigation.  These communications between Apple and ▮▮▮▮ contain technical information regarding the pulse oximetry feature in the Apple Watch Series 6 and other Accused Devices within the scope of this Investigation that would be relevant at least to issues of infringement, bonding, and invalidity.  ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮  Despite this, Apple continues to refuse to respond to the full scope of Masimo's discovery requests and offered to produce only some of the requested communications, leaving open the possibility that Apple is withholding other potentially responsive communications and information.  Accordingly, Masimo seeks an order compelling Apple's full response and document production for Interrogatory No. 71 and RFP No. 107, respectively.

## II.   **FACTUAL BACKGROUND**

Masimo propounded two discovery requests seeking Apple's communications with ▮▮ ▮▮ regarding the Accused Products in this Investigation.  Interrogatory No. 71 requested:

> Describe in detail any communications, either written or oral, that You have had with ▮▮▮▮▮▮▮▮, or any agents, affiliates, or employees thereof, relating to the Accused Products, including but not limited to the Apple Watch Series 6 and Series 7, including, without limitation, submission of any

Exhibit 51

applications, filings, samples, exemplars, tutorials, specifications, scientific or clinical studies, or testing results, or receipt of any requests for information or documents or approval or denial of any applications, and identify all documents by Bates number evidencing the foregoing.

Ex. 1 at 3.  Similarly, RFP No. 107 requested:

All documents and things concerning any communication between Apple and ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ regarding any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6.

Ex. 2 at 90.

Apple objected to these requests on various grounds including relevance and refused to answer the interrogatory or produce responsive documents.  Ex. 1 at 3-4; Ex. 2 at 91.  The parties met and conferred regarding Interrogatory No. 71 and RFP No. 107 on December 1, 2021, but reached an impasse.  Ex. 3.  In the parties' subsequent letter briefs on and at the December 6 discovery teleconference with the ALJ, Apple maintained its position that such documents and information are irrelevant and that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  *See, e.g.,* Ex. 4 at 50:15-17; Ex. 6 at 3.

During the discovery teleconference, the ALJ stated:

Ex. 4 at 51:10-15.

In view of the ALJ's comments at the discovery conference, Masimo promptly requested that Apple respond to the discovery requests seeking ▮▮▮ communications to avoid further motion practice.  Ex. 7 at 3.  In response, Apple stated that it "maintain[s] [its] position that Complainants have failed to articulate the relevance of these requests" but that "Apple agrees to produce nonprivileged documents, if any, that can be located after a reasonable search and *sufficient to*

Exhibit 51

*show* its communications with ▮▮▮▮▮ regarding the pulse oximetry feature in the Series 6 and/or

7." *Id.* at 2 (emphasis added).  Apple did not respond to Masimo's follow-up email on December

14, 2021 requesting that Apple commit to producing all, not merely some, of its correspondence

with ▮▮▮▮▮ regarding the Accused Products. *Id.* at 1.

## III.   ARGUMENT

### A.  Apple's Communications with ▮▮▮▮▮ Concerning the Accused Devices Are Relevant to Multiple Issues in This Investigation

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, the scope of

discovery in the ITC is broad.  Ex. 4 at 51:10-15.  Pursuant to Commission Rule 210.27(b):

> a party may obtain discovery regarding any matter, not privileged, that is relevant to . . . [t]he claim or defense of the party seeking discovery or to the claim or defense of any other party . . . [or] [t]he appropriate bond for the respondents . . . . It is not grounds for objection that the information sought will be inadmissible at the hearing if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

19 C.F.R. 210.27(b).  Apple has thus far refused to provide the full scope of documents and

information requested by RFP No. 107 and Interrogatory No. 71, arguing that "Complainants have

failed to articulate the relevance of these requests."  Ex. 7; *see also* Ex. 5 at 3; Ex. 6 at 3.  As an

initial matter, Masimo bears no burden to "articulate" the relevance of these requests before Apple

would agree to provide the requested discovery.  Due to the breadth of discovery in the ITC, "the

burden of proving that an issue is beyond discovery rests squarely with the party resisting the

discovery."  *See Certain GPS Chips, Associated Software & Systems, & Prods. Containing Same*,

Inv. No. 337-TA-596, Order No. 16, 2007 WL 2285474, at *1 (U.S.I.T.C. July 10, 2007) (citation

omitted).

Regardless, Interrogatory No. 71 and RFP No. 107 plainly seek information that is relevant

to or reasonably calculated to lead to the discovery of admissible evidence relating to infringement,

Exhibit 51

bonding, and invalidity.   Apple's document production thus far confirms that these communications are relevant.  In particular, Apple produced ███████████████████████ ████████████████████████ regarding the pulse oximetry feature in the Apple Watch. Ex. 8 at 1.  The ███████████ stated that the ████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████."  *Id.* (emphases added).  Thus, the ████████████ indicate that Apple has had other communications with ████████ regarding the pulse oximetry feature in the Accused Products and that Apple is continuing to communicate ████████ regarding future products that would fall within the scope of this Investigation.  The technical information contained in Apple's communications ██████████ would be relevant to infringement issues, including the structure and operation of the Accused Devices and whether Apple is intending to make any changes to future devices that would fall within the scope of this Investigation that could either demonstrate further infringement or design arounds to avoid Masimo's patents.

The ████████████ further mention ████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████.  *See, e.g.*, Ex. 8 at 2-3.  Such information would be relevant to the accuracy and function of Apple's pulse oximetry feature and could also provide insight into Apple's other technical documents and discovery responses. ████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████

Exhibit 51

During the discovery teleconference, Apple argued that ▮▮▮▮▮▮▮▮▮▮▮▮ and that ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 4 at 50:2-7.  Apple is incorrect.  The ▮▮▮▮▮▮ contain ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ Ex. 8 at 4.  Apple's discussions regarding ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ may be relevant at least to infringement of asserted claims 21 and 22 of U.S. Patent No. 10,687,745 that recite, in part, "configured to determine a state of wellness of the user" and "configured to determine a trend of wellness of the user," respectively. The fact that such documents could also be relevant to the public interest does not foreclose their relevance to other issues within the scope of this Investigation.

Moreover, to the extent that Apple's communications ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮.  Because the purpose of a bond posted by Respondents during the Presidential Review period is to protect the complainant from injury, such evidence of competitive harm to Masimo would be relevant to bonding and is not cumulative of other technical documents produced by Apple.

Finally, the ▮▮▮▮▮▮ suggest that Apple's communications with ▮▮▮ may contain information relevant to validity issues in this Investigation that also are not cumulative of Apple's other technical documents.  For example, the ▮▮▮▮▮▮ mention that ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮

Exhibit 51



Ex. 8 at 3.  Apple's communications ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ may be relevant to the prior art Apple is relying on, the state of the art for pulse oximetry, and may also relate to secondary considerations of nonobviousness for Masimo's asserted patents.  Accordingly, Apple's communications with ▮▮▮▮ concerning the Accused Products are relevant to multiple issues in this Investigation.

**B.  <u>Apple's Communications with ▮▮▮▮ Are Not Unduly Burdensome to Produce</u>**

Apple clarified at the discovery teleconference that any burden argument regarding Interrogatory No. 71 and RFP No. 107 is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  *See* Ex. 4 at 50:24-51:9.  After the discovery teleconference, Apple further indicated that it would "maintain [its] position that Complainants have failed to articulate the relevance of these requests," but did not mention any other objections, including burden.  Ex. 7.  Thus, Masimo understands that Apple is not continuing to object to these requests on the basis of any undue burden.

However, to the extent Apple continues to assert an undue burden, Apple has not set forth any reason why such communications would be unduly burdensome to produce or why it would be unduly burdensome to respond to Interrogatory No. 71.  Apple's communications ▮▮▮▮▮ should be well-documented and readily identifiable and should not be a burden to gather and produce ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Moreover, Apple's qualified offer to produce only some, but not all, of Apple's communications with ▮▮▮▮ is inadequate.  Ex. 7.  Apple has not articulated in its letter briefing, at the discovery teleconference, or in post-conference communications any reason why all communications and information within the full scope of the discovery requests would be unduly burdensome to locate and produce.  Masimo has no way of knowing what communications and

-6-

Exhibit 51

information are being withheld if Apple selectively agrees to only produce documents "sufficient to show its communications with [redacted] regarding the pulse oximetry feature in the Series 6 and/or 7." Accordingly, Apple should be compelled to produce all communications and information within the full scope of RFP No. 107 and to fully respond to Interrogatory No. 71.

## IV. CONCLUSION

For the foregoing reasons, Masimo respectfully requests that the ALJ issue an order compelling Apple to produce all documents requested by RFP No. 107 and to provide a full response to Interrogatory No. 71 with seven (7) days of the date of any Order granting this Motion.

Dated: December 20, 2021

By: /s/ Sheila N. Swaroop
Stephen C. Jensen
Joseph R. Re
Sheila N. Swaroop
Ted. M. Cannon
Alan G. Laquer
Kendall M. Loebbaka
Douglas B. Wentzel
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, Fourteenth Floor
Irvine, CA 92614
Telephone: (949) 760-0404
Facsimile: (949) 760-9502

William R. Zimmerman
Jonathan E. Bachand
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
1717 Pennsylvania Avenue N.W., Suite 900
Washington, DC 20006
Telephone: (202) 640-6400
Facsimile: (202) 640-6401
Brian C. Horne
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
1925 Century Park East
Suite 600
Los Angeles, CA 90067
Telephone: (310) 551-3450
Facsimile: (310) 551-3458

Exhibit 51

Carol Pitzel Cruz
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
925 4th Ave., #2500
Seattle, WA 98104
Telephone:  (206) 405-2000
Facsimile:  (206) 405 2001

Karl W. Kowalis
Matthew S. Friedrichs
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
1155 Avenue of the Americas
24th Floor
New York, NY 10036
Telephone:  (212) 849-3000
Facsimile:  (212) 849-3001

*Counsel for Complainants*
*Masimo Corporation and*
*Cercacor Laboratories, Inc.*

54755887

Exhibit 51

**APPENDIX**

**LIST OF EXHIBITS**

| Exhibit Number | Description |
|---|---|
| 1 | Excerpt of Respondent's Objections and Responses to Complainants' Sixth Set of Interrogatories (Nos. 71-77) |
| 2 | Excerpt of Respondent's Objections and Responses to Complainants' First Set of Requests for Production of Documents and Things to Apple Inc. (Nos. 1-126) |
| 3 | December 1, 2021 email from Complainants' counsel to Respondent's counsel regarding December 1, 2021 DCM |
| 4 | Excerpt of Transcript of December 6, 2021 Telephonic Discovery Conference |
| 5 | Excerpt of Complainants' December 2, 2021 Letter Brief on Discovery Issues |
| 6 | Excerpt of Respondent's December 3, 2021 Responsive Letter Brief on Discovery Issues |
| 7 | Email chain dated December 8, 2021 to December 14, 2021 between Complainants' counsel and Respondent's counsel |
| 8 | Document produced by Apple bearing production numbers APL_MAS_ITC_00310990-93 |

Exhibit 51

# EXHIBIT 1



Exhibit 51

**UNITED STATES INTERNATIONAL TRADE COMMISSION
WASHINGTON, D.C.**

**Before the Honorable Monica Bhattacharyya
Administrative Law Judge**

| | |
|---|---|
| In the Matter of<br><br>**CERTAIN LIGHT-BASED PHYSIOLOGICAL<br>MEASUREMENT DEVICES AND<br>COMPONENTS THEREOF** | Inv. No. 337-TA-1276 |

**RESPONDENT APPLE INC.'S OBJECTIONS AND RESPONSES TO COMPLAINANTS'
SIXTH SET OF INTERROGATORIES (NOS. 71-77)**

Pursuant to the United States International Trade Commission's Rules of Practice and
Procedure and 19 C.F.R. §§ 210.27 and 210.29, the Administrative Law Judge's Ground Rules (Order
No. 4) and the Protective Order (Order No. 1) in this Investigation, Respondent Apple Inc. ("Apple"),
by counsel, hereby responds to Complainants Masimo Corporation and Cercacor Laboratories, Inc.'s
(collectively, "Complainants") Sixth Set of Interrogatories (Nos. 71-77) ("Interrogatories") as follows:

**RESERVATIONS AND RIGHTS**

These responses are submitted on behalf of Apple and reflect Apple's continuing investigation
of facts and discovery of information and documents relating to the claims and defenses at issue in
this Investigation.  Accordingly, Apple's responses are based solely on information currently available
to Apple based upon a reasonable investigation under the time available to respond.  Investigation and
discovery are ongoing.  Pursuant to 19 C.F.R. § 210.27(f), Apple reserves all rights to supplement,
modify, revise, and/or amend any response should additional information become available through
the discovery process or other means, or to respond at the time required under the Procedural Order,
or to assert additional objections to these Interrogatories as necessary and/or appropriate.  Apple also

1

Exhibit 51

by the Watch Series 6 or Watch Series 7, including "hardware and software regarding temperature sensing and/or pulse rate detection for the measurement of blood oxygen." *See* September 12, 2021 Letter from Frazier to Loebbaka.

      2.      Apple objects to each Definition, Instruction, and Interrogatory that incorporates the term "Upcoming Apple Watch" as defined by Complainants as vague, ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the Investigation, to the extent that term encompasses Apple products that are outside the scope of the Notice of Investigation. Apple further objects to the extent Complainants use this term to seek the disclosure of documents or information that is not proportional to the needs of the Investigation, not relevant to this Investigation, not relevant to any claim or defense of any party, and not reasonably calculated to lead to discovery of admissible evidence pursuant to 19 C.F.R. § 210.27.

## SPECIFIC OBJECTIONS AND RESPONSES

### INTERROGATORY NO. 71:

      Describe in detail any communications, either written or oral, that You have had with          or any agents, affiliates, or employees thereof, relating to the Accused Products, including but not limited to the Apple Watch Series 6 and Series 7, including, without limitation, submission of any applications, filings, samples, exemplars, tutorials, specifications, scientific or clinical studies, or testing results, or receipt of any requests for information or documents or approval or denial of any applications, and identify all documents by Bates number evidencing the foregoing.

### RESPONSE TO INTERROGATORY NO. 71:

      Apple incorporates its General Objections above as if set forth fully herein. Apple further objects to this Interrogatory as not proportional to the needs of the Investigation, overly broad, unduly

3

337-TA-1276 - RESPONDENT APPLE'S OBJECTIONS AND RESPONSES TO COMPLAINANTS' SIXTH SET OF INTERROGATORIES (NOS. 71-77)

Exhibit 51

burdensome, and seeking information that is not relevant to this Investigation, not relevant to any claim or defense of any party, and not reasonably calculated to lead to the discovery of admissible evidence pursuant to 19 C.F.R. § 210.27.  Apple further objects to the extent this Interrogatory seeks information regarding Apple products that are outside the scope of the Notice of Investigation.  Apple further objects to the terms "samples," "exemplars," "tutorials," "specifications,"  "requests  for information," and "documents or approval or denial of any applications" as vague and ambiguous. Apple further objects to this Interrogatory as compound and consisting of multiple subparts; for purposes of counting interrogatories toward the limit set by the Ground Rules, Apple will consider this Interrogatory as consisting of two interrogatories.  Apple further objects to the extent this Interrogatory seeks an identification of "all documents" as overly broad, unduly burdensome, and not proportional to the needs of the Investigation.  Apple further objects to the extent this Interrogatory seeks discovery concerning the impact that an exclusion order would have upon the public health and welfare, competitive conditions in the United States economy, the production of like or directly competitive articles in the United States, and/or United States consumers.  The Commission has not delegated such an inquiry to ALJ Bhattacharyya in this Investigation; accordingly, any Interrogatory seeking information regarding these public interest factors is beyond the scope of relevant discovery.

**INTERROGATORY NO. 72:**

Describe in detail any and all differences in the ███████████████ amongst each model number of Apple Watch Series 6.

**RESPONSE TO INTERROGATORY NO. 72:**

Apple incorporates its General Objections above as if set forth fully herein.  Apple further objects to the extent that this Interrogatory seeks information that is neither relevant to this Investigation nor reasonably calculated to lead to the discovery of admissible evidence.  Apple further

burdensome, and seeking information that is not relevant to this Investigation, not relevant to any claim or defense of any party, and not reasonably calculated to lead to the discovery of admissible evidence pursuant to 19 C.F.R. § 210.27.  Apple further objects to this Interrogatory to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work product doctrine, or any applicable privilege, doctrine, or immunity.

Subject to and without waiving the foregoing General and Specific Objections, Apple responds as follows:

Dated:  November 15, 2021

Respectfully submitted,

*/s/ Sarah R. Frazier*
Joseph J. Mueller
Richard Goldenberg
Sarah R. Frazier
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000

Mark D. Selwyn
WILMER CUTLER PICKERING HALE AND DORR LLP
2600 El Camino Real
Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6031

Michael D. Esch
David L. Cavanaugh
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Ave., NW
Washington, DC 20006
Telephone: (202) 663-6000

*Counsel for Respondent Apple Inc.*

337-TA-1276 - RESPONDENT APPLE'S OBJECTIONS AND RESPONSES TO COMPLAINANTS' SIXTH SET OF INTERROGATORIES (NOS. 71-77)

Exhibit 51

# EXHIBIT 2



Exhibit 51

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**WASHINGTON, D.C.**

**Before the Honorable Charles Bullock**
**Chief Administrative Law Judge**

| | |
|---|---|
| In the Matter of<br><br>**CERTAIN LIGHT-BASED PHYSIOLOGICAL MEASUREMENT DEVICES AND COMPONENTS THEREOF** | Inv. No. 337-TA-1276 |

**RESPONDENT APPLE'S OBJECTIONS AND RESPONSES TO COMPLAINANTS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS TO APPLE INC. (NOS. 1-126)**

Pursuant to the United States International Trade Commission's Rules of Practice and Procedure and 19 C.F.R. §§ 210.27 and 210.30, and the Administrative Law Judge's Ground Rules (Order No. 2) in this Investigation, Respondent Apple Inc. ("Respondent" or "Apple"), by counsel, hereby responds to Complainants Masimo Corporation and Cercacor Laboratories, Inc. (collectively, "Complainants") First Set of Requests for the Production of Documents and Things (Nos. 1-126) ("Requests") as follows:

**RESERVATIONS AND RIGHTS**

Apple hereby incorporates by reference its Reservation of Rights as set forth in Apple's Responses to Complainants' First Set of Interrogatories.

The responses provided here are submitted on behalf of Apple and reflect Apple's continuing investigations of facts and discovery of information and documents for the claims and defenses at issue in this Investigation. Accordingly, Apple's responses are based solely on information currently available to Apple based upon a reasonable investigation. Investigation and discovery are ongoing. Pursuant to 19 C.F.R. § 210.27(f), Apple reserves all rights to supplement,

1

Exhibit 51

Subject to and without waiving the foregoing Specific and General Objections, Apple will produce non-privileged documents and things in its possession, custody, or control, that are relied upon by any fact or expert witness called at any hearing or trial in this Investigation.

**REQUEST FOR PRODUCTION NO. 106:**

All affidavits or declarations ever signed, served, or filed, and transcripts of any sworn testimony in any litigation, arbitration, or government agency proceeding concerning products that include ███████████████████████, from any individual that will testify on behalf of Apple at the evidentiary hearing in this investigation.

**RESPONSE TO REQUEST NO. 106:**

Apple objects to this Request as not likely to lead to the discovery of admissible evidence relevant to the claims or defenses of any party. Apple objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the Investigation. Apple objects to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege, the work product doctrine, common interest privilege, or any other applicable privilege. Apple objects to this Request to the extent it seeks documents not in Apple's possession, custody, or control. Apple objects to this Request to the extent that it seeks production of documents that are already in Complainants' possession and/or that are as easily accessible to Complainants as to Apple (e.g., documents that are publicly available).

Subject to and without waiving the foregoing Specific and General Objections, Apple will produce affidavits, declarations, or testimony related to the Blood Oxygen feature in the Apple Watch Series 6 authored or given by all fact witnesses Apple calls to testify on its behalf at the evidentiary hearing, subject to compliance with any applicable protective orders.

**REQUEST FOR PRODUCTION NO. 107:**

All documents and things concerning any communication between Apple and ███████████ ████████████ regarding any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6.

Exhibit 51

**RESPONSE TO REQUEST NO. 107:**

Apple objects to this Request as not likely to lead to the discovery of admissible evidence relevant to the claims or defenses of any party. Apple objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the Investigation, including to the extent it seeks information related to products beyond the Apple Watch Series 6 or other Apple products with a Blood Oxygen feature that have ██████████████████ by the close of fact discovery. Apple objects to this Request to the extent that it seeks production of documents related to the public interest, which has not been delegated to the Administrative Law Judge in this Investigation.

Subject to and without waiving the foregoing Specific and General Objections, Apple will not produce documents in response to this Request.

**REQUEST FOR PRODUCTION NO. 108:**

All documents and things prepared in connection with this Investigation by any person Apple expects to call as a witness (including both fact and expert witnesses) at any hearing or at trial in this Investigation.

**RESPONSE TO REQUEST NO. 108:**

Apple objects to this Request as not likely to lead to the discovery of admissible evidence relevant to the claims or defenses of any party. Apple objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the Investigation. Apple objects to this Request because the phrase "prepared in connection" is vague, ambiguous, and undefined by Complainants. Apple objects to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege, the work product doctrine, common interest privilege, or any other applicable privilege. Apple objects to this Request to the extent it seeks documents not in Apple's possession, custody, or control. Apple objects to this Request to the extent that it seeks production of documents that are already in Complainants' possession and/or that are as easily accessible to Complainants as to Apple (e.g., documents that are publicly available). Apple objects to this

337-TA-1276 - Respondent Apple's Objections and Responses to Complainants' First Set of Requests For Production of Documents and Things (Nos. 1-126)

Exhibit 51

Request to the extent that it seeks production of documents solely related to claims in the case captioned *Masimo Corp. et al., v. Apple, Inc*., No. 20-cv-00048 (C.D. Cal.), including trade secret claims and allegations not at issue in this Investigation.

Subject to and without waiving the foregoing Specific and General Objections, Apple will meet and confer regarding the scope and meaning of this Request and whether it can be appropriately narrowed to documents relevant to a claim or defense of any party and so that any production is proportional to the needs of the Investigation.

Dated:  August 30, 2021                    Respectfully submitted,

                                           */s/ Sarah R. Frazier*
                                           Mark Selwyn
                                           WILMER CUTLER PICKERING HALE AND DORR LLP
                                           2600 El Camino Real
                                           Suite 400
                                           Palo Alto, CA 94306
                                           Telephone: (650) 858-6031

                                           Joseph J. Mueller
                                           Richard Goldenberg
                                           Sarah R. Frazier
                                           WILMER CUTLER PICKERING HALE AND DORR LLP
                                           60 State Street
                                           Boston, MA 02109
                                           Telephone: (617) 526-6000

                                           Michael D. Esch
                                           David Cavanaugh
                                           WILMER CUTLER PICKERING HALE AND DORR LLP
                                           1875 Pennsylvania Ave., NW
                                           Washington, DC 20006
                                           Telephone: (202) 663-6000

                                           *Counsel for Respondent Apple Inc.*

Exhibit 51

# EXHIBIT 3



Exhibit 51

| From: | Kendall.Loebbaka |
|---|---|
| To: | WH Apple-Masimo 1276 Service List |
| Cc: | Masimo.AppleITC |
| Subject: | ITC No. 337-TA-1276 |
| Date: | Wednesday, December 1, 2021 12:36:29 PM |

Counsel,

The parties reached an impasse on a number of topics during today's DCM today and at the parties' previous DCM.  In addition to the issues already identified to Apple for the Dec. 6 teleconference, Masimo intends to raise the following issues in its letter brief:

- Apple's Untimely Claim Construction Disclosures
- ESI (Masimo RFP Nos. 158-207)
- ▮▮▮ Communications (RFP No. 107 and Interrogatory No. 71)
- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (RFP Nos. 145-149, 155-157, Interrogatory Nos. 65-68, 75, and RFA Nos. 13-29, 37-40)

Best regards,
Kendall

**Kendall Loebbaka**
Partner

**949-721-7687** Direct

**Knobbe Martens**

Exhibit 51

# EXHIBIT 4

REDACTED IN ITS ENTIRETY

Exhibit 51

# EXHIBIT 5



Exhibit 51

# Knobbe Martens

KNOBBE, MARTENS, OLSON & BEAR, LLP

2040 Main St., 14th Fl., Irvine, CA 92614
**T** (949) 760-0404

Sheila N. Swaroop
Sheila.Swaroop@knobbe.com

December 2, 2021
***Via EDIS***

The Honorable Monica Bhattacharyya
Administrative Law Judge
U.S. International Trade Commission
500 E Street, S.W.
Washington, D.C. 20436

Re:   *Certain Light-Based Physiological Measurement Devices and Components Thereof*,
Inv. No. 337-TA-1276:
Discovery Teleconference:   December 6, 2021 at 2 p.m.

Dear Judge Bhattacharyya:

The parties have reached impasse on several issues for which Masimo seeks relief. Masimo's attendees will be Sheila Swaroop, Carol Pitzel Cruz, and Alan Laquer.

**Protective Order Against Apple Discovery and Inspection Conduct**

Masimo seeks leave to move for a protective order preventing Apple from (1) serving discovery about discovery, and (2) engaging in or relying upon improper conduct at inspections. "[T]he [ALJ] may make any order that may appear necessary and appropriate . . . to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including . . . [t]hat discovery not be had,  . . . [t]hat certain matters not be inquired into, or that the scope of discovery be limited to certain matters."  19 C.F.R. § 210.34(a).  Moreover, "the [ALJ] must limit by order the frequency or extent of discovery" in response to a motion for protective order under § 210.34, "if the administrative law judge determines that . . . [t]he burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the Investigation, the importance of the discovery in resolving the issues to be decided by the Commission, and matters of public concern."

Masimo has produced detailed documentation and identified numerous physicals demonstrating its domestic activity for multiple patent-practicing articles as part of the ████.    Rather than seeking discovery regarding domestic industry, Apple served numerous RFAs (2, 3, 6, 8, 9, 12, 13, 16, 18, 19, 22, 23, 26, 28, 29, 32, 33, 36, 38, 39, 42, 43, 46, 48, 49, 52, 53, 56, 59, 62, 63, 66, 69) and Interrogatory No. 80 regarding the purported conduct of counsel during inspection of Masimo's physicals.  *See* Ex. 1, 2.  These RFAs have no bearing on the ultimate facts regarding Masimo's domestic industry assertions, but rather are designed only to annoy and harass.  Because the burden of responding outweighs the lack of any benefit, a protective order is appropriate to curtail further improper discovery requests.

