# EXHIBIT 53

| | |
|---|---|
| **From:** | Passamaneck, Nora Q.E. |
| **To:** | Adam.Powell; *** Apple-Masimo; WH Apple-Masimo Service List |
| **Cc:** | Masimo.Apple |
| **Subject:** | RE: Hearing on December 22 Motion to Compel |
| **Date:** | Friday, January 21, 2022 7:19:09 PM |

Adam,

Apple's December 23 Motion to Compel will be fully briefed next week (and could have been briefed earlier had Plaintiffs' chosen to do so).   We see no reason why the parties should incur the expense and inefficiency of having separate hearings on two discrete motions potentially one week apart. Further, Plaintiffs have not identified any prejudice caused by waiting one week for a hearing on their motion to compel.  Of course, if Plaintiffs insist on seeking a hearing on their motion next week, they may ask the Special Master and note Apple's objection based on the fact that Apple's December 23 Motion will be fully briefed next week.

Best regards,
Nora

**From:** Adam.Powell <Adam.Powell@knobbe.com>
**Sent:** Friday, January 21, 2022 9:03 AM
**To:** Passamaneck, Nora Q.E. <Nora.Passamaneck@wilmerhale.com>; *** Apple-Masimo <Apple-Masimo@gibsondunn.com>; WH Apple-Masimo Service List <WHApple-MasimoServiceList@wilmerhale.com>
**Cc:** Masimo.Apple <Masimo.Apple@knobbe.com>
**Subject:** RE: Hearing on December 22 Motion to Compel

**EXTERNAL SENDER**

Nora,

The parties did not reach a resolution on Apple's December 23 Motion to Compel, so we will file our opposition.  However, we disagree with Apple's approach of withholding its availability on Masimo's fully briefed motion to compel until a separate motion on a separate issue can be heard.  We request that Apple reconsider and provide its availability for a hearing the week of January 24.

Best regards,
Adam

**Adam Powell**
Partner

858-707-4245 **Direct**

**Knobbe Martens**

**From:** Passamaneck, Nora Q.E. <Nora.Passamaneck@wilmerhale.com>

Exhibit 53

**Sent:** Friday, January 14, 2022 3:43 PM
**To:** Adam.Powell <Adam.Powell@knobbe.com>; *** Apple-Masimo <Apple-Masimo@gibsondunn.com>; WH Apple-Masimo Service List <WHApple-MasimoServiceList@wilmerhale.com>
**Cc:** Masimo.Apple <Masimo.Apple@knobbe.com>
**Subject:** RE: Hearing on December 22 Motion to Compel

Adam,

Apple's December 23 Motion to Compel is also pending and the two motions should be heard together.   The only reason the December 23 Motion is not fully briefed is because Plaintiffs asked for additional time at the January 5 hearing, arguing that the Special Master's rulings could affect Plaintiffs' positions with respect to Apple's December 23 Motion.  Given that the Special Master has now granted Apple's motion in relevant part (Interrogatory No. 26), Plaintiffs have no basis to oppose Apple's December 23 Motion to Compel.  As a result, if Plaintiffs will stipulate to the relief requested by Apple's December 23 Motion to Compel, then Apple will agree to proceed with the hearing on Plaintiffs' motion only.  However, if Plaintiffs still plan on opposing notwithstanding Order No. 3, then holding separate hearings on motions that were filed at the same time would be inefficient for both the parties and the Special Master.

Plaintiffs may of course file their opposition to Apple's December 23 Motion before the deadline, and Apple will agree to file its Reply within three business days.

Regards,
Nora

---

**From:** Adam.Powell <Adam.Powell@knobbe.com>
**Sent:** Wednesday, January 12, 2022 7:43 PM
**To:** *** Apple-Masimo <Apple-Masimo@gibsondunn.com>; WH Apple-Masimo Service List <WHApple-MasimoServiceList@wilmerhale.com>
**Cc:** Masimo.Apple <Masimo.Apple@knobbe.com>
**Subject:** Hearing on December 22 Motion to Compel

**EXTERNAL SENDER**

Counsel,

Masimo's December 22 Motion to Compel is now fully briefed.  We write to request your availability for next week in the event that Judge Guilford chooses to hold a hearing.  We can make any day next week work.

Best regards,
Adam

Exhibit 53

**Adam Powell**
Partner

858-707-4245 **Direct**

**Knobbe Martens**

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

Exhibit 53

EXHIBIT 55

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP

333 South Grand Avenue
Los Angeles, CA 90071-3197
Tel 213.229.7000
www.gibsondunn.com

Ilissa Samplin
Direct: +1 213.229.7354
Fax: +1 213.229.6354
ISamplin@gibsondunn.com

May 21, 2021

<u>VIA E-MAIL</u>

Alan G. Laquer
Knobbe Martens
2040 Main Street
Irvine, CA  92614

Cheryl T. Burgess
Knobbe Martens
2040 Main Street
Irvine, CA  92614

Re:     *Masimo et al. v. Apple Inc.*, C.A. 8:20-cv-00048-JVS-JDE (C.D. Cal.)

Dear Alan and Cheryl:

I am writing in response to your emails sent the evening of May 19, 2021, regarding deposition scheduling, and to address the current case schedule dispute between the parties.

Plaintiffs' proposal of an interim stay while motions about the case schedule are briefed does not work because, as we noted previously, the parties have no power to effect their own stay of the case—particularly one that would cause them to fall out of compliance with the Court's Scheduling Order.  Indeed, in response to the stay proposal, Judge Early yesterday commented that he has no power to change the schedule either.  Accordingly, we recommend that the parties agree to interim dates for the exchange of ESI discovery parameters, scheduling of depositions, substantial completion of document discovery, and depositions— so that we continue to move forward with progressing the case in view of the current Scheduling Order by which all parties are presently bound.  To the extent Plaintiffs intend to continue to object to my May 12 declaration after Judge Early's comments yesterday, we also need to immediately discuss that dispute so that we can resolve the question of remote depositions.  We are available today or over the weekend to discuss a mutually agreeable schedule and any remaining remote deposition issues.  **Please provide Plaintiffs' availability as soon as possible.**

With respect to your emails about depositions, Plaintiffs certainly are free to move forward with depositions of Apple witnesses as soon as they would like to do so.  But, as Judge Early made clear at yesterday's hearing, Plaintiffs will do so at the risk of not getting a second

Exhibit 55

# GIBSON DUNN

Alan G. Laquer
Cheryl T. Burgess
May 21, 2021
Page 2

deposition if documents pertaining to those deponents are produced later.  Apple does not intend to make its witnesses available for deposition more than once.  You have indicated that Plaintiffs will take the same position with respect to their deponents (who you are offering for deposition *before* production of their documents).  That is why we believe it is most efficient for both sides to come up with a schedule for the case that sets dates for the exchange of ESI discovery parameters, substantial completion of document production, and Plaintiffs' 30(b)(6) notice, in advance of a deadline for fact depositions.

**<u>Mr. Laquer's Email Regarding Plaintiffs' Requested Depositions</u>**

Mr. Laquer's email mischaracterizes the parties' prior correspondence, and ignores the fact that Apple has already made its position on scheduling abundantly clear.  Contrary to Mr. Laquer's suggestion that Plaintiffs previously accepted the deposition dates for Apple's custodians that Apple provided on April 29 (nearly 3 weeks ago), Plaintiffs have only stated that Apple should "reserve all of the dates" pending the outcome of the parties' dispute based on Plaintiffs' unwillingness to take Apple's depositions remotely.[1]  As Apple informed Plaintiffs, however, Apple's witnesses are unable to indefinitely keep dates open on their calendar, and thus Apple requested multiple times that Plaintiffs confirm the dates.  ***Plaintiffs did not do so until Mr. Laquer's email earlier this week***.

Furthermore, Mr. Laquer's email makes clear that Plaintiffs have no intention of serving Apple with their 30(b)(6) notice prior to these depositions, despite Apple's repeated requests for Plaintiffs' notice before Apple puts its witnesses up for deposition and despite the fact that Apple already served its 30(b)(6) notice to afford Plaintiffs that courtesy.  As we have explained multiple times, many of Apple's witnesses are likely to be corporate designees in this case and Apple is not willing to make its deponents available more than once.  Apple therefore has reasonably requested Plaintiffs' 30(b)(6) topics, so that it can prepare the appropriate corporate designees who have also been designated in their individual capacities.  Plaintiffs have refused.  If Plaintiffs insist on taking the noticed depositions prior to providing their 30(b)(6) topics, Apple will reserve the right to designate their deponents' deposition testimony as Apple's 30(b)(6) testimony after Plaintiffs serve their 30(b)(6)

---

[1]  Plaintiffs have taken the position that "Apple's application was denied" for each of the 11 deponents that are the subject of my May 12 declaration.  Judge Early did not endorse Plaintiffs' position at yesterday's conference.  Plaintiffs' position following the conference is not yet clear to Apple.  And if Plaintiffs continue to insist that "Apple's application was denied" despite the discussion at yesterday's hearing, it is further unclear to Apple whether Plaintiffs are expecting that Apple will continue to keep all dates open while the dispute about my declaration is resolved.

Exhibit 55

**GIBSON DUNN**

Alan G. Laquer
Cheryl T. Burgess
May 21, 2021
Page 3

topics.  In view of Plaintiffs' unwillingness to agree that they will not seek second depositions from Apple's witnesses, even if the witnesses' documents are produced after their deposition, Apple cannot agree to make its witnesses available for deposition at this time.

## Ms. Burgess' Email Regarding Apple's Requested Depositions

Ms. Burgess' email similarly mischaracterizes the parties' correspondence and seeks to place conditions on Apple's ability to depose Plaintiffs' deponents.  Ms. Burgess' email offers— *for the first time*—dates for Plaintiffs' deponents, starting as early as next week.  We have been asking for dates for weeks.  It is unreasonable of Plaintiffs to provide one-weeks' notice for these deponents.  Ms. Burgess' email also makes clear that Plaintiffs will not be providing documents for their deponents prior to the dates Plaintiffs are offering for deposition, and that if Apple wants to take the depositions on the proposed dates, it must agree not to seek second depositions of those witnesses.  In other words, Apple must forego its right to take depositions of Plaintiffs' witnesses with the benefit of Plaintiffs' documents.  These conditions are unreasonable; Apple will not accept Plaintiffs' attempt to impose such conditions.

We are also compelled to address Ms. Burgess' attempt to equate Plaintiffs' conditions on Apple taking Plaintiffs' depositions to the vastly different situation that was presented with respect to Plaintiffs' attempt to depose Wolf Oetting seven (7) months ago.  On November 18, 2020, Plaintiffs noticed Mr. Oetting—and only Mr. Oetting—for deposition.  In response, Apple stated that taking Mr. Oetting's deposition on the date noticed would be premature given the stage of the case.  Indeed, Apple had not yet produced Mr. Oetting's documents or ESI, and Plaintiffs had not yet provided their 30(b)(6) notice.  Apple also noted that Mr. Oetting was not available on the date Plaintiffs noticed due to Apple's annual company-wide shut down the final two weeks of December.  Nonetheless, Apple offered to make Mr. Oetting available for deposition on January 20, 21, or 22, but made clear that it would object to any efforts to take Mr. Oetting's deposition a second time in view of the fact that the parties had not yet completed their document productions.  In other words, Plaintiffs could choose to take Mr. Oetting's deposition knowing that his documents had not been produced—which was their prerogative—but they could not secure a second bite of the apple later having made that choice to proceed early.  Plaintiffs then asked if Mr. Oetting could instead be available in February, and Apple offered February 22.  Plaintiffs next demanded that Apple produce all of Mr. Oetting's documents prior to his deposition.  Apple agreed to do so on February 8, and did in fact produce all of Mr. Oetting's documents, with the exception of ESI, prior to February 22.  With respect to ESI, Apple offered on February 24 to prioritize searching and producing Mr. Oetting's ESI if Plaintiffs provided search terms that

Exhibit 55

**GIBSON DUNN**

Alan G. Laquer
Cheryl T. Burgess
May 21, 2021
Page 4

they wished to apply to the ESI.  Plaintiffs responded a week later that they were "adjusting [Plaintiffs'] search terms," but Apple did not hear again from Plaintiffs until March 12, when Plaintiffs provided search terms for nearly 50 custodians.

In short, the record is clear that Apple was more than willing to produce Mr. Oetting's documents—including ESI—prior to his deposition in order to avoid a later request by Plaintiffs to take his deposition a second time.  Apple expects that Plaintiffs will do the same for the individuals Apple seeks to depose.

**<u>The Parties Need to Set a Schedule That Will Allow Discovery to Move Forward Now</u>**

Apple is eager to move discovery forward now and, as we have made clear, we are willing to work with Plaintiffs to come up with a sensible schedule with that goal in mind.  In particular, as I note above, we are available today or over the weekend to discuss an interim schedule while briefing on the Scheduling Order is pending, so that the parties can continue to work towards progressing this case under the current Schedule Order by which they are bound.

With respect to the parties' dispute about an extension of the Scheduling Order, Apple provided Plaintiffs with the following proposed amended schedule that would allow both parties to take depositions with full knowledge of each other's 30(b)(6) topics as well as documents (including ESI) for all deponents:

Exhibit 55

# GIBSON DUNN

Alan G. Laquer
Cheryl T. Burgess
May 21, 2021
Page 5

| Event | Current Deadline | Proposed Deadline |
|-------|------------------|-------------------|
| Plaintiffs serve 30(b)(6) notice | N/A | May 19, 2021 |
| Final ESI search terms | N/A | June 4, 2021 |
| Deposition schedule set | N/A | June 11, 2021 |
| Substantial completion of document production | N/A | June 25, 2021 |
| Discovery cut-off | July 5, 2021 | July 5, 2021 (except depositions) (includes cut-off for motions to compel) |
| | | August 13, 2021 (depositions only) |
| Opening expert reports | Sept. 6, 2021 | October 27, 2021 |
| Rebuttal expert reports | Oct. 18, 2021 | December 8, 2021 |
| Expert discovery cut-off | Dec. 6, 2021 | December 22, 2021 |
| Law and Motion– motions filed no later than | Jan. 10, 2022 | January 24, 2022 |
| Law and Motion cut-off | Feb. 7, 2022 at 1:30 pm | February 14, 2022 at 1:30 pm |
| MILs | Feb. 14, 2022 | |
| Pretrial documents | Mar. 7, 2022 | |
| Final pretrial conference | March 21, 2022 | |
| Trial | Apr. 5, 2022 | |

Plaintiffs have not provided any proposal that would allow the parties to move forward with scheduling and taking depositions any time in the near future.  To the contrary, in response to Apple's proposal, Plaintiffs proposed that the parties agree to extend the discovery cut-off deadline 90 days after the final IPR decisions.[2]  In other words, Plaintiffs' proposal seeks to extend discovery until at least the summer of 2022 and, with any appeals from the IPRs, potentially well into 2023.  Such a proposal is clearly not intended to allow for discovery to proceed expeditiously now, and would result in a trial date in 2023 or 2024 at the earliest. We urge Plaintiffs to reconsider Apple's proposal.

---

[2]  Plaintiffs have also rebuffed Apple's proposal to include firm deadlines for Plaintiffs to serve their 30(b)(6) notice, negotiate ESI search terms, set a deposition schedule, and substantially complete document production.

Exhibit 55

**GIBSON DUNN**

Alan G. Laquer
Cheryl T. Burgess
May 21, 2021
Page 6

We look forward to hearing from you as soon as possible about Plaintiffs' availability to meet and confer today or over the weekend.

Sincerely,

Ilissa Samplin

Exhibit 55

# EXHIBIT 56

Joseph R. Re (Bar No. 134479)
joseph.re@knobbe.com
Stephen C. Jensen (Bar No. 149894)
steve.jensen@knobbe.com
Benjamin A. Katzenellenbogen (Bar No. 208527)
ben.katzenellenbogen@knobbe.com
Perry D. Oldham (Bar No. 216016)
perry.oldham@knobbe.com
Stephen W. Larson (Bar No. 240844)
stephen.larson@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, Fourteenth Floor
Irvine, CA  92614
Telephone:  (949)-760-0404 Facsimile:  (949)-760-9502

Adam B. Powell (Bar No. 272725)
adam.powell@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
3579 Valley Centre Drive, Suite 300
San Diego, CA 92130
Telephone: (858) 707-4000 Facsimile: (858) 707-4001

Attorneys for Plaintiffs,
Masimo Corporation and Cercacor Laboratories, Inc.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| MASIMO CORPORATION,<br>a Delaware corporation; and<br>CERCACOR LABORATORIES, INC.,<br>a Delaware corporation<br><br>Plaintiffs,<br><br>v.<br><br>APPLE INC., a California corporation<br><br>Defendant. | Case No. 8:20-cv-00048-JVS-JDE<br><br>Hon. James V. Selna<br>Magistrate Judge John D. Early<br><br>**PLAINTIFFS' RESPONSES AND OBJECTIONS TO DEFENDANT'S SECOND NOTICE OF DEPOSITION OF MASIMO CORPORATION AND CERCACOR LABORATORIES, INC. PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 30(b)(6)** |

Exhibit 56

Pursuant to Rules 26 and 30(b)(6) of the Federal Rules of Civil Procedure, Plaintiffs Masimo Corporation and Cercacor Laboratories, Inc. (collectively, "Plaintiffs") hereby object to the Second Notice of Deposition of Plaintiffs pursuant to Fed. R. Civ. P. 30(b)(6) ("the Notice") as follows:

## GENERAL RESPONSE AND OBJECTIONS

Plaintiffs assert each of the following General Objections to the Notice and the Definitions and Topics listed therein.  In addition to these General Objections, Plaintiffs also asserts objections to specific Topics below.  By setting forth such specific objections, Plaintiffs does not intend to limit or restrict its General Objections.

1. Plaintiffs incorporate by reference the General Objections in Plaintiffs Objections and Responses to Defendant's First through Tenth Sets of Requests for Production of Documents and Things and Plaintiffs Objections and Responses to Defendant's First through Seventh Sets of Interrogatories as if fully set forth herein.

2. Plaintiffs object to the time and location for the deposition set forth in the Notice.  Plaintiffs are currently investigating the schedules of potential designees and will coordinate with Defendant to determine a time and location mutually agreeable to the parties.

3. Plaintiffs object to this deposition notice as contrary to Apple's position that the parties should each only serve one deposition notice under rule 30(b)(6) of the Federal Rules of Civil Procedure.

4. Plaintiffs object to Defendant's requirement that the deposition continue from day to day until completed, to the extent that any such deposition becomes duplicative or otherwise unduly burdensome in its duration.  The deposition of any individual designated pursuant to this Notice shall not exceed seven hours.  Plaintiffs does not agree to extend the deposition hours limitations as specified in the Scheduling Order.

Exhibit 56

5.     Plaintiffs object to Apple's definitions of "Masimo" and "Cercacor" as overly broad and unduly burdensome, not proportional with the needs of the case, and inconsistent with the requirements of the Federal Rules of Civil Procedure.  As used herein, "Masimo" means "Masimo Corporation."  As used herein, "Cercacor" means "Cercacor Laboratories, Inc."

6.     Plaintiffs object to Defendant's definitions of "you," "your," "yours," "Plaintiffs," "person," "employees," "officers," "directors," "agents," "natural person" and "entity" as overly broad, unduly burdensome, not proportional with the needs of the case, and inconsistent with the requirements of the Federal Rules of Civil Procedure.

7.     Plaintiffs object to Defendant's instructions regarding "identification," "identify," and "describe" as overly broad and unduly burdensome, and rendering the interrogatories vague, ambiguous, or unintelligible. As with other words and terms used in the following responses, any usage of these terms in accordance with their normal meanings and connotations.

8.     Plaintiffs object to Defendant's definition of "relating to" as overly broad and unduly burdensome, and rendering the interrogatories vague, ambiguous, or unintelligible. As with other words and terms used in the following responses, any usage of these terms in accordance with their normal meanings and connotations.

9.     Plaintiffs object to the Notice of Deposition and each and every Topic to the extent they fail to comply with, or seek to impose any obligations beyond those set forth in the Federal Rules of Civil Procedure (the "Federal Rules"), the Local Rules of the United States District Court for the Central District of California (the "Local Rules"), or the Scheduling Order in this case.

10.     Plaintiffs object to the Topics to the extent they seek information protected from disclosure by the attorney-client privilege, the attorney work

Exhibit 56

product doctrine, common interest privilege, or any other applicable privilege or immunity.  The specific objections stated below on the grounds of attorney-client privilege, and/or work product in no way limit the generality of this objection.  Nothing contained in these responses should be construed as a waiver of attorney-client privilege, the attorney work product doctrine, common interest privilege, or any other applicable privilege or immunity.  To the extent that any request may be construed as calling for disclosure of information protected by such privileges or doctrines, a continuing objection to each and every such request is hereby interposed.

11.     Plaintiffs object to the Topics to the extent they seek information or materials of any third party that is confidential and/or proprietary, protected under a standing protective order, and/or otherwise protected from disclosure.

12.     Plaintiffs object to the Topics as overly broad and not proportional to the discovery needs of the case, to the extent that any Topic seeks information not known or reasonably available to Plaintiffs or outside the possession, custody, and control of Plaintiffs, including, but not limited to, requiring Plaintiffs to seek information about persons not currently employed by or associated with Plaintiffs, or to provide or seek information regarding third parties.

13.     Plaintiffs object to the Topics to the extent that the information sought by the Topics may be derived or ascertained from publicly available documents, Defendant's own documents or witnesses, and/or documents and things previously produced by Plaintiffs because the burden of obtaining such information is less or substantially the same for Defendant as it is for Plaintiffs.

14.     Plaintiffs object to the Topics as overly broad and not proportional to the discovery needs of the case, to the extent that any Topic seeks information that is already in Defendant's possession or readily available from another source that is equally available to Defendant.

15.     Plaintiffs object to the Topics to the extent they seek information that

Exhibit 56

is neither relevant to any party's claims or defenses in this case nor proportional to the needs of the case.

16.    Plaintiffs object to the Topics as overly broad and unduly burdensome to the extent they are unbounded as to time or are not limited to a time frame relevant to the present case.

17.    Plaintiffs object to the Topics to the extent they call for legal conclusions, legal contentions, and/or expert testimony.

18.    To the extent that a Topic is vague or ambiguous, Plaintiffs have responded to the best of their ability based on their understanding of the Topic but have not attempted to speculate as to the meaning of the Topic.

19.    Plaintiffs object to the Topics to the extent they do not describe with reasonable particularity the matters on which examination is requested, as required by Fed. R. Civ. P. 30.

20.    Plaintiffs make their written objections herein without in any way waiving or intending to waive, but on the contrary, intending to preserve and preserving:

a.    The right to raise objections as to the relevance, materiality, privilege, or admissibility of any information provided or document identified in the noticed deposition, either in this action or in any other proceeding;

b.    The right to object to the use of the above information or documents in this action or in any other proceeding; and

c.    The right to object on any ground at any time to other notices or other discovery requests involving this information or the subject matter thereof.

21.    Plaintiffs hereby reserve all objections available under the Federal Rules of Civil Procedure to the use of any videotaped deposition or transcript at trial or hearing.

Exhibit 56

22.     Words and terms used in this response shall be construed in accordance with their normal meaning and connotations, and shall in no way be interpreted as terms of art or statutorily defined terms, and Plaintiffs specifically disavow any such meaning or connotation that might be accorded to such terms.

23.     These responses are made solely for the purpose of this action.  Each response is subject to all objections as to authenticity, competence, relevance, admissibility, and any other objections that would require the exclusion of any statement contained herein if such statement were made by a witness present and testifying in court.  All such objections and grounds are reserved and may be interposed at the time of trial.

24.     Plaintiffs reserve the right to change their position that they will produce a witness on any given topic to the extent the parties agree to limit remaining fact discovery in this litigation.

25.     Any statement that Plaintiffs will designate a witness competent to testify on a Topic should not be construed as a representation that Plaintiffs have any relevant information on that Topic, but merely that a properly designated witness will testify to any relevant and non-privileged corporate knowledge that he or she has obtained by making reasonable preparations for the deposition.

26.     To the extent that Plaintiffs state that they will provide testimony responsive to a Topic, such statement should not be construed as a representation or admission that the information, documents or things referenced or requested in Defendant's Topics are relevant to any claims or defenses in this case, or that they are admissible at trial.

27.     Any restatement of one or more of these General Objections in a specific objection shall not be construed as a waiver of any other General Objection.

28.     Plaintiffs reserve the right to object at deposition to any question asked on the grounds set forth in these General Objections, the specific grounds

Exhibit 56

individually listed in response to each deposition Topic below, or any ground available to Plaintiffs at the time of deposition.

29. Subject to and without waiver of these General Objections, Plaintiffs submits the following specific responses and objections.

## SPECIFIC OBJECTIONS AND RESPONSES

**Topic 1:**

All types or categories of documents (e.g. email, imessages, physical, source code, etc.) sent by, received by, or relating to Marcelo Lamego and Michael O'Reilly that Plaintiffs had in their possession, custody, or control at any time.

**Response to Topic 1:**

Plaintiffs incorporate by reference the General Objections set forth above. Plaintiffs further object to this topic to the extent it seeks information protected by the attorney-client privilege, attorney work product doctrine, and/or any other applicable privilege, rule, or immunity. Plaintiffs further object to this Topic as overbroad and unduly burdensome. Plaintiffs further object to this Topic as vague an ambiguous with respect to the phrase "relating to."  Plaintiffs further object to this deposition notice as contrary to Apple's position that the parties should each only serve one deposition notice under rule 30(b)(6) of the Federal Rules of Civil Procedure.

Subject to the General Objections and the specific objections set forth above, Plaintiffs will provide one or more witnesses to testify about the categories of documents sent by or received by Marcelo Lamego and Michael O'Reilly that Plaintiffs had in their possession, custody, or control at any time, to the extent that such information remains available to Plaintiffs today.

**Topic 2:**

All files in Topic 1 that Plaintiffs currently have in their possession, custody or control, including but not limited to, the documents cited in Exhibits

Exhibit 56

20 and 21 to the Supplemental Declaration of Adam B. Powell in Support of Plaintiffs' Motion to Compel (Dkt. 405-2).

**Response to Topic 2:**

Plaintiffs incorporate by reference the General Objections as well as their Objections to Topic No. 1 above. Plaintiffs further object to this Topic as vague, ambiguous, overbroad, and unduly burdensome. Plaintiffs further object to this topic to the extent it seeks information protected by the attorney-client privilege, attorney work product doctrine, and/or any other applicable privilege, rule, or immunity.  Plaintiffs further object to this topic as vague, nonsensical, and unduly burdensome because, unlike Apple, Plaintiffs have not asserted that they destroyed Lamego's or O'Reilly's files.  Plaintiffs further object to this deposition notice as contrary to Apple's position that the parties should each only serve one deposition notice under rule 30(b)(6) of the Federal Rules of Civil Procedure.

Plaintiffs are not currently aware of files in Topic 1 that are no longer in its possession, custody, or control.  Therefore, the scope of this request appears to be the same as Topic 1.  However, subject to the General Objections and the specific objections set forth above, Plaintiffs will provide one or more witnesses to testify about the documents sent by or received by Marcelo Lamego and Michael O'Reilly that Plaintiffs currently have in their possession, custody, or control.

**Topic 3:**

All files in Topic 1 that Plaintiffs assert they can no longer search for or produce, including the facts and circumstances surrounding Plaintiffs handling of Lamego's and O'Reilly's files and any steps taken that resulted in the files no longer being available after they left your employment.

**Response to Topic 3:**

Plaintiffs incorporate by reference the General Objections as well as their Objections to Topic No. 1 above. Plaintiffs further object to this Topic as overbroad and unduly burdensome.  Plaintiffs further objected to the phrases

Exhibit 56

"handling," "search for or produce," and "no longer being available" as vague and ambiguous. Plaintiffs further object to this topic to the extent it seeks information protected by the attorney-client privilege, attorney work product doctrine, and/or any other applicable privilege, rule, or immunity.  Plaintiffs object to this Topic to the extent it calls for information that is not within Plaintiffs' possession, custody, or control.  Plaintiffs further object to this topic as vague, nonsensical, and unduly burdensome because, unlike Apple, Plaintiffs have not asserted that they destroyed Lamego's or O'Reilly's files.  Plaintiffs further object to this deposition notice as contrary to Apple's position that the parties should each only serve one deposition notice under rule 30(b)(6) of the Federal Rules of Civil Procedure.

Subject to the General Objections and the specific objections set forth above, Plaintiffs are not currently aware of any type or categories of files in Topic 1 that they can "no longer search for or produce" and therefore are not able to designate any appropriate witness.

**Topic 4:**

All location(s) where files in Topic 1 are stored or were stored at any time, including computer or mobile devices, servers or network drives, backups or backup tapes, or exports. The Topic includes files Plaintiffs asserts are outside of its possession, custody, or control, including files in the possession of Plaintiffs' counsel or discovery vendors.

**Response to Topic 4:**

Plaintiffs incorporate by reference the General Objections as well as their Objections to Topic No. 1 above. Plaintiffs further object to this Topic as overbroad and unduly burdensome.  Plaintiffs further objected to the phrase "export" as vague and ambiguous. Plaintiffs further object to this topic to the extent it seeks information protected by the attorney-client privilege, attorney work product doctrine, and/or any other applicable privilege, rule, or immunity.

Exhibit 56

Plaintiffs object to this Topic to the extent it calls for information that is not within Plaintiffs' possession, custody, or control. Plaintiffs object to this Topic as lacking reasonable particularity sufficient to inform Plaintiffs of the matters for examination as required pursuant to Federal Rule of Civil Procedure 30(b)(6). Plaintiffs further object to this topic as vague, nonsensical, and unduly burdensome because, unlike Apple, Plaintiffs have not asserted that they destroyed Lamego's or O'Reilly's files.  Because Plaintiffs are not currently aware of any files in Topic 1 that they can "no longer search for or produce," therefore, identification of non-standard file locations (e.g., backups and exports) is not relevant.  Plaintiffs further object to this deposition notice as contrary to Apple's position that the parties should each only serve one deposition notice under rule 30(b)(6) of the Federal Rules of Civil Procedure.

Subject to the General Objections and the specific objections set forth above, Plaintiffs will provide one or more witnesses to testify regarding the location(s) where the documents sent by or received by Marcelo Lamego and Michael O'Reilly are stored or were stored.

**Topic 5:**

All facts and circumstances relating to Plaintiffs' efforts to search for, locate, and recover files referenced in Topic 1, including the facts and circumstances surrounding Plaintiffs locating O'Reilly's files as referenced in Exhibits 20 and 21 to the Supplemental Declaration of Adam B. Powell in Support of Plaintiffs' Motion to Compel (Dkt. 405-2).

**Response to Topic 5:**

Plaintiffs incorporate by reference the General Objections as well as their Objections to Topic No. 1 above. Plaintiffs further object to this Topic as overbroad and unduly burdensome.  Plaintiffs further objected to the phrase "export" as vague and ambiguous. Plaintiffs further object to this topic as seeking information protected by the attorney-client privilege, attorney work product

Exhibit 56

doctrine, and/or any other applicable privilege, rule, or immunity.  Plaintiffs object to this Topic to the extent it calls for information that is not within Plaintiffs' possession, custody, or control. Plaintiffs object to this Topic as lacking reasonable particularity sufficient to inform Plaintiffs of the matters for examination as required pursuant to Federal Rule of Civil Procedure 30(b)(6). Plaintiffs further object to this topic as vague, nonsensical, and unduly burdensome because, unlike Apple, Plaintiffs have not asserted that they destroyed Lamego's or O'Reilly's files.  Plaintiffs further object to this deposition notice as contrary to Apple's position that the parties should each only serve one deposition notice under rule 30(b)(6) of the Federal Rules of Civil Procedure.

Subject to the General Objections and the specific objections set forth above, Plaintiffs will provide one or more witnesses to testify regarding Plaintiffs' efforts to search for, and locate the documents sent by or received by Marcelo Lamego and Michael O'Reilly.  Plaintiffs are aware of no "recovered" documents within this Topic.

**Topic 6:**

All facts and circumstances relating to Plaintiffs' policies, procedures, and practices for handling an employee's files, including the time frame for handling such files, whether files are moved or copied to some other device, whether all copies are deleted, and whether files are wiped or permanently destroyed.

**Response to Topic 6:**

Plaintiffs incorporate by reference the General Objections as well as their Objections to Topic No. 1 above. Plaintiffs further object to this Topic as overbroad and unduly burdensome.  Plaintiffs further objected to the phrase "wiped" as vague and ambiguous. Plaintiffs further object to this topic to the extent it seeks information protected by the attorney-client privilege, attorney work product doctrine, and/or any other applicable privilege, rule, or immunity. Plaintiffs further object to the phrase "handling" as vague and ambiguous,

Exhibit 56

1    particularly as that term is used in the phrase "the time frame for handling such

2    files."  Plaintiffs further object to this topic as vague, nonsensical, and unduly

3    burdensome because, unlike Apple, Plaintiffs have not asserted that they

4    destroyed Lamego's or O'Reilly's files.  Plaintiffs further object to this deposition

5    notice as contrary to Apple's position that the parties should each only serve one

6    deposition notice under rule 30(b)(6) of the Federal Rules of Civil Procedure.

7         Subject to the General Objections and the specific objections set forth

8    above, Plaintiffs will provide one or more witnesses to testify regarding Plaintiffs'

9    policies, procedures, and practices for handling an employee's files.

10   **Topic 7:**

11        Any software available to Plaintiffs capable of searching for employees'

12   emails, imessages, and other electronic communication streams to the extent that

13   those forms of communication are used for work-related purposes, including

14   whether Plaintiffs have the ability to search for emails and imessages sent to or

15   from Lamego or O'Reilly.

