# EXHIBIT 16

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(SOUTHERN DIVISION - SANTA ANA)


MASIMO CORPORATION, ET AL,    ) CASE NO: 8:20-CV-00048-JVS-JDEx
                              )
              Plaintiffs,     )            CIVIL
                              )
      vs.                     )     Santa Ana, California
                              )
APPLE, INC,                   )  Thursday, September 23, 2021
                              )
              Defendant.      )
_____

IN-PERSON HEARING RE: PLAINTIFFS' MOTION FOR RECONSIDERATION

BEFORE THE HONORABLE JOHN D. EARLY,
UNITED STATES MAGISTRATE JUDGE



<u>APPEARANCES</u>:              SEE PAGE 2


Court Reporter:          Recorded; Digital wave file


Courtroom Deputy:        Maria Barr


Transcribed by:          Exceptional Reporting Services, Inc.
                         P.O. Box 8365
                         Corpus Christi, TX 78468
                         361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

Exhibit 16
Page 1

**<u>APPEARANCES</u>:**

For Plaintiffs:             JOSEPH R. RE, ESQ.
                            Knobbe Martens Olson & Bear, LLP
                            2040 Main Street
                            14th Floor
                            Irvine, CA 92614

                            ADAM POWELL, ESQ.
                            Knobbe Martens Olson & Bear, LLP
                            12790 El Camino Real
                            San Diego, CA 92130


For Defendant:              JOSHUA H. LERNER, ESQ.
                            Gibson Dunn & Crutcher, LLP
                            555 Mission Street
                            Suite 3000
                            San Francisco, CA 94105

                            NATALIE POUS, ESQ.
                            Apple In-House Counsel

Exhibit 16
Page 2

1       **Santa Ana, California; Thursday, September 23, 2021**

2                      **(Call to Order)**

3          **THE COURT:**  Good morning, everyone.

4          **MR. RE:**  Good morning.

5          **MR. LERNER:**  Good morning, Your Honor.

6          **THE COURT:**  One item on calendar today.  Calling Case

7    Number Central District of California 8:20-cv-48-JVS-JDE,

8    *Masimo Corporation, et al., versus Apple, Inc.*

9          Appearances for this in-person hearing, Counsel,

10   starting with counsel for plaintiff.

11         **MR. RE:**  For Masimo and Cercacor, Joseph Re from

12   Knobbe Martens Olson and Bear.  With me is my partner, Adam

13   Powell.

14         **THE COURT:**  Good morning.  Thank you.

15         And on behalf of defendant?

16         **MR. LERNER:**  Good morning, Your Honor.  Joshua

17   Lerner, Gibson Dunn, on behalf of Apple, and with me today is

18   Natalie Pous, legal counsel, litigation, from Apple.

19         **THE COURT:**  I'm sorry; what was the last name?

20         **MR. LERNER:**  P-O-U-S, Your Honor.

21         **THE COURT:**  All right.  And that's in-house counsel

22   at Apple?

23         **MR. LERNER:**  Yes.

24         **THE COURT:**  All right.  All right.  We're here for

25   a -- what's been styled as a motion for reconsideration of my

Exhibit 16
Page 3

1  June 10th ruling regarding Mr. Cook's being designated as an

2  ESI custodian, a motion that I denied on June 10th.  I'll tell

3  you what I've reviewed.  Then I'm going to give you my

4  tentative thoughts.

5          I have reviewed the motion, which, let's see, is

6  Docket Number 471, and memorandum and exhibits and

7  declarations, some of which were filed under seal.  I've

8  reviewed Apple's opposition, which is at 479, along also with

9  two declarations and exhibits.  I don't think any of that was

10  filed -- oh, no, some of it was filed under seal; and a reply

11  from plaintiffs filed on August 5th, also with exhibits and a

12  declaration, some of which was filed under seal.

13          I'm going to now first ask, on plaintiffs' behalf, is

14  there anything that I should have reviewed that I haven't

15  referenced, from your perspective?

16          **MR. RE:**  Nothing, Your Honor.

17          **THE COURT:**  And on behalf of defendant?

18          **MR. LERNER:**  No, Your Honor.

19          **THE COURT:**  All right.  Here is my tentative.  My

20  tentative is to grant the motion for reconsideration, finding

21  that plaintiff under Local Rule 7-18 did act appropriately and

22  in a timely fashion and there is good cause for the motion not

23  being filed within 14 days after the hearing because -- for the

24  reasons stated in the papers, but the -- I don't want to

25  characterize one piece of evidence more important than another,

Exhibit 16
Page 4

1  but certainly the public filing on July 2nd by Apple of an

2  October 2nd, 2013, email from Mr. Marcelo Lamego to Mr. Tim

3  Cook, and I think there was a follow-up email back to

4  Mr. Lamego from a representative at Apple later that same

5  morning, that was publicly filed on July 2nd.  There was a

6  meet-and-confer session requested, I think the next business

7  day, which was July 6th, and a meet-and-confer took place on

8  July 9th, and then per Local Rule 7-8 the motion couldn't have

9  been filed until July 16th, and it was filed on the next

10  business day thereafter, on July 19th, which I, based on all

11  the circumstances -- and I've summarized it; I haven't included

12  everything -- find was -- that plaintiffs acted diligently and

13  had good cause to not file the motion within 14 days after the

14  prior ruling.

15        And I'll also note that, from the bench, the last --

16  at the hearing on the July 10th original motion, I had invited

17  plaintiffs' counsel that should there be new information they

18  could refile the motion.  So, although it's styled as a motion

19  for reconsideration, they could have just filed a brand-new

20  motion.  I offered that up as an option, and that, obviously,

21  would not have been subject to the Local Rule 7-18, 14-day plus

22  good cause requirement.  Now, I may be speaking too much.  Had

23  that happened, it might have been heard by Judge Guilford

24  instead of me under the special master reference, but be that

25  as it may, I find good cause for the filing of motion.

Exhibit 16
Page 5

```
 1              Turning to the substance, I think it was the same

 2    counsel who were here on July -- on June 10th.  I expressed

 3    that it was a -- and I may not have used these words, but the

 4    essence of it was it was a close call.  I found that the -- the

 5    factual evidentiary showing relatively weak by plaintiff in

 6    connection with their request to show that there was some

 7    reasonable likelihood that Mr. Cook might have relevant

 8    information in his emails or other streams.  The flip side was

 9    I noted that defendants offered no evidence of the burden.

10    And, so, essentially, on that close call, I relied on two

11    people.  One of them was Bob Dylan, and one of them was

12    Mr. Lerner and four or five other attorneys from Gibson Dunn

13    and Crutcher who represented -- and I'm going to paraphrase --

14    that it was unlikely that Mr. Cook would have any relevant

15    discoverable information in his ESI.

16              That statement was confirmed at the hearing, and I

17    gave Mr. Lerner an opportunity to recognize that that was an

18    important basis for my ruling and that should that at some

19    future date turn out not to be true, there could be -- and I

20    used the word "severe" -- there could be severe repercussions.

21    I'm not inclined right now to get into repercussions.  I think

22    I'd need to gather some more information.  We can do that if

23    the parties wish.  Right now I'm inclined to move forward with

24    your case, help you each move forward with your respective

25    cases, and rule on the substance of the motion, but we can get
```

Exhibit 16
Page 6

1   into a more deep dive into some other issues that may be

2   lurking out there.

3            And I'll note, in terms of the good cause, moving

4   back in time, that I have considered Apple's arguments that

5   plaintiffs' counsel, at least the firm, had possession of the

6   October 2nd, 2013, email as long ago as last year, and there is

7   a declaration from a paralegal from another firm regarding

8   production in another case.  I'm happy to get into a deep dive

9   on that.

10           I actually -- I don't think you were here,

11  Mr. Lerner, on that other case -- had some thoughts about what

12  was happening, and I used a term from my days visiting New York

13  City when I was a kid in the 1970s where you'd pop out of Penn

14  Station or Grand Central Station and there would be guys with

15  little tables set up playing Three Card Monte.  And I want to

16  explain what that is.  It's a game where you're trying to pick

17  the queen out of three cards.  And the queen is there, and the

18  person dealing the cards isn't cheating; and by dealing, he

19  just throws three cards around, but is being somewhat opaque.

