# EXHIBIT 1

FILED UNDER SEAL

# EXHIBIT 2

FILED UNDER SEAL

# EXHIBIT 3

## FILED UNDER SEAL

# EXHIBIT 4

FILED UNDER SEAL

# EXHIBIT 5

FILED UNDER SEAL

# EXHIBIT 6

FILED UNDER SEAL

# EXHIBIT 7

FILED UNDER SEAL

# EXHIBIT 8

FILED UNDER SEAL

# EXHIBIT 9

FILED UNDER SEAL

# EXHIBIT 10

FILED UNDER SEAL

# EXHIBIT 11

FILED UNDER SEAL

# EXHIBIT 12

FILED UNDER SEAL

# EXHIBIT 13

FILED UNDER SEAL

# EXHIBIT 14

FILED UNDER SEAL

# EXHIBIT 15

FILED UNDER SEAL

# EXHIBIT 16

FILED UNDER SEAL

# EXHIBIT 17

FILED UNDER SEAL

# EXHIBIT 18

FILED UNDER SEAL

EXHIBIT 19

# Knobbe Martens

KNOBBE, MARTENS, OLSON & BEAR, LLP

2040 Main St., 14th Fl., Irvine, CA 92614
**T** (949) 760-0404

Kendall M. Loebbaka
Kendall.Loebbaka@knobbe.com

November 24, 2021
*Via Email*

Sarah R. Frazier
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA  02109

Re:     *Certain Light-Based Physiological Measurement Devices and Components Thereof*
Inv. No. 337-TA-1276

Dear Sarah:

I write regarding Apple's deficient discovery responses served on October 14, 2021 in response to Masimo's Third Set of Requests for Production (Nos. 131-133). Apple's refusal to produce responsive documents is prejudicing Masimo's ability to prepare its case, and we reserve all rights to seek relief based upon such deficient responses. Details regarding the deficiencies are provided below.

RFP No. 131 seeks documents and things produced by Apple in *Masimo Corp. v. Apple Inc.*, No. 8:20-cv-00048 (C.D. Cal.) ("the district court litigation"). RFP No. 132 seeks transcripts of any depositions taken in the district court litigation. And RFP No. 133 seeks responses to interrogatories or to requests for admission served by Apple in the district court litigation. Masimo's requests are relevant to various issues in this Investigation, including at least the development of Apple's products within the scope of this Investigation, infringement, and secondary considerations. Moreover, Apple's discovery responses in the district court litigation are relevant to how Apple characterizes its products. Masimo is entitled to production of relevant responsive information that would demonstrate, for example, if Apple is taking inconsistent positions between the two cases. Apple states that it will not produce documents in response to these requests, except to the extent it has already agreed to produce responsive documents for another request, yet fails to identify any specific request. During a hearing in the district court litigation on Masimo's request to use documents from the district court litigation in this Investigation, Apple represented that it has produced 64,000 pages of documents from the district court litigation in this Investigation. Please identify the documents from the district court litigation that have been produced in this Investigation.

Apple's objections to RFP Nos. 131-133 are ineffectual, and its responses are deficient as detailed below.

First, Apple objects to RFP Nos. 131-133 for purportedly involving "different patents, different products, and different accused functionalities than are at issue in this Investigation, and also trade secret and correction of inventorship claims unrelated to any claim or defense in this Investigation." However, Apple has overlooked the overlapping products at issue in both proceedings and by its own production has acknowledged that documents from the district court litigation are relevant to the issues in this investigation.

Exhibit 19
-218-

**Knobbe Martens**

Second, Apple objects to RFP Nos. 131-133 "to the extent it seeks documents in contravention of or to circumvent the Protective Order issued [i.e., Dkt. No. 67] . . . [in the district court litigation]." However, the Protective Order issued in the district court litigation prohibits only the **_unauthorized_** disclose of information, and expressly permits the **_authorized_** disclosure of information designated under that Protective Order to "any other person with the prior written consent of the Producing Party." *Masimo Corp. v. Apple Inc.*, No. 8:20-cv-00048 (C.D. Cal.), Dkt. No. 67 ¶¶ 9.2(i); *id.* ¶ 9.3. Accordingly, Apple, as the producing party of the information designated under the district court litigation Protective Order that is responsive to RFP Nos. 131-133 as clarified above, can simply authorize the production of said responsive information and has articulated no basis for refusing to authorize such disclosure. Thus, the request does not "seek documents in contravention of or to circumvent the Protective Order," and Apple's objections to the contrary are not well-founded. Moreover, Apple's production of 64,000 pages from the district court litigation in this Investigation confirms that this objection is not well-founded. Please confirm that Apple will withdraw such objections.

### 1.  RFP No. 131

Beyond the first and second objections discussed above, Apple has raised no other objections to RFP No. 131. Accordingly, please confirm that in addition to withdrawing those objections for the reasons explained above, Apple will promptly complete its production of documents responsive to RFP No. 131.

### 2.  RFP Nos. 132-133

In addition to the two improper objections discussed above, Apple objects to RFP No. 132 "to the extent it contravenes or seeks to circumvent the limitations on discovery in . . . 19 C.F.R. § 210.28" and similarly objects that RFP No. 133 "to the extent it contravenes or seeks to circumvent the limitations on discovery in . . . 19 C.F.R. § 210.29." Such objections are ineffectual. 19 C.F.R. § 210.28 is inapplicable to RFP No. 132, which merely seeks the production of responsive deposition transcripts, not the actual depositions of witnesses. Apple cites 19 C.F.R. § 210.28 broadly but provides no basis for objecting under that rule, nor does the rule appear to apply at all to limit Apple's response to this request. Accordingly, as Apple's objection to RFP No. 132 based on 19 C.F.R. § 210.28 is not well-founded, please confirm such objection will promptly be withdrawn and that documents responsive to RFP No. 132 as clarified above will be produced.

Apple's related objection based on 19 C.F.R. § 210.29 for RFP No. 133 is similarly misplaced. RFP No. 133 does not ask Apple to answer the interrogatories or RFAs it served in the district court litigation, and thus the request does not "contravene[] or seek[] to circumvent" the limitations on discovery in 19 C.F.R. § 210.29. Rather, the request merely seeks the production of the responses to such discovery requests served by Apple in the district court litigation. And the production of Apple's written discovery responses from the district court litigation plainly qualifies as a single discovery request given the discrete category of documents sought. Accordingly, as Apple's objection to RFP No. 133 based on 19 C.F.R. § 210.29 is again, not well-founded, please confirm such objection will promptly be withdrawn and that documents responsive to RFP No. 133 as clarified above will be produced.

* * * * * * *

knobbe.com

Exhibit 19
-219-

# Knobbe Martens

Sarah R. Frazier
Page 3

Please advise immediately as to when Apple will withdraw its objections to RFP Nos. 131-133 and begin its production of documents to correct the above-identified deficiencies, and provided the requested confirmations by November 30, 2021.

Sincerely,

Kendall M. Loebbaka

knobbe.com

Exhibit 19
-220-

# EXHIBIT 20

| | |
|---|---|
| **From:** | Passamaneck, Nora Q.E. |
| **To:** | Adam.Powell |
| **Cc:** | *** Apple-Masimo; Masimo.Apple; WH Apple-Masimo Service List; Aglipay, Ernest L. |
| **Subject:** | RE: Masimo v. Apple - Documents Produced In District Court and the ITC |
| **Date:** | Thursday, December 23, 2021 10:25:26 AM |

Adam,

We can provide by COB today and via FTP a .DAT file for the District Court action that will correlate ITC bates numbers to the District Court production.  Please confirm you will be providing the same.

Thanks,

Nora

**From:** Adam.Powell <Adam.Powell@knobbe.com>
**Sent:** Thursday, December 23, 2021 10:16 AM
**To:** Passamaneck, Nora Q.E. <Nora.Passamaneck@wilmerhale.com>
**Cc:** *** Apple-Masimo <Apple-Masimo@gibsondunn.com>; Masimo.Apple <Masimo.Apple@knobbe.com>; WH Apple-Masimo Service List <WHApple-MasimoServiceList@wilmerhale.com>
**Subject:** RE: Masimo v. Apple - Documents Produced In District Court and the ITC

EXTERNAL SENDER

Hi Nora,

We can provide an overlay today if you are ready.  We understand the overlay will correlate ITC bates numbers to district court bates numbers (as opposed to just a "yes" or "no" as to whether the document was produced in both cases).  Please confirm.

Thanks,
Adam

**Adam Powell**
Partner

858-707-4245 **Direct**

**Knobbe Martens**

**From:** Passamaneck, Nora Q.E. <Nora.Passamaneck@wilmerhale.com>
**Sent:** Monday, December 20, 2021 11:35 AM
**To:** Adam.Powell <Adam.Powell@knobbe.com>
**Cc:** *** Apple-Masimo <Apple-Masimo@gibsondunn.com>; Masimo.Apple <Masimo.Apple@knobbe.com>; WH Apple-Masimo Service List <WHApple-MasimoServiceList@wilmerhale.com>
**Subject:** RE: Masimo v. Apple - Documents Produced In District Court and the ITC

Adam,

Exhibit 20
-221-

We disagree that Plaintiffs are entitled to an overlay to determine what documents Masimo contends are relevant to the ITC.  This information is not required in the ESI order, and Judge Early made clear that Masimo could review the district court production for purposes of meeting and conferring with Apple about specific documents within Apple's production that Masimo contends are relevant to the ITC.  However, to avoid a dispute, we will provide this information if Plaintiffs do the same.  Please let us know when Plaintiffs will be able to make this exchange.

Regards,
Nora

**Nora Q.E. Passamaneck | WilmerHale**
1225 Seventeenth St.
Suite 2600
Denver, CO 80202 USA
+1 720 274 3152 (t)
+1 720 274 3133 (f)
nora.passamaneck@wilmerhale.com

**Please consider the environment before printing this email.**

This email message and any attachments are being sent by Wilmer Cutler Pickering Hale and Dorr LLP, are confidential, and may be privileged. If you are not the intended recipient, please notify us immediately—by replying to this message or by sending an email to postmaster@wilmerhale.com—and destroy all copies of this message and any attachments. Thank you.

For more information about WilmerHale, please visit us at http://www.wilmerhale.com.

**From:** Adam.Powell <Adam.Powell@knobbe.com>
**Sent:** Wednesday, December 15, 2021 6:06 PM
**To:** Passamaneck, Nora Q.E. <Nora.Passamaneck@wilmerhale.com>
**Cc:** *** Apple-Masimo <Apple-Masimo@gibsondunn.com>; Masimo.Apple <Masimo.Apple@knobbe.com>; WH Apple-Masimo Service List <WHApple-MasimoServiceList@wilmerhale.com>
**Subject:** RE: Masimo v. Apple - Documents Produced In District Court and the ITC

**EXTERNAL SENDER**

Nora,

Thank you for meeting and conferring with me on this issue at a break during the deposition today.  We agreed that we don't need a separate call on Friday and that you would provide Apple's final position soon.  I would appreciate you doing so tomorrow.

Best regards,
Adam

Exhibit 20
-222-

**Adam Powell**
Partner

858-707-4245 **Direct**

**Knobbe Martens**

---

**From:** Adam.Powell
**Sent:** Wednesday, December 15, 2021 2:43 PM
**To:** Passamaneck, Nora Q.E. <Nora.Passamaneck@wilmerhale.com>
**Cc:** *** Apple-Masimo <Apple-Masimo@gibsondunn.com>; Masimo.Apple <Masimo.Apple@knobbe.com>; WH Apple-Masimo Service List <WHApple-MasimoServiceList@wilmerhale.com>
**Subject:** RE: Masimo v. Apple - Documents Produced In District Court and the ITC

Nora,

Apple's unwillingness to provide this information is prejudicing our ability to identify documents from this case that we believe should be usable in the ITC case. Apple clearly has this information available and could easily provide it, but is refusing to do so. Your assertion that Masimo did not provide this information is irrelevant because Apple never asked. Masimo is happy to identify the documents produced in both the district court and ITC if Apple will also do so. Please confirm Apple agrees. Otherwise, we look forward to speaking to you at 2pm Friday about this issue. Please use the following dial in:



We sent the initial email before you requested that we include the WH listserv and I simply replied to that email below. We will endeavor to include the listserv on future emails.

Best regards,
Adam

**Adam Powell**
Partner

858-707-4245 **Direct**

**Knobbe Martens**

---

**From:** Passamaneck, Nora Q.E. <Nora.Passamaneck@wilmerhale.com>
**Sent:** Wednesday, December 15, 2021 12:01 PM
**To:** Adam.Powell <Adam.Powell@knobbe.com>
**Cc:** *** Apple-Masimo <Apple-Masimo@gibsondunn.com>; Masimo.Apple <Masimo.Apple@knobbe.com>; WH Apple-Masimo Service List <WHApple-MasimoServiceList@wilmerhale.com>
**Subject:** RE: Masimo v. Apple - Documents Produced In District Court and the ITC

Exhibit 20
-223-

Counsel,

We are unaware of any requirement that we provide the information you seek.  Masimo has not provided this information with respect to the documents it has produced.  Please explain the basis for your request so that we can consider it before a meet and confer.  I am available Friday 9-10, or 2-3 PST.  Also, as I requested during our Monday meet and confer, please include the WH listserv (copied above), as I was not on the emails below.

Regards,
Nora

**From:** "Adam.Powell" <Adam.Powell@knobbe.com>
**Date:** December 15, 2021 at 2:42:31 PM EST
**To:** *** Apple-Masimo <Apple-Masimo@gibsondunn.com>
**Cc:** "Masimo.Apple" <Masimo.Apple@knobbe.com>, "Selwyn, Mark" <Mark.Selwyn@wilmerhale.com>
**Subject: RE: Masimo v. Apple - Documents Produced In District Court and the ITC**

[WARNING: External Email]

Counsel,

We have not heard back from Apple on this issue.  Please let us know when you are available to meet and confer.

Best regards,
Adam

**Adam Powell**
Partner
858-707-4245 **Direct**

**Knobbe Martens**

**From:** Adam.Powell
**Sent:** Friday, December 10, 2021 6:27 PM
**To:** *** Apple-Masimo <Apple-Masimo@gibsondunn.com>
**Cc:** Masimo.Apple <Masimo.Apple@knobbe.com>; Selwyn, Mark <Mark.Selwyn@wilmerhale.com>
**Subject:** Masimo v. Apple - Documents Produced In District Court and the ITC

Counsel,

At the November 18 hearing, Apple represented that it had "already produced 64,000 pages that were first produced in this case in the ITC."  Masimo promptly asked Apple's ITC counsel to identify those documents so that Masimo could determine what documents Apple had or had not produced

Exhibit 20
-224-

in both cases.  Apple ignored our request.

We write again to request the same information.  Please provide an overlay identifying those documents immediately.  If Apple declines, please let us know when you are available to meet and confer pursuant to the Special Master Order.

Best regards,
Adam

**Adam Powell**
Partner

**858-707-4245** Direct

**Knobbe** Martens

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

Exhibit 20
-225-

EXHIBIT 21

US010912501B2

(12) **United States Patent**
Poeze et al.

(10) Patent No.: **US 10,912,501 B2**
(45) Date of Patent: *Feb. 9, 2021

(54) **USER-WORN DEVICE FOR NONINVASIVELY MEASURING A PHYSIOLOGICAL PARAMETER OF A USER**

(71) Applicant: **Masimo Corporation**, Irvine, CA (US)

(72) Inventors: **Jeroen Poeze**, Rancho Santa Margarita, CA (US); **Marcelo Lamego**, Cupertino, CA (US); **Sean Merritt**, Lake Forest, CA (US); **Cristiano Dalvi**, Lake Forest, CA (US); **Hung Vo**, Fountain Valley, CA (US); **Johannes Bruinsma**, Opeinde (NL); **Ferdyan Lesmana**, Irvine, CA (US); **Massi Joe E. Kiani**, Laguna Niguel, CA (US); **Greg Olsen**, Lake Forest, CA (US)

(73) Assignee: **Masimo Corporation**, Irvine, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **17/031,356**

(22) Filed: **Sep. 24, 2020**

(65) **Prior Publication Data**

US 2021/0007636 A1      Jan. 14, 2021

**Related U.S. Application Data**

(60) Continuation of application No. 16/834,538, filed on Mar. 30, 2020, which is a continuation of application
(Continued)

(51) **Int. Cl.**
A61B 5/1455      (2006.01)
A61B 5/145      (2006.01)
A61B 5/00      (2006.01)

(52) **U.S. Cl.**
CPC ........ *A61B 5/1455* (2013.01); *A61B 5/14532* (2013.01); *A61B 5/14546* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC . A61B 5/1455; A61B 5/14546; A61B 5/6838; A61B 5/6816; A61B 5/6829;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,452,215 A      6/1969   Alessio
3,760,582 A      9/1973   Thiess et al.
(Continued)

FOREIGN PATENT DOCUMENTS

CA      2264029      3/1998
CN      1270793      10/2000
(Continued)

OTHER PUBLICATIONS

US 8,845,543 B2, 09/2014, Diab et al. (withdrawn)
(Continued)

*Primary Examiner* — Chu Chuan Liu
(74) *Attorney, Agent, or Firm* — Knobbe Martens Olson & Bear LLP

(57) **ABSTRACT**

The present disclosure relates to noninvasive methods, devices, and systems for measuring various blood constituents or analytes, such as glucose. In an embodiment, a light source comprises LEDs and super-luminescent LEDs. The light source emits light at at least wavelengths of about 1610 nm, about 1640 nm, and about 1665 nm. In an embodiment, the detector comprises a plurality of photodetectors arranged in a special geometry comprising one of a substantially linear substantially equal spaced geometry, a substantially linear substantially non-equal spaced geometry, and a substantially grid geometry.

