# EXHIBIT 1

Joseph R. Re (Bar No. 134479)
joseph.re@knobbe.com
Stephen C. Jensen (Bar No. 149894)
stephen.jensen@knobbe.com
Irfan A. Lateef (Bar No. 204004)
irfan.lateef@knobbe.com
Brian C. Claassen (Bar No. 253627)
brian.claassen@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, Fourteenth Floor
Irvine, CA 92614
Telephone: (949)-760-0404
Facsimile: (949)-760-9502

Attorneys for Plaintiffs,
**Masimo Corporation and**
**Cercacor Laboratories, Inc.**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| MASIMO CORPORATION, a Delaware corporation; and CERCACOR LABORATORIES, INC., a Delaware corporation, <br><br> Plaintiffs, <br><br> v. <br><br> TRUE WEARABLES, INC., a Delaware corporation; and MARCELO LAMEGO, an individual, <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Case No. 8:18-cv-2001 <br><br> **COMPLAINT FOR** <br> **(1) BREACH OF CONTRACT** <br> **(2) TRADE SECRET** <br>     **MISAPPROPRIATION** <br> **(3) BREACH OF FIDUCIARY DUTY** <br>     **AND** <br> **(4) PATENT INFRINGEMENT** <br><br> **AND DEMAND FOR JURY TRIAL** |

Exhibit 1
Page 1

Plaintiffs MASIMO CORPORATION ("Masimo") and CERCACOR LABORATORIES, INC. ("Cercacor") hereby complain of Defendants TRUE WEARABLES, INC. ("True Wearables") and MARCELO LAMEGO ("Lamego") (collectively, "Defendants"), and allege as follows:

## I.  THE PARTIES

1.     Plaintiff Masimo is a Delaware corporation having its principal place of business at 52 Discovery, Irvine, California 92618.

2.     Plaintiff Cercacor is a Delaware corporation having its principal place of business at 40 Parker, Irvine, California 92618.

3.     Plaintiffs Masimo and Cercacor formerly employed Defendant Lamego as a highly-trusted engineer.

4.     Lamego is now the founder, CEO, and Chairman of the Board of Defendant True Wearables.  True Wearables is a relatively new company that recently began selling Oxxiom, a pulse oximeter apparently intended to compete directly with Plaintiffs' products.

5.     On information and belief, Defendant Lamego resides at 18 Lyra Way, Coto de Caza, California 92679 and Defendant True Wearables is a Delaware corporation having a principal place of business at 29826 Avenida de Las Banderas, Suite 300, Rancho Santa Margarita, California 92688.

## II.  JURISDICTION AND VENUE

6.     This civil action includes claims for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 100, *et seq*., more particularly, 35 U.S.C. §§ 271 and 281.  This action also arises under the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1836(b)-(c).  This Complaint further alleges breach of contract, trade secret misappropriation, and breach of fiduciary duty.

7.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(a), and 1367(a).

Exhibit 1
Page 2

8.     Defendant Lamego resides in California.   Defendant True Wearables has its principal place of business in California.  Both Defendants are subject to personal jurisdiction in California and have committed the acts complained of in this Judicial District.   The relevant agreements between Plaintiffs and Lamego also include consent to personal jurisdiction in California.

9.     Venue is proper in the Southern Division of the Central District of California pursuant to 28 U.S.C. § 1400(b) with respect to patent infringement because Lamego resides in, and True Wearables has its regular and established place of business in, the County of Orange within the Central District of California.  Defendants also have committed acts of infringement in this Judicial District.   Venue is also appropriate in this Judicial District under U.S.C. § 1391(b) with respect to the DTSA claims.

### III.  STATEMENT OF THE CASE

10.    This action seeks relief for the theft of Plaintiffs' highly confidential information and trade secrets, and infringement of Masimo's patents by Lamego and True Wearables.  Lamego betrayed Plaintiffs' trust by acquiring and wrongfully using their highly confidential and proprietary technical information, product plans, manufacturing knowledge, and other highly confidential information.  Lamego also breached his agreements with Plaintiffs by using and disclosing Plaintiffs' confidential information. This action also seeks relief for Lamego's breach of his fiduciary duty to Cercacor.

### IV.  STATEMENT OF FACTS

11.    Masimo is a medical technology company that revolutionized pulse oximetry and is the only company to have succeeded in developing certain other noninvasive patient monitoring technologies.  Pulse oximetry is a noninvasive method for monitoring a person's arterial oxygen saturation (also called "$SpO_2$") and pulse rate from a sensor that is attached to a user.  Before Masimo,

-2-

Exhibit 1
Page 3

pulse oximetry was plagued by unreliability, often when the measurement was needed most, due to patient motion and low peripheral blood flow (known as "low perfusion"). The industry had essentially given up on solving this problem, concluding it was largely unsolvable. Clinicians had to live with the results – patient monitors gave excessive false alarms, froze their measurements for prolonged periods of time despite potential changes in oxygen saturation or pulse rate, delayed notification of alarms due to long averaging times of sensor data, produced inaccurate measurements, or were unable to obtain data on the most critical patients and babies who cannot be instructed to stay still. Masimo's pioneering technology, known as Masimo Signal Extraction Technology ("Masimo SET"), solved this problem and dramatically improved patient safety by accurately monitoring and reporting oxygen saturation and pulse rate even during motion and low perfusion.

12. Following its success in pulse oximetry, Masimo subsequently invested in developing additional breakthrough measurement technologies, such as non-invasively measuring total hemoglobin, carboxyhemoglobin, and methemoglobin. Masimo has continued to innovate, succeeding where others have consistently failed. Masimo was the first, and remains the only, company delivering these game-changing technologies to hospitals in the United States.

13. From its inception, Masimo has continuously developed cutting-edge noninvasive patient monitoring technologies. Masimo sought and received numerous U.S. patents for many of its inventions in this area. Masimo's revolutionary technology was a key to its gaining significant market praise and penetration. After introduction into the market, many competitors, much larger than Masimo, used Masimo's technology without a license, resulting in patent infringement lawsuits that ultimately confirmed the validity of Masimo's innovations. But, Masimo does not pursue patents on all its innovations. Masimo maintains some technology as trade secrets. In addition, Masimo

-3-

Exhibit 1
Page 4

guards its future product and market plans. Only select employees have knowledge of and access to these guarded secrets.

14. Masimo's innovations also include important advances in sensor technologies that complement Masimo's system and algorithms. Masimo's sensors are integral to the success of the revolutionary technologies Masimo has developed. Masimo also pioneered techniques to manufacture sensors with low waste and low cost, while still providing high quality and exacting specifications. These sensor manufacturing techniques have been critical to Masimo's innovation engine and success for many years.

15. In 1998, Masimo spun certain technology off into a new company, Masimo Laboratories, Inc. or "Masimo Labs," to further research and develop the technologies. The name of the company was later changed to "Cercacor." Cercacor and Masimo have a license agreement between them to facilitate confidential collaboration between the companies.

16. Like Masimo, Cercacor is an innovator of non-invasive monitoring technologies. Cercacor is on the frontline of understanding how measuring, tracking, and analyzing physiological parameters can impact pre-diabetic and diabetic patients, endurance sports training and performance and overall health and wellness. Cercacor continued the development that started at Masimo on total hemoglobin (SpHb), methemoglobin (SpMet), and carboxyhemoglobin (SpCO®) and other non-invasive parameters.

17. Leading hospitals around the world use Cercacor technology licensed to Masimo and sold under the name Masimo rainbow SET. Like Masimo, Cercacor does not pursue patents on all its innovations. Cercacor also maintains some technology as trade secrets, and guards its future product and market plans. Only select employees have knowledge of and access to these guarded secrets.

-4-

Exhibit 1
Page 5

18.     Masimo and Cercacor carefully guard the secrecy of their confidential information and documents.  For example, Masimo and Cercacor have policies regarding labelling confidential information and documents as "CONFIDENTIAL AND PROPRIETARY." They also restrict these documents and information from disclosure to third parties and employees on a need-to-know basis.  Masimo and Cercacor also have policies in place regarding the use of computers and related equipment that govern how their computer systems may be used.   Those policies also govern the protection of Masimo's and Cercacor's confidential information.    Both Masimo and Cercacor have document management systems that restrict access to confidential documents to only those employees with proper security credentials and a need for access. Masimo and Cercacor also require employees to sign agreements precluding the employees from disclosing or making use of any confidential information except as authorized by Masimo and Cercacor and as necessary for the performance of the employees' duties.  Masimo and Cercacor implemented such policies and procedures to maintain the confidentiality of sensitive information. These polices were in place during Lamego's employment and remain in place today.

