# EXHIBIT A

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

## FORM 10-K

**(Mark One)**

☒   **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the Fiscal Year Ended December 31, 2021**

OR

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For transition period from        to**

**Commission file number 001-40735**



# Rockley Photonics Holdings Limited

(Exact name of Registrant as specified in its charter)

| **Cayman Islands** | **98-1644526** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |

3rd Floor, 1 Ashley Road

Altrincham, Cheshire

WA14 2DT, United Kingdom

+44 (0) 1865 292017

(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol | Name of each exchange on which registered |
|---|---|---|
| Ordinary shares, $0.000004026575398 par value per share | RKLY | New York Stock Exchange |
| Warrants, each whole warrant exercisable for one ordinary share at an exercise price of $11.50 per share | RKLY.WS | New York Stock Exchange |

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the Registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the Registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☒ |

If an emerging growth company, indicate by check mark if the Registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 7(a)(2)(B) of the Securities Act. ☐

Indicate by check mark whether the Registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☐

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act): Yes ☐ No ☒

The aggregate market value of voting stock held by non-affiliates of the Registrant on August 12, 2021, based on the closing price of $15.33 for shares of the Registrant's ordinary shares as reported by the New York Stock Exchange, was approximately $1.2 billion. The Registrant has elected to use August 12, 2021, which was the date of its initial listing of ordinary shares, as the calculation date because on June 30, 2021 (the last business day of the Registrant's most recently completed second fiscal quarter), the Registrant was a privately held company.

As of March 3, 2022, there were 128,470,241 shares of the Registrant's ordinary shares, par value $0.000004026575398, issued and outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the Registrant's definitive Proxy Statement relating to the 2022 Annual Meeting of Stockholders are incorporated herein by references in Part III of this Annual Report on Form 10-K to the extent stated herein. Such Proxy Statement will be filed with the Securities and Exchange Commission within 120 days of the Registrant's fiscal year ended December 31, 2021.

**TABLE OF CONTENTS**

| | Page |
|---|---|
| Cautionary Note Regarding Forward-Looking Statements | |
| Risk Factor Summary | |
| **Part I** | |
| Item 1. Business | 1 |
| Item 1A. Risk Factors | 21 |
| Item 2. Properties | 50 |
| Item 3. Legal Proceedings | 50 |
| Item 4. Mine Safety Disclosures | 50 |
| **Part II** | |
| Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 51 |
| Item 6. Selected Financial Data | 51 |
| Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations | 51 |
| Item 7A. Quantitative and Qualitative Disclosures About Market Risk | 65 |
| Item 8. Financial Statements and Supplementary Data | 66 |
| Item 9. Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 102 |
| Item 9A. Controls and Procedures | 102 |
| Item 9B. Other Information | 103 |
| Item 9C. Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 103 |
| **Part III** | |
| Item 10. Directors, Executive Officers and Corporate Governance | 104 |
| Item 11. Executive Compensation | 104 |
| Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 104 |
| Item 13. Certain Relationships and Related Transactions, and Director Independence | 104 |
| Item 14. Principal Accounting Fees and Services | 104 |
| **Part IV** | |
| Item 15. Exhibits, Financial Statement Schedules | 105 |
| Item 16. Form 10–K Summary | 106 |
| Signatures | 107 |

Page A3

Exhibit A
-4-

Table of Contents



4

Table of Contents





www.rockleyphotonics.com

5

Table of Contents



6

Table of Contents



7

Table of Contents

**PART I**

**Item 1.      Business**

**INFORMATION ABOUT ROCKLEY**

*The following discussion contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. When used in this section, the terms "may," "might," "will," "objective," "intend," "should," "could," "can," "would," "expect," "believe," "estimate," "predict," "potential," "plan," "anticipate," "seek," "future," "strategy," "likely," or the negative of these terms, and similar expressions are intended to identify forward-looking statements. These forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause our actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by these or any other forward-looking statements. These risks and uncertainties include, but are not limited to, those risks set forth under "Risk Factors." Readers are cautioned not to place undue reliance on these forward-looking statements, which are based on current expectations and reflect management's opinions only as of the date hereof. These forward-looking statements speak only as of the date of hereof. Company expressly disclaims any obligation or undertaking to release publicly any updates or revisions to any forward-looking statements contained herein to reflect any change in our expectations with regard thereto or any changes in events, conditions or circumstances on which any such statement is based.*

Rockley®, RayDriver™, RPFabric™, RPStack™, Topanga™, LightDriver™, SpectraCloud™, SpectraSense™, VitalSpex™, Bioptx™, and clinic-on-the-wrist™ are among the trademarks, registered trademarks, or service marks owned by Rockley.

**Company Overview**

We have developed a comprehensive range of silicon photonics technologies that have both the power and the flexibility to support a wide range of potential applications. Our silicon-phonics platform will incorporate several key components to support these solutions, including photonic integrated circuits and associated modules, sensors, and end-to-end solutions. We expect that our immediate focus over the next two years will be on developing and commercializing our products for incorporation in consumer wearables, medical devices, and dedicated solutions for the healthcare market. As testament to the relevance of our product development, we have captured the attention of several consumer electronics companies and, as of the date of this Annual Report on Form 10-K, we have non-binding memoranda of understanding ("MOUs") or development and supply agreements with entities that collectively account for over 60% market share of wearable devices, including six of the top 10 consumer wearables companies. These agreements will help shape our development of our consumer and medical device capabilities.

The summation of our technologies and manufacturing expertise is Rockley's "cohesive end-to-end platform." Our end-to-end platform encompasses photonic integrated circuits ("PICs") in silicon with integrated III-V devices (devices incorporating certain conductor elements that offer superior electronic properties, such as lasers), application-specific electronic integrated circuits ("ASICs"), and photonic and electronic co-packaging, which are all supported by and coupled with biosensing algorithms, AI, cloud analytics, firmware/software, system architecture, and hardware design.

With this unique sensing platform, we believe we can reshape several important markets of the healthcare sector such as consumer wellness, long term health trend monitoring, patient monitoring, early disease detection, nutrition management and the treatment of certain chronic diseases. Our biosensing platform will enable multiple applications using our non-invasive, continuous, multi-modal biomarker monitoring capabilities.

Our end-to-end solutions include hardware with the potential to detect multiple biomarkers, related algorithms, and cloud-based analytics and artificial intelligence ("AI"). We have shipped early engineering samples to some of our customers to support research and development efforts.

