# EXHIBIT 1

| From: | Amadi, Brittany |
|---|---|
| Sent: | Thursday, July 21, 2022 2:27 PM |
| To: | Andrew Guilford |
| Cc: | heidi@judicatewest.com; JennaK@judicatewest.com; Lyon, H. Mark; Buroker, Brian M.; Samplin, Ilissa; Kaounis, Angelique; BRosenthal@gibsondunn.com; nfayad@lewisllewellyn.com; mlewis@lewisllewellyn.com; Selwyn, Mark; Sprankling, Thomas; *** Apple-Masimo; Masimo.Apple; WH Apple-Masimo Service List; Parker, Ken; Adam.Powell |
| Subject: | RE: Masimo v. Apple (S279845) - Apple's Motion for Protective Order re Deposition of Tim Cook |

Re:   Masimo Corporation v. Apple, Inc.
     C.D. Cal. Case No. 8:20-cv-00048-JVS-JDE
     JW Case No. S279845-24

Dear Judge Guilford,

The parties have reached an agreement with respect to Apple's June 30 motion for protective order prohibiting the deposition of Apple's CEO, Tim Cook ("June 30 Motion").  Pursuant to that agreement, Apple agrees to withdraw without prejudice its June 30 Motion, subject to the following conditions:  (1) the parties agree that Plaintiffs will not contend that Apple has delayed or waived any right by withdrawing its June 30 Motion and re-filing at a later time; (2) the parties agree that neither party will use the timing of any later-filed motion to argue that the opposing party unduly delayed or waived any right; and (3) the parties agree that the time for any deposition of Mr. Cook (should such deposition occur) will not be excluded from Plaintiffs' deposition hours limit and that Apple will have eight weeks from any ruling ordering Mr. Cook's deposition in which to make Mr. Cook available.  Subject to that agreement, Apple hereby withdraws its June 30 Motion without prejudice, reserving the right to seek appropriate relief as necessary at a later time.

Respectfully,
Brittany Amadi

---

**From:** Amadi, Brittany <Brittany.Amadi@wilmerhale.com>
**Sent:** Thursday, June 30, 2022 5:11 PM
**To:** Andrew Guilford <andrewguilford@judicatewest.com>
**Cc:** heidi@judicatewest.com; JennaK@judicatewest.com; Lyon, H. Mark <MLyon@gibsondunn.com>; Buroker, Brian M. <BBuroker@gibsondunn.com>; Samplin, Ilissa <ISamplin@gibsondunn.com>; Kaounis, Angelique <AKaounis@gibsondunn.com>; BRosenthal@gibsondunn.com; nfayad@lewisllewellyn.com; mlewis@lewisllewellyn.com; Selwyn, Mark <Mark.Selwyn@wilmerhale.com>; Sprankling, Thomas <Thomas.Sprankling@wilmerhale.com>; *** Apple-Masimo <Apple-Masimo@gibsondunn.com>; Masimo.Apple <Masimo.Apple@knobbe.com>; WH Apple-Masimo Service List <WHApple-MasimoServiceList@wilmerhale.com>; Parker, Ken <Ken.Parker@haynesboone.com>; Adam.Powell <Adam.Powell@knobbe.com>
**Subject:** Masimo v. Apple (S279845) - Apple's Motion for Protective Order re Deposition of Tim Cook

Re:   Masimo Corporation v. Apple, Inc.
     C.D. Cal. Case No. 8:20-cv-00048-JVS-JDE
     JW Case No. S279845-24

Dear Judge Guilford,

Exhibit 1
Page 1

Defendant Apple Inc. respectfully moves for a protective order prohibiting the deposition of Apple's CEO, Tim Cook.  Apple hereby submits its opening brief and accompanying exhibits for your consideration.

The password for the brief and exhibits is W1lm3rH4le123!  Thank you.

Respectfully,
Brittany Amadi

**Brittany Amadi | WilmerHale**
1875 Pennsylvania Avenue NW
Washington, DC 20006 USA
+1 202 663 6022 (t)
+1 202 663 6363 (f)
brittany.amadi@wilmerhale.com

**Please consider the environment before printing this email.**

This email message and any attachments are being sent by Wilmer Cutler Pickering Hale and Dorr LLP, are confidential, and may be privileged. If you are not the intended recipient, please notify us immediately—by replying to this message or by sending an email to postmaster@wilmerhale.com—and destroy all copies of this message and any attachments. Thank you.

For more information about WilmerHale, please visit us at http://www.wilmerhale.com.

Exhibit 1
Page 2

# EXHIBIT 2

| | |
|---|---|
| **From:** | Adam Powell <Adam.Powell@knobbe.com> |
| **Sent:** | Friday, August 19, 2022 11:06 AM |
| **To:** | Passananeck, Nora Q.E. |
| **Cc:** | Masimo.Apple;  Apple-Masimo; WH Apple-Masimo Service List |
| **Subject:** | RE: Masimo v. Apple - Cook Motion |

**EXTERNAL SENDER**

Nora,

We do not understand why you would assume Masimo is demanding a 7 hour deposition in person.  My email below asked if Apple was willing to compromise to avoid motion practice.  Apple rejected our request, making clear that it intends to oppose Cook's deposition regardless of the terms.

Even though Apple refused to discuss a compromise, we anticipate Cook's deposition will take less than half a day.  As with any depositions, witness testimony can cause the final time to be shorter or longer than anticipated.  We expect the parties to work together as to whether the deposition proceeds remotely or in person, as we have done throughout the case.  Indeed, we have readily agreed to Apple's request to take some depositions remotely and others in person.  We also agreed that Apple may depose Masimo's CEO in person even though he was traveling in Europe.  We then agreed the deposition of Masimo's CEO (which lasted over seven hours) could proceed remotely when Apple asked that all depositions one week proceed remotely due to recent COVID exposures.  If Apple would like the Cook deposition to proceed remotely, please let us know and we would be happy to consider your request.  We also remain willing to discuss potential compromises to avoid motion practice.

Best regards,
Adam

**Adam Powell**
Partner

858-707-4245 **Direct**

# Knobbe Martens

---

**From:** Passananeck, Nora Q.E. <Nora.Passananeck@wilmerhale.com>
**Sent:** Wednesday, August 17, 2022 10:53 AM
**To:** Adam Powell <Adam.Powell@knobbe.com>
**Cc:** Masimo.Apple <Masimo.Apple@knobbe.com>; Apple-Masimo <Apple-Masimo@gibsondunn.com>; WH Apple-Masimo Service List <WHApple-MasimoServiceList@wilmerhale.com>
**Subject:** RE: Masimo v. Apple - Cook Motion

Adam:

We do not see any justification for Plaintiffs to depose Mr. Cook, and certainly you have not offered one.  We are asking you whether Plaintiffs are proposing any conditions and/or limitations on the scope or duration of the deposition you are seeking.  Indeed, your July 14 email asserted that "the parties should brief any conditions and/or limitations with the August 19 motion, rather than after the Special Master orders the deposition."  As a result, If Plaintiffs are going to argue in opposition that a deposition will not be burdensome because Plaintiffs are willing to limit the number of hours, scope of questioning, and/or agree for it to be remote, Apple is entitled to know that information now.  Given your response, we will assume that Plaintiffs are seeking a full 7-hour deposition in person.

Exhibit 2
Page 1

Regards,
Nora

---

**From:** Adam Powell <Adam.Powell@knobbe.com>
**Sent:** Tuesday, August 16, 2022 8:24 PM
**To:** Passamaneck, Nora Q.E. <Nora.Passamaneck@wilmerhale.com>
**Cc:** Masimo.Apple <Masimo.Apple@knobbe.com>; Apple-Masimo <Apple-Masimo@gibsondunn.com>; WH Apple-Masimo Service List <WHApple-MasimoServiceList@wilmerhale.com>
**Subject:** RE: Masimo v. Apple - Cook Motion

**EXTERNAL SENDER**

Nora,

Are there any conditions and/or limitations that would result in Apple agreeing to make the witness available without motion practice?

Thanks,
Adam

**Adam Powell**
Partner

858-707-4245 **Direct**

**Knobbe Martens**

---

**From:** Passamaneck, Nora Q.E. <Nora.Passamaneck@wilmerhale.com>
**Sent:** Monday, August 15, 2022 4:37 PM
**To:** Adam Powell <Adam.Powell@knobbe.com>
**Cc:** Masimo.Apple <Masimo.Apple@knobbe.com>; Apple-Masimo <Apple-Masimo@gibsondunn.com>; WH Apple-Masimo Service List <WHApple-MasimoServiceList@wilmerhale.com>
**Subject:** RE: Masimo v. Apple - Cook Motion

Adam,

Are you proposing any conditions and/or limitations on the scope or duration of the deposition you are seeking?

Thank you,
Nora

---

**From:** Adam Powell <Adam.Powell@knobbe.com>
**Sent:** Monday, August 15, 2022 12:59 PM
**To:** Passamaneck, Nora Q.E. <Nora.Passamaneck@wilmerhale.com>
**Cc:** Masimo.Apple <Masimo.Apple@knobbe.com>; Apple-Masimo <Apple-Masimo@gibsondunn.com>; WH Apple-Masimo Service List <WHApple-MasimoServiceList@wilmerhale.com>
**Subject:** RE: Masimo v. Apple - Cook Motion

**EXTERNAL SENDER**

Exhibit 2
Page 2

Nora,

Per the email chain below, we write to inform you that we still intend to depose Mr. Cook.  Please let us know if Apple still objects to Masimo taking Cook's deposition.

Best regards,
Adam

**Adam Powell**
Partner

858-707-4245 **Direct**

**Knobbe Martens**

---

**From:** Adam.Powell <Adam.Powell@knobbe.com>
**Sent:** Monday, July 18, 2022 8:42 AM
**To:** Passamaneck, Nora Q.E. <Nora.Passamaneck@wilmerhale.com>
**Cc:** Masimo.Apple <Masimo.Apple@knobbe.com>; Apple-Masimo <Apple-Masimo@gibsondunn.com>; WH Apple-Masimo Service List <WHApple-MasimoServiceList@wilmerhale.com>
**Subject:** RE: Masimo v. Apple - Cook Motion

Nora,

We agree with your email in general.  To be clear, we understand that both parties agree they will not use the timing of the motion to argue the opposing party unduly delayed or waived any right.  As for the overall count of deposition hours, we will not argue that Cook's deposition is excluded from the count.  However, we reserve the right to argue the deposition should proceed even if it would exceed the total allowable hours.

If Apple disagrees with this email, please let us know.  Otherwise, we expect Apple will withdraw its motion promptly.

Best regards,
Adam

**Adam Powell**
Partner

858-707-4245 **Direct**

**Knobbe Martens**

---

**From:** Passamaneck, Nora Q.E. <Nora.Passamaneck@wilmerhale.com>
**Sent:** Friday, July 15, 2022 12:08 PM
**To:** Adam.Powell <Adam.Powell@knobbe.com>
**Cc:** Masimo.Apple <Masimo.Apple@knobbe.com>; Apple-Masimo <Apple-Masimo@gibsondunn.com>; WH Apple-Masimo Service List <WHApple-MasimoServiceList@wilmerhale.com>
**Subject:** RE: Masimo v. Apple - Cook Motion

Adam,

Apple will agree to withdraw its Motion for Protective Order ("Motion") on the understanding that Plaintiffs will not (1) contend that Apple has delayed or waived any right by withdrawing its Motion and re-filing at a later time or (2) use the timing of Apple's refiling to argue that Apple delayed in seeking relief and/or that the time for any deposition of Mr. Cook is not subject to Plaintiffs' 100-hour limit.  Please let us know if you agree and we will notify the Special Master that Apple is withdrawing its motion without prejudice to refiling subject to the parties' agreement on briefing.

3

Exhibit 2
Page 3

Regards,
Nora

---

**From:** Adam.Powell <Adam.Powell@knobbe.com>
**Sent:** Thursday, July 14, 2022 11:18 PM
**To:** Passamaneck, Nora Q.E. <Nora.Passamaneck@wilmerhale.com>
**Cc:** Masimo.Apple <Masimo.Apple@knobbe.com>; Apple-Masimo <Apple-Masimo@gibsondunn.com>; WH Apple-Masimo Service List <WHApple-MasimoServiceList@wilmerhale.com>
**Subject:** RE: Masimo v. Apple - Cook Motion

**EXTERNAL SENDER**

Nora,

To be clear, we also understand the parties agree they will not use the timing of the motion to argue the opposing party unduly delayed in seeking relief on this dispute.  If that is incorrect, please let us know.

Thanks,
Adam

**Adam Powell**
Partner

858-707-4245 **Direct**

**Knobbe Martens**

---

**From:** Adam.Powell
**Sent:** Thursday, July 14, 2022 8:53 PM
**To:** Passamaneck, Nora Q.E. <Nora.Passamaneck@wilmerhale.com>
**Cc:** Masimo.Apple <Masimo.Apple@knobbe.com>; Apple-Masimo <Apple-Masimo@gibsondunn.com>; WH Apple-Masimo Service List <WHApple-MasimoServiceList@wilmerhale.com>
**Subject:** RE: Masimo v. Apple - Cook Motion

Nora,

We accept your proposal on the briefing.  We similarly reserve all rights with respect to any conditions and/or limitations that Apple proposes.  We believe the parties should brief any conditions and/or limitations with the August 19 motion, rather than after the Special Master orders the deposition.

Best regards,
Adam

**Adam Powell**
Partner

858-707-4245 **Direct**

**Knobbe Martens**

---

**From:** Passamaneck, Nora Q.E. <Nora.Passamaneck@wilmerhale.com>
**Sent:** Thursday, July 14, 2022 1:15 PM
**To:** Adam.Powell <Adam.Powell@knobbe.com>
**Cc:** Masimo.Apple <Masimo.Apple@knobbe.com>; Apple-Masimo <Apple-Masimo@gibsondunn.com>; WH Apple-

Exhibit 2
Page 4

Masimo Service List <WHApple-MasimoServiceList@wilmerhale.com>
**Subject:** RE: Masimo v. Apple - Cook Motion

Adam,

To allow complete briefing before the Labor Day holiday, we propose the following minor modification:  (1) Masimo informs Apple by August 15 whether it still seeks to depose Cook; (2) Apple files its motion by August 19, Masimo opposes by August 26, and Apple replies by September 2 (or earlier if Apple chooses); and (3) to the extent the deposition is ordered, Apple will have eight weeks within which to make Cook available for a deposition.  To the extent the court orders a deposition of Mr. Cook, Apple reserves all rights to seek conditions and/or limitations on the deposition in terms of location, length, and whether remote or in person.

Please let us know if Plaintiffs agree.

Regards,

Nora

---

**From:** Adam.Powell <Adam.Powell@knobbe.com>
**Sent:** Thursday, July 7, 2022 8:08 PM
**To:** Passamaneck, Nora Q.E. <Nora.Passamaneck@wilmerhale.com>
**Cc:** Masimo.Apple <Masimo.Apple@knobbe.com>; Apple-Masimo <Apple-Masimo@gibsondunn.com>; WH Apple-Masimo Service List <WHApple-MasimoServiceList@wilmerhale.com>
**Subject:** RE: Masimo v. Apple - Cook Motion

**EXTERNAL SENDER**

Nora,

We cannot agree to shorten our time to oppose Apple's motion.  We also cannot agree the deposition would occur remotely because we do not know what the facts and circumstances will look like when Mr. Cook is deposed.

We suggest the following: (1) Masimo informs Apple by August 17 whether it still seeks to depose Cook; (2) Apple files its motion by August 22, Masimo opposes by August 29, and Apple replies by September 5 (or earlier if Apple chooses); and (3) to the extent the deposition is ordered, Apple will have eight weeks within which to make Cook available for a deposition.  Please let us know by noon tomorrow if Apple agrees.

Thanks,
Adam

**Adam Powell**
Partner

858-707-4245 **Direct**

**Knobbe** **Martens**

---

**From:** Passamaneck, Nora Q.E. <Nora.Passamaneck@wilmerhale.com>
**Sent:** Thursday, July 7, 2022 2:26 PM
**To:** Adam.Powell <Adam.Powell@knobbe.com>
**Cc:** Masimo.Apple <Masimo.Apple@knobbe.com>; Apple-Masimo <Apple-Masimo@gibsondunn.com>; WH Apple-Masimo Service List <WHApple-MasimoServiceList@wilmerhale.com>
**Subject:** RE: Masimo v. Apple - Cook Motion

Exhibit 2
Page 5

Adam,

Apple will agree to withdraw its June 30 motion for protective order on Mr. Cook's deposition without prejudice on the following conditions: (1) Plaintiffs will inform Apple by August 17, 2022 whether they still seek to depose Mr. Cook, (2) Apple will file its motion for protective order by August 22, Plaintiffs' opposition will be due August 25, and Apple's reply will be due August 29; and (3) to the extent Mr. Cook's deposition is ordered, Apple will have eight weeks within which to make him available for deposition (remotely, if Apple so chooses).  Please let us know if you agree.

Thank you,
Nora

**From:** Adam.Powell <Adam.Powell@knobbe.com>
**Sent:** Thursday, July 7, 2022 10:19 AM
**To:** Passamaneck, Nora Q.E. <Nora.Passamaneck@wilmerhale.com>
**Cc:** Masimo.Apple <Masimo.Apple@knobbe.com>; Apple-Masimo <Apple-Masimo@gibsondunn.com>; WH Apple-Masimo Service List <WHApple-MasimoServiceList@wilmerhale.com>
**Subject:** RE: Masimo v. Apple - Cook Motion

**EXTERNAL SENDER**

Nora,

We have not received Apple's position on whether briefing should be delayed until after the other depositions.  Please provide Apple's position promptly and no later than close of business today.

Best regards,
Adam

**Adam Powell**
Partner
858-707-4245 Direct

**Knobbe Martens**

**From:** Adam.Powell
**Sent:** Tuesday, July 5, 2022 9:26 AM
**To:** Passamaneck, Nora Q.E. <Nora.Passamaneck@wilmerhale.com>
**Cc:** Masimo.Apple <Masimo.Apple@knobbe.com>; Apple-Masimo <Apple-Masimo@gibsondunn.com>; WH Apple-Masimo Service List <WHApple-MasimoServiceList@wilmerhale.com>
**Subject:** RE: Masimo v. Apple - Cook Motion

Nora,

We disagree with your assertion that our request runs contrary to the motion Masimo filed in the ITC Investigation.  As you know, different attorneys are primarily responsible for the ITC Investigation.  I understand from them that the ITC motion is time sensitive due to the upcoming deadline for post-trial briefs, and Apple's inclusion of non-admitted exhibits in its post hearing brief.  This motion is not time sensitive.

We also disagree with your assertion that our May 31 email "rejected" Apple's suggestion to delay briefing.  That email merely asked for Tim Cook's availability.  We have explained that Apple should provide his availability in advance for planning purposes even though the parties dispute whether a deposition was appropriate.  Moreover, the extent to

Exhibit 2
Page 6

which Apple would rely on other depositions was not clear to us until we reviewed Apple's motion.  Regardless, it sounds like the parties are now in agreement that briefing should be delayed until after the other depositions.  Please confirm.

Because our opposition is currently due in just two days, we will email Judge Guilford to request a one-week extension.  If you are able to confirm the extension before he responds, we will inform him of Apple's agreement and that he need not take action.

Best regards,
Adam

**Adam Powell**
Partner

858-707-4245 **Direct**

**Knobbe** Martens

---

**From:** Passamaneck, Nora Q.E. <Nora.Passamaneck@wilmerhale.com>
**Sent:** Monday, July 4, 2022 5:34 AM
**To:** Adam.Powell <Adam.Powell@knobbe.com>
**Cc:** Masimo.Apple <Masimo.Apple@knobbe.com>; Apple-Masimo <Apple-Masimo@gibsondunn.com>; WH Apple-Masimo Service List <WHApple-MasimoServiceList@wilmerhale.com>
**Subject:** RE: Masimo v. Apple - Cook Motion

Adam,

Apple did not time its motion to fall over the holiday weekend.  We filed the motion immediately after it had become evident that an impasse was reached.  Apple filed its motion Thursday afternoon at 2:11 pm PST.  You waited until Saturday evening at 6:31 pm PST to request a 1-week extension and asking for an answer by "tomorrow morning if possible."  I also note that your request for "professional courtesy" runs directly contrary to your team's motion filed in the ITC on Friday requesting expedited briefing such that Apple's opposition would be due Wednesday, July 6.

As you know, it is a holiday weekend and I will not be able to consult with Apple on your request until Tuesday.  I am, however, surprised by your suggestion to delay briefing on this issue as I made that exact request in my May 17, 2022 email, which Plaintiffs rejected by insisting on Apple providing his availability in their May 31 email.  I will respond tomorrow.

Thank you, and I hope everyone enjoys the holiday.

Nora

---

**From:** Adam.Powell <Adam.Powell@knobbe.com>
**Sent:** Saturday, July 2, 2022 7:31 PM
**To:** Passamaneck, Nora Q.E. <Nora.Passamaneck@wilmerhale.com>
**Cc:** Masimo.Apple <Masimo.Apple@knobbe.com>; Apple-Masimo <Apple-Masimo@gibsondunn.com>; WH Apple-Masimo Service List <WHApple-MasimoServiceList@wilmerhale.com>
**Subject:** Masimo v. Apple - Cook Motion

**EXTERNAL SENDER**

Nora,

Exhibit 2
Page 7

We write regarding Apple's motion for protective order to prevent a deposition of Tim Cook.  Apple filed its brief on June 30, timing its motion to fall over the holiday weekend.  Many members of our team (including myself) are traveling this week.  Thus, we request a one week extension as a professional courtesy.  We would, of course, be willing to extend a similar courtesy if Apple needs more time to oppose Masimo's motion to compel filed on July 1.  Given the tight schedule and holiday weekend, we would appreciate receiving Apple's position on this request tomorrow morning if possible.

Separately, we note that Apple's opening brief argued extensively that Masimo may obtain the discovery it seeks from witnesses other than Tim Cook, including Jeff Williams, Michael O'Reilly, Steve Hotelling, and Brian Land.  That argument suggests Apple's motion is premature because those depositions have not occurred.  We suggest the parties either (a) extend Masimo's deadline to oppose until one week after those depositions conclude or (b) agree that Apple may file a new motion one week after those depositions conclude.  We would agree that any deposition of Tim Cook may occur after the close of fact discovery.  Please let us know if Apple agrees.  Assuming Apple agrees to our request for a courtesy extension discussed above, please let us know Apple's position on this separate issue by July 6.

Thanks,
Adam

**Adam Powell**
Partner

858-707-4245 **Direct**

**Knobbe Martens**

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.


NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.


NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.


NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.


NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

Exhibit 2
Page 8

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

Exhibit 2
Page 9

# EXHIBIT 3



# Tim Cook
## Chief Executive Officer

**Apple Leadership**

Tim Cook is the CEO of Apple and serves on its board of directors.

