# Exhibit 3

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | SANTA ANA, CALIFORNIA; MONDAY, NOVEMBER 21, 2022; 1:44 P.M.   |
| 01:44 | 2  | THE CLERK:  Calling Item No. 5, SACV-20-00048-JVS,           |
| 01:44 | 3  | Masimo Corporation, et al. versus Apple, Inc.               |
| 01:44 | 4  | Counsel, please state your appearances for the               |
| 01:44 | 5  | record.                                                      |
| 01:44 | 6  | MR. KATZENELLENBOGEN:  Good afternoon, Your Honor.           |
| 01:44 | 7  | Ben Katzenellenbogen for Masismo.  With me is Kendall        |
| 01:45 | 8  | Loebbaka and Mark Kachner.                                   |
| 01:45 | 9  | THE COURT:  Good afternoon.                                  |
| 01:45 | 10 | MS. FRAZIER:  And good afternoon, Your Honor.                |
| 01:45 | 11 | Sarah Frazier from WilmerHale on behalf of Apple, and joined |
| 01:45 | 12 | by Nora Passamaneck.                                         |
| 01:45 | 13 | THE COURT:  Good afternoon.                                  |
| 01:45 | 14 | It's Apple's motion.  Would you like to be heard?            |
| 01:45 | 15 | MS. FRAZIER:  It is, Your Honor.  We have reviewed           |
| 01:45 | 16 | your tentative, Your Honor, and Apple would request that the |
| 01:45 | 17 | tentative be adopted.  As the tentative recognizes,          |
| 01:45 | 18 | witnesses who intend to offer testimony that exceeds their   |
| 01:45 | 19 | percipient knowledge are required to submit reports subject  |
| 01:45 | 20 | to Rule 26(a)(2)(B), and accordingly, the tentative strikes  |
| 01:45 | 21 | the disclosures of Mr. Priddel and Mr. Muhcine that go       |
| 01:45 | 22 | beyond that.                                                 |
| 01:45 | 23 | With respect, Your Honor, to the disclosures of              |
| 01:45 | 24 | Mr. Kiani and Mr. Diab, we understand from the tentative     |
| 01:45 | 25 | Your Honor has found that those disclosures contained new    |

01:45  1    information that was not disclosed during fact discovery and

01:46  2    should have been.  We understand Your Honor is inclined to

01:46  3    allow those opinions to stand.  Apple would request that its

01:46  4    experts be permitted to provide short supplemental reports

01:46  5    to address the new information that would stand under the

01:46  6    tentative, Your Honor.  We can do so in relatively quick

01:46  7    order before any scheduled depositions so as to not disrupt

01:46  8    the remainder of the case schedule.

01:46  9             THE COURT:  Thank you.

01:46  10            Who is going to address this?

01:46  11            Mr. Katzenellenbogen.

01:46  12            MR. KATZENELLENBOGEN:  Yes, Your Honor.

01:46  13            Do you have a preference between -- I usually use

01:46  14   the lectern?

01:46  15            THE COURT:  Yes, the lectern, please.

01:47  16            MR. KATZENELLENBOGEN:  Thank you, Your Honor.

01:47  17            I would like to begin by addressing the last page

01:47  18   of the tentative, page 11, the first full paragraph, in

01:47  19   which Your Honor reiterates an admonition to the parties,

01:47  20   and particularly to Masimo, to be forthcoming with

01:47  21   information in discovery, particularly regarding damages.

01:47  22   We took that admonition very seriously, and that is in part

01:47  23   why we prepared the disclosures that are at issue today.

01:47  24            I want to back up for a moment because the --

01:47  25   Apples' reply began by asserting that we did not dispute

01:47  1    that the information in the disclosures was new, and that's

01:47  2    incorrect.  We very much disagree with that.  And I'd like

01:48  3    to take a few moments today to explain and to walk through

01:48  4    the evidence showing that those disclosures were not new,

01:48  5    but also to address the context in which this issue arose,

01:48  6    which is that typically in expert reports, there are issues

01:48  7    that the experts address where an expert has questions that

01:48  8    are not directly answered in an interrogatory response or in

01:48  9    a deposition.

01:48  10       The expert will often have a phone call with a

01:48  11   party employee to ask a question, and you end up with a

01:48  12   footnote in a report saying the basis for my opinion is a

01:48  13   discussion with so and so.  That happens frequently, and in

01:48  14   fact, Apple has done so in this case as well.

01:48  15       In light of the admonition that Your Honor gave

01:48  16   us, we wanted to go above and beyond that.  We wanted to

01:48  17   make sure that where there were those types of discussions

01:48  18   or information that our expert might be relying on, that we

01:49  19   provided Apple with that information ahead of time.  So

01:49  20   rather than seeing this for the first time in a damages

01:49  21   expert report, they would be able to see this in a written

01:49  22   disclosure weeks before we served the damages expert report.

01:49  23       In addition, as Your Honor is likely familiar

01:49  24   with, typically the dispute ends up being does the opposing

01:49  25   party get to take a deposition of the person referenced in

01:49    1    the conversation in the expert's footnote?  And that was

01:49    2    again why we did these disclosures in the form of a

01:49    3    26(a)(2)(C) report, which was to make it clear that Apple

01:49    4    could take depositions of all four of these employees who

01:49    5    were making these disclosures so we wouldn't have that

01:49    6    issue.

