EXHIBIT 14

Amanda R. Washton (Bar No. 227541)
*a.washton@conklelaw.com*
Sherron Wiggins (Bar No. 321819)
*s.wiggins@conklelaw.com*
**CONKLE, KREMER & ENGEL**
Professional Law Corporation
3130 Wilshire Boulevard, Suite 500
Santa Monica, California 90403-2351
Phone: (310) 998-9100
Fax: (310) 998-9109

Samuel G. Brooks (Bar No. 272107)
*sbrooks@calljensen.com*
Anurita Varma (Bar No. 279486)
*avarma@calljensen.com*
**CALL & JENSEN**
A Professional Corporation
610 Newport Center Drive, Suite 700
Newport Beach, CA 92660
Tel:   (949) 717-3000
Fax:   (949) 717-3100

Peter A. Gergely (*Pro Hac Vice*)
*PGergely@merchantgould.com*
Ryan   J.   Fletcher,   (*Pro   Hac   Vice*)
*RFletcher@merchantgould.com*
Zachary D. Kachmer (*Pro Hac Vice*)
*ZKachmer@merchantgould.com*
**MERCHANT & GOULD, P.C.**
1801 California St., Suite 3300
Denver, CO 80202
Telephone: (303) 357-1651
Facsimile: (612) 332-9081

Paige S. Stradley, (*Pro Hac Vice*)
*PStradley@merchantgould.com*
**MERCHANT & GOULD, P.C.**
150 S. Fifth Street Suite 2200
Minneapolis, MN 55402
Telephone: (612) 332-5300
Facsimile: (612) 332-9081

Attorneys for Defendants
True Wearables, Inc. and Marcelo Lamego

MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Exhibit 14
-174-

1    **UNITED STATES DISTRICT COURT**

2    **CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION**

3

4    MASIMO CORPORATION, a
Delaware Corporation; and
5    CERCACOR LABORATORIES, INC.,
a Delaware corporation,,
6
Plaintiff,
7
8        v.

9    TRUE WEARABLES, INC., a
Delaware corporation; and MARCELO
10   LAMEGO, an individual,

         Defendant.

CASE No. 8:18-cv-2001-JVS-JDE

**MEMORANDUM IN SUPPORT OF
DEFENDANTS TRUE
WEARABLES. INC.'S AND
MARCELO LAMEGO'S MOTION
FOR PARTIAL SUMMARY
JUDGMENT**

**Hearing: October 4, 2021
Time: 1:30 p.m.
Ctrm: 10C**

11
12   Hon. James V. Selna
     Presiding Judge
13   Hon. John D. Early
     Magistrate Judge
14
15   Complaint Filed:    November 8, 2018
     Trial Date:         January 11, 2022
16
     **[REDACTED VERSION OF
17    DOCUMENT PROPOSED TO BE
      FILED UNDER SEAL]**
18
19
20
21
22
23
24
25
26
27
28

---

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ............................................................................ 1

II.   ARGUMENT ................................................................................. 2

      A.    PLAINTIFFS CANNOT SHOW PATENT INFRINGEMENT ............ 2

            1.   The Oxxiom® System does not take measurements until the Oxxiom® Device is paired with the Oxxiom® iOS App ............... 3

            2.   The Oxxiom® System is not "designed to block a range of wavelengths of light sufficient to prevent measurements" .......... 5

            3.   When used as designed and instructed, the alleged cover of the Oxxiom® Device is not in place when the sensor is active ................................................................................... 7

            4.   The alleged cover of the Oxxiom® Device does not prevent light from reaching the detector .................................................. 8

            5.   True Wearables does not infringe claim 6 of the '271 Patent ................................................................................ 9

            6.   True Wearables does not directly infringe claims 1-2 and 7-9 of the '271 Patent or claims 1-5, 9-15, and 18-26 of the '848 Patent ................................................................................ 10

      B.    PLAINTIFFS' CLAIM FOR BREACH OF FIDUCIARY DUTY IS TIME-BARRED AND PREEMPTED BY STATUTE .................. 12

            1.   Plaintiffs' Allegations ............................................................. 12

            2.   Plaintiffs' Claim is Barred by the Statute of Limitations .......... 12

            3.   Plaintiffs' Claim is Preempted by CUTSA ............................... 18

      C.    TRADE SECRET CLAIMS ................................................... 19

            1.   Trade Secrets 1, 6, 9, 12, and 14 ............................................ 19

            2.   Summary Judgment on Trade Secret 6 ..................................... 21

            3.   Summary Judgment on Trade Secret 12 .................................... 22

MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Exhibit 14
-176-

4.      Summary Judgment on Trade Secret 14......................................24

MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Exhibit 14
-177-

1

# TABLE OF AUTHORITIES

2

3

*ABBA Rubber Co. v. Seaquist*,
   235 Cal. App. 3d 1 (Cal. Ct. App. 1991) .......................................................... 23

4

5

*Accent Packaging, Inc. v. Leggett & Platt, Inc.*,
   707 F.3d 1318 (Fed. Cir. 2013) ........................................................................... 6

6

7

*ACCO Brands, Inc. v. ABA Locks Mfr. Co.*,
   501 F.3d 1307 (Fed. Cir. 2007) ......................................................................... 10

8

9

*American Master Lease LLC v. Idanta Partners, Ltd.*,
   171 Cal. Rptr. 3d 548 (Ct. App. 2014) ............................................................. 13

10

11

*Amtower v. Photon Dynamics, Inc.*,
   71 Cal. Rptr. 3d 361 (Ct. App. 2008) ............................................................... 12

12

*Baird v. Sabre Inc.*,
   995 F. Supp. 2d 1100 (C.D. Cal. 2014) .............................................................. 2

13

14

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ............................................................................................. 2

15

16

*Choi v. Sagemark Consulting*,
   226 Cal. Rptr. 3d 267 (Ct. App. 2017) ............................................................. 17

17

18

*City of Vista v. Robert Thomas Sec., Inc.*,
   84 Cal. App. 4th 882 (Cal. Ct. App. 2000) ...................................................... 17

19

20

*E-Pass Techs., Inc. v. 3Com Corp.*,
   473 F.3d 1213 (Fed. Cir. 2007) ......................................................................... 10

21

22

*Exergen Corp. v. Wal–Mart Stores, Inc.*,
   575 F.3d 1312 (Fed. Cir. 2009) ........................................................................... 3

23

*Forcier v. Microsoft Corp.*,
   123 F. Supp. 2d 520 (N.D. Cal. 2000) ........................................................ 24, 25

24

25

*Fox v. Ethicon Endo-Surgery, Inc.*,
   110 P.3d 914 (Cal. 2005) ............................................................................. 13, 16

26

27

*Fuller v. First Franklin Financial Corp.*,
   216 Cal. App. 4th 955 (Cal. Ct. App. 2013) .................................................... 17

28

MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Exhibit 14
-178-

*Glenayre Elecs., Inc. v. Jackson*,
    443 F.3d 851 (Fed. Cir. 2006) ............................................................. 3

*High Tech Medical Instrumentation v. New Image Industries*,
    49 F.3d 1551 (Fed. Cir. 1995) ............................................................ 6

*Mformation Techs., Inc. v. Research in Motion Ltd.*,
    764 F.3d 1392 (Fed. Cir. 2014) ....................................................... 10

*Nikon Corp. v. ASM Lithography B.V.*,
    308 F. Supp. 2d 1039 (N.D. Cal. March 11, 2004) ......................... 10

*Norgart v. Upjohn Co.*,
    981 P.2d 79 (Cal. 1999) .................................................................. 13

*Romano v. Rockwell Internat., Inc.*,
    926 P.2d 1114 (Cal. 1996) .............................................................. 13

*San Jose Construction, Inc. v. S.B.C.C., Inc.*,
    155 Cal. App. 4th 1528 (Cal. Ct. App. 2007) .................................. 23

*Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*,
    587 F.3d 1339 (Fed. Cir. 2009) .................................................. 24, 25

*Walsh v. W. Valley Mission Cmty. Coll. Dist.*,
    66 Cal. App. 4th 1532 (Cal. Ct. App. 1998) .................................. 23

*William L. Lyon & Associates, Inc. v. Superior Court*,
    139 Cal. Rptr. 3d 670 (Ct. App. 2012) ............................................ 13

# I.   **INTRODUCTION**

Masimo Corporation ("Masimo") and Cercacor Inc. ("Cercacor") ("Plaintiffs") filed a complaint against True Wearables, Inc. ("True Wearables") and Marcelo Lamego ("Dr. Lamego") (collectively "True Wearables") on November 8, 2018. (Defendants' Statement of Uncontroverted Facts, filed herewith ("SUF") ¶ 1.)

Dr. Lamego is a Stanford Ph.D. electrical engineer. (SUF ¶ 2.) He was Chief Technology Officer of Cercacor, which used to be a division of Masimo Corp. (SUF ¶ 3.) He left Cercacor in 2014. (SUF ¶ 4.) After leaving, he first worked for Apple Inc., and later founded True Wearables. (SUF ¶ 5.) After founding True Wearables, Dr. Lamego set out to create an inexpensive, disposable noninvasive monitoring device. (SUF ¶ 6.) He understood that device cost could be lowered by ████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████. (SUF ¶ 7.) Dr. Lamego designed a distributed processing scheme in which ████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████. (SUF ¶ 8.)

Dr. Lamego worked night and day for several years developing algorithms. (SUF ¶ 9.) Drawing on extensive experience with complex mathematics, including experience teaching matrix algebra and optimization as a professor and researcher at multiple academic institutions, Dr. Lamego created an optimization problem and corresponding efficient solution that could serve as the core algorithm of his new monitoring device. (SUF ¶¶ 10-11.) Dr. Lamego taught himself an entirely new programming language, Swift, in order to enable him to create an iOS Application for use in Apple devices. (SUF ¶ 14.)

After years of development, Dr. Lamego shipped the first commercial version of his "Oxxiom" device on August 28, 2018. (SUF ¶ 15.) Plaintiffs sued Dr. Lamego and True Wearables for, *inter alia*, patent infringement, breach of fiduciary duty, and trade secret misappropriation. Plaintiffs allege that Dr. Lamego's Oxxiom® Device

-1-
MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Exhibit 14
-180-

infringes Plaintiffs' patents and that Dr. Lamego used trade secret information in developing the Oxxiom®. (SUF ¶ 16.) Plaintiffs have identified a number of documents that allegedly comprise their alleged trade secrets. But Plaintiffs have not asserted or offered any evidence that Dr. Lamego copied, stole, or otherwise physically or electronically took these documents, source code, or other technical materials relating to the trade secrets at issue when he left Cercacor. (SUF ¶ 143.)

True Wearables moves for partial summary judgment under Fed. R. Civ. P. 56(a) on Plaintiffs' claims for 1) infringement of U.S. Patent No. 8,886,271 and U.S. Patent No. 10,194,848; 2) breach of fiduciary duty; and 3) misappropriation of Trade Secrets 1, 6, 9, 12, and 14.

## II. ARGUMENT

Summary judgement is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The movant may satisfy this burden by showing that there is "an absence of evidence to support the nonmoving party's case." *Id*., at 325. Once the movant has met its initial burden, the burden shifts to the nonmoving party to "go beyond the pleadings and identify specific facts that shown a genuine issue for trial." *Baird v. Sabre Inc.*, 995 F. Supp. 2d 1100, 1102 (C.D. Cal. 2014). "A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact." *Id*. Summary judgment is only precluded when there is a genuine dispute over material facts or "where the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

### A.   PLAINTIFFS CANNOT SHOW PATENT INFRINGEMENT

Plaintiffs assert True Wearables directly infringes claims 1-2, 7-11, 15-18 of the '271 Patent and claims 1-5, 9-15, 18-26 of the '848 Patent through their manufacture, use, sale, offer for sale, or importation into the U.S. of the Oxxiom® SA

Exhibit 14
-181-

1   and Oxxiom® RX devices ("Oxxiom® Devices") and accompanying iOS applications

2   (the "Oxxiom® iOS Apps") (together, the "Oxxiom® System").[1] (SUF ¶¶ 17, 36.)

3   Plaintiffs further assert True Wearables indirectly infringes claim 6 of the '271 Patent.

4   (SUF ¶ 18.) For direct infringement, Plaintiffs bear the burden of establishing that

5   True Wearables' Oxxiom® System practices each element of each asserted claim.

6   *Exergen Corp. v. Wal–Mart Stores, Inc.*, 575 F.3d 1312, 1320 (Fed. Cir. 2009). For

7   indirect infringement, Plaintiffs must show direct infringement of the relevant claims.

8   *Glenayre Elecs., Inc. v. Jackson*, 443 F.3d 851, 858 (Fed. Cir. 2006); *see also* Fletcher

9   Decl. Ex. G at ¶¶ 42-44. Plaintiffs cannot establish infringement, and the Court should

10  grant summary judgment in True Wearables' favor.

11        **1.    The Oxxiom® System does not take measurements until the**

12              **Oxxiom® Device is paired with the Oxxiom® iOS App**

13        True Wearables makes and sells the Oxxiom® Device and offers the associated

14  Oxxiom® iOS App for download from the Apple App Store. (SUF ¶ 73.) Each

15  Oxxiom® Device comes with a unique barcode that, when scanned, allows a user to

16  connect (or "pair") with the Oxxiom® iOS App on the user's Apple device. (SUF ¶

17  74.) When an Oxxiom® Device is paired with the Oxxiom® iOS App, the Oxxiom®

18  System can measure and display blood oxygen saturation through the Oxxiom® iOS

19  App. (SUF ¶ 75.)

20        The Oxxiom® System has two modes—standby mode and operation mode.

21  (SUF ¶¶ 79, 83.) Once powered on, the Oxxiom® Device is in standby mode until it

22  is paired with the Oxxiom® iOS App. (SUF ¶ 80.) While in standby mode, the

23  Oxxiom® Device emits a flashing light from a green LED. (SUF ¶ 81.)  Once paired

24  with the Oxxiom® iOS App, the Oxxiom® Device enters operation mode. (SUF ¶84.)

25  _____

26        [1] The Oxxiom® SA and RX Devices and their respective Oxxiom® iOS Apps
    will collectively be referred to as the "Oxxiom® System."  For the purposes of this
27  motion, the Oxxiom® SA and RX Devices and their respective iOS Apps function in
28  the same manner. (SUF ¶ 72.)

-3-
MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Exhibit 14
-182-

1   In operation mode, the green LED no longer emits light, and the Oxxiom® Device

2   instead utilizes a red LED and an infrared LED to determine blood oxygen saturation.

3   (SUF ¶ 85.)

4        True Wearables instructs users how to get the Oxxiom® Device into standby

5   mode and ready for placement on the measurement site:



17   (SUF ¶¶ 71, 92 (prior steps omitted).) As shown above, True Wearables instructs

18   Oxxiom® users to remove Tab 2 prior to placement of the Oxxiom® Device onto the

19   measurement site, while the Oxxiom® Device is in standby mode. (*Id.*)

20        Following removal of Tab 2, True Wearables instructs users to place the

21   Oxxiom® Device onto the measurement site (e.g., a finger) while the Device is in

22   standby mode. (SUF ¶¶ 92, 94.) After the Device is on the measurement site, True

23   Wearables instructs users to pair the Oxxiom® Device with the iOS App. (SUF ¶¶ 93,

24   95.) Once paired with the iOS App, the Oxxiom® System is in operation mode and is

25   ready and able to take measurements through use of red and infrared light. (SUF ¶¶

26   83-85.)

27        Plaintiffs contend that Tab 2 of the Oxxiom® Device (depicted above)

28   constitutes the claimed sensor cover of the '271 and '848 Patents. (SUF ¶ 70.)

-4-

MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Exhibit 14
-183-

1    Importantly, it is undisputed that the Oxxiom® Device cannot take
2  measurements until it is paired with its the Oxxiom® iOS App. (SUF ¶ 82.)
3  Accordingly, while in standby mode (i.e., when the green emitter is on/flashing), the
4  Oxxiom® Device cannot take any measurements because it is not yet connected to the
5  Oxxiom® iOS App. (SUF ¶¶ 79-85.) Plaintiffs' expert, Jack Goldberg, admitted this
6  in deposition, e.g.:

7    "████████████████████████████████████
8  ████████████████████████████████████
9  ████████████████████
10 ████████████████████████████████
11 ████████████████████."

12 (SUF ¶¶ 98-101.) He further admitted in his report that the ████████████
13 ████████████████████████████████████████████
14 ████████████████████████████████████████████
15 ████████████████████████████████████████████
16 (SUF ¶ 97 (emphasis added).) These admissions confirm that, while in standby mode,
17 the Oxxiom® Device cannot take measurements.

18           **2.    The Oxxiom® System is not "designed to block a range of**
19                 **wavelengths of light sufficient to prevent measurements"**

20    Each claim of the '271 Patent requires that the opaque portion of the sensor
21 cover be "configured to block readings" (claim 1 of the '271 Patent and its
22 dependents) or be "configured to block optical readings" (claim 10 of the '271 Patent
23 and its dependents). (SUF ¶¶ 24-35.) The Court construed "an opaque portion
24 attachable to the sensor and configured to block readings by the sensor"/"an opaque
25 portion attachable to the sensor and configured to block optical readings by the
26 sensor" to mean "a portion attachable to the sensor designed to block a range of
27 wavelengths of light sufficient to prevent measurements" and held that the phrase
28 "configured to" requires some level of intentionality. (SUF ¶ 61.)

MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Exhibit 14
-184-

1    Because Tab 2 is only intended to be attached to the Oxxiom® Device while in
2    standby mode and because the Oxxiom® System cannot take measurements while in
3    standby mode, Tab 2 is not designed to block a range of wavelengths of light sufficient
4    to prevent measurements. In other words, when Tab 2 attached to the Oxxiom®
5    Device, there are simply no measurements to prevent because none can even be taken.
6    Goldberg admits that ███████████████████████████████████████
7    ████████████. (SUF ¶ 98.) Accordingly, Goldberg alters the Oxxiom® System and
8    operates it in a manner contrary to its intended and instructed use in order to argue
9    infringement. In particular, Goldberg ██████████████████████████████████
10   ███████████████████████████████████████████████████████████
11   ██████████████. (SUF ¶¶ 102-103.) This follows True Wearables' instructions
12   up to a point. But Goldberg then deviates from True Wearables' instructions by ██████
13   ███████████████████████████████████████████████████████████
14   ███████████████████████████████████████████████████████████
15   ██████████████████. (SUF ¶¶ 102-103.) Nowhere does True Wearables ever
16   instruct a user to act as Goldberg did and ███████████████████████████████
17   ██████████████████████████. (SUF ¶¶ 92-95, 104-105.) Rather,
18   True Wearables instructs users to ████████████████████████████████████
19   ███████████████████████████████████████████████████████████
20   ███████████████████████ (SUF ¶¶ 92-95, 104-105.) Goldberg
21   admits the User Guide does not instruct a user to act as he did. (SUF ¶ 104 ("█████
22   ███████████████████████████████████████████████████████████
23   ██████████████████████); ¶ 105.)
24   There is no infringement as a matter of law if the accused system is altered in
25   a manner contrary to the intended and instructed use. *Accent Packaging, Inc. v.*
26   *Leggett & Platt, Inc.*, 707 F.3d 1318, 1327 (Fed. Cir. 2013); *High Tech Medical*
27   *Instrumentation v. New Image Industries*, 49 F.3d 1551, 1555-56 (Fed. Cir. 1995).
28   This is particularly true here because the Court's construction requires that the

-6-

1  Oxxiom® System be "designed to" prevent measurement and requires some level of

2  intentionality. The Oxxiom® System's "cover" cannot be said to have been designed

3  or intended to prevent measurement when the only way it does so is via unintended

4  alteration and use contrary to True Wearables' instructions.

5         This is further confirmed by Dr. Lamego's own testimony regarding the

6  selection of an opaque tape for Tab 2. When asked the technical reasons he preferred

7  opaque tape instead of clear tape, Dr. Lamego ████████████████████████████████████

8  ████████████████████████████████████████████████████████████████████████████████

9  ████████████████████████████████. (SUF ¶ 107.)

10        The Court should grant summary judgment in True Wearables' favor on all

11 asserted claims of the '271 Patent.

12              **3.    When used as designed and instructed, the alleged cover of the**

13              **Oxxiom® Device is not in place when the sensor is active**

14        Each of the asserted claims of the '271 Patent requires a sensor cover—or the

15 opaque portion thereof—that is configured to prevent the detector from receiving light

16 when the sensor is active or during sensor activation. (SUF ¶¶ 17, 24-35.) Similarly,

17 each of the asserted claims of the '848 Patent requires a sensor cover that covers the

18 sensing components while the sensor is active. (SUF ¶¶ 36, 40-60.) The Parties agreed

19 that the term "active" should receive its plain and ordinary meaning. (SUF ¶ 63.)  The

20 Oxxiom® System does not practice this claim element because the Oxxiom System is

21 not active (i.e., able to measure) until the Oxxiom® Device is paired with the iOS App,

22 which when used according to True Wearables' instructions only ever happens after

23 removal of Tab 2. (*See*, *supra*, Section II(A)(1).) In other words, the Oxxiom® Device

24 is not able to measure (i.e., the plain and ordinary meaning of "active" as used in the

25 '848 Patent) until it pairs with the iOS App.

26        Plaintiffs contend that the Oxxiom® Device, and the sensor contained therein,

27 are "active" when the Oxxiom® Device is "able to do things; awake; alive; powered"

28 (i.e., while in standby mode and before removal of Tab 2 and pairing with the iOS

-7-

MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Exhibit 14
-186-

1   App. and prior to being able to physiological parameters). (SUF ¶ 106.) While True

2   Wearables' User Guide does use the language "activated" to describe the state of the

3   Oxxiom® Device in standby mode, the Oxxiom® System must be "active" as that term

4   is utilized in the Patents in Suit. "Active" as utilized in the Patents in Suit must mean

5   the claimed device is ready and able measure because the stated purpose of Patents in

6   Suit is to reduce or eliminate false readings. (SUF ¶ 64; *see also* SUF ¶ 67 (describing

7   an embodiment and explaining that the "cover prevents measurements from being

8   taken until the sensor 120 is generally secure and the medical personnel are ready to

9   take measurements"); SUF ¶ 65.) There can be no such false readings if a sensor is

10  not even able to measure in the first place. Therefore, contrary to Plaintiffs'

11  contentions, "active" cannot be interpreted as encompassing any state in which a

12  device is not even capable of making readings.

13          **4.    The alleged cover of the Oxxiom® Device does not prevent**

14                  **light from reaching the detector**

15          It is undisputed that the alleged cover of the Oxxiom® Devices, Tab 2, causes

16  some light from the green emitter to be reflected onto the detector. (SUF ¶¶ 108-109.)

17  In operation mode, the Oxxiom® System operates by measuring the amount of light

18  that is *reflected* by a user's skin, as shown in the User Guide:

19

20

21                                      

22

23

24

25

26

27  (SUF ¶¶ 90-91.) In standby mode, however, Tab 2 is in place causing the emitted light

28  to reflect off of the cover and back towards the detector—just like the emitted light

MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Exhibit 14
-187-

1    reflects off a user's skin back towards the detector: [2]



5          Accordingly, Tab 2 of Oxxiom® Device is not "configured to block
6    readings/optical readings by the sensor" as construed by the Court because the cover
7    actually *causes* (and does not *prevent*) light from the emitter to be reflected to the
8    detector. The Court should grant summary judgment in True Wearables' favor on all
9    claims of the '271 Patent.

10         Similarly, the Court should grant summary judgment in True Wearables' favor
11   on all claims of the '848 Patent. Each asserted claim of the '848 Patent requires the
12   claimed cover or cover portion blocks at least a portion of light from the one or more
13   emitters from being received by the detector. (SUF ¶¶ 36, 40-60.) This element is not
14   met when in standby mode because the cover is actually doing the opposite—it causes
15   light from the emitter to reach the detector.

16              **5.      True Wearables does not infringe claim 6 of the '271 Patent**

17         Plaintiffs contend True Wearables indirectly infringes claim 6 of the '271
18   Patent and allege True Wearables' customers directly infringe claim 6 of the '271
19   Patent. (SUF ¶ 110.) But Plaintiffs have put forth no evidence that any customer (or
20   True Wearables in combination with a customer) performed each step of claim 6 of
21   the '271 Patent. (SUF ¶ 111.) Indeed, during his deposition Goldberg admitted that

22   ████████████████████████████████████████████████████
23   ████████████████████████████████████████████████████

---

25         [2] As Defendants' expert Dr. Stone explained, in the Oxxiom® Device, absent
26   an opaque material in front of the emitter, such as the alleged cover Tab 2, the light
27   from the emitter is not directed to the detector and would instead be transmitted into
     the void space in front of the emitter and would not return to the detector. (SUF ¶
28   109.)

MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Exhibit 14
-188-

1    ███████████████. (SUF ¶ 112.) Importantly, he further admitted that ████
2    ██████████████████████████████████████. (SUF ¶ 112.) Such
3    assumptions are insufficient to establish direct infringement. *ACCO Brands, Inc. v.*
4    *ABA Locks Mfr. Co.*, 501 F.3d 1307, 1313 (Fed. Cir. 2007); *E-Pass Techs., Inc. v.*
5    *3Com Corp.*, 473 F.3d 1213, 1217, 1221-23 (Fed. Cir. 2007). Accordingly, because
6    direct infringement is a requirement of establishing indirect infringement, Plaintiffs'
7    claim fails.

8          **6.**      **True Wearables does not directly infringe claims 1-2 and 7-9**
9                  **of the '271 Patent or claims 1-5, 9-15, and 18-26 of the '848**
10                 **Patent**

11         Plaintiffs contend True Wearables directly infringes claims 1-2 and 7-9 of the
12   '271 Patent and claims 1-5, 9-15, and 18-26 of the '848 Patent. (SUF ¶¶ 20, 37-38.)
13   They do not assert indirect infringement of these claims. (SUF ¶¶ 23, 39.) But each
14   of these claims require the accused Oxxiom® perform certain actions. *See, e.g.,*
15   *Mformation Techs., Inc. v. Research in Motion Ltd.*, 764 F.3d 1392, 1399-1400 (Fed.
16   Cir. 2014) (finding claim language "establishing a connection" required that a
17   connection be established); *Nikon Corp. v. ASM Lithography B.V.*, 308 F. Supp. 2d
18   1039, 1065-66 (N.D. Cal. March 11, 2004) (finding that "the claim language's use of
19   a gerund-form verb (viz., 'defining') unequivocally implies an act" and applying the
20   same logic to find the term "determining" also required an act). In particular:

21   •   Claim 1 and its dependent claims 2 and 7-9 of the '271 Patent claim a method
22       comprising providing a sensor cover and "attaching the sensor cover to the
23       sensor, the **sensor cover blocking readings by the sensor** . . ."

24   •   Claim 1 and its dependent claims 2-5 of the '848 Patent require that the sensor
25       cover "covers at least one of the sensing components **while the pulse oximeter**
26       **sensor is active** and **blocks at least a portion of light from the one or more**
27       **emitters** from being received by the detector."

28   •   Claim 9 and its dependent claims 10-15 of the '848 Patent require the sensor

-10-

cover "covers one or more sensing components of the pulse oximeter sensor **while the pulse oximeter sensor is active** and **blocks at least a portion of light from the one or more emitters** of the pulse oximeter sensor from being received by a detector . . . ."

- Claim 18 and its dependent claims 19-25 of the '848 Patent require the cover "cover[] one or more sensing components of the pulse oximeter sensor **while the pulse oximeter sensor is active**."

- Claim 26 (which also depends from claim 18) of the '848 Patent further requires "**activating the one or more emitters** of the pulse oximeter sensor to emit light . . ." and "**blocking**, with the sensor cover, **at least a portion of the light** from the one or more emitters from being received by the detector."

(SUF ¶¶ 24-35, 40-60 (emphasis added).) It is undisputed that these actions can only performed once the Oxxiom® System is powered on.[3] Plaintiffs have put forth no evidence that True Wearables operates and uses the Oxxiom® System; rather, True Wearables manufactures, offers for sale, and sells the Oxxiom® System. (SUF ¶¶ 73.)[4] True Wearables' Oxxiom® System, when made, offered for sale, and/or sold is not powered on, has no active sensor (under either parties' definition), and is not emitting light or blocking light from an emitter. (SUF ¶¶ 114-115.) Again, Plaintiffs' expert Goldberg ████████. (SUF ¶ 115.) Because Plaintiffs do not accuse True Wearables of indirectly infringing claims 1-2 and 7-9 of the '271 Patent or claims 1-5, 9-15, 18-26 of the '848 Patent, Plaintiffs' claims of infringement of these claims fail.

Separately, even if Plaintiffs did assert indirect infringement of these claims

---

[3] Section II(A)(1) above further describes how the Oxxiom® System functions and why these limitations are not met even when the Oxxiom® System is powered on.

[4] In the context of claim 6—the only claim Plaintiffs have asserted is indirectly infringed—Plaintiffs asserted the alleged direct infringers were True Wearables' customers, not True Wearables. (SUF ¶¶ 18-19.)

MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Exhibit 14
-190-

1  (which they do not), Plaintiffs have put forth no evidence of direct infringement via

2  use of the Oxxiom® device by an Oxxiom® customer. (*See*, *supra*, Section II(A)(5).)

3  **B.    PLAINTIFFS' CLAIM FOR BREACH OF FIDUCIARY DUTY IS**

4  **TIME-BARRED AND PREEMPTED BY STATUTE**

5  Plaintiffs have alleged that Dr. Lamego breached a fiduciary duty to Cercacor

6  by failing to disclose information and/or by providing inaccurate information

7  regarding the feasibility of certain technologies. The Court should grant summary

8  judgment in Dr. Lamego's favor because Plaintiffs' claim is barred by the statute of

9  limitations and preempted by the California Uniform Trade Secrets Act ("CUTSA").

10  **1.    Plaintiffs' Allegations**

11  The elements of breach of fiduciary duty are existence of a fiduciary

12  relationship, breach, and damages proximately caused by that breach. *Amtower v.*

13  *Photon Dynamics, Inc.*, 71 Cal. Rptr. 3d 361, 377 (Ct. App. 2008).



14  Plaintiffs' claim arises from ▮▮▮▮▮ that Dr. Lamego, then the CTO of

15  Cercacor, gave ▮▮▮▮▮▮▮▮▮▮ regarding ▮

16  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17  ▮▮▮▮▮▮▮. (SUF ¶ 116.) According to

18  Plaintiffs, Dr. Lamego ▮▮▮▮▮▮▮▮

19  ▮▮▮▮▮▮. (SUF ¶ 117.)

20  Shortly after ▮▮▮▮▮, Dr. Lamego left Cercacor. (SUF ¶

21  4.) Following Dr. Lamego's departure, Cercacor was purportedly ▮▮▮

22  ▮▮▮▮▮▮. (SUF ¶ 119.) In light of their

23  failure, Plaintiffs concluded that Dr. Lamego had either (a) ▮

24  ▮▮▮▮▮▮▮ or (b) ▮▮

25  ▮▮▮▮▮▮▮▮▮

26  ▮▮. (SUF ¶ 120.) Both theories fail as a matter of law.

27  **2.    Plaintiffs' Claim is Barred by the Statute of Limitations**

28  According to Plaintiffs, Dr. Lamego's ▮▮▮▮▮

-12-
MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Exhibit 14
-191-

1    about ███████████████████████ caused Cercacor to

2    █████████████████████. (SUF ¶ 121.) However, Cercacor was ultimately ███████

3    ████████████████████████, which ultimately led to Cercacor ███████

4    ██████████████████████████. (SUF ¶ 122.)

5    Cercacor's ████ was █████████████████. (SUF ¶ 123.) But

6    testimonial and documentary evidence show that Plaintiffs began to suspect

7    ███████████████████████████ as early as January 2014. (SUF ¶ 124.)

8    These suspicions prompted █████████████, which confirmed by April/May

9    2014–and certainly no later than August of 2014—that ████████████

10   ████████████████████████████████████████████████████████

11   ████. (SUF ¶¶ 125, 139.) Because Plaintiffs' claim accrued more than four years

12   before Plaintiffs filed suit, their claim is time-barred under either a three-year or four-

13   year statute of limitations.

## (a)    Legal Standard

15        In California, the statute of limitations for a breach of fiduciary duty claim may

16   be either three or four years, depending on whether the alleged breach is fraudulent.

17   *American Master Lease LLC v. Idanta Partners, Ltd.*, 171 Cal. Rptr. 3d 548, 570 (Ct.

18   App. 2014). When an alleged breach of fiduciary duty does not amount to fraud, the

19   claim is subject to the four-year "catch-all statute" of Code Civ. Proc., § 343. *William

20   L. Lyon & Associates, Inc. v. Superior Court*, 139 Cal. Rptr. 3d 670, 683 (Ct. App.

21   2012). But the three-year statute of limitations per Code Civ Proc., § 338(d) applies

22   when an action for breach of fiduciary duty is fraudulent. *Id.*

23        The statute of limitations begins to run on a claim when that claim accrues.

24   *Romano v. Rockwell Internat., Inc.*, 926 P.2d 1114 (Cal. 1996). Generally, a cause of

25   action accrues when it is complete with all of its elements. *Norgart v. Upjohn Co.*,

26   981 P.2d 79 (Cal. 1999). An exception to this general rule is the "discovery rule,"

27   under which a claim accrues when a plaintiff discovers, or has reason to discover, the

28   cause of action. *Fox v. Ethicon Endo-Surgery, Inc.*, 110 P.3d 914, 919 (Cal. 2005). A

-13-

1   plaintiff has reason to discover a cause of action when he or she "has reason at least
2   to suspect a factual basis for its elements." *Id.* As the California Supreme Court has
3   cautioned, this is not a "hypertechnical approach." *Id.* Rather than asking whether the
4   plaintiff suspects facts supporting each specific legal element of a claim, the court
5   should ask whether the plaintiff has knowledge of the "generic elements of
6   wrongdoing, causation, and harm" and should therefore "look to whether the plaintiffs
7   have reason to at least suspect that a type of wrongdoing has injured them." *Id.* at 920.

8                    **(b)    Plaintiffs' Claim Accrued by April/May 2014**

9          Plaintiffs suspected the facts supporting their claim as early as January of 2014,
10  around when Dr. Lamego informed Plaintiffs of his decision to leave Cercacor. After
11  Dr. Lamego left, Plaintiffs "███████████████████████." (SUF ¶ 128.)
12  ████████████████████████████████████████████████████████
13  ████████████████████████████████████████████████████████
14  ████████████████████████████████████████████████████████
15  ████████████████████████████████████████████████████████
16  ████████████████████████████████████████████████████████
17  ████████████████████████████████████████████████████████
18  ████████████████████████████████ (*Id.*)
19         Soon thereafter, Plaintiffs ███████████████. These efforts
20  were led by ███████████████████████████ following Dr.
21  Lamego's departure. (SUF ¶ 129.) ██████ had been involved with the original
22  ████████████████████████████████████████████████████████
23  ████████████ and had reviewed aspects of the ████████████████
24  ████████ (SUF ¶ 130.) When Dr. Lamego left, it became ██████ responsibility
25  to continue the ████████████████████████████████████████
26  ████. (SUF ¶ 131.) When ██████ took over, he directed ████████████
27  ████████████████████████████████████████████████████████
28  ████████████████████████████████. (SUF ¶ 132.) According

-14-
MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Exhibit 14
-193-



1   to ▮▮▮▮▮ started in February 2014. (SUF ¶ 133.)

2       The goal of ▮▮▮ was to determine whether ▮▮▮

3   ▮▮▮. (SUF ¶¶ 128, 132-

4   136.) To investigate ▮▮▮ directed the team to ▮▮

5   ▮▮▮

6   ▮▮▮.[5] (SUF ¶¶ 132-136.) The results of these efforts are summarized in a

7   document ▮▮▮

8   ▮▮▮. (SUF ¶¶ 134, 135.)

9       The ▮▮▮ discussed the ▮▮▮ and determined "

10  ▮▮▮." (SUF ¶ 136.) According to

11      the ▮▮ led him and ▮▮▮ to believe "

12  ▮▮▮." (*Id.*) ▮▮ estimates that Cercacor came

13  to this conclusion in "***April or May 2014***." (SUF ¶¶ 136, 137.) (emphasis added).

14      Documentary evidence and testimony from CEO Joe Kiani support ▮▮

15  timeline. At the ▮▮▮, "▮

16  ▮▮▮

17  ▮▮▮

18  ▮▮▮." (SUF ¶ 138.) By the time ▮▮▮

19  ▮▮ in August of 2014, Cercacor had determined that ▮▮

20  ▮▮▮. (SUF ¶ 139.) Although Cercacor

21  was still hopeful that ▮▮▮

22  ▮▮▮

23  ▮▮▮, Joe Kiani testified that ▮▮

24  ▮▮▮ and that, as a result, he and Cercacor were

25  _____

26      [5] The ▮▮▮ included ▮

27  ▮▮▮

28  ▮▮▮ (SUF ¶ 118.)



1   ███████████████████████████████████████████. (SUF ¶

2   140.) Indeed, at the August 5, 2014 ██████████, the ████████████

3   ███████████████████████████████████████████████████████

4   █████████████████████████████." (SUF ¶ 141.)

5       Plaintiffs' claim accrued as early as February 2014 and no later than August

6   2014. As soon as Plaintiffs began to ███████████████████████████

7   ████████████████████ Plaintiffs had "reason at least to suspect

8   a factual basis" for each of the elements of their claim. *Fox*, 110 P.3d at 919. Plaintiffs'

9   suspicions began as early as January/February 2014, when Joe Kiani ████████████

10  ███████████████████████████████████████████████████████

11  ███████████████████████████████████████████████████████

12  ██████████████████. (*See* SUF ¶ 128.) Plaintiffs' subsequent ████████████

13  ██████████████ led Plaintiffs to believe that Dr. Lamego had breached a fiduciary duty

14  by █████████████████████████████. By August 2014, Cercacor was

15  prepared  to ███████████████████████████████████████████████

16  ███████████████████████████████████████████████████████

17  █████████████████. (SUF ¶¶ 139-141.)

18      True Wearables denies that ███████████████████████████████

19  ███████████████████████████████████████████████████████

20  ████████████. If Dr. Lamego's ███████████████████████████████

21  ███████████████████████████████████████████████████████

22  ███████████████████████████████████████████████████████

23  ████████████████████████████████. (SUF ¶ 118.)

24      Nonetheless, to the extent the █████████████████████████████████

25  ████████████████████, Plaintiffs discovered that no later than April/May 2014, when

26  ██████ and the Cercacor team ████████████████████████ and concluded that

27  █████████████████████████████████████ (SUF ¶¶ 136-147.)

28  Thus, by April/May 2014, Plaintiffs had knowledge of the facts that form the basis of

-16-

MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Exhibit 14
-195-

1  their claim that Dr. Lamego breached a fiduciary duty to Plaintiffs.

2  　　　　As soon as Plaintiffs discovered these facts, Plaintiffs simultaneously

3  discovered their alleged harm. For instance, as soon as Plaintiffs discovered the

4  alleged ████████████████████████████, Plaintiffs were aware of at least

5  ████████████████████████████████████████████████████████████

6  ████████████████████████. *Choi v. Sagemark Consulting*, 226 Cal.

7  Rptr. 3d 267, 278 (Ct. App. 2017) ("If the last element to occur in a tort action is

8  damages, the statute of limitations begins to run on the occurrence of appreciable and

9  actual harm, however uncertain in amount, that consists of more than nominal

10  damages.") Thus, Plaintiffs discovered the elements of their fiduciary duty claim by

11  April/May 2014 (and certainly no later than August 2014), at which point their claim

12  accrued and the statute of limitations began to run.

13  　　　　　　　　　**(c)　　A Three-Year Statute of Limitations Applies**

14  　　　　Although Plaintiffs did not specifically assert that their fiduciary duty claim is

15  premised on alleged fraud, "[t]he statute of limitations that applies to an action is

16  governed by the gravamen of the complaint, not the cause of action pled." *City of*

17  *Vista v. Robert Thomas Sec.*, Inc., 84 Cal. App. 4th 882, 889 (Cal. Ct. App. 2000).

18  Allegations of misrepresentation and deceit are at the crux of Plaintiffs' claim.

19  According to Plaintiffs, Dr. Lamego ████████████████████████████

20  ████████████████████████████. (SUF ¶¶ 120, 127.) Both

21  of Plaintiffs' alternative theories are grounded in allegations of fraud and deceit, so

22  the three-year statute of limitations applies. *See Fuller v. First Franklin Financial*

23  *Corp.*, 216 Cal. App. 4th 955, 963 (Cal. Ct. App. 2013).

24  　　　　When the three-year statute of limitations is properly applied, Plaintiffs claim

25  is barred whether Plaintiffs' claim accrued in April/May 2014 or in August 2014.

26  Furthermore, because the three-year statute of limitations is appropriate, Plaintiffs'

27  claim is also barred even if Plaintiffs' claim did not accrue until March 2015, when

28  ████████████████████████████████████████████████████████████

-17-

MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Exhibit 14
-196-

1 ██████████████████████████████████████████████████████████████

2 ██████████████████████████████. (SUF ¶ 123.) Even ignoring the evidence of

3 accrual in April/May 2014, Plaintiffs cannot dispute accrual by March of 2015.

4     Accordingly, Plaintiffs' claim can only proceed if *both* (a) Plaintiffs' claim did

5 not accrue prior to November 2014 *and* (b) the four-year statute of limitations applies.

6 As discussed above, the undisputed facts do not support either of these conclusions:

7 Plaintiffs were aware of the elements of their claim by May/April 2014, and Plaintiffs'

8 allegations are squarely rooted in claims that Dr. Lamego ████████████████████

9 ████. The Court should grant summary judgment in True Wearables' favor.

        **3.**    **Plaintiffs' Claim is Preempted by CUTSA**

11     Separately, Plaintiffs' claim is preempted by the CUTSA insofar as the claim

12 is premised on an allegation that Dr. Lamego ████████████████████████████

13 █████████████████████████████████████. In California, CUTSA provides "the

14 exclusive civil remedy" for conduct "based upon misappropriation of a trade secret."

15 *Silvaco Data Sys. v. Intel Corp.*, 109 Cal. Rptr. 3d 27 (Ct. App. 2010), *disapproved*

16 *of on other grounds*, *Kwikset Corp. v. Superior Court* 246 P.3d 877 (Cal. 2011).

17 CUTSA claims supersede any and all claims premised on the wrongful taking of

18 proprietary information, even if that information does not meet the statutory definition

19 of a trade secret. *See Silvaco*, 184 Cal. App. 4th at 239 n.22; *Mattel, Inc. v. MGA*

20 *Entm't, Inc.*, 782 F. Supp. 2d 911, 987 (C.D. Cal. 2010); *SunPower Corp. v. SolarCity*

21 *Corp.*, 2012 U.S. Dist. LEXIS 176284, at *7 (N.D. Cal. Dec. 11, 2012).

22     Under the first of Plaintiffs' alternative theories, Dr. Lamego ████████

23 ████████████████████████████████████████████████████████████████

24 ████████████████████████████████████████████████████████████████

25 ████████████████████████████████████████████████████████████████

26 ██████████████████████████████████████████████. (SUF ¶ 126) Or, to use

27 words of CEO Joe Kiani ██████████████████████████████████████████████

28 ██████████████████████████████████████████████████ (SUF ¶ 127.)

MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Exhibit 14
-197-

1  To the extent Plaintiffs' claim is premised on an allegation that Dr. Lamego

2  ███████████████████, summary judgment in True Wearables' favor is appropriate.

3  **C.**   **TRADE SECRET CLAIMS**

4  Plaintiffs assert True Wearables misappropriated various alleged trade secrets.

5  (SUF ¶ 142.) Partial Summary judgment for True Wearables on Trade Secrets 1, 6, 9,

6  12, and 14 is appropriate because Plaintiffs have failed to put forth evidence of

7  misappropriation for certain specific versions of source code. Summary judgement

8  for True Wearables on Trade Secret 6 is appropriate because True Wearables does not

9  disclose or use the alleged trade secret. Summary judgment for True Wearables on

10  Trade Secret 12 is appropriate because the trade secret is readily ascertainable.

11  Summary judgment for True Wearables on Trade Secret 14 is appropriate because

12  Plaintiffs cannot show Trade Secret 14 was subject to reasonable efforts to maintain

13  its secrecy and/or the trade secret is generally known.

14  **1.**   **Trade Secrets 1, 6, 9, 12, and 14**

15  The Oxxiom® SA and its accompanying iOS App was originally released in

16  August 2018 with source code version 1.5.0. (SUF ¶ 145.) Subsequently, the iOS App

17  was re-released in August 2019 with source code version 1.6.0, in October 2019 with

18  version 1.6.1, and in March 2021 with version 1.7.0. (SUF ¶ 146.) The Oxxiom® Rx

19  with accompanying iOS App was released in October 2020 with source code version

20  1.6.3. (SUF ¶ 147.) █████████████████████████████████████████████

21  ████████████████████████████████████████████████████████. (SUF ¶

22  149.)

23  **(a)**   **Trade Secrets 1 and 12**

24  Plaintiffs' allegation that ███████████████████████████████████████

25  ████████████████████████████████████. Dr. McNames

26  opines "████████████████████████████████████████████████████████

27  ██████████████. (SUF ¶ 150.) (emphasis added.) Dr. McNames agreed he "did

28  not express an opinion" that ██████████████████████ (SUF ¶ 151.)

-19-
MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Exhibit 14
-198-

1   Accordingly, there is no evidence of record that ███████████████████

2   ████████████████████████████████. Conversely, Dr. McNames's report

3   addressing Trade Secret 12 ██████████████████████████. (SUF ¶ 152.)

4   Dr. McNames agreed his opinion relating to Trade Secrets 12 is ████████

5   ████████. (SUF ¶ 153.) Accordingly, there is no evidence of record that ████

6   ██████████████████████████████████████████████████████.

7   Summary judgment for True Wearables holding that no Oxxiom® System with a

8   source code version 1.6.3 or later is using alleged Trade Secret 1 and no Oxxiom®

9   System with a source code version earlier than 1.6.3 uses Trade Secret 12 is

10  appropriate.

11              **(b)     Trade Secrets 6 and 9**

12      Plaintiffs' allegation that True Wearables' Oxxiom® System uses Trade Secrets

13  6 and 9 is limited to Oxxiom® Systems that use source code version 1.5.0. Dr.

14  McNames's expert report limits his opinions to ████████████████████████

15  ████████. (SUF ¶ 154.) Dr. McNames testified he did not recall studying whether ████

16  ████████████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████ (SUF ¶

18  155.) Dr. McNames's expert report on Trade Secret 9 incorporates his opinions on

19  Trade Secret 6 and is therefore limited to ████████████████. (SUF ¶ 156.) Dr.

20  McNames also testified his opinions on Trade Secret 9 are based on his opinions on

21  Trade Secret 6. (SUF ¶ 157.) Accordingly, there is no evidence of record that any

22  Oxxiom® System using source code versions other than 1.5.0 use Trade Secret 6 and

23  9. Summary judgment for True Wearables holding that no Oxxiom® System with any

24  source code version other than 1.5.0 is using alleged Trade Secrets 6 and 9 is

25  appropriate.

26              **(c)     Trade Secret 14**

27      Plaintiffs' allegation that True Wearables uses Trade Secret 14 via its Oxxiom®

28  System is limited solely to Oxxiom® Systems that use source code version 1.6.0 or

1    later. Dr. McNames's expert report limits his opinions to ██████████████

2    ██████ (SUF ¶ 158.) Dr. McNames testified his opinions are limited to ████████

3    ████████████. (SUF ¶ 159.) Accordingly, there is no evidence of record that

4    any Oxxiom® System using source code versions before 1.6.0 use Trade Secret 14.

5    Summary judgment for True Wearables holding that no Oxxiom® System with a

6    source code version earlier than 1.6.0 uses alleged Trade Secret 14 is appropriate.

7                    **2.    Summary Judgment on Trade Secret 6**

8          True Wearables did not misappropriate Trade Secret 6. Plaintiffs define Trade

9    Secret 6 as:



17   (SUF ¶ 160.) Dr. McNames's expert report alleges ████████████████████

18   ████████████████████████████████████████████████

19   ████████████████ because True Wearables allegedly ██████████████

20   ████████████. (SUF ¶ 161.) Dr. McNames admits that ████████████

21   ████████████████. (SUF ¶ 162.) Instead, Dr. McNames opines that ████

22   ████████████████████████████████████████████████

23   ████████. (SUF ¶ 163.) But Dr. McNames admits that he does not know whether

24   ████████████████████████████████████████████████

25   ████████████████████████████████████████████." (SUF

26   ¶ 164.) Dr. McNames is simply speculating: ████████████████████

27   ████████████████████████████████████████████████

28

1 ██████████████████████████████████████████████████████

2 ████████████████████████." (SUF ¶ 165.)

3 ██████████████ and mere speculation that ███████████████████

4 █████████ is not evidence of misappropriation. Fed. R. Evid. 702. Accordingly, there

5 is no evidence of record that True Wearables misappropriated Trade Secret 6, and

6 summary judgment for True Wearables is appropriate.

7         **3.**    **Summary Judgment on Trade Secret 12**

8       True Wearables is entitled to summary judgment on its affirmative defense that

9 Trade Secret 12, the ██████████████████ ("TSS"), is readily ascertainable. The TSS

10 is composed of the ██████████████████████████ and the ███████████████████

11 ██████. (SUF ¶ 166.) The █████████████████████ was disclosed in its

12 entirety in ██████████████████████ (SUF ¶ 167.) The █████████████████████

13 ███████████ was disclosed in its entirety in ██████████████████████████. (SUF

14 ¶ 168.) These publications, and others, specifically refer to ████████████████████

15 ███████████████████████████████████. (SUF ¶ 169 (*E.g.,* ████████████████████

16 ██████████████████████████████████████████████████████████

17 ████████).)   True Wearables has demonstrated that the TSS was readily

18 ascertainable ██████████████████████. *See* Cal. Civ. Code § 3426.1 (1984

19 Legislative Committee Comments) ("Information is readily ascertainable if it is

20 available in trade journals, reference books, or published materials."). Masimo has

21 failed to demonstrate any genuine issue of material fact to support a contrary

22 conclusion.

23       It is irrelevant as a matter of law whether Dr. Lamego in fact ascertained the

24 TSS ██████████████ from the ██████████████████ publications. Any such

25 requirement is inconsistent with the notion of ready ascertainability as an affirmative

26 defense. The Legislative Committee comments to the CUTSA explain that "the

27 assertion that a matter is readily ascertainable by proper means remains available as a

28 defense to a claim of misappropriation." Cal. Civ. Code § 3426.1 (1984 Legislative

-22-

MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Exhibit 14

-201-

1   Committee Comments). Interpreting the CUTSA to require that the defendant in fact

2   ascertain**ed** the trade secret from the public source in question not only contradicts

3   the "readily ascertain**able**" language of the Legislative Comments, but also does away

4   with a separate element of a plaintiff's prima facie case of misappropriation, namely

5   the need to prove the defendant's "acquisition [of the trade secret] . . . by improper

6   means." Cal. Civ. Code § 3426.1(b). That would be a traverse, not an affirmative

7   defense. *See* 5 Witkin, Cal. Proc. Plead § 1081 (5th ed. 2020); *see also, e.g.*, *Walsh v.*

8   *W. Valley Mission Cmty. Coll. Dist.*, 66 Cal. App. 4th 1532, 1546 (Cal. Ct. App.

9   1998). For at least these reasons, the Judicial Council of California Jury Instructions

10  explain that ready ascertainability is an affirmative defense and, as a result, expressly

11  reject any requirement that defendant prove it acquired the alleged trade secret

12  through the identified readily ascertainable means. *See* CACI No. 4420 (2009); *see*

13  *also* Judicial Council of Cal. Admin. Office of the Courts, Report, at 5-6 (2009)

14  (Fletcher Decl. Exs. NN and MM, respectively).

15          Footnote 9 of *ABBA Rubber Co. v. Seaquist*, 235 Cal. App. 3d 1, 21-22 n.9

16  (Cal. Ct. App. 1991), is wrong and should not be relied on by this Court.[6] As the

17  Advisory Committee explained, footnote 9 of *ABBA Rubber*, which suggests an "in

18  fact ascertained" requirement, is dicta and is not controlling authority. *See* Judicial

19  Council of Cal. Administrative Office of the Courts, Report, at 6 (2009); *see also*

20  CACI No. 4420 (2009). More recent California Court of Appeals cases have reached

21  the opposite conclusion and do not impose a requirement that the defendant in fact

22  ascertained the trade secret from the publicly available sources in question. *See San*

23  *Jose Construction, Inc. v. S.B.C.C., Inc.*, 155 Cal. App. 4th 1528, 1542-43 (Cal. Ct.

24  App. 2007) (triable issue of fact as to whether information was readily ascertainable,

25  _____

26          [6] Where, as here, there is no California Supreme Court case on point, this Court

27  must predict how the California Supreme Court would decide issues of state law such

    as this. *See Judd v. Weinstein*, 967 F.3d 952, 955-56 (9th Cir. 2020). Decisions of

28  lower appellate courts of the state are not binding. *Id.*

MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Exhibit 14
-202-

1   that is, whether defendant *could have* replicated it).

2       When the proper interpretation of the CUTSA is applied, True Wearables is

3   entitled to summary judgment on its affirmative defense of ready ascertainability. It

4   is undisputed that ██████████████████████████ were

5   disclosed in their entirety in the ████████████ publications. (SUF

6   ¶¶ 167-168.) No reasonable jury could determine that Trade Secret 12 was not readily

7   ascertainable.

8       **4.**    **Summary Judgment on Trade Secret 14**

9       Summary Judgment in True Wearables' favor is appropriate on Trade Secret

10   14 because ████ disclosed the entirety of Trade Secret 14 in ████,

11   making it generally known and readily ascertainable. Cal. Civ. Code § 3426.1;

12   *Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1355-56 (Fed.

13   Cir. 2009); *Forcier v. Microsoft Corp.*, 123 F. Supp. 2d 520, 528 (N.D. Cal. 2000).

14   Because ████████████████, Plaintiffs also cannot establish

15   that Trade Secret 14 was the subject of reasonable efforts to maintain its secrecy. Cal.

16   Civ. Code § 3426.1.

17   ████████████████

18   ████████████████████

19

20   (SUF ¶ 171.) Dr. McNames testified that ████████████

21   ████████████████. (SUF ¶ 172.)

22   ████████████████████

23

24   ████ (SUF ¶ 173.) The ████ discloses that "████

25   ████████████████████

26   ████████████████████

27

28

MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Exhibit 14
-203-



." (SUF ¶ 176.)

The ▮▮▮▮ recognizes and publicly discloses that ▮▮▮▮

Accordingly, summary judgment for True Wearables holding no misappropriation of Trade Secret 14 is appropriate because it was disclosed to the public ▮▮▮▮ making it generally known or readily ascertainable and/or showing it was not the subject of reasonable efforts to maintain its secrecy. *Ultimax Cement Mfg.,* 587 F.3d at 1355-56; *Forcier,* 123 F. Supp. 2d at 528.

Dated:  September 3, 2021

Anurita Varma
CALL & JENSEN
A Professional Corporation

By:  */s/ Anurita Varma*

Anurita Varma
Attorneys for Defendants
True Wearables, Inc. and Marcelo Lamego

-26-

MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Exhibit 14
-205-