1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

THE HONORABLE JAMES V. SELNA, JUDGE PRESIDING

MASIMO CORPORATION, et al.,    )CERTIFIED TRANSCRIPT
                    Plaintiffs, )
    vs.                        )
                               )  SACV-20-00048-JVS
APPLE, INC.,                   )
                    Defendant.  )
-----------------------------)


REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

February 6, 2023


            SHARON A. SEFFENS, RPR
            United States Courthouse
            411 West 4th Street, Suite 1-1053
            Santa Ana, CA  92701
            (612) 804-8655

```
 1    APPEARANCES OF COUNSEL:

 2    For the Plaintiffs:

 3    JOSEPH R. RE
      BRIAN CHRISTOPHER CLAASEN
 4    BENJAMIN A. KATZENELLENBOGEN
      KNOBBE MARTENS OLSON & BEAR, LLP
 5    2040 Main Street, 14th Floor
      Irvine, CA  92614
 6    (949) 760-0404

 7    MARK D. KACHNER
      KNOBBE MARTENS OLSON & BEAR, LLP
 8    1925 Century Park East, Suite 600
      Los Angeles, CA  90067
 9    (310) 551-3450

10    ADAM POWELL
      DANIEL P. HUGHES
11    KNOBBE MARTENS OLSON & BEAR, LLP
      3579 Valley Centre Drive, Suite 300
12    San Diego, CA  92130
      (858) 707-4000
13

14    For the Defendant:

15    JOSEPH J. MUELLER
      SARAH R. FRAZIER
16    WILMER CUTLER PICKERING HALE & DORR, LLP
      60 State Street
17    Boston, MA  02109
      (617) 526-6000
18
      AMY K. WIGMORE
19    WILMER CUTLER PICKERING HALE & DORR, LLP
      2100 Pennsylvania Avenue, N.W.
20    Washington, DC  20037
      (202) 663-6096
21
      THOMAS GREGORY SPRANKLING
22    MARK D. SELWYN
      WILMER CUTLER PICKERING HALE & DORR, LLP
23    2600 El Camino Real, Suite 400
      Palo Also, CA  94306
24    (650) 858-6031

25
```

1    **JOSHUA HAWKES LERNER**
     WILMER CUTLER PICKERING HALE & DORR, LLP
2    One Front Street, Suite 3500
     **San Francisco, CA  94111**
3    (628) 235-1124

4    KENNETH G. PARKER
     HAYNES & BOONE, LLP
5    600 Anton Boulevard, Suite 700
     Costa Mesa, CA  92626
6    (949) 202-3014

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    SANTA ANA, CALIFORNIA; MONDAY, FEBRUARY 6, 2023; 1:45 P.M.

01:45   2            THE CLERK:  Calling Item No. 4, SACV-20-00048-JVS,

01:45   3    Masimo Corporation, et al., versus Apple, Inc.

01:45   4            Counsel, if you could state your appearances for

01:46   5    the record, please.

01:46   6            MR. RE:  Good afternoon, Your Honor.  For the

01:46   7    plaintiff Masimo, my name is Joseph Re from Knobbe Martens.

01:46   8    With me are my partners Mark Kachner, Ben Katzenellenbogen,

01:46   9    Adam Powell, Dan Hughes, and Brian Claassen.

01:46   10           THE COURT:  Good afternoon.

01:46   11           MR. MUELLER:  Good afternoon, Your Honor.  Joe

01:46   12   Mueller from WilmerHale on behalf of Apple.  With me are my

01:46   13   colleagues Tom Sprankling, Amy Wigmore, and Sarah Frazier at

01:46   14   the table, as well as Mark Selwyn, Josh Lerner, and our

01:46   15   co-counsel Ken Parker from Haynes & Boone.

01:46   16           THE COURT:  Good afternoon.

01:46   17           MR. MUELLER:  Good afternoon, Your Honor.

01:46   18           THE COURT:  It's been a long time, Mr. Mueller.

01:46   19           MR. MUELLER:  It has been, Your Honor.  It's been

01:46   20   over a decade I think.  Good to see you.

01:46   21           THE COURT:  Mr. Mueller represented Broadcom in

01:46   22   one of the last of the Broadcom Qualcomm cases.

01:47   23           Well, why don't we take these up in the order that

01:47   24   they're set forth on the calendar.  Each side is going to

01:47   25   get about ten minutes, plus or minus.  There are a lot of

01:47   1   complicated issues, and a lot of motions that we've got to

01:47   2   go through.  So let's begin with the first one.

01:47   3            MR. RE:  I am here to address the first one, which

01:47   4   is the order regarding Defendant's Motion for Summary

01:47   5   Judgment, 1083, and it's interrelated with the Motion to

01:47   6   Exclude the Expert Testimony of Jeffrey Kinrich, 1120, which

01:47   7   is in the tentative order together.

01:47   8            I want to address the easier issue first.  The

01:47   9   easier issue is in the tentative on page 12 in Section B,

01:48   10  the two sentences on lost profits.  It appears that the

01:48   11  tentative assumes that the damages case for lost profits can

01:48   12  only be advanced by the expert.

01:48   13            The parties briefed a separate issue on the fact

01:48   14  that Masimo could establish lost profits without the expert,

01:48   15  and that was set forth in our opposition at pages 20 and 21

01:48   16  and in Apple's reply brief at page 20.  It appears the

01:48   17  parties are in agreement on the law, that the plaintiff need

01:48   18  not have to have an expert to establish lost profits.

01:48   19  Therefore, the tentative should not assume that Dr. Kinrich

01:49   20  is needed to advance a lost profits case.

01:49   21            I could go through if time permitting what our

01:49   22  evidence would be independent of Dr. Kinrich --

01:49   23            THE COURT:  Well, I agree in the abstract you can

01:49   24  put in a damages case without Kinrich.

01:49   25            MR. RE:  Yes, and they seem to agree, but they're

01:49   1   relying on the prior orders of the Court as if that would

01:49   2   preclude us from doing so.  There seems to be a little

01:49   3   miscommunication on what the damages case is looking at

01:49   4   their reply brief, but we do have sufficient evidence of

01:49   5   record already produced that would allow the advancement of

01:49   6   a lost profits case without Dr. Kinrich.

01:49   7           THE COURT:  There are obviously disclosure issues

01:49   8   that aren't before us today, but if you go that route, there

01:49   9   would be disclosure issues.

01:49   10          MR. RE:  No.  I could actually explain, and I do

01:49   11  have some slides if you want --

01:49   12          THE COURT:  Well, I think it's sufficient to

01:49   13  preserve your right to do it in another fashion.  If there's

01:50   14  an attack to be had on that approach, it could be brought.

01:50   15          MR. RE:  Fine, Your Honor.  So that was my only

01:50   16  point I was going to make with regard to the summary

01:50   17  judgment denial.

01:50   18          I now want to move on to page 8 where you

01:50   19  specifically asked us for a proffer of the facts of record

01:50   20  that would support Dr. Kinrich going forward.  This is

01:50   21  page 8 of your tentative, and I do have a slide on that as

01:50   22  well, which sets forth -- if I may approach?

01:50   23          THE COURT:  Please.

01:50   24          Do you have one for my clerks?

01:51   25          MR. RE:  Yes, Your Honor.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

01:51    1            (Document handed to the Court)

01:51    2            MR. RE:  There were four areas as this chart shows

01:51    3   in debate about what was timely facts of record.  They fall

01:51    4   in the categories of Masimo's time to develop, Masimo's

01:51    5   development costs, Masimo's manufacturing costs, and Apple's

01:51    6   component cost savings.  This chart outlines the exact

01:51    7   evidence and when the disclosures were made under each of

01:51    8   the topics.  I don't know if I need to go through them, but

01:51    9   it's set forth in this chart.  Therefore, we submit that

01:51   10   this would be a timely proper proffer for Dr. Kinrich to go

01:52   11   forward with his damages case.

01:52   12            THE COURT:  Please don't tap.

01:52   13            MR. RE:  Oh, sorry.  Excuse me.

01:52   14            The next part of my presentation would be about

01:52   15   the supplemental, and this is the discussion in the

01:52   16   tentative beginning on page 8 which concludes on page 10.

01:52   17   On page 10, the tentative specifically states that:

01:52   18   "Although the supplemental report followed a Court order,

01:52   19   the Order's substance was to exclude opinions and facts the

01:52   20   Kinrich report originally relied upon and the supplemental

01:52   21   report continued to utilize."

01:52   22            While we did not fully understand the 28(a)(C)

01:53   23   order -- and you were right that we did a very cautious

01:53   24   approach in the supplemental report of Dr. Kinrich.  What we

01:53   25   did in that supplement is we assumed three different

01:53  1    scenarios all in the same supplement because we weren't sure

01:53  2    on the scope of the exclusion.

01:53  3         The three scenarios were, first, we assumed that

01:53  4    the Court precluded Masimo from offering as evidence at

01:53  5    trial the excluded opinions from Priddell and Muhsin on the

01:53  6    2022 documents, so Dr. Kinrich gives that opinion in a

01:53  7    supplement.  We now understand that's out.

01:53  8         He also did a second scenario where he couldn't

01:53  9    rely on any reasonable information from Priddell and Muhsin

01:53  10   based on the conversations, and he gave his opinions based

01:53  11   on the data in the admissible 2022 documents, and now we

01:53  12   know that's out.

01:54  13        But the third scenario has not been addressed, and

01:54  14   that's what is still remaining in the supplemental report

01:54  15   that we believe should not be excluded.  The third scenario

01:54  16   is if he can't rely on the 2022 documents and he can't rely

01:54  17   on Priddell and Muhsin, he still has an opinion based on the

01:54  18   2021 documents.  And the 2021 documents were in fact timely

01:54  19   produced, were in fact the basis made by percipient

01:54  20   witnesses, and he offered his opinion on what it would be

01:54  21   based on that data, and that was timely produced.

01:54  22        So if there's any doubt on what that is -- I

01:54  23   actually prepared that supplement with strike-throughs

01:54  24   showing what remains despite what's been excluded.  If

01:54  25   there's questions about that, I'm more than happy to hand

01:54   1    that out as well.  But my point is there is still material

01:54   2    in the supplement that should be allowed even according to

01:55   3    all of your analysis.

01:55   4            I also wanted to thank the Court for getting all

01:55   5    these out.  I recognize this was an enormous job.  I mean, I

01:55   6    really want to thank you and your staff.  We absorbed it

01:55   7    all.  It's a herculean task.  We appreciate it.  But the

01:55   8    supplemental report still has some legs left despite the

01:55   9    prior analyses.

01:55   10           THE COURT:  Okay.

01:55   11           MR. RE:  With that, I have nothing further.

01:55   12           THE COURT:  Mr. Mueller.

01:55   13           MR. MUELLER:  Your Honor, Ms. Frazier will address

01:55   14   the substance of these arguments.

01:55   15           I neglected to introduce Colette Mayer, who is the

01:55   16   head of Intellectual Property Litigation at Apple.

01:55   17           THE COURT:  Good afternoon.

01:55   18           MS. FRAZIER:  Good afternoon, Your Honor.

01:55   19           Apple requests that the Court adopt the tentative

01:55   20   ruling excluding Mr. Kinrich's lost profits and cost savings

01:55   21   analyses.  Before I talk to that, I'd like to speak to the

01:55   22   summary judgment on lost profits that Mr. Re mentioned.

01:56   23           Your Honor, while we agree as a matter of

01:56   24   principle it is possible in some cases to present damages

01:56   25   evidence and calculations without an expert witness, we do

01:56   1   not think it is appropriate in this case because there has

01:56   2   not been any disclosure of such a theory, Your Honor.

01:56   3           We are now seven weeks from trial.  If plaintiffs

01:56   4   are intending to put on another theory of damages, we need

01:56   5   that calculation.  We needed it several months ago.  So I

01:56   6   would just ask Your Honor to the extent that's been saved

01:56   7   for another day that we do need to address that, and we do

01:56   8   need to address what we believe are serious deficiencies,

01:56   9   because no such other theory including the one raised in our

01:56   10  opposition to the summary judgment motion has been disclosed

01:56   11  during this case.

01:56   12          Moving to Mr. Kinrich's opinions, Your Honor, as I

01:56   13  said, we believe the tentative should be adopted.  It

01:57   14  correctly finds that the theories in his original report

01:57   15  relied exclusively on the opinions and financial analyses

01:57   16  that were conducted by Masimo's employees that Your Honor

01:57   17  previously struck.  It also correctly finds that the

01:57   18  supplement should be struck for two reasons.  The first is

01:57   19  because it was untimely.  It was an untimely attempt to

01:57   20  circumvent that exclusion order.

01:57   21          As your tentative notes, Your Honor, it continues

01:57   22  to rely on the same excluded material.  Mr. Re referred to

01:57   23  the 2021 versions of documents and claims.  Those were

01:57   24  disclosed.  The 2021 versions, Your Honor, are still

01:57   25  analyses that were performed for this litigation by

01:57  1  Mr. Muhsin and Mr. Priddell.  If you look at their
01:57  2  declarations, Your Honor, they're referred to by Bates
01:57  3  number.  It's the same improper analysis, just two different
01:58  4  variations of those documents.
01:58  5          Then with respect to the question of whether there
01:58  6  are facts in the record other than the Priddell and Muhsin
01:58  7  analysis that could support Mr. Kinrich's opinion, the
01:58  8  answer is no, Your Honor, including because he didn't
01:58  9  disclose any other such bases.  He relied on Mr. Muhsin's
01:58  10  opinion about what hypothetically could have been possible
01:58  11  in order to determine a timeframe for his calculations and
01:58  12  the foundation that this module could have been a
01:58  13  possibility.  He then relied on the development costs
01:58  14  calculated by Mr. Muhsin and the per unit manufacturing cost
01:58  15  estimated by Mr. Priddell.
01:58  16          His costs savings analysis then has a fourth input
01:58  17  from Mr. Priddell in the form of his analysis as to which
01:59  18  components would have been replaced.  All four of those
01:59  19  inputs are necessary, and all four have been excluded under
01:59  20  Your Honor's tentative and should remain excluded.
01:59  21          So simply put, Your Honor, the foundation for his
01:59  22  opinions is now gone.  It's crumbled.  They can't replace it
01:59  23  with a new foundation.  They would have to build an entirely
01:59  24  new theory requiring new calculations, new opinions, one
01:59  25  which our experts wouldn't have had a chance to respond to.

01:59  1            If I can just address briefly the facts of record

01:59  2    that Mr. Re submitted on his slide to Your Honor, they

01:59  3    suffer from the same problems.  The Masimo manufacturing

01:59  4    costs, the evidence cited in this slide is the document with

01:59  5    the Bates number MASA 10971155.  Your Honor, that is

01:59  6    Mr. Priddell's analysis.  It's the 2021 version of the

02:00  7    analysis he submitted in his disclosure and said he

02:00  8    prepared.  It is the excluded material.  Mr. Kinrich used

02:00  9    the 2022 version in his original report.  He then just tried

02:00  10   to switch to the 2021 version in his supplemental report.

02:00  11   It's the same evidence.

02:00  12            The same evidence is cited here under Apple

02:00  13   component cost savings.  Again, it's the same evidence

02:00  14   that's already been excluded.

02:00  15            Same issue with respect to the Masimo development

02:00  16   costs, Your Honor.  Several of the documents listed there,

02:00  17   including those that end with the Bates numbers 3492, 3476,

02:00  18   and 3484 are all in Mr. Muhsin's declaration.  They're the

02:00  19   same analyses Your Honor has already struck.

02:00  20            So for that reason, Your Honor, we would ask that

02:00  21   the tentative be adopted.  We do not believe there's any

02:01  22   reason to revisit it based on any of the facts that

02:01  23   plaintiffs have put forth.

02:01  24            THE COURT:  Okay.  Thank you.

02:01  25            So the suggestion is we ought to go back and parse

02:01  1    the analysis based on 2021?

02:01  2          MR. RE:  Correct, and 2021 has not been excluded,

02:01  3    and that's exactly the ambiguity.  It was timely produced,

02:01  4    and it was percipient.  So using your analysis, the 2021,

02:01  5    which was produced way before the discovery cutoff was not

02:01  6    excluded, and that's really what it's coming down to.  It

02:01  7    appears they think it's excluded under your rationale, and I

02:01  8    don't see how it can be.

02:01  9          So maybe we need to go back, parse it out, but

02:01  10   that's what it comes -- that's the misinterpretation we're

02:01  11   having with regard to the order.

02:01  12         THE COURT:  Okay.  I understand the argument.

02:01  13         MR. RE:  Thank you, Your Honor.

02:01  14         THE COURT:  Mr. Mueller.

02:01  15         MR. MUELLER:  Yes, Your Honor.  On this same

02:01  16   motion but the liability portion, with Your Honor's

02:01  17   permission, Ms. Wigmore will address the substance of those

02:02  18   issues.

02:02  19         THE COURT:  Okay.

02:02  20         MS. WIGMORE:  Good afternoon, Your Honor.  Amy

02:02  21   Wigmore for Apple.

02:02  22         I'm addressing Apple's Motion for Summary Judgment

02:02  23   on the Trade Secret Misappropriation Claims.  I'll note that

02:02  24   that motion also included the Kinrich lost profits claim as

02:02  25   well, which Ms. Frazier has addressed.

02:02   1           THE COURT:  Right.

02:02   2           MS. WIGMORE:  Now, I will only focus on two

02:02   3   specific issues.  We have Your Honor's tentative, and I want

02:02   4   to address two specific issues where we ask that Your Honor

02:02   5   reconsider the tentative ruling.  First, that Apple is

02:02   6   entitled to summary judgment on plaintiffs' value

02:02   7   importance, and appropriateness alleged trade secrets.  They

02:02   8   used the abbreviation VIA.  Second, that Apple is entitled

02:02   9   to summary judgment on plaintiffs' alleged LP 5 alleged

02:02   10  trade secret.  In view of confidentiality issues, I'll

02:03   11  endeavor to use abbreviations and not anything specific.

02:03   12          Now, I'll start with the VIA trade secrets.  As

02:03   13  Your Honor is aware, plaintiffs have alleged trade secrets

02:03   14  falling into five separate categories:  the D&D category,

02:03   15  the LP category, the SP category, the B&M category, and the

02:03   16  IH category.  But within each of those categories,

02:03   17  plaintiffs have listed several alleged secrets, and at the

02:03   18  end of each list, they have added a catchall category

02:03   19  referring to the value, importance, and appropriateness of

02:03   20  the trade secrets that precede it.

02:03   21          The specific numbers for the trade secrets in this

02:03   22  category, the alleged secrets, are:  D&D No. 16, LP No. 10,

02:03   23  SP No. 6, B&M No. 8, and IH No. 7.  The Court's tentative

02:03   24  ruling does not specifically address our arguments regarding

02:03   25  the deficiencies of these VIA trade secrets.  But as we

02:04   1    discuss at pages 18 through 21 of our opening brief and

02:04   2    pages 20 to 21 of our reply brief, these VIA trade secrets

02:04   3    are not stated with reasonable particularity, and allowing

02:04   4    them to proceed to the jury would cause confusion and undue

02:04   5    prejudice to Apple.

02:04   6            So starting with the lack of particularity, as

02:04   7    acknowledged in our opening brief, the Court declined to

02:04   8    dismiss these VIA trade secrets at the motion to dismiss

02:04   9    stage, but that opinion does not control here for a couple

02:04  10    of reasons.

02:04  11            First of all, that opinion focused on the distinct

02:04  12    question of whether plaintiffs could later use this claimed

02:04  13    VIA category as a basis for expanding their lists of claimed

02:04  14    secrets, and the Court determined they could not.

02:04  15            Second, the procedural context of that motion was

02:05  16    different.  The Court was assessing the adequacy of the

02:05  17    pleadings under the deferential motion to dismiss standard.

02:05  18    As the Court noted in that opinion, Docket No. 273 at

02:05  19    page 8, trade secret identification is naturally refined

02:05  20    during discovery, and so trade secrets do not have to be

02:05  21    described in minute detail to survive a motion to dismiss.

02:05  22            But now we're at a different phase of the case.

02:05  23    Expert and fact discovery have been concluded, and

02:05  24    plaintiffs have failed to establish any substance to these

02:05  25    alleged VIA secrets beyond the list of individual alleged

secrets that precede them.  They have simply added the
phrase "value, appropriateness, and importance" without
further explication.

As explained in our briefing, their experts have
failed to shed light on the meaning of these phrases.  Their
brief simply argues that Apple should understand what they
mean.  They provide no reason to think that a jury would
understand the meaning of these relative, qualitative terms
that could vary based on the context in which they argue.
In addition, these alleged secrets are confusing, and
allowing them to proceed to the jury would cause undue
prejudice to Apple.

Now, as I've noted, there are already several
individual alleged secrets in each category.  There's
absolutely no reason to pursue those separate secrets
relating to the value, appropriateness, and importance of
those claimed alleged secrets.  These concepts of value,
importance, and appropriateness should be subsumed in the
analysis of whether each individual alleged secret is in
fact a trade secret.

Independent economic value is a required element
of establishing a trade secret.  Allowing a nebulous trade
secret that uses the word "value" will confuse the jury and
improperly suggest that the value requirement has been
satisfied.  This is not a case like the Altavion case where

02:06   1    the experts have identified some combination of trade

02:06   2    secrets that falls into this catchall category.  Plaintiffs

02:07   3    have not identified any specific combinations of the

02:07   4    preceding specific items that fall within this value,

02:07   5    appropriateness, and importance category.  They simply

02:07   6    appended those words.

02:07   7            More confusingly, they've dropped some of the

02:07   8    alleged secrets that fall in the preceding list.  Yet, the

02:07   9    value, appropriateness, and importance category covers all

02:07   10   of the originally pled alleged secrets.  So this will simply

02:07   11   confuse the jury by referring to numbers of trade secrets

02:07   12   that are no longer in the case, and it will allow them to

02:07   13   try to relitigate each individual secret by appending the

02:07   14   nebulous words "value, importance, and appropriateness."

02:07   15           So for all these reasons, there's no need to have

02:07   16   this additional category of alleged secrets that simply adds

02:07   17   confusing terminology but doesn't address any new or

02:07   18   specific combination.

02:07   19           Unless the Court has questions on that, I will

02:08   20   move to the LP 5 trade secrets.

02:08   21           THE COURT:  Okay.

02:08   22           MS. WIGMORE:  Now, LP 5 -- again, I won't repeat

02:08   23   the language of the trade secret in open court, but as we've

02:08   24   argued in our motion at pages 14 to 16, this alleged secret

02:08   25   is unreasonably broad and too general to constitute a trade

02:08  1    secret, and plaintiffs cannot show they were in possession

02:08  2    of anything that broad at the time.

02:08  3            Now, as framed, LP 5 boils down to identifying a

02:08  4    general problem, that X can cause errors, and coupling it

02:08  5    with a general conclusion, designing something to resolve

02:08  6    those errors.  The problem is this alleged secret does not

02:08  7    identify any specific solution or design to avoid the

02:08  8    problem identified.  It simply says design something to

02:08  9    avoid a problem without saying what a specific design or

02:08  10   designs should be.

02:08  11           Now, Your Honor addresses the IMAX decision in

02:09  12   your tentative ruling.  Respectfully, we believe that case

02:09  13   is not distinguishable but directly on point.  The IMAX case

02:09  14   involved a claim to a trade secret to dimensions and

02:09  15   tolerances without specifying what the dimensions and

02:09  16   tolerances are.  The court in that case, the Ninth Circuit,

02:09  17   found that that was not sufficient to state the trade secret

02:09  18   with particularity.  Similarly here, there's a reference to

02:09  19   designing something, but no specifics as to what the design

02:09  20   is or how to conduct the design, and that's exactly what the

02:09  21   Court found deficient in IMAX.

02:09  22           This case is also directly on point with the

02:09  23   Waymo, LLC, versus Uber Technologies, Inc., case.  That's

02:09  24   2017 WL 2123560.  That case addresses the issue of trying to

02:09  25   claim all possible solutions to a scientific problem when

02:10  1    what the alleged plaintiff has alleged involved only a

02:10  2    single solution.

02:10  3         That Court finds -- and I'll read directly from

02:10  4    the opinion at page 7:  "Every company in the field can be

02:10  5    expected to settle on some specific resolution thereof, and

02:10  6    every company's specific resolution may well qualify as a

02:10  7    trade secret, but it would be wrong to allow any company to

02:10  8    leverage a single solution into a monopoly over broad swaths

02:10  9    of other solutions.  For example, merely because they all

02:10  10   fall on the side of generally favoring a particular

02:10  11   consideration over others, to do so would be to allow

02:10  12   monopolization of broad scientific or engineering concepts

02:10  13   and principles.  Waymo's gamesmanship on this score

02:10  14   undermines its credibility on this motion."

02:11  15        This is exactly what's happening with LP 5 in this

02:11  16   case.  Again, a problem is identified, a solution in terms

02:11  17   of making a design is identified, but no specific designs

02:11  18   are identified or claimed.  As a result, to allow this

02:11  19   secret to go forward would allow the plaintiffs to

02:11  20   monopolize every possible solution to a problem when they

02:11  21   have not shown that they've come up with those solutions.

02:11  22        So for those reasons, we respectfully ask the

02:11  23   Court to reconsider its tentative ruling on both the VIA

02:11  24   trade secrets and the LP 5 alleged secret and grant summary

02:11  25   judgment for defendants on both.  Thank you.

02:11   **1**          THE COURT:  Thank you.

02:11   **2**          Mr. Katzenellenbogen.

02:11   **3**          MR. KATZENELLENBOGEN:  Yes, Your Honor.  Thank

02:11   **4**   you.  Your Honor, this is Ben Katzenellenbogen.  I will be

02:12   **5**   addressing the arguments regarding the value, importance,

02:12   **6**   and appropriateness of trade secrets and my colleague,

02:12   **7**   Mr. Claassen, will be addressing LP 5.

02:12   **8**          Counsel's correct that the tentative order did not

02:12   **9**   explicitly address the five value, importance, and

02:12   **10**  appropriateness trade secrets.  I think the analysis in the

02:12   **11**  tentative correctly disposes of those arguments.  The

02:12   **12**  arguments that counsel presented here are simply repeats of

02:12   **13**  the arguments that were in Apple's opening brief, which were

02:12   **14**  addressed in our opposition and then largely ignored in

02:12   **15**  Apple's reply.  I think in Apple's reply the only argument

02:12   **16**  they made was that all three words, "value, importance,

02:12   **17**  appropriateness," are relative terms that vary based on the

02:13   **18**  context in which they are used.  They did not address, much

02:13   **19**  less introduce, any evidence suggesting that in the context

02:13   **20**  of any of the trade secrets that there was any ambiguity or

02:13   **21**  uncertainty.

02:13   **22**          In particular, I would draw the Court's attention

02:13   **23**  to Apple's Statements of Undisputed Facts addressing this

02:13   **24**  issue.  That's at pages 19 through 21 of their Statement of

02:13   **25**  Undisputed Facts.  It's Facts 103 through 117.  What is

| | |
|---|---|
| 02:13 | 1 |
| 02:13 | 2 |
| 02:13 | 3 |
| 02:13 | 4 |
| 02:13 | 5 |
| 02:14 | 6 |
| 02:14 | 7 |
| 02:14 | 8 |
| 02:14 | 9 |
| 02:14 | 10 |
| 02:14 | 11 |
| 02:14 | 12 |
| 02:14 | 13 |
| 02:14 | 14 |
| 02:14 | 15 |
| 02:14 | 16 |
| 02:14 | 17 |
| 02:14 | 18 |
| 02:14 | 19 |
| 02:14 | 20 |
| 02:14 | 21 |
| 02:14 | 22 |
| 02:14 | 23 |
| 02:14 | 24 |
| 02:14 | 25 |

notably absent from any of those facts is any affirmative
assertion that any of those three words are ambiguous or
somehow uncertain in the context of any of the trade
secrets.  They don't cite to any of their own expert
reports.  They don't cite to any evidence asserting
ambiguity.

Their argument is simply the observation that
Masimo's experts did not affirmatively provide definitions.
But that's the argument that we made in opposition, which is
that on summary judgment there's no reason to assume that
any particular word is ambiguous.  And if there was any
actual evidence of this, it would have been Apple's
obligation to present it.

I have a few other arguments I could address
specifically responding to a few of the arguments presented
today.  However, if Your Honor is not inclined to reconsider
this issue and simply include the finding in the tentative
order, I don't need to run through them.

THE COURT:  If you want to address their points,
please do.

MR. KATZENELEENBOGEN:  Okay.  I will go through
them.

THE COURT:  Briefly.

MR. KATZENELLENBOGEN:  All right.  First, with
regard to a reasonable particularity, they mention this

02:14   1   procedural distinction between the motion to dismiss and

02:15   2   summary judgment.  However, they don't argue or present any

02:15   3   reason to think that the Court's prior conclusion was

02:15   4   incorrect.

02:15   5           THE COURT:  Certainly the standard is different,

02:15   6   isn't it?

02:15   7           MR. KATZENELEENBOGEN:  The standard is different,

02:15   8   and they act as if that would be helpful to their case, but

02:15   9   it's actually harmful, because on summary judgment, they

02:15   10   would have to present some sort of evidence as to why there

02:15   11   would be a problem, and they conspicuously do not.

02:15   12           So I submit that the Court's prior conclusion that

02:15   13   "The scope of this phrase is necessarily circumscribed by

02:15   14   the preceding list of trade secrets, meaning that it cannot

02:15   15   be later used as a means for claiming trade secrets about

02:15   16   which Apple does not have notice" is correct, and that that

02:15   17   provides exactly the notice that Apple is arguing is

02:15   18   lacking.

02:15   19           I've already addressed the point that their

02:15   20   experts -- they don't cite to any opinions suggesting what

02:16   21   these terms would mean or any ambiguity.

02:16   22           The second argument was that these were somehow

02:16   23   confusing and undue prejudice.  I don't recall that argument

02:16   24   being supported by any evidence in the briefing.  And the

02:16   25   sort of policy argument that these should somehow be

02:16  1    subsumed seems to be an argument that they would prefer that

02:16  2    Masimo be presenting different trade secrets or presenting

02:16  3    its arguments differently, but that is no reason to

02:16  4    circumscribe Masimo's case.

02:16  5           As we have set forth, these are trade secrets.

02:16  6    And based on Masimo's years and years, decades and decades,

02:16  7    of pioneering research in this area, it's not only the

02:16  8    underlying trade secrets, but also knowing the circumstances

02:16  9    under which these have value and when they are appropriate

02:16  10   are also protectable trade secrets.

02:17  11          Finally, the argument -- the suggestion that

02:17  12   somehow the identification has grown murkier, that's wrong.

02:17  13   This was addressed specifically in our briefing.  Apple

02:17  14   ignored it today, which is that we narrowed the case by

02:17  15   informing Apple that we were not pursuing certain trade

02:17  16   secrets.  That's Exhibit BBBB, and I apologize about the

02:17  17   number of exhibits.  As we pointed out, Apple responded to

02:17  18   that by asking Masimo whether we were going to assert the

02:17  19   value, importance, and appropriateness of the trade secrets

02:17  20   that had been dropped, and Masimo responded, no, we are not.

02:17  21   So there is no ambiguity.  That's simply an incorrect

02:17  22   statement.

02:17  23          If the Court has any other questions about any of

02:17  24   the arguments, I'm happy to address them.

02:17  25          THE COURT:  Thank you.

02:17  1          Mr. Claassen.

02:18  2          MR. CLAASSEN:  Thank you, Your Honor.

02:18  3          I'll be speaking on behalf of Masimo regarding

02:18  4  Trade Secret LP 5.  LP 5 is protectable, and the tentative

02:18  5  is correct.  I think the conclusion that the Court finds

02:18  6  that it's sufficiently particular to create at least a

02:18  7  genuine issue of fact is correct.  There's no evidence that

02:18  8  this is a general idea, and I'll direct you to our briefing,

02:18  9  our opposition at page 15 in particular:  "Apple has not set

02:18  10  forth evidence that the idea itself is general."  That's

02:18  11  enough to dispose of the entirety of their argument.

02:18  12          Do you have any further questions for me, Your

02:18  13  Honor?

02:18  14          THE COURT:  No.  Thank you.

02:18  15          Anybody want to respond very briefly like, two

02:18  16  minutes?

02:18  17          MS. WIGMORE:  Your Honor, as to the VIA trade

02:18  18  secret, I would refer the Court to page 19 of our opening

02:18  19  motion where we very clearly made the argument that the

02:18  20  concept of value is required to prove a trade secret.  So to

02:19  21  allow value to be an alleged trade secret or part of one

02:19  22  would be double counting, and that would be unfair and

02:19  23  prejudicial.

02:19  24          Also, it's not our burden to establish the trade

02:19  25  secret.  That burden falls upon the plaintiffs.  As we noted

02:19   1   on that same page 19 of our motion, the only thing they

02:19   2   cited to was expert testimony of theirs saying that

02:19   3   plaintiffs understood the value and importance.  They didn't

02:19   4   describe anything more, and it is their burden to do so.

02:19   5   Under Celotex, they have failed to do so.

02:19   6           But fundamentally, letting value trade secrets go

02:19   7   to the jury will be unnecessarily confusing in terms of the

02:19   8   individual lists of secrets being narrowed.  All the

02:19   9   plaintiffs are saying is now we're going to have those

02:19   10  individual alleged secrets plus a catch-all value of those

02:19   11  individual secrets without identifying any particular

02:19   12  combination that is anything unique or different compared to

02:19   13  the initial list.

02:20   14          And on LP 5, I'll stand on the arguments I made

02:20   15  previously.

02:20   16          THE COURT:  Okay.  Thank you.

02:20   17          MR. KATZENELEENBOGEN:  May I make one final point,

02:20   18  Your Honor?

02:20   19          THE COURT:  No.  I think we've gone back and forth

02:20   20  enough.  Thank you.

02:20   21          Let's move on to the next motion.  This one will

02:20   22  be submitted.

02:20   23          MR. POWELL:  Thank you, Your Honor.  This is Adam

02:20   24  Powell for Masimo.

02:20   25          I'd like to just let you know a couple things on

02:20  1    your calendar order.  Masimo has submitted on Masimo's
02:20  2    Motion for Partial Summary Judgment.  We're submitting on
02:20  3    the tentative.  So that one we don't need to argue more.
02:20  4                THE COURT:  Wait.  Which one now?
02:20  5                MR. POWELL:  That was Masimo's Motion for Partial
02:20  6    Summary Judgment, Docket 1086.  We understand Apple is also
02:21  7    submitting on the Motion to Strike Untimely Fact and Expert
02:21  8    Declarations Supporting Plaintiffs' Motion for Partial
02:21  9    Summary Judgment.  That's at Docket 1125 and 1172.
02:21  10               So what I'm here to address is Plaintiffs' Daubert
02:21  11   Motion to Exclude Apple's Experts.  There's only one portion
02:21  12   of the tentative that I'd like to direct your attention to.
02:21  13   It's beginning on page 5 and ending at the top of page 6.
02:21  14   It's the sentence spanning both pages.
02:21  15               The sentence reads -- it's referring to Altavion.
02:21  16   It says:  "This case does not stand for the proposition that
02:21  17   Dr. Sarrafzadeh and Dr. Warren are barred from describing
02:21  18   the trade secrets in an element by element manner.  But such
02:21  19   an approach is valid only where the aggregate, not the
02:22  20   individual components, is generally known."
02:22  21               We completely agree with that statement in the
02:22  22   tentative, Your Honor.  We think it's correct consistent
02:22  23   with the law.  And our argument is not that the defendant is
02:22  24   barred from addressing trade secrets element by element.
02:22  25   Our argument is that the defendant is barred from breaking

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

02:22  1    the trade secrets into elements and then attempting to show

02:22  2    only that each element is generally known rather than the

02:22  3    trade secret as a whole.

02:22  4           I can give you an example --

02:22  5           THE COURT:  I don't think anybody can really

02:22  6    dispute that as a matter of law.

02:22  7           MR. POWELL:  I completely agree with you, Your

02:22  8    Honor, but that's exactly what Dr. Sarrafzadeh and Dr.

02:22  9    Warren have done.  The example I'll give you if you start

02:22  10   just at the first trade secret, D&D Trade Secret 1, in Dr.

02:22  11   Sarrafzadeh's report -- and all of the analysis, it follows

02:22  12   basically the same form.  You start with a quote of the

02:22  13   trade secret.  This begins at paragraph 57.  They quote the

02:23  14   trade secret.  They state:  "Every aspect of alleged D&D

02:23  15   Trade Secret No. 1 was generally known or at least readily

02:23  16   ascertainable based on certain references."

02:23  17          Then you have a number of paragraphs that attempt

02:23  18   to show that each element separately was known.  And then

02:23  19   there's a conclusion paragraph, which in this example is

02:23  20   paragraph 93.  That conclusion states:  "Every aspect of

02:23  21   alleged D&D Trade Secret No. 1 was generally known based on

02:23  22   those references."

02:23  23          Dr. Sarrafzadeh goes on to explain what field

02:23  24   those references are in, and then he concludes:  "When

02:23  25   considered as individual elements or as an aggregation of

02:23   1   individual elements, plaintiffs' alleged trade secret was

02:23   2   generally known."

02:23   3           Our point here, Your Honor, is that there's --

02:23   4           THE COURT:  But doesn't the last phrase, including

02:23   5   the aggregation, say whatever flaws there may be and simply

02:24   6   focus on the constituents?

02:24   7           MR. POWELL:  Yes, they do in the last sentence --

02:24   8           THE COURT:  Right, right.

02:24   9           MR. POWELL:  -- they do state in the aggregate.

02:24   10  The problem is there is no analysis connecting the

02:24   11  individual elements to the aggregate.  All we have is

02:24   12  opinions of this element is known, element A.  Element B is

02:24   13  separately known over here.  Element C is known.  Therefore,

02:24   14  the whole trade secret is known.  That's precisely the sort

02:24   15  of conclusory leap that Daubert is designed to prevent.  So

02:24   16  that's our issue on Dr. Sarrafzadeh and Warren in

02:24   17  particular.

02:24   18          Now, we also have the same problem with Kivets and

02:24   19  Perez, but those are not quite as easy to follow the same

02:24   20  standard, so we would be willing to submit on the tentative

02:24   21  for those.  But we do believe that Dr. Sarrafzadeh and Dr.

02:24   22  Warren -- the opinions are so clearly directed only to each

02:25   23  individual element with no analysis linking to the trade

02:25   24  secret as a whole that we think that those should be

02:25   25  excluded under Daubert.

02:25   1                    THE COURT:  Okay.

02:25   2                    MR. POWELL:  Thank you, Your Honor.

02:25   3                    THE COURT:  Okay.  Who's going to address this?

02:25   4                    MR. MUELLER:  Your Honor, Mr. Sprankling will

02:25   5        address the substance of this motion.

02:25   6                    MR. SPRANKLING:  Thank you, Your Honor.  Tom

02:25   7        Sprankling from WilmerHale for Apple.

02:25   8                    Your Honor, I'd like to just back up a step and

02:25   9        talk about the argument that was made in my friend's brief.

02:25   10       Their argument was based on a case called Altavion, and

02:25   11       their position is -- and this is the only case they cite for

02:25   12       it -- that generally known cannot be shown essentially with

02:25   13       multiple references for a trade secret.

02:25   14                    Now, Your Honor has the trade secrets in front of

02:25   15       you.  I might direct you, for example, to D&D No. 9 or D&D

02:25   16       No. 10.  These are nine-step, ten-step, eleven-step trade

02:25   17       secrets.  They are lengthy.  So what our experts have done

02:25   18       in particular examples they give is that they have found

02:25   19       individual references that map onto individual portions, and

02:26   20       they've concluded that in the aggregate looking at all those

02:26   21       references together the trade secret is indeed generally

02:26   22       known.

02:26   23                    Now, the position that plaintiffs have drawn out

02:26   24       of Altavion is that there is no such thing as what our

02:26   25       experts have done.  They haven't cited any case for that.  I

02:26  1    think Your Honor is exactly right in how it describes

02:26  2    Altavion in the tentative, which is Altavion was dealing

02:26  3    with a very narrow set of combination trade secret cases

02:26  4    where every individual element may be known to the public,

02:26  5    but the way that they're put together is not known.  That is

02:26  6    their best case for this proposition that we can't look to

02:26  7    multiple references when considering whether a trade secret

02:26  8    is generally known.  And as Your Honor I think correctly put

02:26  9    it, it doesn't stand for that proposition.

02:26  10         Beyond that, Your Honor, we've canvased the case

02:26  11   law, and we haven't found any case law anywhere and neither

02:26  12   has the other side pointed to it that suggests that you

02:26  13   cannot approach trade secrets on a reference-by-reference

02:26  14   basis.  We have not found any case law that bars that

02:27  15   approach, Your Honor, and we think its permitted under the

02:27  16   plain text.

02:27  17         THE COURT:  Provided that the aggregation is

02:27  18   itself a trade secret, right?

02:27  19         MR. SPRANKLING:  We would agree that Altavion

02:27  20   allows you to look at the aggregation of a trade secret --

02:27  21   an aggregation of the steps.

02:27  22         THE COURT:  Right.

02:27  23         MR. SPRANKLING:  Yes.

02:27  24         THE COURT:  Right.

02:27  25         MR. SPRANKLING:  I'm sorry, Your Honor.  I must be

| | | |
|---|---|---|
| 02:27 | 1 | missing your question. |
| 02:27 | 2 | THE COURT:  Well, does it really matter -- and I |
| 02:27 | 3 | think the case law suggests not -- that each of the |
| 02:27 | 4 | components of the trade secret that form the aggregation are |
| 02:27 | 5 | known in the public?  That doesn't get you home. |
| 02:27 | 6 | MR. SPRANKLING:  I see your point, Your Honor. |
| 02:27 | 7 | THE COURT:  Would you agree? |
| 02:27 | 8 | MR. SPRANKLING:  So, yes, with a but. |
| 02:27 | 9 | THE COURT:  Okay. |
| 02:27 | 10 | MR. SPRANKLING:  So the yes is, yes, you could |
| 02:27 | 11 | potentially show a trade secret that way.  The but is they |
| 02:27 | 12 | have never put into evidence or suggested anything in their |
| 02:27 | 13 | expert reports suggesting they are trying to do a |
| 02:27 | 14 | combination trade secret in this case. |
| 02:28 | 15 | THE COURT:  Okay. |
| 02:28 | 16 | MR. SPRANKLING:  So, you know, our experts |
| 02:28 | 17 | responded to the trade secrets that are in the case and how |
| 02:28 | 18 | they briefed the case. |
| 02:28 | 19 | THE COURT:  Okay. |
| 02:28 | 20 | MR. SPRANKLING:  Your Honor, just to put one more |
| 02:28 | 21 | pin on this combination trade secret idea, I mean, we're |
| 02:28 | 22 | accused in the reply brief by the other side of making the |
| 02:28 | 23 | stock drop.  It's in Milgram, Section 1.08, that this is a |
| 02:28 | 24 | narrow category of trade secrets, and it doesn't -- the |
| 02:28 | 25 | rules there don't necessarily apply to other areas. |

02:28  1          Let me give you one important example, which is

02:28  2   why this distinction matters here.  In order to prove up a

02:28  3   combination trade secret, Your Honor, you need to show that

02:28  4   that combination as a whole has novelty, not any of the

02:28  5   individual components.  We need to show that the whole thing

02:28  6   taken together -- step one, step two, step three, step four

02:28  7   -- has something that's unique, and I've seen nothing in

02:28  8   their expert report that says that.

02:28  9          The one thing they've cited to in their reply

02:28  10  brief, Your Honor, is a summary of their expert statement of

02:28  11  the law, which in turn is summarizing the same Altavion case

02:29  12  we've been talking about several times now.

02:29  13          THE COURT:  Okay.

02:29  14          MR. SPRANKLING:  Your Honor, it sounds like that's

02:29  15  the only part of the tentative on generally known that they

02:29  16  contest.  We think that the generally known aspect of your

02:29  17  opinion is entirely rightly decided.  And we will submit on

02:29  18  readily ascertainable.

02:29  19          THE COURT:  Okay.

02:29  20          Do you want to respond briefly?

02:29  21          MR. POWELL:  Very briefly, Your Honor.

02:29  22          THE COURT:  Okay.

02:29  23          MR. POWELL:  Counsel mentioned a moment ago the

02:29  24  combination trade secret doctrine.  They mentioned Milgram.

02:29  25  What I didn't hear is anything about they have a number of

| | |
|---|---|
| 02:29 | 1 |
| 02:29 | 2 |
| 02:29 | 3 |
| 02:29 | 4 |
| 02:29 | 5 |
| 02:29 | 6 |
| 02:30 | 7 |

procedural requirements that they think must be met in their
opposition brief.  I didn't see any support for that.  And
I'll note as we pointed out in our reply there's no citation
whatsoever in the middle of any of that discussion of this
supposed combination trade secret doctrine with these
different requirements of how a plaintiff has to waive this
and that.  None of that is supported.

02:30    8         Counsel also suggested that we've never pleaded a
02:30    9    combination trade secret.  They are correct that we're not
02:30   10    asserting Trade Secret 1 and Trade Secret 3 and Trade Secret
02:30   11    5 as a combination.  What we're asserting is the whole Trade
02:30   12    Secret 1 needs to be shown that it's generally -- or that it
02:30   13    lacks independent economic value from not being generally
02:30   14    known to the relevant people.

02:30   15         That's where there experts have failed.  Again,
02:30   16    their analysis is directed only to the elements.  There's no
02:30   17    analysis or methodology tying those elements to the
02:30   18    particular trade secret as a whole.  That's something that
02:30   19    we've pointed out, and I don't think counsel had any
02:30   20    response to that.  So I think that's the principal issue,
02:30   21    that there's no actual analysis.  So we have the pure ipse
02:30   22    dixit, trust me, say so of the expert, which is precisely
02:30   23    what Daubert says should be excluded.

02:30   24         THE COURT:  Okay.

02:30   25         MR. POWELL:  Thank you, Your Honor.

02:30    1              MR. SPRANKLING:  Your Honor, may I make a very,

02:30    2    very brief point?

02:30    3              THE COURT:  Very brief.

02:30    4              MR. SPRANKLING:  With your indulgence, just the

02:31    5    generally known is their burden, not our burden, under the

02:31    6    statute.  If you need the Milgram cite for this doctrine to

02:31    7    show we're not making it up, it's 1.05.  You can read about

02:31    8    it there.

02:31    9              THE COURT:  Okay.

02:31   10              MR. POWELL:  Nothing further, Your Honor.

02:31   11              THE COURT:  Okay.  Then this will stand submitted.

02:31   12              Let's move on to the next one.

02:31   13              MR. HUGHES:  Thank you, Your Honor.  Daniel Hughes

02:31   14    on behalf of Masimo, and I'll be addressing Plaintiffs'

02:31   15    Contingent Motion to Strike.  Your Honor, I'd like to

02:31   16    address three issues in the tentative, and I'd like to start

02:31   17    with Section D of the tentative, which begins on page 14,

02:31   18    which addresses the Apple Watch testing.

02:31   19              Now, Your Honor, we believe the tentative

02:31   20    correctly recognizes that Apple presented a new theory in

02:31   21    rebuttal that Trade Secret LP 5 lacks independent value,

02:31   22    because removing it from the Apple Watch has no effect on

02:32   23    performance.  To give that opinion, Apple's expert, Dr.

02:32   24    Warren, relied on testing conducted on a modified Apple

02:32   25    Watch.  That Apple Watch was modified with new source code

02:32  **1**  produced for the first time in litigation, and it was done

02:32  **2**  by an Apple engineer, Mr. Meta, who was never before

02:32  **3**  disclosed anywhere in discovery.

02:32  **4**          We believe the tentative correctly recognizes that

02:32  **5**  this is a new opinion that was never before disclosed, but

02:32  **6**  we understand from the tentative that Your Honor would like

02:32  **7**  us to address the harm caused by this opinion, and so I'd

02:32  **8**  like to address that here.

02:32  **9**          Your Honor, the harm caused by this opinion is not

02:32  **10**  curable with the time we have left in litigation.  That's

02:32  **11**  because to properly rebut this opinion, Masimo would need to

02:32  **12**  take a deposition of Mr. Meta to determine if in fact this

02:32  **13**  source code that modified the watch removes the relevant

02:33  **14**  functionality.  Then Masimo would have to have its own

02:33  **15**  expert design its own test in order to show exactly how this

02:33  **16**  removal affects the functionality of the watch.  Masimo's

02:33  **17**  expert would then need to find a lab to perform this test,

02:33  **18**  would need to enroll participants in the studies that he

02:33  **19**  would be conducting to do this test.  Then, Masimo would

02:33  **20**  have to acquire this modified watch from Apple and conduct

02:33  **21**  its own testing.  That process would take months, and

02:33  **22**  there's no time here left for Masimo to perform that when

02:33  **23**  trial is only six weeks away.

02:33  **24**          Now, we understand Your Honor suggests that the

02:33  **25**  deposition of Dr. Warren may be some sort of cure here, but

02:33  1    that's not true because the deposition doesn't allow Masimo

02:33  2    to perform the testing it would need to rebut Warren's

02:33  3    testing.  So that's why we believe this opinion should be

02:33  4    struck, because in the time we have left, it's not curable.

02:34  5           The second issue I'd like to address, Your Honor,

02:34  6    is Section F of the tentative, which begins on page 18, and

02:34  7    this is on the late disclosed O'Reilly notebooks.  We

02:34  8    understand from the tentative that Your Honor wants us to

02:34  9    meet and confer with Apple about the additional information

02:34  10   we're requesting about these notebooks.  The parties have

02:34  11   already started that meet-and-confer process, but we noted

02:34  12   in the tentative that there wasn't any way for the parties

02:34  13   to report the results of that meet and confer to the Court.

02:34  14   We know elsewhere in the tentative the Court proposes that

02:34  15   within 14 days of the order being issued the parties should

02:34  16   respond with a joint report to the Court.

02:34  17          THE COURT:  Would that be a good benchmark for

02:34  18   this one?

02:34  19          MR. HUGHES:  That's our suggestion, Your Honor.

02:34  20          THE COURT:  Okay.

02:35  21          MR. HUGHES:  Then the third issue and the final

02:35  22   issue I'd like to address, Your Honor, is Section A of the

02:35  23   tentative, which begins on page 4, and then in particular,

02:35  24   we'd like to go to page 8 of the tentative.  So Section A of

02:35  25   the tentative is on Apple's new limitation-by-limitation

02:35   1   analysis that shows allegedly that Masimo's employees were

02:35   2   not inventors of the disputed patents at issue here.

02:35   3         On page 8 of the tentative in the first full

02:35   4   paragraph, the Court notes that Masimo provided numerous

02:35   5   citations to the expert report about what was new and then

02:35   6   states:  "This conclusory argument tells the Court nothing

02:35   7   about the supposed new opinions and theories."

02:35   8         But, Your Honor, the citations do show what's new

02:35   9   because all of those citations are new.  Every one of those

02:35   10   paragraphs is a new opinion, a new theory, on why Masimo

02:36   11   employees did not allegedly invent the disputed patents.

02:36   12   Importantly, in their opposition, Apple doesn't dispute that

02:36   13   it's new.  Instead, Apple only makes arguments that it

02:36   14   wasn't required to do it.

02:36   15         So respectfully, Your Honor, we'd like the Court

02:36   16   to take another look at this issue, that these are in fact

02:36   17   new opinions and that all of the paragraphs cited there are

02:36   18   new opinions.  And then because those are new, those

02:36   19   opinions should be struck.

02:36   20         THE COURT:  Okay.

02:36   21         Who is going to respond?  Mr. Mueller.

02:36   22         MR. MUELLER:  Yes, Your Honor.  I can start where

02:36   23   counsel left off, which was on the limitation-by-limitation

02:36   24   analysis.  We think Your Honor's tentative is correct on

02:36   25   that issue.  Just as context here, Your Honor, the analysis

02:36    1    by Dr. Warren and Dr. Sarrafzadeh, the two technical experts

02:37    2    that we have proffered on this issue -- the analysis

02:37    3    regarding whether Apple's employees should be named

02:37    4    inventors is of the same type that Masimo provided to us

02:37    5    with regard to why Masimo's employees should be named

02:37    6    inventors.

02:37    7            The limitation-by-limitation analysis to which

02:37    8    counsel referred doesn't have to do with the Apple employees

02:37    9    who are the actual named inventors.  It has to do with

02:37   10    Masimo employees and why those Masimo employees should not

02:37   11    be named as inventors.

02:37   12            These are Masimo-alleged contributions, which we

02:37   13    believe to be non-inventive in the context of the claims at

02:37   14    issue.  So when I tell you under this circumstance in which

02:37   15    we are being dilatory in providing Apple information, this

02:37   16    is an analysis of Masimo-alleged contributions provided by

02:37   17    our experts in response to their experts.  So we think this

02:37   18    is proper rebuttal expert testimony.  It's in fact classic

02:37   19    expert testimony where the plaintiffs' experts have offered

02:38   20    detailed explanations through their expert reports on issues

02:38   21    for which they bear the burden of proof and we've responded.

02:38   22            I think the gist of the Complaint is that we were

02:38   23    too specific -- or the experts I should say were too

02:38   24    specific in their response.  We just don't think there's any

02:38   25    proper basis for that.  The experts were analyzing Masimo

02:38   1   information and responding to Masimo arguments.  So again,

02:38   2   just to be clear, this is not us sandbagging with respect to

02:38   3   Apple information.  It's independent experts analyzing the

02:38   4   Masimo record and offering limitation-by-limitation analyses

02:38   5   based on their analysis.

02:38   6          So unless Your Honor has any further questions,

02:38   7   I'll move on to the next issue.

02:38   8          THE COURT:  No.

02:38   9          MR. MUELLER:  The next issue I'll address, Your

02:38   10  Honor, is the one that counsel started with with respect to

02:38   11  Dr. Warren's testing of the Apple Watch.  I'm going to try

02:38   12  to be mindful and respectful of plaintiffs' position with

02:38   13  respect to what the trade secret is, so I'll describe this

02:38   14  at a higher level of generality since we're in open court.

02:38   15         But the short story on this, Your Honor, is in the

02:38   16  expert reports that we received, both from their technical

02:39   17  expert and their damages expert, we received a greater level

02:39   18  of specificity on both the trade secret itself -- and Ms.

02:39   19  Wigmore referred to this particular secret.  This is LP 5 in

02:39   20  her argument earlier.  And without revisiting it, the scope

02:39   21  of that secret is we believe a bit amorphous.  So there is

02:39   22  no way for us to know with particularity exactly what they

02:39   23  were accusing in terms of the structures in the Apple Watch

02:39   24  that allegedly use LP 5 until we received the technical

02:39   25  expert report.

02:39   1          To boot, Your Honor, we also received damages

02:39   2   theories linked to the technical identification of that

02:39   3   structure and offering opinions as to the value that Apple

02:39   4   had allegedly derived from that structure.

02:39   5          Now, in response to that more specific disclosure

02:39   6   in the expert reports, Dr. Warren commissioned and directed

02:39   7   and had full control over some testing that tested a watch

02:40   8   with and without this structure -- and I won't get into the

02:40   9   structure itself, but this accused structure -- to see if

02:40   10  there was a meaningful difference in terms of the

02:40   11  performance of the sensor technology with and without this

02:40   12  particular structure, and he concluded there was not.  Now,

02:40   13  this was an analysis that was conducted in rebuttal to an

02:40   14  expert report, again, on an issue for which Masimo bears the

02:40   15  burden of proof.

02:40   16         I would note again, Your Honor, this is not an

02:40   17  issue where this is Apple information that we had and held

02:40   18  back.  This is Dr. Warren directing as part of his expert

02:40   19  work on the case to test the watch with and without this

02:40   20  structure to see if there was a discernible performance

02:40   21  difference between the two versions.  He produced the source

02:40   22  code.  He produced the results.  He was deposed extensively

02:40   23  on these issues at his deposition.  I believe hours' worth

02:40   24  of questions on this very subject were posed to him at his

02:41   25  deposition.  So there's no question that Masimo knows

02:41   1   precisely what Dr. Warren did.  And to the extent that they

02:41   2   have critiques of it, they can certainly make those

02:41   3   critiques in cross-examination at trial.

02:41   4          The last thing I'd note, Your Honor, we heard that

02:41   5   it would be prejudice to Masimo because Masimo cannot

02:41   6   conduct its own testing to show performance benefits.  This

02:41   7   is an issue on which they bear the burden of proof.  And to

02:41   8   the extent that they believed that performance testing could

02:41   9   show the value of this particular structure and could

02:41   10  substantiate the damages theories of their damages expert,

02:41   11  they could have done it themselves as part of their

02:41   12  affirmative expert reports on issues for which they bear the

02:41   13  burden of proof.

02:41   14         The fact that Dr. Warren in response to their

02:41   15  experts commissioned his own analysis and directed that is

02:41   16  no reason to -- the fact that they did not do that and it

02:41   17  was Dr. Warren who was the first to do it is no excuse and

02:42   18  no reason to delay the trial or anything of the sort, Your

02:42   19  Honor.  This is just classic rebuttal testimony by an expert

02:42   20  in response to issues on which they bear the burden of

02:42   21  proof.

02:42   22         Unless Your Honor has questions on that, I can

02:42   23  turn to the final issue.

02:42   24         The final issue are these notebooks from Dr.

02:42   25  O'Reilly, who's one of the fact witnesses in the case.  And

02:42  1   we're happy to report to Your Honor in 14 days, along with

02:42  2   the report on the generally known references, after we meet

02:42  3   and confer with the plaintiffs.  We're happy to do that.

02:42  4          I'll just briefly preview it, Your Honor.  At a

02:42  5   high level, the facts in terms of what happened here was

02:42  6   that as a matter of document collection and preparation of a

02:42  7   witness for a deposition additional information came to

02:42  8   light in the form of these notebooks.  We promptly produced

02:42  9   them.  We requested consent from Dr. O'Reilly, and he gave

02:42  10  that consent.  They were produced.

02:42  11         We delayed the deposition to ensure they had the

02:42  12  notebooks before his deposition.  We gave them more time at

02:43  13  the deposition.  In fact, they confirmed to us after the

02:43  14  deposition that one place where there was no further dispute

02:43  15  was the deposition in terms of the amount of time they had

02:43  16  to question Dr. O'Reilly.  So we gave them the information.

02:43  17  We made sure they had plenty of time to question him about

02:43  18  that information.

02:43  19         And we further have represented, as Your Honor

02:43  20  noted in the tentative, we will not affirmatively seek to

02:43  21  rely on these notebooks.  There's no sword/shield issue or

02:43  22  anything of the sort where we held back information that we

02:43  23  intend to rely on.  It's not this at all.  This was

02:43  24  discovery collection.  It was produced a bit later than

02:43  25  certainly we would have hoped, but we did everything we

02:43   1   could to make sure there was no prejudice to the plaintiff,

02:43   2   and we're not going to affirmatively rely on it.

02:43   3          So we're happy to meet and confer some more on

02:43   4   this, but we don't see any real issue here.  And I'll note

02:43   5   that the only request we've received from the plaintiffs

02:43   6   since Your Honor's tentative -- because we asked.  We said

02:43   7   what else would you like on this?  They've asked us to agree

02:43   8   to pierce the privilege with Dr. O'Reilly and to allow for

02:44   9   discovery into the communications between counsel and Dr.

02:44   10  O'Reilly, and certainly we're not going to agree to that.

02:44   11  There's no cause to be taking discovery into discovery and

02:44   12  waiving attorney/client privilege on the eve of trial.

02:44   13         So we think this is an issue where the facts are

02:44   14  what they are.  The timeline is as Your Honor has seen, but

02:44   15  there's no actual issue here in terms of our trying to

02:44   16  achieve any sort of substantive edge for the trial.  Quite

02:44   17  the contrary.  We've done everything we possibly can to

02:44   18  ensure there's no prejudice to Masimo, and we don't think

02:44   19  the report that we'll make in 14 days will show anything

02:44   20  other than that.

02:44   21         THE COURT:  Okay.

02:44   22         We've been going awhile.  Why don't we give our

02:44   23  court reporter a break and take about a ten-minute break and

02:44   24  then take up the final two motions.

02:44   25         (Recess)

02:56   1            MR. HUGHES:  If I may be heard briefly.  The issue

02:56   2    here, Your Honor, is not whether it should have been a

02:56   3    rebuttal report or an opening report, but whether they

02:56   4    properly disclosed this theory of discovery.  The tentative

02:56   5    correctly finds on page 15 that they did not disclose this

02:56   6    theory despite Masimo asking Apple in an interrogatory for

02:57   7    all their bases for believing that Trade Secret LP 5 lacks

02:57   8    independent economic value.

02:57   9            Now, Apple now suggests that this is proper

02:57   10   because of some sort of damages issue, but this isn't about

02:57   11   damages.  This is about whether or not it's a trade secret

02:57   12   and whether the trade secret lacks independent value.  So

02:57   13   this argument that this somehow comes out of a response to

02:57   14   the damages arguments is irrelevant because that's not what

02:57   15   our interrogatory asks and not what this opinion was

02:57   16   addressing.

02:57   17           Apple also suggests that we should have performed

02:57   18   our own affirmative testing somehow anticipating that they

02:57   19   might make some sort of argument that -- testing the Apple

02:57   20   Watch.  First of all, Your Honor, our interrogatory asked

02:57   21   for their defenses.  We're entitled to their defenses, and

02:57   22   they should disclose them whether or not we have the burden

02:57   23   of proof.

02:57   24           But perhaps, more importantly, we couldn't do our

02:57   25   own testing on the Apple Watch because we can't modify the

02:57   1   Apple Watch source code.  Only Apple can do that.  So the

02:57   2   suggestion that somehow we could have conducted a test

02:58   3   before Apple did is just impossible.

02:58   4           On the limitation-by-limitation issue, Your Honor,

02:58   5   I think the most important point here is that you did not

02:58   6   hear them dispute that these opinions were not new.  They

02:58   7   never said that.  Instead, again they suggest that this is

02:58   8   some sort of how appropriate because it came in a rebuttal

02:58   9   report.

02:58   10          But, Your Honor, we moved to compel in front of

02:58   11  the special master, and the special master said that if

02:58   12  Apple needed to provide rebuttal on any, quote, "particular

02:58   13  inventorship argument made by plaintiffs on a

02:58   14  limitation-by-limitation basis," then it needed to do so

02:58   15  prior to trial and in response to our interrogatory.  So

02:58   16  these are new opinions, and the special master ordered Apple

02:58   17  to provide them if they intended to prevent these rebuttal

02:58   18  opinions at trial.

02:58   19          Finally, Your Honor, on the O'Reilly issue, I

02:58   20  disagree with what counsel said there, but it sounds like

02:59   21  we're going to meet and confer on that, so we'll defer on

02:59   22  that.

02:59   23          THE COURT:  Okay.  Very good.

02:59   24          Let's move to the next motion, which is --

02:59   25          MR. POWELL:  Your Honor, if I may, I think the

02:59   1   only motion left is the Motion to Strike Interrogatory 33

02:59   2   that both sides have submitted on.

02:59   3             THE COURT:  Okay.  Have we covered everything

02:59   4   then?

02:59   5             MR. POWELL:  Yes, Your Honor.

02:59   6             MR. MUELLER:  Your Honor, it's correct with

02:59   7   respect to those two motions.  As to the motion on the

02:59   8   supplemental interrogatory responses, which is Docket No.

02:59   9   1080, it is correct that we are submitting on that, Your

02:59   10  Honor.  It's also correct as was represented earlier that

02:59   11  we're submitting on Docket 1125.

02:59   12            We did have two additional issues, Your Honor, if

02:59   13  we could.  I still want to address something in the

02:59   14  tentative.

02:59   15            THE COURT:  Okay.

02:59   16            MR. RE:  I have one point of clarification that my

02:59   17  team noted.  They didn't know if I was clear on something,

02:59   18  and that dealt with my opening subject dealing with

02:59   19  paragraph B, lost profits, on page 12.  In our view because

03:00   20  we can't present a lost profits case without Mr. Kinrich,

03:00   21  this portion should be denied because an expert is not

03:00   22  needed.

03:00   23            THE COURT:  It will be modified, sir -- well,

03:00   24  granted in part and denied in part.

03:00   25            MR. RE:  Well, if you don't agree with me on that

03:00   1    other issue on Mr. Kinrich.

03:00   2          THE COURT:  Right.  Okay.

03:00   3          Mr. Mueller.

03:00   4          MR. MUELLER:  Yes, Your Honor.  We had one

03:00   5    additional issue with respect to Your Honor's rulings and

03:00   6    then a couple of questions for Your Honor with respect to

03:00   7    trial procedures.  We thought it might be a good time to

03:00   8    ask.

03:00   9          THE COURT:  Sure.

03:00   10         MR. MUELLER:  With respect to Your Honor's

03:00   11   rulings, with Order No. 1109 -- and this is the order

03:00   12   regarding the motion for limited discovery on AirPods

03:01   13   royalties -- Your Honor ruled that that was a final order

03:01   14   and did not want to hear argument, and we certainly want to

03:01   15   be respectful of Your Honor's guidance on that.

03:01   16         That said, we do have concerns with the

03:01   17   implications of this order for the trial, and I can address

03:01   18   those now, Your Honor, or I can submit a brief.  We're happy

03:01   19   to do so by Wednesday laying out in full our concerns,

03:01   20   whatever Your Honor's preference is.  I can briefly preview

03:01   21   what the issues are.

03:01   22         THE COURT:  Why don't you give me a preview and

03:01   23   put in what you want by Wednesday.

03:01   24         MR. MUELLER:  Sure.  Very, very quickly, Your

03:01   25   Honor, the concerns are as follows.  As our briefing -- as

03:01     1    we tried to make clear, and we'll try to make this even

03:01     2    clearer in our Wednesday filing, AirPods were not part of

03:01     3    this case during fact discovery and in any way accused of

03:01     4    trade secret misappropriation.  Even as of today, including

03:01     5    based on the most recent flurry of briefing on this subject

03:01     6    that led to Your Honor's order, the only even suggestion of

03:02     7    any trade secret misappropriation has to do with the same

03:02     8    LP 5 secret that we've heard about a few times today.

03:02     9              Now, again, I'm not going to deal with the

03:02    10    specifics of that in open court, but I will say this, Your

03:02    11    Honor.  Part of what is alleged to be a trade secret for

03:02    12    LP 5 is a physiological measurement.  Physiological

03:02    13    measurement is part of LP 5.  AirPods just don't do that

03:02    14    under any colorable theory.  They were not alleged to have

03:02    15    done that up until very, very recently in a short

03:02    16    supplemental expert report by Dr. Madisetti, their technical

03:02    17    expert.

03:02    18              And I will note, Your Honor -- and we'll spell

03:02    19    this out in greater detail in our brief on Wednesday -- even

03:02    20    in that supplemental report, Dr. Madisetti's study does not

03:02    21    crystally and clearly state that the AirPods actually

03:02    22    execute a physiological measurement using the alleged trade

03:02    23    secret nor could he.

03:02    24              As a factual matter, what the AirPods do is they

03:03    25    will turn off if they're not in the ear.  That's not a

03:03     1     physiological measurement like heart rate or blood oxygen or
03:03     2     anything like that.  It's called proximity sensing, and it's
03:03     3     a very old technology that was used as early as the earliest
03:03     4     iPhone.  Proximity sensing -- again, there's just no
03:03     5     colorable argument that would be a physiological measurement
03:03     6     of the type that's accused of trade secret misappropriation
03:03     7     in this case.
03:03     8          Our concern with the order -- again, we'll spell
03:03     9     this out in detail in our Wednesday filing -- is that what
03:03    10     is being treated by the plaintiffs as just a request for
03:03    11     supplemental discovery on units sold and so on for purposes
03:03    12     of a reasonable royalty is being used to hop over the
03:03    13     threshold question of is there an actual liability theory
03:03    14     being advanced as against the AirPods?
03:03    15          We think that if there were such a theory, which
03:03    16     we don't think there possibly could be, there would be at
03:03    17     least two things that would need to happen, Your Honor.  The
03:03    18     first is that that would require substantial new discovery
03:03    19     and not just on financial issues.  But to give one example,
03:04    20     on these questions of generally known and other -- readily
03:04    21     ascertainable, other issues pertaining to what was known in
03:04    22     the past, there would be a whole new dimension to discovery
03:04    23     needing to be done on proximity sensing which, again, has
03:04    24     been a very old technology.  It goes back to the original
03:04    25     iPhone.  We hadn't understood this to be part of their case,

03:04   1   so that subject wasn't a subject of fact discovery or expert

03:04   2   discovery for that matter.

03:04   3           The second thing, Your Honor, is that we would

03:04   4   absolutely move for summary judgment on this issue, because

03:04   5   these are not even close to what any reasonable finder of

03:04   6   fact, the jury, could find to be a physiological

03:04   7   measurement.

03:04   8           So we're very concerned that a request for

03:04   9   supplemental damages discovery is being used to hopscotch

03:04   10   over the liability questions by the plaintiff.  And we're

03:04   11   also very, very concerned that this is going to have to

03:04   12   result in our request for more discovery and a

03:04   13   jeopardization of the trial date, which to be very clear,

03:04   14   Your Honor, we don't want to move.  We're ready to try this

03:05   15   case next month.  We are prepared to try the claims that

03:05   16   were actually advanced over the course of fact discovery,

03:05   17   but the AirPods issue would imperil all of that.  And we can

03:05   18   explain this with great specificity in our filing on

03:05   19   Wednesday.

03:05   20           THE COURT:  Okay.  Very good.

03:05   21           MR. MUELLER:  The other issues that we have, Your

03:05   22   Honor, really relate just to administrative questions on the

03:05   23   trial process.  And we defer to Your Honor of course on all

03:05   24   of this, but just to flag a few that will help the parties

03:05   25   in meeting and conferring, I'll start with the deadline for

| | | |
|---|---|---|
| 03:05 | 1 | submitting the jury instructions to the Court.  There's just |
| 03:05 | 2 | a little bit of confusion on both sides based on Your |
| 03:05 | 3 | Honor's standing orders versus the Rule 26 report. |
| 03:05 | 4 | Your standing trial order states at page 2 that |
| 03:05 | 5 | the jury instructions shall be filed no later than seven |
| 03:05 | 6 | days prior to the trial, which in this case would be |
| 03:05 | 7 | March 21st.  The Rule 26 report had the date as March 13th. |
| 03:05 | 8 | We had understood that that has been superceded by various |
| 03:05 | 9 | orders since then.  Whatever Your Honor prefers, we'll do, |
| 03:06 | 10 | but whether it's the 21st or the 13th, we'd certainly defer |
| 03:06 | 11 | to you.  It would just help us to have some clarity as to |
| 03:06 | 12 | when you'd like them. |
| 03:06 | 13 | THE COURT:  I think the 21st.  Seven days in |
| 03:06 | 14 | advance should be sufficient. |
| 03:06 | 15 | MR. MUELLER:  Thank you, Your Honor. |
| 03:06 | 16 | The next one is, Your Honor, under Local -- Local |
| 03:06 | 17 | Rule 16.3 requires disclosure of trial demonstratives at |
| 03:06 | 18 | least 11 days before trial.  As Your Honor knows, in these |
| 03:06 | 19 | intellectual property cases, there's often a lot of |
| 03:06 | 20 | demonstratives.  We would ask Your Honor's permission to |
| 03:06 | 21 | meet and confer with the plaintiff to set an alternate |
| 03:06 | 22 | process for demonstratives. |
| 03:06 | 23 | THE COURT:  That's fine. |
| 03:06 | 24 | MR. MUELLER:  Then the last couple ones we had, |
| 03:06 | 25 | Your Honor, in terms of -- and this will have implications |

03:06  1    for the length of trial.  The number of witnesses in the

03:06  2    Masimo witness list -- and we've already met and conferred

03:06  3    on this -- we believe is just way overbroad.  They've

03:06  4    disclosed 49 may call witnesses to us, along with 11 will

03:06  5    call witnesses.

03:06  6          We just don't see any way the trial could be done

03:07  7    in any reasonable timeframe.  Also, we have trouble holding

03:07  8    time on our own employees' calendars with that many

03:07  9    witnesses disclosed.  So we would ask Your Honor to instruct

03:07  10   both sides to make sure their witness lists are truly in

03:07  11   keeping with the spirit of good faith disclosures on who

03:07  12   might truly be called at trial to allow us to work with our

03:07  13   witnesses to be available.

03:07  14         Case narrowing, again, we have begun a

03:07  15   conversation with the plaintiff on narrowing the scope of

03:07  16   their trade secret allegations, and also we would agree to

03:07  17   reciprocally narrow some of our defenses once we have an

03:07  18   understanding of which secrets they intend to proceed to

03:07  19   trial on.  They currently have over two dozen.  We're

03:07  20   skeptical they're going to go forward on all two dozen plus

03:07  21   of those trade secrets.  So we're working with them to try

03:07  22   to effect a narrowing on both sides, and we'll report back

03:07  23   to Your Honor as soon as we can.  But if they're not

03:08  24   narrowed, that will have implications for what we request

03:08  25   for trial time.

03:08  1           Then the final thing we have on our list, Your

03:08  2   Honor, is we have some concerns -- and this may become ripe

03:08  3   for further discussion a bit later -- with respect to the

03:08  4   extent to which the plaintiffs are treating information as

03:08  5   information that Apple can't see or hear.  This will

03:08  6   certainly come up at trial, but there's one issue that I

03:08  7   wanted to raise right now.

03:08  8           We've asked for permission just to share with

03:08  9   anyone we want at the company, including finance and

03:08  10  accounting folks, the bottom-line damages requests by

03:08  11  Masimo, just the numbers at the bottom line as opposed to

03:08  12  the way they derived those numbers.  We've been told they

03:08  13  will not give us permission to do that, and we just can't

03:08  14  see any reasonable basis for that.

03:08  15           THE COURT:  Well, I assume you'd have some kind of

03:08  16  SEC obligation to disclose major contingent liabilities.

03:08  17           MR. MUELLER:  That's exactly right, Your Honor.

03:08  18  We have to assess things like that, and we can't do it

03:08  19  unless we can disclose just what the amount that they're

03:08  20  seeking is, as distinct from the way in which they derived

03:09  21  the amount.  There's no conceivable way anyone could look at

03:09  22  just the bottom-line numbers and derive anything from that

03:09  23  other than the bottom-line numbers themselves.  So we would

03:09  24  ask for a ruling that we can do that, Your Honor.

03:09  25           THE COURT:  Mr. Re.

03:09    1              MR. POWELL:  I'd like to address that, if I may,

03:09    2    Your Honor.

03:09    3              THE COURT:  Mr. Powell.

03:09    4              MR. POWELL:  Would you like me to start at the end

03:09    5    where counsel left off?

03:09    6              THE COURT:  Well, sure.  Let's take the last --

03:09    7    the disclosure of the number.

03:09    8              MR. POWELL:  Sure, the disclosure of the numbers.

03:09    9    We have offered to allow Apple to treat those numbers as

03:09   10    confidential, and we've asked them why they need to disclose

03:09   11    the information for purposes other than this case.  Apple

03:09   12    has not clearly explained what it is they need to do with

03:09   13    those numbers.

03:09   14              THE COURT:  How about putting them in an SEC

03:09   15    filing?

03:09   16              MR. POWELL:  That's not what they told us yet.

03:09   17    And we have a meet and confer scheduled for this afternoon

03:09   18    on this exact issue.  That's what I plan to ask them is what

03:09   19    do you plan to do with this and see if we can work it out.

03:09   20    I don't think it's ripe or we need to bother you with it at

03:10   21    this time.

03:10   22              THE COURT:  Okay.  Fine.

03:10   23              MR. POWELL:  The second issue I'll deal with is

03:10   24    the witness list.  Counsel is correct that both sides have

03:10   25    rather large witness lists at this point.  What counsel

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

03:10  1    didn't mention is that the witness lists say that many

03:10  2    witnesses are may call or by deposition, and we've asked

03:10  3    Apple if the parties would agree to allow witnesses to

03:10  4    appear by deposition if it's a very short deposition, say a

03:10  5    five-minute deposition clip, rather than dragging the

03:10  6    witness into trial.  Apple just responded to us again on

03:10  7    that this morning.

03:10  8            We plan to again meet and confer with them this

03:10  9    afternoon.  I don't think it's ripe or we need to bother you

03:10  10   at this time.  I hope the parties can work it out.  I expect

03:10  11   both parties will be narrowing that list this week after we

03:10  12   have that meet and confer.

03:10  13           THE COURT:  Okay.  I believe we've discussed

03:10  14   previously a ten-day trial, but am I mistaken?

03:10  15           MR. POWELL:  I believe the parties suggested ten

03:10  16   to 15 days, Your Honor.

03:10  17           THE COURT:  And I think my reaction was ten days.

03:11  18           MR. POWELL:  Understood, Your Honor.

03:11  19           THE COURT:  But you understand when I give the

03:11  20   parties a budget that's just evidence.  It's not openings.

03:11  21   It's not voir dire.  It's not closings.  So it's just the

03:11  22   prime cut, so to speak.

03:11  23           MR. POWELL:  Understood.  I will address as well

03:11  24   the narrowing issue.  This is something that we've addressed

03:11  25   with counsel.  The main problem is that Apple currently has

03:11   1   about 500 generally known references and perhaps tens of

03:11   2   thousands or hundreds of thousands combinations of those

03:11   3   references.  What happened during the 40-day meeting is we

03:11   4   told them what causes of action we were going to pursue.  We

03:11   5   asked them to tell us what defenses they would pursue, not

03:11   6   the generally known references, just the actual defenses in

03:11   7   the answer.

03:11   8           Apple declined at the time.  They told us that we

03:11   9   needed to narrow our trade secret case first.  Again, the

03:11   10  parties are having some disputes here, but we plan to meet

03:11   11  and confer with them.  I don't think it's ripe and that we

03:12   12  need to bother you at this time.

03:12   13          I think the main issue is we've got about, you

03:12   14  know, a few -- a couple dozen trade secrets.  They have 500

03:12   15  generally known references.  So I think there's a lot more

03:12   16  narrowing that needs to happen on their end than our end,

03:12   17  but we're going to work that out and do the best we can.  If

03:12   18  we have any problems, I suggest we talk to you at that time.

03:12   19          THE COURT:  Very good.

03:12   20          MR. POWELL:  Finally, I'll address the AirPods

03:12   21  issue.  Counsel never mentioned that they would raise

03:12   22  AirPods.  The Court had a final order on that, so the person

03:12   23  who is actually primarily responsible for that motion is not

03:12   24  here today because we thought that issue had been resolved.

03:12   25  If counsel had indicated that they planned to raise the

03:12  1  issue, we would of course have brought him, but I'll do my

03:12  2  best.

03:12  3          All of these issues have been briefed in the

03:12  4  briefs already.  Counsel made the same arguments about

03:12  5  physiological measurement, the same arguments on liability.

03:12  6  Most importantly, we identified in the expert report this

03:12  7  theory of liability.  Apple didn't move to strike it.  It

03:12  8  didn't object.  It didn't file for summary judgment.  And it

03:12  9  sounds like what they want now is an untimely motion for

03:13  10  summary judgment after they had their chance to do so.

03:13  11          They've known about this theory for a long time,

03:13  12  and I think the order of the Court is absolutely correct.  I

03:13  13  don't think it should be revisited, particularly on an oral

03:13  14  motion for reconsideration with further briefing.  I don't

03:13  15  see any basis for that.

03:13  16          THE COURT:  I assume you'd like to respond to

03:13  17  their Wednesday filing.

03:13  18          MR. POWELL:  I'm sorry?

03:13  19          THE COURT:  I assume you'd like to respond to

03:13  20  their Wednesday filing.

03:13  21          MR. POWELL:  If they are permitted to file a

03:13  22  Wednesday filing, we would like to respond.  I don't think

03:13  23  it's necessary, but if Your Honor would like them to do

03:13  24  that, then we would like to respond.

03:13  25          THE COURT:  Very good.  Can you do that by the end

03:13   **1**    of the day Friday?

03:13   **2**         MR. POWELL:  Yes, Your Honor.

03:13   **3**         THE COURT:  Okay.  It seems to me these are pretty

03:13   **4**    discrete issues.

03:13   **5**         MR. POWELL:  Yes, we should have no problem

03:13   **6**    responding.

03:13   **7**         THE COURT:  Okay.

03:13   **8**         MR. POWELL:  Anything else, Your Honor?

03:13   **9**         THE COURT:  No.  I might take a moment just in

03:13  **10**    advance of the pretrial conference to go over some of the

03:13  **11**    logistics in this courtroom.

03:13  **12**         MR. POWELL:  Would you like me to sit down?

03:13  **13**         THE COURT:  Yes, please.

03:13  **14**         MR. POWELL:  Okay.  Thank you.

03:13  **15**         THE COURT:  It's a ten-day trial.  I think

03:14  **16**    particularly with the COVID pandemic pretty much in the

03:14  **17**    rearview mirror that eight jurors would do.  If we do that,

03:14  **18**    the jury box holds 14 people, three peremptories each.  If

03:14  **19**    you exercise all the peremptories, we're down to our eight.

03:14  **20**    If you don't exercise them all, then it's the first eight

03:14  **21**    folks in the box.  The No. 1 seat is the top left, 1 through

03:14  **22**    7 and then 8 through 14.

03:14  **23**         In terms of peremptories, you don't lose a

03:14  **24**    peremptory if you pass.  However, two passes in a row, we

03:14  **25**    stop.  I'll probably review this all again at the pretrial

03:15    1    conference, but it's just to give you a heads-up on this.

03:15    2          In terms of voir dire, I'm going to allow each

03:15    3    side 45 minutes.  As far as I'm concerned, if you're not

03:15    4    conditioning the jury, you can use the time as you will.

03:15    5    Some people mine for prejudice and bias.  Some people bond.

03:15    6    Forty-five minutes is more than enough to bond.

03:15    7          Once we've got 14 passed for cause, then we'll

03:15    8    move to the peremptories.  I do a pretty thorough voir dire

03:15    9    myself, and as the order suggests, I also solicit your

03:15   10    input.  I don't see any need for a questionnaire here.  I

03:15   11    tend to limit those to issues that are of an inflammatory

03:16   12    nature such that you wouldn't want the whole panel to hear

03:16   13    an unfavorable response and personal issues, so I really

03:16   14    don't see a need for a questionnaire here.

03:16   15          The usual day is -- we're just going to use the

03:16   16    usual day.  I'm not going to go 8:00 to 2:00.  I've done

03:16   17    that before, but I don't think this case is all that long.

03:16   18    So the usual day is 9:00 to 12:00, 1:30 to 4:30, with a

03:16   19    15-minute break about halfway through at 10:30 and 3:00.

03:16   20          If you're going to use depositions substantively,

03:16   21    you need to get them to me in advance and marked up.

03:17   22          In terms of opening statements, I think you're

03:17   23    entitled to use anything you reasonably believe will come

03:17   24    in.  Demonstratives are fine, but you need to share what

03:17   25    you're going to use in opening statement so that we can iron

03:17  1    out any objections in advance.  If people show up with

03:17  2    50-page PowerPoints and there are objections and we haven't

03:17  3    got time to take them up, you know, on more than one

03:17  4    occasion, I've just barred that party from using the

03:17  5    PowerPoint.  So I think you can probably work out any

03:17  6    problems you have and -- or at least minimize them for the

03:17  7    Court to consider.

03:17  8            So any other questions about just the basic nuts

03:17  9    and bolts?

03:17  10            MR. MUELLER:  Just one, Your Honor.  Will we

03:17  11   receive any notice of the composition of the panel in the

03:17  12   absence of a questionnaire until we arrive in court that

03:17  13   day?

03:17  14            THE COURT:  No advance notice because quite

03:17  15   literally the Clerk's Office doesn't know who they are until

03:18  16   they show up.  Depending on the number of panels, there

03:18  17   could be 60 or 70 people down there, and there is always

03:18  18   some degree of absenteeism.  We find out up here for the

03:18  19   first time when the panel is sent up with an alpha list.

03:18  20            MR. MUELLER:  Understood.  Thank you, Your Honor.

03:18  21            THE COURT:  Okay.  So any other concerns,

03:18  22   questions?

03:18  23            MR. RE:  Nothing for the plaintiff, Your Honor.

03:18  24   Thank you.

03:18  25            MR. MUELLER:  Not for Apple, Your Honor.  Thank

03:18    1    you very much.

03:18    2              THE COURT:  Okay.  You know, as we get closer to

03:18    3    trial, there may be a need for immediate discussions.  Just

03:18    4    contact Ms. Vargas.  I'm generally available.  You know, if

03:18    5    a conference call will solve something, let's have a

03:18    6    conference call.

03:18    7              Okay, let me check one thing.

03:18    8              (Pause in proceedings)

03:18    9              THE COURT:  The start of the trial may be delayed

03:18   10    one week because I have a trial the immediate preceding

03:19   11    week.  That trial I'm pretty certain will wrap up in its

03:19   12    first week or at some point in its second week, but we'll

03:19   13    keep you informed so you know exactly where we are.  But I

03:19   14    want to alert you to that possibility if you've got people

03:19   15    flying in and whatnot.

03:19   16              Today kind of reminds me of my days in private

03:19   17    practice.  I spent most of the 1970s litigating for IBM, and

03:19   18    we had motions and status conferences really every other

03:19   19    month with Judge Ray McNichols, who at the time was Chief

03:19   20    Judge of the District of Idaho, and there would be even more

03:19   21    lawyers than this there.

03:19   22              And, you know, it was not unusual for eight to ten

03:19   23    lawyers to get up and address the Court.  An effort was made

03:19   24    so that the younger lawyers really did get a chance.  And I

03:20   25    see we had quite a variation in years of experience here,

62

| | | |
|---|---|---|
| 03:20 | 1 | but I do think it's important to let people stand up at the |
| 03:20 | 2 | podium and figure out what it feels like.  If you know what |
| 03:20 | 3 | it feels like, after a while, you're not so nervous. |
| 03:20 | 4 | If you think of the astronauts, they put them |
| 03:20 | 5 | through everything.  They put them under water.  They have |
| 03:20 | 6 | them float in the air in airplanes, you know, feel zero-Gs. |
| 03:20 | 7 | They put them in centrifuges so they can feel the venom of |
| 03:20 | 8 | extreme gravity.  And that's sort of what it's like standing |
| 03:20 | 9 | there.  So the older lawyers know that.  The younger ones |
| 03:20 | 10 | need to learn, too. |
| 03:20 | 11 | Anything else for today? |
| 03:20 | 12 | MR. RE:  No, Your Honor. |
| 03:20 | 13 | MR. MUELLER:  No Your Honor. |
| 03:21 | 14 | THE COURT:  Thank you. |
| 03:12 | 15 | (Whereupon, the proceedings were concluded.) |
| 03:12 | 16 | *   *   * |
| 03:12 | 17 | |
| 03:12 | 18 | |
| 03:12 | 19 | |
| 03:12 | 20 | |
| 03:12 | 21 | |
| 03:12 | 22 | |
| 03:12 | 23 | |
| 03:12 | 24 | |
| 03:12 | 25 | |

**CERTIFICATE**

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date:  February 8, 2023


/s/   Sharon A. Seffens  2/8/23
_____
SHARON A. SEFFENS, U.S. COURT REPORTER

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER