# EXHIBIT 9

Online Platforms and Market Power Part 6: Examining the Dominance of Amazon, Apple, Facebook, and Google

Questions for the Record from the Honorable Henry "Hank" Johnson, Jr.

Questions for Tim Cook, CEO, Apple, Inc.

1. **"Efficient infringement"—the use of another company's patents without authorization, based on the understanding that litigation will be too slow to meaningfully stop the infringement and will ultimately only result in the payment of a royalty if the suit is lost (approximately the same royalty that would be paid up front if a license were taken) is a way in which dominant companies currently may be stifling innovation and undermining competitors.**

    **Apple's former patent chief even admitted as much: "efficient infringement, where the benefits outweigh the legal costs of defending against a suit, could almost be viewed as a 'fiduciary responsibility,' at least for cash-rich firms that can afford to litigate without end."[1] As the Chairman of the subcommittee with responsibility for oversight of the patent system, I am concerned about the impact of efficient infringement on the ability of patents to spur innovation and allow startups to effectively compete against established companies.**

Apple is a leading innovator in the fields of wireless communication and mobile devices. Over the past decade, Apple products like the iPhone and iPad have revolutionized these industries. Innovating on this scale requires an extraordinary investment of energy and resources, and Apple relies in part upon a healthy patent system to protect this investment. Apple owns thousands of U.S. patents and is licensed to use thousands more. And when disputes arise, Apple sometimes finds itself in court, whether to enforce its own rights or to defend against allegations of infringement levied by another firm. Apple therefore has a keen interest in a balanced patent system that encourages competition and innovation, and discourages hold-up and waste.

The concept of "efficient infringement" is an anathema to Apple. This is not a concept or idea embraced by our company. As for the individual cited in the article, he is not an Apple employee, he was never the "patent chief" at Apple, and he does not speak for the company. And, since leaving Apple seven years ago, he has gone on to work for several patent assertion entities ("PAEs"), sometimes referred to as patent trolls. He is currently employed by Conversant, one of the largest PAEs in the world. These entities are hardly champions of innovation, entrepreneurs, or start-ups.

The verdict in *Wisconsin Alumni Research Foundation v. Apple Inc.* referenced in the article was overturned two years ago. The Federal Circuit found that, as a matter of law, the jury was incorrect, and that Apple did *not* infringe WARF's patent. WARF petitioned for and was denied further review by the Supreme Court in October 2019.

---

[1] Joe Nocera, *Why Sonos Has Already Lost Its Patent Suit Against Google*, Bloomberg (Jan. 10, 2020), https://www.bloomberg.com/opinion/articles/2020-01-10/even-if-sonos-wins-its-suit-against-google-it-loses.

1

MASA02957628

Exhibit 9
Page 1

> **1.1 To me, these factors suggest that the Supreme Court's decision in *eBay v. MercExchange*, 547 U.S. 388 (2006), to reverse the presumption of awarding injunctive relief to a prevailing patent owner should be reevaluated to ensure that smaller patent owners are playing on a level playing field in patent disputes. Do you agree or disagree, and why?**

Injunctive relief is equally available to "smaller patent owners" and larger ones. *eBay* properly emphasizes that injunctive relief should only be available to avoid irreparable harm, when monetary relief is not sufficient, and after weighing both the balance of hardships and the public interest. Injunctions remain available to protect true innovation from infringement by competitors. Over 1,000 permanent injunctions have been granted in patent litigation matters in the last five years. When requested, permanent injunctions are granted in almost 90% of cases.[2]

*eBay* has made it difficult for PAEs to secure an injunction. These entities exist only to acquire and litigate patents. They "don't actually produce anything themselves."[3] Instead, their business model is "to essentially leverage and hijack somebody else's idea and see if they can extort some money out of them."[4] Because these entities' only aim is monetary relief, courts have correctly recognized that injunctive relief should not be available to them—they would abuse their injunctions to obtain improper leverage and extract outsized monetary settlements. Apple believes that *eBay* strikes a fair balance by making injunctive relief available only when monetary relief is insufficient.

Apple respectfully submits that a concern that requires further study and action is the plague of PAEs. Apple's commercial success has made it a target for PAEs. Our experience confirms what many others have documented: although PAE activity is not necessarily harmful in theory, far too many PAEs exist only to extract undeserved royalties. For example, one study estimated that patent litigation brought by PAEs in the United States resulted in expenditures of $29 billion in 2011 for licensing fees, legal fees, and other costs of responding to PAE litigation.[5] Another study found, by looking at the impact on stock price, that lawsuits by PAEs from 1990 through 2010 were responsible for the defendants losing half a trillion dollars.[6] And those losses are not offset by corresponding gains to patent holders that promote innovation. One study found that the profits received by PAEs from litigation amounted to less than 10% of the lost share value of companies targeted by the PAEs.[7]

> **1.2 What steps does your company take to ensure that any intellectual property it gains access to during acquisition negotiations is not copied or used without authorization if those acquisition negotiations prove to be unfruitful?**

Apple respects the intellectual property rights of third parties and strictly protects third-party confidential information.

Apple enters into Non-Disclosure Agreements ("NDAs") with potential acquisition targets that set forth the requirements and restrictions for treatment, use, and destruction or return of information received

---

[2] Josh Landau, *Much Ado About Injunctions*, Patent Progress (Aug. 1, 2019), https://www.patentprogress.org/2019/08/01/much-ado-about-injunctions/.
[3] *President Obama Participates in a Fireside Hangout on Google+*, YouTube (Feb. 14, 2013), https://www.youtube.com/watch?v=kp_zigxMS-Y.
[4] *Id.*
[5] James Bessen & Michael J. Meurer, *The Direct Costs from NPE Disputes*, 99 Cornell L. Rev. 387, 389–90 (2014).
[6] James Bessen, Jennifer Ford, & Michael J. Meurer, *The Private and Social Costs of Patent Trolls*, 34 Regulation 26, 31 (2011-12).
[7] Bessen & Meurer, *supra*, at 411.

during negotiations. The NDAs typically permit Apple to use the potential acquisition targets' information solely for evaluating and implementing a potential transaction and require Apple to limit disclosure of the potential acquisition targets' information to those with a need to know who are bound by confidentiality obligations to Apple. When acquisition negotiations terminate, a target may ask Apple to destroy or return its confidential information. Apple takes steps to ensure compliance with these requests and all other operative provisions in the NDAs, including requirements that information be used solely for a potential acquisition and no other purpose.

Apple also has policies that expressly prohibit the unauthorized use of third-party intellectual property. When Apple hires an employee, the parties' employment agreement expressly provides that no third-party intellectual property may be used for work at Apple. Apple also has an internal Business Conduct Policy for employees that prohibits the unauthorized use of third-party intellectual property.