Joseph R. Re (Bar No. 134479)
joseph.re@knobbe.com
Stephen C. Jensen (Bar No. 149894)
steve.jensen@knobbe.com
Benjamin A. Katzenellenbogen (Bar No. 208527)
ben.katzenellenbogen@knobbe.com
Perry D. Oldham (Bar No. 216016)
perry.oldham@knobbe.com
Stephen W. Larson (Bar No. 240844)
stephen.larson@knobbe.com
Kendall M. Loebbaka (Bar No. 285908)
kendall.loebbaka@knobbe.com
Justin J. Gillett (Bar No. 298150)
justin.gillett@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, Fourteenth Floor
Irvine, CA 92614
Telephone: (949) 760-0404; Facsimile: (949) 760-9502

Adam B. Powell (Bar No. 272725)
adam.powell@knobbe.com
Daniel P. Hughes (Bar No. 299695)
daniel.hughes@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
3579 Valley Centre Drive
San Diego, CA 92130
Telephone: (858) 707-4000; Facsimile: (858) 707-4001

Attorneys for Plaintiffs,
MASIMO CORPORATION AND CERCACOR LABORATORIES, INC.

[Counsel appearances continues on next page]

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

# SOUTHERN DIVISION

| | |
|---|---|
| MASIMO CORPORATION, a Delaware corporation; and CERCACOR LABORATORIES, INC., a Delaware corporation<br><br>Plaintiffs,<br><br>v.<br><br>APPLE INC., a California corporation<br><br>Defendant. | Case No. 8:20-cv-00048-JVS-JDE<br><br>**DECLARATION OF MARK D. KACHNER IN SUPPORT OF PLAINTIFFS' OPPOSITION TO APPLE'S MOTION *IN LIMINE* NO. 1: PRECLUDE REFERENCES TO OTHER LITIGATIONS AND PROCEEDINGS**<br><br>Date:        March 13, 2023<br>Time:        1:30 p.m.<br>Location:   Courtroom 10C |

Mark D. Kachner (Bar No. 234,192)
mark.kachner@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
1925 Century Park East, Suite 600
Los Angeles, CA 90067
Telephone: (310) 551-3450
Facsimile: (310) 551-3458

Attorneys for Plaintiffs,
MASIMO CORPORATION AND CERCACOR LABORATORIES, INC.

I, Mark D. Kachner, hereby declare:

1.       I am a partner in the law firm of Knobbe, Martens, Olson & Bear, LLP, and I am licensed to practice law in the State of California.  I am a member of the bar of this Court, and Counsel of record for Plaintiffs Masimo Corporation ("Masimo") and Cercacor Laboratories, Inc. ("Cercacor") (collectively "Plaintiffs") in the above-captioned action.  I have personal knowledge of the matters set forth herein and, if I am called upon to testify, I could testify competently thereto.

2.       Attached hereto as Exhibit A is a true and correct copy of an email between Masimo's counsel and Apple's counsel, from May 27, 2022 and June 13, 2022.

3.       Exhibit B is intentionally omitted.

4.       Attached hereto as Exhibit C **[filed under seal]** is a true and correct copy of excerpts of the August 5, 2022 deposition transcript of Joe Kiani.

5.       Attached hereto as Exhibit D **[filed under seal]** is a true and correct copy of an email between Masimo and Apple dated March 22, 2013 that Masimo produced in the case at MASA03217800-801.

6.       Attached hereto as Exhibit E **[filed under seal]** is a true and correct copy of a document Apple produced in the case at APL-MAS_01135388-417.

7.       Attached hereto as Exhibit F **[filed under seal]** is a true and correct copy of an Apple email and attachment Apple produced in this case at APL-MAS_00403772-784, which was Exhibit 259 at the Hotelling deposition.

8.       Attached hereto as Exhibit G **[filed under seal]** is a true and correct copy of a document Apple produced in this case at APL-MAS_01853759-795, which was Exhibit 263 at the Hotelling deposition.

9.       Attached hereto as Exhibit H is a true and correct copy of Apple's direct deposition designations from Marcelo Lamego's July 12, 2022 deposition.

10.     Attached hereto as Exhibit I **[filed under seal]** is a true and correct copy of excerpts of Marcelo Lamego's July 12, 2022 deposition that Apple affirmatively designated for this trial.

11.     Attached hereto as Exhibit J is a true and correct copy of the [Redacted] Findings of Fact and Conclusions of Law in *Masimo Corp. v. True Wearables*, Inc., Case No. 8:18-cv-02001, Dkt. 600.

12.     Attached hereto as Exhibit K is a true and correct copy of Apple's direct deposition designations from Abdul-Hafiz Yassir's February 18, 2022 deposition.

13.     Attached hereto as Exhibit L **[filed under seal]** is a true and correct copy of excerpts of Abdul-Hafiz Yassir's February 18, 2022 deposition that Apple affirmatively designated for this trial.

14.     Attached hereto as Exhibit M is a true and correct copy of Apple's direct deposition designations from Stephen Scruggs' January 6, 2022 deposition.

15.     Attached hereto as Exhibit N **[filed under seal]** is a true and correct copy of excerpts of Stephen Scruggs' January 6, 2022 deposition that Apple affirmatively designated for this trial.

16.     Attached hereto as Exhibit O is a true and correct copy of Apple's direct deposition designations from Stephen Scruggs' February 18, 2022 deposition.

17.     Attached hereto as Exhibit P **[filed under seal]** is a true and correct copy of excerpts of Stephen Scruggs' February 18, 2022 deposition that Apple affirmatively designated for this trial.

/ / /

/ / /

/ / /

/ / /

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on February 21, 2023 at Los Angeles, California.

*/s/ Mark D. Kachner*

57126234

# EXHIBIT A

| | |
|---|---|
| **From:** | Mark Kachner |
| **To:** | Passamaneck, Nora Q.E. |
| **Cc:** | Apple-Masimo; Masimo.Apple; WH Apple-Masimo Service List |
| **Subject:** | RE: Masimo v. Apple - transcripts |
| **Date:** | Monday, June 13, 2022 02:49:21 PM |

Nora,

We agree the ITC trial transcripts are available in the district court case for any purpose.

Regards, Mark

**From:** Passamaneck, Nora Q.E. <Nora.Passamaneck@wilmerhale.com>
**Sent:** Monday, June 13, 2022 11:05 AM
**To:** Mark.Kachner <Mark.Kachner@knobbe.com>
**Cc:** Apple-Masimo <Apple-Masimo@gibsondunn.com>; Masimo.Apple <Masimo.Apple@knobbe.com>; WH Apple-Masimo Service List <WHApple-MasimoServiceList@wilmerhale.com>
**Subject:** RE: Masimo v. Apple - transcripts

Mark,

Mark,
With the ITC trial completed, please confirm that the parties' agreement below regarding cross-use includes the ITC trial transcripts.
Thank you,
Nora

**From:** Passamaneck, Nora Q.E.
**Sent:** Friday, June 3, 2022 7:32 PM
**To:** Mark.Kachner <Mark.Kachner@knobbe.com>
**Cc:** Apple-Masimo <Apple-Masimo@gibsondunn.com>; Masimo.Apple <Masimo.Apple@knobbe.com>; WH Apple-Masimo Service List <WHApple-MasimoServiceList@wilmerhale.com>
**Subject:** RE: Masimo v. Apple - transcripts

Mark,
Apple agrees that ITC transcripts and the Sellers transcript, and accompanying exhibits are available in the district court case for any purpose.
Regards,
Nora

**From:** Mark.Kachner <Mark.Kachner@knobbe.com>
**Sent:** Thursday, June 2, 2022 11:19 PM
**To:** Passamaneck, Nora Q.E. <Nora.Passamaneck@wilmerhale.com>

**Exhibit A**
**-4-**

**Cc:** Apple-Masimo <Apple-Masimo@gibsondunn.com>; Masimo.Apple <Masimo.Apple@knobbe.com>; WH Apple-Masimo Service List <WHApple-MasimoServiceList@wilmerhale.com>
**Subject:** RE: Masimo v. Apple - transcripts

EXTERNAL SENDER

Nora,

During our call yesterday concerning my May 26 letter and our request to discuss Masimo and Apple using the transcripts from the pending ITC investigation and the deposition transcript of Denby Sellers taken in True Wearables, as well as exhibits cited therein, Apple asked for clarification on how Masimo intends to "use" those transcripts in the district court case.  We propose to treat the depositions as available as if taken in this case.  Since the ITC trial transcript does not exist yet, it is not really possible to identify the intended use.  As I explained on our call, our intention when we made the request was that the transcripts be available for impeachment.  But based on our discussion and the examples you offered as other potential "uses" (such as citing a transcript as affirmative evidence in this case), we do not see any reason why these transcripts would not be available for any purpose in this district court litigation.  By tomorrow, please let us know Apple's position on whether the ITC transcripts and the Sellers transcript, and accompanying exhibits are available in the district court case for any purpose.

Regards, Mark

**Mark Kachner**
Partner

310-407-3472 **Direct**

**Knobbe Martens**

---

**From:** Passamaneck, Nora Q.E. <Nora.Passamaneck@wilmerhale.com>
**Sent:** Wednesday, June 1, 2022 9:53 AM
**To:** Mark.Kachner <Mark.Kachner@knobbe.com>
**Cc:** Apple-Masimo <Apple-Masimo@gibsondunn.com>; Masimo.Apple <Masimo.Apple@knobbe.com>; WH Apple-Masimo Service List <WHApple-MasimoServiceList@wilmerhale.com>
**Subject:** RE: Masimo v. Apple - transcripts

We're available at 4.

---

**From:** Mark.Kachner <Mark.Kachner@knobbe.com>
**Sent:** Wednesday, June 1, 2022 10:38 AM
**To:** Passamaneck, Nora Q.E. <Nora.Passamaneck@wilmerhale.com>
**Cc:** Apple-Masimo <Apple-Masimo@gibsondunn.com>; Masimo.Apple <Masimo.Apple@knobbe.com>; WH Apple-Masimo Service List <WHApple-

MasimoServiceList@wilmerhale.com>

**Subject:** RE: Masimo v. Apple - transcripts

**EXTERNAL SENDER**

Nora,

I have a conflict at 1p today.  Are you available at 2p or later?

Thanks, Mark

**Mark Kachner**
Partner

310-407-3472 **Direct**

**Knobbe Martens**

**From:** Passamaneck, Nora Q.E. <Nora.Passamaneck@wilmerhale.com>
**Sent:** Wednesday, June 1, 2022 9:30 AM
**To:** Mark.Kachner <Mark.Kachner@knobbe.com>
**Cc:** Apple-Masimo <Apple-Masimo@gibsondunn.com>; Masimo.Apple <Masimo.Apple@knobbe.com>; WH Apple-Masimo Service List <WHApple-MasimoServiceList@wilmerhale.com>
**Subject:** RE: Masimo v. Apple - transcripts

Hi Mark,
We are available at 1:00 PST. If this time works for you please circulate a dial-in.
Thanks, Nora

**From:** Mark.Kachner <Mark.Kachner@knobbe.com>
**Sent:** Tuesday, May 31, 2022 6:06 PM
**To:** Passamaneck, Nora Q.E. <Nora.Passamaneck@wilmerhale.com>
**Cc:** Apple-Masimo <Apple-Masimo@gibsondunn.com>; Masimo.Apple <Masimo.Apple@knobbe.com>; WH Apple-Masimo Service List <WHApple-MasimoServiceList@wilmerhale.com>
**Subject:** RE: Masimo v. Apple - transcripts

**EXTERNAL SENDER**

Nora,

Please provide your availability to meet and confer regarding my May 26 letter regarding transcripts.

Thanks, Mark

**Mark Kachner**
Partner
310-407-3472 **Direct**
**Knobbe Martens**

---

**From:** Passameneck, Nora Q.E. <Nora.Passameneck@wilmerhale.com>
**Sent:** Friday, May 27, 2022 4:57 PM
**To:** Mark.Kachner <Mark.Kachner@knobbe.com>
**Cc:** Apple-Masimo <Apple-Masimo@gibsondunn.com>; Masimo.Apple <Masimo.Apple@knobbe.com>; WH Apple-Masimo Service List <WHApple-MasimoServiceList@wilmerhale.com>
**Subject:** Masimo v. Apple - transcripts

Mark,
It appears you inadvertently did not include the WH listserv on your letter sent yesterday.  I will follow up early next week with availability to meet and confer as requested.
Regards,
Nora

**Nora Q.E. Passameneck | WilmerHale**
1225 Seventeenth St.
Suite 2600
Denver, CO 80202 USA
+1 720 274 3152 (t)
+1 720 274 3133 (f)
nora.passameneck@wilmerhale.com

**Please consider the environment before printing this email.**

---

This email message and any attachments are being sent by Wilmer Cutler Pickering Hale and Dorr LLP, are confidential, and may be privileged. If you are not the intended recipient, please notify us immediately—by replying to this message or by sending an email to postmaster@wilmerhale.com—and destroy all copies of this message and any attachments. Thank you.

For more information about WilmerHale, please visit us at http://www.wilmerhale.com.

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

# EXHIBIT B

## INTENTIONALLY OMITTED

# EXHIBIT H

*Defendant's Direct Deposition Designations*

| Witness | Date | Defendant's Direct Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections | Defendant's Counter-Counter Designations |
|---|---|---|---|---|---|---|
| Lamego, Marcelo | July 12, 2022 | 9:7-16 | | | | |
| | | 11:10-13 | | | | |
| | | 11:25-12:6 | | | | |
| | | 13:13-16 | | | | |
| | | 13:18 | | | | |
| | | 14:17-22 | | | | |
| | | 15:20-17:21 | | | | |
| | | 18:3-18 | | | | |
| | | 19:10-22 | | | | |
| | | 19:24-20:2 | | | | |
| | | 21:12-22 | | | | |
| | | 21:24-22:5 | | | | |
| | | 22:18-23:1 | | | | |
| | | 23:8-24:3 | | | | |

*Defendant's Direct Deposition Designations*

| Witness | Date | Defendant's Direct Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections | Defendant's Counter-Counter Designations |
|---------|------|-------------------------------|----------------------|--------------------------------|----------------------|------------------------------------------|
| | | 24:5 | | | | |
| | | 24:7-16 | | | | |
| | | 25:19-26:7 | | | | |
| | | 26:11-12 | | | | |
| | | 30:19-31:5 | | | | |
| | | 31:7-14 | | | | |
| | | 31:16-17 | | | | |
| | | 31:20-32:3 | | | | |
| | | 32:19-33:1 | | | | |
| | | 33:18-36:7 | | | | |
| | | 37:8-24 | | | | |
| | | 38:13-15 | | | | |
| | | 40:5-9 | | | | |
| | | 40:11-15 | | | | |

2

*Defendant's Direct Deposition Designations*

| Witness | Date | Defendant's Direct Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections | Defendant's Counter-Counter Designations |
|---|---|---|---|---|---|---|
| | | 40:18-41:20 | | | | |
| | | 42:15-44:14 | | | | |
| | | 44:16-46:22 | | | | |
| | | 46:25 | | | | |
| | | 49:9-50:12 | | | | |
| | | 50:17-52:19 | | | | |
| | | 53:5-10 | | | | |
| | | 53:14-16 | | | | |
| | | 53:23-54:16 | | | | |
| | | 54:19-21 | | | | |
| | | 54:24-25 | | | | |
| | | 55:2-3 | | | | |
| | | 55:5 | | | | |
| | | 56:7-10 | | | | |

3

*Defendant's Direct Deposition Designations*

| Witness | Date | Defendant's Direct Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections | Defendant's Counter-Counter Designations |
|---|---|---|---|---|---|---|
| | | 57:7-9 | | | | |
| | | 60:5-18 | | | | |
| | | 61:6-62:3 | | | | |
| | | 63:4-64:1 | | | | |
| | | 64:5-7 | | | | |
| | | 64:9-15 | | | | |
| | | 65:11-18 | | | | |
| | | 66:8-10 | | | | |
| | | 66:13-14 | | | | |
| | | 66:16 | | | | |
| | | 66:18-21 | | | | |
| | | 66:24-25 | | | | |
| | | 67:4 | | | | |
| | | 67:7-15 | | | | |

4

*Defendant's Direct Deposition Designations*

| Witness | Date | Defendant's Direct Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections | Defendant's Counter-Counter Designations |
|---|---|---|---|---|---|---|
| | | 67:18 | | | | |
| | | 67:20-25 | | | | |
| | | 68:23-69:4 | | | | |
| | | 69:13-17 | | | | |
| | | 69:20-72:17 | | | | |
| | | 72:21-73:4 | | | | |
| | | 73:6-10 | | | | |
| | | 73:12-74:6 | | | | |
| | | 74:9 | | | | |
| | | 74:11-14 | | | | |
| | | 74:16-25 | | | | |
| | | 75:2-5 | | | | |
| | | 75:7 | | | | |
| | | 75:14-25 | | | | |

**Exhibit H**
**-100-**

*Defendant's Direct Deposition Designations*

| Witness | Date | Defendant's Direct Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections | Defendant's Counter-Counter Designations |
|---------|------|-------------------------------|------------------------|----------------------------------|------------------------|------------------------------------------|
| | | 76:5-9 | | | | |
| | | 77:8-12 | | | | |
| | | 77:14-25 | | | | |
| | | 78:2-4 | | | | |
| | | 78:6-79:8 | | | | |
| | | 79:12-14 | | | | |
| | | 79:17-80:12 | | | | |
| | | 82:4-16 | | | | |
| | | 85:11-13 | | | | |
| | | 85:15 | | | | |
| | | 85:17 | | | | |
| | | 85:19 | | | | |
| | | 85:21-24 | | | | |
| | | 86:1-12 | | | | |

6

*Defendant's Direct Deposition Designations*

| Witness | Date | Defendant's Direct Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections | Defendant's Counter-Counter Designations |
|---|---|---|---|---|---|---|
| | | 86:14-19 | | | | |
| | | 86:21-87:18 | | | | |
| | | 88:8 | | | | |
| | | 88:10-11 | | | | |
| | | 88:13-25 | | | | |
| | | 90:3-9 | | | | |
| | | 90:11-20 | | | | |
| | | 90:24-91:10 | | | | |
| | | 91:13-14 | | | | |
| | | 91:16-18 | | | | |
| | | 91:24-92:13 | | | | |
| | | 92:24-93:1 | | | | |
| | | 93:6-94:19 | | | | |
| | | 94:23 | | | | |

**Exhibit H**
**-102-**

*Defendant's Direct Deposition Designations*

| Witness | Date | Defendant's Direct Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections | Defendant's Counter-Counter Designations |
|---------|------|--------------------------------|------------------------|----------------------------------|------------------------|------------------------------------------|
| | | 94:25-95:16 | | | | |
| | | 95:18-20 | | | | |
| | | 95:22-96:10 | | | | |
| | | 96:12 | | | | |
| | | 96:14-17 | | | | |
| | | 96:19-23 | | | | |
| | | 96:25-97:5 | | | | |
| | | 97:8-9 | | | | |
| | | 97:12 | | | | |
| | | 97:14-15 | | | | |
| | | 97:24-98:6 | | | | |
| | | 98:8 | | | | |
| | | 98:10-12 | | | | |
| | | 98:14 | | | | |

**Exhibit H**
**-103-**

*Defendant's Direct Deposition Designations*

| Witness | Date | Defendant's Direct Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections | Defendant's Counter-Counter Designations |
|---------|------|--------------------------------|------------------------|----------------------------------|------------------------|------------------------------------------|
| | | 98:16-18 | | | | |
| | | 98:20-99:1 | | | | |
| | | 99:3-100:10 | | | | |
| | | 100:12 | | | | |
| | | 100:14-15 | | | | |
| | | 101:2-7 | | | | |
| | | 101:9-102:10 | | | | |
| | | 102:13 | | | | |
| | | 102:15-17 | | | | |
| | | 102:19 | | | | |
| | | 102:23-103:3 | | | | |
| | | 103:5-104:20 | | | | |
| | | 105:7-11 | | | | |
| | | 105:13-16 | | | | |

9

*Defendant's Direct Deposition Designations*

| Witness | Date | Defendant's Direct Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections | Defendant's Counter-Counter Designations |
|---------|------|--------------------------------|------------------------|----------------------------------|------------------------|-------------------------------------------|
| | | 105:18-23 | | | | |
| | | 105:25-106:4 | | | | |
| | | 106:23-108:6 | | | | |
| | | 108:8-13 | | | | |
| | | 108:22-24 | | | | |
| | | 109:8-20 | | | | |
| | | 109:22-25 | | | | |
| | | 110:2-9 | | | | |
| | | 111:20-113:15 | | | | |
| | | 115:4-5 | | | | |
| | | 115:7-8 | | | | |
| | | 115:10-11 | | | | |
| | | 115:13 | | | | |
| | | 115:15-17 | | | | |

10

*Defendant's Direct Deposition Designations*

| Witness | Date | Defendant's Direct Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections | Defendant's Counter-Counter Designations |
|---|---|---|---|---|---|---|
| | | 115:19 | | | | |
| | | 115:21-22 | | | | |
| | | 115:24-116:1 | | | | |
| | | 116:15-17 | | | | |
| | | 119:8-120:5 | | | | |
| | | 120:7 | | | | |
| | | 120:9-10 | | | | |
| | | 120:12-18 | | | | |
| | | 121:20-22 | | | | |
| | | 121:24-122:3 | | | | |
| | | 122:6-9 | | | | |
| | | 122:11-22 | | | | |
| | | 123:6-7 | | | | |
| | | 123:9-12 | | | | |

*Defendant's Direct Deposition Designations*

| Witness | Date | Defendant's Direct Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections | Defendant's Counter-Counter Designations |
|---------|------|--------------------------------|------------------------|----------------------------------|------------------------|------------------------------------------|
| | | 123:14-124:9 | | | | |
| | | 124:11 | | | | |
| | | 125:20-127:5 | | | | |
| | | 127:18-22 | | | | |
| | | 129:20 | | | | |
| | | 129:22-23 | | | | |
| | | 129:25-130:5 | | | | |
| | | 130:13-14 | | | | |
| | | 131:4-5 | | | | |
| | | 131:7-8 | | | | |
| | | 131:10-17 | | | | |
| | | 131:19 | | | | |
| | | 131:22 | | | | |
| | | 131:24-132:3 | | | | |

**Exhibit H**
**-107-**

*Defendant's Direct Deposition Designations*

| Witness | Date | Defendant's Direct Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections | Defendant's Counter-Counter Designations |
|---------|------|-------------------------------|------------------------|----------------------------------|------------------------|------------------------------------------|
| | | 141:2-6 | | | | |
| | | 141:8-25 | | | | |
| | | 142:6-10 | | | | |
| | | 142:12-19 | | | | |
| | | 142:21-143:4 | | | | |
| | | 145:11-16 | | | | |
| | | 145:23-146:15 | | | | |
| | | 146:17 | | | | |
| | | 146:20-24 | | | | |
| | | 147:2-4 | | | | |
| | | 147:6 | | | | |
| | | 147:8-11 | | | | |
| | | 147:13-17 | | | | |
| | | 147:19-25 | | | | |

*Defendant's Direct Deposition Designations*

| Witness | Date | Defendant's Direct Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections | Defendant's Counter-Counter Designations |
|---------|------|-------------------------------|----------------------|--------------------------------|----------------------|-----------------------------------------|
|  |  | 148:6-10 |  |  |  |  |
|  |  | 148:12-17 |  |  |  |  |
|  |  | 148:20-25 |  |  |  |  |
|  |  | 149:13-17 |  |  |  |  |
|  |  | 149:20 |  |  |  |  |
|  |  | 151:18-22 |  |  |  |  |
|  |  | 151:25-152:9 |  |  |  |  |
|  |  | 152:11-22 |  |  |  |  |
|  |  | 153:5-13 |  |  |  |  |
|  |  | 153:20-22 |  |  |  |  |
|  |  | 154:2 |  |  |  |  |
|  |  | 154:4-6 |  |  |  |  |
|  |  | 154:13-20 |  |  |  |  |
|  |  | 155:12-25 |  |  |  |  |

14

*Defendant's Direct Deposition Designations*

| Witness | Date | Defendant's Direct Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections | Defendant's Counter-Counter Designations |
|---------|------|--------------------------------|------------------------|----------------------------------|------------------------|------------------------------------------|
| | | 156:12-14 | | | | |
| | | 156:17-19 | | | | |
| | | 156:25-157:3 | | | | |
| | | 157:5-16 | | | | |
| | | 160:12-13 | | | | |
| | | 160:15 | | | | |
| | | 160:17-21 | | | | |
| | | 160:23 | | | | |
| | | 161:6 | | | | |
| | | 161:8-18 | | | | |
| | | 162:19-21 | | | | |
| | | 162:24 | | | | |
| | | 163:2-3 | | | | |
| | | 163:6 | | | | |

*Defendant's Direct Deposition Designations*

| Witness | Date | Defendant's Direct Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections | Defendant's Counter-Counter Designations |
|---------|------|-------------------------------|------------------------|----------------------------------|------------------------|------------------------------------------|
| | | 163:8 | | | | |
| | | 163:10 | | | | |
| | | 163:13-14 | | | | |
| | | 163:16 | | | | |
| | | 163:18-20 | | | | |
| | | 163:22 | | | | |
| | | 163:24-25 | | | | |
| | | 164:4-5 | | | | |
| | | 164:7 | | | | |
| | | 164:9-10 | | | | |
| | | 164:13-14 | | | | |
| | | 165:7 | | | | |
| | | 165:9-20 | | | | |
| | | 165:23-166:24 | | | | |

*Defendant's Direct Deposition Designations*

| Witness | Date | Defendant's Direct Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections | Defendant's Counter-Counter Designations |
|---------|------|-------------------------------|------------------------|----------------------------------|------------------------|------------------------------------------|
| | | 167:12-13 | | | | |
| | | 167:15 | | | | |
| | | 167:17-25 | | | | |
| | | 168:23-170:14 | | | | |
| | | 170:18 | | | | |
| | | 170:20 | | | | |
| | | 170:22-25 | | | | |
| | | 171:7-14 | | | | |
| | | 172:1-18 | | | | |
| | | 172:20-173:1 | | | | |
| | | 173:3-5 | | | | |
| | | 173:7-16 | | | | |
| | | 173:18-174:4 | | | | |
| | | 174:18-21 | | | | |

*Defendant's Direct Deposition Designations*

| Witness | Date | Defendant's Direct Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections | Defendant's Counter-Counter Designations |
|---------|------|--------------------------------|------------------------|----------------------------------|------------------------|------------------------------------------|
| | | 174:23-175:6 | | | | |
| | | 175:13-176:22 | | | | |
| | | 176:25 | | | | |
| | | 177:2-3 | | | | |
| | | 177:5 | | | | |
| | | 177:7-16 | | | | |
| | | 177:20-21 | | | | |
| | | 177:23 | | | | |
| | | 177:25-178:4 | | | | |
| | | 178:7-10 | | | | |
| | | 178:12-180:1 | | | | |
| | | 180:4-5 | | | | |
| | | 180:7-8 | | | | |
| | | 180:10-14 | | | | |

*Defendant's Direct Deposition Designations*

| Witness | Date | Defendant's Direct Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections | Defendant's Counter-Counter Designations |
|---|---|---|---|---|---|---|
| | | 180:16-17 | | | | |
| | | 180:20-181:3 | | | | |
| | | 181:5-12 | | | | |
| | | 181:14-19 | | | | |
| | | 181:22-182:6 | | | | |
| | | 182:8-14 | | | | |
| | | 182:16-24 | | | | |
| | | 183:1-4 | | | | |
| | | 183:7-11 | | | | |
| | | 183:13-25 | | | | |
| | | 184:2-12 | | | | |
| | | 184:14-185:2 | | | | |
| | | 185:19-21 | | | | |
| | | 185:23-186:7 | | | | |

*Defendant's Direct Deposition Designations*

| Witness | Date | Defendant's Direct Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections | Defendant's Counter-Counter Designations |
|---------|------|-------------------------------|----------------------|--------------------------------|----------------------|----------------------------------------|
| | | 187:5-6 | | | | |
| | | 187:10-11 | | | | |
| | | 187:13-14 | | | | |
| | | 187:17 | | | | |
| | | 187:19-20 | | | | |
| | | 187:22 | | | | |
| | | 188:1-4 | | | | |
| | | 188:10-191:16 | | | | |
| | | 191:18-192:1 | | | | |
| | | 192:4-20 | | | | |
| | | 195:7-8 | | | | |
| | | 195:10-11 | | | | |
| | | 195:13-18 | | | | |
| | | 195:20-196:12 | | | | |

20

# EXHIBIT J

1

FILED
CLERK, U.S. DISTRICT COURT

11/7/22

CENTRAL DISTRICT OF CALIFORNIA
BY:    LB    DEPUTY

2

3

4

5

6

7    **JS-6**

8

9

10

11

12

13    UNITED STATES DISTRICT COURT

14    CENTRAL DISTRICT OF CALIFORNIA

15    SOUTHERN DIVISION

16

17

18    MASIMO CORPORATION, et al.,        )    Case No. 8:18-CV-02001-JVS-JDE

19        Plaintiffs/Counterdefendants,  )

20                                         )    FINDINGS OF FACT &

21        v.                              )    CONCLUSIONS OF LAW

22                                         )

23    TRUE WEARABLES, INC., et al.,       )    Redacted

24        Defendants/Counterclaimants    )

25                                         )

26                                         )

27

28

# TABLE OF CONTENTS

I. Bench Trial Background.................................................................................... 1

II. Party Background............................................................................................. 2

III. Findings of Fact and Conclusions of Law..................................................... 4

    A. Jurisdiction and Venue................................................................................ 4

    B. Witness Testimony...................................................................................... 5

    C. Breach of Contract...................................................................................... 5

           Defense: Void Contracts............................................................. 9

    D. Breach of Fiduciary Duty............................................................................ 9

           Defense: Statute of Limitations.................................................. 15

    E. Trade Secrets……....................................................................................... 18

           Trade Secret 1............................................................................. 19

           Trade Secret 5............................................................................. 23

           Trade Secret 8............................................................................. 25

           Trade Secret 9............................................................................. 28

           Trade Secret 11........................................................................... 32

           Trade Secret 12........................................................................... 35

           Willfulness & Maliciousness...................................................... 39

           Defenses……............................................................................... 40

    F. The '848 Patent……................................................................................... 42

           Infringement............................................................................... 42

           Invalidity……............................................................................. 51

                   Level of Ordinary Skill in the Art............................. 53

                   Scope and Content of Prior Art................................. 53

                   Motivation to Combine……...................................... 55

                   Reasonable Expectation of Success.......................... 57

                   Other Indicia of Nonobviousness............................. 58

    G. Other Affirmative Defenses........................................................................ 59

    H. Equitable Remedies……............................................................................. 59

           Breach of Fiduciary Duty…….................................................... 59

           Trade Secrets - Injunctive Relief……........................................ 60

           Breach of Contract - Injunctive Relief……............................... 62

           Patent Applications Containing Trade Secrets........................... 62

           Restraint on Employment……................................................... 65

           Attorney's Fees……................................................................... 66

IV. Summary of Conclusions of Law................................................................... 67

V. Conclusion....................................................................................................... 72

**Exhibit J
-127-**

Case 8:20-cv-00048-JVS-JDE   Document 1333-1   Filed 02/21/23   Page 37 of 116   Page ID
#:133154
Case 8:18-cv-02001-JVS-JDE   Document 600   Filed 11/07/22   Page 3 of 75   Page ID
#:39535

1   　　　　After Plaintiffs waived their right to a jury trial (Dkt. 398), the Court

2   presided over a bench trial. See Dkts.552, 553, 555, 556, 557.  The Court received

3   direct testimony via declaration before holding in-person proceedings for cross-

4   examination, redirect, and recross. At the conclusion of trial, the parties submitted

5   closing briefs (Dkts. 576-1, 579-1) and the Court held closing argument. See Dkt.

6   583. Under Rule 52(a) of Federal Rules of Civil Procedure, the Court now enters

7   its findings of fact and conclusions of law.

8

9   **I.    Bench Trial Background**

10

11   　　　　Plaintiffs' First Amended Complaint (Dkt. 42), Defendants' Answer and

12   Counterclaims (Dkt. 46), and Plaintiffs' Answer to Counterclaims (Dkt. 49) are the

13   operative pleadings. In sum, before trial the case was narrowed to encompass only

14   the following claims and related defenses:

15   •   Breach of contract: Whether Defendant, Dr. Marcelo Lamego, breached

16   　　　contracts with Plaintiffs, Masimo Corporation and Cercacor Labs, based on

17   　　　his employee confidentiality agreements, and whether those agreements are

18   　　　void as a restraint on trade;

19   •   Breach of fiduciary duty: Whether Dr. Lamego breached his fiduciary duty

20   　　　of undivided loyalty to Cercacor based on representations made to the board

21   　　　of directors, and whether this claim is barred by the statute of limitations;

22   •   Trade secret misappropriation: Whether Defendants misappropriated any of

23   　　　Trade Secrets 1, 5, 8, 9, 11, and/or 12 under Cal. Civ. Code § 3246.1

24   　　　(CUTSA), and whether related defenses apply;

25   •   Patent infringement: Whether Defendants infringe Claim 9 of the U.S. Patent

26   　　　No. 10,194,848, and whether Claim 9 is invalid for obviousness; and

27   •   What, if any, equitable relief should be afforded to the parties?

28   See Dkt. 508 (Amended Joint Final Pretrial Conference Order).

## II.    Party Background

Plaintiff Masimo Corporation is a leader in pulse oximetry, which involves measuring oxygen in the blood. Joe Kiani founded Masimo in 1989. Kiani believed he could solve the "motion problem" in pulse oximetry, which prevented accurate pulse oximetry measurements when the patient was moving, leading to false alarms. Mohamed Diab is a scientist who joined Masimo about six months after its founding. Diab designed circuits and wrote the software that Masimo used to develop pulse oximetry technology. A pulse oximeter works by attaching a sensor to a patient to detect a physiological signal. Light sources in the sensor transmit light through the patient's tissue. The amount of light absorbed by the tissue and the corresponding detected signal can provide information about the patient's blood flow and blood content such as oxygen saturation ("$SpO_2$"). The  detected signal is called a photoplethysmogram, photoplethysmograph, pleth, or "PPG" for short.

Historically, motion at the measurement site could corrupt the PPG and result in "noisy" and unreliable data. By the early 1990s, Kiani and Diab had discovered their first solution to the motion problem in pulse oximetry and had developed multiple algorithms for measuring oxygen saturation. Masimo named its technology Masimo "SET" for Signal Extraction Technology. Masimo also began working on an improved pulse rate algorithm. Masimo patented some of its technology and kept other aspects secret.

In 1998, Masimo Corp. spun off Cercacor (formerly known as Masimo Laboratories) to carry forward some portions of Masimo's business that were still in research and development. Kiani became Cercacor CEO, and Diab became the first employee, where he continued to work closely with Masimo. Masimo and Cercacor have a cross-licensing agreement that allows them to work together confidentially on new technologies. For example, Cercacor has focused on glucose

Exhibit J
-129-

1   and other non-invasive parameters. Masimo and Cercacor refer to these parameters

2   as "rainbow" parameters and named the technology "rainbow SET." Under the

3   relevant cross-licensing agreement, Masimo uses Cercacor's technology and pays

4   Cercacor a license fee and royalties.

5       Defendant Dr. Marcelo Lamego holds a Ph.D. in Electrical and Electronics

6   Engineering from Stanford University. Upon graduating from Stanford in 2000,

7   Dr. Lamego obtained employment as an Algorithm Engineer at Masimo

8   Corporation. Dr. Lamego signed his first confidentiality agreement at that time.

9   See JTX-307. In 2000, Dr. Lamego worked at Masimo for approximately six

10  months. From 2001 to 2003, he joined the Boston Consulting Group, in São Paulo,

11  Brazil, where he also worked as a professor at the University of São Paulo,

12  teaching in the MBA program for Management and Product Engineering.

13      In January 2003, Masimo re-hired Dr. Lamego as a Research Scientist. At

14  that time, Dr. Lamego signed a second Masimo confidentiality agreement. See

15  JTX-308. In 2005, Dr. Lamego signed a third Masimo confidentiality agreement.

16  See JTX-309.

17      In February 2007, after Diab began having health problems, Kiani selected

18  Dr. Lamego as Masimo Labs' (now Cercacor) next Chief Technology Officer

19  (CTO). To facilitate this transition, Masimo exposed Dr. Lamego to its technology,

20  including providing access to Masimo's confidential information, such as the

21  rainbow SET source code. Dr. Lamego also shared an office with Diab. Dr.

22  Lamego was one of twelve employees with access to all rainbow directories on

23  Masimo's network. See JTX-20; JTX-26. In his new role as CTO, Dr. Lamego

24  signed another confidentiality agreement, agreeing that his work product would

25  belong to Cercacor and that he would not use or disclose confidential information

26  if he left Cercacor. See  JTX-310.

27      From February 2007 to January 2014, Dr. Lamego served as Cercacor's

28  CTO. In this role, he was responsible for the engineering team and Cercacor's

1  research and product development. Dr. Lamego was charged with assembling a

2  team of engineers and scientists with the goal of applying the rainbow technology

3  to non-invasively measure glucose. Dr. Lamego also worked toward developing an

4  accurate, wireless-wearable sensor to non-invasively monitor patient parameters

5  such as blood oxygen. In 2013, Masimo introduced the iSpO$_2$, the first pulse

6  oximeter for both Apple (iOS) and Android mobile devices, which connected

7  through a cable and was marketed for consumer use only. See JTX-40. In January

8  2014, Dr. Lamego left Cercacor based on disagreements with Cercacor's

9  management. After he left, Dr. Lamego worked at Apple, Inc. from January 2014

10  until July 2014.

11      Upon leaving Apple, Dr. Lamego and his wife, Tatiana Lamego, founded

12  Defendant True Wearables ("TW"). Dr. Lamego has been the CEO of True

13  Wearables ever since. At True Wearables, Dr. Lamego wanted to create an

14  inexpensive, disposable, noninvasive monitoring device. To that end, he created

15  the Oxxiom device. Dr. Lamego intended to keep the cost of the device low by

16  distributing processing tasks between the device and another device, such as an

17  iPhone. To create the Oxxiom, Dr. Lamego used off-the-shelf components, such as

18  processors, batteries, and LEDs, which he believed would be suitable components

19  for a single-use, disposable device, and would be efficient and affordable while

20  performing adequately. Dr. Lamego announced the Oxxiom in January 2016 and

21  shipped the first device in August 2018.

22

23  **III.    Findings of Fact and Conclusions of Law**

24

25      **A.    Jurisdiction and Venue**

26      1.    The Court has subject matter jurisdiction over this action pursuant to

27  28 U.S.C. § 1331 because these claims arise under the federal patent laws. 35

28  U.S.C. §§ 271, 281; 28 U.S.C. § 1338(a).

4

2.     This Court has supplemental jurisdiction over Masimo's state law claims under 28 U.S.C. § 1367(a).  Masimo's state law claims are related to the patent infringement claim such that they form part of the same case or controversy under Article III of the United States Constitution.

3.     The Court has personal jurisdiction over the parties and venue is proper in this Court under 28 U.S.C. §§ 1391(b) and (c) and 1400(b) because Dr. Lamego resides in, and True Wearables has its regular and established place of business in, the County of Orange within the Central District of California.

**B.     Witness Testimony**

4.     Throughout the course of the bench trial, the Court had the opportunity to observe each witness as they testified in open court.  The Court carefully listened to each witness's testimony and observed their demeanor, which helped inform the Court's overall assessment of each witness's credibility.  The Court's credibility assessments underpin several of the findings of fact set forth in this Order.  In turn, those findings of fact inform the Court's conclusions of law.  The Court's credibility findings were especially important with respect to claims or defenses that turned on Dr. Lamego's credibility, as he was a central witness in the case.  Where the Court's conclusions turned on a finding of credibility (or lack thereof), those findings are stated herein.

**C.     Breach of Contract**

5.     To prove breach of contract, Masimo must prove (1) the existence of a contract, (2) Masimo's performance or excuse for nonperformance, (3) Dr. Lamego's breach, and (4) that Masimo suffered harm as a result of the breach. Oasis W. Realty, LLC v. Goldman, 51 Cal. 4th 811, 821, 250 P.3d 1115, 1121 (Cal. 2011).

6.     If a breach causes no actual harm, it may be redressable under

California law because "failure to perform a contractual duty is, in itself, a legal wrong." Elation Sys., Inc. v. Fenn Bridge LLC, 71 Cal. App. 5th 958, 965 (2021) (nominal damages and equitable relief for breach of non-disclosure agreement appropriate despite no actual harm).

7.    Masimo bears the burden of proving breach of contract by a preponderance of the evidence. Pugh v. See's Candies, Inc., 203 Cal. App. 3d 743, 760 (Ct. App. 1988).

8.    Masimo has satisfied all four elements of breach of contract.

9.    First, Dr. Lamego entered into three contracts with Masimo by signing confidentiality agreements in 2000, 2003, and 2005. See Dk. 447-1, AF 7–9; Miller Direct ¶¶ 15, 23, 24; JTX-307; JTX-308; JTX-309. Dr. Lamego also entered into a contract with Cercacor by signing a confidentiality agreement in 2008. See AF-10; JTX-310.

10.    Second, Dr. Lamego signed the agreements "in consideration of the compensation and benefits from my employment," and he does not dispute that Masimo provided the agreed upon compensation and benefits. Thus, Masimo has shown performance.

11.    Third, Masimo has shown Dr. Lamego's breach of the confidentiality agreements because those agreements prohibited Dr. Lamego from taking any Masimo confidential information or property. Specifically, Dr. Lamego agreed that, "After my employment with Masimo has terminated, I will not disclose or make use of any Confidential Information for any purpose, either on my own or on behalf of another business." JTX-307, ¶ 2. "[T]he term Confidential Information means any information in any form that Masimo considers confidential, including business plans, customer files, sales and marketing reports, technical data, prices and costs, designs and formulas, software, databases, personnel and payroll records, mailing lists, accounting records, and other business information." Id. Dr. Lamego also agreed that, "Upon termination of my employment for any reason, I

will immediately assemble all property of Masimo in my possession or under my control and return it unconditionally to Masimo." Id. ¶ 11.

12.     At trial, Dr. Lamego admitted that, upon leaving Cercacor in January 2014, he kept certain documents, including:

- A recommendation letter from Kiani on behalf of Dr. Lamego (JTX-311 at Ex. 2);

- One page of a 2013 email exchange in which Kiani praised Dr. Lamego as the "leading scientist in the world on noninvasive blood constituent monitoring" (JTX-311 at Ex. 3; JTX-312 at Ex. 4);

- A recommendation letter from Diab on behalf of Dr. Lamego (JTX-311 at Ex. 4);

- A 2014 email exchange between Kiani and Gerry Hammarth (CFO of Cercacor) regarding the whereabouts of Dr. Lamego's employment agreements (JTX-311 at Ex. 9);

- An email exchange between Masimo's counsel and Dr. Lamego confirming Plaintiffs had copies of Dr. Lamego's employment agreements and Dr. Lamego did not have access to them at Cercacor (JTX-311 at Ex. 9; JTX-312 at Ex. 9);

- A presentation Dr. Lamego gave at Masimo during his first two weeks of employment in 2000 discussing the Beer-Lamber Model, third party published works, extrapolations, and generalizations made in the subject of light transport in biological tissues (JTX-312 at Ex. 2);

- A 2010 email exchange in which Kiani called Dr. Lamego "one of the smartest, if not the smartest, person I know" (JTX-312 at Ex. 5);

- A 2010 email exchange in which Kiani praised Dr. Lamego and his Cercacor team after a presentation (JTX-312 at Ex. 6);

- A series of emails, without their attachments, disseminating workshops that Dr. Lamego prepared to give to Cercacor engineers (JTX-313 at

7

1    TRUE016662–81);

2   •    A 2012 email exchange between Kiani and Dr. Lamego discussing Dr.

3        Lamego's potential attendance at an FDA meeting (JTX-313 at

4        TRUE016694–96);

5   •    Several 2012 email exchanges between Kiani and Dr. Lamego discussing

6        Cercacor's hiring process and hiring an engineer over Dr. Lamego's

7        objections, which also contain sensitive and confidential information such

8        as: (1) engineer salaries; (2) the amount Cercacor spent acquiring a

9        company; (3) the amount Cercacor spent researching non-invasive glucose;

10       and (4) Kiani's confidential assessment of the business risks posed by one of

11       Cercacor's competitors. (JTX-313 at TRUE016697–715)

12  See 3/18 Tr. 10:21–24, 11:16–19 (Dr. Lamego: "One hundred percent sure that I

13  took it.").

14       13.    Dr. Lamego acknowledged that each of the emails he took includes an

15  express confidentiality notice. Id. at 12:22–25; JTX-313. Dr. Lamego did not have

16  permission to take these confidential documents. See 3/15 Tr. 129:13–131:11. The

17  information contained therein qualifies as "Confidential Information" under the

18  agreements.

19       14.    Additionally, as explained below in the context of the trade secrets

20  claim, Dr. Lamego took certain confidential trade secret information for his own

21  use, and used that information at his new company, True Wearables.

22       15.    Fourth, Masimo has shown that it suffered harm as a result of the

23  breach.  Dr. Lamego's breach of three confidentiality agreements harmed Masimo,

24  because its confidential information is valuable, and because Dr. Lamego's breach

25  threatens Masimo's competitive advantage and the exclusivity of its confidential

26  information. Dr. Lamego's breach of his confidentiality agreement harmed

27  Cercacor, because Cercacor places significant value on its confidential information,

28  and because Dr. Lamego's breach causes Cercacor to lose the competitive

8

**Exhibit J**
**-135-**

1  advantage from maintaining the exclusivity of its confidential information.

2       Defense: Void Contracts

3       16.    In defense of the breach of contract claims, Dr. Lamego has not

4  proven his counterclaim, that is, the confidentiality agreements are void because

5  they restrained Dr. Lamego from engaging in a lawful profession, trade, or

6  business under Cal. Bus. & Prof. Code § 16600.

7       17.    The provisions that Masimo seeks to enforce relate to removing

8  confidential information and company property; those provisions do not restrain

9  Dr. Lamego from engaging in a lawful profession, trade, or business.

10       18.    Even assuming other provisions in the agreements could impose such

11  restrictions, those provisions would not void the entire agreement. See Cal. Bus. &

12  Prof. Code § 16600 (improper restraint voids agreement "to that extent," but the

13  remainder of agreement remains enforceable); Lawrence Crane Enters., Inc. v.

14  Abrams, No. CV 11-7797-DMG (AGRx), 2013 WL 12123997, at *5 (C.D. Cal.

15  Jan. 28, 2013) (voiding some non-compete contract provisions as violating public

16  policy under § 16600 did not void other provisions "prohibit[ing] the use of

17  confidential and proprietary information, including trade secrets, except in the

18  course of employment with Plaintiffs"); Cal. Civ. Code § 1599 ("Where a contract

19  has several distinct objects, of which one at least is lawful, and one at least is

20  unlawful, in whole or in part, the contract is void as to the latter and valid as to the

21  rest.").

22       19.    Defendants have failed to show that the agreements are unenforceable

23  as to the breached provisions. Thus, Masimo's narrow breach of contract claims

24  are not barred by Cal. Bus. & Prof. Code § 16600.

25

26       **D.    Breach of Fiduciary Duty**

27       20.    To prove a breach of fiduciary duty, Cercacor must prove (1)

28  existence of a fiduciary duty; (2) breach of the fiduciary duty; and (3) damage

9

1  proximately caused by the breach. <u>Gutierrez v. Girardi</u>, 194 Cal. App. 4th 925, 932

2  (2011).

3      21.    Corporate officers owe fiduciary duties to the corporation. <u>Oakland</u>

4  <u>Raiders v. Nat'l Football League</u>, 131 Cal. App. 4th 621, 632 (2005). "Inherent in

5  each of these relationships is the duty of undivided loyalty." <u>Wolf v. Superior Ct.</u>,

6  107 Cal. App. 4th 25, 30 (2003).

7      22.    Cercacor bears the burden of proving breach of fiduciary duty by a

8  preponderance of the evidence. <u>Kanbar v. Kaufman</u>, No. C 07-2123 VRW, 2008

9  WL 11408996, at *14 (N.D. Cal. Oct. 22, 2008), <u>aff'd</u>, 372 F. App'x 694 (9th Cir.

10  2010).

11      23.    Cercacor has satisfied all three elements of breach of fiduciary duty.

12      24.    First, it is undisputed that, as Cercacor's Chief Technical Officer, Dr.

13  Lamego owed Cercacor a fiduciary duty of undivided loyalty.  <u>Accord</u> JTX-301 at

14  1 (Dr. Lamego acknowledging "fiduciary responsibilities as the Chief Technical

15  Officer of Cercacor").

16      25.    Second, Cercacor has proven breach of that duty in connection with

17  an October 24, 2013 presentation that Dr. Lamego, then-CTO of Cercacor, gave to

18  the Board of Directors. Because the harm that flows from this breach relates to the

19  parameters deemed the "Chem 5 panel," the Court's analysis of this claim focuses

20  on the Chem 5 panel. <u>See</u> Lamego ¶ 30 (the Chem 5 panel included the following

21  parameters: ███████████████████████████████████████████

22  ███████

23      26.    Dr. Lamego's presentation discussed the feasibility of technology that

24  Cercacor engineers had been developing for noninvasively measuring 20 blood

25  parameters, including the Chem 5 panel. <u>See</u> Merritt Direct ¶ 22; JTX-83.

26      27.    As early as 2007, Dr. Lamego began working on solving noninvasive

27  glucose, which was deemed the "Hummingbird Project." <u>See</u> Kiani ¶ 87; JTX-718.

28  In 2010, Dr. Lamego proposed a hybrid device/sensor to noninvasively measure

glucose. Kiani ¶ 177 (quoting JTX-746 (executive summary)).

28.    In 2011, before glucose was solved, Dr. Lamego told Kiani he was resigning from Cercacor. Kiani ¶¶ 145–46; JTX-1083. Kiani encouraged Dr. Lamego to stay, and Dr. Lamego agreed to stay "until feasibility is proved or disproved for Gu," i.e., glucose.  Kiani ¶ 147; JTX-1083.

29.    Dr. Lamego kept working on glucose and informed Kiani that he made great progress on noninvasively measuring glucose and several other parameters that normally require a blood draw. Kiani ¶ 167. Dr. Lamego told Kiani that a number of these new parameters were ready to start building into products and obtaining regulatory clearances. Id. ¶ 168.

30.    As a result, Kiani asked Dr. Lamego to present his progress on the new parameters to Cercacor's Board of Directors, which resulted in the relevant October 24, 2013 presentation. See JTX-73; Kiani ¶ 169; Diab ¶ 241; Chen ¶¶ 91–92. Dr. Lamego delivered the presentation using PowerPoint slides. JTX-305; JTX-306; 3/17 Tr. 158:15–18, 159:24–160:4; 3/18 Tr. 86:3–8.

31.    Kiani and Diab attended the presentation.  JTX-934; Diab ¶ 240; Kiani ¶ 169.  Hammarth also attended the presentation as CFO and corporate secretary.  JTX-953; Hammarth ¶¶ 31–33. Others on Dr. Lamego's team who reviewed the slides before Dr. Lamego's presentation, including Sean Merritt, Cristiano Dalvi, Ferdyan Lesmana, Jeroen Poeze, Hung Vo, Jesse Chen, Mathew Paul, Kevin Pauly, and Hoi Wong, did not attend the presentation and thus lack personal knowledge regarding what Dr. Lamego said during the presentation.

32.    During the presentation, Dr. Lamego told the board about his progress on the new parameters. JTX-73; 3/15 Tr. 92:20–93:3. Dr. Lamego said the parameters, including glucose, could be measured using Cercacor's sensor, originally designed for glucose. JTX-73 at MASM0087868; JTX-306 at MASM0113841–42; Kiani ¶¶ 170–171, 173.

33.    Dr. Lamego explained that he successfully measured glucose using

11

"patient-dependent calibration," whereas he measured the other parameters using global calibration. See JTX-73 at MASM0087868; JTX-306 at MASM0113841–42, MASMO0113900; JTX-746; Kiani ¶¶ 170, 174–75; Diab ¶¶242, 244.

34.    Kiani was excited by Dr. Lamego's reported results and corresponding proposal to deliver a commercial product measuring fifteen new parameters in one year, as shown below. JTX-73 at MASM0087894, MASM0087808, MASM0087868; Kiani ¶¶ 180–83, 187; Diab ¶ 243.

Case 8:20-cv-00048-JVS-JDE   Document 1333-1   Filed 02/21/23   Page 49 of 116   Page ID
#:133166
Case 8:18-cv-02001-JVS-JDE   Document 600   Filed 11/07/22   Page 15 of 75   Page ID
#:39547

35.     Although Dr. Lamego conveyed enthusiasm about the feasability of the tested parameters during the presentation, at trial he explained that when he said the parameters were feasible, he meant only that his results merited further investigation and development. See Lamego ¶ 27; Merritt ¶ 25.

36.     Dr. Lamego's presentation advises that, "[m]ore clinical studies are required to validate all the 20 noninvasive parameters measured by the glucose AP sensor;" and "[t]hese are preliminary results and a clinical data collection with a larger subject population is needed to confirm the results and assess overall performance." See Merritt ¶ 26; JTX-306 at MASM0113900–14. Kiani explained that additional clinical studies are always required to support regulatory submissions for new products. Kiani ¶ 180.

37.     At trial, Dr. Lamego admitted that, although he did not believe Cercacor could meet the dates set forth in the timeline he presented to the board, he did not reveal this to the board. Compare JTX-306 at MASM0113926 (timeline), with 3/18 Tr. 87:6–91:14 ("THE COURT: Did you believe that would occur? . . . THE WITNESS: I don't believe that we will be able to have that [done] . . . ."; "THE COURT: Did you believe that date?  THE WITNESS: To tell you the truth, no."; "THE COURT: Did you believe that was a realistic date? THE WITNESS: I did not believe that this was possible even with the tests we had . . . . THE COURT: At this meeting of the board, did you tell the board members that date is not realistic? THE WITNESS: Well, I did not say that . . . .").

38.     At trial, Dr. Lamego also criticized the data he had presented favorably to the board, stating that the data look like the product of a random number generator. 3/17 Tr. 173:1–5 ("[J]ust looking at the scatter plot you can see there's no clinical accuracy. You don't have to be an engineer to understand that those scatter plots are almost random number generators.").

39.     By representing feasability of the parameters to the board, alongside specific manufacturing and regulatory timelines, even when Dr. Lamego believed

13

Case 8:20-cv-00048-JVS-JDE   Document 1333-1   Filed 02/21/23   Page 50 of 116   Page ID
#:133167
Case 8:18-cv-02001-JVS-JDE   Document 600   Filed 11/07/22   Page 16 of 75   Page ID
#:39548

the data was not clinically accurate and the timelines were not realistic, Dr. Lamego breached his duty of loyalty to Cercacor.

40.     Fourth, Cercacor has proven damages proximately caused by Dr. Lamego's breach.

41.     Before Masimo decided whether to license from Cercacor any of the parameters tested by Dr. Lamego, Masimo tasked its board member and practicing clinical anesthesiologist, Dr. Steven Barker, with reviewing Dr. Lamego's findings. Kiani ¶¶ 186–87; Barker ¶ 9; 3/16 Tr. 89:13–24. Dr. Barker did so and recommended that Masimo license the Chem 5 panel from Cercacor, but not license the glucose parameter (SpGu). See Barker ¶¶ 21–22; Lamego ¶ 30; 3/16 Tr. 87:5–15; JTX-1160.

42.     In evaluating Masimo's market opportunity, Barker relied on and made recommendations based upon Dr. Lamego's representation of accuracy of the parameters.  3/16 Tr. 90:6–10. Barker's conclusions were based on his impression as a practicing clinician and anesthesiologist who would use the measurements on patients. 3/16 Tr. 82:9–25; see also id. 88:23–90:10.

43.     Kiani shared Dr. Barker's recommendation with Dr. Lamego and sent him Barker's report. Dr. Lamego responded: "Great!!! Thank you!"  JTX-1159; JTX-1160; Kiani ¶ 193. Throughout this process, Dr. Lamego did not tell Barker, Kiani, or anyone else that his timeline was unrealistic or that the data lacked clinical significance. 3/18 Tr. 91:24– 93:15 (Dr. Lamego testified: "I didn't believe based on the data we had that that dat[a] was clinically significant.").

44.     Relying on Dr. Lamego's presentation, the board authorized the additional resources requested by Dr. Lamego to meet his proposed timeline, including approving hiring new engineers. JTX-73 at MASM0087808; Kiani ¶¶ 184–85; 3/15 Tr. 96:1-13. These resources would not have been approved for a product where feasability remained in question. Kiani ¶ 182.

45.     Also relying on Dr. Lamego's representations, Masimo approved

14

1 licensing the Chem 5 panel from Cercacor for licensing fees totaling $2.5 million,

2 which eventually had to be returned due to lack of feasability. JTX-1368; JTX-936;

3 Kiani ¶¶ 189–92, 210; Barker ¶¶ 18, 23; Hammarth ¶ 32.

4    46.    By causing Cercacor to expend additional resources in furtherance of

5 Dr. Lamego's claimed feasability and proposed timeline, in which he himself did

6 not believe, and by causing Cercacor to later return the Chem 5 panel licensing fees

7 to Masimo, Dr. Lamego's breach of fiduciary duty proximately harmed Cercacor.

8 See Kiani ¶¶ 206–07; Diab ¶ 248; Hammarth ¶ 37; JTX-826.

9    Defense: Statute of Limitations

10   47.    In defense of Cercacor's breach of fiduciary duty claim, Dr. Lamego

11 has not proven that the statute of limitations bars this claim.

12   48.    California applies a four-year statute of limitations to claims for

13 breach of fiduciary duty. In re Brocade Commc'ns Sys., Inc. Derivative Litig., 615

14 F. Supp. 2d 1018, 1036 (N.D. Cal. 2009) (citing Cal. Code Civ. P. § 343).

15   49.    "Under the 'discovery rule,' the statute of limitations begins to run

16 when a plaintiff discovers, or has reason to discover, the cause of action." See

17 Klang v. Pflueger, No. 13-1971, 2014 WL 4922401, at *6 (C.D. Cal. July 10,

18 2014) (Selna, J.).

19   50.    "A plaintiff seeking to utilize the discovery rule must plead facts to

20 show his or her inability to have discovered the necessary information earlier

21 despite reasonable diligence." Fox v. Ethicon Endo-Surgery, Inc., 35 Cal. 4th 797,

22 815, 110 P.3d 914, 925 (Cal. 2005). "Indeed, it would be difficult to describe a

23 cause of action filed by a plaintiff, before that plaintiff reasonably suspects that the

24 cause of action is a meritorious one, as anything but frivolous." Id.

25   51.    Defendants have not shown that by April/May 2014, or at the latest

26 August 2014, Cercacor should have reasonably suspected that Dr. Lamego

27 breached his duty of loyalty, and thus the four-year statute of limitation began to

28 run.

Case 8:20-cv-00048-JVS-JDE   Document 1333-1   Filed 02/21/23   Page 52 of 116   Page ID
#:133169
Case 8:18-cv-02001-JVS-JDE   Document 600   Filed 11/07/22   Page 18 of 75   Page ID
#:39550

52.     Although Dr. Lamego resigned from Cercacor to join Apple a few months after giving his October 2013 presentation, <u>see</u> Kiani ¶ 195; JTX-303, an employee leaving for a competitor does not in and of itself provide a sufficient reason for an employer to discover breach of fiduciary duty generally. And in this case, it would not have given Cercacor a reason to discover that Dr. Lamego's feasability data was not clinically accurate and that Dr. Lamego knew it. Although Kiani, Diab, and other Cercacor engineers were surprised that Dr. Lamego left, Diab ¶ 247; Kiani ¶ 203; 3/18 Tr. 154:25–155:2, this does not trigger a claim for breach of fiduciary duty.

53.     Relatedly, Plaintiffs did not know that, around the time of the October 2013 presentation, Dr. Lamego emailed Apple CEO Tim Cook concerning helping Apple solve Glucose. Plaintiffs did not learn of the email until this litigation, so it could not have put Plaintiffs on notice concerning this claim. Kiani ¶ 194; 3/17 Tr. 131: 8–10. Further, nothing suggests that Plaintiffs should have reasonably discovered the email earlier.

54.     Cercacor's decision to retest Dr. Lamego's data also does not trigger the discovery rule. After Dr. Lamego left Cercacor, under Merritt's direction, Cercacor retested the feasability of the parameters Dr. Lamego presented to the board. Kiani ¶ 203; 3/18 Tr. 156:10–17; Merritt ¶¶ 31–36; JTX-405.

55.     Following retesting, Cercacor observed that the correlation results were much lower than what Dr. Lamego presented. Kiani ¶ 204. Merritt began to question the integrity of the data. 3/18 Tr. 157:3–158:12.

56.     Cercacor was unable to validate feasability on any of the parameters presented by Dr. Lamego, so it decided it may have to refund Masimo's $2.5 million license-fee payment. Kiani ¶¶ 206–09; JTX-826 at MASM0113485; JTX-29 at MASM0113478–79; JTX-938 at MASM0129823; Diab ¶¶ 248–49; Hammarth ¶¶ 35–40.

57.     Although Cercacor conducted further investigation, which confirmed

by April/May 2014 and no later than August 2014 that progress on these parameters and potential technologies was different than what Dr. Lamego presented, Merritt ¶¶ 4, 36; JTX-826, 3/16 Tr. 59:15–18, nothing gave Cercacor a reason to suspect that this was because Dr. Lamego misrepresented the clinical accuracy of the data (i.e., breached his duty of loyalty), as opposed to some other data- or test-driven reason.[1]

58.     The fact that Dr. Lamego admitted, years later at trial, that he never believed Cercacor could meet the dates he proposed or in the integrity of the data he presented, could not have given rise to a reason to suspect, in 2014, that Dr. Lamego breached his duty of loyalty. Accordingly, the discovery rule does not bar the claim as of April/May or August 2014.

59.     This is especially true where Plaintiffs were given other contemporaneous indicia of Dr. Lamego's continuing loyalty to his former employer. Kiani ¶¶ 201, 202, 204, 205; 3/15 Tr. 10:7–12, 16:1–4, 111:2–3. For example, when Dr. Lamego left Cercacor for Apple, he told Kiani he was going to be working on something completely different; and, when Dr. Lamego left Apple, Dr. Lamego's close friend Dalvi reported to Kiani that Dr. Lamego left because Apple asked him to compete with Masimo. Kiani ¶¶ 205, 215.

60.     Plaintiffs allege that, under the discovery rule, the statute of limitations on this claim did not begin to run until January 2016, when Dr. Lamego announced his founding of True Wearables and planned release of the Oxxiom device. Because this information would have triggered a reason to suspect Dr. Lamego's loyalty to his former employer, and because Defendants present no earlier date on which the statute reasonably should have begun to run based on the

_____

[1]     During closing argument, Defendants noted that, in reviewing Dr. Lamego's analysis, Merritt did not conclude that Dr. Lamego did anything intentionally wrong. 5/16 Tr. 29:7-11.

17

1    discovery rule, this claim is timely.

2

3           **E.     Trade Secrets**

4           61.     To prove a claim for misappropriation under the California Uniform

5    Trade Secrets Act (CUTSA), Masimo must prove (1) the existence and ownership

6    of a trade secret, and (2) misappropriation of the trade secret.  Cal. Civ. Code §

7    3426.1.

8           62.     Under CUTSA, a trade secret is information that: (1) derives

9    independent economic value, actual or potential, from not being generally known

10   to the public or to other persons who can obtain economic value from its disclosure

11   or use;  and (2) is the subject of efforts that are reasonable under the circumstances

12   to maintain its secrecy.  Cal. Civ. Code § 3426.1(d).

13          63.     "The standard to show that trade secrets derive [independent]

14   economic value is not a high standard." Cisco Sys., Inc. v. Chung, 462 F. Supp. 3d

15   1024, 1052 (N.D. Cal. 2020). "To have independent economic value, a trade secret

16   must be sufficiently valuable and secret to afford an actual or potential economic

17   advantage over others." Id.

18          64.     "The [generally known] inquiry is not whether the alleged trade secret

19   has been publicly disclosed at all, but whether it has become 'generally known to

20   the relevant people, i.e., potential competitors or other persons to whom the

21   information would have some economic value[.]'" Kittrich Corp. v. Chilewich

22   Sultan, LLC, No. CV 12-10079-GHK-ARGx, 2013 WL 12131376, at *4 (C.D.

23   Cal. Feb. 20, 2013) (quoting DVD Copy Control Ass'n, Inc. v. Bunner, 116 Cal.

24   4th 241, 251 (2004)).

25          65.     Masimo bears the burden of proving trade secret misappropriation by

26   a preponderance of the evidence. Sargent Fletcher, Inc. v. Able Corp., 110 Cal.

27   App. 4th 1658, 1667 (2003).

28          66.     As an initial matter, the Court finds that Masimo has proven that

                                              18

Case 8:20-cv-00048-JVS-JDE   Document 1333-1   Filed 02/21/23   Page 55 of 116   Page ID
#:133172
Case 8:18-cv-02001-JVS-JDE   Document 600   Filed 11/07/22   Page 21 of 75   Page ID
#:39553

1   Asserted Trade Secrets 1 (partial), 8, 9, and 12 meet the requirements of Cal. Civ.

2   Code § 3426.1(d)(2), because Masimo made reasonable efforts to maintain their

3   secrecy. For the reasons explained below, alleged TS5 and TS11 do not qualify for

4   trade secret protection.

6   **Trade Secret 1:** ██████████████

7       67.    Trade Secret 1 is: █ ████████████

8   ████████████████████████████████

9   ████████████████████████████████

10  ████████████████████████████████

11  ████████████████████████████████

12  ████████████████████████████████

13  ████████████████████████████

14      68.    Masimo has demonstrated the existence and ownership of TS1 with

15  respect to pulse rate and oxygen saturation. For example, ADS-1022 explains how

16  Masimo uses TS1 in the Masimo SET pulse-rate algorithm. _See_ JTX–491 at 6;

17  McNames ¶¶ 48–68; _see also_ 3/15 Tr. 200:23–201:21 (Diab testifying that ADS-

18  1022 discloses TS1 ████████████████████████[2]

---

20  [2]    To the extent Defendants' objection to Diab's direct testimony implicates this

21  trial testimony because it references paragraph 99 of Diab's direct testimony, _see_ Dkt. 501 at 5,
    the objection is overruled. Defendants object on the basis that it lies "beyond the scope of Diab's

22  previously served Expert Disclosure of Mohamed Diab pursuant to Fed. R. Civ. P. 26(a)(2)(C)

23  (June 21, 2021) [available at Dkt. 573-4]." Dkt. 501 at 5. But the scope of Diab's expert
    disclosure includes but is not limited to the fact that he "ha[s] developed physiological parameter

24  measurement technologies for over 30 years," including "development of signal processing

25  technologies to extract physiological data reliably and efficiently from detected signals from
    multiple light sources after it passes through patient tissue." Dkt. 573-4 ¶ 3; _see also_ _id._ ¶¶ 4–8

26  (explaining measuring oxygen saturation and pulse rate). Diab further disclosed that he "ha[s]

27  worked on algorithms to process and filter PPGs and related parameters for over 30 years while
    at Masimo." _Id._ ¶ 9. Accordingly, Diab's testimony concerning ████████████████

28  falls within this scope.

**Exhibit J**
**-146-**

Cercacor's source code also contains a complete implementation of TS1 with respect to pulse rate and SpO$_2$ (oxygen saturation). See McNames ¶¶ 71–82; 3/17 Tr. 56:25–58:2; JTX–76; Chen ¶¶ 79–81; see also Silvaco Data Sys. v. Intel Corp., 184 Cal. App. 4th 210, 222, 109 Cal. Rptr. 3d 27, 39 (2010) (source code is a trade secret), as modified on denial of reh'g (May 27, 2010), and disapproved on other grounds by Kwikset Corp. v. Superior Ct., 51 Cal. 4th 310, 246 P.3d 877 (2011).

69.     Masimo has not demonstrated the existence and ownership of this trade secret as it relates to perfusion index (pulse strength/blood flow).

70.     Diab testified that he was involved in developing this technique, which was designed to improve the pulse rate algorithm, but he did not identify development or use of the technique with respect to perfusion index. See generally Diab ¶ 62; compare id. at ¶ 63 (discussing his ████████████ concept for pulse rate), with id. ¶ 67 (discussing concept in context of oxygen saturation).

71.     Although Diab testified that this ███████████████████████ ████████████████████████████████████ ████████████████ id. ¶ 69, no evidence was presented concerning applying this technique to improve perfusion index accuracy. The Court assumes that if Masimo had employed it in this specific manner, this evidence would be readily available, as it was for pulse rate and oxygen saturation.

72.     For the portion of TS1 that has been established, Masimo has also demonstrated that it derives independent economic value from being secret.

73.     Dr. McNames explained that TS1 provides a "competitive edge to Masimo" because "Masimo uses it to ensure that the measured parameters are robust in the presence of noise." McNames ¶ 70. Further, [p]ulse oximetry measurements are sensitive to movement and data is easily corrupted," so "[d]esigning algorithms that are robust to outliers improves performance." Id. "There is value in having better performance than the competition." Id.

74.     Therefore, the Court agrees with Dr. McNames that "Trade Secret 1

20

1  has value from not being used by competitors." Id. Likewise, Diab explained that

2  the ability of Masimo's pulse oximeters to provide more accurate results makes

3  them superior to competitor products. See, e.g., Diab ¶¶ 83–85; accord Diab Rule

4  26 Disclosure ¶ 11 (Dkt. 573-4).

5      75.    Masimo has met its burden to demonstrate that Defendants

6  misappropriated the established portion of TS1.

7      76.    "Plaintiffs alleging trade secret misappropriation may prove such

8  misappropriation by circumstantial as well as direct evidence." Brocade Commc'ns

9  Sys., Inc. v. A10 Networks, Inc., 873 F. Supp. 2d 1192, 1212 (N.D. Cal. 2012), on

10  reconsideration in part, No. C 10-3428 PSG, 2012 WL 12925716 (N.D. Cal. July

11  8, 2012).

12      77.    To establish misappropriation, transfer of "the information need not

13  be in writing but may be in the employees' memory." Mattel, Inc. v. MGA Ent.,

14  Inc., 782 F. Supp. 2d 911, 967 (C.D. Cal. 2011) (citing Greenly v. Cooper, 77 Cal.

15  App. 3d 382, 392, 143 Cal. Rptr. 514, 521 (1978)).

16      78.    Diab testified that, "over many months, [he] provided Dr. Lamego the

17  details" of TS1, including ██████████████████████████████

18  ███████████████████████████████████████ Diab ¶ 97;

19  see also id. at 122. Further, Diab explained that Dr. Lamego had access to ADS-

20  1022. Id. ¶ 98.

21      79.    Although Masimo did not present direct evidence of misappropriation,

22  strong circumstantial evidence supports a finding of misappropriation. For

23  example, at trial, Defendants' expert, Dr. Chris Daft, admitted that the Oxxiom

24  ██████████████████████████████████████████ and that

25  this improves the performance of the Oxxiom. 3/18 Tr. 194:17–195:11.

26      80.    Additionally, the Oxxiom pulse rate algorithm ████████████████

27  ████████████████████████ McNames ¶ 91. The function

28  "calculatesAverageMeasurements" calls the function ████████████ using the

21

Case 8:20-cv-00048-JVS-JDE    Document 1333-1    Filed 02/21/23    Page 58 of 116    Page ID
#:133175
Case 8:18-cv-02001-JVS-JDE    Document 600    Filed 11/07/22    Page 24 of 75    Page ID
#:39556

1    ███████████████████████ Id. ¶ 92.█████████████████

2    ██████    See Diab ¶¶ 63, 120, 123; <u>see also</u> McNames ¶ 64 (term not used

3    elsewhere); <u>accord</u> Daft ¶ 105; 3/18 Tr. 195:18–197:8 (Daft, same); 3/22 Tr.

4    50:20–51:23 (Baer, same). This "fingerprint" found in the Oxxiom source code

5    supports misappropriation. <u>See generally</u> McNames ¶ 64; 3/22 Tr. 118:6–119:20.

6      81. Defendants attempted to distinguish Oxxiom's code from TS1, but the

7    Court finds persuasive Dr. McNames's testimony that Masimo's ███████████

8    takes ████████████████████████████████████

9    ████████████████████████████████

10   ████████████████████████████████████████

11   ██████    3/22 Tr. 119:13–18.

12     82. Accordingly, the Court concludes that Defendants misappropriated

13   TS1.

14     83. In the context of is trade secrets analysis, the Court sustains

15   Defendants' objections to the McNames testimony that was not disclosed in his

16   June 21, 2021 expert report. <u>See</u> Dkt. 501, at 16–20. Although the Court set dates

17   for rebuttal report (<u>see</u> Dkt. 141), no rebuttal report was produced of which the

18   Court is aware. Accordingly, the rebuttal opinions that were apparently introduced

19   for the first time at trial violate Rule 26(e)(2). Plaintiffs have not provided any

20   analysis suggesting why this information could come in for the first time at trial,

21   and it is therefore excluded.  <u>See</u> Fed. R. Civ. P. 37(c).

22     84. The Court finds unpersuasive Defendants' argument that TS1 was

23   generally known to the public or other persons who can obtain economic value

24   from its disclosure or use, particularly in the relevant field.

25     85. Defendants' expert Baer did not offer an opinion to rebut Plaintiffs'

26   evidence on this point. 3/22 Tr. 47:9–15.

27     86. The Court disagrees with Defendants' expert Daft that JTX-463, U.S.

28   Patent No. 9,675,286 assigned to Masimo, publicly disclosed ███████████

22

1   █████████ TS1 █████████████████████████████████████ <u>Cf.</u> Daft ¶

2   104██████████████████████████████████████ ADS-1022 (JTX-

3   491) and Cercacor source code are "a matter of general knowledge to persons in

4   the signal processing and pulse oximetry industry"). The Court finds this opinion

5   conclusory and therefore unhelpful. <u>See, e.g.</u>, <u>Cellspin Soft, Inc. v. Fitbit, Inc.</u>, No.

6   4:17-CV-05928-YGR, 2022 WL 2784467, at *1 (N.D. Cal. June 15, 2022)

7   (declining to give weight to conclusory expert opinion). In contrast, the Court finds

8   helpful the detailed testimony cited above concerning the uniqueness of Masimo's

9   ████████████

10      87.    None of Daft's other cited references disclose TS1. <u>See</u> Daft ¶ 106;

11   3/18 Tr. 193:5–194:16████████████████████████████████

12   199:9–205:5███████████████████████████████████

13   ████████████████████ 3/18 Tr. 194:1–16██████████████████

14   █████████████████████████████

15      88.    The Court agrees with McNames that the Oxxiom contains all of the

16   elements of the established portion of TS1. <u>See</u> McNames ¶¶ 83–97.

17      89.    Because the Court finds persuasive McNames's opinion on TS1, the

18   Court disagrees with Daft that the Oxxiom lacks the TS1 elements███████████

19   ████████████████████████████████████ and ████████████████

20   ████████████████████████████ Daft ¶ 116.

21      90.    Based on the foregoing, the Court finds that Defendants

22   misappropriated the established portion of TS1.

23

24   **Trade Secret 5:**████████████████████████

25      91.    Trade Secret 5 is: ████████████████████████

26   ████████████████████████████████████████████

27   ██████████

28   ██████████████████████████████████████████

23

**Exhibit J**
**-150-**

92.     Kiani testified that Masimo maintained the confidentiality of TS5 until 2019, when it publicly announced the Radius PPG (for the professional care field) in 2019, and Masimo Sleep (for consumer).  Kiani ¶¶ 127–28; 3/15 Tr. 138:8–139:5.

93.     If the Radius PPG embodies TS5, then the Court find that TS5 either does not constitute a trade secret or it does not derive independent economic value from being secret in light of other wireless, wearable pulse oximeters and/or sensors available at the relevant time. That Masimo believes it created a device superior to prior devices does not mean this stated "plan" qualifies as a trade secret.

94.     For example, the Mendelson Publication, published in 2005, discloses a wireless and wearable pulse oximeter that can be used inside and outside the patient care field. JTX-251. Although this device uses IEEE 802.11b rather than Bluetooth, the Court agrees with Daft that, because Bluetooth was being incorporated in medical devices starting in 2003, "the public and those who can obtain economic value from Trade Secret 5 would have been well aware that Bluetooth could also be used in connection with the device disclosed in this publication." Daft ¶ 129.

95.     As another example, the Morris Publication, published in 2008, discloses a wireless wearable pulse oximeter that uses Bluetooth. JTX-249. The disclosed device could be used by "home users, researchers, clinicians, etc." See id. Fig. 3 & ¶¶ 21, 25, 29.

96.     Daft provided an additional example of a commercially available

24

Case 8:20-cv-00048-JVS-JDE   Document 1333-1   Filed 02/21/23   Page 61 of 116   Page ID
#:133178
Case 8:18-cv-02001-JVS-JDE   Document 600   Filed 11/07/22   Page 27 of 75   Page ID
#:39559

1   wireless wearable pulse oximeters.  Daft ¶ 131 (e.g., Nonin Onyx II Model 9560,

2   JTX-2997).[3]

3       97.    To the extent Masimo attempts to distinguish such devices from the

4   Radius PPG and Oxxiom because the devices are not disposable, TS5 does not

5   mention disposability.

6       98.    Plaintiffs argue that the publications and products relied on by Daft do

7   not show Masimo's ███████████████████████ but this argument is

8   unpersuasive because TS5 does not identify any such ████████████████

9   besides what Plaintiffs have disclosed as the trade secret. Plaintiffs may not expand

10  the definition now. To the extent the ████████ were to fill ████████████████

11  by creating an improved device, as stated, this cannot be a trade secret because

12  such devices were publicly known.

13      99.    Masimo cites no authority supporting the proposition that having a

14  plan to create an improved device vis-a-vis other available devices can constitute a

15  trade secret. See Agency Solutions.Com, LLC v. TriZetto Grp., Inc., 819 F. Supp.

16  2d 1001, 1017 (E.D. Cal. 2011) ("Ideas or concepts are not, in and of themselves,

17  trade secrets. [Likewise,] [p]roprietary ways of doing the same thing that others in

18  the same field do are not trade secrets." (citations omitted)).

19      100.   Because Masimo has not shown the existence and ownership of a

20  trade secret, there can be no misappropriation. See Cal. Civ. Code § 3426.1.

21

22  **Trade Secret 8:** ██████████████████████████

23      101.   Trade Secret 8 is: ██████████████████████████████

24  ████████████████████████████████████████████████

25  ████████████████████████████████████████████████

26  _____

27      [3]      The Court overrules Plaintiffs' hearsay objection to Daft's reference to this
    website. Experts may rely on hearsay to form their opinions. Further, the cited material falls
28  under the residual exception of Federal Rule of Evidence 807.

102.   Masimo has demonstrated the existence and ownership of TS8.

103.   Jesse Chen developed this algorithm when he was working on the ████████ Chen ¶ 66. The algorithm measures SpHb despite being disturbed by motion. Id.; see also JTX-1041 (attaching ████████████████ Matlab template), JTX-1042 (Matlab file), JTX-2503 (Cercacor software). The purpose of the algorithm is to filter noise from the signal measured by the photodetector, thereby removing parts of the signal unrelated to pulse rate. Chen ¶ 69. ████████████ ████████████████████████████████████████ Id. ¶ 70. ████████ ████████████████████████████████████████████████████ ████████████████████ Id.

104.   Masimo has also demonstrated that TS8 derives independent economic value from being secret. Dr. McNames explained persuasively that "[a]n accurate pulse rate for a noninvasive monitor is important to users and clinicians," and therefore TS8 "has value from not being used by competitors." McNames ¶ 124; see also 3/16 Tr. 105:3–106:21 ████████████████████████████████ ████████████████████████████████████████████████████████████ ████████

105.   The fact TS8 would not work for ████████████ does not undermine Masimo's showing of ongoing potential value of this trade secret (e.g., Masimo could decide to use it in a future device or implementation).

106.   Masimo has met its burden to demonstrate that Defendants misappropriated TS8.

107.   Although Masimo did not present direct evidence of misappropriation, strong circumstantial evidence supports a finding of misappropriation. For example, McNames explained how the Oxxiom uses TS8. McNames ¶¶ 187–97.

Exhibit J
-153-

1  Defendants did not cross-examine McNames on TS8, and the Court accepts his

2  direct testimony as credible.

3      108.  Additionally, U.S. Patent Application No. 16/198,335 (the "'335

4  Application"), JTX-452, which is assigned to True Wearables and lists Dr. Lamego

5  as an inventor, discloses TS8. <u>See</u> McNames ¶¶ 126–92, 194, 196. ███████████

6  ████████████████████████████████████████████████████

7  ████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████

9  ████████████████████████████████████████████████

10  ████████  Defendants' use of this code demonstrates that they recognized the

11  efficiency of the approach. McNames ¶ 197.

12      109.  Defendants attempted to distinguish Oxxiom's code from TS8, but on

13  cross-examination, Baer admitted that the Oxxiom implements a ███████████

14  ███████████████████████████████████  3/22 Tr. 57:8–60:3.

15  ██████████████████████████  Baer also agreed that the Oxxiom

16  calculates ██████████████████████████  3/22 Tr.

17  60:1–15.

18      110.  Based on these specific similarities, the Court finds unpersuasive

19  Daft's attempt to distinguish the Oxxiom code from TS8 as being "████████"

20  Attempting to distinguish Defendants' use of a "███████████████" whereas

21  Masimo uses an "empirical approach" is unhelpful because it does not address

22  misappropriation in this case legally or factually. In the context of this case, which

23  is what matters, it is a distinction without a difference. <u>See</u> McNames ¶ 202.

24      111.  The Court finds unpersuasive Defendants' arguments that various

25  publications show that TS8 is generally known. None of the publications, including

26  Masimo patents, shows that TS8 is generally known to the public or to other

27  persons who can obtain economic value from its disclosure or use, particularly in

28  the field of noninvasive blood content estimators. <u>See</u> U.S. Patent Nos. 6,002,952

**Exhibit J**

**-154-**

1  (JTX-2895), 5,632,272 (JTX-2894), and 8,498,684 (JTX-2896).

2      112.   Based on the foregoing, the Court finds that Defendants

3  misappropriated TS8.

4

5      **Trade Secret 9:** ███████████████████████████████ -

6      113.   Trade Secret 9 is: ██████████████████████████

7  █████████████████████████████████████████

8  ████████████████████████████████████

9  ████████████████████████████████████████

10 ██████████████████████████████████

11     114.   Masimo has demonstrated the existence and ownership of TS9.

12     115.   As discussed herein, companies use various algorithms in pulse

13 oximeters. TS9 requires knowing to select a particular pair of algorithms from

14 among many available algorithms. Diab ¶¶ 127–29[4]; McNames ¶¶ 216–17.

15     116.   First, ██████████████ algorithm is used to determine if a

16 detected pulse ██████████████████████████████

17 ███████ Chen ¶ 78. Second, the ████████████████ is discussed above

18 with respect to TS8.

19     117.   Masimo included this trade secret in ADS-1022, the design

20 specification document discussed above with respect to TS1. See JTX-491 at

21 MASM0140671–80; see Diab ¶ 158 (ADS-1022 explains ███████████████

22 ██████████████████████████

23     118.   Masimo has shown that TS9 derives independent economic value

24 from being secret.

25     119.   Specifically, TS9 provides a competitive edge in calculating pulse rate

26 ────────────────

27     [4]   The Court overrules Defendants' objection to the paragraphs of Diab's direct
   testimony cited in support of the TS9 analysis. See Dkt. 501 at 5. The cited paragraphs fall

28 within the scope of Diab's Rule 26(a)(2)(C) disclosure. See Dkt. 573-4 ¶¶ 9–10, 14.

using ███████████████. When designing algorithms, there are hundreds of different possible approaches. The only way to determine whether an algorithm will be successful is to test it with real data. Collecting data is expensive and requires time. See McNames ¶¶ 245–46; Diab ¶¶ 160–61, 163–65. Therefore, keeping this test-based combination secret is valuable to Masimo.

120.   Masimo has met its burden to demonstrate that Defendants misappropriated TS9.

121.   This is because the Oxxiom uses the ███████████████ recited in TS9. McNames ¶¶ 261–69.[5] The Oxxiom source code supports this conclusion. McNames ¶¶ 249, 261–68.

122.   The Oxxiom uses a ███████████ to compare the incoming data. ███████████████████████████████ 3/22 Tr. 119:21–120:21.

123.   The Oxxiom also uses a ███████████████ as discussed above for TS8.

124.   Defendants' patent applications also use the combination of the ███████████████████████████ See, e.g., JTX-3245 (U.S. Patent Publication 2021/0022676A1 (the "'676 Publication")); see also McNames ¶ 247.

125.   The '676 Publication discloses ███████████████████ It also discloses ███████████████████ ███████████████████ McNames ¶¶ 249–53; see also JTX-141 at TRUE048117–18, TRUE048120–21, TRUE048254, TRUE048261.

126.   The '676 Publication follows the same approach as described in the

---

[5]      The Court sustains Defendants' objection to ¶ 262 insofar as that paragraph references "other versions of the Oxxiom App." that were not disclosed in the June 21, 2021 McNames Report.

1   Cercacor Real-Time Pulse Rate Flow Chart. █████████████████████

2   ████████████████████████████████████████████████████████████

3   ███████████████████████████████████████████████████

4   ████████████████████████   Dr. Lamego's adoption of this approach appears

5   to be copied from the Cercacor Real-Time Pulse-Rate algorithm. See McNames ¶¶

6   254–58.

7        127.   The Court finds it was not a coincidence that Dr. Lamego selected the

8   same ████████████████   from amongst the vast number published in the

9   literature for his implementation at True Wearables.

10       128.   McNames persuasively explained that the '676 Publication discloses a

11   ████████████████   algorithm as well. McNames ¶¶ 247–59.

12       129.   As discussed previously, Defendants use ██████████████

13   ████████   with respect to TS8. McNames ¶ 268. Daft did not directly address

14   McNames's analysis of the ██████████████   of TS9 for the Oxxiom code

15   or Defendants' patent applications. Instead, as he did for other trade secrets, Daft

16   opined that True Wearables uses a ████████████   approach rather than analyzing

17   empirical data. Daft ¶¶ 236–37.

18       130.   Based on the foregoing, the Court concludes that the '676 Publication

19   discloses, and the Oxxiom uses, TS9.

20       131.   That Dr. Lamego used a different programming language in

21   developing the Oxxiom does not change this conclusion. Algorithms are not

22   limited to a single implementation, and there are multiple ways to express an

23   algorithm in source code. 3/22 Tr. 41:14–41:25. A difference in programming

24   language alone carries little weight when viewed against the evidence of

25   misappropriation.

26       132.   The Court finds that the publications proffered by Defendants' experts

27   do not destroy the trade secret. In granting Masimo's preliminary injunction

28   motion, the Court already held, and the Federal Circuit affirmed, that a publication

30

Case 8:20-cv-00048-JVS-JDE    Document 1333-1    Filed 02/21/23    Page 67 of 116    Page ID
#:133184
Case 8:18-cv-02001-JVS-JDE    Document 600    Filed 11/07/22    Page 33 of 75    Page ID
#:39565

1  does not mean the subject matter is generally known under CUTSA. Dkt. 257 at
2  12-13.

3       133.   For example, at trial, Defendants asked Chen about ███████████
4  ██████████████████████ but he had never seen it. 3/16 Tr. 116–18.

5       134.   McNames explained that the ██████████ does not disclose ██████████
6  ████████████████████████ 3/17 Tr. 65:5–19; see JTX-2898. Rather, it
7  discloses ████████████████████████████████ 3/17 Tr. 65:20–24.
8  Further, McNames explained that the patent is not about analyzing ███████████
9  █████████████████████████████████████████████████████████
10 3/17 Tr. 63:25–66:23.

11      135.   Daft's analysis does not demonstrate that TS9 was publicly available.
12 For example, the pictures from Masimo's website show the use of five algorithms
13 in parallel.██████  Daft ¶¶ 216, 220. Those algorithms did not include the
14 ████████████████████████ 3/22 Tr. 28:13–29:22.

15      136.   Further, Daft mistakenly identified████████████████████████
16 ██████████████████████ Daft ¶ 218 ████████████████████████████
17 ██████████████████████ 3/22 Tr. 28:5–7 ████████████████████
18 ██████████████████████ 3/17 Tr. 5:5–18 ████████████████████████████
19 ████████████████████████

20      137.   Daft testified that there are so many pulse oximetry algorithms,
21 numbering in the thousands, that the number is unknowable. 3/22 Tr. 22:24–23:5.
22 Given this vast number, Daft provided no reason to select, or showed an example
23 of a published reference selecting, ████████████████████████ TS9.

24      138.   The vast number of available algorithms would lead to billions of
25 possible combinations. Accordingly, the Court finds it implausible that Dr.
26 Lamego would independently arrive at the same combination.

27      139.   Based on the foregoing, the Court finds that Defendants
28 misappropriated TS9.

31

**Trade Secret 11: Fundamentals of Development**

140.   Trade Secret 11 is: ████████████████████████

█████████████████████

███████████████████████████

██████████████████

████████████████████████████████

█████████████████████████████

141.   Masimo has not demonstrated the existence and ownership of TS11.

142.   TS11 was generally known to persons who can derive economic benefit from its use or disclosure. TS11, as defined by Masimo, is so broad that it encompasses nearly all commonplace uses of mathematical models in medical science and biology over the last century. Goldstein ¶ 22.

143.   TS11 is so broad that it would cover standard mathematical tools (mathematical models and least-squares optimization) that are used extensively in every scientific sub-field.

144.   These methods are so basic that they are part of the nationwide high school data science curriculum established by the College Board. See JTX-3431; Goldstein ¶ 24. Many of these optimization problems are generally known and described in industry literature, including textbooks. See, e.g., Lamego ¶ 64, JTX-2847 (textbook purchased for Cercacor employees).

145.   It is commonplace for any course on signal processing, statistics, electrical engineering, or medical data science to contain units on optimization, including least-squares methods. A good reference for learning about least-squares minimization methods is the video "Introduction to residuals and least-squares regression," available on the Khan Academy website. See JTX-2842; Goldstein ¶¶ 27, 28.

146.   Optimization principles in the fields of noninvasive monitoring and signal processing (which are overlapping fields) were well-known to employees

32

Case 8:20-cv-00048-JVS-JDE   Document 1333-1   Filed 02/21/23   Page 69 of 116   Page ID
#:133186
Case 8:18-cv-02001-JVS-JDE   Document 600   Filed 11/07/22   Page 35 of 75   Page ID
#:39567

who worked in the industry. <u>See, e.g.,</u> Paul (TW) ¶ 3.[6] For example, when Paul was

a Cercacor employee, and prior to 2014, he regularly read industry publications

and books on optimization principles. <u>Id.</u> ¶ 30. Paul noted that Dr. Lamego

purchased a textbook on optimization called Convex Optimization. <u>Id.</u> (referring to

JTX-2847).

147.   Paul testified credibly that he understood he could take the

optimization principles discussed in Convex Optimization, as well as other

literature, and apply those principles in the context of noninvasive monitoring and

signal processing. <u>Id.</u> ¶ 31. He understood that optimization principles were

applicable to many fields, including noninvasive monitoring and signal processing.

<u>Id.</u>

148.   Least-squares optimization. ████████████████████████

████████████████████████████ is widely known as a tool in biological

sensing at large. Virtually every process in data science requires ███████████

████████████████████████        For example, "Fitting Models to

Biological Data using Linear and Nonlinear Regression" by Motulsky and

Christopoulos (2003), covers this process. <u>See</u> JTX-453; Goldstein ¶ 31.

149.   More specifically, the entirety of TS11 is disclosed in the widely used,

generally known book, "Design of Pulse Oximeters" by J. G. Webster (1997).

JTX-454. This book has been cited over 900 times. Goldstein ¶ 32.

150.   McNames did not rebut this proposition with any detail. McNames ¶

195 (offering conclusory opinion that "the book 'Design of Pulse Oximeters,'

edited by J G Webster, does not disclose the approach used by Cercacor and True

Wearables").

---

[6]      The Court overrules Plaintiffs' Rule 701 objection (Dkt. 526-9) to this statement
because Paul's statement is permissible to the extent he is speaking based on his own personal
knowledge as someone who works in the relevant industry. The Court does not construe Paul's
testimony as opinion testimony from an undisclosed expert witness.

33

1     151.   Webster explains how ███████████████ can be used as inputs

2   to linear regression methods that minimize a cost function in a least-squares sense

3   between data and the indexed model. In Section 9.3, after providing a standard

4   formula for minimizing a loss function in the least-squares sense (JTX-454, p. 147,

5   equation 9.33), Webster explains why least-squares regression was so well suited

6   to pulse oximetry: "Furthermore doing a linear regression over the sample points

7   not only eliminates the noise caused by patient movement of the oximeter, it also

8   decreases waveform noise caused by other sources." See Goldstein ¶ 34.

9     152.   Further, in 1997, a standard implementation of pulse oximetry taken

10   directly from Webster's book includes the efficacy and use of setting up

11   optimization problems for non-invasive monitoring applications by comparing

12   ████████████████████████████████████████

13   ████████████████████████████████████████

14   ████████████████████████████████████████

15   ████████████   Id. ¶ 37.

16     153.   Thus, Webster discloses TS11 in its entirety and this disclosure was

17   generally known to persons who can derive economic benefit from its use or

18   disclosure.

19     154.   The Court finds unpersuasive the testimony from McNames stating

20   that TS11 is not disclosed or generally known in the relevant field. See McNames

21   ¶¶ 313–22.

22     155.   Second, even assuming for the sake of argument that Masimo's

23   description of TS11 includes something more than was generally known, Masimo

24   has not shown what that is.

25     156.   McNames testified that workshops presented by Dr. Lamego contain

26   "aspects" of TS11, but he could not point to anything encompassing the entirety of

27   the claimed technique. McNames observed that neither Masimo nor Cercacor

28   practices TS11. McNames Direct ¶ 287; 3/16 Tr. 195:1–196:17.

Case 8:20-cv-00048-JVS-JDE   Document 1333-1   Filed 02/21/23   Page 71 of 116   Page ID
#:133188
Case 8:18-cv-02001-JVS-JDE   Document 600   Filed 11/07/22   Page 37 of 75   Page ID
#:39569

157.   Because TS11 cannot qualify as a trade secret, the Court does not reach misappropriation.

**Trade Secret 12:** ███████████████ **("TSS")**

158.   ████████████████████████████

35

159.   Masimo has demonstrated the existence and ownership of TS12.

160.   The Court previously explained TS12 in detail in the order granting Masimo's Motion for a Preliminary Injunction. See Dkt. 257 at 1–8. The Court incorporates that discussion by reference.

161.   Broadly, the TSS is a framework for linear and quadratic optimization algorithms that solve some linear and quadratic programming problems much faster than established algorithms, such as those provided by Matlab. McNames ¶ 353. The TSS framework demonstrates how problems ████████████ ████████ can be solved ████████████████████████ ████████ JTX-79; McNames ¶¶ 353–66.

162.   The TSS uses ████████████████████ Generally, ████████████ used to determine when ████████████████████████████. McNames ¶¶ 367–68.

163.   The TSS can ████████████████ solution more quickly than known linear or quadratic program solvers. The speed difference can be significant depending on the specifics of the problem to be solved. McNames ¶ 369.

164.   Because the TSS is able to provides solutions much faster than alternatives, it makes real time processing feasible on devices with lower processing power or energy usage constraints. Thus, there is a competitive advantage to knowing how to use the TSS to estimate an optimization variable in biosensing applications to ████████████████████████████. See McNames ¶ 374; Diab ¶¶ 226–27; Chen ¶¶ 52–57.

165.   Accordingly, Masimo has shown that TS12 derives independent economic value from being secret.

166.   The Court finds unpersuasive Defendants' argument that various publications show TS12. None of these publications shows that TS12 is generally known to the public or to other persons who can obtain economic value from its

36

Case 8:20-cv-00048-JVS-JDE   Document 1333-1   Filed 02/21/23   Page 73 of 116   Page ID
#:133190
Case 8:18-cv-02001-JVS-JDE   Document 600   Filed 11/07/22   Page 39 of 75   Page ID
#:39571

disclosure or use, particularly in the field of noninvasive blood content estimators.

167.   In the order granting Masimo's Motion for a Preliminary Injunction, the Court previously rejected Defendants' reliance on two IEEE papers found by Goldstein, Defendants' expert, during this litigation. Dkt. 257 at 12–13. Both this Court and the Federal Circuit rejected Goldstein's reliance on those articles. The articles did not show that the TSS was generally known in the pertinent field. Id.; see also Dkt. 302 at 4–5, Dkt. 424 at 7–8.

168.   Masimo also has shown that Defendants misappropriated TS12.

169.   Dr. Lamego's handwritten notebook from True Wearables includes a page marked "TRADE SECRET #3." JTX-314 at TRUE052893_A. The problem and solution depicted therein rely on the TSS method and framework. McNames ¶ 441; see also id. at ¶ 442, JTX-314 at TRUE052895–96, TRUE052898 (another example), JTX-315 at TRUE052591_A (same).

170.   Dr. Lamego also filed patent applications including the TSS. McNames ¶ 465; 3/18 Tr. 48:3–49:25.

171.   In granting Masimo's Motion for a Preliminary Injunction, the Court analyzed Defendants' use of TS12 in the '158 Application in detail.  See Dkt. 257 at 14–16. The Court incorporates that discussion by reference. See also McNames ¶¶ 375–83, 389–96 (comparing TSS with '158 Application).

172.   True Wearables' '504 Application, which relies on the '158 Application for priority, also describes the TSS. JTX-2203 at TRUE028814; JTX-2204; AF-19; McNames ¶ 376.

173.   In prosecuting the '504 Application, Dr. Lamego argued to the Patent Office that the TSS is novel, nonobvious, and patent eligible. McNames ¶ 465; 3/18 Tr. 49:5–50:19; JTX-314 at TRUE052893_A; JTX-2367 at TRUE049688–89.

174.   Although Dr. Lamego believes that whatever he could remember in his head from his time with Plaintiffs became his, 3/17 Tr. 131:17–132:6, this belief is contrary to trade secret law.

37

175.   Accordingly, the Court finds that Defendants misappropriated TS12.

Harm

176.   Where the Court has found misappropriation as to certain trade secrets, the Court also finds harm to Masimo flowing from the misappropriation. Specifically, Masimo faces an ongoing threat that Dr. Lamego will use, disclose, and destroy the trade secrets or try to claim them as his own. For example, as stated, Dr. Lamego prosecuted patent applications that contain some of the trade secrets. See JTX-2203; JTX-2367.

177.   The evidence establishes that Masimo's trade secrets were discovered after extensive research, brainstorming, experimentation and testing, repeated trial and error, and years of collecting physiological data on thousands of patients to test Masimo algorithms. These efforts occurred over the course of more than a decade while Masimo invested over one hundred million dollars in research and development. These discoveries resulted in various new technological products that no other company has replicated, even after more than ten years. Diab ¶ 228. Loss of these trade secrets would be harmful.

178.   Given the circumstances surrounding the development of Masimo's trade secrets, the Court finds it would be highly improbable for any engineer or group of engineers to quickly recreate any of Masimo's trade secrets, much less several of them together. Diab ¶¶ 229–39.

179.   Protecting its trade secrets is key to Masimo's success. 3/22 Tr. 123:12–17. The Court credits Masimo's concern that this misappropriation could lead to the trade secrets eventually being disclosed to Masimo's competitors (e.g., Apple, Medtronic). This is especially true where Dr. Lamego remains in close contact with former colleagues who now work for a competitor. 3/18 Tr. 108:9–12, 126:4–13; 133:20–134:4; 132:17–19; 134:5–11.

\\\

\\\

Willfulness & Maliciousness

180. If a defendant willfully and maliciously misappropriates a trade secret, the Court may award exemplary damages in an amount up to twice Masimo's recovery for Defendants' unjust enrichment arising from the misappropriation. Cal. Civ. Code § 3426.3(c).

181. "[T]he existence of willful and malicious misappropriation is ordinarily considered a fact that [the finder of fact] must find by clear and convincing evidence. Mattel, Inc. v. MGA Entm't, Inc., 801 F. Supp. 2d 950, 952 (C.D. Cal. 2011).

182. If willful and malicious misappropriation is shown, the Court calculates exemplary damages as a form of equitable relief. See id. at 953.

183. Further, if the Court finds willful and malicious misappropriation, it "may award reasonable attorney's fees and costs to the prevailing party. Cal. Civ. Code § 3426.4. Recoverable costs include "a reasonable sum to cover the services of expert witnesses, who are not regular employees of any party, actually incurred and reasonably necessary in either, or both, preparation for trial or arbitration, or during trial or arbitration, of the case by the prevailing party." Id.

184. The Court finds that Plaintiffs have not carried their burden to demonstrate by clear and convincing evidence that Dr. Lamego's misappropriation was willful and malicious.

185. Although Dr. Lamego expressed disagreement with Plaintiffs' business practices, he also displayed confusion about what information he could continue to use versus what information constitutes protected trade secrets. See 3/17 Tr. 131:22–132:6 ("it's very difficult for you to try to separate your tasks from your know-how"); 3/17 Tr. 131:14–16 (mistakenly believing "my know-how is my property"); 3/17 Tr. 131:14–21 ("What I have absorbed in my mind, my knowledge, is my know-how, right?").

186. Further, although Dr. Lamego criticized Plaintiffs, this hyperbolic

Exhibit J
-166-

criticism is more akin to puffery about the claimed superiority of True Wearables than evidence of maliciousness and willfulness. See, e.g., JTX-51 ("our technology is so good that it is upsetting the competition, and this is priceless"); 3/18 Tr. 58:14-59:15 (Dr. Lamego sought to "build something that would not compete with Masimo.  It would remove Masimo from the map in terms of the pulse oximeter product."), 60:21–61:12 (discussing JTX-304, where Dr. Lamego denigrates Masimo to Fidelity's CEO, knowing that Fidelity was a large Masimo investor).

187.   After carefully observing Dr. Lamego's demeanor at trial, and considering the entirety of his testimony, including testimony in response to direct questions from the Court, the Court concludes that Dr. Lamego is a disgruntled employee who can be overly dramatic, but this does not equate with finding by clear and convincing evidence that he took anything willfully and maliciously.

Defenses

188.   Where the Court finds misappropriation, the Court rejects Defendants' independent development defense because Defendants failed to corroborate or support that defense with any credible evidence.

189.   Dr. Lamego presented no corroborating evidence of his unsupported claim of independent development. Indeed, Dr. Lamego claims he shredded the "copious notes" he allegedly made showing his "independent development" of Oxxiom.  3/18 Tr. 43:6–20; see also 3/18 Tr. 23:10–24:19, 27:4–25. The Court does not find this testimony credible. This finding is based upon the Court's assessment of Dr. Lamego's demeanor, including his refusal to answer questions in a direct manner, and repeatedly raising extraneous issues.

190.   As stated, Dr. Lamego mistakenly believes that whatever Masimo trade secrets he can remember in his head are his to use or disclose. 3/17 Tr. 131:17–132:6.  Dr. Lamego stated that he cannot separate the "know how" in his brain.  Id.

191.   But where he took proprietary information, even if he made certain

40

Case 8:20-cv-00048-JVS-JDE   Document 1333-1   Filed 02/21/23   Page 77 of 116   Page ID
#:133194
Case 8:18-cv-02001-JVS-JDE   Document 600   Filed 11/07/22   Page 43 of 75   Page ID
#:39575

changes for his own device, misappropriation still exists where the trade secret
forms the kernel of the accused subject matter. See SkinMedica, Inc. v. Histogen
Inc., 869 F. Supp. 2d 1176, 1197 (S.D. Cal. 2012) (quoting American Can Co. v.
Mansukhani, 742 F.2d 314, 328–29 (7th Cir. 1984) ("[A] party may not use
another's trade secret even with independent improvements or modifications so
long as the product or process is substantially derived from the trade secret.")).

192.   As further stated, with an unknowable number of algorithms for pulse
oximetry, see 3/18 Tr. 182:12–183:18; 3/22 Tr. 22:24–23:5, the Court finds it
implausible that Dr. Lamego could independently arrive at the same set of trade
secret algorithms found in TS1, TS8, TS9, and TS12.

193.   Further, as stated in the Court's orders on Plaintiffs' Motion for a
Preliminary Injunction and Defendants' Motion for Partial Summary Judgment,
California trade secret law forecloses Defendants' arguments concerning whether
the trade secrets were "readily ascertainable." Unlike federal law, in California, the
legislature expressly declined to include the phrase "readily ascertainable" in the
definition of trade secret. See Ann. Cal. Civ. Code § 3426.1 (1984 Legislative
Committee Comments).

194.   Thus, under the CUTSA, ready ascertainability is only a defense
insofar as the defendant actually gained knowledge of the trade secret by use of
those materials which make the trade secret readily ascertainable. See Imax Corp.
v. Cinema Techs., Inc., 152 F.3d 1161, 1168 n.10 (9th Cir. 1998); Medtronic
MiniMed, Inc. v. Nova Biomedical Corp., 2009 WL 10672947, at *1 (C.D. Cal.
Aug. 14, 2009); Sargent Fletcher, Inc. v. Able Corp., 110 Cal. App. 4th 1658,
1669, 3 Cal. Rptr. 3d 279, 286 (2003) ("Proof that defendant's use resulted from
independent derivation . . . is evidence that there was no improper use on its
part.").

195.   Assuming any asserted trade secret is readily ascertainable, for this to
be relevant, Defendants "must still show that Defendants made use of that means

41

1    of ascertainment to have a defense under the CUTSA." Dkt. 257 at 12; <u>accord</u> Dkt.

2    356 at 23. Defendants have presented no such evidence so there is no basis for the

3    Court to reconsider this ruling. Thus, the Court declines to disturb it.

4        196.   Defendants have not proven that the information contained in the

5    misappropriated trade secrets was readily ascertainable and that Dr. Lamego

6    ascertained it from publicly available sources rather than proprietary sources from

7    his time working for Plaintiffs.

8        197.   Defendants' laches defense fails where they have failed to show (1)

9    Masimo unreasonably delayed asserting or diligently pursuing a claim for

10   misappropriation of trade secrets; and (2) any delay prejudiced Defendants.  <u>See</u>

11   <u>Johnson v. City of Loma Linda</u>, 24 Cal. 4th 61, 77 (Cal. 2000).

12

13       **F.    The '848 Patent**

14            **Infringement**

15       198.   Determining utility patent infringement is a two-step process. <u>Cybor</u>

16   <u>Corp. v. FAS Techs., Inc.</u>, 138 F.3d 1448, 1454 (Fed. Cir. 1998). "First, the court

17   determines the scope and meaning of the patent claims asserted, and then the

18   properly construed claims are compared to the allegedly infringing device." <u>Id.</u>

19   (citations omitted).

20       199.   "Whether an accused device or method infringes a claim either

21   literally or under the doctrine of equivalents is a question of fact." <u>Schoell v. Regal</u>

22   <u>Marine Indus., Inc.</u>, 247 F.3d 1202, 1207 (Fed. Cir. 2001).

23       200.   At trial, Plaintiffs sought to prove that the Oxxiom[7] device infringes

24   Claim 9 of U.S. Patent No. 10,194,848 (the "'848 Patent"), which discloses a non-

25   invasive physiological sensor cover. <u>See</u> JTX-7. The claimed sensor cover is

26   _____

27       [7]      The Oxxiom comes in two models, the "Sports and Aviation" and prescription
     "Rx" model. <u>See</u> JTX-3047, JTX-245. For purposes of the Court's infringement analysis, the two

28   models are the same.

**Exhibit J
-169-**

"capable of being used with a non-invasive physiological sensor, such as a pulse oximetry sensor" for measuring oxygen content in the blood. See id., Abstract. Some embodiments "reduce or eliminate false readings from the sensor when the sensor is not in use, for example, by blocking a light detecting component of a pulse oximeter sensor when the pulse oximeter sensor is active but not in use." Id. In certain embodiments, the sensor cover also "prevent[s] damage to the sensor" and can prevent contamination. Id. at 2:36–41.

201.   Claim 9 discloses:

[9a] A sensor cover for use with a pulse oximeter sensor, the sensor cover comprising:

[9b] a cover portion configured to be adhered to a pulse oximeter sensor and removed before use of the pulse oximeter sensor; and

[9c] a protruding portion that protrudes from the pulse oximeter sensor to facilitate removal of the sensor cover, wherein:

[9d] the sensor cover is removable from the pulse oximetry sensor,

[9e] the cover portion, when adhered to the pulse oximeter sensor, covers one or more sensing components of the pulse oximeter sensor while the pulse oximeter sensor is active and blocks at least a portion of light from one or more emitters of the pulse oximeter sensor from being received by a detector of the pulse oximeter sensor.

JTX-7, Claim 9 (emphasis added).

202.   The Oxxiom is a wireless, disposable, single-use device. JTX-3047; JTX-245. It operates through the reflection of red and infrared light through physiological tissue. JTX-3047. It adheres to a user's skin with an LED emitter and photodiode detector positioned against the skin. Id.; see also JTX-245. The device reads certain physiological measurements and displays the results through a paired iOS application.

203.   As depicted below, the Oxxiom operates by the emitter emitting red

43

Case 8:20-cv-00048-JVS-JDE   Document 1333-1   Filed 02/21/23   Page 80 of 116   Page ID
#:133197
Case 8:18-cv-02001-JVS-JDE   Document 600   Filed 11/07/22   Page 46 of 75   Page ID
#:39578

and infrared light, which penetrates blood-infused skin (dermis) and interacts with
a pulsating signal from the user's heart. Some of the light is absorbed by the user's
tissue and pulsating blood flow. The light absorbs differently based on
characteristics of the user's blood such as oxygen saturation and pulse rate. Some
of the light is reflected back to the detector, which detects intensity changes in the
red and infrared wavelengths of the reflected light. These changes permit the
device and associated application to determine and display physiological data.



JTX-245.

204.   The Oxxiom user guide instructs the user to press a blue dot (depicted
below as a black dot in the bottom right-hand corner) until a green light turns on,
which brings the device into standby mode. Stone ¶ 44.



JTX-245.

205.   Once in standby mode, the user is then instructed to remove Tab 2. Id.

44

Exhibit J
-171-

1  ¶ 45. Next, the user is instructed to place the Oxxiom device on their skin, and to
2  pair the device with the app. After pairing, physiological data will be displayed in
3  waveform. Id. ¶ 46.

4      206.  Defendants' expert, Dr. Robert Stone, opined that the Oxxiom does
5  not infringe Claim 9. Stone ¶ 47. Specifically, Stone opined that the Oxxiom does
6  not meet limitation 9e because it does not contain a sensor cover that, while the
7  sensor is active, blocks at least a portion of light from one or more emitters from
8  being received by the detector. Id. ¶ 50.

9      207.  Plaintiffs' expert, Jack Goldberg, opined that the Oxxiom meets every
10  limitation of Claim 9. See Goldberg ¶¶ 116–63; JTX-238.F. The Court agrees with
11  Goldberg, except with respect to claim element 9e, which is discussed below.

12      208.  In support of non-infringement, Stone testified that Tab 2 of the
13  Oxxiom, as shown above, is not a "sensor cover," as disclosed in Claim 9, because
14  it is intended to protect adhesive that is a permanent part of the Oxxiom. Id. ¶ 53.
15  Without Tab 2, the adhesive would collect environmental debris and no longer
16  adhere to the user's skin. Id. Tab 2 also provides a contrasting background for the
17  printed labeling and pictorial instruction. Id. ¶ 43.

18      209.  The Court finds Stone's opinion regarding the intention behind Tab 2
19  irrelevant to Claim 9 because that claim does not contain the same "configured to"
20  language relevant to other disputes in this case. See, e.g., Dkt. 356 at 4, 11–12
21  (Summary Judgment Order), Dkt. 93 at 16–20 (Claim Construction Order).

22      210.  Stone also opined that Tab 2 cannot be an infringing sensor cover
23  because it does not prevent light from reaching a detector on the Oxxiom. Rather,
24  Stone explained that, when Tab 2 is in place, it diffuses light from the emitter and
25  scatters it back to the detector (i.e., the emitter light bounces off the back of Tab 2
26  and returns to the detector). Id. ¶ 53.

27      211.  Stone did not opine, however, that all of the light bounces back to the
28  detector.  Because the claim requires only a portion of the light to be blocked, the

45

1   Court finds this opinion unpersuasive.

2       212.   Next, Stone opined that, because Tab 2 is removed before the device

3   is active (i.e., paired with an app to give readings), it does not meet Claim 9's

4   limitation that the sensor cover is blocking light from reaching the detector when

5   the sensor is "active." Id. ¶ 63.

6       213.   Stone observed that the Oxxiom user guide requires removing Tab 2

7   before activating the device. Id. But Stone distinguishes between when the device

8   is "activated," i.e., by pressing the blue dot to bring the device into standby mode,

9   and "active" as required by Claim 9, which means being capable of taking

10   measurements or readings. Id. ¶ 64.

11       214.   Thus, Stone concluded that, when used as directed, "[t]he Oxxiom

12   devices are not truly 'active' (i.e., capable of making readings or able to measure)

13   until after tab 2 has been removed. Tab 2 thus does not, and is not configured to,

14   prevent the photodiode detector of the Oxxiom devices from receiving light when

15   the sensor is active. By the time the Oxxiom devices are active, tab 2 is no longer

16   present." Id. ¶ 65.

17       215.   In contrast, Goldberg, opined that, as soon as a user presses the blue

18   dot to activate the device (i.e., bringing it into standby mode), it is "active" within

19   the meaning of Claim 9 because, at that time, there is signal activity on the printed

20   circuit board (PCB). See Goldberg ¶¶ 146–153 (the processor is running, the LEDs

21   are being driven, the analog-to-digital converter that converts signals from the

22   photodetector is converting); JTX-238.F at 1–37.

23       216.   Alternatively, Goldberg opined that, even if "active" is construed to

24   mean "able to measure," Tab 2 "covers one or more sensing components of the

25   pulse oximeter sensor while the pulse oximeter sensor is active" because the

26   Oxxiom's photodiode detector "measures changes in light intensity and is therefore

27   'able to measure.'" Goldberg ¶ 154; JTX-238.F at 17–25.

28       217.   The Court finds Goldberg's analysis unpersuasive because it fails to

apply the plain and ordinary meaning of "active" as disclosed in Claim 9.

218.   First, Goldberg states that the plain and ordinary meaning of "active" is "powered on." See Goldberg ¶¶ 144–58; 3/16 Tr. 150:23–151:8. But during claim construction addressed at the summary judgment stage, the Court resolved the parties' dispute concerning the plain and ordinary meaning of "active."

219.   Specifically, the Court construed "active" as "able to measure." Dkt. 356 at 15. "Thus, 'active' refers to the sensor cover taking measurements, or being unable to do so when blocked by the claimed sensor cover." Id.

220.   Accordingly, Goldberg's first opinion is unreliable because it does not apply the plain and ordinary meaning of "active" as used in the patent. See Liquid Dynamics Corp. v. Vaughn Co., Inc., 449 F.3d 1209, 1224 n.2 (Fed. Cir. 2006) (district courts have discretion to exclude expert testimony "as irrelevant because it [is] based on an impermissible claim construction").

221.   Although the Court previously construed "active" as used in Claims 1 and 10, the Court observes that "active" is used consistently throughout the claims and there is no reason to construe it differently here. See Phillips v. AWH Corp., 415 F.3d 1303, 1314 (Fed. Cir. 2005) ("claim terms are normally used consistently throughout the patent" so "the usage of a term in one claim can often illuminate the meaning of the same term in other claims"). Further, Claim 10 depends from Claim 9, further supporting the conclusion that "active" means the same thing in both claims.

222.   Second, even where Goldberg assumed that "active" means "able to measure," as construed by the Court, his alternative opinion that the sensor is able to measure changes in light intensity is unreliable because it disregards the Court's construction of "readings."

223.   Although the Court did not state explicitly *what* the sensor had to be "able to measure," or what kind of "measurements" were being taken, the Court now makes explicit what was implicit in the summary judgment order: "able to

Case 8:20-cv-00048-JVS-JDE   Document 1333-1   Filed 02/21/23   Page 84 of 116   Page ID
#:133201
Case 8:18-cv-02001-JVS-JDE   Document 600   Filed 11/07/22   Page 50 of 75   Page ID
#:39582

1   measure" means "able to measure readings."

2   224.   In the summary judgment order, the Court construed "readings" as

3   having its plain and ordinary meaning, which the parties disputed. The Court

4   resolved that dispute and construed the plain and ordinary meaning of "readings"

5   as disclosed in the patent as "physiological measurements," which "can include

6   actual patient physiological measurements as well as false measurements that may

7   be triggered." Dkt. 356 at 10.

8   225.   Taken together, "active" in limitation 9e means "able to measure

9   physiological measurements," not changes in light intensity. Accordingly,

10  Goldberg's testing does not demonstrate that the Oxxiom meets limitation 9e.

11  226.   As a further alternative opinion, Goldberg opined that, even if

12  "active" is "narrowly construed to mean 'able to make physiological

13  measurements,' the Oxxiom would still satisfy limitation 9e" because, even after

14  the Oxxiom is paired with the user's device, Tab 2 "continues to block a portion of

15  the light from the emitter form being received by the detector." Goldberg ¶¶

16  159–63.

17  227.   This opinion assumes that the user either pairs the device with the app

18  before removing Tab 2, or at some point after pairing the device and then removing

19  Tab 2, the user re-attaches Tab 2. But activating the device before removing Tab 2,

20  or re-attaching Tab 2 after the device has been activated, is contrary to the

21  Oxxiom's user guide. See JTX-245.

22  228.   At trial, Masimo attempted to show that these two possible uses give

23  rise to infringement because users do not always follow instructions. See 3/22 Tr.

24  84:15–85:20 (on cross-examination, Stone agreed that users do not always follow

25  instructions); see also Goldberg ¶ 170 (easier to pair device with app before

26  affixing Oxxiom to skin and removing Tab 2).

27  229.   In further support of this infringement theory, Masimo submitted a

28  tutorial video prepared by Defendants that demonstrates pairing an Oxxiom with

1  the app (i.e., making it active) before removing Tab 2. JTX-136; 3/16 Tr.
2  174:15–21.

3      230.   Both parties' experts agreed that, even if a user followed the Oxxiom
4  instructions exactly, the user may still reapply Tab 2 when removing the Oxxiom
5  to wash their hands or take a shower. 3/16 Tr. 174:22–175:7 (Goldberg); 3/22 Tr.
6  86:11–87:3 (Stone). But Goldberg admitted his own testing, which involved re-
7  attaching Tab 2, used Oxxiom in a manner contrary to the instructed use. 3/16 Tr.
8  152:21-154:20.

9      231.   Masimo put forth no evidence of an Oxxiom user operating Oxxiom
10 in a manner contrary to the instructed use that resulted in infringement–either by
11 pairing the device with the app before removing Tab 2, or by re-attaching Tab 2
12 later. Therefore, no evidence shows that Tab 2 blocked a portion of the emitter
13 light when the sensor was active (i.e., when the device was paired).

14     232.   Although Masimo pointed to the tutorial video (JTX-1426) to suggest
15 that Defendants performed the steps in the same manner as Goldberg's tests
16 (Goldberg ¶ 170), that video was labeled as confidential (JTX-1426), and more
17 importantly, was made before the '848 Patent issued. 3/16 Tr. 157:15–17,
18 160:2–15. Thus, it cannot provide evidence of infringement. Id. Further, Masimo
19 introduced no evidence that any customer or member of the public ever saw the
20 video. Id. at 157:18-20. This is insufficient to demonstrate infringement.

21     233.   To prove induced infringement, Masimo must establish direct
22 infringement by an Oxxiom customer and that Defendants induced that
23 infringement. Minn. Mining & Mfg. Co. v. Chemque, Inc., 303 F.3d 1294, 1304-05
24 (Fed. Cir. 2002). But the Federal Circuit has cautioned against relying on expert
25 testimony that a device is capable of infringement because the "natural and
26 intuitive way" to use the device would infringe. See ACCO Brands, Inc. v. ABA
27 Locks Mfrs. Co., 501 F.3d 1307, 1312 (Fed. Cir. 2007).

28     234.   In ACCO, the Federal Circuit granted JMOL following a jury verdict

49

Case 8:20-cv-00048-JVS-JDE   Document 1333-1   Filed 02/21/23   Page 86 of 116   Page ID
#:133203
Case 8:18-cv-02001-JVS-JDE   Document 600   Filed 11/07/22   Page 52 of 75   Page ID
#:39584

of infringement over the patentee's argument that the jury was entitled to accept
expert testimony that, "at least some of the time, all users of [the accused device]
would use it in an infringing manner." Id.

235. The Federal Circuit held that "a patentee must either point to specific
instances of direct infringement or show that the accused device necessarily
infringes the patent in suit." Id. at 1313. Where the accused device could be
operated in either an infringing or noninfringing manner, the court explained that
"the accused device does not necessarily infringe the [asserted] patent. Id.

236. Where the patentee failed to point to any instance of customer
infringement, and the only example proffered at trial was by the expert using the
product in an infringing manner, the court ruled this was insufficient to prove
infringement. Id.

237. Further, where the accused infringer instructed its customers to use the
product in the noninfringing manner, there was "no basis for concluding that [the
accused product] users directly infringe the patent." Id.

238. Additionally, a "hang card" depicting the infringing use that was
sometimes given to users by a third party, and of which the accused infringer had
no knowledge, was also insufficient to demonstrate infringement. Id.

239. The Federal Circuit clarified that its "broad legal statement" in a prior
case, that "an accused device may be found to infringe a product claim 'if it is
reasonably capable of satisfying the claim limitations, even though it may also be
capable of non-infringing modes of operation,'" does not "alter the requirement
that [a patentee] must prove specific instances of direct infringement or that the
accused device necessarily infringes the patent in suit." Id. (quoting Hilgraeve
Corp. v. Symantec Corp., 265 F.3d 1336, 1343 (Fed. Cir. 2001)).

240. "Hypothetical instances of direct infringement are insufficient." Id. at
1313; see also Dynacore Holdings Corp. v. U.S. Philips Corp., 363 F.3d 1263,
1274-76 (Fed. Cir. 2004) (affirming summary judgment of no infringement where

50

1   patentee failed to show any actual individual acts of direct infringement, therefore

2   patentee could not prove indirect infringement); <u>Fujitsu Ltd. v. Netgear Inc.</u>, 620

3   F.3d 1321, 1329 (Fed. Cir. 2010) (summary judgment proper where no actual

4   instances of customers operating optional feature that could infringe).

5       241.   Here, Masimo brings an infringement claim and Defendants bring a

6   declaratory relief claim for no infringement. In actions seeking declaratory

7   judgment of noninfringement, the patentee still bears the burden of establishing

8   infringement by the accused infringer. <u>Medtronic, Inc. v. Mirowski Family</u>

9   <u>Ventures, LLC</u>, 571 U.S. 191, 199 (2014).

10      242.   Although Masimo proved that True Wearables offers the Oxxiom for

11  sale in the United States, JTX-1318, and that True Wearables used the Oxxiom

12  when performing functional tests on the device, JTX-2801, Masimo has not shown

13  any specific instance of direct infringement of element 9e by an Oxxiom user or a

14  True Wearables employee. Therefore, Masimo cannot prove that induced

15  infringement as a matter of law.

16      243.   Because element 9e is missing, Masimo has not proven by a

17  preponderance of the evidence that the Oxxiom includes each and every element

18  recited in Claim 9 of the '848 Patent.  35 U.S.C. § 271(a).  Accordingly,

19  Defendants do not literally infringe the '848 Patent when they make, use, offer to

20  sell, and sell the Oxxiom in the United States.

21      244.   Masimo has waived any reliance on the doctrine of equivalents so the

22  Court need not make any findings relating to that doctrine.

23      245.   Accordingly, the Court finds against Masimo on its direct

24  infringement claim and finds for Defendants on their counterclaim and affirmative

25  defense of no infringement.

26              **Invalidity**

27      246.   Although the Court finds no infringement and thus need not reach

28  invalidity, for appeal purposes the Court provides its findings on invalidity.

51

247.   A patent is invalid for obviousness only "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a).

248.   Whether a patent is invalid as obvious is a question of law based on underlying facts. TriMed, Inc. v. Stryker Corp., 608 F.3d 1333, 1341 (Fed. Cir. 2010) (citations omitted).

249.   "Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved." Graham v. John Deere Co. of Kansas City, 383 U.S. 1, 17 (1966).

250.   A court may also take into account "[s]uch secondary considerations as commercial success, long felt but unsolved needs, failure of others, [copying, and unexpected results]." Id. at 17-18; Ruiz v. A.B. Chance Co., 234 F.3d 654, 662-63 (Fed. Cir. 2000).

251.   "[A] patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." KSR Int'l Co. v. Teleflex Inc., 550 U.S. 398, 418-19 (2007). Instead, "[a] party seeking to invalidate a patent on obviousness grounds must demonstrate by clear and convincing evidence that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so." Ivera Med. Corp. v. Hospira, Inc., 801 F.3d 1336, 1344 (Fed. Cir. 2015) (citations omitted).

252.   A motivation to combine prior art references may be found considering the nature of the problem to be solved. Ruiz v. A.B. Chance Co., 357 F.3d 1270, 1276 (Fed. Cir. 2004).

253.   "Whether a motivation to combine references has been demonstrated is a question of fact." <u>McGinley v. Franklin Sports, Inc.</u>, 262 F.3d 1339, 1351 (Fed. Cir. 2001).

<u>Level of Ordinary Skill in the Art</u>

254.   A person of ordinary skill in the art ("POSA") of the '848 Patent would have at least a B.S. in electrical or biomedical engineering or a related field, with at least two years' experience designing patient monitoring systems, or an equivalent amount of work experience. Goldberg ¶ 110.

<u>Scope and Content of Prior Art</u>

255.   Prior art is within the scope of a patent "and can be applied in an obviousness combination if it either (1) is from the same field of endeavor, regardless of the problem addressed or (2) is reasonably pertinent to the particular problem with which the inventor is involved." <u>Unwired Planet, LLC v. Google Inc.</u>, 841 F.3d 995, 1000 (Fed. Cir. 2016) (quotations omitted).

256.   The Court finds that each of the four references on which Stone relied for the proposed obviousness combinations falls within the scope and content of relevant prior art.

257.   Sweitzer (JTX-412) discloses a pulse oximeter. Pompei (JTX-415) discloses a bandage mount system. Larrabee (JTX-413) discloses a light-shielded tube holder for blood washing.  Agnes (JTX-414) discloses a brushless motor with a housing to align the stator and position sensor. The Court discusses each of these references in more detail below.

258.   Sweitzer, U.S. Patent No. 7,486,977, is directed toward "[a] single use, self-contained, self-powered disposable oximeter, in the form of a patch or a bandage strip." JTX-412. The Sweitzer pulse oximeter "activates when the backing paper for its adhesive is peeled off" allowing it "to be removably attached to the patient." The pulse oximeter includes an electronics layer "sandwiched by two protective barrier layers." <u>See</u> <u>id.</u> at Abstract, Summary of the Invention, 2:1–3,

53

1   9:51–54, 10:7–23; see also Goldberg ¶¶ 191, 194.

2   259.   Pompei, U.S. Patent No. 6,140,549, is directed toward a bandage

3   holder for "removably retaining a bandage between two facing wrapping sheets."

4   JTX-415, Abstract; see also Goldberg ¶ 199. Pompei discloses that a primary

5   object of the invention is "to provide for an improved mount for an easily

6   accessible covered bandage that can be applied to a wound using one hand."

7   JTX-415 at 1:54–63, Fig. 1; Goldberg ¶ 200.

8   260.   Larrabee, U.S. Patent No. 4,136,818, is directed toward a "device for

9   holding a transparent tube in an optical sensor while excluding light from external

10   sources" for use with a blood-washing apparatus. JTX-413. Larrabee explains that

11   the device for holding a transparent tube is automatically positioned to exclude

12   external light "upon insertion of the tube into the optical sensor." See id. at

13   Abstract, Fig. 1, 3:62–67; Goldberg ¶ 202–03. Larrabee explains that his invention

14   "automatically shields the optical sensor from external light when the tube is

15   inserted into the optical path between the diode and the transistor." JTX-413 at

16   1:65–2:3, 3:36–59; Goldberg ¶ 205.

17   261.   The blood washing apparatus discussed in Larrabee is a reusable

18   laboratory device.  The cover is a permanent fixture, not removable from the sensor

19   portion of the blood washing apparatus and is described as "pivotally mounted on

20   optical sensor 1 by hinge pin 15." JTX-413 at 4:3–4. Larrabee's cover "shield[s]

21   the optical sensor from external light, allowing it to accurately detect the flow of

22   opaque fluid in tube T in the optical path between the diode and transistor."

23   JTX-413 at 4:25–30; Goldberg ¶ 206.

24   262.   Agnes, U.S. Patent No. 6,661,140, is directed toward an

25   "electronically commutated brushless motor including a housing for accurately

26   angularly aligning a position sensor relative to a position of a stator." JTX-414 at

27   Abstract, Fig. 3. Agnes's sensor cap is intricately shaped, hollow, and made from

28   plastic. JTX-414 at 5:54–60, Fig. 3. Agnes's sensor cap is not removable by the

Case 8:20-cv-00048-JVS-JDE   Document 1333-1   Filed 02/21/23   Page 91 of 116   Page ID
#:133208
Case 8:18-cv-02001-JVS-JDE   Document 600   Filed 11/07/22   Page 57 of 75   Page ID
#:39589

user, and neither the sensor cap nor the optical sensor of Agnes is disposable. The external light blocking character of the Agnes sensor cap is described as: "The sealed chamber protects optical sensor 74 from contamination by dirt, dust, oil and moisture, and accidental triggering by external light sources." JTX-414 at 5:58–60 (emphasis added); Goldberg ¶ 209.

263.   The Patent Office considered both Sweitzer and Pompei during prosecution of the '848 Patent, and during the prosecution of a related application. Goldberg ¶¶ 210–11, 215; JTX-648 at MASM0003326–31, MASM0003381–409; JTX-774 at MASM0094045–51.

264.   The Examiner recognized that the "general state of the prior art" was "directed to one of blocking external light while admitting measurement light or towards measurement systems which ... disregard data when the systems determine that a sensor is not placed at the measurement site." Goldberg ¶ 213; JTX-648 at MASM0003312.

265.   Stone agreed with Goldberg that both Larrabee and Agnes disclose covers that block only external light while allowing measurement light.  Goldberg ¶ 214; 3/22 Tr. 79:9–21 (Stone). Thus, both Larrabee and Agnes are examples of the type of prior art considered by the Examiner when allowing Claim 9. Id.

266.   Because Stone's prior art combination is analogous to prior art considered by the Examiner, the Court gives weight to the Examiner's conclusion that the combination of Sweitzer, Pompei, and prior art that blocks only external light neither "disclose[s] nor would render obvious" Claim 9. JTX-648 at MASM0003331.

Motivation to Combine

267.   Defendants did not demonstrate a motivation to combine Sweitzer and Pompei with Larrabee or Agnes. Stone admitted that the combination of Sweitzer and Pompei does not disclose limitation 9e. Stone (invalidity) ¶ 90. But Stone proposed adding to that combination covers from Larrabee and Agnes. 3/22 Tr.

55

79:3–8.

268.   No evidence suggests that the problem solved by the Asserted Patent was known by a POSA as of the priority date. Stone speculated that the problem of a sensor generating false readings when not in use was known. Stone (invalidity) ¶ 91. But Stone presented no evidence that the problem was known. He pointed only to the "Summary of the Disclosure" of the '848 Patent to opine that the problem was known.

269.   The Court finds no suggestion in the '848 Patent that the problem of reflected emitter light causing false readings when the sensor is not in use was known. Rather the patent observes that, "[i]n some situations, such as in operating rooms, emergency rooms or critical care units," the sensor "can generate false readings by detecting ambient light even though the sensor is not in use." '848 Patent at 2:23–28. This observation does not discuss whether the problem was well known, it only identifies the problem the invention sought to solve.

270.   Without knowledge of the problem to be solved, there is no reason or motivation to combine Sweitzer and Pompei with Larrabee or Agnes. Goldberg ¶¶ 216–18, 226.

271.   The covers in Larrabee and Agnes block only ambient or external light, not emitter light, as required by limitation 9e.[8] Stone (invalidity) ¶ 91; 3/22 Tr. 79:9–21; Goldberg ¶¶ 213–15, 240–43.

272.   The Larrabee and Agnes covers also do not "cover[] one or more of the sensing components" (i.e., the emitters and the detector) of the sensor. '848 Patent, Claim 9; 3/16 Tr. 178:8–15.

273.   Goldberg testified persuasively that applying Larrabee or Agnes to Sweitzer and Pompei "would be like somebody wearing a pulse oximeter and

---

[8]   The Court observes that other claims in the '848 Patent relate to blocking ambient light in addition to emitter light, e.g., Claim 5, but such claims are not asserted here and are therefore irrelevant.

putting a blanket over [their] hand." 3/16 Tr. 178:12–15. Such a modification does not solve the problem of reflected emitter light reaching the detector when the sensor is not on the patient.

274.    Thus, a POSA would not be motivated to combine Sweitzer and Pompei with Larrabee or Agnes, because Larrabee and Agnes do not attempt to solve the problem of emitter light causing false readings. Goldberg ¶¶ 219–20, 227–28; JTX-413 at 4:25–30; JTX-414 at 5:54–60.

275.    Further, a POSA would not be motivated to combine Sweitzer with Larrabee and Agnes because they describe different devices designed for different purposes.  JTX-412; JTX-413, Abstract; Goldberg ¶¶ 221–22, 229–30.

276.    Stone stated that he witnessed false readings when using clear covers, but he solved this by attaching the sensor to the patient before activation. 3/22 Tr. 74:18–24. Stone was unaware of anyone—aside from the parties in this case—who designed sensor covers to solve the problem. 3/22 Tr. 74:25–75:4.

277.    The Court finds persuasive Goldberg's explanation concerning why a POSA would not have had any motivation to make such a combination. Goldberg ¶¶ 216–23, 226–31.

Reasonable Expectation of Success

278.    Defendants have not shown a reasonable expectation of successfully combining Sweitzer and Pompei with Larrabee or Agnes.

279.    Sweitzer and Pompei describe flexible sheets that are easily removable. JTX-412; JTX-415.

280.    Larrabee and Agnes disclose rigid covers that are permanently attached, which could not be successfully incorporated into the pulse oximeter of Sweitzer.  Goldberg ¶¶ 224–25, 232–33.

281.    Larrabee teaches away from the use of flexible and removable adhesive opaque tape. JTX-413 at 1:65–2:3, 3:47–55, 3:57–59, 1:54–60, 3:62-67.

282.    The Court concludes that a POSA would not have had a reasonable

Exhibit J
-184-

Case 8:20-cv-00048-JVS-JDE   Document 1333-1   Filed 02/21/23   Page 94 of 116   Page ID
#:133211
Case 8:18-cv-02001-JVS-JDE   Document 600   Filed 11/07/22   Page 60 of 75   Page ID
#:39592

1    expectation of successfully combining Sweitzer and Pompei with Larrabee.

2    Goldberg ¶¶ 225, 232.

3                    Other Indicia of Nonobviousness

4         283.   Evidence of copying supports nonobviousness. Specifically, Dr.

5    Lamego's employment at Masimo and Cercacor suggests implementing Tab 2 on

6    the Oxxiom is the result of copying. Goldberg ¶ 234.

7         284.   Dr. Lamego knew both the problem and solution from his time at

8    Cercacor. He supervised filing the patent application that led to the '848 Patent.

9    Kiani ¶ 65; Goldberg ¶ 234.

10        285.   "Copying by a competitor is a relevant consideration in the objective

11   indicia analysis," which can "often be the most probative and cogent evidence of

12   nonobviousness." Liqwd, Inc. v. L'Oreal USA, Inc., 941 F.3d 1133, 1136–37 (Fed.

13   Cir. 2019)(cleaned up). Copying can be shown by "duplication of features of the

14   patentee's work based on access to that work," including by access to patent

15   applications. Id. at 1137–39.

16        286.   Even if combined, the prior art does not disclose limitation 9e. This

17   limitation requires that "the sensor cover, when adhered to the pulse oximeter

18   sensor, covers at least one of the sensing components while the pulse oximeter

19   sensor is active and blocks at least a portion of light from the one or more emitters

20   from being received by the detector." Goldberg ¶ 235.

21        287.   Sweitzer did not disclose a sensor cover used to block light from the

22   emitters from being received by the detector while the sensor is active. Goldberg ¶¶

23   236–41, 245–51. Rather, Sweitzer described the advantages of automatically

24   activating the pulse oximeter device via removing the sensor cover. JTX-412 at

25   1:37–39; 6:10; 10:4–26; Goldberg ¶¶ 191–95.

26        288.   Both Larrabee and Agnes block only external or ambient light, while

27   allowing the measurement light from their emitters to be received by the detectors.

28   Goldberg ¶¶ 201–09, 240–42.

289.   Thus, none of the prior art references combined teaches limitation 9e. Goldberg ¶¶ 235–52.

290.   Claim 9 is presumed valid. 35 U.S.C. § 282(a). Defendants bear the burden of proving invalidity by clear and convincing evidence. Microsoft Corp. v. i4i Ltd. P'ship, 564 U.S. 91, 97 (2011).

291.   For the reasons explained above, the Court concludes that Defendants failed to prove by clear and convincing evidence that Claim 9 is obvious under 35 U.S.C. § 103.

292.   Accordingly, Defendants' counterclaim for declaratory judgment of invalidity and their related affirmative defense fail.

### G.   Other Affirmative Defenses

293.   Defendants did not prove by a preponderance of the evidence their affirmative defense of failure to state a claim. It was not raised at trial.

294.   Because Plaintiffs have waived their right to actual damages, Defendants' defense for speculative damages is moot.

### H.   Equitable Remedies

295.   Plaintiffs have waived their right to legal damages and seek equitable relief only, including relief based on unjust enrichment and injunctive relief.

Breach of Fiduciary Duty

296.   Beginning with the breach of fiduciary duty claim, Cercacor has not demonstrated that a portion of Dr. Lamego's salary for any given period should be returned in equity as a result of the breach.

297.   Although Masimo calculated the salary Dr. Lamego received during different periods of time, it did not demonstrate that, for any given time period, Dr. Lamego earned none of his salary (e.g., from the date of the October 2013 board presentation to his departure, Dr. Lamego received $125,000).

Exhibit J
-186-

Case 8:20-cv-00048-JVS-JDE   Document 1333-1   Filed 02/21/23   Page 96 of 116   Page ID
#:133213
Case 8:18-cv-02001-JVS-JDE   Document 600   Filed 11/07/22   Page 62 of 75   Page ID
#:39594

298.   The Court finds that it would be speculative to award the return of some portion of Dr. Lamego's salary as an equitable remedy on this claim, and declines to do so.

299.   Defendants have ███████████████████████ the Oxxiom and have ███████████████████████ True Wearables or the Oxxiom. Rather, Defendants have ████████████ Oxxiom endeavor. Defendants have therefore not been unjustly enriched and no equitable money award is warranted.

Trade Secrets - Injunctive Relief

300.   Masimo has, however, demonstrated that further equitable relief is warranted to ensure protection and preservation of their trade secrets.

301.   The Court has broad discretion to fashion such relief. Tinoqui-Chalola Council of Kitanemuk & Yowlumne Tejon Indians v. U.S. Dep't of Energy, 232 F.3d 1300, 1305 (9th Cir. 2000); Fed. R. Civ. P. 54(c).

302.   The Court concludes that Masimo has demonstrated that Defendants should be enjoined from continuing to misappropriate the relevant trade secrets.

303.   A plaintiff seeking a permanent injunction must demonstrate that: (1) it has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction. eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006); SolarCity Corp. v. Doria, No. 16-cv-03085, 2021 WL 5822608, at *4 (S.D. Cal. Dec. 8, 2021) (applying eBay test in action for trade secret misappropriation under CUTSA).

304.   Masimo proved by a preponderance of the evidence that Defendants' further use and disclosure of Masimo's trade secrets would cause Masimo an irreparable injury.  If Defendants were allowed to continue to use Masimo's trade secrets, Defendants would unfairly receive the benefit of the trade secrets allowing

TW to unfairly compete with Masimo.  Masimo also risks public disclosure of the trade secrets, which would cause irreparable injury.

305.   Masimo proved by a preponderance of the evidence that any monetary award to allow Defendants to continue to misappropriate Masimo's trade secrets would be inadequate to compensate Masimo for such misappropriation.

306.   Masimo showed by a preponderance of the evidence that the balance of hardships tips in favor of Masimo.

307.   Any hardship to Defendants arising from the need to redesign the Oxxiom is not outweighed by the hardship to Plaintiffs arising from the loss of their trade secrets. This is especially true where Dr. Lamego's design decisions for the Oxxiom demonstrate misappropriation.

308.   Masimo showed by a preponderance of the evidence that the public interest would be furthered by a permanent injunction.

309.   The public benefits from enforcing strong trade secrets protection because such protection encourages innovation, which in turn will promote the availability of improved devices for consumers. This benefit outweighs the limited inconvenience to consumers, if any, from being unable to buy an Oxxiom device until after it has been redesigned to omit Plaintiffs' trade secrets.

310.   Based on the foregoing, Defendants are permanently enjoined from further misappropriating the relevant trade secrets and are permanently enjoined from selling the Oxxiom in its current iteration that includes the trade secrets.[9]

311.   For example, the Court agrees with McNames that TS8 is foundational to the algorithm used by Oxxiom to noninvasively measure

---

[9]      This Order makes the preliminary injunction entered at Dkt. 257 permanent, and expands the trade secrets-related injunction to all of the trade secrets found misappropriated herein. The Court observes that, at closing argument, counsel stated that TS1 and TS12 have already been removed from the Oxxiom. The Court orders the parties to meet and confer to find a solution concerning how to share limited information with Dr. Lamego so he can understand what this order requires with respect to removing the other trade secrets.

Case 8:20-cv-00048-JVS-JDE   Document 1333-1   Filed 02/21/23   Page 98 of 116   Page ID
#:133215
Case 8:18-cv-02001-JVS-JDE   Document 600   Filed 11/07/22   Page 64 of 75   Page ID
#:39596

1  physiological parameters.  Without the use of TS8, Defendants would need to use a

2  completely different algorithm to perform pulse oximetry. See McNames ¶ 208.

3  Thus, the Oxxiom may not be sold in its current iteration until this and other trade

4  secrets have been removed and designed around.

5      312.   The Court concludes that this injunctive relief is narrowly tailored to

6  protect Plaintiffs' interest without providing a windfall to Plaintiffs by awarding

7  the Oxxiom device in its entirety to them. It is undisputed that the Oxxiom was

8  designed with many off-the-shelf components, and Plaintiffs have not shown why

9  they should acquire the non-protected aspects of the Oxxiom.

10     Breach of Contract - Injunctive Relief

11     313.   When Dr. Lamego left Cercacor, he had ongoing obligations to not

12  use confidential information or trade secrets belonging to Masimo. In connection

13  with the breach of contract claims, Masimo demonstrated by a preponderance of

14  the evidence that Dr. Lamego should be enjoined from further breaching any of his

15  contracts with Masimo.  See Google, Inc. v. Jackman, 2011 WL 3267907 *5 (N.D.

16  Cal. July 28, 2011) (injunctive relief appropriation for breach of contract when

17  plaintiff has irreparable injury and no adequate legal remedy).

18     314.   Accordingly, Dr. Lamego is ordered to return any confidential

19  information he took from Masimo or Cercacor, including any documents and

20  electronic information, and is enjoined from making further use of any confidential

21  information obtained during his employment.

22     Patent Applications Containing Trade Secrets

23     315.   As a matter of equity, to redress the wrongful misappropriation of

24  intellectual property, the Court may award Masimo ownership of patents and

25  patent applications filed by Defendants. Richardson v. Suzuki Motor Co., 868 F.2d

26  1226, 1249 (Fed. Cir. 1989). The Court may also order patent applications to go

27  abandoned so that Defendants may not hold themselves out as retaining any

28  ownership rights in disclosures that contain trade secrets.

316.   The following table lists Defendants' confidential pending patent applications, and correlates them with evidence showing misappropriation:

| Patent App. No. | Evidence | Masimo TS |
|---|---|---|
| 16/198,335 | McNames Amended Trial Decl. ¶¶ 125–186; JTX-452, JTX-1411, JTX-2380–82; AF-19 | 8 |
| 16/939,925 | McNames Amended Trial Decl. ¶¶ 247–260; JTX: 141, 2389 | 9 |
| 16/198,550 | McNames Amended Trial Decl. ¶¶ 300–311 and 375–434; JTX: 2202; AF-19 | 12 |
| 16/198,504 | McNames Amended Trial Decl. ¶¶ 300–311 and 375–434; JTX- 2204; AF-19; AF-25 | 12 |
| 17/326,957 | AF 29; JTX-2465 | 8 |
| 17/351,767 | AF 30; JTX-2472 | 12 |
| 17/363,314 | AF 31; JTX-2476 | 12 |
| Provisional 62/591,158 | McNames Amended Trial Decl. ¶¶ 300–311 and 375–434; JTX-2203; AF-18 | 12 |

317.   The following table lists Defendants' published pending patent applications, and correlates them with evidence showing misappropriation:

| Patent App. No. | Evidence | Masimo TS |
|---|---|---|
| ██████ | McNames Amended Trial Decl. ¶¶ 247–260 and 300–311; JTX-2207 | 9 |
| ██████ | McNames Amended Trial Decl. ¶¶ 247–260 and 300–311; JTX-2208 | 9 |
| ██████ | McNames Amended Trial Decl. ¶¶ 247–260 and 300–311; JTX-2209 | 9 |

63

| Patent App. No. | Evidence | Masimo TS |
|---|---|---|
| ████████ | McNames Amended Trial Decl. ¶¶ 247–260 and 300–311; JTX-143 | 9 |

318.    Each of the above-identified applications includes Masimo's trade secrets.

319.    Defendants' continued ownership and prosecution of these applications, and any application that depends on them for priority, would cause Masimo an irreparable injury.

320.    Absent abandonment, Defendants could continue to prosecute these applications, make amendments, and benefit from the disclosure already made. Abandonment is necessary to preserve Masimo's trade secrets and prevent Defendants from claiming them for their own exclusive use. Accordingly, the Court orders Defendants to let the foregoing applications go abandoned.

321.    This order does not implicate the property rights of the other named inventors because the applications have been assigned to True Wearables, one of the defendants in this case.

322.    To the extent Defendants believe that any individual patent claims do not implicate misappropriation, they could apply for new patents that comply with the terms of this order.

323.    Defendants have not explained how existing patent applications that disclose trade secrets could survive simply because individual claim language does not disclose a trade secret embodied in the patent as a whole. See, e.g., Phillips v. AWH Corp., 415 F.3d 1303, 1315 (Fed. Cir. 2005) ("[T]he specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.") (quotation marks omitted). Claims language cannot be read in isolation and reading it without the specification

Case 8:20-cv-00048-JVS-JDE   Document 1333-1   Filed 02/21/23   Page 101 of 116   Page ID
#:133218
Case 8:18-cv-02001-JVS-JDE   Document 600   Filed 11/07/22   Page 67 of 75   Page ID
#:39599

1  would be meaningless.

2           Restraint on Employment

3           324.   Masimo has not proven by a preponderance of the evidence that Dr.

4  Lamego is unwilling or unable to work in the field of non-invasive physiological

5  monitoring in any capacity without using Masimo's confidential information and

6  trade secrets. Accordingly, the Court declines to enter the drastic remedy of

7  enjoining him from working in this field for "at least six years, if not forever," as

8  requested by Masimo.[10]

9           325.   Further, California favors employee mobility and "specifically

10  allows" employees to "draw on knowledge and skills they gained from [their

11  former employer] to develop a product for their new employer." Hooked Media

12  Grp., Inc. v. Apple Inc., 55 Cal. App. 5th 323, 332 (Cal. Ct. App. 2020).

13  Accordingly, the Court finds that a full or years-long prohibition from the field of

14  non-invasive physiological monitoring would unnecessarily restrain employee

15  mobility.

16           326.   Although Dr. Lamego displayed confusion concerning the legal

17  definition of a trade secret, 3/17 Tr. 131:17–132:6, he is not a lawyer. Dr. Lamego,

18  however, is represented by a team of highly capable lawyers who can ably direct

19  him on how to comply with all aspects of the Court's orders. The Court believes

20  that the findings in this order, along with the equitable remedies imposed, will

21  return the parties to the status quo with respect to Masimo's confidential

22  information and provide certainty to Dr. Lamego regarding what he is prohibited

23  from doing in the future with respect to Masimo's confidential and trade secret

24  information.

25  _____

26      [10]    Notwithstanding Dr. Lamego's professed inability to separate "know how" from
27  trade secrets (see ¶ 190, supra), the relief here effectively bars his use of the specific trade secrets
he utilized after starting TW.

28

1        Attorney's Fees

2        327.   Because the Court finds that Dr. Lamego did not misappropriate

3    Masimo's trade secrets willfully and maliciously, the Court declines to award

4    attorney's fees under Cal. Civ. Code § 3426.4.

5        328.   Further, even if the Court found such conduct with respect to the trade

6    secrets claims on which Masimo succeeded, it would exercise its discretion to deny

7    attorney's fees in this case.

8        329.   An award of fees is not automatic under the CUTSA. Although such

9    an award "is equitable in cases against well-funded defendants that commit acts of

10   misappropriation that undermine legitimate competition and innovation," Mattel,

11   801 F. Supp. 2d at 956, that is not the case presented here. Cf. 02 Micro Intern.

12   Ltd. v. Monolithic Power Systems, Inc., 399 F. Supp. 2d 1064, 1080 (N.D. Cal.

13   2005) ("the purpose of the statute is to deter specious misappropriation actions,"

14   and attorney's fees are not automatic, even in cases where a jury finds willful and

15   malicious conduct), as amended 420 F. Supp. 2d 1070, affirmed 221 Fed. App'x

16   996 (Fed. Cir. 2007).

17       330.   Plaintiffs drove the trajectory of this case in a manner that required

18   both parties to spend a significant amount on attorney's fees as they prepared for

19   trial. Over three years after the case was filed, at the time of trial, Plaintiffs had

20   whittled their intellectual property case down to a handful of trade secrets and a

21   single patent claim. Further, Plaintiffs prevailed on only a select number of their

22   misappropriation theories, and did not prevail on their patent infringement claim.

23   Against this backdrop, the Court finds it would be inequitable to award Plaintiffs

24   attorney's fees in a trade secrets case they seemingly protracted for years, only to

25   forego the right to damages and demand a bench trial over Defendants' objection

26   in the end. Although this was within Plaintiffs' prerogative, even if the Court were

27   inclined to award fees, it would be difficult to parse the fees incurred to review

28

Case 8:20-cv-00048-JVS-JDE   Document 1333-1   Filed 02/21/23   Page 103 of 116   Page ID
#:133220
Case 8:18-cv-02001-JVS-JDE   Document 600   Filed 11/07/22   Page 69 of 75   Page ID
#:39601

1   only those trade secrets claims on which Plaintiffs prevailed.

2       331.   Accordingly, for the reasons stated, the Court declines to award

3   attorney's fees.

4

## IV.   SUMMARY OF CONCLUSIONS OF LAW

### Breach of Contract

7       332.   Masimo has proven each of the four elements of its breach of contract

8   claim: (1) the existence of the contract: Dr. Lamego entered Confidentiality

9   Agreements with Masimo and Cercacor; (2) Masimo's performance: Masimo paid

10   Dr. Lamego compensation and benefits for his employment; (3) Dr. Lamego's

11   breach: Dr. Lamego took confidential information and property; and (4) Masimo

12   suffered harm as a result of Dr. Lamego's breach.  Oasis W. Realty, LLC v.

13   Goldman, 51 Cal. 4th 811, 821, 250 P.3d 1115, 1121 (Cal. 2011).

14       333.   Dr. Lamego has not proven his counterclaim, that the confidentiality

15   agreements are void as a restraint of trade under Cal. Bus. & Prof. Code § 16600.

16   The provisions Dr. Lamego breached relate to removing confidential information,

17   not to practicing his trade or profession.

### Breach of Fiduciary Duty

19       334.   Cercacor has proven each of the three elements of its breach of

20   fiduciary duty claim: (1) existence of a fiduciary duty: as CTO, Dr. Lamego owed

21   Cercacor a duty of loyalty; (2) breach of the duty with respect to the Chem 5 panel:

22   Dr. Lamego admitted that, when he presented to the Cercacor board concerning the

23   Chem 5 panel, although he did not believe Cercacor could meet the feasability and

24   production dates set forth in the manufacturing and regulatory timelines he

25   presented, he did not reveal this to the board; and (3) damage proximately caused

26   by the breach: the board authorized additional resources requested by Dr. Lamego

27   to meet his proposed timeline.  Gutierrez v. Girardi, 194 Cal. App. 4th 925, 932

28

67

1    (2011).

2      335.   Dr. Lamego has not proven that the statute of limitations bars this

3 claim because he did not prove that, by April/May 2014, or at the latest August

4 2014, Cercacor should have reasonably suspected that he breached his duty of

5 loyalty and thus the four-year statute of limitation began to run. Although

6 Cercacor conducted further investigation, which confirmed by April/May 2014 and

7 no later than August 2014 that progress on the Chem 5 parameters was different

8 than what Dr. Lamego presented, nothing gave Cercacor a reason to suspect that

9 this was because Dr. Lamego misrepresented the clinical accuracy of the data, as

10 opposed to some other data- or test-driven reason.

11    **Trade Secrets**

12      336.   Masimo has proven that Asserted Trade Secrets 1 (partial), 8, 9, and

13 12 meet the requirements of Cal. Civ. Code § 3426.1(d)(2), because Masimo made

14 reasonable efforts to maintain their secrecy.

15      337.   <u>Trade Secret 1</u>: Plaintiffs have proven each of the two elements of

16 misappropriation of Trade Secret 1 with respect to pulse rate and oxygen

17 saturation: (1) the existence and ownership of this trade secret: Masimo and

18 Cercacor use this trade secret and it derives independent economic value from

19 being secret; and (2) strong circumstantial evidence demonstrates misappropriation

20 of the trade secret. Cal. Civ. Code § 3426.1.

21      338.   <u>Trade Secret 5</u>: Plaintiffs have not proven each element of

22 misappropriation of Trade Secret 5. If the Radius PPG embodies TS5 as Plaintiffs

23 suggest, then TS5 does not constitute a trade secret, or it does not derive

24 independent economic value from being secret in light of other wireless, wearable

25 pulse oximeters and/or sensors available at the relevant time. Because Plaintiffs

26 have not shown the existence and ownership of a trade secret, there can be no

27 misappropriation. Cal. Civ. Code § 3426.1.

28

Case 8:20-cv-00048-JVS-JDE   Document 1333-1   Filed 02/21/23   Page 105 of 116   Page ID
#:133222
Case 8:18-cv-02001-JVS-JDE   Document 600   Filed 11/07/22   Page 71 of 75   Page ID
#:39603

339.   <u>Trade Secret 8</u>: Plaintiffs have proven each of the two elements of misappropriation of Trade Secret 8: (1) the existence and ownership of this trade secret: this algorithm was developed in connection with the ██████ and it derives independent economic value from being secret; and (2) strong circumstantial evidence demonstrates misappropriation of the trade secret.  Cal. Civ. Code § 3426.1.

340.   <u>Trade Secret 9</u>: Plaintiffs have proven each of the two elements of misappropriation of Trade Secret 9: (1) the existence and ownership of this trade secret: Plaintiffs use the selection of the ███████████ in connection with their pulse oximetry work and this combination derives independent economic value from being secret; and (2) the fact that the Oxxiom and certain of Defendants' patent applications incorporate the ██████████ demonstrates misappropriation of the trade secret.  Cal. Civ. Code § 3426.1.

341.   <u>Trade Secret 11</u>: Plaintiffs have not demonstrated the existence and ownership of TS11.  TS11 was generally known to persons who can derive economic benefit from its use or disclosure.  Because Plaintiffs have not shown the existence and ownership of a trade secret, there can be no misappropriation.  Cal. Civ. Code § 3426.1.

342.   <u>Trade Secret 12</u>: Plaintiffs have proven each of the two elements of misappropriation of Trade Secret 12: (1) the existence and ownership of this trade secret: Plaintiffs developed the TSS and it provides a competitive advantage through knowing how to use it to estimate an optimization variable in biosensing applications ███████████████ and (2) the facts that Dr. Lamego's notebook marked "trade secret" contained the TSS and certain of Defendants' patent applications also contain it demonstrate misappropriation of the trade secret.  Cal. Civ. Code § 3426.1.

343.   <u>Harm</u>: Where misappropriation was found, the misappropriation has

69

Case 8:20-cv-00048-JVS-JDE   Document 1333-1   Filed 02/21/23   Page 106 of 116   Page ID
#:133223
Case 8:18-cv-02001-JVS-JDE   Document 600   Filed 11/07/22   Page 72 of 75   Page ID
#:39604

1   harmed Plaintiffs because they face an ongoing threat that Dr. Lamego will use,

2   disclose, and destroy the trade secrets or try to claim them as his own.  For

3   example, as stated, Dr. Lamego prosecuted patent applications that contain some of

4   the trade secrets.

5       344.   <u>Willfulness</u>: Plaintiffs have not carried their burden to demonstrate by

6   clear and convincing evidence that Dr. Lamego's misappropriation was willful and

7   malicious.

8       345.   <u>Defenses</u>: Defendants have not proven independent development

9   because they failed to corroborate or support that defense with any credible

10  evidence.  Further, Defendants have not proven that the information contained in

11  the misappropriated trade secrets was readily ascertainable and that Dr. Lamego

12  ascertained it from publicly available sources rather than proprietary sources from

13  his time working for Plaintiffs.  Defendants also failed to demonstrate laches

14  because they failed to show that Masimo unreasonably delayed asserting or

15  diligently pursuing a claim for misappropriation of trade secrets, and that any delay

16  prejudiced Defendants.

17       **Patent Infringement**

18       346.   <u>Infringement</u>: Plaintiffs have not demonstrated induced and therefore

19  direct infringement of Claim 9 of U.S. Patent No. 10,194,848 (the "'848 Patent"),

20  because they did not demonstrate claim element 9e is present in the Oxxiom.

21  Specifically, Plaintiffs presented no evidence of an Oxxiom user operating Oxxiom

22  in a manner contrary to the instructed use that resulted in infringement–either by

23  pairing the device with the app before removing Tab 2, or by re-attaching Tab 2

24  later.  Therefore, no evidence shows that Tab 2 blocked a portion of the emitter

25  light when the sensor was active (<u>i.e.</u>, when the device was paired).  Hypothetical

26  instances of infringement by customers are insufficient.

27       347.   <u>Invalidity</u>: Defendants have not demonstrated obviousness by clear

28

70

**Exhibit J
-197-**

1   and convincing evidence where, for example, they failed to demonstrate a

2   motivation to combine Sweitzer and Pompei with Larrabee or Agnes.  The covers

3   in Larrabee and Agnes block only ambient or external light, not emitter light, as

4   required by limitation 9e.  The Larrabee and Agnes covers also do not cover one or

5   more of the sensing components (i.e., the emitters and the detector) of the sensor.

6   Further, no evidence suggests that the problem solved by the '848 Patent, (reflected

7   emitter light causing false readings when the sensor is not in use), was known by a

8   POSA as of the priority date.  Defendants also failed to show a reasonable

9   expectation of successfully combining Sweitzer and Pompei with Larrabee or

10  Agnes.  Evidence of copying also supports nonobviousness.

11      **Other Affirmative Defenses**

12      348.   Defendants did not raise failure to state a claim at trial, and the

13  defense of speculative damages is moot where Plaintiffs no longer seek monetary

14  damages.

15      **Equitable Remedies**

16      349.   Cercacor has not demonstrated that a portion of Dr. Lamego's salary

17  for any given period should be returned in equity as a result of the breach.

18      350.   Defendants have not been unjustly enriched and no equitable

19  monetary award is warranted.

20      351.   But further equitable relief is warranted to ensure protection and

21  preservation of Plaintiffs' trade secrets.  To that end, the Court enjoins Defendants

22  from continuing to misappropriate and use the relevant trade secrets.

23      352.   Plaintiffs have proven that Defendants' further use and disclosure of

24  the trade secrets would cause an irreparable injury, and that any monetary award to

25  allow Defendants to continue to misappropriate the trade secrets would be

26  inadequate to compensate for the misappropriation.  The balance of hardships tips

27  in favor of Plaintiffs.  Any hardship to Defendants arising from the need to

28

71

**Exhibit J
-198-**

1   redesign the Oxxiom is not outweighed by the hardship to Plaintiffs arising from

2   the loss of their trade secrets.   The public interest would be furthered by a

3   permanent injunction.

4         353.   Accordingly, Defendants are permanently enjoined from further

5   misappropriating the relevant trade secrets and are permanently enjoined from

6   selling the Oxxiom in its current iteration that includes the trade secrets.

7         354.   Dr. Lamego is also ordered to return any confidential information he

8   took from Masimo or Cercacor, including any documents and electronic

9   information, and is enjoined from making further use of any confidential

10   information obtained during his employment.

11         355.   The Court orders Defendants to let the aforementioned patent

12   applications go abandoned.

13         356.   The Court declines to enter the drastic remedy of enjoining Dr.

14   Lamego from working in the field of non-invasive physiological monitoring.

15         357.   The Court declines to award attorney's fees under Cal. Civ. Code §

16   3426.4.

17

18   **V.      CONCLUSION**

19         For the reasons stated above, the Court enters its findings of fact and

20   conclusions of law as stated herein. Plaintiffs shall file a proposed judgment

21   forthwith. Defendants shall file any objections thereto within 7 days of Plaintiffs'

22   filing.  If no objections are received within 7 days, the judgment will be entered

23   immediately, and Federal Rule of Civil Procedure 52(b) will apply upon entry of

24   judgment.

25         The Court asks the parties to meet and confer and, within 7 days of this

26   Order, notify the Court via email to the Courtroom Deputy Clerk which parts of the

27   sealed Order should be redacted from the publicly filed version of the Order based

28

**Exhibit J**
**-199-**

1   on the Court's prior sealing orders. When submitting their sealing request, the

2   parties shall attach a copy of this Order with their proposed redactions highlighted

3   for the Court's review. The Court asks the parties to be judicious in their sealing

4   requests.

5        **IT IS SO ORDERED.**

6   Dated:  11/7/22

7

8                        JAMES V. SELNA

9                        UNITED STATES DISTRICT JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

73

# EXHIBIT K

*Defendant's Direct Deposition Designations*

| Witness | Date | Defendant's Direct Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections | Defendant's Counter-Counter Designations |
|---|---|---|---|---|---|---|
| Abdul-Hafiz, Yassir | Feb. 18, 2022 | 5:7-8 | | | | |
| | | 5:11-14 | | | | |
| | | 5:25-6:12 | | | | |
| | | 9:19-21 | | | | |
| | | 17:8-18:6 | | | | |
| | | 18:9-22 | | | | |
| | | 108:21-24 | | | | |
| | | 109:2-4 | | | | |
| | | 114:19-115:2 | | | | |

1

# EXHIBIT M

*Defendant's Direct Deposition Designations*

| Witness | Date | Defendant's Direct Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections | Defendant's Counter-Counter Designations |
|---------|------|-------------------------------|----------------------|--------------------------------|----------------------|----------------------------------------|
| Scruggs, Stephen | Jan. 6, 2022 | 8:4-6 | | | | |
| | | 8:20-9:1 | | | | |
| | | 9:8-25 | | | | |
| | | 12:23-25 | | | | |
| | | 13:7-8 | | | | |
| | | 46:15-17 | | | | |
| | | 46:24-25 | | | | |
| | | 47:6-7 | | | | |
| | | 53:21-22 | | | | |
| | | 54:1-2 | | | | |
| | | 54:4-6 | | | | |
| | | 54:9 | | | | |

1

**Exhibit M**
**-205-**

# EXHIBIT O

*Defendant's Direct Deposition Designations*

| Witness | Date | Defendant's Direct Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections | Defendant's Counter-Counter Designations |
|---------|------|-------------------------------|------------------------|----------------------------------|------------------------|------------------------------------------|
| Scruggs, Stephen | Feb. 18, 2022 | 6:12-13 | | | | |
| | | 6:17-18 | | | | |
| | | 32:18-20 | | | | |
| | | 38:24-25 | | | | |
| | | 39:3-13 | | | | |
| | | 41:3-18 | | | | |
| | | 42:2-43:15 | | | | |
| | | 43:18-24 | | | | |
| | | 45:8-10 | | | | |
| | | 45:12-20 | | | | |
| | | 45:22-46:7 | | | | |
| | | 46:13-20 | | | | |
| | | 60:2-4 | | | | |
| | | 60:8-15 | | | | |

1

*Defendant's Direct Deposition Designations*

| Witness | Date | Defendant's Direct Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections | Defendant's Counter-Counter Designations |
|---|---|---|---|---|---|---|
| | | 60:18-23 | | | | |
| | | 64:13-16 | | | | |
| | | 64:19-20 | | | | |
| | | 64:22-65:3 | | | | |
| | | 65:8-11 | | | | |
| | | 67:12-14 | | | | |
| | | 67:17-18 | | | | |
| | | 74:11-24 | | | | |
| | | 75:3-4 | | | | |
| | | 75:6-9 | | | | |
| | | 76:3-5 | | | | |
| | | 78:20-29:2 | | | | |

2