# EXHIBIT D

```
                                    ___✓___ FILED
                                    _____ ENTERED
                                    _____ LODGED
                                    _____ RECEIVED

                                       JUL 1 8 2017

                                 CLERK, U.S. BANKRUPTCY COURT
                                 SOUTHERN DISTRICT OF CALIFORNIA
                                 BY LL                    DEPUTY
```

1

2

3

4

5

6

7

8                    UNITED STATES BANKRUPTCY COURT

9                    SOUTHERN DISTRICT OF CALIFORNIA

10

11  In re:                          )   BK. No. 16-05968-LT11
                                    )
12  SOTERA WIRELESS, INC.,          )
                                    )   **AMENDED** MEMORANDUM OF
13              Debtor.             )   DECISION INCLUDING POST-TRIAL
                                    )   FINDINGS OF FACT AND
14                                  )   CONCLUSIONS OF LAW [REDACTED]*
                                    )
15  ─────────────────────────────────────────────────────────

16

17      The trial in connection with debtor Sotera Wireless, Inc.'s objection to the proof of

18  claim filed by Masimo Corporation took place on April 3, 2017 through April 12, 2017.

19  After considering:  (1) the testimonial evidence presented:  (a) at trial,[1] (b) through

20  declarations of experts,[2] and (c) through deposition transcripts;[3] (2) the documentary

21  ─────────────────────────────

22  *  This document contains limited additions, redactions, and corrections, but otherwise duplicates
    the document filed under seal on May 12, 2017 at Dkt. # 895-2.  Additions to the document involve

23  relevant post-trial proceedings.  An unredacted form of this document was filed under seal at Dkt.
    # 1025.  Red-lined pages showing changes to Dkt. # 895-2 are found at Dkt. # 1024.

24  [1]  Trial transcripts are found at Dkt. ## 669, 670, 671, 683, 797, 693, 813, 798, 816, 814, & 815.
    [2]  Expert declarations introduced into evidence are found at Dkt. ## 573 (Barker), 574 (Mangum),

25  575 (Muhsin), 576 (Walbrink), 577 (Kopelev), 582 (Epstein), 583 (Vaughn), 603 (Mangum Errata),
    688 (Epstein Supplement), 689 (Vaughn Errata), & 708 (Kopelev Supplement).  Introduction of this

26  evidence was limited in small measure by the Court's rulings on the parties' objections.  See Dkt.
    ## 615 & 617 for the objections and # 622 for Masimo's response.  The rulings are found in the

27  relevant transcript.
    [3]  The testimonial evidence introduced through deposition excerpts that were not read into the

28  record at trial is found at Dkt. ## 719 & 736.  But see n. 36.  The Court's rulings on objections to
    deposition testimony were made on the record at trial and are set out, in short, in Dkt. # 676, 696,

                                            1

**EXHIBIT D**
**-197-**

1    evidence introduced during trial;[4] (3) the Joint Stipulated Facts;[5] and (4) the arguments

2    made by the parties in briefing, during the course of the trial, and at closing argument,[6] the

3    Court sustained Sotera's objection in part and reduced Masimo's claim to $558,000.  It also

4    found that Masimo was entitled to injunctive relief in some respects.

5            The Court initially announced its determinations, in brief, at a hearing on oral ruling

6    held on April 14, 2017.[7]  This document contains more extensive findings of fact and

7    conclusions of law.[8]  It supplements, rather than replaces, the previous oral ruling.  As the

8    Court stated at the oral ruling, however, to the extent of any inconsistency between the

9    Court's oral ruling and this written document, this document controls.[9]

---

& 707.

[4]   See Dkt. # 884 for a list of the documentary evidence received into evidence at trial.

[5]   See Dkt. # 570.

[6]   See Dkt. ## 571, 581, & 815.  As discussed starting at page 99 below, the Court denied a summary judgment motion filed by Sotera but considered all documents filed in connection with this request as appropriate briefing in connection with the trial. See Dkt. # 620, 623, 625, & 645.

[7]   See Dkt # 815.

[8]   The Court reviewed and, in some limited respects, utilized portions of proposed findings submitted by the Parties.  See Dkt. ## 771 & 782.

[9]   To the extent the Court expressly or implicitly categorizes some of the determinations here as either a finding of fact or a conclusion of law, this categorization is not intended to be rigid.  In many cases, the particular issue decided by the Court may involve a mixed question of law or fact. The parties, thus, should focus on the substance of what the Court has determined rather than the labels.  If a finding of fact is more correctly a conclusion of law, it should be so considered.  The converse is also true.

2

EXHIBIT D
-198-

# I.

## PROCEDURAL BACKGROUND[10]

**State Court Lawsuit**

On May 10, 2013, Masimo filed a lawsuit in the Orange County Superior Court alleging five causes of action:  (1) trade secret misappropriation; (2) breach of contract; (3) intentional interference with prospective economic advantage; (4) unfair competition; and (5) breach of the implied covenant of good faith and fair dealing (the "State Court Litigation").  Claim 50-1; attachment at p. 6-25.  The State Court complaint named Sotera, James Welch, and David Hunt as defendants.  Stipulated Fact ¶ 20.  Mr. Welch and Mr. Hunt are former employees of Masimo; at the time of the State Court complaint, however, they were Sotera employees.  In short, Masimo alleged that Mr. Hunt and Mr. Welch took Masimo trade secret documents and information to Sotera and that Sotera used the documents and information.  Masimo demanded a jury trial.  Claim 50-1; attachment at p. 25.

An amended complaint followed on December 16, 2013.  *Id.* at 27-48.

Masimo sought a preliminary injunction in the State Court Litigation in 2013, but the State Court denied its request.  Dkt. ## 116 at 5:17-28 & 116-1:¶ 3 & ex. A.  There is no evidence before this Court evidencing that Masimo renewed this request.  Masimo asserts that a TRO ultimately was unnecessary given Sotera's post-TRO request agreements.  See Dkt. # 129 at 3:7-16.

---

[10]  The Court's discussion of the State Court Litigation is limited to those procedural aspects of the case where the parties agree or where the Court received evidence.  The Court does not purport to detail all aspects of litigation pending in another court.

Similarly, the discussion of procedural matters during the chapter 11 case is limited to those events and determinations most directly relevant to the resolution of the Masimo claim objection and most likely to be helpful to a reviewing court.  This was an active chapter 11 case and involved numerous applications and motions, contested and otherwise, that are not detailed here.  In particular, the plan confirmation process is not discussed.  Masimo actively participated in other aspects of the case.

**EXHIBIT D**
**-199-**

1    As of the petition date, trial in the State Court Litigation had not commenced.  The

2 parties do not agree as to the extent to which the State Court Litigation was trial ready as of

3 the petition date.  See, e.g., Dkt. ## 116 at 19:25-20:15 & 129:1:23-25.

4    Some pre-petition delay in resolution of the State Court Litigation resulted from

5 issues involving the individual defendants.  See Dkt. # 86 at ¶¶ 24-28.

6

7 **Bankruptcy Proceedings**

8    Sotera filed its chapter 11 case on September 30, 2016.

9    Masimo and Sotera both took prompt steps in an attempt to control resolution of the

10 issues pending in the State Court Litigation.

11

12    **Masimo Adversary Proceeding**

13    Approximately one week after the petition date, Masimo initiated an adversary

14 proceeding [Adv. No. 16-90154].  Dkt. # 44.

15    The Masimo adversary proceeding complaint requested relief based on alleged post-

16 petition misappropriation by Sotera of Masimo's trade secrets under both California law and

17 the United States Defend Secrets Act of 2016.  Masimo Adv. Dkt. # 1.  The adversary

18 proceeding complaint mirrored numerous allegations in the State Court Litigation, and it

19 sought actual damages and injunctive relief.  *Id.*

20    Prior to any answer by Sotera, the Court discussed the pending litigation at a

21 December 9, 2016 hearing on other matters.  See Dkt. ## 224 & 238 at 12:20-24:5.  At that

22 hearing, the Court directed Sotera and Masimo to meet and confer regarding resumption and

23 continuation of discovery in relation to issues related to both the State Court Litigation and

24 the Masimo adversary proceeding.  Dkt. # 238 at 38:1-14 & 42:2-14.  The parties were

25 unable to reach a stipulation concerning discovery, but Sotera lodged a proposed scheduling

26 order, and Masimo responded.  See Masimo Adv. Dkt. ## 13, 14, 15, & 18.  The Court set

27 the matter for hearing, but, prior to hearing, Masimo voluntarily dismissed its adversary

28 proceeding.  See Masimo Adv. Dkt. # 16.

**EXHIBIT D**
**-200-**

1    Sotera objected to dismissal of the adversary proceeding.  See Masimo Adv. Dkt.

2    # 17.  Ultimately, however, Sotera determined not to set this opposition for hearing, and the

3    Court determined that discovery scheduling should continue in connection with the main

4    case and the need for estimation or adjudication of the Masimo claim.  See Masimo Adv.

5    Dkt. # 24.

6         Masimo eventually filed a formal proof of claim in this case and, thus, agreed to the

7    bankruptcy court's adjudication of its claim through the claims allowance process.  As a

8    result, it was and is unnecessary for the Court to consider whether the filing of the Masimo

9    adversary proceeding constituted a submission to the jurisdiction of this Court and a waiver

10   of Masimo's right to a jury trial.  It is further unnecessary for the Court to consider whether,

11   if such waiver occurred, the waiver was obviated by dismissal of the adversary proceeding.

12   The Court takes no position on these issues at this time.

13        **Masimo stay relief motion**

14        Early in the case, Masimo also filed a motion seeking stay relief to continue with a

15   jury trial in State Court.  (See Dkt. ## 84, 86, & 87).

16        Sotera opposed (See Dkt. ## 116 & 117), arguing, among other things, that, contrary

17   to Masimo's assertions, the case was not entirely trial ready.  Dkt. # 116-1 at 2:18-21 & 116

18   at 6:4-8:19.  Sotera asserted that Masimo had recently added "Product Allegations" and

19   claimed that these would require an amended complaint in the State Court, substantial

20   additional discovery, and potentially other action prior to trial.  Dkt. # 116 at 12:3-14 &

21   19:25-20:15.[11]  The Official Committee of Unsecured Creditors (the "OCC") and the

22   secured lenders supported this opposition.  Dkt. # 135.

23        Masimo replied to Sotera's opposition.  Dkt. # 129 & 130.

24        Before a November 14, 2016 hearing, the Court preliminarily determined in a posted

25   Tentative Ruling (See Dkt. # 141) that stay relief was not appropriate because, among other

26   _____

27   [11]  Sotera argued that the State Court Litigation focused on alleged use of trade secrets in marketing and sale, the "Customer Allegations", until shortly before the petition date.  Only then, according to Sotera, did Masimo raise claims based on Sotera's alleged use of Masimo trade secrets in the development of Sotera's technology, the "Product Allegations."

28

**EXHIBIT D**
**-201-**

1   things, it was unclear that Sotera had the financial ability to litigate.  In such a case, a

2   liquidation would follow, and the need to litigate the Masimo claims might evaporate; a

3   chapter 7 trustee might simply allow any pending claim, particularly if the case was

4   administratively insolvent.  Also, among other things, questions of timing and about the trial

5   readiness of the "Product Allegations" concerned the Court.  *Id.*  After the hearing, the Court

6   acknowledged that Sotera had financial challenges but was attempting to obtain post-

7   petition financing.  As a result, and with the acquiescence of Masimo, the Court did not

8   deny the stay relief motion but instead continued the hearing to December 9, 2016.  See Dkt.

9   ## 152 & 159.

10   As of the continued hearing on stay relief the facts had changed.  Mr. Welch had

11   removed the State Court Litigation to the bankruptcy court for the Central District of

12   California and requested a venue transfer to this Court.  See Dkt. # 188, 207, 209, & 215.

13   As a result, stay relief to allow the litigation to proceed in State Court was not then

14   appropriate—there was nothing pending in State Court.  See Dkt. # 238 at 8:19-10:25.  The

15   Court, however, determined that the venue transfer might occur, that a motion for remand

16   might be filed, that such a motion might, and likely would, be granted, and that at such a

17   time the matter would be ripe for adjudication.  See Dkt. ## 217, 224, & 238.  As a result,

18   and with the acquiescence of Masimo, the Court again declined to deny the motion and

19   continued the hearing to January 5, 2017.  Dkt. ## 224 & 238.  The Court also shortened

20   time for notice once a remand motion became appropriate.  *Id.*

21   At the time of the continued hearing, venue transfer had not occurred but appeared to

22   be imminent.  Eventually, the bankruptcy court for the Central District granted the venue

23   transfer.  This Court then considered the remand request and related opposition and

24   remanded the matter to State Court.  See Dkt. ## 236, 274, 281, 282, 283, 287, 289, & 303.

25   By this time, Sotera had obtained post-petition financing sufficient to allow litigation of

26   Masimo's claims.  Dkt. ## 172, 183, 189, 194 at 48:12-51:3, 195, 196, 242, 262, 285 at 2,

27   290, 301, & 308.

28   Thus, resolution of the stay relief motion was now appropriate.

**EXHIBIT D**

**-202-**

1    Questions remained however.  See Tentative Ruling at Dkt. # 279.  First, the parties

2    continued to disagree as to whether the State Court Litigation was trial ready in its entirety.

3    Piece meal litigation in State Court would not allow Sotera to successfully emerge from

4    bankruptcy.  Whether the State Court could timely adjudicate the matter, even if everything

5    was trial ready, was also an issue.  As the Court was in a poor position to determine either

6    the State Court schedule or the State Court's view of trial readiness, the Court granted initial

7    stay relief to allow the State Court to decide what was ready for trial in the State Court and

8    when the State Court trial could occur on both the Customer Allegations and the Product

9    Allegations.  Dkt. ## 290, 308, & 320.

10    In connection with stay relief, Masimo failed to request a waiver of the Federal Rule

11    of Bankruptcy Procedure 4003(a) stay.  As a result, it prematurely filed a motion in State

12    Court, and its motion was void.  *See In re Schwartz*, 954 F.2d 569, 574 (9th Cir. 1992).  Dkt.

13    # 331.  Sotera responded, not with an observation regarding the Rule 4003(a) stay, but with

14    a request for an additional stay.  Dkt. # 333.  The Court determined that the stay request was

15    unnecessary, but it also determined that further delay of the matter was unnecessary.  As a

16    result, the Court issued an additional order retroactively lifting the Federal Rule of

17    Bankruptcy Procedure 4003(a) stay in order to validate Masimo's State Court motion,

18    provided that the matter did not proceed prior to a specific date.  See Dkt. # 335.

19    Unfortunately, the State Court was unable to provide the assistance the parties and

20    the Court needed.  See Dkt. ## 379 & 379-1 passim and, most directly, p. 60 of 106:11-13.

21    It refused to promptly determine whether all issues were then pending and trial ready.

22    Instead, it required a fully noticed motion for hearing approximately two months later.  This

23    date would not allow successful resolution of the bankruptcy case; Sotera was running out

24    of money.  In addition, the State Court refused to commit to any trial date, even if the case

25    was entirely trial ready.  The transcript makes clear the State Court's frustrations.  Dkt.

26    # 379-1; Ex. 9.  The Court can well appreciate the pressures on the State Court, but the State

27    Court's decision left this Court with no option except to proceed to adjudicate the claims in

28    the context of a contested claim objection.  Additional stay relief was not provided;

**EXHIBIT D**
**-203-**

1    eventually Masimo's request became moot as the State Court continued the trial date to

2    June 5, 2017.  Dkt. # 430.  Masimo thus withdrew its stay relief motion, without prejudice.

3    See Dkt. # 448 & 459 at 56:4-59:16.

4         **Request for § 105 injunction**

5         Sotera filed an adversary proceeding [No. 16-90160] requesting that the Court enjoin

6    continuation of the State Court Litigation in connection with claims against the individual

7    defendants, Mr. Hunt and Mr. Welch.  See Sotera Adv. Dkt. # 1.  Sotera sought a TRO.

8    Sotera Adv. Dkt. # 4.  Initially, the Court declined to rule given stipulated delays and the

9    removal of the State Court Litigation from the State Court.

10        Eventually, once Masimo dismissed its adversary proceeding, it became clear that the

11   matter would proceed in some fashion in this Court, and Sotera obtained funding for a

12   defense, the Court denied the emergency TRO request without prejudice.  Sotera Adv. Dkt.

13   ## 40-42.  In particular, there was no need to stay the dismissed Masimo adversary

14   proceeding and there was no evidence that the reorganization process would be negatively

15   impacted if Mr. Hunt and Mr. Welch were required to participate in the State Court

16   Litigation.  *Id.*

17        Sotera never renewed its request for this relief, and the Sotera Adversary Proceeding

18   became dormant.

19        **Estimation motion**

20        As briefly noted in connection with stay relief, Sotera initially brought the need for

21   some level of bankruptcy court adjudication of claims before the Court in connection with a

22   request for estimation of the Masimo claim.  See Dkt. ## 271 & 273.  Masimo opposed.

23   Dkt. ## 337, 380, 386, & 387.  The OCC eventually joined in the estimation request.  Dkt.

24   # 366.  And Sotera replied to Masimo's opposition.  Dkt. # 365.  Once it became clear that

25   the Court needed to reach the merits of the Masimo claim, the need for estimation was no

26   longer present, scheduling in connection with the estimation motion was abandoned, and the

27   schedule in connection with estimation was converted into pretrial scheduling in relation to

28

8

**EXHIBIT D**
**-204-**

1   resolution of the Masimo claim objection.  Dkt. ## 392, 398, 403, 412, 418, & 424 at 22:7-

2   8.

3        In connection with claim estimation, the Court also requested briefing on two issues:

4   (1) could the Court monetize a claim for injunctive relief[12]; and (2) did Masimo have an

5   administrative claim?  While briefing occurred, the move to the claim resolution process

6   made a delay of decision appropriate.  The Court's ruling after trial, coupled with the terms

7   of Sotera's reorganization plan, made a final decision on these issues unnecessary.  See Dkt.

8   # 416.

9        **Masimo proof of claim**

10       Sotera requested a bar date, and the Court established it as December 30, 2016.  See

11   Dkt. # 150, 155, & 157.

12       Masimo then filed a request that it be allowed to delay filing its proof of claim.  Dkt.

13   # 237.  In particular, Masimo wished to preserve its right to a jury trial.  Sotera opposed.

14   Dkt. # 243.  While the Court was sympathetic to Masimo's request, it was equally

15   sympathetic to Sotera's opposition.  In particular, Sotera suggested that Masimo had never

16   articulated its claim for damages with any specificity.  As a result, the Court provided orders

17   that reflected what it believed to be a fair result for both parties.

18       It first granted a short extension that allowed Masimo to be heard.  Dkt. ## 244 &

19   246.  The extension was conditional; it required Masimo on or before the bar date to file an

20   informal proof of claim, filed with reservation of rights, that articulated with specificity the

21   basis for its claim, the amount of its requested damages, and the evidence that it would bring

22   to bear in connection with such a request.  Dkt. # 244.  If Masimo filed this document, the

23   Court then allowed it to delay filing of a proof of claim until the hearing.  *Id.*  Masimo

24   timely filed its informal proof of claim.  See Dkt. ## 266 & 275.  It estimated its damages as

25   at least between $14,420,244 and $15,519,511.  Dkt. # 275 at 3:16-18.  At the hearing, the

26   Court allowed an additional extension.  Dkt. ## 280, 290, 308, & 338.  If Masimo failed to

27   _____

28   [12]  This point was important in connection with Masimo's request for a mandatory injunction
     regarding the Product Allegations.

**EXHIBIT D**
**-205-**

1   file a claim by this later date, it would have waived any claims against the Sotera estate.

2   The hope was that Masimo could obtain a decision from the State Court through jury trial

3   before claim litigation was necessary.  Unfortunately, the State Court could not move with

4   the speed required by the bankruptcy process.

5          Masimo timely filed an informal proof of claim (see Dkt. # 275) and then filed a

6   formal proof of claim.  Claim # 50.  Masimo's formal proof of claim asserted at least

7   $15,500,000 in damages.  Claim # 50-1; attachment at p. 2:15-18.  In its final pre-trial brief,

8   Masimo's claim had ballooned to at least $22,700,000 to $28,500,000 in alleged damages.

9   Dkt. # 571, p. 41:1-4.[13]

10         **Objection to the Masimo proof of claim**

11         Sotera filed an objection to the Masimo claim.  See Dkt. # 403.  As the Masimo claim

12  included requests for injunctive relief, the Court entered a stipulated order that the contested

13  claim objection trial would be deemed an adversary proceeding.  See Dkt. ## 514 at ¶ 2

14  & 517.  The Court also entered a stipulated pretrial order.  Dkt. # 529.

15         During discussions regarding Sotera's plan, it was suggested that Sotera's proposed

16  source(s) of post-confirmation capital were unwilling to lend if the damages in the Masimo

17  claim objection litigation exceeded a certain amount; the Court requested that it not be told

18  the number.  Dkt. ## 418 at 68:2-4 & 459 at 58:13.  When Sotera filed its Third Amended

19  Plan, however, it placed Masimo and certain other creditors in Class 6.  One could

20  extrapolate a Masimo recovery acceptable to the lenders because at $3,325,000 the class

21  would be paid in full.  See Dkt. ## 511 & 512.

22         Masimo filed a motion suggesting that the Court remedy this violation of its directive

23  by requiring Sotera to proceed to trial in the State Court.  Dkt. # 536, 537, & 552.  Sotera

24

25  _____

    [13]  In relevant part, the number is based on: $1,600,000 to $2,500,000 million for lost profits at a

26  hospital; $300,000 to $500,000 in lost profits at another hospital; $18,000 in direct costs; at least
    $2,600,000 in avoided costs (unjust enrichment) on customer related trade secrets; at least

27  $10,300,000 in avoided costs for technical trade secret documents; at least $1,600,000 in unjust
    enrichment on the technical trade secrets (alternatively, at least $4,000,000 in royalty); at least a

28  $300,000 royalty for the pricing strategy trade secrets; and $8,300,000 in sales revenues.  See Dkt. #
    571, pp. 34-38 & Masimo's Closing Argument PowerPoint at 110.

EXHIBIT D
-206-

1  opposed. Dkt. # 548. The Court viewed the motion as requesting an inappropriately

2  punitive sanction and denied the requested relief. Dkt. # 559, 565, & 681 at 24:10-34:11.

3  **Discovery**

4  Once Sotera obtained litigation funding, the Court concluded that discovery should

5  go forward notwithstanding the automatic stay. In short, Sotera intended to seek estimation

6  of Masimo's claim, Masimo had initiated its adversary proceeding, and Sotera asserted that

7  it had not conducted any discovery in relation to the Product Allegations in the State Court

8  Litigation. Masimo also expressed a need for Product Allegations discovery, albeit on an

9  allegedly more limited basis. As a result, the Court ordered, among other things, that

10  discovery used in the State Court Litigation could be used in any proceedings in the

11  bankruptcy court (Dkt. ## 308 & 332) and requested a formal discovery order.

12  The Court originally suggested entry of an appropriate discovery scheduling order in

13  the Masimo adversary proceeding. Dkt. # 238 at 38:1-14 & 42:2-14. When the parties were

14  unable to agree on such an order, and after Masimo dismissed its adversary proceeding, the

15  Court required entry of an appropriate order in the main case. Dkt. ## 291 & 308. Given

16  the estimation motion and the contested plan confirmation process, contested matters existed

17  and Federal Bankruptcy Rules 7001, et seq., which incorporate the Federal Rules of Civil

18  Procedure, were applicable to these disputes.

19  The parties, however, struggled to reach consensus on discovery scheduling. See

20  Dkt. ## 313, 314, & 315. Eventually, the Court resolved the initial disputes. See Dkt.

21  ## 318, 329, & 332.

22  Thereafter, Sotera brought a motion to compel and to seek other relief in connection

23  with its trial preparation, Dkt. ## 404, 407, 411, 413, & 414; Masimo opposed. Dkt. ## 422

24  & 439. Sotera replied. Dkt. # 427. After hearing, the Court granted the motion to compel

25  in part. Dkt. ## 431, 448, 459, & 472.

26  On March 16, 2017, only two weeks before trial, Masimo brought its own motion to

27  compel. Dkt. # 535. Debtor opposed. Dkt. ## 548 & 551. The Court denied Masimo's

28  request that its motion be heard on shortened notice. Dkt. ## 557 & 559. The Court later

**EXHIBIT D**

**-207-**

1  denied the requested relief, as pled, without prejudice to Masimo's right to raise its request

2  again at trial.  It also made clear that it would not try the issue of the alleged superiority of

3  Sotera's technology.  Dkt. ## 557, 565, & 681 at 18:13-18.

4        Masimo did not renew this motion at trial.

5        **Discovery abuse and spoliation issues**

6        Various allegations of discovery abuse and spoliation arose during the course of the

7  case.  These matters are discussed below starting at page 27.

8        **Appeal**

9        The Court made clear at the time of the oral ruling that its oral ruling was not the

10  final word on the Masimo claim objection and that a written ruling and judgment would

11  follow.  The Court also made clear that, as of the time of the oral ruling, it had not finally

12  determined the form of the injunctions.  The minute order on the oral ruling was consistent

13  with these statements.  Dkt. # 747.

14        Notwithstanding this fact, in a burst of enthusiasm for protecting its rights, on

15  April 28, 2017, Masimo filed a notice of appeal from this Court's oral ruling.  Dkt. ## 817 &

16  822.

17        The Court does not believe that Masimo had any inappropriate intent.

18        Further, it was confident of its ability to finalize this document and to enter a final

19  order on the claim objection notwithstanding this appeal.  Its only concern was its ability to

20  consider the form of injunction and to consider a then-pending motion for intervention by

21  Mr. Welch.  As a result, it put the burden on Masimo to either dismiss the premature appeal

22  while reserving rights or to provide the Court with authority that it retained jurisdiction in

23  relation to the injunctions.  See Dkt. ## 865 & 867 at 21:8-22:15; 25:17-23.

24        Masimo provided the requested authority.  See Dkt. # 864.

25        Based on its submissions, the Court allowed Mr. Welch to intervene solely as to

26  formulation of the injunctions (Dkt. ## 774, 859, 942, 955, & 957) and finalized the

27  injunctions.  See Dkt. # 1023; see also Dkt. ## 758, 794, 825, 826, 866, 890, 938, 951, 955,

28  992, 1003, 1008, 1010, & 1012.

**EXHIBIT D**
**-208-**

1    Masimo did not seek a stay pending the appeal from the decision on the Masimo

2    claim objection.  Instead, on May 14, 2017, it filed an emergency motion for a stay pending

3    possible appeal of the order confirming Sotera's chapter 11 plan.  Dkt. ## 904 & 905.

4    Sotera opposed Dkt. # 909.  The OCC and the secured lenders joined.  Dkt. ## 910 & 912.

5    Masimo replied.  Dkt. # 915.

6        The Court denied the request for a stay of the confirmation order.  See Dkt. # 933.  In

7    short, it found that Masimo did not show a strong likelihood of success on its appeal in

8    relation to the claim objection as to the two issues it raised, the content of a yet to be issued

9    injunction and the Court's alarm analytics determinations; as a result it could not show a

10   strong likelihood of success in an appeal from the confirmation order.  *Id.* at 7-11.  It also

11   pointed out that Masimo failed to preserve objections to the confirmation order and that this

12   negatively impacted its likelihood of success.  *Id.* at 6-7.  Next, the Court found no

13   likelihood that Masimo would suffer irreparable harm in the absence of a stay.  *Id.* at 11-14.

14   In contrast, it found that an extraordinarily high risk of damage to Sotera and its other

15   creditors from a stay.  " . . . it likely will kill [Sotera]."  *Id.* at 114.  It concluded with an

16   observation that public policy did not require a different conclusion and that a bond was not

17   offered by Masimo.  *Id.* at 15.

18       Masimo did not appeal from the confirmation order.  It is now final.

19

20                                    **II.**

21                              **LEGAL STANDARDS**

22   **Jurisdiction**

23       The Court has jurisdiction over this matter; it is a core proceeding.  28 U.S.C.

24   §§ 1134; 157(b)(2)(B); *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1940 (2015)

25   ("Congress gave bankruptcy courts the power to hear and determine core proceedings and to

26   enter appropriate orders and judgments, subject to appellate review by the district court.")

27   (citations and internal quotation marks omitted); Southern District of California General

28   Order No. 312-E, *Order referring bankruptcy cases and proceedings to bankruptcy judges*

**EXHIBIT D**
**-209-**

1   *and authorizing bankruptcy appeals to be decided by the Ninth Circuit Bankruptcy*

2   *Appellate Panel*, Part I, 1.01 (Nov. 27, 2013), available at

3   https://www.casd.uscourts.gov/Rules/GeneralOrders/Lists/General%20Orders/Attachments/

4   139/GO_312E.pdf.

5        Venue is proper in the Southern District of California.  28 U.S.C. § 408.

6

7   **Masimo's Jury Trial Rights**

8        In the State Court, Masimo demanded a jury trial.  Masimo repeated that demand,

9   again and again, in this Court.  But, at the latest, when Masimo filed its proof of claim, it

10   subjected itself to the bankruptcy court's equitable power.  *Langenkamp v. Culp*, 498 U.S.

11   42, 44 (1990) (citing *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 58-59, and n.14

12   (1990)).  In doing so, it waived its Seventh Amendment right to a jury trial.  *Id.* at 44-45; see

13   also *In re Hashemi*, 104 F.3d 1122, 1125 (9th Cir. 1996) ("Nevertheless, we have held that a

14   bankruptcy litigant waives his right to a jury trial in proceedings 'vital to the bankruptcy

15   process of allowance and disallowance of . . . claims.' " (citation omitted)), *as amended*

16   (Jan. 24, 1997).[14]

17

18   **Claim Objection Standards**

19        Section 501 allows a creditor to "file a proof of claim."  11 U.S.C. § 501.  A proof of

20   claim is "deemed allowed, unless a party in interest . . . objects."  11 U.S.C. § 502(a).  And a

21   rule-compliant proof of claim provides "prima facie evidence" of the claim's validity and

22   amount.  Fed. R. Bankr. P. 3001(f).  A party in interest, however, may object to a claim

23   under § 502(a).  11 U.S.C. § 502(a); Fed. R. Bankr. P. 3007.  Such an objection to a proof of

24   claim "creates a dispute which is a contested matter . . . ."  *Lundell v. Anchor Const.*

25   *Specialists, Inc.*, 223 F.3d 1035, 1039 (9th Cir. 2000). [15]

26

27   [14]  This should be a non-controversial point.  See, e.g., RE & RE, REMEDIES 89 ("Parties that are
within the equitable jurisdiction of a bankruptcy court generally do not have a right to a jury trial."

28   (citing *Langenkamp*, 498 U.S. 42 and *Katchen v. Landy*, 382 U.S. 323 (1966)) (6th ed. 2005).
[15]  *In re S. California Plastics, Inc.*, 165 F.3d 1243, 1248 (9th Cir. 1999) ("Additionally, because the

**EXHIBIT D**
**-210-**

1    "Upon objection, the proof of claim provides some evidence as to its validity and

2    amount and is strong enough to carry over a mere formal objection without more."  *Id.*

3    (internal quotation marks omitted).[16]  The objector, thus, must come "forward with

4    sufficient evidence and show facts tending to defeat the claim by probative force equal to

5    that of the allegations of the proofs of claim themselves."  *Id.* (internal quotation marks

6    omitted).  If the objector does this, then the "burden reverts to the claimant to prove the

7    validity of the claim by a preponderance of the evidence."  *Id.* (internal quotation marks

8    omitted).  "The ultimate burden of persuasion remains at all times upon the claimant."  *Id.*

9

10   **Misappropriation of Trade Secrets**

11   Masimo seeks to hold Sotera liable for misappropriating its trade secrets.  Masimo's

12   claim is governed by the California Uniform Trade Secret Act ("CUTSA"), Cal. Civ. Code

13   §§ 3426-3246.11.[17]  The CUTSA "creates a statutory cause of action for the

14   misappropriation of a trade secret."  *Altavion, Inc. v. Konica Minolta Sys. Lab. Inc.*, 226 Cal.

15   App. 4th 26, 41 (2014).

16   Trade secret misappropriation occurs when a person:

17   (1) acquires another's trade secret with knowledge or reason to know "that the
     trade secret was acquired by improper means" (§ 3426.1, subd. (b)(1));

18   (2) discloses or uses, without consent, another's trade secret that the person
     "[u]sed improper means to acquire knowledge of" (*id.,* subd. (b)(2)(A));

19   (3) discloses or uses, without consent, another's trade secret that the person, "[a]t
     the time of disclosure or use, knew or had reason to know that his or her

20   knowledge of the trade secret was"
     a) "[d]erived from or through a person who had utilized improper means

21      to acquire it" (*id.,* subd. (b)(2)(B)(i)),
     b) "[a]cquired under circumstances giving rise to a duty to maintain its

22      secrecy or limit its use" (*id.,* subd. (b)(2)(B)(ii)), or

23   _____

     allowance of a claim is a contested matter, the proceeding is before the bench not a jury.").

24   [16]  Federal Rule of Bankruptcy Procedure 3007 "implements the statutory command that claims be
     'deemed allowed' unless a party in interest 'objects,' by requiring that an objection to claim be in

25   writing and filed and by requiring notice to the creditor of the objection to claim at least 30 days
     before the hearing on the objection."  *In re Dynamic Brokers, Inc.*, 293 B.R. 489, 496 (B.A.P. 9th

26   Cir. 2003) (quoting Fed. R. Bankr. P. 3007(a)).
     [17]  California's legislature enacted the Uniform Trade Secret Act in 1984.  *Morlife, Inc. v. Perry*, 56

27   Cal. App. 4th 1514, 1520 (1997) ("By enacting the UTSA in 1984, our Legislature added California
     to the long list of states which have determined that the right of free competition does not include

28   the right to use confidential work product of others.").

**EXHIBIT D**
**-211-**

1         c)  "[d]erived from or through a person who owed a duty to the person
           seeking relief to maintain its secrecy or limit its use" (*id.,* subd.
2                (b)(2)(B)(iii)); **or**
    (4) "[b]efore a material change of his or her position, knew or had reason to know
3           that it was a trade secret when that knowledge of it had been acquired by
      accident or mistake" (*id.,* subd. (b)(2)(C)).
4

5     *DVD Copy Control Ass'n, Inc. v. Bunner*, 31 Cal. 4th 864, 874 (2003), *as modified* (Oct. 15,

6     2003) (formatting and emphasis added).

7           In short, to make a prima facia showing in relation to its misappropriation of trade

8     secret claim, Masimo must show:  "(1) [Masimo] owned a trade secret, (2) [Sotera]

9     acquired, disclosed, or used [Masimo's] trade secret through improper means, and (3)

10    [Sotera's] actions damaged [Masimo]."  Sargent Fletcher, Inc. v. Able Corp., 110 Cal. App.

11    4th 1658, 1665 (2003).

12    **What is a trade secret?**

13    The CUTSA defines a "trade secret" as:

14    [I]nformation, including a formula, pattern, compilation, program, device,
method, technique, or process, that:
15

16    (1) Derives independent economic value, actual or potential, from not being
    generally known to the public or to other persons who can obtain economic
    value from its disclosure or use; and
17    (2) Is the subject of efforts that are reasonable under the circumstances to
    maintain its secrecy.
18

19    Cal. Civ. Code § 3426.1(d).

20          As a definitional matter, information can be a trade secret only if it is not "generally

21    known to the public or to other persons who can obtain economic value from its disclosure

22    or use."  Cal. Civ. Code § 3426.1(d)(1).  In general, "[p]ublic disclosure of information

23    through display, trade journal publications, advertising, or other carelessness can preclude

24    protection."  Cal. Civ. Code § 3426.1 Legis. Comm. Comments.  Thus, information that is

25    disclosed to customers generally cannot be considered a trade secret or confidential.  *See*

26    *Whyte v. Schlage Lock Co.*, 101 Cal. App. 4th 1443, 1454-55 (2002); *In re Providian Credit*

27    *Card Cases*, 96 Cal. App. 4th 292, 304 (2002) ("Public disclosure, that is the absence of

28    secrecy, is fatal to the existence of a trade secret.  If an individual discloses his trade secret

**EXHIBIT D**
**-212-**

1   to others who are under no obligation to protect the confidentiality of the information, or

2   otherwise publicly discloses the secret, his property right is extinguished." (internal

3   quotation marks and citations omitted)).

4          The "secrecy requirement" requires a "fact-intensive analysis." *DVD Copy Control*

5   *Ass'n Inc. v. Bunner*, 116 Cal. App. 4th 241, 251 (2004).  In the context of internet

6   publication, there are two extremes.  One end is:  "[w]idespread, anonymous publication of

7   the information over the Internet", which "may destroy its status as a trade secret." *Id.*  On

8   the other hand, "[p]ublication on the Internet does not necessarily destroy the secret if the

9   publication is sufficiently obscure or transient or otherwise limited so that it does not

10  become generally known to the relevant people, i.e., potential competitors or other persons

11  to whom the information would have some economic value." *Id.*

12         Masimo argues that "even if trade secret information is known by some portion of the

13  public, the information does not lose its status as a trade secret unless it is 'generally

14  known.'"  Dkt. # 571; Masimo Trial Brief at 3 (citing *Silicon Image, Inc. v. Analogix*

15  *Semiconductor, Inc.*, No. C-07-635 JCS, 2007 U.S. Dist. LEXIS 96073, *44-45 (N.D. Cal.

16  Dec. 20, 2007)).

17         It continues:  "The guiding concern in determining the implications of Internet

18  publication of information is whether the information has retained its value to the creator in

19  spite of the publication." *Id.* (quoting *Silicon Image, Inc.* at *45).  But this reading of

20  *Silicon Image, Inc.* is misplaced.

21         First, to the extent it is an accurate interpretation of *Silicon Image, Inc.* (it is not),

22  *DVD Copy Control Association, Inc.*—a published California appellate decision, not an

23  unpublished Northern District of California order denying a request for a preliminary

24  injunction—makes clear that general knowledge is not necessarily knowledge by the general

25  public.  Here, the relevant public includes persons who have an interest in patient

26  monitoring on the general care floor of a hospital be they a customer, an advocate, or a

27  competitor.  Second, *Silicon Image, Inc.* is actually quoting and citing *DVD Copy Control*

28  *Association, Inc.  See Silicon Image, Inc. v. Analogix Semiconductor, Inc.*, No. C-07-00635-

**EXHIBIT D**
**-213-**

1   JCS, 2007 U.S. Dist. LEXIS 96073, *44, 2008 WL 166950, *16 (N.D. Cal. Dec. 20, 2007).

2   And it appropriately cabins "generally known" with "to the relevant people" and includes

3   *DVD Copy Control Association, Inc.*'s laundry list of relevant people.  *Id.*

4        Further, readily ascertainable information cannot be a trade secret.  *Syngenta Crop*

5   *Prot., Inc. v. Helliker*, 138 Cal. App. 4th 1135, 1172 (2006) ("Information that is readily

6   ascertainable by a business competitor derives no independent value from not being

7   generally known." (citing *Am. Paper & Packaging Prod., Inc. v. Kirgan*, 183 Cal. App. 3d

8   1318, 1326 (1986)).

9                    **A customer list may qualify as a trade secret.**

10       Customer lists may be a trade secret under the CUTSA.  *See MAI Sys. Corp. v. Peak*

11   *Computer, Inc.*, 991 F.2d 511, 521 (9th Cir. 1993).  Whether a particular customer list is a

12   trade secret, however, is a factual matter.  *Morlife, Inc.*, 56 Cal. App. 4th at 1521.

13       If a customer list embodies "readily ascertainable" information, such as from a

14   publicly available business directory, courts "are reluctant" to protect it.  *Morlife, Inc.*,

15   56 Cal. App. 4th at 1521.  But if a company "has expended time and effort identifying

16   customers with particular needs or characteristics," courts "will prohibit former employees

17   from using this information to capture a share of the market."  *Id.*[18]  "As a general principle,

18   the more difficult information is to obtain, and the more time and resources expended by an

19   employer in gathering it, the more likely a court will find such information constitutes a

20

21   _____

[18]  *See Courtesy Temp. Serv., Inc. v. Camacho*, 222 Cal. App. 3d 1278, 1287 (1990) ("A list of
22   customers or subscribers built up by ingenuity, time, labor and expense of the owner over a period
     of many years is property of the employer, and knowledge of such a list, acquired by an employee
23   by reason of his employment, may not be used by the employee as his own property or to his
     employer's prejudice.  Employees, by appropriating only those customers who, after [employer's]
24   efforts, chose to patronize [employer] and saving themselves comparable efforts in screening those
     entities who declined [employer] patronage, have acquired commercially invaluable information."
25   (citations, internal quotation marks, and alterations omitted)); *Abba Rubber Co. v. Seaquist*,
     235 Cal. App. 3d 1, 19 (1991) ("By itself, knowledge of the identities of the businesses which buy
26   from a particular provider of goods or services is of no particular value to that provider's
     competitors.  However, that information is valuable to those competitors if it indicates to them a
27   fact which they previously did not know: that those businesses use the goods or services which the
     competitors sell.").
28

                                    18

1  trade secret." *Id.* at 1522.  Put in the language of the CUTSA, a customer list must have

2  economic value:

> 3  The requirement that a customer list must have economic value to qualify as a
>    trade secret has been interpreted to mean that the secrecy of this information
> 4  provides a business with a substantial business advantage.  In this respect, a
>    customer list can be found to have economic value because its disclosure
> 5  would allow a competitor to direct its sales efforts to those customers who
>    have already shown a willingness to use a unique type of service or product as
> 6  opposed to a list of people who only might be interested.  Its use enables the
>    former employee to solicit both more selectively and more effectively.

7

8  *Id.* (citations and internal quotation marks omitted).

9  **Negative information can be a trade secret.**

10  Sometimes valuable information is obtained through research, trial, and effort but

11  never leads to a tangible product.  Such information, however, identifies dead ends, bad

12  ideas, and research and development perils and pitfalls.  It has value to another because it

13  shows what not to do; it can thus save the competitor time and expense.  *See Courtesy*

14  *Temp. Serv., Inc.*, 222 Cal. App. 3d at 1287; Cal. Civ. Code § 3426.1 Legislative Committee

15  Comments ("The definition [of trade secret] includes information that has commercial value

16  from a negative viewpoint, for example the results of lengthy and expensive research which

17  proves that a certain process will *not* work could be of great value to a competitor.").

18  **What is "improper means"?**

19  The CUTSA provides a non-exclusive definition of "improper means."  Cal. Civ.

20  Code § 3426.1(a).  It "includes theft, bribery, misrepresentation, breach or inducement of a

21  breach of a duty to maintain secrecy, or espionage through electronic or other means."  Cal.

22  Civ. Code § 3426.1(a).  Some level of knowledge about impropriety is required:  "Use of a

23  trade secret without knowledge it was acquired by improper means does not subject a person

24  to liability unless the person receives notice that its use of the information is wrongful."

25  *PMC, Inc. v. Kadisha*, 78 Cal. App. 4th 1368, 1383, (2000), *as modified on denial of reh'g*

26  (Apr. 7, 2000).

27  The CUTSA also explicitly provides that "[r]everse engineering or independent

28  derivation alone shall not be considered improper means."  Cal. Civ. Code § 3426.1(a).

19

**EXHIBIT D**
**-215-**

1    Thus, showing "independent derivation or reverse engineering directly refutes the

2    element of use through improper means." *Sargent Fletcher, Inc. v. Able Corp.*, 110 Cal.

3    App. 4th 1658, 1670 (2003).  But, to be clear, this showing is not an affirmative one, and the

4    defendant does not have the burden of proof, although it "acts at its peril if it fails to present

5    evidence that rebuts the plaintiff's showing." *Id.* at 1669; *id.* at 1670 ("Thus, a party that

6    claims it independently derived or reverse engineered a component does not introduce "new

7    matter" or an affirmative defense, but a traverse.").

8    The CUTSA states that misappropriation can occur by:  (1) acquisition by improper

9    means, (2) use, or (3) disclosure.  *Id.* § 3426.1.  Thus, mere acquisition by improper means

10   is enough.

11   But while mere acquisition through improper means may constitute a

12   misappropriation, the absence of use may factor into a determination of monetary damages.

13   **Solicitation of customers may be an improper use of a trade secret.**

14   It is possible, but not inevitable, that a former employee may act improperly and in a

15   manner creating liability under the CUTSA if she solicits business from the customers of her

16   former employee.  "In accordance with these principles, the courts have repeatedly held a

17   former employee may be barred from soliciting existing customers to redirect their business

18   away from the former employer and to the employee's new business *if the employee is*

19   *utilizing trade secret information* to solicit those customers." *Ret. Grp. v. Galante*, 176 Cal.

20   App. 4th 1226, 1237 (2009) (emphasis in original).  To be clear, "it is not the *solicitation* of

21   the former employer's customers, but instead the *misuse of trade secret information*, that

22   may be enjoined." *Id*. (emphasis in original).[19]

23

24   _____

[19]  This concept flows from California's strong public policy against noncompetition agreements.
Cf. Cal. Bus. & Prof. Code § 16600.  See *Ret. Grp.*, 176 Cal. App. 4th at 1238 ("We distill from the

25   foregoing cases that section 16600 bars a court from specifically enforcing (by way of injunctive
relief) a *contractual* clause purporting to ban a former employee from soliciting former customers

26   to transfer their business away from the former employer to the employee's new business, but a
court may enjoin *tortious* conduct (as violative of either the Uniform Trade Secrets Act and/or the

27   Unfair Competition Law) by banning the former employee from using trade secret information to
identify existing customers, to facilitate the solicitation of such customers, or to otherwise unfairly

28   compete with the former employer.  Viewed in this light, therefore, the conduct is enjoinable *not*
because it falls within a judicially-created 'exception' to section 16600's ban on contractual

**EXHIBIT D**
**-216-**

1    **The Court may rely on inference to an appropriate extent.**

2    In its trial brief, Masimo argues:

3    California courts have explained that "[e]vidence of use of trade secrets 'need not be direct, but may be circumstantial, as long as the evidentiary inferences to be drawn are 'reasonably deducible from the evidence, and not such as are derived from speculation, conjecture, imagination, or guesswork.'" *Allergan*, 2012 WL 781705 at *38 (quoting *ThinkVillage-Kiwi, LLC v. Adobe Sys., Inc.*, 2009 U.S. Dist. LEXIS 106687, at *9 (N.D. Cal., Nov. 16, 2009)).

7    Dkt. # 571; Masimo Trial Brief at 5.  The Court agrees that it, as the factfinder, may draw

8    reasonable inferences.  *See Valdez v. Kismet Acquisition, LLC*, 474 B.R. 907, 916 (S.D. Cal.

9    2012) (" 'The bankruptcy court's conclusions of law are reviewed *de novo,* and its findings

10   of fact are reviewed for clear error.' " (quoting *USAA Fed. Sav. Bank v. Thacker (In re*

11   *Taylor),* 599 F.3d 880, 887 (9th Cir.2010)), *aff'd sub nom. In re Icenhower*, 567 F. App'x

12   517 (9th Cir. 2014); *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en

13   banc) (factual finding is clearly erroneous if illogical, implausible, or without support in

14   inferences that may be drawn from the facts in the record); cf. *Altavion, Inc.*, 226 Cal. App.

15   4th 26 at 63 ("We recite the facts in the manner most favorable to the judgment and resolve

16   all conflicts and draw all inferences in favor of respondent Altavion.").

17   **Burden of proof**

18   Under California law, the party asserting a trade secret misappropriation claim has

19   the burden of proof by a preponderance of the evidence.  *Sargent Fletcher, Inc.*, 110 Cal.

20   App. 4th at 1675; cf. Cal. Evid. Code §§ 115 & 500.

21   **Remedies**

22   The CUTSA provides a variety of remedies.  The Court may:  enjoin actual or

23   threatened misappropriation, § 3426.2; award damages for actual loss, § 3426.3(a); award

24   relief for unjust enrichment, § 3426.3(a); or order payment of a reasonable royalty if neither

25   damages nor unjust enrichment are provable, § 3426.3(b).  Cal. Civ. Code §§ 3426.2,

26   3426.3; see *Cadence Design Sys., Inc. v. Avant! Corp.*, 29 Cal. 4th 215, 226 (2002).  In

27   _____

28   nonsolicitation clauses, but is instead enjoinable because it is wrongful independent of any contractual undertaking.").

1   certain contexts, the Court may award exemplary damages and attorneys' fees and costs.

2   Cal. Civ. Code §§ 3426.3(c), 3426.4.

3              **Monetary relief is not required in the absence of unjust enrichment or actual loss.**

4

5        In its trial brief, Masimo suggests: "Damages for trade secret misappropriation are

6   available even if the defendant did not commercially use the trade secrets." Dkt. # 571;

7   Masimo Trial Brief at 7. But its expert appears to go farther; he testified that monetary

8   damages for unjust enrichment, in an eye-popping amount, are appropriate even if trade

9   secrets, in this case customer lists, were never used and sat in a drawer. Dkt. # 683; Test.

10  R. Mangum at 195:18-196:1. That aside, Masimo supports this assertion with a string cite

11  and accompanying explanatory parentheticals. These parentheticals, however, overstate the

12  holding of the cited cases.

13       First, Masimo cites *AT&T*, 1998 U.S. Dist. LEXIS 13459, at *5-6, and includes the

14  following parenthetical: (in a case that "simply involves unlawful access to information

15  about plaintiffs' customers," the court found that once defendants accessed and examined the

16  misappropriated data, they became obligated to pay for their misappropriation). Dkt. # 571;

17  Masimo Trial Brief at 7. The Court disagrees with this characterization of the *AT&T*

18  holding. In fact, the heading for the section containing the quoted language in *AT&T* states:

19  "A Royalty Award is Appropriate in this Case Because Defendants "Used" the TBR." *Id.* at

20  *4. (quotation marks in the original). In *AT&T*, the defendant admitted to using trade secret

21  information to prepare reports, to solicit some customers, to conduct audits and customer

22  verifications, and to in some fashion support an awards program. *Id.* at *3-4. The nuance in

23  the case was that the use of information was not a commercial use justifying a royalty. *Id.*

24  at *5.

25       Second, Masimo cites *Altavion*, 226 Cal. App. 4th at 66-68. Its parenthetical is

26  closer to the mark: (affirming award of reasonable royalty damages even though defendant

27  did not incorporate any of plaintiff's trade secrets into any of its products, or otherwise

28  commercially exploit the trade secrets). Dkt. # 571; Masimo Trial Brief at 7. But *Altavion*

22

only gets Masimo so far—there was significant and serious evidence of use; the defendant got access to information during negotiations subject to a confidentiality agreement and then secretly filed patent applications and obtained patents. *Altavion*, 226 Cal. App. 4th at 65-66.

Third, Masimo cites *Ajaxo Inc. v. E*Trade Fin. Corp. ("Ajaxo II")*, 187 Cal. App. 4th 1295, 1298-99 (2010) and its parenthetical states:  (holding that "where a defendant has not realized a profit or other calculable benefit as a result of his or her misappropriation of a trade secret, unjust enrichment is not provable within the meaning of section 3426.3, [subdivision] (b), whether the lack of benefit is determined as a matter of law or as a matter of fact.").  Dkt. # 571; Masimo Trial Brief at 7.  But *Ajaxo* again evidences actual use. *Ajaxo II*, 187 Cal. App. 4th at *passim*; *id.* at 1308 ("It is settled that in fashioning a pecuniary remedy under the CUTSA for past **use** of a misappropriated trade secret, the trial court may order a reasonable royalty . . . ." (emphasis added)).  *Ajaxo* also says that injunctive relief may be an appropriate remedy.  *Id.* at 1308.

Fourth and finally, Masimo cites *Sonoco Prods. Co. v. Johnson*, 23 P.3d 1287 (Colo. Ct. App. 2001) and its parenthetical states:  (affirming damages award based on plaintiff's research and development costs even for trade secrets improperly acquired but not used by defendant)."  Masimo Trial Brief at 7.  But, in fact, in this case there was active use of much of the misappropriated information and active encouragement of its use.  *Id.* at 1288.

In short, the Court rejects the suggestion made by Masimo's expert, and perhaps made by Masimo, that monetary damages are readily available if there is mere acquisition and no use, no monetary harm to Masimo, and no unjust enrichment to Sotera.  In such a case, injunctive relief alone may be an adequate remedy.

**Royalties**

The Court *may* "order payment of a reasonable royalty for no longer than the period of time the use could have been prohibited" if neither actual damages nor unjust enrichment are provable.  Cal. Civ. Code § 3426.3(b).  The Court, when determining a reasonable royalty, must estimate "what the parties would have agreed was a fair licensing price at the time the misappropriation occurred."  *Ajaxo II*, 187 Cal. App. 4th at 1313.

**EXHIBIT D
-219-**

1                 **Injunctive Relief**

2       The Court *may* also enjoin actual or threatened misappropriation.  Cal Civ. Code

3  § 3426.2(a); *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991)

4  ("An injunction in a trade secret case seeks to protect the secrecy of misappropriated

5  information and to eliminate any unfair head start the defendant may have gained.").  Under

6  the CUTSA, the injunction "shall be terminated when the trade secret has ceased to exist,

7  but the injunction may be continued for an additional period of time in order to eliminate

8  commercial advantage that otherwise would be derived from the misappropriation."  Cal.

9  Civ. Code § 3426.2(a).

10             **Exemplary Damages and Attorneys' Fees**

11       Exemplary damages are available under the CUTSA if the defendant's

12  misappropriation was willful and malicious:

13         If willful and malicious misappropriation exists, the court may award
       exemplary damages in an amount not exceeding twice any award made under

14         subdivision (a) or (b).

15  Cal. Civ. Code § 3426.3(c).

16       "Willful" means "a purpose or willingness to commit the act or engage in the conduct

17  in question, and the conduct was not reasonable under the circumstances then present and

18  was not undertaken in good faith."  *Ajaxo Inc.*, 135 Cal. App. 4th at 66.

19       "Malice" means "conduct which is intended by the defendant to cause injury to the

20  plaintiff or despicable conduct which is carried on by the defendant with a willful and

21  conscious disregard for the rights of others when the defendant is aware [of] the probable

22  consequences of its conduct and willfully and deliberately fails to avoid those consequences.

23  Despicable conduct is conduct which is so vile and wretched that it would be looked down

24  upon and despised by ordinary decent people."  *Id.*

25       A finding of willful and malicious misappropriation must be supported by clear and

26  convincing evidence. *Id.*  But malice may be proven either expressly, by direct evidence

27  probative of the existence of hatred or ill-will, or by implication from indirect evidence from

28

**EXHIBIT D**
**-220-**

1   which the fact-finder may draw inferences.  *Id.* at 66-67 (citing *Neal v. Farmers Ins.*

2   *Exchange*, 21 Cal.3d 910, 923, fn. 6 (1978)).

3      When considering the proper measure of exemplary damages, California courts

4   consider various factors:  "(1) the nature of the misconduct; (2) the amount of compensatory

5   damages; and (3) the defendant's financial condition."  *02 Micro Int'l Ltd. v. Monolithic*

6   *Power Sys., Inc.*, 399 F. Supp. 2d 1064, 1079 (N.D. Cal. 2005), *amended sub nom.*

7   *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 420 F. Supp. 2d 1070 (N.D. Cal. 2006),

8   *aff'd*, 221 F. App'x 996 (Fed. Cir. 2007), and *aff'd*, 221 F. App'x 996 (Fed. Cir. 2007)

9   (citations omitted); *see also Mattel, Inc. v. MGA Entm't, Inc.*, 801 F. Supp. 2d 950, 953

10  (C.D. Cal. 2011).  But "[t]here is no rule . . . mandating that a party show that all three

11  factors point strongly in favor of an exemplary damage award."  *02 Micro Intern. Ltd.*,

12  399 F. Supp. 2d at 1080.  For example, in *02 Micro International Limited*, the court awarded

13  exemplary damages even though no compensatory damages had been awarded.  *Id.*  By

14  contrast, in *Mattel, Inc. v. MGA Entm't, Inc.,* the court declined to award double damages:

15      In many other cases, the maximum statutory award of exemplary damages
       would be warranted, since all of the factors identified by the United States

16      Supreme Court and California Supreme Court appear to have been satisfied.
       The jury found Mattel's conduct reprehensible and the evidence confirmed that

17      Mattel encouraged its employees to consistently violate the California
       Uniform Trade Secrets Act.  Mattel's employees admitted that the company

18      benefitted from the misappropriated information and the jury concluded that
       Mattel's conduct resulted in tens of millions of dollars in harm.  Finally,

19      Mattel's high net worth suggests that a high award of exemplary damages is
       necessary to deter future misconduct, and trade secrets laws adopted by states

20      across the country provide for exemplary damages equal to twice the
       compensatory award.

21
       However, Mattel's conduct does not represent the most reprehensible form of

22      trade secret misappropriation imaginable.  It was silly, not evil, and it
       diminished in 2005.  The need for deterrence is absent because the outcome of

23      this litigation and other toy companies' knowledge about Mattel's pattern of
       misappropriation will preclude Mattel, or other any toy manufacturer, from

24      engaging in this type of conduct again.  Even recognizing its maliciousness,
       the conduct should not be punished by the largest exemplary damage award

25      available.  The Court instead awards MGA $85 million in exemplary
       damages—an amount equal to the remitted compensatory damage award.

26

27  801 F. Supp. 2d 950, 956 (C.D. Cal. 2011).

28

**EXHIBIT D**

**-221-**

1    The Court *may* also award reasonable attorney's fees and costs to the prevailing party

2    if "a claim of misappropriation is made in bad faith, a motion to terminate an injunction is

3    made or resisted in bad faith, or willful and malicious misappropriation exists . . . ."  Cal.

4    Civ. Code § 3426.4.[20]  Even if willful and malicious misappropriation exists, attorney's fees

5    are not mandatory.  *02 Micro Int'l Ltd.*, 399 F. Supp. 2d at 1080.

6

7    **Respondeat Superior**

8    The doctrine of respondeat superior was well explained by the California Court of

9    Appeals:

10       Under the respondeat superior doctrine, an employer may be vicariously liable
         for torts committed by an employee.  The rule is based on the policy that

11       losses caused by the torts of employees, which as a practical matter are certain
         to occur in the conduct of the employer's enterprise, should be placed on the

12       enterprise as a cost of doing business. The basic test for vicarious liability is
         whether the employee's tort was committed within the scope of employment.

13       The determination of scope of employment can be a difficult task. Hence,
         there are numerous judicially developed rules, applicable in differing

14       circumstances, for determining whether an employee was acting within the
         scope of employment.

15

16   *Kephar v. Genuity, Inc.*, 136 Cal. App. 4th 280, 291 (2006) (citations omitted).

17       An employer can be liable under this doctrine whether or not the act of the employee

18   was authorized:

19       An employee's willful, malicious, and even criminal torts may fall within the
         scope of his or her employment for purposes of respondeat superior, even

20       though the employer has not authorized the employee to commit crimes or
         intentional torts.

21

22   *Lisa M. v. Henry Mayo Newhall Mem'l Hosp.*, 12 Cal. 4th 291 (1995).

23       And the employer may be liable even if the employee's motivations had nothing to do

24   with benefit to the employer:

25

26   _____

27   [20]  "Recoverable costs hereunder shall include a reasonable sum to cover the services of expert
     witnesses, who are not regular employees of any party, actually incurred and reasonably necessary

28   in either, or both, preparation for trial or arbitration, or during trial or arbitration, of the case by the
     prevailing party."  Cal. Civ. Code § 3426.4.

**EXHIBIT D**
**-222-**

California no longer follows the traditional rule that an employee's actions are within the scope of employment only if motivated, in whole or part, by a desire to serve the employer's interests.

*Id.* at 297.

## III.

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND APPLICATION OF LAW TO FACTS

**Burden of Proof**

1.    Here, Masimo filed a proof of claim; Sotera objected.  The Court determines that both sides have done as they should to avoid a summary adjudication.  In particular, Sotera came forward with sufficient evidence to return the burden to Masimo.

2.    Masimo, thus, bears the burden of proof by a preponderance of the evidence. *Lundell*, 223 F. 3d at 1039.  This mirrors what would have happened in the State Court. *Sargent Fletcher, Inc.,* 110 Cal. App. 4th at 1675.

**Inference Based on Alleged Discovery Abuse and Spoliation**

3.    During the course of the State Court Litigation and the further litigation of these matters in the bankruptcy court, various allegations of discovery abuse and spoliation arose. Masimo put evidence regarding some of these points before the Court at the trial and also argued the points.  Masimo's intention both at trial and previously was to suggest to the Court that Sotera, and its counsel, had acted inappropriately.  Masimo argued expressly and implicitly that these actions evidenced an intent on Sotera's part to obfuscate the facts, that this was highly relevant in a trade secret misappropriation case, and that an inference adverse to Sotera should occur.

4.    The Court finds that the evidence in this regard does not support an inference that Sotera or its counsel took an action or refrained from taking an action in order to unfairly impact Masimo in connection with this litigation.  As a result, a negative inference is not appropriate.

**EXHIBIT D
-223-**

### Defragmentation of computers

5.      Expert testimony makes clear that Sotera computers use a Windows operating system that incorporates Windows Disk Defragmenter; among other things, this software overwrites files after they are deleted by the user and renders them unrecoverable—at least easily.  See Dkt. # 577; Decla. Kopelev at ¶¶ 14 (f), 15 (g), 64-67, & 98.

6.      The evidence before the Court establishes that defragmentation was part of an automatic process embedded in Sotera's computer software.  Dkt. # 583; Decla. Vaughn at ¶¶ 67-68 & 87.  Dkt. # 683; Test. S. Kopelev at 574:2-578:18 & 594:3-595:10.  Dkt. # 683; Test. J. Vaughn at 784:7-786:10 & 806:13-807:4.[21]  There is no evidence that Sotera installed or activated the defragmentation software feature with an intent to delete information in connection with this litigation.

7.      In contrast to the automatic defragmentation identified by both experts, there was no evidence of any wiping or otherwise more sophisticated attempts to delete information from any of the Sotera computers, and Mr. Kopelev, Masimo's expert, was able to find evidence of many deleted files notwithstanding defragmentation; he recovered link files post-defragmentation that predate download of the Masimo files that are at the core of this dispute.  Dkt. # 671; Test. S. Kopelev at 653:8-662:22.  Dkt. # 683; Test. S. Kopelev at 593:12-594:2.  Dkt. # 583; Decla. Vaughn at ¶¶ 62-66, 85, & 87.  Dkt. # 683; Test. J. Vaughn at 808:18-809:5.

8.      Nor is there evidence that Sotera intentionally deleted documents after the initiation of the State Court Litigation.  Dkt. # 683; Test. S. Kopelev at 572:1-573:22.

9.      The Court, thus, is confident in its conclusion that Sotera did not delete this information with an intent to hide evidence and that the forensic expert for Masimo correctly identified the universe of relevant Masimo trade secret documents downloaded by

---

[21]  The Court is using a form of citation to the record that includes both a particular docket number as well as the trial testimony page citation.  There were pagination problems with some transcripts. Thus, the docket number is necessary to make sure that a reviewing court can accurately access the Court's citations.  The reference to the testifying party was helpful to this Court in its preparation of this document; the references are retained with the thought that they may retain some utility for a reviewing court or the Parties.

**EXHIBIT D**
**-224-**

1  Mr. Hunt and Mr. Welch, transferred to Sotera computers, and opened from Sotera

2  computers.

3      10.   The Court determines that defragmentation is not a basis for inferring improper

4  motives to Sotera.

5          **Source code issues**

6      11.   In the bankruptcy court, Masimo repeatedly argued that Sotera inappropriately

7  delayed production of its source code in the State Court Litigation.  There is truth to this

8  assertion.  Based on pre-trial discussion, the Court is aware that turnover of the source code

9  was hard-fought and required orders from the State Court.  Initially, Sotera turned over its

10  source code without including the relevant comments.  Masimo, again, obtained a State

11  Court order requiring turnover of the comments.

12      12.   The Court determines, however, that the source code controversy is not a basis for

13  inferring improper motives to Sotera.  It does so for three reasons.

14      13.   First, it finds no evidence that Sotera's personnel, in making the decisions to

15  delete the comments, understood that they were in violation of a State Court order.

16      14.   Mr. Watlington testified that the reason for deletion of the comments was out of

17  concern about potential Masimo misuse.  Dkt. # 813; Test. T. Watlington at 987:17-988:21;

18  989:9-12 & 1020:11-1021:16.  See also Dkt. # 683; Test. D. Walker at 621:15-20.  Given

19  the number of sealing orders in this case, as well as the testimony in the record, the Court

20  finds believable that the Sotera business persons held concerns in this area and were not

21  inclined to rely reflexively on the State Court protective orders.  Had they consulted their

22  lawyers prior to removing the comments, they might have gotten better advice; but they

23  apparently did not do so.

24      15.   In addition, the testimony of Daniel Walker, Sotera's former Senior Director of

25  Embedded Systems, is instructive.  See Dkt. # 683 at 615-630.  Mr. Walker was heavily

26  involved in matters related to Sotera's source code.  *Id.* at 618:14-16.  He was also involved

27  in the production of the source code in the State Court Litigation.  *Id.* at 618:17-19.  He

28

**EXHIBIT D**
**-225-**

1    explained the reason for comments in the source code and the rationale for their deletion

2    when the source code was initially produced to Masimo.  *Id.* at 618:620-629:1.

3         16.   Mr. Walker, who no longer works for Sotera, was a highly credible witness.

4         From his testimony, it is clear that Sotera anticipated that the source code would be

5    compared line by line in an attempt to find source code plagiarism.  Dkt. # 683; Test.

6    D. Walker at 621:21-622:1; 623:6-625:7 & 626:13-627:2.

7         17.   It is also clear that he, the technical expert involved in the initial deletion of

8    source code comments, did not believe that deletion of the comments would impede review

9    of the source code for plagiarism.  Dkt. # 683; Test. D. Walker at 627:3-6 & 628:15-25.

10        18.   Finally, although the source code was a source of seemingly constant

11   conversation during the bankruptcy case prior to the Masimo claim objection trial, the

12   source code was not a focus at trial.  The Court reasonably anticipated, based on the pretrial

13   emphasis on the source code, that it would receive evidence showing source code

14   duplication or serious source code irregularities.  No such evidence came before the Court.

15        **The laptop repurposing**

16        19.   A final event occurred during the course of the bankruptcy itself.  Apparently, in

17   connection with the source code evaluation, Sotera's attorneys provided Masimo's attorneys

18   with access to the source code and allowed them to use an allegedly dedicated laptop for

19   source code review and the capture of their analysis.  The Court remains unclear on exactly

20   how the mistake occurred, but the laptop computer was "repurposed" for use in another

21   case.  As a result, Masimo's work product was lost, and Masimo feared that this

22   foreshadowed an attempt to alter the source code or to hide evidence.  Masimo filed a

23   motion seeking sanctions for spoliation of evidence.  Dkt. # 334.  Sotera responded.  Dkt.

24   ## 348, 350, 352, 357, & 363.

25        20.   The parties hotly disputed the issue and proposed to put dueling experts before

26   the Court.  Instead, the Court determined to employ its own expert under Fed. R. Evid. 706.

27   See Dkt. ## 364, 371, 391, 417, 418, 420, 424, 437, 507, 513, 523, & 563.

28

**EXHIBIT D**
**-226-**

21.   Unfortunately, the expert was unable to answer the questions posed by the Court.
Dkt. # 507.  Instead, he proposed an additional expert and opined that Sotera's expert's
approach to the problem appeared to be the appropriate one.  *Id.*

22.   Masimo ultimately agreed not to proceed further with the motion provided that it
was allowed to depose the para-professional at the law firm allegedly responsible for the
repurposing of the laptop and was satisfied as a result of the deposition.  Dkt. # 523 at 15:8-
26:7.

23.   A final order on the alleged spoliation issue has not been entered to date, but this
issue, which featured prominently in pretrial hearings, was not a subject of testimony at
trial.

24.   The Court determines that the laptop repurposing controversy is not a basis for
inferring improper motives to Sotera.

**Parties in the State Court Litigation**

  **Masimo**

25.   Masimo founder and current CEO and chairman, Joe Kiani, testified that Masimo
is in the general business of non-invasive patient monitoring.  Its mission is to take non-
invasive monitoring to new sites and applications by making them reliable and accurate and
taking measurements that before were invasive and making them non-invasive.  Dkt. # 669;
Test. J. Kiani at 56:3-7.

26.   It developed breakthrough technology in the area of pulse oximetry, including by
pioneering motion tolerant oximetry.  Dkt. # 669; Test. J. Kiani at 56:9-57:24; 58:7-24 &
60:14-61:12. See also, Dkt. # 575; Decla. Muhsin at ¶¶ 3-8.

27.   Eventually, Masimo patented its technology, and these fundamental patents
became the basis for its emergence as the industry leader in this area.  Dkt. # 669; Test.
J. Kiani at 62:21-63:4.

28.   Technological advances pioneered by Masimo have resulted in outcomes that
reduce death through human error, identify infants vulnerable to early death through heart

**EXHIBIT D**

-227-

1    defect, and decrease the risk of vision damage in infants in the neonatal intensive care unit.

2    Dkt. # 669; Test. J. Kiani at 62:1-20; 67:6-8; 69:22-70:16 & 71:4-72:2.

3        29.   This technology also reduced false alarms by 30 to 100 fold in the ICU and

4    operating room which was a huge benefit; doctors and nurses could focus more on true

5    emergencies not meaningless alarms.  Dkt. # 669; Test. J. Kiani at 66:21-6; 68:2-69:10 &

6    72:23-73:8.

7        30.   Initially, Masimo and its competitors competed in existing markets—the ICU and

8    operating room.[22]  But a new frontier was found in a hospital's general care wards.  Dkt.

9    # 669; Test. J. Kiani 63:24-64:4.  And with this new frontier came new challenges.

10       31.   Existing patient monitors frequently alarm.  In certain settings, such as an ICU or

11   operating room Masimo reduced this problem with its new technology.  Further, there is

12   more tolerance for alarms there; nurses for all practical purposes are on standby and are

13   easily able to evaluate whether an alarm is legitimate or not.  Dkt. # 669; Test. J. Kiani at

14   94:6-11.

15       32.   But the same is not true in a general care unit; alarm fatigue is a massive problem

16   and Masimo's original technology did not reduce them to the level necessary for practical

17   application in a general care setting.  Dkt. # 669; Test. J. Kiani at 64:11-65:1; 92:8-19 &

18   93:24-16.

19       33.   To the extent alarms are overly sensitive, nurses soon develop the "crying wolf"

20   syndrome; they assume that an alarm is not evidence of an actual emergency and then fail to

21   respond or respond with less than complete alacrity.  Dkt. # 669; Test. J. Kiani at 64:11-

22   65:1; 92:19-22; 103:15-23 & 106:15-107:14.

23       34.   Thus, Masimo felt a need to develop alarms that are more accurate and to develop

24   technology that alarms less frequently.  The goal is alarms that activate only for true

25   emergencies.  Dkt. # 669; Test. J. Kiani at 64:11-65:1.

26

27   _____

     [22]  See Dkt. # 573; Decla. Barker at ¶¶ 14-19 for an overview of noninvasive monitoring outside
28   general care wards.  For a further discussion and analysis of Dr. Barker's testimony see Dkt. # 933
     at 8-11.

**EXHIBIT D**
**-228-**

35.   And this goal is important because until the alarm problem is solved, implementation of general floor monitoring will lag and such monitoring cannot help to address the 200,000 people a year who die from medical error while in a hospital general care unit.  Dkt. # 669; Test. J. Kiani at 79:13-25 & 83:5-14.[23]

36.   Alarm management was one method for reducing these alarms; it involved calibrating alarm thresholds to the characteristics of the individual being monitored, changing the level at which an alarm would sound as a result, and building in alarm delays so that non-life-threatening events of short duration would not cause an alarm.  Dkt. # 669; Test. J. Kiani at 108:1-113.

37.   Hospitals, however, resisted this change as it created liability concerns and, in any event, was too new.  Dkt. # 669; Test. J. Kiani at 109:8-16.

38.   Masimo's Patient SafetyNet is the product that Masimo developed to provide monitoring on the general care floor.  Dkt. # 669; Test. J. Kiani at 77:3-22.

39.   Masimo aggressively attempted to get its technology onto the general floor.  Dkt. # 669; Test. J. Kiani at 95:7-24.

40.   In order to gain industry support, they participated in studies, published the results, and also offered evaluations to individual hospitals based on the hospital's own data.  Dkt. # 669; Test. J. Kiani at 108:11-111:7.

41.   Mr. Welch led the effort in this particular way of collecting data while he was at Masimo.  Dkt. # 669; Test. J. Kiani at 111:8-12.

42.   Eventually, Masimo saw Sotera as a direct competitor in the attempt to get monitoring into the general care wards; they were both going after the same space.  Dkt. # 669; Test. J. Kiani at 130:5-8.

**Sotera Wireless**

43.   In 2002, Dr. Matt Benet and Dr. Bob Murad founded Sotera; it was then known as Triage Wireless.  Dkt. # 813; Test. T. Watlington at 944:24-945-2.

_____

[23]  The problems arising from lack of monitoring on the general care floor appear to have been known well beyond Sotera and Masimo.  See Dkt. # 816; Test. G. Manning at 1492:11-1493:3.

EXHIBIT D
-229-

44.   They formed the company to develop technology to measure blood pressure continuously and non-invasively without inflating the blood pressure cuff (cNIBP).  Dkt. # 813; Test. T. Watlington at 945:2-11.

45.   Mr. Watlington became involved with the company in 2006 and is now its President and CEO.  Dkt. # 813; Test. T. Watlington at 937:24-938:5.

46.   Once Mr. Watlington joined Sotera he recognized, as had Masimo and Mr. Kiani, the seriousness of the 200,000 annual "failure to rescue" deaths; he decided that Sotera needed to solve the problem.  Dkt. # 813; Test. T. Watlington at 946:3-947:2.

47.   Thus, he moved Sotera beyond a focus on blood pressure measurement toward development of a patient worn device that continuously monitored numerous vital signs. Dkt. # 813; Test. T. Watlington at 947:5-22 & 949:21-950:20.  And his target was the general care floor.  *Id.* at 947:15-16 & 950:2-20.

48.   This idea led to development of the ViSi system that Sotera currently markets; but Mr. Watlington's desired project did not get off the ground until Jim Moon joined Sotera. Dkt. # 813; Test. T. Watlington at 948:1-11.

49.   Mr. Moon has a storied past in the patient monitoring world, and he was and is a believer in and successful innovator in mobile patient monitoring.  Dkt. # 813, Test. T. Watlington at 948:12-19:20.  Dkt. # 813; Test. J. Moon at 1053:17-1060:1.

50.   He joined Sotera, first as a Board Member, then, in 2008, as its Chief Technical Officer.  Dkt. # 797; Test. J. Moon at 1073:12-1074:3.

51.   He previously had developed a highly successful multi-parameter patient monitoring system, and Sotera brought him on board to develop a multi-parameter patient monitoring device that incorporated the Sotera cNIBP technology.

52.   Between 2009 and August 2011, Sotera developed the ViSi Mobile system.  Dkt. # 797; Test. J. Moon at 1083:16-22.  Sotera sought to distinguish its technology by having it measure, continuously and non-invasively, all of a patient's vital signs:  EKG, pulse rate, respiratory rate, $SpO_2$, cNIBP, and skin temperature.  Dkt. # 813; Test. T. Watlington at 952:2-953:18.  As expected from its name, ViSi is mobile; instead of connecting cables to a

**EXHIBIT D**
**-230-**

bedside monitor, ViSi is a wrist-worn device.  *Id.*  And ViSi is intended specifically for use on the general care areas of a hospital where the number of patients clearly outnumber the available nurses and other care providers.  *Id.*

53.   ViSi is not intended for use in Masimo's original hospital deployment areas, the operating room and ICU.  Dkt. # 813; Test. T. Watlington at 950:21-951:3.

54.   In August 2011, before Mr. Welch arrived at Sotera, Sotera submitted its "wrist worn monitor" (i.e. the "Patient Worn Device") for initial FDA 510(k) approval.  Dkt. # 813; Test. T. Watlington at 957:12-19.  It received initial FDA 510(k) approval for the wrist monitor in March 2012.  *Id.*

55.   The initial 510(k) approval did not include cNIBP capabilities and wireless connectivity.  Dkt. # 813; Test. T. Watlington at 957:20-958:10.

56.   Sotera's roll out of its product was phased and based on concerns about the FDA's ability to digest new information.  Dkt. # 813; Test. T. Watlington at 958:8-959:10.

57.   But it had already developed all ViSi's measurement technology and basic alarm technology before the initial FDA submission.  Dkt. # 797; Test. J. Moon at 1078:2-7.

58.   In August 2012, Sotera received FDA 510(k) approval for using wireless communications to transmit the wrist monitor's vital sign measurements to both a data server and a remote viewer at the nurse's station.  Dkt. # 813; Test. T. Watlington at 958:25-959:3.

59.   In October 2013, Sotera received 510(k) FDA approval of its cNIBP monitoring technology.  Dkt. # 813; Test. T. Watlington at 959:4-7.

60.   ViSi went on the market in 2013, but it initially did not work well; additional development was needed.  Dkt. # 813; Test. T. Watlington at 959:11-962:6.

61.   Sotera encountered the same significant problem Masimo encountered—an expected problem—too many alarms.  Dkt. # 813; Test. T. Watlington at 951:3-10.

62.   But Sotera took an innovative approach to reduction of alarms caused merely by motion, something that becomes a significant problem on a general care floor where patients are neither fully sedated nor sedentary as they typically are in the ICU or operating room.

**EXHIBIT D**
**-231-**

1   Dkt. # 813; Test. T. Watlington at 954:6-955:14.  Masimo apparently solved the motion
2   problem through advanced mathematics; Sotera measured motion and then compensated for
3   it using its on-body device.  Dkt. # 797; Test. J. Moon at 1075:18-1076:24.

4      63.   The ViSi patient data can be viewed on the device, at the nurse's station, and in
5   other ways; it is also stored in a cloud data base.  Dkt. # 813; Test. T. Watlington at 955:17-
6   956:8.

7      **James Welch**

8      64.   James Welch is a biomedical and electrical engineer with a long career in hospital
9   related biomedical and clinical engineering issues.  Dkt. # 798; Test. J. Welch at 1271:18-
10   1272:13.

11      65.   As a biomedical and clinical engineer, he has been involved in issues related to
12   hospital use of medical devices, including patient monitoring devices, since the '70s.  Dkt.
13   # 798; Test. J. Welch at 1273:1-18.  He has lectured, written, and served on committees
14   addressing related issues, including alarm management and continuous patient monitoring
15   systems since the '90s.  *Id.* at 1287:18-21 & 1307:5-1309:19.

16      66.   He began his career working for hospitals, including Massachusetts General.  Dkt.
17   # 798; Test. J. Welch at 1272:4-6 & 1275:6-15.

18      67.   Mr. Welch's testimony established that he began working with vital sign
19   monitors, establishing alarm thresholds for various vital signs, and engaging in discussions
20   related to the interface between alarm thresholds and alarm frequency at an early point in his
21   career.  Dkt. # 798; Test. J. Welch at 1273:10-1280:5.  While at Massachusetts General, he
22   worked with monitors on the general care floor and was on a small committee tasked with
23   finding a solution for continuous monitoring on the general care floor.  *Id.* at 1280:6-1283:7.

24      68.   Eventually, Massachusetts General obtained a patent for its Flexible Monitoring
25   System; he was one of the co-inventors on the patent.  Dkt. # 798; Test. J. Welch at
26   1283:17-1284:1.

27      69.   Massachusetts General then co-developed commercialization of the Flexible
28   Monitoring System with Protocol Systems.  Dkt. # 798; Test. J. Welch at 1284:15-24.

36

**EXHIBIT D**

**-232-**

70.   Mr. Welch joined Protocol in 1990. Dkt. # 798; Test. J. Welch at 1285:3-4.  At Protocol, he worked with the Propaq monitor and with Jim Moon, who later joined Sotera and led the development of ViSi. Dkt. # 798; Test. J. Welch at 1285:9-23.

71.   The Accuity system related to the Propaq monitor was wired, but it anticipated wireless implementation. Dkt. # 798; Test. J. Welch at 1289:4-10.  It measured numerous vital signs, and Mr. Welch participated in setting alarm limits. Dkt. # 798; Test. J. Welch at 1289:11-25.

72.   Mr. Welch became an employee of Welch Allyn when it purchased Protocol. Dkt. # 798; Test. J. Welch at 1291:4-6.  Among other things, he worked on a wireless device and on setting alarm settings while at Welch Allyn. *Id.* at 1292:2-18.  And throughout the time he was at either Protocol or Welch Allyn, he worked on alarm frequency issues. *Id.* at 1293:2-24.

73.   Eventually, Mr. Welch left Welch Allyn.  He signed a Masimo employee confidentiality agreement on July 24, 2005.  Stipulated Fact ¶ 1.

74.   Mr. Welch began his employment with Masimo on August 1, 2005.  Stipulated Fact ¶ 2.

75.   Masimo originally hired Mr. Welch as Vice President of System Engineering. Dkt. # 669; Test. J. Kiani at 111:12-13.  Mr. Welch understood that his initial charge was to find a solution for Masimo in the area of general floor monitoring primarily based on pulse oximetry. Dkt. # 798; Test. J. Welch at 1298:2-5.

76.   Masimo subsequently determined that Mr. Welch was "more a user advocate and a clinical advocate [as opposed to] a technical expert" and was an expert on patient monitoring technology. Dkt. # 736; Ex. E (Sampath Depo. Test.) at 520:8-521:17.  His strength was in being the liaison between Masimo and the clinical community, and his work was to figure out the type of product and the deployment process for that product for the general care areas of hospitals. Dkt. # 669; Test. J. Kiani at 111:12-19.

77.   In Mr. Kiani's view, Mr. Welch views himself as technical, as an engineer, when he actually excels at sales and interacting with customers:  "But he's really not an engineer's

EXHIBIT D

-233-

engineer.  He is not that technical."  Dkt. # 669; Test. J. Kiani at 122:9-17.  Mr. Kiani thus moved him from Vice President of Engineering to Vice President of Patient Safety and directed him to work with marketing.  *Id.*

78.   Mr. Welch's new focus was Patient SafetyNet.  Dkt. # 669; Test. J. Kiani at 122:18-24; 123:22-124:8.  In particular, he was involved with individualized alarm analytics.  *Id.* at 125:19-126:3.

79.   In terms of Mr. Welch's character, Masimo elicited testimony from Mr. Moon about his belief that Mr. Welch was a self-promoter who took credit for the ideas of others and was not a team player; Mr. Moon did not recommend that Sotera hire Mr. Welch.  Dkt. # 797; Test. J. Moon at 1111:3-23.  Mr. Muhsin similarly testified that he did not feel comfortable about questions from Mr. Welch because, after he told Mr. Welch something, Mr. Welch "would go back and present as his own ideas a lot of times in bigger meetings."  Dkt. # 670; Test. B. Muhsin at 316:18-23.

80.   The Court finds Mr. Welch credible when he discusses his background and experience.

81.   The Court also finds credible that by the time Mr. Welch went to Sotera he had broad knowledge in the area of general floor monitoring, alarm management, monitoring devices, and related issues and that he gained much of his knowledge before he was hired by Masimo.

82.   Finally, the Court finds credible that Mr. Welch's technical engineering skills were not his strength when he went to Sotera and, based on testimony elicited by Masimo from Mr. Moon and Mr. Muhsin, that he was prone to latching onto others ideas and then presenting them as his own.

83.   The Court finds that Sotera hired Mr. Welch with the expectation that he would use his skills, experience, and contacts.  But this is not actionable unless Mr. Welch also used Masimo trade secrets.

**David Hunt**

84.   David Hunt is a salesperson with significant experience selling medical devices.

38

**EXHIBIT D -234-**

1    On April 29, 2000, Hunt signed a Masimo Employee Confidentiality Agreement.

2  Stipulated Fact ¶ 21.

3    85.   On May 15, 2000, Hunt began working for Masimo.  Stipulated Fact ¶ 22.

4    86.   On March 4, 2010, Hunt signed another Masimo Employee Confidentiality

5  Agreement.  Stipulated Fact ¶ 23.

6    87.   Mr. Hunt apparently refused to testify at trial, and he is beyond the Court's

7  subpoena power, but his character, or lack thereof, is clear from the videotaped deposition

8  that was introduced into evidence.  He appears completely lacking of a moral compass.  A

9  few highlights that support the Court's strong views follow:

10    88.   Mr. Hunt worked for both Masimo and Sotera at the same time, which he referred

11  to as "double-dipping." Dkt. # 719; Ex. A (Hunt Depo. Test.) at 133:3-20.  He did not see

12  any problem with this practice.  *Id.* at 131:25-134:23.

13    89.   Mr. Hunt also resold equipment that Masimo customers returned to him, rather

14  than returning such equipment to Masimo.  Dkt. # 719; Ex. A (Hunt Dept. Test.) at 228:14-

15  236:19.  Hunt had the checks for such sales made out to his wife or his son to "keep it clean"

16  because he "didn't want [his] name tied to it." *Id.* at 235:6-236:19.

17    90.   Mr. Hunt's videotaped deposition evidenced animus toward Masimo.  He

18  acknowledged that taking Masimo documents violated his contractual obligations to

19  Masimo; he allegedly felt no remorse based on vague assertions of how he was treated.  His

20  concept of the line between what was personally his and what was Masimo's was blurred.

21  Dkt. # 719; Ex. A (Hunt Depo. Test.) at 68:5-14 & 80:2-22.

22    91.   Mr. Hunt was unapologetic about downloading thousands of Masimo computer

23  files.  Mr. Hunt testified "[h]onestly, I don't remember that Point A to Point B.  Did I take

24  them?  Yes.  How I took them, I don't recall."  Dkt. # 719; Ex. A (Hunt Depo. Test.) at

25  264:11-265:23, 265:25 & 267:25-268:8 ("I took them.  I mean, I've said that multiple times,

26  I took those files.").

27

28

**EXHIBIT D**
**-235-**

**The Acquisition of Masimo Trade Secrets**

      **Sotera Recruits and Hires Welch**

    92.   Mr. Watlington identified Mr. Welch as a potentially valuable employee and recruited him.  They met and spoke on several occasions, but Mr. Welch was not initially receptive.  Dkt. # 813; Test. T. Watlington at 977:1-12.

    93.   On July 27, 2011, however, Mr. Welch provided Sotera with his resume.  Stipulated Fact ¶ 3.

    94.   On August 3, 2011, Mr. Welch interviewed for a position at Sotera.  Stipulated Fact ¶ 4.

    95.   On August 8, 2011, Sotera offered Mr. Welch a position.  Stipulated Fact ¶ 5.

    96.   On September 13, 2011, Mr. Welch gave notice to Masimo that he would terminate his employment.  Stipulated Fact ¶ 6.

    97.   Mr. Watlington on direct and cross resisted the suggestion that he was excited about Mr. Welch's joining the team because of Welch's knowledge of Masimo's trade secrets or that he or Sotera obtained Masimo trade secrets from Mr. Welch.  Dkt. # 813; Test. T. Watlington at 978:11-13; 980:14-18; 982:8-25; 983:23-984:1 & 987:6-10.

    98.   Mr. Watlington was clearly enthusiastic about Welch coming to Sotera because of Mr. Welch's experience:  Mr. Welch was a recognized alarm management expert with extensive experience in the field.  Dkt. # 813; Test. T. Watlington at 987:22-25.

    99.   The Court finds Mr. Watlington highly credible on these points.  While Mr. Watlington, of course, knew that Mr. Welch had experience working at Masimo, the Court finds that his enthusiasm was not improper; nor was his enthusiasm based on the hope or intent of getting Masimo's trade secrets.  The record more than adequately supports that Mr. Welch had deep and decades long experience that was not solely dependent on his time at Masimo and Masimo trade secrets.

    **Welch transfers Masimo files to a hard drive.**

    100. On September 16, 2011, Welch connected a Western Digital external hard drive (the "WD External HD") to his Masimo computer. Stipulated Fact ¶ 7.

**EXHIBIT D**
**-236-**

1      101. And, as he admits, he attempted to copy Masimo computer files to the WD

2  External HD.  Stipulated Fact ¶ 8.

3      102. Sotera agrees that at least some Masimo files were successfully transferred to the

4  WD External HD on September 16, 2011.  Stipulated Fact ¶ 9.

5      103. The Court finds that Mr. Welch copied more than 4,500 Masimo computer files

6  and folders.  Dkt. # 577; Decla. Kopelev at ¶ 14(a).

7      104. Again, Welch was still employed by Masimo at this time.  His employment,

8  however, ended that day.  *See* Stipulated Fact ¶ 10 ("On September 16, 2011, Welch

9  terminated his employment with Masimo.").

10      **Welch's Sotera employment**

11      105. On September 19, 2011, Welch's employment began at Sotera.  Stipulated Fact

12  ¶ 11.

13      106. Mr. Welch had a vague role at Sotera initially but he quickly became responsible

14  for "quality and regulatory," which mainly involved dealing with the FDA and its

15  requirements.  Dkt. # 813; Test. T. Watlington at 979:19-980:13.  The record also shows

16  that Mr. Welch was broadly involved in meetings, discussions, and decisions at Sotera.

17      **Welch transfers Masimo files to a Sotera computer.**

18      107. Once Welch got to Sotera, he connected the WD External HD to a Sotera

19  computer and transferred Masimo files to his Sotera computer.  Dkt. # 577; Decla. Kopelev

20  at ¶ 14.

21      **Welch accesses Masimo files.**

22      108. On October 2 and October 17, 2011, Welch connected the WD External HD to his

23  Sotera Lenovo computer.  Stipulated Fact ¶ 12.

24  •   On October 2, 2011, Welch opened a Masimo document entitled "ApprovedPSN

25      Slides Feb 2011.ppt" from the WD External HD, using his Sotera Lenovo computer.

26      Stipulated Fact ¶ 13.

27  •   On October 2, 2011, Welch opened a Masimo document entitled "FRM1965A.doc"

28      from the WD External HD, using his Sotera Lenovo computer.  Stipulated Fact ¶ 14.

**EXHIBIT D**

**-237-**

1    • On October 17, 2011, Welch opened a Masimo document entitled

2       "bernoullipricing.xls" from the WD External HD, using his Sotera Lenovo computer.

3       Stipulated Fact ¶ 15.

4    • On October 17, 2011, Welch opened a Masimo document entitled "Bernoulli-PSN

5       Worksheetrev3.0b.xls" from his WD External HD, using the Sotera Lenovo

6       computer.  Stipulated Fact ¶ 16.

7    • On October 17, 2011, Welch opened "NewPSNPricingRev6.xls" from his WD

8       External HD, using the Sotera Lenovo computer.  On October 19, 2011, he again

9       opened that file using his Sotera Lenovo computer.  Stipulated Fact ¶ 17.

10   • On February 12, 2012, and March 4, 2012, Welch re-opened a Masimo document

11      entitled "ApprovedPSN Slides Feb 2011.ppt" from the internal hard drive of his

12      Sotera Lenovo computer.  Stipulated Fact ¶ 18.

13      109. In short, no one disputes that Welch opened five Masimo documents while a

14   Sotera employee and on a Sotera computer:  Approved PSN Slides Feb 2011.ppt;

15   FRM1965A.doc; bernoullipricing.xls; Bernoulli-PSN Worksheetrev3.0b.xls; and

16   NewPSNPricingRev6.xls.  The Court also finds that other files were transferred to the

17   Sotera computer.

18      110. The Court determines that when Mr. Welch transferred Masimo files to his Sotera

19   computer and when he opened any of them Sotera acquired Masimo trade secrets and,

20   therefore, misappropriated Masimo trade secrets within the meaning of the CUTSA.

21   Mr. Welch was now a Sotera employee; he used a Sotera computer; he acted contrary to his

22   contractual obligations to Masimo, he therefore acted wrongfully; and, as discussed

23   hereafter, he used some of these documents in the course of his Sotera employment and the

24   documents, even if not opened or used, were relevant to his Sotera employment.

25      111. The Court, however, also notes that the universe of opened documents is small

26   and that there is no evidence that Mr. Welch printed Masimo documents or emailed Masimo

27   documents to someone else at Sotera.  Dkt. # 583; Decla. Vaughn at ¶¶ 42-43 & 49-50.

28

EXHIBIT D
-238-

**Sotera recruits and hires Hunt.**

112. On September 27, 2011, Mr. Hunt sent his resume to Sotera.  Stipulated Fact ¶ 24.

113. On January 12, 2012, Sotera interviewed Mr. Hunt for employment.  Stipulated Fact ¶ 25.

114. On June 22, 2012, Sotera offered Mr. Hunt the position of Regional Sales Manager, Central Region.  Stipulated Fact ¶ 26.

115. On July 9, 2012, Mr. Hunt began his employment with Sotera while still being employed at Masimo.  Stipulated Fact ¶ 27.

116. On July 16, 2012, Hunt submitted his resignation letter to Masimo stating that his last day would be July 27.  Stipulated Fact ¶ 33.

117. On July 27, 2012, Hunt terminated his employment with Masimo.  Stipulated Fact ¶ 35.

118. In Mr. Hunt's view, this practice—being employed by two competing companies at the same time, or "double dipping"—was an industry norm.  Dkt. # 719; Ex. A (Hunt Depo. Test.) at 133:3-20.  The Court does not find this testimony, or Mr. Hunt, credible.

119. Tracy Miller, a Masimo human resources executive, conducted Mr. Hunt's exit interview from Masimo and recorded notes about it.  Dkt. # 670; Test. T. Miller at 252:1-5.  Exs. 1810 & 1811.  Mr. Hunt expressed dissatisfaction about the company, its culture, and how it had changed in the past year.  She also wrote that he said:  "Worked at Masimo for 12 years and no one called him prior to leaving.  Didn't need anyone to call but out of respect would have thought someone in management would have called.  (Fred Kelly, Steve Paul).  This just validates that it's good that he is leaving."  Ex. 1810.

120. This was the extent of any evidence of Masimo mistreatment.  In other words, there was none.

121. The Court finds that Sotera hired Mr. Hunt with the expectation that he would use his skills, experience, and contacts.  But this is not actionable unless Mr. Hunt also used Masimo trade secrets.

**EXHIBIT D**

**-239-**

**Hunt transfers Masimo files to a hard drive.**

122. There is no dispute that Mr. Hunt took Masimo's files.  He admits this in his deposition.

123. On July 15, 2012, Mr. Hunt copied approximately 2,500 files from his Masimo computer to an external hard drive.  Dkt. # 577; Decla. Kopelev at ¶ 71.

124. Mr. Hunt would later connect the external hard drive to his personal Dell computer and then transfer the files to the Dell.  Eventually, the various Masimo files showed up on Mr. Hunt's personal Dell computer, his Sotera USB flash drive, and his Sotera Lenovo computer.  He also emailed four Masimo files from his Masimo email account to a Sotera email account.  Dkt. # 577; Decla. Kopelev at ¶¶ 75-83.

125. Mr. Kopelev's declaration explains that Mr. Hunt's computers and devices had more than 7,600 Word, Excel, PDF, and PowerPoint documents that had an exact MD5 Hash match with files on Masimo devices.  Dkt. # 577; Decla. Kopelev at ¶ 77 and attachment G.  These are not all, however, Masimo trade secret documents.

**Hunt accesses Masimo files.**

126. The parties agree that Mr. Hunt opened six Masimo files on his Sotera computer:

- On July 12, 2012, Hunt opened a Masimo document entitled "Mercy 40 Bed PSN Quote.xlsx" on his Sotera Lenovo computer.  Stipulated Fact ¶ 28.

- On July 13, 2012, Hunt opened a Masimo document entitled "2011 PSN Quote Tool.xls" on his Sotera Lenovo computer.  Stipulated Fact ¶ 29.

- On July 13, 2012, Hunt opened a Masimo document entitled "PSNQuoteROITool_Field_03152011.xls" on his Sotera Lenovo computer.  Stipulated Fact ¶ 30.

- On July 15, 2012, Hunt opened a Masimo document entitled "Field of View – Sensor Agreements" on his Sotera Lenovo computer.  Stipulated Fact ¶ 31.

- On July 15, 2012, Hunt opened a Masimo document entitled "SNRR Install Base v3 061412.xlsx" on his Sotera Lenovo computer.  Hunt opened that document again on August 27, 2012 using his Sotera Lenovo computer.  Stipulated Fact ¶ 32.

44

**EXHIBIT D**
**-240-**

1    • On July 25, 2012, Hunt opened a Masimo document entitled "Copy of

2    PSNQuoteROITool_Field_0315201 1.xls" on his Sotera Lenovo computer.

3    Stipulated Fact ¶ 34.

4    127. There is no real dispute regarding the fact that Mr. Hunt took Masimo's

5    documents and placed them on a Sotera computer. And the Court finds reliable all of

6    Mr. Kopelev's information about Mr. Hunt's computer activity.

7    128. The Court determines that when Mr. Hunt transferred Masimo files to a Sotera

8    computer or flash drive and when he opened any of them Sotera acquired Masimo trade

9    secrets and, therefore, misappropriated Masimo trade secrets within the meaning of the

10   CUTSA. Mr. Hunt was now a Sotera employee; he used a Sotera computer or flash drive;

11   he acted contrary to his contractual obligations to Masimo, he therefore acted wrongfully;

12   and, as discussed hereafter, he used some of these documents in the course of his Sotera

13   employment and the documents, even if not opened or used, were relevant to his Sotera

14   employment.

15   129. The Court, however, also notes that with limited exception the evidence shows no

16   evidence that Mr. Hunt printed or emailed Masimo documents to someone else at Sotera

17   during his employment. The exceptions are the wireless network surveys discussed below

18   starting at page 75 and a Masimo quote discussed at page 51 below. Dkt. # 583; Decla.

19   Vaughn at ¶¶ 79-82, 84.

20

21   **The universe of Masimo files downloaded by Welch and Hunt**

22   130. Mr. Kiani identified numerous documents that were among those downloaded by

23   Mr. Welch or Mr. Hunt prior to termination of their employment with Masimo. In each

24   case, he explained why these documents were important to Masimo both in terms of the

25   difficulty of amassing the information, the potential impact on Masimo, and the opportunity

26   it would provide to a competitor. Dkt. # 669; Test. J. Kiani at 138:20-151:7 & 153:10-

27   161:9. Other Masimo witnesses provided consistent and, in some cases more detailed,

28   testimony. See principally testimony from Mr. Anacone and Mr. Muhsin.

45

**EXHIBIT D**

**-241-**

1    131. The stipulated facts, testimony, and evidence reflect that both Mr. Welch and

2    Mr. Hunt downloaded Masimo highly confidential trade secret documents and then took

3    them to Sotera by transferring them to a Sotera computer or flash drive.

4    **Forensic Expert Testimony Re Welch and Hunt**

5    132. Masimo's expert, Mr. Kopelev, provided expert testimony regarding a forensic

6    analysis of various computers and related devices owned by Masimo, Sotera, Mr. Welch,

7    and Mr. Hunt.  The Court found Mr. Kopelev both believable and helpful.

8    133. Based on Mr. Kopelev's testimony, the Court concludes, as previously stated, that

9    the large data downloads in connection with Mr. Welch occurred as Mr. Kopelev outlined.

10   The real issue for the Court is the universe of documents opened.

11   134. Given Mr. Kopelev's obvious expertise, his failure to identify other opened

12   documents is significant.

13   135. He correctly notes that defragmentation software built into the computer software

14   had complicated his task, but he also noted that there is no evidence of sophisticated

15   forensic wiping activity.  Based on his testimony, and notwithstanding his reservations, the

16   Court concludes that only the limited number of files he identified were opened by

17   Mr. Welch.  Dkt. # 577; Decla. Kopelev at ¶¶ 48-54 & 58-59.  Mr. Vaughn also provided

18   credible evidence on this point.  See Dkt. # 583; Decla. Vaughn at ¶ 49-51.

19   136. In particular, both experts discussed the jump or link file evidence.  See Dkt.

20   # 557; Decla. Kopelev at ¶¶ 48-49 & 67.  Dkt. # 583; Decla. Vaughn at ¶ 66.

21   137. The Court also concludes that Mr. Hunt downloaded a massive number of files

22   given his admission and the forensic evidence.

23   138. He emailed a very significant number of documents from Masimo, to himself, and

24   then to Sotera, and then back to himself.  Dkt. # 77; Decla. Kopelev at ¶¶ 86-94.    Mr. Hunt

25   also opened numerous files.  Dkt. # 577; Decla. Kopelev at ¶¶ 84-85.  Dkt. # 583; Decla.

26   Vaughn at ¶¶ 79-81.

27

28

**EXHIBIT D**

**-242-**

1       139. But the instances of Mr. Hunt emailing Masimo documents to others at Sotera are

2 very limited.  Dkt. # 577; Decla. Kopelev at ¶¶ 93-95.  Dkt. # 583; Decla. Vaughn at ¶¶ 82

3 & 84.

4       140. The Court again concludes that the number of files opened, emailed to other

5 Sotera employees, and printed at Sotera was small in comparison to the massive download

6 of documents.  But the Court also notes that Mr. Hunt had access to a significant number of

7 documents through his personal computer.

8

9 **Masimo investigates Welch and Hunt's departures.**

10       141. Masimo was reasonably concerned about the integrity of its trade secrets when

11 Mr. Welch and then Mr. Hunt left for Sotera.  Mr. Lee outlined the initial investigative

12 procedures he eventually utilized after the departures of Mr. Welch and Mr. Hunt.  These

13 procedures led him to engage the services of an outside consultant to determine the level of

14 potential misappropriation of Masimo confidential information.  See Dkt. # 670; Test.

15 Y. Lee at 237:3-242:10.

16

17 **Masimo initiates the State Court litigation.**

18       142. The discovery of the downloading of thousands of documents, many containing

19 highly sensitive information, prompted the State Court Litigation and the Masimo proof of

20 claim.  When Mr. Kiani was cross-examined, it became clear that Mr. Kiani's decision

21 through Masimo to engage in this litigation was not exclusively based on a desire to recover

22 damages.  In addition, Mr. Kiani testified about a need to, in effect, send a signal to other

23 employees that misuse of confidential information would not be tolerated.  Dkt. # 814; Test.

24 J. Kiani at 1734:24-1735:10.

25       143. The Court has no difficulty in concluding that this motive was one that Mr. Kiani

26 holds.  The Court also believes that it is an appropriate motive.  There is nothing wrong with

27 tenaciously protecting confidential information that a company has obtained at great cost in

28

**EXHIBIT D**

**-243-**

1  terms both financial and otherwise.  This is especially true when a company has more than

2  4,000 employees.

3      144. But Mr. Kiani and virtually all other Masimo witnesses appear to have a one-

4  sided belief in the forensic evidence.  They embrace the evidence of document downloads;

5  so does the Court.  But throughout their testimony they act as though download of the

6  documents necessarily equates to opening of the documents and Sotera's review and use of

7  the valuable information they contain.  The Court understands the feeling of violation that

8  was clearly expressed by Mr. Kiani and all the Masimo employees who testified.  But the

9  forensic evidence should have provided them with comfort that, with very limited

10  exceptions, their trade secret documents were not opened, printed, or emailed to people at

11  Sotera other than Mr. Welch or Mr. Hunt.  The forensic evidence does not require a finding

12  or even suggest a finding that Sotera used most of the downloaded documents.[24]

13

14  **Sotera employees other than Hunt and Welch neither solicited nor participated in the download of Masimo documents.**

15

16      145. No one testified that Sotera caused, requested, suggested, or was in any way

17  involved in Mr. Hunt's and Mr. Welch's initial decisions to take Masimo's documents or the

18  taking of Masimo's documents.  Nor did Masimo present any concrete evidence in this

19  regard.  These actions, thus, were not in the course of their Sotera employment.

20      146. The Court also finds that Sotera did not hire Mr. Hunt or Mr. Welch with the

21  expectation that either would bring Masimo's trade secrets or Masimo's documents; far from

22  it.  Sotera never directly solicited Masimo's trade secret documents from either Mr. Hunt or

23  Mr. Welch.  If Sotera were poaching these men for their confidential knowledge, then the

24  Court would have expected more shared documents.

25      147. Nor is there testimony or evidence that Sotera asked either Mr. Hunt or

26  Mr. Welch to disclose Masimo's confidential information.

27

28

**EXHIBIT D**
**-244-**

148. In fact, Mr. Watlington verbally and through a memo asked that Sotera employees respect the confidentiality of Masimo information and not talk to Mr. Welch about such matters. Dkt. # 813; Test. T. Watlington at 982:8-25. See also ex. 3194.

149. And when he learned that Mr. Hunt circulated a Masimo price quote, he sent an email telling all in the company to get Masimo information off any computers. Dkt. # 813; Test. T. Watlington at 999:1-1001:18. See also ex. 3195.

150. Other Sotera employees testified that they neither asked for nor received Masimo trade secret information from Mr. Hunt or Mr. Welch. The Court found these witnesses, many of whom no longer work for Sotera, to be highly credible and believable.

151. But, as already noted and as will be discussed further, the fact that Mr. Hunt and Mr. Welch acted alone, while highly relevant, does not divest Sotera of all liability.

**Inference does not bridge the gap in the forensic evidence.**

152. The Court acknowledges that there were several instances of Sotera conduct that Masimo points to as problematic and supportive of an inference that Sotera hired Mr. Welch and Mr. Hunt with the intent of obtaining Masimo trade secrets or formed that intention thereafter or knew that they took Masimo documents. Put another way, Masimo lacked a death blow in this litigation so it relied on numerous small points, some problematic and some not, and suggested that the Court infer both wrongful intent and actual use of its trade secrets. But death by tiny cuts requires wounds of a thousand; here the points individually and cumulatively fail to adequately support Masimo's assertions as to the state of mind of those at Sotera other than Mr. Hunt and Mr. Welch—especially given the credible and contrary direct testimony.

- As a technical matter, Mr. Welch did some hiring tasks for Sotera shortly before he started at Sotera. Mr. Welch agreed to interview a candidate for a deployment specialist position at Sotera. Dkt. # 813; Test. T. Watlington at 1025:7-1030:22. See also exs. 113 & 128. But this interview was a favor in anticipation of employment;

---

[24] The Court acknowledges that Masimo has claims against Mr. Welch and Mr. Hunt that appear more extensive than its claims against Sotera; breach of contract claims are available, for example.

**EXHIBIT D**
**-245-**

1    Mr. Welch was a Masimo employee at the time of the interview.  It was also

2    unusual—even if Mr. Welch did the interview on his own time—and Mr. Watlington

3    knew that it raised questions.  *Id.* at 1027:16-20.  As a result, he sent exhibit 131, an

4    email saying don't do this if it makes you uncomfortable "given continuing

5    association with [Masimo]."  These facts show that Sotera was anxious to have

6    Mr. Welch on board, but there is no tie established between the interview of a

7    deployment specialist and Masimo trade secrets.

8    • Mr. Hunt provided Sotera's Vice President for Global Sales with contact information

9      for a Masimo customer prior to his employment.  Mr. Hunt began looking for a job at

10     Sotera in September of 2011.  Ex. 876.  He met with Gary Manning, Sotera's current

11     Vice President for Sales, in October 2011.  At the time of the meeting, Mr. Manning

12     was responsible for all sales.  Dkt. # 816; Test. G. Manning at 1488:18-1489:2.  After

13     this meeting with Manning, Hunt sent Manning contact information (the "VCard")

14     for a Masimo contact at the University of Pittsburgh Medical Center ("UPMC"),

15     Keith Radakovich.  *Id.* at 1532:24-1533:1.  Mr. Manning testified that he used the

16     VCard to reach out to Mr. Radakovich.  *Id.* at 1532:20-1533:1.  He further testified,

17     however, that Mr. Radakovich did not respond to his communications.  *Id.* at 1533:2-

18     14.  The Court concludes that even if the VCard transfer constituted an acquisition of

19     confidential information, as Mr. Radakovich was a key decision maker at UPMC,

20     there is no evidence that Sotera was unjustly enriched or that Masimo was harmed by

21     this acquisition of information; there was no evidence supporting monetary damages

22     solely on this point.  And this point does not establish that Sotera hired Mr. Hunt with

23     the expectation that he would use Masimo trade secrets.

24     • Mr. Hunt was clearly gunning hard for a position at Sotera leading up to his 2012

25       employment.  On December 15, 2011, he sent another email to Gary Manning,

26       apparently in anticipation of an interview.  See ex. 58.  He gave Mr. Manning a "keep

27       this confidential" tip that Ohio Health is a great candidate for ViSi.  According to the

28

The Court, however, makes determinations only in relation to Sotera.

**EXHIBIT D**
**-246-**

1    email, Welch Allen had a product in evaluation, and Mr. Hunt had made sales

2    overtures for Masimo, but Ohio Health wanted capabilities ViSi has.  There is no

3    evidence tying this email to Sotera use of a trade secret, Sotera unjust enrichment, or

4    Masimo damage.  It does not support that Sotera was hiring Mr. Hunt with the

5    expectation that he would use trade secrets.  But it does reflect poorly on Mr. Hunt's

6    character.

7    • Prior to hiring Mr. Welch, Sotera obtained a copy of Mr. Welch's confidentiality

8      agreement and had it reviewed by Sotera's "legal team."  See ex. 1431.  Neither this

9      review, a prudent step to identify "red flags," nor Mr. Watlington's question about

10     refusal to sign "the recent one" concern the court.  If anything, this exhibit evidences

11     an intent to avoid infringing on Masimo's rights.

12   • Exhibit 49 is an email Mr. Watlington sent to Dr. Trommer and Mr. Manning asking

13     if anyone knows Masimo pricing for a competitive product.  He did not copy

14     Mr. Welch or Mr. Hunt.  In response, Mr. Trommer sent a Masimo quote he obtained

15     from Mr. Hunt.  Mr. Watlington responded appropriately.  See ex. 3195; Dkt. # 813;

16     Test. T. Watlington at 999:1-1001:18.  This email reflects well on Mr. Watlington

17     and evidences his desire to avoid use of Masimo trade secrets.

18   • One task that Mr. Watlington assigned Mr. Welch was to review Masimo's patents.

19     Dkt. # 813; Test. T. Watlington at 984:2-4.  As Mr. Watlington explained, he wanted

20     Mr. Welch to consider whether there was any overlap in Sotera and Masimo's

21     patents.  *Id.* at 5-24.  Patents are a matter of public record.  The Court determines that

22     this patent review reflects Sotera's desire to not infringe on Masimo's patents; despite

23     Masimo's suggestion to the contrary, the Court does not consider this as sinister or

24     indicative of anything more.  The Court acknowledges that Mr. Welch's knowledge

25     about Masimo's patents allowed him to spend less time on this review than if he

26     knew nothing about Masimo (and thus Sotera benefited from Mr. Welch's experience

27     at Masimo), but the Court does not view this as unjust or improper.  In particular,

28

51

**EXHIBIT D**

**-247-**

1    Mr. Watlington testified that he also and previously obtained patent review by

2    counsel.  *Id.* at 23-24.

3    • Dr. Trommer passed on a document containing Masimo forms that he received from

4    Mr. Hunt.  See ex. 206.  See discussion below starting at page 75, where the Court

5    discusses evidence that this form was not used.  It is worth noting that Masimo

6    proposed a finding in connection with Dr. Trommer's email that Dr. Trommer

7    "instructed" Adam Vasquez to use the Masimo form as a best practice.  Dkt. # 782 at

8    25:2-4.  But the email doesn't "instruct" Mr. Vasquez to do anything; and the

9    evidence is that he didn't use the form.

10   • Masimo relies on exhibit 1326, an email exchange between Dr. Don Bernstein and

11   Mr. Welch regarding lower limit $SpO_2$ alarms.  Masimo's counsel, in an insult to the

12   intelligence of jurors everywhere, said in closing that this was all he'd need with most

13   jurors in a jury trial.  Dkt. # 814; Masimo Closing Rebuttal at 1849:22-23.

14   Dr. Bernstein, after discussing various scholarly studies, pointing out that each

15   hospital thinks that it is different and, in fact each is (an important point for later

16   discussion and evidence that knowledge about this is not a Masimo trade secret), tells

17   Mr. Welch that ViSi sets off too many alarms and that Mr. Welch must:  "demand

18   better software algorithms . . . and do whatever else is necessary to literally mimic

19   Masimo's 'M1A1 Abram's Tank.'  Nothing less is acceptable."  But to take this

20   statement out of context and to equate "demand better algorithms" and mimic

21   Masimo's success with steal Masimo's trade secrets is a bridge too far.

22   • It is a given that Mr. Welch came to Sotera from Masimo.  And his most recent, but

23   far from exclusive, industry experience was at Masimo.  As a result, it is not

24   surprising that his experience was mentioned as a positive.  But random off-hand

25   comments in emails do not equate to proof of a requirement or even desire that he

26   provide Sotera with Masimo trade secrets.  In fact, given that Masimo showed up to

27   trial with thousands of documents, it is surprising how innocuous the internal Sotera

28   emails were.  See ex. 1394 (email discussing input received at an alarms summit and

52

**EXHIBIT D**
**-248-**

1    referencing Mr. Welch as a team leader because he has most recent experience due to

2    time at Masimo); ex. 2417 (Discussion of "wireless testing" per re line; ruling out

3    Masimo SafetyNet as "our predicate for 1(b)" based on public record FDA

4    information).[25]

5    153.  These events, singly and even collectively, do not change the Court's view that

6    Sotera did not hire Mr. Hunt and Mr. Welch for the purpose of obtaining Masimo trade

7    secrets and did not support the acquisition or use of Masimo trade secrets by Mr. Hunt or

8    Mr. Welch.

9    **Masimo adequately protected its trade secrets.**

10   154.  As a general matter, the Court finds that Masimo took reasonable efforts to

11   maintain the secrecy of its confidential information.  It did this in at least two ways.

12   155.  First, Masimo limited its employee's access to its confidential engineering and

13   marketing documents.  See Dkt. # 670; Test. Y. Lee at 223:15-224:14; 225:10-25; 226:10-

14   227:4; 228:16-19 & 230:16-235:16.  Masimo's chief witness on this point was Mr. Lee,

15   Masimo's head of intellectual and information technology, although almost all of Masimo's

16   witnesses made this point clear.

17   156.  Mr. Lee was a highly credible witness, who established that Masimo has

18   appropriate procedures in place to protect its confidential information.  He was not cross-

19   examined.  In his testimony, he outlined various procedures that Masimo uses to maintain

20   the confidentiality of its information.  He established that Masimo's procedures include

21   restrictions on access by nonemployees of Masimo but that the procedures also differentiate

22   between access levels within the company.

23   157.  In particular, access to certain technology information is not available to over

24   90% of Masimo's employees.  Dkt. # 670; Test. Y. Lee at 224:2-10.

25

26   [25]  Cf. *PhotoMedex, Inc. v. Irwin*, 601 F.3d 919, 925 (9th Cir. 2010) ("Under the 510(k) process, if
     the Class II device is deemed substantially equivalent to a pre-existing device with prior clearance
27   [i.e., a predicate], it can be marketed without further regulatory analysis.  In other words, that device
     receives '510(k) clearance' and can be put on the market." (internal quotation marks and citations
28   omitted)); *id.* at 925 n.3 ("Unlike premarket approval, 510(k) clearance 'does not in any way denote
     official approval of the device.'").

EXHIBIT D
-249-

158. Second, Masimo expected and required its employees, customers, and others to maintain the confidentiality of the information they encountered and relied on confidentiality agreements.  Dkt. # 669; Test. J. Kiani at 114:21-115:3.

159. Tracy Miller, Masimo's current Vice President for Human Resources, was a highly credible witness who testified about the various confidentiality agreements that Masimo has in place and, in particular, identified the confidentiality agreements executed by Mr. Welch (Exhibit # 85) and Mr. Hunt (Exhibit # 1809).  Dkt. # 670; Test. T. Miller at 245:19-251:3 & 251:18-25.

160. She testified regarding exit interviews, the conduct of her exit interview with Mr. Hunt, and the fact that she required a turnover of Masimo owned equipment and documents and provided documents and information related to the obligations of confidentiality.  Dkt. # 670; Test. T. Miller at 251:4-14 & 252:1-253:9.

161. Accordingly, the Court finds that Masimo generally took reasonable steps to maintain the confidentiality of its data.

**The Product Allegations**

    **Acquisition of Technical Trade Secret documents**

162. As discussed starting at pages 40 and 44 above, the Court concludes that Mr. Hunt and Mr. Welch downloaded documents containing Masimo trade secrets.  The Court also concludes that they transferred some or all of these documents to their Sotera computers.  The Court concludes as a result, that there was some misappropriation of Masimo trade secrets by Sotera.

163. This misappropriation included documents containing what has been referred to in the case as Technical Trade Secrets involving Masimo's technology in general and its Patient SafetyNet product in particular.

164. Mr. Welch and Mr. Hunt were employees of Sotera when they placed this information on Sotera's computers, and they did so in the course of their employment; they did not have access to Sotera computers other than in the course of their employment.

**EXHIBIT D**

**-250-**

1  Sotera, thus, improperly misappropriated these documents through acquisition and the

2  doctrine of respondeat superior.[26]  This acquisition is a partial basis for the Product

3  Allegations.

4      165. The Court easily concludes that injunctive relief is appropriate in this regard.

5  Sotera will be required to remove the documents to the extent they consist of Technical

6  Trade Secret documents from all Sotera owned or controlled computers and to destroy all

7  copies if any.  Sotera will be barred from using any of the Technical Trade Secrets.

8      166. Masimo, however, also requests monetary damages.  It claims that Sotera was

9  unjustly enriched by receipt of these documents and requests an award of $10,301,901; its

10  cost to develop the technology represented by the documents.  Dkt. # 574; Decla. Mangum

11  at ¶ 36; Dkt. # 683.  Test. J. Mangum at 679:20-680:3 & 680:15-20.

12      167. Dr. Mangum, Masimo's damages expert, did not qualitatively review the

13  documents in terms of their value to Sotera; if a document allegedly existed on a Sotera

14  computer he assumed Sotera benefited even if it did not have relevance to Sotera's business.

15  Dkt. # 683; Test. J. Mangum at 692:5-693:21.  This was not reasonable.

16      168. He also opined that this award was appropriate even if Sotera never opened the

17  documents and even if it never used the documents or the information they contained.  Dkt.

18  # 683; Test. J. Mangum at 694:22-695:16.

19      169. Dr. Mangum's tenacious defense of this position was not credible unless one

20  assumes that he was ignorant of or otherwise ignored the availability of injunctive relief.  In

21  the absence of evidence of use or actual benefit, his suggested damages are inappropriate.

22  As set out starting at page 22 above, Masimo's case law does not support a contrary

23  position.  The Court declines the request for monetary damages based exclusively on the

24  placement of Masimo Technical Trade Secret documents on Sotera's computers by

25  Mr. Welch and Mr. Hunt.

26

27  [26] In its proposed findings, Masimo requested a finding that Sotera used documents through acquisition.  But the correct finding is that Sotera misappropriated documents through acquisition; acquisition may precede use but the two terms equate to different forms of misappropriation.  See Cal. Civ. Code § 3426.1(b).

28

EXHIBIT D
-251-

1 **Alleged use of Masimo Technical Trade Secrets**

2       170. Masimo also argues that Sotera used the Technical Trade Secrets. As a result, it

3 seeks unjust enrichment damages of $1,632,610, the amount allegedly required to create the

4 information or technology which it alleges Sotera utilized. It also sought broad injunctive

5 relief beyond cessation of use. The Court concludes, however, that in each case use did not

6 occur or that there was no trade secret at issue.

7       171. And, in some measure, Masimo seems to agree. In its pretrial brief it requested

8 an injunction requiring Sotera to re-engineer certain attributes of ViSi to their state before

9 Mr. Welch arrived; in the powerpoint supporting closing argument, this broad request for

10 relief was absent. Instead, Masimo argued for only one express prohibition.

11       172. The Court's generalized analysis is based on the following:

12       173. First, there is no evidence that the Technical Trade Secret documents were

13 accessed from the Sotera computers or otherwise provided to Sotera. The Court recognizes

14 that the forensic review was impaired by the defragmentation software installed in the

15 Sotera computers. The Court is convinced, however, based on the quality of the forensic

16 testimony from both parties, and, in particular, on the quality of Mr. Kopelev's work, that it

17 is not reasonable to infer that they were opened in such a manner that Mr. Kopelev could not

18 identify some instance of opening beyond the very limited instances found. Use requires

19 more than mere possession. *O2 Micron Intern. Ltd. v. Monolithic Power Systems*, 399 F.

20 Supp. 2d at 1072.

21       174. Second, Masimo's expert, Mr. Walbrink, was not helpful to the Court. In large

22 measure, he merely points to a timeline and says that Sotera had certain capabilities before

23 Mr. Welch and Mr. Hunt arrived and augmented or obtained additional technological

24 capabilities after they came. His mission critical opinions, however, fail because they are

25 based largely on mere conclusion and not a rigorous review of Sotera's resources. Put

26 bluntly, he fails to explain why Sotera could not have independently developed the

27 information based on the resources it had available, and he fails to acknowledge the work

28

**EXHIBIT D**

**-252-**

1   that Sotera had done and the technological trade secrets that Sotera already possessed before

2   Mr. Welch and Mr. Hunt joined Sotera.

3       175. In contrast, Sotera put on credible witness after credible witness who explained

4   how Sotera developed each of the allegedly improperly acquired technology features and

5   how Masimo trade secrets were not involved.

6       176. Finally, this is not just a documents case; Mr. Welch theoretically could have

7   provided Masimo secret information based on what he learned and remembered from his

8   time at Masimo.  But Masimo, not Sotera, provided evidence that at the time he left

9   Masimo, Mr. Welch was no longer a technically focused engineer who could independently

10  move technology forward.

11      177. Sotera, on the other hand, put on witnesses who clearly had extensive and current

12  technological, scientific, and engineering capabilities and who explained how they used this

13  capability to create Sotera's technology.

14      178. Masimo had the burden of proof by the preponderance of the evidence on this

15  issue in general and on each of the allegedly infringing technical trade secrets in particular.

16  It failed to meet its burden in each case.

17      179. In the following discussions the Court discusses its more specific conclusions

18  related to each alleged instance of Masimo Technical Trade Secret use.  The Court

19  emphasizes that to the extent it cites particularized evidence, this is not to indicate that this

20  is the only evidence supporting a particular generalized point.  The record here is massive,

21  and the Court has not attempted to corral every statement supportive of exactly the same

22  point.  Similarly, the failure to discuss contrary evidence does not mean that it was missed;

23  the Court has attempted simply to lay out the principal points in opposition.

24      180. The Court's conclusions, as is always the case, were based on the totality of the

25  evidence and the careful review of all of the evidence.

26

27

28

**EXHIBIT D**
**-253-**

**Alleged Technical Trade Secret: recalibrating cNIBP measurements**

181. "Technical Trade Secret 4 addresses Sotera's proprietary measurement of a patient's blood pressure continuously and non-invasively (cNIBP), and without the need for the familiar blood pressure cuff attached to the patient's arm." Sotera's Trial Brief at 28.

182. The Court begins with this trade secret because it so well illustrates the general points just stated; the virtual totality of evidence favors Sotera.

183. Sotera measures cNIBP by measuring a patient's "pulse transit time"[27] ("PTT") which, very simply stated, is the time it takes a pulse to get from the heart to the thumb. Dkt. # 797; Test. J. Moon at 1100:5-23; Test. D. McCombie at 1134:17-22.

184. From its earliest days Sotera focused on cNIBP; its founders, Dr. Benet and Dr. Murad, worked out of a garage to develop technology in this area. Dkt. # 813; Test. T. Watlington at 944:24-945:11.

185. Once Mr. Watlington joined Sotera, while he recognized the importance of monitoring utilizing cNIBP technology, he also moved the company to the area of multi-parameter monitoring. Dkt. # 813; Test. T. Watlington at 945:12-25.

186. And in 2008 when Mr. Moon came to Sotera, he was responsible for the technology that included monitoring utilizing cNIBP. Dkt. # 813; Test. T. Watlington at 947:23-948:5.

187. But while the company moved on to ViSi and multi-parameter monitoring, it was prepared to file an FDA form 510(k) on cNIBP in 2008. Dkt. #813; Test. T. Watlington at 948:1-8.

188. Notwithstanding this fact, it eventually excluded cNIBP from its initial FDA form 510(k) because of concerns that this technology would complicate FDA approval of the original ViSi system. Dkt. # 813; Test. T. Watlington at 957:20-958:24.

189. Sotera received FDA 510(k) approval for cNIBP in 2013. Dkt. # 813; Test. T. Watlington at 959:4-7.

---

[27] Dr. McCombie also uses the term "Pulse Arrival Time" in connection with this concept.

**EXHIBIT D**
**-254-**

190. In relation to blood pressure monitoring, Sotera gathers two pieces of data: (1) blood pressure with the traditional blood pressure cuff; and (2) the PTT.  Sotera then calibrates the cuff measurement with the patient's PTT and uses that relationship in order to continuously measure the patient's blood pressure.  Dkt. # 797; Test. J. Moon at 1101:5-10.

191. PTT and blood pressure are inversely related; as blood pressure goes up, PTT goes down; as blood pressure goes down, PTT takes longer.  Dkt. # 797; Test. J. Moon at 1100:24-1101:3.  Dr. Benet came up with the idea of using the traditional cuff inflation and measurement to create a calibration curve of PTT vs. blood pressure for a specific individual.  Dkt. # 813; Test. J. Moon at 1100:5-10.

192. Dr. Benet's calibration curve was a breakthrough but, in order for it to be utilized in general care floor monitoring, there was a significant problem that had to be solved; various factors, such as patient movement and drug interaction can disrupt the relationship such that the PTT readings are no longer accurate.  Dkt. # 797; Test. J. Moon at 1101:13-23.  Test. D. McCombie at 1135:23-1136:21.  Sotera identified the problem, and, when Dr. Devin McCombie joined Sotera, he brought specific expertise on factors that impacted PTT.  Dkt. # 797; Test. J. Moon at 1102:22-1103:6.

193. While at MIT, Dr. McCombie's doctoral dissertation focused on using PTT to measure cNIBP.  Dkt. # 797; Test. J. Moon at 1102:22-1103:6.  Test. D. McCombie at 1131:4-23.  See also ex. 3124.  In writing his dissertation, he reviewed medical literature on the topic.  Dkt. # 797; Test. D. McCombie at 1137:7-19.  See exs. 3076, 3054, & 3001.  One, in particular, recommended: "Therefore, instead of adopting a regular calibration interval, it is worth investigating an irregular one, in which the length varies adaptively depending on the changes in the pulse arrival time."  Ex. 3001, p. 5.  Thus, recalibrating cNIBP is neither a trade secret per se as a general concept or a Masimo trade secret as implemented by Sotera.

194. Initially, Dr. McCombie worked on the science team at Sotera under Dr. Benet.  Dkt. # 797; Test. D. McCombie at 1132:16-19.  When Dr. Benet left in 2012, Dr. McCombie became the Chief Science Officer.  *Id.* at 1132:20-1133:7.  In these roles, among

**EXHIBIT D**

**-255-**

1   other things, he helped Sotera develop a full understanding of the risk of event-driven

2   disruption of the relationship between blood pressure and PTT.  *Id.* at 1137:7-17.  Thus, in

3   his roles at Sotera, Dr. McCombie applied knowledge gained from his work in connection

4   with his doctoral thesis.

5       195. Dr. McCombie, thus, assisted Sotera in identifying and addressing the risk that an

6   event-driven change in PTT would present.  Dkt. # 797; Test. McCombie at 1139:1-

7   1140:19-1141:5-16 & 1142:2-1143:9.  In particular, he disabused them of the idea that the

8   change was a result of "drift" and focused them on the reality that it resulted from

9   physiologic changes.  *Id.* at 1142:2-1143:9.

10      196. Once Sotera refocused on cNIBP in the 2011 period, Dr. McCombie was project

11  leader on cNIBP measurement.  Dkt. # 797 at 1143:17-1144:3.

12      197. And he was in charge of the cNIBP algorithm.  Dkt. # 797; Test. D. McCombie at

13  1148:4-8.

14      198. As a failsafe, Sotera decided that when the blood pressure measurement produced

15  by PTT deviated by a significant amount, the product would send an alert to the clinician

16  advising the clinician that he or she should take a new cuff measurement to ensure the PTT

17  measurement was accurate.  Dkt. # 797; Test. D. McCombie at 1140:25-1141:7 & 1145:10-

18  1146:16.

19      199. Once Mr. Welch came to Sotera, he was involved with cNIBP.  Dkt. # 813; Test.

20  T. Watlington at 1008:20-22.  But his role was focused on establishment of the right clinical

21  testing, documentation of testing, and analysis of testing—all in connection with submission

22  of the form 510(k) to the FDA.  Dkt. # 797; Test. J. Moon at 1080:21-1081:7.

23      200. Mr. Welch was not involved in the development of the fundamental measurement

24  technology with respect to vital signs such as cNIBP.  Dkt. # 797; Test. J. Moon at 1081:8-

25  11.  And Mr. Moon also testified that he never discussed Masimo's use of pulse transit time

26  to measure blood pressure with Mr. Welch; in fact, he testified:  "I had no idea Masimo was

27  engaged in such efforts."  *Id.* at 1103:7-12.  The Court believes Mr. Moon.

28

**EXHIBIT D**

**-256-**

201. The evidence shows that Dr. McCombie provided information relevant to cNIBP to Mr. Welch—the converse is not evidenced by this record. Dkt. # 797; Test. D. McCombie at 1144:4-1145:9.

202. Similarly, Dr. McCombie testified that he, not Mr. Welch, brought the idea of recalibrating blood pressure measurement to Sotera. Dkt. # 797; Test. D. McCombie at 1148:12-19. And Mr. Welch did not discuss cNIBP technology with him. *Id.* at 1148:9-11.

203. And Dr. McCombie's explanations well satisfy the Court that Exhibits 570, 282, and 3125, where Mr. Welch made reference to cNIBP, do not support the conclusion that Mr. Welch led Sotera's efforts on cNIBP. Dkt. # 798; Test. D. McCombie at 1198:16-1199:10; 1213:19-1216:21 & 1217:2-14.

204. Mr. Welch, himself, testified that he did not have a role in developing Sotera's cNIBP technology or related alerts. Dkt. # 798; Test. J. Welch at 1367:11-1368:25. In fact, he plainly stated that he did not know about the potential for disruption of PTT and blood pressure calibration until he got to Sotera and did not give Sotera knowledge, through Masimo trade secrets or otherwise, on this point. *Id.* at 1369:1-1371:6 & 1375:18-1377:24. On this point, he was believable.

205. Masimo's argument is confusing.

206. First, Masimo does not use cNIBP in any of its products and has never sought FDA approval for cNIBP. Dkt. # 670; Test. B. Muhsin at 367:12-23. It is of the view that the PTT concept had flaws it was not willing to accept. *Id.* at 327:11-24.

207. So, although Masimo investigated how to recalibrate blood pressure monitoring over a long period of time and then decided on intelligent cuff inflation to recalibrate cNIBP, it never deployed intelligent cuff inflation. Dkt. # 670; Test. B. Mushin at 331:17-332:16 & 378:9-14.

208. Despite its conclusion on the issue, Masimo argues that its Technical Trade Secrets were the basis for Sotera's development of technology because " [Mr.] Welch caused Sotera to implement functionality in Sotera's products relating to knowledge of the

**EXHIBIT D**

**-257-**

1    importance of including recalibration of continuous [cNIBP] monitoring based on

2    physiological changes of a patient." Dkt. # 670; Test. B. Muhsin at 369:17-370:5.

3        209. But the Masimo witness on this topic, Mr. Muhsin, could only vaguely state that

4    Masimo acquired alleged knowledge about the importance of recalibrating cNIBP based on

5    physiological change sometime during a four year period, and he could not say where or

6    whether this knowledge had been documented. Dkt. # 670; Test. B. Muhsin at 374:4-

7    375:10.

8        210. And while Mr. Welch was the supposed transmitter of cNIBP related information

9    to Sotera, Mr. Muhsin did not know if Mr. Welch was involved in the development of

10   Masimo's knowledge of the importance of cNIBP. Dkt. 670; Test. B. Muhsin at 375:11-14.

11   Instead, he stated that Mr. Welch was involved in taking technology to the general floor. *Id.*

12   at 331:10-16.

13       211. And finally, while Mr. Muhsin was a credible witness in some respects, it was the

14   Court's clear impression that he struggled, unsuccessfully, with this topic on cross-

15   examination. See e.g. Dkt. # 670; Test. B. Muhsin at 382:18-23.

16       212. Masimo's argument appears to be based largely on coincidence: before

17   Mr. Welch's arrival, Sotera's ViSi Mobile "product did not associate a patient's mean arterial

18   pressure physiological changes or relative physiological changes with recalibration of

19   cNIBP." It, thus, argues that Mr. Welch told Sotera that they should recalibrate the cNIBP

20   when any of the measurements exceeded the lower or upper alarm limits; this observation in

21   terms of timeline is obvious but not persuasive given the existence of Dr. Benet, Mr. Moon,

22   and Dr. McCombie at Sotera. Perhaps sensing the weakness of its argument, Masimo

23   turned to its expert, Mr. Walbrink.

24       213. Mr. Walbrink concluded that before Welch arrived at Sotera, ViSi Mobile "did

25   not associate changes to a patient's blood pressure with any requirement to recalibrate the

26   blood pressure measurement." Dkt. # 576; Decla. Walbrink at ¶ 76. He then supposes that

27   after he arrived, Mr. Welch pushed Sotera to include recalibration and that Sotera, as a

28   result, did eventually include recalibration. *Id.* at ¶ 77-80.

**EXHIBIT D**

**-258-**

214. In connection with recalibration, he, thus, opines that Mr. Welch was driving the process. His testimony, however, ignored that Sotera was already recalibrating based on physiological change and other areas prior to Mr. Welch's arrival, and it completely ignored the depth and extent of Sotera cNIBP experience that preceded Mr. Welch's arrival.

215. On cross, Mr. Walbrink admitted that he did not opine on causation, but instead he opined about when the cNIBP recalibration changes occurred and their relationship to Mr. Welch's arrival at Sotera and what he assumed happened based on some random and limited document entries. Dkt. # 812; Test. H. Walbrink at 530:4-540:12. In other words, he identified an event and placed it on a time line and speculated based on a few words in a document; the Court did not need an expert for development of a chronology and suggestions as to what a comment meant.

216. He completely failed to explain why Sotera could not develop this insight and the related technology without Mr. Welch. And, in any event, he was simply wrong on the facts. Sotera already had recalibrating cNIBP based on physiological changes in their specifications prior to Mr. Welch's arrival. *Id.*; see ex. 284A. The Court found Mr. Walbrink unhelpful and his limited scope of assignment rendered his opinion valueless.

217. The overwhelming evidence supports that Masimo did not meet its burden of proof that Sotera used Masimo Technical Trade Secrets in connection with its cNIBP technology. Mere acquisition of information through the download of documents, if any, does not justify monetary damages. There was no use of Masimo Technical Trade Secrets; injunctive relief is sufficient.

**EXHIBIT D**
**-259-**

**Alleged Trade Secret: respiratory rate alarm limits (4 breaths per minute)**

**There is a remote possibility that a Masimo Trade Secret involving 4 breaths per minute as a lower respiratory rate is established on this record.**

218. Masimo's Rainbow Acoustic Monitoring is technology that measures the respiratory rate of a patient through a neck worn sensor.  Dkt. # 670; Test. B. Muhsin at 332:17-22.

219. It is intended for use on the general care floor.  Dkt. # 670; Test. B. Muhsin at 332:25-333:5.

220. This technology created alarm management challenges.  Dkt. # 670; Test. B. Muhsin at 333:12-15.  Masimo, as a result, analyzed the problem and initially considered reducing the alarm threshold to four breaths per minute as part of its alarm management strategy.  *Id.* at 333:15-23.

221. After conducting a study, however, it decided not to set the lower limit at 4; it left it at 6 breaths per minute.  Dkt. # 670; Test. B. Muhsin at 335:11-336:8.

222. Masimo identifies this trade secret as setting the lower respiratory rate for an alarm monitor at four breaths per minute.  But its theory is perplexing.  True, it considered doing so while Mr. Welch was at Masimo.  Dkt. # 670; Test. B. Muhsin at 335:18-336:3.  But, as noted, Masimo never adopted this lower limit.

223. Sotera argues that this is not a trade secret.  Like every patient monitoring company, Masimo's lower and upper limits for all of the vital signs it monitors, including respiratory rate, are published in its user's manuals.  Dkt. # 798; Test. J. Welch at 1367:23-1366:6.  Masimo must publish its alarm limits in its user manuals pursuant to FDA regulations.  Dkt. # 736; Ex. D (Jansen Depo. Test.) at 182:6-19.

224. Masimo's point, as it requests $88,489 in unjust enrichment damages based on engineering related to the establishment of a breath per minute limit, is that Sotera benefitted because Mr. Welch, it alleges, told it about Masimo's analysis before Masimo reached a final decision.  They argue that the four breaths per minute is a tell—they did not

**EXHIBIT D**

**-260-**

use it, but Sotera's adoption of the limit demonstrates that Sotera must have relied on Masimo trade secret investigation in this area.

225. The Court finds that there is a small possibility that there was some element of relevant trade secret in connection with Masimo's analysis of lower limits for respiratory rate when Mr. Welch left Masimo.  The limit was not then established, and the user manual establishing it was not yet published.  But the problem is that the lower range of breaths per minute that is unsafe appears readily ascertainable.  See Dkt. # 813; Test. T. Watlington at 973:18-974:1.  This appears to be a narrow area of trade secret information if a trade secret exists.  The Court, however, identifies another even stronger reason for denying any relief to Masimo on account of this theory.

### Sotera did not improperly use Masimo Trade Secrets in establishing its lower respiratory rate limit.

226. Sotera does not use the six breaths per minute lower limit established by Masimo.  And the Court determines that Sotera independently determined to use four breaths per minute as its lower limit.

227. Again, Masimo essentially contends that Mr. Welch took his knowledge of Masimo trade secrets with him and argues that he used it to cause Sotera to revise its respiration rate lower threshold to reduce it to four breaths per minute.

228. Mr. Welch disputes that he knew about Masimo's consideration of the four breaths per minute limit.  Dkt. 798; test. J. Welch at 1366:7-13.  The Court does not rely on this testimony.

229. Mr. Walbrink also opined on this topic; he stated the undisputed fact that Sotera reduced its lower alarm respiration limit from five or six, depending on the context, to four after Mr. Welch came to Sotera.  Dkt. # 576; Decla. Walbrink at ¶ 84.  Sotera, he noted, did not have a medical advisor at the time it implemented this change.  *Id.* at ¶ 86.  He noted that Mr. Welch and Mr. Hunt downloaded Masimo documents relevant to this topic.  *Id.* at ¶¶ 82-83.  He then focuses on Dr. McCombie's testimony on the topic—which references

**EXHIBIT D**
**-261-**

1   reliance on Mr. Moon in this area and finds it lacking. *Id.* at ¶ 87.  Based on this facial

2   analysis, he infers that Sotera relied on Masimo trade secrets in setting its lower respiration

3   alarm limits. *Id.*

4        230. Masimo also referred to exhibit 1326 as indicative of Mr. Welch's knowledge and

5   coopting of Masimo's expertise, potentially on multiple fronts.  This evidence was not

6   compelling.  If anything, the email reflects an exchange between a  clinician providing

7   Sotera input about Sotera's default setting—exactly what Masimo contends that Sotera

8   lacked at the time—and the clinician's pointed directive that Sotera better be exactly as good

9   as Masimo if it wanted to compete.

10        231. Sotera, on the other hand, provides compelling evidence that it independently

11   derived the four breaths per minute threshold.

12        232. Respiratory rate, together with $SpO_2$ readings, caused the most alarms, and Sotera

13   had to address the problem.  Dkt. # 813; Test. T. Watlington at 969:5-10.  Thus, Sotera

14   analyzed 694 hours of patient data from "real live hospitals" to determine the incidence of

15   respiratory rate alarms; this analysis was the basis for its decision to use four breaths per

16   minute as the lower limit.  Dkt. # 797; Test. J. Moon at 1096:3-12.  Exs. 3156 & 3157.  See

17   also Dkt. # 813; Test. T. Watlington at 969:11-973:9.

18        233. Mr. Moon provided highly credible evidence on this point.  He had experience

19   with setting respiratory alarm thresholds and generally understands the clinical significance

20   of lower respiratory limits.  Dkt. # 797; Test. J. Moon at 1098:15-1099:19.

21        234. He participated in the discussion at Sotera as they analyzed the data and set the

22   four breaths per minute threshold and was a conservative voice in the conversation.  Dkt.

23   # 797; Test. J. Moon at 1097:3-1098:7.

24        235. He testified that Mr. Welch did not disclose information about Masimo

25   respiratory rates to him or during the relevant discussion of the lowest breath per minute

26   threshold.  Dkt. # 797; Test. J. Moon at 1098:8-14.  The Court believes him.

27        236. Dr. McCombie also provided very credible evidence on this point.  He

28   acknowledges that Mr. Welch participated in relevant discussions but never heard him

**EXHIBIT D**
**-262-**

1   discuss Masimo's practices.  Dkt. # 797; Test. D. McCombie at 1175:21-1176:7 & 1202:2-

2   16.  The Court believes him.

3       237.  The Court concludes that Masimo failed to meet its burden of establishing that

4   Sotera used Masimo trade secrets in establishing its lower alarm limit in relation to

5   respiration.  The overwhelming evidence is that Sotera independently developed this limit.

6   The opinion testimony of Mr. Walbrink is not helpful.  He reaches his opinion that Sotera

7   used Masimo trade secrets without in any way discussing Sotera's independent research

8   study or Mr. Moon's significant relevant experience.  In short, he failed to provide an expert

9   opinion that Sotera could not have independently developed its lower respiration alarm

10  threshold; as a result, his opinion is of no assistance to the Court.

11      238.  Mere acquisition of the information through the download of documents does not

12  justify monetary damages.  There was no use of Masimo Technical Trade Secrets; injunctive

13  relief is sufficient.

14

15      **Alleged Technical Trade Secret: adaptive thresholds calculations for**

16      **$SpO_2$ alarm limits**

17      239.  The parties' title for this trade secret is deceptive; it does not sufficiently identify

18  the trade secret.  The Court finds that the Masimo trade secret is the algorithm it uses when

19  calculating the baseline for the $SpO_2$ thresholds.  Sotera did not misappropriate the

20  algorithm.  But to provide clarity, the Court also discusses what, in the context of adaptive

21  alarm thresholds for $SpO_2$, is *not* a trade secret.

22      240.  In its trial brief, Masimo contends broadly that developing adaptive $SpO_2$

23  technologies is the trade secret:  "For example, Masimo developed technologies that

24  adaptively set $SpO_2$ alarm settings based on individual patient data"; "Welch was involved

25  in changes relating to adapting the $SpO_2$ alarm threshold for a particular patient monitor to

26  the physiology of the individual patient using that monitor."  Masimo's Trial Br., Dkt # 571

27  at 23:21-23 & 29:15-17.  In its closing argument, Masimo framed it in a few different ways:

28  "Sotera also uses additional confidential Masimo information . . . [including] Adaptive

EXHIBIT D

-263-

Threshold Alarms: Adapts the lower SpO$_2$ threshold based on the patient's physiology;" "Important of 'AutoSet' Functionality for SpO$_2$"; "Changing Threshold Based on Patient's Physiology."  But none of those characterizations accurately depicts either the trade secret or Sotera's technology.

241. The use of adaptive alarm thresholds is not a Masimo trade secret.  As Sotera accurately explains in its pre-trial brief, an "adaptive alarm threshold is an alarm threshold which is based on the current value of the patient's vital signs."  Sotera Trial Br., Dkt. # 581 at 27:1-3.

242. Mr. Moon worked with adaptive alarm thresholds when he created the Propaq Monitor in the late 1980s and early 1990s.  Dkt. # 813; Test. J. Moon at 1059:6-11.  He had watched people using a different monitor "trying to adjust alarm settings[,] which invariably meant going down through multiple layers of menus to find the particular value that you wanted to adjust." *Id.* at 1059:12-17.  So he added to the Propaq Monitor a feature called "Statset" which "looked at what the patient's current vital signs were at that point in time and then calculated clinically relevant values for high and low alarm limits and set them automatically." *Id.* at 1059:9-1058:1.  Put slightly differently, it allowed clinicians to press a single button and adaptively reset all of the alarms based on the patient's then current vital signs.  Dkt. #797; Test. J. Moon at 1065:18-21.

243. Thus, adaptive alarm thresholds cannot be the trade secret in question.  Mr. Moon, who worked at Sotera until recently, commercialized them in the 1990s.

244. Nor can the trade secret be using an adaptive alarm threshold with SpO$_2$.

245. First, Mr. Sampath testified that Masimo's manuals say that it has adaptive alarms.  Dkt. # 736; Ex. E (Sampath Depo. Test.) at 195:23-196:1.

246. Nor does Masimo hide the fact that its product has the ability to identify an adaptive baseline for a patient's SpO$_2$ levels.  Dkt. # 736; Ex. E (Sampath Depo. Test.) at 202:1-10.

247. Second, Jim Welch published an article in *Horizons* with Masimo's consent titled *An Evidence-Based Approach to Reduce Nuisance Alarms and Alarm Fatigue.*  Ex.  3250.

EXHIBIT D
-264-

In a detailed discussion, it, among other things, states: "New alarm technologies hold promise to further reduce unnecessary alarms." *Id.* at 50. It identifies one such alarm technology as adaptive alarms and identifies and discusses application of adaptive alarm technology in the context of SpO$_2$. *Id. passim.* At one point, it states: "Setting individual alarms is the recommended practice to reduce alarms, but this effort burdens nursing staff work load. A new alarm concept addresses this challenge by adjusting the audio alarm threshold based on a continuously updated SpO$_2$ baseline calculation." *Id.* at 50. Further, the article states that a clinician may selectively activate the adaptive alarm feature; an algorithm would then determine when to annunciate an alarm. *Id.*

248. The trade secret is also not Masimo's default SpO$_2$ settings. Mr. Jansen testified that the default settings for Masimo's SpO$_2$ levels were published in Masimo's user manuals. Dkt. # 736; Ex. D (Jansen Depo. Test.) at 121:17-122:4. Mr. Sampath agreed; FDA regulations require Masimo to publish the default settings. Dkt. # 736; Ex. E (Sampath Depo. Test.) at 182:14-20.

249. Similarly, the trade secret is also not Masimo's acceptable deviation range for SpO$_2$ levels. Mr. Sampath testified that, once Masimo derives a new baseline, the amount by which Masimo resets the alarm threshold is disclosed. Dkt. # 736; Ex. E (Sampath Depo. Test.) at 196:10-18.

250. The Court is left with what remains: the trade secret is the particular algorithm that Masimo uses for deriving the SpO$_2$ baseline and a vague muddle. Indeed, Masimo's corporate representative on such points, Mr. Sampath, explained that the secret is the computing—the algorithm—that Masimo uses to determine the baseline. Dkt. # 736; Ex. E (Sampath Depo. Test.) at 196:19-198:5.

251. Sotera admits that Masimo apparently developed a complicated algorithm for setting a patient's lower SpO$_2$ alarm threshold based on a running average of the patient's then current SpO$_2$ level; but it argues that it knows this because Masimo published this information in a white paper on their website. Sotera did not develop this further. The Court cannot find the algorithm in the record.

**EXHIBIT D**
**-265-**

252. The Court also finds that Sotera does not use Masimo's algorithm.

253. First, Masimo did not offer a comparison of the two algorithms.  On cross examination, Masimo's expert, Mr. Walbrink, admitted that he had never even looked at Masimo's adaptive threshold alarm.  Dkt. # 812; Test. H. Walbrink at 528:19-529:1.  Nor would it have been difficult to compare the two, and Masimo did not even need Sotera's source code:  Sotera publishes its $SpO_2$ AutoSet adaptive alarm calculation in its user manual.  See ex. 1045 at p. 124.

254. Second, Masimo has not shown (nor does it even suggest) that its algorithm was in the Masimo documents that Mr. Welch took.  *See* Dkt # 736; Ex. E (Sampath Depo. Test.) at 199:11-15 ("Q. . . . But did you find, among the confidential trade secret documents that you identified, any information about deriving the baseline algorithm?  [¶] A. I don't recall seeing that.") ; *id.* at 199:19-22 ("Q. Okay.  And you don't have any basis for believing that Jim Welch took that algorithm to Sotera; correct?  [¶] A. Yes.  I don't.").

255. What's more, the algorithm is not simple; it took several people in Masimo's engineering group to develop the algorithm with use of a software system; Mr. Sampath was not able to recite it.  Dkt # 736; Ex. E (Sampath Depo. Test.) at 197:6-15.

256. The Court finds that Mr. Welch did not bring a complex algorithm over through memory and then provide it to Sotera.

257. Further, Dr. McCombie testified that Mr. Welch never told him anything about Masimo's approach to $SpO_2$ alarm thresholds.  Dkt. # 797; Test. D. McCombie at 1171:17-19.

258. Similarly, Mr. Moon testified that Mr. Welch was not involved in adopting adaptive limits for $SpO_2$ for AutoSet.  Dkt. # 797:  Test. J. Moon at 1095:12-14.

259. And Mr. Elmschig, who wrote Sotera's AutoSet $SpO_2$ source code, testified that Mr. Welch never described Masimo's information to him—indeed, Mr. Welch never said anything about Masimo to him.  Dkt. # 797; Test. N. Elmschig at 1122:19-1123:5.

**EXHIBIT D**

**-266-**

260. The Court finds Dr. McCombie, Mr. Moon, and Mr. Elmschig's testimony on this point credible and believable.  Mr. Elmschig is no longer a Sotera employee.  Dkt. # 797; Test. N. Elmschig at 1114:5-9.

261. Third, while Mr. Walbrink went to great lengths to argue Sotera's misappropriation, he again fails to provide any helpful opinion to the Court.  As he explained:  Some of Sotera's products have an "AutoSet" function.  To activate it, a clinician must press a button; when the clinician does so, the button "automatically change[s] the alarm threshold for the active alarm." Dkt. # 576; Decla. Walbrink at ¶ 68.  Before Welch joined Sotera, the ViSi Mobile's AutoSet functionality used a "simple" formula, Dkt. # 576; *Id.* at ¶ 70.  For $SpO_2$ alarms, the formula resulted in a linear, or straight, line.  *Id.* at ¶ 71.  Mr. Walbrink continues:

> After Welch arrived, he "requested a design discussion for $SpO_2$ alarms."  On February 10, 2012 "Welch discussed a solution for the $SpO_2$ AutoSet algorithm."  That solution was implemented by Nick Elmschig (formerly Utschig) in a February 10, 2012 revision of the AlarmsAutoset.c source code file.

*Id.* at ¶ 72 (citations omitted).  In short, in Mr. Walbrink's opinion, Mr. Welch's arrival at Sotera prompted Sotera to change its $SpO_2$ formula from a "simplistic" formula to a more complicated one.

262. The Court, again, does not find Mr. Walbrink's opinion credible or his insights illuminating.  First, his timeline is incomplete.  He is correct that Mr. Welch and Mr. Elmschig met on February 10, 2012 to discuss a solution; what he misses is that on February 8, 2012, Mr. Elmschig emailed a proposed solution to Mr. Welch.  Dkt. # 797; Test. N. Elmschig at 1121:14-1122:18.  See also ex. 3190.  Thus, Mr. Welch and Mr. Elmschig discussed *Mr. Elmschig's* proposed solution at the February 10, 2012 meeting. See *id.*

263. And Mr. Elmschig testified that Mr. Welch did not discuss Masimo confidential technical information with him while he worked at Sotera.  Dkt. # 797; Test. N. Elmschig at 1122:19-1123:5.  The Court believes him.  As also will be discussed below, Sotera implemented Mr. Elmschig's solution, with only a minor change.

71

264. Also, Mr. Walbrink did not fare well on cross-examination. In connection with the AutoSet function, he confirmed that Sotera had it before Mr. Welch arrived. Dkt. # 812; Test. H. Walbrink at 522:18-24. He failed to establish that after Mr. Welch joined, the formula was significantly changed. See *Id.* at 523:17-528:18. He did not know what Masimo's $SpO_2$ formula was, so he could not possibly opine that Mr. Welch used Masimo trade secrets to create the formula. *Id.* at 528:16-529:1. Instead, he relies on various emails as evidence of Mr. Welch's influence. Dkt. # 576; Decla. Walbrink at ¶ 72. It is clear that he could read the words on the page, as could the Court, but he was unable to place them in any particularly helpful context based on his expertise. His evaluation of the emails added nothing to the Court's own ability to read them and, in fact, the Court finds that his analysis was overly simplistic and inadequately supported.

265. Further, the Court finds that Sotera does not use a true "adaptive" alarm in the $SpO_2$ context. As Dr. McCombie testified; the $SpO_2$ lower limit is fixed at 85%. Dkt. # 797; Test. D. McCombie at 1159:3-11.

266. And the AutoSet function would never let the lower limit go below 85%. Dkt. # 797; Test. D. McCombie at 1170:7-1171:13.

267. In fact, the evidence supports that Sotera independently developed ViSi Mobile's adaptive alarm thresholds.

268. Jim Moon pioneered the use of adaptive alarm thresholds with the Propaq Monitor and its "StatSet" functionality. When Moon joined Sotera, he developed a similar feature for ViSi Mobile and called it "AutoSet." Dkt. # 797; Test. J. Moon at 1089:18-1091:18.

269. In 2010, before Mr. Welch arrived at Sotera, Sotera had developed its AutoSet limit for $SpO_2$. Mr. Elmschig joined Sotera in 2010. Dkt. # 797; Test. N. Elmschig at 1114:18-23. He worked on and implemented ViSi's AutoSet function. Dkt. # 797; Test. N. Elmschig at 1116:10-13. He wrote the computer code. *Id.* at 1116:14-17.

270. Sotera first implemented its AutoSet algorithm for $SpO_2$ on September 22, 2010. Dkt. # 797; Test. D. McCombie at 1160:21-1044:3. See also ex. 3073.

**EXHIBIT D**

**-268-**

1    271. The SpO$_2$ AutoSet mathematical function at that time was linear.  Dkt. # 797;

2    Test. D. McCombie at 1161:4-6; ex. 3073.  But it also had a lower limit, the "care unit

3    limit," that AutoSet could not override.  *Id.* at 1161:11-24.  That lower limit value was 85%.

4    *Id.* at 1161:15-1162:2.

5    272. Sotera changed the source code on May 27, 2011.  Dkt. # 797; Test.

6    D. McCombie at 1162:3-6; ex. 3068.  The mathematical function was still linear.  *Id.* at

7    1162:7-9.

8    273. Mr. Elmschig, who wrote the code, described the change to the lower alarm limit:

9    "[I]t has a slope of one and an offset of negative five.  So it's the same thing as the patient's

10    current limit minus five." Dkt. # 797; Test. N. Elmschig at 1118:5-11.  Dr. McCombie,

11    however, testified that this version of the code had an oversight that allowed the SpO$_2$

12    threshold to drop as low as 80%.  Dkt. # 797; Test. D. McCombie at 1162:10-1163:10.

13    274. It was never deployed to any hospital sites, however.  Dkt. # 797; Test.

14    D. McCombie at 1163:11-16.

15    275. Three months later, Sotera turned off AutoSet's SpO$_2$ functionality.  Dkt. # 797;

16    Test. D. McCombie at 1163:21-1164:4.  Dkt. # 797.  Test. N. Elmschig at 1117:6-22.  See

17    also ex. 3067.

18    276. But because AutoSet's SpO$_2$ functionality was turned off, it generated a "JIRA"

19    ticket, which indicated that the SpO$_2$ functionality wasn't working correctly.  Dkt. # 797;

20    Test. N. Elmschig at 1120:8-19.  Mr. Elmschig, a member of the engineering department,

21    set out to address the JIRA ticket.[28]  *Id.* at 1122:8-13.

22    277. On February 8, 2012, Mr. Elmschig emailed Jim Welch with a proposed solution.

23    Exs. 3189 & 3190.  Dkt. # 797; Test. at 1121:16-24.  More specifically, he proposed:

24    _____

25    [28]  During its cross-examination of Mr. Elmschig, Masimo asked him about Exhibit 3026.  That
exhibit appears to be a February 8, 2012 JIRA ticket email.  It suggests the ticket was created after

26    Jim Welch asked, during a design review meeting, to "discuss alarm limits for SpO2 both in terms
of autoset and in terms of default alarm limits." Ex. 3026; see also ex. 3188 (minutes from 8

27    February 2012 meeting, including: "Jim Welch has requested a design discussion for SpO2
alarms").  This is likely the JIRA ticket that prompted Mr. Elmschig to work on a solution.  It does

28    not, however, suggest that Mr. Welch provided Mr. Elmschig with the solution.

**EXHIBIT D
-269-**

1    If SpO2 > 95%, then limit is 93%
    Else if 95% >= SpO2 > 90%, then limit is SpO2 – 3%
2    Else if 90% >= SPO2 > 87%, then limit is SpO2 – 2%
    Else the limit is 85%.

3

4   278. Two days later, Mr. Elmschig and Mr. Welch met to discuss Mr. Elmschig's

5 proposed change.  Dkt. # 797; Test. N. Elmschig at 1121:25-1122-7.

6   279. Later that day, on February 10, 2012, Mr. Elmschig emailed Mr. Welch the new

7 code.  Ex. 3190.  The proposed code was:

8   > 95      -> 90
   95 >=   SpO2  >  90  -> SpO2 – 3
9   90 >=   SpO2  >  87  -> SpO2 – 2
       Else   -> 85

10

11   280. *Id.*  There is one difference between the solutions:  if a patient's $SpO_2$ reading is

12 greater than 95%, then the lower limit would be 90% instead of 93%.  That is the only

13 change that Mr. Welch could possibly have caused; it is immaterial.

14   281. Mr. Elmschig officially changed the source code on February 10, 2012.  Dkt.

15 # 797; Test. N. Elmschig at 1119:1-8.  See also ex. 3070.

16   282. Mr. Elmschig described this change to the algorithm as being a step-wise

17 function.  Dkt. # 797; Test. N. Elmschig at 1119:9-13.  More specifically:  "If the patient's

18 value is more than 95 percent then the limit is at 90 percent.  If it's then more than

19 90 percent, then it's the same as the patient's value minus three.  And then, finally, if the

20 patient's value is like 88 percent, between 88 percent and 90 percent, then it's going to be the

21 value minus two.  So the Auto Set, the alarm value will be in that case, 86, it will be 85.

22 And then otherwise the limit is 85 percent."  *Id.* at 1119:22-1120:4.

23   283. The closest Masimo came to actually discussing the content of the Sotera source

24 code and related comments was in cross-examination of Mr. Elmschig on the $SpO_2$ topic.

25 He confirmed a source code comment that "$SpO_2$ low has a very special Auto Set

26 algorithm."  Dkt. # 797; Test. N. Elmschig at 1126:22-1127:13.

27   284. On redirect, Mr. Elmschig explained that this algorithm is very special because

28 you cannot have too high of a pulse oxygen; unlike heart rate or temperature, for example,

**EXHIBIT D**

**-270-**

where both too high and too low are a problem, with SpO$_2$, only too low matters.  See Dkt.
# 797; Test. N. Elmschig at 1128:11-20.  This source code comment evidences techie humor
not misuse of Masimo trade secrets.

285. Here the evidence is non-existent that Sotera duplicated Masimo's algorithm for
deriving a SpO$_2$ baseline.  The mere fact that Mr. Welch talked about SpO$_2$ on a rare
occasion is irrelevant; if he did not use a Masimo trade secret, he was entitled to discuss the
topic.

286. In short, the overwhelming evidence shows that Sotera independently created its
algorithms and developed its approach to SpO$_2$ monitoring; Masimo fails to meet its burden
of proof.  Mere acquisition of information through the download of documents does not
justify monetary damages.  If such documents exist, there was no use of Masimo Technical
Trade Secrets; injunctive relief is sufficient.

**Alleged Technical Trade Secret: hospital network infrastructure
collection information & connectivity techniques**

287. Masimo discussed this topic as one trade secret; but there are conceivably several
concepts involved:  (1) the collection of hospital information; (2) aggregation and storage of
data; and (3) the type of wireless to use in a particular medical device.  Stated more
elegantly, the trade secret involves collecting waveform, parameter, and alarm data and
transmitting that data from a server at a care location to a remote location using a secure
network connection.  The Court considered each of the embedded elements of the alleged
Technical Trade Secret.

**Hospital network infrastructure collection information
forms**

288. Masimo alleges that Mr. Hunt "used Masimo's confidential information to assist
Sotera in developing a competitive implementation procedure."  Ex. 4500 at 36:18-21.
Masimo points to Mr. Hunt's emailing two Masimo forms to other Sotera employees.

**EXHIBIT D
-271-**

1      289. It is undisputed that on July 13, 2012, Mr. Hunt sent an email to Sotera

2 employees, including Gunnar Trommer and Adam Vasquez, attaching forms including

3 Masimo Form 1965:

> I have attached some IT forms from my days at Masimo. The 1965 was a
> requirement during either the late stages of the sales process (preferably) or
> right after getting the PO. The other one was for our requirement to have
> VPN access. Hope these help.

7 Exs. 82-84.

8      290. On July 17, 2012, Gunnar Trommer replied, copying Mr. Vasquez:

> Thank you for sharing. Adam, you might want to touch base with Dave and
> compare notes what you have in our RAQ and what Dave provided in these
> docs. There is certainly a "best practice" learning opportunity here…

11 Ex. 206.

12      291. Masimo contends that Sotera was unjustly enriched by at least $48,058—

13 Masimo's personnel costs to develop the forms, which were "the culmination of an extensive

14 process of information gathering and elimination for optimizing and streamlining

15 installation and support activities without overburdening the customer or Masimo's team."

16 Dkt. # 574; Decla. Mangum at ¶ 45.

17      292. And, in fact, Mr. Hunt indirectly provided Mr. Vasquez with form hospital

18 questionnaires. See exs. 83 & 84.

19      293. These Masimo questionnaires must be completed by the hospital itself. In

20 discussing the labor intensive effort in creating these documents, Mr. Muhsin emphasized

21 the hard work that went into making them straightforward and short; otherwise hospitals

22 might be unwilling to fill them out. Dkt. # 670; Test. B. Muhsin at 79:9-80:16. Exhibits 83

23 and 84 are such questionnaires; and they are short.

24      294. And as Mr. Muhsin testified, each "captures the distilled data that we actually

25 needed from the biomed in terms of making it a successful deployment." Dkt. # 670; Test.

26 B. Muhsin at 137:11-16.

27      295. Exhibit 84 was geared toward a hospital's VPN access capabilities. Dkt. # 670;

28 Test. B. Muhsin at 139:13-140:9.

**EXHIBIT D**
**-272-**

1    296. All told, these forms took months of effort.  Dkt. # 670; Test. B. Muhsin at

2    140:16-141:8.

3    297. Had Sotera used the two forms Mr. Hunt sent, some measure of monetary

4    damages might be appropriate.  The evidence presented to the Court, however, leads the

5    Court to conclude that Sotera did not make use of the information.

6    298. The Court accepts the testimony of Sotera's former employee, Mr. Vasquez, that

7    while he briefly reviewed the forms sent by Mr. Hunt, he did not use them in any way to

8    create or modify Sotera's own forms.  Mr. Vasquez's highly credible testimony is supported

9    by documentary evidence.

10    299. Mr. Vasquez is currently employed at Fitbit and has been employed as a wireless

11    network engineer since 2005 or 2006, beginning at SIGMAnet.  Dkt. # 816; Test.

12    A. Vasquez at 1581:1-21.

13    300. He began his employment at Sotera in September 2011, where he was initially

14    employed as "senior deployment specialist."  Dkt. # 816; Test. A. Vasquez at 1581:24-

15    1582:2.

16    301. He was hired to develop processes and procedures to install ViSi on hospital

17    networks.  Dkt. # 816; Test. A. Vasquez at 1582:5-8.

18    302. When he began his employment, Sotera already had documentation in place

19    related to future implementation of ViSi at hospitals which was referred to as the project

20    workbook.  Dkt. # 816; Test. A. Vasquez at 1582:25-1583:6.

21    303. The project workbook was developed by a third party known as the Burwood

22    Group, a "technical company that provides IT services specifically to the health care

23    vertical."  Dkt. # 816; Test. A. Vasquez at 1583:7-13.

24    304. The documentation was an overview of how to conduct an installation project.

25    Dkt. # 816; Test. A. Vasquez at 1583:17-21.  It included documentation designed to collect

26    information about a hospital's wireless network referred to as the Remote Assessment

27    Questionnaire or RAQ.  *Id.*  at 1583:22-1584:6.  The RAQ was to be filled out during

28    preliminary discussions with a customer.  *Id.* at 1584:7-11.

**EXHIBIT D**

**-273-**

305. At the direction of Dr. Gunnar Trommer, Mr. Vasquez took over the project workbook, including the RAQ, in 2011.  Dkt. # 816; Test. A. Vasquez at 1584:12-1585:7; ex. 3088.  Mr. Vasquez was in charge of making updates to the RAQ.  Dkt. # 816; Test. A. Vasquez at 1585:8-9.

306. The RAQ as of September 2011 (Ex. 3090 (Appendix E)) was "designed to collect information about a hospital's network and other parameters that are related to installation…. [including] questions about how many devices were planned for an install.  Dkt. # 816; Test. A. Vasquez at 1586:4-1587:1.

307. The questions in the RAQ were pretty common and not generally unique to Sotera.  Dkt. # 816; Test. A. Vasquez at 1587:1-11.

308. The RAQ in its blank, unfilled out form was not considered Sotera's confidential information.  Dkt. # 816; Test. A. Vasquez at 1587:11-23.

309. Mr. Vasquez identified a version of the RAQ from March 2012 (ex. 3103 "Standard Work Instruction") attached to an email from Mr. Welch to Mr. Trommer (ex. 3100) and a version of the RAQ from October 2012 (ex. 3107) attached to an email from Mr. Vasquez to others (ex. 3106).  Dkt. # 816; Test. A. Vasquez at 1588:5-1589:20.  He testified that they represented the state of the RAQ as of those dates.  *Id*. at 1589:17-20.  He also agreed that the October version was three months after Mr. Hunt sent the Masimo forms to others at Sotera.  *Id.* at 1589:21-24.

310. Mr. Vasquez compared the March 2012 RAQ to the October 2012 RAQ.  He identified several minor wording and ordering differences, including changing "product" to ViSi Mobile," and "project manager" to "deployment specialist."  Dkt. # 816; Test. A. Vasquez at 1590:4-1597:3.  Mr. Vasquez testified that none of the changes were material in any way.  *Id.* at 1597:4-15.  The Court agrees.

311. Mr. Vasquez made all of the changes, did not rely on any other company's form in making the changes and relied solely on his own experience.  Dkt. # 816; Test. A. Vasquez at 1597:16-1598:5.

**EXHIBIT D**
**-274-**

1    312. Mr. Vasquez saw the forms Mr. Hunt had provided.  Dkt. # 816; Test. A. Vasquez
2  at 1598:18-1599:1.

3    313. However, he did not print them out, and he did not review them for more than a
4  minute or two.  Dkt. # 816; Test. A. Vasquez at 1599:2-10.

5    314. Mr. Vasquez did not discuss the forms with Mr. Hunt and he did not use the
6  forms to make changes to any of the Sotera forms.  Dkt. # 816; Test. A. Vasquez at
7  1599:11-14.

8    315. He testified that he received no other forms from Mr. Hunt or Mr. Welch. Dkt.
9  # 816; Test. A. Vasquez at 1599:16-21.

10    316. The Court believes Mr. Vasquez.  He was a credible witness, and Sotera's
11  documents do not evidence any changes as a result of Mr. Hunt's email.

12    317. Mr. Walbrink opined about Sotera's acquisition of Masimo's IT forms:  on
13  July 13, 2012, Hunt emailed Welch and others Masimo's IT forms.  And Sotera's forms, he
14  observed, included many similar features.  Dkt. # 576; Decla. Walbrink at ¶¶ 88-9.

15    318. But Mr. Walbrink conducts an apples versus elephants analysis.  He compares
16  exhibits 83 and 84—forms to be completed by a hospital (where Mr. Muhsin emphasized
17  that the value was in keeping it short and pithy so that the hospital would give you
18  information to allow deployment)—to Exhibits 6 and 1048—forms to be used by Sotera
19  (and completed by Sotera) during or after deployment.  This comparison is meaningless in
20  terms of hospital questionnaire form development; the focus of Mushin's testimony and
21  damages calculations.

22    319. The correct comparison for exhibits 83 and 84, a two page form and a three page
23  form, are exhibits 3107 and 3103, a 10- and 12-page version of a questionnaire.  As
24  Mr. Vasquez testified, the version dated after Mr. Hunt's email shows only cosmetic
25  changes; and the form is far longer than the Masimo version.  Dkt. # 816; Test. A. Vasquez
26  at 1597:4-15.  The documentary evidence again supports Mr. Vasquez's testimony.

27    320. And the Court's view is not changed by the email from Dr. Tommer.  Ex. 206.
28  Dr. Trommer did not instruct Mr. Vasquez to use the Sotera form; he told him to consider it.

**EXHIBIT D**

**-275-**

1   *Id.* And the evidence is that Mr. Vasquez did consider it—for a minute or so—and then did

2   nothing with it further.

3   **2.4 GHz and 5 GHz (dual-band network)**

4   321. Masimo contends that it "determined the optimal wireless protocol to transmit the

5   patient data to the central monitoring station." The Court seriously questions whether the

6   idea of moving from a 2.4 GHz wireless frequency to a 5 GHz one (and that you want a 5

7   GHz bandwidth because the 2.4 GHz bandwidth is clogged with other devices) is a trade

8   secret. Consumers selecting a wireless router for a house have to decide whether to have

9   both a 2.4 GHz and 5 GHz "dual-band" network. Even in 2011, this may have fallen under

10  the category of the "readily ascertainable." And, if so, it would not be a trade secret.

11  322. But, no one made that argument, so the Court assumes that in 2011 this might not

12  have been readily ascertainable.

13  323. Masimo argues that Mr. Welch "was also involved with pushing the importance

14  of prioritizing a specific wireless protocol for use in the hospital when using medical

15  equipment." Dkt. # 571; Masimo Tr. Brief at 29:19-21.

16  324. Masimo again fielded Mr. Walbrink as its expert on this point; his declaration

17  discusses Sotera's decision to move to a 5 GHz wireless frequency. He notes that before

18  Mr. Welch arrived at Sotera, an August 11, 2011 product roadmap listed "802.11 b/g/n"

19  (i.e., 2.4 GHz) as a "must have"; a later roadmap, in October 2011 a month after Welch

20  joined Sotera, listed 802.11 a/b/g/n (2.4 GHz and 5 GHz) as a strategic area for discussion.

21  Thus, he concluded, Sotera began working towards a 5GHz solution only after Mr. Welch

22  joined Sotera.

23  325. Sotera argues that it independently derived this technological point and that "Jim

24  Moon intended to improve the radio so that it could communicate on a 2.4GHz and 5GHz,

25  dual-band network even before Welch arrived; and when Sotera did make this change, it did

26  so because of repeated feedback from customers that they wanted Sotera to be able to run on

27  a 2.4GHz and 5GHz, dual-band network." Dkt. # 581; Sotera Tr. Brief at 32:12-7. Sotera's

28  position is well supported by highly credible testimony.

**EXHIBIT D**

**-276-**

326. Mr. Moon testified that WiFi was identified as a critical need and specified for ViSi as far back as 2009 before Mr. Welch arrived at Sotera.  Dkt. # 797; Test. J. Moon at 1074:22-1075:1; 1078:12-1080:1; 1081:12-15; 1103:23-1104:13 & 1107:13-16.  Mr. Manning began seeking hospital's "expert opinions" for the requirements for a "wireless fully functional multiparameter monitoring system" after his arrival in 2008.  Dkt. # 816; Test. G. Manning at 1372:23-1373:4.

327. The problem was that a viable chip small enough and with an adequate power level to provide dual band radio and still fit in the body-worn ViSi device did not exist at that time.  Dkt. # 797, Test. J. Moon at 1103:23-1108:7.

328. Mr. Moon was a highly credible witness in all his testimony.  On this point, he also supported his testimony with exhibit 3005, an email to a manufacturer of a promising chip in terms of size.  Dkt. # 797; Test. J. Moon at 1106:5-23.  The email, written two months before Mr. Welch arrived at Sotera, references a need to get to dual band, 2.4 and 5 gigahertz, as quickly as possible.  *Id.* at 1106:24-1108:1.

329. On cross-examination, Masimo points to exhibit 1039, an October 5, 2012 email in which Mr. Welch says that the move to 5 gigahertz must be prioritized, apparently to suggest that Mr. Welch, relying on a Masimo trade secret prompted the move to dual band.  Dkt. # 797; Test. J. Moon at 1109:1-1110:22.  But this statement of opinion in no way establishes that Mr. Welch and a Masimo trade secret caused Sotera to desire, specify, and finally incorporate dual band radio capacity into ViSi.  The overwhelming and credible evidence supports that Sotera did not rely on Mr. Welch or a Masimo trade secret in this regard.  *Id.* at 1081:12-15; 1108:2-7.

**Data storage**

330. Finally, there was testimony from Masimo about where it aggregates hospital data.  Mr. Muhsin initially testified that Masimo would either "push it to a cloud or push it to Masimo or Masimo's server would log in and pull it from Masimo's server would log in and pull it from their server.  Dkt. # 670; Test. Muhsin at 75:19-22; 82:16-20; 89:12-14 &

**EXHIBIT D**
**-277-**

90:5-8.  In response to a question from the Court, he clarified that, in effect, he used cloud to mean moving it to a server and not a commercial cloud.  *Id.* at 90:11-91:7.

331. On cross, it was suggested that the use of the term cloud was intended to confuse the Court.  Dkt. # 670; Test. B. Muhsin at 176:2-179:1.

332. Sotera stores data on an Amazon-sponsored cloud server.  Dkt. # 813; Test. T. Watlington at 967:6-968:4.

333. Mr. Muhsin denies knowing this fact, but actually mentioned Amazon while flustered.  Dkt. # 670; Test. B. Muhsin at 383:15-384:3 & 384:16-21.  Mr. Muhsin appeared to be a well-prepared witness with a clear idea of what Masimo hoped to accomplish.  He did well on direct, but he became flustered at times on cross.  The Court will not go so far as to say he was intentionally misleading, but the reference to Amazon in relation to cloud storage does make one wonder.

334. To the extent data aggregation and storage was part of the issue, there was no Masimo Technical Trade Secret utilized by Sotera in this area.  Masimo does not use the cloud; Sotera got the idea for an Amazon Cloud Platform for data storage on a cab ride.  Dkt. # 813; Test. T. Watlington at 967:6-22.

335. In short, Masimo fails to meet its burden of proof on this topic.  Mere acquisition of information through the download of documents or email, if any, does not justify monetary damages.  There was no use of Masimo Technical Trade Secrets; injunctive relief is sufficient.

**Alleged Trade Secret: hospital-specific customized alarm analytics processes (retrospective analysis)**

336. While the parties discuss this trade secret under the heading of a technical product trade secret, it sounds more in the realm of a marketing strategy.  As discussed above, Masimo and Sotera are trying to develop a new market:  deploying patient monitors on the general care floor.  But they face a considerable obstacle:  alarm fatigue.  Both companies seek to address alarm fatigue by reducing the number of non-actionable alarms.  They do

**EXHIBIT D**

**-278-**

1  this by setting new alarm thresholds and alarm delays.  They also have to persuade hospitals

2  to accept these new thresholds and delays—thresholds and delays different from those

3  recommended in the operating room and ICU.

4      337. As discussed with more specificity below, Masimo tried at some point to use a

5  "big data" approach:  aggregate data from a multiplicity of hospitals, analyze that data, and

6  generate a report.  Mr. Welch published Masimo's results in an industry journal, *Horizons*.

7  But hospitals were not receptive.  Masimo eventually realized hospitals would respond if it

8  gathered that hospital's data and then applied the same analysis to the individualized data.

9  After Mr. Welch moved to Sotera, he persuaded them to use these customized alarm

10  analytics when selling ViSi.

11      338. Masimo contends that this individualized analysis was a trade secret.  Sotera

12  argues that this methodology was not a trade secret because Masimo provided the

13  information to hospitals and encouraged Welch to publish an article in 2011.  It contends

14  that Masimo seeks to apply a meaningless distinction:  Masimo admits that applying the

15  methodological analysis from aggregated patient data from multiple hospitals is *not* a trade

16  secret but it argues that it *is* a trade secret when you apply that same analysis to data

17  collected from one hospital.

18      339. The Court agrees with Sotera.

19                          **Masimo's *eureka* moment**

20      340. On this point, Masimo fielded three witnesses.  First, Mr. Muhsin provided an

21  expert declaration before trial, which he adopted at trial.  Dkt. # 575; Decla. Muhsin.  Dkt.

22  # 670; Test. Muhsin at 267:1-3.  In it, he explained that individual hospitals were receptive

23  when the proposed alarm management strategies were supported by customized analytics

24  based on that particular care location's alarm experience.  *Id.* at ¶¶ 47-48.  In short,

25  Mr. Muhsin explained that hospitals do not care about what happens at other hospitals; a

26  hospital cares about what happened in its own wards.  *Id.* at ¶ 50.  On direct as a fact

27  witness, Mr. Muhsin essentially repeated this testimony:  hospitals were not receptive to

28  aggregated data—surprisingly, more data was not better.  Dkt. # 670; Test. B. Muhsin at

**EXHIBIT D**
**-279-**

1  298:18-299:20.  Instead, hospitals preferred to look at their own data and make decisions

2  based on their own work flow.  *Id.* at 299:12-20.

3      341. Masimo's President, Mr. Kiani, provided similar testimony and added some

4  context.  Masimo collected data from Johns Hopkins; it was able to show Johns Hopkins

5  that by changing the alarm trigger and adding an alarm delay, Johns Hopkins could

6  eliminate between 85% and 90% of non-actionable alarms and not put patients at risk.  Dkt.

7  # 669; Test. J. Kiani at 107:15-08:13.  With this, Masimo decided to write a white paper; in

8  Mr. Kiani's words, the point of the white paper was:  "to educate customers that it's okay to

9  have a different alarm thresholds than what they were used to and create an alarm delay."

10  *Id.* at 108:14-109:1.  Mr. Welch took the white paper and published it in *Horizons*, a

11  publication of the Association for the Advancement of Medical Instrumentation.  *Id.*;

12  Ex. 3250.

13      342. But according to Mr. Kiani the white paper and *Horizons* article fell on deaf ears;

14  hospitals were not willing to accept the results.  Dkt. # 669; Test. J. Kiani at 109:8.

15      343. Enter the "eureka" moment.  According to Mr. Kiani, the turning point was when

16  either Jim Welch, Anand Sampath, or Bilal Muhsin realized that Masimo should treat each

17  hospital like Johns Hopkins: take individualized data and show the hospital that altering the

18  alarm threshold would not negatively impact patient safety but rather would enhance it.

19  Dkt. # 669; Test. J. Kiani at 109:21:110:8.

20      344. Mr. Kiani testified that he considered this technique confidential and valuable.

21  Dkt. # 669; Test. J. Kiani at 112:6-11 ("Well, it was a subtle but powerful notion that if you

22  do the analytics for the department for that particular hospital, or just promise you are going

23  to do that, once they install it gets the customers to feel like this can be a successful

24  implementation and it won't boomerang on them you won't be stopped from usage.  It

25  worked.").

26      345. Finally, Mr. Jansen, Masimo's Executive Vice President of Business Development

27  testified by deposition designation.  He explained Masimo's use of white papers; he also

28  testified that the important principle Masimo developed was that each site had different

**EXHIBIT D**
**-280-**

1  alarm activity and different alarm change effects.  Dkt. # 736; Ex. D (Jansen Depo. Test.) at

2  96:25-97:6.  And Masimo then learned from the hospitals that the hospitals were not

3  receptive to aggregated data; they were interested in individualized data.  *Id.* at 98:17-99:21.

4  **Masimo shares information on alarm analytics.**

5  346.  Masimo creates white papers to describe its products or the product parameters,

6  usually through a very generalized, high level description.  Dkt #736; Ex. D (Jansen Depo.

7  Test.) at 64:5-65:21 ("[M]ore often it was just a general description of characteristics or

8  performance of a product, as defined in other data.").

9  347.  It puts data into the white papers to educate its sales team and customers about

10  high-level principles or to publish data.  Dkt #736; Ex. D (Jansen Depo. Test.) at 78:2-8.

11  348.  Masimo publishes some of its white papers on its web site.  Dkt #736; Ex. D

12  (Jansen Depo. Test) at 68:12-25.

13  349.  The *Horizons* article, an outgrowth of a white paper, is critical for the Court's

14  analysis.  In it, Mr. Welch describes the results of Masimo's gathering 32 million $SpO_2$ data

15  points from 10 hospitals and using retrospective analysis "to determine the incidence of

16  alarms at various alarm threshold and delay settings."  Ex. 3250.  The article also generally

17  describes the alarm fatigue problem.

18  350.  The *Horizons* article references three studies that looked at different alarm

19  settings.  First, the "Johns Hopkins Hospital reduced pulse oximetry alarms by 63% in a

20  step-down unit by reducing the low $SpO_2$ alarm thresholds from 90% to 88%."  Second,

21  Rheineck reported a 60% reduction "by adding a 15-second delay to the 90% lower $SpO_2$

22  limit."  And third, the article considered in depth a then-recent case study published in

23  *Anesthesiology* about how Dartmouth-Hitchcock Medical Center achieved more dramatic

24  results.  The Dartmouth-Hitchcock study reported that setting the bedside low $SpO_2$ alarm to

25  80% with an alarm delay resulted in a 68% reduction in rapid response activations and a

26  50% reduction in ICU transfers.  Ex. 3250.

27  351.  Masimo contends that before Welch joined Sotera, Sotera did not have a program

28  to analyze alarm events or provide custom alarm analytics for each hospital or care location:

85

**EXHIBIT D**
**-281-**

1  "Welch persuaded Sotera to implement this alarm customization process, knowing from his

2  work at Masimo that this technique was an effective tool in convincing and assisting

3  hospitals to alter their alarm policies."  Masimo Trial Brief at 22.

4     352. Mr. Walbrink goes to great lengths to postulate about how Welch brought this

5  technique to Sotera.  Based on Dr. McCombie's deposition, Mr. Walbrink concluded that

6  Sotera first used the "alarm analysis tool" in January 2013 and that Mr. Welch persuaded

7  Sotera to implement the alarm analysis and conduct "what-if" scenarios when selling ViSi.

8  Dkt. # 576; Decla. Walbrink at ¶¶ 19-21, 41 & 50.  In short, Mr. Walbrink opined that

9  Welch was instrumental in bringing the "what-if" analysis to Sotera; and he was right.

10    353. In the main, Sotera concedes that Mr. Welch introduced the technique to Sotera.

11    354. Mr. Watlington testified that Mr. Welch introduced the use of the "what-if"

12  scenarios to Sotera and pointed Sotera to articles on the topic.  Dkt. # 813; Test.

13  T. Watlington at 964:12-22.

14    355. On cross-examination, Dr. McCombie also confirmed that Mr. Welch introduced

15  the technique to Sotera.  Dkt # 798; Test. D. McCombie at 1208:24-1210:1.

16    356. Thus, Sotera uses the technique and finds it valuable.  Cf. ex. 2370.  Both

17  Mr. Watlington and Dr. McCombie explained that Sotera presents to hospitals both

18  aggregated data across hospitals and individualized data from the specific hospital.  Dkt.

19  # 797; Test. D. McCombie at 1151:14-21.  Dkt. # 813, Test. T. Watlington at 963:2-19.

20    357. Dr. McCombie testified that Sotera first started providing "what-if" analysis in

21  January 2013.  Dkt. # 797; Test. D. McCombie at 1151:10-21.

22    358. But while Mr. Welch introduced the generalized concept, he did not provide the

23  technology or the algorithm.  Instead, he called in a Sotera engineer, Scottie McCombie,

24  drew a grid, and told him to take the numerics and produce a grid that has the alarms

25  information using incremental delays and thresholds.  Dkt. # 798; Test. S. McCombie[29] at

26

27  _____

28  [29]  Scottie McCombie is Dr. Devin McCombie's brother; the programing he created may have been
    known by some as "the Scottie tool."  Dkt. # 798; Test. D. McCombie at 1207:4-10.

**EXHIBIT D
-282-**

1   1224:1-1225:19.  Mr. Welch testified in a manner consistent with the highly credible

2   Mr. McCombie.  Dkt. # 798; Test. J. Welch at 1345:16-1346:11.

3      359. The Court has no question that use occurred here, but it was use of the concept—

4   not use of the algorithm.

5      360. The Court finds, however, that a claim under the CUTSA is not established on

6   this record because providing customized alarm analysis to individual hospitals is not a

7   trade secret.  And while Masimo's algorithm allowing it to analyze wave form data in terms

8   of alarm activity at various levels of threshold and delay was a trade secret, Sotera did not

9   use it.

10      361. Again, the *process* of gathering the data, analyzing it, and creating a report is not

11   a trade secret.  And Masimo concedes that the *Horizons* article disclosed that Masimo

12   gathered and analyzed aggregated data; Mr. Muhsin admitted this, and it explains the "how"

13   sufficiently for replication.

14      362. Similarly, no one argues that the insight that hospitals viewed themselves as

15   unique was a Masimo trade secret.  Instead, the evidence establishes that this point is

16   commonly understood.  See, e.g., ex. 1326 where Dr. Bernstein provides a substantive

17   example of why there is truth behind a hospital's belief in this regard.  ("It is entirely unfair

18   to compare Dartmouth-Hitchcock Medical Center with other inner city hospitals in indigent

19   neighborhoods.").

20      363. And the evidence establishes that Sotera independently developed the technology

21   necessary to take a hospital's data and run "what-if" scenarios.

22      364. Instead, Masimo must show that applying the analytical method to a single

23   hospital's data, rather than an aggregation of data from multiple hospitals, and then

24   presenting the results to that hospital is a trade secret.  Masimo did not meet its burden on

25   this topic.

26      365. On this point, Mr. Muhsin did not fare well on cross examination.  In particular,

27   he steadfastly, but with obvious discomfort, held to the opinion that analyzing data from a

28   single site in a particular manner is a protected trade secret while analyzing data from

**EXHIBIT D
-283-**

1   multiple sites, in the same manner, something Masimo allowed to be discussed in a paper

2   produced by Mr. Welch, was not a trade secret.  He admitted that analyzing and presenting

3   data from five hospitals was not a secret; nor from three; nor from two.  But just one was.

4   There was no follow up on this testimony on redirect, and the Court, frankly, found the

5   testimony nonsensical.  The mere statement that something is a trade secret falls far short of

6   what the Court needs to find that Masimo has met its burden of proof on this point.

7       366. Next, to the extent it was a trade secret, Masimo's publication of the white paper

8   and the *Horizons* article was a public disclosure of the information.[30]  The Court finds that

9   the key idea here—analyzing an individual hospital's data—is embedded within the article.

10  The article refers to and discusses two case studies where an individual hospital's data was

11  analyzed:  Johns Hopkins and Dartmouth-Hitchcock.  Admittedly, the article's insight is not

12  the provision of customized analytics to a hospital; instead, its insight was Masimo's ability

13  to aggregate "big data" and run analytics on and draw conclusions from that.  But being able

14  to analyze aggregated data from multiple sources requires being able to analyze individual

15  data—the calculations are the same; the data set is just larger.

16      367. In its closing argument, Masimo contended that the *Horizons* article does not

17  disclose:  (1) providing analytics to a care location using the care location's own data;

18  (2) using the analytics to persuade the customer to optimize their alarm settings; (3) giving

19  the customer confidence to buy; and (4) facilitating successful deployment.  The fourth

20  point, gathering data for successful implementation, is discussed in another section, see

21  p. 75 and following; that said, the *Horizons* article's discussion of the Dartmouth-Hitchcock

22

23  _____

    [30]  In his deposition, Mr. Jansen testified that, despite publication, Masimo considered the
    information disclosed in the Horizons article or white paper as proprietary.  Dkt # 736; Ex. D

24  (Jansen Depo. Test.) at 107:7-13.  He explained that the target audience was incredibly small:  a
    small fraction of 1% of the general population.  Dkt # 736; Ex. D (Jansen Depo. Test.) at 107:17-24.

25  He suggested that the information was still proprietary, just selectively disclosed.  And he estimated
    that, despite the white paper and *Horizons* article, 99% of the people Masimo talked with were not

26  aware of the publications.  Dkt # 736; Ex. D (Jansen Depo. Test.) at 117:25-118:24.  But this is not
    persuasive nor did Masimo develop the point further.  Even if the article was not extensively read,

27  the person who introduced the *Horizons* article to Sotera, Mr. Welch, knew that it was published

28  and not a secret.  And the critical audience from a trade secret disclosure perspective is not the

EXHIBIT D
-284-

1   case study emphasizes the need for successful deployment:  "During the implementation

2   phase, careful attention was focused on selecting the right sensor and optimizing every

3   element in the signal chain including the information technology (IT) wireless

4   infrastructure." Ex. 3250 at 51.  In any event, all four of Masimo's argued distinctions are

5   part of a successful sales process.  The Court struggles to see how using data to persuade a

6   customer to buy your product and then helping to set up that product is confidential.  What's

7   more, Masimo admits to using the *Horizons* article as a selling point; indeed, one of the last

8   pages of the *Horizons* journal is a Patient SafetyNet advertisement.  Ex. 3250 at 88.

9       368. In it, Masimo links the use of Patient SafetyNet to the *Anesthesiology* Dartmouth-

10  Hitchcock case study: "Patient SafetyNet and Masimo SET enabled a major teaching

11  hospital to reduce ICU transfers by nearly 50% and reduce rapid response team activations

12  by 65%." Ex. 3250 at 88.  It then provides a footnote citation to *Anesthiology* and the

13  Dartmouth-Hitchcock study.  *Id.*  So even within the *Horizons* journal, Masimo was

14  asserting that it could do for other hospitals what it did for Dartmouth-Hitchcock.  This was

15  a sales opportunity; it was not confidential.

16      369. The Court also finds that the particular insight—providing care locations with

17  customized analytics—is reasonably ascertainable and thus not confidential or proprietary.[31]

18  Again, a consistent theme throughout Masimo's testimony was that hospitals view

19  themselves as unique.  Dkt. # 669; Test. J. Kiani at 110:17-21 ("But I think, secondly,

20  hospitals always think they are unique.  They think somehow their patients are different,

21  somehow their environment is different.  And it's not really true, but they hold that belief

22  tightly.")

23      370. Because of this perception (whether accurate or inaccurate), Masimo or any

24  company trying to sell medical solutions to hospitals, such as Sotera, would need to adopt a

25  _____

26  general population—it includes exactly the people who read *Horizons*.
    [31]  The Court cannot help but add a down to earth example.  Burger King's market research and
    advertising campaign development no doubt consisted of one or more protected trade secrets.  But

27  once it used "have it your way" and aired commercials with employees singing "hold the pickles . . .
    special orders don't upset us," things changed.  Its competitors couldn't use its slogan or catchy

28  lyrics, but they could all latch onto the idea and say:  "we'll let you customize your burger too."

customized approach.  Dkt. # 669; Test. J. Kiani at 110:24-111:7 ("Well, again, it's—now hospitals are siloed, unfortunately.  And just like there's a belief that each hospital is unique, each department thinks they are unique.  And they think their patients have a unique issue or unique circumstance.  And so it was important that we showed them at orthopedic post-surgical, post-orthopedic surgical ward, this is what your data shows you can do, in the post-cardiac surgical ward, this is what your data shows.  We can do that, it is safe and effective.").  Responding, in the sales process, to a customer's self-perception is not proprietary.

371.  Nor is it proprietary or confidential when the hospitals and care locations, themselves, told Masimo that the aggregated data analytics were not helpful and that, instead, they wanted customized analytics.  Dkt. # 736; Ex. D (Jansen Depo. Test.) at 98:17-99:5 ("Well, they told us it wasn't—it was interesting, but it wasn't applicable to them.  And so therefore we employed strategies to do analysis that was helpful to them.  That was my understanding."); Dkt. # 670; Test. B. Muhsin at 299:7-20 ("[I]t didn't mean anything to them specifically, so it didn't represent their patient population, their floors, you know, specific to their care area.  So because it doesn't do that, they didn't take that information and say, 'Okay, I can—this applies to me.'  So we had to actually fall back now on the custom analytics that we were doing on a per site per location basis and that concept of giving them that ability and making them feel they are in the driver's seat.  It gives them a little bit of, you know, okay, they understand why it's happening and how it's happening.  They work with you and they feel like they can make the decisions on what makes sense for them based on their clinical scenarios and based on their nurse, nurse work flow there as well.").  Anyone selling to these hospitals would be told the same thing.

**Damages**

372.  Masimo calculates alleged Sotera's unjust enrichment as $884,440—the personnel cost for the hospital-specific customized alarms.  Dkt. # 574; Decla. Mangum at ¶ 39.

373.  The Court has found that customized analytics is not a trade secret; it has also found that Sotera did not improperly misappropriate the concept because it was readily

1  ascertainable.  Even if the Court were to find otherwise, however, it would not award

2  $884,440.  First, it is undisputed that the "how" of the analytics was not a trade secret.

3  Further, Mr. Kiani testified that, for Masimo, *using* customized analytics was a *eureka*

4  moment.  Accordingly, if a narrow wedge of trade secret exists, $884,440 does not represent

5  the cost of developing it.

6

7  **Technical Trade Secret: negative information**

8  374.  Masimo argues that Mr. Welch, while at Masimo, learned "enormous amounts of

9  information, technologies, and techniques that are necessary to make a monitor viable in the

10  general care areas of a hospital."  Dkt. # 571; Masimo's Trial Brief at 23.  Based on this

11  experience, Masimo suggests that Mr. Welch could identify "those areas in which Sotera's

12  ViSi Mobile product was deficient, and then specify changes to the product that he knew,

13  based on his work at Masimo, would remedy that deficiency."  *Id.*  Masimo thus contends

14  that Mr. Welch misappropriated more than just the individual trade secrets discussed

15  above—he took with him to Sotera the "totality of the information on how to make and sell

16  a viable general care area monitor ***without going through the same intensive trial and error***

17  ***process as Masimo***."  *Id.*

18  375.  And this type of information—negative information or research—can be a trade

19  secret.  But the Court determines that Masimo failed to meet its burden of showing any use

20  of Technical Trade Secret negative information by Sotera.

21  376.  The Court understands Sotera's frustration at Masimo's shifting, Hydra-esque

22  approach to the trade secrets in this case.  At closing and during an in-chambers meeting

23  with counsel, Masimo argued that California Code of Civil Procedure ("CCP") § 2019.210

24  has no application in federal court.  Masimo's Closing Argument, Dkt. # 814; 1753:11-18

25  ("There's a reason behind that.  [Mr. Shapiro is] very bright.  He knows I need to categorize,

26  I need to cabinet.  And what I'm telling you is the law is to the contrary.  And as we were

27  discuss and I saw no brief, and I had [a] brief ready.  I had a brief ready on the 2019 and the

28

**EXHIBIT D**
**-287-**

1  purpose of 2019 and why it's not applicable, in federal court in particular. But that was

2  never followed through."). The parties did not brief the matter.

3      377. And indeed, the "Ninth Circuit has not decided whether CCP § 2019.210 applies

4  to actions in federal court." *Hilderman v. Enea TekSci, Inc.*, No. 05CV 1049 BTM(AJB),

5  2010 WL 143440, at *2 (S.D. Cal. Jan. 8, 2010). District courts across California are split

6  on the matter. *Id.*

7      378. The only published opinion on the matter in the Southern District of California

8  holds that it does apply. *Computer Econ., Inc. v. Gartner Grp., Inc.*, 50 F. Supp. 2d 980,

9  992 (S.D. Cal. 1999) ("Accordingly, the court holds that the principles of *Erie* require

10  application of CCP § 2019[.210].").

11      379. More recently, the Chief Judge of the Southern District held, in an unpublished

12  decision resolving a motion in limine, that it conflicted with Federal Rule of Civil Procedure

13  26. *Hilderman v. Enea TekSci, Inc.*, 2010 WL 143440, at *2 ("Section 2019.210 *conditions*

14  discovery regarding trade secrets on plaintiff sufficiently identifying the trade secret. If

15  Section 2019.210 is applied and the plaintiff fails to make an adequate disclosure by the

16  Rule 26(f) conference, the plaintiff is barred from engaging in discovery on his trade secret

17  claims even though he would otherwise be permitted to do so under the Federal Rules.").

18      380. But the Chief Judge in *Hilderman* also noted that the plaintiff could be barred

19  from presenting trade secret claims at trial where it did not provide fair warning. *Id.* at *3.

20      381. Even more recently, Masimo's counsel may have convinced at least one of the

21  magistrate judges in the Southern District to follow *Hilderman*. *See Freeman Inv. Mgmt.*

22  *Co., LLC v. Frank Russell Co.*, No. 13-CV-2856 JLS (RBB), 2016 WL 5719819, at *7 (S.D.

23  Cal. Sept. 30, 2016) ("On July 30, 2015, Magistrate Judge Brooks denied Defendant's

24  motion to strike. In so doing, Magistrate Judge Brooks held that 'section 2019.210 . . .

25  conflicts with Rule 26 . . . . Accordingly, section 2019.210 does not apply to this

26  action . . . .'" (ECF citations omitted)).

27      382. But when that case reached summary judgment, the District Court granted

28  defendant's motion for summary judgment because plaintiff "failed to meet its burden of

**EXHIBIT D**

**-288-**

1  identifying its alleged trade secrets with the requisite specificity." *Id.* at *12.  *Hilderman* is

2  now on appeal.

3      383. Thus, although the direct application of CCP § 2019.210 to federal diversity cases

4  is questionable, the principles behind it have been accepted and implemented in the

5  Southern District of California.  *Jardin v. DATAllegro, Inc.*, No. 10-CV-2552-IEG-WVG,

6  2011 WL 3299395, at *3 (S.D. Cal. July 29, 2011) ("But the cases rejecting the direct

7  application of § 2019.210 in federal court do not suggest that a federal magistrate judge

8  cannot consider issues related to the policy rationale for § 2019.210; nor do they suggest

9  that a judge employing discovery procedures similar to those mandated by § 2019.210

10  necessarily applies state law."); *Gabriel Techs. Corp. v. Qualcomm Inc.*, No. 08CV1992-

11  AJB-MDD, 2012 WL 849167, at *4 (S.D. Cal. Mar. 13, 2012) ("As set forth above, under

12  *Erie R.R.,* it is appropriate to apply Cal. Civ. Code § 2019.210 in a federal court sitting in

13  diversity, because § 2019.210 does not conflict with a federal rule, is a substantive state law

14  and even if that were questionable, which it is not, its non-application would result in

15  undesirable forum shopping.").

16      384. Put bluntly, even if CCP § 2019.210 is not applicable, it does not mean that

17  Masimo was free to come to trial in this Court with a non-specific claim regarding trade

18  secrets.  It cannot dump facts and, in effect, tell the Court to figure it out.

19      385. And in two important respects, the CCP § 2019.210 issue as argued by Masimo

20  misses the point.

21      386. First, this matter arose in the State Court; CCP § 2019.210 clearly bound Masimo

22  there; and Masimo repeatedly told this Court it was trial ready (or almost so) on the Product

23  Allegations involving the Technical Trade Secrets.  See Dkt. # 557, a Tentative that contains

24  examples of this representation.

25      387. Masimo has no excuse for anything but a crisp articulation of its trade secret

26  allegations more than three years after commencement of the State Court Litigation.

27

28

388. Second, in this case the Court required Masimo to provide very specific details[32] as to its claims against Sotera in its Informal Proof of Claim. Dkt. # 244. This requirement was reasonable; it was a *quid pro quo* in exchange for Masimo's requested relief from the bar date requirement. And unless Masimo "exaggerated" its trial readiness on the Product Allegations, it was reasonable in connection with Masimo claims in litigation pending for well over three years.

389. In short, Masimo fails to meet its burden of proof. The Court cannot award damages on an amorphous negative information claim.

390. Masimo introduced no evidence of monetary damages in this area; it merely requested injunctive relief. Given the Court's conclusion, as discussed below, that Mr. Welch did use Masimo pricing information, and his theft of Masimo trade secret documents, the Court will provide an appropriate injunction specifically barring him from using Masimo trade secrets, including Technical Trade Secrets, in the future as a bookend to the broad injunction barring use of Masimo Trade Secret documents.

**Customer Allegations**

    **Acquisition of Customer Trade Secret documents**

391. Masimo asserts that Sotera misappropriated Masimo's confidential customer and marketing information (the "Customer Trade Secrets"). It further alleges that Sotera used this confidential information to target Masimo's current customers and potential future target customers and caused obstruction and delay of Masimo's sales efforts.

392. The Court finds that the documents downloaded by Mr. Welch and Mr. Hunt included trade secret documents related to customers, target customers, pricing, and other marketing information. Masimo met its burden of proving that this information constituted trade secrets. The documents, among other things, contained information that was not

---

[32] The order required that Masimo: [file] an informal document providing a specific claim amount and a detailed outline of the basis for each category of alleged damages….[t]he detailed outline

1   readily ascertainable; they were created over time through significant investment of Masimo

2   ingenuity, labor, and expense.  Among other things, they contained valuable information

3   about the particular characteristics of customers, identified the best targets for sale, and

4   reflected strategic pricing and marketing analysis.

5        393. Thus, when Mr. Hunt and Mr. Welch downloaded the Customer Trade Secrets on

6   a Sotera computer, this constituted a misappropriation under the CUTSA by Sotera through

7   acquisition.  Mr. Hunt and Mr. Welch were Sotera employees; they used a Sotera computer;

8   they wrongfully transferred the documents and they did so in breach of their contractual

9   obligations to Masimo; and the documents could have been or were helpful to their new

10  employer, Sotera.

11       394. The Court for the reasons previously discussed starting at page 48 and as

12  hereafter discussed specifically in connection with the Customer Allegations, finds that

13  others at Sotera did not know about these actions and did not request or require them.  But

14  the Court finds that the facts support that Sotera must be responsible for certain actions of

15  Mr. Hunt and Mr. Welch under the doctrine of respondeat superior.

16       395. The Court easily concludes that injunctive relief is appropriate to prevent against

17  future use of the Customer Trade Secrets.  True, this information is stale—its utility as a

18  marketing tool many years after creation is questionable.  But an injunction barring use and

19  requiring removal from Sotera computers remains appropriate.

20       396. Masimo, however, also requests monetary damages based on specific alleged use

21  of this information.  It argues both actual damages through delay in obtaining business

22  caused by Sotera and unjust enrichment of Sotera.  The broad assertion is specifically

23  focused on three customers, two documents, and sales related to Mr. Hunt.  The Court

24  discusses these matters separately.

25       397. In the following discussions the Court discusses its more specific conclusions

26  related to each alleged instance of Masimo Customer Trade Secret use.  The Court

27  _____

28  must include reference to all facts, documents, anticipated expert opinions, and anticipated non-
    expert testimony supporting Masimo's alleged claim.

**EXHIBIT D**

**-291-**

1  emphasizes that to the extent it cites particularized evidence, this is not to indicate that this

2  is the only evidence supporting a particular generalized point.  The record here is massive,

3  and the Court has not attempted to corral every statement supportive of exactly the same

4  point.  Similarly, the failure to discuss contrary evidence does not mean that it was missed;

5  the Court has attempted simply to lay out the principal points in opposition.

6      398. The Court's conclusions, as is always the case, were based on the totality of the

7  evidence and the careful review of all of the evidence.

8      **The University of Pittsburgh Medical Center**

9      399. Masimo alleges that it aggressively solicited UPMC for conversion of Nellcor

10  technology to Masimo technology, including sensors, monitors, and sought to also provide

11  general floor monitoring.  It notes that the effort included Mr. Welch and Mr. Hunt.  It

12  asserts that because Sotera improperly solicited UPMC, Masimo was delayed in closing the

13  deal by 12-18 months.

14      400. Mr. Anacone is the North American head of sales for Masimo; the Court found

15  his testimony highly credible as to his belief that Sotera obtained Masimo Customer Trade

16  Secrets and used them.[33]

17      401. Mr. Anacone explained that UPMC wanted to expand from a presence in two

18  hospitals to a presence in all 27 UPMC hospitals and that Patient SafetyNet was part of the

19  expansion.  Dkt. # 812; Test. M. Anacone at 488:12-489:10.  He described a meeting and

20  Masimo's perception that it was close to culminating a deal.  *Id.* at 489:11-23.

21      402. While at UPMC for this meeting, Mr. Anacone encountered Mr. Hunt at a nearby

22  hotel.  Dkt. # 812; Test. M. Anacone at 490:1-7.  Mr. Hunt told Mr. Anacone that he was

23  there to meet with UPMC on behalf of Sotera.  *Id.* at 491:3-5.

24      403. Mr. Hunt also participated in a conference call with UPMC on April 3, 2013.

25  Ex. 263.

26

27  [33]  Mr. Anacone came across very favorably on the witness stand.  The Court had a far less favorable reaction to his testimony in printed deposition excerpts.  In fairness to Masimo and

28  Mr. Anacone, the Court decided to do a second review of Mr. Anacone's deposition testimony—this time by watching the deposition video.  The exercise underscored the importance of tone, delivery,

**EXHIBIT D**
**-292-**

404. At approximately this time, Mr. Anacone described a change in the tenor of negotiations with UPMC; progress stalled.  Dkt. # 812; Test. M. Anacone at 491:18-491:2.

405. The Court accepts Masimo's **belief** that Sotera used Masimo's Customer Trade Secrets and otherwise improperly impeded Masimo's UPMC sales effort.  But the belief is inadequately supported by evidence in the record, and the estimation of the time of the delay appears merely speculative.

406. There was no evidence from UPMC that substantiates Masimo's assertion that Sotera caused delay or was a principal source of delay for any particular time period, while there is evidence from UPMC as to other reasons for delay.  There was no cogent explanation of how Masimo calculated the time of alleged delay;[34] and it moved the goal posts on this theories' field of play right before trial in a way that only confused and weakened an already questionable theory.

407. On the other hand, Sotera's witnesses provided credible evidence supported by directly relevant documentary evidence that supports the Court's conclusion that Sotera identified UPMC as a potential client and arranged meetings and otherwise marketed to UPMC without reliance on Masimo trade secrets.  Sotera was entitled to market ViSi to UPMC, and to use Mr. Hunt and Mr. Welch in this effort, as long as it did not use Customer Trade Secrets (or other Masimo trade secrets) to do so.  *See Ret. Grp. v. Galante,* 176 Cal. App. 4th at 1237.

**Sotera interaction with UPMC did not result from use of Masimo Customer Trade Secrets.**

408. The evidence establishes that Sotera began to establish a sales pipeline for ViSi almost immediately after Gary Manning's arrival.  Dkt. # 816; Test. G. Manning at 1494:13-12.

_____

and demeanor in evaluating testimony; Mr. Anacone came across as very credible in the video.
[34]  This is particularly true as their estimated range of delay is exactly the time period of estimated delay in connection with another hospital.

**EXHIBIT D**
**-293-**

1    409. One area of focus was hospitals with a rapid response team; Sotera identified

2    UPMC through Dr. Michael DeVita as a potential ViSi candidate early on in the process.

3    Dkt. # 816; Test. G. Manning at 1495:22-1496:25.

4    410. Eventually, Sotera developed a set of characteristics that allowed it to identify a

5    small group of target hospitals.  Dkt. # 816; Test. G. Manning at 1502:5-1506:4.  Sotera

6    looked for magnet or leapfrog hospitals in metropolitan areas with busy emergency rooms

7    and a willingness to invest in infrastructure.  *Id.*

8    411. This analysis got Sotera to a core group of 500 hospitals.  Dkt. # 816; Test.

9    G. Manning at 1505:25-1506:4.  UPMC, again, was identified as a target for ViSi through

10    this process.  *Id.* at 1508:17-19.

11    412. The Court finds that Sotera did not rely on Masimo trade secrets to develop this

12    target hospital list.

13    413. Mr. Manning was highly credible, and his testimony was supported by

14    documentary evidence.  Exhibit 3400 is a PowerPoint deck from a 2010 presentation that

15    mirrors his testimony regarding the process for arriving at a target list of hospitals.  Dkt.

16    # 816; Test. G. Manning at 1506:5-1508:7.  Exhibit 3399 listed the 500 hospitals originally

17    selected through this process.  *Id.*at 1508:8-1509:1.  It was supported by exhibit 3398, a

18    July 7, 2011 Sotera Board presentation which listed interested hospitals and included

19    UPMC.  Dkt. *Id.* at 1525:1-1526:2.  These documents were created well before Mr. Welch

20    and Mr. Hunt joined Sotera.

21    414. The Court also finds that Sotera obtained its first meeting with UPMC prior to

22    Mr. Hunt joining Sotera and without use of Masimo trade secrets.

23    415. Again, Mr. Manning was a credible witness and, yet again, his testimony was

24    supported by documentary evidence.  Dkt. # 816; Test. G. Manning at 1500:6-20; 1526:3-

25    1532:19.  Ex. 4248.  The evidence establishes that Sotera was introduced to UPMC and its

26    key decision makers by Cerner, Sotera's value added reseller, and that the meeting flowed

27    from this introduction—not use of Masimo trade secrets.  *Id.*

28

**EXHIBIT D**
**-294-**

1      416. The Court acknowledges that Mr. Welch joined the meeting; but Mr. Radakovitch

2   of UPMC invited him.  See ex. 4249.  And he has known Mr. Radakovitch since before he

3   joined Masimo.  Dkt. # 798; Test. J. Welch at 1383:16-23.

4      417. Similarly, in February 2014, Barbara Callahan who lived in Pittsburgh, took over

5   a region that included Pennsylvania.  Dkt. # 798; Test. B. Callahan at 1239:2-7.

6      418. Ms. Callahan left Sotera in late 2016.  Dkt. # 798; Test. B. Callahan at 1236:12-

7   14.

8      419. But her highly credible testimony establishes that she independently identified

9   UPMC, among others, as a target and then worked to identify key decision makers, to

10  leverage her own contacts, and to market ViSi.  Dkt. # 798; Test. B. Callahan at 1239:8-19;

11  1243:8-1249:20 & 1260:2-12.

12     420. She testified that she did not rely on or use Masimo Customer Trade Secrets in

13  her UPMC marketing.  Dkt. # 798; Test. B. Callahan at 1240:10-22.  The Court believes her.

14     421. Sotera did not use Masimo Customer Trade Secrets in identifying UPMC as a

15  target customer for ViSi, in identifying the UPMC key decision makers as an aid to

16  marketing to UPMC, and in establishing meetings with UPMC.

17     422. The Court acknowledges exhibit 44, which includes a pre-Sotera employment

18  email from Mr. Hunt to Mr. Manning.  It includes four lines discussing UPMC.  But

19  Masimo failed to establish that the information was not readily ascertainable or that Sotera

20  used the information.  This email evidences Mr. Hunt trying to enhance his geographic sales

21  territory.  Mr. Manning's offhand comment:  ". . . if you have any tips let me know" cannot

22  be stretched to an overt request for the UPMC "tips" as UPMC was not previously part of

23  the email string.

24     423. The Court does not question that Sotera may have impacted Masimo's sales

25  efforts.  It had a mobile device, UPMC wanted to consider this new technology, and

26  Masimo did not have an FDA approved competitive device.  Dkt. 683; Test. F. Kelly at

27  646:1-24 & 668:25-669:8.  But this is evidence of healthy competition; Sotera did not use

28  Masimo Customer Trade Secrets in connection with its sales to UPMC.

**EXHIBIT D**
**-295-**

1      **Causation of the delay is not established on this record.**

2      424. The Court finds that Sotera and Masimo had equal access to UPMC; either could

3 have produced or subpoenaed a UPMC employee to support their position; neither did so.

4 Given the equal access, a negative inference is not appropriate, but Masimo has the burden

5 here.  Thus, the absence of such evidence hurts it more.

6      425. The Court also finds a multitude of challenges faced by Masimo that Masimo

7 fails to squarely acknowledge as causes of delay.

8      426. Masimo was competing not just with Sotera for general floor monitoring at

9 UPMC; it was also, and primarily, competing with Nellcor for ICU and operating room

10 monitoring.  Dkt. # 736; Ex. A (Anacone Depo. Test.) at 198:8-11; 199:20-1; 202:18-21; &

11 267:3-270:10.  Nellcor was a formidable adversary; it was the incumbent provider of these

12 services at 27 hospitals and, unlike Sotera, it was a large and well-established company.  *Id.*

13 at 91:14-5; 305:18-9; & 306:4-307:1.  See also Dkt. # 736; Ex. C (Coleman Depo. Test.) at

14 270:18-271:1.

15      427. The Court infers that Nellcor was a significant source of competition and a

16 significant and primary source of delay.  In particular, Nellcor actually obtained renewal of

17 its existing contract.  Dkt. # 736; Ex. C (Coleman Depo. Test.) at 267:6-269:2 & 287:22-

18 288:8.

19      428. The evidence is not crisp on this point, there, again, is nothing from UPMC, but

20 the Court infers that once the Nellcor contract was renewed, Masimo could not reasonably

21 expect to dislodge it easily until the new contract term ended.  This inference is reasoned;

22 Nellcor's contract ended in approximately January of 2017; Masimo finally got its contract

23 in December of 2016.  Dkt. # 736; Ex. C (Coleman Depo. Test.) at 268:20-268:2.

24      429. Another factor was the departure of a key decision maker, David Hargraves, in

25 2014.  In describing the Customer Trade Secret documents, Masimo provided extensive

26 testimony on the importance of key decision makers in its marketing efforts.  Dkt. # 812;

27 Test. M. Anacone at 472:4-21.  The Court infers that this departure was a major source of

28

**EXHIBIT D**

**-296-**

1    delay.  Evidence in the record also supports it.  Dkt. # 683; Test. F. Kelly at 659:3-13; Dkt.

2    # 736; Ex. C (Coleman Depo. Test.) at 288: 1-5.

3        430. Exhibit 4168, a May 18, 2014 email, suggests another serious source of problems

4    and delay for Masimo; its technology did poorly in a trial:  "From a technical perspective I

5    feel obligated to inform you that I am losing confidence in Masimo's ability to fulfill our

6    expectations regarding patient monitoring and safety."  *Id.*  Sotera had nothing to do with

7    this failure.  *Id.;* Dkt. #683; Test. F. Kelly at 655:21-658:25.  And in an October 1, 2014

8    email UPMC gave reasons why it was not moving forward with a Masimo solution at this

9    time; Sotera was not named as a reason for UPMC's reluctance.  Ex. 1624.

10        431. In short, Masimo fails to establish that even appropriate competition was a source

11   of significant delay or had any impact on its inability to dislodge Nellcor at UPMC and to

12   sell UPMC Patient SafetyNet until late 2016.  Sotera was not competing for the business

13   Nellcor held; but the Court must infer that Nellcor was trying to hold onto this account.  A

14   key decision maker's departure slowed things down.  And Masimo's technology apparently

15   failed at trial, at least initially.

16        432. Sotera had every right to compete with Masimo for Patient SafetyNet business at

17   UPMC as Masimo failed to meet its burden of proof that Sotera used Masimo trade secrets

18   at UPMC, but even this appropriate competition was not the apparent cause of any

19   significant measure of delay.

20        **Masimo fails to establish that Sotera caused a 12 to 18 month delay.**

21        433. Mr. Anacone confirmed that Masimo inked a final deal with UPMC in late 2016.

22   He acknowledged that there were numerous factors leading to delay but asserted that the

23   intervention of Sotera through Mr. Hunt resulted in approximately one year to 18 months of

24   delay.

25        434. The Court concludes that Masimo's assertion of a 12-18 month period of delay

26   caused by Sotera is merely speculative.  Masimo fails to identify firm dates for

27   commencement of alleged delay and termination of alleged delay; its timeline is a vague

28   muddle of possibility.

**EXHIBIT D**
**-297-**

435. Shortly before trial, it also changed its argument as to the date on which it initially expected a contract from January 2013 to April 2014.  Sotera brought a summary judgment motion as a result.  Dkt. # 620.[35]  The Court denied the motion but acknowledges that such a 15 month change in such a critical date would be of much moment if Masimo had a theory outlined with precision.  Masimo was free to argue that this major change in position alters nothing only because Masimo provides only a vaguely articulated timeline and a theory grounded on supposition.

436. Mr. Coleman also testified that he did not hold Sotera responsible for Masimo's failure to displace Nellcor from UPMC after 2014.  Dkt. #579; Ex. C (Coleman Depo. Test.) at 288:6-8, 11-17.[36]  All of the alleged delay, then, must have occurred before 2014.  But the evidence shows that Sotera first introduced ViSi to UPMC in late 2012.  There are thus not even 18 months between late 2012 and 2014.

437. Again, the Court acknowledges the sincerity of Masimo's belief that Sotera competition caused some delay.  But it fails to meet its burden of proof as to the period of delay as well as to the actuality of inappropriate delay.

**The alleged damages are grossly overstated.**

438. Masimo was pursuing a contract to provide pulse oximetry throughout UPMC, including operating rooms and ICUs; an expansion from 2 to 27 hospitals.  But Sotera does not compete for that business.  Sotera competition would have been with Masimo's installing the Patient SafetyNet in general care wards.  Masimo fails to establish that Sotera

---

[35]  See Dkt. # 620 at 1:7-6:5 for a discussion of the eve of trial change in Masimo's position in regard to anticipated timing at UPMC.

[36]  Dkt. # 736 contains Sotera's designated deposition testimony.  Sotera had submitted its designated deposition testimony before trial at Dkt. # 579.  During trial, the Court reviewed the designated depositions and provided rulings on objections.  The Court sustained Masimo's objections to Mr. Coleman's designated testimony in part; Dkt. # 736 should have contained testimony consistent with the Court's rulings.  Dkt. # 736, however, omits Mr. Coleman's testimony at 288:11-17.  The Court did not sustain the objection to 288:11-17; it sustained the objection to 288:9-10.  See Dkt. ## 707 ("The Court overrules all objections on 8/24/16 Coleman deposition except at pages 288:9-10 and 390:7-9 as set forth on the record.") & 816 at 1433:21-22 (Court's Oral Ruling: "Coleman 8/24/16, I'm overruling all except 288:9-10, and 390:7-9.").  The Court thus cites the original Coleman deposition excerpts at Dkt. # 579.

**EXHIBIT D**
**-298-**

1  caused the loss of this business.  But were it successful, the correct measure of damages

2  could be limited to losses related to general floor Patient SafetyNet sales.

3      439. And the Court agrees that the correct measure of damages would be delay

4  damages.  Dkt. # 582; Decla. Epstein at ¶ 13-16 & 25-31.  A higher award requires that the

5  Court assume that Masimo will have the UPMC contract in perpetuity.  *Id.* at ¶ 31.  This is

6  not supported by anything but speculation, and it ignores the realities of competition in the

7  market place and changing technology.

8      **John Hopkins University**

9      440. Masimo argues that, while Welch and Hunt worked at Masimo, it was negotiating

10  with John Hopkins University to sell Patient SafetyNet.  It expected to sign a system-wide

11  agreement with Johns Hopkins by January 2015, which would have included sales of Patient

12  SafetyNet and conversion of at least part of the hospital's pulse oximetry technology to

13  Masimo.  It asserts that because Sotera and Welch improperly solicited John Hopkins,

14  Masimo was delayed in closing the deal by 12 to 18 months.

15      441. Mr. Daniel Rice is Masimo's Regional Vice President for Sales for the mid-

16  Atlantic states.  Dkt. # 693; Test. D. Rice at 546:22-23.

17      442. Johns Hopkins has been a Masimo client since 2004 and remains a target for

18  increased pulse oximetry business.  Dkt. # 693; Test. D. Rice at 548:4-13 & 549:21-550:5.

19      443. Mr. Welch worked with Masimo in this endeavor as a content expert in providing

20  overall advice, including advice regarding the IT infrastructure and bedside caregiver nexus.

21  Dkt. # 693; Test. D. Rice at 552:12-553:6.

22      444. In 2009, the alarms committee at Hopkins began an investigation regarding

23  reduction of the bedside alarm issues.  At an initial meeting, which was also attended by

24  General Electric, Masimo participated in suggesting reducing alarm thresholds and

25  increasing delay.  See Exhibit # 693.

26      445. Eventually, Masimo had an opportunity to participate in a study/valuation at

27  Johns Hopkins.  Mr. Rice felt that this went extremely well.  Dkt. # 671; Test. D. Rice at

28  564:8-25; 569:4-13; 570:18-22; 571:2-3; 581:25; &582:4. And his views are supported by

**EXHIBIT D
-299-**

1   the fact that Patient SafetyNet actually caught a patient who was dying and facilitated

2   transfer to the ICU and stabilization.  *Id.* at 574:4-21.

3        446. In the summer of 2014, he felt that they had tremendous momentum.  See

4   exs. 2020 & 1919; Dkt. # 671; Test. D. Rice at 582:9-24.  So he felt that it was reasonable to

5   assume that they would soon expand beyond the 50% Johns Hopkins share they enjoyed.

6   *Id.*  This did not occur.  *Id.* at 582:11-15.

7        447. Mr. Rice believes it is because Sotera impeded their progress and caused an

8   approximate 12 to 18 month delay.[37]  Dkt. # 671; Test. D. Rice at 583:13-23; 585:1 &

9   586:8.  As a result, instead of getting a new contract expanding their share of the Johns

10  Hopkins business they merely obtained a three year extension of their existing business.  *Id.*

11  at 587:3-5.

12       448. The Court's analysis in connection with Johns Hopkins is similar to its analysis in

13  connection with UPMC.  The same evidence establishes that Sotera independently identified

14  Johns Hopkins as a potential ViSi customer and did not rely on Masimo Customer Trade

15  Secrets.  Dkt. # 816; Test. G. Manning at 1509:2-13.

16       449. From Mr. Rice's testimony, it is also clear that Johns Hopkins was actively

17  seeking a general floor monitoring system.

18       450. There is no evidence in the record or even suggestion in argument that Johns

19  Hopkins' interest in alarm management was a secret; the interest appears to be readily

20  ascertainable.  This made Johns Hopkins a natural candidate for ViSi.

21       451. And again, Ms. Callahan provided highly credible evidence that she

22  independently identified Johns Hopkins as a target without use of Masimo Customer Trade

23  Secret information and got positive results because ViSi performed.  Dkt. # 798; Test.

24  B. Callahan at 1239: 10-20; 1250:4-1254:3 & 1255:10-1257:5.

25       452. Important to the Court's analysis is the fact that Mr. Rice makes clear that he

26  identified Sotera as an on-site competitor in mid-2014.  Dkt. # 583; Test. D. Rice at 583:20-

27  _____

28  [37]  Yes, exactly the same vague time period supposedly relevant as to UPMC.

**EXHIBIT D**
**-300-**

23.  At this time, Ms. Callahan was pursuing this sale for Sotera; and Mr. Welch—even if involved—had been gone from Masimo for almost three years; his information was stale.

453.  In short, this is another situation where the overwhelming evidence is that Sotera was engaged in appropriate competitive behavior; the fact that it is marketing to a Masimo customer is not dispositive.

**Masimo fails to meet its burden of proof as to the time of delay.**

454.  Masimo also and again fails to establish that its assertion of a 12-18 month delay is anything but speculative.  Once again, the Court does not doubt the sincerity of Masimo's belief that Sotera interference was a negative.  But once again, it fails to explain how it reached its estimate of time of delay.  And, once again, there is no evidence from Johns Hopkins, missing evidence that the party with the burden of proof needed.

455.  And it is telling that the time of delay here exactly mirrors the anticipated time of delay used in connection with UPMC.  Mere speculation does not equate to meeting a preponderance of evidence burden of proof.

**The alleged damages are overstated.**

456.  And, finally, for the reasons discussed in connection with UPMC, Masimo's calculation of alleged damages is overstated to the extent it awards more than damages arising from delay.

**Cleveland Clinic**

457.  Sotera denies liability in connection with Cleveland Clinic but did not defend against this claim given the small amount of alleged damages.  The Court does not separately address this claim as it awards these damages under a different theory.  See p. 115.

**Pricing Strategy Trade Secrets: Welch**

458.  Masimo maintains confidential pricing lists; Masimo argues that Mr. Welch took its confidential pricing lists with him to Sotera and then accessed and used them when helping Sotera develop new prices.  The Court agrees that Mr. Welch, and, thus, Sotera used this information; it awards Masimo $240,000 in compensatory and punitive damages.

EXHIBIT D
-301-

1           **Is this a trade secret?**

2      459. The Court starts with the *what*. The most relevant document here is a Masimo

3 file called "NewPSNPricingRev6.xls." It contains May 2010 pricing data for Patient

4 SafetyNet. Ex. 88.

5      460. Mr. Kiani testified that Exhibit 88 was pricing for Patient SafetyNet in the

6 United States and around the world, and that it also included the discount schedules that

7 Masimo was willing to give hospitals under a GPO. Dkt. # 669; Test. J. Kiani 147:19-

8 148:1. Masimo viewed the information as sensitive and confidential. *Id.* at 148:2-13.

9 Masimo would have provided the document to its sales force with a confidentiality

10 requirement. *Id.* at 148:14-19. Masimo would not, however, provide the document to a

11 customer. *Id.* at 149:10-11. Further, Mr. Kiani testified that Masimo had a confidentiality

12 agreement with GPOs that it wouldn't disclose the prices. *Id.* at 149:12-16.

13      461. Mr. Kiani testified that it took at least a year to refine prices on most products, but

14 some, such as this one, took longer because Masimo was introducing a new type of product

15 to the market. Dkt. # 669; Test. J. Kiani at 149:17-151:7. This aligned with

16 Mr. Watlington's perspective on pricing groundbreaking technology, discussed below.

17      462. The Court finds and concludes that Masimo's pricing information and strategy

18 documents, particularly Exhibit 88, are trade secrets. It is information that Masimo derived

19 independent economic value from as a result of its not being generally known. As the Court

20 previously found generally, the Court finds that Masimo took appropriate, reasonable steps

21 to maintain the document's secrecy.

22          **Did Sotera improperly use it?**

23      463. Next, the Court finds and concludes that Sotera improperly used the pricing

24 documents.

25      464. On Friday, October 14, 2011 at 9:45 pm, Dr. Trommer emailed Gary Manning,

26 Mr. Welch, and Brandon Poe: "In preparation for our pricing discussion with Tom next

27 week, here are some updated pricing scenarios I put together." Ex. 979. Dr. Trommer

28 asked them to "take a look and let me know your thoughts." On Saturday, October 15,

**EXHIBIT D**
**-302-**

1    2011, at 5:19 pm, Mr. Welch responded, expressing his initial response ("we have some

2    upward latitude in overall system pricing") but saying that he "will spend some quality time

3    this weekend reviewing the pricing." *Id.*

4        465. On Monday morning, October 17, 2011, Mr. Welch connected the WD Hard

5    Drive to his Sotera laptop. *See* Dkt. # 583.  Vaughn Decla. ¶ 45.  Mr. Welch then

6    transferred four Masimo files to his Sotera laptop:  Bernoulli-PSN Worksheetrev3.0b.xls;

7    NewPSNPricingRev6; phillips quote.pdf; and bernoullipricing.xls.  *See id.* ¶ 46.  The parties

8    agree that on October 17, 2011, Mr. Welch opened all of them except phillips quote.pdf.

9    *See* Stipulated Facts ¶¶ 15-17.

10        466. On Wednesday, October 19, 2011 at 4:40 a.m., Mr. Welch again opened

11    NewPSNPricingRev6.xls (exhibit 88) using his Sotera Lenovo computer.  *See* Stipulated

12    Fact ¶ 17; Ex. 3221.  Most relevant here, for Mr. Welch's purposes, exhibit 88 lists

13    Masimo's price for a 12-instrument system at ████████; a 24-bed package at ████████;

14    and a 40-bed package at ████████.  It also listed an EMR connectivity package for the

15    first 10 instruments at ████████.

16        467. Thirteen minutes later (October 19, 2011 at 4:53 am), Mr. Welch sent

17    Dr. Trommer an email about pricing.  Ex. 980.  He wrote:  "The current market for the

18    central station component of competitive products (CPC, Philips, GE, …) for a 12-16 bed

19    system . . . is ████████, for 16-32 ████, and for 48+ (usually with two screens) is ████

20    ████████.  The companies I am aware of also charge ████████ for an [electronic

21    medical record (EMR)] interface."  *Id.*  On cross-examination, Mr. Welch conceded that

22    Masimo would be included in the parenthetical ellipsis "(CPC, Phillips, GE, …)".  Dkt.

23    # 816; Test. J. Welch at 1443:23-1444:6.  He also discussed the similarity in the pricing

24    numbers.  *Id.* at 1446:8-1447:17.

25        468. Mr. Kiani, for his part, opined that the inclusion of GE and Phillips was amusing

26    because he understands that they charge twice what Masimo charges.  Dkt. # 814; Rebuttal

27    Test. J. Kiani at 1728:1-23.

28

**EXHIBIT D**

**-303-**

1    469. That same day, Dr. Trommer replied:  "This is very much in line with the research

2    I did (albeit 1.5-2 years ago) . . . ."  Ex. 980.  But he added:  "I did not have pricing for EMR

3    connectivity other than what I knew from Draeger, which was a little lower than $15k."  *Id.*

4    470. Later that day—apparently after a meeting with at least Mr. Watlington,

5    Mr. Welch, and Mr. Manning—Dr. Trommer emailed others at Sotera with an updated

6    pricing model.  Ex. 981.

7    471. Sotera does not seriously dispute that Mr. Welch accessed or used the pricing

8    document; the Court finds that he did.

9    472. Instead, it contends that Mr. Welch never sent the documents to anyone at Sotera.

10   The Court agrees; Masimo did not meet its burden of showing that Mr. Welch distributed

11   the documents.

12   473. The Court also finds that Dr. Trommer's asking Welch to review pricing

13   documents was not a request for confidential information; the Court similarly finds that no

14   one at Sotera was aware that Mr. Welch accessed or used the Masimo pricing documents.

15   But this does not minimize that Mr. Welch, a Sotera employee, accessed and used the

16   documents in the course of his Sotera employment.

17   474. Sotera chiefly argues that it independently developed its pricing strategy before

18   Mr. Welch ever arrived at Sotera and that the price adjustments were unrelated to Masimo's

19   pricing or to Mr. Welch's recommendation.

20   475. Mr. Watlington testified that he was responsible for pricing.  Dkt. # 813; Test.

21   T. Watlington at 990:18-19.  At Sotera, the marketing department was responsible for

22   putting together the pricing model.  *Id.* at 990:20-991:1.  Mr. Manning also testified that

23   Watlington was responsible for pricing but expected marketing and sales to provide details

24   and input.  Dkt. # 816; Test. G. Manning at 1416.

25   476. Mr. Watlington explained that there are three categories of ViSi Mobile products:

26   first, the hardware; second, the disposables; and third, system or implementation costs

27   (licenses, connectivity, training, etc.).  Dkt. # 813; Test. T. Watlington at 995:13-996:7.

28

**EXHIBIT D**

**-304-**

1    477. Mr. Watlington testified that Sotera established its ViSi pricing through

2    quantitative market research—based on his experience, it is not appropriate to compare

3    innovative novel technology against existing conventional technology. Dkt. # 813; Test.

4    T. Watlington at 874-75. Sotera thus commissioned market research in 2010. *Id.* at 992:3-

5    5.

6        478. The Court acknowledges Sotera's position that it had already developed a pricing

7    strategy before Mr. Welch arrived. It had; but this does not negate Mr. Welch's use of

8    Masimo's trade secrets.

9        479. Sotera's and Masimo's pricing strategies are not static. They respond to the

10   market and each company's needs. For instance, in Fall 2011, Mr. Watlington considered

11   adjusting prices. With Mr. Welch's input, whether vocally at a meeting or indirectly through

12   Dr. Trommer, he did. What's more, both Mr. Watlington and Mr. Kiani testified that setting

13   a pricing strategy for ground-breaking, innovative products is difficult. There is no

14   presently-existing market to compare to. Both companies thus embarked on the time-

15   consuming and likely expensive task of setting a price. Mr. Welch then provided Sotera

16   with Masimo's data well before Sotera should have been able to deduce it.

17                          **Did Sotera's use damage Masimo?**

18       480. Masimo does not seek lost profits or unjust enrichment damages; instead, it

19   requests a royalty. Dr. Mangum opined that the appropriate measure of damages was

20   $346,393. Dkt. # 574; Decla. Mangum at ¶ 59. He explained that he understands that

21   Masimo's pricing strategy is developed over a period of 12 months, and he estimated the

22   personnel costs for developing the Pricing Strategy Trade Secrets at $272,555. *Id.* To

23   calculate a reasonable royalty, he assumed that Sotera could have licensed the Pricing

24   Strategy Trade Secrets for about half Masimo's cost to create them, or $136,276. *Id.* From

25   this, he added a 24.5% annual return, reaching the $346,393 number. *Id.*

26       481. Dr. Epstein criticized Dr. Mangum's opinion. Dkt. # 582; Decla. Epstein at ¶ 55-

27   56. In Dr. Epstein's view, Dr. Mangum's methodology suffered from economic deficiencies:

28   he used personnel information from 2007; he identified no specific documents; and, the

**EXHIBIT D**

**-305-**

1   pricing strategy was four years old and marketing information eventually becomes obsolete.

2   *Id.* Elsewhere, Dr. Epstein criticizes Dr. Mangum's 24.5% annual return as not having any

3   relevance to a hypothetical negotiation. *Id.* ¶¶ 97, 98, & 102 ("But pricing strategies are not

4   like fine wine.  They depreciate over time.").

5       482. The Court recognizes that the pricing strategy documents are limited by time and,

6   thus, in value; they necessarily reflect a snapshot in time.  But that does not mean that 2010

7   pricing information was not valuable in 2011.  It was.

8       483. Mr. Welch clearly found the information useful; he used it.  He based his

9   "knowledge" about industry pricing on it.

10      484. Dr. Trommer, who did not know the information came from Masimo documents,

11   also found the information useful.  It confirmed his nearly two-year old research on the

12   market; he also did not have any information about EMR pricing.  Mr. Welch did, but only

13   through Masimo's documents.

14      485. The CUTSA authorizes the Court to "order payment of a reasonable royalty for

15   no longer than the period of time the use could have been prohibited" if neither actual

16   damages nor unjust enrichment are provable.  Cal. Civ. Code § 3426.3.  A reasonable

17   royalty is appropriate here because neither party showed actual damages or unjust

18   enrichment.[38]  Based on Dr. Mangum's expert testimony, the Court concludes that a

19   reasonable royalty for one-time use is appropriate here.  It adopts Dr. Mangum's $136,276

20   number (representing half of Masimo's cost to create the pricing documents).

21      486. The Court declines to apply his 24.5% annual return on the royalty.  First, the

22   Court finds Dr. Epstein's position on this point more credible and persuasive.  Second, the

23   information in the documents has limited usefulness over time.  Pricing strategies change.

24   The information becomes stale.  Third, witnesses from both companies testified that they

25

26   _____

    [38]  *Ajaxo II*, 187 Cal. App. 4th at 1313.  ("We conclude that where a defendant has not realized a

27   profit or other calculable benefit as a result of his or her misappropriation of a trade secret, unjust
    enrichment is not provable within the meaning of section 3426.3, subdivision (b), whether the lack
    of benefit is determined as a matter of law or as a matter of fact.")  Sotera contends that

28   Dr. Mangum calculated that Masimo spent $272,552 to develop the pricing strategy, and thus
    damages should be limited to that, as the maximum amount of unjust enrichment.

EXHIBIT D
-306-

1   eventually discerned what their competitor's prices were.  Mr. Kiani knew generally what

2   his competitors charged.  Fourth, although the Court finds that Sotera used the pricing

3   information when it set new prices, the Court also finds that it was not the sole basis for

4   Sotera's pricing change.  Fifth, and perhaps most salient, Mr. Kiani testified on direct that

5   Masimo *expected* its competitors to eventually figure out the pricing information contained

6   in exhibit 88.  *See* Dkt. # 669; Test. J. Kiani, at 148:5-13 ("Not only in the medical world

7   prices don't get published, but in a brand new world of general floor monitoring, where no

8   one really knows what's going to work, what's not going to work, we spent a lot of time to

9   come up with what we think would work.  And we certainly didn't expect our competitors to

10  find out about it quickly.  It would take years before they put it all together of how we were

11  pricing when a customer inappropriately would give them our pricing, because they are not

12  supposed to.").  In this context—information that over time becomes ascertainable—the

13  Court determines that a continuing royalty is not an appropriate measure of damages.

14      487. That said, the Court finds that clear and convincing evidence establishes that

15  willful and malicious misappropriation exists here; exemplary damages are thus appropriate.

16      488. Mr. Welch understood what he was doing; he was asked to review Sotera's

17  pricing information.  He confirmed that he was going to review it over the weekend.

18  Perhaps he started reviewing it over the weekend, but he did not finish his review until later.

19  Come Monday morning, he connected his WD Hard Drive—the hard drive that contained

20  the files he took from Masimo—to his Sotera computer and transferred four files to it.

21  These were not any random file, they were pricing files; Masimo's pricing files.  He then

22  opened and, presumably, reviewed them.  A few days later he reopened exhibit 88 and

23  effectively copied its contents into an email to Dr. Trommer; then, through an ellipsis, he

24  tried to mask that the data was Masimo data.

25      489. To compound matters, at his deposition, Mr. Welch testified that he was unable to

26  transfer any Masimo files to the WD Hard Drive; if that were true, then he would have had

27  no cause to search for and use those files.  But he did.

28

**EXHIBIT D**
**-307-**

490. In short, Mr. Welch used Masimo's information to tout himself as knowledgeable about the general market, for self-aggrandizement. He did this willfully, as it was done knowingly, was obviously unreasonable under the circumstances, and was not done in good faith; he acted with a conscious disregard for Masimo's rights.

491. It was also done with malice. The Court stops short of a finding of intentional injury, but Mr. Welch—until recently a senior executive at Masimo—knew how valuable this information could be as it would allow Sotera to enter the market at a competitive price point *vis a vis* Masimo. He consciously disregarded Masimo's rights, knew his actions could hurt Masimo in the market place, and then acted. This was despicable conduct within the meaning of the statute.

492. While Sotera was not otherwise involved, it is responsible under the doctrine of respondeat superior. In calculating the amount of punitive damages, the Court considered the unique circumstances of this case including the nature of the misconduct, Sotera's financial condition, and the amount of the royalty.

493. The Court thus awards Masimo exemplary damages. In total, the Court awards Masimo $240,000 for Sotera's misappropriation of the pricing trade secrets.

**Customer Trade Secrets: Hunt**

494. As previously discussed, it is undisputed that Mr. Hunt downloaded Masimo Customer Trade Secret documents and transferred them to a Sotera computer. It is also undisputed that he opened some of these documents and that he emailed customer lists to himself. The Court determines that information downloaded and accessed by Mr. Hunt includes Masimo trade secrets. And it also cannot be disputed that Mr. Hunt left Masimo with extensive knowledge of its marketing trade secrets; he did not necessarily need to open a document to access and use Masimo's Customer Trade Secrets. Masimo argues that the evidence in the case is such that the Court must infer that Mr. Hunt used Masimo Customer Trade Secrets to generate sales for Sotera and income for himself.

495. Mr. Hunt was unavailable for testimony during trial as he resides in Florida; he apparently did not agree to appear. As a result, the Court reviewed videotaped deposition

**EXHIBIT D**
**-308-**

1   testimony in order to make sure that it had the best possible opportunity to assess credibility

2   and to understand his testimony.

3        496. The picture that emerged was of a consummate opportunist with no compunction

4   in placing financial self-interest over obligation to an employer—or in the case where he

5   chose to work simultaneously for competitors—employers.

6        497. The deposition video also evidenced animus towards Masimo.  Mr. Hunt

7   indicated that he did not think there was a problem in downloading Masimo documents and

8   breaching his contractual obligations to Masimo because of how he was treated.  The record

9   is free of any evidence that Masimo treated Mr. Hunt improperly, but it is full of evidence

10  that he felt entitled to take actions detrimental to Masimo.  See Dkt. # 719 (Ex. A) at 134:2-

11  23.

12       498. After careful consideration of all the evidence, the Court determines that Masimo

13  met its burden of proving that Mr. Hunt used Masimo Trade Secrets in connection with sales

14  where he was working independently and received credit for the sale.  The Court

15  acknowledges that this decision is based on inference.  But the clear record, documentary

16  evidence, and credible testimony that aid Sotera in connection with the UPMC and Johns

17  Hopkins assertions are not available here.

18       499. Sotera argues that there is no evidence that Mr. Hunt disclosed Masimo customer

19  lists and similar materials to others at Sotera.  The Court agrees; it does not infer that

20  Mr. Hunt generally helped others at Sotera.  The Court infers only that Mr. Hunt used

21  Masimo trade secrets where he could get sales credit.  But because he did so in the course of

22  his employment, Sotera is responsible for damages under the principal of respondeat

23  superior.

24       500. Sotera also argues independent derivation.  The Court concedes that some

25  independent work by Sotera, no doubt, aided Mr. Hunt in his sales efforts.  But this fact is

26  not enough to whitewash Mr. Hunt and to negate any need for negative inference.  It is

27  relevant that Mr. Hunt worked remotely; it is reasonable to assume that he would use tools

28  and information that was familiar to him as opposed to relying on the unproven and

**EXHIBIT D**
**-309-**

1   unknown information developed by Sotera's marketing team, especially given that he had no

2   compunctions based on his contractual Masimo confidentiality agreements.

3       501. The Court also concludes that injunction is not a sufficient remedy.  Sotera

4   previously fired Mr. Hunt.  He was subject to a performance improvement plan; Sotera

5   learned that he had worked for both Sotera and Masimo at the same time.  He was promptly

6   fired.  Dkt. # 816; Test. Sanchez at 1571:11-1572:5.  Thus, while Sotera must destroy and

7   refrain from using Customer Trade Secrets, it also appears that Sotera was unjustly enriched

8   by Mr. Hunt's activities.

9       502. Mr. Hunt, while at Sotera, made sales to four former Masimo customers.  Sotera

10  argues that the net profit on account of these sales was $150,887.  See Dkt. # 582; Decla.

11  Epstein at ¶ 54.

12      503. In general, the Court agrees with Dr. Epstein's methodology; Dr. Mangum,

13  Masimo's expert, fails to adequately support that Sotera was unjustly enriched by

14  information where there is no evidence of use beyond an ephemerally inferential use in

15  connection with Mr. Hunt.

16      504. The Court notes some infirmities in its ability to calculate damages.  The Court is

17  not prepared to assume that all of Mr. Hunt's credited sales were exclusively obtained from

18  the use of Masimo confidential information; this suggests unjust enrichment of less than

19  $150,887.  But the cost information provided by Sotera also is confusing; the Court cannot

20  reach Mr. Epstein's net number—apparently because there was data that he used and

21  analysis that he conducted that is not properly in the record.  If the costs are lower, the net

22  number on account of total sales would increase above $150,887.

23      505. The Court, thus, infers that actual damages of $150,000 are appropriate.  This

24  number was conceded as a total number by Sotera, the Court would reduce it to take into

25  account that not all sales were conducted with Masimo trade secrets, but the Court also takes

26  into consideration the infirmity in the offsetting cost evidence provided by Sotera and this

27  would require an increase.

28

**EXHIBIT D**
**-310-**

506. The Court also determines that punitive damages and attorneys' fees in an amount sufficient to cover preparation and attendance at Mr. Hunt's deposition are appropriate.

507. Again, Masimo provided clear and convincing evidence that Mr. Hunt acted willfully and maliciously.

508. It is clear that Mr. Hunt acted deliberately in taking the Masimo trade secrets, the Court infers knowing unreasonable use done in bad faith.  Willfulness is established.

509. There is evidence of animus toward Masimo; the Court can infer intent to injure, and it also can infer that there was despicable conduct and that Mr. Hunt consciously disregarded Masimo's rights, knew using Masimo information could hurt Masimo, and did nothing to ameliorate the consequences of his actions.

510. The Court finds that this constitutes despicable conduct justifying these awards.

511. While Sotera was not otherwise knowingly involved, it is responsible under the doctrine of respondeat superior.

512. The Court, thus, awards punitive damages and reasonable attorneys' fees in an amount sufficient to bring the total award to $300,000.  The Court does not think it necessary to determine the attorneys' fees with precision.  If they are in a reasonable range, then this allows for a not insubstantial addition of punitive damages.  This range of punitive damages is below the statutory maximum because there is no evidence that Mr. Hunt acted other than alone in using Masimo's Customer Trade Secrets and given Sotera's financial condition.  This award includes the $20,000 of damages asserted in connection with Cleveland Clinic.

**Customer Trade Secrets: negative information**

513. As discussed in connection with the Technical Trade Secrets, Masimo requests substantial damages based on a generalized theory that Sotera obtained the Customer Trade Secret documents and thereby obtained both the information therein, the Customer Trade Secrets, and negative information.  Masimo's damages expert provides various proposed categories of damages including over $2 million for creating the Customer Information

**EXHIBIT D**
**-311-**

1    Trade Secrets.  This necessarily includes both the information in the reports and negative

2    information.  See Dkt. # 574; Decla. Mangum at ¶ 32.

3        514. The Court concludes that additional damages in connection with Customer Trade

4    Secrets negative information are not appropriate.

5        515. First, to the limited extent of actual use, the Court has awarded damages.  Second,

6    to avoid additional use, the Court will issue appropriate injunctions.  Finally, while the

7    Court finds that there was an acquisition of the documents and limited use by Mr. Hunt and

8    Mr. Welch for which Sotera must be responsible under the principal of respondeat superior,

9    the Court does not find that Sotera otherwise solicited or used the Customer Trade Secrets.

10   Thus, there was neither additional unjust enrichment to Sotera nor actual damage to

11   Masimo.

12

13   **Other Damages**

14       516. Masimo seeks to recover its "direct costs"—$18,000—for forensic investigation

15   of Sotera's acts.  Sotera did not take discovery and did not elicit evidence on this claim

16   because Sotera decided that it would cost more to litigate than it is worth.  It does not

17   concede liability on this claim.  The Court awards this amount.

18       517. Given the evidence of document download Mr. Lee suspected, and the expert

19   confirmed, forensic investigation was not just reasonable; it was imperative.

20       518. Given the Court's other rulings, Masimo's request for disgorgement of all profits

21   is not appropriate.

22

23   **Injunction**

24       519. Masimo seeks injunctive relief.  The Court will award injunctive relief as

25   previously discussed.

26

27

28

**EXHIBIT D**

**-312-**

## IV.

## CONCLUSION

The Court thus:

1. Overrules Sotera's objection to Masimo's proof of claim, in part; Masimo is entitled to a claim of $558,000.00.

2. Otherwise sustains Sotera's objection to Masimo's claim;

3. Determines that injunctive relief is appropriate as discussed above;

4. Determines that the Court will resolve issues related to the injunction language; and

5. After the Court decides the injunction terms, the parties should submit the final separate judgment.

Dated: July 18, 2017

Laura S. Taylor, Chief Judge
United States Bankruptcy Court

117

# Notice Recipients

| | | |
|---|---|---|
| District/Off: 0974–3 | User: Admin. | Date Created: 7/18/2017 |
| Case: 16–05968–LT11 | Form ID: pdfO1 | Total: 51 |

**Recipients of Notice of Electronic Filing:**

| | | |
|---|---|---|
| aty | Ali Matin | amatin@bmkattorneys.com |
| aty | Christopher V. Hawkins | hawkins@sullivanhill.com |
| aty | David Wiechert | dwiechert@aol.com |
| aty | David Bruce Draper | ddraper@terralaw.com |
| aty | Eric D. Goldberg | eric.goldberg@dlapiper.com |
| aty | Gerald P. Kennedy | gerald.kennedy@procopio.com |
| aty | Gregory Fox | gfox@goodwinlaw.com |
| aty | J. Barrett Marum | bmarum@sheppardmullin.com |
| aty | James P. Hill | Hill@sullivanhill.com |
| aty | Jane Kim | jkim@kellerbenvenutti.com |
| aty | Jennifer Nassiri | jnassiri@venable.com |
| aty | John W Holcomb | 2jwh@knobbe.com |
| aty | Joseph R. Re | joe.re@knobbe.com |
| aty | Karen Weil | karen.weil@knobbe.com |
| aty | Kendall Loebbaka | 2kxl@knobbe.com |
| aty | Lauren Nicole Gans | lgans@shensonlawgroup.com |
| aty | Lisa Yun | LYun@sheppardmullin.com |
| aty | Maria K. Pum | mpum@hcesq.com |
| aty | Marshall Hogan | MHogan@foley.com |
| aty | Michael Goldstein | mgoldstein@goodwinlaw.com |
| aty | Michael D. Breslauer | mbreslauer@swsslaw.com |
| aty | Radmila A. Fulton | rafpacer@sbcglobal.net |
| aty | Scott Weltman | sweltman@weltman.com |
| aty | Shawn Christianson | schristianson@buchalter.com |
| aty | Stephen C. Jensen | 2scj@knobbe.com |
| aty | Tobias Keller | tkeller@kellerbenvenutti.com |
| aty | Valerie Bantner Peo | vbantnerpeo@buchalter.com |
| aty | Victor A. Vilaplana | vavilaplana@foley.com |
| aty | Victoria Foltz | vfoltz@cooley.com |

TOTAL: 29

**Recipients submitted to the BNC (Bankruptcy Noticing Center):**

| | | |
|---|---|---|
| db | Sotera Wireless, Inc. | 10020 Huennekens St.  San Diego, CA 92121 |
| intp | Dorsey & Whitney | 305 Lytton Avenue  Palo Alto, CA 94301 |
| cr | Zhonghuan Hi–Tech Corp. | c/o Law Offices Radmila A. Fulton  1545 Hotel Circle So., Ste 240  San Diego, CA 92108 |
| cr | c/o S.Christianson TriNet Group | Buchalter Nemer PC  55 2nd St. 17th Fl., 55  San Francisco, CA 94105 |
| cr | Jim Moon | 2414 Loon Lake Lane  Lincoln, CA 95648 |
| cr | Maxim Integrated, Inc. | c/o Terra Law LLP (DBD)  50 W. San Fernando St.  Suite 1415  San Jose, CA 95113 |
| intp | Middlefield Ventures Inc. | 2200 Mission College Blvd  Santa Clara, CA 95054 |
| intp | Intel Capital Corp | 2200 Mission College Blvd  Santa Clara, CA 95054 |
| cr | CIT Technology Financing Services, Inc. | Weltman, Weinberg & Reis, Co LPA  323 W. Lakeside Avenue  Suite 200  Cleveland, OH 44113 |
| cr | Sanderling Venture Partners VI, LP | c/o Keller & Benvenutti LLP  650 California Street  19th Floor  San Francisco, CA 94108 |
| intp | Regain Biotech Corporation | Shenson Law Group PC  1901 Avenue of the Stars  suite 200  Los Angeles, CA 90067 UNITED STATES |
| cr | TN Dept of Revenue | P.O. Box 20207  Nashville, TN 37202–0207 |
| intp | Piper Jaffray & Co. | c/o Jennifer L. Nassiri  Venable LLP  2049 Century Park East  23rd Floor  Los Angeles, CA 90067 |
| cr | Novasyte LLC | 3207 Grey Hawk Ct. #100  Carlsbad, CA 92010 |
| cr | FAIR HARBOR CAPITAL LLC | PO Box 237037  New York, ny 10023 |
| cr | Liquidity Solutions, Inc. | One University Plaza Suite 312  Hackensack, NJ 07601 |
| cr | State Board of Equalization | Special Operations Branch, MIC: 55  450 N Street  PO Box 942879  Sacramento, CA 94279–0055 |
| cr | Extension LLC | P.O. Box 633  Woodmere, NY 11598 |
| cr | CIT Finance, LLC | c/o Weltman, Weinberg & Reis, Co., L.P.A  323 W. Lakeside Avenue, Suite 200  Cleveland, OH 44113 |
| aty | Raul Olamendi Smith | 8330 Century Park Court  2nd Floor  San Diego, CA 92123 |
| aty | Troy Zander | DLA Piper, LLP  401 B St. Ste. 1700  San Diego, CA 92101 |
| aty | William McCormick | Office of the Attorney General  P.O. Box 20207  Nashville, TN 37202–0207 |

TOTAL: 22

**EXHIBIT D**