1
2
3
4
5

MARK D. SELWYN, SBN 244180
  mark.selwyn@wilmerhale.com
THOMAS G. SPRANKLING, SBN 294831
  thomas.sprankling@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Tel.: 650.858.6000 / Fax: 650.858.6100

6
7
8
9

JOSHUA H. LERNER, SBN 220755
  joshua.lerner@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
One Front Street, Suite 3500
San Francisco, CA 94111
Tel.: 628.235.1000 / Fax: 628.235.1001

10
11
12
13

AMY K. WIGMORE, *pro hac vice*
  amy.wigmore@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Ave NW
Washington, DC 20037
Tel.: 202.663.6000 / Fax: 202.663.6363

14

[Counsel appearance continues on next page]

15

*Attorneys for Defendant Apple Inc.*

16
17

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

18
19
20
21
22
23
24

| | |
|---|---|
| MASIMO CORPORATION, a Delaware corporation; and CERCACOR LABORATORIES, INC., a Delaware corporation, <br><br> Plaintiffs, <br><br> v. <br><br> APPLE INC., a California corporation, <br><br> Defendant. | CASE NO. 8:20-cv-00048-JVS (JDEx) <br><br> **APPLE'S MEMORANDUM IN SUPPORT OF ITS ORAL MOTION FOR JUDGMENT AS A MATTER OF LAW UNDER RULE 50(a)** |

25

26
27

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

28

Wilmer Cutler
Pickering Hale
and Dorr LLP

JOSEPH J. MUELLER, *pro hac vice*
  joseph.mueller@wilmerhale.com
SARAH R. FRAZIER, *pro hac vice*
  sarah.frazier@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel.: 617.526.6000 / Fax: 617.526.5000

NORA Q.E. PASSAMANECK, *pro hac vice*
  nora.passamaneck@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1225 Seventeenth Street, Suite 2600
Denver, CO 80202
Tel.: 720.274.3152 / Fax: 720.273.3133

BRIAN A. ROSENTHAL, *pro hac vice*
  brosenthal@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Tel.: 212.351.2339 / Fax: 212.817.9539

KENNETH G. PARKER, SBN 182911
  ken.parker@haynesboone.com
HAYNES AND BOONE, LLP
660 Anton Boulevard, Suite 700
Costa Mesa, CA 92626
Tel.: 650.949.3014 / Fax: 949.202.3001

# **TABLE OF CONTENTS**

ARGUMENT .......................................................................................................... 2

I.   Plaintiffs' Misappropriation Claim Fails As a Matter Of Law ........................... 2

   A.   Plaintiffs Have Not Proven That Apple Had The Requisite Intent ............ 2

     1.   No Direct Misappropriation .................................................... 2

     2.   No Indirect Misappropriation ................................................. 3

     3.   Plaintiffs' "Evidence"—Dr. Lamego ...................................... 4

     4.   Plaintiffs' "Evidence"—Dr. O'Reilly ..................................... 5

     5.   Plaintiffs' "Evidence"—General Apple Interest .................... 4

   B.   Plaintiffs' ATS Are Not Defined With Reasonable Particularity ............. 6

   C.   Plaintiffs' ATS Do Not Qualify As Trade Secrets Under CUTSA And, In Any Event, Were Not Acquired, Used Or Disclosed .................. 7

     1.   Business Strategies ................................................................. 7

     2.   ███████████ ....................................................... 11

       a.   L4 .............................................................................. 11

       b.   L5 .............................................................................. 14

     3.   ███████████ ....................................................... 17

     4.   VIA ........................................................................................ 18

   D.   Plaintiffs' Trade Secret Claim Is Time-Barred ...................................... 19

     1.   Single Alleged Misappropriation Triggers Statute ............... 19

     2.   Apple's Burden ...................................................................... 20

     3.   Plaintiffs' Burden ................................................................. 20

   E.   Plaintiffs' Unjust Enrichment Claim Should Not Go To The Jury .......... 22

     1.   No Unjust Enrichment ........................................................... 22

       a.   ███████ ATS ...................................................... 24

       b.   ███████ ATS ...................................................... 24

       c.   Business ATS ........................................................... 25

       d.   Non-Trade Secrets .................................................... 26

Wilmer Cutler
Pickering Hale
and Dorr LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

F.    Apple Did Not Willfully And Maliciously Misappropriate ....................27

2

II.    The  Inventorship And Ownership Claims Fail As a Matter Of Law ...............28

3

A.    '754 patent ...............................................................................28

4

B.    '095 and '390 Patents ..............................................................29

5

C.    '052 and '670 patents ..............................................................29

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Wilmer Cutler
Pickering Hale
and Dorr LLP

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ajaxo Inc. v. E\*Trade Fin. Corp.*,
    187 Cal. App. 4th 1295 (2010) .......................................................................23, 27

*Ajaxo Inc. v. E\*Trade Grp. Inc.*,
    135 Cal. App. 4th 21 (2005) .........................................................................31, 32

*Alta Devices, Inc. v. LG Elecs., Inc.*,
    2019 WL 1924992 (N.D. Cal. Apr. 30, 2019).....................................................1

*AMN Healthcare, Inc. v. Aya Healthcare Services, Inc.*,
    28 Cal. App. 5th 923 (2018) ................................................................................7

*Anderson v. Liberty Lobby*,
    477 U.S. 242 (1986)............................................................................................27

*Atmel Corp. v. Info. Storage Devices, Inc.*,
    189 F.R.D. 410 (N.D. Cal. 1999) ...................................................................9, 17

*BMW of N. America, Inc. v. Gore*,
    517 U.S. 559 (1996)............................................................................................27

*Board of Trustees of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 563 U.S. 776 (2011) ...................................................................28

*Cacique, Inc. v. Robert Reiser & Co.*,
    169 F.3d 619 (9th Cir. 1999) .............................................................................31

*California Police Activities League v. California Police Youth Charities, Inc.*, 2009 WL 537091 (N.D. Cal. Mar. 3, 2009) ..................................................3

*Carr v. AutoNation Inc.*,
    2018 WL 288018 (E.D. Cal. Jan. 4, 2018) .........................................................3

*Cisco Systems, Inc. v. Chung*,
    2023 WL 2622155 (N.D. Cal. Mar. 22, 2023) ....................................................3

*Daly v. Far Eastern Shipping Co.*,
    238 F. 2d 1231 (W.D. Wash. 2003)...................................................................13

*Eli Lilly v. Aradigm Corp.*,
 376 F.3d 1352 (Fed. Cir. 2004) ...........................................................................28

*Forcier v. Microsoft Corp.*,
 123 F. Supp. 2d 520 (N.D. Cal. 2000)...............................................................22

*Gabriel Techs. Corp. v. Qualcomm Inc.*,
 857 F. Supp. 2d 997 (S.D. Cal. 2012) ...............................................................20

*General Elec. Co. v. Wilikins*,
 750 F.3d 1324 (Fed. Cir. 2014) ...........................................................................28

*Glue-Fold v. Slautterback Corp.*,
 82 Cal. App. 4th 1018 (2000) .............................................................................20

*Hexum v. Eli Lilly & Co.*,
 2015 WL 4943959 (C.D. Cal. Aug. 18, 2015) .....................................................1

*Imax Corp. v. Cinema Techs., Inc.*,
 152 F.3d 1161 (9th Cir. 1998) ..............................................................................6

*in Altavion, Inc. v. Konica Minolta Sys. Lab'y, Inc.*,
 226 Cal. App. 4th 26 (2014) .................................................................................9

*InteliClear, LLC v. ETC Glob. Holdings, Inc.*,
 978 F.3d 653 (9th Cir. 2020) ................................................................................6

*Intermedics, Inc. v. Ventritex, Inc.*,
 822 F. Supp. 634 (N.D. Cal. 1993).....................................................................22

*Kewanee Oil Co. v. Bicron Corp.*,
 416 U.S. 470 (1974)...............................................................................................7

*Little v. Amber Hotel Co.*,
 202 Cal. App. 4th 280 (2011) ...............................................................................3

*In re Lopez*,
 378 F. App'x 610 (9th Cir. 2010).......................................................................27

*Manderville v. PCG&S Grp., Inc.*,
 146 Cal. App. 4th 1486 (2007) .............................................................................2

*MedioStream, Inc. v. Microsoft Corp.*,
 869 F. Supp. 2d 1095 (N.D. Cal. 2012)........................................................19, 20

*O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*,
    399 F. Supp. 2d 1064 (N.D. Cal. 2005)................................................................23

*Olaplex, Inc. v. L'Oreal USA, Inc.*,
    855 F. App'x 701 (Fed. Cir. 2021) ........................................................................6

*People v. Miller*,
    81 Cal. App. 4th 1427 (2000) ................................................................................2

*People v. Riley*,
    240 Cal. App. 4th 1152 (2015) ..............................................................................2

*Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*,
    923 F. Supp. 1231 (N.D. Cal. 1995)....................................................................26

*Rivendell Forest Prods. v. Georgia-Pacific Corp.*,
    28 F.3d 1042 (10th Cir. 1994) ...............................................................................8

*Schechter v. Smith*,
    2011 WL 13174954 (C.D. Cal. Dec. 6, 2011)....................................................24

*Summers v. Delta Air Lines, Inc.*,
    508 F.3d 923 (9th Cir. 2007) .................................................................................1

*Tang v. Shell Chem. Co.*,
    317 F. App'x 660 (9th Cir. 2009)........................................................................15

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
    247 F.3d 1316 (Fed. Cir. 2001) ..........................................................................15

*Wagner v. Ashline*,
    2021 WL 5353889 (Fed. Cir. Nov. 17, 2021) ....................................................28

*Wallis v. PHL Assocs., Inc.*,
    168 Cal. App. 4th 882 (2008) ..............................................................................20

*Wang v. Palo Alto Networks, Inc.*,
    2014 WL 1410346 (N.D. Cal. Apr. 11, 2014)....................................................21

**Statutes**

Cal. Civ. Code § 3426.1(b) .........................................................................................2

Cal. Civ. Code § 3426.3(c) .......................................................................................27

During opening statements, Plaintiffs' counsel told the jury that this case was filed to protect Plaintiffs' groundbreaking medical technology, suggesting Apple had benefited by an "astronomical" sum—one so large, it would "blow your mind away." 4/5 AM Tr. 53. Plaintiffs' case crumbled within a matter of days. Out of their eight fact witnesses, only one was able to identify even a single alleged trade secret ("ATS"). Of the two Masimo employees Plaintiffs claimed co-invented patents owned by Apple, one testified that he had never seen the patents and the other testified that he did not believe he was the true inventor. Plaintiffs' supposedly valuable trade secrets were revealed to be bits and bobs—the placement of a piece of black foam in a single quality-control step in a manufacturing line in a factory, the use of a particular type of short circuit among millions of circuits, marketing "strategies" that had been disclosed in press releases a decade earlier, and a modulation approach that even Plaintiffs' expert conceded has never been used in an Apple product. And Plaintiffs unveiled a damages theory that claimed $3.1B for two features of a complex, multi-featured electronic device, even though ***no*** evidence links any purported misappropriation to those features in any way.

Despite three weeks of trial and nearly fifty hours of testimony, Plaintiffs have failed to provide a "legally sufficient evidentiary basis" for a reasonable jury to rule in Plaintiffs' favor on any of their claims. *E.g.*, *Hexum v. Eli Lilly & Co.*, 2015 WL 4943959, at *6 (C.D. Cal. Aug. 18, 2015) (citing Fed. R. Civ. P. 50(a)(1)). Apple accordingly moves under FRCP 50(a) for this Court to rule as a matter of law that Plaintiffs have not established that (1) Apple misappropriated the ATS, (2) Apple was unjustly enriched, (3) Mr. Diab or Mr. Poeze made an inventive contribution to any of the five disputed patents, or (4) either Masimo or Cercacor have an ownership interest in any of the five disputed patents. Apple also asks this Court to rule that Plaintiffs' trade secret claim is barred by the three-year statute of limitations as a matter of law.[1]

---

[1] Consistent with the Court's order, 4/19 PM Tr. 122:18, Apple filed this brief before the close of evidence. Apple thus reserves the right to raise during oral argument additional

*(Cont'd on next page)*

Wilmer Cutler
Pickering Hale
and Dorr LLP

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# ARGUMENT

## I.   PLAINTIFFS' MISAPPROPRIATION CLAIM FAILS AS A MATTER OF LAW

### A.   Plaintiffs Have Not Proven That Apple Had The Requisite Intent

CUTSA requires a plaintiff to prove wrongful intent—i.e., either (1) the defendant used "improper means to acquire knowledge of the trade secret" and used/disclosed the ATS without authorization or (2) the defendant knew or had reason to know their knowledge of the ATS was wrongfully acquired. *See* Cal. Civ. Code § 3426.1(b)(1)-(2).

**1.   No Direct Misappropriation.**   No reasonable jury could find that Apple directly acquired the ATS from Plaintiffs. The only evidence introduced of a direct interaction between Apple and Plaintiffs was a meeting in May 2013, and Mr. Kiani has testified that Plaintiffs did not provide Apple with any trade secrets at that time. *See* 4/6 AM Tr. 73; *see also* 4/13 PM Tr. 115; 4/14 Tr. 97-101; 4/18 PM Tr. 70:2-4.

Plaintiffs have fleetingly (and frivolously) suggested that Apple acquired the purported secrets through "theft, bribery, [and] misrepresentation," Dkt. 1500-1 at 175, but they have made no attempt to meet the elements for such crimes. For bribery, Plaintiffs must prove that Apple paid one of their current employees to hurt Plaintiffs' interests, as well as prove Apple had a specific intent to injure or to defraud. *See People v. Riley*, 240 Cal. App. 4th 1152, 1160-1163 (2015) (discussing Penal Code § 641.3). Similarly, to establish "theft" and "misrepresentation," Plaintiffs must show fraudulent intent (among many other things). *See, e.g., People v. Miller*, 81 Cal. App. 4th 1427, 1440-1441 (2000) (theft); *Manderville v. PCG&S Grp., Inc*., 146 Cal. App. 4th 1486, 1498 (2007) (misrepresentation). Because Plaintiffs cannot as a matter of law even make the lesser showing that Apple merely "knew or should have known," Dkt. 1275 at 9-10, that Drs. O'Reilly and Lamego breached a duty to Plaintiffs, *infra* pp. 3-7, they logically

_____

grounds for JMOL. Apple also incorporates by reference the arguments raised in each of the briefs cited below. Finally, emphasis is added except where noted.

have also failed to prove intent to injure or defraud.  In any event, there is a total absence of record evidence that any Apple employee intended to make a false statement or to induce Plaintiffs to rely on any inaccuracy to their detriment.   Plaintiffs' bribery allegation (i.e., Drs. Lamego and O'Reilly's compensation packages constitute bribes) also fails the current employee test because there is no evidence Apple paid either person while he worked for Plaintiffs.  *See* Dkt. 1500-1 at 175, 179-180.  Plaintiffs' assertion that Apple has direct liability for inducing Drs. O'Reilly and Lamego to breach their duties of confidentiality fails for the same reason—intentional inducement requires a showing that the defendant "*intended* to induce its breach," and there is no such evidence *E.g.*, *Little v. Amber Hotel Co.*, 202 Cal. App. 4th 280, 291 (2011) (emphasis added).

**2.   No Indirect Misappropriation.**  For Plaintiffs to demonstrate that Apple obtained Plaintiffs' alleged trade secrets through Plaintiffs' former employees (i.e., Drs. Lamego and O'Reilly) after Apple hired them, they must show that "Apple knew or should have known" that Dr. Lamego and/or Dr. O'Reilly breached a duty by disclosing to Apple the information that Plaintiffs allege constitute trade secrets.  Dkt. 1275 at 9-11; *see also California Police Activities League v. California Police Youth Charities, Inc.*, 2009 WL 537091, at *3 (N.D. Cal. Mar. 3, 2009) (listing for indirect trade secret misappropriation).   Plaintiffs' assertion that Dr. Lamego's and Dr. O'Reilly's knowledge of their purported wrongdoing can be imputed to Apple is wrong as a matter of law.  *See Carr v. AutoNation Inc.*, 2018 WL 288018, at *2 (E.D. Cal. Jan. 4, 2018) ("[I]t is not 'appropriate to direct a jury to impute an agent's knowledge of a secret to the principal'"—at least where the agent "did not inform *other employees* of plaintiff's concept."); *see also Cisco Systems, Inc. v. Chung,* 2023 WL 2622155, at *12 (N.D. Cal. Mar. 22, 2023) (declining to rely on vicarious liability to impute intent to employer).[2]

No reasonable jury could find that Plaintiffs have proven intent.  Drs. Lamego and

---

[2] Plaintiffs have argued in the context of the jury instructions dispute that an alleged misappropriator's knowledge may be imputed to his or her employer.  *See, e.g.*, Dkt. 1633-1 at 1-4.  But Plaintiffs have neither cited a trade secret case supporting this proposition nor distinguished *Cisco Systems* or Apple's other cited cases.

O'Reilly each confirmed that Apple had not asked them to share Plaintiffs' confidential information and that, to the contrary, Apple had expressly told them not to "bring that type of information" to Apple.  4/13 PM Tr. 74 (Lamego); *see also* 4/14 PM Tr. 7 (O'Reilly testifying that "I never conveyed any confidential information to Apple"); *id.* 4/14 PM Tr. 47 (O'Reilly testifying that he has "strictly complied with … the prohibition about disclosing to Apple secret information of your former employers.").  Both signed agreements with Apple pledging not to "improperly use or disclose to Apple any confidential, proprietary, or secret information of [their] former employers or any other person," and both testified they had complied with those strictures.  JTX-4061; *see* 4/13 PM Tr. 76-77 (Lamego); 4/14 PM Tr. 46-48 (O'Reilly); *see also, e.g.*, JTX-3044.

Apple's other fact witnesses also confirmed that Apple obtained no confidential information from Plaintiffs.  For example, Steve Hotelling testified that he had personally explained Apple's policy prohibiting the use of a third-party's intellectual property to Dr. Lamego and that he "had no doubt" Dr. Lamego could perform his role at Apple without sharing Plaintiffs' information.  4/14 AM Tr. 21; *see also id.* 41 (Hotelling testifying that he did not "have any reason to believe that [Lamego] shared with Apple confidential Masimo or Cercacor information").  Adrian Perica relatedly testified that "Dr. O'Reilly [had not] ever shared any Masimo confidential information with [him] or anyone else at Apple to [his] knowledge," *id.* 103, and that Mr. Perica had neither asked "Dr. Lamego for any confidential or trade secret information from" Plaintiffs nor had he been provided with that information, *id.* 127.  Apple's other witnesses testified to similar effect—repeatedly denying receipt of any such information.

Nor is there evidence that Apple knew or should have known that Drs. O'Reilly or Lamego breached a duty of confidence.  Both of Plaintiffs' experts testified that they were ***not*** expressing an opinion on intent.  *See* 4/11 PM Tr. 91; 4/13 AM Tr. 25-26.

**3.  Plaintiffs' "Evidence"—Dr. Lamego.**  Plaintiffs point to the January 2014 letter to Apple and accompanying Employee Confidentiality Agreement, but as this Court has noted, that letter was "written *before* Lamego began work at Apple" and

before Plaintiffs allege the earliest misappropriation occurred.  Dkt. 606 at 6.  And the undisputed testimony is shortly after the letter was received, Dr. Lamego's supervisor "reminded him of his requirement to not bring confidential information from his prior employers to Apple."  4/14 PM Tr. 21.  Dr. Lamego also testified Apple attorneys counseled him shortly after arrival not to "bring anything from Masimo to Apple."  4/13 PM Tr. 65.  (Regardless, the Agreement's confidentiality provisions are admissible only to establish CUTSA's reasonable efforts element.  Dkt. 1526 at 3 n.1.)

Plaintiffs also point to other documents—an October 2013 email that Dr. Lamego sent Apple CEO Tim Cook, JTX-1719 and an email Dr. O'Reilly sent a few days later noting that Dr. Lamego's "knowledge … may be considered confidential information," JTX-672.  But again, both emails predate Dr. Lamego's work at Apple.  Moreover, Plaintiffs have never claimed any information in the email to Mr. Cook is a trade secret (nor could they, since they have repeatedly filed it on the public docket).  And Dr. O'Reilly testified he sent this email out of an abundance of caution ("It's … Apple's policy to call out any concerns about this kind of thing.") and that he had not seen "any indication … that Dr. Lamego proceeded to share trade secrets with Apple."  4/14 Tr. 56-57.  And importantly, Dr. Lamego signed an agreement requiring him not to disclose confidential information of his prior employers *after* both these documents.  JTX-3044.

**4. Plaintiffs' "Evidence"—Dr. O'Reilly.**  Plaintiffs have suggested that the fact Apple hired Dr. O'Reilly into a VP position means his supposed knowledge of wrongdoing can be imputed to Apple.  As discussed, that is not the law, *see* Dkt. 1642, and in any event, Dr. O'Reilly testified that he did not misappropriate any confidential information, *infra* pp 10-11.  Plaintiffs also suggest that Dr. O'Reilly quickly began sharing advice and know-how, but they identify no information that should have put Apple on notice that Dr. O'Reilly was purportedly sharing Plaintiffs' confidential information or any reason why Apple should have suspected misappropriation upon receiving input from a highly distinguished and respected doctor who had decades of experience in medicine and business before he began working for Plaintiffs, 4/14 PM

Tr. 8-18.  And while Plaintiffs have emphasized the journals Dr. O'Reilly maintained when he was a Masimo employee, he gave uncontradicted testimony that he "didn't share them with anyone at Apple." 4/14 PM Tr. 73:9-14.  Moreover, as discussed below, Plaintiffs have identified nothing in those notebooks that qualifies as a trade secret.

**5.  Plaintiffs' "Evidence"—General Apple Interest.**  Plaintiffs have pointed to testimony that stands for the general proposition that Apple (1) thought highly of Plaintiffs' pulse oximetry expertise and products, (2) briefly considered acquiring or forming some kind of business relationship with Plaintiffs, and (3) ultimately hired or considered hiring several of Plaintiffs' employees.  Nothing about those three points is wrongful or unusual.  Companies like Apple routinely consider business arrangements in areas where an agreement would be mutually beneficial—indeed, evidence that Plaintiffs themselves have introduced shows that Plaintiffs were just one of many companies in the medical technology space that Apple met with in 2013. JTX-260 at -9120; JTX4360.1; J4/14 Tr. 94-96; 4/20 AM (Rough) Tr. 6.  And the mere fact that Apple hired a handful of at-will employees over a seven-year period, 4/20 AM (Rough) Tr. 19, suggests nothing nefarious about Apple's intent.  As this Court has recognized, Drs. O'Reilly and Lamego are the only former employees alleged to have engaged in misappropriation and "employees are not only permitted but encouraged to move freely from one company to another under at-will employment."  Dkt. 1469 at 3.

**B.    Plaintiffs' Have Failed To Adhere To The Particular List of ATS**

"[W]ithout particularity (pre-trial and at trial), there is an inadequate basis for a fair adjudication of what information was actually used by the defendants."  *Olaplex, Inc. v. L'Oreal USA, Inc.*, 855 F. App'x 701, 712 (Fed. Cir. 2021) (granting JMOL on reasonable particularity); *see also Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1167 (9th Cir. 1998) (granting summary judgment).  At trial, Plaintiffs' witnesses repeatedly sought to expand and contract the scope of Plaintiffs' ATS to suit their testimony and to avoid evidence that aspects of the ATS were generally known.  *See* Dkt. 1631 at 5-7 (collecting evidence).  While this issue applies to every ATS, the

purported VIA secret is particularly problematic, as it is an indefinite, "catchall phrase[]" that can incorporate any combination of other ATS, *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 658 (9th Cir. 2020), and uses nebulous terms undefined by Plaintiffs' experts, *see also* Dkt. 1101 at 18-21; Dkt. 1249 at 21-22 (Apple's MSJ briefing).  As further examples, Mr. Kiani's and Dr. Palmatier's testimony suggests that the purported business strategy secrets claim more than their written description and Dr. Madisetti's testimony suggests that L4 and L5 claim less than their written descriptions (i.e., only a few specific, rather than all, solutions).  Dkt. 1631 at 5-6.

## C. <u>Plaintiffs' ATS Do Not Qualify As Trade Secrets Under CUTSA And, In Any Event, Were Not Improperly Acquired, Used Or Disclosed</u>

For each ATS, Plaintiffs have the burden to establish at least that they "owned the trade secret; at the time of misappropriation the information was a trade secret; the defendant improperly acquired, used, or disclosed the trade secret; the plaintiff was harmed; and the defendant's acquisition, use, or disclosure of the trade secret was a substantial factor in causing the plaintiff harm."  *AMN Healthcare, Inc. v. Aya Healthcare Services, Inc.*, 28 Cal. App. 5th 923, 942 (2018).[3]

**1. Business Strategies.**  No reasonable jury could find liability for the B ATS.

***First,*** Plaintiffs cannot establish possession.  The ATS describe general and broad marketing concepts, and there is no evidentiary basis from which a reasonable jury could find that Plaintiffs possessed their full scope.  *See* Dkt. 1631 at 8-9; 4/18 AM Tr. 134-138, 141; 4/18 PM Tr. 11.  For example, Plaintiffs have not even attempted to show that they possess all ways of ██████████████████████████████████ ████████████████████████████ or every variation of the concept of "███████ ████████████████████████████████████████

---

[3] Plaintiffs' attempt to wield trade secret law to prevent use of information disclosed to the public in a patent (D10) or claim control over an entire genus of solutions that they do not possess (L5) demonstrates their overreach.  If the law were as Plaintiffs suggests—though it is not—the Court would need to consider whether such expansive trade secret protection runs afoul of the Constitution.  *See generally Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 479-493 (1974).

Wilmer Cutler Pickering Hale and Dorr LLP

1   ████████████████ both of which appear in B1.  Both Mr. Kiani and Dr.

2   Palmatier sought during the trial itself to introduce additional concepts as limitations

3   that appear nowhere in the business ATS—*e.g.*, 4/6 AM Tr. 35 (B1 & B2 claim ████

4   ████████; 4/5 PM Tr. 78-79 (B2 requires use █████████); *id.* 83 (B4 is a

5   form of █████████ 4/11 PM Tr. 56 (business ATS claim █████

6   ██████—but this does not lessen Plaintiffs' burden to show that they possessed

7   the full purported secrets, *see* 4/13/23 AM Tr. 20-21.  (And if the Court concludes

8   Plaintiffs only need to prove possession of one specific way of performing the ATS,

9   Plaintiffs have failed to show the B ATS are not generally known.  *See infra* pp. 8-9.)

10          ***Second,*** no reasonable jury could find that the purported trade secrets were not

11   generally known at the time of alleged misappropriation (i.e., in 2013 or later).  The B

12   ATS are "high level conceptual ideas" amounting to general marketing principles

13   without any details on implementation. 4/18 PM Tr. 134-136.  For instance, Mr. Kiani

14   conceded on cross-examination that B1 was captured by longstanding healthcare

15   practices and products, including █████████████████

16   █████████████████ *See, e.g.*, 4/5 PM Tr. 97:8-22; *see also id.*

17   73 (describing B1 as ██████████████████████

18   █████████████████████████

19   ██████ 4/18 PM Tr. 18-19 (Kivetz noting Mr. Kiani's description of B1

20   describes "████████████████████").

21   More broadly, Dr. Palmatier conceded (and Plaintiffs have not disputed) that *every*

22   *constituent part* of at least some of the business ATS is generally known.  4/12 AM Tr.

23   34; *id.* at 37.  Because Plaintiffs have acknowledged the components of some or all of

24   the B ATS are generally known, they must have established that the specific combination

25   is "effective, successful, and valuable … and gave the claimant a competitive

26   advantage." *See Rivendell Forest Prods. v. Georgia-Pacific Corp.*, 28 F.3d 1042, 1046

27   (10th Cir. 1994), *cited in Altavion, Inc. v. Konica Minolta Sys. Lab'y, Inc.*, 226 Cal. App.

28   4th 26, 47-48 (2014); *see also* Dkt. 1500-1 at 131 n.52 (collecting cases).  They did not.

Plaintiffs adduced no evidence to meet their burden of proving that the B ATS were not generally known. Dr. Palmatier asserted that he had considered the materials that Apple's expert gathered, but never testified about how he searched for public disclosures, if in fact he did. *See* 4/11 Tr. PM 71:24-72:21. That is insufficient to carry Plaintiffs' burden.[4] By contrast, Dr. Kivetz testified that the B ATS capture marketing principles (e.g., ███████████████████████) that are practiced by other healthcare companies and embodied in other products. *See, e.g.*, 4/18 AM Tr. 135-136, 4/18 PM Tr. 11-17 (B1), 19-25 (B1 & B10), 33-34 (B2 & B4). As Dr. Kivetz explained, the strategies underlying such products and campaigns were general marketing principles commonly taught in universities and described in industry publications before 2013. 4/18 AM Tr. 141; *see also infra* p. 10 (discussing iSpO2).

***Third,*** there is no evidentiary basis from which a reasonable jury could find that the B ATS had independent economic value from being not generally known. These general marketing concepts *were* generally known, *see supra pp.* 8-9, so they necessarily could not have independent economic value from secrecy. The evidence showed that Plaintiffs sought to generate value by publicizing the features of their products and services that embody the B ATS. 4/18 PM Tr. 25-27, JTX 2761. Plaintiffs' evidence offered to prove economic value is not specific to any B ATS—or even specific to the category. For instance, Dr. Palmatier discusses "the time, the money, the labor spent on doing this," 4/11 PM Tr. 69:18-19, and Mr. Kiani spoke about developing B1 as "part of our business strategy … over 15 years ago," 4/5 PM Tr. 73:23-24. But neither witness described with specificity how any particular B ATS generates value for Plaintiffs by virtue of their secrecy. Notably, there is no record evidence of any increase in sales for any product caused by use of any B ATS. *Cf.* 4/18 PM Tr. 30 (Kivetz testifying strategy in B1 lacks value because it is generally known). And the jury heard testimony from

---

[4] *See Atmel Corp. v. Info. Storage Devices, Inc.*, 189 F.R.D. 410, 416-417 (N.D. Cal. 1999) (excluding proposed expert testimony on "generally known" where plaintiffs' expert failed to perform "a survey of literature or other research" and instead relied on his "unrefreshed recollection of his individual experience in the industry").

1   another medical device company that while they tried to keep their marketing materials

2   confidential "prior to … using the information, … once we're marketing it, people would

3   know what our marketing materials are."  Dkt. 1636, Ex. 8 at 5.

4        **Fourth**, no reasonable jury could find that Plaintiffs took reasonable efforts to

5   maintain the secrecy of the business ATS.  Rather, the evidence shows Plaintiffs

6   advertised their marketing strategy around the ██████████ at the core of the

7   business ATS. ███████████████████████████████████████

8   ███████████████████████████████████████

9   ███████████████████████████████████████

10  ███████████████████████████████████████

11  ███████████████████████████████████████

12  ███████████████████████████████████████

13  ███████████████████████████████████████

14  ██████████████████████████████ *See also* 4/18 PM

15  Tr. 35-36 ██████████████████████████████████

16  ████████████ (In the alternative, Plaintiffs' disclosure of their purported secrets to the

17  public by as early as a ████████████ renders the ATS generally known.)

18       **Fifth**, no reasonable jury could find that Apple or Dr. O'Reilly misappropriated

19  the B secrets.  To start, there is no evidence that Dr. O'Reilly wrongly retained or

20  disclosed any of the business ATS.  The unrebutted evidence shows that Dr. O'Reilly's

21  notebooks do not disclose Plaintiffs' ATS, which Dr. Palmatier conceded, 4/12 AM Tr.

22  28:7-14, 33:24-34:6, 36:9-14; *see also* 4/18 PM Tr. 35, 38-40; JTX-487.  To the contrary,

23  ███████████████████████████████████████

24  ████████████████████████████ which Dr. O'Reilly has been

25  familiar with at least since he was in medical school, decades before joining Masimo.

26  *See* 4/14 PM Tr. 50-51; JTX-487.  Dr. Kivetz explained why neither this diagram nor

27  anything written in Dr. O'Reilly's describes the business ATS.  *See* 4/18 Tr. 37-38.  Dr.

28  O'Reilly also testified that several pieces of accused information were written during a

Wilmer Cutler
Pickering Hale
and Dorr LLP

public conference, not a confidential Masimo meeting. 4/14 PM Tr. 50:12-52:12. Nor does the "Smart Monitoring" presentation show the ATS (or any of Plaintiffs' confidential information). *Id.* 25:11-28:13; JTX-528; JTX-529. Again, Dr. Palmatier agreed. 4/12 AM Tr. 42-43. In any event, Dr. O'Reilly delivered the presentation publicly, at a medical conference attended by competitors, as a Masimo employee. 4/14 PM Tr. 30:18-23; *see also* JTX-4638.

Nor could a reasonable jury find that Apple improperly acquired the business ATS through Dr. O'Reilly. Apple was "already considering how its devices could be used to provide both data to both consumers and healthcare providers before Dr. O'Reilly joined Apple." 4/14 Tr. 88-89; JTX-4355.01. Dr. O'Reilly did not disclose Plaintiffs' ATS during his Apple job interview. 4/14 PM Tr. 37-39; 4/18 PM Tr. 39; *see also* JTX-507 (whiteboard). Dr. O'Reilly made no contributions to the ECG feature that Plaintiffs have asserted is somehow linked to the ATS, and his only contribution to the Blood Oxygen feature was to ensure that studies were safely conducted. 4/14 PM Tr. 42-43. Nor is there evidence that Dr. O'Reilly had any role in marketing Apple Watch or that he gave Plaintiffs' confidential information to those who did. 4/18 Tr. AM 71, 104.

Moreover, the accused features are marketed as consumer products, ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ (as the ATS contemplate). *See* 4/18 AM Tr. 86, 88-90, 114:7-10, 4/18 PM Tr. 41, 45:4-7; JTX-3166; JTX-3441; JTX-3442. The evidence shows that Apple trains its sales force *not* to suggest ECG and Blood Oxygen ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* 4/18 AM Tr. 86:12-87:1, 89:20-90:20; 4/18 PM Tr. 43:23-44:4.

**2.** ▮▮▮▮▮▮▮▮▮ No reasonable jury could find liability for the L ATS.

**a. L4.** There is no evidence that Apple misappropriated L4, which requires ▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1 ████████████████████████████████████████████████████████████

2 ██████████████████████████████████████████████████

3    ***First***, Plaintiffs offered no evidence that they possessed the idea of ████████████

4 ████████████████████████████████████████████████████████████

5 ████████████████████████████████████████████████████████████

6 ██████    The Court found that Dr. Madisetti had no disclosed opinion on that issue, and

7 thus precluded him from offering one at trial. *See* 4/11 PM Tr. 5:17-7:20; 4/12 PM Tr.

8 15:8-16:5.    Plaintiffs improperly suggested when cross-examining Apple's expert

9 witness Steve Warren that they need not show possession of L4 in its entirety because

10 they are not alleging misappropriation of the ████████████████████████"

11 portion.  But Plaintiffs must adhere to the scope of "the controlling definitions of the"

12 ATS they drafted, 4/13 AM Tr. 20:11-24 (curative instruction), that appears in the jurors'

13 notebooks, and that their own expert described to the jury as a single unified concept,

14 *see* 4/12 AM Tr. 86:22-87:20 ████████████████████████████████████

15 ████████████████████████████████████████████████████████████

16 ████████████████████    Apple is unaware of any case that permits Plaintiffs to carve

17 off a piece of an ATS *during* trial, *see* Dkt. 669 at 3; Plaintiffs have cited none.

18    ***Second***, no reasonable jury could find that L4 was not generally known to persons

19 who could obtain value from its disclosure or use or that Plaintiffs took reasonable

20 efforts to keep it secret.  The trial record confirms that, years before Dr. Lamego joined

21 Apple, test conditions and procedures to measure ████████████████████████

22 ████████████████████████    without passing through the tissue were generally

23 known.  For example, as Dr. Warren explained, the ████████████████████████

24 ████ explicitly teaches the ***same*** test Plaintiffs described as showing possession of L4—

25 ████████████████████████████████████████████████████████████

26 ████████████████████████████████████████████████████████████

27 ████████████████████████    4/20 AM Tr. 49:9-55:21 (Warren); JTX-3778; 4/6

28 PM Tr. 95:3-12 (Diab's "dark digit" test); P-0162. ████████████████████████

1 ██████████████████████████████████████████████████████████

2 ███████████████████████████████████.  4/20 AM Tr. 55-59; 4/20 PM Tr. 45:9-

3 23; JTX-3778 at 20; JTX-3887 at 79.  And Plaintiffs have published numerous patents

4 that contributed to the body of information showing that L4 is generally known.  *E.g.*,

5 4/20 AM Tr. 60:4-62:9; 4/7 Tr. 94-95; 4/10 Tr. 53:20-57:13 (Scruggs); 4/7 Tr. 40:12-

6 41:18; JTX-1207; JTX-3879; JTX-3707; JTX-3694.  L4 is generally known, so Plaintiffs

7 cannot show that they derived independent economic value *because* it was secret.

8       Nor could a reasonable jury conclude Plaintiffs took reasonable efforts to keep L4

9 secret in view of their explicit disclosures in patents of how to ████████████████

10 ████████████████████████████  *See infra* p. 13.  Plaintiffs claim the

11 patents do not disclose their ████████████, but then neither does L4.  In any event,

12 as Dr. Warren confirmed, any disclosure about ████████████████████ necessarily

13 indicates ████████████████████████.  4/20 PM Tr. 36.

14       ***Third***, no reasonable jury could conclude Apple misappropriated L4.  Plaintiffs

15 hinged their allegations that Dr. Lamego "disclosed" L4 to Apple on a single document

16 in which he listed ████████████████ as a "████████████████."  JTX-143.  But

17 Plaintiffs failed to connect that term to ***anything*** having to do with L4's ████████████

18 or required changes made because of the tests.  The term ████████████████ merely

19 refers to ████████████████████████ and has ***nothing to do***████████████

20 ████  4/18 PM Tr. 80; 4/20 AM Tr. 65-66; 4/20 PM Tr. 89.  Plaintiffs' expert

21 recognized that a Masimo patent, JTX-3707, directed to ████████████████████

22 ████████████████████████████████████████████

23 ██████████████████  PDX9-21.

24       Moreover, Plaintiffs presented no connection between Dr. Lamego's ████████████

25 ████████ comment and ████████████████████ Plaintiffs accuse of using

26 L4.  It is undisputed that Apple was already using ████████████████████ to

27 ████████████████ (which Apple calls ████████████████ ***before*** Dr. Lamego arrived

28 at Apple.  4/18 PM Tr. 72-76, 103, 109-114; 4/19 AM Tr. 48, 61-62; 4/20 AM Tr. 62-

66; JTX-1061; JTX-1078; JTX-4553.   And Plaintiffs offered no evidence that Dr.

Lamego had ***anything*** to do with Apple's later decision to modify that █████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████    4/18 PM Tr. 112:9-113:23.   All record evidence confirms Dr. Lamego

had nothing to do with that decision.  4/18 PM Tr. 77:22-78:11, 113:24-114:1; 4/20 AM

Tr. 62:19-66:5.  Indeed, there is no record evidence of Dr. Lamego ever using the term

"black foam" during his time at Apple.

   ***Fourth***, no reasonable jury could find Apple used ██████████████████████

████████████████████████████    Plaintiffs rely on changes

made  ████████████████████████████████████████████████  but they do not show the changes

occurred because of Dr. Lamego ██████████████████████████

█████████████████████████    Apple's engineers gave unrefuted testimony

that (1) the accused ████████████████

████████████████  and it has never been used as ████████████████

████████████, as L4 requires; and (2) Dr. Lamego had no role in either accused change.

4/18 PM Tr. 77:22-79:11, 113:24-114:18; 4/20 AM Tr. 62:19-66:5.

   **b. L5.**  There is no evidence Apple misappropriated L5, which recites knowledge

of a problem—███████████████████████████████████████████

███████████████████"—but only the generic and non-specific idea of ████████████

████████████████████████████████████████

   ***First***, █████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████. 4/10 Tr. 33:6-36:18;

4/12 PM Tr. 20:15-23:20; 4/13 AM Tr. 56:14-57:7, 58:7-59:20; 4/20 AM Tr. 72:1-78:15;

1   Smith Depo Tr. 91:16-91:23, 92:6-9, 92:13-94:10, 99:20-100:1, 100:4-7.[5]   No

2   reasonable juror could conclude that the ███████████████████████" was the same

3   as the short circuit that Plaintiffs accuse.  As Dr. Warren testified, in his "nearly four

4   decades in the field[,] prior to Dr. Madisetti saying it in court last week he had [n]ever

5   heard anyone refer to a ██████████████████████████████████████████████

6   ████████████████████████████████████████████████████████████████

7   ████████████" 4/20 AM Tr. 76-77.  Plaintiffs accordingly cannot meet their burden to

8   demonstrate that they possessed the full ATS (or even that portion corresponding to the

9   alleged misappropriation).   4/13 AM Tr. 20:14-21:7 (court noting that the "written

10  description of" in the jurors' notebooks defines the "scope of the claim").  Any other

11  result would be nonsensical—like allowing Coca-Cola to take its classic cola recipe and

12  claim it held trade secret rights to the general category of "carbonated soda."

13         ***Second***, there is no evidence of misappropriation.  The undisputed record shows

14  that Apple not only implemented a ***different solution*** █████████████████) from

15  that which Plaintiffs possessed ████████████), Apple did so to avoid ███████

16  ███████████████████—an entirely ***different problem*** from the██████████████

17  from acting like photodiodes" problem that L5 specifies.  4/18 PM Tr. 84-86; 4/19 AM

18  Tr. 24; 4/20 AM Tr. 78-82; JTX-181 at 36 (documenting ██████████████████

19  ████████████████████); JTX-182 at 45; JTX-183 at 59; JTX-186 at 15.  Dr.

20  Madisetti did not allege that later versions of Apple Watch (using the Carnelian,

21  Gemstone, and Topaz ASICs) had the "LEDs acting as photodiodes" problem described

22  by L5, only the "floating LED" situation.  4/12 AM Tr. 28:21-29:7, PDX2-53.[6]

23         Relatedly, no reasonable jury could find that Apple "used" the purported trade

---

[5] Apple anticipates playing the Smith deposition transcript on the final day of trial.

[6] Plaintiffs cannot survive JMOL based on Dr. Madisetti's conclusory and baseless
assertions that (1) ██████████████████████████, and ███████████████████
are the same thing, and (2) Plaintiffs possessed ████████████████████.  *See Tang v.
Shell Chem. Co.*, 317 F. App'x 660, 662 (9th Cir. 2009); *Telemac Cellular Corp. v. Topp
Telecom, Inc.*, 247 F.3d 1316, 1329 (Fed. Cir. 2001).

1    secret within the meaning of the statute based on a rejected proposal from Dr. Lamego

2    to Apple stating "████████████████████████████████████████████

3    █████████████████████████." 4/12 PM Tr. 24:21-25:1.  That ██████████

4    proposal is different from the only solution that Plaintiffs possessed ████████).  It is

5    also different from what Apple implemented in Apple Watch ████████████).  Indeed,

6    the record shows that (1) Apple rejected Dr. Lamego's suggestion because Apple did

7    not have the problem of ██████████████, which was the stated basis for Dr.

8    Lamego's proposal, and (2) Apple never implemented █████████████████

9    ████. 4/18 PM Tr. 80:21-84:8; 4/19 AM Tr. 20:4-24:14; 4/20 AM Tr. 82:8-87:1; JTX-

10   181 at 36; JTX-184 (resolving Dr. Lamego's suggestion with: █████████████

11   ██████████████████████████████.

12       ***Third***, no reasonable jury could find that Plaintiffs met their burden to prove that

13   L5 was not generally known (or had economic value as a result).  As Professor Warren

14   explained, both ██████████████ and solutions to solving that, including

15   ████████████████, were generally known.  For example, the ████ reference shows

16   that it has been known since ████ that ████████████████.  In fact, when

17   explaining that phenomena, █████████████████████████████████

18   ████████████████████████████████████████████████

19   ████████████. 4/20 AM Tr. 88:16-89:10; JTX-3808 at 118-119, Fig. 5-13.[7]  The ████

20   reference from ████ similarly confirms that ████████████████████████

21   ████████s was well known.  4/20 AM Tr. 89:23-91:7; JTX-4232.  Moreover, the

22   ████████████ further confirm that it was generally known decades before Dr.

23   Lamego joined Apple that ████████████████████████████████████

24   4/20 AM Tr. 89:11-92:14; JTX-3887 at 60.  Plaintiffs' own patents confirm the same.

25   4/20 AM Tr. 92:15-95:12; JTX-3003 at 16:40-44, Fig. 8.

26

27   _____

     [7] Dr. Madisetti testified the teachings of ████ had been "forgotten."  But Dr. Madisetti's
     testimony and the ████ reference he relied upon simply corroborate that the teachings

28   of ████ were brought back to the attention of those in the field more than ████████
     before Dr. Lamego joined Apple.  4/20 PM Tr. 75:9-23.

**Fourth**, no reasonable jury could find that Plaintiffs took reasonable efforts to maintain the secrecy of L5.   To the contrary, Plaintiffs themselves filed patents disclosing their ███████s solution to ████████████████████.   Mr. Dalke admitted the ██████████ described in ████████████ patent shows solving ████████████ problem.  4/10 AM Tr. 38:14-41:24; JTX-3007 at Fig. 8.   Dr. Warren confirmed this and identified other patents where Plaintiffs disclosed the same ████████████████ as a solution to █████████████ ██████████████ 4/20 AM Tr. 92:15-95:15; JTX-3003 at 16:40-44, Fig. 8.

**3.  Demodulation.**  No reasonable jury could find liability for the D ATS.

**First**, as a matter of law, Plaintiffs have not established that they possessed any of the alleged D secrets, let alone the full breadth of those ATS.  For example, for D1, Plaintiffs have not provided any concrete evidence that they possessed ████████ ███████████████████████"  Dr. Madisetti's initial explanation for why Plaintiffs possessed D1 did not mention the ████████████████ limitation at all. 4/12 PM Tr. 35-41.   While Dr. Madisetti later made the passing statement that ████████████████ 4/12 PM Tr. 47-49,████████████ and a party cannot avoid judgment as a matter of law based on a conclusory assertion alluding to non-record evidence, *supra* n.6; *see also* 4/19/23 PM Tr. 37-42 (Sarrafzadeh explaining why the materials identified by Madisetti did not show possession of this aspect of D1).  As another example, no reasonable jury could find Plaintiffs possessed D10 because Dr. Madisetti (Plaintiffs' only witness on the issue) failed to address whether Plaintiffs possessed components 8 and 9 of D10.  *See* 4/12 PM Tr. 66-67 (Plaintiffs' counsel asking Madisetti to "explain your analysis of Steps 7, 8, and 9," but Madisetti only explaining Step 7); *see also* 4/19 PM Tr. 90-91 (Sarrafzadeh noting Madisetti had failed to address components 8 and 9).  Although Dr. Madisetti later asserted on rebuttal that his previous testimony had "confirmed" possession, he never addressed 8 and 9 specifically.  4/20 PM  Tr. 82-83.

**Second**, no reasonable jury could find that the D ATS were not generally known.

In particular, Dr. Madisetti's analysis should be rejected as a matter of law because he failed to do his own independent "survey of literature or other research" and instead merely "wait[ed] to see what [Apple] came up with." *Amtel Corp.*, 189 F.R.D. at 416; 4/12 PM Tr. 47.   While Dr. Madisetti relied on an email from Dr. Lamego in 2005 indicating (in Dr. Madisetti's words) that D1 was "not obvious," the cited email does not include the full D1.  *See id.* 47; JTX-828; *see also* Dkt. 1173 at 9 n.5.  Apple's expert—who did conduct a full investigation—testified D1 was generally known.  *See* 4/19 PM Tr. 44-62; *see also* JTX-3581; JTX-3668; JTX-3671; JTX-3584; JTX-3582.

    ***Third,*** no reasonable jury could find that Apple wrongly acquired or wrongly disclosed the D ATS or used it in an actual process.  As to acquisition, Dr. Madisetti was unable to identify a single document where Dr. Lamego disclosed the D1 and D3 purported secrets to Apple.  *See* 4/12 PM Tr. 41-44, 54-56; *see also* 4/19 PM Tr. 64-67, 85-87.  As to disclosure, Dr. Madisetti did not identify anywhere in ███████████ that repeated D1 and D3 verbatim, 4/12 PM Tr. 45, 57 (██████████████████████ to find disclosure of D1 and D3); *see also* 4/19 PM Tr. 67, 87-88 (Sarrafzadeh ██████████ ████████████████ do not disclose D1, D3).  D10 matches the text of claim 1 of the '754 patent, but even Dr. Madisetti has not claimed that D10 was the first committed to writing.  4/13 AM Tr. 65.  Plaintiffs have thus failed to provide sufficient evidence that D10 originated with Plaintiffs rather than through Dr. Lamego's work at Apple.  As to use, Dr. Madisetti conceded that "as of today" "D1, D3, and D10 ***were not used, ever, in any Apple Watch***." 4/12 PM Tr. 98-99; *see also* 4/19 PM Tr. 63-64, 85-87, 88, 92.

    **4.   VIA.**  No reasonable jury could find that Plaintiffs' experts' conclusory statements about the "value, importance, and appropriateness" theory meet Plaintiffs' burden.  Dr. Madisetti testified for just five minutes on the issue, and he did not provide any specific testimony establishing that Plaintiffs possessed VIA (as it relates to the L and D ATS) or that VIA was not generally known.  4/12 PM Tr. 72:15-75:13.  While Dr. Madisetti testified vaguely about the "benefit" provided by Plaintiffs' L and D ATS, he did not identify any specific independent economic value VIA has from secrecy.  *Id.*

Although Dr. Madisetti made the conclusory assertion that "Apple benefited" from using VIA, he did not identify how Apple used its awareness of the value, importance, and appropriateness of the L and D ATS—he simply testified that Apple used the L and D ATS.  *Id.*  Finally, while Dr. Madisetti claimed his VIA analysis was supported by three exhibits (JTX-827, JTX-940, and JTX-941), he did not link those documents to any particular ATS.  Dr. Sarrafzadeh and Dr. Warren later explained—without rebuttal—that since there is no evidence that Plaintiffs proved trade secrecy status, value, or misappropriation of the constituent D1, D3, D10, L4, and L5 alleged secrets, there is accordingly no proof that VIA is a trade secret or was misappropriated in respect to those alleged technical secrets.  4/19 PM Tr. 92:16-94:16; 4/20 AM Tr. 96:4-96:24.

Dr. Palmatier testified for only five minutes on the VIA ATS as it relates to the purported business secrets.  4/11 PM Tr. 65-72.  He did not provide any specific analysis regarding why the VIA ATS was not generally known or whether Plaintiffs had taken any reasonable efforts to protect its secrecy.  *Id.*  And Dr. Kivetz later explained—again, without rebuttal—that the VIA ATS was at a minimum generally known because it was rooted in marketing principles that he had been teaching for years.  4/18 PM Tr. 36-37.

### D.   Plaintiffs' Trade Secret Claim Is Time-Barred

**1.   Single Alleged Misappropriation Triggers Statute.**   The statute of limitations begins to run for all alleged trade secrets as soon as a plaintiff discovers or has reason to discover that the defendant misappropriated a single one—"at least" when the trade secrets "concern related matters."  *MedioStream, Inc. v. Microsoft Corp*., 869 F. Supp. 2d 1095, 1110 (N.D. Cal. 2012) (collecting cases); *see* Dkt. 1617 at 1-5.  Here, Plaintiffs have (wrongly) argued the purported trade secrets were all used to develop and market the same Apple Watch feature—Blood Oxygen—and that the purported secrets are so interchangeable that the jury may permissibly award $1.8 billion in damages if any supposed secret is misappropriated.  Dkt. 1622-1 at 9-16.

Plaintiffs have suggested that notice of misappropriation by Dr. Lamego would not have put them on notice of misappropriation by Dr. O'Reilly, where, as here, a trade

secret plaintiff alleges that a competitor "hired … 'key employees' in order to access 'confidential information' regarding its 'products' and 'technology,'" the plaintiff is on notice to file suit regarding all related, alleged trade secrets once it learned of the first alleged misappropriation through one of these former employees.  *E.g.*, *MedioStream*, 869 F. Supp. 2d at 1110; *see also* Dkt. 1610-1 at 3 (Plaintiffs arguing that evidence shows "Apple intended to obtain Masimo's trade secret information by targeting, interviewing, and hiring Masimo employees.").  And the statute begins to run as soon as "Plaintiffs discovered or had reason to discover that *a trade secret*" (as opposed to every claimed trade secret) "had been misappropriated."  Dkt. 606 at 5 (emphasis added); *accord Intermedics, Inc. v. Ventritex, Inc.*, 822 F. Supp. 634, 658 (N.D. Cal. 1993).[8]

**2.  Apple's Burden.**  Apple only bears the initial burden to show that purported misappropriation began more than three years before the suit was filed (here, January 9, 2017).  *See, e.g.*, *Glue-Fold v. Slautterback Corp.*, 82 Cal. App. 4th 1018, 1024 (2000); *Gabriel Techs. Corp. v. Qualcomm Inc*., 857 F. Supp. 2d 997, 1002-1003 (S.D. Cal. 2012).  Dr. Palmatier testified that Dr. O'Reilly began using the purported business strategies secrets in October 2013.  *See* 4/11 PM Tr. 23-24.  Dr. Madisetti has testified that the only conduit for transmitting the purported technical secrets to Apple is Dr. Lamego, *see* 4/12 AM Tr. 81:25-82:20, 84:15-85:20.  And there is no dispute that if any misappropriation occurred, it was during his six-month employment at Apple, which ended during the summer of 2014.  *See* 4/14 AM Tr. 70:18-20.

**3. Plaintiffs' Burden**.  "Since it is undisputed that the alleged misappropriation of trade secrets took place outside the limitations period," Plaintiffs "have the burden of proving the facts necessary to toll the statute," *Gabriel*, 857 F. Supp. 2d at 1003—i.e., that the misappropriation was not "discovered or by the exercise of reasonable diligence

---

[8] Alternatively, a single limitations period applies collectively to the business and technical ATS allegedly misappropriated via Drs. O'Reilly and Lamego.  But at a minimum, each trade secret category has a single limitations period, since Plaintiffs concede that the B and the D secrets are related among themselves, and their assertion that the L secrets are unrelated lacks an evidentiary basis. *See* Dkt. 1500-1 at 212:18-21.

should have been discovered" before January 9, 2017.

Plaintiffs' counsel has asserted that they first discovered any alleged misappropriation in October 2019. *See* 4/5 AM Tr. 52:3-7. But the only trial evidence that even purported to support this specific timing came from their CEO Joseph Kiani, who referred to certain (undisclosed) communications with his counsel, and this Court subsequently precluded Plaintiffs from "revisit[ing] that testimony during the course of examination and certainly during the course of closing argument." 4/12 AM Tr. 16:6-11; *see also* Dkt. 1586 at 4-6, 17-21 (explaining background). Regardless, Plaintiffs were on inquiry notice before the January 2017.

*First*, on September 20, 2014, a Masimo executive emailed Dr. O'Reilly, asking him to "search [his] journals from [a certain] timeframe to see if [he had] notes" about his Masimo business "dealings." JTX-4393. This email proves Plaintiffs knew that (1) Dr. O'Reilly had retained his personal journals used when he was a Masimo employee and (2) Plaintiffs knew that the journals contained their purported confidential business information. *See id.*; 4/14 PM Tr. 53-55. A plaintiff is put on inquiry notice, triggering CUTSA's discovery rule when it knows an alleged misappropriator breached an obligation to return "confidential information" on time. *See, e.g.*, *Alta Devices, Inc. v. LG Elecs., Inc.*, 2019 WL 1924992, at *12-14 (N.D. Cal. Apr. 30, 2019); *Wang v. Palo Alto Networks, Inc.*, 2014 WL 1410346, at *7 (N.D. Cal. Apr. 11, 2014).

*Second*, Plaintiffs were on notice by the time Dr. Lamego left Apple in the summer of 2014. Plaintiffs' January 2014 letter asserts that (1) Dr. "Lamego possesse[d] detailed knowledge of [their] trade secrets," (2) Apple "target[ed] Masimo and Cercacor personnel for some time," including by "hir[ing] Masimo's Chief Medical Officer, Michael O'Reilly," and (3) "[i]t is difficult to imagine any reason for this sequence of events other than [that] Apple is attempting to gain access to … Cercacor and Masimo's trade secrets." JTX-2937; *see also* 4/13 PM Tr. 64-65. When the January 2014 letter is combined with Mr. Kiani's testimony that (in his view) Dr. Lamego left Apple six months later because "Apple asked him to do something competitive to [Plaintiffs]," 4/5

PM Tr. 49:22-23, the only reasonable inference is that Mr. Kiani had "reason to suspect that a trade secret ha[d] been misappropriated." Dkt. 606 at 3.[9]

**Third**, Plaintiffs were on notice by March 3, 2016, when the '052 patent application published. *See* JTX-1239 at 1. Plaintiffs' January 2014 letter asserted that their Employee Confidentiality Agreement barred Dr. Lamego from working "in an area that … involve[s] healthcare technology, including … the measurement of physiological information," because doing so "would necessarily involve the use or disclosure of Cercacor's trade secrets." JTX-2937 at 2. Yet Dr. Lamego was listed as an inventor of the '052 patent, which plainly concerns measurement of physiological information and in which Plaintiffs claim ownership. *See* JTX-1239 at 1. At a minimum, a reasonable investigation triggered by earlier suspicion would have "produce[d] facts sufficient to confirm th[at] suspicion" by the '052 patent application's publication. Dkt. 606 at 3.

### E.   Plaintiffs' Unjust Enrichment Claim Should Not Go To The Jury

**1. No Unjust Enrichment.** Plaintiffs' sole theory for monetary relief was Mr. Kinrich's assertion that Apple was unjustly enriched through its use of the ATS in connection with Apple Watch Series 6 & 7. *See* 4/13 AM Tr. 74-75; *see also id.* 108.[10] But Mr. Kinrich presented the jury a calculation of profits he attributed to two *features* in those Watches—ECG and Blood Oxygen—in an amount of $3.1 billion. Plaintiffs failed to introduce any evidentiary basis on which a reasonable jury could conclude *any* profits attributable to the ECG or Blood Oxygen features were "*caused by*" the alleged misappropriation (let alone *all* profits attributable to those features that Mr. Kinrich calculated). Cal. Civ. Code § 3426.3(a); Dkt. 1171 at 18-21; *see generally* Dkt. 1643.

---

[9] Mr. Kiani's testimony that he assumed Dr. Lamego "had not spilled [Plaintiffs'] confidential information," 4/5 PM Tr. 50:10-11, does not change this calculus; a "mistaken[] belie[f]" does not toll the statute of limitations, *Forcier v. Microsoft Corp.*, 123 F. Supp. 2d 520, 526 (N.D. Cal. 2000); *Glue-Fold*, 82 Cal. App. 4th at 1024-1027.

[10] Plaintiffs' theories of actual loss were excluded. *See* Dkt. 1283 at 8-10; Dkt. 1516 at 6. Plaintiffs have presented no evidence or argument that alleged acquisition or disclosure of any ATS caused unjust enrichment. Should the Court not grant JMOL of no unjust enrichment, the jury should be instructed that it may not award any monetary relief for alleged misappropriation-by-acquisition or misappropriation-by-disclosure.

Wilmer Cutler
Pickering Hale
and Dorr LLP

To prove that some benefit was unjustly caused by misappropriation, Plaintiffs must provide "some reasonable basis for the computation" of the value of the benefit attributable to the underlying wrong. *Ajaxo Inc. v. E\*Trade Fin. Corp.*, 187 Cal. App. 4th 1295, 1305 (2010); Dkt. 1643 at 1 -2.  Plaintiffs have failed to, as a matter of law.

***First***, because Mr. Kinrich conceded he did "not apportion to the value of any specific alleged trade secrets" (4/13/23 AM Tr. 130:6-8), there is no "sufficient evidence, [n]or a reasonable basis, to determine the unjust enrichment damages" for misappropriation of any specific alleged secrets.  *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 399 F. Supp. 2d 1064, 1076-1077 (N.D. Cal. 2005); *see also* Dkt. 1171 at 18-21; Dkt. 1245 at 11-14.   In Mr. Kinrich's own words, his $3.1B calculation associated with the ECG and Blood Oxygen features could apply to misappropriation of any of B1, B2, B3, B7, or to any combination thereof.  4/13 AM Tr. 122:20-24 ("It could be $3.1 billion depending on the facts, and it could be some other number.").  This absurd result arose because he testified only about the profit supposedly attributable to the Blood Oxygen and ECG features during a two-year period, not to the ATS themselves. *Id.* 92:14-17, 121:11-20.  For the L and D ATS, Mr. Kinrich provided *no* damages estimate whatsoever, leaving the jury to guess their value (or simply to assume that they share the same value as the business ATS).  The fact that Mr. Kinrich suggested that the measure of unjust enrichment could be the same regardless of how many or which alleged secrets are found to be misappropriated, confirms that the numbers he put forth are untethered from any benefit allegedly flowing from the purported secrets themselves.

***Second***, Plaintiffs concede they must show "some causal nexus" between their unjust enrichment damages and Apple's purported use of the ATS, Dkt. 1622-1 at 9, but Mr. Kinrich offered "no opinion" that anything accused by Plaintiffs—not "the black foam step in the manufacturing process, the short circuit, [or] the modulation proposal that was never used in an actual product"—"caused the unjust enrichment number that [he] offered to the jury."  4/13 AM Tr. 120:9-121:10.  He "offered no opinion on causation" at all, claiming instead "[t]hat information or that conclusion will come from

1   the other evidence, not from what I have said." *Id; see also id.* at 113:25-114:26.[11]

2          As set forth in Apple's renewed *Daubert* motion, Mr. Kinrich's failure to even

3   "relate" the profits he calculated to ***any*** of the alleged secrets renders his testimony so

4   unreliable as to require striking. *See generally* Dkt. 1601-1. But even if Mr. Kinrich's

5   testimony is permitted to stand, no reasonable jury could find the profits presented by

6   Mr. Kinrich were ***caused*** by any alleged misappropriation because—contrary to Mr.

7   Kinrich's promise in his report, at deposition, and at trial—that evidence did not come

8   from somewhere else. The entire trial record fails to supply that critical evidence.

9          **a.**    ▮▮▮▮▮▮▮▮▮▮**ATS.** There is no evidence that the profits Mr. Kinrich

10  attributes to the ECG or Blood Oxygen features were caused by the alleged

11  misappropriation of D1, D3, D10 (or VIA as it relates to them). Plaintiffs concede that

12  the purported D secrets "do not relate to ECG." 4/13 AM Tr. 113:8-12. More

13  fundamentally, "for D1, D3, and D10," as Mr. Kinrich acknowledged, "there is ***not even***

14  ***an allegation of use*** in an actual Apple product." 4/13 AM Tr. 123:6-11. Rather, as Dr.

15  Madisetti admitted, "as of today" "D1, D3, and D10 ***were not used, ever, in any Apple***

16  ***Watch***." 4/12/23 PM Tr. 98:25-99:2. And as Apple has explained in the renewed

17  *Daubert* briefing, Plaintiffs have not even argued the D secrets have a connection to the

18  ECG feature and have been unable to identify any record evidence linking the purported

19  D secrets to the Blood Oxygen feature. *See* Dkt. 1626 at 7-8; 1639-1 at 4-7.

20         **b.**    ▮▮▮▮▮▮▮ **ATS. N**o reasonable jury could conclude the profits for the ECG

21  and/or Blood Oxygen features presented by Mr. Kinrich have any connection to the

22  alleged use of the purported L4 and L5 secrets (or VIA as it relates to those purported

23  secrets). Again, Mr. Kinrich did "not apportion to the value of any specific alleged trade

24

25  _____

26  [11] Even if Mr. Kinrich's analysis had linked the ATS to the Blood Oxygen and ECG features in some way, it would still fail as a matter of law because he wildly overvalued those features by failing to account for the fact that there were myriad other differences between the Series 6 & 7 and SE models (e.g., different chips, different color options, and a proximity sensor) and myriad other aspects of the Blood Oxygen and ECG features themselves that the ATS do not purport to cover. *Compare* 4/13 AM Tr. 116-118 *with* 4/18 AM Tr. 93.

27

28

secrets." 4/13/23 AM Tr. 130:6-8.  He did not attribute any specific "value to Apple of using black foam in test procedures" nor "refer at any point … to the value to Apple of using a short circuit." *Id.*113-114.  And there is no basis to conclude that all the profits Mr. Kinrich attributes to the ECG and Blood Oxygen feature are caused by the alleged misappropriation of L4 and L5.  To the contrary, Plaintiffs conceded L4 and L5 have nothing to do with ECG (4/13 AM Tr. 112:6-10, 113:8-12) and made no showing of how, if at all, L4 or L5 caused any profits associated with the Blood Oxygen feature.

Plaintiffs' allegations of use with respect to L4, are that "Apple uses Masimo's L4 … ***to test all its Apple*** watches, right from Series 1 through 8 and the SE model" and that Apple "used" L4 by changing the design beginning with ***Series 4***.  4/12 PM Tr. 14-15.  There is no evidence as to what the purported benefit was of its use to the Blood Oxygen feature, first introduced with Series 6.  *See* Dkt. 1639-1 at 5 & n.3.

There is similarly no evidence of any benefit to Apple from using the short circuit accused of misappropriating L5.  The accused short circuit was ***not*** present in Apple's Series 0 watch, and as Dr. Block's unrebutted testimony confirmed, no performance changes were observed from the short circuit when it was added to the Series 1—it was simply a best practice belt-and-suspenders feature.  4/19 AM Tr. 24:7-25; *see also* 4/20 AM Tr. 84:9-18 ("So they established there was no value for this particular solution).  Plaintiffs' only cited evidence for the benefit allegedly flowing from L5 is a single statement from Dr. Madisetti claiming that ███████████████████████████.  But that statement had nothing to do with the Blood Oxygen feature in particular—indeed, it was made months before development of that feature even began.  *Compare* JTX-0185 *with* 4/18 PM Tr. 69, 70-71, 97; *see also* Dkt. 1639-1 at 5 & n.4.  Moreover, ***the same short circuit*** is present in all Apple Watches Series 1 and later; Plaintiffs have offered no evidence how, if at all, the accused short circuit benefits the Blood Oxygen feature that was first introduced with the Series 6.  4/18 AM Tr. 87-88; JTX-3176.

**c. Business ATS.**  There is likewise no basis on which a reasonable jury could conclude all profits Mr. Kinrich attributes to the Blood Oxygen and ECG features were

caused by misappropriation of the B ATS (or VIA, as it relates to them).  Here too, Mr. Kinrich only "offered the opinions to the value of the ECG feature and the value of the blood oxygen feature: advising "that is up to … the testimony of other witnesses, and then the jury of course on how to then take that information and assign value to the trade secrets."  4/13 AM Tr. 110:6-111:16.  But Plaintiffs' other witnesses, including their expert Dr. Palmatier, made no attempt to connect any allegations of use of the alleged B secrets to either feature in the Series 6 or 7 Apple Watches.  As Plaintiffs have acknowledged, Dr. Palmatier's ECG testimony discussed *only B1* and its alleged use in connection with marketing of the ECG feature on *Series 4*—a product not included in Mr. Kinrich's calculations.  *See* Dkt. 1622-1 at 14; *see also* Dkt. 1639-1 at 6-7.  Without any evidence on which to find the alleged B secrets were used in a manner that caused the profit purportedly attributable to the ECG and Blood Oxygen features, Plaintiffs cannot as a matter of law collect unjust enrichment in the form of those profits.  4/13 AM Tr. 111:17-112:2 (Mr. Kinrich acknowledging even his "lay understanding" of the law is "no use, no unjust enrichment").  Moreover, Plaintiffs have put forth no evidence on which a reasonable jury could conclude *all* profits from the ECG and/or Blood Oxygen feature were caused by "business strategies" allegedly used in connection with marketing those features as compared to, for example, the technology of those features.

        **d.  Non-Trade Secrets.**  At a minimum, Plaintiffs cannot obtain monetary relief for acquisition, use, or disclosure of information that was not a trade secret at the time of the damages period.  Thus, even if certain ATS were not generally known at the time of the alleged misappropriation, subsequent "unprotected disclosure … cause[d] the information to forfeit its trade secret status."  *Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc*., 923 F. Supp. 1231, 1254 (N.D. Cal. 1995).  Here, Mr. Kinrich's calculation for unjust enrichment considers only sales of Apple Watch Series 6 and 7—i.e., sales postdating September 2020 when the Series 6 was released.  *See, e.g.*, 4/13 AM Tr. 80:14-18; 91:6-25.  As noted, Mr. Kiani confirmed—in response to a question from his own counsel—that D10 was "*not a trade secret anymore*" after the '754 patent

published *in March 2019*.  *See* 4/6 AM Tr. 110-111.  There is similarly no genuine dispute that the alleged B trade secrets lost their purported trade secret status before Mr. Kinrich's damages period.  Plaintiffs ███████████████████████████████████ ████████████████████████████████████████.  *See* 4/5 AM Tr. 50:13-18; 4/18 AM Tr. 25:22-26:9, 137:20-25; 4/28 AM Tr. 30:15-17, 34:14-23; *see supra* pp. 9-10.  And because ████████████████████████████████████████████████████ ████████████████████ destroyed that trade secret too.  JMOL should be granted for no unjust enrichment at least, for any ATS publicly disclosed before 2020.[12]

### F.    Apple Did Not Willfully And Maliciously Misappropriate

Punitive damages are available only if Plaintiffs have proven by clear and convincing evidence that Apple misappropriated ATS willfully and maliciously.  *See* Cal. Civ. Code § 3426.3(c); Dkt. 1500-1 at 251-252.  The record contains no evidence that would remotely support such intent.  *See supra* pp. 2-7.  Plaintiffs' failure to prove that Apple intentionally misappropriated means *a fortiori* they failed to prove willful and malicious misappropriation. *See In re Lopez*, 378 F. App'x 610, 612 (9th Cir. 2010); *Ajaxo Inc. v. E\*Trade Grp. Inc.*, 135 Cal. App. 4th 21, 66 (2005).  But even if the Court declines to grant JMOL on intent, the jury should not be charged on punitive damages because the record provides no basis from which "malice [by Apple] may be proven either expressly by direct evidence probative of the existence of hatred or ill-will, or by implication from indirect evidence." *Ajaxo*, 135 Cal. App. 4th at 66-67.  No rational jury could find by clear and convincing evidence that Apple acted willfully and maliciously unless "[P]laintiff[s] … present[ed] affirmative evidence" on this point, because "discredited testimony is not … a sufficient basis for" proving malice by clear and convincing evidence. *Anderson v. Liberty Lobby*, 477 U.S. 242, 256-257 (1986).  There is no evidence from which a jury could infer that Apple's hiring of Drs. O'Reilly

---

[12] Because the link between the $3.1B sought and Apple's purported unjust enrichment is non-existent, awarding that sum (or anything more than a de minimis amount) would in effect amount to the kind of "grossly excessive" punitive damages prohibited by the U.S. Constitution. *E.g., BMW of N. America, Inc. v. Gore*, 517 U.S. 559, 568 (1996).

1   and Lamego "intended … to cause injury to [Plaintiffs]" or that this was
2   "[d]espicable[,] … vile and wretched." *Ajaxo*, 135 Cal. App. 4th at 66.

## II.   THE INVENTORSHIP AND OWNERSHIP CLAIMS FAIL AS A MATTER OF LAW

4   Plaintiffs have failed to "meet the heavy burden" of proving by clear and
5   convincing evidence that Mr. Diab or Mr. Poeze made a significant and inventive
6   contribution to any claim of the '754, '095, '390, '052, and '670 patents (collectively,
7   the "Disputed Patents"). *Eli Lilly v. Aradigm Corp.*, 376 F.3d 1352, 1358-1359 (Fed.
8   Cir. 2004). Nor have Plaintiffs established that Dr. Lamego (all Disputed Patents), Mr.
9   Poeze ('754 patent), or Mr. Diab ('052, '670, '095, and '390 patents) invented the
10  subject matter claimed in the Disputed Patents while employed by Masimo or Cercacor.
11  *See Board of Trustees of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*,
12  563 U.S. 776, 786 (2011). Accordingly, JMOL is warranted on Plaintiffs' patent claims.

13  **A.   '754 patent.**  No reasonable jury could find Plaintiffs have established their
14  inventorship claim, for three reasons. *First*, there is no written corroboration of Mr.
15  Poeze's inventorship, as his notebook fails to disclose any '754 patent claim. *See*
16  *Wagner v. Ashline*, 2021 WL 5353889, at *4 (Fed. Cir. Nov. 17, 2021). *Second*, Mr.
17  Poeze testified that he did not "come up with the method" set forth in his notebook,
18  which was instead taught to him by Dr. Lamego. 4/7 AM Tr. 103:9-18, 108:23-110:8
19  (Poeze); *General Elec. Co. v. Wilikins*, 750 F.3d 1324, 1332 (Fed. Cir. 2014)
20  ("[E]vidence of discussions between named inventor and putative co-inventor
21  concerning subject matter of [the] claimed invention [i]s insufficient to establish co-
22  inventorship."). *Third*, there is no evidence that Mr. Poeze collaborated with Dr.
23  Lamego while Dr. Lamego was working on the ideas claimed in the '754 patent at Apple.
24  *See Eli Lilly*, 376 F.3d at 1359 (joint inventor's work must be "conjoined with the efforts
25  of the named inventors"). This Court should take Mr. Poeze at his word that he does not
26  "believe [he] invented" the subject matter claimed in the '754 patent. 4/7 AM Tr. 116.

27  Plaintiffs have not established Mr. Poeze was a co-inventor, so they cannot claim
28  co-ownership of the patents based on his work. Nor is there evidence from which a

Wilmer Cutler
Pickering Hale
and Dorr LLP

reasonable juror could conclude that the '754 patent claims were invented by Dr. Lamego while at Masimo or Cercacor.  Mr. Hotelling's unrebutted testimony established that the work that led to the '754 patent was performed at Apple.  *See* 4/14 AM Tr. 34:3-35:4; *see also id.* at 25:20-28:21; JTX-880.  And Plaintiffs presented no evidence that the '754 patent claims were invented at Masimo or Cercacor.  4/19 PM Tr. 95:6-97:16.[13]

**B.   '095 and '390 Patents.**   No reasonable jury could credit Plaintiffs' inventorship claims, as Dr. Madisetti's testimony that Mr. Diab's prior patent and publication render him a joint inventor cannot be squared with governing precedent.  *See* 4/19 PM Tr. 97-100; *see also* JTX-1267 ('272 patent); JTX-1206 ('924 publication). Those publications at best establish that Mr. Diab contributed to the prior art, which is insufficient to make him a joint inventor.  4/19 PM Tr. 99; *see Eli Lilly*, 376 F.3d at 1362 ("A contribution of information in the prior art … is not a contribution to conception."). Nor is there evidence that Mr. Diab collaborated with the named inventors while they worked on the ideas claimed in the '095 and '390 patents at Apple.  *See id.* at 1359; *Kimberly-Clark*, 973 F.2d at 917.  As with Mr. Poeze, the Court should take Mr. Diab at his word that he has "no idea if [he] should be a named inventor."  4/7 AM Tr. 31, 32.

Because Plaintiffs have not established Mr. Diab co-invented either patent, they cannot claim co-ownership of the patents based on his work.  And Plaintiffs again failed to present evidence from which a reasonable juror could conclude that the '095 and '390 patent claims were invented by Dr. Lamego while at Masimo or Cercacor.  Mr. Hotelling testified, without contradiction, that the work that led to the '095 and '390 patents was performed at Apple.  4/14 AM Tr. 33, 17-23; *see also id.* at 25-28, 22-24; JTX-880; JTX-3657.  As Dr. Sarrafzadeh explained, Plaintiffs presented no evidence that the '095 and '390 patent claims were invented at Masimo or Cercacor.  4/19 PM Tr. 97-100.

**C.   '052 and '670 patents**.   No reasonable jury could credit Plaintiffs' inventorship claims.  Plaintiffs' case rests on prior art allegedly disclosing certain claim

---

[13] ████████████████████████████████████████████████████████████

1   limitations, but that is insufficient as a matter of law to render Mr. Diab a co-inventor.

2   *See* 4/6 PM Tr. 20:7-16, 96:10-21; 4/12 PM Tr. 79:9-82:19; JTX-777; JTX-1206; JTX-

3   1207; *see supra* p. 1.  In any event, the identified prior art does not disclose any inventive

4   claim limitation, such as reflective layers or reflective structures **separate from** the

5   housing.   *Cf.* JTX-777 (housing colored "Cloud White"); JTX-1206 (reflective

6   "hous[ing]"); 4/20 AM Tr. 97-99.  Plaintiffs also offered no evidence corroborating Mr.

7   Diab's testimony that he taught the idea of reflectivity to Dr. Lamego.  *See* 4/6 PM Tr.

8   87:23-88:4, 103:7-9; JTX-777 (no reference to Diab or Lamego); JTX-1207 (no

9   reference to Diab).  Finally, Trevor Ness, the first named inventor, provided unrebutted

10  testimony that the named inventors conceived of the claimed inventions "at Apple,"

11  without any contribution from Mr. Diab.  4/19 AM Tr. 91:21-23, 92:20-23, 103:17-23.

12  Mr. Diab yet again merely testified he has "no idea" whether he should be an inventor

13  of either patent.  *See* 4/7 Tr. 14:5-15:8, 26:25-27:2, 31:2-4; 4/20 AM Tr. 99-100.

14  　　　Because Plaintiffs have not established Mr. Diab was a co-inventor of either

15  patent, they cannot claim co-ownership of the patents based on his work.  And Plaintiffs

16  failed to present any evidence from which a reasonable jury could conclude that the '052

17  and '670 patent claims were invented by Dr. Lamego at Masimo or Cercacor.  *See* 4/20

18  AM Tr. 100 (Warren).  Mr. Ness testified that work began on the '052 and '670 patents

19  in "February of 2014" during work on Apple Watch.  4/19 AM Tr. 96:8-99:14; JTX-40.

20  Dr. Lamego contributed the idea of using "reflectivity on the back of the Apple Watch,"

21  4/19 AM Tr. 95:3-19, while the other named inventors contributed to the novel idea of

22  depositing reflective coating at particular locations on the Watch, *id.* 98:20-99:14;

23  108:7-15; 4/20 AM Tr. 97-99; JTX-1239 (2:7-11; cls. 1, 14); JTX-1241 (cls. 1, 18).  As

24  Mr. Ness's unrebutted testimony established, all this work was performed at Apple;

25  indeed, Dr. Lamego testified he did not have access to "data collected on the wrist" until

26  joining Apple.  4/13 PM Tr. 64:19-65:2; 99:3-5.

27

28

Wilmer Cutler
Pickering Hale
and Dorr LLP

1   Dated: April 22, 2023                    Respectfully submitted,

2
                                             JOSEPH J. MUELLER
3                                            MARK D. SELWYN
                                             AMY K. WIGMORE
4                                            JOSHUA H. LERNER
5                                            SARAH R. FRAZIER
                                             NORA Q.E. PASSAMANECK
6                                            THOMAS G. SPRANKLING
7                                            WILMER CUTLER PICKERING HALE AND
                                             DORR LLP
8
9                                            BRIAN A. ROSENTHAL
10                                           GIBSON, DUNN & CRUTCHER LLP

11                                           KENNETH G. PARKER
12                                           HAYNES AND BOONE, LLP

13

14
                                             By:  /s/ *Mark D. Selwyn*
15                                                   Mark D. Selwyn

16
17                                           *Attorneys for Defendant Apple Inc.*

18

19

20

21

22

23

24

25

26

27

28

1

# <u>CERTIFICATE OF COMPLIANCE</u>

2      The undersigned, counsel of record for Defendant Apple Inc. certifies that this

3 brief contains 30 pages, which:

4      ___  complies with the word limit of L.R. 11-6.1

5       X   complies with the page limit set by court order on April 19, 2023.

6

7 Dated:  April 22, 2023                    Respectfully submitted,

8

9                                          MARK D. SELWYN

10                                         AMY K. WIGMORE
                                           JOSHUA H. LERNER
11                                         SARAH R. FRAZIER
                                           NORA Q.E. PASSAMANECK
12                                         THOMAS G. SPRANKLING
                                           WILMER CUTLER PICKERING HALE AND
13                                         DORR LLP

14
                                           BRIAN A. ROSENTHAL
15                                         GIBSON, DUNN & CRUTCHER LLP

16
                                           KENNETH G. PARKER
17                                         HAYNES AND BOONE, LLP

18

19

20                                         By:  /s/ *Mark D. Selwyn*
                                                Mark D. Selwyn
21

22
                                           *Attorneys for Defendant Apple Inc.*
23

24

25

26

27

28