Joseph R. Re (Bar No. 134479)
joseph.re@knobbe.com
Stephen C. Jensen (Bar No. 149894)
steve.jensen@knobbe.com
Sheila N. Swaroop (Bar No. 203476)
sheila.swaroop@knobbe.com
Irfan A. Lateef (Bar No. 204004)
irfan.lateef@knobbe.com
Benjamin A. Katzenellenbogen (Bar No. 208527)
ben.katzenellenbogen@knobbe.com
Brian C. Claassen (Bar No. 253627)
brian.claassen@knobbe.com
Stephen W. Larson (Bar No. 240844)
stephen.larson@knobbe.com
Kendall M. Loebbaka (Bar No. 285908)
kendall.loebbaka@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, Fourteenth Floor
Irvine, CA 92614
Phone: (949) 760-0404
Fax: (949) 760-9502

Adam B. Powell (Bar. No. 272725)
adam.powell@knobbe.com
Daniel P. Hughes (Bar No. 299695)
daniel.hughes@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
3579 Valley Centre Drive
San Diego, CA 92130
Phone: (858) 707-4000
Fax: (858) 707-4001

Brian C. Horne (Bar No. 205621)
brian.horne@knobbe.com
Mark D. Kachner (Bar No. 234192)
mark.kachner@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
1925 Century Park East, Suite 600
Los Angeles, CA 90067
Phone: (310) 551-3450
Fax: (310) 551-3458

Attorneys for Plaintiffs,
MASIMO CORPORATION and CERCACOR LABORATORIES, INC.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**
**SOUTHERN DIVISION**

MASIMO CORPORATION, a Delaware corporation; and CERCACOR LABORATORIES, INC., a Delaware corporation

Plaintiffs,

v.

APPLE INC., a California corporation

Defendant.

Case No. 8:20-cv-00048-JVS-JDE

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW**

Date: April 25, 2023
Time: 1:30
Courtroom 10C

Hon. James V. Selna

# TABLE OF CONTENTS

Page No.

I. INTRODUCTION ........ 1

II. LEGAL STANDARD ........ 1

III. ARGUMENT ........ 2

A. Masimo Proved the Mental State Required by CUTSA ........ 2

1. Apple Sought To Obtain Masimo's Trade Secrets ........ 2

2. Apple Acquired Masimo's Trade Secrets By Improper Means ........ 4

3. Apple "Knew or Should Have Known" ........ 5

4. Apple's Reliance on Policies and General Denials Is Insufficient ........ 8

B. Masimo Sufficiently Identified The Asserted Trade Secrets ........ 8

C. Apple Misappropriated the Trade Secrets and was Unjustly Enriched ........ 9

1. Business & Marketing Strategy Trade Secrets ("BTS") ........ 9

2. Apple Misappropriated L4 and Was Unjustly Enriched ........ 14

3. Apple Misappropriated L5 and Was Unjustly Enriched ........ 17

4. Apple Misappropriated D1, D3, and D10 and Was Unjustly Enriched ........ 18

5. Apple Misappropriated VIA and Was Unjustly Enriched ........ 20

D. Masimo's Claim For Trade Secret Misappropriation Is Timely ........ 21

1. The Time To Bring A Claim Runs Separately For Each Trade Secret ........ 21

2. Masimo Did Not Discover Misappropriation Before January 9, 2017 ........ 22

3. Masimo Could Not Have Discovered Apple's Misappropriation Before January 9, 2017 ........ 23

a. Masimo Had No Reason To Suspect Misappropriation ........ 23

b. Masimo Could Not Have Learned Facts Sufficient to Sue ........ 24

**TABLE OF CONTENTS**
**(*cont'd*)**

**Page No.**

4. Apple Bears The Burden Of Proving Its Defense ....................24

E. Masimo's Unjust Enrichment Claim Is Well Supported ....................24

1. Masimo Exceeded Its Burden On Unjust Enrichment.............24

2. Apple's Misappropriation Benefitted the Blood-Oxygen and ECG Features In The Series 6 And 7 Watches..................25

F. The Jury Should Decide If Misappropriation Was Willful or Malicious ....................................................................................27

G. Masimo Established Its Patent Inventorship and Ownership Claims.........................................................................................27

1. Correction of Inventorship......................................................27

a. Diab Contributed to '095 and '390 Patents....................27

b. Diab Contributed to '052 and '670 Patents....................28

c. Poeze Contributed to '754 Patent..................................29

2. Masimo and Cercacor Are Co-Owners of the Disputed Patents ..................................................................................30

IV. CONCLUSION ..........................................................................30

## TABLE OF AUTHORITIES

**Page No(s).**

*Ajaxo*,
135 Cal. App. 4th at 66-67 ........................................................ 27

*Alert Enter., Inc. v. Rana*,
2023 WL 2541353 (N.D. Cal. Mar. 16, 2023) ........................................ 5

*Allergan, Inc. v. Merz Pharms*.,
2012 WL 781705 (C.D. Cal. Mar. 9, 2012) .......................................... 6

*Aqua Connect v. Code Rebel, LLC*,
No. CV 11-05764 ....................................................................... 1

*Atmel Corp v. Info Storage Devices, Inc.*,
189 F.R.D. 410 (N.D. Cal. 1999) ................................................. 10

*BladeRoom Grp. Ltd. v. Emerson Elec. Co.*,
331 F. Supp. 3d 977 (N.D. Cal. 2018) ....................................... 24, 25

*Burlington Indus., Inc. v. Ellerth*,
524 U.S. 742 (1998) ................................................................... 5

*Carr v. AutoNation Inc*.,
2018 WL 288018 (E.D. Cal. Jan. 3, 2018) .......................................... 6

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986), *aff'd*, 837 F. App'x 455 (9th Cir. 2020) ................ 1

*Cisco Systems, Inc. v. Chung*,
2023 WL 2622155 (N.D. Cal. Mar. 22, 2023) ..................................... 6, 7

*Dana-Farber Cancer Inst., Inc. v. Ono Pharm. Co.*,
964 F.3d 1365 (Fed. Cir. 2020) ................................................... 28

*Digital Envoy, Inc. v. Google, Inc.*,
2005 WL 2999364 (N.D. Cal. Nov. 8, 2005) ...................................... 25

*Droeger v. Welsh Sporting Goods*,
541 F.2d 790 (9th Cir. 1976) ........................................................ 6

*EnerTrode, Inc. v. Gen. Capacitor Co. Ltd.*,
2019 WL 1715170 (N.D. Cal. Apr. 17, 2019) .................................... 8, 9

*Forcier v. Microsoft Corp.*,
123 F. Supp. 2d 520 (N. D. Cal. 2000) ....................................... 22, 23

*Glue-Fold*,
82 Cal. App. 4th at 1024-25 ....................................................... 23

**TABLE OF AUTHORITIES**
**(*cont'd*)**

**Page No(s).**

*GSI Tech., Inc. v. United Memories Inc.*,
2015 WL 5655092 (N.D. Cal. Sept. 25, 2015) .......... 5, 6

*Hays v. VDF Futureceuticals, Inc.*,
2016 WL 5660395 (D. Haw. Sept. 28, 2016) .......... 21

*HiRel Connectors, Inc. v. U.S.*,
465 F. Supp. 2d 984 (C.D. Cal. 2005) .......... 22

*Imax Corp. v. Cinema Techs., Inc.*
152 F.3d 1161 (9th Cir. 1998) .......... 8

*Imi-Tech Corp. v. Gagliani*,
691 F. Supp. 214 (S.D. Cal. 1986) .......... 10

*InfoSpan, Inc. v. Emirates NBD Bank PJSC*,
2015 WL 13357646 (C.D. Cal. May 6, 2015) .......... 26

*InteliClear, LLC v. ETC Global Holdings, Inc.*,
978 F.3d 653 (2020) .......... 8, 9

*Intermedics, Inc. v. Ventritex, Inc.*,
822 F. Supp. 634 (1993) .......... 22

*Krechman v. Cnty. of Riverside*,
723 F.3d 1104 (9th Cir. 2013) .......... 1

*Lillie v. ManTech Int'l. Corp.*,
2019 WL 3387732 (C.D. Cal. July 26, 2019) .......... 1

*Little v. Amber Hotel Co.*
202 Cal. App. 4th 280 (2011) .......... 5

*Masimo Corp. v. True Wearables, Inc.*,
2022 WL 17083396 (C.D. Cal. Nov. 7, 2022) .......... 9, 10, 14

*MedioStream, Inc. v. Microsoft Corp.*,
869 F. Supp. 2d 1095 (N.D. Cal. 2012) .......... 22

*Micro Lithography Inc. v. Inko Indus.*,
1991 WL 332053 (Cal. Ct. App. Apr. 9, 1991) (unpublished) .......... 24, 25

*Navigation Holdings, LLC v. Molavi*,
2020 WL 5074307 .......... 5

**TABLE OF AUTHORITIES**
**(*cont'd*)**

**Page No(s).**

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008) ....... 9, 25

*O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*,
399 F. Supp. 2d 1064 (N.D. Cal. 2005) ....... 25

*Ochoa v. Cnty. of Kern*,
2023 WL 2143466 (E.D. Cal. Feb. 21, 2023) ....... 1, 8

*Olaplex, Inc. v. L'Oreal USA, Inc.*,
855 F. App'x 701 (Fed. Cir. 2021) ....... 8

*Pannu v. Iolab Corp.*,
155 F.3d 1344 (Fed. Cir. 1998) ....... 28

*Patriot Rail Corp. v. Sierra R.R.*
2015 WL 4662720 (E.D. Cal. Aug. 5, 2015) ....... 25

*Reeves v. Sanderson Plumbing Prod., Inc.*,
530 U.S. 133 (2000) ....... 1, 26

*Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*,
923 F. Supp. 1231 (N.D. Cal. 1995) ....... 26

*In re Rogstad,*
126 F.3d 1224 (9th Cir.1997) ....... 1

*SolarCity Corp. v. Pure Solar Co.*,
2016 WL 11019989 (C.D. Cal. Dec. 27, 2016) ....... 5

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*,
259 F.3d 1101 (9th Cir. 2011) ....... 27

**OTHER AUTHORITIES**

Cal. Civ. Code § 2332 ....... 5, 6

Cal. Civ. Code § 3426.1 ....... 2, 3, 4, 6

Cal. Civ. Code § 3426.3 ....... 24

Cal. Civ. Code § 3426.6 ....... 21

Fed. R. Civ. P. 50 ....... 1

Rule 50 ....... 1

## I. INTRODUCTION

Apple's Motion relies on cherry-picked quotes from its own witnesses while ignoring contrary testimony and extensive documents supporting Masimo's claims. Masimo presented sufficient evidence for a reasonable jury to find in Masimo's favor on all issues. Thus, the Court should deny Apple's Rule 50(a) Motion in its entirety.

## II. LEGAL STANDARD

Judgment as a matter of law may be granted only when "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1); *Krechman v. Cnty. of Riverside*, 723 F.3d 1104, 1109 (9th Cir. 2013). Apple bears the burden to demonstrate the absence of facts necessary for one or more essential elements of each claim. *Lillie v. ManTech Int'l. Corp.*, 2019 WL 3387732, at *9 (C.D. Cal. July 26, 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)), *aff'd*, 837 F. App'x 455 (9th Cir. 2020). If Apple meets its initial burden, Masimo must then set out specific facts showing a genuine issue for trial to defeat the motion. *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).

The Court must draw all reasonable inferences in Masimo's favor and may not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000); *Krechman*, 723 F.3d at 1110-11. The Court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 151. "The court gives credence to evidence in favor of the moving party only if it is 'uncontradicted and unimpeached' and 'comes from disinterested witnesses.'" *Ochoa v. Cnty. of Kern*, 2023 WL 2143466, at *2 (E.D. Cal. Feb. 21, 2023) (quoting *Reeves*, 530 U.S. at 151.); *see also Aqua Connect v. Code Rebel, LLC*, 2013 WL 3820544, at *3 (C.D. Cal. July 23, 2013) (citing *In re Rogstad,* 126 F.3d 1224, 1227 (9th Cir.1997)) ("A defendant's conclusory denial of wrongdoing fails to satisfy the threshold requirements."). For example, Lamego is not a disinterested witness. JTX-2872 (Lamego seeking job at Apple); JTX-759 (same); JTX-2874 [REDACTED] JTX-2196 [REDACTED] JTX-

2197 (same), JTX-2199 (same). Accordingly, Apple cannot rely on its own witnesses, experts, or Lamego to request JMOL.

## III. ARGUMENT

### A. Masimo Proved the Mental State Required by CUTSA

Apple argues "CUTSA requires a plaintiff to prove ***wrongful intent***." Br. 2.[1] CUTSA sets forth many ways in which a defendant can be liable for misappropriation, none of which requires "wrongful intent." *See* Cal. Civ. Code § 3426.1. This includes acquiring the trade secrets or knowledge thereof by "improper means" and having certain knowledge or "reason to know." *Id.* As explained below, substantial evidence supports a finding of misappropriation under this statute.

#### 1. Apple Sought To Obtain Masimo's Trade Secrets

In 2012, Apple assembled a confidential "Project Rover" to identify third parties to help develop physiological monitoring features. JTX-556. Project Rover sought a team of third-party experts that Apple could use as a "stepping stone" to develop its own products. JTX-260 at -106. In early 2013, Apple identified Masimo and Cercacor as the "standout" companies. JTX-259 at -774; T8-2 at 113, 115. Apple planned to contact Masimo and "frame" the discussion as a licensing discussion. JTX-259 at -783. Apple then contacted and met with Masimo. JTX-3997; T2-2 at 32-33, 36-38. After the meeting, Apple concluded that Masimo's CEO, Joe Kiani, was the "health/wellness leader" that Apple needed. JTX-394; JTX-59 at -932. Apple executives concluded that Apple was "most clueless" in the field and suggested acquiring Masimo. JTX-316.

In July 2013, Apple hired Masimo's Chief Medical Officer, Michael O'Reilly, to become Apple's VP of Medical Technologies. T9-2 at 62. O'Reilly then told Apple [redacted] JTX-317. By that time, the Apple Watch project had fallen "way behind" and

[1] All emphasis is added unless noted otherwise. Citations to the trial transcript are as follows: T[day]-[volume] at [pages].

Apple concluded its "sensor effort will fail." JTX-335; JTX-336; Dkt. 1636-3 (Mansfield) at 35; T9-1 at 122-123; JTX-400.

In October 2013, Cercacor's Chief Technical Officer, Marcelo Lamego, emailed Tim Cook. JTX-605 at -011. Lamego referenced his decade of experience at Masimo and Cercacor and offered to solve Apple's problems in exchange for a senior technical position at Apple. *Id.* Lamego promised to help Apple "develop a new wave of technology that will make Apple the number one brand in the medical, fitness and wellness device market." JTX-1719 at -061. Cook forwarded the email internally and O'Reilly warned that most of Lamego's knowledge was "confidential information of Cercacor or Masimo." JTX-605; T8-2 at 591, 125. But Apple did not find the warning "valuable or impactful or relevant." Dkt. 1636-1 (Sellers) at Page ID #149194–95, 192.

Apple's "Project Everest" then met to focus on how to respond to Lamego and engage with Masimo. T8-2 at 119; T9-1 at 54-56, 101. Apple thought Masimo might accelerate its watch project. T8-2 at 117; JTX-317; T9-1 at 98, 106. Apple discussed joint development or acquisition of Masimo "or people or assets." JTX-263 at -776.

Rather than work with Masimo, Apple sought to obtain Masimo's technology and business strategies by recruiting Masimo's "people." Apple hired Lamego despite O'Reilly's earlier warnings. JTX-1719; T8-2 at 27-29; T9-1 at 57-58, 125, 126. Far from seeking his general experience, Apple hired him for his "***specialized experience*** that we [Apple] are deeply in need of on current and future N27 [Apple Watch] sensors." JTX-265; T9-1 at 57-58, 63-64; Dkt. 1636-1 (Sellers) at Page ID #149188–89, 82-83.

Apple also pursued a "confidential project" to work on recruiting "the next level down" at Masimo and Cercacor. JTX-2070; T12-1 at 12-14, 29. Apple hired numerous Masimo and Cercacor employees, including at least seven people to work on the Apple Watch project. T12-1 at 16-20. During interviews, Apple declined to hire Masimo employees who did not disclose Masimo's confidential information. JTX-176; T11-1 at 32-34. One interviewer recommended against hiring Cercacor engineer Johannes Bruinsma because [REDACTED] JTX-165. But

Lamego convinced Apple to hire Bruinsma anyway because of his "***exclusive knowledge and experience*** [he] was exposed to while working on [Lamego's] team" at Cercacor. *Id.*; T12-1 at 14-16; T11-1 at 32-35, 63. As explained below, Apple then solicited information from Lamego and O'Reilly after they arrived at Apple.

**2. Apple Acquired Masimo's Trade Secrets By Improper Means**

Substantial evidence shows Apple acquired Masimo's trade secrets by "improper means," including financial inducements, misrepresentation, or breach or inducement of a breach of a duty to maintain secrecy. Cal. Civ. Code § 3426.1(a). For example, Apple used financial inducements to acquire Masimo's trade secrets. [redacted]

T8-2 at 129-130; T9-1 at 64-65. Apple hired O'Reilly as VP with a salary of $425,000, a $100,000 signing bonus, and $2.5 million in stock. T9-2 at 62-63. O'Reilly told Kiani these financial inducements were why he was leaving to join Apple. T2-2 at 38.

Apple also misrepresented Apple's intentions when it engaged in talks with Masimo for a potential business deal. As discussed, Apple told Masimo it was interested in a collaborative relationship. T2-2 at 31-33, 36-37. The parties met. T2-2 at 32-33. But Apple also was recruiting O'Reilly and many others at the same time. *See e.g.*, JTX-507. Internally, [redacted] JTX-58.

Apple also acquired Masimo's trade secrets through breach or inducement of a breach of Lamego and O'Reilly's confidentiality obligations to Masimo. Apple knew that Lamego and O'Reilly owed Masimo confidentiality obligations. T5 at 75, 113-115, 126-129, 135-139; T2-2 at 47; T9-2 at 46-48, 56-57; T8-2 at 76; Dkt. 1636-1 (Sellers) at 154:9-20; JTX-605; JTX-672; JTX-1719; JTX-2937. Apple specifically targeted Lamego and O'Reilly for their "specialized" knowledge from Masimo.

Apple argues Masimo should have satisfied various standards that CUTSA does not require, including fraudulent-intent element of criminal statutes, intent to make a "false statement," or what Apple calls a "current employee" test. Br. 2-3. Apple provides no authority for these legal assertions and they are not supported by CUTSA.

Apple also suggests Masimo was required to show "***intentional*** inducement." Br. 3. Again, CUTSA does not require such intent. Apple also cites *Little v. Amber Hotel Co.,* but that case addressed the unrelated tort of intentionally inducing a breach of contract and never mentions trade secrets. 202 Cal. App. 4th 280, 291 (2011).

**3. Apple "Knew or Should Have Known"**

Apple incorrectly argues Masimo must show an employee ***other*** than Lamego or O'Reilly "knew or should have known" of the misappropriation. Br. 3. But Apple ignores its liability under respondeat superior. *SolarCity Corp. v. Pure Solar Co.*, 2016 WL 11019989, at *5 (C.D. Cal. Dec. 27, 2016); *Navigation Holdings, LLC v. Molavi*, 2020 WL 5074307, at *4; *Alert Enter., Inc. v. Rana*, 2023 WL 2541353, at *3 (N.D. Cal. Mar. 16, 2023); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 755-56 (1998). Ample evidence shows Lamego and O'Reilly knew or should have known they were disclosing and using Masimo's trade secrets. JTX-769, JTX-810, JTX-1597 at -650-654, -664-670; T2-2 at 76 (B1), 82-83 (B2), 86 (B4), 88 (B7), T4 at 127 (Dalke); T3-2 at 53 (Demod), 66-67 (D1), 69 (D3, D10), 105 (L4), 110 (L5); T4 at 57-58 (Poeze); JTX-672.

Apple argues that Lamego and O'Reilly's knowledge of their wrongdoing cannot be imputed to Apple. Br. 3. Apple also claims that Masimo has "not cited a trade secret case supporting" that an employee' knowledge of his wrongdoing "may be imputed to his or her employer." Br. 3 n.2. It is California statutory law that "[a]s against a principal, both principal and agent are deemed to have notice of whatever either has notice of, and ought, in good faith and the exercise of ordinary care and diligence, to communicate to the other." Cal. Civ. Code § 2332. This rule applies to all causes of action, including misappropriation, and all employers, including Apple.

Apple ignores the cases that confirm this rule. For example, *GSI Tech., Inc. v. United Memories Inc*., 2015 WL 5655092, (N.D. Cal. Sept. 25, 2015), denied summary judgment because the employees who previously worked for the plaintiff "knew that they were getting [plaintiff's] secrets." *Id.* at *10. The court relied on the rule that "[a] company is deemed to have notice of any facts its employees or agents 'ought, in good

faith and the exercise of ordinary care and diligence, to communicate to the [company].'" *Id.* (quoting Cal. Civ. Code § 2332).

In another case, after a bench trial, Judge Guilford found corporate defendants "liable for the acts of misappropriation committed by their employees and former employees." *Allergan, Inc. v. Merz Pharms*., 2012 WL 781705, at *12 (C.D. Cal. Mar. 9, 2012). The court found the corporate defendants directly "misappropriated Allergan's trade secrets (a) ***through the acts of the Individual Defendants*** described herein, … ." *Id.* at *13. After finding misappropriation under Section 3426.1(b)(1), the court also found the corporate defendants misappropriated trade secrets under Section 3426.1(b)(2)(A), (B)(i), and (B)(ii). *Id.*

Apple relied on *Carr v. AutoNation Inc*., 2018 WL 288018 (E.D. Cal. Jan. 3, 2018), an outlying case that failed to cite Section 2332. *Id.* Apple cites a quote from *Carr* without disclosing it was from a nearly 50-year-old Ninth Circuit decision. *Id.* at *2. The earlier case, *Droeger v. Welsh Sporting Goods*, 541 F.2d 790 (9th Cir. 1976) held it was error to instruct the jury that "'it was no defense' that [the employee with knowledge of the trade secret] did not inform other [of defendant's] employees of [plaintiff's] concept," because that meant "the jury was no longer free to consider the corporation's defense of subsequent independent invention." *Id.* at 792. *Droeger* essentially rejected "inevitable disclosure" by holding it is inappropriate to assume an employee disclosed or used trade secrets in the absence of actual evidence of misappropriation. That is entirely different than properly attributing to the employer an employee's knowledge that his misappropriation was wrongful.

Apple also cites *Cisco Systems, Inc. v. Chung*, 2023 WL 2622155 (N.D. Cal. Mar. 22, 2023), which recognized that a corporate defendant can be held vicariously liable for misappropriation if its employees "were acting in the scope of their employment when they misappropriated trade secrets." *Id.* at *11. Far from rejecting vicarious liability, the *Cisco* court faithfully applied traditional principles of respondeat superior and found, as a factual matter, that the employees were not acting for their employer's benefit. *Id.*

at *12. The court found no evidence of ratification either. *Id.* Thus, Apple's cases, as well as cases Apple failed to cite, confirm the traditional rule that Apple is liable for trade secret misappropriation by its employees when acting within the scope of their employment, regardless of whether other employees knew about the misappropriation.

Regardless, Masimo did present sufficient evidence for the jury to find an employee ***other*** than Lamego and O'Reilly knew or should have known. As discussed, Apple targeted Masimo employees for their "specialized" knowledge. O'Reilly even warned Apple that most of Lamego's knowledge was confidential. JTX-605 at -010.

Despite the warning, Apple hired Lamego. Hotelling then assigned Lamego to work on the same type of technology Lamego worked on at Cercacor. Within one month of joining Apple, Lamego proposed a list of twenty-five improvements to the Apple Watch. JTX-143. [REDACTED] JTX-297 at -772. Lamego also submitted twelve patent disclosures within six months. JTX-610 at -075 (email); T8-2 at 65. Sufficient evidence exists for a jury to conclude that Apple employees other than Lamego, including Hotelling, knew or should have known Lamego was disclosing Masimo's trade secrets. Indeed, Hotelling knew about O'Reilly's warning, Lamego's prompt suggestions, and Lamego's patent filings. O'Reilly also knew that Lamego's information was confidential to Masimo.

A jury could similarly find that others at Apple meet the "knew or should have known" requirement for O'Reilly. Before hiring O'Reilly, Apple was "clueless" about health monitoring and identified Kiani as "a great example of VP of Medical Technologies at Apple." JTX-316 at -707. Instead of working with Masimo and Kiani, Apple hired O'Reilly for that role. During his interview, [REDACTED] JTX-507. O'Reilly admitted he was trying to impress Apple [REDACTED]. T10-1 at 27. He also admitted Apple hired him for his specialized experience as a "chief medical officer" at Masimo. T9-2 at 61-62. O'Reilly even told Kiani if he "hadn't worked for Masimo, Apple would have never hired [him]." T3-1 at 94.

Apple then instructed O'Reilly to conceal his Apple title and to attend conferences under a fake company name. T9-2 at 69-70. [REDACTED] JTX-526 at 989-990. Masimo presented sufficient evidence for a jury to conclude that others at Apple "knew or should have known" O'Reilly was using and disclosing trade secrets.

**4. Apple's Reliance on Policies and General Denials Is Insufficient**

Instead of addressing Masimo's evidence, Apple relies on company policies and general denials. This is insufficient. *Ochoa*, 2023 WL 2143466, at *2. The evidence as a whole is sufficient for a jury to find in Masimo's favor. Apple also criticizes Masimo's experts for failing to opine on intent. Br. 4. But expert testimony is not required, especially on intent which is for the jury, and in view of the facts discussed.

**B. Masimo Sufficiently Identified The Asserted Trade Secrets**

Apple next argues Masimo failed to identify its trade secrets sufficiently. Br. 6-7. This Court repeatedly rejected that argument. *See, e.g.*, Dkt. 246; Dkt. 1283 at 15-16. Apple complains that Masimo's witnesses testified about the scope and meaning of the trade secrets. *See* Br. 6-7. Apple cites three cases, none of which suggest it is improper for witnesses to offer such testimony. The first is an unpublished Federal Circuit case that addressed a trade secret claim in Delaware that did not require a 2019.210 disclosure. *Olaplex, Inc. v. L'Oreal USA, Inc.*, 855 F. App'x 701, 712 (Fed. Cir. 2021). The second is *Imax Corp. v. Cinema Techs., Inc.* 152 F.3d 1161, 1167 (9th Cir. 1998), which Apple cited previously and this Court determined is directed toward discovery obligations. The third is *InteliClear, LLC v. ETC Global Holdings, Inc.*, 978 F.3d 653 (2020), which supports Masimo. *InteliClear* vacated summary judgment that the plaintiff failed to describe its trade secrets with sufficient particularity. *Id.* at 659. The Ninth Circuit held "***a jury properly instructed can make the determination of what trade secrets exist***, before addressing other elements of the claim." *Id.* at 660.

*InteliClear* mirrors the reasoning in a Northern District case where "[d]efining Plaintiffs' trade secret was a heavily disputed issue at trial." *EnerTrode, Inc. v. Gen.*

*Capacitor Co. Ltd.*, 2019 WL 1715170, at *2 (N.D. Cal. Apr. 17, 2019). The court held that defendants, "of course, may 'argue the weight of the evidence' to the jury ***and dispute the scope of the trade secret***" but did not "impose Defendants' definition of Plaintiffs' trade secret as a matter of law." *Id.* The court observed that "the parties submitted conflicting evidence about the scope of Plaintiffs' trade secret, ***raising a question of fact to be decided by the jury***." *Id.* at *3. The court found that, "given the totality of the evidence introduced at trial, a reasonable jury could have determined that Plaintiffs' trade secret [had the scope advocated by plaintiff and was protectable]." *Id.*; *see also* Dkt. 346 at 60-64 (proposed instructions and supporting argument).

Trade secret cases are not like patent cases, where disputes about the scope or meaning of the claims are resolved by the Court as a matter of law. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362-63 (Fed. Cir. 2008). In trade secret cases, disagreements about the scope or meaning of the trade secrets are argued by the parties and resolved by the jury as questions of fact. *See EnerTrode*, 2019 WL 1715170, at *2-3; *InteliClear*, 978 F.3d at 659-60. Masimo proposes the Court supplement Instruction 19 with the bracketed green text in Appendix A.

**C. <u>Apple Misappropriated the Trade Secrets and was Unjustly Enriched</u>**

**1. <u>Business & Marketing Strategy Trade Secrets ("BTS")</u>**

***First***, Apple argues that Masimo cannot establish possession of the "full scope" of any BTS. Br. 7-8. Apple provides no legal support for such a requirement. This Court recently held a plaintiff can establish partial possession and misappropriation. *See Masimo Corp. v. True Wearables, Inc.*, 2022 WL 17083396, at *10 (C.D. Cal. Nov. 7, 2022). There, the Court found ownership of a trade secret "with respect to pulse rate and oxygen saturation" but not "with respect to perfusion index." *Id.* The Court found misappropriation for the "established portion" of the trade secret. *Id.*

Regardless, Masimo demonstrated full possession through Kiani, O'Reilly and Palmatier. T2-2 at 73-78 (B1), 78-83 (B2), 83-86 (B4), 88-89 (B7), 86-88 (VIA); T6-2 at 15-41 (B1), 41-55 (B2), 55-63 (B4), 63-64 (B7), 65-66 (VIA); T7-1 at 24-25 (B1);

T9-2 at 63-69, 71-72; T10-1 at 25-26 (O'Reilly notebooks returned to Masimo). Apple does not address this evidence.

***Second***, Apple argues the BTS are generally known, relying on testimony from its expert Kivetz and purported concessions by Kiani. Br. 8-9. Apple's challenge lacks documentary evidence of third-party products. Kivetz's only document was JTX-2761, a ***Masimo*** press release. Palmatier explained why JTX-2761 did not disclose Masimo's strategies. T6-2 at 118-119; *see also* T7-1 at 53-55. Kivetz undertook no investigation as to how many people had reviewed that or any other document. *See* T10-2 at 56-57.

Apple argues Kiani conceded that B1 was "captured by longstanding healthcare practices and products." Br. 8. But Kiani discussed products at a high level—not the B1 strategy. *See* T2-2 at 97, 73. Palmatier explained why an outward-facing marketing document or product does not disclose an internal strategy. T7-1 at 53-55. Palmatier never conceded ***any*** element of the BTS was generally known. Rather, he observed the English words could be individually found somewhere. T7-1 at 34. He also explained that each BTS should be evaluated as a whole. *Id.* at 37. He reviewed Apple's asserted documents/products for the "generally known" analysis and opined that no BTS were generally known. T6-2 at 69-72; T7-1 at 51. His analysis thus differs from the expert in *Atmel Corp v. Info Storage Devices, Inc.*, 189 F.R.D. 410, 416-17 (N.D. Cal. 1999), who opined a trade secret was not "generally known" without reviewing documents.[2]

Apple insists the BTS are "combination" trade secrets, so Masimo must show they are effective, successful, valuable, and provide a competitive advantage. Br. 8. No such requirements exist. Indeed, the law does not "require[] that a trade secret be patentably nonobvious or novel." *Imi-Tech Corp. v. Gagliani*, 691 F. Supp. 214, 231 (S.D. Cal. 1986); *see also* Dkt. 1548 at 127-130; Dkt. 1633-1 at 9-11.

***Third***, Apple argues the BTS do not have independent economic value from not

[2] Apple's similar critique of Madisetti (Br. 18) fails for the same reason. Unlike the expert in *Atmel*, Madisetti reviewed numerous documents to come to the affirmative opinion that the technical trade secrets were not generally known. *See infra* III.C.2-5.

being generally known. This ignores Kiani and Palmatier testimony. T2-2 at 76, 82-83, 86-88; *see also* T6-2 at 68-72. Apple assumes that (1) general marketing concepts are known; (2) the BTS are purportedly derived from general marketing concepts; and (3) thus, the BTS necessarily could not have independent economic value. But Kivetz conceded confidential marketing strategies can be created from marketing principles. T10-2 at 47-49; *see also* Dkt. 1636-8 (Nonin) at 160:14-161:3, 161:5-162:7.

***Fourth***, Apple argues Masimo did not make reasonable efforts to maintain secrecy of the BTS because of the iSpO2 press releases. Br. 10. But Palmatier explained why these press releases do ***not*** disclose the BTS. T6-2 at 118-119; *see also* T7-1 at 53-55. Kiani also supported this point. T2-2 at 76.

***Fifth***, Apple argues no reasonable jury could find misappropriation because O'Reilly's notebooks do not disclose the BTS. Br. 10-11. Palmatier never conceded the notebooks fail to disclose the BTS. Rather, he explained they are "consistent with," "supporting," and "reflective of" the BTS. T7-1 at 28. Palmatier also explained how the notebooks mapped onto each BTS. T6-2 at 25-26 (mapping B1 to JTX-487); *id.* at 48-50 (mapping B2 to JTX-489, 493, 488); *id.* at 58-59 (mapping B4 to JTX-487). Palmatier relied on Apple documents and O'Reilly communications to support Apple's use of the BTS. *Id.* at 34-41 (identifying for B1 JTX-534, JTX-1516 at 415, JTX-462 at 839, JTX-462 at 840, JTX-1811 at 562, JTX-126 at 245, JTX-1520 at 882, JTX-459 at 453, JTX-458 at 943, JTX-1521 at 876, JTX-1351); *id.* at 52-54 (identifying for B2 JTX-1578 at 808, JTX-1815 at 457, JTX-1581 at 444, JTX-1814 at 462); *id.* at 61-63 (identifying for B4 JTX-1578 at 808, JTX-1516 at 514, JTX-1581 at 445-446). For B7, Palmatier testified that O'Reilly "shared information that would provide knowledge to Apple of what Masimo's business and marketing strategies were." *Id.* at 64-65 (citing JTX-263, 393, 487, 502, 499, 535). For VIA, Palmatier opined on Apple's acquisition and use. *Id.* at 66-68 (identifying for VIA JTX-499, 502, 507, 535, 1508, 1510, 1512).

For B2, Apple argues [redacted] in O'Reilly's notebook is a well-known "healthcare learning system," that he drew while attending a conference, and that he

presented a similar [redacted] publicly in JTX-529. Br. 10-11. No evidence suggests O'Reilly possessed this [redacted] before learning it at Masimo. O'Reilly had no experience with business and marketing strategies when he joined Masimo. T3-1 at 94. Further, O'Reilly did not testify that he learned the [redacted] at the conference. Apple also ignores the other examples of this [redacted] in O'Reilly's Masimo notebook. T6-2 at 46 (citing JTX-486 at 4769, JTX-487 at 4594, 4607). O'Reilly's testimony that he delivered the entirety of JTX-529 publicly is undermined by the "confidential" label on every page, the minimal time allotted to him at the event, O'Reilly's inability to recall whether he presented all of JTX-529, and the lack of evidence as to the number of attendees. T10-1 at 46-48. Apple also identifies no evidence the presentation rendered B2 generally known. Indeed, both experts testified that JTX-529 did ***not*** describe the entirety of B2. T7-1 at 40-41, 44 (Palmatier); T10-2 at 39-40 (Kivetz).

Apple challenges improper acquisition through O'Reilly. Br. 11. But Apple was "focused on wellness" in August 2013 and [redacted] T6-2 at 67-68 (citing JTX-499, 502, 507). O'Reilly's emails also show [redacted] *See e.g.*, JTX-1578 at -808; *see also* JTX-4394 JTX-377.

Apple argues no reasonable jury could find misappropriation of BTS because [redacted] Br. 11. But Apple targets clinicians for the Apple Watch. T10-1 at 84-85; JTX-1814 (apps "capable of helping medical professionals deliver personalized care."); JTX-1581 ("Our technology helps [healthcare providers] work effectively within hospitals..."); JTX-3166, 1815, 3254. Apple cites JTX-3441 and JTX-3442, but these internal documents are not available to Apple Watch users. Indeed, Waydo conceded people are likely to use Apple Watch in the medical context. T11-2 at 19.

***Finally***, Apple's misappropriation benefitted the blood-oxygen and ECG features in Series 6 and 7. Palmatier explained how Apple used B1 to add ECG and pulse-oximetry features. Br. 7-8. Palmatier explained how O'Reilly redirected Apple to [redacted]

[redacted] When Apple hired O'Reilly, [redacted] *Id.* at 26-41 (B1), 52-54 (B2), 60-63 (B4), and 64-67 (B7). When Apple adopted Masimo's strategies, [redacted]. at 32; T10-1 at 26-29; JTX-502.

Palmatier explained how Apple used B1 and B4 to position "the ECG feature," first added in Series 4 watch and maintained in later watches. T6-2 at 34-37; 61-62. ECG was a result of O'Reilly [redacted] *Id.* at 35. Palmatier analyzed Apple's documents and FDA clearance, which emphasized "sharing with physician" and "going between the consumer and physician." *Id.* at 35-37 (citing JTX-126, 1516, 462, 1811). Palmatier explained how Apple [redacted] *Id.* at 61-62 (citing JTX-1516).

Palmatier then explained how Apple used B1 to position the blood-oxygen feature in the Series 6 and later watches. *Id.* at 37-41. He explained Apple documents seeking to [redacted] *Id.* at 38. [redacted]" *Id.*; JTX-458, 459, 1520, 1521; JTX-385C (Apple set 90% target for two background readings per day, but achieved only 37%); JTX-736 (released blood oxygen for consumer use because users "would switch from Fitbit to Apple Watch" during "the chaos of COVID-19" because "many are looking into buying a blood oxygen monitoring device"). Palmatier explained how Apple's press release for blood oxygen leveraged Apple's FDA-approved ECG feature to suggest blood oxygen was accurate and reliable. *Id.* at 39 (watch was "already a powerful health tool" due to ECG "and now" Apple added

"another valuable health measurement" with blood oxygen).

**2. Apple Misappropriated L4 and Was Unjustly Enriched**

***First***, Apple argues Masimo did not show possession of the L4 [REDACTED] " Br. 12. But Diab and Poeze testified that Masimo [REDACTED] Indeed, Warren conceded that Diab's testimony shows [REDACTED] T12-2 at 31-32. [REDACTED]

[REDACTED] Thus, even if Masimo had not presented sufficient evidence on that option, Masimo could still show misappropriation of the other option. *See True Wearables*, 2022 WL 17083396, at *10.

***Second***, Apple argues L4 does not have independent economic value from not being generally known. Br. 12. But Madisetti opined L4 was not generally known for numerous reasons, including that Masimo developed L4 over years of experimentation. T7-2 at 7-15. [REDACTED]

[REDACTED]

[redacted]

Apple argues Warren identified Masimo patents discussing light piping. Br. 12-13. But Madisetti explained these references do not disclose L4. T12-2 at 67-70. Apple assumes the patents disclose [redacted] Br. 13. But Apple offers n[redacted] basis to make such an assumption. And Madisetti disagreed with Warren. T12-2 at 67-70. [redacted]

Apple also argues that Masimo did not take reasonable efforts to maintain secrecy. But Diab and Scruggs testified that Masimo keeps L4 confidential. T3-2 at 105; T5-1 at 53. Masimo marks the documents describing L4 "Confidential and Proprietary." JTX-935, 936, 937. And Masimo presented robust evidence on its reasonable efforts to maintain the secrecy of its confidential information. T2-2 at 18-19 (Kiani); T3-2 at 10-13, 15-16, 58 (Diab); T4 at 126-127 (Dalke), 55-59 (Poeze); T5 at 61-75, 79-80, 89 (Muhsin), 104-115 (Miller), 125-132, 136-139 (Hammarth); T9-2 at 70-71 (O'Reilly); JTX-485, 769, 828, 2217, 2263, 2266, 2388, 2561, 2563, 2564.

***Third***, Apple argues that Lamego had nothing "to do with Apple's later decision to modify" its [redacted]. Br. 13-14. But the evidence shows Lamego's involvement [redacted]. *See* JTX-1063 at -845, -859. Apple offered no other document explaining another reason [redacted] T7-2 at 10-13. This evidence supports Madisetti's opinion that Apple misappropriated L4. T7-2 at 10-15.

Further, Lamego identified [redacted]. T8-2 at 44-45; JTX-143. Apple

cites a Masimo patent to argue [redacted] Br. 13. JTX-143 at -568. But, as Madisetti explained, [redacted] T12-2 at 90; JTX-3707 at Abstract. Madisetti explained, that unlike the patent, Lamego's recommendation [redacted] T12-2 at 90-92, 96; JTX-143 at -568, JTX-1063 at -845, -859.

***Fourth***, substantial evidence shows Apple uses the L4 [redacted] JTX-1063 at -859; T12-2 60-63, 124-125. As Madisetti explained, Land confirmed during a trial deposition that [redacted] T12-2 at 60. Further, Apple's documents reveal that [redacted] JTX-1068 at -789, -798-99, 814, 816-17. Thus, Apple [redacted] T7-2 at 12-14. This is sufficient evidence for a jury to conclude that Apple misappropriated L4.

***Finally***, Apple's misappropriation benefitted the blood-oxygen feature in Apple's Series 6 and 7 watches. Diab explained that [redacted] T3-2 at 71, 74-77, 104, 105, 114. Kiani explained that the wrist is a challenging location for measurements because it has fewer vascularized capillaries than the finger. T2-2 at 54. Diab explained that, as a result, it is vitally important to reduce signal noise, including noise due to crosstalk. T3-2 at 27-32; 78-100. Diab explained that [redacted] T3-2 at 71, 74-77, 104-05, 114. Apple used L4 to [redacted]

Madisetti explained the significant benefit Apple realized by using L4. T7-2 at 11-12. As explained above, Madisetti confirmed Apple used L4 to [redacted]

[redacted]. T7-2 at 12-13; JTX-1061 at -718; JTX-1063 at -859; *see also* T12-2 at 60-62; JTX-1068 at -789, -798-99, -814, -816-17. As Madisetti explained, light piping "becomes even more critical" for pulse oximetry. T7-2 at 14; *see also* JTX-1078 at -632. Madisetti confirmed that, for Series 6 and 7, [redacted] T7-2 at 14.

### 3. Apple Misappropriated L5 and Was Unjustly Enriched

***First***, Apple argues Masimo "[redacted] Br. 14. Apple cites no authority holding that Masimo must possess every possible solution. Regardless, as Madisetti explained, Masimo's [redacted] T7-1 at 19-22; T7-2 at 56-57. [redacted] T5 at 33-36, 42-43. The evidence precludes JMOL that L5 was generally known or a "general category."

***Second***, Apple argues it "implemented a different solution." Br. 15. But the trade secret is not limited to a particular solution. [redacted]. T12-2 at 71-73, 21-23; JTX-181 at -767. [redacted]-185 at -173; JTX-541.

***Third***, Apple argues L5 lacks independent economic value from not being generally known. [redacted]-2 at 31. Apple relies on Warren's testimony about various references. Br. 16. But Apple ignores Warren's concessions and Madisetti's rebuttal addressing the references. T12-2 at 32-37, 74-77. Apple also argues Masimo's patents confirm L5 was generally known. Br. 16. But Dalke and Madisetti explained the patents do not disclose L5. T5 at 22-24, 38-41, 43-44; T12-2 at 76-77.[redacted]

[redacted]. T5 at 22-25; JTX-4233. And, as described [redacted].

***Fourth***, Apple argues Masimo did not take reasonable efforts to maintain the secrecy of L5. As discussed above, Masimo's efforts were robust.

***Finally***, Apple's misappropriation of L5 benefited the blood-oxygen feature in Series 6 and 7. [redacted] T2-2 at 54; T3-2 at 27-32; 78-100, 107-109. Apple benefitted from using L5. T7-2 at 26-30. Apple identified L5 as "must have" feature. T7-2 at 26; JTX-185 at -836. [redacted] T7-2 at 28-30; JTX-184 at -173; JTX-185 at -836.

After Lamego left Apple, Apple engineer Dong Zheng described [redacted] T7-2 at 26-28; JTX-541.

**4. <u>Apple Misappropriated D1, D3, and D10 and Was Unjustly Enriched</u>**

***First***, Apple argues Masimo has not established that it possesses D1 and D10. Br. 17. Masimo presented ample evidence of possession. T3-2 at 34:12-20, 38:18-40:3, 41:2-42:19, 48:5-50:7, 50:18-51:22, 52:11-20, 53:25-54:17, 55:22-56:8, 60:15-62:2, 62:9-66:21 (Diab); T4 at 61:13-64:23, 65:9-70:12, 70:13-71:17, 73:18-80:25, 81:1-82:7 (Poeze); T7-2 at 34:22-41:14, 47:17-49:18, 51:9-54:12, 61:14-67:22 (Madisetti); T8-1 at 66:19-67:5 (Madisetti); T12-2 at 82:19-83:14; JTX-798, 811, 827, 827, 828, 831, 832, 831, 832, 784. And even Apple does not argue Masimo did not possess D3.

Apple argues Masimo did not possess [REDACTED] Br. 17. But Apple ignores Madisetti's opinions. *See* T7-2 at 34-41. [REDACTED]. T4 at 81; T7-2 at 47-48.

Apple next argues that Masimo failed to show it possesses D10's eighth and ninth steps. Br. 17. [REDACTED] T4 at 79-84.

***Second***, Apple argues no reasonable jury could find the demodulation trade secrets have independent economic value from not being generally known. Br. 17-18. Apple presented no evidence that D10 was generally known and Apple's expert conceded no reference showed what Sarrafzadeh labeled D3[c]. T11-2 at 114. Madisetti also explained why the demodulation trade secrets are not generally known. T7-2 at 38, 44-45, 47, 49-51, 58-60, 71-72; T12-2 at 79-82. And Lamego thought D1 was "not obvious." JTX-828; *see also* T3-2 at 62-66 (Diab); T7-2 at 37-39 (Madisetti). Madisetti also explained the flaws in Sarrafzadeh's analysis. T7-2 at 47; T12-2 at 54-55, 79-81.

***Third***, Apple argues no reasonable jury could find that Apple misappropriated the demodulation trade secret. Br. 18. But Madisetti explained documents showing Lamego disclosed the entirety of D1 (JTX-161) and D3 (JTX-154) to Apple. T7-2 at 41-69; JTX-795. Apple also ignores Madisetti's explanation that Masimo committed D10 to writing in [REDACTED] years before the '754 patent. T7-2 at 67-68; T8-1 at 66-67.

Apple argues the demodulation trade secrets were not used in the Apple Watch. But Apple used the demodulation trade secrets to [redacted] T7-2 at 69-70. Apple's witnesses provided evidentiary support for Madisetti's analysis. T8-2 at 41-57 (Lamego); T11-1 at 124; T11-2 at 10, 19; Dkt. 1636-10 (Bokma) at 55, 81, 96; Dkt. 1636-11 (Fu) at 113-116, 121-126, 130-132, 147-148, 161; Dkt. 1636-12 (Kanaris) at 18, 41; JTX-142, 14, 143, 851, 161, 162, 1262, 140, 153, 238, 412, 415, 880, 851.

***Finally***, Apple's misappropriation benefitted the blood-oxygen feature in Apple's Series 6 and 7 watches. Diab explained the advantages of using Masimo's trade secrets [redacted] T3-2 at 48-50, 52-53, 68, 70. Madisetti explained the benefit Apple realized by using D1, D3, and D10. JTX-143. Apple used D1, D3, and D10 [redacted]. JTX-153. Apple engineer Kanaris [redacted] Dkt. 1636-12 (Kanaris) at 27-29; JTX-153, 273; *see also* T7-2 at 42-46, 56-57, 69-70. By using D1, D3, and D10, Lamego helped Apple [redacted]

**5. <u>Apple Misappropriated VIA and Was Unjustly Enriched</u>**

Apple argues Madisetti did not show Masimo possessed VIA for the technical trade secrets. But Madisetti explained that Masimo understood the VIA of using these trade secrets to make accurate and reliable sensors. T7-2 at 72-74. Diab, Dalke, and Poeze testified that Masimo possessed these trade secrets and that others in the industry do not. T3-2 at 104-105; T4 at 61-85, 140-141.

Apple argues it did not misappropriate VIA for the technical trade secrets. Br. 19. [redacted]-143 at -836; JTX-185 at -568. T7-2 at 23-26, 28, 41,

73-74 . Apple misappropriated the VIA by using the technical trade secrets to develop the Apple Watch. T7-2 at 72-75.

Apple asserts Palmatier did not analyze why VIA of BTS was not generally known or whether Masimo took reasonable efforts to protect its secrecy. Br. 19. But O'Reilly, while at Apple, [REDACTED] T6-2 at 66-68; *see also* JTX-487, 499, 502, 507, 535; JTX-1508, 1510, 1512. Palmatier testified VIA had independent economic value from not being generally known. T6-2 at 69-72. Further, as explained above, Masimo submitted robust evidence that Masimo took reasonable efforts to maintain the secrecy of its confidential information. *See supra* III.C.2; *see also* T6-2 at 10:1-11:13 (Palmatier).

Finally, Apple derived significant value from misappropriating Masimo's VIA trade secret. *See* T2-2 at 32-36, 87-88; T6-2 at 67-68; T7-2 at 74; T8-2 at 113, 116-119; JTX-143 at -568; JTX-185 at -836; JTX-259 at -783; JTX-260 at -109; JTX-263, 317, 487, 499, 502, 507, 535, 1508, 1510, 1512, and 2353.

## D. Masimo's Claim For Trade Secret Misappropriation Is Timely

"An action for misappropriation must be brought within three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered." Cal. Civ. Code § 3426.6. A plaintiff should have discovered misappropriation "when there is reason to suspect that a trade secret has been misappropriated, and a reasonable investigation would produce facts sufficient to confirm this suspicion (and justify bringing suit)." *Hays v. VDF Futureceuticals, Inc.*, 2016 WL 5660395, at *3 (D. Haw. Sept. 28, 2016). "[A] suspicion that [trade secrets] theoretically could be shared provides an insufficient basis for filing a trade secret misappropriation claim." Dkt. 606 at 7 (citing *Cypress Semiconductor Corp. v. Superior Ct.*, 163 Cal. App. 4th 575, 587, (2008)).

### 1. The Time To Bring A Claim Runs Separately For Each Trade Secret

Apple argues a single misappropriation triggers the statute of limitations for all

asserted trade secrets. Br. 19. The Court already resolved this issue by listing each trade secret separately for Apple's defense on the verdict form. Regardless, the time to bring a claim begins to run as to other trade secrets only if "they are related." *MedioStream, Inc. v. Microsoft Corp.*, 869 F. Supp. 2d 1095, 1110 (N.D. Cal. 2012) (collecting cases); *see also, Forcier v. Microsoft Corp.*, 123 F. Supp. 2d 520, 526 (N. D. Cal. 2000); *HiRel Connectors, Inc. v. U.S.*, 465 F. Supp. 2d 984, 988 (C.D. Cal. 2005); *Intermedics, Inc. v. Ventritex, Inc.*, 822 F. Supp. 634, 654 (1993). For the same reason, any alleged "inquiry notice" as to O'Reilly's misappropriation does not trigger the same for Lamego.

Apple argues the trade secrets in this case are related because they were all "used to develop and market the same Apple Watch feature—Blood Oxygen." Br. 19. Just because trade secrets were used to "develop and market" blood oxygen does not mean they are related. The technical trade secrets concern different technologies and address different problems, albeit with overlapping application. *See, e.g.*, T3-2 at 26-27, 70-71, 106-108. The BTS have no overlapping subject matter with the technical trade secrets. As such, the statute-of-limitation defense applies separately for at least each category.

Apple also argues the trade secrets are related because Masimo seeks recovery of the same award for Apple's unjust enrichment regardless of which trade secret Apple misappropriated. That Apple derived the same benefit from its misappropriation of each trade secret does not mean that the trade secrets are related.

**2. <u>Masimo Did Not Discover Misappropriation Before January 9, 2017</u>**

Masimo did not discover Apple's misappropriation until after January 9, 2017. Kiani testified that he learned Lamego shared Masimo trade secrets with Apple when he saw a Lamego Apple patent in October 2019 that included Masimo's trade secrets. T2-2 at 49-50; T3-1 at 61-62. Before October 2019, Kiani believed Lamego "had not spilled our confidential information" because Cristiano Dalvi, a friend of Lamego, assured Kiani that Lamego "left [Apple] when Apple asked him to do something competitive to [Masimo]." *Id.* Kiani did not know of any Lamego Apple patent before October 2019. T3-1 at 95. Apple presented no contrary evidence. Br. 21.

**3. Masimo Could Not Have Discovered Apple's Misappropriation Before January 9, 2017**

Contrary to Apple's arguments, the evidence does not show Masimo had reason to suspect misappropriation occurred before January 2017 or that a reasonable investigation would have revealed facts sufficient to bring suit.

**a. Masimo Had No Reason To Suspect Misappropriation**

Apple argues a September 2014 email from a Masimo executive to O'Reilly shows Masimo knew O'Reilly retained his Masimo notebooks and they contained Masimo confidential information. Br. 21 (citing JTX-4393). No evidence suggests Masimo knew the notebooks contained confidential Masimo information, much less that Apple misappropriated such information. Indeed, Kiani saw the notebooks for the first time when they were returned to Masimo during this litigation. T3-1 at 105.

Apple argues Masimo knew of Apple's misappropriation because Masimo sent a letter to Apple about Lamego. *See* JTX-2937; T8-2 at 130. This Court found the letter insufficient. Dkt. 606 at 3. And Masimo sent the letter before Lamego started at Apple, so Masimo could not have suspected misappropriation already occurred.

So Apple now "combines" the letter with Kiani's testimony that Lamego left Apple when Apple "asked him to do something competitive to [Masimo]" to argue Kiani had reason to suspect misappropriation. Br 21-22. But Kiani understood Lamego "***had not spilled*** our confidential information." T2-2 at 50. Apple argues Kiani's "mistaken belief does not toll the statute of limitations." Br. 22 n.9. Apple's cases are inapplicable because the plaintiffs there ***had discovered*** the misappropriation and thought the defendant "would desist" or "had gone out of business." *Glue-Fold*, 82 Cal. App. 4th at 1024-25; *Forcier*, 123 F. Supp. 2d at 526. Here, Masimo did not suspect misappropriation had already occurred. T2-2 at 50-51; Dkt. 296-1 ¶ 262.

Finally, Apple relies on the March 2016 '052 patent publication. Br. 22. But that publication does ***not*** disclose the trade secrets. Apple identifies no evidence that it published Masimo's trade secrets before January 2017. Apple merely asserts the patent

publication could show Lamego worked on physiological measurements at Apple. Br. 22. But that does not show Masimo would have reason to suspect misappropriation.

**b. Masimo Could Not Have Learned Facts Sufficient to Sue**

Apple ignores the second requirement: that "a reasonable investigation would produce facts sufficient to confirm this suspicion (and justify bringing suit) . . .." Dkt. 606 at 3 (quoting *Hays*, 2016 WL 5660395 at *3). The record includes ***no*** evidence that Masimo could have learned facts sufficient to bring suit before 2017. For example, all but one of the Apple patents at issue published in 2018 and 2019, and the remaining patent did not disclose Masimo trade secrets. JTX-1239, 1241, 1262, 1268, 1269. O'Reilly [REDACTED] and attended trade shows under a fake company name. *See e.g.,* JTX-526; T9-2 at 69-70. Apple points to no public disclosure of Masimo's trade secrets. Thus, no investigation would have revealed facts sufficient to justify bringing suit.

**4. Apple Bears The Burden Of Proving Its Defense**

Because California adopted a statutory discovery rule for CUTSA, the burden of proving the statute-of-limitations defense falls on the defendant. *See* Dkt. 1637 at 1-3.

**E. Masimo's Unjust Enrichment Claim Is Well Supported**

Masimo may recover for "unjust enrichment caused by misappropriation." Cal. Civ. Code § 3426.3(a). Masimo has the initial burden to show Apple's sales. Restatement (Third) of Unfair Competition § 45 cmt. f. Apple then has the burden to prove any benefit not reasonably attributed to its misappropriation, as well as its reasonable expenses. *Id.*; *Micro Lithography Inc. v. Inko Indus.*, 1991 WL 332053, at *1 (Cal. Ct. App. Apr. 9, 1991) (unpublished); *BladeRoom Grp. Ltd. v. Emerson Elec. Co.*, 331 F. Supp. 3d 977, 988 (N.D. Cal. 2018).

**1. Masimo Exceeded Its Burden On Unjust Enrichment**

Kinrich analyzed Apple's revenue and costs to calculate Apple's profits on Series 6 and 7 watches. T8-1 at 84-85, 87-92. He then apportioned out some of Apple's profits unrelated to Apple's misappropriation. He did so by comparing Apple's profit on the

Series 6 and 7, which include blood oxygen and ECG, to Apple's profit on Series SE, which was sold simultaneously with the Series 6 and 7 but lacked those features. *Id*. Finally, he valued the blood-oxygen and ECG features by determining how much of the profit difference between Series 6-7 and Series SE was attributable to the blood-oxygen and ECG features.[3] *Id*. at 83, 92-106. This more than satisfies Masimo's burden.

**2. <u>Apple's Misappropriation Benefitted the Blood-Oxygen and ECG Features In The Series 6 And 7 Watches</u>**

Apple argues Masimo did not show ***all*** profits from blood oxygen or ECG were caused by Apple's misappropriation. Br. 25. But a "trade secret need ***not*** be the ***sole*** source of a defendant's profits where a plaintiff has shown some causal nexus." *Digital Envoy, Inc. v. Google, Inc.*, 2005 WL 2999364, at *5 (N.D. Cal. Nov. 8, 2005); *see also Patriot Rail Corp. v. Sierra R.R.* Co., 2015 WL 4662720, at *8-9 (E.D. Cal. Aug. 5, 2015) (a "reasonable jury could [have] conclude[d] that Patriot's acts were a 'substantial factor in . . . causing Patriot to be unjustly enriched'"). Apple's reliance on *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 399 F. Supp. 2d 1064, 1076-77 (N.D. Cal. 2005), is misplaced. Unlike Kinrich's opinion here, the plaintiff's damages computation in *O2 Micro* depended on the defendant misappropriating ***all*** trade secrets. *Id.* at 1076.

Apple also argues Masimo failed to show "any profits attributable to the ECG or Blood Oxygen features were '***caused by***' the alleged misappropriation." Br. 22 (emphasis in original). Not so. As explained above, Masimo showed how Apple's misappropriation was a substantial factor in causing Apple to be unjustly enriched. Substantial evidence shows the blood-oxygen feature in Series 6 and 7 watches benefited from Apple's misappropriation of D1, D3, D10, L4, and L5, and the blood-oxygen and ECG features benefited from BTS and VIA. *See supra* §III.C. Masimo addresses

---

[3] In a footnote, Apple argues Kinrich's analysis "would fail as a matter of law" because Kinrich did not account for other differences between the Series 6 and 7, and Series SE. Br. 24 n.11. Apple cites no law and does not explain its argument. Regardless, Kinrich fully explained why he apportioned to three key differences. T8-1 at 92-103. At most, Apple raises a factual dispute for the jury.

Apple's additional critiques on each trade secret below.

***Demodulation***. Apple argues that D1, D3, or D10 are not [redacted] Br. 24. But a trade secret need not be [redacted] for Apple to benefit from its misappropriation. *InfoSpan, Inc. v. Emirates NBD Bank PJSC*, 2015 WL 13357646, at *7 (C.D. Cal. May 6, 2015) (research and development constitutes use). Here, Apple benefited from its use of D1, D3, and D10 [redacted]. *See supra* §III.C.4.

Apple argues Kiani somehow "confirmed" Apple destroyed the secrecy of D10 by publishing the '754 Patent. Br. 26. But a defendant "cannot rely on his own improper postings to support the argument that the [plaintiff's] documents are no longer secrets." *Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 923 F. Supp. 1231, 1256 (N.D. Cal. 1995). Apple cannot benefit from its own malicious act.

***Light Propagation***. Apple argues it derived no benefit from L5 based on testimony from its own engineer. Br. 25. As discussed above, Masimo presented significant evidence to the contrary. Apple cannot obtain JMOL by pointing to a contested issue of fact. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000)) ("The court 'must disregard all evidence favorable to the moving party that the jury is not required to believe.' . . . 'the court should give credence to the evidence favoring the nonmovant.'").

***BTS***. Apple argues Palmatier discussed ECG for B1 only. Br. 26. Apple ignores that B2, B4, B7, and VIA build on B1. Apple's benefit from ECG and pulse oximetry from B1 applies to the other BTS and VIA. Palmatier also testified about Apple's use of B2 and B4 to position and market its products. T6-2 at 53-54, 61-63. For example, Apple advertises the ECG feature for [redacted] and discusses how to make healthcare [redacted]-1581 at -447-48. Apple marketing explains that [redacted]

JTX-1815 at -457; *see also* JTX-1814. Palmatier also explained how Apple used B7, which is the knowledge that Masimo was pursuing these particular strategies. T6-2 at 63-65.

Apple argues Palmatier discussed ECG regarding only Series 4. Br. 26. Palmatier did ***not*** limit his analysis to Series 4. T6-2 at 35, 37-38. Instead, he analyzed the ECG feature, which "is available on Apple Watch Series 4 and later (not including Apple Watch SE) …." *See* JTX-1520 at -900 (Series 6 advertisement); *see also* JTX-1516.

Apple also argues Masimo cannot recover for unjust enrichment after Masimo "publicly disclosed B1, B2, and B4 in press releases." Br. 27. But Palmatier testified that no Masimo press release revealed B1, B2, or B4. T6-2 at 107-122; T7-1 at 51-59.

**F. <u>The Jury Should Decide If Misappropriation Was Willful or Malicious</u>**

Apple argues that no reasonable juror could find by clear and convincing evidence that Apple acted willfully and maliciously. Br. 27. First, Masimo need only show willful and malicious misappropriation by a preponderance of the evidence. *See Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101 (9th Cir. 2011) (rejecting "heightened quantum of proof" for trade secret punitive damages). Regardless, Masimo's evidence discussed above satisfies either standard. *See supra* §III.A.

Second, Apple contends Masimo failed to show malice. Br. 27 (citing *Ajaxo*, 135 Cal. App. 4th at 66-67). But *Ajaxo* declined to grant JMOL on willful and malicious misappropriation when evidence showed defendant "acted with a willful and conscious disregard for the rights of others." *Ajaxo*, 135 Cal. App. 4th at 67. Apple acted willfully and with a conscious disregard for Masimo's rights. *See supra* §III.A.

**G. <u>Masimo Established Its Patent Inventorship and Ownership Claims</u>**

**1. <u>Correction of Inventorship</u>**

**a. <u>Diab Contributed to '095 and '390 Patents</u>**

Diab testified that he created the analog front end subject matter at Masimo. *See* T3-2 at 20-34; JTX-1267; *see also* T2-1 at 100-114 (Kiani); T2-2 at 6-17 (Kiani). Diab testified that Lamego had no understanding of noninvasive physiological monitoring

when he first joined Masimo, Diab worked daily with Lamego, and Diab explained everything about Masimo's technology to Lamego, including after he returned to Masimo. *See id.* at 43-44, 53-70; JTX-908, 782, 828. Madisetti's opinions and analysis of the evidence regarding the analog front end subject matter confirmed that Lamego learned of this subject matter and made his contribution to the '095 and '390 Patents while employed by Masimo and Cercacor. *See* T7-2 at 82-86; JTX-1267, 1268, 1269, 1206, 1239, 1241.

Apple makes two arguments. First, Apple argues that Diab's prior publications establish a contribution to the prior art, but are insufficient to make him a joint inventor. Br. 29. This argument inaccurately asserts that an inventor's contributions cannot be in the prior art. Diab can be a co-inventor even if he "placed his contribution in the prior art more than one year before" making his contribution. *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1351 (Fed. Cir. 1998) (contrary argument "is mistaken"); *see also Dana-Farber Cancer Inst., Inc. v. Ono Pharm. Co.*, 964 F.3d 1365, 1372-73 (Fed. Cir. 2020). Second, Apple argues that Hotelling testified the inventive work occurred at Apple. Br. 29. Hotelling may know that *his* work with Lamego occurred at Apple, but Hotelling has no idea where or when Lamego's inventive work occurred.

**b. Diab Contributed to '052 and '670 Patents**

Lamego was exposed to use of reflectors and reflective surfaces in sensors to increase the signal while employed by Masimo and Cercacor. *See* T3-2 at 87-88 (Diab), 102-104, 111-113; JTX-343, 777, 1227, P-0005.

Apple's witness, Ness, testified that the subject matter of the '052 and '670 Patents is "various ways to use reflective treatment on the back of the Apple Watch in order to improve the accuracy of the heart rate sensor." T11-1 at 94; *see also, id.* at 107-108; JTX-47, 48. Ness further testified that Lamego alone contributed the "initial idea to use reflectivity on the back of the Apple Watch." *Id.* at 95, 98-99, 105-108; JTX-40. Lamego disclosed this idea in February 2014, immediately after Lamego joined Apple and before Lamego had any interaction with Ness or his team. *Id.* at 105. Madisetti

explained how the evidence regarding reflectance indicates Lamego learned of his contribution to the '052 and '670 Patents while employed by Masimo and Cercacor. *See* T4 at 76, 79-82; JTX-1910 at -669, JTX-1227 at -574, JTX-777, JTX-1206 at -622, -650, JTX-1207 at -694, -7008, -7010.

Apple first repeats the false assertion that inventive contributions cannot be in the prior art. Br. 29-30. Apple then appears to make an unsupported claim construction argument that the "reflector" and "reflective layer" must be "separate from" the housing. Br. 30. Regardless, Ness explained that Lamego's contribution was the "idea to use reflectivity on the back of the Apple Watch." If this contribution was sufficient to make Lamego an inventor, then teaching that idea to Lamego is sufficient to make Diab an inventor. Ness's testimony that Lamego disclosed reflectivity to him at Apple is irrelevant to where or when Lamego learned about reflectivity. Ness's description that Lamego contributed the idea of using reflection within days of starting at Apple confirms Lamego brought the idea from Masimo. *See* T11-1 at 105-106.

**c. Poeze Contributed to '754 Patent**

Poeze testified that he and Lamego created subject matter claimed in the demodulation patent when they created the algorithm for the [REDACTED] at Cercacor. T4 at 61-71, 73-81 (Poeze); *id*. at 81-82, *id.* at 83-85; T3-2 at 42, 48-56 JTX-1262. Poeze's laboratory notebooks and Poeze's code confirm his testimony. *See* JTX-831, 832. Madisetti's opinions and analysis of the evidence regarding [REDACTED] and the '754 Patent confirmed that Lamego's inventive work took place at Cercacor. *See* T7-1 at 81-82; T7-2 at 62-69, 77-79, 106-107. Madisetti testified that Masimo and Cercacor should be at least co-owners regardless of whether Poeze is added as an inventor. *Id.* at 78.

Apple makes three arguments. First, Apple disputes, without record citation, whether Poeze's lab notebook includes all the claim limitations. Br. 28. That is, at best, arguing the weight of the evidence. It is also irrelevant because Apple does not dispute that Poeze's code corroborates the testimony. Br. 28. Second, Apple argues that Poeze's

implementation of Lamego's ideas does not rise to the level of inventorship. Br. 28. The relative weight to be given to Lamego's ideas and Poeze's implementation is a question of fact for the jury. *See* T4 at 115-116. Moreover, Poeze's testimony confirmed Lamego made his inventive work as a Cercacor employee, and therefore owed an obligation to assign. *See id.* Apple claims Hotelling offered "unrebutted testimony" that the work leading to the patent occurred at Apple. Hotelling is not even a named inventor. Moreover, Hotelling may know that his discussions with Lamego occurred at Apple, but Hotelling has no idea where or when Lamego's inventive work occurred. Apple failed to rebut Masimo's evidence. Third, Apple argues that Poeze did not communicate with Lamego at Apple. Br. 28. That is irrelevant because they communicated at Cercacor. Apple also established that Poeze does not know whether his contributions mean he should be named as an inventor under the patent laws. *See id.* at 113. That is irrelevant. Poeze explained his technical work in detail.

### 2. Masimo and Cercacor Are Co-Owners of the Disputed Patents

Masimo and Cercacor established ownership of the five Apple patents for two independent reasons. First, Masimo and Cercacor co-own any patent on which Diab or Poeze is added as an inventor. Second, regardless of any change in inventorship, Lamego's inventive work for each patent took place while he was under an obligation to assign to Masimo or Cercacor. Diab, Lamego, and Poeze had an obligation to assign to Masimo or Cercacor any rights in the patents. *See, e.g.*, T5 at 136-138, T7-1 at 81-82, 76-77; T3-2 at 12-13; JTX-2981.1; T4 at 55-57; JTX-1309, 1677; T5-2 at 104-109; JTX-808, 810; JTX-769, 2263, 2266, 2388; T7-2 at 79-86; JTX-1239, 1241, 1262, 1268, 1269. Thus, a reasonable jury could conclude that Masimo and/or Cercacor are co-owners of the Disputed Patents.

## IV. CONCLUSION

For the reasons set forth above, the Court should deny Apple's request for JMOL.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: April 24, 2023

By: */s/ Daniel P. Hughes*

Joseph R. Re
Stephen C. Jensen
Sheila N. Swaroop
Brian C. Horne
Irfan A. Lateef
Benjamin A. Katzenellenbogen
Brian C. Claassen
Stephen W. Larson
Mark D. Kachner
Adam B. Powell
Kendall M. Loebbaka
Daniel P. Hughes

Attorneys for Plaintiffs
MASIMO CORPORATION and
CERCACOR LABORATORIES, INC.

57461440