MARK D. SELWYN, SBN 244180
  mark.selwyn@wilmerhale.com
THOMAS G. SPRANKLING, SBN 294831
  thomas.sprankling@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Tel.: 650.858.6000 / Fax: 650.858.6100

JOSHUA H. LERNER, SBN 220755
  joshua.lerner@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
One Front Street, Suite 3500
San Francisco, CA 94111
Tel.: 628.235.1000 / Fax: 628.235.1001

[Counsel appearance continues on next page]

*Attorneys for Defendant Apple Inc.*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

| | |
|---|---|
| MASIMO CORPORATION, a Delaware corporation; and CERCACOR LABORATORIES, INC., a Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>APPLE INC., a California corporation,<br><br>Defendant. | CASE NO. 8:20-cv-00048-JVS (JDEx)<br><br>**APPLE'S SUPPLEMENTAL RULE 50(B) MOTION OF NO UNJUST ENRICHMENT**<br><br>No hearing set.[1] |

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

---

[1] Pursuant to this Court's Rule 50(b) order, "[t]he court will decide at a later time whether to hold further oral argument on the unjust enrichment causation issue." Dkt. 1901 at 16 n.4.

1  AMY K. WIGMORE, *pro hac vice*
     amy.wigmore@wilmerhale.com
2  WILMER CUTLER PICKERING
     HALE AND DORR LLP
3  2100 Pennsylvania Ave NW
   Washington, DC 20037
4  Tel.: 202.663.6000 / Fax: 202.663.6363

5

6  JOSEPH J. MUELLER, *pro hac vice*
     joseph.mueller@wilmerhale.com
7  SARAH R. FRAZIER, *pro hac vice*
     sarah.frazier@wilmerhale.com
   WILMER CUTLER PICKERING
8    HALE AND DORR LLP
   60 State Street
9  Boston, MA 02109
   Tel.: 617.526.6000 / Fax: 617.526.5000
10
   NORA Q.E. PASSAMANECK, *pro hac vice*
11   nora.passamaneck@wilmerhale.com
   WILMER CUTLER PICKERING
12   HALE AND DORR LLP
   1225 Seventeenth Street, Suite 2600
13 Denver, CO 80202
   Tel.: 720.274.3152 / Fax: 720.273.3133
14
   BRIAN A. ROSENTHAL, *pro hac vice*
15   brosenthal@gibsondunn.com
   GIBSON, DUNN & CRUTCHER LLP
16 200 Park Avenue
   New York, NY 10166-0193
17 Tel.: 212.351.2339 / Fax: 212.817.9539

18 KENNETH G. PARKER, SBN 182911
     ken.parker@haynesboone.com
19 HAYNES AND BOONE, LLP
   660 Anton Boulevard, Suite 700
20 Costa Mesa, CA 92626
   Tel.: 650.949.3014 / Fax: 949.202.3001
21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

ARGUMENT ............................................................................................................... 2

I.     PLAINTIFFS' ASSERTION THAT THE PURPORTED SECRETS ARE "CRITICAL" TO THE BLOOD OXYGEN FEATURE RESTS ON A SINGLE, INAPPOSITE SLIDE. ....... 3

II.     PLAINTIFFS' SECRET-SPECIFIC CAUSATION ARGUMENTS ARE MERITLESS. .......... 3

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*AMN Healthcare, Inc. v. Aya Healthcare Services, Inc.*,
  28 Cal.App.5th 923 (2018) ............................................................................... 2

*Bowman v. Wyatt*,
  186 Cal.App.4th 286 (2010) ............................................................................. 3

*Lakeside-Scott v. Multnomah County*,
  556 F.3d 797 (9th Cir. 2009) ................................................................... 5, 7, 8

*Premier Displays & Exhibits v. Cogswell*,
  2009 WL 8623588 (C.D. Cal. Dec. 23, 2009) ............................................. 7, 8

*Saelzer v. Advanced Group 400*,
  25 Cal.4th 763 (2001) ....................................................................................... 2

Plaintiffs' unjust enrichment case rests on nothing but "attorney arguments with string-cite record citations … without analysis." Dkt. 1901 at 15. The record is devoid of support for their contention that Apple's purported misappropriation of (1) a black foam test, (2) a short circuit, or (3) a rejected demodulation proposal was a substantial factor in causing any profits attributable to Apple Watch's Blood Oxygen feature. Plaintiffs' expert on unjust enrichment admitted he offered "no opinion that those three things caused the unjust enrichment number that [he] offered to the jury." 4/13 AM Tr. [Kinrich] 120:21-121:5. He did "not address[] the issue of causation at all." *Id.* 121:21-25. Apple's expert, who *did* offer an opinion on the issue, confirmed "there is no causal link" and no evidence to "show[] how much, if any, of the profits for the blood oxygen … feature[] was derived from the alleged use of the trade secrets." 4/25 Tr. [Webster] 26:5-12. Having no expert opinion on an issue on which they bear the burden of proof, and in the face of an unrebutted contrary expert opinion, Plaintiffs are left with only attorney argument and a hodgepodge of (irrelevant) exhibits—none of which would allow a reasonable jury to find in Plaintiffs' favor.

As Apple previously submitted, Plaintiffs bear the burden to show **both** (1) that Apple's purported misappropriation was a substantial factor in causing Apple to receive profits attributable to the Blood Oxygen feature and (2) "the total amount of the benefit attributable to the misappropriation of particular alleged trade secrets." Dkt. 1643 at 5; Dkt. 1676 at 16; Dkt. 1500-1 at 242. While the Court's instructions did not adopt Apple's position on calculating the amount of unjust enrichment—which Apple maintains—the Court did instruct the jury that Plaintiffs must show the alleged misappropriation was a "substantial factor" in causing the unjust enrichment they seek—*i.e.*, the profits attributed to the Blood Oxygen feature.

Under that standard, no reasonable juror could have concluded Plaintiffs met their burden. As discussed further below, the vast majority of the scattershot documents Plaintiffs cite have nothing to do with the Blood Oxygen feature in the first place. Further, they indisputably predate Apple's development of that feature, which

*began* in "November, December of 2014." *See* 4/18 PM Tr. [Land] 70:24-71:1; *see also infra* p. 5. The "mere possibility" that the purported trade secrets enriched Apple—which in this case is utterly theoretical, given the complete absence of causal evidence—fails as a matter of law to support unjust enrichment. *See Saelzer v. Advanced Group 400*, 25 Cal. 4th 763, 781 (2001). This Court should grant JMOL.

## ARGUMENT

This Court instructed the jury that to award unjust enrichment, they needed to find that Plaintiffs had established that Apple's misappropriation "was a substantial factor in causing Apple to be unjustly enriched." Dkt. 1715 at 26; *see also AMN Healthcare, Inc. v. Aya Healthcare Servs., Inc.*, 28 Cal.App.5th 923, 948 (2018) (disclosure of plaintiff's secret list of travel nurses was not a substantial factor in causing harm because "there [wa]s no evidence [defendant] ever used or relied on such information"). Plaintiffs did not object to that instruction, *see* Dkt. 1679, and thus agreed that they bear the burden to link Apple's supposed use of the purported technical trade secrets to the unjust enrichment they seek—*i.e.*, the total profits they attribute to the Blood Oxygen feature in Apple Watch Series 6 and 7.[2]

Plaintiffs' damages expert Mr. Kinrich presented only a single measure of unjust enrichment regardless which or how many alleged technical secrets were misappropriated. 4/13 AM Tr. [Kinrich] 121:11-123:1. Plaintiffs must therefore show that the purported misappropriation of *each* alleged technical secret was a "substantial factor" in causing the profits they attribute to the Blood Oxygen feature. Plaintiffs' proof did not remotely establish this. Mr. Kinrich conceded that he was offering no opinion causally linking any alleged trade secret and the Blood Oxygen feature. *See id.* 120:9-121:25. The bottom line is that no reasonable juror could find a causal connection between the black foam test, the short circuit, or the rejected demodulation proposal, on the one hand, and any particular profits, on the other.

---

[2] Apple also maintains no reasonable juror could find Mr. Kinrich properly determined the value of the Blood Oxygen feature. *See* Dkt. 1765 at 14; Dkt. 1841 at 16-17.

I. **PLAINTIFFS' ASSERTION THAT THE PURPORTED SECRETS ARE "CRITICAL" TO THE BLOOD OXYGEN FEATURE RESTS ON A SINGLE, INAPPOSITE SLIDE.**

Plaintiffs' Rule 50(b) opposition identified just a single supposed link between the alleged technical trade secrets as a whole and Blood Oxygen—*i.e.*, that "█████████████████████████████████████" and "█████████████████████████████████████████████████████████████████████████████████" 50(b) Opp. 13-14.  The only piece of evidence cited in support of the assertion that █████████████████████████████████ was a single page from an internal Apple development slideshow created two years before the feature launched.  *See* JTX-1078 at -632.  This slide generally references ████████████████████████████ ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ *Id.*

Nothing on that slide has anything to do with demodulation techniques (*i.e.*, the subject matter of D1, D3, and D10) or the noise caused by ███████████████ ████████████ (*i.e.*, the subject matter of L5).  To the extent that Plaintiffs are arguing that the slide is related to L4, a ████████████████████████████████████ ██████████████████████████████████████████████ is insufficient for any reasonable jury to find Apple's alleged use of the black foam test was a factor (let alone more than a trivial factor) in causing the Blood Oxygen profits.  *See infra* pp. 6-7; *see also Bowman v. Wyatt*, 186 Cal.App.4th 286, 313-314 (2010) (causation cannot be established merely by drawing "inferences … from [the] circumstances [that] are *consistent* with [plaintiffs'] theory" (emphasis added)).

II. **PLAINTIFFS' SECRET-SPECIFIC CAUSATION ARGUMENTS ARE MERITLESS.**

**A. D1, D3, and D10.**  There is no dispute that "█████████████████ ████████████████████████" 4/12 PM Tr. [Madisetti] 98:25-99:2, and that Plaintiffs have not alleged that D1, D3, and D10 were "incorporated in the body of a watch," 4/13 AM Tr. [Kinrich] 114:12-19; *see also* 4/25 Tr. [Webster] 23:11-21 ("Plaintiffs

have acknowledged that [D1, D3, and D10] are not used in any Apple Watch"). Nor do Plaintiffs dispute that they are requesting $1.85 billion for three purported secrets that Apple has never incorporated within Watch. Instead, they argue Apple "used these trade secrets" in the sense that they allegedly helped Apple "understand limitations of DCS and adopt an improved DCS2 algorithm, which benefited Apple's blood-oxygen feature." 50(b) Opp. 15. This is at most the kind of "trivial" linkage this Court's instructions make clear does not constitute a substantial factor. In any event, no evidence corroborates this attorney argument—indeed, there is no mention of the term "DCS2" in the trial transcript.

Apple "used a modulation technique [it] called dark channel subtraction from the very beginning" of Watch development—specifically, a two-sided dark channel subtraction technique. 4/19 AM Tr. [Waydo] 120:10-123:18. If Plaintiffs' reference to "DCS2" is intended to refer to that two-sided DCS technique—*i.e.*, the only DCS technique used in Apple Watch—no evidence exists from which a reasonable jury could conclude that technique "benefited" in any way from Dr. Lamego's rejected demodulation proposal. Unrebutted testimony confirms that Apple's DCS technique was "fully developed before [Dr. Lamego] even started at Apple" in January 2014 and a year before development of Blood Oxygen began. *See* 4/19 AM Tr. [Waydo] 120:20-123:25; *see also* 4/18 PM Tr. [Land] 89:1-90:1 (confirming "the dark channel subtraction technique for pulse rate [and] other physiological parameters" was developed "in 2013" by Mr. Land and Dr. Waydo's teams). Dr. Waydo testified that his "initial reaction" to Dr. Lamego's proposal was confusion because it was "a very complex solution to a problem that we felt we had *already solved* very well with two-sided DCS." 4/19 AM Tr. 124:25-125:4 (emphasis added).[3]

Plaintiffs' Rule 50(b) opposition brief cited (at 15) internal Apple documents—

---

[3] While Dr. Waydo's team "revisited our own analysis and experiments around two-sided DCS *to confirm* that we had in fact addressed the ambient light issues as well as we needed to," he ultimately proceeded with the technique developed before Dr. Lamego's arrival. 4/19 AM Tr. [Waydo] at 124:19-127:15; JTX-4199 at -193 (email).

and a snippet of testimony from an Apple engineer—to support their assertion that Apple used Dr. Lamego's proposal to "adopt an improved DCS2 algorithm." But none of the Apple documents or the transcript they cite supports that claim. None even references either (1) the specific techniques in D1, D3, and D10 or (2) Blood Oxygen. *See* JTX-411 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇); JTX-153 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇); JTX-4199 (▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ JTX-183 ▇▇▇▇▇▇▇▇▇▇▇▇▇ 4/18 PM Tr. [Land] 99.[4] Plaintiffs have made no attempt to explain how these documents relate to "improving" DCS2—let alone how those improvements benefited Blood Oxygen. Plaintiffs' expert Dr. Madisetti did not even testify about JTX-411, JTX-4199, or JTX-183, and his testimony about JTX-153 and JTX-273 was merely that "▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇" 4/12 PM Tr. [Madisetti] 45:14-46:12. Such conclusory testimony is insufficient. *Lakeside-Scott v. Multnomah Cnty.*, 556 F.3d 797, 802 (9th Cir. 2009).

Moreover, Plaintiffs ignore that almost all the documents cited are from mid-2014 or earlier—six years before Blood Oxygen was released and months before Apple began development of Blood Oxygen in November/December 2014. *See supra* p. 1. Plaintiffs cannot reasonably claim D1, D3, and D10 were a "substantial factor" in the development of Blood Oxygen where—even under Plaintiffs' own (inaccurate)

---

[4] Plaintiffs have also cited JTX-431, 50(b) Opp. 15, but that architecture proposal is from 2012—*i.e.*, years before development began on Blood Oxygen. Plaintiffs elicited no testimony linking this document to Blood Oxygen.

account—they were "used" by Apple long before any work on Blood Oxygen began.[5]

**B. L4.** Plaintiffs have not established that Apple's use of L4 conferred any benefit or profit related to the Blood Oxygen feature specifically.  This is unsurprising, as it is undisputed that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" 4/12 PM Tr. [Madisetti] 12-15; *see also* 4/25 Tr. [Webster] 24:5-11 (similar).  In other words, Mr. Kinrich calculated profits for Blood Oxygen by comparing devices that do and do not contain Blood Oxygen but ignored that all those devices (according to Plaintiffs) misappropriated L4.

Plaintiffs' response in their Rule 50(b) opposition relied heavily on a single slide in JTX-1078 in an attempt to connect L4 and Apple's Blood Oxygen feature.  50(b) Opp. 14.[6]  The referenced slide (at -632) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ But L4 requires ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ While the slide mentions ▮▮▮▮▮▮▮▮▮▮▮▮, it does not state or imply that the ▮▮▮▮ were made due to Apple's use of L4.  JTX-1078 at -632.  To the contrary, unrebutted testimony confirmed that the black foam test ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  4/19 AM Tr. [Block] 19:19-20:1 (Q. "Did Apple use the results of the black foam test … to design the optical sensor in either the second or the third generation of the optical modules[?]  A. No."); 4/18 PM Tr. [Land] 78:15-79:1 (similar); 4/20 AM Tr. [Warren] 66:10-19 (similar).  And as detailed in Apple's 50(b) Reply (at 4), the record offers nothing supporting Plaintiffs' assertion that ▮▮▮▮▮▮▮▮▮▮" supports their claim that Apple used a black foam test to ▮▮▮▮▮▮

---

[5] And no reasonable jury could award damages on D10 because Plaintiffs' CEO testified it was "not a trade secret" after the '754 patent published in March 2019—a year before the Series 6 went on sale. *See* 4/6 AM Tr. [Kiani] 110-111; *see also* 4/11 PM Tr. 8:10-19 (that D10 is no longer a secret "is established by the record").

[6] Plaintiffs also cite in passing to JTX-1064, 50(b) Opp. 14, but the referenced slide is from a May 2014 presentation (*i.e.*, before Apple began developing Blood Oxygen), and Plaintiffs did not elicit any testimony linking this document to Blood Oxygen.

1  ▓▓▓ to improve the Blood Oxygen feature.

2  In any event, even accepting Plaintiffs' position that the ▓▓▓ reflected on page -632 of JTX-1078 somehow shows "use" of L4, Plaintiffs have not shown that the ▓▓▓ contemplated in JTX-1078 was a substantial factor in causing Blood Oxygen profits. While they argued in their 50(b) opposition (at 15) that "Masimo's trade secrets benefitted Apple by making its blood-oxygen feature functional enough to convince consumers to purchase its watch despite providing no real benefit to the consumer," they have not cited a single piece of evidence in support of that bald assertion. Plaintiffs have not, for example, shown that the depicted design change improved performance, allowed Apple to charge a premium, or otherwise was "singled out … as a key element of" the Blood Oxygen feature. *See Premier Displays & Exhibits v. Cogswell*, 2009 WL 8623588, at *11 (C.D. Cal. Dec. 23, 2009) (Selna, J.) (trade secret design not a substantial factor in defendant winning bid where it was arguably "important" to bid but was not "singled out for praise or as a key element").

Plaintiffs' Rule 50(b) briefing also relied on Dr. Madisetti's generic testimony that the purported ▓▓▓ 4/12 PM Tr. [Madisetti] 14:1-24. But Plaintiffs do not dispute that his testimony is so conclusory as to be irrelevant to the JMOL determination, *see* 50(b) Reply at 3; *see also Lakeside-Scott*, 556 F.3d at 802, and they fail to identify any statement from Dr. Madisetti expressly linking the use of L4 to the development of the Blood Oxygen feature. Plaintiffs relatedly pointed to Mr. Diab's testimony that "▓▓▓." 50(b) Opp. 14. But Mr. Diab lacked any knowledge of Apple's technology or L4—and thus could not testify to any benefits *Apple* allegedly received from using L4. *See* 4/7 Tr. [Diab] 19:9-13 ("I do not know the trade secrets themsel[ves] and what they mean.").

**C. L5.** Plaintiffs have similarly failed to show that the short circuit alleged to have misappropriated L5 was a substantial factor in creating any profits attributed to the Blood Oxygen feature. Again, it is undisputed that ▓▓▓

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.  4/25 Tr. [Webster] 23:22-24:4.  It is thus impossible to measure any value added to Watch by L4 and L5 by comparing the SE Series to Series 6 and 7.

Plaintiffs failed to introduce any evidence showing the circuit benefited the Blood Oxygen feature at all, much less that it was a substantial factor in the feature's profitability.  Plaintiffs pointed to a *May* 2014 Apple document that they claim refers to L5 as a ▇▇▇▇▇▇ in a ranking of features for Watch.  50(b) Opp. 14 (citing JTX-185 at -836).  Even assuming the comment refers to the accused short circuit, it logically has nothing to do with the Blood Oxygen feature, which again was not in development until November/December 2014.  *See supra* pp. 1, 5.  Plaintiffs' only explanation for this fallacy is their assertion that Apple "began developing blood oxygen in 2012."  50(b) Opp. 14.  But Plaintiffs do not provide any record citation for this statement, which is factually inaccurate.

Plaintiffs also cited Mr. Diab's testimony, 50(b) Opp. 14, but that testimony related generically to the benefits of minimizing crosstalk—not to L5 specifically (which Mr. Diab had never seen) or to the benefits of L5 *to Apple Watch*, with which Mr. Diab has no experience.  *See supra* p. 7.  The *only* record evidence regarding any benefit (or lack thereof) of the short circuit accused of misappropriating L5 was Dr. Block's testimony explaining it was incorporated as a "best practice" but did not result in "any changes to performance."  4/19 AM Tr. [Block] 21:17-20, 24:15-17.

At a minimum, any connection between L5 and the Blood Oxygen was trivial.  As noted, Plaintiffs did not introduce any evidence, for instance, that the short circuit improved accuracy or was otherwise singled out as important.  *See Cogswell*, 2009 WL 8623588, at *11.  And there was no such evidence.  This failure is especially apparent here because the accused short circuit is just one of millions of components, *see* 4/12 PM Tr. [Madisetti] 95:4-6, and while Dr. Madisetti claimed that this component has ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ *id*. 95:11-13, he offered no evidence to justify that conclusory statement, *see Lakeside-Scott*, 556 F.3d 797 at 802.

| | |
|---|---|
| Dated: August 21, 2023 | Respectfully submitted, |

JOSEPH J. MUELLER
MARK D. SELWYN
AMY K. WIGMORE
JOSHUA H. LERNER
SARAH R. FRAZIER
NORA Q.E. PASSAMANECK
THOMAS G. SPRANKLING
WILMER CUTLER PICKERING HALE AND DORR LLP

BRIAN A. ROSENTHAL
GIBSON, DUNN & CRUTCHER LLP

KENNETH G. PARKER
HAYNES AND BOONE, LLP


By: /s/ *Mark D. Selwyn*
     Mark D. Selwyn


*Attorneys for Defendant Apple Inc.*

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Defendant Apple Inc. certifies that this brief contains 2919 words, which [choose one]:

\_\_\_\_   complies with the word limit of L.R. 11-6.1

  X    complies with the page limit set by court order dated August 7, 2023 (Dkt. 1901).

Dated: August 21, 2023   Respectfully submitted,

          MARK D. SELWYN
          AMY K. WIGMORE
          JOSHUA H. LERNER
          SARAH R. FRAZIER
          NORA Q.E. PASSAMANECK
          THOMAS G. SPRANKLING
          WILMER CUTLER PICKERING HALE AND DORR LLP

          BRIAN A. ROSENTHAL
          GIBSON, DUNN & CRUTCHER LLP

          KENNETH G. PARKER
          HAYNES AND BOONE, LLP


          By: /s/ *Mark D. Selwyn*
             Mark D. Selwyn


          *Attorneys for Defendant Apple Inc.*