MARK D. SELWYN, SBN 244180
  mark.selwyn@wilmerhale.com
THOMAS G. SPRANKLING, SBN 294831
  thomas.sprankling@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Tel.: 650.858.6000 / Fax: 650.858.6100

JOSHUA H. LERNER, SBN 220755
  joshua.lerner@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
One Front Street, Suite 3500
San Francisco, CA 94111
Tel.: 628.235.1000 / Fax: 628.235.1001

[Counsel appearance continues on next page]

*Attorneys for Defendant Apple Inc.*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

| | |
|---|---|
| MASIMO CORPORATION, a Delaware corporation; and CERCACOR LABORATORIES, INC., a Delaware corporation, <br><br> Plaintiffs, <br><br> v. <br><br> APPLE INC., a California corporation, <br><br> Defendant. | CASE NO. 8:20-cv-00048-JVS (JDEx) <br><br> **APPLE'S SUPPLEMENTAL RULE 50(B) MOTION OF NO UNJUST ENRICHMENT** <br><br> No hearing set.[1] |

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

---

[1] Pursuant to this Court's Rule 50(b) order, "[t]he court will decide at a later time whether to hold further oral argument on the unjust enrichment causation issue." Dkt. 1901 at 16 n.4.

Wilmer Cutler Pickering Hale and Dorr LLP

AMY K. WIGMORE, *pro hac vice*
 amy.wigmore@wilmerhale.com
WILMER CUTLER PICKERING
 HALE AND DORR LLP
2100 Pennsylvania Ave NW
Washington, DC 20037
Tel.: 202.663.6000 / Fax: 202.663.6363

JOSEPH J. MUELLER, *pro hac vice*
 joseph.mueller@wilmerhale.com
SARAH R. FRAZIER, *pro hac vice*
 sarah.frazier@wilmerhale.com
WILMER CUTLER PICKERING
 HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel.: 617.526.6000 / Fax: 617.526.5000

NORA Q.E. PASSAMANECK, *pro hac vice*
 nora.passamaneck@wilmerhale.com
WILMER CUTLER PICKERING
 HALE AND DORR LLP
1225 Seventeenth Street, Suite 2600
Denver, CO 80202
Tel.: 720.274.3152 / Fax: 720.273.3133

BRIAN A. ROSENTHAL, *pro hac vice*
 brosenthal@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Tel.: 212.351.2339 / Fax: 212.817.9539

KENNETH G. PARKER, SBN 182911
 ken.parker@haynesboone.com
HAYNES AND BOONE, LLP
660 Anton Boulevard, Suite 700
Costa Mesa, CA 92626
Tel.: 650.949.3014 / Fax: 949.202.3001

1

## **TABLE OF CONTENTS**

ARGUMENT ........................................................................................................ 2

I.    PLAINTIFFS' ASSERTION THAT THE PURPORTED SECRETS ARE "CRITICAL"
      TO THE BLOOD OXYGEN FEATURE RESTS ON A SINGLE, INAPPOSITE SLIDE. ....... 3

II.   PLAINTIFFS' SECRET-SPECIFIC CAUSATION ARGUMENTS ARE MERITLESS. .......... 3

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **TABLE OF AUTHORITIES**

2

**Page(s)**

3

**Cases**

4

*AMN Healthcare, Inc. v. Aya Healthcare Services, Inc.*,
   28 Cal.App.5th 923 (2018) ....................................................................................2

*Bowman v. Wyatt*,
   186 Cal.App.4th 286 (2010) ................................................................................3

*Lakeside-Scott v. Multnomah County*,
   556 F.3d 797 (9th Cir. 2009) ........................................................................5, 7, 8

*Premier Displays & Exhibits v. Cogswell*,
   2009 WL 8623588 (C.D. Cal. Dec. 23, 2009).................................................7, 8

*Saelzer v. Advanced Group 400*,
   25 Cal.4th 763 (2001) ..........................................................................................2

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Wilmer Cutler
Pickering Hale
and Dorr LLP

1   Plaintiffs' unjust enrichment case rests on nothing but "attorney arguments with
2   string-cite record citations … without analysis." Dkt. 1901 at 15.  The record is devoid
3   of support for their contention that Apple's purported misappropriation of (1) a black
4   foam test, (2) a short circuit, or (3) a rejected demodulation proposal was a substantial
5   factor in causing any profits attributable to Apple Watch's Blood Oxygen feature.
6   Plaintiffs' expert on unjust enrichment admitted he offered "no opinion that those three
7   things caused the unjust enrichment number that [he] offered to the jury."  4/13 AM
8   Tr. [Kinrich] 120:21-121:5.  He did "not address[] the issue of causation at all."  *Id.*
9   121:21-25.  Apple's expert, who ***did*** offer an opinion on the issue, confirmed "there is
10  no causal link" and no evidence to "show[] how much, if any, of the profits for the
11  blood oxygen … feature[] was derived from the alleged use of the trade secrets."  4/25
12  Tr. [Webster] 26:5-12.  Having no expert opinion on an issue on which they bear the
13  burden of proof, and in the face of an unrebutted contrary expert opinion, Plaintiffs are
14  left with only attorney argument and a hodgepodge of (irrelevant) exhibits—none of
15  which would allow a reasonable jury to find in Plaintiffs' favor.

16  As Apple previously submitted, Plaintiffs bear the burden to show ***both*** (1) that
17  Apple's purported misappropriation was a substantial factor in causing Apple to
18  receive profits attributable to the Blood Oxygen feature and (2) "the total amount of
19  the benefit attributable to the misappropriation of particular alleged trade secrets."
20  Dkt. 1643 at 5; Dkt. 1676 at 16; Dkt. 1500-1 at 242.  While the Court's instructions did
21  not adopt Apple's position on calculating the amount of unjust enrichment—which
22  Apple maintains—the Court did instruct the jury that Plaintiffs must show the alleged
23  misappropriation was a "substantial factor" in causing the unjust enrichment they
24  seek—*i.e.*, the profits attributed to the Blood Oxygen feature.

25  Under that standard, no reasonable juror could have concluded Plaintiffs met
26  their burden.  As discussed further below, the vast majority of the scattershot
27  documents Plaintiffs cite have nothing to do with the Blood Oxygen feature in the first
28  place.  Further, they indisputably predate Apple's development of that feature, which

1  ***began*** in "November, December of 2014."  *See* 4/18 PM Tr. [Land] 70:24-71:1; *see*

2  *also infra* p. 5.  The "mere possibility" that the purported trade secrets enriched

3  Apple—which in this case is utterly theoretical, given the complete absence of causal

4  evidence—fails as a matter of law to support unjust enrichment.  *See Saelzer v.*

5  *Advanced Group 400*, 25 Cal. 4th 763, 781 (2001).  This Court should grant JMOL.

6  **ARGUMENT**

7  This Court instructed the jury that to award unjust enrichment, they needed to

8  find that Plaintiffs had established that Apple's misappropriation "was a substantial

9  factor in causing Apple to be unjustly enriched."  Dkt. 1715 at 26; *see also AMN*

10  *Healthcare, Inc. v. Aya Healthcare Servs., Inc.*, 28 Cal.App.5th 923, 948 (2018)

11  (disclosure of plaintiff's secret list of travel nurses was not a substantial factor in

12  causing harm because "there [wa]s no evidence [defendant] ever used or relied on such

13  information").  Plaintiffs did not object to that instruction, *see* Dkt. 1679, and thus

14  agreed that they bear the burden to link Apple's supposed use of the purported

15  technical trade secrets to the unjust enrichment they seek—*i.e.*, the total profits they

16  attribute to the Blood Oxygen feature in Apple Watch Series 6 and 7.[2]

17  Plaintiffs' damages expert Mr. Kinrich presented only a single measure of unjust

18  enrichment regardless which or how many alleged technical secrets were

19  misappropriated.  4/13 AM Tr. [Kinrich] 121:11-123:1.  Plaintiffs must therefore show

20  that the purported misappropriation of ***each*** alleged technical secret was a "substantial

21  factor" in causing the profits they attribute to the Blood Oxygen feature.  Plaintiffs'

22  proof did not remotely establish this.  Mr. Kinrich conceded that he was offering no

23  opinion causally linking any alleged trade secret and the Blood Oxygen feature.  *See*

24  *id.* 120:9-121:25.  The bottom line is that no reasonable juror could find a causal

25  connection between the black foam test, the short circuit, or the rejected demodulation

26  proposal, on the one hand, and any particular profits, on the other.

27  _____

28  [2] Apple also maintains no reasonable juror could find Mr. Kinrich properly determined the value of the Blood Oxygen feature.  *See* Dkt. 1765 at 14; Dkt. 1841 at 16-17.

**I. PLAINTIFFS' ASSERTION THAT THE PURPORTED SECRETS ARE "CRITICAL" TO THE BLOOD OXYGEN FEATURE RESTS ON A SINGLE, INAPPOSITE SLIDE.**

Plaintiffs' Rule 50(b) opposition identified just a single supposed link between the alleged technical trade secrets as a whole and Blood Oxygen—*i.e.*, that " ██████████ ████████████████████████████████████ " and ██████████████ ██████████████████████████████████████████████████████████ " 50(b) Opp. 13-14. The only piece of evidence cited in support of the assertion that █ ██████████████████████████████ was a single page from an internal Apple development slideshow created two years before the feature launched. *See* JTX-1078 at -632. This slide generally references ████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████ *Id.*

Nothing on that slide has anything to do with demodulation techniques (*i.e.*, the subject matter of D1, D3, and D10) or the noise caused by ██████████████ ████████ (*i.e.*, the subject matter of L5). To the extent that Plaintiffs are arguing that the slide is related to L4, a ████████████████████████████████ ████████████████████████████████████████ is insufficient for any reasonable jury to find Apple's alleged use of the black foam test was a factor (let alone more than a trivial factor) in causing the Blood Oxygen profits. *See infra* pp. 6-7; *see also Bowman v. Wyatt*, 186 Cal.App.4th 286, 313-314 (2010) (causation cannot be established merely by drawing "inferences … from [the] circumstances [that] are *consistent* with [plaintiffs'] theory" (emphasis added)).

**II. PLAINTIFFS' SECRET-SPECIFIC CAUSATION ARGUMENTS ARE MERITLESS.**

**A. D1, D3, and D10.** There is no dispute that " ████████████████████████ ████████████████████████ " 4/12 PM Tr. [Madisetti] 98:25-99:2, and that Plaintiffs have not alleged that D1, D3, and D10 were "incorporated in the body of a watch," 4/13 AM Tr. [Kinrich] 114:12-19; *see also* 4/25 Tr. [Webster] 23:11-21 ("Plaintiffs

have acknowledged that [D1, D3, and D10] are not used in any Apple Watch"). Nor do Plaintiffs dispute that they are requesting $1.85 billion for three purported secrets that Apple has never incorporated within Watch. Instead, they argue Apple "used these trade secrets" in the sense that they allegedly helped Apple "understand limitations of DCS and adopt an improved DCS2 algorithm, which benefited Apple's blood-oxygen feature." 50(b) Opp. 15. This is at most the kind of "trivial" linkage this Court's instructions make clear does not constitute a substantial factor. In any event, no evidence corroborates this attorney argument—indeed, there is no mention of the term "DCS2" in the trial transcript.

Apple "used a modulation technique [it] called dark channel subtraction from the very beginning" of Watch development—specifically, a two-sided dark channel subtraction technique. 4/19 AM Tr. [Waydo] 120:10-123:18. If Plaintiffs' reference to "DCS2" is intended to refer to that two-sided DCS technique—*i.e.*, the only DCS technique used in Apple Watch—no evidence exists from which a reasonable jury could conclude that technique "benefited" in any way from Dr. Lamego's rejected demodulation proposal. Unrebutted testimony confirms that Apple's DCS technique was "fully developed before [Dr. Lamego] even started at Apple" in January 2014 and a year before development of Blood Oxygen began. *See* 4/19 AM Tr. [Waydo] 120:20-123:25; *see also* 4/18 PM Tr. [Land] 89:1-90:1 (confirming "the dark channel subtraction technique for pulse rate [and] other physiological parameters" was developed "in 2013" by Mr. Land and Dr. Waydo's teams). Dr. Waydo testified that his "initial reaction" to Dr. Lamego's proposal was confusion because it was "a very complex solution to a problem that we felt we had *already solved* very well with two-sided DCS." 4/19 AM Tr. 124:25-125:4 (emphasis added).[3]

Plaintiffs' Rule 50(b) opposition brief cited (at 15) internal Apple documents—

---

[3] While Dr. Waydo's team "revisited our own analysis and experiments around two-sided DCS *to confirm* that we had in fact addressed the ambient light issues as well as we needed to," he ultimately proceeded with the technique developed before Dr. Lamego's arrival. 4/19 AM Tr. [Waydo] at 124:19-127:15; JTX-4199 at -193 (email).

and a snippet of testimony from an Apple engineer—to support their assertion that Apple used Dr. Lamego's proposal to "adopt an improved DCS2 algorithm."  But none of the Apple documents or the transcript they cite supports that claim.  None even references either (1) the specific techniques in D1, D3, and D10 or (2) Blood Oxygen.  *See* JTX-411 ██████████████████████████████████████████████ ████████████████████████); JTX-153 ███████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████████ ████████████████████████████████████████████████); JTX-4199 (██████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████ JTX-183 ████████████ ███████████████████████████ 4/18 PM Tr. [Land] 99.[4]  Plaintiffs have made no attempt to explain how these documents relate to "improving" DCS2—let alone how those improvements benefited Blood Oxygen.  Plaintiffs' expert Dr. Madisetti did not even testify about JTX-411, JTX-4199, or JTX-183, and his testimony about JTX-153 and JTX-273 was merely that "████████████████████████████████████████████████" 4/12 PM Tr. [Madisetti] 45:14-46:12.  Such conclusory testimony is insufficient. *Lakeside-Scott v. Multnomah Cnty.*, 556 F.3d 797, 802 (9th Cir. 2009).

Moreover, Plaintiffs ignore that almost all the documents cited are from mid-2014 or earlier—six years before Blood Oxygen was released and months before Apple began development of Blood Oxygen in November/December 2014.  *See supra* p. 1.  Plaintiffs cannot reasonably claim D1, D3, and D10 were a "substantial factor" in the development of Blood Oxygen where—even under Plaintiffs' own (inaccurate)

---

[4] Plaintiffs have also cited JTX-431, 50(b) Opp. 15, but that architecture proposal is from 2012—*i.e.*, years before development began on Blood Oxygen.  Plaintiffs elicited no testimony linking this document to Blood Oxygen.

Wilmer Cutler Pickering Hale and Dorr LLP

account—they were "used" by Apple long before any work on Blood Oxygen began.[5]

**B. L4.** Plaintiffs have not established that Apple's use of L4 conferred any benefit or profit related to the Blood Oxygen feature specifically. This is unsurprising, as it is undisputed that ███████████████████████████████████████████████ ██████████████████████████████████████████" 4/12 PM Tr. [Madisetti] 12-15; *see also* 4/25 Tr. [Webster] 24:5-11 (similar). In other words, Mr. Kinrich calculated profits for Blood Oxygen by comparing devices that do and do not contain Blood Oxygen but ignored that all those devices (according to Plaintiffs) misappropriated L4.

Plaintiffs' response in their Rule 50(b) opposition relied heavily on a single slide in JTX-1078 in an attempt to connect L4 and Apple's Blood Oxygen feature. 50(b) Opp. 14.[6] The referenced slide (at -632) ██████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ But L4 requires ████████████████████████████████████████████ ████████████████████████████ While the slide mentions ██████████████, it does not state or imply that the ██████ were made due to Apple's use of L4. JTX-1078 at -632. To the contrary, unrebutted testimony confirmed that the black foam test ████████████████████. 4/19 AM Tr. [Block] 19:19-20:1 (Q. "Did Apple use the results of the black foam test … to design the optical sensor in either the second or the third generation of the optical modules[?]  A. No."); 4/18 PM Tr. [Land] 78:15-79:1 (similar); 4/20 AM Tr. [Warren] 66:10-19 (similar). And as detailed in Apple's 50(b) Reply (at 4), the record offers nothing supporting Plaintiffs' assertion that ██████████ ██████████" supports their claim that Apple used a black foam test to ██████████████

---

[5] And no reasonable jury could award damages on D10 because Plaintiffs' CEO testified it was "not a trade secret" after the '754 patent published in March 2019—a year before the Series 6 went on sale. *See* 4/6 AM Tr. [Kiani] 110-111; *see also* 4/11 PM Tr. 8:10-19 (that D10 is no longer a secret "is established by the record").

[6] Plaintiffs also cite in passing to JTX-1064, 50(b) Opp. 14, but the referenced slide is from a May 2014 presentation (*i.e.*, before Apple began developing Blood Oxygen), and Plaintiffs did not elicit any testimony linking this document to Blood Oxygen.

1    ███████ to improve the Blood Oxygen feature.

2    In any event, even accepting Plaintiffs' position that the ████████████ reflected

3    on page -632 of JTX-1078 somehow shows "use" of L4, Plaintiffs have not shown that

4    the ██████████████████ contemplated in JTX-1078 was a substantial factor in

5    causing Blood Oxygen profits.  While they argued in their 50(b) opposition (at 15) that

6    "Masimo's trade secrets benefitted Apple by making its blood-oxygen feature

7    functional enough to convince consumers to purchase its watch despite providing no

8    real benefit to the consumer," they have not cited a single piece of evidence in support

9    of that bald assertion.  Plaintiffs have not, for example, shown that the depicted design

10   change improved performance, allowed Apple to charge a premium, or otherwise was

11   "singled out … as a key element of" the Blood Oxygen feature.  *See Premier Displays*

12   *& Exhibits v. Cogswell*, 2009 WL 8623588, at *11 (C.D. Cal. Dec. 23, 2009) (Selna,

13   J.) (trade secret design not a substantial factor in defendant winning bid where it was

14   arguably "important" to bid but was not "singled out for praise or as a key element").

15   Plaintiffs' Rule 50(b) briefing also relied on Dr. Madisetti's generic testimony

16   that the purported ██████████████████████████████████████

17   ████████████████████████████████ 4/12 PM Tr. [Madisetti] 14:1-24.  But

18   Plaintiffs do not dispute that his testimony is so conclusory as to be irrelevant to the

19   JMOL determination, *see* 50(b) Reply at 3; *see also Lakeside-Scott*, 556 F.3d at 802,

20   and they fail to identify any statement from Dr. Madisetti expressly linking the use of

21   L4 to the development of the Blood Oxygen feature.  Plaintiffs relatedly pointed to Mr.

22   Diab's testimony that "████████████████████████████████."  50(b)

23   Opp. 14.  But Mr. Diab lacked any knowledge of Apple's technology or L4—and thus

24   could not testify to any benefits *Apple* allegedly received from using L4.  *See* 4/7 Tr.

25   [Diab] 19:9-13 ("I do not know the trade secrets themsel[ves] and what they mean.").

26   **C.  L5.**  Plaintiffs have similarly failed to show that the short circuit alleged to

27   have misappropriated L5 was a substantial factor in creating any profits attributed to

28   the Blood Oxygen feature.  Again, it is undisputed that ████████████████████

1   ███████████████████████████████████████████

2   ██████.  4/25 Tr. [Webster] 23:22-24:4.  It is thus impossible to measure any value

3   added to Watch by L4 and L5 by comparing the SE Series to Series 6 and 7.

4          Plaintiffs failed to introduce any evidence showing the circuit benefited the

5   Blood Oxygen feature at all, much less that it was a substantial factor in the feature's

6   profitability.  Plaintiffs pointed to a *May* 2014 Apple document that they claim refers

7   to L5 as a ███████████ in a ranking of features for Watch.  50(b) Opp. 14 (citing JTX-

8   185 at -836).  Even assuming the comment refers to the accused short circuit, it

9   logically has nothing to do with the Blood Oxygen feature, which again was not in

10  development until November/December 2014.  *See supra* pp. 1, 5.  Plaintiffs' only

11  explanation for this fallacy is their assertion that Apple "began developing blood

12  oxygen in 2012."  50(b) Opp. 14.  But Plaintiffs do not provide any record citation for

13  this statement, which is factually inaccurate.

14         Plaintiffs also cited Mr. Diab's testimony, 50(b) Opp. 14, but that testimony

15  related generically to the benefits of minimizing crosstalk—not to L5 specifically

16  (which Mr. Diab had never seen) or to the benefits of L5 *to Apple Watch*, with which

17  Mr. Diab has no experience.  *See supra* p. 7.  The *only* record evidence regarding any

18  benefit (or lack thereof) of the short circuit accused of misappropriating L5 was Dr.

19  Block's testimony explaining it was incorporated as a "best practice" but did not result

20  in "any changes to performance."  4/19 AM Tr. [Block] 21:17-20, 24:15-17.

21         At a minimum, any connection between L5 and the Blood Oxygen was trivial.

22  As noted, Plaintiffs did not introduce any evidence, for instance, that the short circuit

23  improved accuracy or was otherwise singled out as important.  *See Cogswell*, 2009 WL

24  8623588, at *11.  And there was no such evidence.  This failure is especially apparent

25  here because the accused short circuit is just one of millions of components, *see* 4/12

26  PM Tr. [Madisetti] 95:4-6, and while Dr. Madisetti claimed that this component has █

27  ███████████████████ *id.* 95:11-13, he offered no evidence to justify that

28  conclusory statement, *see Lakeside-Scott*, 556 F.3d 797 at 802.

1   Dated:  August 21, 2023       Respectfully submitted,

2

3                        JOSEPH J. MUELLER

4                        MARK D. SELWYN

5                        AMY K. WIGMORE

                        JOSHUA H. LERNER

6                        SARAH R. FRAZIER

7                        NORA Q.E. PASSAMANECK

                        THOMAS G. SPRANKLING

8                        WILMER CUTLER PICKERING HALE AND DORR LLP

9

10                       BRIAN A. ROSENTHAL

                       GIBSON, DUNN & CRUTCHER LLP

11

12                       KENNETH G. PARKER

                       HAYNES AND BOONE, LLP

13

14

15                       By:  /s/ *Mark D. Selwyn*

16                             Mark D. Selwyn

17

18                       *Attorneys for Defendant Apple Inc.*

19

20

21

22

23

24

25

26

27

28

1

## CERTIFICATE OF COMPLIANCE

2      The undersigned, counsel of record for Defendant Apple Inc. certifies that this

3 brief contains 2919 words, which [choose one]:

4      ____   complies with the word limit of L.R. 11-6.1

5      _X_   complies with the page limit set by court order dated August 7, 2023 (Dkt.

6             1901).

7

8 Dated:  August 21, 2023                    Respectfully submitted,

9

10                                            MARK D. SELWYN
                                             AMY K. WIGMORE
11                                            JOSHUA H. LERNER
                                             SARAH R. FRAZIER
12                                            NORA Q.E. PASSAMANECK
                                             THOMAS G. SPRANKLING
13                                            WILMER CUTLER PICKERING HALE AND
14                                            DORR LLP

15                                            BRIAN A. ROSENTHAL
16                                            GIBSON, DUNN & CRUTCHER LLP

17
                                             KENNETH G. PARKER
18                                            HAYNES AND BOONE, LLP

19

20

21                                            By:  /s/ *Mark D. Selwyn*_____
22                                                  Mark D. Selwyn

23
                                             *Attorneys for Defendant Apple Inc.*
24

25

26

27

28