Joseph R. Re (Bar No. 134479)
joseph.re@knobbe.com
Stephen C. Jensen (Bar No. 149894)
steve.jensen@knobbe.com
Sheila N. Swaroop (Bar No. 203476)
sheila.swaroop@knobbe.com
Brian C. Claassen (Bar No. 253627)
brian.claassen@knobbe.com
Jared C. Bunker (Bar No. 246946)
jared.bunker@knobbe.com
Kendall M. Loebbaka (Bar No. 285908)
kendall.loebbaka@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, Fourteenth Floor
Irvine, CA 92614
Phone: (949) 760-0404
Fax:(949) 760-9502

Adam B. Powell (Bar. No. 272725)
adam.powell@knobbe.com
Daniel P. Hughes (Bar No. 299695)
daniel.hughes@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
3579 Valley Centre Drive
San Diego, CA 92130
Phone: (858) 707-4000
Fax: (858) 707-4001

Brian C. Horne (Bar No. 205621)
brian.horne@knobbe.com
Mark D. Kachner (Bar No. 234192)
mark.kachner@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
1925 Century Park East, Suite 400
Los Angeles, CA 90067
Phone: (310) 551-3450
Fax: (310) 551-3458

Attorneys for Plaintiffs,
MASIMO CORPORATION and CERCACOR LABORATORIES, INC.

### IN THE UNITED STATES DISTRICT COURT
### FOR THE CENTRAL DISTRICT OF CALIFORNIA
### SOUTHERN DIVISION

| | |
|---|---|
| MASIMO CORPORATION, a Delaware corporation; and CERCACOR LABORATORIES, INC., a Delaware corporation<br><br>Plaintiffs,<br><br>v.<br><br>APPLE INC., a California corporation<br><br>Defendant. | Case No. 8:20-cv-00048-JVS-JDE<br><br>**PLAINTIFFS MASIMO CORPORATION AND CERCACOR LABORATORIES, INC.'S L.R. 52-1 [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>**Hon. James V. Selna**<br><br>**Pre-Trial Conf.: 10/28/2024<br>Trial: 11/05/2024** |

### REDACTED VERSION OF DOCUMENT
### PROPOSED TO BE FILED UNDER SEAL

1

# TABLE OF CONTENTS

2

Page No.

3

4  I. JURISDICTION AND VENUE.........................................................................1

5  II. PROCEDURAL POSTURE OF THE CASE ....................................................2

6  III. PROPOSED FINDINGS OF FACT ...............................................................3

7      A.    Background ...........................................................................................3

8            1.    Pulse Oximetry...........................................................................3

9            2.    Masimo's Founding and Goals ...................................................9

10           3.    Masimo's Development of SET .................................................10

11           4.    Masimo Develops Rainbow Technology....................................12

12           5.    Masimo Hires Lamego ...............................................................13

13           6.    Lamego Becomes CTO of Cercacor and Develops
                    Pronto-7 ....................................................................................15

14           7.    Masimo's Consumer Products ...................................................17

15     B.    Masimo And Cercacor Protect Their Confidential Information.........19

16     C.    Masimo Develops Trade Secrets Relating to Sensors and
17           Physiological Parameter Measurement And Calculation
18           Strategies ............................................................................................22

19           1.    ████████████████████████████████
20                 ████████ Trade Secret L4) ...........................................23

21           2.    ████████████████████████████████
22                 ████████ Trade Secret L5) ...........................................28

23           3.    ████████████████████████████████
24                 ██████ Trade Secret D1) ..............................................30

25           4.    ████████████████████████████████
26                 ████████ Trade Secret D3) ...........................................34
27

28

**TABLE OF AUTHORITIES**
(*cont'd*)

Page No(s).

5.    ██████████████████████████ Trade Secret D10)...........38

D.    Lamego Learns About And Develops Masimo's Trade Secrets.........42

    1.    Lamego Learns About ███████████████ Trade Secret L4).................................................42

    2.    Lamego Learns About ████████████████ Trade Secret L5)...................................44

    3.    Lamego Learns About And Develops ████ (D1)...............................................45

    4.    Lamego Learns About And Develops ████ (D3)....................................................47

    5.    Lamego Learns About and Develops ████ (D10).....................................................47

E.    Masimo's Trade Secrets Derive Independent Economic Value By Not Being Generally Known..........................................................48

    1.    ██████████████████████████ Management L4)..............................................48

    2.    ██████████████████████████ (L5)..............................................................49

    3.    ████████████████ Trade Secret D1)..........................................51

    4.    ████████████████ Trade Secret D3).........................................53

**TABLE OF AUTHORITIES**
(*cont'd*)

Page No(s).

5. ███████████████████████ Trade Secret D10)...........54

6. Apple Derived Significant Economic Value from Masimo's Trade Secrets.................................54

F. Apple Seeks to Obtain Masimo's Technology and Lamego .............55

G. Apple Acquires Masimo's Trade Secrets Through Lamego .............59

   1. ███████████████████████ Trade Secret L4 .............................................................59

   2. ███████████████████████ Trade Secret L5 .............................................................61

   3. ██████████████████ Trade Secret D1 ..............63

   4. ██████████████████ Trade Secret D3 ..............65

   5. █████████████████ Trade Secret D10 ............67

H. Other Apple Employees Knew Or Should Have Known Of Apple's Improper Acquisition of Masimo's Trade Secrets ████████████████████████████████ █████████████ ....................................................68

I. Apple's Use and Disclosure of Masimo's Trade Secrets .................69

   1. Apple Uses L4 In Its Development and Manufacturing Of the Apple Watch ...............................................69

   2. Apple Uses and Discloses L5 In Its Development and Manufacturing Of the Apple Watch ........................72

   3. Apple Uses and Discloses D1, D3, and D10 In Its Development Of the Apple Watch ████████████ .......73

J. Apple Files Patents On Masimo's Inventions....................................74

   1. U.S. Patent No. 10,078,052 ....................................74

   2. U.S. Patent No. 10,247,670 ....................................77

   3. U.S. Patent No. 9,952,095 ......................................78

**TABLE OF AUTHORITIES**
(*cont'd*)

Page No(s).

    4.    U.S. Patent No. 11,009,390 ......................................81

████ ████████████████████████ ......................82

K.    Before late 2019, Masimo Had No Reason To Believe That Apple Misappropriated Its Trade Secrets.................................83

L.    Masimo Discovers Apple's Misappropriation In Late 2019 ..............84

M.    Apple's Misappropriation Causes Harm to Masimo and Legal Remedies Do Not Address Apple's Ongoing and Future Misappropriation ........................................................................86

N.    Additional Equitable Factors Support an Injunction .........................88

O.    Apple's Misappropriation Unjustly Enriched Apple .........................90

P.    Apple Willfully and Maliciously Misappropriated Masimo's Trade Secrets ....................................................................................95

IV. PROPOSED CONCLUSIONS OF LAW ..............................................97

A.    Jurisdiction and Venue .....................................................................97

B.    Apple's Violation of the California Uniform Trade Secrets Act........97

    1.    Legal Standard ........................................................................97

    2.    Apple Misappropriated Several Masimo Trade Secrets.........100

        a.    Masimo's Asserted Trade Secrets Are Trade Secrets Under CUTSA .................................................100

            i.    Masimo's Trade Secrets Were Subject to Reasonable Efforts to Maintain their Secrecy .................................................................100

            ii.    Masimo Possessed Trade Secret L4, Which Obtains Economic Value From Not Being Generally Known To Others Who Could Obtain Value From Its Use ................................101

            iii.    Masimo Possessed Trade Secret L5, Obtains Economic Value From Not Being Generally Known To Others Who Could Obtain Value From Its Use........................................................101

**TABLE OF AUTHORITIES**
*(cont'd)*

Page No(s).

        iv.    Masimo Possessed Trade Secret D1, Obtains Economic Value From Not Being Generally Known To Others Who Could Obtain Value From Its Use ......................................................... 102

        v.    Masimo Possessed Trade Secret D3, Obtains Economic Value From Not Being Generally Known To Others Who Could Obtain Value From Its Use ......................................................... 102

        vi.    Masimo Possessed Trade Secret D10, Obtains Economic Value From Not Being Generally Known To Others Who Could Obtain Value From Its Use ................................. 103

    b.    Apple Misappropriated Every Asserted Trade Secret ........................................................ 103

        i.    Lamego Had Access to the Asserted Trade Secrets ............................................................. 103

        ii.    Apple Acquired Masimo's Trade Secrets Through Improper Means And Knew Or Should Have Known That Lamego Improperly Provided Masimo's Trade Secrets ............................................................. 103

        iii.    Apple Misappropriated Trade Secret L4 ........... 105

        iv.    Apple Misappropriated Trade Secret L5 ........... 105

        v.    Apple Misappropriated Trade Secret D1 .......... 105

        vi.    Apple Misappropriated Trade Secret D3 .......... 106

        vii.    Apple Misappropriated Trade Secret D10 ........ 106

        viii.    Apple Is Also Vicariously Liable For Lamego's Wrongful Conduct ............................ 106

    c.    Apple's Misappropriation Of Every Trade Secret Was Willful And Malicious ......................................... 106

C.    Correction of Inventorship of U.S. Patents ....................................... 106

    1.    Legal Standard ......................................................... 106

1
2
3

## TABLE OF AUTHORITIES
### (*cont'd*)

Page No(s).

4
5

2. Mohamed Diab Should Be A Named Inventor On Four Apple Patents ......................................................................108

6

a. U.S. Patent No. 10,078,052 ...........................................108

7

b. U.S. Pat. No. 10,247,670 ...............................................108

8

c. U.S. Patent No.  9,952,095 ............................................108

9

d. U.S. Patent No. 11,009,390 ...........................................109

10

D. Declaratory Judgment of Patent Ownership of U.S. Patents ............109

11

1. Legal Standard ........................................................................109

12
13

2. Masimo is a Co-Owner of the '052, '670, '095, and '390 Patents Because Diab Made His Inventive Contributions While Employed By Masimo And Cercacor ........................109

14
15
16

3. Masimo is a Co-Owner of the Five Patents-At-Issue Because Lamego Made His Allegedly Inventive Contributions While Employed By Masimo And Cercacor ....................................................................................109

17

a. U.S. Pat. No. 10,078,052 ...............................................110

18

b. U.S. Pat. No. 10,247,670 ...............................................111

19

c. U.S. Pat. No. 9,952,095 .................................................111

20

d. U.S. Pat. No. 11,009,390 ...............................................112

21

█ ████████████████ ....................................112

22

E. Apple Was Unjustly Enriched ...........................................................112

23

F. Remedies ............................................................................................113

24

1. Permanent Injunction on Trade Secret Claims ......................113

25

a. Legal Standard ................................................................113

26
27

b. The Court Should Enjoin Apple From Misappropriating Masimo's and Willow's Trade Secrets ...........................................................................115

28

2. Correction of Inventorship .....................................................116

**TABLE OF AUTHORITIES**
*(cont'd)*

Page No(s).

a.    Legal Standard ................................................................ 116

b.    The U.S. Patent and Trademark Office Should Correct Inventorship of the '052, '670, '095, and '390 Patents ................................................................ 116

3.    Declaration of Patent Co-Ownership ................................ 117

a.    Legal Standard ................................................................ 117

b.    The Court Should Declare Masimo and/or Willow are Patent Co-Owners ................................................ 117

4.    Constructive Trust ............................................................ 118

a.    Legal Standard ................................................................ 118

b.    The Court Should Impose a Constructive Trust Upon Apple as Trustee for Masimo's Benefit ............ 118

5.    Attorneys' Fees and Costs ................................................ 118

a.    Legal Standard ................................................................ 118

b.    Because Apple's Misappropriation Was Willful and Malicious, Apple Should Pay Masimo and Cercacor Their Reasonable Attorneys' Fees and Costs ................................................................................ 119

G.    Apple Cannot Establish Any Of The Defenses It Preserved ........... 119

1.    Statute of Limitations ...................................................... 119

a.    Legal Standard ................................................................ 119

b.    Apple Cannot Establish the Statute of Limitations Began to Run More Than Three Years Before Masimo Filed Suit ...................................................... 120

i.    Masimo Did Not Have Actual Knowledge of Apple's Misappropriation Before January 9, 2017 ................................................ 120

ii.    Masimo Did Not Have Constructive Knowledge of Apple's Misappropriation Before January 9, 2017 ...................................... 120

1
2

**TABLE OF AUTHORITIES**
*(cont'd)*

3

Page No(s).

4
5

        (a)    Masimo Had No Reason to Suspect Misappropriation Occurred Before January 9, 2017 .......................................... 121

6
7

        (b)    Masimo Could Not Have Discovered Facts Sufficient To Bring A Claim Before January 9, 2017 ............................ 122

8

   2.   Laches ................................................................. 122

9
10

      a.    Laches Does Not Apply To Legal Claims Such as Trade Secret Misappropriation ..................................... 122

11

      b.    Legal Standard ................................................ 123

12

      c.    Apple Cannot Establish Laches ..................................... 124

13
14

          i.    Apple Cannot Show Masimo Unreasonably Delayed In Filing Suit ......................................... 124

15
16

          ii.    Apple Cannot Show Masimo Knew Of Apple's Technical Trade Secret Misappropriation .................................... 124

17
18

          iii.    The Unrebutted Evidence Shows Masimo Filed Suit Promptly After Learning About Apple's Misappropriation In Late 2019 ............. 124

19

          iv.    Apple Has Not Shown Prejudice ........................ 124

20

   3.   Waiver ................................................................. 125

21

      a.    Legal Standard ................................................ 125

22

      b.    Apple Cannot Establish Waiver ................................... 125

23

  H.    Apple Has No Other Defenses ......................................... 125

24

V. MISCELLANEOUS ......................................................... 126

25
26
27
28

1

# TABLE OF AUTHORITIES

2

**Page No(s).**

3

4

*ABBA Rubber Co. v. Seaquist*,
   235 Cal. App. 3d 1 (1991) ............................................................... 99

5

*Alamar Biosciences Inc. v. Difco Laboratories Inc.*,
   1996 WL 648286 (E.D. Cal., Feb. 27, 1996) .................................. 119

6

7

*Alert Enter., Inc. v. Rana*,
   2023 WL 2541353 (N.D. Cal. Mar. 16, 2023) ................................ 100

8

*Am. Can Co. v. Mansukhani*,
   728 F.2d 818 (7th Cir. 1982) ............................................................ 98

9

10

*Beech Aircraft Corp. v. EDO Corp.*,
   990 F.2d 1237 (Fed. Cir. 1993) .............................................. 109, 117

11

12

*Blaser v. State Teachers' Ret. Sys.*,
   86 Cal. App. 5th 507 (2022), *review denied* (Mar. 15, 2023) ........ 122, 123

13

*Boys Club of San Fernando Valley, Inc. v. Fid. & Deposit Co.*,
   6 Cal. App. 4th 1266 (1992) ............................................................ 125

14

*Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*,
   2013 WL 890126 (N.D. Cal. Jan. 23, 2013) .................................. 114

15

16

*Burlington Indus., Inc. v. Ellerth*,
   524 U.S. 742 (1998) ....................................................................... 100

17

18

*Cal. Ins. Guar. Ass'n v. Burwell*,
   227 F. Supp. 3d 1101 (C.D. Cal. 2017) .......................................... 113

19

*City of Ukiah v. Fones*,
   64 Cal. 2d 104 (1962) ..................................................................... 124

20

21

*Cnty. of Oneida v. Oneida Indian Nation of N.Y.*,
   470 U.S. 226 (1985) ................................................................. 122, 123

22

*Comet Techs. USA Inc. v. XP Power LLC*,
   2022 WL 4625149 (N.D. Cal. Sept. 30, 2022) .............................. 114

23

24

*Connolly v. Trabue*,
   204 Cal. App. 4th 1154 (2012) ................................................. 122, 123

25

26

*Conti v. Board of Civil Service Commissioners*,
   1 Cal. 3d 351 (1969) ....................................................................... 123

27

28

<div align="center">

**TABLE OF AUTHORITIES**
*(cont'd)*

</div>

**Page No(s).**

*Cruz v. Nat'l Steel & Shipbuilding Co.*,
   910 F.3d 1263 (9th Cir. 2018) ................................................................124

*Cypress Semiconductor Corp.v. Superior Ct.*,
   163 Cal. App. 4th 575 (2008) ...............................................................120

*Dana-Farber Cancer Inst., Inc. v. Ono Pharm. Co.*,
   964 F.3d 1365 (Fed. Cir. 2020) .............................................................107

*DRG/Beverly Hills, Ltd. v. Chopstix Dim Sum Cafe & Takeout III, Ltd.*,
   30 Cal. App. 4th 54 (1994) ...................................................................124

*DVD Copy Control Ass'n, Inc. v. Bunner*,
   116 Cal. 4th 241 (2004) ..........................................................................98

*eBay Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006).................................................................................113

*Eldorado Stone LLC v. Renaissance Stone*,
   2007 WL 3308099 (S.D. Cal. Oct. 24, 2007)..........................................119

*Eli Lilly & Co. v. Aradigm Corp.*,
   376 F.3d 1352 (Fed. Cir. 2004) .............................................................107

*Equate Media, Inc. v. Suthar*,
   2024 WL 1217217 (C.D. Cal. Mar. 20, 2024) .......................................113, 114

*Ethicon, Inc. v. U.S. Surgical Corp.*,
   135 F.3d 1456 (Fed. Cir. 1998) .............................................................107

*Fina Oil & Chem. Co. v. Ewen*,
   123 F.3d 1466 (Fed. Cir. 1997) .............................................................106

*Garcia v. Lawn*,
   805 F.2d 1400 (9th Cir. 1986) ...............................................................113

*Hays v. VDF Futureceuticals, Inc.*,
   2016 WL 5660395 (D. Haw. Sept. 28, 2016)..........................................120

*Imax Corp. v. Cinema Technologies, Inc.*,
   152 F.3d 1161 (9th Cir. 1998) ............................................................98, 99

*Imi-Tech Corp. v. Gagliani*,
   691 F. Supp. 214 (S.D. Cal. 1986) ...........................................................98

# TABLE OF AUTHORITIES
## (*cont'd*)

Page No(s).

*Johnson v. City of Loma Linda*,
  24 Cal. 4th 61 (2000) ...................................................................123

*Kaszuk v. Bakery & Confectionary Union & Indus. Int'l Pension Fund*,
  791 F.2d 548 (7th Cir. 1986) .........................................................113

*Keating v. Jastremski*,
  2021 WL 1195868 (S.D. Cal. Mar. 30, 2021) .................................119

*Kittrich Corp. v. Chilewich Sultan, LLC*,
  No. CV1210079GHKARGX, 2013 WL 12131376
  (C.D. Cal. Feb. 20, 2013)................................................................98

*Masimo Corp. v. True Wearables, Inc.*,
  2022 WL 17083396 (C.D. Cal. Nov. 7, 2022) ................................123

*Masimo v. True Wearables*,
  2022 WL 2173073 (C.D. Cal. May 17, 2022)..................................113

*Mattel, Inc. v. MGA Ent., Inc.*,
  801 F. Supp. 2d 950 (C.D. Cal. 2011) ............................................118

*Medtronic MiniMed, Inc. v. Nova Biomedical Corp.*,
  2009 WL 10672947 (C.D. Cal. Aug. 14, 2009) ................................99

*Monster Energy Co., v. Vital Pharms., Inc.*,
  2023 WL 8168854 (C.D. Cal. Oct. 6, 2023) ..........................114, 118

*Navigation Holdings, LLC v. Molavi*,
  2020 WL 5074307 ..........................................................................100

*Pannu v. Iolab Corp.*,
  155 F.3d 1344 (Fed. Cir. 1998) .....................................................107

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
  572 U.S. 663 (2014)................................................................122, 123

*Pinkette Clothing, Inc. v. Cosm. Warriors Ltd.*,
  894 F.3d 1015 (9th Cir. 2018) .................................................122, 123

*Rogers v. B. Braun Medical, Inc.*,
  Civ. No. 98-cv-250-B (RBB), Dkt. 390 and Dkt. 415
  (S.D. Cal. September 13, 2004).......................................................118

*Sargent Fletcher, Inc. v. Able Corp.*,
  110 Cal. App. 4th 1658, 3 Cal. Rptr. 3d 279 (2003) ........................98

1

2

# TABLE OF AUTHORITIES
## (*cont'd*)

3

Page No(s).

4

5

*SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*,
   580 U.S. 328 (2017)..................................................................122, 123

6

*SolarCity Corp. v. Pure Solar Co.*,
   2016 WL 11019989 (C.D. Cal. Dec. 27, 2016)..................................99

7

8

*Solis v. Couturier*,
   2009 WL 2022343 (E.D. Cal. July 8, 2009)....................................125

9

*The Ret. Grp. v. Galante*,
   176 Cal. App. 4th 1226 (Cal. Ct. App. 2009).....................................99

10

11

*Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*,
   750 F.2d 1552 (Fed. Cir. 1984) ......................................................114

12

13

*Univ. of Pittsburgh of Commonwealth Sys. of Higher Educ. v. Hedrick*,
   573 F.3d 1290 (Fed. Cir. 2009) ......................................................107

14

*Universal Bldg. Maint. LLC v. Calcote*,
   2022 WL 18397628 (C.D. Cal. Nov. 7, 2022) ................................114

15

16

*In re VerHoef*,
   888 F.3d 1362 (Fed. Cir. 2018), *as amended* (May 7, 2018)..........107

17

*Vinyl Interactive, LLC v. Guarino*,
   2009 WL 1228695 (N.D. Cal. May 1, 2009).....................................114

18

19

*Waller v. Truck Ins. Exchange, Inc.*
   11 Cal. 4th 1 (1995) .......................................................................124

20

21

*Wilshire Westwood v. Atlantic Richfield*,
   20 Cal. App. 4th 739 (1993) ...........................................................119

22

# OTHER AUTHORITIES

23

28 U.S.C. § 1331..................................................................................1, 97

24

28 U.S.C. § 1338..................................................................................1, 97

25

28 U.S.C. § 1367..................................................................................1, 97

26

28 U.S.C. § 1391..................................................................................2, 97

27

28 U.S.C. § 1400..................................................................................2, 97

28

28 U.S.C. § 2201..................................................................................1, 97

1
2
3

# TABLE OF AUTHORITIES
## (*cont'd*)

Page No(s).

4    28 U.S.C. § 2202 ............................................................................................. 1, 97
5    35 U.S.C. § 256 ...................................................................................... 1, 97, 116
6    35 U.S.C. § 271 ............................................................................................... 1, 97
7    35 U.S.C. § 281 ............................................................................................... 1, 97
8    Cal. Civ. Code § 2224 ......................................................................................... 118
9    Cal. Civ. Code § 3425.2 ...................................................................................... 113
10    Cal. Civ. Code § 3425.4 .............................................................................. 118, 119
11    Cal. Civ. Code § 3426.1 .................................................................................. 98, 99
12    Cal. Civ. Code § 3426.4 ........................................................................................ 99
13    Cal. Civ. Code § 3426.6 ..................................................... 119, 120, 121, 123
14    California Uniform Trade Secret Act, Cal. Civ. Code § 3246 ................................. 2
15    California Uniform Trade Secrets Act ......................................................... 1, 97, 113
16    California Uniform Trade Secrets Act, Cal. Civ. Code § 3426 ......................... 1, 97
17    Local Rule 52-1 ........................................................................................... *passim*
18    Rule 11 ............................................................................................................. 121
19    Rule 50 ............................................................................................................. 125
20    Rule 52 of the Federal Rules of Civil Procedure ................................................... 3
21    Rule 54 ............................................................................................................. 113
22    Article III of the United States Constitution ................................................... 2, 97
23
24
25
26
27
28

Pursuant to Local Rule 52-1, Plaintiffs Masimo Corporation and Cercacor Laboratories, Inc. respectfully submit these Proposed Findings of Fact and Conclusions of Law. This document includes a summary of key findings and conclusions Masimo anticipates the Court will make based upon Masimo's understanding of the evidence likely to be presented at trial. It does not purport to be exhaustive or to address all the findings and conclusions that may be appropriate based on the evidence actually offered at the trial scheduled to commence on Tuesday, November 5, 2024. Plaintiffs Masimo Corporation and Cercacor Laboratories, Inc. (now Willow), are collectively referred to as "Masimo" unless the distinction is material.

## I. **JURISDICTION AND VENUE**

Masimo Corporation is organized and exists under the laws of the State of Delaware and has its principal place of business in Irvine, California. Dkt. 2177-1 at 4. In 2024, Cercacor Laboratories, Inc., which was incorporated in Delaware, changed its name to Willow Laboratories, Inc. and changed its state of incorporation to Nevada. Hammarth ¶¶ 39-42; JTX-5188, JTX-5189, JTX-5190. Willow is organized and exists under the laws of the State of Nevada and has its principal place of business in Irvine, California. Dkt. 296-1 at 2; JTX-5187-5190.

Apple Inc. is organized and exists under the laws of the state of California, and has a principal place of business at One Apple Park Way, Cupertino, California, 95014. Dkt. 2177-1 at 4.

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 1338(a) because the Patent Infringement claims arise under federal patent laws, 35 U.S.C. §§ 271 and 281, because the Correction of Inventorship claims arise under federal patent law, 35 U.S.C. § 256, and under the Declaratory Judgement Act, 28 U.S.C. §§ 2201 and 2202.

The Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over Masimo's state law claims for misappropriation of trade secrets under the California Uniform Trade Secrets Act, Cal. Civ. Code § 3426, and for ownership of patent and

patent application claims.   Masimo's state law claims are related to the patent infringement and correction of inventorship claims such that that they form part of the same case or controversy under Article III of the United States Constitution.

This Court has personal jurisdiction over Apple and venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and 1400(b) because a substantial part of the events giving rise to the parties' dispute arose in this judicial district.   All these parties have been served and have appeared.   No other parties have been named in the pleadings.

## II.  PROCEDURAL POSTURE OF THE CASE

The parties will proceed to a bench trial on the following issues.

Masimo's issues pled in its Fourth Amended Complaint (Dkt. 296-1; Dkt. 750) include:

| | |
|---|---|
| Claim 13: | Apple violated the California Uniform Trade Secret Act, Cal. Civ. Code § 3246 *et seq.* by misappropriating Masimo's trade secrets. |
| Claims 14 & 20: | One or more Masimo employees should be named as an inventor of subject matter claimed in, and Masimo is at least a joint owner of, U.S. Patent No. 10,078,052. |
| Claims 15 & 21: | One or more Masimo employees should be named as an inventor of subject matter claimed in, and Masimo is at least a joint owner of, U.S. Patent No. 10,247,670. |
| Claims 16 & 22: | One or more Masimo employees should be named as an inventor of subject matter claimed in, and Masimo is at least a joint owner of, U.S. Patent No. 9,952,095. |
| Claim 23: | Masimo is at least a joint owner of U.S. Patent No. 10,219,754. |
| Claims 26 & 28: | One or more Masimo employees should be named as an inventor of subject matter claimed in, and Masimo is at least a joint owner of, U.S. Patent No. 11,009,390. |

Apple's issues for trial from its Amended Answer (Dkt. 370) include: (1) Statute of Limitations, (2) Laches, and (3) Waiver.

1

2

3

4

     The Court bifurcated Masimo's Claims 11-12 regarding Apple's infringement of Masimo's patents (U.S. Patent Nos. 8,457,703 and 10,433,776, respectively) for trial at a later date. Dkt. 2062. Masimo reserves all rights with respect to its Claim 4 of the Fourth Amended Complaint (infringement of U.S. Patent No. 10,588,554).

5

6

7

     On October 16, 2024, Plaintiffs submitted direct testimony by declaration. On October 23, 2024, Apple submitted direct testimony by declaration. On October 25, 2024, Apple submitted direct testimony for Dr. Weber.

8

     Commencing on November 5, 2024, the Court will conduct a bench trial.

9

10

11

12

     Masimo and Cercacor hereby request that this Court, once it has reviewed all evidence submitted by the parties, make the following Findings of Fact and Conclusions of Law, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure and Local Rule 52-1.

13

### III.  **PROPOSED FINDINGS OF FACT**

14

**A.**  **Background**

15

    **1.**  **Pulse Oximetry**

16

17

18

19

20

    1.    Pulse oximeters non-invasively measure oxygen saturation in a person's blood. Diab ¶ 82.[1] They also measure pulse rate, among other parameters. *Id.* Pulse oximeters work by shining red and infrared light through the tissue, detecting the light after it has passed through the tissue, and comparing how blood absorbs light at the emitted wavelengths of red and infrared light. *Id.* ¶¶ 84-86.

21

22

23

    2.    Pulse oximetry systems are typically composed of (1) a monitor containing electronics and processing circuitry, (2) a sensor that attaches to a patient to detect a physiological signal, and (3) a cable connecting the monitor and the sensor. *Id.* ¶ 83.

24

25

26

27

28

---

[1] The parties' trial declarations are cited by the last name of the relevant witness.



JTX-2943[2] at -720-22; JTX-P-0132.  The sensor attaches to a patient's finger, wrist, or other body part.  Diab ¶ 83.

      3.    The sensor comprises light sources, such as light-emitting diodes ("LEDs"), that emit light at different wavelengths through the patient's tissue.  *Id.* ¶ 84.  The sensor measures signals by detecting light with an electronic part called a photodetector or detector.  *Id.* ¶ 89.  That detector outputs one electrical signal (a composite signal) that represents the intensity of all the detected light (i.e., emitted light that is not absorbed by the tissue, as well as ambient light, that reaches the detector) over time.  *Id.*  To obtain the relevant light intensity information from the detected signal, signal processing extracts (or demodulates) the composite signal of interest (red and infrared light intensity) and separates (or demultiplexes) that composite signal into the two signals needed to calculate oxygen saturation, which are called photoplethysmographs ("pleths" or "PPGs" for short): (1) one PPG for red light and (2) one PPG for infrared light.  *Id.* ¶ 90.  An exemplary PPG for red light is shown below.  *Id.*

---

[2] Trial exhibits are cited as JTX-[#].

Diab ¶ 90.

4.    For a given wavelength (e.g., red or infrared light) the PPG contains information about the blood flow and blood content at the measurement site. Diab ¶ 90. The amount of light absorbed by the tissue, and the corresponding detected, signal changes over time. *Id.* ¶ 88. One reason this happens is because the heart is pumping blood through the body, which results in the amount of blood changing over time or pulsatile blood flow. *Id.*

5.    Each cardiac cycle appears as a peak in the PPG followed by a trough. *Id.* ¶ 90. Accurately measuring the height of the peak and depth of the trough for each PPG is not needed to determine pulse rate. *Id.* Instead, pulse rate is determined by counting repeating features, such as peaks, in a PPG corresponding to one wavelength. *Id.* However, to determine oxygen saturation and other more complex measurements, it is critical to accurately measure the height of the peak and depth of the trough of the PPG for each emitted wavelength of light. *Id.* ¶¶ 90-91. The pulse oximeter uses the resulting red and infrared PPGs to determine an oxygen saturation value. *Id.* ¶ 109.

6.    Early generation pulse oximeters, and many oximeters to this day, calculate incorrect measurements or no measurements at all when the PPG signals are corrupted, by movement or otherwise. *Id.* ¶¶ 8-9, 111-112.

7.    Pulse oximetry sensors operate according to one of two modes: transmittance (or transmissive) (below, left) or reflectance (below, right).



*Id.* ¶ 85.

8.      In a transmittance sensor, the sensor's red and infrared light sources (shown at the top of the finger) are on the opposite side from the detector.  The sensor can detect the emitted light that transmits through and reaches the detector on the other side of the tissue.  *Id.*

9.      In a reflectance sensor, the sensor's red and infrared light sources and are on the same side of the tissue as the detector.  The sensor can detect the emitted light that passes through tissue and reflects back to the sensor.  *Id.* ¶ 86.

10.     In either sensor type, some the light emitted by the sensor is absorbed by the patient's tissue and pulsating blood before it is detected.  *Id.*  Depending on the measurement site (e.g., finger or wrist), a transmittance or reflectance pulse oximetry sensor may be used.  *Id.*  Masimo develops and sells transmittance and reflectance pulse oximetry sensors.  *Id.* ¶ 87.

11.     Diab is an inventor of U.S. Patent No. 5,632,272 ("the '272 patent"), which is based on work he and his Masimo colleagues did between approximately 1990 and 1994. *Id.* ¶ 92; JTX-1267.  The '272 patent provides an overview of some basic concepts applied by Masimo and modern pulse oximetry sensors.  Diab ¶¶ 92-93.

12.     Figure 11 of the '272 patent illustrates the general components of a pulse oximetry sensor (300) at a high level.  *Id.*  ¶ 93; JTX-1267 at -829.  The red emitter (301) and infrared emitter (302) are quickly turned on and off in alternating fashion many

times per second.  The emitted light passes through the tissue (310) and reaches the detector (320), which converts the detected light into one analog electrical signal corresponding to the intensity of all light that hits the detector (i.e., a composite signal). The detector outputs the detected signal to the front-end analog signal conditioning circuitry (330) for amplification.  After amplification, the digital conversion circuit (332) converts the analog signal into a digital signal (i.e., digital numbers).  The digital signal processing system (334) processes the digital signal to compute the user's oxygen saturation, and the computed value is shown on a display.  Diab ¶¶ 93-94; JTX-1267 at -829 (FIG. 11).

13.    Figure 12 of the '272 patent shows amplification and filtering that is done to remove irrelevant information from the detected signal (composite signal) before converting it to a digital signal.  JTX-1267 at -830 (FIG. 12).  The entire detected signal is first amplified by a small amount using a pre-amplifier (342).  However, the entire signal can include portions that are not relevant to the pulse oximetry calculation, such as portions of the signal due to ambient light (e.g., from the sun, room lights, etc.) that reaches the detector.  Those irrelevant portions may have an intensity that is hundreds of times larger than the intensity of the relevant information (i.e., the intensity of emitted red and infrared light that is detected).  Diab ¶¶ 96-99; JTX-1267 at -830 (FIG. 12).

14.    After high pass filtration, the signal is output to a fixed amplifier (346) and a programmable-gain amplifier (348).  The fixed amplifier amplifies the signal by a set amount, or does nothing.  The programmable-gain amplifier is programmable and can be adjusted based on the needs of the device, such as by amplifying the signal more when the signal is weaker (e.g., the user has a thicker finger) and less when the signal is stronger (e.g., the user has a thinner finger).  Diab ¶ 100; JTX-1267 at FIG. 12.

15.    After amplification, the signal is output to a low pass filter (350) to pass the relevant parts of the signal while removing higher frequency noise that could result in various errors if not removed.  Diab ¶¶ 101-102; JTX-1267 at FIG. 12.

16.   Modulation is a technique to transmit a signal through a medium that can then be reliably extracted through an inverse process called demodulation.  Figures 14 and 15 of the '272 patent show the digital processing system (334) which performs demodulation and demultiplexing functions on the digital signal.  In pulse oximetry, modulation refers to turning the red and infrared LEDs on and off so that the relevant portions of the detected light signal (i.e., the portions of the light signal due to the sensor-emitted red and infrared light) can be identified and extracted from ambient light after being detected by the detector.  The activation and deactivation of light sources (LEDs) in a repetitive cycle over time creates a modulated signal.  Diab ¶¶ 103-106; JTX-1267 at FIGS. 11, 14.

17.   A pulse oximetry device needs a way to extract the relevant portions of the detected signal.  The technique Masimo uses to extract the signal containing detected light intensities corresponding to when the red and infrared LEDs are emitting light from the overall detected signal is called demodulation.  In FIG. 14 of the '272 patent, after amplification, filtration, and digitization, the relevant portions of the resulting digital signal are obtained using the demodulation module (400).  Diab ¶ 107; JTX-1267 at FIG. 14.

18.   Calculating measurements of oxygen saturation requires a separate red PPG and an infrared PPG.  Therefore, the composite signal must be separated into a red signal and an infrared signal (i.e., separate "channels" or "data streams") to create the PPGs. The technique Masimo uses to separate the composite signal into a red signal and an infrared signal is called demultiplexing (or "demux" or "dmux").  In FIG. 15 of the '272 patent, demultiplexing separates the demodulated signal into four signals: (1) red + ambient light, (2) ambient light, (3) infrared + ambient light, (4) ambient light.  From those signals, the device determines the separate red and infrared PPG signals that are needed to calculate oxygen saturation measurements.  Diab ¶ 108; JTX-1267 at FIG. 15.

19.   An idealized, demodulated and demultiplexed PPG for light of a particular wavelength (red or infrared) is shown in FIG. 1 of the '272 patent, with time (t) on the

1   x-axis and the intensity of the detected light (I) on the y-axis. Diab ¶ 109; JTX-1267 at

2   FIG. 1.

3       20.    Once the detected signal has been conditioned and processed into separate

4   red and infrared PPG signals, the pulse oximeter device further separates each PPG

5   signal into (1) the varying portion attributable to the pulsatile arterial blood entering and

6   exiting the measurement site, which is called the "AC component," and (2) the relatively

7   constant portion attributable to bloodless tissue, bone, and non-pulsatile blood, which is

8   called the "DC component." Diab ¶ 109. Using the AC and DC components of the red

9   and infrared PPG signals, the pulse oximeter computes a "ratio of ratios" to determine

10  an oxygen saturation value ("SpO$_2$"). *Id.*

11      **2.    Masimo's Founding and Goals**

12      21.    Masimo is a leader in pulse oximetry. *See* Kiani ¶¶ 45-53. Most patient

13  monitoring companies, including most of Masimo's former competitors, are now

14  Masimo customers who include Masimo pulse oximetry technology in their products.

15  *Id.* ¶ 48. Today, over 100 different OEMs integrate Masimo circuit boards into their

16  products, including predominantly patient monitors but also infant incubators, infant

17  warmers, ventilators, anesthesia machines, and defibrillators. *Id.*

18      22.    Joe Kiani founded Masimo, originally named Vital Signals, in 1989. Kiani

19  ¶¶ 1, 14-26. Mohamed Diab joined Masimo about six months after Masimo's founding.

20  Kiani ¶ 20; Diab ¶ 7; JTX-781 at -766. As founded, the mission of Masimo was to

21  improve patient outcomes and reduce the cost of care by taking noninvasive monitoring

22  through "new sites and applications." Kiani ¶ 15. By "new sites and application," Kiani

23  meant to extend the use of pulse oximetry beyond the traditional setting in the operating

24  room and intensive care unit. *Id.* Traditionally, pulse oximetry had been significantly

25  more reliable in those settings where a patient is anesthetized and does not move. *Id.* ¶

26  17. Kiani recognized that pulse oximetry at the time suffered from a significant flaw—

27  the "motion problem" in pulse oximetry, which prevented accurate pulse oximetry

28  measurements when the patient was moving and led to false alarms. *Id.* ¶¶ 10-13, 15-

16; Diab ¶¶ 8-9, 111-112. Kiani believed that he could solve the "motion problem." Kiani ¶¶ 10-13, 15-16. Others in the pulse oximetry industry maintained that the motion problem was unsolvable. Kiani ¶ 3; Diab ¶ 11.

### 3. Masimo's Development of SET

23. After Diab joined the company, Kiani and Diab developed pulse oximetry algorithms. Kiani ¶ 22; Diab ¶ 12. Diab designed circuits and wrote the software that Masimo used when developing its pulse oximetry technology. *Id.* Masimo named its technology Masimo SET for "Signal Extraction Technology." Kiani ¶ 23; Diab ¶ 13.

24. By late 1989, Kiani and Diab recognized that, in addition to the "motion problem," another problem known as "low perfusion" contributed to the inaccuracy of pulse oximeters. Kiani ¶¶ 10, 15, 17; Diab ¶¶ 8-9. Low perfusion happens when the patient has low blood flow. *Id.* Low perfusion further complicates the motion problem and makes it even more difficult for pulse oximeters to accurately measure during motion. *Id.* As such, Masimo set a goal to address both low perfusion and motion problems. Kiani ¶ 21; Diab ¶ 10.

25. Through research and development, Kiani and Diab developed multiple algorithms for measuring oxygen saturation. Diab ¶¶ 12-19. These algorithms use adaptive filters, spectral estimation, frequency domain techniques, time domain techniques, and other signal processing techniques. *Id.* By the early 1990s, Kiani and Diab had discovered their first solution and could extract a reliable pulse oximetry signal even when the measurement site was being disturbed by motion. Diab ¶ 13; Kiani ¶ 23. This was the beginning of Masimo SET. Diab ¶¶ 13-19; Kiani ¶ 23. Kiani and Diab photographed themselves documenting their success with their early results of their breakthrough. Kiani ¶ 25; Diab ¶ 14; JTX-1902.

26. Over many years, Kiani and Diab extensively researched and developed these algorithms to improve the measurement accuracy of pulse oximeters. Diab ¶¶ 12-19. Collectively, Masimo refers to its propriety oxygen saturation and pulse rate

measuring technology, including the associated algorithms, as Masimo SET (or "Signal Extraction Technology"). Diab ¶ 19.

27. Masimo released its first products with SET technology in the 1990s. Diab ¶¶ 21-38; Kiani ¶ 31; JTX-1270 at -304. In 1995, Masimo released circuit boards to incorporate in other manufacturers' products. Kiani ¶ 31; Diab ¶¶ 24-27; JTX-1270 at -304. The first circuit board Masimo released was called MS-1. *Id.* In 1996, Masimo released its first sensors called the LNOP ("low noise optical probe") sensors. Kiani ¶¶ 33-34; Diab ¶¶ 28-29; JTX-2749, 2750.

28. Over 100 scientific studies have shown the superior accuracy and clinical benefits of Masimo SET over conventional pulse oximetry. Kiani ¶¶ 72-76; Diab ¶¶ 66-70; JTX-5134; JTX-2752; JTX-2748; JTX-1270; JTX-5175; JTX-5176.

29. Masimo's breakthrough technology proved especially useful with premature infants in neonatal intensive care units. Kiani ¶¶ 72-73; Diab ¶ 40-41. Several studies concluded that Masimo's pulse oximeters saved the vision of thousands of babies by preventing retinopathy of prematurity. Kiani ¶¶ 72-73; Diab ¶ 41.

30. In 1998, Masimo announced it received Food and Drug Administration ("FDA") clearance for its measure-through motion technology. Kiani ¶ 37; JTX-5135 at -367; JTX-2749; JTX-2750. Masimo received expanded FDA clearance in 1999 for its measure-through motion technology, covering neonates to adults. Kiani ¶ 40; Diab 35; JTX-5136 at -373-74. Masimo also released the "Radical" around this time. Diab ¶¶ 35-37; JTX-1270.

31. Masimo has received many awards recognizing the revolutionary capabilities of Masimo SET. Kiani ¶¶ 81-88; JTX-1847; JTX-1857; JTX-2801; JTX-5137; *see also* JTX-1868; JTX-1869; JTX-1870; JTX-1871; JTX-2725; JTX-2726; JTX-2728 – JTX-2745; JTX5142 – JTX-5151; JTX-5181; JTX-5182.

32. To introduce its first pulse oximeter to market, Masimo raised over $100 million for the necessary research and development. Kiani ¶ 44; Diab ¶ 39. Over the

next 20 years, and to this day, Masimo continued to invest a large portion of its revenue to further research and development.  Kiani ¶ 44; Diab ¶ 39.

33.    The Masimo SET algorithms, and the insights obtained during their development, are extremely valuable to Masimo.  Diab ¶ 19.  While at Masimo, Diab had worked on algorithms to process and filter PPGs and related parameters for over thirty years.  Diab ¶ 239.  Masimo's applied signal processing, filtering algorithms, and source code, as well as many details of Masimo's system design and hardware, are maintained in secret.  *Id.*  Kiani and Diab filed patents on many Masimo SET algorithms individually, but others were kept confidential.  *Id.* ¶ 20.

### 4.    Masimo Develops Rainbow Technology

34.    In around 1995, Diab and his team of engineers at Masimo started developing technology for noninvasively measuring other physiological parameters, besides oxygen saturation.  Diab ¶¶ 117-118.

35.    In about 1998, Masimo spun out a company called Masimo Laboratories, which later became Cercacor, and is now Willow.  Kiani ¶ 55; Diab ¶ 50.  Cercacor focused on ███████████████████ and other physiological parameters that nobody else had been able to measure.  Diab ¶¶ 51, 54; Kiani ¶ 56.  While working to achieve such measurements, Masimo and Cercacor developed the ability to measure oxygen saturation as well as a variety of useful physiological parameters using six, eight, or more wavelengths of light.  Diab ¶ 54.  Masimo and Cercacor eventually referred to these parameters as "rainbow" parameters and the technology as rainbow SET.  Kiani ¶ 60; Diab ¶ 54; JTX-1908.  Masimo and Cercacor entered into cross-licensing agreements that allow them to work together confidentially on rainbow and the other technologies they develop.  Kiani ¶¶ 57-58; Diab ¶¶ 51-52; Hammarth ¶¶ 5-9; JTX 1344.

36.    In 2005, Masimo released its first products with rainbow technology: (1) the MX-1 circuit board for OEM customers; (2) the Rad-57 handheld monitor; and (3) the Radical-7 bedside monitor.  Diab ¶¶ 58-59; JTX-1270 at -306-307; JTX-1879 at

-053-135.  The Rad-57 remains widely used by fire departments to check firefighters to carbon monoxide (CO) poisoning.  Diab ¶¶ 64-65; JTX-1882 at -657-58.

37.    Cercacor began developing a ███████████████████ █████████████████████████████████████████████████████ ███████████████    Kiani ¶ 99; JTX-1378.

38.    Through the rainbow project, Masimo developed the ability to measure numerous blood parameters in addition to oxygen saturation and pulse rate, including (1) carbon monoxide (SpCO), which can identify people with carbon monoxide poisoning; (2) SpMet (methemoglobin), which can detect dysfunctional hemoglobin caused by drugs administered in the hospital; and (3) total hemoglobin, which allows detection of hidden bleeding is therefore important for surgeries or postpartum hemorrhaging.  Diab ¶¶ 54-57.  Masimo's advance from pulse oximetry to rainbow technology was a significant leap forward in non-invasive monitoring because rainbow could detect serious health issues that pulse oximeters could not.  *Id.* ¶¶ 117-120.

### 5.    Masimo Hires Lamego

39.    In 2000, Masimo hired Lamego.  Kiani ¶ 7150; Diab ¶ 138; Miller ¶ 16; JTX-808 at -614.

40.    Lamego signed his first confidentiality agreement when he first joined Masimo in 2000.  JTX-810; Miller ¶ 18.  Lamego agreed not to use or disclose Masimo's confidential information, during and after his employment at Masimo.  JTX-810 at ¶¶ 1-2; Miller ¶¶ 20-21.  Lamego also agreed that the "fruits and products" of his labor at Masimo would belong solely to Masimo.  JTX-810 at ¶ 6; Miller ¶ 23.

41.    Before working at Masimo, Lamego had no experience with pulse oximetry.  Kiani ¶ 150; Diab ¶¶ 138-139.  Diab taught Lamego about the technological concepts critical to Masimo's business, which was a major undertaking.  Diab ¶ 139.

42.    When Lamego started at Masimo, Diab and Lamego worked closely together every day, primarily on Masimo's rainbow technology.  Diab ¶ 140.  Diab and Lamego quickly became close, both as colleagues and friends.  *Id.*

-13-

43.     In 2001, Lamego left Masimo and moved to Brazil. *Id.* ¶ 141; Kiani ¶ 152; Miller ¶ 17; JTX-808 at -614. By that time, Diab had taught Lamego everything he knew about light propagation through tissue, how pulse oximeters work, Masimo's prior learnings in these areas, and Masimo's goals to non-invasively measure other physiological parameters. Diab ¶ 142.

44.     After Lamego left Masimo in 2001, Masimo developed a complex computer simulation to formally assess the feasibility of its multi-wavelength sensor concepts and technologies. *Id.* ¶¶ 143-144. The simulation, which required 40 computers connected together to run, was referred to as "Big Red." *Id.*; JTX-1904. Based on the results of the Big Red simulation, Kiani agreed that Masimo should create a formal project, using more engineers and resources, to develop its multi-wavelength sensor technologies for measuring additional physiological parameters (e.g., carbon monoxide, total hemoglobin). Diab ¶ 145. That project became project rainbow. *Id.*

45.     Lamego later moved back to the United States and rejoined Masimo in 2003 as a research scientist. Kiani ¶ 152; Diab ¶ 158; Miller ¶ 17; JTX-808 at -614. When Lamego returned to Masimo, he was part of Masimo's core technical team and frequently interacted with Diab and the rest of Masimo's engineers, including hardware engineers like Bob Smith and Dave Dalke, the rainbow project manager Ammar Al-Ali, with the sensor team including Gene Mason and Sean Merritt, and basically every Masimo engineer working on the rainbow project. Diab ¶ 162. Masimo tasked Diab with exposing Lamego to Masimo's technology. Kiani ¶ 153. Masimo also tasked Lamego with learning from Diab, and then helping develop some of Masimo's most complex technologies. Kiani ¶ 155.

46.     On January 28, 2003, Lamego signed a second Masimo confidentiality agreement. JTX-1312.

**6.    Lamego Becomes CTO of Cercacor and Develops Pronto-7**

47.    Masimo believed Lamego could eventually take over Masimo's advanced research.  Kiani ¶¶ 153-58.  Because of concerns about Diab's health at the time, Masimo planned on having Lamego take over for Diab.  *Id.*

48.    Masimo took the necessary steps to prepare Lamego to succeed Diab, including exposing Lamego to everything Diab knew about Masimo technology, giving Lamego unfettered access to Masimo's confidential information, such as rainbow SET source code, and having Lamego share an office with Diab.  *Id.*; Diab ¶¶ 138-42.

49.    Lamego had spent years absorbing knowledge from Masimo and Cercacor. *E.g.*, Kiani ¶¶ 45-54, 72-76, 77-91 (explaining superiority of Masimo and Cercacor technology), 153-58 (explaining Lamego's exposure to Masimo and Cercacor technology).

50.    In 2005, Lamego signed a third Masimo confidentiality agreement.  JTX-2978.

51.    By signing the Masimo confidentiality agreements, Lamego agreed to multiple provisions stating: "After my employment with Masimo has terminated, I will not disclose or make use of any Confidential Information for any purpose, either on my own or on behalf of another business."  JTX-808 ¶ 2; JTX-1312 ¶ 2; JTX-2978 ¶ 2.

52.    In February 2007, Kiani appointed Lamego to CTO of Cercacor.  Kiani ¶¶ 159-162; JTX-830; Hammarth ¶ 27; Miller ¶ 25.  Lamego served as Cercacor's CTO until January 2014.  Hammarth ¶¶ 27-28; JTX-2263; Kiani ¶¶ 161, 202; JTX-786.

53.    Lamego was charged with assembling a team of engineers and scientists with the goal of applying the rainbow technology to ███████████████  Kiani ¶¶ 161-62; JTX-830.

54.    Even after Lamego left Masimo to become CTO of Cercacor, he continued to have access to confidential Masimo documents.  Muhsin ¶¶ 31-37; JTX-2354, 2556, 2560, 2565.

55.     Cercacor engineers and technicians reported to Lamego as CTO.  Lamego reported to Cercacor's CEO, Joe Kiani.  Kiani ¶ 161; JTX-830.  Kiani relied on Lamego to lead Cercacor's daily operations.  Kiani ¶ 162.

56.     Lamego signed a Confidentiality Agreement, agreeing that his work product would belong to Cercacor, and to not use or disclose confidential information if he left Cercacor.  JTX-769 ¶¶ 2, 7; Hammarth ¶¶ 30, 33, 35; Kiani ¶ 160; *see also* JTX-2233 at -617 (¶¶ 2, 7).

57.     By signing the Cercacor Confidentiality Agreement, Lamego agreed to JTX-769 ¶ 2 providing that:  After my employment with [Cercacor] has terminated, I will not disclose or make use of any Confidential Information for any purpose, either on my own or on behalf of another business.

58.     By signing the Cercacor Confidentiality Agreement, Lamego also agreed to JTX-769 ¶ 11, providing that:  Upon termination of my employment for any reason, I will immediately assemble all property of [Cercacor], including any proprietary or confidential information, in my possession or under my control and return it unconditionally to [Cercacor].

59.     As CTO, Lamego had access to all of Cercacor's technical documents, including source code, engineering, and clinical documents.  Kiani ¶ 156; Hammarth ¶ 24.

60.     Lamego supervised the development of the Pronto-7 monitor at Cercacor.  Poeze ¶¶ 16-18; Kiani ¶ 162.  Lamego also supervised Cercacor algorithm and engineering teams.  Poeze ¶¶ 16-18; Kiani ¶ 162.  Lamego was Poeze's supervisor when he started at Cercacor.  Poeze ¶ 16.  Poeze worked on a product called G0 which became the G1, a later version, and this became Pronto-7, which was the final product as sold.  *Id.* at ¶ 17.  Pronto-7 is a handheld non-invasive hemoglobin measurement device.  *Id.* Cercacor uses multiple wavelengths of light from LEDs to measure the hemoglobin.  *Id.* The Pronto-7 and the things leading up to it involved demodulation and demultiplexing

of the signals from the many wavelengths of light required to measure hemoglobin non-invasively. *Id.*

61.    In 2010, Masimo released its Pronto and Pronto-7 devices, which allowed clinicians to spot-check hemoglobin measurements non-invasively.  Kiani ¶¶ 67-68; Diab ¶¶ 61-62; JTX-1270 at -308; JTX-831.

62.    Lamego will testify that he was Cercacor's "intellectual property shepherd" and he knew it was his job to make sure that Masimo's and Cercacor's confidential information "didn't get public."

63.    On January 9, 2014, Lamego resigned from Cercacor because he had accepted an offer to join Apple.  Kiani ¶ 202; JTX-786; JTX-1716; JTX-2987.  Lamego resigned with no forewarning to Cercacor, right at the beginning of the World Patient Safety Summit that was being led by Kiani, with dignitaries from around the world.  Kiani ¶ 202; JTX-786.  Lamego knew how important this Summit was for Kiani.  Kiani ¶ 205.  Indeed, Kiani took extraordinary steps to show Lamego he was valued as Cercacor's CTO.  Kiani ¶ 206.  This included bringing Lamego to Patient Safety Summit in 2013, and arranging to have Lamego meet and take a photograph with former President Bill Clinton.  Kiani ¶ 205; JTX-5141.  Lamego's resignation and the timing caught Kiani completely off guard.  Kiani ¶ 205.

### 7.    Masimo's Consumer Products

64.    Before Lamego joined Masimo in 2000, Masimo explored the need for a wireless, wearable pulse oximeter and sensor.  Kiani ¶ 97; JTX-1506 at -311.

65.    In 2012, Masimo released the first pulse oximeter for both Apple and Android mobile devices, which it called iSpO2.  Kiani ¶¶ 92-94, 167-168; JTX-1270 at -309, -366; JTX-P-0018; JTX-2761.  Masimo also presented the iSpO2 at the Consumer Electronics Show in January 2013.  Kiani ¶ 167.

66.    In 2015, Masimo Corp. released a compact, wireless pulse oximeter called MightySat that clips onto a person's finger and does not require a separate monitor.

Kiani ¶ 95; JTX-P-0022; JTX-P-0023, JTX-P-0169; JTX-5193; JTX-2542; JTX-3297; JTX-3511.

67. The Radius PPG is a wearable, wireless, disposable pulse oximeter. Masimo announced its FDA clearance in May of 2019. Kiani ¶¶ 104-11; JTX-1354; JTX-5183; JTX-5194; JTX-2998; JTX-P-0001; JTX-P-0002. The Radius PPG has been in high demand and is a very successful product. Kiani ¶ 109.

68. Masimo also developed a wrist-worn monitor for a health watch. Muhsin ¶¶ 53-66; Kiani ¶¶ 113-14; JTX-5191; JTX-5192; JTX-P-0098; JTX-P-0099; JTX-P-0110. Masimo called its first health watch the Masimo W1. Muhsin ¶ 53; Kiani ¶ 113; JTX-P-0110.

69. Masimo developed the Masimo W1 in part to monitor wearers that are taking opioid drug for opioid induced respiratory depression, which can result in death. Kiani ¶¶ 101-03, 112, 114.

70. Masimo developed its wrist-worn technology with clinical-grade accuracy, usability, and durability. Muhsin ¶ 54. Masimo followed FDA guidance on its clinical tests to ensure its wrist-worn technology met Masimo's standards for clinical-grade accuracy. *Id.* at ¶¶ 55-59. Masimo tested the accuracy of the Masimo W1 against a gold standard continuous invasive blood draw for reference. *Id.* at ¶ 59. Masimo also tested the accuracy of the Masimo W1 in accordance with International standard ISO 80601-2-61, by subjecting test subjects to desaturation events. *Id.* at ¶ 58, 60-62; JTX-696.

71. In November 2023, Masimo received FDA 510(k) clearance for the Masimo W1 for over the counter and prescription use to provide continuous real time oxygen saturation and pulse rate. Muhsin ¶ 63; Kiani ¶ 116; JTX-5192 and 5193.

72. Hospitals have begun to recognize the benefits of the Masimo W1 to remotely monitor patients at home. Kiani ¶ 115.

73. Masimo designed the wrist-worn sensor used in the Masimo W1 to be modular, so that the module could be incorporated into third-party watches. Muhsin ¶ 66; Kiani ¶¶ 122, 125; JTX-P-0096. The Masimo SET board used in the wrist-worn

sensor module in the Masimo W1 incorporates all sensors and circuitry and is approximately the size of a quarter. Kiani ¶ 118, JTX-P-0098, JTX-P-0110. Masimo's goal is to get its wrist-worn technology into the hands of as many people as possible, as quickly as possible, and is open to having other companies manufacture their devices using Masimo's biosensing technology. Kiani ¶ 122.

74. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

75. On September 13, 2024, Masimo announced a partnership with Google, whereby Masimo will develop a reference platform using Masimo's wrist-worn sensor technology for third-party watches that use Google's Wear OS platform. *Id.* at ¶ 124. This partnership will allow third-party watch developers to incorporate Masimo's wrist-worn biosensing technologies and standardize on Masimo's reference platform. *Id.*; Muhsin ¶ 66.

76. Masimo has plans for future wrist-worn products including ██████ ██ Freedom watch. Kiani ¶¶ 120-121; JTX-1363. The upcoming Freedom is designed as a smartwatch that will include cell phone functionality and is designed to be a beautiful product. Kiani ¶ 121.

**B.    Masimo And Cercacor Protect Their Confidential Information**

77. Protecting intellectual property is critical to Masimo's success in protecting its innovations from its competitors. Kiani ¶¶ 49-54; Diab ¶¶ 71-77, 157, 178, 219, 228. Masimo and Cercacor pursue both patent and trade secret protection. Kiani ¶¶ 126-134; Diab ¶ 71.

78. Masimo and Cercacor take measures to protect their confidential information. Kiani ¶¶ 127-31; Diab ¶¶ 71-77. Masimo and Cercacor have policies that require sensitive documents and information be labeled "CONFIDENTIAL AND PROPRIETARY." Kiani ¶ 128; Muhsin ¶¶ 17-19; Hammarth ¶ 25; *see, e.g.*, JTX-936

(exemplary Cercacor ████████ document labeled as "CONFIDENTIAL AND PROPRIETARY"). The policies also restrict these documents and information from disclosure to third parties, and employees on a need-to-know basis. Kiani ¶ 128; Muhsin ¶¶ 17-19, 32-34; Hammarth ¶ 13; JTX-2556 (exemplary Masimo document showing that Masimo grants network access to employees on a need-to-know basis); JTX-2266 at -556 (exemplary Cercacor document restating the policy that access to confidential information is granted on a "need-to-know" basis and must be authorized by management).

79.  All employees at Masimo and Cercacor are responsible for maintaining confidentiality. Kiani ¶ 130; Hammarth ¶¶ 10-11. Masimo and Cercacor have their employees sign confidentiality agreements upon hiring, and whenever the agreement changes. Miller ¶¶ 5-10, 12; Hammarth ¶¶ 10-12; Kiani ¶ 69; *see also* JTX-2514 (exemplary Masimo Employee Confidential Agreement); JTX-2388 (the Willow Code of Business Conduct and Ethics); Diab ¶ 77; JTX-2981.1.

80.  Masimo and Cercacor require that each employee receive training on the company's confidentiality policies as part of their onboarding. Kiani ¶ 130; Muhsin ¶ 20; Miller ¶ 12. The companies also provide ongoing training and annual retraining to ensure that employees understand and adhere to these policies. Muhsin ¶ 22; Hammarth ¶ 16. Masimo's head of human resources (Tracy Miller), Cercacor's Chief Financial Officer, and sometimes Masimo's general counsel (Tom McClenahan) are involved in the training process. Kiani ¶ 130; Miller ¶ 12. Masimo occasionally has its lawyers present to employees about the importance of compliance with Masimo's confidentiality policies. Muhsin ¶ 21; Diab ¶ 75.

81.  When an employee leaves the company, Masimo and Cercacor conduct an exit interview with the employee to remind the employee of their continuing confidentiality obligations and require them to return all Masimo property in their possession. Miller ¶¶ 13-15; Hammarth ¶ 37.

82.    The companies employ physical safeguards, including keycard access and visitor logging, to protect confidential information.  Muhsin ¶¶ 8-12; Hammarth ¶¶ 20-21; Diab ¶¶ 72-73.  Masimo also has secure sign-in and escort procedures for added security.  Muhsin ¶ 11.

83.    Kiani has always instructed engineers to record their work in engineering notebooks. Kiani ¶ 127; Diab ¶ 72; Dalke ¶¶ 7-9; Poeze ¶¶ 12-13.  Masimo and Cercacor protect those notebooks by storing them in fireproof safes in a secure room on-site in a manner in which individuals cannot access a notebook by themselves.  Diab ¶ 73; Dalke ¶ 7; Poeze ¶ 13.  Access to notebooks is on a need-to-know basis only.  Diab ¶ 73.  An employee requesting a notebook must go to the notebook safe room, ask the assistant there to access a particular notebook, explain why they need access, and if access is approved, the assistant retrieves the specified notebook and gives it to the requesting employee.  *Id.*  Diab testified that every employee of Masimo and Cercacor that he knows or has worked with handles their notebooks in this secure way.  *Id.*

84.    Bilal Muhsin (for Masimo) and Gerry Hammarth (for Cercacor) testified the companies secure their computer systems, implementing separate network drives, each requiring approved credentials to access.  Muhsin ¶¶ 13-16; Hammarth ¶¶ 22-23.

85.    The companies have policies that instruct employees on how to handle their computer resources to ensure that these resources remain secure so the companies' proprietary information will be protected.  Kiani ¶ 129; Muhsin ¶¶ 22-23; Hammarth ¶¶ 9, 21; Dalke ¶ 8; JTX-2217 (Masimo's Information Security Policy, 2006); JTX-2564 (Masimo's Information Technology Training Policy and Procedure, 2005); JTX-2561 (Masimo's Computer Equipment Acceptable Use Policy, 2005); JTX-2563 (Masimo's Server Security Policy, 2005); JTX-2323 (Masimo's Email Use Policy, 2005); JTX-2402 (Cercacor Information Systems Policy/Procedure); JTX-2403 (Cercacor Information Systems Policy/Procedure).  These policies impose password requirements, access restrictions, and training on Masimo Corp. and Cercacor employees to guard the companies' confidential information.    Muhsin ¶¶ 23, 27; JTX-2217; JTX-2561;

Hammarth ¶ 14; JTX-2266 at -558-59.  These policies are provided to new employees.  Muhsin ¶ 26; Hammarth ¶ 15.

86.    By default, Cercacor employees did not have access to Masimo's source code or assembly and design specifications.  Such access would only be provided if specially requested.  Kiani ¶ 156.

**C.    Masimo Develops Trade Secrets Relating to Sensors and Physiological Parameter Measurement And Calculation Strategies**

87.    Crosstalk is a problem in pulse oximetry.  Diab ¶ 113.  Crosstalk refers to a phenomenon where unintended information infiltrates and is included in a signal or data channel, thereby corrupting it and rendering the measurement inaccurate.  *Id.*  The more crosstalk there is in a signal, the less accurate the resulting measurements will be.  *Id.*

88.    In the context of pulse oximetry, crosstalk can arise from numerous sources.  Diab ¶ 114.  Because crosstalk can manifest in hidden ways, it is particularly difficult and deceptive to identify and fix, especially because it can subtly affect the already small amplitude (size) of the detected signal.  *Id.*  Such subtle changes in signal amplitude are especially problematic because pulse oximetry requires accurately determining the amplitude of the red and infrared PPGs signals.  *Id.*  If the signal amplitude is not accurately determined, it can lead to significant errors in the resulting oxygen saturation measurement.  *Id.*  Allowing crosstalk to distort the pulse oximetry measurements given to a clinician could be dangerous, such as by leading the clinician to believe that the patient's oxygen saturation is normal when in truth their saturation is concerningly lower.  *Id.* ¶ 115.

89.    In developing its multi-wavelength rainbow technology, Masimo learned

**1.** ████████████████████████████████████████

████████████████████████████████ **Trade Secret L4)**

90.    Light piping is a type of crosstalk that occurs when light emitted by the sensor does not propagate through the user's tissue and is, nevertheless, detected by the photodetector.  Diab ¶ 180.  Light piping is problematic because it causes the detected signal to be inaccurate, thereby causing inaccuracies in the non-invasive measurement of oxygen saturation and other physiological parameters.  *Id.* ¶ 181.  Light piping can make it appear that the intensity of the light that has passed through tissue is larger than it actually is, thereby indicating that the tissue absorbed less light than it actually did.  *Id.*  In this way, light piping corrupts the information needed for accurate measurements (i.e., the intensity of the emitted light that was detected after passing through tissue).  *Id.*  Light piping causes inaccurate measurements, and the inaccuracy due to light piping can be very significant.  *Id.*









1 ███████████████████████████████████████████████████

2 ███████████████████████████████████████████████████

3 ███████████████████████        ███████████████████████

4 ███████████████████████████████████████████████████

5 ██████████████████████████████████████████

6      110.   Madisetti opined that Masimo developed and was in possession of Trade

7 Secret L4.  Madisetti ¶¶ 83-94.

8     **2.**   ██████████████████████████████████

9 ███████████████████████████████████████

10 ████████████████████████████████  **Trade Secret L5)**

11      111.   During the rainbow project in early 2003, Dalke worked on a 9-LED

12 prototype sensor board called the R0 board and then on another prototype with multiple

13 wavelengths called the R1 board.  JTX-827; JTX-1951; JTX-P-0135 at 688; Dalke

14 ¶¶ 10-13, 21.  █████████████████████████████████████

15 ████████████████████████  Dalke ¶¶ 30-32, 37; JTX-827; JTX-1951; JTX-P-

16 0135 at 682-685.  The R0 and R1 boards were precursors to the rainbow MX-1 board,

17 which was the first rainbow sensor board that Masimo released.  Dalke ¶¶ 11-17.

18 ████████████████████████████████████████████████

19 ████████████████████████████████████████████████

20 ████████████████████████████████████████████████

21 ████████████████████████████████████████████████

22 ████████████████████████████████████████████████

23 ████████████████████████████████████████████████

24 ████████████████████████████████████████████████

25 ████████████████████

26      113.  ████████████████████████████████████████

27 ████████████████████████████████████████████████

28 ████████████████████████████████████████████████



1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3 ▮▮▮▮▮

4     117.   Madisetti opined that Masimo developed and was in possession of Trade

5 Secret L5.  Madisetti ¶¶ 130-137.

6   **3.**    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

7         ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ **Trade Secret D1)**

8     118.   Masimo uses modulation to control the light transmitted into tissue and

9 demodulation and demultiplexing techniques to process the detected light into individual

10 channels, with each channel reflecting a particular light source.  Diab ¶¶ 121-123.

11 Ideally, each of those separated channels is free of crosstalk.  *Id.*  Over the course of

12 many years, Diab and his team of engineers at Masimo developed and refined

13 demodulation and demultiplexing techniques to mitigate crosstalk or eliminate it

14 entirely, thereby increasing the accuracy of oxygen saturation and other measurements.

15 *Id.* ¶ 121.

16     119.   In pulse oximetry and in Masimo's products, a red LED is turned on

17 (activated) and off (deactivated) and an infrared LED is turned on (activated) and off

18 (deactivated) very quickly in a repeatable cycle.  *Id.* ¶¶ 124-125; JTX-677 at FIG. 12.

19 The red LED and infrared LED are activated at different times.  Diab ¶ 125; JTX-677 at

20 FIG. 12.  The activation and deactivation of the LEDs in a repetitive cycle over time, or

21 modulation cycle, creates a modulated signal at the photodetector.   Diab ¶¶ 124-125;

22 JTX-677 at FIG. 12.   The number of repeating cycles per second is called the

23 "modulation frequency" or modulation cycle, which is typically in the hundreds of

24 cycles per second.  *Id.*  A single detector outputs one signal corresponding to the intensity

25 of all light it measures over time.  *Id.*  Therefore, the detector signal includes increased

26 intensity for the time slots when the red LED or infrared LED are activated.  *Id.*  Because

27 the detector signal includes both red light intensity and infrared light intensity, it is called

28 a "composite signal."  Diab ¶ 125; JTX-677 at FIG. 12.

120.    The modulated, composite detector signal must be processed before it can be used to calculate physiological parameters.  Diab ¶ 126.  The signal must be demodulated to a lower frequency and then demultiplexed (separated) into one PPG signal for each wavelength of light being measured (e.g., separated into a red PPG signal and an infrared PPG signal).  *Id.*





127.

1  ███████████████████████████████████████████████████████

2  ███████████████████████████████████████████

3    ███████████████████████████████████████████████████

4  ███████████████████████████████████████████████████████

5  ███████████████████████████████████████████████████████

6  ███████████████████████████████████████████████████████

7  ███████████████████████████████████████████████████████

8  ███████████████████████████████████████████████████████

9  ███████████████████████████████████████████████████████

10 ███████████████████████████████████████████████████████

11 ████████████████████████████████

12        130.   Madisetti opined that Masimo developed and was in possession of Trade

13 Secret D1.  Madisetti ¶¶ 174-185.

14        **4.**     █████████████████████████████████████████

15            ████████████████████████

16            ████████████████████  **Trade Secret D3)**

17   ███████████████████████████████████████████████████████

18 ███████████████████████████████████████████████████████

19 ███████████████████████████████████████████████████████

20 ███████████████████████████████████████████████████████

21 ███████████████████████████████████████████████████████

22 ███████████████████████████████████████████████████████

23 ██████████████████████████████████████████

24   ████████████████████████████████████████████████████

25 ███████████████████████████████████████████████████████

26 █████████████████████████████████████████████████

27   ████████████████████████████████████████████████████

28 ███████████████████████████████████████████████████████



1  ████████████████████████████████████████████

2  ████████████████████████████████████████████

3  ████████████████████████████████████████████

4  ████████████████████████████████████████████

5  ████████

6      137.  Lamego supervised Poeze in the development of Cercacor's Pronto-7.

7  Poeze ¶¶ 16-18, 66.  Lamego instructed Poeze on how to develop and implement ██

8  ████████████████████████████████████████████

9  ██ Lamego explained to Poeze how ██████████████████████

10 ████████████████████████████████████████████

11 ████████████████████████████████████████████

12 ████████████████████████████████████████████

13      ███████████████████████████████████████

14 ████████████████████████████████████████████

15 ████████████████████████████████████████████

16 ████████████████████████████████████████████

17 ████████████████████████████████████████████

18 ████████████████████████████████████████████

19 ████████████████████████████████████████████

20 ███████████████████

21     ██████████████████████████████████████████

22 ████████████████████████████████████████████

23 ████████████████████████████████████████████

24 ████████████████████████████████████████████

25 ████████████████████████████████████████████

26 ████████████████████████████████████████████

27 ████████████████████████████████████████████

28





147. Madisetti opined that Masimo developed and was in possession of Trade Secret D3.  Madisetti ¶¶ 208-211.

5. **Trade Secret D10)**

148. The Pronto-7 source code shows that Masimo developed and implemented the features and performed all steps of Trade Secret D10 in the Pronto-7.  Madisetti ¶ 230.



150.



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22



23    158.    Madisetti opined that Masimo developed and was in possession of Trade

24    Secret D10.  Madisetti ¶¶ 230-49.

25

26

27

28

**D.** **Lamego Learns About And Develops Masimo's Trade Secrets**

    **1.** **Lamego Learns About** ███████████████

███████████████████████

███████████ **Trade Secret L4)**

    159.  When Lamego rejoined Masimo in 2003, he and Diab shared an office for about a year and a half.  Diab ¶¶ 191, 193.  One of the very first things Diab assigned Lamego to work on was █████████████████████.  *Id.* ¶ 191.  Diab exposed Lamego to Masimo's ████████████ ████████████████████████ *Id.* ¶¶ 191-217; JTX-1906; JTX-782; JTX-940; JTX-343; JTX-941; JTX-1022; JTX-1016; JTX-935; JTX-937; JTX-1045; JTX-P-0161; JTX-P-0162; JTX-938; JTX-1041; JTX-173; JTX-777.





167. Lamego supervised the development of Masimo's Pronto-7. Hammarth ¶ 28. ▮▮▮ a document that Lamego had access to and implemented as Cercacor's CTO. *Id.* ¶¶ 24-26; JTX-936. Lamego also ▮▮▮ JTX-1018

2. **Lamego Learns About** ▮▮▮ **Trade Secret L5)**

1

2

3

4

5

6

7

8

9

10

11

12

13 **3.** <u>**Lamego Learns About And Develops**</u> ███████████ **(D1)**

14 171. Lamego was also aware of Masimo's ██████████████

15

16

17

18

19

20

21

22

23

24

25

26

27

28



**4.    Lamego Learns About And Develops** ██████████████

████████████████████████████████████

**(D3)**

176.    Lamego learned about and developed the Trade Secret D3 strategies, including Masimo's ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

**5.    Lamego Learns About and Develops** ████████████████

████████████████████**(D10)**

179.    Lamego also learned about and developed D10 strategies ████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

Trade Secret D10.  Madisetti ¶¶ 210-211.

**E.  Masimo's Trade Secrets Derive Independent Economic Value By Not Being Generally Known**

    **1.**  ███████████████████████████████████████████

        ████████████████████ **Management L4)**

    180.  Diab explained that Masimo has consistently kept Masimo's ██████ ████████████████████████████████ confidential and guarded this information within the company.  Diab ¶¶ 219, 240-41, 76.

    181.  Masimo's █████████████████████████████████████████ ██████ is very important to Masimo's business.  Diab ¶¶ 218-219, 239-241; Kiani ¶ 145; JTX-172.  Diab explained that ████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ █████████████████████████████ *Id.* ¶ 218; Kiani ¶ 220; JTX-307.

    182.  Diab explained that L4 being proprietary provides Masimo with a competitive advantage because Masimo's competitors have ████████████████ █████████████████████████████ Diab ¶¶ 218-219, 239-241.  The techniques encompassed by L4 have helped establish Masimo as a market leader in pulse oximetry.  *Id.*

    183.  Madisetti testified that L4 was not generally known based on, among other things, Masimo's independent development, the advantage L4 provides, Apple being unaware of L4 prior to obtaining it from Lamego, and Apple's expert finding no reference disclosing L4 after extensive searching.  Madisetti ¶¶ 115-127.

    184.  Madisetti explained the evidence that Masimo keeps Trade Secret L4 confidential.  *Id.* ¶ 115; JTX-935 (marked "Confidential and Proprietary"); JTX-936

1  (marked "Confidential and Proprietary"); JTX-937 (marked "Confidential and

2  Proprietary").

3      185.   Madisetti explained the evidence that L4 is critical to Masimo because it

4  ███████████████████████████████████████████, and that L4 gives

5  Masimo an advantage over its competitors.  Madisetti ¶¶ 115-116; Kiani ¶¶ 138-147;

6  Diab ¶¶ 218-219, 239-241.

7      186.   Madisetti explained that L4 is not generally known, and that the documents

8  Apple relies on do not disclose L4 because they do not address, for example, ███

9  ██████████████████████████████████████████████████████

10 ██████████████████████████████████████████████████████

11 ███████████  Madisetti ¶¶ 118-127; JTX-3778.

12     **2.**    ████████████████████████████████

13            ████████████████████████████████████

14            **(L5)**

15            ███████████████████████████████████████████

16 ██████████████████████████████████████████████████████

17 ██████████████████████████████████████████████████████

18 ██████████████████████████████████████████████████████

19 ██████████████████████████████████████████████████████

20 ██████████████████████████████████████████████████████

21 ██████████████████████████████████████████████████████

22 ██████████████████████████████████████████████████████

23 ██████████████████████████████████████████████████████

24 ██████████████████████████████████████████████████████

25 ██████████████████████████████████████████████████████

26 ██████████████████████████████████████████████████████

27 ██████████████████████████████████████████████████████

28 ████████████████████████████

1  ███████████████████████████████████████████████

2  ███████████████████████████████████████████████████

3  ███████████████████████████████████████████████████

4  ███████████████████████████████████████████████████

5  ██████

6  ████████████████████████████████████████████████

7  ███████████████████████████████████████████████████

8  ███████████████████████████████████████████████████

9  ███████████████████████████████████████████████████

10 ███████████████████████████████████████████████████

11 ███████████████████████████████████████████████████

12 ███████████████████████████████████████████████████

13 ███████████████████████████████████████████████████

14 ███████████████████████████████████████████████████

15 █████████████████████████

16 ████████████████████████████████████████████████

17 ███████████████████████████████████████████████████

18 ███████████████████████████████████████████████████

19 ██████████████████████████████████████████████

20   191.   Madisetti explained the evidence showing that Masimo keeps Trade

21 Secret L5 confidential. *Id.* ¶ 163; Dalke ¶¶ 7, 9; Diab ¶ 73.

22   192.   Madisetti explained the evidence that Trade Secret L5 is important and

23 valuable to Masimo because it ████████████████████████████████

24 ███████████████████████████████████████████████████

25 ███████████████████████████████████████████████████

26 ██████████████████████   Madisetti ¶ 162; Dalke ¶¶ 60, 67, 82; Diab ¶ 240.

27   193.   Madisetti explained that sophisticated companies like Apple and ██████████

28 did not know about the ██████████████████████████████████████████

1

2

3

4  *Id.*; JTX-541.  Madisetti also explained

5  that despite reading Trade Secret L5 and conducting extensive searching, none of the

6  references Apple relies on disclose Trade Secret L5, including because they do not

7  address, for example,

8

9  Madisetti ¶¶ 164-170.

10  **3.**

11  **Trade Secret D1**

12  194.   Diab explained that Masimo has consistently kept

13

14  Diab ¶¶ 157, 174, 178, 238, 76.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

197.    Madisetti testified that Trade Secret D1 was not generally known based on, among other things, Masimo's independent development, the advantage D1 provides, Apple being unaware of D1 prior to obtaining it from Lamego, and Apple's expert finding no reference disclosing D1 after extensive searching.  Madisetti ¶¶ 195-204.

198.    Madisetti explained the evidence showing that Masimo keeps Trade Secret D1 confidential.  Madisetti ¶ 195; Poeze ¶¶ 9-15; Diab ¶ 73.

199.    Madisetti explained the evidence that Trade Secret D1 is critical to Masimo because it ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ██████████  Madisetti ¶ 195; JTX-153 at -843; JTX-273 at -369; JTX-828; 2022-08-12 Kanaris Tr. at 29:10-30:6, 37:12-38:13, 39:13-40:5, 48:8-49:20.

200.    Madisetti explained Trade Secret D1 was not generally known, and that despite reading Trade Secret D1 and conducting extensive searching, none of the references Apple relies on disclose Trade Secret D1, including because they do not address, for example, ████████████████████████████████████ ████████████████████████████████████████████.  Madisetti ¶¶ 197-204.

-52-

**4.** ███████████████████████████████████

███████████████████████

██████████████████████████ **Trade Secret D3)**

201.   Diab and Poeze explained that Masimo has consistently kept Trade Secret D3 confidential and carefully guarded this information within the company.   Diab ¶¶ 153-57, 238, 76; Poeze ¶¶ 9-15.

202.   Trade Secret D3 is very important to Masimo's business.   Diab ¶¶ 153-54.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

203.   Trade Secret D3 derives value from not being generally known because it gives Masimo a significant advantage over competitors.   Trade Secret D3's ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████ *Id.* ¶¶ 153-55; 238; Poeze ¶¶ 21, 32-36, 65; JTX-832 at -907.

204.   Madisetti testified that Trade Secret D3 was not generally known based on, among other things, Masimo's independent development, the advantage D3 provides, Apple being unaware of D3 prior to obtaining it from Lamego, and Apple's expert finding no reference disclosing D3 after extensive searching.   Madisetti ¶¶ 217-226.

205.   Madisetti explained the evidence showing that Masimo keeps Trade Secret D3 confidential.   Madisetti ¶ 217; Poeze ¶¶ 9-15; Diab ¶ 73.

206.    Madisetti explained the evidence that Trade Secret D3 ████████ ████████████████████ and gives Masimo an advantage over its competitors. Madisetti ¶¶ 217-18; Diab ¶¶ 153-55; 2022-08-12 Kanaris Tr. at 29:10-30:6, 37:12-38:13, 39:13-40:5, 48:8-49:20.

207.    Madisetti explained that Trade Secret D3 is not generally known, including because Apple admitted it was not generally known ███████████ ████████████ Madisetti ¶ 219.  Madisetti explained that Trade Secret D3 is also not generally known because after reading this trade secret and conducting extensive searching, Apple could not find a reference disclosing Trade Secret D3.   Madisetti ¶¶ 220-26.  None of the references Apple relies on address, for example, ████████ ████████████████████████████████████████████████████████ ████████████████████████████████████ *Id.*

**5.**    ████████████████████████████████ **Trade Secret D10)**

208.    Poeze explained that Masimo has consistently kept Trade Secret D10 confidential and carefully guarded this information within the company.  Poeze ¶¶ 9-20. Further, Poeze explained that he kept work ██████████████████ confidential and that access to his lab notebooks was restricted.  *Id.* at ¶¶ 9-15.

209.    ██████████████████████████████████ ████████████████████████████████████████████Apple also understood D10's value.  D10 gives Masimo an advantage over its competitors.

210.    D10 is used in Masimo products to ██████████████ ████████████████████ Madisetti ¶¶ 253-257.

**6.**    **Apple Derived Significant Economic Value from Masimo's Trade Secrets**

211.    Based on the foregoing, Masimo's L4 and L5 trade secrets allowed Apple to ████████████████████████████████.  Furthermore, Apple used Masimo's D1, D3, and D10 in ████████████████████████

-54-

████████████████████████████████████████████████

██████████████████████

212.    Kinrich explained that Apple earned significant profits from the blood oxygen feature on Series 6 and 7 of the Apple Watch.  Kinrich ¶¶ 5,17-19, 72.  Thus, Apple obtained significant economic value from its misappropriation.

**F.    Apple Seeks to Obtain Masimo's Technology and Lamego**

213.    In February 2012, Apple decided it wanted to pursue physiological monitoring on the watch.  JTX-431; Han Tr. at 144.  Later in 2012, Apple began Project "Rover" to identify third parties to help Apple develop its physiological monitoring technology.    JTX-1718.    Apple's goal was to identify and target physiological monitoring companies.  JTX-1718 at -186-192.  Apple initially identified Masimo as a "Tier 1" target.  *Id.* at -191.  Apple ███████████████ buy Masimo sensors to extensively investigate and teardown.  JTX-422; JTX-426; JTX-427; JTX-428; JTX-429; Han Tr. at 16-17, 21, 59, 61, 74, 85, 112, 135.  Apple used Masimo's products as the "baseline reference" and ██████████ JTX-423; JTX-425; Han Tr. at 98, 106.

214.    By January 2013, Apple refined its plans to obtain health technology. Apple sought to identify an "experienced team [to] teach[] Apple" everything they knew about physiological monitoring technology.  JTX-260 at -106.  Apple planned to "use[] this stepping stone" so that Apple could "quickly" release its own products.  *Id.*  Apple also elevated Masimo Corp. and Cercacor to the "two standout" companies in the field. JTX-259 at -774; JTX-260 at -109 (████████████████████████████ ████████████.

215.    Apple then decided to reach out to Masimo.  In March 2013, Adrian Perica (Apple's VP for corporate acquisitions) told Masimo that Apple was considering implementing Masimo technology in Apple products.    JTX-1367 at -627.  Perica indicated Apple wanted to "dig deep" to learn about Masimo's best-in-class technology. *Id.*  Apple then met with Masimo in May 2013.  Kiani ¶¶ 167-70; JTX-559; Land ¶ 19.

Masimo met with Apple to discuss possible collaboration at Apple's Cupertino headquarters. Kiani ¶¶ 171-76. Kiani told Lamego about Apple's interest. *Id.* at ¶ 188.

216.    Apple was very interested in Masimo and knew that Lamego and Kiani were the two sole officers of Cercacor. 2021-12-15 Sellers Tr. 132:5-12; JTX-70. Apple referred to Kiani as having a Steve Jobs like reputation in the medical space. JTX-70; JTX-648; 2021-12-15 Sellers Tr. 132:5-12. Apple viewed Lamego as one of Kiani's "key guys." *Id.*

217.    Apple also expressed interest in purchasing Cercacor. Kiani ¶ 187. Kiani had informed Lamego of this. *Id.* at ¶ 188. Kiani responded that Cercacor was not for sale. Kiani ¶ 187.

218.    In June 2013, Tim Cook, Apple CEO, asked Perica ██████████ ████████████████████████████████████████ JTX-316 at -708. Cook told Perica that ████████████████████████████████████████ ██████████   *Id.* Perica responded that Apple was "the most clueless" in the field of "non-invasive diagnostics." *Id.* at -707. Perica told Cook that Kiani was the medical leader that Apple needed, but Kiani was "not a recruiting alternative." *Id.*; JTX-59; 2021-12-15 Sellers Tr. at 75. Perica said he was considering an acquisition, but acknowledged that acquiring companies as large as Masimo was not Apple's "style." JTX-316 at -707; *see also* JTX-332; JTX-393; JTX-394; JX-395; Mansfield Tr. at 21-22. Cook personally rejected acquiring Masimo. JTX-317 at -808.

219.    Apple instead hired Masimo employees. Kiani ¶¶ 178-181, 183, 190, 202; JTX-771, JTX-768. Apple first recruited Masimo's Chief Medical Officer, Michael O'Reilly. Kiani ¶¶ 178-79; JTX-58; 2021-12-15 Sellers Tr. at 52, 59, 67. O'Reilly told Kiani that Apple's offer was so lucrative he could not refuse. Kiani ¶ 181. ████ ████████████████████████████████████████████████████████ ██████████████████████████ JTX-518; O'Reilly Tr. at 334. Apple continued trying to recruit other engineers. *Id.* at ¶ 190; JTX-768. Kiani warned Lamego: "Be careful

with your team.  Look what apple is doing."  Kiani ¶ 190; JTX-768.  Lamego thanked Kiani and responded, "Will do."  Kiani ¶ 192; JTX-768.

220.   Unbeknownst to Masimo and Kiani at the time, Apple also had contacted Lamego earlier in 2013.  JTX-1719.  Lamego initially declined Apple's offer.  JTX-1719.

221.   On September 28, 2013, Lamego sent Kiani an email asking Kiani to make Lamego CTO of both Masimo Corp. and Cercacor.  Kiani ¶¶ 195-96; JTX-780; JTX-5139; JTX-5140.  In response to Lamego's request, Kiani talked to Masimo's executive team.  Kiani ¶¶ 198-99.  Masimo was not interested in making Lamego its CTO.  *Id.* at ¶¶ 199-200.  On October 1, 2013, Kiani told Lamego that Kiani did not plan to offer Lamego the CTO position at Masimo Corp.  *Id.* ¶ 200.

222.   Lamego reconsidered Apple's offer after Kiani rejected Lamego's request to become CTO of Masimo.  *Id.* at ¶ 201. Unbeknownst to Kiani, Lamego sent an email on October 2, 2013, to Apple CEO Tim Cook, offering to help Apple make medical devices to compete with Masimo's accuracy and performance in exchange for a senior technical executive position at Apple.  Kiani ¶ 166; JTX-1719; JTX-293.  Lamego offered to help solve Apple's patient monitoring problems in exchange for a senior executive position at Apple.  JTX-1719.  Lamego referenced his "10 years" at Masimo and explained the "patient equation" was the "deceptive part" that only Lamego could help solve.  *Id.*  Lamego invited Cook to respond if he agreed with Lamego's offer.  *Id.*

223.   Lamego told Apple that making medical devices work in almost the entire population is extremely complex and referred to this "patient equation" as the "deceptive part" of creating "a competitive global medical, wellness and fitness product portfolio."  JTX-1719.  Lamego offered to help Apple solve the "deceptive part" to become "the number one brand in the medical, fitness and wellness device market."  *Id.*  Kiani did not know of Lamego's email to Tim Cook until it was made public years later in litigation.  Kiani ¶ 208.

224.    Early that same morning, ███████████████████████████
████████████████████████████████████████████████████. JTX-566 at -008.  When Apple sought O'Reilly's input, O'Reilly warned Apple that most of Lamego's "knowledge (that would be directly applicable to what we are doing) may be considered confidential information of Cercacor or Masimo."  *Id.* at -007; JTX-512; O'Reilly Tr. at 316.

225.    ██████████████████████████████████ and how to engage with Masimo, including whether to acquire Masimo or its "people."  JTX-263 at -760, -776 (Project Everest presentation); Tom Tr. at 8:21-9:1, 9:15-20, 21:17-22:4, 32:10-16, 46:1-2, 46:6-7, 46:19-7; JTX-320.  Around the same time, Apple had concluded that its own sensor design was a "mess" and on a path to failure.  JTX-335 at -321; JTX-337 at -427-28; JTX-400 at -580; Mansfield Tr. at 32-35, 41; Williams Tr. at 30.

226.    Lamego knew that Apple was recruiting him to help Apple develop light-based sensor hardware and algorithms, technologies that would compete with Masimo.  2021-12-15 Sellers Tr. at 25:17-26:9, 26:13-27:2, 27:19-28:2, 30:4-11, 31:3-32:4, 116:22-117:8, 117:15-118:9, 119:17-120:4, 234:20-235:20, 236:2-21, 242:20-243:11, 257; 274:7-14; JTX-652, JTX-655, JTX-657, JTX-659, JTX-668; JTX-648.

227.    Lamego told Apple he wanted to make contributions on hardware and algorithms.  2021-12-15 Sellers Tr. at 257:13-22.

228.    Apple ultimately hired Lamego, despite O'Reilly's warning.  JTX-605; 2021-12-15 Sellers Tr. at 189:3-191:2. ████████████████████████████
████████████████████████████ 2021-12-15 Sellers Tr. at 92:22-93:17. ████████
██████████████████████████████████████████ JTX-1720 at -986 (████████████████████████████████████████████
██████████ JTX-265 (Apple offered Lamego more than guidelines due to his "specialized experience that we are deeply in need of"); JTX-295; JTX-628 ("this is an acquisition-like need for specialized capability that we do not have at Apple"); JTX-295;

-58-

2021-12-15 Sellers Tr. at 223:8-13; Williams Tr. at 96-97, 102-103, 105, 107-108; Kiani ¶¶ 181-82.

229.   Apple continued recruiting Masimo employees, including employees the "next level down."  JTX-664.  Over the next several years, Apple hired about ▓ other Masimo employees.  Defendant Apple Inc.'s Supplemental Objections and Responses to Plaintiffs Masimo Corporation and Cercacor Laboratories, Inc.'s Third Set of Interrogatories to Defendant Apple Inc. (Nos. 11-13) at 16-18, 27; JTX-511; JTX-513-517; O'Reilly Tr. at 323-333. ████████████████████████████ ██████████████████████████████████████████████████████████. *See, e.g.*, JTX-255; Kim Tr. at 177-179.

**G.    Apple Acquires Masimo's Trade Secrets Through Lamego**

230.   After Lamego joined Apple, Masimo wrote to Apple explaining that Lamego possessed Masimo's trade secrets and that Apple should refrain from obtaining them through Lamego.  Kiani ¶¶ 209-11; JTX-2937.  Apple quickly used Lamego to learn about Masimo's trade secrets.

231.   By June 30, 2014, Lamego had already ███████████████████████ ████████████████  JTX-3050.  ████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████. *Id*. ██████████████████ ████████████████████████████████████████████ *Id*.  On July 11, 2014, Lamego left Apple.  Defendant Apple Inc.'s Fourth Supplemental Objections and Responses to Plaintiffs' Masimo Corporation and Cercacor Laboratories, Inc.'s Third Set of Interrogatories to Defendant Apple Inc. (No. 11) at 7-8; JTX-3641.

**1.**     ████████████████████████████████  **Trade Secret L4**

232.   Lamego joined Apple at the end of January 2014.  Land ¶ 23; Block ¶ 15. ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████

1    ███████████████████████████████████████████). JTX-143 at 568;

2    Land ¶ 24.

3         233.    ████████████████████████████████████████

4    █████████████████████████████████████████████████████

5    █████████████████████████████████████████████████████

6    ██████████████████████████████████████████████ Lamego

7    disclosed the knowledge of Trade Secret L4 that he gained at Masimo to Apple.

8    Madisetti ¶ 96.

9    ████████████████████████████████████████████████

10   █████████████████████████████████████████████████████

11   █████████████████████████████████████████████████████

12   █████████████████████████████████████████████████████

13   █████████████████████████████████████████████████████

14   █████████████████████████████████████████████████████

15   █████████████████████████████████████████████████████

16   █████████████████████████████████████████████████████

17   █████████████████████████████████████████████████████

18   ███████████████████

19        235.    Before Lamego disclosed Trade Secret L4 to Apple, Apple also used the

20   █████████████ JTX-1064 at 857, 859; JTX-1063 (email and attached presentation).;

21   Land ¶¶ 41-43.

22   ██████████ JTX-1064 at 859; Land ¶ 44.

23        236.    After Lamego arrived, Apple ████████████. Madisetti ¶ 99; Block ¶ 25.

24   By May 20, 2014, after Lamego disclosed Trade Secret L4 to Apple in ████████████

25   ████████████████████ JTX-1064 at -859. █████████████████

26   █████████████████████████████████████████████████████

27   ████████████ *Id.* ████████████████████████); Land ¶ 44.

28

1   ██████████████████████████████████████████ *Id.* Madisetti

2   ¶ 99.

3       237.  Lamego worked on the ████████████████████████

4   █████████████████████████████████████████████████

5   █████████████████████████████████████████████████

6   ██████████████████████████████████████

7       **2.**     ████████████████████████   **Trade Secret L5**

8     █████████████████████████████████████████████

9   █████████████████████████████████████████████████

10  █████████████████████████████████████████████████

11  █████████████████████████████████████████████████

12  █████████████████████████████████████████████████

13  █████████████████████████████████████████████████

14  █████████████████████████████████████████████████

15  ████████████████████████

16      239.  ████████████████████████████████████████

17  ████████████████████████████████████████████  ████

18  █████████████████████████████████████████████████

19  █████████████████████████████████████████████████

20  █████████████████████████████████████████████████

21  █████████████████████████████████████████████████

22  █████████████████████████████████████████████████

23  █████████████████████████████████████████████████

24  █████████████████████████████████████████████████

25  █████████████████████████████████████████████████

26  ████████████████████████████████████████

27    ███████████████████████████████████████████████

28  █████████████████████████████████████████████████





**3.** **Trade Secret D1**

245. Lamego disclosed Trade Secret D1 to Apple. Madisetti ¶¶ 186-191.

Madisetti ¶ 186; JTX-143 at -568; *see also* JTX-23 at -169; JTX-24 at -123; JTX-25 at -535; JTX-27 at -226; Bokma Tr. at 81, 96, 139; Fu Tr. at 130-32.

-63-



1  █████████████████████████████████████████████

2  ████████████████████████████████████████████████

3  ████████████████████████████████████████████████

4  ███████████████████████

5  **4.** ██████████████████████████    **Trade Secret D3**

6  251.  Lamego disclosed Trade Secret D3 to Apple.  Madisetti ¶¶ 212-216; *see*

7  *also* JTX-23 at -169; JTX-24 at -123; JTX-25 at -535; JTX-27 at -226; Bokma Tr. at 81,

8  96, 139; Fu Tr. at 130-32. ███████████████████████

9  ████████████████████████████████████████████████

10 ████████████████████████████████████████████████

11 ████████████████████████████████████████████████

12 ████████████████████████████████████████████████

13 ████████████████████████████████████████████████

14 ████████████████████████████████    *Id.*; JTX-880.

15 252.  MATLAB is a software program that allows writing scripts that accurately

16 simulate  mathematical  functions.  Madisetti ¶ 213. ████████████████

17 ████████████████████████████████████████████████

18 ████████████████████████████████████████████████

19 ████████████████████████████████████████████████

20 ████████████████████████████████████████████████

21 ████████████████████████████████████████████████

22 ████████████████████████████████████████████████

23 ████████████████████████████████████████████████

24 ████████████████████████████████████████████████

25 ████████████████████████████████████████████████

26 ████████████████████████████████████████████████

27 ████████████████████████████████████████████████

28 ████████████████████████████████████████████████

Madisetti ¶ 213.

Lamego also disclosed Trade Secret D3

5.       **Trade Secret D10**

256. Apple misappropriated Trade Secret D10



**H. Other Apple Employees Knew Or Should Have Known Of Apple's Improper Acquisition of Masimo's Trade Secrets (**

259. Apple and numerous Apple employees knew or should have known Lamego was using and disclosing Masimo's trade secrets to Apple. Apple created "Project Rover" to find others to use as a "stepping stone" to develop physiological monitoring products. JTX-260 at -106. Apple identified Masimo as the "standout," met with Masimo, and considered an acquisition. JTX-59 at -932; JTX-259 at -774; JTX-316 at -707; JTX-332; JTX-394; JTX-395 at -497; JTX-556 at -191; JTX-559 at -800; JTX-3997; Mansfield Tr. at 21-22. By September 2013, Apple concluded its sensor project was a "mess" and "will fail." JTX-335 at -321; JTX-337 at -427-28; JTX-400 at -580; Mansfield Tr. at 32-35, 41. In October 2013, Lamego contacted Cook and

-68-

1   promised to solve Apple's problems.  JTX-605 at -011.  O'Reilly warned Apple that

2   Lamego's knowledge was "confidential information of Cercacor or Masimo."  *Id.* at -

3   010.  Apple then convened "Project Everest" to discuss how to proceed, including

4   whether to acquire Masimo or its "people."  JTX-263 at -776.

5        260.  Apple chose the latter option, hiring Lamego for his "specialized

6   experience" Apple was "deeply in need of."  JTX-265 at -567; JTX-628 at -439; JTX-

7   658 at -325; ; Dkt. 1636-1 at 154, 189-191.  Apple also pursued a "confidential project"

8   to recruit "the next level down" at Masimo.  JTX-2070 at -989; *see also* JTX-317 at -

9   809.  Apple selectively hired people it thought would disclose confidential information.

10  *Compare* JTX-176 *with* JTX-165.

11       261.  ▮▮▮▮▮▮▮▮▮President▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

12  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

13  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

14  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

15  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

18  ▮▮▮

## I.   Apple's Use and Disclosure of Masimo's Trade Secrets

### 1.   Apple Uses L4 In Its Development and Manufacturing Of the Apple Watch

22       262.  After receiving Masimo's Trade Secret L4 ▮▮▮▮▮▮▮▮▮▮▮▮

23  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮Land ¶¶ 46-47; *see also* JTX-1064; JTX-434; JTX-1068;

26  JTX-1069; JTX-1070; JTX-1072; Han Tr. at 182.

27  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

28  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1 ██████████████████████████████████████████

2 ██████████████████████████████████████████

3 ████████████████████

4     264.   The Series 6 watch was the first product that Apple introduced with a blood

5 oxygen feature.  Madisetti ¶ 103.  As discussed above, addressing the ██████████

6 problem becomes even more critical for measuring blood oxygen.  *Supra* §§ III.A.1;

7 III.C.1. ████████████████ that might have been acceptable to a pulse rate-only sensor,

8 such as those in Apple Watches before the Series 6, were no longer acceptable for the

9 oxygen saturation sensor, such as that in the Apple Watch Series 6 and 7.  Madisetti

10 ¶ 103. ██████████████████████████████████

11 ██████████████████████████████████████████

12 ██████████████████████████████████████████

13 ██████████████████████████████████████████

14 ██████████████████████████████████████████

15 ██████████████████████████████████████████

16 ██████████████████████████████████████████

17 ██████████████████████████████████████████

18 ██████████████████████████████████████████

19 ██████████████████████████████████████████

20 ██████████████████████████████████████████

21 ██████████████████████████████████████████

22 ██████████████████████████████

23 ████████████████████████████████████████

24 ██████████████████████████████████████████

25 ██████████████████████████████████████████

26 ██████████████████████████████████████████

27 ██████████████████████████████████████████

28 ████████████████



2.    **Apple Uses and Discloses L5 In Its Development and Manufacturing Of the Apple Watch**

272.    As explained above, Apple received the L5 Trade Secret from Masimo and

-72-

█████████████████████████████████████████████████

████████████████████████████

  ███████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████

**3.    Apple Uses and Discloses D1, D3, and D10 In Its Development Of the Apple Watch** ██████████████████████

276.    As explained above, ██████████████ disclosed and claimed Masimo's D1, D3, and D10.  *Supra* §§ III. G.3-III. G.5.  Thus, Apple used, acquired, and disclosed D1, D3, and D10 ████████████████████████

277.    Apple used Masimo Trade Secret D1 and acknowledged its value.  Madisetti ¶ 194. ███████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████

278.    Therefore, Apple recognized how valuable ████████████████

█████████████████████████████████████████████████

███████████████████████████████████

1

J.    **Apple Files Patents On Masimo's Inventions**

2

1.    **U.S. Patent No. 10,078,052**

3

279.   Diab designed reflective surfaces to improve the performance of pulse

4

oximeters and other sensors since the early 1990s.  Diab ¶¶ 213-17; Madisetti ¶ 274.

5

██████████████████████████████████████████████████████████████

6

██████████████████████████████████████████████████████████████

7

██████████████████████████████████████████████████████████████

8

██████████████████████████████████████████████████████████████

9

██████████████████████████████████████████████████████████████

10

██████████████████████████████████████████████████████████████

11

██████████████████████████████████████████████████████████████

12

Thus, by March 1990, Diab recognized the potential advantages of using reflective

13

surfaces in sensors.  *Id.*

14

280.   ███████████████████████████████████████████████████

15

██████████████████████████████████████████████████████████████

16

██████████████████████████████████████████████████████████████

17

██████████████████████████████████████████████████████████████

18

██████████████████████████████████████████████████████████████

19

██████████████████████████████████████████████████████████████

20

███████████████████████████████████████████             Thus, Diab had

21

conceptualized the use of reflective surfaces to improve the performance of reflectance

22

sensor as early as the 1990s.  *See id.*

23

281.   Diab taught Lamego about sensor reflective surface technologies.  Diab

24

¶¶ 139, 230.

25

282.   Masimo followed through with development of a sensor with a reflective

26

layer called the TF-I.  JTX-777.  The TF-I sensor includes all the features of the '052

27

Patent.  For example, the TF-I housing has an aperture, specifically an opening on the

28

bottom drawing of JTX-777.  The TF-I drawing notes that the color of the housing is

1    ███████████████████████████████████ Diab explained that the color

2    was selected, in part, for its reflective properties.  Diab ¶ 217.  The TF-I has a light

3    emitter in one aperture and a detector.

4         283.  Apple's expert, Sarrafzadeh, has opined ████████████████████

5    ████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████████

7    ████████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████

12   Thus, Masimo's TF-I sensor embodies every aspect of claim 1.  Madisetti ¶ 283.

13   Lamego was exposed to that TF-I sensor during his work at Masimo and Cercacor and

14   through his interactions with Diab.  Diab ¶ 208.

15        284.  In addition to the TF-I, Marcelo Lamego was named as an inventor on

16   multiple Masimo patent applications regarding reflectors and reflective layers.  Lamego

17   was a named inventor on U.S. Patent Pub. No. 2006/0211924 ('924 publication) that

18   published on September 21, 2006.  JTX-1206.  Lamego was also a named inventor on

19   U.S. Patent Pub. No. 2010/0030040 ('040 publication) that published on February 4,

20   2010.  JTX-1207.

21        285.  The disclosure in the '924 and '040 publications include all the features of

22   claim 1 of the '052 patent.  In the '040 publication, the housing is shown in Figure 7B

23   and described in paragraph 108.  JTX-1207 at -954 (FIG. 7B), -008 ([0088]), -010

24   ([0104], [0105], [0108], [0111]); *see also id.* at -004 ([0009], [0015]), -943-48 (FIGS.

25   3A-3F).  In the '040 publication, the light emitters are also shown in Figure 7B and

26   referenced in, at least, paragraph 87.  *Id.* at -954 (FIG. 7B), -008 ([0087]), -010 ([0112]);

27   *see also id.* at -004 ([0027], [0029]), -005 ([0050]), -006-07 ([0063]-[0073]). In the '040

28

-75-

1    publication, the detectors are also shown in Figure 7B and referenced, at least, in

2    paragraph 87 of the '040 publication. *Id.* at -954 (FIG. 7B), -008 ([0087]), -010 ([0112]).

3        286.  The reflector and reflective layer disclosure in the '040 publication is in

4    paragraphs 90, 104, and 105.  JTX-1207 at -009 ([0090]), -010 ([0104], [0105]).  For

5    example, the '040 publication teaches "It can be constructed of reflective material (e.g.,

6    white silicone or plastic)." *Id.* at -010 ([0104]).  The '040 publication similarly teaches

7    that the sensor "can be constructed of white material used for reflective purposes (such

8    as white silicone or plastic)" and the detector shell "can be constructed of reflective

9    material, such as white silicone or plastic." *Id.* at -009 ([0090]), -010 ([0105]).  The

10   specification also teaches that "such materials can increase the usable signal at a detector

11   by forcing light back into the tissue and measurement site." *Id.* at -010 ([0105]).

12       287.  The disclosure in the '924 publication includes a sensor that can be formed

13   as "a reflectance" device.  JTX-1206 at -645 ([0057]); *see also id.* at -597 (FIGS. 2B,

14   2C).  In the '924 publication, an emitter shell and a detector shell form a housing of the

15   sensor.  *Id.* at -650 ([0097]).  The emitter is described in the '924 publication as

16   comprising an emitter pad 3000 with emitter array 700 formed on the pad and an emitter

17   window 3020 providing an optical path for the emitter array. *Id.* ([0099]); *see also id.*

18   at -622-23 (FIGS. 30A-H).  The detector is described in the '924 publication as

19   comprising a detector pad 3100 with a shoe box 3200 formed on it to accommodate the

20   detector assembly 2400.  *Id.* at -650 ([0099], [0101]).  The '924 publication also

21   describes that the shoe box is colored black and the emitter pad 3000 and detector pad

22   3100 are each colored white or other substantially light reflecting color. *Id.* ([0101]).

23       288.  Masimo, with Lamego's involvement, already conceived of every

24   limitation of Claim 1 of each of the '052 patent while Lamego still worked at Masimo.

25   Madisetti ¶ 295.  Lamego's later filing of patent applications at Apple reflect his earlier

26   work at Masimo rather than anything he developed at Apple.  *Id.*  Thus, at a minimum,

27   Masimo should be added as an owner of the '052 patent.  *Id.*

28

289.   Furthermore, as Warren opined, all the limitations in the '052 patent are generally known concepts except for the "reflector" limitation in the claim 1 of the '052 patent. Madisetti ¶ 293. However, ██████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████ Madisetti ¶ 296.   Thus, Masimo had possession of those concepts before Lamego.   *Id.*   This shows that Diab should be added as an inventor of the '052 patent.   *Id.*

**2.    U.S. Patent No. 10,247,670**

290.   In addition to the above, the TF-I sensor includes all the features of at least claim 1 of the '670 Patent.  Madisetti ¶ 283; JTX-1241.  For example, the TF-I housing has white surface.   JTX-777.  The TF-I drawing notes that the color of the material is ████████████████████████████████████ *Id.*  Diab explained that the color was selected, in part, for its reflective properties.  Diab ¶ 217.  The TF-I white surface has two openings, one for a light emitter and another opening for the detector. *Id.*; JTX-777.    Thus, Masimo's TF-I sensor embodies every aspect of claim 1. Madisetti ¶ 283.  Lamego was exposed to that TF-I sensor during his work at Masimo and Cercacor and through his interactions with Diab.  Diab ¶ 208.

291.   Furthermore, as Warren opined, all the limitations in the '670 patent are generally known concepts except for the "reflective layer" of claim 1 of the '670 patent. Madisetti ¶ 296; Warren ¶ 158.  However, ██████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ Madisetti ¶ 296.   Thus, Masimo had possession of those concepts before Lamego.  *Id.* This shows that Diab should be added as an inventor of '670 patent.

3.      **U.S. Patent No. 9,952,095**

292.    Diab is a named inventor on U.S. Patent No. 5,632,272 ("the '272 patent") and he helped develop the concepts shown and described in this patent in the early 1990s. JTX-1267 at -812; Diab ¶ 92.  The '272 patent was filed in 1994 and is based on work Diab and his co-inventors did between approximately 1990 and 1994.  Diab ¶ 92.

293.    Figure 11 of the patent, shown below provides a very high-level overview of how a pulse oximeter functions.  JTX-1267 at -829 (FIG. 11), -867 (34:10-12); Diab ¶ 93.



FIG. 11

JTX-1267 at -829 (FIG. 11).

294.    On the left of Figure 11 is a dashed box 300, which represents the sensor. *Id.* at -867 (34:10-20), -829 (FIG. 11); Diab ¶ 94.  Within the sensor 300 are emitters and a detector.  JTX-1267 at -867 (34:10-20, 35:23-27); Diab ¶ 94.  Specifically, the sensor 300 includes a red emitter 301 such as a red LED and an infrared emitter 302 such as an infrared LED.  JTX-1267 at -867 (34:10-20, 35:23-27); Diab ¶ 94.  Those emitters emit red and infrared light through the tissue (shown as a finger) 310.  JTX-1267 at -867 (34:10-20, 35:23-27); Diab ¶ 94.  The red and infrared emitters are not left

on all the time.  JTX-1267 at -868 (36:6-16); Diab ¶ 94.  Instead, the emitters are very quickly turned on and off alternatively (e.g., red emitter on, red emitter off, infrared emitter on, infrared emitter off) many times per second (e.g., 200 times per second). JTX-1267 at -868 (36:6-16); Diab ¶ 94.  As Figure 11 shows, the emitted light passes through the tissue 310 and reaches the detector 320.  JTX-1267 at -829 (FIG. 11); Diab ¶ 94.  The detector 320 converts the detected light into one analog electrical signal representative of the intensity of all light that hits the detector.  JTX-1267 at -867 (34:16-20).

295.   As shown in Figure 11, the detector 320 outputs the detected signal to the front-end analog signal conditioning circuitry 330.   JTX-1267 at -867 (34:19-20); Diab ¶ 94.

296.   Figure 12 provides a more detailed illustration of the signal conditioning circuitry 330.  JTX-1267 at -831 (FIG. 12), -868 (36:25-28); Diab ¶ 96.



*FIG. 12*

297.   Starting on the left of Figure 12, the analog detected signal ("composite signal") is output to a pre-amplifier 342, which amplifies the *entire* signal by a small amount.  JTX-1267 at -831 (FIG. 12), -868 (36:31-46); Diab ¶ 97.  To focus on the relevant parts of the signal (i.e., the intensity of light at the red and infrared wavelengths emitted by the sensor and then detected after passing through tissue), after pre-

amplification, the signal is output to a high pass filter 344 to remove undesirable light from the signal. JTX-1267 at -831 (FIG. 12), -868 (36:56-57); Diab ¶ 98.

298. Specifically, the high pass filter 344 allows signals of high frequency to pass, but removes lower frequency signals from the signal. JTX-1267 at -831 (FIG. 12), -868 (36:56-57); Diab ¶ 98. The high pass filter has a corner (or cutoff) frequency, and removes signals that are below that frequency. Diab ¶ 98. In the '272 patent, we explained that a suitable corner (or cutoff) frequency for the high pass filter 344 could be about 0.5 to 1 Hz. JTX-1267 at -868 (36:59-62); Diab ¶ 98. We also explained that the corner frequency could be up to 90 Hz. JTX-1267 at -868 (36:59-62); Diab ¶ 98. In this patent, we described that the red and infrared LEDs were turned on and off at a frequency of 625 Hz. JTX-1267 at -868 (36:62-64); Diab ¶ 98. As such, the red and infrared light emitters are modulated. JTX-1267, at -868 (36:6-23). Therefore, a high pass filter that allows only signals greater than 1 Hz (or greater than 90 Hz) will pass the red and infrared portions of the detected light signal while removing lower frequency portions of the signal that are due to sources like ambient light. Diab ¶ 98.

299. Diab was the person at Masimo who came up with the concept of using a filter to remove unwanted low frequency/high wavelength light intensity information from the detected signal. Diab ¶ 99. Through our development efforts, we arrived at using the high pass filter 344 to remove this low frequency information from the signal because (1) it is not useful or needed for pulse oximetry, and (2) if it is not filtered out the signal could exceed the maximum output of the amplifier. *Id.*

300. After the high pass filter 344, the resulting signal is output to a fixed amplifier 346 and then a programmable-gain amplifier 348, as shown in Figure 12 above. JTX-1267 at -831 (FIG. 12), -868 (36:64-65), -869 (37:5-7); Diab ¶ 100. The programmable-gain amplifier 348 is programmable and can therefore be adjusted based on the specific needs of the device. JTX-1267 at -868 (37:9-16); Diab ¶ 97.

301. These emitters are also described in paragraph 99 and Figures 30A through H of the '924 publication. JTX-1206 at -650 ([0099]), -622-23 (FIGS. 30A-H). The

'924 publication also discloses a detector that detects or obtains emitted light after attenuation by the body tissue. *Id.* at -650 ([0100], [0101]).

302.   Masimo had already conceived of every limitation of the elements of Claim 17 of the '095 patent long before Lamego left for Apple.  Madisetti ¶ 305; JTX-1268. Lamego's later filing of patent applications at Apple reflects his earlier work at Masimo rather than anything he developed at Apple. *Id.*

303.   Diab worked on the above-mentioned technology either alone or with Lamego over several years at Masimo and Cercacor, and they developed the technology while they were employees of Masimo and Cercacor. *Id.* at ¶ 306.  Masimo should be added to the list of assignees for the '095 and the '390 patents, and Diab should be added as an inventor to the '095 and the '390 patents to the extent that these patents are valid. *Id.*

### 4.   U.S. Patent No. 11,009,390

304.   As the facts above show, Masimo's publications disclose two emitters are described in paragraph 99 and Figures 30A through H of the '924 publication and at 35:23-27 and 36:6-12 of the '272 patent. JTX-1206 at -650 ([0099]); JTX-1267 at -867 (35:23-27), -868 (36:6-12).   They also disclose that the emitters are modulated to transmit light to a subject through an aperture.   They also disclose a detector that detects or obtains emitted light after attenuation by the body tissue.  JTX-1267 at -829 (FIG. 11), -867 (34:10-20, 35:23-27); Diab ¶ 94; JTX-1206 at -650 ([0099], [0101]); -604 (FIG. 9).   They also disclose a sensor for receiving light from the measurement cite.   JTX-1206 at -650 ([0099], [0101]); JTX-1267 at -829 (FIG. 11), -867 (34:10-20); Diab ¶ 94. They also disclose a high pass filter to filter out frequency below up to 90 Hz.   JTX-1267 at -831 (FIG. 12), -868 (36:56-64); Diab ¶ 98; JTX-1206 at -650-51 ([0107]), -637 (FIG. 40).  That frequency is higher than the normal range of pulse rates in humans (as modulated).   JTX-1267 at -868 (36:6-16); Diab ¶¶ 96-99; Poeze ¶ 37.  Finally, they disclose an analog to digital converter. JTX-1267 at -869 (37:41-44); JTX-1206 at -604 (FIG. 9), -647 ([0070]), -651 ([0108]).

305.    Masimo had already conceived of every limitation of the elements of Claim 1 of the '390 patent long before Lamego left for Apple.  Madisetti ¶ 305; JTX-1269.  Lamego's later filing of patent applications at Apple reflects his earlier work at Masimo rather than anything he developed at Apple.  Madisetti ¶ 305.

306.    Diab worked on the above-mentioned technology either alone or with Lamego over several years at Masimo and Cercacor, and they developed the technology while they were employees of Masimo and Cercacor.  *Id.* at ¶ 306.  Masimo should be added to the list of assignees for the '390 patent, and Diab should be added as an inventor to the '095 and the '390 patents to the extent that these patents are valid.  *Id.*



**K.    Before late 2019, Masimo Had No Reason To Believe That Apple Misappropriated Its Trade Secrets**

313.    After arriving at Apple, O'Reilly "repeatedly told [Kiani] that Apple had no interest in pulse oximetry and that there was no competitive concern in that area." Kiani ¶ 184.    He reassured Kiani with continued dialogue and friendship over the years. *Id.* ¶¶ 184-186.    Kiani believed O'Reilly based on his long and trusting friendship. *Id.* ¶¶ 178-180; JTX-2824.

314.    Lamego also personally assured Masimo that he would not be involved in competitive technology at Apple.    Kiani told Lamego it was important Lamego not use trade secrets he had learned at Masimo at Apple.    Kiani ¶ 206.    Lamego "insisted" that he would never use Masimo's trade secrets and promised "he would be working in areas at Apple completely unrelated to his work at Cercacor or Masimo."    *Id.*    He personally assured Kiani that "if Apple asked him to do anything that would compete with us, he would quit his job there immediately" because "competing with Masimo and Cercacor at Apple would not fit his ethics and he would never do so."    *Id.*    Kiani believed Lamego. *Id.* at ¶¶ 206-07.    Apple was "a very large company, with many products to work on" so it made sense that he would be working in an unrelated field at Apple.    *Id.*    It also made sense because the first time Lamego left Masimo to go to Brazil, he worked on a consulting job unrelated to his work at Masimo.    *Id.* ¶ 207.

315.    Cercacor's CFO, Gerry Hammarth, conducted Lamego's exit interview. Hammarth ¶¶ 37-38.    Hammarth also reminded Lamego of his obligations to maintain

-83-

confidentiality of Cercacor's trade secrets and confidential business information. *Id.* at ¶ 38.

316.   After Lamego went to Apple, Kiani directed that a letter be sent notifying Apple of Lamego's obligations under his Employee Confidentiality Agreements.   Kiani ¶¶ 209-211; JTX-2937.

317.   Cristiano Dalvi, a friend of Lamego and former Cercacor employee, later confirmed Lamego's representations to Kiani.   In particular, after Lamego left in July 2014, Kiani spoke to Dalvi, who told him that "Lamego left Apple because they had asked him to do something that would compete with us, and he did not want to do that because it was not consistent with his character."   Kiani ¶ 212.   Kiani believed Dalvi and it was "consistent with what Lamego had told [Kiani] when he left."   *Id.*

**L.   Masimo Discovers Apple's Misappropriation In Late 2019**

318.   Masimo first learned of Apple's misappropriation in October 2019 when it saw patents issued to Apple naming Lamego as the inventor.   Kiani ¶ 221.   As Kiani explained, the patents "covered technology that had been developed at Masimo and Cercacor, specifically things that were documents in our notebooks and worked on by individuals like Mohamed Diab and Jeroen Poeze."   *Id.*   Kiani thus authorized an investigation and Masimo and Cercacor brought this case about three months later in January 2020.   *Id.* ¶ 222.

319.   Masimo did not know or have reason to suspect Apple misappropriated any asserted trade secret before January 2017 (three years before suit).   Masimo took extensive efforts to protect its trade secrets, including having employees like Lamego and O'Reilly sign confidentiality agreements.   *See supra* § III.B (and evidence cited therein).   Kiani trusted O'Reilly and Lamego's representations that they would not misuse Masimo's trade secrets, Apple had no interest in pulse oximetry, and they were not working on competing technology.   Kiani ¶¶ 178-186, 202-207.   When Lamego left, Dalvi confirmed Lamego's representation by explaining that Lamego left as soon as

Apple suggested that he work on competing technology. *Id.* ¶ 212.  Kiani believed Dalvi. *Id.*

320.    A reasonable investigation would not have revealed Apple misappropriated L4 more than three years before suit.  The facts showing misappropriation are contained in internal Apple documents (*see supra* §§ G and I above) that were not available pursuant to a reasonable investigation *at any time*. ███████████████████ ████████████████████████████████████████████████████████ *See* Madisetti ¶ 102; JTX-1064. ██████████████████████████████████████████ ████████████ (Madisetti ¶¶ 103-113).  The earliest Masimo could have learned that ████████████████████████████████████████ is September 2018 when Apple released the Series 4 watch.  Even if Masimo had learned that Apple ████████ ████████████████████████████████████████████████████████ ██████████████████████████████

321.    A reasonable investigation before 2017 also would not have revealed Apple misappropriated L5.  Masimo did not learn Apple misappropriated L5 until discovery. No evidence suggests that Masimo could have learned that Apple ███████████████ ██████████████████████████████████████ Masimo also could not have learned that the ██████████████ were identified to Apple by Marcelo Lamego before obtaining discovery.  Thus, Masimo could not have learned that Apple misappropriated L5 until it had access to Apple's internal documents.

322.    A reasonable investigation before 2017 also would not have revealed Apple misappropriated D1, D3, or D10.  Masimo first learned Apple misappropriated D1, D3, and D10 █████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ███████████████ Thus, a reasonable investigation would not have revealed facts sufficient to bring suit as to D1, D3, or D10 ██████████████████

**M.**    **Apple's Misappropriation Causes Harm to Masimo and Legal Remedies Do Not Address Apple's Ongoing and Future Misappropriation**

323.    Masimo faces an ongoing threat that Apple will use, disclose, and destroy its trade secrets.  Apple disclosed D1, D3, and D10 ██████████████████ ███████████████████████████████ Madisetti ¶¶ 192-193, 215, 219; ████ Apple disclosed L5 ████████████████.  Madisetti ¶¶ 142-149; JTX-541 at 581-582; JTX-1156 at 527; Land ¶ 65.  Masimo risks further disclosure as Apple has shown no regard for Masimo's trade secrets.  Masimo also risks further disclosure as Apple continues to work with ████████████████████████████████████ ███████████████████████████████████

324.    Apple has also maintained possession of Masimo's ████████ ████████████████████████████████████████ Madisetti ¶¶ 186-194, 212-216, 250-252; JTX-143 at -568; JTX-154 at -673-74; JTX-161 at -721; JTX-162 at -416; JTX-853; JTX-855 at -353; JTX-852 at -571; JTX-851 at -415; ████ ████ JTX-153 at 843; JTX-273 at 369; JTX-847; JTX-880. ████████████████ ████████████████████████████████████████████ ████████████████ JTX-153 at -843; JTX-273 at -369; Madisetti ¶ 194; Kanaris Tr. at 7:21-8:2, 8:13-9:14, 10:15-11:3, 12:20-13:2, 14:1-3, 14:12-13, 15:2-3, 15:5-9, 18:17-19, 18:21-19:2, 19:4-10, 22:22-23:3, 23:11-17, 24:3-19, 24:21-22, 25:2-11, 26:22-27:4, 27:19-28:7, 29:10-30:9, 30:14-18, 30:20-31:3, 31:5-12, 37:4-38:8, 40:1-3, 40:5-5, 41:4-6, 41:8-8, 48:1-5, 48:8-48:17, 55:4-16.  Masimo faces a great risk that, after this case, Apple will implement ████████████ that Lamego provided in the Apple Watch. Kiani ¶ 137.  This would mean Masimo would have to compete against a product that uses Masimo's trade secrets.  *Id.*

325.    Apple owns ████████████████████████████.  Madisetti ¶¶ 192-193, 215, 219; ████████ Masimo would be harmed if Apple ██████████████ █████████████████████████████████████████████████ ████████████████████████████ Masimo would be further harmed if other

-86-

Masimo engineers believed they could disclose trade secrets with impunity to future employers and to the public in patents.

326.  Apple's continued use of Masimo's trade secrets, and potential future use of D1, D3, and D10 in an Apple Watch, ███████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████

327.  Masimo also experienced a reduction in demand for its technology when Apple introduced the blood oxygen feature in the Apple Watch.  Kiani ¶¶ 217-218. Masimo's future sales of Freedom watches and wrist-worn sensor modules are likely to be impacted by any future sales of Apple Watches with the blood oxygen feature, which benefits from Masimo's trade secrets.  Kiani ¶¶ 120-125; Muhsin ¶ 66.

328.  Masimo and Willow engineers need to be able to share their ideas freely with each other in order to collaborate to solve the most difficult problems in noninvasive patient monitoring.  Kiani ¶ 222; Diab ¶¶ 51-53.  Masimo and Willow depend on strong trade secret protection to give their engineers confidence to share information with each other, knowing that whatever they share will remain within the company and not end up with a competitor.  Kiani ¶¶ 223-224; Diab ¶¶ 51-53, 71-76.

329.  Allowing Apple to continue misappropriating Masimo's trade secrets undermines Masimo's engineers' ability to collaborate in confidence.  This would cause a chilling effect on the free sharing of ideas within Masimo.  Kiani ¶ 222; Diab ¶ 51-53, 76.

330.  Masimo depends on strong trade secret protection to maintain its competitive technical advantage.  Kiani ¶ 126; Diab ¶¶ 71-76, 157, 178, 219, 228, 238-242, 249.

331.  Masimo places significant value on the trade secrets in this case because they provide a competitive advantage.  Kiani ¶¶ 72-76, 137-147; Diab ¶¶ 157, 175-178, 218-219, 228, 238-249.  If Masimo's competitors were allowed to use Masimo's L4, L5, D1, D3, or D10 trade secrets, then Masimo's competitive advantage would be seriously

harmed.  Kiani ¶ 137 (D1, D3, D10), Diab ¶¶ 157, 170, 173, 175, 238 (D1, D3, D10);
Kiani ¶ 140-143 (L4), Diab ¶¶ 218-219, 239-241 (L4); Diab ¶¶ 228, 239-240, 242, 249
(L5).

332.    The evidence established that Masimo's trade secrets were discovered after
extensive research, brainstorming, experimentation and testing, repeated trial and error,
and years of collecting physiological data on thousands of patients to one Masimo
algorithms.  These efforts occurred over the course of more than a decade while Masimo
invested over ███████████████████ in research and development.  These
discoveries resulted in various new technological products that no other company has
replicated, even after more than ten years.  Kiani ¶ 139; Diab ¶¶ 121, 136, 183, 185, 238-
241.

333.    This Court finds that it would be highly improbable that any engineer or
group of engineers would be able to recreate any of Masimo's trade secrets, much less
many or all of them together.  Kiani ¶¶ 135-136; Diab ¶¶ 220-223, 226-227, 233-237.

334.    The Court finds that Masimo has shown by a preponderance of the evidence
that Apple's misappropriation harmed Masimo.  If Apple were allowed to continue to
misappropriate Masimo's trade secrets, Masimo would be irreparably harmed.

**N.    Additional Equitable Factors Support an Injunction**

335.    Masimo would suffer extreme hardship if it could not protect its trade
secrets with injunctive relief.

336.    Masimo depends on strong trade secret protection to maintain its
competitive technical advantage.  Kiani ¶ 126; Diab ¶¶ 71-76, 157, 178, 219, 228, 238-
242, 249.

337.    If Masimo's competitors were allowed to use Masimo's L4, L5, D1, D3, or
D10 trade secrets, then Masimo's competitive advantage would be seriously harmed and
cause Masimo a hardship.  Kiani ¶ 137 (D1, D3, D10), Diab ¶¶ 157, 170, 173, 175, 238
(D1, D3, D10); Kiani ¶¶ 140-143 (L4), Diab ¶¶ 218-219, 239-241 (L4); Diab ¶¶ 228,
239-240, 242, 249 (L5).

338.   Apple earned significant profits attributable to the blood oxygen feature on the Series 6 and 7 Watches.  Kinrich ¶¶ 72, Tables 17 and 18; Webster ¶¶ 24-55, Table 2.  Masimo would suffer extreme hardship if forced to compete against Apple who earned significant profits by misappropriating Masimo's trade secrets.

339.   Apple has identified no hardship it would suffer if it were enjoined from further misappropriation.

340.   The public has a strong interest in the enforcement of trade secret rights.

341.   The public has a strong interest in protecting trade secret rights so that engineers and innovators can collaborate without concern that their trade secrets will be taken to competitors.  Kiani ¶¶ 223-225.

342.   The public has a strong interest in encouraging innovative medical device companies, like Masimo, to invest in technology that saves lives and money.  Masimo's trade secrets helped Masimo to develop technologies including Masimo SET and Rainbow, are used by approximately 200 million patients annually and have saved many lives and decreased the cost of effective patient care.  Kiani ¶ 89; Muhsin ¶ 40; Muhsin ¶¶ 38-40; JTX-2801.  Masimo SET technology alone has saved thousands of lives and billions of dollars in healthcare costs.  Kiani ¶ 53; Diab ¶ 48; JTX-2783.  The superior performance of Masimo SET technology has been confirmed by over 100 studies, and Masimo SET improves patient care by allowing clinicians to accurately measure oxygen saturation through motion and low perfusion.  Kiani ¶¶ 72-76; Diab ¶¶ 66-70.  Masimo SET technology has been used to virtually eliminate retinopathy of prematurity in premature babies, which was previously causing blindness in thousands of babies per year.  Kiani ¶¶ 46, 77; Diab ¶¶ 40-41.  Masimo SET has also been used virtually eliminate the missed detection of critical congenital heart defects in infants, which can be fatal if left untreated.  Kiani ¶ 78.  Masimo SET has further been used to eliminate preventable deaths due to opioid overdose and helped to reduce COVID-19 mortality by over 70 percent.  Kiani ¶¶ 79-80, 108-109; Muhsin ¶¶ 44-46.  Masimo's Rainbow technology has saved many lives by allowing clinicians to accurately and noninvasively

monitor more physiological parameters and thereby detect even more health condition, including carbon monoxide poisoning, methemoglobinemia, and internal bleeding. Kiani ¶¶ 60-71; Diab ¶¶ 54-65. Masimo's Rainbow technology also allows noninvasively measuring total hemoglobin, which has been used to reduce post-surgical mortality by over 30 percent. Kiani ¶¶ 63-64; Diab ¶ 57.

343. False alarms in pulse oximetry measurements lead to distrust in the measurement and desensitize users to true alarms. Kiani ¶ 18.

344. The blood oxygen feature in the Apple Watch does not have FDA clearance and Apple did not seek FDA clearance. Caldbeck ¶ 21.

345. The blood oxygen feature in the Apple Watch is not medical grade and does now work in many use cases. Dua Tr. at 16-19.

346. Evidence shows that the blood oxygen feature in the Apple Watch detected only 6 percent of true desaturation events, and when it did so, its accuracy was only 4.5 percent. Kiani ¶ 219; JTX-5178.

347. The public does not have a strong interest in permitting Apple's continued misappropriation, when Apple uses Masimo's trade secrets to offer a blood oxygen feature that is not medical grade, does not comprehensively detect desaturation events, provides false alarms, burdens the medical system, and prevents other patients who need medical resources from accessing them.

348. The Court should find that Apple should not be allowed to continue misappropriating trade secrets it obtained from Lamego.

**O.** **Apple's Misappropriation Unjustly Enriched Apple**

349. Apple's misappropriation benefited Apple. As explained below, each trade secret helped ████████████████████████████████████████████ ████████████████████████████████████████████ JTX-1078 at -632.

-90-

350. L4 ████████████████████████████████. Diab ¶¶ 181-186; Madisetti ¶¶ 83-85. L5 ████████████████████████████ ████ Dalke ¶¶ 55-87; Madisetti ¶¶ 130-137.

████ Apple used L4 ████████████████████████████ Madisetti ¶¶ 102-113; JTX-1064 at -859. Based on L4, ████████████



352. Apple identified L5 ████████████████████

████ Diab established that D1, D3, and D10 ████████████

354. ████████████████████████████

355. Apple first launched the blood oxygen feature in the Series 6 Apple Watch, on September 18, 2020. Kinrich ¶ 6; JTX-5166; JTX-5167; JTX-1769. Apple discontinued the Series 5 (which did not include the blood oxygen feature) on September 15, 2020, three days before Apple launched the Series 6. Kinrich ¶ 20; JTX-5055.

356.   Apple's sales and profits on Series 6 and 7 Watches that include the blood oxygen feature, while Apple was simultaneously selling the Series SE Watch that did not include the blood oxygen feature demonstrates Apple was unjustly enriched from misappropriating Masimo's trade secrets.  Kinrich ¶¶ 12, 15-19.  Apple Watch SE was specifically developed to be a more economic model that Series 6, in order to appeal to a wider range of consumers.  Caldbeck ¶ 25; Webster ¶ 28.  Evidence from these simultaneous sales show customers were willing to pay a premium for the Series 6 and 7 over Series SE, to obtain certain features in the Series 6 and 7 that were not available in the Series SE.  Kinrich ¶¶ 12, 15-19.  Basic economic theory dictates that price of a product is a driver of both demand and sales.  Webster ¶ 28.

357.   Apple sold millions of units of the Series 6 and Series 7.  Kinrich ¶ 24; Kinrich Table 3; JTX-1754; JTX-1755; JTX-278; JTX-1413; JTX-349; Webster ¶ 53, Table 2; JTX-4201.1; JTX-4202.1; JTX-4688; JTX-4691.

358.   Apple earned additional profits on Series 6 and 7 watches that included the blood oxygen feature compared to simultaneously sold Series SE watches that did not include the blood oxygen feature.  Kinrich ¶¶ 12, 15-19.  The incremental profits are attributable to the features of the Series 6 and 7 Watches that were not present in the Series SE.  *Id*.

359.   When Apple launched the Series 6 Watch, Apple highly promoted the blood oxygen feature.  Kinrich ¶ 43-45; JTX-1351; JTX-1353; JTX-3176.

360.   Apple's New Product Security team used the phrase "crown jewel" to refer to the Blood Oxygen App before it was released.  Caldbeck ¶ 35.

361.   The Apple Series 6 launch video prominently features the blood oxygen feature.  Kinrich ¶ 43; JTX-1351.

362.   Apple also showcased the blood oxygen feature on its website.  Kinrich ¶ 44-46; JTX-1353.  Apple relied on the blood oxygen feature to declare "The future of health is on your wrist," and "Blood Oxygen, A breath of fresh innovation."  Kinrich ¶ 44-45; JTX-1353 at 856-57.

363.   When Apple launched the blood oxygen feature, the New York Times reported that "The new Apple Watch can be summed up in two words: blood oxygen. The ability to measure your blood's oxygen saturation – an overall indicator of wellness – is the most significant new feature in the Apple Watch Series 6."  Kinrich ¶ 47; JTX-5184.  This article was a strong indication of the importance of the blood oxygen feature relative to other features on the watch.  Kinrich ¶ 47.

364.   Before Apple incorporated the blood oxygen feature in the Series 6 Watch,

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

Kinrich ¶ 48-52; JTX-5118 at 662.

365.   When Apple launched the Series 6 watch with the blood oxygen feature, Apple promoted just three differences between the Series 6 and Series SE: (1) blood oxygen, (2) ECG, and (3) always-on display.  Kinrich ¶ 54; JTX-1353 at 873.  Apple identified only these three feature differences on Apple's watch comparison website, where Apple helped buyers decide "Which Apple Watch is right for you?"  *Id*.  The profit differential between the Series 6 and the Series SE is attributable to these feature differences.  Kinrich ¶ 55.

366.   ████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████  Kinrich ¶ 64; JTX-367C at -664; JTX-4194 at -529; JTX-5041 at -529; JTX-4195 at -340; JTX-5044 at -340; JTX-4196 at -928; JTX-5042 at -928; JTX-4197 at –766, -776; JTX-5045 at -766, -776; JTX-4198 at -134; JTX-5043 at -134; JTX-5027 at -091; JTX-5028 at -311; Jue Tr. at 15, 53-56, 172, 234-36, 239, 241, 256-58.

367.   ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

1 ███████████████████████████████████████████████

2 ██████  JTX-1760; JTX-367C at -664; JTX-4194 at -529; JTX-

3 4195 at -340; JTX-5044 at -340; JTX-4196 at -928; JTX-5042 at -928; JTX-4197 at -

4 766, -776; JTX-5045 at -766, -776; JTX-4198 at -134; JTX-5043 at -134; JTX-5027 at

5 -091; JTX-5028 at -311; JTX-4204; Jue Tr. at 15, 53-56, 172, 234-36, 239, 241, 256-58.

6     368. ████████████████████████████████

7 ███████████████████████████████████████████████

8 ████████████████████████  Kinrich ¶ 64-66.

9     369.  Apple's profits attributable to the blood oxygen feature have been

10 significant. Kinrich ¶¶ 72, Table 18 and 19; JTX-1744; JTX-1754; JTX-1755; Webster

11 ¶ 48.  Apple sold ██████ of Series 6 and Series 7 Watches with the blood oxygen

12 feature. Kinrich ¶24, Table 3; Webster ¶ 53; JTX-4688; JTX-4691.

13     370.  In January 2024, an ITC exclusion order prevented Apple from importing

14 into the U.S. Apple Watches with the blood oxygen feature enabled. Kinrich ¶ 73; JTX-

15 5071.  Apple disabled the blood oxygen feature on Series 9 and Ultra 2 watch models

16 sold in the U.S. starting on January 18, 2024.  Kinrich ¶ 11, 25; JTX-5054, JTX-5071;

17 Caldbeck ¶ 37; Webster ¶ 56, 61, 66.

18     371.  Apple's U.S. watch sales in fiscal Q2 2024 (the quarter where the import

19 ban took effect) were ████████. Kinrich ¶ 73; JTX-5010; JTX-4691. But in the

20 same quarter in Apple's 2023 fiscal year, Apple sold ████████ of watches in the

21 U.S. *Id*. And in the same quarter in Apple's 2022 fiscal year, Apple sold ████████

22 of watches in the U.S. *Id*.  This means that in fiscal Q2 2024, Apple's U.S. watch sales

23 were just ████████████ of Apple's U.S. watch sales in the same quarter

24 in 2023, and just ████████████ of Apple's U.S. watch sales in the same

25 quarter in 2022. *Id*.

26     372.  Apple's U.S. sales of Apple Watches ██████ in Q1 FY 2024, the last

27 full quarter when Apple was still selling watches in the U.S. with the blood oxygen

28 feature enabled, resulting in ████████████████████████

1  ████████████. Webster ¶ 60. U.S. consumers and resellers (e.g., Best Buy, Target)
2  who were going to purchase an Apple Watch in the U.S. during the first half of the fiscal
3  year did so in Q1 (when Apple Watches had the blood oxygen feature enabled) rather
4  than Q2 (when the import ban took effect). *Id.*

5      373.  Concerns about the future availability of all Apple Watch models in the
6  U.S. after issuance of the October 26, 2023 ITC Order may have resulted in ████████
7  ████████ of Apple Watch models in November and December 2023, both of which
8  are part of Apple's Q1 FY 2024. Webster ¶ 61.

9      374.  Apple recognized that being prevented from selling Apple Watches in the
10  U.S. with the blood oxygen feature enabled ███████████████ Kinrich ¶ 75; JTX-
11  5072 at 2, 6.

12  **P.   Apple Willfully and Maliciously Misappropriated Masimo's Trade Secrets**

13     375.  Apple's actions to obtain Masimo's technology show willful and malicious
14  behavior. *See supra* §§ III. F and III. H.

15     376.  Apple earned significant profits from its acts of misappropriation. *See*
16  *supra* § III.O.

17     377.  Apple hired Marcelo Lamego for his "specialized experience" to accelerate
18  Apple's research and development of sensors for the Apple Watch. Williams Tr. at
19  96:15-97:12; JTX-265.

20     378.  To entice Lamego to come work for Apple, and based on Apple's
21  "extraordinary need for his specialized skills," Apple offered Lamego ████████████
22  ██████████████████████████████████████████████████
23  ███ Williams Tr. at 101:19-102:7, 102:19-103:4, 103:12-103:21; 105:7-105:17 JTX-
24  295. Jeff Williams, Apple's Chief Operating Officer, and the individual responsible for
25  Apple Watch activities from an engineering standpoint, ████████████████████
26  ████████████████████ Williams Tr. at 108:3-108:8.
27     ████Jeff Williams, Apple's Chief Operating Officer, ████████████████
28  ████████████████████████████████████████████████████

-95-

381. ███████████████████████████████████████

███████████████████████████████████████ Williams Tr. at 60:1-4.

382. Dr. Michael O'Reilly warned Apple that all of Lamego's relevant information was likely proprietary to Masimo. O'Reilly Tr. at 315:9-316:5, 316:9-17; JTX-512.

383. In addition, Apple assured Masimo it was not working on blood oxygen. Kiani ¶¶ 182, 184, 212. Apple also did not respond to Masimo's letter after they hired Lamego dissuading them from misusing Masimo's intellectual property through Lamego. *Id.* at ¶ 211; JTX-2937. Moreover, Apple hid its misappropriation of D1, D3, and D10 by ████████████████████ Finally, Apple's misappropriation has continued after Masimo filed suit.



# IV.  PROPOSED CONCLUSIONS OF LAW

## A.    Jurisdiction and Venue

1.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 1338(a) because the Patent Infringement claims arise under federal patent laws, 35 U.S.C. §§ 271 and 281, because the Correction of Inventorship claims arise under federal patent law, 35 U.S.C. § 256, and under the Declaratory Judgement Act, 28 U.S.C. §§ 2201 and 2202.

2.    The Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over Masimo's state law claims for misappropriation of trade secrets under the California Uniform Trade Secrets Act, Cal. Civ. Code § 3426, and for ownership of patent and patent application claims.  Masimo's state law claims are related to the patent infringement and correction of inventorship claims such that that they form part of the same case or controversy under Article III of the United States Constitution.

3.    This Court has personal jurisdiction over Apple and venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and 1400(b) because a substantial part of the events giving rise to the parties' dispute arose in this judicial district.  The parties agree that the facts requisite to federal jurisdiction and venue are admitted

## B.    Apple's Violation of the California Uniform Trade Secrets Act

### 1.    Legal Standard

4.    Masimo will prove the following elements, by a preponderance of the evidence, for each of Trade Secrets L4, L5, D1, D3, and D10 ("Asserted Trade Secret(s)"):

    a.    Masimo and/or Willow developed or otherwise lawfully possessed the Asserted Trade Secret;

    b.    At the time of misappropriation, the Asserted Trade Secret derived actual or potential independent economic value from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use, and was the subject of efforts that are reasonable under

-97-

1    the circumstances to maintain its secrecy;

2        c.    Apple improperly acquired, used, or disclosed the Asserted Trade Secret.

3    Dkt. 1715 (instruction 19); Cal. Civ. Code § 3426.1; *Sargent Fletcher, Inc. v. Able Corp.*,

4    110 Cal. App. 4th 1658, 1667, 3 Cal. Rptr. 3d 279, 284 (2003).

5        5.    "The [generally known] inquiry is not whether the alleged trade secret has

6    been publicly disclosed at all, but whether it has become 'generally known to the

7    relevant people, i.e., potential competitors or other persons to whom the information

8    would have some economic value[.]'" *Kittrich Corp. v. Chilewich Sultan, LLC*, 2013

9    WL 12131376, at *4 (C.D. Cal. Feb. 20, 2013) (quoting *DVD Copy Control Ass'n, Inc.

10   v. Bunner*, 116 Cal. 4th 241, 251 (2004)).

11       6.    Finding aspects of the trade secret across various publications and applying

12   a patent-like obviousness analysis does not render the trade secret generally known

13   under CUTSA.  *See Imi-Tech Corp. v. Gagliani*, 691 F. Supp. 214, 231 (S.D. Cal. 1986)

14   ("The defendants' attempts to show that Imi-Tech's alleged trade secrets were known in

15   the prior art also fail to provide a defense for the defendants, since it is not required that

16   a trade secret be patentably nonobvious or novel.").  "'[O]bviousness' is not the

17   benchmark" in a trade secrets action.  *Am. Can Co. v. Mansukhani*, 728 F.2d 818, 819

18   (7th Cir. 1982).  Whether a person could alter a patent to be the same as a trade secret

19   does not show that the trade secret is generally known.  *Id*.

20       7.    "[W]hether information is 'readily ascertainable' is not part of the

21   definition of a trade secret in California." *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d

22   1161, 1168 n.10 (9th Cir. 1998).  Instead, under the CUTSA, ready ascertainability is a

23   defense that "will be based upon an absence of misappropriation, rather than the absence

24   of a trade secret." *ABBA Rubber Co. v. Seaquist*, 235 Cal. App. 3d 1, 21 n.9 (1991).

25   Under CUTSA, ready ascertainability is only a defense insofar as the defendant actually

26   gained knowledge of the trade secret by use of those materials which make the trade

27   secret readily ascertainable. *See Imax*, 152 F.3d at 1168 n.10; *Medtronic MiniMed, Inc.*

28

1    *v. Nova Biomedical Corp.*, 2009 WL 10672947, at *1 (C.D. Cal. Aug. 14, 2009); *see*

2    *also* Dkt. 257 at 12-13; Dkt. 424 at 7 n.1.

3        8.    Defendants are liable for trade secret misappropriation by acquisition if

4    they knew or had reason to know that the trade secret was acquired by improper means.

5    Cal. Civ. Code § 3426.1(b)(1).

6        9.    Defendants are liable for trade secret misappropriation by disclosure or use

7    if they use or disclose a trade secret that they used improper means to acquire. *Id.*

8    § 3426.1(b)(2)(A).    Defendants are also liable for trade secret misappropriation by

9    disclosure or use if, at the time of disclosure or use, they knew or had reason to know

10   that their knowledge of the trade secret was: (i) Derived from or through a person who

11   had utilized improper means to acquire it; (ii)  Acquired under circumstances giving rise

12   to a duty to maintain its secrecy or limit its use;  or (iii)  Derived from or through a

13   person who owed a duty to the person seeking relief to maintain its secrecy or limit its

14   use.  Cal. Civ. Code § 3426.1(b)(2)(B).

15       10.   California's policy favoring employee mobility does not override trade

16   secret law.  *See The Ret. Grp. v. Galante*, 176 Cal. App. 4th 1226, 1237 (Cal. Ct. App.

17   2009) (acknowledging California policy but finding that "[a]n equally lengthy line of

18   cases has consistently held former employees may not misappropriate the former

19   employer's trade secrets to unfairly compete with the former employer.").  California's

20   employee-mobility policy does not sanction misappropriation of trade secrets. *Id.*

21       11.   Further, if "willful and malicious misappropriation exists, the court may

22   award reasonable attorney's fees and costs to the prevailing party.  Recoverable costs

23   hereunder shall include a reasonable sum to cover the services of expert witnesses, who

24   are not regular employees of any party, actually incurred and reasonably necessary in

25   either, or both, preparation for trial or arbitration, or during trial or arbitration, of the

26   case by the prevailing party."  Cal. Civ. Code § 3426.4.

27       12.   Masimo does not need to show that an employee *other* than Lamego "knew

28   or should have known" of the misappropriation because Apple is also liable under

-99-

respondeat superior. *SolarCity Corp. v. Pure Solar Co.*, 2016 WL 11019989, at *5 (C.D. Cal. Dec. 27, 2016); *Navigation Holdings, LLC v. Molavi*, 2020 WL 5074307, at *4; *Alert Enter., Inc. v. Rana*, 2023 WL 2541353, at *3 (N.D. Cal. Mar. 16, 2023); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 755-56 (1998). Regardless, Lamego knew or should have known he was disclosing and using Masimo's trade secrets. *See Supra* § III. D; JTX-769, JTX-810, JTX-1597 at -650-654, -664-670; Dalke ¶ 9; Kiani ¶¶ 57, 126-134; JTX-672.

13.    Regardless, Masimo did present sufficient evidence for the jury to find an employee ***other*** than Lamego knew or should have known. As discussed, Apple targeted Masimo employees for their "specialized" knowledge. O'Reilly even warned Apple that most of Lamego's knowledge was confidential. JTX-605 at -010.

14.    Despite the warning, Apple hired Lamego. Hotelling then assigned Lamego to work on the same type of technology Lamego worked on at Cercacor. Within one month of joining Apple, ███████████████████████████████████ ████████████ JTX-143. ████████████████████████████ ████████████████ JTX-297 at -772. Lamego also ████████████ ████████████████████ JTX-610 at -075 (email). Sufficient evidence exists to conclude that Apple employees other than Lamego, including Hotelling, knew or should have known Lamego was disclosing Masimo's trade secrets. Indeed, Hotelling knew about O'Reilly's warning, ████████████████████████████████████ O'Reilly also knew that Lamego's information was confidential to Masimo.

### 2.    Apple Misappropriated Several Masimo Trade Secrets

#### a.    Masimo's Asserted Trade Secrets Are Trade Secrets Under CUTSA

##### i.    Masimo's Trade Secrets Were Subject to Reasonable Efforts to Maintain their Secrecy

15.    Masimo presented evidence that it took reasonable efforts to maintain the secrecy of trade secrets D1, D3, D10, L4, L5, ("asserted trade secrets"). Kiani, Diab,

Muhsin, Dalke, Poeze, Scruggs, Madisetti, Miller, and Hammarth testified about the steps Masimo took to keep the asserted trade secrets confidential and proprietary to Masimo and Cercacor.  Kiani ¶¶ 69, 127-31, 156; Muhsin ¶¶ 8-29, 32-34; Miller ¶¶ 5-15; Hammarth ¶¶ 10-26, 37; Diab ¶¶ 71-77, 219, 228, 239-42; Scruggs ¶ 14; Dalke ¶¶ 7-9; Poeze ¶¶ 9-15; Madisetti ¶¶ 163, 195, 209, 217; JTX-769; JTX-811; JTX-827; JTX-828; JTX-832; JTX-935–JTX-937; JTX-1309; JTX-1677; JTX-2217; JTX-2323; JTX-2263; JTX-2266; JTX-2388; JTX-2403; JTX-2514; JTX-2556; JTX-2561; JTX-2563; JTX-2564; JTX-2974; JTX-2981.1.

### ii.  Masimo Possessed Trade Secret L4, Which Obtains Economic Value From Not Being Generally Known To Others Who Could Obtain Value From Its Use

16.     Diab and Scruggs explained that Masimo possessed, and exposed Lamego to, the information captured by the words of L4.  Diab ¶¶ 179-217, 230; Scruggs ¶¶ 6-13; Hammarth ¶ 28; JTX-173; JTX-343; JTX-777; JTX-782; JTX-881; JTX-935 – JTX-941; JTX-1016; JTX-1022; JTX-1045; JTX-1227; JTX-1906; JTX-P-0005; JTX-P-0005p; JTX-P-0161; JTX-P-0161p; JTX-P-0162; JTX-P-162p. Dr. Madisetti explained his analysis showing that Masimo developed and uses L4.  Madisetti ¶¶ 83-94.

17.     Kiani, Diab, and Madisetti explained the independent economic value that Masimo and Cercacor obtained from this trade secret not being generally known to the public or to other persons who can obtain economic value from its disclosure or use. Diab ¶¶ 218-19, 239-41; Madisetti ¶¶ 115-127; Kiani ¶¶ 138-147.

### iii.  Masimo Possessed Trade Secret L5, Obtains Economic Value From Not Being Generally Known To Others Who Could Obtain Value From Its Use

18.     Diab and Dalke explained that Masimo possessed, and exposed Lamego to, the information captured by the words of L5.  Diab ¶¶ 73, 76, 220-228, 239-40, 242-249; Dalke ¶¶ 7, 9-17, 21, 24-79, 82-85; JTX-702, 703, 704, 827, 1082.1, 1082.2, 1086,

1091, 1644, 1951, JTX-P-0135. Dr. Madisetti explained his analysis showing that Masimo developed and uses L5. Madisetti ¶¶ 130-137, 163.

19. Diab, Dalke, and Madisetti explained the independent economic value that Masimo and Cercacor obtained from this trade secret not being generally known to the public or to other persons who can obtain economic value from its disclosure or use. Diab ¶¶ 228, 239-40, 242; Dalke ¶¶ 60, 67, 82; Madisetti ¶¶ 162-170; JTX-541; *see also* Zheng Tr. at 52-57:8-15, 68:12-22.

iv.   **Masimo Possessed Trade Secret D1, Obtains Economic Value From Not Being Generally Known To Others Who Could Obtain Value From Its Use**

20. Diab, Poeze, and Dalke explained that Masimo possessed, and exposed Lamego to, the information captured by the words of D1. Diab ¶¶ 73, 76, 121-26, 129-37, 146-52, 155-57, 159, 168-74, 178, 238; Poeze ¶¶ 9-15, 18-29, 40, 44-55, 61-62, 66-67; Dalke ¶¶ 15, 30-32, 51; JTX-341, 677, 784, 798, 811, 827, 828, 831, 832, 1912. Dr. Madisetti explained his analysis showing that Masimo developed and possessed D1. Madisetti ¶¶ 174-85.

21. Diab and Madisetti explained the independent economic value that Masimo and Cercacor obtained from trade secret D1 not being generally known to the public or to other persons who can obtain economic value from its disclosure or use. Diab ¶¶ 157, 174-178, 238; Madisetti ¶¶ 195-204; JTX-153, 273, 828.

v.   **Masimo Possessed Trade Secret D3, Obtains Economic Value From Not Being Generally Known To Others Who Could Obtain Value From Its Use**

22. Diab and Poeze explained that Masimo possessed, and exposed Lamego to, the information captured by the words of D3. Diab ¶¶ 76, 126, 131-37, 153-59, 167-74; Poeze ¶¶ 16-18, 21-39, 66-68; JTX-798, 811, 827, 828, 831, 832, 784. Dr. Madisetti explained his analysis showing that Masimo developed and possessed D3. Madisetti ¶¶ 208-11.

23.    Diab, Poeze, and Madisetti explained the independent economic value that Masimo and Cercacor obtained from trade secret D3 not being generally known to the public or to other persons who can obtain economic value from its disclosure or use. Diab ¶¶ 73, 153-55, 238; Poeze ¶¶ 21, 32-36, 65; Madisetti ¶¶ 217-18, 220-26; *see also* 2022-08-12 Kanaris Tr. at 29:10-30:6, 37:12-38:13, 39:13-40:5, 48:8-49:20.

vi.    **Masimo Possessed Trade Secret D10, Obtains Economic Value From Not Being Generally Known To Others Who Could Obtain Value From Its Use**

24.    Poeze explained that Masimo possessed, and exposed Lamego to, the information captured by the words of D10.  Poeze ¶¶ 9-15, 21, 39, 40-56, 65-66, 71-72, 230, 236; JTX-798, 811, 827, 828, 831, 832, 784, 1207.  Dr. Madisetti explained his analysis showing that Masimo developed and possessed D10.  Madisetti ¶¶ 230-49.

25.    Madisetti explained the independent economic value that Masimo and Cercacor obtained from trade secret D10 not being generally known to the public or to other persons who can obtain economic value from its disclosure or use.  Madisetti ¶¶ 253-257.

b.    **Apple Misappropriated Every Asserted Trade Secret**

i.    **Lamego Had Access to the Asserted Trade Secrets**

26.    Diab, Muhsin, Hammarth, and Kiani explained that Lamego had virtually unfettered access to Masimo's confidential information, including the asserted trade secrets.  Diab ¶¶ 138-42; Muhsin 31-37; Kiani ¶¶ 153-58; Hammarth ¶ 24-26, 28; JTX-2354, 2556, 2560, 2565.

ii.    **Apple Acquired Masimo's Trade Secrets Through Improper Means And Knew Or Should Have Known That Lamego Improperly Provided Masimo's Trade Secrets**

27.    Kiani testified about Apple's knowledge of the confidentiality obligations of Masimo employees and about Apple's desire to acquire Masimo's technology.  Kiani

¶¶ 166-76, 178-82, 183, 187-88, 190, 192, 202, 209-11; JTX-559, 771, 768, 2353, 2937, 3997. Apple witnesses provided evidentiary support, including through testimony and documents, for Masimo's claim that Apple (a) acquired Masimo's trade secrets through improper means, (b) used and disclosed the trade secrets it acquired through improper means, and (c) used and disclosed trade secrets it knew or should have known were obtained through Lamego. 2021-12-15 Sellers Tr. 26:13-27:2; 92:22-93:17; 132:5-12, 257:13-22; JTX-70, 263, 265, 295, 314, 316, 337, 393-95, 556, 652, 655, 657, 659, 664, 668, 1719, 1720; Defendant Apple Inc.'s Supplemental Objections and Responses to Plaintiffs Masimo Corporation and Cercacor Laboratories, Inc.'s Third Set of Interrogatories to Defendant Apple Inc. (Nos. 11-13) at 16-18, 27.

28.    Apple's "Project Rover" sought to identify a third-party expert that Apple could use as a "stepping stone" to release its own products. JTX-260. Apple identified Masimo as a "Tier 1" "Target" for "Sensor Components" and later elevated Masimo Corp. and Cercacor to the two "standout" companies. JTX-556; JTX-259. Apple approached Masimo to conduct a "deeper dive" into Masimo's technology and discuss how Apple could integrate Masimo's technology. JTX-720. Apple concluded that Joe Kiani was the "health/wellness leader we are looking for" and discussed acquiring Masimo. JTX-394. Apple then recruited Masimo's Chief Medical Officer, Michael O'Reilly.

29.    In September 2013, Apple executives concluded Apple's sensor designs were a "mess" and on a path to failure. JTX-335 at -321; JTX-337 at -427-28; JTX-400 at -580; Mansfield Tr. at 32-35, 41. Cercacor's Chief Technical Officer, Marcelo Lamego, then reached out to Apple in October 2013 and offered to solve Apple's problems. JTX-1719. Apple's "Project Everest" then discussed how to engage with Masimo, including by joint development, acquisition, or acquisition of Masimo's people. JTX-263. Apple then hired Lamego for his "specialized experience that we are deeply in need of." JTX-265. And Apple started a "confidential" project to pursue the "next level down" of Masimo employees. JTX-2070. Apple then hired numerous other

Masimo employees.  JTX-165; Kiani ¶¶ 178-181, 183, 190, 202 209; JTX-165, 176, 664, 768, 771; Defendant Apple Inc.'s Supplemental Objections and Responses to Plaintiffs Masimo Corporation and Cercacor Laboratories, Inc.'s Third Set of Interrogatories to Defendant Apple Inc. (Nos. 11-13) at 16-18, 27.  Apple specifically sought the "exclusive knowledge" of Masimo employees—not their "general" experience as Apple argues. *See, e.g.*, JTX-165.

30.    Witness testimony will confirm that Apple sought out, obtained, and used Masimo's confidential information from Lamego.  Lamego testimony will confirm that he repeatedly used and disclosed Masimo's trade secrets at Apple.

31.    Apple's other witnesses, such as Hotelling, Land, Block, Perica, Mansfield, and Sellers will testify as to Apple's acquisition, use, and disclose of Masimo's trade secrets.

### iii.    Apple Misappropriated Trade Secret L4

32.    Dr. Madisetti explained Apple's misappropriation of L4. Madisetti ¶¶ 79, 95-114.  Apple's witnesses will provide evidentiary support for Dr. Madisetti's analysis. JTX-84, 143, 434, 1061, 1063, 1064, 1068, 1069, 1070, 1072, 1045, 1076-80, 1790.

### iv.    Apple Misappropriated Trade Secret L5

33.    Dr. Madisetti explained Apple's misappropriation of L5.  Madisetti ¶¶ 79, 138-61.  Apple's witnesses will provide evidentiary support for Dr. Madisetti's analysis. JTX-143, 181-186, 162, 353C, 541, 859, 1140, 1086, 1156, 5079-83, 5113, 5115, 5159.

### v.    Apple Misappropriated Trade Secret D1

34.    Dr. Madisetti explained Apple's misappropriation of D1.  Madisetti ¶¶ 79, 186-94.  Apple's witnesses will provide evidentiary support for Dr. Madisetti's analysis. JTX-14, 140, 142, 143, 153, 154, 161, 162, 273, ██ 851, 853, ██ 238, 412, 415, 880.

1

### vi.  Apple Misappropriated Trade Secret D3

2      35.     Dr. Madisetti explained Apple's misappropriation of D3.  Madisetti ¶¶ 79,

3  212-16.  Apple's witnesses will provide evidentiary support for Dr. Madisetti's analysis.

4  JTX-154, 162, 847, ████ 880.

5

### vii.  Apple Misappropriated Trade Secret D10

6      36.     Dr. Madisetti explained Apple's misappropriation of D10.  Madisetti ¶¶ 79,

7  250-52.  Apple's witnesses will provide evidentiary support for Dr. Madisetti's analysis.

8  JTX-14, 142, 143, 847, 880, ████████.

9

### viii.  Apple Is Also Vicariously Liable For Lamego's Wrongful

10                        Conduct

11      37.     Masimo also presented evidence that Lamego used Masimo's trade secrets

12  in the course and within the scope of his employment and disclosed those trade secrets

13  to Apple in technical discussions, business discussions, marketing discussions,

14  documents, and invention disclosures.  *See supra* § III. G.  Thus, Apple is liable under

15  the doctrine of respondeat superior.

16

### c.  Apple's Misappropriation Of Every Trade Secret Was Willful

17                        And Malicious

18      38.     The evidence discussed above also shows Apple's misappropriation was

19  willful and malicious.  Apple acted specifically to obtain Masimo's trade secrets by

20  hiring Masimo's employees with specialized and exclusive knowledge.  Steven

21  Hotelling was tasked with the job of recruiting such employees from Masimo and

22  Cercacor, as explained above.

23  **C.  Correction of Inventorship of U.S. Patents**

24      **1.  Legal Standard**

25      39.     Masimo must prove by clear and convincing evidence that the alleged

26  inventor:

27      a. contributed to the conception of at least one limitation in at least one claim of

28  the patent; and

b. this contribution was not insignificant in quality, when that contribution is measured against the dimension of the full invention. quality, when that contribution is measured against the dimension of the full invention." *Fina Oil & Chem. Co. v. Ewen*, 123 F.3d 1466, 1473 (Fed. Cir. 1997).

40.    Moreover, a person can be an inventor if he or she contributed to the conception of at least one limitation in at least one claim of the patent: "the law of inventorship does not hinge co-inventor status on whether a person contributed to the conception of all the limitations in any one claim of the patent." *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1361-62 (Fed. Cir. 2004) ("the law of inventorship does not hinge co-inventor status on whether a person contributed to the conception of all the limitations in any one claim of the patent."). "Rather, the law requires only that a co-inventor make a contribution to the conception of the subject matter of a claim." *Id.*; *Ethicon, Inc. v. U.S. Surgical Corp.,* 135 F.3d 1456, 1462 (Fed. Cir. 1998) (if an omitted inventor conceived of one part of one limitation of a long claim then "he contributed to the subject matter of" the claim and he was properly added as an inventor because the claim "includes the elements that [he] contributed to the invention according to the district court's findings."); *In re VerHoef*, 888 F.3d 1362, 1366 (Fed. Cir. 2018), *as amended* (May 7, 2018) (contribution of one limitation in a two-limitation claim sufficient).

41.    "The inventors need not work physically together or contemporaneously to be joint inventors; nor must each inventor contribute equally or to each claim of the patent." *Univ. of Pittsburgh of Commonwealth Sys. of Higher Educ. v. Hedrick*, 573 F.3d 1290, 1298, 1297 (Fed. Cir. 2009). "Rather, each needs to perform only a part of the task which produces the invention." *Ethicon*, 135 F.3d at 1460.

42.    Someone can be a co-inventor even if he "placed his contribution in the prior art more than one year before" making his contribution. *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1351 (Fed. Cir. 1998) (contrary argument "is mistaken"); *see also Dana-Farber Cancer Inst., Inc. v. Ono Pharm. Co.*, 964 F.3d 1365, 1372-73 (Fed. Cir. 2020)

1   ("Inventorship of a complex invention may depend on partial contributions to

2   conception over time, and there is no principled reason to discount genuine contributions

3   made by collaborators because portions of that work were published prior to conception

4   for the benefit of the public.").

5       **2.    Mohamed Diab Should Be A Named Inventor On Four Apple Patents**

6           **a.    U.S. Patent No. 10,078,052**

7       43.    Diab's notebooks and patents show that Diab developed reflective sensors

8   before Lamego came to Masimo.  Diab ¶¶ 229; JTX-1227; JTX-1910.  Indeed, Diab

9   taught Lamego about sensor reflective surface technologies.  Diab ¶¶ 139, 230. Apple

10  agreed that reflective surfaces were the focus of the invention of the '052 Patent.

11  Madisetti ¶ 293.

12      44.    Diab should be named as an inventor U.S. Patent Nos. 10,078,052, because

13  he conceived of reflective surfaces, not Lamego, and reflective surface, is one limitation

14  of at least Claim 1 of the '052 Patent.  Madisetti ¶¶ 266, 296; JTX-1239.

15          **b.    U.S. Pat. No. 10,247,670**

16      45.    In addition, Diab should be named as an inventor on the '670 Patent

17  because he conceived of reflective surfaces, not Lamego, and reflective surface is one

18  limitation of at least Claim 1 of the '670 patent.  Madisetti ¶¶ 266, 296; JTX-1239.  Apple

19  agreed that reflective surfaces were the focus of the invention of the '670 Patent.

20  Madisetti ¶ 293.

21          **c.    U.S. Patent No.  9,952,095**

22      46.    Diab's developed analog front-end processing before Lamego came to

23  Masimo.  Diab ¶¶ 92-99; JTX-1267.  Indeed, Diab taught Lamego about analog front-

24  end processing technologies.  Diab ¶¶ 139, 230.

25      47.    Diab should be named as an inventor '095 Patent because he conceived of

26  the analog front-end processing, not Lamego, and that processing forms part of many

27  limitations of at least Claim 17 of the patent '095 Patent.  Madisetti ¶¶ 266, 297, 306.

28

### d.    U.S. Patent No. 11,009,390

48.    In addition, Diab should be named as an inventor on the '390 Patent because he conceived of the analog front-end processing, not Lamego, and that processing forms part of many limitations of at least Claim 1 of the '390 Patent.  *Id.*

## D.    Declaratory Judgment of Patent Ownership of U.S. Patents

### 1.    Legal Standard

49.    To prove an ownership interest in a patent requires proof by a preponderance of the evidence that: (1) at least one inventor assigned their interest to the purported owner; or (2) made their inventive contribution to the patent at a time and under conditions that created an obligation to assign to the purported owner their rights in such inventions; or both.  *See Beech Aircraft Corp. v. EDO Corp.*, 990 F.2d 1237, 1248-1249 (Fed. Cir. 1993).

### 2.    Masimo is a Co-Owner of the '052, '670, '095, and '390 Patents Because Diab Made His Inventive Contributions While Employed By Masimo And Cercacor

50.    Diab assigned to Masimo all rights in inventions he conceived while employed by Masimo.  Diab ¶ 77; JTX-2981.1; JTX-1673 at 684-687; *see also* JTX-1673 at 692-696, 688-689, 657-659, 611-615, 596-600, 666-668.  Because Diab made his inventive contribution of at least one claim of the '052, '670, '095, and '390 Patents, Masimo has an ownership interest in each of these Patents.

### 3.    Masimo is a Co-Owner of the Five Patents-At-Issue Because Lamego Made His Allegedly Inventive Contributions While Employed By Masimo And Cercacor

51.    Diab and Kiani testified that Lamego had no understanding of noninvasive physiological monitoring when he first joined Masimo, Diab worked daily with Lamego, and Diab explained everything about Masimo's technology to Lamego.    Kiani ¶ 150; Diab ¶¶ 138-139.

52.     Lamego signed agreements assigning to Masimo all rights in inventions he conceived while employed by Masimo.  *See* Miller ¶¶ 18, 20-21, 23; JTX-810, 1312, 2978. Lamego also assigned to Cercacor all rights in inventions he conceived while employed by Cercacor.  Hammarth ¶¶ 30, 33, 35; Kiani ¶ 160; JTX-769, 808, 810, 2233, 2266, 2263, 2388,  2514.

### a.     U.S. Pat. No. 10,078,052

53.     Diab testified, and the documentary evidence confirms, that Lamego was exposed to the concept of using reflectors and reflective surfaces in sensors to increase the signal while employed by Masimo and Cercacor.  *See* Diab ¶¶ 139, 217, 229-30; JTX-343, 777, 1206, 1207, 1209, 1211, 1227, 1910, JTX-P-0005.

54.     ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████  Ness ¶ 20; Madisetti ¶ 293.

55.     ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

████  Madisetti testified that the evidence regarding reflectance confirmed that Lamego learned of his contribution to the '052 Patent while employed by Masimo and Cercacor.  *See* Madisetti ¶¶ 293-96; JTX-1910 at 669, JTX-1227 at 574, JTX-777, JTX-1206 at 622 & 650, and JTX-1207 at 694, 7008, & 7010.  Because Lamego made his inventive contribution of reflective surfaces that is part of at least Claim 1 of '052 Patent

at Masimo and he assigned his ideas made while at Masimo to Masimo, Masimo has an ownership interest in the '052 Patent.

### b.    U.S. Pat. No. 10,247,670

57.    As explained above, Diab taught the concept of reflective surfaces to Lamego. Madisetti testified that the evidence regarding reflectance confirmed that Lamego learned of his contribution to the '670 Patent while employed by Masimo and Cercacor. *See* Madisetti ¶¶ 293-96, JTX-1910 at 669, JTX-1227 at 574, JTX-777, JTX-1206 at 622, 650, and JTX-1207 at 694, 7008, 7010.

58.    Because Lamego made his inventive contribution of reflective surfaces that is part of at least Claim 1 of '670 Patent at Masimo and he assigned his ideas made while at Masimo to Masimo, Masimo has an ownership interest in the '670 Patent.

### c.    U.S. Pat. No. 9,952,095

59.    Diab testified that he created the analog front-end subject matter at Masimo. *See* Diab ¶¶ 92-98; JTX-1267. Diab helped develop the concepts shown and described in the '272 patent in the early 1990s. JTX-1267 at -812; Diab ¶ 92. Kiani and Diab testified that Lamego had no understanding of noninvasive physiological monitoring when he first joined Masimo, Diab worked daily with Lamego, and Diab explained everything about Masimo's technology to Lamego, including analog frontend technology. Kiani ¶ 150; Diab ¶¶ 138-139.

60.    Madisetti's opinions and analysis of the evidence regarding the analog front end subject matter confirmed that Lamego learned of this subject matter and made his contribution to the '095 and '390 Patents while employed by Masimo and Cercacor. *See* Madisetti ¶¶ 305-06; JTX-1267, JTX-1206.

61.    Because Lamego made his inventive contribution of analog frontend processing that is part of at least Claim 17 of '095 Patent while at Masimo and he assigned his ideas made while at Masimo to Masimo, Masimo has an ownership interest in the '095 Patent.

#### d.    U.S. Pat. No. 11,009,390

62.    As explained above, Diab taught Lamego about analog front-end processing.  Because Lamego made his inventive contribution of analog frontend processing that is part of at least Claim 1 of '390 Patent while at Masimo and he assigned his ideas made while at Masimo to Masimo, Masimo has an ownership interest in the '390 Patent.

### E.    Apple Was Unjustly Enriched

65.    Apple's misappropriation of Masimo's trade secrets contributed to improvements in the performance of Apple's blood oxygen feature.

66.    Masimo will prove by a preponderance of the evidence that Apple was unjustly enriched.  Masimo will also prove by a preponderance of the evidence that Apple's misappropriation of Masimo's trade secrets was a substantial factor in causing Apple to be unjustly enriched.

67.    Kinrich analyzed Apple's revenue and costs to calculate Apple's profits on Series 6 and 7 watches.  Kinrich ¶¶ 21-40.  Kinrich apportioned out Apple's profits from

-112-

features unrelated to Apple's misappropriation. *Id*. ¶ 41. He did so by comparing Apple's profit on the Series 6 and 7, which include blood oxygen, ECG, and an always-on display, to Apple's profit on Series SE, which was sold simultaneously with the Series 6 and 7 but lacked those features. *Id*. ¶¶ 62-66, 72. Finally, he valued the blood-oxygen feature by determining how much of the profit difference between Series 6-7 and Series SE was attributable to the blood-oxygen feature.

## F.    <u>Remedies</u>

68.    "[C]ourts of equity have broad discretion in shaping remedies." *Garcia v. Lawn*, 805 F.2d 1400, 1403 (9th Cir. 1986). Rule 54(c) provides:

> A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings. Every other final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings.

69.    "Rule 54(c) has been liberally construed, leaving no question that it is the court's duty to grant whatever relief is appropriate in the case on the facts proved." *Kaszuk v. Bakery & Confectionary Union & Indus. Int'l Pension Fund*, 791 F.2d 548, 559 (7th Cir. 1986) (quoting and citing numerous authorities); *see Cal. Ins. Guar. Ass'n v. Burwell*, 227 F. Supp. 3d 1101, 1116 (C.D. Cal. 2017). This Court's equitable power to issue injunctive relief applies even if Masimo had not specifically requested it. *See Masimo v. True Wearables*, 2022 WL 2173073, at *3 (C.D. Cal. May 17, 2022).

### 1.    <u>Permanent Injunction on Trade Secret Claims</u>

#### a.    <u>Legal Standard</u>

70.    A prevailing plaintiff may receive an injunction to prevent "actual or threatened misappropriation" of trade secrets. Cal. Civ. Code § 3425.2(a).

71.    A plaintiff seeking a permanent injunction must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and

(4) that the public interest would not be disserved by a permanent injunction. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see Equate Media, Inc. v. Suthar*, 2024 WL 1217217, *3 (C.D. Cal. Mar. 20, 2024) (applying *eBay* test in action for trade secret misappropriation under the California Uniform Trade Secrets Act.)

72.   Many courts have recognized that "[a] finding of misappropriation is generally adequate for a finding of irreparable injury in trade secret cases." *Equate Media, Inc. v. Suthar*, 2024 WL 1217217, *3 (C.D. Cal. Mar. 20, 2024) (quoting *Monster Energy Co., v. Vital Pharms., Inc.*, 2023 WL 8168854, *18 (C.D. Cal. Oct. 6, 2023) and *Comet Techs. USA Inc. v. XP Power LLC*, 2022 WL 4625149, *2 (N.D. Cal. Sept. 30, 2022)).  Loss of competitive advantage also demonstrates irreparable harm.  *Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*, 2013 WL 890126, at *9 (N.D. Cal. Jan. 23, 2013).

73.   Injunctive relief is necessary to protect against harm from future misappropriation. *Equate Media, Inc. v. Suthar*, 2024 WL 1217217, *3 (C.D. Cal. Mar. 20, 2024); *Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*, 750 F.2d 1552, 1565 (Fed. Cir. 1984) (injunctions are "designed to prevent future infringement, and damages are awarded as compensation for past infringement.")  Remedies that may be available at law, such as monetary damages, are inadequate to compensate for harm from future misappropriation. *Universal Bldg. Maint. LLC v. Calcote*, 2022 WL 18397628, *6 (C.D. Cal. Nov. 7, 2022) ("Monetary damages are inadequate because without equitable relief, [defendant] can still possess and use the confidential information.").

74.   Restraining a party from unlawful conduct imposes no hardship. *Equate Media, Inc. v. Suthar*, 2024 WL 1217217, *3 (C.D. Cal. Mar. 20, 2024); *see also Monster Energy Co., v. Vital Pharms., Inc.*, 2023 WL 8168854, *18 (C.D. Cal. Oct. 6, 2023) (permanent injunction restraining a defendant from further misappropriation "would not work any hardship on [the defendant], which has no right to use the information in the first place.") (quoting *Vinyl Interactive, LLC v. Guarino*, 2009 WL 1228695, *8 (N.D. Cal. May 1, 2009).

75.    Numerous courts have recognized "the public has a strong interest in ensuring trade secrets are protected." *Equate Media, Inc. v. Suthar*, 2024 WL 1217217, *3 (C.D. Cal. Mar. 20, 2024) (quoting *Comet Techs. USA Inc. v. XP Power LLC*, 2022 WL 4625149, *5 (N.D. Cal. Sept. 30, 2022)); *see also Monster Energy Co., v. Vital Pharms., Inc.*, 2023 WL 8168854, *18 (C.D. Cal. Oct. 6, 2023) ("[T]he public interest favors the vindication of intellectual property rights.") (collecting cases).

### b.    The Court Should Enjoin Apple From Misappropriating Masimo's and Willow's Trade Secrets

76.    Masimo will prove by a preponderance of the evidence that Apple's further use and disclosure of Masimo's trade secrets would cause Masimo an irreparable injury. If Apple were allowed to continue to use Masimo's trade secrets, Apple would unfairly receive the benefit of the trade secrets allowing Apple to unfairly compete with Masimo. Masimo also risks public disclosure of its trade secrets, thereby causing Masimo further irreparable injury.  Masimo will also prove that the theft of Masimo's technology by Apple has harmed its innovation process by chilling open engineering collaboration at Masimo.

77.    Masimo will prove by a preponderance of the evidence that any monetary award to allow Defendants to continue to misappropriate Masimo's trade secrets would be inadequate to compensate Masimo for such misappropriation.

78.    Masimo will show by a preponderance of the evidence that the balance of hardships tip in favor of Masimo.  The injunction in this case imposes no hardship on Apple, because the injunction does not restrain Apple from any lawful conduct.

79.    Masimo will show by a preponderance of the evidence that the public interest would not be disserved by a permanent injunction.

80.    Based on the foregoing, Defendants should be permanently enjoined from further misappropriating Masimo's Asserted Trade Secrets.  Specifically, Apple should be permanently enjoined from:

a.   further acquiring, disclosing, or using Masimo's Trade Secret L4, L5, D1, D3, and D10;

b.   using L4, L5, D1, D3, and D10 in developing or designing any light-based monitoring product;

c.   manufacturing or selling any light-based monitoring product that is ████ ████████████████████ using L4;

d.   manufacturing or selling any light-based monitoring product that includes L5;

e.   making or having ██████████████████████████ that incorporates the L5 trade secret;

f.   manufacturing or selling any light-based monitoring product that includes ██████████████████ that incorporates the L5 trade secret; and

g.   manufacturing or selling any light-based monitoring product that includes D1, D3, or D10.

81.   In addition, Apple will destroy all information, electronic or otherwise, that contains the description of Masimo's trade secrets L4, L5, D1, D3, and D10, including schematics, source code, and ████████████████████████

## 2. Correction of Inventorship

### a. Legal Standard

82.   The Court "may order correction of the patent on notice and hearing of all parties concerned and the Director shall issue a certificate accordingly." 35 U.S.C. § 256.

### b. The U.S. Patent and Trademark Office Should Correct Inventorship of the '052, '670, '095, and '390 Patents

83.   Masimo will prove that Mohamed Diab is an inventor on the '052, '670, '095, and '390 Patents.

84.   The United States Patent and Trademark Office should correct the inventorship of the '052, '670, '095, and '390 Patents to reflect that Diab is an inventor.

85. Apple should be directed to take all necessary steps to ensure the United States Patent and Trademark Office corrects inventorship and names Diab as an inventor on the '052, '670, '095, and '390 Patents.

### 3. Declaration of Patent Co-Ownership

#### a. Legal Standard

86. To prove an ownership interest in a patent requires proof by a preponderance of the evidence that: (1) at least one inventor assigned their interest to the purported owner; or (2) made their inventive contribution to the patent at a time and under conditions that created an obligation to assign to the purported owner their rights in such inventions; or both. *See Beech Aircraft Corp. v. EDO Corp.*, 990 F.2d 1237, 1248-1249 (Fed. Cir. 1993).

#### b. The Court Should Declare Masimo and/or Willow are Patent Co-Owners

87. Masimo will prove by a preponderance of the evidence that, when Marcelo Lamego contributed to the conception of at least one limitation in at least one claim of the '052, '670, '095, '754, and '390 Patents, he was contractually obligated to assign those inventions to Masimo and/or Willow.

88. Masimo will prove by a preponderance of the evidence that, when Mohamed Diab contributed to the conception of at least one limitation in at least one claim of the '052, '670, '095, and '390 Patents, he was contractually obligated to assign those inventions to Masimo and/or Willow.

89. Masimo and/or Willow will prove it should be added as an owner of the '052, '670, '095, '754, and '390 Patents.

90. Masimo and/or Willow will prove it should be added as an owner of all foreign and domestic patent applications, patents, continuations, divisionals, and reissues that claim priority to one or more of the following: the '052, '670, '095, '754, and '390 Patents.

1

### 4. Constructive Trust

2

#### a. Legal Standard

3

91. "One who gains a thing by fraud, accident, mistake, undue influence, the

4

violation of a trust, or other wrongful act, is, unless he or she has some other and better

5

right thereto, an involuntary trustee of the thing gained, for the benefit of the person who

6

would otherwise have had it." Cal. Civ. Code § 2224.

7

#### b. The Court Should Impose a Constructive Trust Upon Apple as

8

#### Trustee for Masimo's Benefit

9

92. Because of Apple's trade secret misappropriation and filing for patents with

10

inventions based on work at Masimo and Cercacor, Apple should be ordered to be an

11

involuntary trustee for the '052, '670, '095, '754, and '390 Patents for the benefit of

12

Masimo and/or Willow.

13

93. Apple should be directed to take all necessary steps to maintain the '052,

14

'670, '095, '754, and '390 Patents, including paying all maintenance fees through

15

expiration.

16

94. Apple should be directed to maintain all foreign and domestic patent

17

applications, patents, continuations, divisionals, and reissues that claim priority to one

18

or more of the '052, '670, '095, '754, and '390 Patents.

19

### 5. Attorneys' Fees and Costs

20

#### a. Legal Standard

21

95. When willful and malicious misappropriation exists, the Court may award

22

reasonable attorneys' fees and costs to the prevailing party. Cal. Civ. Code § 3425.4;

23

*Monster Energy Co. v. Vital Pharms., Inc.*, 2023 WL 8168854, at *21 (C.D. Cal. Oct. 6,

24

2023).

25

96. An award under § 3425.4 is "equitable in cases against well-funded

26

defendants that commit acts of misappropriation that undermine legitimate competition

27

and innovation." *Mattel, Inc. v. MGA Ent., Inc.*, 801 F. Supp. 2d 950, 956 (C.D. Cal.

28

2011) (defendants "profits from its acts of misappropriation far exceeded the costs

[plaintiff] incurred in prosecuting this lawsuit, and any incentive to misappropriators must be eradicated through the award of fees…"). A "sophisticated corporate scheme of misappropriation" supports a finding of willful and malicious misappropriation. *Rogers v. B. Braun Medical, Inc.*, Civ. No. 98-cv-250-B (RBB), Dkt. 390 at 12 and Dkt. 415 (S.D. Cal. September 13, 2004). A "prolonged, covert" scheme of misappropriation supports a finding of willfulness and maliciousness. *Keating v. Jastremski*, 2021 WL 1195868, at *6 (S.D. Cal. Mar. 30, 2021). Awards under § 3425.4 are also "appropriate to deter intentional misconduct." *Eldorado Stone LLC v. Renaissance Stone*, 2007 WL 3308099, at *1 (S.D. Cal. Oct. 24, 2007).

> **b.** **Because Apple's Misappropriation Was Willful and Malicious, Apple Should Pay Masimo and Cercacor Their Reasonable Attorneys' Fees and Costs**

97. Because Apple's misappropriation was willful and malicious, prolonged and covert, Masimo should be awarded reasonable attorneys' fees and costs in an amount to be determined after further briefing. This award should also include post-judgment interest.

**G.** **Apple Cannot Establish Any Of The Defenses It Preserved**

> **1.** **Statute of Limitations**

> > **a.** **Legal Standard**

98. Under the CUTSA, the statute of limitations does not begin to run when the cause of action accrues. Rather, "[a]n action for [trade secret] misappropriation must be brought within three years after the misappropriation ***is discovered*** or by the exercise of reasonable diligence ***should have been discovered***." Cal. Civ. Code § 3426.6 (emphases added). CUTSA effectively incorporates the common law discovery rule into the statutory predicate for triggering the limitations period. *See Alamar Biosciences Inc. v. Difco Labs. Inc.*, 1996 WL 648286, at *3 (E.D. Cal., Feb. 27, 1996) (citing *Wilshire Westwood v. Atlantic Richfield*, 20 Cal. App. 4th 739, 740 (1993)) ("Under both the

California common law 'discovery rule' and the [C]UTSA, the limitations period begins when the plaintiff has actual or constructive notice of the facts giving rise to the claim.").

99.    A trade secret plaintiff "should have discovered the misappropriation" only when there is both "reason to suspect that a trade secret has been misappropriated, ***and a reasonable investigation would produce facts sufficient to confirm this suspicion (and justify bringing suit)***." Dkt. 2159 at 14 (quoting Dkt. 606 at 3) (emphases added); *Hays v. VDF Futureceuticals, Inc.*, 2016 WL 5660395, at *3 (D. Haw. Sept. 28, 2016). Mere "suspicion that [trade secrets] theoretically could be shared provides an insufficient basis for filing a trade secret misappropriation claim." Dkt. 2159 at 14; Dkt. 606 at 7 (citing *Cypress Semiconductor Corp.v. Superior Ct.*, 163 Cal. App. 4th 575, 587, (2008)).

**b.    Apple Cannot Establish the Statute of Limitations Began to Run More Than Three Years Before Masimo Filed Suit**

**i.    Masimo Did Not Have Actual Knowledge of Apple's Misappropriation Before January 9, 2017**

100.    Masimo did not discover Apple's misappropriation of Masimo's trade secrets until after long January 9, 2017. Masimo's CEO, Joe Kiani, testified that he learned Lamego shared Masimo trade secrets with Apple when he saw Apple patents naming Lamego as an inventor in October 2019 that disclosed work done by Mr. Diab and Jereon Poeze. Kiani ¶ 221. No evidence suggests that Masimo discovered any Apple patents or publications disclosing Apple's misappropriation before January 9, 2017. *See also supra*, § III.K (and evidence cited therein).

**ii.    Masimo Did Not Have Constructive Knowledge of Apple's Misappropriation Before January 9, 2017**

101.    Apple provided no evidence that Masimo could have discovered the misappropriation before January 9, 2017. *See* Cal. Civ. Code § 3426.6.

(a) **Masimo Had No Reason to Suspect**
**Misappropriation Occurred Before**
**January 9, 2017**

102. Masimo presented evidence that Lamego was obligated to maintain the confidentiality of Masimo's trade secret information. JTX-810, 1312, 2978, 769, 2233; Miller ¶ 18; Hammarth ¶¶ 30, 33, 35; Kiani ¶¶ 160, 206-07. As explained below, Lamego assured Masimo that he was upholding those obligations. Kiani ¶ 206. *Id.* at ¶¶ 206-07.No evidence suggests that it was unreasonable for Masimo to accept Lamego's assurances he would not divulge Masimo's information and would quit if Apple asked him to work on projects competitive to Masimo.

103. In addition, Masimo sent a letter to Apple before Lamego began working there to ensure compliance with Lamego's confidentiality obligations to Masimo. *See* JTX-2937. The letter cautioned Apple to "refrain from inducing Mr. Lamego to take actions that would violate the Agreement while he performs services for Apple" and asked Apple to "direct Mr. Lamego to honor his obligations to all of his prior employers." JTX-2937 at -094. It also declared Masimo's "trust that Apple will employ Mr. Lamego in an area that does not involve healthcare technology, including mobile health applications and the measurement of physiological information." *Id*.

104. Kiani also testified that, later, Cristiano Dalvi, a friend of Lamego, assured Kiani that Lamego left Apple when Apple asked him to do something competitive to Masimo.

105. Thus, Masimo had no reason to suspect that misappropriation had occurred. *See also supra* § III.K (and evidence cited therein).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**(b)** **Masimo Could Not Have Discovered Facts**
**Sufficient To Bring A Claim Before**
**January 9, 2017**

106.   Regardless of when Masimo should have become suspicious, no evidence indicates that an investigation would have revealed facts sufficient to bring a claim for misappropriation that satisfies Rule 11.  *See supra* § III.L (and evidence cited therein).

**2.** **Laches**

**a.** **Laches Does Not Apply To Legal Claims Such as Trade Secret**
**Misappropriation**

107.   Apple's laches defense is superfluous in this bench trial.  Apple concedes that laches, as an equitable defense, cannot bar a legal claim for misappropriation of trade secrets that is filed within the statute of limitations. *See* Dkt. 1904 at 4 ("the parties agree that laches may be applied as an equitable bar to *untimely* misappropriation claims").  Thus, as long as Masimo brought its claim for misappropriation within the statute of limitations, Apple's laches defense does not apply.  Whereas, if Masimo's claim were barred by the statute of limitations, Apple's laches defense would be irrelevant.

108.   Masimo previously explained that Apple's laches defense does not apply to legal claims for which the legislature expressly provided a statute of limitations period. *See Petrella v. Metro-Goldwyn-Mayer, Inc*., 572 U.S. 663, 678 (2014) ("laches is a defense developed by courts of equity; its principal application was, and remains, to claims of an equitable cast for which the Legislature has provided no fixed time limitation"); *id.* at 679 ("we adhere to the position that, in face of a statute of limitations enacted by Congress, laches cannot be invoked to bar legal relief").  The Supreme Court recently elaborated that "[t]he enactment of a statute of limitations necessarily reflects a congressional decision that the timeliness of covered claims is better judged on the basis of a generally hard and fast rule rather than the sort of case-specific judicial determination that occurs when a laches defense is asserted…applying laches within a

-122-

1   limitations period specified by Congress would give judges a "legislation-overriding"

2   role that is beyond the Judiciary's power.  *SCA Hygiene Prods. Aktiebolag v. First*

3   *Quality Baby Prods., LLC*, 580 U.S. 328, 334-35, (2017).  *Pinkette Clothing, Inc. v.*

4   *Cosm. Warriors Ltd.*, 894 F.3d 1015, 1024 (9th Cir. 2018); *see Cnty. of Oneida v. Oneida*

5   *Indian Nation of N.Y.*, 470 U.S. 226, 245 at n.16 (1985) ("application of the equitable

6   defense of laches in an action at law would be novel indeed"); *Connolly v. Trabue*, 204

7   Cal. App. 4th 1154, 1164, (2012).  The California Court of Appeal recently cited *Petrella*

8   and *SCA Hygiene* and explained that, "[e]ven where equitable claims are combined with

9   actions at law, laches remains unavailable as a defense to the legal claims."  *Blaser v.*

10  *State Teachers' Ret. Sys.*, 86 Cal. App. 5th 507, 540 (2022), *review denied* (Mar. 15,

11  2023).

12      109.   Trade secret misappropriation is a legal claim for which the California

13  legislature expressly provided a statute of limitations.  *See* Cal. Civ. Code § 3426.6.

14  Thus, laches is simply not a defense to trade secret misappropriation, regardless of

15  whether Masimo also sought equitable relief.  *See Petrella*, 572 U.S. at 678-79; *SCA*

16  *Hygiene*, 580 U.S. at 334-35; *Oneida*, 470 U.S. at 244, n.16; *Pinkette*, 894 F.3d at 1024;

17  *Connolly*, 204 Cal. App. 4th at 1164; *Blaser*, 86 Cal. App. 5th at 540.

18      110.   Nor could Apple satisfy the elements of laches.

19          **b.   <u>Legal Standard</u>**

20      111.   In general, "'[t]he defense of laches requires [1] unreasonable delay plus

21  either [2a] acquiescence in the act about which plaintiff complains or [2b] prejudice to

22  the defendant resulting from the delay.'"  *Johnson v. City of Loma Linda*,

23  24 Cal. 4th 61, 68 (2000) (quoting *Conti v. Board of Civil Service Commissioners*, 1 Cal.

24  3d 351, 359 (1969)); *see Masimo Corp. v. True Wearables, Inc.*, 2022 WL 17083396, at

25  *20 (C.D. Cal. Nov. 7, 2022).  However, Apple does not argue acquiescence in this case.

26  *See* Dkt. 2159 at 16-17 (Apple identifying evidence in alleged support of laches).  Thus,

27  Apple's defense of laches would have required it to prove that: (1) Masimo unreasonably

28

-123-

delayed asserting or diligently pursuing a claim for misappropriation of trade secrets; and (2) any delay prejudiced Apple.

        **c.**    **Apple Cannot Establish Laches**

           **i.**    **Apple Cannot Show Masimo Unreasonably Delayed In Filing Suit**

112.   As explained above, no evidence shows Masimo delayed in bringing suit.

           **ii.**    **Apple Cannot Show Masimo Knew Of Apple's Technical Trade Secret Misappropriation**

113.   As explained above, no evidence shows Masimo was aware in 2018 or earlier of any Apple patent that contained any Masimo technical trade secrets.

           **iii.**    **The Unrebutted Evidence Shows Masimo Filed Suit Promptly After Learning About Apple's Misappropriation In Late 2019**

114.   Kiani was unaware of Apple's misappropriation until late 2019. Kiani ¶¶ 221-222. He also explained that Masimo did not delay filing suit. *Id.* Masimo filed suit just three months after Kiani learned of Apple's misappropriation.

115.   The evidence shows that Apple prevented Masimo from learning of the misappropriation before 2019, in part, ███████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ███████ a few months before Masimo discovered it and less than one year before Masimo filed suit.

           **iv.**    **Apple Has Not Shown Prejudice**

116.   Apple has not presented any evidence that it suffered any legally cognizable prejudice from when Masimo filed this suit.

**3.** **Waiver**

a. **Legal Standard**

117. "Under California law, 'waiver is the *intentional* relinquishment of a known right *after knowledge* of the facts.'" *Cruz v. Nat'l Steel & Shipbuilding Co.*, 910 F.3d 1263, 1270 (9th Cir. 2018) (quoting *Waller v. Truck Ins. Exchange, Inc*. 11 Cal. 4th 1, 31 (1995)). "The burden ... is on the party claiming a waiver of a right to prove it by ***clear and convincing evidence*** that does not leave the matter to speculation, and 'doubtful cases will be decided against a waiver'" *Waller*, 11 Cal. 4th at 31 (emphasis added, ellipsis in original) (quoting *City of Ukiah v. Fones*, 64 Cal. 2d 104, 107-08 (1962)); *DRG/Beverly Hills, Ltd. v. Chopstix Dim Sum Cafe & Takeout III, Ltd.*, 30 Cal. App. 4th 54, 60 (1994).

b. **Apple Cannot Establish Waiver**

118. Apple identifies no act by which Masimo purportedly intentionally relinquished its right to pursue a claim for misappropriation after learning the facts that form the basis for this lawsuit.

119. Masimo satisfies the statute of limitations as explained above, so the timing of when Masimo filed suit "cannot constitute waiver of any cause of action… ." *Solis v. Couturier*, 2009 WL 2022343, at *2 (E.D. Cal. July 8, 2009) (striking affirmative defense of waiver); *see also Boys Club of San Fernando Valley, Inc. v. Fid. & Deposit Co*., 6 Cal. App. 4th 1266, 1275 (1992) ("Unreasonable delay in asserting a right does not, in itself, warrant a finding of waiver of the right.") (finding in dicta right to arbitration was neither waived nor barred by laches).

**H.** **Apple Has No Other Defenses**

120. Apple discusses the following additional defenses that Apple initially pled: readily ascertainable, independent development, independent invention, no causation, and unclean hands. Apple preserved none of these defenses for trial. Dkt. 2177-1 at 13-14 (Pretrial Conference Order in which Apple stated it is assertion only laches,

statute of limitations, and waiver).  Apple also did not preserve these defenses in the prior pretrial conference order.  Dkt. 1483 at 9-10.

121.   Moreover, in the Court's Rule 50(a) order, the Court found that most of these defenses were moot because Apple "represented off the record to the Court in preparing the jury instructions that it would no longer advance such defense." Dkt. 1724 at 1924.  Accordingly, Apple has no defense other than laches, statute of limitations, and waiver.  Apple's assertions regarding these unasserted defenses are also wrong for the reasons discussed in prior briefing.

## V.  <u>MISCELLANEOUS</u>

122.   Any Conclusion of Law more appropriately characterized in whole or in part as a Finding of Fact shall be deemed a Finding of Fact to that extent.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  October 29, 2024

By:  */s/ Jared C. Bunker*
Joseph R. Re
Stephen C. Jensen
Sheila N. Swaroop
Brian C. Horne
Brian C. Claassen
Jared C. Bunker
Mark D. Kachner
Adam B. Powell
Kendall M. Loebbaka
Daniel P. Hughes

Attorneys for Plaintiffs
MASIMO CORPORATION and
CERCACOR LABORATORIES, INC.