1  MARK D. SELWYN, SBN 244180
       mark.selwyn@wilmerhale.com
2  THOMAS G. SPRANKLING, SBN 294831
   thomas.sprankling@wilmerhale.com
3  WILMER CUTLER PICKERING
       HALE AND DORR LLP
4  2600 El Camino Real, Suite 400
   Palo Alto, CA 94306
5  Tel.: 650.858.6000 / Fax: 650.858.6100

6  JOSHUA H. LERNER, SBN 220755
       joshua.lerner@wilmerhale.com
7  WILMER CUTLER PICKERING
       HALE AND DORR LLP
8  One Front Street, Suite 3500
   San Francisco, CA 94111
9  Tel.: 628.235.1000 / Fax: 628.235.1001

10  AMY K. WIGMORE, *pro hac vice*
    amy.wigmore@wilmerhale.com
11  WILMER CUTLER PICKERING
        HALE AND DORR LLP
12  2100 Pennsylvania Ave NW
    Washington, DC 20037
13  Tel.: 202.663.6000 / Fax: 202.663.6363

14  [Counsel appearance continues on next page]

15  *Attorneys for Defendant Apple Inc.*

16          UNITED STATES DISTRICT COURT
17  CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

18  MASIMO CORPORATION,            CASE NO. 8:20-cv-00048-JVS (JDEx)
    a Delaware corporation; and
19  CERCACOR LABORATORIES, INC.,   **APPLE'S POST-TRIAL BRIEF**
    a Delaware corporation,
20
                  Plaintiffs,
21
          v.                       Trial: Nov. 5, 2024
22                                 Hearing: Jan. 27, 2025, 1:30 p.m.
    APPLE INC.,
23  a California corporation,
24                Defendant.
25
26              REDACTED VERSION OF DOCUMENT
27            PROPOSED TO BE FILED UNDER SEAL
28

1
2
3
4
5

JOSEPH J. MUELLER, *pro hac vice*
  joseph.mueller@wilmerhale.com
SARAH R. FRAZIER, *pro hac vice*
  sarah.frazier@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel.: 617.526.6000 / Fax: 617.526.5000

6
7
8
9

NORA Q.E. PASSAMANECK, *pro hac vice*
  nora.passamaneck@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1225 Seventeenth Street, Suite 2600
Denver, CO 80202
Tel.: 720.274.3152 / Fax: 720.273.3133

10
11
12
13

BRIAN A. ROSENTHAL, *pro hac vice*
  brosenthal@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Tel.: 212.351.2339 / Fax: 212.817.9539

14
15
16

KENNETH G. PARKER, SBN 182911
  Ken.parker@haynesboone.com
HAYNES AND BOONE, LLP
660 Anton Boulevard, Suite 700
Costa Mesa, CA 92626
Tel.: 650.949.3014 / Fax: 949.202.3001

17
18
19
20
21
22
23
24
25
26
27
28

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................. 1

ARGUMENT ...................................................................................................... 5

I.   PLAINTIFFS HAVE NOT REMOTELY MET THEIR BURDEN TO ESTABLISH TRADE SECRET MISAPPROPRIATION, THAT THE STATUTE OF LIMITATIONS DOES NOT APPLY, OR THAT AN INJUNCTION IS APPROPRIATE ................................................. 5

    A.   None Of The Five Remaining Alleged Trade Secrets Was Possessed By Plaintiffs, Qualifies As A Trade Secret Under CUTSA, Or Was Misappropriated By Apple ......................................................................... 5

        1.   Plaintiffs Have Not Shown L4 (The Accused Black Foam Test) Is A Trade Secret Or That Apple Misappropriated It ......................... 6

        2.   Plaintiffs Have Not Shown L5 (The Accused Short Circuit) Is A Trade Secret Or That Apple Misappropriated It ........................... 19

        3.   Plaintiffs Have Not Shown D1, D3, D10 (The Rejected Demodulation Proposal) Are Trade Secrets Or That Apple Misappropriated Them .................................................................. 25

    B.   Plaintiffs Have Failed To Prove That Apple Had The Requisite Intent To Misappropriate Trade Secrets ................................................................ 32

        1.   Apple Did Not Hire Dr. Lamego Intending To Access Plaintiffs' Confidential Information (Direct Misappropriation) .................... 33

        2.   Plaintiffs Have Not Established That Apple Knew Or Should Have Known That Dr. Lamego Conveyed Any Of Plaintiffs' Allegedly Confidential Information During His Six-Month Employment (Indirect Misappropriation) ............................................................ 34

    C.   Plaintiffs' CUTSA Claim Is Time Barred ............................................ 36

    D.   Plaintiffs Are Not Entitled To An Injunction Or Any Other Relief ........ 39

        1.   Plaintiffs Are Barred From Receiving An Injunction ................... 39

        2.   Plaintiffs Are Not Entitled To An Injunction Under *eBay* ........... 40

        3.   If Any Party Should Receive Attorney's Fees, It Is Apple ........... 43

II.  PLAINTIFFS HAVE NOT PROVEN THAT MR. DIAB CO-INVENTED OR THAT PLAINTIFFS CO-OWN THE APPLE PATENTS ................................................ 46

    A.   The Reflective Treatments Applied To Apple Watch That Are Claimed In The '052 and '670 Patents Were Not Invented By Mr. Diab, Nor Are They Co-Owned By Plaintiffs ................................................................ 46

    B.   Plaintiffs Failed To Prove That They Co-Own The ██████████ ............ 47

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

C.   Mr. Diab's Discussions With Dr. Lamego About Prior Art Do Not Make
Mr. Diab A Co-Inventor Or Plaintiffs Co-Owners Of The '095 and '390
Patents ................................................................................................48

CONCLUSION............................................................................................49

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Acromed Corp. v. Sofamor Danek Grp., Inc.*,
  253 F.3d 1371 (Fed. Cir. 2001) ............................................................... 48

*Ajaxo Inc. v. E*Trade Grp. Inc.*,
  135 Cal. App. 4th 21 (2005) ................................................................... 44

*Altavion, Inc. v. Konica Minolta Sys. Lab'y Inc.*,
  226 Cal. App. 4th 26 (2014) ................................................................... 13

*Atmel Corp. v. Info. Storage Devices, Inc.*,
  189 F.R.D. 410 (N.D. Cal. 1999) ................................................. 8, 22, 28

*Attia v. Google LLC*,
  983 F.3d 420 (9th Cir. 2020) ............................................................. 14, 30

*Bennett v. Isagenix Int'l*,
  118 F.4th 1120 (9th Cir. 2024) ............................................................... 42

*Citcon USA, LLC v. RiverPay Inc.*,
  2022 WL 287563 (9th Cir. Jan. 31, 2022)............................................... 41

*Dana-Farber Cancer Inst., Inc. v. Ono Pharm. Co.*,
  964 F.3d 1365 (Fed. Cir. 2020) ............................................................... 49

*Direct Techs., LLC v. Elec. Arts, Inc.*,
  836 F.3d 1059 (9th Cir. 2016) ................................................................. 45

*DVD Copy Control Ass'n, Inc. v. Bunner*,
  116 Cal. App. 4th 241 (2004) ................................................................... 5

*eBay Inc. v. MercExchange, LLC*,
  547 U.S. (2006).......................................................................... 4, 40, 41, 42

*Eli Lilly & Co. v. Aradigm Corp.*,
  376 F.3d 1352 (Fed. Cir. 2004) ............................................................... 46

*EnerTrode, Inc. v. Gen. Capacitor Co.*,
  2019 WL 1715170 (N.D. Cal. Apr. 17, 2019).................................... 44, 45

Wilmer Cutler
Pickering Hale
and Dorr LLP

APPLE'S POST-TRIAL BRIEF

iii

CASE NO. 8:20-cv-00048-JVS (JDEx)

*Fractus, S.A. v. Samsung Electronics Co.*,
  876 F. Supp. 2d 802 (E.D. Tex. 2012) ................................................................ 43

*Gabriel Techs. Corp. v. Qualcomm Inc.*,
  857 F. Supp. 2d 997 (S.D. Cal. 2012) ................................................................ 37

*Gemini Aluminum Corp. v. Cal. Custom Shapes, Inc.*,
  95 Cal. App. 4th 1249 (2002) ............................................................................ 45

*Imax Corp. v. Cinema Techs., Inc.*,
  152 F.3d 1161 (9th Cir. 1998) .............................................................. 13, 14, 20

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*,
  941 F.2d 970 (9th Cir. 1991) ............................................................................. 42

*Masimo Corp. v. True Wearables, Inc.*,
  2022 WL 205485 (Fed. Cir. Jan. 24, 2022) ...................................................... 10

*Moore v. Robinson Oil Corp.*,
  588 F. App'x 528 (9th Cir. 2014) ...................................................................... 22

*Olaplex, Inc. v. L'Oreal USA, Inc.*,
  855 F. App'x 701 (Fed. Cir. 2021) .................................................................... 13

*Paice LLC v. Toyota Motor Corp.*,
  504 F.3d 1293 (Fed. Cir. 2007) ......................................................................... 42

*Pannu v. Iolab Corp.*,
  155 F.3d 1344 (Fed.Cir.1998) ........................................................................... 48

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
  659 F.3d 1142 (Fed. Cir. 2011) ......................................................................... 41

*Robert L. Cloud & Assocs v. Mikesell*,
  69 Cal. App. 4th 1141 (1999) ............................................................................ 42

*San Miguel Pure Foods Co., v. Ramar Int'l Corp.*,
  625 F. App'x 322 (9th Cir. 2015) ...................................................................... 40

*Sargent Fletcher v. Able Corp.*,
  110 Cal. App. 4th 1658 (2003) .......................................................................... 15

*SkinMedica, Inc. v. Histogen Inc.*,
  869 F.Supp.2d 1176 (S.D. Cal. 2012) ............................................................... 30

*Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*,
    587 F.3d 1339 (Fed. Cir. 2009) ................................................................. 10

*Unilogic, Inc. v. Burroughs Corp.*,
    10 Cal. App. 4th 612 (1992) ..................................................................... 32

*Waymo LLC v. Uber Techs., Inc.*,
    2017 WL 2123560 (N.D. Cal. May 15, 2017).......................................... 20

*Waymo LLC v. Uber Techs., Inc.*,
    2018 WL 466510 (N.D. Cal. Jan. 18, 2018).....................................*passim*

*Yeti by Molly Ltd. v. Deckers Outdoor Corp.*,
    259 F.3d 1101 (9th Cir. 2001) ................................................................. 40

**Statutes**

Cal. Bus. & Prof. Code § 16600 ...................................................................... 37

Cal. Civ. Code § 3426.1................................................................... 14, 32, 34

Cal. Civ. Code § 3426.2.................................................................................. 43

Cal. Civ. Code § 3426.4.................................................................................. 45

# INTRODUCTION

After nearly five years of litigation and two trials, it remains unclear why Joe Kiani chose to file this suit and why Plaintiffs have forced this Court and Apple to spend the time and resources litigating over a black foam quality control test, a single short circuit (out of millions of Apple Watch circuits), and a rejected demodulation proposal that Apple has undisputedly never used or licensed. It may have been pique over Apple hiring certain personnel from Plaintiffs, personal anger towards Dr. Marcelo Lamego, a desire to further Mr. Kiani's prior aspiration to move Plaintiffs beyond the clinical setting, or simply an attempt to obtain billions of dollars (via damages claims that have now been dropped). But what is clear, and what the retrial record firmly established, is that Apple did not misappropriate any trade secrets from Plaintiffs.

## *Plaintiffs Failed To Trace Any Thread Of Misappropriation*

Despite combing for years through the millions of pages of discovery and examining dozens of Apple witnesses in over one hundred hours of depositions and at two trials, Plaintiffs' final arguments at the November 2024 retrial were quite narrow. Of the various employees of Plaintiffs who—over many years—have chosen to work at Apple, Plaintiffs now assert just one (Dr. Marcelo Lamego, who worked at Apple for six months over a decade ago) conveyed trade secrets to Apple. Where Plaintiffs once alleged misappropriation of dozens of purported trade secrets, their case now rests on black foam, a short circuit, and an algorithm ill-suited to wearable devices. That Plaintiffs' case has now been reduced to these three things—only one of which (the short circuit) is even arguably in Apple Watch—demonstrates Plaintiffs' inability to identify any technological thread that runs from Plaintiffs, through Dr. Lamego, to Apple Watch.

Unable to trace such a thread from any secrets that Plaintiffs possessed, Plaintiffs provided a written description of "trade secrets" that used generalized terms drawing on well-known concepts—alleging trade secrets that are not secrets at all. Indeed, Plaintiffs would be unable to make out a viable claim for L4 and L5 even if (contrary to fact) Dr. Lamego conveyed those two purported secrets to Apple verbatim and Apple had used

APPLE'S POST-TRIAL BRIEF

CASE NO. 8:20-cv-00048-JVS (JDEx)

them.  That is because both L4 and L5 draw on rudimentary ideas that have been known for years, which can be summarized in plain English as ████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ████████████████████████████████████ The law simply does not permit treating such well-known, simple concepts as trade secrets.

The fundamental problem is that Plaintiffs failed to prove a connection between any actual secret they possessed, the suggestions Dr. Lamego made during his six-month employment at Apple, and the technologies used in Apple Watch.  As to the purported D secrets, for example, Plaintiffs have contended D1, D3, and D10 were included in █ ███████████████████████████████████████████████████████████ but there is no dispute that Apple *rejected* Dr. Lamego's suggestion and that the Ds have never been used in any Apple Watch.  The retrial also established that Plaintiffs themselves did not possess the full breadth of what is covered by D1, D3, and D10.

Similarly, as to L4, Plaintiffs do not seriously contend that Dr. Lamego taught Apple the very basic concepts claimed by the purported secret ████████████████████ ███████████████████.  Rather, the evidence established that, before Dr. Lamego was hired, Apple engineers knew ████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ████████████ *See, e.g.*, Land Direct ¶¶ 28-29.  Apple engineers even knew how to perform ███████████████████████████████████████████████████.  11/12 PM Tr. [Land] 30:6-21.  At its root, L4 reflects common sense: ████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ █████████████████████████████

And as to L5, which requires 

In a final effort to find some thread running from their technology, through Dr. Lamego, to Apple, Plaintiffs' witnesses and counsel alike changed their position on the scope of the alleged trade secrets *during trial*. Plaintiffs' counsel asserted that Plaintiffs' own written descriptions of the purported trade secrets are not controlling, *see* 11/5 AM Tr. [Opening] 20:15-21, when they had previously agreed to jury instructions stating that the "descriptions provide the controlling definitions of the Asserted Trade Secrets in this case," Dkt. 2345 at 2-4. Plaintiffs' witnesses treated the purported secrets like an accordion, narrowing them when trying to establish possession and broadening the same supposed secrets when trying to establish that the same concepts were not generally known and that Apple had used them.

### *Plaintiffs Failed To Meet Multiple Legal Requirements*

Despite this maneuvering, Plaintiffs never arrived at a theory that would clear any of the many hurdles needed to receive relief under the California Uniform Trade Secret Act ("CUTSA"), the Patent Act, or general state law ownership principles. ***First***, Plaintiffs failed to prove that L4, L5, D1, D3, or D10 are cognizable trade secrets. They are not. Plaintiffs failed to show that they possessed any of the alleged trade secrets in full—or that what they did possess was not generally known. Plaintiffs further failed to

show that Apple improperly used or disclosed the supposed secrets. It did not. Rather, the evidence is clear that what is accused differs from what Plaintiffs actually possessed.

*Second*, Plaintiffs have not come close to establishing that Apple had the requisite intent for misappropriation—i.e., that at least one Apple employee other than Dr. Lamego himself knew or should have known that the information covered by the five purported trade secrets was acquired through improper means. Every single Apple witness testified that they did not believe Apple had received any of Plaintiffs' confidential information. They were right: Apple had not.

*Third*, even if Plaintiffs could make out a *prima facie* misappropriation case (they cannot), they failed to meet their burden to show that they could not have filed their suit within the three-year statute of limitations. As early as January 2014, Plaintiffs sent a letter accusing Apple of engaging in precisely the same conduct that is at the heart of the current litigation—i.e., hiring Dr. Lamego to gain access to Plaintiffs' proprietary pulse oximetry technology. Moreover, at least by March 2016, a reasonable investigation into publicly available patent filings would have confirmed that Apple had employed Dr. Lamego to work on non-invasive physiological monitoring, something Plaintiffs' letter had asserted would inevitably reveal their supposed trade secrets. In short, this suit was brought too late—though, to be clear, it would have failed no matter when it was brought. There was no misappropriation at any point in time.

*Fourth*, having waived all damages theories—and more importantly, having failed on the merits—Plaintiffs have no basis for seeking an injunction. Even had Plaintiffs not utterly failed to prove liability, they have forfeited the right to seek injunctive relief—both under FRCP 37(c) (because Plaintiffs failed to disclose their theory and its supporting facts until October 2024) and because Plaintiffs had concededly sought billions of dollars in legal remedies but recently chose to abandon those claims. In any event, Plaintiffs cannot satisfy the traditional *eBay* test, not least because they have failed to identify a single, non-speculative theory of irreparable harm.

***Finally***, Plaintiffs' patent ownership/inventorship claims were a mere afterthought at trial and are as unsupported as the misappropriation claim. Plaintiffs abandoned one inventorship claim (██████████) and their remaining inventorship claims rely on the same flawed theory that an individual (here, Mr. Diab) qualifies as a co-inventor simply because he had prior art patents with related subject matter. Plaintiffs' ownership claims fare no better, as the weight of the evidence—including testimony from several Apple engineers and Dr. Lamego himself—establishes that Dr. Lamego made his inventive contributions to the patents-in-suit while working for Apple.

Plaintiffs have had two chances—and five years—to back up their spurious claims that Apple stole their supposed intellectual property. They have not come close to doing so. Apple respectfully requests that the Court deny these claims and bring this chapter of the lawsuit to a close.[1]

## ARGUMENT

I.    **PLAINTIFFS HAVE NOT REMOTELY MET THEIR BURDEN TO ESTABLISH TRADE SECRET MISAPPROPRIATION, THAT THE STATUTE OF LIMITATIONS DOES NOT APPLY, OR THAT AN INJUNCTION IS APPROPRIATE**

A.    **None Of The Five Remaining Alleged Trade Secrets Was Possessed By Plaintiffs, Qualifies As A Trade Secret Under CUTSA, Or Was Misappropriated By Apple**

To establish misappropriation, Plaintiffs must prove by a preponderance of the evidence "(1) the existence and ownership of a trade secret and (2) misappropriation of the trade secret." Dkt. 1275 at 3 (citing Cal. Civ. Code § 3426.1). "[T]o qualify as a trade secret, the information 'must be secret, and must not be of public knowledge or of a general knowledge in the trade or business.'" *DVD Copy Control Ass'n, Inc. v. Bunner*, 116 Cal. App. 4th 241, 251 (2004) (citation omitted). Plaintiffs must also show

---

[1] This brief provides an overview of the factual and legal flaws in Plaintiffs' case. Those flaws are explained in greater detail in Apple's simultaneously filed Proposed Post-Trial Findings of Fact and Conclusions of Law.

that they possessed the information at issue, that it "derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use," and that it "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Dkt. 1275 at 4 (citing Cal. Civ. Code § 3426.1(d)); *see also* Dkt. 1898 at 9 n.6 ("Plaintiffs bear the burden to demonstrate that [the purported trade secret] is not generally known"). Importantly, Plaintiffs' own "written descriptions" of L4, L5, D1, D3, and D10 "provide the controlling definitions of the Asserted Trade Secrets in this case." Dkt. 1715 at 27 (Court's Instruction No. 20).[2]

### 1.    Plaintiffs Have Not Shown L4 (███████████████████) Is A Trade Secret Or That Apple Misappropriated It

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
█████████████████████████████████████:

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████

---

[2] Plaintiffs have long since waived the right to object to this fundamental rule of law, as Plaintiffs' lead counsel agreed to this instruction during the April 2023 trial. *See* Dkt. 2345 at 4. In any event, this Court already rejected a motion for reconsideration challenging its holding that Plaintiffs are bound to the written description of their purported secrets, Dkt. 1898 at 6-8.

1

### a.    Plaintiffs did not possess L4

2    Plaintiffs failed to establish they possessed the ████████████

3  ████████████████████████████████████ and therefore cannot prove possession of

4  L4. *See* Dkt. 1715 at 33 (Court's Instruction No. 24) ("Each Asserted Trade Secret must

5  be analyzed as a whole.").  Dr. Madisetti conceded that he did not provide ████████

6  ████████████████████████████████████████████████████████████████

7  ████████████████████████████████████████████████████████████████

8  ████████████████████████████████████

9    On cross-examination, Dr. Madisetti sought to remedy this complete failure of

10  proof by claiming for the first time "I rely on other witnesses like Mr. Diab and

11  [Plaintiffs'] exhibits" to establish possession ██████████████████.  *See* 11/7 AM Tr.

12  [Madisetti] 9:23-10:2.  But as Professor Warren confirmed, there was ████████████

13  ████████████████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████████████████

16  ████████████████████████████████████████

17    In fact, Plaintiffs' own witnesses explained that ████████████████████

18  ████████████████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████████████

23  ████████  ████████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████████████████

25  ██████████████████████████

26

27  _____

28  [3] Emphasis added unless noted.

In sum, Plaintiffs failed to prove they possessed L4 as ***they chose*** to define it. That should be the end of the inquiry. *See* Dkt. 1898 at 7-8 ("[A] trade secret plaintiff may not modify its trade secret disclosures … when a case goes to trial."); *cf.* Dkt. 1901 at 5 (declining to grant JMOL on possession of L4 because of ███████████

███████████████████████████████████████████████████

███████████████████

### b.    Plaintiffs have failed to show L4 was not generally known

### i.    L4 as possessed by Plaintiffs was generally known

Plaintiffs failed to meet their burden to establish ████████████████████ ██████████ recited by L4 were not generally known years before Apple hired Dr. Lamego. The evidence confirms that they were.

Tellingly, Plaintiffs did not offer a witness who assessed public and industry knowledge of L4, and instead relied almost entirely on Dr. Madisetti. But Dr. Madisetti considered only the references that ***Apple's*** witness (Professor Warren) identified and— even then—addressed them only in two conclusory charts that provided no detail beyond the word "NO" or the letter "X" next to the name of each reference. *See* Madisetti Direct ¶ 123.[4]  He thus did not conduct the kind of "survey of literature or other research" that is required for a plaintiff to prove that its alleged trade secret is in fact secret. *Atmel Corp. v. Info. Storage Devices, Inc.*, 189 F.R.D. 410, 416 (N.D. Cal. 1999).  Nor did Mr. Diab, Plaintiffs' primary fact witness on L4.  Mr. Diab admitted that, when it comes to what is "publicly known" about how ████████████████████████████

███████████████████████████████████████ he "ha[s] no idea what is out there." 11/5 PM Tr. [Diab] 65:13-25; *see also* 11/5 AM Tr. [Kiani] 112:3-11 (stating, in response to a similar inquiry, "I don't know.  I didn't work at Nellcor.").

---

[4] Dr. Madisetti's assertion that his direct testimony presented only unreasoned charts because he was "not sure which references Apple would rely upon" (11/7 AM Tr. 19:25-20:10) is not credible. *See* Madisetti Direct ¶ 123.  Apple's 2023 FRCP 50(b) brief relied on Petersen and Webster to show L4 was generally known. S*ee* Dkt. 1765 at 6.  Plaintiffs moreover put on no rebuttal evidence from Dr. Madisetti.  *See* 11/13 Tr. 141:14-15.

When confronted on cross examination, Plaintiffs conceded the concepts claimed by L4 were publicly disclosed in patents filed by Nellcor—Plaintiffs' chief competitor—and Masimo itself. *See* Dkt. 2345 at 6-7 (collecting admissions). ███████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███     ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████     ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████████

And none of this was a secret even before the Nellcor patent. █████████

████████████████████████████████████████████████████████████████

██████████████████████████████████ For example, it is discussed in a 1997 textbook ("Webster," JTX-3887) that Professor Warren described as a "seminal resource in the field of pulse oximetry" and uses in his own classes. Warren Direct ¶ 29. Webster teaches that optical sensor designers should aim "'[t]o minimize errors'" from light piping "'through thoughtful LED/photodiode placement,'" "'light impervious barriers,'" "'coat[ings on] the housing around the photodiode'" and other "changes to

1 physical characteristics of an optical sensor." *Id.* ¶ 51 (quoting JTX-3887 at -583).

2 ███████████████████████████████████████████████████████████

3 ███████████████████████████████████████████████████████████

4 ██████████████████████████████████

5     Moreover, Mr. Diab confirmed that multiple of Masimo's own patents disclose

6 ███████████████████████████████████████      ██████████████

7 ███████████████████████████████████████████████████████████

8 ███████████████████████████████████████████████████████████

9 ███████████     This concession about Plaintiffs' own patents is particularly notable to the

10 generally known inquiry, as "evidence of how the owner of an alleged trade secret …

11 treat[s] that information is relevant to whether the information is generally known."

12 *Masimo Corp. v. True Wearables, Inc.*, 2022 WL 205485, at *2 (Fed. Cir. Jan. 24, 2022).

13     Unable to credibly dispute the numerous disclosures of ██████████████

14 ██████████████████     Plaintiffs tried to suggest ██████████████

15 ███████████████████████████████████████████████████████████

16 ███████████████████████████████████████████████████████████

17 ██████████████████████████████████     Neither is true. ██████

18 ███████████████████████████████████████████████████████████

19 ███████████████████████████████████████████████████████████

20 ██████████████████████████████████     And while a purported

21 trade secret need not be disclosed by a single reference to be generally known, *see* Dkt.

22 1284 at 5-6, Nellcor's Petersen patent filed in 2008 does exactly that. *See* Warren Direct

23 ¶¶ 41-56; *Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1355

24

25 _____

26 [5]Plaintiffs' questioning of Professor Warren implied that there is a legal requirement for
27 a defense expert to quantify how many people have seen each cited reference to disprove
   Plaintiffs' not-generally-known assertions. *See, e.g.*, 11/13 Tr. [Warren] 35:8-37:12.
28 The Court rejected this burden-shifting argument at the *Daubert* stage. *See* Dkt. 1284
   at 6.

(Fed. Cir. 2009) ("disclosure of a trade secret in a patent places the information comprising the secret into the public domain," so that "the trade secret is extinguished").

Petersen discloses how to █████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

██████[6] Specifically, Petersen discloses a use of a "tissue phantom" or "false finger …
made of black foam or… plastic" to ████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████

████████████████████████████

Petersen also teaches reducing ██████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████ ██

---

[6] Plaintiffs failed to prove (or even present evidence to show) that the "increasing the modulation frequency to higher than 100 Hz" portion of L4 is not generally known.

1

█████████████████████████████████████████████

2  Plaintiffs have failed to provide any evidence other than conclusory say-so (e.g., Dr.

3  Madisetti's "NOs") to rebut the plain language of Petersen or Professor Warren's

4  opinion that Petersen discloses all that Plaintiffs possessed of L4.  AF-C ¶ 57.

### ii.  Plaintiffs cannot meet their burden by unilaterally narrowing L4

7  Unable to seriously dispute that the principles recited in L4 (as possessed and

8  written by Plaintiffs) were generally known decades before Dr. Lamego's brief

9  employment by Apple, Mr. Kiani, Mr. Diab, and Dr. Madisetti each tried to read

10  requirements into L4's broad language, thereby changing the scope of the alleged trade

11  secret during the trial.  This Court rejected precisely the same tactic in dismissing

12  Plaintiffs' purported business trade secrets at the conclusion of the April 2023 trial, as

13  "testimony suggesting there is something more hidden behind [a purported trade secret]

14  as defined by Plaintiffs cannot save it from being generally known as it was disclosed in

15  this case."  Dkt. 1898 at 9 (quoting Dkt. 1723 at 7).

16  In particular, all three of Plaintiffs' witnesses on L4 sought to narrow the

17  purported secret's (in Mr. Kiani's words) ██████████████████████████████

18  ██████████████████████████████████████████████

19  ██████████████████████████████████████████████

20  ███████████████

21  Mr. Kiani, Mr. Diab, and Dr. Madisetti also read myriad other limitations into L4.

22  For example, Dr. Madisetti asserted that L4 included  ████████████████████

23  ██████████████████████████████████████████████

24  ██████████████████████████████████████████████

25  ████████████████████  But as Dr. Madisetti conceded, the text of L4 includes none of

26  those requirements.  *Id.* ████████████████████████████████████████

27  ████████████████████████████████  Similarly, Mr. Diab and Mr.

28  Kiani claimed, respectively, that L4 includes ████████████████████████████

1

2

3                                                          But again, both witnesses were

4   forced to agree that L4 "doesn't say" anything that would impose such specific

5   requirements.  *See* 11/5 AM Tr. [Kiani] 108:9-25; *see also* 11/5 PM Tr. [Diab] 61:2-23

6   (similar).

7          Plaintiffs' witnesses diverged from the text of L4 for an obvious and

8   impermissible reason: "If a trade secret is written so broadly as to sweep in some

9   concepts that are generally known and some that are not, as a whole, it cannot be a trade

10  secret." Dkt. 1898 at 9 n.7.  As the above makes clear, the plain text of L4 sweeps in

11  concepts that were so broadly known, they appeared in nearly 30-year-old patents

12  (including one filed by Plaintiffs' key competitor).

13         Plaintiffs' inconsistency on the scope of L4 is itself an independent basis to deny

14  relief.  A trade secret plaintiff must "describe the subject matter of the trade secret with

15  sufficient particularity to separate it from matters of general knowledge in the trade or

16  of special knowledge of those persons … skilled in the trade."  *Imax Corp. v. Cinema*

17  *Techs., Inc.*, 152 F.3d 1161, 1164-1165 (9th Cir. 1998) (granting summary judgment on

18  particularity); *Altavion, Inc. v. Konica Minolta Sys. Lab'y Inc.*, 226 Cal. App. 4th 26, 43

19  (2014) (granting summary judgment on particularity); *see also Olaplex, Inc. v. L'Oreal*

20  *USA, Inc.*, 855 F. App'x 701, 712 (Fed. Cir. 2021) (JMOL on particularity).

21         Here, Plaintiffs have tried to exploit arguable ambiguity in the purported trade

22  secret *they drafted* in two improper ways.  First, while Plaintiffs wrote L4 to include

23

24

25

26

27

28                                                                                  .

*See supra* pp. 12-13 (discussing testimony from Kiani, Diab, and Madisetti).  Under both lines of argument, Plaintiffs' written description of L4 fails to "*clearly refer* to tangible trade secret material" and instead referred to a broad array of information that only "potentially qualifies for trade secret protection."  *Imax*, 152 F.3d at 1167 (plaintiff that broadly claimed all "dimensions and tolerances" of its projector system failed to identify a trade secret with the requisite particularity).

### c.    Plaintiffs did not take reasonable efforts to maintain the secrecy of L4 as they possessed it

As discussed above, Mr. Diab conceded that Plaintiffs' own patents disclosed various ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████  Mr. Diab's testimony (and the Masimo patents it cites) runs directly contrary to Plaintiffs' assertions that they made "efforts that [we]re reasonable under the circumstances to maintain [L4's] secrecy."  Cal. Civ. Code § 3426.1(d)(2).  Whether Plaintiffs employed various ***general*** protocols to prevent unauthorized dissemination of their engineers' ideas (e.g., securely archiving unused lab notebooks) can only take them so far.  After all, a plaintiff's own decision to "disclos[e] … a trade secret in a patent application extinguishes the information's trade secret status" and precludes the plaintiff from "assert[ing] a [trade secret] claim relating to the patented information," *Attia v. Google LLC*, 983 F.3d 420, 426 (9th Cir. 2020).  If information placed in a public patent is not a secret, a trade secret plaintiff who makes a voluntary decision to include such information in a patent application cannot possibly be said to have taken reasonable efforts to protect the secrecy of that information.

### d.    Apple did not misappropriate L4

There is no evidence that Dr. Lamego played any role in ███████████████ ████████████████████████████████████████████████████████ ██████████████      ████████████████████████████████████ it necessarily did not misappropriate that test (or L4 as a whole) from Plaintiffs.  With L4

as with all the other alleged trade secrets, there is no evidence of a thread running from an actual secret possessed by Plaintiffs, through Dr. Lamego, to Apple.

**First,** the trial record establishes that Apple independently developed the accused black foam test before Apple hired Dr. Lamego. *See Sargent Fletcher v. Able Corp.*, 110 Cal. App. 4th 1658, 1666-1669, 1675 (2003) (plaintiff has burden to disprove independent development). For years before Dr. Lamego arrived, █████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

It should be no surprise that Apple █████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████

1

2

3

4

5

6

7

8

9

10

11

12

As of November 2013, the only question that Apple had not decided was ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████    ███

Plaintiffs cannot dispute that Apple possessed the L4 test as they defined it, so
they have pivoted to ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████

Regardless, ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

_____

[7] Plaintiffs could not establish misappropriation-by-acquisition liability even if Dr.
Lamego **had** taught Apple L4, because Plaintiffs have not advanced any theory (let alone
proof) that they were or could be harmed solely by Apple's purported acquisition of ███
████████████████████. *See Waymo LLC v. Uber Techs., Inc.*, 2018 WL 466510, at *3
(N.D. Cal. Jan. 18, 2018); *see also* AF-C ¶ 320.

1

██████████████████████████████████████████████████

2    ██████    There is zero evidence Dr. Lamego had anything to do with this decision.  To

3    the contrary, as Brian Land—manager of the team responsible for designing the optical

4    sensor—testified, Dr. Lamego contributed "nothing" to ████████████████████

5    ██████████████████████████████████████████████████

6    ██████████████████████████████████████████████████

7    ██████████████████████████████████████████████████

8    ████████████████████████████████████████████

9         Plaintiffs have not identified a single document authored by Dr. Lamego using

10   ██████████████████████████████████████████████████

11   ██████████    Plaintiffs have instead pointed to just two documents they claim connect

12   Dr. Lamego to ████████████████████    But neither provides any support for their

13   position.  The first is an email sent ***to*** Dr. Lamego and ***38 other Apple employees***, ██████

14   ██████████████████████████████████████    Even Plaintiffs' expert witness

15   conceded that the email lacks any indication that Lamego contributed to either the

16   attached presentation or the specific change Plaintiffs accused.  *See* 11/7 AM Tr.

17   [Madisetti] 31:1-13.  The only other document Plaintiffs identify (and the ***sole*** document

18   authored by Dr. Lamego) is a list of suggestions Dr. Lamego wrote after joining Apple

19   that  references  ████████████████████████    ████████████████

20   ██████████████████████████████████████████████████

21   ██████████████████████████████████████████████████

22   ██████████████████████████████████████████████████

23   ██████████████████████████████████████████████████

24   ██████████████████████████████████████████████████

25   _____

26   [8] One iteration of ████████████████

27   ██████████████████████████████████████████████████

28   ██████████████████████████████████████████████████

Wilmer Cutler
Pickering Hale
and Dorr LLP

1

2

3

4

5

6

7    This is consistent with general engineering usage—even Masimo's own patent

8    uses the term "photodiode detector shielding" in the same manner as Mr. Land—i.e., to

9    refer to "shield[ing] a photodiode detector from electromagnetic interference and

10   ambient light."  JTX-3707 at 1; *see also* Warren Direct ¶ 76.

11       ***Second***, there is no evidence that Apple

12                                                                              a requirement

13   of L4.  To the contrary, all evidence points in one direction:  The results of

14

15

16

17

18

19

20

21       Plaintiffs' primary response is that Apple

22                                                                        But

23   this is pure *ipse dixit*.

24

25

26

27

28

1

2

3

4

5

██████

### 2. Plaintiffs Have Not Shown L5 (The Accused Short Circuit) Is A Trade Secret Or That Apple Misappropriated It

L5 identifies a ████████████████████████████████

████ ██ ████████████ ████ █████ █████ ███████ ██ ██████

████████████████

        ██████████████████████████████████

        ██████████████████████████████████

        █████████████████████

### a. Plaintiffs did not possess and cannot permissibly claim *every* solution to a known problem

L5's plain text claims ████████████████████████████

████████████████████████  In view of this extremely broad scope, Plaintiffs have not met their burden to prove the possession and particularity requirements for L5.

**First**, this Court previously held "the idea claimed in L5 [to be] sufficiently particular to let the possession question go to the jury" precisely because the Court accepted Plaintiffs' representation that L5 "*does not* claim every solution to" ██ ████████████████████████████  Dkt. 1901 at 8; *see also id.* at 8 (noting that Plaintiffs did not "claim every undisclosed possible solution to the problem").  At the November 2024 retrial, Dr. Madisetti directly contradicted Plaintiffs' prior representation, in response to questioning from this Court—with Dr. Madisetti contending that L5 ████████████████████████████████

1

2

3    L5 therefore fails to meet the requirement that a purported trade secret must be

4    identified with sufficient particularity. *See Imax*, 152 F.3d at 1164-1167. A trade secret

5    plaintiff cannot permissibly claim ownership of "broad swaths of solutions to general

6    [engineering problems]" because such an approach would "allow monopolization of

7    broad scientific or engineering concepts and principles." *Waymo LLC v. Uber Techs.,*

8    *Inc.*, 2017 WL 2123560, at *7 (N.D. Cal. May 15, 2017). And Plaintiffs cannot possibly

9    have described their alleged trade secret with the required level of particularity, if they

10   are purporting to claim solutions to the L5 problem that they are unaware of or—

11   worse—that no one has yet invented.

12       *Second*, Plaintiffs cannot possibly show possession of *every* potential solution to

13   ████████████████████████████—especially those that have not yet been

14   invented. To the contrary, as Plaintiffs' own engineers admitted at trial, Plaintiffs

15   possessed *a single* solution to the L5 problem: ████████████████

16   ████████████████████████  ████████████████

17   ████████████████████████████████████████

18   ████████████████████████████████████████

19   ████████████████████████████████████████

20   ████████████████████████████████████████

21   ████████████████████████████  Plaintiffs cannot

22   meet their burden to show possession of L5 "as a whole" based on just one solution—

23   one which this Court's questioning of Dr. Madisetti confirmed ████████████

24   ████████████████████████████████████████

25   ████████████████████████████████████████

26   ████████

27       In yet another effort to find a connecting thread where none exists, Plaintiffs'

28   witnesses discussed ████████████████████████████████

**b.    The elements of L5 that Plaintiffs possessed were generally known.**

While Plaintiffs' engineers may not have themselves identified the

In particular, Professor Warren identified references from as early as 1973 showing that

---

[9] This patent was admitted as JTX-4233 and JTX-3003.  Apple uses JTX-4233 herein.

Wilmer Cutler
Pickering Hale
and Dorr LLP

1

2

████████████████████████████████████████████

████████████████████████████████████

Even though Plaintiffs "bear the burden to demonstrate that [L5] is not generally known," Dkt. 1898 at 9 n.6, Dr. Madisetti baldly asserted that "mark[ing] 'NO' in [a] chart[]" to argue that the Mims, Roedel, and Webster references do not disclose L5; this was not enough to establish that L5 was not generally known. Madisetti Direct ¶¶ 167-168.[10]    But an "expert's conclusory testimony, without further explanation, is insufficient to meet [a plaintiff's] burden of production," *e.g.*, *Moore v. Robinson Oil Corp.*, 588 F. App'x 528, 530 (9th Cir. 2014), let alone to satisfy Plaintiffs' burden to ***prove*** that L5 was not generally known. Dr. Madisetti apparently made no effort to investigate whether L5 was generally known, relying instead "on testimony from Dalke and others" about ████████████████████████████████████████

████████████████████████████████████████████

███████████████████████ But relying on the subjective impressions of employees from a single company— rather than taking steps to "determine[e] … what others in the industry generally knew"—amounts to an unacceptable "ignorance-is-bliss strategy" that is "inadequate" evidence of "what was 'generally known.'" *Atmel*, 189 F.R.D. at 416. Again, Plaintiffs cannot meet their burden by asking their expert to put his head in the sand. *See id.*; *see also supra* p. 8.

c.    **Plaintiffs did not take reasonable efforts to preserve the secrecy of L5 as they possessed it**

Plaintiffs also failed to meet their burden to prove they took reasonable efforts to keep L5 secret. Regardless of whether Plaintiffs took steps that—as a general matter— were intended to keep their information confidential, *cf.* Madisetti Direct ¶ 163, is irrelevant because Plaintiffs made no effort to preserve the secrecy of L5 in particular.

---

[10] Again, Dr. Madisetti's failure to address the Mims, Roedel, and Webster references in his direct testimony is fatal, particularly because Apple's 2023 FRCP 50(b) brief relied on all three to show that L5 was generally known, *see* Dkt. 1765 at 9; *supra* n.4.

Plaintiffs published the concepts of L5 in a patent.  *See* JTX-4233 at 16:40-43, Fig. 8; Warren Direct ¶¶ 121-125; *supra* p. 14.  Even more notably, ███████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████ Plaintiffs cannot establish they took reasonable efforts to keep L5 secret if its alleged inventor concedes they did not.

### d.    Apple did not misappropriate L5

Even under Plaintiffs' theory that they possessed a protectable trade secret in their ████████████████████████████████████████████████████ Plaintiffs failed to prove that Apple improperly acquired, used, or disclosed that concept.

***First***, Apple did not acquire (much less ***improperly*** acquire) through Dr. Lamego the narrow version of L5 that Plaintiffs actually possessed.[11]  Plaintiffs do not contend— nor does the evidence show—that Dr. Lamego ███████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████ ███████████

---

[11] Plaintiffs could not establish misappropriation-by-acquisition liability even if Dr. Lamego ***had*** conveyed their L5 solution to Apple, because Plaintiffs have not advanced any theory (let alone proof) that they were or could be harmed solely by Apple's purported acquisition of their L5 solution.  *See Waymo*, 2018 WL 466510, at *3; *see also* AF-C ¶ 343.

1   ██████████████████ ; ████████████████████████████████████

2   ██████████████████████████ ████████

3   **Second**, Apple has never used L5 in Apple Watch. ██████████████

4   ████████████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████████████

7   ████████████████████████████████████████████████████████████

8   ████████████████████████████ ██████████████████████

9   ████████████

10  In any event, Plaintiffs failed to prove that Apple implemented ████████████

11  ██████████████████████████████████████ and for good reason—

12  Apple Watch never had that problem.  *See* 11/13 Tr. [Block] 18:18-20, *id.* [Warren]

13  56:22-25, 129:12-14, 130:20-131:7.  Rather, as Apple's engineers and the final

14  documentation for the chip that includes the accused circuit confirms, Apple added ██

15  ████████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████████████

17  ██████████████████████████████████████████████████ █

18

19

20

21

22

─────────────────────

23  [12] Plaintiffs rely on references to "████████ in a draft engineering requirements

24  specification, *see* 11/13 Tr. [Warren] 65:16-67:15 (discussing JTX-1142), and an email
    about a non-final ASIC design, *see id.* at 52:23-56:17 (discussing JTX-541).  But as

25  Professor Warren's unrebutted testimony reflects, none refers to ██████████████████
    and—in any event—that design was not used.  *Id.* at 65:25-66:16, 129:25-130:17.

26  [13] ████████████████████████████████████████████████████████████

27  ████████████████████████████████████████████████████████████

28  ████████████████████████████████████████████████████████████

As Professor Warren summarized, ██████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

██████████████████████████████████████████████████████

11/13 Tr. [Warren] 132:9-14; DDX-6.22.

*Third*, contrary to Plaintiffs' allegations, Apple did not disclose L5 to ██████████ or any other third party.  Plaintiffs' disclosure theory relies on an Apple Engineering Requirement Specifications document discussing the ███████████ issue and a single email among Apple engineers that refers to a non-final design for a certain kind of specialized chip (called an ASIC) that was never implemented in the Specifications or any Apple product.  *See* PF-C [FOF] ¶¶ 273-275.  None of those documents addresses the L5 problem (which Apple Watch did not have) nor refers to ████████████████ ████████████████████████

### 3.    Plaintiffs Have Not Shown D1, D3, D10 (The Rejected Demodulation Proposal) Are Trade Secrets Or That Apple Misappropriated Them

Plaintiffs allege that Dr. Lamego conveyed D1, D3, and D10 to Apple ██ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████

### a.    Plaintiffs did not possess D1, D3, or D10

Plaintiffs have not established that any product, document, or combination thereof includes all elements of D1, D3, or D10.  *First*, with respect to D1, Plaintiffs rely on information distributed over five pieces of evidence— ███████████████████ ████████████████████████████████████████████ to demonstrate possession.  *See* AF-C ¶¶ 159-163, 351.  But neither ███████████████████████████ establish that Plaintiffs possessed the aspects of D1 that require ████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████████████ Plaintiffs' argument is inconsistent with Dr. Madisetti's testimony about whether D1 is not generally known, in which he argues that prior public disclosures of a ████████ ███████████████████████████   ████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████

*Second*, Plaintiffs' evidence for possession of D3 is similarly deficient.  None of the documents Plaintiffs rely upon demonstrates Plaintiffs possessed ████████████ ████████████████████████████████████████████████████████████

1    ███████████████████████████████ Most significantly, the pages

2    from Mr. Poeze's lab notebook (JTX-832 at -907 and -935) that Plaintiffs have relied

3    upon to show the ███████████████████ do not actually disclose it.  Mr. Poeze has

4    admitted that ████████████████████████████████████████████████

5    █████████████████████████████████████████████████████████████

6    █████████████████████████████████████████████████████████████

7    ████████  ███████████████████████████████████████████████████

8    █████████████████████████████████████████████████████████████

9    ███████████████████  ██████████████████████████████████████████

10   Again, Plaintiffs do not try to reconcile their contention that this vague reference suffices

11   for possession with Dr. Madisetti's "generally known" opinion that a prior reference to

12   ████████████████████████████████████████—the two positions are

13   irreconcilable.  *See* Sarrafzadeh Direct ¶¶ 63, 106, 122-124; Madisetti Direct ¶¶ 176,

14   180, 203, 209.

15        ***Third***, as to D10, Plaintiffs' ████████████████████████████

16   █████████████████████████████████████████████████████████████

17   █████████████████████████████████████████████████████████████

18   ████████████████████████████████████████████  █████████████████

19   █████████████████████████████████████████████████████████████

20   █████████████████████████████████████████████████████████████

21   █████████████████████████████████████████████████████████████

22   █████████████████████████████████████████████████████████████

23   ███████████  ██████████████████████████████████████████████████

24   █████████████████████████████████████████████████████████████

25   █████████████████████████████████████████████████████████████

26   █████████████████████████████████████████████████████████████

27   ████████████████████████████

28

Finally, and more broadly, Dr. Madisetti's repeated assertion that possession can be proven by considering evidence scattered throughout a collection of references, *e.g.* Madisetti Direct ¶¶ 176-183, is flatly inconsistent with his position that whether a purported secret is "generally known" is assessed based on whether it is embodied in a single reference, *see, e.g.*, *id.* ¶ 198; *see also* 11/7 AM Tr. [Madisetti] 61:5-17 (Dr. Madisetti conceding that while he had criticized Apple's witness for "drawing on multiple sources of evidence to establish generally known," Dr. Madisetti was "relying on multiple sources of information" to show possession of D1 and D3). The references Dr. Sarrafzadeh used to prove that D1 and D3 are generally known are—like Dr. Madisetti's supposed evidence of possession—Plaintiffs' own documents and projects, created by the "same people" and related to the "same project." 11/7 AM Tr. [Madisetti] 61:17; *see also* 11/12 AM Tr. [Sarrafzadeh] 60:1-6; AF-C ¶¶ 165-170, 193-196 (citing Plaintiffs' patent filings). This logical inconsistency—and Plaintiffs' failure to meaningfully reconcile their approach to possession with their approach to "generally known"—undermines Dr. Madisetti's credibility on possession and makes clear that Plaintiffs' case is not grounded in a consistent interpretation of trade secret law.

> **b.** **Plaintiffs failed to prove that at least D1 and D3 are not generally known or that Plaintiffs treated them as trade secrets before this litigation**

Plaintiffs have not met their burden to show that at least D1 and D3 are not generally known. As a threshold matter, Dr. Madisetti's failure to conduct a literature search before providing an opinion on the "generally known" issue renders that opinion facially deficient. *See Atmel*, 189 F.R.D. at 416. In any event, the evidence shows that D1 and D3 were generally known at the time that Apple received and rejected Dr. Lamego's demodulation proposal.

Dr. Sarrafzadeh explained that Masimo's own Weber 2018 patent discloses any elements of D1 that Plaintiffs possessed. *See* 11/12 AM Tr. [Sarrafzadeh] 12:7-9, 64:15-65:24; AF-C ¶¶ 165-168. Even Dr. Madisetti does not dispute that Weber 2018 fully

discloses D1—his only ground for distinction was that it issued after Dr. Lamego had purportedly conveyed D1 to Apple. *See* Madisetti Direct ¶ 202. Plaintiffs, however, have not identified any theory of harm from Apple's supposed use or disclosure of D1 that occurred prior to 2018. For example, the ███████████████████████ ████████████████████████████████████ and Apple Watch's Blood Oxygen feature (which Plaintiffs wrongly claim has a connection to D1) was not launched until 2020. *See* JTX-1262; Land Direct ¶ 81. Plaintiffs have no explanation for why they can seek forward-looking relief like an injunction over a concept that they ***voluntarily*** put in the public domain six years ago.[14]

Moreover, if Dr. Madisetti is right that disclosures of ████████████ ████████████████████████████████████████████ ███████████████████████████     ███████████████████████ ██████████████████████ At trial, Plaintiffs offered no testimony that could explain how ████████████████████████████ can have expansive definitions when it comes to proving Plaintiffs' possession but narrow definitions when it comes to interpreting Plaintiffs' prior public disclosures in patent filings. 11/12 AM Tr. [Sarrafzadeh] 67:4-68:10 (discussing this discrepancy in Plaintiffs' case).

To the extent Plaintiffs possessed D3, it too was generally known. If this Court credits Plaintiffs' assertion that the page from Mr. Poeze's notebook discloses ██████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████     In any event, D3 is clearly disclosed by Poeze 2011 when considered in combination with Weber 2005 and Lamego 2011 ███████████████████ ████████████████████████████████

---

[14] Plaintiffs implied during cross-examination that Dr. Sarrafzadeh's position that Plaintiffs did not possess D1 was inconsistent with his "generally known" analysis. *See* 11/12 AM Tr. [Sarrafzadeh] 12:3-13:20. But Plaintiffs never argued that Weber 2018 establishes possession of D1 and, in any event, it was published and therefore not secret. Sarrafzadeh Direct ¶¶ 67-72; 11/12 AM Tr. [Sarrafzadeh] 12:3-13:20, 64:15-67:3.

More broadly, Plaintiffs' decision to disclose the concepts claimed in D1 and D3 in their own patents should be fatal to their claim that they have made reasonable efforts to preserve secrecy of the purported secrets. *See supra* p. 14; *cf. Attia*, 983 F.3d at 426.

### c.    Apple did not misappropriate D1, D3, or D10, none of which is used in Apple Watch

Even if D1, D3, or D10 could qualify as protectable trade secrets (they cannot), Apple did not misappropriate any of them. First, it is undisputed that Apple has never used any of these purported secrets in Apple Watch. *See* Madisetti Direct ¶¶ 205; AF-C ¶¶ 157, 236, 368, 386, 394. There is no evidence that Apple Watch's technology changed in any way after Apple's engineers rejected Dr. Lamego's demodulation proposal, let alone that anything used in Apple Watch is "substantially derived" from Dr. Lamego's suggestion. *SkinMedica, Inc. v. Histogen Inc.*, 869 F.Supp.2d 1176, 1197 (S.D. Cal. 2012) (defining scope of "use" for purposes of trade secret law); *see also* Sarrafzadeh Direct ¶¶ 28-32, 76-86, 89. Nor is there any dispute that (1) prior to Dr. Lamego's six-month tenure at Apple, Dr. Steve Waydo and his colleagues independently developed a demodulation technique known as DCS or (2) Apple has used DCS to address all ambient light rejection issues since before Dr. Lamego began working Apple. *See* Waydo Direct ¶¶ 23-29; AF-C ¶¶ 157, 236, 368, 386, 394. Apple has used DCS to address issues of ambient light rejection since 2013. *Id.*

Plaintiffs also cannot establish use through the doctrine of "negative know-how," which refers to how "a defendant might ... tak[e the] lesson to *avoid* developing apparently fruitless technology. *Waymo*, 2018 WL 466510, at *2. Dr. Lamego did not warn Apple away from his demodulation plan; he recommended it. Apple then ***wasted time*** evaluating and rejecting his proposal, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮   ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮

Plaintiffs also failed to prove that Apple can be liable for improperly acquiring D1, D3, or D10 because Dr. Lamego was not employed by Plaintiffs when he developed the technologies in his rejected demodulation proposal.[15]  Rather, Dr. Lamego wrote the ██████████████ upon which D1, D3, D10 and the ██████████ are based in March 2014 (i.e., when he was employed by Apple) and did so using well-known concepts he had learned during his undergraduate education.  *See* AF-C ¶ 220.  Dr. Lamego testified that he did not use or disclose any of Plaintiffs' confidential information in connection with his work on ██████████████, *see* 11/7 PM Tr. [Lamego] 130:12-16, and other Apple employees similarly testified that they were unaware of any confidential information belonging to Plaintiffs being used in connection with this work.  *See* AF-C ¶ 27.

Finally, Plaintiffs have not established that Apple is liable for misappropriation-by-disclosure in connection with ██████████████████████  In particular, as Dr. Sarrafzadeh explained, the ██████████ does not disclose D1 because it fails to ██████ ████████████████████████████████████████████  Plaintiffs also failed to carry their burden to prove that ██████████████████████████████████████ ██████████████

While D10 echoes ████████████████ that is only because Plaintiffs concededly ████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████  Plaintiffs have failed to show that Apple improperly acquired the technique described in D10 (since it was derived from Dr. Lamego's work product at

---

[15] Plaintiffs could not establish misappropriation-by-acquisition liability even if Dr. Lamego *had* developed D1, D3, or D10 while employed by Plaintiffs, because they advanced no theory (let alone proved) that they were or could be harmed solely by Apple's purported acquisition of the demodulation algorithm.  *See Waymo*, 2018 WL 466510, at *3; *see also* AF-C ¶ 369-370.

Apple) and, in any event, have not shown that Plaintiffs suffered any harm from the ███████████████████ (let alone harm from the purported acquisition of D10). For instance, Plaintiffs presented no evidence that there was a change to their business or to the industry following ███████████████. Nor is there any evidence that the ████████ has been asserted against or used or licensed by anyone. As noted above, Plaintiffs cannot establish CUTSA liability without proving that the purported misappropriation "was a substantial factor in causing the[m] … harm." *AMN Healthcare*, 28 Cal. App. 5th at 942; *see also Unilogic, Inc. v. Burroughs Corp.*, 10 Cal. App. 4th 612, 626 (1992) (same).

**B.    Plaintiffs Have Failed To Prove That Apple Had The Requisite Intent To Misappropriate Trade Secrets**

Even if Plaintiffs had shown possession, secrecy, and acquisition/use/disclosure of L4, L5, D1, D3, or D10 (when in fact, they have shown none of these), Plaintiffs have not come close to establishing that Apple had the necessary intent to misappropriate. To make that showing, Plaintiffs were required to prove that Apple, at a minimum, (1) used "improper means to acquire knowledge of the [alleged] trade secret[s]" or (2) "knew or had reason to know that [its] knowledge of the [alleged] trade secret[s] was … [d]erived from or through a person who owed a duty to [Plaintiffs] to maintain its secrecy or limit its use." Cal. Civ. Code § 3426.1(b)(2)(A), (B)(iii).[16]  The evidence does not remotely prove that Apple knew or should have known that Dr. Lamego provided any of Plaintiffs' confidential information, let alone that Apple hired Dr. Lamego for the purpose of misappropriation.

---

[16] Plaintiffs do not dispute (1) Dr. Lamego lawfully obtained access to their confidential information in his capacity as their employee, or (2) Plaintiffs provided no trade secret information directly to Apple. *See* AF-C ¶ 282.  Other modes of misappropriation CUTSA contemplates are thus irrelevant, *see* Cal. Civ. Code § 3426.1(b)(2)(B)(i)-(ii). This Court declined to charge the jury on those theories. *See* Dkt. 1715 at 40.

### 1.  Apple Did Not Hire Dr. Lamego Intending To Access Plaintiffs' Confidential Information (Direct Misappropriation)

During the 2023 trial, Plaintiffs requested (over Apple's objection) that the Court charge the jury on the theory that Apple directly misappropriated by using "[i]mproper means of acquiring … knowledge of a trade secret, includ[ing] theft, financial inducements, misrepresentation, or breach or inducement of a breach of a duty to maintain secrecy." Dkt. 1715 at 43 (Court's Instruction No. 33). Each of these extreme accusations would have required Plaintiffs to show that Apple had at least specific intent to injure or defraud Plaintiffs. *See* Dkt. 1765 at 17 (collecting cases providing the legal standard for theft, bribery, etc.). The record is devoid of any such evidence. The closest Plaintiffs could muster at the first trial was the fact that Apple offered Dr. Lamego more compensation than most other engineers hired at his level. *See* Dkt. 1703 at 4. But this offer reflected only that "he came from a much higher comp and title position at his previous company,"—it "[d]idn't have anything to do with his knowledge." 11/8 PM Tr. [Hotelling] 58:2-15. Moreover, Dr. Lamego, Mr. Hotelling, and the documentary record confirm that Apple employees took care "multiple times, many times" to "make clear" to Dr. Lamego that Apple's policies forbid using other companies' confidential information. 11/7 PM Tr. [Lamego] 130:10-11; s*ee also, e.g.*, Hotelling Direct ¶¶ 46, 49-54; JTX-3044 (signed Intellectual Property Agreement).

Plaintiffs appear to have abandoned this unfounded theory of liability. *See generally* PF-C [COL] ¶¶ 1-122 (nowhere asserting any direct misappropriation theory).[17] While Plaintiffs repackage this argument as part of their plea for attorney's fees, PF-C [FOF] ¶¶ 375-384, that request is equally meritless. *See infra* pp. 43-45.

---

[17] In 2023, Apple moved for JMOL on direct misappropriation at both the FRCP 50(a) and 50(b) stages. *See* Dkts. 1705 at 2-3; 1765 at 17. The Court did not expressly grant JMOL on this issue, but it has presented the sole issue as whether Apple knew or had reason to know Dr. Lamego conveyed Plaintiffs' confidential information—*i.e.*, whether Apple is liable for indirect misappropriation. *See* Dkt. 1723 at 3; Dkt. 1901 at 19-20.

1    ## 2.    Plaintiffs Have Not Established That Apple Knew Or Should
2    Have Known That Dr. Lamego Conveyed Any Of Plaintiffs'
3    Allegedly Confidential Information During His Six-Month
4    Employment (Indirect Misappropriation)

5    Plaintiffs have failed to show that Apple "knew or had reason to know" that Dr.

6    Lamego had conveyed Plaintiffs' allegedly confidential information in breach of a duty.

7    Cal. Civ. Code § 3426.1(b)(2)(B)(iii).  To meet their burden, Plaintiffs were required to

8    prove that "another [Apple] employee besides Lamego … knew [or] … should have

9    known" about the alleged misappropriation.  Dkt. 1723 at 3.  This is because the doctrine

10   of *respondeat superior* does not apply in this context.  As this Court has repeatedly held,

11   it is wrong "'to impute an agent's knowledge of a secret to the principal,' at least where

12   [as here] the agent 'did not inform other employees of plaintiff's concept.'"  Dkt. 1723

13   at 3 (quoting *Carr v. AutoNation, Inc.*, 2018 WL 288018, at *2 (E.D. Cal. Jan. 4, 2018);

14   Dkt. 1901 at 19 (same).

15   In light of Plaintiffs' repeated, failed attempts to raise a *respondeat superior*

16   theory during the first trial, this Court instructed Plaintiffs in August 2023 that "the Court

17   has already ruled on this issue … and does not intend to revisit it for any future trial."

18   Dkt. 1901 at 18 n.7.  Plaintiffs ignored this guidance by reasserting the same *respondeat*

19   *superior* theory **three more times** in October 2024 alone.  *See* Dkt. 2175 at 21 (Plaintiffs'

20   Contentions Of Law And Fact); Dkt. 2216 at 2-5 (Plaintiffs' October 29, 2024 Trial

21   Brief); Dkt. 2218-1 at 99-100, 106 (Plaintiffs' October 29, 2024 Proposed Findings Of

22   Fact And Conclusions Of Law).  This *sub silentio* request for reconsideration is

23   improper, particularly because Plaintiffs have not identified any new authority beyond

24   what they pointed to in April 2023.  *Compare, e.g.*, Dkt. 2216 at 2-4 (citing *Burlington*,

25   *Yamaguchi*, *Lisa M.*, *Language Line*, *Allergan*, *Sotera*, and *Brain Injury*) *with*

26   Sprankling Decl. Ex. A (April 25, 2023 email from Plaintiffs' counsel listing the same

27   cases and nearly two dozen others as "authorities on which we may rely during [the

28

FRCP 50(a)] oral argument" later that day); Dkt. 1812 at 16-17 (Plaintiffs' opposition to Apple's FRCP 50(b) motion citing *Burlington*, *Yamaguchi*, and *Brain Injury*).

Of course, even if the *respondeat superior* were available, Dr. Lamego has repeatedly testified under oath that he does not believe (and has no reason to believe) he conveyed Plaintiffs' purported trade secrets to Apple. *See* 11/7 PM Tr. [Lamego] 135:19-136:13. But Plaintiffs' attempts to tiptoe around this Court's prior ruling underscores that—without *respondeat superior*—they have no plausible intent theory. Plaintiffs have not presented a shred of evidence establishing that any Apple employee knew or should have known that any information Dr. Lamego conveyed during his six-month employment was derived from Plaintiffs' confidential information. To the contrary, Apple's current and former employees consistently testified that they are not aware of Dr. Lamego having provided any confidential Masimo or Cercacor information while he worked at Apple. *See, e.g.*, Hotelling Direct ¶¶ 66-67, 83; *see also* Land Direct ¶¶ 83-84; Waydo Direct ¶¶ 60-61; Block Direct ¶¶ 16-17, 58; Ness Direct ¶ 7; Perica Direct ¶ 6, 19; Russell-Clarke Direct ¶ 30. Dr. Lamego also "affirmatively stated" to his colleagues "that he was taking care to avoid intellectual property conflicts." Hotelling Direct ¶ 67. For instance, when Dr. Lamego described his work on ███████ ████████████████████████████████████████ that Plaintiffs allege conveyed D1, D3, and D10, Dr. Lamego wrote that he "had to exercise extra care to avoid IP conflicts." JTX-3050 at -213. Plaintiffs have never identified any reason why Mr. Hotelling or any other Apple employee should have doubted Dr. Lamego's representations or otherwise suspected that he had conveyed Plaintiffs' confidential information. *Cf.* 11/6 PM Tr. [Madisetti] 46:22-47:18 (Dr. Madisetti agreeing that he was not offering any "opinion that Apple intentionally took trade secrets from Masimo or Cercacor").

More broadly, Plaintiffs failed to substantiate their underlying theory of the case: that Apple supposedly hired Dr. Lamego as a substitute for acquiring or partnering with Masimo. Apple CEO Tim Cook had no recollection of Adrian Perica ever "raising with [him] a possible M&A" or "a joint development with Masimo." Dkt. 2402-3 [Cook

Dep.] 53:18-54:1. Apple took ***none*** of the "significant series of steps" that would be involved even in formulating an offer to acquire "a large public company" like Masimo. *See* 11/8 AM Tr. [Perica] 54:5-15. Nor does the evidence suggest that Apple's leadership felt any need to look outside for help on its sensor engineering. *Id.* at 55:23-56:2. Plaintiffs' allegation to the contrary is based on a single, out-of-context remark from an email between an engineering leader and the head of Apple's industrial design group, stating that the Apple Watch optical sensor engineering effort was "confused" and thus "a mess." JTX-337 at -427. But that email makes clear that the "confus[ion]" arose from the then-existing directive for engineers to place the optical sensor in a constrained space within the "showerhead" layout proposed by the industrial design team—a design option that was ultimately abandoned in favor of the design that shipped. *See* 11/8 PM Tr. [Hotelling] 74:4-75:2. In fact, in summarizing for Mr. Cook Apple's capabilities in "[n]on-invasive diagnostics," Mr. Perica expressed confidence that "we internally understand how to be good at these engineering disciplines." JTX-316 at -707.

Apple's actual intent was to hire Dr. Lamego for his general expertise, in the hope that after joining Apple, he would bring inventive energies to Apple research projects. *See* Hotelling Direct ¶ 49 ("In onboarding Dr. Lamego, I communicated to him that he should not bring any confidential information from his prior employers[.]"). Apple did not want—and explicitly told Dr. Lamego it did not want—him to use any confidential information from Plaintiffs while at Apple. *See, e.g., id.* ¶¶ 49-54; JTX-3044 (signed Intellectual Property Agreement); 11/7 PM Tr. [Lamego] 100:4-16 ("They didn't want to have any type of transfer from Masimo to Apple, by any means. I heard that almost every week, if not every day at Apple. They were very, very careful about that."). And in fact, he did not.

## C.    Plaintiffs' CUTSA Claim Is Time Barred

The parties' dispute over the statute of limitations is now relatively narrow. Plaintiffs have conceded Apple has met its initial burden to show that the purported

1    misappropriation began outside of the three-year statute of limitations period (i.e.,

2    "before January 9, 2017"). Dkt. 1901 at 17; *see also* Dkt. 2280 at 9. And this Court has

3    held that L4, L5, D1, D3, and D10 "are related for statute-of-limitations-notice

4    purposes," meaning that "the statute of limitations beg[an] to run for ***all*** [of them] as

5    soon as Plaintiffs could have discovered that Apple misappropriated a single ***one***." Dkt.

6    1901 at 18. Accordingly, Plaintiffs' CUTSA claim is time-barred unless Plaintiffs

7    proved that they lacked "reason to suspect … misappropriat[ion], … [under

8    circumstances where] a reasonable investigation would produce facts sufficient to

9    confirm this suspicion[.]" Dkt. 606 at 3; *see also* Dkt. 1715 at 46; *Gabriel Techs. Corp.

10   v. Qualcomm Inc.*, 857 F. Supp. 2d 997, 1003 (S.D. Cal. 2012).

11         Plaintiffs failed to carry their burden. Plaintiffs first articulated their (unfounded)

12   suspicion that Apple had hired Dr. Lamego to misappropriate trade secrets as early as

13   January 2014—days before Dr. Lamego began working for Apple. *See* Kiani Direct ¶

14   211. At that time, Plaintiffs sent Apple a letter stating that "[i]t is difficult to imagine

15   any reason for this sequence of events other than Apple … attempting to gain access

16   to … Cercacor and Masimo's trade secrets." JTX-2937 at -093.[18] Mr. Kiani himself

17   testified that the January 2014 "letter explained" the theory that remains the thesis of

18   this litigation—i.e., that "Apple had already approached Masimo about a possible

19   collaboration but had abandoned these discussions without explaining why and was

20   targeting Masimo and Cercacor personnel for hiring." Kiani Direct ¶ 210.

21         In addition, a reasonable investigation would have confirmed well before January

22   2017 Plaintiffs' suspicions that Dr. Lamego was working on physiological sensors,

23   which their letter (falsely) asserted would amount to trade secret misappropriation. That

24   is because, as Mr. Kiani admitted, "documents linking Dr. Lamego to physiological

25

26   _____

27   [18] Plaintiffs' January 2014 letter also wrongly asserted that Dr. Lamego's employment
     agreement "prohibit[ed him[ … from competing with Cercacor" for two years after
     leaving. JTX-2937 at -093. California law bars employers from imposing such broad
28   non-compete obligations as conditions of employment. *See* Cal. Bus. & Prof. Code
     § 16600(b)(1).

sensors at Apple were public as of 2016." 11/5 PM Tr. [Kiani] 16:10-15. Specifically, in March 2016, the application for U.S. Patent No. 10,078,052 published and listed Dr. Lamego as an inventor. JTX-1239 at -140. The '052 application covers technology usable for "a wearable fitness device … positioned against the skin of a user's wrist" to "obtain therefrom certain physiological data about the user such as heart rate, … blood oxygenation, … and so on." JTX-1239 at 1:48-53; *see also* 11/5 PM Tr. [Kiani] 15:4-16:15. This information should have been more than enough to alert Plaintiffs to their claim, as their own January 2014 letter asserted that if Apple "employ[ed] Mr. Lamego in an area … involv[ing] healthcare technology, including … the measurement of physiological information," Apple would necessarily encroach upon "Cercacor and Masimo's trade secrets." JTX-2937 at -093-094. Accordingly, the three-year statute of limitations began to run at least by March 2016, and Plaintiffs' January 2020 CUTSA claim is untimely.[19]

While Plaintiffs have argued that Mr. Kiani was not personally on notice of Plaintiffs' claim (because of assurances he supposedly received from Dr. Lamego and others, *e.g.*, PF-C [COL] ¶¶ 100-105), Plaintiffs have cited no authority holding that a single corporate officer's personal knowledge can substitute for an entire corporation. That approach would lead to terrible incentives (a CEO's strategic decision to bury his head in the sand, for example, could shield the corporation even though another officer had the requisite knowledge), and it is impossible to square with how Plaintiffs (and this Court's jury instructions) have assessed ***Apple's*** knowledge in the context of misappropriation. *See, e.g.*, Dkt. 1715 at 39 (Apple's *mens rea* assessed based on whether ***any*** "person at Apple" other than Dr. Lamego or Dr. Michael O'Reilly were aware the purported trade secrets were obtained through improper means).

---

[19] Plaintiffs' suit is also barred as untimely under the equitable doctrines of laches and waiver. *See* AF-C ¶¶ 430-434. Apple continues to preserve for appeal its other affirmative defenses of readily ascertainable and unclean hands. *See id.*

In any event, Mr. Kiani was undoubtedly on notice. Mr. Kiani authorized sending the January 2014 letter precisely because "*we* were worried" that Apple "was trying to steal trade secrets." 11/5 PM Tr. [Kiani] 10:9-13.[20] Moreover, Mr. Kiani asserts that he was told later that year that Apple "had asked [Dr. Lamego] to do something that would compete with" Plaintiffs. Kiani Direct ¶ 212. As this Court recently observed, "if Kiani believed Dalvi at the time of the statements," then "Dalvi's representation that Apple had attempted to coerce Lamego into divulging trade secrets potentially should have triggered an investigation." Dkt. 2348 at 2. Mr. Kiani has in fact testified that "I believed what Dalvi told me," Kiani Direct ¶ 212, and has provided no convincing explanation for why Plaintiffs did not at least attempt to investigate at that time.

Of course, even had Plaintiffs timely brought this case, it would have failed, because there was no misappropriation by Apple at any point in time.

### D.    Plaintiffs Are Not Entitled To An Injunction Or Any Other Relief

### 1.    Plaintiffs Are Barred From Receiving An Injunction

As detailed above, Plaintiffs have failed to meet a host of merits requirements, mooting the question of remedies. Even if the many evidentiary gaps in Plaintiffs' liability case were filled, however, Plaintiffs failed to timely identify facts or legal theories that would support an injunction or even put Apple on notice as to the scope of the injunction being sought. Plaintiffs' operative complaint makes only one reference to an injunction and—even then—describes Plaintiffs' requested relief at a high-level of generality. *See* Dkt. 296-1 at 132. Apple accordingly served Interrogatory No. 17 on April 14, 2020, which asked Plaintiffs to "[s]tate *in detail* all factual and legal bases for Your contention that You are entitled to any relief in this case, including … injunctive relief." Dkt. 2181-2 at 5. Plaintiffs supplemented their response to Interrogatory No. 17 nine times before the 2023 trial and three times after that, but they never identified

---

[20] The word "worry" is virtually synonymous with "suspicion." *See* Black's Law Dictionary (12th ed. 2024) (defining "suspicion" as "[t]he *apprehension* or imagination of the existence of something wrong based on inconclusive or slight evidence, or *possibly even no evidence*").

their purported basis for seeking an injunction.  *Id.* at 6, 13, 20-21.  The first time Plaintiffs articulated the legal and factual bases for their injunction request was in their October 29, 2024 Proposed Findings Of Fact And Conclusions Of Law.  *See* PF-C [FOF] at ¶¶ 335-348; *id.* [COL] ¶¶ 69-81.  These theories, disclosed only one week before the ***retrial***, are thus "untimely and should be excluded under Rule 37(c)(1)."  Dkt. 1526 at 1 (excluding part of Apple's unclean hands defense shortly before April 2023 trial); *see also Yeti by Molly Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106-1108 (9th Cir. 2001) (discussing FRCP 37).

Plaintiffs cannot prove that "[]either of the[] exceptions" to Rule 37(c)(1)— substantial justification or harmlessness—"applies here."  *Yeti*, 259 F.3d at 1106-1108. ***First***, there can be no justification for more than four years of silence on the metes-and-bounds of the remedy that Plaintiffs' lead counsel now asserts was "***the*** goal of th[is] case."  11/5 AM Tr. [Opening] 30:17-31:14 ("Forget about the money.  It was a diversion.").  ***Second***, Plaintiffs' delay was not harmless.  By refusing to provide clarity regarding their request for injunctive relief over four years, Plaintiffs deprived Apple of the opportunity to take discovery on Plaintiffs' (still vague) theories of harm or to put on an expert witness.

## 2.    Plaintiffs Are Not Entitled To An Injunction Under *eBay*

**a.    *eBay* Factor 1: No irreparable injury.**  Plaintiffs have not identified a coherent, non-speculative theory of irreparable harm.  *See, e.g.*, *San Miguel Pure Foods Co., v. Ramar Int'l Corp.*, 625 F. App'x 322, 327 (9th Cir. 2015) (reversing grant of permanent injunction where "district court's finding of irreparable harm was based on the speculation that 'Ramar ***would*** effectively lose control over the Magnolia brand'") (emphasis in original) (quotation marks and citation omitted).  Plaintiffs' Proposed Findings list a half-dozen future "risk[s]" or hypothetical scenarios where Plaintiffs "would be harmed," *see* PF-C [FOF] ¶¶ 323-325; *id.* [COL] ¶ 76, but this is pure attorney argument.  *See also, e.g.*, PF-C [FOF] ¶¶ 324, 325, 329 ("Masimo ***would*** have to compete against...," "Masimo ***would*** be harmed if Apple ███████████████ "This

*would* cause a chilling effect").  Plaintiffs have ***never*** clearly explained how they have been harmed by Apple's purported misappropriation of any of the five alleged trade secrets, and they adduced no non-speculative testimony or evidence that they will be harmed in the future.  *See* AF-C ¶¶ 226-237.  While Plaintiffs assert (based on a few conclusory statements from Mr. Kiani) that future misappropriation would chill Plaintiffs' engineers' willingness to collaborate, PF-C [FOF] ¶ 329; *see also id.* [COL] ¶ 76, this is again highly speculative.  Regardless, Plaintiffs do not explain why a legal remedy would not prevent that supposed chilling effect.  Finally, while Plaintiffs contend that they suffered a "reduction in demand for [their] technology" when the Blood Oxygen feature was introduced on Apple Watch, PF-C [FOF] ¶ 327, Plaintiffs never specifically connected L4, L5, D1, D3, or D10 to the Blood Oxygen feature, nor did they introduce any evidence of the purported reduction.  *See* Dkt. 1841 at 14-16; *see also* Dkt. 2348 at 2 (Court noting lack of "persuasive" evidence that Apple's purported "misappropriation … weakened consumer interest in products with the Masimo health module" or the W1); 11/6 AM Tr. [Muhsin] 98:20-99:6 (Masimo's COO conceding Plaintiffs "are not aware of any sale that Masimo has lost to Apple"); AF-C ¶¶ 229- 234.

Plaintiffs also appear to ask the Court to presume irreparable harm based upon a finding of CUTSA liability.  PF-C [COL] ¶¶ 71-72.  The Ninth Circuit has flatly rejected that argument.  *See Citcon USA, LLC v. RiverPay Inc.*, 2022 WL 287563, at *2 (9th Cir. Jan. 31, 2022) (The "argument … that injunctive relief automatically flows from a successful trade secret misappropriation claim[] is untenable.").  *Citcon* aligns with *eBay*'s prohibition on "categorical rule[s]" when assessing the appropriateness of an injunction.  *eBay Inc. v. MercExchange, LLC*, 547 U.S. at 388, 393 (2006); *see also, e.g.*, *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1149 (Fed. Cir. 2011) ("*eBay* jettisoned the presumption of irreparable harm").

**b. *eBay* Factor 2: Legal remedies are sufficient.**  Plaintiffs had adequate legal remedies to compensate for injury caused by Apple's purported misappropriation—they simply chose not to pursue them.  Plaintiffs consistently argued until recently that their

1    harm could be compensated via money (whether through a reasonable royalty or lost

2    profits) and that any purported benefit to Apple was redressable through an award of

3    unjust enrichment.  *See* Dkt. 2181-1 at 1-2.  CUTSA's injunction provision is not meant

4    to be invoked in such a situation.  *See Robert L. Cloud & Assocs v. Mikesell*, 69 Cal.

5    App. 4th 1141, 1150 (1999) (injunction limited to situations where money would not

6    afford relief or the appropriate amount would be difficult to quantify).  That Plaintiffs

7    have "voluntarily chos[e]n to *forego* a legal remedy" does not "mean that 'no adequate

8    legal remedy' exists," *Bennett v. Isagenix Int'l*, 118 F.4th 1120, 1129 (9th Cir. 2024)

9    (emphasis in original), as a party cannot "bolster its case for equitable relief by

10   abandoning its request for … damages," *TD Bank N.A. v.* Hill, 928 F.3d 259, 282-283

11   (3d Cir. 2019).[21]

12       **c.  *eBay* Factors 3 and 4: The breadth of Plaintiffs' requested injunction**

13   **means the balance of hardships and public interest factors favor Apple**.  Plaintiffs

14   have failed to draw any non-speculative link between the purported trade secrets and

15   any Apple Watch feature, including Blood Oxygen.  *See supra* p. 41.  This is because

16   the purported trade secrets are essentially *de minimis* to Apple Watch's functioning.

17   Even L5—the only purported secret that is even arguably incorporated into Apple

18   Watch—is used in in a single circuit out of over a million and simply to implement a

19   "best practice."  *See supra* pp. 24-25.  In the counterfactual scenario where Plaintiffs

20   actually proved liability and met all the *eBay* factors, an injunction would need to be

21   limited to the particular alleged trade secrets—L4, L5, D1, D3, and D10—rather than

22   Apple Watch as a whole or any feature within Apple Watch.  *See Lamb-Weston, Inc. v.*

23   *McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991) ("Injunctive relief … must be

24   tailored to remedy the specific harm alleged.").  Yet Plaintiffs have sought a broad

25

26   _____

27   [21] Two of Plaintiffs' cases (*Universal* and *Equate*, *see* PF-C [COL] ¶ 73) suggesting
     monetary damages are *per se* insufficient provide no reasoning, much less address
     *eBay*'s bar on categorical rules.   The third (*Trans-World*, *see* PF-C [COL] ¶ 73)
28   summarizes the (outdated) principle that "ordinarily" damages are backwards-looking.
     *But see Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1314 (Fed. Cir. 2007).

injunction that targets *any* "light based monitoring product" that includes or incorporates the purported secrets, which is wholly disproportionate to the purported harm.[22]

The breadth of Plaintiffs' proposed injunctions means the balance of equities weighs in Apple's favor. Plaintiffs have identified no cognizable harm caused by Apple's purported misappropriation. *See supra* pp. 16 n.7, 23 n.11, 31 n.15. By contrast, Plaintiffs' broad requested injunction could potentially limit Apple's ability to sell a fully featured Apple Watch (since nothing but a sliver of Apple Watch (the single short circuit) purportedly uses any of the alleged trade secrets) and harm Apple's position in the marketplace. AF-C ¶ 457.

Relatedly, while the public interest is generally served by protecting trade secret rights, Plaintiffs have identified nothing more specific that weighs in their favor here. By contrast, a broad injunction could well "disrupt related third-party businesses, such as [Apple's] suppliers and customers," as well as "the retail sellers of" Apple Watches. *Fractus, S.A. v. Samsung Electronics Co.*, 876 F. Supp. 2d 802, 854 (E.D. Tex. 2012). Moreover, Plaintiffs' requested injunction would disrupt consumers' access to the broad set of technologies in Apple Watch, including its health-and-wellness features.

### 3.     If Any Party Should Receive Attorney's Fees, It Is Apple

Plaintiffs' request for attorney's fees and costs pursuant to CUTSA should be rejected because they have not come close to proving any misappropriation, let alone proving by clear and convincing evidence that Apple engaged in willful and malicious misappropriation. Dkt. 1723 at 19; *see also* AF-C ¶¶ 466-472. For all the reasons discussed above, Apple did not misappropriate anything, and did not have the requisite intent for run-of-the-mill misappropriation, much less a specific "inten[t] … to cause

---

[22] It is undisputed that Weber 2018 discloses D1, *see* Madisetti Direct ¶ 202, and that the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Apple undisputedly uses neither and *wasted* resources assessing Dr. Lamego´s proposal. *See supra* p. 30. Neither D1 nor D10 can be the subject of injunctive relief, because CUTSA requires an "injunction shall be terminated when the trade secret has ceased to exist." Cal. Civ. Code § 3426.2.

1   injury to [Plaintiffs]" or to behave in a "[d]espicable[,] … vile and wretched" manner.
2   *Ajaxo Inc. v. E\*Trade Grp. Inc.*, 135 Cal. App. 4th 21, 66 (2005); *see supra* pp. 32-36.

3          Plaintiffs' "evidence" to the contrary rests on nothing but strained inference and
4   baseless innuendo.  PF-C [FOF] ¶¶ 375-384.  For example, that Dr. Lamego was offered
5   more compensation than someone of his level normally would receive was a function of
6   the fact that Dr. Lamego took a step down in title to work in a non-executive role at
7   Apple.  *See supra* p. 33.  Moreover, while Plaintiffs make sweeping generalizations
8   about Apple's procedures for ensuring new products do not infringe others intellectual
9   property, the record here shows that Apple did everything it could to avoid obtaining
10  Plaintiffs' confidential information from Dr. Lamego—and succeeded.  *See* AF-C ¶¶ 12,
11  15-18, 27 (noting that Apple repeatedly instructed Dr. Lamego not to share Plaintiffs'
12  confidential information and required him to sign an agreement to that effect).  As yet
13  another example, while Plaintiffs imply Apple ignored their January 2014 letter asserting
14  that Apple had hired Dr. Lamego to acquire Plaintiffs' purported trade secrets, Dr.
15  Lamego testified that his Apple colleagues "were very concerned" about intellectual
16  property issues "because of the letter [Plaintiffs] sent [his] first week" at Apple and that
17  he had to meet with "a lot of attorneys."  11/7 PM Tr. [Lamego] 100:4-16.

18         Regardless whether Plaintiffs could meet their burden, a fees award is always
19  discretionary under CUTSA.  *EnerTrode, Inc. v. Gen. Capacitor Co*., 2019 WL
20  1715170, at \*10 (N.D. Cal. Apr. 17, 2019) (denying fees).  This Court recognized as
21  much in *True Wearables* when it concluded that awarding fees and costs would be
22  inequitable because, as here, "Plaintiffs drove the trajectory of this case in a manner that
23  required both parties to spend a significant amount on attorney's fees as they prepared
24  for trial" and by the time of trial years later, Plaintiffs had "whittled their intellectual
25  property case down to a handful of trade secrets" and a few patent claims.  2022 WL
26  17083396, at \*33.  As in *True Wearables*, "it would be inequitable to award Plaintiffs
27  attorney's fees in a trade secrets case they seemingly protracted for years, only to forego

28

1    the right to damages and demand a bench trial over Defendants' objection in the end."

2    *Id.*[23]

3          If any party should receive fees, it is Apple. Cal. Civ. Code § 3426.4 "authorizes

4    attorney's fees when 'a claim of misappropriation is made in bad faith.'" *Direct Techs.,*

5    *LLC v. Elec. Arts, Inc.*, 836 F.3d 1059, 1071 (9th Cir. 2016). Attorney's fees "may be

6    proper even if the claim is not frivolous" and even if the claim "superficially appear[s]

7    to have merit." *Id.* The test is whether the plaintiffs' claim is objectively specious and

8    whether the plaintiff had "subjective bad faith in bringing or maintaining the claim." *Id.*

9          Here, Plaintiffs spent five years litigating a CUTSA claim that initially involved

10   dozens of alleged trade secrets. Of the ten alleged secrets Plaintiffs ultimately brought

11   to trial, this Court already held that no reasonable jury could have found liability on five.

12   Dkt. 1724 at 5-7; Dkt. 1901 at 11-12. Moreover, Plaintiffs have—on the eve of the

13   retrial—waived without clear explanation the right to seek monetary relief that they once

14   claimed was worth billions. *See* Dkt. 2076; Dkt. 2078 at 2. At the retrial, Plaintiffs'

15   lead counsel told the Court to "[f]orget about the money," describing these requests—

16   which had been the subject of time- and resource-intensive litigation for years—as just

17   "a diversion." 11/5 AM Tr. [Opening] 30:22-23. Plaintiffs also failed to state a viable

18   trade secret claim for numerous reasons, and they resorted to shape-shifting at trial in a

19   final, failed effort to find a thread running from Plaintiffs, through Dr. Lamego, to Apple.

20   *See generally,* Dkt. 2345. In short, Plaintiffs' trade secret claim is clearly meritless, and

21   its method of litigating that claim "raises an inference of subjective bad faith," including

22   "the intention of causing unnecessary delay" and a "purpose of harassing [Apple],"

23   *Gemini Aluminum Corp. v. Cal. Custom Shapes, Inc*., 95 Cal. App. 4th 1249, 1263

24   (2002). Apple reserves the right to file a motion for fees at the appropriate time.

25

26

27   _____

28   [23] Because Plaintiffs are not entitled to attorney's fees—the only monetary relief left that
     they have not waived or forfeited—they logically are not entitled to post-judgment
     interest on that fee award.

Wilmer Cutler
Pickering Hale
and Dorr LLP

APPLE'S POST-TRIAL BRIEF
                                        45                    CASE NO. 8:20-cv-00048-JVS (JDEx)

## II. PLAINTIFFS HAVE NOT PROVEN THAT MR. DIAB CO-INVENTED OR THAT PLAINTIFFS CO-OWN THE APPLE PATENTS

While Plaintiffs assert that Mohammed Diab should be a named co-inventor on four Apple patents—i.e., the same patents that he testified at the April 2023 trial he had "no idea" whether he should be so named, *e.g.*, 4/7/23 Trial Tr. [Diab] 26:4-27:2, 30:18-32:7, and did not address at all in his direct testimony—they not have come close to meeting the "heavy burden" of proving by clear and convincing evidence that Mr. Diab made a significant contribution to at least one of the claims of each patent. *See Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1358-1359 (Fed. Cir. 2004); Dkt. 1715 at 51-52 (Court's Instruction No. 41). Nor have Plaintiffs shown by a preponderance of the evidence that Dr. Lamego developed his contribution to the five Apple patents while employed by Cercacor. *See* Dkt. 1715 at 53 (Court's Instruction No. 42). Rather, Dr. Lamego's work was done at Apple, and was inspired by the special challenges posed by a wearable device like Watch.

### A. The Reflective Treatments Applied To Apple Watch That Are Claimed In The '052 and '670 Patents Were Not Invented By Mr. Diab, Nor Are They Co-Owned By Plaintiffs

The concepts underlying U.S. Patent Nos. 10,078,052 and 10,247,670 were invented in 2014 by a team of Apple engineers, including Trevor Ness and Dr. Lamego. JTX-1239, JTX-1241. At a high level, the patents describe various ways to use a reflective treatment on the back of Apple Watch to improve the accuracy of the heart rate sensor. Ness Direct ¶¶ 30-31; *see also* AF-C ¶¶ 258-259.

When Dr. Lamego joined Apple, Mr. Ness and his team were already working on methods to increase the signal and decrease the noise collected by Watch's optical heart sensor. Ness Direct ¶ 31. While Mr. Ness determined the right materials and location for the reflective treatment and others on the team tested prototypes and worked on the production process, Dr. Lamego's contribution to this effort was modest—he came up with the initial idea of applying reflectivity to the back of Watch, although he failed to

provide any specific idea for locations or how to do so. *Id.* ¶¶ 24-28. In fact, Dr. Lamego's role was so limited that Mr. Ness (the team leader) has only ever interacted with Dr. Lamego on two occasions. *Id.* ¶ 46.

Notably, there is no evidence that Dr. Lamego did any work while employed by Plaintiffs that relates to his specific contribution to the '052 and '670 patents—i.e., using reflectivity on the back of a smartwatch—because there is no evidence that Dr. Lamego ever worked on any wrist-worn device while at Masimo or Cercacor. Warren Direct ¶ 164 (discussing Madisetti Direct ¶ 273). Accordingly, there is no basis to award Plaintiffs any ownership stake in either patent based on Dr. Lamego's contribution.

Nor is there any evidence that Mr. Diab contributed anything at all to the '052 or '670 patents, let alone that he made a "contribution [that] was significant in quality as measured against the scope of the full invention," as required. Dkt. 1715 at 51 (Court's Instruction No. 41). Mr. Diab was not involved in the work that Mr. Ness's team did at Apple in 2014, nor did he communicate with any Apple employee regarding the patents' concepts when they were under development. Ness Direct ¶ 29. At most, Mr. Diab and Dr. Lamego had previously discussed high-level concepts regarding reflectivity. However, those same concepts were well known in the prior art, including as a result of Masimo's TF-I reflectance sensor, which was released in 2003. AF-C ¶ 266. As the Court instructed the jury at the first trial, "if someone only explains to the actual inventors well-known concepts or the current state of the art, then he or she is not a joint inventor." Dkt. 1715 at 52 (Court's Instruction No. 41).

## B. Plaintiffs Failed To Prove That They Co-Own The '754 Patent

Dr. Lamego invented the concepts underlying U.S. Patent No. 10,219,754 after he left Cercacor and began working for Apple. At a high-level, the '754 patent claims methods and systems for modulation and demodulation of optical signals. JTX-1262. While Plaintiffs assert that Dr. Lamego invented the '754 patent while in their employ, contemporaneous evidence shows his work was done at Apple. For example, Figure 7 of the patent contains the same subject material that appears in an internal Apple

presentation.  AF-C ¶ 269.  Other concepts disclosed in the patent appear in a MATLAB script that Dr. Lamego wrote while employed at Apple.  *Id.*  These documents corroborate Dr. Lamego's testimony that he developed the demodulation technique that appears in claim 1 of the '754 patent to address a specific challenge posed by Apple Watch.  *See id.*

C. **Mr. Diab's Discussions With Dr. Lamego About Prior Art Do Not Make Mr. Diab A Co-Inventor Or Plaintiffs Co-Owners Of The '095 and '390 Patents**

Mr. Hotelling and Dr. Lamego jointly developed U.S. Patent Nos. 9,952,095 and U.S. Patent No. 11,009,390 while working together at Apple.  At a high level of generality, the two patents claim signal processing methods for optical sensors that can estimate or determine a user's physiological parameter (e.g., heart rate).  *See* AF-C ¶ 246.

Dr. Madisetti testified that Mr. Diab should be named a co-inventor of these patents on the basis of matching certain claim limitations from the '095 and '390 patents with certain disclosures from two prior Masimo patents on which Mr. Diab was one of several listed inventors (the '272 patent and the '924 publication, publicly disclosed in 1997 and 2006, respectively).  AF-C ¶ 250.  But this testimony is deficient because it at most shows that Mr. Diab could have explained to Dr. Lamego concepts that were long known to a person skilled in the art.  Sarrafzadeh Direct ¶ 197.  Indeed, Dr. Madisetti acknowledged that the ideas he believes Mr. Diab conveyed to Dr. Lamego involve well-known aspects of a physiological sensor.  *Id.* ¶ 199.  However, "a purported inventor must show that he … 'did more than merely explain to the real inventors well-known concepts and/or the current state of the art.'"  *Acromed Corp. v. Sofamor Danek Grp., Inc.*, 253 F.3d 1371, 1379 (Fed. Cir. 2001) (quoting *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1351 (Fed.Cir.1998)).  To be sure, "partial contributions to conception over time" may give rise to inventorship where a putative co-inventor was engaged in "collaboration [that] spans a period of time and … involve[d] multiple contributions."

*Dana-Farber Cancer Inst., Inc. v. Ono Pharm. Co.*, 964 F.3d 1365, 1372-1373 (Fed. Cir. 2020).[24]    But here, no record evidence establishes that Mr. Diab actually communicated any of the '095 and '390 patents' claim limitations to Dr. Lamego, as opposed to Dr. Lamego understanding these concepts from his education and experience outside of Plaintiffs' employ.  Sarrafzadeh Direct ¶ 198.

Plaintiffs also failed to prove that Dr. Lamego worked for them when he invented the concepts he contributed to the '095 and '390 patents.  The evidence related to Dr. Lamego and Mr. Hotelling's development of the concepts claimed in the '095 and '390 Patents instead reflects that the work was conducted at Apple.  Hotelling Direct ¶ 74; Sarrafzadeh Direct ¶ 200.  As just one example, a figure that appears in both patents is similar to a figure Dr. Lamego created for a brainstorming session with Apple colleagues on March 3, 2014.  *See* AF-C ¶ 248.

## CONCLUSION

This Court should grant judgment in Apple's favor on Plaintiffs' CUTSA claim and inventorship and ownership claims.  Plaintiffs' requests for injunctive relief, attorney's fees and costs, and prejudgment interest should be denied as moot.  If any party should be awarded fees and costs, it is Apple.

---

[24] Plaintiffs wrongly argue that "[s]omeone can be a co-inventor even if he 'placed his contribution in the prior art more than one year before' making his contribution."  PF-C [COL] ¶ 42 (quoting *Pannu*, 155 F.3d at 1351).  *Pannu* held no such thing.  Rather, *Pannu* held that a putative co-inventor did "more than simply provid[e] … well-known principles or explain[] the state of the art," and it was "undisputed that the invention was conceived while [they] were engaged in a collaborative enterprise."  155 F.3d at 1351.

1     Dated:  December 19, 2024               Respectfully submitted,

2

3                                            MARK D. SELWYN
4                                            AMY K. WIGMORE
                                             JOSHUA H. LERNER
5                                            JOSEPH J. MUELLER
6                                            SARAH R. FRAZIER
                                             NORA Q.E. PASSAMANECK
7                                            THOMAS G. SPRANKLING
8                                            WILMER CUTLER PICKERING HALE AND
                                             DORR LLP
9
10                                           BRIAN A. ROSENTHAL
                                             GIBSON, DUNN & CRUTCHER LLP
11
12                                           KENNETH G. PARKER
                                             HAYNES AND BOONE, LLP
13

14

15                                           By: */s/ Mark D. Selwyn*
16                                               Mark D. Selwyn

17
                                             *Attorneys for Defendant Apple Inc.*
18

19

20

21

22

23

24

25

26

27

28

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Defendant Apple, Inc., certifies that this brief is 49 pages long, which:

___ complies with the word limit of L.R. 11-6.1.

X_ complies with the 50 page limit set by court order dated November 26, 2024.

Dated: December 19, 2024          Respectfully submitted,

MARK D. SELWYN
AMY K. WIGMORE
JOSHUA H. LERNER
JOSEPH J. MUELLER
SARAH R. FRAZIER
NORA Q.E. PASSAMANECK
THOMAS G. SPRANKLING
WILMER CUTLER PICKERING HALE AND DORR LLP

BRIAN A. ROSENTHAL
GIBSON, DUNN & CRUTCHER LLP

KENNETH G. PARKER
HAYNES AND BOONE, LLP


By: /s/ Mark D. Selwyn
    Mark D. Selwyn