Masimo also seeks a protective order to prevent further improper informal discovery of individuals present at these inspections.  During the first inspection, after Apple's attorneys

# Knobbe Martens

improperly interrogated Knobbe attorney, Perry Oldham, Masimo explained this was improper. *See* Ex. 3.  Yet Apple continued to interrogate Mr. Oldham at the next inspection.  *See id*. A party cannot use an inspection as an opportunity to interrogate.  *See* 19 C.F.R. § 210.30(a)(1); *see also In re Certain Audio Processing Hardware, Software, and Products Containing the Same*, Inv. No. 337-TA-1026, Order No. 12 at 7 (U.S.I.T.C. Feb. 15, 2016) ("Respondents do not intend to passively observe Andrea employees as the employees work, but intend to ask the employees substantive questions . . . . Such questions are appropriately raised during a deposition or through written discovery, not an inspection.").

Masimo also seeks a protective order against Apple's unconsented recording of Mr. Oldham at these inspections.  Apple's attorneys not only improperly interrogated Mr. Oldham, but also recorded confidential communications *without his consent*. Ex. 4; Ex. 5.  California law requires the consent of *all* parties to a confidential communication to record the communication. *See* Cal. Penal Code § 632.  Apple's improper interrogations of Mr. Oldham regarding Masimo's CBI are confidential communications, and Mr. Oldham did not consent to being questioned while recorded.  Masimo requested that Apple cease such conduct, but Apple has not provided that assurance and has instead maintained that its conduct was appropriate.  *See* Ex. 3, 6.  Thus, Masimo requests leave to move for a protective order prohibiting further improper conduct by Apple's attorneys at inspections of Masimo's physicals.  Moreover, because "evidence obtained as a result of eavesdropping upon or recording a confidential communication in violation of [Section 632] is not admissible," Cal. Penal Code § 623(d),  the ALJ should prohibit Apple from relying on all such unconsented recordings.

## Apple's Untimely Claim Construction Disclosures

Order No. 6 required the parties to identify claim terms, including any terms contended to be indefinite, by November 12, and required an exchange of proposed constructions on November 24.  [Doc ID 754138].  Apple identified no terms for construction on Nov. 12. Ex. 7. In response to Masimo's identification of three terms ("bulk measurement," "second shape," and "plurality of operating wavelengths"), Apple belatedly contended that several phrases containing one of Masimo's terms was indefinite, that the preambles of all asserted claims are limiting, and that Masimo's two other terms should be given their "plain and ordinary" meaning. Exs. 8, 9. Apple's belated disclosures do not comply with Ground Rule 6 or the Procedural Schedule. Masimo thus seeks confirmation from the ALJ that Apple will be precluded from (1) contending any claim term is indefinite; (2) contending that any preambles are limiting; and (3) proposing any construction of Masimo's proposed terms that were not explicitly set forth in Apple's Nov. 24 exchange. Ex. 9.

## Masimo's Request for Apple Electronically Stored Information (ESI)

After months of asking Apple to identify ESI custodians, Masimo served formal production requests seeking ESI from specific custodians.  Ex. 10.  Masimo also explained to Apple the relevance of each individual as someone identified by Apple in discovery, having documents produced by Apple, or publicly identified as having relevant information. Ex. 11.  Apple objected to every ESI request and is unwilling to provide Masimo with hit-count information for any of these custodians or explain why the identified custodians are unlikely to have relevant information.  For example, Apple's CEO received correspondence from a former Masimo employee offering assistance in developing medical, wellness and fitness technologies for

**Knobbe Martens**

Apple.  Ex. 12.  Masimo has also sought ESI from three individuals Apple itself has identified as knowledgeable of "the design, structure, function, and operation of the optical-sensing hardware for the Blood Oxygen feature in the Apple Watch Series 6 and Series 7."  *See* Ex. 11 at 4. Masimo seeks the ALJ's assistance in compelling Apple to produce ESI discovery.

**Apple's** ███████████████████ **regarding the Accused Products**

Apple has refused to provide discovery relating to its ████████████████ (RFP 107, Interrogatory No. 71) on grounds that Masimo has failed to articulate relevance.  Ex. 13, 14.  Such ████████████████████████████████████████████████████████ of the Accused Products and are relevant to their structure and operation.  *See e.g.,* Ex. 15. Masimo seeks the ALJ's assistance in compelling Apple to provide complete discovery on its █████████████ .

**Scope of Products Within Investigation**
**(RFP 145-149, 155-157, Interrogatory Nos. 65-68, 75, and RFA Nos. 13-29, 37-40)**

Apple typically releases a new watch series every September, and this investigation concludes in January 2023.  Masimo has asked Apple for discovery on any devices with light-based pulse-oximetry functionality that will be imported during the pendency of this investigation. But Apple has restricted its response to products with a ████████████████ imported prior to the close of fact discovery in February 2022 and refused to provide such discovery.  Ex. 16-17 (RFPs 145-149, 155-157), 14 (Interrogatory 75) 18 (Interrogatory No. 65-68), 19 (RFAs 13-29, 37-40).  Masimo seeks the ALJ's assistance in compelling Apple to provide full discovery regarding the products within the scope of this investigation that Apple will import during the pendency of this investigation.

**Supplemental Protective Order**

Apple has refused to produce CAD files or source code absent entry of a Supplemental Protective Order, but the parties have not reached agreement on the scope of that Order.  In Ex. 20, Masimo provides a redline showing the Supplemental Protective Order that Masimo seeks as compared to what Apple confirmed it will agree to.  The remaining areas of dispute are (1) Masimo proposes that the definition of "Relevant Technology" at page 17, which controls the scope of the prosecution bar (page 18) and product development bar (page 19), include "pulse oximetry," and (2) the location of source code inspection, with Masimo proposing that both counsel be permitted to inspect source code at a selected office location of the opposing counsel of record.

Respectfully submitted,

/s/ *Sheila N. Swaroop*
Sheila N. Swaroop

Exhibit 51

# EXHIBIT 6



Exhibit 51

**WILMERHALE**

Sarah R. Frazier

+1 617 526 6022 (t)
+1 617 526 5000 (f)
sarah.frazier@wilmerhale.com

December 3, 2021

The Honorable Monica Bhattacharyya
Administrative Law Judge
U.S. International Trade Commission
500 E Street, S.W., Room 317
Washington, D.C. 20436

Re: *Certain Light-Based Physiological Measurement Devices and Components Thereof*, Inv.
No. 337-TA-1276: Apple's Response to Complainants' December 2, 2021 Letter

Dear ALJ Bhattacharyya:

Complainants' primary issue—their request for a "protective order" to prevent Apple from asking basic questions about items produced for inspection and seeking discovery regarding them—is another attempt to cover up a central problem with this case: The Complainants had no ▓▓▓▓ ▓▓▓ when this Investigation began. The Complaint and supporting declarations are rife with misrepresentations concerning the so-called ▓▓▓▓▓▓ the asserted domestic industry article for four of the five patents-in-suit. Complainants request for a "protective order" asking that Apple not be permitted to seek information about the ▓▓▓▓▓▓ is designed to impede Apple from exposing that central problem.

The flurry of other issues in Complainants' letter are further attempts to distract. Complainants did not even broach two of the issues in their letter with Apple until a few days ago—after Complainants requested a telephone conference—then rushed to declare new impasses. These requests are without merit and should be denied.

***Complainants' Request for a "Protective Order" Is Frivolous.*** Apple has long been seeking production of the ▓▓▓▓▓ the Complaint promised was "available upon request." Expecting to see ▓▓▓▓▓▓▓▓" described in the Complaint, Apple was instead confronted at the first inspection with a random assortment of items ▓▓▓▓ none of which was identified there or before the inspection to Apple. Complainants' counsel proctored the review and demonstrated a small number of items of their choosing, but refused to tell Apple's attorneys what the other items at the inspection were or even if they were capable of powering on. In view of this refusal to provide basic information about the devices, Apple sought discovery regarding their capabilities. Contrary to Complainants' letter, these issues are squarely related to the allegations that Complainants satisfy the technical prong. Complainants have ***denied*** each of the RFAs cited in their letter based on objections, including a purported lack of knowledge regarding what occurred at the inspection. To the extent any relief is warranted on those RFAs, Complainants should be ordered to respond to them substantively.

At the second inspection, Complainants provided ▓ items—again without any prior identification to Apple. Complainants refused Apple physical access to any devices and again demonstrated only devices and features of their choosing. As seen in Exhibit 5 to Complainants' letter, Complainants refused to respond to even such basic questions as "What functionalities do you

Exhibit 51

December 3, 2021
Page 2

believe are being shown?"  Complainants also refused to demonstrate functionality as requested by Apple.  As the ALJ acknowledged at the last hearing (Ex. A, at 32:4-5 [11/19 Hr'g Tr.]), Complainants cannot both refuse to let Apple physically inspect the devices themselves *and* refuse to demonstrate the functionality Apple seeks to observe.  The ALJ has already instructed the parties to confer about a deposition where the devices can be operated as Apple requests.

Finally, Complainants allege Apple improperly recorded Complainants' counsel, citing Exhibits 4 and 5 to their letter.  That is false.  Complainants consented to video recording at both inspections (*see* Ex. B at 5 [10/8 Loebbaka Ltr.]; Ex. C [11/4 Loebbaka Email]), and Mr. Oldham again consented at the actual inspections.  Complainants allege Mr. Oldham was not aware of the video taken in Exhibit 4.  While Apple believes the taking of the video was obvious to Mr. Oldham, Apple has confirmed the intent of the video was to film the devices, not record the conversation.  *See* Cal. Penal Code § 632 (prohibiting "[a] person who, *intentionally*, and without the consent of all parties" records a confidential communication); Ex. D at 6 [11/19 Frazier Ltr.].  Apple further asked if Complainants wanted the video to be deleted, but received no response.  Ex. D at 6.  The spuriousness of Complainants' allegations that these videos were unconsented to is captured on video itself: as can be seen at the end of Exhibit 5, Apple stopped recording immediately upon Mr. Oldham's request that it do so.  Complainants' request for a protective order should be denied.

***Apple Timely Disclosed Claim Construction Terms.***  Complainants' argument that Apple failed to timely disclose claim terms stems from different understandings of Ground Rule 6.  Apple had understood the parties were discouraged from identifying claims they contended were indefinite and for which they intended to rely on expert opinion as part of the *Markman* process.  In response to Complainants' identification of "bulk measurement," Apple provided its position that the term as used in the asserted claims is indefinite.  On Monday, Complainants alleged Apple's position was untimely under Ground Rule 6.  Apple—upon re-reading and appreciating that its interpretation of Ground Rule 6 may have been in error—promptly provided Complainants identification of all the terms it believes are indefinite.  *See also* Ex. E [11/30 Cox Ltr.].  Complainants have identified no prejudice caused by the timing of Apple's disclosures, and there is none: Complainants received Apple's disclosures before any contention deadline, six weeks before the parties are even required to meet and confer to discuss disputed terms.  Further, Apple timely disclosed its position that the other terms should be given their plain and ordinary meaning—*i.e.*, do not need to be construed.  Complainants have alleged Apple must nonetheless provide a construction.  While Apple disagrees, it provided Complainants with Apple's understanding of the plain and ordinary meanings.  Ex. F [12/1 Cox Email].

***Masimo's ESI Requests Lack Relevance and Are Overly Broad and Unduly Burdensome.***  Complainants' letter fails to provide all the facts regarding the parties' dispute regarding the appropriate scope of ESI discovery.  Those details are fully laid out in Ex. G [11/24 Frazier Ltr.].  A glaring omission is the precise nature of what Complainants seek: that Apple search emails, chat messages, and text messages of *25* Apple employees using what amounts to *over 150 unique search terms*.  These employees include Apple CEO Tim Cook and others with no relevance to this Investigation.  As evidenced by the email on which they rely, Complainants' requests are a transparent attempt to inject their claims from separate trade secret cases (where that email was produced) into this Investigation.  The employee who sent that email to Mr. Cook left Apple *six*

Exhibit 51

December 3, 2021
Page 3

*years* before the release of the accused products.

See Ex. H at 10-11[9/16 O&R to Rog 26].

Complainants' overbroad requests are grossly disproportionate to the need to adjudicate the patent infringement issues in this Investigation.  Courts with significant patent dockets employ model electronic discovery orders with much lower limits.  *See* Ex. I at ¶ 6 [EDTX Model Order] (limiting email production to "*eight* custodians per producing party"); Ex. J at ¶ 3(a) [D. Del. ESI Standard] (limiting to "[t]he *10* custodians most likely to have discoverable information in their possession").  And none suggest that text and similar messages are appropriate sources of ESI discovery.

*Apple's Communications with the* ████████████████ *Are Not Relevant.*  This request too is an attempt to inject irrelevant material into this Investigation.  Apple responded to RFP No. 107 in *September*, and it was only this past Monday—after Complainants lost their cross-use motion in the district court litigation that would have allowed them to use materials from that case in this Investigation (Ex. K [DCT Order (Dkt. 515)])—that they identified "deficiencies" with Apple's response.  Complainants have failed to articulate the relevance of their request for Apple's communications with ████ to any issue to be decided by the ALJ.  There is none.  Apple has produced ample technical documentation showing the structure and operation of the accused features.  These requests appear to seek information regarding the public interest inquiry that— consistent with Complainants' opposition—was not delegated to the ALJ.  Ex. L at 90-91 [8/30 O&R to RFP 107]; *see also* Ex. M at 3-4 [11/15 O&R to Rog 71].

*Apple's Unreleased Products*

*See, e.g.*, Ex. N at 1-2 [11/18 Frazier Ltr.].  Complainants initiated this Investigation in July against the Series 6.  The Series 7 was first imported for sale only six weeks ago.

        Discovery into future products is consistently limited to items respondents intend to *import before the close of the evidentiary record*.  *See, e.g., Certain Activity Tracking Devices,* Inv. No. 337-TA- 963, Order No. 27 at 5 (Feb. 1, 2016) (permitting discovery of unreleased products "likely to be made or imported into the United States prior to the close of the evidentiary record"); *Certain Elec. Devices, Including Wireless Commc'n Devices,* Inv. No. 337-TA-862, Order No. 37 (Apr. 18, 2013) (requiring discovery on "on any relevant product that Samsung intends to import … prior to the commencement of the evidentiary hearing"); *Certain Polyethylene Terephthalate Yarn*, Inv. No. 337-TA-457, Order No. 43 at 2 (Dec. 19, 2001) (same).

Best regards,

*/s/ Sarah R. Frazier*

Sarah R. Frazier

Exhibit 51

# EXHIBIT 7



Exhibit 51

| From: | Douglas.Wentzel |
|---|---|
| To: | Garcia, Nina |
| Cc: | Masimo.AppleITC; WH Apple-Masimo 1276 Service List |
| Subject: | RE: ITC No 337-TA-1276 | ALJ Teleconference |
| Date: | Tuesday, December 14, 2021 4:48:52 PM |

Counsel,

At the December 10 meet and confer, Masimo raised Apple's December 9 email regarding Masimo's RFP No. 107 and Interrogatory No. 71, which states that Apple will produce non-privileged documents "sufficient to show its communications with ▇▇▇▇ regarding the pulse oximetry feature in the Series 6 and/or 7."  Apple confirmed it would not produce all of its communication with ▇▇▇ regarding the pulse oximetry feature of the Apple Watch Series 6 or 7.  Apple also confirmed that it would not exclude communications with ▇▇▇ regarding the pulse oximetry feature of its Apple Watch products merely because the Apple Watch Series 6 or Series 7 is not expressly mentioned in the communication.  Further, Apple confirmed it would supplement its response to Interrogatory No. 71 to identify the relevant ▇▇▇▇▇▇ in its production.

Masimo's RFP No. 107 seeks "[a]ll documents and things concerning any communication between Apple and ▇▇▇▇▇▇▇ regarding any Accused Product and Components Thereof, including but not limited to, the Apple Watch Series 6."  Apple must therefore produce all, not some, of its correspondence with ▇▇▇ regarding the Accused Products, including the Apple Watch Series 6 and 7.  Such documents are readily identifiable by Apple and not unduly burdensome to produce.  Accordingly, absent confirmation by 5pm ET tomorrow that Apple will, by 5pm ET on December 17, produce the full scope of ▇▇▇▇▇▇ sought by RFP No. 107 and identify those documents in a supplemental response to Interrogatory No. 71, Masimo will proceed with moving to compel this clearly discoverable information.

Best regards,

Doug

**Douglas Wentzel**

949-721-6352 **Direct**

# Knobbe Martens

---

**From:** Garcia, Nina <Nina.Garcia@wilmerhale.com>
**Sent:** Thursday, December 9, 2021 1:17 PM
**To:** Kendall.Loebbaka <Kendall.Loebbaka@knobbe.com>; WH Apple-Masimo 1276 Service List <WHApple-Masimo1276ServiceList@wilmerhale.com>
**Cc:** Masimo.AppleITC <Masimo.AppleITC@knobbe.com>
**Subject:** RE: ITC No 337-TA-1276 | ALJ Teleconference

Kendall,

We are available to meet and confer tomorrow at 1pm ET regarding Masimo's ESI requests.  In view

Exhibit 51

of the ALJ's guidance that Complainants' request for 25 custodians is too high and the model orders are an appropriate guide, and in order to make efficient use of the parties' time, please send us your next proposal for a more reasonable number of potential custodians in advance of the meet and confer.  At a minimum, the parties agree that email production is warranted from 5 custodians.  Given the procedural schedule, we do not want the parties' continued negotiations to further delay collection and production of email discovery.  We identified 5 requested email custodians, and search terms, in my November 29 letter that Complainants have not responded to.  Please confirm that you agree to produce email from the custodians we identified using the search terms we provided and will begin that process.  We reiterate our offer to begin collecting and producing email from 5 Apple employees if we agree they are knowledgeable about the issues to be decided in this Investigation and are likely to have relevant email.

During tomorrow's meet and confer, we also intend to discuss Complainants' deficiencies with respect to Apple's RFPs 175, 176 and 177 and Interrogatories 82, 84, 88 and 91.  Please be prepared to provide us with your availability for a Rule 3.4.1. teleconference with the ALJ regarding these requests for the week of December 13, which we have requested several times now.

With respect to Complainants' RFP 107 and Interrogatory 71, we maintain our position that Complainants have failed to articulate the relevance of these requests.  In the interest of reducing the number of disputes in front of the ALJ, Apple agrees to produce nonprivileged documents, if any, that can be located after a reasonable search and sufficient to show its communications with ▆▆ ▆▆ regarding the pulse oximetry feature in the Series 6 and/or 7.  Please confirm this resolve the dispute.

We have separately responded regarding the Supplemental Protective Order.  However, your email incorrectly suggests that Apple agreed to Complainants' proposal to make its source code available in the location of their choosing.  The only outstanding issue is the scope of the "Relevant Technology" paragraph, as reflected in the December 2 redline Complainants' provided in which you agree to make your source code available for inspection in Knobbe Marten's New York office.

Best,
Nina

**Nina Garcia | WilmerHale**
+1 617 526 6446 (t)
nina.garcia@wilmerhale.com

---

**From:** Kendall.Loebbaka <Kendall.Loebbaka@knobbe.com>
**Sent:** Wednesday, December 8, 2021 12:10 PM
**To:** WH Apple-Masimo 1276 Service List <WHApple-Masimo1276ServiceList@wilmerhale.com>
**Cc:** Masimo.AppleITC <Masimo.AppleITC@knobbe.com>
**Subject:** ITC No 337-TA-1276 | ALJ Teleconference

EXTERNAL SENDER

Exhibit 51

Counsel,

We write to follow up on the December 6 hearing with the ALJ on several issues.  Please respond by close of business tomorrow so that we can move forward promptly on these issues.

**ESI**
The ALJ ordered the parties to meet and confer within a week to discuss Masimo's ESI requests.  We are available Friday December 10 to discuss anytime after 10 a.m. PT/1 p.m. ET.  Please let us know what times during that window work for Apple.

**Supplemental Protective Order**
We have not heard from Apple with regard to the last proposal from Alan Laquer last week.  We understood from the hearing that Apple has agreed to the location of source code inspection as proposed by Masimo but had some comments on the definition of Relevant Technology.  Please promptly provide that so we can determine whether can finalize the SPO without further involvement by the ALJ.

███████████

The ALJ authorized Masimo to file a motion to compel.  In view of the ALJ's comments at the December 6 hearing about the scope of discovery in the ITC, please let us know if Apple is maintaining its objections, or if Apple will agree to respond to this discovery to avoid unnecessary motion practice.

Best regards,
Kendall

**Kendall Loebbaka**
Partner
949-721-7687 **Direct**
**Knobbe Martens**

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

Exhibit 51

# EXHIBIT 8

REDACTED IN ITS ENTIRETY



Exhibit 51

EXHIBIT 52

**UNITED STATES INTERNATIONAL TRADE COMMISSION**

**Washington, D.C.**

| In the Matter of | |
|---|---|
| **CERTAIN LIGHT-BASED PHYSIOLOGICAL MEASUREMENT DEVICES AND COMPONENTS THEREOF** | **Inv. No.  337-TA-1276** |

ORDER NO. 11:      **GRANTING JOINT MOTION TO EXTEND TIME TO RESPOND TO COMPLAINANTS' MOTION TO COMPEL**

(January 4, 2022)

On December 28, 2021, Complainants Masimo Corporation and Cercacor Laboratories, Inc. (collectively, "Masimo") and Respondent Apple Inc. ("Apple") filed a joint motion (1276-013) to extend the deadline for responses to Masimo's motion to compel (1276-011).

On December 20, 2021, Masimo filed a motion to compel Apple to supplement its responses to certain discovery requests (Motion Docket No. 1276-011).  Pursuant to Ground Rule 1.6, the deadline for responses to this motion was December 29, 2021.  The parties submit that they reached an agreement regarding the discovery at issue and thus seek a ten-day extension of the deadline for responses, at which time the motion to compel may be moot.

There being no opposition and for good cause shown, the motion (1276-013) is hereby GRANTED.  The deadline for responding to Masimo's motion to compel (1276-011) shall be extended to January 10, 2022.

**SO ORDERED.**

Monica Bhattacharyya
Administrative Law Judge

Exhibit 52

EXHIBIT 58

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**WASHINGTON, D.C.**

**Before the Honorable Monica Bhattacharyya**
**Administrative Law Judge**

| | |
|---|---|
| In the Matter of<br><br>**CERTAIN LIGHT-BASED PHYSIOLOGICAL MEASUREMENT DEVICES AND COMPONENTS THEREOF** | Inv. No. 337-TA-1276 |

**MASIMO CORPORATION AND CERCACOR LABORATORIES, INC.'S FIFTH SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS TO APPLE INC. (145-149)**

Pursuant to the United States International Trade Commission's Rules of Practice and Procedure and 19 C.F.R. §§ 210.27 and 210.30, Complainants Masimo Corporation and Ceracor Laboratories, Inc. (collectively, "Complainants") hereby request that Respondent Apple Inc. ("Apple") responds to the following Requests for Production of Documents and Things within the time prescribed by the rules of the Administrative Law Judge and the Commission.

<u>**DEFINITIONS**</u>

The following definitions shall apply to each of the interrogatories herein:

1.      The terms "Respondent," "Apple," "You," and "Your" mean Apple Inc., including, without limitation: any predecessor, predecessor-in-interest, successor, subsidiary, affiliate, and/or division; and any past or present principal, officer, director, employee, former employee, servant, agent, attorney, or other representative.

2.      The terms "Complainants" mean Masimo Corporation and Ceracor Laboratories, Inc., collectively and individually, including: any predecessor, predecessor-in-interest, successor, subsidiary, affiliate, and/or division; and any principal, officer, director, employee, former employee, servant, agent, attorney, or other representative.

1

Exhibit 58

3.      The term "Complaint" means the operative complaint under § 337 of the Tariff Act of 1930, in this Investigation, which at the time of the service of this document is the amended complaint filed on July 12, 2021 and identified in 86 F.R. 38764.

4.      The terms "Present Investigation" or "Investigation" means *In the Matter of Certain Light-Based Physiological Measurement Devices and Components Thereof*, ITC Inv. No. 337-TA-1276.

5.      The term "Commission" or "ITC" means and refers to the United States International Trade Commission, Washington D.C.

6.      The term "Section 337" refers to 19 U.S.C. § 1337.

7.      "The '501 Patent" means U.S. Patent No. 10,912,501 and any application leading thereto.

8.      "The '502 Patent" means U.S. Patent No. 10,912,502 and any application leading thereto.

9.      "The '648 Patent" means U.S. Patent No. 10,945,648 and any application leading thereto.

10.     "The '745 Patent" means U.S. Patent No. 10,687,745 and any application leading thereto.

11.     "The '127 Patent" means U.S. Patent No. 7,761,127 and any application leading thereto.

12.     The term "Patents-in-Suit" shall mean the '501 Patent, '502 Patent, '648 Patent, '745 Patent, and '127 Patent, and any additional patents that may be added to the Investigation in the future.

Exhibit 58

13.     The term "Asserted Claim(s)" means any claim of the Patents-in-Suit that Complainants allege Respondents infringe or any claim Complainants contend is practiced by Domestic Industry Products, including those claims identified in the Complaint and exhibits thereto.

14.     The terms "person," "individual," and "entity" shall include natural persons, corporate or other business entities, and all other forms of legal entities.  The acts of a person, individual, or entity shall include the acts of directors, officers, owners, members, employees, agents, attorneys, or other representatives acting on the person's, individual's, or entity's behalf.

15.     The term "document" shall be construed under the broadest possible construction under the Federal Rules of Civil Procedure and shall include without limitation any written, recorded, graphic, or other matter, whether sent or received or made or used internally, however produced or reproduced and whatever the medium on which it was produced or reproduced (whether on paper, cards, charts, file, or printouts; tapes, discs, video tapes, audiotapes, tape recordings, cassettes, or other types of voice recording or transcription; computer tapes, databases, or emails; pictures, photographs, slides, films, microfilms, or motion pictures; or any other medium), and any other tangible item or thing of readable, recorded, or visual material of whatever nature including without limitation originals, drafts, and all non-identical copies of each document (which, by reason of any variation, such as the presence or absence of hand-written notes or underlining, represents a distinct version).  By way of example, the terms "document" or "documents" as used herein shall include, without limitation: correspondence; blueprints; memoranda; notes; diaries; letters; e-mails; text messages; metadata; minutes; agendas; contracts; reports; studies; checks; statements; receipts; returns; summaries; pamphlets; circulars; press releases; advertisements; books; inter-office and intra-office communications; handwritten or

Exhibit 58

typewritten notes; notations or summaries of telephone conversations, meetings, or conferences; bulletins; computer printouts; databases; invoices; worksheets; photographs; tape recordings; and all other tangible items of readable, recorded, or visual material of any kind.

16.     The term "thing" means tangible objects of any type, composition, construction, or nature.

17.     The term "communication" means all written, electronic, oral, telephonic, or other inquiries, dialogues, conversations, interviews, correspondence, consultations, negotiations, agreements, understandings, meetings, letters, notes, advertisements, computer mail, email, text messages, and all other documents evidencing any verbal or nonverbal interaction between persons and entities.

18.     The term "concerning" is used in its customary broad sense and, by way of example and not by way of limitation, it includes referring to, relating to, mentioning, discussing, stating, describing, noting, recording, embodying, studying, analyzing, evaluating, evidencing, reflecting, containing, demonstrating, identifying, comprising, constituting, supporting, and undermining, and shall encompass all express and implied references to the specified person, subject, event, or thing.  A document concerning a particular subject includes documents concerning the preparation of other documents or draft documents that concern the subject.

19.     The term "Patent and Trademark Office," "PTO," or "USPTO" means United States Patent and Trademark Office.

20.     The term "Infringement" means and refers to direct, contributory, and induced infringement, whether literally or under the doctrine of equivalents, under the applicable laws.

Exhibit 58

21.    The term "Domestic Industry" means domestic industry as that term is used in Commission Rule 210.12(a)(6)(i), 19 C.F.R. § 210.12(a)(6)(i), and alleged in Section VII of the Complaint.

22.    The term "Domestic Industry Product" means any product on which Complainant relies for its contention that a Domestic Industry either exists or is in the process of being established, including the products identified in the Complaint and Ex. 27 to the Complaint.

23.    The term "Accused Product(s) and Components Thereof" means any product of Respondents that is accused of infringement in the Present Investigation, including the Apple Watch Series 6, including all components of those products, all spare parts of those products, and all variants of those products designed, developed, manufactured, assembled, offered for sale, distributed, imported or sold by Apple or on behalf of Apple in the United States that include light-based pulse oximetry functionality.  By way of example, the term "Accused Product(s) and Components Thereof" shall include any and all hardware and software utilized in or contributing to the measurement of blood oxygen saturation, including but not limited to hardware such as processors, light-emitting diodes, photodetectors, lenses, magnets, thermistors, and materials covering or surrounding the light emitting diodes or photodiodes, and including but not limited to software such as source code, libraries, and firmware.

24.    The term "prosecution," in relation to a patent or patent application, means all proceedings before, and communications with, a patent office relating to a patent, patent application, continuation, continuation-in-part, and/or divisional, including, but not limited to, interference, reissue, reexamination, opposition, cancellation, inter partes review or other post grant proceedings.

Exhibit 58

25.     The term "Prior Art" is defined in its broadest sense under the patent laws to include, for example, all publications, patents, patent applications, disclosures, presentations, physical specimens, products, devices, uses, sales, offer for sale, or other activity concerning the subject matter of any Asserted Claim of the Patents-in-Suit (or that any person has alleged to be concerning the patentability of any Asserted Claim of the Patents-in-Suit, and related patent or application, or any foreign counterpart of these patents and applications) and existing or occurring prior to the filing date of the Patents-in-Suit.

26.     The term "Blood Oxygen App" means any feature of any Apple Watch that You refer to as the Watch's "Blood Oxygen app," and any software and hardware relied upon by that app to take a blood oxygen measurement.

27.     The term "Target Date" means the target date in this Investigation, which is currently January 16, 2023.

28.     The term "Next Apple Watch" means the next Apple Watch introduced by Apple after the Apple Watch Series 7 that includes pulse oximetry.

## <u>INSTRUCTIONS</u>

The following instructions shall apply to each of the requests for production of documents and things herein:

1.     If You contend that any information called for by these requests is privileged or otherwise excludable from discovery, provide all responsive information that is not privileged and, with respect to each responsive document or thing withheld or redacted, provide the information required under Commission Rule 210.27(e).

2.     The definitions set forth herein have the broadest possible meaning under Commission Rule 210.27.

Exhibit 58

3.      Written responses to these requests for production are required pursuant to Commission Rule 210.30(b)(2).

4.      State, for each request, whether or not any documents within the scope of the request exist and whether any such documents are in Your possession, custody, or control.

5.      These document requests call for all documents that are known or available to You, including all documents in the custody, possession or control of or available to Your attorneys, agents, or representatives, or any investigators or any other person acting on Your behalf or under the direction or control of You or Your attorneys or agents, and including documents maintained by any employee, officer, director, agent or other representative in any files at such person's home or on such person's personal computer.

6.      If You object in part to any request for production, provide a complete answer to all portions of the request to which You have not objected.

7.      If You claim that a request is overly broad and/or unduly burdensome, produce documents responsive to any portion of the request to which You have not objected and specifically identify the respect in which the request is allegedly overly broad and/or unduly burdensome.

8.      If You claim that a request is vague and/or ambiguous, produce documents responsive to any portion of the request to which You have not objected and specifically identify the particular words, terms or phrases that You assert make such request vague and/or ambiguous.

9.      If no documents are responsive to a particular request, state that no responsive documents exist.

10.      The singular form of a word should be interpreted in the plural and vice versa.  Any pronoun shall be construed to refer to the masculine, feminine, or neuter gender as in each case is

Exhibit 58

most appropriate.  The words "and" and "or" shall be construed conjunctively or disjunctively, whichever makes the request most inclusive.  The word "including" shall be without limitation. The terms "each" and "any" shall mean any and all.

11.     To the extent these requests seek information that is recorded in any form of document, including electronically stored documents such as word processing files and email, take steps to ensure that all such documents are preserved for this litigation and to ensure that no responsive electronically stored documents are erased or deleted.

12.     Produce all documents requested in the same file or other organizational environment in which they are maintained.  For example, a document that is part of a file, docket, or other grouping, should be physically produced together with all other documents from said file, docket, or grouping, in the same order or manner of arrangement as the original.  Alternatively, as to each document and thing produced in response hereto, You shall identify the request for production and where applicable, the interrogatory number, in response to which the document or thing is being produced.  Where a document or thing exists in hard copy and electronic format, You shall produce both the hard and the electronic copy.

13.     These requests seek all responsive documents in their original language and, if such original language is not English, these requests also seek all English-language translations that exist now, or any English-language translations that may exist at any time in the future, for any such documents.

14.     You shall keep and produce a record of the source of each document produced. This shall include the name and location of the file where each document was located and the name of the person, group, or department having possession, custody, or control of each document.

Exhibit 58

15.     These requests shall include information acquired or identified up to the date(s) of Your answers and shall be deemed to be continuing.   Therefore, promptly produce to Complainants, as supplemental responses to these requests in accordance with 19 C.F.R. § 210.27(f), any additional information that You identify, acquire, or become aware of up to and including the time of the hearing.

## REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS

**REQUEST FOR PRODUCTION NO. 145:**

All documents and things reflecting any research and development for any actual, anticipated, or contemplated Blood Oxygen app of the Next Apple Watch.

**REQUEST FOR PRODUCTION NO. 146:**

All documents describing or otherwise referring to any Blood Oxygen app of the Next Apple Watch.

**REQUEST FOR PRODUCTION NO. 147:**

Two samples of the Next Apple Watch.

**REQUEST FOR PRODUCTION NO. 148:**

The source code for any Blood Oxygen app developed for use in the Next Apple Watch.

**REQUEST FOR PRODUCTION NO. 149:**

Documents sufficient to show the identity of all Apple Watch products that You plan to begin importing into the United States or have imported into the United States by the Target Date.

Dated:  October 21, 2021               By: */s/ Alan G. Laquer*_____
                                              Stephen C. Jensen
                                              Joseph R. Re
                                              Sheila N. Swaroop
                                              Ted. M. Cannon
                                              Alan G. Laquer
                                              Kendall M. Loebbaka

Exhibit 58

Douglas B. Wentzel
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, Fourteenth Floor
Irvine, CA  92614
Telephone:  (949) 760-0404
Facsimile:  (949) 760-9502

William R. Zimmerman
Jonathan E. Bachand
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
1717 Pennsylvania Avenue N.W., Suite 900
Washington, DC 20006
Telephone:  (202) 640-6400
Facsimile:  (202) 640-6401

Brian C. Horne
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
1925 Century Park East
Suite 600
Los Angeles, CA 90067
Telephone:  (310) 551-3450
Facsimile:  (310) 551-3458

Carol Pitzel Cruz
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
925 4th Ave., #2500
Seattle, WA 98104
Telephone:  (206) 405-2000
Facsimile:  (206) 405 2001

Karl W. Kowalis
Matthew S. Friedrichs
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
1155 Avenue of the Americas
24th Floor
New York, NY 10036
Telephone:  (212) 849-3000
Facsimile:  (212) 849-3001

*Counsel for Complainants*
*Masimo Corporation and*
*Cercacor Laboratories, Inc.*

10

Exhibit 58

**In the Matter of Certain Physiological Measurement Devices
and Components Thereof
Investigation No. 337-TA-1276**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 21, 2021, I caused a copy of the foregoing document to be served as indicated below:

| Counsel for Respondent Apple, Inc. | |
|---|---|
| Michael Esch and co-counsel<br>**WILMER CUTLER PICKERING HALE AND DORR LLP**<br>1875 Pennsylvania Avenue, NW<br>Washington, DC 20006<br><br>Mark Selwyn and co-counsel<br>**WILMER CUTLER PICKERING HALE AND DORR LLP**<br>2600 El Camino Real<br>Suite 400<br>Palo Alto, California 94306<br><br>Joseph Mueller and co-counsel<br>**WILMER CUTLER PICKERING HALE AND DORR LLP**<br>60 State Street<br>Boston, Massachusetts 02109 | ☑ Via E-mail to<br>WHApple-Masimo1276ServiceList@wilmerhale.com |

October 21, 2021

/s/ Claire A. Stoneman
Knobbe, Martens, Olson & Bear, LLP

Exhibit 58

# EXHIBIT 60



US010945648B2

(12) **United States Patent**
Poeze et al.

(10) **Patent No.:** **US 10,945,648 B2**
(45) **Date of Patent:** *Mar. 16, 2021

(54) **USER-WORN DEVICE FOR NONINVASIVELY MEASURING A PHYSIOLOGICAL PARAMETER OF A USER**

(71) Applicant: **Masimo Corporation**, Irvine, CA (US)

(72) Inventors: **Jeroen Poeze**, Rancho Santa Margarita, CA (US); **Marcelo Lamego**, Cupertino, CA (US); **Sean Merritt**, Lake Forest, CA (US); **Cristiano Dalvi**, Lake Forest, CA (US); **Hung Vo**, Fountain Valley, CA (US); **Johannes Bruinsma**, Opeinde (NL); **Ferdyan Lesmana**, Irvine, CA (US); **Massi Joe E. Kiani**, Laguna Niguel, CA (US); **Greg Olsen**, Lake Forest, CA (US)

(73) Assignee: **Masimo Corporation**, Irvine, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **17/031,316**

(22) Filed: **Sep. 24, 2020**

(65) **Prior Publication Data**

US 2021/0007635 A1     Jan. 14, 2021

**Related U.S. Application Data**

(60) Continuation of application No. 16/834,538, filed on Mar. 30, 2020, which is a continuation of application
(Continued)

(51) **Int. Cl.**
| | |
|---|---|
| *A61B 5/1455* | (2006.01) |
| *A61B 5/145* | (2006.01) |
| *A61B 5/00* | (2006.01) |

(52) **U.S. Cl.**
CPC ........ *A61B 5/1455* (2013.01); *A61B 5/14532* (2013.01); *A61B 5/14546* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC . A61B 5/1455; A61B 5/14546; A61B 5/6838; A61B 5/6816; A61B 5/6829;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,452,215 A | 6/1969 | Alessio |
| 3,760,582 A | 9/1973 | Thiess et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2264029 | 3/1998 |
| CN | 1270793 | 10/2000 |

(Continued)

OTHER PUBLICATIONS

US 8,845,543 B2, 09/2014, Diab et al. (withdrawn)
(Continued)

*Primary Examiner* — Chu Chuan Liu
(74) *Attorney, Agent, or Firm* — Knobbe Martens Olson & Bear LLP

(57) **ABSTRACT**

The present disclosure relates to noninvasive methods, devices, and systems for measuring various blood constituents or analytes, such as glucose. In an embodiment, a light source comprises LEDs and super-luminescent LEDs. The light source emits light at least wavelengths of about 1610 nm, about 1640 nm, and about 1665 nm. In an embodiment, the detector comprises a plurality of photodetectors arranged in a special geometry comprising one of a substantially linear substantially equal spaced geometry, a substantially linear substantially non-equal spaced geometry, and a substantially grid geometry.

**30 Claims, 65 Drawing Sheets**



Exhibit 60

US 10,945,648 B2

**43**

drical housing **1480/1580** (not shown) attached to an emitter submount **1702**, which is attached to a circuit board **1719**.

A spring **1787** attaches to a detector shell **1706** via pins **1783, 1785**, which hold the emitter and detector shells **1704, 1706** together. A support structure **1791** attaches to the detector shell **1706**, which provides support for a shielding enclosure **1790**. A noise shield **1713** attaches to the shielding enclosure **1790**. A detector submount **1700** is disposed inside the shielding enclosure **1790**. A finger bed **1710** provides a surface for placement of the patient's finger. Finger bed **1710** may comprise a gripping surface or gripping features, which may assist in placing and stabilizing a patient's finger in the sensor. A partially cylindrical protrusion **1705** may also be disposed in the finger bed **1710**. As shown, finger bed **1710** attaches to the noise shield **1703**. The noise shield **1703** may be configured to reduce noise, such as from ambient light and electromagnetic noise. For example, the noise shield **1703** may be constructed from materials having an opaque color, such as black or a dark blue, to prevent light piping.

Noise shield **1703** may also comprise a thermistor **1712**. The thermistor **1712** may be helpful in measuring the temperature of a patient's finger. For example, the thermistor **1712** may be useful in detecting when the patient's finger is reaching an unsafe temperature that is too hot or too cold. In addition, the temperature of the patient's finger may be useful in indicating to the sensor the presence of low perfusion as the temperature drops. In addition, the thermistor **1712** may be useful in detecting a shift in the characteristics of the water spectrum in the patient's finger, which can be temperature dependent.

Moreover, a flex circuit cover **1706** attaches to the pins **1783, 1785**. Although not shown, a flex circuit can also be provided that connects the circuit board **1719** with the submount **1700** (or a circuit board to which the submount **1700** is connected). A flex circuit protector **1760** may be provided to provide a barrier or shield to the flex circuit (not shown). In particular, the flex circuit protector **1760** may also prevent any electrostatic discharge to or from the flex circuit. The flex circuit protector **1760** may be constructed from well known materials, such as a plastic or rubber materials.

FIG. **18** shows the results obtained by an exemplary sensor **101** of the present disclosure that was configured for measuring glucose. This sensor **101** was tested using a pure water ex-vivo sample. In particular, ten samples were prepared that ranged from 0-55 mg/dL. Two samples were used as a training set and eight samples were then used as a test population. As shown, embodiments of the sensor **101** were able to obtain at least a standard deviation of 13 mg/dL in the training set and 11 mg/dL in the test population.

FIG. **19** shows the results obtained by an exemplary sensor **101** of the present disclosure that was configured for measuring glucose. This sensor **101** was tested using a turbid ex-vivo sample. In particular, 25 samples of water/glucose/ Liposyn were prepared that ranged from 0-55 mg/dL. Five samples were used as a training set and 20 samples were then used as a test population. As shown, embodiments of sensor **101** were able to obtain at least a standard deviation of 37 mg/dL in the training set and 32 mg/dL in the test population.

FIGS. **20** through **22** shows other results that can be obtained by an embodiment of system **100**. In FIG. **20, 150** blood samples from two diabetic adult volunteers were collected over a 10-day period. Invasive measurements were taken with a YSI glucometer to serve as a reference measurement. Noninvasive measurements were then taken with

**44**

an embodiment of system **100** that comprised four LEDs and four independent detector streams. As shown, the system **100** obtained a correlation of about 85% and Arms of about 31 mg/dL.

In FIG. **21, 34** blood samples were taken from a diabetic adult volunteer collected over a 2-day period. Invasive measurements were also taken with a glucometer for comparison. Noninvasive measurements were then taken with an embodiment of system **100** that comprised four LEDs in emitter **104** and four independent detector streams from detectors **106**. As shown, the system **100** was able to attain a correlation of about 90% and Arms of about 22 mg/dL.

The results shown in FIG. **22** relate to total hemoglobin testing with an exemplary sensor **101** of the present disclosure. In particular, 47 blood samples were collected from nine adult volunteers. Invasive measurements were then taken with a CO-oximeter for comparison. Noninvasive measurements were taken with an embodiment of system **100** that comprised four LEDs in emitter **104** and four independent detector channels from detectors **106**. Measurements were averaged over 1 minute. As shown, the testing resulted in a correlation of about 93% and Arms of about 0.8 mg/dL.

Conditional language used herein, such as, among others, "can," "could," "might," "may," "e.g.," and the like, unless specifically stated otherwise, or otherwise understood within the context as used, is generally intended to convey that certain embodiments include, while other embodiments do not include, certain features, elements and/or states. Thus, such conditional language is not generally intended to imply that features, elements and/or states are in any way required for one or more embodiments or that one or more embodiments necessarily include logic for deciding, with or without author input or prompting, whether these features, elements and/or states are included or are to be performed in any particular embodiment.

While certain embodiments of the inventions disclosed herein have been described, these embodiments have been presented by way of example only, and are not intended to limit the scope of the inventions disclosed herein. Indeed, the novel methods and systems described herein can be embodied in a variety of other forms; furthermore, various omissions, substitutions and changes in the form of the methods and systems described herein can be made without departing from the spirit of the inventions disclosed herein. The claims and their equivalents are intended to cover such forms or modifications as would fall within the scope and spirit of certain of the inventions disclosed herein.

What is claimed is:

1. A user-worn device configured to non-invasively determine measurements of physiological parameter of a user, the user-worn device comprising:

a plurality of light emitting diodes (LEDs);

four photodiodes configured to receive light emitted by the LEDs, the four photodiodes being arranged to capture light at different quadrants of tissue of a user;

a protrusion comprising a convex surface and a plurality of openings extending through the protrusion, the openings arranged over the photodiodes and configured to allow light to pass through the protrusion to the photodiodes; and

one or more processors configured to receive one or more signals from at least one of the photodiodes and determine measurements of oxygen saturation of the user.

2. The user-worn device of claim **1**, wherein the one or more processors are further configured to process the one or

Copy provided by USPTO from the PIRS Image Database on 05-24-2021

Exhibit 60

US 10,945,648 B2

**45**

more signals to determine a bulk measurement indicating a positioning of the user-worn device.

3. The user-worn device of claim 1 further comprising optically transparent glass windows, each window extending across a different one of the openings.

4. The user-worn device of claim 1, wherein the plurality of LEDs and the photodiodes are positioned on a same side of tissue of the user.

5. The user-worn device of claim 1, wherein the protrusion further comprises an opaque material, and wherein the one or more signals are substantially free of noise caused by light piping.

6. A user-worn device comprising:

a first set of light emitting diodes (LEDs), the first set of LEDs comprising at least an LED configured to emit light at a first wavelength and an LED configured to emit light at a second wavelength;

a second set of LEDs spaced apart from the first set of LEDs, the second set of LEDs comprising at least an LED configured to emit light at the first wavelength and an LED configured to emit light at the second wavelength;

four photodiodes arranged on a surface and configured to receive light after at least a portion of the light has been attenuated by tissue of a user;

a protrusion arranged above the surface, the protrusion comprising a convex surface including windows, the windows extending across the four photodiodes, wherein light passes through the protrusion to the four photodiodes via at least the windows;

a thermistor configured to provide a temperature signal; and

one or more processors configured to:

receive one or more signals from at least one of the photodiodes;

receive the temperature signal; and

adjust operation of the user-worn device responsive to the temperature signal.

7. The user-worn device of claim 6, wherein the protrusion further comprises an opaque material, the opaque material extending from the convex surface of the protrusion to an interior surface of the protrusion opposite the convex surface.

8. A user-worn device configured to non-invasively determine measurements of a physiological parameter of a user, the user-worn device comprising:

a first set of light emitting diodes (LEDs), the first set comprising at least an LED configured to emit light at a first wavelength and at least an LED configured to emit light at a second wavelength;

a second set of LEDs spaced apart from the first set of LEDs, the second set of LEDs comprising an LED configured to emit light at the first wavelength and an LED configured to emit light at the second wavelength;

four photodiodes;

a protrusion comprising a convex surface, at least a portion of the protrusion comprising an opaque material;

a plurality of openings provided through the protrusion and the convex surface, the openings aligned with the photodiodes;

a separate optically transparent window extending across each of the openings;

one or more processors configured to receive one or more signals from at least one of the photodiodes and output measurements of a physiological parameter of a user;

**46**

a housing; and

a strap configured to position the housing proximate tissue of the user when the device is worn.

9. The user-worn device of claim 8 further comprising a network interface configured to wirelessly communicate the measurements of the physiological parameter to at least one of a mobile phone or a computer network.

10. The user-worn device of claim 9 further comprising a user interface including a touch-screen display configured to display indicia responsive to the measurements of the physiological parameter.

11. The user-worn device of claim 10, wherein an orientation of the user interface is configurable responsive to a user input.

12. The user-worn device of claim 8, wherein the physiological parameter comprises oxygen or oxygen saturation.

13. The user-worn device of claim 8 further comprising a storage device configured to at least temporarily store at least the measurements of the physiological parameter.

14. The user-worn device of claim 8, wherein the physiological parameter comprises pulse rate.

15. The user-worn device of claim 8 further comprising a thermistor.

16. The user-worn device of claim 8, wherein the openings are configured to prevent light piping.

17. The user-worn device of claim 8, wherein the housing hermetically seals at least a portion of an interior of the user-worn device.

18. The user-worn device of claim 8, wherein the windows comprise a conductive material.

19. The user-worn device of claim 8, wherein the windows are arranged on the protrusion configured to be in contact with tissue of the user.

20. A user-worn device configured to non-invasively determine measurements of a user's tissue, the user-worn device comprising:

a plurality of light emitting diodes (LEDs);

at least four photodiodes configured to receive light emitted by the LEDs, the four photodiodes being arranged to capture light at different quadrants of tissue of a user;

a protrusion comprising a convex surface and a plurality of through holes, each through hole including a window and arranged over a different one of the at least four photodiodes; and

one or more processors configured to receive one or more signals from at least one of the photodiodes and determine measurements of oxygen saturation of the user.

21. The user-worn device of claim 20, wherein the one or more processors are further configured to process the one or more signals to determine a bulk measurement indicating a positioning of the user-worn device.

22. The user-worn device of claim 20, wherein the plurality of LEDs and the photodiodes are positioned on a same side of the user's tissue.

23. The user-worn device of claim 20, wherein the one or more signals are substantially free of noise caused by light piping.

24. The user-worn device of claim 20, wherein the protrusion comprises opaque material configured to substantially prevent light piping.

25. The user-worn device of claim 20, further comprising gaps between the photodiodes and the windows.

26. The user-worn device of claim 20, wherein the photodiodes are arranged in a quadrant configuration.

27. The user-worn device of claim 26, further comprising opaque walls surrounding the photodiodes.

Exhibit 60

US 10,945,648 B2

47

48

**28.** The user-worn device of claim **27**, wherein the walls are configured to reduce mixing of light from distinct quadrants of the tissue.

**29.** The user-worn device of claim **20**, wherein the protrusion further comprises one or more extensions.

**30.** The user-worn device of claim **20**, wherein the protrusion further comprises one or more chamfered edges.

\* \* \* \* \*

Exhibit 60

# EXHIBIT 61

US010687745B1

(12) **United States Patent**
Al-Ali

(10) **Patent No.:**      **US 10,687,745 B1**
(45) **Date of Patent:**      *Jun. 23, 2020

(54) **PHYSIOLOGICAL MONITORING DEVICES, SYSTEMS, AND METHODS**

(71) Applicant: **MASIMO CORPORATION**, Irvine, CA (US)

(72) Inventor: **Ammar Al-Ali**, San Juan Capistrano, CA (US)

(73) Assignee: **Masimo Corporation**, Irvine, CA (US)

( * ) Notice:   Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/835,772**

(22) Filed:   **Mar. 31, 2020**

**Related U.S. Application Data**

(63) Continuation of application No. 16/791,963, filed on Feb. 14, 2020, which is a continuation of application
(Continued)

(51) **Int. Cl.**
    *A61B 5/1455*      (2006.01)
    *A61B 5/024*      (2006.01)
    (Continued)

(52) **U.S. Cl.**
    CPC ........ *A61B 5/14552* (2013.01); *A61B 5/0002* (2013.01); *A61B 5/02416* (2013.01);
    (Continued)

(58) **Field of Classification Search**
    None
    See application file for complete search history.

(56)      **References Cited**

U.S. PATENT DOCUMENTS

| 4,960,128 A | 10/1990 | Gordon et al. |
| 4,964,408 A | 10/1990 | Hink et al. |
| | (Continued) | |

FOREIGN PATENT DOCUMENTS

| CN | 101484065 B | 7/2009 |
| CN | 101564290 B | 10/2009 |
| | (Continued) | |

OTHER PUBLICATIONS

US 8,845,543 B2, 09/2014, Diab et al. (withdrawn)
(Continued)

*Primary Examiner* — Eric F Winakur
*Assistant Examiner* — Marjan Fardanesh
(74) *Attorney, Agent, or Firm* — Knobbe, Martens, Olson & Bear, LLP

(57)      **ABSTRACT**

A non-invasive, optical-based physiological monitoring system is disclosed. One embodiment includes an emitter configured to emit light. A diffuser is configured to receive and spread the emitted light, and to emit the spread light at a tissue measurement site. The system further includes a concentrator configured to receive the spread light after it has been attenuated by or reflected from the tissue measurement site. The concentrator is also configured to collect and concentrate the received light and to emit the concentrated light to a detector. The detector is configured to detect the concentrated light and to transmit a signal representative of the detected light. A processor is configured to receive the transmitted signal and to determine a physiological parameter, such as, for example, arterial oxygen saturation, in the tissue measurement site.

**27 Claims, 7 Drawing Sheets**



US 10,687,745 B1

15

The term "and/or" herein has its broadest, least limiting meaning which is the disclosure includes A alone, B alone, both A and B together, or A or B alternatively, but does not require both A and B or require one of A or one of B. As used herein, the phrase "at least one of" A, B, "and" C should be construed to mean a logical A or B or C, using a non-exclusive logical or.

The apparatuses and methods described herein may be implemented by one or more computer programs executed by one or more processors. The computer programs include processor-executable instructions that are stored on a non-transitory tangible computer readable medium. The computer programs may also include stored data. Non-limiting examples of the non-transitory tangible computer readable medium are nonvolatile memory, magnetic storage, and optical storage. Although the foregoing disclosure has been described in terms of certain preferred embodiments, other embodiments will be apparent to those of ordinary skill in the art from the disclosure herein. Additionally, other combinations, omissions, substitutions and modifications will be apparent to the skilled artisan in view of the disclosure herein. Accordingly, the present invention is not intended to be limited by the description of the preferred embodiments, but is to be defined by reference to claims.

Additionally, all publications, patents, and patent applications mentioned in this specification are herein incorporated by reference to the same extent as if each individual publication, patent, or patent application were specifically and individually indicated to be incorporated by reference.

What is claimed is:

1. A physiological monitoring device comprising:
a plurality of light-emitting diodes configured to emit light in a first shape;
a material configured to be positioned between the plurality of light-emitting diodes and tissue on a wrist of a user when the physiological monitoring device is in use, the material configured to change the first shape into a second shape by which the light emitted from one or more of the plurality of light-emitting diodes is projected towards the tissue;
a plurality of photodiodes configured to detect at least a portion of the light after the at least portion of the light passes through the tissue, the plurality of photodiodes further configured to output at least one signal responsive to the detected light;
a surface comprising a dark-colored coating, the surface configured to be positioned between the plurality of photodiodes and the tissue when the physiological monitoring device is in use, wherein an opening defined in the dark-colored coating is configured to allow at least a portion of light reflected from the tissue to pass through the surface;
a light block configured to prevent at least a portion of the light emitted from the plurality of light-emitting diodes from reaching the plurality of photodiodes without first reaching the tissue; and
a processor configured to receive and process the outputted at least one signal and determine a physiological parameter of the user responsive to the outputted at least one signal.

2. The physiological monitoring device of claim 1, wherein at least one of the plurality of light-emitting diodes is configured to emit light of a first wavelength and at least one of the plurality of light-emitting diodes is configured to emit light of a second wavelength, the second wavelength being different than the first wavelength.

16

3. The physiological monitoring device of claim 1, further comprising a display configured to present visual feedback responsive to the determined physiological parameter.

4. The physiological monitoring device of claim 3, wherein the display is a touch-screen display.

5. The physiological monitoring device of claim 1, wherein the plurality of light-emitting diodes and the plurality of photodiodes are arranged in a reflectance measurement configuration.

6. The physiological monitoring device of claim 1, wherein the plurality of photodiodes are arranged in an array having a spatial configuration corresponding to a shape of a portion of the tissue bounded by the light block.

7. The physiological monitoring device of claim 1, wherein the light block comprises an at least partially circular shape, and wherein the plurality of light-emitting diodes are positioned outside the light block and the plurality of photodiodes are positioned inside the light block.

8. The physiological monitoring device of claim 1, wherein the physiological parameter comprises pulse rate.

9. The physiological monitoring device of claim 1, wherein the physiological parameter comprises oxygen saturation.

10. The physiological monitoring device of claim 1, wherein the material comprises glass.

11. The physiological monitoring device of claim 1, wherein the material comprises plastic.

12. The physiological monitoring device of claim 1, wherein the second shape comprises a circular geometry.

13. The physiological monitoring device of claim 1, wherein the opening defined in the dark-colored coating comprises a width and a length, and wherein the width is larger than the length.

14. The physiological monitoring device of claim 1, wherein the dark-colored coating comprises black.

15. A physiological monitoring device comprising:
a plurality of light-emitting diodes configured to emit light proximate a wrist of a user;
a light diffusing material configured to be positioned between the plurality of light-emitting diodes and a tissue measurement site on the wrist of the user when the physiological monitoring device is in use;
a light block having a circular shape;
a plurality of photodiodes configured to detect at least a portion of the light emitted from the plurality of light-emitting diodes after the light passes through the light diffusing material and a portion of the tissue measurement site encircled by the light block, wherein the plurality of photodiodes are arranged in an array having a spatial configuration corresponding to a shape of the portion of the tissue measurement site encircled by the light block, wherein the plurality of photodiodes are further configured to output at least one signal responsive to the detected light, and wherein the plurality of light-emitting diodes and the plurality of photodiodes are arranged in a reflectance measurement configuration;
wherein the light block is configured to optically isolate the plurality of light-emitting diodes from the plurality of photodiodes by preventing at least a portion of light emitted from the plurality of light-emitting diodes from reaching the plurality of photodiodes without first reaching the portion of the tissue measurement site;
a processor configured to receive and process the outputted at least one signal and determine a physiological parameter of the user responsive to the outputted at least one signal; and

Copy provided by USPTO from the PIRS Image Database on 02-23-2021

Exhibit 61

US 10,687,745 B1

**17**

wherein the physiological monitoring device is configured to transmit physiological parameter data to a separate processor.

**16.** The physiological monitoring device of claim **15,** wherein the plurality of light-emitting diodes are positioned outside the light block and the plurality of photodiodes are positioned inside the light block.

**17.** The physiological monitoring device of claim **15,** wherein the physiological parameter comprises pulse rate.

**18.** The physiological monitoring device of claim **15,** wherein the physiological parameter comprises oxygen saturation.

**19.** The physiological monitoring device of claim **15,** wherein the plurality of light-emitting diodes are configured to emit light in a first shape, and wherein the light diffusing material is configured to change the first shape into a second shape by which the light emitted from one or more of the plurality of light-emitting diodes is projected towards the tissue measurement site.

**20.** A system configured to measure one or more physiological parameters of a user, the system comprising:

a physiological monitoring device comprising:

a plurality of light-emitting diodes configured to emit light in a first shape;

a material configured to be positioned between the plurality of light-emitting diodes and tissue of the user when the physiological monitoring device is in use, the material configured to change the first shape into a second shape by which the light emitted from one or more of the plurality of light-emitting diodes is projected towards the tissue;

a plurality of photodiodes configured to detect at least a portion of the light after the at least the portion of the light passes through the tissue, the plurality of photodiodes further configured to output at least one signal responsive to the detected light;

a surface comprising a dark-colored coating, the surface configured to be positioned between the plurality of photodiodes and the tissue when the physiological monitoring device is in use, wherein an opening defined in the dark-colored coating is configured to allow at least a portion of light reflected from the tissue to pass through the surface;

**18**

a light block configured to prevent at least a portion of light from the plurality of light-emitting diodes from reaching the plurality of photodiodes without first reaching the tissue; and

a processor configured to receive and process the outputted at least one signal and determine a physiological parameter of the user responsive to the outputted at least one signal; and

a processing device configured to wirelessly receive physiological parameter data from the physiological monitoring device, wherein the processing device comprises a user interface, a storage device, and a network interface configured to wirelessly communicate with the physiological monitoring device, and wherein the user interface includes a touch-screen display configured to present visual feedback responsive to the physiological parameter data.

**21.** The system of claim **20,** wherein the system is configured to determine a state of wellness of the user based on the determined physiological parameter.

**22.** The system of claim **20,** wherein the system is configured to determine a trend of wellness of the user based on the determined physiological parameter.

**23.** The system of claim **20,** wherein the visual feedback presented by the touch-screen display is responsive to at least one of a pulse rate and an oxygen saturation of the user.

**24.** The system of claim **20,** wherein the material comprises at least one of glass and plastic.

**25.** The system of claim **20,** wherein the second shape comprises a width and a length, and wherein the width is different from the length.

**26.** The system of claim **20,** wherein the plurality of photodiodes are arranged in an array having a spatial configuration corresponding to a shape of a portion of the tissue encircled by the light block.

**27.** The system of claim **20,** wherein at least one of the plurality of light-emitting diodes is configured to emit light of a first wavelength and at least one of the plurality of light-emitting diodes is configured to emit light of a second wavelength, the second wavelength being different than the first wavelength.

\*   \*   \*   \*   \*

Exhibit 61

# EXHIBIT 62



US010912501B2

(12) **United States Patent**
Poeze et al.

(10) **Patent No.:** **US 10,912,501 B2**
(45) **Date of Patent:** *****Feb. 9, 2021**

(54) **USER-WORN DEVICE FOR NONINVASIVELY MEASURING A PHYSIOLOGICAL PARAMETER OF A USER**

(71) Applicant: **Masimo Corporation**, Irvine, CA (US)

(72) Inventors: **Jeroen Poeze**, Rancho Santa Margarita, CA (US); **Marcelo Lamego**, Cupertino, CA (US); **Sean Merritt**, Lake Forest, CA (US); **Cristiano Dalvi**, Lake Forest, CA (US); **Hung Vo**, Fountain Valley, CA (US); **Johannes Bruinsma**, Opeinde (NL); **Ferdyan Lesmana**, Irvine, CA (US); **Massi Joe E. Kiani**, Laguna Niguel, CA (US); **Greg Olsen**, Lake Forest, CA (US)

(73) Assignee: **Masimo Corporation**, Irvine, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **17/031,356**

(22) Filed: **Sep. 24, 2020**

(65) **Prior Publication Data**

US 2021/0007636 A1    Jan. 14, 2021

**Related U.S. Application Data**

(60) Continuation of application No. 16/834,538, filed on Mar. 30, 2020, which is a continuation of application
(Continued)

(51) **Int. Cl.**
| | |
|---|---|
| *A61B 5/1455* | (2006.01) |
| *A61B 5/145* | (2006.01) |
| *A61B 5/00* | (2006.01) |

(52) **U.S. Cl.**
CPC ........ *A61B 5/1455* (2013.01); *A61B 5/14532* (2013.01); *A61B 5/14546* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC . A61B 5/1455; A61B 5/14546; A61B 5/6838; A61B 5/6816; A61B 5/6829;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,452,215 A | 6/1969 | Alessio |
| 3,760,582 A | 9/1973 | Thiess et al. |
| | (Continued) | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2264029 | 3/1998 |
| CN | 1270793 | 10/2000 |
| | (Continued) | |

OTHER PUBLICATIONS

US 8,845,543 B2, 09/2014, Diab et al. (withdrawn)
(Continued)

*Primary Examiner* — Chu Chuan Liu
(74) *Attorney, Agent, or Firm* — Knobbe Martens Olson & Bear LLP

(57) **ABSTRACT**

The present disclosure relates to noninvasive methods, devices, and systems for measuring various blood constituents or analytes, such as glucose. In an embodiment, a light source comprises LEDs and super-luminescent LEDs. The light source emits light at at least wavelengths of about 1610 nm, about 1640 nm, and about 1665 nm. In an embodiment, the detector comprises a plurality of photodetectors arranged in a special geometry comprising one of a substantially linear substantially equal spaced geometry, a substantially linear substantially non-equal spaced geometry, and a substantially grid geometry.

**30 Claims, 65 Drawing Sheets**



Exhibit 62

US 10,912,501 B2

45

46

What is claimed is:

1. A user-worn device configured to non-invasively measure a physiological parameter of a user, the user-worn device comprising:

at least three light emitting diodes (LEDs);

at least three photodiodes arranged on an interior surface of the user-worn device and configured to receive light attenuated by tissue of the user;

a protrusion arranged over the interior surface, the protrusion comprising a convex surface and a plurality of openings extending through the protrusion and positioned over the three photodiodes, the openings each comprising an opaque lateral surface, the plurality of openings configured to allow light to reach the photodiodes, the opaque lateral surface configured to avoid light piping through the protrusion; and

one or more processors configured to receive one or more signals from the photodiodes and calculate a measurement of the physiological parameter of the user.

2. The user-worn device of claim 1, wherein glass covers each of the openings.

3. The user-worn device of claim 1 further comprising:

a network interface configured to wirelessly communicate the measurement of the physiological parameter to a mobile phone;

a user interface comprising a touch-screen display, wherein the user interface is configured to display indicia responsive to the measurement of the physiological parameter;

a memory configured to at least temporarily store at least the measurement; and

a strap configured to position the user-worn device on the user.

4. The user-worn device of claim 1 further comprising:

a network interface configured to wirelessly communicate the measurement of the physiological parameter to a computer network;

a user interface comprising a touch-screen display, wherein the user interface is configured to display indicia responsive to the measurement of the physiological parameter;

a memory configured to at least temporarily store at least the measurement; and

a strap configured to position the user-worn device on the user.

5. The user-worn device of claim 1 further comprising:

at least one wall extending between the interior surface and the protrusion, wherein at least the interior surface, the wall and the protrusion form one or more cavities, wherein the photodiodes are arranged within the cavities.

6. The user-worn device of claim 1, wherein the physiological parameter comprises oxygen or oxygen saturation.

7. The user-worn device of claim 1, wherein the physiological parameter comprises pulse rate.

8. The user-worn device of claim 1, wherein the physiological parameter comprises trending information.

9. The user-worn device of claim 1 further comprising:

a thermistor configured to output a temperature signal, wherein the one or more processors are further configured to:

receive the temperature signal; and

adjust operation of the user-worn device responsive to the temperature signal.

10. The user-worn device of claim 9, wherein the temperature signal is responsive to a temperature of the tissue of the user.

11. The user-worn device of claim 1, wherein the LEDs and the photodiodes are arranged on a same side of the tissue of the user.

12. The user-worn device of claim 1, wherein the convex surface of the protrusion is an outermost surface configured to contact the tissue of the user and conform the tissue into a concave shape.

13. The user-worn device of claim 1, wherein the one or more processors are further configured to process the one or more signals to determine a bulk measurement responsive to a positioning of the user-worn device.

14. The user-worn device of claim 1, wherein:

the at least three LEDs comprises at least six LEDs;

a first set of LEDs includes three of the six LEDs;

a second set of LEDs includes a different three of the six LEDs;

the second set is spaced apart from the first set;

a first of the three LEDs in the first set of LEDs is configured to emit light at a first wavelength and a second of the three LEDs in the first set of LEDs is configured to emit light at a second wavelength; and

a first of the three LEDs in the second set of LEDs is configured to emit light at the first wavelength and a second of the three LEDs in the second set of LEDs is configured to emit light at the second wavelength.

15. The user-worn device of claim 1, wherein the at least three photodiodes comprise four photodiodes arranged on the interior surface in a quadrant arrangement.

16. The user-worn device of claim 1, wherein the protrusion further comprises one or more extensions.

17. The user-worn device of claim 16, wherein the one or more extensions surround the convex surface.

18. The user-worn device of claim 1, wherein the protrusion further comprises one or more chamfered edges.

19. A user-worn device comprising:

a plurality of light emitting diodes (LEDs);

at least three photodiodes arranged within the user-worn device and configured to receive light attenuated by tissue of a user;

a protrusion extending over the three photodiodes and comprising a convex surface, the protrusion including a separate window associated with each of the three photodiodes, an opaque material lining a lateral surface of the windows and extending through the protrusion, the opaque material configured to reduce an amount of light reaching the photodiodes without being attenuated by the tissue; and

one or more processors configured to receive one or more signals from at least one of the photodiodes, the one or more processors configured to output measurements responsive to the one or more signals, the measurements indicative of a physiological parameter of the user.

20. The user-worn device of claim 19 further comprising a thermistor.

21. The user-worn device of claim 20, wherein the one or more processors are further configured to receive a temperature signal from the thermistor and adjust operation of the user-worn device responsive to the temperature signal.

22. The user-worn device of claim 19, wherein the opaque material is configured to reduce an amount of noise caused by light piping in the one or more signals.

23. The user-worn device of claim 19 further comprising:

a network interface configured to wirelessly communicate the measurements to another computing device;

Exhibit 62

US 10,912,501 B2

47

a user interface comprising a touch-screen display, wherein the user interface is configured to display indicia responsive to the measurements; and

a memory configured to at least temporarily store at least the measurements.

**24.** The user-worn device of claim **19**, wherein the physiological parameter comprises an oxygen saturation or oxygen measurement.

**25.** The user-worn device of claim **19**, wherein the physiological parameter comprises a pulse rate.

**26.** A user-worn device configured to non-invasively measure a pulse rate of a user, the user-worn device comprising:

a first set of light emitting diodes (LEDs), the first set comprising at least an LED configured to emit light at a first wavelength and an LED configured to emit light at a second wavelength;

a second set of LEDs spaced apart from the first set of LEDs, the second set of LEDs comprising at least an LED configured to emit light at the first wavelength and an LED configured to emit light at the second wavelength;

at least three photodiodes arranged on an interior surface of the user-worn device and configured to receive light attenuated by tissue of the user;

a thermistor configured to provide a temperature signal;

a protrusion arranged over the interior surface, the protrusion comprising a convex surface extending over the three photodiodes, the protrusion further comprising one or more sidewalls extending at least partially around a perimeter of the convex surface;

48

a plurality of openings extending through the protrusion and aligned with the three photodiodes, each opening defined by an opaque surface extending through the protrusion and configured to reduce light piping;

at least one wall extending between the interior surface and the protrusion, wherein at least the interior surface, the wall and the protrusion form one or more cavities, wherein the photodiodes are arranged within the cavities;

one or more processors configured to receive one or more signals from the photodiodes and calculate a pulse rate measurement of the user;

a user interface comprising a display, wherein the user interface is configured to display indicia responsive to the pulse rate measurement;

a memory configured to at least temporarily store at least the pulse rate measurement; and

a strap configured to position the user-worn device on the user.

**27.** The user-worn device of claim **26**, further comprising a network interface configured to wirelessly communicate the pulse rate measurement to a mobile phone.

**28.** The user-worn device of claim **26**, further comprising a network interface configured to wirelessly communicate the pulse rate measurement to a computer network without involving a mobile phone.

**29.** The user-worn device of claim **26**, wherein the protrusion further comprises one or more extensions.

**30.** The user-worn device of claim **26**, wherein the protrusion further comprises one or more chamfered edges.

\* \* \* \* \*

Copy provided by USPTO from the PIRS Image Database on 05-06-2021

Exhibit 62

# EXHIBIT 63



US010912502B2

(12) **United States Patent**
Poeze et al.

(10) **Patent No.:**     **US 10,912,502 B2**
(45) **Date of Patent:**     **\*Feb. 9, 2021**

(54) **USER-WORN DEVICE FOR NONINVASIVELY MEASURING A PHYSIOLOGICAL PARAMETER OF A USER**

(71) Applicant: **Masimo Corporation**, Irvine, CA (US)

(72) Inventors: **Jeroen Poeze**, Rancho Santa Margarita, CA (US); **Marcelo Lamego**, Cupertino, CA (US); **Sean Merritt**, Lake Forest, CA (US); **Cristiano Dalvi**, Lake Forest, CA (US); **Hung Vo**, Fountain Valley, CA (US); **Johannes Bruinsma**, Opeinde (NL); **Ferdyan Lesmana**, Irvine, CA (US); **Massi Joe E. Kiani**, Laguna Niguel, CA (US); **Greg Olsen**, Lake Forest, CA (US)

(73) Assignee: **Masimo Corporation**, Irvine, CA (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **17/031,407**

(22) Filed: **Sep. 24, 2020**

(65) **Prior Publication Data**

US 2021/0000392 A1     Jan. 7, 2021

**Related U.S. Application Data**

(60) Continuation of application No. 16/834,538, filed on Mar. 30, 2020, which is a continuation of application
(Continued)

(51) **Int. Cl.**
| | | |
|---|---|---|
| *A61B 5/1455* | (2006.01) | |
| *A61B 5/145* | (2006.01) | |
| *A61B 5/00* | (2006.01) | |

(52) **U.S. Cl.**
CPC ........ *A61B 5/1455* (2013.01); *A61B 5/14532* (2013.01); *A61B 5/14546* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC . A61B 5/1455; A61B 5/14546; A61B 5/6838; A61B 5/6816; A61B 5/6829;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,452,215 A | | 6/1969 | Alessio |
| 3,760,582 A | | 9/1973 | Thiess et al. |
| | | (Continued) | |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| CA | 2264029 | 3/1998 | |
| CN | 1270793 | 10/2000 | |
| | | (Continued) | |

OTHER PUBLICATIONS

US 8,845,543 B2, 09/2014, Diab et al. (withdrawn)
(Continued)

*Primary Examiner* — Chu Chuan Liu
(74) *Attorney, Agent, or Firm* — Knobbe Martens Olson & Bear LLP

(57)     **ABSTRACT**

The present disclosure relates to noninvasive methods, devices, and systems for measuring various blood constituents or analytes, such as glucose. In an embodiment, a light source comprises LEDs and super-luminescent LEDs. The light source emits light at least wavelengths of about 1610 nm, about 1640 nm, and about 1665 nm. In an embodiment, the detector comprises a plurality of photodetectors arranged in a special geometry comprising one of a substantially linear substantially equal spaced geometry, a substantially linear substantially non-equal spaced geometry, and a substantially grid geometry.

**30 Claims, 65 Drawing Sheets**



Exhibit 63

US 10,912,502 B2

**43**

The sensor signal is communicated via the flexible coupling **1630** to the connector end **1620**. The connector end **1620** can mate with a cable (not shown) that communicates the sensor signal to a monitor (not shown), such as any of the cables or monitors shown above with respect to FIGS. 2A through 2D. Alternatively, the connector end **1620** can mate directly with the monitor.

FIG. **17** illustrates an exploded view of certain of the components of the sensor **301f** described above. A heat sink **1751** and a cable **1781** attach to an emitter shell **1704**. The emitter shell attaches to a flap housing **1707**. The flap housing **1707** includes a receptacle **1709** to receive a cylindrical housing **1480/1580** (not shown) attached to an emitter submount **1702**, which is attached to a circuit board **1719**.

A spring **1787** attaches to a detector shell **1706** via pins **1783**, **1785**, which hold the emitter and detector shells **1704**, **1706** together. A support structure **1791** attaches to the detector shell **1706**, which provides support for a shielding enclosure **1790**. A noise shield **1713** attaches to the shielding enclosure **1790**. A detector submount **1700** is disposed inside the shielding enclosure **1790**. A finger bed **1710** provides a surface for placement of the patient's finger. Finger bed **1710** may comprise a gripping surface or gripping features, which may assist in placing and stabilizing a patient's finger in the sensor. A partially cylindrical protrusion **1705** may also be disposed in the finger bed **1710**. As shown, finger bed **1710** attaches to the noise shield **1703**. The noise shield **1703** may be configured to reduce noise, such as from ambient light and electromagnetic noise. For example, the noise shield **1703** may be constructed from materials having an opaque color, such as black or a dark blue, to prevent light piping.

Noise shield **1703** may also comprise a thermistor **1712**. The thermistor **1712** may be helpful in measuring the temperature of a patient's finger. For example, the thermistor **1712** may be useful in detecting when the patient's finger is reaching an unsafe temperature that is too hot or too cold. In addition, the temperature of the patient's finger may be useful in indicating to the sensor the presence of low perfusion as the temperature drops. In addition, the thermistor **1712** may be useful in detecting a shift in the characteristics of the water spectrum in the patient's finger, which can be temperature dependent.

Moreover, a flex circuit cover **1706** attaches to the pins **1783**, **1785**. Although not shown, a flex circuit can also be provided that connects the circuit board **1719** with the submount **1700** (or a circuit board to which the submount **1700** is connected). A flex circuit protector **1760** may be provided to provide a barrier or shield to the flex circuit (not shown). In particular, the flex circuit protector **1760** may also prevent any electrostatic discharge to or from the flex circuit. The flex circuit protector **1760** may be constructed from well known materials, such as a plastic or rubber materials.

FIG. **18** shows the results obtained by an exemplary sensor **101** of the present disclosure that was configured for measuring glucose. This sensor **101** was tested using a pure water ex-vivo sample. In particular, ten samples were prepared that ranged from 0-55 mg/dL. Two samples were used as a training set and eight samples were then used as a test population. As shown, embodiments of the sensor **101** were able to obtain at least a standard deviation of 13 mg/dL in the training set and 11 mg/dL in the test population.

FIG. **19** shows the results obtained by an exemplary sensor **101** of the present disclosure that was configured for measuring glucose. This sensor **101** was tested using a turbid ex-vivo sample. In particular, 25 samples of water/glucose/

**44**

Liposyn were prepared that ranged from 0-55 mg/dL.. Five samples were used as a training set and 20 samples were then used as a test population. As shown, embodiments of sensor **101** were able to obtain at least a standard deviation of 37 mg/dL in the training set and 32 mg/dL in the test population.

FIGS. **20** through **22** shows other results that can be obtained by an embodiment of system **100**. In FIG. **20**, 150 blood samples from two diabetic adult volunteers were collected over a 10-day period. Invasive measurements were taken with a YSI glucometer to serve as a reference measurement. Noninvasive measurements were then taken with an embodiment of system **100** that comprised four LEDs and four independent detector streams. As shown, the system **100** obtained a correlation of about 85% and Arms of about 31 mg/dL.

In FIG. **21**, 34 blood samples were taken from a diabetic adult volunteer collected over a 2-day period. Invasive measurements were also taken with a glucometer for comparison. Noninvasive measurements were then taken with an embodiment of system **100** that comprised four LEDs in emitter **104** and four independent detector streams from detectors **106**. As shown, the system **100** was able to attain a correlation of about 90% and Arms of about 22 mg/dL.

The results shown in FIG. **22** relate to total hemoglobin testing with an exemplary sensor **101** of the present disclosure. In particular, 47 blood samples were collected from nine adult volunteers. Invasive measurements were then taken with a CO-oximeter for comparison. Noninvasive measurements were taken with an embodiment of system **100** that comprised four LEDs in emitter **104** and four independent detector channels from detectors **106**. Measurements were averaged over 1 minute. As shown, the testing resulted in a correlation of about 93% and Arms of about 0.8 mg/dL.

Conditional language used herein, such as, among others, "can," "could," "might," "may," "e.g.," and the like, unless specifically stated otherwise, or otherwise understood within the context as used, is generally intended to convey that certain embodiments include, while other embodiments do not include, certain features, elements and/or states. Thus, such conditional language is not generally intended to imply that features, elements and/or states are in any way required for one or more embodiments or that one or more embodiments necessarily include logic for deciding, with or without author input or prompting, whether these features, elements and/or states are included or are to be performed in any particular embodiment.

While certain embodiments of the inventions disclosed herein have been described, these embodiments have been presented by way of example only, and are not intended to limit the scope of the inventions disclosed herein. Indeed, the novel methods and systems described herein can be embodied in a variety of other forms; furthermore, various omissions, substitutions and changes in the form of the methods and systems described herein can be made without departing from the spirit of the inventions disclosed herein. The claims and their equivalents are intended to cover such forms or modifications as would fall within the scope and spirit of certain of the inventions disclosed herein.

What is claimed is:

1. A user-worn device configured to non-invasively measure a physiological parameter of a user, the user-worn device comprising:

   a first set of light emitting diodes (LEDs), the first set of LEDs comprising at least an LED configured to emit

Copy provided by USPTO from the PIRS Image Database on 05-06-2021

Exhibit 63

US 10,912,502 B2

**45**

light at a first wavelength and an LED configured to emit light at a second wavelength;

a second set of LEDs spaced apart from the first set of LEDs, the second set of LEDs comprising at least an LED configured to emit light at the first wavelength and an LED configured to emit light at the second wavelength;

four photodiodes arranged on an interior surface of the user-worn device and configured to receive light after attenuation by tissue of the user;

a protrusion comprising:

a convex surface extending over the interior surface,

a plurality of openings in the convex surface extending through the protrusion and aligned with the four photodiodes, each opening defined by an opaque surface, and

a plurality of windows, each of the windows extending across a different one of the openings; and

one or more processors configured to receive one or more signals from at least one of the photodiodes and calculate a measurement of the physiological parameter of the user.

2. The user-worn device of claim 1, wherein the windows comprise glass.

3. The user-worn device of claim 1, wherein the windows comprise plastic.

4. The user-worn device of claim 1 further comprising:

a network interface configured to wirelessly communicate the measurement of the physiological parameter to at least one of: a mobile phone or a computer network;

a user interface comprising a touch-screen display, wherein the user interface is configured to display indicia responsive to the measurement of the physiological parameter;

a storage device configured to at least temporarily store at least the measurement; and

a strap configured to position the user-worn device on the user.

5. The user-worn device of claim 1, wherein the opaque surface is configured to reduce light piping.

6. The user-worn device of claim 1 further comprising:

at least one wall extending between the interior surface and the protrusion,

wherein at least the interior surface, the wall and the protrusion form cavities, wherein the photodiodes are arranged on the interior surface within the cavities.

7. The user-worn device of claim 1, wherein the physiological parameter comprises at least one of: methemoglobin, total hemoglobin, carboxyhemoglobin, or carbon monoxide.

8. The user-worn device of claim 1, wherein the physiological parameter comprises oxygen or oxygen saturation.

9. The user-worn device of claim 1, wherein the physiological parameter comprises trending information.

10. The user-worn device of claim 1 further comprising a thermistor.

11. The user-worn device of claim 1, wherein the LEDs and the photodiodes are arranged on a same side of the tissue of the user.

12. The user-worn device of claim 1, wherein the one or more processors are further configured to calculate a bulk measurement responsive to a positioning of the user-worn device.

13. The user-worn device of claim 1, wherein, within each of the first and second sets of LEDs, any one LED is positioned within 2 mm to 4 mm of another.

**46**

14. The user-worn device of claim 1, further comprising a third set of LEDs, the third set of LEDs comprising at least an LED configured to emit light at the first wavelength and an LED configured to emit light at the second wavelength.

15. The user-worn device of claim 1, wherein the four photodiodes comprise first, second, third and fourth photodiodes and wherein the first photodiode and the second photodiode are arranged on the interior surface across from each other on opposite sides of a central point along a first axis, and the third photodiode and the fourth photodiode are arranged across from each other on opposite sides of the central point along a second axis which is different from the first axis.

16. The user-worn device of claim 1, wherein the protrusion further comprises one or more extensions.

17. The user-worn device of claim 16, wherein the one or more extensions surround a perimeter of the convex surface of the protrusion.

18. The user-worn device of claim 1, wherein the protrusion further comprises one or more chamfered edges.

19. A user-worn device configured to non-invasively measure an oxygen saturation of a user, the user-worn device comprising:

a plurality of emitters configured to emit light, each of the emitters comprising at least two light emitting diodes (LEDs);

four photodiodes arranged within the user-worn device and configured to receive light after at least a portion of the light has been attenuated by tissue of the user;

a protrusion comprising a convex surface including separate openings extending through the protrusion and lined with opaque material, each opening positioned over a different one associated with each of the four photodiodes, the opaque material configured to reduce an amount of light reaching the photodiodes without being attenuated by the tissue;

optically transparent material within each of the openings; and

one or more processors configured to receive one or more signals from at least one of the four photodiodes and output measurements responsive to the one or more signals, the measurements indicative of the oxygen saturation of the user.

20. The user-worn device of claim 19 further comprising a thermistor.

21. The user-worn device of claim 20, wherein the one or more processors are further configured to receive a temperature signal from the thermistor and adjust operation of the user-worn device responsive to the temperature signal.

22. The user-worn device of claim 21, wherein the plurality of emitters comprise at least four emitters, and wherein each of the plurality of emitters comprises a respective set of at least three LEDs.

23. The user-worn device of claim 22, wherein, within each respective set of at least three LEDs, the LEDs of the set are positioned within 2 mm to 4 mm of each other.

24. The user-worn device of claim 19 further comprising:

a network interface configured to wirelessly communicate at least the measurements of oxygen saturation to at least one of: a mobile phone or a computer network;

a user interface comprising a touch-screen display, wherein the user interface is configured to display indicia responsive to the measurements of oxygen saturation; and

a memory device configured to at least temporarily store at least the measurements of oxygen saturation.

Copy provided by USPTO from the PIRS Image Database on 05-06-2021

Exhibit 63

US 10,912,502 B2

47

**25**. The user-worn device of claim **19**, wherein the photodiodes comprise first, second, third and fourth photodiodes and wherein the first photodiode and the second photodiode are arranged across from each other on opposite sides of a central point along a first axis, and the third photodiode and the fourth photodiode are arranged across from each other on opposite sides of the central point along a second axis which is different from the first axis.

**26**. The user-worn device of claim **19**, wherein the optically transparent material is glass.

**27**. The user-worn device of claim **19**, wherein the optically transparent material is plastic.

**28**. A user-worn device configured to non-invasively measure an oxygen saturation of a user, the user-worn device comprising:

a first set of light emitting diodes (LEDs), the first set of LEDs comprising at least an LED configured to emit light at a first wavelength and an LED configured to emit light at a second wavelength;

a second set of LEDs spaced apart from the first set of LEDs, the second set of LEDs comprising at least an LED configured to emit light at the first wavelength and an LED configured to emit light at the second wavelength;

four photodiodes arranged in a quadrant configuration on an interior surface of the user-worn device and configured to receive light after at least a portion of the light has been attenuated by tissue of the user;

a thermistor configured to provide a temperature signal;

a protrusion arranged above the interior surface, the protrusion comprising:

a convex surface;

a plurality of openings in the convex surface, extending through the protrusion, and aligned with the four photodiodes, each opening defined by an opaque surface configured to reduce light piping; and

48

a plurality of transmissive windows, each of the transmissive windows extending across a different one of the openings;

at least one opaque wall extending between the interior surface and the protrusion, wherein at least the interior surface, the opaque wall and the protrusion form cavities, wherein the photodiodes are arranged on the interior surface within the cavities;

one or more processors configured to receive one or more signals from at least one of the photodiodes and calculate an oxygen saturation measurement of the user, the one or more processors further configured to receive the temperature signal;

a network interface configured to wirelessly communicate the oxygen saturation measurement to at least one of a mobile phone or an electronic network;

a user interface comprising a touch-screen display, wherein the user interface is configured to display indicia responsive to the oxygen saturation measurement of the user;

a storage device configured to at least temporarily store at least the measurement; and

a strap configured to position the user-worn device on the user.

**29**. The user-worn device of claim **28**, further comprising:

a driver configured to energize the first and second sets of LEDs; and

a front-end interface comprising one or more amplifiers and one or more analog to digital converters (ADCs), wherein the front-end interface receives the signals from the photodiodes, the one or more amplifiers amplify the signals and the one or more ADCs convert the signals to digital information, and wherein the processors receive the converted signals.

**30**. The user-worn device of claim **28**, wherein the protrusion further comprises one or more sidewalls extending at least partially around a perimeter of the convex surface.

\* \* \* \* \*

Copy provided by USPTO from the PIRS Image Database on 05-06-2021

Exhibit 63

# EXHIBIT 64

US007761127B2

(12) **United States Patent**
Al-Ali et al.

(10) Patent No.: **US 7,761,127 B2**
(45) Date of Patent: **Jul. 20, 2010**

(54) **MULTIPLE WAVELENGTH SENSOR SUBSTRATE**

(75) Inventors: **Ammar Al-Ali**, Tustin, CA (US);
**Mohamed Diab**, Mission Viejo, CA
(US); **Marcelo Lamego**, Rancho Santa
Margarita, CA (US); **James P. Coffin**,
Mission Viejo, CA (US); **Yassir
Abdul-Hafiz**, Irvine, CA (US)

(73) Assignee: **Masimo Laboratories, Inc.**, Irvine, CA
(US)

( * ) Notice: Subject to any disclaimer, the term of this
patent is extended or adjusted under 35
U.S.C. 154(b) by 1154 days.

(21) Appl. No.: **11/366,209**

(22) Filed: **Mar. 1, 2006**

(65) **Prior Publication Data**

US 2006/0211922 A1      Sep. 21, 2006

**Related U.S. Application Data**

(60) Provisional application No. 60/657,596, filed on Mar.
1, 2005, provisional application No. 60/657,281, filed
on Mar. 1, 2005, provisional application No. 60/657,
268, filed on Mar. 1, 2005, provisional application No.
60/657,759, filed on Mar. 1, 2005.

(51) **Int. Cl.**
*A61B 5/145*          (2006.01)

(52) **U.S. Cl.** ......................................... **600/310**; 362/84

(58) **Field of Classification Search** ................ 600/310,
600/331, 333, 336
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,998,550 A      12/1976  Konishi et al.

| | | |
|---|---|---|
| 4,157,708 A | 6/1979 | Imura |
| 4,167,331 A | 9/1979 | Nielsen |
| 4,266,554 A | 5/1981 | Hamaguri |
| 4,446,871 A | 5/1984 | Imura |
| 4,586,513 A | 5/1986 | Hamaguri |
| 4,621,643 A | 11/1986 | New et al. |
| 4,653,498 A | 3/1987 | New et al. |
| 4,685,464 A | 8/1987 | Goldberger |

(Continued)

FOREIGN PATENT DOCUMENTS

WO          WO 98/43071      10/1998

(Continued)

OTHER PUBLICATIONS

Schmitt, Joseph M.; Zhou, Guan-Xiong; Miller, Justin, *Measurement
of Blood Hematocrit by Dual-wavelength Near-IR
Photoplethysmography*, published May 1992, Proc. SPIE vol. 1641,
p. 150-161, Physiological Monitoring and Early Detection Diagnostic Methods, Thomas S. Mang; Ed. (SPIE homepage), in 12 pages.

*Primary Examiner*—Eric F Winakur
*Assistant Examiner*—Etsub D Berhanu
(74) *Attorney, Agent, or Firm*—Knobbe Martens Olson &
Bear LLP

(57) **ABSTRACT**

A physiological sensor has emitters configured to transmit
optical radiation having multiple wavelengths in response to
corresponding drive currents. A thermal mass is disposed
proximate the emitters so as to stabilize a bulk temperature for
the emitters. A temperature sensor is thermally coupled to the
thermal mass. The temperature sensor provides a temperature
sensor output responsive to the bulk temperature so that the
wavelengths are determinable as a function of the drive currents and the bulk temperature.

**30 Claims, 48 Drawing Sheets**



Exhibit 64

US 7,761,127 B2

**19**

limit the scope of the claims that follow. One of ordinary skill in art will appreciate many variations and modifications.

What is claimed is:

1. A physiological sensor comprising:

a plurality of emitters configured to transmit optical radiation having a plurality of wavelengths in response to a corresponding plurality of drive currents, the plurality of emitters including a substrate;

a thermal mass disposed proximate the emitters and within the substrate so as to stabilize a bulk temperature for the emitters; and

a temperature sensor thermally coupled to the thermal mass,

wherein the temperature sensor provides a temperature sensor output responsive to the bulk temperature so that the wavelengths are determinable as a function of the drive currents and the bulk temperature.

2. The physiological sensor according to claim 1 wherein the substrate has a first side and a second side,

wherein the emitters are mounted to the first side, and

wherein the temperature sensor is mounted to the second side.

3. The physiological sensor according to claim 2 wherein the temperature sensor is a thermistor and the emitters are LEDs.

4. The physiological sensor according to claim 3:

wherein the thermal mass is a plurality of layers of the substrate.

5. The physiological sensor of claim 4 wherein each of the layers of the thermal mass is substantially copper clad.

6. The physiological sensor according to claim 1:

wherein the thermal mass is disposed within the substrate proximate the light emitting sources and the temperature sensor.

7. A physiological sensor capable of emitting light into tissue and producing an output signal usable to determine one or more physiological parameters of a patient, the physiological sensor comprising:

a thermal mass;

a plurality of light emitting sources, including a substrate of the plurality of light emitting sources, thermally coupled to the thermal mass, the sources having a corresponding plurality of operating wavelengths, the thermal mass disposed within the substrate;

a temperature sensor thermally coupled to the thermal mass and capable of determining a bulk temperature for the thermal mass, the operating wavelengths dependent on the bulk temperature; and

a detector capable of detecting light emitted by the light emitting sources after tissue attenuation, wherein the detector is capable of outputting a signal usable to determine one or more physiological parameters of a patient based upon the operating wavelengths.

8. The physiological sensor according to claim 7:

wherein the thermal mass is disposed within the substrate proximate the light emitting sources and the temperature sensor.

9. The physiological sensor according to claim 7 wherein the temperature sensor comprises a thermistor.

10. The physiological sensor according to claim 9 wherein the light emitting sources are disposed on a first side of the substrate and the temperature sensor is disposed on a second side of the substrate.

11. The physiological sensor according to claim 7 wherein the thermal mass is a plurality of layers of the substrate.

12. The physiological sensor of claim 11 wherein each of the layers of the thermal mass is substantially copper clad.

**20**

13. In a physiological sensor adapted to determine a physiological parameter using a plurality of light emitting sources with emission wavelengths affected by one or more dynamic operating parameters, a sensor method comprising:

providing a thermal mass disposed within the substrate proximate the light emitting sources and a temperature sensor thermally coupled to the thermal mass;

transmitting optical radiation from the plurality of light emitting sources into body tissue;

detecting the optical radiation after tissue attenuation; and

determining a plurality of operating wavelengths of the light emitting sources dependent on a bulk temperature of the light emitting sources so that one or more physiological parameters of a patient can be determined based upon the operating wavelengths.

14. The physiological sensor method according to claim 13 wherein the determining step comprises stabilizing the bulk temperature for the light emitting sources.

15. The physiological sensor method according to claim 14 wherein the determining further comprises thermally coupling a thermistor to the light emitting sources so as to indicate the bulk temperature.

16. The physiological sensor method according to claim 15 further comprising disposing the thermistor proximate the light emitting sources.

17. The physiological sensor according to claim 13 wherein the thermal mass is disposed within the substrate proximate the light emitting sources and the temperature sensor.

18. The physiological sensor method according to claim 13 wherein the thermal mass is a plurality of layers of the substrate.

19. The physiological sensor method according to claim 18 wherein each of the layers of the thermal mass is substantially copper clad.

20. In a physiological sensor adapted to determine a physiological parameter using a plurality of light emitting sources with emission wavelengths affected by one or more dynamic operating parameters, a sensor method comprising:

providing a thermal mass disposed within a substrate of the light emitting sources and a temperature sensor thermally coupled to the thermal mass;

transmitting optical radiation from the plurality of light emitting sources into body tissue;

detecting the optical radiation after tissue attenuation; and

indicating an operating wavelength for each of the plurality of light emitting sources.

21. The physiological sensor method according to claim 20 wherein the indicating step comprises measuring a bulk temperature for the light emitting sources.

22. The physiological sensor method according to claim 21 wherein the indicating further comprises utilizing a thermistor thermally coupled to the light emitting sources so as to measure a bulk temperature.

23. The physiological sensor according to claim 20 wherein the thermal mass is disposed within the substrate proximate the light emitting sources and the temperature sensor.

24. The physiological sensor method according to claim 20 wherein the thermal mass is a plurality of layers of the substrate.

25. The physiological sensor method according to claim 24 wherein each of the layers of the thermal mass is substantially copper clad.

Exhibit 64

US 7,761,127 B2

21

26. A physiological sensor comprising:

a plurality of emitters configured to transmit optical radiation having a plurality of wavelengths in response to a corresponding plurality of drive currents;

a thermal mass disposed proximate the emitters and within 5 a substrate so as to stabilize a bulk temperature for the emitters; and

a temperature sensor thermally coupled to the thermal mass,

wherein the temperature sensor provides a temperature 10 sensor output responsive to the bulk temperature so that the wavelengths are determinable as a function of the drive currents and the bulk temperature;

a substrate having a top side and a bottom side,

wherein the emitters are mounted to the top side, and 15

wherein the temperature sensor is mounted to the bottom side.

22

27. The physiological sensor according to claim 26 wherein the temperature sensor is a thermistor and the emitters are LEDs.

28. The physiological sensor according to claim 26 wherein the thermal mass is a plurality of layers of the substrate.

29. The physiological sensor of claim 28 wherein each of the layers of the thermal mass is substantially copper clad.

30. The physiological sensor according to claim 26:

wherein the light emitting sources and the temperature sensor are disposed on the substrate, and

wherein the thermal mass is disposed within the substrate proximate the light emitting sources and the temperature sensor.

* * * * *

Copy provided by USPTO from the PIRS Image Database on 02-23-2021

Exhibit 64

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.         : 7,761,127 B2                    Page 1 of 1
APPLICATION NO.    : 11/366209
DATED              : July 20, 2010
INVENTOR(S)        : Ammar Al-Ali et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Page 2, Line 9, Column 2, change " $I_\lambda = I_{0,\lambda} e^{-d_\lambda \cdot \mu_{a,\lambda}}$ " to -- $I_\lambda = I_{0,\lambda} e^{-d_\lambda \cdot \mu_{a,\lambda}}$ --.

Claim 13, change "the substrate" to -- a substrate --.

Signed and Sealed this
Fourth Day of January, 2011

David J. Kappos
*Director of the United States Patent and Trademark Office*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

| | | |
|---|---|---|
| PATENT NO. | : 7,761,127 B2 | Page 1 of 1 |
| APPLICATION NO. | : 11/366209 | |
| DATED | : July 20, 2010 | |
| INVENTOR(S) | : Ammar Al-Ali et al. | |

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Page 2, Column 2, Line 9, change " $I_\lambda = I_{0,\lambda} e^{-d_\lambda \cdot \mu_{a,\lambda}}$ " to -- $I_\lambda = I_{o,\lambda} e^{-d_\lambda \cdot \mu_{a,\lambda}}$ --.

Claim 13, Column 20, Line 5, change "the substrate" to -- a substrate --.

This certificate supersedes the Certificate of Correction issued January 4, 2011.

Signed and Sealed this
First Day of February, 2011

David J. Kappos
*Director of the United States Patent and Trademark Office*

EXHIBIT 68

Joseph R. Re (Bar No. 134479)
joseph.re@knobbe.com
Stephen C. Jensen (Bar No. 149894)
steve.jensen@knobbe.com
Perry D. Oldham (Bar No. 216016)
perry.oldham@knobbe.com
Stephen W. Larson (Bar No. 240844)
stephen.larson@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, Fourteenth Floor
Irvine, CA  92614
Telephone:  (949)-760-0404
Facsimile:  (949)-760-9502

Attorneys for Plaintiffs,
**Masimo Corporation and Cercacor Laboratories, Inc.**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| MASIMO CORPORATION, a Delaware corporation; and CERCACOR LABORATORIES, INC., a Delaware corporation <br><br> Plaintiffs, <br><br> v. <br><br> APPLE INC., a California corporation <br><br> Defendant. | ) Case No. 8:20-cv-00048-JVS-JDE <br> ) <br> ) **PLAINTIFFS MASIMO** <br> ) **CORPORATION AND** <br> ) **CERCACOR LABORATORIES,** <br> ) **INC.'S FIRST SET OF REQUESTS** <br> ) **FOR PRODUCTION OF** <br> ) **DOCUMENTS TO DEFENDANT** <br> ) **APPLE INC. (NOS. 1-25)** <br> ) <br> ) <br> ) Hon. James V. Selna <br> ) <br> ) <br> ) |

Exhibit 68

the Masimo Asserted Patents.

**REQUEST FOR PRODUCTION NO. 3:**

All documents and things that refer or relate to any efforts to design any of the Accused Products around the inventions claimed in the Masimo Asserted Patents.

**REQUEST FOR PRODUCTION NO. 4:**

All documents and things concerning, evaluating, discussing, and/or commenting on the existence, infringement, or scope of the Masimo Asserted Patents.

**REQUEST FOR PRODUCTION NO. 5:**

Documents sufficient to show the design and operation of the Accused Products.

**REQUEST FOR PRODUCTION NO. 6:**

All documents and things describing the operation of the Accused Products, including, without limitation, product brochures, user manuals, instructional materials, and directions for use.

**REQUEST FOR PRODUCTION NO. 7:**

All training materials concerning any of the Accused Products, including, without limitation, training manuals, training videos, presentations, and handouts.

**REQUEST FOR PRODUCTION NO. 8:**

All marketing materials concerning any of the Accused Products, including, without limitation, advertisements, promotional materials, pamphlets, brochures, product catalogs, websites, product brochures, informational materials, and videos.

Exhibit 68

**REQUEST FOR PRODUCTION NO. 9:**

All publications, articles, abstracts, papers, presentations, seminars, speeches, press releases, and internet postings relating to any of the Accused Products.

**REQUEST FOR PRODUCTION NO. 10:**

All videos or DVDs demonstrating or showing the operation of the Accused Products.

**REQUEST FOR PRODUCTION NO. 11:**

All documents and things that refer or relate to the use, effectiveness, capabilities, functionality, or characteristics of the physiological monitoring features of any of the Accused Products.

**REQUEST FOR PRODUCTION NO. 12:**

All technical documents for the Accused Products, including, without limitation, product specifications, diagrams, schematics, memos, conceptual or technical drawings, design requirements documents, design capture documents, technical requirements documents, product briefs, product plans, product requirements, document trees, assembly design documents, design review documents, system design documents, fabricating drawings, manufacturing documents, and technical meeting minutes.

**REQUEST FOR PRODUCTION NO. 13:**

All documents and things that refer or relate to technical information, specifications, and research data for any of the Accused Products.

**REQUEST FOR PRODUCTION NO. 14:**

All documents and things concerning the research, design, and development of any of the Accused Products or any component of any of the Accused Products, including, without limitation, laboratory notebooks, invention disclosures, memoranda, product specifications, conceptual or

Exhibit 68

technical drawings, schematics, diagrams, technical specifications, meeting minutes, presentations, and prototypes.

**REQUEST FOR PRODUCTION NO. 15:**

All documents and things that refer or relate to optical or structural components of any of the Accused Products, including emitters, sensors, detectors, filters, covers, lenses, masks, housing, adhesives, openings, magnets, magnetic shields, carriers, bodies, interior surfaces, walls, protrusions, and sensor subsystems.

**REQUEST FOR PRODUCTION NO. 16:**

All documents and things that refer or relate to any components, surface areas, or adhesives that separate light emitted by LEDs from other components of any of the Accused Products.

**REQUEST FOR PRODUCTION NO. 17:**

Documents sufficient to show the operation of any algorithms used to monitor any physiological parameter in any of the Accused Products.

**REQUEST FOR PRODUCTION NO. 18:**

Documents sufficient to show the operation of any heart rate algorithms used in any of the Accused Products.

**REQUEST FOR PRODUCTION NO. 19:**

All documents and things that refer or relate to the development of the heart rate algorithms for any of the Accused Products.

**REQUEST FOR PRODUCTION NO. 20:**

All documents and things that refer or relate to selection between any heart rate algorithms used in any of the Accused Products.

**REQUEST FOR PRODUCTION NO. 21:**

All documents and things that refer or relate to power consumption by any heart rate algorithms used in any of the Accused Products.

Exhibit 68

**REQUEST FOR PRODUCTION NO. 22:**

All documents and things that refer or relate to the operation of any LEDs used to determine pulse rate or heart rate for any of the Accused Products, including but not limited to documents and things that refer or relate to LED timing, duty cycle, current, or power usage.

**REQUEST FOR PRODUCTION NO. 23:**

All documents and things that refer or relate to collecting first heart rate metrics using a first technique during a first period and collecting second heart rate metrics using a second technique during a second period for any of the Accused Products.

**REQUEST FOR PRODUCTION NO. 24:**

All documents and things that refer or relate to changes in collecting heart rate metrics based on user input for any of the Accused Products.

**REQUEST FOR PRODUCTION NO. 25:**

All documents and things that refer or relate to changes in collecting heart rate metrics based on a change in operating mode for any of the Accused Products.

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  March 16, 2020          By: */s/ Stephen W. Larson*

Joseph R. Re
Stephen C. Jensen
Perry D. Oldham
Stephen W. Larson

Attorneys for Plaintiffs,
Masimo Corporation and
Cercacor Laboratories, Inc.

-7-

Exhibit 68

1   Joseph R. Re (Bar No. 134479)
    joseph.re@knobbe.com
2   Stephen C. Jensen (Bar No. 149894)
    steve.jensen@knobbe.com
3   Perry D. Oldham (Bar No. 216016)
    perry.oldham@knobbe.com
4   Stephen W. Larson (Bar No. 240844)
    stephen.larson@knobbe.com
5   **KNOBBE, MARTENS, OLSON & BEAR, LLP**
6   2040 Main Street, Fourteenth Floor
    Irvine, CA 92614
7   Telephone:  (949) 760-0404; Facsimile:  (949) 760-9502
8
    Adam B. Powell (Bar. No. 272725)
9   adam.powell@knobbe.com
    **KNOBBE, MARTENS, OLSON & BEAR, LLP**
10  12790 El Camino Real
    San Diego, CA 92130
11  Telephone: (858) 707-4000; Facsimile: (858) 707-4001
12
    Attorneys for Plaintiffs,
13  Masimo Corporation and Cercacor Laboratories, Inc.
14
15              **IN THE UNITED STATES DISTRICT COURT**
16            **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
17                        **SOUTHERN DIVISION**
18
19  MASIMO CORPORATION,                ) Case No. 8:20-cv-00048-JVS-JDE
    a Delaware corporation; and        )
    CERCACOR LABORATORIES, INC.,       ) **PLAINTIFFS MASIMO**
20  a Delaware corporation             ) **CORPORATION AND**
                                       ) **CERCACOR LABORATORIES,**
21              Plaintiffs,            ) **INC.'S THIRD SET OF REQUESTS**
                                       ) **FOR PRODUCTION OF**
22          v.                         ) **DOCUMENTS TO DEFENDANT**
                                       ) **APPLE INC. (NOS. 61-147)**
23  APPLE INC., a California corporation )
                                       )
24                                     ) Hon. James V. Selna
                Defendant.             ) Magistrate Judge John D. Early
25                                     )
                                       )
26                                     )
27
28
                                                        Exhibit 68

any component of any of the Apple Watch Products that relate to pulse rate detection, pulse rate measurement, power consumption by pulse rate detection, or power consumption by pulse rate measurement, including, without limitation, testing protocols, reports, results, notes, and summaries.

**REQUEST FOR PRODUCTION NO. 67:**

All documents and things concerning any attempt to obtain FDA approval of any of the Apple Watch Products.

**REQUEST FOR PRODUCTION NO. 68:**

All documents and things concerning the FDA approval of any of the Apple Watch Products.

**REQUEST FOR PRODUCTION NO. 69:**

All documents and things submitted to or received from the FDA or any other governmental agency that refer or relate to the Apple Watch Products.

**REQUEST FOR PRODUCTION NO. 70:**

All documents and things that refer or relate to clinical trials of the Apple Watch Products.

**REQUEST FOR PRODUCTION NO. 71:**

Documents sufficient to identify all persons involved in the research, design, and development of any physiological monitoring capability of the Apple Watch Products.

**REQUEST FOR PRODUCTION NO. 72:**

All documents concerning any changes made to any of the Apple Watch Products' firmware, software, or comments thereto that relate to physiological monitoring.

**REQUEST FOR PRODUCTION NO. 73:**

All documents concerning any changes made to firmware, software, or comments thereto, between the Apple Watch Series 3 and Apple Watch Series 4 and later.

Exhibit 68

**REQUEST FOR PRODUCTION NO. 74:**

All documents and things that refer or relate to the performance of non-invasive physiological measurements for the Apple Watch Series 3.

**REQUEST FOR PRODUCTION NO. 75:**

All documents and things that refer or relate to the performance of non-invasive physiological measurements for the Apple Watch Series 4 and later.

**REQUEST FOR PRODUCTION NO. 76:**

All documents and things that refer or relate to changes in the performance of non-invasive physiological measurements between the Apple Watch Series 3 and the Apple Watch Series 4.

**REQUEST FOR PRODUCTION NO. 77:**

All documents and things that refer or relate to changes in the performance of non-invasive physiological measurements between the Apple Watch Series 4 and the Apple Watch Series 5.

**REQUEST FOR PRODUCTION NO. 78:**

The complete source code, including prior versions, revisions, and comments, that relates to the following features of Apple Watch Products: LEDs, photodiodes, duty cycle, changes in measurement modes, heart rate context, calculation of physiological parameters based on detected optical signals, determination of heart rate, the health application, the breathe application, and communications of physiological parameters to Apple iOS Products.

**REQUEST FOR PRODUCTION NO. 79:**

The complete source code, including prior versions, revisions, and comments, that relates to the following features of Apple iOS Products: communication of physiological parameters from Apple Watch Products, the health application, and tracking of physiological parameters over time.

Exhibit 68

**REQUEST FOR PRODUCTION NO. 95:**

All documents and things relating to any analysis, study, investigation, or test of any Masimo or Cercacor product or technology by Apple, including without limitation, emails, test results, notes, memoranda, and the actual products or systems examined.

**REQUEST FOR PRODUCTION NO. 96:**

All documents and things that refer or relate to any analysis, reverse engineering, and/or study of any Masimo or Cercacor product or technology.

**REQUEST FOR PRODUCTION NO. 97:**

All and things that refer or relate to any comparison between any Masimo or Cercacor product or technology and any of the Apple Watch Products.

**REQUEST FOR PRODUCTION NO. 98:**

All documents and things referring or relating to forecasts or projections regarding sales, revenue, expenses, and/or profit associated with changes between the Apple Watch Series 3 and the Apple Watch Series 4.

**REQUEST FOR PRODUCTION NO. 99:**

All documents and things referring or relating to forecasts or projections regarding sales, revenue, expenses, and/or profit associated with changes between the Apple Watch Series 4 and the Apple Watch Series 5.

**REQUEST FOR PRODUCTION NO. 100:**

All documents and things that relate to any comparison of any of the Apple Watch Products to any of the Masimo or Cercacor products or technologies.

**REQUEST FOR PRODUCTION NO. 101:**

All documents and things concerning any competitive analysis of any competitor to the Apple Watch Products.

/ / /

/ / /

-9-

Exhibit 68

1  requests for production, responses to interrogatories, responses to requests for

2  admission, and all supplemental disclosures and responses.

3  **REQUEST FOR PRODUCTION NO. 146:**

4       All documents and things relating to the contents and/or subject matter of

5  any declarations or affidavits filed by You in this litigation.

6  **REQUEST FOR PRODUCTION NO. 147:**

7       All documents and things upon which You intend to rely upon, use, or

8  introduce at trial, for any purpose, including to introduce into evidence, or use

9  as impeachment, rebuttal, or demonstrative purposes.

10

11                  KNOBBE, MARTENS, OLSON & BEAR, LLP

12

13  Dated: July 17, 2020      By: */s/ Adam B. Powell*
                        Joseph R. Re

14                          Stephen C. Jensen
                        Perry D. Oldham

15                          Stephen W. Larson
                        Adam B. Powell

16                          Attorneys for Plaintiffs,
                        Masimo Corporation and

17                          Cercacor Laboratories, Inc.

18

19

20

21

22

23

24

25

26

27

28

-17-

Exhibit 68

Joseph R. Re (Bar No. 134479)
joseph.re@knobbe.com
Stephen C. Jensen (Bar No. 149894)
steve.jensen@knobbe.com
Perry D. Oldham (Bar No. 216016)
perry.oldham@knobbe.com
Stephen W. Larson (Bar No. 240844)
stephen.larson@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, Fourteenth Floor
Irvine, CA 92614
Telephone:  (949)-760-0404; Facsimile:  (949)-760-9502

Adam B. Powell (Bar. No. 272725)
adam.powell@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
12790 El Camino Real
San Diego, CA 92130
Telephone: (858) 707-4000; Facsimile: (858) 707-4001

Attorneys for Plaintiffs,
Masimo Corporation and Cercacor Laboratories, Inc.

# IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| MASIMO CORPORATION, a Delaware corporation; and CERCACOR LABORATORIES, INC., a Delaware corporation<br><br>Plaintiffs,<br><br>v.<br><br>APPLE INC., a California corporation<br><br>Defendant. | ) Case No. 8:20-cv-00048-JVS-JDE<br>)<br>) **PLAINTIFFS MASIMO**<br>) **CORPORATION AND**<br>) **CERCACOR LABORATORIES,**<br>) **INC.'S FIFTH SET OF REQUESTS**<br>) **FOR PRODUCTION OF**<br>) **DOCUMENTS TO DEFENDANT**<br>) **APPLE INC. (NOS. 173-248)**<br>)<br>)<br>) Hon. James V. Selna<br>) Magistrate Judge John D. Early<br>)<br>) |

Exhibit 68

**REQUEST FOR PRODUCTION NO. 225:**

All documents and things relating to Apple's practices, procedures, and/or policies relating to the treatment of confidential information, including formal and informal policies, training documents, and presentations.

**REQUEST FOR PRODUCTION NO. 226:**

All documents and things owned by, created in whole or in part by, or originating with, Masimo or Cercacor.

**REQUEST FOR PRODUCTION NO. 227:**

All electronic documents that contain the word "Masimo" or "Cercacor" in the electronic document's "company" metadata field.

**REQUEST FOR PRODUCTION NO. 228:**

All computers, Computer Media, networks, or databases that were used or acquired by any Former Employee while they worked for Masimo or Cercacor.

**REQUEST FOR PRODUCTION NO. 229:**

All computers, Computer Media, networks, or databases that may have ever contained information owned by, created in whole or in part by, or originating with, Masimo or Cercacor.

**REQUEST FOR PRODUCTION NO. 230:**

All documents and things authored by, prepared by, provided by, reviewed by, or in the possession, custody, or control of any Former Employee that relate to Masimo or Cercacor or any Masimo or Cercacor products or technologies, including, without limitation, internal and external communications, and any studies, reports, memoranda, presentations, or other documents.

**REQUEST FOR PRODUCTION NO. 231:**

All documents and things authored by, prepared by, provided by, reviewed by, or in the possession, custody, or control of any Former Employee

Exhibit 68

**REQUEST FOR PRODUCTION NO. 244:**

All communications between Michael O'Reilly and any hospital or healthcare provider in the first twelve months that Mr. O'Reilly worked at Apple.

**REQUEST FOR PRODUCTION NO. 245:**

Documents sufficient to show the date and reason for any of Michael O'Reilly's changes in title or job responsibilities at Apple.

**REQUEST FOR PRODUCTION NO. 246:**

All communications between Marcelo Lamego and any hospital or healthcare provider while Mr. Lamego worked at Apple.

**REQUEST FOR PRODUCTION NO. 247:**

All patent and/or invention disclosure documents provided by Marcelo Lamego to Apple.

**REQUEST FOR PRODUCTION NO. 248:**

Documents sufficient to show the date and reason for Marcelo Lamego's employment at Apple ending.


                                        KNOBBE, MARTENS, OLSON & BEAR, LLP


Dated:  October 9, 2020          By: */s/ Adam B. Powell*
                                        Joseph R. Re
                                        Stephen C. Jensen
                                        Perry D. Oldham
                                        Stephen W. Larson
                                        Adam B. Powell

                                        Attorneys for Plaintiffs,
                                        Masimo Corporation and
                                        Cercacor Laboratories, Inc.

-15-

Exhibit 68

Joseph R. Re (Bar No. 134479)
joseph.re@knobbe.com
Stephen C. Jensen (Bar No. 149894)
steve.jensen@knobbe.com
Benjamin A. Katzenellenbogen (Bar No. 208527)
ben.katzenellenbogen@knobbe.com
Perry D. Oldham (Bar No. 216016)
perry.oldham@knobbe.com
Stephen W. Larson (Bar No. 240844)
stephen.larson@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, Fourteenth Floor
Irvine, CA 92614
Telephone: (949)-760-0404; Facsimile: (949)-760-9502

Adam B. Powell (Bar. No. 272725)
adam.powell@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
3579 Valley Centre Drive
San Diego, CA 92130
Telephone: (858) 707-4000; Facsimile: (858) 707-4001

Attorneys for Plaintiffs,
Masimo Corporation and Cercacor Laboratories, Inc.

# IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| MASIMO CORPORATION, a Delaware corporation; and CERCACOR LABORATORIES, INC., a Delaware corporation<br><br>Plaintiffs,<br><br>v.<br><br>APPLE INC., a California corporation<br><br>Defendant. | Case No. 8:20-cv-00048-JVS-JDE<br><br>**PLAINTIFFS MASIMO CORPORATION AND CERCACOR LABORATORIES, INC.'S EIGHTH SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT APPLE INC. (NOS. 281-317)**<br><br>Hon. James V. Selna<br>Magistrate Judge John D. Early |

Exhibit 68

**REQUEST FOR PRODUCTION NO. 283:**

All documents and communications reflecting the name and number of individuals hired by Apple who previously worked for companies that make pulse oximetry products, including but not limited to Masimo, Cercacor, Nellcor Puritan Bennett, Inc., Philips Electronic North America Corporation, Mindray DS USA, Inc., and Nonin Medical, Inc.

**REQUEST FOR PRODUCTION NO. 284:**

All communications between (1) Marcelo Lamego, True Wearables, Inc., or any other individuals associated with True Wearables, Inc., and (2) any Apple employee or other individuals associated with Apple, including Apple in-house council or employees of Gibson, Dunn & Crutcher LLP, after Marcelo Lamego ended his employment at Apple.

**REQUEST FOR PRODUCTION NO. 285:**

All communications between (1) any Apple employee or other individuals associated with Apple, including Apple in-house council or employees of Gibson, Dunn & Crutcher LLP, and (2) the Food and Drug Administration (FDA), regarding any of the Apple Watch Products, including any application operating on the Apple Watch Products.

**REQUEST FOR PRODUCTION NO. 286:**

All communications between (1) any Apple employee or other individuals associated with Apple, including Apple in-house council or employees of Gibson, Dunn & Crutcher LLP, and (2) the FDA, regarding the measurement of any physiological parameter.

**REQUEST FOR PRODUCTION NO. 287:**

All communications between (1) any Apple employee or other individuals associated with Apple, including Apple in-house council or employees of Gibson, Dunn & Crutcher LLP, and (2) the FDA, regarding any informal meetings with the FDA, including but not limited to informal meetings

Exhibit 68

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: May 19, 2021          By: /s/ Adam B. Powell
                                  Joseph R. Re
                                  Stephen C. Jensen
                                  Benjamin A. Katzenellenbogen
                                  Perry D. Oldham
                                  Stephen W. Larson
                                  Mark D. Kachner
                                  Adam B. Powell

                                  Attorneys for Plaintiffs,
                                  Masimo Corporation and
                                  Cercacor Laboratories, Inc.

-10-

Exhibit 68

Joseph R. Re (Bar No. 134479)
joseph.re@knobbe.com
Stephen C. Jensen (Bar No. 149894)
steve.jensen@knobbe.com
Benjamin A. Katzenellenbogen (Bar No. 208527)
ben.katzenellenbogen@knobbe.com
Perry D. Oldham (Bar No. 216016)
perry.oldham@knobbe.com
Stephen W. Larson (Bar No. 240844)
stephen.larson@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, Fourteenth Floor
Irvine, CA 92614
Telephone: (949)-760-0404; Facsimile: (949)-760-9502

Adam B. Powell (Bar. No. 272725)
adam.powell@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
3579 Valley Centre Drive
San Diego, CA 92130
Telephone: (858) 707-4000; Facsimile: (858) 707-4001

Attorneys for Plaintiffs,
Masimo Corporation and Cercacor Laboratories, Inc.

# IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| MASIMO CORPORATION, a Delaware corporation; and CERCACOR LABORATORIES, INC., a Delaware corporation | Case No. 8:20-cv-00048-JVS-JDE |
| Plaintiffs, | **PLAINTIFFS MASIMO CORPORATION AND CERCACOR LABORATORIES, INC.'S NINTH SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT APPLE INC. (NOS. 318-524) (CORRECTED)** |
| v. | |
| APPLE INC., a California corporation | |
| Defendant. | Hon. James V. Selna |
| | Magistrate Judge John D. Early |

Exhibit 68

**REQUEST FOR PRODUCTION NO. 436:**

Documents regarding Apple implementing or considering any of the Strategies For Interacting With Hospitals described under heading "E" of Plaintiffs' Section 2019.210 Statement, including any amendments.

**REQUEST FOR PRODUCTION NO. 437:**

Documents regarding Apple implementing or considering any strategy for persuading hospitals to share clinical data.

**REQUEST FOR PRODUCTION NO. 438:**

Documents regarding the value and importance of any strategy for persuading hospitals to share clinical data.

**REQUEST FOR PRODUCTION NO. 439:**

Documents regarding decisions to research or design products used to calculate pulse rate and oxygen saturation.

**REQUEST FOR PRODUCTION NO. 440:**

Documents regarding decisions to research or design products that can be used for medical research.

**REQUEST FOR PRODUCTION NO. 441:**

Documents regarding decisions to research or design any Apple wrist worn monitor that performs pulse oximetry.

**REQUEST FOR PRODUCTION NO. 442:**

An inspection of any Apple product that calculates heart rate or pulse oximetry, including without limitation, prior and future planned versions and prototypes.

**REQUEST FOR PRODUCTION NO. 443:**

All communications regarding pulse rate or pulse oximetry between an Apple employee or Apple representative, including Apple's inhouse or outside counsel, and any employee of Plaintiffs, while the employee was employed by Plaintiffs.

-22-

**HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY**

Exhibit 68

**REQUEST FOR PRODUCTION NO. 523:**

Documents sufficient to identify the source of each item of information regarding pulse rate or oxygen saturation technology used by each of the following individuals while employed by Apple: John Aguilar, Anderson Briglia, Johannes Bruinsma, Ottavia Golfetto, Haritha Haridas, Swapnil Harsule, Joe Jagenow, Marcelo Lamego, Inje Lee, Yinghui Lu, Ehsan Masoumi, Michael O'Reilly, Boris Oreshkin, Mathew Paul, Kornelius Raths, Will Regan, Felipe Tonello, Vincent Wayne, and Rich Young.

**REQUEST FOR PRODUCTION NO. 524:**

Documents identifying the source of each item of information regarding pulse rate or oxygen saturation technology used by each of the following individuals while employed by Apple: John Aguilar, Anderson Briglia, Johannes Bruinsma, Ottavia Golfetto, Haritha Haridas, Swapnil Harsule, Joe Jagenow, Marcelo Lamego, Inje Lee, Yinghui Lu, Ehsan Masoumi, Michael O'Reilly, Boris Oreshkin, Mathew Paul, Kornelius Raths, Will Regan, Felipe Tonello, Vincent Wayne, and Rich Young.

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: May 25, 2021          By: /s/ Adam B. Powell
                                  Joseph R. Re
                                  Stephen C. Jensen
                                  Benjamin A. Katzenellenbogen
                                  Perry D. Oldham
                                  Stephen W. Larson
                                  Mark D. Kachner
                                  Adam B. Powell

                                  Attorneys for Plaintiffs,
                                  Masimo Corporation and
                                  Cercacor Laboratories, Inc.

-34-

**HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY**

Exhibit 68

EXHIBIT 69

JOSHUA H. LERNER, SBN 220755
  jlerner@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street Suite 3000
San Francisco, CA 94105
Telephone:  415.393.8200
Facsimile:   415.393.8306

H. MARK LYON, SBN 162061
  mlyon@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA 94304-1211
Telephone:  650.849.5300
Facsimile:   650.849.5333

ILISSA SAMPLIN, SBN 314018
  isamplin@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:   213.229.7520

BRIAN M. BUROKER, *pro hac vice*
  bburoker@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Telephone:  202.955.8541
Facsimile:   202.467.0539

ANGELIQUE KAOUNIS, SBN 209833
  akaounis@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2029 Century Park East Suite 4000
Los Angeles, CA 90067
Telephone:  310.552.8546
Facsimile:   310.552.7026

*Attorneys for Defendant Apple Inc.*

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| MASIMO CORPORATION, a Delaware corporation; and CERCACOR LABORATORIES, INC., a Delaware corporation, <br><br> Plaintiffs, <br><br> v. <br><br> APPLE INC., a California corporation, <br><br> Defendant. | CASE NO. 8:20-cv-00048-JVS (JDEx) <br><br> **DEFENDANT APPLE INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS TO PLAINTIFFS MASIMO CORPORATION AND CERCACOR LABORATORIES, INC.** <br><br> Action Filed:    January 9, 2020 |

64.     All Documents and Communications relating to the potential collaboration between Apple and You referenced in paragraph 19 of the Complaint.

65.     All Documents and Communications sufficient to show the alleged Trade Secrets referenced in paragraphs 210–24 of the Complaint.

66.     All Documents sufficient to show Your efforts to maintain the secrecy of the alleged Trade Secrets reference in paragraphs 211–24 of the Complaint, including without limitation (i) Documents sufficient to identify all Persons who have accessed the alleged Trade Secrets; and (ii) Documents sufficient to show the confidentiality obligations of each such Person to You, if such obligations differ from those identified and described in response to Request No. 58.

67.     All Documents and Communications that support, refute, or relate to the allegations in paragraphs 210–24 of the Complaint that Apple has misappropriated Trade Secrets belonging to You.

68.     All Documents and Communications relating to the conception, reduction to practice, diligence from conception to reduction to practice, development, and/or design of any information that You claim to be a Trade Secret misappropriated by Apple, including, without limitation, invention disclosure forms, laboratory notebooks, engineering notebooks, journals, laboratory reports, test results, test data, internal memoranda, correspondence, research reports, development proposals, Documents describing manufacturing techniques and specifications, product requirement Documents, product proposals, functional specifications, product literature, source code or other software, engineering drawings, Documents describing the system architecture, flow charts, user manuals, project approvals, research agreements, grant applications, business plans, articles, press releases, and sales and marketing materials.

69.     All Documents sufficient to identify each Person involved in the design, development, and/or use of any information that You claim to be a Trade

Gibson, Dunn & Crutcher LLP

APPLE INC.'S FIRST SET OF REQUESTS FOR
PRODUCTION OF DOCUMENTS AND THINGS TO PLAINTIFFS MASIMO AND CERCACOR
CASE NO. 8:20-CV-00048-JVS (JDEX)

Exhibit 69

informal means (i.e., not via litigation or legal action)—of trade secret misappropriation, including, but not limited to, cease and desist letters, demands, notices, or other correspondence.

77.     All Documents and Communications relating to any agreements with Apple regarding any product or technology that You contend involves or incorporates Your alleged Trade Secrets, including copies of all such agreements.

78.     To the extent not already requested or required, all Documents, Communications, and Things that You may use to support any of Your allegations or contentions in Your Complaint or otherwise made in this Action, including, but not limited to, any Documents, Communications, and/or Things that You intend to introduce at trial.

Dated: April 3, 2020                    Respectfully submitted,

                                        JOSHUA H. LERNER
                                        H. MARK LYON
                                        BRIAN M. BUROKER
                                        ILISSA SAMPLIN
                                        ANGELIQUE KAOUNIS
                                        GIBSON, DUNN & CRUTCHER LLP


                                        By:  */s/Joshua H. Lerner*
                                            Joshua H. Lerner

                                        *Attorneys for Defendant Apple Inc.*

APPLE INC.'S FIRST SET OF REQUESTS FOR
PRODUCTION OF DOCUMENTS AND THINGS TO PLAINTIFFS MASIMO AND CERCACOR
CASE NO. 8:20-CV-00048-JVS (JDEx)

Exhibit 69

1   JOSHUA H. LERNER, SBN 220755
       jlerner@gibsondunn.com
2   GIBSON, DUNN & CRUTCHER LLP
    555 Mission Street Suite 3000
3   San Francisco, CA 94105
    Tel.: 415.393.8200 / Fax: 415.393.8306
4
5   H. MARK LYON, SBN 162061
       mlyon@gibsondunn.com
6   GIBSON, DUNN & CRUTCHER LLP
    1881 Page Mill Road
7   Palo Alto, CA 94304-1211
    Tel.: 650.849.5300 / Fax: 650.849.5333

8   BRIAN M. BUROKER, *pro hac vice*
       bburoker@gibsondunn.com
9   BRIAN K. ANDREA, *pro hac vice*           ILISSA SAMPLIN, SBN 314018
    bandrea@gibsondunn.com                       isamplin@gibsondunn.com
10  GIBSON, DUNN & CRUTCHER LLP              GIBSON, DUNN & CRUTCHER LLP
    1050 Connecticut Avenue, N.W.            333 South Grand Avenue
11  Washington, DC 20036                     Los Angeles, CA 90071-3197
    Tel.: 202.955.8541 / Fax: 202.467.0539   Tel.: 213.229.7000 / Fax: 213.229.7520
12
    BRIAN A. ROSENTHAL, *pro hac vice*       ANGELIQUE KAOUNIS, SBN 209833
13     brosenthal@gibsondunn.com                akaounis@gibsondunn.com
    GIBSON, DUNN & CRUTCHER LLP              GIBSON, DUNN & CRUTCHER LLP
14  200 Park Avenue                          2029 Century Park East Suite 4000
    New York, NY 10166-0193                  Los Angeles, CA 90067
15  Tel.: 212.351.2339 / Fax: 212.817.9539   Tel.: 310.552.8546 / Fax: 310.552.7026

16  *Attorneys for Defendant Apple Inc.*

17                    **UNITED STATES DISTRICT COURT**
18  **FOR THE CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION**

19  MASIMO CORPORATION,
    a Delaware corporation; and
20  CERCACOR LABORATORIES, INC.,            CASE NO. 8:20-cv-00048-JVS (JDEx)
    a Delaware corporation,
21                                          **DEFENDANT APPLE INC.'S**
                   Plaintiffs,              **SECOND SET OF REQUESTS FOR**
22                                          **PRODUCTION OF DOCUMENTS**
          v.                                **AND THINGS TO PLAINTIFFS**
23                                          **MASIMO CORPORATION AND**
    APPLE INC.,                             **CERCACOR LABORATORIES, INC.**
24  a California corporation,               **(NOS. 79-98)**

25                 Defendant.               Hon. James V. Selna
26                                          Magistrate Judge John D. Early
27
28

Gibson, Dunn &
Crutcher LLP

20.     Each of the foregoing Definitions and Instructions is hereby incorporated by reference into, and shall be deemed a part of, each Request.

### III.   REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 79:**

The source code, including all prior versions, revisions, and comments, for any functionality of any product Plaintiffs identify in response to Apple's Interrogatory No. 21 as allegedly meeting an element of any Asserted Claim feature.

**REQUEST FOR PRODUCTION NO. 80:**

The source code, including all prior versions, revisions, and comments, from any product Masimo sold or offered for sale before July 2, 2001 that relates to any low power feature including, but not limited to changing or altering duty cycle, measurement mode, drive current, and/or sampling frequency.

**REQUEST FOR PRODUCTION NO. 81:**

All documents and things relating to whether any product Plaintiffs identify in response to Apple's Interrogatory No. 21 practices any Asserted Claim of any Asserted Patent and on a claim-by-claim basis, explain the basis for that assertion, identify all documents supporting or refuting that assertion, and identify the date on which the earliest such product practicing such claim was introduced to the market.

**REQUEST FOR PRODUCTION NO. 82:**

All documents and things that refer or relate to any testing and/or analysis of the properties and/or characteristics of any product accused of infringement in your Infringement Contentions.

**REQUEST FOR PRODUCTION NO. 83:**

All monthly sales and revenue data for any product Plaintiffs identify in response to Apple's Interrogatory No. 21, from the priority date of the corresponding Asserted Patent to present.

**REQUEST FOR PRODUCTION NO. 84:**

Exhibit 69

Gibson, Dunn &
Crutcher LLP

1  performed by Plaintiffs or any third party.

2

3

4  Dated:  September 4, 2020                    Respectfully submitted,

5                                              JOSHUA H. LERNER
                                               H. MARK LYON
6                                              BRIAN M. BUROKER
                                               BRIAN A. ROSENTHAL
7                                              ILISSA SAMPLIN
                                               ANGELIQUE KAOUNIS
8                                              BRIAN K. ANDREA
                                               GIBSON, DUNN & CRUTCHER LLP
9

10

11                                             By:  */s/Joshua H. Lerner*
                                                    Joshua H. Lerner
12
                                               *Attorneys for Defendant Apple Inc.*
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

APPLE INC.'S SECOND SET OF REQUESTS FOR
PRODUCTION OF DOCUMENTS AND THINGS TO PLAINTIFFS MASIMO AND CERCACOR
CASE NO. 8:20-CV-00048-JVS (JDEx)

Exhibit 69

JOSHUA H. LERNER, SBN 220755
  jlerner@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street Suite 3000
San Francisco, CA 94105
Tel.: 415.393.8200 / Fax: 415.393.8306

H. MARK LYON, SBN 162061
  mlyon@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA 94304-1211
Tel.: 650.849.5300 / Fax: 650.849.5333

BRIAN M. BUROKER, *pro hac vice*
  bburoker@gibsondunn.com
BRIAN K. ANDREA, *pro hac vice*
bandrea@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Tel.: 202.955.8541 / Fax: 202.467.0539

BRIAN A. ROSENTHAL, *pro hac vice*
  brosenthal@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Tel.: 212.351.2339 / Fax: 212.817.9539

ILISSA SAMPLIN, SBN 314018
  isamplin@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Tel.: 213.229.7000 / Fax: 213.229.7520

ANGELIQUE KAOUNIS, SBN 209833
  akaounis@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2029 Century Park East Suite 4000
Los Angeles, CA 90067
Tel.: 310.552.8546 / Fax: 310.552.7026

*Attorneys for Defendant Apple Inc.*

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION**

| | |
|---|---|
| MASIMO CORPORATION, a Delaware corporation; and CERCACOR LABORATORIES, INC., a Delaware corporation, <br><br> Plaintiffs, <br><br> v. <br><br> APPLE INC., a California corporation, <br><br> Defendant. | CASE NO. 8:20-cv-00048-JVS (JDEx) <br><br> **DEFENDANT APPLE INC.'S EIGHTH SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS TO PLAINTIFFS MASIMO CORPORATION AND CERCACOR LABORATORIES, INC. (NOS. 128-253)** <br><br> Hon. James V. Selna <br><br> Magistrate Judge John D. Early |

Gibson, Dunn & Crutcher LLP

APPLE INC.'S EIGHTH SET OF REQUESTS FOR
PRODUCTION OF DOCUMENTS AND THINGS TO PLAINTIFFS MASIMO AND CERCACOR
CASE NO. 8:20-CV-00048-JVS (JDEX)

Exhibit 69

1  **REQUEST FOR PRODUCTION NO. 141:**

2      All Communications between You and Marcelo Lamego related to the subject

3  matter of this litigation, including the Trade Secrets and the subject matter that is

4  contained in the Apple Patents and Apple Applications.

5  **REQUEST FOR PRODUCTION NO. 142:**

6      All Communications between You and Michael O'Reilly related to the subject

7  matter of this litigation, including the Trade Secrets and the subject matter that is

8  contained in the Apple Patents and Apple Applications.

9  **REQUEST FOR PRODUCTION NO. 143:**

10      All Documents, Communications, and Things relating to Your products that

11  are compatible with any Apple products.

12  **REQUEST FOR PRODUCTION NO. 144:**

13      All Documents, Communications, and Things relating to the marketing

14  materials for all of Your products that are referenced in the Complaint.

15  **REQUEST FOR PRODUCTION NO. 145:**

16      Documents sufficient to show the date that each reflectance-based pulse

17  oximetry product sold by You, including but not limited to the Masimo M-LNCS

18  TF-I and LNCS-TFA-1 products, was offered for sale and sold anywhere in the

19  world.

20  **REQUEST FOR PRODUCTION NO. 146:**

21      All Documents, Communications, and Things regarding the Apple Watch.

22  **REQUEST FOR PRODUCTION NO. 147:**

23      All Documents, Communications, and Things that relate to the ownership of

24  the Trade Secrets, including but not limited to Documents, Communications, and

25  Things that relate to any changes in ownership of each of the Trade Secrets since the

26  conception of the Trade Secret.

27

28

Gibson, Dunn & Crutcher LLP

12

APPLE INC.'S EIGHTH SET OF REQUESTS FOR
PRODUCTION OF DOCUMENTS AND THINGS TO PLAINTIFFS MASIMO AND CERCACOR
CASE NO. 8:20-CV-00048-JVS (JDEX)

Exhibit 69

1

**REQUEST FOR PRODUCTION NO. 192:**

All Documents and Communications between Mohamed Diab, Ammar Al-Ali, Walter Weber, and Joe Kiani, on the one hand, and Marcelo Lamego, on the other, regarding the sensor placement techniques referenced in Paragraph 42 of the Complaint.

**REQUEST FOR PRODUCTION NO. 193:**

All Communications between Marcelo Lamego and anyone who You allege contributed to the development of the subject matter that is contained in the Apple Patents and Apple Applications, including Communications between Mr. Lamego and the Alleged Inventors.

**REQUEST FOR PRODUCTION NO. 194:**

Documents sufficient to show Your annual earnings, revenues, sales, costs, company valuation, and profits from 2012 to the present.

**REQUEST FOR PRODUCTION NO. 195:**

Documents sufficient to show the annual earnings, revenues, sales, costs, and profits from 2012 to the present for each of Your products that You contend incorporates Your Trade Secrets.

**REQUEST FOR PRODUCTION NO. 196:**

Documents sufficient to show the annual earnings, revenues, sales, costs, and profits from 2012 to the present resulting from Your use of the "Business and Marketing Plans and Strategies" Trade Secrets identified by You in Paragraph 43 of the Complaint.

**REQUEST FOR PRODUCTION NO. 197:**

Documents sufficient to show the annual earnings, revenues, sales, costs, and profits from 2012 to the present resulting from Your use of the "Strategies for Interacting with Hospitals" Trade Secrets identified by You in Paragraph 44 of the Complaint.

20

APPLE INC.'S EIGHTH SET OF REQUESTS FOR
PRODUCTION OF DOCUMENTS AND THINGS TO PLAINTIFFS MASIMO AND CERCACOR
CASE NO. 8:20-CV-00048-JVS (JDEx)

Exhibit 69

Gibson, Dunn &
Crutcher LLP

1   **REQUEST FOR PRODUCTION NO. 198:**

2       Documents sufficient to show Your projections of annual earnings, revenues,

3   sales, costs, company valuation, and profits for each year after and including 2012.

4   **REQUEST FOR PRODUCTION NO. 199:**

5       Document sufficient to show Your projections of annual earnings, revenues,

6   sales, costs, and profits for each year after and including 2012 for each of Your

7   products that You contend incorporates Your Trade Secrets.

8   **REQUEST FOR PRODUCTION NO. 200:**

9       Documents sufficient to show Your projections of annual earnings, revenues,

10  sales, costs, and profits for each year after and including 2012 resulting from Your

11  use of the "Business and Marketing Plans and Strategies" Trade Secrets identified

12  by You in Paragraph 43 of the Complaint.

13  **REQUEST FOR PRODUCTION NO. 201:**

14      Documents sufficient to show Your projections of annual earnings, revenues,

15  sales, costs, and profits for each year after and including 2012 resulting from Your

16  use of the "Strategies for Interacting with Hospitals" Trade Secrets identified by You

17  in Paragraph 44 of the Complaint.

18  **REQUEST FOR PRODUCTION NO. 202:**

19      All Documents and Communications relating to Your projections, business

20  plans, budgets, forecasts, sales, profit margins, royalties, or profit projections

21  regarding the sale, distribution, or licensing of each of Your Trade Secrets.

22  **REQUEST FOR PRODUCTION NO. 203:**

23      Documents sufficient to show the annual market share in the relevant

24  market(s) for each year from 2012 to the present for each of Your products that You

25  contend incorporates Your Trade Secrets.

26  **REQUEST FOR PRODUCTION NO. 204:**

27

28

Gibson, Dunn &
Crutcher LLP

Exhibit 69

**REQUEST FOR PRODUCTION NO. 252:**

All Documents and Communications relating to any "inability to generate sufficient return on Plaintiffs' significant investment in research and development" experienced by You and caused by Apple's alleged trade secret misappropriation in accordance with Your assertion in Your response to Apple's Interrogatory No. 27.

**REQUEST FOR PRODUCTION NO. 253:**

All Documents and Communications relating to any harm to "Plaintiffs' competitive advantage" experienced by You and caused by Apple's alleged trade secret misappropriation in accordance with Your assertion in Your response to Apple's Interrogatory No. 27.

Dated: March 5, 2021                    Respectfully submitted,

JOSHUA H. LERNER
H. MARK LYON
BRIAN M. BUROKER
BRIAN A. ROSENTHAL
ILISSA SAMPLIN
ANGELIQUE KAOUNIS
BRIAN K. ANDREA
GIBSON, DUNN & CRUTCHER LLP

By:  */s/Joshua H. Lerner*
Joshua H. Lerner

*Attorneys for Defendant Apple Inc.*

Exhibit 69

Gibson, Dunn &
Crutcher LLP

EXHIBIT 70

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**WASHINGTON, DC**

**Before the Honorable Charles E. Bullock**
**Chief Administrative Law Judge**

|  |  |
|---|---|
| In the Matter of<br><br>CERTAIN LIGHT-BASED<br>PHYSIOLOGICAL MEASUREMENT<br>DEVICES AND COMPONENTS THEREOF | Inv. No. 337-TA-1276 |

**RESPONDENT APPLE INC.'S FIRST SET OF REQUESTS**
**FOR THE PRODUCTION OF DOCUMENTS AND THINGS**
**TO COMPLAINANTS MASIMO CORPORATION**
**AND CERCACOR LABORATORIES, INC. (NOS. 1-163)**

Respondent Apple Inc. ("Respondent"), by counsel, and pursuant to 19 C.F.R. § 210.30,

requests that Complainants Masimo Corporation and Cercacor Laboratories, Inc. (together,

"Complainants") produce the following Documents and Things for inspection and copying.  The

inspection shall occur at the offices of Wilmer Cutler Pickering Hale and Dorr LLP, 1875

Pennsylvania Ave. NW, Washington, DC 20006, within (10) days of the date of service hereof,

or at some other place that is mutually agreeable to the parties.

**DEFINITIONS**

1.      "Complainants," "You," and "Your" mean Complainants Masimo Corporation

and Cercacor Laboratories, Inc. (both together or individually), including any and all

predecessors, successors, divisions, subsidiaries, or joint ventures thereof, together with any and

all parent or affiliated companies or corporations, and all past or present officers, directors,

employees, agents, attorneys, representatives, and all other persons acting or purporting to act or

that have acted or purported to have acted on behalf of any of the foregoing.

Exhibit 70

employees, officers, agents, consultants and/or board of directors relating to the Asserted Patents, the Related Patents, or the subject matter thereof.

## REQUEST FOR PRODUCTION NO. 11

All minutes, memoranda, notes, or other Documents and Things relating to any of Complainants' corporate Board of Director meetings from 2005 to the present that relate to any Asserted Patent or Related Patent, Apple, any license or license Agreement with Apple, any license negotiations or discussions with Apple, this Investigation, or any action or litigation involving any Asserted Patent or Related Patent.

## REQUEST FOR PRODUCTION NO. 12

All Documents and Things relating to plans, suggestions, decisions, discussions, or contemplated action regarding the bringing or institution of this or any action relating to the Asserted Patents or any Related Patents against Respondent, including, without limitation, all corporate minutes and all other Documents and Things relating to meetings of either Complainant's Board of Directors, Executive Committee, other board committees, or stockholders or any other of Complainants' corporate boards, committees, or sub-committees.

## REQUEST FOR PRODUCTION NO. 13

All Documents and Things showing or relating to the conception, creation, design, development, testing, assembly, manufacture, actual or constructive reduction to practice, or alleged diligence leading to the reduction to practice, of the subject matter of each claim of each Asserted Patent, including, without limitation, any engineering notebooks, laboratory notebooks, log books, records books, memoranda, design reviews, progress reports, technical reports, drawings, schematics, specifications, diagrams, data sheets, electronically stored information, diaries, calendars, test results, invention disclosures or reports and patent prosecution records of

Exhibit 70

the Named Inventors, and any Documents or Things that Complainants contend corroborate the conception, reduction to practice, and/or alleged diligence leading to the reduction to practice.

**REQUEST FOR PRODUCTION NO. 14**

All Documents and Things relating to the identity of any Person involved in the conception, design, development, or initial implementation of the subject matter of any claim of any Asserted Patent or Related Patent.

**REQUEST FOR PRODUCTION NO. 15**

All Documents and Things relating to any equipment, materials, tools, and facilities used by any inventor named in any Asserted Patent or Related Patent for any work including or leading to the conception or reduction to practice of any invention claimed in any Asserted Patent or Related Patent.

**REQUEST FOR PRODUCTION NO. 16**

All Documents and Things relating to any contractual or other Agreement relating to any work including or leading to the conception or reduction to practice of any invention claimed in any Asserted Patent or Related Patent

**REQUEST FOR PRODUCTION NO. 17**

All engineering notebooks, laboratory notebooks, records, logs, and files (including not limited to those generated at or by the direction of any Named Inventor) relating to the subject matter of any Asserted Patent or Related Patent.

**REQUEST FOR PRODUCTION NO. 18**

All engineering notebooks, laboratory notebooks, records, logs, and files (including those from non-Complainant sources) relating to the research, design, development, manufacture, assembly, testing, or operation of any Covered Product.

Exhibit 70

**REQUEST FOR PRODUCTION NO. 121**

All Documents and Things relating to any the marketing, use, sale, or offer for sale by any third party or non-party of any Covered Product.

**REQUEST FOR PRODUCTION NO. 122**

All Documents that are or have been included with any Covered Product, including, without limitation, instruction Product manuals, data sheets, installation manuals, retail kits, diagnostic software, installation software, warranties or specifications.

**REQUEST FOR PRODUCTION NO. 123**

Sales catalogs and Product literature for the Products, including but not limited to each Complainant Product and each Product of any Complainant licensee, that Complainants contend embody any of the inventions claimed by any claim of any Asserted Patent or Related Patent that have been distributed in the United States.

**REQUEST FOR PRODUCTION NO. 124**

Two samples of each Covered Product.

**REQUEST FOR PRODUCTION NO. 125**

All Documents and Things relating to U.S.-based research, development, engineering, design, production, manufacture, assembly, packaging, testing, service, warranty, repair, quality control, technical marketing, and/or technical support of any Covered Product.  This includes, without limitation, engineering notebooks, lab notebooks, blueprints, design reports, illustrations, diagrams, test specifications, data sheets, flow charts, drawings, specifications, control drawings, engineering Documents, schematic diagrams, process schematics, design Documents, project books, project files, manufacturing Documents, procurement Documents (including all invoices), requests for proposals, requests for quotations, and correspondence for all versions of any prototype, prototypes, engineering models, or other physical models.

Exhibit 70

and development, investment in licensing, and/or investment in testing relating to Covered

Product, from the commencement of research or development of such Product to the present.

**REQUEST FOR PRODUCTION NO. 131**

All Documents and Things related to the costs or expenses associated with the design,

research, development, manufacture, sale, or distribution of each Covered Product.

**REQUEST FOR PRODUCTION NO. 132**

Documents and Things sufficient to identify any work allegedly performed in the United

States by Complainants or any third party relating to any Covered Product.

**REQUEST FOR PRODUCTION NO. 133**

Documents and Things sufficient to show Complainants' or any third party's investment

in the exploitation of the Asserted Patents or Related Patents through engineering and research

and development in the United States.

**REQUEST FOR PRODUCTION NO. 134**

All Documents concerning the capacity of Complainants and/or their licensees to

manufacture Covered Products.

**REQUEST FOR PRODUCTION NO. 135**

All Documents concerning any awards or public recognition of Covered Products.

**REQUEST FOR PRODUCTION NO. 136**

All Documents and Things relating to the financial condition of Complainants from 2005

to the present, including but not limited to business plans, financial reports or statements, sales

records or reports, auditor's letters, budgets, investor information, and presentations or reports

prepared for any investors.

Exhibit 70

**REQUEST FOR PRODUCTION NO. 137**

All of Complainants' annual and quarterly reports, financial filings, and other financial statements for groups, units, divisions, or departments involved with the use, research, design, development, testing, service, repair, manufacture, operation, distribution, importation, sale, licensing and marketing of any technology, Products, or methods that Complainants claim to embody, fall within the scope of, or practice any subject matter disclosed or claimed in the Asserted Patents.  This includes, without limitation, income statements, statements of operations, balance sheets, auditor's reports, statements of changes in retained earnings and notes thereto, whether prepared for internal or external purposes.

**REQUEST FOR PRODUCTION NO. 138**

Documents and Things sufficient to show the accounting methods, accounting software, and chart of accounts Complainants utilize or have utilized in generating financial statements.

**REQUEST FOR PRODUCTION NO. 139**

All Documents and Things relating to any research regarding Respondent, including any information regarding the alleged infringement, revenues, profitability, or market share of Respondent.

**REQUEST FOR PRODUCTION NO. 140**

All Documents and Things that support, rebut, or otherwise relate to Complainants' contention regarding the appropriate remedy that should be imposed pursuant to 19 U.S.C. §§ 1337(d) and (f) in the event that the Commission finds a violation of Section 337 in this Investigation, including the extent to which components of the accused Products or downstream Products containing the accused Products should be covered.

Exhibit 70

**REQUEST FOR PRODUCTION NO. 155**

All Documents and Things relating to any affidavit or declaration ever given in any proceeding by any Person whom Complainants expect to call as an expert witness at any hearing or at trial in this Investigation.

**REQUEST FOR PRODUCTION NO. 156**

All Documents and Things, not produced in response to another Request, Complainants intend to, or will, seek to introduce in evidence at any hearing or in support of any motion in this Investigation or seek to use at a deposition in this Investigation.

**REQUEST FOR PRODUCTION NO. 157**

All Documents and Things produced to either Complainant in this Investigation, formally or informally, by any third party or non-party in connection with this Investigation.

**REQUEST FOR PRODUCTION NO. 158**

All Documents and Things produced, provided, communicated by or to Complainants related to, in, or as part of this Investigation.

**REQUEST FOR PRODUCTION NO. 159**

All Documents and Things reflecting any expense projections relating to any Covered Product.

**REQUEST FOR PRODUCTION NO. 160**

The "fixed asset registry" referenced in Complaint Exhibit 28, as well as any documentation related to how the "fixed asset registry" was created and is maintained.

**REQUEST FOR PRODUCTION NO. 161**

All Documents and Things reflecting any production, sales, or expense forecasts with respect to any Covered Product.

Exhibit 70

Dated: August 19, 2021

                       Respectfully submitted,

                       */s/ Sarah R. Frazier*

Joseph J. Mueller
Richard Goldenberg
Sarah R. Frazier
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000

Mark Selwyn
WILMER CUTLER PICKERING HALE AND DORR LLP
2600 El Camino Real
Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6031

Michael D. Esch
David L. Cavanaugh
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Ave., NW
Washington, DC 20006
Telephone: (202) 663-6000

*Counsel for Respondent Apple Inc*

Exhibit 70

**CONTAINS COMPLAINANTS' CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER**

**UNITED STATES INTERNATIONAL TRADE COMMISSION WASHINGTON, DC**

**Before the Honorable Monica V. Bhattacharyya**
**Administrative Law Judge**

| | |
|---|---|
| In the Matter of<br><br>CERTAIN LIGHT-BASED PHYSIOLOGICAL MEASUREMENT DEVICES AND COMPONENTS THEREOF | Inv. No. 337-TA-1276 |

**RESPONDENT APPLE INC.'S THIRD SET OF REQUESTS FOR THE PRODUCTION OF DOCUMENTS AND THINGS TO COMPLAINANTS MASIMO CORPORATION AND CERCACOR LABORATORIES, INC. (NOS. 168-170)**

Respondent Apple Inc. ("Respondent"), by counsel, and pursuant to 19 C.F.R. § 210.30, requests that Complainants Masimo Corporation and Cercacor Laboratories, Inc. (together, "Complainants") produce the following Documents and Things for inspection and copying. The inspection shall occur at the offices of Wilmer Cutler Pickering Hale and Dorr LLP, 1875 Pennsylvania Ave. NW, Washington, DC 20006, within (10) days of the date of service hereof, or at some other place that is mutually agreeable to the parties.

**DEFINITIONS AND INSTRUCTIONS**

Apple incorporates its Definitions and Instructions from its First Set of Requests for the Production of Documents and Things as if fully set forth herein.

**REQUESTS FOR PRODUCTION**



- 1 -

Exhibit 70

**CONTAINS COMPLAINANTS' CONFIDENTIAL BUSINESS
INFORMATION SUBJECT TO PROTECTIVE ORDER**

███████████████████████████████████████████████

████

**REQUEST FOR PRODUCTION NO. 169**

     All source code for the functionality in the Covered Products that Complainants allege practice claims of the Asserted Patents.

█████████████████████████████

████████████████████████████████████████

Dated: September 23, 2021               Respectfully submitted,

                                */s/ Sarah R. Frazier*
                                Joseph J. Mueller
                                Richard Goldenberg
                                Sarah R. Frazier
                                WILMER CUTLER PICKERING HALE AND DORR LLP
                                60 State Street
                                Boston, MA 02109
                                Telephone: (617) 526-6000

                                Mark D. Selwyn
                                WILMER CUTLER PICKERING HALE AND DORR LLP
                                2600 El Camino Real
                                Suite 400
                                Palo Alto, CA 94306
                                Telephone: (650) 858-6031

                                Michael D. Esch
                                David L. Cavanaugh
                                WILMER CUTLER PICKERING HALE AND DORR LLP
                                1875 Pennsylvania Ave., NW
                                Washington, DC 20006
                                Telephone: (202) 663-6000

                                *Counsel for Respondent Apple Inc.*

Exhibit 70

EXHIBIT 71

| | |
|---|---|
| **From:** | Adam.Powell |
| **To:** | Andrea, Brian |
| **Cc:** | Masimo.Apple; *** Apple-Masimo |
| **Subject:** | RE: Masimo v. Apple (A279845-24) - Motion re Cross-Use Provision |
| **Date:** | Monday, October 11, 2021 8:15:54 AM |

Brian,

We have no problem briefing this as a regular motion under LR 7, so we will do it that way.

Best regards,
Adam

**Adam Powell**
Partner

858-707-4245 **Direct**

**Knobbe Martens**

---

**From:** Andrea, Brian <BAndrea@gibsondunn.com>
**Sent:** Sunday, October 10, 2021 7:41 AM
**To:** Adam.Powell <Adam.Powell@knobbe.com>
**Cc:** Masimo.Apple <Masimo.Apple@knobbe.com>; *** Apple-Masimo <Apple-Masimo@gibsondunn.com>
**Subject:** RE: Masimo v. Apple (A279845-24) - Motion re Cross-Use Provision

Dear Adam,

As we have stated many times, Apple believes this should be brought to Judge Early as a regular motion pursuant to Local Rule 7 because it is a motion to modify an order issued by the Court (the Protective Order) and not a discovery motion to which Local Rule 37 would apply. However, in the interest of avoiding this dispute, Apple will not oppose using the joint stipulation procedure pursuant to Local Rule 37 as long as Plaintiffs agree to not use this agreement to argue that Apple has conceded this is a discovery dispute.

Best Regards,
Brian

**Brian Andrea**

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W., Washington, DC 20036-5509
Tel +1 202.887.3624 • Fax +1 202.530.4220
BAndrea@gibsondunn.com • www.gibsondunn.com

---

Exhibit 71

**From:** Adam.Powell <Adam.Powell@knobbe.com>
**Sent:** Friday, October 8, 2021 3:59 PM
**To:** Andrea, Brian <BAndrea@gibsondunn.com>
**Cc:** Masimo.Apple <Masimo.Apple@knobbe.com>; *** Apple-Masimo <Apple-Masimo@gibsondunn.com>
**Subject:** FW: Masimo v. Apple (A279845-24) - Motion re Cross-Use Provision

**[WARNING: External Email]**

Brian,

Based on Judge Guilford's email below and Apple's assertion that Masimo should brief this dispute to Judge Early, we will pursue a motion before Judge Early.  We will prepare a joint stipulation pursuant to Local Rule 37.  Please let us know today if Apple disagrees with that approach.

Thanks,
Adam

**Adam Powell**
Partner
858-707-4245 **Direct**

**Knobbe Martens**

---

**From:** Andrew Guilford <andrewguilford@judicatewest.com>
**Sent:** Thursday, October 7, 2021 4:37 PM
**To:** Adam.Powell <Adam.Powell@knobbe.com>
**Cc:** Heidi Adams <heidi@judicatewest.com>; *** Apple-Masimo <Apple-Masimo@gibsondunn.com>; Lerner, Joshua H. <JLerner@gibsondunn.com>; Buroker, Brian M. <BBuroker@gibsondunn.com>; Samplin, Ilissa <ISamplin@gibsondunn.com>; Kaounis, Angelique <AKaounis@gibsondunn.com>; Rosenthal, Brian A. <BRosenthal@gibsondunn.com>; nfayad@lewisllewellyn.com; mlewis@lewisllewellyn.com; Andrea, Brian <BAndrea@gibsondunn.com>; Masimo.Apple <Masimo.Apple@knobbe.com>
**Subject:** Re: Masimo v. Apple (A279845-24) - Motion re Cross-Use Provision

Dear Mr. Powell,

Concerning your issue below, you state that Apple "believes that the Order Appointing Special Master does not provide Your Honor with such authority." On this matter, I seek not to take action that makes my authority an issue in reviewing my rulings. I am out of town right now, but as I recall, I was not given authority to determine my authority.

Here, I will rule on the matter you raise below when a judge properly determines and states that I have such authority.

Exhibit 71

You may cite this email as a request for such a determination.


Sincerely,


Andrew J. Guilford


**Hon. Andrew J. Guilford, Ret.**
**Mediator | Arbitrator | Private Judge**
[andrewguilford@judicatewest.com](mailto:andrewguilford@judicatewest.com)

On Oct 7, 2021, at 3:26 PM, Adam.Powell <[Adam.Powell@knobbe.com](mailto:Adam.Powell@knobbe.com)> wrote:


Re:      *Masimo Corporation v. Apple, Inc.*
          C.D. Cal. Case No. 8:20-cv-00048-JVS-JDE
          JW Case No. A279845-24

Dear Judge Guilford,

The parties write jointly to request clarification as to how they should present their dispute regarding a cross-use provision on discovery between this case and the pending ITC case.  I have set forth the parties' respective positions on this matter below.

Masimo's position:  At the hearing last week, Masimo recalls indicating it has no preference as to who decides this issue.  However, based on the language of the Order Appointing Special Master, we expressed concern that Judge Early may believe he lacks jurisdiction to decide this dispute.  We seek clarification to avoid the delay associated with filing a motion before Judge Early only to have him decide that he lacks jurisdiction.  Masimo understood you indicated the parties should brief the matter to you and that you would issue a one-page order referring the dispute along with the briefing to Judge Early for a decision on that record.

Apple's position:  Apple does not have a preference who decides this issue but, as stated during the hearing last week, believes that the Order Appointing Special Master does not provide Your Honor with such authority.  Since Plaintiffs have indicated that they consent to Judge Early hearing Plaintiffs' motion for modification of the Protective Order, Apple believes Plaintiffs should file their motion directly with the Court without involving Your Honor.  Nonetheless, to the extent there continues to be a dispute over jurisdiction, Apple understood you indicated the parties should brief the jurisdictional issue alone so that you can issue an Order indicating whether the dispute should be

Exhibit 71

briefed to you or Judge Early.

Please let us know how you would like us to proceed.

Best regards,
Adam

**Adam Powell**
Partner
Adam.Powell@knobbe.com
858-707-4245 **Direct**

**Knobbe Martens**
3579 Valley Centre Drive, Suite 300
San Diego, CA  92130
www.knobbe.com/adam-powell

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

---

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

---

Exhibit 71

EXHIBIT 72

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**WASHINGTON, D.C.**

**Before the Honorable Monica Bhattacharyya**
**Administrative Law Judge**

| | |
|---|---|
| **In the Matter of** <br><br> **CERTAIN LIGHT-BASED PHYSIOLOGICAL MEASUREMENT DEVICES AND COMPONENTS THEREOF** | Inv. No. 337-TA-1276 |

**MASIMO CORPORATION AND CERACOR LABORATORIES, INC.'S SECOND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS TO APPLE INC. (127-130)**

Pursuant to the United States International Trade Commission's Rules of Practice and Procedure and 19 C.F.R. §§ 210.27 and 210.30, Complainants Masimo Corporation and Ceracor Laboratories, Inc. (collectively, "Complainants") hereby request that Respondent Apple Inc. ("Apple") responds to the following Requests for Production of Documents and Things within the time prescribed by the rules of the Administrative Law Judge and the Commission.

**<u>DEFINITIONS</u>**

The following definitions shall apply to each of the interrogatories herein:

1.      The terms "Respondent," "Apple," "You," and "Your" mean Apple Inc., including, without limitation: any predecessor, predecessor-in-interest, successor, subsidiary, affiliate, and/or division; and any past or present principal, officer, director, employee, former employee, servant, agent, attorney, or other representative.

2.      The terms "Complainants" mean Masimo Corporation and Ceracor Laboratories, Inc., collectively and individually, including: any predecessor, predecessor-in-interest, successor, subsidiary, affiliate, and/or division; and any principal, officer, director, employee, former employee, servant, agent, attorney, or other representative.

1

Exhibit 72

3.      The term "Complaint" means the operative complaint under § 337 of the Tariff Act of 1930, in this Investigation, which at the time of the service of this document is the amended complaint filed on July 12, 2021 and identified in 86 F.R. 38764.

4.      The terms "Present Investigation" or "Investigation" means *In the Matter of Certain Light-Based Physiological Measurement Devices and Components Thereof*, ITC Inv. No. 337-TA-1276.

5.      The term "Commission" or "ITC" means and refers to the United States International Trade Commission, Washington D.C.

6.      The term "Section 337" refers to 19 U.S.C. § 1337.

7.      "The '501 Patent" means U.S. Patent No. 10,912,501 and any application leading thereto.

8.      "The '502 Patent" means U.S. Patent No. 10,912,502 and any application leading thereto.

9.      "The '648 Patent" means U.S. Patent No. 10,945,648 and any application leading thereto.

10.     "The '745 Patent" means U.S. Patent No. 10,687,745 and any application leading thereto.

11.     "The '127 Patent" means U.S. Patent No. 7,761,127 and any application leading thereto.

12.     The term "Patents-in-Suit" shall mean the '501 Patent, '502 Patent, '648 Patent, '745 Patent, and '127 Patent, and any additional patents that may be added to the Investigation in the future.

Exhibit 72

13.     The term "Asserted Claim(s)" means any claim of the Patents-in-Suit that Complainants allege Respondents infringe or any claim Complainants contend is practiced by Domestic Industry Products, including those claims identified in the Complaint and exhibits thereto.

14.     The terms "person," "individual," and "entity" shall include natural persons, corporate or other business entities, and all other forms of legal entities.  The acts of a person, individual, or entity shall include the acts of directors, officers, owners, members, employees, agents, attorneys, or other representatives acting on the person's, individual's, or entity's behalf.

15.     The term "document" shall be construed under the broadest possible construction under the Federal Rules of Civil Procedure and shall include without limitation any written, recorded, graphic, or other matter, whether sent or received or made or used internally, however produced or reproduced and whatever the medium on which it was produced or reproduced (whether on paper, cards, charts, file, or printouts; tapes, discs, video tapes, audiotapes, tape recordings, cassettes, or other types of voice recording or transcription; computer tapes, databases, or emails; pictures, photographs, slides, films, microfilms, or motion pictures; or any other medium), and any other tangible item or thing of readable, recorded, or visual material of whatever nature including without limitation originals, drafts, and all non-identical copies of each document (which, by reason of any variation, such as the presence or absence of hand-written notes or underlining, represents a distinct version).  By way of example, the terms "document" or "documents" as used herein shall include, without limitation: correspondence; blueprints; memoranda; notes; diaries; letters; e-mails; text messages; metadata; minutes; agendas; contracts; reports; studies; checks; statements; receipts; returns; summaries; pamphlets; circulars; press releases; advertisements; books; inter-office and intra-office communications; handwritten or

Exhibit 72

typewritten notes; notations or summaries of telephone conversations, meetings, or conferences; bulletins; computer printouts; databases; invoices; worksheets; photographs; tape recordings; and all other tangible items of readable, recorded, or visual material of any kind.

16.     The term "thing" means tangible objects of any type, composition, construction, or nature.

17.     The term "communication" means all written, electronic, oral, telephonic, or other inquiries, dialogues, conversations, interviews, correspondence, consultations, negotiations, agreements, understandings, meetings, letters, notes, advertisements, computer mail, email, text messages, and all other documents evidencing any verbal or nonverbal interaction between persons and entities.

18.     The term "concerning" is used in its customary broad sense and, by way of example and not by way of limitation, it includes referring to, relating to, mentioning, discussing, stating, describing, noting, recording, embodying, studying, analyzing, evaluating, evidencing, reflecting, containing, demonstrating, identifying, comprising, constituting, supporting, and undermining, and shall encompass all express and implied references to the specified person, subject, event, or thing.  A document concerning a particular subject includes documents concerning the preparation of other documents or draft documents that concern the subject.

19.     The term "Patent and Trademark Office," "PTO," or "USPTO" means United States Patent and Trademark Office.

20.     The term "Infringement" means and refers to direct, contributory, and induced infringement, whether literally or under the doctrine of equivalents, under the applicable laws.

Exhibit 72

21.     The term "Domestic Industry" means domestic industry as that term is used in Commission Rule 210.12(a)(6)(i), 19 C.F.R. § 210.12(a)(6)(i), and alleged in Section VII of the Complaint.

22.     The term "Domestic Industry Product" means any product on which Complainant relies for its contention that a Domestic Industry either exists or is in the process of being established, including the products identified in the Complaint and Ex. 27 to the Complaint.

23.     The term "Accused Product(s) and Components Thereof" means any product of Respondents that is accused of infringement in the Present Investigation, including the Apple Watch Series 6, including all components of those products, all spare parts of those products, and all variants of those products designed, developed, manufactured, assembled, offered for sale, distributed, imported or sold by Apple or on behalf of Apple in the United States that include light-based pulse oximetry functionality.  By way of example, the term "Accused Product(s) and Components Thereof" shall include any and all hardware and software utilized in or contributing to the measurement of blood oxygen saturation, including but not limited to hardware such as processors, light-emitting diodes, photodetectors, lenses, magnets, thermistors, and materials covering or surrounding the light emitting diodes or photodiodes, and including but not limited to software such as source code, libraries, and firmware.

24.     The term "prosecution," in relation to a patent or patent application, means all proceedings before, and communications with, a patent office relating to a patent, patent application, continuation, continuation-in-part, and/or divisional, including, but not limited to, interference, reissue, reexamination, opposition, cancellation, inter partes review or other post grant proceedings.

Exhibit 72

25.     The term "Prior Art" is defined in its broadest sense under the patent laws to include, for example, all publications, patents, patent applications, disclosures, presentations, physical specimens, products, devices, uses, sales, offer for sale, or other activity concerning the subject matter of any Asserted Claim of the Patents-in-Suit (or that any person has alleged to be concerning the patentability of any Asserted Claim of the Patents-in-Suit, and related patent or application, or any foreign counterpart of these patents and applications) and existing or occurring prior to the filing date of the Patents-in-Suit.

## <u>INSTRUCTIONS</u>

The following instructions shall apply to each of the requests for production of documents and things herein:

1.     If You contend that any information called for by these requests is privileged or otherwise excludable from discovery, provide all responsive information that is not privileged and, with respect to each responsive document or thing withheld or redacted, provide the information required under Commission Rule 210.27(e).

2.     The definitions set forth herein have the broadest possible meaning under Commission Rule 210.27.

3.     Written responses to these requests for production are required pursuant to Commission Rule 210.30(b)(2).

4.     State, for each request, whether or not any documents within the scope of the request exist and whether any such documents are in Your possession, custody, or control.

5.     These document requests call for all documents that are known or available to You, including all documents in the custody, possession or control of or available to Your attorneys, agents, or representatives, or any investigators or any other person acting on Your behalf or under

Exhibit 72

the direction or control of You or Your attorneys or agents, and including documents maintained by any employee, officer, director, agent or other representative in any files at such person's home or on such person's personal computer.

6.     If You object in part to any request for production, provide a complete answer to all portions of the request to which You have not objected.

7.     If You claim that a request is overly broad and/or unduly burdensome, produce documents responsive to any portion of the request to which You have not objected and specifically identify the respect in which the request is allegedly overly broad and/or unduly burdensome.

8.     If You claim that a request is vague and/or ambiguous, produce documents responsive to any portion of the request to which You have not objected and specifically identify the particular words, terms or phrases that You assert make such request vague and/or ambiguous.

9.     If no documents are responsive to a particular request, state that no responsive documents exist.

10.     The singular form of a word should be interpreted in the plural and vice versa.  Any pronoun shall be construed to refer to the masculine, feminine, or neuter gender as in each case is most appropriate.  The words "and" and "or" shall be construed conjunctively or disjunctively, whichever makes the request most inclusive.  The word "including" shall be without limitation. The terms "each" and "any" shall mean any and all.

11.     To the extent these requests seek information that is recorded in any form of document, including electronically stored documents such as word processing files and email, take steps to ensure that all such documents are preserved for this litigation and to ensure that no responsive electronically stored documents are erased or deleted.

Exhibit 72

12.     Produce all documents requested in the same file or other organizational environment in which they are maintained.  For example, a document that is part of a file, docket, or other grouping, should be physically produced together with all other documents from said file, docket, or grouping, in the same order or manner of arrangement as the original.  Alternatively, as to each document and thing produced in response hereto, You shall identify the request for production and where applicable, the interrogatory number, in response to which the document or thing is being produced.  Where a document or thing exists in hard copy and electronic format, You shall produce both the hard and the electronic copy.

13.     These requests seek all responsive documents in their original language and, if such original language is not English, these requests also seek all English-language translations that exist now, or any English-language translations that may exist at any time in the future, for any such documents.

14.     You shall keep and produce a record of the source of each document produced. This shall include the name and location of the file where each document was located and the name of the person, group, or department having possession, custody, or control of each document.

15.     These requests shall include information acquired or identified up to the date(s) of Your answers and shall be deemed to be continuing.  Therefore, promptly produce to Complainants, as supplemental responses to these requests in accordance with 19 C.F.R. § 210.27(f), any additional information that You identify, acquire, or become aware of up to and including the time of the hearing.

Exhibit 72

## REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS

**REQUEST FOR PRODUCTION NO. 127:**

All documents and things relating to the conception, design, development, structure, implementation, testing, manufacturing, and importation of any wrist-worn Apple product containing light-based pulse oximetry functionality, including but not limited to the Apple Watch Series 6, produced by Apple in ITC Inv. No. 337-TA-1266, *In the Matter of Certain Wearable Electronic Devices with ECG Functionality and Components Thereof.*

**REQUEST FOR PRODUCTION NO. 128:**

All interrogatory and request for admission responses by Apple relating to the conception, design, development, structure, implementation, testing, manufacturing, and importation of any wrist-worn Apple product containing light-based pulse oximetry functionality, including but not limited to the Apple Watch Series 6, served by Apple in ITC Inv. No. 337-TA-1266, *In the Matter of Certain Wearable Electronic Devices with ECG Functionality and Components Thereof.*

**REQUEST FOR PRODUCTION NO. 129:**

All documents and things relating to any version, model, or part thereof of the Apple Watch, released or unreleased, where Apple made efforts to remove, alter, flatten, or otherwise change the convex surface feature identified in Complainants' Exhibits 15-17 to the First Amended Complaint.

**REQUEST FOR PRODUCTION NO. 130:**

All documents and things relating to any designs of alternative versions, models, or part thereof of the Apple Watch with light-based physiological monitoring, including released and unreleased, that do not include the convex surface feature identified in Complainants' Exhibits 15-17 to the First Amended Complaint.

Exhibit 72

Dated:  September 27, 2021      By: */s/ Kendall M. Loebbaka*          
Stephen C. Jensen
Joseph R. Re
Sheila N. Swaroop
Ted. M. Cannon
Alan G. Laquer
Kendall M. Loebbaka
Douglas B. Wentzel
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, Fourteenth Floor
Irvine, CA  92614
Telephone:  (949) 760-0404
Facsimile:  (949) 760-9502

William R. Zimmerman
Jonathan E. Bachand
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
1717 Pennsylvania Avenue N.W., Suite 900
Washington, DC 20006
Telephone:  (202) 640-6400
Facsimile:  (202) 640-6401

Brian C. Horne
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
1925 Century Park East
Suite 600
Los Angeles, CA 90067
Telephone:  (310) 551-3450
Facsimile:  (310) 551-3458

Carol Pitzel Cruz
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
925 4th Ave., #2500
Seattle, WA 98104
Telephone:  (206) 405-2000
Facsimile:  (206) 405 2001

Karl W. Kowalis
Matthew S. Friedrichs
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
1155 Avenue of the Americas
24th Floor
New York, NY 10036

Exhibit 72

Telephone:  (212) 849-3000
Facsimile:  (212) 849-3001

*Counsel for Complainants*
*Masimo Corporation and*
*Cercacor Laboratories, Inc.*

Exhibit 72

**In the Matter of Certain Physiological Measurement Devices and Components Thereof**
**Investigation No. 337-TA-1276**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on September 27, 2021, I caused a copy of **MASIMO CORPORATION AND CERACOR LABORATORIES, INC.'S SECOND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS TO APPLE INC. (127-130)** to be served as indicated below:

| Counsel for Respondent Apple, Inc. | |
|---|---|
| Michael Esch<br>**WILMER CUTLER PICKERING HALE AND DORR LLP**<br>1875 Pennsylvania Avenue, NW<br>Washington, DC 20006<br><br>Mark Selwyn<br>**WILMER CUTLER PICKERING HALE AND DORR LLP**<br>2600 El Camino Real<br>Suite 400<br>Palo Alto, California 94306<br><br>Joseph Mueller<br>Sarah Frazier<br>**WILMER CUTLER PICKERING HALE AND DORR LLP**<br>60 State Street<br>Boston, Massachusetts 02109 | ☐ Via Hand Delivery<br>☑ Via E-mail to<br>WHApple-Masimo1276ServiceList@wilmerhale.com<br>☐ Via Express Delivery<br>☐ Via Facsimile |

September 27, 2021

*/s/ Claire A. Stoneman*
Claire A. Stoneman
Litigation Paralegal
Knobbe, Martens, Olson & Bear, LLP

54148891

Exhibit 72

EXHIBIT 73

## UNITED STATES INTERNATIONAL TRADE COMMISSION
## WASHINGTON, D.C.

| | |
|---|---|
| **In the Matter of**<br><br>**CERTAIN LIGHT-BASED PHYSIOLOGICAL MEASUREMENT DEVICES AND COMPONENTS THEREOF** | **Inv. No. 337-TA-__**<br>**[Docket No. 3554]** |

## PUBLIC INTEREST STATEMENT OF
## PROPOSED RESPONDENT APPLE INC.

Exhibit 73

Apple Inc. ("Apple") respectfully submits this response to the Commission's solicitation of comments concerning the public interest issues raised by the Complaint and the Section 210.8(b) Statement filed by Complainants Masimo Corporation and Cercacor Laboratories, Inc. ("Statement").  *See* 86 Fed. Reg. 35,533 (July 6, 2021).

Headquartered in Cupertino, California, Apple has over 75,000 U.S. employees.  With the iPhone, iPad, and, more recently, the Apple Watch, Apple's U.S.-based engineers have designed highly successful new product categories, spurring the creation of millions of U.S.-based jobs.

Complainants are medical technology companies focused on patient monitoring devices used in hospitals and homes.  In seeking an exclusion order against the Apple Watch Series 6, Complainants are acting as non-practicing entities, asserting patents not to protect competing products (as they offer no smartwatch products), but rather to monetize their patents by attempting to eliminate Apple's product from the market.  Furthermore, Complainants are asking for an exclusion order that would cut sharply against the public interest and be particularly harmful as the country continues to suffer from the effects of the COVID-19 pandemic.

The accused Apple Watch Series 6 serves a host of important health-related and non-health functions for U.S. consumers.  It is used in the U.S. by millions of consumers to monitor and perform essential personal, commercial, governmental, and wellness-related tasks that are wholly unrelated to Complainants' asserted patents.  Some of the wellness-related features include monitoring for unusually high or low heart rates, fall detection (which automatically makes an emergency call after a user has a hard fall and is unresponsive for a minute), and tracking of other health statistics.  The Apple Watch Series 6 products also include two features—an ECG application and PPG-based Irregular Rhythm Notification (IRN) feature—that studies have shown can help alert users that they may suffer from a possibly fatal heart-condition called atrial fibrillation (AFib).  As a study of more than 400,000 participants conducted by researchers at

1

Exhibit 73

Stanford University concluded, "the[] data support the ability of the algorithm [of the IRN feature on Apple Watch] to correctly identify atrial fibrillation in users whom it notifies of irregular pulses."[1]  Untreated, AFib "doubles the risk of heart-related deaths and is associated with a 5-fold increased risk for stroke."[2]  Yet Complainants seek to remove from the U.S. the Apple Watch Series 6 products with this combination of features that are major consumer health tools for helping to identifying possible AFib not previously diagnosed.[3]

Further, the innovative blood oxygen sensor and application on the Apple Watch Series 6 products conveniently measures users' blood oxygen saturation periodically throughout the day, not only on demand.  This allows users to better understand their overall wellness.  Furthermore, the blood oxygen sensor is currently enabling researchers to gather data for developing future health technologies utilizing blood oxygen information.  Such regular monitoring and data collection are of critical importance, especially given the ongoing COVID-19 pandemic.

Complainants' claim that removing the Apple Watch Series 6 products from the U.S. would not negatively impact public health is wrong.  Complainants propose to replace the Apple Watch Series 6 products with their own medical-grade pulse oximeters.  But Complainants' single-function pulse oximeters do not provide the same host of health and wellness features that the Apple Watch Series 6 devices do.  Unlike the accused watches, Complainants' consumer products

---

[1]  Marco V. Perez et al., *Large-Scale Assessment of a Smartwatch to Identify Atrial Fibrillation*, N Engl J Med 2019; 381:1909-1917, *available at*
https://www.nejm.org/doi/full/10.1056/NEJMoa1901183
[2]  *What is Atrial Fibrillation (AFib or AF)?*, Am. Heart Ass'n. (July 31, 2016),
https://www.heart.org/en/health-topics/atrial-fibrillation/what-is-atrial-fibrillation-afib-or-af.
[3]  *See, e.g.*, *Normal tests couldn't prove Houston man's irregular heartbeat. But his Apple Watch could*, Houston Chronicle (Feb. 15, 2021, 6:00 AM),
https://www.houstonchronicle.com/lifestyle/renew-houston/health/article/Normal-tests-couldn-t-prove-Houston-man-s-15946059.php; *Fire Marshal shares news of his heart attack during American Heart Month*, SouthTahoeNow.com (Feb. 12, 2021, 9:53 PM),
http://southtahoenow.com/story/02/12/2021/fire-marshal-shares-news-his-heart-attack-during-american-heart-month.

2

Exhibit 73

cannot be worn regularly while engaging in other activities and therefore do not provide the same convenient collection of blood oxygen data. Nor do Complainants' products have any potential to aid in the detection of AFib as the accused products do. The other smartwatches currently sold by Apple—the Apple Watch Series 3 and Apple Watch SE products—also cannot serve as substitutes; none have the combination of the ECG, IRN, or blood oxygen functionality present on the Apple Watch Series 6 devices. Similarly, Complainants provide no evidence that any of the other smartwatch manufacturers could fill the void left if the Apple Watch Series 6 products were excluded. Complainants present no evidence that any of those companies offers a device with the blood oxygen, ECG *and* IRN functionality available on the Apple Watch Series 6, let alone that any of them would have excess capacity to fill the void if Apple's accused products are removed.

## I.    THE PUBLIC HEALTH AND WELFARE WOULD BE NEGATIVELY IMPACTED.

The requested remedy of excluding the Apple Watch Series 6 devices from the U.S. would be detrimental to public health and welfare. Removing the unique combination of the ECG and IRN functionality from the market would leave Apple Watch users less informed and less likely to identify early warning signs about heart health, while removing the blood oxygen capabilities would deprive consumers of a convenient way to passively monitor their blood oxygen and deprive researchers of critical data collection —all during a pandemic known to affect blood oxygen levels, when the need for research in this area is heightened.

First, Apple Watch Series 6 devices with IRN and ECG are beneficial to users. Users receive an alert if the IRN feature detects an irregular heart rhythm, which prompts users to visit their doctor for further testing and diagnosis; the ECG app allows users to monitor their heart rhythm health and share the data with their healthcare providers. The positive health impact of these features on the broad base and growing number of Apple Watch users is confirmed by the Stanford Heart Study discussed above and other independent studies of the ECG and IRN features on Apple

3

Exhibit 73

Watch.[4]

Second, the blood oxygen sensor and application on the Apple Watch Series 6 devices provide consumers with convenient, periodic monitoring of their blood oxygen levels; a consumer who experiences a drop in blood oxygen levels can use that information in assessing their overall wellness.  The blood oxygen sensor and application are also the foundation for several current health studies designed to inform the use of blood oxygen levels in future health applications.  For instance, Apple is collaborating with the University of California, Irvine, and Anthem to examine how longitudinal measurements of blood oxygen and other physiological signals can help manage and control asthma.[5]  Apple is also working closely with investigators at the Ted Rogers Centre for Heart Research and the Peter Munk Cardiac Centre at the University Health Network to better understand how blood oxygen measurements and other Apple Watch Series 6 metrics can help with management of heart failure.[6]  Removal of the accused products will negatively impact public health and welfare by depriving consumers of important information about their own wellness and stunting the medical research currently enabled by these devices during a critical time.

## II.   NO EVIDENCE SUGGESTS THAT OTHER SUPPLIERS COULD REPLACE THE CHALLENGED PRODUCTS IN A COMMERCIALLY REASONABLE TIME.

Complainants' conclusory assertion that other smartwatch suppliers could replace the

---

[4]  *See, e.g.*, Nabeel Saghir et al., *A comparison of manual electrocardiographic interval and waveform analysis in lead 1 of 12-lead ECG and Apple Watch ECG: A validation study*, Cardiovascular Digit. Health J., Vol. 1, Issue 1, July-Aug. 2020, 30-36 ("The cardiovascular data analyzed in this study support the accuracy and validity of the [ECG app on Apple Watch], and in specific outpatient clinical scenarios the [ECG app on Apple Watch] can be incorporated as a tool for use by the clinician given the device's high quality tracings.").

[5]  *Anthem, UCI will investigate how digital tools can aid asthma management*, UCI News (Sept. 16, 2020), https://news.uci.edu/2020/09/16/anthem-uci-will-investigate-how-digital-tools-can-aid-asthma-management/.

[6]  *New study explores how Apple Watch can help identify worsening heart failure early*, Ted Rogers Ctr. for Heart Rsch. (Feb. 22, 2021), https://tedrogersresearch.ca/2021/02/new-study-explores-how-apple-watch-can-help-identify-worsening-heart-failure-early/.

Exhibit 73

volume of the targeted Apple Watch products (Statement at 5) is without evidentiary support and strains credulity.   Apple has about 40% of North American smartwatch sales.[7]   The closest competitor is FitBit, with about 20% of sales, and Samsung has about 5% of sales.[8]  The necessary near *doubling* of production would be extremely difficult in a short period of time, particularly in the context of the ongoing, worldwide semiconductor shortage.

Moreover, the Apple Watch Series 6 products occupy a unique space in the competitive landscape in that they have two, independent functions that can detect if a user is suffering from possible AFib—the IRN feature and an independent ECG app application.  Complainants present no evidence that ***any*** of the proposed replacement products offer both IRN- and ECG-based AFib detection.   Indeed, Complainants' own products they propose as replacements offer ***neither*** feature.

III.   **CONCLUSION**

The requested exclusion of the Apple Watch Series 6 products will directly harm consumers by depriving the public of important health surveillance tools, likely resulting in some in the U.S. going undiagnosed with a potentially fatal heart disease, thereby increasing the risk for serious illness and even death.  In the event the Commission institutes an investigation, Apple respectfully requests that the Commission authorize the ALJ to take evidence, hear argument, make findings of fact, and issue a recommended determination on the public interest.

---

[7] *See* Statista 2020 Smartwatch Analysis at 19.

[8] *Id.*

5

Exhibit 73

Dated:  July 14, 2021                    Respectfully submitted,

                                */s/ Mark D. Selwyn*

Mark D. Selwyn
WILMER CUTLER PICKERING HALE AND DORR LLP
2600 El Camino Real
Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000
mark.selwyn@wilmerhale.com

Joseph J. Mueller
Sarah R. Frazier
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
joseph.mueller@wilmerhale.com
sarah.frazier@wilmerhale.com

Michael D. Esch
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Ave., NW
Washington, DC 20006
Telephone: (202) 663-6000
michael.esch@wilmerhale.com

*Counsel for Proposed Respondent Apple Inc.*

Exhibit 73