16   **Response to Topic 7:**

17        Plaintiffs incorporate by reference the General Objections as well as their

18   Objections to Topic No. 1 above. Plaintiffs further object to this Topic as

19   overbroad and unduly burdensome.  Plaintiffs further objected to the phrase

20   "export" as vague and ambiguous. Plaintiffs further object to this topic to the

21   extent it seeks information protected by the attorney-client privilege, attorney

22   work product doctrine, and/or any other applicable privilege, rule, or immunity.

23   Plaintiffs further object to this topic as vague, nonsensical, and unduly

24   burdensome because, unlike Apple, Plaintiffs have not asserted that they

25   destroyed Lamego's or O'Reilly's files.  Plaintiffs further object to this deposition

26   notice as contrary to Apple's position that the parties should each only serve one

27   deposition notice under rule 30(b)(6) of the Federal Rules of Civil Procedure.

28        Subject to the General Objections and the specific objections set forth

Exhibit 56

above, Plaintiffs will provide one or more witnesses to testify regarding the software available to Plaintiffs capable of searching for emails or imessages or other communications streams.

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  September 24, 2021     By: */s/Daniel Hughes/s/*
                                          Joseph R. Re
                                          Stephen C. Jensen
                                          Benjamin A. Katzenellenbogen
                                          Perry D. Oldham
                                          Stephen W. Larson
                                          Mark D. Kachner
                                          Adam B. Powell
                                          Daniel P. Hughes

                                          Attorneys for Plaintiffs,
                                          Masimo Corporation and
                                          Cercacor Laboratories, Inc.

Exhibit 56

## PROOF OF SERVICE

I am a citizen of the United States of America and I am employed in Irvine, California.  I am over the age of 18 and not a party to the within action.

On September 24, 2021, I served the within **PLAINTIFFS' RESPONSES AND OBJECTIONS TO DEFENDANT'S SECOND NOTICE OF DEPOSITION OF MASIMO CORPORATION AND CERCACOR LABORATORIES, INC. PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 30(b)(6)** on the parties or their counsel shown at the email addresses shown below:

Apple-Masimo@gibsondunn.com

Joshua H. Lerner
JLerner@gibsondunn.com

H. Mark Lyon,
MLyon@gibsondunn.com

Brian M. Buroker
BBuroker@gibsondunn.com

Brian K. Andrea
BAndrea@gibsondunn.com

Brian A. Rosenthal
BRosenthal@gibsondunn.com

Ilissa Samplin
ISamplin@gibsondunn.com

Angelique Kaounis
AKaounis@gibsondunn.com

I certify and declare under penalty of perjury under the laws of the State of California that I am a member of the bar of this Court, and that the forgoing is true and correct.

Executed on September 24, 2021, at Irvine, California.

*/s/Daniel.Hughes/s/*
Daniel Hughes

53950579

Exhibit 56

-13-

EXHIBIT 57

| | |
|---|---|
| **From:** | Daniel.Hughes |
| **To:** | Parker, Kenneth G. |
| **Cc:** | Ben.Katzenellenbogen; Lo, Jason; McDermott, Shannon C.; Joe.Re; Steve.Jensen; Perry.Oldham; Stephen.Larson; Adam.Powell; Mark.Kachner; Masimo.Apple; *** Apple-Masimo; Lerner, Joshua H.; Lyon, H. Mark; Buroker, Brian M.; Samplin, Ilissa; Kaounis, Angelique; Andrea, Brian; Rosenthal, Brian A.; Frazier, Sarah; Selwyn, Mark; nora.passamaneck@wilmerhale.com; WHApple-MasimoServiceList@wilmerhale.com |
| **Subject:** | RE: Masimo Corp. et al. v. Apple Inc. \| 20-cv-00048 - Deposition Ground Rules |
| **Date:** | Monday, November 29, 2021 5:32:18 PM |

Hi Ken,

Thank you for confirming Mr. Hammarth's deposition.  As we explained previously, Mr. Hammarth has requested that the deposition proceed remotely in light of his at-risk family member.  Counsel will be in a separate room.  We suggest starting at 10:00AM pacific.  Please confirm the logistical details today so that we can let Mr. Hammarth know.

Thanks,
Daniel

**Daniel Hughes**
Partner

858-707-4208 **Direct**

**Knobbe Martens**

---

**From:** Parker, Kenneth G. <KParker@gibsondunn.com>
**Sent:** Wednesday, November 24, 2021 6:25 PM
**To:** Daniel.Hughes <Daniel.Hughes@knobbe.com>
**Cc:** Ben.Katzenellenbogen <Ben.Katzenellenbogen@knobbe.com>; Lo, Jason <JLo@gibsondunn.com>; McDermott, Shannon C. <SMcDermott@gibsondunn.com>; Joe.Re <Joe.Re@knobbe.com>; Steve.Jensen <Steve.Jensen@knobbe.com>; Perry.Oldham <Perry.Oldham@knobbe.com>; Stephen.Larson <Stephen.Larson@knobbe.com>; Adam.Powell <Adam.Powell@knobbe.com>; Mark.Kachner <Mark.Kachner@knobbe.com>; Masimo.Apple <Masimo.Apple@knobbe.com>; *** Apple-Masimo <Apple-Masimo@gibsondunn.com>; Lerner, Joshua H. <JLerner@gibsondunn.com>; Lyon, H. Mark <MLyon@gibsondunn.com>; Buroker, Brian M. <BBuroker@gibsondunn.com>; Samplin, Ilissa <ISamplin@gibsondunn.com>; Kaounis, Angelique <AKaounis@gibsondunn.com>; Andrea, Brian <BAndrea@gibsondunn.com>; Rosenthal, Brian A. <BRosenthal@gibsondunn.com>; Frazier, Sarah <Sarah.Frazier@wilmerhale.com>; Selwyn, Mark <Mark.Selwyn@wilmerhale.com>; nora.passamaneck@wilmerhale.com; WHApple-MasimoServiceList@wilmerhale.com
**Subject:** Re: Masimo Corp. et al. v. Apple Inc. \| 20-cv-00048 - Deposition Ground Rules

Daniel,

We can do Hammarth on 12/2.

**Ken Parker**
Partner

Exhibit 57

# EXHIBIT 60

PUBLIC VERSION

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TEXARKANA DIVISION

| | |
|---|---|
| MAXELL, LTD., | Case No. 5:19-cv-00036-RWS |
| *Plaintiff*, | **JURY TRIAL DEMANDED** |
| v. | PUBLIC VERSION |
| APPLE INC., | |
| *Defendant*. | |

## MAXELL, LTD.'S OPPOSED MOTION FOR SANCTIONS

Exhibit 60

PUBLIC VERSION

# Table of Contents

I.   Background ........................................................................................................... 1

   A.   Governing Rules and Orders ........................................................................ 1

   B.   Maxell's Efforts to Obtain Relevant Discovery ......................................... 2

   C.   Exemplary Exchange Regarding Deficiencies ............................................ 4

II.  Legal Standard ..................................................................................................... 6

III. Argument ............................................................................................................. 7

   A.   Apple's Failure to Satisfy P.R. 3-4 ............................................................. 7

   B.   Failure to Satisfy Order Directing Substantial Completion of Production ............. 9

   C.   Prejudice to Maxell .................................................................................... 10

   D.   Requests for Sanctions .............................................................................. 11

IV.  Conclusion .......................................................................................................... 15

Exhibit 60

# <u>Table of Authorities</u>

**Cases**

*Apple Inc. v. Samsung Elecs. Co., Ltd.*, 2012 WL 2862613 (N.D. Cal. July 11, 2012) ................. 6

*Apple Inc. v. Samsung Elecs. Co., Ltd.*, No. C 11-1846, 2012 WL 1595784 (N.D. Cal. May 4, 2012) ....................................................................................................................................... 13

*Burnett v. Ford Motor Co.*, C.A. No. 3:13-cv- 14207, 2015 WL 1527875 (S.D.W.Va. Apr. 3, 2015) ........................................................................................................................................ 8

*Delphix Corp. v. Actifio, Inc.*, No. 13-cv-4613-BLF-HRL, 2015 WL 5693722 (N.D. Cal. Sept. 29, 2015) ..................................................................................................................................... 8

*Edward D. Ioli Trust v. Avigilon Corp.*, C.A. No. 2:10-cv-605-JRG, 2012 WL 5830711 (E.D. Tex., Nov. 6, 2013) ....................................................................................................................... 8

*Hullinger v. Anand*, No. CV 15-7185, 2016 WL 7444620 (C.D. Cal. Aug. 19, 2016) ................. 6

*Morrison Knudsen Corp. v. Fireman's Fund Ins. Co.*, 175 F.3d 1221 (10th Cir.1999)................ 7

*Personal Audio, LLC v. Apple, Inc.*, No. 9-cv-111, 2011 WL 6148587 (E.D. Tex. June 16, 2011) ................................................................................................................................................... 7

*Roadway Express, Inc. v. Piper*, 447 U.S. 752 (1980) ................................................................. 7

*SynQor, Inc. v. Artesyn Techs., Inc.*, No. 2:07-CV-497, 2011 U.S. Dist. LEXIS 74337 (E.D. Tex. July 11, 2011)............................................................................................................................... 7

*United States v. Ocwen Loan Servicing, LLC*, No. 4:12-cv-543, 2016 WL 3189589 (E.D. Tex. Jun. 8, 2016)................................................................................................................................ 12

*VirnetX Inc. v. Cisco Sys., Inc.*, No. 6:10-CV-417, 2012 WL 7997962 (E.D. Tex. Aug. 8, 2012) ................................................................................................................................................. 11

**Rules**

Fed. R. Civ. P. 37(b)(2)(A) ........................................................................................................... 7

Fed. R. Civ. P. 37(b)(2)(C) ........................................................................................................... 7

Exhibit 60

PUBLIC VERSION

Two primary orders and the Local Patent Rules govern the scope and timing of discovery in this case, and Apple has disobeyed them. Though Apple repeatedly represented to Maxell and the Court that its document and source code productions were complete under the rules, the representations were simply untrue. Moreover, Apple has refused to address its deficiencies in good faith, often disregarding the materiality and relevance of the materials sought and accusing Maxell of overreaching, harassing, and trying to drive up the costs of litigation. Now, however, we are in the final stages of fact discovery, and Maxell is having to work through documents and source code that *continue* to be produced instead of preparing for depositions and expert reports. Even worse, Apple still has not produced fulsome, complete discovery for all accused products, components, and functionalities. It is too late now for Maxell to review and make meaningful use of such late produced materials. To remedy the prejudice, the Court should 1) preclude Apple from using the discovery it failed to timely produce, including discovery produced after January 31; 2) deem certain accused products/components and source code to be representative of all versions of that product as detailed in the chart below; and 3) assess monetary sanctions.

## I.    Background

### A.    Governing Rules and Orders

Patent Rule 3-4(a) requires production of "[s]ource code, specifications, schematics, flow charts, artwork, formulas, or other documentation sufficient to show the operation of any aspects or elements of an Accused Instrumentality identified by the patent claimant in its P.R. 3-1(c) chart." D.I. 62 at 1-2. At a September 2019 hearing, Apple represented to the Court that it had timely complied with the P.R. 3-4 requirement. D.I. 90 (9/17/19 Hr'g. Tr. at 46:7-47:8). On this point, the Court was very clear: "If you haven't met that deadline, you're in violation of the Rule." *Id.* at 46:21-22. To which, Apple's counsel acknowledged: "we are taking the position that we have met that deadline and that is a hard deadline." *Id.* at 47:5-6. Despite such

1

Exhibit 60

PUBLIC VERSION

representation, Maxell's review of Apple's technical documents and source code revealed that Apple had not only failed to meet the deadline but was withholding relevant documents and code for certain accused products and versions of accused operating systems.

Beyond the Patent Rules, Apple has ignored the "Additional Disclosures" requirement of this Court's Discovery Order D.I. 42 at 3(b). When that deadline passed with only a paltry production by Apple, Maxell quickly alerted the Court to ensure Apple's timely compliance. D.I. 56. Maxell argued that Apple's conduct must be addressed early "to avoid more prejudice from Apple's delays, including waiting until the final days of discovery to provide relevant, responsive information." *Id.* at 1. In response, the Court held: "Apple agreed to substantially complete all discovery by November 27, 2019… and the Court expects it to meet this deadline." D.I. 126 at 4. The Order reiterated Apple's obligation to "produce or permit the inspection of all documents… in [its] possession, custody, or control that are relevant to the pleaded claims or defenses…." *Id.* Acknowledging these obligations, Apple filed a Notice of Compliance on November 27 representing that it substantially completed its document and source code production. D.I. 147. In fact, however, Apple's production was woefully incomplete.

## B. Maxell's Efforts to Obtain Relevant Discovery

Maxell has attempted to work with Apple on discovery from the beginning. On June 18, 2019, Maxell sent a letter identifying the most relevant categories of documents including, for example, technical specifications, schematics, and source code relating to the accused features and functionalities and to a limited number of implicated components, as well as non-technical materials such as market studies and customer surveys. Ex. A (6/18/19 Ltr. Beaber to Simmons). When Maxell asked whether there were any categories Apple would not produce, Apple responded it was "unaware of any areas where the parties are at an impasse." Ex. B (7/18/19 Ltr. Beasley to Beaber). Apple also confirmed it would "continue to produce documents sufficient to

Exhibit 60

PUBLIC VERSION

show information 'relevant to the pleaded claims or defenses involved in this action' on a rolling basis…." Ex. C (7/18/19 Ltr. Beasley to Beaber). Although not then clear, Apple's agreement to produce documents "sufficient to show" relevant information, as opposed to the relevant information itself, previewed Apple's unduly narrow view of discovery.

Apple's response to Maxell's Motion to Compel made clear that Maxell would have to push Apple to produce necessary relevant information. Maxell began to do so immediately. A week after Apple's in-Court representation that it had satisfied P.R. 3-4, Maxell sent a letter detailing undeniable deficiencies with Apple's productions. Ex. D (9/24/19 Ltr. Beaber to Beasley). Given the limited types of documents Apple had produced,[1] Maxell focused broadly on additional categories of documents it believed should exist and be produced, asserting that "it is almost certain that Apple has additional types of documents, including additional specifications, internal technical presentations, service manuals, testing documents, and many more documents from Apple's [component] suppliers." *Id.* Maxell identified deficiencies with Apple's source code production, including that Apple provided no way for Maxell to link any of the source code to a particular version of operating system and/or Accused Product. *Id.*

Apple responded that it had complied with its obligation to produce documents "sufficient to show the operation" of the accused functionalities and attacked Maxell's additional requests as impermissible under the Federal Rules. Ex. E (10/2/19 Ltr. Beasley to Beaber at 2). Though Maxell raised these categories of materials at the outset of the case, *to no objection*, Apple now asserted that "Maxell articulates no reasonable basis for why such documents are relevant to the case, nor why any such documents would provide any different or non-cumulative information of the accused functionalities above and beyond the documents already produced."

---

[1] At that time, Apple's technical production consisted only of publicly available specifications, developer documents and support information, ███████████████████████████████████████████ ███████████████, and a small number of documents related to a subset of components from three suppliers.

3

Exhibit 60

*Id.* at 3. Apple asserted that "the source code provides the most complete and accurate representation of how the accused Apple products actually work," yet refused Maxell's request for a way to link the produced source code to the accused products: "Apple has no obligation … to re-organize its source code to make review more convenient to Maxell." *Id.* at 4-5.

The line was drawn. Apple resisted any attempt to expand its technical production beyond those minimum documents that it decided were sufficient to show the operation of the accused functionalities. Every time Maxell identified missing material, Apple responded that the request was not proportional to the case[2] and demanded specific explanations of relevance, though such is clear from Maxell's infringement contentions. This happened even when Maxell raised a new document that fell within a previously-addressed category of materials.[3] Thus, every time Maxell identified a document or piece of source code as missing, the parties engaged in weeks of discussion. The result is an uninterrupted five months of constant back and forth regarding Apple's deficient productions. All told, the parties have exchanged over 30 letters (not counting emails) and held at least five telephonic meet and confers regarding Apple's discovery deficiencies, most lasting over an hour.[4] *See* Miller Decl. at ¶ 19 (summarizing exchanges).

### C. Exemplary Exchange Regarding Deficiencies

Maxell's efforts to obtain third-party component documents provides an example of the efforts Maxell has had to unnecessarily expend to obtain relevant discovery. Although Maxell requested such documents on June 18, 2019 (Ex. A), Apple's P.R. 3-4 production only contained a small handful of such documents. Maxell raised the deficiency at the hearing on its first Motion

---

[2] Despite many requests to explain why Maxell's requests were not proportional, Apple has provided no basis.

[3] For example, Maxell raised Apple's failure to produce component documents as early as 9/24/19. On December 18, Maxell identified specific components for which materials were missing. Ex. H. Apple responded "Maxell's efforts to shoehorn demands for newly identified components into its prior requests is without merit…" Ex. I.

[4] This directly contradicts Apple's assertion to the Court that Maxell's approach to discovery is to vaguely allege deficiencies and then "run[] to court with aspersions of nefarious intent and misconduct." D.I. 199 at 1. Maxell has only filed two motions to compel, the second one following nearly five months of discovery discussions. Apple has "run to the Court" more often than Maxell.

Exhibit 60

to Compel and in its follow-up letter thereto, identifying exemplary components present in Maxell's infringement contentions for which documents were not produced (*e.g.*, Avago AFEM-8056). D.I. 90 (9/17/19 Hr'g. Tr. at 13:22-14:17); Ex. D (9/24/19 Ltr. Beaber to Beasley). Though Apple had not previously objected to producing these documents, its attitude changed:

> Maxell appears to contend that if *any* third-party component is ever implicated by an accused feature in any incidental fashion whatsoever, beyond what Maxell has alleged in its infringement contentions, Apple must produce every technical document related to that component. This is not required by the local rules, and such a broad scope of discovery would impose an impossibly high and unreasonable burden on both Apple and its suppliers in a manner inconsistent with the proportionality rule under the Federal Rules of Civil Procedure. [ ] If there are specific, accused components for which Maxell legitimately contends it needs additional documents regarding accused functionality, where the component-level information are necessary to understand operation of the accused functionality, and that Maxell contends such documents are relevant, necessary, proportional to the needs of the case, and especially non-cumulative in light of the already-produced schematics, BOMs, user manuals, developer guides, and source code, please identify such components and articulate Maxell's basis for such contention.

Ex. E (10/2/19 Ltr. Beasley to Beaber). Maxell noted the narrow scope of its request and identified components for which the request was most important (*e.g.*, Avago AFEM-8056). Ex. F (10/8/19 Ltr. Beaber to Beasley). Following Apple's November 27 production, Maxell identified a significant number of component documents as still missing.[5] Ex. H (12/18/19 Ltr. Beaber to Beasley) (identifying, *e.g.*, Avago AFEM-8056). In January, Apple responded that "[s]pecifications regarding the components identified in Maxell's letter… are not relevant to any claim or defense… as evidenced by the facts that these components are not accused in Maxell's infringement contentions and have not been identified in any prior correspondence."[6] Ex. I (1/15/20 Ltr. Pensabene to Beaber). But some components, like the Avago AFEM-8056, were identified in Maxell's contentions (*see* Ex. O (Excerpt of '193 Inf. Contentions) at 44), and in

---

[5] Maxell also subpoenaed the suppliers directly for component information. In many instances, the suppliers resisted or delayed production, noting that Apple should have the documents and was given permission to produce them.

[6] Maxell could not know of the identity of most of the implicated components until Apple provided such information in response to Maxell's interrogatory, which Apple did not begin until the end of November.

Exhibit 60

PUBLIC VERSION

prior correspondence. Apple complained that component discovery was irrelevant and not proportional to the needs of the case, and argued Maxell never explained why it needed the documents. Ex. I (1/15/20 Ltr. Pensabene to Beaber). Nonetheless, on February 10 Apple produced many of the requested component documents, including the Avago datasheets Maxell identified months earlier. But even then, many datasheets were incomplete excerpts. For example, the AFEM-8056 datasheet contained only pages 1, 2, 66-74, and the back cover. Ex. N. Although ██████████████████████████████████████████s, they have not been produced. *Id.* at 1.

## II.     Legal Standard

Federal Rule 37(b)(2) states that if a party "fails to obey an order to provide or permit discovery," the court may issue "further just orders," including without limitation that "facts be taken as established for purposes of the action" and that the disobedient party be prohibited "from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence." Fed. R. Civ. P. 37(b)(2)(A). Instead of or in addition to these sanctions, a court must order the party and/or their counsel "to pay the reasonable expenses, including attorney's fees, caused by the failure…." Fed. R. Civ. P. 37(b)(2)(C). "With respect to monetary sanctions, once a violation is demonstrated, the disobedient party bears the burden of showing that the failure was justified or that special circumstances make an award of expenses unjust." *Hullinger v. Anand*, No. CV 15-7185, 2016 WL 7444620, at *8 (C.D. Cal. Aug. 19, 2016) (citing *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 2012 WL 2862613, at *6 (N.D. Cal. July 11, 2012). "Rule 37 sanctions must be applied diligently both 'to penalize those whose conduct may be deemed to warrant such a sanction, [and] to deter those who might be tempted to such conduct in the absence of such a deterrent.'" *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 763-64 (1980).

Rule 37 sanctions are appropriate where parties show a complete disregard of their

Exhibit 60

discovery obligations and violate the Court's discovery orders. *See SynQor, Inc. v. Artesyn Techs., Inc*., No. 2:07-CV-497, 2011 U.S. Dist. LEXIS 74337, at *26-27 (E.D. Tex. July 11, 2011)(ordering Delta to pay $500,000.00 in civil contempt sanctions to SynQor and also granting SynQor's Motion for attorneys' fees and costs that were attributable to Delta's discovery abuses). "A refusal to disclose information without substantial justification is ground for sanctions." *Personal Audio, LLC v. Apple, Inc*., No. 9-cv-111, 2011 WL 6148587 (E.D. Tex. June 16, 2011) (citing *Morrison Knudsen Corp. v. Fireman's Fund Ins. Co*., 175 F.3d 1221, 1229–30 (10th Cir.1999).

## III. Argument

Maxell attempted to get ahead of Apple's discovery abuses, bringing an early motion to compel to clarify Apple's obligations. Apple argued in response that, given the time then-remaining in fact discovery, Maxell's "aspersions of 'prejudice' ring hollow and are without explanation or basis." D.I. 62 at 1. But the prejudice Maxell tried to avoid has come to pass. Apple disobeyed P.R. 3-4, the Discovery Order, and this Court's order requiring substantial completion of discovery by November 27, 2019. Apple refuses to acknowledge its failures,[7] let alone provide substantial justification for them. Apple's actions have prejudiced Maxell and warrant sanctions.

### A. Apple's Failure to Satisfy P.R. 3-4

Apple acknowledges it was required to produce documents and source code sufficient to show the operation of the accused functionalities by August 14, 2019. Under its narrow view of this obligation, Apple believes that it can unilaterally pick and choose the amount and types of

---

[7] Indeed, despite previously filing a Notice of Compliance with D.I. 126, Apple now posits that the Order did not actually require Apple to substantially complete its document production by November 27. Ex. M (3/4/20 Ltr. Pensabene to Beaber) ("Maxell identified no court order that Apple has violated other than its incorrect position that Apple was required by this Court's prior orders to complete essentially all document production by November 27.").

Exhibit 60

documents that are "sufficient to show" operation. But that interpretation of P.R. 3-4 has been rejected in this District: the rule "requires the alleged infringer to produce any and all documents describing the operation of any aspects or elements of an accused instrumentality." *Edward D. Ioli Trust v. Avigilon Corp.*, C.A. No. 2:10-cv-605-JRG, 2012 WL 5830711, at *3 (E.D. Tex., Nov. 6, 2013).

Apple also believes it can pick and choose the types of documents that Maxell must rely on to prove its case, repeatedly asserting that source code provides the most complete and accurate representation of how the accused products work. *See, e.g.*, Ex. E (10/2/19 Ltr. Beasley to Beaber). Maxell should not, however, be forced to prove its case to the jury using the most technical, and most restricted, discovery available. Alleged infringers must produce materials in addition to source code. *See e.g., Delphix Corp. v. Actifio, Inc.*, No. 13-cv-4613-BLF-HRL, 2015 WL 5693722, at *5 (N.D. Cal. Sept. 29, 2015) ("Under Patent L.R. 3-4, Delphix is required to produce, in addition to source code, 'specifications, schematics, flow charts, artwork, formulas, or other documentation sufficient to show the operation of any aspects or elements of an Accused Instrumentality ....'"); *see also, e.g., Burnett v. Ford Motor Co.*, C.A. No. 3:13-cv-14207, 2015 WL 1527875, at *5 (S.D.W. Va. Apr. 3, 2015) (Rejecting argument that source code need not be produced because documents relevant and necessary for the analysis and development of theory were already produced and holding "Plaintiffs should not be forced to rely on Ford's determination as to what is the 'most relevant' evidence in its possession.").

Regardless, under any reading of the rule, Apple did not produce materials "sufficient to show" the accused functionalities in August 2019. For example, at the outset Maxell identified "Maps" as an accused functionality and accused certain iPhones, iPads, and Watches. *See, e.g.,* Ex. P (Excerpt of '317 Inf. Contentions). Maxell also identified FaceTime as an accused

Exhibit 60

functionality and accused certain iPhones, iPads, iPod Touches, and MacBooks. *See, e.g.,* Ex. Q (Excerpt of '991 Inf. Contentions). Yet, Apple did not produce source code for 1) "Maps" for any accused Watch products; or 2) FaceTime for any accused MacBook product until February 19, 2020—more than six months after its P.R. 3-4 deadline. Further, in September 2019, Apple released a new operating system, iPadOS 13.1, which runs on several accused products. Although Maxell has requested that code since at least November 14, 2019, Apple did not address Maxell's request until March 5, 2020. *See* Ex. G (11/14/19 Ltr. Beaber to Beasley). This despite Apple's contention that the source code is "the most complete and accurate" evidence.

### B. Failure to Satisfy Order Directing Substantial Completion of Production

The Court directed Apple to substantially complete production of all relevant documents by November 27, 2019. D.I. 126. On that date, Apple submitted a Notice of Compliance representing that it had. But Apple had to know that it was not being forthright. On December 6, Apple for the first time produced internal customer surveys regarding the accused products. Miller Decl. at ¶ 20. Maxell requested those materials in June 2019 and raised them in its first motion to compel. Ex. A; D.I. 90 (9/17/19 Hr'g. Tr. at 39:22-40:2). But even Apple's December 6 production was incomplete. ████████████████████████████████

███████, which Maxell requested on January 28. Ex. J. Apple delayed responding until February 12, indicating then it was "working through some issues regarding the documents."[8] Ex. L. Finally, on February 20, Apple produced nearly 250 more internal-survey type documents.

Following review of Apple's November 27 productions and representations, Maxell raised (in 13 pages) additional deficiencies, including technical specifications for accused

---

[8] Apple made this statement **after** the time period set forth in the Discovery Order for meeting and conferring and providing a written response to a discovery request had expired, even though Maxell had made several requests for a meet and confer. Apple attacked Maxell's inclusion of this issue in its motion to compel as "willfully ignoring this Court's standing order requiring … meet and confer" (D.I. 205 at 1), but it is Apple that refused to meet and confer within the allotted time. Maxell is not required to wait indefinitely for Apple to respond to issues at its convenience.

Exhibit 60

PUBLIC VERSION

functionalities, ███████████████████████████ third-party component documents, 22 categories of source code, the improper production of documents on the source code computer, and deficient interrogatory responses. Ex. H. After additional back and forth and a meet and confer, Apple wrote on January 31 that "Apple has conducted a reasonable investigation for the accused functionalities and produced all responsive technical documents that could be located after a reasonable search." Ex. K (1/31/20 Ltr. Pensabene to Beaber). But Maxell believed material to be missing, and questioned the sufficiency of Apple's reasonable investigation. So Maxell filed a second motion to compel. Apple has produced over 4,200 documents since its January 31 representation of completion.[9]

All told, Apple has produced over 4,750 documents and significant additional source code after November 27. Its late productions consist of, for example, marketing surveys, third-party component datasheets, internal specifications, materials improperly produced on the source-code computer (*see* D.I. 197), and ███████████████.

### C.  Prejudice to Maxell

Maxell bears the burden to show that the accused products infringe its patents. Apple has withheld evidence central to Maxell's effort to carry that burden. This Court's rules and procedures are intended to facilitate discovery, save cost and time, and ensure the orderly progression of cases. The early disclosure of technical documents and information is critical to these intentions. Apple has abused the rules and procedures to withhold information, thereby impairing Maxell's ability to prosecute its case in exactly the way the rules and procedures are designed to prevent. Apple's conduct has required Maxell to dedicate countless hours and cost to identifying and pursuing Apple's production deficiencies. Regarding source code, Maxell has

---

[9] Although many of these are believed to be the materials that were improperly produced on the source code computer (*see* D.I. 197), that is not true for all.

Exhibit 60

PUBLIC VERSION

expended substantial time and money to repeatedly send attorneys and experts to perform review of incomplete source code, often without up-to-date interrogatory responses linking source code to operating systems/accused products or complete technical documents that describe the functionalities in the source code. Moreover, Apple demanded that Maxell prepare supplemental infringement contentions based on incomplete source code, and then moved to compel further supplementation when it was dissatisfied with the results, thereby causing Maxell to expend unnecessary time and resources opposing a motion that was spurred by Apple's own deficiencies, and preparing iterative supplementations.

The biggest prejudice on Maxell, however, has been the divergence of time and effort spent addressing Apple's discovery misconduct at the expense of analyzing discovery, preparing for depositions and expert reports, and preparing the case for trial. Apple's eleventh-hour productions in February and March, when discovery is winding down and depositions are imminent, make this prejudice particularly acute. And there is no doubt that Apple will continue producing relevant materials up until the close of fact discovery. After months of fighting against such a result, Maxell should not be the party that suffers from Apple's gamesmanship.

### D.      Requests for Sanctions

Maxell requests its fees and expenses incurred in connection with the filing of its second motion to compel, this motion for sanctions, and for the iterative reviews of source code it has been forced to perform. Monetary sanctions alone, however, are not sufficient. Apple's persistent resistance to Maxell's reasonable discovery requests and delays in producing relevant information have impeded Maxell's ability to build its case. Monetary sanctions cannot remedy this harm. Nor are they sufficient to deter such conduct in the future. Where hundreds of millions of dollars are at stake, as here, Apple would be happy to pay a relatively small sum in exchange for the ability to delay discovery and handicap Maxell's case. Parties must be made aware that

11

Exhibit 60

they cannot just pay their way out of such discovery abuse. *See, e.g.*, *VirnetX Inc. v. Cisco Sys., Inc.*, No. 6:10-CV-417, 2012 WL 7997962, at *5 (E.D. Tex. Aug. 8, 2012) ("If the Court simply imposes fees and expenses and orders completion of [the] deposition, it would be a nominal sanction at best, as Apple would have accomplished what it conceivably wanted…. Such a nominal sanction would not provide any deterrent effect and would not put VirnetX in the position it was in prior to the termination of the deposition.").

On January 31, following a meet and confer, Apple claimed (wrongly) it had "produced all responsive technical documents that could be located after a reasonable search" and even threatened to seek relief in response to Maxell's requests for further production: "To the extent Apple has agreed to investigate and produce additional technical documents and/or source code, it does not concede that such additional documents or code are relevant or are necessary … and the production of any additional code is without prejudice to Apple seeking relief based on the date of its P.R. 3-4 production." Ex. K (1/31/20 Ltr. Pensabene to Beaber). Apple should thus be precluded from relying on any documents produced after January 31, 2020 to prosecute or defend its case. Maxell, however, may rely on such documents, and Apple may cross-examine Maxell's witnesses about any document or code introduced by Maxell. The Court has previously found such sanctions to be appropriate in the face of untimely productions for which there was no substantial justification. *See e.g.*, *United States v. Ocwen Loan Servicing, LLC*, No. 4:12-cv-543, 2016 WL 3189589, at *5 (E.D. Tex. Jun. 8, 2016). Even Apple itself has requested, and received, such a sanction for materials produced during fact discovery. *Apple Inc. v. Samsung Elecs. Co., Ltd.*, No. C 11-1846, 2012 WL 1595784, at *3-4 (N.D. Cal. May 4, 2012).

There are certain accused functionalities for which Apple's productions remain incomplete, thereby hindering Maxell's ability to establish certain claim elements. There are also

Exhibit 60

certain categories of documents/code for which Apple has not made a complete production across all accused products, obviously prejudicing Maxell's ability to cite to evidence in support of its infringement assertions for each product. Maxell has attempted to resolve this issue through an agreement regarding representative products, but Apple has not yet agreed. Because Apple has not produced relevant documents for certain functionalities, has failed to produce complete technical information for all accused products, and will not yet agree to representative products, Maxell further seeks the following sanctions:

| Requested Sanction | Example Tying Discovery Abuse to Sanction |
|---|---|
| Apple be prohibited from opposing claim that iPad 7th generation (A2200, A2198) has the same components as iPad 6th generation for the claims where the iPad 7th generation is accused. | Apple has not identified the components included in iPad 7th generation in response to Maxell Interrogatory No. 6. |
| Apple be prohibited from opposing claim that MacBook Pro (15,2) has the same WiFi/ Bluetooth components as MacBook Pro (15,1) for the claims where MacBook Pro (15,2) is accused. | Apple has not identified the WiFi/Bluetooth components included in MacBook Pro (15,2). |
| Apple be prohibited from opposing claim that one accused product is representative of other products having the same category of components (*e.g.*, CMOS sensor, camera, gyroscope, image signal processor) for the "mixing and culling" and image stabilization limitations of the '493 Patent. | Apple has not produced ▮▮▮▮▮▮ ▮▮▮▮▮▮ for all accused products; camera module hardware specifications; complete gyroscope specifications; native, legible sensor spreadsheets (originally produced on source code computer), or ▮▮▮▮▮▮ code for iOS 7.  Apple did not produce ▮▮▮▮▮▮ for iPhone 6S and iPhone 6s Plus until February 2020, after Maxell filed its Motion to Compel. |
| Apple be prohibited from opposing claim that one accused products is representative of other products having the same category of components (*e.g.*, modem, power amplifier, variable amplitude amplifier) for the "controller controls a gain of said variable amplitude amplifier and a bias condition of said power amplifier using a set of bias and gain data stored in memory" limitations of the '193 Patent. | Apple has not produced schematics demonstrating connections between implicated components for all accused products; complete transceiver and modem specifications containing block diagrams and describing the functionality of power control; complete power amplifier datasheets that disclose bias control data; testing documents related to power measurement; spreadsheets containing data regarding the settings of power amplifiers and their control by modems |

Exhibit 60

| | |
|---|---|
| | (only made available on the source code computer).<br><br>Intel states it withheld production of Intel specifications pending Apple permission. |
| Apple be prohibited from opposing claim that three accused products (one iOS, one watchOS, one macOS) are representative of other products having the same category of components (*e.g.*, Bluetooth and WiFi) for the "Bluetooth carrying authentication" and "WiFi carrying data exchange" limitations of the '438 Patent. | Apple has not produced complete specifications/datasheets for Bluetooth and WiFi components (*e.g.*, ███████ ████), which contain information regarding structure and functionality. |
| Apple be prohibited from opposing claim that one accused product is representative of other products having the same category of components (*e.g.*, Bluetooth) for the "transceiver which performs short-range wireless communications" limitation of the '586 Patent. | Apple has not produced complete specifications/datasheets for Bluetooth and WiFi components (e.g., ███████ ████), which contain information regarding structure and functionality. |
| Apple be prohibited from opposing claim that one accused product is representative of other products having the same category of components (*e.g.*, camera, microphone, application processor, FaceTime application) for the "renders the camera operative" and/or "renders the camera and microphone operative" limitations of the '991 Patent. | Apple has not produced schematics demonstrating connections between implicated components for all accused products; camera module hardware specifications; or source code for camera/microphone interface for macOS products. |
| Apple be prohibited from opposing claim that FaceTime in macOS products operates the same as FaceTime in iOS products in connection with the '991 Patent. | Apple did not produce FaceTime source code for any macOS product until February 2020, after Maxell filed its Motion to Compel. |
| Apple be prohibited from opposing claim that WiFi and cellular components work the same way in connection with the making/receiving of a FaceTime call in connection with the '991 Patent. | Apple has not produced complete technical specifications for WiFi and cellular functionalities (*e.g.*, ████ ███████████████), which contain information regarding structure and functionality. |
| Apple be prohibited from opposing claim that Maps and Find My Friends operate the same way across different versions of iOS in connection with the '317/'999/'498 Patents. | Apple has not produced complete transceiver and modem specifications that show t██ ████████████████████████████████; complete Bluetooth and Wifi datasheets for every accused product (*e.g.* ███████ ████) that show how Bluetooth/Wifi can be used for location services; or complete gyroscope datasheets (*e.g.*, ████) that show how the gyroscope can be used for |

Exhibit 60

| | orientation. |
|---|---|
| Apple be prohibited from opposing claim that Maps in watchOS products operates the same as Maps in iOS products in connection with the '317/'999/'498 Patents. | Apple did not produce Maps source code for any watchOS products until February 2020, after Maxell filed its Motion to Compel. |
| Apple be prohibited from opposing claim that one accused product is representative of other products having the same category of components (*e.g.*, ███████), where Maxell has provided a basis for such representation, with respect to the Express Transit functionality in connection with the '794 Patent. | Apple has not produced source code for Express Transit or complete ███████ for components used to provided Express Transit. |
| Apple be prohibited from opposing claim that Express Transit (NFC chip) continues to work after a first battery threshold and stops working after a second battery threshold when the device is shut down completely. | Apple has not produced source code for Express Transit or complete ███████ ███████ specifications for all accused products (███████ ███████ ██). |
| Apple be prohibited from opposing claim that one ███████ chip is representative of other ███████ chips, with respect to the accused functions of the '794 Patent. | Apple has not produced complete ███████ specifications for a majority of the accused products (███████ ███████ ██). |
| Apple be prohibited from opposing claim that one accused product is representative of other products having the same category of components (*e.g.*, speaker, application processor, Announce Caller software) with respect to AnnounceCaller in connection with the '306 Patent. | Apple has not produced documents related to the operation of AnnounceCaller. |
| Apple be prohibited from opposing claim that produced source code for iOS 13 for "███████" and "███████" applies also to iOS 7 functionality. | Apple has not produced source code for iOS7 for ███████. |

These narrow measures will allow this case to be decided on the merits while preventing Apple from benefitting from its discovery misconduct.

## IV. Conclusion

Apple has severely prejudiced Maxell in this case through its discovery abuses. Sanctions are the only way to penalize Apple for such abuses and to deter future litigants from engaging in similar conduct. Maxell therefore requests the sanctions set forth above.

Exhibit 60

Dated: March 5, 2020                    By:   /s/ Jamie B. Beaber
                                              Geoff Culbertson
                                              Kelly Tidwell
                                              Patton, Tidwell & Culbertson, LLP
                                              2800 Texas Boulevard (75503)
                                              Post Office Box 5398
                                              Texarkana, TX 75505-5398
                                              Telephone: (903) 792-7080
                                              Facsimile: (903) 792-8233
                                              gpc@texarkanalaw.com
                                              kbt@texarkanalaw.com

                                              Jamie B. Beaber
                                              Alan M. Grimaldi
                                              Kfir B. Levy
                                              James A. Fussell, III
                                              Baldine B. Paul
                                              Tiffany A. Miller
                                              Saqib J. Siddiqui
                                              Bryan C. Nese
                                              William J. Barrow
                                              Alison T. Gelsleichter
                                              Clark S. Bakewell
                                              MAYER BROWN LLP
                                              1999 K Street, NW
                                              Washington, DC 20006
                                              Telephone: (202) 263-3000
                                              Facsimile: (202) 263-3300
                                              jbeaber@mayerbrown.com
                                              agrimaldi@mayerbrown.com
                                              klevy@mayerbrown.com
                                              jfussell@mayerbrown.com
                                              bpaul@mayerbrown.com
                                              tmiller@mayerbrown.com
                                              ssiddiqui@mayerbrown.com
                                              bnese@mayerbrown.com
                                              wbarrow@mayerbrown.com
                                              agelsleichter@mayerbrown.com
                                              cbakewell@mayerbrown.com

                                              Robert G. Pluta
                                              Amanda Streff Bonner
                                              Mayer Brown LLP
                                              71 S. Wacker Drive
                                              Chicago, IL 60606
                                              (312) 782-0600

16

Exhibit 60

**F** PUBLIC VERSION

rpluta@mayerbrown.com
asbonner@mayerbrown.com

*Counsel for Plaintiff Maxell, Ltd.*

## CERTIFICATE OF CONFERENCE

I certify that Plaintiff Maxell, Ltd. has complied with the requirements of Local Rule CV-7(h). Specifically, on February 27, 2020 counsel for Maxell reached out to counsel for Apple to request a meet and confer regarding this motion. On March 3, 2020, Maxell sent Apple a list of the specific sanctions that Maxell intended to include in this motion. Shortly thereafter, the parties held a telephonic meet and confer, which was attended by lead and local counsel. After a short discussion, it was clear that counsel for Apple believed it could benefit from having additional time to consider Maxell's sanctions. Maxell agreed to Apple taking such time and followed up near the close of business on March 4. Apple responded on the evening of March 4 stating that it could not meaningfully consider Maxell's proposals at this time, given the state of Maxell's current infringement contentions. Thus, the parties were not able to reach agreement regarding the issues raised in this Motion.

*/s/ Jamie B. Beaber*

Jamie B. Beaber

*/s/ Geoff Culbertson*

Geoff Culbertson

Exhibit 60

### CERTIFICATE OF SERVICE

The undersigned certifies that all counsel of record who are deemed to have consented to electronic service are being served this 5th day of March 2020, with a copy of this document via electronic mail.

*/s/ Jamie B. Beaber*
Jamie B. Beaber

Exhibit 60

# EXHIBIT 61

```
                    UNITED STATES DISTRICT COURT
                    CENTRAL DISTRICT OF CALIFORNIA
                    (SOUTHERN DIVISION - SANTA ANA)




MASIMO CORPORATION, ET AL,    ) CASE NO: 8:20-CV-00048-JVS-JDEx
                              )
             Plaintiffs,      )            CIVIL
                              )
     vs.                      )         Santa Ana, California
                              )
APPLE, INC,                   )        Thursday, June 3, 2021
                              )
             Defendant.       )     (10:05 a.m. to 12:59 p.m.
_____)


        HEARING RE: PLAINTIFFS' MOTION TO COMPEL [DKT.NO.357]


              BEFORE THE HONORABLE JOHN D. EARLY,
                UNITED STATES MAGISTRATE JUDGE


    ** NOTE:  WORD REDACTED ON PAGE 90 PER ORDER OF THE COURT **



APPEARANCES:                  SEE PAGE 2



Court Reporter:          Recorded; CourtSmart

Courtroom Deputy:        Maria Barr

Transcribed by:          Exceptional Reporting Services, Inc.
                         P.O. Box 8365
                         Corpus Christi, TX 78468
                         361 949-2988




Proceedings recorded by electronic sound recording;
transcript produced by transcription service.
```

Exhibit 61

<u>**APPEARANCES**</u>:


For Plaintiffs:                     BENJAMIN A. KATZENELLENBOGEN, ESQ.
                                    Knobbe Martens Olson & Bear, LLP
                                    2040 Main Street
                                    14th Floor
                                    Irvine, CA 92614

                                    ADAM POWELL, ESQ.
                                    Knobbe Martens Olson & Bear, LLP
                                    12790 El Camino Real
                                    San Diego, CA 92130


For Defendant:                      JOSHUA H. LERNER, ESQ.
                                    Gibson Dunn & Crutcher, LLP
                                    555 Mission Street
                                    Suite 3000
                                    San Francisco, CA 94105

                                    ILISSA S. SAMPLIN, ESQ.
                                    Gibson Dunn & Crutcher, LLP
                                    2029 Century Park East
                                    Suite 4000
                                    Los Angeles, CA 90067

Exhibit 61

1    __Santa Ana, California; Thursday, June 3, 2021; 10:05 a.m.__

2                          **(Call to Order)**

3              **THE COURT:**  Good morning, everyone.

4        **(Counsel greet the Court)**

5              **THE COURT:**  We're calling the case of *Masimo*

6    *Corporation, et al. v. Apple Inc.*, Central District of

7    California Case Number 8:20-cv-48-JVS-JDE.  We're here for the

8    continued hearing on Plaintiffs' Second Motion to Compel, which

9    is Docket Number 357.  We'll now take appearances from counsel,

10   starting with Plaintiffs, please.

11             **MR. POWELL:**  Thank you, Your Honor.  Adam Powell for

12   Plaintiffs Masimo Corporation and Cercacor Laboratories, Inc.

13   With me is my partner, Ben Katzenellenbogen.

14             **THE COURT:**  Good morning.

15             And on behalf of Apple?

16             **MR. LERNER:**  Good morning, Your Honor.  Josh Lerner

17   and Ilissa Samplin on behalf of Apple.

18             **THE COURT:**  Good morning.

19             All right.  As I mentioned, we're here for the

20   continued hearing on Plaintiffs' Second Motion to Compel,

21   Docket 357.  I think I went over for our hearing two weeks ago

22   on May 27th what I've reviewed, and I've reviewed all the

23   relevant material.  In addition, there was a supplement or a

24   joint statement filed on June 1st, 2021, at Docket Number 419

25   that indicates that the parties have reached an agreement on

Exhibit 61

4

1    Requests for Production Numbers 101, 102, 103, 106, 107, 108,

2    109, and 235 and, therefore, the motion is withdrawn as to

3    those Requests for Production.  And it indicates certain

4    proposals made by Plaintiff as to Requests Numbers 226, 230

5    through 234, 180, 187, 192, 198 through 201, and 203 through

6    206 with the Defendant responding with a counter proposal as to

7    one of them -- I think it was 226.  Yes.

8         Has anything else changed since the filing of the

9    joint statement from Plaintiffs' standpoint?

10        **MR. POWELL:**  Yes, Your Honor.  In preparing for the

11   hearing we did review some of the requests and we've identified

12   some with counsel that I think there's no issue on.  And we've

13   also proposed some compromises on a few other requests based on

14   what we thought the parties had agreed to on the other requests

15   and what might be a reasonable compromise.

16        **THE COURT:**  All right.  So, let me start with what

17   you think agreements have been reached that that would

18   potentially moot further argument and then I'll confer with

19   Defense counsel if they agree.

20        **MR. POWELL:**  Sure.  So, on Requests 191, 197, and

21   202, we believe that --

22        **THE COURT:**  Let me do this.  Just slow down, because

23   I've got like three different places that I've got to jump back

24   and forth.  So, 190 -- say again.

25        **MR. POWELL:**  I apologize, Your Honor.  191.

Exhibit 61

5

1      **THE COURT:**  You don't have to apologize.

2      **MR. POWELL:**  All right, 191.

3      **THE COURT:**  Okay.

4      **MR. POWELL:**  197.

5      **THE COURT:**  Okay.

6      **MR. POWELL:**  And 202.

7      **THE COURT:**  Tell me what's the new status of those.

8      **MR. POWELL:**  It appears that Apple has agreed to

9  search for all responsive documents and so we would agree that

10  that representation has mooted the motion.

11      **THE COURT:**  Let me ask Apple if that's correct.

12      **MS. SAMPLIN:**  It is correct, Your Honor, with the

13  caveat we said we were conducting a reasonable and diligent

14  search for all responsive documents.  I just want to make sure

15  that we're clear on that.

16      **THE COURT:**  Let me be very clear that anything that's

17  ordered and with respect to a request for production is whether

18  you want to say limited to or requires a reasonable and

19  diligent search.

20      So, based on my understanding there is then an

21  agreement and Requests for Production Numbers 191, 202, and 197

22  are moot, the motion as to those three Requests for Production

23  are moot.

24      Mr. Powell, anything further?

25      **MR. POWELL:**  Yes, there's two other categories.  The

Exhibit 61

1   first is Request for Production Number 82.

2          THE COURT:  All right.

3          MR. POWELL:  That request, Apple has agreed to

4   conduct a reasonable search for responsive documents and has

5   limited the request -- or the search to ESI custodian

6   searching.

7          THE COURT:  All right.

8          MR. POWELL:  And so that would moot our motion, this

9   particular motion, but we do have another issue about whether

10  that's appropriate that's being discussed for a bunch of

11  different RFPs.  So, we would just like to reserve our right to

12  discuss that issue with the other RFPs on the same issue later.

13         THE COURT:  Well, what I really want is a clear

14  answer.  Is Number 82 moot or not?

15         MR. POWELL:  It is moot for this motion, Your Honor.

16         THE COURT:  All right.  From Apple's standpoint, is

17  it your understanding that the motion as to Request for

18  Production Number 82 is moot?

19         MS. SAMPLIN:  Well, it's moot, Your Honor, if we have

20  an agreement that we're limiting our search to ESI, meaning

21  search terms and custodians, but what I hear I think, it wasn't

22  clear to me --

23         THE COURT:  So, the answer's no.  Is that correct?

24  You don't understand that it's moot and we'll have to have a

25  hearing on it.

Exhibit 61

```
 1          MS. SAMPLIN:  I'm actually not sure, Your Honor.

 2          THE COURT:  All right.

 3          MS. SAMPLIN:  Because I didn't understand what

 4   Mr. Powell was just saying about wanting to reserve the right

 5   to deal with something later.  I'm not sure what he means.  I

 6   thought we had reached agreement before this conference that it

 7   was moot, but he seems to be saying he's reserving some right

 8   to raise something later and I just don't know what that

 9   something is.

10          THE COURT:  Mr. Powell, here's what I need to know.

11   Do I have to have a hearing, are we having a hearing today on

12   Request for Production Number 82, or have the parties reached

13   an agreement as to Request for Production Number 82?

14          MR. POWELL:  I don't think we need a hearing as to 82

15   at this time.  This is just --

16          THE COURT:  I mean really be very clear.  Without

17   wiggle room, okay -- I'm here to make decisions.  It's okay if

18   you want a decision or a ruling on something.  But the I don't

19   think and at this time, now is the time and not think maybe,

20   yes or no, are we going to go forward with a hearing on

21   Number 82?  I'm happy to do it either way.

22          MR. POWELL:  No, Your Honor, and I just want to

23   explain why for me.  The only reason is that this issue that

24   I'm discussing has not been briefed to the Court and so we

25   don't think it's an issue the Court needs to decide.  There's
```

8

1    just a separate discussion we've been having on custodians and

2    search terms and whether RFPs should be searched only by

3    custodians and search terms.  And that pertains to a bunch of

4    different RFPs.  We've had it in our letters back and forth.

5            **THE COURT:**  All right.

6            **MR. POWELL:**  It has not been briefed to the Court and

7    I don't think it's at issue in this motion.

8            **THE COURT:**  And it's I don't think.  That's the

9    issue.  So, here's what I'm going to tell each side.  When you

10   write to each other, that's an officer of the court writing to

11   each other.  When you have a commitment from one side to take

12   certain actions, that's going to be, barring some reason why it

13   shouldn't, some good reason, that's going to be enforceable on

14   a subsequent motion to ask a party to comply with their own

15   statement of compliance.

16           But, since I don't know what the dispute is, my

17   question to you, Mr. Powell, it's your clients' motion, is the

18   motion as to Number 82 withdrawn?

19           **MR. POWELL:**  Yes.  That dispute we're talking about

20   is not at issue in this motion.

21           **THE COURT:**  All right.  So, I don't need your

22   approval.  They've withdrawn it.

23           So, what else, Mr. Powell?

24           **MR. POWELL:**  Requests for Production Numbers 98, 99,

25   and 163.

Exhibit 61

9

1           **THE COURT:**  All right.  My memory is that has to deal

2  with third party, potential third-party objections, that Apple

3  made agreements to comply subject to not receiving objections

4  from third parties.  Is that right with respect to those three?

5           **MR. POWELL:**  Correct.  The issue there is Apple has

6  agreed to produce documents from third parties if it gets

7  approval.  That's fine.  And it has stated that it represents

8  it does not have any of its own forecasts and all I did is I

9  clarified with counsel this morning that if they do find such

10 forecasts later, they will produce them, they won't just mark

11 them nonresponsive.  And I believe counsel confirmed that for

12 me.

13          **THE COURT:**  Is that representation correct on behalf

14 of Apple?

15          **MS. SAMPLIN:**  Yes, that's accurate, Your Honor.

16          **THE COURT:**  So, again getting to the bottom line,

17 Mr. Powell, with respect to Requests for Production Number 98,

18 99, and 163, is the motion withdrawn?

19          **MR. POWELL:**  Yes, Your Honor.

20          **THE COURT:**  All right.  Is there anything further,

21 Mr. Powell?

22          **MR. POWELL:**  Yes.  There were proposals that we

23 provided on eight additional Requests for Production and Apple

24 declined those proposals.  If Your Honor would -- thinks it

25 would be helpful, I can either --

Exhibit 61

1          **THE COURT:**  Truthfully, no, it's not helpful.

2          **MR. POWELL:**  Okay.

3          **THE COURT:**  I thought I was clear -- and I'm sure it

4   was done in good faith, but I thought I was clear with respect

5   to the supplement that all I wanted was these are withdrawn or

6   not withdrawn.  I didn't want further argument.  I didn't want

7   further proposals.  We talked about it at the hearing.  Once

8   you get here, you're kind of stuck with what you've got.  By

9   making further proposals -- you know, I may look at them, I may

10   consider them, because I had a little bit of time with the

11   supplement to consider them.  But doing it on the fly, the time

12   for that has passed.  I don't want to hear about eight more new

13   proposals.  The time to have made those proposals was weeks

14   ago.

15          I'm going to leave -- you know, we can argue whatever

16   you want.  When you get to it if you want to ask and we can

17   talk about it, that's fine.  But the number of places I have to

18   go to get to the bottom of these disputes is seemingly endless

19   and I don't want to add to that on the fly.

20          All right?  Anything further, Mr. Powell?

21          **MR. POWELL:**  No, Your Honor.

22          **THE COURT:**  On behalf of Apple, anything beyond what

23   Mr. Powell has set forth?

24          **MS. SAMPLIN:**  No, Your Honor.

25          **THE COURT:**  All right, let's get started.

Exhibit 61

11

1          Turning to the Joint Stipulation -- and we're going

2    to stay on the record in public session unless someone tells me

3    you wish to have the transcript sealed.  But I'd really like to

4    go as far as we can without doing sealed filings if we can

5    handle it.

6          All right, so with the Joint Stipulation, and it's

7    category or Heading Number 2, where we get into the RFPs.

8    Heading Number 2 deals with Numbers 82, 98, 99, 107, 163, and

9    164.  It looks to me that, based on what Mr. Powell just said

10   and based on the supplemental filing, the motion is either,

11   call it withdrawn, you can call it mooted as to Numbers 82, 98,

12   99, 107, and 163, and that leaves us 164.

13          Is that correct, Mr. Powell?

14          **MR. POWELL:**  Yes, Your Honor.

15          **THE COURT:**  All right.  I'm going to give you my

16   tentative on 164.  And that is that the main objection appears

17   to be overbreadth.  The argument from Apple is the use of the

18   term "physiological monitoring" is overbroad considering the

19   trade secrets at issue in the case.  It appears, however, that

20   RFP Number 164 actually uses the phrase pulse oximetry, which

21   is narrower and generally seems more limited.  And again, this

22   falls in the category of facially.  164 appears to seek

23   relevant information.  An argument could certainly be made that

24   it's overly broad, unduly burdensome, and not proportional to

25   the needs of the case.  But what I didn't get from Apple was

Exhibit 61

12

```
 1    any evidence to support that, and the argument refers to a

 2    phrase that's not contained in that particular RFP.

 3            So, I'll hear from Apple, because my tentative would

 4    be to grant the motion as to 164.

 5            MS. SAMPLIN:  Your Honor, we think RFP 164 exceeds

 6    the scope of the alleged trade secrets in this case.  Pulse

 7    oximetry is not a trade secret at issue in this case.  And as

 8    we discussed this with Your Honor last time, it's a broad

 9    terminology, it extends well beyond the trade secrets in this

10    case.  We have a 2019.210 disclosure that sets forth the trade

11    secrets at issue.  We respectfully submit that these RFPs

12    should be limited to those trade -- those alleged trade

13    secrets.

14            When the parties met and conferred after we were

15    before Your Honor last week, and the reason why we were able to

16    reach agreement on requests such as 107, is because Plaintiffs

17    went back and agreed to narrow their requests to, I'm not going

18    to say them out loud, but trade secrets that are actually at

19    issue in this case.  They didn't do that with respect to

20    RFP 164.  Pulse oximetry is overbroad.  It goes well beyond

21    that which is at issue in this case.

22            Another issue is, as we told Plaintiffs, we don't

23    have forecasts of the type they are looking for here.  So, I

24    also don't even know how we would search for this because we

25    don't have a defined set of forecasts of the type that maybe
```

Exhibit 61

13

1    other companies have.  We've conducted our due diligence, we

2    don't have those kind of documents.

3            So, this request is overbroad in that it would

4    require us to just search within ESI for any kind of documents

5    that could be taken as some kind of projections or sales,

6    revenue, expenses type documents, which is pretty broad, and

7    then untethered to the trade secrets alleged in this case.

8            So, we think this RFP is broad and it could be

9    narrowed potentially in the way that Plaintiffs have agreed to

10   narrow other requests to focus them on the alleged trade

11   secrets in this case, per the discussion at the last hearing

12   before Your Honor.

13           **THE COURT:**  All right.  I appreciate your argument.

14   Let me just say I'm not going to hold somebody -- hold it as a

15   negative if somebody narrowed other requests and didn't narrow

16   this particular request.  And again, using what you heard last

17   time, my pipe analysis.  It's relating to and it's limited by

18   forecasts or projections, so that's the first narrowing.  It's

19   only forecasts and projections.  It's not past sales history or

20   anything like that.  It's just forecasts or projections.  And

21   then it's only regarding sales, revenue, expenses, or profit,

22   and it's further limited because it's only regarding the

23   inclusion of pulse oximetry and then it's even further limited

24   in Apple Watch Product.

25           I know we've had a discussion about how broad that

Exhibit 61

14

1  last category is, but we get down to a fairly discreet set of

2  documents.  Pulse oximetry may or may not be a specifically

3  identified trade secret, but it is, in the context of how this

4  is worded and how narrow it is, to me a sufficient, to use that

5  tethered word, it is tethered with this narrowing sufficient to

6  make this at least a relevant and facially proportional

7  request.

8           If I had evidence that this was going to be

9  impossible or really expensive to comply with, I would

10  certainly consider it, but I don't have that.  And when you

11  tell me that you don't -- that Apple doesn't think it has any

12  of that sort of forecast information, that cuts against a

13  proportionality argument.  And it may be that the simple answer

14  is you search for it and there are none.

15          You don't have to make that specific representation.

16  That's not required by Rule 34.  You are required to make a

17  reasonable and diligent search for documents within your

18  possession, custody, or control that aren't privileged that

19  fall within that narrowing pipe.

20          So, in light of that I'm going to grant the motion as

21  to 164.

22          **MS. SAMPLIN:**  Can I just say one more thing, Your

23  Honor?  The reason I don't think that not having forecasts cuts

24  against us, and I apologize if I wasn't clear, if the request

25  was forecasts or projections regarding and then the language

Exhibit 61

15

1    that you said, I would agree with you that it's a narrow set of

2    documents, but the beginning of the request is all documents

3    and things referring or relating to forecasts or projections --

4            **THE COURT:**  And if there was never a --

5            **MS. SAMPLIN:**  -- so then --

6            **THE COURT:**  If there was never a forecast or

7    projection, then there won't be any documents referring or

8    relating to and that's fair.

9            **MS. SAMPLIN:**  An official forecast or projection.

10   But if there is communications among Apple employees --

11           **THE COURT:**  And after a reasonably -- reasonably and

12   diligent search is all that's required.  All right?

13           I'm going to grant the motion as to 164.

14           All right, that concludes category Heading 2 from the

15   Joint Stipulation.  Heading 3 is Requests for Production

16   Numbers 101 through 106, 108 and 109.  Those have all been

17   withdrawn by the filing on June 1st.

18           Turning to Heading Number 4, Requests for Production

19   Numbers 165 through 170.  I'm going to need to hear argument.

20   To me we once again have a situation where there's an argument

21   about proportionality and burden from Defendants, but no

22   evidence to suggest to me how difficult it would be or why it

23   would be difficult at all to conduct a reasonable and diligent

24   search for documents relating to a Masimo pulse oximeter or two

25   different Masimo pulse oximeter products.  Maybe it would be.

Exhibit 61

16

1    I don't know.  I don't have any evidence to support that.

2         But the flip side evidence, I'll say that Plaintiffs

3    statement of relevance here is pretty weak, all things

4    considered.  Just as we talked about before, it's got that

5    wiggle language of the word, and this is at Page 61, and I'm

6    not going to read it -- I'm not going to read the substance

7    because it's under seal, but I guess it's sort of halfway

8    between Line 17 and Line 18, the very first word there is the

9    word "may."  And you don't have to prove your case in order to

10   get discovery, but you do have to show some tie of relevance.

11        So, I don't have a tentative on this one.  I think

12   the Requests for Production ties to relevance are somewhat

13   weak, but the countervailing arguments regarding

14   proportionality and burden, I wish I had evidence to support

15   them.  I don't.  I don't know how hard it would be for Apple to

16   search, to do a reasonable and diligent search for these

17   records.

18        So, since I haven't found that these are sufficiently

19   described with reasonable particularity and supported by

20   relevance I'm going to start with Plaintiffs to justify these

21   five requests -- six requests.

22        **MR. POWELL:**  Thank you, Your Honor.  And I'll just

23   note, I think we missed Heading 3, but we can come back to

24   that.  I'm happy to go to Heading 4.

25        **THE COURT:**  Well, start with Heading 4.  If I missed

Exhibit 61

17

```
 1   Heading 3, we'll go back to it.

 2            MR. POWELL:   Okay.   Thank you, Your Honor.

 3            These requests are directly relevant because

 4   Plaintiffs have alleged that Apple met with Plaintiffs back in

 5   2014 and wanted our technology in their product.   They stated

 6   that our technology was, quote/unquote, "the platinum, the best

 7   around," and it seems almost impossible that after focusing on

 8   our product so much and --

 9            THE COURT:   Well, I'm going to interrupt you.

10   Heading 3 we did cover.   Those are all out.   Those were all

11   withdrawn.   Right?   That's at Page 119.   It lists 101 through

12   106, 108 and 109.   Those were all withdrawn on the June -- am I

13   wrong?

14            MR. LERNER:   I may -- so, first of all, with the

15   caveat that I confess I have tried mightily but might have lost

16   the thread a little bit.   I think the confusion, Your Honor,

17   may be that we would -- I can't get the exact percentage rate,

18   but 98 percent rate, I think maybe it's 104 and 5 are still at

19   issue.   That's all I could figure out.   But I admittedly am

20   doing what you're doing, which is looking between a lot of

21   different things.   So, if I'm wrong about that, I'll defer

22   that.

23            MR. POWELL:   That is correct, Your Honor.   Everything

24   except 104 and 105 was resolved.

25            THE COURT:   All right, let's do them in order.   Let's
```

Exhibit 61

18

1   go back to 104 and 105.

2      **(Pause)**

3           104 and 105 are denied.

4           All right, let's get back then to Heading 4, 165 to

5   170.

6           **MR. POWELL:**  Thank you, Your Honor.

7           So, again, Apple was pursuing Plaintiffs and their

8   technology back at the beginning in 2014, before they recruited

9   Mr. O'Reilly and Mr. Lamego and a number of others, and they

10  were focused on our technology because they wanted to

11  incorporate the technology into the watch, and so we think that

12  it is directly relevant.  Apple's efforts and analysis and

13  discussions of our products is directly relevant to many issues

14  in the case, including Apple's knowledge that it was taking our

15  trade secrets, it's relevant to willfulness on the trade secret

16  claims.  If Apple, for example --

17          **THE COURT:**  When did the MightySat pulse oximeter hit

18  the market?

19          **MR. POWELL:**  I would have to check the exact date,

20  Your Honor.

21          **THE COURT:**  Can you give me a timeframe?

22          **MR. POWELL:**  I want to say somewhere around that

23  time.

24          **THE COURT:**  When you say "that time," what are you

25  referring to?

Exhibit 61

19

```
 1              MR. POWELL:  2014/2015.  Same with iSpO2.  That's my

 2    understanding, but --

 3              THE COURT:  So, there wouldn't be any relevance --

 4    explain the relevance after it's hit the market.

 5              MR. POWELL:  I'm not sure I understand Your Honor's

 6    question.

 7              THE COURT:  Explain the relevance of Apple having

 8    documents relating to Masimo's MightySat pulse oximeter after

 9    it was publicly available for anyone to look at and discuss.

10              MR. POWELL:  Oh, it's not the documents that -- you

11    know, the Masimo marketing materials or something.  That's not

12    what we're talking --

13              THE COURT:  I'm not asking about marketing material.

14    I'm asking about anything.

15              MR. POWELL:  Right.  So, Apple's analysis of the

16    product.  Apple, for example --

17              THE COURT:  Is it unlawful for Apple to look at a

18    potential competitor's product and say, wow, this is really

19    good, we should include something like that in our watch?

20              MR. POWELL:  No, but if Apple --

21              THE COURT:  So, tell me the relevance to a trade

22    secret claim of documents that Apple has that are related to

23    Masimo's MightySat pulse oximeter or the SpO2 pulse oximeter

24    after they hit the market.

25              MR. POWELL:  Sure.  So, again, Apple's -- for
```

Exhibit 61

20

1    example, if they tore down the product, they reverse engineered

2    it, they investigated it, and they said this is --

3            **THE COURT:**  Reverse engineering would not be a theft

4    of a trade secret, is that right?

5            **MR. POWELL:**  That's correct, Your Honor.

6            **THE COURT:**  Okay.

7            **MR. POWELL:**  But it's not going to -- the reverse

8    engineering is not going to show theft of a trade secret

9    itself.  And that's straight from the statute.  You are

10   correct.  But what it does show is a motivation to obtain our

11   technology.  Testing, for example, showing that these are the

12   best products around and that they outperform Apple's products

13   when Apple was investigating --

14           **THE COURT:**  When did Mr. Lamego arrive?

15           **MR. POWELL:**  In 2014.

16           **THE COURT:**  All right.  So, I'm struggling for the

17   relevance of this after both Mr. Lamego's arrival and after the

18   public release of the product.  As opposed to a more -- I'm not

19   saying that there isn't a portion that conceivably could be

20   more narrowly crafted that would say documents showing Apple's

21   intention to use the Masimo MightySat technology in one of its

22   products and documents along those lines.  But --

23           **MR. POWELL:**  And I agree that would certainly be

24   relevant as well.  But the issue of whether they are testing

25   the product and realizing that it outperforms Apple's products

Exhibit 61

1    and that they need to get our technology, they need to obtain

2    it, they need to change what they are doing so that they can

3    match our performance, that all is going to be directly

4    relevant to again willfulness and it's going to be directly

5    relevant to damages.  It shows how important our technology is.

6             So, for example, a document at Apple that tears down

7    and looks at our product, tests it, and benchmarks it next to

8    Apple's product and says, wow, this is the best, we will never

9    be able to compete unless we have technology this good, that's

10   going to be directly relevant to our damages case.

11            **THE COURT:**  That's not what this asks for though.

12   This asks for anything related to either of those pulse

13   oximeters.

14            **MR. POWELL:**  Right, and that's Requests for

15   Production 165 and 166, and I would submit that those are very

16   easy to search for.  This isn't a question of --

17            **THE COURT:**  Why do you say that?

18            **MR. POWELL:**  Because we're already doing ESI

19   searching and they can just run the term MightySat and iSpO2

20   through ESI searching and I --

21            **THE COURT:**  You're suggesting that this be limited to

22   the ESI custodians?

23            **MR. POWELL:**  We would agree to that.

24            **THE COURT:**  All right.  What about 168 and 169, which

25   relate to Apple's sales or marketing of -- and I'm not sure I

Exhibit 61

22

1    understand it, so maybe you can explain it to me -- Apple's

2    sales or marketing of Masimo's, either the iSpO2 pulse oximeter

3    or the MightySat pulse oximeter.

4          **MR. POWELL:**  Thank you, Your Honor.

5          So, these are examples of a couple that when I was

6    looking at them last night we would be happy to, for example,

7    cross out the communications with customers.  I didn't see that

8    initially when I was doing the briefing and I apologize for

9    that.

10         But the marketing of the product again is going to be

11   relevant to the damages because, for example, if Apple's

12   marketing says, wow, this product is incredibly successful,

13   it's done quite well --

14         **THE COURT:**  Maybe I'm -- I admit I'm not the sharpest

15   tool in the toolbox.  What -- you're asking for Apple's sales

16   or marketing of Masimo's MightySat pulse oximeter.  What does

17   that mean?

18         **MR. POWELL:**  So, Apple marketed both the MightySat

19   and the iSpO2 for a period of time in roughly 2016 onward.  And

20   I believe they stopped very recently, but I don't have the

21   exact date.  Anyway, these products were marketed as being

22   compatible with the iPhone and what happened is Apple, now that

23   it has its own competing pulse oximetry product on the watch, I

24   believe is no longer marketing at least one or both of those

25   products and has essentially replaced us, our products, with

Exhibit 61

23

1   its watch product.

2           **THE COURT:**  Where were they --

3           **MR. POWELL:**  And so, the --

4           **THE COURT:**  Where were they selling or marketing

5   Masimo's product?

6           **MR. POWELL:**  I believe it was on Apple.com and in

7   Apple stores.

8           And then you'll notice in 168 we have a specific

9   reference to advertisements in the Apple Magazine.  And in

10  167 --

11          **THE COURT:**  If I can ask you, and again I -- when you

12  say there's items in Apple Magazine, are those advertisements

13  that Apple is putting in Apple Magazine or that Masimo is

14  putting or requesting to be put in Apple Magazine?

15          **MR. POWELL:**  My understanding is it was Apple, but we

16  may have been involved in the process.  I don't know for sure.

17          **THE COURT:**  All right.  And then 170 is similar to --

18          **MR. POWELL:**  Right.  So, Your Honor, 169 and --

19          **THE COURT:**  169 and 170 just are only different in

20  one is MightySat and one is the iSpO2.  168 appears to be --

21  well, it's hard to distinguish between some of these.  But --

22          **MR. POWELL:**  If I may --

23          **THE COURT:**  -- all right, anything further in support

24  of Requests Numbers 165 through 170?

25          **MR. POWELL:**  I'll just note on 169 -- so, 167 and 168

Exhibit 61

24

1    are the parallels on iSpO2 and MightySat for marketing.  169

2    and 170, again parallels for MightySat and iSpO2, directed more

3    towards the communications discussing sales of those products

4    in comparison to Apple's own products.  And so that's why 169

5    and 170 are a slightly different scope and they are directly

6    relevant.  Again, for example, if Apple says, wow, these

7    products are doing fantastically well, we need to get pulse

8    oximetry in our watch and we need it to perform as well as

9    Masimo's so that we can replace the Masimo products with our

10   own.

11         **THE COURT:**  All right.  Let me hear from Apple,

12   focusing, if you don't mind, on what evidence I have of how

13   difficult or burdensome this would be in light of the

14   restriction that it would be related -- it would be limited to

15   ESI custodian searches.

16         **MS. SAMPLIN:**  Well, Your Honor, I think the first

17   question is relevance, respectfully.  And the problem, even if

18   it's limited to the ESI custodians is, as you heard Mr. Powell

19   say, you know, Apple sold and marketed these products, so a

20   request for production that asks for all documents and things

21   related to Masimo's MightySat pulse oximeter is not limited to

22   this claim he's now saying, which, by the way, is not in his

23   Complaint, but a claim that Apple intended to use that

24   technology in its own technology.  If that's their claim, as

25   Your Honor said, they can serve a targeted request that goes to

Exhibit 61

25

1   documents showing Apple's intention to use Masimo's MightySat

2   in its Apple Watch technology.

3          **THE COURT:**  Okay, I'm going to ask you to focus on my

4   question.  Do I have evidence of burden for Apple to respond to

5   these?

6          **MS. SAMPLIN:**  I don't think you have evidence beyond

7   the fact that we've been ordered to search for documents from

8   39 different custodians and Apple --

9          **THE COURT:**  I don't know where that's coming from.

10   You were not ordered to search from 39 custodians.  I believe

11   the Order said up to 39 custodians.

12          **MS. SAMPLIN:**  And Plaintiffs have interpreted that

13   Order to mean that we're obligated to search from 39

14   custodians.

15          **THE COURT:**  I'm only telling you what the Order said.

16          **MR. LERNER:**  So, I think, Your Honor, if it helps,

17   just on Page 63, and hopefully this answers your question --

18          **THE COURT:**  Could you pull the microphone towards

19   you?  I'm not sure --

20          **MR. LERNER:**  Yes.

21          **THE COURT:**  -- that you're getting picked up by the

22   recording.

23          **MR. LERNER:**  I apologize.  I think the place where we

24   at least attempt to address this is on Page 63, where we talk

25   about the fact that we, as has been discussed before, are

Exhibit 61

1   talking about marketing their products, which we do do, and I

2   would just offer two other facts which I think are important.

3   You didn't hear anything about the timing of these devices --

4           **THE COURT:**  Could I really focus -- let's get

5   focused.

6           **MR. LERNER:**  Okay.

7           **THE COURT:**  Where is the evidence on Page 63 of

8   burdensomeness?

9           **MR. LERNER:**  There's -- so, we pointed out that we

10  are marketing -- we marketed and sold these products, which is

11  what Ms. Samplin was talking about.  So, you're talking about,

12  as they concede, every document about marketing and selling

13  their product, which they wanted us to do.  There's no dispute

14  about that.  You're correct that we don't have a declaration as

15  to, you know, how many pages that would be and the answer there

16  is that we don't have that because we cannot wrap our head

17  around how marketing relating to devices that are on your

18  finger from the Plaintiffs years ago have something to do with

19  any issue in this case, which Your Honor asked about, and they

20  don't.  Even if --

21          **THE COURT:**  All right, so I just want --

22          **MR. LERNER:**  -- everything Plaintiffs said was

23  right --

24          **THE COURT:**  There is a period at the end of the

25  sentence.  There is no evidence to support a burdensomeness

Exhibit 61

27

1    that's been submitted by Apple.  Is that right?  So, I don't

2    have to look at Page 63 anymore for that issue?

3             **MR. LERNER:**  It says we were marketing and selling

4    their product.  We thought that was sufficient.  It sounds like

5    it's not.  But the burden is that we marketed and sold their

6    product and now they're asking for all documents relating to

7    marketing and selling their product.

8         **(Pause)**

9             **MS. SAMPLIN:**  And I guess, Your Honor, one other

10   thing I'd --

11            **THE COURT:**  I'm very sorry, we're submitted on these

12   right now.

13        **(Pause)**

14            All right, the motion's going to be granted as to

15   Numbers 165 and 166, but limited so that it will read as

16   follows:

17            165:  All documents and things reflecting an intent

18   by Apple to investigate technology for commercial use based on

19   Masimo's MightySat pulse oximeter.

20            166 will be the same except instead of MightySat it

21   will refer to iSpO2.

22            **MS. SAMPLIN:**  Your Honor, can I ask a clarifying

23   question?

24            **THE COURT:**  Not right now.

25            The motion is denied as to Numbers 167, 168, 169, and

**EXCEPTIONAL REPORTING SERVICES, INC**

Exhibit 61

1  170.

2          What is the clarifying question?

3          MS. SAMPLIN:  The clarifying question is the meaning

4  of commercial use.  And so, I'm just -- you know, if we sold

5  their products just generally to the market, is that a

6  commercial use that's picked up by that request, or is it

7  commercial use in terms of intent to use it in our own product?

8          THE COURT:  Intent to use in Apple's own product.

9          MS. SAMPLIN:  Okay.  Thank you, Your Honor.

10         THE COURT:  All right, turning to Heading 5.  This is

11  RFAs 67 -- I'm sorry, RFPs 67 to 70 and 155 to 157.

12         MR. LERNER:  Your Honor, I apologize.  May I ask you

13  one other question?

14         THE COURT:  Let's save it till the end, all right?

15         MR. LERNER:  Okay.

16         THE COURT:  On 1 -- I'm sorry, 155 to 157, my

17  tentative is to grant the motion.  67 through 70, my intention

18  and tentative is to deny the motion and it would be denied as

19  to Number 70 based on Apple's representation contained, I don't

20  recall if it's in its original response or if it's in the

21  briefing, but based on that representation the motion would be

22  denied.  So, 67 through 70 are denied, 155 to 157 would be

23  granted.

24         I'll start with you, Mr. Powell.  It's your motion.

25         MR. POWELL:  Thank you, Your Honor.

Exhibit 61

29

1        I'm not sure what representation you're referring to

2  on Number 70.  I apologize.

3        THE COURT:  So, Apple agrees to produce documents

4  related to the technical features accused of infringement and

5  responsive to the unobjectionable scope of this request to the

6  extent such information exists and is located after a

7  reasonably diligent search.

8        Other than the phrase "unobjectionable scope,"

9  because I don't know what that means, I'm striking that, but

10  subject to that statement of compliance the motion would be

11  denied because that's a sufficient response, a sufficient

12  statement that responsive documents related to the technical

13  features accused of infringement and responsive -- and maybe

14  I'll change that from infringement to technical features that

15  are subject to the trade secret claims.  So, I appreciate that.

16  I should amend that to say the technical features in the trade

17  secret disclosures.

18        MR. POWELL:  Thank you, Your Honor.

19        If -- sorry, I wasn't sure if you were done or if I

20  should start.

21        THE COURT:  No, you can proceed.

22        MR. POWELL:  Okay, thank you.

23        I would submit that on 67 through 69, in particular

24  69, these are appropriate and relevant, and I would direct Your

25  Honor to one particular trade secret here on Exhibit 29.  This

Exhibit 61

30

1   is Document -- Docket Number 3 --

2         **THE COURT:**  Before you get into it.  Read that --

3   read Number 69.

4         **MR. POWELL:**  All documents and things submitted to or

5   received from the FDA or any other government agency that refer

6   or relate to the Apple Watch Products.

7         **THE COURT:**  If I can be blunt, are you kidding me?

8   Any government agency that sends anything to Apple about any

9   Apple Watch you think is a reasonably narrowly tailored request

10  for information tied to the issues in this case?

11        **MR. POWELL:**  Well, Your Honor, I guess I was focused

12  on the FDA, and I have not heard any --

13        **THE COURT:**  Well, I'm not focused on the FDA.  I'm

14  focused on the request that's in front of me.  I hammer nails.

15  This is what you put in front of me.  You can point me to

16  whatever you want, but I don't know how you get around that.

17        **MR. POWELL:**  Well, Your Honor, how I would get around

18  that is Apple has not indicated that there are any documents

19  responsive to this request or any evidence of burden or

20  anything.  I don't know if there have been documents --

21        **THE COURT:**  Any government agency.  Any communication

22  from any government agency, not limited to topic, time,

23  jurisdiction, any government agency that sent something to

24  Apple at any time that referenced any Apple Watch Product you

25  want.

Exhibit 61

31

1          **MR. POWELL:**  Well, Your Honor, primarily what we're

2   looking for --

3          **THE COURT:**  Primarily doesn't -- we're past

4   primarily.  That's what meet-and-confer is about.  You're

5   asking me to issue an order and I'm not going to issue that

6   order.

7          **MR. POWELL:**  I understand, Your Honor, and the only

8   thing I would add is that during the meet-and-confer, Apple did

9   not object on that basis and if they had, we would have struck

10  "or other government agency" from that.  I would have had no

11  problem doing that but that issue never came up during the

12  meet-and-confer.  So I didn't have an opportunity to do so.

13  And I understand Your Honor's concerns and I would happily

14  strike "or other government agency."

15         **THE COURT:**  The time has passed for that.  You -- as

16  I told you last time, you're here -- you stand and fall with

17  what's in front of me and that's what's in front of me.  So 69

18  is denied.  It's tentatively denied.

19         Anything else you want to offer, Mr. Powell?

20         **MR. POWELL:**  Well, I would direct Your Honor to

21  Number 68 then and Number 68 is directed towards documents and

22  things concerning the FDA approval of any of the Apple Watch

23  products.  My understanding is that there's only been one FDA

24  approval of one app on the FDA -- on the Apple Watch products.

25         That issue is directly relevant to one of our trade

Exhibit 61

32

1  secrets which is not limited to pulse oximetry and pulse rate.

2  The business and sales trade secrets go beyond those two things

3  and so the trade secret at issue -- we could seal it or I could

4  direct Your Honor to it but the -- obtaining FDA approval on

5  any feature of the watch would be directly relevant to that

6  trade secret.

7         THE COURT:  It's overbroad.  Anything further?

8         MR. POWELL:  No, Your Honor.

9         THE COURT:  All right.  From Apple on that group?

10        MR. LERNER:  I think the only ones that were grant --

11 if I heard correctly and I apologize if I didn't -- were 155

12 and 156.  Is that correct, Your Honor.

13        THE COURT:  Well, let me ask you a question.  I

14 actually changed your response because I think your responses

15 were written when the focus was --

16        MR. LERNER:  Yes.

17        THE COURT:  -- on the patent and I have amended it.

18 So I would -- if you tell me that your Statement of Compliance

19 includes what I said, I will leave it as a denied but let me

20 read it to you again.  So we're at Page 69 of the joint

21 stipulation and it's Apple's response to RFP Number 70 after

22 the -- oh, I don't know -- 25 lines of objections.  We get to

23 the Statement of Compliance.  Subject to those objections,

24 here's what I would deem my interpretation.  Tell me if you

25 agree on behalf of Apple.

Exhibit 61

33

1          "Apple agrees to produce documents related to the

2          technical features alleged in the -- in Plaintiffs'

3          trade secret disclosures responsive to this request

4          to the extent such information exists and is located

5          after a reasonably diligent search."

6          **MR. LERNER:**  Thank you, Your Honor.  No objection to

7    Your Honor's revision.

8          **THE COURT:**  Okay.  With that being -- and just to be

9    clear that that's what Apple is now agreeing, because I changed

10   it, I'm asking for Apple's confirmation that they are agreeing

11   to comply as just stated; is that correct?

12         **MR. LERNER:**  Yes, Your Honor.

13         **THE COURT:**  All right.  So, yes, Number 170 (sic)

14   would be denied and that leaves the grants as 156, 157 and 155.

15         **MR. LERNER:**  Your Honor, I apologize.  Can we just

16   clarify?  I believe you said "170" instead of "70."

17         **THE COURT:**  I'm sorry.  It's 70.

18         **MR. LERNER:**  Thank you.  And I'm happy to address 155

19   through 157, Your Honor.

20         **THE COURT:**  Please.

21         **MR. LERNER:**  So with respect to these -- and,

22   obviously, I don't have the benefit of Your Honor's thinking on

23   the reason for the grant but as we mentioned before, pulse

24   oximetry is not a secret here.  It's --

25         **THE COURT:**  So I'm going to give you a little insight

Exhibit 61

34

1    into what I'm thinking.

2              **MR. LERNER:**  Okay.

3              **THE COURT:**  So starting with 150, as we get into the

4    specific language, it's the decision not to seek FDA approval

5    for pulse oximetry and I understand there's a dispute about how

6    focused pulse oximetry is and how critical it is.  It's within

7    the penumbra of relevance here.

8              If there is no decision not to seek FDA approval, I

9    don't know -- again, I don't have anything in front of me to

10   tell me how burdensome that would be and maybe there wasn't a

11   decision.  Maybe there was.  I don't know how difficult it

12   would be to search for that.  So that's 155.

13             156 is a closer call and here it is limited as

14   opposed to the one I raked Mr. -- and I'm being, of course,

15   facetious.  You can't see the smile on my face but raked

16   Mr. Powell over the coals on for asking for any communications

17   with any governmental entity.  It's attempts to obtain FDA

18   approval on the pulse oximetry feature of any Apple Watch

19   product.

20             Using the pipe analogy, you have a number of things

21   that narrow it and I don't have anything in response that tells

22   me how difficult it would be for Apple to find that.  But it

23   doesn't strike me without such evidence that it's inherently

24   overly broad.

25             The last one is -- well, let me see here.  Well,

Exhibit 61

```
 1   actually, 157 I may reconsider a little bit but why don't you

 2   tell me what evidence I have?  Because this does have the other

 3   government agency but I don't know what other government agency

 4   would be looking into pulse -- the pulse oximetry feature other

 5   than potentially the FDA but if you can point me to something

 6   in the record that would suggest to me that that's an overly

 7   broad or unduly burdensome search, I'd be happy to consider it.

 8        MR. LERNER:  Okay.  So I'll tackle your points in the

 9   order raised.  Starting with 155 on relevance and the penumbra,

10   I just -- I want to make clear our position so that, hopefully,

11   it is helpful.  The allegations in this case that relate to the

12   FDA or anything pertaining to the alleged secrets here relate

13   to -- according to the complaint, relate to one person which is

14   Michael O'Reilly.  That's the one person the Plaintiffs have

15   connected from Apple to the FDA when you look at their

16   complaint.

17        They say that he approached the FDA shortly after he

18   joined Apple.  They don't say he disclosed any secrets there.

19   There's not some, to Your Honor's earlier point, strong --

20   remotely strong showing on the threshold question of relevance

21   here when we're talking about FDA approval or not approval or

22   seeking or not seeking approval with respect to a subject

23   that's broader than the secret.

24        But even if you drill down from there, Your Honor

25   correctly asked this earlier about questions, for example, with
```

EXCEPTIONAL REPORTING SERVICES, INC

Exhibit 61

1    respect to reverse engineering or looking at a product.  In

2    what universe is that relevant to any legal claim?  If the

3    allegation here is that we somehow misappropriated pulse

4    oximetry secrets which it isn't.  It's much, much narrower than

5    that.  Even if it were, what's the relevance of not seeking

6    approval given the allegations in this case just with the

7    threshold question of relevance?  And that's 155.

8              On 156, any attempt to obtain FDA approval on that

9    subject for any watch, again, it's not limited.  I --

10             **THE COURT:**  As I understand --

11             **MR. LERNER:**  I understand the penumbra point but --

12             **THE COURT:**  -- as I understand, you've indicated that

13   the only thing we're talking about from Apple's standpoint is

14   an app; is that right?

15             **MR. LERNER:**  Well, that's the biggest problem of all,

16   is -- and this goes to Your Honor's point about how these were

17   drafted and if --

18             **THE COURT:**  Okay.  Can --

19             **MR. LERNER:**  -- we have tried to explain this until

20   we are blue in the face.

21             **THE COURT:**  -- I interrupt?  Can you answer my

22   question?

23             **MR. LERNER:**  Yes.  The answer is "Yes."

24             **THE COURT:**  Okay.  Now, if you want to explain,

25   please explain.

Exhibit 61

1          **MR. LERNER:**  The answer may be very simple based on

2    Your Honor's point.  We didn't seek approval of any feature of

3    the Apple Watch product.  We sought approval of an app.  And

4    this request -- and I think this may be the easiest way to

5    address it and so I appreciate Your Honor perhaps directing me

6    to this point.

7          If you look at the definition of an Apple Watch

8    product, it does not include the app.  So we don't have this

9    stuff and we tried to explain that and as on many of these

10   things, we nonetheless are here.  But we didn't seek approval

11   for a feature of an Apple Watch.  This relates to an app.

12          **THE COURT:**  All right.

13          **MS. SAMPLIN:**  And could I just add one thing to what

14   Mr. Lerner said which is that the app offers an ECG feature

15   which isn't -- doesn't use any of the technology that

16   Plaintiffs say Apple misappropriated.  It's not alleged to

17   either.  And the ECG app and its features are not alleged

18   anywhere in the complaint or the 2019 210 disclosure.

19          **THE COURT:**  Well, I don't want to get too wrapped up

20   in that point.  Here's what I want to tell you.  They live and

21   die with what they wrote.

22          **MR. LERNER:**  Okay.

23          **THE COURT:**  If they defined -- and this is what I was

24   reading, that Apple Watch product -- it has the word "product"

25   in it and if a fair reading of that is that it doesn't include

38

1    apps -- and I know that Plaintiff said, wow, well, wait a

2    minute.  It does include apps.

3           We all use common sense in reading and interpreting

4    language.  And when you have a defined term, we have to use

5    common sense.  We have to use a fair reading.  If a fair

6    reading of this does not include the app, I don't -- I think

7    we're fighting over nothing.  One exception to this may be 157

8    and, again, this gets back to the idea of any government agency

9    and it's "all documents submitted to or received from the FDA

10   or any government agency."

11          And as I went back and reread it, I started

12   rethinking this one.  I don't know what other government agency

13   -- whereas the last one was just in general, here it's

14   referring specifically to pulse oximetry.  I don't know if

15   there could be any other government agency that would have

16   communications with Apple.  I wish I knew that but I don't.

17          But I'd be inclined to say 157 -- I'd amend my

18   tentative order to grant the motion but I would strike "or any

19   other government agency."  And if the reality is that under the

20   definition of "Apple Watch product" there's been no

21   communication with the FDA and any no attempt for approval from

22   the FDA, the answer is simple.  But that does circle us back to

23   155.

24          And, again, this is where there is a balancing here.

25   I don't think it's all that relevant but I also have no idea

Exhibit 61

1    how difficult -- whether there was a decision to not -- and

2    it's a double negative but whether there was a decision not to

3    seek approval or whether it was simply, it wasn't even

4    discussed.  It was -- there's no need for FDA approval for a

5    public-facing commercial product.  I don't know the answer to

6    that.

7          So that -- let's turn back to 155.  How difficult

8    would that be to comply with?

9          **MR. LERNER:**  And I do not want to try and evade Your

10   Honor's questions.  When we take requests like this one, we did

11   not brief the burden for you because if every request we

12   briefed the burden, we -- first of all, we can't even discuss

13   most of these things with our client because not even in-house

14   counsel is allowed to see any of the alleged secrets.

15         **THE COURT:**  Well --

16         **MR. LERNER:**  Second --

17         **THE COURT:**  -- let me stop you.  You've been telling

18   me that it's not tied to the secret.  So you couldn't go to

19   in-house counsel to say, hey, did Apple even make a decision to

20   seek FDA approval of the pulse oximetry feature?

21         **MR. LERNER:**  It's public that the pulse oximetry

22   feature is not -- from the app is not FDA approved.  That's --

23         **THE COURT:**  Okay.  That's a different question.  The

24   question is, did -- was there a decision within Apple not to

25   seek FDA approval or was it simply, hey, I don't need FDA

40

1   approval to manufacture a pen or to a large extent --

2            MR. LERNER:  And, again, I want to be very clear.  We

3   did not get to that issue because we do not believe that this

4   question is relevant full stop and feel strongly about that.

5   It is a question relating to not seeking approval of something

6   that's not a secret.  And so we did not do, to answer Your

7   Honor's question, the burden analysis here.

8            THE COURT:  But now I'm asking you, outside of that,

9   what can you tell me?  Anything on it?

10           MR. LERNER:  No.  I -- we did not do that analysis

11  here as to the decision-making behind FDA approval of this

12  feature, particularly when it's not to seek.

13           THE COURT:  But that's my point.  That one would have

14  been easy.

15           MR. LERNER:  It is -- and I appreciate Your Honor's

16  point.  I think hopefully the following seems fair and

17  accurate.  We are dealing with hundreds of these.  So we have

18  to make a judgment call as to, okay, this looks like it might

19  actually relate to the case and what's happening here but it's

20  going to require so much work that we'll go get a declaration

21  from an engineer to submit or it's so divorced that we're going

22  to say, we're sorry, this doesn't have anything to do with the

23  case and we're not going to have declarations about the burden.

24           And a lot of this here, all documents and things

25  concerning any decision by Apple not to seek FDA approval, we

Exhibit 61

41

1   feel comfortable that on its face that it's not relevant to the

2   case and it's overbroad.  So that's what we live with on this

3   one and I can't read this and come to a different conclusion

4   than what I just said.

5          THE COURT:  All right.  I'm sorry, Mr. Powell.  I saw

6   movement out of the corner of my eye.  Were you raising your

7   hand or no?

8          MR. POWELL:  No, Your Honor, I was scratching my

9   head.

10          THE COURT:  All right.  I'm going to amend my

11   tentative and I'm going to deny the motion as to 155 but based

12   on the representations about how "Apple Watch product" is

13   defined, I'm going to grant the motion as to Requests for

14   Production Numbers 156 and 157.  And if there are no responsive

15   documents, there are no responsive documents.

16          MS. SAMPLIN:  And, Your Honor, are you striking the

17   "any other governmental agency" from 157 or leaving that in?

18          THE COURT:  Yes, that'll be ordered further response

19   with the exclusion of "any other" -- "or any other government

20   agency."

21          MR. LERNER:  Your Honor, would the Court like to hear

22   any argument on 155?

23          THE COURT:  No, I've heard enough.

24          All right.  Let's turn to Heading VI on Page 78 and

25   this is where the supplement will guide our discussion to some

Exhibit 61

42

1    extent.  Numbers 226 -- RFP Numbers 226 and 230 through 235,

2    Number 235 has been resolved and is removed.

3           With respect to the remaining documents, we have

4    Number 226, parties in the supplement at Docket 419 have given

5    counterproposals.  Maybe we can hash this out.

6           To Apple, is the only difference between the

7    proposals, you're limiting it specifically the nature of the

8    electronic search fields?

9           **MS. SAMPLIN:**  Yes, Your Honor.

10          **THE COURT:**  Explain to me -- I don't want to get into

11   the weeds of telling people how to conduct ESI searches.  If

12   that proviso is a -- still results in a reasonable and diligent

13   search, I don't think it's necessary.  If it's narrowing what

14   would otherwise be a reasonable and diligent search into

15   something more narrow, I'd like an explanation as to why.

16          So I guess where I'm circling back to is I don't want

17   to get into the weeds of how your ESI techs are going to be

18   doing word searches or other things and how they're going to --

19   I don't even know how they're going to break things into

20   fields.

21          So why should I get into this as opposed to simply

22   say, as with all Requests for Production, it's a reasonable and

23   diligent search and does not require people to go through every

24   file cabinet in Apple to look for responsive documents?

25          **MS. SAMPLIN:**  Well, Your Honor, the request as

Exhibit 61

43

written is, "All documents and things owned by, created in

whole or in part by or originating with Masimo or Cercacor."

We think that's overbroad.

        **THE COURT:**  Understood.  And Masimo made a proposal

and that's what we're talking about.  We're now to their

counterproposal.

        **MS. SAMPLIN:**  Right, I know but I'm just trying to

set up the context.  The reason that we would agree to this

broad request if tethered to ESI's metadata field is because

that is a reasonable search in our mind because we can look to

certain fields and then produce anything to them that has

Masimo or Cercacor in that field.  If it's not limited by that

field --

        **THE COURT:**  But -- well, here's what I'm telling you.

I don't know what a "field" means.  I don't know how your ESI

people are setting things up.  I don't know how they're

breaking down the electronic data.  So I don't know if -- how

much harder it would be to push "field search" or "document

search."  I don't know what the numbers that would pop up.  So

it would be limited to a reasonable and diligent search but I

do not want to get into the technicalities of this.

        **MR. LERNER:**  If we can't do that, Your Honor, then

this one on its face should be denied.  We tried and we

understand that Your Honor doesn't want to get into the

particulars of it but if it's not possible, then this on its

Exhibit 61

44

1   face is a denial.  We were just discussing a moment ago all the

2   stuff that they said we marketed for them for however many

3   years.

4          THE COURT:  Okay.  So this says, "originating with,"

5   right?

6          MR. LERNER:  Yes.

7          THE COURT:  Are you saying that the marketing

8   material would fall within that?  That's what I was getting at

9   before, is who is doing the marketing?  Who is -- like, who did

10  the advertisement at *Apple Magazine*?  Did that originate from

11  Masimo or is that something that --

12         MR. LERNER:  So even if you put aside that tougher

13  question, which I don't think Plaintiffs answered, it's hard

14  for me to imagine people are doing advertising without their

15  input for them but --

16         THE COURT:  Well, that was why I was confused by the

17  whole concept but --

18         MR. LERNER:  Yeah.  I agree but --

19         THE COURT:  -- I want to understand it.

20         MR. LERNER:  -- but documents and things -- before we

21  even get to that issue -- that originate with them, we were

22  selling their products.

23         THE COURT:  Okay.  How about if we put "non-public"?

24         MR. LERNER:  What's that?

25         THE COURT:  We add the phrase "non-public" which is

EXCEPTIONAL REPORTING SERVICES, INC

Exhibit 61

45

1    what they added to their proposal.  So things that go out in

2    marketing materials are public.  So it's non-public documents

3    or things owned by, originated or created by Plaintiffs.

4              MR. LERNER:  Right.  So every communication about the

5    boxes of MightySats they're sending over or every communication

6    about things that everybody agrees has absolutely zero to do

7    with this case.

8              THE COURT:  We're going to use a reasonable

9    interpretation.  Non-public documents and things owned by,

10   created in whole or in part or originating with Masimo --

11   there's no reasonable interpretation that says an email about

12   what we're going to advertise in Apple's magazine is, again,

13   pipes -- non-public, owned by or originating with Masimo --

14   that's a communication above board.  If you want to try to

15   narrow it down further, that's fine but I don't want to get

16   into saying only in a field --

17             MS. SAMPLIN:  Well, wouldn't that be --

18             MR. LERNER:  It's "or originating."

19             MS. SAMPLIN:  -- originating?  Wouldn't that be a

20   document originating with --

21             THE COURT:  You know what they're asking for.

22             MR. LERNER:  I really, really don't.

23             THE COURT:  I really, really think you do.

24             MR. LERNER:  Well --

25             THE COURT:  Okay.  Let's sit there and figure --

Exhibit 61

46

1          MS. SAMPLIN:  Your Honor, this is --

2          THE COURT:  Let's sit -- please don't interrupt me.

3          MS. SAMPLIN:  Sorry.

4          THE COURT:  Let's sit here and figure it out.

5          MR. LERNER:  Okay.

6          THE COURT:  Masimo, do you want to narrow this down

7   to be specific to exclude communications relating to ongoing

8   business between the companies?

9          MR. POWELL:  That's fine, Your Honor.

10          THE COURT:  Okay.

11          MR. POWELL:  What is it that we are looking for?

12   What documents or things that will come from them?

13          THE COURT:  They're looking for their trade secrets

14   or documents relating to their trade secrets, right?  Isn't

15   that what you're looking for?  You're looking for the origin of

16   how our information owned by Masimo -- whether it's a trade

17   secret or related to the trade secret, your allegation is it

18   wound up at Apple.  That's what you're looking for; is that

19   right?

20          MR. LERNER:  Yes, Your Honor.

21          THE COURT:  All right.  So --

22          MS. SAMPLIN:  Can we add that to the request because

23   the request doesn't say that?

24          THE COURT:  Let's work it out.

25          MR. LERNER:  That's -- what you just said is -- has,

EXCEPTIONAL REPORTING SERVICES, INC

Exhibit 61

47

 1  A, already been asked and argued and, B, is actually completely

 2  different from --

 3          THE COURT:  Well, I disagree.  I think the intent is

 4  clear enough and if you folks want to narrow it down so that

 5  you're more comfortable with it, I think that it's a fair

 6  request as narrowed.

 7          MS. SAMPLIN:  Can we add in what Your Honor just said

 8  which is related to the alleged trade secrets in this case?  I

 9  do agree that that is a more fair narrowing but right now, it

10  says, "anything that originates with Masimo or Cercacor."

11          THE COURT:  Well, non-public but if you want it to be

12  non-public documents relating to the trade secrets owned by,

13  created in whole or in part or originating with Masimo or

14  Cercacor; is that right?

15          MR. LERNER:  In general, yes, Your Honor.  The

16  problem is we have this dispute over how they're -- or how they

17  are interpreting the trade secrets, right.  We've talked about

18  this before on how they've interpreted the Section 2019

19  statement and I think Apple is interpreting it very narrowly.

20          THE COURT:  Well, they do that at their own risk.

21  They do that at their own risk.  I mean, I'm not going to go

22  into Apple's file cabinets and look myself.  We trust lawyers

23  to be ethical, to interpret requests for production using

24  common sense and rationality.  And the penalties, if it should

25  turn out at some future time that it's discovered that relevant

Exhibit 61

48

1   information was withheld, are potentially severe both to an

2   entity and to an attorney who's found to have done that.

3            What's fascinating in the world of patent litigation

4   and trade secret litigation -- and I'm not going to say it's

5   going to happen here.  You never know and maybe we've talked

6   about this.  Companies that are fighting tooth and nail over

7   patent infringement or trade secret infringement sometimes a

8   year later are in acquisition talks and you have teams going

9   doing due diligence and suddenly things pop up that should have

10  been disclosed.  And that can happen.

11           But if you're asking me to say, well, I don't trust

12  them to produce documents asking -- relating to the -- how long

13  -- how many pages were the trade secret disclosures?

14           **MR. LERNER:**  I don't remember at this point, Your

15  Honor.

16           **THE COURT:**  It's pretty long.  I've looked at them a

17  lot.  It's pretty long.  I know it's A, B, C, D, E and F,

18  right?  They've offered that, that they'll respond to this

19  relating to that lengthy trade secret.  That's not good enough

20  for you?

21           **MR. LERNER:**  Well, Your Honor, it's not that I don't

22  trust counsel and I'm not trying to imply that at all.  I think

23  we just have a disagreement.  So, for example, on the pulse

24  oximetry issue, counsel earlier explained to Your Honor that

25  they don't think pulse oximetry is relevant to the trade

Exhibit 61

49

1    secrets.  We think it is.

2            So I would be okay if you want to narrow these to

3    some subject matter rather than a broad -- anything in the

4    2019, for example -- so if you wanted to say anything in the

5    2019 and pulse rate and pulse oximetry, for example.  So we at

6    least get everything that talks about pulse oximetry without

7    this dispute as to whether that's relevant to the trade

8    secrets.

9            MR. POWELL:  And, Your Honor, I will just say, I am

10   trying my best here but doing this months after, A, Apple paid

11   for me to brief this and, B, I can't talk with them about these

12   proposals which are rewriting this request in wholesale, I

13   can't do.

14           THE COURT:  All right, thank you.  I appreciate that.

15   226 will be granted as limited and as rewritten as follows:

16   "Non-public documents and things relating to Plaintiffs' trade

17   secrets as identified in their disclosure owned by, created in

18   whole or in part by or originating with Masimo and Cercacor."

19           All right, 230.  Now, from here on out, we have no

20   counterproposal.  It's just Masimo's proposal.  I'm really not

21   sure whether I want to go through and try to figure out what to

22   do with competing proposals at this stage in the game when I

23   made it -- I thought I had made it clear that I didn't want

24   more argument on these issues.  All I wanted in the statement

25   that was filed was a statement of which Request for Production

Exhibit 61

50

```
 1   had been agreed to and which hadn't or just which ones had been

 2   agreed to.

 3             MS. SAMPLIN:  And, Your Honor, can I just --

 4             THE COURT:  I'm going to -- just wait, please.

 5             How is -- let me start with one issue.  How is

 6   "former employee" defined?

 7             MR. POWELL:  "Former" -- sorry, Your Honor.  Was that

 8   directed at me?

 9             THE COURT:  I don't care who.

10             MR. POWELL:  Okay.

11             THE COURT:  I'm assuming you all know how it was

12   defined.  There's only one definition, right?  How is it

13   defined?

14             MR. POWELL:  Correct.  I can get the exact definition

15   but --

16             THE COURT:  Let's get the exact definition.  I have a

17   hard time finding things in here.

18             MR. POWELL:  Okay, Your Honor, I have it.

19             THE COURT:  All right.

20             MR. POWELL:  This is at Docket 353-2, Exhibit 3, Page

21   2.  That's Page 5 of the docket number.  And it cites, "The

22             term 'former employee' shall mean and refer to any

23             current or former Apple employee who worked at Masimo

24             or Cercacor before being employed by Apple."

25             THE COURT:  How many people do you think that would
```

Exhibit 61

51

1   encompass?

2          **MR. POWELL:**  I am aware of roughly, I think, 17 or

3   18.  And we've --

4          **THE COURT:**  Tell me about those 17 or 18.

5          **MR. POWELL:**  Well, this is addressed at the briefing,

6   Your Honor, at Page 84 of the Joint Stipulation.

7          **THE COURT:**  All right.  And beyond Mr. O'Reilly and

8   Mr. Lamego.  So you -- tell me about Ms. -- and I'm just going

9   to use last names -- Conrad, Eylers, Panaro (all spelled

10  phonetically).

11         **MR. POWELL:**  So those three individuals we agreed in

12  our joint stipulation that we were not seeking information

13  about.

14         **THE COURT:**  All right.  How about Briglia, Lu,

15  Tonello, Young, Jaginou, Raths, Aguirre, Arsul, Masume,

16  Oreshkin, Paul, Reagan and Wayne (all spelled phonetically)?

17         **MR. POWELL:**  So those individuals, it's unclear based

18  on the information we have from Apple of whether they were

19  involved --

20         **THE COURT:**  What do you know about them?

21         **MR. POWELL:**  We know these are individuals who were

22  -- worked at Masimo, later --

23         **THE COURT:**  Where did they work at Masimo?

24         **MR. POWELL:**  I'm sorry?

25         **THE COURT:**  What did they do at Masimo?

Exhibit 61

```
1              MR. POWELL:  It depends on the person but
2   generally --
3              THE COURT:  Let's go through them.  Mr. -- or I don't
4   know -- Anderson Briglia, what did that person do at Masimo?
5              MR. POWELL:  I do not know off the top of my head,
6   Your Honor.  Most of these people are engineers.  I --
7              THE COURT:  What did Ying Wi (phonetic) Lu do at
8   Masimo?
9              MR. POWELL:  Again, I don't know off the top of my
10  head for any of these people, what their title was at Masimo.
11             THE COURT:  Okay.  So I can just -- we don't have to
12  go through the list.  You don't know what they did there?  But
13  you want me to issue an order that Apple needs to look for
14  things that these people wrote, reviewed, et cetera, related to
15  the Apple Watch.  It could be the Apple Watch band, the Apple
16  Watch clock, the Apple Watch -- what else does Apple Watch do?
17  Does it drive your car yet?  You want me to order them for all
18  those people that you don't even know what they did at Masimo
19  to find all these various types of documents?
20             MR. POWELL:  No, Your Honor, that's not what we're
21  asking.  And I'll --
22             THE COURT:  It sure seems like it.  I mean, let me
23  read it.
24             And this is the original of 230.  "All documents and
25             things authored by, prepared by, provided by,
```

53

1          reviewed by or in the possession, custody or control

2          of any former employee that relate to Masimo or

3          Cercacor or any Masimo or Cercacor products or

4          technology including without limitations internal and

5          external communications and studies, reports,

6          memoranda, presentations or other documents."

7      So if it relates to -- it has the word "Masimo" or

8  "Cercacor," any of those people and you don't know what they

9  did there, they have to go search for it and produce it?

10      **MR. POWELL:**  No, Your Honor.  We narrowed that

11  request during the meet-and-confer as set forth in the Joint

12  Stipulation and it was our understanding that Your Honor was

13  okay if we narrowed requests during the meet-and-confer --

14      **THE COURT:**  Well, what I told you is if that was an

15  agreement to narrow it, that's fine.  If there wasn't an

16  agreement to narrow it, I'm just going to rule on what's in

17  front of me.  I'm not going to be jumping back and forth

18  between meet-and-confer letters, joint stipulations, a new

19  document filed three days ago to try to figure out what I'm

20  ruling on.  I'm ruling on the requests in front of me.

21      **MR. POWELL:**  And, Your Honor, if I may?  I'm just

22  directing Your Honor straight to the Joint Stipulation where we

23  just were.  And what we say on Category 2 -- and I'll quote it

24  -- is the issue is, "Plaintiffs asked" -- this is Page 84 at

25  Line 25.  "Plaintiffs asked Apple for more information on

Exhibit 61

54

1    individuals in Category 2 and asked Apple to produce

2    information on the individuals in Category 3."

3            And then if you look at Page 85, Line 1, so we state

4    -- I guess, let me continue.  So on 84, Line 27, we say the

5    Court "should order Apple to produce information on at least

6    the individuals in Category 3 because they are relevant for the

7    reasons discussed above."

8            **THE COURT:**  This is a request for production of

9    documents.  All right.  It's not an interrogatory.  You could

10   have asked an interrogatory.  You can't even tell me what

11   Category 2 folks did at Masimo and you want me to order Apple

12   to -- on a request for production to tell you what these people

13   did at Apple?

14           **MR. POWELL:**  No, Your Honor.  That's -- if you look

15   at Page --

16           **THE COURT:**  The Court should order Apple to produce

17   information for any individuals on Capital 2 that had any

18   involvement in the developing or marketing of the Apple Watch

19   or Apple health monitoring technology.  So if they made --

20   essentially making the band or the clock, you want that.  You

21   want anything that they reviewed, anything that -- how do you

22   search for that?

23           **MR. POWELL:**  I think that the way you would search

24   for that is you would ask those individuals.  It's going to be

25   the Category 3 individuals and then only Category 2 if they

Exhibit 61

1   were involved.

2          **THE COURT:**  Do you understand what you're -- first of

3   all, what you're asking me to do and then what you're asking

4   them to do is try to divine from multiple different sources for

5   multiple different people who you can't even tell me what they

6   did at Masimo to start inquiring them -- who may or may not

7   still be there and then have an ESI search if they have any

8   leftover email account and you can designate that person.

9          **MR. POWELL:**  And, Your Honor, I could tell you what

10   these individuals did.  I just don't know off the top of my

11   head.  That is information that would be easy for us to find.

12   Apple --

13          **THE COURT:**  Well, that's the risk when you have

14   defined -- we see it all the time.  When you have these defined

15   terms -- right, my favorite one is "you."  "You" means, when

16   it's a company, yourself, all your officers, all your

17   employees, you're your affiliates, anyone who was ever an

18   affiliate.  And then you're stuck with that.  How are they

19   going to respond to that?

20          When you define "former employees" to be any current

21   or former employee who formally was employed by Masimo and you

22   tell me there's -- what did you say -- 19 of them, that's 19

23   and you're putting them in three different categories and I

24   want you to do this for these people and that for these people.

25   I don't know what to do about these.  Why don't we just have

Exhibit 61

56

1    these under submission?  All right.

2          Do you want to be heard on behalf of Apple on this?

3          **MR. LERNER:**  Very briefly, Your Honor.  These should

4    be denied for four reasons.  First of all, this is not a joint

5    stipulation on Plaintiffs' proposals.  We said, we don't have

6    an agreement on these.  They just gave you their position on

7    them.

8          Second, the idea that you can say -- even if they

9    could tell you what these people did at Masimo that they should

10   have discovery of everything that was prepared by them or

11   anything else without a showing that they are somehow tied to

12   any wrongdoing flies in the face of California law.  We do not

13   assume that people are going to disclose secret information

14   about what they worked on.  Full stop.  Your Honor obviously

15   knows that.

16         Second (sic), we don't say that people can't talk

17   with their former co-workers.  Again, full stop.

18         And, third (sic) -- which to me in some ways is the

19   worst thing of all here and it happened the last time, too.

20   They asked Judge Selna to order us to give them a copy of any

21   patent, patent application, document or other presentation of

22   information by any of the former employees.  And that was not

23   ordered.  Yet we're still back here arguing the same thing

24   again.

25         And it is not relevant.  It's also not appropriate

Exhibit 61

57

1    and they should be denied as drafted.

2            MS. SAMPLIN:  And can I just add one more point which

3    goes to Your Honor's comment on the definition of "former

4    employees"?  The definition that is used throughout these

5    requests brings in former Apple employees who worked in entry-

6    level positions, people who worked in customer service

7    positions at retail locations at Apple and people who left

8    Plaintiffs decades before they went to Apple because maybe they

9    interned at Masimo, had a bunch of other jobs and then went out

10   to Apple.  So we really think this term "former employees" is

11   very, very overbroad.

12           THE COURT:  All right.  Let's -- for the time being,

13   Numbers 226, 230 through 234 are under submission.

14           MR. KATZENELLENBOGEN:  Your Honor, this is Ben

15   Katzenellenbogen.  Would you like us to address the reference

16   to the inevitable disclosure doctrine or should we leave it on

17   the current record?

18           THE COURT:  Is it in the briefing?

19           MR. KATZENELLENBOGEN:  I think the point is not

20   because Mr. Lerner's point --

21           THE COURT:  Well, then we're going to move on.  We've

22   had plenty of briefing on this.  I'm going to rule on what's in

23   front of me.

24           MS. SAMPLIN:  I'm sorry.  Just -- Your Honor, one

25   more clarification because you just said 226 is under

Exhibit 61

58

 1  submission but I believe Your Honor decided that one.

 2          **THE COURT:**  Well, for the time being, that -- this

 3  whole category is under submission.

 4          **MS. SAMPLIN:**  Okay.

 5          **THE COURT:**  It might not be by the time we get to the

 6  end of the hearing.

 7          **THE COURT:**  All right.  Let's turn to Category VII;

 8  RFP Numbers 236, 237, 239, 240, 241, 244, 245, 246, and 248.

 9          I don't know of a better way with these than to go

10  through them one by one.  Some of the issues are overlapping to

11  some earlier ones.

12          236 is, "All communications between Apple and any

13  former employee while the former employee was working at Masimo

14  and Cercacor."

15          And I understand, and I'm not saying it's the sole

16  objection.  But the primary objections from Apple on these

17  three coming up are, "Well, there's no solicitation -- improper

18  solicitation claim in this case; therefore, the recruitment

19  efforts are not relevant."  That's sort of the lead argument.

20          I don't agree with that.  But I do agree that, when

21  you, if referring to all former employees, I don't know --

22  again, I'm sort of stuck with what I have in front of me.

23  There has been -- there's no attempt to narrow this one.

24          And if it were certain identifiable former employees

25  who Mr. Lamego, and I think -- I assume maybe we even covered

Exhibit 61

59

1  that last time that there have been requests for that --

2  Mr. O'Reilly, maybe others who are known to have been involved

3  in the issues relating to the trade secrets.  That certainly

4  seems like a reasonable request.

5          But, again, the broad definition of former employee

6  is troubling.  But that's 236.

7          237 seems it's -- the main distinction being, one,

8  "while the person was working at Masimo."  Now 237, it's

9  "before the person began working for Apple."

10          Again, this could envelop someone who worked for

11  Masimo ten years earlier, and now is coming to Apple from some

12  third-party company.  That seems even less reasonably

13  calculated, or less relevant.

14          239.  This is a closer call to me.  It gets to what I

15  think -- even though there's not a solicitation claim, if there

16  is efforts to -- and I'm not -- and maybe I can get some

17  clarification on this -- but efforts to cease doing business

18  with Masimo, if that's in some way different from quitting a

19  job.

20          But, again, the broad term, "former employee," is not

21  tied to our issues here, and it's not a situation where -- as

22  we often see in unfair competition cases where someone is using

23  allegedly confidential information to raid a competitor, that's

24  not what we're seeing here.

25          I wish there hadn't been this former employee defined

Exhibit 61

60

1   term that requires me to now potentially go through 19

2   different people to see who fits in and who doesn't.  But those

3   are a little bit difficult.

4          I'm just reading my own notes for Number 240.  I

5   wrote, "Seems unnecessary."  And that is, again, not tied to

6   the specific issues of the case.  The personnel file for anyone

7   who falls into the definition of former employee seems

8   unnecessary.

9          241.  So, "Hiring or termination of any former

10  employees."  If we're talking about people tied to the trade

11  secrets and potential theft of trade secrets, that could be a

12  ripe area for discovery.  But it's any former employee not tied

13  to the issues.

14         244.  So now we get to a specifically identified

15  former employee, Mr. O'Reilly.  That's good.  But, "All

16  communications between Mr. O'Reilly and any hospital or

17  healthcare provider in the first 12 months that he worked at

18  Apple."

19         Again, I understand.  But is that speaking generally

20  as a trade secret E, D?

21         **MR. POWELL:**  D and E, Your Honor.

22         **THE COURT:**  D and E.  That you're interested in

23  certain things, but, you know, to the extent -- my guess is,

24  when he arrived at Apple, he probably sent out announcements

25  and sent out requests to have meetings.  It seems excessive.

Exhibit 61

61

1    That's what I wrote, and that's what I still think.

2           Again, I wrote the same note, "In tangential," on

3    245.  "Document sufficient to show the date and reason for any

4    of Michael O'Reilly's changes in titles or job responsibilities

5    at Apple.

6           Number 246.  "All communications between Marcelo

7    Lamego and any hospital or healthcare provider while Mr. Lamego

8    worked at Apple."

9           Similar concerns.  And I don't know that there's any

10   basis for me to think -- and you can tell me if you're wrong.

11   I think Mr. Lamego was sitting in that chair about 12 or 13

12   days ago -- if there's any reason to think that he has -- that

13   he had communications with healthcare providers while at Apple,

14   as opposed to being an engineer.  But we can see whether I have

15   evidence of that.

16          248.  So this is one that might be worth more

17   discovery or more discussion.  "Documents sufficient to show

18   the date and reason for Marcelo Lamego's employment at Apple

19   ending.

20          That one -- I'm interested in that one.  So you've

21   got me on that one.

22          So having heard my admittedly vague thoughts, I'm

23   going to let you, Mr. Powell, pick -- you can talk about all of

24   them.  But pick -- I'd suggest you spend your time on the ones

25   that maybe there's a good chance of getting some success with

Exhibit 61

1    respect to those requests.

2          **MR. POWELL:**  Thank you, Your Honor.  I'll start with

3    Number 248 then.  That's the one about sufficient to show the

4    reasons for Marcelo Lamego's employment at Apple ending.

5          **THE COURT:**  Uh-huh.

6          **MR. POWELL:**  This is an extremely important request.

7    And we think it's directly relevant.  Because we don't know

8    why, and Apple won't tell us, and neither will Mr. Lamego, as

9    to why he was terminated from Apple.

10          If Mr. Lamego was terminated because Apple knew that

11   he was stealing our trade secrets, that would be extraordinary

12   relevant to the case.

13          Likewise, if he was termination because he was -- he

14   had access to -- or he was using some other documents from

15   Masimo even if they're not identified as a specific trade

16   secret in this case, again, extremely relevant because Apple is

17   contesting and stating that it had no reason to know that

18   Mr. Lamego took any of our information.

19          That's an argument that Apple made in the Motion to

20   Dismiss several times now.

21          And so, if Apple did, in fact, know that Mr. Lamego

22   was using our information, then that would be extremely

23   relevant.

24          And that is a very small and discrete set of

25   documents that would be easy to find, is what -- it's not

Exhibit 61

63

1    something that's difficult to search for and not something that

2    is burdensome.  There's no evidence of burden there.  So that's

3    number one.

4           Number 245 is a similar issue.  This is the reason

5    for O'Reilly's change in title or job responsibilities -- is,

6    again --

7           **THE COURT:**  Let me just say, there is a potential

8    inference; termination a short time after arrival that -- and

9    he hadn't been there long enough.  And I don't even know if

10   termination.  He could have left on his own -- but a short

11   departure time, and then why did he depart.

12          And we're slicing things now.  But that's something

13   I'm interested in; why Mr. O'Reilly had any change in title or

14   job responsibility.

15          Let's just say the inferential chain that somehow

16   either he's being rewarded for stealing trade secrets or he's

17   being punished for receiving trade -- the inferential chain

18   there is getting pretty removed when it's just change in title

19   or job responsibility.

20          **MR. POWELL:**  I understand, Your Honor's point.  But,

21   again, I would submit that this is a very, again, easy-to-

22   locate set of documents.

23          Frankly, Request Number 240, the HR file for -- if it

24   was just for Lamego and O'Reilly, that would likely contain

25   documents --

64

 1          THE COURT:  But you're not asking --

 2          MR. POWELL:  -- sufficient to show.

 3          THE COURT:  -- just for Lamego and O'Reilly.  You're

 4  asking for any former employee.  So let's -- I'm not going to

 5  grant 240.

 6          MR. POWELL:  I know.  And that's not what I was

 7  trying to --

 8          THE COURT:  Okay.

 9          MR. POWELL:  -- imply, Your Honor.

10          What I meant was, for Number 245 and Number 248, the

11  HR file would be -- of Lamego and O'Reilly would be a document

12  sufficient to show both of those things.

13          THE COURT:  Well, now, a termination letter, if he

14  was terminated for cause and it set forth the grounds for

15  termination; not the entire HR file.

16          MR. POWELL:  Okay.

17          THE COURT:  I'm not going to start saying what is or

18  what isn't.  Because I don't think you wrote -- well, you

19  write, "Sufficient to show and date."

20          So a termination letter or an internal memorandum

21  saying, "Mr. Lamego resigned today because he wanted to be

22  closer to his family" or "because he wanted to work for

23  himself."

24          And that's what we're talking about here; not the

25  entirety of an HR file.

Exhibit 61

65

```
1           MR. POWELL:  And that's fine.  I don't know what
2   documents are there.  I was just suggesting that the HR file is
3   a very easy place to look for those documents.
4           THE COURT:  All right.
5           MR. POWELL:  Right?
6           THE COURT:  Anything further on any of these?
7           MR. POWELL:  The only thing further that I would
8   mention is recruiting of all of our employees is directly
9   relevant again because this issue of Apple claiming it had no
10  knowledge that it was obtaining our trade secrets.
11          And if the evidence would, for example, show that
12  Apple did know it was recruiting our trade secrets and was --
13  or I'm sorry -- it was recruiting employees for the purpose of
14  obtaining our trade secrets, that would be directly relevant.
15          And the reason why we ask for communications with
16  former employees, like 236, while they were employed with
17  Masimo, I can easily give them the Masimo email accounts for
18  all of these people.  It makes it very easy to search, to just
19  search for emails sent to those Masimo email accounts.
20          I have no indication that there's any burden, no
21  evidence, no declaration submitted.
22          THE COURT:  It's all true.  My biggest problem are
23  two.  There is a global issue that just because someone changed
24  jobs does not make it relevant to a trade secret case.
25          And, secondly, if you had listed certain names and
```

Exhibit 61

66

1  said, "Well, here's five people," yeah.  But when you get to 19

2  or even if you narrow it down to 14, I got to get into a

3  balancing.  You're right.  I don't have evidence of burden on

4  that one.

5          But by the same token, we talked about this last

6  time.  Reasonable particularity; that's what Rule 34 requires.

7  And that definition, to me, is not reasonably particular.

8          I'm glad that you folks tried to work it out and come

9  up with a narrower version of names that we know what we're

10 looking for.  But I don't know -- I wish I did.  But I don't

11 know the specific of how burdensome it would be.

12         But trying to do searches, even if you narrow it to

13 custodians -- and I'm not sure if that's what you're saying --

14 for all these email addresses across Apple, companywide, is

15 potentially burdensome; if you narrow it to just DSI (phonetic)

16 custodians, maybe not so burdensome.

17         But if you had limited this to, "Here's the four or

18 five key people -- because you know who your people are, and

19 you know generally who the -- whether those key people went

20 straight to Masimo or went to Masimo within a short enough time

21 period that, conceivably, there could be an issue about what

22 they may have brought with them.  That's not what this does.

23         So anything further?

24         **MR. POWELL:**  Only that Apple had agreed, in the

25 portion of the joint stipulation on defining former employee,

Exhibit 61

67

1    to at least include Marcelo Lamego and Michael O'Reilly.

2            And so I would request that, if Your Honor is

3    inclined to not grant on the full definition, that Apple's

4    proposal be adopted to --

5            **THE COURT:**  Did they say they would produce?

6            We're leaving aside to the definition.  Did they say

7    they would produce with respect to Numbers 236, 237, 239 to

8    241, 244 to 246, and 248, to the extent it referred to Messrs.

9    Lamego and O'Reilly?

10           **MR. POWELL:**  No.  I believe there were other

11   objections to those requests.

12           **THE COURT:**  Okay.

13           **MS. SAMPLIN:**  We did, Your Honor, to be candid.  We

14   did for 236, 237, and 239, on page 98.  We agreed to produce

15   documents responsive to those three RFPs to the extent they

16   pertain to O'Reilly and Lamego.

17           **MR. LERNER:**  And that -- we weren't taken up on that.

18   So now what we're getting is, "Now we'll take those."  And I

19   just go back -- we can't keep doing it this way.

20           **THE COURT:**  Yes, we can.

21           **MR. LERNER:**  Okay.

22           **MS. SAMPLIN:**  But I want to be clear that those were

23   the only three we said that for.

24           **THE COURT:**  236, 237, and 239; is that right?

25           **MS. SAMPLIN:**  Yes.

Exhibit 61

68

1        **THE COURT:**  All right.  Anything else from Apple?

2   Let me focus you particularly on 248.

3        **MR. LERNER:**  Yeah.  I'll skip the other former

4   employee issues and go straight to 248.

5        It is important to us -- and I think correct -- that

6   we should not be producing documents from HR files, which I

7   think we all agree.  We shouldn't be producing personal

8   documents about people.

9        **THE COURT:**  Hold on.  I don't know what you're

10  getting at.

11       **MR. LERNER:**  Well, what I'm getting --

12       **THE COURT:**  I'm not going to tell you where -- I'm

13  not going to get in -- I'm not micromanaging where something

14  comes from.

15       **MR. LERNER:**  Okay.  We shouldn't be --

16       **THE COURT:**  If you have the best -- if the best

17  document responsive -- I'm tentatively going to grant 248 -- is

18  contained in Mr. Lamego's personnel file, that doesn't make not

19  subject to discovery.

20       We've got an Attorneys' Eyes Only protective order to

21  the extent you're worried about confidential private

22  information of an employee.

23       **MR. LERNER:**  No.  This goes to relevance.  The

24  request here is, "Documents sufficient to show the date and

25  reason for Marcelo Lamego's employment at Apple ending."

Exhibit 61

69

1          We told them, "We will give you any documents from
2     his file that relate to" -- and, again, maybe this is one where
3     we tried to resolve it, and this is what we'll live with now.
4          We said, "We'll produce documents from the HR files
5     of Marcelo Lamego" -- and we also did it for O'Reilly -- "that
6     relate to the acquisition, use, or disclosure of confidential
7     or proprietary information to the extent those documents
8     exist."
9          We didn't limit it even to theirs.  We just said --
10    this is a trade secret case.  There were some patent claims
11    too.  If there's anything that has anything to do with an
12    intellectual property claim of any of the 31 flavors --
13          **THE COURT:**  So I'm going to cut you off.  That's one
14    basis for it.  There's all sorts of other things that could be
15    relevant to why Mr. Lamego left.
16          The mere fact that there -- you're saying, "Well, I'm
17    going to give you evidence if it relates to the theft of trade
18    secrets."
19          Bias is always relevant, all right?  Maybe Mr. Lamego
20    has a bias against Apple.  That's relevant for them to know,
21    all right?
22          Maybe there's a basis for Apple to have a claim
23    against Mr. Lamego, which could shape or shade his testimony.
24    That's relevant for them to know.
25          The reason why he left Apple is relevant.  And the

Exhibit 61

70

1  date, because it relates to the entirety of the case, is

2  relevant too.

3          So there's more to relevance than just saying, "Well,

4  I'll give it to you if it relates to disclosure of trade

5  secrets."  There's more to it.  And I'm inclined to grant it.

6          Again, I'll hear from you if there's some particular

7  privilege or some claim.  But it certainly doesn't sound unduly

8  burdensome.

9          MR. LERNER:  I don't think it's burdensome at all.  I

10  think I can't -- my answering your question is the very basis

11  for our objection.

12          I think there are a ton of reasons he could have left

13  Apple that --

14          THE COURT:  You're right.  And if we were talking

15  about --

16          MR. LERNER:  -- had nothing to do with --

17          THE COURT:  -- 15 different --

18          MR. LERNER:  -- the case --

19          THE COURT:  If you were talking about 15 different

20  people, I agree.  But we're talking about one person who

21  everyone agrees, right, central to this case.

22          A representation has been made to me by Mr. Powell --

23  and you could tell me if it's not true -- that Apple hasn't

24  told Masimo why Mr. Lamego left, what, six or eight months

25  after he arrived in 2014.

Exhibit 61

71

1          Is that right?

2          **MR. LERNER:**  Absolutely correct.

3          **THE COURT:**  Okay.  They're going to be entitled to

4    this in discovery here.

5          All right.  So my tentative is going to be for the

6    reasons stated, largely dealing with scope and overbreadth due

7    to the definition of former employee and, to the lesser extent,

8    not tying it to the specific issues in the case, that all of

9    Category Seven is denied except for 248, except to the extent

10   Apple agreed to produce information with respect to Numbers

11   236, 237, and 239, relating to Messrs. O'Reilly and Lamego.

12         I may not include that in the actual order.  I'm just

13   telling Apple that I'm holding you to that representation that

14   was made in the joint stipulation.

15         All right.  Interrogatory Number 10.  Give me one

16   moment.  All right.

17         So rather than read -- it's a lengthy interrogatory.

18   I'm going to talk to you about getting to the practicality of

19   this.  Page 105 of the joint stipulation, starting at line --

20   first full sentence, starting at line four, Apple writes, this

21   investigation -- why don't I start at line 3, first full

22   sentence.

23         "To the contrary, Apply conducted a reasonable

24   investigation to identify responsive information.  This

25   investigation yielded few results because the Apple Watch was

Exhibit 61

72

1    developed in-house by Apple's own engineers.

2              "Nonetheless, Apple did identify a document

3    containing analysis of various wrist-worn monitors, citation,

4    and asked Plaintiffs whether the information in this comparison

5    was of the type sought by Interrogatory Number 10."

6              And then there's back and forth between both sides,

7    including an in-Plaintiff supplemental memoranda about whether

8    there was a response given.

9              Apple, is there any reason -- on behalf of Apple, is

10   there any reason why Apple can't just write, "The investigation

11   yielded few results," and then identify the documents, under

12   Rule 33(d), that contain the information?

13             This question is directed to Apple.

14             **MS. SAMPLIN:**  Your Honor, we can do that.

15             I think our concern was the indications we were

16   getting in the meet-and-confer process was that that wouldn't

17   be sufficient to Plaintiffs.  And so we would end up back

18   before Your Honor.

19             And so that's why we were trying to negotiate with

20   Plaintiffs about the interrogatory.  But if Your Honor wants us

21   to do that, in the interrogatory, we can certainly do so.  I

22   just suspect that we'll be back here.

23             **THE COURT:**  Well, I'm not going to micromanage it.

24             **MS. SAMPLIN:**  Yeah.

25             **THE COURT:**  You know, right now, there's no response,

Exhibit 61

73

1    okay?

2           What's difficult for me is, on lots of other things,

3    you're giving me a long list of objections and told me that

4    this is irrelevant, has nothing to do with the case.

5           What I don't have -- I don't have that here.  I'm

6    glad.  It makes it easier for me.  But what I do have is,

7    "Well, we kind of raised a trial balloon, and said, 'Is this

8    what you're looking for?'"

9           And, you know, that's not how discovery works.

10   Either make a response and let them challenge it, or, you know,

11   and then you can either stand on it or supplement.

12          But what I have right now is almost -- I've use it

13   before -- the unbaked cake analogy.  I don't really have much

14   to rule on right here.  I have the trial balloon, and then

15   someone saying, "Well, they never actually gave me the trial

16   balloon.  It's still just a trial balloon."

17          So give them a trial balloon.  And if you want to

18   move to compel on it later -- I don't want to be giving

19   advisory opinions on what should or shouldn't be in an answer

20   when I don't have the full answer.

21          You know, and there's language like, "Well, the

22   investigation yielded few results."

23          I don't know what that means.  Are there other

24   documents out there?  Is there a more fulsome answer that could

25   be provided?

Exhibit 61

74

1          **MR. LERNER:**  Understood.

2          **THE COURT:**  I'm going to order this one -- the motion

3   granted to require a further response.  I'm not ruling on what

4   the further response should or shouldn't be.  All right?

5          **MS. SAMPLIN:**  Understood, Your Honor.

6          **THE COURT:**  So let's turn to Numbers 180 -- RFP

7   Numbers 180, 187, 191, 192, 197 through 206.

8          And let's see here.  We have determined that 191,

9   197, and 202 are moot.

10          Is that right, Mr. Powell?

11          **MR. POWELL:**  I believe so, Your Honor.  Did you say,

12   "191, 197, and 202"?

13          **THE COURT:**  Yes.

14          **MR. POWELL:**  That's correct, Your Honor.

15          **THE COURT:**  Okay.  So we'll recognize that the joint

16   stipulation has material under seal.

17          I think we can deal with this largely by referring to

18   them by their letter in the 2019.210 disclosure.  And some of

19   these Masimo -- I guess, perhaps it's all the ones other than

20   the ones that were mooted.

21          Masimo provided an additional compromise on the

22   Tuesday, June 1st filing, which, again, complicates how we

23   proceed on this.

24          And there's a sense in which these requests general,

25   and there's a difference -- I'll say that the disclosures --

Exhibit 61

75

1    the D and E disclosures are a little bit broader.

2         But there's a sense that -- I'm glad that these are

3    tied to some specific trade secrets.  But is it at such a level

4    of generality that -- how do we -- well, why don't you --

5         Why don't I start with you, Mr. Powell.  But focus me

6    on how -- and I appreciate the attempt to limit it in the

7    proposed modification from three days ago.  I wish it were -- I

8    wish that had come a long time earlier.

9         But how do we deal with this?  I think the general

10   topic is very fair, right?  That's what I've been asking you to

11   do since our hearing two weeks ago.  But it's also, when you're

12   using the headings as opposed to the subfactors -- help me.

13        Walk me through this.  Why is this a fair, reasonable

14   request?

15        **MR. POWELL:**  Thank you, Your Honor.  So I will say --

16   and I apologize if I misunderstood as for whether you wanted to

17   see proposed compromises.

18        The reason why those weren't made earlier is that we

19   did not understand that Your Honor would have a problem with

20   the language of all documents that refer or relate to.

21        That's language that Apple has used in its request.

22   And we have -- and when we heard that at the hearing, I

23   thought, let's --

24        **THE COURT:**  Can I tell you --

25        **MR. POWELL:**  -- "Let's fix that."

Exhibit 61

76

1          **THE COURT:**  I don't have a problem with that,

2   depending on what follows.

3          If what follows is a very discrete issue -- and I use

4   the example of Coca-Cola, right?  All documents related to

5   caffeine, well, that's huge.

6          All documents related to the distribution of Coca-

7   Cola products in the Ukraine during, you know, the calendar

8   year 2014, you know, throw in enough limitations, okay, that's

9   narrow enough.

10          So I don't have a problem with refer or relate-to.

11   What I have a problem refer or relate-to against the pipe

12   scenario, where does it go?  Does it narrow or is it broad, all

13   right?

14          **MR. POWELL:**  I understand, Your Honor.  And the issue

15   here is we've drafted kind of two separate types of requests.

16          One of them is directed toward specific types of

17   documents that we're looking for that we think would have

18   information relevant to the trade secrets.

19          And on those requests, many of the objections we get

20   is, "Well, those documents that can be contained documents that

21   relate to the trade secrets and documents that don't relate to

22   the trade secrets.  So you need to go narrower," right?

23          And so we tried these that say, "Okay, just give me

24   the documents that actually relate to the trade secrets," and

25   that the intent here is, well --

Exhibit 61

77

1          **THE COURT:**  I mean, let's work through this.  I mean,

2    I don't think you disagree.  You've been saying it all along;

3    "Tie it to the trade secret, tie it to the trade secret."

4          The problem is -- I assume you're going to tell me,

5    is, well, if you tie it to a level of generality so high,

6    that's not -- and we had a fight about this, right, whether the

7    headings were themselves Attorneys' Eyes Only or not.

8          And correct me if I'm wrong, I think I said they

9    weren't Attorneys' Eyes Only, but I also said, "But they are

10   still confidential."

11         So it's this middle ground.  What can you folks do to

12   get what you are entitled to and that doesn't overburden them?

13         And if we have to go through these one by one, we

14   can.  But I'm disappointed that you couldn't work these out a

15   little bit; that you couldn't say, "Okay, what is it you're

16   looking for here?  How can we narrow this?  Can we do it either

17   with a time frame limitation?  Can we do it to get the -- we

18   start out with Trade Secret Category A.  Can we be a little bit

19   more specific about what we're looking for?  Can you have your

20   tech people come up with a search term list that gets you what

21   you want?"

22         I'm disappointed that you couldn't work this out.

23         **MR. POWELL:**  All right.

24         **THE COURT:**  So here's what I'm saying.  That these

25   categories generally are relevant, and it's really what I've

Exhibit 61

78

1    been telling the Plaintiffs to do the entire time.

2            And, frankly, Mr. Lerner, it's kind of what you've

3    been telling them, whenever they say, "pulse oximetry," well,

4    tie it to the trade secret.

5            So here, these are tied to the trade secret, but is

6    it a high-level generality?  What can we do?

7            **MR. POWELL:**  Well, Your Honor --

8            **THE COURT:**  Any offers, Mr. Powell?

9            **MR. POWELL:**  Well, I would clarify the request.  I'm

10   looking at Request Number 180.  It does specify described under

11   Heading A.

12           So we're not asking about heading -- headings.  We're

13   only asking about the specific numbered trade secrets that are

14   set forth under --

15           **THE COURT:**  Okay.

16           **MR. POWELL:**  -- the headings.

17           **THE COURT:**  Fair enough.

18           **MR. POWELL:**  And, again, the objection that we've

19   received to these was, for example, that they were not -- each

20   of the requests were not limited to the Apple Watch itself.

21   That's what -- one of Apple's primary objections to this.

22           And two issues with that.  Number one, none of these

23   trade secrets have to be directed towards the Apple Watch.

24           Some of them, like Categories D and E, are business

25   and marketing plans that would apply beyond the Apple Watch,

Exhibit 61

1    frankly.

2            And I think all of them, if Apple has some other

3    product -- say it's making a pulse oximeter that is not the

4    Apple Watch, and it uses all of our trade secrets in that

5    product, I think we're entitled to that.

6            And that's -- the issue here is I don't know what is

7    out there.  I don't know if the Apple Watch is the only

8    relevant thing because we've received no indication from Apple

9    to state that there is anything beyond the Apple Watch.

10           There's no declaration saying, "Yeah, we have all of

11   these other products that might use that.  And it would be

12   burdensome for this reason."  I just don't know.

13           But I do think that there's use of our trade secrets

14   in a product other than Apple Watch, I think that's directly

15   relevant to the case, and I think that it's --

16           **THE COURT:**  Well, let me --

17           **MR. POWELL:**  -- within the scope.

18           **THE COURT:**  -- just say I don't disagree with you,

19   okay?  But here's where digging into the individual trade

20   secrets matters.

21           And I hope you don't mind.  Can I characterize

22   certain trade secrets as relating to marketing?

23           **MR. POWELL:**  Sure.

24           **THE COURT:**  All right.  And looking at -- let's look

25   at Number 200; Request for Production Number 200, "All

Exhibit 61

80

1    documents and things that refer or relate to Apple's business

2    and marketing plans for products that calculate one or more

3    physiological parameters."

4              You're right.  It's not limited to the Apple Watch.

5    And I'm not necessarily requiring -- you know, a trade secret

6    could be used as some other product.  But I don't know what

7    else Apple makes that would use the trade secrets.

8              And that Number 120 that I just read is not tied to

9    the trade secrets specifically.  And, more generally, if you

10   look at 198 and 199, you know, here's where the specificity of

11   the trade secret that I found sufficient, under 2019.210,

12   depending on the trade secret --

13             We had a long discussion about tethering, right?

14             Sometimes the radius of the tether might be greater

15   or less, based on the nature of the trade secret.  Some of D

16   and E -- and I'm going from memory.  I want to be careful that

17   I don't contradict myself.  But some of D and E, I would say,

18   should have a shorter tether in terms of relevance for

19   discovery purposes.

20             Then maybe some of the technical descriptions in A,

21   B, C, and F -- am I talking too much in code for you to

22   understand what I'm saying, Mr. Powell?

23             **MR. POWELL:**  I understand what you're saying, Your

24   Honor.

25             **THE COURT:**  I'll ask Mr. Lerner, am I -- are you

**EXCEPTIONAL REPORTING SERVICES, INC**

Exhibit 61

81

1    understanding what I'm saying?

2              **MR. LERNER:**  Yes, Your Honor.

3              **THE COURT:**  All right.  So tell me what you think of

4    that, Mr. Powell.

5              Maybe it can be asked another way.  I can't ask it

6    that way, because I know what that answer will be.

7              But, in all seriousness, how important is -- are the

8    requests here that are tied -- that it makes specific reference

9    to business and marketing plans, and how far does the refer or

10   relate-to as to those, should I extend the tether as opposed to

11   specific technical specifications contained in the others?

12             **MR. POWELL:**  Well, Your Honor, the trade secret set

13   forth in Categories D and E are important.

14             **THE COURT:**  I knew that was going to be the answer.

15             But here's what I'm going to say.  I can imagine

16   doing a search -- again, I'm not going to be specific -- for

17   technical terms in A, B, C, and F, having my IT person, say,

18   "Look for this, within three of this."

19             Or, D and E, I can see having much more difficulty

20   coming up with a search paradigm -- search algorithm that will

21   get you what you want that won't bring up -- with a company

22   like Apple, that won't bring up tens of millions of hits.

23             Now, I don't know.  And I don't have that in front of

24   me.  This is where I wish I had something, where I could say,

25   "Hey, listen.  This is what trying to do this would result in."

Exhibit 61

82

```
 1              So I'm not sure what I'm going to do with these.

 2              MR. POWELL:  Well, in that --

 3              THE COURT:  Tell me anything else you want to tell me

 4   in defense of your position in the motion, Mr. Powell.

 5              MR. POWELL:  Thank you, Your Honor.  I think, when

 6   we're talking about the idea of how long the tether is, that is

 7   certainly relevant when we're talking about requests that

 8   aren't directly -- directed specifically to the trade secrets.

 9              These, I think, it's not really an issue of the

10   tether, because they're directed right at the trade secret.

11              THE COURT:  But let's focus on the marketing ones.

12              MR. POWELL:  Sure.

13              THE COURT:  And you could use a specific term, right?

14   A defined technical term to run a search.  It's much harder to

15   run a defined technical term because marketing -- the terms in

16   the marketing -- not all of them.  But the terms in D and E are

17   more general.

18              That's not to say -- and that's where I wanted to

19   catch myself.  It's not to say they're too general to be trade

20   secrets.  But they can apply across different platforms that

21   really have no actual connection to the specific trade secret.

22              Does that make sense?  And that's what I want to get

23   at.  How referring or relating to those two, whether there's a

24   way to narrow those.

25              MR. POWELL:  Well, I understand what Your Honor is
```

Exhibit 61

83

1   saying.  And I appreciate it.  I'm trying to answer it as best

2   I can.

3            I think these trade secrets -- there is language in

4   these trade secrets that can be searched from.  And I think

5   this all goes back to what the Federal Rules say.  It's a

6   reasonable search.

7            I would be happy to work with Apple if they want to

8   propose some search terms and say, "Would you agree that this

9   is reasonable?"  I'd be happy to talk to them about that.

10           The other thing is -- again, I don't want to get into

11  too much of the details about what they're doing on their side.

12  But if it were me, and what I do on my side, is I'd call up my

13  witness, and I'd say, "Hey, who is, you know, in charge of

14  marketing and the plans for the Apple Watch?"

15           And I would say, "Okay.  Can you" -- I'd talk to them

16  about it and try to get some information from them about what

17  type of documents they have and get those documents.

18           I'd run a search on whatever terms that are unique in

19  this trade secret disclosure.  And that's how I would craft a

20  reasonable search.

21           And I'm happy to work with Mr. Lerner, if he wants to

22  run that by us to try to get our approval so that there's not a

23  dispute on that.  That's something we can certainly talk about.

24           **THE COURT:**  All right.  And let me just tell you, in

25  terms of a tentative, for 200, 201, 202; those, I think I can

Exhibit 61

84

```
 1   find are overly broad and not tied on a reasonable tether to
 2   the trade secrets at issue, and are beyond the scope of
 3   relevance for purposes of damages at this stage.
 4          MR. POWELL:  The only thing I would add, Your Honor,
 5   is I believe we reached an agreement on 202.
 6          THE COURT:  Oh, 202, okay.
 7          MR. POWELL:  So you don't need to address that one.
 8          THE COURT:  Well, good.  You've stopped me.
 9          All right.  So 200 and 201.  The other ones, I'm
10   still considering.
11          And, again, I'll turn to you, Mr. Lerner.  But part
12   of my thinking here is, as you have pointed out in other
13   filings, that the last motion was denied, what, 30 out of 34,
14   primarily over me telling Mr. Powell and you arguing, "Tie it
15   to the trade secrets; tie it to the trade secrets."
16          Here, they have tied it to the trade secrets in
17   large -- to a large extent.
18          So tell me --
19          MR. LERNER:  Sorry.  One question that I -- I should
20   have tried to catch this before.
21          I'm not aware -- and I may have dismissed an
22   agreement on 202.  And I'm happy to take this in whatever order
23   you want.  We can address that later.  We can --
24          THE COURT:  I have that, earlier today, I was advised
25   that 191, 197, and 202 are moot, based on an agreement.
```

Exhibit 61

1          But I'm not going to put "based on agreement."

2    They've been mooted or withdrawn.

3          **MR. LERNER:**  Okay.  Let me put a pin in that.

4          There's obviously been a lot going on.  So let me try

5    and answer your question, and I'll come back to 202, if that

6    makes sense?

7          **THE COURT:**  All right.

8          **MR. LERNER:**  Okay.  So the issue here -- and I do

9    want to address your point about trying to work this out -- is,

10   when you were talking about the technical secrets -- so let's

11   take 180, for example -- we went through and tried to point out

12   carefully that what's happening here is kind of only half of

13   the equation, which is, they're saying, "Every document and

14   thing that relates to this entire alleged secret, under the

15   heading of A, and all of the many steps thereunder."

16          They're not limiting it to -- and this is important,

17   because it is what frames what they have an allegation -- a

18   basis to allege in this case -- is the watch.

19          We went through -- there is nowhere in the

20   complaint -- which guides this -- where they say, "These

21   secrets are incorporated in some other Apple device.  It is

22   only the watch."

23          So that's why we were focusing on the watch.

24          Now, why is that important?  Well, to Your Honor's

25   point about trying to figure this out, one way to limit this is

Exhibit 61

86

1    where you would look for this.

2           And as I said last time, we have said, "If you want

3    to know how we do this process that's set out in A, here is the

4    source code that shows how we do it."

5           So we've tried to look for ways to show them the

6    documents that get to the crux of the issue.  And they have it.

7    And they haven't ever told you again that we do it the way they

8    do.  And the problem that arises when you get beyond trying to

9    actually show them, for example, how we do it, is --

10          And this came up at the last hearing.  Your Honor,

11   pointed out that these -- and I'll just keep focusing on A --

12   there are parts of this broad concept that are not a secret.

13          What's alleged to be a secret is the very specific

14   way in which they do it, and the order in which they do it,

15   which they claim has -- apparently, you know, generates certain

16   results or something else.

17          But the point is, if you just start saying anything

18   that refers or relates to, then we're in the universe where we

19   were two weeks ago where we're talking about, well, anything

20   that refers or relates to them relates to component pieces that

21   everybody agrees are not a secret.

22          Which is why we've been trying to work this out by

23   saying, for example, we're giving you what everybody says are

24   the crown jewels; the source code.

25          If you see anything there, let's go forward with

Exhibit 61

87

1    Judge Early and have a dispute about why this needs to go

2    broader or anything else, but what we don't have here is even a

3    limit to the product that allegedly incorporates the secrets, a

4    limit to the patents that allegedly disclose the secrets.

5    Those are the two places; no limits to the individual who

6    allegedly disclosed this stuff to us.

7            All you have is everything in Apple that refers or

8    relates to the entire subject matter.  And that, to us, to Your

9    Honor's point, is A, overbroad, but B, not really workable,

10   which is why we've done things like hand over all of the source

11   code that relates to this.

12           So, that's why we disagree with this set, and until

13   having had, for example, the source code, which shows how we do

14   it, somebody says to Your Honor, "They do it the same way we

15   do", all of this seems overbroad and, you know, obviously,

16   burdensome.

17           But I don't understand how we can go from "The watch

18   that incorporates this or a patent discloses it" to "Every

19   document in the whole company that refers or relates to any

20   component", I think, was the word Your Honor used the last

21   time, "that's a part of any of these secrets".  That does not

22   seem workable as these are drafted.

23           **THE COURT:**  Well --

24           **MR. LERNER:**  And I will -- the final thing I'll add,

25   which I think you've touched on is, the parties are in

**EXCEPTIONAL REPORTING SERVICES, INC**

Exhibit 61

1    agreement on 28 custodians and their negotiating terms.  So, if

2    there is some additional overflow that -- where the source code

3    isn't good enough, then the parties are going through the

4    terms, and I don't think anybody in the court is going to tell

5    you that they haven't been thinking about these secrets when

6    they've been giving us their terms.

7              **THE COURT:**  All right.  Anything further?

8              **MR. POWELL:**  Submitted, Your Honor.

9              **MS. SAMPLIN:**  I'll just add that 202, Mr. Powell is

10   correct.  We did reach agreement on that.

11             **MR. LERNER:**  Sorry about that; I was wrong.

12             **THE COURT:**  Well, I have a question for both of you.

13   I know you've been back and forth on this, but these are

14   important, these requests.

15             You've now sat with me for over eight hours.  Do you

16   think, Mr. Powell, that you can find a way to get what you're

17   looking for?  What Mr. Lerner is saying, among other things, is

18   hey, you've got the source code; that shows how our Apple Watch

19   uses these things.

20             One of the things you're saying is A, well, I

21   shouldn't just be limited to what Apple says; I should be able

22   to get other records to test that.  And also, I don't know that

23   the Apple Watch is the only product that my alleged trade

24   secrets were either used or contemplated being used in, and so,

25   it shouldn't be limited to the Apple Watch.

Exhibit 61

89

1          The complaint refers only to the Apple Watch

2     Products, but that doesn't mean that, to the extent there is

3     discoverable information elsewhere, that that's the end of the

4     inquiry.

5          But I get back to how one would conduct a search.  Is

6     there a way that you can be more specific in what you're asking

7     for for each of the trade secrets, and just say, "Look, if we

8     get search terms that have these things through these -- with

9     these custodians, that's good enough for me"?  Or even just

10    say, "No, I just want a ruling up or down on these RFPs as

11    written".

12         **MR. POWELL:**  We never just want a ruling up or down.

13    I'm always happy to negotiate and try to reach an agreement.

14         **THE COURT:**  Well, but here's my take.  Okay.  I hear

15    it, but now we're here.

16         **MR. POWELL:**  Yeah.

17         **THE COURT:**  And now all I can do is up or down.  I

18    can't modify these.  These are as they incorporate the trade

19    secrets, some of which are pages long, I can't start saying

20    this, not that, this, not that.  I don't know enough, and I

21    wouldn't want to do that.  But you know enough.  It's being

22    represented that some of the things in the trade secrets are

23    not themselves confidential; that they're public information.

24         There's, you know, different characterizations of the

25    dispute.  Is there anything that you can do, do you think you

Exhibit 61

1   can do, with Mr. Lerner or Ms. Samplin to try to resolve this

2   to get what you really want, and to save Apple from having to

3   attempt to do a broad-based search for anything relating to,

4   again, however many pages of trade secrets we have?  Can we

5   find a more targeted way to get what you need?

6           **MR. POWELL:**  I think so.  I think that we could work

7   with them, like I said, if they want to propose some search

8   terms.  I also think that they should talk to their witnesses

9   and try to find out where the documents, for example, on

10  xxxxxx       are.  And the reason that's important, I just want

11  to --

12          **THE COURT:**  Do you need that in any way shielded?

13  That term.

14          **MR. POWELL:**  -- I'm sorry.  Yes, I do.  I'm so sorry.

15          **MR. LERNER:**  You just --

16          **THE COURT:**  Yeah.  We're -- all right.  Any

17  transcript of this proceeding will redact the word that --

18  beginning with the letter "D" that Mr. Powell just used from

19  public view.

20          **MR. POWELL:**  Thank you, Your Honor.  I apologize.

21          So, the issue here is the source code, we've heard

22  this quite a bit, that the source code has been produced; that

23  should be good enough.  And we haven't told them that the

24  source code misappropriates our trade secrets.

25          So, a couple of things there.  Number one, this isn't

Exhibit 61

1  summary judgment, or we haven't even done expert reports yet.

2  So, yes, we've looked at the source code.  We have some

3  analysis on it.  I am not the person that did that because I

4  don't read source code, so it's difficult for me to try to

5  rebut those arguments on the fly.

6          But more importantly, research and development, and

7  consideration is a use of trade secrets.  It doesn't have to be

8  in the final product in the source code.

9          And this is -- I'll just refer Your Honor to the *PMC*

10 case and the *SkinMedica* case that's cited in our briefing.  And

11 *PMC* states that employing the confidential information and

12 manufacturing --

13          **THE COURT:**  If I can cut to the chase --

14          **MR. POWELL:**  Okay.

15          **THE COURT:**  -- I've already told you, I'm not viewing

16 solely what's in the complaint in reference to the Apple Watch

17 as being a hard slamming of the door if there's relevant

18 responsive information located -- reasonably located in other

19 places.

20          But how do we work out a mechanism for Apple to be

21 able to search that which is a reasonable search?

22          **MR. POWELL:**  I would think that we trust counsel's

23 representation that they've conducted a reasonable and diligent

24 search, and I'm happy to work with them if they want to say,

25 hey, for the ESI portion of this search, are these search terms

Exhibit 61

92

1   good enough?  Do you have anything to add?  I would be happy to

2   have that discussion with them.

3           THE COURT:  Well, you're asking for them to propose

4   the search terms.  Why -- have you proposed search terms for

5   these particular RFPs?

6           MR. POWELL:  We have proposed search terms.

7           THE COURT:  What was -- what was the response?

8           MR. POWELL:  We are still working on those search

9   terms with each other that's --

10          THE COURT:  I'm asking you about these specific, that

11  there's objections to.  You proposed search terms for 236

12  through 248, and that's not -- there's some gaps in there, as

13  well as 180, 187 -- I'm sorry.

14          Yes, 180, 187, 192, 198, 201, 203 to 206.  You're

15  telling me you proposed search terms for those requests?

16          MR. POWELL:  No, they weren't tied to any particular

17  request.  What we did is we provided --

18          THE COURT:  I appreciate that.  So, did those search

19  terms, if you get an appropriate response from Apple, will that

20  encompass what you're looking for in these?

21          MR. POWELL:  To give you an answer on that, Your

22  Honor, I would need to check.  I might need a brief recess.

23          MR. LERNER:  Your Honor, can I just try and answer

24  this?

25          THE COURT:  Well, I'm asking what Mr. Powell's

Exhibit 61

1    understanding is.  If you want to give your understanding, then

2    go ahead.

3          **MR. LERNER:**  I don't need to if I'm interrupting.  I

4    just thought it might be helpful.

5          The parties are negotiating terms, and I think Your

6    Honor's at least thought on this seems useful to me which is,

7    the answer to your question is, even if their terms are not

8    tied to these specific RFPs, they are tied directly to, without

9    stating any of them, for example, Secret A.

10         The very terms they are giving us come out of the

11   alleged secrets, and then to Your Honor's point about what the

12   parties are doing to make this workable or not workable, we're

13   actually sharing the data on the burden in terms of the hit

14   counts.

15         So, I think at least the answer to Your Honor's

16   question, and people can take a break if they need to check it,

17   is, yes, there are terms that are directly related to each of

18   these because they are directly related to the alleged secrets,

19   which is no surprise, and the parties are exchanging the hit

20   counts on those terms.

21         **THE COURT:**  All right.  I don't remember who it was,

22   but someone had earlier said, "Hey, we want to get moving on

23   this".  You've got a motion, dueling motions to extend the

24   discovery cutoff date.

25         I hate to leave this open to say, you folks work it

Exhibit 61

94

1   out, because past history -- don't take this the wrong way;

2   past history tells me it won't be worked out and we're merely

3   delaying the inevitable.

4          But if each of you are saying you think there is a

5   reasonable likelihood that Plaintiff will get what it wants

6   from these requests based on the negotiations that are ongoing,

7   here's what I want to do.

8          I don't want to throw a hand grenade in the middle of

9   your garden party, but I tried to change it from an unpleasant

10  metaphor, and created an even more unpleasant metaphor.

11         So, I don't want to invite the skunk to the garden

12  party, and blow up a negotiation -- boy, now, I've completely

13  mixed the metaphors -- by issuing a ruling that one party is

14  going to say, aha, we get everything, or aha, you get nothing,

15  if you folks are in good faith trying to work through this.

16         Here's what I'll tell you.  I don't like to give

17  advisory opinions, but this is what I was trying to get at last

18  time.  Focus on what you need, but at the same time, balance

19  out the difficulties for any company, much less a, you know, I

20  was going to say multibillion, but is it multitrillion?  I

21  don't know.  A very large company, and how they're going to

22  find responsive information.

23         And the way you do that, you're both technically

24  proficient, I'm not, is by the iterative process of back and

25  forth these search terms, a quick check yielded x number of

Exhibit 61

95

1    hits.  Try this, try that.

2         But I don't want to do something that's going to

3    grind that to a halt by issuing a ruling that someone's going

4    to say, aha, I don't have to do that, or aha, you have to do

5    ten times that.

6         So, with respect to Category IX, don't take this the

7    wrong way, but I also don't want to leave things open.  What I

8    may do is say, I'm going to deny the motion subject to the

9    parties' neutral representation that they are working through

10   search terms and a procedure to get Plaintiffs a reasonable --

11   the relevant information that is reasonably available subject

12   to a reasonable and diligent search.

13        And if the parties are unable to reach that

14   agreement, they can -- Plaintiff can file a notice, and what's

15   Category IX in the joint stipulation will immediately be

16   considered an active motion again.  And there'll be no further

17   briefing.  We're just going to issue rulings.  If Plaintiff

18   issues that notice, it'll be immediately under submission for

19   an immediate ruling.

20        Does that make sense?  But first of all, I want --

21   I'm going to first ask if what I -- the premise of that is

22   true, that each side thinks they may be able to work this out

23   with respect to these requests for productions.

24        From -- Mr. Powell, from Plaintiff's standpoint, is

25   that true?

Exhibit 61

96

1          **MR. POWELL:**  Yes, but I'd like to add one quick

2     thing, Your Honor.

3          **THE COURT:**  Okay.

4          **MR. POWELL:**  And that is only that at the beginning

5     of this, we talked about both search terms and discussing the

6     matter with witnesses as part of a reasonable search.

7          We think that part of that reasonable search would be

8     asking the witnesses, "Hey, where do you keep documents on

9     Category blank".

10         **THE COURT:**  I'm not going to order anything other

11    than what the Rules require and what the cases require from

12    counsel in responding to discovery and engaging in a good faith

13    meet and confer process, which is designed in good faith to

14    resolve all or as many of the disputes as possible, which one

15    would be hard-pressed to say involves no communication between

16    an attorney and his or her client, but I don't want to

17    micromanage things here.

18         We're assuming good faith, and you said you take

19    counsel at their word when they make representations to you.

20    So, I'm assuming that this is not Apple's counsel that's

21    driving everything; that there are -- in fact, they fought

22    tooth and nail to get as much access to non-AEO information as

23    possible to their in-house counsel that -- in-house counsel are

24    involved in this as well.

25         So, I'm going to take that as a yes to my question.

Exhibit 61

97

1   Mr. Lerner, do you think on behalf of your clients that the

2   parties could reasonably resolve these disputes, bearing in

3   mind that I think that each party has valid interests in their

4   positions with respect to what I called Category IX?

5           **MR. LERNER:**  Yes, Your Honor.  And I don't have an

6   additional argument point; I just had a question, and I realize

7   you've been at this for a while, so I apologize for the

8   question.

9           My sense is that's true for the technical ones, but

10  200 and 201 are out.

11          **THE COURT:**  Yes --

12          **MR. LERNER:**  Okay.

13          **THE COURT:**  -- 200 and 201 are -- make sure I'm

14  looking at the right ones.  Yes, that's --

15          **MR. LERNER:**  With that submitted, Your Honor, nothing

16  else from us.

17          **THE COURT:**  -- okay.  So, here's what I'm going to

18  do.  And I'm going to ask about the procedure, make sure you're

19  okay with it, Mr. Powell.  My procedure is going to be, I'm

20  going to deny the motion as to the requests in Category IX; 200

21  and 201 will just be straight denials.  The remainders -- and

22  202 has been withdrawn.

23          The remainders I will deny based on counsel's

24  representation that they think they can potentially be

25  resolved, and it's without prejudice to Plaintiff filing a

**EXCEPTIONAL REPORTING SERVICES, INC**

Exhibit 61

1   notice with respect to any failure to finally resolve the

2   matter, identifying which requests for production they're -- no

3   resolution could be reached.

4           There will be no argument in that notice, and

5   there'll be no response to that notice.  As of that notice,

6   those requests for production will be immediately under

7   submission and subject to immediate ruling based on the

8   arguments that have already been presented.

9           Is that acceptable to you, Mr. Powell?

10          **MR. POWELL:**  Yes, Your Honor.

11          **THE COURT:**  Mr. Lerner.

12          **MR. LERNER:**  Yes, Your Honor.

13          **THE COURT:**  All right.  I have to now circle back

14  because there was one grouping that I took under submission.

15          **MR. POWELL:**  Your Honor, could I ask one

16  clarification question?

17          **THE COURT:**  Yes.

18          **MR. POWELL:**  If such a notice is required, and we're

19  really hoping it is not, would you like the last best proposals

20  from each party?

21          **THE COURT:**  Well, I'm going to let you know, here --

22  since -- if I go just by what the record is, Apple's official

23  response to I think each of these was no statement that they

24  would comply; is that correct?

25          What does -- does Apple want to have an opportunity

```
 1   to potentially have a -- no, I'm just going to leave it, we're

 2   going to leave it as is.  We're going to leave it as is.

 3          I don't want to overcomplicate things, and we'll just

 4   rule.  I certainly encourage you to try to resolve this.

 5          Now, I need to circle back because I didn't take good

 6   enough notes.

 7      (Pause)

 8          THE COURT:  All right.  And as to Category 7, I'm

 9   just trying to remind myself now because I did not take good

10   notes on it.

11          MR. LERNER:  That was --

12          THE COURT:  So as to Number 248, that, I indicated

13   was a grant.  Does that sound right?

14          MR. LERNER:  Yes, Your Honor.

15          THE COURT:  But --

16          MR. LERNER:  I think it was 236 to 246 were under

17   submission on the --

18          THE COURT:  Okay.

19          MR. LERNER:  Reargue it.  I'll just leave it at that.

20          THE COURT:  Well I'd like to -- if I can give you a

21   ruling today, I'd like to do it.

22          MS. SAMPLIN:  I thought we ruled on Category 7.  I

23   thought it was 226 and 230 to 234 that you took under

24   submission.

25          THE COURT:  Well let me see here.
```

1          Yeah, I think I denied it.  236, 237, 239, 240 --

2          MS. SAMPLIN:  Do you want me to read you my notes?

3          THE COURT:  -- 241, 244, 245, 246.  Yes, I denied as

4    to all those and granted as to 248.

5          MR. LERNER:  Okay.  Then that resolves it.

6          MS. SAMPLIN:  Yeah.  And then you said "except to the

7    extent Apple agreed to produce for 236, 237 --

8          THE COURT:  Right.

9          MS. SAMPLIN:  -- and 239."  So I think that resolves

10   Category 7.

11         MR. LERNER:  Right.

12         MS. SAMPLIN:  I believe it's Category 6 that you took

13   under submission.

14         THE COURT:  All right.

15      (Pause; Counsel conferring)

16         MR. LERMA:  So the ones that were under submission,

17   Your Honor, as I understand it were 226 and 230 to 234.

18         THE COURT:  All right.  And --

19         MR. POWELL:  Your Honor --

20         THE COURT:  Just a second please.

21         226, as limited.

22      (Pause)

23         So 235, of Roman Numeral 6, 235 is out; that's been

24   resolved.

25         MS. SAMPLIN:  Yes, Your Honor.

1          **THE COURT:**  236 -- I'm jumping back between different

2    documents.

3          **MS. SAMPLIN:**  236 is in Category 7, Your Honor.

4          **THE COURT:**  I'm sorry.  226, we had nonpublic --

5          Why did I write this?  I remember doing it.

6          Nonpublic documents and it was relating to (reads

7    under breath) Oh, I know why.  I have two copies of this.

8          **MR. KATZENELLENBOGEN:**  Yes, Your Honor.  I believe

9    that was --

10         **THE COURT:**  I got it.  I actually wrote it in the

11   blueback copy.

12         So 226 is granted based on an amended version of

13   Masimo's proposal contained in Docket 419.

14         "Nonpublic documents and things relating to

15   Plaintiffs' trade secret (plural) as identified on their

16   disclosures, owned by, created, in whole or in part, by or

17   originating with Masimo or Cercacor."

18         Then 230 was a no, denied.

19         231 is a denied.

20         232 is denied.

21         233 is denied.

22         234 is denied.

23         And 235 was previously resolved.

24         Actually, let me go back and look at 234 for a

25   moment.

1          235 is out.

2      **(Pause)**

3          You know what?  234, I have a question mark.  And I

4    don't remember if we discussed 234.  Did we specifically

5    discuss 234?

6          **MR. LERMA:**  I think only as part of a group, Your

7    Honor.

8          **THE COURT:**  All right.  It has to do with part of the

9    problem is the former employee.  And the physiological

10   monitoring technology is broader than some of the other ones

11   that I've granted.

12         What was the -- can you tell me what the resolution

13   was with respect to 235?

14         **MS. SAMPLIN:**  I believe I have that, Your Honor.

15         The resolution, Your Honor, for 235 was:

16         "Any disclosure to Apple regarding pulse rate or

17         oxygen saturation by any former employee."

18         **MR. POWELL:**  And Your Honor, if I may?

19         We had a similar proposal on 234 that was in Docket

20   419 limiting this to pulse rate and pulse oximetry.

21         **THE COURT:**  All right.  Let me hear from Apple why a

22   similar striking of "any physiological monitoring technology"

23   and replacing it with "any pulse rate or oxygen saturation

24   technology" would still be overbroad in Number 234.

25         **MS. SAMPLIN:**  Your Honor, they didn't propose a

103

1    limitation with pulse rate or oxygen saturation.  That was why

2    we rejected their proposal.

3              **THE COURT:**  Right.  I'm now proposing it.

4              **MS. SAMPLIN:**  Okay.

5              **THE COURT:**  Let me know what you think.

6              **MR. LERMA:**  So I think that -- to be as straight-

7    forward as I can on the fly -- I think the difference is that

8    you've got a bunch of commas and disjunctives here.  And so

9    even if you were to try and limit it that way --

10             **THE COURT:**  Let me read this to you.

11             **MR. LERMA:**  -- you would still have --

12             **THE COURT:**  Let me read this to you.

13             **MR. LERMA:**  Yeah.

14             **THE COURT:**  "All documents and things that refer to,

15                   relate -- refer or relate to any pulse rate or oxygen

16                   saturation technology that was developed or

17                   manufactured by Plaintiffs or any former employee."

18                   (Period).

19             **MR. LERMA:**  Right.  And that would be, for example --

20   and this puts us back where we were before.  That would include

21   or relate to, for example, any document or things that relate

22   to the products that we sold for them.  That was why we

23   rejected this one.  We couldn't find a way to fix it.

24             **THE COURT:**  How about excluding marketing materials?

25             **MS. SAMPLIN:**  The --

Exhibit 61

1          **MR. LERMA:**  It would still -- go ahead.

2          **MS. SAMPLIN:**  Yeah.  I was just going to say, the

3    reason we agreed to the modification for 235 because it was a

4    disclosure to Apple regarding pulse rate or oxygen saturation

5    by any former employee.  So I think that's their argument.

6    They --

7          **THE COURT:**  But this is developed or manufactured.

8    That seems even more restrictive than coming from Plaintiffs

9    which could be all sorts of different things.

10         **MS. SAMPLIN:**  But it's all the former employees.  And

11   so that's I think it still suffers from the overbreadth.

12         **THE COURT:**  Isn't Number 235 all former employees?

13         **MS. SAMPLIN:**  Right, but disclosed to Apple.  So

14   we're searching in Apple's files for things that were

15   disclosed.

16         **THE COURT:**  If I got rid of any former employees it

17   wouldn't narrow this at all.

18         **MR. LERMA:**  No I mean that's -- there's all these

19   "or's".  But to Your Honor's point, it wouldn't just be

20   marketing; it would be anything about since it's developed or

21   manufactured, it's anything about any of their products.  Full

22   stop.

23         **THE COURT:**  Well, pulse rate or oxygen saturation

24   technology.

25         **MR. LERMA:**  But that's what their products do.  They

1  don't anything else.

2          **THE COURT:**  Excluding marketing materials.

3          **MR. LERMA:**  Right.  Even if you exclude marketing

4  materials, it's still everything related to their products.  We

5  just could not find a way to fix it.

6          **THE COURT:**  Why would you have things relating to

7  their products other than in the marketing that we talked about

8  earlier?

9          **MR. LERMA:**  Because we sell them and have for --

10          **THE COURT:**  That's marketing material.

11          **MR. LERMA:**  And I think part of the --

12          **THE COURT:**  That's what we're --

13          **MR. LERMA:**  No, not just mark -- we have

14  everything --

15          **THE COURT:**  Anything relating to sales or marketing.

16          **MR. LERMA:**  What's that?

17          **THE COURT:**  Excluding sales or marketing.

18          **MR. LERMA:**  That's my point is there's a whole

19  universe when you sell something that has nothing to -- we're

20  not just engaged in the sales -- the marketing.  We actually

21  have the store.  And so there's communications about how much

22  of these do you want?  How much are you paying?  When are you

23  getting them?  There's all this stuff that has nothing to do

24  with the case.

25          And just to give Your Honor some idea, the stuff that

Exhibit 61

1   we're talking about of theirs is a thing that goes on your

2   finger.  And then in many instances it connects to a phone,

3   including ours.  So we're talking about a large universe of

4   stuff with 234 that we couldn't find a way to fix that doesn't

5   have anything to do with the case.

6           THE COURT:  All right.  Anything further from

7   Plaintiffs on 234?

8           MR. POWELL:  Not unless Your Honor has any questions

9   for us.

10          THE COURT:  Well, I'm probably going to deny the

11  motion.  So if you have anything you want to add, add it now,

12  just as to 234.

13          MR. POWELL:  Okay.  Thank you, Your Honor.

14          I would think that the pulse rate and oxygen

15  saturation limitation is more than appropriate.

16          And Counsel has identified sales and marketing

17  documents as being a problem and we can easily exclude those.

18  And that is, again, after discussing about excluding those,

19  Counsel mentioned that documents about how many products are

20  purchased and how many products are shipped to stores and that

21  kind of thing, those are, again, part of the sales and

22  marketing.

23          If it helps, we can change this to exclude nonpublic

24  -- or I'm sorry, to include only nonpublic documents and

25  exclude any of these public documents that might be out there

1    that they're referring to.

2         But I do think this is directly relevant.  It's

3    similar to what they agreed to on 235.  And I do think it is

4    appropriate.

5         **MR. LERMA:**  It's not remotely.

6         **THE COURT:**  Whoa, whoa, whoa, I'll let you know if I

7    need to hear further argument.

8         **MR. LERMA:**  Apologies.

9         **(Pause)**

10        **THE COURT:**  I'm going to add 234 to the Category 9,

11   that you folks are to meet and confer further on this to see

12   whether since we're really talking about what needs to be

13   excluded from an otherwise broadly relevant but argument is

14   overbroad request, that you folks are to meet and confer

15   further with respect to 234.

16        It's denied without prejudice, following the meet and

17   confer, to Plaintiff filing a notice that it could not be

18   resolved.

19        **MR. POWELL:**  Understood, Your Honor.

20        **THE COURT:**  I'm working my way backwards to make sure

21   I've got everything down.

22        **(Pause)**

23        All right.  Adding Number 5, 67 through 70,

24   155 through 157 or 67 through 69, it's denied.

25        70 is denied but it's subject to what's been

Exhibit 61

108

1   confirmed at the hearing with that Apple will comply as

2   modified to replace "accused of infringement" with "Plaintiffs'

3   trade secret disclosures".

4            As to 155, that's a deny.

5            166 -- is a grant -- I'm sorry.

6            156 is a grant;

7            And 157 is a grant but with the reference to, "or any

8   other government agency," stricken.

9            Roman Numeral 4, 165 to 170.

10           165, and reworded, "All documents and things

11  reflecting an intent by Apple to investigate for commercial use

12  technology based on Masimo's MightySat Pulse Oxsimeter".

13           And similar for 166, with the difference being the

14  iSpO2 Pulse Oximeter.  So those are both granted as reworded.

15           And the motion is denied as to 167, 168, 169 and 170.

16           Moving back to heading Roman Numeral 3, I think these

17  have largely been withdrawn, except for 104 and 105 which were

18  denied.  And the basis for the denial was overbreadth, not

19  reasonably calculated or not proportional to the needs of the

20  case, and not sufficiently reasonably narrowly tailored with

21  respect to 104 and 105.

22           And then finally, Category Heading Roman Numeral 2:

23           Number 82, that has been withdrawn as moot.

24           Number 98, also withdrawn.

25           Number 99, also withdrawn.

Exhibit 61

1          Number 107 was withdrawn in the filing on Tuesday.

2          163 is also withdrawn.

3          And 164 is a grant.  And I don't think there was any

4    change to the language of 164.

5          **MS. SAMPLIN:**  No, there was not, Your Honor.

6          **THE COURT:**  Yes, so 164 is a grant.

7          What's a reasonable time to make production or

8    respond to Interrogatory Number 10?  I think, Plaintiffs, you

9    asked for 14 days on the motion.

10          Is there any separate request based on the current

11    status of the case?

12          **MR. POWELL:**  I think we would leave it with our

13    request on the motion.

14          **THE COURT:**  Okay.  Mr. Lerner, do you want to be

15    heard on the amount of time needed to comply?

16          **MR. LERMA:**  On the -- on the -- sorry for pausing for

17    a second.

18          On the interrogatories -- on the interrogatory, two

19    weeks works.

20          **THE COURT:**  All right.  What about the production of

21    documents?

22          **MR. LERMA:**  Given the number that we are talking

23    about here and the ongoing discussions about terms and

24    custodians, that is obviously more difficult, particularly

25    because some of these, as Your Honor has indicated, are

Exhibit 61

1  substantial.  I certainly think we --

2          THE COURT:  Let me interrupt.

3          As of this moment your discovery cutoff is July 5th?

4          MR. LERMA:  Yep.

5          THE COURT:  I wouldn't want to set it out beyond

6  then.

7          MR. LERMA:  Understood.

8          THE COURT:  July 5th is I think it's a federal

9  holiday; it may not be a holiday for the entire entirety of

10 folks but how about today is the 3rd; how about by Friday, June

11 21 which would be 22 days.  And obviously if the parties get an

12 extension of the discovery cutoff, they can agree amongst

13 themselves to extend the dates.

14         MR. KATZENELLENBOGEN:  Your Honor, I believe that's a

15 Monday.

16         THE COURT:  I'm sorry.  June 25.  What did I say?

17         MR. LERMA:  June 25th works, Your Honor.  Obviously

18 we'll confer with counsel if there's --

19         THE COURT:  You don't need an extension if it's

20 granted by the other side if for whatever reason as you work

21 things out you discover more time is needed.

22         All right.  So why don't -- I'll leave the

23 Interrogatory Number 10 supplemental response due by June 17th,

24 and any further production of documents due by June 25th, and

25 the parties may, on their own without coming to court, grant

111

1    extensions for such further responses as they may agree.

2           Is there anything further that we should take up on

3    this motion, Number 357?

4           **MR. POWELL:**  Nothing from Masimo, Your Honor.

5           **THE COURT:**  And from Apple?

6           **MR. LERMA:**  No, Your Honor, thank you for your time.

7           **THE COURT:**  All right.  Thank you.  You-all have a

8    good day.

9           **MR. LERMA:**  You too.

10          **MR. POWELL:**  Thank you, Your Honor.

11       **(Proceeding adjourned at 12:59 p.m.)**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit 61

112

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    June 5, 2021

                Signed                                      Dated


*TONI HUDSON, TRANSCRIBER*

Exhibit 61

# EXHIBIT 63

1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(SOUTHERN DIVISION - SANTA ANA)


MASIMO CORPORATION, ET AL,    ) CASE NO: 8:20-CV-00048-JVS-JDEx
                              )
            Plaintiffs,       )            CIVIL
                              )
    vs.                       )        Santa Ana, California
                              )
APPLE, INC,                   )        Thursday, May 20, 2021
                              )
            Defendant.        )
_____)


PARTIAL TRANSCRIPT RE:

MOTION TO COMPEL [DKT.NOS.351,357]


BEFORE THE HONORABLE JOHN D. EARLY,
UNITED STATES MAGISTRATE JUDGE

(SEALED PORTIONS OMITTED)


APPEARANCES:            SEE PAGE 2


Court Reporter:        Recorded; REMOTE; Wave

Courtroom Deputy:      Maria Barr

Transcribed by:        Exceptional Reporting Services, Inc.
                       P.O. Box 8365
                       Corpus Christi, TX 78468
                       361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

Exhibit 63

48

1    on one side, I don't know what's coming from the other side.

2    And I had a 240-page joint stipulation not too long ago that

3    was not difficult at all to rule on.  Sometimes I have six-page

4    apex-type depositions that are incredibly complex and require a

5    great deal of thought.

6              And -- again you're getting too inside baseball here.

7    Law clerks are great.  Law clerks who have never practiced I

8    don't think are able to handle a lot of the discovery disputes

9    as easily as someone who has practiced.  So -- I don't want to

10   waste any more time.  You don't have positions on it.  We're

11   going to proceed, but it can't go on like this and I don't know

12   what to do.

13             I think we had -- and maybe it was that same phone

14   call or maybe it was on a subsequent Order, but I on one issue

15   offered to have an informal, made myself available to have an

16   informal telephone call about whatever the issue was, and my

17   mind is forgetting what that was, and I wasn't taken up on it.

18             I don't know if that's going to help, but things like

19   spoliation or spolation, that's not one I can rule on on the

20   fly and that's not one anyone can.  But if we -- if this is the

21   reality of what we have, we're going to have to come up with

22   another way or a better way to handle it that takes into

23   account that this is a public office that serves all sorts of

24   people, not just one case.

25             So, let's proceed on with -- we left off at Request

Exhibit 63

1  Number 65.  I read it into the record.  I gave some tentative

2  thoughts to you, Mr. Powell.  It's the refer or relate and any

3  ruling would be without prejudice to you or your client serving

4  a follow-up request for production.

5         And I'm going to throw this out there.  I don't mind

6  seeing request for production number 850.  That in and of

7  itself tells me nothing, because 850 carefully crafted requests

8  for production are much better than ten, you know, give me

9  every single document referring, relating, concerning, having

10  anything to do with some general topic.  So, I don't mind if

11  the numbers get up there high.

12         What I mind is trying to figure out how on an eight-

13  year time period with I understand there's still a dispute on

14  up to 39 custodians, and possibly more if a showing is made

15  that it's warranted, how refer or relate to documents are

16  needed.  You know, I don't -- the difficulty is I don't have on

17  the flip side the evidence of the burden.  But on this one,

18  when I see refer or relate to it causes me concern and we'll

19  continue to hear that as we go through this.

20         But let me hear from you, Mr. Powell.  I don't

21  actually recall if you had an opportunity to be heard on 65.

22         **MR. POWELL:**  Sure, Your Honor.

23         So, just a few things.  And I recognize what you're

24  saying about it being -- this language being a bit broad.  And

25  part of that is because we're in a situation where we don't

Exhibit 63

165

 1    order -- I think one example is we said "work related" instead

 2    of "work meetings;" we said "work-related meetings".  They say

 3    we haven't complied with your order.

 4             Also, we had our in -- given the timeframe -- it was

 5    a quick turnaround -- we had our in-house counsel send the

 6    emails to the employees and asked them to answer these

 7    questions.  In-house counsel then forwarded me all the

 8    responses.  I personally placed eyes on every single email from

 9    each of those 11 folks but their side is taking the position

10    because those emails weren't sent directly to me, we didn't

11    comply with your order.

12             So I'm raising now -- they requested a meet and

13    confer in fairness on it today but they've put this position in

14    the email and we kind of just looked at it and said, I don't

15    really want to brief this issue to you.  I think we did our

16    best to comply with your order.  I don't think there's any

17    question that we satisfied the order with respect to many of

18    the deponents who have answered all the questions perfectly.  I

19    don't really want to engage in a joint stipulation quibbling

20    over the language but I'm kind of at a loss of what to do

21    because we have these deponents who answered the questions.

22    And I think under the order should be proceeding with remote

23    depositions.  And we're happy to show you the declaration; I

24    have it here today if that would be helpful.

25             THE COURT:  Plaintiffs' counsel?

Exhibit 63

1          **MR. POWELL:**  Thank you, Your Honor.

2          Frankly, we suggested in speaking about this because

3     we're open to trying to compromise if we can.

4          And the issue here, though, I would take issue. It's

5     not a quibbling with a word here or there.  I think Your Honor

6     was very specific in stating a number of things.

7          Number one was that Apple required -- the employee

8     was advised by Apple that they were required to work remotely

9     for the next 60 days.  Every single one of the deponents came

10    back and the language was that they understand that Apple's

11    policy is that they should work remotely whenever possible; it

12    doesn't say that they were told they were required to work

13    remotely.

14         And then again you have the issue of who spoke

15    directly with these people, and you have the issue there were,

16    I think I believe four people who do regularly attend meetings

17    at Apple; and of course we'd be willing to talk about some of

18    those people.

19         Like for example, there's one I can think of and I

20    wish I could remember who it was -- it might be Ms. Haggarty

21    (phonetic) who has -- she said she has a family member who's

22    immunocompromised.  That's certainly something I'm happy to

23    talk to them about and see if this is someone, for example,

24    that she's worked -- living with or sees all the time, we can

25    work that out and that's why we wanted to talk to them about

Exhibit 63

1  it.  Even though that -- Ms. Haggarty -- I think if it was

2  Ms. Haggarty, she does attend meetings at Apple so she wouldn't

3  qualify under Your Honor's order.  But look, I'm sensitive to

4  that and I have a family member who's immunocompromised myself.

5  And so I wanted to try to talk to them and if it's really

6  someone that she sees all the time and she's very worried about

7  it, then we could talk about that one, for example.  That was

8  what we were planning on doing.

9          MS. SAMPLIN:  I will just say the email from their

10  counsel yesterday said the Court's order is denied with respect

11  to your depositions and we need to talk about proceeding with

12  in-person depositions.  So I didn't really get the sense that

13  there was room there.  Happy to discuss and particularly -- and

14  I said, you know, myself, for certain people they didn't answer

15  the questions the way Your Honor had envisioned because some

16  people have gone into Apple.  I understand those present

17  different circumstances.  I think Plaintiffs are well within

18  their right to ask to meet and confer about those folks because

19  they didn't directly comply with the order and I'm happy to

20  discuss those.  But for the other folks, I respectfully do

21  think it's quibbling over language.  I'm happy to show you the

22  declaration.  I don't know that a meet and confer really should

23  be required on those because I think they answered all of your

24  questions.  Of course if Your Honor tells us they didn't, we're

25  happy to provide or revise wording but I think they answered

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    **May 26, 2021**

            Signed                                              Dated


                    *TONI HUDSON, TRANSCRIBER*

EXHIBIT 66

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(SOUTHERN DIVISION - SANTA ANA)


| | | |
|---|---|---|
| MASIMO CORPORATION, ET AL, | ) | CASE NO: 8:20-CV-00048-JVS-JDEx |
| | ) | |
| Plaintiffs, | ) | CIVIL |
| | ) | |
| vs. | ) | Santa Ana, California |
| | ) | |
| APPLE, INC, | ) | Thursday, June 17, 2021 |
| | ) | |
| Defendant. | ) | (9:58 a.m. to 10:36 a.m.) |


HEARING RE: PLAINTIFFS' MOTION TO COMPEL [DKT.NO.400]


BEFORE THE HONORABLE JOHN D. EARLY,
UNITED STATES MAGISTRATE JUDGE



<u>APPEARANCES</u>:                SEE PAGE 2


Court Reporter:           Recorded; CourtSmart

Courtroom Deputy:         Maria Barr

Transcribed by:           Exceptional Reporting Services, Inc.
                          P.O. Box 8365
                          Corpus Christi, TX 78468
                          361 949-2988







Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

Exhibit 66

```
 1   all these emails back and forth and everybody gets either

 2   comfort that, okay this is what happened and there's no further

 3   action to be taken or we're going to run with some other motion

 4   and that's what we're going to do.

 5            All right.  So that's going to be the ruling.  It's

 6   going to be to deny the motion but to sua sponte grant the

 7   30(b)(6) deposition on narrow topics relating to document

 8   retention (slash) destruction for these two witnesses to be

 9   completed by July 5th, unless the discovery cutoff is extended

10   by Judge Selna.

11            And Apple is separately directed to file a redacted

12   version of the Goldberg Declaration, if you could do that let's

13   say by Monday, June 21st.

14            All right.  First of all, are there any questions on

15   the ruling, starting with plaintiff?

16            MR. POWELL:  No, Your Honor.

17            THE COURT:  Mr. Lerner, on behalf of Apple?

18            MR. LERNER:  Nothing, Your Honor, thank you.

19            THE COURT:  All right.  That'll be the order of the

20   Court.  Thank you.

21            MR. POWELL:  Thank you, Your Honor.

22        (Proceeding adjourned at 10:36 a.m.)

23

24

25
```

Exhibit 66

30

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    **June 18, 2021**

Signed                                                                 Dated


*TONI HUDSON, TRANSCRIBER*

Exhibit 66

# EXHIBIT 68

JOSHUA H. LERNER, SBN 220755
  jlerner@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street Suite 3000
San Francisco, CA 94105
Tel.: 415.393.8200 / Fax: 415.393.8306

H. MARK LYON, SBN 162061
  mlyon@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA 94304-1211
Tel.: 650.849.5300 / Fax: 650.849.5333

BRIAN M. BUROKER, *pro hac vice*
  bburoker@gibsondunn.com
BRIAN K. ANDREA, *pro hac vice*
  bandrea@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Tel.: 202.955.8541 / Fax: 202.467.0539

BRIAN A. ROSENTHAL, *pro hac vice*
  brosenthal@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Tel.: 212.351.2339 / Fax: 212.817.9539

ILISSA SAMPLIN, SBN 314018
  isamplin@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Tel.: 213.229.7000 / Fax: 213.229.7520

ANGELIQUE KAOUNIS, SBN 209833
  akaounis@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2029 Century Park East Suite 4000
Los Angeles, CA 90067
Tel.: 310.552.8546 / Fax: 310.552.7026

*Attorneys for Defendant Apple Inc.*

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**
**SOUTHERN DIVISION**

| | |
|---|---|
| MASIMO CORPORATION, a Delaware corporation; and CERCACOR LABORATORIES, INC., a Delaware corporation, <br><br> Plaintiffs, <br><br> v. <br><br> APPLE INC., a California corporation, <br><br> Defendant. | CASE NO. 8:20-cv-00048-JVS (JDEx) <br><br> **DEFENDANT APPLE INC.'S SECOND NOTICE OF DEPOSITION OF MASIMO CORPORATION AND CERCACOR LABORATORIES, INC. UNDER FRCP 30(B)(6)** |

SECOND NOTICE OF DEPOSITION OF MASIMO CORP. AND
CERCACOR LABS., INC. UNDER FRCP 30(b)(6)
CASE NO. 8:20-cv-00048-JVS (JDEx)

Exhibit 68

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Defendant Apple, Inc., by and through its undersigned attorneys, will take the oral deposition of Plaintiffs Masimo Corporation and Cercacor Laboratories, Inc. ("Plaintiffs") on September 22, 2021 at Gibson, Dunn & Crutcher, 333 South Grand Avenue, Los Angeles, CA 90071, unless otherwise agreed, and continuing from day to day thereafter until concluded, Saturdays, Sundays, and holidays excepted. The deposition is being taken for the purposes of discovery, for use at trial, and for any other purposes as permitted under the Federal Rules of Civil Procedure, court order, and any other applicable rules. Pursuant to Federal Rule of Civil Procedure 30(b)(6), Plaintiffs are directed to designate one or more officers, directors, managing agents, or other individuals able to fully and completely testify on behalf of Plaintiffs regarding the subject matters listed in Exhibit A attached hereto.

The deposition shall be conducted before a notary public or some other officer authorized by law to administer oaths for use at the trial herein. The deposition will be recorded by stenographic, sound, video, audiovisual, and/or any other such appropriate means. Any recording, videotape, and transcript of this deposition may be used for any legally permissible purpose, including admission at trial.

Gibson, Dunn & Crutcher LLP

SECOND NOTICE OF DEPOSITION OF MASIMO CORP. AND CERCACOR LABS., INC. UNDER FRCP 30(b)(6)
CASE NO. 8:20-CV-00048-JVS (JDEX)

Exhibit 68

1   Dated:  August 9, 2021                     Respectfully submitted,

2                                              JOSHUA H. LERNER
                                               H. MARK LYON
3                                              BRIAN M. BUROKER
                                               BRIAN A. ROSENTHAL
4                                              ILISSA SAMPLIN
                                               ANGELIQUE KAOUNIS
5                                              BRIAN K. ANDREA
                                               GIBSON, DUNN & CRUTCHER LLP
6

7

8                                              By:  */s/ Joshua H. Lerner*
                                                    Joshua H. Lerner
9

10                                             *Attorneys for Defendant Apple Inc.*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND NOTICE OF DEPOSITION OF MASIMO CORP. AND
CERCACOR LABS., INC. UNDER FRCP 30(b)(6)
CASE NO. 8:20-CV-00048-JVS (JDEX)                          Exhibit 68

# EXHIBIT A

## DEFINITIONS

Notwithstanding any definition set forth below, each word, term, or phrase used in these interrogatories is intended to have the broadest meaning permitted under the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the Central District of California.  In these interrogatories, the following terms are to be given their ascribed definitions.

1.    The term **"Masimo"** refers to Masimo Corporation and its officers, directors, current and former employees, counsel, agents, consultants, representatives, and any other Persons acting on behalf of any of the foregoing, and Masimo Corporation's affiliates, parents, divisions, joint ventures, licensees, franchisees, assigns, predecessors and successors in interest, and any other legal entities, whether foreign or domestic, that are owned, partially owned, or controlled by Masimo Corporation.

2.    The term **"Cercacor"** refers to Cercacor Laboratories, Inc. and its officers, directors, current and former employees, counsel, agents, consultants, representatives, and any other Persons acting on behalf of any of the foregoing, and Cercacor Laboratories, Inc.'s affiliates, parents, divisions, joint ventures, licensees, franchisees, assigns, predecessors and successors in interest, and any other legal entities, whether foreign or domestic, that are owned, partially owned, or controlled by Cercacor Laboratories, Inc.

3.    The terms **"You," "Your,"** or **"Plaintiffs,"** refer to Masimo and Cercacor, jointly or individually.

4.    The terms "**Defendant**" or "**Apple**" refer to Apple Inc.

5.    The terms **"Person"** or **"Persons"** shall mean any natural person, or any business, legal or governmental entity or association, including, without limitation, the owners, officers, directors, agents, trustees, parents, or subsidiaries, affiliates, assignees, predecessors, and successors of such entities or associations and/or natural persons.

3

Gibson, Dunn & Crutcher LLP

Second Notice of Deposition of Masimo Corp. and Cercacor Labs., Inc. Under FRCP 30(b)(6) CASE NO. 8:20-CV-00048-JVS (JDEX)

Exhibit 68

6. The term **"Communication"** shall mean every manner of disclosure, transfer, or exchange of information whether person-to-person, in a group, orally, in writing, by telephone, by electronic transmission, or otherwise.

7. The terms **"Document"** or **"Documents"** is used in the most comprehensive and broadest sense permitted by the Federal Rules of Civil Procedure 26 and 34, and specifically includes electronically stored information and every "writing" and "recording," as those terms are defined in Rule 1001 of the Federal Rules of Evidence.  A draft or non-identical copy is a separate Document within the meaning of this term.

8. The term **"each"** shall mean each and every.

9. The term **"any"** shall include the word "all," and vice versa.

10. The terms **"and," "or,"** and **"and/or"** shall be construed in the conjunctive or the disjunctive, whichever makes the discovery request more inclusive so as to bring within the scope of the request all Documents that might otherwise be construed to be outside of its scope.

11. The present tense includes the past and future tenses.  The singular includes the plural, and the plural includes the singular.  Words in the masculine, feminine or neutral form shall include all of the other genders.

12. The use of the term "**the**" shall not be construed as limiting the scope of any interrogatory.

13. References to **"employees," "officers," "directors,"** or **"agents"** shall include both current and former employees, officers, directors, and agents.

14. A request for **"identification,"** to **"identify,"** or to "**describe**" requires the following:

(a) When used with respect to a Document or tangible thing, to state: (1) the type of Document or tangible thing (e.g., letter, memorandum, computer disk drive, etc.); (2) the date it was created; (3) its author and signatories; (4) its addresses and all other persons receiving copies; (5) the nature and substance of

4

Gibson, Dunn & Crutcher LLP

SECOND NOTICE OF DEPOSITION OF MASIMO CORP. AND CERCACOR LABS., INC. UNDER FRCP 30(b)(6) CASE NO. 8:20-CV-00048-JVS (JDEX)

Exhibit 68

the Document in sufficient particularity to enable it to be identified; and (6) its location and its custodian (or, if it is no longer within your possession, custody, or control, state what disposition was made of it; state the date of such disposition; identify every person who participated in or approved the disposition; and identify the person or persons having knowledge of its contents).

(b)    When used with respect to a Communication, provide the date of the Communication, identify the person who initiated the Communication, identify each person who received such Communication, identify the form of the Communication, identify any Document which embodies the Communication, and provide a general description of the content of the Communication.

(c)    When used with respect to an act, event, instance, occasion, meeting, conversation, allegation, or contention, means to state all facts concerning the subject matter in detail, including the date and place thereof, to identify the individual participants, to summarize separately for each individual participant what she or he said or did, and to identify each Document or Communication used or prepared in connection therewith or making any reference thereto.

15.    References to any natural person shall include, in addition to the natural person, any agent, employee, representative, attorney, superior, or principal thereof.

16.    References to any entity shall include, in addition to the entity, any officer, director, employee, partner, corporate parent, subsidiary, affiliate, agent, representative, attorney, or principal thereof.

17.    "Relating to" shall mean referring to, reflecting, regarding, describing, evidencing, constituting, containing, concerning, discussing, alluding to, germane to, mentioning, surrounding, analyzing, setting forth, summarizing, supporting, refuting, or characterizing, directly or indirectly, expressly or implicitly, in whole or in part, the subject matter of the Request.

## DEPOSITION TOPICS

1.    All types or categories of documents (e.g. email, imessages, physical,

5

Gibson, Dunn &
Crutcher LLP

SECOND NOTICE OF DEPOSITION OF MASIMO CORP. AND
CERCACOR LABS., INC. UNDER FRCP 30(b)(6)
CASE NO. 8:20-CV-00048-JVS (JDEX)

Exhibit 68

source code, etc.) sent by, received by, or relating to Marcelo Lamego and Michael O'Reilly that Plaintiffs had in their possession, custody, or control at any time.

2.     All files in Topic 1 that Plaintiffs currently have in their possession, custody or control, including but not limited to, the documents cited in Exhibits 20 and 21 to the Supplemental Declaration of Adam B. Powell in Support of Plaintiffs' Motion to Compel (Dkt. 405-2).

3.      All files in Topic 1 that Plaintiffs assert they can no longer search for or produce, including the facts and circumstances surrounding Plaintiffs handling of Lamego's and O'Reilly's files and any steps taken that resulted in the files no longer being available after they left your employment.

4.     All location(s) where files in Topic 1 are stored or were stored at any time, including computer or mobile devices, servers or network drives, backups or backup tapes, or exports.  The Topic includes files Plaintiffs asserts are outside of its possession, custody, or control, including files in the possession of Plaintiffs' counsel or discovery vendors.

5.     All facts and circumstances relating to Plaintiffs' efforts to search for, locate, and recover files referenced in Topic 1, including the facts and circumstances surrounding Plaintiffs locating O'Reilly's files as referenced in Exhibits 20 and 21 to the Supplemental Declaration of Adam B. Powell in Support of Plaintiffs' Motion to Compel (Dkt. 405-2).

6.     All facts and circumstances relating to Plaintiffs' policies, procedures, and practices for handling an employee's files, including the time frame for handling such files, whether files are moved or copied to some other device, whether all copies are deleted, and whether files are wiped or permanently destroyed.

7.     Any software available to Plaintiffs capable of searching for employees' emails, imessages, and other electronic communication streams to the extent that those forms of communication are used for work-related purposes, including whether Plaintiffs have the ability to search for emails and imessages sent to or from Lamego or

6

Gibson, Dunn & Crutcher LLP

SECOND NOTICE OF DEPOSITION OF MASIMO CORP. AND CERCACOR LABS., INC. UNDER FRCP 30(b)(6) CASE NO. 8:20-CV-00048-JVS (JDEX)

Exhibit 68

1    O'Reilly.

2

3    Dated:  August 9, 2021                    Respectfully submitted,

4                                              JOSHUA H. LERNER
                                               H. MARK LYON
5                                              BRIAN M. BUROKER
                                               BRIAN A. ROSENTHAL
6                                              ILISSA SAMPLIN
                                               ANGELIQUE KAOUNIS
7                                              BRIAN K. ANDREA
                                               GIBSON, DUNN & CRUTCHER LLP
8

9
                                              By:  */s/ Joshua H. Lerner*
10                                                  Joshua H. Lerner

11                                            *Attorneys for Defendant Apple Inc.*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

7

## CERTIFICATE OF SERVICE

I, Tracy Morgan, declare as follows:

I am employed in the County of Orange, State of California. I am over the age of 18 and am not a party to this action. My business address is 3161 Michelson Drive, Irvine, CA 92612, in said County and State. On August 9, 2021, I served the following document(s):

**DEFENDANT APPLE INC.'S SECOND NOTICE OF DEPOSITION OF MASIMO CORP. AND CERCACOR LABS., INC. UNDER FRCP 30(B)(6)**

on the persons stated below, by the following means of service:

KNOBBE, MARTENS, OLSON & BEAR, LLP

Joseph R. Re (joseph.re@knobbe.com)

Stephen C. Jensen (steve.jensen@knobbe.com)

Perry D. Oldham (perry.oldham@knobbe.com)

Stephen W. Larson (stephen.larson@knobbe.com)

Adam B. Powell (adam.powell@knobbe.com)

Mark Kachner (mark.kachner@knobbe.com)

The document was served pursuant to Fed. R. Civ. Pro. P. 5(b) via electronic mail. Based on an agreement of the parties to accept service by email or electronic transmission to the above service list, I served the documents to the persons at the email addresses listed above.

I certify and declare under penalty of perjury under the laws of the United States of America that the forgoing is true and correct, and that this declaration was executed on August 9, 2021, at Irvine, California.

By: _____*Tracy Morgan*_____
Tracy Morgan

8

Exhibit 68

Gibson, Dunn & Crutcher LLP

EXHIBIT 73

| | |
|---|---|
| **From:** | Adam.Powell |
| **To:** | Selwyn, Mark |
| **Cc:** | WH Apple-Masimo Service List; *** Apple-Masimo; Masimo.Apple; Passmaneck, Nora Q.E.; Parker, Kenneth G. |
| **Subject:** | RE: Masimo v. Apple DCT: deadlines for oppositions on motions to compel |
| **Date:** | Wednesday, January 12, 2022 1:14:23 PM |

Mark,

Thank you for sending us Apple's proposal and discussing it with us yesterday. Masimo continues to believe that an eight-month extension for fact discovery is appropriate for the reasons described in our motion. To avoid burdening the Court, however, we would be willing to compromise on a six-month extension for fact discovery. Because Apple appears to want more time later in the process for summary judgment motions, we would be willing to extend trial by seven months instead of six if you want. The parties should also discuss a briefing schedule on summary judgment motions for planning purposes. We suggest the same time that the parties recently adopted for Apple's pending MSJ (four weeks for oppositions and two weeks for replies).

Finally, Apple's January 7 filing states that Apple favors a "faster briefing schedule" if the parties cannot reach an agreement on the schedule. Please let us know what you had in mind. We would be willing to shorten the time for opposition and reply so that Apple's opposition is due January 14 and Masimo's reply is due January 19, even though Masimo's time to reply would fall over the weekend. We also suggest the parties inform the Court it can decide the issue anytime without a hearing. Please let us know Apple's position as soon as possible.

Best regards,

Adam

**Adam Powell**
Partner

858-707-4245 **Direct**

**Knobbe Martens**

**Adam Powell**
Partner

858-707-4245 **Direct**

**Knobbe Martens**

**From:** Selwyn, Mark <Mark.Selwyn@wilmerhale.com>
**Sent:** Tuesday, January 11, 2022 12:17 PM
**To:** Adam.Powell <Adam.Powell@knobbe.com>
**Cc:** WH Apple-Masimo Service List <WHApple-MasimoServiceList@wilmerhale.com>; *** Apple-Masimo <Apple-Masimo@gibsondunn.com>; Masimo.Apple <Masimo.Apple@knobbe.com>; Passmaneck, Nora Q.E. <Nora.Passmaneck@wilmerhale.com>; Parker, Kenneth G. <KParker@gibsondunn.com>
**Subject:** RE: Masimo v. Apple DCT: deadlines for oppositions on motions to compel

Adam:

Although we agree that trial should be moved by approximately five months, we believe that fact discovery can be completed by mid-May 2022 as shown below. We available today at 3:30pm PT to discuss.

| Event | Current Schedule | Masimo's Proposed Schedule | Apple's Proposed Schedule |
|---|---|---|---|
| Non-Expert Discovery Cut- | | 8/8/2022 | 5/19/22 |

Exhibit 73

| | | | |
|---|---|---|---|
| Off | 3/7/2022 | | |
| Opening Expert Reports | 5/9/2022 | 10/10/2022 | 7/22/22 |
| Rebuttal Expert Reports | 6/20/2022 | 11/21/2022 | 9/16/22 |
| Expert Discovery Cut-Off | 8/8/2022 | 1/9/2022 | 11/18/22 |
| Law and Motion – Motions Filed No Later Than | 9/12/2022 | 2/13/2022 | 1/9/23 |
| Law and Motion Cut-Off | 10/11/2022 | 3/13/2023 | 2/13/23 |
| Deadline To File Motions In Limine | 10/17/2022 | 3/20/2023 | 3/28/23 (6 weeks before trial) |
| Deadline To File Pretrial Documents | 11/7/2022 | 4/10/2023 | 4/10/23 (same as Masimo proposal) |
| Final Pretrial Conference | 11/21/2022 | 4/24/2023 | 4/24/23 (same as Masimo proposal) |
| Jury Trial | 12/6/2022 | 5/9/2023 | 5/9/23 (same as Masimo proposal) |

Mark

**From:** Adam.Powell <Adam.Powell@knobbe.com>
**Sent:** Tuesday, January 11, 2022 11:53 AM
**To:** Parker, Kenneth G. <KParker@gibsondunn.com>
**Cc:** WH Apple-Masimo Service List <WHApple-MasimoServiceList@wilmerhale.com>; *** Apple-Masimo <Apple-Masimo@gibsondunn.com>; Masimo.Apple <Masimo.Apple@knobbe.com>; Passamaneck, Nora Q.E. <Nora.Passamaneck@wilmerhale.com>
**Subject:** RE: Masimo v. Apple DCT: deadlines for oppositions on motions to compel

EXTERNAL SENDER

Ken,
During our brief call on Friday, you indicated that you hoped to provide Apple's position on Friday or over the weekend. We did not hear from you over the weekend or on Monday, leaving us with no choice but to file a motion to modify the schedule. As we noted in our *ex parte* application, we remain available to discuss this issue to see if we can reach an agreement. Please let us know when Apple has finalized its position and is prepared to talk.
Best regards,
Adam

**Adam Powell**
Partner

**858-707-4245 Direct**

**Knobbe Martens**

**From:** Adam.Powell
**Sent:** Friday, January 7, 2022 8:43 AM

Exhibit 73

**To:** Passamaneck, Nora Q.E. <Nora.Passamaneck@wilmerhale.com>
**Cc:** WH Apple-Masimo Service List <WHApple-MasimoServiceList@wilmerhale.com>; *** Apple-
Masimo <Apple-Masimo@gibsondunn.com>; Masimo.Apple <Masimo.Apple@knobbe.com>
**Subject:** RE: Masimo v. Apple DCT: deadlines for oppositions on motions to compel

Nora,

We still have not received Apple's position or even a time that Apple is available to meet despite
Apple telling us it would meet and confer with us this week. If we do not hear from you soon, we will
apply *ex parte* for relief from Local Rule 7-3.

Best regards,

Adam

**Adam Powell**
Partner

858-707-4245 **Direct**

## Knobbe Martens

**From:** Adam.Powell <Adam.Powell@knobbe.com>
**Sent:** Thursday, January 6, 2022 10:52 AM
**To:** Passamaneck, Nora Q.E. <Nora.Passamaneck@wilmerhale.com>
**Cc:** WH Apple-Masimo Service List <WHApple-MasimoServiceList@wilmerhale.com>; *** Apple-
Masimo <Apple-Masimo@gibsondunn.com>; Masimo.Apple <Masimo.Apple@knobbe.com>
**Subject:** RE: Masimo v. Apple DCT: deadlines for oppositions on motions to compel

Nora,

We disagree with Apple's position that it may decline to respond to Masimo emails because of its
"shutdown," while simultaneously pushing Masimo on other issues. It has now been almost two
weeks since Apple requested (and we provided) Masimo's position on this issue. Apple told us that it
would meet and confer with us this week. We expect Apple to respond today with its position in
writing along with the times that it is available to meet and confer tomorrow.

Best regards,

Adam

**Adam Powell**
Partner

858-707-4245 **Direct**

## Knobbe Martens

**From:** Passamaneck, Nora Q.E. <Nora.Passamaneck@wilmerhale.com>
**Sent:** Wednesday, January 5, 2022 3:42 PM
**To:** Adam.Powell <Adam.Powell@knobbe.com>; *** Apple-Masimo <Apple-
Masimo@gibsondunn.com>; Masimo.Apple <Masimo.Apple@knobbe.com>
**Cc:** WH Apple-Masimo Service List <WHApple-MasimoServiceList@wilmerhale.com>
**Subject:** RE: Masimo v. Apple DCT: deadlines for oppositions on motions to compel

Adam,

As we have told you, Apple's holiday shutdown lasted through and including Monday, January 3. We
expect to be in a position to meet and confer with you this week, and will follow up with specific
suggested times.

Regards,

Nora

**From:** Adam.Powell <Adam.Powell@knobbe.com>

Exhibit 73

**Sent:** Tuesday, January 4, 2022 4:29 PM
**To:** Passamaneck, Nora Q.E. <Nora.Passamaneck@wilmerhale.com>; *** Apple-Masimo <Apple-Masimo@gibsondunn.com>; Masimo.Apple <Masimo.Apple@knobbe.com>
**Cc:** WH Apple-Masimo Service List <WHApple-MasimoServiceList@wilmerhale.com>
**Subject:** RE: Masimo v. Apple DCT: deadlines for oppositions on motions to compel

<mark>EXTERNAL SENDER</mark>

Nora,

We have not received a response despite requesting a meet and confer more than a week ago. Please let us know when you are available.

Best regards,

Adam

**Adam Powell**
Partner

858-707-4245 **Direct**

## Knobbe Martens

**From:** Adam.Powell
**Sent:** Monday, January 3, 2022 3:00 PM
**To:** Passamaneck, Nora Q.E. <Nora.Passamaneck@wilmerhale.com>; *** Apple-Masimo <Apple-Masimo@gibsondunn.com>; Masimo.Apple <Masimo.Apple@knobbe.com>
**Cc:** WH Apple-Masimo Service List <WHApple-MasimoServiceList@wilmerhale.com>
**Subject:** RE: Masimo v. Apple DCT: deadlines for oppositions on motions to compel

Nora,

Thanks for your email. We disagree with Apple's position on this issue, as well as its reference to Logan's email. Logan was responding to **Apple's** request to defer Masimo's meet and confer on privilege logs until the week of January 3. In agreeing to Apple's request, Logan suggested the parties also discuss Apple's similar request to meet and confer on privilege logs at the same time. Regardless, we understand Apple is representing it is unable to discuss this issue with us before Tuesday. Please let us know a date and time when you are available.

Best regards,

Adam

**Adam Powell**
Partner

858-707-4245 **Direct**

## Knobbe Martens

**From:** Passamaneck, Nora Q.E. <Nora.Passamaneck@wilmerhale.com>
**Sent:** Thursday, December 30, 2021 2:19 PM
**To:** Adam.Powell <Adam.Powell@knobbe.com>; *** Apple-Masimo <Apple-Masimo@gibsondunn.com>; Masimo.Apple <Masimo.Apple@knobbe.com>
**Cc:** WH Apple-Masimo Service List <WHApple-MasimoServiceList@wilmerhale.com>
**Subject:** RE: Masimo v. Apple DCT: deadlines for oppositions on motions to compel

Adam,

You have now made conflicting demands for a meet-and-confer. You previously asserted that Plaintiffs required Apple's position "at least 24 hours in advance of the meeting" so that the parties "can have a productive meet and confer." Yet you now demand that we meet-and-confer on January

Exhibit 73

3, even though we have previously told you that Apple is shutdown through January 3, returning January 4. That Apple is not available this week should come as little surprise – Plaintiffs have put off a meet-and-confer on privilege logs until next week when members of your team will be back from the holidays. *See* Logan Young December 30 email. We will confer with our client as soon as reasonably possible in light of the holidays and will propose a time to meet-and-confer next week.

Regards,

Nora

---

**From:** Adam.Powell <Adam.Powell@knobbe.com>
**Sent:** Thursday, December 30, 2021 11:25 AM
**To:** Passamaneck, Nora Q.E. <Nora.Passamaneck@wilmerhale.com>; *** Apple-Masimo <Apple-Masimo@gibsondunn.com>; Masimo.Apple <Masimo.Apple@knobbe.com>
**Cc:** WH Apple-Masimo Service List <WHApple-MasimoServiceList@wilmerhale.com>
**Subject:** RE: Masimo v. Apple DCT: deadlines for oppositions on motions to compel

EXTERNAL SENDER

Nora,

Apple requested that Masimo provide its position on the schedule on December 27. We did so that same day. Apple now states it cannot respond or meet with us for at least a week. Since Apple is unwilling to meet with us this week, please confirm a time that you are available to meet with us on January 3 so that any necessary motion practice can proceed expeditiously.

Best regards,

Adam

**Adam Powell**
Partner

858-707-4245 **Direct**

# Knobbe Martens

---

**From:** Passamaneck, Nora Q.E. <Nora.Passamaneck@wilmerhale.com>
**Sent:** Wednesday, December 29, 2021 4:17 PM
**To:** Adam.Powell <Adam.Powell@knobbe.com>; *** Apple-Masimo <Apple-Masimo@gibsondunn.com>; Masimo.Apple <Masimo.Apple@knobbe.com>
**Cc:** WH Apple-Masimo Service List <WHApple-MasimoServiceList@wilmerhale.com>
**Subject:** RE: Masimo v. Apple DCT: deadlines for oppositions on motions to compel

Adam,

Thank you for providing Plaintiffs' proposal. Due to the holidays and Apple's week-long shutdown, we will not be able to respond "by the close of business today." We expect to be in a position to meet and confer with you next week.

Best regards,

Nora

---

**From:** Adam.Powell <Adam.Powell@knobbe.com>
**Sent:** Wednesday, December 29, 2021 12:03 PM
**To:** Passamaneck, Nora Q.E. <Nora.Passamaneck@wilmerhale.com>; *** Apple-Masimo <Apple-Masimo@gibsondunn.com>; Masimo.Apple <Masimo.Apple@knobbe.com>
**Cc:** WH Apple-Masimo Service List <WHApple-MasimoServiceList@wilmerhale.com>
**Subject:** RE: Masimo v. Apple DCT: deadlines for oppositions on motions to compel

EXTERNAL SENDER

Exhibit 73

Nora,

We disagree with Apple's perspective, but note that Apple seeks further document discovery and claims there are numerous remaining disputes to be resolved.

My prior email proposed "a five-month extension of time." Below is a chart applying that timing with potential dates. Masimo reserves the right to request different dates in any motion practice on the schedule.

| Event | Current Schedule | Proposed Schedule |
|---|---|---|
| Non-Expert Discovery Cut-Off | 3/7/2022 | 8/8/2022 |
| Opening Expert Reports | 5/9/2022 | 10/10/2022 |
| Rebuttal Expert Reports | 6/20/2022 | 11/21/2022 |
| Expert Discovery Cut-Off | 8/8/2022 | 1/9/2022 |
| Law and Motion – Motions Filed No Later Than | 9/12/2022 | 2/13/2022 |
| Law and Motion Cut-Off | 10/11/2022 | 3/13/2023 |
| Deadline To File Motions In Limine | 10/17/2022 | 3/20/2023 |
| Deadline To File Pretrial Documents | 11/7/2022 | 4/10/2023 |
| Final Pretrial Conference | 11/21/2022 | 4/24/2023 |
| Jury Trial | 12/6/2022 | 5/9/2023 |

Please provide Apple's position by the close of business today and let us know when you are available to meet and confer tomorrow.

Best regards,

Adam

**Adam Powell**
Partner

858-707-4245 **Direct**

**Knobbe Martens**

**From:** Passamaneck, Nora Q.E. <Nora.Passamaneck@wilmerhale.com>
**Sent:** Wednesday, December 29, 2021 8:01 AM
**To:** Adam.Powell <Adam.Powell@knobbe.com>; *** Apple-Masimo <Apple-Masimo@gibsondunn.com>; Masimo.Apple <Masimo.Apple@knobbe.com>
**Cc:** WH Apple-Masimo Service List <WHApple-MasimoServiceList@wilmerhale.com>
**Subject:** RE: Masimo v. Apple DCT: deadlines for oppositions on motions to compel

Adam,

Plaintiffs complain that Apple has somehow caused delay and produced only recently almost 2 million pages of documents, yet Plaintiffs have produced well over 2.9 million pages, and inexplicably

Exhibit 73

have delayed in producing the simplest of collections (e.g., we received Mr. Lamego's deposition transcripts just last week, after numerous requests). Further, as described in Apple's most recent motions to compel, Plaintiffs have failed to provide Apple crucial discovery regarding the purported trade secrets at issue and damages Plaintiffs seek. Moreover, certain of the deadlines (such as that for non-email ESI) are the result of Plaintiff raising issues very late in discovery and then, even after raising them, inexplicably delaying filing motions.

Please provide Plaintiffs' proposed changes to the schedule up to and including trial so that we can evaluate precisely what Plaintiffs are proposing.

Thank you,

Nora

---

**From:** Adam.Powell <Adam.Powell@knobbe.com>
**Sent:** Monday, December 27, 2021 5:28 PM
**To:** Passamaneck, Nora Q.E. <Nora.Passamaneck@wilmerhale.com>; *** Apple-Masimo <Apple-Masimo@gibsondunn.com>; Masimo.Apple <Masimo.Apple@knobbe.com>
**Cc:** WH Apple-Masimo Service List <WHApple-MasimoServiceList@wilmerhale.com>
**Subject:** RE: Masimo v. Apple DCT: deadlines for oppositions on motions to compel

EXTERNAL SENDER

Nora,

Thank you for confirming the parties agreement on the schedule for briefing Masimo's 12/22 motion to compel and Apple's 12/23 motion to compel.

As for the overall schedule, we never expressed a "desire" to extend the schedule. Instead, we explained that the numerous and lengthy extensions obtained by Apple had a cumulative effect of making the current schedule untenable, and that Apple's position on the overall schedule left us with no choice but to decline further extensions that we would normally provide. The current fact discovery cutoff is March 7, 2022. Dkt. 468 at 5. Apple recently produced almost 2 million pages of documents that Masimo needs to review in order to complete depositions. Apple has also successfully obtained numerous extensions of time to provide discovery ordered by the Special Master, including lengthy extensions to produce documents not until January. After the parties finish reviewing each other's productions, the parties intend to take more than 20 depositions each. Based on prior experience in this case, we also expect the parties will continue having a significant number of disputes that all take time to resolve.

Accordingly, we do not believe the current schedule is feasible. We suggest that a five-month extension of time would hopefully be sufficient to complete fact discovery in an orderly fashion. Please let us know when Apple is available this week for a conference of counsel to discuss the schedule and, if necessary, a motion to adjust the schedule. So that we can have a productive meet and confer, please provide Apple's position on our request at least 24 hours in advance of the meeting.

Best regards,

Adam

**Adam Powell**
Partner

858-707-4245 **Direct**

# Knobbe Martens

---

**From:** Passamaneck, Nora Q.E. <Nora.Passamaneck@wilmerhale.com>

Exhibit 73

**Sent:** Monday, December 27, 2021 2:20 PM
**To:** Adam.Powell <Adam.Powell@knobbe.com>; *** Apple-Masimo <Apple-Masimo@gibsondunn.com>; Masimo.Apple <Masimo.Apple@knobbe.com>
**Cc:** WH Apple-Masimo Service List <WHApple-MasimoServiceList@wilmerhale.com>
**Subject:** RE: Masimo v. Apple DCT: deadlines for oppositions on motions to compel

Adam,

We understand that Plaintiffs agree to a reciprocal extension for both motions submitted last week so long as the extension is not used against Plaintiffs on any motion to modify the case schedule. We agree. Further, Plaintiffs have now mentioned several times their desire for an extension of the schedule, but have never made any proposal for Apple to consider. If Plaintiffs have a proposal, please make one.

Thank you,

Nora

---

**From:** Adam.Powell <Adam.Powell@knobbe.com>
**Sent:** Monday, December 27, 2021 11:24 AM
**To:** Passamaneck, Nora Q.E. <Nora.Passamaneck@wilmerhale.com>; *** Apple-Masimo <Apple-Masimo@gibsondunn.com>; Masimo.Apple <Masimo.Apple@knobbe.com>
**Cc:** WH Apple-Masimo Service List <WHApple-MasimoServiceList@wilmerhale.com>
**Subject:** RE: Masimo v. Apple DCT: deadlines for oppositions on motions to compel

**EXTERNAL SENDER**

Nora,

Masimo did not refuse Apple's extension "in order to disrupt the personal obligations of [its] own team and [Apple's]." We have explained many times that one extension alone may not be prejudicial, but the cumulative effect of Apple's many extensions has made the current schedule untenable.

We continue to believe Apple should not be asking for extensions given Apple's position that the schedule cannot change. However, we will grant this particular request as a professional courtesy in view of the holidays if Apple agrees it will not use this extension against us on any motion to modify the case schedule. Please let us know by close of business today if Apple agrees.

Best regards,

Adam

**Adam Powell**
Partner

858-707-4245 **Direct**

**Knobbe Martens**

**From:** Passamaneck, Nora Q.E. <Nora.Passamaneck@wilmerhale.com>
**Sent:** Sunday, December 26, 2021 7:26 AM
**To:** Adam.Powell <Adam.Powell@knobbe.com>; *** Apple-Masimo <Apple-Masimo@gibsondunn.com>; Masimo.Apple <Masimo.Apple@knobbe.com>
**Cc:** WH Apple-Masimo Service List <WHApple-MasimoServiceList@wilmerhale.com>
**Subject:** RE: Masimo v. Apple DCT: deadlines for oppositions on motions to compel

Adam:

We filed our motion because Masimo has refused to provide adequate responses to the interrogatories at issue and to comply with its Rule 26(a)(1) obligations. Apple's motion obviously

Exhibit 73

has nothing to do with seeking "leverage on a requested extension on a separate issue."
We fail to see how either side would be prejudiced in any way by a reciprocal one-week extension.
Contrary to your e-mail, you obviously do have a choice: you could act professionally and
accommodate a reasonable request for a reciprocal extension, or you could refuse in order to
disrupt the personal obligations of your own team and ours. You have chosen the latter.
Regards,
Nora

**From:** Adam.Powell <Adam.Powell@knobbe.com>
**Sent:** Friday, December 24, 2021 5:23 PM
**To:** Passamaneck, Nora Q.E. <Nora.Passamaneck@wilmerhale.com>; *** Apple-Masimo <Apple-
Masimo@gibsondunn.com>; Masimo.Apple <Masimo.Apple@knobbe.com>
**Cc:** WH Apple-Masimo Service List <WHApple-MasimoServiceList@wilmerhale.com>
**Subject:** RE: Masimo v. Apple DCT: deadlines for oppositions on motions to compel

<mark>EXTERNAL SENDER</mark>

Nora,
We are in receipt of your extension request that you sent at 7:53pm on December 23 demanding a
response on Christmas Eve. Your request seeks an extension for Apple to respond to our December
22 motion in exchange for an extension for Masimo to respond to your December 23 motion. We
disagree with what appears to us to be Apple's tactic of filing a premature motion the evening
before Christmas Eve to seek leverage on a requested extension on a separate issue.
As we separately explained to Mr. Parker, Apple has requested many lengthy extensions while
simultaneously stating that it will not agree to extend the schedule. While we would ordinarily grant
your request as a professional courtesy in view of the holidays, Apple has left us no choice but to
decline the request at this time. If Apple changes its position regarding extending the overall case
schedule, then we are happy to discuss a reasonable extension on this issue.
Best regards,
Adam

**Adam Powell**
Partner
858-707-4245 **Direct**

## Knobbe Martens

**From:** Passamaneck, Nora Q.E. <Nora.Passamaneck@wilmerhale.com>
**Sent:** Thursday, December 23, 2021 7:53 PM
**To:** *** Apple-Masimo <Apple-Masimo@gibsondunn.com>; Masimo.Apple
<Masimo.Apple@knobbe.com>
**Cc:** WH Apple-Masimo Service List <WHApple-MasimoServiceList@wilmerhale.com>
**Subject:** Masimo v. Apple DCT: deadlines for oppositions on motions to compel
Counsel,
Apple's opposition to Plaintiffs' Motion to Compel Apple to produce documents responsive to
Masimo's Request for Production Nos. 377, 388-395, 413-416, 418, 420-421, 425, 480, 536-537, and
548-553 is currently due December 29, and Plaintiffs' opposition to Apple's Motion to Compel
supplementation of Plaintiffs' responses to Apple Interrogatory Nos. 13, 17, and 28 and their initial
disclosure regarding computation of damages under FRCP 26 is due December 30. In light of the
holidays, we propose that the parties agree on reciprocal one-week extensions of the deadlines for

Exhibit 73

oppositions. Please let us know if you agree, and we can notify Judge Guilford. If we do not hear from you by tomorrow, we will proceed with the default briefing schedule for both motions.

Regards,

Nora

**Nora Q.E. Passamaneck | WilmerHale**

1225 Seventeenth St.

Suite 2600

Denver, CO 80202 USA

+1 720 274 3152 (t)

+1 720 274 3133 (f)

nora.passamaneck@wilmerhale.com

**Please consider the environment before printing this email.**

This email message and any attachments are being sent by Wilmer Cutler Pickering Hale and Dorr LLP, are confidential, and may be privileged. If you are not the intended recipient, please notify us immediately—by replying to this message or by sending an email to postmaster@wilmerhale.com—and destroy all copies of this message and any attachments. Thank you.

For more information about WilmerHale, please visit us at http://www.wilmerhale.com.

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

Exhibit 73

# EXHIBIT 74

**The New York Times** | https://nyti.ms/2X0DtZd

U.S.A. ▽          World ▽          Health ▽

# Tracking Coronavirus in California: Latest Map and Case Count

Updated Jan. 23, 2022

## New reported cases

| **All time** | Last 90 days |





| | DAILY AVG. ON JAN. 22 | 14-DAY CHANGE | TOTAL REPORTED |
|---|---|---|---|
| Cases | 112,361 | +72% | 7,660,930 |
| Tests | 417,975 | +43% | — |
| Hospitalized | 15,725 | +70% | — |
| Deaths | 116 | +72% | 78,775 |

About this data

Exhibit 74

# Daily new hospital admissions by age in California

This chart shows for each age group the number of people per 100,000 that were newly admitted to a hospital with Covid-19 each day, according to data from the U.S. Department of Health and Human Services. Dips and spikes could be due to inconsistent reporting by hospitals.



About this data

---

**Hot spots**

AVERAGE DAILY CASES PER 100,000 PEOPLE IN PAST WEEK



Exhibit 74

California Coronavirus Map and Case Count - The New York Times



© Mapbox © OpenStreetMap



**Hot spots**



Hospitalized



Vaccinations



Cases per capita



Deaths per capita

About this data

## Vaccinations

|  | AT LEAST ONE DOSE | FULLY VACCINATED |
|---|---|---|
| **All ages** | 86% | 68% |
| **12 and up** | 95% | 78% |
| **65 and up** | 95% | 88% |

See more details ›

About this data

## Mask mandates and guidance

As of Jan. 19, 2022

The New York Times is tracking mask policies at the state level, including current federal guidance by county and where leaders are rejecting such guidance or mandates. Read more here ›

• Masks are mandated indoors by state officials.

• Masks are mandated in schools for all students by state officials.

Exhibit 74

# Reported cases, deaths and other trends by county

This table is sorted by places with the most cases per 100,000 residents in the last seven days. Charts show change in daily averages and are each on their own scale. Select a table header to sort by another metric.

| **Recent trends** | All time | Search counties |
|---|---|---|

**Cases**  Hospitalizations  Deaths  Vaccinated

| | CASES DAILY AVG. | PER 100,000 ▼ | 14-DAY CHANGE | |
|---|---|---|---|---|
| California | 112,361 | 284 | +72% | |
| Los Angeles › | 36,305 | 362 | +29% | |
| Kings › | 503 | 329 | +253% | |
| Inyo › | 59 | 326 | +34% | |
| Imperial › | 560 | 309 | +94% | |
| San Diego › | 10,307 | 309 | +52% | |
| Napa › | 408 | 296 | +99% | |
| Tulare › | 1,357 | 291 | +315% | |
| San Bernardino › | 6,295 | 289 | +69% | |
| Riverside › | 7,043 | 285 | +89% | |
| Fresno › | 2,772 | 277 | +235% | |

Show all        About this data

---

# How trends have changed in California

| **All time** | Last 90 days |
|---|---|

**New reported cases by day**



100,000 cases

7-day average

Exhibit 74

1/23/22, 1:40 PM                    California Coronavirus Map and Case Count - The New York Times



## Tests by day



## Hospitalizations

Early data may be incomplete.



## New reported deaths by day



Exhibit 74

California Coronavirus Map and Case Count - The New York Times



Feb. 2020        Jun.        Oct.        Feb. 2021        Jun.        Oct.

About this data

---

# About the data

In data for California, The Times primarily relies on reports from the state, as well as health districts or county governments that often report ahead of the state. California typically releases new data each day. Weekend counts may be lower because fewer sources report to the state. The state reports cases and deaths based on a person's permanent or usual residence.

The Times has identified reporting anomalies or methodology changes in the data.

**More about reporting anomalies or changes**

The tallies on this page include probable and confirmed cases and deaths in some counties.

**Confirmed cases and deaths**, which are widely considered to be an undercount of the true toll, are counts of individuals whose coronavirus infections were confirmed by a molecular laboratory test. **Probable cases and deaths** count individuals who meet criteria for other types of testing, symptoms and exposure, as developed by national and local governments.

Governments often revise data or report a single-day large increase in cases or deaths from unspecified days without historical revisions, which can cause an irregular pattern in the daily reported figures. The Times is excluding these anomalies from seven-day averages when possible. For agencies that do not report data every day, variation in the schedule on which cases or deaths are reported, such as around holidays, can also cause an irregular pattern in averages. The Times uses an adjustment method to vary the number of days included in an average to remove these irregularities.

---

# Tracking the Coronavirus

**United States**

Exhibit 74

**Latest Maps and Data**
Cases and deaths for every county

**Vaccinations**
How many have been vaccinated, and who's eligible

**Your Places**
Build your own dashboard to track cases

**Mask Mandates**
See state mask guidance for schools and indoors

**Your County's Risk**
See guidance for your local area

**Hospitals Near You**
How many I.C.U. beds are occupied

## World

**Latest Maps and Data**
Cases and deaths for every country

**Global Vaccinations**
How many have been vaccinated, by country

## Health

**Vaccines**
Track their development

**Treatments**
Rated by effectiveness and safety

## Previous Projects

**Nursing Homes**
The hardest-hit states and facilities

**Colleges and Universities**
Cases at more than 1,800 schools

**Deaths Above Normal**
The true toll of the pandemic in the U.S.

**Deaths Above Normal**
The true toll of coronavirus around the world

## Countries

| | | |
|---|---|---|
| Australia | India | Spain |
| Brazil | Italy | U.K. |
| Canada | Japan | United States |
| France | Mexico | |
| Germany | South Africa | |

Exhibit 74

## States, Territories and Cities

| | | |
|---|---|---|
| Alabama | Maine | Oregon |
| Alaska | Maryland | Pennsylvania |
| Arizona | Massachusetts | Puerto Rico |
| Arkansas | Michigan | Rhode Island |
| California | Minnesota | South Carolina |
| Colorado | Mississippi | South Dakota |
| Connecticut | Missouri | Tennessee |
| Delaware | Montana | Texas |
| Florida | Nebraska | U.S. Virgin Islands |
| Georgia | Nevada | Utah |
| Guam | New Hampshire | Vermont |
| Hawaii | New Jersey | Virginia |
| Idaho | New Mexico | Washington |
| Illinois | New York | Washington, D.C. |
| Indiana | North Carolina | West Virginia |
| Iowa | North Dakota | Wisconsin |
| Kansas | Northern Mariana Islands | Wyoming |
| Kentucky | Ohio | |
| Louisiana | Oklahoma | |

## Data

Frequently Asked Questions About the Covid Data

Access the Open Source Covid Data

## Credits

By Jordan Allen, Sarah Almukhtar, Aliza Aufrichtig, Anne Barnard, Matthew Bloch, Sarah Cahalan, Weiyi Cai, Julia Calderone, Keith Collins, Matthew Conlen, Lindsey Cook, Gabriel Gianordoli, Amy Harmon, Rich Harris, Adeel Hassan, Jon Huang, Danya Issawi, Danielle Ivory, K.K. Rebecca Lai, Alex Lemonides, Eleanor Lutz, Allison McCann, Richard A. Oppel Jr., Jugal K. Patel, Alison Saldanha, Kirk Semple, Shelly Seroussi, Julie Walton Shaver, Amy Schoenfeld Walker, Anjali Singhvi, Charlie Smart, Mitch Smith, Albert Sun, Rumsey Taylor, Lisa Waananen Jones, Derek Watkins, Timothy Williams, Jin Wu and Karen Yourish.  ·  Reporting was contributed by Jeff Arnold, Ian Austen, Mike Baker, Brillian Bao, Ellen Barry, Shashank Bengali, Samone Blair, Nicholas Bogel-Burroughs, Aurelien Breeden, Elisha Brown, Emma Bubola, Maddie Burakoff, Alyssa Burr, Christopher Calabrese, Julia Carmel, Zak Cassel, Robert Chiarito, Izzy Colón, Matt Craig, Yves De Jesus, Brendon Derr, Brandon Dupré, Melissa Eddy, John Eligon, Timmy Facciola, Bianca Fortis, Jake Frankenfield, Matt Furber, Robert Gebeloff, Thomas Gibbons-Neff, Matthew Goldstein, Grace Gorenflo, Rebecca Griesbach,

Exhibit 74

California Coronavirus Map and Case Count - The New York Times

Benjamin Guggenheim, Barbara Harvey, Lauryn Higgins, Josh Holder, Jake Holland, Anna Joyce, John Keefe, Ann Hinga Klein, Jacob LaGesse, Alex Lim, Alex Matthews, Patricia Mazzei, Jesse McKinley, Miles McKinley, K.B. Mensah, Sarah Mervosh, Jacob Meschke, Lauren Messman, Andrea Michelson, Jaylynn Moffat-Mowatt, Steven Moity, Paul Moon, Derek M. Norman, Anahad O'Connor, Ashlyn O'Hara, Azi Paybarah, Elian Peltier, Richard Pérez-Peña, Sean Plambeck, Laney Pope, Elisabetta Povoledo, Cierra S. Queen, Savannah Redl, Scott Reinhard, Chloe Reynolds, Thomas Rivas, Frances Robles, Natasha Rodriguez, Jess Ruderman, Kai Schultz, Alex Schwartz, Emily Schwing, Libby Seline, Rachel Sherman, Sarena Snider, Brandon Thorp, Alex Traub, Maura Turcotte, Tracey Tully, Jeremy White, Kristine White, Bonnie G. Wong, Tiffany Wong, Sameer Yasir and John Yoon.  ·  Data acquisition and additional work contributed by Will Houp, Andrew Chavez, Michael Strickland, Tiff Fehr, Miles Watkins, Josh Williams, Nina Pavlich, Carmen Cincotti, Ben Smithgall, Andrew Fischer, Rachel Shorey, Blacki Migliozzi, Alastair Coote, Jaymin Patel, John-Michael Murphy, Isaac White, Steven Speicher, Hugh Mandeville, Robin Berjon, Thu Trinh, Carolyn Price, James G. Robinson, Phil Wells, Yanxing Yang, Michael Beswetherick, Michael Robles, Nikhil Baradwaj, Ariana Giorgi, Bella Virgilio, Dylan Momplaisir, Avery Dews, Bea Malsky, Ilana Marcus and Jason Kao.

Additional contributions to Covid-19 risk assessments and guidance by Eleanor Peters Bergquist, Aaron Bochner, Shama Cash-Goldwasser, Sydney Jones and Sheri Kardooni of Resolve to Save Lives.

Exhibit 74