20  And sometimes it involves having a third party who appears to

21  be an independent third party who's actually working with the

22  dealer out on this little table outside the station looking for

23  tourists coming into town to have the third party, who looks to

24  be independent, win a couple times, and then when the tourist

25  puts their money down, suddenly the card is much harder to

Exhibit 16
Page 7

1    find.  The card exists; it's just being obscured.

2           I'm happy to hear from Apple about anything that they

3    want to talk about.  But one of the things we might get into

4    and have to get into if we're going to do a deep dive is the

5    relationship between Apple and True Wearables, the defendant in

6    the other case; how it came to pass that the October 2nd email

7    was designated as confidential in that case; maybe we need to

8    get into communications between the parties.  I don't know, and

9    I certainly am not going to issue any orders on the fly on

10   that, but maybe we need to, to find out how it came to pass.

11   And there is an argument from Apple that plaintiff --

12   plaintiffs could have just moved to de-designate that October

13   2nd, 2013, email in the True Wearables case.  I'm not sure what

14   the basis for that argument is.  There is no basis in the

15   protective order in that case to simply say:  I want to use

16   something that was designated as confidential in another case.

17   You can move to de-designate by saying something isn't

18   confidential.  And here at least it was represented at the last

19   hearing that -- I think it was by Mr. Re -- that during the

20   course of the True Wearables case Mr. Lamego said that that

21   email, he designated that as confidential at the request of --

22   and I'm not sure if it was expressed or in his mind

23   interpreted -- at the request of Apple.  And you each have

24   heard me talk about my views of protective orders and that

25   they're not to be willy-nilly disregarded, and that protective

Exhibit 16
Page 8

1  order limited the use of that email once it was designated as

2  confidential to the prosecution or defense of that case only.

3  So, plaintiffs could not have simply thrown it in front of me.

4          Now, the timing here, perhaps it was a genius move by

5  plaintiffs to serve a third-party subpoena on Apple, have Apple

6  file a motion to quash, and then have that document be brought

7  to my attention in connection with that motion to quash, but be

8  that as it may, that was -- they didn't have an ability to

9  bring it to my attention in this court in this hearing on June

10 10th.  And I'm a little troubled by the suggestion that it was

11 that simple or that plaintiffs here were at fault.  And, so, if

12 we want to go down that road, we will, but we're probably at

13 that point going to have to have some evidentiary issues if we

14 really want to push it.  But I'm comfortable right now with

15 what I see to say they did not have authorization from me or

16 Mr. Lamego.  And I saw the emails from Mr. Lamego's counsel

17 essentially telling plaintiff they couldn't even disclose this

18 to in-house counsel at Apple; it could only be an attorneys'-

19 eyes-only presentation of the email from plaintiff to Apple's

20 counsel before plaintiffs' counsel would be authorized to file

21 it in connection with the motion to quash in the True Wearables

22 case.

23         So, I'm riffing a little bit.  I've given you the

24 short version of my tentative.  I guess I'll start with you,

25 Mr. Re, or Mr. Powell.  It's plaintiffs' motion.  At the risk

Exhibit 16
Page 9

```
1    of potentially snatching defeat from the jaws of victory,

2    you're welcome to offer any additional argument, since you have

3    the burden here, but -- or give me any new information, since I

4    think the last filing was your reply over a month ago, if

5    there's any new information that you want to impart to me.

6              Mr. Re, the floor is yours.

7              MR. RE:  Thank you, Your Honor.  I only have one

8    statement to make, and that is, we, in an abundance of caution,

9    had the same interpretation of the protective order that you

10   just gave.  And that is, even if I were to show it to

11   Mr. Lerner, for example, for a meet-and-confer to get a court

12   order to approve it after the fact, that might even be deemed a

13   use.  So, we have an ambiguity on the word "use," and we took

14   the broadest interpretation, just like you just did in your

15   explanation.

16             THE COURT:  Anything further?

17             MR. RE:  Nothing further.

18             THE COURT:  All right.  Subject to your ability to

19   respond, any arguments from Mr. Lerner?  Mr. Lerner, you've

20   heard my tentative and my thoughts.  Let me hear what you want

21   to argue.

22             MR. LERNER:  Thank you, Your Honor.  I will not spend

23   time on your point about the procedure here.  I want to get to

24   the substance, which is that there's new information that

25   changes the basis for the Court's prior ruling.
```

Exhibit 16
Page 10

1          **THE COURT:**  Could I ask you a favor?  Just pull the

2   microphone a little closer to you so I make sure that if there

3   is a transcript that the transcriber can hear the recording.

4          **MR. LERNER:**  Yeah.  Is that better, Your Honor?

5          **THE COURT:**  Yes.

6          **MR. LERNER:**  Okay.  So, the argument that you heard

7   and, obviously, what Your Honor has focused on is the email

8   from Mr. Lamego to Mr. Cook.

9          **THE COURT:**  And there's multiple facts, but that's

10  the one that I focused on in giving my tentative.  It's not the

11  only reason.

12         **MR. LERNER:**  Understood.  And I'll quickly address

13  the others, as well.  But that unsolicited email to Mr. Cook

14  notes that Apple -- to other people, not Mr. Cook, and not --

15  is suggested in the email that Mr. Cook's suggestion or

16  anything else had already approached Mr. Lamego.

17         **THE COURT:**  Okay.

18         **MR. LERNER:**  And --

19         **THE COURT:**  Let me slow everything down.  Okay.  The

20  question is whether Mr. Cook has relevant information, and

21  they're not going to prove their case by this email.  I want

22  you to -- tell you I don't view this as the smoking gun that

23  declares victory for plaintiffs in this case.  But the question

24  is, does -- have they shown enough to show that Mr. Cook has

25  potentially relevant information in his electronic streams,

Exhibit 16
Page 11

1    email, or whatnot.  And I mentioned I relied heavily on what

2    you told me, in writing and affirmed at the hearing, that there

3    is -- it's unlikely that there is relevant, discoverable

4    information in his email streams.

5              I have a question for you:  Is the email, from your

6    perspective, from Mr. Lamego to Mr. Cook on August -- I'm

7    sorry -- on October 2nd, 2013, relevant?

8         **MR. LERNER:**  We have been consistent on the point

9    that not only is the answer to that no, it should not be and

10   cannot be to bring Mr. Cook into a dispute --

11        **THE COURT:**  Okay.  You say the answer is no.  We're

12   going to do a little bit more of a deep dive now.  So, let's --

13   so that we're -- all know what we're talking about, let's pull

14   up -- well, first of all, let's talk about some of the claims

15   in the case.  Theft of trade secrets is a claim in the case,

16   right?

17        **MR. LERNER:**  Yes, sir.

18        **THE COURT:**  My days as a prosecutor, whenever you

19   file a -- whenever you investigate a charge, file a charge, get

20   ready for trial, you pull up the elements, right?  What are

21   some of the elements of a claim for theft of trade secret?

22        **MR. LERNER:**  You need a trade secret, and you need

23   misappropriation.

24        **THE COURT:**  Okay.  And in order for there to be

25   misappropriation, if a third party doesn't have any idea that

Exhibit 16
Page 12

1    something is a trade secret, and some third party who just

2    walks in and without any knowledge or notice that it's

3    potentially a confidential trade secret, the company uses it,

4    would that company have a defense in that situation of lack of

5    knowledge and intent?

6         **MR. LERNER:**  Yes, Your Honor.

7         **THE COURT:**  Okay.  So, knowledge and intent of the

8    receiving party matters.  Is that true?

9         **MR. LERNER:**  Yes, it is, Your Honor.

10        **THE COURT:**  And tell me, in the grand scheme of

11   things, does knowledge and intent by the third person, who

12   allegedly walks out with a trade secret, does that matter?  Is

13   that something that -- under the broad definition of relevance

14   of Rule 401 under the evidence code, is that something that

15   matters?

16        **MR. LERNER:**  Could be, in that --

17        **THE COURT:**  Okay.  Could be.

18        **MR. LERNER:**  -- hypothetical; I don't know.

19        **THE COURT:**  All right.  We're at a stage where we

20   don't know; there's going to be -- you've got more than a year

21   until trial.

22            All right.  So, let's talk about -- those are some of

23   the issues, what Mr. Lamego, who's the person we're talking

24   about here, knew; what Apple knew when Mr. Lamego came on

25   board; and I think from your papers you concede that you hired

Exhibit 16
Page 13

1   him effective to start January, 2014.  There is a dispute about

2   whether he was -- he was recruited or -- was recruited as part

3   of a grander scheme, but that that's part of the case.

4           So, let's turn to that email, because that's going to

5   be what we're focusing on.  The very first paragraph -- and I'm

6   looking at -- I'm going to go -- because some of this is

7   sealed, some of it isn't.  I don't think this -- I know this

8   was unsealed, and I'm just going to tell you where in the

9   record I'm finding it.  It is in a few places in connection

10  with the motion, but this is at Document Number 321-1, page 37

11  of 94, and this is -- it has the little Stanford alumni

12  insignia on top of it.  It's an email entitled:  The Three

13  Equations.  It's from, at least facially, from Mr. Lamego to T.

14  Cook at Apple.com dated Wednesday, October 2nd, 2013, at

15  12:54 a.m.  The first paragraph:

16          "I was approached by Apple in the beginning of this

17          year and was asked if I would like to join the

18          executive team."

19          Leaving aside where it was found, do you think that

20  that's -- that statement has any bearing on Mr. Lamego's state

21  of mind in connection with the issues in this case?

22          **MR. LERNER:**  Saying that he was approached by two

23  other people, to me, Your Honor, does not reflect on his state

24  of mind.

25          **THE COURT:**  Okay.  How about Apple's state of mind?

Exhibit 16
Page 14

1  Does it have any bearing?  Remembering that Rule 401 means,

2  does the evidence at issue or the fact at issue have any

3  tendency to make a fact of consequence at issue in the case

4  more or less likely, does an assertion by Mr. Lamego that he

5  was approached by Apple in the beginning of 2013 and asked if

6  he would like to join the executive team, does that have any

7  bearing on any issue in this case?  That statement.

8          **MR. LERNER:**  Yes, and that's --

9          **THE COURT:**  Okay.

10          **MR. LERNER:**  -- actually where I was starting.  If I

11  can --

12          **THE COURT:**  Perfect.

13          **MR. LERNER:**  -- just get a word in --

14          **THE COURT:**  No, no.

15          **MR. LERNER:**  -- edgewise, Your Honor --

16          **THE COURT:**  No, no, no.  No, no, no, no.  I've read

17  your papers.  So, that fact is material.  Where did that fact

18  originate?  Where did Mr. Lamego send that email with that fact

19  in it?

20          **MR. LERNER:**  It originated with two other gentlemen,

21  David Affourtit and James Foster, who were the people who

22  approached him.

23          **THE COURT:**  I'm asking you.  The statement that --

24  leaving that aside, may or may not be true -- I don't know if

25  it's true or not -- but I know that from this record, on its

Exhibit 16
Page 15

1   face, Mr. Lamego says it's true.  So, where did Mr. Lamego send

2   that?

3              MR. LERNER:  He sent it to Mr. Cook.

4              THE COURT:  And, so, it existed at least at one time

5   in Mr. Cook's email stream.

6              MR. LERNER:  Yes.  And --

7              THE COURT:  All right.  Let's turn to the next thing

8   I want to ask you about.

9              MR. LERNER:  May I offer a point on that, Your Honor?

10              THE COURT:  No.  "Because I did not" -- I'm reading

11   from the email again.

12              "Because I did not want to sign the Apple's NDA for

13              onsite review, the process came to a halt."

14              Period.  Next sentence:

15              "I felt that it was not appropriate to receive

16              confidential information from or disclose

17              confidential information to Apple given my fiduciary

18              responsibilities as technical officer of Cercacor."

19              Period.  Close quote.

20              Do you think that a statement by Mr. Lamego in an

21   email directed to Mr. Cook stating, one, earlier in the year he

22   didn't want to sign an NDA, in part because he felt it was,

23   quote, "not appropriate," close quote, to, quote, "disclose

24   confidential information to Apple," and, two, that described he

25   had and owed, quote, "fiduciary responsibilities as technical

Exhibit 16
Page 16

1    officer of Cercacor."  Period, close quote.

2           Are those two facts that are contained in this email

3    in any way relevant to any issue in this case?

4           MR. LERNER:  They could be.  The point which we've

5    been consistent on throughout, Your Honor, is that --

6           THE COURT:  Thank you.  They could be.

7           MR. LERNER:  -- is that --

8           THE COURT:  Let's talk about --

9           MR. LERNER:  Your Honor, may I please --

10          THE COURT:  Let's talk about one more --

11          MR. LERNER:  -- answer your question?

12          THE COURT:  -- clause from this email.  Let's talk

13   about one more clause from this email.  Next page.  We're now

14   at page 38 of Docket Number 321-1, second to last substantive

15   paragraph.  Quote:

16          "I would appreciate if the content of this letter

17          could be kept confidential since it can jeopardize

18          the outcome of my career at Cercacor."

19          Period.  Close quote.

20          Do you think that that expression of concern about

21   his career at Cercacor, based on this letter that he sent to

22   Mr. Cook, that that has any bearing on any fact of consequence

23   in this case?

24          MR. LERNER:  In this case?  It sounds like it was a

25   big deal in the other case where he was very concerned.

Exhibit 16
Page 17

```
 1              THE COURT:  I'm asking about this case.

 2              MR. LERNER:  I --

 3              THE COURT:  Do you think that Apple being placed on

 4    notice that the person who, in your words, unsolicitedly sent

 5    an email to Tim Cook, asked Mr. Cook to keep this email

 6    confidential, a potential -- I don't know if you were

 7    competing, if the companies were competitors at that point --

 8    but asked to have this communication confidential, do you think

 9    that that has any bearing on -- for instance, we talked about

10    knowledge of the receiving party in a trade secret case knowing

11    that the potential information is a trade secret or is

12    confidential -- does this have any bearing on any issue of

13    consequence in this case?

14              MR. LERNER:  It could, and we're addressing --

15              THE COURT:  Okay.  It could.

16              MR. LERNER:  -- two separate --

17              THE COURT:  It could.  Thank you.

18              MR. LERNER:  -- issues.  We're addressing --

19              THE COURT:  So, now let's turn to -- let's get --

20    let's really get into the weeds now.  I really want to get into

21    this.

22              MR. LERNER:  Your Honor --

23              THE COURT:  Let's talk about -- no, no.  I've read

24    your papers.

25              MR. LERNER:  I'm not commenting on my papers.  I just
```

Exhibit 16
Page 18

1  would like to be heard.

2          **THE COURT:**  We're going to turn now to the -- what I

3  think is the operative pleading, which is the fourth

4  amendment -- fourth amended complaint.  Paragraph 21 of the

5  fourth amended complaint reads, in part:

6              "Apple systematically recruited other key Masimo

7              personnel, such as Marcello Lamego, who was the

8              former chief technical officer at Cercacor and a

9              former research scientist at Masimo."

10         The remainder of paragraph 21 describes dates that

11 Mr. Lamego worked at Masimo or Cercacor.

12         Here is -- and that's -- that's the fourth amended

13 complaint.  Here is defendant's, Apple's, amended answer to the

14 fourth amended complaint with respect to paragraph 21:

15             "To the extent it implicates a legal conclusion, no

16             response is required.  To the extent that a response

17             is required, Apple admits that it hired Marcelo

18             Lamego in 2014.  Apple denies that it systematically

19             recruited other key Masimo personnel, such as Marcelo

20             Lamego.  Apple lacks information sufficient to form a

21             belief about the truth of the remaining allegations

22             and characterizations in paragraph 21 of the fourth

23             amended complaint, and, therefore, Apple denies

24             them."

25             End of quotation.

Exhibit 16
Page 19

1        So, Apple, in responding to paragraph 21, did not

2   admit and, in fact, denied, based on lack of information, that

3   Marcelo Lamego was the former chief technical officer of

4   Cercacor.  So, apparently, that Apple's taking is challenging

5   that based on lack of information or belief.

6        Does the -- Mr. Lerner, does the first line of -- or

7   not the first line, but the -- Mr. Lamego's letter, does that

8   have any bearing on whether he was the former chief technical

9   officer of Cercacor?

10       **MR. LERNER:**  It doesn't say he was former.  It says

11  as the chief, at this time.

12       **THE COURT:**  Okay.

13       **MR. LERNER:**  He held multiple positions.

14       **THE COURT:**  We're talking about relevance.  You're

15  not proving your case.  Does it have any bearing on the issue

16  of whether he was, at one time, the chief technical officer at

17  Cercacor?

18       **MR. LERNER:**  He says:  "My responsibilities as the

19  chief technical officer of Cercacor."

20       **THE COURT:**  So, could you answer my question?  Does

21  it have any bearing on the issue of a fact that apparently

22  Apple contests, due to lack of information or belief, whether

23  Mr. Lamego was the chief technical officer at Cercacor?

24       **MR. LERNER:**  He held multiple positions, and we're

25  talking about different times, but, yes, this does say he was

Exhibit 16
Page 20

```
 1   the --
 2              THE COURT:  All right.  Yes.  Let's go on --
 3              MR. LERNER:  -- chief technical officer.
 4              THE COURT:  -- to paragraph 22.  All right.
 5   Paragraph 22 of the fourth amended complaint.  Just read the
 6   first sentence for now:
 7              "Lamego had unfettered access to plaintiffs' highly
 8              confidential, technical information."
 9              Here is reading now from Apple's answer to the fourth
10   amended complaint:
11              "To the extent paragraph" -- 22 -- although it says,
12   "To the extent paragraph 23," I believe that's a typo, because
13   it's numbered 22.
14              "To the extent" -- the paragraph -- "implicates legal
15              conclusions, no response is required.  To the extent
16              that a response is required, Apple lacks knowledge or
17              information sufficient to form a belief about the
18              truth of the allegations and characterizations of
19              paragraph 22 of the fourth amended complaint, and
20              therefore Apple denies them."
21              So, that puts -- that statement whether or not
22   Mr. Lamego had unfettered access to plaintiffs' highly
23   confidential technical information, do you think, since that's
24   now at issue and plaintiff has to prove it since it's been
25   denied by Apple, that that letter has any bearing on that
```

Exhibit 16
Page 21

1    issue?

2              MR. LERNER:  Whether or not he had unfettered access?

3              THE COURT:  Yeah.

4              MR. LERNER:  He says:  "I developed several medical

5    devices in the last 10 years."

6              THE COURT:  He also said that he didn't want to sign

7    an NDA because of -- that would require him -- by which he

8    would have shared confidential information, he wasn't

9    comfortable, given his fiduciary duties.  So --

10             MR. LERNER:  No, no, that's --

11             THE COURT:  -- does that letter have any bearing on

12   this?

13             MR. LERNER:  This is important.  That is not what

14   that says.

15             THE COURT:  All right.  Fine.  Your --

16             MR. LERNER:  It does not say he would have --

17             THE COURT:  Is it your contention -- yes or no, is it

18   your contention that that letter has any bearing on plaintiffs'

19   now requirement to prove its contentions in paragraph 22 of its

20   answer, this contention that Apple denies?

21             MR. LERNER:  Mr. Lamego sent this --

22             THE COURT:  Yes or no?  Just give me a yes or no.

23   Does it have any bearing?

24             MR. LERNER:  As to Apple, he sent this email.  The

25   whole point of our argument and what I've been trying to

Exhibit 16
Page 22

1    explain is that it cannot be the test that sending an email to

2    Mr. Cook, where he effectively says, by forwarding it without

3    comment, this is not on my plate; I'm not --

4          **THE COURT:**  He doesn't say that.  He doesn't say that

5    at all.  We're moving on now.

6          **MR. LERNER:**  He --

7          **THE COURT:**  Since you didn't answer my question,

8    we're going to keep going.  Paragraph 228 of the fourth amended

9    complaint.

10         **MR. LERNER:**  I apologize.

11         **THE COURT:**  I'm going to --

12         **MR. LERNER:**  How did I not answer your question?

13         **THE COURT:**  I'm going to -- I asked you for a yes or

14   no question of whether it had any bearing on the issue of the

15   case, and you didn't answer that.

16         **MR. LERNER:**  That's --

17         **THE COURT:**  So, we're moving forward to paragraph 228

18   of the fourth amended complaint.  I'm reading a portion of it.

19             "At the time of the disclosure, O'Reilly and Lamego

20             knew, or had reason to know, that their knowledge of

21             plaintiffs' confidential information was acquired by

22             an employer-employee relationship, fiduciary

23             relationship, and employment agreements, which

24             created a duty for them to keep plaintiffs'

25             confidential information secret."

Exhibit 16
Page 23

1          That's the allegation of paragraph 228.  In response,

2    in its answer to paragraph 228, leaving aside the legal

3    conclusion statement previously read, this is the entirety of

4    the answer:

5               "To the extent that a response is required, Apple

6               denies the allegations and characterizations in

7               paragraph 228 of the fourth amended complaint and

8               specifically denies that it has committed any active

9               trade secret misappropriation."

10         So, Apple is affirmatively denying all the

11   allegations contained in paragraph 28, including the allegation

12   that Mr. Lamego knew, or had reason to know, that their

13   knowledge of confidential information was required by, among

14   other -- was acquired by, among other things, a fiduciary

15   relationship.

16         Does the October 2nd, 2013, from Mr. Lamego have any

17   bearing on what plaintiff now has to prove -- because Apple has

18   denied it -- that Mr. Lamego knew that he had knowledge of

19   plaintiffs' confidential information acquired as a result of a

20   fiduciary obligation?

21         **MR. LERNER:**  It well could, and I will not contest

22   any of the further points, Your Honor.  I don't think I can get

23   out my point, but I take Your Honor's questions, understand

24   your point.  I don't need to keep arguing it.

25         **THE COURT:**  Well, we're going to go a little more;

Exhibit 16
Page 24

```
 1    because I want to make sure that -- you know, you had some

 2    pushback there.  Let's go to paragraph 229, the next paragraph

 3    of the fourth amended complaint:

 4               "Plaintiffs allege at the time of the acquisition

 5               defendant also knew, or had reason to know, that its

 6               employees obtained plaintiffs' confidential

 7               information pursuant to a duty to keep plaintiffs'

 8               confidential information secret."

 9               And, then, skipping down:

10               "Defendants also knew Lamego was the chief technical

11               officer of Cercacor and a research scientist at

12               Masimo.  Defendant knew Lamego and O'Reilly were each

13               under a duty to maintain the secrecy of the

14               information they obtained from plaintiffs.  Defendant

15               knew plaintiffs considered the information

16               confidential by virtue of its prior relationship of

17               plaintiffs."

18               And we talked earlier about in a trade secret case

19    the state of mind of the defendant matters, right?

20               MR. LERNER:  Yes, Your Honor.

21               THE COURT:  And this allegation is that the

22    defendant, Apple, a corporation, knew that, among other things,

23    Lamego was the chief technical officer of Cercacor and was

24    under a duty to maintain the secrecy of information --

25    confidential information contained, and that defendant knew
```

Exhibit 16
Page 25

1   that plaintiffs considered information confidential by virtue

2   of that relationship.  Apple in its answer to paragraph 229

3   admits that it received a letter from plaintiffs on or around

4   January 24th, 2014, containing the language quoted in paragraph

5   229, but denied the remaining allegations and characterizations

6   of paragraph 229.

7          Do you think that Mr. Lamego's October 2nd, 2013,

8   letter bears in any way on Apple's denial -- other than

9   referencing the January 24th, 2014, letter -- has any bearing

10  on the issue of Apple's state of mind with respect to the trade

11  secret case?

12         **MR. LERNER:**  Not as we understood the accusations

13  there, Your Honor.  They were based on, as we understood them,

14  on that letter.

15         **THE COURT:**  So, you say it has no bearing whatsoever.

16  That letter has no bearing whatsoever about whether defendant

17  knew Lamego was the chief technical officer and that he was

18  under a duty to maintain secrecy of confidential information.

19  You're saying that that letter is irrelevant to plaintiffs'

20  obligation to prove those allegations.

21         **MR. LERNER:**  No, Your Honor.  The point we've been

22  trying to make -- and I accept your point, and I don't want to

23  keep arguing it, because I understand you don't --

24         **THE COURT:**  Yeah, and I can go on for --

25         **MR. LERNER:**  -- accept my argument.  So, I --

Exhibit 16
Page 26

```
 1              THE COURT:  -- for quite a long time.  But we'll stop

 2    now on the fourth amended complaint.

 3              And, now, before you get to what you want to tell

 4    me --

 5              MR. LERNER:  No, I --

 6              THE COURT:  -- I want to ask you:  What did you know

 7    at the time you wrote and affirmed in court when you said that

 8    Mr. Cook's email is unlikely to contain relevant, discoverable

 9    information?  Were you aware of the October 2nd, 2013, from

10    Mr. Lamego that you have now repeatedly confirmed contains

11    relevant information?  Were you aware of it at the time you

12    wrote your brief in connection with the June 10th, 2021, motion

13    or opposi- -- motion, and were you aware of it at the time you

14    sat here in court on June 10th and said you understood that I

15    was relying on that representation?  Were you aware of that

16    email at that time?

17              MR. LERNER:  Yes, Your Honor.  We had talked about it

18    with the Court a week earlier.

19              THE COURT:  You hadn't talked about it to me.

20              MR. LERNER:  I'm sorry.

21              THE COURT:  When did you talk about it to me a week

22    earlier?

23              MR. LERNER:  We --

24              THE COURT:  Tell me what day you spoke to me about

25    that email.
```

Exhibit 16
Page 27

1          **MR. LERNER:**  I apologize if I got that incorrect in

2  terms of my characterization.  On June 3rd, at set forth in the

3  papers here, we had communicated with the plaintiffs about this

4  email.  They gave us a brief that was redacted and didn't have

5  the information, and we said, "What's redacted?"  And they went

6  to True Wearables and got approval to show it to us, and it was

7  this email.

8          **THE COURT:**  Are you saying that's the first you've

9  ever seen that email?

10          **MR. LERNER:**  No, Your Honor.

11          **THE COURT:**  Okay.

12          **MR. LERNER:**  So, at that point --

13          **THE COURT:**  So, when did you -- when did you -- you

14  said you told me about it a week before June 10th.  When did

15  you tell me about it?

16          **MR. LERNER:**  We -- I apologize.  We filed the brief

17  that day, June 3rd, with Your Honor.  As described there, we

18  didn't tell you about it; we filed the paper.  So, obviously,

19  we were aware of it.

20          **THE COURT:**  But you didn't tell me about it, and I --

21          **MR. LERNER:**  No, that's correct.

22          **THE COURT:**  Do you want to take a look at what I get

23  every morning?  It's a list of every document filed in every

24  case that I'm on.  Do you think, as I'm getting ready for

25  hearings, I open up and analyze every filing, in every other

Exhibit 16
Page 28

```
 1   case, on the off chance that there's something in there that

 2   might have relevance?  Do you think that I do that?

 3          MR. LERNER:  No, Your Honor.

 4          THE COURT:  Of course not.  What do I do?  I rely on

 5   the candor of counsel at times, like I did on June 10th, when

 6   you told me Mr. Cook is unlikely to have any relevant,

 7   discoverable material in his email, and you just confirmed to

 8   me -- we could talk about the issue of ESI custodian in a

 9   moment -- but you just confirmed to me that this email is

10   relevant on so many issues that you -- you don't even want to

11   talk about it anymore.  Did you lie to me?

12          MR. LERNER:  Certainly it was not my intent, Your

13   Honor, and I apologize that you feel that way.

14          The -- very quickly, the point that I have been

15   trying to make to explain why I don't want you to feel that way

16   is that we have been very consistent in pointing out that

17   sending an email to Mr. Cook --

18          THE COURT:  I'm not -- we'll get to that.

19          MR. LERNER:  Okay.

20          THE COURT:  The question isn't -- look, there's all

21   sorts of things that you can argue.  You could have argued on

22   June 10th to say:  You know what, Your Honor?  I wrote in the

23   brief that there is -- his email is unlikely to have relevant,

24   discoverable information; you know, there is this email,

25   unsolicited from Mr. Lamego, that, you know, came in, I guess
```

Exhibit 16
Page 29

```
 1   that's relevant, but here's the reasons why that doesn't make
 2   him and Mr. Cook a proper ESI custodian.  You didn't say that.
 3   And to the extent you think that I'm scouring files --
 4           MR. LERNER:  No.
 5           THE COURT:  -- for -- for --
 6           MR. LERNER:  I do not.
 7           THE COURT:  -- when you tell me --
 8           MR. LERNER:  I do not.
 9           THE COURT:  -- there is unlikely to have relevant,
10   discoverable information, and this email is in there, separate
11   and apart from whether he's an appropriate discussion, and you
12   knew about it, and you told me:  No, nothing relevant or
13   discoverable; unlikely to have anything relevant and
14   discoverable in his email.  You sat there when I said --
15   because I'm relying on you and your four or five colleagues
16   that signed that brief -- that this is a close call.  But I'm
17   relying on that statement to deny the motion, and you didn't
18   say:  By the way, there is this other thing out there.  And
19   they couldn't tell me.  Because they heard me, and they heard
20   me when I talked about protective orders and what they mean.
21   They knew about it from a protective order.  They couldn't tell
22   me in the context of this case.  And you sat there and let it
23   all go by like it didn't exist.
24           So, before we get to the appropriateness of the
25   custodian, I want to get -- since we've now gone down this
```

Exhibit 16
Page 30

```
 1   road, I want to get to the bottom of this.  Do you still

 2   contend -- and I noticed from your papers you no longer say his

 3   email is unlikely to contain discoverable, relevant

 4   information.  It now says it's unlikely to contain discoverable

 5   non-duplicative information.  So, that tells me that you

 6   recognized that you were not completely candid with me on June

 7   10th.  And we can get to your other arguments, but how am I

 8   supposed to trust anything you say now?

 9          MR. LERNER:  I apologize, Your Honor.  As I said

10   earlier, the way that we understood the argument here and the

11   issues is, did he have information that made him a proper

12   custodian.

13          THE COURT:  Okay.  That's not what you wrote, and I

14   was at the hearing --

15          MR. LERNER:  I --

16          THE COURT:  -- and you were at the hearing, and I

17   made it very clear that there was a careful balancing going on

18   here, and that the plaintiffs' showing was not particularly

19   strong about specific contacts.  There was references to public

20   statements about Mr. Cook saying he wanted the future of Apple

21   to be and the health -- the health monitoring field, and the

22   statements around the timing and conversations and meetings

23   with Mr. O'Reilly, but that that didn't really show a lot of

24   relevance to our dispute here and in connection to it.

25          And on your side, you didn't show me any burden, and
```

Exhibit 16
Page 31

1   so it was a close call, but I'm going to take you at your word

2   when you tell me as an officer of the Court it's not likely to

3   have any relevant discoverable information.  And to hear that

4   you knew about this October 2nd, 2013, letter at the time you

5   made that representation, and assured me that you understood

6   that that's what I was relying on, and to hear as we sat here

7   today the various myriad ways in ways that letter is relevant

8   to the issues in this case, I'm not sure what to do with that.

9          But let's move on.  You want to tell me something.

10  Do you now concede that that representation was, let's just say

11  not entirely accurate, and that there is reason to believe --

12  in fact, there is -- you've now conceded that there was at

13  least at one time relevant information in Mr. Cook's email?

14          MR. LERNER:  I understand your point, Your Honor, and

15  I apologize --

16          THE COURT:  I'm not making a point.  I'm asking a

17  question.  Can we move past that?

18          MR. LERNER:  Yes.

19          THE COURT:  Is it now the state of play that we can

20  start from this spot, where we couldn't start from last time.

21  I now have evidence in front of me that at least at one time

22  Mr. Cook had relevant information in his email strings.

23          MR. LERNER:  Yes.

24          THE COURT:  All right.  Make whatever further

25  argument you want to make.

Exhibit 16
Page 32

```
1              MR. LERNER:  Two very quick points.
2              THE COURT:  I don't want you to be rushed.  Take as
3    much time as you want.
4              MR. LERNER:  I understand Your Honor's point so far.
5    When we briefed this throughout, and Your Honor just raised,
6    for example, the meeting with Mr. O'Reilly, that was a meeting.
7    We didn't say they didn't meet.  To the contrary.  We went and
8    got a declaration from Mr. O'Reilly about the meeting with
9    Mr. Cook.
10             THE COURT:  And as you heard, I'm not talking about
11   that.  I found that insufficient before.
12             MR. LERNER:  And what we had when we looked at this
13   email isn't even a meeting.  We have an email that comes in.
14   He forwards it, and as far as we can tell, has nothing else to
15   do with it.  And then, in order to make sure, and give the
16   Plaintiffs every opportunity we can to test this theory that
17   Mr. Cook knew anything about this, we said, on each of these
18   documents actually, we'll make the people involved custodians.
19   So, this was forwarded to Jeff Williams.
20             THE COURT:  What day did you offer Jeff Williams as
21   an ESI custodian?
22             MR. LERNER:  I think as they pointed out, it was
23   right before one of our briefs.
24             THE COURT:  Maybe the day before your opposition?
25             MR. LERNER:  I think that's what -- that's what was
```

Exhibit 16
Page 33

1  said in the papers, and if that's so, that's accurate.

2          THE COURT:  And why should they take your word that

3  that's going to, in your words, "put the matter to bed"?

4          MR. LERNER:  That was one of many people who -- to

5  whom we said, let's make them a custodian so you can test this

6  theory.  That is who Tim Cook in the first instance forwarded

7  this to.

8          And by the way, when we -- when we went and looked,

9  and provided information about his emails, there was not, as

10 far as we can tell, not follow-ups until November.  And not to

11 involve Mr. Cook as we saw.

12         Now, on the second point where they say --

13         THE COURT:  When you say you investigated the email

14 chain, did you ask Mr. Cook?

15         MR. LERNER:  We have not asked Mr. Cook.

16         THE COURT:  Okay.

17         MR. LERNER:  And again, that goes, I think, to the

18 point I was trying to make.  And I understand Your Honor's

19 response to it which is, if in every instance where somebody

20 sends Mr. Cook an unsolicited email, and he forwards it to

21 other people to deal with, we have to go talk to him or review

22 his emails, that's not a workable standard.

23         THE COURT:  Well, when you make a representation that

24 an email account is not likely to have relevant information at

25 a time you know and knew that it did, I'd suggest, if you're

Exhibit 16
Page 34

1    going to come back and say, "Oh, well, never mind, this was

2    never followed up on".

3           In that situation, when your credibility is now at

4    issue, maybe you should ask, or ask someone, and say, and this

5    is what you stated in your declaration at Paragraph 7 in

6    connection with the opposition, "I attest that a reasonably

7    diligent search did not yield any indication that Tim Cook ever

8    responded to or substantively commented on this email chain".

9    That doesn't mean that there isn't other information in his

10   email or that there isn't other potential information in the

11   question as -- well.

12          That's a very narrow statement.  "Oh, well, we

13   couldn't find that Mr. Cook further commented on this email

14   chain".

15          What about other email chains?  Did you ask him?

16   Apparently not.

17          **MR. LERNER:**  We --

18          **THE COURT:**  And we're starting from a kernel that

19   didn't exist at the last hearing that now exists, and you have

20   said a couple of times "unsolicited email".  Well, fine.

21   Unsolicited as to Mr. Cook, but at least according to the

22   email, Mr. Lamego had been contacted by two people from Apple.

23          So, it's not, as you put in your opposition, a

24   statement from customers that email Tim Cook, and he didn't

25   respond to.  It's unsolicited in the sense that Mr. Cook didn't

Exhibit 16
Page 35

1  ask for it, but people from Apple contacted Mr. Lamego, and he

2  dealt directly with Mr. Cook.  Why did he deal directly with

3  Mr. Cook?  Well, maybe there's a -- we're now getting into

4  Mr. Lamego's head, but maybe there's a bit of an inkling in

5  that last second to last paragraph.  "Please keep this

6  confidential".  He's going to the top.

7          And you indicated, and your papers indicated, that

8  Mr. Cook, "Oh, he just forwarded it on for other people,

9  without any comment".

10         I'm going to tell you, just like I said, and I quoted

11 Bob Dylan last time, that I don't need a weather man to know

12 which way the wind blows.

13         I'm going to go out on a limb, and we do have an

14 Apple representative in court.  I'm going to go out on a limb

15 that if Mr. Cook got an email at 12:53 a.m. and forwarded it to

16 the head of HR and the head of the, what is it, the Health

17 Sciences Division, at what was it, like 7:00 a.m.  I mean, we

18 don't even have a minute of 9:00 to 5:00 business time before

19 that was sent out.

20         Now, obviously, Apple doesn't necessarily work on a

21 9:00 to 5:00 business, but you're talking about that's an

22 immediate turn around, and it's not just going to an assistant

23 or going to someone.  It's going to the head of HR and the head

24 of the relevant department.  So, he did put thought into it.

25 He didn't just slough it off.  He picked two critical people

Exhibit 16

Page 36

1   that bear directly on what Plaintiffs are alleging, and he did

2   it almost instantaneously considering the time it came in.

3          And one of those people almost instantaneously

4   reached back out to Mr. Lamego within a couple of hours.  I am

5   very curious about whether there was any other communication

6   with Mr. Cook about this issue.  I'm sure the Plaintiffs are

7   interested were there emails to other people.

8          So, to say, "Well, we didn't find him commenting on

9   this email thread", doesn't answer the question and doesn't

10  really get to it other than it -- the fact that it's there

11  makes one of the legs that underpinned my prior ruling go away.

12  And it's more than just a customer sending an email that he has

13  his assistant look at.

14         And I'll say something else.  Again, this comes from

15  my time as a prosecutor.  The metadata on this is going to be

16  important because your client may say, "You know what, Tim Cook

17  doesn't even monitor his email account, the general email

18  account.  He's got an assistant that does that.  An assistant

19  made this decision".  Maybe so.  I don't know.  But I'd be

20  interested to know what came in before, what came in after.

21  And I'm not saying that's discoverable, but what I'm saying is

22  potentially where this goes, if there's an argument that

23  Mr. Cook didn't forward it, someone else did, well, they may

24  have the ability and be approved to make an ability to test

25  that.

Exhibit 16
Page 37

1          But this is an important email.  What happened to it

2    is important, and it suggests to me, reasonable cause to

3    believe that there -- that first of all, Mr. Cook is

4    knowledgeable about the facts, because he didn't just send it

5    to his assistant and say, "I don't know what this is, deal with

6    it".  And sometimes saying nothing is saying a lot.  What is

7    it, Cool Hand Luke?  Sometimes nothing is a pretty cool hand?

8          Sometimes when the CEO of the world's largest company

9    forwards, without comment, an email about an unsolicited email

10   from the chief technology officer from a competitor or

11   potential competitor to the head of HR and the head of the

12   Health Sciences Division, that speaks loudly, even if there

13   isn't anything written in text in the email.

14         So, please continue.

15         **MR. LERNER:**  I do not need to continue to test your

16   patience, Your Honor.  As I can tell, so only --

17         **THE COURT:**  I have -- listen, you're not testing my

18   patience.

19         **MR. LERNER:**  -- the only two points I would clarify

20   is that I tend to read my email sometimes around 8:00 or 9:00

21   in the morning.  That's what Mr. Cook did based on the

22   documents we saw here.  I just want to clarify that point.

23         **THE COURT:**  Can I get the exact time?  When was the

24   exact time --

25         **MR. LERNER:**  8:50 a.m.

Exhibit 16
Page 38

```
 1            THE COURT:  -- because again, it might be important

 2    for the metadata to see when it was opened; how quickly it was

 3    sent out.

 4            What was the exact time he forwarded it to

 5    Mr. Williams and --

 6            MR. LERNER:  8:50 and 57 seconds Pacific time.

 7            THE COURT:  All right.  And it was sent at 1:50 a.m.

 8            MR. LERNER:  Right.  So --

 9            THE COURT:  So, we're -- we didn't even get to

10    business hours.  You're right.  Maybe he does it first thing in

11    the morning, but again it shows you something.

12            MR. LERNER:  I just --

13            THE COURT:  You check your email in the morning.  I

14    check my Court docket in the morning.  Important things, I send

15    something to Maria right away.  Oh, we've got to deal with

16    this.  We've got an ex parte from -- well, leave it at that.

17    We've got to deal with this right away.

18            Less important things, they kind of filter out

19    through the day.  Maria is nodding her head.  We deal with them

20    when we deal with them, but important things, boy, we send them

21    out right away, and we make sure we get it to the right person

22    right away.

23            So, when Judge Carter or Judge Selna sends me an

24    email, even without comment, I'm getting back to him, or Judge

25    Staton right away because, boy, that's important.
```

Exhibit 16
Page 39

1          So, go ahead.

2          **MR. LERNER:**  I, like I said, I do not have more to

3    take your time with this other than that the two people you

4    mentioned, Mr. Cook tends to interact with other senior people.

5    So, he forwarded it to senior people, and as you can tell from

6    the follow-up, some of those people, it sounds like already

7    knew about the discussions and there were discussions in place.

8    So, there was -- there was follow-up.

9          These are all factual issues.  I understand Your

10   Honor's point that you would like to know more about them.  We

11   understand your tentative.

12         I think I've made my point about the standard for

13   making him a custodian.  I understand that's not carrying

14   water, and I understand your other points.

15         **THE COURT:**  Well, do you have anything you want to

16   add from a legal standpoint?  Have I said anything wrong from a

17   legal standpoint about what the right standard is?

18         **MR. LERNER:**  For making him a custodian?

19         **THE COURT:**  Yeah, what's -- what do you contend the

20   standard is?

21         **MR. LERNER:**  I contend the standard should not and

22   cannot, and I don't have a case specific to these facts because

23   we have not seen one, but it should not be enough to make the

24   CEO of a company a custodian because he receives and forwards

25   an email.

Exhibit 16
Page 40

```
 1          THE COURT:  All right.  You cited two cases in your

 2   opposition that dealt with the ESI custodian issue.  All the

 3   other cases --

 4          MR. LERNER:  Yep.

 5          THE COURT:  -- deal with the issue of the timing and

 6   appropriateness of the requests for -- of the motion for

 7   reconsideration under the rules.  Is there anything you want to

 8   tell me about those cases that you think should guide my

 9   analysis here?

10          MR. LERNER:  No, Your Honor.  I'm sure you've already

11   reviewed them and read the papers, as you've said.  So I,

12   again, don't need to take more of your time.

13          THE COURT:  Well, I want -- listen.  Tell me if

14   there's anything, and I'm going to point out from my reading.

15   You're right.  I did read them, the *BlackBerry* case, and that

16   was Judge Stevenson in L.A. from 2019, and the citation is 2019

17   WL 4544425.

18          I don't know that that helps your cause because

19   although Judge Stevenson denied a motion, and it relates to

20   Mr. Mark Zuckerberg from Facebook, denied a motion to require

21   that he search -- or that Facebook search his email strings as

22   to four categories or four search issues.

23          She had earlier had required Facebook to conduct a

24   search of Mr. Zuckerberg's email for a particular issue that

25   she found relevant, and then because -- it was largely because
```

Exhibit 16
Page 41

1    it was a patent case, patent infringement case, there was no

2    showing that Mr. Zuckerberg knew anything about the patents at

3    issue, those other patent-related ESI terms were not required

4    to be searched, but he was required -- Facebook was required to

5    search as to an issue which he did have knowledge.

6          **MR. LERNER:**  And we cited that case, to be clear,

7    Your Honor, because the proposed order here that you've been

8    asked, is not just to run the terms that the parties have

9    negotiated on Mr. Cook --

10         **THE COURT:**  But what I'm -- but this is a very

11   different situation.  And if this were just a patent case,

12   we're not dealing with just a patent case.  We're dealing with

13   the very issue that that letter goes -- that email goes to the

14   heart of as it relates to the trade secret case.

15         **MR. LERNER:**  And --

16         **THE COURT:**  So, the relevant information that at

17   least at one time was in his email string, and that again, by

18   not speaking, he spoke loudly; by how quickly he forwarded it

19   and to whom he forwarded it to shows that he did have some

20   knowledge and did -- and there is reason to believe that

21   there'd be more information in his emails.

22         And then the other case is the *Lauris versus Novartis*

23   from 2016.  That's Stan Boone's case in the Eastern District.

24   And he also denied an ESI request for four senior executives of

25   Novartis, but first of all said, and I'm quoting from Star

Exhibit 16
Page 42

1    Three of the Opinion, "That the Court is not persuaded that the

2    Apex Doctrine applies to discovery at issue", and then found

3    that the discovery sought was not proportionate to the needs of

4    the case noting that it would double the costs of the discovery

5    that had taken place thus far.

6         So, he had information from the Defense about what

7    the costs would be to do these four, and I'm using the term

8    loosely, Apex ESI searches, whereas I have none.  And I do find

9    that it is relevant, and there is reason to believe that

10   material information would be contained in the email thread,

11   and I'll note Judge Stevenson also did not apply, and expressly

12   said she was not applying an Apex Doctrine approach to the

13   issue, but was instead just relying on relevance and

14   proportionality.

15        And based on the information that I have, I find that

16   there is reason to believe that there's relevant information

17   and that I, having no countervailing facts, and the only thing

18   that I relied on last time, which was counsel's representation,

19   which turned out not to be true, from a proportionality

20   analysis, I find that -- or I am tentatively finding that the

21   -- Mr. Cook being designated as an ESI custodian is

22   proportional to the needs of the case, as Defendant has not

23   shown me any evidence otherwise.

24        Anything else, Mr. Lerner?

25        **MR. LERNER:**  No, Your Honor.

Exhibit 16
Page 43

1          **THE COURT:**  Mr. Re or Mr. Powell, any rebuttal or

2     response?

3          **MR. RE:**  Nothing, Your Honor.

4          **THE COURT:**  So, I'm going to ask this.  I'm going to

5     hold off on issuing a ruling.  I'm not sure that -- I'm not

6     saying he isn't, I'm not saying he is.  I'm not sure that the

7     same search terms that might apply to the head of R and D or

8     the head of some of the other issues, would necessarily apply

9     to Mr. Cook in a search of his email, as I know there's this

10    issue of efficient infringement.

11         I'm not making a ruling on it, but I want there to be

12    some discussion among the parties about whether this -- whether

13    the search terms can be agreed to or whether I need to make a

14    finding.  I'll hear from you on that, Mr. Re.

15         **MR. RE:**  We did propose a very, very, very few terms

16    for Mr. Cook.

17         **THE COURT:**  Is this in the proposed order?

18         **MR. RE:**  It is in, actually in a letter to Mr. Brian

19    Andrea at Gibson Dunn.  And it's at Exhibit 22.  Oh, it's

20    Document 475-2, filed July 19th this year, and its Page 46 of

21    47; otherwise Exhibit 22 at 190.

22         And you'll see at the very, very bottom of that page

23    just how limited the terms are for Mr. Cook compared to

24    everybody else.  And so, you're right.  We have already had

25    correspondence setting forth a very, very targeted number of

**Exhibit 16**
Page 44

1    search terms for Mr. Cook.

2              **THE COURT:**  All right.  So, for the record, those

3    search terms are, "Masimo, or Cercacor, or Kiani, or Diab" is

4    one Boolean search.  A second one is, "Lamego, or Marcelo, or

5    O'Reilly, or O'Riley", spelled alternatively.  The third one is

6    the phrase, "efficient infringement".  And the last is,

7    "healthcare, or embedded patient or medical closed in bed

8    (phonetic) within five of monitor, with an end Boolean change

9    allotment".  Those are the four terms.

10             Tell me what you think about those terms, Mr. Lerner.

11            **MR. LERNER:**  We think, as we briefed, that "efficient

12   infringement" has nothing to do with this case.  It feels like

13   it's plucked out of the media.

14             The last one on its face is not as described.  Asking

15   us to look through all of Tim Cook's emails for healthcare

16   is --

17            **THE COURT:**  All right.  Mr. Re.

18             It sounds like the main objection is to the final

19   two, so let's focus on those two.  Is there any connection that

20   you found in discovery thus far to the phrase "efficient

21   infringement" as it relates to this case?

22            **MR. RE:**  I will defer to Mr. Powell, who is the

23   author of that letter.

24            **MR. POWELL:**  Thank you, Your Honor.  I'm not aware of

25   any documents in discovery using that phrase that we've

Exhibit 16
Page 45

1   received yet.  The phrase came out, and you'll see this in our

2   reply brief, is the issue is that there's been statements,

3   public statements about this is a practice at Apple known as

4   efficient infringement --

5          THE COURT:  I've seen it, and there was back and

6   forth about whether the person who made the allegation actually

7   was who, in terms of his position at Apple, was who he claimed

8   to be.  And my memory is whoever wrote the response to that

9   said something to the effect of Apple doesn't do that and

10  doesn't believe in that.

11         MR. POWELL:  Right, Your Honor.  So, Mr. Cook

12  indicated that he does not think Apple does that and so, our

13  point is this is just a search term.  If Apple doesn't do that,

14  then it shouldn't have any hits.  And if it does have hits, it

15  might be Mr. Cook saying, "Yeah, we definitely don't do

16  efficient infringement, that's not our practice".  You would

17  think that Apple would want to produce such documents.

18         THE COURT:  All right.  And tell me about the other

19  category that seems like it has the potential in using the

20  phrase "patient within five of monitor or monitoring"

21  considering the nature of some of Apple's products that that

22  conceivably could result in a large number of documents that

23  have nothing to do with the claims in this case.

24         MR. POWELL:  Yeah, I don't know how many documents it

25  would result on.  I think the issue here is to at least run the

Exhibit 16
Page 46

1   search terms and get hit counts.  If the search terms don't

2   result in many documents, then there's no burden.  If the

3   search terms result in, you know, a million documents or

4   something, just for Mr. Cook, then of course we can -- I'm

5   happy to have that conversation with Mr. Lerner.

6         **THE COURT:**  All right.  Anything further on this

7   issue, Mr. Lerner?

8         **MR. LERNER:**  The only other thing that I'll add is,

9   particularly for Mr. O'Reilly obviously, you're talking about

10  an Apple employee.  So, just the name doesn't limit it to this

11  case.  You're talking about every communication with a

12  gentleman who was -- whose title at one point was chief medical

13  officer.  So, there's no limit there.

14        **THE COURT:**  Let me ask you, if I give you guys -- and

15  I understand you object and you don't agree with my ruling, but

16  if I give you guys 10 minutes, do you think you can narrow

17  this, or at least narrow some of it, because I am cognizant to

18  the potential -- because we're talking about -- what's the

19  timeframe we're talking about?

20        **MR. POWELL:**  We're talking roughly 2013 to present.

21        **THE COURT:**  Yeah, I'd like to see whether it's

22  something that you folks can narrow a little bit, but I'm not

23  making a ruling on whether that's inappropriate as stated, but

24  it might be worthwhile to, you know, any email for an eight-

25  year period -- is Mr. O'Reilly still at Apple?

**Exhibit 16**
Page 47

```
 1           MR. LERNER:  Yes, Your Honor.  And --

 2           THE COURT:  Any email that comes up with the name

 3   "O'Reilly", which seems to be what Bullet Point 2 would

 4   authorize, seems likely to, even though we don't have the

 5   testing, seems likely to pull up an untoward and unnecessary

 6   number of documents.

 7           MR. POWELL:  Well, Your Honor, I would be happy to

 8   have that conversation.  I would just only note that what we've

 9   done before is we run the search terms and get hit counts --

10           THE COURT:  I hear you.

11           MR. POWELL:  -- okay.

12           THE COURT:  And the problem with that here is, we're

13   trying -- I'm cognizant of a lot of issues, and to the extent

14   you can try to narrow things a little bit now and see whether

15   there's a way that you won't have to run it again, that way you

16   can get to -- hey, nothing is going to be perfect.  You're not

17   necessarily going to capture everything you want, and you're

18   probably going to capture some things that they don't want

19   captured that are going to be produced.  And I don't mean that

20   in a nefarious way.

21           Let's try to work it out.  Let's take five minutes.

22   Just give me five minutes to talk and see if the parties can

23   first talk amongst themselves, and then talk with each other to

24   see if there's a way to narrow these in a way that is less

25   objectionable.  And I'm not saying, again, that I'm not
```

Exhibit 16
Page 48

1  ultimately going to order it.

2        And I'm just going to -- just going to sit here for

3  five minutes, and if you folks want to step outside, you may.

4        **(A five-minute recess was taken)**

5        **THE COURT:**  All right.  Counsel have returned.  Do

6  you need a minute?

7        **MR. POWELL:**  No.  You may not like what we're going

8  to say, but --

9        **THE COURT:**  Okay.  I don't --

10       **MR. POWELL:**  -- I think we both thought we needed to

11 have consultation with the rest of the people on our teams.  We

12 didn't feel that we could do the kind of job on the fly here at

13 the courthouse because we all rely on other people, and we

14 would kindly request if we could have additional time to --

15       **THE COURT:**  What's going -- obviously, we used to

16 meet regularly, and we don't anymore.  What's going on in your

17 case?  Are there any deadlines or any reasons that this needs

18 to be expedited?

19       **MR. POWELL:**  No, and in fact, we even postponed this

20 hearing a few weeks so that we both could be here.  So, there

21 -- the answer is no.

22       **THE COURT:**  How much time do you think you need to

23 talk?  And again, I'm not expecting Apple to agree with the

24 ruling, but to the extent there are things that are less

25 objectionable that can be worked out, I want to provide that

Exhibit 16
Page 49

```
 1   opportunity.

 2          How much time to you think you need from Plaintiffs'

 3   standpoint just to consult with your team and make a

 4   presentation to Apple?

 5          MR. POWELL:  A day or two.

 6          THE COURT:  So, by Monday.

 7          MR. POWELL:  Monday.

 8          THE COURT:  Okay.  Monday, the 20th -- I'm sorry, the

 9   27th.

10          And Mr. Lerner, assuming you get a proposal from

11   Apple by Monday, the 20th, is that something you can respond to

12   -- I'm sorry, the 27th.

13          MR. LERNER:  Proposal on the 27th.

14          THE COURT:  Monday the 27th.

15          MR. LERNER:  Yes, Your Honor.

16          THE COURT:  All right.  So, what I'll do is I'm going

17   to hold off on a written ruling at least until Monday, the

18   27th, and I'll direct Plaintiffs' counsel to file just a status

19   report if there's any change to the request by nature of search

20   terms for Mr. Cook's email, but my tentative will be the order

21   that the motion will be granted.

22          And in terms of the timing, Mr. Lerner, Plaintiffs

23   ask for this to be done within -- to be completed, including

24   production, within 14 days.  What's an appropriate time from

25   your perspective?
```

Exhibit 16
Page 50

1          **MR. LERNER:**  It will obviously depend a little bit on

2  -- not a little bit, a lot on the search terms, just in terms

3  of volume and review.  And as Your Honor has noted before,

4  which should surprise nobody, it takes additional review of

5  Mr. Cook's emails, just given the importance.

6          If we could get 30 days at the very least, that is

7  much more workable for us.  It may, as I said, we may need more

8  time just given the volume, if it turns out to be a lot more.

9          **THE COURT:**  All right.  Is there any reason why 30

10  days -- why a faster time period is required, Mr. Re or

11  Mr. Powell?

12          **MR. POWELL:**  No, Your Honor.

13          **THE COURT:**  All right.  So, here's what we're going

14  to do.  The order is going to be, the parties are directed to

15  meet and confer, file a -- Plaintiff is directed to file a

16  status report as of September 27th regarding requested terms

17  following that meet and confer for the ESI search.  And the

18  production will be ordered to be made by October 27th.  And if

19  more time is needed, the parties can agree among themselves.

20  An if the parties can't agree, they can return this one issue

21  back to me on that.

22          Is there anything further with respect to this motion

23  on behalf of Plaintiffs?

24          **MR. POWELL:**  Nothing further, Your Honor.

25          **THE COURT:**  And on behalf of Defendants?

Exhibit 16
Page 51

```
1              MR. LERNER:  No, Your Honor.

2              THE COURT:  All right.  Thank you.  We're adjourned.

3         (Proceeding adjourned)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Exhibit 16
Page 52

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    September 29, 2021

        Signed                                                    Dated

*TONI HUDSON, TRANSCRIBER*

Exhibit 16
Page 53