**30 Claims, 65 Drawing Sheets**



Exhibit 21
-226-

US 10,912,501 B2

45

What is claimed is:

1. A user-worn device configured to non-invasively measure a physiological parameter of a user, the user-worn device comprising:

at least three light emitting diodes (LEDs);

at least three photodiodes arranged on an interior surface of the user-worn device and configured to receive light attenuated by tissue of the user;

a protrusion arranged over the interior surface, the protrusion comprising a convex surface and a plurality of openings extending through the protrusion and positioned over the three photodiodes, the openings each comprising an opaque lateral surface, the plurality of openings configured to allow light to reach the photodiodes, the opaque lateral surface configured to avoid light piping through the protrusion; and

one or more processors configured to receive one or more signals from the photodiodes and calculate a measurement of the physiological parameter of the user.

2. The user-worn device of claim 1, wherein glass covers each of the openings.

3. The user-worn device of claim 1 further comprising:

a network interface configured to wirelessly communicate the measurement of the physiological parameter to a mobile phone;

a user interface comprising a touch-screen display, wherein the user interface is configured to display indicia responsive to the measurement of the physiological parameter;

a memory configured to at least temporarily store at least the measurement; and

a strap configured to position the user-worn device on the user.

4. The user-worn device of claim 1 further comprising:

a network interface configured to wirelessly communicate the measurement of the physiological parameter to a computer network;

a user interface comprising a touch-screen display, wherein the user interface is configured to display indicia responsive to the measurement of the physiological parameter;

a memory configured to at least temporarily store at least the measurement; and

a strap configured to position the user-worn device on the user.

5. The user-worn device of claim 1 further comprising:

at least one wall extending between the interior surface and the protrusion, wherein at least the interior surface, the wall and the protrusion form one or more cavities, wherein the photodiodes are arranged within the cavities.

6. The user-worn device of claim 1, wherein the physiological parameter comprises oxygen or oxygen saturation.

7. The user-worn device of claim 1, wherein the physiological parameter comprises pulse rate.

8. The user-worn device of claim 1, wherein the physiological parameter comprises trending information.

9. The user-worn device of claim 1 further comprising:

a thermistor configured to output a temperature signal, wherein the one or more processors are further configured to:

receive the temperature signal; and

adjust operation of the user-worn device responsive to the temperature signal.

10. The user-worn device of claim 9, wherein the temperature signal is responsive to a temperature of the tissue of the user.

46

11. The user-worn device of claim 1, wherein the LEDs and the photodiodes are arranged on a same side of the tissue of the user.

12. The user-worn device of claim 1, wherein the convex surface of the protrusion is an outermost surface configured to contact the tissue of the user and conform the tissue into a concave shape.

13. The user-worn device of claim 1, wherein the one or more processors are further configured to process the one or more signals to determine a bulk measurement responsive to a positioning of the user-worn device.

14. The user-worn device of claim 1, wherein:

the at least three LEDs comprises at least six LEDs;

a first set of LEDs includes three of the six LEDs;

a second set of LEDs includes a different three of the six LEDs;

the second set is spaced apart from the first set;

a first of the three LEDs in the first set of LEDs is configured to emit light at a first wavelength and a second of the three LEDs in the first set of LEDs is configured to emit light at a second wavelength; and

a first of the three LEDs in the second set of LEDs is configured to emit light at the first wavelength and a second of the three LEDs in the second set of LEDs is configured to emit light at the second wavelength.

15. The user-worn device of claim 1, wherein the at least three photodiodes comprise four photodiodes arranged on the interior surface in a quadrant arrangement.

16. The user-worn device of claim 1, wherein the protrusion further comprises one or more extensions.

17. The user-worn device of claim 16, wherein the one or more extensions surround the convex surface.

18. The user-worn device of claim 1, wherein the protrusion further comprises one or more chamfered edges.

19. A user-worn device comprising:

a plurality of light emitting diodes (LEDs);

at least three photodiodes arranged within the user-worn device and configured to receive light attenuated by tissue of a user;

a protrusion extending over the three photodiodes and comprising a convex surface, the protrusion including a separate window associated with each of the three photodiodes, an opaque material lining a lateral surface of the windows and extending through the protrusion, the opaque material configured to reduce an amount of light reaching the photodiodes without being attenuated by the tissue; and

one or more processors configured to receive one or more signals from at least one of the photodiodes, the one or more processors configured to output measurements responsive to the one or more signals, the measurements indicative of a physiological parameter of the user.

20. The user-worn device of claim 19 further comprising a thermistor.

21. The user-worn device of claim 20, wherein the one or more processors are further configured to receive a temperature signal from the thermistor and adjust operation of the user-worn device responsive to the temperature signal.

22. The user-worn device of claim 19, wherein the opaque material is configured to reduce an amount of noise caused by light piping in the one or more signals.

23. The user-worn device of claim 19 further comprising:

a network interface configured to wirelessly communicate the measurements to another computing device;

Exhibit 21
-227-

US 10,912,501 B2

47

a user interface comprising a touch-screen display, wherein the user interface is configured to display indicia responsive to the measurements; and

a memory configured to at least temporarily store at least the measurements.

24. The user-worn device of claim 19, wherein the physiological parameter comprises an oxygen saturation or oxygen measurement.

25. The user-worn device of claim 19, wherein the physiological parameter comprises a pulse rate.

26. A user-worn device configured to non-invasively measure a pulse rate of a user, the user-worn device comprising:

a first set of light emitting diodes (LEDs), the first set comprising at least an LED configured to emit light at a first wavelength and an LED configured to emit light at a second wavelength;

a second set of LEDs spaced apart from the first set of LEDs, the second set of LEDs comprising at least an LED configured to emit light at the first wavelength and an LED configured to emit light at the second wavelength;

at least three photodiodes arranged on an interior surface of the user-worn device and configured to receive light attenuated by tissue of the user;

a thermistor configured to provide a temperature signal;

a protrusion arranged over the interior surface, the protrusion comprising a convex surface extending over the three photodiodes, the protrusion further comprising one or more sidewalls extending at least partially around a perimeter of the convex surface;

48

a plurality of openings extending through the protrusion and aligned with the three photodiodes, each opening defined by an opaque surface extending through the protrusion and configured to reduce light piping;

at least one wall extending between the interior surface and the protrusion, wherein at least the interior surface, the wall and the protrusion form one or more cavities, wherein the photodiodes are arranged within the cavities;

one or more processors configured to receive one or more signals from the photodiodes and calculate a pulse rate measurement of the user;

a user interface comprising a display, wherein the user interface is configured to display indicia responsive to the pulse rate measurement;

a memory configured to at least temporarily store at least the pulse rate measurement; and

a strap configured to position the user-worn device on the user.

27. The user-worn device of claim 26, further comprising a network interface configured to wirelessly communicate the pulse rate measurement to a mobile phone.

28. The user-worn device of claim 26, further comprising a network interface configured to wirelessly communicate the pulse rate measurement to a computer network without involving a mobile phone.

29. The user-worn device of claim 26, wherein the protrusion further comprises one or more extensions.

30. The user-worn device of claim 26, wherein the protrusion further comprises one or more chamfered edges.

*   *   *   *   *

Exhibit 21
-228-

US010912502B2

(12) **United States Patent**
Poeze et al.

(10) Patent No.: **US 10,912,502 B2**
(45) Date of Patent: *****Feb. 9, 2021**

(54) **USER-WORN DEVICE FOR NONINVASIVELY MEASURING A PHYSIOLOGICAL PARAMETER OF A USER**

(71) Applicant: **Masimo Corporation**, Irvine, CA (US)

(72) Inventors: **Jeroen Poeze**, Rancho Santa Margarita, CA (US); **Marcelo Lamego**, Cupertino, CA (US); **Sean Merritt**, Lake Forest, CA (US); **Cristiano Dalvi**, Lake Forest, CA (US); **Hung Vo**, Fountain Valley, CA (US); **Johannes Bruinsma**, Opeinde (NL); **Ferdyan Lesmana**, Irvine, CA (US); **Massi Joe E. Kiani**, Laguna Niguel, CA (US); **Greg Olsen**, Lake Forest, CA (US)

(73) Assignee: **Masimo Corporation**, Irvine, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **17/031,407**

(22) Filed: **Sep. 24, 2020**

(65) **Prior Publication Data**

US 2021/0000392 A1      Jan. 7, 2021

**Related U.S. Application Data**

(60) Continuation of application No. 16/834,538, filed on Mar. 30, 2020, which is a continuation of application
(Continued)

(51) **Int. Cl.**
*A61B 5/1455* (2006.01)
*A61B 5/145* (2006.01)
*A61B 5/00* (2006.01)

(52) **U.S. Cl.**
CPC ........ *A61B 5/1455* (2013.01); *A61B 5/14532* (2013.01); *A61B 5/14546* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC . A61B 5/1455; A61B 5/14546; A61B 5/6838; A61B 5/6816; A61B 5/6829;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,452,215 A    6/1969   Alessio
3,760,582 A    9/1973   Thiess et al.
(Continued)

FOREIGN PATENT DOCUMENTS

CA         2264029        3/1998
CN         1270793        10/2000
(Continued)

OTHER PUBLICATIONS

US 8,845,543 B2, 09/2014, Diab et al. (withdrawn)
(Continued)

*Primary Examiner* — Chu Chuan Liu
(74) *Attorney, Agent, or Firm* — Knobbe Martens Olson & Bear LLP

(57) **ABSTRACT**

The present disclosure relates to noninvasive methods, devices, and systems for measuring various blood constituents or analytes, such as glucose. In an embodiment, a light source comprises LEDs and super-luminescent LEDs. The light source emits light at at least wavelengths of about 1610 nm, about 1640 nm, and about 1665 nm. In an embodiment, the detector comprises a plurality of photodetectors arranged in a special geometry comprising one of a substantially linear substantially equal spaced geometry, a substantially linear substantially non-equal spaced geometry, and a substantially grid geometry.

**30 Claims, 65 Drawing Sheets**



Exhibit 21
-229-

US 10,912,502 B2

43
44

The sensor signal is communicated via the flexible coupling **1630** to the connector end **1620**. The connector end **1620** can mate with a cable (not shown) that communicates the sensor signal to a monitor (not shown), such as any of the cables or monitors shown above with respect to FIGS. **2A** through **2D**. Alternatively, the connector end **1620** can mate directly with the monitor.

FIG. **17** illustrates an exploded view of certain of the components of the sensor **301** described above. A heat sink **1751** and a cable **1781** attach to an emitter shell **1704**. The emitter shell attaches to a flap housing **1707**. The flap housing **1707** includes a receptacle **1709** to receive a cylindrical housing **1480/1580** (not shown) attached to an emitter submount **1702**, which is attached to a circuit board **1719**.

A spring **1787** attaches to a detector shell **1706** via pins **1783**, **1785**, which hold the emitter and detector shells **1704**, **1706** together. A support structure **1791** attaches to the detector shell **1706**, which provides support for a shielding enclosure **1790**. A noise shield **1713** attaches to the shielding enclosure **1790**. A detector submount **1700** is disposed inside the shielding enclosure **1790**. A finger bed **1710** provides a surface for placement of the patient's finger. Finger bed **1710** may comprise a gripping surface or gripping features, which may assist in placing and stabilizing a patient's finger in the sensor. A partially cylindrical protrusion **1705** may also be disposed in the finger bed **1710**. As shown, finger bed **1710** attaches to the noise shield **1703**. The noise shield **1703** may be configured to reduce noise, such as from ambient light and electromagnetic noise. For example, the noise shield **1703** may be constructed from materials having an opaque color, such as black or a dark blue, to prevent light piping.

Noise shield **1703** may also comprise a thermistor **1712**. The thermistor **1712** may be helpful in measuring the temperature of a patient's finger. For example, the thermistor **1712** may be useful in detecting when the patient's finger is reaching an unsafe temperature that is too hot or too cold. In addition, the temperature of the patient's finger may be useful in indicating to the sensor the presence of low perfusion as the temperature drops. In addition, the thermistor **1712** may be useful in detecting a shift in the characteristics of the water spectrum in the patient's finger, which can be temperature dependent.

Moreover, a flex circuit cover **1706** attaches to the pins **1783**, **1785**. Although not shown, a flex circuit can also be provided that connects the circuit board **1719** with the submount **1700** (or a circuit board to which the submount **1700** is connected). A flex circuit protector **1760** may be provided to provide a barrier or shield to the flex circuit (not shown). In particular, the flex circuit protector **1760** may also prevent any electrostatic discharge to or from the flex circuit. The flex circuit protector **1760** may be constructed from well known materials, such as a plastic or rubber materials.

FIG. **18** shows the results obtained by an exemplary sensor **101** of the present disclosure that was configured for measuring glucose. This sensor **101** was tested using a pure water ex-vivo sample. In particular, ten samples were prepared that ranged from 0-55 mg/dL. Two samples were used as a training set and eight samples were then used as a test population. As shown, embodiments of the sensor **101** were able to obtain at least a standard deviation of 13 mg/dL in the training set and 11 mg/dL in the test population.

FIG. **19** shows the results obtained by an exemplary sensor **101** of the present disclosure that was configured for measuring glucose. This sensor **101** was tested using a turbid ex-vivo sample. In particular, 25 samples of water/glucose/

Liposyn were prepared that ranged from 0-55 mg/dL. Five samples were used as a training set and 20 samples were then used as a test population. As shown, embodiments of sensor **101** were able to obtain at least a standard deviation of 37 mg/dL in the training set and 32 mg/dL in the test population.

FIGS. **20** through **22** shows other results that can be obtained by an embodiment of system **100**. In FIG. **20**, 150 blood samples from two diabetic adult volunteers were collected over a 10-day period. Invasive measurements were taken with a YSI glucometer to serve as a reference measurement. Noninvasive measurements were then taken with an embodiment of system **100** that comprised four LEDs and four independent detector streams. As shown, the system **100** obtained a correlation of about 85% and Arms of about 31 mg/dL.

In FIG. **21**, 34 blood samples were taken from a diabetic adult volunteer collected over a 2-day period. Invasive measurements were also taken with a glucometer for comparison. Noninvasive measurements were then taken with an embodiment of system **100** that comprised four LEDs in emitter **104** and four independent detector streams from detectors **106**. As shown, the system **100** was able to attain a correlation of about 90% and Arms of about 22 mg/dL.

The results shown in FIG. **22** relate to total hemoglobin testing with an exemplary sensor **101** of the present disclosure. In particular, 47 blood samples were collected from nine adult volunteers. Invasive measurements were then taken with a CO-oximeter for comparison. Noninvasive measurements were taken with an embodiment of system **100** that comprised four LEDs in emitter **104** and four independent detector channels from detectors **106**. Measurements were averaged over 1 minute. As shown, the testing resulted in a correlation of about 93% and Arms of about 0.8 mg/dL.

Conditional language used herein, such as, among others, "can," "could," "might," "may," "e.g.," and the like, unless specifically stated otherwise, or otherwise understood within the context as used, is generally intended to convey that certain embodiments include, while other embodiments do not include, certain features, elements and/or states. Thus, such conditional language is not generally intended to imply that features, elements and/or states are in any way required for one or more embodiments or that one or more embodiments necessarily include logic for deciding, with or without author input or prompting, whether these features, elements and/or states are included or are to be performed in any particular embodiment.

While certain embodiments of the inventions disclosed herein have been described, these embodiments have been presented by way of example only, and are not intended to limit the scope of the inventions disclosed herein. Indeed, the novel methods and systems described herein can be embodied in a variety of other forms; furthermore, various omissions, substitutions and changes in the form of the methods and systems described herein can be made without departing from the spirit of the inventions disclosed herein. The claims and their equivalents are intended to cover such forms or modifications as would fall within the scope and spirit of certain of the inventions disclosed herein.

What is claimed is:

1. A user-worn device configured to non-invasively measure a physiological parameter of a user, the user-worn device comprising:

a first set of light emitting diodes (LEDs), the first set of LEDs comprising at least an LED configured to emit

Exhibit 21
-230-

US 10,912,502 B2

45 | 46

light at a first wavelength and an LED configured to emit light at a second wavelength;

a second set of LEDs spaced apart from the first set of LEDs, the second set of LEDs comprising at least an LED configured to emit light at the first wavelength and an LED configured to emit light at the second wavelength;

four photodiodes arranged on an interior surface of the user-worn device and configured to receive light after attenuation by tissue of the user;

a protrusion comprising:

a convex surface extending over the interior surface,

a plurality of openings in the convex surface extending through the protrusion and aligned with the four photodiodes, each opening defined by an opaque surface, and

a plurality of windows, each of the windows extending across a different one of the openings; and

one or more processors configured to receive one or more signals from at least one of the photodiodes and calculate a measurement of the physiological parameter of the user.

**2**. The user-worn device of claim **1**, wherein the windows comprise glass.

**3**. The user-worn device of claim **1**, wherein the windows comprise plastic.

**4**. The user-worn device of claim **1** further comprising:

a network interface configured to wirelessly communicate the measurement of the physiological parameter to at least one of: a mobile phone or a computer network;

a user interface comprising a touch-screen display, wherein the user interface is configured to display indicia responsive to the measurement of the physiological parameter;

a storage device configured to at least temporarily store at least the measurement; and

a strap configured to position the user-worn device on the user.

**5**. The user-worn device of claim **1**, wherein the opaque surface is configured to reduce light piping.

**6**. The user-worn device of claim **1** further comprising:

at least one wall extending between the interior surface and the protrusion,

wherein at least the interior surface, the wall and the protrusion form cavities, wherein the photodiodes are arranged on the interior surface within the cavities.

**7**. The user-worn device of claim **1**, wherein the physiological parameter comprises at least one of: methemoglobin, total hemoglobin, carboxyhemoglobin, or carbon monoxide.

**8**. The user-worn device of claim **1**, wherein the physiological parameter comprises oxygen or oxygen saturation.

**9**. The user-worn device of claim **1**, wherein the physiological parameter comprises trending information.

**10**. The user-worn device of claim **1** further comprising a thermistor.

**11**. The user-worn device of claim **1**, wherein the LEDs and the photodiodes are arranged on a same side of the tissue of the user.

**12**. The user-worn device of claim **1**, wherein the one or more processors are further configured to calculate a bulk measurement responsive to a positioning of the user-worn device.

**13**. The user-worn device of claim **1**, wherein each of the first and second sets of LEDs, any one LED is positioned within 2 mm to 4 mm of another.

**14**. The user-worn device of claim **1**, further comprising a third set of LEDs, the third set of LEDs comprising at least an LED configured to emit light at the first wavelength and an LED configured to emit light at the second wavelength.

**15**. The user-worn device of claim **1**, wherein the four photodiodes comprise first, second, third and fourth photodiodes and wherein the first photodiode and the second photodiode are arranged on the interior surface across from each other on opposite sides of a central point along a first axis, and the third photodiode and the fourth photodiode are arranged across from each other on opposite sides of the central point along a second axis which is different from the first axis.

**16**. The user-worn device of claim **1**, wherein the protrusion further comprises one or more extensions.

**17**. The user-worn device of claim **16**, wherein the one or more extensions surround a perimeter of the convex surface of the protrusion.

**18**. The user-worn device of claim **1**, wherein the protrusion further comprises one or more chamfered edges.

**19**. A user-worn device configured to non-invasively measure an oxygen saturation of a user, the user-worn device comprising:

a plurality of emitters configured to emit light, each of the emitters comprising at least two light emitting diodes (LEDs);

four photodiodes arranged within the user-worn device and configured to receive light after at least a portion of the light has been attenuated by tissue of the user;

a protrusion comprising a convex surface including separate openings extending through the protrusion and lined with opaque material, each opening positioned over a different one associated with each of the four photodiodes, the opaque material configured to reduce an amount of light reaching the photodiodes without being attenuated by the tissue;

optically transparent material within each of the openings; and

one or more processors configured to receive one or more signals from at least one of the four photodiodes and output measurements responsive to the one or more signals, the measurements indicative of the oxygen saturation of the user.

**20**. The user-worn device of claim **19** further comprising a thermistor.

**21**. The user-worn device of claim **20**, wherein the one or more processors are further configured to receive a temperature signal from the thermistor and adjust operation of the user-worn device responsive to the temperature signal.

**22**. The user-worn device of claim **21**, wherein the plurality of emitters comprise at least four emitters, and wherein each of the plurality of emitters comprises a respective set of at least three LEDs.

**23**. The user-worn device of claim **22**, wherein, within each respective set of at least three LEDs, the LEDs of the set are positioned within 2 mm to 4 mm of each other.

**24**. The user-worn device of claim **19** further comprising:

a network interface configured to wirelessly communicate at least the measurements of oxygen saturation to at least one of: a mobile phone or a computer network;

a user interface comprising a touch-screen display, wherein the user interface is configured to display indicia responsive to the measurements of oxygen saturation; and

a memory device configured to at least temporarily store at least the measurements of oxygen saturation.

Exhibit 21
-231-

US 10,912,502 B2

47

**25**. The user-worn device of claim **19**, wherein the photodiodes comprise first, second, third and fourth photodiodes and wherein the first photodiode and the second photodiode are arranged across from each other on opposite sides of a central point along a first axis, and the third photodiode and the fourth photodiode are arranged across from each other on opposite sides of the central point along a second axis which is different from the first axis.

**26**. The user-worn device of claim **19**, wherein the optically transparent material is glass.

**27**. The user-worn device of claim **19**, wherein the optically transparent material is plastic.

**28**. A user-worn device configured to non-invasively measure an oxygen saturation of a user, the user-worn device comprising:

a first set of light emitting diodes (LEDs), the first set of LEDs comprising at least an LED configured to emit light at a first wavelength and an LED configured to emit light at a second wavelength;

a second set of LEDs spaced apart from the first set of LEDs, the second set of LEDs comprising at least an LED configured to emit light at the first wavelength and an LED configured to emit light at the second wavelength;

four photodiodes arranged in a quadrant configuration on an interior surface of the user-worn device and configured to receive light after at least a portion of the light has been attenuated by tissue of the user;

a thermistor configured to provide a temperature signal;

a protrusion arranged above the interior surface, the protrusion comprising:

a convex surface;

a plurality of openings in the convex surface, extending through the protrusion, and aligned with the four photodiodes, each opening defined by an opaque surface configured to reduce light piping; and

48

a plurality of transmissive windows, each of the transmissive windows extending across a different one of the openings;

at least one opaque wall extending between the interior surface and the protrusion, wherein at least the interior surface, the opaque wall and the protrusion form cavities, wherein the photodiodes are arranged on the interior surface within the cavities;

one or more processors configured to receive one or more signals from at least one of the photodiodes and calculate an oxygen saturation measurement of the user, the one or more processors further configured to receive the temperature signal;

a network interface configured to wirelessly communicate the oxygen saturation measurement to at least one of a mobile phone or an electronic network;

a user interface comprising a touch-screen display, wherein the user interface is configured to display indicia responsive to the oxygen saturation measurement of the user;

a storage device configured to at least temporarily store at least the measurement; and

a strap configured to position the user-worn device on the user.

**29**. The user-worn device of claim **28**, further comprising:

a driver configured to energize the first and second sets of LEDs; and

a front-end interface comprising one or more amplifiers and one or more analog to digital converters (ADCs), wherein the front-end interface receives the signals from the photodiodes, the one or more amplifiers amplify the signals and the one or more ADCs convert the signals to digital information, and wherein the processors receive the converted signals.

**30**. The user-worn device of claim **28**, wherein the protrusion further comprises one or more sidewalls extending at least partially around a perimeter of the convex surface.

* * * * *

Exhibit 21
-232-

US010945648B2

## (12) United States Patent
### Poeze et al.

(10) Patent No.: **US 10,945,648 B2**

(45) Date of Patent: **\*Mar. 16, 2021**

(54) **USER-WORN DEVICE FOR NONINVASIVELY MEASURING A PHYSIOLOGICAL PARAMETER OF A USER**

(71) Applicant: **Masimo Corporation**, Irvine, CA (US)

(72) Inventors: **Jeroen Poeze**, Rancho Santa Margarita, CA (US); **Marcelo Lamego**, Cupertino, CA (US); **Sean Merritt**, Lake Forest, CA (US); **Cristiano Dalvi**, Lake Forest, CA (US); **Hung Vo**, Fountain Valley, CA (US); **Johannes Bruinsma**, Opeinde (NL); **Ferdyan Lesmana**, Irvine, CA (US); **Massi Joe E. Kiani**, Laguna Niguel, CA (US); **Greg Olsen**, Lake Forest, CA (US)

(73) Assignee: **Masimo Corporation**, Irvine, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **17/031,316**

(22) Filed: **Sep. 24, 2020**

(65) **Prior Publication Data**

US 2021/0007635 A1     Jan. 14, 2021

### Related U.S. Application Data

(60) Continuation of application No. 16/834,538, filed on Mar. 30, 2020, which is a continuation of application (Continued)

(51) **Int. Cl.**
| | | |
|---|---|---|
| *A61B 5/1455* | (2006.01) | |
| *A61B 5/145* | (2006.01) | |
| *A61B 5/00* | (2006.01) | |

(52) **U.S. Cl.**
CPC ........ **A61B 5/1455** (2013.01); **A61B 5/14532** (2013.01); **A61B 5/14546** (2013.01); (Continued)

(58) **Field of Classification Search**
CPC . A61B 5/1455; A61B 5/14546; A61B 5/6838; A61B 5/6816; A61B 5/6829; (Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,452,215 A | 6/1969 | Alessio | |
| 3,760,582 A | 9/1973 | Thiess et al. | |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2264029 | 3/1998 |
| CN | 1270793 | 10/2000 |

(Continued)

OTHER PUBLICATIONS

US 8,845,543 B2, 09/2014, Diab et al. (withdrawn)

(Continued)

*Primary Examiner* — Chu Chuan Liu

(74) *Attorney, Agent, or Firm* — Knobbe Martens Olson & Bear LLP

(57) **ABSTRACT**

The present disclosure relates to noninvasive methods, devices, and systems for measuring various blood constituents or analytes, such as glucose. In an embodiment, a light source comprises LEDs and super-luminescent LEDs. The light source emits light at least wavelengths of about 1610 nm, about 1640 nm, and about 1665 nm. In an embodiment, the detector comprises a plurality of photodetectors arranged in a special geometry comprising one of a substantially linear substantially equal spaced geometry, a substantially linear substantially non-equal spaced geometry, and a substantially grid geometry.

**30 Claims, 65 Drawing Sheets**



Exhibit 21
-233-

US 10,945,648 B2

43

drical housing **1480/1580** (not shown) attached to an emitter submount **1702**, which is attached to a circuit board **1719**.

A spring **1787** attaches to a detector shell **1706** via pins **1783**, **1785**, which hold the emitter and detector shells **1704**, **1706** together. A support structure **1791** attaches to the detector shell **1706**, which provides support for a shielding enclosure **1790**. A noise shield **1713** attaches to the shielding enclosure **1790**. A detector submount **1700** is disposed inside the shielding enclosure **1790**. A finger bed **1710** provides a surface for placement of the patient's finger. Finger bed **1710** may comprise a gripping surface or gripping features, which may assist in placing and stabilizing a patient's finger in the sensor. A partially cylindrical protrusion **1705** may also be disposed in the finger bed **1710**. As shown, finger bed **1710** attaches to the noise shield **1703**. The noise shield **1703** may be configured to reduce noise, such as from ambient light and electromagnetic noise. For example, the noise shield **1703** may be constructed from materials having an opaque color, such as black or a dark blue, to prevent light piping.

Noise shield **1703** may also comprise a thermistor **1712**. The thermistor **1712** may be helpful in measuring the temperature of a patient's finger. For example, the thermistor **1712** may be useful in detecting when the patient's finger is reaching an unsafe temperature that is too hot or too cold. In addition, the temperature of the patient's finger may be useful in indicating to the sensor the presence of low perfusion as the temperature drops. In addition, the thermistor **1712** may be useful in detecting a shift in the characteristics of the water spectrum in the patient's finger, which can be temperature dependent.

Moreover, a flex circuit cover **1706** attaches to the pins **1783**, **1785**. Although not shown, a flex circuit can also be provided that connects the circuit board **1719** with the submount **1700** (or a circuit board to which the submount **1700** is connected). A flex circuit protector **1760** may be provided to provide a barrier or shield to the flex circuit (not shown). In particular, the flex circuit protector **1760** may also prevent any electrostatic discharge to or from the flex circuit. The flex circuit protector **1760** may be constructed from well known materials, such as a plastic or rubber materials.

FIG. **18** shows the results obtained by an exemplary sensor **101** of the present disclosure that was configured for measuring glucose. This sensor **101** was tested using a pure water ex-vivo sample. In particular, ten samples were prepared that ranged from 0-55 mg/dL. Two samples were used as a training set and eight samples were then used as a test population. As shown, embodiments of the sensor **101** were able to obtain at least a standard deviation of 13 mg/dL in the training set and 11 mg/dL in the test population.

FIG. **19** shows the results obtained by an exemplary sensor **101** of the present disclosure that was configured for measuring glucose. This sensor **101** was tested using a turbid ex-vivo sample. In particular, 25 samples of water/glucose/Liposyn were prepared that ranged from 0-55 mg/dL. Five samples were used as a training set and 20 samples were then used as a test population. As shown, embodiments of sensor **101** were able to obtain at least a standard deviation of 37 mg/dL in the training set and 32 mg/dL in the test population.

FIGS. **20** through **22** shows other results that can be obtained by an embodiment of system **100**. In FIG. **20**, **150** blood samples from two diabetic adult volunteers were collected over a 10-day period. Invasive measurements were taken with a YSI glucometer to serve as a reference measurement. Noninvasive measurements were then taken with

44

an embodiment of system **100** that comprised four LEDs and four independent detector streams. As shown, the system **100** obtained a correlation of about 85% and Arms of about 31 mg/dL.

In FIG. **21**, **34** blood samples were taken from a diabetic adult volunteer collected over a 2-day period. Invasive measurements were also taken with a glucometer for comparison. Noninvasive measurements were then taken with an embodiment of system **100** that comprised four LEDs in emitter **104** and four independent detector streams from detectors **106**. As shown, the system **100** was able to attain a correlation of about 90% and Arms of about 22 mg/dL.

The results shown in FIG. **22** relate to total hemoglobin testing with an exemplary sensor **101** of the present disclosure. In particular, 47 blood samples were collected from nine adult volunteers. Invasive measurements were then taken with a CO-oximeter for comparison. Noninvasive measurements were taken with an embodiment of system **100** that comprised four LEDs in emitter **104** and four independent detector channels from detectors **106**. Measurements were averaged over 1 minute. As shown, the testing resulted in a correlation of about 93% and Arms of about 0.8 mg/dL.

Conditional language used herein, such as, among others, "can," "could," "might," "may," "e.g.," and the like, unless specifically stated otherwise, or otherwise understood within the context as used, is generally intended to convey that certain embodiments include, while other embodiments do not include, certain features, elements and/or states. Thus, such conditional language is not generally intended to imply that features, elements and/or states are in any way required for one or more embodiments or that one or more embodiments necessarily include logic for deciding, with or without author input or prompting, whether these features, elements and/or states are included or are to be performed in any particular embodiment.

While certain embodiments of the inventions disclosed herein have been described, these embodiments have been presented by way of example only, and are not intended to limit the scope of the inventions disclosed herein. Indeed, the novel methods and systems described herein can be embodied in a variety of other forms; furthermore, various omissions, substitutions and changes in the form of the methods and systems described herein can be made without departing from the spirit of the inventions disclosed herein. The claims and their equivalents are intended to cover such forms or modifications as would fall within the scope and spirit of certain of the inventions disclosed herein.

What is claimed is:

1. A user-worn device configured to non-invasively determine measurements of physiological parameter of a user, the user-worn device comprising:

a plurality of light emitting diodes (LEDs);

four photodiodes configured to receive light emitted by the LEDs, the four photodiodes being arranged to capture light at different quadrants of tissue of a user;

a protrusion comprising a convex surface and a plurality of openings extending through the protrusion, the openings arranged over the photodiodes and configured to allow light to pass through the protrusion to the photodiodes; and

one or more processors configured to receive one or more signals from at least one of the photodiodes and determine measurements of oxygen saturation of the user.

2. The user-worn device of claim **1**, wherein the one or more processors are further configured to process the one or

Exhibit 21
-234-

US 10,945,648 B2

45

more signals to determine a bulk measurement indicating a positioning of the user-worn device.

**3**. The user-worn device of claim **1** further comprising optically transparent glass windows, each window extending across a different one of the openings.

**4**. The user-worn device of claim **1**, wherein the plurality of LEDs and the photodiodes are positioned on a same side of tissue of the user.

**5**. The user-worn device of claim **1**, wherein the protrusion further comprises an opaque material, and wherein the one or more signals are substantially free of noise caused by light piping.

**6**. A user-worn device comprising:

a first set of light emitting diodes (LEDs), the first set of LEDs comprising at least an LED configured to emit light at a first wavelength and an LED configured to emit light at a second wavelength;

a second set of LEDs spaced apart from the first set of LEDs, the second set of LEDs comprising at least an LED configured to emit light at the first wavelength and an LED configured to emit light at the second wavelength;

four photodiodes arranged on a surface and configured to receive light after at least a portion of the light has been attenuated by tissue of a user;

a protrusion arranged above the surface, the protrusion comprising a convex surface including windows, the windows extending across the four photodiodes, wherein light passes through the protrusion to the four photodiodes via at least the windows;

a thermistor configured to provide a temperature signal; and

one or more processors configured to:

receive one or more signals from at least one of the photodiodes;

receive the temperature signal; and

adjust operation of the user-worn device responsive to the temperature signal.

**7**. The user-worn device of claim **6**, wherein the protrusion further comprises an opaque material, the opaque material extending from the convex surface of the protrusion to an interior surface of the protrusion opposite the convex surface.

**8**. A user-worn device configured to non-invasively determine measurements of a physiological parameter of a user, the user-worn device comprising:

a first set of light emitting diodes (LEDs), the first set comprising at least an LED configured to emit light at a first wavelength and at least an LED configured to emit light at a second wavelength;

a second set of LEDs spaced apart from the first set of LEDs, the second set of LEDs comprising an LED configured to emit light at the first wavelength and an LED configured to emit light at the second wavelength;

four photodiodes;

a protrusion comprising a convex surface, at least a portion of the protrusion comprising an opaque material;

a plurality of openings provided through the protrusion and the convex surface, the openings aligned with the photodiodes;

a separate optically transparent window extending across each of the openings;

one or more processors configured to receive one or more signals from at least one of the photodiodes and output measurements of a physiological parameter of a user;

46

a housing; and

a strap configured to position the housing proximate tissue of the user when the device is worn.

**9**. The user-worn device of claim **8** further comprising a network interface configured to wirelessly communicate the measurements of the physiological parameter to at least one of a mobile phone or a computer network.

**10**. The user-worn device of claim **9** further comprising a user interface including a touch-screen display configured to display indicia responsive to the measurements of the physiological parameter.

**11**. The user-worn device of claim **10**, wherein an orientation of the user interface is configurable responsive to a user input.

**12**. The user-worn device of claim **8**, wherein the physiological parameter comprises oxygen or oxygen saturation.

**13**. The user-worn device of claim **8** further comprising a storage device configured to at least temporarily store at least the measurements of the physiological parameter.

**14**. The user-worn device of claim **8**, wherein the physiological parameter comprises pulse rate.

**15**. The user-worn device of claim **8** further comprising a thermistor.

**16**. The user-worn device of claim **8**, wherein the openings are configured to prevent light piping.

**17**. The user-worn device of claim **8**, wherein the housing hermetically seals at least a portion of an interior of the user-worn device.

**18**. The user-worn device of claim **8**, wherein the windows comprise a conductive material.

**19**. The user-worn device of claim **8**, wherein the windows are arranged on the protrusion configured to be in contact with tissue of the user.

**20**. A user-worn device configured to non-invasively determine measurements of a user's tissue, the user-worn device comprising:

a plurality of light emitting diodes (LEDs);

at least four photodiodes configured to receive light emitted by the LEDs, the four photodiodes being arranged to capture light at different quadrants of tissue of a user;

a protrusion comprising a convex surface and a plurality of through holes, each through hole including a window and arranged over a different one of the at least four photodiodes; and

one or more processors configured to receive one or more signals from at least one of the photodiodes and determine measurements of oxygen saturation of the user.

**21**. The user-worn device of claim **20**, wherein the one or more processors are further configured to process the one or more signals to determine a bulk measurement indicating a positioning of the user-worn device.

**22**. The user-worn device of claim **20**, wherein the plurality of LEDs and the photodiodes are positioned on a same side of the user's tissue.

**23**. The user-worn device of claim **20**, wherein the one or more signals are substantially free of noise caused by light piping.

**24**. The user-worn device of claim **20**, wherein the protrusion comprises opaque material configured to substantially prevent light piping.

**25**. The user-worn device of claim **20**, further comprising gaps between the photodiodes and the windows.

**26**. The user-worn device of claim **20**, wherein the photodiodes are arranged in a quadrant configuration.

**27**. The user-worn device of claim **26**, further comprising opaque walls surrounding the photodiodes.

Exhibit 21
-235-

US 10,945,648 B2

47

48

**28**. The user-worn device of claim **27**, wherein the walls are configured to reduce mixing of light from distinct quadrants of the tissue.

**29**. The user-worn device of claim **20**, wherein the protrusion further comprises one or more extensions.

**30**. The user-worn device of claim **20**, wherein the protrusion further comprises one or more chamfered edges.

\* \* \* \* \*

Exhibit 21
-236-

# EXHIBIT 22

WILMERHALE

July 30, 2021

**Mark D. Selwyn**

+1 650 858 6031 (t)
+1 650 858 6100 (f)
mark.selwyn@wilmerhale.com

*VIA EDIS*

The Honorable Lisa R. Barton
Secretary
U.S. International Trade Commission
500 E Street, S.W.
Washington, D.C. 20436

Re: *In the Matter of Certain Light-Based Physiological Measurement Devices and Components
Thereof* – Docket No. 3554; ITC Inv. No. 337-TA-_____

Dear Secretary Barton:

Pursuant to 19 C.F.R. § 210.8(c)(1), Proposed Respondent Apple Inc. ("Apple")
respectfully submits the enclosed Public Interest Statement of Proposed Respondent Apple Inc.
Please note that the Public Interest Statement contains Confidential Business Information, and
pursuant to the Commission's Rules of Practice and Procedure, a separate letter requesting
confidential treatment of the information accompanies this filing.

Thank you for your attention to this filing. Please contact the undersigned if you have
any questions or concerns.

Respectfully submitted,

/s/ *Mark D. Selwyn*
Mark D. Selwyn

Enclosure

Exhibit 22
-237-

WILMERHALE

July 30, 2021

**Mark D. Selwyn**

+1 650 858 6031 (t)
+1 650 858 6100 (f)
mark.selwyn@wilmerhale.com

*VIA EDIS*

The Honorable Lisa R. Barton
Secretary
U.S. International Trade Commission
500 E Street, S.W.
Washington, D.C. 20436

Re:  *In the Matter of Certain Light-Based Physiological Measurement Devices and Components Thereof* – Docket No. 3554; ITC Inv. No. 337-TA-_____; Request for Confidential Treatment

Dear Secretary Barton:

Pursuant to 19 C.F.R. §§ 201.6 and 210.5, Proposed Respondent Apple Inc. ("Apple") respectfully requests confidential treatment for the Confidential Business Information contained on pages 4 and 5 of the Public Interest Statement of Proposed Respondent Apple Inc.

The information for which confidential treatment is sought is proprietary commercial information not otherwise publicly available and consists of business proprietary information concerning the relative sales volume of the accused products and Apple's operations respecting the manufacture of its smartwatches.

The information described above qualifies as Confidential Business Information pursuant to Rule 201.6(a) because:

1. It is not publicly available;

2. Unauthorized disclosure of such information could cause substantial harm to Apple's competitive position; and

3. The disclosure of such information could impair the Commission's ability to obtain information necessary to perform its statutory function.

I certify under penalty of perjury that to the best of my knowledge, information, and belief, established after a reasonable inquiry, that substantially identical information is not available to the public.  Please feel free to contact me at 650-858-6031 if you have any questions regarding this request, or if this request is not granted in full.

Exhibit 22
-238-

WILMERHALE

The Honorable Lisa R. Barton
Page 2

Respectfully submitted,

/s/ *Mark D. Selwyn*
Mark D. Selwyn

Exhibit 22
-239-

PUBLIC VERSION

### UNITED STATES INTERNATIONAL TRADE COMMISSION
### WASHINGTON, D.C.

| | |
|---|---|
| **In the Matter of**<br><br>**CERTAIN LIGHT-BASED PHYSIOLOGICAL MEASUREMENT DEVICES AND COMPONENTS THEREOF** | **Inv. No. 337-TA-____**<br>**[Docket No. 3554]** |

### PUBLIC INTEREST STATEMENT OF
### PROPOSED RESPONDENT APPLE INC.

Exhibit 22
-240-

Apple Inc. ("Apple") respectfully submits this response to the Commission's solicitation of comments concerning the public interest issues raised by the Amended Complaint and the Section 210.8(b) Statement filed by Complainants Masimo Corporation and Cercacor Laboratories, Inc. ("Statement"). *See* 86 Fed. Reg. 38,764 (July 22, 2021).

Headquartered in Cupertino, California, Apple has over 75,000 U.S. employees. With the iPhone, iPad, and, more recently, the Apple Watch, Apple's U.S.-based engineers have designed highly successful new product categories, spurring the creation of millions of U.S.-based jobs.

Complainants are medical technology companies focused on patient monitoring devices. In seeking an exclusion order against the Apple Watch Series 6, Complainants are acting as non-practicing entities, asserting patents not to protect competing products (they do not offer any smartwatch products), but rather to monetize their patents by attempting to eliminate Apple's product from the market at a time when awareness of health and wellness parameters is of heightened importance to U.S. consumers.

The exclusion order sought by Complainants would cut sharply against the public interest. The accused Apple Watch Series 6 provides a host of important health, wellness, and other features, the removal of which would be detrimental to the public good. Two of those features—an ECG application and a PPG-based Irregular Rhythm Notification (IRN) feature—are major consumer health tools for helping to identify possible atrial fibrillation (AFib)[1], a serious heart condition that, if untreated, "doubles the risk of heart-related deaths and is associated with a 5-fold increased risk for stroke."[2]

In addition, the innovative Blood Oxygen feature on the Apple Watch Series 6 products conveniently

---

[1] *See, e.g.*, Julie Garcia, *Normal tests couldn't prove Houston man's irregular heartbeat. But his Apple Watch could*, Houston Chronicle (Feb. 15, 2021, 6:00 AM), https://www.houstonchronicle.com/lifestyle/renew-houston/health/article/Normal-tests-couldn-t-prove-Houston-man-s-15946059.php; *Fire Marshal shares news of his heart attack during American Heart Month*, SouthTahoeNow.com (Feb. 12, 2021, 9:53 PM), http://southtahoenow.com/story/02/12/2021/fire-marshal-shares-news-his-heart-attack-during-american-heart-month.
[2] *What is Atrial Fibrillation (AFib or AF)?*, Am. Heart Ass'n. (July 31, 2016), https://www.heart.org/en/health-topics/atrial-fibrillation/what-is-atrial-fibrillation-afib-or-af.

Exhibit 22
-241-

allows consumers to monitor this parameter (alongside many others tracked by the products) to better understand and identify trends in their overall wellness.  Furthermore, this Blood Oxygen feature is currently enabling researchers to gather data for developing future health technologies.  Such large-scale and convenient collection of blood oxygen data is of critical importance, especially as our country's reliance on remote healthcare is increasing.

Complainants' claim that removing the Apple Watch Series 6 products from the U.S. would not negatively impact public health is wrong.  Complainants propose to replace the Apple Watch Series 6 products with their own medical-grade pulse oximeters.  But even Complainants' "wrist-worn" device serves an entirely different market with a different purpose: they are clinical devices purely "[f]or professional use" that may be sold only "by or on the order of a physician."[3]  They are not available to the wide range of consumers interested in monitoring their own fitness and wellness statistics, including blood oxygen, like the accused products are.  Nor do Complainants' products have any potential to aid in the detection of AFib as the accused products do.  And Complainants provide no evidence that either Apple or any other smartwatch manufacturer could fill the void left if the Apple Watch Series 6 products were excluded from the market.  None of the other smartwatches currently sold by Apple—the SE and Series 3—can serve as substitutes because none has the combination of the ECG, IRN, and Blood Oxygen functionality present on the Apple Watch Series 6 devices.  Similarly, Complainants present no evidence that any other smartwatch company offers a device with all three features, let alone that any of those companies would have excess capacity to fill the void if Apple's accused products are removed.

## I.     THE PUBLIC HEALTH AND WELFARE WOULD BE NEGATIVELY IMPACTED.

The requested remedy of excluding the Apple Watch Series 6 devices from the U.S. would be detrimental to public health and welfare.  Removing the unique combination of the ECG and IRN functionality from the market would leave Apple Watch users less informed and less likely to identify early warning signs about heart health, while removing the Blood Oxygen capabilities would deprive consumers

---

[3]  *Radius PPG™ Tetherless Pulse Oximetry*, Masimo (2021),
https://www.masimo.com/products/sensors/radius-ppg/.

Exhibit 22
-242-

of a convenient way to passively monitor their blood oxygen and deprive researchers of critical data collection.  All this in the midst of a pandemic when the need to maintain our health and advance research into remote healthcare technologies is heightened.

First, Apple Watch Series 6 devices with IRN and ECG are beneficial to users and help enable the identification of potentially undiagnosed AFib.  Users receive an alert if the IRN feature detects signs of an irregular heart rhythm, which prompts users to visit their doctor for further testing and diagnosis; the ECG app allows users to take a reading and share the data with their healthcare providers.  The software for both features received de novo FDA classifications.[4]  And independent studies have confirmed the positive health impact of these features on the broad base and growing number of Apple Watch users.  For example, a study of more than 400,000 participants conducted by researchers at Stanford University and published in the *New England Journal of Medicine* concluded that "the[] data support the ability of the algorithm [of the IRN feature on Apple Watch] to correctly identify atrial fibrillation in users whom it notifies of irregular pulses."[5]  Another independent study concluded that the ECG app "can be incorporated as a tool for use by the clinician given the device's high quality tracings."[6]  Removing the only Apple Watch on the market with these features will undeniably impact public health and welfare by leaving users less informed and less likely to identify early warning signs about heart health.

Second, the Blood Oxygen feature on the Apple Watch Series 6 devices provides consumers with convenient, periodic monitoring of their blood oxygen levels for general fitness and wellness without the need for a physician's order.  The Watch is widely available and can be worn continuously without

---

[4]  *See* DEN180042 (IRN feature),
https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpmn/denovo.cfm?ID=DEN180042;
DEN180044 (ECG application),
https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpmn/denovo.cfm?id=DEN180044.
[5]  Marco V. Perez *et al.*, *Large-Scale Assessment of a Smartwatch to Identify Atrial Fibrillation*,
N Engl J Med 2019; 381:1909-1917, *available at*
https://www.nejm.org/doi/full/10.1056/NEJMoa1901183
[6]  Nabeel Saghir *et al.*, *A comparison of manual electrocardiographic interval and waveform analysis in lead 1 of 12-lead ECG and Apple Watch ECG: A validation study*, Cardiovascular Digit. Health J., Vol. 1, Issue 1, July-Aug. 2020, 30-36; *available at*
https://www.sciencedirect.com/science/article/pii/S2666693620300062

Exhibit 22
-243-

interfering with other activities, and users who experience a change in blood oxygen levels can use that information in assessing their overall wellness.  The Apple Watch Series 6 and its Blood Oxygen feature are also the foundation for several current health studies designed to inform the use of blood oxygen levels in future health applications.  For instance, Apple is collaborating with the University of California, Irvine, and Anthem to examine how longitudinal measurements of Blood Oxygen and other physiological signals can help manage and control asthma.[7]  Apple is also working closely with investigators at the Ted Rogers Centre for Heart Research and the Peter Munk Cardiac Centre at the University Health Network to better understand how Blood Oxygen measurements and other Apple Watch Series 6 metrics can help with management of heart failure.[8]  Removal of the accused products will negatively impact public health and welfare by depriving consumers of important information about their own wellness and stunting the medical research currently enabled by these devices during a critical time.

## II.   NO EVIDENCE SUGGESTS THAT OTHER SUPPLIERS COULD REPLACE THE ACCUSED PRODUCTS IN A COMMERCIALLY REASONABLE TIME.

Complainants' conclusory assertion that other smartwatch suppliers could replace the volume of the targeted Apple Watch products lacks evidentiary support and strains credulity.  Apple has about 40% of North American smartwatch sales,[9] ███████████████████████████ sales of the Series 6. The closest competitor is FitBit, with about 20%, and Samsung has about 5%.[10]  For these competitors to nearly *double* production would be extremely difficult in a short time, particularly in the context of the ongoing, worldwide semiconductor shortage that would prevent even companies with large resources from ramping up unplanned productions.[11]

---

[7]  *Anthem, UCI will investigate how digital tools can aid asthma management*, UCI News (Sept. 16, 2020), https://news.uci.edu/2020/09/16/anthem-uci-will-investigate-how-digital-tools-can-aid-asthma-management/.

[8]  *New study explores how Apple Watch can help identify worsening heart failure early*, Ted Rogers Ctr. for Heart Rsch. (Feb. 22, 2021), https://tedrogersresearch.ca/2021/02/new-study-explores-how-apple-watch-can-help-identify-worsening-heart-failure-early/.

[9]  *See* Statista 2020 Smartwatch Analysis at 19.

[10]  *Id.*

[11]  *See, e.g.,* Sam Shead, *The global chip shortage could last until 2023*, CNBC (May 12, 2021), https://www.cnbc.com/2021/05/12/the-global-chip-shortage-could-last-until-2023-.html.

4

Exhibit 22
-244-

Moreover, the Apple Watch Series 6 products occupy a unique space in the competitive landscape that cannot be readily replaced.  Complainants present no evidence that ***any*** of the proposed replacement products offers the unique combination of two heart health features—the ECG app and IRN feature—along with a Blood Oxygen feature.  Indeed, Complainants' own products offer neither the ECG nor the IRN functionality.

Finally, Complainants' suggestion that Apple could easily restart the manufacture of its own discontinued smartwatches without the accused Blood Oxygen feature is baseless.  The facilities used to manufacture Apple's Series 4 and Series 5 smartwatches ████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████ .

## III.   CONCLUSION

The requested exclusion will directly harm consumers by depriving the public of important heart health features, likely resulting in some in the U.S. going undiagnosed with potentially fatal AFib (increasing risk for serious illness and even death), and depriving consumers and researchers of a readily accessible Blood Oxygen feature.  If the Commission institutes an investigation, Apple respectfully requests that the Commission delegate the public interest issue to the ALJ pursuant to Rule 210.50.

Exhibit 22
-245-

Dated:  July 30, 2021                    Respectfully submitted,

                                         /s/ Mark D. Selwyn_____

                                         Mark D. Selwyn
                                         WILMER CUTLER PICKERING HALE AND DORR LLP
                                         2600 El Camino Real
                                         Suite 400
                                         Palo Alto, CA 94306
                                         Telephone: (650) 858-6000
                                         mark.selwyn@wilmerhale.com

                                         Joseph J. Mueller
                                         Sarah R. Frazier
                                         WILMER CUTLER PICKERING HALE AND DORR LLP
                                         60 State Street
                                         Boston, MA 02109
                                         Telephone: (617) 526-6000
                                         joseph.mueller@wilmerhale.com
                                         sarah.frazier@wilmerhale.com

                                         Michael D. Esch
                                         WILMER CUTLER PICKERING HALE AND DORR LLP
                                         1875 Pennsylvania Ave., NW
                                         Washington, DC 20006
                                         Telephone: (202) 663-6000
                                         michael.esch@wilmerhale.com

                                         *Counsel for Proposed Respondent Apple Inc.*

6

Exhibit 22
-246-

# EXHIBIT 23

PUBLIC VERSION

WILMERHALE

**Sarah R. Frazier**

+1 617 526 6022 (t)
+1 617 526 5000 (f)
sarah.frazier@wilmerhale.com

December 2, 2021

The Honorable Monica Bhattacharyya
Administrative Law Judge
U.S. International Trade Commission
500 E Street, S.W., Room 317
Washington, D.C. 20436

Re:  *Certain Light-Based Physiological Measurement Devices and Components Thereof*, Inv. No. 337-TA-1276: RFP No. 105

Dear ALJ Bhattacharyya:

In the two discovery hearings that Your Honor held previously, Respondent Apple raised serious issues regarding the purported ██████████████ that Complainants allege to constitute the domestic industry article supporting this Investigation with respect to four of the five patents-in-suit.  Following the last hearing, where Your Honor directed Complainants to identify for Apple the physical items on which they rely for the domestic industry technical prong, Complainants have continued their pattern of obfuscation—repeatedly refusing to answer the basic question of whether there was ████████████████ when the Complaint was filed.  Complainants have continued to provide inconsistent and non-responsive answers to Apple's repeated requests—in formal discovery and through communications to counsel—to identify the alleged ██████ ██████ described in the Complaint including the exhibits and declarations thereto.   Apple noted at the prior hearings that these issues go to the heart of this Investigation, and that the issues could become more than a discovery matter.

We have now reached that point.  It is now clear that the Amended Complaint, and certain supporting declarations—including that submitted by Masimo's Chief Operating Officer—were rife with factual misrepresentations.  In particular, it is now obvious that ██████████████ actually existed on the date of the Complaint—despite pages and pages of factual statements describing ██████████████████████████████████████████████████████  Before Thanksgiving, Apple asked Complainants to withdraw the Complaint.  With Complainants having decided to move forward with a case that was initiated on false pretenses, Apple is compelled to move for sanctions under Rule 210.4.  Apple will be serving that sanctions motion next week.   In the meantime, Apple continues to defend itself in response to Complainants' allegations and seeks leave to file a motion to compel production of documents in Complainants' possession regarding Apple's Watch products in response to Request for Production 105.

***Apple's RFP No. 105.***  Apple served RFP No. 105 on August 19, 2021, and the request seeks documents referring or relating to Apple or any Apple product.  Ex. A at 95-96 [Complt. Response to RFP 105].  Complainants objected to the scope of the original request, and in an effort to compromise Apple narrowed the request to documents referring or relating to any Apple Watch product, including those not accused in this Investigation.  *See* Ex. B [10/18 Frazier Letter].  Complainants have agreed to produce only documents referring or relating to the Apple Watch

December 2, 2021
Page 2

Series 6 and Series 7 products.  *See* Ex. C at 2 [11/29 Loebbaka Letter].  But as explained to Complainants, documents referring to other Apple Watch products are relevant to several of Apple's defenses in this case.

***First***, whether Complainants considered or had knowledge of Apple Watch products while prosecuting the asserted patents is directly relevant to at least Apple's defenses of prosecution laches and unclean hands regarding the prosecution of the asserted '501, '502, and '648 patents. The timeline of Complainants' prosecution of the asserted patents underscores Apple's prosecution laches and unclean hands argument and the relevance of the information sought by RFP No. 105. As shown below, Complainants delayed prosecution of the asserted '501, '502, and '648 patents for more than ***twelve years*** after the initial application was filed, and followed a consistent pattern of filing continuations shortly after Apple released the subsequent generations of its Watch.

- July 3, 2008 – July 1, 2010: Masimo files original provisional application
- *April 24, 2015: Apple releases its first generation Apple Watch*
- December 28, 2015: Masimo files the next application in the chain (five years after the prior application)
- *September 21, 2018: Apple releases its Series 4 Watch*
- December 6, 2018 – August 7, 2019: Masimo files next four applications in the chain
- *September 20, 2019: Apple releases its Series 5 Watch*
- December 23, 2019 – March 30, 2020: Masimo files next two applications in the chain
- January 2020: Masimo sues Apple in federal district court; Masimo accuses Apple's Series 4 and Series 5 Watches of infringing patents stemming from the 2018-2019 applications (*see* Ex. D [1/9/20 DCT Compl.] ¶¶ 40, 54, 69, 83, 97, 110, 123, 136, 150, 166)
- *September 18, 2020: Apple releases its Series 6 Watch*
- September 24, 2020: Masimo files the next three applications in the chain, which ultimately issue as the '501, '502, and '648 patents

The fact that Masimo's delays were not isolated, but instead tracked the releases of Apple Watch products strongly suggests that Masimo unreasonably delayed its prosecution of this patent family, including the asserted '501, '502 and '648 patents.  Documents in Complainants' possession reflecting its consideration of Apple Watch products are relevant to understanding the extent to which Masimo was aware of and considered the Apple Watches during its prosecution and whether its patent prosecution strategy was intended to draft claims to cover Apple technologies as they were being developed, all of which relate to Apple's prosecution laches and unclean hands defenses.  *See, e.g.*, *Hynix Semiconductor Inc. v. Rambus Inc.*, 2007 WL 4209386, at *4-5 (N.D. Cal. Nov. 26, 2007) (denying summary judgment on prosecution laches, noting that "[i]nternal . . . documents also strongly suggest that [patentee] was drafting its claims to cover technologies as they developed"); *Personalized Media Commc'ns, LLC v. Apple, Inc.*, No. 2:15-CV-01366-JRG, 2021 WL 3471180, at *16 (E.D. Tex. Aug. 5, 2021) (applying prosecution laches where court found delays were not coincidental); *Consol. Aluminum Corp. v. Foseco Int'l Ltd.*, 910 F.2d 804, 812 (Fed. Cir. 1990) (finding patents unenforceable under unclean hands doctrine based on misconduct that court found "permeated the prosecution" of those patents).

Exhibit 23
-248-

December 2, 2021
Page 3

**Second**, Complainants' knowledge of and consideration of the Apple Watch products in the prosecution of the asserted and related patents or development of Masimo's own products is directly relevant to whether Complainants were drawing ideas for features and functions from Apple and not, as they contend, that Apple uses any of Complainants' alleged inventions.

Complainants have not identified any alleged burden associated with collecting and producing documents relating or referring to all Apple Watch products, and Apple's request is narrowly limited to a handful of devices.

Notwithstanding Apple's narrowing of the request and repeated, detailed explanations—in both correspondence and during the parties' DCMs—of the relevance of Complainants' knowledge of Apple Watch products, Complainants for months have refused to confirm whether they will produce documents responsive to this request that relate or refer to all Apple Watch products. Accordingly, Apple respectfully seeks leave to move to compel Complainants' production of documents in response to RFP No. 105.

**Supplemental Protective Order.** Before Apple requested this conference the parties had also reached impasse on the proposed scope of a Supplemental Protective Order ("SPO"). Yesterday afternoon Complainants informed Apple that they were withdrawing their positions with respect to nearly all of the disputed issues. The parties' only remaining dispute is the definition of the "relevant technology" for purposes of the development bar included in the SPO. Apple believes the parties are close to resolving this dispute and understands that doing so would moot any dispute over the SPO, and also moot Complainants' pending motions objecting to Apple's experts (*see* Motions 1276-004, 1276-005, 1276-006). Given the timing of Complainants' withdrawal of their positions, however, more time is needed to reach agreement on this final issue. Accordingly, Apple does not address any disputes regarding the SPO in this letter to avoid unnecessarily burdening the ALJ, but respectfully requests the opportunity to provide the ALJ with an update at the conference on Monday regarding whether agreement has been reached that would moot the pending motions or whether a dispute remains that will need to be addressed.

Apple expects that myself, Joe Mueller, and Mark Selwyn will speak for Apple at the upcoming telephone conference regarding Apple's request and the issues Complainants have indicated they will be raising.

Best regards,

*/s/ Sarah R. Frazier*

Sarah R. Frazier

Exhibit 23
-249-

# EXHIBIT 24

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**WASHINGTON, D.C.**

**Before the Honorable Charles E. Bullock**
**Chief Administrative Law Judge**

| | |
|---|---|
| In the Matter of<br><br>**CERTAIN LIGHT-BASED PHYSIOLOGICAL MEASUREMENT DEVICES AND COMPONENTS THEREOF** | Inv. No. 337-TA-1276 |

**RESPONSE OF APPLE INC. TO FIRST AMENDED COMPLAINT AND NOTICE OF INVESTIGATION**

| RESPONDENT | COUNSEL FOR APPLE INC. |
|---|---|
| Apple Inc.<br>One Apple Park Way<br>Cupertino, CA 95014<br>Tel: 408-996-1010 | Mark D. Selwyn<br>WILMER CUTLER PICKERING HALE AND DORR LLP<br>2600 El Camino Real<br>Suite 400<br>Palo Alto, CA 94306<br>Telephone: (650) 858-6000<br>mark.selwyn@wilmerhale.com<br><br>Joseph J. Mueller<br>Sarah R. Frazier<br>WILMER CUTLER PICKERING HALE AND DORR LLP<br>60 State Street<br>Boston, MA 02109<br>Telephone: (617) 526-6000<br>joseph.mueller@wilmerhale.com<br>sarah.frazier@wilmerhale.com<br><br>Michael D. Esch<br>WILMER CUTLER PICKERING HALE AND DORR LLP<br>1875 Pennsylvania Ave., NW<br>Washington, DC 20006<br>Telephone: (202) 663-6000<br>michael.esch@wilmerhale.com |

Exhibit 24
-250-

PUBLIC VERSION

## <u>LIST OF EXHIBITS</u>

| Exhibit No. | Description |
|:---:|:---|
| A | INFORMATION REQUIRED BY 19 C.F.R. § 210.13 |

i

Exhibit 24
-251-

PUBLIC VERSION

## <u>LIST OF APPENDICES</u>

| Appendix No. | Description |
|:---:|:---|
| A | Identification of Exemplary Prior Art to the Asserted Patents |

ii

Exhibit 24
-252-

Pursuant to 19 C.F.R. § 210.13, Respondent Apple Inc. ("Apple" or "Respondent"), by and through its attorneys, hereby responds to the First Amended Complaint Under Section 337 of the Tariff Act of 1930, As Amended ("Complaint") filed by Masimo Corporation and Cercacor Laboratories, Inc. (collectively, "Complainants") on July 12, 2021 and to the Notice of Institution of Investigation issued by the United States International Trade Commission ("Commission") on August 13, 2021 ("Notice").

Complainants' action is an attempt to use old ideas to block new, cutting-edge technologies and eliminate competitors in the consumer wearables market.  Complainants' effort is both inconsistent with the mission of the ITC and unfounded on the merits.

Apple denies that any asserted claim of U.S. Patent Nos. 10,912,501 ("'501 patent"), 10,912,502 ("'502 patent"), 10,945,648 ("'648 patent"), 10,687,745 ("'745 patent"), and 7,761,127 ("'127 patent") (collectively, "the Asserted Patents") is valid or enforceable.  The Asserted Patents claim nothing more than well-known combinations of generic components in a crowded field of prior art.  The patents asserted by Complainants are closely related to those whose validity is currently the subject of scrutiny by the PTAB in twenty instituted Inter Partes Review proceedings.

Each Asserted Patent purports to be a continuation in a line of patents that date back between six and sixteen years, yet Complainants waited until after initiating litigation against Apple last year to apply for four of them.  Further, Complainants delayed applying for the '501, '502, and '648 patents until *after* the September 2020 launch of the Apple Watch Series 6 that Complainants now accuse of infringement.  And Complainants flooded the Patent and Trademark Office with prior art during prosecution of the Asserted Patents—disclosing in several cases *thousands* of prior art references while simultaneously requesting Prioritized Examination of the

1

Exhibit 24
-253-

applications leading to these patents—effectively obscuring material references from the examiner and insulating the applications from appropriate scrutiny.

Apple denies that it has engaged in unfair competition or violated Section 337 by importing, selling for importation, and/or selling after importation into the United States any product that infringes, literally or under the doctrine of equivalents, directly, indirectly, or by inducement, any valid claim of the Asserted Patents. The Accused Products are the result of hard work and innovation by Apple engineers—efforts that resulted in new and different technologies than those claimed in the Asserted Patents.

Apple denies each and every allegation of the Complaint, except as specifically admitted herein. Any factual allegation admitted below is admitted only as to the specific admitted facts, and not as to any purported conclusions, characterizations, implications, or speculations that might follow from the admitted facts. To the extent that any allegation of the Complaint refers to or relies upon information not previously supplied to Apple, Apple is without information sufficient to admit or deny such allegations, and therefore denies the same. In responding to the Complaint and Notice of Investigation, Apple has understood "Accused Products" to mean the Apple Watch Series 6 products accused of infringement in the Complaint. Apple explicitly reserves the right to take further positions and raise additional defenses as may become apparent including as a result of additional information discovered subsequent to filing this Response, or to the extent Complainants modify their Complaint or contentions.

## RESPONSE TO COMPLAINT

In answer to the allegations set forth in the Complaint, Apple responds as follows:

Inv. No. 337-TA-1276
Apple Inc.'s Response to the First Amended Complaint and Notice of Investigation

Exhibit 24
-254-

# I.   **INTRODUCTION**[1]

1.      Apple admits that Complainants have requested that the U.S. International Trade Commission institute an investigation into alleged violations of Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337 ("Section 337") by Apple.  Apple denies any remaining allegations in Paragraph 1.

2.      Apple admits that the Complaint purports to be directed to Apple's Watch Series 6 products and that Complainants have asserted infringement of the patents listed in Paragraph 2 of the Complaint.  Apple further admits that the '501 patent is titled "User-Worn Device for Noninvasively Measuring a Physiological Parameter of a User," the '502 patent is titled "User-Worn Device for Noninvasively Measuring a Physiological Parameter of a User,"  the '648 patent is titled "User-Worn Device for Noninvasively Measuring a Physiological Parameter of a User," and the '127 patent is titled "Multiple Wavelength Sensor Substrate."  Apple denies that the '745 patent is titled "Physiological Monitoring Devices, Systems, and Methods."  Apple denies that the Apple Watch Series 6 or any other Apple product infringes any valid and enforceable claim of the Asserted Patents.  Apple denies any remaining allegations in Paragraph 2.

3.      Apple denies that the Apple Watch Series 6 or any other Apple product infringes any valid and enforceable claim of the Asserted Patents.  Apple denies any remaining allegations in Paragraph 3.

4.      Apple admits that Exhibits 1-5 purport to be certified copies of the '501 patent, '502 patent, '648 patent, '745 patent, and '127 patent, respectively.  Apple further admits that Exhibits 6-9 purport to be certified copies of recorded assignments related to the Asserted Patents

---

[1]     For convenience and clarity, Apple uses certain of the same headings as set forth in the Complaint.  Apple denies any allegations contained in Complainants' headings.

Inv. No. 337-TA-1276
Apple Inc.'s Response to the First Amended Complaint and Notice of Investigation

Exhibit 24
-255-

and that Confidential Exhibit 11 purports to be a copy of an Amended and Re-Stated Cross-Licensing Agreement between Masimo Corp. and Masimo Laboratories.  Apple denies that Exhibit 9 contains certified copies of recorded assignments for the '127 patent.  Apple lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in Paragraph 4 and, on that basis, denies them.

5.      Apple denies the allegations in Paragraph 5.

6.      Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 6, and therefore denies them.

7.      Apple admits that Complainants purport to seek a permanent limited exclusion order and a permanent cease and desist order as relief in this matter.  Apple denies any remaining allegations in Paragraph 7.

8.      Apple admits that Complainants purport to seek a bond for the 60-day Presidential review period as relief in this matter.  Apple denies any remaining allegations in Paragraph 8.

## II.    COMPLAINANTS

9.      Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 9, and therefore denies them.

10.     Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 10, and therefore denies them.

11.     Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 11, and therefore denies them.

12.     Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 12, and therefore denies them.

4

Exhibit 24
-256-

13.     Apple admits that pulse oximetry allows for the noninvasive measurement of the oxygen saturation level of arterial blood, which delivers oxygen to the body's tissues.  Apple further admits that pulse oximetry may allow for the measurement of pulse rate.   Apple lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 13, and therefore denies them.

14.     Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 14, and therefore denies them.

15.     Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 15, and therefore denies them.

16.     Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 16, and therefore denies them.

17.     Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 17, and therefore denies them.

18.     Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 18, and therefore denies them.

19.     Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 19, and therefore denies them.

20.     Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 20, and therefore denies them.

### III.     <u>PROPOSED RESPONDENT</u>

21.     Apple admits that it is a corporation organized under the laws of the State of California and that its principal place of business is at One Apple Park Way, Cupertino, California 95014.  Apple denies the remaining allegations contained in Paragraph 21.

Inv. No. 337-TA-1276
Apple Inc.'s Response to the First Amended Complaint and Notice of Investigation

Exhibit 24
-257-

PUBLIC VERSION

22.    Apple admits that its business includes designing, manufacturing, and marketing smartphones, personal computers, tablets, wearables, and accessories.  Apple admits that its wearables product offerings include the Apple Watch Series 6.  Apple denies any remaining allegations contained in Paragraph 22.

## IV.    PRODUCTS AND TECHNOLOGY AT ISSUE

23.    Apple admits that photoplethysmography ("PPG") is an optical measurement method used for physiological monitoring purposes, which can involve a photodetector to measure the intensity of reflected light from tissue.  Apple admits that, in photoplethysmography methods, the measurement of reflected light can be accomplished through a sensor applied to a body part. Apple denies the remaining allegations contained in paragraph 23.

24.    Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 24, and therefore denies them.

25.    Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 25, and therefore denies them.

26.    Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 26, and therefore denies them.

27.    Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 27, and therefore denies them.

28.    Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 28, and therefore denies them.

29.    Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 29, and therefore denies them.

6

Exhibit 24
-258-

30.     Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 30, and therefore denies them.

31.     Apple admits the Asserted Patents purport to claim certain devices and/or components used in the non-invasive measurement of physiological parameters.  Apple denies that the Asserted Patents cover anything "novel" or any improvements.   Apple denies the characterizations of the Asserted Patents to the extent inconsistent with the language of the specifications and claims.   The remaining statements and allegations of Paragraph 31 contain opinions and legal arguments rather than factual assertions and therefore require no response is required; to the extent a response is required, Apple denies them.

32.     Apple admits that in 2013, representatives of Apple and Masimo held a meeting and that Apple and Masimo entered into certain mutual confidentiality agreements ███████

████████     Apple denies the remaining allegations in Paragraph 32.

33.     Apple admits that it employed Michael O'Reilly beginning in July 2013 as its Vice President of Medical Technology.  Apple admits that Mr. O'Reilly has assisted with projects related to wellness and non-invasive measurement of physiological parameters.  Apple admits that Mr. O'Reilly met with the FDA on behalf of Apple in or around December 2013 regarding the FDA's regulation of consumer products.  Apple lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 33, and therefore denies them.

34.     Apple admits that it hired Marcelo Lamego in 2014.  Apple admits that Mr. Lamego is named as an inventor on four of the Asserted Patents.  Apple denies that it "systematically recruited other key Masimo personnel, such as Marcelo Lamego."  Apple lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 34, and therefore denies them.

7

35.     Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 35, and therefore denies them.

36.     Apple admits that it received a letter from outside counsel for Cercacor Laboratories, Inc. on or around January 24, 2014.  Apple denies that the letter contains the language quoted in the third sentence of Paragraph 36 of the Complaint.  Apple admits that the letter contains the language quoted in the fourth sentence of Paragraph 36 of the Complaint.  Apple lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in Paragraph 36, and therefore denies them.

37.     Apple denies the allegations in Paragraph 37.

38.     Apple admits that it announced the first version of the Apple Watch in September 2014 and began shipping that product in April 2015.  Apple admits that the Apple Watch Series 6 is the first Apple Watch incorporating a Blood Oxygen feature.  Apple denies the remaining allegations in Paragraph 38.

39.     Apple admits that the Apple Watch Series 6 is an electronic smartwatch that incorporates a Blood Oxygen feature.  Apple admits that claim charts purporting to compare one or more of the asserted claims to the Apple Watch Series 6 are attached as Exhibits 15-19 to the Complaint.  Apple denies the remaining allegations contained in Paragraph 39.

40.     Apple admits that the Apple Watch Series 6 is imported into and sold within the United States by or on behalf of Apple.  Apple admits that it maintains inventory of the Apple Watch Series 6 in the United States.  Apple denies any remaining allegations contained in Paragraph 40.

Inv. No. 337-TA-1276
Apple Inc.'s Response to the First Amended Complaint and Notice of Investigation

Exhibit 24
-260-

41.     The statements and allegations of Paragraph 41 contain opinions and legal arguments rather than factual assertions and therefore require no response; to the extent a response is required, Apple denies them.

## V.     THE ASSERTED PATENTS

- **U.S. Patent No. 10,912,501**

42.     Apple admits that the '501 patent is entitled "User-Worn Device for Noninvasively Measuring a Physiological Parameter of a User," and that it issued on February 9, 2021.  Apple further admits that the '501 patent issued from U.S. Patent Application Serial No. 17/031,356, filed on September 24, 2020.  Apple admits that the face of the '501 patent states that the '501 patent is purportedly a continuation of U.S. Patent Application No. 16/834,538, filed March 30, 2020, which is a continuation of U.S. Patent Application No. 16/725,292, filed December 23, 2019, which is a continuation of U.S. Patent Application No. 16/534,949, filed August 7, 2019, which is a continuation of U.S. Patent Application No. 16/409,515, filed May 10, 2019, which is a continuation of U.S. Patent Application No. 16/261,326, filed January 29, 2019, which is a continuation of U.S. Patent Application No. 16/212,537, filed December 6, 2018, which is a division of U.S. Patent Application No. 14/981,290 filed December 28, 2015, which is a continuation of U.S. Patent Application No. 12/829,352 filed July 1, 2010, which is a continuation of U.S. Patent Application No. 12/534,827 filed August 3, 2009 (now abandoned).  Apple admits that the face of the '501 patent states that U.S. Patent Application No. 12/829,352 is also a continuation-in-part of U.S. Patent Application No. 12/497,528 filed July 2, 2009, which is a continuation-in-part of U.S. Design Patent Application Nos. 29/323,408 and 29/323,409, both filed August 25, 2008.  Apple admits that the face of the '501 patent states that U.S. Patent Application No. 12/829,352 is also a continuation-in-part of U.S. Patent Application No. 12/497,523 filed July

9

2, 2009, which is also a continuation-in-part of U.S. Design Patent Application Nos. 29/323,408 and 29/323,409. Apple admits that the face of the '501 patent states that it is related to Provisional Application Nos. 61/086,060, filed on August 4, 2008; 61/086,108, filed on Aug. 4, 2008; 61/086,063, filed on Aug. 4, 2008; 61/086,057, filed on August 4, 2008; 61/091,732, filed on August 25, 2008; 61/078,228, filed on July 3, 2008; and 61/078,207, filed on July 3, 2008. Apple admits that a certificate of correction issued for the '501 patent on April 6, 2021. Apple admits that the expiration date of the '501 Patent is August 25, 2028.

43.     Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first, second, third, and fourth sentences of Paragraph 43, and therefore denies them. Apple denies that the '501 patent is valid and enforceable. Apple lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in Paragraph 43, and therefore denies them.

44.     Apple admits that Appendices A and B of the Complaint purport to be an electronic copy of the uncertified prosecution history of the '501 patent and electronic copies of each technical reference mentioned in the prosecution history of the '501 patent, respectively.

45.     Apple admits that Exhibit 12 to the Complaint purports to contain a list of foreign patents, applications, and denied, abandoned, or withdrawn foreign patent applications corresponding to the '501 patent. Apple lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 45, and therefore denies them.

46.     Apple denies that any limitations of the '501 patent are "novel." The remaining statements and allegations of Paragraph 46 contain opinions and legal arguments rather than factual assertions and therefore require no response; to the extent a response is required, Apple denies them.

Inv. No. 337-TA-1276
Apple Inc.'s Response to the First Amended Complaint and Notice of Investigation

Exhibit 24
-262-

47.     Apple denies the first sentence in paragraph 47.   Apple lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 47, and therefore denies them.

48.     The allegations of Paragraph 48 contain opinions and legal arguments rather than factual assertions and therefore require no response; to the extent a response is required, Apple denies them.

- **U.S. Patent No. 10,912,502**

49.     Apple admits that the '502 patent is entitled "User-Worn Device for Noninvasively Measuring a Physiological Parameter of a User," and that it issued on February 9, 2021.  Apple further admits that the '502 patent issued from U.S. Patent Application Serial No. 17/031,407, filed on September 24, 2020.  Apple admits that the face of the '502 patent states that the '502 patent is purportedly a continuation of U.S. Patent Application No. 16/834,538, filed March 30, 2020, which is a continuation of U.S. Patent Application No. 16/725,292, filed December 23, 2019, which is a continuation of U.S. Patent Application No. 16/534,949, filed August 7, 2019, which is a continuation of U.S. Patent Application No. 16/409,515, filed May 10, 2019, which is a continuation of U.S. Patent Application No. 16/261,326, filed January 29, 2019, which is a continuation of U.S. Patent Application No. 16/212,537, filed December 6, 2018, which is a division of U.S. Patent Application No. 14/981,290 filed December 28, 2015, which is a continuation of U.S. Patent Application No. 12/829,352 filed July 1, 2010, which is a continuation of U.S. Patent Application No. 12/534,827 filed August 3, 2009 (now abandoned).  Apple admits that the face of the '502 patent states that U.S. Patent Application No. 12/829,352 is also a continuation-in-part of U.S. Patent Application No. 12/497,528 filed July 2, 2009, which is a continuation-in-part of U.S. Design Patent Application Nos. 29/323,408 and 29/323,409, both filed

11

PUBLIC VERSION

August 25, 2008.  Apple admits that the face of the '502 patent states that U.S. Patent Application
No. 12/829,352 is also a continuation-in-part of U.S. Patent Application No. 12/497,523 filed July
2, 2009, which is also a continuation-in-part of U.S. Design Patent Application Nos. 29/323,408
and 29/323,409, both filed August 25, 2008.  Apple admits that the face of the '502 patent states
that it is related to Provisional Application Nos. 61/086,060, filed on August 4, 2008, 61/086,108,
filed on Aug. 4, 2008; 61/086,063, filed on Aug. 4, 2008; 61/086,057, filed on August 4, 2008;
61/091,732, filed on August 25, 2008; 61/078,228, filed on July 3, 2008; and 61/078,207, filed on
July 3, 2008.  Apple admits that a certificate of correction issued for the '502 patent on July 6,
2021.  Apple admits that the expiration date of the '502 Patent is August 25, 2028.

50.     Apple lacks knowledge or information sufficient to form a belief as to the truth of
the allegations in the first, second, third, and fourth sentences in Paragraph 50, and therefore denies
them.  Apple denies that the '502 patent is valid and enforceable.  Apple lacks knowledge or
information sufficient to form a belief as to the truth of any remaining allegations in Paragraph 50,
and therefore denies them.

51.     Apple admits that Appendices C and B of the Complaint purport to be an electronic
copy of the uncertified prosecution history of the '502 patent and electronic copies of each
technical reference mentioned in the prosecution history of the '502 patent, respectively.

52.     Apple admits that Exhibit 12 to the Complaint purports to be a list of foreign
patents, applications, and denied, abandoned, or withdrawn foreign patent applications
corresponding to the '502 patent.  Apple lacks knowledge or information sufficient to form a belief
as to the truth of the remaining allegations in Paragraph 52, and therefore denies them.

53.     Apple denies that any limitations of the '502 patent are "novel."  The remaining
statements and allegations of Paragraph 53 contain opinions and legal arguments rather than

12

Exhibit 24
-264-

PUBLIC VERSION

factual assertions and therefore require no response; to the extent a response is required, Apple denies them.

54.     Apple denies the first sentence in paragraph 54.   Apple lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 54, and therefore denies them.

55.     The allegations of Paragraph 55 contain opinions and legal arguments rather than factual assertions and therefore require no response; to the extent a response is required, Apple denies them.

- **U.S. Patent No. 10,945,648**

56.     Apple admits that the '648 patent is entitled "User-Worn Device for Noninvasively Measuring a Physiological Parameter of a User," and that it issued on March 16, 2021.   Apple further admits that the '648 patent issued from U.S. Patent Application Serial No. 17/031,316, filed on September 24, 2020. Apple admits that the face of the '648 patent states that the '648 patent is purportedly a continuation of U.S. Patent Application No. 16/834,538, filed March 30, 2020, which is a continuation of U.S. Patent Application No. 16/725,292, filed December 23, 2019, which is a continuation of U.S. Patent Application No. 16/534,949, filed August 7, 2019, which is a continuation of U.S. Patent Application No. 16/409,515, filed May 10, 2019, which is a continuation of U.S. Patent Application No. 16/261,326, filed January 29, 2019, which is a continuation of U.S. Patent Application No. 16/212,537, filed December 6, 2018, which is a division of U.S. Patent Application No. 14/981,290 filed December 28, 2015, which is a continuation of U.S. Patent Application No. 12/829,352 filed July 1, 2010, which is a continuation of U.S. Patent Application No. 12/534,827 filed August 3, 2009 (now abandoned).   Apple admits that the face of the '648 patent states that U.S. Patent Application No. 12/829,352 is also a

13

continuation-in-part of U.S. Patent Application No. 12/497,528 filed July 2, 2009, which is a continuation-in-part of U.S. Design Patent Application No. 29/323,408 and 29/323,409, both filed August 25, 2008.  Apple admits that the face of the '648 patent states that U.S. Patent Application No. 12/829,352 is also a continuation-in-part of U.S. Patent Application No. 12/497,523 filed July 2, 2009, which is also a continuation-in-part of U.S. Design Patent Application Nos. 29/323,408 and 29/323,409.  Apple admits that the face of the '648 patent states that it is related to Provisional Application Nos. 61/086,060, filed on Aug. 4, 2008, 61/086,108, filed on Aug. 4, 2008; 61/086,063, filed on Aug. 4, 2008; 61/086,057, filed on Aug. 4, 2008; 61/091,732, filed on Aug. 25, 2008; 61/078,228, filed on July 3, 2008; and 61/078,207, filed on July 3, 2008.  Apple admits that a certificate of correction issued for the '648 Patent on April 20, 2021.  Apple admits that the expiration date of the '648 Patent is August 25, 2028.

57.     Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first, second, third, and fourth sentences of Paragraph 57, and therefore denies them.  Apple denies that the '648 patent is valid and enforceable.  Apple lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in Paragraph 57, and therefore denies them.

58.     Apple admits that Appendices D and B of the Complaint purport to be an electronic copy of the uncertified prosecution history of the '648 patent and electronic copies of each technical reference mentioned in the prosecution history of the '648 patent, respectively.

59.     Apple admits that Exhibit 12 to the Complaint purports to be a list of foreign patents, applications, and denied, abandoned, or withdrawn foreign patent applications corresponding to the '648 patent.  Apple lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 59, and therefore denies them.

Inv. No. 337-TA-1276
Apple Inc.'s Response to the First Amended Complaint and Notice of Investigation

Exhibit 24
-266-

60.     Apple denies that any limitations of the '648 patent are "novel."  The remaining allegations of Paragraph 60 contain opinions and legal arguments rather than factual assertions and therefore require no response; to the extent a response is required, Apple denies them.

61.     Apple denies the first sentence in paragraph 61.  Apple lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 61, and therefore denies them.

62.     The allegations of Paragraph 62 contain opinions and legal arguments rather than factual assertions and therefore require no response; to the extent a response is required, Apple denies them.

- **U.S. Patent No. 10,687,745**

63.     Apple admits that the '745 Patent is entitled "Physiological Monitoring Devices, Systems, and Methods," and that it issued on June 23, 2020.  Apple further admits that the '745 Patent issued from U.S. Patent Application Serial No. 16/835,772, filed on March 31, 2020.  Apple admits that the face of the '745 patent states that the '745 patent is purportedly a continuation of Application No. 16/791,963, filed on Feb. 14, 2020, which is a continuation of Application No. 16/532,065, filed on Aug. 5, 2019, which is a continuation of Application No. 16/226,249, filed on Dec. 19, 2018, which is a continuation of Application No. 15/195,199, filed on Jun. 28, 2016.  Apple further admits that the face of the '745 patent states that it is related to Provisional Application No. 62/188,430, filed on Jul. 2, 2015.  Apple admits that a certificate of correction issued for the '745 Patent on September 22, 2021.  Apple lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in Paragraph 63.

64.     Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first, second, third, and fourth sentences of Paragraph 64, and therefore denies

15

them.  Apple denies that the '745 patent is valid and enforceable.  Apple lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in Paragraph 64, and therefore denies them.

65.      Apple admits that Appendices E and F of the Complaint purport to be an electronic copy of the uncertified prosecution history of the '745 Patent and electronic copies of each technical reference mentioned in the prosecution history of the '745 Patent, respectively.

66.      Apple admits that Exhibit 12 to the Complaint purports to be a list of foreign patents, applications, and denied, abandoned, or withdrawn foreign patent applications corresponding to the '745 Patent.  Apple lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 66, and therefore denies them.

67.      Apple denies that any limitations of the '745 patent are "novel."   The remaining allegations of Paragraph 67 contain opinions and legal arguments rather than factual assertions and therefore require no response; to the extent a response is required, Apple denies them.

68.      Apple denies the first sentence in paragraph 68.  Apple lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 68, and therefore denies them.

69.      The allegations of Paragraph 69 contain opinions and legal arguments rather than factual assertions and therefore require no response; to the extent a response is required, Apple denies them.

- **U.S. Patent No. 7,761,127**

70.       Apple admits that the '127 Patent is entitled "Multiple Wavelength Sensor Substrate," and that it issued on July 20, 2010.  Apple further admits that the face of the '127 patent states that the '127 patent issued from U.S. Patent Application Serial No. 11/366,209, filed on

16

March 1, 2006.  Apple admits that the face of the '127 patent states that it is purportedly related to the following Provisional Application Nos.: 60/657,596, 60/657,281, 60/657,268, and 60/657,759 (all filed on Mar. 1, 2005).  Apple admits that a certificate of correction issued for the '127 Patent on January 4, 2011 and February 1, 2011.  Apple admits that the expiration date of the '127 Patent is April 28, 2029.

71.     Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first, second, third, and fourth sentences of Paragraph 71, and therefore denies them.  Apple denies that the '127 patent is valid and enforceable.  Apple lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in Paragraph 71, and therefore denies them.

72.     Apple admits that Appendices G and H of the Complaint purport to be an electronic copy of the uncertified prosecution history of the '127 Patent and electronic copies of each technical reference mentioned in the prosecution history of the '127 Patent, respectively.

73.     Apple admits that Exhibit 12 to the Complaint purports to be a list of foreign patents, applications, and denied, abandoned, or withdrawn foreign patent applications corresponding to the '127 Patent.  Apple lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 73, and therefore denies them.

74.     The allegations of Paragraph 74 contain opinions and legal arguments rather than factual assertions and therefore require no response; to the extent a response is required, Apple denies them.

75.     Apple denies that the first sentence in paragraph 75.  Apple lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 75, and therefore denies them.

Exhibit 24
-269-

76.     The allegations of Paragraph 76 contain opinions and legal arguments rather than factual assertions and therefore require no response; to the extent a response is required, Apple denies them.

- **Licensees**

77.     Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 77, and therefore denies them.

### VI.      UNLAWFUL AND UNFAIR ACTS OF PROPOSED RESPONDENT

78.     Apple admits that it has knowledge of the '745 patent from the filing and service of this Complaint.  Apple denies the remaining allegations contained in Paragraph 78.

79.     Apple admits that Apple Watch Series 6 products are sold in the United States under the model names and numbers listed in Paragraph 79 of the Complaint, with the exception that the Apple Watch Series 6 (GPS + Cellular) Stainless Steel 44 mm case is sold only under the model number A2294, not model number A2293.  The Apple Watch Series 6 (GPS + Cellular) Stainless Steel 40 mm case is sold under the model number A2293.  Apple denies any remaining allegations contained in Paragraph 79.

80.     Apple admits that Exhibit 13 purports to be photographs of an Apple Watch Series 6 with the model number A2291 and the packaging thereto.  Apple further admits that Exhibit 14 purports to be information regarding the Apple Watch Series 6 from Apple's website.  Apple denies any remaining allegations contained in Paragraph 80.

81.     Apple admits that at least some manufacturers of the Apple Watch Series 6 are located in China.  Apple admits the Apple Watch Series 6 is sold for importation into the United States, imported into the United States, and/or sold after importation into the United States by or on behalf of Apple.  Apple denies any remaining allegations in Paragraph 81.

18

82.      Apple denies the allegations in Paragraph 82.

83.      Apple admits that claim charts purporting to compare one or more of the asserted claims to the Apple Watch Series 6 are attached as Confidential Exhibits 15-19 to the Complaint. Apple denies that the Apple Watch Series 6 or any Apple product infringes any valid and enforceable claims of the Asserted Patents.  Apple denies any remaining allegations in Paragraph 83.

84.      Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 84, and therefore denies them.

85.      Apple denies the allegations in Paragraph 85.

### VII.    THE DOMESTIC INDUSTRY RELATED TO ASSERTED PATENTS

86.      Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 86, and therefore denies them.

87.      Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 87, and therefore denies them.

- **Technical Prong**

88.      Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 88, and therefore denies them.

89.      Apple admits that Confidential Exhibits 20 and 21 purport to be visual representations of Masimo's products.  Apple admits that claim charts purporting to compare one or more of the asserted claims to Masimo's products are attached as Confidential Exhibits 22-26 to the Complaint.  Apple admits that Confidential Exhibit 27 purports to be a declaration made by an individual named Bilal Muhsin.  Apple lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in Paragraph 89, and therefore denies them.

19

Exhibit 24
-271-

PUBLIC VERSION

- **Economic Prong**

90.     Apple admits that Confidential Exhibit 28 purports to be a declaration made by an individual named Micah Young.  Apple lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in Paragraph 90, and therefore denies them.

91.     Apple admits that Confidential Exhibit 28 purports to be a declaration made by an individual named Micah Young.  Apple lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in Paragraph 91, and therefore denies them.

92.     Apple admits that Confidential Exhibit 28 purports to be a declaration made by an individual named Micah Young.  Apple lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in Paragraph 92, and therefore denies them.

93.     Apple admits that Confidential Exhibit 28 purports to be a declaration made by an individual named Micah Young. Apple lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in Paragraph 93, and therefore denies them.

94.     Apple admits that Confidential Exhibit 28 purports to be a declaration made by an individual named Micah Young.  Apple lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in Paragraph 94, and therefore denies them.

## VIII.   SPECIFIC INSTANCES OF UNFAIR IMPORTATION AND SALE

95.     Apple admits that at least some manufacturers of the Apple Watch Series 6 are located in China.  Apple admits the Apple Watch Series 6 is sold for importation into the United States, imported into the United States, and/or sold after importation into the United States by or on behalf of Apple.  Apple admits that it sells and offers for sale the Apple Watch Series 6 directly to customers in the United States.  Apple admits that it stated in a press release dated September

20

Exhibit 24
-272-

15, 2020 that availability of the Apple Watch Series 6 would begin September 18, 2020 in the United States. Apple denies any remaining allegations in Paragraph 95.

96.     Apple admits that Confidential Exhibit 30 purports to be a receipt dated April 19, 2021 showing the purchase of an Apple Watch Series 6 for delivery to an address in the United States.  Apple admits that Exhibit 31 purports to be photographs of Apple Watch Series 6 product packaging stating "Made in China."  Apple denies any remaining allegations in Paragraph 96.

97.     Apple admits that its Form 10-K dated October 30, 2020, for the fiscal year ending September 26, 2020, states that "[s]ubstantially all of the Company's hardware products are manufactured by outsourcing partners that are located primarily in Asia, with some Mac computers manufactured in the U.S. and Ireland."

### IX.     CLASSIFICATION OF THE INFRINGING PRODUCTS UNDER THE HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES

98.     The Harmonized Tariff Schedule item number for the Apple Watch Series 6 is HTSUS 8517.62.0090.  Apple denies the remaining statements and allegations of Paragraph 98 insofar as they contain opinions and legal arguments rather than factual assertions and therefore require no response; to the extent a response is required, Apple denies them.

### X.     RELATED LITIGATION

99.     Apple admits that, on January 9, 2020, Complainants filed suit against Apple in the United States District Court for the Central District of California, Civil Action No: 8:20-cv-00048, alleging trade secret misappropriation and infringement of patents not asserted in this Investigation.  Apple further admits that Complainants also seek purported correction of ownership and a declaration of ownership as to certain patents and applications in that case.  Apple further admits that the patent infringement claims raised in the Central District of California are stayed

Exhibit 24
-273-

pending the resolution of certain *inter partes* review proceedings.  Apple denies any remaining

allegations contained in Paragraph 99.

100.    Apple admits that it has filed the fifteen petitions for *inter partes* review listed in

Paragraph 100.  Apple further admits that the Patent Trial and Appeals Board has instituted *inter*

*partes* review on fourteen of those fifteen petitions, on the dates listed in Paragraph 100.  Apple

further admits that it filed six additional petitions for *inter partes* review as to patents asserted by

Complainants in *Masimo Corp., et al. v. Apple Inc*., No. 8:20-cv-00048 (C.D. Cal.), and the PTAB

instituted *inter partes* review on each of those petitions as well:  IPR2020-01713 (instituted May

5, 2021); IPR2020-01714 (instituted April 13, 2021); IPR2020-01715 (instituted April 13, 2021);

IPR2020-01716 (instituted May 5, 2021); IPR2020-01733 (instituted May 5, 2021); IPR2020-

01737 (instituted May 12, 2021).

101.    Apple lacks knowledge or information sufficient to form a belief as to the truth of

the allegations in Paragraph 101, and therefore denies them.

## XI.    REQUESTED RELIEF

102.    Apple denies that Complainants are entitled to any relief whatsoever by way of

their Complaint.  Apple denies any remaining allegations of Paragraph 102(a)-(g).

\* \* \* \* \*

## RESPONSE TO NOTICE OF INVESTIGATION

1.    Pursuant to Commission Rule 210.13(b), Apple hereby responds to the Notice of

Investigation ("Notice") issued by the U.S. International Trade Commission ("Commission") on

August 13, 2021, and published in the Federal Register on August 18, 2021.  Without admitting

any of the specific or general allegations set forth in the Complaint, as referenced in the Notice,

Apple provides the following response:

Inv. No. 337-TA-1276
Apple Inc.'s Response to the First Amended Complaint and Notice of Investigation

Exhibit 24
-274-

2.      Apple acknowledges that the Commission has initiated an Investigation as set forth
in the Commission's Notice of Institution of Investigation.

3.      Apple denies that there has been any violation of Section 337 by Apple in the
importation into the United States, the sale for importation, and/or the sale after importation into
the United States of any Apple products by reason of alleged infringement of any valid claims of
any Asserted Patents.

4.      Apple further contends that the claims of the Asserted Patents are invalid and/or
unenforceable and cannot support any remedy for alleged infringement.  Apple also denies that a
protectable domestic industry, as required by 19 U.S.C. § 1337(a)(2)-(3), exists and/or is in the
process of being established.   Apple further denies that it is in the public interest to grant any relief
to Complainants in connection with this Investigation.  Apple denies that Complainants are entitled
to any relief in this proceeding.

## APPLE'S STATEMENT UNDER COMMISSION RULE 210.13(b)

5.      Pursuant to Commission Rule 210.13(b), Apple provides the following information
with the sole intention of supplying statistical and other data required by 19 C.F.R. § 210.13(b).
Apple specifically denies that any of the information or data supplied relates to or supports any
allegations of infringement against Apple or any violation of 19 U.S.C. § 1337.  Apple specifically
denies that any of the supplied data refers or relates to any unlawful act under Section 337 or
otherwise, and Apple specifically denies that its products infringe in any way any claim of the
Asserted Patents.

6.      From the Complaint, Apple understands that the Accused Products in this
Investigation are the Apple Watch Series 6 products.  The approximate statistical data related to

23

Exhibit 24
-275-

the quantity and value of the categories of Accused Products is set forth in Confidential Exhibit A attached hereto.

7.      The Harmonized Tariff Schedule item number for the Accused Products imported into the United States is HTSUS 8517.62.0090.

8.      Apple has relied on and currently relies on non-Respondents to manufacture the Accused Products.  The names and addresses of Apple's manufacturers of the Accused Products are set forth in Confidential Exhibit A attached hereto.

9.      Apple believes that the United States is a significant market for the accused Apple Watch Series 6 and is important to Apple's overall operations.

## ADDITIONAL AFFIRMATIVE DEFENSES

10.      Apple specifically alleges and asserts the following additional affirmative defenses in response to the allegations set forth in the Complaint.  Apple's inclusion of these additional affirmative defenses in this Response is not a concession that Apple bears the burden of proof with respect to any of them.  Discovery has only recently begun and, therefore, Apple has not fully collected and reviewed all information that may be relevant to the matters and issues raised herein.  Accordingly, pursuant to 19 C.F.R. §§ 210.14(b) and 210.14(c), Apple reserves the right to supplement, modify, and/or amend its defenses, and to take further positions as discovery proceeds in this Investigation.

### FIRST ADDITIONAL AFFIRMATIVE DEFENSE (NON-INFRINGEMENT)

11.      Although Apple does not bear the burden of proof on this issue, Apple has not directly infringed or induced infringement, and does not directly infringe or induce infringement, of any valid and enforceable claim of the Asserted Patents, either literally or under the doctrine of

Inv. No. 337-TA-1276
Apple Inc.'s Response to the First Amended Complaint and Notice of Investigation

Exhibit 24
-276-

PUBLIC VERSION

equivalents, and has not otherwise committed any acts in violation of 35 U.S.C. § 271 and/or 19
U.S.C. § 1337.

12.     The asserted claims of the Asserted Patents are not entitled to any construction that
would cover any product made, used, sold, offered for sale, or imported into the United States by
or on behalf of Apple.  Apple does not infringe any of the Asserted Patents, either directly or
indirectly, at least because Complainants have not shown that the Accused Products meet every
limitation of any of the asserted claims of the Asserted Patents.

13.     Apple's investigation is ongoing. Apple reserves the right to alter, amend or
supplement this affirmative defense as the investigation proceeds.

**SECOND ADDITIONAL AFFIRMATIVE DEFENSE (INVALIDITY)**

14.     Each asserted claim of the Asserted Patents is invalid for failure to comply with the
requirements of 35 U.S.C. §§ 101, 102, 103, 112, and/or of any other applicable statutory
provisions of Title 35 of the United States Code.

15.     With respect to each Asserted Patent, Apple provides an identification of prior art
that supports this additional affirmative defense in Appendix A to this Response. The prior art
provided in Appendix A is exemplary only and should not be construed as limiting in any way the
defenses that Apple will present in this Investigation.  Apple's investigation is ongoing.

16.     Further, nothing herein should be construed as an admission that Apple agrees with
any of Complainants' express or implied claim constructions.

**THIRD ADDITIONAL AFFIRMATIVE DEFENSE (NO DOMESTIC INDUSTRY)**

17.     Although Apple does not bear the burden of proof on this issue, on information and
belief, Complainants have not adequately alleged and cannot prove the existence of a domestic

Inv. No. 337-TA-1276
Apple Inc.'s Response to the First Amended Complaint and Notice of Investigation

Exhibit 24
-277-

PUBLIC VERSION

industry as required under 19 U.S.C. § 1337(a)(2)-(3), in connection with the Asserted Patents, or that such a domestic industry is in the process of being established.

### FOURTH ADDITIONAL AFFIRMATIVE DEFENSE (NO UNFAIR ACT)

18.     Although Apple does not bear the burden of proof on this issue, on information and belief, no act or method of competition by Apple constitutes a violation of 19 U.S.C. § 1337.

### FIFTH ADDITIONAL AFFIRMATIVE DEFENSE (REQUESTED REMEDY IS NOT IN THE PUBLIC INTEREST)

19.     Complainants demand for relief is not in the public interest under Section 337(d)(1). Any exclusion order(s) or cease-and-desist order(s) would have an adverse impact on the public interest, including public health and welfare, competitive conditions in the United States economy, the production of like or directly competitive articles in the United States, and United States consumers. The public interest, therefore, precludes issuance of the requested remedial orders, in accordance with 19 U.S.C. § 1337(d)(1) and (f)(1).

### SIXTH ADDITIONAL AFFIRMATIVE DEFENSE (ESTOPPEL)

20.     On information and belief, and subject to further discovery, Complainants are estopped from asserting and construing any asserted claim to have been infringed by any Apple product and asserting infringement by any Apple product under the Doctrine of Equivalents, in whole or in part, by statutory estoppel, argument-based estoppel, prosecution history estoppel, and collateral, administrative, and/or judicial estoppel, including by virtue of the cancellations, amendments, arguments, representations, and concessions made to the Patent and Trademark Office during the pendency of the applications for the Asserted Patents and for related patents and patent applications, post-grant proceedings, pending or prior litigation, and prior investigations by the International Trade Commission.

### SEVENTH ADDITIONAL AFFIRMATIVE DEFENSE (ENSNAREMENT)

Inv. No. 337-TA-1276
Apple Inc.'s Response to the First Amended Complaint and Notice of Investigation

Exhibit 24
-278-

PUBLIC VERSION

21.     On information and belief, and subject to further discovery, Complainants' infringement claims are barred by the doctrine of ensnarement.  Complainants are foreclosed from asserting infringement under the doctrine of equivalents to the extent the scope of such equivalent would ensnare prior art.

### EIGHTH ADDITIONAL AFFIRMATIVE DEFENSE (EQUITABLE ESTOPPEL, ACQUIESCENCE, WAIVER, UNCLEAN HANDS, PROSECUTION LACHES)

22.     On information and belief, and subject to further discovery, the Asserted Patents are unenforceable against Apple on one or more of the following grounds: equitable estoppel, acquiescence, waiver, unclean hands, prosecution laches, and/or other equitable doctrines.

23.     On information and belief, Complainants' claims are barred as a result of laches and/or estoppel due to conduct during the prosecution of the Asserted Patents.  For example, Masimo waited more than eleven years and filed at least 20 intermediary patent applications before filing applications for U.S. Pat. Nos. 10,912,501 (the "'501 patent"), 10,912,502 (the "'502 patent"), and 10,945,648 (the "'648 patent") within a week after Apple launched the Apple Watch Series 6 in September 2020.  Masimo's delay in prosecuting the '501, '502, and '648 patents caused prejudice to Apple at least because Apple developed and released the Accused Product before Masimo filed its applications for the '501, '502, and '648 patents.

### NINTH ADDITIONAL AFFIRMATIVE DEFENSE (INEQUITABLE CONDUCT)

24.     On information and belief, and subject to further discovery, the claims of the Asserted Patents are unenforceable as a result of inequitable conduct during their prosecution.

25.     For example, during prosecution of '501, '502, and '648 patents, the applicants identified thousands of prior art references to the Patent Office, while at the same time requesting to fast track the review of the applications through the Prioritized Examination procedure.  On information and belief, this conduct was specifically intended to, and did, obscure material

27

Exhibit 24
-279-

references from the examiner, insulating the applications from appropriate scrutiny.  In the context

of the applications, the examiner could not possibly have read each reference that the applicants

identified.  The single most reasonable inference that can be drawn from the evidence is that the

applicants and/or their prosecution counsel intended to deceive the Patent Office by burying the

examiner with prior art and leaving the examiner with no practical way to review everything that

was disclosed or figure out what was pertinent among the thousands of listed references.  On

information and belief, but for this deceptive conduct, the examiner would not have allowed one

or more claims of the Asserted Patents, including one or more claims now asserted against Apple.

     26.    During prosecution of the application for the '745 patent, the applicants identified

over 1,300 prior art references to the Patent Office.  At the same time, the applicants requested

Prioritized Examination of the application.  Remarkably, the examiner signed the Information

Disclosure Statement just two days after it was submitted.  It defies reality that the examiner could

have actually obtained, read, and considered each of the over 1,300 prior art references in a span

of two days.  On information and belief, this conduct was specifically intended to, and did, obscure

material references from the examiner among many minimally relevant references, effectively

preventing appropriate scrutiny of the application.  For example, the applicants and their

prosecution counsel obscured U.S. Patent No. 6,343,223 ("Chin") from the examiner.  Chin

discloses, *inter alia*, an oximeter sensor with a diffuser to diffuse the light emitted from LEDs,

causing the light to pass through more tissue—which the applicants and their prosecution counsel

presumably knew based on their selection of the reference for disclosure.  Yet the examiner's

Notice of Allowability concluded that the claim limitation missing from the prior art was a diffuser

element that could "change the first shape into a second shape by which the light emitted from one

or more of the plurality of light emitting diodes is projected towards the tissue."  The applicants

28

Exhibit 24
-280-

PUBLIC VERSION

and  their prosecution counsel failed to point out Chin and its disclosure of that claim limitation, or point out any other material references buried among the over 1,300 prior art references, to the examiner.   The single most reasonable inference that can be drawn from the evidence is that the applicants and their prosecution counsel intended to deceive the Patent Office.  On information and belief, but for this deceptive conduct, the examiner would not have allowed or more claims of the '745 patent, including one or more claims now asserted against Apple.

27.     During prosecution of the '127 patent, applicants and their prosecution counsel identified over 500 prior art references to the Patent Office.  On information and belief, this conduct was specifically intended to, and did, obscure material references from the examiner, effectively preventing the application from appropriate scrutiny.  In addition, the applicants and their prosecution counsel intentionally withheld other prior art references material to patentability to the Patent Office.  Masimo had identified those other prior art references during the prosecution of related foreign patent applications, and specifically intended to obscure those material references from the examiner during prosecution of the '127 patent and prevent appropriate scrutiny of its application.  For example, PCT Patent Application Publication No. WO2004034898 was  identified  during  the  prosecution  of  related  foreign  applications  JP2008531218  and PCT/US2006/007540.  Additionally, U.S. patent application US2004158132A1 (which issued as U.S. Patent No. 6,956,572) was identified during the prosecution of related foreign application PCT/US2006/007540.  On information and belief, applicants and their prosecution counsel were thus  aware  of  the  materiality  of  WO2004034898  (A2)  and  US2004158132A1,  but  failed  to disclose those publications to the Patent Office during prosecution of the '127 patent.  As another example, during prosecution of the '127 patent, Masimo failed to identify its own prior art, including PCT Patent Application Publication No. WO2005011488 (A2) (which was identified

29

Exhibit 24
-281-

during the prosecution of related foreign application PCT/US2006/007536); PCT Patent Application Publication No. WO2002089664 (which was identified during the prosecution of related foreign application PCT/US2006/007958); and PCT Patent Application Publication No. WO200113790 (which was identified during the prosecution of related foreign application PCT/US2006/007516). The examiners in each of those foreign prosecutions understood and believed prior art patent application publications—including, *e.g.*, WO2004034898 (A2) and US2004158132A1, and Masimo's own prior art patent application publications WO2005011488 (A2), WO2002089664, and WO200113790—were material to the patentability of foreign applications related to the '127 patent. For example, the examiners in those respective foreign prosecutions ranked the WO2004034898 (A2), WO2002089664 (A), and the WO200113790 (A) publications as "Document[s] of Particular Relevance"; the examiners also noted that the US2004158132A1 and WO2005011488 (A2) publications were material documents that "defin[ed] the general state of the art." On information and belief, applicants and their prosecution counsel were thus aware of the materiality of prior art patent application publications and Masimo's own prior art, but they failed to disclose that prior art to the Patent Office during prosecution of the '127 patent. The single most reasonable inference that can be drawn from the evidence is that they intended to deceive the Patent Office. On information and belief, but for this deceptive conduct, the examiner would not have allowed or more claims of the '127 patent, including one or more claims now asserted against Apple.

### TENTH ADDITIONAL AFFIRMATIVE DEFENSE (OTHER DEFENSES)

28.     Apple reserves the right to amend its Response to include other affirmative defenses that Apple may learn of during the course of this Investigation.

Exhibit 24
-282-

PUBLIC VERSION

## PRAYER FOR RELIEF

WHEREFORE, Apple requests that the Commission issue an order:

1.     Denying all relief requested in the Complaint;

2.     Finding that Apple has not violated Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337;

3.     Finding that Apple does not directly infringe or induce infringement of any valid and enforceable claim of the Asserted Patents, either literally or under the doctrine of equivalents, and has not otherwise committed any acts in violation of 35 U.S.C. § 271 or 19 U.S.C. § 1337;

4.     Finding that the asserted claims of the '501, '502, '648, '745, and '127 patents are invalid;

5.     Finding that there is no domestic industry for the '501, '502, '648, '745, or '127 patents;

6.     Complainants' demands for relief are barred because of the relief's effect upon the public health and welfare, competitive conditions in the United States economy, the production of like or directly competitive articles in the United States, and United States consumers;

7.     Finding that Complainants' claims as they relate to the '501, '502, '648, '745, or '127 patents are barred by reason of equitable doctrines, including equitable estoppel, acquiescence, unclean hands, prosecution laches, and/or waiver;

8.     Awarding Apple its attorneys' fees and costs incurred in responding to the Complaint and defending this Investigation;

9.     Dismissing the present Complaint and terminating the present Investigation

10.    Finding that it is not in the public interest to grant any relief to Complainants; and

11.    Awarding such other and further relief as the Commission deems just and proper.

Inv. No. 337-TA-1276
Apple Inc.'s Response to the First Amended Complaint and Notice of Investigation

Exhibit 24
-283-

Respectfully submitted,

Dated: September 7, 2021                    */s/ Sarah F. Frazier*

Mark D. Selwyn
WILMER CUTLER PICKERING HALE AND DORR LLP
2600 El Camino Real
Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000
mark.selwyn@wilmerhale.com

Joseph J. Mueller
Richard Goldenberg
Sarah R. Frazier
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
joseph.mueller@wilmerhale.com
sarah.frazier@wilmerhale.com

Michael D. Esch
David Cavanaugh
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Ave., NW
Washington, DC 20006
Telephone: (202) 663-6000
michael.esch@wilmerhale.com

*Counsel for Respondent Apple Inc.*

Inv. No. 337-TA-1276
Apple Inc.'s Response to the First Amended Complaint and Notice of Investigation

Exhibit 24
-284-

PUBLIC VERSION

## <u>VERIFICATION</u>

I, Mark Rollins, am a Finance Manager at Apple Inc.  I am authorized to make this verification on behalf of Apple Inc.  I have read the RESPONSE OF APPLE INC. TO FIRST AMENDED COMPLAINT AND NOTICE OF INVESTIGATION and know its contents.

To the best of my knowledge, information, and belief, formed after a reasonable inquiry, I verify that the facts set forth in this Response (excluding facts related to Complainants' confidential business information, which I am not permitted to see) and accompanying exhibits are true and correct as of the date indicated below. My information and belief may be based on statements, reports, and records of other Apple employees upon whom I customarily rely.

Dated: September 7, 2021

_____

Mark Rollins

1

Exhibit 24
-285-

# EXHIBIT 25

PUBLIC VERSION

## UNITED STATES INTERNATIONAL TRADE COMMISSION
### Washington, D.C.

### Before the Honorable Monica Bhattacharyya
### Administrative Law Judge

| | |
|---|---|
| In the Matter of<br><br>**CERTAIN LIGHT-BASED PHYSIOLOGICAL MEASUREMENT DEVICES AND COMPONENTS THEREOF** | Inv. No. 337-TA-1276 |

**RESPONDENT APPLE INC.'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS REFERRING OR RELATING TO ANY APPLE WATCH PRODUCT (REQUEST FOR PRODUCTION NO. 105)**

Pursuant to Commission Rules 210.15 and 210.33 and Ground Rules 3.1 and 3.4, Respondent Apple Inc. respectfully moves for an order compelling Complainants Masimo Corporation and Cercacor Laboratories, Inc. to produce documents referring or relating to any Apple Watch product, as sought by Request for Production No. 105. A supporting memorandum containing evidence and argument on these issues accompanies this motion.

### <u>GROUND RULE 3.2 CERTIFICATION</u>

Pursuant to Ground Rule 3.2, counsel for Apple certifies that they contacted Complainants concerning this dispute at least two business days in advance of filing this motion in a good faith effort to reach resolution, including discussions in Discovery Committee Meetings, but reached an impasse. At the December 6 teleconference, the Administrative Law Judge granted Apple leave to file this motion, which Complainants indicated they will oppose.

1

Exhibit 25
-286-

**PUBLIC VERSION**

DATED: December 15, 2021        Respectfully submitted,


*/s/ Sarah R. Frazier*           
Mark D. Selwyn
WILMER CUTLER PICKERING HALE AND DORR LLP
2600 El Camino Real
Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6031

Joseph J. Mueller
Richard Goldenberg
Sarah R. Frazier
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000

Michael D. Esch
David Cavanaugh
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Ave., NW
Washington, DC 20006
Telephone: (202) 663-6000


*Counsel for Respondent Apple Inc.*

2

Exhibit 25
-287-

PUBLIC VERSION

Pursuant to Commission Rule 210.29, Apple will identify by Bates number documents sufficient to identify Apple engineers whose hard work and innovation resulted in new pulse oximetry technologies, including those technologies practiced by the Blood Oxygen feature of the Accused Products.

Dated: December 3, 2021

Respectfully submitted,

*/s/ Sarah R. Frazier*
Joseph J. Mueller
Richard Goldenberg
Sarah R. Frazier
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000

Mark D. Selwyn
WILMER CUTLER PICKERING HALE AND DORR LLP
2600 El Camino Real
Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6031

Michael D. Esch
David L. Cavanaugh
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Ave., NW
Washington, DC 20006
Telephone: (202) 663-6000

*Counsel for Respondent Apple Inc.*

Exhibit 25
-288-

# EXHIBIT 26

| | |
|---|---|
| **From:** | Daniel.Hughes |
| **To:** | Masimo.Apple; *** Apple-Masimo; WH Apple-Masimo Service List; Parker, Ken |
| **Subject:** | Apple v. Masimo - Ex Parte Motion Re Cross-Use |
| **Date:** | Monday, May 2, 2022 6:57:45 PM |

Counsel,

Masimo requests that Apple allow cross-use of the below listed documents in *In re Certain Light-Based Physiological Measurement Devices and Components Thereof*, ITC Inv. No. 337-TA-1276 (the "ITC Investigation").  If Apple refuses to allow cross-use, Masimo intends to move *ex parte* for relief from the protective order to use these documents in the ITC Investigation.  Please confirm that Apple agrees to allow cross use of these documents or provide Apple's availability on Tuesday, May 4 or Wednesday, May 5 to meet and confer on Masimo's *ex parte* motion. Additionally, if Apple does not agree to allow cross use of these documents, please identify which, if any, Apple believes should be filed under seal.

- APL-MAS_00212155
- APL-MAS_00225017
- APL-MAS_00226067
- APL-MAS_00332007
- APL-MAS_00359911
- APL-MAS_00403773
- APL-MAS_00415060
- APL-MAS_00433706
- APL-MAS_00433808
- APL-MAS_00536875
- APL-MAS_00592181
- APL-MAS_00676497
- APL-MAS_00690233
- APL-MAS_00700555
- APL-MAS_00733237
- APL-MAS_01058238
- APL-MAS_01135388
- APL-MAS_01853759

Thanks,
Daniel

**Daniel Hughes**
Partner
Daniel.Hughes@knobbe.com
858-707-4208 **Direct**
**Knobbe Martens**

Exhibit 26
-289-