19.     When Lamego started at Masimo, he was not skilled in physiological monitoring and had no exposure to manufacturing techniques. However, Masimo ultimately came to believe, after some time, that he had the technical capability to excel.  He had exhibited what appeared to be high integrity and qualities of trustworthiness.  Accordingly, Masimo ultimately decided to allow Masimo's key engineers who developed Masimo's revolutionary technology to disclose it to Lamego.  Masimo believed that, by allowing these key engineers to disclose the secrets of Masimo's technologies, Lamego could eventually take over for Masimo's chief scientist.  To accomplish this, Masimo arranged to have Lamego shadow these engineers, and expose him

-5-

Exhibit 1
Page 6

to every aspect of Masimo's technology, including top-secret algorithms, proprietary circuit board manufacturing, confidential sensor designs and much more. The engineers disclosed the extensive secrets that underlie Masimo technology and Masimo gave Lamego unfettered access to its most highly confidential technical information. Masimo groomed Lamego to continue this development with the access he had been given to the top engineers at Masimo.

20.    In addition to revealing the secrets of Masimo's technology, Masimo exposed Lamego to Masimo's plans with respect to future products and market plans. Through this exposure, Masimo disclosed to Lamego what technologies Masimo believed would be significant and successful in those markets.

21.    Masimo's founder, Chairman and CEO, also disclosed to Lamego Masimo's know-how and trade secrets regarding his strategic vision of non-invasive monitoring, managing an R&D organization, and strategic product and marketing plans. Indeed, Masimo's founder had regular one-on-one meetings with Lamego to disclose Masimo's know-how and trade secrets to him.

22.    Lamego started with Masimo in 2000 as an Algorithm Engineer, initially staying less than one year. At that time, Lamego agreed to and signed a Masimo Employee Confidentiality Agreement (the "Masimo 2000 Agreement") dated June 26, 2000. A copy of the Masimo 2000 Agreement is attached hereto as Exhibit 1. Among the terms of the Masimo 2000 Agreement are the following:

      a.    "For purposes of this Agreement, the term Confidential Information means any information in any form that Masimo considers confidential, including business plans, customer files, sales and marketing reports, technical data, prices and costs, designs and formulas, software, databases, personnel and payroll records, mailing lists, accounting records, and other business information."

-6-

Exhibit 1
Page 7

b.   "During my employment by Masimo, I will not disclose or make use of any Confidential Information except as authorized by Masimo and as necessary for the performance of my duties as a Masimo employee."

c.   "After my employment with Masimo has terminated, I will not disclose or make use of any Confidential Information for any purpose, either on my own or on behalf of another business."

d.   "Upon termination of my employment for any reason, I will immediately assemble all property of Masimo in my possession or under my control and return it unconditionally to Masimo."

e.   "During my employment, I will devote all of my working time and energy to the business of Masimo, and I will not render services to anyone outside Masimo, accept competing employment, or make preparations to compete with Masimo."

f.   "During and after my employment, I will not solicit or induce any employee or consultant of Masimo to quit their employment or cease doing business with Masimo…."

g.   "For purposes of enforcing this Agreement, I hereby consent to jurisdiction in the Superior Court of California for the County of Orange, as well as any other jurisdiction allowed by law."

h.   "I understand that my obligations under this Agreement remain in effect even after my employment with Masimo terminates."

23.   When he started in 2000, Lamego was not familiar with pulse oximetry product development.   Masimo's key engineers began training Lamego on Masimo's pulse oximetry technology, from basic principles to sophisticated Masimo algorithms and approaches.

24.   Lamego left Masimo for a short period from January 2001 to December 2002 to work as a consultant and professor.   Lamego returned to

-7-

Exhibit 1
Page 8

Masimo in January 2003, as a Research Scientist, and held that position until November 2006.

25.     Upon re-joining Masimo, Lamego signed a second agreement with Masimo dated January 28, 2003 with provisions similar to his first agreement. A copy of the 2003 Agreement is attached hereto as Exhibit 2.   The 2003 Agreement further confirmed, "I agree to assign and hereby assign to Masimo all rights that I may have to any inventions, works of authorship, developments, improvements, or trade secrets that I may develop during the course of my employment, except for inventions which I am allowed to retain under California Labor Code section 2870, a copy of which is attached to this Agreement as Exhibit B."

26.     Masimo's most trusted and skilled engineers continued to expose Lamego to Masimo's technology.   As Lamego became more immersed in Masimo's technology, Masimo gave Lamego access to the most confidential of information that was restricted to only a very small number of Masimo's trusted engineers.   Masimo's chief scientist spent significant time over the years disclosing to Lamego Masimo's technical know-how and trade secrets.   To accelerate this process, Masimo's chief scientist shared an office with Lamego for years, disclosing everything he could about Masimo technology.   Masimo expected Lamego would eventually succeed Masimo's chief scientist.

27.     In his trusted position, Masimo exposed Lamego to Masimo's future product and market plans.  Lamego was a senior member of a team that was developing SpHb, SpMet, SpCO, and other non-invasive parameters.  He was also part of a team developing a plan to pursue un-tethered, wearable monitoring solutions and wireless sensors, whereby the patient or user would no longer be connected by a wire to a monitor.  Masimo had begun its strategic plans for wireless sensors and wearable monitors, and Lamego was privy to those discussions and plans.  Those plans also included developing wearable

-8-

Exhibit 1
Page 9

devices, including wireless sensors and wearable monitors, and marketing those products outside of the medical field, for example, to athletes and health conscious consumers. Lamego was personally involved in strategic discussions on both the marketing and product plans for wireless sensors and wearable monitors and the planned target markets. These plans were not generally known.

28.     Lamego signed a third agreement with Masimo dated January 31, 2005. A copy of the 2005 Agreement is attached hereto as Exhibit 3. The 2005 Agreement also added:

a.     "For purposes of this Agreement, the term Confidential Information means any information in any form that Masimo considers confidential, including without limitation business plans, customer files, sales and marketing reports, technical data, prices and costs, designs and formulas, software, databases, personnel and payroll records, mailing lists, accounting records, and other business information. Confidential Information also includes information to which I am exposed during the course of my employment with Masimo that is considered confidential to Masimo's affiliates or any third party."

b.     "Upon termination of my employment for any reason, I will immediately assemble all property of Masimo in my possession or under my control and return it unconditionally to Masimo.

c.     "I agree that the fruits and products of my labor as a Masimo employee shall belong solely to Masimo."

d.     "I agree that the activities forbidden in paragraphs 13 and 14 above would necessarily involve the use or disclosure of Masimo's trade secrets and proprietary and confidential information . . . and are necessary to protection of Masimo's trade secrets and proprietary and confidential information. I understand that none of my activities will be prohibited

Exhibit 1
Page 10

under paragraphs 13 and 14 to the extent that I can prove that the action was taken without the use or disclosure of any of Masimo's trade secrets or proprietary or confidential information.

29.     In 2006, Lamego, having received extensive exposure to Masimo's confidential information from Masimo's key engineers, moved from Masimo to Masimo Labs.  Lamego was promoted to Chief Technical Officer of Masimo Labs.  With this promotion, he became the most senior ranking executive engineer of Masimo Labs.  Masimo Labs' mission was to continue developing non-invasive technologies using the technology originally developed at Masimo, which was licensed to Masimo Labs.  Masimo Labs focused on the market outside of the professional medical caregiver market with these new innovative technologies.

30.     Masimo Labs was also working to measure glucose levels in the blood non-invasively.  As CTO, Lamego led all Masimo Labs' technology development.  He was also involved in, exposed to, and responsible for carrying out strategic plans for products and markets, including for wearable monitors and wireless sensors, and target markets for those products.

31.     While at Masimo Labs, Lamego signed an Employee Confidentiality Agreement (the "Cercacor Agreement") dated May 19, 2009.  A copy of the Cercacor Agreement is attached hereto as Exhibit 4.  Among the terms of the Cercacor Agreement are the following:

a.      "For purposes of this Agreement, the term Confidential Information means any information in any form that Masimo Labs considers confidential, including without limitation business plans, customer files, customer lists, supplier lists, sales and marketing reports, forecasts, strategies, technical data, prices and costs, designs and formulas, discoveries, processes, manufacturing techniques, know-how, improvements, ideas or copyrightable works, software, databases,

-10-

Exhibit 1
Page 11

personnel and payroll records, mailing lists, accounting records, works of authorship, inventions, trade secrets and other business information. Confidential Information also includes information to which I am exposed during the course of my employment with Masimo Labs that is considered confidential to Masimo Labs' affiliates or any third party."

b.      "During my employment by Masimo Labs, I will not disclose or make use of any Confidential Information except as authorized by Masimo Labs and as necessary for the performance of my duties as a Masimo Labs employee."

c.      "After my employment with Masimo Labs has terminated, I will not disclose or make use of any Confidential Information for any purpose, either on my own or on behalf of another business."

d.      "Upon termination of my employment for any reason, I will immediately assemble all property of Masimo Labs, including any proprietary or confidential information, in my possession or under by control and return it unconditionally to Masimo Labs."

e.      "During my employment, I will devote all of my working time and energy to the business of Masimo Labs, and I will not render services to anyone outside Masimo Labs, accept competing employment, or make preparations to compete with Masimo Labs."

f.      "I agree that the activities forbidden in paragraphs 13 and 14 above would necessarily involve the use or disclosure of Masimo Labs' trade secrets and proprietary and confidential information and are necessary to protection of Masimo Labs' trade secrets or activities."

g.      "For purposes of enforcing this Agreement, I hereby consent to jurisdiction in the Superior Court of California for the County of Orange, as well as any other jurisdiction allowed by law."

/ / /

-11-

Exhibit 1
Page 12

h.     "I understand that my obligations under this Agreement remain in effect even after my employment with Masimo Labs terminates."

32.    The Masimo 2000 Agreement, 2003 Agreement, 2005 Agreement, and the Cercacor 2009 Agreement are collectively referred to herein as the "Lamego Agreements."

33.    At Masimo Labs, later renamed Cercacor, Lamego's understanding of Plaintiffs' confidential information continued to develop regarding, among other things, the construction of physiological sensors, how to manufacture high-quality sensors to exacting specifications at a reasonable cost, how to process signals based on light transport through physiological tissue, and photon diffusion.   He continued to be Cercacor's most-trusted engineer with unrestricted access to Masimo's and Cercacor's confidential information.  In his executive role at Cercacor, he was further closely involved in the strategic future plans of Masimo and Cercacor on many topics, including Masimo plans to enter certain markets and particular technologies that would likely be successful.  He was also introduced to potential suppliers relating to components for wireless sensors and untethered monitors.

34.    In his role at Cercacor, Lamego led the engineering team and Cercacor's research and product development.  With regular guidance provided by the CEO, Lamego managed and directed all technical activities, including developing product roadmaps, project management, intellectual property strategy, recruitment of employees, negotiation of supplier agreements and non-disclosure agreements, modeling, hardware development, algorithm design, software implementation, biosensor development, and industrial design. Lamego also participated in many discussions about the development of a wireless sensor and other wireless configurations for Plaintiffs. Masimo and Cercacor disclosed their vast pulse oximetry sensor technology, including

-12-

Exhibit 1
Page 13

processing of signals based on light transport through physiological tissue, and photon diffusion while he worked. Masimo also disclosed manufacturing techniques for producing pulse oximetry sensors with reasonable cost constraints. As former Chief Technical Officer of Cercacor and a Research Scientist at Masimo, he had unfettered access to and responsibility for maintaining Plaintiffs' highly confidential technical information.

35. Lamego resigned from Cercacor in January 2014, after having sought, and obtained, a position at Apple, Inc. Lamego learned of Apple's interest and heavy recruiting of Masimo's technical and clinical team, including soliciting Masimo's key engineers. Apple's recruitment included the key engineers that Lamego knew intimately understood Masimo's technology. Apple also solicited and succeeded in hiring Masimo's Chief Medical Officer, Michael O'Reilly, who as a Masimo executive, was also intimately familiar with Masimo's strategic product and marketing plans. Lamego was aware of Masimo's and Cercacor's concerns about Apple pursuing key team members. On information and belief, Lamego then sought and obtained a position from Apple. Shortly after joining Apple, Lamego pursued on behalf of Apple numerous patent applications on some of the same technologies as disclosed in Masimo's patents.

36. When Lamego informed Masimo and Cercacor that he was leaving for Apple, Lamego proactively volunteered to Masimo and Cercacor that he would not work on pulse oximetry and other technologies he had worked on while with Masimo or Cercacor. He assured Plaintiffs that if Apple asked him to do so, he would quit. Yet, he continued such work on his own after leaving Apple.

37. Although only at Apple for seven months, Lamego was listed as an inventor in multiple Apple-filed patent applications that were closely tied to the work he had done and the technology he had been taught by Masimo's key

-13-

Exhibit 1
Page 14

scientists. Based on those now-published patent applications, Masimo and Cercacor now understand that while at Apple, Lamego worked as an engineer on development of non-invasive physiological measurements, including pulse oximetry, for Apple for wearable products, directly in conflict with his assurances to Masimo and Cercacor.

38. After seven months, Lamego's employment at Apple ended. He then founded True Wearables. In late 2016, Plaintiffs cautioned Lamego that his activity raised significant concerns about his obligations to Plaintiffs. Lamego contended that the products he was developing for True Wearables did not rely on Plaintiffs' confidential information. But, Lamego refused to share with Plaintiffs' outside counsel the Oxxiom hardware or software. On information and belief, Lamego later released his Oxxiom device with its software fully encrypted.

39. Lamego also was aware of Masimo's and Cercacor's ongoing projects for wearable wireless devices, and indeed, Lamego oversaw such projects at Cercacor. Plaintiffs' plans, known to Lamego, were not generally known outside of Plaintiffs.

40. After True Wearables introduced its Oxxiom product to market, Plaintiffs unfortunately confirmed the concerns raised by Lamego and True Wearables that were identified in the Plaintiffs' letters.

41. Lamego never sought any type of permission or rights from Plaintiffs to use their confidential information, trade secrets or other intellectual property.

42. Before Lamego left Cercacor, he claimed to have proven the feasibility of measuring glucose and multiple other blood constituents non-invasively. He assured Cercacor's CEO that he had transferred all know-how for these measuring these blood constituents to others at Cercacor. Because of the unexpected departure of Lamego, Cercacor revisited the feasibility studies

Exhibit 1
Page 15

and could not demonstrate feasibility of any of the measurements. Accordingly, either Lamego withheld from Cercacor information critical to the development of the technology for these parameters or misrepresented their feasibility.

43. Lamego also recruited onto Defendant True Wearables' Board another former Masimo executive, Anthony Allan, previously Chief Operating Officer at Masimo. Allan was in charge of manufacturing at Masimo, and had access to extensive know-how regarding Masimo's manufacturing, such as how to manufacture disposable and reusable pulse oximetry sensors, to exacting specifications, at a reasonable cost with low waste.

## V. <u>FIRST CAUSE OF ACTION</u>
### <u>(BREACH OF CONTRACT WITH MASIMO BY LAMEGO)</u>

44. Masimo hereby realleges and incorporates by reference the allegations set forth in paragraphs 1 through 43.

45. The covenants in the Masimo 2000 Agreement, 2003 Agreement, and 2005 Agreement (collectively, "Masimo Agreements") were intended and necessary to protect Plaintiffs' legitimate business interests in its goodwill and confidential information.

46. The Masimo Agreements are valid and enforceable contracts between Masimo and Lamego.

47. Because of the Masimo Agreements, Lamego had an obligation to keep confidential and not to disclose or to make use of any of Masimo's confidential information, except as authorized by Masimo and as necessary for the performance of his duties as an employee of Masimo.

48. Because of the Masimo Agreements, Lamego also had an obligation not to disclose or to make use of any Masimo confidential information, for any purpose, either on his own or on behalf of another business after his employment with Masimo had terminated.

/ / /

-15-

Exhibit 1
Page 16

49.   Masimo breached the Masimo Agreements by taking and using Masimo's confidential information for his own benefit and for the benefit of True Wearables.   On information and belief, Lamego continues to breach the Masimo Agreements by wrongfully utilizing Masimo's confidential information to the benefit of others and in the course of his employment with True Wearables.

50.   Because of the Masimo Agreements, Lamego also had an obligation to cooperate with Masimo to do whatever necessary or appropriate to obtain patents.

51.   Lamego breached the Masimo Agreements by failing to cooperate with Masimo by failing to pursue the patenting of certain subject matter he was instructed to pursue, as well as by refusing to review and sign inventor declarations and assignments for continuing patent applications on which he was a named inventor.   Masimo suffered harm as a result, including attorneys' fees and expenses.

52.   Masimo has fully performed all its obligations and has satisfied all conditions for performance under the Masimo Agreement.

53.   Lamego has willfully, and with conscious disregard for the contractual obligations owed to Masimo, breached the Masimo Agreements.

54.   Unless restrained and enjoined by the Court, Lamego will continue to breach the Masimo Agreements.

55.   As a foreseeable, direct, and proximate result of Lamego's breach of contract, Masimo has suffered irreparable injury to their rights and pecuniary damages.   Masimo will continue to suffer such injury, loss, and damage unless and until Lamego is enjoined from further use or disclosure of Masimo's confidential information.

56.   Lamego has derived and received and will continue to derive and to receive from the aforementioned breach of contract, gains, profits, and

-16-

Exhibit 1
Page 17

advantages, many of which are not presently known to Masimo. As a result, Lamego should be required to disgorge these gains, profits, and advantages in restitution for his breach.

57.     Masimo is therefore entitled to injunctive relief or specific performance of the Masimo Agreements.

## VI.  <u>SECOND CAUSE OF ACTION</u>
## <u>(BREACH OF CONTRACT WITH CERCACOR BY LAMEGO)</u>

58.     Plaintiffs hereby reallege and incorporate by reference the allegations set forth in paragraphs 1 through 57.

59.     The covenants in the Cercacor Agreement were intended and necessary to protect Cercacor's legitimate business interests in its goodwill and confidential information.

60.     The Cercacor Agreement is a valid and enforceable contract between Cercacor and Lamego.

61.     Because of the Cercacor Agreement, Lamego had an obligation to keep confidential and not to disclose or to make use of any of Cercacor's confidential information, except as authorized by Cercacor and as necessary for the performance of his duties as an employee of Cercacor.

62.     Because of the Cercacor Agreement, Lamego also had an obligation not to disclose or to make use of any Plaintiffs' confidential information, for any purpose, either on his own or on behalf of another business after his employment with Cercacor had terminated.

63.     Lamego breached the Cercacor Agreement by taking and using Cercacor's confidential information for his own benefit and for the benefit of True Wearables.  On information and belief, Lamego continues to breach the Cercacor Agreements by wrongfully utilizing Plaintiffs' confidential information to the benefit of others and in the course of his employment with True Wearables.

-17-

Exhibit 1
Page 18

64.     Lamego also breached the Cercacor Agreement by taking and using Cercacor's trade secrets to compete directly with Cercacor.  Cal. Bus. & Prof. Code § 16600 generally prohibits agreements forbidding former employees from engaging in work for a competitor.  However, courts in California have recognized a trade secrets exception to Section 16600.  *See Asset Mktg. Sys. v. Gagnon*, 542 F.3d 748, 758 (9th Cir. 2008).  Lamego agreed with Cercacor "for a period of two (2) years immediately following my termination of employment with Masimo Labs (voluntary or otherwise), I shall be prohibited from competing with any business, product or service of Masimo Labs."  Ex. 4 at ¶14.  Lamego also agreed that this was necessary to protect trade secrets. *See* Ex. 4 at ¶15.  Lamego and True Wearables compete directly with Cercacor, using Cercacor trade secrets, in violation of the terms of the Cercacor Agreement.

65.     Because of the Cercacor Agreement, Lamego also had an obligation to cooperate with Cercacor to do whatever necessary or appropriate to obtain patents.

66.     Lamego breached the Cercacor Agreement by failing to cooperate with Cercacor by failing to pursue the patenting of certain subject matter he was instructed to pursue, as well as by refusing to review and sign inventor declarations and assignments for continuing patent applications on which he was a named inventor.  Cercacor suffered harm as a result, including attorneys' fees and expenses.

67.     Lamego also breached the Cercacor Agreement by not disclosing sufficient information regarding glucose and the other non-invasive parameters he claimed to have proven feasibility of at Cercacor, or in the alternative, not accurately presenting the status of their development.

68.     Cercacor has fully performed all its obligations and have satisfied all conditions for performance under the Cercacor Agreement.

-18-

Exhibit 1
Page 19

69.     Lamego has willfully, and with conscious disregard for the contractual obligations owed to Plaintiffs, breached the Cercacor Agreement.

70.     Unless restrained and enjoined by the Court, Lamego will continue to breach the Cercacor Agreement.

71.     As a foreseeable, direct, and proximate result of Lamego's breach of contract, Cercacor has suffered irreparable injury to their rights and pecuniary damages.  Cercacor will continue to suffer such injury, loss, and damage unless and until Lamego is enjoined from further use or disclosure of Cercacor's confidential information.

72.     Lamego has derived and received and will continue to derive and to receive from the aforementioned breach of contract, gains, profits, and advantages, many of which are not presently known to Cercacor.  As a result, Lamego should be required to disgorge these gains, profits, and advantages in restitution for his breach.

73.     Cercacor is therefore entitled to injunctive relief or specific performance of the Cercacor Agreement.

## VII.  **THIRD CAUSE OF ACTION**
## **(TRADE SECRET MISAPPROPRIATION UNDER**
## **CALIFORNIA'S UNIFORM TRADE SECRET LAW)**

74.     Plaintiffs hereby reallege and incorporate by reference the allegations set forth in paragraphs 1 through 73.

75.     This is a cause of action for Misappropriation of Trade Secrets under California's Uniform Trade Secrets Act, Cal. Civ. Code §§ 3426 *et seq*., based upon Defendants' wrongful and improper use and disclosure of confidential and proprietary trade secret information of Plaintiffs.

76.     Plaintiffs own the trade secrets including, but not limited to, Plaintiffs' business plans, know-how, technical information, technical data,

-19-

Exhibit 1
Page 20

designs, manufacturing techniques and other business information ("Confidential Information").

77.   Plaintiffs' Confidential Information is currently, and was at the time of Defendants' misappropriation, not generally known. All individuals with access to Plaintiffs' Confidential Information were instructed to keep it confidential, and they were subject to obligations to keep Plaintiffs' Confidential Information secret.  Additionally, Plaintiffs' Confidential Information is not generally known to the public or to other persons who can obtain economic value from its disclosure or use.

78.   Plaintiffs' Confidential Information has actual and potential independent economic value because it is not generally known.  The actual and potential independent economic value of Plaintiffs' Confidential Information is derived from not being generally known because it gives Plaintiffs an actual and potential business advantage over others who do not know the information and who could obtain economic value from its disclosure or use.

79.   Plaintiffs made reasonable efforts under the circumstances to keep Plaintiffs' Confidential Information from becoming generally known.  For example, Plaintiffs' efforts included marking documents confidential, instructing those individuals with access to the information to treat it as confidential, restricting access to the information, and requiring individuals to sign confidentiality agreements.

80.   Plaintiffs are informed and believe, and thereon alleges, that Lamego misappropriated Plaintiffs' Confidential Information by disclosure.   On information and belief, Lamego disclosed Plaintiffs' Confidential Information, without Plaintiffs' consent, to True Wearables, True Wearables' employees, and True Wearables' contractors in order for them improperly develop the Oxxiom product.  Additionally, at the time of disclosure, Lamego knew or had reason to know that his knowledge of Plaintiffs' Confidential Information was acquired by

-20-

Exhibit 1
Page 21

an employer-employee and fiduciary relationship and Lamego's employment agreements, which created a duty for Lamego to keep Plaintiffs' Confidential Information secret.

81. Plaintiffs are informed and believe, and thereon allege, that Defendants also misappropriated Plaintiffs' Confidential Information by use. On information and belief, Lamego used Plaintiffs' Confidential Information in deciding to form True Wearables, in identifying the target market, the products to pursue, and during Lamego's employment at True Wearables, without Plaintiffs' express or implied consent, for True Wearables to identify the target market, target product, and to develop and manufacture pulse oximetry product.

82. Plaintiffs are informed and believe, and thereon allege, that True Wearables also misappropriated Plaintiffs' Confidential Information by disclosure. On information and belief, True Wearables disclosed Plaintiffs' Confidential Information, without Plaintiffs' consent, in order to improperly develop and manufacture the pulse oximetry devices. True Wearables knew or had reason to know that his knowledge of Plaintiffs Confidential Information came from Plaintiffs, and that Lamego had previously acquired Plaintiff's Confidential Information by virtue of an employer-employee and fiduciary relationship and the Lamego agreements, all of which created a duty for Lamego to keep Plaintiffs' Confidential Information secret.

83. Plaintiffs are informed and believe, and thereon allege, that Defendants misappropriated Plaintiffs' Confidential Information by acquisition because True Wearables obtained possession of Plaintiffs' Confidential Information from Lamego, when True Wearables knew or had reason to know that Lamego used improper means to acquire it. Additionally, True Wearables used improper means to acquire Lamego's Confidential Information from Lamego because True Wearables relied on Lamego's breach of his duty not to use Plaintiffs' Trade Secrets. Lamego acquired the trade secrets by improper means.

-21-

Exhibit 1
Page 22

Additionally, at the time of acquisition, Lamego knew or had reason to know that his knowledge of Plaintiffs' Confidential Information came from Plaintiffs and that Lamego had previously acquired Plaintiffs' Confidential Information by virtue of an employer-employee and fiduciary relationship and the Lamego agreements, all of which created a duty for Lamego to protect and not use Plaintiffs' Confidential Information.

84.    Plaintiffs were harmed by Defendants' acquisition, use, and disclosure of Plaintiffs' Confidential Information, and Defendants' actions were substantial factors in causing Plaintiffs' harm.  As a direct and proximate result of Defendants' willful, improper, and unlawful acquisition, use, and disclosure of Plaintiffs' trade secrets, Plaintiffs have suffered, and will continue to suffer, great harm and damage.  Plaintiffs will continue to be irreparably damaged unless Defendants are enjoined from further use and disclosure of Plaintiffs Confidential Information.

85.    Defendants were unjustly enriched by Defendants' acquisition, use, and disclosure of Plaintiffs' Confidential Information, and Defendants' actions were substantial factors in causing Defendants to be unjustly enriched. Defendants were unjustly enriched because their misappropriation of Plaintiffs' Confidential Information caused Defendants to receive a benefit that they otherwise would not have achieved.

86.    If neither damages nor unjust enrichment caused by Defendants' misappropriation of Plaintiffs' Confidential Information is provable at trial, Plaintiffs are entitled to a reasonable royalty for the period of time that Defendants' use of Plaintiffs' Confidential Information could have been prohibited.

87.    The aforementioned acts of Defendants in wrongfully misappropriating Plaintiffs trade secrets were, and continue to be, willful and malicious, warranting an award of reasonable attorneys' fees, as provided by

-22-

Exhibit 1
Page 23

Cal. Civ. Code § 3426.4, and exemplary damages, as provided by Cal. Civ. Code §§ 3294 and 3426.3(c).

## VIII.  FOURTH CAUSE OF ACTION

## (TRADE SECRET MISAPPROPRIATION UNDER THE FEDERAL DEFENSE OF TRADE SECRETS ACT)

88.    Plaintiffs hereby reallege and incorporate by reference the allegations set forth in paragraphs 1 through 87.

89.    This is a cause of action for Misappropriation of Trade Secrets under the Federal Defense of Trade Secrets Act of 2016, 18 U.S.C. §§ 1836 *et seq.*, based upon Defendants' wrongful and improper use of confidential and proprietary trade secret information of Plaintiffs.

90.    Plaintiffs own the trade secrets including, but not limited to, the Confidential Information previously described.

91.    Plaintiffs' Confidential Information is currently, and was at the time of Defendants' misappropriation, secret.  All individuals with access to Plaintiffs' Confidential Information were instructed to protect it, and they were subject to obligations to keep Plaintiffs' Confidential Information secret.  Additionally, Plaintiffs' Confidential Information is not generally known to the public or to other persons who can obtain economic value from its disclosure or use. Plaintiffs' Confidential Information is not readily ascertainable by the public or to other persons.

92.    Plaintiffs' Confidential Information has actual and potential independent economic value because it is not generally known.  The actual and potential independent economic value of Plaintiffs' Confidential Information is derived from not being generally known because it gives Plaintiffs an actual and potential business advantage over others who do not know the information and who could obtain economic value from its disclosure or use.

/ / /

-23-

Exhibit 1
Page 24

93.     Plaintiffs made reasonable efforts under the circumstances to keep Plaintiffs' Confidential Information secret.   For example, Plaintiffs' efforts included marking documents confidential, instructing those individuals with access to the information to treat it as confidential, restricting access to the information, and requiring individuals with access to the information to sign confidentiality agreements.

94.     Plaintiffs are informed and believe, and thereon allege, that True Wearables misappropriated Plaintiffs' Confidential Information by use.   True Wearables' unauthorized use of Plaintiff's Confidential Information has occurred after the enactment of the DTSA in May 2016, and such unauthorized and improper use is ongoing and continues to this day.

95.     On information and belief, Lamego disclosed Plaintiffs' Confidential Information, without Plaintiffs' consent, to True Wearables and to True Wearables' employees for them improperly develop the Oxxiom product.   True Wearables used Plaintiffs' Confidential Information, without Plaintiffs' express or implied consent, improperly to pursue the concept, and to identify the target market, identify the target product and develop and manufacture the Oxxiom device.   On information and belief, True Wearables used Plaintiffs' Confidential Information, without Plaintiffs' consent, by choosing the target market, choosing the target product, and advertising and releasing True Wearables Oxxiom product. Additionally, at the time of disclosure, True Wearables knew or had reason to know that Lamego's knowledge of Plaintiffs' Confidential Information was acquired by virtue of an employer-employee and fiduciary relationship and Lamego's employment agreements, which created a duty for Lamego to protect Plaintiffs' Confidential Information.

96.     On information and belief, Defendants also used Plaintiffs' Confidential Information during Lamego's employment at True Wearables, without Plaintiffs' express or implied consent, in order for True Wearables to

-24-

Exhibit 1
Page 25

identify the target market, the target product, and develop and manufacture the Oxxiom product.

97.     Plaintiffs' are informed and believe, and thereon allege, that Defendants misappropriated Plaintiffs' Confidential Information by acquisition because True Wearables obtained possession of Plaintiffs' Confidential Information from Lamego, when True Wearables knew or had reason to know that Lamego used improper means to acquire it.  Additionally, True Wearables used improper means to acquire Lamego's Confidential Information from Lamego because True Wearables relied on Lamego's breach of his duty not to use Plaintiffs' Trade Secrets.

98.     Plaintiffs were harmed by Defendants' acquisition, use, and disclosure of Plaintiffs' Trade Secrets, and Defendants' actions were substantial factors in causing Plaintiffs' harm.  As a direct and proximate result of Defendants' willful, improper, and unlawful acquisition, use, and disclosure of Plaintiffs' trade secrets, Plaintiffs have suffered, and will continue to suffer, great harm and damage.  Plaintiffs will continue to be irreparably damaged unless Defendants are enjoined from further use and disclosure of Plaintiffs' Trade Secrets.

99.     Defendants were unjustly enriched by Defendants' acquisition, use, and disclosure of Plaintiffs' Trade Secrets, and Defendants' actions were substantial factors in causing Defendants to be unjustly enriched.  Defendants were unjustly enriched because their misappropriation of Plaintiffs' Trade Secrets caused Defendants to receive a benefit that they otherwise would not have achieved.

100.   In the event that neither damages nor unjust enrichment caused by Defendants' misappropriation of Plaintiffs' Trade Secrets is provable at trial, Plaintiffs are entitled to a reasonable royalty for the period of time that Defendants' use of Plaintiffs' trade secrets could have been prohibited.

Exhibit 1
Page 26

101.    The aforementioned acts of Defendants in wrongfully misappropriating Plaintiffs trade secrets were, and continue to be, willful and malicious, warranting an award of reasonable attorneys' fees, as provided by 18 U.S.C. § 1836(b)(3)(D), and exemplary damages, as provided by 18 U.S.C. § 1836(b)(3)(C).

## IX.  FIFTH CAUSE OF ACTION
## (BREACH OF FIDUCIARY DUTY OF UNDIVIDED LOYALTY AGAINST LAMEGO)

102.    Cercacor hereby realleges and incorporates by reference the allegations set forth in paragraphs 1 through 101.

103.    As an officer of Cercacor, Lamego owed duties of loyalty and other fiduciary duties to Cercacor, including the duty not to exploit his position within Cercacor's corporate structure for his own benefit and the duty not to hinder or usurp Cercacor's corporate opportunities.

104.    While serving as Cercacor's Chief Technical Officer, Lamego oversaw research and development into technology for the noninvasive measurement of over twenty additional blood parameters.

105.    Lamego failed to pursue patent subject matter he was instructed to pursue.  Although filing patents that appeared to relate to the subject matter, Lamego excluded certain subject matter for which he was instructed to seek patent protection.

106.    In 2013, Lamego represented to the Cercacor Board of Directors that many non-invasive parameters were feasible and available for license to Masimo.

107.    Cercacor revisited the feasibility studies for these parameters after Lamego's unexpected departure, but could not confirm their feasibility.  Either Lamego failed to fully disclose information critical to their feasibility, in breach of his fiduciary duty or he did not accurately represent the status, also in breach of his fiduciary duty.  To the extent that Lamego did not accurately present to Cercacor

-26-

Exhibit 1
Page 27

and its Board of Directors the status of his research and development into the technology for non-invasively measuring those blood parameters, or failed to fully disclose the developed technology, Lamego breached his duty of undivided loyalty.

108.   Based on Lamego's representations, in December 2013, Masimo licensed the Lamego-developed technology to noninvasively measure five of those blood parameters and paid Cercacor a license fee of $2,500,000.

109.   Lamego acted against Cercacor's interests by either not accurately presenting the status of at least the five parameters ultimately licensed by Masimo, or by failing to disclose sufficient information to Cercacor regarding feasibility of the technology for the parameters before his departure from Cercacor at the end of 2013.   Indeed, Lamego did not maintain notebooks or sufficient records at Cercacor.

110.   Following Lamego's departure from Cercacor, Cercacor was unable to transfer the technology to Masimo in a manner that allowed successful development of a product.   Cercacor revisited the testing of the Lamego-developed technology and ultimately determined it could not show feasibility sufficient to maintain the license to Masimo.

111.   Cercacor suffered financial harm as a result, refunding the $2,500,000 license fee to Masimo and the expense of substantial resources to develop the technology Lamego oversaw.   Lamego's failure in his duties to Cercacor was a substantial factor in causing Cercacor's harm.

## X.   THE PATENTS-IN-SUIT

112.   Masimo is the owner by assignment of U.S. Patent No. 8,983,564 entitled "Perfusion Index Smoother" ("the '564 patent"), which the United States Patent and Trademark Office lawfully and duly issued on March 17, 2015.  A true and correct copy of the '564 patent is attached hereto as Exhibit 5.

/ / /

-27-

Exhibit 1
Page 28

113.   Masimo is the owner by assignment of U.S. Patent No. 8,886,271 entitled "Non-Invasive Physiological Sensor Cover" ("the '271 patent"), which the United States Patent and Trademark Office lawfully and duly issued on November 11, 2014.  A true and correct copy of the '271 patent is attached hereto as Exhibit 6.

114.   Masimo is the owner by assignment of U.S. Patent No. 7,295,866 entitled "Low Power Pulse Oximeter" ("the '866 patent"), which the United States Patent and Trademark Office lawfully and duly issued on November 13, 2007.  A true and correct copy of the '866 patent is attached hereto as Exhibit 7.

115.   Masimo is the owner by assignment of U.S. Patent No. 7,186,966 entitled "Amount of Use Tracking Device and Method for Medical Product" ("the '966 patent"), which the United States Patent and Trademark Office lawfully and duly issued on March 6, 2007.  A true and correct copy of the '966 patent is attached hereto as Exhibit 8.

## XI.  SIXTH CAUSE OF ACTION
## (INFRINGEMENT OF U.S. PATENT NO. 8,983,564)

116.   Plaintiffs hereby reallege and incorporate by reference the allegations set forth in paragraphs 1 through 115.

117.   Upon information and belief, True Wearables' products, including at least the Oxxiom pulse oximeter, infringe at least Claims 1-3 of the '564 patent under at least 35 U.S.C. § 271(a), (b), and (c).

118.   Upon information and belief, True Wearables has directly infringed one or more claims of the '564 patent through manufacture, use, sale, offer for sale, and/or importation into the United States of pulse oximeters, including the Oxxiom device.

/ / /

/ / /

119.   For example, upon information and belief, in operation, the Oxxiom device and its corresponding Oxxiom application perform all of the limitations of Claim 2 of the '564 patent.  The Oxxiom device and application determine an indication of perfusion index, displayed on the Oxxiom application and labeled as "PI" as shown in the image below found on True Wearables website at https://www.truewearables.com/:



After approximately 15 seconds, SpO2, PR, and PI measurements are displayed continuously

120.   The Oxxiom device receives plethysmograph ("pleth") data based on a signal received from a detector contained in an Osram SFH7050, a component within the Oxxiom device.  On information and belief, the Oxxiom device and application use pleth data to determine $SpO_2$, pulse rate, and perfusion index.  Lamego further describes the Oxxiom device and application in a patent application he filed that published as U.S. Patent Application Publication 2018/0110450 on April 26, 2018.  A copy of the publication is attached as Exhibit 9.  That publication describes that the Oxxiom device receives pleth data and processes it, for example in Fig. 24 and the corresponding text.

121.   The Oxxiom device and/or application determine an indication of perfusion index by utilizing at least one of a first calculation technique and a

-29-

Exhibit 1
Page 30

second calculation technique to determine a resulting indication of perfusion index. As shown above in the image, the Oxxiom application displays a resulting indication of perfusion index. On information and belief, when the Oxxiom device is tapped or rubbed while attached to a user, the perfusion index readings demonstrate the use of at least two different perfusion index calculation techniques.

122. On information and belief, the Oxxiom device also determines the indication of perfusion index by choosing a calculation technique that will result in a lower perfusion index value. For example, when the Oxxiom device is tapped or rubbed, the perfusion index readings demonstrate the choice of a calculation technique resulting in the lowest perfusion index value.

123. Upon information and belief, Lamego and True Wearables have knowledge of Masimo's patents, including the '564 patent at least based on Lamego's former positions with Masimo and Cercacor. Masimo filed the patent application that led to the '564 patent on September 26, 2012 and it published on March 28, 2014, both while Lamego was employed by Cercacor as Chief Technical Officer and oversaw Cercacor's IP strategy. Upon further information and belief, through the knowledge of the '564 patent gained by monitoring Masimo's patents, Lamego and True Wearables knew or should have known that these activities would infringe. True Wearables also had knowledge of the '564 patent no later than the filing of this Complaint.

124. Upon information and belief, True Wearables has actively induced others to infringe the '564 patent by marketing and selling the above Oxxiom device, knowing and intending that such systems would be used by customers and end users in a manner that infringes the '564 patent. To that end, True Wearables provides instructions and teachings to its customers and end users that such Oxxiom devices be used to infringe the '564 patent. True Wearables'

-30-

Exhibit 1
Page 31

acts constitute infringement of the '564 patent in violation of 35 U.S.C. § 271(b).

125.   Upon information and belief, True Wearables actively induces users to directly infringe the asserted claims of the '564 patent.  By way of example only, upon information and belief, Oxxiom actively induces direct infringement of the '564 patent by providing directions, demonstrations, guides, manuals, training for use, and/or other materials necessary for the use of the Oxxiom device.  Upon information and belief, True Wearables knew or should have known that these activities would cause direct infringement.

126.   Upon information and belief, True Wearables' acts constitute contributory infringement of the '564 patent in violation of 35 U.S.C. § 271(c). Upon information and belief, True Wearables contributorily infringes because, among other things, True Wearables offers to sell and/or sells within the United States, and/or imports into the United States, components of the Oxxiom device that constitute material parts of the invention of the asserted claims of the '564 patent, are not staple articles or commodities of commerce suitable for substantial non-infringing use, and are known by True Wearables to be especially made or especially adapted for use in an infringement of the '564 patent.

127.   Upon information and belief, True Wearables' infringement of the '564 patent has been, and continues to be, willful, deliberate, and intentional by continuing its acts of infringement after becoming aware of the '564 patent and its infringement thereof, thus acting in reckless disregard of Masimo's patent rights.

128.   Because of True Wearables' infringement of the '564 patent, Masimo has suffered and will continue to suffer irreparable harm and injury, including monetary damages in an amount to be determined at trial.

/ / /

Exhibit 1
Page 32

129.  Upon information and belief, unless enjoined, True Wearables, and/or others acting on behalf of True Wearables, will continue their infringing acts, thereby causing additional irreparable injury to Masimo for which there is no adequate remedy at law.

## XII.  SEVENTH CAUSE OF ACTION
## (INFRINGEMENT OF U.S. PATENT NO. 8,886,271)

130.  Plaintiffs hereby reallege and incorporate by reference the allegations set forth in paragraphs 1 through 129.

131.  Upon information and belief, True Wearables' products, including at least the Oxxiom pulse oximeter, infringe at least Claims 1-2, 6-11, and 15-18 of the '271 patent under at least 35 U.S.C. § 271(a), (b), and (c).

132.  Upon information and belief, True Wearables has directly infringed one or more claims of the '271 patent through manufacture, use, sale, offer for sale, and/or importation into the United States of pulse oximeters, including the Oxxiom device.

133.  For example, upon information and belief, the Oxxiom includes all of the limitations of Claim 10 of the '271 patent.  The Oxxiom device has a sensor cover, including "tab 2," for use with a noninvasive optical physiological sensor, the Oxxiom.  The sensor cover comprises all the limitations of Claim 10. It includes an opaque portion attachable to the sensor and configured to block optical readings by the sensor, as shown in the instructions from the True Wearables website (https://www.truewearables.com/), reproduced below:

/ / /

/ / /

-32-

Exhibit 1
Page 33

TURN ON OXXIOM

"Tab 2" also includes a non-adhesive portion that protrudes from the sensor to facilitate removal of the sensor cover, as showing in the depiction above. Furthermore, the Oxxiom device is a sensor that includes a light source configured to emit light from one or more emitters of the sensor and a detector configured to receive at least a portion of the light emitted by the one or more emitters after the light has passed through a tissue site. The Oxxiom device includes a light source that has multiple emitters, the multiple LEDs contained in an Osram SFH7050. That same Osram SFH7050 includes a detector that is configured to receive at least a portion of the light emitted by the one or more emitters after the light has passed through a tissue site. The opaque portion of "Tab 2" is configured to prevent the detector from receiving light during sensor activation, as shown in the instructions above.

134. Upon information and belief, Lamego and True Wearables have knowledge of Masimo's patents, including the '271 patent at least based on Lamego's former position with Cercacor. The inventors filed the patent application that led to the '271 patent on June 17, 2013, while Lamego was employed by Cercacor as Chief Technical Officer and oversaw IP strategy. Upon further information and belief, through the knowledge of the '271 patent gained by monitoring Masimo's patents, True Wearables knew or should have

-33-

Exhibit 1
Page 34

known that these activities would cause direct infringement.  True Wearables also had knowledge of the '271 patent no later than the filing of this Complaint.

135.   Upon information and belief, True Wearables has actively induced others to infringe the '271 patent by marketing and selling the above Oxxiom devices, knowing and intending that such systems would be used by customers and end users in a manner that infringes the '271 patent.  To that end, True Wearables provides instructions and teachings to its customers and end users that such Oxxiom devices be used to infringe the '271 patent.  True Wearables' acts constitute infringement of the '271 patent in violation of 35 U.S.C. § 271(b).

136.   Upon information and belief, True Wearables actively induces users to directly infringe the asserted claims of the '271 patent.  By way of example only, upon information and belief, Oxxiom actively induces direct infringement of the '271 patent by providing directions, demonstrations, guides, manuals, training for use, and/or other materials necessary for the use of the Oxxiom device.  Upon information and belief, True Wearables knew or should have known that these activities would cause direct infringement.

137.   Upon information and belief, True Wearables' acts constitute contributory infringement of the '271 patent in violation of 35 U.S.C. § 271(c). Upon information and belief, True Wearables contributorily infringes because, among other things, True Wearables offers to sell and/or sells within the United States, and/or imports into the United States, components of the Oxxiom that constitute material parts of the invention of the asserted claims of the '271 patent, are not staple articles or commodities of commerce suitable for substantial non-infringing use, and are known by True Wearables to be especially made or especially adapted for use in an infringement of the '271 patent.

/ / /

Exhibit 1
Page 35

138.   Upon information and belief, True Wearables' infringement of the '271 patent has been, and continues to be, willful, deliberate, and intentional by continuing its acts of infringement after becoming aware of the '271 patent and its infringement thereof, thus acting in reckless disregard of Masimo's patent rights.

139.   As a consequence of True Wearables' infringement of the '271 patent, Masimo has suffered and will continue to suffer irreparable harm and injury, including monetary damages in an amount to be determined at trial.

140.   Upon information and belief, unless enjoined, True Wearables, and/or others acting on behalf of True Wearables, will continue their infringing acts, thereby causing additional irreparable injury to Masimo for which there is no adequate remedy at law.

## XIII.  <u>EIGHTH CAUSE OF ACTION</u>
## <u>(INFRINGEMENT OF U.S. PATENT NO. 7,295,866)</u>

141.   Plaintiffs hereby reallege and incorporate by reference the allegations set forth in paragraphs 1 through 140.

142.   Upon information and belief, True Wearables' products, including at least the Oxxiom pulse oximeter, infringe at least Claims 10-12 of the '866 patent under at least 35 U.S.C. § 271(a), (b), and (c).

143.   Upon information and belief, True Wearables has directly infringed one or more claims of the '866 patent through manufacture, use, sale, offer for sale, and/or importation into the United States of pulse oximeters, including the Oxxiom device.

144.   For example, upon information and belief, the Oxxiom device includes all of the limitations of Claim 10 of the '866 patent.  The Oxxiom device is a pulse oximeter capable of varying its power consumption, comprising all of the elements of Claim 10.  The Oxxiom device includes an emitter driver, a Texas Instruments AFE4403.  The Texas Instruments AFE4403

contains an integrated dual LED driver. The emitter driver of the Oxxiom device outputs a drive signal capable of driving at least one emitter of a sensor, contained in an Osram SFH7050, that detects energy attenuated by tissue of a measurement site of a patient.

145. The Oxxiom also includes a controller, a Nordic Semiconductor nRF51422 system on a chip device with a Bluetooth transceiver, input/output interfaces, memory, and a processor. The Nordic chip, as configured in the Oxxiom device, uses at least a first duty cycle of the drive signal corresponding to a first power consumption and a second duty cycle of the drive signal corresponding to a second power consumption different than the first power consumption. For example, the data sheet for the Texas Instruments AFE4403 explains that the device contains a configurable timing controller, controllable through a serial interface (SPI) to the Nordic Semiconductor nRF51422. On information and belief, through the serial interface, the Nordic Semiconductor nRF51422 configures the Texas Instruments AFE4403 to switch between duty cycles corresponding to two different power consumptions.

146. Further description of the Oxxiom device is found in Exhibit 9, the patent application filed by Lamego that published on April 26, 2018. That publication describes many aspects of the Oxxiom device. For example, at paragraph 71, the publication states "FIG. 37 shows the typical workflow, advantages, and technical specifications of a wireless, fully disposable, single-use continuous clinical-grade oximeter (OXXIOM™) according to an embodiment of these inventions." The publication specifically identifies the Osram SFH7050 at paragraph 95, the Nordic nRF51422 at paragraph 101, and the Texas Instruments AFE4403 at paragraph 88. The publication at paragraph 88 further confirms that "If the preferred low-cost low-power pulse oximeter front[-]end from Texas Instruments, AFE4403 is used as the instrumentation electronics [], then it can be programmed to generate and control directly the

-36-

Exhibit 1
Page 37

required LED modulation scheme without additional resources from the sensor processor [].” Figures 34A-C and paragraph 89 explain that “Modulations as shown in FIG. 34A can also be adopted in the case of measurement sites with low perfusion and/or subject to excessive motion.” This description is consistent with the operation of the Oxxiom device.

147. Upon information and belief, Lamego and True Wearables have knowledge of Masimo’s patents, including the ’866 patent at least based on Lamego’s former positions with Masimo and Cercacor. The ’866 patent issued in November 2007, while Lamego was employed by Cercacor as Chief Technical Officer and supervised IP strategy. Upon further information and belief, through the knowledge of the ’866 patent gained by monitoring Masimo’s patents, True Wearables knew or should have known that these activities would cause direct infringement. True Wearables also had knowledge of the ’866 patent no later than the filing of this Complaint.

148. Upon information and belief, True Wearables has actively induced others to infringe the ’866 patent by marketing and selling the above Oxxiom devices, knowing and intending that such systems would be used by customers and end users in a manner that infringes the ’866 patent. To that end, True Wearables provides instructions and teachings to its customers and end users that such Oxxiom devices be used to infringe the ’866 patent. True Wearables’ acts constitute infringement of the ’866 patent in violation of 35 U.S.C. § 271(b).

149. Upon information and belief, True Wearables actively induces users to directly infringe the asserted claims of the ’866 patent. By way of example only, upon information and belief, Oxxiom actively induces direct infringement of the ’866 patent by providing directions, demonstrations, guides, manuals, training for use, and/or other materials necessary for the use of the

-37-

Exhibit 1
Page 38

Oxxiom device.  Upon information and belief, True Wearables knew or should have known that these activities would cause direct infringement.

150.  Upon information and belief, True Wearables' acts constitute contributory infringement of the '866 patent in violation of 35 U.S.C. § 271(c). Upon information and belief, True Wearables contributorily infringes because, among other things, True Wearables offers to sell and/or sells within the United States, and/or imports into the United States, components of the Oxxiom device that constitute material parts of the invention of the asserted claims of the '866 patent, are not staple articles or commodities of commerce suitable for substantial non-infringing use, and are known by True Wearables to be especially made or especially adapted for use in an infringement of the '866 patent.

151.  Upon information and belief, True Wearables' infringement of the '866 patent has been, and continues to be, willful, deliberate, and intentional by continuing its acts of infringement after becoming aware of the '866 patent and its infringement thereof, thus acting in reckless disregard of Masimo's patent rights.

152.  Because of True Wearables' infringement of the '866 patent, Masimo has suffered and will continue to suffer irreparable harm and injury, including monetary damages in an amount to be determined at trial.

153.  Upon information and belief, unless enjoined, True Wearables, and/or others acting on behalf of True Wearables, will continue their infringing acts, thereby causing additional irreparable injury to Masimo for which there is no adequate remedy at law.

/ / /

/ / /

-38-

Exhibit 1
Page 39

## XIV.  NINTH CAUSE OF ACTION
### (INFRINGEMENT OF U.S. PATENT NO. 7,186,966)

154. Plaintiffs hereby reallege and incorporate by reference the allegations set forth in paragraphs 1 through 153.

155. Upon information and belief, True Wearables' products, including at least the Oxxiom pulse oximeter, infringe at least Claims 1, 4, 15, and 19 of the '966 patent under at least 35 U.S.C. § 271(a), (b), and (c).

156. Upon information and belief, True Wearables has directly infringed one or more claims of the '966 patent through manufacture, use, sale, offer for sale, and/or importation into the United States of pulse oximeters, including the Oxxiom device.

157. For example, upon information and belief, the Oxxiom device and its application perform all of the limitations of Claim 1. The Oxxiom device is a noninvasive probe, and the Oxxiom and its application track the amount of use of the electronics of the Oxxiom device. The application alerts a caregiver when the electronics have expired.

158. The Oxxiom device and its application determine a cumulative amount of use of the noninvasive probe, the Oxxiom device. The Oxxiom device includes a plurality of emitters, including the red and infrared LEDs located in an Osram SFH7050 on the Oxxiom device. The same Osram SFH7050 also contains a detector capable of detecting light attenuated by tissue. These features are further described in Lamego's published patent application regarding the Oxxiom, Ex. 9 at paragraph 106.

159. On information and belief, when the cumulative amount of use exceeds a predetermined amount of time, twenty-four hours, the Oxxiom application activates one or more indications, including a red "X" displayed on the battery icon in the application, conveying that the noninvasive optical probe has expired.

Exhibit 1
Page 40

160.   Upon information and belief, Lamego and True Wearables have knowledge Masimo's patents, including the '966 patent at least based on Lamego's former positions with Masimo and Cercacor.  The '966 patent issued in March 2007, while Lamego was employed by Cercacor as Chief Technical Officer and supervised IP strategy.  Upon further information and belief, through the knowledge of the '966 patent gained by monitoring Masimo's patents, True Wearables knew or should have known that these activities would cause direct infringement.  True Wearables also had knowledge of the '966 patent no later than the filing of this Complaint.

161.   Upon information and belief, True Wearables has actively induced others to infringe the '966 patent by marketing and selling the above Oxxiom devices, knowing and intending that such systems would be used by customers and end users in a manner that infringes the '966 patent.  To that end, True Wearables provides instructions and teachings to its customers and end users that such Oxxiom devices be used to infringe the '966 patent.  True Wearables' acts constitute infringement of the '966 patent in violation of 35 U.S.C. § 271(b).

162.   Upon information and belief, True Wearables actively induces users to directly infringe the asserted claims of the '966 patent.  By way of example only, upon information and belief, Oxxiom actively induces direct infringement of the '966 patent by providing directions, demonstrations, guides, manuals, training for use, and/or other materials necessary for the use of the Oxxiom device.  Upon information and belief, True Wearables knew or should have known that these activities would cause direct infringement.

163.   Upon information and belief, True Wearables' acts constitute contributory infringement of the '966 patent in violation of 35 U.S.C. § 271(c).  Upon information and belief, True Wearables contributorily infringes because, among other things, True Wearables offers to sell and/or sells within the United

-40-

Exhibit 1
Page 41

States, and/or imports into the United States, components of the Oxxiom device that constitute material parts of the invention of the asserted claims of the '966 patent, are not staple articles or commodities of commerce suitable for substantial non-infringing use, and are known by True Wearables to be especially made or especially adapted for use in an infringement of the '966 patent.

164.   Upon information and belief, True Wearables' infringement of the '966 patent has been, and continues to be, willful, deliberate, and intentional by continuing its acts of infringement after becoming aware of the '966 patent and its infringement thereof, thus acting in reckless disregard of Masimo's patent rights.

165.   Because of True Wearables' infringement of the '966 patent, Masimo has suffered and will continue to suffer irreparable harm and injury, including monetary damages in an amount to be determined at trial.

166.   Upon information and belief, unless enjoined, True Wearables, and/or others acting on behalf of True Wearables, will continue their infringing acts, thereby causing additional irreparable injury to Masimo for which there is no adequate remedy at law.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for judgment in its favor against Defendants for the following relief:

A.      Pursuant to 35 U.S.C. § 271, a determination that True Wearables and its officers, agents, servants, employees, attorneys and all others in active concert and/or participation with them have infringed each of the '564, '271, '866 and '966 patents through the manufacture, use, importation, offer for sale, and/or sale of infringing products and/or any of the other acts prohibited by 35 U.S.C. § 271;

-41-

Exhibit 1
Page 42

B. Pursuant to 35 U.S.C. § 283, an injunction enjoining True Wearables and its officers, agents, servants, employees, attorneys and all others in active concert and/or participation with them from infringing the '564, '271, '866 and '966 patents through the manufacture, use, importation, offer for sale, and/or sale of infringing products and/or any of the other acts prohibited by 35 U.S.C. § 271, including preliminary and permanent injunctive relief;

C. Pursuant to 35 U.S.C. § 284, an award compensating Masimo for True Wearables' infringement of the '564, '271, '866 and '966 patents through payment of not less than a reasonable royalty on True Wearables' sales of infringing products;

D. Pursuant to 35 U.S.C. § 284, an award increasing damages up to three times the amount found or assessed by the jury for True Wearables' infringement of each of the '564, '271, '866 and '966 patents in view of the willful and deliberate nature of the infringement;

E. Pursuant to 35 U.S.C. § 285, a finding that this is an exceptional case, and an award of reasonable attorneys' fees and non-taxable costs;

F. An assessment of prejudgment and post-judgment interest and costs against True Wearables, together with an award of such interest and costs, pursuant to 35 U.S.C. § 284;

G. That Defendants, and each of them, be adjudged to have misappropriated Plaintiffs' trade secrets in violation of the United States Defense of Trade Secrets Act of 2016, 18 U.S.C. §§ 1836 *et seq.*, and that True Wearables acts in doing so be adjudged willful, malicious, and done knowingly;

H. That Defendants, and each of them, be adjudged to have misappropriated Plaintiffs' trade secrets in violation of the California Uniform Trade Secrets Act, Cal. Civ. Code § 3426 *et seq.*, and that Lamego's acts in doing so be adjudged willful, malicious, oppressive, and done knowingly

-42-

Exhibit 1
Page 43

I. That Lamego be adjudged to have breached the Masimo Agreements, and that Lamego's acts in doing so be adjudged willful, malicious, oppressive, and done knowingly;

J. For an order that Lamego specifically perform the Masimo Agreements;

K. For preliminary and permanent injunctions enjoining Lamego from breaching the Masimo Agreements;

L. That Lamego be adjudged to have breached the Cercacor Agreement, and that Lamego's acts in doing so be adjudged willful, malicious, oppressive, and done knowingly;

M. For an order that Lamego specifically perform the Cercacor Agreement;

N. For preliminary and permanent injunctions enjoining Lamego from breaching the Cercacor Agreement;

O. That the Court award Cercacor its actual damages caused by Lamego's breach of his fiduciary duty to Cercacor;

P. That Defendants, and each of them, be adjudged to have been unjustly enriched;

Q. That Defendants and each of them, their respective agents, servants, employees, and attorneys, and all those persons in active concert or participation with each of them, be forthwith temporarily, preliminarily, and thereafter permanently required to return all of Plaintiffs' trade secrets and confidential information and enjoined from further using and disclosing to any third parties any of Plaintiffs' trade secrets and confidential information;

R. That Defendants, their respective agents, servants, employees, and attorneys, and all those persons in active concert or participation with Defendants, be forthwith temporarily, preliminarily, and thereafter permanently required to

Exhibit 1
Page 44

1  return all of Plaintiffs' trade secrets and enjoined from further using and disclosing
2  to any third parties any of Plaintiffs' trade secrets;

3        S.      That Defendants be enjoined from selling or offering to sell any
4  product, including True Wearables Oxxiom product, that includes or uses any of
5  Plaintiffs' trade secrets;

6        T.      That Defendants, and each of them, be directed to file with this Court
7  and to serve on Plaintiffs within thirty (30) days after the service of the injunction,
8  a report in writing, under oath, setting forth in detail the manner and form in which
9  Defendants, and each of them, have complied with the injunction;

10       U.      That Defendants, and each of them, be required to account to
11  Plaintiffs for any and all gains, profits, and advantages derived by each of them,
12  and all damages sustained by Plaintiffs, by reason of Defendants' acts complained
13  herein;

14       V.      That Plaintiffs be awarded exemplary damages from Defendants, and
15  each of them, pursuant to Cal. Civ. Code §§ 3294 and 3426.3(c);

16       W.      An award of taxable costs; and

17       X.      That this Court award such other and further relief as this Court
18  may deem just.

19                                     Respectfully submitted,

20                                     KNOBBE, MARTENS, OLSON & BEAR, LLP

21
22  Dated:  November 8, 2018        By: */s/ Brian C. Claassen*
                                        Joseph R. Re
23                                      Stephen C. Jensen
                                        Irfan A. Lateef
24                                      Brian C. Claassen

25                                      Attorneys for Plaintiffs,
                                        Masimo Corporation and
26                                      Cercacor Laboratories, Inc.

27

28

                                     -44-

Exhibit 1
Page 45

# **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs Masimo Corporation and Cercacor Laboratories, Inc., hereby demand a trial by jury on all issues so triable.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  November 8, 2018        By: */s/ Brian C. Claassen*

Joseph R. Re
Stephen C. Jensen
Irfan A. Lateef
Brian C. Claassen

Attorneys for Plaintiffs,
Masimo Corporation and
Cercacor Laboratories, Inc.

-45-

Exhibit 1
Page 46