Our platform has been built upon our silicon photonics technology, which enables highly advanced sensor performance, power, resolution, and formfactor. This technology has the potential to allow monitoring devices, currently the size of clinical laboratory machines, to be miniaturized to the size of a wearable device. We believe that this miniaturization capability has the potential to unlock additional applications in consumer electronics and medical devices. Our technology is built on over 190 patents, over eight years of product development, and over approximately $450 million in total funding as of the date of this Annual Report on Form 10-K, through the issuance of convertible loan notes and ordinary shares.

Our target biomarkers for consumer healthcare include lactate, alcohol, glucose (indicator), hydration, blood pressure, blood oxygen, and core body temperature, among others. Our lasers will deliver an extremely high level of performance,

1

Table of Contents

supporting up to 1,000,000 times higher resolution, 1,000 times higher accuracy, and 100 times broader range in wavelengths than existing LED offerings in wearable solutions (based on product analysis undertaken by Rockley comparing the Rockley silicon photonics-based spectrometer chip to existing solutions). With this performance, we believe that Rockley's platform will be able to address existing applications in consumer wearable and medical devices with significantly higher resolution, accuracy, and range.

We have established a manufacturing ecosystem based upon our wholly-owned, proprietary processes in several areas. We believe that this manufacturing ecosystem will support rapid scalability, providing us with a significant competitive advantage.

As we do not currently have any products in commercial production, our current customer relationships are in the following stages: (a) customers with whom we are "engaged," or in discussions with, regarding potential product features for incorporation into such customer's end products, or (b) customers with whom we are "contracted," where we have non-binding MOUs or development and supply agreements. These MOUs and development and supply agreements provide a general framework for our transactions with the customer and typically provide that we will develop and deliver new products meeting the customer's specifications. There are no binding purchase commitments under our MOUs and supply agreements. We currently anticipate that sales of our products will be primarily made pursuant to standard purchase orders, which orders may be cancelled, reduced, changed, or rescheduled with little or no notice or penalty. Our ability to grow our business will depend on our ability to attract and retain customers with whom we are engaged in discussions only and successfully transition such customers to contracted customers with whom we have MOUs or development and supply agreements, and to otherwise attract new customers.

Our mission is to address many pressing healthcare concerns using our technology, and we believe that there exists a large market opportunity for our platform. We estimate that the total addressable market ("TAM") for the consumer wearables, mobile device, and medical device markets is projected to be over $48 billion by 2025, based on data sourced from IDC, as the universe of healthcare and consumer wearable devices incorporating additional sensing capabilities emerges. Our products are being designed for utilization in: (a) medical devices, including blood pressure, body temperature, blood glucose, and alcohol monitoring devices, pulse oximetry, and near infra-red ("NIR") spectrometers, with an aggregate forecasted TAM of $15.1 billion by 2025, according to the Yole Report, and mobile cardiac telemetry/general patient monitoring patch devices, with an aggregate forecasted TAM of $2.7 billion by 2025, according to the IDtechEx Report; and (b) consumer wearables and mobile devices, including smartwatches, smart earbuds, fitness bands, and mobile phones, which, based on our internal estimates, are expected to have a TAM of $2.7 billion, $3.0 billion, $1.5 billion, and $23.5 billion, respectively, or an aggregate TAM of $30.7 billion, by 2025. We estimated our TAM in the consumer wearables and mobile device sectors by multiplying third-party forecasted total volumes in 2025 for the devices for which our products are being designed, by our currently anticipated and estimated average selling prices for these products. The volume estimate for smartwatches was based on the benchmarked figure forecasted by annual volume for smartwatches for 2022 according to the TrendForce Report. The volume estimate for smart earbuds was based a 20% volume CAGR between 2020-2025, with 2020 annual shipments estimated at 230 million units, according to the TrendForce Report. According to the Yole Report, fitness bands were forecasted to reach 89 million units by 2025. The volume estimates for smartphones were based on multiple third-party forecasted volumes for mobile phones, multiplied by the average selling price.

**Product Applications and Development Status**

We believe that our innovative and differentiated silicon photonics platform positions us to make photonics-based solutions increasingly pervasive, while unlocking previously unaddressed applications. Consequently, we believe that the potential applications for our technology will be wide-ranging. Leveraging the flexibility and power of our innovative silicon photonics platform, we believe that we are positioned to become a leading supplier of end-to-end solutions (including integrated optical components, algorithms, data analytics, and AI) for dynamic, high-growth market sectors, including consumer sensors, medtech and healthcare.

2

Table of Contents

*Figure 1: Rockley end-to-end sensing platform*



To date, we have been engaged in developing customer-specific designs of our silicon photonics chipsets and modules for incorporation into our consumer electronics customers' end products. We are working with leading customers in the medtech market to deliver a standalone wrist-wearable product for targeted use cases. In parallel, we are shaping and developing our own standard offerings that could have different shapes and form factors. Currently, we do not have any of our own end products in commercial production. We have started delivering samples to strategic customers, and we intend to deliver final samples and begin production of these products in the second half of 2022. During 2022, our aim is to build a collaboration model for our AI/analytics cloud platform before proceeding to a commercial launch of a subscription platform, planned for the first half of 2023.

*Figure 2: Product development and commercial roadmap*



**Healthcare: Consumer Wearables**

We believe the high-density optical integration capabilities of our platform can personalize healthcare monitoring of multiple biomarkers and can significantly improve how individuals track and monitor their health and well-being. Our VitalSpex™ biomarker sensing platform will address the consumer wearable market. Further, as part of our product offering, we believe that our cloud-based analytics and AI platform will offer further insight by leveraging data collected through our unique and broad sensing platform and will provide meaningful and actionable insights to end users. Our plans for the VitalSpex™ biomarker sensing platform include a Baseline module and a Pro module, each of which will have a wide array of current and potential applications, as shown in the figure below. Depending on the needs of each customer and market trends, multiple generations of products could be built on each of these platforms addressing different set of biomarkers, form factors, performance specifications, and potential use cases.

3

Table of Contents

*Figure 3: Targeted biomarker sensing capabilities*



These products are intended to address the needs of the consumer market and will provide information about general health and wellness. (i.e., they do not require regulatory approval for offered applications and end uses.) As we move forward, we intend to monitor and comply with regulations to the extent they become applicable to us, including any requirements for clearance by the U.S. Food and Drug Administration (FDA) and/or other regulatory bodies.

**Healthcare: Medical Devices**

Our Bioptx™ healthcare sensing platform will address the medical and professional healthcare market. We plan to incorporate our biomarker sensing technology into existing devices (such as medical patches, wearable bands, and other monitoring devices) to provide additional biomarker sensing capabilities not currently available to consumers. Also, as part of the Bioptx product offering, we intend to deliver a complete standalone finished product with targeted use cases for healthcare and health monitoring.

We believe that these product offerings will enhance point-of-care and remote monitoring and will have the potential to ultimately transform and disrupt the delivery of patient monitoring and healthcare. In the medical device space, we currently anticipate that we will develop two types of devices: an advisory device that will not need regulatory clearance and a clinical device that will need regulatory clearance from the FDA or other regulatory bodies.

These products are still under development. Even though there can be no assurance that these product development efforts will succeed or that, even if developed, these products will be approved by regulators or achieve widespread market acceptance, we believe that there are significant market opportunities in addition to our consumer wearables applications.

4

Table of Contents

software in a certain manner. In the event that portions of its software are determined to be subject to an open source license, Rockley could be required to publicly release the affected portions of its source code, re-engineer all, or a portion of, that software or otherwise be limited in the licensing of its software, each of which could reduce or eliminate the value of its product. Many of the risks associated with usage of open source software cannot be eliminated, and could negatively affect its business, results of operations, and financial condition.

## Customer-Related Risks

***Rockley currently has, and intends to target, customers and suppliers that are large corporations with substantial negotiating power, exacting product, quality, and warranty standards, and potentially competitive internal solutions. If Rockley is unable to sell its products to these customers or is unable to enter into agreements with customers and suppliers on satisfactory terms, its prospects and results of operations will be adversely affected.***

Many of Rockley's customers and suppliers, and potential customers, are large corporations with substantial negotiating power relative to it and, in some instances, may have internal solutions that are competitive to Rockley's products. Many of these large corporations that are customers or potential customers also have significant development resources, which may allow them to acquire or develop independently, or in partnership with others, competitive technologies. Meeting the technical requirements and securing design wins with any of these companies will require a substantial investment of Rockley's time and resources. Rockley cannot assure you that its products or technology will secure design wins from these or other companies or that it will generate meaningful revenue from the sales of its products to these key customers and potential customers. If Rockley's products are not selected by these large corporations or if these corporations develop or acquire competitive technology, it will have an adverse effect on Rockley's business.

***Rockley currently depends on a few large customers for a substantial portion of its revenue. The loss of, or a significant reduction in, orders from Rockley's customers, including its largest customer, could significantly reduce its revenue and adversely impact Rockley's operating results.***

Rockley believes that its operating results for the foreseeable future will continue to depend to a significant extent on revenue attributable to a few large customers, including Apple Inc., Rockley's largest customer, and Hengtong Rockley Technology Co., Ltd. ("HRT"), its second largest customer. Rockley's two largest customers collectively accounted for 82% and 100% of Rockley's revenue in 2021 and 2020, respectively. Revenue attributable to Rockley's largest customer accounted for the majority of its revenue in 2021 and 2020, respectively. Rockley anticipates revenue attributable to this customer will fluctuate from period to period, although it expects to remain dependent on this customer for a significant portion of its revenue for the foreseeable future. Rockley has a master supply and development agreement with this customer, which provides a general framework for Rockley's transactions with it. This agreement continues until either party terminates for material breach. Under this agreement, Rockley has agreed to develop and deliver new products to this customer at its request, provided it also meets Rockley's business purposes, and has agreed to indemnify it for intellectual property infringement or any injury or damages caused by Rockley's products. This customer does not have any minimum or binding purchase obligations to Rockley under this agreement and could elect to discontinue or reduce making purchases from Rockley with little or no notice.

HRT is a joint venture (the "JV") formed by Rockley with Jiangsu Hengtong Optic-Electric Co., Ltd. ("Hengtong"), a subsidiary of Hengtong Group, Co., Ltd., in 2017. Under the Sino-Foreign Equity Joint Venture Contract dated December 19, 2017 by and between Hengtong and Rockley Photonics Ltd, a wholly-owned subsidiary of Rockley (the "JV Agreement") and the related technology development agreement and license agreement, HRT must procure chipsets from Rockley for use in finished products and HRT owns the copyright in the final designs. HRT has a license to the underlying intellectual property in the reference designs and Rockley has certain non-compete obligations under the JV Agreement. During the years ended December 31, 2021 and 2020, Rockley made sales to HRT of $0.3 million and $5.3 million, respectively. See "*Certain Relationships and Related Party Transactions – Rockley – Hengtong JV*" and Notes 4 and 13 to the notes to Rockley's consolidated financial statements included elsewhere in this Annual Report on Form 10-K.

In addition, customers may seek to enter into licensing arrangements in lieu of product purchases, which could negatively impact Rockley's revenue, and, to a lesser extent, Rockley's gross margins. If Rockley's customers were to choose to work with other manufacturers or its relationships with its customers is disrupted for any reason, it could have a significant negative impact on Rockley's business. Any reduction in sales attributable to Rockley's larger customers would have a significant and disproportionate impact on Rockley's business, financial condition, and results of operations.

Rockley's customers, or the distributors through which it sells to these customers, may choose to use products in addition to Rockley's, use a different product altogether, or develop an in-house solution. Any of these events could significantly harm its business, financial condition, and results of operations. In addition, if Rockley's distributors' relationships with Rockley's

Page A12

Exhibit A
-13-

Table of Contents

end customers, including its larger end customers, are disrupted for inability to deliver sufficient products or for any other reason, it could have a significant negative impact on Rockley's business, financial condition, and results of operations.

***Rockley is dependent in part upon its relationships and alliances with industry participants to generate revenue, which involves risks and uncertainties.***

Rockley has, and in the future may, acquire interests in joint ventures, which may subject Rockley to risk because, among other things, Rockley cannot exercise sole decision-making power and its partners may have different economic interests than Rockley has. For example, Rockley currently holds a 24.9% share in a strategic joint venture with another industry participant and is currently in discussions regarding potential licensing of technology to the joint venture in return for future payments. Rockley is therefore dependent on the successful execution of a licensing agreement with this joint venture partner to generate additional revenue. Rockley may also acquire interests in other joint ventures with third parties. There are additional risks involved in joint venture transactions. For example, as a co-investor in a joint venture, Rockley may not be in a position to exercise sole decision-making authority relating to the joint venture or other entity. As a result, the operations of any joint venture are subject to the risk that third parties may make business, financial, or management decisions with which Rockley does not agree, or the management of the joint venture may take risks or otherwise act in a manner that does not serve Rockley's interests. Further, there may be a potential risk of impasse in some business decisions because Rockley may not be in a position to exercise sole decision-making authority. In such situations, it is possible that Rockley may not be able to exit the relationship because it may not have the funds necessary to complete a buy-out of the other partner or it may be difficult to locate a third-party purchaser for its interest. Because Rockley may not have the ability to exercise control over such operations, it may not be able to realize some or all of the benefits that it believes will be created from its involvement. In addition, there is the potential that a joint venture partner may become bankrupt or have divergent, conflicting, or inconsistent economic or business interests from Rockley. This could result in, among other things, exposing Rockley to liabilities of the joint venture in excess of its proportionate share of these liabilities. If any of the foregoing were to occur, Rockley's business, financial condition, and results of operations could suffer.

***If Rockley is unable to expand or further diversify its customer base, its business, financial condition, and results of operations could suffer.***

Rockley currently expects the composition of its largest customers to vary over time, and that revenue attributable to its largest customers in any given period may decline over time. Rockley's relationships with existing customers may deter potential customers who compete with these customers from buying Rockley's products. If Rockley is unable to expand or further diversify its customer base, it could harm its business, financial condition, and results of operations.

Rockley does not currently have any products in commercial production. Accordingly, Rockley views its current customer relationships in the following stages: (a) customers with whom it is "engaged", or in discussions with, regarding potential product features for incorporation into such customer's end products or (b) customers with whom it is "contracted" where Rockley has non-binding MOUs or development and supply agreements. These non-binding MOUs and development and supply agreements provide a general framework for Rockley's transactions with the customer and typically provide that Rockley will develop and deliver new products meeting the customer's specifications. These agreements do not contain any minimum or binding purchase obligations. If Rockley is unable to transition customers with whom it is engaged in discussions to contracted customers or if Rockley fails to otherwise attract new customers, it would negatively impact Rockley's ability to grow its business and gain market share, which in turn would harm Rockley's financial condition and results of operations.

***Because Rockley does not anticipate long-term purchase commitments with its customers, orders may be cancelled, reduced, or rescheduled with little or no notice, which in turn exposes Rockley to inventory risk, and may cause its business and results of operations to suffer.***

Rockley anticipates that its products will be sold directly to customers as well as through distributors and resellers, with, in certain cases, no long-term or minimum purchase commitments from them or their end customers. Rockley expects that sales of its products will be primarily made pursuant to standard purchase orders, which orders may be cancelled, reduced, changed, or rescheduled with little or no notice or penalty. Cancellations of orders could result in the loss of anticipated sales without allowing Rockley sufficient time to reduce its inventory and operating expenses. In addition, changes in forecasts or the timing of orders from its customers expose Rockley to the risks of inventory shortages or excess inventory. As a result, Rockley's revenue and operating results could fluctuate materially and could be materially and disproportionately impacted by purchasing decisions of Rockley's customers, including Rockley's larger customers. In the future, Rockley's customers or its distributors or their end customers may decide to purchase fewer units than expected, may alter their purchasing patterns at any time with

# EXHIBIT B



03-11-22

# Rockley Photonics is developing a wearable to track blood sugar

Rockley Photonics, whose sensors help power the Apple Watch, is working to deliver a game-changing development in health tech.



[Source photos: YuLi4ka/Getty Images; Sebastian Dumitru/Unsplash]



**BY RUTH READER**
4 MINUTE READ

A deal between two little-known companies—at least, to the public—could bring to the market something that health experts have for years considered the holy grail of wellness: glucose-monitoring capabilities on wearable tech.

Exhibit B
-15-

Rockley Photonics, the California-based maker of the biosensors used in Apple devices, announced Thursday a partnership with Medtronic, the medical device manufacturer headquartered in Minnesota to scale a health wearable that can detect a bevy of health metrics, including glucose, or sugar, levels. That may sound boring, but being able to detect glucose levels without a blood sample or an implant is a big deal—one that has the potential to save a lot of lives.

Rockley Photonics has previously designed and tested a wrist-worn health wearable, called the Bioptx, which can detect glucose trends along with body temperature, blood pressure, body hydration, alcohol, and lactate. The Bioptx is built to last several days between charging and only monitors biometrics. (You cannot email from the device or take a call.) But the Bioptx has not yet been made widely available to the general public; the new partnership with Medtronic will help scale manufacturing of Rockley's technology and run the clinical trials necessary to gain approval from the Food and Drug Administration (FDA).



Rockley Bioptx [Photo: Rockley Photonics]

"We're very much engaged in that market and working on designing our technology into leading companies in the consumer space and into their future generations of products," says Rockley CEO Andrew Rickman.

Health has historically been thought about in the context of disease. Obesity has long been used as an indicator for understanding a person's risk of common diseases like heart disease, stroke, and type 2 diabetes (a trifecta known as metabolic syndrome). There are other associations like high blood sugar

Exhibit B
-16-

and high cholesterol, but weight, perhaps the most visible of signals, became a target for addressing poor health. That is changing as researchers are realizing that health can be measured in many ways, and heavy. It turns out you don't need to be lean to be healthy (and—shocker!—you can be skinny and unwell).

Blood sugar is now one of the key metrics for understanding health in people who are at risk of developing some of the most common diseases. High blood sugar puts people at risk of diabetes, yes, but also blood vessel, nerve, organ, and tissue damage—all of which increase risk of heart attack, stroke, kidney disease, and blindness, according to the Cleveland Clinic. A class of startups, including January AI, Levels, Signos, and Supersapiens have cropped up to help people who are not diagnosed with diabetes get a handle on their blood sugar by tracking it with a continuous glucose monitor, but that tech relies on needles and bulky external devices.

Current wearable glucose monitors detect glucose levels through the body fluid that runs between cells. It requires injecting a piece of filament into your arm through a needle, a process that's not painful so much as it is jarring (especially for anyone with a fear of needles). Everyone agrees that being able to slap a smartwatch on your wrist to track glucose would be a far better experience, but it has been difficult to miniaturize the necessary technology.

Rockley has figured out a way to make the necessary sensors small enough to fit on a wrist and developed machine learning to better understand a person's glucose reading. It built a chip-based spectrophotometer, which means it can use a variety of light sources to measure biometrics through skin. The company then uses artificial intelligence to understand what those sugar levels mean within the context of an individual to answer whether their sugar is too high, too low, or average.

Exhibit B
-17-



[Photo: Rockley Photonics]

Now it needs to get the technology produced at scale, sold into health systems, and begin the process of seeking FDA approval. That's why it's partnering with Medtronic. "The med-tech market is actually moving faster for us than the consumer market," says Rickman. "We're finding traction in that market pre-FDA qualification of our devices, because the medical market wants to get the benefit of monitoring patients."

Even without FDA approval, he says, doctors want to be able to offer patients remote monitoring technology, not to make medical decisions, but so that they can have some sort of barometer for understanding their own health as they follow doctors' orders.

Through the deal with Medtronic, Rockley will be in "volume production" in the fourth quarter of this year, according to Rickman, meaning these devices will start making their way into health systems next year. But the technology also has implications for future consumer-level devices like the Apple Watch.

Apple has reportedly been trying to get this technology into its watches for years without success, and a 2021 Securities and Exchange Commission filing shows that Apple is Rockley Photonics' largest customer.

Maybe the suits in Cupertino are waiting to bring Rockley's tech to their Apple Watch—though they'll need to fix battery-life issues first. For healthcare applications, like glucose monitoring, that are taking

Exhibit B
-18-

place continuously in the background, battery life is key. "It's just not feasible to charge the device every day, Rickman says. "It's got to be much longer than you get on a smartwatch."

# FAST COMPANY

FOLLOW   LOGIN

## ABOUT THE AUTHOR

Ruth Reader is a writer for *Fast Company*. She covers the intersection of health and technology. More

# IMPACT

**IMPACT**
**At Google's new campus, 'dragonscale' solar panels capture sunlight from all different angles**

**IMPACT**
**There's a hidden, huge source of emissions companies are ignoring: their banking**

**IMPACT**
**How family farmers are working to get federal support for regenerative agriculture**

# NEWS

**NEWS**
**Why America's baby formula crisis is an entirely self-inflicted problem**

**NEWS**
**Dire baby formula shortage prompts a legislative response from House Democrats**

**NEWS**
**What's happening with Tether? Investors flee amid fears of the next stablecoin crisis**

# CO.DESIGN

**CO.DESIGN**
**See Lego's stunning new set, which turns Van Gogh's 'Starry Night' into 3D art**

**CO.DESIGN**
**Today's top design innovators have it all wrong. Here's how to think bigger**

**CO.DESIGN**

5/21/22, 8:38 PM                                    Apple partner is developing a wearable to track blood sugar

See the cutting-edge tech turning government buildings into lean, green machines



WORK LIFE

**Why the 9-to-5 schedule has lost its place in the workplace**

WORK LIFE

**Considering professional development? Maybe prioritize this instead**

WORK LIFE

**Chef Kwame Onwuachi's debut cookbook is a taste of Black America**

Advertise  |  Privacy Policy  |  Terms  |  Notice of Collection  |  Do Not Sell My Data  |  Permissions  |  Help Center  |  About Us  |  Site Map  |  Fast Company & Inc © 2022 Mansueto Ventures, LLC    ▷

Exhibit B
-20-

# EXHIBIT C

1

1

2

3

4                 UNITED STATES DISTRICT COURT

5                CENTRAL DISTRICT OF CALIFORNIA

6                     SOUTHERN DIVISION

7                         - - -

8        THE HONORABLE JAMES V. SELNA, JUDGE PRESIDING

9

        MASIMO CORPORATION, et al.,   )CERTIFIED TRANSCRIPT
10                      Plaintiffs, )
            vs.                      )
11                                   )  SACV-18-02001-JVS
        TRUE WEARABLES, INC., et al., )
12                      Defendants. )  TRIAL DAY 4
        ------------------------------)
13

14

15        REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                 Santa Ana, California

17                   March 18, 2022

18

19                     SHARON A. SEFFENS, RPR
                       United States Courthouse
20                     411 West 4th Street, Suite 1-1053
                       Santa Ana, CA  92701
21                     (714) 543-0870

22

23

24

25

        SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

Exhibit C
-21-

2

```
 1   APPEARANCES OF COUNSEL:

 2   For the Plaintiffs:

 3   JOSEPH R. RE
     STEPHEN C. JENSEN
 4   BRIAN CHRISTOPHER CLAASEN
     IRFAN LATEEF
 5   KNOBBE MARTENS OLSON & BEAR, LLP
     2040 Main Street, 14th Floor
 6   Irvine, CA  92614
     (949) 760-0404
 7
     For the Defendants:
 8
     PETER A. GERGELY
 9   MERCHANT & GOULD, PC
     767 Third Avenue, Suite 23C
10   New York, NY  10017
     (212) 223-6520
11
     PAIGE S. STRADLEY
12   MERCHANT & GOULD, PC
     150 South Fifth Street, Suite 2200
13   Minneapolis, MN  55402
     (612) 332-5300
14
     RYAN J. FLETCHER
15   KRISTEN M. GEARY
     MERCHANT & GOULD, PC
16   1801 California Street, Suite 3300
     Denver, CO  80202
17   (303) 357-1670

18   SCOTT P. SHAW
     MERCHANT & GOULD, PC
19   611 Wilshire Boulevard, Suite 808
     Los Angeles, CA  90017
20   (303) 357-1670

21

22

23

24

25
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

Exhibit C
-22-

| | | | |
|---|---|---|---|
| 11:51 | 1 | Q | Good morning, Mr. Dalvi. |
| 11:51 | 2 | A | Good morning. |
| 11:51 | 3 | Q | My name is Irfan Lateef.  We have met before? |
| 11:51 | 4 | A | Sorry.  Your name? |
| 11:51 | 5 | Q | Irfan Lateef. |
| 11:51 | 6 | A | Okay. |
| 11:51 | 7 | Q | You left Cercacor in 2020; is that correct? |
| 11:51 | 8 | A | Yes. |
| 11:51 | 9 | Q | Okay.  Are you currently employed? |
| 11:51 | 10 | A | Yes. |
| 11:51 | 11 | Q | Where do you currently work? |
| 11:51 | 12 | A | Can you repeat that? |
| 11:51 | 13 | Q | Where do you currently work? |
| 11:51 | 14 | A | The company is called Rockley Photonics. |
| 11:51 | 15 | Q | Now, does Rockley Photonics make products for wearable |
| 11:51 | 16 | | noninvasive monitoring? |
| 11:52 | 17 | A | I believe this is confidential information. |
| 11:52 | 18 | Q | You believe that's confidential information? |
| 11:52 | 19 | A | I believe so.  I believe you are guessing. |
| 11:52 | 20 | | THE COURT:  Sir, I will seal the courtroom and |
| 11:52 | 21 | | declare that your testimony is subject to the protective |
| 11:52 | 22 | | order in this case. |
| 11:52 | 23 | | THE WITNESS:  Sorry.  I can't hear you that well. |
| 11:52 | 24 | | THE COURT:  I'm going to close the courtroom.  We |
| 11:52 | 25 | | have a protective order in this case that restricts the |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

Exhibit C
-23-

| | | |
|---|---|---|
| 11:52 | 1 | highly confidential information from dissemination.  I'm |
| 11:52 | 2 | going to put your testimony under that, so your testimony |
| 11:52 | 3 | will be screened from the public. |
| 11:52 | 4 | So you need to answer the questions.  Your company |
| 11:52 | 5 | is having all the protection that anybody else's |
| 11:52 | 6 | confidential information has.  So you need to answer the |
| 11:52 | 7 | question. |
| 11:52 | 8 | THE WITNESS:  Thank you, sir.  So I answer now? |
| 11:52 | 9 | THE COURT:  Yes, please. |
| 11:52 | 10 | (The following portion was under seal:) |
| 11:52 | 11 | (The entirety of Mr. Dalvi's testimony |
| 11:52 | 12 | was unsealed on page 111, line 22.) |
| 11:52 | 13 | THE WITNESS:  The device that is made over there |
| 11:52 | 14 | is possible to be used in a wearable device. |
| 11:52 | 15 | BY MR. LATEEF: |
| 11:52 | 16 | Q   Okay.  That would include the calculation of pulse |
| 11:53 | 17 | oximetry? |
| 11:53 | 18 | A   I don't know. |
| 11:53 | 19 | Q   So you don't work on any pulse oximetry products at |
| 11:53 | 20 | Rockley Photonics? |
| 11:53 | 21 | A   No. |
| 11:53 | 22 | Q   Do you do any research with LEDs and detecting |
| 11:53 | 23 | noninvasive blood parameters? |
| 11:53 | 24 | A   Can you repeat the question? |
| 11:53 | 25 | Q   Yes.  Do you work on sensors that noninvasively detect |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

Exhibit C
-24-

| | | |
|---|---|---|
| 11:53 | 1 | blood parameters? |
| 11:53 | 2 | A    It's a wearable device, and it has optical devices that |
| 11:53 | 3 | measures tissue parameters, yes. |
| 11:53 | 4 | Q    Okay.  And what are some of those tissue parameters? |
| 11:54 | 5 | A    Temperature and hydration. |
| 11:54 | 6 | Q    Any others? |
| 11:54 | 7 | A    I don't know. |
| 11:54 | 8 | Q    Now, during your deposition that took place in 2020, |
| 11:54 | 9 | you didn't -- sorry.  I'll speak louder. |
| 11:54 | 10 | THE COURT:  Sir, we have an assisted-hearing |
| 11:54 | 11 | device.  Do you think that would help you? |
| 11:54 | 12 | THE WITNESS:  Yeah. |
| 11:54 | 13 | (Witness provided with assisted-hearing device) |
| 11:55 | 14 | THE COURT:  Is that better? |
| 11:55 | 15 | THE WITNESS:  It's better. |
| 11:55 | 16 | THE COURT:  Okay.  Good. |
| 11:55 | 17 | BY MR. LATEEF: |
| 11:55 | 18 | Q    Very good. |
| 11:55 | 19 | A    Would you please repeat the last question, please. |
| 11:56 | 20 | Q    I actually don't remember what my last question was, |
| 11:56 | 21 | but it's okay.  I will go off my notes. |
| 11:56 | 22 | Do you recall your deposition in 2020? |
| 11:56 | 23 | A    I recall some stuff, yeah. |
| 11:56 | 24 | Q    Do you recall that Masimo took your deposition in 2020? |
| 11:56 | 25 | A    Yes. |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

Exhibit C
-25-

102

| | | |
|---|---|---|
| 11:56 | 1 | Q    Okay.  And at that deposition do you recall that you |
| 11:56 | 2 | would not disclose to us where you worked? |
| 11:56 | 3 | A    I did. |
| 11:56 | 4 | Q    Do you recall that? |
| 11:56 | 5 | A    I recall that. |
| 11:56 | 6 | Q    Okay.  Now, do you understand that Rockley Photonics is |
| 11:57 | 7 | a supplier to Apple? |
| 11:57 | 8 | A    I don't know.  If I understand that?  What is the |
| 11:57 | 9 | question? |
| 11:57 | 10 | Q    Do you know that Rockley Photonics is a supplier to |
| 11:57 | 11 | Apple? |
| 11:57 | 12 | A    I don't know.  I know they're our customers, but they |
| 11:57 | 13 | are not under my team.  I don't know all the customers. |
| 11:58 | 14 | Q    But do you know that Apple is a customer? |
| 11:58 | 15 | A    I cannot tell you.  I have no idea. |
| 11:58 | 16 | Q    Do you know who purchases the products that you help |
| 11:58 | 17 | create? |
| 11:58 | 18 | A    There is a new release on the company website, and they |
| 11:58 | 19 | publish who is buying. |
| 11:58 | 20 | Q    Okay.  And have you read that press release? |
| 11:58 | 21 | A    I have. |
| 11:58 | 22 | Q    Okay.  And who are some of the customers listed in that |
| 11:58 | 23 | press release? |
| 11:58 | 24 | A    Medtronics. |
| 11:58 | 25 | Q    Okay.  Are there others that you recall? |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

Exhibit C
-26-

| | | |
|---|---|---|
| 01:47 | 1 | Q    What kind of products? |
| 01:47 | 2 | A    Cuffless blood pressure. |
| 01:47 | 3 | Q    And when did you leave CardieX? |
| 01:47 | 4 | A    In March of 2020. |
| 01:47 | 5 | Q    And several other employees from Masimo or Cercacor |
| 01:47 | 6 | also work at the same company you work for now, correct? |
| 01:47 | 7 | A    That's correct. |
| 01:47 | 8 | Q    And that includes at least Cristiano Dalvi, who just |
| 01:47 | 9 | testified, Phillip Perea, Maria Javier, and Ferdyan Lesmana, |
| 01:47 | 10 | correct? |
| 01:47 | 11 | A    That's correct. |
| 01:47 | 12 | Q    And all of those were people from Cercacor, correct? |
| 01:48 | 13 | A    Not Phillip Perea. |
| 01:48 | 14 | Q    He came from Masimo? |
| 01:48 | 15 | A    That's correct. |
| 01:48 | 16 | Q    Could you turn to your witness statement.  It should be |
| 01:48 | 17 | in the binder that your lawyer gave you.  And look at your |
| 01:48 | 18 | testimony.  It's at page 1 under background. |
| 01:48 | 19 | A    I see. |
| 01:48 | 20 | Q    And you gave several paragraphs, paragraphs 5 through |
| 01:48 | 21 | 12 on your background, correct? |
| 01:48 | 22 | A    That's correct. |
| 01:48 | 23 | Q    And in those paragraphs you did not identify your |
| 01:48 | 24 | current employer, correct? |
| 01:48 | 25 | A    That's correct. |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

Exhibit C
-27-

117

| | | |
|---|---|---|
| 01:48 | 1 | Q    And over two years since you left CardieX, your |
| 01:48 | 2 | LinkedIn profile still says you work for CardieX, correct |
| 01:49 | 3 | A    That's correct. |
| 01:49 | 4 | Q    And during your deposition you refused to identify your |
| 01:49 | 5 | employer, correct? |
| 01:49 | 6 | A    That's correct. |
| 01:49 | 7 | Q    And who is your current employer? |
| 01:49 | 8 | A    Rockley Photonics. |
| 01:49 | 9 | Q    And what is your position there? |
| 01:49 | 10 | A    Senior principal sensing engineer. |
| 01:49 | 11 | Q    So if my memory serves me properly, then, that brings |
| 01:49 | 12 | us to you, Cristiano Dalvi, Ferdyan Lesmana, Maria Javier, |
| 01:49 | 13 | Phillip Perea, and Matthew Paul, all former Cercacor or |
| 01:49 | 14 | Masimo employees that now work for Rockley Photonics, |
| 01:49 | 15 | correct? |
| 01:49 | 16 | A    That's correct. |
| 01:49 | 17 | Q    Did I miss anyone else from Cercacor or Masimo that |
| 01:49 | 18 | works for Rockley Photonics? |
| 01:49 | 19 | A    Howard Chen. |
| 01:49 | 20 | Q    Anybody else? |
| 01:49 | 21 | A    And maybe another person.  Ping Lei. |
| 01:50 | 22 | Q    Anybody else? |
| 01:50 | 23 | A    There is another person.  I don't know the name. |
| 01:50 | 24 | Q    Okay.  And that's all the names you can remember today? |
| 01:50 | 25 | A    That's right. |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

Exhibit C
-28-

01:53    1    Q    And the devices that you're working on are for both the

01:53    2    clinical and consumer side of healthcare management,

01:53    3    correct?

01:53    4    A    That's correct.

01:53    5    Q    And down in paragraph three, do you see paragraph three

01:53    6    a little further down on that page?

01:53    7    A    Yes, I do.

01:53    8    Q    It mentions that wearable devices should be robust,

01:53    9    reliable, and easy to wear, and may include skin contact

01:53   10    patches, wristwatches, rings, earbuds, headbands, and

01:53   11    glasses frames.  Do you see that?

01:53   12    A    Yes.

01:53   13    Q    So you understand the technology that you're working on

01:53   14    has application in those types of wearable devices, correct?

01:53   15    A    Yes, I do.

01:54   16    Q    If you could go to page -- go to page 59 of that

01:54   17    publication and the paragraph 274.  Do you see a list of

01:54   18    parameters there that are listed in that paragraph?

01:54   19    A    Yes.

01:54   20    Q    And that talks about potential applications for this

01:54   21    product you're working on?

01:54   22    A    Yes.

01:54   23    Q    And some of those are PPG, heart rate, heart rate

01:54   24    variability, blood pressure, oxygen saturation, total

01:54   25    hemoglobin, carboxyhemoglobin, methemoglobin, brain

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

Exhibit C
-29-

| | | |
|---|---|---|
| 01:54 | 1 | oximetry -- and the list goes on.  Do you see that? |
| 01:54 | 2 | A    Yes. |
| 01:54 | 3 | Q    Then if you would turn the page, the last entry is |
| 01:54 | 4 | glucose monitoring? |
| 01:54 | 5 | A    Yes. |
| 01:54 | 6 | Q    And at least methemoglobin, carboxyhemoglobin, and an |
| 01:55 | 7 | attempt to do glucose were part of the Rainbow project you |
| 01:55 | 8 | worked on at Cercacor, correct? |
| 01:55 | 9 | A    That's correct. |
| 01:55 | 10 | Q    And in fact, Cercacor had a product that could measure |
| 01:55 | 11 | parameters such as total hemoglobin using the Rainbow |
| 01:55 | 12 | parameters, correct? |
| 01:55 | 13 | A    That's correct. |
| 01:55 | 14 | Q    Now, that wasn't the only patent you were named on at |
| 01:55 | 15 | Rockley, correct, that is now published? |
| 01:55 | 16 | A    I'm not sure. |
| 01:55 | 17 | Q    Okay.  We'll deal with that in a minute. |
| 01:55 | 18 | MR. JENSEN:  Your Honor, given the foundation I've |
| 01:55 | 19 | laid, I would like to move WO202229486A WIPO patent |
| 01:55 | 20 | publication into evidence as an exhibit. |
| 01:55 | 21 | THE COURT:  Does it have an exhibit number? |
| 01:55 | 22 | MR. JENSEN:  It would be Exhibit 3433. |
| 01:55 | 23 | THE COURT:  Any objection? |
| 01:55 | 24 | MS. STRADLEY:  No objection. |
| 01:55 | 25 | THE COURT:  3433 will be received. |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

Exhibit C
-30-

125

| 02:00 | 1 | A     Apple is doing an independent development that is not |
| 02:00 | 2 | from the application side that uses Rockley technology. |
| 02:00 | 3 | Q     So the products you make would be incorporated into |
| 02:00 | 4 | Apple products, correct? |
| 02:00 | 5 | A     That's not correct.  The products that Rockley could |
| 02:00 | 6 | make as a company but not the products that I am working on, |
| 02:00 | 7 | if that makes sense. |
| 02:00 | 8 | Q     That helps.  Okay.  And you are aware that Rockley -- |
| 02:00 | 9 | are you aware that just a week ago Rockley announced a |
| 02:00 | 10 | partnership to develop wearables for Medtronics? |
| 02:00 | 11 | A     Yes. |
| 02:00 | 12 | Q     And you understand that in the medical space Medtronics |
| 02:00 | 13 | is Masimo's much larger competitor, correct? |
| 02:00 | 14 | A     Yes. |
| 02:00 | 15 | Q     Okay.  Now, in your deposition, in LinkedIn, and even |
| 02:01 | 16 | your current testimony I pointed to you before the Court, |
| 02:01 | 17 | you did not mention that you're currently working on |
| 02:01 | 18 | biosensors for consumer and professional use for wearables; |
| 02:01 | 19 | did you? |
| 02:01 | 20 | A     I did not. |
| 02:01 | 21 | Q     Wouldn't you agree that by not disclosing that |
| 02:01 | 22 | information, it would leave the impression that you were a |
| 02:01 | 23 | disinterested third-party witness? |
| 02:01 | 24 | A     I guess I wasn't asked about that information during |
| 02:01 | 25 | the deposition. |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

Exhibit C
-31-

| | | |
|---|---|---|
| 02:01 | 1 | Q    Well, you were asked who your employer was, correct? |
| 02:01 | 2 | A    I was asked who my employer was. |
| 02:01 | 3 | Q    And you refused to provide that information. |
| 02:01 | 4 | A    My employer asked me not to provide that information at |
| 02:02 | 5 | the time. |
| 02:02 | 6 | Q    But it's not secret today who you work for, correct? |
| 02:02 | 7 | A    That's correct. |
| 02:02 | 8 | Q    And you didn't put it in your witness statement either; |
| 02:02 | 9 | did you? |
| 02:02 | 10 | A    I didn't. |
| 02:02 | 11 | Q    And you haven't updated your LinkedIn; have you? |
| 02:02 | 12 | A    I haven't updated my LinkedIn many times. |
| 02:02 | 13 | Q    Since you left Cercacor and went to CardieX? |
| 02:02 | 14 | A    Before. |
| 02:02 | 15 | Q    But you updated your LinkedIn after you left Cercacor |
| 02:02 | 16 | and went to CardieX, correct? |
| 02:02 | 17 | A    I was requested by the CEO at CardieX to update my |
| 02:02 | 18 | LinkedIn profile. |
| 02:02 | 19 | Q    So the answer to my question is yes, correct? |
| 02:02 | 20 | A    Yes. |
| 02:02 | 21 | Q    Would you agree with me, given what we've just covered, |
| 02:02 | 22 | that to properly evaluate your objectivity, a reasonable |
| 02:02 | 23 | person might want to know that you, Cristiano, and Matt Paul |
| 02:02 | 24 | are working for Rockley, a company that has a relationship |
| 02:02 | 25 | with Apple developing biosensors for wearables to track |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

Exhibit C
-32-

127

| | | |
|---|---|---|
| 02:02 | 1 | physiological parameters?  Do you agree that that would be |
| 02:02 | 2 | something that would help a reasonable person assess your |
| 02:02 | 3 | objectivity in the testimony you're providing? |
| 02:03 | 4 | A    I believe I still have objectivity in testifying. |
| 02:03 | 5 | Q    My question was a little different.  Do you think that |
| 02:03 | 6 | it would be relevant for someone assessing that objectivity |
| 02:03 | 7 | as opposed to your personal belief, someone evaluating that |
| 02:03 | 8 | might want to know that information about your employer and |
| 02:03 | 9 | what you're doing? |
| 02:03 | 10 | A    Sure. |
| 02:03 | 11 | Q    But you didn't provide any of that information, |
| 02:03 | 12 | correct? |
| 02:03 | 13 | A    I did not. |
| 02:03 | 14 | Q    To obtain approval for providing your testimony in this |
| 02:03 | 15 | case to support True Wearables, did you have to obtain any |
| 02:03 | 16 | approvals from Rockley? |
| 02:03 | 17 | A    I did not. |
| 02:03 | 18 | Q    So you didn't tell them you were going to do this? |
| 02:03 | 19 | A    I don't recall. |
| 02:03 | 20 | Q    Did you consult with any lawyers other than the |
| 02:03 | 21 | Merchant & Gould lawyers that represent you about this |
| 02:04 | 22 | testimony that you were going to provide here from Rockley |
| 02:04 | 23 | or Apple or anybody else besides Merchant & Gould? |
| 02:04 | 24 | A    Yes. |
| 02:04 | 25 | Q    Who?  What firm?  What lawyers? |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

Exhibit C
-33-

128

| | | |
|---|---|---|
| 02:04 | 1 | A    Pillsbury. |
| 02:04 | 2 | Q    And who were they representing?  Do you know? |
| 02:04 | 3 | A    Myself. |
| 02:04 | 4 | Q    Okay.  Anybody else? |
| 02:04 | 5 | A    Just general counsel at Rockley. |
| 02:04 | 6 | Q    Okay.  So you did speak with a lawyer at Rockley about |
| 02:04 | 7 | that you were going to be doing this? |
| 02:04 | 8 | A    Yes. |
| 02:04 | 9 | Q    Okay.  I'm going to move to a different subject.  When |
| 02:04 | 10 | you began your employment with Masimo, you signed an |
| 02:04 | 11 | employee confidentiality agreement, correct? |
| 02:04 | 12 | A    Correct. |
| 02:04 | 13 | Q    Could you find in your book what has been labeled -- it |
| 02:04 | 14 | should be labeled 400. |
| 02:05 | 15 | A    Yes, I see it. |
| 02:05 | 16 | Q    Okay.  Do you recognize Exhibit 400 as the employee |
| 02:05 | 17 | confidentiality agreement that you signed at Masimo? |
| 02:05 | 18 | A    Yes, I do. |
| 02:05 | 19 | Q    And you understand that while you were employed at |
| 02:05 | 20 | Masimo, you were obligated under the confidentiality |
| 02:05 | 21 | agreement, right? |
| 02:05 | 22 | A    That's right. |
| 02:05 | 23 | Q    And when you moved over to Cercacor, you also |
| 02:05 | 24 | understood that you were obligated under a confidentiality |
| 02:05 | 25 | agreement there, correct? |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

Exhibit C
-34-

| 04:29 | 1 |
| 04:29 | 2 |
| 04:29 | 3 |
| 04:29 | 4 |
| 04:29 | 5 |

CERTIFICATE

| 04:29 | 6 |
| 04:29 | 7 |

I hereby certify that pursuant to Section 753,

Title 28, United States Code, the foregoing is a true and

correct transcript of the stenographically reported

proceedings held in the above-entitled matter and that the

transcript page format is in conformance with the

regulations of the Judicial Conference of the United States.

Date:  March 19, 2022

/s/   Sharon A. Seffens  3/19/22

SHARON A. SEFFENS, U.S. COURT REPORTER

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

Exhibit C
-35-

# EXHIBIT D

DOCUMENT FILED UNDER SEAL