Before being named CEO in August 2011, Tim was Apple's chief operating officer and was responsible for all of the company's worldwide sales and operations, including end-to-end management of Apple's supply chain, sales activities, and service and support in all markets and countries. He also headed Apple's Macintosh division and played a key role in the continued development of strategic reseller and supplier relationships, ensuring flexibility in response to an increasingly demanding marketplace.

Prior to joining Apple, Tim was vice president of Corporate Materials for Compaq and was responsible for procuring and managing all of Compaq's product inventory.

Previous to his work at Compaq, Tim was the chief operating officer of the Reseller Division at Intelligent Electronics.

Tim also spent 12 years with IBM, most recently as director of North American Fulfillment where he led manufacturing and distribution functions for IBM's Personal Computer Company in North and Latin America.

Tim earned an MBA from Duke University, where he was a Fuqua Scholar, and a Bachelor of Science degree in Industrial Engineering from Auburn University.



Exhibit 3    1/2
Page 1

| | | | | |
|---|---|---|---|---|
| AirTag | Apple Card | Apple Trade In | **For Healthcare** | **About Apple** |
| Accessories | Apple Books | Order Status | Apple in Healthcare | Newsroom |
| Gift Cards | Apple Podcasts | Shopping Help | Health on Apple Watch | Apple Leadership |
| | App Store | | Health Records on iPhone | Career Opportunities |
| | | | | Investors |
| | **Account** | | **For Government** | Ethics & Compliance |
| | Manage Your Apple ID | | Shop for Government | Events |
| | Apple Store Account | | Shop for Veterans and Military | Contact Apple |
| | iCloud.com | | | |

More ways to shop: **Find an Apple Store** or **other retailer** near you. Or call 1-800-MY-APPLE.

Copyright © 2022 Apple Inc. All rights reserved.    Privacy Policy  |  Terms of Use  |  Sales and Refunds  |  Legal  |  Site Map                                                  United States

# EXHIBIT 4
# Redacted in its Entirety

# EXHIBIT 5
Redacted in its Entirety

# EXHIBIT 6
Redacted in its Entirety

# EXHIBIT 7
Redacted in its Entirety

# EXHIBIT 8
Redacted in its Entirety

# EXHIBIT 9

Joseph R. Re (Bar No. 134479)
joseph.re@knobbe.com
Stephen C. Jensen (Bar No. 149894)
steve.jensen@knobbe.com
Benjamin A. Katzenellenbogen (Bar No. 208527)
ben.katzenellenbogen@knobbe.com
Perry D. Oldham (Bar No. 216016)
perry.oldham@knobbe.com
Stephen W. Larson (Bar No. 240844)
stephen.larson@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, Fourteenth Floor
Irvine, CA 92614
Telephone: (949)-760-0404; Facsimile: (949)-760-9502

Adam B. Powell (Bar. No. 272725)
adam.powell@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2579 Valley Centre Drive
San Diego, CA 92130
Telephone: (858) 707-4000; Facsimile: (858) 707-4001

Attorneys for Plaintiffs,
Masimo Corporation and Cercacor Laboratories, Inc.

### IN THE UNITED STATES DISTRICT COURT

### FOR THE CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| MASIMO CORPORATION, a Delaware corporation; and CERCACOR LABORATORIES, INC., a Delaware corporation | Case No. 8:20-cv-00048-JVS-JDE |
| | Hon. James V. Selna |
| Plaintiffs, | Magistrate Judge John D. Early |
| v. | **PLAINTIFFS' NOTICE OF DEPOSITION OF MICHAEL O'REILLY** |
| APPLE INC., a California corporation | |
| Defendant. | |

Exhibit 9
Page 1

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that, pursuant to Rules 26 and 30 of the Federal Rules of Civil Procedure, Plaintiffs MASIMO CORPORATION ("Masimo") and CERCACOR LABORATORIES, INC. ("Cercacor") (collectively, "Plaintiffs") will take the deposition upon oral examination of Michael O'Reilly.

The deposition will commence on June 14, 2021 at 9:00 a.m. at the offices of Knobbe, Martens, Olson & Bear LLP, 333 Bush St., 21st Floor, San Francisco, CA 94104 and shall continue from day to day until completed. The deposition will be taken before a court reporter, notary public, or other officer authorized to administer oaths. The oral examination will be recorded stenographically and by use of Realtime and videotape. You are hereby invited to attend and cross-examine the witness in the manner provided under the Federal Rules of Civil Procedure.

                                KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  April 19, 2021          By: */s/ Adam B. Powell*
                                    Joseph R. Re
                                    Stephen C. Jensen
                                    Benjamin A. Katzenellenbogen
                                    Perry D. Oldham
                                    Stephen W. Larson
                                    Mark D. Kachner
                                    Adam B. Powell

                                    Attorneys for Plaintiffs,
                                    Masimo Corporation and
                                    Cercacor Laboratories, Inc.

Exhibit 9
Page 2

## PROOF OF SERVICE

I am a citizen of the United States of America and I am employed in San Diego, California.  I am over the age of 18 and not a party to the within action.

On April 19, 2021, I served the within **PLAINTIFFS' NOTICE OF DEPOSITION OF MICHAEL O'REILLY** on the parties or their counsel shown at the email addresses shown below:

Apple-Masimo@gibsondunn.com

Joshua H. Lerner
JLerner@gibsondunn.com

H. Mark Lyon,
MLyon@gibsondunn.com

Brian M. Buroker
BBuroker@gibsondunn.com

Brian K. Andrea
BAndrea@gibsondunn.com

Brian A. Rosenthal
BRosenthal@gibsondunn.com

Ilissa Samplin
ISamplin@gibsondunn.com

Angelique Kaounis
AKaounis@gibsondunn.com

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on April 19, 2021, at Irvine, California.

Karina Villanueva

Exhibit 9
Page 3

# EXHIBIT 10

| From: | Adam.Powell <Adam.Powell@knobbe.com> |
|---|---|
| Sent: | Wednesday, May 4, 2022 1:41 AM |
| To: | *** Apple-Masimo; WH Apple-Masimo Service List; Lerner, Joshua H.; Lyon, H. Mark; Buroker, Brian M.; Andrea, Brian; Rosenthal, Brian A.; Samplin, Ilissa; Kaounis, Angelique; Lo, Jason; mlewis@lewisllewellyn.com; Selwyn, Mark; Gosma, Derek; Wigmore, Amy; Tobias Snyder; Passamaneck, Nora Q.E.; Frazier, Sarah; Parker, Ken; Jason.Lao@haynesboone.com |
| Cc: | Masimo.Apple |
| Subject: | Masimo v. Apple |
| Attachments: | 2022-05-03 Masimo's AEO 30b6 Notice.pdf |

**EXTERNAL SENDER**

Counsel,

Attached is Masimo's 30(b)(6) Notice and below is a list of Apple witnesses that Masimo would like to depose.

- David Affortit
- Ueyn Block
- Louis Bokma
- Johannes Bruinsma
- Deirdre Caldbeck
- Tim Cook
- Daniel Culbert
- Josh Du
- Aditya Dua
- James Foster
- Jack Fu
- Myra Haggerty
- Chinsan Han
- Steve Hotelling
- Eugene Kim
- Erno Klaassen
- Brian Land
- Paul Manheimer
- Bob Mansfield
- Naoto Matsuyuki
- Afshad Mistri
- Divya Nag
- Trevor Ness
- Lan Nguyen
- Michael O'Reilly
- Wolf Oetting
- Adrian Perica
- Kornelius Raths
- Mark Rollins
- Peter Russell-Clarke

Exhibit 10
Page 1

- Chris Saari
- Denby Sellers
- Steve Smith
- David Smoley
- David Tom
- Steve Waydo
- Jeff Williams
- Doug Zheng

Best regards,
Adam

**Adam Powell**
Partner

858-707-4245 **Direct**

**Knobbe** Martens

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

Exhibit 10
Page 2

# EXHIBIT 11
Redacted in its Entirety

# EXHIBIT 12
# Redacted in its Entirety

# EXHIBIT 13
Redacted in its Entirety

# EXHIBIT 14
# Redacted in its Entirety

# EXHIBIT 15
Redacted in its Entirety

# EXHIBIT 16
Redacted in its Entirety

# EXHIBIT 17
Redacted in its Entirety

# EXHIBIT 18
Redacted in its Entirety

# EXHIBIT 19
Redacted in its Entirety

# EXHIBIT 20

1 | Hon. Andrew J. Guilford (Ret.)
Judicate West
2 | 1851 East First Street
Suite 1600
3 | Santa Ana, CA 92705
Phone: (714) 834-1340
4 |
Special Master
5 |

6 | IN THE UNITED STATES DISTRICT COURT

7 | FOR THE CENTRAL DISTRICT OF CALIFORNIA

8 | SOUTHERN DIVISION

9 |

10 | MASIMO CORPORATION, a Delaware
Corporation; and CERCACOR               ) Case No. SACV 20-00048 JVS (JDEx)
11 | LABORATORIES, INC., a Delaware         )
Corporation,                            ) (JW Reference No.: A279845)
12 |                                       )
                                        )
13 |                       Plaintiffs,    )
                                        ) **ORDER NO. 13 OF SPECIAL MASTER**
14 |          vs.                          ) **REGARDING THREE DISCOVERY DISPUTES**
                                        )
15 | APPLE INC., a California corporation,  )
                                        )
16 |                       Defendant.     )
                                        )
17 | _____)

18 |

19 | 1.   **INTRODUCTION**

20 |         This Discovery Order No. 13 of the Special Master addresses three sets of pending discovery

21 | disputes.

22 |         For two of the sets of discovery disputes, relating to disagreements over each other's Rule

23 | 30(b)(6) topics, the parties agreed to a modified briefing schedule. The Special Master must

24 | commend the parties on their extensive meet and confer efforts relating to each other's extensive

25 | Rule 30(b)(6) topics. Those efforts have paid off, with limited disputes now being raised before the

26 | Special Master on an agreed, expedited schedule. Plaintiffs and Apple each filed an opening brief

27 | on July 7, 2022 moving to compel the other to designate a witness on certain disputed topics. ("Plf.

28 | Op. 30(b)(6) Br."; "Def. Op. 30(b)(6) Br.") The parties each filed a responsive cross-brief on July 14,

1

Exhibit 20
Page 1

1    2022. ("Def. Resp. 30(b)(6) Br."; Plf. Resp. 30(b)(6) Br.")

2       The third discovery dispute relates to Apple's July 1, 2022 motion to compel production of a

3    subset of documents from the *True Wearables* case. ("TW Mot.") Plaintiffs opposed Apple's motion

4    on July 8, 2022 ("Opp'n re TW"), and Apple filed a reply on July 15, 2022 ("Reply re TW").

5       After thorough letter-briefing, an oral argument was scheduled for July 13, 2022. Before the

6    hearing, the parties were provided with a tentative ruling relating to the three disputes. Counsel for

7    Plaintiffs emailed the Special Master stating that the parties had agreed to submit on the tentative

8    ruling and requested that the hearing be canceled. The Special Master accordingly did so. The

9    Special Master now adopts his tentative ruling as his final Discovery Order No. 13, as reflected by

10    the analysis provided herein.

11       The Special Master provides this written Order under the terms of Paragraph 10 of the Order

12    Appointing the Special Master.

13       As explained further in various sections of this Order, the Special Master now rules as

14    follows.

15      •   Each party's July 7, 2022 motion to compel the other to designate a witness on certain

16         Rule 30(b)(6) topics is **DENIED**.

17      •   A ruling on Apple's July 1, 2022 motion to compel is **DEFERRED** pending the completion

18         of the additional steps specified in Section 4.3 of this Order.

19   **2.**    **BACKGROUND**

20       As Judge Selna has noted in recent rulings, "The parties are familiar with the facts of this

21    case." (Dkt. No. 732 at 2.) Rather than list the facts relevant to the various motions here, the

22    Special Master will state any relevant facts necessary to resolve the parties' dispute in the

23    corresponding analysis subsection of this Order.

24       The Special Master again expresses his concern that the extremely granular nature of the

25    discovery sought and the resulting very extensive motion practice will not permit effective use of the

26    discovery leading up to trial and especially during trial. For example, it will be hard to show that a

27    Rule 30(b)(6) witness had a relevant gap in the witness's knowledge, and the significance of such a

28    gap, if any.

2

Exhibit 20
Page 2

**3.     LEGAL STANDARD**

Judge Selna has explained,

> [d]iscovery requests must be reasonably calculated to lead to the discovery of admissible evidence. Fed. R. Civ. P. 26(b)(1). Once the party seeking discovery has demonstrated relevance under Rule 26(b)(1), "the party opposing discovery has the burden of showing that discovery should not be allowed, and also has the burden of clarifying, explaining and supporting its objections with competent evidence." *Heredia v. Sunrise Senior Living LLC*, Case No. 8:18-cv-01974-JLS (JDEx), 2020 WL 3108699, at *2 (C.D. Cal. Jan. 31, 2020) (internal citation omitted). In analyzing the scope of discovery, the general rule is that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claims or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1).

(Dkt. No. 732 at 3.)

As Judge Selna has also explained,

> Rule 30(b)(6) of the Federal Rules of Civil Procedure requires an organization upon request to designate a representative to testify on its behalf on specified topics. "The persons designated must testify about information known or reasonably available to the organization." (Fed. R. Civ. P. 30(b)(6).) "[T]he corporate deponent has an affirmative duty to make available such number of persons as will be able to give complete, knowledgeable and binding answers on its behalf." *Reilly v. Natwest Markets Group, Inc.*, 181 F.3d 253, 268 (2d Cir. 1999) (internal quotation marks omitted).

*Hakim v. Murano, Inc.*, No. CV 15-05633 JVS (PLAx), 2017 WL 11632290, at *2 (C.D. Cal. Mar. 6, 2017), *motion for reconsideration granted in part on other issue*, No. CV 15-05633 JVS (PLAx), 2017 WL 11632278 (C.D. Cal. May 2, 2017).

**4.     ANALYSIS**

**4.1     Plaintiffs' July 7, 2022 Motion to Compel a Rule 30(b)(6) Witness on Plaintiffs' Topics 27–31, 57, 59, 68–70, and 73–79**

**4.1.1  Plaintiffs' Topics 68–70**

Apple's responsive brief states, "[w]hile Apple maintains that Topics 68 and 70 seek irrelevant information, Apple will designate a witness to testify as to non-privileged information on both topics in order to narrow the parties' dispute." The Special Master thus finds Plaintiffs' motion **MOOT** as to Topics 68 and 70.

Plaintiff's Topic 69 states the following.

3

Exhibit 20
Page 3

69.     Tim Cook's preparation and responses to "Questions for the Record from the Honorable Henry 'Hank' Johnson, Jr., including the statement that "[t]he concept of 'efficient infringement' is an anathema to Apple," and that Boris Teksler "is not an Apple employee, [] was never the 'patent chief' at Apple, and [] does not speak for the company."

(Ex. 12 to Plf. Op. 30(b)(6) Br., at 66–68 (internal document numbering, corresponding to pages 94–96 of exhibit packet).)

The Special Master **DENIES** Plaintiffs' motion to compel a Rule 30(b)(6) witness on Topic 69. On its face, Topic 69 is very likely to implicate privileged information. Plaintiffs have not adequately explained how they would overcome privilege issues regarding, for example, "Time Cook's preparation" for the congressional hearing. Topic 69 otherwise relates to the same issues more generally raised by Topics 68 and 70. The Special Master agrees with Apple that the additional information sought in the context of this Topic is likely to also be cumulative of other discovery Plaintiffs have sought and obtained. The information sought is not otherwise proportional to the needs of this case.

### 4.1.2  Plaintiffs' Topics 75 and 76

In a footnote in its responsive brief, Apple states, "Plaintiffs appear to argue that Apple has also objected to Topics 75 and 76 . . . . In fact, Apple agreed to designate a witness on both Topics 75 and 76 in its very first response to Plaintiffs' Rule 30(b)(6) notice." (Def. Resp. 30(b)(6) Br. at 2 n.1.) The Special Master thus finds Plaintiffs' motion **MOOT** as to Topics 75 and 76.

### 4.1.3  Plaintiffs' Topics 27–31, 57, 59, 73, 74, and 77–79

Plaintiffs concede that Topics 27–31, 57, 59, and 73–79 "request Apple's factual bases for its contentions," including "that Apple is not using Masimo's trade secrets, that Masimo's trade secrets were not disclosed to Apple, that Masimo's trade secrets do not possess independent economic value, that Masimo'[s] trade secrets were not confidential, and that Masimo's trade secrets were disclosed to third parties." (Plf. Op. 30(b)(6) Br. at 4.) Plaintiffs state that they "maintain[ ] that neither party should have to designate witness[es] on such contentions. If the Special Master disagrees and determines that Apple's contention topics are appropriate, however, Masimo respectfully requests that the Special Master order Apple to provide a witness on Masimo's

4

Exhibit 20
Page 4

1     contention topics." (*Id.* at 5.)

2        In *TCL v. Ericsson*, the Magistrate Judge reopened the deposition of a corporate witness

3 based on counsel's improper instructions not to answer certain questions during the witness's

4 original deposition. Judge Selna considered a "motion for review" of the Magistrate Judge's order.

5 Judge Selna found that the Magistrate Judge's ruling should not be disturbed (plaintiff, the moving

6 party, was not requesting that he do so), but further found that the defendant in the case should be

7 additionally instructed to refrain from asking "improper-contention questions" at the reopened

8 deposition. *TCL Commc'ns Tech. Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson*, No. SA CV 14-

9 0341 JVS (DFMx), 2015 WL 13882659, at *6 (C.D. Cal. Nov. 6, 2015). Judge Selna stated,

10       [Plaintiff] cites numerous cases for the impropriety of asking contention questions via

11       deposition. In particular, [plaintiff] relies on *McCormick-Morgan, Inc. v. Teledyne Indus., Inc.*, 134 F.R.D. 275 (N.D. Cal. 1991) [footnote omitted] and the Court agrees

12       with the concern that "no one human being can be expected to set forth, especially orally in deposition, a fully reliable and sufficiently complete account of all the bases

13       for the contentions made and positions taken" by the party it has been deposed to represent. *McCormick-Morgan, Inc.*, 134 F.R.D. at 286. Contention questions are more

14       appropriately raised via interrogatory, and it is unfair to make a single Rule 30(b)(6) witness, the representative of the party, attempt a response to questions about the

15       position of the party that usually require entire teams of lawyers and experts to adequately answer. *See also Memory Integrity, LLC v. Intel Corp.*, 15-cv-0262, 308

16       F.R.D. 656 (D. Or. July 29, 2015) ("In particular, when the proposed deposition topics [. . .] involve legal issues that require the assistance of an attorney, the interrogatory is

17       the preferred device.").

18

19 *Id.* Although *TCL v. Ericsson* did not involve Rule 30(b)(6) *topics*, the Special Master finds that

20 Judge Selna's reasoning also applies here.

21        The Special Master otherwise agrees that some of the disputed topic would otherwise create

22 a dilemma for Apple, as Apple would seek to rely on AEO information to support its responses to

23 questions on those topics, yet Apple has not been permitted to share that AEO information with its

24 witnesses.

25        Plaintiffs' motion to compel designation of a Rule 30(b)(6) witness regarding its Topics 27–

26 31, 57, 59, 73, 74, and 77–79 is **DENIED**.

27

28

5

Exhibit 20
Page 5

**4.2**     Apple's July 7, 2022 Motion to Compel a Rule 30(b)(6) Witness on Apple's Topics 4, 8, 31, 44, 49, 67, and 68

### 4.2.1  Apple's Topics 4, 8, 31, 44, and 49

Apple's Topics 4, 8, 31, 44, and 49 are contention topics. Topic 4 is a three-part topic requesting "[a]ll facts and circumstances relating to the access by and/or disclosure to Apple of each of Plaintiffs' alleged Trade Secrets." Topic 8 asks Plaintiffs to testify regarding "Apple's alleged past, present, and/or future use or disclosure of each alleged Trade Secret." Topic 31 seeks "Plaintiffs' *contention* that Apple unjustly benefited" due to Apple's alleged trade secret misappropriation. Topic 44 seeks information "that You contend would not have been available to Apple but for its alleged misappropriation of Plaintiffs' Trade Secrets." Topic 49 seeks "[h]arm that Plaintiffs believe they have suffered and/or damages that Plaintiffs believe they have incurred," including based on 11 separate subtopics.

For the same reasons stated in Section 4.1.3 of this Order as to Plaintiffs' contention topics, Apple's motion to compel designation of a witness on these five topics is **DENIED**.

### 4.2.2  Apple's Topics 67 and 68

Apple argues, "[i]f Plaintiffs intend to seek damages based on their inventorship and ownership claims, Apple is entitled to depose Plaintiffs regarding the material facts supporting those claims . . . Similarly, if Plaintiffs intend to present testimony at trial that the value of the technology at issue provided Apple with an incentive to claim inventorship, Topics 67 and 68 are relevant to that claim as well." (Def. Op. 30(b)(6) Br. at 3.) Apple also makes a third argument, asserting that "Apple's Topic 68 mirrors Plaintiffs' Topic 58."

Plaintiffs state, "[t]o avoid any ambiguity, Masimo confirms it is not seeking monetary damages for its patent ownership and inventorship claims. Thus, these topics are plainly irrelevant." (Plf. Resp. 30(b)(6) Br. at 3.) Plaintiffs also make other arguments in response to Apple's other assertions.

Apple's motion to compel designation of a witness on these two topics is **DENIED**, both on the basis of mootness and because Apple's other arguments fail to support that the information sought is sufficiently relevant to be proportional to the needs of this case.

Exhibit 20
Page 6

### 4.3    Apple's July 1, 2022 Motion to Compel Production of *True Wearables* Documents

In Discovery Order No. 8, the Special Master considered Apple's March 11, 2022 motion to compel production in response to certain RFPs, including RFP Nos. 283–286. Those RFPs sought documents from *Masimo v. True Wearables*, Case No. 8:18-CV-02001-JVS-JDEx. After Discovery Order No. 8 issued, Apple submitted objections to Judge Selna. In an Order Regarding Apple's Objections to Special Master Order No. 8, Judge Selna overruled Apple's objections to this aspect of Discovery Order No. 8.

Among other things, Judge Selna stated the following (the Special Master copy-pastes extensively from Judge Selna's ruling because both parties spend precious brief space on their characterizations of individual sentences in it).

. . . . Plaintiffs' briefing did not discuss relevance. See ECF No. 667-18 (Ex. 28) at 4-5 ("Apple's Request Nos. 283-286 are also overly burdensome and not proportionate to the needs of this case for many reasons."). Accordingly, rather than entertaining new relevance arguments for the first time before this Court, for the purposes of resolving the objection, the Court will assume the requested materials are relevant to whether Lamego possessed Plaintiffs' asserted trade secrets while working for Plaintiffs (i.e., Apple argues that, if he did not possess them, he could not have taken them to Apple). [Footnote 2: To the extent Plaintiffs now argue that Apple does not explain the overlap between the asserted trade secrets in this case and in the True Wearable case, Apple has no occasion to know what trade secrets have been asserted in another case governed by a restrictive protective order to which it is not a party.]

. . . . The Court is familiar with the breadth of the filings in [the *True Wearables*] case and recently presided over a bench trial in that case. Considering the totality of that case, Plaintiffs have shown that Apple's requests are not proportional to the needs of *this* case. Moreover, Apple does not address the burdens associated with requiring Plaintiffs to manually review the entire True Wearables case for responsiveness to Apple's present requests, or relatedly, the issues arising from True Wearables' conditional consent to allow document sharing only after Plaintiffs have completed considerable manual review to comply with those conditions. Accordingly, the Court **OVERRULES** this objection.

To the extent Apple wishes to seek a more limited production of relevant materials from the True Wearables litigation, Apple should meet and confer with Plaintiffs to discuss whether its new proposals concerning, e.g., 100 sealed docket entries is proportional to the needs of the case. If Apple brings an appropriate request before the Special Master in the first instance, in responding, Plaintiffs are in the best position to advise whether the requested material is relevant and proportional to the needs of this case (e.g., Plaintiffs know whether they are asserting any of the same trade secrets against Apple as they asserted against the True Wearables defendants,

Exhibit 20
Page 7

so Plaintiffs are in the best position to gauge the potential manual-review burden associated with any future narrowed request from Apple; if there is little to no overlap between the asserted trade secrets, for example, there may be little for Plaintiffs to review and the burden may be low). The Court expresses no opinion on such a hypothetical motion.

(Dkt. No. 748 at 5–6.)

Apple now moves to compel production of seven categories of documents from the *True Wearables* case, "including all associated papers such as oppositions, replies, and declarations." (TW Mot. at 2.) These seven categories of documents are:

1.   Motion for Preliminary Injunction (Dkt. 153);
2.   Defendants' Motion for Partial Summary Judgment (Dkt. 333);
3.   Motion for Relief from Rule 60 (Dkt. 274);
4.   Trial transcripts including written testimony, and closing arguments;
5.   Trial briefs, including Motion to Strike (Dkt. 550);
6.   All post-trial briefs, including all submissions of proposed findings of fact and conclusions of law (whether submitted before, during or after trial); and
7.   Masimo's interrogatory responses.

(*Id.*) There are no other proposed limits on the information sought. For example, as Plaintiffs observe, Apple has not tailored its request "to documents that relate to Lamego's **work at Masimo or Apple.**" (Opp'n re TW at 5 (emphasis in original).) Apple also does not specifically clarify that Plaintiffs can exclude documents or information that True Wearables designated as confidential. (*Id.*)

Although Apple insists that it has narrowly tailored its request for documents from the *True Wearables* case, with its stated document categories, it sweeps in "all associated papers." These requests look to be much broader than first glance might suggest.

But ultimately, it is simply unclear from the record how many documents (and redactions) are actually implicated by Apple's request, making it impossible to similarly evaluate whether the requests are overbroad or otherwise continue to create an undue burden (assuming threshold relevance has been established). And here, the Special Master must also comment that over-designation appears to be a severe problem in this case. No doubt, similar problems persist with the *True Wearables* docket as well. The Special Master wonders if a manual review might lead to determinations that some of the sealed material should simply be unsealed, for the benefit of both

8

Exhibit 20
Page 8

1  Apple and the public at large.

2       But turning back to the threshold question of relevance, Plaintiffs' assertions that many of

3  the documents sought are irrelevant is surprising. Plaintiffs are strongly litigating a non-party issue

4  preclusion theory in this case based on the *True Wearables* case, including by seeking documents

5  that Apple claims are protected by a common interest privilege with True Wearables. If Plaintiffs

6  want to bind Apple to determinations reached in the *True Wearables* case, Apple should at least be

7  able to fairly review documents from that matter that may be relevant to defend against such a

8  claim. (And if Apple wants to argue that Plaintiffs' non-party issue preclusion theory has no basis,

9  Apple's insisting on the vast production of documents from *True Wearables* creates an interesting

10  twist of its own. It seems that everyone wants to have their cake and eat it too.)

11       For its part, though, Apple appears to suggest that whether Plaintiffs are ultimately

12  permitted to pursue discovery on a non-party issue preclusion theory, Apple is still entitled to the

13  discovery it seeks from *True Wearables*. Apple states, for example,

14       [b]oth lawsuits involved allegations of trade secret misappropriation by Plaintiffs'
15       former employee Marcelo Lamego and allegations that Dr. Lamego disclosed those
16       purported trade secrets to competitors . . . . At minimum, the materials sought by Apple
        are relevant to assess whether Plaintiffs have taken reasonable measures to secure
17       the purported trade secrets and the scope of Dr. Lamego's knowledge of Plaintiffs'
        technology while he was their employee.

18
19  (TW Mot. at 2.) Apple also asserts that based on the limited information it has been provided, it

20  believes there is some type of overlap or comparability between the trade secrets at issue in this

    case and *True Wearables*, further supporting relevance. (*Id.* at 3–4.)

21
22       At a high level, Apple's relevance arguments are reasonable. Assuming Plaintiffs are

23  ultimately permitted to pursue discovery regarding their non-party issue preclusion theory,

24  threshold relevance is even more easily established. The Special Master finds that in the current

25  circumstances, including where the parties have recently been directed to brief the threshold

26  issues surrounding Plaintiffs' non-party issue preclusion theory to Judge Selna (*see* Discovery Order

    No. 11), the Special Master finds a relevance evaluation for the current motion is premature.
27

28

Exhibit 20
Page 9

1   But either way, as noted, more information will also ultimately be necessary before either

2   relevance or undue burden can be fairly evaluated. The Special Master **ORDERS** Plaintiffs to send

3   an email to Apple within 7 days of this Order, that provides their best estimate of how many

4   documents and/or redactions they believes are implicated by Apple's request, and their best

5   estimate of how much time it would take to manually review those estimated documents. The

6   parties must then meet and confer to determine whether they can reach agreement on narrowing

7   any of the disputed issues discussed here, before then filing a joint report with the Special Master

8   within 14 days of this Order.

9   **5.   CONCLUSION**

10   Numerous other arguments were presented in the briefs and oral arguments, and all were

11   considered by the Special Master in making this Order.

12   As explained further in various sections of this Order, the Special Master now rules as

13   follows.

14   • Each party's July 7, 2022 motion to compel the other to designate a witness on certain

15   Rule 30(b)(6) topics is **DENIED**.

16   • A ruling on Apple's July 1, 2022 motion to compel is **DEFERRED** pending the completion

17   of the additional steps specified in Section 4.3 of this Order.

18   As noted, the Special Master provides this written Order under the terms of Paragraph 10 of

19   the Order Appointing the Special Master, which states in part as follows.

20   The Special Master shall issue rulings by order, except for any contempt findings that
21   shall be issued by report and recommendation. See Fed. R. Civ. P. 53(c)(2). The Special
     Master shall provide any written order, report, or recommendation to counsel for the
22   parties by email to give them an opportunity to propose redactions before submission
     to the Court. The parties shall meet and confer and submit any proposed redactions to
23   the Special Master within three court days. If the parties cannot agree on redactions,
     the parties shall provide their positions by email to the Special Master, including all
24   proposed redactions, and the Special Master may redact upon a finding that redaction
     is appropriate in his/her discretion before filing.
25
     THUS IT IS ORDERED.
26

27   Dated: July 20, 2022                   _____

28                                          Hon. Andrew J. Guilford (Ret.)
                                            Special Master

10

Exhibit 20
Page 10



**JUDICATE WEST**
Alternative Dispute Resolution

1851 E. First Street
Suite 1600
Santa Ana, CA 92705
Phone: (714) 834-1340
Fax: (714) 834-1344

*Results Beyond Dispute*℠

*www.judicatewest.com*

### PROOF OF SERVICE

I, the undersigned, an employee of Judicate West, located at 1851 E. First Street, Suite 1600, Santa Ana, CA 92705 declare under penalty of perjury that I am over the age of eighteen (18) and not a party to this matter or proceeding.

On July 20, 2022, I served the foregoing documents, described as:

**ORDER NO. 13 OF SPECIAL MASTER REGARDING THREE DISCOVERY DISPUTES**

to the following parties:

### SEE ATTACHED MAILING LIST

**(X) BY E-MAIL** I caused the above-referenced document to be transmitted via electronic mail (e-mail) to the parties as listed on this Proof of Service

**( ) BY ELECTRONIC FILING** I caused such document to be sent via electronic service by submitting an electronic version of the document(s) to One Legal, LLC, through the user interface at www.onelegal.com.

**( ) BY FASCIMILE** I caused the above-referenced document to be transmitted via facsimile to the parties as listed on this Proof of Service. The document was transmitted by facsimile transmission and the transmission was reported as complete and without error.

**( ) BY PERSONAL SERVICE** I personally delivered the documents to the persons at the address (es): by leaving the documents at the person (s) office, in an envelope or package clearly labeled to identify the person(s) being served, with a receptionist or an individual in charge of the office.

**( ) BY UNITED STATES PARCEL SERVICE** I am readily familiar with the business' practice for collection and processing of correspondence and mailing with the United States Postal Service; such correspondence would be deposited with the United States Postal Service the same day of deposit with postage thereon fully prepaid at Santa Ana, California in the ordinary course of business

**( ) STATE** I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

**( ) FEDERAL** I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on **July 20, 2022,** at Santa Ana, California

Heidi Adams
Judicate West

Downtown Los Angeles Office • 601 S. Figueroa St., Suite 3400 • Los  Angeles, CA 90017 • (213) 223-1 113 • Fax (213) 223-1114
Sacramento Office • 980 9ᵀᴴ Street, Suite 2200 • Sacramento, CA  95814 • (916) 394-8490 • Fax (916) 394-8495
San Diego Office • 402 West Broadway, Suite 2400 • San Diego, CA  92101 • (619) 814-1966 • Fax (619) 814-1967
San Francisco Office • 100 Pine St., Suite 1950 • San Francisco, CA  94111 • (415) 266-1242 • Fax (415) 266-1243
West Los Angeles Office • 11601 Wilshire Blvd., Suite 2040 • Los  Angeles, CA 90025 • (310) 442-2100 • Fax (310) 442-2125

Exhibit 20
Page 11



**Santa Ana Office**
1851 East First Street
Suite 1600
Santa Ana, CA 92705
Phone: (714) 834-1340
Fax: (714) 834-1344

**www.judicatewest.com**

## Case Contact List

as of Tuesday, July 19, 2022

**JW Case #: A279845**

### *Case Caption: Masimo Corporation, et al. vs. Apple, Inc.*

Jeremy A. Anapol, Esq.
Knobbe, Martens, Olson & Bear, LLP
2040 Main St.
14th Floor
Irvine, CA 92614
Phone: (949) 760-0404  Fax: (949) 760-9502
Email: jeremy.anapol@knobbe.com
Representing Masimo Corporation; Cercacor Laboratories, Inc.

Christian D. Boettcher, Esq.
Knobbe, Martens, Olson & Bear, LLP
2040 Main St.
14th Floor
Irvine, CA 92614
Phone: (949) 760-0404   Fax: (949) 760-9502
Email: christian.boettcher@knobbe.com
Representing Masimo Corporation; Cercacor Laboratories, Inc.

Adam B. Powell, Esq.
Knobbe, Martens, Olson & Bear, LLP
12790 El Camino Real
San Diego, CA 92130
Phone: (858) 707-4000   Fax: (858) 707-4001
Email: adam.powell@knobbe.com
Representing Masimo Corporation; Cercacor Laboratories, Inc.

Daniel P. Hughes, Esq.
Knobbe, Martens, Olson & Bear, LLP
12790 El Camino Real
San Diego, CA 92130
Phone: (858) 707-4000   Fax: (858) 707-4001
Email: daniel.hughes@knobbe.com
Representing Masimo Corporation; Cercacor Laboratories, Inc.

Joseph F. Jennings, Esq.
Knobbe, Martens, Olson & Bear, LLP
2040 Main St.
14th Floor
Irvine, CA 92614
Phone: (949) 760-0404   Fax: (949) 760-9502
Email: joe.jennings@knobbe.com
Representing Masimo Corporation; Cercacor Laboratories, Inc.

Downtown Los Angeles Office ● 601 S. Figueroa Street Suite 4000 ● Los Angeles, CA 90017 ● (213) 223-1113 ● Fax (213) 223-1114
San Diego Office ● 402 W. Broadway Suite 2400 ● San Diego, CA 92101 ● (619) 814-1966 ● Fax (619) 814-1967
San Francisco Office ● 100 Pine Street Suite 1950 ● San Francisco, CA 94111 ● (415) 266-1242 ● Fax (415) 266-1243
West Los Angeles Office ● 11601 Wilshire Blvd Suite 2040 ● Los Angeles, CA, 90025 ● (310) 442-2100 ● Fax (310) 442-2125
Sacramento Office ● 980 9th Street Suite 2200 ● Sacramento, CA 95814 ● (916) 394-8490 ● Fax (916) 394-8495

Exhibit 20
Page 12



**Santa Ana Office**
1851 East First Street
Suite 1600
Santa Ana, CA 92705
Phone: (714) 834-1340
Fax: (714) 834-1344

**www.judicatewest.com**

Stephen C. Jensen, Esq.
Knobbe, Martens, Olson & Bear, LLP
2040 Main St.
14th Floor
Irvine, CA 92614
Phone: (949) 760-0404   Fax: (949) 760-9502
Email: steve.jensen@knobbe.com
Representing Masimo Corporation; Cercacor Laboratories, Inc.

Mark D. Kachner, Esq.
Knobbe, Martens, Olson & Bear, LLP
2040 Main St.
14th Floor
Irvine, CA 92614
Phone: (949) 760-0404   Fax: (949) 760-9502
Email: mark.kachner@knobbe.com
Representing Masimo Corporation; Cercacor Laboratories, Inc.

Benjamin A. Katzenellenbogen, Esq.
Knobbe, Martens, Olson & Bear, LLP
2040 Main St.
14th Floor
Irvine, CA 92614
Phone: (949) 760-0404   Fax: (949) 760-9502
Email: ben.katzenellenbogen@knobbe.com
Representing Masimo Corporation; Cercacor Laboratories, Inc.

Stephen W. Larson, Esq.
Knobbe, Martens, Olson & Bear, LLP
2040 Main St.
14th Floor
Irvine, CA 92614
Phone: (949) 760-0404   Fax: (949) 760-9502
Email: stephen.larson@knobbe.com
Representing Masimo Corporation; Cercacor Laboratories, Inc.

Perry D. Oldham, Esq.
Knobbe, Martens, Olson & Bear, LLP
2040 Main St.
14th Floor
Irvine, CA 92614
Phone: (949) 760-0404   Fax: (949) 760-9502
Email: perry.oldman@kmob.com
Representing Masimo Corporation; Cercacor Laboratories, Inc.

Downtown Los Angeles Office ● 601 S. Figueroa Street Suite 4000 ● Los Angeles, CA 90017 ● (213) 223-1113 ● Fax (213) 223-1114
San Diego Office ● 402 W. Broadway Suite 2400 ● San Diego, CA 92101 ● (619) 814-1966 ● Fax (619) 814-1967
San Francisco Office ● 100 Pine Street Suite 1950 ● San Francisco, CA 94111 ● (415) 266-1242 ● Fax (415) 266-1243
West Los Angeles Office ● 11601 Wilshire Blvd Suite 2040 ● Los Angeles, CA 90025 ● (310) 442-2100 ● Fax (310) 442-2125
Sacramento Office ● 980 9th Street Suite 2200 ● Sacramento, CA 95814 ● (916) 394-8490 ● Fax (916) 394-8495

Exhibit 20
Page 13



**Santa Ana Office**
1851 East First Street
Suite 1600
Santa Ana, CA 92705
Phone: (714) 834-1340
Fax: (714) 834-1344

**www.judicatewest.com**

Joseph R. Re, Esq.
Knobbe, Martens, Olson & Bear, LLP
2040 Main St.
14th Floor
Irvine, CA 92614
Phone: (949) 760-0404   Fax: (949) 760-9502
Email: jre@kmob.com
Representing Masimo Corporation; Cercacor Laboratories, Inc.

Brian K. Andrea, Esq.
Gibson, Dunn & Crutcher, LLP
1050 Connecticut Ave. N.W.
Washington, D.C. 20036
Phone: (202) 955-8500   Fax: (202) 530-4238
Email: bandrea@gibsondunn.com
Representing Apple, Inc.

Brian M. Buroker, Esq.
Gibson, Dunn & Crutcher, LLP
1050 Connecticut Ave. N.W.
Washington, D.C. 20036
Phone: (202) 955-8500   Fax: (202) 530-4238
Email: bburoker@gibsondunn.com
Representing Apple, Inc.

Angelique Kaounis, Esq.
Gibson, Dunn & Crutcher, LLP
2029 Century Park E.
Suite 4000
Los Angeles, CA 90067
Phone: (310) 552-8500   Fax:
Email: akaounis@gibsondunn.com
Representing Apple, Inc.

Jason C. Lo, Esq.
Gibson, Dunn & Crutcher, LLP
333 S. Grand Ave.
49th Floor
Los Angeles, CA 90071
Phone: (213) 229-7000   Fax: (213) 229-6635
Email: jlo@gibsondunn.com
Representing Apple, Inc.

H. Mark Lyon, Esq.
Gibson, Dunn & Crutcher, LLP
1881 Page Mill Rd.
Palo Alto, CA 94304
Phone: (650) 849-5300   Fax: (650) 849-5333
Email: mlyon@gibsondunn.com
Representing Apple, Inc.

Downtown Los Angeles Office ● 601 S. Figueroa Street Suite 4000 ● Los Angeles, CA 90017 ● (213) 223-1113 ● Fax (213) 223-1114
San Diego Office ● 402 W. Broadway Suite 2400 ● San Diego, CA 92101 ● (619) 814-1966 ● Fax (619) 814-1967
San Francisco Office ● 100 Pine Street Suite 1950 ● San Francisco, CA 94111 ● (415) 266-1242 ● Fax (415) 266-1243
West Los Angeles Office ● 11601 Wilshire Blvd Suite 2040 ● Los Angeles, CA 90025 ● (310) 442-2100 ● Fax (310) 442-2125
Sacramento Office ● 980 9th Street Suite 2200 ● Sacramento, CA 95814 ● (916) 394-8490 ● Fax (916) 394-8495

Exhibit 20
Page 14



**Santa Ana Office**
1851 East First Street
Suite 1600
Santa Ana, CA 92705
Phone: (714) 834-1340
Fax: (714) 834-1344
**www.judicatewest.com**

Brian Rosenthal, Esq.
Gibson, Dunn & Crutcher, LLP
1050 Connecticut Ave. N.W.
Washington, D.C. 20036
Phone: (202) 955-8500   Fax: (202) 530-4238
Email: barosenthal@gibsondunn.com
Representing Apple, Inc.

Ilissa S. Samplin, Esq.
Gibson, Dunn & Crutcher, LLP
333 S. Grand Ave.
49th Floor
Los Angeles, CA 90071
Phone: (213) 229-7000   Fax: (213) 229-6635
Email: isamplin@gibsondunn.com
Representing Apple, Inc.

Kenneth G. Parker, Esq.
Haynes Boone, LLP
600 Anton Blvd.
Suite 700
Costa Mesa, CA 92626
Phone: (949) 202-3000   Fax: (949) 202-3114
Email: ken.parker@haynesboone.com
Representing Apple, Inc.

Marc R. Lewis, Esq.
Lewis & Llewellyn, LLP
601 Montgomery St.
Suite 2000
San Francisco, CA 94111
Phone: (415) 800-0590   Fax: (415) 390-2127
Email: mlewis@lewisllewellyn.com
Representing Apple, Inc.

Tobias G. Snyder, Esq.
Lewis & Llewellyn, LLP
601 Montgomery St.
Suite 2000
San Francisco, CA 94111
Phone: (415) 800-0590   Fax: (415) 390-2127
Email: tsnyder@lewisllewellyn.com
Representing Apple, Inc.

Mark D. Selwyn, Esq.
Wilmer Cutler Pickering Hale & Dorr, LLP
2600 El Camino Real
Suite 400
Palo Alto, CA 94306
Phone: (650) 858-6031   Fax:
Email: mark.selwyn@wilmerhale.com
Representing Apple, Inc.

Downtown Los Angeles Office ● 601 S. Figueroa Street Suite 4000 ● Los Angeles, CA 90017 ● (213) 223-1113 ● Fax (213) 223-1114
San Diego Office ● 402 W. Broadway Suite 2400 ● San Diego, CA 92101 ● (619) 814-1966 ● Fax (619) 814-1967
San Francisco Office ● 100 Pine Street Suite 1950 ● San Francisco, CA 94111 ● (415) 266-1242 ● Fax (415) 266-1243
West Los Angeles Office ● 11601 Wilshire Blvd Suite 2040 ● Los Angeles, CA 90025 ● (310) 442-2100 ● Fax (310) 442-2125
Sacramento Office ● 980 9th Street Suite 2200 ● Sacramento, CA 95814 ● (916) 394-8490 ● Fax (916) 394-8495

Exhibit 20
Page 15

# EXHIBIT 21
Redacted in its Entirety

# EXHIBIT 22
Redacted in its Entirety

# EXHIBIT 23
Redacted in its Entirety

# EXHIBIT 24

```
                    UNITED STATES DISTRICT COURT
                   CENTRAL DISTRICT OF CALIFORNIA
                   (SOUTHERN DIVISION - SANTA ANA)



MASIMO CORPORATION, ET AL,    ) CASE NO: 8:20-CV-00048-JVS-JDEx
                              )
             Plaintiffs,      )             CIVIL
                              )
     vs.                      )        Santa Ana, California
                              )
APPLE, INC,                   )       Thursday, June 10, 2021
                              )
             Defendant.       )     (10:01 a.m. to 10:19 a.m.)


         HEARING RE: PLAINTIFFS' MOTION TO COMPEL [DKT.NO.377]
                   AND ORDER DENYING THE MOTION


            BEFORE THE HONORABLE JOHN D. EARLY,
              UNITED STATES MAGISTRATE JUDGE




APPEARANCES:              SEE PAGE 2


Court Reporter:           Recorded; CourtSmart

Courtroom Deputy:         Maria Barr

Transcribed by:           Exceptional Reporting Services, Inc.
                          P.O. Box 8365
                          Corpus Christi, TX 78468
                          361 949-2988




Proceedings recorded by electronic sound recording;
transcript produced by transcription service.
```

Exhibit 24
Page 1

2

<u>APPEARANCES</u>:


For Plaintiffs:             JOSEPH R. RE, ESQ.
                            Knobbe Martens Olson & Bear, LLP
                            2040 Main Street
                            14th Floor
                            Irvine, CA 92614

                            ADAM POWELL, ESQ.
                            Knobbe Martens Olson & Bear, LLP
                            12790 El Camino Real
                            San Diego, CA 92130


For Defendant:              JOSHUA H. LERNER, ESQ.
                            Gibson Dunn & Crutcher, LLP
                            555 Mission Street
                            Suite 3000
                            San Francisco, CA 94105

                            ANGELIQUE KAOUNIS, ESQ.
                            Gibson Dunn & Crutcher, LLP
                            2029 Century Park East
                            Suite 4000
                            Los Angeles, CA 90067

1       <u>Santa Ana, California; Thursday, June 10, 2021; 10:01 a.m.</u>

2                              <u>(Call to Order)</u>

3            **THE COURT:**  Good morning, everyone.

4        **(Attorneys greet the Court)**

5            We're calling the case of *Masimo Corporation, et al.*

6   *versus Apple, Inc.*; Central District of California Case Number

7   8:20-cv-48-JVS-JDEx.  We're here on Plaintiffs' Motion to

8   Compel which is Docket Number 377.

9            And we'll take appearances of counsel, starting with

10  counsel for Plaintiffs.

11           **MR. RE:**  Good morning, Your Honor.  Joseph Re from

12  Knobbe Martens.  With me is my partner, Adam Powell.

13           **THE COURT:**  Good morning.

14           And on behalf of Defendant?

15           **MR. LERNER:**  Good morning, Your Honor.  Joshua Lerner

16  and Angelique Kaounis from Gibson Dunn on behalf of Apple.  And

17  with us today is Ryan Moran, in-house counsel at Apple.

18           **THE COURT:**  All right.  Good morning.

19           All right.  We're here on the Motion to Compel.  I've

20  reviewed the motion; I've reviewed the joint stipulation; I've

21  reviewed declarations and exhibits offered in support and

22  opposition to the requested relief and Plaintiffs' supplemental

23  memorandum and related information.

24           We're going to get started.

25           I have a tentative.  I'm going to give you the short

4

1  version.

2          The tentative is I'm tentatively inclined to deny the

3  motion.

4          I'm going to assume, without deciding, that it was

5  Apple's burden here, based on both the case law and the

6  existing order previously entered by me in this case, that

7  Apple had the burden here to oppose the relief Plaintiffs seek

8  with respect to Mr. Cook's -- a search of Mr. Cook's -- or

9  designating Mr. Cook as an ESI custodian.

10          And although the apex doctrine relating to

11  depositions and 30(b) -- or depositions doesn't apply directly

12  here; some, but not all, of the considerations that underly

13  that doctrine apply; and that is that it is more burdensome.

14  And I don't need a declaration to know this; that it is more

15  burdensome to search the CEO of a multi-billion dollar, maybe

16  multi-trillion dollar international corporation for records.

17  But the burden is not the same as having that person appear for

18  an apex depositions but there is some burden, there is some

19  burden and that's facially apparent.

20          And the proffer made by Plaintiffs, I'm going to

21  characterize as relatively weak in connection with the

22  relevance of Mr. Cook's email and other electronically stored

23  information sources as it relates to the claim in this case --

24  claims in this case -- claims and defenses in this case.

25          Gonna have a big bright light proviso now.  Counsel

Exhibit 24
Page 4

5

1    have heard me say this at least once, maybe twice.

2            I'm going on what's in front of me; and in

3    particular, I would take counsel at their word.  We've got

4    excellent counsel in this case.  And I've got a representation

5    by counsel for Apple -- and although only -- it's

6    electronically signed by one person, there are (one, two,

7    three, four, five, six) seven attorneys underneath that

8    signature so I'm attributing this to all those counsel and the

9    firm representing Apple and Apple itself.

10           Quote, page -- this is from page 9 of the Joint

11   Stipulation, (quote):

12               "Tim Cook (comma), Apple's CEO (comma), is not likely

13               to have discoverable information relevant to any

14               parties' claims or defenses." (period, close/quote).

15           It's a conclusory statement but it's made by an

16   Officer of the Court and Officers of the Court, to this Court

17   in connection with this motion.  And I want Apple and its

18   counsel to understand that's the basis for my tentative and

19   potentially the basis for my ruling.

20           The world's a funny place.  We talked about it

21   before.  Sometimes there are acquisitions.  Sometimes things

22   come out that no one knew were going to come out and no one

23   understood were going to come out that can change how things

24   are looked at later.

25           I'm accepting that representation, that counsel's

Exhibit 24
Page 5

6

1    done an inquiry and based on their inquiry, Tim Cook is not

2    likely to have discoverable information relevant to any

3    parties' claims or defenses.  And I've read -- there's dueling

4    declarations here.  Frankly, the issues at depth in those

5    dueling declarations are sort of tersely.  They're not to the

6    heart of the case.

7            But that statement, I'm relying on.  If that turns

8    out to not be true, through some other source, there will be

9    severe repercussions because I'm relying on it.  So I want to

10   make sure Apple understands that.

11           Regardless of my ruling here, Apple can still agree

12   to conduct a search of Mr. Cook's email as an ESI custodian.

13   I'm not -- my tentative is not to order it but be on notice.

14   You have put yourself out there and I'm relying on it.  If it

15   turns out not to be true, the consequences, we will be back

16   here and there will be an evidentiary hearing.

17           All right.  So let me hear -- Plaintiff, it's your

18   motion.  You've heard my tentative is to rule against you.  Let

19   me hear from you.

20           **MR. RE:**  Thank you, Your Honor.

21           I think --

22           **THE COURT:**  And this is Mr. Re speaking for our

23   recording.

24           **MR. RE:**  Thank you.  Mr. Re, R-e, is the last name.

25           I don't see any record evidence at all about burden.

7

1   This is simply an ESI search.  It is minimal effort.

2          **THE COURT:**  And if you heard what I said, there are

3   -- you haven't been here for all the discovery motions in here

4   and I've talked about that issue, that there are some -- some

5   cases where the burden is facially apparent.  And I'm not

6   saying it rises to the level of what the burden would be for an

7   apex deposition but I am saying it's facially apparent that

8   there is a burden to -- and we've also talked about pipes in

9   this case a lot -- that discovery requests are going through

10  pipes.  The pipes here are expanded in terms of the number of

11  potential custodians.  But we're trying to do things that make

12  economic sense under Rule 1 of the Federal Rules of Civil

13  Procedure but also get you what you're looking for.

14         Your showing to me, Plaintiffs showing to me is

15  minimal at best.  The fact that the CEO of Apple indicated he's

16  very interested in health care technology, it has very little

17  weight in terms of making that person's email subject to

18  search.

19         The issues regarding Dr. O'Riley, the fact that

20  regardless of how you characterize it, I don't see evidence.

21  We have Dr. O'Riley's first person attestation that his

22  interaction with Mr. Kirk at his interviews was essentially a

23  windup; they did not discuss substance of any Masimo

24  technology.  And the fact that the CEO met with someone at the

25  end of a day's worth of interviews, even taking into account

Exhibit 24
Page 7

1   all the information, is not to me sufficient to overcome that

2   limited burden that's facially apparent from the request.

3            **MR. RE:**   Okay.  You say "facially apparent."  I do

4   want to address the basis for the tentative.

5            The representation made that you're relying upon is

6   made without any representation as to how they could possibly

7   know this.  What's the basis for the representation?  I don't

8   even see them even suggesting that they've done any ESI

9   searching to even have a basis for the representation.

10           **THE COURT:**   And again, it gets back to they're -- I

11   think I quoted Bob Dylan at one of our earlier hearings.  I

12   don't need a weatherman to know which way the wind blows.

13           I can -- you don't have to have 15 declarations to

14   say doing an ESI search for the President and CEO of Apple,

15   Inc. from 2013 to the present -- where, again, talking

16   generally about whatever the time period is going to be -- the

17   number of devices, the number of avenues of communication that

18   need to be searched and the heightened -- the heightened need

19   for review when you're looking at a CEO's search is different

20   from the type of review, an attorney review that you're doing

21   for an engineer's -- search of an engineer's email.  These are

22   all things that I don't need a declaration to tell me.  They're

23   independently knowable.

24           That said, I'm not saying it's a massive showing or a

25   massive, per se, burden demonstrated, but that's the whole

9

1   purpose of the apex doctrine in depositions is it goes without

2   saying that that's a burden.

3          Now I'm not saying the apex doctrine applies here but

4   the aspects of it are equally available.  And I'm going to ask

5   you, Mr. Re, if you can if you can keep your mask on.

6          Aspects of it, aspects of it, the theory of it is the

7   same but I'm being very clear and I'm repeating that

8   representation that I mentioned and that you mentioned.

9          Implicit in every discovery response is an

10  affirmation and attestation by the attorney that it's made in

11  good faith; that it's made not to conceal or not to

12  unnecessarily delay the case.  Ramp it up when it's made in a

13  brief to the court.

14          I don't believe that Apple's lawyers would make that

15  willy-nilly without some foundation and I'm accepting it.  But

16  I am letting everyone know if it turns out from some other

17  source that Mr. Cook actually does have discoverable

18  information relevant to any parties' claims or defenses in his

19  ESI streams, we will be having a hearing and it may involve a

20  hearing of Mr. Cook testifying in this court, in person, if

21  that turns out to be a representation that was made to me that

22  I'm relying on for purposes of making this order.  And it may

23  also require testimony from counsel who made this

24  representation but that's only if it turns out to potentially

25  not be true.

Exhibit 24
Page 9

10

1          All right.  Please continue, Mr. Re.

2          **MR. RE:**  Well, it sounds like you made up your mind

3    and --

4          **THE COURT:**  I mean I have thought about it and -- but

5    I want to make sure you have a full and fair opportunity to be

6    heard.

7          **MR. RE:**  Well, my only point is that there's no basis

8    for the statement.  You're just relying on the good-faith

9    Officer of the Court; I assume it's true.  If that's the

10   analysis, I have nothing further to add.

11         **THE COURT:**  Well let me just say, combined with what

12   doesn't require evidence; and that is, there is a burden on the

13   CEO of one of the largest corporations in the world to have me

14   have that person designated as an ESI custodian beyond what it

15   would be for, say, an engineer or a lesser person who's not

16   dealing with lawyers on a regular basis, who's not probably got

17   a the same level of communications.

18         So I don't need an expert, I don't need a declaration

19   to understand that that's where the apex doctrine comes from.

20         **MR. RE:**  But the apex doctrine is based on the burden

21   and oppression to the witness.  We have no evidence or

22   suggestion by anybody that the witness is even involved --

23         **THE COURT:**  So I'm going to disagree with you.  The

24   apex doctrine is not just the burden on the witness; it's the

25   burden on the entity to have --

**EXCEPTIONAL REPORTING SERVICES, INC**

Exhibit 24
Page 10

11

1          We talked about the *Mattel versus Bratx* case, right?

2    We were here -- I know you were here, Mr. Lerner, when you had

3    the CEO of Mattel International sitting up in Judge Carter's

4    courtroom in the back row for a week.  That was a burden on him

5    but it was also a burden on Mattel.  And what we're talking

6    about with respect to the apex doctrine is a burden on the

7    witness but also a burden on the company itself to have the CEO

8    pulled out for eight hours or four hours or whatnot.  So it's a

9    burden on both.

10          **MR. RE:**  I agree with what you just said but we have

11    no evidence that Mr. Cook will be pulled to do anything.

12    That's the difference between a personal appearance and a ESI.

13    You can check my ESI and I don't even know it's happening so

14    there's no participation --

15          **THE COURT:**  Well so again I'm going to stop you.

16          I expect more from counsel when checking ESI.  If

17    Mr. Cook or any custodian uses devices, uses a communications

18    stream other than company email, it's up to the lawyers to

19    investigate that and find out.  What's the simplest way?  Ask

20    the person.  And he may say well that takes three seconds to

21    ask.

22          Easier said than done when presumably the primary

23    time period you're talking about is 2013 and 2014, to ask the

24    CEO where and what communication streams he or she used during

25    that time period is not an easy task.

Exhibit 24
Page 11

12

1     **MR. RE:**  I can't debate non-existent evidence.  You

2  tell me this.  I've been doing this for 35 years.  If you say

3  so, okay.  I can't convince you but I can't rebut non-existent

4  evidence.

5     **THE COURT:**  Well again, I'm doing a balancing, and

6  one of the things I'm balancing is what's the relevance.  And

7  what I'm telling you is what's been presented is not compelling

8  in terms of even if it's just a limited burden, what's been

9  presented is not compelling.  Most of it relates to, again, the

10  idea of Mr. Cook was interested in health care products.  All

11  right.  Mr. Cook spoke with Dr. Riley after his interviews.

12  Okay.

13     And the rest of it is primarily Mr. Cook's, as it's

14  characterized -- and I'm doing air quotes -- "right-hand man,"

15  (close/quote), also had interactions that you want to know

16  about.  But my understanding is that right-hand man is one of

17  the custodians.  And so to the extent Mr. Cook was

18  communicating with the right-hand man, presumably you're going

19  to get that.

20     So I don't find the showing by Plaintiffs

21  particularly compelling.

22     And from the defense standpoint, it's by operation of

23  law and commonsense that there is a burden and I don't find --

24  I find that you haven't overcome it.

25     But again, I'm going to reiterate what I said before

13

1  about none of this prevents Defendant from going forward with

2  the ESI search of Mr. Cook and agreeing to do so.  And if they

3  don't, they do it at their own risk.

4          All right.  Anything else, Mr. Re?

5          **MR. RE:**  Nothing further.

6          **THE COURT:**  All right.  Mr. Lerner, unless there's

7  something you want to add or clarify or find out about, the

8  tentative will be the order of the court and the motion will be

9  denied for the reasons stated on the record.

10         **MR. LERNER:**  No, Your Honor.  We agree with both the

11  reasoning as to relevance on the issues raised in the

12  plaintiffs' papers like health care and with respect to the

13  burden.

14         **THE COURT:**  All right.  And do you hear and

15  understand what I said about the representation made at page 9

16  of the Joint Stipulation?

17         **MR. LERNER:**  Yes, Your Honor.

18         **THE COURT:**  All right.  Could you make sure.  And I

19  know we have a representative from Apple's in-house counsel.

20  Could you make sure that that is passed on.  And nothing

21  prevents you and Apple from going forward with Mr. Cook, doing

22  a search of Mr. Cook's ESI.  This order merely denies the

23  motion.  And I'm letting plaintiffs know if they get further

24  information that bears on -- that causes me to question this

25  linchpin of what I'm relying on, this is without prejudice to

Exhibit 24
Page 13

14

1  re-raising this motion and I would expect that there would be a

2  hearing.  But it depends on what the showing is; I'm not going

3  to prejudge anything but I expect that there would be a hearing

4  where live testimony would be taken if that's the case and a

5  sufficient showing is made and there will be likely -- well

6  I'll leave it at that.

7          All right?

8          **MR. LERNER:**  Thank you.

9          **MR. RE:**  Thank you.

10         **THE COURT:**  Thank you.  We're adjourned.

11         **MS. KAOUNIS:**  Thank you, Your Honor.

12     **(Proceeding adjourned at 10:19 a.m.)**

13

14

15

16

17

18

19

20

21

22

23

24

25

15

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    June 12, 2021

     Signed                                             Dated

*TONI HUDSON, TRANSCRIBER*

# EXHIBIT 25

```
                    UNITED STATES DISTRICT COURT
                    CENTRAL DISTRICT OF CALIFORNIA
                   (SOUTHERN DIVISION - SANTA ANA)




MASIMO CORPORATION, ET AL,    ) CASE NO: 8:20-CV-00048-JVS-JDEx
                              )
              Plaintiffs,     )            CIVIL
                              )
     vs.                      )       Santa Ana, California
                              )
APPLE, INC,                   )  Thursday, September 23, 2021
                              )
              Defendant.      )
_____   )


   IN-PERSON HEARING RE: PLAINTIFFS' MOTION FOR RECONSIDERATION

               BEFORE THE HONORABLE JOHN D. EARLY,
                 UNITED STATES MAGISTRATE JUDGE




APPEARANCES:            SEE PAGE 2


Court Reporter:         Recorded; Digital wave file


Courtroom Deputy:       Maria Barr


Transcribed by:         Exceptional Reporting Services, Inc.
                        P.O. Box 8365
                        Corpus Christi, TX 78468
                        361 949-2988




Proceedings recorded by electronic sound recording;
transcript produced by transcription service.
```

2

<u>APPEARANCES</u>:


For Plaintiffs:            JOSEPH R. RE, ESQ.
                           Knobbe Martens Olson & Bear, LLP
                           2040 Main Street
                           14th Floor
                           Irvine, CA 92614

                           ADAM POWELL, ESQ.
                           Knobbe Martens Olson & Bear, LLP
                           12790 El Camino Real
                           San Diego, CA 92130


For Defendant:             JOSHUA H. LERNER, ESQ.
                           Gibson Dunn & Crutcher, LLP
                           555 Mission Street
                           Suite 3000
                           San Francisco, CA 94105

                           NATALIE POUS, ESQ.
                           Apple In-House Counsel

Exhibit 25
Page 2

3

1            **Santa Ana, California; Thursday, September 23, 2021**

2                        **(Call to Order)**

3            **THE COURT:**  Good morning, everyone.

4            **MR. RE:**  Good morning.

5            **MR. LERNER:**  Good morning, Your Honor.

6            **THE COURT:**  One item on calendar today.  Calling Case

7    Number Central District of California 8:20-cv-48-JVS-JDE,

8    *Masimo Corporation, et al., versus Apple, Inc.*

9            Appearances for this in-person hearing, Counsel,

10   starting with counsel for plaintiff.

11           **MR. RE:**  For Masimo and Cercacor, Joseph Re from

12   Knobbe Martens Olson and Bear.  With me is my partner, Adam

13   Powell.

14           **THE COURT:**  Good morning.  Thank you.

15           And on behalf of defendant?

16           **MR. LERNER:**  Good morning, Your Honor.  Joshua

17   Lerner, Gibson Dunn, on behalf of Apple, and with me today is

18   Natalie Pous, legal counsel, litigation, from Apple.

19           **THE COURT:**  I'm sorry; what was the last name?

20           **MR. LERNER:**  P-O-U-S, Your Honor.

21           **THE COURT:**  All right.  And that's in-house counsel

22   at Apple?

23           **MR. LERNER:**  Yes.

24           **THE COURT:**  All right.  All right.  We're here for

25   a -- what's been styled as a motion for reconsideration of my

4

```
 1   June 10th ruling regarding Mr. Cook's being designated as an
 2   ESI custodian, a motion that I denied on June 10th.  I'll tell
 3   you what I've reviewed.  Then I'm going to give you my
 4   tentative thoughts.
 5           I have reviewed the motion, which, let's see, is
 6   Docket Number 471, and memorandum and exhibits and
 7   declarations, some of which were filed under seal.  I've
 8   reviewed Apple's opposition, which is at 479, along also with
 9   two declarations and exhibits.  I don't think any of that was
10   filed -- oh, no, some of it was filed under seal; and a reply
11   from plaintiffs filed on August 5th, also with exhibits and a
12   declaration, some of which was filed under seal.
13           I'm going to now first ask, on plaintiffs' behalf, is
14   there anything that I should have reviewed that I haven't
15   referenced, from your perspective?
16           MR. RE:  Nothing, Your Honor.
17           THE COURT:  And on behalf of defendant?
18           MR. LERNER:  No, Your Honor.
19           THE COURT:  All right.  Here is my tentative.  My
20   tentative is to grant the motion for reconsideration, finding
21   that plaintiff under Local Rule 7-18 did act appropriately and
22   in a timely fashion and there is good cause for the motion not
23   being filed within 14 days after the hearing because -- for the
24   reasons stated in the papers, but the -- I don't want to
25   characterize one piece of evidence more important than another,
```

5

1    but certainly the public filing on July 2nd by Apple of an

2    October 2nd, 2013, email from Mr. Marcelo Lamego to Mr. Tim

3    Cook, and I think there was a follow-up email back to

4    Mr. Lamego from a representative at Apple later that same

5    morning, that was publicly filed on July 2nd.  There was a

6    meet-and-confer session requested, I think the next business

7    day, which was July 6th, and a meet-and-confer took place on

8    July 9th, and then per Local Rule 7-8 the motion couldn't have

9    been filed until July 16th, and it was filed on the next

10   business day thereafter, on July 19th, which I, based on all

11   the circumstances -- and I've summarized it; I haven't included

12   everything -- find was -- that plaintiffs acted diligently and

13   had good cause to not file the motion within 14 days after the

14   prior ruling.

15           And I'll also note that, from the bench, the last --

16   at the hearing on the July 10th original motion, I had invited

17   plaintiffs' counsel that should there be new information they

18   could refile the motion.  So, although it's styled as a motion

19   for reconsideration, they could have just filed a brand-new

20   motion.  I offered that up as an option, and that, obviously,

21   would not have been subject to the Local Rule 7-18, 14-day plus

22   good cause requirement.  Now, I may be speaking too much.  Had

23   that happened, it might have been heard by Judge Guilford

24   instead of me under the special master reference, but be that

25   as it may, I find good cause for the filing of motion.

6

1          Turning to the substance, I think it was the same

2    counsel who were here on July -- on June 10th.  I expressed

3    that it was a -- and I may not have used these words, but the

4    essence of it was it was a close call.  I found that the -- the

5    factual evidentiary showing relatively weak by plaintiff in

6    connection with their request to show that there was some

7    reasonable likelihood that Mr. Cook might have relevant

8    information in his emails or other streams.  The flip side was

9    I noted that defendants offered no evidence of the burden.

10   And, so, essentially, on that close call, I relied on two

11   people.  One of them was Bob Dylan, and one of them was

12   Mr. Lerner and four or five other attorneys from Gibson Dunn

13   and Crutcher who represented -- and I'm going to paraphrase --

14   that it was unlikely that Mr. Cook would have any relevant

15   discoverable information in his ESI.

16          That statement was confirmed at the hearing, and I

17   gave Mr. Lerner an opportunity to recognize that that was an

18   important basis for my ruling and that should that at some

19   future date turn out not to be true, there could be -- and I

20   used the word "severe" -- there could be severe repercussions.

21   I'm not inclined right now to get into repercussions.  I think

22   I'd need to gather some more information.  We can do that if

23   the parties wish.  Right now I'm inclined to move forward with

24   your case, help you each move forward with your respective

25   cases, and rule on the substance of the motion, but we can get

Exhibit 25
Page 6

7

1    into a more deep dive into some other issues that may be

2    lurking out there.

3            And I'll note, in terms of the good cause, moving

4    back in time, that I have considered Apple's arguments that

5    plaintiffs' counsel, at least the firm, had possession of the

6    October 2nd, 2013, email as long ago as last year, and there is

7    a declaration from a paralegal from another firm regarding

8    production in another case.  I'm happy to get into a deep dive

9    on that.

10           I actually -- I don't think you were here,

11   Mr. Lerner, on that other case -- had some thoughts about what

12   was happening, and I used a term from my days visiting New York

13   City when I was a kid in the 1970s where you'd pop out of Penn

14   Station or Grand Central Station and there would be guys with

15   little tables set up playing Three Card Monte.  And I want to

16   explain what that is.  It's a game where you're trying to pick

17   the queen out of three cards.  And the queen is there, and the

18   person dealing the cards isn't cheating; and by dealing, he

19   just throws three cards around, but is being somewhat opaque.

20   And sometimes it involves having a third party who appears to

21   be an independent third party who's actually working with the

22   dealer out on this little table outside the station looking for

23   tourists coming into town to have the third party, who looks to

24   be independent, win a couple times, and then when the tourist

25   puts their money down, suddenly the card is much harder to

8

1    find.  The card exists; it's just being obscured.

2         I'm happy to hear from Apple about anything that they

3    want to talk about.  But one of the things we might get into

4    and have to get into if we're going to do a deep dive is the

5    relationship between Apple and True Wearables, the defendant in

6    the other case; how it came to pass that the October 2nd email

7    was designated as confidential in that case; maybe we need to

8    get into communications between the parties.  I don't know, and

9    I certainly am not going to issue any orders on the fly on

10   that, but maybe we need to, to find out how it came to pass.

11   And there is an argument from Apple that plaintiff --

12   plaintiffs could have just moved to de-designate that October

13   2nd, 2013, email in the True Wearables case.  I'm not sure what

14   the basis for that argument is.  There is no basis in the

15   protective order in that case to simply say:  I want to use

16   something that was designated as confidential in another case.

17   You can move to de-designate by saying something isn't

18   confidential.  And here at least it was represented at the last

19   hearing that -- I think it was by Mr. Re -- that during the

20   course of the True Wearables case Mr. Lamego said that that

21   email, he designated that as confidential at the request of --

22   and I'm not sure if it was expressed or in his mind

23   interpreted -- at the request of Apple.  And you each have

24   heard me talk about my views of protective orders and that

25   they're not to be willy-nilly disregarded, and that protective

Exhibit 25
Page 8

9

1    order limited the use of that email once it was designated as

2    confidential to the prosecution or defense of that case only.

3    So, plaintiffs could not have simply thrown it in front of me.

4           Now, the timing here, perhaps it was a genius move by

5    plaintiffs to serve a third-party subpoena on Apple, have Apple

6    file a motion to quash, and then have that document be brought

7    to my attention in connection with that motion to quash, but be

8    that as it may, that was -- they didn't have an ability to

9    bring it to my attention in this court in this hearing on June

10   10th.  And I'm a little troubled by the suggestion that it was

11   that simple or that plaintiffs here were at fault.  And, so, if

12   we want to go down that road, we will, but we're probably at

13   that point going to have to have some evidentiary issues if we

14   really want to push it.  But I'm comfortable right now with

15   what I see to say they did not have authorization from me or

16   Mr. Lamego.  And I saw the emails from Mr. Lamego's counsel

17   essentially telling plaintiff they couldn't even disclose this

18   to in-house counsel at Apple; it could only be an attorneys'-

19   eyes-only presentation of the email from plaintiff to Apple's

20   counsel before plaintiffs' counsel would be authorized to file

21   it in connection with the motion to quash in the True Wearables

22   case.

23          So, I'm riffing a little bit.  I've given you the

24   short version of my tentative.  I guess I'll start with you,

25   Mr. Re, or Mr. Powell.  It's plaintiffs' motion.  At the risk

Exhibit 25
Page 9

1    of potentially snatching defeat from the jaws of victory,

2    you're welcome to offer any additional argument, since you have

3    the burden here, but -- or give me any new information, since I

4    think the last filing was your reply over a month ago, if

5    there's any new information that you want to impart to me.

6            Mr. Re, the floor is yours.

7            **MR. RE:**  Thank you, Your Honor.  I only have one

8    statement to make, and that is, we, in an abundance of caution,

9    had the same interpretation of the protective order that you

10   just gave.  And that is, even if I were to show it to

11   Mr. Lerner, for example, for a meet-and-confer to get a court

12   order to approve it after the fact, that might even be deemed a

13   use.  So, we have an ambiguity on the word "use," and we took

14   the broadest interpretation, just like you just did in your

15   explanation.

16           **THE COURT:**  Anything further?

17           **MR. RE:**  Nothing further.

18           **THE COURT:**  All right.  Subject to your ability to

19   respond, any arguments from Mr. Lerner?  Mr. Lerner, you've

20   heard my tentative and my thoughts.  Let me hear what you want

21   to argue.

22           **MR. LERNER:**  Thank you, Your Honor.  I will not spend

23   time on your point about the procedure here.  I want to get to

24   the substance, which is that there's new information that

25   changes the basis for the Court's prior ruling.

1          **THE COURT:**  Could I ask you a favor?  Just pull the

2   microphone a little closer to you so I make sure that if there

3   is a transcript that the transcriber can hear the recording.

4          **MR. LERNER:**  Yeah.  Is that better, Your Honor?

5          **THE COURT:**  Yes.

6          **MR. LERNER:**  Okay.  So, the argument that you heard

7   and, obviously, what Your Honor has focused on is the email

8   from Mr. Lamego to Mr. Cook.

9          **THE COURT:**  And there's multiple facts, but that's

10  the one that I focused on in giving my tentative.  It's not the

11  only reason.

12         **MR. LERNER:**  Understood.  And I'll quickly address

13  the others, as well.  But that unsolicited email to Mr. Cook

14  notes that Apple -- to other people, not Mr. Cook, and not --

15  is suggested in the email that Mr. Cook's suggestion or

16  anything else had already approached Mr. Lamego.

17         **THE COURT:**  Okay.

18         **MR. LERNER:**  And --

19         **THE COURT:**  Let me slow everything down.  Okay.  The

20  question is whether Mr. Cook has relevant information, and

21  they're not going to prove their case by this email.  I want

22  you to -- tell you I don't view this as the smoking gun that

23  declares victory for plaintiffs in this case.  But the question

24  is, does -- have they shown enough to show that Mr. Cook has

25  potentially relevant information in his electronic streams,

Exhibit 25
Page 11

12

1   email, or whatnot.  And I mentioned I relied heavily on what

2   you told me, in writing and affirmed at the hearing, that there

3   is -- it's unlikely that there is relevant, discoverable

4   information in his email streams.

5           I have a question for you:  Is the email, from your

6   perspective, from Mr. Lamego to Mr. Cook on August -- I'm

7   sorry -- on October 2nd, 2013, relevant?

8           **MR. LERNER:**  We have been consistent on the point

9   that not only is the answer to that no, it should not be and

10  cannot be to bring Mr. Cook into a dispute --

11          **THE COURT:**  Okay.  You say the answer is no.  We're

12  going to do a little bit more of a deep dive now.  So, let's --

13  so that we're -- all know what we're talking about, let's pull

14  up -- well, first of all, let's talk about some of the claims

15  in the case.  Theft of trade secrets is a claim in the case,

16  right?

17          **MR. LERNER:**  Yes, sir.

18          **THE COURT:**  My days as a prosecutor, whenever you

19  file a -- whenever you investigate a charge, file a charge, get

20  ready for trial, you pull up the elements, right?  What are

21  some of the elements of a claim for theft of trade secret?

22          **MR. LERNER:**  You need a trade secret, and you need

23  misappropriation.

24          **THE COURT:**  Okay.  And in order for there to be

25  misappropriation, if a third party doesn't have any idea that

13

1    something is a trade secret, and some third party who just

2    walks in and without any knowledge or notice that it's

3    potentially a confidential trade secret, the company uses it,

4    would that company have a defense in that situation of lack of

5    knowledge and intent?

6            **MR. LERNER:**  Yes, Your Honor.

7            **THE COURT:**  Okay.  So, knowledge and intent of the

8    receiving party matters.  Is that true?

9            **MR. LERNER:**  Yes, it is, Your Honor.

10           **THE COURT:**  And tell me, in the grand scheme of

11   things, does knowledge and intent by the third person, who

12   allegedly walks out with a trade secret, does that matter?  Is

13   that something that -- under the broad definition of relevance

14   of Rule 401 under the evidence code, is that something that

15   matters?

16           **MR. LERNER:**  Could be, in that --

17           **THE COURT:**  Okay.  Could be.

18           **MR. LERNER:**  -- hypothetical; I don't know.

19           **THE COURT:**  All right.  We're at a stage where we

20   don't know; there's going to be -- you've got more than a year

21   until trial.

22           All right.  So, let's talk about -- those are some of

23   the issues, what Mr. Lamego, who's the person we're talking

24   about here, knew; what Apple knew when Mr. Lamego came on

25   board; and I think from your papers you concede that you hired

Exhibit 25
Page 13

14

1 him effective to start January, 2014.  There is a dispute about

2 whether he was -- he was recruited or -- was recruited as part

3 of a grander scheme, but that that's part of the case.

4    So, let's turn to that email, because that's going to

5 be what we're focusing on.  The very first paragraph -- and I'm

6 looking at -- I'm going to go -- because some of this is

7 sealed, some of it isn't.  I don't think this -- I know this

8 was unsealed, and I'm just going to tell you where in the

9 record I'm finding it.  It is in a few places in connection

10 with the motion, but this is at Document Number 321-1, page 37

11 of 94, and this is -- it has the little Stanford alumni

12 insignia on top of it.  It's an email entitled:  The Three

13 Equations.  It's from, at least facially, from Mr. Lamego to T.

14 Cook at Apple.com dated Wednesday, October 2nd, 2013, at

15 12:54 a.m.  The first paragraph:

16    "I was approached by Apple in the beginning of this

17    year and was asked if I would like to join the

18    executive team."

19   Leaving aside where it was found, do you think that

20 that's -- that statement has any bearing on Mr. Lamego's state

21 of mind in connection with the issues in this case?

22   **MR. LERNER:**  Saying that he was approached by two

23 other people, to me, Your Honor, does not reflect on his state

24 of mind.

25   **THE COURT:**  Okay.  How about Apple's state of mind?

EXCEPTIONAL REPORTING SERVICES, INC

Exhibit 25
Page 14

15

1   Does it have any bearing?  Remembering that Rule 401 means,

2   does the evidence at issue or the fact at issue have any

3   tendency to make a fact of consequence at issue in the case

4   more or less likely, does an assertion by Mr. Lamego that he

5   was approached by Apple in the beginning of 2013 and asked if

6   he would like to join the executive team, does that have any

7   bearing on any issue in this case?  That statement.

8           **MR. LERNER:**  Yes, and that's --

9           **THE COURT:**  Okay.

10          **MR. LERNER:**  -- actually where I was starting.  If I

11  can --

12          **THE COURT:**  Perfect.

13          **MR. LERNER:**  -- just get a word in --

14          **THE COURT:**  No, no.

15          **MR. LERNER:**  -- edgewise, Your Honor --

16          **THE COURT:**  No, no, no.  No, no, no, no.  I've read

17  your papers.  So, that fact is material.  Where did that fact

18  originate?  Where did Mr. Lamego send that email with that fact

19  in it?

20          **MR. LERNER:**  It originated with two other gentlemen,

21  David Affourtit and James Foster, who were the people who

22  approached him.

23          **THE COURT:**  I'm asking you.  The statement that --

24  leaving that aside, may or may not be true -- I don't know if

25  it's true or not -- but I know that from this record, on its

16

1    face, Mr. Lamego says it's true.  So, where did Mr. Lamego send

2    that?

3              **MR. LERNER:**  He sent it to Mr. Cook.

4              **THE COURT:**  And, so, it existed at least at one time

5    in Mr. Cook's email stream.

6              **MR. LERNER:**  Yes.  And --

7              **THE COURT:**  All right.  Let's turn to the next thing

8    I want to ask you about.

9              **MR. LERNER:**  May I offer a point on that, Your Honor?

10             **THE COURT:**  No.  "Because I did not" -- I'm reading

11   from the email again.

12             "Because I did not want to sign the Apple's NDA for

13             onsite review, the process came to a halt."

14             Period.  Next sentence:

15             "I felt that it was not appropriate to receive

16             confidential information from or disclose

17             confidential information to Apple given my fiduciary

18             responsibilities as technical officer of Cercacor."

19             Period.  Close quote.

20             Do you think that a statement by Mr. Lamego in an

21   email directed to Mr. Cook stating, one, earlier in the year he

22   didn't want to sign an NDA, in part because he felt it was,

23   quote, "not appropriate," close quote, to, quote, "disclose

24   confidential information to Apple," and, two, that described he

25   had and owed, quote, "fiduciary responsibilities as technical

Exhibit 25
Page 16

17

1    officer of Cercacor."  Period, close quote.

2            Are those two facts that are contained in this email

3    in any way relevant to any issue in this case?

4            **MR. LERNER:**  They could be.  The point which we've

5    been consistent on throughout, Your Honor, is that --

6            **THE COURT:**  Thank you.  They could be.

7            **MR. LERNER:**  -- is that --

8            **THE COURT:**  Let's talk about --

9            **MR. LERNER:**  Your Honor, may I please --

10           **THE COURT:**  Let's talk about one more --

11           **MR. LERNER:**  -- answer your question?

12           **THE COURT:**  -- clause from this email.  Let's talk

13   about one more clause from this email.  Next page.  We're now

14   at page 38 of Docket Number 321-1, second to last substantive

15   paragraph.  Quote:

16           "I would appreciate if the content of this letter

17           could be kept confidential since it can jeopardize

18           the outcome of my career at Cercacor."

19           Period.  Close quote.

20           Do you think that that expression of concern about

21   his career at Cercacor, based on this letter that he sent to

22   Mr. Cook, that that has any bearing on any fact of consequence

23   in this case?

24           **MR. LERNER:**  In this case?  It sounds like it was a

25   big deal in the other case where he was very concerned.

**EXCEPTIONAL REPORTING SERVICES, INC**

Exhibit 25
Page 17

18

1          **THE COURT:**  I'm asking about this case.

2          **MR. LERNER:**  I --

3          **THE COURT:**  Do you think that Apple being placed on

4    notice that the person who, in your words, unsolicitedly sent

5    an email to Tim Cook, asked Mr. Cook to keep this email

6    confidential, a potential -- I don't know if you were

7    competing, if the companies were competitors at that point --

8    but asked to have this communication confidential, do you think

9    that that has any bearing on -- for instance, we talked about

10   knowledge of the receiving party in a trade secret case knowing

11   that the potential information is a trade secret or is

12   confidential -- does this have any bearing on any issue of

13   consequence in this case?

14          **MR. LERNER:**  It could, and we're addressing --

15          **THE COURT:**  Okay.  It could.

16          **MR. LERNER:**  -- two separate --

17          **THE COURT:**  It could.  Thank you.

18          **MR. LERNER:**  -- issues.  We're addressing --

19          **THE COURT:**  So, now let's turn to -- let's get --

20   let's really get into the weeds now.  I really want to get into

21   this.

22          **MR. LERNER:**  Your Honor --

23          **THE COURT:**  Let's talk about -- no, no.  I've read

24   your papers.

25          **MR. LERNER:**  I'm not commenting on my papers.  I just

**EXCEPTIONAL REPORTING SERVICES, INC**

Exhibit 25
Page 18

19

1    would like to be heard.

2           **THE COURT:**  We're going to turn now to the -- what I

3    think is the operative pleading, which is the fourth

4    amendment -- fourth amended complaint.  Paragraph 21 of the

5    fourth amended complaint reads, in part:

6                "Apple systematically recruited other key Masimo

7                personnel, such as Marcello Lamego, who was the

8                former chief technical officer at Cercacor and a

9                former research scientist at Masimo."

10          The remainder of paragraph 21 describes dates that

11   Mr. Lamego worked at Masimo or Cercacor.

12          Here is -- and that's -- that's the fourth amended

13   complaint.  Here is defendant's, Apple's, amended answer to the

14   fourth amended complaint with respect to paragraph 21:

15               "To the extent it implicates a legal conclusion, no

16               response is required.  To the extent that a response

17               is required, Apple admits that it hired Marcelo

18               Lamego in 2014.  Apple denies that it systematically

19               recruited other key Masimo personnel, such as Marcelo

20               Lamego.  Apple lacks information sufficient to form a

21               belief about the truth of the remaining allegations

22               and characterizations in paragraph 21 of the fourth

23               amended complaint, and, therefore, Apple denies

24               them."

25               End of quotation.

Exhibit 25
Page 19

20

1          So, Apple, in responding to paragraph 21, did not

2  admit and, in fact, denied, based on lack of information, that

3  Marcelo Lamego was the former chief technical officer of

4  Cercacor.  So, apparently, that Apple's taking is challenging

5  that based on lack of information or belief.

6          Does the -- Mr. Lerner, does the first line of -- or

7  not the first line, but the -- Mr. Lamego's letter, does that

8  have any bearing on whether he was the former chief technical

9  officer of Cercacor?

10          **MR. LERNER:**  It doesn't say he was former.  It says

11  as the chief, at this time.

12          **THE COURT:**  Okay.

13          **MR. LERNER:**  He held multiple positions.

14          **THE COURT:**  We're talking about relevance.  You're

15  not proving your case.  Does it have any bearing on the issue

16  of whether he was, at one time, the chief technical officer at

17  Cercacor?

18          **MR. LERNER:**  He says:  "My responsibilities as the

19  chief technical officer of Cercacor."

20          **THE COURT:**  So, could you answer my question?  Does

21  it have any bearing on the issue of a fact that apparently

22  Apple contests, due to lack of information or belief, whether

23  Mr. Lamego was the chief technical officer at Cercacor?

24          **MR. LERNER:**  He held multiple positions, and we're

25  talking about different times, but, yes, this does say he was

Exhibit 25
Page 20

21

1   the --

2            THE COURT:  All right.  Yes.  Let's go on --

3            MR. LERNER:  -- chief technical officer.

4            THE COURT:  -- to paragraph 22.  All right.

5   Paragraph 22 of the fourth amended complaint.  Just read the

6   first sentence for now:

7            "Lamego had unfettered access to plaintiffs' highly

8            confidential, technical information."

9            Here is reading now from Apple's answer to the fourth

10  amended complaint:

11           "To the extent paragraph" -- 22 -- although it says,

12  "To the extent paragraph 23," I believe that's a typo, because

13  it's numbered 22.

14           "To the extent" -- the paragraph -- "implicates legal

15           conclusions, no response is required.  To the extent

16           that a response is required, Apple lacks knowledge or

17           information sufficient to form a belief about the

18           truth of the allegations and characterizations of

19           paragraph 22 of the fourth amended complaint, and

20           therefore Apple denies them."

21           So, that puts -- that statement whether or not

22  Mr. Lamego had unfettered access to plaintiffs' highly

23  confidential technical information, do you think, since that's

24  now at issue and plaintiff has to prove it since it's been

25  denied by Apple, that that letter has any bearing on that

1   issue?

2           **MR. LERNER:**  Whether or not he had unfettered access?

3           **THE COURT:**  Yeah.

4           **MR. LERNER:**  He says:  "I developed several medical

5   devices in the last 10 years."

6           **THE COURT:**  He also said that he didn't want to sign

7   an NDA because of -- that would require him -- by which he

8   would have shared confidential information, he wasn't

9   comfortable, given his fiduciary duties.  So --

10          **MR. LERNER:**  No, no, that's --

11          **THE COURT:**  -- does that letter have any bearing on

12  this?

13          **MR. LERNER:**  This is important.  That is not what

14  that says.

15          **THE COURT:**  All right.  Fine.  Your --

16          **MR. LERNER:**  It does not say he would have --

17          **THE COURT:**  Is it your contention -- yes or no, is it

18  your contention that that letter has any bearing on plaintiffs'

19  now requirement to prove its contentions in paragraph 22 of its

20  answer, this contention that Apple denies?

21          **MR. LERNER:**  Mr. Lamego sent this --

22          **THE COURT:**  Yes or no?  Just give me a yes or no.

23  Does it have any bearing?

24          **MR. LERNER:**  As to Apple, he sent this email.  The

25  whole point of our argument and what I've been trying to

23

1    explain is that it cannot be the test that sending an email to

2    Mr. Cook, where he effectively says, by forwarding it without

3    comment, this is not on my plate; I'm not --

4           **THE COURT:**  He doesn't say that.  He doesn't say that

5    at all.  We're moving on now.

6           **MR. LERNER:**  He --

7           **THE COURT:**  Since you didn't answer my question,

8    we're going to keep going.  Paragraph 228 of the fourth amended

9    complaint.

10          **MR. LERNER:**  I apologize.

11          **THE COURT:**  I'm going to --

12          **MR. LERNER:**  How did I not answer your question?

13          **THE COURT:**  I'm going to -- I asked you for a yes or

14   no question of whether it had any bearing on the issue of the

15   case, and you didn't answer that.

16          **MR. LERNER:**  That's --

17          **THE COURT:**  So, we're moving forward to paragraph 228

18   of the fourth amended complaint.  I'm reading a portion of it.

19          "At the time of the disclosure, O'Reilly and Lamego

20          knew, or had reason to know, that their knowledge of

21          plaintiffs' confidential information was acquired by

22          an employer-employee relationship, fiduciary

23          relationship, and employment agreements, which

24          created a duty for them to keep plaintiffs'

25          confidential information secret."

24

1          That's the allegation of paragraph 228.  In response,

2    in its answer to paragraph 228, leaving aside the legal

3    conclusion statement previously read, this is the entirety of

4    the answer:

5               "To the extent that a response is required, Apple

6               denies the allegations and characterizations in

7               paragraph 228 of the fourth amended complaint and

8               specifically denies that it has committed any active

9               trade secret misappropriation."

10          So, Apple is affirmatively denying all the

11    allegations contained in paragraph 28, including the allegation

12    that Mr. Lamego knew, or had reason to know, that their

13    knowledge of confidential information was required by, among

14    other -- was acquired by, among other things, a fiduciary

15    relationship.

16          Does the October 2nd, 2013, from Mr. Lamego have any

17    bearing on what plaintiff now has to prove -- because Apple has

18    denied it -- that Mr. Lamego knew that he had knowledge of

19    plaintiffs' confidential information acquired as a result of a

20    fiduciary obligation?

21          **MR. LERNER:**  It well could, and I will not contest

22    any of the further points, Your Honor.  I don't think I can get

23    out my point, but I take Your Honor's questions, understand

24    your point.  I don't need to keep arguing it.

25          **THE COURT:**  Well, we're going to go a little more;

Exhibit 25
Page 24

25

1    because I want to make sure that -- you know, you had some

2    pushback there.  Let's go to paragraph 229, the next paragraph

3    of the fourth amended complaint:

4              "Plaintiffs allege at the time of the acquisition

5              defendant also knew, or had reason to know, that its

6              employees obtained plaintiffs' confidential

7              information pursuant to a duty to keep plaintiffs'

8              confidential information secret."

9              And, then, skipping down:

10             "Defendants also knew Lamego was the chief technical

11             officer of Cercacor and a research scientist at

12             Masimo.  Defendant knew Lamego and O'Reilly were each

13             under a duty to maintain the secrecy of the

14             information they obtained from plaintiffs.  Defendant

15             knew plaintiffs considered the information

16             confidential by virtue of its prior relationship of

17             plaintiffs."

18             And we talked earlier about in a trade secret case

19    the state of mind of the defendant matters, right?

20             **MR. LERNER:**  Yes, Your Honor.

21             **THE COURT:**  And this allegation is that the

22    defendant, Apple, a corporation, knew that, among other things,

23    Lamego was the chief technical officer of Cercacor and was

24    under a duty to maintain the secrecy of information --

25    confidential information contained, and that defendant knew

Exhibit 25
Page 25

26

1    that plaintiffs considered information confidential by virtue

2    of that relationship.  Apple in its answer to paragraph 229

3    admits that it received a letter from plaintiffs on or around

4    January 24th, 2014, containing the language quoted in paragraph

5    229, but denied the remaining allegations and characterizations

6    of paragraph 229.

7            Do you think that Mr. Lamego's October 2nd, 2013,

8    letter bears in any way on Apple's denial -- other than

9    referencing the January 24th, 2014, letter -- has any bearing

10   on the issue of Apple's state of mind with respect to the trade

11   secret case?

12           **MR. LERNER:**  Not as we understood the accusations

13   there, Your Honor.  They were based on, as we understood them,

14   on that letter.

15           **THE COURT:**  So, you say it has no bearing whatsoever.

16   That letter has no bearing whatsoever about whether defendant

17   knew Lamego was the chief technical officer and that he was

18   under a duty to maintain secrecy of confidential information.

19   You're saying that that letter is irrelevant to plaintiffs'

20   obligation to prove those allegations.

21           **MR. LERNER:**  No, Your Honor.  The point we've been

22   trying to make -- and I accept your point, and I don't want to

23   keep arguing it, because I understand you don't --

24           **THE COURT:**  Yeah, and I can go on for --

25           **MR. LERNER:**  -- accept my argument.  So, I --

Exhibit 25
Page 26

1          **THE COURT:**  -- for quite a long time.  But we'll stop

2   now on the fourth amended complaint.

3          And, now, before you get to what you want to tell

4   me --

5          **MR. LERNER:**  No, I --

6          **THE COURT:**  -- I want to ask you:  What did you know

7   at the time you wrote and affirmed in court when you said that

8   Mr. Cook's email is unlikely to contain relevant, discoverable

9   information?  Were you aware of the October 2nd, 2013, from

10  Mr. Lamego that you have now repeatedly confirmed contains

11  relevant information?  Were you aware of it at the time you

12  wrote your brief in connection with the June 10th, 2021, motion

13  or opposi- -- motion, and were you aware of it at the time you

14  sat here in court on June 10th and said you understood that I

15  was relying on that representation?  Were you aware of that

16  email at that time?

17         **MR. LERNER:**  Yes, Your Honor.  We had talked about it

18  with the Court a week earlier.

19         **THE COURT:**  You hadn't talked about it to me.

20         **MR. LERNER:**  I'm sorry.

21         **THE COURT:**  When did you talk about it to me a week

22  earlier?

23         **MR. LERNER:**  We --

24         **THE COURT:**  Tell me what day you spoke to me about

25  that email.

28

1          **MR. LERNER:**  I apologize if I got that incorrect in

2   terms of my characterization.  On June 3rd, at set forth in the

3   papers here, we had communicated with the plaintiffs about this

4   email.  They gave us a brief that was redacted and didn't have

5   the information, and we said, "What's redacted?"  And they went

6   to True Wearables and got approval to show it to us, and it was

7   this email.

8          **THE COURT:**  Are you saying that's the first you've

9   ever seen that email?

10          **MR. LERNER:**  No, Your Honor.

11          **THE COURT:**  Okay.

12          **MR. LERNER:**  So, at that point --

13          **THE COURT:**  So, when did you -- when did you -- you

14   said you told me about it a week before June 10th.  When did

15   you tell me about it?

16          **MR. LERNER:**  We -- I apologize.  We filed the brief

17   that day, June 3rd, with Your Honor.  As described there, we

18   didn't tell you about it; we filed the paper.  So, obviously,

19   we were aware of it.

20          **THE COURT:**  But you didn't tell me about it, and I --

21          **MR. LERNER:**  No, that's correct.

22          **THE COURT:**  Do you want to take a look at what I get

23   every morning?  It's a list of every document filed in every

24   case that I'm on.  Do you think, as I'm getting ready for

25   hearings, I open up and analyze every filing, in every other

Exhibit 25
Page 28

29

1   case, on the off chance that there's something in there that

2   might have relevance?  Do you think that I do that?

3         **MR. LERNER:**  No, Your Honor.

4         **THE COURT:**  Of course not.  What do I do?  I rely on

5   the candor of counsel at times, like I did on June 10th, when

6   you told me Mr. Cook is unlikely to have any relevant,

7   discoverable material in his email, and you just confirmed to

8   me -- we could talk about the issue of ESI custodian in a

9   moment -- but you just confirmed to me that this email is

10  relevant on so many issues that you -- you don't even want to

11  talk about it anymore.  Did you lie to me?

12        **MR. LERNER:**  Certainly it was not my intent, Your

13  Honor, and I apologize that you feel that way.

14        The -- very quickly, the point that I have been

15  trying to make to explain why I don't want you to feel that way

16  is that we have been very consistent in pointing out that

17  sending an email to Mr. Cook --

18        **THE COURT:**  I'm not -- we'll get to that.

19        **MR. LERNER:**  Okay.

20        **THE COURT:**  The question isn't -- look, there's all

21  sorts of things that you can argue.  You could have argued on

22  June 10th to say:  You know what, Your Honor?  I wrote in the

23  brief that there is -- his email is unlikely to have relevant,

24  discoverable information; you know, there is this email,

25  unsolicited from Mr. Lamego, that, you know, came in, I guess

Exhibit 25
Page 29

30

1   that's relevant, but here's the reasons why that doesn't make

2   him and Mr. Cook a proper ESI custodian.  You didn't say that.

3   And to the extent you think that I'm scouring files --

4           **MR. LERNER:**  No.

5           **THE COURT:**  -- for -- for --

6           **MR. LERNER:**  I do not.

7           **THE COURT:**  -- when you tell me --

8           **MR. LERNER:**  I do not.

9           **THE COURT:**  -- there is unlikely to have relevant,

10  discoverable information, and this email is in there, separate

11  and apart from whether he's an appropriate discussion, and you

12  knew about it, and you told me:  No, nothing relevant or

13  discoverable; unlikely to have anything relevant and

14  discoverable in his email.  You sat there when I said --

15  because I'm relying on you and your four or five colleagues

16  that signed that brief -- that this is a close call.  But I'm

17  relying on that statement to deny the motion, and you didn't

18  say:  By the way, there is this other thing out there.  And

19  they couldn't tell me.  Because they heard me, and they heard

20  me when I talked about protective orders and what they mean.

21  They knew about it from a protective order.  They couldn't tell

22  me in the context of this case.  And you sat there and let it

23  all go by like it didn't exist.

24          So, before we get to the appropriateness of the

25  custodian, I want to get -- since we've now gone down this

31

1  road, I want to get to the bottom of this.  Do you still

2  contend -- and I noticed from your papers you no longer say his

3  email is unlikely to contain discoverable, relevant

4  information.  It now says it's unlikely to contain discoverable

5  non-duplicative information.  So, that tells me that you

6  recognized that you were not completely candid with me on June

7  10th.  And we can get to your other arguments, but how am I

8  supposed to trust anything you say now?

9        **MR. LERNER:**  I apologize, Your Honor.  As I said

10  earlier, the way that we understood the argument here and the

11  issues is, did he have information that made him a proper

12  custodian.

13        **THE COURT:**  Okay.  That's not what you wrote, and I

14  was at the hearing --

15        **MR. LERNER:**  I --

16        **THE COURT:**  -- and you were at the hearing, and I

17  made it very clear that there was a careful balancing going on

18  here, and that the plaintiffs' showing was not particularly

19  strong about specific contacts.  There was references to public

20  statements about Mr. Cook saying he wanted the future of Apple

21  to be and the health -- the health monitoring field, and the

22  statements around the timing and conversations and meetings

23  with Mr. O'Reilly, but that that didn't really show a lot of

24  relevance to our dispute here and in connection to it.

25        And on your side, you didn't show me any burden, and

Exhibit 25
Page 31

32

1   so it was a close call, but I'm going to take you at your word

2   when you tell me as an officer of the Court it's not likely to

3   have any relevant discoverable information.  And to hear that

4   you knew about this October 2nd, 2013, letter at the time you

5   made that representation, and assured me that you understood

6   that that's what I was relying on, and to hear as we sat here

7   today the various myriad ways in ways that letter is relevant

8   to the issues in this case, I'm not sure what to do with that.

9           But let's move on.  You want to tell me something.

10  Do you now concede that that representation was, let's just say

11  not entirely accurate, and that there is reason to believe --

12  in fact, there is -- you've now conceded that there was at

13  least at one time relevant information in Mr. Cook's email?

14          **MR. LERNER:**  I understand your point, Your Honor, and

15  I apologize --

16          **THE COURT:**  I'm not making a point.  I'm asking a

17  question.  Can we move past that?

18          **MR. LERNER:**  Yes.

19          **THE COURT:**  Is it now the state of play that we can

20  start from this spot, where we couldn't start from last time.

21  I now have evidence in front of me that at least at one time

22  Mr. Cook had relevant information in his email strings.

23          **MR. LERNER:**  Yes.

24          **THE COURT:**  All right.  Make whatever further

25  argument you want to make.

Exhibit 25
Page 32

33

1          **MR. LERNER:**  Two very quick points.

2          **THE COURT:**  I don't want you to be rushed.  Take as

3    much time as you want.

4          **MR. LERNER:**  I understand Your Honor's point so far.

5    When we briefed this throughout, and Your Honor just raised,

6    for example, the meeting with Mr. O'Reilly, that was a meeting.

7    We didn't say they didn't meet.  To the contrary.  We went and

8    got a declaration from Mr. O'Reilly about the meeting with

9    Mr. Cook.

10         **THE COURT:**  And as you heard, I'm not talking about

11   that.  I found that insufficient before.

12         **MR. LERNER:**  And what we had when we looked at this

13   email isn't even a meeting.  We have an email that comes in.

14   He forwards it, and as far as we can tell, has nothing else to

15   do with it.  And then, in order to make sure, and give the

16   Plaintiffs every opportunity we can to test this theory that

17   Mr. Cook knew anything about this, we said, on each of these

18   documents actually, we'll make the people involved custodians.

19   So, this was forwarded to Jeff Williams.

20         **THE COURT:**  What day did you offer Jeff Williams as

21   an ESI custodian?

22         **MR. LERNER:**  I think as they pointed out, it was

23   right before one of our briefs.

24         **THE COURT:**  Maybe the day before your opposition?

25         **MR. LERNER:**  I think that's what -- that's what was

Exhibit 25
Page 33

34

1    said in the papers, and if that's so, that's accurate.

2            **THE COURT:**  And why should they take your word that

3    that's going to, in your words, "put the matter to bed"?

4            **MR. LERNER:**  That was one of many people who -- to

5    whom we said, let's make them a custodian so you can test this

6    theory.  That is who Tim Cook in the first instance forwarded

7    this to.

8            And by the way, when we -- when we went and looked,

9    and provided information about his emails, there was not, as

10   far as we can tell, not follow-ups until November.  And not to

11   involve Mr. Cook as we saw.

12           Now, on the second point where they say --

13           **THE COURT:**  When you say you investigated the email

14   chain, did you ask Mr. Cook?

15           **MR. LERNER:**  We have not asked Mr. Cook.

16           **THE COURT:**  Okay.

17           **MR. LERNER:**  And again, that goes, I think, to the

18   point I was trying to make.  And I understand Your Honor's

19   response to it which is, if in every instance where somebody

20   sends Mr. Cook an unsolicited email, and he forwards it to

21   other people to deal with, we have to go talk to him or review

22   his emails, that's not a workable standard.

23           **THE COURT:**  Well, when you make a representation that

24   an email account is not likely to have relevant information at

25   a time you know and knew that it did, I'd suggest, if you're

35

1    going to come back and say, "Oh, well, never mind, this was

2    never followed up on".

3           In that situation, when your credibility is now at

4    issue, maybe you should ask, or ask someone, and say, and this

5    is what you stated in your declaration at Paragraph 7 in

6    connection with the opposition, "I attest that a reasonably

7    diligent search did not yield any indication that Tim Cook ever

8    responded to or substantively commented on this email chain".

9    That doesn't mean that there isn't other information in his

10   email or that there isn't other potential information in the

11   question as -- well.

12          That's a very narrow statement.  "Oh, well, we

13   couldn't find that Mr. Cook further commented on this email

14   chain".

15          What about other email chains?  Did you ask him?

16   Apparently not.

17          **MR. LERNER:**  We --

18          **THE COURT:**  And we're starting from a kernel that

19   didn't exist at the last hearing that now exists, and you have

20   said a couple of times "unsolicited email".  Well, fine.

21   Unsolicited as to Mr. Cook, but at least according to the

22   email, Mr. Lamego had been contacted by two people from Apple.

23          So, it's not, as you put in your opposition, a

24   statement from customers that email Tim Cook, and he didn't

25   respond to.  It's unsolicited in the sense that Mr. Cook didn't

1   ask for it, but people from Apple contacted Mr. Lamego, and he

2   dealt directly with Mr. Cook.  Why did he deal directly with

3   Mr. Cook?  Well, maybe there's a -- we're now getting into

4   Mr. Lamego's head, but maybe there's a bit of an inkling in

5   that last second to last paragraph.  "Please keep this

6   confidential".  He's going to the top.

7          And you indicated, and your papers indicated, that

8   Mr. Cook, "Oh, he just forwarded it on for other people,

9   without any comment".

10          I'm going to tell you, just like I said, and I quoted

11   Bob Dylan last time, that I don't need a weather man to know

12   which way the wind blows.

13          I'm going to go out on a limb, and we do have an

14   Apple representative in court.  I'm going to go out on a limb

15   that if Mr. Cook got an email at 12:53 a.m. and forwarded it to

16   the head of HR and the head of the, what is it, the Health

17   Sciences Division, at what was it, like 7:00 a.m.  I mean, we

18   don't even have a minute of 9:00 to 5:00 business time before

19   that was sent out.

20          Now, obviously, Apple doesn't necessarily work on a

21   9:00 to 5:00 business, but you're talking about that's an

22   immediate turn around, and it's not just going to an assistant

23   or going to someone.  It's going to the head of HR and the head

24   of the relevant department.  So, he did put thought into it.

25   He didn't just slough it off.  He picked two critical people

37

1    that bear directly on what Plaintiffs are alleging, and he did

2    it almost instantaneously considering the time it came in.

3           And one of those people almost instantaneously

4    reached back out to Mr. Lamego within a couple of hours.  I am

5    very curious about whether there was any other communication

6    with Mr. Cook about this issue.  I'm sure the Plaintiffs are

7    interested were there emails to other people.

8           So, to say, "Well, we didn't find him commenting on

9    this email thread", doesn't answer the question and doesn't

10   really get to it other than it -- the fact that it's there

11   makes one of the legs that underpinned my prior ruling go away.

12   And it's more than just a customer sending an email that he has

13   his assistant look at.

14          And I'll say something else.  Again, this comes from

15   my time as a prosecutor.  The metadata on this is going to be

16   important because your client may say, "You know what, Tim Cook

17   doesn't even monitor his email account, the general email

18   account.  He's got an assistant that does that.  An assistant

19   made this decision".  Maybe so.  I don't know.  But I'd be

20   interested to know what came in before, what came in after.

21   And I'm not saying that's discoverable, but what I'm saying is

22   potentially where this goes, if there's an argument that

23   Mr. Cook didn't forward it, someone else did, well, they may

24   have the ability and be approved to make an ability to test

25   that.

Exhibit 25
Page 37

38

1          But this is an important email.  What happened to it

2     is important, and it suggests to me, reasonable cause to

3     believe that there -- that first of all, Mr. Cook is

4     knowledgeable about the facts, because he didn't just send it

5     to his assistant and say, "I don't know what this is, deal with

6     it".  And sometimes saying nothing is saying a lot.  What is

7     it, Cool Hand Luke?  Sometimes nothing is a pretty cool hand?

8          Sometimes when the CEO of the world's largest company

9     forwards, without comment, an email about an unsolicited email

10    from the chief technology officer from a competitor or

11    potential competitor to the head of HR and the head of the

12    Health Sciences Division, that speaks loudly, even if there

13    isn't anything written in text in the email.

14          So, please continue.

15          **MR. LERNER:**  I do not need to continue to test your

16    patience, Your Honor.  As I can tell, so only --

17          **THE COURT:**  I have -- listen, you're not testing my

18    patience.

19          **MR. LERNER:**  -- the only two points I would clarify

20    is that I tend to read my email sometimes around 8:00 or 9:00

21    in the morning.  That's what Mr. Cook did based on the

22    documents we saw here.  I just want to clarify that point.

23          **THE COURT:**  Can I get the exact time?  When was the

24    exact time --

25          **MR. LERNER:**  8:50 a.m.

39

```
 1              THE COURT:  -- because again, it might be important

 2   for the metadata to see when it was opened; how quickly it was

 3   sent out.

 4              What was the exact time he forwarded it to

 5   Mr. Williams and --

 6              MR. LERNER:  8:50 and 57 seconds Pacific time.

 7              THE COURT:  All right.  And it was sent at 1:50 a.m.

 8              MR. LERNER:  Right.  So --

 9              THE COURT:  So, we're -- we didn't even get to

10   business hours.  You're right.  Maybe he does it first thing in

11   the morning, but again it shows you something.

12              MR. LERNER:  I just --

13              THE COURT:  You check your email in the morning.  I

14   check my Court docket in the morning.  Important things, I send

15   something to Maria right away.  Oh, we've got to deal with

16   this.  We've got an ex parte from -- well, leave it at that.

17   We've got to deal with this right away.

18              Less important things, they kind of filter out

19   through the day.  Maria is nodding her head.  We deal with them

20   when we deal with them, but important things, boy, we send them

21   out right away, and we make sure we get it to the right person

22   right away.

23              So, when Judge Carter or Judge Selna sends me an

24   email, even without comment, I'm getting back to him, or Judge

25   Staton right away because, boy, that's important.
```

40

1          So, go ahead.

2          **MR. LERNER:**  I, like I said, I do not have more to

3   take your time with this other than that the two people you

4   mentioned, Mr. Cook tends to interact with other senior people.

5   So, he forwarded it to senior people, and as you can tell from

6   the follow-up, some of those people, it sounds like already

7   knew about the discussions and there were discussions in place.

8   So, there was -- there was follow-up.

9          These are all factual issues.  I understand Your

10  Honor's point that you would like to know more about them.  We

11  understand your tentative.

12         I think I've made my point about the standard for

13  making him a custodian.  I understand that's not carrying

14  water, and I understand your other points.

15         **THE COURT:**  Well, do you have anything you want to

16  add from a legal standpoint?  Have I said anything wrong from a

17  legal standpoint about what the right standard is?

18         **MR. LERNER:**  For making him a custodian?

19         **THE COURT:**  Yeah, what's -- what do you contend the

20  standard is?

21         **MR. LERNER:**  I contend the standard should not and

22  cannot, and I don't have a case specific to these facts because

23  we have not seen one, but it should not be enough to make the

24  CEO of a company a custodian because he receives and forwards

25  an email.

41

1          **THE COURT:**  All right.  You cited two cases in your

2    opposition that dealt with the ESI custodian issue.  All the

3    other cases --

4          **MR. LERNER:**  Yep.

5          **THE COURT:**  -- deal with the issue of the timing and

6    appropriateness of the requests for -- of the motion for

7    reconsideration under the rules.  Is there anything you want to

8    tell me about those cases that you think should guide my

9    analysis here?

10          **MR. LERNER:**  No, Your Honor.  I'm sure you've already

11    reviewed them and read the papers, as you've said.  So I,

12    again, don't need to take more of your time.

13          **THE COURT:**  Well, I want -- listen.  Tell me if

14    there's anything, and I'm going to point out from my reading.

15    You're right.  I did read them, the *BlackBerry* case, and that

16    was Judge Stevenson in L.A. from 2019, and the citation is 2019

17    WL 4544425.

18          I don't know that that helps your cause because

19    although Judge Stevenson denied a motion, and it relates to

20    Mr. Mark Zuckerberg from Facebook, denied a motion to require

21    that he search -- or that Facebook search his email strings as

22    to four categories or four search issues.

23          She had earlier had required Facebook to conduct a

24    search of Mr. Zuckerberg's email for a particular issue that

25    she found relevant, and then because -- it was largely because

1   it was a patent case, patent infringement case, there was no

2   showing that Mr. Zuckerberg knew anything about the patents at

3   issue, those other patent-related ESI terms were not required

4   to be searched, but he was required -- Facebook was required to

5   search as to an issue which he did have knowledge.

6        MR. LERNER:  And we cited that case, to be clear,

7   Your Honor, because the proposed order here that you've been

8   asked, is not just to run the terms that the parties have

9   negotiated on Mr. Cook --

10        THE COURT:  But what I'm -- but this is a very

11   different situation.  And if this were just a patent case,

12   we're not dealing with just a patent case.  We're dealing with

13   the very issue that that letter goes -- that email goes to the

14   heart of as it relates to the trade secret case.

15        MR. LERNER:  And --

16        THE COURT:  So, the relevant information that at

17   least at one time was in his email string, and that again, by

18   not speaking, he spoke loudly; by how quickly he forwarded it

19   and to whom he forwarded it to shows that he did have some

20   knowledge and did -- and there is reason to believe that

21   there'd be more information in his emails.

22        And then the other case is the *Lauris versus Novartis*

23   from 2016.  That's Stan Boone's case in the Eastern District.

24   And he also denied an ESI request for four senior executives of

25   Novartis, but first of all said, and I'm quoting from Star

43

1    Three of the Opinion, "That the Court is not persuaded that the

2    Apex Doctrine applies to discovery at issue", and then found

3    that the discovery sought was not proportionate to the needs of

4    the case noting that it would double the costs of the discovery

5    that had taken place thus far.

6            So, he had information from the Defense about what

7    the costs would be to do these four, and I'm using the term

8    loosely, Apex ESI searches, whereas I have none.  And I do find

9    that it is relevant, and there is reason to believe that

10   material information would be contained in the email thread,

11   and I'll note Judge Stevenson also did not apply, and expressly

12   said she was not applying an Apex Doctrine approach to the

13   issue, but was instead just relying on relevance and

14   proportionality.

15           And based on the information that I have, I find that

16   there is reason to believe that there's relevant information

17   and that I, having no countervailing facts, and the only thing

18   that I relied on last time, which was counsel's representation,

19   which turned out not to be true, from a proportionality

20   analysis, I find that -- or I am tentatively finding that the

21   -- Mr. Cook being designated as an ESI custodian is

22   proportional to the needs of the case, as Defendant has not

23   shown me any evidence otherwise.

24           Anything else, Mr. Lerner?

25           **MR. LERNER:**  No, Your Honor.

Exhibit 25
Page 43

44

1          **THE COURT:**  Mr. Re or Mr. Powell, any rebuttal or

2   response?

3          **MR. RE:**  Nothing, Your Honor.

4          **THE COURT:**  So, I'm going to ask this.  I'm going to

5   hold off on issuing a ruling.  I'm not sure that -- I'm not

6   saying he isn't, I'm not saying he is.  I'm not sure that the

7   same search terms that might apply to the head of R and D or

8   the head of some of the other issues, would necessarily apply

9   to Mr. Cook in a search of his email, as I know there's this

10  issue of efficient infringement.

11          I'm not making a ruling on it, but I want there to be

12  some discussion among the parties about whether this -- whether

13  the search terms can be agreed to or whether I need to make a

14  finding.  I'll hear from you on that, Mr. Re.

15          **MR. RE:**  We did propose a very, very, very few terms

16  for Mr. Cook.

17          **THE COURT:**  Is this in the proposed order?

18          **MR. RE:**  It is in, actually in a letter to Mr. Brian

19  Andrea at Gibson Dunn.  And it's at Exhibit 22.  Oh, it's

20  Document 475-2, filed July 19th this year, and its Page 46 of

21  47; otherwise Exhibit 22 at 190.

22          And you'll see at the very, very bottom of that page

23  just how limited the terms are for Mr. Cook compared to

24  everybody else.  And so, you're right.  We have already had

25  correspondence setting forth a very, very targeted number of

45

1   search terms for Mr. Cook.

2          **THE COURT:**  All right.  So, for the record, those

3   search terms are, "Masimo, or Cercacor, or Kiani, or Diab" is

4   one Boolean search.  A second one is, "Lamego, or Marcelo, or

5   O'Reilly, or O'Riley", spelled alternatively.  The third one is

6   the phrase, "efficient infringement".  And the last is,

7   "healthcare, or embedded patient or medical closed in bed

8   (phonetic) within five of monitor, with an end Boolean change

9   allotment".  Those are the four terms.

10         Tell me what you think about those terms, Mr. Lerner.

11         **MR. LERNER:**  We think, as we briefed, that "efficient

12  infringement" has nothing to do with this case.  It feels like

13  it's plucked out of the media.

14         The last one on its face is not as described.  Asking

15  us to look through all of Tim Cook's emails for healthcare

16  is --

17         **THE COURT:**  All right.  Mr. Re.

18         It sounds like the main objection is to the final

19  two, so let's focus on those two.  Is there any connection that

20  you found in discovery thus far to the phrase "efficient

21  infringement" as it relates to this case?

22         **MR. RE:**  I will defer to Mr. Powell, who is the

23  author of that letter.

24         **MR. POWELL:**  Thank you, Your Honor.  I'm not aware of

25  any documents in discovery using that phrase that we've

Exhibit 25
Page 45

46

1   received yet.  The phrase came out, and you'll see this in our

2   reply brief, is the issue is that there's been statements,

3   public statements about this is a practice at Apple known as

4   efficient infringement --

5             THE COURT:  I've seen it, and there was back and

6   forth about whether the person who made the allegation actually

7   was who, in terms of his position at Apple, was who he claimed

8   to be.  And my memory is whoever wrote the response to that

9   said something to the effect of Apple doesn't do that and

10  doesn't believe in that.

11            MR. POWELL:  Right, Your Honor.  So, Mr. Cook

12  indicated that he does not think Apple does that and so, our

13  point is this is just a search term.  If Apple doesn't do that,

14  then it shouldn't have any hits.  And if it does have hits, it

15  might be Mr. Cook saying, "Yeah, we definitely don't do

16  efficient infringement, that's not our practice".  You would

17  think that Apple would want to produce such documents.

18            THE COURT:  All right.  And tell me about the other

19  category that seems like it has the potential in using the

20  phrase "patient within five of monitor or monitoring"

21  considering the nature of some of Apple's products that that

22  conceivably could result in a large number of documents that

23  have nothing to do with the claims in this case.

24            MR. POWELL:  Yeah, I don't know how many documents it

25  would result on.  I think the issue here is to at least run the

47

1   search terms and get hit counts.  If the search terms don't

2   result in many documents, then there's no burden.  If the

3   search terms result in, you know, a million documents or

4   something, just for Mr. Cook, then of course we can -- I'm

5   happy to have that conversation with Mr. Lerner.

6          THE COURT:  All right.  Anything further on this

7   issue, Mr. Lerner?

8          MR. LERNER:  The only other thing that I'll add is,

9   particularly for Mr. O'Reilly obviously, you're talking about

10  an Apple employee.  So, just the name doesn't limit it to this

11  case.  You're talking about every communication with a

12  gentleman who was -- whose title at one point was chief medical

13  officer.  So, there's no limit there.

14         THE COURT:  Let me ask you, if I give you guys -- and

15  I understand you object and you don't agree with my ruling, but

16  if I give you guys 10 minutes, do you think you can narrow

17  this, or at least narrow some of it, because I am cognizant to

18  the potential -- because we're talking about -- what's the

19  timeframe we're talking about?

20         MR. POWELL:  We're talking roughly 2013 to present.

21         THE COURT:  Yeah, I'd like to see whether it's

22  something that you folks can narrow a little bit, but I'm not

23  making a ruling on whether that's inappropriate as stated, but

24  it might be worthwhile to, you know, any email for an eight-

25  year period -- is Mr. O'Reilly still at Apple?

Exhibit 25
Page 47

48

1          **MR. LERNER:**  Yes, Your Honor.  And --

2          **THE COURT:**  Any email that comes up with the name

3  "O'Reilly", which seems to be what Bullet Point 2 would

4  authorize, seems likely to, even though we don't have the

5  testing, seems likely to pull up an untoward and unnecessary

6  number of documents.

7          **MR. POWELL:**  Well, Your Honor, I would be happy to

8  have that conversation.  I would just only note that what we've

9  done before is we run the search terms and get hit counts --

10         **THE COURT:**  I hear you.

11         **MR. POWELL:**  -- okay.

12         **THE COURT:**  And the problem with that here is, we're

13  trying -- I'm cognizant of a lot of issues, and to the extent

14  you can try to narrow things a little bit now and see whether

15  there's a way that you won't have to run it again, that way you

16  can get to -- hey, nothing is going to be perfect.  You're not

17  necessarily going to capture everything you want, and you're

18  probably going to capture some things that they don't want

19  captured that are going to be produced.  And I don't mean that

20  in a nefarious way.

21         Let's try to work it out.  Let's take five minutes.

22  Just give me five minutes to talk and see if the parties can

23  first talk amongst themselves, and then talk with each other to

24  see if there's a way to narrow these in a way that is less

25  objectionable.  And I'm not saying, again, that I'm not

Exhibit 25
Page 48

49

 1   ultimately going to order it.

 2          And I'm just going to -- just going to sit here for

 3   five minutes, and if you folks want to step outside, you may.

 4      **(A five-minute recess was taken)**

 5          **THE COURT:**  All right.  Counsel have returned.  Do

 6   you need a minute?

 7          **MR. POWELL:**  No.  You may not like what we're going

 8   to say, but --

 9          **THE COURT:**  Okay.  I don't --

10          **MR. POWELL:**  -- I think we both thought we needed to

11   have consultation with the rest of the people on our teams.  We

12   didn't feel that we could do the kind of job on the fly here at

13   the courthouse because we all rely on other people, and we

14   would kindly request if we could have additional time to --

15          **THE COURT:**  What's going -- obviously, we used to

16   meet regularly, and we don't anymore.  What's going on in your

17   case?  Are there any deadlines or any reasons that this needs

18   to be expedited?

19          **MR. POWELL:**  No, and in fact, we even postponed this

20   hearing a few weeks so that we both could be here.  So, there

21   -- the answer is no.

22          **THE COURT:**  How much time do you think you need to

23   talk?  And again, I'm not expecting Apple to agree with the

24   ruling, but to the extent there are things that are less

25   objectionable that can be worked out, I want to provide that

1   opportunity.

2          How much time to you think you need from Plaintiffs'

3   standpoint just to consult with your team and make a

4   presentation to Apple?

5          **MR. POWELL:**  A day or two.

6          **THE COURT:**  So, by Monday.

7          **MR. POWELL:**  Monday.

8          **THE COURT:**  Okay.  Monday, the 20th -- I'm sorry, the

9   27th.

10          And Mr. Lerner, assuming you get a proposal from

11   Apple by Monday, the 20th, is that something you can respond to

12   -- I'm sorry, the 27th.

13          **MR. LERNER:**  Proposal on the 27th.

14          **THE COURT:**  Monday the 27th.

15          **MR. LERNER:**  Yes, Your Honor.

16          **THE COURT:**  All right.  So, what I'll do is I'm going

17   to hold off on a written ruling at least until Monday, the

18   27th, and I'll direct Plaintiffs' counsel to file just a status

19   report if there's any change to the request by nature of search

20   terms for Mr. Cook's email, but my tentative will be the order

21   that the motion will be granted.

22          And in terms of the timing, Mr. Lerner, Plaintiffs

23   ask for this to be done within -- to be completed, including

24   production, within 14 days.  What's an appropriate time from

25   your perspective?

51

1          **MR. LERNER:**  It will obviously depend a little bit on

2   -- not a little bit, a lot on the search terms, just in terms

3   of volume and review.  And as Your Honor has noted before,

4   which should surprise nobody, it takes additional review of

5   Mr. Cook's emails, just given the importance.

6          If we could get 30 days at the very least, that is

7   much more workable for us.  It may, as I said, we may need more

8   time just given the volume, if it turns out to be a lot more.

9          **THE COURT:**  All right.  Is there any reason why 30

10  days -- why a faster time period is required, Mr. Re or

11  Mr. Powell?

12         **MR. POWELL:**  No, Your Honor.

13         **THE COURT:**  All right.  So, here's what we're going

14  to do.  The order is going to be, the parties are directed to

15  meet and confer, file a -- Plaintiff is directed to file a

16  status report as of September 27th regarding requested terms

17  following that meet and confer for the ESI search.  And the

18  production will be ordered to be made by October 27th.  And if

19  more time is needed, the parties can agree among themselves.

20  An if the parties can't agree, they can return this one issue

21  back to me on that.

22         Is there anything further with respect to this motion

23  on behalf of Plaintiffs?

24         **MR. POWELL:**  Nothing further, Your Honor.

25         **THE COURT:**  And on behalf of Defendants?

Exhibit 25
Page 51

52

1          **MR. LERNER:**  No, Your Honor.

2          **THE COURT:**  All right.  Thank you.  We're adjourned.

3      **(Proceeding adjourned)**

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

53

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    **September 29, 2021**

        Signed                                               Dated


                    *TONI HUDSON, TRANSCRIBER*

# EXHIBIT 26
Redacted in its Entirety

# EXHIBIT 27
Redacted in its Entirety

# EXHIBIT 28
# Redacted in its Entirety

# EXHIBIT 29
Redacted in its Entirety

# EXHIBIT 30
Redacted in its Entirety

# EXHIBIT 31
Redacted in its Entirety

# EXHIBIT 32
Redacted in its Entirety

# EXHIBIT 33
Redacted in its Entirety

# EXHIBIT 34
Redacted in its Entirety

# EXHIBIT 35
Redacted in its Entirety

# EXHIBIT 36

**From:**   Marcelo Lamego <mmlamego@alumni.stanford.edu>
**Received(Date)** Fri, 21 Dec 2018 15:35:09 -0800
**Subject:**   1 Billion Watches in the next 10 years
**To:**   tcook@apple.com
**Date:**   Fri, 21 Dec 2018 15:35:09 -0800

Tim,

We would like to place our product (www.oxxiom.com) in the Apple store on-line for sale. Any help would be really appreciated. Oxxiom costs only $34.95 and is a disposable, wireless, single-use pulse oximeter that weights only 3.5 grams, and that would be an alternative to the reusable pulse oximeter (more than 70 grams in weight) currently sold in the store for $300.00.

If Apple is willing to place our product (Oxxiom for Sports and Aviation) in the Apple store on-line for sale, in exchange, I would be willing to disclose an application for the Apple Watch that will turn it into a device as essential as the iPhone.

I estimate that with this new application, Apple could sell more than 1 billion Watch units in the next 10 years.

The application is NOT in the healthcare space, and the implementation is within Apple's core competences.

In order to implement it completely, the Watch will need a few hardware changes, but they are all low-risk. A partial version could be implemented without hardware changes.

Merry Christmas to you!

Marcelo Lamego

Confidentiality notice: This e-mail may contain information confidential and/or privileged from disclosure. If the reader is not the intended recipient, copying, dissemination or continued possession of this communication is strictly prohibited.

Exhibit 36
Page 1

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# EXHIBIT 37

| **From:** | Marcelo Lamego <mmlamego@alumni.stanford.edu> |
| **Received(Date)** | Fri, 21 Sep 2018 15:14:13 -0700 |
| **Subject:** | Oxxiom |
| **To:** | "tcook@apple.com" <tcook@apple.com> |
| **Date:** | Fri, 21 Sep 2018 15:14:13 -0700 |

Dear Tim,

I hope you are well. This is just to let you know we are now shipping the Oxxiom device, the world's first wireless, continuous, single-use, fully disposable pulse oximeter. Please let me know if you have any interest in knowing more about Oxxiom.

This is the product website: www.truewearables.com

These are the 2 press releases:

https://www.prnewswire.com/news-releases/true-wearables-is-now-shipping-oxxiom-for-sports-and-aviation-for-34-95--300703380.html

https://www.einpresswire.com/article/460905742/oxxiom-for-sports-and-aviation-now-available-at-amazon

Have a great weekend!

Marcelo

Exhibit 37
Page 1

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

APL-MAS_02725455

# EXHIBIT 38
Redacted in its Entirety

# EXHIBIT 39

Newsroom

Search Newsroom     Popular Topics

PRESS RELEASE
November 15, 2011

# Apple Names Arthur D. Levinson Chairman of the Board

## Robert A. Iger, President & Chief Executive Officer of The Walt Disney Company, Joins Apple's Board

CUPERTINO, California—November 15, 2011—Apple® today named Arthur D. Levinson, Ph. D. as the Company's non-executive Chairman of the Board. Levinson has been a co-lead director of Apple's board since 2005, has served on all three board committees— audit and finance, nominating and corporate governance, and compensation— and will continue to serve on the audit committee. Apple also announced that Robert A. Iger, President and Chief Executive Officer of The Walt Disney Company, will join Apple's board and will serve on the audit committee.

"Art has made enormous contributions to Apple since he joined the board in 2000," said Tim Cook, Apple's CEO. "He has been our longest serving co-lead director, and his insight and leadership are incredibly valuable to Apple, our employees and our shareholders."

"Bob and I have gotten to know one another very well over the past few years and on behalf of the entire board, we think he is going to make an extraordinary addition to our already very strong board," said Tim Cook. "His strategic vision for Disney is based on three fundamentals: generating the best creative content possible, fostering innovation and utilizing the latest technology, and expanding into new markets around the world which makes him a great fit for Apple."

"I am honored to be named chairman of Apple's board and welcome Bob to our team," said Art Levinson. "Apple is always focused on out-innovating itself through the delivery of truly innovative products that simplify and improve our lives, and that is something I am very proud to be a part of."

Exhibit 39
Page 1

"Apple has achieved unprecedented success by consistently creating high quality, truly innovative products, and I am extremely pleased to join the board of such a wonderful company," said Bob Iger. "Over the years, I have come to know and admire the management team, now ably led by Tim Cook, and I am confident they have the leadership and vision to ensure Apple's continued momentum and success."

Levinson is chairman of Genentech, Inc. and a member of the Roche Board of Directors. He joined Genentech as a research scientist in 1980, and served as Genentech's Chief Executive Officer from 1995 to 2009. He is also a director of Amyris, NGM Biopharmaceuticals, Inc., and the Broad Institute of MIT and Harvard. Levinson currently serves on the Board of Scientific Consultants of the Memorial Sloan-Kettering Cancer Center and the Advisory Council for the Lewis-Sigler Institute for Integrative Genomics. He has authored or co-authored more than 80 scientific articles and has been a named inventor on 11 United States patents. In 2008, he was elected to the American Academy of Arts & Sciences. Levinson received his Bachelor of Science degree from the University of Washington and earned a doctorate in Biochemical Sciences from Princeton University.

Iger is the steward of the world's largest media company and some of the most respected and beloved brands around the globe. He has built on Disney's rich history of unforgettable storytelling, with the acquisition of Pixar (2006) and Marvel (2009), two of the entertainment industry's greatest storytellers. Always one to embrace new technology, Iger has made Disney an industry leader at the forefront of offering its creative content across new and multiple platforms. He is a member of the board of directors for the National September 11 Memorial & Museum and Lincoln Center for the Performing Arts, Inc. He became a board member of the US-China Business Council in June 2011. In June 2010, President Barack Obama appointed him to the President's Export Council, which advises the president on how to promote US exports, jobs and growth. He is also a member of the Partnership for a New American Economy, a coalition of mayors and business leaders from across the United States that support comprehensive immigration reform. Iger is a graduate of Ithaca College.

Apple designs Macs, the best personal computers in the world, along with OS X, iLife, iWork and professional software. Apple leads the digital music revolution with its iPods and iTunes online store. Apple has reinvented the mobile phone with its revolutionary iPhone and App Store, and has recently introduced iPad 2 which is defining the future of mobile media and computing devices.

**Press Contacts:**
Katie Cotton

Exhibit 39
Page 2

Apple

katiec@apple.com

(408) 974-7269

Steve Dowling

Apple

dowling@apple.com

(408) 974-1896

© 2011 Apple Inc. All rights reserved. Apple, the Apple logo, Mac, Mac OS and Macintosh are trademarks of Apple. Other company and product names may be trademarks of their respective owners.

**The latest news and updates, direct from Apple.**

**Read more**

Newsroom        Apple Names Arthur D. Levinson Chairman of the Board

| **Shop and Learn** | **Services** | **Apple Store** | **For Business** | **Apple Values** |
|---|---|---|---|---|
| Store | Apple Music | Find a Store | Apple and Business | Accessibility |
| Mac | Apple TV+ | Genius Bar | Shop for Business | Education |
| iPad | Apple Fitness+ | Today at Apple | | Environment |
| iPhone | Apple News+ | Apple Camp | **For Education** | Inclusion and Diversity |
| Watch | Apple Arcade | Apple Store App | Apple and Education | Privacy |
| AirPods | iCloud | Refurbished and Clearance | Shop for K-12 | Racial Equity and Justice |
| TV & Home | Apple One | Financing | Shop for College | Supplier Responsibility |
| AirTag | Apple Card | Apple Trade In | | |
| Accessories | Apple Books | Order Status | **For Healthcare** | **About Apple** |
| Gift Cards | Apple Podcasts | Shopping Help | Apple in Healthcare | Newsroom |
| | App Store | | Health on Apple Watch | Apple Leadership |
| | | | Health Records on iPhone | Career Opportunities |
| | **Account** | | | Investors |
| | Manage Your Apple ID | | **For Government** | Ethics & Compliance |
| | Apple Store Account | | Shop for Government | Events |
| | iCloud.com | | Shop for Veterans and Military | Contact Apple |

More ways to shop: Find an Apple Store or other retailer near you. Or call 1-800-MY-APPLE.

Copyright © 2022 Apple Inc. All rights reserved.     Privacy Policy     Terms of Use     Sales and Refunds     Legal     Site Map                              United States

Exhibit 39

Page 3

# EXHIBIT 40
Redacted in its Entirety

# EXHIBIT 41
Redacted in its Entirety

# EXHIBIT 42
Redacted in its Entirety

# EXHIBIT 43
# Redacted in its Entirety

# EXHIBIT 44
Redacted in its Entirety

# EXHIBIT 45
Redacted in its Entirety

# EXHIBIT 46
Redacted in its Entirety

# EXHIBIT 47
Redacted in its Entirety

# EXHIBIT 48

Becker's Healthcare · Hospital · ASC · Spine · Clinical · Health IT · CIO · Dental · Payer · Process · Behavioral · Careers    1.800.417.2035 · Email Us

# BECKER'S
# HOSPITAL REVIEW

Search... | **SEARCH**



**BECKER'S HEALTHCARE** — GET TOP NEWS STORIES DELIVERED TO YOUR INBOX DAILY. *SUBSCRIBE.*

| E-Newsletters | Conferences | Virtual Conferences | Webinars | Whitepapers | Podcasts | Print Issue | Multimedia | Lists | About Us |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |

Cybersecurity    EHRs    Telehealth    Innovation    Digital Health    Disruptors    Marketing

# Behind Apple's healthcare strategy: 4 quotes from CEO Tim Cook

Jackie Drees - Monday, December 14th, 2020


Save  Post  Tweet  Share  Listen  Text Size  Print  Email

Apple CEO Tim Cook expects the tech giant's devices and developments in healthcare and wellness to account for the company's overall greatest contributions.

Apple has been moving into the healthcare space over the past few years, with products including its Apple Watch, Health Records app, Research app and iCloud Platform. This year, the company launched Apple Watch Series 6, which includes features for tracking blood oxygen levels and an electrocardiogram app.

In a recent interview for *Outside*'s podcast, Mr. Cook shared some insights on Apple's healthcare strategy and outlook on the future. Here are four quotes from the discussion:

1. On Apple Watch's impact on consumers' health: "We thought it was a big idea to continuously monitor the heart. What we didn't necessarily predict was all of these cases were going to come out of it where the person told us, 'I would not have been here any longer. Do you understand? This is life changing for me.'"

3. On the impact that customer's Apple Watch reviews had on innovation process: "After the first few of those, you realize that there's something there. And you start pulling that string further. That led to AFib and then ECG. It led to putting control limits around your heart where, if it gets too low, you get a notification. If it gets too high, you get a notification. … All of these things are in service of the user so they can own their health in a way that they haven't been able to in the past."

3. On Apple's research study initiatives: "We've also got many people enrolled in different research projects; and we have democratized research in a way as well by having much larger constituents that are able to participate. Because a lot of people do want to help, but they don't know how. And now they can opt in, make conscious decisions to take part in that."

4. On Apple's biggest contribution: "I really believe that if you zoom out to the future and you look back to ask: 'What has Apple's greatest contribution been?' It will be in the wellness-and-health area."

**Subscribe to the following topics:** health innovation   consumerism   apple watch   healthcare   consumerism   apple health

**Latest articles on Disruptors:**
Amazon exec joins healthcare workforce company
Johnson & Johnson names former CVS president, CEO as future board chair of consumer health arm
Amazon to end Amazon Care services for employers

### Featured Learning Opportunities

1. Health IT Whitepapers

2. Health IT Webinars

3. Process Improvement Whitepapers

4. Finance Whitepapers

5. Clinical Whitepapers

6. Payer Whitepapers

7. Process Improvement Webinars

8. Finance Webinars

9. Clinical Webinars

10. Hospital Review Virtual Events

### Featured Whitepapers

1. ERP Built by Accountants, for Accountants - Download

2. Increasing productivity and collections with AI and RPA - Download

3. Trends in hospital pharmacy kit and tray management: Habits, practices and perceptions about kit and tray management following the pandemic - Download

4. 3 member engagement strategies

The Becker's Hospital Review website uses cookies to display relevant ads and to enhance your browsing experience. By continuing to use our site, you acknowledge that you have read, that you understand, and that you accept our Cookie Policy and our Privacy Policy.    ✕



Exhibit 48
Page 1

4. On Apple's long-term vision: "I would love for them to someday, be it in the future, look back to ask: 'What has Apple's greatest contribution been?' It will be in the wellness-and-health area."

**Subscribe to the following topics:** health innovation   consumerism   apple watch   healthcare   consumerism   apple health

**Latest articles on Disruptors:**

Amazon exec joins healthcare workforce company

Johnson & Johnson names former CVS president, CEO as future board chair of consumer health arm

Amazon to end Amazon Care services for employers

We think you might be interested in this whitepaper: The Asynchronous Telemedicine Guide: Solve healthcare's biggest challenges - Read Now!

Copyright © 2022 Becker's Healthcare. All Rights Reserved. Privacy Policy. Cookie Policy. Linking and Reprinting Policy.

## Subscribe to the Becker's Hospital Review newsletter for the latest in healthcare news!

**Email***

You can unsubscribe from these communications at any time. For more information, please review our Privacy Policy.

**SUBSCRIBE**   OR

f Register with Facebook

in Register with LinkedIn

Invite a Friend

0 Comments   Becker's Hospital Review   🔒 Disqus' Privacy Policy   1 Login ⌄

♡ Favorite   Tweet   f Share                                   Sort by Oldest ⌄

Start the discussion…

LOG IN WITH          OR SIGN UP WITH DISQUS ?

D f t G          Name

Be the first to comment.

✉ Subscribe   Add Disqus to your site   ⚠ Do Not Sell My Data          DISQUS

### Featured Webinars

1. Reinventing healthcare: A framework for patient-centricity, cybersecurity and climate-neutrality - Register

2. How Memorial Hermann is bringing precision healthcare to Texans with population genomics - Register

3. Optimizing Capacity of the Perioperative Suite for Peak Operational and Financial Performance - Register

4. Financial Excellence in Rural Healthcare During Challenging Times - Register

5. Dental marketing 101: Simple ways to attract patients - Register

6. As OR staffing shortages continue, how should you pivot to provide OR performance? - Register

7. Find your RCM denial pain points: review, identify, act - Register

8. The evolution of pharmacy as health system's innovative partner - Register

3. Trends in hospital pharmacy kit and tray management: member practices and perceptions about kit and tray management following the pandemic - Download

4. 3 member engagement strategies to prevent costly chronic disease - Download

5. Provide access without compromise — the ultimate guide to nativaging third-party remote access - Download

6. Managing the business of healthcare in 2022: How revenue cycle partnerships allow for stronger focus on the core mission - Download

7. Supercharge eligibility and estimates with a better payer intelligence engine - Download

8. The fraud-prevention playbook: How payer Chief Risk Officer can safeguard revenue and protect patients - Download

9. Enhancing patient data with market research to drive superior results in healthcare - Download

10. Investing in AI: Proven Strategies to Fuel Transformation in Hospital Operations - Download

The Becker's Hospital Review website uses cookies to display relevant ads and to enhance your browsing experience. By continuing to use our site, you acknowledge that you have read, that you understand, and that you accept our Cookie Policy and our Privacy Policy.   ✕

SUBSCRIBE

Exhibit 48

Page 2



Exhibit 48
Page 3

Document title: Behind Apple&#39;s healthcare strategy: 4 quotes from CEO Tim Cook
Capture URL: https://www.beckershospitalreview.com/disruptors/behind-apple-s-healthcare-strategy-4-quotes-from-ceo-tim-cook.html
Capture timestamp (UTC): Thu, 25 Aug 2022 17:41:24 GMT

Page 3 of 4

market research to drive superior results in healthcare - Download

10. Investing in AI: Proven Strategies to Fuel Transformation in Hospital Operations - Download

**0 Comments**     Becker's Hospital Review     🔒 Disqus' Privacy Policy     **1** Login ▾

♡ Favorite     🐦 Tweet     f Share                                    Sort by Oldest ▾

Start the discussion…

LOG IN WITH                OR SIGN UP WITH DISQUS ⑦

Name

Be the first to comment.

✉ Subscribe    ⊙ Add Disqus to your site    ⚠ Do Not Sell My Data                **DISQUS**

**Featured Webinars**

1. Reinventing healthcare: A framework for patient-centricity, cybersecurity and climate-neutrality - **Register**

2. How Memorial Hermann is bringing precision healthcare to Texans with population genomics - **Register**

3. Optimizing Capacity of the Perioperative Suite for Peak Operational and Financial Performance - **Register**

4. Financial Excellence in Rural Healthcare During Challenging Times - **Register**

5. Dental marketing 101: Simple ways to attract patients - **Register**

6. As OR staffing shortages continue, how should you pivot to provide OR performance? - **Register**

7. Find your RCM denial pain points: review, identify, act - **Register**

8. The evolution of pharmacy as health system's innovative partner - **Register**

9. How AI and automation are helping Baylor Scott & White lower the cost to collect + increase net revenue - **Register**

10. How technology is knocking down health equity barriers - **Register**

---

**Becker's Websites**          Conferences          Contact Us

Hospital          Becker's Health IT + Digital Health + RCM          1.800.417.2035

ASC          ASC Annual Meeting: The Business and Operations of ASCs          becker@beckershealthcare.com

Spine          CEO + CFO Roundtable

Clinical          Upcoming          🔊  in  🐦  f  ▶

Health IT

CFO

Dental + DSO

Payer

Podcasts

Behavioral Health

Virtual Learning

Webinars

Whitepapers

Podcasts

The Becker's Hospital Review website uses cookies to display relevant ads and to enhance your browsing experience. By continuing to use our site, you acknowledge that you have read, that you understand, and that you accept our Cookie Policy and our Privacy Policy.     ✕

SUBSCRIBE

Exhibit 48
Page 4

Document title: Behind Apple&#39;s healthcare strategy: 4 quotes from CEO Tim Cook
Capture URL: https://www.beckershospitalreview.com/disruptors/behind-apple-s-healthcare-strategy-4-quotes-from-ceo-tim-cook.html
Capture timestamp (UTC): Thu, 25 Aug 2022 17:41:24 GMT                                                        Page 4 of 4

# EXHIBIT 49

**SP**

# Tim Cook: 'Apple's greatest contribution could be in health and wellness'

Convergent hardware and software sees tech giant's CEO eyeing personal fitness sector.

16 FEBRUARY 2021 | TOM BASSAM

**NEWS**

EMERGING TECHNOLOGY ,
FINANCE & INVESTMENT , GLOBAL ,
INVESTMENT ,
MULTI-SPORTS EVENTS ,
NORTH AMERICA , TECHNOLOGY



Getty Images

SHARE THIS ARTICLE |   

- Apple launched Fitness+ home workout platform in December
- Tech giant holds dominant 28% share in smartwatch sector

Apple chief executive Tim Cook has suggested that the technology giant could be set to play a major role in the rapidly developing personal fitness sector.

With people stuck at home during the pandemic, Apple decided to launch subscription home workout platform Fitness+, which went live in December.

- At Large | What would an Apple sports strategy look like?

The platform draws on the company's blend of consumer products, including Apple Watch's measurement tools, Apple Music and larger-screen hardware such as iPads or laptops. In identifying an area which draws together Apple's various offerings, Cook feels personal fitness could be a sector the company comes to define itself by.

Stay up to date with the latest sports business news and insights

Enter your email address    SIGN UP

## RELATED CONTENT


HBCU Go's SWAC and CIAA college football games wil...
22 AUGUST 2022


LIV Golf "not trying to destroy the PGA Tour", s...
3 AUGUST 2022


The Open's expanded five-year Nikon deal inclu...
11 JULY 2022


NHL launches video clip digital collectibles and off...
23 JUNE 2022


Ajax expand Ziggo shirt deal to include GigaNet bran...
9 JUNE 2022

Exhibit 49
Page 1

- **At Large | What would an Apple sports strategy look like?**



The platform draws on the company's blend of consumer products, including Apple Watch's measurement tools, Apple Music and larger-screen hardware such as iPads or laptops. In identifying an area which draws together Apple's various offerings, Cook feels personal fitness could be a sector the company comes to define itself by.

Cook told Outside: "I really believe that if you zoom out to the future and then look back and ask, 'what has Apple's greatest contribution been?' it will be in the health and wellness area."

Cook's comments come with Apple appearing to want to double-down on a sector where it also leads the wearable technology race. Reporting on Q3 2020 in December last year, Apple held a 28 per cent share of the smartwatch market, up from 26 per cent in the same quarter in 2019, with sales reaching US$2.3 billion in that period, up 18 per cent year-over-year.

**Stay up to date with the latest sports business news and insights**

Enter your email address    SIGN UP

Cook also hinted that he thinks Apple has room to innovate more as the sector develops.

"Never discount the amount of innovation that can be in the future," he said. "To use a baseball analogy, we are in the early innings."

He added: "We take the challenge to continue innovating in that space just as seriously as we take the challenge to keep innovating in each of the product categories we're in."

Apple chief executive Tim Cook has suggested that the technology giant could be set to play a major role in the rapidly developing personal fitness sector



### RELATED CONTENT



**HBCU Go's SWAC and CIAA college football games wil...**
22 AUGUST 2022

**LIV Golf "not trying to destroy the PGA Tour", s...**
3 AUGUST 2022

**The Open's expanded five-year Nikon deal inclu...**
11 JULY 2022

**NHL launches video clip digital collectibles and off...**
23 JUNE 2022

**Ajax expand Ziggo shirt deal to include GigaNet bran...**
9 JUNE 2022



**Events**
SportsPro Insider Series
SportsPro Live
SportsPro Asia
OTT Summit
OTT Awards
OTT Summit USA
Motorsport Forum

**News**
Insights
SportsPro Magazine
Most Marketable
Shop

**About**
Advertise
Newsletters
Contact Us

**FOLLOW US**

Stay up to date with the latest sports business news and insights

Enter your email address    SIGN UP

SportsPro

© SportsPro 2021    Cookies    Terms & Conditions    Privacy    Contact Us    About Us    Created by PT SportSuite

Exhibit 49
Page 2

Document title: Tim Cook: 'Apple's greatest contribution could be in health and wellness' - SportsPro
Capture URL: https://www.sportspromedia.com/news/tim-cook-apple-watch-sports-fitness-plus/
Capture timestamp (UTC): Thu, 25 Aug 2022 17:38:36 GMT

Page 2 of 2

# EXHIBIT 50



FL $36.82 -3.02% ↓   MANU $13.20 -2.08% ↓   GOLF $49.83 -2.67% ↓   BYD $56.38 -1.40% ↓   CWH $21.28 -3.33% ↓   ELY $23.07 -3.01% ↓   VSTO $29.53 -3.5% ↓   GCO $62.95 -2.05% ↓   LVS $38.34

Athletes    Deals    Fitness    Gaming    Law    Markets    Media    Real Estate    Retail    Tech

My Other Passion Podcast: Ricky Williams Joins Us for Episode 7                    Listen Now ›


THE NEW *LIVE AUTOGRAPH* EXPERIENCE
DIG|S|GN

**FITNESS**

# Apple's Next Move

- Apple launched Fitness+ in December.
- The package integrates Apple Watch, Apple TV, Apple Music, and a workout video recommendation engine.

BY OWEN POINDEXTER
FEBRUARY 15, 2021 | 06:49 PM

Share ↗



**FRONT OFFICE SPORTS** PRO

Actionable, timely insights on the most promising opportunities where sports meets industry.

**Join Pro Today** ›



Apple



UP NEXT

How to Improve the Fan Experience at the Stadium and Online

**Register Now** ›

Apple CEO Tim Cook wants you to take a break from the devices and move your body.

"I really believe that if you zoom out to the future and then look back and ask, 'What has Apple's greatest contribution been?' it will be in the health and wellness area," Cook told Outside Magazine.



Exhibit 50
Page 1

Apple CEO Tim Cook wants you to take a break from the devices and move your body.



"I really believe that if you zoom out to the future and then look back and ask, 'What has Apple's greatest contribution been?' it will be in the health and wellness area," Cook told Outside Magazine.

With gyms closed or limited, Apple is bringing the workout experience into homes through Fitness+, a subscription service it launched in December.

Fitness+ combines many of the tech giant's hardware and software capabilities: Apple Watch's heart rate monitor, Apple Music for playlists, iPads to present classes with workout data displayed natively.

**"Never discount the amount of innovation that can be in the future,"** Cook said. "To use a baseball analogy, we are in the early innings."

Fitness hardware and subscriptions have seen impressive investor interest lately.



FRONT OFFICE SPORTS

My Other Passion

Presented by ORACLE NETSUITE

This week's guest:
**Ricky Williams**

Listen now >

- Lululemon acquired Mirror for $500 million last June.
- Amazon, Stephen Curry and several other star athletes joined Tonal's $110 million funding round in September.
- Peloton went public at $27 per share in September 2019 and has seen its stock price reach as high as $171 since then.
- Beachbody is going public via a SPAC with a nearly $3 billion dollar valuation.

**So how does Apple prioritize turning off the screens when its products have largely enabled our dependence on them?** Cook admits he doesn't know, but is searching for a solution.

"We take the challenge to continue innovating in that space just as seriously as we take the challenge to keep innovating in each of the product categories we're in," he said.

Beyond workouts, a recent Mount Sinai study found the Apple Watch could detect heart rate variability changes that can help identify COVID-19 — a testament to the potential of Apple's health and wellness ambitions.

## Related



**FITNESS**

Peloton Developing DIY Assembly Bikes In Cost-Cutting Measure



**FITNESS**

SoulCycle Shutters 23% of Its Studios, Reportedly Cuts 75 Jobs



**FITNESS**

China's Cycling Market Projected to Reach $16.5B by 2026



**FITNESS**

Peloton to Cut Nearly 800 Jobs, Prices

Exhibit 50
Page 2

Beachbody is going public via a SPAC with a nearly $3 billion dollar valuation.

**So how does Apple prioritize turning off the screens when its products have largely enabled our dependence on them?** Cook admits he doesn't know, but is searching for a solution.

"We take the challenge to continue innovating in that space just as seriously as we take the challenge to keep innovating in each of the product categories we're in," he said.

Beyond workouts, a recent Mount Sinai study found the Apple Watch could detect heart rate variability changes that can help identify COVID-19 — a testament to the potential of Apple's health and wellness ambitions.



This week's guest:
**Ricky Williams**
Listen now ›

## Related



**FITNESS**

**Peloton Developing DIY Assembly Bikes In Cost-Cutting Measure**

The company is working on bikes that won't require delivery and setup



**FITNESS**

**SoulCycle Shutters 23% of Its Studios, Reportedly Cuts 75 Jobs**

SoulCycle is closing 19 of its 83 studios.



**FITNESS**

**China's Cycling Market Projected to Reach $16.5B by 2026**

China's bicycle market is expected to reach $1.65 billion by 2026.



**FITNESS**

**Peloton to Cut Nearly 800 Jobs, Raise Prices**

Peloton CEO Barry McCarthy wrote in a letter to employees Friday that...

---

## FRONT OFFICE SPORTS

Front Office Sports covers the influence of sports on business and culture.

     

| | | |
|---|---|---|
| Homepage | Learning | Advertise |
| Podcasts | Live | Press |
| Newsletters | Awards | Careers |
| Pro | About Us | Contact Us |
| Terms of Use | Privacy Policy | ↑ Back to top |

© 2022 Front Office Sports. All Rights Reserved.

80 Pine Street, Suite 3202 • New York, **FOS**

Exhibit 50
Page 3

# EXHIBIT 51
Redacted in its Entirety

# EXHIBIT 52
Redacted in its Entirety

# EXHIBIT 53
Redacted in its Entirety

# EXHIBIT 54
Redacted in its Entirety

# EXHIBIT 55
# Redacted in its Entirety

# EXHIBIT 56
Redacted in its Entirety

# EXHIBIT 57
Redacted in its Entirety

# EXHIBIT 58

**Online Platforms and Market Power Part 6: Examining the Dominance of Amazon, Apple, Facebook, and Google**

**Questions for the Record from the Honorable Henry "Hank" Johnson, Jr.**

**Questions for Tim Cook, CEO, Apple, Inc.**

1. **"Efficient infringement"—the use of another company's patents without authorization, based on the understanding that litigation will be too slow to meaningfully stop the infringement and will ultimately only result in the payment of a royalty if the suit is lost (approximately the same royalty that would be paid up front if a license were taken) is a way in which dominant companies currently may be stifling innovation and undermining competitors.**

   **Apple's former patent chief even admitted as much: "efficient infringement, where the benefits outweigh the legal costs of defending against a suit, could almost be viewed as a 'fiduciary responsibility,' at least for cash-rich firms that can afford to litigate without end."[1] As the Chairman of the subcommittee with responsibility for oversight of the patent system, I am concerned about the impact of efficient infringement on the ability of patents to spur innovation and allow startups to effectively compete against established companies.**

Apple is a leading innovator in the fields of wireless communication and mobile devices. Over the past decade, Apple products like the iPhone and iPad had revolutionized these industries. Innovating on this scale requires an extraordinary investment of energy and resources, and Apple relies in part upon a healthy patent system to protect this investment. Apple owns thousands of U.S. patents and is licensed to use thousands more. And when disputes arise, Apple sometimes finds itself in court, whether to enforce its own rights or to defend against allegations of infringement levied by another firm. Apple therefore has a keen interest in a balanced patent system that encourages competition and innovation, and discourages hold-up and waste.

The concept of "efficient infringement" is an anathema to Apple. This is not a concept or idea embraced by our company. As for the individual cited in the article, he is not an Apple employee, he was never the "patent chief" at Apple, and he does not speak for the company. And, since leaving Apple seven years ago, he has gone on to work for several patent assertion entities ("PAEs"), sometimes referred to as patent trolls. He is currently employed by Conversant, one of the largest PAEs in the world. These entities are hardly champions of innovation, entrepreneurs, or start-ups.

The verdict in *Wisconsin Alumni Research Foundation v. Apple Inc.* referenced in the article was overturned two years ago. The Federal Circuit found that, as a matter of law, the jury was incorrect, and that Apple did *not* infringe WARF's patent. WARF petitioned for and was denied further review by the Supreme Court in October 2019.

---

[1] Joe Nocera, *Why Sonos Has Already Lost Its Patent Suit Against Google*, Bloomberg (Jan. 10, 2020), https://www.bloomberg.com/opinion/articles/2020-01-10/even-if-sonos-wins-its-suit-against-google-it-loses.

Exhibit 58
Page 1

MASA02957628

**1.1 To me, these factors suggest that the Supreme Court's decision in *eBay v. MercExchange*, 547 U.S. 388 (2006), to reverse the presumption of awarding injunctive relief to a prevailing patent owner should be reevaluated to ensure that smaller patent owners are playing on a level playing field in patent disputes. Do you agree or disagree, and why?**

Injunctive relief is equally available to "smaller patent owners" and larger ones. *eBay* properly emphasizes that injunctive relief should only be available to avoid irreparable harm, when monetary relief is not sufficient, and after weighing both the balance of hardships and the public interest. Injunctions remain available to protect true innovation from infringement by competitors. Over 1,000 permanent injunctions have been granted in patent litigation matters in the last five years. When requested, permanent injunctions are granted in almost 90% of cases.[2]

*eBay* has made it difficult for PAEs to secure an injunction. These entities exist only to acquire and litigate patents. They "don't actually produce anything themselves."[3] Instead, their business model is "to essentially leverage and hijack somebody else's idea and see if they can extort some money out of them."[4] Because these entities' only aim is monetary relief, courts have correctly recognized that injunctive relief should not be available to them—they would abuse their injunctions to obtain improper leverage and extract outsized monetary settlements. Apple believes that *eBay* strikes a fair balance by making injunctive relief available only when monetary relief is insufficient.

Apple respectfully submits that a concern that requires further study and action is the plague of PAEs. Apple's commercial success has made it a target for PAEs. Our experience confirms what many others have documented: although PAE activity is not necessarily harmful in theory, far too many PAEs exist only to extract undeserved royalties. For example, one study estimated that patent litigation brought by PAEs in the United States resulted in expenditures of $29 billion in 2011 for licensing fees, legal fees, and other costs of responding to PAE litigation.[5] Another study found, by looking at the impact on stock price, that lawsuits by PAEs from 1990 through 2010 were responsible for the defendants losing half a trillion dollars.[6] And those losses are not offset by corresponding gains to patent holders that promote innovation. One study found that the profits received by PAEs from litigation amounted to less than 10% of the lost share value of companies targeted by the PAEs.[7]

**1.2 What steps does your company take to ensure that any intellectual property it gains access to during acquisition negotiations is not copied or used without authorization if those acquisition negotiations prove to be unfruitful?**

Apple respects the intellectual property rights of third parties and strictly protects third-party confidential information.

Apple enters into Non-Disclosure Agreements ("NDAs") with potential acquisition targets that set forth the requirements and restrictions for treatment, use, and destruction or return of information received

---

[2] Josh Landau, *Much Ado About Injunctions*, Patent Progress (Aug. 1, 2019), https://www.patentprogress.org/2019/08/01/much-ado-about-injunctions/.
[3] *President Obama Participates in a Fireside Hangout on Google+*, YouTube (Feb. 14, 2013), https://www.youtube.com/watch?v=kp_zigxMS-Y.
[4] *Id.*
[5] James Bessen & Michael J. Meurer, *The Direct Costs from NPE Disputes*, 99 Cornell L. Rev. 387, 389–90 (2014).
[6] James Bessen, Jennifer Ford, & Michael J. Meurer, *The Private and Social Costs of Patent Trolls*, 34 Regulation 26, 31 (2011-12).
[7] Bessen & Meurer, *supra*, at 411.

Exhibit 58
Page 2

MASA02957629

during negotiations.  The NDAs typically permit Apple to use the potential acquisition targets' information solely for evaluating and implementing a potential transaction and require Apple to limit disclosure of the potential acquisition targets' information to those with a need to know who are bound by confidentiality obligations to Apple.  When acquisition negotiations terminate, a target may ask Apple to destroy or return its confidential information.  Apple takes steps to ensure compliance with these requests and all other operative provisions in the NDAs, including requirements that information be used solely for a potential acquisition and no other purpose.

Apple also has policies that expressly prohibit the unauthorized use of third-party intellectual property.  When Apple hires an employee, the parties' employment agreement expressly provides that no third-party intellectual property may be used for work at Apple.  Apple also has an internal Business Conduct Policy for employees that prohibits the unauthorized use of third-party intellectual property.

3

Exhibit 58
Page 3

MASA02957630

# EXHIBIT 59
Redacted in its Entirety

# EXHIBIT 60
# Redacted in its Entirety

# EXHIBIT 61
Redacted in its Entirety

# EXHIBIT 62
Redacted in its Entirety

# EXHIBIT 63
Redacted in its Entirety

# EXHIBIT 64
Redacted in its Entirety

# EXHIBIT 65
Redacted in its Entirety

# EXHIBIT 66
Redacted in its Entirety

# EXHIBIT 67
Redacted in its Entirety

# EXHIBIT 68
Redacted in its Entirety