01:49    7            Rather than simply having a black box of a

01:49    8    sentence or a few lines of text in an expert report, we've

01:50    9    provided pages of discussion of what was the information

01:50   10    that was being provided to the expert and the bases for

01:50   11    that.

01:50   12            So the first issue I'd like to take on is the

01:50   13    suggestion in a couple of places in the tentative that there

01:50   14    were new legal theories, and then I'd like to address

01:50   15    specifically the support and the evidence that establishes

01:50   16    these were almost entirely percipient facts, and to the

01:50   17    extent that there were any opinions, they were proper

01:50   18    percipient opinions.

01:50   19            If Your Honor has any particular questions, I'd be

01:50   20    happy to address them.  Otherwise, I will proceed.

01:50   21            THE COURT:  Proceed.

01:50   22            MR. KATZENELLENBOGEN:  So big picture, the theory

01:50   23    that particularly Mr. Priddell and Mr. Muhsin were

01:50   24    addressing was Masimo's theory that -- and I will pause for

01:50   25    a moment.  If counsel believes I'm getting into anything

| | | |
|---|---|---|
| 01:51 | 1 | that's confidential or where there's a concern, please |
| 01:51 | 2 | interrupt and let me know so that we don't inadvertently |
| 01:51 | 3 | address anything confidential -- that Masimo's theory is |
| 01:51 | 4 | that when Apple approached Masimo in 2013, if instead of |
| 01:51 | 5 | misappropriating Masimo's trade secrets, Apple had pursued a |
| 01:51 | 6 | business collaboration with Masimo that that would have |
| 01:51 | 7 | resulted in Apple purchasing the Masimo health module from |
| 01:51 | 8 | Masimo and that that would have resulted -- and therefore |
| 01:51 | 9 | there were both lost profits to Masimo for not making those |
| 01:51 | 10 | sales and unjust enrichment to Apple as a result of stealing |
| 01:51 | 11 | the trade secrets rather than buying the module, as well as |
| 01:51 | 12 | other related theories. |
| 01:51 | 13 | And the pieces of information that are in these |
| 01:51 | 14 | disclosures that are at issue today are very, very small |
| 01:52 | 15 | pieces of that.  And so I wanted to make sure that we didn't |
| 01:52 | 16 | inadvertently give the Court the impression that what |
| 01:52 | 17 | Mr. Priddell and Mr. Muhsin had provided was the extent of |
| 01:52 | 18 | the disclosures and therefore Masimo was asking for billions |
| 01:52 | 19 | of dollars, that there is a detailed, very thorough expert |
| 01:52 | 20 | report addressing all of the damages issues.  And |
| 01:52 | 21 | Mr. Priddell and Mr. Muhsin and -- as well as Mr. Kiani and |
| 01:52 | 22 | Mr. Diab were addressing very narrow parts of that, very |
| 01:52 | 23 | specific parts. |
| 01:52 | 24 | And so with respect to the theory generally, I |
| 01:52 | 25 | have some citations to Exhibit 12 to the -- I believe it was |

01:52  1  to the Passamaneck declaration -- that is our discovery

01:52  2  response regarding damages.  And I don't know if Your Honor

01:52  3  can pull that up.  I can walk through it or I can provide

01:52  4  the cites and read the text.

01:52  5       THE COURT:  Why don't you do the latter.

01:53  6       MR. KATZENELLENBOGEN:  Okay.  I'll try to go slow.

01:53  7  If at any point it gets to be too much, let me know, and we

01:53  8  can try to take it another way.

01:53  9       So beginning in April 27, 2021, so very early on

01:53  10 in the case, we identified Joe Kiani, Bilal Muhsin, and

01:53  11 Mohamed Diab as people who had information relevant to

01:53  12 damages.  And that's Exhibit 12, page 11 -- and I'm using

01:53  13 the consecutive pagination down at the bottom rather than

01:53  14 the internal pagination from my cites -- lines 2 through 3.

01:53  15      Then, in March of 2022, we disclosed that:

01:53  16 "Apple's misappropriation of trade secrets harmed Masimo

01:53  17 because Masimo lost the value of a collaboration or other

01:53  18 business arrangement with Apple in 2013."  The cite for that

01:53  19 is -- this is all Exhibit 12 -- page 13, lines 1 through 3.

01:53  20 So that's where we disclose that this is starting in 2013.

01:54  21      We continued: "Such a business relationship would

01:54  22 have had significant value to Masimo and its shareholders.

01:54  23 Such a relationship would have allowed Masimo to quickly

01:54  24 realize its goal of bringing medical-grade, noninvasive,

01:54  25 physiological parameter, measurement devices to consumers."

01:54   1               THE COURT:  Slow down.

01:54   2               MR. KATZENELLENBOGEN:  All right.  Would you like

01:54   3   me to repeat that or?

01:54   4               THE COURT:  Just slow down a little bit.  It'll

01:54   5   help our court reporter.

01:54   6               MR. KATZENELLENBOGEN:  Okay.  Thank you.  I'm

01:54   7   sorry.  I know when reading sometimes, I do that.  My

01:54   8   apologies.

01:54   9               So now we have disclosed that we are starting in

01:54  10   2013, and the harm was that, but for the misappropriation,

01:54  11   that we would have been able to offer this technology to the

01:54  12   market via Apple earlier.

01:54  13               Then April 15, 2022, we again supplemented.  And

01:54  14   here we get into some of the details of this specific

01:54  15   theory.  "But for Apple's misappropriation of trade secrets,

01:54  16   Masimo would have earlier developed a pulse oximetry

01:55  17   hardware and software module for use in wearable products

01:55  18   for at least Apple to incorporate into a watch.  But for

01:55  19   Apple's misappropriation, Masimo would have developed its

01:55  20   module that could be incorporated into third-party products

01:55  21   or co-branded with third parties.  But for Apple's

01:55  22   misappropriation, Masimo would have sold hardware to Apple

01:55  23   for incorporation into Apple's products."

01:55  24               And so -- and then, that is at page 17, lines --

01:55  25   sorry, page 17, line 20 through page 18, line 4.  And then

01:55  1  that included an identification of people knowledgeable,

01:55  2  including Joe Kiani and, again, Bilal Muhsin.

01:55  3          And so there, we have laid out what the theory is,

01:55  4  which is specifically it was the Masimo -- it was the pulse

01:55  5  oximetry module and that we would have sold it to Apple.

01:56  6  And combining this, we would have started this in 2013, and

01:56  7  we would have gotten it to the market much sooner.

01:56  8          Our disclosures continued.  In July of 2022, we

01:56  9  said:  "Masimo has provided Apple with documents in this

01:56  10 litigation that include facts relevant to determining

01:56  11 Masimo's lost profits for its lost sales of pulse oximetry

01:56  12 hardware modules to Apple at" -- and it provides a Bates

01:56  13 number -- "MASA 10971155 and MASA 11073487."  And that's at

01:56  14 page 23, line 28 through page 24, line 3.

01:56  15         And those particular Bates numbers are important

01:56  16 because the first one is the bill of materials cost analysis

01:57  17 from 2021 that Mr. Priddell relied on, and the second is the

01:57  18 2021 development cost analysis that Mr. Muhsin relied on.

01:57  19 So now we've disclosed the theories and we've disclosed the

01:57  20 documents on which we're going to rely.

01:57  21         Our disclosure continued:  "In addition, because

01:57  22 of Apple's misappropriation of plaintiff's trade secrets,

01:57  23 Apple avoided purchasing pulse oximetry hardware modules

01:57  24 from Masimo for incorporation into the accused product."

01:57  25 That's at page 25, line 10 through 12.  So now we've

01:57  **1**  explained the benefit Apple got, as well as the harm to

01:57  **2**  Masimo.

01:57  **3**  We continued:  "Plaintiffs' expert will determine

01:57  **4**  the value of this component of Apple's unjust enrichment

01:57  **5**  taking into account the amount Apple saved by not purchasing

01:57  **6**  pulse oximetry hardware modules from Masimo and licensing

01:58  **7**  Masimo's algorithms, technology, and applications used with

01:58  **8**  Masimo's pulse oximetry hardware modules."

01:58  **9**  That's page 25, lines 15 to 18.

01:58  **10**  There was an additional disclosure on August 12

01:58  **11**  where we disclosed deposition transcripts of Bilal Muhsin

01:58  **12**  and Steven Scrugs, quote:  "In relation to Masimo's

01:58  **13**  development of its pulse oximetry hardware and software

01:58  **14**  module for use in wearable products."  That was at page 29,

01:58  **15**  lines 19 to 22..

01:58  **16**  And then finally, on September 6, 2022, which was

01:58  **17**  the deadline for completing the fulsome contention

01:58  **18**  interrogatories, we disclosed Masimo discloses -- sorry,

01:58  **19**  this is not a quote -- we disclosed the updated documents on

01:58  **20**  which Priddell relies, and that's a Bates number ending in

01:59  **21**  3619, and all of the updated documents on which Mr. Muhsin

01:59  **22**  relies, and that's at page 30, lines 6 through 9.

01:59  **23**  And the reason those were updated was because the

01:59  **24**  original analysis that we had prepared was through 2021.

01:59  **25**  And there were some additional costs that could be captured.

01:59   1   And so, as part of our obligation to supplement financial

01:59   2   disclosures, sales, those types of information, rather than

01:59   3   waiting until the eve of trial, in light of your admonition

01:59   4   that we needed to be affirmatively forthcoming, we said,

01:59   5   okay, discovery is closing.  Let's get it updated through

01:59   6   now.  And so that's what those documents did.  They updated

01:59   7   that.

01:59   8        And I think it's also worth noting that the nature

01:59   9   of those documents were adding additional costs.  And so

02:00   10  what those documents were doing was by increasing Masimo's

02:00   11  costs, both in terms of the price of the module as well as

02:00   12  increasing the expenses that we had to develop it, we're

02:00   13  actually reducing our damages theory.

02:00   14        So this was not something that we added to try to

02:00   15  surprise Apple and get the damages number up.  This was us

02:00   16  trying to be as careful as we could.  And rather than

02:00   17  waiting for Apple's expert to offer some criticism and then

02:00   18  try to address it or try to address it in the deposition, we

02:00   19  said, okay, let's try to address this ahead of time and

02:00   20  let's try to make this as conservative as possible.

02:00   21        And finally, we said, quote:  "In addition,

02:00   22  changes to Apple's material costs for components associated

02:00   23  with noninvasive physiological monitoring, e.g., back

02:00   24  crystal assembly for Apple watch, as Apple modifies those

02:00   25  components based on plaintiffs' trade secrets, provide

02:01  1  evidence that Apple determined plaintiffs' trade secrets

02:01  2  provide Apple more value than the increased component

02:01  3  costs."  And so there we were making sure that Apple knew

02:01  4  that one aspect of this was going to be looking at changes

02:01  5  in component costs, and particularly the component costs as

02:01  6  it related to both our lost profits and the unjust

02:01  7  enrichment.

02:01  8         And so I hope that that establishes that, to the

02:01  9  extent we're talking about a legal theory, the legal theory

02:01  10  was very well disclosed.

02:01  11         Before I move on to specifically addressing the

02:01  12  individual witness disclosures, does Your Honor have any

02:01  13  questions about that?

02:01  14         THE COURT:  No.

02:01  15         MR. KATZENELLENBOGEN:  So I would like to start

02:01  16  with Mr. Priddell.  And so, Mr. Priddell offered two

02:01  17  opinions that are identified by the Court, and I believe the

02:01  18  Court's characterization of those is at both page 5 and

02:02  19  page 8 of the tentative.  Would you like me to point to

02:02  20  specific aspects of the tentative or address this slightly

02:02  21  more broadly?

02:02  22         THE COURT:  More broadly.

02:02  23         MR. KATZENELLENBOGEN:  Okay.  So what Mr. Priddell

02:02  24  was doing was assessing the cost of the actual module

02:02  25  itself.  And so, one of the opinions -- it's actually his

02:02   1   second opinion -- was the amount of money that Masimo would

02:02   2   have spent to manufacture its risk module for Apple.  And

02:02   3   when you use the word "would have," which is in the title,

02:02   4   it starts to sound like it's a hypothetical.

02:02   5          And if you look at what he actually did, what his

02:02   6   analysis was, was to say, okay, what did we actually spend

02:02   7   to develop this module, because that's our theory, which is

02:02   8   we actually built this module, and that either this module

02:02   9   or something very similar to it would have been what we

02:02   10  would have sold to Apple.

02:02   11         And so what he says is, okay, what were the actual

02:02   12  costs?  And he looks at the 2021 documents that we disclosed

02:03   13  to Apple long ago in discovery and he relies on the 2022

02:03   14  updates to those, which capture additional costs.  But there

02:03   15  was nothing new there.  And then what he says is based on my

02:03   16  familiarity with having developed this project, I think

02:03   17  these are what the costs would have been if we'd done it in

02:03   18  2013 for Apple.

02:03   19         The second part -- and this might have been where

02:03   20  the Court had a little bit more pause -- which is he offers

02:03   21  an opinion about components that would have been redundant

02:03   22  as a result of Apple buying this module from Masimo.  And

02:03   23  again, here it's important to recognize that this wasn't

02:03   24  done to increase the damages.  This was done to decrease

02:03   25  them to try to be as fair and conservative as possible

02:03  1    because --

02:03  2         THE COURT:  But whether you're increasing or

02:03  3    decreasing damages, at the end of the day, the question is

02:03  4    did you disclose the methodology sufficiently whether these

02:04  5    supposedly new calculations, new projections raise or lower

02:04  6    the cost?  Was the information disclosed?

02:04  7         MR. KATZENELLENBOGEN:  Yes.  And the answer is

02:04  8    yes, and that's because as the declaration says, the

02:04  9    analysis of these costs is set forth in the spreadsheets

02:04  10   that were produced.  And the original methodology was

02:04  11   produced in the 2021 spreadsheet that was produced at --

02:04  12   sorry, that's the Bates number ending in 1115.  And so, yes,

02:04  13   the methodology was produced, and then a few days after the

02:04  14   close of fact discovery, the updated numbers were produced.

02:04  15        And Apple appears to argue this as if the only

02:04  16   analysis is in the text of Mr. Priddell's disclosure when

02:04  17   really what he's doing is he's authenticating these

02:05  18   analyses.  And the analysis and the details are in the

02:05  19   documents that he's referring to that we produced in

02:05  20   discovery.

02:05  21        And there was also an issue about the ITC case

02:05  22   between the same parties.  And I apologize if we suggested

02:05  23   that we thought Apple was put on notice of these documents

02:05  24   because of something that happened in the ITC.  That was not

02:05  25   what we intended to argue.  Apple was on notice of these

02:05    1    because we disclosed them in our interrogatory responses in

02:05    2    this case and because we produced the documents in this

02:05    3    case.

02:05    4            The reference to the ITC case was that Apple, in

02:05    5    the ITC case, took extensive discovery and deposition

02:05    6    questions about the 2021 cost documents.  And so the idea

02:05    7    that any of this was a surprise or that we somehow hadn't

02:05    8    fully disclosed the methodology was what that was rebutting

02:05    9    because, of course, those transcripts are fully available in

02:05   10    this case as well.

02:05   11            And so then -- so that was the methodology on the

02:06   12    financial side.  And then what he also did is he said, okay,

02:06   13    let me take a look at all of the components and

02:06   14    functionality of the Masimo module, which the Court

02:06   15    acknowledges that's proper.  That's percipient knowledge.

02:06   16    And then what he did is he said, okay, well let me just see

02:06   17    which of those components are in the Apple watch because, of

02:06   18    course, Apple could take those out, and Apple would be able

02:06   19    to save money by taking those out.

02:06   20            And so at that point, he's just lining up the

02:06   21    components and saying these are redundant, these are

02:06   22    redundant.  And Apple makes a big deal out of the fact that

02:06   23    the specific document he relied on for the list of Apple

02:06   24    parts was not produced in discovery.  It was not produced

02:06   25    during fact discovery.  It was produced after the close of

02:06  1   fact discovery.  And the reason was because Apple produced a
02:06  2   bill of costs.  And we repeatedly -- in our interrogatory
02:07  3   responses and Apple's interrogatory responses -- addressed
02:07  4   their bill of materials and their costs.  But it was
02:07  5   "Attorney's Eyes Only," so we couldn't show that to
02:07  6   Mr. Priddell.
02:07  7           So we did the next best thing, which is we said,
02:07  8   okay, hey, look, there's a publically available version.
02:07  9   Just use that to say these are the things that Apple would
02:07  10  have been able to get rid of.  And so there was certainly no
02:07  11  surprise.  And if there's any question as to that being an
02:07  12  inaccurate document or deviating in any material way from
02:07  13  the bill of materials that Apple produced, Apple is
02:07  14  certainly in a good position to be able to cross-examine
02:07  15  them on that.
02:07  16          And so those are the only two opinions that
02:07  17  Mr. Priddell offered, and so I think there was both fair
02:07  18  disclosure of them and that they were based on percipient
02:07  19  information.
02:07  20          THE COURT:  It doesn't follow that if we compared
02:07  21  your bill of costs to Apple's bill of costs, that the mere
02:07  22  disclosure of those two documents constitute a disclosure of
02:08  23  an opinion as to redundancy.
02:08  24          MR. KATZENELLENBOGEN:  So it's not -- to be clear,
02:08  25  it wasn't -- it was a bill of materials.  It's listing them.

02:08    1    And that's where I think we did identify in our

02:08    2    interrogatory responses -- and I will go back to my notes

02:08    3    here where we talked about changes to Apple's material costs

02:08    4    for components.  I think that was placing them on notice.

02:08    5            And also, when we were addressing -- and this is

02:08    6    on the earlier cite to July, page 25, lines 15 to 18, where

02:08    7    we talked about the amount Apple saved by not purchasing the

02:08    8    pulse oximetry hardware modules from Masimo and licensing

02:08    9    Masimo's technology.  But that was again placing them on

02:08   10    notice that what we were going -- one aspect of this was

02:08   11    going to say, okay, you would have purchased ours for $10 or

02:08   12    $100 or whatever it would have been, and you would have then

02:09   13    saved some amount of money.

02:09   14            And again, is it word for word what the witness

02:09   15    wrote in the disclosure?  It's not.  But I think Apple was

02:09   16    fairly put on notice of what the argument was going to be,

02:09   17    which is, look, this is based on the fact that we would have

02:09   18    produced this earlier, we would have sold this to you

02:09   19    earlier, and that your bill of costs -- your costs are going

02:09   20    to be important.

02:09   21            And so we're not -- to be clear, we're not lining

02:09   22    up how much we paid for it and how much they paid for it.

02:09   23    Let me just make sure I -- I may have bungled this slightly.

02:09   24    It's really the bill of materials.  It says there's an LED,

02:09   25    there's an emitter, there's a sensor, and there's wiring, et

02:09   1    cetera, and saying, okay, well, then you could get rid of

02:09   2    this LED, you could get rid of this wiring, you could get

02:09   3    rid of this.

02:09   4            And so that opinion is almost -- it's not quite,

02:09   5    but it starts to get close -- to the level of opinion that

02:10   6    you might be able to offer under 701.  But I think they were

02:10   7    fairly put on notice that the issue -- what the issue was

02:10   8    going to be, which is our module and their savings on their

02:10   9    bill of materials.

02:10  10            So then moving on to Mr. Muhsin.  So the first

02:10  11    one, his first opinion, has to do with when Masimo would

02:10  12    have developed this module in the but-for world where they

02:10  13    collaborated with Apple.  And what he did was he said, okay,

02:10  14    how long did it actually take us to do this?  Three years?

02:10  15    Okay.  Based on my -- that's historical percipient

02:10  16    knowledge.  Based on my historical percipient knowledge, was

02:10  17    there any technical reason that we couldn't have started

02:10  18    this earlier, right, was there some technology that didn't

02:11  19    exist, was there some breakthrough.  And the answer was no.

02:11  20    So if we had started in 2013, it would have taken us the

02:11  21    same three years.  That's all he was saying was that there

02:11  22    was no reason why it would have taken longer or why we

02:11  23    couldn't have done this in the same three years if we had

02:11  24    started.

02:11  25            And the tentative focused a little bit of

02:11    1    attention on the fact that he also said, well, as a

02:11    2    practical matter, if it had been with Apple and we'd had

02:11    3    that amount of resources behind the project, it probably

02:11    4    would have gone faster.  I think that's a fair opinion, but

02:11    5    it's also probably something that's immaterial because our

02:11    6    damages expert ultimately decided to be conservative and

02:11    7    just assumed that it would have taken the same amount of

02:11    8    time.  So whether that particular part of it is in or out

02:11    9    probably doesn't matter.

02:11   10            So that opinion was proper.  It was certainly

02:11   11    disclosed because as we went through in the interrogatory

02:11   12    response, we said but for there misappropriation, we would

02:12   13    have started in 2013 and we would have done this earlier.

02:12   14    That's all he said.

02:12   15            Then there was the amount of cost Masimo incurred

02:12   16    to develop the Masimo health module.  Again, this was simply

02:12   17    based on what our lost profits were.  And so, again, to do

02:12   18    that, as a matter of sort of basic logic, you would take,

02:12   19    okay, what was your costs, and what was your revenue, and

02:12   20    you subtract one from the another.  So I'm not sure we would

02:12   21    have needed to say anything to put Apple on notice that our

02:12   22    costs were relevant to our lost profits, but in fact we did.

02:12   23            And we walked through in the interrogatory

02:12   24    responses, but also the analysis, again, of what those costs

02:12   25    are, that was in the spreadsheet from 2021 that we

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

02:12   1   specifically identified in our interrogatory response in

02:12   2   July of 2022 at page 23, line 28, through page 24, line 3,

02:13   3   with the Bates number ending in 3487.

02:13   4            And so Your Honor asked about the methodology that

02:13   5   he used.  Yes, the methodology that he used was disclosed,

02:13   6   and then we updated those same spreadsheets.  And I think

02:13   7   there were a few additional spreadsheets, because there were

02:13   8   some additional type of costs that simply hadn't been

02:13   9   incurred yet, relating to things like certain types of

02:13   10  production tooling that I think was purchased after 2021.

02:13   11           And so again, as part of your admonition to be

02:13   12  forthcoming with this information, we volunteered it.  We

02:13   13  supplemented all of these productions.  And then rather than

02:13   14  have this simply be a footnote in an expert report that said

02:13   15  I confirmed with Mr. Muhsin that Masimo could have started

02:13   16  building this in 2013 and it would have taken the same

02:14   17  amount of time -- which is typically what would happen -- we

02:14   18  put together a disclosure so that they could read it, review

02:14   19  the bases, and take his deposition.

02:14   20           And I think it's important to note that, certainly

02:14   21  in terms of conduct of the parties, this is, I think,

02:14   22  probably far less substantive than some of the things that

02:14   23  Apple has done, which I raise not to suggest that we did

02:14   24  something wrong, and because they did something worse, you

02:14   25  should let ours go, but because this reflects the parties'

| | |
|---|---|
| 02:14 | 1 | understanding of the rules and the process for how this |
| 02:14 | 2 | works, which is that Apple provided rebuttal expert reports. |
| 02:14 | 3 | And one of their -- their technical expert relied |
| 02:14 | 4 | on a previously undisclosed set of testing of one of our |
| 02:14 | 5 | products done by a third party that wasn't done in -- wasn't |
| 02:14 | 6 | produced in fact discovery. They never mentioned the third |
| 02:14 | 7 | party. And so we may end up having a dispute about whether |
| 02:14 | 8 | we get to depose that third party, but for Apple's arguments |
| 02:15 | 9 | here, we never would have thought that hat's something we |
| 02:15 | 10 | should move to strike. |

02:14   1   understanding of the rules and the process for how this
02:14   2   works, which is that Apple provided rebuttal expert reports.
02:14   3          And one of their -- their technical expert relied
02:14   4   on a previously undisclosed set of testing of one of our
02:14   5   products done by a third party that wasn't done in -- wasn't
02:14   6   produced in fact discovery. They never mentioned the third
02:14   7   party. And so we may end up having a dispute about whether
02:14   8   we get to depose that third party, but for Apple's arguments
02:15   9   here, we never would have thought that hat's something we
02:15   10  should move to strike.
02:15   11          Similarly, Apple's damages expert on rebuttal says
02:15   12  that the expert relied --
02:15   13          THE COURT:  We're focusing on your disclosures.
02:15   14          MR. KATZENELLENBOGEN:  Yes.  I understand that,
02:15   15  and in terms of the proprietary of our disclosures, I think
02:15   16  we contrast what we did --
02:15   17          THE COURT:  Well, I don't want to contrast.  I
02:15   18  want to know what you did and why it was appropriate.
02:15   19          MR. KATZENELLENBOGEN:  Okay.  Yes, and why we did
02:15   20  it and why it was appropriate was because this is the type
02:15   21  of information that would typically simply be a footnote in
02:15   22  an expert's report, and what we did in response to Your
02:15   23  Honor saying be forthcoming is we put together five, six,
02:15   24  seven page disclosures laying all of that information out.
02:15   25  And all I meant was that simply we seemed to have been

02:15   1   punished or criticized in the tentative for being more

02:15   2   forthcoming, and I would hate to think that we would have

02:15   3   better off if we had simply done what Apple did and simply

02:16   4   add the footnote.  I meant to keep it anchored on what we

02:16   5   did.

02:16   6           So if you have any questions -- that addresses the

02:16   7   26(e) issue --

02:16   8           THE COURT:  We need to move on.

02:16   9           MR. KATZENELLENBOGEN:  Okay.  May I have, like, a

02:16   10  minute to address the expert report rule?

02:16   11          THE COURT:  Fine.

02:16   12          MR. KATZENELLENBOGEN:  I'll try to be super quick,

02:16   13  which is I really -- if we went through the requirements of

02:16   14  (a)(2)(B), because these are such focused opinions, the

02:16   15  complete statement of all opinions and bases therefore, the

02:16   16  facts or data considered by the witness, and any exhibits

02:16   17  that will be used to summarize them, those are all in those

02:16   18  reports, so these would satisfy (a)(2)(B).  The

02:16   19  qualifications, publications, testimony, and statement of

02:16   20  compensation; those formalities weren't in there.  But none

02:16   21  of these witnesses are being compensated for this, and we

02:16   22  set forth that we can certainly provide that ministerial

02:16   23  information.

02:16   24          And finally, on the standard as to whether it's

02:16   25  based on being an employee or whether it's based on being

02:17    1    percipient, I would just say that having gone through the

02:17    2    two cases that the Court cited in the tentative and all of

02:17    3    the cases that Apple cited, that all of those cases cite to

02:17    4    Goodman, and they cite to earlier cases, and they don't

02:17    5    mention the other line of cases.  They don't mention it at

02:17    6    all.

02:17    7           And that Goodman, although the opinion did come

02:17    8    out in 2011 after the 2010 changes to the rules, it was

02:17    9    submitted in December 6 -- on December 6, 2010, five days

02:17   10    after the effective date -- and all of the district court

02:17   11    proceedings had occurred under the prior version of the

02:17   12    rule.

02:17   13           And I think if Your Honor takes another look

02:17   14    at it -- and I would just ask Your Honor -- I'm sure you

02:17   15    looked at this already but to take a second look at Doe 1,

02:17   16    Allstate, and the Zofran cases that we've cited, because I

02:17   17    think if Your Honor looks at that, all of the cases that

02:17   18    actually look at the analysis and walk through both lines of

02:18   19    cases even though they may say prior to 2010, this was

02:18   20    majority, this is minority, they all come out the same way,

02:18   21    which is whatever we may think of the policy, Rule 26 is

02:18   22    very clear..

02:18   23           And then finally, I would just conclude with there

02:18   24    may be an issue as to whether -- if there are aspects of the

02:18   25    tentative that stand, whether we are addressing the issue as

| | | |
|---|---|---|
| 02:18 | 1 | to whether these witnesses can testify in front of the jury |
| 02:18 | 2 | about these facts or these opinions -- I guess, particularly |
| 02:18 | 3 | the opinions, the facts wouldn't be at issue -- or whether |
| 02:18 | 4 | the experts are allowed to rely on them, even if they're not |
| 02:18 | 5 | admissible.  And if what we are dealing with is a situation |
| 02:18 | 6 | where it's, okay, of course, like in the footnote, your |
| 02:18 | 7 | experts can rely on this, but I don't want your employee |
| 02:18 | 8 | witnesses offering independent opinions, that's one issue. |
| 02:18 | 9 | THE COURT:  That issue is not before me today. |
| 02:19 | 10 | MR. KATZENELLENBOGEN:  Okay. |
| 02:19 | 11 | THE COURT:  And either it's in the report and |
| 02:19 | 12 | there's sufficient basis to rely or there isn't.  I mean, |
| 02:19 | 13 | nothing we do today is going to change the sufficiency of |
| 02:19 | 14 | the report and the bases for the opinions. |
| 02:19 | 15 | Okay.  Thank you. |
| 02:19 | 16 | MR. KATZENELLENBOGEN:  Thank you, Your Honor. |
| 02:19 | 17 | THE COURT:  Ms. Frazier. |
| 02:19 | 18 | MS. FRAZIER:  Yes, Your Honor. |
| 02:19 | 19 | Your Honor, I'd like to start with where |
| 02:19 | 20 | Mr. Katzenellenbogen left off, which is whether or not |
| 02:19 | 21 | Rule 26(a)(2)(B) reports were required for these witnesses |
| 02:19 | 22 | and what their appropriate standard is for requiring that. |
| 02:19 | 23 | Your Honor, the tentative, in its acknowledgement of Goodman |
| 02:19 | 24 | and it's progeny is exactly right with respect to the |
| 02:19 | 25 | standard there. |

02:19  1          I believe that the descriptions we've heard from

02:19  2   counsel about the disclosures of Priddell and Muhsin prove

02:19  3   our point, Your Honor.  These are hypotheticals about what

02:19  4   would have happened in a world in 2013 if reality had played

02:20  5   out in a manner other than it actually did.  And

02:20  6   Mr. Priddell then takes that hypothetical reality, does an

02:20  7   analysis of what may or may not have come out of the Apple

02:20  8   watch under this hypothetical scenario that then tries to

02:20  9   get linked up to various costs.

02:20  10          Certainly, Your Honor, the reports in their

02:20  11  current state do not satisfy 26(a)(2)(B) as the tentative

02:20  12  recognizes, they fall far short of that standard.  To give

02:20  13  Your Honor just an example, the Priddell disclosure -- and I

02:20  14  will ask counsel to please, as you did with me, if you think

02:20  15  we're in territory that needs to be sealed, please

02:20  16  interject -- but that analysis, Your Honor, includes a

02:20  17  spreadsheet with hundreds of components, and the detailed

02:20  18  level of whether it would be placed or not is a yes, no, or

02:20  19  a maybe.  It's just not the level of basis and rationale

02:21  20  that would be required under 26(a)(2)(B).

02:21  21          I think that the nature of these reports, the

02:21  22  tentative is certainly correct that they go far beyond

02:21  23  percipient experience and into the realm of a retained

02:21  24  expert, and therefore should be struck for that reason.

02:21  25          With respect to whether the information in them

02:21   1   was new, while Mr. Katzenellenbogen pointed us to some

02:21   2   disclosures in the interrogatory response that deal

02:21   3   generally with this theory that Apple may have purchased a

02:21   4   pulse oximetry module from Masimo in the but-for world, the

02:21   5   specifics of this theory that are then disclosed in the

02:21   6   Priddell and Muhsin disclosures are no where in that

02:21   7   interrogatory response.

02:21   8          And if I could just correct one thing, there were

02:21   9   references to Exhibit 12, and specifically to page 29 of

02:22   10  that exhibit, where there is a reference to Apple's costs,

02:22   11  Your Honor.  I won't read the whole thing out loud.  It does

02:22   12  go into some confidential material.  But what it says is

02:22   13  changes to Apple's materials cost for components associated

02:22   14  with noninvasive physiological monitoring, e.g., back

02:22   15  crystal assembly for Apple watch, as Apple modifies those

02:22   16  components based on plaintiffs' trade secrets, provide

02:22   17  evidence that Apple determined plaintiff's trade secrets

02:22   18  provided Apple more value than the increased component

02:22   19  costs.

02:22   20         You'll see the next sentence and citation, Your

02:22   21  Honor, goes on to show changes to costs in Apple's back

02:22   22  crystal component between the Series 5 and Series 6.  It's a

02:22   23  completely different theory about Apple's costs in one

02:23   24  version of its watch as compared to another.  It is not the

02:23   25  theory that we see disclosed in the Priddell and Muhsin

02:23   1   disclosures about what the hypothetical price differential

02:23   2   would have been if Masimo had created a module for the Apple

02:23   3   watch, which it did not.

02:23   4           No where in the disclosures did we hear mention of

02:23   5   Mr. Priddell at all.  He was not disclosed as having any

02:23   6   relevant knowledge with respect to damages.

02:23   7           And finally, Your Honor, with respect to the

02:23   8   spreadsheets.  Those spreadsheets themselves, the updated

02:23   9   analysis that was referred to, were provided after the close

02:23   10  of fact discovery.  They are not factual documents.

02:23   11  Exhibit 9 to Apple's opening motion, Your Honor, is counsel

02:23   12  for plaintiff stating that those documents are not analysis

02:24   13  Masimo performs in the ordinary course of business, nor are

02:24   14  the documents produced kept in the ordinary course of

02:24   15  business.  Rather, this analysis was done for this

02:24   16  litigation as part of expert discovery.

02:24   17          So again, the notion that these spreadsheets were

02:24   18  fully disclosed is not accurate.  They were not.  And they

02:24   19  are expert analysis, and if plaintiff's had wanted to rely

02:24   20  on them, they should have been submitted with a full report

02:24   21  under Rule 26(a)(2)(B).

02:24   22          THE COURT:  Thank you.

02:24   23          Two minutes.

02:24   24          MR. KATZENELLENBOGEN:  First, the reference that

02:24   25  counsel makes, I believe, is to the 2022 updates as set

02:24   1   forth in the, at least, Mr. Priddell's disclosure.  The cost

02:24   2   basis is something that was prepared in the ordinary course

02:25   3   of business, the 2021 version of that, and if there was

02:25   4   anything that was inconsistent with that in an e-mail from

02:25   5   counsel, then that was just mistaken.

02:25   6           Quickly, I misspoke when I said Goodman was

02:25   7   decided six days after the effective date of the 2010

02:25   8   amendments.  It was four days before.  It was December 6,

02:25   9   and the amendments were effective 2010.  And so I think

02:25   10  that's why Goodman isn't addressing -- sorry, effectively it

02:25   11  was December 10, and so that's why Goodman and its progeny

02:25   12  aren't addressing the correct wording of the rule.

02:25   13          Again, I won't belabor that point, but simply if

02:25   14  Your Honor could take a second look at the cases that we

02:25   15  cited, I think you will see that all of the cases that look

02:25   16  at both lines of cases say, well, the line of cases that

02:25   17  follows the wording of the rule, they've got the right of

02:25   18  this.

02:25   19          And then with respect to Priddell, I think we

02:26   20  addressed this in the briefing.  But again, this was simply

02:26   21  an issue of trying to be as forthcoming as we could.  There

02:26   22  were a number of Masimo employees, including Mr. Scruggs,

02:26   23  who had the information, the percipient information, who

02:26   24  could have provided this same type of testimony.  But due to

02:26   25  Mr. Scruggs' personal circumstances, we were concerned that

02:26   1   he wouldn't be available for deposition during expert

02:26   2   discovery, and we didn't want to be in a situation of not

02:26   3   being able to put forth the person in the disclosures for a

02:26   4   deposition.  And so that's why we had Mr. Priddell prepare

02:26   5   this, based on the same information that was disclosed in

02:26   6   our interrogatory responses.

02:26   7           And so again, I think that's all part of us trying

02:26   8   to be more forthcoming than we needed to be.

02:26   9           If Your Honor has any questions, I'll answer them.

02:27  10   Otherwise, I appreciate it.

02:27  11           THE COURT:  No, thank you.  The matter will stand

02:27  12   submitted.  I want to take another look at this.  Thank you

02:27  13   very much.

02:27  14           (Whereupon, the proceedings were concluded.)

02:27  15                       *    *    *

16

17

18

19

20

21

22

23

24

25

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER